# Exhibit D

Page 1

1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3    HOUSTON AREA URBAN           )
     LEAGUE, et al.,              )
4         Plaintiff,              )
                                  )
5    VS.                          ) Civil Action No.
                                  ) 5:21-cv-0848-XR
6    GREG ABBOTT, et al.,         )
          Defendant.             )

7

8

       *************************************************
9           ORAL AND VIDEOTAPED IN-PERSON AND
             REMOTEDEPO™/VIDEOCONFERENCE OF
10
                 SENATOR BRYAN HUGHES
11
                   APRIL 19, 2022
12     *************************************************

13       ORAL AND VIDEOTAPED IN-PERSON AND

14   REMOTEDEPO™/VIDEOCONFERENCE OF SENATOR BRYAN HUGHES,

15   produced as a witness at the instance of the Plaintiff,

16   and duly sworn, was taken in the above-styled and

17   numbered cause on April 19, 2022, from 10:16 a.m. to

18   7:09 p.m., before Kim Seibert, CSR in and for the State

19   of Texas, reported by machine shorthand, at the PRICE

20   DANIEL, SR. STATE OFFICE BUILDING, 209 West 14th

21   Street, Austin, Texas, pursuant to the Federal Rules of

22   Civil Procedure and the provisions stated on the record

23   or attached hereto.

24

25

Senator Bryan  Hughes
April 19, 2022                                    2 to 5

```
 1            A P P E A R A N C E S
 2
    FOR THE PLAINTIFF HOUSTON AREA URBAN LEAGUE:
 3      Mr. Kenneth E. Broughton
        Ms. Keely Dulaney
 4      REED SMITH, LLP
        811 Main Street
 5      Houston, Texas 77002
        (713) 469-3819
 6      kbroughton@reedsmith.com
        kdulaney@reedsmith.com
 7
 8  FOR THE LUPE PLAINTIFFS:
        Ms. Nina Perales
 9      MALDEF
        110 Broadway Street
10      Suite 300
        San Antonio, Texas 78205
11      (210) 224-5476
        nperales@maldef.org
12
13  FOR SENATOR BRYAN HUGHES AND THE STATE DEFENDANTS:
        Mr. Patrick K. Sweeten
14      Mr. Eric A. Hudson
        Mr. Jack DiSorbo
15      TEXAS ATTORNEY GENERAL'S OFFICE
        P.O. Box 12548
16      Austin, Texas 78711
        (512) 463-4139
17      patrick.sweeten@oag.texas.gov
        eric.hudson@oag.texas.gov
18      jack.disorbo@oag.texas.gov
19
    ALSO PRESENT:
20      Brent Kirby - Videographer
        Dana Paikowsky (Via Zoom)
21      Camryn Pak (Via Zoom)
        Courtney Hostetler (Via Zoom)
22      Wendy Olson (Via Zoom)
        Georgina Yeomans (Via Zoom)
23      Jason Kanterman (Via Zoom)
        Liliana Zaragoza (Via Zoom)
24      Haley Costello-Essig (Via Zoom)
        Tony Nelson (Via Zoom)
25      Fatima Menendez (Via Zoom)
```

```
 1  REPORTED BY:
 2      Kim Seibert, CSR, RPR
 2      U.S. Legal Support, Inc.
        KimBowenCSR@yahoo.com
 3      (512) 788-8627
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    INDEX
 2  Appearances.....................................   2
 3
 4  SENATOR BRYAN HUGHES
 5
 6  Examination by Mr. Broughton....................  10
    Examination by Ms. Perales......................  222
 7  Witness' Signature Page.........................  305
    Reporter's Certificate..........................  307
 8
 9
10                   EXHIBITS
11  NUMBER       DESCRIPTION                        PAGE
12  Exhibit 1    ..............................       157
                 Texas Civil Rights Project
13  Exhibit 2    Testimony on S.B. 1               164
14               ..............................
                 Letter from the Democratic
15  Exhibit 3    Caucus regarding S.B. 7 dated      167
                 3/31/21
16               ..............................
                 David Weinberg's Testimony
17  Exhibit 4    before the Texas State Affairs     172
                 Committee on Senate Bill 1113
18               dated 3/22/21
19  Exhibit 5    ..............................       174
                 Testimony on S.B. 7 by the Texas
20               Civil Rights Project dated
                 3/26/21
21  Exhibit 6    ..............................       176
22               The False Narrative of
    Exhibit 7    Vote-by-Mail Fraud from Brennan    178
23               Center for Justice
24               ..............................
25               Letter from the Texas
                 Association of Elections
                 Administrators dated 7/1/21
                 ..............................
                 Document by Jolt Action
```

```
 1  Exhibit 8    ..............................       179
                 Letter from Lauren Gerken with
 2               Texas Council for Developmental
                 Disabilities and Members of the
 3               Committee dated 3/22/21
 4  Exhibit 9    ..............................       180
                 Letter from the Anti-Defamation
 5               League dated 3/26/21
 6  Exhibit 10   ..............................       181
                 Testimony on S.B. 1 from the
 7               Texas Civil Rights Project
 8  Exhibit 11   ..............................       184
                 Temporary Senate Rules
 9  Exhibit 12   ..............................       198
                 S.B. No. 1
10  Exhibit 13   ..............................       218
                 Article entitled "New ballot
11               causes voter confusion, East
                 Texas election administrators
12               say"
13  Exhibit 14   ..............................       221
                 Texas Tribune Article dated
14  Exhibit 15   4/6/22                            230
15               ..............................
    Exhibit 16   Texas Election Results            231
16               ..............................
17  Exhibit 17   Race Summary Report from the       254
                 2016 General Election, dated
18  Exhibit 18   11/8/16                           255
19               ..............................
    Exhibit 19   Oath of Assistance signature       272
20               page
21  Exhibit 20   ..............................       275
22               Oath of Assistance
23               ..............................
24               Subpoena to Produce Documents,
25               Information, or Objects, or to
                 Permit Inspection of Premises
                 in a Civil Action
                 ..............................
                 Office of the Attorney General
                 of Texas, Election Fraud
                 Violations, Prosecutions
                 Resolved
```

Senator Bryan  Hughes
April 19, 2022                                              6 to 9

---

**Page 6**

1           THE VIDEOGRAPHER:  Stand by.  This is the
2   videotaped oral deposition of Senator Bryan Hughes.
3   Today's date, April 19th, 2022.  The approximate time,
4   10:16 a.m. Central Standard time.  We're recording and
5   on the record.
6           If counsel would now introduce
7   themselves.
8           MR. BROUGHTON:  My name is
9   Kenneth Broughton of the law firm of Reed Smith.  I'm
10  one of the attorneys representing the plaintiffs in
11  this lawsuit, Houston Area Urban League versus Abbott,
12  et al.
13          MS. PERALES:  I'm Nina Perales for the
14  LUPE plaintiffs.
15          MR. SWEETEN:  Okay.  So it appears we
16  have some folks on the -- on the Zoom screen.  Can
17  you-all please -- I guess maybe a way to do it would be
18  to ask if you want -- I mean, why don't you go ahead
19  and introduce yourself and tell us who the parties that
20  you represent are.
21          We've got Ms. Pak, it looks like, or
22  Mr. Pak.
23          MS. PAK:  Hi, everyone.  My name is
24  Camryn.  I am an intern at the Justice Department, and
25  I'm just here taking notes on the deposition.

**Page 7**

1           MR. SWEETEN:  Okay.  So you are with the
2   Justice Department.  Okay.  Thank you.
3           Then we have Ms. Olson.
4           MS. OLSON:  Wendy Olson, Stoel Rives.  We
5   are here for the plaintiffs.  Courtney Hostetler for
6   the Free Speech For People is also with the plaintiffs.
7   And we will be in and out of the deposition and don't
8   plan to ask any questions.
9           MR. SWEETEN:  Okay.  Ms. Hostetler?
10  Courtney Hostetler, who do you represent?
11          MS. OLSON:  Sir, I just covered her.  She
12  may be on --
13          MR. SWEETEN:  Okay.  Very good.
14          MS. OLSON:  Ms. Hostetler, we both are
15  here for the plaintiffs.
16          MR. SWEETEN:  Thank you, Wendy.
17          Okay.  Georgina Yeomans?
18          MS. YEOMANS:  Good morning.
19  Georgina Yeomans on behalf of the Houston Area Urban
20  League.  I don't -- I'm not going to be asking any
21  questions today.
22          MR. SWEETEN:  Thank you.
23          Jason Kanter -- I'm sorry -- Kanterman?
24          MR. KANTERMAN:  Good morning.  Yes,
25  Jason Kanterman from Fried, Frank, Harris, Shriver &

---

**Page 8**

1   Jacobson in New York City.  I represent the LUPE
2   plaintiffs.  And to the extent we have any questions my
3   colleague, Nina Perales, will be handling it.
4           MR. SWEETEN:  Okay.
5           Liliana Zaragoza?
6           MS. ZARAGOZA:  Yes.  Hello.  I'm with the
7   NAACP Legal Defense Fund, and I represent the Hall
8   plaintiffs.  (Inaudible) will be asking questions on
9   our behalf today.
10          MR. SWEETEN:  Okay.
11          Haley Costello?  We'll skip her.
12          Tony Nelson?
13          MR. NELSON:  Yes, Tony Nelson, assistant
14  Travis County attorney.  He and I represent the Travis
15  County defendants, Travis County District Attorney
16  Garza, and Travis County Clerk Guerrero,
17  Rebecca Guerrero.
18          MR. SWEETEN:  Okay.
19          Haley Costello?  Okay.  Still don't know
20  who she's representing.
21          Let's see.  Fatima Menendez?
22          MS. MENENDEZ:  Good morning.
23  Fatima Menendez, attorney with MALDEF.  I will not be
24  speaking today.  MALDEF represents some of the
25  plaintiffs, and I'm here taking notes for Nina Perales.

**Page 9**

1           MR. SWEETEN:  Okay.  And, finally,
2   Haley Costello, starts with an E, but I can't see the
3   last name.  Does anybody know who she represents?
4           MS. OLSON:  Yeah, that's
5   Haley Costello-Essig.  I think she also is with the
6   LUPE plaintiffs.  And it looks like she's having
7   trouble connecting with the audio anyway, so that might
8   be the challenge there.
9           MR. SWEETEN:  Okay.  I think that's --
10  she's not with the LUPE plaintiffs, I'm told.
11          MS. OLSON:  I'm sorry.  LULAC.  My
12  mistake.
13          MR. SWEETEN:  LULAC.  Okay.
14          MS. OLSON:  She's with LULAC.  She's with
15  Elias law firm.
16          MR. SWEETEN:  Okay.  I think that's
17  everyone on the Zoom conference right now.  I wanted to
18  make sure I understood who's representing whom.
19          I am Patrick Sweeten.  I am representing
20  Senator Hughes as well as the State defendants in this
21  matter.  With me is attorney Eric Hudson and attorney
22  Jack DiSorbo.
23          Okay.  Introductions complete, I guess
24  we'll turn it over to Mr. Broughton.
25          THE STENOGRAPHER:  Okay.  If you'll raise

---

Page 10

1   your right hand, please.
2              SENATOR BRYAN HUGHES,
3   having been first duly sworn, testified as follows:
4              EXAMINATION
5   BY MR. BROUGHTON:
6       Q.   Senator, where do you live?
7       A.   Mineola, Texas.
8       Q.   All right.  You lived there your whole life?
9       A.   Well, away for -- no, not my whole life.
10      Q.   So where were you born?
11      A.   Quitman, Texas.
12      Q.   Okay.  And how long have you lived in Mineola?
13      A.   For about the last 20 years.
14      Q.   And where is your current law office?
15      A.   Tyler, Texas.
16      Q.   Okay.  Tell us very -- give me your employment
17  background, if you would, please.
18      A.   So -- are you -- so just so I'm clear --
19      Q.   Once you got out of law school.
20      A.   Okay.  Got it.
21      Q.   All right.
22      A.   Very good.  So I was -- I graduated law school
23  in 1995, and I was a law clerk for
24  Judge William Steiger, Eastern District of Texas, Tyler
25  Division, from '95 to '97.  From '97 to '98 I practiced

Page 11

1   law in Marshall with Franklin Jones and Mike Miller.
2       Q.   Let me stop you there.
3       A.   Okay.
4       Q.   And you're a litigator?
5       A.   Yes, sir.
6       Q.   Okay.  And so what -- what sorts of cases were
7   you working on for them in '97 and '98?
8       A.   '97, '98 we were doing products liability;
9   personal injury; wrongful death; FELA, railroad --
10  representing railroad workers; and multi law.  So
11  generally plaintiffs' work.
12      Q.   Okay.  And then after '98, what -- what did
13  you do next?
14      A.   From roughly '98 to '01 I was at the Wellborn
15  Houston law firm in Henderson, Texas.
16      Q.   And what sort of cases were you working on
17  there?
18      A.   Again, litigation on the plaintiffs' side;
19  products liability, wrongful death, there with an
20  emphasis on toxic torts and, in particular, asbestos
21  litigation.
22      Q.   All right.  After '01 where did you go next?
23      A.   I was on my own for a few years, and then --
24  back in Mineola, Texas, in my home town, opened an
25  office there.

Page 12

1       Q.   A solo practitioner?
2       A.   That's correct, yes, sir.
3       Q.   Okay.
4       A.   And a general civil practice there.
5   Litigation, but, you know, whatever the Lords sends, a
6   small-town practice.  And then -- that was roughly '01
7   to '03, as I recall.
8       Q.   Okay.  And then '03 you were elected to the
9   Legislature, right?
10      A.   Well, I wasn't elected -- that's right,
11  elected in '02 and then sworn in '03.  Now, I continued
12  to practice law.  I don't know if that's relevant or
13  not, but I want to make sure I'm giving you full
14  answers.
15      Q.   Sure.  No, I know most people continue to --
16      A.   Okay.
17      Q.   -- continue their employment.  So did you
18  continue your solo practice -- well, you said '01
19  through '03 solo practice in Mineola.  What did you do
20  after that?
21      A.   In '03 I joined the Lanier Law Firm based in
22  Houston, though I practiced out of the office in
23  Longview.
24      Q.   Okay.  And what sort of cases did you work on
25  for the Lanier Law Firm?

Page 13

1       A.   Again, litigation on the plaintiffs' side,
2   primarily representing folks who had been exposed to
3   asbestos or the families of those who had died from
4   exposure to asbestos.  A few other cases, but mostly
5   toxic tort asbestos exposure.
6       Q.   Okay.  And how long did you work for the
7   Lanier firm?
8       A.   As I recall, that was roughly '03 to '08.
9       Q.   All right.  And what did you do after '08?
10      A.   Then back into solo practice in '08.
11      Q.   In Mineola?
12      A.   Yes, sir, that's right.
13      Q.   All right.  Same sorts of cases?
14      A.   Yes, that's correct.
15      Q.   And how long did -- is that what you did from
16  '08 to the present?
17      A.   Well, no, sir.  There's been a couple others
18  in between there.
19      Q.   Okay.  Keep going, if you would.
20      A.   Okay.  So -- and I'm -- around 2016 I joined
21  the firm of Beard & Harris in Tyler, Texas, again
22  general civil -- bless you -- general civil litigation,
23  plaintiffs and defense.  And I was with them until the
24  end of 2019, and at this time I maintain my solo
25  practice, but I'm -- I'm also of counsel to the firm of

Page 14

1  Franklin Scott Conway.  And I've been of counsel with
2  them since the -- roughly the end of 2019, early 2020.
3      Q.   Where are they located?
4      A.   Well, the -- firm is based in DC, offices
5  in Dallas, office in Tyler where I practice.  So
6  multiple offices, but I think officially based in the
7  District of Columbia.
8      Q.   Thanks.  Okay.  So as a litigator myself I
9  know it's -- it's hard to get to trial, although when
10 you're doing plaintiffs' work there's a lot more
11 opportunity.  So how many trials, actual trials, do you
12 think you've participated in?
13     A.   Well, if you mean -- you mean picking a jury
14 or going all the way through verdict?  I just want to
15 make sure I'm answering the right question.
16     Q.   Let's go all the way through verdict.
17     A.   Only taken a handful all the way through
18 verdict.
19     Q.   Okay.  Ten?
20     A.   Not more than ten.  Not more ten, I would say.
21     Q.   Okay.  And would you have been first chair on
22 any of those?
23     A.   Yes.  First chair on some, second chair on
24 some.
25     Q.   All right.  So --

Page 15

1      A.   Or second or third chair on some, but first
2  chair on some, yes.
3      Q.   Sure.  I know the feeling.  So on the trials
4  that you've had, how many -- obviously you've had some
5  that settled during trial?
6      A.   Yes, sir.
7      Q.   So about how many trials do you think you've
8  had that settled or were otherwise disposed of after
9  the jury was impaneled?
10     A.   I bet there's -- I don't know -- half a dozen
11 or so during that time.
12     Q.   Okay.  I assume you've done some bench trials
13 as well?
14     A.   Yes, sir.
15     Q.   Okay.  Most of your practice has been in East
16 Texas?
17     A.   That's correct, yes, sir.
18     Q.   So on the -- on the trials that you first
19 chaired, were they all asbestos cases or any other
20 sorts?
21     A.   Oh, no, sir.  I was -- other -- other
22 litigation matters.  Mostly plaintiffs, some defense,
23 all civil litigation.
24     Q.   Okay.  Personal injury cases?
25     A.   Personal injury, civil rights, and breach of

Page 16

1  contract, I believe, would cover them.
2      Q.   Okay.  And so --
3      A.   That is -- that is not all in one case, but
4  those are the three areas, I think, that cover the
5  cases.
6      Q.   Right.  And I think you mentioned you did some
7  railroad work?
8      A.   Yes, sir.
9      Q.   What sort of railroad work did you do?
10     A.   Well, so representing railroad workers who had
11 been injured in their work under the FELA, the Federal
12 Employees Liability Act, that covers railroad workers.
13 It's -- you know, it's a federal --
14     Q.   Sure.
15     A.   -- that federal statute that governs their
16 employment and injuries.
17     Q.   All right.  What sort of civil rights cases
18 have you been involved in?
19     A.   Well, I was appointed to represent a -- an
20 inmate in the Texas Department of Criminal Justice
21 early in my practice, not long after leaving my
22 clerkship, and I was appointed to represent an inmate
23 who had been -- excessive force was used against him,
24 and I represented him in -- represented him trial in
25 the Eastern District in Tyler.

Page 17

1      Q.   And you said you've been involved in several
2  wrongful death cases?
3      A.   Yes, sir.
4      Q.   And what sort of wrongful death cases?
5      A.   So most of the wrongful death cases, or at
6  least quite a few, would be asbestos cases where
7  someone has contracted a disease from exposure to
8  asbestos and then died from that disease.  I've also
9  represented at least two families that were -- whose
10 loved ones were killed in an automobile accident,
11 really a -- involving an 18-wheeler or a commercial
12 vehicle.  So I think the wrongful death cases I've
13 worked on have been either -- as either toxic
14 tort-related or motor vehicle accident.
15     Q.   Okay.  No railroad -- no railroad wrongful
16 deaths?
17     A.   I've worked at law firms that have handled
18 railroad wrongful death cases.  I don't know if I've
19 personally worked on any of those.  Not -- as I sit
20 here today I don't recall.
21     Q.   And so I assume whether you're doing
22 plaintiffs' work or defense work on these asbestos
23 cases, personal injury cases, or wrongful death cases
24 you've been involved in retaining expert witnesses,
25 right?

Page 18

1    A.   Yes, sir, I have.
2    Q.   Okay.  And you retain expert medical doctors?
3    A.   Yes, that's correct.
4    Q.   And some expert damages witnesses?
5    A.   Yes, sir.
6    Q.   All right.  And why do you retain witnesses in
7    those cases, expert witnesses?
8    A.   Well, if -- forgive me.  Do you want to me to
9    talk about fact witnesses versus expert witness under
10   the rules?  And I just want to make sure I understand
11   the --
12        MR. SWEETEN:  Objection, compound.
13   Q.   (BY MR. BROUGHTON)  I'm happy to -- I'm happy
14   to rephrase.
15        So in these personal injury or wrongful
16   death cases, your asbestos cases, you've said that you
17   would hire expert witnesses to testify on medical
18   issues; is that right?
19   A.   To be precise, I think the treating physicians
20   would normally testify.  So not to split hairs, I don't
21   know if we hired them, but -- but, yes, there were --
22   maybe the treating physician would offer expert
23   testimony.  And there probably were cases where there
24   were other consulting medical experts.  So, yes, I
25   think that's right.  I think you're correct.

Page 19

1    Q.   All right.  And why would you make use of
2    expert witnesses to testify on behalf of your clients?
3        MR. SWEETEN:  Objection compound.
4        Go ahead.
5        THE WITNESS:  Well, under the Rules of
6    Civil Procedure and state and federal court as -- as
7    I've understood them.  Fact witnesses can testify about
8    facts that they have personal knowledge of to offer
9    opinions based on science or other -- other arts.  One
10   must be qualified as an expert witness.  And, of
11   course, under the rules they can offer expert
12   testimony.  And so that's when we would need experts
13   because they're -- this information the jury needs
14   that's not available from a fact witness.  I hope I'm
15   answering your question.
16   Q.   Sure.
17   A.   Is that -- is that what you're looking for?
18   Q.   Sure.
19   A.   Okay.
20   Q.   So -- so in these personal injury or wrongful
21   death cases in the representation of your clients
22   you -- you want input from physicians regarding these
23   injuries or the cause of the asbestos or the cause of
24   death; is that right?
25        MR. SWEETEN:  Objection, compound;

Page 20

1    objection, relevance.
2        Go ahead.  You can answer.
3        THE WITNESS:  In most cases I believe
4    that's true.
5    Q.   (BY MR. BROUGHTON)  Likewise --
6    A.   In most -- forgive me.  In most of those types
7    of cases I believe that's true.
8    Q.   All right.  Likewise, you would retain
9    financial damages type of experts to provide expert
10   testimony regarding lost earnings, life expectation,
11   issues like that, right?
12        MR. SWEETEN:  Objection, vague;
13   objection, compound; objection, relevance.
14        You can answer.
15        THE WITNESS:  We normally have economists
16   testify about damages in those matters you discuss.
17   So, yes, in many cases we do.
18   Q.   (BY MR. BROUGHTON)  Okay.  And why do you find
19   it necessary to retain economists to provide expert
20   testimony in some of the cases that you've been
21   involved in?
22        MR. SWEETEN:  Same objection.
23        THE WITNESS:  In some of the cases I've
24   been involved in the jury needs information that's
25   beyond the knowledge of a fact witness, and so an

Page 21

1    economist is necessary.  As you know, normally most of
2    the parties will present economists and the jury will
3    decide which ones they believe and help render their
4    decision.
5    Q.   Are there any areas that you consider yourself
6    to be an expert on?
7    A.   If -- are we talking about under the Rules of
8    Civil Procedure and Daubert?
9    Q.   Just --
10   A.   Help me --
11   Q.   -- in the normal, everyday definition, your
12   definition of an expert, do you consider yourself to be
13   an expert on any topic?
14   A.   So I have been -- I've offered expert
15   testimony in litigation on attorneys' fees.  As you
16   know, that's not uncommon for attorneys' fees --
17   attorneys to talk about attorneys' fees.  I would
18   not -- if you're talking about under the Rules of Civil
19   Procedure have I been adjudicated by a court to be an
20   expert?  I -- no, I have not.
21   Q.   Okay.  That wasn't my question.
22   A.   Okay.  I'm sorry.
23   Q.   So law practice aside, law degree aside, Rules
24   of Civil Procedures aside, just the -- your everyday
25   understanding of what an expert is, do you consider

Senator Bryan Hughes
April 19, 2022
22 to 25

Page 22

1  yourself to be an expert on any topic under the sun
2  other than on reasonable and necessary attorneys' fees?
3      A.   I -- I've learned a few things in life.  I do
4  not hold myself out as an expert.
5      Q.   Okay.  So do you frequently find it necessary
6  in performing your legislative duties to consult with
7  outside experts on various topics that are of interest
8  to you in performing your legislative duties?
9           MR. SWEETEN:  I'm going to go ahead and
10 assert the objection of legislative privilege.  It's --
11 as you know, based on the subpoena responses, as well
12 as the privilege log that we've supplied you in advance
13 of this deposition, Senator Hughes is going to be
14 asserting the legislative privilege today.  We can talk
15 about where I believe those contours are, but one of
16 those contours is his mental impressions and thoughts
17 about pending legislation he's not going to testify
18 about today.
19          As a general matter, I -- and to the
20 extent that he can provide an answer to that I'm going
21 to let him do that, but I'm also going to assert -- I'm
22 going to object legislative privilege.
23          With that, you can answer if you can.
24          THE WITNESS:  Witnesses often testify
25 before legislative committees, witnesses that have

Page 23

1  specialized knowledge or experience.  There's no formal
2  process that I'm aware of for designating them as
3  experts, but witnesses do often testify on legislation,
4  again, in -- which we might call -- we might broadly
5  refer to them as experts, but I don't know if we're
6  talking about experts in the legal civil litigation
7  sense.
8      Q.   (BY MR. BROUGHTON)  Okay.  Thank you.  And my
9  question, I think, was a little bit different.  All
10 right?  So as a legislator, whether in the House or in
11 the Senate, many different sorts of issues come across
12 your desk, right?
13     A.   Yes, that's correct.
14     Q.   And I'm sure many of them involve areas about
15 which you have very little knowledge, experience, or
16 training, right?
17     A.   That's correct.
18     Q.   So have you on occasion found it helpful to
19 reach out to outside consultants or experts to seek
20 their input to give you a better understanding of these
21 various issues?
22          MR. SWEETEN:  Same objection, same
23 instruction.
24          THE WITNESS:  It is normally our practice
25 to -- to do research, to rely on our Senate staff to do

Page 24

1  research.  I don't -- I don't -- I don't know about
2  seeking out experts, per se.  I don't -- I don't think
3  that's common.
4      Q.   Okay.  And so you say you have a Senate staff,
5  for instance, to do research.  Are there specific
6  staffers who have been assigned to you, or is it a
7  general pool available to all senators?
8      A.   Both.
9      Q.   Okay.  So how many are specifically assigned
10 to you?
11     A.   In the Texas Senate and the Texas House the
12 elected member is given a budget, and within that
13 budget they can hire as many or as few as they can,
14 want to.  In the Texas Senate I have also -- I'm also
15 the chair of the Senate Committee on State Affairs, and
16 that committee also has staff to help handle these
17 matters.  So as far as the staff assigned to me and the
18 Senate Committee on State Affairs, which I'm currently
19 the chair of, there will be around ten full-time staff.
20 Those are the folks who work for the taxpayers but
21 answer directly to me.
22          Beyond that the Texas Senate has lots of
23 support.  There's a senate research division.  They
24 research.  That's what they do.  As you may know, the
25 Texas Legislative Council is made up of attorneys and

Page 25

1  they draft legislation on behalf of members of the
2  House and the Senate.  And so at the Texas Legislative
3  Council different drafting attorneys cover different
4  areas of the law, areas of the code.  And so they're
5  not experts, but they know that section of the code
6  well, and so they are also a resource.  So I would say
7  those are the most common -- those are the most common
8  sources for us when we need information outside our
9  area of expertise.
10     Q.   And if I understood you correctly, you said
11 you have about ten that are assigned specifically to
12 you?
13     A.   That's correct.  To be precise, during the
14 legislative session when the workload is heavier it is
15 customary for the members of the Senate and the House
16 to bring on additional staff for the session only.  And
17 so that number can fluctuate, but ten is pretty close.
18     Q.   And so the ten that are assigned to you, these
19 are people that you personally select?
20     A.   That's correct.
21     Q.   And where do you find these folks?
22     A.   Well, my current staff many of them had worked
23 with me when I was a member of the Texas House and came
24 over with me.  The remaining members of my staff sent
25 their resumes to me when I was elected to the Texas

Page 26

1  Senate but before I took office, and so that's how we
2  found them.
3      Q.   Okay.  And who -- tell us the names of the
4  folk who work for you that you brought over from the
5  House.
6      A.   So my chief of staff is Cody Terry.  He worked
7  with us in the House.  Caroline Harris is -- works on
8  legislation policy with us.  She came over from the
9  House.  Then Isabel McGuffin was with us in the House.
10  She handles administrative matters, district matters.
11  And then our current team, Ray Wilson, who serves with
12  us in the district, worked with us in the House, as did
13  Courtney Smith, who worked with us in the House and is
14  now with us in the Senate.  And she does district
15  matters as well as committee matters and all kinds of
16  stuff here in Austin.
17           To my knowledge, those are my current
18  team members who were with me in the Texas House.  And
19  I'm going to be very embarrassed if I've forgotten
20  someone, and I hope they'll forgive me.
21      Q.   I'll let you write their name in --
22      A.   Thank you.
23      Q.   -- later if you want to.
24      A.   Thank you.
25      Q.   And so that's, I think, five or six folks you

Page 27

1  mentioned.  And who else do you recall is working for
2  you right now that's assigned to you?
3      A.   So Drew Tedford joined us when we got to the
4  Texas Senate.  He's been general counsel.  Now he's
5  the -- he's a lawyer, obviously.  Now he's the director
6  of the State Affairs Committee, which I'm honored to
7  chair.  Burwell Thompson is our legislative director.
8  He joined us when we got to the Texas Senate.
9  Matthew Murdoch joined us our second session in the
10  Texas Senate.  He does -- well, you just asked for the
11  names.  Matthew Murdoch.  And then Caitriana Corkill is
12  a very sharp lawyer, works with us as deputy director
13  of the State Affairs Committee.
14      Q.   How do you spell her last name?
15      A.   Sure.  C-o-r-k-i-l-l.
16      Q.   I did that for the benefit of our wonderful
17  court reporter.
18      A.   Thank you.  Caitriana is C-a-i-t-r-i-a-n-a.
19           THE STENOGRAPHER:  Thank you.
20           THE WITNESS:  Yes, ma'am.
21           And then James Odom handles education
22  policy communications with us and also -- those are --
23  I believe I've -- I believe I've covered our
24  full-time -- our full-time staff.  We have
25  Melina Botello, B-o-t-e-l-l-o, who's a very sharp law

Page 28

1  student, helps us with correspondence and has done
2  research and those matters for us as well.
3      Q.   (BY MR. BROUGHTON)  Did you undertake any
4  preparations to give your deposition?
5      A.   Yes.
6      Q.   And without telling us the content of any
7  discussions with your attorneys, what did you do to
8  prepare for your deposition?
9      A.   So, again, not the content, but I met with my
10  lawyers.
11      Q.   Who did you meet with?
12      A.   My -- two of the lawyers who are representing
13  us here.
14      Q.   Patrick and Eric?
15      A.   That's correct, and -- and one other very
16  sharp lawyer whose name escapes me, but he's with the
17  Attorney General's office.  We -- he -- we also met.
18  And then -- we met in person.  And then before that the
19  same -- I believe the same group, it was a -- had a
20  telephone conversation.
21      Q.   And how long did the telephone conversation
22  last?
23      A.   My -- and I'm calling it telephone.  I was on
24  the phone.  Some of them may have been on Zoom.  My
25  recollection was it was an hour, hour and a half or so.

Page 29

1      Q.   And when was this in-person meeting?
2      A.   The in-person meeting was yesterday.
3      Q.   And about how long did that last?
4      A.   I'm going to say around 2-1/2 to three hours.
5      Q.   You said in the telephone call you were on the
6  phone and others were on Zoom.  You've used Zoom
7  yourself many times, have you not?
8      A.   Yes, sir, I have.  And to be precise, it was
9  the Zoom app that was on my phone and so it was audio
10  only for me.
11      Q.   So you didn't have to comb your hair?
12      A.   Exactly right.
13      Q.   All right.  And I assume you've had quite a
14  few depositions that have been by Zoom or Teams or some
15  virtual process?
16      A.   I have not done a deposition over Zoom, but I
17  know they happen.
18      Q.   All right.
19      A.   Well, let me be precise to answer your
20  question.  I've not done a deposition by Zoom or Teams
21  or any remote other than having lawyers on a
22  speakerphone.  So I've not done that, but I know it
23  happens.
24      Q.   Okay.  And have you had some court hearings or
25  trials by Zoom?

Page 30

1    A.   Mercifully no trials.  Maybe a hearing or two.
2    Q.   All right.
3    A.   By Zoom, that is.
4    Q.   All right.  That's because the Supreme Court
5  of Texas issued such an order allowing that and it was
6  prevalent largely for the last two years around Texas,
7  right?
8    A.   That's correct.
9    Q.   Did you find the Zoom to be reliable?
10   A.   I don't believe -- again, I've not tried a
11 lawsuit via Zoom.  I don't think that's a good idea.
12 You didn't ask my opinion, but -- so I've not tried a
13 lawsuit over Zoom.  Zoom is a great tool.  I guess the
14 reliability depends on your Internet connection.  Help
15 me -- I'm not sure I understand the question.  Did I
16 find it to be reliable?  Help me out.
17   Q.   No.  I think you answered it, yeah.
18   A.   Okay.  Thanks.
19   Q.   So Keely and I had a three-month Zoom trial,
20 yeah.
21   A.   Bless your heart.
22   Q.   But we could wear shorts and flip-flops,
23 right?
24   A.   Well, there's that.  There's that.
25   Q.   Okay.  So did you look at any documents to

Page 31

1  prepare for your deposition?
2           MR. SWEETEN:  Objection, privilege.
3           Don't answer.
4           MR. BROUGHTON:  Are you invoking the
5  legislative privilege?
6           MR. SWEETEN:  I'm actually -- let me be
7  more clear.  I'm -- I'm invoking the attorney/client
8  privileges to the meetings that we had, and documents
9  is specifically your question.  So, yes.  And I'm
10 instructing him not to answer.
11          MR. BROUGHTON:  All right.  So I've been
12 doing this for 30 years --
13          MR. SWEETEN:  Uh-huh.
14          MR. BROUGHTON:  -- and I went to the same
15 law school the Senator went to, and this is the first
16 time anybody has told me that I can't ask what
17 documents were viewed.  But you're sticking by that?
18          MR. SWEETEN:  Understood.  I am.  And we
19 can discuss it at a break if you -- if you, you know,
20 want to --
21          MR. BROUGHTON:  Well, I don't think
22 that's the law, but okay.
23   Q.   (BY MR. BROUGHTON)  So are you refusing to
24 tell me what documents you reviewed in preparation for
25 your deposition?

Page 32

1    A.   I'm following my lawyer's advice.
2    Q.   All right.  Did you listen to any
3  tape-recordings to prepare for your deposition?
4           MR. SWEETEN:  Same instruction.
5    Q.   (BY MR. BROUGHTON)  Are you refusing to answer
6  that question?
7    A.   I am.  I'm following my lawyer's advice.
8    Q.   Did you look at any videos to prepare for your
9  deposition?
10          MR. SWEETEN:  Same instruction.
11          THE WITNESS:  I'm going to follow my
12 lawyer's advice.
13   Q.   (BY MR. BROUGHTON)  So you're refusing to
14 answer that question?
15   A.   I am.
16   Q.   Senator, how many deposition have you taken in
17 your career?
18   A.   I don't have an exact number.  I don't want to
19 say it's scores, but I don't know exactly how many.
20   Q.   More than 100?
21   A.   Probably not more than 100.  I have defended
22 more than 100, but taken, it would be less than 100.
23   Q.   All right.  Have you probably taken
24 50 depositions?
25   A.   Maybe 50.  Maybe 50.  Not more than 50.

Page 33

1    Q.   When you deposed witnesses you asked them what
2  documents they reviewed to prepare for their
3  deposition, didn't you?
4           MR. SWEETEN:  Objection, relevance.
5           THE WITNESS:  It's been a while since
6  I've taken a deposition and I really don't recall.
7    Q.   (BY MR. BROUGHTON)  Really?
8    A.   Yeah.
9    Q.   You don't recall ever asking any witness you
10 deposed, "What documents did you review to prepare for
11 your deposition?"
12          MR. SWEETEN:  Same objection.
13          THE WITNESS:  I don't recall
14 specifically.  It's been a while since I've taken a
15 deposition.
16   Q.   (BY MR. BROUGHTON)  To prepare for your
17 deposition did you talk to anyone other than the
18 lawyers you've told us about?
19   A.   Yes.
20   Q.   Who else did you talk to?
21   A.   So I mentioned to you the Zoom/phone call.
22 Drew Tedford, who's a lawyer who works with us on the
23 Senate staff, was also on that call, and he helped me
24 prepare on that call as well.
25   Q.   That's the only other person that you've

Page 34

1  talked to to prepare for your deposition?
2      A.  That's correct.
3      Q.  You were involved in -- oh, let me ask you
4  this.  Do you have any social media accounts?
5      A.  Yes.
6      Q.  Tell us what each one of those accounts is.
7      A.  So on Facebook, I believe the campaign Senate
8  account is Bryan Hughes Tx.  If I'm using the correct
9  term that is a Facebook page.  Then I have a Facebook
10  profile, which I think is D. Bryan Hughes.  You'll find
11  those two -- those two Facebook pages, sites, are
12  virtually identical.  We've put everything on both of
13  those.  And then I have a Twitter account that is Sen
14  Bryan Hughes.  S-e-n Bryan Hughes.  Someone already had
15  Sen Hughes.  And then on LinkedIn, I don't recall
16  exactly, but if you look -- if you search Bryan Hughes,
17  Bryan with a y, it will come up.  And then Instagram, I
18  believe it is Sen Bryan Hughes on Instagram.  So that's
19  two Facebooks, Twitter, Instagram, LinkedIn.  I believe
20  that's the extent.
21          I'm -- and I think we recently set up an
22  account on GETTR, G-E-T-T-R, if I'm not mistaken, and
23  it is linked to that Instagram account and so
24  everything goes on those.  I believe those are all of
25  my social media accounts.  If I've left one out I

Page 35

1  apologize.  If you -- if you have another one, please
2  tell me, but those are the ones that I'm aware of as we
3  sit here today, the ones I recall using on a pretty
4  regular basis.
5      Q.  Have you read any of the complaints filed with
6  the court with respect to the lawsuit we're here on
7  today?
8      A.  I have not thoroughly read them, but I've --
9  but I've looked at some of them.
10     Q.  How long -- when was the last time you looked
11  at any of those complaints?
12     A.  It's been -- it's been at least a couple
13  weeks.  It's been some time ago.
14     Q.  And with respect to this lawsuit have you
15  previously been asked to gather or produce any
16  documents?
17     A.  By -- are you asking what my -- does that
18  include what my lawyers have asked me about?
19     Q.  Yes.
20         MR. SWEETEN:  So with -- I mean, I don't
21  think he's asking for the substance --
22         THE WITNESS:  Got it.
23         MR. SWEETEN:  -- of the communication.
24  You can answer just --
25         THE WITNESS:  Yeah.

Page 36

1          And, Yes, I have.
2      Q.  (BY MR. BROUGHTON)  All right.  And what sorts
3  of documents did you provide to your attorney?
4      A.  My recollection is we searched our -- our
5  e-mails and paper files and computer files, and so
6  e-mails, notes, memos, working documents, things like
7  that.
8      Q.  And what e-mail accounts do you maintain?
9      A.  My -- so the official senate e-mail.  Do you
10  want the e-mail address?
11     Q.  Sure.
12     A.  It is Bryan, B-r-y-a-n, dot Hughes,
13  H-u-g-h-e-s, at Senate.texas.gov.  I think that's
14  right.  And then -- then I have a couple of personal
15  e-mail addresses.  One is Bryan@bryanhughes.com.  One
16  is Dbryanhughes@gmail.com.  We searched those as well.
17  And then I've got a -- I've got a work e-mail, you
18  know, from the law firm -- a couple of law firm
19  e-mails, one for my own little law practice, which is
20  Bryan@hughesfirm.com.  And then I mentioned I'm of
21  counsel to that Franklin, Scott, Conway.  My e-mail
22  there is Bryan@fsc.legal.  And those are the e-mail
23  accounts I use and the ones we searched for -- for
24  documents.
25     Q.  So it might be that you could have used any of

Page 37

1  those e-mails addresses to correspond with persons
2  regarding S.B. 7 or S.B. 1 or other legislative duties?
3      A.  It's our practice to use the state e-mail
4  accounts for those things, but -- but one may send us
5  something to another address or we may reply and use --
6  on the iPhone without paying attention.  So -- so, yes,
7  sometimes they'll pop up on the other accounts.  But
8  our primary practice to use the state e-mail for those
9  matters.  But the answer is, yes, it does happen
10  sometimes.
11     Q.  So do you have your own website?
12     A.  Yes.
13     Q.  Great.  And what is that website?
14     A.  Bryanhughes.com.
15     Q.  All right.  Is that the only one?
16     A.  I -- probably other than Facebook and --
17  that's right.  That's the only one.
18     Q.  Okay.  And did anyone assist you in searching
19  for these documents that you provided to your attorney
20  regarding this lawsuit?
21     A.  Yes.
22     Q.  Who assisted you?
23     A.  So Drew Tedford, the lawyer I mentioned to you
24  before who is our general counsel and is the director
25  of the State Affairs Committee assisted, as did

Page 38

1  Cody Terry, who's our chief of staff.  I dealt directly
2  with them.  It's possible, even likely, that they asked
3  for help from other members of our staff, but the ones
4  I'm aware of are Drew Tedford and Cody Terry.
5      Q.  And do you maintain most documents
6  electronically or do you also have a lot of paper
7  files?
8      A.  Well, we are trying to move toward maintaining
9  them electronically.  We still have -- we still have
10  paper files.  But I would say it's -- I would say the
11  majority are -- I don't know.  We're trying to move
12  toward electronic, but it's hard.  It's hard.  We just
13  like paper.
14      Q.  I'm the same way, as Keely knows.  Do you
15  frequently use text messages?
16      A.  For -- you mean, in general or for any
17  purposes or -- I mean, yes, we use a lot of text
18  messages.
19      Q.  All right.  So do you use text messages to
20  communicate regarding legislative issues?
21      A.  Not generally.  Obviously, if you're -- if
22  you're trying to schedule a -- getting together with
23  someone or you miss a call and say, "I'll call you
24  back," there's invariably going to be text messages
25  like that.  But as far as the dealing with the

Page 39

1  substance of legislative matters it's not our practice
2  to use text messages for that.
3      Q.  And would that just be on your own personal
4  cell phone that you would use text messages?
5      A.  Yes.  I don't -- I don't have a state cell
6  phone.  I just have my personal cell phone.
7      Q.  Okay.  And do you ever use Instant Messenger?
8      A.  I can't remember the last time I did.
9      Q.  All right.  Or WhatsApp?
10      A.  I do -- I do have a WhatsApp, so that's a good
11  point.  So when I say text messages I guess I would be
12  including WhatsApp in that.  I don't use that a lot,
13  but I have some friends on WhatsApp, so I do use that
14  from time to time.
15      Q.  Have you lived in Texas your whole life?
16      A.  Yes, sir.
17      Q.  Have you always voted in person?
18      A.  Yes, I have.
19      Q.  You've never done a mail-in ballot?
20      A.  I never have, no, sir.  When I was in law
21  school living in Waco, which you're familiar with, I
22  was -- my recollection is I made it back home to vote,
23  so I don't remember ever voting by mail.  That would
24  have been the only time I would have, and I don't
25  believe I did.  I believe I was always back home to

Page 40

1  vote.
2      Q.  Your parents or grandparents or any family
3  members ever use mail-in ballots to your knowledge?
4      A.  Yes.
5      Q.  They've done that for a long time?
6      A.  My parents have for some years.  I don't know
7  how long, but, yes, they have for some time, at
8  least -- at least since they've been -- well, they --
9  at least for a number of election cycles.  I don't know
10  how long, but, yes, they have.
11      Q.  Where do they live?
12      A.  They live at Golden, Texas, which is just
13  outside Mineola up in East Texas.
14      Q.  Do you think it's unsecure for your parents to
15  use mail-in ballots?
16      MR. SWEETEN:  Hold on.  I'm going to
17  object to the extent that it -- if it asks for your
18  reasoning regarding the legislation.  But other than
19  that, if it won't reveal your mental impressions
20  regarding legislation you can go ahead and answer.
21      THE WITNESS:  No, I don't believe it's
22  unsecure for my parents to use mail ballots.
23      Q.  (BY MR. BROUGHTON)  And why is that?
24      MR. SWEETEN:  Same instruction.
25      THE WITNESS:  Texas has a system in place

Page 41

1  for folks who are over 65 who vote by mail, and that's
2  the process they followed, and it's worked well.
3      Q.  (BY MR. BROUGHTON)  So you said you had at
4  least glanced at the lawsuits, complaints that we're
5  here on today.  What is your understanding of what
6  these lawsuits are about?
7      MR. SWEETEN:  Hold on a second.  I'm
8  going to object as to legislative privilege.  To the
9  extent -- I'm just going to instruct that to the extent
10  it would reveal your mental impressions about
11  legislation, don't provide that answer.  Okay?  If it
12  won't, then you can answer it.  Okay?
13      THE WITNESS:  Okay.  My general
14  understanding of the -- of the complaint is that the
15  plaintiffs are concerned about the ballot harvesting
16  provisions in the law, the changes to the vote by mail
17  procedures, assistance of voters.  That's my general
18  recollection of the -- at least some of the issues in
19  the complaint.
20      Q.  (BY MR. BROUGHTON)  For eligible voters in
21  Texas do you think it should be easy to vote or hard to
22  vote?
23      MR. SWEETEN:  I'm going to object to the
24  extent that that -- to the extent the question may
25  be asking for your privileged mental impressions

Senator Bryan Hughes
April 19, 2022                                          42 to 45

Page 42

1  regarding legislation.  If it would not do that, then
2  you can answer the question.
3          THE WITNESS:  Okay.
4              If you're asking what the law should be,
5  what's good policy, it should be easy to vote, hard to
6  cheat.
7      Q.   (BY MR. BROUGHTON)  What was the last part?
8      A.   Easy to vote, hard to cheat.
9      Q.   Okay.  You thought Ronald Reagan was a really
10 good president, didn't you?
11     A.   Yes.
12     Q.   Why did you think Ronald Reagan was a good
13 president?
14     A.   Well, I was pretty young when he was in
15 office, and I've appreciated him more as years have
16 gone by.  But, obviously, I think even his critics
17 would acknowledge that he restored faith, restored our
18 country's faith in America and its history and its --
19 he was bright and optimistic and encouraging.  He's got
20 a great poor boy story, came up the hard way, great
21 American dream story, and he put policies in place that
22 lifted everyone up, helped the middle class, helped
23 working folks.  Those are a few of the reasons I'm a
24 big fan.
25     Q.   I will represent to you that President Reagan

Page 43

1  made the following quote, The right to vote is the
2  crown jewel of American liberties and we will not see
3  its luster diminished, end quote.  Assuming that he
4  said that, would you agree with that statement?
5          MR. SWEETEN:  I'm going to instruct on
6  legislative privilege as I have.  Same instruction, but
7  you can answer the question to the extent it doesn't
8  reveal your mental impressions regarding the bills.
9          THE WITNESS:  I absolutely agree.
10     Q.   (BY MR. BROUGHTON)  All right.  You would
11 never want to deny any eligible American's right to
12 vote, would you?
13         MR. SWEETEN:  Same on instruction.
14         THE WITNESS:  Of course not.
15     Q.   (BY MR. BROUGHTON)  Okay.  You don't want to
16 deny a disabled person's right to vote, do you?
17         MR. SWEETEN:  Same instruction.
18         THE WITNESS:  Of course not.
19     Q.   (BY MR. BROUGHTON)  Do you want to make it
20 easier or harder for disabled folks to vote?
21         MR. SWEETEN:  Objection.  Are you asking
22 with respect to the pending legislation or are you
23 asking --
24         MR. BROUGHTON:  In general.
25         MR. SWEETEN:  Okay.  So same instruction

Page 44

1  that I provided.  You may answer if it doesn't reveal
2  legislative privileges, your mental impressions about
3  the bill.  Go ahead.
4          THE WITNESS:  Easier.
5      Q.   (BY MR. BROUGHTON)  Do you want to make voting
6  harder or easier for our black citizens?
7          MR. SWEETEN:  And you're just asking not
8  about legislation; you're asking generally?
9          MR. BROUGHTON:  Correct.
10         MR. SWEETEN:  Okay.  Same instruction,
11 legislative privilege.  You may respond if it doesn't
12 reveal mental impressions about the legislation that is
13 being addressed today.
14         THE WITNESS:  Easier.
15     Q.   (BY MR. BROUGHTON)  As a general rule, do you
16 want to make it easier or harder for brown people to
17 vote?
18         MR. SWEETEN:  Same instruction, same
19 instruction.
20         THE WITNESS:  Easier.
21     Q.   (BY MR. BROUGHTON)  As a general rule, do you
22 want to make it harder or easier for shift workers to
23 vote?
24         MR. SWEETEN:  Same objection, same
25 instruction.

Page 45

1          THE WITNESS:  Easier.
2      Q.   (BY MR. BROUGHTON)  As a general rule, do you
3  want to make it harder or easier for Sunday morning
4  church goers to vote?
5          MR. SWEETEN:  Same objection, same
6  instruction.
7          THE WITNESS:  Easier.
8      Q.   (BY MR. BROUGHTON)  Do you appreciate the fact
9  that there are citizens who volunteer to be poll
10 watchers?
11         MR. SWEETEN:  Same objection, same
12 instruction.  Do not reveal your mental impressions
13 regarding legislation.  However, if you can answer
14 without doing that, you can -- you can provide that
15 answer.  Okay?
16         THE WITNESS:  So am I aware of -- I'm so
17 sorry.
18     Q.   (BY MR. BROUGHTON)  I'll ask the question
19 again --
20     A.   Thank you.  Thank you.
21     Q.   -- noting the objection.  Do you appreciate
22 that there are Texans who volunteer to be poll
23 watchers?
24         MR. SWEETEN:  Same objection, same
25 instruction.

Page 46

1          THE WITNESS:  I do.
2     Q.   (BY MR. BROUGHTON)  Are you glad they do that?
3          MR. SWEETEN:  Same objection, same
4  instruction.
5          THE WITNESS:  I am.
6     Q.   (BY MR. BROUGHTON)  Would you want to do
7  anything that discouraged Texans from volunteering to
8  be poll watchers?
9          MR. SWEETEN:  Same objection, same
10 instruction.
11         THE WITNESS:  No, I would not.
12    Q.   (BY MR. BROUGHTON)  Would you want to do
13 anything that discouraged caregivers from assisting
14 persons in need of help to vote?
15         MR. SWEETEN:  Same legislative privilege,
16 objection, and instruction.
17         THE WITNESS:  No, I would not.
18    Q.   (BY MR. BROUGHTON)  You know what a legal hold
19 notice is to preserve documents, don't you?
20    A.   Yes.
21    Q.   Okay.  Have you received one of those with
22 respect to this case related to the 2021 sessions?
23         MR. SWEETEN:  I'll let you answer --
24         THE WITNESS:  Yes.
25         MR. SWEETEN:  -- whether you've received

Page 47

1  a hold letter.  Nothing else about any -- any
2  substantive information exchanged between you and your
3  counsel.  Okay?
4          THE WITNESS:  Yes, I have.
5     Q.   (BY MR. BROUGHTON)  Do you still maintain all
6  on your e-mails, notes, and other documents related to
7  the 2021 sessions?
8     A.   Yes.  Well, let me be precise.  Since
9  receiving that hold letter we have.  Over the course
10 of -- the e-mail system, I think, automatically deletes
11 e-mails just based on storage space.  That's a senate
12 policy, not our office.  But since receiving the notice
13 to hold we have -- I've asked my team, and I believe we
14 have preserved all of those.
15    Q.   Okay.  And you say there's a deletion policy.
16 Is it -- is it -- it's based on chronology, right?
17 Older e-mails are deleted, right?
18    A.   That's my understanding, that's right.
19    Q.   Okay.  Do you know the current racial makeup
20 of District No. 1?
21    A.   I do not.
22    Q.   That's your district, right?
23    A.   That's correct.
24    Q.   And generally what counties are included in
25 District 1?

Page 48

1     A.   Under the current map there are 16 counties in
2  District 1, and the boundaries generally are from
3  Tyler-Smith County east toward Louisiana to
4  Carthage-Panola County, then north to Texarkana-Bowie
5  County, and then back west to Paris-Lamar County and
6  then back down to Tyler.  After redistricting I'll be
7  picking up three more beautiful counties in the -- over
8  toward the western end.  But those are the general
9  confines of the district today.
10    Q.   So Mount Pleasant is in your district?
11    A.   It is.
12    Q.   I go there a lot.  Do you know County Judge
13 Brian Lee?
14    A.   I do indeed.  I know the good better man.
15    Q.   Yeah.  Would it surprise you to know that the
16 approximate non-Anglo population of District 1
17 currently is about 35.5 percent?
18    A.   That sounds about right.  I'll certainly take
19 your word for it.  I could have given you a general
20 approximation, but didn't want to estimate.  That
21 sounds about right to me, but I couldn't swear to it.
22    Q.   So I assume your Senate office receives mail?
23    A.   Yes.
24    Q.   Okay.  Lots of mail?
25    A.   Since the time I've been in office probably

Page 49

1  more e-mails than -- than the U.S. Postal physical
2  mail, but still quite a bit of mail, yes.
3     Q.   And you have persons in your office that
4  review the mail?
5     A.   Yes, sir.
6     Q.   Okay.  Do they ever show any of the mail to
7  you?
8     A.   Oh, yes, sir.
9     Q.   Okay.  So about what percentage of the e-mails
10 or hard copy mail that your office receives do you
11 think you probably look at?
12    A.   I don't know.  We have a policy so that
13 correspondence, whether it's e-mail or physical mail or
14 phone calls, are logged and handled.  And so when it's
15 time to prepare a response is normally when I get
16 involved.  So I don't know what I don't know.  Forgive
17 me.  I don't know what I'm seeing, but my impression is
18 that I know I see a lot of it.
19    Q.   So on the mail -- when I say "mail," I'll
20 include hard copy mail and e-mail -- that is not
21 actually shown to you, does anybody in your staff
22 provide summaries or reports to you?
23    A.   Again, when it's time to reply we do.  And if
24 I can explain.  Many times we will receive a form
25 e-mail where, you know, multiple people have sent us

Senator Bryan   Hughes
April 19, 2022                                          50 to 53

Page 50

1   the same e-mail.  And, of course, we take those
2   seriously just like an individually drafted e-mail or
3   letter.  And so when it is time to reply, if we receive
4   identical e-mails, then the response is going to be
5   pretty much identical.  And so I'm aware in -- I'm most
6   aware in those cases, I guess, with the volume we've
7   received on a -- of a particular e-mail.  I'm not sure
8   if I answered your question.  Is that what you're
9   looking for?
10      Q.  Well, no, it was certainly helpful.  Do they
11  provide any sort of summary, like a topical summary, of
12  the sorts of e-mail that your -- or mail that your
13  office receives?
14      A.  I know that we can -- we have software where
15  everything is logged in and so that we can search on a
16  certain topic and we can determine how many e-mails
17  we've received on a certain bill or a certain policy
18  area, and we do have discussions of those from time to
19  time.
20      Q.  Okay.  And so let's say on S.B. 7 or S.B. 1,
21  do you recall receiving e-mail or mails -- mail
22  regarding those topics?
23      A.  I do.
24      Q.  Okay.  And how would those be logged or
25  recorded or summarized by your staff?

Page 51

1       A.  The software is called CMS.  It's -- I'm
2   calling it software.  It's a proprietary system
3   developed by the Texas Legislature.  It's called
4   Constituent Management System is my understanding.  And
5   so every communication is entered there and then
6   categorized and -- so that we can -- so that we can
7   reply when we hear from folks.
8       Q.  And do you try to reply to every piece of
9   correspondence sent?
10      A.  We do.  We try to.  We endeavor to.
11      Q.  And with respect to S.B. 7 and S.B. 1, I
12  assume you received mail both pro and con.  Would that
13  be fair?
14      A.  That's correct.
15      Q.  Do you have any idea of the breakdown of how
16  much correspondence your office received that favored
17  it versus that opposed it?
18      A.  My recollection is there was more pro than
19  con, but I don't have the exact percentages.
20      Q.  Okay.  Is that something that your staff
21  recorded?
22      A.  It would be in that -- it should be in that
23  system I described, that Constituent Management System.
24      Q.  That CMS system, for instance, would you --
25  was there electronic folders that your staff prepares

Page 52

1   on -- by topic, for instance?
2       A.  That I don't know.
3       Q.  Okay.
4       A.  I apologize.  I don't know that level of
5   detail.
6       Q.  So for instance, would they group the -- the
7   mail received that was pro together and the -- and the
8   mail that was received that was in opposition together
9   so that they would kind of be electronically filed
10  together?
11      A.  My understanding is all of the communications
12  are logged and then searches can be performed for
13  various fields.  Is that the term, like in a data basis
14  they call it a field?
15      Q.  Sure.
16      A.  So I think that's how it was done.  So I don't
17  think they're categorized as -- necessarily as pro or
18  con.  I think the information is there and it can be
19  sorted in various ways.
20      Q.  What leadership roles have you held in the
21  Senate?  So by "leadership role" you've probably seen
22  it.  Committee chair, some --
23      A.  Okay.
24      Q.  Yeah.
25      A.  Thank you.  So I'm chairman of the Senate

Page 53

1   Committee on State Affairs, I have been chairman of the
2   Committee on Administration.  I was chair of the Select
3   Committee on Election Integrity a few years ago.  I
4   believe those are the committees that I've chaired in
5   the Senate.
6       Q.  And what does the Administration Committee do?
7       A.  Administration Committee is responsible for,
8   you might say, back office operations of the Senate, so
9   budgets, you know, assigning things like expenses,
10  budgets.  Also during the session the local and
11  uncontested calendar.  And by "calendar" we're
12  referring to the -- the mechanism through which bills
13  come to the floor.  And so those local and uncontested
14  bills, bills that are not controversial, but just
15  keeping the trains running on time, which is the bulk
16  of the bills we file, those go through the
17  Administration Committee, and then when a member wants
18  to have a committee hearing outside the Capitol that's
19  according to that committee.  So just sort of nuts and
20  bolts back office operations of the Senate as well as
21  that local and uncontested calendar.  That's the main
22  responsibility of the Senate Committee on
23  Administration.
24      Q.  And what years were you chairman of the
25  Administration Committee?

Page 54

1        A.   I -- I'm going to say roughly 2019, 2020.  I
2   apologize for not recalling exactly.  It was before I
3   became -- I was chairman of the Senate State Affairs
4   Committee, which is the one I currently hold, and so it
5   was a year or two before that.
6        Q.   And you talked about the uncontested or local
7   calendar.  I assume the Senate has a system of rules
8   and procedures it follows?
9        A.   Yes, that's correct.
10       Q.   Tell us about those.
11       A.   Well, the Senate rules are adopted at the
12  beginning of each session voted on by the members of
13  the Senate.  Customarily there are not significant
14  changes in the rules from one session to the next, so
15  to be precise the rules must be adopted at the
16  beginning of every session.  But it is the Senate
17  practice, at least since I've been there, to begin as a
18  starting point with the rules from the previous session
19  and then make whatever changes and adopt those for the
20  next session.
21       Q.   And you've been in the Senate for several
22  years?
23       A.   Elected in 2016, so, yes, sir.
24       Q.   And what have you done to familiarize yourself
25  with the Senate rules?

Page 55

1        A.   Well, I've at various times -- let me back up.
2   When I was first elected to the Senate I tried to get a
3   handle on the rules, and now I try to.  And counsel I
4   know you know what I'm talking about.  And then I -- at
5   various times when questions come up during debate or
6   during committee about the rules, of course, that
7   causes you to take a look at the particular section of
8   the rules or the particular rule implicated.  So I
9   would just say in the course of being in the Senate you
10  look at them from time to time.  There's not a formal
11  process that I'm aware of.
12       Q.   And I assume that members of your staff will
13  help you with rules from time to time?
14       A.   Oh, yes, they certainly do.
15       Q.   So I call Keely and say, "Look this up for me.
16  Send me a copy"?  That's -- you do things like that?
17       A.   Oh, yes, sir.
18       Q.   Okay.  So tell us what the Committee on State
19  Affairs does.
20       A.   Committee on State Affairs has broad
21  jurisdiction, so questions about free speech, about --
22  about the right to life, questions about religious
23  freedom.  Normally judicial court matters are there.
24  Election matters generally go to the State Affairs
25  Committee.  Sometimes second amendment gun issues go to

Page 56

1   the State Affairs Committee.  It has -- it has broad
2   jurisdiction.
3        Q.   And were you on this committee prior to
4   becoming its chair?
5        A.   Yes, sir.
6        Q.   How long were you on that committee?
7        A.   I've been on the committee since I was sworn
8   into the Senate in 2017.
9        Q.   And who was the chairperson before you?
10       A.   Senator Joan Huffman chaired the State Affairs
11  committee before I did.
12       Q.   And who before Ms. Huffman?
13       A.   I know that Senator Robert Duncan from Lubbock
14  chaired the committee for some time.  I -- and I want
15  to say that -- I don't know if there was anyone in
16  between him.  When I got to the Senate it was
17  Senator Huffman and so I was not keeping as close watch
18  on senate committee chairmanships.  But I believe it
19  was Senator Robert Duncan from Lubbock before Senator
20  Joan Huffman.  I could be wrong, but that's -- if I've
21  forgotten someone in between I hope they'll forgive me.
22  That's my recollection.
23       Q.   And how does one become a member of the State
24  Affairs Committee?
25       A.   The lieutenant governor in the Texas Senate

Page 57

1   appoints committee -- appoints senators to committees
2   and appoints chairs and vice chairs, and so typically
3   one will meet with lieutenant governor before the
4   session and tell lieutenant governor what committees
5   you like and why, and then the lieutenant governor
6   weighs all that and tries to put people in the right
7   place.  So the appointment is -- the appointment is
8   made by the lieutenant governor.
9        Q.   So it's your understanding that typically a
10  senator will at some point communicate that senator's
11  desire for committee appointments to the lieutenant
12  governor and then it's up to the lieutenant governor?
13       A.   That's right.  That's my understanding of the
14  process.
15       Q.   So do these committees propose legislation?
16       A.   Well, individual senators will file
17  legislation, then it will be referred to a committee
18  based on its subject matter, and so then the committees
19  will consider those individual bills.  So to be
20  precise, the committees don't have power to propose
21  legislation, but members of committees do.
22       Q.   All right.  But anyone in the Senate, for
23  instance, could propose voting rights or
24  election-related legislation, right?
25       A.   That's exactly right.

Page 58

1    Q.   If they propose legislation on voting or
2  elections, then that would go to the State Affairs
3  Committee?
4    A.   At least recently that's been the referral
5  pattern.  The -- my recollection -- my understanding is
6  lieutenant governor and the parliamentarian make those
7  decisions.  But, yes, generally those type of bills
8  would go to state affairs.
9    Q.   And how many people are on the State Affairs
10  Committee?
11    A.   There are nine members on state affairs.
12    Q.   And of those nine members how many are
13  Republicans?
14    A.   I believe the partisan breakdown is
15  six Republicans, three Democrats currently on state
16  affairs.
17    Q.   And is the current nine members the same as it
18  was during the 2021 sessions?
19    A.   I believe that's right.  There are a couple of
20  members of state affairs who are not seeking
21  re-election or who have otherwise announced they're not
22  going to be campaigning.  And so there will definitely
23  be some changes, but my recollection is today the
24  membership is the same as it was during the 2021
25  session and special sessions.

Page 59

1    Q.   Any of those nine members in the 2021 sessions
2  persons of color?
3    A.   Senator -- yes.
4    Q.   Who is that?
5    A.   Senator Eddie Lucio and Senator -- of the
6  current membership on state affairs I believe
7  Senator Lucio would currently be the member who you
8  would classify that way.
9    Q.   So just one person of color in the 2021
10  sessions?
11    A.   I believe that's correct.
12    Q.   Any disabled persons?
13    A.   Senator Brian Birdwell has recovered largely
14  from his injuries he received at the Pentagon
15  September 11, 2001.  I believe he is still fully
16  disabled as a Veteran.  He handles it very well.  And
17  this -- I guess we're getting into personal matters and
18  maybe HIPAA matters, but I -- most folks wouldn't --
19  question his status on one a disability.  He's --
20  other than Senator Birdwell, offhand I -- I can't think
21  of any other members of that committee that I would --
22  I would characterize as disabled.  And he probably
23  wouldn't call himself, but he certainly qualifies
24  legally in my opinion.
25    Q.   All right.  And so once a -- the lieutenant

Page 60

1  governor or the parliamentarian assigns a piece of
2  proposed legislation to the State Affairs Committee
3  what -- how does the committee function thereafter with
4  respect to that proposed legislation?
5         MR. SWEETEN:  You're asking as a general
6  matter, just to be clear?
7         MR. BROUGHTON:  As a general matter.
8         MR. SWEETEN:  Okay.
9         THE WITNESS:  So the Senate State Affairs
10  Committee, like other senate committees, will have a
11  hearing scheduled.  Because the Senate State Affairs
12  Committee gets a larger number of bills than most
13  committees, sometimes the largest number in a given
14  session, normally State Affairs Committee will have
15  two meeting slots per week.  Most committees will have
16  one.  And so the -- as chairman of the committee I will
17  look at the bills that have been referred to the
18  committee and I will determine which ones will be set
19  for hearing and when.  So that's generally the process.
20    Q.   And when you say "hearing," you mean hearing
21  before the committee?
22    A.   Thank you.  I'm glad you said that.  That's
23  right.  When I say hearing I mean which ones of those
24  bills -- which of the bills that have been referred to
25  the committee will get a committee hearing in state

Page 61

1  affairs and when, that's right.
2    Q.   And do you prepare agendas for these hearings?
3    A.   My office does, yes.
4    Q.   How does a committee member know which pieces
5  of legislation that are going to be discussed at an
6  upcoming meeting?
7    A.   The senate rules dictate that, and there are
8  strict requirements about notice.  Those rules can be
9  suspended with a -- with a certain vote threshold.  But
10  the notice of the hearing must be posted online and
11  still must be posted physically.  There's a board, if
12  you will, outside the senate chamber where public
13  notices go, kind of like the -- kind of like outside
14  the courthouse, and so a paper notice has to be placed
15  there as well.
16         And beyond that members will normally get
17  notice as soon as the decision is made to give them as
18  much notice as possible, but it must be done within the
19  senate rules and on pretty strict time parameters.
20    Q.   And what would be their reason for -- reasons
21  for possibly suspending those rules?
22    A.   There are situations, especially toward the
23  end of the session when things are moving quickly
24  there's not time to get everything done.  And so
25  that's -- so normally -- there are normally exigent

Page 62

1  circumstances before those rules are -- those kind of
2  rules are suspended.
3      Q.   What would be the exigent circumstances?
4          MR. SWEETEN:  You're asking as a general
5  manner?
6          MR. BROUGHTON:  Yes.
7          MR. SWEETEN:  Okay.  You can answer as a
8  general manner.
9          THE WITNESS:  As a general manner,
10  sometimes it may be that a bill was scheduled for a
11  later hearing and as author of that bill asks if we can
12  hear it earlier because they're going to be gone or
13  because they have a witness who may not be available.
14  So often for convenience of witnesses, convenience of
15  members of the senate, those -- those come to mind.
16      Q.   (BY MR. BROUGHTON)  Any others?
17      A.   I'm sure there are others, but I don't recall
18  any other specifics right now.
19      Q.   So during your tenure in the senate, how often
20  do you recall the rules being suspended?
21      A.   Let me be precise.  Are we -- are we -- I may
22  have gotten sloppy.  Are we talking about -- the rules
23  about posting notice for a hearing of the agenda or
24  just the rules broadly?
25      Q.   The rules broadly.

Page 63

1      A.   Okay.  The rules broadly are suspended in the
2  Texas Senate.  Certain rules are suspended routinely in
3  the Texas Senate.
4      Q.   And which of those are routinely suspended?
5      A.   There's the -- the Senate's regular order of
6  business is suspended.  There's a motion to suspend the
7  rules to take up a bill out of the Senate's regular
8  order of business every time a bill comes to the floor.
9  That's the first motion made.
10      Q.   Okay.  What else?
11      A.   There's also the constitutional rule that
12  bills be read on three several days.  The first reading
13  is when a bill is referred to committee, and then a
14  second reading when the bill is debated on the floor,
15  and third reading would be another hearing of the bill
16  on the senate floor the following day.  In the senate
17  it's very common for us -- after we have that second
18  reading and a full debate on the floor and a vote it is
19  very common for members of the senate to vote by super
20  majority to suspend the constitutional rule that the
21  bill be heard again the next day.  So normally it's
22  passed when it's heard on the senate floor the first
23  time, which is second reading.  That's -- I'm not
24  trying to make that sound confusing.  I'm sure you got
25  that.  So those rules are routinely suspended in the

Page 64

1  senate.
2      Q.   What other rules are routinely suspended in
3  the Senate?
4      A.   To my knowledge, those are the ones that are
5  routinely suspended.  Other rules are suspended from
6  time to time, but those on a regular basis.
7      Q.   Okay.  You also mentioned suspending the rules
8  regarding posting notices.  When -- when would those
9  rules be suspended?
10      A.   So we discussed the situation where for the
11  convenience of a witness or the convenience for a
12  member of the -- of the Senate for scheduling purposes.
13  Those will sometimes be suspended.  And, also, again,
14  as you know, the sessions are limited in days, and as
15  we -- as days begin to count down and the session is
16  about to end things -- people try to get bills through.
17  And so many times toward the end of the session those
18  posting rules will be suspended.  Again, it's got to be
19  done by a motion and we've get -- a vote threshold has
20  to be met to do that.  Motion has to be made on the
21  Senate floor in public when senators are there.
22      Q.   Okay.  So going back to your administration of
23  the State Affairs Committee, so you set the agenda on
24  which pieces of legislation are going to get a hearing
25  in front of the State Affairs Committee, right?

Page 65

1      A.   That is generally, true, yes.
2      Q.   So take us just through the general process of
3  how that works within the committee up until it's --
4  would you call it being referred to the full Senate?
5      A.   Okay.  Under Senate rules -- so are we at the
6  point where the bill has been referred to the State
7  Affairs Committee?  Is that where we want to start?  Yes.
8      Q.   Yes.
9      A.   Okay.  Under the Senate rules the author of a
10  bill must request a hearing.  Each senate committee has
11  it own rules about what that hearing request looks
12  like, what form it must take.  Our requirements are
13  fairly -- fairly easy in the Senate Committee on State
14  Affairs and so the author of the bill must request a
15  hearing.  It's just a little-one page document on our
16  committee that says, "Hey, I would like to have a
17  hearing on Senate Bill X," and the author makes that
18  request.  And so that -- of course, my staff sees that.
19  That comes to me and we consider the subject matter of
20  the bill.  It may be of a subject matter that we're
21  going to be taking up at a next -- at a later hearing.
22          We generally -- we sometimes will try to
23  have a certain subject matter at a given hearing or
24  maybe multiple subject matters.  But if we have a
25  number of bills on a certain topic we'll try to cluster

Page 66

1  those together to the extent we can.  So that goes into
2  the discussion about when to hear a bill.
3              There's also going to be discussions --
4  we're speaking in general terms, not about specific
5  legislation.  There will be discussions among members
6  of the committee about -- about the bill, support for
7  the bill, concerns about the bill.  All those are
8  weighed in.  And then once a decision is made to hear
9  the bill normally I or someone on my team will check
10  with the senator who authored the bill, who requested
11  the hearing, and make sure that that date is okay for
12  them.  And then at that point it goes on the list of
13  bills.
14      Q.   Okay.  Let me stop you right there --
15      A.   Okay.
16      Q.   -- just so I'm clear.  So before there's an
17  **actual hearing from the proponent of that piece of**
18  **legislation the committee meets and discusses the**
19  **merits, need, aspects, et cetera, and expresses some**
20  **preliminary opinions about that proposed legislation?**
21      A.   No, sir, there's not a -- there's not a formal
22  meeting whereby that takes place.  Perhaps this is
23  helpful.  If you -- you are a member of the Senate --
24  you are a member of the Senate and you have a bill
25  before the committee and you've asked for a hearing

Page 67

1  you, as the -- as the author of that bill, will very
2  likely go to other members of the Senate who are on the
3  State Affairs Committee and say, "Senator, I filed
4  Senate Bill X.  I've requested a hearing.  How do you
5  like my bill?  Do you want to hear the bill?"
6              And so those discussions take place on a
7  one-on-one basis normally between the author of the
8  bill and individual members.  Those individual members
9  will normally then communicate to me and realize -- I
10  hope this is helpful, but the process we just described
11  is going on, you know, for scores of bills at any given
12  time.  I'm talking to you about my bills, you're
13  talking to me about your bills.  Does that make sense?
14      Q.   Uh-huh, sure.
15      A.   So it's not a formal meeting that takes place,
16  but these discussions are going on to determine the
17  level of support for a bill, to gain support for a
18  bill.  If you're the author you're going to be talking
19  to the members and trying to convince them that you
20  have a good bill that ought to get a hearing.
21      Q.   All right.  **And so I assume there are proposed**
22  **bills that after the author talks to members of the**
23  **committee there's just not enough interest or support**
24  **among the members of the committee to actually want to**
25  **go further with that.  Is that fair?**

Page 68

1      MR. SWEETEN:  Still you're asking
2  generally, Ken, right?
3      MR. BROUGHTON:  I'm absolutely asking
4  generally.
5      THE WITNESS:  As a general rule -- as a
6  general rule that is correct.  That's correct as a
7  general rule, that's right.  That's how it normally
8  goes.
9      Q.   (BY MR. BROUGHTON)  **So these members on a --**
10  **on just a generic bill report to you, "Yeah, I think we**
11  **ought to hear this," or, "I don't think we ought to**
12  **hear it"?  That's what happens?**
13      A.   Generally, yes, because as a rule -- as a rule
14  if a bill does not have the votes to get out of the
15  committee and I'm the author of the bill, I don't want
16  to have a hearing on my bill to have it voted down.  So
17  that's a courtesy to the author as well as part of the
18  process.  So, yes, that's correct.  If the support is
19  not there for a bill normally the author will not want
20  it to be heard nor would the committee want to bring up
21  the bill and then vote it down.
22              And, again, that's not a rule.  That's
23  just sort of the practice, sort of a courtesy.  And I
24  would say that's observed by most members -- most
25  committees in the Senate.  Again, I haven't been there

Page 69

1  forever, but that's -- that's been my observation, and
2  we try to honor that.
3      Q.   Okay.  **So generally for each proposed bill**
4  **that's assigned to your committee before you set a**
5  **hearing on it you assess from a communications with the**
6  **nine members whether this -- there should be a hearing**
7  **or not?**
8      A.   We certainly try to, yes.
9      Q.   All right.  **So let's say you decide, "Yeah,**
10  **we're going to have a hearing," and the author is going**
11  **to make a presentation or bring some witnesses.  Is**
12  **that -- is that how it works?**
13      A.   That's correct.  In Texas committee hearings
14  are open to the public and anyone can testify.  So
15  normally we'll coordinate with the author and the
16  author will lay out the bill.  The term we use in the
17  Senate and the House is laying out the bill.  So the
18  author -- so the chair will call up the bill and the
19  author is recognized to lay out the bill.  And then the
20  witnesses will have registered.  They'll be -- they'll
21  come to the committee room either before or during the
22  hearing and they will have registered electronically,
23  give us their information and said, "I want to testify
24  on Senate Bill X."  And normally we'll try to work with
25  the author on the order of those witnesses.  In the

Page 70

1  Texas Senate there is invited testimony, and those tend
2  to be the ones that the author has asked for or that
3  the committee has asked for.  And those witnesses are
4  generally given a little bit more time.  And so
5  that's -- that's the time when the member of the Senate
6  who's authored the bill is making her case for the
7  bill.
8          And then public testimony.  Anyone can
9  testify.  Those witnesses do not always get as much
10 time as the invited witnesses.  But, yes, then those --
11 whoever has come to testify will testify.
12         MR. SWEETEN:  And, Ken, if -- we've been
13 going over an hour.  If you get to a point --
14         MR. BROUGHTON:  We can take a break right
15 now.  How long a break do we want?  It's 11:37.
16         MR. HUDSON:  Can we do ten minutes?  I
17 would like to get a coffee.
18         MR. BROUGHTON:  Yeah, absolutely.
19         THE VIDEOGRAPHER:  We're off the record,
20 11:37.
21         (Recess from 11:37 a.m. to 12:01 p.m.)
22         THE VIDEOGRAPHER:  Stand by.  This is
23 Segment No. 2.  We're back on the record, 12:01.
24     Q.   (BY MR. BROUGHTON)  So we left off when we
25 were off talking about scheduling hearings in the State

Page 71

1  Affairs Committee.  And so will there be only one
2  hearing on a bill or more than one, or it depends?
3          MR. SWEETEN:  Kenneth, we're talking
4  generally?
5          MR. BROUGHTON:  Generally.
6          MR. SWEETEN:  Okay.
7          THE WITNESS:  For most bills there will
8  be one hearing, and then the vote on the bill will
9  normally take place at another hearing.  But normally
10 that second hearing there's not testimony or debate or
11 discussion.  It's just the vote on the bill that we had
12 previously heard as a general rule in a regular
13 session.
14     Q.   (BY MR. BROUGHTON)  Okay.  And how long will
15 that second -- after there's a hearing typically on
16 most bills, when will the committee vote yea or nay on
17 sending it to the full Senate?
18     A.   Sometimes bills will be voted on in the same
19 hearing they were heard, sometimes in a later hearing.
20 But the vote itself is not a lengthy process.  The bill
21 has been -- been heard and so it's just a matter of
22 taking -- announcing the bill and someone makes a
23 motion to pass the bill and then the clerk calls the
24 roll.
25     Q.   Okay.  And so you said that for each session

Page 72

1  the lieutenant governor or the parliamentarian will
2  decide which bills are sent to the State Affairs
3  Committee, right?
4      A.   That's correct.  I believe that the process
5  for any Senate committee.  I believe that's right.
6      Q.   And in 2021, I mean, do you recall how many
7  bills were sent to the State Affairs Committee, more or
8  less?
9      A.   I don't know.  It was -- I don't know the
10 number.  State Affairs generally has the highest or
11 second highest numbers of bills referred as compared to
12 other committees, but I don't know the number.
13     Q.   Okay.  So just trying to get a feel for the
14 ballpark.  Are we talking 20 bills, are we talking
15 100 bills, are we talking 200 bills?
16     A.   I'm pretty sure it's going to be over 100.
17 But, again, I -- we can look, but I don't know.
18     Q.   So it's a large number?
19     A.   It's a large number.
20     Q.   Okay.
21     A.   It's normally going to be -- my recollection
22 is it's going to be well over 100.
23     Q.   All right.  And do you recall of those
24 approximate over 100 bills how many of them were
25 referred to the full Senate, more or less?

Page 73

1      A.   I really don't know.  I don't know.  We
2  could -- it's a matter of record, obviously.  The -- we
3  could -- we could look, but I don't know.
4      Q.   You think it's most or only a few?
5      A.   It's definitely going to be more than a few.
6  As far as whether it's most or half, I don't know.  I
7  don't know.  Quite a few bills come to the committee
8  and a number of bills come out of the committee and
9  head to the floor, but I don't know the numbers.
10     Q.   So what's the process if the -- if the
11 committee approves a bill to go to the full Senate?
12 How does the transition to the full Senate happen?
13     A.   For legislation generally where we --
14     Q.   Well, is there -- is there some different
15 route for voting or election-related legislation than
16 there is for general legislation?
17     A.   I don't know of any special rules based on the
18 subject matter of the bill.  The -- the in a regular
19 session, normally after the committee votes and votes
20 to approve the bill and to send it to the full Senate
21 there's paperwork prepared by the Senate committee
22 staff.  And, again, there are rules about when that has
23 got to be distributed to members of the Senate or when
24 it's got to be posted.  And then the bill will be
25 eligible for consideration before the full Senate

Page 74

1  usually in a matter of days after that vote takes place
2  in the committee.
3      Q.   And what is going on in the House while a bill
4  is making its way through the Senate with respect to
5  that proposed bill?
6              MR. SWEETEN:  Objection, compound.
7              THE WITNESS:  So generally -- well, let
8  me back up.
9              As you know, a bill must make it through
10  both Houses and be signed by the governor to become
11  law.  For some legislation there will be companion
12  bills, so a similar or identical bill is filed in the
13  Senate and the House.  Those bills are both -- they're
14  each moving through the process in the respective
15  houses.  But, again, one of those bills has to pass the
16  originating house make it to the other house and pass
17  that house in the same form before it can become law.
18  So depending on the legislation, there may be a
19  companion bill that is moving through the House or it
20  may not.  It may be that this bill makes it all the way
21  through the Senate and then goes over to the House for
22  a fresh start.
23      Q.   (BY MR. BROUGHTON)  All right.  So if -- when
24  you say there's a companion bill, so if -- let's say if
25  you were the author proposing a certain bill as a

Page 75

1  senator, if you wanted a companion bill going through
2  the House would you go to some House member and say,
3  "Would you be willing to propose this"?  Is that how
4  that works?
5              MR. SWEETEN:  As a general matter?
6              MR. BROUGHTON:  Yeah.
7              THE WITNESS:  That's generally how it
8  works, or the converse.  A House member might come to
9  us and say, "I'm filing this in the House.  Will you
10  file a companion in the Senate?"  Companions do not
11  have to be identical.  And under the rules, I believe,
12  of the House and the Senate the parliamentarian of each
13  chamber will determine whether two bills are
14  companions.  But, yes, normally you're correct, a House
15  member would ask us or we would ask a House member.
16      Q.   (BY MR. BROUGHTON)  How does the Senate handle
17  bills that come from the House to the Senate generally?
18      A.   Like a newly-filed bill, those bills that come
19  over from the House must be referred to a committee.
20  And that's handled by the lieutenant governor and the
21  parliamentarian, and then a very similar process that
22  we described for a bill originating in the -- in the
23  Senate.  There's a determination of whether there will
24  be a hearing and when, and then the hearing is
25  conducted in similar fashion where the Senate sponsor

Page 76

1  of that house bill will present the bill, there will be
2  witnesses.  And then at some point a vote is taken if
3  support is there and it makes its way toward the Senate
4  floor.
5      Q.   About how many bills have you drafted since
6  you've been in the Senate, more or less?  Just looking
7  for a ballpark number.
8      A.   I have at least drafted or drafted and filed
9  to be -- there may be that there's a --
10      Q.   What's the difference?
11      A.   Well -- so you might begin the process of
12  working on a bill and you get it prepared and before
13  you file yours someone else files a similar bill or the
14  same bill or a bill comes over from the House.  So
15  there are going to be situations where you may draft a
16  bill, but then for whatever reason decide not to move
17  forward with it.  So I don't know what that number
18  would be.  Most of the bills that we draft we pretty
19  much file just as my -- off the top of my head
20  recollection.  But in any given session I'm going to
21  file, oh, 30 or 40 bills.  I -- that's my general
22  recollection.
23      Q.   All right.  And these would be bills that you
24  and your staff draft?
25      A.   Well, I spoke to you earlier about the

Page 77

1  Legislative Council, and that's the nonpartisan
2  legislative agency made up of attorneys, and they work
3  for the House and the Senate.  And so if you're a
4  member of the Senate or the House and you have an idea
5  for a bill, you contact Legislative Council, tell them
6  what you want to do, and then they will draft a bill
7  and send you a draft of the draft to determine how to
8  go.  And they're responsible for making it fit into the
9  existing code, changing other codes that are affected
10  by this.  So the literal drafting is normally done by
11  the Legislative Council, but -- but the idea for the
12  bill, the initiating the process would come from our
13  office.
14      Q.   And so just like I do when Keely sends me
15  something, do you then mark it up and make suggestions
16  and possible word changes, additions, subtractions,
17  that sort of thing, when you receive a draft from the
18  Legislative Council based on some bill that you've
19  proposed the idea for?
20      A.   That's our -- depending on the topic, that's
21  our general practice.  I mentioned to you that I
22  have -- we have Drew Tedford and Caitriana Corkill
23  and -- you had asked about current members of the -- of
24  my team.  During the session we had more members, and
25  so we had lawyers internally on my Senate staff that

Page 78

1  would go through the process you're describing before I
2  saw it.  But, yes, I'll sometimes have a hand in that
3  as well.
4            THE STENOGRAPHER:  Just so you know, the
5  Zoom feed is off because our internet has clicked off.
6            THE VIDEOGRAPHER:  Let's go off.  We're
7  off at 12:11.
8            (Recess from 12:11 p.m. to 12:15 p.m.)
9            THE VIDEOGRAPHER:  Stand by.  Back on the
10  record, 12:15.
11       Q.   (BY MR. BROUGHTON)  So when we left off you
12  told us about how many bills you thought you had
13  actually filed.  And so when you are drafting a bill,
14  all right, obviously you consult with members of your
15  staff that you've told us about and you use the
16  Legislative Council.  Would you ever seek -- before you
17  actually file it would you seek input from anybody
18  outside your staff or the Legislative Council?
19       A.   In some cases, yes.
20       Q.   Would you seek input from constituents?
21       A.   Yes, quite often.
22       Q.   Would you seek input from the governor's
23  office about the governor's thoughts about a
24  proposition?
25            MR. SWEETEN:  Ken, you're asking him

Page 79

1  generally?
2            MR. BROUGHTON:  I am.
3            MR. SWEETEN:  Okay.
4            THE WITNESS:  Yes, it's good to know what
5  the governor thinks -- what the governor thinks about a
6  bill since we hope the governor will sign the bill if
7  we get it passed.
8       Q.   (BY MR. BROUGHTON)  How about the lieutenant
9  governor's office?  Would you seek input from the
10  lieutenant governor's office?
11            MR. SWEETEN:  I'm going to object to
12  these as compound.  But we're -- you're talking about
13  the whole swath of legislation that he's talking about,
14  so just objection, compound.
15            You can answer.
16            THE WITNESS:  At times, yes.
17       Q.   (BY MR. BROUGHTON)  Okay.  How about the
18  Attorney General's office?
19       A.   At times, yes.
20       Q.   Secretary of State's office?
21       A.   There may be -- there may be legislation that
22  would be implemented -- or not implemented, but that
23  would involve the Secretary of State's office.  So with
24  any state agency if we're dealing with a bill in their
25  subject matter we'll sometimes check with them, check

Page 80

1  with their staff.  So, yes.
2       Q.   How about outside lobbying groups?
3       A.   Some -- in some cases, yes.
4       Q.   Groups like Chamber of Commerce, might you
5  seek their input on something?
6       A.   I don't recall a specific case we've done
7  that, but -- but it -- it wouldn't be unusual for that
8  to happen.
9       Q.   Local bar associations, would you ever seek
10  input from them perhaps?
11       A.   Yes.
12       Q.   How about outside think tank groups?
13            MR. SWEETEN:  Same objection, compound.
14            You can answer.
15            THE WITNESS:  I don't know how common it
16  would be to solicit.  We often receive input from think
17  tank groups, and -- and there will be cases where -- I
18  could see cases where we would ask for help from -- ask
19  for input from a think tank.  But normally the
20  information we hear from them is distributed
21  unsolicited.
22       Q.   (BY MR. BROUGHTON)  And they would just send
23  it to your office, e-mail it to you?  How would that
24  come to your staff?
25            MR. SWEETEN:  Objection, compound.

Page 81

1            THE WITNESS:  At various times during the
2  legislative session and regular session and special
3  sessions groups will bring one-pagers as -- one-pagers
4  is the colloquial term they use in the legislature
5  about legislation.  E-mails get sent.  So I would say
6  multiple sources.
7       Q.   (BY MR. BROUGHTON)  Earlier we talked with
8  regard to your practice of law that you would retain
9  experts, outside experts, whether they're medical
10  experts or damages experts or causation experts, from
11  time to time, right?
12       A.   Yes.
13       Q.   Similarly, when -- when drafting a bill would
14  it be common to seek some -- if there were, in your
15  mind, some expert issues involved, issues beyond
16  your -- the knowledge that you or your staff have,
17  would it be normal to seek input from experts in that
18  field?
19            MR. SWEETEN:  Objection, asked and
20  answered; objection, compound.
21            You can answer.
22            THE WITNESS:  Depending on the subject
23  matter, yes.
24       Q.   (BY MR. BROUGHTON)  When a bill that you did
25  not author comes up for your -- for your vote, what --

Page 82

1  what typically -- what typical sort of research would
2  you perform, analysis would you perform before you
3  decide whether you're going to vote yea or nay?
4          MR. SWEETEN:  I'm going to object as to
5  legislative privilege.  We're now really treading into
6  what are his -- what are the things that he does mental
7  impressions regarding legislation.  It's also compound.
8  You're asking about a whole swath of legislation, so
9  I'm going to object as to legislative privilege and
10 instruct accordingly.  You're asking about his process
11 in evaluating legislation, which I believe is
12 legislatively privileged.
13         MR. BROUGHTON:  I'm just asking generally
14 does he -- does he do any outside research.  I'm not
15 asking about a specific bill or any communications with
16 other legislators.
17         MR. SWEETEN:  Okay.  Well, it's not
18 just -- let me just say what I -- I need to say about
19 the legislative privilege.  It's not simply what did he
20 discuss with the legislator or what he discuss with a
21 staffer.  Those, of course, are privileged.  But it's
22 also his mental impressions regarding a bill.  But --
23         MR. BROUGHTON:  And I'm not asking that.
24         MR. SWEETEN:  Okay.  You're not asking
25 his mental impressions about what he does, the things

Page 83

1  he thinks about when he's -- when he's evaluating
2  legislation because that's how I understood the
3  question to --
4          MR. BROUGHTON:  Right.
5          MR. SWEETEN:  That's what I understood it
6  to go to.
7          MR. BROUGHTON:  Let me ask it again.
8          MR. SWEETEN:  Okay.
9      Q.   (BY MR. BROUGHTON)  Generally -- I'm not
10 asking about any specific topic or specific bill.  All
11 right?  When a bill comes before you that you did not
12 have any part in drafting or -- all right -- do you
13 conduct any outside research or seek input to educate
14 yourself about the subject matter of that generic bill
15 in deciding whether you're going to vote for or against
16 that bill?
17         MR. SWEETEN:  I'm going to let him answer
18 as phrased.
19         THE WITNESS:  Yeah.  Depending on the
20 subject matter, yes, we do.
21     Q.   (BY MR. BROUGHTON)  And -- and typically
22 what -- what's -- who would you go to -- what sorts of
23 groups or individuals would you go to to get that
24 input?  How would you find them?
25         MR. SWEETEN:  Objection, compound.

Page 84

1          You may answer.
2          THE WITNESS:  So members of my staff will
3  do quite a bit of research, which will inform
4  recommendations they make to me and they'll present
5  findings to me.  And then if we need more, then we
6  might go beyond that.  But normally those matters are
7  handled by my team.  And this would apply to votes in
8  committee as well as to votes on the Senate floor.
9          There will be some legislation that comes
10 through a committee that I am on and I vote on.  And
11 when that bill makes it to the Senate floor we've
12 already been through our analysis and process because
13 we voted on it in a committee.  Other times I see
14 legislation on the Senate floor for the first time
15 because the committee it was referred to is not one
16 that I'm a member of.  But the process is similar for
17 us internally.
18     Q.   (BY MR. BROUGHTON)  Based on your experience
19 in the Senate, if a bill makes it out of the committee
20 does it typically get passed on the floor?
21     A.   I don't know if -- I don't know if a majority
22 of the bills coming out of committee get passed on the
23 floor.  I don't know what those numbers are.  But if a
24 bill makes it through the committee process I think
25 it's fair to say it has a good chance of passing the

Page 85

1  Senate floor.  That's a gross generalization, but I
2  think that's fair to say.
3      Q.   Based on your experience, is the governor's
4  office involved at all in the legislative process
5  before a bill is actually received by the governor to
6  sign or not sign?
7          MR. SWEETEN:  Objection; vague, compound.
8          THE WITNESS:  In some cases the
9  governor's office will contact a member of the
10 legislature about pending legislation to offer input,
11 ask questions.  So that's -- that's pretty common.
12     Q.   (BY MR. BROUGHTON)  Has the governor ever
13 contacted you about any piece of legislation?
14     A.   Are you asking if the governor has personally
15 contacted me or his office to my office?
16     Q.   Or his office.
17     A.   Well, yes.  Inquiries from the governor's
18 office about legislation are pretty common, and the
19 governor has -- the governor called me personally about
20 legislation that I carried last session, not the
21 subject of this litigation.
22     Q.   From your experience --
23     A.   And he liked the bill, by the way.  But go
24 ahead.  Sorry.
25     Q.   From your experience, is the Attorney

Page 86

1  General's office ever involved in the legislative
2  process?
3      A.   In my experience --
4          MR. SWEETEN:  Objection, vague and
5  compound.
6          You can answer.
7          THE WITNESS:  In my experience, the
8  Attorney General's office will take a somewhat similar
9  role.  As I mentioned before, any state agency that's
10  going to be involved with the legislation, once it
11  becomes law, we in the legislature like to get their
12  input.  The Attorney General has a role on -- in
13  addition to that because legal advice from the Attorney
14  General's office is helpful in many cases when general
15  legislators process.  So, yes, they're involved.
16      Q.   (BY MR. BROUGHTON)  So just so I'm clear on
17  that last part, so if a bill's legality is questioned
18  during the process it would be common to reach out to
19  the Attorney General's office to get some input?
20      A.   Well, not only if -- I wouldn't say that it's
21  because a bill's legality is in question.  But if there
22  are just -- internally just questions about how this
23  would -- what this would look like in practice, the
24  Attorney General's office would be consulted to that.
25      Q.   So just so I'm clear, so if you're curious

Page 87

1  about how it would be implemented, how that particular
2  bill might play out in the future, you might seek their
3  input to -- for that --
4      A.   Yes.
5      Q.   -- for that information?
6      A.   Yes, that's correct.
7      Q.   Okay.  So you've told us the general process
8  regarding how committees work, hearings before
9  committees, voting bills out of committees, voting to
10  the full floor.  Would any of your answers be different
11  if the bill related to voting or election issues, or
12  would those be handled in exactly the same general
13  process that you've told us about?
14          MR. SWEETEN:  Objection, vague and
15  compound.
16          THE WITNESS:  We have discussed the
17  general process during a regular session, and that
18  applies to -- I would say to any legislation.  We take
19  legislation seriously.  If we're considering bills in a
20  special session, special sessions last 30 days as
21  opposed to the regular session, which lasts 140 days.
22  So in a special session, regardless of the subject
23  matter of the bill, timeframes are compressed,
24  processes have to be compressed.  But as far as the
25  subject matter of a bill, I'm not aware of any

Page 88

1  different rules or different processes.  If you're
2  aware of something, let me know, but I can't think of
3  anything offhand.
4      Q.   (BY MR. BROUGHTON)  Okay.  And so you've
5  mentioned the special -- special sessions, that certain
6  time periods are reduced, compressed, et cetera.  Does
7  the same general descriptions of how bills are proposed
8  and hearings and voted upon still apply even though it
9  may be compressed in time?
10          MR. SWEETEN:  Objection, vague and
11  compound.
12          You can answer.
13          THE WITNESS:  I would say those rules
14  generally still apply.  But, yes, often very compressed
15  in times.  You have only 30 days.
16      Q.   (BY MR. BROUGHTON)  When was the first time
17  that you proposed a bill, whether it was in the House
18  or the Senate, related -- relating to any voting or
19  election topics?
20      A.   The first legislation I recall along those
21  lines was in my second session as a member of the Texas
22  House.
23      Q.   What year would that have been?
24      A.   I believe -- well, that would have been 2005,
25  and I think it was in 2005, my second session.

Page 89

1      Q.   Okay.  And what was the subject matter of that
2  bill?
3          MR. SWEETEN:  You can answer the general
4  subject matter.
5          THE WITNESS:  That was a bill to require
6  paper backup, an auditable paper trail for electronic
7  voting.
8      Q.   (BY MR. BROUGHTON)  And you authored that bill
9  in the House?
10      A.   I did.
11      Q.   Okay.  And was it ultimately passed by the
12  House?
13      A.   It was not.
14      Q.   Okay.  Did the Senate propose a similar bill
15  back at that time?
16      A.   I'm not aware if they did.  They may well
17  have, but I don't know.
18      Q.   Okay.  So did that paper backup make it out of
19  committee?
20      A.   It did not.
21      Q.   All right.  When was the next time you
22  proposed any legislation relating to voting or
23  elections?
24      A.   As a member of the House, I filed that paper
25  backup bill or a similar paper backup bill in multiple

Senator Bryan   Hughes
April 19, 2022                                                90 to 93

Page 90

1   sessions.  I don't recall exactly how many, but I know
2   I filed it more than once.  As a member of the House, I
3   don't off the top of my head recall other voting
4   legislation, though there may well have been some.  And
5   if you have something, please tell me and I'll -- the
6   record will speak for itself.  But that's the one that
7   comes to mind when I was in the House.
8       Q.   And was a paper backup -- was paper backup
9   legislation ever finalized and come into law?
10      A.   It was in 2021 as part of Senate Bill 1 and
11  also standalone legislation in that session.
12      Q.   Okay.  So you've told us what you recall with
13  respect to proposing bills regarding voting or
14  elections while you were in the House, right?
15      A.   Those are the ones I can -- that's the one I
16  can remember, yes, sir.
17      Q.   Okay.  Let's go to the Senate.  What -- what
18  was the first time you recall proposing voting or
19  election legislation in the Senate?
20      A.   I -- if I'm not mistaken, I filed a paper
21  backup auditable paper trail bill in 2017, my first
22  session.  I'm not certain that's the case, but I'm
23  pretty sure I did.  It would not have been the
24  identical bill I filed in the House.  You know,
25  technology has changed over that time.  We've learned

Page 91

1   more.  But I'm -- if I didn't file one in 2017 I should
2   have.  So -- but one -- the first bill I distinctly
3   remember filing in the Senate on the issue of elections
4   and the processes was Senate Bill 9, and that was in
5   the 2019 session.  That's the one I distinctly remember
6   by number and general subject matter.
7       Q.   Okay.  So -- just so I'm clear, so once you
8   got to the Senate you're pretty sure you proposed a
9   bill regarding the paper backup, right?
10      A.   Yes, sir.  I would have either filed one or
11  signed on to someone else's.  It's been an important
12  issue.
13      Q.   And then the next one that you recall was
14  S.B. 9 in 2019?
15      A.   Yes, sir.  There may have been others, but
16  those are the ones that come to mind.
17      Q.   Okay.  And did you draft S.B. 9?
18           MR. SWEETEN:  Objection.  Legislative --
19      Q.   (BY MR. BROUGHTON)  Did you propose S.B. 9?
20      A.   I filed the bill, and we've talked about the
21  process involving lawyers at the Legislative Council,
22  those nonpartisan lawyers that do the technical
23  drafting.  And, of course, my team participated on our
24  side.
25      Q.   And --

Page 92

1       A.   By "my team" I mean my Senate staff.
2       Q.   All right.  And so it went through the State
3   Affairs Committee?
4       A.   I believe it did.  Let me -- this -- if this
5   is helpful, in the -- over the interim going into the
6   2019 session the lieutenant governor appointed a Select
7   Committee on Election Integrity, which I chaired.  I
8   may have mentioned that earlier, but -- so testimony
9   was taken by the Select Committee on Election Integrity
10  over that interim.  I don't recall today if that
11  committee dissolved at the beginning of session and
12  those matters then went to the State Affairs Committee
13  or if that committee was still there during 2019.  I
14  think you're correct that bill went to the State
15  Affairs Committee in 2019, but I -- we would have to
16  defer to the official record on that.
17      Q.   Okay.  So let's talk about the Select
18  Committee on Election Integrity for a minute.  All
19  right?
20      A.   Okay.
21      Q.   So you said the lieutenant governor created
22  that committee?
23      A.   Yes.
24      Q.   In 2019?
25      A.   I believe it was in 2017 or '18.  So since we

Page 93

1   meet only in regular session every other year, during
2   that interim the period between sessions it's common
3   for the lieutenant governor on the Senate side and the
4   Speaker of the House to appoint interim committees,
5   select committees, joint committees.  And so this was
6   part of the interim work between the 2017 session and
7   the 2019 session so I don't recall if it was set up
8   during 2017 or 2018, but I know it was active in 2018.
9       Q.   And you were the chair?
10      A.   I was.
11      Q.   All right.  And how many persons were on that
12  committee?
13      A.   There would have been seven or nine.  I'm
14  embarrassed.  I don't recall for sure.
15      Q.   Okay.
16      A.   It would have been an odd number, seven or
17  nine.
18      Q.   And the lieutenant governor would have
19  appointed those persons?
20      A.   Yes.
21      Q.   Okay.  And was -- similar to what you told us
22  about before, was that -- had legislators gone to -- or
23  senators gone to the lieutenant governor and say, "I'm
24  interested in such a committee"?
25      A.   Yes.  I -- my general understanding is that's

Page 94

1  what would have happened.  I wasn't there for other
2  conversations, but that would be the general process, I
3  think.
4          MR. SWEETEN:  Yeah.  Okay.  So I want to
5  stop here and I want to instruct you that you don't
6  reveal the substance of any communications with the
7  lieutenant governor on this subject.  So --
8      Q.  (BY MR. BROUGHTON)  Did you ask the lieutenant
9  governor or did you tell the lieutenant governor you
10  wanted to be on the -- this select committee?
11          MR. SWEETEN:  Same objection.  You're
12  asking for a communication with another -- with the
13  lieutenant governor and that's -- that's legislatively
14  privileged.
15          Don't answer that question.
16      Q.  (BY MR. BROUGHTON)  Are you refusing to
17  answer?
18      A.  I'm refusing to answer following my lawyer's
19  advice.
20      Q.  So do you recall who else -- whether it was
21  seven or nine members, do you recall who else served on
22  this -- or any of the other senators -- was this all
23  senators on the select committee?
24      A.  Yes, sir.  This was just senators on this one.
25      Q.  Do you recall who else served on that

Page 95

1  committee?
2      A.  I recall -- and this is -- this will be a
3  matter of record.  We can -- you can look it up, but I
4  recall Senator Boris Miles from Houston being a member.
5  I'm embarrassed.  I hope I won't hurt anyone's
6  feelings.  I don't recall for sure what the other
7  members of that committee were.
8      Q.  Okay.  And what was the purpose of this
9  committee?
10          MR. SWEETEN:  You can answer to the
11  extent it doesn't reveal communications or
12  legislatively-privileged information.  But you can
13  answer as to the general purpose of the committee if
14  you won't be revealing those.
15          MR. BROUGHTON:  Okay.
16          THE WITNESS:  So when the committee was
17  created, it was announced the -- as -- I'm not going to
18  be able to quote it, but the general purpose of the
19  committee was to hear testimony about the election
20  process and ways to improve it.
21      Q.  (BY MR. BROUGHTON)  So were hearings, then,
22  held?
23      A.  Yes.
24      Q.  And how were -- how were witnesses obtained?
25      A.  So, of course, the hearings were publicly

Page 96

1  announced word went out.  There were -- and so the
2  public was invited to attend.  As I recall, there were
3  quite a number of witnesses to testify.  And that's how
4  those interim hearings normally work.  A hearing is
5  held and folks are invited to come and share their
6  experiences, offer their -- offer their contributions.
7  So I don't think there was anything unusual about the
8  way this one was conducted.
9      Q.  Did -- do you recall inviting any particular
10  witnesses to testify?
11      A.  I don't recall.  It is certainly possible that
12  that happened, someone on my team or my staff did that.
13  I don't personally recall.
14      Q.  Were any of the members allowed to invite
15  witnesses to testify?
16      A.  Well, I can -- I don't specifically recall
17  talking to any members about that, but that's certainly
18  my practice as a committee chairman and that's a common
19  courtesy in the member -- as a -- to the members of the
20  Senate, so -- and, again, anyone who shows up is
21  allowed to testify.  That's -- I think Texas is unique
22  in that, but anybody can come testify.
23      Q.  Do you remember whether anyone from the
24  Secretary of State's office provided any testimony?
25      A.  I don't specifically recall.  It -- Keith

Page 97

1  Ingram from the Secretary of State's office may have
2  testified, but I can't swear to it.  We would have to
3  look at the record and see.
4      Q.  And tell us who Keith Ingram is.
5      A.  Keith Ingram at that time was director of the
6  elections division of the Secretary of State's office,
7  yeah.
8      Q.  And he's appointed by the governor?
9      A.  I don't know that.  He -- I don't know if he's
10  appointed, but -- well, the Secretary of State is
11  appointed by the governor.  I'm not certain if the
12  elections division director was appointed by the
13  Secretary of State.  I think -- I don't know.  You -- I
14  don't know the answer to that.  I believe positions
15  within the Secretary of State's office are appointed by
16  the Secretary of State, but don't quote me on that.
17  But that's my general understanding.
18      Q.  So you know Keith Ingram, right?
19      A.  I do.
20      Q.  And you've heard him provide testimony or read
21  his statements on several occasions, right?
22      A.  Yes.  He's a frequent witness before the State
23  Affairs Committee.  He is called up by Democratic and
24  Republican members of the committee to talk about the
25  election code, about the election process.

Page 98

1      Q.   Do you recall any other witnesses who
2  testified either by specific name or by the
3  organization they were from?
4      A.   For the Select Committee on Election Integrity
5  in 2018?
6      Q.   Yes.
7      A.   Yes, I do.
8      Q.   Who else do you recall?
9      A.   There was a district attorney from the Rio
10  Grande Valley.  I believe his name was Escobar.  I
11  apologize if I've gotten his name wrong.  It's been a
12  few years ago.  There was a law enforcement officer
13  from his office, from his county.  There were some
14  election administrators from various counties that
15  testified.  There were -- there were witnesses from
16  various interest groups, civil rights groups, voting
17  rights groups.  Then there's -- the witness list is
18  published and we can -- you know, you can refer to
19  that.  But that's my recollection of the -- of the
20  testimony from 2018.
21      Q.   Any -- do you recall any witnesses from any of
22  the think tank groups?
23      A.   I don't recall, but it is likely that -- I
24  would have to -- I could speculate that think tank
25  groups would have likely testified, but I don't

Page 99

1  specifically recall any of them.
2      Q.   Do you recall if anyone from the Heritage
3  Foundation testified?
4      A.   I don't -- I don't think they did.  I don't
5  remember if they did.
6      Q.   So did this committee make any
7  recommendations?
8      A.   It is -- committees like that over the interim
9  will normally prepare a report to the legislature, and
10  so this committee -- my recollection is the Select
11  Committee on Election Integrity did prepare a report.
12  I haven't seen it in a while, but I'm pretty sure they
13  prepared a report.
14      Q.   This committee, whether it was seven or nine,
15  did it include both Republicans and Democrats?
16      A.   It did.
17      Q.   Do you recall the breakdown?
18      A.   I don't recall.  I don't recall.
19      Q.   Do you recall if in the -- well, let me ask
20  you this.  The S.B. 9 that you proposed in the '86
21  legislative session, was it based in part on
22  recommendations that were in this report to the
23  legislature from the select committee?
24           MR. SWEETEN:  Yeah, it's -- I'm to object
25  as to legislative privilege.  You're asking him his

Page 100

1  mental impressions about why the -- the language
2  contained contained -- was contained.  So I can't let
3  him answer that on the -- on the basis of legislative
4  privilege.
5           MR. BROUGHTON:  Okay.  I'll rephrase if I
6  need to.  I wasn't asking why.  I just said was -- any
7  of the items from the report to the legislature that
8  was issued by the Select Committee on Election
9  Integrity, did anything from that report find its way
10  into SB 9.
11           MR. SWEETEN:  In other words -- and let
12  me just make sure I'm clear.  In other words, was -- on
13  the face of the bill was there any -- were there any
14  issues from the committee report that were addressed in
15  the bill?
16           MR. BROUGHTON:  Yes.
17           MR. SWEETEN:  Is that your question?
18           MR. BROUGHTON:  Yes.
19           MR. SWEETEN:  Okay.
20           You can answer it as phrased.
21           THE WITNESS:  Yes, that's correct.
22      Q.   (BY MR. BROUGHTON)  Do you recall which ones?
23      A.   I would -- I don't.  I have not looked at that
24  report in some time and I do not recall what --
25  specifics.  But if you were to compare the documents,

Page 101

1  the report of the Senate Select Committee on Election
2  Integrity and Senate Bill 9 you would see many common
3  elements.
4      Q.   So when you proposed the Senate Bill 9, did
5  you -- was there a companion bill going through the
6  house at the same time?
7      A.   I don't recall if there was.  I don't think
8  there was.  I've forgotten one or forgotten a member of
9  the House who did that.  I apologize.  But I don't
10  believe there was.  I do -- I can say -- and it's a
11  matter of record -- there were many bills filed in the
12  House which contained elements that were also in Senate
13  Bill 9.  And this is from the face of the bills.  But I
14  do not believe there was a companion bill, per se.
15      Q.   On the -- on the face of Senate Bill 9,
16  what -- what was included?  What were the provisions
17  that you recall?
18      A.   Senate Bill 9 dealt with election integrity.
19  In the mail ballot process there was -- some of the
20  testimony we heard was about ballot harvesters.  Some
21  of the testimony we also heard was about folks who
22  claimed to be assisting voters, but, at least based on
23  their testimony, in fact, rather than assisting voters
24  they were overcoming the voters' will, misleading the
25  voter.  So Senate Bill 9 contained elements to address

Page 102

1    that.
2            Of course, paper backup, auditable paper
3    trail for electronic voting.  Those are -- I remember
4    those matters.  And, again, it's all in the bill, but
5    those are the matters that I recall sitting here.
6        Q.   And when you use the term "ballot harvesters,"
7    what do you mean?
8            MR. SWEETEN:  Yeah, I think that's
9    legislative privilege, so I'm going to object as to
10   legislative privilege.  You're asking him to define
11   what he views as ballot harvesters, so --
12       Q.   (BY MR. BROUGHTON)  So you won't tell me what
13   you mean by ballot harvester?
14           MR. SWEETEN:  Yeah, my instruction is not
15   to answer the question.
16       Q.   (BY MR. BROUGHTON)  So you're refusing to
17   answer?
18       A.   I'm going to follow my lawyer's aside and
19   refuse to answer.
20       Q.   So I don't know what you mean by ballot
21   harvester?
22       A.   You could -- there is -- there are --
23           MR. SWEETEN:  If you -- I'll tell you
24   what.  If you -- if you can define it in a -- in --
25   without providing your mental impressions regarding,

Page 103

1    you know, the bills that address ballot harvesting, you
2    know, separately as a general word of use, you can --
3    you know, you can do that.
4        A.   If I may ask.  If a term is defined in a bill
5    or a statute, is it appropriate to refer one to that
6    bill or statute, or is that even --
7            MR. HUDSON:  Can we get five minutes off
8    the record so we can confer with our client about --
9    about this issue?
10           MR. BROUGHTON:  Sure.
11           THE VIDEOGRAPHER:  We're off the record,
12   12:46.
13           (Recess from 12:46 p.m. to 12:53 p.m.)
14           THE VIDEOGRAPHER:  All right.  Stand by.
15   This is Segment No. 3.  We're back on the record,
16   12:53.
17       Q.   (BY MR. BROUGHTON)  So could you tell me what
18   you mean by the term "voter ballot harvesting"?
19       A.   The term is defined in statute and I don't
20   have it memorized.  We could pull that up and read it,
21   but it's defined in the statute.
22       Q.   Okay.  But generally, just so we don't have to
23   take a minute and look that up, how would you -- if I
24   was your constituent and I said, "What do you mean by
25   voter ballot harvester, Senator," what would you say?

Page 104

1            MR. SWEETEN:  To the extent you're able
2    to paraphrase the words on the bill you can go ahead
3    and answer that question.
4            THE WITNESS:  So under the law, generally
5    ballot harvesting refers to a paid political operative
6    and a ballot by mail who's attempting to influence a
7    voter in their casting and their handling of that
8    ballot by mail.  That's a very rough generalization of
9    what the law says.
10       Q.   (BY MR. BROUGHTON)  Okay.  Thanks.  So under
11   S.B. 9 what changes did you propose to mail-in ballots
12   generally?
13           MR. SWEETEN:  You're asking about the
14   text of the bill or --
15           MR. BROUGHTON:  The text of the bill.
16           MR. SWEETEN:  -- what did it do?  Okay.
17           THE WITNESS:  I don't recall specific
18   provision from Senate Bill 9, but we could -- we could
19   look at the bill and see.  It's on the face of the
20   bill.  But generally it was in response to testimony
21   about concerns about -- again, about ballot harvesters,
22   about folks who were trying to mislead voters, trying
23   to overcome the voters' will, that sort of thing.
24       Q.   (BY MR. BROUGHTON)  Do you recall any of your
25   fellow legislators expressing concerns about any of the

Page 105

1    provisions in S.B. 9?
2            MR. SWEETEN:  You can -- don't reveal
3    privileged conversation with other legislators, but to
4    the extent that you can refer to matters of the public
5    record you can do that either committee or the final
6    floor debate.
7            THE WITNESS:  As I recall, in committee,
8    in the public hearing of the bill, and also debate on
9    the floor there were discussions about how this would
10   affect people going through the voting process.  So,
11   yes, during the debate many senators and I discussed
12   that on the record.
13       Q.   (BY MR. BROUGHTON)  Okay.  And several of your
14   colleagues stated they believed that certain provisions
15   would suppress voter turnout, didn't they?
16           MR. SWEETEN:  Same instruction.
17           THE WITNESS:  We would have to go back
18   and look at the transcript or the video of the debate,
19   but I remember we talked about that.
20       Q.   (BY MR. BROUGHTON)  Okay.
21       A.   That's my recollection just from what's in the
22   public record.
23       Q.   Right.  And from the public record -- I mean,
24   you definitely recall some of the legislators said
25   words to the effect on the public record that they

Page 106

1  believed certain provisions in S.B. 9 would suppress
2  voter turnout, right?
3      A.   Those discussions, public discussions from
4  Senate Bill 1 are fresher, more recent, but I think
5  there were discussions like that in Senate Bill 9 as
6  well.  Bless you.
7      Q.   In any of the bills that -- and I'm not
8  talking about any specific bills, but over the course
9  of your many years in the House and in the Senate there
10 have been bills where impact analyses have been
11 conducted, right?
12     A.   I'm not -- help me out.  I'm not sure what
13 "impact analysis" is.
14     Q.   Well, for instance, you told us earlier that
15 you believed it would be common practice to go to the
16 Attorney General's office and say, "Okay.  If such and
17 such bill was implemented, how would you see it playing
18 out?  Do you see any problems with how this bill is
19 written in terms of implementing it in actuality," that
20 sort of thing, impact analysis.  What would be -- what
21 would be the -- the impact of -- of a bill generally?
22     A.   So I'm not sure if I would -- and, of course,
23 I trust you.  I'm not sure what all "impact analysis"
24 means.  But if you're asking if we seek input and
25 receive testimony about the consequences of the effect

Page 107

1  of a bill, yes.
2      Q.   Okay.  And so with respect to S.B. 9 you
3  believe the committee -- the State Affairs Committee
4  received testimony regarding what witnesses
5  believed the consequences of S.B. 9 would be?
6      A.   Of course, all the testimony was recorded and
7  all the names of the witnesses have been reported, so I
8  don't recall specific testimony.  But any testimony
9  that was offered the committee heard, and that's part
10 of the process.
11     Q.   Did -- as the author of that -- of S.B. 9, did
12 you consult or your staff consult any outside
13 consultants to get their input about what the
14 consequences of implementing S.B. 9 might be?
15          MR. SWEETEN:  Yeah, I think we're now
16 getting into legislative privilege; in other words,
17 what steps did he take, mental processes, regarding the
18 legislation.  So I think that's improper and I'm going
19 to instruct him not to answer.
20          MR. BROUGHTON:  Okay.  So I wasn't asking
21 about his mental impressions.  I was just asking were
22 any outside -- was any outside input solicited.  I
23 wasn't asking what that input was.
24          MR. SWEETEN:  I think we're close to the
25 line here.  I think with -- you can -- I mean, he's not

Page 108

1  going to reveal the substance of those communications
2  if he solicited input.  If you're asking him, you know,
3  the name -- who he talked to, you know, privilege log
4  stuff; in other words, not the substance, then I might
5  be willing to allow that --
6          MR. BROUGHTON:  Okay.
7          MR. SWEETEN:  -- in this situation.
8          MR. BROUGHTON:  Thanks.
9          THE WITNESS:  On Senate Bill 9 I don't
10 recall any outside groups being consulted.  Now, many
11 groups testified before the committee.  I don't recall
12 any outside groups being consulted from our office on
13 Senate Bill 9.
14     Q.   (BY MR. BROUGHTON)  So apart from receiving --
15 with respect to S.B. 9, apart from receiving testimony
16 from witnesses regarding their opinions about S.B. 9,
17 you or your staff did not prepare any sort of written
18 report or analysis about what they believed the
19 consequences would be; is that right?
20     A.   The -- well, the report of the Senate Select
21 Committee on Election Integrity talked about the bill
22 and talked about the need for legislation, proposed
23 legislation.  So that's bound up in a -- in a document
24 like that, and in discussions how a bill is going to
25 play out on the ground is always going to be discussed.

Page 109

1  So are you asking me about a specific document?  I just
2  want to make sure.
3      Q.   I am asking about a document as opposed to
4  just discussions.
5      A.   I want to make sure I'm answering the right
6  question.  A document that's specifically about -- I
7  mean, there's a bill analysis that's conducted.  That's
8  the public record.
9      Q.   Right.
10     A.   That's -- that's when we get our hearing.
11 There's reports prepared at various stages of the
12 process.  So I'm not trying to be difficult.  I don't
13 understand exactly what you're asking.
14     Q.   Okay.  So you -- you know, I was using the
15 term "impact analysis."  You said, "Well, of course, we
16 would try to foresee the consequences of implementing a
17 bill, right, or talk to the Attorney General about the
18 consequences of implementing a bill"?
19     A.   The results of how a bill will -- will work
20 out in implementation, yes.
21     Q.   Right.  And so was any report of that nature
22 prepared with respect to the consequences of S.B. 9
23 being implemented?
24     A.   Various documents that are prepared in the
25 course of legislation will address that issue.  I don't

Page 110

1  recall a specific document devoted only to that topic.

2      Q.  So let's go forward to the 2021 sessions.  So

3  you drafted S.B. 7?

4      A.  With the help of Legislative Council and my

5  staff, yes.

6      Q.  All right.  And what was the text of S.B. 7

7  from your recollection?  What was included in the text

8  of S.B. 7?

9      A.  So S.B. 7 dealt with -- well, again, as the

10  words of the bill demonstrate, dealt with a number of

11  the matters that we've talked about.  The process

12  for -- for ballots by mail, ballot harvesting, those

13  claiming to assist voters, but were addressed also.

14  Senate Bill 7 contains provisions about election day

15  processes for voting in person; of course, paper

16  backup, auditable papers trails were worked on for a

17  long time; verification -- verification of the accuracy

18  of voting machines, voting equipment.  Those are some

19  of the -- some of the broad topics that you'll see when

20  you look at Senate Bill 7.

21      Q.  When you and your staff drafted S.B. 7 or made

22  comments on what the Legislative Council had drafted

23  regarding S.B. 7 did you consider any impact it might

24  have on minority voters that was implemented?

25          MR. SWEETEN:  Objection.  That's clearly

Page 111

1  legislatively-privileged.  I'm going to instruct you

2  not to answer that question.  He's asking you what you

3  considered.  That's legislatively-privileged.

4      Q.  (BY MR. BROUGHTON)  Are you refusing to answer

5  that question?

6      A.  I'm going to follow my lawyer's advice and

7  refuse to answer that question.

8      Q.  You would not want -- or you would not be in

9  favor -- whether you proposed a bill or not, you would

10  not be in favor of Texas implementing a law that

11  discouraged minority voters from voting, would you?

12          MR. SWEETEN:  Okay.  We're back in the

13  legislative privilege.  You're asking about his mental

14  impressions about -- that -- that could impact the

15  bill.  To the extent you can answer without revealing

16  your thought processes or mental impressions about the

17  bill, you can answer.  But, otherwise, I'm instructing

18  you not to answer.

19          THE WITNESS:  Okay.  Of course not.

20      Q.  (BY MR. BROUGHTON)  How about with respect to

21  disabled persons?

22          MR. SWEETEN:  Same instruction.

23          THE WITNESS:  Of course not.

24      Q.  (BY MR. BROUGHTON)  Did you work with any

25  other members of the Texas Legislature in drafting

Page 112

1  S.B. 7?

2      A.  Yes.

3      Q.  Okay.  And who else did you work with?

4      A.  A number of legislators were involved.

5  Senator Paul Beckencort from Houston, Senator

6  Judith Safarini from Laredo.  Those were two senators

7  that offered --

8          MR. SWEETEN:  Don't get into the

9  substance of the communication.

10          THE WITNESS:  Okay.

11          MR. SWEETEN:  You can -- you can answer

12  did you -- you know, that question, but don't get into

13  the substance of what y'all talked about.

14          THE WITNESS:  Okay.  Thank you.

15          Many senators offered input elements to

16  be considered for Senate Bill 7.  I mentioned -- I

17  mentioned those two.  There were also standalone

18  bills -- this is a matter of record -- that were filed,

19  for example, for the auditable paper trail, other

20  provisions that were filed by other members of the

21  Senate, Republican and Democrat, that we then included

22  in Senate Bill 7.  So would the names of those senators

23  be helpful?  It's --

24      Q.  (BY MR. BROUGHTON)  Sure.

25          THE WITNESS:  Is that okay to talk about

Page 113

1  that?

2          So Senator Jose Menendez from

3  San Antonio, Senator Dawn Buckingham from Travis

4  County, Senator Bob Hall from Edgewood, Senator

5  Brandon Crayton from Conroe.  Those are -- let me back

6  up.

7          In the legislative process their

8  discussions, their debates, they were amendments offered,

9  that's all a matter of public record.  Those are the

10  senators who come to mind as members of the Senate with

11  whom we had discussions which led to elements being

12  included -- and I would add Senator Royce West to that

13  list -- again, those senators whom I recall having

14  discussion with that led to elements being included in

15  Senate Bill 7.  I'm sure there are others, but those

16  are the ones I recall as we -- as I sit here today.

17      Q.  (BY MR. BROUGHTON)  Does the term "omnibus

18  bill" have a meaning to you?

19      A.  Yes.

20      Q.  And what does that mean to you?

21      A.  I don't know if there's a legal definition,

22  but in the Texas Legislative vernacular at least it

23  refers to a bill on a broad topic with a number of

24  discrete elements as opposed to a single narrow issue

25  bill.  At least that's how I have used the term, and I

Page 114

1  think -- I think it's used generally in that way.

2      Q.  And you would personally consider S.B. 9 to

3  have been an omnibus bill, right?

4          MR. SWEETEN:  Yeah, I think his personal

5  consideration of S.B. 9 and how it works, whether -- I

6  think you're getting into his mental processes related

7  to legislation, so --

8      Q.  (BY MR. BROUGHTON)  So you're going to refuse

9  to answer that question?

10     A.  I'm going to refuse to answer that.  I can

11  observe in the public record that it has been referred

12  to as an omnibus elections bill.

13     Q.  Similarly, the public record referred to

14  S.B. 7 as an omnibus bill, right?

15     A.  I believe that's correct.

16     Q.  And you mentioned that there were several

17  other senators who proposed individual, for lack of a

18  better term, one-topic bills on topics that were also

19  included in S.B. 7, right?

20     A.  That's correct.

21     Q.  And S.B. 1 was referred to in the public

22  record as an omnibus bill, right?

23     A.  It was.

24     Q.  So tell us what happened with respect to

25  S.B. 7 in the State Affairs Committee.

Page 115

1          MR. SWEETEN:  You can refer to matters of

2  the public record testimony or how the bill -- anything

3  that we could find on the Legislative Council website

4  about how it progressed and what happened.

5          THE WITNESS:  Senate Bill 7 followed --

6          MR. SWEETEN:  Otherwise, the legislative

7  privilege.

8          Go ahead.

9          THE WITNESS:  Okay.  Thank you.

10         So speaking on matters that are available

11  publicly and are a matter of record, Senate Bill 7

12  proceeded in the way that we have discussed the bill.

13  I filed the bill, the bill was referred to the Senate

14  Committee on State Affairs, the bill was heard in

15  committee, testimony was offered on the bill.  A --

16  the -- a vote was taken in the committee.  The majority

17  of the members voted to send the bill onto the floor of

18  the Senate and the bill was -- made it to the floor of

19  the Senate, was debated and passed.

20     Q.  (BY MR. BROUGHTON)  Do you recall whether you

21  or your office received any input from any third-party

22  organizations regarding the content of S.B. 7?

23         MR. SWEETEN:  So on that I'm, again,

24  going to object as to legislative privilege and

25  instruct him not to answer.  If you're asking about

Page 116

1  contacts, privileged log information, you can ask that.

2  But as far as the substance or -- or what -- or input,

3  as you've termed it, I believe that -- that treads on

4  legislative privilege.

5          MR. BROUGHTON:  I wasn't asking about the

6  substance.

7      Q.  (BY MR. BROUGHTON)  I'm just asking about, did

8  any third-party organizations provide your office, you

9  or your office, with any information, opinions, and

10  their information or opinions or input about S.B. 7?

11         MR. SWEETEN:  Same objection, but I will

12  just tell him that you can -- you can discuss whether

13  you were contacted regarding the bill.  But as far as

14  the substance of the contact, which I think "input"

15  encompasses, then I'm going to object as to -- on the

16  basis of legislative privilege.

17         THE WITNESS:  So, then, groups which

18  contacted us about the bill?

19     Q.  (BY MR. BROUGHTON)  Yes.

20     A.  Is that what we're talking about?

21     Q.  Yeah, just the identity of those groups.

22     A.  Okay.  Would that include testimony offered in

23  the hearing or coming directly to our office or --

24     Q.  Apart from testimony at the hearing.

25     A.  Okay.  So, yes, there was such contact.

Page 117

1      Q.  And who do you recall?  What third-party

2  groups, just the identity of those groups, do you

3  recall contacting your office?

4      A.  Chase Bearden with -- a leader in the

5  disability rights community.  And we had -- I'm fairly

6  certain we had contact from Ms. Perales or her office,

7  the Texas Public Policy Foundation.  Those are the ones

8  that I recall.  Of course, we're not talking about

9  testimony before the committee, but those are the ones

10  I recall offering input.  There were -- I can't -- I'm

11  not sure that's all, but those are the ones that I

12  recall offering input in the process to our office

13  directly.

14     Q.  You do recall the Heritage Foundation

15  contacting your office, right?

16     A.  There were -- there were probably e-mails.  I

17  mentioned to you the Texas Public Policy Foundation.

18  They do not have a formal relationship with the

19  Heritage Foundation, but I think -- I think the Texas

20  Public Policy Foundation may have -- I think some of

21  their input may have been related to the Heritage

22  Foundation.  I'm sure there are e-mails and, again,

23  documents slipped under the door.  But as far as

24  contact with me or specific contact with input for the

25  bill, those are the groups I remember.

Page 118

1      Q.   So I've seen a video where I believe it was
2   the president of the Heritage Foundation claimed to
3   have written all or parts of S.B. 7 or S.B. 1.  Would
4   that video be inaccurate?
5      A.   Well, the current president of the Heritage
6   Foundation was with the Texas Public Policy Foundation,
7   so that might explain it.  But I don't know the video
8   or the name of the person involved, but that's just
9   going to be my recollection.  But the current president
10  Heritage was with Texas Public Policy Foundation last
11  year during the consideration of Senate Bill 7 and
12  Senate Bill 1.
13     Q.   So you don't recall ever seeing or hearing
14  about that video?
15     A.   I don't recall.  If you -- if you show it to
16  me I might remember.  But I'm embarrassed.  I don't
17  recall.
18     Q.   So assuming that such a -- in such a video
19  that individual claimed credit for some of the wording
20  in S.B. 7 or S.B. 1, would you agree or disagree with
21  his statement?
22          MR. SWEETEN:  I'm going to object on
23  legislative privilege.  I'm also going to object on
24  assumes facts not in evidence and incomplete
25  hypothetical.

Page 119

1          So don't answer the question.
2      Q.   (BY MR. BROUGHTON)  Do you recall if anyone
3   from the Texas Public Policy Foundation or the Heritage
4   Foundation provided any of the wording for S.B. 7 or
5   S.B. 1?
6          MR. SWEETEN:  I'm going to object.  I
7   think you're calling for matters that are -- that are
8   privileged under the legislative privilege, so I'm
9   going to instruct not to answer on that question.
10     Q.   (BY MR. BROUGHTON)  Are you refusing to answer
11  that question?
12     A.   I'm going to follow my lawyer's advice.
13     Q.   Did you contact anyone with the governor's
14  office about the provisions of S.B. 7?
15          MR. SWEETEN:  Objection, legislative
16  privilege.
17          MR. BROUGHTON:  I didn't ask for content.
18  I just asked for identity.
19          MR. SWEETEN:  In other words, was
20  there -- did he discuss, what, S.B. 1 with the
21  governor's office?  Is that the question?
22          MR. BROUGHTON:  Did he have any
23  communication with anyone in the governor's office
24  about the provisions of S.B. 7?
25          MR. SWEETEN:  You can answer whether a

Page 120

1   communication occurred.  Don't provide the substance of
2   the communication.
3          THE WITNESS:  Yes.
4      Q.   (BY MR. BROUGHTON)  And did you have any
5   communication with anyone from the governor's office
6   regarding the contents of S.B. 1?
7          MR. SWEETEN:  Same objection, same
8   instruction.
9          THE WITNESS:  Yes.
10     Q.   (BY MR. BROUGHTON)  Did you have any
11  communication with anyone from the Texas Attorney
12  General's office regarding the content of S.B. 7?
13          MR. SWEETEN:  Same objection, but I'll
14  also add attorney/client privilege with respect to
15  that.
16          You can answer whether or not a contact
17  was had.
18          THE WITNESS:  Yes.
19     Q.   (BY MR. BROUGHTON)  Did you have any
20  communication with anyone at the Attorney General's
21  office regarding the contents of S.B. 1?
22          MR. SWEETEN:  Same instruction, same
23  objection.
24          THE WITNESS:  Yes.
25     Q.   (BY MR. BROUGHTON)  Did you have any contact

Page 121

1   with anyone at the Texas Secretary of State's office
2   regarding the contents of S.B. 7?
3          MR. SWEETEN:  Same objection, same
4   instruction.
5          THE WITNESS:  Keith Ingram from the
6   Secretary of State's office testified in the committee
7   on the bill.  There may have been -- Keith Ingram and
8   other folks from the Secretary of State's office
9   testified on -- I'm certain on both bills.
10     Q.   (BY MR. BROUGHTON)  Have you found
11  Keith Ingram to be a truthful person, in your opinion?
12     A.   Yes.
13     Q.   Have you found him to be a knowledgeable
14  person?
15     A.   Yes.
16     Q.   A competent person?
17     A.   Oh, yes.
18     Q.   Did you have any communications, you or your
19  staff have any communications with any election
20  administrators about the content of S.B. 7?
21          MR. SWEETEN:  You can answer with respect
22  to whether contact was had, but don't provide the
23  substance of the communication.
24          THE WITNESS:  Yes.
25     Q.   (BY MR. BROUGHTON)  Okay.  Did you have any

Page 122

1 communication with any election administrators
2 regarding the content of S.B. 1?
3            MR. SWEETEN:  Same objection, same
4 instruction.
5            THE WITNESS:  Yes.
6       Q.   (BY MR. BROUGHTON)  At the State Affairs
7 Committee hearing on S.B. 7 with respect to matters on
8 the public record, do you recall any of the witnesses
9 who expressed concern about any of the provisions in
10 S.B. 7?
11           MR. SWEETEN:  Matters of public record
12 you can respond.
13           THE WITNESS:  Yes.
14      Q.   (BY MR. BROUGHTON)  And tell me about each
15 witness who you do recall who expressed concern.
16      A.   There were -- I mentioned Mr. Bearden earlier
17 from the disability rights community.  He testified.
18      Q.   Do you recall what concerns he expressed on
19 the public record?
20      A.   As I recall, he had concerns with some of the
21 specific provisions and how those might play out on the
22 ground.  And, again, this is in public record.  I think
23 if we go back and watch that hearing we'll see that he
24 had suggestions about how the goal might be
25 accomplished in a way that would address his concerns.

Page 123

1 That's my recollection.
2            And then the -- oh, my goodness.  There's
3 another witness whose name escapes me.  I've known him
4 for a long time.  He wears a cool cowboy hat.  He's the
5 head of NAACP Texas.  I'm so embarrassed, Ms. Perales.
6 He's going to -- anyway, he --
7            MS. PERALES:  No, I know you know.  It's
8 Gary Bledsoe.
9            THE WITNESS:  Gary Bledsoe.  I was going
10 to say Gary.  Gary Bledsoe.  Thank you.  He testified
11 with concerns about the bill.  Ms. Perales testified.
12 And, again, the public record will indicate that
13 matters on which he offered some -- it's in public
14 records -- offered some suggestions to be considered.
15 There were a number of individual witnesses not
16 representing groups who testified some -- many for the
17 bill, many against the bills, some with specific
18 concerns, some with generalized concerns.  We could go
19 back and look -- you know, look at the record.
20            But as far as those -- those folks
21 representing groups of people or -- or -- those are the
22 ones that come to mind.  You asked about the ones who
23 expressed concerns, right?
24      Q.   Correct.
25      A.   Those come to mind.  And we can go back and

Page 124

1 look at the witness list and -- for others, but I
2 definitely recall those.
3      Q.   Were any changes made to the bill after -- was
4 there just one hearing from witnesses on S.B. 7?
5      A.   My recollection is there was one hearing on
6 Senate Bill 7, yes, sir.
7      Q.   Any changes made to S.B. 7 after that hearing?
8      A.   The -- within the public record -- without
9 telling you what my mental impressions were and my
10 processes were, the public record will indicate that
11 suggestions offered by some of those witnesses were
12 taken to heart and were implemented in the bill.
13           MR. SWEETEN:  Okay.
14      Q.   (BY MR. BROUGHTON)  And so ultimately I think
15 you said the committee approved that; is that right?
16      A.   Yes.
17      Q.   And then it proceeded to the full Senate?
18      A.   Yes.
19      Q.   Okay.  And I think you told us the Senate
20 passed it?
21      A.   Yes.
22      Q.   All right.  What was done with respect to the
23 House regarding S.B. 7?
24      A.   I don't -- I didn't follow every step of the
25 process in the House.  I can tell you what -- what

Page 125

1 happened publicly that I recall.
2      Q.   That's all I'm asking you.
3      A.   Okay.  Thank you.  You were asking about
4 companion bills earlier.  As I recall, the House was
5 moving an omnibus, if you will, elections bill,
6 addressed some of the same matters just looking at the
7 face of the two bills, the faces of the two bills.
8 That -- as I recall, that bill went through a hearing
9 in the committee and the House.  And at some point my
10 recollection is maybe on the floor of the House the --
11 those bills were substituted, so the Senate bill was
12 brought up in lieu of the House bill.  And forgive me
13 if I'm butchering the House rules, but it did make it
14 to that point in the process.
15           I don't believe the bill ultimately
16 passed the House.  And if I'm conflating the multiple
17 sessions I apologize.  This is just my recollection of
18 what happened.
19      Q.   Okay.  So S.B. 7 passed in the Senate, but it
20 did not pass in the House?
21      A.   I believe that's correct.
22      Q.   And what happened next with respect to S.B. 7?
23      A.   Well, the legislative session came to an end
24 and the bill did not pass, so that bill ended.  And so
25 whenever a session ends everything that did not become

Senator Bryan   Hughes
April 19, 2022                    126 to 129

Page 126

1   law dies.  And so the governor called a special session
2   and the process started over.  So a new bill was filed
3   and the process which we've described had to start
4   over.
5       Q.   Okay.
6       A.   So Senate Bill 7 ended with the end of that
7   session.  It's -- there was no way -- you know, again,
8   when the session ends everything dies and the process
9   begins afresh in the next special or regular session.
10      Q.   Okay.
11           MR. BROUGHTON:  So we talked about taking
12  a lunch break about ten minutes ago.  So it's 1:25, so
13  do you want to take a lunch break now?
14           MR. SWEETEN:  That's fine.
15           MR. BROUGHTON:  So we think 30 minutes is
16  good?
17           MR. SWEETEN:  Plenty.
18           MR. BROUGHTON:  All right.  Great.  So
19  we'll come back at 1:55, right?
20           MR. SWEETEN:  Yeah.
21           THE VIDEOGRAPHER:  Of.
22           MR. BROUGHTON:  All right.
23           THE VIDEOGRAPHER:  Off the record, 1:25.
24      (Lunch recess from 1:25 p.m. to 2:05 p.m.)
25           THE VIDEOGRAPHER:  Stand by.  This is

Page 127

1   Segment No. 4.  We're back on the record, 2:05.
2       Q.   (BY MR. BROUGHTON)  Before our lunch break we
3   had -- I asked you several questions about contacts or
4   communications that you or your staff had had with
5   outside third parties.  Do you recall generally that we
6   had some questions about that?
7       A.   I do.  And I think we were talking about
8   outside third parties who had concerns about the bill.
9   But I do remember the discussion, yes.
10      Q.   Okay.  And so I'm going to follow up there.
11  And I'm not limiting it to who had concerns about the
12  bill, but I'm interested in communications between your
13  office and any outside third party such as these think
14  tanks or lobbyist groups regarding S.B. 7.  Okay?
15      A.   Okay.
16      Q.   What communications -- and you mentioned the
17  Texas Public Policy -- is it Forum?
18      A.   Foundation.
19      Q.   Foundation.  Texas Public Policy Foundation.
20  Did you or your staff have communications -- I believe
21  you said you did have some communications with the
22  Texas Public Policy Foundation, right?
23      A.   Yes.
24      Q.   And what was the substance of those
25  communications?

Page 128

1           MR. SWEETEN:  So I'm going to instruct
2   you not to -- not to answer on the basis of legislative
3   privilege.
4       Q.   (BY MR. BROUGHTON)  And just so I'm clear,
5   nobody with the Texas Public Policy Foundation was in
6   the legislature or part of the legislative staff,
7   correct?
8       A.   I believe that's correct.
9       Q.   Okay.  So are you following your attorney's
10  advice that you will not tell me about communications
11  between you or your office and persons at the Texas
12  Public Policy Foundation?
13      A.   You asked about substance of those
14  communications and I'm going to follow the lawyer's
15  advice.
16      Q.   All right.  The same series of questions about
17  the substance of communications between you or your
18  office and anyone from the Heritage Foundation.
19           MR. SWEETEN:  Same objection.  Calls for
20  his mental impressions and communications, fact-finding
21  regarding the bill; therefore, I'm objecting as to
22  legislative privilege and instructing the senator not
23  to answer the question.
24      Q.   (BY MR. BROUGHTON)  So I wasn't asking for
25  your mental impressions.  I was asking for the

Page 129

1   substance of communications, what was said, whether in
2   writing or verbally, between you or your office and the
3   Texas Public Policy Foundation or the Heritage
4   Foundation.
5           MR. SWEETEN:  Same objection, legislative
6   privilege.  Instruct not to answer.
7       Q.   (BY MR. BROUGHTON)  Are you refusing to
8   answer?
9       A.   I'm following my lawyer's advice.
10      Q.   Okay.  So what other think tanks do you recall
11  you or your office having communications with regarding
12  the subject matter contained in S.B. 7?
13           MR. SWEETEN:  So same objection.  And
14  also the question is asking of him and his office,
15  and -- and I think that that is not within his personal
16  knowledge, so I'll add that as well.  But we're
17  objecting to him revealing the substance of
18  communications based on the legislative privilege.
19           MR. BROUGHTON:  So I'll reword that.
20      Q.   (BY MR. BROUGHTON)  What communications are
21  you aware of between anyone in your office and any
22  think tank or lobbyist group in addition to the Texas
23  Public Policy Foundation and the Heritage Foundation?
24           MR. SWEETEN:  So I'm going to again
25  object on legislative privilege.  I'm not sure if

Page 130

1   you're asking --
2            MR. BROUGHTON:  I'm asking for identity
3   at this point.
4            MR. SWEETEN:  Just identity?  So, in
5   other words, you're asking for basically privileged log
6   stuff?
7            MR. BROUGHTON:  Yes.
8            MR. SWEETEN:  So that's -- we'll let him
9   provide the contact, but not the substance based on
10  legislative privilege.
11           Go ahead.
12           THE WITNESS:  Okay.  And so think tanks,
13  lobby groups -- I just want to make sure I'm answering
14  precisely.  So think tanks --
15      Q.  (BY MR. BROUGHTON)  Who -- yes.
16      A.  So think tanks.  I believe the only think
17  tanks, as I understand that term or groups that refer
18  to themselves as think tanks, would be the Texas Public
19  Policy Foundation and the Heritage Foundation.
20      Q.  All right.  How about lobbying groups --
21           MR. SWEETEN:  Same instruction, same
22  objection.
23      Q.  (BY MR. BROUGHTON)  -- to the extent they're
24  separate and distinct in your mind from the Texas
25  Public Policy and the Heritage Foundations?

Page 131

1       A.  So would a group like -- like MALDEF be in the
2   category of a lobbying group?  I just want to make sure
3   I'm answering the question the way you're asking.
4       Q.  Do you consider them a lobbying group?
5       A.  Well, they're -- I don't know if they're
6   registered as lobbyists, but they represent people
7   before the legislature, so -- I'm not trying to split
8   hairs.  I just want to make sure I'm answering the
9   right question.
10      Q.  Sure.
11      A.  Sometimes they might be referred to as --
12  referred to as interest groups or -- or rights groups?
13      Q.  Okay.
14      A.  Would you like me to include those in my
15  answer?
16      Q.  So would you include -- let's -- let's say for
17  convenience and ease and not have to worry about
18  splitting hairs --
19      A.  Yes.
20      Q.  -- rather than use the term "lobbyists,"
21  interest groups, which would -- might include
22  lobbyists, might -- so really any interest groups that
23  you recall that you're aware of that your office had
24  communications with regarding S.B. 7?
25      A.  Yes.

Page 132

1            MR. SWEETEN:  Same objection and
2   instruction.
3            Go ahead.
4            THE WITNESS:  So MALDEF --
5       Q.  (BY MR. BROUGHTON)  Uh-huh.
6       A.  -- the Foundation For Government
7   Accountability, the NAACP, Disability Rights Texas.
8   There was also -- there were also communications
9   received from political parties.  Would those be under
10  this heading?
11      Q.  Sure.
12      A.  The two major parties in Texas, the Democratic
13  Party of Texas, the Republican Party of Texas.
14      Q.  Okay.
15      A.  As far as organized groups, those are the ones
16  that come to mind.  We could look and see -- see the
17  witness list from the hearing and see who testified,
18  but those are groups that come to mind as I sit here
19  today.
20      Q.  Okay.  So what communications do you -- what
21  was the substance of communications that you're aware
22  of at your office, which would include you, had with
23  MALDEF?
24           MR. SWEETEN:  So --
25           THE WITNESS:  So did you ask about the

Page 133

1   substance?
2       Q.  (BY MR. BROUGHTON)  The substance.
3            MR. SWEETEN:  Yeah, he asked about the
4   substance, and so I'm again going to object on
5   legislative privilege.  To the extent that this
6   involves his analysis or mental impressions about the
7   bill, I'm going to instruct not to answer as to the
8   substance of the communication.  Okay?
9       Q.  (BY MR. BROUGHTON)  So are you refusing to
10  answer that question?
11      A.  I'm following my lawyer's advice.
12      Q.  Okay.  So with respect to the foundation for
13  government accountability, what's your understanding of
14  what is that group?
15      A.  They are an interest group that, as I
16  understand, focus on open government, transparency,
17  matters like that.  At least the correspondence that I
18  see from them is generally in that broad category.
19      Q.  So what was the substance of communications
20  that you're aware of between your office and the
21  foundation for government accountability?
22           MR. SWEETEN:  Objection, legislative
23  privilege for reasons articulated previously.  Instruct
24  not to answer regarding the substance of those
25  communications.

Page 134

1          MR. BROUGHTON: And just so I'm clear,
2  I'm not asking for his mental impressions or thought
3  processes. I'm just asking for actually the substance
4  of what was said either verbally or in writing. So --
5          MR. SWEETEN: Understood.
6          MR. BROUGHTON: -- same --
7          MR. SWEETEN: Same instructions, same
8  objections.
9          MR. BROUGHTON: Okay. All right.
10     Q.   (BY MR. BROUGHTON) So you're refusing to
11  answer on that basis?
12     A.   I'm going to follow my lawyer's advice.
13     Q.   Okay. Same series of questions as to the
14  NAACP.
15          MR. BROUGHTON: Same thing?
16          MR. SWEETEN: That's -- it would be the
17  same objection on the substance if you're -- but there
18  were other questions about other groups. So if it's
19  about identity --
20          MR. BROUGHTON: Okay. All of -- I'm
21  going to ask a laundry list here --
22          MR. SWEETEN: Okay.
23          MR. BROUGHTON: -- all about the
24  substance.
25          MR. SWEETEN: Okay. That's helpful.

Page 135

1          MR. BROUGHTON: Okay.
2     Q.   (BY MR. BROUGHTON) The substance of
3  communications between -- that you're aware of between
4  your office and the NAACP.
5          MR. SWEETEN: Same objection, same
6  instruction.
7     Q.   (BY MR. BROUGHTON) Are you refusing to
8  answer?
9     A.   I'm going to follow my lawyer's advice.
10     Q.   Okay. Could you please tell me about the
11  substance of the communications that you're aware of
12  between your office and Disability Rights Texas?
13          MR. SWEETEN: Same objection, same
14  instruction.
15     Q.   (BY MR. BROUGHTON) Are you refusing to
16  answer?
17     A.   I'm going to follow my lawyer's advice.
18     Q.   Could you please tell me about the substance
19  of communications between -- that you're aware of
20  between your office and the Republican Party of Texas?
21          MR. SWEETEN: Same objection, same
22  instruction.
23     Q.   (BY MR. BROUGHTON) Are you refusing to answer
24  that question?
25     A.   I'll follow my lawyer's advice.

Page 136

1     Q.   Could you please tell me about the substance
2  of communications between -- that you're aware of
3  between anyone in your office and the Democratic Party
4  of Texas?
5          MR. SWEETEN: Same objection, same
6  instruction.
7     Q.   (BY MR. BROUGHTON) Are you refusing to
8  answer?
9     A.   I'm going to follow my lawyer's advice. I
10  don't know if I -- would give me the list of groups if
11  I -- if I included LULAC.
12     Q.   Okay. So could you please tell me the
13  substance of the communications that you're aware of
14  between anyone in your office and LULAC?
15          MR. SWEETEN: Same objection, same
16  instruction.
17     Q.   (BY MR. BROUGHTON) Are you refusing to answer
18  that question?
19     A.   I'm going to follow my lawyer's advice.
20     Q.   Before the lunch break I think we left off
21  when you were telling us about the end of the general
22  session and the calling of the special session, right?
23     A.   I believe that's right.
24     Q.   Okay. And we had not really launched into
25  that?

Page 137

1     A.   That's correct.
2     Q.   Okay. So do you recall how long after the end
3  of the general session that you found out that the
4  governor was going to call a special session?
5     A.   I don't recall. My memory is that there was a
6  gap, there was -- some time had passed. I don't recall
7  exactly how long.
8     Q.   Do you think it was days or weeks?
9     A.   It may have been weeks, but I don't think it
10  was months.
11     Q.   Okay. And so during that interim time period
12  did you have any discussion with anyone in the
13  governor's office about calling -- about the governor
14  calling a special session?
15          MR. SWEETEN: So I'm going to object
16  because it contains the subject matter and, therefore,
17  the substance of any such communication. I'm going to
18  object to him providing that substance, so I'm going to
19  instruct not to answer on the basis of legislative
20  privilege.
21     Q.   (BY MR. BROUGHTON) So are you going to refuse
22  to answer that question?
23     A.   I'm going to follow my lawyer's advice.
24     Q.   So any questions I ask you or that I want to
25  ask you about communications that you're aware of

Page 138

1  between your office and anyone from the governor's
2  office concerning S.B. 1 are you going to refuse to
3  answer?
4      A.   About the substance of those communications?
5      Q.   The substance of those communications.
6           MR. SWEETEN:  Yes.  Objection,
7  legislative privilege, so instruct not to answer.
8      Q.   (BY MR. BROUGHTON)  And you're going to refuse
9  to answer?
10     A.   I'll follow my lawyer's advice.
11     Q.   Earlier you told us about the search that your
12 office conducted to provide e-mails or other documents
13 to your counsel regarding issues in this lawsuit,
14 right?
15     A.   I remember discussing that, yes, sir.
16     Q.   Okay.  So did you yourself turn those over or
17 someone in your office send those to your counsel?
18     A.   Someone in my office did that.
19     Q.   Do you recall who did that?
20     A.   I worked directly with Drew Tedford and
21 Cody Terry, but I don't know exactly who did what after
22 that.
23     Q.   Okay.
24     A.   I know they took care of it.
25     Q.   Do you have any idea of the quantity of hard

Page 139

1  paper documents that were turned over to your counsel?
2      A.   I don't.
3      Q.   Have any idea about the number of e-mails that
4  were turned over to your counsel?
5      A.   No, I don't know.
6      Q.   Do you know if any of those documents have
7  actually been produced to the plaintiffs in this
8  lawsuit?
9      A.   No, I don't.
10     Q.   You don't know one way or the other?
11     A.   I don't.
12     Q.   So do you recall if the governor announced why
13 he was calling a special session?
14     A.   In the public record the governor calling a
15 special session issues it via proclamation, and the
16 proclamation must state the topics for consideration.
17 So I don't recall exactly what was in the proclamation.
18 We could look and see.  It would be a matter of public
19 record.
20     Q.   Was the subject matter of what became S.B. 1
21 included in the proclamation, to your recollection?
22     A.   My recollection from reading the proclamation
23 was it did include election integrity.  I don't recall
24 the exact words used, but I believe that's right.
25     Q.   Back to S.B. 7, do you recall receiving any

Page 140

1  input from any county officials from around the state
2  regarding the consequences of implementing S.B. 7?
3           MR. SWEETEN:  Objection, legislative
4  privilege.  His discussions of fact-finding and mental
5  impressions regarding the legislation are covered by
6  the legislative privilege and, therefore, to the extent
7  that your question is asking about the substance of
8  those communications I'm objecting on legislative
9  privilege and instructing him not to answer.  He can
10 answer whether or not he had contact with the county
11 administrator, but he's not going to reveal the
12 substance of those communications.
13     Q.   (BY MR. BROUGHTON)  Did you have any
14 communications with any elections administrators from
15 around the state regarding the -- any concerns about
16 the implementation of S.B. 7?
17           MR. SWEETEN:  Concerns?  I think -- I
18 think the question -- unfortunately, it presupposes the
19 substance of the communication and so, therefore, I'm
20 going to object on the basis of legislative privilege
21 to revealing the substance, but not whether or not the
22 contact occurred with a county administrator.
23     Q.   (BY MR. BROUGHTON)  So did you have any
24 contact with the county administrator -- election
25 administrators about how implementing S.B. 7 might

Page 141

1  impact them?
2           MR. SWEETEN:  I'm going to object
3  legislative privilege.  We're -- you're getting into
4  his fact-finding and mental impressions regarding the
5  bill, so I'm going to have to object.
6           MR. BROUGHTON:  All right.  Just to be
7  clear, I'm only asking about the substance of
8  communications, not his mental impressions.
9           MR. SWEETEN:  Okay.  And, again, the
10 senator in his process in evaluating a bill, the
11 communications that he's had, the fact-finding that he
12 may engage in would reveal his mental impressions about
13 the bill and the method by which, you know, he
14 evaluated the legislation and so, therefore, it's
15 legislatively privileged.  I'm going to instruct him
16 not to answer.
17     Q.   (BY MR. BROUGHTON)  Are you refusing to answer
18 that question?
19     A.   I'm going to follow my lawyer's advice.
20     Q.   So tell us about how S.B. 1 came about.
21           MR. SWEETEN:  Same objection, that you're
22 calling for his mental impressions and thoughts about
23 legislation and so I'm going to object except for to
24 the extent you would be asking matters of the public
25 record, like when it was filed, when it was heard,

Page 142

1  et cetera.  But he's not going to give his mental
2  impressions based on legislative privilege.
3          MR. BROUGHTON:  Okay.
4      Q.   (BY MR. BROUGHTON)  Are you refusing to answer
5  that question?
6      A.   Well, I'm refusing to answer to the extent
7  that my lawyer objected.  I can tell you that in the
8  public record it's clear that once the special session
9  was called I filed Senate Bill 1 and began the process
10  generally that we described earlier.
11     Q.   Okay.  And so you filed S.B. 1 in the special
12  session and then you -- you were chairman of the
13  committee, right?
14     A.   Yes.
15     Q.   So you set a hearing date?
16     A.   Yes.
17     Q.   Did you or your office invite specific
18  witnesses to testify?
19     A.   We could look at the witness list.  I don't
20  recall if there was invited testimony or if it was all
21  public testimony.  There was a lot of testimony.  I
22  don't recall if we had invited witnesses at that --
23  that is to say witnesses designated as such at that
24  hearing or not.
25     Q.   And does the public record state whether they

Page 143

1  were an invited witness or just showed up on their own
2  accord?
3      A.   It may.  I'm not sure if they are delineated
4  as such on the witness list.  But if one were to watch
5  the recording of the hearing, normally the chair will
6  say, "We'll open invited testimony."  And after that
7  normally the chair will say, "We'll now open public
8  testimony."  So we could go back and watch the video,
9  but I'm embarrassed.  I don't recall exactly for that
10  hearing.
11     Q.   And the chair is you?
12     A.   Yes, sir.
13     Q.   So that would be you saying that?  Okay.
14     A.   Unless I was, you know, using the restroom and
15  the vice chair had the gavel.  But, generally speaking,
16  that's going to be me, yes, sir.
17     Q.   Okay.  And so if I understand you correctly,
18  during the hearing those -- any -- if there were
19  invited witnesses they would be called first, and then
20  once that concluded then the chair would say,
21  "Okay.  We're now opening up for public testimony"?
22     A.   That's correct.  I recall in one of those
23  hearings -- I believe it was Senate Bill 1 -- and I'm
24  just talking about things that were stated from the
25  dais in the hearing.  A number of witnesses had come in

Page 144

1  from out of town and the senator representing them
2  asked they be taken out of order so that they could get
3  back on the road.  They -- I think they were -- had
4  charted a bus.  So there's always going to be
5  housekeeping matters like that.  But, generally
6  speaking, invited testimony will be at the front.
7      Q.   And was there just one hearing on S.B. 1?
8      A.   We could -- we would have to look at the
9  record, but my recollection is there was one -- one
10  hearing where testimony was taken, and then at a
11  subsequent hearing the vote was taken.  That's my
12  recollection.
13     Q.   Okay.  And I know the record will speak for
14  itself, but do you recall about how long that first
15  hearing that included testimony lasted?
16     A.   I recall it was many hours.  It was hours.
17  There was quite a bit of testimony.  And, again,
18  everyone who comes to testify gets to testify, so I
19  know it was hours.
20     Q.   Do you recall any person or group that
21  specifically testified against S.B. 1?
22     A.   I can tell you generally there were many
23  witnesses for, many witnesses against.  Again, the
24  witness list will indicate whether the witness --
25  whether each witness testified on, for, or against.

Page 145

1  Some witnesses offered testimony on the bill expressing
2  opinions or answering questions, but not for or
3  against.  Most state their position as for or against.
4  So we could look at that witness list and it would tell
5  us.
6          My recollection is there was more for
7  than against, but there was a lot of testimony on that
8  bill.  And did you ask if I remember specific
9  individuals?  Forgive me.  I think I answered about the
10  testimony generally.
11     Q.   Yeah.  I did, yeah.
12     A.   And so there were some specific witnesses.
13  Would you like me to tell you every witness that I
14  remember by name or --
15     Q.   Sure.  That would be great.
16     A.   -- were you looking for groups or --
17     Q.   Either by name or by group.
18     A.   Well, Keith Ingram from the -- who runs the
19  elections division of the Secretary of State's office
20  testified.  And, of course, since he works for a state
21  agency his testimony would be on the bill.  State
22  employees do not testify for or against.  Agency
23  employees do not.  He testified at some length.  And,
24  as I recall, he was called up multiple times by
25  Republican and Democrat members of the committee who

Page 146

1  had questions about the law and about the running of
2  the elections process.  So I recall his testimony.
3        I believe Ms. Perales testified and
4  Mr. Bledsoe, I believe testified, whom we talked about
5  before from the NAACP.  The gentleman from the
6  Foundation For Government Accountability that we
7  discussed earlier I'm pretty sure testified.  A
8  representative from the Republican Party of Texas
9  testified.  A representative from the Democratic Party
10 of Texas testified.  A number of individuals -- and I
11 did not memorize the names of the individuals --
12 testified.  But dozens of witnesses, scores of
13 witnesses testified.
14        Congressman O'Roarke testified, I
15 believe, at the -- Congressman Beto O'Roarke, I
16 believe, testified at the hearing on Senate Bill 1.
17 Again, the record will show, but I believe he testified
18 at the hearing on Senate Bill 1 as well.
19    Q.   How about anyone from the Heritage Foundation?
20    A.   We would have to look at the list and I will
21 defer to what's on the list.  I don't remember a
22 witness from the Heritage Foundation.
23    Q.   How about the Texas Public Policy Foundation?
24    A.   I believe there was a witness from the Texas
25 Public Policy Foundation.  I believe that's right.

Page 147

1  Again, the list will tell us.
2    Q.   Leading up to that hearing had you had any
3  meetings outside of the committee setting with any of
4  the legislators to discuss S.B. 1?
5        MR. SWEETEN:  You can answer that because
6  it's just topically about S.B. 1 and was there a
7  conversation.  Go ahead.
8        THE WITNESS:  So to make sure I'm clear
9  about meetings, you know in the course of the day --
10   Q.   (BY MR. BROUGHTON)  Just discussions?
11   A.   -- over a meal, passing in the hall, or do you
12 mean a meeting that we called to discuss the bill?  I
13 just want to make sure I'm answering the right
14 question.
15   Q.   Any of those; passing in the hall, over lunch,
16 over coffee.
17   A.   Yes, I would say that there were conversations
18 like that with most of the members of the Senate at
19 some point, between me and the majority of the members
20 at the Senate at some point had a discussion like that.
21 Many -- probably more than one for most senators.
22   Q.   So at what point in time -- I assume that
23 members of the State Affairs Committee received a copy
24 of S.B. 1?
25   A.   Yes.

Page 148

1    Q.   All right.  And when would they have received
2  that, if you recall?
3    A.   Oh, the -- we would have to go back and look
4  because there's a -- once the bill is filed and it's
5  made available we have to go back and look.  I don't
6  recall exactly when it took place, but it was after the
7  bill was filed.
8    Q.   Okay.  And do you recall, did you file it the
9  first day of the legislative session?
10   A.   I don't know if it was the first day, but it
11 would have been pretty early.  I know we -- it would
12 have been our goal to file it the first day.  I can't
13 recall if we did.  We could look at the record and see,
14 but it should have been pretty early given that we have
15 such a short timeframe in a special session.
16   Q.   So is it your recollection that most of the
17 testimony at the hearing on S.B. 1 was in favor of S.B.
18 1?
19   A.   I don't recall exactly.  Again, we could look
20 at the witness list.  It's public record.  But I don't
21 know.  There was a lot of testimony on both sides, but
22 I don't recall whether it was -- whether the majority
23 was for or against of the folks who testified.
24   Q.   So after the -- so you told us about the first
25 hearing where there was testimony, that it lasted

Page 149

1  several hours.  Do you recall how many days until there
2  was the vote?
3    A.   If memory serves me, the vote was the next day
4  or the -- it was within a matter of days.  I'm going to
5  say one or two days.
6    Q.   Okay.
7    A.   Again, this -- again, the record will show.
8  But if I'm correct we went pretty late into the night
9  to get -- to allow every witness to testify, and then
10 came back the next day, maybe mid-morning.  And, again,
11 I'm -- this is a guess based on my memory, but we voted
12 on it the next day or the following day.
13   Q.   And do you recall what the vote was?
14   A.   I do not recall.  It was a majority.  The bill
15 passed, but I do not recall what the vote tally was.
16 That will be in the record as well.
17   Q.   And once it passed, then it went to the full
18 Senate?
19   A.   Yes.
20   Q.   Okay.  And was there -- during the special
21 session was there a companion bill going through the
22 House?
23   A.   I believe -- I believe there was.  My
24 recollection is that there was.  Again, the House
25 journal and the Senate journal will make this clear,

Senator Bryan  Hughes
April 19, 2022                                    150 to 153

Page 150

1  and so will the -- you know, the video recordings of
2  the hearing, but I believe there was a companion bill
3  moving in the House at the same time.
4      Q.   And so what happened once this bill went to --
5      A.   May I correct something I said?
6      Q.   Yes.
7      A.   Forgive me.  I'm not trying to interrupt you,
8  but I told you I believe there was a companion bill.
9  As I mentioned before in previous testimony,
10 designation of a bill as a companion, that's a process
11 in that it's handled by the parliamentarian in the
12 House and in the Senate.  And so I don't know if the
13 bill -- if the big elections bill moving through the
14 House while Senate Bill 1 was moving in the Senate --
15 I'm not sure at what point they were declared
16 companions or if amendments made them companions.  But
17 there was -- I think I called it a companion bill.  I
18 don't want to imprecise.  There was an elections
19 bill -- an omnibus elections bill moving in the House
20 while Senate Bill 7 was moving, but I know they were
21 not identical.
22     Q.   All right.  And so what ultimately happened in
23 the Senate with respect to S.B. 1?
24     A.   Senate Bill 1 was debated on the Senate floor.
25 A long debate and the bill passed.

Page 151

1      Q.   Was it an overnight debate?
2      A.   I believe it was.  There were a number of big
3  bills.  And by "big," I mean bills that got people's
4  attention and had interest on both sides during 2021,
5  and this was certainly one of them.  And I believe it
6  was an overnight debate and -- at least it went late
7  into the night, and then -- that's right.  And I
8  believe Senate -- I want to say Senate Bill 1 was --
9  was filibustered by one of my colleagues.  I believe
10 that was Senate Bill 1.  Again, the record -- the
11 record will show.  But the filibuster did not kill the
12 bill after a number of hours.  The filibuster -- the
13 bill was -- was allowed to vote and the bill did pass.
14     Q.   How many special sessions have you served on
15 in your tenure either in the House or the Senate?
16     A.   I don't know exactly, but my first session in
17 the House in 2003 -- there were several.  Maybe --
18 maybe close to 20.  Not more than 20, I would say, in
19 the time I've been in the legislature.  I may be wrong
20 about that, but certainly close to 20.
21     Q.   Okay.  How many overnight debates have you
22 participated in?
23     A.   Between the House and the Senate -- and by
24 "participate" -- to make sure I'm understanding the
25 question, do you mean --

Page 152

1      Q.   Attended.
2      A.   Ah.  Thank you.  I would say in the time I've
3  been in the House and Senate half a dozen to ten.
4  Committee hearings going overnight are a little more
5  common than that.  But as far as debates on the floor
6  to go overnight, probably six to ten.  That was
7  imprecise.  Committee hearings going overnight are much
8  more common, but, again, floor debates six to ten.
9      Q.   All right.  And so the Senate passed S.B. 1
10 basically along party lines.  Is that your
11 recollection?  I know the record speaks for itself.
12     A.   We have to look.  I believe that's correct.
13 We have to look and see, but I believe that's right.
14     Q.   And what happened at that point with that
15 bill?
16     A.   So the bill made its way over to the House for
17 consideration there.
18     Q.   All right.  And were there changes made to the
19 bill according to the public record?
20     A.   Yes.  Thank you for that question.  The --
21 it's just clear in the public record that the House
22 made some changes to the bill when it got over there.
23     Q.   Didn't the House change the text of the bill
24 in its entirety?
25     A.   The House -- I mentioned before that there was

Page 153

1  an omnibus elections bill moving through the House
2  while Senate Bill 7 was moving.  And I'm not an expert
3  on the house rules.  Well, I guess we established
4  before I'm not an expert on anything.  But the House
5  rules -- under the House rules I believe a motion was
6  made to substitute one bill for the other.  And so
7  there were many common elements in the two bills, but
8  they were not identical.  So at the end of the day the
9  House passed a version of the bill that was different
10 than the Senate had passed, which is not uncommon for a
11 big bill.  It's very unusual for one house to accept
12 exactly what is sent to it by the other house.  In
13 fact, that's -- in a big bill that never happens.  I'm
14 probably rambling now.  Sorry.
15     Q.   Okay.  So -- just so I'm clear, so the House
16 passed -- the House omnibus bill, not the Senate
17 omnibus bill?
18     A.   We have to go back and look at the record.  It
19 was in the debate.  My recollection is they
20 substituted -- they brought up -- my recollection is
21 they brought up Senate Bill 1 and then substituted the
22 text of the House bill, but still in the -- in the
23 vehicle of Senate Bill 1.  So made some changes to the
24 bill.  That's my recollection.  It's been a while, but
25 that's what I recall happening.

Senator Bryan  Hughes
April 19, 2022                           154 to 157

---

Page 154

1    Q.  Do you ever recall an incident like that
2  happening in your years at the legislature?
3    A.  Yes.
4         MR. SWEETEN:  Matters of public record.
5  You can --
6         THE WITNESS:  We could -- yes, we could
7  certainly look back on previous sessions, and even that
8  session, and see where that happened.  Yes, we
9  mentioned before that a bill has to make it through
10  both houses.  And especially in a special session with
11  compressed time it is more common for a maneuver like
12  that so that the bill doesn't have to start all the way
13  from the beginning in the other house.
14         MS. DULANEY:  I think we might have lost
15  them.
16         THE STENOGRAPHER:  No.
17         MR. SWEETEN:  Are they saying they can't
18  hear or something?
19         MS. DULANEY:  The Wi-Fi just went out.
20    Q.  (BY MR. BROUGHTON)  So the -- obviously during
21  the general session and the special session in 2021 we
22  were still kind of in the middle of the Covid pandemic,
23  right?
24    A.  I don't know if we were in the middle of it,
25  but it was still a matter of public debate.

---

Page 155

1    Q.  And there was a decision by your committee
2  that virtual testimony would not be allowed?
3    A.  We would have to go back and look at the
4  public record.  The Senate -- and we talked about the
5  Senate rules earlier.  I recall public discussions on
6  the floor of the Senate about changes to the Senate
7  rules about -- and about Covid-19 procedures, about
8  testing, about masks, and all those things.  But you
9  asked if there was a decision by our committee not to
10  allow virtual testimony.  I believe the decision was
11  made to allow in-person testimony with testing for
12  folks in the Capitol to address the concerns about
13  Covid.  Is that -- is that what you're asking?  I'm
14  sorry.  I got to rambling there.
15    Q.  No, that's helpful.  So -- so virtual -- if
16  somebody wanted to testify virtually they would not
17  have been allowed to do so; is that correct?
18    A.  That is historic and not allowed under the
19  Senate rules, which I believe that's correct.
20         Now, we -- to clarify, we did open up and
21  publicize a portal so that anyone could submit written
22  testimony that would be part of the official record and
23  shared with the committee.  But as far as oral
24  testimony, that would not be offered virtually.
25    Q.  Okay.  You told us that after -- with respect

---

Page 156

1  to S.B. 7 that after the witnesses had offered
2  testimony -- excuse me -- some changes were made to
3  S.B. 7, right?
4    A.  That's right.  That's demonstrated by the
5  public record, that's right.
6    Q.  Okay.  After testimony was received at the
7  hearing about S.B. 1 were any changes made to S.B. 1?
8    A.  The record will show that there were after the
9  hearing and also during debates on the floor.  The
10  record will demonstrate that when concerns were raised
11  those were many times -- many times those were
12  addressed in both the committee and during the floor
13  debate.
14         MR. BROUGHTON:  Can we take like about a
15  ten-minute break right now?
16         MR. SWEETEN:  Of course.
17         MR. BROUGHTON:  Thanks.
18         THE VIDEOGRAPHER:  Off the record, 2:44.
19  (Recess from 2:44 p.m. to 2:59 p.m.)
20         THE VIDEOGRAPHER:  Stand by.  This is
21  Segment No. 5.  Back on the record, 2:59.
22    Q.  (BY MR. BROUGHTON)  I think over the break you
23  remembered something else you wanted to mention in
24  response to a previous question.
25    A.  Thank you.  Earlier you asked me about other

---

Page 157

1  senators' involvement, and I told you how the public
2  record demonstrates that there were members of the
3  Senate who filed standalone bills or otherwise offered
4  specific areas to be included in the legislation.  This
5  is all clear from hearings and from floor debates.  And
6  I mentioned a number of senators.  I failed to mention
7  on that list Senator Lois Kolkhorst from Brenham,
8  K-o-l-k-h-o-r-s-t.  Lois Kolkhorst should also be in
9  that list.
10    Q.  Okay.  And so you had a discussion with her
11  outside of the public hearing?
12    A.  Well, the question I'm referring to, we talked
13  about -- it's been some time here, but we talked about
14  senators who had filed standalone bills --
15    Q.  Ah, okay.
16    A.  -- and then they made their way into the
17  larger bill.  She had one of those.
18    Q.  So I want to mark --
19         MS. DULANEY:  I already did.  I already
20  did.
21         MR. BROUGHTON:  Oh.
22         (Exhibit No. 1 marked.)
23    Q.  (BY MR. BROUGHTON)  Okay.  Let me hand you
24  what's been marked as Hughes No. 1, and ask you if you
25  recall ever reading this testimony on S.B. 1 from the

---

Page 158

1  Texas Civil Rights Project?
2      A.  I recognize Texas Civil Rights Project and
3  hearing testimony from them, also receiving documents.
4  This specific document I'm looking at -- and it does
5  look familiar.  If I haven't seen the document I've at
6  least heard testimony from the Texas Civil Rights
7  Project generally along these lines; that is, as I look
8  at the headings and the topics.
9      Q.  Okay.
10     A.  I haven't read every word of it as we sit
11 here.
12     Q.  All right.  And if you would turn to the last
13 two pages of Exhibit 1, Pages 6 and 7.  Do you recall
14 seeing this pie chart entitled "Estimated Demographics
15 of Harris County Extended Hours Voters"?
16     A.  I don't know if I've seen this -- this -- if
17 this was submitted to the committee, then it was before
18 us, and I know that members of the staff and Senate
19 have seen it.  If you're asking if I have a specific
20 memory of looking at this, I don't, but I do see what
21 it's about.
22     Q.  So while you may not remember specifically
23 looking at it, you're sure that if it was presented to
24 the committee you or someone on your staff did review
25 it?

Page 159

1      A.  That's correct.
2      Q.  Okay.
3      A.  Confirm that.
4      Q.  And if you look at the pie chart on Page 6,
5  "Estimated Demographics of Harris County Extended Hours
6  Voters," you see that about 56 percent of those voters
7  were minorities.  Do you see that?
8      A.  May I put these on?
9      Q.  Of course you can.
10     A.  Thank you.
11     Q.  I always say glasses make me look smarter.
12     A.  I don't know if they're helping me, but -- so
13 I see this chart says "Caucasian, 44 percent."  And so
14 then if we did the math, then I guess the non-Caucasian
15 would be 56 percent.  Is that --
16     Q.  So you are an expert in math?
17     A.  Yes.  If that's the point you're making, I do
18 see that there.
19     Q.  Okay.  And if you look at Page 7 -- you can
20 keep your readers on -- I think you'll see that
21 53 percent of the drive-through early voters were
22 minorities.  Do you see that?
23     A.  I see where it says -- yes, I believe that
24 math is correct.  I believe that's what the charts say.
25 I don't know exactly where the information came from;

Page 160

1  that is to say, where the Texas Civil Rights Project
2  got the information, but I believe you read them
3  correctly.
4      Q.  Okay.  So would that sort of information be
5  important to you in making your decision about S.B. 1?
6          MR. SWEETEN:  Objection, legislative
7  privilege, calls for his mental impressions regarding
8  legislation.
9          Do not answer the question.  Instruct not
10 to answer.
11     Q.  (BY MR. BROUGHTON)  Are you refusing to answer
12 on that basis?
13     A.  I'm going to follow my lawyer's advice.
14         (Exhibit No. 2 marked.)
15     Q.  (BY MR. BROUGHTON)  While she's doing that,
16 let me ask you this.
17     A.  Yes.
18     Q.  So earlier I asked you about communications
19 that you're aware of between your office and, for
20 instance, the Heritage Foundation.  Your office
21 received e-mails from the Heritage Foundation, did they
22 not?
23     A.  I know that we receive lots of e-mails, and I
24 feel like some -- there were some from the Heritage
25 Foundation.  I don't recall specific e-mails, but, yes,

Page 161

1  I'm sure we have e-mails from the Heritage Foundation.
2      Q.  And did -- did anyone from the Heritage
3  Foundation provide your office with, for instance,
4  proposed drafts of legislation?
5          MR. SWEETEN:  I'm -- I'm going to object
6  as to legislative privilege, so I'm going to instruct
7  not to answer on that basis.
8      Q.  (BY MR. BROUGHTON)  Are you refusing to answer
9  whether anyone from the Heritage Foundation provided
10 you with a document related to proposed legislation?
11     A.  I'm going to follow my lawyer's advice.  It
12 doesn't sound like you asked the same question both
13 times, but I'm going to follow the lawyer's advice.
14     Q.  Okay.  Same with Texas Public Policy
15 Foundation.  They sent e-mails to your office regarding
16 S.B. 1, didn't they?
17     A.  I believe that's right, yes.
18     Q.  And they sent e-mails to your office regarding
19 S.B. 7, didn't they?
20     A.  I believe so.
21     Q.  Okay.  Do you recall what the substance of
22 those e-mails were?
23         MR. SWEETEN:  So I'm going to object.  I
24 mean, if you're asking him the substance of them, I
25 think that's what you --

Page 162

1         MR. BROUGHTON: I am asking the
2 substance.
3         MR. SWEETEN: Very good. So I'm going to
4 object. It calls for legislative privilege and you're
5 requesting his mental impressions, but also his
6 communications made for legislative purpose, which are
7 all covered by the privilege of an instruct not to
8 answer on that basis.
9         MR. BROUGHTON: Okay.
10    Q.  (BY MR. BROUGHTON) So just to be clear, I'm
11 not asking for your mental impressions. I'm asking for
12 what was communicated by the Heritage Foundation to --
13 that you're aware of to you or anyone in your office
14 regarding S.B. 7 or S.B. 1.
15         MR. SWEETEN: Again, those are privileged
16 communications. Those relate to the fact-gathering
17 process as well as it impacts his mental impression, so
18 I'm going to instruct him not to answer about that
19 communication on the basis of legislative privilege.
20    Q.  (BY MR. BROUGHTON) And are you refusing to
21 answer that question?
22    A.  I'll following the lawyer's advice, yes.
23    Q.  So with respect to both -- any documentation,
24 which would include e-mails from either the Heritage
25 Foundation or the Texas Public Policy Foundation, did

Page 163

1 your office turn those -- copies of those e-mails or
2 copies of those documents over to your counsel with
3 respect to documents requested in this lawsuit?
4    A.  Well, any responsive documents we had we
5 turned over to our lawyers, of course.
6    Q.  Your office received e-mails from the -- or
7 written documents from the Republican Party of Texas,
8 isn't that correct, with respect to S.B. 7 and S.B. 1?
9    A.  I believe that's correct.
10    Q.  Okay. Do you recall what the substance of
11 those documents were?
12         MR. SWEETEN: I'm going to object on the
13 basis of legislative privilege and for the reasons that
14 I've articulated.
15         Instruct not to answer.
16    Q.  (BY MR. BROUGHTON) Are you refusing to answer
17 that question?
18    A.  I'm going to follow my lawyer's advice.
19    Q.  Okay. Do you know if the e-mail
20 communications or other documents from the Republican
21 party of Texas were turned over to your counsel for
22 possible production in this lawsuit?
23    A.  Any responsive documents we had we turned over
24 to our lawyers.
25    Q.  Your office, to your knowledge, received

Page 164

1 e-mails or other documents from the Foundation For
2 Government Accountability, didn't they?
3    A.  I know that the Foundation For Government
4 Accountability testified before the committee. I don't
5 know that we received e-mails or documents from them.
6 If we did we turned them over to our lawyers.
7    Q.  Let me hand you what's been marked as Hughes
8 Exhibit 2 --
9         MR. SWEETEN: Thank you.
10    Q.  (BY MR. BROUGHTON) -- and ask you if you
11 recognize this March 31, 2021 letter from the
12 Democratic Caucus regarding S.B. 7?
13    A.  Yes, it was -- yeah, I believe so.
14    Q.  Okay. When your office receives these, do you
15 read these yourself or does someone else in your office
16 read these?
17         MR. SWEETEN: I think that question has
18 been asked and answered, but you can go ahead and
19 answer that, Senator Hughes.
20         THE WITNESS: If you mean correspondence
21 generally, it's -- everything is read by a member of my
22 team, and most of it makes it directly to me, depending
23 on whether it's duplicative of other correspondence. A
24 document like this signed by members of the Senate
25 would get to me much quicker. And, yes, I do -- so,

Page 165

1 yes, members of my staff saw this and I saw this.
2    Q.  You see the first sentence of the second
3 paragraph says, "Senate Bill 7 would make it more
4 difficult for historically disenfranchised persons to
5 participate in the democratic process."
6         Do you see that?
7    A.  I do.
8    Q.  Do you disagree with that statement?
9         MR. SWEETEN: Objection, legislative
10 privilege. That calls for his mental impressions
11 regarding legislation.
12         Instruct not to answer on that basis.
13    Q.  (BY MR. BROUGHTON) Are you refusing to
14 answer?
15    A.  I'm going to follow my lawyer's advice.
16    Q.  Okay. That first sentence of the third
17 paragraph says, "As members of this body, we strongly
18 urge you to vote against the bill due to its disparate
19 impact on members of racial and ethic minorities and
20 persons with disabilities, including veterans." Do you
21 see that?
22    A.  I do.
23    Q.  Did you disagree with that statement?
24         MR. SWEETEN: Objection. Legislative
25 privilege. It calls for his mental impressions

Senator Bryan  Hughes
April 19, 2022                                166 to 169

Page 166

1  regarding legislation; therefore, instruct not to
2  answer.
3      Q.    (BY MR. BROUGHTON)  Are you refusing to
4  answer?
5      A.    Well, I'm going to follow my lawyer's advice.
6                 (Exhibit No. 3 marked.)
7      Q.    (BY MR. BROUGHTON)  I hand you what's been
8  marked as Hughes Exhibit 3.
9                 MR. SWEETEN:  Thank you.
10     Q.    (BY MR. BROUGHTON)  This is from
11  David Weinberg, Brennan Center for Justice.  Do you
12  know what the Brennan Center for Justice is?
13     A.    I've heard of it.
14     Q.    You've heard of it?
15     A.    I've heard of it, yes, sir.
16     Q.    Your impression, do you have any idea what --
17  what the Brennan Center for Justice does or strives to
18  do?
19     A.    I don't know everything it does.  They comment
20  on matters of public concern, but I don't know what all
21  they do.
22     Q.    Do you recall whether or not you read this
23  letter?
24     A.    Senate Bill 1113, I -- off the top of my head
25  I can't recall exactly what that bill was about.  We

Page 167

1  could look.  Again, if it's my bill, I apologize.  I
2  don't recognize that bill number.  I'm looking at the
3  document now.  If you'll give me a moment I'll read it
4  and tell you what I remember about it.
5      Q.    Sure.
6      A.    This indicates that it was testimony before
7  the State Affairs Committee.
8                 MR. BROUGHTON:  That sounds like my
9  refrigerator door being left open.
10                 MR. SWEETEN:  That's a fancy
11  refrigerator.
12                 MR. BROUGHTON:  It is.  Thankfully it
13  makes that noise because I leave the door open all the
14  time.
15                 THE WITNESS:  Okay.  The testimony,
16  again, on the face of the document appears to be about
17  maintenance of voter rolls by counties, and so I
18  understand what it's about now.
19     Q.    (BY MR. BROUGHTON)  Okay.  Now that you've
20  read it, does it -- do you -- does it refresh your
21  memory whether you read it before?
22     A.    No, it does not.  If it was -- if it is what
23  it purports to be, testimony before the Senate
24  Committee on State Affairs, then I would have heard the
25  testimony given orally and seen this document.  But I

Page 168

1  don't have a specific recollection of this.
2      Q.    Okay.  So if you looked at the one, two,
3  three -- fourth paragraph of Exhibit 3 starting with,
4  "This sentiment," do you see that?
5      A.    Yes.
6      Q.    It says, "This sentiment has been stated by
7  Keith Ingram, director of the Elections Division --
8  Election Division of the Texas Secretary of State, who
9  recently testified, 'In the Texas House Elections
10  Committee, quote, In spite of all the circumstances,
11  Texas had an election that was smooth and secure.'"  Do
12  you see that quote?
13     A.    I do.
14     Q.    Did you disagree with Keith Ingram that the
15  elections had been smooth and secure?
16                 MR. SWEETEN:  I'm going to object on the
17  basis of legislative privilege.  You're calling for his
18  mental impressions about pending legislation or
19  legislation and, therefore, instruct not to answer on
20  that basis.
21     Q.    (BY MR. BROUGHTON)  Are you refusing to
22  answer?
23     A.    Well, I'm going to follow my lawyer's advice.
24     Q.    In the preceding paragraph, Paragraph 3 of
25  Hughes Exhibit 3, Mr. Weinberg states, "The idea that

Page 169

1  there is widespread voter fraud or problems in Texas
2  elections is dangerous, racist and moreover, it is
3  devoid of evidentiary support.  In Harris County, a
4  bipartisan, multiagency elections security task force
5  found no cases of voter fraud in the 2020 election.
6  Also in 2020, Texas Attorney General
7  Ken Paxton's office spent 22,000 hours looking for
8  voter fraud and uncovered just 16 cases of false
9  address on registration forms, out of nearly 17 million
10  registered voters according to news reports."
11                 Do you see that?
12     A.    Yes.
13     Q.    Do you have any reason to doubt the accuracy
14  of that statement?
15                 MR. SWEETEN:  I'm going to object as it
16  calls for his mental impressions regarding legislation
17  and, therefore, is legislatively privileged.
18                 Instruct not to answer on that basis.
19     Q.    (BY MR. BROUGHTON)  Are you refusing to
20  answer?
21     A.    I'm going to follow my lawyer's advice.
22     Q.    Did you know that Harris County had conducted
23  this audit?  Were you aware of that, a bipartisan,
24  multiagency election security force.  See that?
25     A.    I may have missed it.  Where does it say

Senator Bryan  Hughes
April 19, 2022                           170 to 173

Page 170

1    audit?  I may -- I don't see it.  I'm sorry.
2        Q.  Well, it doesn't use the word "audit," but
3    they looked into Harris County voting in the 2020
4    election, right?
5        A.  That's what this documents says.  I have no
6    way of knowing anything beyond what's on the face of
7    the document.
8        Q.  All right.  So you never heard about that
9    particular undertaking?
10       A.  If this was testified to in the committee,
11   then I would have heard it at that time, but I don't
12   have a specific recollection.
13       Q.  Okay.  Independent of this --
14       A.  I'm sorry.  And I have no other basis in the
15   public record otherwise for knowing about that.
16       Q.  Okay.  Independent of this letter, were you
17   aware that Ken Paxton's office looked into voter fraud
18   in the 2020 election?
19           MR. SWEETEN:  Objection.  You're asking
20   him did he -- in public testimony did he hear that?
21   I'm trying to get a clarification on the question.
22   You're saying -- are you asking him about this letter?
23           MR. BROUGHTON:  I said independent of
24   this letter.
25           MR. SWEETEN:  Independent of this letter?

Page 171

1    Okay.
2           You can answer to the extent it would
3    relate to matters on the public record, but don't
4    reveal your mental impressions regarding legislative --
5    legislation.
6           THE WITNESS:  Based on matters of public
7    record, the Attorney General's Office investigates
8    cases of election fraud.  As to the specific number of
9    hours spent, I don't know about that.
10       Q.  (BY MR. BROUGHTON)  Okay.  But you recall it
11   being reported in the media back at the time,
12   regardless of the exact number of hours spent, that
13   Ken Paxton was looking into whether or not there was
14   voter fraud in the 2020 election?  You recall that?
15           MR. SWEETEN:  You're asking about whether
16   he's -- he heard a media report?  Is that what your
17   question is?
18           MR. BROUGHTON:  He recalls it being
19   generally reported in the media.
20       Q.  (BY MR. BROUGHTON)  I mean, it was common
21   knowledge, right?
22       A.  I believe it was generally reported in the
23   media, yes.
24       Q.  All right.  Do you believe Ken Paxton's
25   undertakings to be thorough and competent?

Page 172

1           MR. SWEETEN:  I'm going to object, calls
2    for legislative privilege.  To the extent you're asking
3    him about the information that related to his mental
4    impressions about legislation I'm going to object on
5    the basis of legislative privilege.
6           MR. BROUGHTON:  I'm not asking about
7    legislation.
8           MR. SWEETEN:  Okay.
9        Q.  (BY MR. BROUGHTON)  I'm saying, in general do
10   you believe Attorney General Ken Paxton -- you know,
11   when he conducts an investigation that it would be
12   thorough and competent?
13           MR. SWEETEN:  To the extent -- to the
14   extent that it would reveal your legislative -- matters
15   subject to the legislative privilege, don't reveal it.
16   Otherwise, you -- you can respond to that question.
17           THE WITNESS:  I do believe that to be the
18   case, and that's based on observation of cases and
19   matters in the public record and not based on my
20   legislative process or mental processes.
21           (Exhibit No. 4 marked.)
22       Q.  (BY MR. BROUGHTON)  I hand you what's been
23   marked as Hughes Exhibit 4, ask you if you recall ever
24   seeing this testimony that was offered with respect to
25   S.B. 7 by the Texas Civil Rights Project?

Page 173

1        A.  I recall testimony from the Texas Civil Rights
2    Project and others on Senate Bill 7 and on this -- the
3    topic addressed in this document.  Yes, I do remember
4    that.
5        Q.  Okay.  And part of S.B. 7 included closing
6    polling stations in Harris County and Travis County?
7        A.  No.  Well --
8           MR. SWEETEN:  I'm sorry.  Hold on.
9    Can --
10          MR. BROUGHTON:  I'm asking from the
11   public record.
12          MR. SWEETEN:  I didn't hear the question
13   is my issue there.  I'm sorry.
14          MR. BROUGHTON:  Sure.  Okay.
15       Q.  (BY MR. BROUGHTON)  Were there provisions in
16   S.B. 7 that would have resulted in closing polling
17   stations in Harris County or Travis County?
18          MR. SWEETEN:  So I'm going to object on
19   the basis of legislative privilege to the extent it
20   relates to your mental impressions.  You can confine
21   your testimony to the text of the bill, of the specific
22   bill.
23          THE WITNESS:  The provisions of Senate
24   Bill 7 would not have required that.
25       Q.  (BY MR. BROUGHTON)  So if you look at the

Page 174

1  second paragraph of Hughes Exhibit 4 it says, "Although
2  Section 3.05 is neutrally worded, its discriminatory
3  impact is undeniable.  Attached to my written testimony
4  is an analysis of its effect in certain counties.  The
5  result would be more polling places in predominantly
6  white districts than in districts populated by people
7  of color."
8            Do you disagree with that statement?
9            MR. SWEETEN:  Objection, calls for
10  legislative privilege.  You're asking him his mental
11  impressions about this bill, S.B. 7, and he's not going
12  to reveal those.  He's asserted the legislative
13  privilege, so I'm going to object on that basis and
14  instruct not to answer that question.
15      Q.  (BY MR. BROUGHTON)  You're refusing to answer
16  on that basis?
17      A.  I'm following my lawyer's advice.
18            (Exhibit No. 5 marked.)
19      Q.  (BY MR. BROUGHTON)  I hand you what's been
20  marked as Hughes 5 and ask you if you have seen this
21  document from the Brennan Center for Justice?
22      A.  Notes at the top of the document indicate it
23  came to my office and I recognize the names at the top
24  from my office.  So based on that, I believe that it
25  was received by my office.  I don't know if I've seen

Page 175

1  it.
2      Q.  Okay.  So Brittany Keller and Courtney Smith
3  worked in your office?
4      A.  Yes.
5      Q.  Do they still work there?
6      A.  Ms. Smith does.  Ms. Keller does not.
7  Ms. Keller was a session-only legislative intern.
8      Q.  Do you see in this Hughes Exhibit 5 it
9  discusses as paragraphs labeled "Identity
10  verification," "Bar codes," "Ballot tracking through
11  the U.S. Postal Service," "Secure drop-off locations
12  and drop boxes"?  Do you see that?
13      A.  I see those paragraphs, yes, sir.
14      Q.  Were any of those alternatives that you
15  considered?
16            MR. SWEETEN:  Objection, legislative
17  privilege, calls for his mental impressions regarding
18  legislation.
19            Instruct not to answer on that basis.
20      Q.  (BY MR. BROUGHTON)  Are you refusing to
21  answer?
22      A.  Oh, I'm going to follow my lawyer's advice.
23            (Exhibit No. 6 marked.)
24      Q.  (BY MR. BROUGHTON)  I hand you what's been
25  marked as Hughes 6.  Did I give you two copies or just

Page 176

1  one?
2      A.  I think I may have gotten -- or maybe got
3  stuck -- they got stapled together.
4      Q.  Oh, they got stapled together, yeah.  Sorry
5  about that.
6            MR. SWEETEN:  Come on, Kenneth.
7            MR. BROUGHTON:  It's Keely's fault.
8            MS. DULANEY:  Always.
9            MR. BROUGHTON:  I haven't touched a
10  stapler in at least two days.
11      Q.  (BY MR. BROUGHTON)  All right.  This is dated
12  July 1, 2021 from the Texas Association of Elections
13  Administrators.  Do you see that?
14      A.  Yes, sir.
15      Q.  Is -- have you heard of that organization
16  before?
17      A.  I have.
18      Q.  All right.  Have you -- how have you heard of
19  them before?
20      A.  They -- they offer testimony before the
21  legislature on, obviously, election-related matters.
22  They correspond with us.  They're involved in normally
23  election legislation.
24      Q.  Do you consider this to be a nonpartisan
25  professional organization?

Page 177

1      A.  As far as I know it is.  Elections
2  administrators are not elected.  They are appointed.
3  And I guess they'll by appointed by Republicans or
4  Democrats, depending on who's got the majority in the
5  given county.  But, yes, I do not consider this to be a
6  partisan organization.
7      Q.  Do you recall whether or not you read this
8  letter from the Texas Association of Elections
9  Administrators back at the time?
10      A.  I don't recall.
11      Q.  Do you see that Texas Association of Elections
12  Administrators is offering some recommended changes or
13  some criticisms of the provisions in Senate Bill 7?  If
14  you look at the very bottom under "Election integrity
15  and security" in the first page it says "creates a
16  significant financial burden for counties with
17  populations exceeding 100,000."  Do you see that?
18      A.  I do.
19      Q.  Do you recall being aware of that back at the
20  time?
21      A.  I do.  This was part of the oral testimony
22  offered in public record, and that's how I know about
23  it.
24      Q.  Did you take any of these suggestions from the
25  Texas Association of Elections Administrators into

Page 178

1  consideration?

2       MR. SWEETEN:  Objection, legislative

3  privilege, calls for his mental impressions about

4  legislation.

5       Instruct not to answer on that basis.

6       Q.  (BY MR. BROUGHTON)  Are you refusing to

7  answer?

8       A.  I'm going to follow my lawyer's advice.

9            (Exhibit No. 7 marked.)

10      Q.  (BY MR. BROUGHTON)  Let me hand you what's

11 been marked as Hughes 7.

12      MR. SWEETEN:  Kind of got a rhythm down,

13 Kenneth.

14      MR. BROUGHTON:  I'm trying.  As long as

15 Keely doesn't staple them together we're doing good.

16      Q.  (BY MR. BROUGHTON)  Do you recall seeing this

17 from Jolt?

18      A.  I don't.

19      Q.  Okay.  Are you familiar with Jolt?

20      A.  I'm not sure.  It sounds familiar, but I'm

21 not -- it's not a group I'm familiar with.

22      Q.  All right.  So if you -- if you look after the

23 first page, which is some bullet points, there's

24 some -- several pages of charts here.  Do you recall

25 whether or not you saw these back at the time?

Page 179

1       A.  As I read these points, I recall public

2  testimony and also public debate involving many of

3  these.  I don't recall this specific document.

4       Q.  That doesn't mean your office didn't receive

5  it.  It just means you don't recall it one way or the

6  other, right?

7       A.  That is correct.

8            (Exhibit No. 8 marked.)

9       Q.  (BY MR. BROUGHTON)  Let me hand you what's

10 been marked Hughes 8 and ask you if you recall ever

11 seeing this before?

12      A.  I'm familiar with the Texas Council for

13 Developmental Disabilities and know that they've

14 offered testimony.  I don't have a specific memory of

15 this exact document.

16      Q.  In your mind is the Texas Council For

17 Developmental Disabilities kind of a neutral

18 organization?

19      MR. SWEETEN:  I'm going to object to the

20 extent that would implicate legislative privilege.

21      But if it would not, then you can answer

22 the question.

23      THE WITNESS:  Based on what I know about

24 them from public discourse and remarks made in public

25 on public record, I don't believe them to be an

Page 180

1  especially partisan organization.

2       Q.  (BY MR. BROUGHTON)  Okay.  You don't recall

3  one way or another whether you read this back at the

4  time with respect to S.B. 7?

5       MR. SWEETEN:  Objection, asked and

6  answered.

7       THE WITNESS:  The document is dated about

8  a year ago.  I remember from the hearing publicly --

9  public testimony and discussion about these topics.

10 This document purports to be testimony before the

11 committee, written testimony, which would have been

12 distributed to us, but I do not specifically remember

13 looking at this document.  I'm familiar with generally

14 what it says and I recall public testimony along these

15 lines.

16           (Exhibit No. 9 marked.)

17      Q.  (BY MR. BROUGHTON)  Okay.  Let me hand you

18 Hughes Exhibit 9, ask you if you recall ever seeing

19 Hughes 9 before from the Anti-Defamation League?

20      A.  I'm familiar with the Anti-Defamation League,

21 of course.  They've testified for years before the

22 legislature.  As I look at the document I recall public

23 discussion of these matters, but I don't know that I've

24 read this specific document from stem to stern.

25      Q.  Do you believe someone from your office would

Page 181

1  have read it --

2       A.  Oh, yeah.

3       Q.  -- if it was received?

4       A.  Oh, yes.

5       Q.  And the Anti-Defamation League is a national

6  nonpartisan group, correct?

7       A.  Based on common knowledge in their -- their

8  history, that's my impression, yes.

9            (Exhibit No. 10 marked.)

10      Q.  (BY MR. BROUGHTON)  I hand you Hughes 10.

11 This is testimony on S.B. 1 from the Texas Civil Rights

12 Project.  Do you recall whether or not you read this

13 back at the time?

14      A.  I do.

15      Q.  If you look at the top of Page 2 underlined in

16 bold it says, "SB 1 will empower partisan poll watchers

17 to wreak havoc in polling places and intimidate

18 voters."

19           Do you see that?

20      A.  I do.

21      Q.  So tell me from the text of S.B. 1 about the

22 provision regarding partisan poll watchers.

23      MR. SWEETEN:  Okay.  I want to make sure

24 I'm clear on the question.  You're asking him what is

25 the text -- you're asking him to paraphrase what the

Page 182

1   text says in the bill?
2            MR. BROUGHTON:  Correct.
3            MR. SWEETEN:  Okay.  I think I'm going to
4   allow you to do that confining matters to the text of
5   the bill.
6            THE WITNESS:  Yeah, I don't have every
7   word of the bill memorized.  Generally we found that
8   the provision -- it was observed and testified
9   publicly --
10           MR. SWEETEN:  Hold on a second.  I want
11  to make sure you're not revealing your mental
12  impressions on why something was done in the bill.
13           THE WITNESS:  Okay.
14           MR. SWEETEN:  He's just simply asking
15  you, you know -- and if you can't do it without the
16  text of the bill, don't.  But he's asking you what the
17  text of the bill says about this issue, I believe.  And
18  so that's -- I'll let you answer that.
19           THE WITNESS:  As far as the text of
20  Senate Bill 1, I would need to look at the bill and the
21  election code to make sure I get it right.  Generally
22  speaking, the provision says that poll watchers who are
23  legally qualified must be allowed to enter the polling
24  place and must be reasonably close to observe the
25  activity they're entitled to observe, but must not

Page 183

1   interfere with the voting process.  I believe that's a
2   fair characterization of what is on the face of Senate
3   Bill 1, but I would ask you to let me look at if you
4   want more detail than that.
5        Q.  (BY MR. BROUGHTON)  Okay.  Is that one of the
6   topics that the Texas Public Policy Foundation and/or
7   the Heritage Foundation communicated to your office
8   about?
9            MR. SWEETEN:  Objection, legislative
10  privilege.  Don't provide that -- that would reveal
11  communications that are privileged as well as his
12  mental impressions, fact-gathering process regarding
13  the bill.
14           I'm going to instruct you not to answer
15  on that basis, Senator.
16           MR. BROUGHTON:  Okay.  I'm not asking for
17  mental impressions.  I'm just asking about
18  communications from outside groups.
19       Q.  (BY MR. BROUGHTON)  Are you refusing to
20  answer?
21       A.  Yeah, I'm going to follow my lawyer's advice.
22           MR. BROUGHTON:  Pardon me for a second.
23  Who is C. Dodge?  I'm not sure I'm familiar.
24           MR. HUDSON:  Chris Dodge is with the
25  Elias group.

Page 184

1            MR. BROUGHTON:  Okay.  Very good.
2   Take a five-minute break?
3            MR. SWEETEN:  Yes.
4            MR. BROUGHTON:  Trying to shorten things
5   here.
6            MR. SWEETEN:  Got it.  I'm for it.
7            THE VIDEOGRAPHER:  Off the record, 3:38.
8   (Recess from 3:38 p.m. to 3:53 p.m.)
9            THE VIDEOGRAPHER:  Stand by.  This is
10  Segment No. 6.  We're back on the record, 3:53.
11           MR. BROUGHTON:  Let me hand you this
12  little thing.
13           (Exhibit No. 11 marked.)
14           MR. BROUGHTON:  It's been marked as
15  Hughes 11.
16           MR. SWEETEN:  Thank you.
17       Q.  (BY MR. BROUGHTON)  I think we somewhat
18  touched on this general topic earlier and you told us
19  about the Senate rules.  So this is entitled "Temporary
20  Senate Rules, January 13, 2021, amended August 7,
21  2021."  Do you see that?
22       A.  I do.
23       Q.  Okay.  So do you recall these rules?
24       A.  Generally, yes.
25       Q.  All right.  And why -- do you why they're

Page 185

1   entitled Temporary Senate Rules?  Is it just because it
2   only applies to that session or what is it, if you
3   know?
4            MR. SWEETEN:  You can answer that.
5            THE WITNESS:  My recollection, based on
6   the debate and the adoption of these rules, I'm not
7   certain, but I believe it had to do with Covid-19.  And
8   the processes might be different during this 2021
9   session because of Covid-19 protocols, but I'm not
10  certain about that.  As a general rule, we come in
11  under temporary rules and then adopt permanent rules.
12  So I -- I don't know exactly why these were temporary
13  rules for this time period.  That's just my general
14  recollection.
15       Q.  (BY MR. BROUGHTON)  Okay.  Thanks.
16           Going back to S.B. 7, do you recall that
17  there was a -- why the first conference committee was
18  called regarding S.B. 7?
19           MR. SWEETEN:  You're asking questions
20  about the legislation.  I think you're going to his
21  mental impression.  So to the extent you're doing that,
22  I instruct him not to answer that question.  But to the
23  extent that they're matters of public record that he
24  can, you know, address or reference, then I'm going to
25  allow him to do that.

Page 186

1          MR. BROUGHTON:  Thanks.
2          MR. SWEETEN:  Uh-huh.
3          THE WITNESS:  I can say that as a matter
4  of legislative process the conference committee is
5  called for when the two houses have passed different
6  versions of a piece of legislation and so the
7  conference committee exists to work out a compromised
8  version of those -- the House version and the Senate
9  version, that conference committee made up of the
10 members of the House and the Senate will propose a
11 compromised version that will then go back to the House
12 and the Senate for an up or down vote.  So the
13 conference committee process is normally toward the end
14 of the legislative session and, again, it's when a bill
15 has gone from one house to the other and changes have
16 been made.  And that was true in Senate Bill 7 as a
17 matter of public record.
18     Q.   (BY MR. BROUGHTON)  Okay.  If you would turn
19 in Hughes 11, the temporary Senate rules, if you'll
20 turn to Page 92.  It's pretty far back in that stack.
21 And do you see Rule 12.03 under the heading
22 "Limitations on Conference Committee Actions"?  Do you
23 see that?
24     A.   I do.
25     Q.   It says, "Except as otherwise provided in this

Page 187

1  article, conference committees shall limit their
2  discussions and their actions solely to the matters in
3  disagreement between the two houses.  A conference
4  committee shall have no authority with respect to any
5  bill or resolution to:  (1) change, alter, or amend
6  texts which is not in disagreement; (2) omit text which
7  is not in disagreement; (3) add text on any matter
8  which is not in disagreement; (4) add text on any
9  matter which is not included in either the House or
10 Senate version of the bill or resolution.  This rule
11 shall be strictly construed by the presiding officer in
12 each House to achieve the purposes hereof."
13          Do you see that?
14     A.   I do.
15     Q.   Is that a rule that you're familiar with?
16     A.   It is.
17     Q.   And how -- how are you familiar with that?
18     A.   Toward the end of any legislative session
19 conference committee -- committees are appointed to
20 work out differences between a House version of a bill
21 and the Senate version of a bill.  And so these are
22 generally the rules under which those conference
23 committees operate.  So if words are in both the House
24 and the Senate version, then they're not up for
25 consideration by the conference committee.  The

Page 188

1  conference committee -- that would be text which is not
2  in disagreement.
3          So if something is in the House and the
4  Senate version of the bill, then it doesn't come out,
5  they cannot omit text.  And if the House and Senate
6  already agree on something text is not added on those
7  topics.  It's for those areas where there is
8  disagreement.  So that's generally how -- the general
9  rules of conference committee.  Of course, these rules
10 can be suspended by resolution in the House and the
11 Senate, and that's pretty common as well.  But that's
12 generally how those operate.
13     Q.   Just below what I read there's a paragraph
14 entitled "Note of Ruling," and it says, "Rule 12.03
15 does not prohibit a conference committee from adding
16 text not in either the Senate or House version of a
17 bill when the text added relates to a matter in
18 disagreement between the two Houses."
19          Do you see that?
20     A.   I do.
21     Q.   Did you recall that note as well?
22     A.   Generally, yes, I recall that in practice.
23     Q.   Have you ever heard the term "out-of-bounds
24 resolution"?
25     A.   I have.

Page 189

1     Q.   Okay.  What's your understanding of what's
2  referred to as an out-of-bounds resolution?
3          MR. SWEETEN:  You're asking for his
4  general Senate knowledge?
5          MR. BROUGHTON:  Just general knowledge,
6  yeah.
7          THE WITNESS:  So Rule 12.03 Sub (4),
8  which you -- which is in the exhibit says, among
9  limitations, they may not add text on any matter which
10 is not included in either the House or Senate version
11 of the bill or resolution.  And so an out-of-bounds
12 resolution is commonly passed in the House and the
13 Senate when the conference committee wishes to present
14 something to the House and the Senate which was not in
15 the versions of the bill passed by the House or the
16 Senate.  So you might say that Rule 12.03 are the
17 bounds of the conference committee, and so a resolution
18 is introduces and passed to allow the conference
19 committee to go outside the bounds for certain limited
20 purposes that are set out -- that are set out in the
21 out-of-bounds resolution.  That's true for any bill,
22 any conference committee in the legislative process in
23 Texas.
24     Q.   (BY MR. BROUGHTON)  Was there any
25 out-of-bounds resolution passed with respect to S.B. 7?

Page 190

1    MR. SWEETEN:  You can answer to the
2    extent it's a matter of public record.
3    THE WITNESS:  I believe the record will
4    show that there was.  I would have to go back and look,
5    but I believe there was an out-of-bounds resolution for
6    the conference committee on Senate Bill 7 for most --
7    for many bills, and certainly for most multipage bills
8    there will be an out-of-bounds resolution.  They're
9    common in the House and Senate toward the end of
10   session, regular session and special sessions.
11   Q.   (BY MR. BROUGHTON)  Who serves on the
12   conference committee or who -- generally?
13   A.   Conference committees are appointed by the
14   presiding officers of each House.  So the lieutenant
15   governor and the Senate -- the speaker in the House.
16   It is customary for the author of each bill to chair
17   the conference committee on -- in each respective
18   House; that is, the senator on the Senate side, the
19   House member on the House side.  That's not required.
20   It's customary.  It's also customary for at least some
21   members of the conference committee to be members of
22   the substantive committee that heard the bill when it
23   moved through the respective House.  But it's
24   completely at the discretion of the lieutenant governor
25   in the Senate and the speaker of the house in the

Page 191

1    House.
2    Normally you'll see conference committees
3    that are bipartisan.  And, again, normally the bill
4    author is there, normally they're members from the
5    substantive committee that came through.  But it's all
6    at the discretion of the lieutenant governor in the
7    Senate and the speaker in the House.
8    Q.   And, indeed, you were the chair for the Senate
9    conference bill on the S.B. 7, right?
10   A.   I believe -- I believe that's what the record
11   will show.  I believe that's right.
12   Q.   And there were bipartisan members on that
13   committee; is that right?
14   A.   That's right.  And when the conference
15   committee is appointed that appears in the Senate
16   journal and those names also appear on the report.
17   And, yes, that's correct.
18   Q.   And is it your testimony that an agreement was
19   reached on the content of the conference committee
20   report on -- as to S.B. 7?
21   MR. SWEETEN:  If that's a matter of
22   public record you can speak to it.  If it --
23   THE WITNESS:  We would have to defer to
24   the public record.  I believe that's the case.  I
25   believe that's right.

Page 192

1    Q.   (BY MR. BROUGHTON)  So the committee actually
2    issued a report; is that right?
3    A.   So a conference committee report is the term
4    for the proposed compromised bill that reconciles the
5    House bill and the Senate bill that is then presented
6    to both Houses for an up or down vote.  And so the term
7    for that is conference committee report.  And I -- as I
8    recall, the conference committee did come up with a
9    conference committee report.  I would have to -- I
10   would have to go back and look at the journal to verify
11   that, but I believe that's what happened.
12   Q.   Were the Democratic members of the conference
13   committee provided with a copy of that report?
14   A.   Every member of the Senate.  I can't say what
15   happened on the House side, but I'm sure they follow
16   the same rules.  Every member of the -- of the Senate
17   and the House would receive a copy of the conference
18   committee report, yes.
19   Q.   And at what point in time would they receive a
20   copy of the conference committee report?
21   A.   Depending on whether we are in a regular
22   session or a special session and how tight the
23   timeframes are, it will be distributed -- it will be
24   given as soon as possible.  Those documents are
25   negotiated between the members of the House and members

Page 193

1    of the Senate, and so sometimes changes are being made
2    up to the -- up to the last -- you know, up to the end
3    of the process, but generally as early as possible.
4    Before you -- while there's not a pending
5    question can we take a break?
6    Q.   Sure.
7    A.   Thank you.
8    THE VIDEOGRAPHER:  We're off at 4:06.
9    (Recess from 4:06 p.m. to 4:15 p.m.)
10   THE VIDEOGRAPHER:  Segment No. 7.  We're
11   back on the record, 4:15.
12   Q.   (BY MR. BROUGHTON)  You recall the text of
13   S.B. 7 included restricting Sunday voting hours in
14   counties with populations of 30,000 or more?
15   A.   I believe the -- I believe in the conference
16   committee report, I believe that's -- we have to look
17   at the document to see, but I believe that's right.
18   Q.   Okay.
19   A.   I believe that's right.
20   Q.   And do you recall how the 30,000 number was
21   arrived at?
22   MR. SWEETEN:  I'm going to object.  That
23   calls for legislative privilege and so instruct you not
24   to answer on that basis.
25   Q.   (BY MR. BROUGHTON)  Are you refusing to

Page 194

1    answer?
2        A.    I'm going to follow my lawyer's advice.  As a
3    matter of public record, I can say that the law already
4    set out -- already spoke to requirements for early
5    voting and so there were some provisions already in
6    place and some population brackets were already in
7    place.  And that's a matter of public record.
8        Q.    With respect to the Sunday voting hours do you
9    recall that there was a Senate floor debate
10    regarding -- where -- where speakers spoke about the
11    impact that would have on black voters?
12        A.    I recall that being debated on the Senate
13    floor, yes, I do.
14        Q.    Okay.  And what do you recall to the best -- I
15    know it's a matter of public record, but from your
16    recollection what do you recall being discussed on the
17    Senate floor about that?
18        A.    My recollection of that debate -- of course,
19    it's all taken down, I believe, in the Senate journal
20    and certainly archived on video.  Most of that
21    discussion was between Senator Royce West and me and
22    discussion about Sunday voting in Dallas County.
23    During the discussion, during the debate it came out
24    that that provision, changing those hours for Sunday
25    voting, was not in the Senate version of the bill, but

Page 195

1    that it came from the House.  There was a discussion
2    about when Sunday voting was conducted in different
3    counties.  Senator West from Dallas primarily took the
4    lead indicating -- as I recall, he indicated that --
5    having early voting not start until noon.  I recall he
6    indicated a concern that that would affect Sunday
7    voting in Dallas County.  That's my recollection of the
8    debate.
9            I can also tell you that public record
10    will show that early voting in Dallas County has never
11    been started before noon.  That's in Dallas County
12    records going way back.  That's all matters of public
13    record and that's from the debate on the Senate floor.
14        Q.    Okay.  Did you make some argument to the
15    effect that it would give election workers an
16    opportunity to go to church?
17        A.    I distinctly recall saying that, yes.
18        Q.    Okay.
19        A.    I also said during the debate that my
20    recollection of Sunday voting -- and you may recall
21    this came up during the debate, the phrase "souls to
22    the polls" is often how Sunday voting is described in
23    East Texas and, apparently, as I recall, from
24    Senator West in Dallas.  And as I recall a senator from
25    Houston was familiar with the same term.

Page 196

1            I stated to Senator West during debate,
2    public record, that I had always understood Sunday
3    voting to be an afternoon activity.  This is all in the
4    debate.  And the public record shows that Sunday voting
5    in Dallas County has always started in the afternoon.
6    Going back to the 1980s public records will show that
7    there was no Sunday morning voting in Dallas County
8    before or after Senate Bill 1 or Senate Bill 7 or any
9    legislation I've been involved in.  That's been the law
10    for a long time, and it's public record.
11        Q.    Do you recall -- do you know who
12    Representative Clardy is?
13        A.    I do.
14        Q.    And who is Representative Clardy?
15        A.    Representative Clardy, Travis Clardy -- I
16    don't recall his district number, and he's from
17    Nacogdoches.  And in the House he represented at that
18    time Nacogdoches County, Rusk County and I believe
19    Cherokee County.  In redistricting I believe those
20    lines have been refigured somewhat.  But Representative
21    Travis Clardy, C-l-a-r-d-y, is a state representative
22    from Nacogdoches.
23        Q.    Okay.
24        A.    I guess that's all I should have said.  Sorry
25    for the speech.

Page 197

1        Q.    It's okay.  Do you recall him referring to --
2    to some issue about the differences between, I guess,
3    the Senate bill and the House bill as a scrivener's
4    error?
5            MR. SWEETEN:  You're asking about public
6    testimony?
7            MR. BROUGHTON:  Yes.
8            MR. SWEETEN:  Thank you.
9            THE WITNESS:  I do recall reading about
10    an interview he gave or hearing about an interview he
11    gave about Sunday voting.  And, yes, I don't recall if
12    he used the term typo, scrivener error -- that's what
13    he should have said as a lawyer.  I didn't hear that
14    directly, but I read about that or heard someone talk
15    about that.
16        Q.    (BY MR. BROUGHTON)  Did you believe there had
17    been an error, a scrivener's error or a typo?
18            MR. SWEETEN:  Did he believe?  Wait.
19    Hold on.  Hold on.  You're asking him about his mental
20    impressions about legislation and his beliefs, and I'm
21    going to instruct him that that is legislatively
22    privilege and not to answer that question.
23        Q.    (BY MR. BROUGHTON)  Was there a typo?
24        A.    I can --
25            MR. SWEETEN:  You can refer to matters of

Senator Bryan  Hughes
April 19, 2022                               198 to 201

Page 198

1  the public record.  Don't reveal internal mental
2  impressions and thoughts about legislation.
3              THE WITNESS:  I can say for the public
4  record that the change to those hours for Sunday voting
5  did not take place on the Senate side.  That came from
6  the House.  And so I then, and now, wouldn't have
7  knowledge of what -- why the House took the action they
8  took.  And so I had -- when -- so, again, that's --
9  that's what the public record shows.
10             (Exhibit No. 12 marked.)
11        Q.   (BY MR. BROUGHTON)  I hand you what's been
12  marked Hughes 12.  I gave you the whole thing.  Do you
13  recognize Hughes 12 as S.B. 1?
14        A.   It appears to be a copy of S.B. 1.
15        Q.   And I believe you've already told us that you
16  were the -- you're the senator who proposed S.B. 1,
17  correct?
18        A.   That's correct.  I don't know if I used the
19  precise term I'm the -- I'm the author of Senate
20  Bill 1.  I filed the bill.
21        Q.   So you would be considered the author or the
22  filer or both?
23        A.   Author is the official term.
24        Q.   Okay.
25        A.   I'm literally the filer as well.

Page 199

1        Q.   Okay.  And I believe you told us earlier that
2  at least initially the Legislative Council would have
3  done the actual drafting; is that correct?
4        A.   I described the process generally, and so
5  allow me to do that.  The legislative process, the
6  drafting process, generally in Texas a member of the
7  legislature, usually working with -- with their staff,
8  will have an idea for legislation and then will share
9  that with lawyers at the Texas Legislative Council.
10  That's that nonpartisan agency where lawyers direct
11  legislation, and then they prepare the draft and
12  then -- so -- so, yes, that's how the process begins.
13        Q.   Okay.
14        A.   So that's also how the process began, as the
15  record will show, on Senate Bill 1.
16        Q.   All right.  So it was the same that you
17  already told us about?
18        A.   Yes, that's correct.
19        Q.   Okay.  Did the Texas Public Policy
20  Foundation -- what did they communicate to you about
21  any provision of S.B. 1?
22             MR. SWEETEN:  I'm going to object as that
23  calls for legislative privilege.  You're asking him
24  about privileged communications made for legislative
25  purpose and is part of the fact-gathering process.  And

Page 200

1  so I'm going to instruct Senator Hughes that that
2  involves legislative privilege and not to answer that
3  question based upon his prior assertion of legislative
4  privilege.
5        Q.   (BY MR. BROUGHTON)  Are you going to refuse to
6  answer that question?
7        A.   I'll follow my lawyer's advice, of course.  If
8  I may ask you, are you including in your question
9  public testimony offered at the hearing or only private
10  communications?
11        Q.   Private communications.
12        A.   I'm going to follow my lawyer's advice.
13        Q.   Okay.  And did the Texas Public Policy
14  Foundation provide you any draft language regarding
15  S.B. 1?
16             MR. SWEETEN:  Same objection, legislative
17  privileges.
18             Instruct not to answer on the basis of
19  legislative privilege.
20        Q.   (BY MR. BROUGHTON)  Are you refusing to
21  answer?
22        A.   Oh, I'm going to follow my lawyer's advice.
23        Q.   Did the Texas Public Policy Foundation send
24  you any -- or your office any e-mails regarding S.B. 1?
25             MR. SWEETEN:  You can answer whether you

Page 201

1  received an e-mail, privileged log information.
2             THE WITNESS:  Yes, I believe they did.
3        Q.   (BY MR. BROUGHTON)  And has your office turned
4  those over to your counsel with respect to this
5  lawsuit?
6        A.   Every responsive document we have has been
7  turned over to our lawyers.
8        Q.   Okay.  And what do you recall was the
9  substance of those e-mails that Texas Public Policy
10  Foundation sent to your office?
11             MR. SWEETEN:  Objection, legislative
12  privilege.
13             Instruct not to answer.
14        Q.   (BY MR. BROUGHTON)  Are you going to refuse to
15  answer?
16        A.   I'm going to follow my lawyer's advice.
17        Q.   Did the Heritage Foundation send your office
18  re e-mails regarding Senate Bill 1?
19             MR. SWEETEN:  You can answer with respect
20  to whether an e-mail was sent.  You can answer that
21  question, in other words.
22             THE WITNESS:  I don't recall specific
23  e-mails from the Heritage Foundation, but it's likely
24  we -- our office received some.
25        Q.   (BY MR. BROUGHTON)  Did your office receive

Senator Bryan  Hughes
April 19, 2022                    202 to 205

---

Page 202

1  any draft language from the Heritage Foundation that
2  they urged you to include in S.B. 1?
3      MR. SWEETEN:  I'm going to object.
4  You're now asking about the substance of the
5  communication, which is legislatively-privileged
6  communication.
7          Instruct not to answer.
8      Q.  (BY MR. BROUGHTON)  Are you going to refuse to
9  answer?
10     A.  I'm going to follow my lawyer's advice.
11     Q.  With respect to any e-mails that might have
12  been sent from Heritage Foundation to your office
13  regarding S.B. 1, do you recall what the -- or tell us
14  what was in the substance of those e-mails.
15         MR. SWEETEN:  Objection, legislative
16  privilege.
17             Instruct not to answer.
18     Q.  (BY MR. BROUGHTON)  Are you going to follow
19  that advice?
20     A.  I'm going to follow that advice from my
21  lawyer.
22     Q.  With respect to S.B. 1, did you have
23  communications with anyone in the governor's office
24  about S.B. 1?
25             MR. SWEETEN:  You can answer as to the

Page 203

1  existence of a communication.  Do not provide the
2  substance of the communication.
3             THE WITNESS:  Yes, my office did.
4      Q.  (BY MR. BROUGHTON)  And what was the substance
5  of those communications between your office and the
6  governor's office regarding SB 1?
7          MR. SWEETEN:  Objection, calls for
8  legislative privilege.
9             Instruct not to answer on that basis.
10     Q.  (BY MR. BROUGHTON)  Are you going to refuse to
11  answer?
12     A.  I'm going to follow my lawyer's advice.
13     Q.  Did you -- did your office have any
14  communications with the Attorney General's office
15  regarding S.B. 1?
16         MR. SWEETEN:  Objection.  I mean, you can
17  answer the question as to whether communications were
18  had, privilege log-type information.  Don't get into
19  the substance of the communication.
20             THE WITNESS:  Yes.
21     Q.  (BY MR. BROUGHTON)  And what was the substance
22  of the communications between your office and the
23  Attorney General's office regarding S.B. 1?
24         MR. SWEETEN:  Objection on the basis of
25  attorney/client privilege and legislative privilege.

Page 204

1             Instruct not to answer on that basis.
2      Q.  (BY MR. BROUGHTON)  Are you going to refuse?
3      A.  I'm going to follow my lawyer's advice.
4      Q.  Did the Attorney General's office provide you
5  any proposed language to be included in S.B. 1?
6          MR. SWEETEN:  Same objection, legislative
7  privilege, attorney/client privilege.
8             Instruct not to answer.
9      Q.  (BY MR. BROUGHTON)  Are you going to refuse to
10  answer?
11     A.  I'm going to follow my lawyer's advice.
12     Q.  Did the Governor's office provide you any
13  proposed language to be included in S.B. 1?
14         MR. SWEETEN:  Same objection,
15  legislative -- well, legislative privilege.
16             Instruct not to answer on that basis.
17     Q.  (BY MR. BROUGHTON)  Are you going to refuse to
18  answer?
19     A.  I'm going to follow my lawyer's advice.
20     Q.  Did your office have any communications with
21  the Secretary of State's office regarding S.B. 1?
22         MR. SWEETEN:  You can answer.
23         THE WITNESS:  Yes.
24     Q.  (BY MR. BROUGHTON)  And did the Secretary of
25  State's office provide you with any proposed language

Page 205

1  regarding S.B. 1?
2          MR. SWEETEN:  Objection on the basis of
3  legislative privilege.
4             Instruct not to answer on that basis.
5      Q.  (BY MR. BROUGHTON)  Are you going to refuse to
6  answer?
7      A.  I'm going to follow my lawyer's advice.
8      Q.  And what was the substance of the e-mails that
9  were exchanges between your office and the Secretary of
10  State's office regarding S.B. 1?
11         MR. SWEETEN:  Same objection, legislative
12  privilege.
13             Instruct not no answer.
14             THE WITNESS:  I -- did we -- I want to
15  make sure that I'm following -- I'm going to follow my
16  lawyer's advice.  I'm not sure if we said they were
17  e-mails.  You asked about communications.  I don't know
18  if I said there were e-mails.  There may not have been,
19  but I want to make sure I'm not --
20     Q.  (BY MR. BROUGHTON)  So you want to go back on
21  the question about did you have e-mail communications
22  with the Secretary --
23     A.  Sure.  Again, just to be clear --
24     Q.  We'll just start again just to be clear.  No
25  problem.

Page 206

1    A.   Just to be clear.  Thank you.
2    Q.   We've got all evening.
3    A.   All right.  Thanks.
4    Q.   So you've told us there were communications
5    between your office and the Secretary of State's office
6    regarding S.B. 1?
7    A.   Yes.
8    Q.   Do you recall if there were e-mails between
9    your office and the Secretary of State's office
10   regarding S.B. 1?
11   A.   It's very likely that -- it's very likely that
12   there were, but I don't have a specific recollection of
13   e-mails.  And we hadn't talked about e-mails before.  I
14   wanted to make sure I hadn't missed something.
15   Q.   Okay.  So you don't recall one way or the
16   other?
17   A.   That's right.
18   Q.   Would you have -- if there were e-mails would
19   you have turned those over to your counsel with respect
20   to this lawsuit?
21   A.   Yes.  Anything in our office responsive to the
22   requests we turned over to our lawyers.
23   Q.   Did the Secretary of State's office provide
24   your office with any proposed language for S.B. 1?
25        MR. SWEETEN:  Objection, legislative

Page 207

1    privilege.
2         Instruct not to answer.
3    Q.   (BY MR. BROUGHTON)  Are you going to follow
4    your lawyer's advice?
5    A.   Yes, I'm going to follow the lawyer's advice.
6    Q.   Earlier in your deposition this morning -- I
7    think pretty close to the start -- when you were
8    telling us about the State Affairs Committee you
9    mentioned the first amendment of the U.S. Constitution.
10   Do you recall that?
11   A.   Yes.  Yes, sir.
12   Q.   Okay.  And so are you familiar with the first
13   amendment of the U.S. Constitution?
14   A.   Generally, yes.
15   Q.   All right.  And just off -- you know, it
16   speaks for itself, but what's -- what's your
17   recollection about what is contained in the first
18   amendment of the U.S. Constitution?
19   A.   It's freedom of speech, freedom of religion,
20   freedom to assemble, freedom of the press.
21   Q.   If you go too fast it makes it hard for her.
22   A.   I'm exercising that free speech too quickly.
23   Thank you very much.  That's right.
24   Q.   Did you finish?
25   A.   I probably left something out, but I think

Page 208

1    that's all I got right now.
2    Q.   Okay.
3    A.   Did I mention petition, the government for
4    redress?
5    Q.   I don't think you did.
6    A.   Okay.  Thank you.
7    Q.   You don't hear that redress word very often.
8    A.   That's right.
9    Q.   Did you ask the Attorney General's office to
10   review S.B. 1 to be sure it did not violate the first
11   amendment?
12        MR. SWEETEN:  Objection, legislative
13   privilege, attorney client privilege.
14        Instruct not to answer on that basis.
15   Q.   (BY MR. BROUGHTON)  Are you refusing to
16   answer?
17   A.   I'm going to follow my lawyer's advice.
18   Q.   Do you know what the 14th amendment of the
19   U.S. Constitution is?
20   A.   Yes.
21   Q.   Does it generally require equal protection
22   under the law for all citizens?
23   A.   I believe that's a fair characterization.
24   Q.   How have you become familiar with the contents
25   of 14th amendment?

Page 209

1    A.   So beyond any legislative matters, as a -- as
2    a student, as an American, I learned that growing up.
3    I learned about it in law school.  It's come up in
4    litigation and comes up in discussions about political
5    science and law and policy all the time.
6    Q.   Did you ask the Attorney General's office to
7    review S.B. 1 to be sure it complied with the
8    14th amendment?
9         MR. SWEETEN:  Objection, attorney/client
10   privilege, legislative privilege.
11        Instruct not to answer on that basis.
12   Q.   (BY MR. BROUGHTON)  Are you refusing to answer
13   that question?
14   A.   I'm going to follow my lawyer's advice.
15   Q.   Did you ask any outside group -- by that I
16   mean non-legislators or legislative staff, to review
17   S.B. 1 to be sure it complied with the 14th amendment?
18        MR. SWEETEN:  So I'm going to object to
19   that as calling for legislative privilege.  Those would
20   be privileged communications.  Those would -- those
21   would eviscerate the privilege as it relates to his
22   information-gathering processes in his legislative
23   role.  And I'm going to instruct him not to answer on
24   the basis of legislative privilege.
25   Q.   (BY MR. BROUGHTON)  Are you refusing to

Page 210

```
1   answer?
2        A.  I'm going to follow my lawyer's advice.
3        Q.  Did you ask any outside group -- and by that I
4   mean anyone other than other legislators or legislative
5   staff -- whether S.B.1 violated the first amendment?
6            MR. SWEETEN:  Same objection, same
7   instruction.
8        Q.  (BY MR. BROUGHTON)  Are you going to refuse to
9   answer that question?
10       A.  I'm going to follow my lawyer's advice.
11       Q.  Okay.  And do you have a general understanding
12  of what is contained in the 15th amendment to the
13  U.S. Constitution?
14       A.  Generally, yes.
15       Q.  And that is the state shall not pass laws that
16  deny or abridge the right to vote on account of race,
17  right?
18       A.  I believe that's right.
19       Q.  So you're familiar with the 15th amendment?
20       A.  Yes.
21       Q.  What did you do to ensure that S.B.1 complied
22  with the 15th amendment?
23           MR. SWEETEN:  That calls for legislative
24  privilege, and so I'm going to instruct him not to
25  answer on that basis.
```

Page 211

```
1        Q.  (BY MR. BROUGHTON)  Are you refusing to
2   answer?
3        A.  I'm going to follow my lawyer's advice.
4        Q.  Did you contact the Attorney General's office
5   and seek input from the Attorney General's office
6   whether or not S.B.1 would violate the 15th amendment?
7            MR. SWEETEN:  Objection, attorney/client
8   privilege, legislative privilege.
9            Instruct not to answer on that basis.
10       Q.  (BY MR. BROUGHTON)  Are you refusing to
11  answer?
12       A.  I'm going to follow my lawyer's advice.
13       Q.  Did you seek any input from any outside
14  group -- and by "outside group" I mean non-legislators
15  or legislative staff -- to determine whether or not
16  S.B.1 would violate the 15th amendment?
17           MR. SWEETEN:  Objection, calls for
18  legislatively privileged information including his
19  thought processes, his privileged communications, his
20  fact-gathering process.  Instruct him not to answer on
21  that basis.
22       Q.  (BY MR. BROUGHTON)  Are you refusing to
23  answer?
24       A.  I'm following my lawyer's advice.
25       Q.  Okay.  And so you understand that in each of
```

Page 212

```
1   those questions I didn't ask you for the substance of
2   what they said.  I just asked you a yes or no question.
3   Did you contact the Attorney General's office or any
4   outside groups to seek their input on whether or not
5   S.B.1 violated the first 14th or 15th amendment.  You
6   understood that, right?
7            MR. SWEETEN:  Objection to the question
8   as argumentative.  Also misstates facts.  The
9   question -- the predicate of the question supplied the
10  substance of the communication and, thus, I instructed
11  him accordingly not to respond to those questions.  I
12  continue with that instruction.
13       Q.  (BY MR. BROUGHTON)  So you're refusing to
14  answer that question?
15       A.  I'm following my lawyer's advice.
16       Q.  Are you familiar with Section 2 of the Voting
17  Rights Act?
18       A.  Generally, yes.
19       Q.  And what do you understand Section 2 of the
20  Voting Rights Act provides?
21       A.  Section 2 of the Voting Rights Act obviously
22  deals with the right to vote, protections.  I realize
23  that some portions of the Voting Rights Act have been
24  affected or changed by the US Supreme Court.  But,
25  generally speaking, the Voting Rights Act is about the
```

Page 213

```
1   right to vote about actions taken by states and to
2   ensure that states do not take actions to undermine the
3   right to vote or federal protections.  Forgive me.
4   That's a very general description of my understanding
5   of the Voting Rights Act.
6        Q.  It also includes provisions not to
7   discriminate based on race with regard to voting,
8   correct?
9        A.  I believe that's correct.
10       Q.  Did you contact the Attorney General's office
11  to determine whether or not S.B.1 would violate
12  Section 2 of the Voting Rights Act?
13           MR. SWEETEN:  Objection, attorney/client
14  privilege, legislative privilege.  Instruct not to
15  answer on that basis.  He can answer as to whether he
16  had communications with the attorney/client -- I'm
17  sorry -- with the Attorney General's office, but he's
18  not going to provide the substance as the predicate of
19  your question requires him to do.
20       Q.  (BY MR. BROUGHTON)  Are you going to refuse to
21  answer that question?
22       A.  I'm going to follow my lawyer's advice.  I've
23  previously testified that there was -- there were
24  communications with the Attorney General's office.  On
25  my lawyer's advice I'm going to refuse to answer your
```

Senator Bryan  Hughes
April 19, 2022                                    214 to 217

Page 214

1 particular question.
2      Q.  Did you contact any other outside groups --
3 and by "outside groups" I mean groups or persons other
4 than fellow legislators or legislative staff -- to
5 determine whether S.B. 1 would violate Section 2 of the
6 Voting Rights Act?
7           MR. SWEETEN:  Same objection.  I think
8 your question goes to legislative privilege, including
9 his mental impressions about legislation, his
10 fact-gathering process, and privileged communications
11 that he may have had.  The predicate of the question
12 supplies the substance of it and, therefore, I'm going
13 to instruct him not to answer on that basis.
14      Q.  (BY MR. BROUGHTON)  Are you going to refuse to
15 answer?
16      A.  I'm going to follow my lawyer's advice.
17      Q.  Do you understand that Section 2.08 of the
18 Voting Rights Act provides disabled and
19 non-English-speaking voters with the right to their
20 assister of choice?
21      A.  I don't have the code in front of me.  I do
22 understand those rights are protected, but I'll take
23 your word for it if you say it's 2.08.
24      Q.  What do you to ensure that the provisions of
25 S.B. 1 would not violate Section 2.08 of the Voting

Page 215

1 Rights Act?
2           MR. SWEETEN:  Same objection, legislative
3 privilege.  And to the extent it would implicate
4 attorney/client privilege instruct not to answer on
5 that basis.
6      Q.  (BY MR. BROUGHTON)  Are you refusing to answer
7 that question?
8      A.  I'm following my lawyer's advice.
9      Q.  Do you understand Title 2 of the Americans
10 With Disabilities Act to require reasonable
11 accommodations for disabled persons and prohibit
12 discrimination based on disability status?
13      A.  I did not -- I didn't know it was in Title 2
14 in particular.  I know the ADA provides for that, and
15 if you say it's Title 2 I believe you.
16      Q.  What did you do to ensure that S.B. 1 complied
17 with Title 2 of the ADA?
18           MR. SWEETEN:  Objection, attorney/client
19 privilege; objection, legislative privilege.
20           Instruct not to answer on that basis.
21      Q.  (BY MR. BROUGHTON)  Are you refusing to
22 answer?
23      A.  I'm following my lawyer's advice.
24      Q.  Did you contact the Attorney General's office
25 and seek its input on whether S.B. 1 complied with the

Page 216

1 ADA?
2           MR. SWEETEN:  Objection, attorney/client
3 privilege; objection, legislative privileges.  I will
4 let him answer as to whether he contacted the AG, but
5 not as to the substance of the question and the
6 predicate that you supplied.
7           So instruct not to answer with the
8 question on the table.
9      Q.  (BY MR. BROUGHTON)  Are you going to follow
10 your lawyer's advice?
11      A.  I am.
12      Q.  Are you familiar with the Rehabilitation Act
13 of 1973?
14      A.  Not the specific details of that legislation,
15 no, I'm not.
16      Q.  I'll represent to you that Section 5.04 of the
17 Rehabilitation Act of 1973 prohibits discrimination
18 based on disability status.  Does that ring a bell at
19 all?
20      A.  Oh, I'm certainly familiar with the concept.
21 I didn't know exactly where it was found in the code.
22 But, yes, I'm generally familiar with that.
23      Q.  Did you take --
24      A.  If you say that's where it is, I believe you.
25      Q.  Did you take any steps to ensure that S.B. 1

Page 217

1 complied with Section 5.04 of the Rehabilitation Act of
2 1973?
3           MR. SWEETEN:  Objection, attorney/client
4 privilege, legislative privilege.
5           Instruct not to answer on that basis.
6      Q.  (BY MR. BROUGHTON)  Are you refusing to
7 answer?
8      A.  I'm going to follow my lawyer's advice.
9      Q.  Okay.
10           MR. BROUGHTON:  What number is it going
11 to be, 13?
12           MS. DULANEY:  Yeah.
13           (Exhibit No. 13 marked.)
14      Q.  (BY MR. BROUGHTON)  Has your office received
15 any communications from constituents or anyone else
16 following the March 22 primary election relaying
17 problems that they experienced in their efforts to
18 vote?
19           MR. SWEETEN:  Hold on one second.  I want
20 to consult regarding privilege.
21           You can answer the question.
22           THE WITNESS:  I don't know about all the
23 communications received in our office.  Forgive me.
24 What was the specific question again?  I'm --
25      Q.  (BY MR. BROUGHTON)  Sure.

Senator Bryan  Hughes
April 19, 2022                                    218 to 221

Page 218

1    A.   -- doing my best.
2    Q.   I'm happy to --
3    A.   I'm sorry.
4    Q.   Let's do this.  Let me hand you Hughes
5  Exhibit 13.
6              MR. SWEETEN:  Do you have an extra copy,
7  by chance?  It's okay if not.
8              MR. BROUGHTON:  I don't.  I'm sorry.
9    Q.   (BY MR. BROUGHTON)  Let me know when you've
10 looked through that and I'll ask you some questions.
11 Most of it's -- just for completeness we attached the
12 rest of the whole document --
13   A.   Okay.
14   Q.   -- but most of it's not that article.
15   A.   Okay.  I've read it.
16   Q.   All right.  Had you seen this article before?
17   A.   I don't believe so.
18   Q.   Do you know Wood County Elections
19 Administrator Laura Wise?
20   A.   Yes.
21   Q.   Okay.  That's in your district?
22   A.   Yes.
23   Q.   Gregg County is in your district?
24   A.   Yes, it is.
25   Q.   Do you know Jennifer Briggs?

Page 219

1    A.   Yes.
2    Q.   So did anyone make your office aware of --
3  this headlines says, "New ballot causes voter
4  confusion, East Texas election administrators say."
5    A.   It looks like the objection in this article
6  has to do with the way some of the ballot envelopes
7  provided space for writing in the numbers.  And so I
8  don't know if I had heard this specific concern.  There
9  were questions about implementation by the counties of
10 the new law, but I don't know if I've heard this
11 specific concern before.
12   Q.   And so what concerns had you heard?  If you
13 have not heard about those what concerns had you heard
14 as a result of incidents that occurred in the
15 March 2022 primary election?
16   A.   Well, generally that the requirement of
17 putting under the envelope the application of ballot by
18 mail, a -- the driver license number, state ID, the
19 last four digits of social.  That was a new
20 requirement.  And so whenever there's a change made to
21 processes it's a change, and so it's something people
22 haven't seen before.  So I'm talking about discussions
23 about that.
24   Q.   All right.  Did you follow the news articles
25 and the media reports about the number of mail-in

Page 220

1  ballots that were rejected under the new law?
2    A.   I did.  I don't have the numbers memorized,
3  but I've read articles -- I've read a number of
4  articles about it.
5    Q.   Do you recall about 12 percent of mail-in
6  ballots were rejected?
7              MR. SWEETEN:  Objection, assumes facts
8  not in evidence.
9              THE WITNESS:  I don't know about that
10 number.  I do recall that the rejection rate varied
11 widely by county.  My recollection is from what I read
12 in the media and the numbers I saw that Harris County
13 had a much, much larger rejection rate than Travis
14 County, for example.  So I do remember that.
15   Q.   (BY MR. BROUGHTON)  Harris County has a much
16 larger minority population that Travis County, right?
17   A.   I don't know that.  If you say so.  I don't
18 know the numbers.
19   Q.   But generally you know that to be true?
20   A.   That sounds right.  I haven't -- it sounds
21 right.  I haven't looked at the numbers.  That sounds
22 right.
23            (Exhibit No. 14 marked.)
24   Q.   (BY MR. BROUGHTON)  Let me hand you what's
25 been marked as Hughes 14.  Are you familiar with the

Page 221

1  Texas Tribune?
2    A.   I am.
3    Q.   How are you familiar with that?
4    A.   It's an online news source in Austin.  I know
5  some of the people that work there.  I've dealt with
6  them.  And, Lord, that's been around for -- I don't
7  know -- maybe ten years or so.  If I'm off on this you
8  can correct me.  But it's an Austin-based online news
9  service.
10   Q.   Is it nonpartisan, as far as you know?
11   A.   I don't know if there's an officially --
12 there's certainly no official partisan designation to
13 it.  The articles tend to be slanted to the left, but
14 there's no official partisan affiliation that I'm aware
15 of.  In my opinion, articles seem to be slanted to the
16 left, that is.  And that's the generalization.  Each
17 reporter is different.  Each story is different.
18   Q.   So the title of this says, "More than 12% of
19 mail-in ballots were rejected in Texas under new GOP
20 voting rules, final tally shows."
21            First paragraph, "Figures released by the
22 Texas secretary of state show that more than
23 24,000 Texas voters had their ballots rejected in the
24 March primary.  The rejection rate is a significant
25 increase over previous elections."

Page 222

1              Do you see that?
2    A.   I see that.
3    Q.   Do you have any reason to believe that that's
4    an inaccurate statement?
5    A.   I haven't seen the official numbers, so if
6    that's -- I don't have a specific reason to doubt that.
7    Again, I know the rejection rate varied widely by
8    county, but I don't know about that number overall.
9              MR. BROUGHTON:  I pass the witness.
10             MS. PERALES:  Can we take that break so I
11   can move my things?
12             MR. BROUGHTON:  We can.
13             THE VIDEOGRAPHER:  We're off at 4:57.
14        (Recess from 4:57 p.m. to 5:07 p.m.)
15             THE VIDEOGRAPHER:  Stand by.  This is
16   Segment No. 8.  We're back on the record, 5:07.
17                  EXAMINATION
18   BY MS. PERALES:
19   Q.   Good afternoon.
20   A.   Good afternoon.
21   Q.   Yes, it's still afternoon.  Thank you so much
22   four your patience today, Chairman.  I'm going to --
23   just for the purposes of the record I'm going to
24   introduce myself to you.
25   A.   Okay.

Page 223

1    Q.   My name is Nina Perales, and I represent the
2    LUPE plaintiffs in this case.
3    A.   Okay.  Thank you.  Good to see you.
4    Q.   It's good to see you too.  And you have been
5    doing such a wonderful job in your deposition that the
6    usual things that I say to a witness about making your
7    answers out loud and not talking over, I don't need to
8    do any of that with you.  I did want to ask you a
9    question that didn't come up earlier, which is whether
10   you've ever had your deposition taken before.
11   A.   I have not.  Today is my first.
12   Q.   Well, you are a natural at it, I will say.
13   A.   Thank you.
14   Q.   I have a couple of questions about your
15   background, and I just wanted to mention in apropos of
16   nothing that in 1995, 1996 when I guess you were
17   clerking in East Texas my husband was clerking in the
18   Southern District of Texas in Laredo for
19   Judge George P. Kazen.
20   A.   Really?
21   Q.   So we were leading parallel lives at that
22   time.
23   A.   Yes, we were.  Wow.
24   Q.   It was a really nice time, a great judge.  It
25   was a good experience.

Page 224

1    A.   I believe that Judge Kazen and Judge Steiger,
2    for whom I clerked for, were contemporaries.  And I
3    know -- of course, I obviously know the name and I
4    believe that they knew each other and I believe -- I
5    think they were friends.
6    Q.   I'm sure they would have been.
7         I noticed in your biography when I was
8    reading -- the official one where it talks about --
9    it's on your page for the Capitol that it said that you
10   were the first in your family to get a Bachelor's
11   degree; is that correct?
12   A.   Yes.
13   Q.   And it looked like you started off at the
14   junior college and you finished at the four-year; is
15   that right?
16   A.   Yes.
17   Q.   Did you work during that time when you were
18   going to school, going to college?
19   A.   I did.
20   Q.   Tell me about the most interesting job you had
21   when you were in college.
22   A.   Thank you very much.  And I don't want to
23   overstate it.  I was working part-time to help with
24   expenses -- my parents were also helping -- selling
25   water filters door to door was probably the most

Page 225

1    interesting.
2    Q.   That does sound good.  Tell me what your
3    father's occupation was.
4    A.   My father worked for the railroad.  He was a
5    railroad brakeman and then a conductor for the Texas
6    and Pacific and Missouri Pacific and Union Pacific.  He
7    didn't change jobs, but there were merges and corporate
8    changes.  So he did that for almost 40 years.
9    Q.   Have you ever in your time as a lawyer
10   represented a client who hasn't had the opportunity to
11   complete the eighth grade of school?
12   A.   I believe so.  I can think of two that I
13   believe would be in that category.  There may be others
14   that I'm not aware of, but I can think of two that I
15   believe would be in category.
16   Q.   Did you ever represent a client who struggled
17   to read some of the documentation that you were putting
18   before them and as their lawyer you would have to
19   explain to them what they were looking at, what they
20   were signing?
21   A.   Yes, I have done that.
22   Q.   Have you ever represented a client who was
23   limited English proficient?  And by that I mean has
24   limited ability to read and understand the English
25   language.

Senator Bryan  Hughes
April 19, 2022                    226 to 229

Page 226

1   A.   Yes, I have, more than one.
2   Q.   Did you ever use an interpreter in your office
3  to talk to that client?
4   A.   Yes.  Yes, ma'am.
5   Q.   And did the interpreter do a good job for you?
6   A.   I believe so.  The -- you know, the client
7  seemed satisfied and I believe so.  I'm sorry.  I was
8  going to say I -- my -- these clients of limited
9  English proficiency were native Spanish speakers, and
10  so I'm not qualified as interpreter, but perhaps a
11  little bit of Spanish so that I could -- so I have a
12  general sense that the interpreter was doing a good job
13  and the client seemed happy as well.
14   Q.   Good.  The first level of proficiency in
15  Spanish is usually cursing.  I don't know if that's
16  within your skill set.  I'm not asking that as a
17  question.  Just want to put it out there.
18   A.   Thank you.
19   Q.   So I have some questions for you about things
20  that you said during the debates on S.B. 7 and S.B. 1.
21  And so what I'm going to do is ask you if you remember
22  saying some of these things.  And if you don't or if
23  you need your recollection refreshed I do have the
24  links to the videos with the timestamps on my laptop.
25  And so I want you to feel comfortable that I'm not

Page 227

1  putting words in your mouth, that if I ask you a
2  question about something you may have said and you're
3  not sure you could ask me to play the video.  Is that
4  all right?
5   A.   Okay.  Thank you.
6   Q.   And I'm sure some of this is burned in your
7  recollection and others might not be.  And I also
8  recognize that this was a little bit of that movie
9  Groundhog Day because we kept waking up and there was
10  another session having to do with election integrity.
11       I'm wondering if you recall making a
12  statement that it was your duty as legislators to
13  balance the interest in maintaining a fair and honest
14  election with the opportunity to exercise one's right
15  to vote?
16   A.   That certainly sounds like something I would
17  have said, and I -- so I'm not trying to split hairs.
18  I can't swear that I remember uttering those words, but
19  that sounds like something I would have said that is
20  consistent with things that I did say.  And of course I
21  believe you, but that's my recollection.
22   Q.   Okay.  And I'm going to just play you a tiny
23  bit of yourself.  I know it's awkward, but I am going
24  to show you a little bit of yourself.  Those words are
25  going to be in there, but it's also just because -- I

Page 228

1  don't know if you've ever had to use the slider on
2  these videos, but there's going to be a little bit more
3  of you right before that.
4   A.   Okay.
5   Q.   It's probably about -- maybe about 25 seconds
6  before you say that.  And I just want to get you to
7  confirm that you said, quote, and so the franchise is
8  paramount.  It's our duty as the legislature to balance
9  the interest in maintaining a fair and honest election
10  with the opportunity to exercise one's right to vote.
11       THE WITNESS:  Would you like --
12       MS. PERALES:  I'll do it.  It's okay.
13       THE WITNESS:  Oh, you don't -- you can
14  see it.  I'm sorry.
15       MS. PERALES:  I can see it just a teeny
16  bit.
17       THE WITNESS:  Okay.
18            (Video playing.)
19       SENATOR HUGHES:  "-- coming in as we've
20  been reminded of today, elections are a fundamental
21  pillar of American life.  Many of us are concerned as
22  we see confidence in our elections on Democratic
23  process begin to erode.  And so it's important that
24  elections be free and fair and accurate and that people
25  know they are free and fair and accurate, because if

Page 229

1  folks don't trust the process I don't believe that
2  their vote will be counted, will be counted accurately.
3  They'll stop participating, and that's bad all around.
4  And so the franchise is paramount.  It's our duty as
5  the legislature to balance the interest in maintaining
6  a fair and honest election with the opportunity to
7  exercise one's right to vote.  Senate Bill 7 we
8  believe" --
9            (End of Video.)
10   Q.   (BY MS. PERALES)  Did you say those words?
11   A.   I did.  Thank you.  Thank you, Ms. Perales.  I
12  did.
13   Q.   You're very welcome.
14       MR. HUDSON:  Sorry.  Just for the record,
15  I wasn't able to see that video, so I just wanted to
16  see if you could identify it for the record.
17       MR. SWEETEN:  The timestamp?
18       MR. HUDSON:  Yeah, the timestamp --
19       MS. PERALES:  Yes.
20       MR. HUDSON:  -- from once it came.
21       MS. PERALES:  Yes.
22       MR. HUDSON:  Yeah, the day.
23       MS. PERALES:  So the video is the Senate
24  Committee on State Affairs.  The timestamp is hour 2,
25  minute 46.  And I am looking for the date, and I'm

Page 230

1  going to have to get that for you on a break.
2                MS. DULANEY:  They're in the link.
3                MS. PERALES:  They're in the link?
4                MS. DULANEY:  Move the mouse over that.
5                MS. PERALES:  Up here?
6                MS. DULANEY:  On March 26.
7                MS. PERALES:  March 26, 2021, so during
8  the regular session.
9                THE WITNESS:  Thank you.
10               MR. SWEETEN:  Thank you for that, Nina.
11               MS. PERALES:  Is the next exhibit in the
12  series Exhibit No. 15?
13               THE STENOGRAPHER:  Yes, ma'am.
14               (Exhibit No. 15 marked.)
15        Q.   (BY MS. PERALES)  Chairman, I'm handing you
16  what has been marked Deposition Exhibit No. 15.
17               MR. SWEETEN:  Thank you.
18        Q.   (BY MS. PERALES)  It is a document of several
19  pages, and I'll represent to you that it comes from the
20  Texas Secretary of State.  You can just see the tiniest
21  little icon in the upper left-hand corner.
22        A.   Thank you.
23        Q.   And I was hoping you would turn with me to the
24  second page of the document where it is showing the
25  presidential election for November 2020 results.  And

Page 231

1  then all the way at the bottom it has a race total.  Do
2  you see that there?
3        A.   Yes, ma'am.
4        Q.   And would you agree with me that in Texas in
5  the November 2020 general election that more than one
6  million ballots -- more than 11 million ballots were
7  cast in the presidential race?
8        A.   I believe that's right, yes.
9        Q.   You can put that aside now.
10               (Exhibit No. 16 marked.)
11        Q.   (BY MS. PERALES)  I'm handing you what has
12  been marked Deposition Exhibit No. 16.  And I will
13  represent to you that this also comes from the office
14  of the Texas Secretary of State.  And I wanted to know
15  if you would observe with me that more than 8.9 million
16  votes were cast in the presidential race in Texas in
17  the November 2016 general election?
18        A.   Yes, I believe that's right.
19               MR. SWEETEN:  Nina, can I just ask, on
20  the source of Document 15 and the now we've looked at
21  16.  In 15 you're saying -- you're representing it's
22  from the Secretary of State's office.  Is it in the
23  same place that you found this one?  This looks like a
24  new style of reporting elections is why I ask.  This I
25  very much recognize the front, et cetera, so --

Page 232

1                MS. PERALES:  Well, you haven't been
2  keeping up with the latest trends on the Secretary of
3  State's website, Patrick.  But there is a new way of
4  showing the election results.  I will say it is not an
5  improvement in terms of finding information, but it
6  is -- it is what it is.
7                MR. SWEETEN:  All right.  Do you want me
8  to pass that along or --
9                MS. PERALES:  You certainly could.  I
10  would ask Senator Hughes to pass it along, but he won't
11  tell us what he says to the Secretary of State, so it
12  may have to be you, Patrick.
13        Q.   (BY MS. PERALES)  Chairman, as a general
14  matter, would you agree with me that if someone
15  complained about a problem happening in one or
16  two counties that you would not assume the same problem
17  is happening in every county in Texas?
18               MR. SWEETEN:  Objection.  It's an
19  incomplete hypothetical, it's vague.  It doesn't even
20  provide what the issue is.  In addition, I want to just
21  instruct him generally that to the extent that any
22  question like this could impede upon your legislative
23  mental impressions, thought process, fact-gathering
24  that occurred related to legislation, then don't
25  answer.  But if you can answer without that you can

Page 233

1  provide that answer.  Okay?
2                THE WITNESS:  Thank you.  So I would say
3  generally, not speaking about legislation or
4  legislative process, it would seem to me it would
5  depend on what counties, the size of the counties, what
6  the subject matter was.  I don't think I have enough
7  information to make a generalization based on the
8  question.
9        Q.   (BY MS. PERALES)  And so is your answer, then,
10  that you would assume that a problem that's happening
11  in a couple of counties is happening throughout Texas?
12               MR. SWEETEN:  Objection, asked and
13  answered.
14               THE WITNESS:  Sure.  I would say it would
15  depend on the size of the counties and what the nature
16  of the problem was before we could make a determination
17  like that.
18               MR. SWEETEN:  And I'm going to just
19  reiterate the objection for the proceeding question as
20  to that question.
21        Q.   (BY MS. PERALES)  Do you recall having an
22  exchange during the regular session with Senator West
23  about a provision that would require certain large
24  counties to allocate polling places based on the number
25  of voters in each state representative district?

Page 234

1          MR. SWEETEN:  Is this a matter of public
2    record, Nina?
3          MS. PERALES:  Yes, I'm talking about a
4    public exchange during the debates.
5          MR. SWEETEN:  You can answer.
6          THE WITNESS:  I recall this topic being
7    discussed at some length during the debate.  I remember
8    exchanges with Senator Alvarado at some length and a
9    number of other senators.  I don't recall the specific
10   words that Senator West and I used, but I do remember
11   the debate and do remember the topic.
12        Q.   (BY MS. PERALES)  Do you recall stating that
13   the provision -- so do you recall Senator West asking
14   why this provision at that time applied to large
15   counties and your answer that you had only heard of the
16   problem happening in larger counties?
17        A.   I do remember that exchange.  Yes, I do
18   remember that answer, that's right.
19        Q.   Okay.  Thank you.
20        A.   Thank you.
21        Q.   I'm going to ask you about another public
22   exchange, this time with Senator Boris Miles.  And I
23   think you might remember this one because Senator Miles
24   was talking about himself having been accused of vote
25   harvesting and having been not convicted.

Page 235

1          Do you recall Senator Miles asking you if
2    S.B. 1 addressed people making false accusations of
3    voter fraud and your answer saying that the law already
4    addressed that?
5          A.   I do remember that exchange.  Senator Miles,
6    again, in this public debate on the floor of the Senate
7    was quite exercised about having been accused of that.
8    And he shared that with us, and understandably.
9          Q.   Okay.  And do you recall answering when he
10   asked you whether -- whether anything about false
11   accusations was in S.B. 1 that you answered that making
12   a false accusation of voter fraud was already covered
13   by existing law?
14        A.   I do remember that exchange, yes.  I do
15   remember saying that, yes.
16        Q.   Have you ever served as a poll watcher?
17        A.   I have not.
18        Q.   Have you ever filled out certifications to
19   authorize poll watchers to serve on your behalf?
20        A.   I recall in one race -- I'm trying to answer.
21   I don't recall if I filled that certification, but I do
22   recall being asked to appoint an observer, 2016.  There
23   was a -- in my race for the Texas Senate in the primary
24   there was a recount, and so the county conducting that
25   asked me to send -- told me I could send someone.  And

Page 236

1    so I don't recall going through the normal poll watcher
2    procedures that are set out in the law.  This may have
3    been an informal process.  But that's the only time I
4    recall asking someone to serve as a poll watcher on my
5    behalf, and really it was a recount watcher.  So, I'm
6    sorry.  The answer is no, but I came close to that.
7        Q.   Okay.  So you've had a contested primary
8    election then?
9        A.   Yes.  Yes, ma'am.
10       Q.   And did you have any others besides in 2016?
11       A.   Yes, I have.  In the -- in the Texas House I
12   believe I had a contested primary one time, one time.
13   Yes, one contested primary that I recall in the Texas
14   House.  And then, of course, races in the fall.  And in
15   the Texas Senate I had a contested primary in 2016 when
16   I was initially elected, and not one since then, but
17   opponents in the fall.
18       Q.   So of course you've had contested general
19   elections is what you're saying?
20       A.   Yes.  Thank you.
21       Q.   And have you ever requested that there be poll
22   watchers present in the polling places in the districts
23   where you've run in either the primary or the general?
24       A.   I have not.
25       Q.   In general, where you are Senate District 1 do

Page 237

1    the political parties appoint the poll watchers?
2        A.   That's my understanding of the process, yes.
3        Q.   Have you ever assisted another person to vote?
4        A.   I have not.
5        Q.   Are you aware whether a family member or a
6    friend of yours has ever assisted another person to
7    vote?
8        A.   To my knowledge, I'm not aware of any.
9        Q.   You mentioned earlier in the deposition that
10   your parents vote by mail; is that right?
11       A.   Yes.
12       Q.   And I'm going to take a wild guess here and
13   say it's because they're over 65?
14       A.   Yes, that's correct.
15       Q.   Okay.  And do you know whether your parents
16   have voted in person once they were over 65?
17       A.   I don't know that.  I -- my general impression
18   is that they've been voting by mail since shortly after
19   turning 65.  I could be wrong.  They may have voted in
20   person since that time, but I know their -- I recall
21   their general practice to be voting by mail.
22       Q.   It's certainly an option, though, isn't it?
23   For an elderly person who wants to show up in person at
24   the polls and walk in and cast their ballot, they can
25   do that, right?

Page 238

1    A.   Yes, ma'am, that's right.

2    Q.   Are you aware that voters who don't speak

3  English well may use assisters to help them vote?

4    A.   Yes.

5    Q.   Do you recall the last time you voted?

6    A.   Well, what year is this?  So I had -- I

7  voted -- I voted for -- yes, I voted in the primary

8  election this year.

9    Q.   March 2022 primary election?

10   A.   Yes.  Thank you.

11   Q.   Did you vote in person?

12   A.   I did.

13   Q.   Can you tell me about the machine or other

14  apparatus that you voted on?

15   A.   Yes.  In Wood County I voted on a direct

16  recording electronic machine, one of those that I don't

17  like because it doesn't provide for an auditable paper

18  trail.  The new one will under the law.  When they

19  replace that there will be an auditable paper trail.

20  So -- and I say I don't like it.  Nothing against that

21  particular machine, but it's one of those machines with

22  a console and a wheel whereby you select your

23  candidates, choose the one you want, and then you cast

24  your ballot and it says, "Okay, you voted."  It's

25  electronic -- it's voted electronically.

Page 239

1    Q.   And you mentioned that the machine does not

2  spit out a piece of paper after you've cast your ballot

3  to show you how you voted; is that right?

4    A.   That's correct.

5    Q.   And the machine has a wheel on it that you

6  rotate to move through your options on the ballot; is

7  that correct?

8    A.   That's how I should have described it.  Yes,

9  that's how it works.

10   Q.   And would you consider it appropriate if a

11  voter was eligible for assistance that the assister

12  help that person understand, for example, how to use

13  the dial to select the candidate of choice?

14   A.   The law -- it's my understanding the law

15  provides for that and that that -- are you asking how I

16  think it should be or how I think it is or --

17   Q.   Whether you think it's appropriate, that it's

18  okay that the assister would help the voter understand

19  how to use that dial that you were talking about before

20  to move among the selections for candidate.

21        MR. SWEETEN:  Objection, vague.

22        Go ahead.  You can answer.

23        THE WITNESS:  Yes, that makes sense to

24  me.

25   Q.   (BY MS. PERALES)  Okay.  Does it make sense to

Page 240

1  you for a voter assister to help a deaf person

2  communicate with poll workers when the deaf person has

3  come to vote?

4        MR. SWEETEN:  Objection, vague.

5        THE WITNESS:  Yes.

6    Q.   (BY MS. PERALES)  Would you consider it okay

7  for a voter assister to help an elderly person come in

8  to the poll and move around that space, for example, by

9  leaning on the assister if the elderly person is not

10  completely stable in their walking?

11        MR. SWEETEN:  Objection to the question

12  as vague.

13        THE WITNESS:  Yes.  And, of course, as

14  you know under the law, the -- for someone who has

15  difficulty doing that the election equipment can be

16  brought out to their car to accommodate them in that

17  way, which is obviously important as well, if they want

18  to do that, if the voter wants to do that.

19   Q.   (BY MS. PERALES)  But it's also okay if the

20  voter wants to come into the polling place and maybe

21  use a stable -- stabling arm from a friend or a

22  neighbor, a family member to help them move around the

23  polling place; is that right?

24        MR. SWEETEN:  Objection to the question

25  as vague.

Page 241

1        But go ahead.

2        THE WITNESS:  I believe so.

3    Q.   (BY MS. PERALES)  Is it okay with you for a

4  voter who is wheelchair-bound to use an assister to

5  push the wheelchair into the polling place and push it

6  up to the poll workers or the voting machine?  Does

7  that sound okay with you?

8    A.   Of course.

9        MR. SWEETEN:  Same objection.

10        THE WITNESS:  Of course.

11   Q.   (BY MS. PERALES)  Are you familiar with any

12  other kinds of voter assistance besides the type of

13  assistance that I've been describing to you?

14        MR. SWEETEN:  I'm sorry.  Could you

15  repeat the question, Nina?

16   Q.   (BY MS. PERALES)  Are you familiar with any

17  other types of voting assistance besides the examples

18  that I have just given you now?

19   A.   Depending on one's disability there are

20  different voting machines, equipment available.

21  Forgive me for not having the proper terms.  Depending

22  on the physical capabilities of the voter there are

23  machines where the voter -- even a voter with more --

24  more profound disabilities can, if they wish, vote a

25  private ballot; for example, where they can puff to --

Page 242

1  and that will make their choice on the machine.  So
2  that's -- that's available for the voters who want that
3  for whom it's important to, you know, have that private
4  ballot.
5           So I don't know if that's exactly what
6  you're talking about, but I know -- I remember hearing
7  very heartfelt testimony from members of the disability
8  community about how important that was for those who
9  wanted to to be able to vote a private ballot by
10 themselves.  So that's available as well.
11     Q.   And you're also aware that some blind voters
12 can vote with voting machine-adapted for braille; is
13 that correct?
14     A.   Yes.
15     Q.   And it's the case, isn't it, that sometimes a
16 voter will use some of these adaptive technologies to
17 vote that private ballot, as you mentioned, right?
18     A.   Sometimes, yes.
19     Q.   And is it also the case that a disabled voter
20 or an elderly voter might also use assistance from a
21 trusted family members to help them navigate the
22 polling place and figure out how to use the machine and
23 cast the ballot?
24     A.   Yes.
25     Q.   Okay.  Do you ever -- do you canvas

Page 243

1  door-to-door when you're running for office now?
2      A.   Yes.
3      Q.   Have you ever been standing outside someone's
4  door and reminded them to vote?
5      A.   Yes.
6      Q.   And have you done this during the early voting
7  period?
8      A.   Yes.
9      Q.   Have you ever had someone that you were
10 standing on their doorstep reminding them to vote tell
11 you that they had their mail ballot at home already?
12     A.   No.
13     Q.   Have you ever offered a ride to the polls for
14 a voter?
15     A.   As a -- I don't know if I have as a candidate.
16 I know that as a neighbor, as a friend I've -- you
17 know, with an elderly neighbor or a relative I've --
18 I've done that.  I don't know if I have as a candidate.
19 Now, that's not what you asked.  I'm just trying to
20 give a precise answer.
21     Q.   Well, you anticipated my next question --
22     A.   Sorry about that.
23     Q.   -- which is as a candidate we've talked about
24 you personally canvassing door-to-door.  And I want to
25 ask whether as a candidate you've ever had others

Page 244

1  campaigning on your behalf canvassing door-to-door?
2      A.   Yes.
3      Q.   Have you ever had others on your behalf making
4  phone calls to voters to encourage them to come out to
5  vote?
6      A.   Yes.
7      Q.   Have you ever had your campaign headquarters
8  or workers offer to give a ride to a voter to the
9  polling place if that voter needed a ride?
10     A.   Yes.
11     Q.   And have you ever had campaign workers on your
12 behalf provide a ride to a voter to the polling place?
13     A.   Yes.
14     Q.   And do you know whether those voters were
15 able-bodied and able to get out of the car or whether
16 this was a curbside voting situation?
17     A.   I don't know that.
18     Q.   Do you know about how many times you might
19 call the same voter to encourage them to turn out to
20 vote when you're doing phone banking?
21     A.   I don't know if we have good information,
22 right, about who has voted and who has yet to vote.
23 Ideally, a voter could receive more than one call if
24 they hadn't yet turned out to vote, but -- so I don't
25 know how exactly how often that happens in our

Page 245

1  campaigns.  If my campaigns were more efficient that
2  would happen a whole lot.  I hope it does, but I don't
3  know specifically.
4      Q.   Okay.  You mentioned that in your private
5  capacity you have offered to give a ride to a voter to
6  the polling place.  Do you remember that?
7      A.   Yes.
8      Q.   And have you ever, in fact, provided a ride to
9  a voter to the polling place?
10     A.   Yes, I have.
11     Q.   Do you remember whether the voter voted
12 curbside or went into the polling place?
13     A.   When I have done that the voter went into the
14 polling place.
15     Q.   And so tell me how that would unfold.  Would
16 you be chatting with your friend or neighbor and say,
17 "Hey, if you need a ride I'm here to give that ride to
18 you"?
19     A.   In those cases where I have personally done
20 that it's been at the request of an elderly friend,
21 neighbor.  I think I drove my grandmother one time.
22 It's been sometime years ago, obviously.  So I don't
23 recall the time when I've personally drove someone
24 where I had offered, but it was -- it would have been
25 when they requested.

Senator Bryan  Hughes
April 19, 2022                          246 to 249

Page 246

1    Q.   Okay.  And let's take your grandmother as an
2  example.  Did you also remind your grandmother that it
3  was voting time and it was time to vote?
4    A.   As I recall, I did.  It's been some years ago,
5  but I believe I did.
6    Q.   Okay.  Have you ever found yourself reminding
7  neighbors or friends around town as early voting was
8  commencing that it was time to vote and that you would
9  encourage them to vote?
10   A.   Yes.
11   Q.   You mentioned that you have been living in
12  Mineola for about 20 years; is that right?
13   A.   That's right.
14   Q.   So you must be a familiar face around by now?
15   A.   For good or for ill I think that's true.
16   Q.   You were given an exhibit before called Hughes
17  Exhibit 12.  It's S.B. 1.
18   A.   Oh, thank you.
19   Q.   Uh-huh.  I'm just going to catch up with my
20  outline because I got so caught up in the conversation
21  that I lost my place.
22   A.   I understand.
23   Q.   Okay.  So before we get into S.B. 1 I'm going
24  to ask you some questions that are not related to S.B.
25  1.  And I'm saying that so that Patrick doesn't start

Page 247

1  to panic.
2        Would you agree with me that before S.B.
3  1 a voter assister already had to provide their name
4  and address to be entered on the poll list next to the
5  voter's name?
6        MR. SWEETEN:  I'm going to object as to
7  legislative privilege to the extent that he is being
8  asked to provide his mental impressions about the
9  legislation that we are here to talk about today.
10       So to the extent that this is asking for
11  legislative privilege I would instruct you not to
12  answer.  But to the extent that you can answer without
13  revealing your mental thoughts about the -- and
14  impressions about the bill you can go ahead and answer.
15  Okay?  Is that clear?
16       THE WITNESS:  Yes.  As far as what the
17  law was before Senate Bill 1 you described that process
18  accurate.  Of course you know it well.  You described
19  that accurately that that's the requirement before
20  Senate Bill 1, is assisting a voter.
21   Q.   (BY MS. PERALES)  I'm going to ask you
22  two more similar questions, and Mr. Sweeten may want to
23  add a similar objection.
24       You would agree with me, wouldn't you,
25  that before S.B. 1 it was illegal for a voter assister

Page 248

1  to assist someone who was not eligible?
2        MR. SWEETEN:  So objection to the extent
3  it calls for your mental processes and
4  legislatively-privileged matters.  But to the extent
5  that it does not request that information or you can
6  answer without, you can go ahead and do that.  I'll
7  also just caution you that, you know, the text of the
8  bill you can -- you can discuss the text of the actual
9  bill that was in existence in advance of the session.
10  So legislative privilege.  That was longwinded.
11       Objection, legislative privilege, but you
12  can answer beyond -- to the extent it doesn't implicate
13  that.  Is that clear?
14       THE WITNESS:  It is.  Thank you.
15       MR. SWEETEN:  I could -- I could restate
16  it if you need me to.
17       THE WITNESS:  Thank you.
18       MS. PERALES:  You got the question
19  completely wrong.
20       THE WITNESS:  Speaking only to what was
21  the law before Senate Bill 1, you have stated that
22  provision correctly, yes, ma'am.
23   Q.   (BY MS. PERALES)  And, finally, you would
24  agree with me, wouldn't you, that before S.B. 1 it was
25  illegal for a voter assister to tell a voter how to

Page 249

1  vote?
2        MR. SWEETEN:  Same objection as before
3  and instruction.
4        You can go ahead and answer if it doesn't
5  reveal privilege.
6        THE WITNESS:  That's my understanding of
7  the law before Senate Bill 1.
8    Q.   (BY MS. PERALES)  Now we're going to look at
9  Senate Bill 1.  I would ask you to turn to
10  Section 6.04.  And I will get you page number on that.
11  It's Page 52 of my version.
12   A.   6.04.  I have it here.
13   Q.   Excellent.  One of the nifty things about
14  bills is that the way they're written you can see
15  what's being added to the election code and what's
16  being taken away.  And so first I'm going to ask you,
17  would you agree with me that the text in this exhibit,
18  Hughes 12 here on Page 52, if the text is underlined,
19  then it's an addition to existing law; is that right?
20   A.   That's correct.
21   Q.   And if the text is -- has a line drawn through
22  it, that means that the text is coming out of the law,
23  correct?
24   A.   Yes, that's correct.
25   Q.   So would you agree with me that Section 6.04

Senator Bryan Hughes
April 19, 2022                                    250 to 253

Page 250

1  of S.B. 1 addresses the oath that an assister takes
2  prior to providing assistance?
3      A.   Yes.
4      Q.   And S.B. 1 adds to the oath the words, quote,
5  under penalty of perjury, unquote?
6      A.   Yes.
7      Q.   And then also we're going to be reading
8  Page 52 and then flowing on to Page 53.  S.B. 1 adds
9  the language to the assister oath, quote, the voter I
10 am assisting represented to me they are eligible to
11 receive assistance, unquote; is that right?
12     A.   That's right.
13     Q.   And then a few lines later, would you agree
14 with me that in the sentence where the assister is
15 swearing to confine their assistance, S.B. 1 adds
16 language, quote, reading the ballot to the voter,
17 directing the voter to read the ballot, marking the
18 voter's ballot, or directing the voter to mark the
19 ballot, unquote?
20     A.   That's correct.
21     Q.   And would you also agree with me that S.B. 1
22 removes the language from the assister oath, quote,
23 answering the voter's questions, to stating
24 propositions on the ballot, and to naming candidates
25 and, if listed, their political parties, unquote?

Page 251

1      A.   Yes, that's correct.
2      Q.   Would you agree with me, then, that just a
3  little bit further on in the assister oath S.B. 1 adds
4  the language, quote, I did not pressure or coerce the
5  voter into choosing me to provide assistance, unquote?
6      A.   Yes, that's correct.
7      Q.   With respect to the new language in S.B. 1 in
8  the assister oath that the voter has represented to the
9  assister that the voter is eligible for assistance, can
10 you explain to me how that would unfold in real life?
11          MR. SWEETEN:  Yeah, I'm going to object.
12 I think that calls for legislative privilege.  You're
13 asking him to directly interpret the legislation as it
14 would be applied, quote, in real life.  I think that
15 invades his legislative privilege.  I'm going to
16 instruct him not to answer that question.  He can
17 answer based on what the text says or doesn't say, what
18 was added or what was subtracted, but he is not going
19 to provide his mental impressions.  Those are
20 legislatively privileged.  Those relate to legislation
21 and I'm going to instruct him not to answer that
22 question.
23     Q.   (BY MS. PERALES)  Are you declining to answer
24 based on advice of counsel?
25     A.   Yes, I am.

Page 252

1          MS. PERALES:  Just so I'm clear,
2  Patrick --
3          MR. SWEETEN:  Uh-huh.
4          MS. PERALES:  -- you believe that
5  legislative privilege covers the witness' idea of how
6  this bill would affect real life interaction even
7  though the bill is already now passed?
8          MR. SWEETEN:  I'm saying that I think
9  that your question requires him to provide his mental
10 impressions about legislation; in other words, why
11 it -- something was included or not included.  And to
12 that extent I think it's legislatively privileged and
13 that's why I've instructed him that way.
14         MS. PERALES:  I want to make clear that
15 I'm not asking the witness to explain why certain
16 language was included or not included in the bill.  My
17 question goes to his testimony on how the bill now
18 passed and inshrined in law would play out in real
19 life.
20         MR. SWEETEN:  Yeah, I think his
21 understanding of how the bill could be interpreted and
22 how it would be applied in your incomplete hypothetical
23 is asking for information that directly relates to
24 legislatively-privileged information.  I'm going to --
25 you know, to the extent that you're asking about the

Page 253

1  text of the bill I don't have an issue with you asking
2  that.  But to ask him to apply that also calls for a
3  legal -- legal conclusion and I think that goes to his
4  interpretation post facto, is inextricably linked with
5  his -- with his mental impressions about the
6  legislation.  With that, I'm instructing him not to
7  answer the question and that is the basis.
8      Q.   (BY MS. PERALES)  And are you declining to
9  answer based on your counsel's advice?
10     A.   Yes, ma'am.
11         (Exhibit No. 17 marked.)
12     Q.   (BY MS. PERALES)  Senator, I'm handing you
13 what has been marked Deposition Exhibit No. 17.
14         MR. SWEETEN:  Thank you.
15     Q.   (BY MS. PERALES)  Senator, if you would look
16 with me in the upper left part of the form which has
17 very tiny print.  Do you see the language there where
18 it says, "Prescribed by the Secretary of State"?
19     A.   Yes, ma'am.
20     Q.   And do you see down on the last part of that
21 it says "9/13"?
22     A.   Yes, ma'am.
23     Q.   And I'll represent to you that this is an oath
24 of assistance from prior to S.B. 1.
25     A.   Okay.

Page 254

1    Q.   And do you see in the -- in the old oath of
2   assistance where the assister swears or affirms, quote,
3   that I will not suggest by word, sign, or gesture how
4   the voter shall vote, unquote?
5    A.   Yes.  Yes, ma'am.
6    Q.   All right.  And then do you see the language
7   after that, quote, I will confine my assistance to
8   answering the voter's questions, to stating
9   propositions on the ballot, and to naming candidates
10  and, if listed, their political parties, unquote?
11   A.   Yes, I -- yes, ma'am, I see that.
12       MR. SWEETEN:  Nina, can I ask you, is
13  this -- is this a form from pre -- I don't see a date
14  on this.  Maybe I'm missing it.
15       MS. PERALES:  Yes.  The witness and I
16  have walked through the date, September 2013 --
17       MR. SWEETEN:  Okay.
18       MS. PERALES:  -- in the upper left-hand
19  corner.
20       MR. SWEETEN:  Got it.  Okay.  Very good.
21       MS. PERALES:  And I have represented to
22  him that this a pre S.B. 1 assister.
23       MR. SWEETEN:  Okay.  Very good.  Thank
24  you.
25            (Exhibit No. 18 marked.)

Page 255

1    Q.   (BY MS. PERALES)  You don't have to talk,
2   Senator.  I'm just going to say that I'm handing you
3   what has been marked Deposition Exhibit No. 18.
4    A.   Thank you.
5    Q.   If you would look with me on the upper
6   left-hand corner of this document, do you see where it
7   says, "Prescribed by the Secretary of State"?
8    A.   Yes, ma'am.
9    Q.   And do you see under there a couple of lines
10  where it says "1/2022"?
11   A.   Yes, ma'am.
12   Q.   And I'm not sure.  Do you recognize this
13  document?  Have you ever seen this before?
14   A.   I don't know that I have.  I don't believe --
15  no, I don't believe I have.
16   Q.   Well, I'll represent to you that it is a form
17  prescribed by the Texas Secretary of State pursuant
18  to -- well, several requirements including S.B. 1.
19   A.   Okay.
20   Q.   And do you see the -- towards the top of the
21  page underneath the words "Oath of Assistance" that the
22  assister will now sign underneath this oath, which
23  starts with, "Oath of person assisting voter:"  Do you
24  see that there?
25   A.   Yes, ma'am.

Page 256

1    Q.   And do you see the language -- I'm going to
2   read it, and you tell me if I read it correctly, quote,
3   I swear (or affirm) under penalty of perjury that the
4   voter I am assisting represented to me they are
5   eligible to receive assistance, unquote?
6    A.   That's -- that's -- that's correct.
7    Q.   Yes, I wouldn't have written it that way
8   either, but it is what it is.  I think there's a "that"
9   missing.  But, anyway, did you have anything else you
10  wanted to observe in response to my question whether I
11  had read it correctly?
12   A.   Oh, no.  You read that -- you read that first
13  part correctly.  Thank you.
14   Q.   Okay.  And then a little bit further on we see
15  some language that's very similar to the old oath, and
16  so I wanted to ask you if I'm reading correctly where
17  it starts with, "I will confine my assistance," which
18  is in the second line.
19   A.   Yes, I see that.
20   Q.   Okay.  I'm going to read it and you tell me if
21  I read it correctly.  Quote, I will confine my
22  assistance to reading the ballot to the voter,
23  directing the voter to read the ballot, marking the
24  voter's ballot, or directing the voter to mark the
25  ballot, unquote.

Page 257

1    A.   You read that correctly, yes, ma'am.
2    Q.   Thank you.  Oh, don't put it away just yet.
3   Would you agree with me, Senator, that the eligibility
4   criteria for assistance is not listed in the oath?
5    A.   I believe that's -- I believe that's right.  I
6   believe you're correct.
7    Q.   Would you agree with me that the oath that
8   we're looking at does not state whether it is legal
9   assistance to help an elderly person move around the
10  polling place?
11   A.   This oath does not address that one way or the
12  other, that's correct.  That's correct.
13   Q.   Is it also true that the oath does not provide
14  for the assister language explaining whether
15  encouraging a voter three times to vote is pressuring
16  the voter?
17   A.   There's nothing about that in this oath,
18  that's correct.
19   Q.   Now I'm going to ask you a general question
20  not related to S.B. 1.  But you would agree with me,
21  wouldn't you, that you would not sign an oath under
22  penalty of perjury if you were not sure that you were
23  performing some act that you are swearing not to do?
24   A.   I think the purpose of the oath is to --
25       MR. SWEETEN:  No.  So just answer her

Page 258

1  question, Senator, yeah.
2           THE WITNESS:  Yeah.
3       Q.  (BY MS. PERALES)  I can repeat it if you want
4  me to.
5       A.  Well, thank you.
6       Q.  Wouldn't you agree with me that you would not
7  sign an oath under penalty of perjury if you were not
8  sure that you were performing some act that you're
9  swearing not to perform?
10          MR. SWEETEN:  I'm going to object to
11  incomplete hypothetical and that it -- the question is
12  vague.
13          But you can answer to the extent you can
14  understand it.
15          THE WITNESS:  You -- one should not sign
16  an oath unless they're comfortable that -- swearing to
17  what's in the oath.  If that's -- if that's a fair
18  answer, I think that's -- maybe that's what you're
19  asking.
20      Q.  (BY MS. PERALES)  Yes.  And you personally --
21  I mean, you're an attorney.  You know what the risk is
22  of committing perjury.  Would you personally not sign
23  an oath if you weren't sure if you were complying with
24  that oath?
25          MR. SWEETEN:  Same objection.

Page 259

1           THE WITNESS:  No, that's good practice.
2  Yeah, that is correct.
3       Q.  (BY MS. PERALES)  Thank you.  You can put that
4  paper away.
5       A.  Thank you.
6           MS. PERALES:  He's so good at following
7  instructions.
8       Q.  (BY MS. PERALES)  Senator, do you think that
9  people who assist large numbers of voters are
10  necessarily committing fraud?
11          MR. SWEETEN:  Objection.  Are you asking
12  him to interpret S.B. 1, or what -- what is -- I don't
13  understand the question.  It's an incomplete
14  hypothetical.  Are you asking him to provide his legal
15  conclusion as to what's legal and illegal as it relates
16  to, you know, Senate Bill 1?  If so, I think that's
17  legislatively-privileged.  I don't understand the
18  question.
19          MS. PERALES:  Okay.
20      Q.  (BY MS. PERALES)  Well, Senator, do you recall
21  during the public debate on S.B. 1 making the statement
22  that S.B. 1, quote, builds a record so that those who
23  do cheat cannot hide as easily.  We do this in part by
24  building a record where people are assisting large
25  numbers of voters, unquote?

Page 260

1       A.  Yes.
2       Q.  And, thus, I will ask you a question about
3  that statement, which is whether you think that people
4  who assist large numbers of voters are necessarily
5  committing fraud?
6           MR. SWEETEN:  I'm going to object to the
7  extent it asks -- to the extent that it would implicate
8  his mental impressions or thoughts about S.B. 1.
9           If you can answer it without doing that,
10  then you can go ahead.
11          THE WITNESS:  Yeah, separate from Senate
12  Bill 1 and from any legislative considerations, no, I
13  do not believe that assisting a large number of voters
14  in and of itself makes one guilty of fraud.
15      Q.  (BY MS. PERALES)  Okay.  Are you aware of any
16  nonprofit nonpartisan organizations that offer to
17  assist voters at the polls?
18      A.  I want to say that there are some, but I
19  don't -- I don't have personal knowledge of that.  If
20  you know, let me know.  I don't know of any particular
21  groups, but -- I just don't know for sure.  I think
22  I've heard discussion about that, but I don't have
23  specific knowledge of how prevalent that is if it's
24  offered.
25      Q.  Okay.

Page 261

1       A.  I do know that it's not offered in every
2  polling place.  I can say that having, you know, worked
3  elections and having voted.
4       Q.  Are you familiar generally with the League of
5  Women Voters?
6       A.  I am.
7       Q.  Are you aware whether or -- whether they are a
8  nonprofit nonpartisan organization?
9       A.  My impression is they're a nonprofit
10  nonpartisan organization.  That's based on dealing with
11  them before I was in the legislature and observing what
12  they do publicly and matters of public record.
13      Q.  Do you know whether any of the League of Women
14  Voters' materials state that if the voter needs a ride
15  to the polls or needs assistance in voting that the
16  league would be able to provide that?
17      A.  I don't know that.  That wouldn't surprise me,
18  but I don't -- I don't -- I can't say that I've seen
19  that in literature, but it wouldn't surprise me if that
20  were the case.
21      Q.  Would you agree with me that the new oath
22  required by S.B. 1 requires all assisters to swear to
23  the oath whether or not that assister is working for a
24  campaign or not?
25          MR. SWEETEN:  You can refer to the text

Page 262

1  of the bill if you want.
2            THE WITNESS:  Okay.  The oath that --
3  where I was talking about the oath you and I were
4  discussing a few moments ago?  So I don't see that
5  specific language in the oath.  Forgive me.  If I'm
6  missing it, please help me out.  I don't --
7      Q.  (BY MS. PERALES)  I'll ask again.
8      A.  Thank you.
9      Q.  Would it be fair to say that the oath of
10  assistance is required of all assisters whether or not
11  they work for a political campaign?
12      A.  Forgive me.  I believe that's correct.  And I
13  misunderstood the question.
14      Q.  And that -- that was my fault for -- my fault
15  for asking a bad question, and then smacking my mic is
16  a second fault.  I'm sorry.
17            I'm going to move now to some -- I'm
18  going to move now to the public debate on S.B. 1.  And
19  there were a couple of times that you read aloud from
20  what you described as sworn testimony of voters
21  regarding in-person voter assistance misdeeds, for lack
22  of a better word.
23      A.  Yes, ma'am.
24      Q.  And I remember at least two hearings where you
25  read aloud from the testimony of the voters.  One was

Page 263

1  named Alandra, I believe, and there was another
2  individual as well.
3      A.  I believe -- go ahead.
4      Q.  You generally remember that?
5      A.  I do.  I believe Angie Cavazos was the name of
6  one voter, but I do generally recall that testimony and
7  sharing it at hearings and related areas, yes, ma'am.
8      Q.  Okay.  And I could play -- if you need me to,
9  as I ask you these questions I can also play you one
10  time from the hearing to refresh your recollection if
11  you need it.  But you're remembering very well because
12  you remember the name of the voter.
13            Would it be correct to say that the
14  in-person voter assistance that was described in that
15  sworn testimony was given by a campaign worker, a
16  campaign worker, Ms. Gutierrez?
17      A.  Was the worker named Ms. Gutierrez?  I
18  recall -- I think her first name was Marcella and I had
19  forgotten her last name.  Pardon me.  But --
20      Q.  Marcella.  We can call her Marcella.
21      A.  Thank you.  Thank you very much.  The -- in
22  the case of Angie Cavazos, based on her testimony, yes.
23  The -- the -- what I think everyone would agree was
24  improper illegal assistance was given by a paid
25  campaign worker.  Yes, that's my recollection.

Page 264

1      Q.  Okay.  Do you recall -- so I am going to play
2  this for you because I want to refresh your
3  recollection that you read from the testimony of
4  two voters.
5      A.  Thank you.
6            MR. SWEETEN:  And, Nina, just like the
7  last time, if you could identify the date and then the
8  timestamp that you're going to be showing him on the
9  video clips so we can all go look at it later if we
10  need to.
11      Q.  (BY MS. PERALES)  It's going to take me just a
12  minute.
13      A.  That's fine.  Thank you.
14      Q.  If you could be patient.
15      A.  Of course.  Of course.
16      Q.  I'm going to put my phone right next to the
17  computer so that it works better since I'm using my hot
18  spot.  Okay.  And this is -- I'm going to use Keely's
19  method -- July 10, 2021, Senate Committee on State
20  Affairs.  And the timestamp is going to be 12:35.  And
21  once it loads I'm going to move the little slider to
22  12:35.  This is very early on, possibly a bill way out,
23  but don't hold me to it.
24      A.  No problem.
25            (Video playing.)

Page 265

1            SENATOR HUGHES:  "Actually, we want them
2  to do that.  The security measures of this bill largely
3  are directed at voter (audio cut out) the harvesters or
4  folks who are trying to steal votes, trying to
5  influence votes, unduly trying to coerce votes.  We do
6  want to crack down on that, making it easy for folks to
7  vote their own will.  The opportunity for a voter with
8  a disability" --
9            MS. PERALES:  I want to make sure that --
10            SENATOR HUGHES:  -- "they receive
11  assistance is not only fair and right.  It's necessary.
12  Voters with disabilities then will have the same
13  rights.  They must have the same rights as those
14  without a disability.  At the same time, we're not
15  going to let people take advantage of those
16  opportunities for disabled folks and cheat and coerce
17  and steal votes.  I want to read you at this time a
18  couple of accounts from voters who have testified in
19  various cases across the state where their right to
20  vote and to vote by secret ballot was manipulated or
21  coerced.  Each of these was testifying under oath and I
22  want you to hear their stories.
23            "This is sworn testimony offered in a
24  pending -- in a matter in Texas courts from -- from
25  Alandra.  She's asked, 'Do you know the person or

Page 266

1  the name' -- she said, 'Did someone call and ask you to
2  go vote?'
3              She says, 'I was picked up by Pippo.'
4              "'Is that the nickname for
5  Mr. Rodriguez?'
6              "'Yes.'
7              "'Did he call and tell you he was going
8  to come pick you up?'
9              "'Yes, he was calling and calling and
10 wouldn't be alone -- wouldn't leave me alone.'
11             "'So you told him, 'Go ahead.  I'll go
12 vote?'
13             "'Yes.'
14             "'And he came and picked you up?'
15             "'Yes.'
16             "'Did he tell you what was going to
17 happen when you got the polling place, whether someone
18 was going to assist you?'
19             "And the witness says, 'Yes.'
20             "'Who did he tell you was going to assist
21 you?'
22             "'Marcella.'
23             "'Did he give you a little piece of paper
24 with her name on it?'
25             "'I think so.  I don't remember.'

Page 267

1              "'Did he also give you a little piece of
2  paper with the name of the candidates he wanted you to
3  vote for?'
4              "'Yes.'
5              "The witness goes on.  It is asked, 'When
6  you got to the polling place and you were walking
7  towards where you actually voted, the building where
8  you vote, did Marcella Gutierrez talk to you?'
9              "Answer, 'I asked for her because I
10 thought she was going to help me vote because it was my
11 first time.  I didn't know how.'
12             "The witness is asked, 'And she came
13 out?'
14             "'Yes.'
15             "'What happened next?'
16             "'Then she took me where you vote and she
17 was the one who told me to press for them.'
18             "So -- then the witness is asked, 'So she
19 went into the polling place where you were voting?'
20             "'Yes.'
21             "'And she told you which people to vote
22 for?'
23             "And the witness says, 'Yes, with her
24 finger like this.'
25             "The witness is asked, 'You indicated

Page 268

1  with your finger that she was telling you what persons
2  on the ballot to vote for; is that right?'
3              "The witness says, 'Yes.'
4              "'Did these persons include Rudy Franz?'
5              "'Yes.'
6              "Oziel Trevino?'
7              "'Yes.'
8              "'And Mr. Rodriguez?'
9              "'Yes.'
10             "'Did you do what she told you to do and
11 vote for those persons?'
12             "The witness says, 'Yes.'
13             "This sworn testimony is from
14 Angie Cavazos describing her experience trying to vote.
15             "Question, 'And what did he tell you?'
16             "And she says before I got out of the
17 truck he told me, 'Tell them for Marcella to assist
18 you.'
19             "'So what did you do?'
20             "'By that time I didn't have the
21 intention of voting for them, so I went in, they took
22 my information, I signed.'
23             "'And then what happened?'
24             "'Then I go to the polling place and
25 Marcella goes up.  I go to the polls and Marcella comes

Page 269

1  up behind me.  I had the intention of -- of voting and
2  she was going to assist me how to do those things
3  because I didn't understand that machine.  So she
4  started punching in the machine.  I don't even remember
5  the language.  She was telling me, 'You are going to
6  press here and you're going to press over there.'  So I
7  saw that she put it in favor of the team that she was
8  on.'
9              "'She marked the computer for
10 Oziel Trevino?'
11             "'Yes.'
12             "'You did not mark it?'
13             "The voter says, 'No, I did not touch it
14 at any time.'
15             "'And then what happened?'
16             "'So I had the idea that she was giving
17 me like a tour of how to do those things and that she
18 was going to leave.  So by the time I told her, 'Okay,
19 let me -- let me -- let me vote on my own.'
20             "'And she said, 'No, you already voted.'"
21             (End of Video.)
22     Q.   (BY MS. PERALES)  Do you recall -- having
23 watched the video, do you recall having made those
24 statements and read aloud about two voters?
25     A.   I do.  I do.

Page 270

1    Q.   In both cases that you read aloud about in the
2  hearing there was one -- one assister,
3  Marcella Gutierrez; is that right?
4    A.   I believe that's right.  In each case she was
5  the -- the assister.
6    Q.   And you mentioned before it was your
7  recollection that Marcella Gutierrez was a campaign
8  worker?
9    A.   Yes, in at least one of those proceedings she
10  testified that she was being paid by a campaign.
11    Q.   Okay.  Do you recall reading at another point
12  from a transcript involving a man named
13  Guadalupe Rincon who said that Ms. Gutierrez stood by
14  him with while he voted?
15    A.   That sounds familiar.  I remember most
16  Ms. Cavazos' testimony, but the one you described, the
17  voter you described, sounds familiar with as well.
18    Q.   And that was the same assister, correct,
19  Marcella Gutierrez?
20    A.   I believe -- that's my recollection, yes,
21  ma'am.
22    Q.   Okay.  And this testimony that you read from
23  was from a civil election contest, not a criminal
24  trial, correct?
25    A.   I believe it was a civil case in Hidalgo

Page 271

1  County, yes, ma'am.
2    Q.   And so the case came about because
3  two candidates were disputing who won in a close
4  election, correct?
5    A.   I -- that's my recollection.  I mean, you
6  know, the -- I'm sure you have -- the trial documents
7  will tell us, but I believe -- I believe that's right.
8  I believe you.
9    Q.   Well, have you ever been involved in election
10  contest litigation?
11    A.   I have not.
12    Q.   You are a lucky man.
13         MS. PERALES:  Patrick, I don't have
14  copies of this, so I'm going to show it to you before I
15  hand it to the witness.
16         MR. SWEETEN:  Okay.
17         (Exhibit No. 19 marked.)
18         MS. PERALES:  I just marked Hughes
19  Deposition Exhibit No. 19.  I'm going to hand it to
20  counsel for him to look at first.
21         MR. SWEETEN:  Okay.
22         MS. PERALES:  I'm sorry.  It's late.
23         THE WITNESS:  Aren't you going to have
24  some water while you have a chance?
25         MS. PERALES:  I just had some.

Page 272

1         THE WITNESS:  Okay.  I know you know what
2  you're doing.  I'm just --
3         MR. SWEETEN:  Okay.
4    Q.   (BY MS. PERALES)  Okay.  Senator, I'm handing
5  you what has been marked as Deposition Exhibit No. 19.
6  If you would please turn -- well, first of all, do you
7  recognize this as a subpoena for documents served on
8  you?
9    A.   Yes.  Yes, ma'am.
10    Q.   Okay.  If you would turn to Page A-10 for me
11  and look at Request No. 12.
12    A.   I see that, yes, ma'am.
13    Q.   And would you agree with me that that is a
14  request asking you to provide documents related to
15  voter fraud?
16    A.   Yes.  That's what it looks like, yes, ma'am.
17    Q.   And so there were these documents that you
18  were reading from in the hearing and you were quoting
19  from the testimony from the litigation.  Did you
20  provide those documents to us in response to the
21  subpoena?
22    A.   The transcripts that I was reading from?  I
23  don't know.  I could go back and look.  I don't know if
24  we did.  It sounds like they would be responsive, but I
25  don't know.

Page 273

1         MS. PERALES:  And I'll represent that we
2  don't seem to have them.
3         MR. SWEETEN:  Okay.
4         MS. PERALES:  And so I'll ask counsel --
5  not the witness.
6         MR. SWEETEN:  Yeah.
7         MS. PERALES:  I'll ask the witness'
8  lawyer if he wouldn't mind going back and looking for
9  those documents.  They are -- they were read from in a
10  public hearing and we believe they are responsive to
11  Request No. 12 in the documents --
12         MR. SWEETEN:  Okay.  And then -- so
13  we'll -- we can take that up with him after the
14  deposition.  I understand your request and we'll
15  discuss it.
16         MS. PERALES:  Okay.  This is my last
17  exhibit.
18         MR. HUDSON:  I just want to make clear on
19  the record.  As I understand it, the subpoena that you
20  just handed him is the subpoena from the United States,
21  not from private plaintiffs?
22         MS. PERALES:  Yes, that's right.
23         MR. HUDSON:  Okay.  I just want to be
24  clear that that's what we're talking about, is a
25  subpoena that didn't actually come from you or your

Senator Bryan  Hughes
April 19, 2022                                    274 to 277

Page 274

1   client.
2           MS. PERALES:  Let me know if that's going
3   to be a problem in terms of responding to my requests.
4   If it is, we can talk about it more off my record.
5           MR. HUDSON:  Yeah, we can talk about it
6   off the record.  But it's not that you're trying to
7   make a production request through the deposition based
8   on a subpoena that you didn't serve?  We can talk about
9   that off the record.
10          MS. PERALES:  I am not making a
11  production request through this deposition.  We will
12  talk about it off the record.
13          (Exhibit No. 20 marked.)
14      Q.  (BY MS. PERALES)  Senator, I'm handing you
15  what has been marked Deposition Exhibit No. 20.
16          MR. SWEETEN:  Thank you.
17      Q.  (BY MS. PERALES)  Do you recognize this
18  document?  Oh, yes, and the type is very small.
19      A.  Thank you.
20          MR. SWEETEN:  Nina, so this was your --
21  this was produced, you're saying, from the State of
22  Texas, the State defendants, not from Mister -- not
23  from Senator Hughes, correct?
24      Q.  It has the State Bates stamp in the bottom
25  right-hand corner.

Page 275

1       A.  I don't know if I have seen this document, but
2   I have seen similar document or documents like it.
3   Again, I can't say that every entry here is identical
4   to what I've seen, but I have seen something like this.
5       Q.  This chart -- would you agree with me that
6   this chart goes back as far as the 2004 election cycle,
7   but not before that?
8           MR. SWEETEN:  You can take your time to
9   review the document, Senator, to the extent you need
10  to.
11          THE WITNESS:  Of course I trust you.  But
12  you asked me to agree with you, so I looked down in
13  that election involved column and it does appear that
14  that 2004 primary is the earliest election referenced
15  on this document, yes, ma'am.
16      Q.  (BY MS. PERALES)  Okay.  Now I'm going to ask
17  you a similar question, which it might be easier to
18  flip from the back forward.  But when I reviewed the
19  document I only saw two prosecutions for the 2016
20  general election.  Would you agree with me on that,
21  looking at the column "Election Involved"?  Sorry.
22      A.  That's all right.
23      Q.  Yes, "Election Involved."  It appears to me
24  there's two prosecutions for the 2016 general election.
25  You let me know.

Page 276

1       A.  I believe you're right.  Many from the 2016
2   primary, but only two from the 2016 general election.
3   I believe you're right.
4       Q.  And just so we're clear, in the center of the
5   first page at the very bottom, would you agree with me
6   it says, "Information as of 11/5/2021"?
7       A.  Yes, ma'am.
8           THE WITNESS:  Let me see if he needs
9   those.  I borrowed those.
10          MR. SWEETEN:  Thank you.
11          THE WITNESS:  I borrowed his glasses.  I
12  think I'm better without them.  You might need them.
13          MR. SWEETEN:  That says something about
14  these glasses.
15          THE WITNESS:  No.  Just my vanity maybe.
16      Q.  (BY MS. PERALES)  I think we're going to move
17  on from this document.  It is very hard to read.
18      A.  Thank you.
19      Q.  One more thing while I'm busy teeing up my
20  next bit of video is, did you happen to notice on
21  here -- and I know you said you don't practice criminal
22  law, but did you happen to notice that sometimes there
23  were multiple counts associated with the same incident?
24      A.  Yes, ma'am.
25      Q.  Okay.

Page 277

1       A.  Or the same -- at least in the same -- in the
2   same litigation there will be multiple counts.
3       Q.  Well, yes.  But also multiple counts
4   associated with the -- with the same single bad act.
5   Let me see if I can find you an example.  Okay.  So on
6   the second page -- not on the second page, but on the
7   one that's Bates stamped 1146 --
8       A.  Yes, ma'am.
9       Q.  -- if you count up from the bottom one, two,
10  three, four, five, six, seven -- eight, which is the --
11  the entry for Christina Lichtenburger.
12      A.  Yes, ma'am.
13      Q.  If you look in "Charges," that column sort of
14  in the middle there, it says, "1 count of unlawful
15  assistance, 1 count of method of returned marked
16  ballot."  Do you see that?
17      A.  Yes, ma'am.
18      Q.  Does that tell us if it was the same incident
19  of the voter and the mail ballot or whether these were
20  two different voters?
21      A.  I don't know.  If you know the answer, I'm
22  curious.  I don't know from -- from reading that.
23      Q.  No, I don't know either.
24          And then, finally, my last question on
25  this, even though I told you we weren't -- I wasn't

Page 278

1  going to ask you anymore questions about this, do you
2  see any allegation from the "Allegation" column here,
3  do you see any allegation that is focused on in-person
4  voter assistance at the polling place as opposed to
5  mail ballot fraud?
6       A.   There are a number of legal assistance.
7  Sometimes if you look over to charges --
8       Q.   Uh-huh.
9       A.   -- the charges refer to -- sometimes they
10  refer to carrier envelopes, and that would indicate
11  those are ballots by mail.  There may be a couple of
12  illegal assistance charges that don't specify that, but
13  I don't see anything that specifically says illegal
14  voting, in-person voting.  Is that what you're asking?
15       Q.   Yes.  I'm wondering if you -- if you see any
16  of the unlawful assistance descriptions that don't
17  reference the mail ballot.
18       A.   Again, I may not be reading this right, but,
19  for example, on Bates Stamp 1148, the -- in almost the
20  middle of the document from Cameron County,
21  Tomas Chavez.  So there are three counts involving
22  carrier envelope.  The first one is the voter of
23  three counts assisting voter violation, three counts
24  returning mail ballot.  But then four counts unlawful
25  assistance to voter.  So I don't know if that means the

Page 279

1  fourth count there was unrelated to the mail.  It -- we
2  seem to have an unaccounted for count, if I can put it
3  way.  So we need more information, but that -- that one
4  seems to indicate -- or certainly could indicate that
5  there was more than just the mail ballot illegal
6  assistance.  I wish I were more familiar with the terms
7  used in this document, but that's one I can see --
8       Q.   Okay.
9       A.   -- to respond to your question.
10       Q.   And that one in particular, Thomas Chavez, it
11  doesn't make reference to the polling place, though,
12  does it?
13       A.   Oh, no, ma'am.  I thought you asked me for one
14  that referred to illegal assistance, but wasn't clearly
15  just tied to mailing ballots.  But, you're correct.
16  Does -- did I hear your -- that second question?
17       Q.   No, you're right.
18       A.   I'm trying.
19       Q.   You're right.  I was asking a follow-up.
20       A.   Okay thank you.
21       Q.   I wasn't -- I wasn't trying to catch you up on
22  your first answer.
23       A.   Okay.  Thank you.  Thank you.  You're correct.
24  No specific reference to in-person voting, you're
25  correct in that one.

Page 280

1       Q.   Okay.  I'm going to play you another bit of
2  video, which hopefully will go a little smoother.
3  There's about 15 seconds leading up to it that is not
4  what I'm looking for here, but there is some -- this is
5  in a -- this is in a public hearing.  I will tell you
6  where it's from -- March 26th, 2021 Senate State
7  Affairs Committee.  And the timestamp is 3:10:34.  And
8  this is some -- some -- I keep saying testimony.  This
9  is some talk by you where you're talking about voter
10  assisters preying on voters at the polls.  And this is
11  one -- one excerpt of you talking about that, but I'll
12  represent to you there were a couple of other times
13  when you mentioned the word preying, which, by the way,
14  is spelled p-r-e-y --
15       A.   Thank you.
16            THE STENOGRAPHER:  Yeah.
17       Q.   (BY MS. PERALES)  -- because if voter
18  assisters are praying on voters that would be like a
19  whole other thing possibly implicating the First
20  Amendment, but we won't go there right now.
21       A.   Yes, ma'am.
22       Q.   I'm going to play you the video.
23            (Video playing.)
24            SENATOR HUGHES:  "Around casting the
25  ballot itself."

Page 281

1            UNIDENTIFIED SPEAKER:  "No, I'm asking
2  about exactly what you just said, invading the privacy
3  of a private ballot.  When you have someone that's
4  voting and you have an assister, is the poll watcher
5  able to kind of overlook that person voting?
6            SENATOR HUGHES:  "Senator, there was
7  testimony before the State Affairs Committee in
8  previous sessions and also over the interim about folks
9  who will show up at the polling places and they will
10  prey upon voters who look maybe like they can overcome
11  their will and say, 'You need help, don't you?  Do you
12  need assistance,' and they would then walk them in.
13  And it wasn't clear whether the voter was doing the one
14  voting or the one who was supposed to be helping them.
15  And so this is based on testimony from -- from
16  prosecutors and from other witnesses.  That's where
17  this comes from.  So, again, this is just to make sure
18  that the voter is the one expressing their will casting
19  their ballot and not somebody.  That's all this is
20  about."
21            (End of Video.)
22       Q.   (BY MS. PERALES)  Okay.  Now I cut off the
23  question from Senator West.
24       A.   Thank you.  He won't mind.
25       Q.   I wanted to ask you a couple of questions

Page 282

1   about what you said there.  You mentioned that there
2   was testimony from prosecutors and other witnesses.  Do
3   you recall who those other witnesses were?
4        A.   So my recollection is -- and, again, I think I
5   said in that statement it was testimony before the
6   State Affairs Committee.  I should have said the Senate
7   Select Committee on Election Integrity, the one that
8   we -- that I talked about with counsel earlier.  The
9   district attorney, Mr. Escobar -- and I do not recall
10  what county he is from, in -- generally in the
11  Rio Grande Valley.  He testified.  And I recall his --
12  I'm going to say his investigator, an investigator from
13  his office.  And I don't recall if he was a deputy
14  sheriff assigned to the office or if he was
15  commissioned by the district attorney's office.  As you
16  know, that's handled differently in different counties.
17  But a law enforcement officer who worked with the
18  district attorney, they testified about that, and they
19  described, based on my recollection -- it certainly
20  made an impression on me they described folks who will
21  wait at the polling places.  And when they saw what
22  appears to be a vulnerable voter, maybe an unsure
23  first-time voter, a timid voter, they will come
24  alongside them and say, "Let me help you.  Let me walk
25  you in and help you."

Page 283

1            So that's the process I was describing.
2   And I recall that testimony from the district attorney
3   and I believe from his investigator as well.  I --
4   there may have been others, but those are the two that
5   stick in my memory.  It's been a few years ago.
6        Q.   I'm glad you helped with the name of the
7   hearing because I had the Select Committee on Elections
8   Security in February of 2018, and I see Omar Escobar
9   there, but I don't see his investigator.
10       A.   Okay.
11       Q.   Do you recall him coming to yet another
12  hearing for the Senate Select Committee?
13       A.   I'm fairly certain that an investigator from
14  his office or his county testified along the same lines
15  that he did and -- but thank you for pulling up the
16  list.  I don't know.  It must have been a different
17  hearing.  But Omar Escobar was the district attorney
18  that I was trying to think of.  And I think I called it
19  the Select Committee Election Integrity and it was
20  election -- Select Committee on -- what did you call
21  it?  What did you tell me the name was?  I'm sorry.
22       Q.   I have the February 22, 2018 Select Committee
23  on Election Security.
24       A.   On Election Security, not Election Integrity.
25  I misspoke.  Thank you.  That's the committee I --

Page 284

1   that's the committee I was referring to.
2        Q.   Well, do you happen to recall whether --
3            MR. SWEETEN:  What are we doing?  What
4   are we doing here?
5            MS. PERALES:  Oh, just let us.
6            MR. HUDSON:  For purposes of the record,
7   Ms. Perales just handed a cell phone to Senator Hughes.
8            THE WITNESS:  Okay.
9            MS. PERALES:  It is a -- it's a screen
10  shot of the witness list for the Select Committee on
11  Election Security.  And I do see Omar Escobar here, but
12  pretty much everybody else --
13       Q.   (BY MS. PERALES)  But I'll withdraw the
14  question because you don't have a recollection of it
15  and it's my responsibility to go find that hearing and
16  figure it out.  So I'll withdraw that question because
17  I don't want to make --
18            MR. SWEETEN:  Yeah, uncomfortable, yes.
19            MS. PERALES:  Mr. Sweeten is going to get
20  uncomfortable, so I'll withdraw that question.
21            THE WITNESS:  Thank you.
22            MS. PERALES:  All right.
23       Q.   (BY MS. PERALES)  Senator, do you recall a
24  voter coming to the Capitol to testify that they
25  experienced in-person voter assistance fraud at the

Page 285

1   polls?
2        A.   As I recall, there was testimony before the
3   House Committee on Elections, but that's about all I
4   can remember.  I apologize.
5        Q.   Okay.  So in the Senate you don't recall a
6   voter coming and saying that they had experienced
7   in-person voter assistance fraud at the polls?
8        A.   I don't recall that testimony in the Senate
9   committee.  I could be wrong.  We've had a number of
10  hearings.  I remember testimony about it.  I remember
11  talking about it, but it may have been in front of the
12  House Committee on Elections or other communication we
13  received from a -- from a voter.
14       Q.   Do you recall -- do you have a recollection of
15  a voter saying that they experienced in-person voter
16  assistance fraud in -- at the polling place?
17            MR. SWEETEN:  In testimony you're asking?
18  That's what I hear you asking.
19            MS. PERALES:  Yes, in testimony.
20            MR. SWEETEN:  Okay.  All right.  Very
21  good.
22            THE WITNESS:  I believe there was such
23  testimony, but I don't know exactly when.  I would have
24  to -- I can't say for sure.
25       Q.   (BY MS. PERALES)  Okay.  You mentioned that --

Page 286

1  oh, go ahead.  Finish you answer.
2       A.  I'm so sorry.  I'm so sorry.  I will clarify,
3  of course, that the testimony that I read from those
4  transcripts is testimony, but not testimony offered in
5  front of the legislature.  So I believe there was
6  legislative testimony, but I'm not sure.
7       Q.  **You don't have a specific recollection of what**
8  **hearing or what chamber?**
9       A.  I believe there was testimony along those
10  lines in front of the House Elections Committee, but
11  I'm not certain.
12       Q.  **Okay.  And in your recollection it has to do**
13  **with in-person voter assistance fraud, not mail ballot**
14  **fraud?**
15       A.  That's my general recollection, but I don't
16  have -- I don't recall specific details.  And I could
17  be wrong about that.
18       Q.  **Okay.  Do you think Hispanic voters are more**
19  **easily manipulated by third persons than non-Hispanic**
20  **voters?**
21            MR. SWEETEN:  Objection, I think, to the
22  extent it would call for any sort of mental impressions
23  regarding the bill.  Also as to the question I would --
24  I would object as to foundation, incomplete
25  hypothetical.

Page 287

1            So you can answer the question, but don't
2  reveal any sort of legislative --
3            THE WITNESS:  Okay.  Right.
4            MR. SWEETEN:  -- you know, mental
5  impressions or thoughts about the legislation.  Okay?
6            THE WITNESS:  Completely separate from
7  the bill in the process of developing legislation, I
8  believe that voters with limited English proficiency,
9  regardless of their -- of their national origin or of
10  their ethnicity, are more vulnerable or can be more
11  vulnerable.  I also believe that -- that older voters,
12  regardless of their ethnicity or national origin, can
13  be more vulnerable to this kind of improper influence.
14            MR. SWEETEN:  And so I'm going to go
15  ahead -- I think we've been going at least an hour, and
16  I'm going to go ahead and ask the senator, do you want
17  to take a break, maybe a five-minute, ten-minute
18  comfort break, something like that?
19            THE WITNESS:  Sounds good.
20            MR. SWEETEN:  All right.  And how much --
21  do you have any idea how much more you have?  That
22  much?  Okay.  All right.
23            MS. PERALES:  It's not that much,
24  honestly.
25            MR. SWEETEN:  Okay.

Page 288

1            MS. PERALES:  It's not that much.  I had
2  an eight-page -- I had an eight-page outline.  I'm on
3  the last page.
4            MR. SWEETEN:  Okay.  I mean, it's up to
5  the senator.
6            Do you want to take a break or do you --
7  yeah.
8            THE WITNESS:  We can take a break if you
9  don't mind.  Thank you.
10            THE VIDEOGRAPHER:  Off at 6:39.
11            (Recess from 6:39 p.m. to 6:45 p.m.)
12            THE VIDEOGRAPHER:  Stand by.  This is
13  Segment No. 9.  We're back on the record, 6:47.
14       Q.  **(BY MS. PERALES)  Senator, right before the**
15  **break we were talking about voters who are limited**
16  **English proficient, and I wanted to ask you if**
17  **generally you would agree with me that Texas citizens**
18  **who don't speak the English language well were**
19  **typically born in countries other than the United**
20  **States?**
21            MR. SWEETEN:  Don't reveal your
22  legislative mental impressions or anything related to
23  the legislation in answering the question.  You can
24  answer the question if answering it would not do that.
25  Go ahead.

Page 289

1            THE WITNESS:  I believe that's generally
2  true.
3       Q.  **(BY MS. PERALES)  And we'll set aside our**
4  **Texas friends who don't speak English very well anyway.**
5       A.  Yes, ma'am.
6       Q.  **Okay.  Do you recall a Mr. Jonathan White**
7  **coming to testify in some of the hearings around S.B.**
8  **1, S.B. 7?**
9       A.  I do.
10       Q.  **And do you recall that Jonathan White's**
11  **testimony was general in the sense that he was**
12  **describing how voter fraud could happen, but he did not**
13  **provide specific instances, such as a name or the**
14  **election in question?**
15            MR. SWEETEN:  Objection, compound;
16  objection, vague.
17            THE WITNESS:  Well, we -- you probably
18  have.  We have to go back and -- and look at his
19  testimony.  I remember he was asked about the types of
20  fraud that they see most commonly, and I recall he was
21  asked for specific examples.  Honestly, I don't
22  remember if he -- I remember he talked about city
23  council elections, school elections, so he covered a
24  lot of ground.  Are you asking if he -- are you asking
25  if he gave specific like names of defendants?  I

Senator Bryan  Hughes
April 19, 2022                              290 to 293

Page 290

1    don't --
2         Q.   (BY MS. PERALES)  Or specific instances of
3    voter fraud, that "this fraudster committed the fraud
4    in this election"?
5         A.   I recall he described different elections
6    where fraud had already taken place.  He described how
7    it happens.  I don't remember.  If you say he didn't, I
8    mean, I trust you.  But I haven't -- I would need to go
9    back and watch his testimony, and I don't remember that
10   he didn't do that.
11        Q.   Okay.  Do you recall a point at which you and
12   Jonathan White were having a discussion about chicken
13   plates outside the polling place?
14        A.   And you're talking about a discussion during
15   the Senate State Affairs Committee hearing?
16        Q.   Yes, in the hearing.
17        A.   I do recall that discussion, yes, ma'am.
18        Q.   I'm going to ask you a couple of questions
19   about the chicken plates.
20        A.   Okay.
21        Q.   You've run a number of campaigns, haven't you,
22   for yourself?
23        A.   I have, yes, ma'am.
24        Q.   Have you ever thrown a barbecue or other
25   food-involved event related to your campaign?

Page 291

1         A.   I have.
2         Q.   Have you ever had barbecue plates or other
3    type of food somewhere near a polling place?
4         A.   I have not.  I know other candidates do, but I
5    have not.
6         Q.   And when you say you know of other candidates,
7    do you mean in the part of East Texas where you're
8    from?
9         A.   I don't -- I don't know if I've seen it in my
10   part of the country, but I've heard testimony that
11   happens across the state in urban, rural, suburban
12   settings.  It's -- I don't know that I've seen it in my
13   part of the state, but I know it -- I know it does
14   happen.
15        Q.   Would you agree with me that having a barbecue
16   outside a polling place, as long as you're beyond the
17   100-foot perimeter, is a legal activity?
18             MR. SWEETEN:  Don't reveal mental
19   impressions regarding legislation.  You can answer
20   without -- as long as you know.  You can be doing that.
21             THE WITNESS:  I believe -- I believe
22   that's right.  There's certainly a way to do it that
23   doesn't violate the law.
24        Q.   (BY MS. PERALES)  I have two more parts of
25   S.B. 1 that I wanted to look at quickly with you.  One

Page 292

1    of them is in the same area, Section 6.06.  It's going
2    to be on Page 54.
3         A.   Okay.  Got it.  Thank you.
4         Q.   Okay.  And Section 6.06, would you agree with
5    me makes it unlawful or makes it an offense for a
6    person to compensate or offer to compensate another
7    person for assisting voters as provided by
8    Section 86.010 of the Texas Election Code?
9         A.   Yes.
10        Q.   And that's a reference to mail voting, is it
11   not?
12        A.   I believe that's correct.
13        Q.   All right.  So altogether what this does,
14   Section 6.06, is it makes it an offense to compensate
15   or offer to compensate another person to assist voter
16   in mail voting generally?
17        A.   I believe that's what -- that's what this
18   section of the bill does.
19        Q.   Okay.  And if we go to Page 55, we'll see that
20   under -- at Line 9 -- sorry.  Go ahead.
21        A.   I'm sorry.  Go ahead.  Go ahead.  I -- go
22   ahead.
23        Q.   Page 55, Line 9, we see here that the offense
24   is a state jail felony; is that correct?
25        A.   Yes, that's correct.

Page 293

1         Q.   Okay.  Are you aware of any nonprofit
2    nonpartisan organizations that conduct get-out-the-vote
3    activities door to door?
4              MR. SWEETEN:  Objection.  Don't -- don't
5    reveal any legislatively-privileged material, but
6    otherwise you can answer the question.
7              THE WITNESS:  Did you say nonprofit
8    nonpartisan that do door-to-door get-out-the-vote?  I
9    have not seen that.  I've -- I've heard people talk
10   about that, but I've never seen that myself.
11        Q.   (BY MS. PERALES)  Okay.  If you were -- going
12   back to this earlier hypothetical, if you were standing
13   on someone's porch talking to them while you were
14   campaigning, would you necessarily know if that person
15   had a mail ballot somewhere nearby?
16             MR. SWEETEN:  I'm going to object as
17   incomplete hypothetical and vague and calls for
18   speculation.  But he can answer the question.
19             THE WITNESS:  When you asked if there was
20   one nearby --
21        Q.   (BY MS. PERALES)  Would you necessarily know,
22   like inside the door on the little table where people
23   put their mail.
24        A.   So in the hypothetical you've described if the
25   voter was not holding the mail ballot or making it

Senator Bryan Hughes
April 19, 2022                                  294 to 297

Page 294

1  visible and did not tell you and if I didn't ask them,
2  "Do you have your mail ballot," in that hypothetical I
3  don't believe you would necessarily know.
4      Q.   Okay.  Do you have any paid campaign workers?
5      A.   At -- I do not presently.  But when we have
6  contested races we have volunteers that help and
7  sometimes we also have paid campaign workers.
8      Q.   Do you sometimes give your volunteers what's
9  called swag?
10     A.   By that -- so campaign shirts, hats, campaign
11  things like that?
12     Q.   Yes.
13     A.   Yes, ma'am.
14     Q.   Okay.  Have you ever instructed a campaign
15  worker who was working for you that if -- while they
16  were canvassing a voter asked them to come in and help
17  fill out the mail ballot that they -- that they could
18  do that, that the campaign worker could do that?
19     A.   No, I have not.
20          MR. SWEETEN:  Objection, vague.
21          Go ahead.
22     Q.   (BY MS. PERALES)  Do you know if anybody in
23  your campaign has ever advised canvassers about how to
24  assist voters who request their help while the campaign
25  workers are going door to door?

Page 295

1      A.   I do not know.  Senate Bill 1, of course,
2  passed in 2021 and has taken effect since then.  I have
3  not had a contested race since Senate Bill 1 has taken
4  effect.  But the answer to your question is no.
5      Q.   Okay.  And so my question also would go to any
6  times that you had campaign workers working for you
7  prior to S.B. 1, whether you or a member of your
8  campaign ever advised them on what to do if a voter
9  asked them to come in and help them with a mail ballot.
10     A.   In the past we've not had a policy on that,
11  no, ma'am.
12     Q.   If you would go with me to Section 7.04.
13     A.   I got to 8.01.  I missed it somehow.  I
14  thought I was going to be there first.
15     Q.   7.04 starts on the bottom of Page 58.
16     A.   Yes, ma'am.  I see it now.  Thank you.
17     Q.   Okay.  That's a hard one to find.  And if you
18  would turn to the next page, which is Page 59.  And I
19  would point your attention to Line 7 where the bill
20  provides a definition of vote harvesting services.  Do
21  you see that?
22     A.   Yes, ma'am.
23     Q.   Okay.  And am I reading it correctly, "'Vote
24  harvesting services' means in-person interaction with
25  one or more voters, in the physical presence of an

Page 296

1  official ballot or a ballot voted by mail, intended to
2  deliver votes for a specific candidate or measure"?
3      A.   Yes, ma'am, you read that correctly.
4      Q.   Okay.  And would you agree with me that a
5  campaign worker going door-to-door certainly could face
6  the situation where a voter invites that campaign
7  worker in to assist them with the mail voting process?
8          MR. SWEETEN:  Objection, calls for a
9  legal conclusion and calls -- and to the extent it
10  calls for legislatively- privileged information I'll
11  instruct not to answer.  But to the extent that you can
12  do so without that, you can without revealing
13  privilege.
14          THE WITNESS:  So then speaking about
15  campaigning door-to-door, it is possible that -- that a
16  campaign worker in the course of knocking on doors
17  could be invited in and asked by a voter for assistance
18  with the preparation of that voter's mail ballot.  Yes,
19  that is possible.
20     Q.   (BY MS. PERALES)  Would it also be possible
21  that a non-campaign get-out-the-vote nonpartisan
22  nonprofit worker could be canvassing door-to-door on a
23  measure, let's say, for a bond issue for infrastructure
24  and the voter might invite that nonprofit worker inside
25  to help with the mail ballot?

Page 297

1          MR. SWEETEN:  Same objection and
2  instruction.
3          THE WITNESS:  And I believe that the
4  answer is the same.  I believe that is -- that is
5  possible.
6      Q.   (BY MS. PERALES)  You and Senator Miles had an
7  exchange during one of the hearings about 24-hour
8  voting, and I just want to ask you -- and if you need
9  the video I will show it to you.  Do you recall an
10  exchange with Senator Miles where he asked you if you
11  were aware of any voter fraud associated with 24-hour
12  voting and you responded that you were not aware of
13  voter fraud related to 24-hour voting?
14     A.   That sounds right.
15     Q.   Did you cover tagging bills with my friend who
16  was asking questions before me?
17     A.   I don't believe we talked about that.
18     Q.   Okay.  Well, I'm not going to ask you to
19  define "tagging," but would it be fair to say that
20  during the regular session that you stated in one of
21  the Senate State Affairs Committee hearings that S.B. 7
22  had been tagged by Senators West, Menendez, Powell,
23  Eckert, and Gutierrez?
24     A.   Yes, I do recall that.  That -- I confess I
25  don't recall each specific senator, but that sounds

U.S. LEGAL SUPPORT, INC
713-653-7100

Page 298

1  correct, and I trust you.
2      Q.   Okay.
3      A.   The bill was tagged with multiple senators and
4  that sounds like the list.
5      Q.   All right.  And do you remember apologizing to
6  the witnesses who had come to testify and letting them
7  know there wouldn't be -- you wouldn't be taking their
8  testimony that day?
9      A.   I do.
10     Q.   Do you recall making the statement, quote, but
11  this is not going to stop these bills, unquote?
12     A.   I do.
13     Q.   Okay.  Do you recall having an exchange with
14  Senator West during one of the hearings in which he
15  asked if you knew of any studies of the potential
16  disparate impact of S.B. 1, and you responded that you
17  were not aware of any studies of the potential
18  disparate impact of S.B. 1?
19     A.   Yes, I remember that discussion.  I do
20  remember that.
21     Q.   A few times during the hearings on S.B. 1 do
22  you recall referencing Texas' adoption of a new voter
23  ID law in 2011 and sharing some observations about
24  voter turnout in the wake of the voter ID law?
25     A.   I do.  I do remember that coming up in the

Page 299

1  hearings and I believe in debate on the floor as well.
2  But that's in the public record, yes, ma'am.
3      Q.   And you mentioned a couple of times that the
4  voter ID law was found constitutional, and you used
5  that word "constitutional."  Do you remember that?
6      A.   That sounds right, yes, ma'am.
7      Q.   Do you also recall that the Texas 2011 voter
8  ID law was found unlawful under the Voting Rights Act
9  by a district court and then affirmed in the Fifth
10  Circuit?
11     A.   I do recall that.  I don't recall the details.
12  I know my recollection is changes were made to the law
13  and the law in effect today and at the time I made
14  those statements had been upheld by the courts as
15  constitutional.  You could correct me if I'm wrong.
16  You were probably involved in the litigation, but
17  that's my recollection.
18          MR. SWEETEN:  She was.
19     Q.   (BY MS. PERALES)  So my -- my question is,
20  then, would you agree with me that the voter ID law
21  that ended up applying in the 2016 election and
22  afterwards, which was also the subject of some of your
23  observations regarding voter turnout, was a voter ID
24  law that had been changed in some respects to respond
25  to a finding of illegality?

Page 300

1      A.   A finding of illegality?  I'm not sure
2  exactly -- that may be a term of art in the litigation
3  you've described that I'm not as familiar with.  But
4  it's a matter of public record that changes were made
5  to the voter ID law as a result of court rulings.  Is
6  that -- is that what you're talking about?
7      Q.   Yes.  And would you also agree with me --
8          MR. SWEETEN:  I'm going to object to the
9  question as assumes facts not in evidence.
10         But go ahead.  You can --
11         MS. PERALES:  Well --
12         MR. SWEETEN:  The previous question.  I'm
13  a little late, but it's late.
14         MS. PERALES:  It's late.
15         MR. SWEETEN:  Go ahead.  Next question.
16     Q.   (BY MS. PERALES)  Well, I just wanted to
17  follow up on that last one.  You said as a result of
18  some court rulings.  Are you aware that there were
19  court rulings in the district court affirmed by the
20  Fifth Circuit that the original voter ID law violated
21  the Voting Rights Act because it discriminated against
22  minority voters?
23         MR. SWEETEN:  Objection, foundation.
24         But go ahead.
25         THE WITNESS:  I don't recall the details

Page 301

1  of the ruling.  I wasn't involved in litigation, but I
2  do remember there was litigation and -- and changes
3  were made.  And I'll -- I'll defer to you and those who
4  were involved in the case, but I haven't read the
5  opinion.
6      Q.   (BY MS. PERALES)  Right before it was my turn
7  to ask you some questions you spoke a little bit about
8  the rollout of S.B. 1, specifically with respect to the
9  rejection of mail ballots.  I'm going to ask you a
10  couple of questions about that.
11     A.   Okay.
12     Q.   Did you hear testimony that the requirement of
13  putting an ID number, like a driver's license number or
14  the last four of a social, on either a mail ballot
15  application or a mail ballot would be problematic
16  because there were voters who didn't have that number
17  in their voter registration record?
18     A.   I remember in the hearing discussions with
19  county elected officials; that is, county election
20  officials, again, at the hearing, public record, and
21  also, I believe, testimony from Keith Ingram at the
22  Secretary of State's office and -- and I -- and your --
23  forgive me.  You may have -- I recall your testimony on
24  voter roll cleanup, and you may have testified about
25  this or someone from your group as well.  I remember

Page 302

1  discussions about that.  And I remember at the
2  committee -- I don't recall the details.  I know that
3  it's a matter of public record that there were
4  discussions during the hearing.  And if one were to
5  look at the bill before those discussions and to look
6  at the bill after those discussions, it's clear that
7  that was a work in progress.
8              And so I remember the discussion of
9  these.  I don't recall the specifics, but I know there
10 was input publicly offered to -- on that issue.
11    Q.    Okay.  Are you aware when it became a
12 requirement to put either a driver's license number or
13 the last four of your social on your voter registration
14 application?
15    A.    I am not aware.
16    Q.    Are you aware of how many voters in Texas use
17 in-person assistance at the polling place from -- from
18 the -- chosen assisters as opposed to polling place
19 workers?
20    A.    I'm not.
21    Q.    Are you aware of the proportions, for example,
22 of limited English proficient versus disabled voters
23 who use in-person voter assistance at the polls?
24    A.    I am not.
25              MS. PERALES:  I pass the witness.

Page 303

1              MR. SWEETEN:  Okay.  I think -- she's
2  with you, right?
3              MS. PERALES:  She's with me.
4              MR. SWEETEN:  She's with you also?
5              MS. PERALES:  She's with me.
6              MR. SWEETEN:  Okay.  Ms. Paikowsky, do
7  you have any questions?  We're -- we've got a few
8  minutes here.
9              MS. PAIKOWSKY:  I do not.  I did just
10 want to know, you know, that the -- our -- our piece
11 came up previously and just wanted to know if there's
12 anything that's, you know, within the deponent's --
13 it's actually on a -- that it's clearly responsive to
14 the -- the request we would, you know, expect
15 consistent with the subpoena that we produced.  You
16 know, I know you-all keep working offline, but I just
17 wanted to -- to make that clear.
18              MR. SWEETEN:  You wanted to voice your --
19 your agreement with Nina?  Okay.  We understand your --
20 your position.
21              Ms. Yeomans?
22              MS. DULANEY:  She's with us.
23              MR. SWEETEN:  She's with you.  Okay.  So
24 I think I've exhausted everyone that still is
25 remaining.  It appears there's one, two, three, four

Page 304

1  after starting with about 15 today.
2              So we have no questions for the witness
3  and we'll go ahead and --
4              MR. HUDSON:  Ask for read and sign.
5              MR. SWEETEN:  We'll --
6              THE STENOGRAPHER:  We already --
7              MR. SWEETEN:  We'll go ahead and we'll
8  reserve the opportunity to read and sign the
9  deposition.  Thank you.
10             THE VIDEOGRAPHER:  We're off the --
11             MS. PAIKOWSKY:  As --
12             THE STENOGRAPHER:  I don't know what
13 she's saying.
14             MR. SWEETEN:  Ma'am, we -- is this Dana?
15 Dana, we can't hear you very well.  Can you say it
16 again?
17             MS. PAIKOWSKY:  Oh, I was just requesting
18 a transcript for us, but we can also work that out
19 online.
20             MR. SWEETEN:  Okay.
21             MS. PAIKOWSKY:  Thanks.
22             MR. SWEETEN:  Thank you.
23             THE VIDEOGRAPHER:  We're off the record,
24 7:09.
25             (Proceedings concluded at 7:09 p.m.)

Page 305

1       WITNESS CORRECTIONS AND SIGNATURE
2     Please indicate changes on this sheet of paper,
3  giving the change, page number, line number, and reason
4  for the change.  Please sign each page of changes.
4  PAGE/LINE    CORRECTION        REASON FOR CHANGE
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24
25              _____
                  SENATOR BRYAN HUGHES

Senator Bryan  Hughes
April 19, 2022                                      306 to 308

Page 306

SIGNATURE OF WITNESS

1

2

3       I, SENATOR BRYAN HUGHES, solemnly swear or
4   affirm under the pains and penalties of perjury that
5   the foregoing pages contain a true and correct
6   transcript of the testimony given by me at the time and
7   place stated, with the corrections, if any, and the
8   reasons therefor noted on the foregoing correction
9   pages(s).

10

11

12

13                     _____
                       Senator Bryan Hughes
14

15

16

17  Job No. 6130916-001 KS

18

19

20

21

22

23

24

25

Page 307

1            UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2               SAN ANTONIO DIVISION
3   HOUSTON AREA URBAN        )
    LEAGUE, et al.,           )
4       Plaintiff,            )
                              )
5   VS.                       ) Civil Action No.
                              ) 5:21-cv-0848-XR
6   GREG ABBOTT, et al.,      )
        Defendant.            )
7

8

    *******************************************************
9

         REPORTER'S CERTIFICATE
10

    THE STATE OF TEXAS:
11  COUNTY OF TRAVIS:
12       I, Kim Seibert, a Certified Shorthand Reporter in
13  and for the State of Texas, hereby certify to the
14  following:
15       That the witness, SENATOR BRYAN HUGHES, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony given
18  by the witness;
19       That the deposition transcript was submitted on
20  _____, 2022, to the witness, or to the
21  attorney for the witness, for examination, signature,
22  and return to U.S. Legal Support, Inc., by
23  _____, 2022;
24

25

Page 308

1       That the amount of time used by each party at the
2   deposition is as follows:
3           Mr. Kenneth E. Broughton - 5 hr. 3 min.
            Ms. Nina Perales - 1 hr. 54 min.
4

5       I further certify that I am neither counsel for,
6   related to, nor employed by any of the parties or
7   attorneys in the action in which this proceeding was
8   taken, and further that I am not financially or
9   otherwise interested in the outcome of the action.
10      GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this the
11  _____ day of _____, 2022.
12

13

14

15

16          Kim Seibert, Texas CSR 4589
            Expiration Date:  7-31-2023
17          U.S. Legal Support, Inc.
            Firm Registration 341
18

19  Job No. 6130916-001 KS

20

21

22

23

24

25

U.S. LEGAL SUPPORT, INC
713-653-7100