# Exhibit F

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION

3
LA UNION DEL PUEBLO ENTERO, )
4 et al.,                    )
        Plaintiffs,          )
5                            )        Civil Action No.
  vs.                        )        5:21-cv-844(XR)
6                            )        (Consolidated Case)
                             )
7 GREG ABBOTT, et al.,       )
        Defendants.          )
8                            )
  MI FAMILIA VOTA, et al.,   )
9       Plaintiffs,          )
                             )
10 vs.                       )
                             )
11 GREG ABBOTT, et al.,      )
        Defendants.          )
12 _____)

13 HOUSTON AREA URBAN LEAGUE, )
   et al.,                   )
14      Plaintiffs,          )
                             )        CIVIL ACTION NO.
15 vs.                       )        5:21-cv-0848-XR
                             )
16 GREG ABBOTT, et al.,      )
        Defendants.          )
17 _____)

18

19
   ORAL/VIDEOTAPED DEPOSITION OF REPRESENTATIVE ANDREW MURR
20                THURSDAY, MAY 5, 2022

21

22      ANSWERS AND DEPOSITION OF REPRESENTATIVE ANDREW

23 MURR, produced as a witness at the instance of the

24 Plaintiff Houston Area Urban League, and duly sworn, was

25 taken on the 5th day of May, 2022, from 9:39 a.m. to

Page 2

1  2:32 p.m. before Nancy A. Lozano, a Certified Shorthand
2  Reporter in and for the State of Texas, reported by
3  machine shorthand, at the Price Daniel State Office
4  Building, 209 West 14th Street, First Floor conference
5  room, Austin, Texas, pursuant to the Federal Rules of
6  Civil Procedure.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              APPEARANCES - CONTINUED
2
   FOR THE PLAINTIFF BEXAR COUNTY ELECTIONS
3  ADMINISTRATION AND BEXAR COUNTY:
4       MS. LISA CUBRIEL (Via Videoconference)
        Bexar County District Attorney
5       Civil Litigation Division
        101 West Nueva
6       Paul Elizondo Tower, Fourth Floor
        San Antonio, Texas  78205
7       210.335.2142
        lisa.cubriel@bexar.org
8
9  FOR THE PLAINTIFF MI FAMILIA VOTA:
10      MR. MARK BIETER (Via Videoconference)
        Stoel Rives, LLP
11      101 South Capitol Boulevard
        Suite 1900
12      Boise, Idaho  83702
        202.999.7421
13      mark.bieter@stoel.com
14
15 FOR THE WITNESS, MR. MURR, AND DEFENDANTS:
16      MR. PATRICK SWEETEN
        MR. JACK DISORBO
17      MR. WILLIAM D. WASSDORF
        Texas Assistant Attorney Generals
18      General Litigation
        P.O. Box 12548
19      Austin, Texas  78711-2548
        512.936.1666
20      Patrick.sweeten@oag.texas.gov
21
22 ALSO PRESENT:
23      Brad Rosauer, videographer
24
25

Page 3

1              APPEARANCES
2  FOR THE PLAINTIFF HOUSTON AREA URBAN LEAGUE:
3       MS. KEELY DULANEY
        Reed Smith, LLP
4       811 Main Street
        Suite 1700
5       Houston, Texas  77002
        713.469.3888
6       kdulaney@reedsmith.com
7           AND
8       MS. LILIANA ZARAGOZA (Via Videoconference)
        NAACP Legal Defense & Education Fund Inc.
9       40 Rector Street, 5th Floor
        New York, New York  10006
10      212.965.2252
        rzaragoza@naacpldf.org
11
            AND
12
        MS. GEORGINA YEOMANS (Via Videoconference)
13      NAACP Legal Defense & Education Fund Inc.
        700 14th Street, NW Sixth Floor
14      Washington DC 20005
        917.841.5947
15      gyeomans@naacpldf.org
16
17 FOR THE PLAINTIFF HIDALGO COUNTY:
18      MS. LEIGH TOGNETTI (Via Videoconference)
        Hidalgo County District Attorney's Office
19      100 East Cano Street
        Edinburg, Texas  78539
20      956.292.7600
        leigh.tognetti@da.co.hidalgo.tx.us
21
22
23
24
25

Page 5

1                    INDEX
2                                              PAGE
3  Appearances ....................      2
4  REPRESENTATIVE ANDREW MURR
5       - Examination by Ms. Dulaney        8
6  Signature and Changes ............    157
7  Reporter's Certificate ...........    159
8
9                  EXHIBITS
10 NO.        DESCRIPTION                 MARKED
11 Exhibit 1 ..........................     82
             Solution to Policies and Procedures that
12           Adversely Affect Election Security -
             Bates-Stamped TXLEG 01743 - 01744
13
   Exhibit 2 .........................     83
14           Election Integrity Case Studies by Texas
             Public Policy Foundation Bates-Stamped
15           TXLEG 01534 - 01568
16 Exhibit 3 .........................     85
             Recommendations to HB 3 and SB 1 by
17           Secure Democracy TXLEG 01642 - 01644
18 Exhibit 4 .........................     88
             Texas Tribune Article "More than Twelve
19           Percent of Mail-in Ballots were Rejected
             in Texas Under New GOP Voting Rules"
20
   Exhibit 5 .........................     91
21           Email Between Harrison and Ducayet Re:
             Concerns with HB 3 - 7/11/21
22
   Exhibit 6 .........................     92
23           Email Between Harrison and Ruth Re: SB 1
             Question - 8/25/21
24
25

Page 6

1                  EXHIBITS - Continued
2  NO.       DESCRIPTION                              MARKED
3  Exhibit 7 ......................................      95
        Email Between Murr and Kanu Re: SB 1
4       9/02/21
5  Exhibit 8 ......................................      96
        Transcript of Audio Recording of House
6       Select Committee on Constitutional Rights
        and Remedies Hearing on HB 3 - 7/10/21
7
    Exhibit 9 ......................................     102
8       Transcript of Audio Recording of House
        Floor Debate 87th Legislature - Second
9       Called Session - 8/26/21
10 Exhibit 10.....................................      113
        Transcript of Audio Recording of House
11      Select Committee on Constitutional Rights
        and Remedies Hearing on SB 1 - 8/23/21
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1                VIDEOGRAPHER:  Good morning.  We are on
2  the record on Thursday, May 5, 2022, at 9:39 a.m.,
3  beginning the video deposition of Andrew Murr.  Will
4  counsel please introduce themselves for the record after
5  which the court reporter will swear in the witness.
6                MS. DULANEY:  Morning.  My name is Keely
7  Dulaney.  I'm one of the attorneys representing
8  plaintiffs, Houston Area Urban League.
9                MR. SWEETEN:  Do we want to maybe --
10 there's three of them.  So we've got -- it looks like
11 we've got -- to introduce, we've got Leigh Tognetti,
12 Mark Bieter, Georgina Yeomans and Lisa Cubriel.  Is
13 there anybody else on the Zoom other than those four who
14 have been previously introduced to the court reporter?
15                UNIDENTIFIED SPEAKER:  I think it's just
16 the four of us.
17                MR. SWEETEN:  Okay.  Thank you.  All
18 right.  So on behalf of the witness and the State
19 defendants in this case, I'm Patrick Sweeten.  With me
20 is attorney Jack Disorbo and attorney Will Wassdorf,
21 like I said, representing the witness and State
22 defendants in this case.
23
24
25

Page 8

1                REPRESENTATIVE ANDREW MURR,
2  being first duly sworn, testified as follows:
3                EXAMINATION
4  BY MS. DULANEY:
5      Q.  Good morning, Representative Murr.  Will you
6  state and spell your name for the record.
7      A.  My name is Andrew Murr, A-N-D-R-E-W, M-U-R-R.
8      Q.  Have you ever been deposed before?
9      A.  I have not.
10     Q.  Okay.  So I'm just going to go over some key
11 rules of a deposition then, so we're all on the same
12 page.  So I'm going to ask you questions.  You must
13 answer them truthfully.  Although no judge is present,
14 it's a formal legal proceeding just like testifying in
15 court, and you're under the same legal obligation to
16 tell the truth.
17                Is there any reason you wouldn't be able
18 to give truthful testimony or anything that might
19 otherwise impair your ability to recall events about
20 which I might ask you today?
21     A.  Not that I'm aware of, no.
22     Q.  So your attorney will assert objections, but
23 unless he specifically instructs you not to answer, you
24 should go ahead and respond after he objects.  I'm happy
25 to restate the question if you need me to following any

Page 9

1  objection.  Do you understand that?
2      A.  I understand.
3      Q.  And if you don't understand a question, tell
4  me.  I'll try to ask it in another way.  If you do
5  answer the question, I'll assume that you understood it.
6  Is that okay?
7      A.  I understand.
8      Q.  Also, the court reporter here, as you may have
9  noticed, is typing everything you and I are saying and
10 will type everything said by anyone in the room.  So
11 it's really important that only one of us speaks at a
12 time.  I'll finish my questions, and I'll do my best to
13 allow you to finish your answers before jumping into the
14 next question.  Is that okay?
15     A.  Yes.
16     Q.  And then you must answer audibly.  So just
17 don't shake your ahead and say "uh-huh" or "huh-uh."
18 Okay?
19     A.  Yes.
20     Q.  And then, finally, I'm entitled to the best
21 most complete response to my questions you're able to
22 give.  In some cases, however, I may ask a question that
23 you don't know the exact answer to.  In those cases, I'm
24 entitled to and I would want your best estimate, but
25 please don't guess.  Do you understand?

Andrew Murr
May 05, 2022                                                    10 to 13

Page 10

1   A.   I understand.
2   Q.   Okay.  So I want to talk a little bit about
3   your preparation for today.  Without disclosing the
4   content of any discussions with your attorney, did you
5   prepare for the deposition today?
6   A.   Yes.
7   Q.   How?
8   A.   I met with my attorneys, Patrick and Jack.
9   Q.   Are those the only two attorneys you met with?
10  A.   Yes.
11  Q.   And when?
12  A.   Yesterday and again this morning.
13  Q.   About how long did those meetings last?
14  A.   Yesterday was for a couple of hours, and this
15  morning for at least an hour.
16  Q.   Aside from the conversation with your
17  attorneys, did you discuss your preparation with anyone
18  else for the deposition today?
19  A.   No.
20  Q.   Did you have any other conversations with
21  anyone about the deposition today?
22  A.   No.
23  Q.   Did you speak with any of the defendants in
24  anticipation of or to help you prepare for your
25  deposition today?

Page 11

1   A.   No.
2   Q.   Okay.  What about any of your fellow
3   legislators to prepare for the deposition today?
4   A.   Can you clarify?
5   Q.   Did you speak with any of your fellow
6   legislators to prepare for your deposition today?
7   A.   No.
8   Q.   Did you review any documents to prepare for
9   your deposition?
10  A.   Yes.
11  Q.   Okay.  What kinds of documents?
12  A.   I reviewed the complaint.  I guess that would
13  be the active complaint in the matter, reviewed the
14  privilege log with my attorneys and also reviewed the
15  bill book that I had used during, yeah.
16  Q.   Used during what?  I'm sorry.  I missed that.
17  A.   My -- my notes that I used during layout on the
18  House floor.
19  Q.   Okay.  Did you also review -- did you review
20  any of the documents that you produced in this case
21  for -- that you were custodian of record on?
22  A.   In preparation for the deposition?
23  Q.   Yes.
24  A.   No.
25  Q.   Okay.  Did you bring your bill book with you

Page 12

1   today?
2   A.   No.
3   Q.   What's your understanding of why you're here
4   today?
5   A.   I understand that there are one or more
6   lawsuits pending regarding Senate Bill 1.
7   Q.   Let me rewind too.  You said you reviewed a
8   complaint.  Do you know which of the complaints that you
9   reviewed?
10  A.   My attorneys provided me what I understand to
11  be the active complaint, which is the second amended
12  petition in the consolidated case.
13  Q.   Okay.  What's your residential address?
14  A.   Physical or mailing?
15  Q.   Physical.
16  A.   Residential address is 769 Stevenson,
17  S-T-E-V-E-N-S-O-N, Ranch Road, Junction, Texas 76849.
18  Q.   I love Junction.  I grew up going there,
19  actually.  We went for Labor Day every year.
20       What about mailing address?
21  A.   Mailing address is Post Office Box 125, same
22  city, state and zip.
23  Q.   Do you have any social media accounts?
24  A.   For purposes of my campaign as a public
25  official, I do have a Facebook account.

Page 13

1   Q.   What's the name on that account?
2   A.   I don't personally manage it, and I do not
3   check it on a regular basis.  Instead, I look to my
4   staff to assist me to do that.
5   Q.   Okay.  You don't have any personal social media
6   accounts?
7   A.   Can you clarify what that would mean?
8   Q.   Do you have a personal Facebook?
9   A.   No.
10  Q.   Do you have a personal Twitter?
11  A.   No.  I do not have a Twitter handle.
12  Q.   Instagram?
13  A.   No.
14  Q.   TikTok?
15  A.   No.
16  Q.   LinkedIn?
17  A.   No.
18  Q.   What about a web page?
19  A.   For purposes of my campaign, I do have a web
20  page.
21  Q.   Okay.  Do you know the URL for that?
22  A.   It should be AndrewMurr.com.  It can also be
23  found at Andrewmurr.org, O-R-G.
24  Q.   Wow, no social media.  Have you ever been
25  involved in any other lawsuits?

Page 14

1    A.   As a party to a lawsuit?

2    Q.   Sure.  We can start as a party.

3    A.   I have never been a party to a lawsuit.

4    Q.   In what ways have you been involved in other
5 lawsuits?

6    A.   I'm a practicing attorney.  So, consequently,
7 you could look at it from practicing law whether it's
8 transaction law or not, one can't be involved in
9 lawsuits.

10    Q.   Besides being a practicing attorney, have you
11 ever been involved in any other lawsuits as a witness or
12 just any other way?

13    A.   No.

14    Q.   Okay.  Have you ever -- so you've never
15 testified in court?

16    A.   I have never testified in court.

17    Q.   Okay.  All right.  So I know that you're a
18 practicing attorney.  What's the -- so is a JD the
19 highest level of education you've completed?

20    A.   Yes.

21    Q.   Yes.  So let's rewind a little bit.  Where did
22 you attend high school?

23    A.   Junction High School.

24    Q.   And when did you graduate?

25    A.   I graduated in May of 1995.

Page 15

1    Q.   And did you go straight to college?

2    A.   That fall I went to college.

3    Q.   And you attended Texas A&M?

4    A.   I attended Texas A&M.

5    Q.   What was your major?

6    A.   At the time that I began matriculating?

7    Q.   Well, I guess what did you graduate with from
8 Texas A&M?

9    A.   I graduated with a degree in agricultural
10 development with an emphasis in ag economics.

11    Q.   And what kind of courses did you take in that
12 degree program?

13    A.   That degree program was marketed as a
14 cross-section of all agriculture within the college of
15 agriculture.  So you had the opportunity to take
16 anything from agronomy to poultry science.  And so it
17 was a concept of making one a well-rounded student.

18    Q.   Did you take any classes that you think help
19 you in your legislative career?

20    A.   Yes.  Frequently, students with an ag
21 development degree often obtain their teaching
22 certificate to become a schoolteacher.  And so I pursued
23 that, and I think having the opportunity to learn how to
24 identify another's ability to learn and understand how
25 to relay information to that has been helpful and

Page 16

1 useful, not simply in the legislative process, but in my
2 daily life.

3    Q.   So after you graduated from A&M, what did you
4 do next?

5    A.   Upon completion of my graduation, I finished
6 out my student teaching for my teaching certificate the
7 next semester.

8    Q.   So you finished your certificate, what, in
9 December 1999?

10    A.   It would have been spring of 2000.

11    Q.   Okay.  Okay.  And then what did you do after
12 you got your teaching certificate?

13    A.   I was admitted to attend Texas Tech University
14 School of Law that fall of 2000.

15    Q.   So did you ever utilize your teaching
16 certificate?

17    A.   Did not have the opportunity to seek employment
18 for that purpose.

19    Q.   Did you work or have any employment while you
20 were at Texas Tech Law?

21    A.   While I attended Texas Tech Law over the course
22 of three years for law school, yes.

23    Q.   And what was that?

24    A.   I was not employed while I took classes.  So
25 that was only for the summers.

Page 17

1    Q.   So where were your summer internships?

2    A.   One summer internship was with the 198th
3 District Attorney's Office in Junction.

4    Q.   And what about the next summer?

5    A.   The next summer was with two law firms in
6 Dallas.

7    Q.   And when you graduated from Texas Tech Law --
8 so that would have been in 2003?  What did you do after
9 that?

10    A.   I studied for the bar exam.

11    Q.   And after the bar exam where were you employed?

12    A.   I was employed -- at the time the firm's name
13 was Locke Lord in Dallas.

14    Q.   How long did you stay at Locke Lord?

15    A.   Approximately four years.  I'm going off --
16 it's been a long time.

17    Q.   I understand.  What did you do after Locke
18 Lord?

19    A.   Returned home to Junction, Texas.

20    Q.   And in what way were you employed?  How were
21 you employed when you returned home?

22    A.   When I returned home, to start my own law
23 practice; so self-employed.

24    Q.   What kind of law did you practice?

25    A.   In a small town, you practice all law.

Page 18

1    Q.   Can you give me some specific examples of the
2  types of cases you handled?
3    A.   I would articulate it as it is law of folks by
4  necessity.  So typically, it involves estate planning
5  and probate.  It involves criminal work, criminal law
6  work or transactions dealing with real estate or
7  businesses.
8    Q.   Why did you leave Locke Lord?
9    A.   I had always hoped to be able to return to my
10 hometown.
11   Q.   What kind of law did you practice at Locke
12 Lord?
13   A.   I was an associate in the litigation section.
14   Q.   Do you still maintain your private practice
15 today?
16   A.   Yes.
17   Q.   What's the name of your practice?
18   A.   Murr Law Office PLLC.
19   Q.   So is that the only other employment that
20 you've had besides being a legislator?
21   A.   Can you explain what employment means?
22   Q.   However you would describe employment in
23 everyday language.
24   A.   In everyday language, employment indicates that
25 there's an employee and an employer.  And so if you're

Page 19

1  asking me if I have any other employers, the answer is
2  no.
3    Q.   What about employment in that you've been paid
4  for jobs that you've done?
5    A.   So I ranch on the side as part of living on the
6  family ranch, and so arguably you could say that is
7  another career.  In addition, my sister and I have a
8  partnership, and we ranch with that as well.  And then
9  to clarify, my law firm is also a member of another law
10 firm.
11   Q.   Okay.  What law firm?
12   A.   It's Moore, Ganske, Murr, Sessions, PLLC.
13   Q.   And you're also currently the representative
14 for House District 53, correct?
15   A.   Yes, ma'am.  So that would round out my
16 employment with the State, yes.
17   Q.   As an elected representative, do you have a
18 budget or funding allocated for your office?
19   A.   Yes.
20   Q.   How much is your budget?
21   A.   Off the top of my head -- off the top of my
22 head, I don't recall.
23   Q.   Do you know how you've allocated your budget?
24   A.   Typically, for any House member, a majority of
25 their budget goes towards personnel expenses.

Page 20

1    Q.   So tell me about your staff in the Texas House.
2    A.   In what way?
3    Q.   Tell me each member of your staff and their
4  role.
5    A.   Logan Harrison is my chief of staff.  Kristen
6  Mills.  It's K-R-I-S-T-E-N, Mills is my legislative
7  director and deputy chief of staff.  Kellie,
8  K-E-L-L-I-E, Early is my district director in my
9  district office.
10   Q.   Is there anyone else?
11   A.   Those are my full-time staff members.
12   Q.   Do you have part-time staff members?
13   A.   I do.
14   Q.   And who are they?
15   A.   David Griffith, ends with a TH.
16   Q.   What's his role?
17   A.   He is constituent services, and he is located
18 in Llano County.
19   Q.   Anyone else?
20   A.   Not at this time.
21   Q.   What about interns?
22   A.   During session only if the opportunity arises,
23 we do seek out additional help via interns.  Oftentimes
24 we look towards folks that are constituents in our
25 district if they want the opportunity to have a

Page 21

1  legislative experience.
2    Q.   Did you have any interns during the 87th
3  legislative session?
4    A.   During the regular session, yes.
5    Q.   How many?
6    A.   Two.
7    Q.   What were their names?
8    A.   And forgive me.  At this moment, I can't recall
9  their names, but both were college students.
10   Q.   Is there any other staff that you work with
11 regularly as a legislator --
12   A.   No.
13   Q.   -- even outside of those that you hire?
14   A.   No.
15   Q.   And are you in charge of the hiring process for
16 your staff?
17   A.   Yes.
18   Q.   As part of your responsibilities, do you
19 personally read the mail and the emails that your office
20 receives?
21   A.   I coordinate that effort with my staff due to
22 sometimes the volume that we may receive and the time
23 constraints of my office.
24   Q.   What would you say the guidelines are in
25 whether a piece of mail or an email comes in front of

Andrew Murr
May 05, 2022                                                          22 to 25

Page 22

1 you?

2  A.  I don't know that we have any express
3 guidelines.

4  Q.  Okay.  Is there like some kind of instruction
5 you've given your staff for "if this email says that" or
6 anything along those lines that you would want to see
7 it?

