# Exhibit G

Transcript of the Testimony of

**Rafael Anchia**

**Date:**

August 22, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
1              IN THE UNITED STATES DISTRICT COURT
                            FOR THE
2                  WESTERN DISTRICT OF TEXAS

3   LA UNION DEL PUEBLO          )
    ENTERO, et al,               )
4                                )
         Plaintiff,              )
5                                )      Civil Action No.
    v.                           )      5:21-cv-00844-XR
6                                )
    GREGORY W. ABBOTT, et al,    )
7                                )
         Defendant.              )
8

9

10       -----------------------------------------------

              ORAL AND VIDEOTAPED DEPOSITION OF
11
              REPRESENTATIVE RAFAEL ANCHIA
12
                     AUGUST 22, 2022
13       -----------------------------------------------

14

15         ORAL DEPOSITION OF REPRESENTATIVE RAFAEL ANCHIA,

16   produced as a witness at the instance of the state

17   defendants and duly sworn, was taken in the above-styled

18   and numbered cause on August 22, 2022, from 9:20 a.m. to

19   12:02 p.m. before Brent Sturgess, CSR in and for the

20   State of Texas, reported by machine shorthand at the

21   offices of Civitas Capital Group, 1722 Routh Street,

22   Suite 800, Dallas, Texas, 75201, pursuant to Notice, the

23   Federal Rules of Civil Procedure and the provisions

24   stated on the record or attached hereto.

25
```

```
 1                    I N D E X

 2                                                       PAGE

 3   Appearances........................................ 4-5

 4   REPRESENTATIVE RAFAEL ANCHIA
          Examination by Mr. Thompson....................  7
 5
     Signature and Changes............................. 102
 6
     Reporter's Certificate............................ 104
 7

 8

 9
                        EXHIBITS
10
     NUMBER      DESCRIPTION                             PAGE
11
     1      Legislative Session:  87(2).............  18
12
     2      Amend CSSB 1............................  19
13
     3      Amend CSSB 1............................  20
14
     4      A Bill To Be Entitled, An Act..........  21
15
     5      Subchapter A. Appointment..............  25
16
     6      An Act.................................  27
17
     7      2020 Series:  Voter Protection.........  29
18
     8      Letter from Ruth R. Hughs to
19          David Maxwell, 09-02-20................  36

20   9      Investigations:  State requests criminal
            investigation into alleged election
21          violations inside Travis County
            Office.................................  38
22
     10     Legislative Session:  79(R)............  51
23
     11     Voter Information......................  52
24
     12     House Journal, Eighty-Second
25          Legislature, Regular Session...........  65
```

1   13          House Journal, Eighth Legislature,
                Regular Session...........................   71
2
    14          House Journal, Eighty-Seventh
3               Legislature, Second Called Session.......   73

4   15          Texas needs tougher laws to reel in
                mail-in vote fraud.......................   82
5
    16          Dallas Observer - City, County
6               Investigate Possible Voter Fraud In
                Upcoming Council Election................   87
7
    17          Application for a Ballot by Mail.........   94
8
    18          Title 52 - Voting and Elections..........   98
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 A P P E A R A N C E S

 2

 3   Will Thompson, Esq.
     DEPUTY CHIEF FOR SPECIAL LITIGATION
 4   P.O. Box 12548
     Austin, Texas  78711
 5   512.936.2567
     will.thompson@oag.texas.gov
 6

 7   George (Tex) Quesada, Esq.
     SOMMERMAN, MCCAFFITY, QUESADA & GEISLER
 8   3811 Turtle Creek Blvd., Suite 1400
     Dallas, Texas  75219
 9   214.720.0720
     quesada@textrial.com
10

11   Mark L. Bieter (via Zoom)
     STOEL RIVES, LLP
12   101 S. Capitol Blvd., Suite 1900
     Boise, Idaho  83702
13   208.387.4217
     mark.bieter@stoel.com
14

15   Stephen J. Kenny (via Zoom)
     JONES DAY
16   51 Louisiana Avenue NW
     Washington, D.C.  20001
17   202.879.3667
     skenny@jonesday.com
18

19   Breanna Williams (via Zoom)
     FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
20   One New York Plaza
     New York, New York  10004
21   212.859.8722
     breanna.williams@friedfrank.com
22

23

24

25
```

```
 1

 2

 3    Witness:   Representative Rafael Anchia

 4    Via Zoom:   Kenneth Broughton
                  Barbara Nicholas
 5                Dana Paikowsky
                  Leigh Tognetti
 6                Lisa Cubriel

 7    Videographer:   Tony McGough

 8    Court Reporter:   Brent Sturgess, CSR

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                THE VIDEOGRAPHER:  We're now on the
 2     record.  This begins Video Number 1 in the deposition
 3     of Representative Rafael Anchia in the matter of La
 4     Union Del Pueblo Entero, et al versus Gregory W.
 5     Abbott, et al in the United States District Court for
 6     the Western District of Texas, Civil Action Number
 7     5:21-CV-00844-XR.
 8                     Today is Monday, August 22nd, 2022, and
 9     the time is 9:20 a.m.  This deposition is being taken
10     at Civitas Capital Group at the request of Office of
11     the Attorney General of Texas.  The videographer is
12     Tony McGough of Magna Legal Services and the court
13     reporter is Brent Sturgess of Magna Legal Services.
14                     Will counsel and all parties present
15     please state their appearances and whom they
16     represent?  After which the court reporter will please
17     swear in the witness.
18                     MR. THOMPSON:  Will Thompson from the
19     Office of the Attorney General representing the state
20     defendants.
21                     MR. QUESADA:  I'm Tex Quesada here on
22     behalf of Chairman Anchia.
23                     MR. BROUGHTON:  Kenneth Broughton from
24     Reed Smith on behalf of the Hall plaintiffs.
25                     MR. KENNY:  Stephen Kenny of Jones Day
```

```
 1    on behalf of the intervenor defendants.
 2                    MR. BIETER:  Mark Bieter with Stoel
 3    Rives on behalf of the Mi Familia Vota plaintiffs.
 4                    MS. CUBRIEL:  Lisa Cubriel on behalf of
 5    the Bexar County defendants.
 6                    MS. NICHOLAS:  Barbara Nicholas on
 7    behalf of the Dallas County defendants.
 8                    MS. PAIKOWSKY:  Dana Paikowsky on
 9    behalf of the United States.
10                    MS. WILLIAMS:  Breanna Williams from
11    Fried, Frank, Harris, Shriver & Jacobson on behalf of
12    the LUPE plaintiffs.
13                    MS. TOGNETTI:  Leigh Ann Tognetti on
14    behalf of the Hidalgo County Elections Administrator,
15    Yvonne Ramon.
16                    THE REPORTER:  Mr. Anchia, would you
17    please raise your right hand and be sworn?
18                    THE WITNESS:  (Witness complies.)
19                    THE REPORTER:  Do you solemnly swear or
20    affirm that the testimony you will give in this matter
21    will be the truth, the whole truth and nothing but the
22    truth so help you God?
23                    THE WITNESS:  I do.
24                    THE REPORTER:  Thank you.
25                        EXAMINATION
```

1          Q.    (By Mr. Thompson)  Chairman Anchia, as you
2     heard earlier, my name's Will Thompson.  I'm from the
3     Office of the Attorney General, and I represent the
4     state defendants here.

5          A.    Good morning.

6          Q.    You're a lawyer; right?

7          A.    I am.

8          Q.    You have a JD from Tulane Law School?

9          A.    Correct.

10         Q.    Have you been deposed before?

11         A.    Yes.

12         Q.    Before we continue, do you like to be called

13    "Chairman" or "Representative" or something else?

14         A.    "Rafael" is fine or -- or -- or

15    "Representative" is fine.  Thank you.  Whatever is

16    easier for you, candidly.

17         Q.    There's just a couple of reminders that you

18    probably know.  The court reporter's transcribing what

19    we say, and so it's important to give verbal answers

20    as opposed to a nodding or shaking your head.

21               Does that make sense?

22         A.    Yes.

23         Q.    And this isn't a marathon.  You're welcome

24    to take a break whenever you want.  The only thing I'd

25    ask is that you answer any pending question before we

 1    take a break.

 2                    Does that sound fair?

 3         A.    Yes.

 4         Q.    And if you don't understand any of my

 5    questions, will you please ask me to clarify?

 6         A.    I will.

 7         Q.    If you -- if you answer a question without

 8    asking for clarification, I'm going to assume you

 9    understood it.

10                    Is that okay?

11                    MR. QUESADA:  I'm going to object to

12    the form of the question.

13         A.    Yes.

14         Q.    (By Mr. Thompson)  You are the state

15    representative for House District 103; correct?

16         A.    Yes.

17         Q.    That's in Dallas County?

18         A.    Yes.

19         Q.    You're also of counsel at Haynes and Boone;

20    right?

21         A.    Yes.

22         Q.    And you have another business that we're in

23    right now; is that right?

24         A.    Civitas Capital.  I'm a managing director

25    here.

1          Q.    What is Civitas Capital?

2          A.    It's a real estate investment group.

3          Q.    You are associated with the Mexican American

4     Legislative Caucus; is that correct?

5          A.    Yes.

6          Q.    If I refer to that as "MALC" for short, will

7     you know what I mean?

8          A.    Yes.

9          Q.    Are you the chairman of MALC?

10         A.    Yes.

11         Q.    What are the duties of the chairman of MALC?

12         A.    To preside over the organization, to assist

13    the membership in achieving either legislative,

14    administrative or judicial goals, to protect the

15    voting rights of Latinos in the state of Texas, and,

16    among others, to preside over the executive board of

17    the organization.

18         Q.    Did you vote in the March 1st, 2022,

19    democratic primary?

20         A.    I believe I did.

21         Q.    Do you remember how you voted?

22               For example, by mail or in person?

23         A.    I believe I voted in person.

24         Q.    Do you have any reason to believe that your

25    ballot was not counted?

1            A.   I don't.

2            Q.   Did you encounter any problems as a voter

3     that you attribute to Senate Bill 1?

4            A.   In my personal ballot, no.

5            Q.   And do you know what I mean when I refer to

6     Senate Bill 1?

7            A.   I do.

8            Q.   This was a piece of legislation that passed

9     during the second special session of the 87th

10    Legislature; correct?

11           A.   Yes.

12           Q.   When you were voting, did you witness any

13    problems for other voters that you attribute to SB 1?

14           A.   Yes.

15           Q.   What did you witness?

16           A.   My daughter had difficulty casting her

17    ballot.  She had to come back, I think, twice because

18    her name was not on the list of voters.  Even though

19    we had duly registered -- she had her voter

20    registration card, she had her passport -- she was

21    turned away, I believe -- I believe, just once, and we

22    had to come back later that afternoon.

23           Q.   And was that for the March 1st, 2022,

24    democratic primary?

25           A.   Yes.

```
 1         Q.    Do you know if she was voting on election
 2    day?
 3         A.    I believe she was an early voter.  I believe
 4    we were both early voters if I'm not mistaken.
 5         Q.    Was your daughter a first-time voter?
 6         A.    Yes.
 7         Q.    When did she register to vote?
 8               MR. QUESADA:  I'm sorry.  Was it when
 9    did she or when did he?
10               MR. THOMPSON:  When did she?
11               MR. QUESADA:  I'm sorry.  I just didn't
12    hear -- hear what you said.
13         A.    Prior to the election, during the
14    statutorily permitted times for -- for voting, for
15    registering to vote.
16         Q.    (By Mr. Thompson)  Did she register to vote
17    with the local authorities in Dallas County?
18         A.    I don't recall where, whether it was with
19    the Secretary of State or with the -- I -- I believe
20    it was Dallas County now come to think of it.
21         Q.    And if you can just walk me through what
22    happened.
23               I take it she showed up to a polling
24    place to vote during the March 1st, 2022, democratic
25    primary; is that right?
```

Rafael Anchia                                          August 22, 2022
                                                              Page 13

```
 1          A.    Yes.
 2          Q.    And you were there?
 3          A.    Yes.
 4          Q.    And she was not allowed to vote on her first
 5   attempt?
 6          A.    Correct.
 7          Q.    Did anyone give any explanation for why?
 8          A.    Her name did not appear on a list.
 9          Q.    And you understood that list to be a list of
10   people registered to vote in Dallas County?
11          A.    That's right.
12          Q.    Did anyone explain why her name wasn't on
13   the list even though she thought she had registered?
14          A.    No.
15          Q.    What did -- to the best of your knowledge,
16   what did she do to address that issue?
17          A.    Came back later.  I mean, she had her valid
18   voter registration card and -- and her passport.  So
19   she -- she was asked to come back later and she came
20   back later.
21          Q.    And what happened when she came back later?
22          A.    Her name was still not on the list, but I --
23   I think there were some calls made by the local
24   polling officials down to central office, and
25   ultimately it got sorted out and she was able to vote.
```

1          Q.   So, to your understanding, the people at the

2     polling place were able to confirm that she was, in

3     fact, registered to vote?

