# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LA UNION DEL PUEBLO ENTERO,    )
et. al.,                       )
                               )
    Plaintiffs,                )
                               )   CIVIL ACTION NO.
                               )   5:21-CV-00844-XR
v.                             )
                               )
GREGORY W. ABBOTT, et al.      )
------------------------------------------------------------

ORAL & VIDEO DEPOSITION OF CAROL ALVARADO

October 6, 2022
----------------------------------------------------

    Oral & video deposition of Carol Alvarado, produced
as a witness at the instance of the plaintiffs, and
duly sworn, was taken in the above-styled and numbered
cause on the 6th day of October, 2022, before
Patrick Stephens, Certified Court Reporter, at
209 West 14th Street, Ground Floor Conference Room,
Austin, Texas 78701.



Carol Alvarado

October 06, 2022
Pages 2 to 5

## Page 2

A P P E A R A N C E S

ON BEHALF OF SENATOR CAROL ALVARDO:

MARTIN GOLANDO, ESQ.
Attorney at Law
405 N St Mary's Street
Suite 700
San Antonio, TX 78205
Telephone:  (210) 892-8543
martin.golando@gmail.com

ON BEHALF OF THE DEFENDANTS:

KATHLEEN HUNKER, ESQ.
J. AARON BARNES, ESQ.
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711
Telephone:  (512) 463-4139
kathleen.hunker@oag.texas.gov
aaron.barnes@oag.texas.gov

ALSO PRESENT:

Layton Marrs, Videographer.
Magna Legal Services
Sushma Jasti-Smith, Esq. (Senator Alvarado)
William Atallah, Intern, TX OAG's Office

VIA ZOOM

Roswill Mejia, Counsel for Plaintiffs (Reed Smith)
Eric Nichols, Harris Co. District Atty's Office
Charles Roberts, Intervening Defendants
Raquel Panza, Law Clerk (Fried & Jacobson)
Mike Stewart, Department of Justice

## Page 3

1                         I N D E X
2   APPEARANCES ............................................ 02
3   CAROL ALVARADO
4          Cross-Examination by Ms. Hunker ................ 08
5
6
7
8
9
10
11
12
13   Reporter's Certificate ................................ 240
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                        E X H I B I T S

3   NO.      DESCRIPTION                           PAGE
4   1        Alvarado Biography                     16
5   2        Senate Journal                         21
6   3        8/27/20 Letter                         27
7   4        Original Petition                      32
8   5        Court of Appeals Petition              36
9   6        Harris Co. Website                     42
10  7        Paxton Letter                          45
11  8        Justice Devine Dissent                 51
12  9        11/2/20 Order                          56
13  10       Houston Chronicle Article              61
14  11       7/22/20 Letter                         68
15  12       Governor Abbott Letter                 70
16  13       Devine Dissent (10/7/20)               74
17  14       Ingram Declaration                     78
18  15       Early-voting Schedule                  84
19  16       Video Clip Number 2                    95
20  17       Video Clip Number 5                    96
21  18       SB7                                   100
22  19       SB7 (Amended)                         101
23  20       Press Release                         106
24  21       TLO List of Amendments                111
25

## Page 5

1                    E X H I B I T S (Cont.)

3   22       SB7                                   114
4   23       Video Clip                            117
5   24       SB7 (Engrossed)                       117
6   25       SB1                                   120
7   26       Video Clip                            121
8   27       Video Clip                            125
9   28       Twitter Post                          130
10  29       Twitter Post 8/11/22                  143
11  30       Election Advisory                     149
12  31       Prosecution Records                   162
13  32       Privilege Log                         166
14  33       House Journal                         167
15  34       Zaffirini Letter                      170
16  35       Texas Democrats' Website              174
17  36       KXN Website                           176
18  37       Photo                                 178
19  38       Election Advisory                     180
20  39       Chapter 33 (Election Code)            186
21  40       Chapter 276 (Election Code)           187
22  41       Video Clip                            188
23  42       Handbook                              191
24  43       Election Advisory                     196
25



Carol Alvarado

October 06, 2022
Pages 6 to 9

**Page 6**

E X H I B I T S (Cont.)

3  44    Video Clip                              199
4  45    Video Clip                              205
5  46    Census Numbers                          207
6  47    Voting Figures (Harris)                 212
7  48    Voting Figures (Fort Bend)              213
8  49    Voting Figures (Galveston)              214
9  50    Voting Figures (Montgomery)             214
10 51    Senate Journal (8/11/21)                217
11 52    Senate Journal (8/31/21)                224
12 53    Senate Journal (8/27/21)                231
13 54    Alvarado Notes                          234

**Page 7**

1        P R O C E E D I N G S
2        VIDEOGRAPHER:  We are now on the record.  This
3  begins the deposition of Senator Carol Alvarado in the matter of
4  La Union Del Pueblo Entero, et al., versus Gregory W. Abbott, et
5  al., in the US District Court, Western District of Texas.
6        Today is October 6th, 2022, and the time is
7  10:04 AM.  This deposition is being taken at 209 West 14th
8  Street, Austin, Texas, at the request of the office of the
9  Attorney General of Texas.  The videographer is Layton Marrs of
10  Magna Legal Services and the court reporter is Patrick Stephens
11  of Magna Legal Services.  Will counsel and all parties present
12  state their appearances and whom they represent?
13        MS. HUNKER:  Kathleen Hunker.  I represent the
14  State defendants.  I am joined by co-counsel Aaron Barnes.
15        MR. GOLANDO:  Martin Golando on behalf of
16  Senator Alvarado.
17        VIDEOGRAPHER:  And will the court reporter please
18  swear in the witness?
19        COURT REPORTER:  All right.  Senator Alvarado,
20  would you raise your right hand for me?
21        THE WITNESS:  Sure.
22        COURT REPORTER:  Do you solemnly swear or affirm
23  the testimony you'll give will be the truth, the whole truth and
24  nothing but the truth, so help you God?
25        THE WITNESS:  I do.

**Page 8**

1        COURT REPORTER:  Okay.  Great.  You may take
2  over.
3        (Whereupon,
4            CAROL ALVARADO
5        was called as a witness herein and, having first been
6        duly sworn, was examined and testifies as follows on:)
7            CROSS-EXAMINATION
8    Q    Good morning, Senator.
9    A    Good morning.
10   Q    Thank you for coming today.
11   A    Sure.
12   Q    And I hope you had a good drive in.
13   A    Uh-huh.
14   Q    My name is Kathleen Hunker.  I'm an attorney with the
15  office of attorney general in Texas, representing the State
16  defendants.  For the record, could you just please state and
17  then spell your name?
18   A    Sure.  Carol, C-a-r-o-l, Alvarado, A-l-v-a-r-a-d-o.
19   Q    Senator, I'm going to start with some instructions and
20  introductory questions.  After that's done, I'll move on to the
21  main subject of the deposition.  Have you been deposed before?
22   A    No.
23   Q    Have you testified in court before?
24   A    No.
25   Q    You understand that you are under oath, though;

**Page 9**

1  correct?
2    A    Yes.
3    Q    And you understand that the oath you've taken today
4  has the same effect as if you were testifying in open court;
5  correct?
6    A    Yes.  Wait, wait.  When you asked about testifying,
7  during my time on city council, there was a -- it wasn't court,
8  but it was, I guess -- maybe it was a depo -- I'm not -- I don't
9  know what it was called, though.  Anyway, yeah.
10   Q    But I ask these questions --
11   A    Okay.
12   Q    -- just so you understand that you are under oath and
13  what the effect --
14   A    Sure.
15   Q    -- would have; is that correct?
16   A    Yes.
17   Q    For the court reporter, you will need to provide
18  verbal answers, like yes or no, rather than nodding or shaking
19  your head --
20   A    Okay.
21   Q    -- or using filler words like umm or ah.  This has
22  extra importance here today because we have several attorneys
23  who are participating through Zoom and they may not have -- be
24  able to see you --
25   A    Sure.



Carol Alvarado

October 06, 2022
Pages 10 to 13

Page 10

1   Q   -- at the same clarity as I can.  Does that make
2   sense?
3   A   Yes.
4   Q   It also helps the court reporter if you and I don't
5   talk over one another, so I'm going to do my best to wait for
6   you to finish your answer before I ask my next question.  I do
7   ask that you wait until I finish my question before you start
8   your answer.  Is that okay?
9   A   Yes, ma'am.
10  Q   If you don't understand the question, will you please
11  let me know?
12  A   Uh-huh, yes.
13  Q   And if you do answer the question, I'm going to assume
14  that you've understood the question.  Does that make sense?
15  A   Yes.
16  Q   If you need a break at any time, please just let me
17  know.  I usually take a break about every hour, but it is always
18  left to the witness's discretion.  Okay?
19  A   Okay.
20  Q   Also, if you hear an objection from your counsel, that
21  typically is for a court to decide later.  I therefore ask that
22  you go ahead and answer the question unless you're specifically
23  told not to by your counsel.  Okay?
24  A   Okay.
25  Q   Now, there are a couple of questions that I have to

Page 11

1   ask just as a matter of course.  Have you consumed any alcohol
2   today?
3   A   No.
4   Q   Have you consumed any drugs today?
5   A   No.
6   Q   Have you consumed any mind-altering substance?
7   A   No.
8   Q   Are you aware of anything that would affect your
9   ability to testify truthfully and accurately today?
10  A   No.
11  Q   Can you please tell me your educational background
12  starting from the end of high school moving forward?
13  A   Sure.  I received my undergrad from the University of
14  Houston, bachelor of arts.  I majored in political science and
15  then a master's in business also from the University of Houston.
16  I received my MBA in 2008.
17  Q   And did you pursue any other coursework but perhaps
18  not received a degree from it?
19  A   No.
20  Q   And, now, outside of your work with the Texas
21  legislature, do you have any other paid employment?
22  A   Yes.  I am an independent consultant.  The name of my
23  business is Girasol, G-i-r-a-s-o-l, LLC.
24  Q   And can I just ask what is the -- the subjects in
25  which you consult?

Page 12

1   A   It involves everything from HR to business
2   development, to marketing, to strategy for various businesses.
3   Q   And so your current work focuses really on business;
4   is that correct?
5   A   Yes.
6   Q   And prior to having your independent consulting firm,
7   what did you do prior?
8   A   Well, I've been doing that for a while, probably since
9   the early 2000s.  Before that, I was on the Houston City Council
10  where we did receive a salary and it was -- for me, it was a --
11  a full-time job.
12  Q   And when were you a member of the Houston City
13  Council?
14  A   2001 to 2008.
15  Q   Was that your first position in which you were
16  elected?
17  A   Oh, well, if you want to count something like a
18  precinct chair, a person who runs elections, that was in --
19  yeah, 1990 -- early '90s.
20  Q   And so was being a precinct chair your first act of
21  government service?
22  A   Elected, yeah.  I -- I volunteered in campaigns as a
23  child.
24  Q   But that was your first elected position; is that
25  correct?

Page 13

1   A   Right, uh-huh, uh-huh.
2   Q   And so after you were precinct chair, you were elected
3   to city council; is that correct?
4   A   Sometime after.  I was a precinct chair and then I
5   went to work in Washington, D.C., as a legislative aide for
6   Congressman Gene Green.  I did that for a couple of years.
7   Q   So just so I have a better sense of timeline, what
8   years were you a precinct chair?
9   A   (Nonverbal response.)
10  Q   If you can recall.
11  A   It -- it was 10 years, and I'm trying to think of the
12  exact year.  It was early '90s until -- I guess until I ran for
13  city council, because I couldn't do both.  I think that was the
14  deal.  Yeah, so I -- yeah, I ran elections for about 10 years.
15  Q   And were you the Democrat precinct chair?
16  A   Yes.
17  Q   And was this in Houston?
18  A   Yes.  I was the chair and the election judge.
19  Q   And what were some of your responsibilities as
20  precinct chair?
21  A   Well, the day of the election -- I mean -- or day
22  prior to the election, you set up the polling location, you hire
23  your alternate judge, your election clerks.  There's a list of
24  things you have to do, mark off all the people that voted early.
25  Back then it was all done very differently.  It was very -- it



Carol Alvarado

Page 14

1 was manually done; you had to write on -- the list out.  And you
2 conducted -- oversaw the election in the precinct and then
3 afterwards you counted the -- tabulated the -- the ballots,
4 processed ballots and then transferred the ballot box to the
5 county.
6    Q    And you mentioned that there have been some changes
7 since you were precinct chair in how the elections are
8 conducted; is that right?
9    A    Yes.
10    Q    And you mentioned that one of the big changes was the
11 switch from manual input to having more electronic systems; is
12 that correct?
13    A    Correct.
14    Q    Were there any other major changes that you observed
15 since?
16    A    Oh, the voting machines were different way back then.
17    Q    Any other significant changes that you can think of?
18    A    Well, it was easy to accommodate people that were
19 disabled when they come -- would come to vote.  You could take
20 the machines out so they could vote from their car.  That was a
21 no-brainer; it was very easy to do.  Poll watchers were far and
22 few in between.
23    Q    Okay.
24    A    If you had a -- happened to have a poll watcher, the
25 poll watcher sat wherever the precinct judge told them to sit,

Page 15

1 they weren't to talk to anyone, they had to get permission to
2 ask questions and they had to get permission if they went to the
3 bathroom or wanted to leave and it was up to the judge to allow
4 them to come back.
5    Q    And so how many locations were you precinct chair?
6    A    One, my home district, which was Precinct 66.
7    Q    And so you did not act as an election judge to any
8 other location besides Precinct 66?
9    A    Right.
10    Q    And that was in Harris County?
11    A    Right.  And also, during that time, you didn't -- you
12 -- you could come in and if you had your voter-registration
13 card, you didn't have to show an ID.
14    Q    I also believe then you didn't have countywide voting,
15 too; is that correct?
16    A    Right.
17    Q    And so you were at Houston City Council, you said,
18 from 2001 to 2008; is that right?
19    A    Uh-huh.
20    Q    Now, I'm going to hand you our first exhibit for
21 today.
22    A    Okay.
23    Q    Do you have the document in front of you?
24    A    Uh-huh.
25    Q    Do you recognize this particular document?

Page 16

1    A    Yes.
2    Q    And what is it?
3    A    It's from the Senate website.
4    Q    And so this is a printout of your bio on your Texas
5 Senate website?
6    A    Uh-huh, yes.
7    Q    Now, it mentions here that in 2008 you were elected to
8 the Texas House of Representatives; is that correct?
9    A    Right.
10    Q    And it says that you served five terms representing
11 District 145; is that correct?
12    A    Right.
13    Q    And you since ran for Texas Senate in 2018; is that
14 correct?
15    A    Yes.
16    Q    And you won that particular race; correct?
17    A    Yes.
18    Q    And so you've now -- did you run for reelection?
19    A    Yes.
20    Q    And which cycle did you run for reelection?
21    A    2020 and then now, 2022.
22    Q    Now, when you were a member of the Houston City
23 Council, was that a partisan position?
24    A    No.
25    Q    When you ran for the Texas House of Representatives,

Page 17

1 that is a partisan position; correct?
2    A    Yes.
3    Q    And you ran as a Democrat.
4    A    Yes.
5    Q    And when you ran for the Texas Senate, you also ran as
6 a Democrat; correct?
7    A    Yes.
8    Q    All right.  Were you a member of any caucuses while
9 you were a member of the Texas House of Representatives?
10    A    Well, I was a member of the Mexican-American
11 Legislative Caucus, I was a member of the Women's Health Caucus,
12 the Sportsmen's Caucus and, of course, the Democratic Caucus.
13    Q    And what about the caucuses that you're a part of as a
14 member of the Texas Senate?
15    A    Well, I lead the Senate Democratic Caucus, I might
16 still be a member of the Sportsmen's Caucus.  I don't -- I
17 haven't participated in that, but I believe I'm still a member
18 of that group, and then we have the -- I'm a member of the
19 Senate Hispanic Caucus.
20    Q    And how long were you a leader of the Texas Democratic
21 Caucus?
22    A    The Senate Democratic Caucus?
23    Q    That's correct.
24    A    I have led that since 2019.
25    Q    And what are your responsibilities as the head of the



Page 18

1 Texas Senate Democratic Caucus?
2    A   Well, a lot of what I do is make sure that we have
3 good communication between our senators, that they have
4 information about legislation coming through. We talk about
5 positions to take possibly on various pieces of legislation.
6    Q   And as part of -- as the head of the Texas Democratic
7 Caucus, is part of your responsibilities -- is to help Democrats
8 get elected?
9    A   No. We're not a PAC.
10   Q   Now, according to your website, it says that you are
11 the vice chair of the Senate Select Committee on Ports; is that
12 correct?
13   A   Yes.
14   Q   And are you still -- occupy that position?
15   A   Yes.
16   Q   And it also says you were a member of the Senate
17 Committees on Administration, Natural Resources and Economic
18 Development, Nominations, Transportation; is that correct?
19   A   Yes, and redistricting.
20   Q   You are not a member of the State Affairs Committee;
21 correct?
22   A   Right.
23   Q   Were you a member of the State Affairs Committee the
24 last legislative session?
25   A   No.

Page 19

1    Q   And so you've never been on the State Affairs
2 Committee?
3    A   Right.
4    Q   When you were on -- in the Texas House, were you ever
5 on the elections committee?
6    A   No.
7    Q   Your website also states that your primary legislative
8 focus has been on economic development, public health and public
9 education. Is that an accurate description?
10   A   Yes.
11   Q   And is that the focus of your legislative efforts when
12 you were in the House as well?
13   A   Yes.
14   Q   And so you typically do not focus on elections issues;
15 is that correct?
16   A   Well, I have been filing a bill for online voter
17 registration since my time in the House. I believe I filed that
18 bill in four or five sessions.
19   Q   And so outside of the bill regarding electronic-voter
20 registration --
21   A   Uh-huh.
22   Q   -- you have not focused your legislative efforts at
23 elections typically?
24   A   Well, it's -- it's been on defense when bills like the
25 bills I'm sure we're going to talk about --

Page 20

1    Q   Uh-huh.
2    A   -- or voter ID in the House, I was engaged in debate
3 on those issues.
4    Q   So I guess, then, I should maybe rephrase it. So you
5 haven't -- you don't typically file elections legislation with
6 the exception of your electronic-voter registration bill; is
7 that correct?
8    A   The bill that I have filed continuously has been the
9 online voter registration. That's it.
10   Q   You don't get -- hold yourself out as being a voting-
11 rights specialist; correct?
12   A   I would say voting-rights advocate.
13   Q   And -- and this is just asking your familiarity.
14   A   Uh-huh.
15   Q   So what is your familiarity with the Voting Rights
16 Act?
17   A   Well, I know it's been diminished as time has passed
18 and various sections have been done away with.
19   Q   Have you, let's say, read the case law surrounding the
20 Voting Rights Act?
21   A   No, I've not read any case law.
22   Q   And have you read any of the case law surrounding
23 Section 2 of the Voting Rights Act?
24   A   No, I've not read the cases.
25   Q   And you are not an attorney; correct?

Page 21

1    A   Right.
2    Q   All right. All right. We can put this document
3 aside.
4         MR. GOLANDO: Do you want to mark it?
5         COURT REPORTER: I have the marked copy.
6         MR. GOLANDO: You have the marked copy?
7         COURT REPORTER: Yes, I have that one.
8         MS. HUNKER: I tried to printout enough of them.
9 BY MS. HUNKER (resuming):
10   Q   So we're going to move on to another exhibit. And I
11 will say we'll be going back to this exhibit on and off through
12 some of the deposition, so even if you put it aside, [sic] not
13 to move it too far.
14       MS. HUNKER: (Provides exhibit.)
15       MR. GOLANDO: Thank you.
16 BY THE WITNESS (resuming):
17   A   Okay.
18   Q   Do you have the document in front of you?
19   A   Yes.
20   Q   Can you see on the top where it says, Senate Journal
21 87th Legislature, Regular Session; correct?
22   A   Uh-huh, yes.
23   Q   And do you see where it says addendum?
24   A   Uh-huh, yes.
25   Q   And then you'll see below it says, 40th day, Saturday,



Carol Alvarado

Page 22

1 May 29th, 2021.

2   A   Yes.

3   Q   And then it goes:  The following remarks regarding

4 SR 547 and SB7 were ordered reduced in writing and printed in

5 the journal.  Did I read that correctly?

6   A   Yes.

7   Q   And you're aware that occasionally members of the

8 legislature can ask that the, I guess, debate get transcribed

9 for the record; correct?

10   A   Yes.

11   Q   And you're aware that that usually comes through an

12 addendum in the Senate Journal; correct?

13   A   Yes.

14   Q   And so I'm going to represent to you that this is the

15 addendum and Senate transcript of the debate over SB7 on May

16 29th, 2021.  Do you have any reason to doubt my description of

17 the document?

18   A   No.

19   Q   I will also represent that I've only included the

20 pages that are going to be relevant for the deposition, so this

21 is not the full transcript.  And so I want to turn to Page 56.

22   A   Uh-huh.

23   Q   Okay.  And we're going to go to where it says, Senator

24 Alvarado, let's talk about.

25   A   Uh-huh.

Page 23

1   Q   Do you see that?

2   A   Yes.

3   Q   Okay.  And so it says:  Let's talk about the big

4 elephant in the room, and I'm not talking about party mascot;

5 I'm talking about Harris County.  Did I read that correctly?

6   A   Yes.

7   Q   Senator Hughes replies:  All right.  And you respond

8 with:  Okay.  This is about Harris County.  Would you agree?

9 Did I read that correctly?

10   A   Yes.

11   Q   And before we talk about this particular exchange, let

12 me take a step back.  So you spoke, I believe, on what's called

13 the back mic when Senate Bill 7 was up for consideration; is

14 that correct?

15   A   There's not a back mic in the Senate.

16   Q   Oh, there's not.  My apologies --

17   A   You just --

18   Q   -- for getting the terminology wrong.

19   A   -- do it from the chair, yeah.

20   Q   So let me rephrase that.  During the consideration of

21 Senate Bill 7, you asked questions of Senator Hughes; is that

22 correct?

23   A   Yes.

24   Q   And this would have been when the conference committee

25 report would have been up for consideration in the Senate.

Page 24

1 Would you agree with that?

2   A   Yes.  Just a minute.  I'm looking at the previous

3 page. (Reviewing.)  Okay.  Yes, that was at 2 o'clock in the

4 morning on -- very early on Sunday morning during Memorial

5 weekend, yes.

6   Q   And so you were talking about the impetus in this case

7 of Senate Bill 7; is that right?

8   A   Yes.

9   Q   Okay.  And so it's your belief that election

10 legislation that was introduced during the 87th Legislature was

11 in response to the actions taken by Harris County.  Is that a

12 fair description?

13   A   Partly.

14   Q   You'd agree that at least some provisions then in

15 Senate Bill 7 and then ultimately Senate Bill 1 were in response

16 to the actions taken by Harris County.

17   A   Yes.

18   Q   Okay.  And so specifically, it was the actions taken

19 by Harris County in the 2020 election; is that right?

20   A   Yes.

21   Q   Now, you would agree with me that in 2020, in March,

22 the United States and the world got hit with the coronavirus --

23   A   Yes.

24   Q   -- COVID-19 pandemic; correct?

25   A   Uh-huh, yes.

Page 25

1   Q   And that introduced a significant number of challenges

2 for the administration of a successful election; is that right?

3   A   Yes.

4   Q   And so a lot of counties had to take innovative steps

5 in order to conduct a successful election; is that correct?

6   A   Yes.

7   Q   And as part of this innovation, some counties

8 introduced practices that had not yet been seen in Texas; is

9 that right?

10   A   Yes.

11   Q   The county clerk in Harris County during part of this

12 time was Chris Hollins; correct?

13   A   Yes.

14   Q   And do you know Chris Hollins at all?

15   A   Yes, I do.

16   Q   And where do you know him from?

17   A   Just politics, being in the community.

18   Q   And so did you know him before he was county clerk?

19   A   Yes.  Yeah, I don't know -- remember where I met him,

20 but we knew each other.

21   Q   Okay.  So you knew each other, but it was not like a

22 -- a strong relationship.  It seems to be more casual; is that

23 correct?

24   A   That's correct.

25   Q   And so, during the 2020 elections, Chris Hollins



Carol Alvarado

October 06, 2022
Pages 26 to 29

Page 26

1 introduced a number of innovative practices in Harris County
2 with respect to voting; is that correct?
3    A   Yes.
4    Q   And so I want to talk a little bit about those
5 innovations.
6    A   Sure.
7    Q   You can put that aside, but I wouldn't put it too far
8 aside.
9    A   Okay.  Is it okay to mark this or --
10    Q   Yes.
11    A   Okay.
12    Q   It's your copy.
13    A   Okay.
14        MR. GOLANDO:  That's actually the actual exhibit.
15        COURT REPORTER:  The witness's copy will be
16 the --
17        MS. HUNKER:  Yes.
18        MR. GOLANDO:  You can mark this one.
19        COURT REPORTER:  -- actual exhibit.
20        THE WITNESS:  Okay.  I can mark -- so mark this?
21        MR. GOLANDO:  (Nonverbal response.)
22        THE WITNESS:  Okay.
23        MS. HUNKER:  (Provides exhibit.)
24        MR. GOLANDO:  Thank you.
25 BY MS. HUNKER (resuming):

Page 27

1    Q   And do you have the document in front of you?
2    A   Yes.
3    Q   Okay.  Do you see on top where it says State of Texas,
4 Ruth R. Hughs, Secretary of State?
5    A   Yes.
6    Q   And do you see that this is from the election division
7 in the top left corner?
8    A   Yes.
9    Q   And this is a letter addressed to Chris Hollins,
10 Harris County Clerk, on August 27th, 2020?
11    A   Yes.
12    Q   And if you turn the page, you will see it was signed
13 by Keith Ingram, director of elections.  Do you see that?
14    A   Yes.
15    Q   Do you know Keith Ingram at all?
16    A   No.  I mean, I -- just by name.  I don't know him.
17    Q   And so you haven't had many interactions with him?
18    A   No.
19    Q   Okay.  And so would you agree with my description that
20 this is a letter dated August 27th from Keith Ingram, director
21 of elections at the secretary of state's office, to Chris
22 Hollins, the Harris County Clerk?
23    A   Yes.
24    Q   And so I'm going to start with the first paragraph.
25    A   Uh-huh.

Page 28

1    Q   It reads:  It has come to our attention that Harris
2 County intends to send an application to vote by mail to every
3 registered voter in the county.  Such action would be contrary
4 to our office's guidance on this issue and an abuse of rights
5 under the Texas Election Code Section 31.005.  Did I read that
6 correctly?
7    A   Yes.
8    Q   Were you aware that Harris County made an attempt to
9 send an application to vote by mail to every registered voter in
10 the county?
11    A   Yes.
12    Q   Were you aware that the secretary of state had sent a
13 letter advising Mr. Collins [sic] that this was contrary to the
14 secretary of state's guidance on the issue?
15    A   I wasn't aware that there was a letter.  I was aware
16 that there -- that there was some -- that the State weighed in
17 on it, but I didn't know in which way.
18    Q   Okay.  So you knew the secretary of state's office had
19 commented on the -- Harris County's intention to send an
20 application to vote by mail to every registered voter in the
21 county, but not that it had taken the form of a letter.
22    A   Right.
23    Q   But you'd agree with me that the letter does state
24 that the secretary of state's office thought that Chris Hollins'
25 actions in trying to send a letter -- for an application to vote

Page 29

1 by mail to every registered voter in the county would be against
2 their guidance on the issue and an abuse of rights under the
3 election code.
4    A   According to what I'm reading, yes.
5    Q   And if you move to the next paragraph, it states:  As
6 you know, the Texas Election Code requires that voters have a
7 qualifying reason to vote by mail.  They must be 65 years or
8 older, disabled, out of the country while voting is occurring or
9 confined in jail but otherwise eligible to vote.  Did I read
10 that sentence correctly?
11    A   Yes.
12    Q   And you're aware that Texas limits voting by mail to
13 those four categories; correct?
14    A   Yes.
15    Q   And the letter continues:  It is not possible that
16 every voter in Harris County will satisfy one or more of these
17 requirements.  Did I read that correctly?
18    A   Yes.
19    Q   And then if we go to the next paragraph:  By sending
20 applications to all voters, including many who do not qualify
21 for voting by mail, your office may cause voters to provide
22 false information on the form.  Did I read that correctly?
23    A   Yes.
24    Q   Were you aware that this was a concern by the
25 secretary of state's office regarding Chris Hollins' intention



Carol Alvarado

October 06, 2022
Pages 30 to 33

Page 30

1  to send an application to vote by mail to every registered voter
2  in the county?
3      A   Which part?
4      Q   The part of -- that it may cause voters to provide
5  false information on the forms.
6      A   No, I was not aware.
7      Q   And then we go to Paragraph 4, it reads:  At a
8  minimum, sending an application to every registered voter will
9  confuse voters about their ability to vote by mail.  Earlier
10  this year and continuing, there have been a number of lawsuits
11  challenging the fact that Texas law requires a reason to vote by
12  mail.  Thus far, the challenged law remains the same in spite of
13  these lawsuits.  An official application from your office will
14  lead many voters to believe they are allowed to vote by mail
15  when they do not qualify.  Did I read that correctly?
16      A   Yes, you read that correctly.
17      Q   Were you aware that there were lawsuits filed during
18  the coronavirus pandemic, specifically in 2020, about expanding
19  voting by mail in Texas as a response to the pandemic?
20      A   I don't recall.
21      Q   Were you aware the secretary of state's office had
22  voiced a concern that Chris Hollins' intention to send an
23  application of vote by mail to every registered voter in the
24  county could confuse voters about their ability to vote by mail?
25      A   No.