8  A.  Generally speaking, if we receive
9 correspondence from constituents, for us, that is always
10 a priority.

11  Q.  For the mail and the emails that your office
12 receives that you don't personally review, how are you
13 briefed on those documents?

14  A.  In routine visits with my staff.

15  Q.  And how do they log those documents or track
16 it?

17  A.  I don't know that I understand your question.

18  Q.  Okay.  That's okay.  I'll ask it a different
19 way.  Does your staff provide summaries of the mail and
20 email your office receives?

21  A.  Not on some regular basis, but I guess that
22 would be the subject of conversation on a regular basis
23 with my staff.

24  Q.  So in these routine visits, you'll sit down and
25 say, "What mail did you receive," or "What emails did

Page 23

1 you receive that I need to know about?"

2  A.  Generally speaking, I would agree with your
3 categorization.

4  Q.  And you leave it up to your staff -- let's
5 see -- Mr. Hanson -- is that right -- or Harris?

6  A.  Harrison.

7  Q.  -- Harrison and Ms. Mills to let you know what
8 you should look at?

9  A.  Yes.  And err on the side of caution of us
10 making sure that we cast a wide net.

11  Q.  Other than being a representative, have you
12 held any other elected roles?

13  A.  Yes.

14  Q.  And what was that?

15  A.  I served as the Kimble County judge in Junction
16 for approximately five years.

17  Q.  What was the time line of that?

18  A.  The time line would have been 2008 through 2013
19 approximately.

20  Q.  So you left your judgeship to run for office?

21  A.  Yes.

22  Q.  Are you currently registered to vote?

23  A.  Yes.

24  Q.  Would you consider yourself a routine voter?

25  A.  Voted Monday.

Page 24

1  Q.  Do you recall any election you haven't voted in
2 since you became eligible?

3  A.  Not to my recollection.

4  Q.  When did you first register to vote?

5  A.  I don't know that I can solidly answer that
6 question, but I believe that would be as soon as I was
7 eligible when I graduated high school.

8  Q.  Are you currently registered to vote at your
9 residential address, the 769 Stevenson Ranch Road?

10  A.  Yes.

11  Q.  Have you ever voted by a mail-in ballot?

12  A.  I have.

13  Q.  How many times?

14  A.  I don't know that I can recall that.

15  Q.  Why did you vote by mail-in ballot?

16  A.  After I registered as a graduating high school
17 student, obviously, I wasn't residing in Junction.
18 Instead I was attending school, but while I attended
19 Texas A&M, while I attended Texas Tech and during
20 internships that occurred while I was in college, I
21 voted by mail routinely.

22  Q.  Okay.  Do you know if your parents or
23 grandparents have ever used mail-in ballots?

24  A.  I do not know that.

25  Q.  Have you ever assisted any other voter in any

Page 25

1 way?

2  A.  Can you clarify?

3  Q.  Yeah.  Like, have you ever offered a ride to a
4 voter to get to the polls?

5  A.  Not to my knowledge, no.

6  Q.  Are you married?

7  A.  I am.

8  Q.  Have you ever offered your wife a ride to the
9 polls?

10  A.  No.  She does her own thing.  So I don't get in
11 the way.

12  Q.  I feel that.  What about any family members or
13 friends or neighbors?

14  A.  Offered a ride?  No, not to my knowledge.  But
15 as an elected official and a candidate, just like one
16 would expect, I encourage everyone to exercise their
17 right to vote.

18  Q.  Speaking of being an elected official, do you
19 have volunteers for your campaigns?

20  A.  I guess you could couch it in those terms.  I
21 don't know that we run campaigns in such that there are
22 categories such as volunteers.

23  Q.  Do you have, like, door knockers?

24  A.  When I first ran, we did have volunteers for
25 that purpose.

Page 26

1    Q.   So in your most recent campaigns, you haven't
2 had anyone helping you with trying to get people on your
3 team?
4    A.   Well, I'm not going to throw cold water on my
5 supporters.  Obviously, they -- unrelated to my
6 campaign -- have encouraged folks to exercise their
7 right to vote or remind them to go vote.
8    Q.   But you haven't -- have you had any events for
9 your campaigns?
10    A.   Events?
11    Q.   Events like hosted a dinner or had a townhall.
12    A.   Yes.
13    Q.   And did you have volunteers at those events?
14    A.   Again, I don't necessarily have a category of
15 volunteers.  So there's not that, but did I have
16 supporters that attended the events?  Yes.
17    Q.   Was there anyone at those events on behalf of
18 your campaign that was handing out door signs or handing
19 out pamphlets about your interest in what values you
20 stand for?
21    A.   Yes, specifically me and my family members,
22 yes.
23    Q.   Just you and your family members?
24    A.   No.  I also had campaign staff.
25    Q.   Okay.  To your personal knowledge, have any of

Page 27

1 your supporters ever assisted any other voter in getting
2 to the polls?
3    A.   I don't know that I have any knowledge of that.
4    Q.   Have your supporters ever been an assistant to
5 anyone at the polls?
6    A.   I don't know that I have any knowledge of that.
7    Q.   Would you agree that Texans giving fellow
8 voters a ride is a service to the community?
9         MR. SWEETEN:  This is probably the first
10 question that could implicate legislative privilege.  So
11 to the extent it would, you probably -- you know, you
12 don't offer that.  But if you can answer it without
13 revealing legislative privilege, then you can.
14    A.   It seems to be a very broad question.
15    Q.   (BY MS. DULANEY)  You can answer the question.
16 Would you like me to repeat it?
17    A.   Could you repeat it, please?
18    Q.   Yeah.  Would you agree that Texans giving
19 fellow voters a ride is a service to the community?
20         MR. SWEETEN:  I'm going to object also as
21 to form, and I'll give a few bases, which I think that
22 it's vague, unintelligible and it's compound.  But to
23 the extent you can answer it and do so without revealing
24 legislative privilege, you can answer, Representative
25 Murr.

Page 28

1    A.   It is a very broad question that seeks a
2 conclusion.  Do I think that every voter should have the
3 opportunity to exercise their right to vote?  Yes.  Do I
4 think that Texas law provides an opportunity under
5 certain circumstances for them to vote in person,
6 curbside if appropriate, or by mail?  Yes.
7    Q.   (BY MS. DULANEY)  Would you agree that Texans
8 giving fellow voters a ride aids a person's right to
9 vote?
10         MR. SWEETEN:  So I'm going to object as to
11 form, incomplete hypothetical, vague, unintelligible,
12 also just to the extent that it would reveal legislative
13 privilege, don't do that.  But you can answer the
14 question subject to those objections and that
15 instruction.
16    A.   I believe your question talks about aiding a
17 person and their right to vote.  I can understand that
18 some folks may want to characterize giving folks a ride
19 to a polling location as helping someone in the voting
20 process.  So I'm not going to disagree with your
21 characterization of that.
22    Q.   (BY MS. DULANEY)  Do you think that's a benefit
23 for Texas democracy?
24         MR. SWEETEN:  Same objection and
25 instruction.

Page 29

1    A.   That's really a broad question.  Again, I go
2 back to Texas law allows folks to vote in person.  It
3 allows for the opportunity for curbside voting where
4 appropriate and allows for them to vote by mail, if they
5 can't for the enumerated reasons, vote in person.
6    Q.   (BY MS. DULANEY)  But specifically with respect
7 to offering a voter a ride, do you believe that that's a
8 benefit for Texas democracy?
9         MR. SWEETEN:  Same objection and same
10 instruction.  I'd also add asked and answered.  But go
11 ahead.
12    A.   I don't know that I can answer it any other
13 way, but I don't necessarily agree with your
14 characterization.
15    Q.   (BY MS. DULANEY)  How do you disagree?
16    A.   I think you are --
17         MR. SWEETEN:  Same objection and
18 instruction.  Go ahead.  You can answer.
19    A.   I think you are asking me to agree with
20 conclusory statements that you're making.
21    Q.   (BY MS. DULANEY)  Do you think that a Texan who
22 offers a voter a ride is necessarily committing fraud?
23         MR. SWEETEN:  Objection, form.  Incomplete
24 hypothetical, vague, unintelligible, and also just the
25 instruction to the extent it would reveal any sort of

Andrew Murr
May 05, 2022                                                    30 to 33

Page 30

1 legislatively privileged information, don't provide
2 that. But, otherwise, if you can answer without doing
3 so, go ahead if you can understand the question.
4      A.   I think your hypothetical lacks additional
5 facts, but in very generic circumstances, no.
6      Q.   (BY MS. DULANEY)  Have you ever acted as a poll
7 watcher?
8      A.   No.
9      Q.   So we're here today to talk about the voting
10 law passed by the Texas Legislature signed by Governor
11 Abbott in September 2021.  We'll refer to it today as
12 Senate Bill 1 or SB 1.  We'll also discuss other related
13 legislation, HB 6 and HB 3.  Are you familiar with each
14 of those?
15      A.   Yes.
16      Q.   And are you okay with me referring to House
17 Bill 6 as HB 6, House Bill 3 as HB 3?
18      A.   Yes.
19      Q.   Were you asked by counsel to produce any
20 documents related to this case?
21           MR. SWEETEN:  Don't reveal the substance
22 of communication that you've had with me or with Jack,
23 but to the extent you can answer without revealing
24 attorney-client communications, you can.  Yeah.
25      A.   Yes.

Page 31

1      Q.   (BY MS. DULANEY)  What documents did you
2 produce?
3           MR. SWEETEN:  Just objection, vague to the
4 question; same instruction on attorney-client privilege,
5 but you can go ahead and answer.
6      A.   Produced documents that I understood were as
7 instructed by my counsel applicable for counsel's review
8 in this legal matter.
9      Q.   (BY MS. DULANEY)  What kinds of documents were
10 they?
11           MR. SWEETEN:  I think the question is
12 vague.  Are you saying that he provided to his
13 attorneys, or are you saying that were produced in this
14 case?  Because you would know what the latter is and --
15      Q.   (BY MS. DULANEY)  Yeah, provided to your
16 attorneys.  What kinds of documents did you provide to
17 your attorneys?
18           MR. SWEETEN:  Objection, vague; but you
19 can answer to the extent you're able.
20      A.   In broad terms in trying to answer your
21 question --
22      Q.   (BY MS. DULANEY)  Yeah.
23      A.   -- documents included copies of all -- of any
24 pieces of the legislation that you just referenced as
25 well as notes that were created during that process and

Page 32

1 review of any correspondence that my office or I
2 received on this topic of the election bills.
3 Generically, I'm going to lump all of that together, the
4 HB 3, SB 1.
5      Q.   Would correspondence your office received
6 include written testimony about the bills?
7      A.   In what way do you mean written testimony?
8      Q.   Like the written testimony received in
9 committee or received just by House representatives of
10 people in support or in opposition of the bills.
11           MR. SWEETEN:  Objection, form, vague.  You
12 can answer.
13      A.   If someone chose to hand myself or my office a
14 copy of whatever materials that they were sharing either
15 with other offices or as you mentioned the committee,
16 yeah, generally speaking, I'd put those in a file.
17      Q.   (BY MS. DULANEY)  And gave them to your
18 attorneys?
19      A.   Yes.
20      Q.   What was your process for identifying all of
21 these documents that you gave to your attorneys?
22           MR. SWEETEN:  Don't reveal attorney-client
23 communications, but to the extent you can answer without
24 doing so, go ahead.
25      A.   My process involved reviewing the subpoena and

Page 33

1 asking questions of my counsel.
2      Q.   (BY MS. DULANEY)  Did you have any assistance
3 in compiling the documents?
4           MR. SWEETEN:  Again, don't reveal
5 attorney-client communications, but to the extent you
6 can answer, go ahead without doing that.
7      A.   Yes.
8      Q.   (BY MS. DULANEY)  By who?
9      A.   My chief of staff.
10      Q.   Mr. Harrison?
11      A.   Yes.
12      Q.   Do you recall any of the search terms that you
13 or Mr. Harrison used to compile the documents?
14      A.   I don't know that I understand.  What do you
15 mean "search terms"?
16      Q.   Search terms like in your email or search terms
17 for documents that -- like Senate Bill 1?  A search
18 term.
19      A.   I don't know that I follow the process that
20 you're alluding to.  The way that I operate and the way
21 I run my office is we create lots of folders.  And so
22 those folders were already established and maintained
23 throughout the special sessions.  So all we had to do
24 was look to the applicable folders.
25      Q.   Okay.

Page 34

1    A.    I didn't have to go do search terms.  Does that
2  make sense?
3    Q.    **Yeah.**
4    A.    Yes.
5    Q.    **Any of the documents in those folders, did you**
6  **not get -- let me scratch that.**
7              **Were there any documents in those folders**
8  **that you did not give to your attorneys in the relevant**
9  **folders?**
10             MR. SWEETEN:  Objection to the question,
11  form, vague.  But to the extent you can answer it, and
12  of course continuing instruction will be don't reveal
13  any attorney-client communications, obviously.  But to
14  the extent you can understand the question, you can
15  answer.  Yeah.
16    A.    Those materials were shared with my attorneys.
17    Q.    **(BY MS. DULANEY)  There wasn't any document in**
18  **the relevant folders that you kept behind that you did**
19  **not hand to your attorneys?**
20    A.    To the best of my knowledge --
21    Q.    **Okay.**
22    A.    -- no.
23    Q.    **Do you consider yourself an expert on anything?**
24    A.    No.  I would think that both my wife and the
25  fact that I am continuing to always practice law but

Page 35

1  never be an expert at law, I'm not an expert on
2  anything.
3    Q.    **So based on that, in general, how do you**
4  **evaluate issues that aren't -- that you're not as**
5  **knowledgeable about when you're offering a bill?**
6              MR. SWEETEN:  You're asking as a general
7  matter?
8              MS. DULANEY:  Uh-huh.
9              MR. SWEETEN:  Okay.  You can answer.
10    A.    Could you clarify a little bit so that I can
11  answer your question?
12    Q.    **(BY MS. DULANEY)  Yeah.  As a legislator how**
13  **would you evaluate an issue that you weren't familiar**
14  **with or weren't knowledgeable on when you were authoring**
15  **a bill?**
16    A.    Generally speaking, in a very generic sense,
17  whenever an issue arises, I do what I can to educate
18  myself on that issue.  Whether that is reviewing
19  applicable current statutes, if it's derived from a
20  specific fact scenario, then trying to familiarize
21  myself with that factual scenario and ask questions of
22  interested parties.
23    Q.    **Would you ever conduct any research, general**
24  **research on those topics?**
25    A.    What do you mean by research?

Page 36

1    Q.    **Would you Google it, try to find data?**
2    A.    Not necessarily.  I would say typically that
3  might be limited to known articles, news publications,
4  but, no, I don't think we sit down and Google it.
5    Q.    **We, as in you and members of your staff?**
6    A.    That is correct.  If we're looking for
7  additional information, we may contact an applicable
8  state agency in a generic sense to try to learn more
9  about how that state agency handles whatever the issue
10  may be and ask if they happen to collect any data that
11  would be useful in us understanding that topic.
12    Q.    **Have you ever consulted the governor's office?**
13             MR. SWEETEN:  I want to understand the
14  question.  Is the question regarding his general
15  legislative process, has he ever contacted the
16  governor's office?
17             MS. DULANEY:  Yeah.  He said he may
18  contact an applicable state agency to learn more.  So
19  I'm curious if he's ever contacted the governor's
20  office.
21    A.    In a generic sense?  We're still just talking
22  about not individualized scenarios?  But, yes, I have.
23    Q.    **(BY MS. DULANEY)  The Attorney General's**
24  **Office?**
25    A.    Yes.

Page 37

1    Q.    **Secretary of State?**
2    A.    Yes.
3    Q.    **What about any -- like, private practice**
4  **lawyers?  Have you ever consulted any lawyers?**
5    A.    It's not something that I would frequently do,
6  but I can recall a couple of instances where we've had
7  legislation that did involve a private attorney, yes.
8    Q.    **What triggered you consulting those private**
9  **attorneys?**
10    A.    For example, in that event, that issue was
11  brought to me by a constituent.  It was a very
12  specialized topic, and the constituent actually had
13  located an attorney that had specialized knowledge on
14  the specialized topic.
15    Q.    **Have you ever consulted with any lobbyists?**
16    A.    And by the term "lobbyist," I guess that would
17  be anyone that registers to lobby?
18    Q.    **Correct.**
19    A.    Yes.
20    Q.    **Who?**
21             MR. SWEETEN:  So if we're getting into
22  specifics now about legislation, I'll just instruct you
23  generally as to the legislative privilege.  To the
24  extent any answer would reveal your mental processes,
25  mental impressions, fact-gathering process about a

Page 38

1  specific piece of legislation, don't provide that
2  answer.  If you can answer it without doing so, you can.
3      A.   That's a very broad question, but being that
4  there are literally hundreds of members of the lobby, I
5  don't know that I can name them all off.
6      Q.   (BY MS. DULANEY)  Can you name any of them?
7      A.   Now you're getting specific, but as far as
8  entities go and their lobbies, especially with a rural
9  district, Texas Farm Bureau, Texas Cattle Raisers, Texas
10 Bankers Association, the Independent Bankers Association
11 of Texas.  I'd throw those out as examples that often
12 have constituents in my district as members.
13     Q.   What about any interest group organizations?
14     A.   And could you clarify what you mean by that so
15 that I understand we're on the same wavelength?
16     Q.   Just an interest group as you would define it
17 in your daily job as a legislator.
18     A.   So not necessarily a lobbyist, but somebody or
19 a group of somebodies that cares about a specific topic?
20     Q.   Correct.
21     A.   Yes.  I know that I've interacted or had
22 conversations with interest groups.
23     Q.   What interest groups?
24     A.   Again, that is a broad swath over the course of
25 eight years at the capital.  That's a lot of folks.

Page 39

1      Q.   Which interest groups can you recall consulting
2  with?
3             MR. SWEETEN:  Same instruction of
4  legislative privilege.  If answering it would reveal
5  specific fact-gathering, mental processes regarding the
6  legislation, then, you know, don't answer it that way.
7  But if you can answer generally without disclosing
8  specific communications on a specific piece of
9  legislation, you can.
10     A.   That's my problem, is without attempting to
11 pare it down, I don't know that I really can easily
12 answer that.
13     Q.   (BY MS. DULANEY)  You can answer.
14     A.   No.  I'm just telling you I don't know that I
15 can easily answer it off the top of my head.  During a
16 session, I will meet with many different people, whether
17 they be constituents or just interested persons who are
18 not from my district or interest groups about a variety
19 of topics, some of which may have to do with a bill that
20 I'm working on while others just has to do with a piece
21 of legislation that could come before a committee I
22 serve on or before the House for a vote.  And so that's
23 a really broad brush there to sit down and try to rattle
24 off names, but I certainly don't deny that I've met with
25 interest groups.

Page 40

1      Q.   Just off the top of your head, which interest
2  groups can you recall consulting with?
3             MR. SWEETEN:  Objection, vague.
4  Objection, asked and answered, form.
5      A.   If you could narrow it down to at least a
6  topic, it would be a lot easier.  It's just very --
7      Q.   (BY MS. DULANEY)  During the 87th legislative
8  session.
9             MR. SWEETEN:  Same instruction on
10 legislative privilege that I've provided.  And same
11 objection, form and vague.  Go ahead.
12     A.   I mean, without more specificity, it's really
13 hard for me to just tell you.  I don't have a list that
14 I keep.  I don't know.
15     Q.   (BY MS. DULANEY)  You don't remember any off
16 the top of your head that you consulted with during the
17 87th legislative session?
18             MR. SWEETEN:  Same objection and same
19 instruction.
20     A.   Not at this moment.
21     Q.   (BY MS. DULANEY)  Okay.  What about any think
22 tanks?
23             MR. SWEETEN:  Instruction is the same;
24 same objection.
25     A.   And what would you define or describe a think

Page 41

1  tank as?  I understand a little bit more at the federal
2  level because I read about that from time to time in a
3  newspaper article, but at the state level, think tank,
4  is that like an interest group?
5      Q.   (BY MS. DULANEY)  What about like the Heritage
6  Foundation?
7      A.   I don't recollect having meetings with the
8  Heritage Foundation.  That doesn't mean that I didn't.
9  I just don't recall.
10     Q.   What about the Texas Public Policy Foundation?
11     A.   I do recall having interactions with TPPF as
12 they're commonly known.
13     Q.   During the 87th legislative session?
14     A.   Yes.
15             MR. SWEETEN:  Same instruction, same
16 objection.
17     Q.   (BY MS. DULANEY)  Are you familiar with the
18 Texas Legislative Black Caucus?
19     A.   Not intimately familiar, but I've heard the
20 term.
21     Q.   Based on any familiarity that you have, do you
22 think that the TLBC has information that would be
23 helpful to you when drafting legislation in considering
24 the potential impact to the African-American community
25 in Texas?

Page 42

1          MR. SWEETEN:  Okay.  Lots of objections
2 here.  Form, vague, unintelligible, calls for
3 speculation, incomplete hypothetical.  Those are the
4 form objections.  Then I'm going to give the legislative
5 privilege instruction, which is to the extent that it
6 would reveal any of your mental impressions or thoughts
7 about pending legislation, don't provide that answer.
8 You can answer subject to those objections and that
9 instruction.
10     A.  I don't know.
11     Q.  (BY MS. DULANEY)  Is there any group in Texas
12 that you would consider to have important insight
13 regarding whether or how a particular legislation would
14 affect the African-American community?
15          MR. SWEETEN:  Same instruction and same
16 objection to this question.
17     A.  I don't really have an answer for that.  I
18 don't think so.
19     Q.  (BY MS. DULANEY)  Are you familiar with the
20 Texas Mexican-American Legislative Caucus?
21     A.  I am familiar with the term.
22     Q.  Based on that familiarity, do you think that
23 MALC has information that would be helpful to you when
24 drafting legislation in considering the potential impact
25 to the Latino community in Texas?