4          A.   Yes.  Ultimately, yes.

5          Q.   Do you know why the list the people at the

6     polling place had didn't include her name if she was

7     registered to vote?

8          A.   I don't.

9          Q.   Is it fair to say you don't know whether

10    Senate Bill 1 had anything to do with that issue?

11         A.   I don't.

12         Q.   You don't know whether it did?

13         A.   I don't know one way or the other.

14         Q.   So, other than the experience you just

15    described with your daughter, are you -- did you

16    witness anyone else as a voter having problems during

17    the March 1st, 2022, democratic primary that you

18    attribute to Senate Bill 1?

19         A.   I -- I did not.

20         Q.   Can you identify any would-be voter who was

21    not able to vote in either the democratic or the

22    republican primary in 2022 as a result of Senate Bill

23    1?

24         A.   You -- you would -- just to clarify, you

25    would like me to provide an example or the name of a

1    voter that was unable to vote or whose vote was not --

2    ultimately not counted?

3         Q.   I'm asking whether you are able to provide

4    the name of any voter who was not able to vote in the

5    primary elections as a result of Senate Bill 1.

6         A.   I -- I'm unaware.

7         Q.   Did you vote in the May 24th, 2022,

8    democratic primary runoff?

9         A.   I would say that's a safe bet.  Although,

10   I -- I -- I don't recall.

11        Q.   Do you recall having any problems voting in

12   that election?

13        A.   No.

14        Q.   To the extent you voted, do you have any

15   reason to think that your ballot wasn't counted?

16        A.   I have no basis to -- to think that, no.

17        Q.   Did you witness any voters during the May

18   24th, 2022, primary elections for the runoffs have any

19   problems voting?

20        A.   I did not.

21        Q.   Can you identify any would-be voter who was

22   not able to vote in either the democratic primary

23   runoff or the republican party primary runoff as a

24   result of Senate Bill 1?

25        A.   I'm not.

1     Q.   Was that "No"?

2     A.   I -- I -- I'm unable to, yes.  No.

3     Q.   Do you remember if you voted in the May 7th,

4    2022, election?

5     A.   I don't recall.

6     Q.   In case it helps, I'll just represent to you

7    that would have been an election with constitutional

8    amendments on the ballot and potentially some local

9    races.

10     A.   Okay.

11     Q.   To the best of your recollection, did you

12    have any problems voting in that election as a -- as a

13    result of Senate Bill 1?

14     A.   I don't recall.

15     Q.   Do you recall witnessing any other voters

16    have problems during that election as a result of

17    Senate Bill 1?

18     A.   No.

19     Q.   Can you identify any would-be voter who was

20    not able to vote in the May 7th, 2022, election as a

21    result of Senate Bill 1?

22     A.   No.

23     Q.   Other than the elections we just talked

24    about, the primary, the primary runoff, the May 7th

25    election, have you voted in any other elections since

```
1    Senate Bill 1 took effect?

2         A.   Not that I can recall.

3         Q.   Are you aware of any would-be voter who was

4    not able to vote in any other election as a result of

5    Senate Bill 1?

6         A.   No.

7         Q.   You're a member of the House of

8    Representatives; right?

9         A.   I am a member or do I remember?

10        Q.   Sorry.  You are a member --

11        A.   I am.

12        Q.   -- of the Texas House of Representatives?

13        A.   I -- yes.

14             MR. QUESADA:  If you remember that.

15             THE WITNESS:  Yes.

16        Q.   (By Mr. Thompson)  And you participated in

17   House proceedings related to Senate Bill 1; correct?

18        A.   Yes.

19        Q.   You're not a member of the Texas Senate;

20   correct?

21        A.   Correct.

22        Q.   Did you have any participation in Senate

23   proceedings related to Senate Bill 1?

24        A.   I did not.

25        Q.   Did you have any involvement with the Office
```

 1    of the Governor related to Senate Bill 1?

 2           A.    Not that I recall.

 3           Q.    Do you recall what committee Senate Bill 1

 4    went through in the House?

 5           A.    Senate Bill 1 during the second-called

 6    special session went, I believe, through a special

 7    committee.

 8           Q.    Were you a member of that committee?

 9           A.    I was not.

10           Q.    Did you testify before that committee?

11           A.    No.

12           Q.    Do you recall offering some amendments on

13    the House floor to Senate Bill 1?

14           A.    Yes.

15           Q.    So I'm going to show you a couple of those

16    amendments.  You actually have one in front of you.

17    If you don't mind, I'll just mark it with an exhibit

18    sticker.  Actually, first, I'll show you a list of

19    amendments.

20                 MR. QUESADA:  Oh, thank you.

21                 (Exhibit Number 1 marked.)

22           Q.    (By Mr. Thompson)  Representative Anchia,

23    can you see Exhibit 1 in front of you?

24           A.    I can.

25           Q.    Does it appear to be a list of amendments

Rafael Anchia                                        August 22, 2022
                                                          Page 19

```
 1    related to SB 1 printed off from the Texas

 2    Legislature's website?

 3         A.   Yes.

 4         Q.   Do you see the first House amendment listed

 5    has your name next to it?

 6         A.   Yes.

 7         Q.   And do you recall, in fact, offering an

 8    amendment at the beginning of the House's

 9    consideration of Senate Bill 1 on the floor?

10         A.   Yes.

11                   (Exhibit Number 2 marked.)

12         Q.   (By Mr. Thompson)  I'm going to hand you

13    what's been marked as Exhibit 2.

14                   Is that the Amendment Number 1 that you

15    offered to Senate Bill 1?

16         A.   Yes.

17         Q.   Amendment Number 1 that you offered would

18    have struck the enacting clause of the bill; is that

19    correct?

20         A.   Yes.

21         Q.   Striking the enacting clause of the bill

22    would have defeated the bill; correct?

23         A.   Yes.

24         Q.   It would have ended consideration of Senate

25    Bill 1; correct?
```

Rafael Anchia                                               August 22, 2022
                                                                    Page 20

1        A.    Correct.

2        Q.    Do you recall whether an amendment to strike

3    the enacting clause of the bill is automatically

4    considered before other motions to amend a bill?

5        A.    It is usually considered before other

6    amendments because it strikes the -- because

7    amendments are usually taken in order of the bill

8    text.  And by striking the enacting clause, 1 goes

9    first, or this amendment would go first in con -- in

10   order of consideration.

11       Q.    Is it fair to say that your goal in offering

12   Amendment Number 1 was to defeat Senate Bill 1?

13       A.    Yes.

14       Q.    And the amendment did not pass; correct?

15       A.    It did not.  It failed.

16       Q.    Okay.  If it had succeeded, we wouldn't have

17   a Senate Bill 1, would we?

18       A.    That's right.

19                   (Exhibit Number 3 marked.)

20       Q.    (By Mr. Thompson)  I'm going to hand you

21   Exhibit 3.

22       A.    Thank you.

23       Q.    Can you see Exhibit 3 in front of you?

24       A.    I can.

25       Q.    Does it appear to be another amendment

1    offered on Senate Bill 1?

2         A.   Yes.

3         Q.   Now, if you look back at Exhibit 1, which is

4    your list of amendments, I think if you just flip the

5    page over, the first one listed will be Amendment 34.

6              And it has your name next to it; right?

7         A.   It does.

8         Q.   Do you remember offering Amendment Number

9    34?

10        A.   Vaguely.

11        Q.   Do you remember that you offered an

12   amendment --

13        A.   Yes.

14        Q.   -- other than Amendment Number 1?

15        A.   Yes.

16        Q.   Do you recall what your other amendment

17   would have done?

18        A.   Generally, it related to the secrecy of the

19   ballot and concerns that had been offered in committee

20   and -- and among the membership about poll watchers

21   and their ability to roam freely throughout the

22   polling location.

23              (Exhibit Number 4 marked.)

24        Q.   (By Mr. Thompson)  Now, to try and make

25   Exhibit 3 make a little bit more sense, I'm going to

1    hand you Exhibit 4.

2           A.    Thank you.

3           Q.    Can you see Exhibit 4 in front of you?

4           A.    I can.

5           Q.    At the top right-hand corner of Exhibit 4,

6    does it say "S.B. No. 1"?

7           A.    Top-right, yes, it says "S.B. No. 1".

8           Q.    And then also at the top on the left side of

9    Exhibit 4, does it say "Substitute the following for

10   S.B. No. 1"?

11          A.    Yes.

12          Q.    You understand this to be the committee

13   substitute for Senate Bill 1 that the amendments would

14   have been amending?

15          A.    Yes.

16          Q.    Now, so Exhibit 3, which is Amendment 34,

17   says in Paragraph 1, "On Page 12, Line 25, strike

18   Subsections (e) and (f) and substitute Subsection

19   (f)".

20                Do you see that?

21          A.    Yes.

22          Q.    So let's go within the committee substitute,

23   Page 12, Line 25.

24                So within the committee substitute for

25   SB 1, Page 12, Line 25 is within Section 4.04 of the

1    bill; correct?

2         A.   Yes.

3         Q.   And so Amendment Number 34 would have

4    altered the text on that page so that it read "Section

5    33.056, Election Code, is amended by amending

6    Subsection (a) and adding Subsection (f) to read as

7    follows;" correct?

8         A.   Yes.

9         Q.   And then the second change that would have

10   been made via Amendment 34 was on Page 13 to strike

11   Line 6 through 8; correct?

12        A.   Yes.

13        Q.   Now, let's look at Page 13, Line 6 through

14   8, the committee substitute, and there we see a

15   paragraph labeled (e); correct?

16        A.   Correct.

17        Q.   And that paragraph labeled (e) is what would

18   have been deleted by Amendment 34; correct?

19        A.   Yes.

20        Q.   I'm just going to read that and ask you to

21   confirm that I read it correctly.  This is the

22   committee substitute, Page 13, Lines 6 through 8,

23   "(e)  Except as provided by Section 33.057(b), a

24   watcher may not be denied free movement where election

25   activity is occurring within the location at which the

1    watcher is serving."

2                    Do you see that?

3         A.    Yes.

4         Q.    It's fair to say that's the part of Senate

5    Bill 1 that you wanted to delete with your second

6    offered amendment?

7         A.    Yes.

8         Q.    Why did you want to delete that provision?

9         A.    We were concer -- or I was concerned about

10   secrecy of the ballot.  And if watchers who are

11   partisans and appointed by campaigns are given free

12   movement, they may infringe upon the secrecy of the

13   ballot of a voter.  And so I was concerned that this

14   language, this free movement language, was so vague

15   that voter intimidation was certainly possible as a

16   result.

17        Q.    Okay.  Did you have any other reason for

18   wanting to delete that provision besides preserving

19   the secrecy of the ballot?

20                    MR. QUESADA:  Object to --

21        A.    Not that I --

22                    MR. QUESADA:  I'm sorry.  I'm going to

23   object to the form of the question.  You may answer.

24        A.    Not that I recall.

25        Q.    (By Mr. Thompson)  Do you know whether the

 1    secrecy of the ballot wound up being addressed in the

 2    final version of SB 1?

 3          A.   I don't recall.

 4                   MR. THOMPSON:  Do you mind if we go off

 5    the record for just a second?  I misplaced a document.

 6                   THE VIDEOGRAPHER:  We're off the record

 7    at 9:42 a.m.

 8                        (Break.)

 9                   THE VIDEOGRAPHER:  We're back on the

10    record at 9:52 a.m.

11                   (Exhibit Number 5 marked.)

12          Q.   (By Mr. Thompson)  Welcome back,

13    Representative Anchia.  I'm going to hand you what's

14    been marked as Exhibit 5.

15                   MR. QUESADA:  Okay.

16          Q.   (By Mr. Thompson)  On the first page at the

17    top of Exhibit 5, does it say "Election Code, Title 3.

18    Election Officers and Observers, Chapter 33.

19    Watchers"?

20          A.   Yes.

21          Q.   I'll just represent to you this is a copy of

22    Chapter 33 of the Texas Election Code.

23                   Do you have any reason to dispute that

24    this is an accurate copy of the Texas Election Code?

25          A.   I do not.

 1          Q.   If you'd turn to Page 11, please.  At the

 2     bottom of Page 11 there is a Section 33.057 labeled

 3     "Observing Preparation of Voter's Ballot".

 4                    Do you see that?

 5          A.   I do.

 6          Q.   And if you'll turn to Page 12, you'll see

 7     Paragraph (b) within that section.  Let me know when

 8     you're there.

 9          A.   I'm on Page 12 now.

10          Q.   Do you see Paragraph (b) at the top of Page

11     12?

12          A.   I do.

13          Q.   It says "A watcher may not be present at the

14     voting station when a voter is preparing the voter's

15     ballot or is being assisted by a person of the voter's

16     choice."

17                    Do you see that?

18          A.   I do.

19          Q.   Do you understand that voters have the

20     option of filling out their ballots in secret without

21     a poll watcher watching?