Page 31

1      Q   And were you aware that the Texas secretary of state's
2  office was concerned that if Mr. Hollins sent an application to
3  vote by mail to every registered voter in the county that it
4  would lead many voters to believe that they are allowed to vote
5  by mail when they do not qualify?
6      A   I don't recall.
7      Q   Okay.  Would you agree with me, though, that based on
8  this letter, the secretary of state did communicate to
9  Mr. Hollins that it had a concern that his actions of sending
10  an application to vote by mail to every registered voter in the
11  county could cause voter confusion and could cause voters to
12  believe they are allowed to vote by mail when they do not
13  qualify?
14          MR. GOLANDO:  Objection, compound.  Answer if you
15  can.
16  BY THE WITNESS (resuming):
17      A   I can't say.
18      Q   Okay.  Would you agree with me, then, that based on
19  this letter, the secretary of state communicated to Mr. Hollins
20  that his intention to send out an application to vote by mail to
21  every registered voter in the county would confuse voters?
22      A   Based on what I'm reading, it -- it looks that way.
23      Q   And would you agree with me that based on this letter
24  that the secretary of state's office communicated to Mr. Hollins
25  that they were concerned that his intention to send an

Page 32

1  application to vote by mail to every registered voter in the
2  county would lead many voters to believe they are allowed to
3  vote by mail when they do not qualify?
4      A   Just based on -- based on what I'm reading, it looks
5  that way.
6      Q   And we can put this document aside.
7      A   Okay.
8      Q   Do you have the document in front of you?
9      A   Yes.
10      Q   And so this is Exhibit 4.  Do you see on top where
11  there's a stamp, and it says, District Clerk, Harris County, and
12  then there's a date, August 31st, 2020?
13      A   Yes.
14      Q   And do you see that there's a case caption on top of
15  this, which is the State of Texas v. Chris Hollins?
16      A   Yes.
17      Q   And if we turn to Page 12, you'll see that it is
18  signed and dated August 31st, 2020, and then it contains a list
19  of attorneys from the attorney general's office; is that
20  correct?
21      A   Yes.  Is that your name I see on there?
22      Q   It is.
23      A   Okay.  Yes.
24      Q   And do you see on -- if you go back to the front page
25  that the title of this document reads, Plaintiff's Original

Page 33

1  Verified Petition and Application for Temporary Restraining
2  Order, Temporary Injunction and Permanent Injunction.  Did I
3  read that correctly?
4      A   Yes.
5      Q   Would you agree with me that this is a verified
6  petition submitted in the district clerk -- sorry -- the
7  District Court for Harris County?
8      A   Yes.
9      Q   And if we read the first paragraph, it states:  The
10  State of Texas, by and through Ken Paxton, the Attorney General
11  of Texas, files this original verified petition and application
12  for temporary restraining order, temporary injunction and
13  permanent injunction against defendant, Chris Hollins, in his
14  capacity as Harris County Clerk.  Did I read that correctly?
15      A   Yes.
16      Q   And the next sentence reads:  The State seeks an
17  injunction against Hollins to prevent him from sending over 2
18  million applications for ballots to every registered voter in
19  Harris County, irrespective of whether any voter requested an
20  application or even qualifies to vote by mail.  Did I read that
21  correctly?
22      A   You read it correctly.
23      Q   And then it continues:  Hollins' actions will create
24  confusion, facilitate fraud and is a legal ultra vires act
25  because it exceeds his statutory authority.  Did I read that



Page 34

1 correctly?
2    A   Yes, you did.
3    Q   Would you agree with me that this is a petition that
4 the State of Texas filed that alleges that Chris Hollins planned
5 to send applications to vote by mail to every registered voter
6 in Harris County was an illegal act because it exceeded his
7 statutory authority?
8          MR. GOLANDO:  Objection, to the extent it calls
9 for a legal conclusion.  You may answer if you have an opinion.
10 BY THE WITNESS (resuming):
11   A   Yeah, I -- I can't say.
12   Q   Would you agree that it says that the State is seeking
13 an injunction against Chris Hollins to prevent him from sending
14 the applications?
15   A   Yes, I'm reading here where it says the State seeks an
16 injunction.
17   Q   And would you agree that the document states that the
18 State is asserting that Hollins' actions is an illegal ultra
19 vires act because it exceeds his statutory authority?
20   A   I'm reading that it says Hollins' action will create
21 confusion, and then it later does say the ultra vires act.  I'm
22 just reading what is here.
23   Q   And so, according to this document, the State took the
24 position that Hollins' actions would create confusion; is that
25 correct?

Page 35

1    A   I'm reading where it says, Hollins' actions will
2 create confusion.
3    Q   And according to this document, the State took the
4 position that Hollins' actions would facilitate fraud; correct?
5    A   Say that again, please.
6    Q   According to this document, the State took the
7 position that Hollins' actions will facilitate fraud; correct?
8    A   Yes.
9    Q   And according to this document, the State alleged that
10 Hollins' actions was an illegal ultra vires act; is that
11 correct?
12   A   That's what it says here on the document.
13   Q   And if we turn to Page 4, Paragraph 13, where it says,
14 No statute -- please let me know when you have that in your
15 sight.
16   A   Go ahead.
17   Q   It reads:  No statute, however, empowers an early-
18 voting clerk to send a vote-by-mail application form to any
19 applicant who does not request one from the clerk and power to
20 send unsolicited applications to millions of voters, the vast
21 majority of whom do not qualify to vote by mail, cannot fairly
22 be implied from the statutory screens -- scheme.  Did I read
23 that correctly?
24   A   You did.
25   Q   And so would you agree that in this document, the

Page 36

1 State alleges that no statute empowers an early-voting clerk to
2 send a vote-by-mail application form to an applicant who did not
3 request one?
4          MR. GOLANDO:  (Unintelligible.)  Sorry.
5 BY THE WITNESS (resuming):
6    A   I can't say.
7    Q   Okay.  We can put this aside.
8    Q   Are we going to come back to it?
9    A   We are not.
10   A   Okay.
11         MS. HUNKER:  (Provides exhibit.)
12         MR. GOLANDO:  Thank you.
13 BY MS. HUNKER (resuming):
14   Q   Do you have the document in front of you?
15   A   Yes.
16   Q   Okay.  Do you see on top where it says, In the Supreme
17 Court of Texas?
18   A   Yes.
19   Q   And do you see where it says, the State of Texas,
20 petitioner, v. Chris Hollins, in his official capacity as Harris
21 County Clerk, respondent?
22   A   Yes.
23   Q   And then it says below, On petition for review from
24 the Court of Appeals for the 14th District of Texas; is that
25 right?

Page 37

1    A   Yes.
2    Q   And then it states that it was argued September 30th,
3 2020; is that correct?
4    A   Yes.
5    Q   And you understand that means that this particular
6 legal question was argued before the Texas Supreme Court on
7 August 30th, 2020.
8    A   Yes.
9    Q   And do you see below where it says, Per Curiam.
10   A   Yes.
11   Q   And then if we turn the page, so to Page 14, you'll
12 see where it says, Opinion delivered October 7th, 2020.  Did I
13 read that correctly?
14   A   Yes.
15   Q   And so would you agree with me that this is a copy of
16 a Supreme Court opinion issued in the case, Texas v. Hollins?
17   A   (Reviewing.)  I believe so.
18   Q   And so let's look at the first paragraph of the first
19 page.  It states:  Voting by mail in Texas is limited by statute
20 to certain groups.  To obtain a mail-in ballot, a registered
21 voter must assert eligibility on an application form that meets
22 statutory requirements.  Election officials must make a form
23 application produced by the secretary of state available to
24 voters.  Did I read that correctly?
25   A   Yes.



Page 38

1  Q  This paragraph then continues: The Harris County
2  Clerk proposes to mail unsolicited ballot applications to all
3  registered voters under 65 years of age, only a fraction of whom
4  are eligible to vote by mail.  Did I read that correctly?
5  A  Yes.
6  Q  Would you agree with me that this opinion is about the
7  Harris County Clerk's intention to send applications to every
8  registered voter in Harris County?
9      MR. GOLANDO:  Objection, form.
10 BY THE WITNESS (resuming):
11 A  I -- I can't say.
12 Q  Would you agree that this is at least about the Harris
13 County Clerk proposing to mail unsolicited ballot applications
14 to all registered voters over the --
15     MR. GOLANDO:  Objection -- sorry.
16 BY MS. HUNKER (resuming):
17 Q  -- over the age of 65, based on the document?
18     MR. GOLANDO:  Objection, form.
19 BY THE WITNESS (resuming):
20 A  I -- I don't know.
21 Q  Okay.  Let's continue.  It says:  Because no other
22 election official in Texas is doing or has ever done what the
23 clerk proposes, his plan threatens to undermine the statutorily
24 required uniform operation of election laws across the state.
25 Did I read that correctly?

Page 39

1  A  Yes, you read that correctly.
2  Q  Okay.  And then if we move to the next page, last
3  paragraph -- this last full paragraph --
4  A  Okay.
5  Q  -- it reads, We conclude the election code does not
6  authorize the mailing proposed by the Harris County Clerk.
7  Accordingly, we grant the State's petition for review, reverse
8  the Court's [sic] Appeals judgment and remand the case to trial
9  to issue a temporary injunction prohibiting the Harris County
10 Clerk from mass-mailing unsolicited ballot applications to
11 voters.  Did I read that correctly?
12 A  You read that correctly.
13 Q  Would you agree with me that the Texas Supreme Court
14 stated that the Harris County Clerk did not have the authority
15 to send out unsolicited vote-by-mail applications?
16 A  According to what I'm reading, yes.
17 Q  If you remember, we had talked about the date on the
18 last page, Page 14 --
19 A  Uh-huh.
20 Q  -- that this opinion was delivered.
21 A  Uh-huh.
22 Q  This was on October 7th, 2020; correct?
23 A  Yes.
24 Q  And that's within a month of the election; correct?
25 A  Yes.

Page 40

1  Q  And so there is litigation about -- let me rephrase
2  that.  And so there's litigation a month before election about
3  the actions that Harris County is taking regarding mail-in-
4  ballot application forms; is that correct?
5  A  Yes.
6  Q  Now, as a general matter, do you think that questions
7  over an election official's powers and responsibilities should
8  be resolved well in advance of an election?
9      MR. GOLANDO:  Objection, to the extent it calls
10 for a legal opinion.  If you have an opinion, please answer.
11 BY THE WITNESS (resuming):
12 A  It depends.
13 Q  And how does it depend?
14 A  It depends on what the issue is.
15 Q  You can put that document aside, and we will not be
16 going back to it.
17 A  Okay.  Thank you.
18 Q  Now, in Senate Bill 1 and Senate Bill 7 -- let's --
19 let me specify to Senate Bill 1.  So let me strike that question
20 and start again.
21 A  Which -- can you also mention which session, regular,
22 special, which special?
23 Q  That's a good point.  So let's clarify some terms.
24 When I say Senate Bill 7, you understand that I am talking about
25 the omnibus elections bill that was proposed in the 87th Regular

Page 41

1  Session; correct?
2  A  Yes.
3  Q  And when I say Senate Bill 1, I am referring to the
4  omnibus elections bill that was enacted in the second special
5  session.
6  A  Okay.
7  Q  If I am referring to Senate Bill 1 that was proposed
8  in the first special session, I will state so specifically, but
9  I will state in advance that anytime I'm referring to Senate
10 Bill 1 without that clarification, I am referring to the one in
11 the second special session.
12 A  Okay.
13 Q  Does that makes sense?
14 A  Yes.
15 Q  Now, I know there were some companion bills, but I
16 don't think I will be addressing them specifically during this
17 deposition.
18 A  (Nonverbal response.)
19 Q  And so Senate Bill 1 addressed county election
20 officials being able to send out unsolicited vote-by-mail
21 applications; correct?
22 A  That, among other -- other things in the bill.
23 Q  And so would you agree that Senate Bill 1 addressed
24 the concern that was raised in the litigation we were talking
25 about over what authority the county clerk had to send



Carol Alvarado

October 06, 2022
Pages 42 to 45

Page 42

1 unsolicited ballot-by-mail applications?
2    A    Partly.
3    Q    We're going to move on to our next exhibit.
4         MS. HUNKER:  (Provides exhibit.)
5         MR. GOLANDO:  Thank you.
6 BY MS. HUNKER (resuming):
7    Q    Do you have the document in front of you?
8    A    Yes.
9    Q    Do you see on the top where it says, Isabel Longoria,
10 elections administrator?
11   A    Yes.
12   Q    And then there's a little seal next to it that says
13 Harris County elections.
14   A    Yes.
15   Q    And if we turn to the next few pages, you'll see that
16 it has, Elections division, contact us, along with E-mail
17 addresses and other information from the Harris County Elections
18 Division; is that correct?
19   A    Yes.
20   Q    Now, would you agree with me -- oh, I'm going to
21 represent to you that this is a printout of the elections
22 administrator website on Harris County.  Do you have any reason
23 to doubt or -- doubt my representation?
24   A    No.
25   Q    And so if we turn to Page 2, it says, Purpose --

Page 43

1    A    Uh-huh.
2    Q    -- Drive-through voting was created in the wake of the
3 COVID-19 pandemic as a safer and socially distant alternative to
4 walk-in voting for all voters.  Harris County is the first
5 jurisdiction in Texas history to create this new method of
6 voting at scale that allows any registered voter to cast their
7 ballot without leaving the comfort of their vehicle.  Did I read
8 that correctly?
9    A    Yes.
10   Q    Okay.  Now, were you aware that Harris County
11 introduced drive-through voting during the 2020 elections?
12   A    Yes.
13   Q    And were you aware that Harris County considers itself
14 to be the first jurisdiction in Texas to offer this method of
15 voting at scale?
16   A    That's what it says in this document.
17   Q    Do you know of any other county that offered drive-
18 through voting prior to Harris County?
19   A    Not that I'm aware of.
20   Q    To your belief, is Harris County the first county to
21 offer drive-through voting in Texas?
22   A    That's what I'm reading on the document you provided.
23   Q    You can put that aside.
24   A    (Complies with request.)
25        MR. GOLANDO:  Thank you.

Page 44

1         THE WITNESS:  Uh-huh.
2 BY MS. HUNKER (resuming):
3    Q    Now, did you use drive-through voting in Harris
4 County?
5    A    No.
6    Q    Did you ever go to one of the drive-through voting
7 sites while they were operating?
8    A    No.
9    Q    Did you talk to election -- sorry -- Election County
10 Clerk, Chris Hollins, about drive-through voting at all?
11   A    I don't recall.
12   Q    Did you speak to anybody in the Harris County Clerk's
13 office about drive-through voting?
14   A    I don't recall.
15   Q    And I'm only going to specify because they changed the
16 titles of the office.  Did you talk to anybody in the election
17 administrator's office in Harris County about drive-through
18 voting?
19   A    I don't recall.
20   Q    And so where do you have -- where did you receive your
21 information about drive-through voting?
22   A    What was reported in the press, in the news and people
23 who used it.
24   Q    So is it fair to say that you received the information
25 from news and voters that you communicated to?

Page 45

1    A    Correct.
2    Q    Okay.  And how many voters did you speak with about
3 drive-through voting?
4    A    I don't know.
5    Q    Okay.  Do you remember when?
6    A    No.
7    Q    But you have no personal experience with how drive-
8 through voting operated in Harris County; is that correct?
9    A    Just what I saw on the news as people were going
10 through, and they're talking to people who actually used it.
11   Q    So I am going to introduce our next exhibit.
12        MS. HUNKER:  (Provides exhibit.)
13        MR. GOLANDO:  Thank you.
14 BY MS. HUNKER (resuming):
15   Q    Do you have the document in front of you?
16   A    Yes.
17   Q    And do you see on top where it says, Ken Paxton,
18 Attorney General of Texas, along with the seal of the attorney
19 general?
20   A    Yes.
21   Q    And do you see that it is dated October 16th, 2020?
22   A    Yes.
23   Q    And do you see where it's addressed to Texas election
24 officials?
25   A    Yes.



Carol Alvarado

October 06, 2022
Pages 46 to 49

Page 46

1    Q    And then if we turn the page, you'll see that it is
2  signed by the attorney general, Ken Paxton; is that correct?
3    A    Yes.
4    Q    And so would you agree with me that this is a letter
5  sent from Ken Paxton, the Attorney General of Texas, to Texas
6  election officials on October 16th, 2020?
7    A    Yes.
8    Q    Okay.  And so if we read the first paragraph, it
9  states:  Some political subdivisions throughout Texas have
10  expanded their use of curbside voting this election season to
11  offer expansive drive-through voting to all registered voters.
12  Did I read that correctly?
13    A    Yes.
14    Q    It continues:  This letter serves as a notice and
15  reminder that the election code provides curbside voting as an
16  option only to those who meet a certain narrow set of criteria.
17  Curbside voting is not, as some have asserted, contrary to Texas
18  law, an option for all -- any and all voters who simply wish to
19  vote from the comfort of their cars when they are physically
20  able to enter the polling place.  Did I read that correctly?
21    A    You read it correctly.
22    Q    Okay.  And then it continues:  The Texas Election Code
23  provides that each polling place shall be located inside a
24  building.  The code makes no provision for polling places
25  located outdoors in parking lots or in parking structures.  More

Page 47

1  specifically, the code makes no provision for drive-through
2  voting at which any voter may cast a ballot from his or her
3  vehicle regardless of physical condition.  Did I read that
4  correctly?
5    A    Yes.
6    Q    Okay.  So before I ask you some questions specifically
7  about the content of the letter, I just want to make sure that
8  we are using the same terminology.
9    A    Okay.
10    Q    And so you do understand that curbside voting is
11  distinct from drive-through voting; is that correct?
12    A    Yes.
13    Q    Okay.  And curbside voting in Texas is limited to
14  individuals who have certain physical ailments or disability; is
15  that right?
16    A    Yes.
17    Q    And then drive-through voting, in contrast, was the
18  option offered by Harris County that would let any individual
19  vote using their car; is that correct?
20    A    Yes, and I will add that this form of voting, along
21  with some other forms of voting, was proposed, agreed to by a
22  bipartisan committee --
23    Q    Uh-huh.
24    A    -- or counsel, whatever it's called.  I believe there
25  were people from both parties, the Republican Party of Harris

Page 48

1  County and the Democratic Party, involved in this decision-
2  making.
3    Q    Okay.  So I'm going to ask you about that in a minute.
4    A    Okay.
5    Q    So, now, have you ever voted curbside?
6    A    No.  I have, during my role as a precinct chair,
7  assisted.
8    Q    And so curbside voting is still available today;
9  correct?
10    A    Yes.  It is different than when I was involved in it,
11  yes.
12    Q    Okay.  And curbside voting was allowed in 2020;
13  correct?
14    A    Yes.
15    Q    Okay.  And so, in curbside voting, a person pulls up
16  to the voting location; correct?
17    A    Yes.
18    Q    And then usually there's either a phone number or some
19  sort of signal to communicate to those inside that there's
20  somebody waiting to do curbside; is that correct?
21    A    Yes.
22    Q    Okay.  And then the poll workers will bring the device
23  to the car; is that correct?
24    A    Yes.
25    Q    And a person can cast their ballot from inside their

Page 49

1  car.
2    A    Yes.
3    Q    Okay.  And so that's curbside voting; correct?
4    A    Yes.
5    Q    Okay.  All right.  So let's look back at this letter.
6  So would you agree with me that in this letter the attorney
7  general communicated to Texas election officials his belief that
8  the election code makes no provision for drive-through voting
9  centers at which a voter may cast a ballot from his or her
10  vehicle regardless of physical condition?
11    A    Yeah, I can't say.
12    Q    Would you agree with me that in this letter, the
13  attorney general, Ken Paxton, is communicating to Texas election
14  officials that he believes drive-through voting is illegal?
15    A    I'm reading.  I'm reading to find if it says that.
16  (Reviewing.)  I -- I can't say that.
17    Q    Okay.  So let's look at two sentences, the last
18  sentence in Paragraph 2:  More specifically, the code makes no
19  provision for drive-through voting centers at which any voter
20  may cast a ballot from his or her vehicle regardless of physical
21  condition.  Did I read that correctly?
22    A    You did.
23    Q    And so the attorney general told Texas election
24  officials that it's -- it was his belief that the election code
25  makes no provision for drive-through voting centers at which any



Carol Alvarado

October 06, 2022
Pages 50 to 53

Page 50

1 voter may cast a ballot from his or her vehicle regardless of
2 physical condition; is that correct?
3    A    Yes.
4    Q    Okay.  Now, let's look at the last sentence of
5 Paragraph 3:  But if a voter could enter the polling place on
6 his or her own without a likelihood of injury, then it is
7 unlawful for an election official to allow that voter to cast a
8 ballot outside of the voting place.  Did I read that correctly?
9    A    Yes.
10    Q    Would you agree with me then that Attorney General Ken
11 Paxton communicated to Texas election officials that he believed
12 that if a voter could enter the polling place on his or her own
13 without a likelihood of injury, then it would be unlawful for
14 the election official to allow that voter to cast a ballot
15 outside the polling place?
16    A    I can't say that.
17    Q    What, then, do you think he meant by that last
18 sentence in Paragraph 3?
19    A    I'm not sure.
20    Q    We can put this document aside.
21    A    (Complies with request.)
22        MS. HUNKER:  (Provides exhibit.)
23        MR. GOLANDO:  Thank you.
24 BY MS. HUNKER (resuming):
25    Q    Do you have the document in front of you?

Page 51

1    A    Yes.
2    Q    Okay.  Do you see where it says, In the Supreme Court
3 of Texas?
4    A    Yes.
5    Q    And do you see where it has the -- case heading,
6 In Re Steven Hotze, M.D., Harris County Republican Party?
7    A    Yes.
8    Q    And do you see where it says, On petition for writ of
9 mandamus?
10    A    Yes.
11    Q    Okay.  And if we look at the first sentence where it
12 says, Justice Devine -- do you see that?
13    A    Yes.
14    Q    It reads:  Justice Devine, dissenting from the Court's
15 order, denying the petition for writ of mandamus and motion to
16 stay.  Did I read that correctly?
17    A    Yes.
18    Q    And if we turn the page to Page 5, you'll see where it
19 says, Opinion delivered October 22nd, 2020.  Did I read that
20 correctly?
21    A    Yes.
22    Q    Would you agree with me that this document is Justice
23 Devine's dissent in the action, In Re Steven Hotze, M.D., Harris
24 County Republican Party, that was issued by the Court on
25 October 22, 2020?

Page 52

1    A    According to what I'm reading here, yes.
2    Q    Okay.  Now, were you aware that after Chris Hollins
3 introduced the practice of drive-through voting that several
4 individuals filed -- challenged the action in state court?
5    A    I heard that.
6    Q    And so if we turn to Page 2, looking at the second
7 sentence, it says:  As such, I would grant relator's motion to
8 stay to ensure compliance with the code and give this Court the
9 opportunity to consider whether the novel drive-through voting
10 measure qualifies as a polling place under Section 64.009(a) or
11 whether it is a grave departure from the expressed language of
12 the statute.  Did I read that correctly?
13    A    You did.
14    Q    And then if we go to the third paragraph where it
15 says, Hollins stretches.  Do you see that?
16    A    Yes.
17    Q    It states:  Hollins stretches the text of the code
18 beyond its historical and commonsense understanding.  The Texas
19 Election Code states that polling locations may be located in
20 any stationary structure, including a movable structure.
21 Hollins argues that these tents satisfy the requirements of a
22 movable structure, but that interpretation goes beyond the plain
23 language of the statute and cannot be harmonized with other
24 demands of the code.  Did I read that correctly?
25    A    Yes.

Page 53

1    Q    And if we turn to Page 4, in the middle of the first
2 partial paragraph, where it says, Denying review -- do you see
3 that?
4    A    Where it says what now?
5    Q    Denying review.
6    A    I'm looking for that.
7        MR. GOLANDO:  (Indicating.)  First partial,
8 Denying.
9 BY THE WITNESS (resuming):
10    A    Okay.  Yes.
11    Q    Denying review of whether a clerk's implied managerial
12 power allows him to create a new method of voting is striking,
13 especially given that we have not seen mass drive-through voting
14 in elections before this year.  Did I read that correctly?
15    A    Yes.
16    Q    Would you agree with me that based on this paragraph,
17 Justice Devine believes that Texas had not seen mass drive-
18 through voting before Harris County in 2020?
19    A    I -- I can't say.
20    Q    Okay.  And then if we go down to the second full
21 paragraph where it says, It is hard to see --
22    A    Uh-huh.
23    Q    -- it reads:  It is hard to see how creating a drive-
24 through voting process is not simply a way of side -- to
25 sidestep the legislature's narrow -- narrow allowance of



Carol Alvarado

Page 54

1 curbside voting. The legislature has already spoken on when a
2 person may vote in a vehicle. Did I read that correctly?
3    A   Yes.
4    Q   And then if we go to the last paragraph on Page 4, it
5 says: Simply put, by creating drive-through voting locations,
6 Hollins acts beyond his discretion. I would grant stay until
7 this Court can decide whether this novel procedure of drive-
8 through voting is in fact permitted under the Texas Election
9 Code. By denying relief, relators, one of whom is on the ballot
10 in the general election, are left with no remedy. Without such
11 relief, thousands of ballots will continue to be cast through
12 what is likely an unauthorized voting procedure. Did I read
13 that correctly?
14    A   Yes.
15    Q   Would you agree with me that Justice Devine, based on
16 his opinion, doubts the legality of drive-through voting?
17    A   I can't say.
18    Q   Would you agree that he says in the last paragraph,
19 where he describes drive-through voting as being, Cast through
20 what is likely an unauthorized voting procedure?
21    A   I'm reading for that exact wording.
22       MR. GOLANDO:  (Reviewing.)
23 BY THE WITNESS (resuming):
24    A   Yes, that's what it says here in this document.
25    Q   All right. Now, you have said that you're aware that

Page 55

1 several parties had challenged drive-through voting; correct?
2    A   Yes.
3    Q   Were you aware that they were seeking to stop the
4 practice of drive-through voting in Harris County?
5    A   Yes.
6    Q   Are you aware that -- actually, I'm going to take a
7 step back. Do you see where it says October 22nd, 2020?
8    A   Yes.
9    Q   That would have been when in-person early voting was
10 taking place; correct?
11    A   Yes.
12    Q   And so this is being considered while early voting is
13 ongoing; is that correct?
14    A   It appears that way.
15    Q   Okay. Were you aware that the parties were seeking to
16 disqualify the votes that had been cast through drive-through
17 voting up to that point?
18    A   Yes.
19    Q   Are you aware that if a ballot is cast at an illegal
20 location, it is not counted?
21       MR. GOLANDO:  Objection, to the extent it calls
22 for a legal conclusion. You can answer, if you know.
23 BY THE WITNESS (resuming):
24    A   I -- I'm not aware of that.
25    Q   So you do not know what happens to a ballot that is

Page 56

1 cast at an illegal location; is that correct?
2    A   No.
3    Q   You do not know; is that correct?
4    A   No, I don't.
5       MS. HUNKER:  Okay. If you want, we've probably
6 hit about an hour. We can take a break.
7       THE WITNESS:  That'd be great.
8       VIDEOGRAPHER:  Okay. Off the record at 11:16.
9       (A recess is taken from 11:16 a.m. to 11:33 a.m.)
10 BY MS. HUNKER (resuming):
11    Q   All right. Senator, I'm going to hand you Exhibit
12 Number 9.
13       MS. HUNKER:  (Provides exhibit.)
14       MR. GOLANDO:  Thanks.
15 BY THE WITNESS (resuming):
16    A   Are we done with this last one?
17    Q   Yes, we are. Do you have the document in front of
18 you?
19    A   Yes.
20    Q   Okay. And do you see where it says, In the United
21 States District Court for the Southern District of Texas,
22 Houston Division?
23    A   Yes.
24    Q   And then you'll see it says, United States District
25 Court, Southern District of Texas, entered November 2nd, 2020.

Page 57

1 There's a little stamp on the top. Do you see that?
2    A   Yes.
3    Q   Okay. And then you'll see that on top of the page
4 there is a case setting, Steven Hotze, M.D., v. Chris Hollins.
5 Do you see that?
6    A   Yes.
7    Q   And then this document is labeled order. Do you see
8 that?
9    A   Uh-huh.
10    Q   Would you agree with me that --
11    A   Yes.
12    Q   -- this is an order issued by the United States
13 District Court, Southern District of Texas, on November 2nd,
14 2020, in the case Steven Hotze v. Chris Hollins?
15    A   Yes.
16    Q   And if we turn to Page 7 --
17    A   (Complies with request.)
18    Q   -- you'll see the second -- the first paragraph, last
19 sentence:  Further, if granted, the injunction would only
20 require defendant to conduct elections as Harris County has
21 conducted them in the past without drive-through voting.
22    A   Which paragraph? I'm sorry.
23    Q   First paragraph on Page 7 --
24    A   Okay.
25    Q   -- last sentence.



Page 58

1    A    I see.  Thank you.
2    Q    Did I read that correctly?  If you want, I can read it
3 again.
4    A    Go ahead.
5    Q    Further, if granted, the injunction would only require
6 the defendant to conduct elections as Harris County has
7 conducted them in the past without drive-through voting.  Did I
8 read that correctly?
9    A    Yes.
10    Q    Would you agree with me that this order is about
11 Harris County's drive-through voting program?
12    A    It appears so.
13    Q    Okay.  Now, if we go to the second paragraph --
14    A    Uh-huh.
15    Q    -- where it says, First, in the middle -- do you see
16 it?
17    A    Yes.
18    Q    Okay.  First, drive-through early voting as designed
19 and implemented is, to this Court's reading, legal as described
20 above.  Second, there have been over 120 -- sorry -- 120,000
21 citizens who have legally voted utilizing this process.  Did I
22 read that correctly?
23    A    Yes.
24    Q    And so according to this court document, 120,000
25 citizens have voted drive-through voting by the time this order

Page 59

1 was issued; is that correct?
2    A    It -- it's -- that's what it says.
3    Q    And then if we go to the last sentence:  To
4 disenfranchise over 120,000 voters who voted as instructed the
5 day before the scheduled election does not serve the public
6 interest.  Did I read that correctly?
7    A    Yes.
8    Q    Okay.  Would you agree with me that this order was
9 over whether or not 120,000 citizens should have their vote
10 discounted because they utilized drive-through voting?
11        MR. GOLANDO:  Objection, to the extent it calls
12 for a legal conclusion.  You can answer if you understand the
13 question.
14 BY THE WITNESS (resuming):
15    A    Yeah, I -- I can't say.
16    Q    Okay.  Now, you have stated that you were aware there
17 were court cases filed that were challenging the drive-through
18 voting in Harris County; correct?
19    A    Yes.
20    Q    And you said you were aware that, through those
21 challenges, the parties were seeking to disqualify votes that
22 were conducted through drive-through voting; is that correct?
23    A    Yes.
24    Q    Okay.  And we have already established that according
25 to this document, 120,000 citizens had voted drive-through

Page 60

1 voting by the time this order was issued; correct?
2    A    According to the document, yes.
3    Q    And the Court was concerned, according to this
4 document, that if an injunction was imposed, it would
5 disenfranchise 120,000 voters who voted through drive-through
6 voting, according to this document; is that correct?
7    A    State your question.  I'm not real clear on the
8 question.
9    Q    And so, according to this document, the Court was
10 concerned that if it had issued an injunction on drive-through
11 voting --
12    A    Where are you reading that?
13    Q    This is, To disenfranchise.
14    A    (Reviewing.)
15        MR. GOLANDO:  (Indicating.)
16 BY THE WITNESS (resuming):
17    A    Okay.
18    Q    To disenfranchise over 120,000 voters who voted as
19 instructed the day before the scheduled election does not serve
20 the public interest.  That part.  Do you see that?
21    A    I see that.
22    Q    Okay.  Would you agree with me that the Court thought
23 that if it issued an injunction, it would disenfranchise over
24 120,000 voters who voted as instructed the day before the
25 scheduled election?

Page 61

1    A    Yeah -- yes.
2    Q    Okay.  And if we turn to Page 9, you'll see the date.
3 The date is November 2nd -- November 2020; is that correct?
4    A    Yes.
5    Q    And so this would have been while early voting was
6 well underway; correct?
7    A    I'm not sure.  I don't know when early voting ended.
8    Q    Would you agree, then, this would have been after
9 early voting would have started?
10    A    Yes.
11    Q    And so after early voting had started, you had a -- a
12 court case that was ongoing over whether or not Harris County's
13 voting practice of drive-through voting should be permitted; is
14 that correct?
15    A    Yes.
16    Q    And we can put this aside.
17    A    (Complies with request.)
18    Q    And I am going to introduce Exhibit Number 10.
19        MS. HUNKER:  (Provides exhibit.)
20        MR. GOLANDO:  Thank you.
21 BY MS. HUNKER (resuming):
22    Q    Do you have the document in front of you?
23    A    Yes.
24    Q    Okay.  And so this is a Houston Chronicle article;
25 correct?