Page 43

1          MR. SWEETEN:  Objection, form, foundation,
2 vague.  Also, same instruction on legislative privilege:
3 If it would reveal your mental impressions or thoughts
4 about a specific piece of legislation, don't provide
5 that answer.  But to the extent you can answer the
6 questions generally, you can do so.
7     A.  I don't know.
8     Q.  (BY MS. DULANEY)  Is there any group in Texas
9 you would consider to have important insight regarding
10 whether or how a particular legislation would affect the
11 Latino community?
12          MR. SWEETEN:  Same objection, same
13 instruction.
14     A.  I don't know.
15          MS. DULANEY:  Patrick, I'm about to get
16 into a new topic.  Do you want to take a break?  It's
17 been about an hour.
18          MR. SWEETEN:  If you want to, yeah, no
19 problem.  Are you good with a break?
20          MS. DULANEY:  Ten minutes?
21          MR. SWEETEN:  Yeah, yeah, let's do that.
22          VIDEOGRAPHER:  We are off the record.  The
23 time is 10:32 a.m.
24          (Brief recess:  10:32 a.m. to 10:49 a.m.)
25          VIDEOGRAPHER:  We are back on the record.

Page 44

1 The time is 10:49 a.m.
2     Q.  (BY MS. DULANEY)  So I'd like to talk a little
3 bit about your involvement with House Bill 6 during the
4 87th legislative regular session.  You were a coauthor
5 of House Bill 6, correct?
6     A.  I believe that's accurate along with many other
7 members.
8     Q.  What does it mean to be a coauthor of a House
9 bill?
10     A.  Generally speaking, that term implies that any
11 member has the opportunity to visit the clerk's office
12 and include their name as a coauthor on a piece of
13 legislation.
14     Q.  Was that the extent of your involvement in or
15 with House Bill 6?
16     A.  What do you mean by that?
17          MR. SWEETEN:  Yeah.  Objection, vague.
18     Q.  (BY MS. DULANEY)  Going to the clerk's office
19 to put your name as a coauthor, was that the extent of
20 your involvement with House Bill 6?
21     A.  No.  I don't think I would categorize it that
22 way.
23     Q.  Did you assist in the drafting process?
24          MR. SWEETEN:  I think you can -- you can
25 respond -- I think you can answer that question, just

Page 45

1 assist in the drafting process.
2          Agree?
3     A.  I did not assist in the drafting process of
4 House Bill 6 as drafted.
5     Q.  (BY MS. DULANEY)  What role did you serve then
6 as coauthor of House Bill 6?
7          MR. SWEETEN:  Objection, form, vague.
8 I'll just go ahead and caution you because it sounds
9 like we're going to be talking about specific bills.
10 Don't reveal -- don't provide answers -- because you've
11 asserted the legislative privilege both in your
12 responses to the discovery that -- to adhere to the
13 legislative privilege, don't reveal your mental thoughts
14 and impressions or fact-gathering or communications with
15 legislators or communications with staff members about
16 the bill.  So with that cautionary instruction, you
17 could go ahead and answer.
18     A.  So, obviously, had discussions with members
19 about the bill, and the record is very clear that I
20 authored a floor amendment to the version of House Bill
21 6.  I don't know if that was at that time Senate Bill 7
22 or House Bill 6 that was being heard on the floor, but I
23 was the author of a floor amendment.
24     Q.  (BY MS. DULANEY)  As a matter of public record,
25 tell me more about the floor amendment that you

Page 46

1 authored.

2    A.    The floor amendment was a culmination of

3 discussion amongst House members.

4    Q.    What did the floor amendment entail?

5             MR. SWEETEN:  You can answer if it's a

6 matter of public record.

7    A.    I mean, I would have to go back and review that

8 amendment.  It was lengthy, but it addressed concerns

9 raised by various members.

10    Q.    (BY MS. DULANEY)  In summation what was the

11 amendment?

12    A.    It's been a while since that.  I mean, that was

13 last May.  So that was a year ago.  I would have to go

14 back and review that amendment.

15    Q.    You have no recollection of what that amendment

16 included -- the provisions?

17    A.    Honestly, at this moment, no, because that was

18 a different version of the legislation than of the SB 1

19 or HB 3 that you are also talking about today.

20             MS. DULANEY:  Can I see what his answer

21 was to whether he assisted with the drafting process?  I

22 blanked.

23             THE REPORTER:  I'm sorry.  Which one?

24             MS. DULANEY:  Can you scroll up?  Keep

25 going.  Keep going.  Okay.  Thanks.

Page 47

1    Q.    (BY MS. DULANEY)  In your assistance with House

2 Bill 6, did you conduct any research?

3             MR. SWEETEN:  Again, I'm going to give you

4 the legislative-privilege instruction.  So to the extent

5 you won't reveal your mental processes -- excuse me --

6 your mental impressions, your fact-gathering process,

7 your communications with legislators or staff, you can

8 answer the question as phrased.

9    A.    And when you talk about research, in what

10 connotation do you mean?

11    Q.    (BY MS. DULANEY)  As you would define it.

12    A.    Okay.  That would be fact-gathering, getting on

13 the internet, looking at Google?

14    Q.    Sure.

15    A.    No.

16    Q.    Did you instruct anyone to conduct research for

17 you?

18    A.    For purposes of our discussion on House Bill 6

19 and an amendment to that, no.

20    Q.    I'm not asking about your mental impressions,

21 but are you aware of any data showing the impact that

22 the House Bill 6 would have had on minority voters when

23 you were assisting with the bill?

24             MR. SWEETEN:  I think that that would

25 intrude on his legislative privilege:  What he reviewed,

Page 48

1 what he considered, what his --

2    Q.    (BY MS. DULANEY)  Just awareness, yes or no?

3             MR. SWEETEN:  I'm going to go ahead and

4 instruct that that is a matter of legislative privilege.

5 I'm going to instruct not to answer on that basis.

6    Q.    (BY MS. DULANEY)  Are you refusing to answer?

7    A.    I am following the directions of my counsel to

8 not answer.

9    Q.    What other members of the Texas Legislature did

10 you work with when you were assisting with House Bill 6?

11             MR. SWEETEN:  You can provide privilege

12 log information, names of people you may have discussed,

13 but don't reveal the contents of those communications

14 with other legislators or other staffers about

15 legislation.

16    A.    Certainly.  And I apologize if I start to lose

17 my voice a little bit.  It's the weather.

18    Q.    (BY MS. DULANEY)  That's okay.

19    A.    So I have water.  That was a year ago.  That

20 was last May of 2021.  Knowing that there's 150 House

21 members, I know we operate in a room where interaction

22 is common.  When you discuss who I worked with, that

23 would have been both -- it would have been a number of

24 different members that engaged in the discussions or I

25 talked with.  I don't know that I can recall all of

Page 49

1 them, but I can give you some of their names.

2    Q.    Yeah.

3    A.    Representative Joe Moody, Representative Terry

4 Canales, Representative Stephanie Klick, obviously

5 Representative Briscoe Cain, Representative Jacey

6 Jetton, Representative Brooks Landgraf, you have to

7 forgive me.  I'm trying to think back in time.

8    Q.    Take your time.

9    A.    And when that bill was occurring on the floor,

10 I believe it ran until the early hours of morning.  So

11 we were there for a long time.  There were certainly

12 other members:  Representative John Bucy, Representative

13 John Turner amongst others.

14             MR. SWEETEN:  Keely, can I just ask for

15 clarification?  Are we talking about HB 6, or are we

16 talking about SB 1 right now?

17             MS. DULANEY:  HB 6, yeah.

18             MR. SWEETEN:  We're non-HB 6.  Okay.

19             MS. DULANEY:  We're in -- we're in the

20 regular session.

21             MR. SWEETEN:  Got it.  Okay.  Very good.

22    Q.    (BY MS. DULANEY)  Out of those representatives

23 that you can recall, did you work with any -- did you

24 work especially close with any of them in particular?

25    A.    I'm sorry.  I'm thinking.

Page 50

1    Q.   That's okay.
2    A.   I believe while I didn't recall all of the
3 names that I probably had conversations with, everyone
4 that I mentioned to you I had multiple conversations
5 with.
6    Q.   There isn't any representative that stands out
7 as someone you worked with the most?
8    A.   No.
9    Q.   So as part of your work on HB 6, I'd also like
10 to understand the full scope of people you spoke to
11 outside of fellow legislators, legislative staff.  Who
12 else did you consult when you were drafting House
13 Bill 6?
14    A.   Your question is who else did I consult with
15 when I was drafting House Bill 6?
16    Q.   Sorry.  When you were assisting on House Bill
17 6?
18    A.   I will clarify that I did not draft House Bill
19 6.
20    Q.   Yes.
21    A.   Assisting with House Bill 6 and/or reaching
22 language that was offered as a floor amendment, which we
23 can -- we know is in the record, consulted with staff
24 that works for the speaker including the speaker's chief
25 of staff and his legislative director and his general --

Page 51

1 and the general counsel.  I also consulted with the
2 parliamentarians and attorneys at Texas Legislative
3 Council.
4    Q.   What about any third-party organizations?
5         MR. SWEETEN:  Like the others, don't
6 reveal the substance of those communications, but she
7 can ask privilege log, things like contact.
8    A.   I do not recall consulting with any third-party
9 organizations.
10    Q.   (BY MS. DULANEY)  Texas Secretary of State's
11 Office?
12    A.   I can't recall that at that time, that I was
13 involved in any communications with the Texas Secretary
14 of State's Office.
15    Q.   The Attorney General's Office?
16    A.   My same answer would be that I don't recall
17 that I had any communications with the AG's Office at
18 that moment in time.
19    Q.   What about any district attorneys' offices?
20    A.   I don't recall having any interactions or
21 communications with district attorneys' offices at the
22 time that HB 6 or its Senate companion was being
23 considered on the floor and we were discussing with
24 fellow members of any floor amendments.
25    Q.   Any of your constituents?

Page 52

1    A.   At that time, no.  I do not recall any
2 discussions with any of my constituents.
3    Q.   So outside of the members of the legislator,
4 speaker, staff, general counsel, parliamentarians, Texas
5 Legislative Council, there was no one else, no other
6 third party that you consulted with when you were
7 assisting on House Bill 6?
8         MR. SWEETEN:  Objection, asked and
9 answered.  Objection, compound.  Go ahead.
10    A.   Not to my recollection.
11    Q.   (BY MS. DULANEY)  Okay.
12    A.   And if I may add, that was for a very focused
13 period of time when we're talking about House Bill 6 --
14    Q.   Correct.
15    A.   -- or the Senate companion --
16    Q.   Correct.
17    A.   -- when it was being considered on the floor of
18 the House.
19    Q.   Are you aware of any racial impact analysis
20 that was conducted to aid in drafting HB 6?
21         MR. SWEETEN:  Same general instruction on
22 legislative privilege.  Do you want me to clarify?  Do
23 you want to talk about privilege?  Do you need a second
24 to talk about that?
25         THE WITNESS:  Yes.

Page 53

1         MR. SWEETEN:  Okay.  Let's do that.
2         VIDEOGRAPHER:  We are off the record.  The
3 time is 11:03 a.m.
4         (Brief recess:  11:03 a.m. to 11:06 a.m.)
5         VIDEOGRAPHER:  We are back on the record.
6 The time is 11:06 a.m.
7    Q.   (BY MS. DULANEY)  Are you aware of any racial
8 impact analysis conducted to aid in drafting House
9 Bill 6?
10         MR. SWEETEN:  Same general instruction on
11 legislative privilege, but you can answer that question.
12    A.   No, I am not aware.
13    Q.   (BY MS. DULANEY)  Did you hear any testimony on
14 the -- whoa, rewind.  Did you hear any testimony on the
15 discriminatory impact HB 6 would have on Black, Latino
16 or disabled voters?
17    A.   When you reference testimony, are you talking
18 about witness testimony in a House or a Senate committee
19 hearing?
20    Q.   We can start there, yes.
21    A.   To my recollection, no.  But that is because I
22 did not serve on a committee in which the House or the
23 Senate companion was heard and voted on.
24    Q.   So you didn't attend any of those hearings just
25 as a legislator?

Andrew Murr
May 05, 2022                                              54 to 57

Page 54

1    A.   And I'll point out that there were many other
2  committees typically in the process that are all meeting
3  at the same time with dozens if not hundreds of bills
4  all being focused upon.  So it's like a busy mall at
5  Christmastime.  If the concept would be am I focused on
6  what is happening in one store whenever the rest of the
7  mall is busy, I don't recall that -- that I attended
8  either by watching it on internal television or in
9  person.
10   Q.   So what about from your fellow legislators
11 during House floor debates on HB 6?  Did you hear
12 anything regarding a discriminatory impact the bill
13 would have on Black, Latino or disabled voters?
14   A.   If I recall, according to the record and
15 comments made by members at either the front or the back
16 microphone during debate, I believe that some members
17 did discuss that topic.
18   Q.   And based on those discussions, did you ever
19 suggest that impact analysis should be conducted by the
20 legislature?
21        MR. SWEETEN:  You can answer with regard
22 to matters of the public record, but don't reveal
23 communications you've had with other legislators or
24 staffers about a bill.
25   A.   No, I did not.

Page 55

1    Q.   (BY MS. DULANEY)  Why not?
2        MR. SWEETEN:  That's legislative
3  privilege, instruction not to answer on that one.
4    Q.   (BY MS. DULANEY)  Are you refusing to answer?
5    A.   I'm refusing to answer on the advice of my
6  counsel.
7    Q.   Did you or your office create any documents
8  that assessed House Bill 6's impact on any racial,
9  ethnic or disabled status groups?
10        MR. SWEETEN:  I'm going to object on the
11 basis of legislative privilege.  It goes to his --
12 first, it would go to his communications with his
13 staffers.  Second, it would go to his thought process
14 and mental impressions regarding existing legislation.
15 In light of that instruction, I'm going to instruct you
16 not to answer that question.
17        MS. DULANEY:  The creation of a document,
18 whether or not a document was created?
19        MR. SWEETEN:  There's more in the
20 question.  You've embedded the specifics of what would
21 be in the document in the question.  So objection and my
22 instruction is the same.
23   Q.   (BY MS. DULANEY)  Are you refusing to answer?
24   A.   I'm declining to answer on advice of counsel.
25   Q.   Did you receive any documents that assessed

Page 56

1  House Bill 6's impact on any racial, ethnic or
2  disability status groups during the regular session?
3        MR. SWEETEN:  In other words, with that
4  subject matter, did he receive something?
5        MS. DULANEY:  Yes.
6        MR. SWEETEN:  Okay.  You can -- I think to
7  the extent -- I think you can answer that question as
8  phrased.
9    A.   To my recollection, I don't recall receiving
10 any documents relating to that topic with respect to
11 House Bill 6.
12   Q.   (BY MS. DULANEY)  As part of your assistance on
13 House Bill 6, do you recall receiving any feedback from
14 anyone outside of the legislature about the bill?
15        MR. SWEETEN:  I'm going to let you answer
16 as phrased.
17   A.   May I ask?  When you say "feedback about House
18 Bill 6," are you talking about feedback that occurred
19 before the House considered and voted on it, or are you
20 talking about at any point in its filing and its
21 pendency during the regular session?
22   Q.   (BY MS. DULANEY)  At any point.
23   A.   While I'll caveat I may have because there is a
24 crush of people during a regular session, I don't recall
25 receiving any feedback.

Page 57

1    Q.   Did any county officials reach out to you with
2  concerns about implementing House Bill 6?
3        MR. SWEETEN:  Objection, vague, time
4  frame; but you can answer to the extent you're able.
5    A.   Similarly to the previous question, in regards
6  to House Bill 6 during the regular session, I don't
7  recall having any conversations or receiving feedback
8  from county officials on that topic.
9    Q.   (BY MS. DULANEY)  Do you recall receiving an
10 email from Isabel Longoria?
11        MR. SWEETEN:  Objection, vague, form.
12 Vague.
13   A.   At this moment in time, I don't recall
14 receiving an email from Isabel Longoria.
15   Q.   (BY MS. DULANEY)  Do you recall being briefed
16 on an email by your staff from Isabel Longoria about her
17 concerns of implementing House Bill 6?
18        MR. SWEETEN:  I think we're getting into
19 legislatively privileged information because you're
20 asking about the substance of a communication between
21 Representative Murr and his staff.  Therefore, I'm going
22 to instruct that with respect -- don't reveal any of the
23 substance of the communications -- of any communications
24 you've had with your staff regarding legislation.  But
25 if you can answer without doing so, you can.

Page 58

1    A.   No, I don't recall.

2    Q.   (BY MS. DULANEY)  So I'd like to switch now to

3  House Bill 3, something I think you're a little bit more

4  familiar with.  You were the author of House Bill 3,

5  correct?

6    A.   Yes.

7    Q.   Is House Bill 3 the first bill you ever filed?

8    A.   No.

9    Q.   Did any of the past bills that you filed --

10 were they ever heard by a committee?

11   A.   Yes.

12   Q.   Did any of them ever make it out of the

13 committee?

14   A.   Some of them did.

15   Q.   Do you recall which ones?

16   A.   Not at this time, no.  That's over the course

17 of four sessions.

18   Q.   What was the process for becoming the author of

19 House Bill 3?

20        MR. SWEETEN:  I'm going to object to the

21 extent that that would reveal communications that you've

22 had with any legislative member or staffer.  So if

23 answering it would do that, then don't answer -- don't

24 provide that information, communications that you've had

25 regarding legislation.  To the extent you're able to

Page 59

1  answer it otherwise, you know, you can.

2    A.   And your question is what was the process by

3  which I became the author?  I was contacted by Speaker

4  Phelan and asked to be the author of the bill during the

5  first called session.

6    Q.   (BY MS. DULANEY)  So did you request to be the

7  author?

8        MR. SWEETEN:  Don't -- yeah.  At that

9  point, we're getting into particular communications that

10 you've had.  So I'm going to instruct you not to answer

11 about what communications you had with Speaker Phelan or

12 he had with you other than the very public one you just

13 made.

14        MR. DISORBO:  I think the instruction was

15 not to answer.

16        THE WITNESS:  That is my instruction?  Not

17 to answer?

18        MR. SWEETEN:  Yeah, the instruction is not

19 to answer, yeah.

20   A.   Okay.  So based on the advice of counsel, I

21 decline to answer.

22   Q.   (BY MS. DULANEY)  As the author of House

23 Bill 3, did you assist in the drafting process?

24        MR. SWEETEN:  You can answer that as

25 phrased.

Page 60

1    A.   Yes.  As the author of House Bill 3, I assisted

2  in the drafting process.

3    Q.   (BY MS. DULANEY)  As part of your assistance in

4  the drafting process, did you conduct any research?

5        MR. SWEETEN:  Yeah.  I think now we're

6  getting into his mental processes and fact-gathering

7  processes.  So I think that's legislatively privileged.

8  I'm going to instruct you not to answer that question.

9    Q.   (BY MS. DULANEY)  Are you refusing to answer?

10   A.   I'm declining to answer based on the advice of

11 counsel.

12   Q.   I'm not asking about the substance of any

13 research or your fact-gathering process.  But did you,

14 yes or no, conduct any research during the process of

15 drafting House Bill 3?

16        MR. SWEETEN:  I think we're getting

17 into -- I think we're getting into his mental processes

18 when you're doing that, his fact-gathering process.  I

19 mean, the very question asks that.  So I'm going to have

20 to instruct him not to answer your question as phrased.

21   Q.   (BY MS. DULANEY)  Are you refusing to answer?

22   A.   Based on the advice of counsel, I decline to

23 answer.

24   Q.   Do you know of any research conducted to assist

25 you in drafting House Bill 3, just whether or not it was

Page 61

1  conducted?

2        MR. SWEETEN:  Objection to the question as

3  vague -- form, vague, unintelligible, compound.  And

4  then I'll just instruct you that if -- if to answer it

5  would reveal your legislatively privileged thoughts,

6  mental impressions, fact-gathering about the bill, don't

7  do that.  But, otherwise, you can answer.

8    A.   I'll simply point out that during testimony

9  during both the committee process and floor debate by

10 members, I believe that either witnesses or members may

11 have referenced information or materials regarding that

12 topic.

13   Q.   (BY MS. DULANEY)  Did you work with other

14 members of the Texas legislature in drafting House

15 Bill 3?

16        MR. SWEETEN:  You can answer as phrased.

17   A.   Yes.

18   Q.   (BY MS. DULANEY)  Who?

19   A.   Worked with many members.  And so I don't know

20 that I can give you a comprehensive list of all of those

21 that I may have had discussions with.  But they may have

22 included Representative John Bucy, Representative

23 Stephanie Klick, Representative John Turner,

24 Representative Joe Moody, Representative Jacey Jetton,

25 Representative Briscoe Cain.  Sorry.  I'm thinking of

Page 62

1 the process.  Senator Hughes, Representative Steve
2 Allison, Representative Mike Schofield, and there were
3 certainly others, but those come to mind because I
4 recall having discussions with them.