22                    MR. QUESADA:  I'm going to object to

23     the form of the question.

24          A.   My concern -- I -- I as -- now, let me make

25     sure I understand what you're asking.  That -- you're

```
 1   suggesting that this current law permits them or gives
 2   them the option to cast their ballot without someone
 3   watching?  So -- I -- I'm sorry.
 4        Q.   (By Mr. Thompson)  Let me try it again.
 5        A.   Yeah.
 6        Q.   Do you understand that under Texas law
 7   voters are able to cast their ballots in secret
 8   without poll watchers seeing who they're voting for?
 9        A.   Certainly.
10                  (Exhibit Number 6 marked.)
11        Q.   (By Mr. Thompson)  I'm going to hand you
12   what's been marked as Exhibit 6.
13                  In the top right-hand corner of Exhibit
14   6, does it "S.B. No. 1"?
15        A.   Yes.
16        Q.   I'll represent to you this is a copy of
17   Senate Bill 1 as it was enacted.
18                  If you'd just flip over to the back
19   page, you'll see signatures from the president of the
20   Senate, speaker of the House, Secretary of State, the
21   chief clerk of the House and the governor; correct?
22        A.   Yes.
23        Q.   Do you have any reason to dispute that this
24   is an accurate copy of Senate Bill 1?
25        A.   I do not.
```

 1          Q.   If you'd flip to Page 2, please.

 2                    Starting in Line 11 of Page 2, do you

 3     see Section 1.04?

 4          A.   Yes.  On -- on Line 11 you were asking;

 5     correct?

 6          Q.   Yes, starting on Line 11.

 7          A.   Yes.

 8          Q.   And Section 1.04 of SB 1 adds Section 1.0015

 9     to the election code; correct?

10          A.   Yes.

11          Q.   And that section is labeled "Legislative

12     Intent;" correct?

13          A.   Yes.

14          Q.   In Lines 16 and 17, does SB 1 include

15     protecting the secrecy of the ballot as part of the

16     legislature's intent?

17          A.   Yes.

18          Q.   Have you ever served as a poll watcher?

19          A.   Not that I'm aware.  No, I don't recall.

20          Q.   Do you know how poll watchers are selected?

21          A.   By campaigns.

22          Q.   Has your campaign ever selected poll

23     watchers?

24          A.   Not that I'm aware of.

25          Q.   Do you know whether the Texas Democratic

```
 1    Party uses poll watchers?

 2          A.    I imagine they do, yes.

 3                (Exhibit Number 7 marked.)

 4          Q.    (By Mr. Thompson)  I'm handing you what's

 5    been marked as Exhibit 7.  Oh, sorry.

 6          A.    That's all right.

 7          Q.    7.

 8                MR. QUESADA:  Thank you.

 9          Q.    (By Mr. Thompson)  Representative Anchia,

10    does Exhibit 7 appear to be a printoff from the

11    texasdemocrats.org website?

12          A.    That -- yes.  That's what it says at the

13    bottom.

14          Q.    And is Exhibit 7 labeled "2020 Series:

15    Voter Protection by Rose Clouston, Voter Protection

16    Director"?

17          A.    That is what it says, yes.

18          Q.    If you could turn to Page 9, please.  The

19    page number's in the bottom right-hand corner of this

20    document.

21                At the bottom of Page 9 it says "The

22    Texas democrats voter protection team in conjunction

23    with our full-time staffers and volunteers is

24    recruiting volunteer poll watchers across Texas to be

25    at polling places on election day?"
```

1                    Do you see that?

2        A.   Yes.

3        Q.   And then if you flip to Page 10, it says "In

4    order to make sure Texans' voting rights are not being

5    violated when they head to their polling location to

6    cast a ballot, Texas democrat poll watchers will

7    observe the voting process, report any voting

8    irregularities and advocate on voter's behalf should

9    they encounter any confusion or issues while voting;"

10   correct?

11       A.   Yes.

12       Q.   Fair to say that the Texas Democratic Party

13   uses poll watchers to monitor the regularity of

14   elections?

15       A.   It appears so.

16       Q.   There's nothing nefarious about that; right?

17       A.   Not on its face, no.

18       Q.   Do you think it's a responsible thing for

19   the Texas Democratic Party to do?

20       A.   It's permitted by law.  Certainly.

21       Q.   Are you aware of any problems that Texas

22   Democratic Party poll watchers caused in 2020?

23       A.   I'm not aware of any.

24       Q.   Are you aware of any other -- other problems

25   caused by any poll watchers in 2020?

1          A.    Yes.

2          Q.    Are any of those in Texas?

3          A.    Yes.

4          Q.    Please tell me about those issues.

5          A.    So I received a call from a -- an election

6    judge while SB 1 was being considered, and she -- she

7    is a Dallas County election judge.  Her name is Rosa

8    Orenstein.

9          Q.    Before you continue, could you spell that

10   for the court reporter's benefit?

11         A.    Rosa, R-o-s-a, Orenstein, O-r-e-n-s-t-i-e-n,

12   I believe.  Okay.  And she mentioned that republican

13   poll watchers were incredibly disruptive in the

14   polling location, that she had to warn them a num -- a

15   number of times before -- before having to have some

16   escorted out of the polling location, and that there

17   were concerns that they were not taking direction from

18   the election judge and that they were disrupting the

19   conduct of the election.

20         Q.    So before we dive into that, any other

21   examples that you're aware of when poll watchers cause

22   problems during a Texas election?

23         A.    That's the one that I'm aware of.

24               MR. QUESADA:  Now, earlier you asked

25   him about the 2020 election.  You just -- was the

1    follow-up question having to do with the 2020 election

2    or ever or...

3                    MR. THOMPSON:  Ever.

4                    MR. QUESADA:  Okay.

5        Q.   (By Mr. Thompson)  Does that affect your

6    answer at all?

7        A.   It doesn't affect my answer, right.

8                    MR. QUESADA:  Okay.

9        Q.   (By Mr. Thompson)  Do you know the names of

10   any of the repu -- republican poll watchers who

11   Ms. Orenstein told you about?

12       A.   I do not.

13       Q.   And I think you said that Ms. Orenstein

14   described the poll watchers in question as being

15   disruptive; correct?

16       A.   Correct.

17       Q.   Did she describe to you what they did that

18   was allegedly disruptive?

19       A.   I don't recall.

20       Q.   And I think you also mentioned that

21   Ms. Orenstein said the republican poll watchers did

22   not take direction from the election judge; is that

23   right?

24       A.   I believe that's correct.

25       Q.   Do you know what direction was given by the

1    election judge?

2         A.   I don't.

3         Q.   Do you know what the poll watchers were

4    doing that led to the election judge giving a

5    direction?

6         A.   I don't know the specifics.

7         Q.   Do you know if any voters were prevented

8    from voting as a result of what these poll watchers

9    were doing?

10        A.   I don't know the answer to that.

11        Q.   I think you mentioned that the poll watchers

12   were eventually escorted off the premises; is that

13   correct?

14        A.   At least one of them was is my recollection.

15        Q.   Do you know who did that escorting?

16        A.   I don't recall.  It might have been law

17   enforcement.

18        Q.   After that poll watcher was escorted off the

19   premises, were there any further problems?

20        A.   I -- I don't recall.

21        Q.   Do you know whether this incident was ever

22   publicly reported?

23        A.   I recall that -- that Rosa mentioned she

24   reported it, but I don't remem -- recall where other

25   than maybe to county authorities, but I -- I don't

Rafael Anchia                                            August 22, 2022
                                                           Page 34

1    recall.

2         Q.    Do you know whether any --

3         A.    Or -- or maybe to law enfor -- law enfor --

4    I apologize.  She did report it to law enforcement,

5    but I don't recall where else that might have -- she

6    might have reported it.

7         Q.    Do you know which law enforcement agency?

8         A.    I don't.

9         Q.    And, just to be clear, you weren't present

10   when this happened; right?

11        A.    No.  This is the basis of a phone call.

12        Q.    Now, if we wanted to get in touch with

13   Ms. Orenstein, do you know how we might be able to do

14   that?

15        A.    She's an upstanding member of the bar and,

16   I'm sure, would be easily identifiable for the Dallas

17   Bar Association.

18        Q.    Do you have an understanding of what poll

19   watchers are supposed to do?

20        A.    Generally.

21        Q.    What is your general understanding?

22        A.    They are supposed to observe the -- the

23   goings-on under the auspices of the election judge.

24   They are not to -- they -- they have a designated area

25   is my recollection where they're supposed to observe.

1    They're supposed to stay away from -- from voters, not

2    engage in campaigning.  Those are gener -- that's

3    generally my understanding of their role.

4         Q.   So part of their role is to observe the

5    conduct of the election to see if there is anything

6    inappropriate happening; is that fair?

7         A.   Yes.

8         Q.   They're not able to perform that function if

9    they can't see what's happening; correct?

10         A.   I don't understand the question.  Can you

11    repeat it?

12         Q.   It's a tad tautological, so that may be why

13    it's confusing.

14              But if they're supposed to observe the

15    election and for some reason they can't see what's

16    happening in the conduct of an election, then they're

17    not able to perform their function; correct?

18              MR. QUESADA:  Let me object to the form

19    of the question.  You may answer.

20         A.   So -- so within -- within reason.  But

21    because these are partisans, whether they be democrats

22    or republicans, their activities can also get in the

23    way of the conduct of an election or it can border on

24    campaigning, I would imagine.

25              It can potentially intimidate voters,

1    and -- and that's -- that's why I carried my

2    amendment.  Because, yes, while -- while legislative

3    intent here is -- is -- is correct, and I'm glad they

4    include it, it seems to be at odds with a complete

5    free movement of a watcher at an election location.

6             When you -- when you have partisans who

7    are in an election contest with -- with no limits,

8    oftentimes in cramped spaces, right, having been in --

9    in polling locations that are no bigger than a -- you

10   know, than a portable and not placing -- I felt that

11   this Subsection (e) in this amendment that I sought to

12   strike was at odds with existing law and legislative

13   intent.  And so, yes, I saw it as -- as a -- in

14   conflict.

15             MR. THOMPSON:  Objection,

16   nonresponsive.

17        Q.   (By Mr. Thompson)  Are you familiar with any

18   past controversies in which poll watchers in Texas

19   were not permitted to view what election workers were

20   doing?

21        A.   No.

22             (Exhibit Number 8 marked.)

23        Q.   (By Mr. Thompson)  I'm going to hand you

24   what's been marked as Exhibit 8.

25        A.   Thank you.

1          MR. QUESADA:  Thank you, sir.

2      Q.   (By Mr. Thompson)   Representative Anchia, is

3   Exhibit 8 a letter from the Secretary of State's

4   Office to the Director of Law Enforcement at the

5   Office of the Attorney General?

6      A.   Yes.

7      Q.   Is it dated September 2, 2020?

8      A.   Yes.

9      Q.   This was before SB 1 was enacted; right?

10     A.   Yes.

11     Q.   Take a look at the first paragraph.  The

12  Secretary of State's Office requests assistance "...in

13  reviewing allegations of poll watchers being

14  obstructed from observing activity at the Travis

15  County central counting station for the July 14, 2020,

16  election."

17          Do you see that?

18     A.   I do.

19     Q.   The beginning of that paragraph says the

20  letter is being sent pursuant to Section 31.006 of the

21  Texas Election Code; correct?

22     A.   It does.

23     Q.   Are you familiar with 31.006 of the Texas

24  Election Code?

25     A.   Not by number.

1          Q.    Sure.  Are you aware the Secretary of

2     State's Office has the authority under the election

3     code to refer matters to the Office of the Attorney

4     General when allegations of criminal conduct relating

5     to an election have been made?

6          A.    Yes.

7          Q.    Are you aware that before SB 1 became law

8     there were potential criminal consequences for

9     obstructing the activities of a poll watcher in Texas?

10         A.    Yes, I seem to recall that.

11                    (Exhibit Number 9 marked.)

12         Q.    (By Mr. Thompson)  I'm handing you what has

13    been marked --

14         A.    Thank you.

15         Q.    -- as Exhibit 9.

16                    MR. QUESADA:  Thank you, sir.

17         Q.    (By Mr. Thompson)  Based on the URL at the

18    bottom of the page, does Exhibit 9 appear to be a news

19    article from KXAN Austin?

20         A.    It does.

21         Q.    Is it headlined "State requests criminal

22    investigation into alleged election violations inside

23    Travis County Clerk's Office"?

24         A.    Yes.

25         Q.    And is the article dated November 2, 2020?

1      A.   Yes.

2      Q.   Again, this is before the legislature passed

3  SB 1; correct?

4      A.   Yes.

5      Q.   All right.  So let's take a look at Page 2.

6           Now, based on the first paragraph this

7  article seems to be mentioning the letter from the

8  Secretary of State's Office asking for a criminal

9  investigation related to the poll watcher incident in

10 Travis County; correct?

11     A.   Yes.

12     Q.   And according to the second sentence of the

13 first paragraph there were republican poll watchers

14 who claimed the clerk's office kept them from doing

15 their jobs; correct?