Carol Alvarado

October 06, 2022
Pages 62 to 65

Page 62

1   A   Uh-huh.
2   Q   And the title of this Houston Chronicle article is,
3   Reversing Course, Harris County Shuts Down 9 of 10 Drive-through
4   early -- Drive-through Election Day Voting Sites.  Did I read
5   that correctly?
6   A   You did.
7   Q   Okay.  And this was updated November 3rd, 2020;
8   correct?
9   A   (Reviewing.) Yes.
10   Q   Okay.  And if we turn the page, it reads:  Harris
11   County Clerk, Christopher Hollins, has shut down 9 of 10
12   Election Day drive-through voting sites over concern that votes
13   could later be thrown out through an ongoing legal challenge
14   filed by Republicans.  Did I read that correctly?
15   A   You did.
16   Q   The next paragraph reads:  Hollin [sic] had said
17   Monday afternoon that drive-through voting sites remain open
18   after US District Judge Andrew S. Hanen rejected a request from
19   a group of Republicans to invalidate 127,000 votes cast at --
20   then during the early-voting period.  Did I read that correctly?
21   A   Yes.
22   Q   And then the third paragraph reads:  He reversed
23   course at 10:30 p.m., stating on Twitter that the risk was too
24   great, that the votes could later be challenged or thrown out.
25   Specifically, he was concerned that Hanen had expressed doubt

Page 63

1   that nine of the tented sites did not meet the Texas Election
2   Code requirement that polling places be inside a building.  Did
3   I read that correctly?
4   A   Yes.
5   Q   Okay.  Were you aware that Harris County had shut down
6   9 of its 10 election day drive-through voting sites for election
7   day?
8   A   I was aware that some were shut down.  I don't know --
9   I don't recall the exact number.
10   Q   Okay.  Were you aware of the reason they were shut
11   down when they were shut down?
12   A   To some extent.
13   Q   So you were aware that they were shut down because of
14   an ongoing concern that the lawsuits that were challenging the
15   drive-through voting sites would be successful; is that concern
16   -- is that correct?
17   A   I knew it had to do something with the definition of a
18   structure or building.
19   Q   Okay.  So you knew it had to do with interpretation of
20   the election code.
21   A   I knew that it had to do something with the definition
22   of a structure or polling location.
23   Q   Okay.  And so you knew it had to do with a
24   definitional question that had yet to be resolved.  Is that fair
25   to say?

Page 64

1   A   The definition of a building structure or polling
2   location.
3   Q   Okay.  And do you know which drive-through polling
4   site remained open?
5   A   No.  Maybe Toyota Center.
6   Q   And where is the Toyota Center?
7   A   Downtown.
8   Q   And so if we go to Paragraph 4, it says:  I cannot in
9   good faith encourage voters to cast their votes in tents if that
10   puts their votes at risk.  Did I read that correctly?
11   A   Yes.
12   Q   Now, would you agree that, according to this document,
13   Chris Hollins closed the drive-through voting centers because he
14   could not in good faith encourage voters to cast their ballots
15   at drive-through voting centers if that put their votes at risk?
16   A   I can't say.
17   Q   Now, you had mentioned that you had known that one of
18   the reasons the drive-through centers were closed was because
19   there was a question of how you defined -- you said -- what was
20   the phrase you used?
21   A   A building structure --
22   Q   Building or structure.
23   A   -- or polling location.
24   Q   Now, typically, you would not want election officials
25   to be unsure of a definition of polling place or structure in

Page 65

1   the days leading to election day; is that correct?
2   A   Re -- restate that.
3   Q   Sure.  Let me rephrase.
4   A   Yes.
5   Q   Would you agree that in order for counties to be able
6   to successfully run an election, they need to have clarity over
7   what their obligations are?
8   A   That's pretty broad.  Can you be more specific?
9   Q   Okay.  Do you think in order for an election official
10   to be able to successfully run an election, they would need to
11   have clarity over what the definition of a structure or polling
12   place is?
13   A   I -- I don't know.
14   Q   Do you think that having confusion over the definition
15   of a polling place and/or structure could result in difficulties
16   administering elections?
17   A   I'm not sure.
18   Q   We can set this aside.  Now, you had talked about the
19   bipartisan committee --
20   A   Uh-huh.
21   Q   -- being responsible for -- or let me rephrase.  You
22   had referenced a bipartisan committee with respect to the
23   creation of drive-through voting; is that correct?
24   A   An assortment of proposals, yes.
25   Q   And so who was this bipartisan committee?



Carol Alvarado

October 06, 2022
Pages 66 to 69

Page 66

1    A    I don't know names of the committee members.
2    Q    Do you know which officers would have made it up?
3    A    No, I don't.  I just know it was a bipartisan group of
4    individuals, some from each party, Republican Party, Democrat
5    Party.
6    Q    And was the proposals you're talking about in
7    reference to the SAFE initiative that Harris County conducted
8    during the 2020 election?
9    A    I don't recall.
10    Q    Okay.  Do you know if -- let me take a step back.  Do
11    you know how many Republicans were on the committee?
12    A    No.
13    Q    Do you know how many non-Republicans were on the
14    committee?
15    A    No.
16    Q    Do you know if the proposals forwarded by the
17    committee had to be approved by -- approved unanimously?
18    A    No, I don't.
19    Q    And do you know if the proposals forwarded by the
20    committee had to be approved by both Republicans and Democrats
21    on the committee?
22    A    I'm not aware.
23    Q    Okay.  Do you know if the Republican members of this
24    committee endorsed each of the proposals that were forwarded?
25    A    I'm not aware.

Page 67

1    Q    And so where did you learn about this bipartisan
2    committee?
3    A    I believe it was in the -- in the press, in the media,
4    yeah.
5    Q    So your information about the bipartisan committee
6    that you believe was the impetus for drive-through voting, the
7    ideas behind drive-through voting, you got that information from
8    the press?
9    A    Yes, and the Harris County administrator at the time
10    of the committee hearing, Isabel Longoria, during her testimony,
11    she made a point to mention that it was a bipartisan group.
12    This was a committee that I sat in a hearing of.
13    Q    And you do happen to recall when this testimony would
14    have taken place, or at least in -- with respect to which bill?
15    A    No.
16    Q    Okay.  Drive-through voting was addressed in Senate
17    Bill 1; correct?
18    A    Yes.
19    Q    And Senate Bill 1 clarified that drive-through voting
20    would not be permitted; correct?
21    A    Yes.
22    Q    I'm going to move on to Exhibit 11.
23        MS. HUNKER:  (Provides exhibit.)
24        MR. GOLANDO:  Thank you.
25    BY MS. HUNKER (resuming):

Page 68

1    Q    Do you have the exhibit in front of you?
2    A    Yes.
3    Q    Okay.  And do you see on top where it says Chris
4    Hollins, County Clerk, recording the mayor events -- major
5    events of your life and protecting your right to vote?
6    A    Yes.
7    Q    And do you see where it has the seal, County Clerk,
8    Harris County, Texas?
9    A    Yes.
10    Q    And do you see the date is July 22nd, 2020?
11    A    Yes.
12    Q    And that the letter is addressed to Governor Greg
13    Abbott?
14    A    Yes.
15    Q    And that it is signed by Chris Hollins, County Clerk
16    of Harris County, on the bottom?
17    A    Yes.
18    Q    Okay.  Would you agree with me that this is a letter
19    sent by Chris Hollins, county clerk from Harris -- yeah -- Texas
20    to Governor Greg Abbott dated July 22nd, 2020?
21    A    Yes.
22    Q    And so I am going to draw your attention to the third
23    paragraph where it says, I write.  Do you see that?
24    A    Yes.
25    Q    Okay.  It says:  I write today to ask two things of

Page 69

1    you:  One, please provide by the end of July the new start date
2    of early voting for the November election; and, two, please
3    increase early voting by at least one week to begin no later
4    than Tuesday, October 13th, 2020.  Did I read that correctly?
5    A    Yes.
6    Q    And I want to look a little bit at Paragraph 2 as
7    well.
8    A    Okay.
9    Q    Do you see in the top of the paragraph, it reads:
10    Acknowledging the difficulty of voting during the ongoing
11    pandemic, you moved the May primary runoff elections to July and
12    also increased the days of early voting for July elections.  Did
13    I read that correctly?
14    A    Yes.
15    Q    Were you aware that Governor Abbott extended early
16    voting for the primary runoff in 2020 by an additional week?
17    A    Yes.
18    Q    Now, would you agree with me that in this letter,
19    Chris Hollins is asking Governor Abbott to increase early voting
20    by at least a week for the November 2020 election?
21    A    That's what it says here, yes.
22    Q    Okay.  And we can put this down.
23    A    Okay.  (Complies with request.)
24    Q    And I'm going to produce Exhibit Number 12.
25        MS. HUNKER:  (Provides exhibit.)



MAGNA ▶
LEGAL SERVICES

Page 70

1          MR. GOLANDO:  Thank you.
2  BY MS. HUNKER (resuming):
3     Q   Do you have the document in front of you?
4     A   Yes.
5     Q   Okay.  And so you see on top where it says, Governor
6  Greg Abbott, with the seal of the Governor?
7     A   Yes.
8     Q   And this is dated July 27th, 2020.
9     A   Yes.
10     Q   And this letter is dated to [sic] Secretary of State,
11  Ruth Hughs; is that correct?
12     A   Yes.
13     Q   And then it says:  Pursuant to his powers as Governor
14  of the State of Texas, Greg Abbott has issued the following:  A
15  proclamation suspending certain statutes concerning elections on
16  November 3rd, 2020.  Did I read that correctly?
17     A   Yes.
18     Q   And so if we turn the page, we'll see the
19  proclamation; is that correct?
20     A   Yes.
21     Q   Okay.  And if we turn to Page 3 -- or Page 2 of the
22  proclamation --
23     A   Uh-huh.
24     Q   -- you'll see that it is filed in the secretary of
25  state's office July 27th, 2020; is that correct -- on the

Page 71

1  bottom?
2     A   Yes.
3     Q   All right.  And now let's look at the substance of the
4  proclamation.  And, actually, before I do that, you'll agree
5  with me that the document I've given you is a copy of the
6  proclamation issued by Governor Greg Abbott on July 27th, 2020,
7  in response to the COVID-19 pandemic.
8     A   Yes.
9     Q   Okay.  And so let's look where it says, Now, therefore
10  I, Greg Abbott --
11     A   (Complies with request.)  Okay.
12     Q   -- under the authority vested in me by the
13  constitution and laws of the State of Texas do hereby suspend
14  Section 85.001(a) of the Texas Election Code to the extent
15  necessary to require that for any election ordered or authorized
16  to occur on November 3rd, 2020, early voting by personal
17  appearance shall begin on Tuesday, October 13th, 2020, and shall
18  continue through the fourth day before election.  Did I read
19  that correctly?
20     A   Yes.
21     Q   Okay.  And so in this proclamation, Governor Greg
22  Abbott extends early voting by one week during the November 2020
23  election; is that correct?
24     A   Yes.
25     Q   And so he abided by the request of County Clerk

Page 72

1  Chris Hollins, who requested an additional week of early voting;
2  is that correct?
3     A   I'm not sure he -- it was done because of the -- that
4  request.  I don't know.
5     Q   You'd agree, though, that Governor Greg Abbott's
6  actions aligned with Chris Hollins' request that early voting be
7  extended one week?
8     A   I -- I don't know.
9     Q   And then let's look at the next sentence:  I further
10  suspend Section 86.006(a-1) --
11     A   Uh-huh.
12     Q   -- of the Texas Election Code for any election ordered
13  or authorized to occur on November 3rd, 2020, to the extent
14  necessary to allow a voter to deliver a marked mail ballot in
15  person to the early-voting clerk's office prior to and including
16  on election day.  Did I read that correctly?
17     A   Yes.
18     Q   Were you aware of -- of when a voter could deliver in
19  person their marked mail ballot prior to the proclamation?
20     A   Not exactly, no.
21     Q   Okay.  So you were not aware that prior to the
22  proclamation, the only date a voter could return their marked
23  mail ballot in person was on election day.
24     A   No, I wasn't aware.
25     Q   Would you agree that Governor Greg Abbott's order

Page 73

1  extended the number of days that a voter could deliver in person
2  a marked mail ballot?
3     A   According to this, yes.
4     Q   Okay.  And so Governor Greg Abbott, in response to the
5  COVID-19 pandemic, took steps to make voting easier in light of
6  the challenges presented; is that correct?
7          MR. GOLANDO:  Objection, form.
8  BY THE WITNESS (resuming):
9     A   Can you restate that, please?
10     Q   Sure.  Would you agree with me that based on this
11  document, Governor Greg Abbott took steps to alleviate the
12  burdens that COVID-19 would have on voters trying to vote?
13     A   I don't know if that was the intent.  According to
14  this, two changes were made.
15     Q   Would you agree that he responded to the COVID-19
16  pandemic by expanding early-voting period and by expanding the
17  number of days an individual can deliver their marked mail
18  ballot in person?
19     A   According to this proclamation, he made two changes.
20     Q   And those are the two changes; correct?
21     A   Yes, these two.
22     Q   And so you would agree with me that in response to the
23  COVID-19 pandemic, Governor Greg Abbott took at least two
24  actions with respect to elections:  The first, extending the
25  number of days of early voting by one week; and, second,



Page 74

1 extending the number of days that an individual could return
2 their marked mail ballot in person?
3    A   That's what it says in the proclamation.
4    Q   We can put this aside.  Were you aware that Harris
5 County sought to increase the number of locations in which an
6 individual can deposit their marked mail ballot in person?
7    A   Yes.
8    Q   So I'm going to introduce Exhibit Number 13.
9        MS. HUNKER:  (Provides exhibit.)
10       MR. GOLANDO:  Thank you.
11       THE WITNESS:  Thank you.
12 BY MS. HUNKER (resuming):
13   Q   Do you have the document in front of you?
14   A   Yes.
15   Q   Okay.  And so you read where it says, In the Supreme
16 Court of Texas, and then it has, In re Hotze, M.D., Harris
17 County Republican Party.
18   A   Yes.
19   Q   And it also has Justice Devine dissenting from the
20 Court's order, denying the petition of writ of mandamus and
21 motion to stay.
22   A   Yes.
23   Q   And if we turn to the last page, you'll see the
24 opinion is delivered on October 7th, 2020; is that correct?
25   A   Yes.

Page 75

1    Q   Okay.  Would you agree with me that this is Justice
2 Devine's dissent issued on October 7th, 2020, in the case, In Re
3 Hotze, specifically Number 20-0751?
4    A   Yes.
5    Q   Now, let's turn to Page 2.
6    A   (Complies with request.)
7    Q   Towards the end of Paragraph 2, you'll see where it
8 says, Texas Election Code states.  Let me know when you've found
9 it in the document.
10   A   (Reviewing.)
11   Q   Second to last sentence.
12   A   Okay.  Yes.
13   Q   It reads:  Texas Election Code states a voter may
14 deliver a marked ballot in person to the early-voting clerk's
15 office only while the polls are open on election day.  If the
16 county clerk receives a ballot returned in violation of this
17 section, the ballot may not be counted.  Did I read that
18 correctly?
19   A   Yes.
20   Q   And then let's look at the next paragraph:  On
21 September 24th, 2020, when asked by what date the county clerk
22 would begin accepting hand-delivered mail ballots, he responded,
23 We will begin accepting mail ballots as soon as they hit voters'
24 mailboxes.  I anticipate -- in parentheses -- September 20th,
25 2020, that will happen.  The county clerk's office went on to

Page 76

1 say that, Mail ballots will be accepted at each of the county
2 clerk's annexes, presumably the county clerk is intent on
3 counting the ballots he receives.  Did I receive -- did I read
4 that correctly?
5    A   Yes.
6    Q   And then it immediately follows:  Thus, the clerk is
7 violating the election code in two ways:  First, the county
8 clerk is accepting hand mail ballots ahead of the November 3rd
9 election day and, second, is accepting those ballots at annexes
10 rather than at the voting clerk's office as prescribed by
11 statute.  Did I read that correctly?
12   A   Yes.
13   Q   Now, would you agree with me that Justice Devine
14 thought that the county clerk would be violating the election
15 code in two ways:  First, by accepting a hand-delivered mail-in
16 ballot ahead of the November 3rd election day and, second, by
17 accepting those ballots at annexes rather than the voting
18 clerk's office, based on this document?
19       MR. GOLANDO:  Objection, form, compound, but you
20 can answer if you can.
21 BY THE WITNESS (resuming):
22   A   I -- I can't say what he thought.  I don't know.
23   Q   Okay.  Would you agree that the document states that
24 the clerk is violating the election code in two ways?
25   A   That's what it says here.

Page 77

1    Q   Okay.
2    A   That's what I'm reading.
3    Q   And would you agree the second way that's cited is
4 accepting those ballots at annexes rather than at the voting
5 clerk's office as prescribed by statute?
6    A   That's what it reads here.
7    Q   Okay.  And so, according to this opinion, one of the
8 ways that Justice Devine states that the Harris County clerk is
9 violating the election code is by accepting those ballots at
10 annexes rather than the early-voting clerk's office; is that
11 correct?
12   A   That's what it reads here.
13   Q   Did you know that there was litigation over whether or
14 not the Governor could suspend -- let me take that back.  I'm
15 going to restate that question.
16   A   Uh-huh.
17   Q   Were you aware there was litigation over whether
18 Harris County clerk [sic] could accept ballots at annexes rather
19 than its main office?
20   A   No, not exactly, no.
21   Q   Okay.  You used the phrase, Not exactly.  Do you mean
22 you had an inkling, or how did you mean by that?
23   A   I knew there was some question about locations, but I
24 didn't know exactly what was in question, the exact locations.
25   Q   And do you know what happens to a ballot that is



Page 78

1 accepted at an office -- at an incorrect location?

2   A   No.

3   Q   And so you don't know whether a ballot accepted at an

4 incorrect location would be discounted; is that correct?

5   A   Right, I -- I don't know.

6   Q   Okay.  We can put that aside.  Were you aware that

7 following Harris County's announcement that it would have

8 multiple ballot locations of in-person delivery that other

9 counties followed suit?

10   A   No, I'm not aware.

11   Q   Okay.  And so I'm going to introduce Exhibit 14.

12       MS. HUNKER:  (Provides exhibit.)

13       MR. GOLANDO:  Thank you.

14       THE WITNESS:  Thank you.

15 BY MS. HUNKER (resuming):

16   Q   Do you have the document in front of you?

17   A   Yes.

18   Q   Do you see where it says:  In the United States

19 District Court for the Western District of Texas, Austin

20 Division?

21   A   Yes.

22   Q   And then it also has a case heading, Texas League of

23 United Latin American Citizens v. Greg Abbott.  Did I read that

24 correctly?

25   A   Yes.

Page 79

1   Q   And then further down it says, Declaration of Brian

2 Keith Ingram.  Did I read that correctly?

3   A   Yes.

4   Q   And if we turn to the last page it says, Executed on

5 October 8th, 2020, and it has Mr. Ingram's signature; is that

6 correct?

7   A   Yes.

8   Q   Okay.  We can go back to the front page.

9   A   (Complies with request.)

10   Q   Would you agree with me that this is a declaration

11 filed or submitted by Brian Keith Ingram in the case, Texas

12 League of United Latin American Citizens versus Greg Abbott?

13   A   Yes.

14   Q   And you can see from the top it actually also states

15 the date, October 8th, 2020.  Do you see that?

16   A   Yes.

17   Q   Okay.  And so let's look at Paragraph 1:  I currently

18 serve as the director of elections for the office of the Texas

19 Secretary of State and have served in this capacity since 2012.

20 Did I read that correctly?

21   A   Yes.

22   Q   And so this is a declaration from the director of

23 elections from the office of the Texas Secretary of State;

24 correct?

25   A   Yes.

Page 80

1   Q   Now let's move on to Paragraph 8, which is on the next

2 page.

3   A   (Complies with request.)

4   Q   It reads:  During the July 14th, 2020, primary runoff,

5 Harris County became the first county in Texas, to my knowledge,

6 to ever offer multiple locations for in-person delivery of mail

7 ballots pursuant to Section 86.006(a-1) of the election code.

8 Did I read that correctly?

9   A   Yes.

10   Q   Are you aware of any other county besides Harris

11 County that had offered multiple ballot locations for in-person

12 delivery prior to this date?

13   A   I'm not aware.

14   Q   Okay.  And let's look at Paragraph 9.  It reads:

15 Following the issuance of the Governor's July 27th, 2020,

16 proclamation suspending Section 86.006(a-1) and allowing the

17 delivery of marked mail ballots in person to the early-voting

18 clerk's office prior to election day, several early-voting

19 clerks, including the Harris County Clerk, announced plans to

20 have multiple mail-ballot delivery locations in their counties

21 for the November election.  Did I read that correctly?

22   A   Yes.

23   Q   It continues:  Sometime in late August or September,

24 it was reported that Travis County also intended to organize

25 multiple sites for the in-person delivery of mail ballots.  Fort

Page 81

1 Bend County followed suit and publicized its policy change in

2 either late September or on October 1st.  My understanding is

3 that some counties intended to utilize annexed locations or

4 parking garages for delivery sites.  Did I read that correctly?

5   A   Yes.

6   Q   And so you had not heard of any other county besides

7 Harris County offering multiple ballot-delivery sites; is that

8 correct?

9   A   I don't -- I don't recall, no.

10   Q   Okay.  And so you don't recall if you heard anything

11 about Travis County or Fort Bend County also offering multiple

12 delivery sites; is that correct?

13   A   I don't recall.

14   Q   Okay.  Do you have any reason to doubt Keith Ingram's

15 statement that these two counties, in addition to Harris County,

16 announced their intention to follow suit?

17   A   No.

18   Q   Okay.  And let's move to Paragraph 10.  Out of 254

19 counties, I am only aware of four counties that intended to

20 utilize more than one location for in-person delivery of mail

21 ballots:  Harris, Travis, Fort Bend and Galveston.  By statute

22 and even under the July 27th proclamation, some of these

23 locations would not have been authorized sites to deliver a

24 marked ballot in person because they do not constitute an

25 early-voting clerk's office.  For example, in Fort Bend County,



Carol Alvarado

October 06, 2022
Pages 82 to 85

Page 82

1 the early-voting clerk is the county's election administrator
2 who maintains only one office. My understanding is that the
3 Fort Bend County intended to use other county annexed offices in
4 addition to the election administrator's office to accept in-
5 person delivery of mail ballots under Section 86.006(a-1). Did
6 I read that correctly?
7    A   Yes.
8    Q   Okay. And so you had -- you had not heard that in at
9 least one case, Fort Bend County, they had intended to use
10 offices that were not the early-voting clerk's office; is that
11 correct?
12   A   Yeah, I don't -- I didn't know. I'm not aware.
13   Q   Now, we had already established that you don't know
14 what occurs when a ballot is cast at an illegal voting site; is
15 that correct?
16   A   Correct.
17   Q   We can put this aside.
18       (Complies with request.)
19   Q   Now, Senate Bill 1 addressed the number of locations
20 that mail-in ballots could be delivered; is that correct?
21   A   Yes.
22   Q   And so Senate Bill 1 addressed the question that was
23 presented by litigation over what was a proper delivery site; is
24 that correct?
25       MR. GOLANDO: Objection, to the extent it calls

Page 83

1 for a legal conclusion. If you have an opinion, you may offer
2 it.
3 BY THE WITNESS (resuming):
4    A   Can you restate --
5    Q   Sure.
6    A   -- the question?
7    Q   So Senate Bill 1 addresses the concern that was raised
8 in litigation over what the definition of a proper ballot-
9 delivery site was.
10   A   I -- I'm not aware.
11   Q   Okay. Now, did you talk to any election official --
12 when I say election official, I'm talking about the county
13 clerk's office -- during the 2020 election about how multiple
14 ballot-delivery locations operated in Harris County in 2020?
15   A   No, I don't believe so.
16   Q   And did you talk to any voters about their experience
17 using the multiple ballot-delivery sites in the July 2020
18 runoff?
19   A   No.
20   Q   And so you don't know any, like, logistical problem
21 that may have occurred with the in person -- multiple in-person
22 delivery sites; is that correct?
23   A   That's correct.
24   Q   And did you inquire over whether any logistical
25 concerns had come about in response to the multiple in-person

Page 84

1 delivery sites?
2    A   No.
3    Q   Okay. And I have a similar question regarding drive-
4 through voting: Did you inquire into whether there were any
5 logistical concerns or problems that arose in response to
6 conducting drive-through voting?
7    A   I don't recall.
8    Q   And you're not aware of any with respect to drive-
9 through voting; is that correct?
10   A   I don't recall.
11   Q   Okay. I'm going to move on to Exhibit Number 15.
12       MS. HUNKER: (Provides exhibit.)
13       MR. GOLANDO: Thank you.
14 BY MS. HUNKER (resuming):
15   Q   And I apologize in advance for the small print.
16   A   That's okay. (Reviewing.)
17   Q   And do you see on top where it says November 3rd,
18 2020, general and special elections early-voting schedule?
19   A   Yes.
20   Q   Okay. Now, would you agree with me that this is a
21 list of all of the early-voting locations in Harris County
22 during the November 3rd, 2020, election?
23   A   Yes.
24   Q   And if you can see the red print kind of underneath
25 the diagram, it says, Open 24 hours on October 29th; is that

Page 85

1 correct?
2    A   Yes.
3    Q   Do you know how long early voting was during the
4 November 2020 election?
5    A   Can you be more specific?
6    Q   Sure. Do you know how long early voting -- how many
7 days early voting was available during the November 2020
8 election?
9    A   I don't recall.
10   Q   Would you agree with me that it was approximately
11 three weeks?
12   A   Yes.
13   Q   And so out of approximately three weeks of early
14 voting, Harris County offered 24-hour voting on a single day,
15 which was October 29th; is that correct?
16   A   Yes.
17   Q   And it also lists in red locations that were 24 hours
18 during October 29th. Do you see the red locations or locations
19 in red print?
20   A   Yes.
21   Q   And so let's count them. One, two, three, four -- on
22 the first page --
23   A   Uh-huh.
24   Q   -- and then an additional two on the back page; is
25 that correct?



Carol Alvarado

October 06, 2022
Pages 86 to 89

Page 86

1    A    Yes.
2    Q    And so, according to this document, Harris County had
3  only six locations that were open for 24 hours on October 29th;
4  is that correct?
5    A    Yes.
6    Q    And this is out of, I believe, 112 locations; is that
7  correct?
8    A    (Reviewing.)  Yes.
9    Q    And so Harris County offered early -- let me take that
10  back.  Harris County offered 24-hour voting at six locations one
11  day out of its 112 early-voting locations; is that correct?
12    A    (Reviewing.)  It appears that way.
13    Q    Okay.  Are you aware of any other county that offered
14  24-hour voting in the 2020 election?
15    A    I'm not.
16    Q    Are you aware of any county that offered 24-hour
17  voting prior to the November 2020 election?
18    A    I'm not aware.
19    Q    To your knowledge, is Harris County the first county
20  in Texas that would have offered 24-hour voting?
21    A    Yes.
22    Q    And did you talk to any of the election officials in
23  the county clerk's office about how 24-hour voting was
24  conducted?
25    A    No.

Page 87

1    Q    Did you talk to any voters about their experience
2  using 24-hour voting?
3    A    Yes.
4    Q    And do you know approximately how many voters you
5  would have spoken to?
6    A    No.
7    Q    And when would you have talked to them about it?
8    A    Out and about in my district, maybe at, you know,
9  various speaking engagements.
10    Q    And did you inquire as to whether there were any
11  logistical concerns or problems when conducting 24-hour voting?
12    A    No.
13    Q    And you're not aware of any logistical concerns or
14  problems with respect to conducting 24-hour voting; is that
15  correct?
16    A    No.  People said it was convenient and easy.
17    Q    Okay.  Are you aware if there are any municipalities
18  in Harris County that are partially in Harris County but also
19  partially in an adjacent county?
20    A    I would imagine so.
21    Q    Did you inquire as to whether there was any confusion
22  within these municipalities on the time that would be available
23  for their -- for voting?  You personally.
24    A    No.
25    Q    Did you inquire whether there was any voting confusion

Page 88

1  regarding voters knowing which locations offered the 24-hour
2  voting?
3    A    No.
4    Q    And did you inquire as to whether there was any voter
5  confusion on voters not knowing which sites had the extended
6  hours?
7    A    No.
8    Q    All right.  We can put that aside.  Senate Bill 1
9  addressed 24-hour voting; correct?
10    A    Yes.
11    Q    I believe Senate Bill 1 standardized the hours that
12  each county could offer in-person voting; is that correct?
13    A    Yes.  And, again, you are referring to Senate Bill 1
14  in the second special session?
15    Q    That's correct.
16    A    Yes.
17    Q    Let's refer back to that exhibit in the beginning that
18  had the Senate Journal, which was Exhibit Number 2.
19        MR. GOLANDO:  (Provides exhibit.)
20        THE WITNESS:  Thank you.
21        MR. GOLANDO:  Yes, ma'am.
22  BY THE WITNESS (resuming):
23    A    Uh-huh.  (Reviewing.)
24    Q    Now, specifically, I want to turn to Page A-56.
25    A    Okay.

Page 89

1    Q    Do you have that in front of you?
2    A    Yes.
3    Q    Okay.  So I'm looking at the second to last statement
4  that you would have given, which reads, Okay, so let's -- do you
5  see that?
6    A    The one that says, Okay, so let's talk?
7    Q    Yes.
8    A    Yes.
9    Q    So it reads:  Senator Alvarado, okay.  So let's talk
10  about the drive-through voting.  This bill would eliminate
11  voting in tents or garages, those type of structures or anything
12  else that could be considered drive-through voting.  Is that
13  accurate?  Senator Hughes, I believe that is fair.  The idea is
14  that drive-through voting was not specifically provided for in
15  the election code before, and so this is clarifying that's not
16  what's in the code.  Did I read that correctly?
17    A    Yes.
18    Q    Now, we had discussed that there was litigation over
19  whether or not drive-through voting was permitted by the code;
20  correct?
21    A    Right.
22    Q    And so Senator Hughes here is referring to that
23  question of whether or not the election code previously before
24  Senate Bill 1 allowed drive-through voting; is that correct?
25    A    Say that again.



Carol Alvarado

Page 90

1  Q   So Senator Hughes here is stating that --
2      MS. HUNKER:  Actually, will the court reporter be
3  able to repeat my question?
4      COURT REPORTER:  Yes.  Okay.  Question:  And so
5  Senator Hughes here is referring to that question of whether or
6  not the election code previously before Senate Bill 1 allowed
7  drive-through voting; is that correct?
8  BY THE WITNESS (resuming):
9  A   I'm not sure.
10  Q   Okay.  Would you agree that he referenced the question
11  over whether drive-through voting was allowed under the code
12  previously when he was explaining his reasons for having
13  provisions in the omnibus elections bill that excluded drive-
14  through voting?
15  A   Yes.  According to this journal, he does reference the
16  election code.
17  Q   Okay.  And if we turn to Page 58, Senator Hughes
18  states in the middle:  Well, I remember reading where the
19  election official in charge of this in Harris County said that
20  we stopped doing it before election day because we were
21  concerned the votes wouldn't count.  That sounds like a real
22  problem.  Did I read that correctly?
23  A   You did.
24  Q   And we had talked about Chris Hollins had shut down
25  several drive-through voting sites before election day; correct?