5    Q.   Of those members, did you work with any
6 closely?

7          MR. SWEETEN:  So I'm going to let you
8 answer the question as phrased, but don't reveal any
9 communications you've had with other legislators or
10 staff members regarding the bill itself.  So the
11 substance, don't reveal that.  It's just the question
12 about the contact if you can answer.

13   A.   I don't know that I would describe working with
14 any members closely or with any particular member more
15 than any other member.

16   Q.   (BY MS. DULANEY)  Were any of those members
17 that you listed Democratic legislators?

18   A.   Yes.

19   Q.   Which ones?

20   A.   I believe that's clearly a matter of public
21 record, and I'd have to go back and see who I mentioned,
22 but that would include Joe Moody, John Turner, John
23 Bucy, for example.

24   Q.   I'm not asking about substance of any
25 communications, but how did you work with these

Page 63

1 legislators?

2          MR. SWEETEN:  I'm just going to object to
3 the question, form, vague, unintelligible.  Again, but
4 since she's limiting it -- she's taken out the
5 substance, I'll let you answer to the extent you're
6 able.

7    A.   How did I work with them?  I guess I would try
8 to interpret the question.  I don't fully understand it,
9 but I would say by having conversations with them.

10   Q.   (BY MS. DULANEY)  Did you email about the bill
11 with these legislators?

12         MR. SWEETEN:  Objection, form, vague.  Go
13 ahead.  You can answer.

14   A.   No.  My primary method of communication was
15 always orally and in person.

16   Q.   (BY MS. DULANEY)  And were those conversations
17 always on the House floor?

18   A.   Not necessarily always on the House floor.

19   Q.   So as the author of HB 3, I also want to
20 understand the full scope of people you spoke to during
21 the process outside of your fellow legislators and the
22 House staff.  Who else do you recall consulting when you
23 were drafting House Bill 3?

24         MR. SWEETEN:  To the extent -- she's not
25 asking you, I think, the substance of the communication.

Page 64

1 This would be privilege-log stuff.  Folks that you've
2 talked to is what she's asking about.

3    A.   I recall that I certainly had conversations
4 with the Texas Secretary of State's Office as well as
5 staff for the speaker's office and the House
6 parliamentarian.

7    Q.   (BY MS. DULANEY)  What about the TLC?

8    A.   By TLC you mean the Texas Legislative Council?
9 Yes, I did have many conversations with TLC regarding
10 the drafting process and the review of draft language.

11   Q.   Did you consult with the AG's office?

12   A.   I can't rule out that I consulted with the AG's
13 office.  I just don't recall.  To clarify, if there was
14 a consultation with the AG's office, it probably had to
15 do with a specific question regarding language in the
16 bill.

17   Q.   What about any district attorneys' offices?

18   A.   I didn't reach out and contact district
19 attorneys' offices, but one or more may have contacted
20 me.  And if I recall correctly, they may have appeared
21 as witnesses during the hearing on the bill before
22 committee.

23   Q.   Do you recall which DA's offices contacted you?

24   A.   I do not.

25   Q.   What about the governor's office?

Page 65

1          MR. SWEETEN:  Obviously, don't reveal the
2 substance of any communication about any discussions you
3 may have had regarding HB 6.  I also object to the
4 question as vague, but you can go ahead and answer with
5 those instructions.

6    A.   And just to go back to the original language in
7 your question, you're just talking about did I have
8 communications with these folks?  So I do recall having
9 communications with the governor's office.

10   Q.   (BY MS. DULANEY)  Who within the governor's
11 office?

12   A.   It would be the governor's staff.

13   Q.   Do you recall any names?

14   A.   Courtney Hjaltman, starts with an H.

15   Q.   Any others?

16   A.   Primarily Courtney.  Perhaps there may have
17 been others, but it was primarily her.

18   Q.   What about any members of the judiciary?

19         MR. SWEETEN:  Objection, form, vague.

20   A.   I don't recall having any conversations or
21 communications with members of the judiciary.  I'll
22 caveat that with they may have tried to correspond with
23 my office or they attended and participated as a witness
24 in a hearing.  I don't recall that.

25   Q.   (BY MS. DULANEY)  Did you consult with any

Page 66

1 political organizations when you were drafting House
2 Bill 3?
3      A.    And what do you define a political organization
4 to be?
5      Q.    As you would define a political organization.
6      A.    Well, first, just to make sure I understand
7 your question, I would define a political organization
8 to either be the Texas GOP party or the Texas Democrat
9 party and no other organization in that.
10      Q.    Okay.  So what about the Texas Democratic
11 party?
12      A.    I did not reach out and communicate with either
13 of those two parties.  That being said, I don't
14 recollect whether either of those parties through their
15 staff communicated with or tried to communicate with me.
16 I just don't recall.  And I don't recollect, but perhaps
17 they may also have testified as witnesses during the
18 hearing.
19      Q.    Did you consult with any election
20 administrators when you were drafting House Bill 3?
21      A.    Generally on that topic, I consulted with the
22 Texas Secretary of State's Office since they act as a
23 guidepost for elections administrators.
24      Q.    Were there any other third-party organizations
25 you consulted with when you were drafting House Bill 3?

Page 67

1      A.    There may have been, but I don't really
2 recollect at this time.
3      Q.    What about the Texas Public Policy Foundation?
4      A.    I may have had conversations with Texas Public
5 Policy Foundation.
6      Q.    And did that organization take a public
7 position on HB 3?
8           MR. SWEETEN:  That's a matter of public
9 record.  You can respond.
10      A.    Honestly, I don't know.  I don't recall.
11      Q.    (BY MS. DULANEY)  Now, you publicly welcomed
12 questions, comments and discussions on House Bill 3 from
13 your fellow legislatures, correct -- legislators.
14 Sorry.
15           MR. SWEETEN:  She's asking matters of
16 public record.
17      A.    Yes.  I did that both in a letter to all of
18 their offices and at every opportunity given including
19 my statements to the committee as well as on the House
20 floor.
21      Q.    (BY MS. DULANEY)  As a matter of public record,
22 did you make any recommendations on provisions to
23 include in House Bill 3?
24           MR. SWEETEN:  So I don't think she's
25 asking about communications that would be legislatively

Page 68

1 privileged.  I think she's asking matters of the public
2 record.  So to the extent statements -- you know, public
3 record statements, you can answer to that extent.
4      A.    Could you ask again?
5      Q.    (BY MS. DULANEY)  Yeah.
6      A.    I just want to make sure I answer your
7 question.
8      Q.    As a matter of the public record, did you make
9 any recommendations on provisions to include in House
10 Bill 3?
11      A.    Based on the way you ask your question, I don't
12 recall making any recommendations.  That being said,
13 during my 14 hours of when the bill was being considered
14 in both the first called session and then again in the
15 second called session, I did address generally some
16 topics with committee members if they had concerns that
17 we could look at language once it reached the House
18 floor for any changes or improvements that folks desired
19 to the bill.
20      Q.    In your assistance with drafting the bill, did
21 you add any provisions to House Bill 3?
22           MR. SWEETEN:  I'm sorry, Keely.  I just
23 missed the question.
24           MS. DULANEY:  That's okay.
25           MR. SWEETEN:  So can you ask it again?

Page 69

1           MS. DULANEY:  Can you repeat?
2           (The record was read as requested.)
3           MR. SWEETEN:  I think you can answer that
4 question as far as did you add -- did you add provisions
5 to SB 3.  I think that you can answer that, but don't
6 reveal your thought processes or mental impressions.
7      A.    So based on your question if I'm trying to
8 understand it correctly, you're talking about HB 3 once
9 it was filed --
10      Q.    (BY MS. DULANEY)  Correct.
11      A.    -- did I make any drafting changes to House
12 Bill 3?
13      Q.    Correct.
14      A.    And that would appear in the version -- in the
15 public record as floor amendments that I offered once it
16 reached the House floor in a version numbered as SB 1.
17      Q.    Uh-huh.  And which floor -- like, describe
18 those floor amendments that you made.
19           MR. SWEETEN:  You can answer with respect
20 to the public record.
21      A.    Honestly, I'd have to go back and review those
22 floor amendments since that was last summer, but there
23 were several floor amendments if I'm not mistaken that I
24 offered.
25      Q.    (BY MS. DULANEY)  You have no recollection of

Page 70

1 what those floor amendments consisted of?

2    A.    I haven't necessarily studied up on that topic

3 for you today.  I'm sorry.  But those floor amendments

4 are certainly available for folks to review.

5    Q.    Do you recall if anyone from outside the

6 legislature contacted you to express concerns regarding

7 House Bill 3?

8              MR. SWEETEN:  I think you can answer that

9 as phrased.

10    A.    Generally speaking, during the first called

11 special session and the second called special session, I

12 recall that there was a number of folks that expressed

13 their comments or their opinions on the legislation as

14 filed or as heard in committee.

15    Q.    (BY MS. DULANEY)  Do you recall the names of

16 any third-party organizations that contacted you to

17 express concerns regarding House Bill 3?

18    A.    Not off the top of my head.

19    Q.    Are you familiar with the Mexican-American

20 Legal Defense and Education Fund?  It's also known as

21 MALDEF?

22    A.    I've heard the term, yes.

23    Q.    Do you have any understanding of MALDEF's

24 purpose?

25    A.    A little bit, but I won't purport to be an

Page 71

1 expert on that.

2    Q.    What is the little bit that you understand of

3 MALDEF's purpose?

4    A.    That it is an organization that focuses on

5 Mexican-American rights, and from time to time you hear

6 it as an entity that's mentioned in the news.  That's

7 it.

8    Q.    Are you familiar with the NAACP Legal Defense

9 Fund also known as LDF?

10    A.    No.  I'm only familiar with the NAACP.

11    Q.    Okay.  What's your understanding of the NAACP's

12 purpose?

13    A.    I don't know that I expressly can state what

14 the NAACP's purpose is, but based on the name of the

15 organization, it's to advance concerns and interests

16 raised by African-Americans.

17    Q.    What's your familiarity with the Brennan Center

18 for Justice?

19    A.    I'm not familiar with that organization.

20    Q.    Are you familiar with the Texas Civil Rights

21 project?

22    A.    Only in a limited degree on criminal justice

23 topics.

24    Q.    Are you familiar with Disability Rights of

25 Texas?

Page 72

1    A.    Yes, through the course of working on HB 3 and

2 SB 1.

3    Q.    What's your understanding of the Disability

4 Rights of Texas' purpose?

5    A.    Based on their testimony as witnesses before

6 the committee hearings on this legislation, they are

7 proponents and advocates of making sure that those

8 disabled persons' rights to participate in society are

9 not overlooked.

10    Q.    Did any third-party organizations contact you

11 in support of HB 3?

12              MR. SWEETEN:  You can answer that question

13 as phrased.

14    A.    I'm sure they did, but at this moment, I don't

15 necessarily think I can recall who that might be.  I

16 believe that I was contacted by individuals or groups

17 that both favored the legislation or had criticisms of

18 the legislation.

19    Q.    (BY MS. DULANEY)  Were you ever contacted by

20 the Heritage Foundation regarding House Bill 3 or Senate

21 Bill 1?

22    A.    I don't necessarily recall.

23    Q.    Are you familiar with the Heritage Foundation?

24    A.    Not familiar with the Heritage Foundation, no.

25    Q.    Do you recall if the Texas Public Policy

Page 73

1 Foundation ever contacted you in support of HB 3?

2    A.    I have had conversations with TPPF on a number

3 of topics, primarily on criminal justice reform.  So off

4 the top of my head, I don't recollect whether I had any

5 conversations with them about HB 3 or SB 1.

6    Q.    What's your understanding of TPPF's purpose

7 generally?

8    A.    TPPF's purpose generally is to be a proponent

9 of several different topics of both research and

10 advocacy.  Those topics include criminal justice and tax

11 reform.  So I am familiar with their work in those

12 areas.

13    Q.    Do you recall if any county officials reached

14 out to you with concerns about implementing HB 3?

15              MR. SWEETEN:  Now we're talking about

16 implementation of and that specific issue.  I'll just

17 give you the general instruction on legislative

18 privilege.  So if you -- if this reveals any

19 communications you've had with legislators or staffers,

20 if this reveals your mental impression or fact-gathering

21 process about a particular piece of legislation, then

22 you would not answer that.  But if you can answer

23 without doing that, then you can answer the question.

24    A.    May I ask you a question regarding your

25 question?  When you describe the term "county official,"

Page 74

1 do you mean only elected officials?

2     Q.   (BY MS. DULANEY)  No.

3     Q.   You mean appointed officials that would include
4 an elections administrator?

5     Q.   Yes.

6     A.   I don't recall any specific conversations with
7 any elections administrators, but I do recollect that
8 there was testimony by witnesses during one or both of
9 the hearings during the first and second called special
10 sessions with your term of "county officials" expressing
11 their observations about implementation.

12     Q.   Which county officials do you recall testifying
13 regarding House Bill 3?

14     A.   Honestly, I don't know that I recall a specific
15 county official testifying, but I do recollect that
16 there was discussion from witnesses regarding Nueces
17 County, for example, but I don't recollect the witness.

18     Q.   So I'd like to talk a little bit about the
19 House select committee on constitutional rights and
20 remedies.  How many members were there on that
21 committee?

22     A.   I believe that's a matter of public record and
23 available at Texas Legislature online.

24     Q.   Do you recall how many members there were?

25     A.   Not off the top of my head, I do not.

Page 75

1     Q.   Do you recall how many members -- your best
2 estimate -- were Democrats?

3     A.   No.  But I am aware of the fact that there were
4 both Republicans and Democrats that were on the
5 committee both from urban and rural settings.

6     Q.   Do you recall there being people of color on
7 the committee?

8     A.   Yes.  I recall that there were both Latinos and
9 African-American members on the committee.

10     Q.   Do you recall if there was anyone on the
11 committee who's legally disabled?

12     A.   I'm not aware of that.  So I don't know.

13     Q.   And House Bill 3 was referred to that
14 committee, correct?

15     A.   Yes.

16     Q.   What role did you play on the committee?

17     A.   I was not a member of the committee.

18     Q.   But you testified in front of the committee,
19 correct?

20     A.   I did not testify in front of the committee.  I
21 laid out the bill before the committee, but not as a
22 witness, as the bill author.

23     Q.   And with that, the committee members were able
24 to ask you questions about the bill?

25     A.   Yes.

Page 76

1     Q.   Did House Bill 3 receive opposition in
2 committee?

3     A.   In what way?

4     Q.   Were committee members opposed to House Bill 3?

5     A.   Many of the Democrats on the committee voiced
6 their opposition to the legislation during the bill
7 layout and the five hours of questions that they asked
8 me.

9     Q.   Do you recall which Democratic legislators?

10     A.   No, but I know that the record is very
11 reflective of who asked questions and what the topics
12 were.

13     Q.   Do you recall any of the explanations for why
14 they didn't support House Bill 3?

15     A.   I don't recall that any of them actually
16 provided explanations.  They just expressed their
17 concerns about different topics as the record was
18 reflected then in both the first called hearing and the
19 second called hearing.

20     Q.   And what's your recollection of some of those
21 concerns?

22     A.   During the first called session as it's very
23 clear on the video of the committee hearing on HB 3,
24 committee members took turns going through different
25 sections of the bill asking questions.  They didn't

Page 77

1 necessarily provide me feedback on their observations.
2 The questions were theirs to ask, and I answered their
3 questions to the best I could.

4     Q.   You have no recollection of a general basis of
5 what their concerns were about the bill?

6     A.   No.  I think the record is pretty clear on
7 that.

8     Q.   What's your recollection?

9     A.   Some of the committee members expressed
10 concerns that they thought the legislation would not be
11 implemented well or they had concerns about
12 understanding different sections of the bill.

13          And that was all expressed in the recorded
14 testimony and exchanges between the committee members
15 and myself.

16     Q.   After you laid out the bill in front of the
17 committee, did you remain in attendance in any of the
18 public hearings regarding House Bill 3?

19          MR. SWEETEN:  It's a matter of public
20 record.  You can respond.

21     A.   So there was only one hearing in the first
22 called session on HB 3, and it lasted 14 hours if I
23 recall correctly.  After my five-hour layout, I did take
24 a break in order to go eat food and get a drink of
25 water.  So I maintained an opportunity to listen to the

Page 78

1 public testimony before completing concluding remarks.
2    Q.    (BY MS. DULANEY)  As an attendee of that public
3 hearing, did you pay attention to the testimony that was
4 given?
5    A.    Generally, yes.
6    Q.    What did you learn about Texans' opposition to
7 the bill?
8          MR. SWEETEN:  So I think we're getting
9 into legislative privileges, thought processes about
10 what he learned and how he applied that, that all
11 relates to the legislation itself.  So I think we're
12 getting into legislative privilege with that question,
13 Keely.  So I'm going to instruct accordingly.
14          I don't think you can provide an answer
15 without revealing legislative privilege.
16    Q.    (BY MS. DULANEY)  Are you refusing to answer?
17    A.    I'm declining to answer based on the advice of
18 counsel.
19    Q.    I'm not asking about your mental impressions.
20 Did you take any notes on the testimony of those who
21 opposed the bill?
22          MR. SWEETEN:  I'll let you answer that if
23 you want to.  I mean, you can answer if you took notes.
24    A.    Generally speaking, I did not take detailed
25 notes.

Page 79

1    Q.    (BY MS. DULANEY)  Did anyone from your staff
2 take detailed notes of the testimony of those who
3 opposed the bill?
4          MR. SWEETEN:  Objection, foundation.  You
5 can answer.  Form.
6    A.    Not to my knowledge.
7    Q.    (BY MS. DULANEY)  In light of the public
8 testimony, were there any revisions made to House
9 Bill 3?
10          MR. SWEETEN:  So I'm going to -- I think
11 you can refer to matters of the public record, but don't
12 reveal your mental impressions or thoughts about the
13 legislation itself in answering this question.  Okay?
14    A.    I think your question is overly broad in the
15 sense that it -- it's presumptuous and it says, "Hey,
16 out of all of these folks that might have showed up over
17 the course of 14 hours, was the bill changed?"  The end
18 result after -- in the second called session in the
19 second hearing on the bill, when it arrived on the House
20 floor, changes were made.  Some of those changes might
21 speak to similar topics that were raised by witnesses
22 during the hearings in either the first called session
23 or the second called session.  But I don't recall
24 tethering those up.  Primarily, those also had to do
25 with discussions between members.

Page 80

1    Q.    (BY MS. DULANEY)  In your involvement with
2 House Bill 3 and SB 1, were you presented with written
3 testimony in opposition of the bills?
4          MR. SWEETEN:  You can answer that, a
5 matter of public record.
6    A.    I believe that I was, but I don't recall
7 specifically what testimony that was.  Frequently in
8 general practice, it is not uncommon for folks who are
9 testifying in support or against bills to also provide
10 handouts or a summary of their testimony to either the
11 committee members themselves or to the bill's author or
12 even House members generically.
13    Q.    (BY MS. DULANEY)  I saw reference to a Dropbox
14 in one of the emails that you were custodian of record
15 on.  Was there a Dropbox?  What was that Dropbox?  Do
16 you recall?
17          MR. SWEETEN:  I'm going to object to the
18 question as vague, foundation also.  Can you be more
19 clear with your question?  There's a Dropbox --
20          MR. DISORBO:  Are you asking him if he
21 knows what it is?
22          MR. SWEETEN:  There's a Dropbox provision
23 in the bill.  I don't think that's what you're talking
24 about.  I think you're talking about a method of
25 communicating with legislators.  So I'm confused as to

Page 81

1 the term.
2    Q.    (BY MS. DULANEY)  A Dropbox like what you would
3 store documents in.  I saw reference to a Dropbox like
4 you would store documents in, in one of your emails.
5 Was there a Dropbox among the legislators or committee
6 members that included all of this written testimony?
7          MR. SWEETEN:  You can respond to that
8 question.
9    A.    I don't know the answer to your question, but
10 generally speaking; most committee clerks now receive
11 copies of the bill and the required documents go with it
12 and place it in Dropbox which is a computer program and
13 make it accessible to their committee members in lieu of
14 handing out paper copies.  But I'm not clear on whether
15 that was applicable here, but that would be the most
16 likely conclusion that I reach.
17    Q.    (BY MS. DULANEY)  Did the committee clerks put
18 anything other than copies of bills in those Dropboxes?
19          MR. SWEETEN:  You're asking did the
20 committee clerk?
21          MS. DULANEY:  Yeah.
22          MR. SWEETEN:  To the extent that's a
23 matter of public record, you can respond to that.
24    A.    I'm not advised.  I don't know.
25          MS. DULANEY:  Okay.  I'm at a stopping

Page 82

1 point.

2                VIDEOGRAPHER:  We are off the record.  The
3 time is 11:55 a.m.

4                (Brief recess:  11:55 a.m. to 12:37 p.m.)

5                VIDEOGRAPHER:  We are back on the record.
6 The time is 12:37 p.m.

7                (Deposition Exhibit No. 1 marked)

8      Q.   (BY MS. DULANEY)  So I want to look through
9 some of the documents that you and your office received
10 regarding the election bills that you produced as part
11 of this litigation.  I'm going to hand you what I've
12 marked as Exhibit 1.  And it's Bates-stamped Texas
13 Legislature 1742.  Do you want to take a minute and
14 review this document?  Let me know when you're ready.