16     A.   Yes, that was their claim.

17     Q.   If you look at Paragraph 2, Sentence 2, the

18 article reports "One poll watcher said he wasn't

19 allowed into the counting room at all."

20          Do you see that?

21     A.   Yes.

22     Q.   And then the next sentence says "Another two

23 poll watchers said they were sequestered into a 'media

24 room' at the clerk's office, unable to hear and see

25 ballot tabulations and counts the night the polls

```
 1    closed in July."

 2                    Do you see that?

 3         A.   Yes.

 4         Q.   And, finally, look at the last paragraph on

 5    this page.  It quotes a poll watcher named John Wood

 6    who said, "I was in this glass box.  I could not hear

 7    any conversation.  People were doing something, which

 8    I could not identify what.  All video screens of their

 9    information were out of my sight."

10                    Do you see that?

11         A.   Yes.

12         Q.   And according to this article, again, "Wood

13    is one of the three complainants listed in the

14    Secretary of State's criminal investigation request;"

15    correct?

16         A.   Yes.

17         Q.   Turn to Page 3, Article -- continues to

18    quote Wood in Paragraph 2, "'So I was absolutely

19    useless,' Wood said.  'There was nothing I could tell

20    about the process.  It was opaque to me, a watcher,

21    and I found very discouraging.'"

22                    Do you see that?

23         A.   Yes.

24         Q.   Now, you don't know whether these

25    allegations are true, do you?
```

```
 1          A.   I have no basis.

 2          Q.   But, as a legislator, it would concern you

 3     if poll watchers were prevented from seeing election

 4     activities in Travis County; correct?

 5          A.   Anywhere, yeah.

 6          Q.   Sorry.  Just to make sure I get it clear on

 7     the record, you're saying it would concern you if poll

 8     watchers were prevented from seeing election

 9     activities in any county in Texas; is that fair?

10          A.   Well, if -- if they were prevented from

11     seeing electric -- election activities in their role

12     as -- as -- as watchers and -- and if they, in fact,

13     are behaving in a way that watchers are -- are to

14     behave.  Impossible to know from this article, and

15     I -- and -- and difficult to see.  I don't think

16     there's any final disposition here or -- so...

17          Q.   All right.  If we can just quickly turn to

18     Page 5 of the article.

19          A.   Yeah.

20          Q.   Do you see at the very top of the page it

21     says...

22                    Well, excuse me.

23                    Before I read that, do you know who

24     Dana DeBeauvoir was or is?

25          A.   Is -- yes, I do.
```

1        Q.    Who is Dana DeBeauvoir?

2        A.    She is the former elections administrator, I

3    believe, for Travis County.

4        Q.    And I'll just represent to you, I -- I think

5    at the time her title was county clerk, but that she

6    had the role of overseeing the election process.

7        A.    That's right.

8        Q.    Does that sound right to you?

9        A.    That sounds right to me.

10       Q.    Okay.  So on Page 5 of this article, at the

11   top of the page it says "DeBeauvoir did not deny

12   corraling the poll watchers in her building's media

13   room;" correct?

14       A.    Where are you reading from?  I'm sorry.  I

15   may -- I may have missed that.

16       Q.    I'm sorry.  Page 5.  It's at the very top of

17   the page.  It's above a large color photograph.

18       A.    Oh, oh, oh, sorry.  Yes.

19       Q.    So you see -- you see that it says

20   "DeBeauvoir did not deny corraling the poll watchers

21   in the building's media room;" correct?

22       A.    Correct.

23       Q.    Do you think it's reasonable for Texas

24   legislators to be worried about the allegations in

25   this article?

```
 1                 MR. QUESADA:  I'm going to object to

 2      the form of the question.

 3           A.   I think it's reasonable for them to

 4      investigate the allegations.

 5           Q.   (By Mr. Thompson)  In your role as a

 6      legislator, you sometimes run across issues because of

 7      press reports; right?

 8           A.   Yes.

 9           Q.   And sometimes as a result of those press

10      reports, you pursue legislation on a particular topic;

11      is that fair?

12           A.   If it turns out that the allegations were

13      substantiated, yes, and -- and -- and if there was

14      sort of a persistent problem rather than a one-off.

15      Yeah, there are all kinds of factors that would go

16      into that.  But rarely -- rarely just based on

17      allegations.  That often makes bad policy.

18           Q.   Earlier I handed you Chapter 33 of the

19      election code.

20                 Do you still have that in front of you?

21           A.   I do.

22           Q.   And, just for the clarity of the record,

23      what exhibit number is on the front of that?

24           A.   Exhibit 5, I believe.  It's Chapter 33 of

25      the election code.
```

1        Q.    Let's take a look at the first page of

2    Exhibit 5.

3        A.    I'm there.

4        Q.    Okay.  Do you see Section 33.0015?

5        A.    Yes.

6        Q.    Entitled "Chapter Purpose and Watcher Duty;"

7    correct?

8        A.    "Chapter Purpose and Watcher Duty," yes.

9        Q.    Okay.  The first sentence says "The purpose

10   of this chapter is to preserve the integrity of the

11   ballot box in accordance with Section 4, Article VI,

12   Texas Constitution, by providing for the appointment

13   of watchers."

14               Do you see that?

15       A.    Yes.

16       Q.    And the Texas Constitution imposes a duty on

17   the legislature to preserve the integrity of the

18   ballot box; correct?

19       A.    Yes.

20       Q.    The next sentence says "It is the intent of

21   the legislature that watchers duly accepted for

22   service under this chapter be allowed to observe and

23   report on irregularities in the conduct of any

24   election, but may not interfere in the orderly conduct

25   of an election."

1                      Do you see that?

2          A.    Yes.

3          Q.    You support that intent, don't you?

4          A.    Certainly.

5          Q.    It's good for poll watchers to be able to

6     observe and report on irregularities?

7          A.    Yes.

8          Q.    But it's also important that they not

9     interfere in the orderly conduct of an election;

10    correct?

11         A.    Yes.

12         Q.    Now, the final sentence in that section says

13    "To effect that purpose, a watcher appointed under

14    this chapter shall observe without obstructing the

15    conduct of an election and call to the attention of an

16    election officer any observed or suspected

17    irregularity or violation of law in the conduct of the

18    election."

19                      Do you see that?

20         A.    Yes.

21         Q.    And do you understand this provision to

22    define the duties of a poll watcher in part?

23         A.    Ask that question again.  Do I understand --

24    I'll repeat it back to you just to make sure I've got

25    it.  Do -- do I understand this to be in part the

1    duties of a poll watcher?

2         Q.   Yes.

3         A.   Yes.

4         Q.   So in this provision the legislature is

5    instructing poll watchers to avoid obstructing the

6    conduct of an election; fair?

7         A.   Ask the question again kindly.

8         Q.   Sure.  In this provision the legislature is

9    instructing poll watchers to avoid "obstructing the

10   conduct of an election"?

11        A.   Yes.

12        Q.   And this is a provision that was added to

13   the election code by Senate Bill 1; correct?

14        A.   It appears to be, yes.

15        Q.   Are you aware of any instances in which poll

16   watchers have prevented an eligible Texas voter from

17   voting?

18        A.   I'm unaware.

19        Q.   Are you aware of any instances in which poll

20   watchers have obstructed an election in Texas?

21        A.   I'm unaware.

22        Q.   Are you aware that the Secretary of State's

23   Office provides training for poll watchers in Texas?

24        A.   Yes.

25        Q.   Are you aware that that is a consequence of

1   Senate Bill 1?

2       A.   I'm unaware.  It was my impression that they

3   did -- that the Secretary of State's Office also did

4   watcher training in advance of SB 1.

5       Q.   Do you still have Senate Bill 1 in front of

6   you?

7       A.   I do.

8       Q.   Let's turn to Page 25.

9            On Page 25, Line 13, do you see Section

10  4.04 of Senate Bill 1?

11      A.   Yes.

12      Q.   Does it amend Chapter 33 of the election

13  code by adding Section 33.008?

14      A.   Yes.

15      Q.   And does that provision say, starting in

16  Line 15, "The Secretary of State shall develop and

17  maintain a training program for watchers"?

18            Is that what it says?

19      A.   Yes.

20      Q.   And then it has various requirements for the

21  training program under that; correct?

22      A.   Yes.

23      Q.   One of them is that the training program

24  must be available on the internet?

25      A.   Yes.

1          Q.    And another is that the training program

2     must provide a watcher who completes the training

3     program with a Certificate of Completion; correct?

4          A.    Yes.

5          Q.    And on that same page, Page 25, par -- Line

6     24, there is a Section 4.05 of SB 1; correct?

7          A.    Line 24?

8          Q.    Yes.

9          A.    On Page 26?  I apologize.  I may -- may be

10    looking at the wrong place.

11         Q.    Page 25.

12         A.    25.  Sorry.

13         Q.    Line 24.

14         A.    Line 24.

15         Q.    Do you see Section 4.05 of SB 1?

16         A.    I do.

17         Q.    And Section 4.05 of SB 1 amends Section

18    33.031 of the election code by adding a Subsection

19    (b); correct?

20         A.    Yes.

21         Q.    And that new Subsection (b) says "In

22    addition to the requirements of Subsection (a), to be

23    eligible to serve as a watcher, a person must complete

24    training under Section 33.008;" correct?

25         A.    Yes.

1      Q.   If you could turn to Page 29 of Senate Bill

2   1, please.

3                In Line 2, do you see Section 4.09 of

4   SB 1?

5      A.   Yes.

6      Q.   And Section 4.09 of SB 1 amends Section

7   33.061(a) of the election code; correct?

8      A.   Yes.

9      Q.   When a bill has underlying text like you see

10   in Section 4.09, that means that the bill is adding

11   that language to the language that was already in the

12   code; correct?

13      A.   That's my understanding.

14      Q.   So 4.09 amends Section 33.061(a) of the

15   election code by adding, among other things, a mens

16   rea requirement to the criminal offense specified by

17   that section; correct?

18      A.   Can you point out the mens rea requirement?

19      Q.   Sure.  Sorry.  Just for -- you know what a

20   mens rea requirement --

21      A.   I do.

22      Q.   -- is generally; right?

23      A.   I do.

24      Q.   Yeah.

25      A.   I do.

1          Q.    So within --

2          A.    Oh, the knowing s -- knowing standard on --

3    on Line 7.  Sorry.  And I just overtalked.  You were

4    about to tell me where it was, but I think I see.  I

5    see it now.

6          Q.    That is what I'm referring to, the -- the

7    requirement that the person knows the watcher is

8    entitled to observe an activity in Line 7.

9          A.    Yes.

10         Q.    So that mens rea requirement didn't exist in

11   that provision of the election code before SB 1;

12   correct?

13         A.    It is new language that is being added,

14   correct.

15         Q.    And the criminal act, the criminal offense

16   specified in that provision, is one that relates to a

17   person serving in an official capacity preventing a

18   watcher from observing an activity or procedure the

19   person knows the watcher is entitled to observe;

20   correct?

21         A.    Yes.

22         Q.    Without the knowing requirement added by

23   Senate Bill 1, more conduct would be made criminal by

24   the election code; correct?

25                    MR. QUESADA:  Object to the form of the

Rafael Anchia                                                    August 22, 2022
                                                                Page 51

 1    question.

 2         Q.    (By Mr. Thompson)  If that didn't make sense

 3    I can rephrase it.

 4         A.    If you don't mind.

 5         Q.    Adding the mens rea requirement narrows the

 6    scope of limit -- of criminal liability under the

 7    election code; correct?

 8         A.    Yes.

 9         Q.    Are you familiar with something called voter

10    information posters in Texas elections?

11         A.    Yes.

12         Q.    I have various documents I can put in front

13    of you if this would be helpful.

14                   But do you recall sponsoring or --

15    excuse me -- jointly offering a bill about voter

16    information posters?

17         A.    In what year?

18         Q.    There's a bill called HB719.  I need to look

19    up the exact year.

20         A.    So the short answer is, no, I don't recall

21    this.

22         Q.    Probably have a lot of bills that you're

23    responsible for; is that fair?

24         A.    Yes.

25                   (Exhibit Number 10 marked.)

 1        Q.    (By Mr. Thompson)  I'm going to hand you

 2   what's been marked as Exhibit 10.

 3        A.    Thank you.

 4              MR. QUESADA:  Thank you.

 5        Q.    (By Mr. Thompson)  Does Exhibit 10 appear to

 6   be a printoff from the Texas Legislature's website?

 7        A.    Yes.

 8        Q.    And does Exhibit 10 relate to House Bill 719

 9   from the 79th regular session?

10        A.    It appears to, yes.

11        Q.    Are you listed as a joint author of House

12   Bill 719 in the 79th regular session?

13        A.    Yes.  On March 17th, 2005.

14        Q.    Okay.

15        A.    My first session.

16              (Exhibit Number 11 marked.)