Page 91

1  A   Yes.
2  Q   And so Senator Hughes is referencing this closure of
3  voting sites before election day in his testimony and exchange
4  with you; correct?
5  A   Yes.
6  Q   And so he's -- he states that one of his concerns over
7  drive-through voting is the fact that election officials were
8  required to shut down the voting sites prior to election day; is
9  that correct?
10  A   According to what I read, yes.
11  Q   Okay.  And so I want to turn further down, and we're
12  going to go to A-95 at the end where it has:  Presiding officer,
13  Senator Bettencourt for what purpose do you rise?  And Senator
14  Bettencourt responds:  Ask questions of the author.  Did I read
15  that correctly?
16  A   Yes.
17  Q   And which county does Senator Bettencourt district
18  reside?
19  A   Harris County.
20  Q   And so I referenced that part of his exchange just to
21  introduce who was speaking.  If you can turn to Page 98.
22  A   (Complies with request.)  Okay.
23  Q   Okay.  So if you look in the first paragraph, first --
24  the sentence that says, There is a tremendous.  Do you see that?
25  A   The first complete paragraph or --

Page 92

1  Q   No, not complete.  It's three lines from the top.
2  A   Okay.  Yes.
3  Q   (Reading.)  There is a tremendous error rate in these
4  statistics because Harris County -- if this is all about Harris
5  County, Senator Gutierrez -- it is because they did it on the
6  fly.  And, in fact, there's a complaint filed by Rachel Hooper,
7  Esquire.  We talked about this last time we had a debate where
8  there's a difference in count.  Still today, six months after
9  the election, they can't reconcile the JBCC-VR and the vote
10  roster of 1,775 votes from the East Lake CDR to the daily
11  record, 1,884.  And this problem started conveniently during
12  early vote, and actually The Texan covered it at one point in
13  time.
14      I am quoting The Texan from the 27th of October, the
15  secretary of state's website, which reflects the data submitted
16  by the county had reported 1,000,100 -- sorry -- 1,081,000; the
17  daily record of early voting by Clerk Hollins was 1,090,000; a
18  third report, the Harris County early-voting site, had
19  1,092,000.  There was a difference of 9,000 and 10,000 votes on
20  that day, then after myself, several other people, including
21  Lieutenant Governor, questioned these numbers, shockingly, they
22  were changed in two days, but they still reflected a difference
23  on October the 29th of 1,539 votes, and these totals have not
24  changed.  So my question to you, Senator Hughes, are you
25  surprised that there's almost 1,884 votes in Harris County that

Page 93

1  aren't accounted for?  Did I read that correctly?
2  A   Yes.
3  Q   And so let's quickly jump to Page 100.
4  A   (Complies with request.)  Uh-huh.
5  Q   Actually, I'm sorry.  Can we go back to Page 98?  I
6  missed a line.
7  A   Uh-huh.
8  Q   So Senator Bettencourt continues:  In fact, it's a
9  one-and-a-half percent error rate.  Did I read that correctly?
10  A   (Reviewing.)
11  Q   No, we're down -- further down.
12  A   Oh, okay.  Okay.  Yes.
13  Q   Senator Eckhardt, wouldn't you like to hold an
14  election, Senator Buckingham, with a one-and-a-half percent
15  error rate that you can't verify who voted?  You don't know who
16  the names are and you are not even sure that your vote totals
17  match your own figures, much less what you sent to the secretary
18  of state.  That's what the record of Harris County is.  It's not
19  a record, Dean, of success, it's a record of failure, because
20  they had a one-and-a-half percent error rate in the -- in that
21  drive-through voting system.  Did I read that correctly?
22  A   Yes.
23  Q   And so in this long soliloquy, Senator Bettencourt is
24  stating that -- or alleging that there was a one-and-a-half
25  percent error rate in the vote totals through drive-through



Carol Alvarado

October 06, 2022
Pages 94 to 97

Page 94

1 voting; is that correct?

2    A    That's what he says here.

3    Q    Yeah.  And so he's alleging this on the floor;

4 correct?

5    A    Yes.

6    Q    Had you heard of any concerns in Harris County about

7 an inability to reconcile the numbers for drive-through voting?

8    A    I don't recall.

9    Q    Okay.  Now let's turn to Page A-100.

10    A    (Complies with request.)

11    Q    And we're going to go towards the middle where it

12 says, So, members, we've heard a lot.

13    A    Yes.

14    Q    So, members, we've heard a lot, but facts are stubborn

15 things, and these are the facts of what the real Harris County

16 experiment is:  Even today we've got 1,884 unaccounted-for

17 votes.  And why does that matter?  Well, two election cycles ago

18 we had a state rep when by 47 votes and another one lose by 117.

19 This last election cycle we had a -- had win [sic] by 300.  In

20 the same -- in the same race, the other guy lost by 300.  So

21 1,884 votes means something.  An error rate of one --

22 one-and-a-half percent affects the outcome of these elections,

23 and the public won't tolerate it, and that's why I support

24 Senate Bill 7.  Did I read that correctly?

25    A    Yes.

Page 95

1    Q    And so you'd agree that in this discussion,

2 Senator Bettencourt expresses a concern that an error rate in

3 drive-through voting could change the totals of a close

4 election.

5    A    That's what he states here.

6    Q    And do you have any reason to doubt the veracity of

7 his belief?

8    A    I -- I can't say.

9    Q    We can put this aside, but we will be coming back to

10 it.

11    A    Okay.

12    Q    And so would you agree that the state has an interest

13 in ensuring that every vote legally cast is counted?

14    A    Sure.

15    Q    Now, I actually want to introduce Exhibit Number 16,

16 but it's going to be Clip Number 2.

17       (Video playing.)

18 BY MS. HUNKER (resuming):

19    Q    Were you able to hear that clip?

20    A    Barely.

21    Q    Were you able to make out its contents?

22    A    Yes.

23    Q    That was a clip of the filibuster you gave in

24 Senate Bill 1; correct?

25    A    Yes.

Page 96

1    Q    And in it, you say that Texas Democrats support

2 election integrity; is that correct?

3    A    Yes.

4    Q    And do you still hold that position?

5    A    Yes.

6    Q    And do you support election integrity?

7    A    Yes.

8    Q    And so you'd agree that election integrity is a

9 interest of the state; correct?

10    A    It's an interest of mine.

11    Q    And would you agree the state has an interest in

12 advancing election integrity?

13    A    Yes.

14    Q    And so I'm going to introduce Exhibit 17 as another

15 clip.

16       (Video playing.)

17 BY MS. HUNKER (resuming):

18    Q    Were you able to hear that clip?

19    A    Yes.

20    Q    Okay.  And that was also a clip from your filibuster

21 of Senate Bill 1; correct?

22    A    Yes.

23    Q    And in it, you talk about the ability of the Texas

24 Senate to have respectful disagreement; is that correct?

25    A    Yes.

Page 97

1    Q    And so we had talked about your interest in election

2 integrity and that you support election integrity; correct?

3    A    Yes.

4    Q    And we talked about how the Texas Democrats have an

5 interest in election integrity and that they support election

6 integrity; correct?

7    A    Yes.

8    Q    You'd agree, though, that people can disagree about

9 the best way of advancing election integrity; correct?

10    A    Yes.

11    Q    And that in the Texas Senate, it could be respectful

12 disagreement; is that correct?

13    A    Yes.

14    Q    Now, would you agree that the State of Texas has an

15 interest in ensuring that voters have confidence in the

16 election?

17    A    Yes.

18    Q    And would you agree that voters losing confidence in

19 the election can have a negative impact on our Democratic

20 system?

21    A    Yes.

22    Q    And would you agree that for some members of the

23 public, advancing election integrity is a way of advancing

24 confidence in the voters' confidence in the election?

25    A    Could be.



Carol Alvarado

Page 98

1    Q    And would you agree that some members of the Texas
2  Senate believe that advancing election integrity is a way of
3  advancing voters' confidence in the election?
4    A    It could be. It's open for interpretation.
5    Q    Would you agree that it is important that elections
6  are conducted securely?
7    A    Yes.
8    Q    And would you agree that the State of Texas has an
9  interest in ensuring that elections are conducted securely?
10   A    Yes.
11   Q    Do you believe it is important that the State of Texas
12  discourage and prevent voter fraud?
13   A    Yes.
14   Q    Do you agree that the State of Texas has a significant
15  interest in preventing voter fraud from occurring?
16   A    Yes.
17   Q    Would you agree that privacy is important with regards
18  to elections, specifically the ability to cast a ballot in
19  secret?
20   A    Yes.
21   Q    And do you support the secret ballot?
22   A    Yes.
23   Q    Would you agree that the State of Texas has a
24  legitimate interest in protecting the secrecy of the ballot?
25   A    Yes.

Page 99

1    Q    Would you agree that the State has a legitimate
2  interest in preventing voters from being coerced into casting a
3  vote for or against a particular candidate or proposition?
4    A    Say that again.
5    Q    Would you agree that the State has a legitimate
6  interest in preventing voters from being coerced into casting a
7  vote for or against a particular candidate or proposition?
8    A    I -- I don't know. I'm not sure.
9    Q    Let me rephrase the question, since it might have
10  been --
11   A    Yeah.
12   Q    -- confusingly stated. Would you agree that the State
13  has a legitimate interest in preventing voters from being
14  coerced into voting a specific way?
15   A    Yes.
16   Q    Would you agree that a voter is unable to fully
17  exercise his or her right to vote if he or she is coerced into
18  voting a specific way?
19   A    Possibly.
20   Q    Would you agree that there's a possibility that a
21  voter can be coerced at home when filling out a mail-in ballot?
22   A    I don't know.
23   Q    Would you agree that it's possible for a voter to be
24  coerced when voting in a car by other passengers who can see the
25  voter's ballot?

Page 100

1    A    No, I don't agree.
2    Q    Okay. Is there a risk that people might be unfairly
3  targeted and penalized for how they vote if there was not a
4  secret ballot?
5    A    I don't know.
6    Q    And so let's talk a little bit about Senate Bill 7.
7    A    Okay.
8    Q    I believe this is going to be Exhibit Number 18.
9         MS. HUNKER: (Provides exhibit.)
10        MR. GOLANDO: Thank you.
11  BY MS. HUNKER: (resuming):
12   Q    Do you have the document in front of you?
13   A    Yes.
14   Q    Okay. So Senate Bill 7 was the omnibus bill that was
15  discussed during the regular session; correct?
16   A    Yes.
17   Q    Now, you introduced an amendment to this piece of
18  legislation; correct?
19   A    Yes.
20   Q    And that amendment failed; is that correct?
21   A    Yes, it failed along party lines.
22   Q    Okay. And I'm going to introduce Exhibit 19 to be
23  considered alongside Exhibit 18.
24   A    Okay.
25        MS. HUNKER: (Provides exhibit.)

Page 101

1         MR. GOLANDO: Thank you.
2  BY MS. HUNKER: (resuming):
3    Q    Do you have the exhibit in front of you?
4    A    Yes.
5    Q    And would you agree that this is a copy of the
6  amendment that you submitted in Senate Bill 7?
7    A    Let me read it. (Reviewing.) Yes.
8    Q    And so this amendment would have required the
9  secretary of state to conduct a thorough analysis and report
10  that assesses whether the act were it implemented would produce
11  a desperate impact on women, the elderly, persons with
12  disabilities, students or racial and ethnic minorities; is that
13  correct?
14   A    Yes.
15   Q    Okay. And you mentioned that it failed along party
16  lines; is that right?
17   A    Right.
18   Q    Did you talk to the bill author prior to the
19  amendment's introduction?
20   A    I don't recall. I mean, it's usually my practice to
21  do so, but I don't -- I don't recall on this one.
22   Q    Okay. Do you recall if you spoke to any legislators
23  or senators with respect to this particular amendment?
24   A    I might have.
25   Q    Did you speak to the secretary of state's office prior



MAGNA
LEGAL SERVICES

Carol Alvarado

October 06, 2022
Pages 102 to 105

Page 102

1 to filing the amendment?

2    A    I don't recall.

3    Q    Okay. Do you recall if you spoke to the secretary of

4 state's office during consideration of Senate Bill 7 generally?

5    A    I don't recall.

6    Q    Did you inquire whether the secretary of state [sic]

7 office does these type of reports and assessments prior to

8 submitting this amendment?

9    A    I don't recall.

10    Q    Did you inquire as to whether the secretary of state's

11 office had the resources, know-how and experience to conduct an

12 analysis on whether the act would have disparate impact on the

13 various demographic groups listed?

14    A    I don't recall.

15    Q    And did you inquire as to how much funding would be

16 needed in order for the secretary of state's office to conduct

17 this type of analysis on the disparate impact the act might have

18 on the demographic groups listed?

19    A    I don't recall, no.

20    Q    Do you know if the secretary of state's office

21 conducts these type of analysis for other legislation?

22    A    I don't know.

23    Q    Okay. Do you know if the secretary of state's office

24 has a standard methodology that they would apply to conducting

25 analysis on disparate impact of legislation?

Page 103

1    A    I don't know.

2    Q    Do you know if the secretary of state's office would

3 have to craft and develop a methodology in order to conduct this

4 particular type of assessment?

5    A    I don't know.

6    Q    Do you know how much resources it would take the

7 secretary of state's office, specifically money and manpower, to

8 conduct this type of analysis?

9    A    I'm not aware.

10    Q    And do you know if the secretary of state's office has

11 any experience in conducting these type of analysis?

12    A    I'm not aware.

13    Q    Now, you did not provide funding for the secretary of

14 state to conduct the analysis in this amendment; correct?

15    A    That's correct.

16    Q    And you did not file separate legislation that would

17 have given the secretary of state's office funding in order to

18 conduct this type of analysis; is that correct?

19    A    That's correct.

20    Q    And so this would have been an unfunded mandate on the

21 secretary of state's office; is that correct?

22    A    I don't know.

23    Q    Okay. It would -- your amendment would have imposed

24 on the secretary of state an obligation to conduct an

25 assessment, but it did not include allocated funding; is that

Page 104

1 correct?

2    A    That's correct.

3    Q    You can put these aside.

4         THE WITNESS:  (Provides exhibit to counsel.)

5         MR. GOLANDO:  Thank you.

6 BY MS. HUNKER (resuming):

7    Q    You did not file that amendment for Senate Bill 1;

8 correct?

9    A    I don't believe so.

10    Q    Now, Senate Bill 7, a version of it, passed the House

11 and the Senate; correct?

12    A    Yes.

13    Q    And then it went to conference committee; is that

14 right?

15    A    Yes.

16    Q    And the conference committee came up for consideration

17 in the Senate; is that right?

18    A    Yes.

19    Q    And did the -- the senators voted in favor; is that

20 correct?

21    A    I don't recall the exact vote.

22    Q    Okay. But do you remember if it left the Senate?

23    A    Yes.

24    Q    Okay. And so the last thing in the legislature Senate

25 Bill 7 had to do was the conference committee report had to be

Page 105

1 approved by the House; is that correct?

2    A    I believe so.

3    Q    Okay. And you recall that the Texas Democrats broke

4 quorum towards the end of legislative session in order to

5 prevent a vote taking place; is that correct?

6    A    I don't recall the sequence of events.  I know there

7 were a lot of things that kind of broke the norm when it came to

8 that bill.  I don't recall the sequence of events.

9    Q    Okay. You'd agree with me, though, that the

10 conference committee report did not pass the Texas House;

11 correct?

12    A    Right. Okay.

13    Q    Now, following the close of the regular session,

14 Governor Greg Abbott called a first special session; is that

15 correct?

16    A    Yes.

17    Q    And the special session is 30 days; correct?

18    A    Right.

19    Q    Now, Texas Democrats in the House, they broke quorum;

20 correct?

21    A    Yes.

22    Q    I believe they fled to Washington, D.C.; is that

23 correct?

24    A    Yes.

25    Q    The Senate, though, did not break quorum; is that



Page 106

1 correct?
2    A   Right.
3    Q   And so I am going to introduce Exhibit 20.  Do you
4 have the document in front of you?
5    A   Yes.
6    Q   Okay.  And so this is a press release from the Texas
7 Senate Democratic Caucus; correct?
8    A   Right.
9    Q   And this was through July 13th, 2021; correct?
10    A   Uh-huh.
11    Q   And so you had mentioned that you are the chair of the
12 Texas Senate Democratic Caucus.
13    A   Right.
14    Q   So did you see this particular statement before it was
15 released?
16    A   Yes.
17    Q   And did you approve the statement before it was
18 released?
19    A   Yes.
20    Q   And so the title of this is, Texas Senate Democrats
21 Take Fight to Nation's Capital.  Did I read that correctly?
22    A   Uh-huh.
23    Q   Now, if we go down to the second page -- sorry --
24 second paragraph --
25    A   Uh-huh.

Page 107

1    Q   -- you say:  Rather than continuing to fruitlessly
2 debate Republicans who refuse to legislate in good faith, Texas
3 Senate Democrats decided to take matters into their own hands in
4 order to secure the voting rights of Texas -- Texans, especially
5 voters of colors, seniors and those with disabilities, and work
6 with our partners at the federal level to pass voting-rights
7 legislation that would reign in discriminatory voter-suppression
8 laws and unfair redistricting practices.  Did I read that
9 correctly?
10    A   Yes.
11    Q   What did you mean by, Refused to legislate in good
12 faith?
13    A   Well, there were several things that happened during
14 -- I believe it may have been Senate Bill 7 during the regular
15 session -- a couple of things.  Because there were several
16 sessions and bills, I may not be exactly clear, but what I can
17 tell you is that when things occurred, like the -- I believe it
18 was the conference committee that was filed, usually the
19 conference committee and an out-of-bounds resolution are filed
20 at the same time.  That didn't occur.  Conference committee was
21 filed in the morning hours and then there was a revised one
22 filed later in the afternoon, then the out-of-bounds resolution
23 wasn't presented until the time that Senator Hughes was laying
24 out the bill, which is not normal.  It was a pretty thick
25 document, we hadn't had a chance to read it, to absorb it, and

Page 108

1 it appeared to me and others that things were just sort of
2 thrown together at the last minute.  There wasn't due process.
3 There were things that -- that broke from the normal procedure
4 of doing business.
5    Q   Okay.  So when you were stating, Refused to legislate
6 in good faith --
7    A   Right.
8    Q   -- you were referencing some of -- what you thought
9 were procedural abnormalities --
10    A   Yes.
11    Q   -- that occurred after the conference committee came
12 out.
13    A   Yes.
14    Q   Or surrounding the conference committee; is that
15 right?
16    A   Yeah, pretty much.
17    Q   Okay.
18    A   I mean, there were other things, but that -- that had
19 a lot to do with it, yes.
20    Q   And you said -- you used the phrase, to -- you said
21 the phrase, To -- appeared to me and to others.
22    A   Uh-huh.
23    Q   Who are the others?
24    A   Other senators, Democratic senators.
25    Q   And was there anything else that you were thinking of

Page 109

1 when you used the phrase, Refused to legislate in good faith?
2    A   Well, a lot of it had to do with procedures, with
3 timeliness.  I think it's in one of the journal statements that
4 you handed out on one of the previous pages that we didn't look
5 at, but I raised the point that we were debating this very
6 significant bill -- I forget what time it was, 2 o'clock -- at 2
7 o'clock in the morning, and we were given information at the
8 last minute --
9    Q   Okay.
10    A   -- not having time to -- to read.  Uh-huh.
11    Q   And so is it fair to say that when you were
12 referencing the phrase, Refused to legislate in good faith, you
13 were talking about procedural concerns you had regarding Senate
14 Bill 7.
15    A   Yes.  There were things that also occurred, like the
16 no-tag rule, no 24-hour notice for hearings -- and this was a
17 very significant bill getting a lot of attention, not just
18 statewide but nationally, so it was a very high-profile bill.
19         MS. HUNKER:  Okay.
20         MR. GOLANDO:  You guys want to take a break?
21         MS. HUNKER:  That's what I was about to say, if
22 you want to take a break for lunch.
23         MR. GOLANDO:  Sure.  I appreciate it.
24         VIDEOGRAPHER:  Off record at 12:58.
25         (A recess is taken.)



Carol Alvarado

October 06, 2022
Pages 110 to 113

Page 110

1        VIDEOGRAPHER: On the record at 1:39.
2 BY MS. HUNKER (resuming):
3    Q   Senator, did you have a good break?
4    A   Yes, it was nice to get some fresh air.
5    Q   Glad to hear it. So when we were closing up our last
6 session, we were talking a bit about the quorum break that
7 occurred in the summer of 2021; correct?
8    A   Uh-huh.
9    Q   Were you part of the negotiations to get Texas
10 Democrats back into quorum?
11   A   No.
12   Q   And did you communicate with anybody while those
13 negotiations were ongoing with respect to the negotiations?
14   A   No -- about the negotiations, no. I kept in
15 communication with some of my house colleagues.
16   Q   Uh-huh. Do you know the ultimate reason why the Texas
17 House Democrats came back?
18   A   No.
19   Q   So I'm going to introduce what I believe is
20 Exhibit 21.
21       MS. HUNKER: (Provides exhibit.)
22       MR. GOLANDO: Thank you.
23       THE WITNESS: Thank you.
24 BY MS. HUNKER (resuming):
25   Q   Do you have the document in front of you?

Page 111

1    A   Yes.
2    Q   And do you recognize this document?
3    A   Uh-huh, yes.
4    Q   And what is it?
5    A   It has a list of amendments.
6    Q   And so this is from the Texas Legislature Online --
7    A   Yeah.
8    Q   -- is that correct?
9    A   Yes.
10   Q   And do you know what Texas Legislature Online is?
11   A   Yes.
12   Q   And that's a place where legislative record is
13 compiled; is that correct?
14   A   Yes.
15   Q   And so here I have a list of amendments for Senate
16 Bill 1, which you can see from the legislative session, it was
17 during the second special session.
18   A   Uh-huh.
19   Q   Would you agree with that description?
20   A   Yes.
21   Q   Okay. Now, you did not file an amendment for Senate
22 Bill 1; is that correct?
23   A   Right.
24   Q   Okay. The other Democrats did propose amendments;
25 correct?

Page 112

1    A   Yes.
2    Q   And a few of those amendments proposed by Texas
3 Democrats were adopted; is that correct?
4    A   Yes.
5    Q   And so we can see, if going down to Number 11,
6 Senator Bucy had an amendment that was adopted; correct?
7    A   Yes.
8    Q   And -- sorry -- House Member Bucy.
9    A   Uh-huh.
10   Q   And Bucy's a member of the House Texas Democratic
11 Caucus; correct?
12   A   Yes.
13   Q   And then if we look at the Senate amendments, on top
14 we see West on F-9 and Zaffirini for F-7 and F-5. They had
15 amendments adopted; correct?
16   A   Yes.
17   Q   And Senator West is a Democrat; correct?
18   A   Yes.
19   Q   And Senator Zaffirini is a Democrat, too; correct?
20   A   Yes.
21   Q   And so the Texas Legislature accepted amendments from
22 Texas Democrats for Senate Bill 1; correct?
23   A   A few, a -- some, not near as many as Republican
24 amendments.
25   Q   They did -- the Texas Legislature did accept some

Page 113

1 Texas-Democrat amendments -- correct? -- for Senate Bill 1.
2    A   Some, not many.
3    Q   Now, even though you did not propose an amendment, you
4 did have an effect on the content of the final document;
5 correct?
6    A   Yes.
7    Q   Okay. And so let's talk a little bit about some of
8 the provisions that you are responsible for either their
9 introduction or removal.
10   A   Okay.
11   Q   And so I want to go back -- you can put this document
12 aside -- to Exhibit Number 2.
13   A   Exhibit Number 2?
14   Q   Yes. This is the Senate Journal that we have been --
15   A   Okay.
16   Q   -- using occasionally.
17   A   All right.
18   Q   And we're going to be looking at Page 57.
19   A   Uh-huh.
20   Q   Specifically starting with, So you are saying.
21   A   Okay.
22   Q   Let me know when you -- when you see it.
23   A   I have it.
24   Q   Okay. You state: So you are saying you made some
25 changes based on a conversation you had with me or Senator Miles



Carol Alvarado

October 06, 2022
Pages 114 to 117

Page 114

1 or Senator Whitmire. Senator Hughes says: Yes. You said:
2 What is that change? Senator Hughes replies: Senator, you and
3 I had lengthy discussions when we were discussing on Senate Bill
4 7 when it was originally -- when it was in the Senate
5 originally, and we talked about those early-voting locations in
6 urban counties and you recalled a provision that was going to
7 require them to be distributed evenly based on population. Did
8 I read that correctly?
9      A   Yes.
10     Q   And then there's a rapid exchange where you say:
11 Yeah, we had -- we had quite an exchange on that.
12     A   Uh-huh.
13     Q   And then he replies: As you probably noticed, that
14 provision is not in the conference committee report. Did I read
15 that correctly?
16     A   Yes.
17     Q   And so I am going to introduce Exhibit Number 22.
18         MS. HUNKER:  (Provides exhibit.)
19         MR. GOLANDO:  Thank you.
20         THE WITNESS:  There's something in this room that
21 triggers my allergies.  I don't know what it is.  I know I have
22 them.
23         MR. GOLANDO:  It's probably me.
24         MS. HUNKER:  No comment.
25 BY THE WITNESS (resuming):

Page 115

1      A   Okay.
2      Q   So this is a copy of Senate Bill 7; correct?
3      A   Yes.
4      Q   And I'll represent to you that this was the engrossed
5 copy printed from the Texas Legislative Online website.  Do you
6 have any reason to doubt my representation?
7      A   No.
8      Q   Okay.  And so let's look at Page 14.
9      A   Okay.
10     Q   And you'll see where it says Subsection 2.
11     A   Yes.
12     Q   And this reads:  In a county with a population of 1
13 million or more, the number of polling places located in each
14 state-representative district included in the territory of the
15 county is calculated by deriving the number of eligible voters
16 residing in that district by the total number of eligible voters
17 residing in the county and using the number generated as a
18 percentage to allocate the same percentage of polling-place
19 locations, rounding up to the nearest whole number if necessary.
20 Did I read that correctly?
21     A   Yes.
22     Q   And was this the provision you were referring to that
23 had to do with the urban counties and requiring polling places
24 to be distributed evenly based on population?
25     A   Yes.  We had quite a lengthy discussion on it in

Page 116

1 debate, and I had to go through a lot of numbers and facts
2 during the debate to show -- to demonstrate to Senator Hughes
3 what I saw as something that was an unfair process.
4      Q   And Senator Hughes responded favorably to your points,
5 removing a provision from Senate Bill 7; is that correct?
6      A   After a lengthy discussion --
7      Q   Yes.
8      A   -- yes.
9      Q   So after a lengthy discussion, he removed it.
10     A   After my -- mostly my lengthy discussion pointing out
11 the errors and the flaws.
12     Q   So after you pointed out the errors and the flaws in a
13 lengthy discussion with Senator Hughes --
14     A   Yes.
15     Q   -- Senator Hughes agreed to take out the provision; is
16 that correct -- from Senate Bill 7?
17     A   Yes.
18     Q   Okay.  And that provision remained excluded in Senate
19 Bill 1, which was introduced and enacted during the second
20 special session; correct?
21     A   Yes.
22     Q   And so your discussion with Senator Hughes about the
23 distribution of early-voting locations bore fruit in the final
24 bill that was passed by the legislature?
25     A   Yes.  Again, after I pointed out the many flaws,

Page 117

1 errors and lengthy -- lengthy discussion on my part.
2      Q   And so I want to bring up another clip from your
3 filibuster.
4      A   Okay.
5         (Video playing.)
6         THE WITNESS:  I can't hear it.
7         MS. HUNKER:  Hold on a second.  (Reviewing.)  My
8 apologies.  It was on mute.
9         (Video playing.)
10 BY MS. HUNKER (resuming):
11     Q   Were you able to hear that clip?
12     A   Yes.
13     Q   And that is a statement you had offered during your
14 filibuster of Senate Bill 1; correct?
15     A   Yes.
16     Q   Okay.  And so I am going to introduce our next
17 exhibit, Exhibit 24.
18         COURT REPORTER:  (Provides exhibit.)
19         THE WITNESS:  Thank you.
20 BY THE WITNESS (resuming):
21     A   Are we through with 22?
22     Q   We might be going back to it.
23     A   Okay.  On the side.
24     Q   And so if you turn to Page 40 -- well, let me take a
25 step back.  So you see that it says Senate Bill 1; correct?



Page 118

1    A   Yes.
2    Q   Now, I'm going to represent to you that this is a copy
3  of the engrossed version of Senate Bill 1, taken from the Texas
4  Legislative Online website.  Do you have any reason to doubt my
5  description?
6    A   No.
7    Q   And can you just for the record and clarity tell me
8  what an engrossed copy is?
9    A   Both -- it's passed both chambers.
10    Q   Passed both or only one?
11        MR. GOLANDO:  You said engrossed; right?
12        MS. HUNKER:  Yes.
13  BY MS. HUNKER (resuming):
14    Q   Engrossed means it only passed one; correct?  One
15  chamber?
16    A   Yes.  I'm sorry.  Well, in this case, yeah, the
17  Senate.
18    Q   And so I want to turn to Page 42.
19    A   42.  Okay.
20    Q   So if you look on 41 -- so if you look at 41 at
21  Section 5.04, and this is the oath that an assistor would take
22  when providing assistance to a voter; is that correct?
23    A   Yes.
24    Q   And just for clarity of the record, you're aware that
25  whenever words are underlined, that means that the language has

Page 119

1  been added to the bill; correct?
2    A   Yes.
3    Q   And if language has a strike through it, that means
4  that's been removed; correct?
5    A   Right, right.
6    Q   And if we look at the oath, one of the changes in the
7  middle on Page 42, it says:  I did not encourage, pressure or
8  coerce the voter into choosing me to provide assistance.  Did I
9  read that correctly?
10    A   Yes.
11    Q   And was this the revision you were referring to in
12  your filibuster testimony?
13    A   Yes.
14    Q   And so your concern was over the word encourage; is
15  that correct?
16    A   Right.
17    Q   And so now I want to give to you Exhibit, I think, 25.
18        MS. HUNKER:  Am I correct?
19        MR. GOLANDO:  No, I think you're on 24.
20        THE WITNESS:  We're on -- this is 24.
21        COURT REPORTER:  Yeah.
22        MS. HUNKER:  So 25.
23        THE WITNESS:  Yeah, that's 25 there.
24        MS. HUNKER:  (Provides exhibit.)
25        MR. GOLANDO:  Thank you.

Page 120

1  BY MS. HUNKER (resuming)
2    Q   And you see this is Senate Bill 1; correct?
3    A   Yes.
4    Q   And if you turn to the back, you'll see that it's
5  signed by the president of the Senate and the Speaker of the
6  House; correct?
7    A   Yes.
8    Q   As well as signed by the Governor.
9    A   Yes.
10    Q   And there's also a little stamp that says it was filed
11  in the office of the secretary of state on September 7th.
12    A   Yes.
13    Q   And so would you agree with me that this is an
14  enrolled version of the Senate Bill 1 which was enacted by the
15  legislature?
16    A   Yes.
17    Q   And so this is the version that would have taken
18  effect and become law; correct?
19    A   Yes.
20    Q   And so let's turn to Page 53.
21    A   (Complies with request.)
22    Q   The oath actually starts on Page 52, just to
23  acknowledge that this is also in reference to the oath, and now
24  let's look at that provision.  It reads:  I did not pressure or
25  coerce the voter into choosing me to provide assistance.  Did I

Page 121

1  read that correctly?
2    A   Which page are we on?  I'm sorry.
3    Q   50 --
4        MR. GOLANDO:  It's right here.
5        THE WITNESS:  Okay.
6  BY MS. HUNKER (resuming):
7    Q   53.
8    A   (Reviewing.) Yes.
9    Q   Okay.  And so between the enrolled version, which
10  passed the Senate, and the enacted version, which was passed by
11  both Houses, signed by the Governor and effected into law, they
12  removed the word encouraged; correct?
13    A   Yes.
14    Q   And so Senator Hughes responded to your criticism by
15  removing the -- the specific word and language that you
16  objected to; is that correct?
17    A   I don't know if it was mine alone, but possibly.
18    Q   Okay.  But at the very least, he responded to
19  something you -- you and possibly others had objected to
20  regarding the language of the oath provision; is that correct?
21    A   Yes.
22    Q   And I'm going to show you another clip, and this is
23  being introduced as Exhibit Number 26.
24        (Video playing.)
25  BY MS. HUNKER (resuming):



Carol Alvarado

October 06, 2022
Pages 122 to 125

Page 122

1    Q    Were you able to hear the clip?
2    A    Yes.
3    Q    And was that a statement -- an exchange that you had
4  with Senator Blanco during the filibuster?
5    A    Yes.
6    Q    And so in the clip you mentioned a need for training
7  of poll watchers; is that correct?
8    A    Yes, and I do mention that he had brought it up in
9  previous discussions with Republicans and Democrats in a mixed
10 audience, so this issue of the training had been discussed
11 multiple times.
12   Q    And so the addition of a training program was
13 something you and multiple other senators had recommended get
14 added to the bill; is that correct?
15   A    Yes, several times.
16   Q    And I want to go now to Senate Bill 1 --
17   A    Uh-huh.
18   Q    -- on Page 25.
19        MR. GOLANDO:  Which version of Senate Bill 1?
20        MS. HUNKER:  The one that was enacted, so the
21 enrolled version.
22 BY THE WITNESS (resuming):
23   A    Okay.  Page 25?
24   Q    Uh-huh.
25   A    Okay.