15     A.   Okay.  I'm ready.

16     Q.   Do you recall receiving this document?

17     A.   Honestly, I do not recall receiving this
18 document.

19     Q.   Have you seen this document before?

20     A.   If I have seen this document before, I just
21 don't recall it at this time.

22     Q.   Do you recall who sent you this document?

23     A.   No, I do not recall who sent me this document.

24     Q.   Upon reviewing the document, did you consider
25 any of these points in your role as author of HB 3?

Page 83

1                MR. SWEETEN:  Objection, legislative
2 privilege.  Don't answer that.  That calls for your
3 mental impressions about the legislation.

4      A.   Based on the advice of counsel, I decline to
5 answer the question.

6                (Deposition Exhibit No. 2 marked)

7      Q.   (BY MS. DULANEY)  I'm going to hand you what
8 I've marked as Exhibit 2.  It Bates-stamped Texas Leg
9 1534.

10     A.   As part of the housekeeping, is there some
11 spot --

12     Q.   Yes.  Will you give your exhibits to the court
13 reporter?

14     A.   Right there.

15     Q.   I'll give you a minute to look through this.
16 Let me know when you're ready.

17     A.   Thank you.

18     Q.   You're welcome.

19     A.   Okay.

20     Q.   Have you seen this document before?

21     A.   I recall seeing this document before.

22     Q.   If you'll turn to Page 4, it's Bates-stamped
23 1537.  There are some statistics listed on the bottom
24 right regarding increased voter turnout.  Do you recall
25 seeing these statistics that Black American turnout

Page 84

1 increased from 60 percent in 2016 to 63 percent in 2020?

2                MR. SWEETEN:  Objection, vague; objection,
3 foundation.  And then to the extent that it would reveal
4 anything that -- your mental impressions related to the
5 legislation, don't reveal that.  Otherwise, to the
6 extent you can answer, you can.

7      A.   In response, I don't recall seeing that
8 specific --

9      Q.   (BY MS. DULANEY)  Do you have any reason to
10 dispute that?

11     A.   I do not have any reason to dispute that.

12     Q.   Were you aware of this increase in Black voter
13 turnout prior to the implementation of SB 1?

14                MR. SWEETEN:  I'm going to object.  I
15 think it calls for legislative privilege to the extent
16 it would reveal his mental impressions, thoughts about
17 legislation.  To the extent it would not, you can
18 respond.

19     A.   No, I was not aware.

20     Q.   (BY MS. DULANEY)  And then that next bullet
21 point down, do you recall seeing this statistic that
22 Hispanic turnout increased from 50 percent in 2018 to
23 54 percent in 2020?

24                MR. SWEETEN:  Same objection, same
25 instruction.

Page 85

1      A.   No, I do not recall.

2      Q.   (BY MS. DULANEY)  Do you have any reason to
3 dispute that?

4                MR. SWEETEN:  Objection, foundation;
5 objection, calls for speculation.  And you can answer
6 otherwise.

7      A.   I do not have any reason to dispute that.

8      Q.   (BY MS. DULANEY)  Were you aware of the
9 increase in Hispanic voter turnout prior to the
10 implementation of SB 1?

11                MR. SWEETEN:  Objection, form, assumes
12 facts not in evidence; objection also to the extent that
13 it could call for his mental impressions regarding
14 legislation.  With that instruction, you can answer to
15 the degree --

16     A.   To my recollection, I was not aware of any
17 statistic.

18                (Deposition Exhibit No. 3 marked)

19     Q.   (BY MS. DULANEY)  Okay.  I'm going to hand you
20 what I've marked as Exhibit 3.  It's Bates-stamped Texas
21 Leg 1642.  I'll give you a minute to review.  Let me
22 know when you're ready.

23     A.   Okay.

24     Q.   Do you recall receiving this document titled
25 "Recommendations Concerning HB 3 and SB 1" from Secure

Page 86

1 Democracy?

2    A.   At this point in time, I do not recall
3 receiving this document.

4    Q.   But you have no reason to dispute that your
5 office received this document, correct?

6    A.   I have no reason to dispute that my office
7 received this document, and, honestly, during the
8 legislative process, generally speaking, legislators
9 receive unsolicited documents from interested
10 individuals in groups all the time.

11    Q.   If you'll turn to Page 2, it's Bates-stamped
12 1643, and review the two paragraphs starting with "ID
13 numbers for mail ballots" that's in bold.  Let me know
14 when you're ready.

15    A.   So that would be the first -- or the second
16 paragraph on the top of the page?

17    Q.   The second and third paragraph.

18    A.   Okay.  Okay.

19    Q.   Do you recall concerns regarding the provision
20 requiring matching ID numbers for mail-in ballots and an
21 ID number on the carrier envelope?

22         MR. SWEETEN:  You can answer related to
23 the public record.  Don't reveal communications you've
24 had with legislators or legislative staff.

25    A.   So not from this document but from the

Page 87

1 testimony before the hearing of HB 3 and obviously SB 1
2 in both the first called session and the second called
3 session.  I recall, and the testimony shows, that one or
4 more members of the committee asked questions and raised
5 issues about this topic as well as some witness
6 testimony.

7    Q.   (BY MS. DULANEY)  Did you consider that concern
8 in revising HB 3?

9         MR. SWEETEN:  Objection.  Don't answer
10 that.  That calls for legislative privilege and your
11 mental impression.  So instruction not to answer the
12 question as posed.

13    A.   Based on the advice of counsel, I decline to
14 answer.

15    Q.   (BY MS. DULANEY)  Are you aware of the issues
16 statewide related to mail-in ballots and the
17 implementation of SB 1 in the March 2022 primary
18 election?

19         MR. SWEETEN:  Objection, vague and
20 objection to the extent it would reveal your mental
21 impressions regarding the legislation itself.  If it
22 would not do so, you may answer the question.  I'll also
23 just object as -- I think I said vague and
24 unintelligible, but go ahead.  You can answer.

25    A.   While I've concluded that your question is very

Page 88

1 broad, based on some newspaper articles that I have
2 read, I think some issues or questions have been raised
3 about that topic during the 2022 primary election.

4         (Deposition Exhibit No. 4 marked)

5    Q.   (BY MS. DULANEY)  I'm going to hand you what
6 I've marked as Exhibit 4.  This is an article from
7 April 6, 2022, from the Texas Tribune.  If you'll take a
8 minute to review and let me know when you're ready.

9    A.   Okay.

10    Q.   If you'll turn to the second page and read into
11 the record the second paragraph on the second page
12 starting at "roughly."

13    A.   "Roughly 12.4 percent of mail-in ballots
14 returned to the state's 254 counties were not counted
15 according to figures released Wednesday by the Texas
16 Secretary of State.  Just over 3 million people voted
17 overall in the low-turnout primary."

18    Q.   Do you have any reason to dispute that?

19    A.   I have no reason to dispute that information.

20    Q.   And if you'd continue down to the --

21         MR. SWEETEN:  I'm sorry.  I'm going to
22 object to the last question as form and foundation.  But
23 go ahead.  You can answer -- ask the next one.  I'm
24 sorry.

25    Q.   (BY MS. DULANEY)  If you continue down to the

Page 89

1 fourth paragraph, starts with "put another way."  Would
2 you read that paragraph into the record?

3    A.   "Put another way, one in every eight mail-in
4 voters lost their votes in the primary.  The rate
5 amounts to a significant surge in rejections compared
6 with previous years including the higher turnout 2020
7 presidential election when less than 1 percent of
8 ballots were tossed."

9    Q.   Do you have any reason to dispute that?

10         MR. SWEETEN:  Same objection.  Objection.
11 Foundation.  Objection, calls for speculation.  You can
12 answer.

13    A.   I do not have any reason to dispute that
14 information.

15    Q.   (BY MS. DULANEY)  Did you anticipate this
16 rejection rate of mail-in ballots when you were drafting
17 SB 1?

18         MR. SWEETEN:  Objection, calls for
19 legislative privilege, in particular any conversations
20 he had or his mental impressions about the bill.  He
21 cannot answer the question without violating legislative
22 privilege.  And, therefore, I'm going to instruct him
23 not to answer.

24    A.   Based on the advice of counsel, I decline to
25 answer the question.

Andrew Murr
May 05, 2022

90 to 93

Page 90

1     Q.   (BY MS. DULANEY)  Were you warned of this
2  issue, of the possible rejection rate of mail-in ballots
3  when you were drafting and sponsoring SB 1?
4          MR. SWEETEN:  On this one, I'd just object
5  to the extent it would call for legislative privilege,
6  but to the extent that you -- you can certainly refer to
7  matters in the public record in answering the question.
8     A.   To the best of my recollection, I believe that
9  one or more witnesses may have testified before the
10 committee in both the first called session and the
11 second called session on this topic and provided their
12 comments regarding mail-in ballots.
13    Q.   (BY MS. DULANEY)  Regarding the rejection of
14 mail-in ballots?
15    A.   If I recall, witness testimony generally about
16 mail-in ballots focused on what they perceived to be
17 changes in the mailed ballot process under the law.  I
18 don't recall that there was specific discussion on what
19 the end result might be.  I think it was more focused on
20 the language of the legislation before the committee.
21 But the record would clearly show what their concerns
22 were when they raised it.
23    Q.   Does the rejection rate of mail-in ballots from
24 the 2022 primary affect your view of this legislation's
25 utility?

Page 91

1          MR. SWEETEN:  To the extent this would
2  implicate your mental impressions regarding the
3  legislation itself, don't provide that response.  To the
4  degree you can without revealing that thought process
5  about the bill, then you can respond.  Does that make
6  sense?
7          THE WITNESS:  Yes.
8          MR. SWEETEN:  Okay.  Very good.
9     A.   I think my answer would be no, it does not.
10         (Deposition Exhibit No. 5 marked)
11    Q.   (BY MS. DULANEY)  I'm going to hand you what
12 I've marked as -- where are we?  Five? -- Exhibit 5,
13 Texas Leg 1647.
14    A.   Thank you.
15    Q.   Take a minute to review and let me know when
16 you're ready.
17    A.   Okay.
18    Q.   Excuse me.  Do you recall receiving this
19 document?
20    A.   Yes, I believe I recall receiving this
21 document.
22    Q.   Did this document make you aware of concerns
23 that HB 3 would make it more difficult for elderly
24 persons to vote given their disabilities or need for
25 assistance?

Page 92

1          MR. SWEETEN:  Objection, assumes facts not
2  in evidence; objection, foundation to form.  You can
3  respond except for to the extent it would reveal your
4  mental processes -- mental thought processes regarding
5  legislation.
6     A.   I appreciated hearing from all interested
7  parties regarding their comments or concerns about HB 3.
8     Q.   (BY MS. DULANEY)  And in hearing those
9  concerns, do you specifically recall concerns related to
10 making it -- to HB 3 making it more difficult for
11 elderly persons to vote?
12         MR. SWEETEN:  I'm going to object to the
13 form as vague and unintelligible, but I also instruct on
14 legislative privilege.  But to the extent you can answer
15 it without revealing that, you may do so.
16    A.   I hate to ask you.  Could you repeat the
17 question?
18         MS. DULANEY:  Will you repeat that?  It
19 was a little lengthy.
20         (The record was read as requested.)
21         MR. SWEETEN:  Same objection, same
22 instruction.  Go ahead.
23    A.   No.  I don't specifically recall.
24         (Deposition Exhibit No. 6 marked)
25    Q.   (BY MS. DULANEY)  Okay.  I'm going to hand you

Page 93

1  what I've marked as Exhibit 6, Bates-stamped Texas Leg
2  1746.
3          MR. SWEETEN:  Thank you.
4          MS. DULANEY:  Oh, gosh.
5          MR. SWEETEN:  I got it; I got it.
6          MS. DULANEY:  Sorry.
7          MR. SWEETEN:  That's okay.
8          MR. DISORBO:  Good catch.
9          MR. SWEETEN:  We would have just gone
10 under for it.
11    Q.   (BY MS. DULANEY)  Where were we?  Okay.  Let me
12 know when you're ready.
13    A.   Okay.
14    Q.   Have you seen this email before?
15    A.   Yes.  I'm familiar with this email.
16    Q.   Did Mr. Harrison pass these questions along to
17 you?
18    A.   Yes.
19    Q.   Did you ever respond to these questions?
20    A.   Not to my knowledge, no.
21    Q.   Why not?
22         MR. SWEETEN:  I think he can answer.
23         MR. DISORBO:  May I see the exhibit?
24         MR. SWEETEN:  Yeah, yeah.  Give us a
25 second.

Andrew Murr
May 05, 2022                                           94 to 97

Page 94

1    I would say he can answer so long as --
2    (Counsel conferring.)
3    MR. SWEETEN:  I mean, just same
4 instruction on legislative privileges.  Don't reveal
5 mental impressions, but otherwise you can respond to the
6 question.
7    A.    Generally speaking, I review inquiries from the
8 media to determine whether or not they are related to my
9 district.  I'm sent to Austin to serve the constituents
10 in my district.  And whenever I get requests from the
11 media generically for any legislation, I review it with
12 a hard eye of whether or not that is a conduit for me to
13 actually communicate with my constituents.
14    And so for me, that is a prioritization of
15 time and management with communications with my
16 constituents.  And being that I represent 12 rural
17 counties that don't have daily newspapers, I tend to
18 focus on making sure that I communicate with them first
19 and foremost.
20    **Q.    (BY MS. DULANEY)  So in this email you were**
21 **asked if you had any data on how many times someone had**
22 **been accused of blocking a poll watcher in the past.**
23 **Did you have any data?**
24    MR. SWEETEN:  Yeah.  So I think that is
25 asking for legislatively privileged information, his

Page 95

1 fact-gathering, his understanding, his mental processes.
2 So I think that's legislatively privileged.  As such,
3 I'm going to instruct you not to answer.
4    A.    Based on the advice of counsel, I decline to
5 answer.
6    (Deposition Exhibit No. 7 marked)
7    **Q.    (BY MS. DULANEY)  Okay.  I'm going to hand you**
8 **what I've marked as Exhibit 7, Bates-stamped Texas Leg**
9 **1745.  Let me know when you're ready.**
10    A.    Okay.
11    **Q.    Do you recall receiving this email?**
12    A.    Yes, I recall receiving this email.
13    **Q.    Did you ever respond?**
14    A.    No, I did not respond.
15    **Q.    Why not?**
16    A.    As I mentioned previously, it is my general
17 practice in a very generic sense to analyze all
18 inquiries from the media to determine whether or not
19 that is the best way to communicate with my
20 constituents.  And I prioritize media requests for my
21 district first and foremost.
22    **Q.    I'd like to go through some of these questions**
23 **with you.  Were you in support of the speaker's request**
24 **to refrain from mentioning racism?**
25    MR. SWEETEN:  That's legislatively

Page 96

1 privileged.  Objection, mental impressions regarding
2 thoughts about the bill.  So do not answer that because
3 it is privileged.
4    A.    I decline to answer based on the advice of
5 counsel.
6    **Q.    (BY MS. DULANEY)  Do you believe that**
7 **refraining from mentioning race would have aided the**
8 **debate on SB 1?**
9    MR. SWEETEN:  Same objection, same
10 instruction.
11    A.    Same response.  I decline to answer based on
12 the advice of counsel.
13    **Q.    (BY MS. DULANEY)  We talked about you attending**
14 **the hearing in front of the House select committee on**
15 **constitutional rights and remedies regarding HB 3,**
16 **right?**
17    A.    Yes.
18    **Q.    Where you laid out the bill and were questioned**
19 **on it?**
20    A.    Yes.
21    (Deposition Exhibit No. 8 marked)
22    **Q.    (BY MS. DULANEY)  I'm going to hand you what**
23 **I've marked as Exhibit 8.  It's a big one.**
24    MR. SWEETEN:  Keely, I see it's a
25 transcript of something.

Page 97

1    MS. DULANEY:  Yeah.  It's -- I do.
2    MR. SWEETEN:  Have you guys produced this?
3    MS. DULANEY:  Yes, yes.  Well, I need to
4 double-check on that.
5    MR. SWEETEN:  Okay.
6    MS. DULANEY:  I believe so after the last
7 request, but I will confirm.
8    MR. SWEETEN:  Okay.
9    **Q.    (BY MS. DULANEY)  It's a certified copy of the**
10 **transcript from the July 10 hearing before the House**
11 **select committee on constitutional rights.  Okay.  So**
12 **you recall attending this hearing?**
13    A.    Yes.  And this would have been during the first
14 called special session.
15    **Q.    Correct.  Do you recall being questioned about**
16 **Keith Ingram's report on the 2020 election?**
17    A.    I recall receiving a lot of questions during
18 the hearing.  I don't necessarily recall that specific
19 question.
20    **Q.    Do you know who Keith Ingram is?**
21    A.    He works at the Secretary of State's Office.
22    **Q.    Do you know him personally?**
23    A.    I only know him because I have conversed with
24 him in the past regarding this legislation.  Outside of
25 that, I do not know him.

Page 98

```
1    Q.   From your conversations with him, do you
2  believe he's a truthful person?
3            MR. SWEETEN:  You can answer.
4    A.   I have no reason to think otherwise.
5    Q.   (BY MS. DULANEY)  Do you believe he's a
6  knowledgeable person?
7    A.   Yes, I believe he is knowledgeable.
8    Q.   Do you believe he's a competent person?
9    A.   In all of our conversations, I've found him to
10 be competent.
11   Q.   If you'll turn to the transcript -- it's
12 Page 142 for me -- 142 of the transcript, not of this
13 massive stack.  I condensed it because it's lengthy.
14 I've got cheaters.  I'm sorry.
15   Q.   No.  That's fine.  I don't blame you.
16   A.   You said 142?
17   Q.   Yes.  Will you read Lines 14 through 20 into
18 the record?
19   A.   Lines 14 through 20 are spoken by
20 Representative Bucy?
21   Q.   Correct.
22   A.   Lines 14 through 20 say, "Then in our committee
23 same day we had the DPS come and tell us about how well
24 their system was using the Secretary of State's Office,
25 Keith Ingram, went on to say that the 2020 elections in
```

Page 99

```
1  Texas were smooth and secure and a success.  So as --
2  that is what the Republican Greg Abbott
3  Governor-appointed Secretary of State's Office is
4  telling us."
5    Q.   And now, if you'll flip to Page 145 and read
6  Lines 15 through 22 into the record.
7    A.   Statements by Representative Bucy?
8    Q.   And yourself.
9    A.   15 through 22?
10   Q.   Correct.
11   A.   Okay.  Fifteen, Representative Bucy, "Let me
12 just say as -- as we're about to move on to some content
13 in Section 5 going back to what the Secretary of State
14 reported and -- and I believe you told Representative
15 Neave that you -- you agree with that.  You agree with
16 the assessment of the Secretary of State, correct?"
17          Line 21, Representative Murr:  "I do not
18 disagree.  I agree.  That's correct."
19   Q.   Sitting here today, do you still agree with
20 Mr. Ingram's report that the 2020 election was smooth,
21 safe and secure?
22          MR. SWEETEN:  You can answer to the extent
23 it doesn't reveal your mental impressions about the
24 bill; so legislative privilege, but you can answer if it
25 doesn't.
```

Page 100

```
1    A.   I stand by my comments that I made during the
2  hearing.
3    Q.   (BY MS. DULANEY)  At this hearing, do you
4  recall being questioned generally on whether you had
5  conducted a racial impact analysis in your role as
6  author of HB 3?
7    A.   I recall generally being questioned on that
8  topic, yes.
9    Q.   Will you turn to Page 188 for me?
10   A.   Okay.
11   Q.   If you'll read Lines 11 through 16 into the
12 record.
13   A.   Eleven through 16 is an exchange between
14 Representative Joe Moody and Representative Murr; is
15 that correct?
16   Q.   Correct.
17   A.   Line 11, Representative Moody:  "Okay.  Has --
18 have you or a member of your office done any research as
19 to how this change in the law will impact voters of
20 color?"
21          Line 14, Representative Murr:  "No one in
22 my office has done research on that topic -- no, sir --
23 on this provision."
24   Q.   Did you or any member of your office ever
25 conduct any research as to how HB 3 would impact voters
```

Page 101

```
1  of color?
2            MR. SWEETEN:  Objection, form, vague.  But
3  you can go ahead and answer to the extent it's a matter
4  of public record.
5    A.   Would you repeat the question?  I'm sorry.
6    Q.   (BY MS. DULANEY)  That's okay.
7    A.   I was busy reading that exchange between
8  Representative Moody and Representative Murr on the
9  topic of the question that you asked.
10   Q.   Did you or any member of your office ever
11 conduct any research as to how HB 3 would impact voters
12 of color?
13   A.   No.
14   Q.   Did you or any member of your office ever
15 attempt to initiate any research as to how HB 3 would
16 impact voters of color?
17          MR. SWEETEN:  That, I'm going to object as
18 to legislative privilege.  I think that's outside of
19 what was discussed in the public record, and I think
20 that that would reveal his fact-gathering and mental
21 impressions that were not publicly disclosed.  So I
22 would object on the basis of legislative privilege as to
23 that particular question.
24   A.   Based on the advice of counsel, I decline to
25 answer the question.
```

Andrew Murr
May 05, 2022                                           102 to 105

Page 102

1    Q.   (BY MS. DULANEY)  We're going to go back to
2   this.  So don't put this away yet, but I'm going to mark
3   the next exhibit.
4            (Deposition Exhibit No. 9 marked)
5    Q.   (BY MS. DULANEY)  Exhibit 9 is a certified copy
6   of the transcript from the August 26, 2021, House floor
7   debate on Senate Bill 1.
8            MS. DULANEY:  I'll check if this was
9   produced to you, Patrick.
10            MR. SWEETEN:  Okay.  Thank you.
11    Q.   (BY MS. DULANEY)  If you'll turn to page --
12            MR. SWEETEN:  Can I just ask you, Keely,
13   did you guys transcribe the entirety of the first and
14   second session?
15            MS. DULANEY:  No, just select hearings.
16            MR. SWEETEN:  Select pieces.  Okay.
17            MS. DULANEY:  Yeah.
18    Q.   (BY MS. DULANEY)  Turn to Page 34 to 35,
19   please -- actually, Page 35.  Sorry.  And if you'll read
20   Lines 13 through 17 into the record?
21    A.   This appears to be an exchange between
22   Representative John Turner and myself.  It may be --
23   there were multiple Turners.  So I don't know -- unless
24   the transcript indicates a first name going back in
25   time.