17        Q.    (By Mr. Thompson)  I'm going to hand you

18   what's been marked as Exhibit 11.

19        A.    Thank you.

20              MR. QUESADA:  Oh, thank you so much.

21        Q.    (By Mr. Thompson)  Now, do you see that

22   Exhibit 11 is a form prescribed by the Secretary of

23   State according to the top right-hand corner of the

24   document?

25        A.    Yes.

1      Q.   And the bold header at the top says "Voter

2    Information;" correct?

3      A.   Yes.

4      Q.   And right below that it lists a series of

5    rights that voters have.

6                Do you see that?

7      A.   Yes.

8      Q.   The second right says "You have the right to

9    cast your vote in secret and free from intimidation;"

10   correct?

11     A.   Yes.

12     Q.   And that is a right that voters have under

13   Texas law; correct?

14     A.   Yes.

15     Q.   Are you aware that each polling place in

16   Texas posts this form in a prominent location?

17     A.   I'm not aware that every polling location in

18   the state does so, but that there's a requirement to

19   do so.

20     Q.   You're aware that they're legally required

21   to post these voter information posters --

22     A.   Yes, sir.

23     Q.   -- correct?

24     A.   Yes, sir.

25     Q.   And you're not aware of any that refused to

1    post them; correct?

2         A.    I have no basis.

3         Q.    How long have you lived in Dallas County?

4         A.    Ooh.  1986, I guess.

5         Q.    Where did you move from when you moved to

6    Dallas County?

7         A.    From Miami, Florida to go to college.  I was

8    17 years old.

9         Q.    I guess you would have left -- forgive me.

10              So you moved to Dallas in 1986 to go to

11   SMU; correct?

12        A.    Yes.

13        Q.    And then after you graduated from SMU, you

14   spent a few years at Tulane Law School?

15        A.    (Witness nods head.)

16        Q.    Correct?

17        A.    Uh-huh, yeah.

18        Q.    So, other than your years in law school,

19   have you lived in Dallas County since 1986?

20        A.    Yeah.  And I returned every summer to --

21   to -- to work in Dallas even when I was in law school.

22        Q.    Have you been a Dallas County voter since

23   1986?

24        A.    Ooh.  I don't recall.

25        Q.    Have you been a Dallas County voter for a

1    long time?

2         A.    Yes.

3         Q.    To the best of your knowledge, Dallas County

4    has never offered drive-thru voting; correct?

5         A.    That's correct.

6         Q.    To the best of your knowledge, had any Texas

7    county used drive-thru voting before the November 2020

8    general election?

9         A.    I'm unaware.

10        Q.    To the best of your knowledge, how many

11   Texas counties offered drive-thru voting during the

12   November 2020 general election?

13        A.    I'm unaware.

14        Q.    Are you aware of any?

15        A.    I believe Harris County.

16        Q.    Any others?

17        A.    I'm not.

18        Q.    To the best of your knowledge, has any Texas

19   county offered drive-thru voting since the November

20   2020 general election?

21        A.    Let me amend my answers.  If by -- if by

22   "drive-thru voting" you mean exclusively drive-thru

23   without any sort of disability or impediment, because

24   I believe all -- all counties should offer it to

25   people -- under existing law for people who are --

 1    have some sort of impediment, are unable to leave

 2    their automobile, something like that.

 3                    So if by "drive-thru voting" you mean

 4    no-impediment drive-thru voting, then the only example

 5    I'm aware of is Harris County.  So, yeah, those are

 6    the one that comes to mind.

 7         Q.   And that was in the 2020 general election;

 8    correct?

 9         A.   Yes.

10         Q.   And, just to clarify your terminology, have

11    you heard the term "curbside voting" before?

12         A.   Yes.

13         Q.   Is "curbside voting" the term generally used

14    to refer to voters with disabilities who vote at the

15    curb sometimes from their vehicles rather than going

16    into polling places?

17         A.   That is one of the -- the, I believe, common

18    terms used.

19         Q.   And I'll represent to you, I think it's a

20    term used in the election code.

21                    Do you know one way or the other?

22         A.   I -- I have no basis.

23         Q.   So, just for purposes of what I mean when

24    I'm asking questions, I'll use the term "curbside

25    voting" if I'm trying to refer to the method of voting

1    available to individuals with disabilities.

2           A.    Excellent.

3           Q.    Is that fair?

4           A.    That's fair.

5           Q.    And I'll use "drive-thru voting" to refer to

6    a broader program allowing people to vote from their

7    cars not related to disabilities.

8           A.    Yes.

9           Q.    Is that fair?

10          A.    Yes.

11          Q.    Are you familiar with the term "24-hour

12   voting"?

13          A.    Generally.

14          Q.    What is your understanding of that term?

15          A.    That during the pandemic some counties, and

16   I'm aware that Houst -- Harris County did, allowed

17   persons to come in in order to spread out the -- the

18   concentrations of people in polling locations.  They

19   extended the hours to -- to 24 hours, and also

20   acknowledging workers in the healthcare industry that

21   may have been sort of frontline during the pandemic to

22   allow more availability of -- of polling hours.  So

23   that's my general understanding.

24          Q.    24-hour voting was when election officials

25   opened a polling place for 24 straight hours; correct?

 1      A.   Yes, that's my understanding.

 2      Q.   I mean, it didn't -- it didn't close at the

 3   end of any kind of normal business hours; correct?

 4      A.   I don't know.  I don't know.  I couldn't say

 5   whether they cl -- whether they closed at all.

 6      Q.   To the best of your knowledge, Dallas County

 7   has never offered 24-hour voting; correct?

 8      A.   I'm unaware.

 9      Q.   To the best of your knowledge, had any Texas

10   county used 24-hour voting before the November 2020

11   general election?

12      A.   I'm unaware.

13      Q.   To the best of your knowledge, how many

14   Texas counties offered 24-hour voting during the

15   November 2020 general election?

16      A.   I'm only aware of Harris County.

17      Q.   To the best of your knowledge, has any Texas

18   county offered 24-hour voting since the November 2020

19   general election?

20      A.   I'm not aware.

21      Q.   You haven't had any personal involvement

22   with drive-thru voting; correct?

23      A.   No.

24      Q.   And you haven't had any personal involvement

25   with 24-hour voting; correct?

1        A.    No.

2        Q.    I'm sorry.  I'm going to have to clarify

3   those because of the ambiguities in the negative

4   question and then a "No" answer.

5               MR. QUESADA:  Ask it in one question

6   and he'll answer to all in one.

7               MR. THOMPSON:  Great.

8        Q.    (By Mr. Thompson)  If you don't mind

9   answering this "Correct" or "Incorrect," I think it

10  will make things clear.

11       A.    Correct.

12       Q.    You have not had any personal involvement

13  with either drive-thru voting or 24-hour voting;

14  correct?

15       A.    Correct.

16       Q.    Thank you.  And we can take a break now if

17  you want.  I'm about to switch topics.  Whatever you

18  prefer.

19       A.    At your pleasure.

20               MR. THOMPSON:  Okay.  Let's go off the

21  record real quick.

22               THE VIDEOGRAPHER:  We're off the record

23  at 10:41 a.m.

24               (Break.)

25               THE VIDEOGRAPHER:  We're back on the

 1    record at 10:55 a.m.

 2        Q.    (By Mr. Thompson)  Welcome back, Chairman

 3    Anchia.

 4        A.    Thank you.

 5        Q.    Do you recall the provisions in SB 1

 6    relating to the assistance provided to voters with

 7    disabilities?

 8        A.    Somewhat.

 9        Q.    Are you -- let me think.

10              Do you have a disability?

11              MR. QUESADA:  I'm going to object to

12    the form of the question.

13        A.    I -- I -- I would say many.

14        Q.    (By Mr. Thompson)  Okay.  I'm not going to

15    get into your, like, general, personal, medical stuff.

16              Like, do you have any disabilities that

17    are relevant to your voting?

18        A.    No.

19        Q.    So you've never sought assistance as a voter

20    with a disability at a polling place; correct?

21        A.    No.

22        Q.    Have you ever witnessed a Texas voter with a

23    disability seek assistance at a polling place?

24        A.    Yes.

25        Q.    About how many times do you think you've

 1   seen that?

 2        A.   I don't remember the exact number.  More

 3   than one.

 4        Q.   What is the first instance you can remember

 5   of seeing that?

 6        A.   I don't recall details.

 7        Q.   Let me try it more broadly and then we'll

 8   drill down.

 9             Have you ever witnessed a voter with a

10   disability seek assistance for voting, but then not be

11   able to vote for any reason?

12        A.   No.

13        Q.   Have you ever witnessed anything that you

14   would consider inappropriate in the context of people

15   at a polling place reacting to a voter's request for

16   assistance based on a disability?

17        A.   No.

18        Q.   Can you identify any voters who have been

19   prevented from voting as a result of the Senate Bill 1

20   provisions related to assistance for voters with

21   disabilities?

22        A.   I'm unaware.

23        Q.   Are you aware of any problems in that

24   regard?

25        A.   I'm unaware.

1          Q.    Have you ever voted by mail?

2          A.    I don't believe so.

3          Q.    You haven't voted by mail since Senate Bill

4     1 took effect; correct?

5          A.    No.

6          Q.    And you haven't attempted to vote by mail

7     since Senate Bill 1 took effect; correct?

8          A.    No.

9          Q.    Have you witnessed anyone attempting to vote

10     by mail since Senate Bill 1 took effect?

11          A.    No.

12          Q.    Can you identify any voters who were

13     prevented from voting as a result of Senate Bill 1's

14     provisions related to voting by mail?

15          A.    No.

16          Q.    Do you have any personal knowledge of any

17     problems related to voting by mail that you would

18     attribute to Senate Bill 1?

19          A.    No.

20          Q.    You're represented by counsel for purposes

21     of this litigation; right?

22          A.    Say -- say it one more time.

23          Q.    You're represented by counsel for purposes

24     of this litigation --

25                    MR. QUESADA:  Well, for this --

 1      Q.   (By Mr. Thompson)  -- correct?

 2                MR. QUESADA:  For this deposition.

 3                MR. THOMPSON:  Okay.

 4      A.   Yes.

 5                MR. THOMPSON:  And I'm not trying to

 6   broaden the scope of your representation or anything.

 7                MR. QUESADA:  Fine.

 8      Q.   (By Mr. Thompson)  So I see that Tex here is

 9   a lawyer for you; correct?

10      A.   That is correct.

11      Q.   Do you have any other lawyers related to

12   this matter other than Tex?

13                MR. QUESADA:  I'm going to object to

14   the form of the question.

15      A.   I would answer Sean McCaffity and --

16                MR. THOMPSON:  I just want to know who

17   represents him.

18                MR. QUESADA:  In -- for purposes of

19   this deposition my firm -- the lawyers in my firm do.

20                THE WITNESS:  Yeah.

21                MR. QUESADA:  Including Mr. McCaffity.

22      Q.   (By Mr. Thompson)  Do you remember the name

23   of that law firm?

24      A.   Sommerman, Quesada -- or, no -- So -- I

25   think Quesada comes first.

1          MR. QUESADA:  It should, but it comes

2    third.

3          THE WITNESS:  It should, it should.

4    Q.   (By Mr. Thompson)  If you --

5    A.   Sommerman, Quesada, McCaffity...

6    Q.   Sure.

7    A.   In some order.

8    Q.   Do you want to just confirm that --

9          MR. QUESADA:  Well, I think ours has

10   four.  My card's there.  Sommerman, McCaffity --

11         THE WITNESS:  Sommerman, McCaffity,

12   Quesada & Geisler.

13   Q.   (By Mr. Thompson)  Other than lawyers at

14   that law firm, are you represented by any other

15   attorneys related to this matter?

16   A.   Not that I'm aware of.

17   Q.   Have you communicated with anyone other than

18   attorneys at that law firm about testifying in a trial

19   in this matter?

20   A.   No.

21   Q.   Are you aware that some of the plaintiffs in

22   this case identified you as a potential witness at

23   that trial?

24   A.   Yes.

25   Q.   How did you become aware of that?

```
 1        A.    My counsel.
 2                  MR. QUESADA:  Yeah.  Don't answer if
 3    it -- if it involves attorney-client.
 4                  THE WITNESS:  Okay.
 5                  MR. QUESADA:  Just tell him it involves
 6    attorney-client.
 7                  THE WITNESS:  It involves
 8    attorney-client.
 9        Q.    (By Mr. Thompson)  Other than conversations
10    with counsel, you don't have any knowledge about being
11    listed as a witness; is that fair?
12        A.    That's fair.
13        Q.    Do you have any plans to testify at the
14    trial in this matter?
15        A.    Not at the present time.
16                  (Exhibit Number 12 marked.)
17        Q.    (By Mr. Thompson)  I'll hand you Exhibit 12.
18        A.    Thank you.
19                  MR. QUESADA:  Thank you.
20        Q.    (By Mr. Thompson)  Representative Anchia,
21    does the front of Exhibit 12 say "House Journal,
22    Eighty-Second Legislature, Regular Session"?
23        A.    It does.
24        Q.    Is it dated Monday, March 21, 2011?
25        A.    It is.
```

1        Q.   Does this appear to be a copy of the House

2    Journal published by the Texas Legislature?

3        A.   It does.

4        Q.   Can you flip to Page 914?

5             The page numbers are on the top-left

6    and right-hand corners, sort of booklet style.