Page 123

1    Q    And if you see Section 4.04, which amends Section
2  33.008 of the election code, it says:  Training program, the
3  secretary of state shall develop and maintain a training program
4  for watchers.  The training must, one, be available; A, entirely
5  be of the Internet; and, B, at any time without a requirement
6  for prior registration; and, two, provide a watcher who
7  completes the training with a certificate of completion.
8    A    Uh-huh.
9    Q    Did I read that correctly?
10   A    Yes.
11   Q    And then if you move on to Section 4.05 of Senate
12 Bill 1 --
13        THE WITNESS:  I'm sorry.  Who -- we had somebody
14 new join us.  Who is -- who are you?
15        MR. ATALLAH:  I'm just an intern.
16        MS. HUNKER:  This is Will Atallah.  He is a
17 intern in my office.
18        THE WITNESS:  Okay.
19        MS. HUNKER:  Like I mentioned earlier --
20        THE WITNESS:  Okay.
21        MS. HUNKER:  -- he might join us.
22        THE WITNESS:  All right.  That's fine.  Okay.  Go
23 ahead.
24 BY MS. HUNKER (resuming):
25   Q    And so if we look at Page 25, Section 4.05 of Senate

Page 124

1  Bill 1, which amends Section 33.031 of the election code, it
2  reads: In addition to the requirements of Subsection A to be
3  eligible to serve as a watcher, a person must complete training
4  under Section 33.008.
5    A    Yeah.
6    Q    Did I read that correctly?
7    A    You did.
8    Q    And so the final version of Senate Bill 1 added a
9  training program that you and other senators had recommended be
10 added; is that correct?
11   A    Yes, but that was done in the House, not the Senate
12 where we, on multiple locations, stressed the need for mandatory
13 training, and quite frankly we were ignored, so it wasn't until
14 it went to the House that that was done.
15   Q    Okay.  And the Senate ultimately passed the version of
16 the bill that contained the training requirement; is that
17 correct?
18   A    Yes.
19   Q    And so the provision that you had recommended was
20 ultimately accepted by the Texas Senate with respect to the
21 training of poll watchers?
22   A    After multiple occasions of trying to make the point
23 of why it was necessary and then it going to the House and a
24 House member putting [sic] on the bill, then ultimately, yes, it
25 was passed by the Senate.

Page 125

1    Q    And I'm going to introduce another audio clip as an
2  exhibit, 27.
3    A    Okay.
4        (Video playing.)
5  BY MS. HUNKER (resuming):
6    Q    Were you able to hear the clip?
7    A    Yes.
8    Q    Okay.  And this was a statement you had given during
9  your filibuster of Senate Bill 1; correct?
10   A    Yes.
11   Q    Now, this was talking about signature-match
12 requirements; is that correct?
13   A    Yes.
14   Q    Now, the signature-match requirement predated Senate
15 Bill 1; correct?
16   A    I believe so.
17   Q    Okay.  And you were talking in the clip about the need
18 for an opportunity to cure; is that correct?
19   A    Yes.
20   Q    And so I want to go back to Senate Bill 1, the version
21 that was enacted, Page 46.
22   A    (Complies with request.)
23   Q    Now, you stated in the clip that there was no
24 opportunity to cure a mismatched signature; is that correct?
25   A    Yes.



Carol Alvarado

October 06, 2022
Pages 126 to 129

Page 126

1    Q    And you also, I believe, stated that there was no
2  opportunity to correct a carrier envelope that did not have a
3  signature; is that correct?
4    A    Yes.
5    Q    And so prior to Senate Bill 1, there was no way to
6  cure -- or for a voter to cure a mismatched or omitted
7  signature; is that correct?
8    A    Yes.
9    Q    And so let's look at Page 46, Section 5.12, which
10  amends Section 87.0411.  Do you see that?
11    A    (Reviewing.)
12    Q    Towards the bottom of the page, starting on Line 16.
13    A    Okay.  5.12?
14    Q    5.14.  You're on the wrong page.  Oh, we can -- let's
15  do 5.12.  That's on Page 43.
16    A    Okay.
17    Q    Opportunity to Correct Defect, which amends Section
18  87.0271.
19    A    Okay.
20    Q    And so this is talking about the signature-
21  verification committee; correct?
22    A    Yes.
23    Q    And it says:  This section applies to an early-voting
24  ballot voted by mail:  One, for which the voter did not sign the
25  carrier-envelope certificate; two, for which it cannot be

Page 127

1  immediately determined whether the signature on the carrier
2  envelope is that of the voter; three, missing any required
3  statement of residence; four, missing information or containing
4  incorrect information required under Section 84.002 or Section
5  86.002; or five, containing incomplete information with respect
6  to a witness.  Did I read that correctly?
7    A    Yes.
8    Q    Okay.  And so, if we continue, it says:  Not later
9  than the second business day after a signature-verification
10  committee discovers a defect described by Subsection A and
11  before the committee decides whether to accept or reject a
12  timely delivered ballot under Section 87.08 -- 027.  The
13  committee shall, one, determine if it would be possible for the
14  voter to correct the defect and return the carrier envelope
15  before the time the polls are required to close on election day;
16  and, two, return the carrier envelope to the voter by mail if
17  the committee determines that it would be possible for the voter
18  to correct the defect and return the carrier envelope before the
19  time the poles are required to close on election day.  Did I
20  read that correctly?
21    A    Yes.
22    Q    And so then the rest of this talks about what the
23  signature-verification committee should do to provide notice to
24  the voter; is that correct?
25    A    Yes.

Page 128

1    Q    And so it says that:  The committee may notify the
2  voter of the defect by telephone or E-mail and inform the voter
3  that the voter may request to have the voter's application to
4  vote by mail canceled in the matter described by Section 84.032
5  or come to the early-voting clerk's office in person not later
6  than the sixth day after election day to correct the defect.
7  Did I read that correctly?
8    A    Yes.
9    Q    And so this provides a opportunity to cure certain
10  defects on carrier envelopes; is that correct?
11    A    Yes.
12    Q    And among the defects that it allows to be cured is
13  the mismatched signature or the failure to include a signature;
14  correct?
15    A    Yes.
16    Q    And so your concern that was voiced in the filibuster
17  was addressed to a degree in the final version of Senate Bill 1;
18  is that correct?  Regarding the opportunity to cure a mismatched
19  signature.
20    A    Well, and, again, this issue had been brought up other
21  times by Senate Democrats.
22    Q    And so you said it was brought up multiple times by
23  Senate Democrats; is that correct?
24    A    Yes.
25    Q    And it was ultimately adopted into the final version

Page 129

1  of Senate Bill 1; correct?
2    A    After being advocated for by -- on multiple occasions
3  by Senate Democrats.
4    Q    So after it was advocated multiple times by Senate
5  Democrats, the addition of a cure process was added to the final
6  version of Senate Bill 1; correct?
7    A    Yes.
8    Q    And I want to look at Section 5.13.
9    A    What page?
10    Q    45.  It's the one right immediately after.
11    A    (Reviewing.)  Okay.
12    Q    And so it's actually -- so this is to show you at
13  Section 5.13, which amends Section 87.041 of the election code.
14
15    A    Uh-huh.
16    Q    And so let's look at Subsection D1, which is on the
17  next page, 46.
18    A    (Complies with request.)
19    Q    And Section D1 states:  If a voter provides the
20  information required under Section 86.002(g) and identifies the
21  same voter identified on the voter's application for voter
22  registration under Section 13.002(c)(8), the signature on the
23  ballot application and on the carrier-envelope certificate shall
24  be presumed to be the signatures of the voter.  Did I read that
25  correctly?



Page 130

1    A   Yes.
2    Q   And so Senate Bill 1 also added a presumption in favor
3 of the voter that the signature would be a match; is that
4 correct?
5    A   Yes.
6    Q   So I'm going to introduce Exhibit 28.
7         MS. HUNKER:  (Provides exhibit.)
8         MR. GOLANDO:  Thank you kindly.
9 BY MS. HUNKER (resuming):
10    Q   Do you have the document in front of you?
11    A   Yes.
12    Q   Okay.  And so is this your Twitter handle, Carol For
13 Texas?
14    A   Yes.
15    Q   And so this is a tweet that you would have sent out on
16 August 11th, 2021; correct?
17    A   Yes.
18    Q   And then it says:  For the third time, TX Leg.
19 Republicans are attempting to enact deliberate voting barriers
20 to silence Texans' voices.  Anti-voter SB1 is likely to be on
21 the Texas Senate Floor today; tune in at 9 a.m.
22    A   Right.
23    Q   Did I read that correctly?
24    A   Yes.
25    Q   And then there's also a -- a diagram and photo

Page 131

1 attached to this tweet; correct?
2    A   Uh-huh.
3    Q   And so, because of its size, I included a blow-up --
4 blown-up version of that on the next page.
5    A   Okay.
6    Q   And so I want to look at where you say, Easier to
7 intimidate, your fourth provision.  It says --
8    A   Uh-huh.
9    Q   -- Creates excessive criminal penalties for honest
10 mistakes by community members serving as poll workers and
11 assistants.  Did I read that correctly?
12    A   Yes.
13    Q   And so can you tell me what you meant there?
14    A   Well, it seemed like there was a lot of burden put on
15 the poll workers and assistants and making it easy for poll
16 watchers to file complaints on poll workers, so that's -- I
17 mean, obviously, you know, you can't go into a full explanation
18 here.  I'm making bullet points.  So that was -- that was one of
19 my concerns.
20    Q   All right.  And so it had to do with the criminal
21 liability that could come if a poll worker interfered with a
22 poll watcher; is that correct?  Is that a fair assessment or...?
23    A   Say that again now.
24    Q   Did this point have to do with the criminal liability
25 a poll worker would face --

Page 132

1    A   Uh-huh.
2    Q   -- for interfering with a poll watcher?
3    A   Possibly.
4    Q   Okay.  So I want to turn -- this is going back to
5 Senate Bill 7.
6    A   Exhibit 22?
7    Q   Yes.
8    A   Okay.
9    Q   Page 13.
10    A   (Reviewing.)  Okay.
11    Q   And you'll see Subsection -- I'm sorry -- 3 -- Section
12 3.04, which amends Section 33.061 of the election code.  Do you
13 see that?
14    A   Yes.
15    Q   And it says:  An offense under Subsection A includes
16 an action taken to distance or obstruct the view of a watcher in
17 any way that makes observation reasonably ineffective.  Did I
18 read that correctly?
19    A   Yes.
20    Q   And so was this one of the provisions that you were
21 referring to when you were saying, Creates excessive criminal
22 penalties for honest mistakes by community members serving as
23 poll workers and assistants?
24    A   Yeah, one of them.
25    Q   Okay.  And so let's compare that version with the one

Page 133

1 on Senate Bill 1, and that's going to be on Page 29 of the
2 enrolled version.
3    A   (Reviewing.)
4         THE WITNESS:  Wait.  Which one of these?
5         MR. GOLANDO:  It's the enrolled version.
6         MS. HUNKER:  I believe Exhibit 25.
7 BY THE WITNESS (resuming):
8    A   Okay.  Okay.  Where on Page 29?
9    Q   We're going to be looking at the top, where it says,
10 Section 4.09 --
11    A   Okay.
12    Q   -- which amends Section 33.061(a) --
13    A   Okay.
14    Q   -- of the election code.  And so this used -- looks
15 more at the full Subsection A, and it reads:  A person commits
16 an offense if the person serves in an official capacity at a
17 location at which the presence of watchers is authorized and
18 knowingly prevents a watcher from observing an activity or
19 procedure a person knows the watcher is entitled to observe,
20 including by taking any action to obstruct the view of a watcher
21 or distance the watcher from the activity or procedure to be
22 observed in a manner that would make the observation not
23 reasonably effective.  Did I read that correctly?
24    A   Yes.
25    Q   Okay.  And so would you agree with me that



Carol Alvarado

October 06, 2022
Pages 134 to 137

Page 134

1 Section 33.061(a) of the election code had already stated that,
2 A person commits an offense if the person serves in an official
3 capacity at a location at which the presence of a watcher is
4 authorized and knowingly prevents the watcher from observing an
5 activity the watcher is entitled to observe, based on the
6 language that's --
7    A   Based on the language, yes.
8    Q   Okay.  And so that -- the offense preexisted Senate
9 Bill 1; correct?
10   A   Yes.
11   Q   Okay.  Now, if we look at the difference between
12 Senate Bill 7 and Senate Bill 1 --
13   A   Okay.
14   Q   -- we see that in Senate Bill 1, it includes the
15 phrase, The person knows the watcher is entitled to observe.
16   A   Yes.
17   Q   Do you see that?
18   A   Yes.
19   Q   And so this knowing requirement is not in the version
20 for Senate Bill 7; is that correct?
21   A   Right.
22   Q   And so Senate Bill 1 adds the requirement that the
23 poll worker know that they are obstructing the poll watcher and
24 engaging in from them -- from engaging in the activities.
25   A   Say that again.

Page 135

1    Q   Let me rephrase.
2    A   Uh-huh.
3    Q   And so Senate Bill 1 --
4    A   Uh-huh.
5    Q   -- added the requirement --
6    A   Uh-huh.
7    Q   -- that a person know that they are obstructing what a
8 poll watcher is entitled to observe; is that correct?
9    A   Yes.
10   Q   And so it adds a mens rea requirement; is that
11 correct?
12       MR. GOLANDO:  Objection, to the extent it calls
13 for a legal conclusion.  I'm sorry.  Restate it.
14       MS. HUNKER:  Yeah.
15 BY MS. HUNKER (resuming):
16   Q   It requires that a person have a certain state of
17 mind; is that correct?
18       MR. GOLANDO:  Same objection.
19 BY THE WITNESS (resuming):
20   A   I don't know.
21   Q   Okay.
22   A   Yeah.
23   Q   Would you agree that this somewhat addresses your
24 concern that Senate Bill 1 would create excessive criminal
25 penalties for honest mistakes by community members serving as

Page 136

1 poll workers and assistants?
2    A   Somewhat.  And, again, there's -- there's a pattern
3 here.  You know, these issues had been brought up multiple times
4 and then in a 15-hour filibuster, so it seemed like a lot of
5 these things, we had to keep pushing --
6    Q   Uh-huh.
7    A   -- many -- there had to be many attempts to convince.
8    Q   And so after many attempts of attempting to convince
9 Senate Republicans and House Republicans to add this protective
10 language, and it sounds like after including it in your
11 filibuster, Senate Republicans did approve of language that
12 addressed in part your concern that Senate Bill 1 would create
13 excessive criminal penalties for honest mistakes by community
14 members?
15   A   After many exhausting attempts, yes.
16   Q   And you can put this document aside.
17   A   (Complies with request.)
18       MR. GOLANDO:  Thank you.
19       THE WITNESS:  Uh-huh.
20 BY MS. HUNKER (resuming):
21   Q   And so let's go back to Exhibit 2.  It's the --
22   A   Journal.
23   Q   -- journal.
24   A   Okay.
25   Q   And we're going to be turning to Page 56.

Page 137

1    A   (Reviewing.)  Okay.
2    Q   And, actually, it might be easier if we went to your
3 question ahead of time, so let's turn quickly to Page 55 and add
4 that into the record as well.
5    A   Uh-huh.
6    Q   So you say:  So in March, I noted that we were --
7    A   Wait a minute.  (Reviewing.)  Okay.  Go ahead.
8    Q   So you say:  So in March, I noted that League of Women
9 Voters, NAACP, MALDEF, LULAC, ACLU were all opposed to this bill
10 and all of these organizations still oppose this bill.  Are you
11 aware of that?  Senator Hew (ph) [sic] replies:  Well, Senator,
12 I know that some of the suggestions made by some of those groups
13 are reflected in the conference committee report.  Senator
14 Blanco and I were talking about cameras and whether poll
15 watchers would have cameras.  That has been removed from the
16 bill, and as, I think, a number of the groups you mentioned
17 testified against that provision, and so you know how the
18 process works.  At every step, the bills hopefully get better
19 based on input, based on criticisms we've heard from groups all
20 across the spectrum.  Did I read that correctly?
21   A   Yes.
22   Q   And so in this exchange, Senator Hughes states that
23 they had received opposition from League of Women Voters, NAACP,
24 MALDEF, LULAC and ACLU about whether poll watchers would be
25 allowed to take cameras with them to polling places; is that



Carol Alvarado

October 06, 2022
Pages 138 to 141

Page 138

1 correct?
2    A    Well, he says some of the suggestions and some of the
3 groups, so I wouldn't say it was all of them.
4    Q    Would you agree that he's stating that some of these
5 groups have brought up opposition to Senate Bill 7 in part
6 because of the provision that would have allowed cameras to be
7 taken inside polling places?
8    A    Yes.
9    Q    Okay.  And he says that that had been removed from the
10 bill; is that correct?
11    A    Yes, and, again, after several times the Democrats
12 brought up the issue of the cameras.  So, again, the -- the
13 pattern continues where we had to keep advocating on many
14 occasions for certain things.
15    Q    And was this one of the provisions that you also
16 objected to in Senate Bill 7?
17    A    Yes.
18    Q    And did you object to its inclusion in Senate Bill 1?
19    A    Yes.
20    Q    Okay.  And did you communicate that objection to
21 Senator Hughes and other Texas Republicans?
22    A    It was communicated by -- by many senators.
23    Q    And so that provision was ultimately left out of
24 Senate Bill 1; correct?
25    A    Yes.  Again, after many attempts.

Page 139

1    Q    So after many attempts by Texas Democrats as well as
2 outside organizations, Texas Republicans removed the language
3 that would have required poll watchers -- or allowed poll
4 watchers --
5    A    Yes.
6    Q    -- I should say, to have cameras inside the polling
7 place; is that correct?
8    A    Right.
9    Q    Now, Senator Hughes mentions here:  You know how the
10 process works.  At every step, the bills hopefully get better
11 based on input, based on criticisms we've heard from groups
12 across the spectrum.  Would you agree that that is how the
13 process worked for Senate Bill 1, that over the course of the
14 debate, the bill got better although not to necessarily the
15 extent you would have liked?
16    A    Not entirely.
17    Q    When you say, Not entirely, what do you mean?
18    A    Well, there was still things that we advocated for and
19 other groups did, too, that didn't -- didn't make it.
20    Q    Okay.  Would you agree that the bill that was passed,
21 Senate Bill 1, was better than the bill that was proposed
22 initially at the start of the regular session, which was Senate
23 Bill 7?
24    A    It was less bad.
25    Q    Okay.  And so let's turn to Page 61 of this journal.

Page 140

1    A    (Complies with request.)
2    Q    Specifically, we're going to go towards the bottom,
3 the last statement you had given on this page.  Do you see --
4    A    Okay.
5    Q    -- where it says Section 2?
6    A    Yes.
7    Q    Okay.  So it reads:  Senator Alvarado, Section 2 of
8 the Voting Rights Act, this is what really concerns me because
9 we -- every time the legislature passes something to do with
10 elections and voting, it's not making it easier and more
11 accessible.  Do you know that I have filed bills numerous times
12 for online voter registration just to be able to register
13 online?  Are you aware of that?  Did I read that correctly?
14    A    Yes.
15    Q    Senator Hughes responds:  Senator, I am, and
16 Senator Buckingham also had an online voter registration bill
17 this session, and those provisions were in Senate Bill 7 as it
18 left the Senate, and so that issue has been discussed quite a
19 bit, and as you know, if we're talking about making it easier to
20 vote, Senate Bill 7, the conference committee report before us
21 and the version that left here, for the first time says that in
22 early voting in Texas, if you're in line when the polls close,
23 you get to vote no matter how long it takes.  Also says you're
24 going to have a paperback for electronic voting.  Did I read
25 that correctly?

Page 141

1    A    Yes.
2    Q    And so this is in reference to the legislation you had
3 mentioned earlier in our deposition; correct?
4    A    Uh-huh, yes.
5    Q    Okay.  And is this accurate that when Senate Bill 7
6 passed the Senate, it did include a provision regarding online
7 voter registration?
8    A    It didn't reflect the online voter registration --
9 straight-up online voter registration like my bill that I'd been
10 filing.
11    Q    Did it include a variation of it?
12    A    It -- it had some form of being able to register
13 online.
14    Q    Okay.  And do you know how that provision got removed
15 from Senate Bill 7?
16    A    No.
17    Q    All right.  So I want to look at Senate Bill 1,
18 specifically Page 6.
19        MR. GOLANDO:  This is the enrolled version?
20        MS. HUNKER:  This is the enrolled version.
21 BY THE WITNESS (resuming):
22    A    Oh, I'm sorry.  What page?
23    Q    Page 6.  I think we can put the engrossed version
24 aside.  I don't believe I have any more references to it.
25        MR. GOLANDO:  Thank you very kindly.



Carol Alvarado

October 06, 2022
Pages 142 to 145

Page 142

1 BY THE WITNESS (resuming):
2    A   (Reviewing.)  Okay.
3    Q   And so, looking at Section 2.03, which amends
4 Section 15.021 -- do you see that?  On Page 6, Line 2.
5    A   Yes.
6    Q   Okay.  We're going to look at Subsection D, which is
7 on Line 11.  It reads:  A voter -- and then it crosses out --
8 who continues to reside in the county in which the voter is
9 registered may correct information under this section by digital
10 transmission of the information under a program administered by
11 the secretary of state and the Department of Information
12 Resources.  Did I read that correctly?
13    A   Yes.
14    Q   And so by removing the language, Who continues to
15 reside in the county in which the voter is registered, that
16 means a voter may correct their information online regardless of
17 the circumstances as long as they're registered; correct?
18    A   Yes.
19    Q   And so it while it will not complete online electronic
20 registration, it does provide some form of voter registration
21 for -- for individuals who want to correct their registration
22 records; is that correct?
23    A   I -- I don't see it that way.
24    Q   How do you see it?
25    A   I mean, it's just correcting information.  It doesn't

Page 143

1 mean they are registering online.
2    Q   And so would this include voters, let's say, who move
3 from one place to another?
4    A   Possibly.
5    Q   Okay.
6    A   But they could be correcting anything, a misspelling
7 of their name or something, a digit that's wrong in the address.
8    Q   Uh-huh.  Would you consider it an improvement that
9 voters would be able to correct their information online as
10 opposed to doing it through mail?
11    A   How fast?  It's barely.
12    Q   Is it an improvement?
13    A   Barely an improvement.
14    Q   So I'm going to pull up our next exhibit, which is 29.
15        MS. HUNKER:  (Provides exhibit.)
16        MR. GOLANDO:  Thank you.
17        THE WITNESS:  Thanks.
18 BY MS. HUNKER (resuming):
19    Q   Do you have the document in front of you?
20    A   Yes.
21    Q   And this is a tweet that was sent from your Twitter
22 account; correct?
23    A   Yes.
24    Q   And it was on August 11th, 2022.
25    A   Yes.

Page 144

1    Q   And this tweet on the top commemorates the one-year
2 anniversary in which you gave the filibuster for Senate Bill 1;
3 is that correct?
4    A   Yes.
5    Q   And I believe your Senate filibuster lasted 15 hours;
6 is that right?
7    A   Yes.
8    Q   And so let's look at the second part of the tweet.
9    A   Uh-huh.
10    Q   It says:  After 15 hours and hearing from Texans
11 worried about the impacts, SB1 still passed the Texas Senate,
12 however the final version of Senate Bill 1 including -- included
13 provisions that I fought for in those 15 hours, like poll-
14 watcher training.  Did I read that correctly?
15    A   Yes.
16    Q   Were there any other provisions that we did not cover
17 that you were able to get included into SB1?
18    A   I can't think of any.  And when you say, Get included,
19 again, this -- it came after a 15-hour filibuster and many
20 exhausting attempts to get points across.
21    Q   And we can put that aside.
22    A   Okay.
23    Q   The Texas House is controlled by the Republicans;
24 correct?
25    A   Yes.

Page 145

1    Q   And the Texas Senate is controlled by the Republicans;
2 correct?
3    A   Yes.
4    Q   And the Texas Governor is a Republican; correct?
5    A   Yes.
6    Q   And so is the Lieutenant Governor.
7    A   Yes.
8    Q   And you are a member of the minority party; correct?
9    A   Correct.
10    Q   And you are not on state affairs; correct?
11    A   Correct.
12    Q   And despite being a member of the minority priority,
13 you were able to get provisions you thought beneficial added to
14 Senate Bill 1; is that correct?
15    A   After many exhausting attempts, there were some
16 provisions that were made.
17    Q   So despite being a member of the minority party, you
18 were able to get some provisions through after multiple attempts
19 of debating your fellow colleagues.
20    A   And having to make many exhausting attempts.
21    Q   And despite being a part of the minority party, you
22 were able to get provisions that you thought were harmful
23 removed from the final version of SB1; is that correct?
24    A   After several exhausting attempts, yes, and I believe
25 one -- well, one -- at least one I know of was made in the



Carol Alvarado

October 06, 2022
Pages 146 to 149

Page 146

1 House, not the Senate.

2     Q    And so despite being a member of the minority party,

3 you were able to exert influence over the final version of

4 Senate Bill 1; is that correct?

5     A    I believe that after many long and exhausting attempts

6 there were some changes made.

7     Q    And through those changes being made, you were able to

8 exert influence over the final product -- the final version of

9 Senate Bill 1; is that correct?

10     A    Sure.

11     MS. HUNKER:  I am about to change topics.  It

12 might be a good idea to take a break since we're about an hour

13 in.

14     THE WITNESS:  Okay.

15     MR. BARNES:  How long do we want?

16     MS. HUNKER:  10 minutes.

17     VIDEOGRAPHER:  Off the record at 2:35.

18     (A recess is taken.)

19     VIDEOGRAPHER:  On the record at 2:47.

20 BY MS. HUNKER (resuming):

21     Q    Senator Alvarado, so you conducted a filibuster for

22 Senate Bill 1; correct?

23     A    Uh-huh, yes.

24     Q    And what motivated you to do a filibuster?

25     A    Well, I didn't like the bill, that was the main

Page 147

1 reason, and I felt that certain things needed to be highlighted

2 and I pointed to various things in the bill that I thought

3 needed attention, and I just -- I felt very strong about the

4 entire bill and the impact it would have on the disabled and

5 senior citizens.  And so I -- I didn't start off saying, Oh, I'm

6 going to go 15 hours, it just turned into that.  I had no idea

7 how long it was going to go.

8     Q    And so what provisions in the enacted version of

9 Senate Bill 1 do you think are harmful to voters specifically?

10     A    Well, the issue with the -- the matching IDs, and we

11 talked about that a little bit.  Many of us were concerned that

12 ballots would get rejected, and as it turns out, that was the

13 case.  In the 2022 primary, 12.4 percent of ballots statewide

14 were rejected versus less than 1 percent in the 2020

15 presidential election; less than 2 percent in the 2018 election,

16 and the majority of those, 98 and 99 percent were related to the

17 matching-ID issue.

18     Q    And so this is something I should have asked at the

19 beginning of the deposition --

20     A    Uh-huh.

21     Q    -- and I'll admit I'm a little embarrassed I had

22 forgotten to.  Did you bring any notes with you to this

23 deposition?

24     A    This one page, and you're welcome to it after I read

25 it.

Page 148

1     Q    And so, yeah, after the deposition, if I could have a

2 copy of that --

3     A    Sure.

4     Q    -- I'd appreciate it.

5     A    Uh-huh.

6     Q    And so your concern with the -- with the ID match was

7 that it would lead to rejection rates; is that correct?

8     A    Yes, and as you -- as I just read, those were pretty

9 significant.  In Harris County alone, 19 percent were rejected

10 versus .3 percent in 2018.

11     Q    We're not talking about what happened, but let's talk

12 about when you're looking forward, so the time when you're

13 considering the legislation.

14     A    Uh-huh.

15     Q    What was it about the ID numbers that made you think

16 it would lead to a rejection rate?

17     A    Say that again.

18     Q    So not talking about what happened --

19     A    Okay.

20     Q    -- but from your position as somebody who's

21 considering the bill before you, why did you think requiring

22 voter ID numbers would lead to a rejection rate?

23     A    Well, a lot of times, especially for senior citizens,

24 they may not recall which form of ID they used.  You have to use

25 the same one.  They may use their Social Security or other form

Page 149

1 of ID or driver's license on one -- on one piece of -- one

2 document and maybe not the other.

3     Q    And so did you look at the different ways that a voter

4 could update their voter-registration file?

5     A    No, not at that time.

6     Q    Okay.  And are you aware that Senate Bill 1 provides

7 for multiple avenues by which a voter may update their

8 voter-registration record to include ID numbers?

9     A    Yes.  I think that's what you were trying to refer to

10 as online voter registration.

11     Q    That's one -- one way.  If you want, we can -- let me

12 look at the -- so I'm going to introduce another exhibit.

13     MS. HUNKER:  (Provides exhibit.)

14     MR. GOLANDO:  Thank you.

15     THE WITNESS:  Thanks.

16 BY MS. HUNKER (resuming):

17     Q    Do you have the document in front of you?

18     A    Yes.

19     Q    And so this says:  Texas Secretary of State

20 John B. Scott on top; correct?

21     A    Right.

22     Q    And then it also says Election Advisory Number

23 2022-08; is that correct?