Page 103

1    Q.   Let's see.
2    A.   I'm just trying to be clear with you.
3    Q.   Yeah, understood.  Let's see if we can find
4   that.
5    A.   There is a Representative Chris Turner, and
6   there is a Representative John Turner, and both spoke
7   that day.
8            MR. SWEETEN:  And both are Democrats,
9   right?
10            THE WITNESS:  Yes.
11    Q.   (BY MS. DULANEY)  I don't see where that says
12   that in the record.  But I can find that out for you.
13    A.   No problem.
14    Q.   Would that impact your ability to read --
15    A.   No, ma'am.  I was just trying to give you clear
16   information.
17    Q.   So Lines 13 to 17 on Page 35.
18    A.   Lines 13, Mr. Turner states, "But you didn't
19   make any attempt to initiate such a study to ensure that
20   there would not be a disparate impact?"
21            Mr. Murr responds, "I did not make an
22   attempt to initiate a study, no, sir."
23    Q.   But you were aware that minority voter turnout
24   increased during the 2020 election?
25            MR. SWEETEN:  Objection.  That calls for

Page 104

1   matters of legislative privilege.  Those would be his
2   mental impressions about legislation.  So I'd instruct
3   you not to answer that question.
4    A.   Based on the advice of counsel, I decline to
5   answer that question.
6    Q.   (BY MS. DULANEY)  Okay.  You can put this aside
7   for a minute, but we're going to come back to it.
8    A.   Okay.  I also believe that is probably
9   Representative Chris Turner if I was guessing.
10    Q.   Okay.
11            MR. SWEETEN:  Are we finished with this,
12   or are we going back to it?
13            MS. DULANEY:  We're going to go back to it
14   in a minute.
15    Q.   (BY MS. DULANEY)  If you'll go back to
16   Exhibit 8.  Is that -- okay.  Exhibit 8.
17            MR. SWEETEN:  Which one is eight, the big
18   one?
19            MS. DULANEY:  The big one?
20            MR. SWEETEN:  Let's call it the big one.
21            MR. DISORBO:  The previous transcript.
22    Q.   (BY MS. DULANEY)  Truly.  And if you'll turn to
23   Page 189 for me and read Lines 3 to 12 into the record.
24    A.   This would be question and answer between
25   Representative Moody and Representative Murr.  Line 3,

Page 105

1   Representative Moody, "Do you think it's important for
2   the body or this committee to know whether and to what
3   extent how this change in the law would impact voters of
4   color?"
5            Representative Murr responds, "I -- I
6   think it's important to consider all information that's
7   known or available.  At the same time, I go back to the
8   intent that we talked about.  The likelihood of fraud
9   seems, practically speaking, to increase when someone
10   is -- especially with a campaign -- helping a voter
11   vote."
12    Q.   Do you have any data to base your statement on?
13            MR. SWEETEN:  I think that would call for
14   legislative privilege.  He can discuss the matters in
15   the public record, but you're now asking for the basis
16   of his knowledge and his mental impressions regarding
17   legislation.  So instruct not to answer on the basis of
18   legislative privilege.
19    A.   I decline to answer the question based on the
20   advice of counsel.
21    Q.   (BY MS. DULANEY)  Do you stand by your
22   statement that you made on July 10 sitting here today?
23            MR. SWEETEN:  You can answer; you can
24   answer.
25    A.   I have no reason not to stand by statements

Page 106

1 made to the committee during the hearing.

2    Q.    (BY MS. DULANEY)  Would you be surprised to
3 learn that volunteers for the campaigns of several of
4 your fellow Republican legislators, in fact, assist
5 voters in getting to the polls?

6              MR. SWEETEN:  Objection, assumes facts not
7 in evidence; objection, vague.  Also, just -- you can
8 answer but not to the extent that it would reveal your
9 legislative processes, your mental impressions about the
10 legislation.  With that, you can respond.

11    A.    I'm really not aware of any of the status of
12 campaigns, Republican or Democrat, regarding that
13 process.

14    Q.    (BY MS. DULANEY)  Do you believe your fellow
15 legislators who are, in fact, assisting voters in
16 getting to the polls are necessarily committing fraud?

17              MR. SWEETEN:  Objection, form, incomplete
18 hypothetical; objection, vague and objection, calls for
19 speculation.  You can answer if you can.

20    A.    No.  I do not believe that my fellow members
21 are necessarily committing fraud.

22    Q.    (BY MS. DULANEY)  On the same page, Page 189,
23 will you read Lines 13 to 18 into the record?

24    A.    This is going to be a conversation between
25 Representative Moody and myself.  Line 13,

Page 107

1 Representative Moody, "It is -- is it your intent to ask
2 any governmental entity whether and to what extent this
3 particular change in the law would impact voters of
4 color?"

5              Representative Murr's response, "I have no
6 hesitation in asking any applicable agency or entity
7 that question."

8    Q.    Given your lack of hesitation, did you ever ask
9 any governmental entity or agency whether and to what
10 extent HB 3 would impact voters of color?

11              MR. SWEETEN:  So I think that that would
12 go to his fact-gathering, his mental impressions and,
13 therefore, would be legislatively privileged.  I'm going
14 to instruct not to answer on that basis.

15    A.    Based on the advice of counsel, I decline to
16 answer the question.

17    Q.    (BY MS. DULANEY)  During this July 10 hearing,
18 do you recall agreeing that it would be important to
19 determine the racial impact of HB 3?

20              MR. SWEETEN:  You can respond to matters
21 in the public record, yeah.

22    A.    Being that it was a 14-hour hearing and that I
23 was interrogated by many of the committee members, I
24 don't necessarily recall that specific topic, but I'm
25 sure that the record would reflect whether or not we had

Page 108

1 that conversation.

2    Q.    (BY MS. DULANEY)  Will you turn to Page 41 for
3 me?  And if you'll read from Line 19 on Page -- oh,
4 sorry.  Tell me when you're there.

5    A.    41?

6    Q.    Yes.

7    A.    Okay.

8    Q.    If you'll read from Line 19 on Page 41 through
9 Page 42, at Line 4.

10    A.    Line 19 on Page 41 is an exchange between
11 Representative Neave and myself.  Representative Neave
12 states, "So you're -- so you have not requested any
13 particular racial impact study to be conducted to
14 determine the impact of this legislation, correct?"

15              Representative Murr responds, "I have
16 not."

17              Representative Neave states, "Okay.  Don't
18 you think that would be important?"

19              Representative Murr responds, "Sure, that
20 is important, but at the same time, I also look to my
21 peers for their input, and I have considered their input
22 in the document in front of you as well."

23    Q.    Can you tell me the provisions of HB 3 where
24 you considered the input of your peers regarding the
25 impact HB 3 would have on people of color?

Page 109

1              MR. SWEETEN:  That calls for legislative
2 privilege and your mental impressions, fact-gathering
3 regarding a bill.  Therefore, I'm going to instruct you
4 not to answer the question as posed.

5    A.    Based on the advice of counsel, I decline to
6 answer that question.

7    Q.    (BY MS. DULANEY)  On Page 42, will you read
8 Lines 5 through 10 into the record?

9    A.    Lines 5 through 10 is an exchange between
10 Representative Neave and myself.  Representative Neave
11 states, "And you'll consider the testimony of the
12 individuals that are testifying today with respect to
13 the impact of legislation on people of color?"

14              Representative Murr responds, "I look
15 forward to listening to every witness' testimony."

16    Q.    Can you tell me the provisions of HB 3 where
17 you considered the input of public testimony on the
18 impact of HB 3 on people of color?

19              MR. SWEETEN:  Objection, legislative
20 privilege; instruct not to answer on that basis.

21    A.    Based on the advice of counsel, I decline to
22 answer that question.

23    Q.    (BY MS. DULANEY)  But would you agree you were
24 aware of the public testimony in opposition and your
25 fellow legislators' opposition to HB 3 based on racial

Andrew Murr
May 05, 2022                          110 to 113

Page 110

1 impact?

2            MR. SWEETEN:  Same objection; same
3 instruction:  Legislative privilege.

4       A.   Based on the advice of counsel, I decline to
5 answer the question.

6       Q.   (BY MS. DULANEY)  As a matter of public record,
7 were you aware of the opposition from your fellow
8 legislators to HB 3 based on racial impact?

9            MR. SWEETEN:  You can answer as to matters
10 of the public record.

11      A.   As to the matters of the public record
12 including the document entitled "Exhibit 8" that we're
13 reviewing, I believe certain members of the committee
14 raised their concerns on that topic.

15      Q.   (BY MS. DULANEY)  At this July 10 hearing, do
16 you recall being questioned regarding whether or not you
17 had conducted a racial impact analysis in relation to
18 the proposed provisions of HB 3 providing for criminal
19 penalties?

20           MR. SWEETEN:  Objection, compound.  But as
21 phrased, she's asking about the public record.  So you
22 can respond.

23      A.   Is that not the same topic that you've asked a
24 few questions on already?

25      Q.   (BY MS. DULANEY)  I'm asking specific for

Page 111

1 provisions providing for criminal penalties.

2       A.   Well, I mean, at this time I don't recall that
3 specificity.

4       Q.   Will you turn to Page 269?  And if you'll read
5 Lines 10 through 20 into the record -- Line 20 ending at
6 "consider."

7       A.   Lines 10 through 20 are an exchange between
8 Representative Neave and myself.  Representative Neave
9 states, "But specifically when it comes to this new
10 group of individuals that are going to be referred to
11 prosecution, have you done any racial impact study or
12 any research to determine the disproportionate impact of
13 this section, new Section 2.03 of your legislation?"

14           Representative Murr responds, "No, ma'am,
15 I have not."

16           Representative Neave states, "Okay.  Don't
17 you think that would be important to do?"

18           Representative Murr responds, "I think all
19 information is important to consider."

20      Q.   When you said, "all information," did that
21 include information on the impact the criminal penalty
22 provisions would have on minority voters?

23      A.   Generally speaking, in the exchange between the
24 members on their questions on this -- on this bill and
25 this subject matter, I look at the record.  And I point

Page 112

1 to the fact that all information should be considered
2 whenever we are drafting legislation for the State of
3 Texas.

4       Q.   So sitting here today, you still agree with
5 that statement that the information would be important
6 to consider?

7            MR. SWEETEN:  To the extent it goes to his
8 legislative privilege, his mental processes about the
9 specific bill and is not a matter of public record, I'd
10 instruct -- I'd instruct you that would involve
11 legislative privilege, but to the extent you can answer
12 without revealing your mental impressions about the
13 bill, you can do so.

14      A.   Regarding the statements that we are looking at
15 in the public record here, I don't disagree with them.

16      Q.   (BY MS. DULANEY)  Did you consider that
17 information in drafting or revising HB 3?

18           MR. SWEETEN:  Yeah.  On that, objection,
19 legislative privilege; instruct not to answer as
20 phrased.

21      A.   Based on the advice of counsel, I decline to
22 answer that question.

23      Q.   (BY MS. DULANEY)  You also attended House floor
24 debates where SB 1 was discussed, right?

25      A.   Yes.

Page 113

1       Q.   You can put this away.

2       A.   Do you want me to put away --

3            MR. SWEETEN:  The big one?

4       A.   -- Exhibit 9 as well?

5       Q.   (BY MS. DULANEY)  No.  Keep 9, but let's put
6 Exhibit 8 away, the big one.

7            (Deposition Exhibit No. 10 marked)

8       Q.   (BY MS. DULANEY)  So I'm going to hand you what
9 I've marked as Exhibit 10.  It's a certified copy of the
10 transcript from the August 23, 2021, hearing before the
11 House select committee on constitutional rights and
12 remedies.  Sorry.  I think I said House floor debates,
13 but this is still committee hearing.

14           MS. DULANEY:  Oh, I'm sorry.

15           MR. SWEETEN:  That's okay.

16           MR. DISORBO:  I think you said nine was
17 floor debate?  Let me back up.  I think you said nine
18 was floor debate and ten is committee hearing; is that
19 right, or are they all committee hearing?

20           MS. DULANEY:  Nine is the August 26 floor
21 debate.

22           MR. DISORBO:  Okay.

23           MS. DULANEY:  Ten is the August 23
24 committee hearing.

25           MR. DISORBO:  You were right.  I was just

Page 114

1 checking.

2          MS. DULANEY:  No.  I mean, I need to

3 double-check myself too.

4      Q.   (BY MS. DULANEY)  Do you recall attending this

5 hearing?

6      A.   Yes.

7      Q.   And during this hearing, do you recall the

8 committee questioning you regarding SB 1?

9      A.   Yes.

10     Q.   Do you recall Representative Johnson following

11 up with whether or not you had conducted a racial impact

12 analysis since the opposition you confronted at the

13 July 10 hearing?

14     A.   I would have to defer to the public record on

15 making that recollection.

16     Q.   Okay.  If you'll turn to Page 45, let me know

17 when you're there.

18     A.   Okay.

19     Q.   If you'll read from Line 24 on Page 45 through

20 Line 19 on Page 46 into the record.

21     A.   Lines 24 and 25 on Page 45?

22     Q.   Correct.

23     A.   It's an exchange between Representative Johnson

24 and myself.  Line 24, Representative Johnson asks, "What

25 have -- since our hearing on the 10th --" Representative

Page 115

1 Murr says, "Yes."  Representative Johnson states, "As

2 this example of the statistics I gave you, if you use

3 these innovative policies with relation to anything else

4 my colleagues may have asked you on the 10th, have

5 you-all since had a chance to look at the racial impact

6 of this legislation?"  And I'm sorry.  How far?

7      Q.   To 19.

8      A.   Representative Murr responds, "So by you-all

9 you mean me?"

10          Representative Johnson: "Yeah."

11 Representative Murr: "No, I have not re- -- researched

12 that further.  I know that this was a question you had

13 asked --"

14          Representative Johnson:  "Yeah."

15          Representative Murr:  "-- July 10th --"

16          Representative Johnson:  "Yeah."

17          Representative Murr:  "-- if I had

18 conducted any studies, reviewed any impacts.  No, I have

19 not."

20     Q.   You previously testified you were going to

21 consider input from your peers, yet you never conducted

22 any studies or reviewed or researched any impact

23 analysis.  Why not?

24          MR. SWEETEN: On that, the "why not" is

25 objectionable because of legislative privilege.  It

Page 116

1 would reveal your mental processes and fact-gathering

2 about legislation.  So as phrased, I'm going to instruct

3 you not to answer that.

4      A.   Based on the advice of counsel, I decline to

5 answer.

6      Q.   (BY MS. DULANEY)  If you'll turn to Page 51 and

7 read Lines 7 to 17 into the record.

8      A.   This is an exchange between Representative

9 Moody and myself.  Line 7, Representative Moody

10 states -- or asks, "Is there a reason why we haven't --

11 we haven't requested that information in the interim

12 (indiscernible) --"

13          Representative Murr: "I'm not aware of a

14 state agency to request that information from, but

15 I'm -- also certainly take guidance from other members

16 and --"

17          Representative Moody: "Okay."

18          Representative Murr: "-- colleagues as to

19 that information that may be available for

20 consideration."  Keep reading until?

21     Q.   Oh, no.  Sorry.  Is the same reasoning true

22 today that you weren't aware of a state agency to

23 request that information from?

24          MR. SWEETEN:  To the extent that impacts

25 your mental impressions and thought processes regarding

Page 117

1 the bill, I would object on the basis of legislative

2 privilege and instruct you if it does that to not answer

3 that question.  You can confine your remarks to matters

4 of the public record.

5      A.   Regarding the statements made here, I stand by

6 these statements.

7      Q.   (BY MS. DULANEY)  Was you not being aware of a

8 state agency to request that information from the only

9 reason that you didn't conduct a racial impact analysis?

10          MR. SWEETEN:  Objection, legislative

11 privilege, calls for his mental impressions regarding

12 pending legislation and instruct not to answer on that

13 basis.

14     A.   Based on the advice of counsel, I decline to

15 answer the question.

16     Q.   (BY MS. DULANEY)  Do you believe you could have

17 found out which state agency to request that information

18 from?

19          MR. SWEETEN:  I'm going to object on

20 legislative privilege grounds; instruct not to answer.

21     A.   Based on the advice of counsel, I decline to

22 answer that question.

23     Q.   (BY MS. DULANEY)  On bills you had authored in

24 past legislative sessions, were you able to find out

25 which state agency to request information from?

Page 118

1        MR. SWEETEN:  Objection, compound;
2 objection, vague; objection, foundation.  You can talk
3 as a general matter as long as it's not related to a
4 specific piece of legislation.
5        THE WITNESS:  I understand.
6    A.   Generally speaking, I think that question
7 certainly tries to compartmentalize prior legislation,
8 and not all legislation needs information requested from
9 a state agency to be drafted.
10    Q.   (BY MS. DULANEY)  On legislation that does need
11 information from state agencies, were you able to find
12 out which state agencies to request that information
13 from?
14        MR. SWEETEN:  Same objection, same
15 instruction.  You can answer.
16    A.   I just don't think I have comparable
17 legislation.
18    Q.   (BY MS. DULANEY)  There's been no legislation
19 that you've authored or assisted with in the past that
20 you've needed information from a state agency from?
21    A.   Information specifically dealing with the
22 voting activities and the application of that to people
23 of color?  No.
24    Q.   No, generally.
25    A.   I know, but I'm being very specific because

Page 119

1 that's a unique piece of information.
2    Q.   I'm not asking specifically, though.  On any
3 legislation that you've drafted or assisted with in the
4 past, have you been able to find out which state agency
5 to request information from where you've needed it?
6        MR. SWEETEN:  Objection, asked and
7 answered; objection, foundation; objection, compound;
8 objection, vague.  And then with that our general
9 instruction on legislative privilege --
10    A.   I'm not trying to be flippant.
11        MR. SWEETEN:  -- you can answer.
12    A.   But sometimes I needed information and there's
13 not a state agency that has that information.  And so
14 it's not easily categorized in the sense of, Oh, I'm
15 drafting legislation, and I need information on a
16 specific topic.  That doesn't necessarily mean that
17 there's a state agency that will provide me data on the
18 topic I'm dealing with.  It doesn't always happen.
19    Q.   (BY MS. DULANEY)  But you're able to find out
20 whether or not there is a state agency?
21        MR. SWEETEN:  Same objection for all the
22 reasons stated.  I won't restate them --
23    A.   Yeah.
24        MR. SWEETEN:  -- and then the general
25 instruction on legislative privilege.

Page 120

1    A.   Generally, yes.
2    Q.   (BY MS. DULANEY)  Okay.  So if we'll go back to
3 Exhibit 9 -- and we're finished with this one.  Again,
4 this is a certified transcript of the August 26th House
5 floor debate where SB 1 was discussed.  Do you recall
6 Representative Turner -- not sure which one --
7 questioning you regarding the instances of election
8 fraud in Texas?
9    A.   Not specifically, but I believe that we can
10 look at the record to learn more information.
11    Q.   If you'll turn to Page 30 and -- sorry.  Let me
12 know when you get there.
13    A.   I just need to undo the clip so I can actually
14 see 30.  Okay.
15    Q.   And if you'll read from Line 22 on Page 30
16 through Line 17 on Page 31; so 22 through 31, 17.
17    A.   Page 30 Line 22, it's Mr. Turner.  I believe it
18 would be Chris Turner.  "Chairman Murr, I have several
19 questions.  Your bill includes the word 'fraud' several
20 times including in the caption and in the -- and in the
21 bill's legislative findings section.  Could you detail
22 for the body how many instances of election fraud
23 occurred in the 2020 election in the State of Texas?"
24        Mr. Murr responds, "I don't have that
25 information in front of me, although I do know that

Page 121

1 there are resource witnesses with both the Texas
2 Secretary of State and the Office of the Attorney
3 General during the committee hearing that may have asked
4 those questions.  But the focus of this bill is
5 forward-looking, and if you'll notice when we talk about
6 fraud, at least in portions of it that you referenced,
7 it has to do with the likeliness or likelihood of
8 fraud."
9        Mr. Turner responds, "Okay.  But you're --
10 you're not able to identify how many instances of fraud
11 may have occurred in 2020?"
12        Mr. Murr responds, "No, sir.  And I don't
13 necessarily believe that fraud is a condition precedent
14 for implementing good policy."
15    Q.   Do you stand by this statement sitting here
16 today?
17    A.   Yes, I do.
18    Q.   Did you ever determine how many instances of
19 fraud may have occurred in the 2020 election?
20        MR. SWEETEN:  To the extent that that
21 would reveal your mental impressions, thought processes,
22 I would object on the basis of legislative privilege.
23 So --
24    A.   I will defer to the public record and the
25 witness testimony offered by the Office of the Attorney

Andrew Murr
May 05, 2022                                    122 to 125

Page 122

1 General and the Secretary of State's Office in both the
2 first and second called sessions hearings on HB 3, SB 1.
3      Q.   (BY MS. DULANEY)  So you don't dispute that the
4 AG's office found 16 total instances of fraud?
5           MR. SWEETEN:  Objection, assumes facts not
6 in evidence.  Misstates testimony in the record.  So
7 with that, you can answer.
8      A.   Assuming that's what the record states, I don't
9 necessarily dispute that.
10     Q.   (BY MS. DULANEY)  Of those 16 instances, do you
11 dispute that only four prosecutions resulted from the
12 subsequent investigations?
13          MR. SWEETEN:  So I'm going to object,
14 assumes facts not in evidence, misrepresents; so
15 form.  And then with respect to if it's a matter of
16 public record, you can refer to matters in the public
17 record, but don't reveal your mental impressions about
18 the bill based on legislative privilege.  Go ahead.
19     A.   I just don't know much about those matters --
20 those cases.  So I don't know.
21     Q.   (BY MS. DULANEY)  If I represent to you that
22 the AG's Office only had four prosecutions result from
23 the subsequent investigations, do you dispute that?
24          MR. SWEETEN:  Objection, asked and
25 answered; objection, assumes facts not in evidence.