7        A.   I'm on Page 914.

8        Q.   According to this excerpt from the House

9    Journal, about the middle of the page you are quoted

10   as saying "Yet this bill doesn't deal with the type of

11   voter fraud that we've seen most prevalently in the

12   state of Texas, which is mail-in ballots."

13            Do you see that?

14       A.   Yes.

15       Q.   Is that an accurate reporting of what you

16   said?

17       A.   Yes.  Those are the words I said in the

18   journal, as reflected in the journal.

19       Q.   This was in the context of a debate about a

20   voter ID bill; correct?

21       A.   Yes.  A strict photo ID bill, correct.

22       Q.   And you were opposing that bill; correct?

23       A.   That's correct.

24       Q.   That bill dealt with a voter showing photo

25   identification in order to vote in person; correct?

```
 1        A.    Correct.

 2        Q.    And I believe some supporters of the bill

 3   said that the bill would be helpful for combating or

 4   preventing in-person voter-impersonation fraud --

 5        A.    Right.

 6        Q.    -- is that right?

 7        A.    Correct.

 8        Q.    And you explained to your colleagues that

 9   that type of voter-impersonation fraud was less common

10   than fraud related to voting by mail; correct?

11        A.    Virtually nonexistent.

12                   MR. THOMPSON:  Do you want to --

13                   MR. QUESADA:  I'm sorry, go ahead.  It

14   says whatever it says.  I'm going to object to the

15   form of the question.  I don't think that's -- I don't

16   think that's what Chairman Anchia said on the record.

17        Q.    (By Mr. Thompson)  Now, at the bottom of

18   this Page 914 --

19        A.    Yes.

20        Q.    -- you're quoted saying, "If you have opened

21   the door to the integrity of elections, then I think

22   it's fair game to discuss that type of fraud, which we

23   actually do see in the state of Texas."

24                   Do you see that?

25        A.    Yes.
```

```
 1        Q.   And you were referring to mail-in ballot
 2   fraud; correct?
 3        A.   Yes.
 4        Q.   Can you flip to Page 915?
 5             The second set of remarks from you on
 6   this page says, "I actually chair the select committee
 7   on that, and I've had in the past mail-in ballot
 8   bills.
 9             Do you see that?
10        A.   Yes.
11        Q.   Do you recall what bills you were referring
12   to in those remarks?
13        A.   I don't.
14        Q.   Based on what you remember today, have you
15   offered bills in the past related to mail-in ballots?
16        A.   I think I was a joint author on mail-in
17   ballot bills in the past.
18        Q.   Would this have been a bill authored by
19   Representative Oliverson...
20        A.   I don't recall.
21        Q.   ...where he would have --
22        A.   I don't recall.
23        Q.   To the best of your recollection, what was
24   the purpose of the bills related to mail-in ballots
25   that you were offering?
```

```
 1        A.    I don't recall.

 2        Q.    Let me go to the next comment from you on

 3   that page.  It's the third one, "Here's the quandary

 4   for this body.  If you say passing this bill is going

 5   to restore integrity of elections, you do nothing in

 6   this bill to deal with mail-in ballots and 70 percent

 7   of all the prosecutions by the Attorney General have

 8   been mail-in ballots, then you're really not restoring

 9   integrity of elections because people, like they have

10   for the last six years, will be reading about mail-in

11   ballot fraud, mail-in ballot fraud, mail-in ballot

12   fraud."

13               Do you see that?

14        A.    I do.

15        Q.    Do you generally conduct research to support

16   the factual statements that you make on the floor of

17   the House of Representatives?

18        A.    Yes.

19        Q.    Do you think you've researched the

20   prosecutions brought by the Attorney General related

21   to voter fraud?

22        A.    Yes.

23        Q.    And your research showed that 70 percent of

24   the Attorney General's prosecutions related to voter

25   fraud were about mail-in ballots?
```

1          A.    At the time.

2          Q.    Do you know whether those numbers are

3    similar or different now?

4          A.    I don't, I don't.  I recall that they were

5    low -- very low at the time.  So 70 percent of a low

6    number.  I don't recall that exact number.  But my

7    whole point in -- just for further context because,

8    you know, folks have tried to take this language out

9    of context on the House floor.  So I figured I'd offer

10   an explanation, some context here.

11               Number one is an acknowledgment that

12   voter fraud in the state of Texas is a very s -- a

13   very small number.  It's like a rou -- I think I

14   described it at one point as a rounding error of a

15   rounding error.  You're more -- you're more likely to

16   get struck by lightning.  To the extent it exists, it

17   is not in -- it was not found in voter impersonation,

18   which undercut the -- the pretext that was being given

19   by the legislature at that time about the need to have

20   strict -- a strict photo ID standard in the state, and

21   ultimately we won this in court.

22               But it undercut their argument to

23   suggest that in-person voter impersonation was about

24   the integrity of election when at the time they were

25   not doing anything about mail-in ballot fraud, which

```
 1    was the one place where we did see some, not much, but

 2    some.

 3                    And of the cases that the Attorney

 4    General had prosecuted, they had all been in that

 5    area.  So it seemed to suggest that their pretext for

 6    bringing that photo identification bill was -- was not

 7    sincere, and that's what I was pointing out here.

 8         Q.   I certainly don't mind you offering context.

 9                    MR. THOMPSON:  I will, nonetheless,

10    have to object as nonresponsive.

11         A.   Okay.

12         Q.   (By Mr. Thompson)  It's nothing personal, of

13    course.

14         A.   No, of course.  None -- no personal...

15         Q.   Okay.

16         A.   Nothing -- nothing personal taken, Will.

17                    (Exhibit Number 13 marked.)

18         Q.   (By Mr. Thompson)  Good.  I'm going to hand

19    you what's been marked as Exhibit 13.

20                    Exhibit 13 is an excerpt from the House

21    Journal of the Eightieth Legislature, Regular Session;

22    correct?

23         A.   Yes.

24         Q.   And it's dated Monday, April 23, 2007;

25    correct?
```

1      A.   Yes.

2      Q.   If you could flip to Page 2224, please.

3      A.   I am with you.

4      Q.   That Page 2224 contains remarks from you

5   about House Bill 218; correct?

6      A.   Yes.

7      Q.   Take a look down at the third paragraph of

8   your remarks, and then halfway through that paragraph

9   there's a sentence that begins "Furthermore..."

10              Do you see that?

11     A.   Yes.

12     Q.   I'm going to read that and ask you to

13  confirm that I read it correctly.

14     A.   Yes.

15     Q.   "Furthermore, there's another wonderful

16  loophole in this bill that creates a glaring weakness

17  that essentially allows vote by mail to continue

18  without photo identification.  Vote by mail, that we

19  know, is the greatest source of voter fraud in this

20  state.  In fact, all of the prosecutions by the

21  Attorney General -- I shouldn't say all, but a great

22  majority of the prosecutions by the Attorney General

23  occur with respect to vote by mail."

24              Do you see that?

25     A.   Correct.

1        Q.    And this is an accurate transcription of

2    what you said in those remarks; correct?

3        A.    Correct.

4                    (Exhibit Number 14 marked.)

5        Q.    (By Mr. Thompson)  I'd like to show you a

6    new exhibit.  This is marked Exhibit 14.

7        A.    Thank you.

8                    MR. QUESADA:  Thank you, guy.

9        Q.    (By Mr. Thompson)  Representative Anchia, is

10   Exhibit 14 -- I'm sorry.  Before we get going, I just

11   want to make sure.  There's a printer error on my

12   copy, and it's a little bit hard to read.

13                    Does your copy look clear?

14       A.    It does.

15       Q.    Okay, perfect.  Then I'll just use a

16   different copy.

17                    Exhibit 14 is an excerpt from the House

18   Journal of the Eighty-Seventh Legislature, Second

19   Called Session; correct?

20       A.    Yes.

21       Q.    And it's dated Tuesday, August 31, 2021;

22   correct?

23       A.    Yes.

24       Q.    Okay.  If you flip to Pa -- the next page is

25   Page 316 in the top left-hand corner.

```
 1                     And there's a bold heading that says
 2    "SB 1 - Conference Committee Report Adopted;" correct?
 3         A.   Yes.
 4         Q.   Just below that it says "Representative Murr
 5    submitted the conference committee report on SB 1;"
 6    correct?
 7         A.   Yes.
 8         Q.   When the Texas House and the Texas Senate
 9    pass two different versions of the bill, members meet
10    in something called a conference committee; correct?
11         A.   Yes.
12         Q.   And the conference committee irons out the
13    differences between the House version and the Senate
14    version; correct?
15         A.   Yes.
16         Q.   So after they settle on some sort of
17    compromised version, that version goes back to both
18    the House and the Senate; correct?
19         A.   Yes.
20         Q.   And then for the bill to become law, the
21    House and the Senate have to pass the same version of
22    the bill; right?
23         A.   Yes.
24         Q.   And that would be the conference committee
25    report version of the bill; correct?
```

1          A.    Correct.

2          Q.    That's what happened in the case of SB 1;

3     right?

4          A.    Correct.

5          Q.    So the House vote adopting the conference

6     committee report on SB 1 would be the last to vote of

7     the Texas House of Representatives before the bill

8     went to the governor; is that correct?

9          A.    Yes.

10         Q.    Now, if you'll turn to Page 319 in this

11    excerpt from the House Journal, we can see the -- the

12    vote on adopting the conference committee report;

13    correct?

14         A.    Yes.

15         Q.    And this reports that there were 80 yeas, 41

16    nays and one member present not voting; correct?

17         A.    Yes.

18         Q.    You can see the list of all the

19    representatives who voted in favor of SB 1 here;

20    right?

21         A.    Yes.

22         Q.    Can you identify any member of the Texas

23    House of Representatives who voted in favor of Senate

24    Bill 1 with a racially discriminatory intent?

25         A.    I can't look into their hearts or minds, so

1    I'm unable to say either way.

2         Q.   You're not a mind-reader; right?

3         A.   I am not a mind-reader.

4         Q.   You don't know what your colleagues were

5    thinking about when they voted for Senate Bill 1?

6         A.   I don't, I don't.

7         Q.   Did any of your colleagues -- outside of

8    what they said on the public record on the House floor

9    or something, did any of your colleagues tell you why

10   they were voting in favor of Senate Bill 1?

11        A.   No.

12        Q.   Did you hear any of your colleagues say

13   anything in the context of Senate Bill 1 that you

14   thought reflected an intent to racially discriminate?

15        A.   No.

16        Q.   There was an election bill that the Texas

17   House of Representatives was considering toward the

18   end of the 87th regular session; correct?

19        A.   Say that one more time.  There was an

20   election bill that the House of Representatives was

21   considering...

22        Q.   ...at the end of the 87th regular session?

23        A.   Yes.

24        Q.   It did not pass; correct?

25        A.   Ooh.  I imagine a number of different

Rafael Anchia

August 22, 2022
Page 77

1    election bills did not pass at the end of the -- of

2    the 87th session, regular session.

3         Q.    Do you recall democratic members of the

4    Texas House of Representatives leaving Texas at the

5    end of the 87th regular session?

6         A.    No.

7         Q.    Do you recall them leaving the House

8    chamber?

9         A.    Yes.

10        Q.    Did that deprive the Texas House of

11   Representatives of a quorum to conduct business?

12        A.    Yes.

13        Q.    Was that the intent of the members who were

14   leaving?

15        A.    Yes.

16        Q.    Was the goal to prevent passage of the

17   election bill that was then pending on the House

18   floor?

19        A.    If we're referring to, I think, SB 7, then

20   the answer's, yes.

21        Q.    And, just for clarity of the record, could

22   you briefly describe what...

23              Oh, don't worry about it.

24              SB 7 was an election bill that had some

25   similarities with SB 1, but also had some differences;

1    correct?

2         A.   Yes.

3         Q.   At what point did members of the Texas House

4    of Representatives who were democrats decide to leave

5    the state after the close of the 87th regular session?

6              MR. QUESADA:  I'm going to object to

7    the form of the question.

8         A.   I don't recall the exact date.

9         Q.   (By Mr. Thompson)  Were you a member who

10   left the state?

11        A.   Yes.

12        Q.   When did you leave?

13        A.   I don't recall exactly.

14        Q.   Was it before the first special session was

15   called?

16        A.   Yes.

17        Q.   Was it --

18        A.   I don't recall.  I don't recall if it was

19   after the call itself or in anticipation of the call

20   itself.  I don't recall.