24     A    Yes.

25     Q    With the date of January 28, 2022.



Carol Alvarado

October 06, 2022
Pages 150 to 153

---

Page 150

1    A    Yes.
2    Q    And the subject is, New Law, Senate Bill 1,
3  Opportunity to Correct Defects On Application for a Ballot By
4  Mail and Carrier Envelope.  Did I read that correctly?
5    A    Yes.
6    Q    And were you aware of what election advisory is?
7    A    No.
8    Q    Okay.  I will represent to you that election
9  advisories are the way the secretary of state communicates
10  interpretation information regarding counties' responsibilities
11  under the election code.  Do you have any reason to doubt or
12  object to my description --
13    A    No.
14    Q    -- or representation?
15    A    No.
16    Q    Okay.  Now, let's look at Page 3, which is Opportunity
17  to Correct Rejection of ABBM.
18    A    Okay.
19    Q    Well, actually, before we do that, let's talk a little
20  bit just about what the requirements of Senate bill 1 is with
21  respect to voter ID numbers.  And so if we look at Page 1 where
22  it says, New Requirements for Application to Vote By Mail --
23    A    Uh-huh.
24    Q    -- you'll see it says:  As amended by Senate Bill 1,
25  Section 84.002 of the election code provides that a voter who

---

Page 151

1  seeks to vote by mail must include one of the following on their
2  ABBM, that is the number of applicants driver's license,
3  election-identification certificate or personal-identification
4  card issued by the department of public safety, the last four
5  digits of the applicant's Social Security number if the
6  applicant has not been issued a DPS number or a statement that
7  the applicant has not been issued one of these numbers.  Did I
8  read that correctly?
9    A    Yes.
10    Q    And so a person who is applying to vote by mail can
11  provide any one of these numbers and have other application
12  accepted so long as there's a match; is that correct?
13    A    Yes.
14    Q    Okay.  And now let's talk about the opportunity to
15  correct the rejection of an ABBM.
16    A    Uh-huh.
17    Q    And so this says on Page 3:  As described above, if
18  the early-voting clerk rejects an ABBM because the voter failed
19  to provide any of the required information or the information
20  included on the ABBM does not match the voter's
21  voter-registration record, the early-voting clerk must provide
22  the voter with notice of the rejection in accordance with
23  Section 86.001; is that correct?
24    A    Yes.
25    Q    And then it says:  The notice must include information

---

Page 152

1  explaining how to correct the defect by using the online
2  ballot-by-mail tracker available at www.votetexas.gov.  Is that
3  correct?
4    A    Yes.
5    Q    And then it says:  If the -- if the applicant corrects
6  the missing incorrect information by validating the required
7  information through the ballot-by-mail tracker and this
8  information subsequently identifies the voter identified on the
9  applicant's voter-registration record, the early-voting clerk
10  shall provide a ballot to the applicant.  Did I read that
11  correctly?
12    A    Yes.
13    Q    And let's move on to the next paragraph where it says:
14  If the early-voting clerk rejects an ABBM because the voter's
15  voter record does not contain any of the personal-identification
16  number provided on the ABBM, the clerk must offer the voter an
17  opportunity to correct this defect.  The notice must include
18  instructions on how the voter can update their
19  voter-registration record to include one or more of the required
20  identification numbers by submitting a voter-registration
21  application to the registrar or by validating their personal
22  identification numbers on Texas.gov.  Did I read that correctly?
23    A    Yes.
24    Q    Okay.  Were you aware that a voter can correct their
25  information via the online ballot-by-mail tracker?

---

Page 153

1    A    Yes.
2    Q    And were you aware that a voter can also update their
3  information by submitting a updated voter-registration form?
4    A    Yes.
5    Q    Are you aware that once the voter updates -- submits
6  the voter-registration form with the new information, that
7  information will forever be in their registration file?
8    A    Yes.
9    Q    And so, for a voter who had their application to vote
10  by mail rejected because the number was not in their file --
11    A    Uh-huh.
12    Q    -- that number would be in their file for subsequent
13  elections.  Are you aware of that?
14    A    I am now.
15    Q    Are you aware that the secretary of state's office
16  conducted a syncing process with the department of public safety
17  in order to add additional Social Security numbers and driver
18  license numbers to voter-registration records?
19    A    No, I wasn't.
20    Q    Are you aware that after --
21    A    When did that occur?
22    Q    That would have occurred in December of 2021.
23    A    Okay.
24    Q    Were you aware that after the secretary of state
25  conducted that process, the number of individuals who did not



Page 154

1 have either a Social Security number or a driver's license
2 number in their voter-registration file decreased?
3    A    No.
4    Q    Now, when you were giving me some stats regarding
5 Harris County and some of the other rejection rates, were you
6 talking about the -- for applications to vote by mail or were
7 you -- applications or were you talking about the actual
8 ballots?
9    A    The ballots.
10    Q    Okay.  Now, did you look at the numbers for the
11 subsequent elections that occurred in 2022?
12    A    Well, the number I gave you was 20 -- the '22 primary.
13    Q    Okay.
14    A    That was the 12.4 percent statewide.
15    Q    And so that was for the March 1st, 2022, primary; is
16 that correct?
17    A    Right.
18    Q    And you're --
19    A    And -- and versus less than 1 percent in the previous
20 -- well, the 2020 presidential election, November.
21    Q    And you're aware that there have been two other
22 statewide elections since the March primary; correct?
23    A    Yes.
24    Q    There was also the primary runoff on May 24th;
25 correct?

Page 155

1    A    Yeah.  Those are much smaller turnouts, yes.
2    Q    And there was also the May 7th election.
3    A    Even smaller.
4    Q    Did you look to see what the rejection rates were for
5 mail ballots for those two elections?
6    A    No, because I was trying -- attempting to compare
7 apples to apples, so looking at, you know, 2022 primary versus
8 the 2020 presidential, the 2018.  I wouldn't see it being
9 comparing apples to apples with the very small -- I don't even
10 know -- know what the turnout was, but it was a very small
11 turnout in the May election --
12    Q    So you --
13    A    -- and runoffs are small turnouts, too.
14    Q    So you did not look to see if the rejection rate had
15 decreased --
16    A    No.
17    Q    -- during the other elections --
18    A    No.
19    Q    -- is that correct?
20    A    Right.
21    Q    Have you spoken to any of the election officials in
22 Harris County about how they tried to inform voters about the ID
23 requirement?
24    A    No.
25    Q    Have you spoken to them about whether they've gotten

Page 156

1 the feeling that voters are becoming more accustomed to the
2 requirement?
3    A    No.
4    Q    Have you spoken to them about whether there are often
5 higher rejection rates after new requirements get implemented
6 through law?
7    A    No.
8    Q    Did you talk to them about how they implemented
9 Senate Bill 1?
10    A    I don't recall that one.
11    Q    And so where did you get the rejection-rate numbers?
12    A    Oh, from my staff.
13    Q    Okay.  And do you expect similar rejection-rate
14 numbers for the 2020 general?
15    A    I don't know.
16    Q    Sorry.  Let me rephrase that.  Do you expect similar
17 rejection rates to the 2022 general?
18    A    I don't know.
19    Q    Sorry.  I realized I had given the wrong date.
20    A    I knew what you meant.
21    Q    And did you talk to any other counties about the
22 implementation of the voter-ID provision in Senate Bill 1?
23    A    Didn't -- say that again.
24    Q    Did you speak to any other county --
25    A    Oh, no.

Page 157

1    Q    And so is it fair to say that your sole understanding
2 of how the voter-ID provision [sic] effect on voters was the
3 rejection-rate numbers that your staff looked up?
4         MR. GOLANDO:  Objection, form.
5 BY THE WITNESS (resuming):
6    A    State it again, please.
7    Q    Sure.  Is it fair to say that your understanding of
8 how the ID numbers affected voters -- when I say ID numbers, I
9 mean the ID requirement --
10    A    Uh-huh.
11    Q    -- came from the rejection-rate numbers that you
12 received from staff?
13    A    Partially.
14    Q    What other information do you have regarding the
15 implementation of Senate --
16    A    Well, talking -- talking to folks in the community.
17 People -- I mean, this was a pretty high-profile bill.  Talking
18 to people that are involved in campaigns that knew of ballots
19 that had been rejected.
20    Q    And did you speak to anybody that had their own ballot
21 rejected?
22    A    I don't recall.  Yeah, I...
23    Q    And so you don't recall if you spoke to any individual
24 who had their ballot rejected as a result of the voter-ID number
25 requirement; is that correct?



Carol Alvarado

October 06, 2022
Pages 158 to 161

Page 158

1    A    Right, I don't recall.
2    Q    Now, the 19 percent, do you know if that includes the
3  number of individuals who were later able to cure the defect in
4  their ballot?
5    A    I don't know.
6    Q    Now, you had, I believe, discussed on the floor --
7    A    Uh-huh.
8    Q    -- during your filibuster some of your concerns
9  regarding the signature-match requirement; is that right?
10    A    Yes.
11    Q    Okay.  I believe you said that individuals with
12  disabilities, that their signature can change --
13    A    Yes.
14    Q    -- is that correct?
15    A    Yes.
16    Q    And so one of your concerns is that a voter would have
17  their signature rejected because their disability would cause
18  their signature not to be the same election to election; is that
19  correct?
20    A    Right.
21    Q    A voter-ID number does not change; is that correct?
22    A    Right.
23    Q    And so do you think some voters with disabilities
24  would find it easier to include their voter-ID number as a
25  method of identification as opposed to signature match?

Page 159

1    A    I don't know.  I mean, if they are elderly, they may
2  not recall what they used on -- one each one.  I don't know.
3    Q    Let's take a quick look at Senate Bill 1.
4    A    (Complies with request.)
5         THE WITNESS:  We can put these two back over
6  there.
7         MR. GOLANDO:  (Complies with request.)
8         THE WITNESS:  Thank you.
9  BY THE WITNESS (resuming):
10    A    Okay.
11    Q    And we're going to look at Section 5.07, and I will
12  let you know it is Page 38.
13    A    (Complies with request.)
14    Q    And so if you see Subsection F of Section 5.07, which
15  amends Section 86.001 of the election code, it reads:  If the
16  information required under Section 84.002(a-1)(a)[sic] included
17  on the application does not identify the same voter identified
18  on the applicant's application for voter registration under
19  Section 13.002(c)(8), the clerk shall reject the application.
20  Did I read that correctly?
21    A    Yes.
22    Q    And so are you aware that a voter who applies for --
23  let me rephrase that.  Is your understanding that a voter can
24  use any of the required numbers so long as one of them matches
25  and have their application accepted?

Page 160

1    A    Yes.
2    Q    And you're aware that the standard is that if the
3  number does not match something in the record as opposed to the
4  specific number that was used either on the application or
5  voter-registration form [sic].
6    A    Yes.
7    Q    All right.  We can put that down.  So we talked a
8  little bit about voter-ID requirement.
9    A    Uh-huh.
10    Q    Were there any other provisions within Senate Bill 1
11  that you thought were harmful to voters?
12    A    Well, I -- I just didn't see the -- need for the
13  bill to begin with.  It made it seem like there was -- they were
14  trying to prevent -- they were trying to say that there was
15  fraud when there wasn't.  In fact, the number of charges and
16  prosecutions, if we can look at that, from 20 -- 2004 to 2020,
17  0.0006 percent of votes cast during that time resulted any -- in
18  any type of prosecution; 534 offenses that were made that was --
19  that -- that number out of 94 million votes cast, and of those
20  534 offenses, 154 were actually charged.  So I felt that -- that
21  the bill was a solution in search of a problem.
22    Q    Okay.  And so is it that you believe that the 2020
23  general election was basically smooth and secure, and that's why
24  there was not a need for --
25    A    All along.  I mean, we've -- we've not heard of any

Page 161

1  prosecutions, anything that would demonstrate that elections
2  were -- contained fraud and that we needed this massive bill to
3  address it.
4    Q    So we had talked a little bit earlier about some of
5  the litigation in response to Harris County.
6    A    Uh-huh.
7    Q    Would you agree with me that there was at least a lot
8  of open questions about what the election code allowed in
9  regards to certain voting practices, such as drive-through
10  voting, multiple in-person delivery [sic] ballot locations and
11  24-hour voting?
12    A    To some extent.
13    Q    And so I want to introduce our next exhibit.  I
14  believe this is Exhibit 31.
15         THE WITNESS:  Can you give me a minute?  I need
16  to --
17         MS. HUNKER:  Sure.  Can we go off the record real
18  quickly?
19         THE WITNESS:  Yes.  Okay.  Thank you.
20         VIDEOGRAPHER:  Off record at 3:10.
21         (A recess is taken.)
22         VIDEOGRAPHER:  On the record at 3:16.
23  BY MS. HUNKER (resuming):
24    Q    Senator Alvarado, if you can please turn to
25  Exhibit 31.



Carol Alvarado

October 06, 2022
Pages 162 to 165

Page 162

1    A    Uh-huh.  Okay.
2    Q    All right.  And so this is a document -- as you can
3 see from the bottom, it says State-087323 that was disclosed in
4 this case, and if you see on top, it's from the office of
5 Attorney General of Texas, election-fraud violations,
6 prosecutions result.  Do you see that on top?
7    A    Yes.
8    Q    Have you seen this document before?
9    A    No.
10    Q    Were you aware that this document was circulated among
11 members of the legislature?
12    A    I don't recall.  I'm not aware.
13    Q    Were you aware that the document was referred to
14 during committee testimony?
15    A    In the Senate -- in state affairs in the Senate?
16    Q    I believe it was in the House and also used in the
17 Senate as well.
18    A    I don't recall.
19    Q    Okay.  And so you can see that this is prosecutions
20 resolved from the attorney general's office; correct?
21    A    Yes.
22    Q    And so then it lists the county, the defendant and the
23 allegation; is that right?
24    A    Yes.
25    Q    And the it also talks about the election that was

Page 163

1 involved; is that right?
2    A    Right.
3    Q    And then it talks about the case-number description as
4 well as the number of defendants charged and the charges that
5 were brought; is that right?
6    A    Yes.
7    Q    Okay.  And we can -- I also want to show that on the
8 bottom it says information as of April 20th, 2022.  Do you see
9 that?
10    A    Yes.
11    Q    And so this document is only as accurate as
12 April 20, 2022.  Does that make sense?
13    A    Yes.
14    Q    Okay.  And so if we look through the document, we'll
15 see different types of offenses, and so let's turn to Page 5.
16    A    (Complies with request.)
17    Q    You can see that there are, on the bottom, in Cameron
18 County, vote harvesting, mail-ballot fraud, assistance fraud,
19 influencing voter.  Do you see that?
20    A    Yes.
21    Q    And do you see that it talks about the different
22 charges that were brought; correct?
23    A    Yes.
24    Q    And we can look elsewhere.  If you turn to Page 6,
25 we'll see that there's one from Harris County, forgery and

Page 164

1 tampering with petition of candidacy from the 2014 election; is
2 that correct?
3    A    Hold on.  What page?
4    Q    Page 6.
5    A    (Reviewing.)  Okay.
6    Q    And if we turn to Page 9 and then going into 10 --
7    A    Wait a minute.  Okay.  Say that Harris County -- so
8 there's one change?
9    Q    On that particular one, yes.
10    A    Out of how many votes cast?
11    Q    I'm just talking about the incidences themselves.
12    A    Okay.
13    Q    And so if we turn to Page 9 and 10 --
14    A    Okay.
15    Q    -- do you see a number of charges brought in different
16 actions in Harris County?
17    A    (Reviewing.)
18    Q    The entire Page 10 is --
19    A    Oh, I'm sorry, 10.  (Reviewing.)
20    Q    And so this -- the first one is a false statement on
21 registration application, illegal voting, tampering with
22 government records, election fraud, false registration address.
23 Did I read that correctly?
24    A    Yes.
25    Q    And then if you can see, there's a similar description

Page 165

1 for each of the entries on this page.
2    A    Yes.
3    Q    And then you can see that each -- each has a number of
4 defendants charged or offenses charged and there's -- that's
5 listed as well.
6    A    (Reviewing.)
7    Q    You're aware that an individual who conducts illegal
8 election activity can affect multiple ballots cast; correct?
9    A    Yes.
10    Q    Do you know how many jurisdictions in Texas have less
11 than 10,000 people?
12    A    No.
13    Q    Any jurisdictions in Texas have less than a thousand?
14    A    No.
15    Q    Would you agree with me that election fraud has the
16 most likely -- is most likely to effect the results in a small
17 election?
18    A    I -- I don't know.
19    Q    Would you agree with me that Texas has a lot of small
20 jurisdictions?
21    A    Yes.
22    Q    Would you agree with me that the Attorney General of
23 Texas has brought charges relating to voter fraud in Harris
24 County?
25    A    It appears so according to this document.



Carol Alvarado

October 06, 2022
Pages 166 to 169

Page 166

1  Q  And would you agree with me that the Texas Attorney
2  General has brought charges against -- for illegal voting or
3  election fraud in other counties as well?
4  A  According to this, yes.
5  Q  Are you aware that election -- election-fraud
6  prosecutions are also brought by county district attorneys?
7  A  Yes.
8  Q  Do you know the amount of charges that are brought by
9  these district attorneys each year?
10  A  No.
11  Q  I also want to turn to Page 30 -- sorry -- Exhibit 32.
12  A  (Complies with request.)
13  Q  And you'll see that there's a caption, Lupe v. Texas.
14  Do you see that?
15  A  Yes.
16  Q  And do you see where it says, United States' Responses
17  to Texas' First Set of RFPs-Privilege Log?
18  A  Yes.
19  Q  And I want to look towards the privilege basis that's
20  brought for some of these documents.
21  A  Okay.
22  Q  And do you see where -- the third entry down, it says,
23  Complaint alleging voter fraud via text message.
24  A  Yes.
25  Q  And do you see the next one down says, Voicemail

Page 167

1  complaint alleging voter fraud in Texas?
2  A  Yes.
3  Q  And do you see how there are other entries here that
4  also state that there were complaints received by the United
5  States regarding election fraud in Texas?
6  A  Yes.
7  Q  We can put these two documents aside.  I'm going to
8  introduce Exhibit 33.
9      MS. HUNKER:  (Provides exhibit.)
10      MR. GOLANDO:  Thank you.
11  BY MS. HUNKER (resuming):
12  Q  Do you have the exhibit in front of you?
13  A  Yes.
14  Q  Do you see it says House Journal?
15  A  Yes.
16  Q  And do you see this is from Monday, April 23rd, 2007;
17  is that correct?
18  A  Yes.
19  Q  And so I'm going to turn -- ask you to turn the page
20  to 2224, and I will represent to you that I've only included the
21  portions of this House Journal that were relevant to our
22  deposition for today.  And so do you see where it says
23  Representative Anchia?
24  A  Yes.
25  Q  Do you know who Representative Anchia is?

Page 168

1  A  Yes.
2  Q  And he's a Democrat; correct?
3  A  Yes.
4  Q  And did you work with him when you were in the Texas
5  House?
6  A  Yes.  And just to be clear, I was not in the House
7  during this time, during 2007.
8  Q  And I want to go to the third paragraph, where it
9  starts with, Furthermore.
10  A  Okay.
11  Q  Actually, let's do the whole paragraph.  Let's start
12  with, We know.  It says:  We know that there's no evidence of
13  it, but if this body wants to create an opportunity for voter
14  fraud, then vote for HB218.  In fact, that Section 3 Part A of 2
15  -- HB218 creates a wonderful opportunity for people at a low
16  cost to be able to impersonate someone else by saying that this
17  is a valid employee ID and no poll worker, no election worker,
18  no election judge will be able to discern a ballot from invalid
19  ID.  Did I read that correctly?
20  A  Yes.
21  Q  Furthermore, there's another wonderful loophole in
22  this bill that creates a glaring weakness:  It essentially
23  allows vote by mail to continue without voter identification.
24  Vote by mail, as we know, is the greatest source of fraud --
25  voter fraud in this state.  In fact, all of the prosecutions by

Page 169

1  the attorney general -- I shouldn't say all, but a great
2  majority of the prosecutions by the attorney general occur with
3  request to vote by mail.  Did I read that correctly?
4  A  Yes.
5  Q  Would you agree with me that in this statement on the
6  floor, Representative Anchia said that vote by mail is the
7  greatest source of voter fraud in this state?
8  A  According to what I'm reading, that -- that's what he
9  said.
10  Q  Okay.  And would you agree with me that he is talking
11  about fraud in vote-by-mail context -- sorry.  Let me rephrase
12  that.  Would you agree with me that he is talking about fraud
13  through vote by mail in the context of photo ID?
14      MR. GOLANDO:  Objection, form.
15  BY THE WITNESS (resuming):
16  A  I don't know.
17  Q  Okay.  Would you agree with me that he's comparing
18  vote by mail from in-person voting with respect to photo IDs?
19      MR. GOLANDO:  Same objection.
20  BY THE WITNESS (resuming):
21  A  I don't know.
22  Q  Would you agree with me that he says that the bill
23  would create a wonderful loophole because it allows vote by mail
24  to continue without photo identification?
25  A  I'm not sure.



Page 170

1    Q   Okay.  Would you agree that he says there's another
2 wonderful loophole in this bill that creates a glaring weakness:
3 It essentially allows vote by mail to continue without photo
4 identification?
5    A   (Reviewing.)  That's what I'm reading.
6    Q   And let's go to introduce the next exhibit, which is
7 34.
8        MS. HUNKER:  (Provides exhibit.)
9        MR. GOLANDO:  Thank you.
10 BY MS. HUNKER (resuming):
11    Q   And you see that this is a letter from Judith
12 Zaffirini, State Senator, District 21?
13    A   Yes.
14    Q   And Senator Zaffirini is a Democrat; correct?
15    A   Yes.
16    Q   And this letter was sent on December 3rd, 2018; is
17 that correct?
18    A   Yes.
19    Q   And it's directed to Senator Hughes, chair of the
20 select committee on election security.
21    A   Yes.
22    Q   Okay.  I want to look at page -- Paragraph 1 where it
23 says, This letter, however, let me know when you've arrived.
24    A   Yes, I have it.
25    Q   Okay.  It reads:  This letter however is to record my

Page 171

1 concerns regarding the need to, one, provide concrete
2 recommendations to address mail-in ballot fraud.  Did I read
3 that correctly?
4    A   Yes.
5    Q   And now let's look at the next paragraph:  During the
6 last several sessions, many legislators have focused on voter-ID
7 laws intended to prevent in-person voter fraud, but not on [sic]
8 increasingly serious problem of mail-in ballot fraud.  Our
9 committee heard troubling testimony regarding the state of
10 election security related to the latter.  Did I read that
11 correctly?
12    A   Yes.
13    Q   It continues:  The report's recommendation that the
14 legislature needs to find a solution to the vexing issue of
15 mail-in ballot fraud.  At nursing homes and assisted-living
16 facilities is a good start, but we must take all possible steps
17 to address voting irregularities caused by fraudulent mail-in
18 ballots.  Did I read that correctly?
19    A   Yes.
20    Q   And so would you agree that in this letter she states
21 that the legislature needs to provide concrete recommendations
22 to address mail-in ballot fraud?
23    A   (Reviewing.)
24    Q   Based on the first paragraph.
25    A   Well, if the -- that's what it reads here.

Page 172

1    Q   Would you agree with me that she said that:
2 Legislators are focused on voter-ID laws intended to prevent
3 in-person voter fraud, but not on the increasing serious problem
4 of mail-in ballot fraud.
5    A   That's what I read.
6    Q   And you'd agree that she said that she heard troubling
7 testimony regarding the state of election security related to
8 mail-in ballot fraud.
9    A   That's what it reads here.
10    Q   The voter-ID number requirement introduces a voting --
11 let me take -- let me rephrase that.  The requirement that a voter
12 provide either their Social Security number or driver's license
13 or voter ID on their mail-in ballot adds a voter-ID component to
14 mail-in ballots; is that correct?
15    A   I suppose so.
16    Q   Would you agree that it addresses the concern raised
17 by Senator Zaffirini that legislators are focused on voter-ID
18 laws intended to prevent in-person voter fraud, but not on the
19 increasing serious problem of mail-in ballot fraud?
20    A   I -- I don't know.  I can't say.
21    Q   We can put that document aside.  So we had discussed
22 earlier about some of your concerns regarding poll watchers;
23 correct?
24    A   Yes.
25    Q   And do you have concerns regarding poll watchers with

Page 173

1 respect to Senate Bill 1?
2    A   Yeah, there are some.  I mean, obviously we've talked
3 quite a bit about the -- the training.
4    Q   Uh-huh.
5    A   But if I recall, I don't know if there are provisions
6 in there on what exactly a poll watcher can do, if they can
7 speak at any moment or get up and wander around at any moment.
8 I -- I don't recall.
9    Q   Okay.
10    A   But I know that -- that was a concern as well of mine.
11    Q   Okay.  And so we did talk a little bit about training,
12 and so just out of curiosity, have you at any point looked at
13 the training that was provided by the secretary of state for
14 poll watchers?
15    A   After the bill?
16    Q   Yes.
17    A   No, no.
18    Q   Have you talked to any of the new poll watchers
19 regarding the training and their experience going through the
20 training?
21    A   No.
22    Q   And have you talked to any election administrators or
23 county election officials about how the training has worked with
24 respect to poll watchers at their locations?
25    A   No, not yet.



Carol Alvarado

October 06, 2022
Pages 174 to 177

Page 174

1    Q    Now, poll watchers are selected by political parties
2 or campaigns; is that correct?
3    A    Yes.
4    Q    And have [sic] your campaign ever utilized a poll
5 watcher?
6    A    A long time ago.
7    Q    So at some point your campaign had volunteer poll
8 watchers.
9    A    Yes.
10    Q    And are you aware of other Texas Democrats who use
11 poll watchers as part of their campaign?
12    A    Yeah, in various campaigns, and -- but this was a long
13 time ago.
14    Q    And are you aware that the Texas Democrats' website
15 asked for volunteers for poll watchers?
16    A    No, I don't remember.  When -- when is that?  When was
17 that in effect?
18    Q    I'll bring it up.  I'm going to introduce Exhibit
19 Number 35.  Do you have the document in front of you?
20    A    Yes.
21    Q    And do you see on the top where it says Texas
22 Democrats?
23    A    Yes.
24    Q    And it says, Sign up to help Texas -- to help Texas
25 Democrats get elected.

Page 175

1    A    Yes.
2    Q    And that it includes a space for contact
3 information --
4    A    Well --
5    Q    -- is that correct?
6    A    Yes.
7    Q    And if you look at the back, you'll see information
8 towards the bottom that says it's copyrighted, 2021, Texas
9 Democratic Party, Political Ad.
10    A    Okay.
11    Q    Okay.  And it says it's paid by the Texas Democratic
12 Party, www.tx --
13    A    Yes.
14    Q    Okay.
15    A    What is the date of this?  Do you know?  When was
16 this --
17    Q    So I will represent to you that I pulled this from the
18 Texas Democratic Party website yesterday.
19    A    Okay.
20    Q    Do you have any reason to doubt my representation?
21    A    No.
22    Q    And so if you look at where it says volunteer
23 information on Page 2 --
24    A    Uh-huh.
25    Q    -- it asks:  Are you interested in serving as a poll

Page 176

1 watcher during the 2022 general election.
2    A    Yes.
3    Q    And so would you agree with me that on the Texas
4 Democrat website, there is an option asking for volunteers to be
5 a poll watcher during the 2022 general election?
6    A    Yes.
7    Q    And we can put that aside.  And you had heard that
8 there was a controversy in Travis County regarding poll watchers
9 being sequestered from the central counting location.
10    A    I'm not aware.
11    MS. HUNKER:  (Provides exhibit.)
12    MR. GOLANDO:  Thank you.
13 BY MS. HUNKER (resuming):
14    Q    And so this is Exhibit Number 36.
15    A    Okay.
16    Q    Do you have it in front of you?
17    A    Yes.
18    Q    And so this is a news article, as you can see, from
19 KXN.com, and it reads:  Second criminal investigation into
20 Travis County clerk requested over November election.  Did I
21 read that correctly?
22    A    Yes.
23    Q    And if you look at the second paragraph, it reads:
24 After review of the submitted documentation, we believe
25 information regarding offenses warrant a submission for criminal

Page 177

1 investigation to the Texas Attorney General, as the specific
2 allegations described involved a potential misdemeanor offense.
3 Did I read that correctly?
4    A    Yes.
5    Q    And if we look at Paragraph 1, it talks a little bit
6 about what that was in response to.  It says:  It took only a
7 few weeks for Texas Secretary of State to finish its review of
8 poll watcher obstruction that happened during the November
9 election in Travis County.  The review ended with the secretary
10 of state asking the Texas Attorney General's office for a
11 criminal investigation.  Did I read that correctly?
12    A    Yes.
13    Q    And if we look to Paragraph 4, where it says, This is,
14 the second --
15    A    Yes.
16    Q    -- one.  It says:  This is the second referral from
17 the secretary of state since September.  In July, poll watchers
18 made the same allegations against Dana stemming from the July
19 runoff election.  Did I read that correctly?
20    A    Yes.
21    Q    And then if we skip a paragraph and we go to where it
22 says:  Obstructing a poll watcher is a Class A misdemeanor in
23 Texas and a conviction carries up to a year in jail and fines up
24 to $4,000.  Did I read that correctly?
25    A    Yes.



Carol Alvarado

Page 178

1  Q   Now, you agree with me that this occurred before
2  Senate Bill 1 would have taken effect; correct?
3      A   Let's see.  This was -- yes.  Yes.
4      Q   And so it was a Class A misdemeanor to obstruct a poll
5  watcher before Senate Bill 1 took effect; correct?
6      A   Okay.  Yes.
7      Q   And if we turn the page, we can see a black-and-white
8  photo, and I am going to give to you as Exhibit 37 a blown-up
9  version of that photo.
10     A   Okay.
11     Q   And you agree with me that this is the same photo as
12 the one in the news article; correct?
13     A   Yes.
14     Q   Okay.  And you can see in the photo that the poll
15 watchers are -- are in a room sequestered; correct?
16     A   I just see that they're in a room.
17     Q   Okay.  And you can see that they are looking through a
18 window.
19     A   I see one person looking through a window.
20     Q   And so let's read what's described in the news
21 article.  It says:  Photographic evidence collected by Fleck
22 during her poll watcher assignment inside the counting station
23 shows poll watchers sequestered inside a media room.  The room
24 is separated from the counting station where election workers
25 were tabulating and counting ballots.  Did I read that

Page 179

1  correctly?
2      A   Yes.
3      Q   And then it says:  Large windows allow poll watchers
4  to see inside the counting room, but many poll watchers we spoke
5  with and interviewed said they could not see or hear any of the
6  action on the other side of the wall.  Did I read that
7  correctly?
8      A   Yes.
9      Q   And so you had not heard of this particular incident;
10 is that correct?
11     A   No, ma'am.
12     Q   And you don't know to the extent this incident would
13 have influenced Senate Republicans and House Republicans in the
14 provisions they were crafting for Senate Bill 1; is that
15 correct?
16     A   I'm not aware.
17     Q   Okay.  And we can put that aside.  I want to look a
18 little bit at another election advisory, and this is going to be
19 Exhibit Number 37 --
20     A   38.
21     Q   -- 38.
22         MS. HUNKER:  (Provides exhibit.)
23         THE WITNESS:  He -- he needs a copy.
24         MR. GOLANDO:  Thank you.
25 BY MS. HUNKER (resuming):

Page 180

1      Q   Do you have the exhibit in front of you?
2      A   Yes.
3      Q   Okay.  And do you see where it says Election Advisory
4  2022-09?
5      A   Yes.
6      Q   And that this would have been issued February 4th,
7  2022?
8      A   Yes.
9      Q   And the subject of this is, New Law, Changes to Poll
10 Watcher Requirements under House Bill 3107 and Senate Bill 1; is
11 that correct?
12     A   Yes.
13     Q   And would you agree with me that this was issued by
14 the secretary of state?
15     A   Yes.
16     Q   And so I want to turn first to where it says, Purpose
17 and duty of poll watchers.
18     A   Okay.
19     Q   It says:  Section 33.0015 of the code provides that it
20 is the intent of the legislature that poll watchers, duly
21 accepted for service under Chapter 33, be allowed to observe and
22 report on irregularities in the conduct of any election but may
23 not interfere in the orderly conduct of an election.  Did I read
24 that correctly?
25     A   Yes.