Page 123

1 Objection, misstates facts.  And then to the extent it
2 calls for legislative privilege, I'd instruct on that,
3 but you can answer to the extent it would not reveal
4 legislative privilege, mental impressions regarding the
5 bill.
6      A.   I don't have any knowledge of the status or a
7 number of prosecutions occurring for election fraud, but
8 I don't dispute what you told me.
9      Q.   (BY MS. DULANEY)  Sitting here today, do you
10 still believe that SB 1 was necessary to prevent
11 election fraud?
12          MR. SWEETEN:  To the extent that that
13 would call on your mental impressions related to the
14 bill as I've explained today, then do not provide an
15 answer if it would reveal legislative privilege.
16 Otherwise, you may respond.
17     A.   I decline to answer the question based on the
18 advice of counsel.
19     Q.   (BY MS. DULANEY)  So I want to talk generally
20 now again just about your time in the legislator --
21 legislature.  Good Lord, if I can get those words right
22 today.
23          Okay.  In your seven years as a Texas
24 legislator, would you say it's typical for a bill to
25 pass out of committee when the public testimony is

Page 124

1 overwhelmingly in opposition?
2      A.   Generally speaking, I can't speak to every
3 bill, but generally what you're going to find is it's
4 not always a scenario of who showed up.  It's going to
5 be the votes that are in the committee in order to move
6 the legislation along.  So you could have no witnesses
7 show up that are for or against the bill, and that bill
8 will move.
9           And you could have witnesses that only
10 show up as proponents of a bill and it still not move
11 out of committee.  So I believe it's across the board
12 and has to do a lot with the legislative process and
13 input from other members as to whether or not a bill
14 proceeds forward out of committee in the House.
15     Q.   Have you -- have you been on a committee when
16 there was a bill that had a considerable amount of
17 public testimony?
18          MR. SWEETEN:  Objection, vague; objection,
19 incomplete hypothetical.  You may respond.
20     A.   Yes.
21     Q.   (BY MS. DULANEY)  And in those times, how many
22 times can you remember -- how many times can you
23 remember that happening in your career where there was a
24 bill presented to the committee and there was a very
25 large amount of public testimony?

Page 125

1      A.   Being that every session approximately 10,000
2 pieces of legislation are filed in a five-month period,
3 you're going to get a percentage of those that are high
4 demand, high capacity, lots of witnesses scenarios.  And
5 they're not necessarily going to be in each and every
6 committee, but many committees will have several of
7 those high-profile bills.
8           It occurs.  I'd say the percentage varies
9 greatly depending on the topics and issues of the day.
10 But it's been my experience that members will see that
11 occur.
12     Q.   And when that occurs, does the bill usually
13 pass out of committee if that testimony is
14 overwhelmingly in opposition?
15          MR. SWEETEN:  Same objection, vague,
16 incomplete hypothetical, form.  You can respond as a
17 general matter.
18     A.   I think generally speaking, one cannot reach a
19 consensus conclusion on the treatment of each bill.
20 It's going to be more individualized than that.
21     Q.   (BY MS. DULANEY)  In your experience then with
22 the bills that you've had in front of you in a
23 committee, is it typical for the bill to pass out of the
24 committee where there has been public testimony
25 overwhelmingly in opposition?

Page 126

1          MR. SWEETEN:  Objection, vague; objection,
2  compound; objection, foundation; objection, incomplete
3  hypothetical.  You can answer as a general matter if you
4  understand the question.
5      A.    When you have a bill that has a high volume of
6  interest and a lot of witness testimony, there's nothing
7  typical about it, and I don't think you can categorize a
8  scenario that it's typical a bill moves or doesn't move
9  based solely on witness testimony.  It doesn't work that
10 way.  It's not part of the legislative process.
11         There are more and complex factors to
12 consider including conversations between members and the
13 issue at hand, how long the issue has existed, et
14 cetera, et cetera.
15     Q.    (BY MS. DULANEY)  In your seven years as a
16 Texas legislator, would you say it's typical to have an
17 overnight debate on a bill?
18         MR. SWEETEN:  You can respond.
19     A.    There are a couple different ways to look at
20 that.  I think typically as a legislator, one must
21 anticipate that at least a few of the hearings that you
22 participate in will occur during the night or overnight.
23 Sometimes that's due to the fact that the House is in
24 session on the floor.  When the House is in session on
25 the floor per the House rules, no committees are

Page 127

1  permitted to meet without permission of the House.
2          That means that if you have a long floor
3  debate, then committee hearings will resume upon
4  conclusion of floor debate even if it is at ten o'clock
5  at night.  So I have experienced where hearings have
6  gone all night long and not on the bill that we're
7  talking about today.  It happens.
8      Q.    (BY MS. DULANEY)  How many times would you say
9  it's happened in your career?
10     A.    A handful of times.
11     Q.    Like five or less?
12     A.    Ten or less.  It also has to do with which
13 committees one serves on, which committees one has a
14 bill in front of.  And, for example, you may have a bill
15 that you have few people interested in testifying, but
16 you're behind and waiting for the conclusion of a large
17 bill that has a high volume of witnesses.  And so you
18 yourself will be sitting there for hours waiting your
19 turn.
20          So I've experienced all of those, and I'll
21 caveat that with the longest that I went without sleep
22 was 42 hours.
23     Q.    That's a lot of coffee.
24     A.    I don't drink coffee.
25     Q.    Oh, no.  In your seven years as a Texas

Page 128

1  legislator, would you say it's typical to pass an
2  omnibus bill in the middle of the night?
3          MR. SWEETEN:  So with respect to -- she's
4  just asking if it's typical over a seven-year period.  I
5  would object to vague and compound, but I think you can
6  answer without revealing --
7      A.    What does --
8          MR. SWEETEN:  -- without revealing
9  legislative privilege.
10     A.    What does ominous mean in your question?
11     Q.    (BY MS. DULANEY)  Omnibus?
12     A.    Omnibus, excuse me.
13     Q.    Did you think I said ominous?
14     A.    Yes.
15     Q.    Oh, no.  I said omnibus.
16     A.    Okay.  Omnibus.  And how do you characterize an
17 omnibus bill?
18     Q.    Like SB 7, HB 6, they were, I believe, both
19 omnibus bills.
20     A.    Okay.  I'm going to characterize an omnibus
21 bill as a bill that deals with multiple topics
22 throughout a specific section of statute.  And so given
23 that, I would say more likely than not, you will find
24 that omnibus bills garner a lot more attention, have a
25 higher volume of witness testimony and stakeholder

Page 129

1  input -- or at least offering of input than small
2  focused bills.
3          So that is -- that's a normal process.
4  You ask about when they pass.  That is up to each
5  committee and also under the circumstances in which one
6  occurs.  And I think you overlooked the fact that the
7  bill we're talking about being House Bill 3 or SB 1
8  occurred during a special session which is a
9  time-is-of-the-essence scenario.
10         MR. SWEETEN:  Okay.  Are we -- I think
11 we've been going about an hour.  Are you getting
12 close --
13         MS. DULANEY:  Yeah.  I'm like almost to
14 the next section, like five or ten more minutes.
15         MR. SWEETEN:  Yeah, yeah.  That's fine.
16 That's fine.
17     Q.    (BY MS. DULANEY)  Okay.  Regardless of whether
18 you're in a special session, how many times in your
19 career have you passed or have you -- how many times in
20 your career have you passed an omnibus bill in the
21 middle of the night?
22         MR. SWEETEN:  Objection to the question as
23 vague and compound, but you may answer.
24     A.    Well, I think that question is a little
25 misleading because I could vote as a member of the House

Andrew Murr
May 05, 2022                                                    130 to 133

Page 130

1 on the floor and pass legislation, or I could be the
2 author of legislation. And so I don't know if you
3 intend for me to answer that as the author of an omnibus
4 bill or simply as a member of the House voting on
5 legislation.
6   Q.   (BY MS. DULANEY)  Let's do member of the House.
7   A.   Okay.  It is not infrequent for the House to go
8 into the wee hours of the morning to debate and then
9 ultimately vote on legislation.  That is fairly
10 common --
11   Q.   So --
12   A.   -- especially given the time frame in which the
13 House meets.
14   Q.   So would that occur -- like, it's occurred
15 every session since you've been a legislator?
16   A.   Yes.
17   Q.   In your seven years as a Texas legislator, how
18 many times has a bill that passes the Senate have the
19 text replaced in its entirety once it got to the House?
20        MR. SWEETEN:  It's a matter of public
21 record.  To the extent you understand the question, you
22 can answer.  I'll object, compound and vague, but go
23 ahead.
24   A.   I don't know that I can speak to that as
25 someone who would know that, but that's not atypical.

Page 131

1 That would be common in some circumstances.  So it's not
2 unusual.
3   Q.   (BY MS. DULANEY)  What circumstances?
4   A.   I think there are a variety of different
5 circumstances where you have replacement of text.  It
6 could have to do with negotiated language between the
7 House member and the Senator that are dealing on the
8 legislation.  Perhaps one got through one body faster,
9 and they've managed to make changes.  There are a
10 variety of legislative factors on why that might occur.
11   Q.   In your time as a legislator, has a bill ever
12 been called for discussion when that bill was not on a
13 committee meeting's agenda?
14        MR. SWEETEN:  You can answer as a general
15 matter.
16   A.   I'm not sure that I understand your question
17 completely.  A bill called for discussion or called for
18 vote?
19   Q.   (BY MS. DULANEY)  Called for discussion.
20   A.   Generally speaking, I believe that -- let me
21 back up.  I'm a little confused by the term "discussion"
22 in answering your question.  So bills are either set for
23 hearing and that involves a presentation and layout by
24 the bill author and witness testimony and then a closing
25 by the bill author and/or bills are considered for a

Page 132

1 vote.
2        Discussion is not necessarily a topic that
3 I think a chairwoman or a chairman brings up on a bill.
4 It's either they're set for a hearing or they're set for
5 a vote.
6   Q.   How many times has a bill been called for a
7 vote when the bill is not on the committee meeting's
8 agenda?
9        MR. SWEETEN:  Objection, vague; objection,
10 compound.
11   A.   I direct you to review the House rules.  I
12 don't know that there's a requirement that to call a
13 bill for a vote, it has to be set on any agenda.
14   Q.   (BY MS. DULANEY)  Do you recall anytime where a
15 bill was called for a vote where it wasn't on the
16 committee meeting's agenda?
17   A.   Generally, there's not a formal agenda for
18 votes, only for hearings.
19   Q.   Okay.  So how many times has a bill been called
20 for a hearing when that bill was not on the committee
21 meeting's agenda?
22        MR. SWEETEN:  Objection, form, vague,
23 compound.  You may answer.
24   A.   I believe that a hearing notice is required in
25 order to comport with House rules.  So it has to be set

Page 133

1 for a hearing and noticed to the public for the hearing
2 purposes.
3   Q.   (BY MS. DULANEY)  So in your experience, you've
4 never had a bill -- you've never heard of a bill being
5 called for a hearing when it wasn't on the committee
6 meeting's agenda?
7   A.   Let me clarify because I think your question is
8 too broad.  Once a bill has been heard once, if the
9 Senate companion is over, it's not necessary for it to
10 be set and posted again.  So your question is too broad.
11   Q.   In your time as a legislator, how many times --
12 let me start over.  In your time as a legislator, how
13 many times has a bill been scheduled to be heard on the
14 House floor with over 100 proposed amendments offered to
15 its text?
16        MR. SWEETEN:  Objection, incomplete
17 hypothetical; objection, compound; objection, vague.
18 You can answer if you are able.
19   A.   I'm probably not the best person to answer your
20 question.  I think public record would show that that
21 happens with some frequency each legislative session.
22 Unless there is a specific calendar rule in place for
23 the prefiling of amendments, amendments can be filed up
24 until that bill is on the floor and while that bill is
25 on the floor.

Andrew Murr
May 05, 2022                                    134 to 137

Page 134

1     Q.   (BY MS. DULANEY)  Is it atypical for a bill to
2  be scheduled to be heard with over 100 proposed
3  amendments offered to its text?
4          MR. SWEETEN:  Same objection.  I'll also
5  add -- I think I said compound, vague, incomplete
6  hypothetical.  Yeah.  I'll leave it at that.  Go ahead.
7     A.   No, it is not atypical.  Rather it is a regular
8  occurrence each legislative session that you will see
9  several bills like that occur.
10         MS. DULANEY:  Okay.  You want to take a
11 break?
12         MR. SWEETEN:  Sure.
13         MS. DULANEY:  Is ten minutes good?
14         MR. SWEETEN:  That's fine.
15         VIDEOGRAPHER:  We are off the record.  The
16 time is 1:49 p.m.
17         (Brief recess:  1:49 p.m. to 2:07 p.m.)
18         VIDEOGRAPHER:  We are back on the record.
19 The time is 2:07 p.m.
20    Q.   (BY MS. DULANEY)  All right.  So I want to ask
21 a little bit about your familiarity with certain
22 constitutional provisions and other federal laws to the
23 extent that you understand them and your obligations to
24 abide by them as a Texas legislator.
25         Will you tell me what you understand to be

Page 135

1  a citizen's right to vote?
2          MR. SWEETEN:  Okay.  So when you're
3  answering these questions, to the extent it would
4  implicate any of your mental processes related to the
5  legislation, don't provide that answer, but if it would
6  do so -- if providing it would not implicate that, you
7  can answer her question as phrased.
8     A.   Can you repeat the question, please?
9     Q.   (BY MS. DULANEY)  Uh-huh.  Will you tell me
10 what you understand to be a citizen's right to vote?
11         MR. SWEETEN:  Same instruction but also
12 object as vague and calls for a legal conclusion.
13    A.   In laymen's terms I understand that to be that
14 a person who is qualified under the law has the right to
15 participate in the voting process to select their local,
16 state and federal officials.
17    Q.   (BY MS. DULANEY)  And based on your personal
18 knowledge, do you have a general understanding of what
19 the First Amendment of the US Constitution is?
20         MR. SWEETEN:  Let me assert my objection.
21 Objection, form, calls for a legal conclusion and vague
22 and then just general instruction on legislative
23 privilege.  You can respond.
24    A.   I would say in laymen's terms I have a basic
25 understanding of the First Amendment of the United

Page 136

1  States' Constitution.
2     Q.   (BY MS. DULANEY)  What is that understanding?
3          MR. SWEETEN:  Same objection and
4  instruction.
5     A.   And I don't have the First Amendment in front
6  of me, nor have I memorized it verbatim, but I assume it
7  includes the right to vote; is that correct?
8     Q.   (BY MS. DULANEY)  I think it's arguable.  I
9  don't want to answer for you.
10    A.   Well, I don't have the First Amendment in front
11 of me.  If I did, I would certainly give more detail to
12 your question.
13    Q.   Did you do anything to ensure the provisions of
14 SB 1 complied with the First Amendment?
15         MR. SWEETEN:  Objection, don't respond.
16 That calls for legislative privilege.  Instruct not to
17 answer.
18    A.   Based on the advice of my counsel, I decline to
19 answer that question.
20    Q.   (BY MS. DULANEY)  Did you do anything to
21 determine whether or not SB 1 violated the First
22 Amendment?
23         MR. SWEETEN:  Objection, calls for
24 legislatively privileged information as well as
25 attorney-client information.  And so I'm going to

Page 137

1  instruct you not to answer.
2     A.   Based on the advice of my client [sic], I
3  decline to answer the question.
4     Q.   (BY MS. DULANEY)  Did you do anything to try to
5  understand your obligations under the First Amendment
6  when you were drafting HB 3 and SB 1?
7          MR. SWEETEN:  Objection, calls for matters
8  that are legislatively privileged, also calls for
9  matters that would be subject to the attorney-client
10 privilege.  Therefore, I'm going to instruct him not to
11 answer.
12    A.   Based on the advice of counsel, I decline to
13 answer the question.
14    Q.   (BY MS. DULANEY)  Do you have a general
15 understanding of what the 14th Amendment of the US
16 Constitution is?
17    A.   In laymen's terms, I believe that I have a
18 general understanding of all of the amendments to the US
19 Constitution even though I don't have them in front of
20 me today.
21    Q.   Do you understand the 14th Amendment to require
22 equal protection for all citizens?
23    A.   I believe that is my understanding of the
24 terminology contained in the 14th Amendment.
25         MR. SWEETEN:  Let me just object, form,

Page 138

1 legal conclusion on that one. Go ahead.

2 Q. (BY MS. DULANEY) Where does your familiarity
3 with the 14th Amendment come from?

4          MR. SWEETEN: Objection, form, legal
5 conclusion. You can respond.

6 A. Fourteenth Amendment along with the Bill of
7 Rights and other constitutional provisions were raised
8 and were a topic of discussion in law school when I
9 attended law school.

10 Q. (BY MS. DULANEY) What do you understand equal
11 protection to mean as it relates to race?

12          MR. SWEETEN: Objection, form, calls for a
13 legal conclusion. It's also vague. Also I'll just
14 instruct to not reveal matters that are subject to the
15 attorney-client privilege or the legislative privilege.
16 With that instruction, you can respond if you can.

17 A. With that instruction, I don't think I can
18 respond. So I decline to answer the question based on
19 the advice of counsel.

20 Q. (BY MS. DULANEY) You don't have a general
21 understanding for what equal protection means as it
22 relates to race?

23          MR. SWEETEN: Same objection, same
24 instruction. If you can respond without revealing
25 privileged information, you may. If not, do not respond

Page 139

1 to the question.

2 A. On the advice of counsel, I decline to respond.

3 Q. (BY MS. DULANEY) I'm not talking in terms of
4 SB 1 or HB 3, any of the legislation that we discussed
5 today. I'm asking generally, do you understand equal
6 protection -- what do you understand equal protection to
7 mean as it relates to race?

8          MR. SWEETEN: I'm going to object to form,
9 legal conclusion, vague. Also, to the extent that it
10 would implicate attorney-client or legislative
11 privilege, you do not have to respond. If it will not,
12 you may respond.

13 A. I don't purport to have an expert understanding
14 of the equal protection clause contained in the
15 14th Amendment of the United States. It is a topic that
16 I see in the news from time to time and arises in legal
17 proceedings in cases that I've had the opportunity to
18 review from time to time. But it's not an area of the
19 law in which I work.

20 Q. (BY MS. DULANEY) Do you understand equal
21 protection to mean that states cannot make laws that
22 will deny equal protection of citizens on account of
23 race?

24          MR. SWEETEN: Objection, form, calls for a
25 legal conclusion and vague.

Page 140

1 A. I don't necessarily know, have enough
2 information in order to dispute the conclusion you
3 reached in your question.

4 Q. (BY MS. DULANEY) Do you agree that States
5 can't make laws that will deny equal protection of
6 citizens on account of race?

7          MR. SWEETEN: Objection, form; calls for a
8 legal conclusion and vague. Also, just same instruction
9 on attorney-client privilege and legislative privilege.
10 I won't repeat all of that. But if it would reveal
11 privilege, then you can --

12 A. I'm just saying, I don't have a background in
13 the legal world in that area. So I'd defer to you in
14 asking your question to a great deal to say that I guess
15 I arrive at the conclusion that you ask in your
16 question. I don't have any reason to otherwise.

17 Q. (BY MS. DULANEY) As your role as a Texas
18 legislator, you don't understand equal protection to
19 mean that States can make law --

20          THE REPORTER: Wait a second. Repeat that
21 again. I missed that.

22          MS. DULANEY: Sorry. I was going fast.

23 Q. (BY MS. DULANEY) So in your role as a Texas
24 legislator, you don't have an understanding of equal
25 protection to mean that States cannot make laws that

Page 141

1 will deny equal protection to citizens on the account of
2 race?

3          MR. SWEETEN: Objection to form on legal
4 conclusion, vague. Also, instruct on attorney-client
5 and legislative privilege that if it would reveal either
6 of those, then do not provide a response that would
7 reveal privileged information. You may respond subject
8 to that instruction.