21        Q.   But you left with the purpose of not being

22   present for the first called special session; is that

23   correct?

24        A.   I was already out of the state.  So I want

25   to make sure I'm technically -- it's tech -- my -- it

```
 1    was my intent not to be present for the first special
 2    called session.
 3         Q.   When had you left the state?
 4         A.   I don't remember the exact date.  I'd have
 5    to go back and look at my records.
 6         Q.   Why had you left the state?
 7         A.   Spend time with my family.
 8         Q.   And where were you at that point?
 9         A.   At which point?
10         Q.   At the point -- when you first left the
11    state of Texas after the end of the 87th regular
12    session, where did you go?
13              MR. QUESADA:  I'm going to object to
14    the form of the question.  You may answer.
15         A.   So I went to my father's village to see
16    family in -- in -- the name of the village is
17    Markina-Xemein.  M-a-r-k-i-n-a-X-e-m-e-i-n.
18         Q.   (By Mr. Thompson)  And where is that?
19         A.   It's in the Basque Country.
20         Q.   Is that in Spain?
21         A.   It's -- the Basque Country's in both Spain
22    and France, but the particular village is in -- in
23    Spain.
24         Q.   Did you eventually join democratic
25    colleagues in D.C.?
```

Rafael Anchia                                                    August 22, 2022
                                                                       Page 80

1        A.    I did.

2        Q.    Do you know when you did that?

3        A.    I don't remember the exact date.

4        Q.    Do you remember approximately when it was?

5        A.    In the summer.

6        Q.    Do -- when you were out of the state, did

7    you communicate with any republican colleagues about

8    when you would be returning?

9        A.    I don't recall.

10       Q.    Do you know whether your democratic

11   colleagues, any of them, were communicating with

12   republican colleagues about when they would return?

13       A.    I don't recall.

14       Q.    Is it fair to say that, to the best of your

15   knowledge, the republicans didn't know when the House

16   would have quorum again?

17       A.    Yes, to the best of my knowledge.

18       Q.    When did you return to Austin?

19       A.    I don't remember.

20       Q.    Do you remember approximately?

21       A.    I'd have to go back and look at my dates.

22       Q.    Do you think it was during the second called

23   special session?

24       A.    Yes.

25       Q.    And you think it was after the special

1    session started?

2         A.    That's my recollection, yes.

3         Q.    Did you return to the House chamber only

4    after a quorum had been established?

5         A.    That's my recollection.

6         Q.    At that point, did you communicate to any

7    republican members whether you would stay or leave

8    again?

9         A.    I don't recall.

10        Q.    Is it fair to say that, to the best of your

11   knowledge, republican members of the House didn't know

12   whether democratic members of the House might break

13   quorum again?

14        A.    I don't know.

15        Q.    Do you read the Dallas Morning News?

16        A.    Yes.

17        Q.    Forgive me if I mispronounce this.

18             But have you ever heard of a Dallas

19   Morning News writer named Gromer, G-r-o-m-e-r,

20   Jeffers?

21        A.    Yes.

22        Q.    Who is that?

23        A.    He's a reporter for the Dallas Morning News.

24   He's a Cubs fan.

25        Q.    Do you have any knowledge about whether he's

1      an honest man?

2              A.   I don't know.

3                      MR. QUESADA:  He said he was a Cubs

4      fan.

5                      (Exhibit Number 15 marked.)

6              Q.   (By Mr. Thompson)  I'm going to hand to you

7      what's been marked as Exhibit 15.

8              A.   Yeah.

9                      MR. QUESADA:  Thank you.

10             Q.   (By Mr. Thompson)  Is Exhibit 15 an article

11     from the Dallas Morning News entitled "Texas needs

12     tougher laws to reel in mail-in vote fraud"?

13             A.   Yes.

14             Q.   Is it written by Gromer Jeffers, Jr.?

15             A.   Yes.

16             Q.   Is it dated April 26th, 2017?

17             A.   Yes.

18             Q.   Do you see in the first paragraph of

19     Mr. Jeffers it says "Let's face it.  Mail-in ballot

20     voting, a necessary and noble process, is vulnerable

21     to fraud"?

22             A.   Yes.

23             Q.   Do you see in the second paragraph he says

24     "Residents --," referring to residents of West

25     Dallas, "-- there have complained about receiving

1    absentee ballots they didn't request, raising the

2    possibility that someone is casting votes for them."

3                    Do you see that?

4         A.   Yes.

5         Q.   Do you have any knowledge one way or the

6    other about whether residents were receiving absentee

7    ballots they didn't request?

8         A.   I'm unaware.

9         Q.   Do you know one way or the other whether

10   someone was casting votes for them?

11        A.   I'm unaware.

12        Q.   If you could flip to Page 2, please.  Up at

13   the top says -- it has a quote from Mayor Mike

14   Rawlings.

15                   Do you see that?

16        A.   Yes.

17        Q.   Excuse me.  The quote is also jointly

18   authored by Representative Eric Johnson; correct?

19        A.   Yes.

20        Q.   And they said, "We ask that you devote

21   additional resources to verify the integrity of each

22   mail-in ballot in Texas."

23                   Do you see that?

24        A.   Yes.

25        Q.   And they wrote that in a letter to the

1      Dallas County Elections Department; correct?

2            A.    Yes.

3            Q.    Were you involved at all in the Dallas

4      County Elections Department's response to that letter?

5            A.    Not that I recall.

6            Q.    Do you recall communicating with Mayor

7      Rawlings, Representative Johnson or anyone from the

8      Dallas County government about this issue at the time?

9            A.    Not that I recall.

10           Q.    If you'll look in Paragraph 3, Mr. Jeffers

11     says, "Voter fraud, even with mail-in ballots, does

12     not occur on a large scale.  But in low-turnout

13     elections, stealing just a few votes can be the

14     difference between winning and losing."

15                 Do you see that?

16           A.    I do.

17           Q.    Are you aware of the fact that some elected

18     officials in Texas are elected by just a few votes in

19     a very close race?

20           A.    Yes.

21           Q.    You've had colleagues in the House of

22     Representatives who won by just a handful of votes;

23     right?

24           A.    Yes.

25           Q.    And so even a very small amount of mail-in

1      ballot fraud in those elections could alter the

2      outcome; correct?

3            A.    Certainly, or a small amount of voters being

4      turned away at the polls.

5            Q.    Who is Representative Steve Wolens?

6            A.    Steve Wolens is a lawyer, a former state

7      representative and my predecessor in office.  I

8      call -- I would consider him a friend.

9            Q.    He was a knowledgeable public servant?

10           A.    Quite.

11           Q.    He's quoted in the fourth paragraph on Page

12     2 as saying "'You have to have a conversation in order

13     to prevent coercion and fraud,' said former Rep --

14     former State Rep. Steve Wolens, who in 2003 sponsored

15     legislation to overhaul the state's mail-in ballot

16     system, 'Then you tailor-make a new law that deals

17     with abuse and opens up voting.'"

18                 Do you see that?

19           A.    I do.

20           Q.    If you look at the seventh paragraph on Page

21     2, it uses a Spanish term "politiqueros".

22                 Do you see that?

23           A.    Yes.

24           Q.    Are you familiar with that term?

25           A.    Vaguely.

 1        Q.   What is your understanding of the term

 2   "politiqueros"?

 3        A.   People who are involved in political

 4   campaigns.

 5        Q.   Here Mr. Jeffers says "The law also devised

 6   ways to track mail-in vote operatives, called

 7   "politiqueros," in Hispanic neighborhoods where

 8   absentee campaigns are aggressive."

 9             Do you see that?

10        A.   I do.

11        Q.   Are you familiar with allegations that

12   people identified as "politiqueros" have

13   inappropriately stolen people's votes?

14        A.   No.

15        Q.   You don't know one way or the other?

16        A.   No.  I'm unaware of any allegations.

17        Q.   Do you know whether any of your colleagues

18   in the Texas Legislature read this piece by

19   Mr. Jeffers in the Dallas Morning News?

20        A.   I don't.

21        Q.   Do you recall Representative Lozano

22   referring to it on the floor when the legislature was

23   debating SB 1?

24        A.   To this specific piece?  Is that the

25   question?

1        Q.    Yeah.

2        A.    No.

3        Q.    Do you recall your colleagues more generally

4    talking about newspaper articles on the topic of

5    mail-in ballot fraud?

6        A.    I don't.

7              (Exhibit Number 16 marked.)

8        Q.    (By Mr. Thompson)  I'm going to hand you

9    what's been marked as Exhibit 16.

10       A.    Thank you.

11             MR. QUESADA:  Thank you, sir.

12       Q.    (By Mr. Thompson)  Does Exhibit 16 appear to

13   be an article from the Dallas Observer entitled "City,

14   County Investigate Possible Voter Fraud In Upcoming

15   Council Election"?

16       A.    Yes.

17       Q.    Is it authored by Stephen Young?

18       A.    Yes.

19       Q.    Is it dated April 24, 2017?

20       A.    Yes.

21       Q.    And in the bottom right-hand corner on Page

22   1, do you see a Bates stamp MS007397?

23       A.    Yes.

24       Q.    And I'll just represent to you that there's

25   some highlighting in this document.  My understanding

1    is that this highlighting came from the party that

2    produced the document and that the highlighting

3    probably was not in the original publication.

4                   Are you able to read the document okay

5    despite the highlighting?

6         A.    Correct.

7         Q.    Okay.  Do you read the Dallas Observer?

8         A.    On occasion.

9         Q.    Do you know whether any of your colleagues

10   in the legislature read the Dallas Observer?

11        A.    I don't.

12        Q.    If you could turn to the second page of this

13   exhibit, which is Bates stamped MS007398, in the

14   second full paragraph it says "Earlier this month

15   several senior citizens in West Dallas and Oak Cliff

16   complained to WFAA-TV that they'd received mail-in

17   ballots without having asked for one."

18                   Do you see that?

19        A.    I do.

20        Q.    You represent part of West Dallas; correct?

21        A.    Correct.

22        Q.    Do you represent Oak Cliff?

23        A.    I do.

24        Q.    Did your office receive any complaints on

25   this topic?

```
 1        A.   Not that I'm aware.

 2        Q.   Do you have any reason to doubt that senior

 3   citizens from West Dallas and Oak Cliff complained to

 4   the local TV station that they had received mail-in

 5   ballots without having asked for one?

 6        A.   No.

 7        Q.   Would you agree that receiving a mail-in

 8   ballot that you did not request would reasonably cause

 9   one to wonder whether some sort of irregularity was

10   occurring?

11        A.   Error or irregularity.  Certainly error.

12        Q.   In Texas you're not supposed to receive a

13   mail-in ballot without having asked for one; right?

14        A.   That's right.

15        Q.   So when senior citizens receive a mail-in

16   ballot without having asked for one, they know

17   something's gone wrong; correct?

18        A.   Yes.

19             MR. THOMPSON:  Do you need to take a

20   break or anything?

21             MR. QUESADA:  Nope.

22        Q.   (By Mr. Thompson)  If you look toward the

23   bottom of this page, the second-to-the-last paragraph,

24   second sentence, it says "As the Dallas Observer has

25   documented for well over a decade, Dallas' council
```

1    races, especially in the city's low-turnout districts

2    like West Dallas' District 6, can come down to which

3    candidate better executes its absentee ballot

4    Strategy.  In 2015 incumbent Monica Alonzo, whose

5    campaign didn't return a request to comment for this

6    story, won her District 6 seat despite receiving only

7    958 votes."

8              Do you see that?

9         A.   I do.

10        Q.   Do you know whether it's true that Dallas

11   City Council races can come down to which candidate

12   better executes an absentee ballot strategy?

13        A.   I don't.

14        Q.   Do you know anything about Monica Alonzo's

15   election in 2015?

16        A.   No.  Other than she was elected, no.

17        Q.   No reason to dispute that it was a

18   relatively low-turnout election?

19        A.   No.

20        Q.   Is that common for District 6 in Dallas?

21        A.   I have no basis.

22        Q.   Do you know whether any of your colleagues

23   in the legislature read this article when they were

24   considering Senate Bill 1?

25        A.   I don't.

```
 1                  MR. THOMPSON:  All right.  If we can

 2     take a short break, I think we can wrap up here.

 3                  MR. QUESADA:  Okay.

 4                  THE VIDEOGRAPHER:  We're off the record

 5     at 11:36 a.m.

 6                       (Break.)

 7                  THE VIDEOGRAPHER:  We're back on the

 8     record at 11:48 a.m.

 9          Q.   (By Mr. Thompson)  Chairman Anchia, are you

10     familiar with any irregularities since the passage of

11     Senate Bill 1?

12          A.   Since the passage of Senate Bill 1?  Is that

13     what you said?

14          Q.   No, sir.

15          A.   I apologize.

16          Q.   Was the process used for passing Senate Bill

17     1 into law irregular in any respect?

18          A.   No.

19          Q.   Everybody was following the normal House

20     rules when they considered the bill?

21          A.   It seems so, yes.

22          Q.   Have you studied the impacts, if any, of

23     SB 1 on voters in Texas?

24          A.   We have not.  We -- we asked for that to be

25     included as part of the bill, but that -- those
```

1    amendments were rejected.  So the answer's, no.