Page 181

1      Q   It continues:  A poll watcher appointed under
2  Chapter 33 shall observe without obstructing the conduct of an
3  election and can call to the attention of an election officer
4  any observed or suspected irregularity or violation of law in
5  the conduct of the election.  Did I read that correctly?
6      A   You did.
7      Q   And do you agree with this description of what a poll
8  watcher should be doing?
9      A   Say that again.
10     Q   Do you agree with this description of what a poll
11 watcher's purpose and duty should be?
12     A   To some extent
13     Q   To what extent?
14     A   Let's see.  Well, that they're to observe and report.
15     Q   And so you'd agree with me that the secretary of state
16 has stated that poll watchers are allowed to observe and report
17 on irregularities, but they may not intervene in the orderly
18 conduct of an election.
19     A   Right.
20     Q   And you would agree with me that the secretary of
21 state advised this after the passage and SB1 taking effect.
22     A   Yes.
23     Q   Now, we talked a little bit about the training
24 requirements for poll watchers, so I'm going to skip that --
25     A   Yes.



Carol Alvarado

October 06, 2022
Pages 182 to 185

Page 182

1    Q    -- section and go to 04, poll watchers.  It says:
2  Before accepting a watcher, an election officer shall require
3  the watcher to take the following oath:  I swear or affirm that
4  I will not disrupt the voting process or harass -- harass voters
5  in the discharge of my duties.  Did I read that correctly?
6    A    Yes.
7    Q    And then it continues:  This oath has been added to
8  the certificate of appointment that the poll watcher presents
9  and signs in the presence of the presiding judge.  Did I read
10  that correctly?
11    A    Yes.
12    Q    Would you agree with me that this oath provision was
13  added by Senate Bill 1?
14    A    Yes.
15    Q    Do you consider this to be a good provision that was
16  added?
17    A    It's a provision that -- again, that we advocated for
18  some reform and -- some changes to be made on multiple
19  occasions.
20    Q    Okay.  And so this was a provision that the Texas
21  Democrats had advocated for on multiple occasions; is that
22  correct?
23    A    Among others --
24    Q    And this --
25    A    -- multiple times.

Page 183

1    Q    And this provision requiring an oath for poll watchers
2  was added to Senate Bill 1; correct?
3    A    After multiple and multiple exhausting discussions.
4    Q    Okay.  And so I want to flip the page --
5    A    (Complies with request.)
6    Q    -- and it says:  While a poll watcher may be present
7  if an election worker is assisting a voter, a poll watcher may
8  not be present at the voting station when a voter is preparing
9  the voter's ballot or is being assisted by a person of a voter's
10  choice, including by a person also serving as an interpreter at
11  the voting station.  Did I read that correctly?
12    A    Yes.
13    Q    And so according to this, a poll watcher is not
14  allowed to observe a voter when preparing their ballot or when
15  they're being assisted by a person of their choice; is that
16  correct?
17    A    Yes, but it wasn't the case in the original bill.
18  This was a very, very significant point of contention for many
19  of us.
20    Q    And so was this also a provision that was advocated by
21  Texas Democrats, including yourself?
22    A    It was advocated by -- by many members quite a bit.
23  There was a lot of convincing -- I mean there was a lot of
24  discussion about it -- about this particular part.
25    Q    Okay.  Now, this provision, I should say, that a poll

Page 184

1  watcher may not be present at the voting station when a voting
2  -- voter is preparing the ballot or being assisted by a person
3  of their choice --
4    A    Uh-huh.
5    Q    -- that preexisted Senate Bill 1; is that right?
6    A    Say that again.
7    Q    So we can look at this -- if you want, I can bring up
8  the election code, but to clarify, this provision did -- that
9  the poll watcher may not be present at the voting station when a
10  voter is preparing the voter's ballot or is being assisted by a
11  person of the voter's choice --
12    A    Uh-huh.
13    Q    -- was already in the election code prior to Senate
14  Bill 1.
15    A    I believe so.
16    Q    And so your advocacy in this provision was to keep the
17  provision as it existed; is that correct?
18    A    Yes.
19    Q    And then if we look to the next sentence, it says:  A
20  poll watcher does not have the right to free movement in other
21  areas of an election code -- in other areas of an election
22  office that is not being used to -- used for designated
23  activities.  Did I read that correctly?
24    A    Yes.
25    Q    And so under Senate Bill 1, poll watchers are limited

Page 185

1  in their movement in areas that are not being used for
2  designated activities; is that correct?
3    A    It's -- it's what was in the -- it's what preexisted
4  before, yes.
5    Q    Okay.  And if we go back to where it says, Removal of
6  Poll Watchers, it says --
7    A    Down here on the bottom?
8    Q    Down here on the bottom.
9    A    Uh-huh.
10    Q    -- it says:  A presiding judge may not have a poll
11  watcher removed from a polling place for violating the Texas
12  Election Code for any other law relating to the conduct of an
13  election other than a violation of the penal code unless the
14  violation was observed by an election judge or clerk.  Did I
15  read that correctly?
16    A    Yes.
17    Q    And it says:  A presiding judge may call a law
18  enforcement officer to request that a poll watcher be removed if
19  the poll watcher commits a breach of the peace or a violation of
20  law.  Did I read that correctly?
21    A    Yes.
22    Q    So I want to look at Chapter 33 --
23    A    Okay.
24        COURT REPORTER:  (Provides exhibit.)
25        THE WITNESS:  Thank you.



Carol Alvarado

October 06, 2022
Pages 186 to 189

Page 186

1 BY MS. HUNKER (resuming):
2   Q   -- and we're going to be turning to Page 10 and 11.
3           MR. GOLANDO:  There are no page numbers.
4           MS. HUNKER:  Say what?
5           MR. GOLANDO:  There are no --
6           THE WITNESS:  There are no page numbers.
7           MS. HUNKER:  Oh, I'm sorry.
8 BY THE WITNESS (resuming):
9   A   Let's see.  One, two, three, four --
10  Q   We're going to be turning to where it says Section
11 33.057.
12          MR. GOLANDO:  57?
13          MS. HUNKER:  Yes.
14          THE WITNESS:  Okay.
15 BY MS. HUNKER (resuming):
16  Q   It's titled, Observing Preparation of Voter's Ballot.
17  A   Okay.
18  Q   Now, it says:  A watcher -- if you look at
19 Subsection B -- may not be present at the voting station when a
20 voter is preparing the voter's ballot or being assisted by a
21 person of the voter's choice.  Correct?
22  A   Yes.
23  Q   And then if we look at the next one down, next
24 section, it's Section 33.058, it says:  While on duty, a watcher
25 may not converse with an election officer regarding the election

Page 187

1 except to call attention to irregularity or a violation of law,
2 converse with a voter or communicate in any manner with a voter
3 regarding the election.  Did I read that correctly?
4   A   Right, yes.
5   Q   And so according to the election code, even under
6 Senate Bill 1, a poll watcher may not converse with an election
7 officer regarding the election except to call attention to
8 irregularity or violation of law; is that correct?
9   A   Yes.
10  Q   And the election code, even under Senate Bill 1, a
11 poll watcher may not converse with a voter; correct?
12  A   Yes.
13  Q   And according to the election code under -- even under
14 Senate Bill 1, a poll watcher may not communicate in any manner
15 with a voter regarding the election; is that correct?
16  A   Yes.
17  Q   Now you can put that aside.
18  A   (Complies with request.)
19  Q   And we're going to be starting -- looking at another
20 provision of the election code next.  Do you see this is Chapter
21 276 of the election code?
22  A   Yes.
23  Q   And it says, Retaliation Against Voter; correct?
24  A   Yes.
25  Q   And it says:  A person commits an offense of

Page 188

1 retaliation against a voter who has voted for or against a
2 candidate or measure or a voter who has refused to reveal how
3 the voter voted.  The person knowingly harms or threatens the
4 voter by an unlawful act.  Did I read that correctly?
5   A   Yes.
6   Q   And so if you remember when we were looking at the
7 election advisory for removal of a poll watcher, it says that a
8 poll watcher may be removed if the poll watcher commits breach
9 of the peace or a violation of law; correct?
10  A   Yes.
11  Q   And then a violation of the law is knowingly harms or
12 threatens a voter by [sic] unlawful act; is that correct?
13  A   Yes.
14  Q   And so a poll watcher can be removed if they seek to
15 knowingly harm or threaten a voter; is that correct?
16  A   Yes.
17  A   And we can put that aside.
18  A   (Complies with request.)
19  Q   Now, did you have any concerns regarding poll watchers
20 -- let me take that back.  Let me go to the actual language.  So
21 while I'm looking for the particular provision, I'm going to
22 play a clip from your filibuster and introduce it as an exhibit.
23          (Video playing.)
24 BY MS. HUNKER (resuming):
25  Q   Did you hear that clip?

Page 189

1   A   Yes.
2   Q   And that was a clip from your filibuster; correct?
3   A   Yes.
4   Q   And in it, you said that the standard that existed for
5 poll watchers ahead of time conveniently close you thought was
6 sufficient; is that correct?
7   A   Yes.
8   Q   Is it your understanding that Senate Bill 1 changed
9 that particular standard?
10  A   I don't recall.
11  Q   Okay.
12  A   No.
13  Q   Okay.  Do you not have an opinion on whether or not
14 Senate Bill 1 revised or altered that standard?
15  A   No.
16  Q   Okay.  When you were voting, in your -- in your
17 experience, have you ever experienced harassment or intimidation
18 from a poll watcher?
19  A   No.
20  Q   Are you aware of any individual who has?
21  A   No.
22  Q   Have you heard of any incidents following the
23 enactment of Senate Bill 1 regarding intimidation or harassment
24 by poll watchers to voters?
25  A   No.



Carol Alvarado

October 06, 2022
Pages 190 to 193

**Page 190**

1   Q   Have you heard any indication that the number of
2   incidences of harassment or intimidation of voters went up since
3   the passage of Senate Bill 1?
4   A   No.
5   Q   I want to quickly talk about voter assistance.  You
6   had mentioned a few times during your filibuster that you were
7   concerned regarding voting-assistance provisions in SB1; is that
8   correct?
9   A   Yes.
10  Q   And what exactly were your concerns?
11  A   Well, people that were assisting might not even
12  knowingly be committing something that could be seen as wrong or
13  in violation of something.
14  Q   And have you, since Senate Bill 1's enactment --
15  A   Uh-huh.
16  Q   -- spoken to voters who've had problems with attaining
17  assistance to vote because of Senate Bill 1?
18  A   No.
19  Q   And have you talked to any assistors who were subject
20  to some sort of either criminal penalty or investigation because
21  of provisions in Senate Bill 1?
22  A   No.
23  Q   And are you aware of any voter who was unable to vote
24  because of the assistance provisions in Senate Bill 1?
25  A   No.

**Page 191**

1   Q   Now, you are aware that some of the provisions
2   regarding assistance in Senate Bill 1 were enjoined by a federal
3   courts; correct?
4   A   I believe so.
5   Q   I'd like to introduce an exhibit.  We're going to be
6   looking at Page 46, Section D, where it says, Rendering
7   Assistance to Voters, but before I do, I should probably just
8   talk a little bit about what the document is.
9   A   Okay.
10  Q   Do you see it says, Qualifying Voters on Election Day,
11  2022?
12  A   Yes.
13  Q   And it says it's a handbook for election judges and
14  clerks; correct?
15  A   Yes.
16  Q   And then it says it was issued by the office of the
17  Texas Secretary of State Elections Division.
18  A   Yes.
19  Q   And you'll see on the bottom that there's a Bates
20  number.  It says State-110976.
21  A   Yes.
22  Q   Did I read that correctly?
23  A   Yes.
24  Q   And are you aware of what the handbook for election
25  judges and clerks is?

**Page 192**

1   A   Yes.  It's a guide.
2   Q   And so let's look at Section D on Page 46, and if you
3   look on the top, it says:  The person who is to provide
4   assistance must first taken an oath of assistance administered
5   by one of the election officers; is that correct?
6   A   Yes.
7   Q   And then if you go to the next -- so two paragraphs
8   down, it says:  In its June 6th order, the district court
9   enjoined the State of Texas and the secretary of state along
10  with their employees, agents and successors in office and all
11  persons acting in concert with them from enforcing Sections
12  64.031 or 64.0321 of the Texas Election Code.  Did I read that
13  correctly?
14  A   Yes.
15  Q   And it says:  The district -- it continues:  The
16  district court also prohibited the enforcement of the portion of
17  Section 64.034, stating, I will confine my assistants to reading
18  the ballot to the voter, directing the voter to read the ballot,
19  marking the voter's ballot or directing the voter to mark the
20  ballot.  Did I read that correctly?
21  A   Yes.
22  Q   Was this the particular provision within Senate Bill 1
23  that you were concerned about that it would limit assistance
24  that voters could obtain?
25  A   Possibly.

**Page 193**

1   Q   Okay.  Are you aware of any other provisions offhand
2   that you thought could have affected a voter's ability to obtain
3   assistance?
4   A   Maybe issues dealing with language barriers.
5   Q   Okay.
6   A   Yeah -- yes.
7   Q   And if we go to the next paragraph, it says:  The
8   district court further ordered the State of Texas and the
9   secretary of state shall revise training and instruction
10  material for state and county election officials to remove
11  language that reflects the substance of Sections 64.031, 64.0321
12  or the portion of 64.034 identified above.  Did I read that
13  correctly?
14  A   Yes.
15  Q   And because this references the sections of the
16  election code, it might be helpful if we just quickly reference
17  Senate Bill 1 just so you can see what those are referring to.
18  And so we're going to be looking at Sections 6.02 and 6.04 of
19  Senate Bill 1.
20  A   What page did you say?
21  Q   I'm about to tell you.  (Reviewing.)  50 -- 52 and
22  also 51.
23  A   (Reviewing.)  Okay.
24  Q   And so specifically if you see Section 6.02, which is
25  what amends Section 64.031 of the election code --



Page 194

1    A    Okay.
2    Q    -- and so the part that was stricken is:  A voter is
3   eligible to receive assistance in marking or reading the ballot
4   as provided by this chapter if the code -- if the voter cannot
5   prepare or read the ballot because of.
6    A    Okay.  What line are you on?  I'm sorry.  I lost it.
7    Q    It's all right.  Lines 19 through 27.
8    A    Okay.
9    Q    I'm just kind of giving --
10   A    Okay.
11   Q    -- a general overview.
12   A    All right.
13   Q    And then the oath provision is Section 6.04, and
14  that's on Page 52 --
15   A    Yep.
16   Q    -- and you can see what the oath reads there.
17   A    Okay.
18   Q    And so were these two provisions that were enjoined by
19  the Court what your principal concern was regarding voter
20  assistance?
21   A    Yes, some, yes.
22   Q    Okay.  And so the fact that these provisions have been
23  enjoined, they are no longer a concern of yours; is that
24  correct?
25   A    Yes, these are not a concern.

Page 195

1    Q    Okay.  Then we can close that, then.  One last thing
2   on the handbook.  If you look where it's bolded --
3    A    What page?
4    Q    46.
5    A    Okay.
6    Q    It says:  An eligible voter is entitled to receive
7   assistance from a person of their choosing so long as that
8   person is eligible to provide assistance under Section 2.08 of
9   the Voting Rights Act and that assistance is not limited to
10  marking or reading the ballot or otherwise limited to conduct
11  that occurs in the voting booth.  Did I read that correctly?
12   A    Yes.
13   Q    Okay.  And have you talked to any of the election
14  officials in Harris County about the implementation of this
15  particular injunction?
16   A    No.
17   Q    Okay.  And have you talked to the election officials
18  in Harris County about whether or not any of the other
19  provisions have affected assistants who also serve as
20  interpreters?
21   A    No.
22   Q    Are you aware of any voter who was unable to secure
23  the assistance of an interpreter?
24   A    No.
25        MS. HUNKER:  I think this would be a good spot to

Page 196

1   take a break since I'm about to end this section.
2        THE WITNESS:  Okay.
3        VIDEOGRAPHER:  Off the record at 4:06.
4        (A recess is taken.)
5        VIDEOGRAPHER:  Back on the record at 4:20.
6   BY MS. HUNKER (resuming):
7    Q    All right.  So I had actually missed over one of the
8   election advisories I wanted to go over with you and so I'm
9   going to do that now before we move on to our next subject.
10   A    Okay.
11   Q    And do you have the document in front of you?
12   A    Yes.
13   Q    And do you see how it says, Texas Election Advisory
14  Number 2022-12?
15   A    Yes.
16   Q    This was issued February 11th, 2022.
17   A    Yes.
18   Q    And it says:  Additional procedures regarding
19  correction of defects on application for ballot by mail or
20  carrier envelope.
21   A    Yes.
22   Q    Would you agree with my -- agree with my description
23  that this is an election advisory issued to election officials
24  from the secretary of state's office regarding additional
25  procedures for mail-in ballots and carrier envelopes?

Page 197

1    A    Yes.
2    Q    Okay.  So we're going to turn to Page 2 where it says,
3   Returning the Carrier Envelope to Voter.
4    A    Uh-huh.
5    Q    It states here:  If the early-voting clerk discovers
6   that the carrier envelope is missing the voter's signature, has
7   an incomplete signature, have a missing or incomplete witness or
8   assistant information or has missing or incorrect
9   personal-identification information --
10   A    Uh-huh.
11   Q    -- the early-voting clerk may deliver the carrier
12  envelope in person or by mail to the voter so that the voter may
13  correct the defect.  Did I read that correctly?
14   A    Yes.
15   Q    Were you aware that the early-voting clerk has the
16  option of returning the carrier envelope to the voter in person?
17   A    No.
18   Q    And if we go to the next paragraph where it says, Upon
19  receipt, do you see that?
20   A    Next paragraph?  (Reviewing.)  Oh, yes --
21   Q    Okay.
22   A    -- midway through, uh-huh.
23   Q    It says:  Upon receipt of the carrier envelope, the
24  voter may correct the defect immediately and surrender the
25  carrier envelope to the early-voting clerk personnel who'd



Carol Alvarado

Page 198

1 return to the clerk's office with a corrected carrier envelope.
2 Did I read that correctly?
3    A   Yes.
4    Q   Now, were you aware that voters could return their
5 corrected carrier envelope to the personnel of the early-voting
6 clerk in person when the early-voting clerk delivered the defect
7 ballot?
8    A   No.
9    Q   And then it says:  Alternatively, the early-voting
10 worker could leave the carrier envelope in the voter's
11 possession and allow the voter to either make the correction on
12 their own and mail the ballot to the early-voting clerk or
13 cancel their mail ballot and vote in person.  Did I read
14 correctly?
15    A   Yes.
16    Q   And then if you look at the next paragraph, it reads:
17 The early-voting clerk may return defective carrier envelopes by
18 mail under Section 86.011(d) up to the point when the SVC, EVBB
19 -- or signature-verification committee, early-voting ballot
20 board -- begins notifying voters of defects by phone or E-mail.
21 Did I read that correctly?
22    A   Yes.
23    Q   Do you know if Harris County will be delivering defect
24 ballots to voters in person so that they may correct?
25    A   I don't know.

Page 199

1    Q   And do you know if any counties are going to be taking
2 this option of delivering the defective ballot in person?
3    A   I don't know.
4    Q   Okay.  We can put that aside.
5    A   (Complies with request.)
6         (Video playing.)
7         THE WITNESS:  I was looking at Sosa (ph) when I
8 said that.
9 BY MS. HUNKER (resuming):
10    Q   Were you able to hear that clip?
11    A   Yes.
12    Q   And was that clip from your filibuster of Senate
13 Bill 1?
14    A   Yes.
15    Q   Okay.  And can you tell me a little more about your
16 concern regarding privacy for curbside voting?
17    A   With a -- in regards to a poll watcher?
18    Q   Yes.
19    A   Well, I didn't think it was necessary, for one,
20 because usually the poll watcher is inside and is not to move
21 unless they get permission from the election judge, and that it
22 could possibly intimidate.  I mean, you already have, you know,
23 a small confined space in a car.  Bringing out the device -- I
24 mean, I don't know exactly how -- you know, because each machine
25 varies.  You bring out things and you've got the clerk, you

Page 200

1 might have someone helping the clerk, another clerk possibly and
2 then you might have a poll watcher.  For a senior citizen, a
3 little old lady, that -- that could be intimidating.  Woah, you
4 know, These people are in my space here, my private space, my
5 car or very near, hovering over, that -- that people could be
6 intimidated.  That poll watcher looking at that person's
7 address, you know, maybe that poll watcher's coming from a
8 opposing campaign or party and they know because maybe that
9 person that's voting has a bumper sticker on their car or
10 something and they can possibly see their address or personal
11 information.
12    Q   And so did you agree with -- in the context of secrecy
13 of the ballot?
14    A   Uh-huh, yes.
15    Q   So you expressed concern regarding a poll watcher
16 being able to view how an individual in the car voted.  Did you
17 have the same concern regarding individuals in the same car who
18 might be casting their ballot through curbside voting?
19    A   You mean somebody -- another passenger in the car
20 or --
21    Q   Another passenger or the driver.
22    A   No, because that person is a trusted person.  They may
23 be related.  They -- I don't see that as an issue.
24    Q   And so in the context of drive-through voting, you do
25 not view it as a concern that individuals in the same car could

Page 201

1 view how another person voted.
2    A   No.
3    Q   Do you think that family members can pressure other
4 family members to vote a specific way?
5    A   I don't know.
6    Q   So I want to go back to Exhibit 2, the House -- sorry
7 -- the Senate Journal where you were discussing things with
8 Senator Hughes.
9    A   Uh-huh.  What page?
10    Q   It's going to be Page 59.
11    A   Okay.
12    Q   And so we're going to look at the first statement
13 Senator Hughes makes.
14    A   Uh-huh.
15    Q   (Reading.)  Well, Senator, for voters across the
16 board, wherever they lived and whatever their demographics, as
17 Senator Mendez and I discussed, that private ballot is a big
18 deal, and there has been testimony that with drive-through
19 voting, we have people -- multiple people in a car looking over
20 each other's shoulder, seeing how they voted, questions about
21 whether the poll workers -- poll watchers were able to do their
22 job.  Did I read that correctly?
23    A   Uh-huh, yes.
24    Q   And so here Senator Hughes is expressing a concern
25 regarding privacy of the secret ballot in the context of



Carol Alvarado

Page 202

1  drive-through voting; correct?

2    A   Yes.

3    Q   And he states that he's concerned that people could

4  look over someone's shoulder and view -- and view the persons

5  casting their ballot's vote; is that correct?

6    A   Yes.

7    Q   Do you have any doubt on the authenticity of

8  Senator Hughes' concern?

9    A   Well, I -- I do ask if any of these were sustained,

10  did they lead to any convictions or anything.  I mean, I -- I

11  didn't hear the testimony he's referring to.

12    Q   Okay.  And you are not a member of the Senate State

13  Affairs Committee; correct?

14    A   Right.

15    Q   And so you would not have heard the testimony that was

16  delivered to the Senate State Affairs Committee while it was

17  considering this bill; is that correct?

18    A   That's correct, but throughout the debate of these

19  bills, testimony was referenced, people would say, Well, during

20  the hearing such and such -- you know, people said this, claimed

21  this.  This was the first time I'd ever heard of that back part.

22    Q   Okay.  And so you continue and you actually ask: Were

23  any of these substantiated, did you know, did they lead to any

24  convictions or anything.

25    A   Yes.

Page 203

1    Q   And so he responds: Well, it wouldn't be a violation

2  of the law to look over someone's shoulder and see how they

3  voted, but it's not something we want to encourage.  As you

4  know, when you vote in a voting place, you're in that booth by

5  yourself and no one's looking over your shoulder.  Even your

6  closest friend and family doesn't know how you voted.  It's a

7  private ballot and that's important.  Did I read that correctly?

8    A   Yes.

9    Q   And so you raised the concern regarding whether or not

10  the testimony and the complaints alleged in his testimony were

11  substantiated; right?

12    A   Uh-huh.

13    Q   And Senator Hughes responded that although it was a

14  concern, it's not necessarily a violation of the law; is that

15  correct?

16    A   Right.

17    Q   And then if we go down further in the exchange, you

18  said: So where did you hear about these concerns on

19  drive-through voting?  Did you talk to the people that actually

20  experienced them?  And Senator Hughes responds:  There were

21  media reports and there's also at least one or two claims that

22  have been filed suggesting that the number of people who voted

23  did not equal the number of votes cast, and I don't know what

24  the final outcome has been.  I know there were a lot of

25  questions around it because, again, this had never been done

Page 204

1  before.  This was invented in one county for one election.  Did

2  I read that correctly?

3    A   Yeah.  One or two claims out of how many votes cast?

4  Drive-through voting.  What was it, 128,000?

5    Q   Does every vote matter?

6    A   Sure.

7    Q   And does everyone's right to vote in secrecy matter?

8    A   Yes.

9    Q   And so you mentioned that you were not concerned about

10  the privacy issue because you think that the individuals in the

11  car are trusted; is that correct?

12    A   Well, when you talk about comparing it to a poll

13  watcher.  A poll watcher who's a complete stranger to the person

14  in the car voting is different than, say, your sibling, your

15  husband, your parent in the car next to you.

16    Q   Are you aware if people take taxis to vote?

17    A   Well, probably Uber, not taxi today.

18    Q   Are you aware if people took Uber or Lyft to vote?

19    A   Yeah.

20    Q   Would the voter know the Uber or Lyft driver in

21  advance?

22    A   No, but the driver is sitting in front of them,

23  whereas if the poll watcher's there, they're, I would think,

24  probably right outside the door looking in.

25    Q   And what about individuals who are brought to the

Page 205

1  polls by outside organizations?  Could there be multiple

2  individuals in the car that do not have a pre-existing close

3  relationship?

4    A   From my experience, it's usually been senior citizens

5  and they all know each other, they all gather daily, they know

6  [sic] one another for many years.

7    Q   Do you think Senator Hughes was genuine in his concern

8  over the lack of privacy in drive-through voting?

9    A   I don't know.

10       COURT REPORTER:  So to clarify the record, the

11  last clip that you played, was that Exhibit 44?

12       MS. HUNKER:  Yes.

13       COURT REPORTER:  Okay.

14       MS. HUNKER:  And this one will be Exhibit 45.

15       COURT REPORTER:  Gotcha.  Okay.

16       (Video playing.)

17  BY MS. HUNKER (resuming):

18    Q   Did you hear that clip?

19    A   Yes.

20    Q   And was this from your filibuster for Senate Bill 1?

21    A   Yes.

22    Q   And I'll repeat the numbers since I know it went

23  pretty quick.

24    A   Uh-huh.

25    Q   You put down for 24-hour voting it was used by -- 33



Carol Alvarado

October 06, 2022
Pages 206 to 209

Page 206

1 -- 36 percent were Hispanic, 12 percent were African-American, 8
2 percent Asian; and for drive-through voting, you stated 23
3 percent were Hispanic, 22 percent were African-American and 8
4 percent were Asian.
5    A    Uh-huh.
6    Q    My first question for you is where you got the
7 numbers.
8    A    From Harris County.
9    Q    And so this was from Harris County itself?
10    A    Uh-huh.
11    Q    And do you know how Harris County determined the race
12 of the individual who --
13    A    I don't.
14    Q    And so you don't know if they obtained the numbers
15 through an outside source; is that correct?
16    A    I don't know.
17    Q    And you don't know the methodology that was used to
18 determine the numbers; is that correct?
19    A    I don't know.
20    Q    Okay.  Harris County is a minority-majority
21 district --
22    A    Right.
23    Q    -- county; correct?
24    A    Yes.
25    Q    Now, you have stated that 24-hour voting and

Page 207

1 drive-through voting, that elimination of these practices would
2 have a disproportionate effect on minorities; is that correct?
3    A    The disabled and seniors.
4    Q    Okay.  And were these numbers the basis for that
5 determination?
6    A    Somewhat, to some extent.
7    Q    And what was the other basis?
8    A    Just hearing about -- knowing the people who had used
9 either one.
10    Q    Okay.  And did you have an -- because Harris County
11 was the only county to do drive-through --
12    A    Uh-huh.
13    Q    -- and 24-hour voting, you did not have the
14 opportunity to compare Harris County's numbers with a majority
15 White county --
16    A    Right.
17    Q    -- exercising the same programs --
18    A    Right.
19    Q    -- is that correct?
20    A    Right.
21    Q    So I want to introduce Exhibit Number 47 --
22          COURT REPORTER:  46.
23 BY MS. HUNKER (resuming):
24    Q    -- 46, and do you see on top where it says, United
25 States Census Bureau?

Page 208

1    A    Yes.
2    Q    And that this is quick facts from Harris County,
3 Texas?
4    A    Yes.
5    Q    And so I want to look at the percentages for Black or
6 African-American alone, which is 20.3 percent.  You can see it's
7 darkened.
8    A    Yes.
9    Q    Okay.  And then two lines down, it says, Asian alone,
10 7.4 percent, and then Hispanic or Latino is 44.4 percent; is
11 that correct?
12    A    Yes.
13    Q    And so let's add that together.
14          MR. GOLANDO:  These are population numbers?
15          MS. HUNKER:  That's correct.
16          THE WITNESS:  Not voting; right?
17          MS. HUNKER:  That's correct.  I'm doing the
18 numbers that were provided to me by the US Census.
19 BY MS. HUNKER (resuming)
20    Q    Now, when I added the numbers together, I got 72.1
21 percent.  Is that what you got?
22    A    Yes.
23    Q    Okay.  And if we add the numbers of those who utilized
24 24-hour voting --
25    A    Uh-huh.

Page 209

1    Q    -- the 36 percent, the 12 percent and the 8 percent --
2    A    Right.
3    Q    -- we have 56 percent --
4    A    Right.
5    Q    -- is that correct?
6    A    Yes.
7    Q    And 56 is less than 72.1; correct?
8    A    Right.
9    Q    And so minority voters used 24-hour voting at a rate
10 that was less than their representation in the population of
11 Harris County; is that correct?
12    A    Yes.
13    Q    And if we go through drive-through voting and we add
14 the 23 percent, 22 percent and 8 percent, we get 53 percent; is
15 that correct?
16    A    Right.
17    Q    And 53 percent is less than 72.1 percent; correct?
18    A    Yes.
19    Q    So based on these numbers, minority voters utilized
20 drive-through voting at a rate that was less than the
21 representation of the population; is that correct?
22    A    Yes.
23    Q    What --
24    A    And we did make clear that these are -- these are just
25 straight-up population numbers --



Carol Alvarado

October 06, 2022
Pages 210 to 213

Page 210

1  Q   That's correct.
2  A   -- not registered voters.
3  Q   And so the number, based on the process of
4  elimination, about 44 percent of individuals who utilized
5  24-hour voting would have been -- 44 percent White alone; is
6  that correct?
7  A   On which one?  I'm sorry.
8  Q   So by process of elimination --
9  A   Uh-huh.
10 Q   -- since 56 percent of minorities utilized 24-hour
11 voting --
12 A   Right.
13 Q   -- it goes to say that 44 percent would have been
14 White; is that correct?
15 A   Yes.
16 Q   And then for drive-through voting, Whites would have
17 utilized drive-through voting at 47 percent; correct?
18 A   Yes.
19 Q   And so if we look at where it says, White alone, not
20 Hispanic/Latino, on the US Census Bureau facts, it says 27.7
21 percent; correct?
22 A   Yes.
23 Q   And so White voters utilized 24-hour voting at a rate
24 that was higher than the representation of the population in
25 Harris County; correct?