9 A. In a general response, I understand that as a
10 legislator, I'm obligated and duty bound to follow both
11 the rules of the state and federal Constitution and the
12 laws of our states. That being said, the courts often
13 have interpreted what you speak of, and I don't
14 necessarily disagree that equal protection includes
15 protection on account of a variety of factors including
16 race.

17 Q. (BY MS. DULANEY) Did you do anything to ensure
18 the provisions of SB 1 complied with the 14th Amendment?

19          MR. SWEETEN: Objection. That calls for
20 matters that are subject to the legislative privilege.
21 Do not respond. I'm instructing not to answer. Go
22 ahead.

23 A. Based on the advice of counsel, I decline to
24 answer the question.

25 Q. (BY MS. DULANEY) In what way did you determine

Andrew Murr
May 05, 2022                                                                142 to 145

Page 142

1 that SB 1 did not violate the 14th Amendment?
2            MR. SWEETEN: Same objection, legislative
3 privilege. And instruct not to answer on that basis.
4        A.    I decline to answer the question based on the
5 advice of counsel.
6        Q.    (BY MS. DULANEY) Did you do anything to try to
7 understand your obligations under the 14th Amendment
8 when you were drafting HB 3 and SB 1?
9            MR. SWEETEN: Object based on legislative
10 privilege. Calls for his mental impression,
11 fact-gathering process regarding legislation.
12 Therefore, instruct not to answer on that basis and on
13 the basis -- and to the extent it would reveal
14 attorney-client information.
15        A.    Based on the advice of counsel, I decline to
16 answer the question.
17        Q.    (BY MS. DULANEY) I'm not asking about your
18 fact-gathering or your mental impressions. I'm asking a
19 yes or no. Did you do anything to try to understand
20 your obligations under the 14th Amendment when you were
21 drafting SB 1 or HB 3?
22            MR. SWEETEN: Same objection. I think it
23 calls for your mental impressions. I mean, it calls for
24 his mental impressions and his fact-gathering process
25 regarding pending legislation -- in other words -- his

Page 143

1 processes. So I think the question is still infirm on
2 that basis, and I'm going to instruct him not to answer.
3        A.    Based on the advice of counsel, I decline to
4 answer the question.
5        Q.    (BY MS. DULANEY) Do you have a general
6 understanding of what the 15th Amendment of the US
7 Constitution is?
8            MR. SWEETEN: Objection, form, legal
9 conclusion and vague. Otherwise, you may answer.
10        A.    Would you remind me of the details of the
11 15th Amendment, please?
12        Q.    (BY MS. DULANEY) The 15th Amendment of the
13 Constitution prohibits States from passing laws that
14 deny or abridge the right to vote on account of race.
15 Is that your understanding of the 15th Amendment?
16        A.    That's my understanding --
17            MR. SWEETEN: Object to form.
18        A.    -- of the 15th Amendment.
19        Q.    (BY MS. DULANEY) So you're familiar with this
20 amendment?
21        A.    Yes.
22        Q.    What did you do to ensure the provisions of
23 SB 1 complied with the 15th Amendment?
24            MR. SWEETEN: Objection, legislative
25 privilege; objection, attorney-client privilege. And

Page 144

1 instruct not to answer on that basis.
2        A.    Based on the advice of counsel, I decline to
3 answer the question.
4        Q.    (BY MS. DULANEY) Did you do anything to
5 determine SB 1 did not violate the 15th Amendment?
6            MR. SWEETEN: Same objection. First, it
7 calls for a legal conclusion, but you're also asking him
8 his mental impressions and processes related to
9 legislation, also, to the extent it would include
10 attorney-client privilege. So I'm instructing you not
11 to answer on the basis of legislative privilege and to
12 the extent it would reveal attorney-client privilege.
13        A.    Then to that end, based on the advice of
14 counsel, I decline to answer.
15        Q.    (BY MS. DULANEY) Do you have a general
16 understanding of Section 2 of the Voting Rights Act?
17            MR. SWEETEN: Objection, form, calls for a
18 legal conclusion, vague.
19        A.    Can you provide a little more insight into
20 that?
21        Q.    (BY MS. DULANEY) Section 2 of the Voting
22 Rights Act prohibits States from enacting voting
23 qualifications and prerequisites that would deny US
24 citizens the right to vote and discriminate based on
25 race for voting. Is that your understanding of Section

Page 145

1 2 of the Voting Rights Act?
2            MR. SWEETEN: Same objection. Also, to
3 the extent it would call for your mental impressions
4 regarding the legislation, don't reveal those. But if
5 it would not, you may answer that question.
6        A.    Based on your additional information, that is
7 my understanding.
8        Q.    (BY MS. DULANEY) So you're familiar with this
9 statute?
10            MR. SWEETEN: Same objection, form, legal
11 conclusion, vague. Same instruction on the legislative
12 privilege. You may respond if it would not reveal it.
13        A.    I am familiar with the statute.
14        Q.    (BY MS. DULANEY) And where does that
15 familiarity come from?
16        A.    That comes from working on HB 3 and SB 1.
17        Q.    Did you do anything to ensure the provisions of
18 SB 1 complied with this statute?
19            MR. SWEETEN: Objection, calls for
20 legislative privilege and attorney-client privilege.
21 Therefore, I instruct not to answer on the basis of
22 legislative privilege and to the extent there's overlap
23 with the A/C privilege.
24        A.    Based on the advice of counsel, I decline to
25 answer the question.

Andrew Murr
May 05, 2022                                          146 to 149

Page 146

1    Q.   (BY MS. DULANEY)  How did you determine whether
2 or not SB 1 would violate this statute?
3         MR. SWEETEN:  Same objection, same
4 instruction.  Calls -- it calls for legislatively
5 privileged information, potentially attorney-client.
6 I'm going to instruct not to answer on the basis of
7 legislative privilege and to the extent there's overlap
8 with the A/C privilege.
9    A.   Based on the advice of counsel, I decline to
10 answer the question.
11    Q.   (BY MS. DULANEY)  Did you do anything to try to
12 understand your obligations under this federal statute
13 when you were drafting HB 3 and SB 1?
14         MR. SWEETEN:  Same instruction,
15 Representative.
16    A.   Based on the advice of counsel, I decline to
17 answer the question.
18    Q.   (BY MS. DULANEY)  Do you have a general
19 understanding of Section 208 of the Voting Rights Act?
20         MR. SWEETEN:  Objection, calls for a legal
21 conclusion and vague.  You may respond to the extent it
22 doesn't reveal legislative privilege.
23    A.   Would you be so kind to provide additional
24 clarification regarding Section 2.08.
25    Q.   (BY MS. DULANEY)  Section 208 of the Voting

Page 147

1 Rights Act -- it operates to provide disabled and
2 non-English-speaking voters with the right to their
3 assister of choice.  Is that your understanding?
4         MR. SWEETEN:  Objection, calls for a legal
5 conclusion and vague.  Objection, misstates and assumes
6 facts not in evidence.  And also objection to the extent
7 it would call for legislative privilege, but you may
8 respond to the extent it would not.
9    A.   Based on the additional information you
10 provided me, that is my understanding.
11    Q.   (BY MS. DULANEY)  Where does your familiarity
12 with the statute come from?
13    A.   From working on HB 3 and SB 1.
14    Q.   And what did you do to ensure the provisions of
15 SB 1 complied with this statute?
16         MR. SWEETEN:  Objection, calls for matters
17 that are subject to the legislative privilege.  Instruct
18 not to answer on that basis.  Also, it may call for
19 attorney-client privileged information.  So to the
20 extent it does, do not provide that answer.
21    A.   Based on the advice of counsel, I decline to
22 answer the question.
23    Q.   (BY MS. DULANEY)  Did you do anything to
24 determine whether SB 1 would violate this statute?
25         MR. SWEETEN:  Same objection; same

Page 148

1 instruction.
2    A.   Based on the advice of counsel, I decline to
3 answer the question.
4    Q.   (BY MS. DULANEY)  Do you have a general
5 understanding of what Title 2 of the ADA provides, the
6 Americans with Disabilities Act?
7         MR. SWEETEN:  Objection, form, calls for a
8 legal conclusion and is vague.
9    A.   I'm broadly familiar with the Americans with
10 Disability Act, but I would need more specificity in
11 order to understand that provision.
12    Q.   (BY MS. DULANEY)  Do you understand Title 2 of
13 the Americans with Disabilities Act to require
14 reasonable accommodations for disabled persons and
15 prohibit discrimination based on disability status?
16         MR. SWEETEN:  Objection, form, calls for a
17 legal conclusion.
18    A.   Yes.  I understand that to be the case.
19    Q.   (BY MS. DULANEY)  And where does your
20 familiarity with this statute come from?
21    A.   Broadly, my familiarity with the ADA statute
22 originates in my service as county judge, but more
23 specifically, focused on the provision that you ask
24 about while working on HB 3 and SB 1.
25    Q.   Did you consider Title 2 of the ADA when you

Page 149

1 were drafting SB 1?
2         MR. SWEETEN:  Objection, calls for matters
3 of legislative privilege, specifically his mental
4 impressions, thought process, fact-gathering related to
5 the bill.  And, therefore, I'm going to instruct you not
6 to answer on that basis.
7    A.   Based on the advice of counsel, I decline to
8 answer the question.
9    Q.   (BY MS. DULANEY)  Did you do anything to ensure
10 the provisions of SB 1 complied with Title 2 of the ADA?
11         MR. SWEETEN:  Same objection, same
12 instruction as to that question, Representative.
13    A.   Based on the advice of counsel, I decline to
14 answer the question.
15    Q.   (BY MS. DULANEY)  Have you heard of Section 504
16 of the Rehabilitation Act of 1973?
17         MR. SWEETEN:  Objection, form, calls for a
18 legal conclusion, vague.  You may answer.
19    A.   I don't know that I'm specifically familiar
20 with that section.
21    Q.   (BY MS. DULANEY)  Do you have any familiarity
22 with this statute?
23    A.   I do not have a lot of familiarity with that
24 statute.
25    Q.   Did you take Section 504 of the Rehabilitation

Andrew Murr
May 05, 2022                                    150 to 153

Page 150

1 Act into consideration when you were drafting HB 3 or
2 SB 1?
3                    MR. SWEETEN:  Objection, calls for matters
4 of legislative privilege, specifically his mental
5 impressions, thoughts about pending legislation, his
6 fact-gathering process.  Therefore, on that basis, I
7 instruct you not to answer.
8      A.   Based on the advice of counsel, I decline to
9 answer the question.
10     Q.   (BY MS. DULANEY)  I want to talk a little bit
11 about the period of time following the implementation of
12 SB 1 up through the present day.  Other than the surge
13 in rejected mail-in ballots that we talked about
14 previously, have any other issues arising from the
15 implementation of SB 1 been relayed to you or your
16 office?
17     A.   Just to clarify, you're talking about other
18 than the topic of mail-in ballots?  I have had
19 conversations with at least one elections administrator
20 just regarding the process and clarification of some
21 implementation of the processes, which we in turn
22 directed him to the Secretary of State's office.
23     Q.   Who was that elections administrator?
24     A.   It was Bob Reeves who is the tax assessor
25 collector for Kerr County.

Page 151

1      Q.   What issue did Bob Reeves complain of?
2      A.   He didn't complain.  He sought clarification in
3 the cure methodologies for mail-in ballots:  If staff or
4 his office were allowed to physically go to the voter's
5 residence or place of residence to deliver the ballot so
6 that they could make the corrections in order to cure
7 the ballot.
8      Q.   Other than Mr. Reeves, did any other election
9 administrators relay problems to you stemming from the
10 implementation of SB 1?
11     A.   If they have, I don't recollect it at this
12 time.
13     Q.   What about have any third-party organizations
14 relayed problems to you stemming from the implementation
15 of SB 1?
16     A.   Nothing comes to mind at the moment, but I
17 can't rule that out because many of us were distracted
18 with our own election processes as candidates ourselves.
19     Q.   Has anyone relayed problems to you stemming
20 from the implementation of SB 1 regarding voting access
21 for persons with disabilities?
22     A.   At this moment, I don't have a recollection of
23 that, but I can't rule that out.
24     Q.   Has anyone relayed problems to you stemming
25 from SB 1 -- stemming from the implementation of SB 1

Page 152

1 regarding voting access for minorities?
2      A.   I don't have a recollection of that.
3      Q.   Do you think that Ronald Reagan was a great
4 president?
5                    MR. SWEETEN:  Objection, relevance.  But
6 go ahead.
7      A.   I don't have any reason to dispute that
8 statement, but I was a minor when he was president.
9      Q.   (BY MS. DULANEY)  I'll represent to you that
10 President Reagan made the following quote.  "For this
11 nation to remain true to its principles, we cannot allow
12 any American's vote to be denied, deleted or defiled.
13 The right to vote is the crown jewel of American
14 liberties, and we will not see its luster diminished."
15 You don't disagree with this quote by President Reagan,
16 do you?
17     A.   I don't have any reason to disagree with
18 President Reagan's quote.
19     Q.   And you would never want to deny, delete or
20 defile any American's right to vote, right?
21     A.   In fact, with SB 1, the whole goal was to make
22 it easier to vote.
23                    MR. SWEETEN:  So just answer her question.
24                    THE WITNESS:  Oh, sorry.
25     A.   Would you restate the question, please?

Page 153

1      Q.   (BY MS. DULANEY)  You would never want to deny,
2 delete or defile any American's right to vote, correct?
3      A.   No.
4      Q.   Do you want to make it you --
5                    MR. DISORBO:  I'm sorry.  You said,
6 "right," and he said, "no."  But I think he -- can you
7 ask it again?  Do you understand my concern?
8                    MS. DULANEY:  I think that's clear, isn't
9 it?
10                    MR. SWEETEN:  Let's read the last Q and A
11 back.
12                    MR. DISORBO:  I think you asked the
13 question -- you said, "You wouldn't want to do this?"
14 You said, "Correct?"  And he said, "No."  And I wanted
15 to make sure that he wasn't disagreeing with the
16 question --
17                    MS. DULANEY:  As in he would never want
18 to?
19                    MR. DISORBO:  Right.
20                    MS. DULANEY:  Okay.  I see what you mean.
21                    MR. DISORBO:  I'm sorry.
22                    MS. DULANEY:  No.
23                    MR. DISORBO:  I just wanted to make sure
24 that it was clear.
25     Q.   (BY MS. DULANEY)  You would never want to deny,

Andrew Murr
May 05, 2022                                      154 to 157

Page 154

1 delete or defile any American's right to vote, correct?

2    A.    I would never want to deny, delete or defile

3 any American's right to vote.

4    Q.    Do you want to make it easier or harder for

5 Texans to vote?

6    A.    Easier.

7    Q.    Do you want to make it easier or harder for

8 disabled persons to vote?

9    A.    Easier.

10    Q.    Veterans?

11    A.    Easier.

12    Q.    Black people?

13    A.    Easier.

14    Q.    Elderly people?

15    A.    Easier.

16    Q.    Mail-in voters?

17    A.    Easier.

18    Q.    Latino people?

19    A.    Easier.

20    Q.    Shift workers?

21    A.    All Texans, I want to have the right to vote as

22 easy as possible under the law.

23    Q.    Shift workers?

24    A.    Yes, easier.

25    Q.    Caretakers?

Page 155

1    A.    Easier.

2    Q.    And Sunday morning church-goers?

3    A.    Easier.

4    Q.    And sitting here today, you don't believe that

5 SB 1 will make it harder for Texan voters to vote, do

6 you?

7         MR. SWEETEN:  So to the degree that she'd

8 be asking questions about your mental processes about

9 the bill, you know, you would not want to provide those.

10 But if it does not, you may answer the question.

11    A.    As I stated both in my layout in hearing and

12 before the full House, no.  I want to make it easier for

13 Texans to vote.  And I think SB 1 is good policy.

14         MS. DULANEY:  I'm going to pass the

15 witness.

16         MR. SWEETEN:  No questions.

17         MS. DULANEY:  And no one on Zoom?  They

18 said they're not.

19         MR. SWEETEN:  They said they're not.

20         MR. DISORBO:  Let's double-check.

21         MS. DULANEY:  Do we want to double-check?

22         MR. DISORBO:  Yeah.  For anybody on Zoom,

23 I think previously, y'all -- this is Jack Disorbo, by

24 the way.  I think y'all had previously said no

25 questions.  That's still the case, right?

Page 156

1         UNIDENTIFIED SPEAKER:  That's still

2 correct.

3         MR. SWEETEN:  Okay.  We'll read and sign

4 the deposition.

5         VIDEOGRAPHER:  This concludes today's

6 deposition.  We are off the record.  The time is

7 2:32 p.m.  Number of media used is two.

8         (Deposition concluded at 2:32 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 157

1         CHANGES AND SIGNATURE

2 WITNESS NAME:  REPRESENTATIVE ANDREW MURR

3 DATE OF DEPOSITION:  Thursday, May 5, 2022

4 PAGE  LINE  CHANGE OR CORRECTION        REASON

5 _____ _____ _____ - _____

6 _____ _____ _____ - _____

7 _____ _____ _____ - _____

8 _____ _____ _____ - _____

9 _____ _____ _____ - _____

10 _____ _____ _____ - _____

11 _____ _____ _____ - _____

12 _____ _____ _____ - _____

13 _____ _____ _____ - _____

14 _____ _____ _____ - _____

15 _____ _____ _____ - _____

16 _____ _____ _____ - _____

17 _____ _____ _____ - _____

18 _____ _____ _____ - _____

19 _____ _____ _____ - _____

20 _____ _____ _____ - _____

21 _____ _____ _____ - _____

22 _____ _____ _____ - _____

23         I, REPRESENTATIVE ANDREW MURR, have read the

24 foregoing deposition and hereby affix my signature that

25 same is true and correct, except as noted above.

## Page 158

```
 1
 2                    _____
                     REPRESENTATIVE ANDREW MURR
 3
 4   THE STATE OF _____ )
 5   COUNTY OF _____ )
 6
 7        Before me, _____, on this day
 8   personally appeared REPRESENTATIVE ANDREW MURR, known
 9   to me (or proved to me under oath or through _____)
10   (description of identity card or other document) to
11   be the person whose name is subscribed to the
12   foregoing instrument and acknowledged to me that
13   they executed the same for the purposes and
14   consideration therein expressed.
15        GIVEN UNDER MY HAND and seal of office this
16   _____ day of _____, 2022.
17
18
19                    _____
                     Notary Public in and
20                   for the State of _____
21
22
23
24
25
```

## Page 159

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION
 3
     LA UNION DEL PUEBLO ENTERO, )
 4   et al.,                     )
          Plaintiffs,            )
 5                               )   Civil Action No.
     vs.                         )   5:21-cv-844(XR)
 6                               )   (Consolidated Case)
                                 )
 7   GREG ABBOTT, et al.,        )
          Defendants.            )
 8                               )
     MI FAMILIA VOTA, et al.,    )
 9        Plaintiffs,            )
                                 )
10   vs.                         )
                                 )
11   GREG ABBOTT, et al.,        )
          Defendants.            )
12                               )
     HOUSTON AREA URBAN LEAGUE,  )
13   et al.,                     )
          Plaintiffs,            )
14                               )   CIVIL ACTION NO.
     vs.                         )   5:21-cv-0848-XR
15                               )
     GREG ABBOTT, et al.,        )
16        Defendants.            )
                                 )
17
18
             REPORTER'S CERTIFICATE
19   ORAL/VIDEOTAPED DEPOSITION OF REPRESENTATIVE ANDREW MURR
                THURSDAY, MAY 5, 2022
20   _____
21        I, Nancy A. Lozano, Certified Shorthand
22   Reporter for the State of Texas, do hereby certify to
23   the following:
24        That the witness, REPRESENTATIVE ANDREW MURR,
25   was duly sworn by the officer and that the transcript of
```

## Page 160

```
 1   the oral deposition is a true record of the testimony
 2   given by the witness;
 3        That the original deposition transcript was
 4   delivered to KEELY DULANEY;
 5        That a copy of this certificate was served on all
 6   parties and/or the witness shown herein on
 7   _____.
 8        That the amount of time used by each party at
 9   the deposition is as follows:
10   Ms. Keely Dulaney  - 3 Hours, 38 Minutes
11        I further certify that pursuant to FRCP (30)(f)(1)
12   the signature of the deponent:
13        was requested by the deponent or a party before
14   the completion of the deposition and that the signature
15   is to be before any notary public and returned within 30
16   days from date of receipt of the transcript.  If
17   returned, the attached changes and signature page
18   contains any changes and the reasons therefore:
19        That $_____  is the deposition officer's
20   charges to the Plaintiff Houston Urban League for
21   preparing the original deposition transcript and any
22   copies of exhibits;
23
24
25
```

## Page 161

```
 1        I further certify that I am neither counsel for,
 2   related to, nor employed by any of the parties or
 3   attorneys in this action in which this proceeding was
 4   taken, and further that I am not financially or
 5   otherwise interested in the outcome of the action.
 6        CERTIFIED to by me this the 17th day
 7   of May, 2022.
 8
 9
10                    _____
                      Nancy A. Lozano
11                    Nancy A. Lozano, CSR 4051
                      Expiration Date: 4/30/24
12                    US Legal Support Firm # 10558
                      701 Brazos Street
13                    Suite 380
                      Austin, Texas  78701
14                    P(512) 292-4249 F (512) 292-3866
15
16
17
18
19
20
21
22
23
24
25
```