2         Q.    Who's the "we" you're referring to?

3         A.    The offerers of amendments and those persons

4    who voted for the amendments, the requesting racial

5    impact studies, et cetera.

6         Q.    I think I recall seeing those.

7         A.    Yeah.

8         Q.    Is it fair to say that the amendments to

9    which you're referring would have required Texas

10   officials to study the impacts of SB 1 and assess if

11   those impacts were different for members of different

12   racial groups?

13        A.    Yes.

14        Q.    And those amendments were not adopted;

15   correct?

16        A.    That's correct.

17        Q.    I believe your colleagues indicated that

18   they had not looked at the racial impacts of the bill

19   prior to drafting it; is that correct?

20        A.    Even -- even after they had drafted it as

21   well.  So not -- not just prior, but during the

22   drafting and during the legislative process.

23        Q.    I'm sorry.  Just to make sure I understand,

24   your understanding is that your colleagues in the

25   House had not studied the racial impacts of the bill

1    at any point; is that right?

2        A.   That -- that's what I believe specifically I

3    had this conversation with Representative Cain during

4    the first regular session, and he said "No".  I don't

5    recall what the answers were for the special -- for

6    the second called special legislative session...

7        Q.   Okay.

8        A.   ...on that issue.

9        Q.   And apart from these studies, you don't have

10   personal knowledge of what the impacts of SB 1 have

11   been --

12       A.   I -- I do not.

13       Q.   -- on voters; correct?

14       A.   I do not.

15       Q.   Would you identify any of your colleagues in

16   the Texas House of Representatives as racists?

17       A.   Would I?  Could I?  What was the question?

18       Q.   Would you describe any of your colleagues in

19   the House of Representatives as racists?

20       A.   Oh, I can't -- I can't look in their hearts.

21   I'll -- I'll say I -- I -- I couldn't say one way or

22   the other.

23       Q.   Is that also true for members of the Texas

24   Senate?

25       A.   Yes.

1          Q.   Are you familiar with the process for

2    applying to vote for a ballot by mail?

3                    I'm sorry.  I think I worded that

4    incorrectly.

5                    Are you familiar with the process for

6    applying to vote by mail?

7          A.   Is it an application for a ballot to vote by

8    mail?  Is that what we're referring to?

9          Q.   Yes.

10         A.   Yes.

11                   (Exhibit Number 17 marked.)

12         Q.   (By Mr. Thompson)  I'm going to hand you

13   what's been marked as Exhibit 17.

14         A.   Thank you.

15         Q.   Is Exhibit 17 an application for a ballot by

16   mail?

17                   MR. QUESADA:  Thank you.

18         A.   It appears to be.

19         Q.   (By Mr. Thompson)  Okay.  An application for

20   ballot by mail requests certain identifying

21   information from the voter; correct?

22         A.   Yes.

23         Q.   So you can see in Box 1 on this form that an

24   application for a ballot by mail asks the voter for

25   the voter's name and address; correct?

```
 1        A.    Yes.
 2        Q.    And then also within Box 1 it says "Optional
 3   Information" and it gives voters the option of
 4   providing a date of birth, a VUID number, a precinct
 5   number, an e-mail address and a telephone number;
 6   correct?
 7        A.    Yes.
 8        Q.    Now, kind of to the right of Box 1 the
 9   current version of the application for ballot by mail
10   requires voters to provide either a Texas Driver's
11   License Number, a Texas Personal Identification
12   Number, Election Identification Certificate Number or
13   the last four digits of a social security number;
14   correct?
15        A.    Yes.
16        Q.    And the -- if I refer to the information
17   requested in that section of the form as ID numbers,
18   will you know what I mean?
19        A.    Yes.
20        Q.    And this requirement to provide an ID number
21   is new because of Senate Bill 1; correct?
22        A.    That's my understanding.
23        Q.    So before Senate Bill 1 a voter still had to
24   provide information like name and address, but didn't
25   have to provide an ID number; correct?
```

1        A.    That's right.

2        Q.    Have you heard of the voter file?

3        A.    Yes.

4        Q.    Do you understand the voter file to be a

5    database of information about vote -- about voters

6    that is maintained at the state level by the Secretary

7    of State or at the local level by county officials?

8        A.    Yes.

9        Q.    The voter file is public information that

10   people can request from the government; correct?

11       A.    That's my understanding.  But -- but not all

12   of the information.  I think there's some information

13   that's redacted, if I'm not mistaken, to protect the

14   identity of -- of the voter.  Can be, I should say.

15   Can be redacted.

16       Q.    My understanding is, that's correct, that

17   there's some -- I'll just represent to you there's

18   some information in the voter file that's publicly

19   released and some that conceivably could be redacted.

20       A.    Yes, correct.

21       Q.    Do you understand that campaigns request the

22   public versions of the voter file sometimes?

23       A.    Yes.

24       Q.    Has your campaign done that?

25       A.    I don't -- no, not my campaign.  Not that

1    I'm aware of at least.

2         Q.   And sometimes campaigns hire consultants who

3    have a copy of the voter file; correct?

4         A.   That's right.

5         Q.   Is that something your campaign does?

6         A.   Correct.

7         Q.   And the public version of the voter file

8    that a campaign or somebody could get includes a

9    voter's name and address; correct?

10        A.   Yes.

11        Q.   But a voter's ID numbers are not public

12   information; correct?

13        A.   That is my understanding, that is correct.

14        Q.   So before Senate Bill 1 when an application

15   for a ballot by mail did not require an ID number, all

16   the information required by the form could have been

17   gleaned from the publicly available voter file;

18   correct?

19        A.   That sounds right.

20        Q.   But after Senate Bill 1 the application for

21   a ballot by mail requires a voter to provide nonpublic

22   information; correct?

23        A.   Yes.

24        Q.   Do you know whether other laws besides SB 1

25   required voters to provide either a driver's license

 1    number or a social security number for identification

 2    purposes?

 3         A.   I don't know.

 4              (Exhibit Number 18 marked.)

 5         Q.   (By Mr. Thompson)  I'll put Exhibit 18 in

 6    front of you.

 7         A.   Thank you.

 8              MR. QUESADA:  Thank you, sir.

 9         Q.   (By Mr. Thompson)  Does Exhibit 18 appear to

10    be a copy of 52 U.S.C., Section 21083?

11         A.   Yes.

12         Q.   If you could turn to Page 75 of the

13    document.

14         A.   I'm with you.

15         Q.   And it should be Section 21083(A)(5)(A)(i).

16         A.   Beginning with "In general"?

17         Q.   Yes.  Do you see that it says "Except as

18    provided in clause (ii), notwithstanding any other

19    provision of law, an application for voter

20    registration for an election for federal office may

21    not be accepted or processed by a state unless the

22    application includes (i) in the case of an applicant

23    who has been issued a current and valid driver's

24    license, the applicant's driver's license number; or

25    (ii) in the case of any other applicant (other than

 1    the applicant to whom clause (ii) applies), the last 4

 2    digits of the applicant's social security number"?

 3                    Do you see that?

 4        A.   Yes.

 5        Q.   Do you know whether your colleagues in the

 6    legislature decided to use the driver's license or

 7    social security number requirement based on its

 8    similarity to this provision of federal law?

 9        A.   I don't.

10        Q.   And do you recall speaking with

11    Representative Lozano on the House floor during the

12    debate over SB 1?

13        A.   Vaguely, yes.

14        Q.   Representative Lozano said, "We need to

15    verify that people are who they are before they vote."

16    And you responded, "Stipulated, stipulated," according

17    to the House Journal.

18                    Do you agree that we need to verify who

19    people are before they vote?

20        A.   Yes.

21        Q.   That's always been your --

22        A.   Stipulated.

23        Q.   That's always been your position, hasn't it?

24        A.   Sure.

25                    MR. THOMPSON:  No further questions.

 1    Thank you, Representative.

 2                    THE WITNESS:  Thank you.

 3                    MR. THOMPSON:  Thanks so much for your

 4    time.  I appreciate it.

 5                    THE WITNESS:  Appreciate you.

 6                    MR. THOMPSON:  Is there anyone on Zoom

 7    who would like to ask questions of Representative

 8    Anchia?

 9                    MS. CUBRIEL:  Nothing from Bexar

10    County.

11                    MR. BROUGHTON:  Nothing from Hall.

12                    MS. NICHOLAS:  Nothing from Dallas

13    County defendants.

14                    UNIDENTIFIED SPEAKER:  Nothing from

15    Travis County defendants.

16                    MR. KENNY:  Nothing from intervenor

17    defendants.

18                    MS. WILLIAMS:  Nothing from the LUPE

19    plaintiffs.

20                    MR. BIETER:  Nothing from Mi Familia

21    Vota.

22                    Ms. TOGNETTI:  Nothing from Hidalgo

23    County.

24                    MR. BIETER:  Nothing from the Mi

25    Familia Vota plaintiffs.

1              THE VIDEOGRAPHER:  Anything further,

2     Counsel?

3              MR. QUESADA:  Nothing here.

4              THE VIDEOGRAPHER:  All right.  We're

5     off the record at 12:02 p.m.

6              THE REPORTER:  This is the court

7     reporter.  At this time anyone on Zoom who would like

8     a copy besides Mark, I'll go ahead and take that now.

9              MR. KENNY:  The intervenor defendants

10    would like a copy of the transcript, please.

11             (Deposition concluded:  12:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CHANGES AND SIGNATURE
 2    WITNESS NAME:  REPRESENTATIVE RAFAEL ANCHIA
 3            DATE:  AUGUST 22, 2022
 4       PAGE LINE       CHANGE          REASON
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

1          I, REPRESENTATIVE RAFAEL ANCHIA, have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted above.

4

5

6                              _____

                               REPRESENTATIVE RAFAEL ANCHIA

7     THE STATE OF _____)

8     COUNTY OF _____)

9

10         Before me, _____, on

11    this day personally appeared REPRESENTATIVE RAFAEL

12    ANCHIA, known to me (or proved to me under oath or

13    through _____) (description of identity

14    card or other document) to be the person whose name is

15    subscribed to the foregoing instrument and acknowledged

16    to me that they executed the same for the purposes and

17    consideration therein expressed.

18         Given under my hand and seal of office this

19    _____ day of _____, _____.

20

21

22

23

24                             _____

                               NOTARY PUBLIC IN AND FOR

                               THE STATE OF _____

25                             COMMISSION EXPIRES: _____

1                 IN THE UNITED STATES DISTRICT COURT
                              FOR THE
2                  WESTERN DISTRICT OF TEXAS
3    LA UNION DEL PUEBLO                )
     ENTERO, et al,                     )
4                                       )
         Plaintiff,                     )
5                                       )          Civil Action No.
     v.                                 )          5:21-cv-00844-XR
6                                       )
     GREGORY W. ABBOTT, et al,          )
7                                       )
         Defendant.                     )
8
9                      REPORTER'S CERTIFICATION
10        DEPOSITION OF REPRESENTATIVE RAFAEL ANCHIA
11                      AUGUST 22, 2022
12        I, Brent Sturgess, Certified Shorthand Reporter in
13   and for the State of Texas, hereby certify to the
14   following:
15        That the witness, REPRESENTATIVE RAFAEL ANCHIA, was
16   duly sworn by the officer and that the transcript of the
17   oral deposition is a true record of the testimony given
18   by the witness;
19        That the deposition transcript was submitted on
20   _____ to the witness or to the attorney
21   for the witness for examination, signature and return to
22   me by _____;
23        That the amount of time used by each party at the
24   deposition is as follows:
25        Will Thompson - 02 HOUR(S):06 MINUTE(S)
          George (Tex) Quesada - 00 HOUR(S):00 MINUTE(S)

Rafael Anchia                                          August 22, 2022
                                                              Page 105

```
 1        That pursuant to information given to the
 2   deposition officer at the time said testimony was taken,
 3   the following includes counsel for all parties of
 4   record:
 5        That $_____ is the deposition officer's
 6   charges to Will Thompson for preparing the original
 7   deposition transcript and any copies of exhibits;
 8        I further certify that I am neither counsel for,
 9   related to, nor employed by any of the parties or
10   attorneys in the action in which this proceeding was
11   taken, and further that I am not financially or
12   otherwise interested in the outcome of the action.
13        Certified to by me this _____ day of
14   _____, 2022.
15
16
17
18
19
20
21                   Brent Sturgess
22        _____
          Brent Sturgess, CSR No. 3557
23        Expiration Date:  10/31/23
          Magna Legal Services
24        1635 Market Street, 8th Floor
          Philadelphia, Pennsylvania  19103
25        Phone:  832.871.5100
```