Page 211

1  A   Yes.
2  Q   And White voters utilized drive-through voting at a rate
3  that was higher than their percentage in the population in Harris
4  County; correct?
5  A   Yes.
6  Q   We can put that document aside.
7  A   Okay.
8  Q   Now, I believe you had mentioned also that the actions
9  taken by Chris Hollins to introduce drive-through voting,
10 24-hour voting as well as the multiple ballot delivery locations
11 had led to Harris County having a higher voter turnout; is that
12 correct?
13 A   I don't know if I said it quite like that, but Harris
14 County did have record-breaking turnout.
15 Q   Okay.  And do you escribe the record-breaking turnout
16 to any of the voting practices such as 24-hour voting,
17 drive-through voting and multiple in-person delivery locations?
18 A   Possibly.  It was a high-profile election.
19 Q   Okay.  And so you don't know whether or not 24-hour
20 voting contributed to Harris County having record-breaking
21 numbers; is that correct?
22        MR. GOLANDO:  Objection to form.
23 BY THE WITNESS (resuming):
24 A   I don't know.  It could have.
25 Q   So you don't know one way or the other whether 24-hour

Page 212

1  voting would have contributed to Harris County having
2  record-breaking turnout.
3        MR. GOLANDO:  Objection to form.
4  BY THE WITNESS (resuming):
5  A   Say that again.
6  Q   You don't know one way or the other whether 24-hour
7  voting would have contributed to Harris County having
8  record-breaking turnout?
9  A   It -- it could have.
10 Q   And you don't know one way or the other whether
11 drive-through voting would have contributed to Harris County
12 having record-breaking voter turnout.
13 A   Same thing, it could have.
14 Q   So I want to look at a few documents.
15        MS. HUNKER:  (Provides exhibit.)
16        MR. GOLANDO:  Thank you.
17 BY MS. HUNKER (resuming):
18 Q   Do you have the document in front of you?
19 A   Yes.
20 Q   Okay.  And you see where it says Harris County Voter
21 Registration Figures; correct?
22 A   Yes.
23 Q   And then there's also the percent who voted.  Do you
24 see that?
25 A   Uh-huh.

Page 213

1  Q   Let's turn the page where it has the 2020 election --
2  A   (Complies with request.)
3  Q   -- and it has the percent of registered voters who
4  voted at 68.86 percent; correct?
5  A   Say that number again.
6  Q   I misread the number.
7  A   Uh-huh.
8  Q   It had the percent voted in the 2020 election at 65.86
9  percent?
10 A   Yes.
11 Q   And that is of registered voters; correct?
12 A   Yes.
13 Q   And so let's look at a few adjacent counties.  And
14 before I continue, I should have more established the documents.
15 Do you see where it says, Texas Secretary of State John B.
16 Scott?
17 A   Yes.
18 Q   And would you agree with me that this is a copy of a
19 website on the secretary of state's webpage?
20 A   Yes.
21 Q   Okay.  And that was true also of Harris County's
22 numbers; correct?
23 A   Yes.
24 Q   And so let's look at the percent voted in 2020 from
25 Fort Bend County.  And we see that in Fort Bend, the number --



Page 214

1 the percentage of registered voters who voted was 73.99 percent;
2 correct?
3    A    Yes.
4    Q    And that's higher than Harris County; correct?
5    A    Yes.
6    Q    And let's look at -- next what I have, which is from
7 Galveston County.  And you'd agree this was also taken from the
8 Texas Secretary of State's --
9    A    Yes.
10    Q    -- website; correct?
11    A    Yes.
12    Q    And if we look at the percent of registered voters who
13 voted in 2020, we have 67.33 percent; correct?
14    A    Yes.
15    Q    And that's higher than Harris County; correct?
16    A    Yes.
17    Q    And we're going to look at -- next county on the
18 list that I have is Montgomery County.
19    A    Okay.
20    Q    And Montgomery County is also from the -- taken from
21 the secretary of state's webpage; correct?
22    A    Yes.
23    Q    And the percent of voters -- registered voters who
24 voted in the 2020 election was 73.28 percent; correct?
25    A    Uh-huh, yes.

Page 215

1    Q    And that is also higher than Harris County; correct?
2    A    Yes.
3    Q    Montgomery County, Fort Bend County and Galveston
4 County, they border Harris County, do they not?
5    A    Right.
6    Q    And so bordering counties to Harris County had a
7 higher percentage of voter turnout; correct?
8    A    Yes.
9    Q    And those counties did not have the same voting
10 practices such as 24-hour voting, drive-through voting or
11 multiple in-person delivery locations; is that correct?
12    A    Yes.
13    Q    And so these counties have higher voter turnout
14 without utilizing those practices; is that correct?
15    A    Yes.
16    Q    And so let's also do a little bit of comparison in
17 terms of the percentage of increase between 2018 and 2020.
18 For Harris County?
19    Q    For Harris County, yes.
20    A    Okay.
21    Q    And so I have that as an increase of 13.86 percent.
22    A    Okay.  I'm sorry.  Between 20 --
23    Q    2018 and 2020.  So it's the difference between 52
24 percent and 65.86 percent.
25    A    Okay.  All right.

Page 216

1    Q    And I have that as 13.86 percent.
2    A    Okay.
3    Q    And if we look at Montgomery County --
4    A    Okay.
5    Q    -- the difference between 2018 and 2020 is a
6 difference of 14.28 percent.
7    A    Okay.
8    Q    And then Fort Bend County, we see a difference of
9 13.99 percent.
10    A    Okay.
11    Q    Now, these numbers are either larger or comparable to
12 the increase seen in Harris County; correct?
13    A    Yes.
14    Q    And these counties, again, did not utilize the same
15 innovative voting practices as Harris County such as
16 drive-through voting, 24-hour voting or multiple in-person
17 delivery locations; is that correct?
18    A    Yes.
19    Q    And so they had similar increases, if not greater
20 increases, between 2018 and 2020 with respect to voter turnout
21 despite not having the innovative practices such as
22 drive-through voting, 24-hour voting and multiple in-person
23 delivery locations; is that correct?
24    A    Yes.
25    Q    And we can put these documents aside.

Page 217

1    A    (Complies with request.)
2    Q    Do you think that the State has an interest in
3 promoting uniformity in the interpretation, application and
4 operation of the election code?
5    A    Possibly.
6    Q    So I want to turn to another Senate Journal entry, and
7 I'm going to introduce that as an exhibit.  This is a different
8 Senate Journal --
9        MS. HUNKER:  (Provides exhibit.)
10        MR. GOLANDO:  Thank you.
11 BY MS. HUNKER (resuming):
12    Q    -- than the one we've been utilizing.  Do you have the
13 document in front of you?
14    A    Yes.
15    Q    And do you see where it says, Senate Journal, 87th
16 Legislature, Second-called Special Session?
17    A    Yes.
18    Q    And do you see where it says the date, Wednesday,
19 August 11th, 2021?
20    A    Yes.
21    Q    Okay.  And so if we turn to Page 83 -- and I will
22 again represent to you that only included the sections of the
23 journal that were relevant to our deposition today.
24    A    Okay.
25    Q    -- on the bottom of the page, you'll see where it



Carol Alvarado

October 06, 2022
Pages 218 to 221

Page 218

1 says, Committee Substitute, Senate Bill on the Third Reading.
2 Did I read that correctly?
3    A   Yes.
4    Q   And it says:  Senator Hughes moved to suspend the
5 regular order of business to take up for consideration CSSB1 at
6 this time on its third reading and final passage.  Did I read
7 that correctly?
8    A   Yes.
9    Q   And so CSSB1 stands for Committee Substitute Senate
10 Bill 1; correct?
11   A   Yes.
12   Q   And this would have been the version that passed the
13 Senate; is that correct?
14   A   Yes.
15   Q   Now, if you look, it says:  Relating to election
16 integrity and security, including by preventing fraud in the
17 conduct of elections in the state, increasing criminal
18 penalties, creating criminal offenses, providing civil
19 penalties.  The motion prevailed by the following vote:  Yeas,
20 18; Nays, 21.  Did I read that correctly?
21   A   Yes.
22   Q   And so if we jump a little bit further down, it says:
23 Question:  Shall Senate Bill 1 be finally passed?  And it says:
24 The bill was read a third time and was passed by the following:
25 18 yeas, 11 nays, same as previous rollcall.  Did I read that

Page 219

1 correctly?
2    A   Yes.
3    Q   Okay.  And so let's look at the previous rollcall vote
4 for who voted in favor of Senate Bill 1 as it was passed by the
5 Senate.  Do you see where it says the yeas and the nays?
6    A   Yes.
7    Q   Okay.  And so I am going to ask you if you could
8 identify by circling in red pen who you think voted yes with the
9 intent to discriminate against Texas voters of color.
10   A   Yeah, I -- I don't know.  I'm not going to do that.
11   Q   Okay.  Do you know if any of the individuals who voted
12 in favor of Senate Bill 1 had an intent to discriminate against
13 minority voters?
14   A   Well, I think the -- the author.
15   Q   So you think Senator Hughes had an intent to
16 discriminate against minority voters.
17   A   Yes.
18   Q   And what is the basis for this conclusion?
19   A   Well, for starters, tackling the drive-through voting,
20 the 24-hour voting, the -- the identification-matching issue.
21 I'd say those are a couple of them.
22   Q   Okay.  And so is it the provisions themselves that you
23 think are evidence of the discriminatory intent of
24 Senator Hughes?
25   A   Yes.

Page 220

1    Q   Okay.  Did you talk to Senator Hughes and
2 Senator Hughes ever state that he had a discriminatory purpose?
3    A   No, no, he did not say that.
4    Q   And did you have any conversations with him that you
5 thought his discriminatory purpose was implied outside of the
6 provisions themselves?
7    A   I don't recall.
8    Q   Okay.  Let me state it a little differently --
9    A   Okay.
10   Q   -- and see if that -- if this is a little bit easier
11 to understand:  Did, at any point, Senator Hughes say something
12 that you thought was indicative of an intent to discriminate?
13   A   Well, maybe it wasn't what he said, but what was --
14 for example, in the -- you know, the original bill when I was
15 pointing out the early-voting locations that there was -- I
16 thought it was flawed in the polling -- the number of polling
17 locations in the minority-member districts versus the others, we
18 had a lengthy discussion on that.
19   Q   And Senator Hughes did ultimately remove that
20 provision; is that correct?
21   A   Eventually.
22   Q   Now, did anything in your conversations with
23 Senator Hughes seem to indicate that he was uninformed as
24 opposed to have a discriminatory intent?
25   A   Say that again.

Page 221

1    Q   Was there anything in your conversation --
2    A   Uh-huh.
3    Q   -- with Senator Hughes that indicated he was simply
4 uninformed as opposed to having a discriminatory intent?
5    A   I don't recall.
6    Q   And so was there anything else besides the provisions
7 themselves that you thought was evidence of discriminatory
8 intent?
9    A   Well, I felt like those of us that were raising the
10 issues, mainly the members of color, myself and other Latino
11 legislators or African-American legislators, I felt like our
12 concerns weren't being heard or received or taken seriously.
13   Q   Okay.  Who ignored you and other minority members of
14 the Texas Senate?
15   A   Well, I -- I just said I think that the author did,
16 yeah.
17   Q   And we had talked about very early during the
18 deposition about some of the changes that were made in response
19 to your concerns and some of the concerns --
20   A   Okay.
21   Q   -- raised by the Texas Senate Democratic Caucus.
22 Senator Hughes was responsive to those concerns eventually, was
23 he not?
24   A   Well, it -- it didn't happen right away.  I felt like
25 we had to repeat over and over our concerns.



Carol Alvarado

October 06, 2022
Pages 222 to 225

Page 222

1  Q  So is it fair to say that your frustration was with
2  the amount of time it took to persuade Senator Hughes to make
3  the changes?
4        MR. GOLANDO:  Objection, form.
5  BY THE WITNESS (resuming):
6    A  I -- I don't know if it was just that.  It just seemed
7  like we had to do a lot of explaining for the issues that we
8  felt would disproportionately give challenges to Latinos,
9  African-Americans, the disabled, senior citizens.
10   Q  Did you think you did not have to explain the position
11 before Senator Hughes should be -- should accept your concerns
12 and objections?
13       MR. GOLANDO:  Objection, form.
14 BY THE WITNESS (resuming):
15   A  I don't understand your question.
16   Q  Sure.  Did you think he should have just accepted your
17 proposals or objections without an explanation?
18   A  Well, I'm not saying that.  It just -- it took
19 multiple times.  Sometimes we would say the same thing over and
20 over, sometimes it would -- it could be conversations in
21 private, meaning in caucus, or sometimes on -- on the Floor, but
22 it seemed like -- if -- just looking at the amendments that were
23 adopted, the number of amendments adopted by Latinos or
24 African-American senators versus amendments adopted by
25 non-minority members.

Page 223

1    Q  And you agree the majority of the amendments that were
2  adopted were adopted from the majority party; correct,
3  Republicans?
4    A  It -- yes.
5    Q  Are there any Latino senators in the Republican caucus
6  in the Senate?
7    A  No, not right now.
8    Q  And do you have any evidence that the reason the
9  amendments were not accepted were because of the racial identity
10 of the amendment author as opposed to the party of the amendment
11 author?
12   A  I -- I don't know.
13   Q  And do you have any evidence that the reason why an
14 amendment was rejected was because of the race of the person who
15 proposed the amendment as opposed to the content of the actual
16 amendment?
17   A  I'm not advised.
18   Q  Okay.  Do you have any evidence on whether the
19 amendments were rejected because of the racial identity of the
20 author as compared to procedural concerns such as not raising
21 the amendment with the bill author prior to the amendment's
22 proposal?
23   A  What -- say that last part again.  I'm sorry.
24   Q  Sure.  Do you have any evidence that the amendments
25 were rejected because of the racial identity of the amendment

Page 224

1  author as compared to other procedural concerns, such as not
2  bringing the amendment to the bill author's attention prior to
3  proposing the amendment?
4    A  Well, that last part, that's not a rule or part of
5  procedure.  I mean, sometimes it's just a courtesy.
6    Q  And so let me rephrase the question, then:  Do you
7  have any evidence that amendments were rejected because of the
8  amendment author's racial identity as compared to the author of
9  the amendment not following courtesies such as bringing the
10 amendment to the bill author's attention prior to proposing the
11 amendment?
12   A  Well, I -- what I know is that myself, other Latino
13 senators, African-American senators tried to make points,
14 amendments that addressed our concerns for our communities --
15 African-American, Latino communities -- that just seemed to fall
16 by the wayside.  They were ignored.
17   Q  Then let's put this aside, and I want to go to the
18 next Senate Journal that I'm introducing.
19       MS. HUNKER:  (Provides exhibit.)
20       MR. GOLANDO:  Thank you.
21       COURT REPORTER:  (Provides exhibit.)
22       THE WITNESS:  Thank you.
23 BY MS. HUNKER (resuming):
24   Q  And do you see that this says Senate Journal on top
25 and it's dated Tuesday, August 31st, 2021?

Page 225

1    A  Yes.
2    Q  And so this would have been when -- well, actually,
3  let's turn to the next page.  The next page reads:  The
4  conference committee report on Senate Bill 1 adopted; correct?
5    A  Yes.
6    Q  And so this is when the Texas Senate is considering
7  the adoption of the conference committee report; correct?
8    A  Yes.
9    Q  And the conference committee report is the
10 reconciliation of the Senate version and the House version
11 together; correct?
12   A  Yes.
13   Q  And were you on the conference committee?
14   A  No.
15   Q  Do you know who was on the conference committee?
16   A  I don't recall.
17   Q  Okay.  Did you talk to any of the individuals on the
18 conference committee?
19   A  I don't recall.
20   Q  Okay.  Do you recall if you talked to anybody about
21 what occurred during the conference committee to reconcile the
22 two versions?
23   A  On Senate Bill 1; right?
24   Q  Yes, that's correct.
25   A  I don't --



Carol Alvarado

October 06, 2022
Pages 226 to 229

Page 226

1    Q    Okay.
2    A    -- recall.
3    Q    And so if we look further down, it says:  On motion of
4    Senator Hughes, the conference committee report was adopted, 18
5    yeas, 13 nays.  Do I -- did I read that correctly?
6    A    Yes.
7    Q    And I'm going to ask you the same question that I
8    asked before, which is:  Could you identify an individual that
9    you believe voted in favor of Senate Bill 1's conference
10   committee report due to the intent to racially discriminate?
11   A    I don't know.  I mean, aside from the author, like I
12   said earlier, I -- I don't know.
13   Q    Okay.  So to clarify, the only individual that you are
14   claiming had a discriminatory intent is the bill author,
15   Senator Hughes; is that correct?
16   A    Right, because it --
17          MR. GOLANDO:  Objection, form.
18   BY THE WITNESS (resuming):
19   A    And I say that because it was his bill.
20   Q    Okay.  And you are not alleging race discrimination
21   against any other Senate member; is that correct?
22          MR. GOLANDO:  Objection, form.
23   BY THE WITNESS (resuming):
24   A    I can't say.
25   Q    Okay.  And you're not alleging that any of the other

Page 227

1    senators voted in favor of the conference committee report for
2    Senate Bill 1 on account of the racial -- the impact it would
3    have on racial minorities.
4    A    I -- I can't say.
5    Q    Okay.  Now, we have discussed at length your reasons
6    for believing that Senator Hughes had a discriminatory intent.
7    Are there any additional reasons that you think apply with
8    respect to the conference committee report that did not apply
9    with the version that passed the Senate the first round?
10   A    No.  My answer would be the same.
11   Q    Okay.  And do you think that there are any
12   improvements that would alleviate your concerns about
13   Senator Hughes, considering the differences between the House --
14   sorry -- the Senate version and the conference committee
15   version?
16   A    I don't know.
17   Q    Okay.  How do you define voter suppression?
18   A    Things that make it more difficult for people to vote.
19   Q    And so is it any restriction on voting that would be
20   considered voter suppression?
21   A    Meaning this bill or --
22   Q    No, in general.
23   A    Creating more -- more bureaucracy, making more
24   requirements, limiting what the local county clerks can do.
25   Q    And so would you consider any restriction on voting to

Page 228

1    be voter suppression?
2    A    I'm sorry.
3    Q    Would you consider any restriction on voting to be
4    voter restriction?
5          MR. GOLANDO:  Objection, form.
6    BY THE WITNESS (resuming):
7    A    It depends what it is.
8    Q    Okay.  If a county introduces a practice --
9    A    Uh-huh.
10   Q    -- and then determines that it's too expensive and
11   withdraws the practice, would that be considered voter
12   restriction?
13          MR. GOLANDO:  Objection, form.
14   BY THE WITNESS (resuming):
15   A    It depends on what it is.  You'd have to be specific.
16   Q    Okay.  And let's be a little bit more specific.
17   A    Uh-huh.
18   Q    Let's talk about drive-through voting.
19   A    Okay.
20   Q    Let's say Harris County introduced drive-through
21   voting --
22   A    Uh-huh.
23   Q    -- and the state determined that it was too expensive
24   and decided not to allow drive-through voting --
25          MR. GOLANDO:  You said --

Page 229

1    BY MS. HUNKER (resuming):
2    Q    -- would that be considered --
3          MR. GOLANDO:  You said the state.
4    BY THE WITNESS (resuming):
5    A    The state?
6    Q    Sorry.  I meant to say the county.
7    A    Yeah, okay.
8          MR. GOLANDO:  Objection, form; speculation.
9    BY THE WITNESS (resuming):
10   A    Yeah, I -- I don't know.
11   Q    Okay.  And so you had said that it would depend on the
12   circumstances of whether or not something is voter suppression
13   -- a restriction is voter suppression.  What type of
14   circumstances would that be?
15   A    I was answering your question.
16   Q    Yes, but I'm just curious.
17   A    Okay.
18   Q    In what type of circumstances would it be voter
19   suppression?
20   A    Well, I think the attempt to discontinue the 24-hour
21   voting, the drive-through voting, the -- the -- the ID-matching
22   requirement.
23   Q    So if a county introduces a voting practice such as
24   drive-through voting --
25   A    Uh-huh.



Carol Alvarado

October 06, 2022
Pages 230 to 233

Page 230

1  Q  -- would it never be permitted to take away that
2  practice?
3       MR. GOLANDO:  Objection, form.
4  BY THE WITNESS (resuming):
5  A  I -- I don't know.
6  Q  Okay.  Is the requirement to register to vote voter
7  suppression?
8       MR. GOLANDO:  Objection, form.
9  BY THE WITNESS (resuming):
10  A  I -- I can't say.
11  Q  Is Texas' failure to have online voter registration
12  voter suppression?
13       MR. GOLANDO:  Same objection.
14  BY THE WITNESS (resuming):
15  A  It could be.
16  Q  Is Texas' requirement that voting by mail be limited
17  to the four categories we discussed earlier be considered voter
18  suppression?
19       MR. GOLANDO:  Same objection.
20  BY THE WITNESS (resuming):
21  A  I can't say.
22  Q  You can put these documents aside.
23       THE WITNESS:  (Provides exhibit to counsel.)
24       MR. GOLANDO:  Thank you kindly.
25       The WITNESS:  Uh-huh.

Page 231

1  BY MS. HUNKER (resuming):
2  Q  One last journal for you.
3       MS. HUNKER:  (Provides exhibit.)
4       MR. GOLANDO:  Thank you, ma'am.
5       COURT REPORTER:  Sorry.
6       THE WITNESS:  That's fine.
7       COURT REPORTER:  I was doing so good all day.
8  (Provides exhibit to witness.)
9       MR. GOLANDO:  This is the House Journal?
10       MS. HUNKER:  Yes.
11       MR. GOLANDO:  Okay.
12  BY MS. HUNKER (resuming):
13  Q  Do you see on top where it says House Journal?
14  A  Yes.
15  Q  And it says, 87th Legislature, Second-called Session.
16  A  Yes.
17  Q  Then it says Friday, August 27th, 2021?
18  A  Yes.
19  Q  And if we turn over the page, it says, SB1 on Third
20  Reading.
21  A  Yes.
22  Q  Did you have any conversations with House members
23  regarding Senate Bill 1?
24  A  In this session?
25  Q  Yes.

Page 232

1  A  I don't recall.  I don't know.
2  Q  Okay.  And if you see, it says, SB1 was passed:  80
3  yeas, 41 nays, 1 present not voting.  Did I read that correctly?
4  A  Yes.
5  Q  And then it lists the names of the individuals who
6  voted in favor and those who voted against; correct?
7  A  Correct.
8  Q  Can you please tell me of the names who voted in favor
9  who you think or have evidence to believe voted in favor of
10  Senate Bill 1 with an intentional discriminatory intent?
11  A  I can't say.
12  Q  And so you're not aware of any House member who would
13  have voted in favor of Senate Bill 1 because of a racial -- a
14  desire to racially discriminate; is that correct?
15       MR. GOLANDO:  Objection, form, legal conclusion.
16  BY THE WITNESS (resuming):
17  A  I can't answer that.  I don't know.
18  Q  You don't have any evidence to support that any of the
19  individuals who voted in favor of Senate Bill 1 in the House
20  voted with the intent to racially discriminate --
21       MR. GOLANDO:  Objection, form.
22  BY MS. HUNKER (resuming):
23  Q  -- is that correct?
24       MR. GOLANDO:  Sorry.  Objection, form.
25  BY THE WITNESS (resuming):

Page 233

1  A  Yeah, I'm not in that chamber.  I don't -- I don't
2  know.
3  Q  Okay.  We can put that aside.
4  A  Uh-huh.
5  Q  Were you aware that Senate Bill 1 allows voters to
6  vote if they are in line when polls close during early-voting
7  period?
8  A  Yeah.
9  Q  Are you aware that that was added by Senate Bill 1 and
10  did not pre-exist it with respect to early voting?
11  A  Yes.
12  Q  And were you aware that Senate Bill 1 expands
13  protection for voters against employer penalties during the
14  early-voting period?
15  A  I wasn't aware of that part.
16  Q  Let's quickly look then at page -- Section 702 [sic]
17  of Senate Bill 1.
18       MR. GOLANDO:  What page is that?
19  BY THE WITNESS (resuming):
20  A  What page did you say?
21  Q  Section 7.02.  It's going to be on Page 57.
22  A  Okay.
23  Q  Okay.  And it says:  This Section 7.02, which amends
24  Sections 276.004(a) and (b) of the election code --
25  A  Uh-huh.



Carol Alvarado

October 06, 2022
Pages 234 to 237

Page 234

1 Q -- and if you see A, which already existed: A person
2 commits an offense if, with respect to another person over whom
3 the person has authority in the scope of employment, the person
4 knowingly refuses or permit the other person to be absent from
5 work election day. And then Senate bill 1 adds: Or while early
6 voting is in progress for the purpose of attending the polls to
7 vote. Did I read that correctly?
8 A Yes.
9 Q It also says that the person would be committing an
10 offense if they knowingly -- subjects, threatens to subject the
11 other person to a penalty for attending the polls on election
12 day or -- or while early voting is in progress to vote, and
13 Senate Bill 1 added, Or while early voting is in progress. Did
14 I read that correctly?
15 A Yes.
16 Q Okay. And so would you agree with me that here,
17 Senate Bill 1 extended protections to workers to take time to
18 vote during the early-voting period?
19 A Possibly, yes, yes.
20 Q Is that a yes?
21 A Yes.
22 Q Okay. Also, since we're getting towards the end of
23 the deposition, I was hoping that we can now introduce your
24 notes --
25 A Sure.

Page 235

1 Q -- as an exhibit.
2     MS. HUNKER: And that would be Exhibit 54, I
3 believe.
4     COURT REPORTER: (Affirmative response.)
5     MS. HUNKER: Thank you very much.
6     THE WITNESS: Uh-huh.
7     MS. HUNKER: With that, can we take a quick
8 five-minute break so at that I can look over my notes?
9     THE WITNESS: Okay.
10     MR. GOLANDO: Yes.
11     THE WITNESS: I don't have a copy of my --
12     VIDEOGRAPHER: Off the record at 5:17.
13     (A recess is taken.)
14     VIDEOGRAPHER: Back on the record at 5:25.
15 BY MS. HUNKER (resuming):
16 Q Senator Alvarado, you would agree with me that
17 Senator Hughes alone could not pass Senate Bill 1; correct?
18 A What do you mean, he alone?
19 Q You'd agree that his vote alone was not sufficient to
20 enact Senate Bill 1.
21 A Right, the rules would not allow that.
22     THE WITNESS: She's trying to come in. Can y'all
23 let her in? Okay.
24 BY MS. HUNKER (resuming):
25 Q And lastly, did you look at any data or reports

Page 236

1 following the 2022 March primary?
2 A In regards to what?
3 Q In regards to the effect that SB1 would have had on
4 voters.
5 A No.
6 Q Okay. And did you look at any data or reports
7 following the primary runoff regarding the impact Senate Bill 1
8 would have had on voters?
9 A No.
10 Q And did you look at any reports or data following the
11 May local election on the impact that Senate Bill 1 would have
12 had on voters?
13 A No.
14 Q Did you look at any reports or data that showed the
15 impact Senate Bill would have -- 1 would have had on racial
16 minorities?
17 A No, I have not.
18 Q And outside of the numbers you received from Harris
19 County, have you looked at any data or reports that assess the
20 likelihood of -- let me rephrase that. Outside of the data and
21 numbers you had received from Harris County, had you looked at
22 any other data or reports regarding the use of 24-hour voting,
23 drive-through voting or multiple in-person delivery locations by
24 racial minorities?
25 A No.

Page 237

1     MS. HUNKER: Then, with that, I pass the witness.
2     MR. GOLANDO: We have no questions, but I imagine
3 the folks online might.
4     MS. HUNKER: Does anybody online have questions
5 for the witness?
6     MR. ROBERTS: No questions from intervenor
7 defendants.
8     COURT REPORTER: And who are you?
9     MR. ROBERTS: This is Charles Roberts.
10     MS. HUNKER: All right. With the remaining
11 counsels' silence, I take that as there's no further questions.
12     THE WITNESS: Thank you.
13     MS. MEJIA: We'll reserve until trial.
14     COURT REPORTER: Who are you?
15     MS. MEJIA: Apologies. Roswill Mejia on behalf
16 of plaintiffs.
17     COURT REPORTER: Okay. Great. With that, before
18 we go off the record, I do want to do transcript requests. I
19 will start with the people on Zoom. Does anybody want to
20 request a copy of the deposition today?
21     MR. ROBERTS: I do.
22     COURT REPORTER: Okay. Now who are you?
23     MR. ROBERTS: This is Charles Roberts again from
24 the defendants. Cetroberts at Jones Day.com.
25     COURT REPORTER: Okay. Great. And then anyone



Carol Alvarado

October 06, 2022
Pages 238 to 241

Page 238

1 else?
2          MS. MEJIA:  We would also like a copy.  This is
3 Roswill Mejia on behalf of plaintiffs.
4          COURT REPORTER:  Okay.  Anyone else?  And then
5 standard order for Ms. Hunker.
6          MS. HUNKER:  That's correct, no need to rush.
7          MR. GOLANDO:  No money spent by me.
8          COURT REPORTER:  Read and sign?
9          MR. GOLANDO:  Yeah, that's fine.
10         COURT REPORTER:  Gotcha.
11         VIDEOGRAPHER:  Off the record at 5:29.
12
13
14
15
16
17
18
19
20
21
22
23
24
25          (Whereupon, the proceedings were concluded.)

Page 240

1              I, CAROL ALVARADO, have read the
2 foregoing deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5
6                   CAROL ALVARADO, Witness
7 THE STATE OF _____    )
8 COUNTY OF              )
9          Before me,                , on this day
10 personally appeared CAROL ALVARADO, known to me (or proved to
11 me under oath of through            ) (description of
12 identity card or other document) to be the person whose name is
13 subscribed to the foregoing instrument and acknowledged to me
14 that they executed the same for the purposes and consideration
15 therein expressed.
16          Given under my hand and seal of office this
17 day of                ,          .
18
19
20
21              NOTARY PUBLIC IN AND FOR
22              THE STATE OF
23
24
25

Page 239

1              CHANGES AND SIGNATURE
2 WITNESS NAME:  CAROL ALVARADO
3 DATE OF DEPO:  OCTOBER 6, 2022
4 PAGE    LINE    CHANGE          REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 241

1              IN THE UNITED STATES DISTRICT COURT
2              FOR THE WESTERN DISTRICT OF TEXAS
3                   AUSTIN DIVISION
   LA UNION DEL PUEBLO ENTERO,    )
   et. al.,                 )
                         )
       Plaintiffs,            )
                         )   CIVIL ACTION NO.
                         )   5:21-CV-00844-XR
   v.                    )
                         )
   GREGORY W. ABBOTT, et al.    )
   -----------------------------------------------------
13              REPORTER'S CERTIFICATE
14         ORAL & VIDEO DEPOSITION OF CAROL ALVARADO
15                OCTOBER 6, 2022
16    I, Patrick A. Stephens, Certified National Court Reporter,
17 hereby certify to the following:
18    That the witness, CAROL ALVARADO, was duly sworn and that
19 the transcript of the deposition is a true record of the
20 testimony given by the witness;
21    That pursuant to information given to the deposition
22 officer at the time said testimony was taken, the following
23 includes all parties of record and the amount of time used by
24 each party at the time of the deposition:
25



Carol Alvarado

October 06, 2022
Page 242

Page 242

Mr. Martin Golando (0 mins)

    Attorney for Carol Alvarado

Ms. Kathleen P. Hunker (5 hrs 44 mins)

    Attorney for Defendants

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

    Certified to by me on this 27th day of October, 2022.

        *

        *

        *

        *

        *

        *

        PATRICK A. STEPHENS

        NVRA NO. 5462

        Expiration: 06/01/2023

        Magna Legal Services

        Firm Registration No.633

        16414 San Pedro Ave.,

        Ste. 900

        San Antonio, TX  78232

