Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 5:21-cv-00844-XR
                                 )
GREGORY W. ABBOTT, et al.,       )
                                 )
          Defendants.            )

-----------------------------------------------------------------

ORAL & VIDEO DEPOSITION OF NICOLE COLLIER

January 30, 2023
-------------------------------------------------------

        Oral & video deposition of NICOLE COLLIER, produced as a

        witness at the instance of the defendants, and duly sworn,

        was taken in the above-styled and numbered cause on the

        30th day of January, 2023, before Patrick Stephens,

        Certified Court Reporter, at 209 W. 14th Street,

        Austin, Texas 78701.



Nicole Collier

January 30, 2023
Page 2

# A P P E A R A N C E S

ON BEHALF OF THE DEFENDANTS:

        KATHLEEN HUNKER, ESQ.

        J. AARON BARNES, ESQ.

        ETHAN SZUMANSKI, ESQ.

        Office of the Attorney General

        P.O. Box 12548

        Austin, Texas 78711

        Telephone:  (512) 463-4139

        kathleen.hunker@oag.texas.gov

        aaron.barnes@oag.texas.gov

ON BEHALF OF THE WITNESS:

        GARY L. BLEDSOE, ESQ.

        The Bledsoe Law Firm

        6633 E Hwy 290

        Suite 208

        Austin, Texas 78723

        Telephone:  (512) 322-9992

        gbledsoe@thebledsoelawfirm.com

VIDEOGRAPHER:

        Lauren Morris, Magna Legal Services

        laurenmorrisplg@yahoo.com

ALSO PRESENT VIA ZOOM:

        Lisa V. Cubriel, Bexar County DA's Office

        Ari Herbert, Texas AG's Office

        Jennifer Holmes, NAACP LDF, HAUL Plaintiffs

        Uruj Sheikh, NAACP

        John Cheretis, Jones Day

        Tony Nelson, Travis County Civil Litigation Division

        Wendy Olson, Mi Familia Vota Plaintiffs

        Victoria Giese, Butler Snow, Harris Co. DA's Office



```
 1                        I N D E X

 2   APPEARANCES ........................................... 04

 3   NICOLE COLLIER

 4          Cross-Examination by Ms. Hunker ................ 05

 5

 6

 7

 8   Reporter's Certificate ............................... 262

 9

10

11                       E X H I B I T S

12

13   NO.        DESCRIPTION                                 PAGE

14   1          Deposition Notice                           12

15   2          Collier Biography                           17

16   3          Letter                                      31

17   4          Petition                                    38

18   5          9/30/20 Petition                            43

19   6          Harris Co. Website                          ???

20   7          Paxton Letter                               62

21   8          Opinion (State)                             66

22   9          Opinion (Federal)                           73

23   10         ???                                         76

24   11         Harris Co. Voter Reg. Figures               91

25   12         Tarrant Co. Voter Reg. Figures              96
```



1                  E X H I B I T S (Cont.)

2

3  NO.        DESCRIPTION                                  PAGE

4  13         TLO Website                                   109

5  14         Transcript                                    116

6  15         Senate Bill 7 (Engrossed)                     133

7  16         Senate Bill 1 (Enrolled)                      134

8  17         House Journal                                 153

9  18         Article                                       166

10 19         Congress Memorandum                           170

11 20         Collier Written Testimony                     172

12 21         Transcript                                    182

13 22         Texas Democrat Website                        211

14 23         2/4/22 Election Advisory                      225

15 24         House Journal                                 232

16 25         TX AG Fraud Results                           240

17 26         News Article (Tarrant)                        246

18 27         News Article (Denton)                         249

19

20

21

22

23

24

25



```
 1              P R O C E E D I N G S
 2              VIDEOGRAPHER:  Good afternoon.  Today is Monday,
 3   January 30th, 2023.  My name is Lauren Morris and I'm the
 4   videographer today for the deposition of Nicole Collier in
 5   Cause 21-CV-00844-XR.  The time is 2:07 p.m., and we are on the
 6   record.
 7              COURT REPORTER:  All right.  Ms. Collier, would
 8   you raise your hand -- right hand for me?
 9              THE WITNESS:  Yes.  (Complies with request.)
10              COURT REPORTER:  Do you solemnly swear or affirm
11   the testimony you'll give will be the truth, the whole truth
12   and nothing but the truth, so help you God?
13              THE WITNESS:  I do.
14              COURT REPORTER:  Okay.  Great.  You may take
15   over.
16        (Whereupon,
17                     NICOLE COLLIER
18        was called as a witness herein and, having first been
19        duly sworn, was examined and testifies as follows on:)
20                     CROSS-EXAMINATION
21   BY MS. HUNKER:
22        Q    Good afternoon, Representative.  How are you today?
23        A    All right.
24        Q    I wanted to thank you for driving all this way down,
25   especially with inclement weather.  We really appreciate it.
```



1    My name is Kathleen Hunker.  I am the attorney representing the

2    State defendants in this matter.  Can you please state and then

3    spell your name for the record?

4          A    Nicole, N-i-c-o-l-e; Collier, C-o-l-l-i-e-r.

5          Q    Representative, I believe you are an attorney; is

6    that correct?

7          A    Yes.

8          Q    And you work in private practice; is that right?

9          A    Yes.

10         Q    And how long have you practiced?

11         A    Let's see.  Since 2002.

12         Q    And I assume then you've participated in an untold

13   number of depositions; is that right?

14         A    Yes.

15         Q    So I assume you're familiar with how these

16   depositions work, but as a precaution, I am going to, for the

17   record, start with some instructions and an introductory

18   question.  After that, we'll move on to the main subject of the

19   deposition.  Okay?

20         A    All right.

21         Q    Have you ever been deposed before?

22         A    I don't think so.

23         Q    But you understand that you're under oath; correct?

24         A    Yes.

25         Q    For the court reporter, you'll need to provide verbal



 1  answers, like yes or no, rather than nodding or shaking your

 2  head.  This has extra importance here today because we have a

 3  number of attorneys who are going to participate remotely via

 4  Zoom and they may not be able to see you as clearly as us in

 5  the room with you.  Is that understood?

 6      A    Yes.

 7      Q    And it also helps the court reporter and other

 8  attorneys if we don't talk over each other.  I'll do my best to

 9  wait for you to finish your answers.  Will you do your best to

10  wait for me to finish my questions?

11      A    Yes.

12      Q    If you don't understand a question, will you please

13  let me know?

14      A    Yes.

15      Q    And if you do answer the question, I am going to

16  assume that you understood the question.  Is that fair?

17      A    Yes.

18      Q    If you need a break at any time, please just let me

19  know.  My only request is that you answer any pending question

20  before we take a break.  Is that okay?

21      A    Yes.

22      Q    Also, if you hear an objection from your counsel,

23  that is typically for the Court to decide at a later date.  I

24  therefore ask that you please go ahead and answer the question

25  unless you are instructed not to answer.  Is that okay?



1    A    Yes.

2    Q    Now, I'm obliged to ask the following questions:  Are

3 you aware of anything that would affect your ability to testify

4 truthfully today?

5    A    I have hot flashes.  I mean, not -- it's not going to

6 affect my ability to testify truthfully, but I may need to take

7 a break.

8    Q    Understood.  And we are happy to take those breaks as

9 needed.  Have you consumed any alcohol or drugs today?

10    A    No.

11    Q    And did you bring any documents with you today such

12 as notes?

13    A    No.

14    Q    And did you prepare for today's deposition at all?

15    A    No.

16    Q    So before we move on, I want to make sure we have a

17 complementary understanding of certain terms that will come up

18 in this deposition.  You understand that when I reference

19 Senate Bill 1, I am referring to the election omnibus bill

20 passed by the 87th Legislature in the Second Special Session.

21    A    Okay.

22    Q    Do you also understand that I may use the term Senate

23 Bill 1 or SB 1 interchangeably, but for both terms, I am

24 referring to that election omnibus bill passed by the 87th

25 Legislature in the Second Special Session?



```
 1        A      In the second -- okay.  Yes.

 2        Q      And you're aware that this lawsuit involves another

 3   -- a number of constitutional and statutory claims to SB 1?

 4        A      I have not read it, no.

 5        Q      And so you're not familiar with the claims that are

 6   being raised by the lawsuit; is that correct?

 7        A      Not all.  That's correct.

 8        Q      You also might hear me reference House Bill 6 and

 9   Senate Bill 7.  Are you aware that House Bill 6 and Senate

10   Bill 7 were two election bills considered by the 87th

11   Legislature during the regular session?

12        A      Yes.

13        Q      And you understand that when I use the phrase

14   House Bill 6 and Senate Bill 7, I'm referring to those two

15   bills passed during that session.

16        A      Yes.

17        Q      You understand that I might use the abbreviation HB 6

18   or SB 7; is that correct?

19        A      Yes.

20        Q      And you're aware that these two bills were

21   predecessor bills and that they laid the groundwork for what

22   ultimately became Senate Bill 1; is that correct?

23                  MR. BLEDSOE:  Object to the form of the

24   question.

25   BY THE WITNESS (resuming):
```



1    A    I'm not sure if they were the basis for the -- that

2 bill.

3    Q    Would you agree that provisions within HB 6 and SB 7

4 ultimately ended up in Senate Bill 1?

5              MR. BLEDSOE:  Object to the form of the

6 question.

7 BY THE WITNESS (resuming):

8    A    I -- I would -- if you say so, yes.  I -- I literally

9 don't remember that part.

10    Q    So you don't recall whether or not provisions within

11 HB 6 or Senate Bill 7 were incorporated later on into SB 1; is

12 that correct?

13    A    Well, I would say that there are some that were, but

14 I don't know exactly all of them.

15    Q    Okay.  If at any time you're confused about which

16 bill I'm referring, will you please let me know?

17    A    Yes.

18    Q    And I'm also going to clarify that today we're going

19 to be talking about elections prior to the general election in

20 2022, so I'm not going to be discussing or asking questions

21 about that specific election, but rather going up to about

22 August of 2022.

23    A    August of 2022.

24    Q    Yes.  Which is when we had originally tried to

25 schedule the deposition.



```
 1      A    Okay.
 2      Q    This is just to -- you understand that sort of
 3  limitation on the deposition that I'm going to be asking you.
 4      A    Yes.
 5      Q    And I'm going to introduce our first exhibit of the
 6  day.
 7               MR. BLEDSOE:  Is anyone appearing virtually, as
 8  in other lawyers in the case?
 9               MS. HUNKER:  Can any of the attorneys
10  participating remotely identify themselves?
11               MS. OLSON:  Wendy Olson on behalf of the
12  Mi Familia Vota plaintiffs.
13               MS. HUNKER:  Are there any other attorneys
14  representing the plaintiffs or defendants in this case
15  participating remotely?
16               MS. GIESE:  Yes, this is Victoria Giese with
17  Butler Snow on behalf of the Harris County District Attorney's
18  Office.
19               MS. HOLMES:  You also have Jennifer Holmes from
20  the NAACP Legal Defense Fund on behalf of the HAUL plaintiffs,
21  and my colleague, Uruj Sheikh, is also here.
22               MS. CUBRIEL:  Lisa Cubriel from the Bexar County
23  District Attorney's Office here on behalf of defendant
24  Jaquelyn Callanen.
25               MS. HUNKER:  Are there any other attorneys
```



 1  participating who have not announced themselves?  All right.

 2  Then I'm going to continue on with questions.

 3  BY MS. HUNKER (resuming):

 4      Q    Do you have the document before you?

 5      A    Exhibit 1, yes.

 6      Q    And do you see on the top where it has the caption,

 7  In The United States District Court for the Western District of

 8  Texas, San Antonio Division?

 9      A    Yes.

10      Q    And do you see it has the caption, La Union Del

11  Pueblo Entero v State of Texas?

12      A    Yes.

13      Q    And you see that there's a stamp on the top that

14  indicates that this was filed December 2nd, 2021.

15      A    Yes.

16      Q    And if you look at the title, the title reads:  LUPE,

17  OCA-Greater Houston, Houston Justice, LULAC and Mi Familia Vota

18  Plaintiffs' First Amended Rule 26(a)(1) Initial Disclosures.

19  Did I read that correctly?

20      A    Yes.

21      Q    And I want to turn to Page 26, which, because I've

22  crafted the document, will be the next page over.

23      A    (Complies with request.)

24      Q    Do you see where it says, C, computation of each

25  category of damages claimed by disclosing party, on top of the



 1  page?

 2      A    I read that, yes.

 3      Q    Okay.  And so now we're going to go to the next

 4  section down, which is Proposed Deponents.  Do you see that?

 5      A    Proposed Deponents, yes.

 6      Q    Okay.  It says:  Pursuant to this Court's

 7  instructions in the status conference held November 16th, 2021,

 8  the plaintiffs provide the following list in three tiers of

 9  proposed opponents.  Did I read that correctly?

10      A    Yes.

11      Q    And do you see it has Tier 1 with a list of names of

12  -- most of which are government officials, including

13  representatives and senators for the State of Texas?

14      A    Yes.

15      Q    And if we turn the page, do you see your name listed,

16  Representative Nicole Collier?

17      A    Yes.

18      Q    And then it says Chair of the Texas Legislative Black

19  Caucus; is that correct?

20      A    Yes.

21      Q    Were you aware that the private plaintiffs in this

22  case had listed you as a Tier 1 deponent in their initial

23  disclosures?

24      A    No.

25      Q    Do you understand that the State defendants have



1    called you here to be deposed in response to your being listed

2    as a Tier 1 deponent in the private plaintiffs' initial

3    disclosures?

4        A    Did you ask me if I understood that?

5        Q    Yes.

6        A    I -- I understand what you just told me, yes.

7        Q    We can put that aside.

8        A    Oh, okay.

9        Q    If you would tell me your educational history,

10   starting in college and working your way up to the present.

11       A    Sure.  I graduated from the University of Houston

12   with a bachelor's of science degree and then I went to law

13   school at the Texas Wesleyan University School of Law.

14       Q    And did you pursue any other degrees besides the two

15   that you just listed?

16       A    No -- well, I have a minor in sociology.

17       Q    And did you pursue any other professional course or

18   certification outside of your legal coursework?

19       A    Certification?  What do you mean?  Like --

20       Q    So you're barred with the State of Texas; is that

21   correct?

22       A    Yes.

23       Q    Do you have any other [sic] professional license or

24   certification that you received from Texas or another state?

25       A    I do not have another license.



1    Q    And we'll talk a little bit about your law practice

2  in a moment, but do you have any other paid employment while

3  you were a elected representative?

4    A    It's all legal work.

5    Q    And did you have any other paid employment since the

6  time you graduated law school outside of the legal profession?

7    A    Yes.  I want to say that we had, like, a basketball

8  camp -- my husband and I had a basketball camp that we did.

9    Q    And so outside of the basketball camp, the only other

10 paid employment you've had has been through the legal

11 profession since law school.  Is that fair to say?

12   A    Yes, it was all legal work.

13   Q    And then could you please describe to me your legal

14 experience from law school moving onwards?

15   A    Sure.  So when I came out of law school, I was on my

16 own and then I did general practice and then I got a job at a

17 law firm in Denton County, and we did personal injury and

18 Social Security disability, we did workers' comp law, and I

19 guess it was just about -- I mean, there was an attorney there

20 that did criminal law and I did backup for that.  Oh, well, let

21 me go back.  I did do a little bit of criminal when I first

22 started, but it was more like observing, learning a little bit

23 back then, and it was a federal -- in federal court.  And then

24 -- so that law firm, I stayed there maybe two years and then I

25 went to another firm in Dallas and I worked there for about



1  nine -- nine years, and we did personal injury, Social Security

2  disability and workers' comp and contract law, some real estate

3  law, kind of general practice as well, and then I opened up my

4  own law firm and ran for office.

5       Q    And have you ever practiced election cases?

6       A    No.

7       Q    And have you --

8       A    Oh, wait.  Well, no, it was a contract case that was

9  from an election case.

10      Q    And so outside of the contract case, did you have any

11 other cases that related to elections?

12      A    No.

13      Q    And have you done any voting-rights cases?

14      A    No.

15      Q    And to what extent are you familiar with

16 voting-rights law?

17           MR. BLEDSOE:  Object to the form.

18 BY THE WITNESS (resuming):

19      A    What do you mean familiar?  Like, can you explain

20 that?

21      Q    Sure.  So when you're considering legislation, have

22 you ever researched voting-rights law?

23      A    Oh, yes, we -- yes.

24      Q    Okay.  And so you've researched voting-rights law in

25 the course of your work as a legislator; is that right?



```
 1        A    Yes.

 2        Q    And how frequently do you have to do that type of

 3   research?

 4        A    I don't file bills -- that many bills that are

 5   related to election law, so it's not often.

 6        Q    I am going to introduce our second exhibit.  And just

 7   a quick question:  Are you still listed as a partner for

 8   West & Associates, LLP?

 9        A    Yes.  Oh, I'm so sorry.  I didn't finish -- yes, good

10   catch.  I'm so sorry.  I forgot about that, because you said my

11   current law firm, and my current law firm is West & Associates,

12   LLP.  So after I ran for office, opened up my own practice and

13   then I went with West & Associates, LLP, and I still have my

14   own law practice.

15        Q    So you have both your own law practice and --

16        A    Yes.

17        Q    -- an associated law firm.

18        A    Yes.  Sorry about that.

19        Q    It must keep you busy.

20        A    Oh, yeah.

21        Q    And is that law firm based out of Tarrant County?

22        A    They have a -- we have a Fort Worth office, yes.

23        Q    And so do you have the second exhibit in front of

24   you?

25        A    Yes.
```



1       Q    Okay.  And do you recognize it?

2       A    It looked -- I -- I've seen this before, yes.

3       Q    And this is the biography that is on your Texas House

4   Member website; is that correct?

5       A    Is it now?

6       Q    That's a good specification.  So you see on the top

7   corner where it says 87th Legislature?

8       A    Yes.

9       Q    Okay.  And then you see on the left corner it has a

10  date that this was printed, which was August 11th, 2022.

11      A    Okay.

12      Q    And so would you agree with me that this is a

13  printout of the biography on your Texas House Member website as

14  of August 11th, 2022?

15                  MR. BLEDSOE:  Objection to form.

16  BY THE WITNESS (resuming):

17      A    It appears to be.

18      Q    And so you are an elected member of the Texas House;

19  is that correct?

20      A    Yes.

21      Q    And you represent House District 95.

22      A    Yes.

23      Q    And where is House District 95?

24      A    In Tarrant County.

25      Q    And is it entirely within Tarrant County?



Nicole Collier

```
 1        A    Yes.

 2        Q    And does House District 95 cover the city of

 3   Fort Worth?

 4        A    It is in part, but yes.

 5        Q    And are there any other cities or municipalities that

 6   House District 95 covers?

 7        A    Yes.

 8        Q    And what district -- what cities and municipalities

 9   are those?

10        A    Everman, Forest Hill, there's a little bit of

11   Kennedale, Arlington, Crowley and Edgecliff Village.

12        Q    And how would you describe House District 95?  Is it

13   urban or suburban or rural?

14        A    Both.

15                  MR. BLEDSOE:  Object to form.

16   BY THE WITNESS (resuming):

17        A    I think it's -- it has pieces of everything,

18   actually, even some rural parts.

19        Q    So can you give me just a description then of House

20   District 95 in terms of its population density?

21        A    Well, currently, we have over 203,000 people in

22   House District 95.  It's the largest district -- House district

23   in the state.  It wasn't before, but as of the date of this

24   document that you've provided, there's 203,000 people.

25        Q    And when were you elected into House District 95?
```



Nicole Collier

January 30, 2023
Page 20

1      A      In November of 2012.

2      Q      And you were reelected in 2022; is that correct?

3      A      Yes.

4      Q      And so is that six sessions?

5      A      Yes, starting the sixth session.

6      Q      And I see here it says, for the 87th Legislature, you

7  were on the Criminal Jurisprudence Committee and the Public

8  Health Community.  Is that inaccurate?

9      A      For which year?

10      Q      So if you look on the website where it has Committees

11  on the second column --

12      A      Oh, okay.  Yes, that is correct.  But this -- I see

13  -- already see something that my office didn't update on the

14  back.

15      Q      And so you were the chair of the Criminal

16  Jurisprudence Committee during the 87th Legislature; is that

17  right?

18      A      That it correct.

19      Q      And you are a Democrat; is that correct?

20      A      Yes.

21      Q      And the majority of the Texas House is Republican; is

22  that correct?

23      A      Yes.

24      Q      And who decides who is chair of a committee in the

25  Texas House?



1      A     The speaker.

2      Q     And who was the speaker who appointed you?

3      A     Speaker Dade Phelan.  Oh, well -- in the 87th?

4      Q     Yes.

5      A     Oh, yeah.  Speaker Dade Phelan.

6      Q     And is Speaker Dade Phelan a Republican?

7      A     Yes.

8      Q     And so a Republican speaker appointed you as chair of

9  the Criminal Jurisprudence Committee; is that correct?

10     A     Yes.

11     Q     And a Republican speaker appointed you chair of the

12 Criminal Jurisprudence Committee despite the fact that you are

13 a member of the minority party; is that correct?

14     A     That's the second time, yes, I was appointed chair by

15 a Republican.

16     Q     And when was the previous time that you were

17 appointed chair by a Republican?

18     A     The 86th.

19     Q     And was that the same committee?

20     A     Yes.

21     Q     And so you were appointed to the Criminal just (ph)

22 -- sorry -- Criminal Jurisprudence Committee as chair two

23 consecutive sessions by a Republican speaker; is that correct?

24     A     Yes, but they were different speakers.

25     Q     Were you on any select committee or any other --



 1  yeah, a select committee that year?

 2       A    I don't think so.

 3       Q    And are you -- were you on any committee that's not

 4  listed?

 5       A    Are you -- well, is a conference committee the same?

 6       Q    I would not consider it the same.

 7       A    Okay.  Then no.  I think they would list it

 8  automatically.  I -- I don't have any control over this part.

 9       Q    Good to know.  So you were not on the Elections

10  Committee; is that correct?

11       A    I was -- yeah, that's correct.

12       Q    And you were not on the select committee on

13  constitutional rights and remedies; is that correct?

14       A    That's correct.

15       Q    Okay.  Now, I want you to turn the page to the first

16  sentence.

17       A    Okay.

18       Q    It says:  The Texas Legislative Black Caucus

19  reelected Representative Collier as the vice -- first vice

20  chair in 2018.  Is that an accurate statement?

21       A    Well, that is true.  It was in 2018.

22       Q    And I was going to say is it -- is it still true that

23  you are the vice -- first vice chair?

24       A    No.

25       Q    And what position do you now occupy with the Texas



 1   Legislative Black Caucus?

 2       A     I'm a member.

 3       Q     And so you don't have currently any -- any leadership

 4   role in the caucus?

 5       A     Not in the black caucus.

 6       Q     Okay.  And was that the case in the 87th Legislature?

 7       A     No.

 8       Q     And what position did you hold in the 87th

 9   Legislature?

10       A     I was chair of the Texas Legislative Black Caucus.

11       Q     And how long were you the chair of the Texas

12   Legislative Black Caucus?

13       A     Let's see.  Let's see.  December -- what -- let's

14   see.  If it's December 2020, I think, is going into the special

15   -- I mean going into the legislative session, so it was

16   December, I believe, of 2020, and then we had our election

17   September of 2022.

18       Q     So for most -- you -- I'm going to rephrase the

19   question.  You were the chair of the Texas Legislative Black

20   Caucus for most of the 87th Legislature; is that correct?

21       A     Yes, I would say that.

22       Q     And you were the chair of the Texas Legislative Black

23   Caucus while the legislature was convening in 2021; is that

24   correct?

25       A     Yes.



1    Q    Are there any other caucuses that you're a member of?

2    A    Yes.

3    Q    And what caucuses?

4    A    The Women's Health Caucus; it's -- it's the Broadband

5    Technology Caucus, Gio Capriglione is the chair of that

6    committee; and -- let's see -- the House Democratic Caucus; the

7    LGBTQ Caucus -- oh, I don't know if that's a caucus, LSG.  I

8    don't know if that's a caucus.  I'm trying to remember the

9    other ones.  I don't remember.  There might be more.

10    Q    And is there an area of legislation that you focus

11    your efforts in terms of the bills that you file?

12    A    I don't say that I -- I do that.  There may be areas

13    that -- where, like, there's more bills, but I try to focus on

14    -- my legislation on what the community asks.

15    Q    Did you file any bills in the 87th Legislature that

16    pertained to elections?

17    A    I don't remember.

18    Q    Okay.  And we can put this one aside.

19    A    Okay.

20    Q    Do you know who the election administrator is in

21    Tarrant County?

22    A    Yes.

23    Q    And what's his name?

24    A    Heidi Gilder Garcia.

25    Q    Heider Garcia.



1       A       Heidi -- yeah.

2       Q       And have you ever spoken with Mr. Garcia with respect

3   to elections in Tarrant County?

4       A       I don't think so.

5       Q       And have you spoken to any of the individuals within

6   his staff about elections in Tarrant County?

7       A       I -- I did not, but I've had my office call to get

8   clarifications on things.

9       Q       And what were those calls about?

10      A       Like, how do they process the mail-in ballots.  I

11  know I've referred people to his office.  They've called the

12  state office with questions.

13      Q       And when your office was contacting Mr. Garcia's

14  office about mail-in ballots, what were they -- when was this

15  occurring?

16      A       It was after -- so it was -- because you said before

17  the 2022 election; is that right?

18      Q       That's correct.

19      A       So there was a 20 -- there was an election, I think

20  it was, where the legislation -- and that's SB 1 --

21      Q       Uh-huh.

22      A       -- was effected.  Was that -- what year was that?

23  20 --

24      Q       -- 22.

25      A       It was 2022, then no.  Then I'm talking about 2022,



 1  and it may be outside of the reference that you're referring
 2  to.  Sorry.
 3      Q    That's all right.  Let me actually clarify that
 4  because I probably wasn't very clear.  So there were four
 5  elections in 2022:  The primary election in March, the primary
 6  runoff in late March -- sorry -- late May and then the
 7  constitutional election that occurred in early May.  Are you
 8  familiar with those three elections?
 9      A    Yes.
10      Q    And then there would have been the general election
11  in November --
12      A    Right.
13      Q    -- correct?
14      A    Yes.
15      Q    And so when I'm talking about -- not including the
16  general election, I am going to discuss the March primary, the
17  constitutional election in May and then the constitutional
18  runoff --
19      A    Okay.
20      Q    -- in late May.
21      A    So then my reference was for the May -- March
22  primary, ahead of the March primary.
23      Q    And did your office speak to him at all regarding the
24  constitutional election or the March -- or the May primary
25  runoff?



 1      A    Not him directly.

 2      Q    His office?

 3      A    They spoke with him -- well, it was about procedure,

 4   yes.

 5      Q    And so was this a communication that your office

 6   frequently has with Mr. Garcia's office?

 7      A    No.  I instructed them to call to get an update on

 8   when the procedure was going to come out.

 9      Q    And outside of the conversations that your staff had

10   regarding mail-in ballots --

11      A    It was more than mail-in ballot [sic].  It was just

12   procedure period because I think that it was a lot of confusion

13   about how they were going to process them because the secretary

14   of state hadn't given the final direction at that point.  So I

15   wasn't sure who to call and I was directed to call the

16   secretary of state.

17      Q    So are you referencing the implementation of SB 1?

18      A    Yes.

19      Q    And so when you're talking about the conversations

20   your staff had, that would have been over multiple topics

21   related to the implementation of SB 1 including mail-in

22   ballots?

23      A    Yes.

24      Q    And once the secretary of state had issued its

25   advisories, did your office continue to contact Mr. Garcia's



1  office?

2      A    No, because we were in contact with the secretary of

3  state's office.  And I was.  I spoke with them.

4      Q    And did your office contact Mr. Garcia prior to the

5  implementation of SB 1?

6      A    I don't know.

7      Q    Okay.  And so you cannot recall whether your office

8  would have contacted Mr. Garcia prior to the implementation of

9  SB 1.  Is that fair to say?

10     A    That's right.  It could -- they could have.  I don't

11 remember.

12     Q    Do you know if they contacted Mr. Garcia's office

13 regarding anything relating to the 2020 election?

14     A    You know what?  I did call, because I don't know if

15 it was the secretary of state's office or his office, but there

16 was a problem with the -- a machine at a location.  They said

17 that the location was closed down and so we reached out and

18 they said that they were already on it.  And the location

19 wasn't even in my district.  It was on the north side of

20 Fort Worth.

21     Q    And so outside of that communication regarding the

22 polling location, did you have any other conversations with

23 Mr. Garcia or his staff related to the 2020 elections?

24              MR. BLEDSOE:  Objection to form.

25 BY THE WITNESS (resuming):



1      A    It's possible.  I mean, if I can sit here and think
2   about it, I can probably...
3      Q    Well, in the event you do think of a conversation,
4   would you please just let me know?
5      A    Okay.
6      Q    So in March of 2020, you would agree that the state
7   of Texas along with the rest of the country got hit by the
8   COVID-19 pandemic.
9      A    Yes.
10     Q    And would you agree that that introduced unique
11  challenges on conducting elections during the pandemic?
12     A    Yes.
13     Q    And are you aware that numerous election
14  administrators and county clerks introduced new procedures in
15  order to better accommodate voters during the pandemic?
16           MR. BLEDSOE:  Objection to form.
17  BY THE WITNESS (resuming):
18     A    I read about that, yes.
19     Q    And are you aware that many of these new procedures
20  had not yet been -- had not been -- let me rephrase that
21  question.  Are you aware that many of the procedures introduced
22  to accommodate voters during the COVID-19 pandemic had not been
23  done in Texas before?
24           MR. BLEDSOE:  Objection to form --
25  BY THE WITNESS (resuming):



 1       A    Are you asking --

 2            MR. BLEDSOE:  -- and calls for speculation.

 3    BY THE WITNESS (resuming):

 4       A    -- me now or then?  Because --

 5       Q    Then.

 6       A    No, because I was only focused on Tarrant County at

 7    the time, and so we didn't implement any different -- I don't

 8    remember doing anything different in Tarrant County.

 9       Q    Okay.  And so your focus during the 2020 election

10    would have been Tarrant County.

11       A    It was more focused on Tarrant County and what was

12    happening there, but I had read about other counties, but

13    making sure that people in Tarrant County -- the voters in

14    Tarrant County had access.

15       Q    Through your readings, were you aware that Harris

16    County had introduced a number of, I'll say, new procedures and

17    practices during the 2020 election?

18            MR. BLEDSOE:  Objection to form.

19    BY THE WITNESS (resuming):

20       A    Then?

21       Q    Yes.

22       A    I read about it, yes.

23       Q    So I want to talk a little bit about that just to

24    sort of see what you were aware of at the time.

25       A    Sure.



 1      Q      Do you have Exhibit 3 in front of you?

 2      A      Yes.

 3      Q      And do you see on the top where it has the heading,

 4 The State of Texas, Ruth R. Hughs, Secretary of State?

 5      A      Yes.

 6      Q      And do you see that it has -- it's dated

 7 August 27th, 2020?

 8      A      Yes, I see that.

 9      Q      And that it's addressed to Chris Hollins in -- the

10 Harris County Clerk?

11      A      I see that, yes.

12      Q      Did you have any conversations with Chris Hollins

13 during the 2020 election season?

14      A      No, I've never had any -- I don't know him.

15      Q      And so I want to quickly ask:  Would you agree that

16 this is a letter from the Secretary of State Ruth Hughs to

17 Chris Hollins that was dated on August 27th, 2020?

18      A      It appears to be from her office, but it's -- you

19 have it signed by somebody else.

20      Q      Oh, that's a good point.  Do you see on the back it's

21 signed by Keith Ingram, Director of Elections?

22      A      Yes, I see that.

23      Q      And are you familiar with Keith Ingram?

24      A      No, I'm not.

25      Q      Would you agree with my representation that this is a



 1  letter from Keith Ingram, the Director of Elections of the

 2  Secretary of State's office, addressed to Chris Hollins, Harris

 3  County Clerk, and dated August 27th, 2020?

 4             MR. BLEDSOE:  Object to form.

 5  BY THE WITNESS (resuming):

 6       A    I've never seen this letter, so I would take you at

 7  your word.

 8       Q    And so let's look at the first paragraph.  It reads:

 9  It has come to our office's attention that Harris County

10  intends to send application to vote by mail to every registered

11  voter in the county.  Such action would be contrary to our

12  office's guidance on this issue and abuse of voters' rights

13  under the Texas Election Code, Section 31.005.  Did I read that

14  correctly?

15       A    That's what it says, yes.

16       Q    And then it continues:  As you know, the Texas

17  Election Code requires that voters have a qualifying reason to

18  vote by mail.  They must be 65 years or older, disabled, out of

19  the country while voting is occurring or confined in jail but

20  otherwise eligible to vote.  It is not possible that every

21  voter in Harris County will satisfy one or more of these

22  requirements.  Did I read that correctly?

23       A    No.  You said country, but I think it says county.

24       Q    Oh, my mistake.

25       A    Okay.  Other than that, I -- it -- that's what it



 1  says.

 2        Q    And then it continues on the third paragraph:  By

 3  sending applications to all voters, including many who do not

 4  qualify for voting by mail, your office may cause voters to

 5  provide false information on the form.  Did I read that

 6  correctly?

 7        A    That's what it says.

 8        Q    Were you aware that Harris County attempted to send

 9  unsolicited vote-by-mail applications to every voter in

10  Harris County?

11        A    Not on --

12             MR. BLEDSOE:  Object to form --

13  BY THE WITNESS (resuming):

14        A    -- August --

15             MR. BLEDSOE:  -- mischaracterizes --

16  BY THE WITNESS (resuming):

17        A    -- 27th, 2020.

18        Q    Were you aware -- did you become aware after the

19  fact?

20             MR. BLEDSOE:  Objection to form --

21  BY THE WITNESS (resuming):

22        A    When I read the news -- I mean it was in the news.

23  But I -- I read that they -- well, no.  Hmm.  You said send

24  every voter an application?  No, I did not know that.

25        Q    Okay.



1    A    It was something else I knew, that I read.

2    Q    And -- and what did you read?  Just so I --

3    A    That they had drive-thru voting --

4    Q    Okay.

5    A    -- and 24-hour voting.  That -- that's what I was

6  really familiar with when I watched the media and read the

7  news.

8    Q    Okay.  So you were not aware that the Harris County

9  Clerk had an attempt to send unsolicited vote-by-mail

10 applications to voters in Harris County?

11            MR. BLEDSOE:  Objection to form --

12 BY THE WITNESS (resuming):

13   A    It may have been included in the news.  I -- it just

14 didn't catch my eye.

15            COURT REPORTER:  One thing:  You know, allow

16 your attorney to object first and then begin your answer.

17            MR. BLEDSOE:  Thank you.

18            THE WITNESS:  Thank you.  Sorry.

19            COURT REPORTER:  If you can repeat your answer.

20 Okay.  Thank you.

21            MS. HUNKER:  I'm sorry.  I didn't hear --

22            COURT REPORTER:  Would you repeat?

23            THE WITNESS:  Oh, well, I forgot.  What was I --

24 BY MS. HUNKER (resuming):

25   Q    So you were not aware that Chris Hollins, the Harris



```
 1  County Clerk, had attempted to send unsolicited vote-by-mail
 2  applications to every voter in Harris County during the 2020
 3  election?
 4                  MR. BLEDSOE:  Objection to form, asked and
 5  answered.
 6  BY THE WITNESS (resuming):
 7      A    I was not aware of -- that that was -- if it was
 8  included in the media, it didn't catch my eye.
 9      Q    And so you were not aware that the secretary of
10  state's office, specifically Keith Ingram, had sent a letter
11  advising Mr. Hollins that his actions would be an abuse of
12  voters' rights.
13                  MR. BLEDSOE:  Objection to form.
14  BY THE WITNESS (resuming):
15      A    Not on August 27th, 2020.
16      Q    And were you aware at any other point, not focusing
17  specifically on the date of August 27th, 2020?
18      A    I think during the hearings, I may have heard some
19  testimony about that.
20      Q    Okay.
21      A    And I'm talking about the HB 6 hearings.
22      Q    Okay.  And so it was discussed during the HB 6
23  hearings that Chris Hollins had attempted to send unsolicited
24  vote-by-mail applications to all voters in Harris County?
25                  MR. BLEDSOE:  Objection to form,
```



 1  mischaracterizes the testimony.

 2  BY THE WITNESS (resuming):

 3      A    I -- I don't think that was exactly the way it was

 4  put -- the way it happened.  It was -- there was testimony

 5  about the process and this -- the bill prohibited it.

 6      Q    Okay.

 7      A    Explicitly prohibited it.

 8      Q    Okay.  And so the topic of unsolicited vote-by-mail

 9  applications came up during the HB 6 discussions.  Is that fair

10  to say?

11      A    I would say during the hearings.

12      Q    During the hearings.

13      A    Yes, because that was a provision in the bill.  My

14  understanding -- it said that.

15      Q    Were you aware that the secretary of state's office

16  sent a letter to Chris Hollins stating -- let me rephrase the

17  question.  Were you aware that the secretary of state's office

18  advised Harris County that sending unsolicited vote-by-mail

19  applications to voters would confuse voters about their ability

20  to vote by mail?

21              MR. BLEDSOE:  Objection to form, calls for

22  speculation.

23  BY THE WITNESS (resuming):

24      A    Not on August 27th, 2020.

25      Q    And what about any other date after August 27th,



```
 1   2020?
 2              MR. BLEDSOE:  Objection to form, calls for
 3   speculation.
 4   BY THE WITNESS (resuming):
 5      A    All I was aware is that there was the vote-by-mail
 6   applications being mailed out and then there was a letter being
 7   sent -- that was sent out to tell them to stop, I guess.  Is
 8   that what this is?  (Reviewing.)  Yeah, it says, You must
 9   immediately halt.
10      Q    And that would have come up in testimony during the
11   HB 6?
12      A    It was during the proceedings, yes.
13      Q    And did you learn about this controversy any other
14   time -- or read about this controversy any other time outside
15   of the testimony for HB 6?
16              MR. BLEDSOE:  Objection, form.
17   BY THE WITNESS (resuming):
18      A    It may not have been directly with this particular
19   provision, but I knew that there was a dispute with Harris
20   County's procedure.
21      Q    Okay.  Then let's put that aside.
22      A    (Complies with request.)
23      Q    Do you have the exhibit in front of you?
24      A    Exhibit 4?
25      Q    Yes.
```



 1      A     Yes.

 2      Q     Okay.  And so you see on the top that it is stamped,

 3 District Clerk, Harris County, on August 31st, 2020?

 4      A     I see that, yes.

 5      Q     Okay.  And do you see that it has the case caption,

 6 In the State of Texas v. Chris Hollins, in his official

 7 capacity as Harris County Clerk?

 8      A     Yes.

 9      Q     And then do you see the title that says Plaintiff's

10 Original Verified Petition and Application for Temporary

11 Restraining Order, Temporary Injunction and Permanent

12 Injunction?

13      A     Yes.

14      Q     Okay.  And let's look at the first paragraph.  It

15 says:  The State of Texas, by and through Ken Paxton, the

16 Attorney General of Texas, files this original verified

17 petition and application for temporary restraining order,

18 temporary injunction and permanent injunction against defendant

19 Chris Hollins, in his official capacity as Harris County Clerk.

20 Did I read that correctly?

21      A     Yes.

22      Q     And then it continues:  The State seeks an injunction

23 against Hollins to prevent him from sending over 2 million

24 applications for mail ballots to every registered voter in

25 Harris County irrespective of whether any given voter requested



1  an application or even qualifies to vote by mail.  Did I read

2  that correctly?

3      A    Yes.

4      Q    And then the paragraph concludes:  Hollins' actions

5  will create confusion, facilitate fraud and is an illegal ultra

6  vires act because it exceeds his statutory authority.  Did I

7  read that correctly?

8      A    I -- I don't know how to pronounce the word variz

9  (ph), virus (ph), so I assume you did.

10     Q    And so then, if you turn to the end of the document,

11 you'll see that it is signed by Charles K. Eldred, Special

12 Litigation Division of the Attorney General of Texas.  Did I

13 read that correctly?

14     A    Yes.

15     Q    Okay.  And so were you aware -- well, let me take a

16 step back.  Would you agree that based on this document the

17 Attorney General of Texas files a verified petition,

18 application for a temporary restraining order, temporary

19 injunction and permanent injunction, to stop Chris Hollins from

20 sending 2 million applications for mail ballots to every

21 registered voter in Harris County?

22             MR. BLEDSOE:  Objection to form, calls for

23 speculation.

24 BY THE WITNESS (resuming):

25     A    I'm not sure exactly what this -- because, I mean,



 1  that's in the caption, but I haven't -- this is my first time
 2  seeing it, so I don't know what it does.
 3      Q    Would you agree that it says:  The State seeks an
 4  injunction against Hollins to prevent him from sending over 2
 5  million applications for mail ballots to every registered voter
 6  in Harris County, irrespective of whether any given voter
 7  requested an application or even qualifies to vote by mail?
 8      A    That's what it says, yes.
 9      Q    Okay.  Did you know that the State sought an
10  injunction against Chris Hollins to prevent him from sending
11  over 2 million applications for mail ballots to every
12  registered voter in Harris County, irrespective of whether any
13  given voter requested an application or even qualifies to vote
14  by mail?
15              MR. BLEDSOE:  Object to form.
16  BY THE WITNESS (resuming):
17      A    I -- I heard about this in the news, but I don't know
18  if that was the exact reason.
19      Q    Okay.  So you heard that the secretary -- sorry --
20  that the State sought an injunction against the action?  Is
21  that fair to say?
22              MR. BLEDSOE:  Objection to form.
23  BY THE WITNESS (resuming):
24      A    Well, I heard that the State filed a lawsuit.
25      Q    Okay.  So you're aware that the State filed a lawsuit




 1  against Chris Hollins about the unsolicited applications to
 2  vote by mail.
 3                  MR. BLEDSOE:  Objection to form,
 4  mischaracterizes the testimony.
 5  BY THE WITNESS (resuming):
 6      A    Well, the State of Texas, by and through Ken Paxton,
 7  the Attorney General of Texas, files this original verified
 8  petition -- I'm familiar with what you just told me.
 9      Q    Okay.  So you're familiar that the State of Texas,
10  through Ken Paxton, the Attorney General, had filed a lawsuit
11  against Chris Hollins about the unsolicited vote-by-mail
12  applications in Harris County?
13      A    No --
14                  MR. BLEDSOE:  Object to form.
15                  THE WITNESS:  Okay.  Sorry.
16  BY THE WITNESS (resuming):
17      A    No, not -- no.  I -- I was aware that there was a
18  lawsuit filed with the process and procedures in Harris County.
19      Q    Okay.  So you're aware of the lawsuit related to
20  unsolicited vote-by-mail applications.  Is it fair to say,
21  then, you were not aware of who sought -- who initiated the
22  lawsuit?
23      A    Well, I would think --
24                  MR. BLEDSOE:  Objection to form.
25  BY THE WITNESS (resuming):



 1     A     I would think it would be Ken Paxton because he does
 2  file the suits on behalf of the State of Texas.
 3     Q     Okay.  So I'm a little confused by your answer.
 4     A     Okay.
 5     Q     So were you aware that the State of Texas initiated a
 6  lawsuit about the unsolicited vote-by-mail applications?
 7     A     Not on August 31st, 2020.
 8     Q     Okay.  When did you become aware?
 9     A     I guess when the news media hit it.  They got ahold
10  of it and they started reporting it.
11     Q     Okay.  So sometime after August 31st, 2020 --
12     A     Yes.
13     Q     -- you became aware that the State initiated a
14  lawsuit against Chris Hollins about the unsolicited
15  vote-by-mail applications.
16              MR. BLEDSOE:  Objection to form.
17  BY THE WITNESS (resuming):
18     A     Actually, I didn't even know it was against
19  Chris Hollins.  I just thought it was Harris County.
20     Q     So after August 31st, 2020, you became aware that the
21  State initiated a lawsuit about the unsolicited vote-by-mail
22  applications.
23              MR. BLEDSOE:  Objection to form.
24  BY THE WITNESS (resuming):
25     A     You know, I read that it was about all of the things,



```
 1   about 24-hour voting and drive-thru voting.  I thought it was
 2   about all of that.
 3       Q    Okay.
 4       A    That was my understanding at the time.
 5       Q    So was your understanding at the time then that the
 6   State was responding to multiple actions from Harris County?
 7       A    They had --
 8                MR. BLEDSOE:  Objection to form.
 9   BY THE WITNESS (resuming):
10       A    They disagreed with the processes that were
11   implemented by Harris County.
12       Q    Okay.  And let's put that aside.
13       A    (Complies with request.)
14       Q    And do you have Exhibit 5 in front of you?
15       A    Yes.
16       Q    And do you see the caption that says, In the Supreme
17   Court of Texas?
18       A    Yes.
19       Q    And then it has the additional caption:  The State of
20   Texas, Petitioner v. Chris Hollins, in his official capacity as
21   Harris County Clerk, Respondent.  Did I read that correctly?
22       A    Yes.
23       Q    And then it has the title:  On Petition for Review
24   from the Court of Appeals for the 14th District of Texas.  Did
25   I read that [sic]?
```



 1      A     Yes.

 2      Q     And then it states that this was argued

 3  September 30th, 2020; is that right?

 4      A     That's what it says, yes.

 5      Q     And let's look at the first paragraph.  It starts

 6  with:  Voting by mail in Texas is limited by statute to certain

 7  groups.  To obtain a mail-in ballot, a registered voter must

 8  assert eligibility on an application form that meets statutory

 9  requirements.  Election officials must make a form application

10  produced by the secretary of state available to voters.  Did I

11  read that correctly?

12      A     That's what it says.

13      Q     It continues:  The Harris County Clerk proposes to

14  mail unsolicited ballot applications to all registered voters

15  under 65 of age, only a fraction of whom are eligible to vote

16  by mail.  Because no other election official in Texas is doing

17  or has ever done what the clerk proposes, his plan threatens to

18  undermine the statutorily required uniform operation of

19  election laws across the state.  Did I read that correctly?

20      A     That's what it says.

21      Q     Okay.  Now let's turn the page and let's look at the

22  last paragraph just before it says Roman Numeral 1.  Do you see

23  that?  It starts with, We conclude.

24      A     Yes.

25      Q     Okay.  It reads:  We conclude that the election code



1    does not authorize the mailing proposed by the Harris County

2    Clerk.  Did I read that correctly?

3        A    Yes.

4        Q    (Reading.)  Accordingly, we grant the State's

5    petition for review, reverse the Court of Appeals judgment and

6    remand the case to trial to issue a temporary injunction

7    prohibiting Harris County Clerk from mass-mailing unsolicited

8    ballot applications to voters.  Did I read that correctly?

9        A    To the trial court.

10       Q    Okay.  Let me reread that, then.

11       A    Okay.

12       Q    Accordingly, we grant the State's petition for

13   review, reverse the Court of Appeals judgment and remand the

14   case to the trial court to issue a temporary injunction

15   prohibiting the Harris County Clerk from mass-mailing

16   unsolicited ballot applications to voters.  Did I read that

17   correctly?

18       A    That's what it says, yes.

19       Q    Okay.  And so here the Court states that they

20   concluded that the election code does not authorize the mailing

21   proposed by Harris County Clerk; correct?

22               MR. BLEDSOE:  Objection to form.

23   BY THE WITNESS (resuming):

24       A    It says what it says.  I mean, if that's your

25   interpretation.



```
 1        Q     And what is your interpretation, ma'am?
 2        A     We conclude --
 3                   MR. BLEDSOE:  Objection to form.
 4                   THE WITNESS:  Oh.
 5   BY THE WITNESS (resuming):
 6        A     We conclude that the election code does not authorize
 7   the mailing proposed by the Harris County Clerk.  Accordingly,
 8   we grant the State's petition for review, reverse the Court of
 9   Appeals judgment and remand the case to the trial court to
10   issue a temporary injunction prohibiting the Harris County
11   Clerk from mass-mailing unsolicited ballot applications to
12   voters.
13        Q     And is that what --
14        A     I mean, that's what it says.  I mean, you skipped a
15   lot.  There's probably stuff in there -- in the middle.
16        Q     Okay.  And are you aware that the Texas Supreme Court
17   had issued an opinion stating that it determined that the
18   election code does not authorize the mailing proposed by the
19   Harris County Clerk?
20                   MR. BLEDSOE:  Objection to form.
21   BY THE WITNESS (resuming):
22        A     I read -- I heard about it in the news at some
23   point --
24        Q     Okay.
25        A     -- but not at the time of this release.
```



1        Q    So you said you had read about it in the news
2   sometime afterwards.  Is that fair to say?
3        A    Yes.  And -- and whenever this came out, the news
4   started, you know, reporting about it, and I do remember
5   vaguely hearing about it.
6        Q    Okay.  And was this raised at all during the
7   discussions about Senate Bill 1?
8        A    Senate Bill 1?  Is that during the second special
9   session?
10       Q    That's correct.
11       A    I was not there.
12       Q    Okay.  And what about HB 6?
13       A    The Supreme Court?
14       Q    Well, yeah, that's correct, the Supreme Court
15  opinion.  Do you know -- do you recall if that got raised
16  during the discussions?
17       A    I feel like at some point there was a mention of
18  this, that the Supreme Court -- I think there were multiple
19  cases.  I -- I don't remember.  There were multiple cases going
20  on and it was going back and forth.  Maybe that's what this
21  Court of Appeals thing is -- what they're talking about here.
22       Q    Okay.
23       A    And at one point, they would -- it was in favor of
24  Harris County, then it wasn't, so I think that's how that went.
25       Q    Okay.  So you -- you think during discussions of HB



1  6, there were discussions about the -- I guess the litigation

2  involving the unsolicited vote-by-mail applications.  Is that

3  fair to say?

4      A    In the discussions, yeah.  Maybe not necessarily in

5  testimony, but in the discussions.

6      Q    And let's go to the Page 14.

7      A    (Complies with request.)

8      Q    The last paragraph starts with:  We hold that the

9  election code does not authorize an early-voting clerk to send

10 an application to vote by mail to a voter who has not requested

11 one, and that a clerk's doing so results in irreparable injury

12 to the State.  Did I read that correctly?

13     A    Yes, you did.

14     Q    Now, you had mentioned discussions regarding HB 6 and

15 that this may have come up.  Do you remember the context in

16 which this opinion would have come up?

17                MR. BLEDSOE:  Objection to form.

18 BY THE WITNESS (resuming):

19     A    I -- I don't remember.  It could have been during the

20 hearing, like somebody was testifying; it could have been,

21 like, during a conference committee discussion -- I was on the

22 conference committee for HB 6 -- well, it was SB 7.  My bad.

23 I'm sorry.

24     Q    And so is it fair to say you can't recall the

25 specific context, but that you believe that the Supreme Court's



```
 1  opinion regarding unsolicited vote-by-mail applications were
 2  raised in discussions over HB 6?
 3                 MR. BLEDSOE:  Objection to form.
 4  BY THE WITNESS (resuming):
 5      A    Oh.  Well, again, when I'm talking about that, I'm --
 6  I'm referring to everything.  I don't know.  Was there a
 7  separate Supreme Court decision on the vote by mail -- I mean
 8  the 24-hour voting and drive-thru voting?  That's what -- I'm
 9  lumping it all together.  I'm sorry.
10      Q    No, that's all right.  So you don't recall if this
11  specific issue was raised in the discussions.  Is that fair to
12  say, then?
13      A    Well, to me, they're all a part of the process that
14  Harris County implemented and that was all in dispute, but if
15  -- if you're asking me to separate this particular issue, I
16  can't say that I remember that --
17      Q    Okay.
18      A    -- specifically.
19                 MS. HUNKER:  Then let's put this aside.  And I
20  think it would be fair to take our first break since we're
21  about an hour in.
22                 THE WITNESS:  Oh, is that it?  It's only been an
23  hour?
24                 VIDEOGRAPHER:  Going off the record at 3:01 p.m.
25                 (A recess was taken.)
```



```
 1              VIDEOGRAPHER:  We are back on the record at
 2    3:23 p.m.
 3    BY MS. HUNKER (resuming):
 4         Q    Representative, did you have a good break?
 5         A    Yes.
 6         Q    So I want to talk a little bit more about the
 7    unsolicited vote-by-mail applications in Harris County.  Only a
 8    few more questions and then we'll move on to a new topic.  Did
 9    you speak to any individual from the Harris County Clerk's
10    office about the unsolicited vote-by-mail applications?
11         A    When?
12         Q    At any time between 2020 and present day.
13              MR. BLEDSOE:  Objection to form.
14    BY THE WITNESS (resuming):
15         A    I know that I saw -- well, no.  I guess the county
16    judge -- is she in the election -- Harris County election
17    office?  Is she part of it?  I saw her at the hearing.
18         Q    Okay.  And so did you talk to the Harris County judge
19    about the unsolicited vote-by-mail applications?
20         A    No.
21         Q    Okay.  And did you talk to any other Harris County
22    official regarding unsolicited vote-by-mail applications?
23         A    No.
24         Q    Starting in 2020 and workings towards the present,
25    have you ever researched logistics of sending unsolicited
```



```
 1  vote-by-mail applications?
 2       A    No.  What do you mean by logistics, though?  Can you
 3  clarify that?
 4       Q    Sure.  So looking at the elections office, the
 5  different steps that the elections office would have to take in
 6  order to actually send out the applications to vote by mail,
 7  such as printing paper, securing paper supply, designing it,
 8  including instructions -- basically all of the -- the -- the
 9  nitty-gritty in actually conducting the operation.
10       A    You said prior to 2020?
11       Q    No, from 2020 to present.
12       A    I did have an issue with -- like, what do you mean
13  printing, like, who decides where the signatures go on the
14  inside, outside envelope --
15       Q    Okay.
16       A    -- stuff like that.  I -- like, I talked about
17  logistics for that being inconvenient and it's a bit much.
18       Q    And did you ever speak about logistics of
19  vote-by-mail applications?
20       A    Applications.  I did with -- this is where I --
21  remember where I was telling you that I had a conversation with
22  the secretary of state because I -- we -- my office reached out
23  to Heidi [sic] Garcia to see when the process was going to be
24  finalized, and it hadn't been because it needed to come from
25  the secretary of state, and at that point is when I reached out
```



 1  to the secretary of state's office and I spoke with somebody in

 2  government relations to find out what the process was going to

 3  be because we literally were up on the deadline and the

 4  training needed to be done for those who were going to process

 5  it and hadn't, so I did try to figure out what was going on

 6  with that.

 7       Q    And that was [sic] respect to implementation of SB 1;

 8  correct?

 9       A    Of that voting provision -- vote-by-mail provision.

10       Q    Now, I'm talking in this case about the logistics of

11  sending out unsolicited vote-by-mail applications.

12       A    So, see, when you're saying that, I didn't know that

13  there was separation.  I didn't really -- when I was learning

14  about Harris County, it literally was about the process of

15  them, you know, doing vote by -- drive-thru voting and

16  24-hour voting, and if this was something that was included,

17  then it wasn't the main thing that I noticed, because the

18  drive-by and 24-hour voting offered the -- it -- it -- it did

19  provide an avenue to increase voter participation based on the

20  numbers that we saw, so it wasn't on this particular provision.

21       Q    Okay.  So you didn't look at any logistics relating

22  to this particular topic, the unsolicited vote-by-mail

23  applications.

24       A    No.

25       Q    And do you know if Tarrant County elections office



 1  considered doing the same, sending out unsolicited vote-by-mail
 2  applications?
 3      A    I do not know.
 4      Q    Okay.  And do you know if they did send out
 5  unsolicited vote-by-mail applications?
 6      A    I do not know.
 7      Q    Okay.  And so I want to turn our attention to drive-
 8  thru voting in Harris County.
 9               MS. HUNKER:  Can I see the one I sent --
10               THE WITNESS:   (Complies with request.)
11  BY MS. HUNKER (resuming):
12      Q    Okay.  And so do you have Exhibit 6 in front of you?
13      A    Yes.
14      Q    And do you see on the top where it says,
15  Isabel Longoria, Elections Administrator?
16      A    Yes, it says that.
17      Q    Yes.  And then do you see where it says, Next
18  Election, March 1st, 2022, Primarily Election; Early Voting,
19  February 14th to February 25th?
20      A    Yes.
21      Q    And if we look at the back page, you'll see it says,
22  Voters at Harris Votes.com.
23      A    I see that at the top, yes.
24      Q    Okay.  And if we turn to the page just before that,
25  you'll see, Election Division, contact us.



     1       A     Election Division, contact us, yes.

     2       Q     I'm going to represent to you that this is a printout

     3  of the Harris County Elections Administrator website.  Do you

     4  have any reason to doubt my representation?

     5       A     When -- when was this captured?

     6       Q     This would have been captured in -- give me a second

     7  -- February 2022.

     8       A     February 2022.  Okay.

     9       Q     And do you have any reason to doubt my representation

    10  that this is a printout of the Harris County Elections [sic]

    11  Administrator website?

    12       A     No.  I just met you, but I take it that you wouldn't

    13  defraud me (ph).

    14       Q     And so if you look at the second page where it says,

    15  Purpose, we're going to look at the second sentence.

    16       A     Okay.

    17       Q     And it says:  Harris County is the first jurisdiction

    18  in Texas history to create this new method of voting at scale

    19  that allows any registered voter to cast their ballot without

    20  leaving the comfort of their vehicle.  Did I read that

    21  correctly?

    22       A     Yes.

    23       Q     And were you aware that Harris County offered

    24  drive-thru voting during the 2020 election?

    25       A     You mean on February 2022, yes.



 1      Q     No --

 2      A     Oh.

 3      Q     Sorry.  Let me restate the question.  Were you aware

 4  that Harris County introduced drive-thru voting?  Just

 5  generally.

 6      A     You know, I heard about multiple counties.  Like,

 7  there was one in North Texas that did it, too, and so I don't

 8  know who did it first, but this is what it says here in what

 9  you just read to me that they did it first, but again, with the

10  news reports, they said, you know, Harris County -- and I feel

11  like it was either Dallas County and there was another county

12  that did drive-thru voting.

13      Q     And so when did you first hear about Harris County

14  conducting drive-thru voting?

15      A     I don't know the date.

16      Q     Do you know roughly?

17      A     It was --

18            MR. BLEDSOE:  Objection to form.

19  BY THE WITNESS (resuming):

20      A     It was during the election for the general election,

21  I guess, for 2020.  I guess during the election process or

22  period.

23      Q     And so you're aware that Harris County offered

24  drive-thru voting in 2020; is that correct?

25            MR. BLEDSOE:  Objection to form.



```
 1  BY THE WITNESS (resuming):
 2       A    Based on what I read in the news and heard in the
 3  news, yes --
 4       Q    And --
 5       A    -- in 2020.
 6       Q    -- you don't have any firsthand knowledge of the
 7  drive-thru voting program in Harris County; is that correct?
 8       A    Firsthand knowledge?
 9       Q    Yes.
10       A    You mean -- like, what I read, yes.
11       Q    So let me -- let me rephrase it, then.  Everything
12  you know about drive-thru voting in Harris County, is that
13  something you've read?
14       A    Yes.
15       Q    And you said that you were under the impression that
16  other counties also had drive-thru voting during 2020.
17       A    Yes.
18       Q    Do you recall which counties?
19       A    It's either Dallas County -- I don't know.  I feel
20  like it was another county.  At least one other.
21       Q    Okay.  And did you also learn that through the news?
22       A    Uh-huh, yes.
23       Q    And did you ever talk to Harris County about the
24  drive-thru voting program that they offered?
25       A    No.  I'm in Tarrant County, so no.
```



Nicole Collier                                    January 30, 2023
                                                        Page 57

```
 1      Q    And did you ever look at the cost of drive-thru
 2 voting on a county?
 3      A    I wouldn't -- I wouldn't do that.  I mean, that
 4 wasn't -- any county or Tarrant County?
 5      Q    Well, right now I'm talking about did you look into
 6 the cost generally.
 7      A    When?
 8      Q    About drive-thru voting at any point since 2020.
 9      A    I think since 2020 -- I'm trying to think if there
10 was any testimony about that at the hearing, about the cost.  I
11 don't recall.
12      Q    And did you ever research logistics of how drive-thru
13 voting operates?
14      A    Other than it's 24 hours?
15      Q    Yeah.
16      A    That's about as much as I know.  Is that --
17 basically, I -- this is what I remember about this:  24-hour
18 voting and it was drive-thru voting, and that it had -- this is
19 what I remember:  Harris County had the highest voter turnout
20 because of the various ways that they offered the ability to
21 vote, and then when you had Ruth Hughs with the secretary of
22 state's office come back out and say it was secure -- the
23 election was secure, to me, that -- that's what I know about it
24 -- remember about it --
25      Q    Okay.
```



```
 1       A    -- in terms of the process and the logistic.
 2       Q    And so did you look at how counties had to go about
 3  staffing drive-thru voting locations?
 4       A    No, I did not.
 5       Q    And did you look at any of the security procedures or
 6  safeguards that were put in place?
 7       A    I took the secretary of state -- they said that it
 8  was secure, meaning that the 2020 general election was secure,
 9  so, I mean, I guess from that, I could conclude that there was
10  no problems with it.
11       Q    So did you look to see what safeguards Harris County
12  put into place?
13       A    Not at the time, no.
14       Q    And have you since?
15       A    No.
16       Q    And were you aware of any discrepancies in the
17  reconciliation forms or vote totals in Harris County related to
18  drive-thru voting?
19       A    I was not.  I have not seen them.
20       Q    And did you know -- did you talk to Tarrant County's
21  elections office about whether they were going to introduce
22  drive-thru voting?
23       A    No, I don't recall.
24       Q    And do you know if they were considering introducing
25  drive-thru voting?
```



1      A    I do not know.

2      Q    Did they offer drive-thru voting in 2020?

3      A    I don't think so.  Well, I mean, other than -- what

4  do you mean, drive-thru?  Like --

5      Q    So let me specify.  I know that there's something

6  called curbside voting --

7      A    Yes.

8      Q    -- and then there is something that was slightly

9  different offered by Harris County, which they called

10 drive-thru voting.

11     A    Yes.

12     Q    And would you agree that curbside voting is when an

13 individual either with a physical disability or is unable for

14 health or a medical reason to access the polling location, they

15 can pull up to the voting site and vote in their car curbside?

16     A    I -- well, I mean, curbside voting is for people who

17 are unable to go into -- for any reason.  I don't know -- if

18 they're unable to go inside.

19     Q    Okay.  You'd agree with me, though, that curbside

20 voting is for an individual who can't go inside the polling

21 place.

22     A    Who's unable to go inside, yes.

23     Q    And that drive-thru voting in Harris County expanded

24 that to include any voter, not just individuals who were unable

25 to access the polling location.



 1              MR. BLEDSOE:  Objection to form, calls for
 2   speculation.
 3   BY THE WITNESS (resuming):
 4       A    I would -- my understanding of what Harris County did
 5   was that you could drive-thru and then turn in your ballot.
 6       Q    Okay.
 7       A    That's what -- I didn't think about the, like,
 8   limitations on who it was.
 9       Q    Okay.  Is it your understanding that drive-thru
10   voting in Harris County included individuals who could access
11   the polling location but chose not to in exercising the
12   drive-thru voting process?
13              MR. BLEDSOE:  Objection --
14   BY THE WITNESS (resuming):
15       A    I don't --
16              MR. BLEDSOE:  -- to form.
17              THE WITNESS:  I'm sorry.
18   BY THE WITNESS (resuming):
19       A    I don't know why they would -- I mean, I can't, you
20   know, say that they chose not to.  There may be something going
21   on that that was their only option.
22       Q    Okay.  Are you aware of the criteria that Harris
23   County used to determine who would be able to access drive-thru
24   voting?
25       A    No.



1      Q    Okay.  And when I talk about Tarrant County
2 drive-thru voting, do you understand that I am not talking
3 about curbside voting?
4      A    Now I do.
5      Q    Okay.  And so I'm going to just ask the questions
6 again for clarification.  Are you aware if Tarrant County
7 attempted to introduce drive-thru voting?
8      A    I am not aware.
9      Q    And do you know the reason why Tarrant County -- let
10 me take a step back.  To your knowledge, Tarrant County did not
11 offer drive-thru voting in 2020; is that correct?
12      A    That -- my understanding, that's correct, I don't
13 think they did.
14      Q    And is it your understanding Tarrant County did not
15 offer drive-thru voting in 2021?
16      A    2021?
17      Q    Yes.
18      A    The election in 2021?
19      Q    Any of the elections that occurred in 2021.
20      A    I don't think so.
21      Q    And do you know why Tarrant County decided not to
22 have drive-thru voting?
23      A    No.  I'm not in those discussions.
24      Q    All right.  I'm going to introduce our next exhibit.
25 Do you have Exhibit 7 in front of you?



 1      A     Yes.

 2      Q     Okay.  And do you see on top where it has the

 3 letterhead, Attorney General of Texas, Ken Paxton?

 4      A     Yes.

 5      Q     And do you see that it's dated October 16th, 2020?

 6      A     Yes.

 7      Q     And addressed to, Dear Texas election officials?

 8      A     Yes.

 9      Q     And if you turn the page, you'll see that it's signed

10 by Ken Paxton; is that correct?

11      A     Yes.

12      Q     Okay.  And October 2020 is before SB 1 was enacted;

13 is that correct?

14      A     Yes.

15      Q     And October 16th, 2020, is before HB 6 and SB 7 were

16 considered; is that correct?

17      A     Yes.

18      Q     And so let's read the first sentence:  Some political

19 subdivisions throughout Texas have expanded their use of

20 curbside voting this election season to offer expansive

21 drive-thru voting to all registered voter -- voters.  This

22 letter serves as a notice and reminder that the election code

23 provides curbside voting as an option only to those who meet

24 certain narrow set of criteria.  Curbside voting is not, as

25 some have asserted contrary to Texas law, an option for any and



 1  all voters who simply wish to vote from the comfort of their

 2  cars when they are physically able to enter the polling place.

 3  Did I read that correctly?

 4              MR. BLEDSOE:  Objection, form.

 5  BY THE WITNESS (resuming):

 6      A    That's what it says.

 7      Q    And the next paragraph reads:  Texas Election Code

 8  provides that -- in quotation marks -- each polling place shall

 9  be located inside a building -- end quotation marks -- Texas

10  Election Code Section 43.031(b).  Did I read that correctly?

11              MR. BLEDOSOE:  Objection, form.

12  BY THE WITNESS (resuming):

13      A    That's what it says.

14      Q    And then it continues:  The code makes no provision

15  for polling places located outdoors, in parking lots or in

16  parking structures.  More specifically, the code makes no

17  provision for drive-thru voting centers at which any voter may

18  cast a ballot from his or her vehicle regarding -- regardless

19  of physical condition.  Did I read that correctly?

20              MR. BLEDSOE:  Objection to form.

21  BY THE WITNESS (resuming):

22      A    That's what it says.

23      Q    Yeah.  And so the Texas Attorney General sent this

24  letter to election officials in October 2020; correct?

25              MR. BLEDSOE:  Objection to form.



```
 1  BY THE WITNESS (resuming):
 2       A    I don't know who -- I don't know what that means,
 3  Texas election officials.  Is that -- does that mean like the
 4  county election administrator?  Because I'm an election -- I
 5  guess -- well, I'm not an election official.  Who -- who would
 6  this go to?
 7       Q    Generally speaking, election administrators --
 8       A    Like --
 9       Q    -- county clerks --
10            MR. BLEDSOE:  Objection -- objection to form.
11  It calls for speculation.
12  BY THE WITNESS (resuming):
13       A    Tell -- tell me what this --
14       Q    Okay.
15       A    Like, who is that?
16       Q    Texas election officials is generally used to refer
17  to election administrators of a county.
18       A    Like Heidi Garcia?
19       Q    Like Heider Garcia --
20       A    Okay.
21            MR. BLEDSOE:  Objection -- objection to form.
22  BY MS. HUNKER (resuming):
23       Q    -- their staff and then county clerks and voter
24  registrars to the extent that they have voting
25  responsibilities.
```



```
 1              MR. BLEDSOE:  Objection to form.
 2  BY THE WITNESS (resuming):
 3      A    Okay.
 4      Q    Would you agree that the attorney general sent this
 5  letter prior to the enactment of Senate Bill 1?
 6              MR. BLEDSOE:  Objection to form, calls for
 7  speculation.
 8  BY THE WITNESS (resuming):
 9      A    Well, I -- I don't know.  It's dated October 16th,
10  2020 --
11      Q    Uh-huh.
12      A    -- and that is before the enactment and
13  implementation of SB 1, yes, but it's after -- you did an
14  exhibit earlier where the Supreme Court said to stop doing
15  something.
16      Q    Yes, but if you remember, that was regarding
17  unsolicited vote-by-mail applications.
18      A    But, see, remember, I think -- I was thinking they're
19  all the same, the whole thing, and I meant -- I didn't realize
20  that there was a separate suit.  When I was thinking of it, I
21  thought it was all in one, the drive-thru voting, the 24-hour
22  voting and that.  I would consider them all the same, so this
23  is separate, then, from that.
24      Q    So --
25      A    Because that was dated September 30th -- this is
```



 1  Exhibit 5 -- and I was thinking that they're connected.

 2       Q    Okay.  And so were you aware that the Texas Attorney

 3  General's Office sent a notice advising that he [sic] thought

 4  that drive-thru voting was against the Texas Election Code?

 5                 MR. BLEDSOE:  Objection to form.

 6  BY THE WITNESS (resuming):

 7       A    I see it now, but -- what you're showing me now.

 8       Q    And you were -- but you were not aware of it

 9  beforehand.

10                 MR. BLEDSOE:  Objection, form.

11  BY THE WITNESS (resuming):

12       A    I know the -- the media made some references about

13  the lawsuit against Harris County and then other -- I guess

14  that they won at that point and then they lost -- they come

15  back and lost, so I don't know if this letter was, you know --

16       Q    Discussed.

17       A    -- in the media.

18       Q    And so let's look at Exhibit 8.  Would you agree,

19  though, then that drive-thru voting was controversial in 2020?

20       A    There was a dispute as to the use of it in 2020.

21       Q    And I want you to take a look at this particular

22  exhibit, Exhibit 8.  Do you have that in front of you?

23       A    Yes.

24       Q    Okay.  On the top it says, In the Supreme Court of

25  Texas; is that correct?



1        A     Yes.

2        Q     And it says, In Re:  Steven Hotze, M.D., Harris

3    County Republican Party, Honorable Keith Nielsen and

4    Sharon Hemphill, relators.  Did I read that correctly?

5        A     Is it Hotsey (ph)?  Isn't that Hotze?

6        Q     Hotsey (ph).

7        A     Okay.

8        Q     I've actually never heard it pronounced as so.

9        A     Well, I -- I heard a L in your -- in your

10   pronunciation, so I wasn't sure.

11       Q     Do you see where it says:  Justice Devine, dissenting

12   from the Court's order, denying the petition for a writ of

13   mandamus and motion for stay?

14       A     Yes, I see that.

15       Q     And are you aware that Justice Devine was a member of

16   the Texas Supreme Court in 2020?

17       A     I -- I see that now.  No, I wasn't.

18       Q     And so I want to turn the page to Paragraph 2 --

19   sorry -- Page 2, first paragraph.  Do you see where it begins,

20   As such?

21       A     Oh, Page 2?

22       Q     Yes.  You're on the right page.

23       A     Mine starts with, Not granting.

24       Q     I'm looking at the second sentence.

25       A     Oh, okay.



```
 1      Q    If you want, we can start from --

 2      A    No, no, that's fine.

 3      Q    Let's start at the top.  Not granting today's stay

 4 gives Harris County Election Clerk Chris Hollins the benefit of

 5 the doubt and suggests that a state official's blessing can

 6 otherwise cure an ultra vires act.  Did I read that sentence

 7 correctly?

 8      A    What does ultra vires mean?  I don't know what that

 9 means.

10      Q    Okay.

11      A    Are you asking me if I understand it or if I just

12 read it?

13      Q    If I read that correctly.

14      A    That's what it says, but I don't know what it means.

15      Q    Okay.  I'm going to represent to you that ultra vires

16 means outside of the power --

17      A    Okay.

18      Q    -- or outside the power of an individual.

19      A    Outside the power?

20      Q    Usually in reference to a state official, and so a

21 state official who has --

22      A    I'm glad I've never heard of that, then.

23      Q    I don't think it applies to legislators.

24      A    Well, you said state official, so I'm glad I've never

25 heard of that word.  But go ahead.  Sorry.
```



1    Q    That's all right.  It continues:  As such, I would
2    grant relator's motion to stay to ensure compliance with the
3    code and to give this Court the opportunity to consider whether
4    the novel drive-thru voting measure qualifies as a polling
5    place under Section 64.009(a) or where it is a grave departure
6    from the express language of the statute.  Did I read that
7    correctly?
8    A    That's what it says, yes.
9    Q    Okay.  And let's jump to the last paragraph where it
10   starts with Hollins.  (Reading.)  Hollins stretches the text of
11   the code beyond historical and commonsense understanding.  Did
12   I read that sentence correctly?
13   A    That's what it says.  I read that.
14   Q    (Reading.)  The Texas Election Code states that
15   polling locations may be located in any stationary structure,
16   including a movable structure -- and then it cites Election
17   Code 85.062(b).  Did I read that correctly?
18   A    Well, it says Id., and let me see what it's -- if
19   that's the election code.  (Reviewing.)  Yeah, the previous one
20   was the election code.  Okay.  Yes, that's what it says.
21   Q    Okay.  And it continues:  Hollins argues that these
22   tents satisfy the requirements of a moveable structure, but
23   that interpretation goes beyond the plain language of the
24   statute and cannot be harmonized with other demands of the
25   code.  Did I read that correctly?



1        A    That's what I read there.

2        Q    Were you aware of this opinion from Justice Devine at

3   any time between 2020 and the present day?

4                    MR. BLEDSOE:  Objection to form.

5   BY THE WITNESS (resuming):

6        A    I have not seen this, no.

7        Q    And you had mentioned that you were aware of

8   litigation over the drive-thru voting.  Is this the specific

9   case that you were referring to?

10                   MR. BLEDSOE:  Objection to form.

11  BY THE WITNESS (resuming):

12       A    Oh, this -- oh, this is a different case.  No, I -- I

13  don't know.  I just -- this is what I remember:  That there was

14  a dispute as to whether that was authorized under the statute,

15  and what we found out is that when they did do the drive-thru

16  voting and the 24-hour voting, we had -- Harris County had the

17  highest rate of voter participation since like 2017 and more

18  people of color were able to vote.

19       Q    Okay.  And let's just look at the last page.  Do you

20  see the date October 22nd, 2020?

21       A    Opinion -- yes.

22       Q    Okay.  And would you agree with me that that is only

23  a few weeks before election day in 2020?

24       A    October 22nd, 2020 --

25       Q    Yes.



 1      A      -- was a few weeks -- yes, but this is not signed,

 2  what you gave me.

 3      Q      Yes.

 4      A      Okay.  Is this an official opinion?

 5      Q      It is.  It's one from their website.

 6      A      Oh, okay.

 7      Q      I do not know why it is not --

 8      A      Oh, okay.  It's not even, like, postmarked.  I guess

 9  it wouldn't be post -- I don't know.  Does it have a filing on

10  it?  (Reviewing.)

11      Q      And so you have a lawsuit that is still being

12  considered about the legality of drive-thru voting in the weeks

13  leading up to election day in 2020; is that correct?

14              MR. BLEDSOE:  Objection to form.

15  BY THE WITNESS (resuming):

16      A      Sorry.  I was reading.  Can you repeat the question?

17      Q      Sure.  And so we have ongoing litigation regarding

18  the legality of drive-thru voting within a few weeks of

19  election.  Do you agree with that?

20              MR. BLEDSOE:  Objection to form.

21  BY THE WITNESS (resuming):

22      A      I don't know if this is -- I don't know about that.

23  What do you -- you mean ongoing litigation about the validity

24  of --

25      Q      Okay.  Would you agree with me that this opinion



 1  referenced a -- the legal question of whether drive-thru
 2  voting --
 3       A    But this is a dissenting opinion.
 4       Q    Yes.  I'm just asking about whether or not this
 5  opinion referenced was in relation to that question.
 6                 MR. BLEDSOE:  Objection to form.
 7  BY THE WITNESS (resuming):
 8       A    If you could give me fuller -- because I don't know
 9  what this is dissenting to.  Like, what was the major opinion
10  in the case?  It -- because each judge had the ability to draft
11  their own dissent; right?
12       Q    Yes.
13       A    And so this, to me, would be this person's opinion in
14  the case, so what was the actual case?
15       Q    Okay.
16       A    But that's what I -- because I don't know.  Maybe
17  they picked up one sign -- one thing in the case and they wrote
18  about -- you know, wrote about it.  I don't know.  If I could
19  see the case.  I don't know what this case was about.
20       Q    And let's look at the next one.
21                 MS. HUNKER:  Are we on Exhibit 9?
22                 COURT REPORTER:  Yes.
23  BY MS. HUNKER (resuming):
24       Q    And if you notice -- do you have Exhibit 9 in front
25  of you?



 1      A    Yes.

 2      Q    And if you notice, this says, In the United States

 3  District Court for the Southern District of Texas, Houston

 4  Division.

 5      A    Yes.

 6      Q    Did I read that correctly?

 7      A    Yes.

 8      Q    And so this is a federal case, whereas the one I was

 9  referencing before was a state case; correct?

10      A    Yeah, they -- they are -- the one -- Exhibit 8 is a

11  state case and Exhibit 9 is a federal case, yeah.

12      Q    And if we see, it says, Steven Hotesay (ph) Hotze --

13      A    Yes.

14      Q    -- versus Chris Hollins; is that correct?

15      A    He's one of the plaintiffs, yes.

16      Q    And then if we see -- it says -- stamped, Entered

17  November 2nd, 2020; is that correct?

18      A    Yes, I see that.

19      Q    Okay.

20      A    It was filed on November 2nd, 2020.

21      Q    And so let's turn -- actually, let's put that aside.

22      A    Okay.

23      Q    Now, you had also mentioned 24-hour voting with

24  respect to Harris County earlier in our discussion; is that

25  correct?



1       A     Yes.

2       Q     And so you're aware that Harris County offered

3    24-hour voting at some point during the November 2020 general

4    election.

5       A     Yes, and I think another county did, too, in the

6    North Texas area.  I feel like I -- I remember hearing about

7    that.

8       Q     Okay.  And the information you have from the 24-hour

9    voting, did that also come from reading news articles?

10      A     Yes.  They said that it had offered additional

11   opportunities for individuals to vote, and again, the

12   conclusion, more people of color were able to participate in

13   that election.  Tarrant -- Harris County had the highest voter

14   participation since 2017.  I believe that was the year that

15   they talked about.

16      Q     And did you -- when you were talking about voters of

17   color participating using 24-hour voting, where did you receive

18   that information from?

19      A     It was -- I guess it was the reports that they had,

20   the data that they collected that people of color were able to

21   participate because of the nontraditional hours.  You know,

22   some people work at night, some people have, you know -- some

23   people like to vote at night.  I don't know.

24      Q     And did you review those reports?

25      A     Yes, we did see the statistics, and it was during the



1  hearing where -- I think it was -- testimony was provided about

2  that.

3       Q    And do you know where the data came from?

4       A    No, I don't.  I assume that they brought it from

5  their own report.

6       Q    When you say they, who do you mean by they?

7       A    The administrators.  The -- like, I think -- what's

8  -- was Chris -- no, I don't think he testified at that hearing.

9  I know I've read it in a article.

10      Q    And so Harris County --

11      A    I would think -- yeah, Harris County did 24-hour and

12 another county, I feel like they did, too.  I want to say it

13 was somewhere in North Texas.

14      Q    So the information that you have regarding drive-thru

15 voting came from news articles, but then you said the testimony

16 that you heard --

17      A    It was some data that was supporting that there was a

18 higher voter participation.

19      Q    Did you have -- have any other sources of information

20 regarding 24-hour voting in Harris County?

21      A    No, and it really was after the fact anyway.  I mean,

22 there's a lot of lawsuits.  Now I'm confused, because it -- I

23 do -- I thought it was all one suit.  I didn't know there were

24 multiple lawsuits that were going on.  Now you're showing me

25 all of these different lawsuits.  I didn't realize that they



1  were broken down like that.

2       Q    So I'm going to introduce to you Exhibit 10.  Do you

3  have that exhibit in front of you?

4       A    Yes.

5       Q    Okay.  Have you seen this document before?

6       A    No.

7       Q    Okay.  And you see on top it says November 3rd, 2020,

8  General and Special Elections Early-Voting Schedule.

9       A    I see that.

10      Q    And you see on the bottom where it says Harris

11 County.

12      A    Yes.

13      Q    And then do you see where it has the logo of the

14 county clerk in the dead center of the page?

15      A    Yes.

16      Q    It's small.

17      A    Yes.  It says, County Clerk, Harris County, Texas,

18 1836.

19      Q    And it does also mention Chris Hollins, Harris County

20 Clerk; correct?

21      A    His name is there, yes.

22      Q    And it says that this is a general and special

23 elections early-voting schedule; is that right?

24      A    Where?

25      Q    On top.  If you look after it says November 3rd,



```
 1  2020.
 2       A    (Reviewing.)  Oh, you said this says general and
 3  special elections early-voting schedule, yes.
 4       Q    Okay.  And let's take a look at that.  So it has
 5  early-voting hours of our operation.  Do you see that?  It's
 6  little small print.
 7       A    Yes.
 8       Q    Okay.  And then it says October 7th through 29th,
 9  10 a.m. -- sorry -- 7 a.m. to 10 p.m.  Do you see that?
10       A    Yes.
11       Q    And then you see where it says, October 29th, 24-hour
12  voting at seven locations.  Did I read that correctly?
13       A    It says that.
14       Q    Okay.  Were you aware that Harris County only offered
15  drive-thru voting at seven -- sorry.  Let me rephrase that
16  question because I used the wrong phrase -- wrong term.  Were
17  you aware that Harris County offered 24-hour voting at only
18  seven of its polling locations?
19       A    I was aware that the 24-hour voting offered
20  opportunities for more voter participation, especially for
21  people of color.
22              MS. HUNKER:  Okay.  So I'm going to object to
23  that as nonresponsive.
24  BY MS. HUNKER (resuming):
25       Q    My question's a little bit different.
```



 1       A     Okay.

 2       Q     I'm asking very specifically:  Were you aware that

 3   24-hour voting was only available at seven polling locations?

 4             MR. BLEDSOE:  Objection to form.

 5   BY THE WITNESS (resuming):

 6       A     I think that the news may have said that they have it

 7   available at certain locations.

 8       Q     Okay.  And were you aware that 24-hour voting was

 9   only available one night --

10             MR. BLEDSOE:  Objection to form.

11   BY MS. HUNKER (resuming):

12       Q     -- on October 29th?

13             MR. BLEDSOE:  Objection to form.

14   BY THE WITNESS (resuming):

15       A     I am now.

16       Q     Okay.  And let's look at how many polling locations

17   they had during the early-voting schedule.  If we turn the

18   page, we see it goes to 112 locations; is that correct?

19       A     Yes.

20       Q     And so, out of 112 locations, only seven locations

21   offered 24-hour voting; is that correct?

22       A     Well, it says --

23             MR. BLEDSOE:  Objection to form.

24   BY THE WITNESS (resuming):

25       A     Well, it says, October 29th, 24-hour voting at seven



 1  locations.
 2      Q    Now, you had mentioned that you thought there was one
 3  other county that offered 24-hour voting.
 4      A    They -- I feel like I read about -- I heard of
 5  something like that.
 6      Q    And --
 7      A    I don't know which one it was, though.
 8      Q    Do you recall where in Texas it would have been
 9  located?
10      A    I feel like it was in the North Texas area, but
11  apparently it stopped, you know, when the lawsuit -- you showed
12  me the Supreme Court or something.  Oh, no, that was not about
13  that.  That was about something else; right?
14      Q    That was about drive-thru voting.
15      A    Sorry.  To me, again, they were all the same.  There
16  was a separate suit, though -- right? -- about -- no?
17      Q    Not that I am aware of.
18      A    Oh.
19      Q    That's not to say it --
20           MR. BLEDSOE:  Objection to form.
21  BY THE WITNESS (resuming):
22      A    Oh, okay.  I thought that that was the whole thing
23  with the lawsuit, to be honest.  I -- I didn't know it was
24  something different.
25      Q    And where did you hear about this second location?



 1      A    In the news.

 2      Q    In the news?  And did anybody testify during the

 3 hearings about the second location?

 4      A    No, but I feel like somebody was -- was doing it.

 5 Maybe they were doing -- yeah, I don't know.

 6      Q    And the numbers you received at the -- the hearing

 7 that you referenced, did that indicate how many individuals

 8 utilized 24-hour voting?

 9      A    I don't recall.

10      Q    And did you talk to any voters about whether they

11 would be unable to vote had they not had 24-hour voting?

12      A    In Harris County --

13      Q    Yeah.

14      A    -- no.

15      Q    And did you look at any of the logistics that it took

16 Harris County to put on 24-hour voting?

17      A    No.

18      Q    And did you look at the cost of putting on 24-hour

19 voting?

20           MR. BLEDSOE:  Objection to form.

21 BY THE WITNESS (resuming):

22      A    No.  I had no reason to.  I mean -- no.  You mean

23 before they did it?  Like --

24      Q    Just the cost that Harris County expended to put

25 together --



Nicole Collier

January 30, 2023
Page 81

```
 1        A     No, I did not.

 2        Q     -- 24-hour voting.

 3        A     No.

 4        Q     And do you know any of the safeguards that Harris

 5   County implemented with respect to 24-hour voting?

 6        A     Do I know of any?

 7        Q     Yeah.

 8        A     Other than what the secretary of state said, that the

 9   election was secure.

10        Q     So you don't know what precautions or safeguards

11   Harris County took.

12        A     They were good enough.  I mean, the secretary of

13   state said that they were secure.

14        Q     And so would you take smooth and secure as being that

15   there were no controversies during the election?

16        A     I didn't say smooth and secure.  I just said secure.

17        Q     Secure.  Okay.

18        A     But you're right.  I think that the secretary of

19   state's office did say smooth and secure.  I think that was the

20   exact phrase.

21        Q     And so did you take that expression to mean that

22   there were no controversies regarding the 2020 election?

23        A     There was no -- I took that to mean that the process

24   did not lead to any type of irregularities that warranted an

25   investigation into that whole thing or to call into question
```



Nicole Collier

January 30, 2023
Page 82

1    the election, rather.

2        Q    Okay.  So you took it as there were no irregularities

3    that would call the result of the election into question.  Is

4    that fair?

5                MR. BLEDSOE:  Objection to form.

6    BY THE WITNESS (resuming):

7        A    Pretty much.  I mean, there wasn't anything because,

8    literally, we got reassured by the secretary of state's office

9    that the election -- the general election for 2020 was exactly

10   what you said, smooth and secure.  So, to me, that meant that

11   the outcome was accurate.

12       Q    And do you know if every legislature [sic]

13   interpreted that statement the same way?

14       A    I don't know how -- I can only tell you what I know.

15       Q    And did you follow up at all with the secretary of

16   state's office about what they meant by smooth and secure?

17       A    I'm trying to think if we -- I mean, I'm sure that

18   there were statements that were put out, but did I personally

19   call?  No, I did not.

20       Q    Or have any communications with the secretary of

21   state's office with respect to that particular saying.

22       A    I'm trying to think if the secretary of state had a

23   representative during the conference committee discussions.  I

24   know the attorney general -- they had a representative there,

25   and I -- I just can't remember if there was somebody during the



 1  discussions for the conference committee, because I'm sure
 2  that's where it would have came up.  So I -- I can't -- I don't
 3  remember.
 4       Q    And do you know if Tarrant County considered
 5  implementing 24-hour voting?
 6       A    I do not.
 7       Q    And to your knowledge, did Tarrant County offer
 8  24-hour voting during the 2020 election?
 9       A    I do not recall them doing that, no.
10       Q    Do you recall them offering 24-hour voting in any
11  other election following the November 2020 election?
12       A    After the 2020, no, I do not.
13       Q    And do you know why Tarrant County chose not to offer
14  24-hour voting?
15       A    No, I do not.
16       Q    You can put that aside.
17       A    (Complies with request.)
18       Q    Were you aware that there was a dispute over the
19  number of in-person mail -- sorry -- in-person ballot-by-mail
20  delivery locations?
21       A    No.
22       Q    Were you aware that Harris County attempted to
23  offer --
24       A    And you're talking about Harris County, though.
25       Q    Yes.



```
 1        A    Okay.  No, I wasn't.
 2        Q    Were you aware if Harris County offered multiple
 3   in-person delivery locations?
 4                  MR. BLEDSOE:  Objection to form.
 5   BY THE WITNESS (resuming):
 6        A    No, I was not.
 7        Q    And are you aware of any of the legal disputes
 8   surrounding in person -- multiple in-person delivery locations?
 9                  MR. BLEDSOE:  Object to form.
10   BY THE WITNESS (resuming):
11        A    What do you mean by delivery locations?  What are you
12   talking about?
13        Q    When I'm referring to in-person delivery locations, I
14   am referring to an individual who received a mail-in ballot and
15   instead of sending the ballot back by mail is instead
16   delivering it in person.
17        A    To who?
18        Q    The county clerk or elections administrator,
19   depending on the county -- the early-voting clerk.
20        A    Okay.
21        Q    Are you familiar with that process generally?
22        A    I think it changed through SB 1.
23        Q    Were you familiar with the process prior to SB 1?
24        A    I didn't use it, so I didn't -- I probably wasn't as
25   familiar as somebody who had to do it.
```



1     Q     Okay.  And did you do any type of research regarding
2  in-person delivery of mail-in ballots?
3     A     When?
4     Q     Leading up to the passage of SB 1.
5     A     Did I do any research?  I don't -- up to the passage
6  of SB 1.  Remember, I wasn't there for SB 1.
7     Q     Okay.  So let me then talk about Senate Bill 7 and HB
8  6.
9     A     Sure.
10    Q     When that was being considered, did you look up
11  information regarding in-person delivery of mail-in ballots?
12    A     We looked up -- I don't know if I looked up, but we
13  -- we talked to, you know, people who are advocates for, you
14  know, voter participation --
15    Q     Uh-huh.
16    A     -- and they explained the process and -- and how it
17  worked.
18    Q     Okay.  And how did -- what information did they offer
19  regarding in-person delivery of mail-in ballots?
20    A     I'm trying to think if it was exactly that, but I
21  mean, to me, the general process of returning your -- your own
22  ballot, that was -- and then making sure that people don't get
23  criminalized for minor mistakes.
24    Q     So were you aware that in 2020 -- sorry.  Let me take
25  that back.  Were you aware that prior to SB 1, the election



1  code only allowed in-person delivery of mail-in ballots on

2  election day?

3      A      That makes -- makes sense, yeah.  That makes -- I

4  mean, that lines up with what I was thinking.

5      Q      Okay.  Were you aware that in 2020, Governor Abbott

6  passed a proclamation allowing individuals to submit their

7  mail-in-ballot application through personal delivery throughout

8  the early-voting period as well?

9             MR. BLEDSOE:  Objection to form.

10 BY THE WITNESS (resuming):

11     A      I don't know if I remember that.

12     Q      Okay.  And did you look at any of the logistics that

13 goes into providing multiple in-person delivery locations for

14 mail-in ballots?

15     A      I'm not sure I understand the question.

16     Q      Sure.  Did you look at how a county would be able to

17 implement having multiple in-person delivery locations, the

18 resources, personnel, that would be involved?

19             MR. BLEDSOE:  Objection to form.

20 BY THE WITNESS (resuming):

21     A      And -- and when are you talking about?  Did I -- when

22 did I look at that?  Was there a timeframe for that question?

23     Q      Yes.  So my timeframe for that question would be from

24 2020 to present.

25     A      Then no.



1      Q      And did you look at the cost that a county would have
2   to expend in order to offer multiple in-person delivery
3   locations?
4      A      I do not know the cost.
5      Q      And did you look at the safeguards that would be
6   needed to offer in-person delivery locations?
7      A      Again, when you're talking about safeguards, the
8   secretary of state said it was safe, so whatever thing that
9   they implemented was sufficient.
10     Q      Okay.  So your thought is any safeguards that were in
11  place were sufficient; is that correct?
12     A      Well, based on the representation from the secretary
13  of state's office, that the election was, as you said, smooth
14  and secure.
15     Q      Do you have any personal knowledge of whether those
16  safeguards were sufficient?
17     A      I don't -- no, I did not look into that, no.
18     Q      And do you have any personal knowledge on whether the
19  safeguards were sufficient for drive-thru voting in Harris
20  County?
21     A      Only the fact that the -- the person who was in
22  charge of elections in the state of Texas said that the general
23  election for 2020 was smooth and secure.
24     Q      So outside of that representation, do you have any
25  personal knowledge on whether the safeguards in Harris County



1    provided for in -- for drive-thru voting was sufficient?

2        A    I do not.

3        Q    And do you have personal knowledge of whether the

4    safeguards that Harris County implemented for 24-hour voting

5    were -- were sufficient?

6        A    I would -- same answer is that I had the

7    representation from the head person, the leader of elections in

8    the state of Texas, the secretary of state's office, who said

9    that the general election for 2020 was smooth and secure, which

10   leads me to believe that the -- whatever they put in place was

11   sufficient.

12       Q    Okay.  And outside of that representation, do you

13   have any personal knowledge of whether the safeguards

14   implemented by Harris County for 24-hour voting were

15   sufficient?

16       A    No.

17       Q    Okay.  So you had talked a little bit about voter

18   turnout in Harris County in 2020, and so what is your

19   understanding of voter turnout in Harris County in 2020?

20              MR. BLEDSOE:  Objection to form.

21   BY THE WITNESS (resuming):

22       A    Can you be more specific?

23       Q    Sure.  When you were considering HB 6 and SB 7, you

24   had mentioned that Harris County gave you the information

25   regarding their voter turnout; is that correct?



```
 1                    MR. BLEDSOE:  Objection --
 2   BY THE WITNESS (resuming):
 3       A    Gave them to me?
 4                    MR. BLEDSOE:  Objection to form.
 5   BY MS. HUNKER (resuming):
 6       Q    Gave it to the -- the committee.
 7                    MR. BLEDSOE:  Objection to form,
 8   mischaracterizes testimony.
 9   BY THE WITNESS (resuming):
10       A    There was information, yes --
11       Q    Okay.
12       A    -- there was information shared about their voter
13   turnout.
14       Q    And who did Harris County share that to generally?
15                    MR. BLEDSOE:  Objection to form,
16   mischaracterizes testimony.
17   BY THE WITNESS (resuming):
18       A    I -- I feel like that it was in the media and then
19   also information -- what was -- Lina -- what's the county
20   judge?  She came to --
21       Q    Hidalgo.
22       A    She came to testify and I feel like she may have
23   shared data.
24       Q    And were you -- did you attend any of the hearings
25   regarding SB 7 and HB 6?
```



1      A    I did.

2      Q    Now, you were not a member of the committees that

3 oversaw that legislation; is that correct?

4      A    That is correct.

5      Q    And so did you attend as a guest or did you just --

6 like, just attend -- what did you attend?  I should say.

7      A    Well, as a member of the legislature, it's common

8 practice for members to be able to participate in any hearing

9 as a -- you know, that's one of the, you know, available

10 options for members is that the courtesy is that you allow a

11 member that's not on the committee to participate in the

12 hearing for any -- any -- any type of committee.

13     Q    And when you say participate --

14     A    Well, not any committee.  I take that back.  General

15 investigating is closed.

16     Q    When you say participate, did you mean that you were

17 able to ask questions of the people who came up to testify?

18     A    I've done that in other committees, yes.

19     Q    And did you do it in the case of HB 6 and SB 7?

20     A    After -- not the first hearing, no, I wasn't able to

21 do it.

22     Q    And when were you able to do it?

23     A    It was the second time they had the hearing.  I feel

24 like it was the second time that they had the hearing.  It was

25 in March, I believe, of 2021.  I feel like it was the -- but I



1  don't know how many times they heard that -- that bill.  They

2  heard that bill multiple times.

3       Q     And what was the information communicated to members

4  of the committee about voter turnout in Harris County?

5       A     That they had the highest voter turnout since 2017.

6       Q     And when you say highest voter turnout since 2017, do

7  you mean the highest voter turnout for that particular county?

8       A     I would think so, yes.

9       Q     Okay.

10      A     For Harris County, like, they had the highest --

11  like, over the years, you know when -- the number of people

12  that came out.

13      Q     Okay.  And so I'm going to introduce to you our next

14  exhibit, Exhibit Number 11.  Do you have that document in front

15  of you?

16      A     Yes.

17      Q     And do you see on the top where it says Texas

18  Secretary of State, John B. Scott?

19      A     Yes.

20      Q     And do you see where it says Harris County Voter

21  Registration Figures?

22      A     Harris County Registration -- Voter Registration --

23  yes.

24      Q     And have you ever gone to the secretary of state's

25  website to look at voter registration figures generally?



```
 1        A    I don't think so.
 2        Q    Were you aware that the Texas Secretary of State's
 3   website has the registration figures available?
 4        A    I would hope so.
 5        Q    And so do you see where it says the years, starting
 6   in 1988?
 7        A    Yes.
 8        Q    And if we turn the page, it goes all the way to 2020;
 9   is that correct?
10        A    Well, I -- I don't see 2017.  It's been cut off.
11        Q    Okay.  So the numbers I'm looking at are for general
12   elections, so even-year elections.
13        A    Oh, it -- are -- you didn't tell me that.
14        Q    Yeah.  So do you see where it says every even-year
15   election from 1988 to 2020?
16        A    I don't -- why would they do that?  Harris County
17   Voter Registration Figures.  I guess they -- the secretary of
18   state only tabulates that during a general year?
19        Q    I can't say what the secretary of state --
20        A    Oh.
21        Q    -- does every year; I can only say what they've
22   posted on the website.
23        A    Oh, okay.  Now, what -- when was this done, this
24   form?
25        Q    This would have been printed in August 2022.
```



 1      A    Okay.  All right.  And what was your question?
 2      Q    Okay.  My question is:  Did you see where this has
 3 the years?
 4      A    Yes, I do see the years.
 5      Q    Okay.  And then the columns read registered voters
 6 -- registered being abbreviated -- the number voted --
 7      A    Uh-huh.
 8      Q    -- the percent that voted and then it breaks down
 9 early vote and EV percentage, early-voting percentage.  Do you
10 see that?
11      A    Yes.
12      Q    Okay.  Let's turn the page and look at Harris
13 County's percent voted.  Do you see on 2020 where it says 65.86
14 percent?
15      A    Wait a minute.  Percent voted.  Voted percent.  Oh,
16 wait a minute.  Let me see how that lines up.  (Reviewing.)
17 One, two, three, four -- wait.  One, two, three, four; one,
18 two, three, four -- yes.
19      Q    Okay.  And do you see that it says 68.86 percent
20 turnout of registered voters in 2020?
21      A    68?
22      Q    .86.
23      A    This says 65.
24      Q    Sorry.  65.86 percent.
25      A    Okay.



```
 1      Q     And so it says 65.86 percent; correct?

 2      A     Yes.  So that is true.  It's the highest since 2017.

 3      Q     And so let's look at 2016, which was the last

 4  previous presidential election prior to 2020.

 5      A     Okay.

 6      Q     And so that is 58.37 percent; correct?

 7      A     Sure, yes.

 8      Q     And let's just look at that math.  And so that's an

 9  increase of 7.49 percent; correct?

10      A     I don't know.

11      Q     Okay.  Would you like to do the math -- the

12  calculation?

13      A     No, I'm not good at that.

14      Q     Okay.

15      A     I went to law school not to be a scientist -- I mean

16  mathematician.

17      Q     Well, let's just take a look, then, through --

18  through the calculator.  65.86, subtracting 58.37.

19      A     I don't know what that means, and I would rely on an

20  expert to explain that.  Literally, I don't even know...

21      Q     Okay.  Would you agree with me that based on this

22  document, the percent that voted in Harris County in 2020 was

23  65.86 percent?

24      A     Yes, that's what it says, 65.86 voting -- voted

25  percentage --
```



1        Q    Okay.

2        A    -- yes, in 2020.  Yep.

3        Q    And would you agree with me that it says in 2016, the

4   number was 58.37 percent?

5        A    (Reading.)  Voted percentage, 2016, 58.37 percent.

6   Yes.

7        Q    And would you agree with me that if you subtract

8   65.86 -- I'm sorry.  You take that number and subtract 58.37,

9   you get 7.49.

10       A    I don't know.

11       Q    Okay.  Would you like to use a calculator to do the

12  subtraction?

13       A    No.  I didn't come here to do math.

14       Q    Would you agree that it's larger, 2020 from 2016?

15            MR. BLEDSOE:  Objection to form.

16  BY THE WITNESS (resuming):

17       A    What's larger?

18       Q    The percentage of turnout in 2020 from 2016.

19            MR. BLEDSOE:  Objection to form.

20  BY THE WITNESS (resuming):

21       A    The voter turnout, the number?

22       Q    Yes, 2020 was larger than 2016.

23       A    That's what it says, yes --

24       Q    Okay.

25       A    -- it's -- well, 65, I know that's higher than 58,



 1  yes.

 2              MR. BLEDSOE:  Counsel, why do we have to go

 3  through all of Harris County's stuff with a --

 4              MS. HUNKER:  Well --

 5              MR. BLEDSOE:  -- Tarrant County witness?  She's

 6  just unfamiliar with all of this.

 7              MS. HUNKER:  Her statement -- not that I need to

 8  explain -- is that Harris County had a significant increase in

 9  voter turnout specifically among minorities.

10              THE WITNESS:  No.  I said they had the highest

11  voter turnout.

12              MS. HUNKER:  Yes, the highest voter turnout, so

13  we're --

14              THE WITNESS:  Especially among people of color.

15              MS. HUNKER:  -- we're simply going to discuss

16  that right now.

17              THE WITNESS:  Okay.

18  BY MS. HUNKER (resuming):

19      Q    And so you see on the top where it says Texas

20  Secretary of State, John B. Scott?

21      A    Yes.

22      Q    Okay.  And do you see where it has percent voted and

23  it also has the same title but Tarrant County voter

24  registration figures?

25      A    Tarrant County Voter -- and this is all general



 1  election?

 2       Q    Yes.

 3       A    Okay.  Yes.

 4       Q    And it's --

 5       A    And what was the date of this?

 6       Q    The same -- I printed it the same day, so this would

 7  have been in August 2022.

 8       A    Okay.

 9       Q    And so you see the years are the same from 1988 to

10  2020 looking at general elections.

11       A    Oh, you mean like the 1998 --

12       Q    Yeah.

13       A    -- 1988, oh, yeah, yeah, this is -- yes, they're the

14  same type of data.

15       Q    Okay.  And if you notice, the columns are the same as

16  well; correct?

17       A    Yes.

18       Q    Okay.  Now let's look at 2020.

19       A    All right.

20       Q    2020 in Tarrant County was 67.64 percent --

21       A    On the voting?

22       Q    -- correct?  Voter turnout, registered voters.

23       A    (Reviewing.)  Yes, 67.64 percent.

24       Q    Okay.

25       A    And if you notice that we worked really hard to



1  register additional voters in Tarrant County, I was involved

2  with that, making sure that we got more people registered.  So

3  we did a good job of increasing the number of registered

4  voters.

5      Q    You did.  And let's look at the percentage compared

6  to Harris County.

7      A    Where is that?  Oh, on this one?

8      Q    Yes.

9      A    So 11 and 12.  Okay.

10     Q    And so Tarrant County had a voter registration

11  turnout --

12     A    What year are you looking at?

13     Q    2020.

14     A    Okay.

15     Q    -- of 67.64 percent.  Harris County had a voter

16  registration turnout of 65.86 percent; correct?

17     A    Say that again.  Harris County had 65.86, Tarrant

18  County had 67.64, yes.

19     Q    Tarrant County's voter turnout percentage was higher

20  than Harris County's; correct?

21          MR. BLEDSOE:  Objection, form.

22  BY THE WITNESS (resuming):

23     A    I think it's always been higher.

24     Q    I'm talking specifically about 2020.

25     A    And --



1      Q    In 2020, the voter turnout in Tarrant County was

2  higher than the voter turnout in Harris County.

3                MR. BLEDSOE:  Object to form.

4  BY THE WITNESS (resuming):

5      A    Yes, but that's true for 2016, 2018, and it's a trend

6  apparently.

7      Q    Okay.  So with 2020, though, it was higher --

8                MR. BLEDSOE:  Object to form.

9  BY MS. HUNKER (resuming):

10     Q    -- the voter registration rate than Harris County.

11     A    The voter registration?

12     Q    I'm sorry.  I said that incorrectly.  In 2020 in

13 Tarrant County, the voter registration turnout in that election

14 was higher than Harris County in 2020.

15                MR. BLEDSOE:  Objection to form.

16 BY THE WITNESS (resuming):

17     A    That -- it appears that, yeah, the percentage numbers

18 -- 67 is higher than 65.

19     Q    Tarrant County did not have drive-thru voting;

20 correct?

21     A    I don't believe they did.

22     Q    And Tarrant County did not have 24-hour voting;

23 correct?

24     A    I don't believe they did.

25     Q    And Tarrant County did not have multiple in-person



 1  delivery locations; is that correct?

 2       A    I don't believe -- I don't know that they did.

 3       Q    And so Tarrant County did not, at the very least,

 4  engage in drive-thru voting and 24-hour voting and still had a

 5  higher voter turnout than Harris County; correct?

 6       A    But they --

 7            MR. BLEDSOE:  Objection to form.

 8  BY THE WITNESS (resuming):

 9       A    But they always do.  If you look at the trend,

10  Tarrant County has a higher voter turnout than Harris County.

11  It's a regular trend.

12       Q    Okay.

13       A    Go back to 20 -- even if you look at 2018, 2018,

14  Harris County had 52 percent, Tarrant County had 57 percent.

15  Again -- that's in 2018, and Tarrant County --

16       Q    But let's --

17       A    And then if you look at 2016, Tarrant County had 61

18  percent and Harris County had 58 percent, and then 37 percent

19  for 2014 for Tarrant and then 32 percent.  So, I mean, it seems

20  like Tarrant County has a higher voter participation.

21       Q    So then let's look at the increase between them,

22  between 2016 and 2020.

23       A    For who?

24       Q    Both Tarrant County and Harris County.

25       A    Okay.  The increase?



1      Q     Let's look at the increase.

2      A     In what?

3      Q     Of voter percent turnout.

4      A     Okay.

5      Q     And so this time I'm afraid we're going to have to do

6   some math.

7      A     Are we comparing apples and apples or apples to

8   oranges?

9      Q     Apples and apples, 2020 compared to 2016 for both.

10     A     I think the counties are different sizes.

11     Q     We're still looking at the percentage increase.

12     A     Yeah, but I think that the whole dynamic of the

13  counties, I can't say that they're the same.

14     Q     But we're going to do it anyway.  And so let's look

15  at Harris County first.  65.86 percent difference from --

16  sorry.  I have to repeat that.  65.86 percent, subtract 58.37.

17  (Calculating.)  7.49.  Would you like to do the math as well?

18     A     No.

19     Q     And then let's look at Tarrant County's difference.

20  67.64 compared to 2016.  And so have you looked at the increase

21  between the counties, between Tarrant and Harris County, from

22  2016 to 2020?

23     A     The increase between Tarrant County --

24     Q     So looking at Tarrant County and comparing it to

25  Harris County, have you ever looked at the difference in the



 1  increase in voter turnout between 2016 and 2017?
 2                  MR. BLEDSOE:  Objection to form.
 3  BY THE WITNESS (resuming):
 4       A    No, because they're different counties.  They -- I
 5  don't compare -- I don't think that they're the same.
 6       Q    Okay.
 7       A    They're not even equivalent.
 8       Q    And so what county would be equivalent to
 9  Harris County?
10       A    I don't know.  Is there a county as large as
11  Harris County in Texas?
12       Q    And do you think that looking at large counties
13  generally would be a proper equivalent?
14       A    Well, I think that there's so many dynamics that go
15  into place.  I mean, if you look at just the -- the -- the size
16  of the county, it's just huge.  I don't know how many miles it
17  is, but I think that they -- it may not be compact or -- I
18  think there's so many variables that go into place that I just
19  can't say that Harris County is similar to Tarrant.
20       Q    Okay.  But have you looked at the voter registration
21  -- sorry -- the voter turnouts in those counties at all?
22       A    In Tarrant County, yes.
23       Q    Okay.  And did you look at the reasons why there was
24  an increase in 2020 compared to 2016 or the previous elections?
25       A    For Tarrant County?



1    Q    Yes.

2    A    I know we -- there was a big push to register voters.

3    Q    And looking, though, at percentage of registered

4    voters who voted, so the percentage would not change depending

5    on the number of registered voters.

6    A    Looking -- say that again.  Looking at?

7    Q    So looking at the turnout -- we're looking at

8    turnout.

9    A    Okay.

10    Q    So not the registered voters but turnout of

11    registered voters.

12    A    Okay.

13    Q    So did you look at why there was an increase in

14    Tarrant County from 2016 through 2020?

15    A    I don't know why, but I know that there was more

16    involvement.  There was, you know, a good push, but I don't

17    know why, no.

18    Q    Okay.  And so you haven't looked to see if the same

19    reasons that led to an increase in Tarrant County --

20    A    Who was on the ballot in 2020?  Wasn't that a

21    presidential year?

22    Q    Yes.

23    A    So maybe that's why.  I mean, it could be a whole

24    bunch of things.

25    Q    Okay.  And did those factors also apply to Harris



 1  County, though?

 2      A    Well, I think they -- Tarrant County, they have a

 3  higher -- traditionally have a higher voter turnout, so it's

 4  more likely that their voters are going to come out.

 5      Q    And so you don't think that the presidential election

 6  and candidates would have had an effect on Harris County

 7  turnout?

 8      A    I live in -- I -- I focus on Tarrant, so I don't know

 9  what was going on.

10      Q    So you don't know the motivations for the voters of

11  why there was an increase in Harris County; is that correct?

12      A    So what -- the difference between what happened in

13  Harris County in 2018 and 2020 is that they had additional ways

14  to vote.

15      Q    And so you thought that there was an increase in

16  voter turnout.  Would you agree there was an increase in voter

17  turnout in Tarrant County?

18      A    Yes, there was an increase from the previous general

19  election.

20      Q    And you've identified multiple factors that led to

21  that increase; correct?

22      A    Well, it was mostly registering new voters, yeah, and

23  I mean it could be just anything.

24      Q    Uh-huh.  And so couldn't those factors also play a

25  role in Harris County --



```
 1              MR. BLEDSOE:  Object to the form.
 2   BY MS. HUNKER (resuming):
 3      Q     -- registration increasing?
 4      A     I guess anything's possible, but I think that the
 5   more reasonable reason is because they had more ways to vote.
 6      Q     And did you look at any of the surrounding counties
 7   in -- near Harris County on their voter increase -- on their
 8   voter -- I'm sorry.  Let me -- let me rephrase the question.
 9   Have you looked at any of the adjacent counties to
10   Harris County on their percent turnout?
11      A     Can you tell me the adjacent counties to
12   Harris County?
13      Q     So Fort Bend County would be an example.
14      A     No, I did not look at Fort Bend County.
15      Q     Galveston County?
16      A     No, I have not looked at Galveston County.
17      Q     Montgomery County?
18      A     No, I've not looked at Montgomery County.
19      Q     Have you looked at the voter registration turnout for
20   -- sorry -- let me rephrase that.  Have you looked at the voter
21   turnout percentage rates in other minority-majority counties?
22      A     What are they?  I don't know.  What are the other
23   minority -- what'd you say?  Majority --
24      Q     Minority-majority counties.
25      A     What is that?  Tell me what you mean by that.
```



1      Q    That more voters than not are -- identify as a

2  minority.

3      A    More voters identify -- I don't -- how many of those

4  are there in Texas?  How many counties have majority-minority

5  votes?

6      Q    I couldn't tell you the exact number but a

7  significant number.

8      A    That have minority --

9      Q    -- majority counties.  So have you looked at any

10 other counties that are minority majority to see their increase

11 -- sorry -- their voter turnout generally?

12     A    I'm trying to think if I looked at Dallas.  I don't

13 know.  I can't remember.

14     Q    Have you looked at any other county turnout other

15 than Harris County and Tarrant County?

16     A    Based -- I mean, just from the data that we got

17 during the proceeding -- we got data from the proceeding of the

18 HB 6 --

19     Q    Yeah, but --

20     A    -- and SB 7.

21     Q    -- even outside of that, have you yourself looked at

22 voter -- voting turnout in 2020 in any other minority-majority

23 county?

24     A    Maybe in the redistricting process.  I mean, that's

25 important to consider when you're looking at the redistricting.



1  Probably.

2      Q    And what about now in the consideration of HB 6 and

3  SB 7?  Did you look at the voter turnout rates of other

4  counties besides Tarrant or Harris?

5      A    I feel like there was some stuff that was provided.

6  I just don't know, like, off the top of my head.  I feel like

7  we got data.  Even the secretary of state -- I feel like the

8  secretary of state [sic] office came and brought data.

9      Q    But you didn't compare other counties' voter turnout

10 to Harris County, did you?

11     A    I'm sure we looked at it.  I mean, literally, it was

12 a -- it was an exhibit.  I feel like they had exhibits that

13 they brought us that were provided to -- to members.

14     Q    But you can't recall whether you compared --

15     A    I mean, if it was on there, I looked at it.  I don't

16 think I, like, said -- I don't know if you're asking, like, a

17 statistical data, like, interpretation.

18     Q    So what I'm trying to get at is:  Did you look at the

19 increase in voter turnout from other counties and compare that

20 to Harris County?

21     A    Comparing it to Harris County?  But I do remember --

22 because remember -- remember I said I read that they said

23 Harris County had the highest voter turnout since 2017.

24     Q    Uh-huh.  Did you look to see whether other counties

25 also had the highest turnout since 2017?



```
 1      A    I didn't see that in that article.

 2                MS. HUNKER:  Okay.  I think we're good for a

 3   break if you'd like to.

 4                THE WITNESS:  I'm good.

 5                MS. HUNKER:  If we can just take five minutes.

 6                THE WITNESS:  Oh, sure.

 7                MS. HUNKER:  Sorry.  I just need one.

 8                THE WITNESS:  Okay.

 9                VIDEOGRAPHER:  Going off the record at 4:35 p.m.

10                (A recess is taken.)

11                VIDEOGRAPHER:  We are back on the record at

12   4:48 p.m.

13   BY MS. HUNKER (resuming):

14      Q    Representative Collier, we're going to turn our

15   attention to the legislative process leading into Senate

16   Bill 1, first looking at Senate Bill 7 and HB 6.

17      A    Okay.

18      Q    And so HB 6 and Senate Bill 7 were companion bills;

19   is that right?

20      A    Yes, I believe so.

21      Q    And the version that ended up making it the furthest

22   along the process was Senate Bill 7; is that correct?

23      A    In the 87th Regular Session, Senate Bill 7 was -- was

24   substituted for HB 6.

25      Q    So I'm going to introduce our next exhibit.  Do you
```



 1  have the exhibit in front of you?

 2       A    Yes, Exhibit 13.

 3       Q    Now, you're familiar with Texas Legislative Online.

 4       A    Yes.

 5       Q    And can -- and that website includes legislative

 6  history about the different bills being proposed by the Texas

 7  legislature; is that correct?

 8       A    Like, if you go to the bill, then you can click on

 9  the bill and it'll tell you about the bill.

10       Q    Yes?

11       A    Yes.

12       Q    And so if you look here, this says Bill SB 7,

13  Legislative Session, 87-R; is that correct?

14       A    Yes, that's what it says.

15       Q    And it says the author, Hughes.

16       A    Yes.

17       Q    Okay.  And senator -- and Hughes is a senator;

18  correct?

19       A    Yes, Brian Hughes.

20       Q    Okay.  And then this talks about the number of

21  amendments; is that correct?

22       A    Yes.

23       Q    And this lists the amendments that were considered

24  for Senate Bill 7; is that correct?

25       A    I guess it combines the House and the Senate.  I



1    wasn't in the Senate side, so there's one that says S-2, so I'm

2    assuming that those are amendments that were done in the

3    Senate, which I was not there.

4        Q    So if you look on the bottom of the page, you'll see

5    where it says H-2.

6        A    Yes.

7        Q    Okay.  And so would you agree with me this is a list

8    of amendments, both the Senate and House, for Senate Bill 7?

9        A    I'm trying to -- what does the H-2 mean?  Hang on.

10   It says number of -- reading, second reading -- or House second

11   reading, I guess, is what that means.  Yes, I -- I would -- I

12   don't know.  I guess so.  I mean...

13       Q    Okay.  Did you propose an amendment to SB 7?

14       A    I feel like I had an amendment.  Sometimes you don't

15   file them right away, you hold on to them, because if somebody

16   has another amendment, you don't file it or there's a strategy.

17   So I feel like I had some amendments, but I don't see mine on

18   here.

19       Q    So to your recollection, you had amendments but you

20   did not file those amendments.

21       A    I feel like I had some, yes, but I don't see any on

22   this list.

23       Q    And so you did not file any amendments for SB 7; is

24   that correct?

25       A    If this -- yeah, if this is for everything that was



1  done.  Now, this only has ones that were -- let's see here --

2  called up, I guess.  I mean, is this all of them that were

3  filed?  Like, if you filed it, does it show that?  Well, we

4  have an internal system, too --

5      Q    Uh-huh.

6      A    -- where you can file them, so I don't know if this

7  shows ones that were filed and/or not adopted or considered.

8      Q    Okay.  Is it fair to say, then, you didn't have any

9  amendments considered for Senate Bill 7 --

10              MR. BLEDSOE:  Object to form.

11 BY MS. HUNKER (resuming):

12     Q    -- in the second reading?

13              MR. BLEDSOE:  Object to form.

14 BY THE WITNESS (resuming):

15     A    There were none that were discussed on the House

16 floor.  That's -- that's true, that I thought -- well, you know

17 what?  I take that back, because, again, if I -- if I had a

18 duplicate one, you try not to, you know, add additional time.

19 You would -- whoever got theirs up there first, you let them

20 carry it if it's the same one that you had.

21     Q    So you're not the primary authority of any of the

22 amendments that were considered.

23     A    I don't know.

24              MR. BLEDSOE:  Object to form.

25 BY THE WITNESS (resuming):



1      A     You know, that's an even better point because --
2                   THE WITNESS:  I'm sorry.
3    BY THE WITNESS (resuming):
4      A     -- if I was -- sometimes we also sign onto an
5    amendment, like multiple names would go on it, and I don't know
6    if they put every -- because, like, you see how they have
7    et al.?  They won't show you everyone else that signed onto it.
8      Q     Do you recall if you had any amendments that you
9    authored that were up for a vote for SB 7?
10                  MR. BLEDSOE:  Object to form.
11   BY THE WITNESS (resuming):
12     A     Up for -- up for a vote?  I don't know if there were
13   ones that I signed onto or if there was one that I was -- that
14   I had was going to file or I did file and it was already up
15   there for consideration.  I don't know.
16     Q     Okay.  Can you think of any amendments that you
17   either filed, co-authored or offered yourself that was
18   considered on the House floor regarding Senate Bill 7?
19     A     Not off the top of my head.  If there was some, it
20   would be in the -- the system.
21     Q     Okay.  And when Senate Bill 7 was being considered by
22   the House, certain amendments that were offered by Democrats
23   were accepted; is that correct?
24     A     I'm not sure.  Is this --
25                  MR. BLEDSOE:  Object to form.



```
 1                    THE WITNESS:  Sorry.
 2   BY THE WITNESS (resuming):
 3        A     Is this on -- like, what -- what date were these
 4   considered?  Is this the -- right at the end, May 7th?  Let's
 5   see.  May 6th, May 7th -- because it looks like on May 6th for
 6   the House, only one and it failed and then maybe we went into
 7   midnight or something and we went into the next day, so that
 8   was May 7th.  I don't remember.
 9        Q     Representative Bucy, is he a Democrat?
10        A     Yes.  He's a member of the House Democratic Caucus.
11        Q     And if we look at where it says, H-2, Number 7 --
12        A     Yes.
13        Q     It has the author as Bucy; correct?
14        A     Yes.
15        Q     And then it says adopted.
16        A     Yes.
17        Q     And then if we look at Numbers 11 and 12, they are
18   also amendments by Bucy.
19        A     Yes.
20        Q     And those also were adopted.
21                    MR. BLEDSOE:  Object to the form.
22   BY THE WITNESS (resuming):
23        A     It says adopted.
24        Q     And do you see any other representative part of the
25   Democratic Caucus on this list?
```



```
 1              MR. BLEDSOE:  Object to form.
 2   BY THE WITNESS (resuming):
 3        A    Do I see them?
 4        Q    Yeah.  If you can identify them for me.
 5        A    Well, I will add this:  There are times where what is
 6   ultimately adopted has been altered or compromised, so it --
 7   the Republicans agreed to it because it was something that they
 8   accepted.  It wasn't like we won a vote.  We can't outvote
 9   them.  We don't have the numbers.  So if it was something -- it
10   was something like -- I -- I can't -- I don't know which one,
11   7, 11 and 12 were, but I know Bucy had to change the language
12   in some of his amendments in order for it to be acceptable.
13        Q    And that's part of election process.
14        A    Well, sometimes.  Sometimes it's -- I mean, you don't
15   get what you -- he was really working hard on a provision for
16   Crystal Mason, and the way that it was altered, it didn't meet
17   the intended -- it didn't have the intended effect, so it was
18   just basically writing on the wall.
19        Q    And do you recognize any other names that are listed
20   here where it says H-2 --
21        A    H-2.
22        Q    -- who are members of the Democratic Caucus?
23        A    I see Jessica Gonzalez, hers failed; Jarvis Johnson
24   et al.; Bucy; I'm thinking this Davis is Yvonne Davis, but it
25   was withdrawn -- and sometimes when something is withdrawn is
```



1  because it's going to fail or maybe they need to work on it or

2  maybe somebody -- they got it on another amendment.  So there

3  could be multiple reasons why it was withdrawn.  And then I see

4  Bucy adopted, Minjarez adopted, two more Bucys and then Howard

5  adopted, Klick, which is a Republican, Gervin-Hawkins -- I feel

6  like there were more amendments than this.  Is this the last

7  night of the session?

8       Q    I couldn't tell you.

9       A    And so I don't know when -- because there was a bunch

10 of amendments that were -- I mean, literally like 200, and we

11 didn't get a chance to present all of them at -- during the

12 hearing because they -- they shut it down.  They cut down the

13 opportunity for us to debate and present.  But let me finish

14 your question.  You said Gervin-Hawkins and then John Turner

15 and Dutton and Beckley.  But I feel like there were more than

16 this.  We only got through 20.

17      Q    Okay.

18      A    Again, you guys can't see these, the rest of them,

19 because we have an internal system and it's called the Floor

20 Access System, FAST, and you can see the rest of the stuff that

21 didn't make it on here probably.

22      Q    So there were multiple Democrats who offered

23 amendments for SB 7 and adopted; is that correct?

24           MR. BLEDSOE:  Objection to form.

25 BY THE WITNESS (resuming):



 1      A      Well, there was more that didn't get adopted.

 2      Q      But there were some that were adopted; is that

 3  correct?

 4      A      That is correct.

 5      Q      And we can put that away.

 6      A      (Complies with request.)

 7      Q      And so I want to move on to our next exhibit.

 8      A      Okay.

 9      Q      And do you see where it says Audio Transcript, Date

10  of Transcription, May 6th, 2021?

11      A      Uh-huh, yes, I see that.

12      Q      Okay.  And if we turn the page, it provides the date

13  May 6th, 2021.

14      A      Yes.

15      Q      And do you see on the bottom where it has Kim Tindall

16  & Associates?

17      A      On page -- (reviewing.)

18      Q      It's on the bottom of each.

19      A      Oh, Kim Tindall and -- yes.

20      Q      And do you see where there is a Bates stamp on the

21  bottom that has HJ and then a series of numbers?  The first one

22  on the first page being 0007740.

23      A      I don't know what that means.

24      Q      Do you see the numbers there?

25      A      Yes.  Are you saying that this is the order of the



 1  pages?

 2       Q    Yes.

 3       A    Well, then, where's Page 2?

 4       Q    Well, so I -- the transcript is quite long.  I only

 5  included sections that were relevant to our discussions today,

 6  specifically the part where you're talking

 7       A    Are they in consecutive order where we can get --

 8       Q    Yes, they are.

 9       A    -- the full context?  Okay.

10                 MR. BLEDSOE:  Object to the form.

11  BY MS. HUNKER (resuming):

12       Q    And so let's turn to Page 74 where it says

13  HJ-0007814.

14       A    (Complies with request.)  Page 74.  That's 73, -4, -5

15  -- 74.  Okay.

16       Q    And if you look at Line 4, it says Representative

17  Collier, Mr. Speaker.

18       A    Yes.

19       Q    And Speaker Phelan says:  Ms. Collier, for what

20  purpose?  And you responded:  Will the gentleman yield for some

21  questions.

22       A    Yes.

23       Q    And so this is the part where you engaged in a

24  back-and-forth with Chairman Cain over Senate Bill 7; is that

25  correct?



```
 1       A      (Reviewing.)

 2       Q      Actually, let me look at Page 3 of the page before --

 3       A      Uh-huh.

 4       Q      -- and if you'll see, it is beginning on Line 2.  It

 5  says:  Members, the next bill on the calendar is House Bill 6.

 6  The Senate is over and eligible.  The Chair lays out -- on

 7  second reading, SB 7.  The clerk will read the bill.  And then

 8  if we go to -- back to Page 74 --

 9       A      Didn't the bill die and we had to send it back to

10  committee and then it came back?  Because I -- now I'm trying

11  to remember.  May 6th is the early part of the session.  This

12  is the first part.  When you get to the -- towards the end of

13  the sessions, there's limitations -- I mean -- I'm sorry -- the

14  bill came back to the floor.  So when I talked about not being

15  able to speak, I'm referring to when it came back, because I

16  felt like there was a point of order and they sent the bill

17  back and then it came back to the floor.

18       Q      Okay.

19       A      That's what I recall.  So I -- I can't remember.

20  That's why I was saying is this May 6th, the end?  I don't

21  think it was the end of this session.

22       Q      Would you agree on May 6th that Senate Bill 7 was up

23  for discussion in the House?

24       A      It was up for discussion.  I don't know if -- I'm --

25  I'm thinking it was May 7th -- 6th, or whatever the date is,
```



1    that -- is that what the May 6th means, is the date that it was
2    up for discussion?  (Reviewing.)  Yes.  Is that right?  Is that
3    what you mean?
4        Q    Yes.  This is the date that the transcript was in
5    reference to.
6        A    Okay.  Not the date that it was transcribed, but
7    rather it was the date of the hearing -- of the matter -- it
8    was the date of the matter that was on the floor.
9        Q    Correct.
10       A    Okay.
11       Q    And if you want, we can look at the --
12       A    No.  I'm just wanting what you're representing, that
13   that was the date.
14       Q    Yes.
15       A    Because I do remember it came back on a different
16   date.
17       Q    And so you engaged in a conversation with
18   Representative Cain about Senate Bill 7; correct?
19       A    Yes.
20       Q    Okay.  And so if we look at your first discussion
21   with Representative Cain --
22       A    On Page 74?
23       Q    Yes.
24       A    Okay.
25       Q    Or 7814, if you want to look at the Bates numbers.



1  You say:  Thank you, Chairman Cain, for allowing me to ask you

2  some questions about this bill.  I just want to pick up where

3  Chairman Anchia left off.  If you could help, turn with me to

4  Page 4 of your bill, and it says:  In this code, the watcher,

5  who is entitled to observe an opportunity or procedure is

6  entitled to sit or stand near enough to see and hear the

7  activity of procedure.  Why -- what does this word observe mean

8  and why is it in quotation?  Did I read that correctly?

9      A    Yes, that's what it says.

10     Q    Okay.  And then if you can read your communication or

11 conversation with Chairman Cain, and let me know when you've

12 gotten to Line 17 on the next page.

13     A    Read my conversation?

14     Q    To yourself, just to refamiliarize yourself.

15     A    Number 13 -- from Line 13?

16     Q    From Line 13 --

17     A    Okay.

18     Q    -- to Line 17 of the next page.

19     A    Okay.  (Reviewing.)  And what -- what -- what page do

20 you want me to get to?

21     Q    To Line 17 on Page75.

22     A    Oh, I'm sorry.  I did get there.

23     Q    Okay.  And so you were asking Representative Cain

24 about what is meant by the word observe.  Is that fair to say?

25     A    Well, I -- I was trying to get why is it in



 1  quotations.

 2       Q    Okay.

 3       A    Remember, this bill changed multiple times before it

 4  even got here and then it changed multiple times again, and so

 5  I don't even know if he saw that part.

 6       Q    Uh-huh.

 7       A    Yeah, I don't think he even answered my question.

 8       Q    Okay.  And so did you get an answer of what is meant

 9  to observe?

10       A    I wanted to know why it was in a quotation.

11       Q    Okay.  So your question for Senator Cain [sic] was

12  about the quotation mark.  It was not about the word observe

13  generally.  Is that fair to say?

14       A    Well, I just wanted to know why they would put that

15  word in quotation to -- did it mean that they were saying --

16  did it indicate a different meaning than what traditionally is

17  meant by observe, did they have a new definition for observe,

18  why would it be in quotation, and he talked about some federal

19  way that they say [sic], but I don't know.  I don't know if

20  that was just, like, a grammatical error or something, and

21  that's what I was trying to get clarity on.  I mean, if it's

22  something that we've got to take into -- what do they -- what

23  do they mean by observe.

24       Q    Okay.

25       A    It wasn't clear.



1        Q      And to your knowledge, was the quotation marks

2    removed from the bill?

3        A      I believe so.

4        Q      And let's turn to Page 78 where it's 007818 on the

5    Bates number.

6        A      78?

7        Q      Yes.

8        A      Okay.

9        Q      If we look at Line 8, you -- (reading)

10   Representative Collier:  Okay.  So does this part, Section E

11   that we're still on, does this mean that a watcher is entitled

12   to see a voter's ballot?  Did I read that correctly?

13       A      Oh, well, you know what?  I just read -- sorry.  I'm

14   going to go back to what you're saying, but on page -- on the

15   Line 3, it's -- it's -- I said:  It is not meant to mean

16   anything -- is that correct? -- with the quotes, I mean.  And

17   then Chairman Cain said:  Yeah, you're probably right.  So it

18   probably was a grammatical error, so they didn't put that in.

19   That was incorrect.  They didn't review it, I guess, that part.

20   All right.  So then you want me to ask -- you want to ask me

21   about the next line, 8?

22       Q      Yes.

23       A      What about it?

24       Q      And so it says:  So does this part, Section E that

25   we're still on, does that mean that a watcher is entitled to



1  see a voter's ballot?  Did I read that correctly?

2       A    That's right.  I asked that.

3       Q    And then Representative Cain responds:  No, not at

4  all.  In fact, they're not allowed to do that under the

5  election code.  Did I read that correctly?

6       A    Yes, but that's what they were changing, the election

7  code, so when you're changing the law, you can do -- I mean,

8  that was the whole purpose.  They're changing a law, so if you

9  change the law, then you can change what people can do, and so

10  I wanted to get clarity about his intent.

11      Q    Okay.  And he expressed that his intent was not to

12  change it.

13      A    Well, he said that they're not allowed to do that

14  under the election code.

15      Q    And they are not allowed to -- when I say they're --

16  a poll watcher is not entitled to see a voter's ballot under SB

17  1; is that correct?

18               MR. BLEDSOE:  Objection to form.

19  BY THE WITNESS (resuming):

20      A    Well, I -- I think that they can see because they can

21  -- like, they can come over there and -- and if somebody's

22  having an interpreter, they're allowed to go anywhere where

23  there's voting activity, so that's not permissible, but is

24  there a chance that they could see it?  I would say yes,

25  because then, if the person is going to deposit their ballot



1  into the machine, there's a chance that the poll watcher could

2  see it.

3       Q    And have you visited a polling site in Tarrant County

4  since SB 1 was enacted?

5       A    I -- I voted, yes.

6       Q    Outside of voting, did you visit polling sites?

7       A    Outside of voting?  I mean, I wouldn't go inside of

8  them, but I -- I did stand outside to advocate for my election.

9       Q    And -- and did you see where poll watchers were

10 stationed at the polling place that you attended?

11      A    Did I see where they were stationed?  You know, I --

12 my -- because I -- there was an election in March and I feel

13 like I voted at a smaller location, and then the one that I

14 voted in the general was a larger location, so I did see poll

15 watchers at both of them.

16      Q    Okay.  And in those cases, were they standing close

17 enough to where they could see a voter put in -- the ballot

18 into the machine?

19      A    I would say yes for the first one.  It's on

20 Miller Avenue.  It's at the sub courthouse.  It's -- the room

21 is so small.  I mean, literally, it might cut off -- it's

22 small.  I would say that they could.

23      Q    And was the poll watcher just sitting down?

24      A    This is what was kind of -- so they had -- like, the

25 way it was set up, they had a bunch of poll -- what are those



1  things called? -- the machines set up and they were all

2  together literally.  I mean, I can't help but to look at your

3  paper if I'm this close to you.

4      Q    Did you vote at that site prior to SB 1?

5      A    Yes, I think I have been inside of that site before.

6      Q    And was there a poll watcher when you were voting in

7  those cases?

8      A    Probably.

9      Q    Do you know if they were sitting in a similar --

10     A    Yes.  That's what I'm -- I'm used to seeing them sit

11 down in a corner, because I used to be an election judge, and

12 back in the day that's what we did.  You had to sit in the

13 corner and then you can observe the activities, but you weren't

14 allowed to, like, get up and walk around.

15     Q    And so the poll watcher at the site when you voted

16 after SB 1 was implemented --

17     A    Oh, yes, that's what I was going to tell you.  So you

18 see how you're sit -- you're sitting like right here for me?  I

19 felt like the poll watcher was right here and then the voting

20 was going on right there, and the -- this place is so small

21 that we're crammed in there at that particular site.

22     Q    The poll watcher was sitting at the same location as

23 they were sitting prior to SB 1; is that correct?

24     A    No.  Because prior to SB 1, they had them by the door

25 on the opposite side of where the -- where the machines were.



1  So this time they were inside where the machines are; before,

2  they were on the outside of the machines, and I felt like they

3  were sitting down, now that I think about it.  Because when you

4  come into this one -- this is -- and this is why it's such a

5  small space -- you've got to go see this one.  I mean,

6  literally, they cram in like eight machines into this very

7  small space, and I -- I felt like -- I know because it -- I

8  know the person.  They're sitting right there when you walk in,

9  and you're like, Hey, you know -- you know them.  You're like,

10 Hey, and they're sitting right there.

11      Q    And do you know -- and you don't know why the poll

12 watcher changed spots where he was sitting; is that correct?

13      A    They weren't the same type of poll -- they weren't

14 the same poll watchers this last time.

15      Q    The location where the poll watchers were sitting, do

16 you know why that location had changed?

17      A    No.  Like, what do you mean the location?

18      Q    So you had said where they were sitting was

19 different --

20      A    It was different people.  Like, it -- it -- the poll

21 watchers, you know, they're not allowed to talk to you, but a

22 lot of the times you know the person, who it is.  This time it

23 was not even somebody that was from that community.  I didn't

24 -- I don't remember seeing that person, like, who it was.

25      Q    So I think I may be not being clear.  You had



1  mentioned that when you recently voted at this polling site,

2  the poll watcher was sitting in one place and then you had said

3  the other time, you were --

4      A    Before SB 1.

5      Q    -- before SB 1, the poll watcher was sitting at a

6  different location.

7      A    But they were different poll watcher -- okay.  So,

8  then, the --

9      Q    My question --

10     A    The poll watcher was black -- a black person in this

11 predominantly black neighborhood, was sitting at the door, and

12 then this time we see a Caucasian poll watcher sitting in the

13 inside.

14     Q    And you didn't speak to this poll watcher; correct?

15     A    No.

16     Q    So you don't know whether that poll watcher is a

17 resident of the community; is that correct?

18     A    No, I don't.

19     Q    Did you assume that the poll watcher was not a member

20 of the community based on that person's skin color?

21     A    I made no assumptions of who they were.  I just know

22 that I had not seen a -- a Caucasian poll watcher in that area

23 the last time I voted there.

24     Q    My question, again, is a little different.  I am

25 asking:  You don't know the reason why the poll watcher was



1  sitting in a difference spot than the poll watcher in the

2  previous election.

3      A    Well, I would take it that SB 1 allowed them to sit

4  wherever they wanted because of the election activity.

5      Q    Do you have any personal knowledge of why that -- if

6  that actually was the result -- reason for the change?

7      A    I don't know, no.

8      Q    And so let's look at Page 81, HJ-007821.  And so

9  let's look at Line 19 where it says Representative Collier.

10     A    Uh-huh, yes.

11     Q    (Reading.)  Sure.  So will this bill permit a

12  presiding judge to remove a watcher who causes physical harm to

13  a voter?  Chairman Cain reads [sic]:  I guess, since that would

14  be a violation of the code.  Otherwise, they really should call

15  the police so that person could be arrested.  Did I read that

16  correctly?

17     A    That's what it says.

18     Q    And then you responded:  Well, I mean, would the

19  presiding judge be able to have that poll watcher removed?

20  Chairman Cain responds:  Yeah.  They're 100 percent able to

21  call the police and have these people removed, and I'm sure

22  they can ask them to step outside, yes.  Did I read that

23  correctly?

24     A    That's what it says.

25     Q    Okay.



 1      A    But I think it was in context to the fact that you
 2  had to actually observe the violation, and we wanted to get --
 3  I wanted to get clarity -- and we, as the Democrats -- clarity
 4  on this because if they didn't see -- because I think it said,
 5  When can you remove a poll watcher, and there was a provision
 6  that said the election judge or the presiding judge had to
 7  observe the violation, meaning they -- they can't be told that
 8  they did it, they have to see it happen.  So that's when they
 9  can be removed without violating the new law, and so there was
10  a concern that if they actually caused physical harm, does the
11  presiding judge actually have to say, I saw it, and actually
12  see it to have that person removed or is it that somebody can
13  say, Oh, they hit me, or whatever.
14      Q    Okay.  And to your knowledge, was that provision
15  corrected in SB 7?
16            MR. BLEDSOE:  Object to the form.  It's -- this
17  is mischaracterizing and misleading.  This bill is not the one
18  that's passed and everything was worded in different language,
19  and --
20  BY MS. HUNKER (resuming):
21      Q    You can answer.
22            MR. BLEDSOE:  This is May 7th.
23            MS. HUNKER:  I am asking about the general
24  legislative history, and I'm going to ask that you avoid doing
25  speaking objections.  If you have an objection, please refrain



 1  and continue to use objection to form.

 2              MR. BLEDSOE:  I'll say what I need to.  Thank

 3  you.

 4  BY THE WITNESS (resuming):

 5      A    Okay.  Repeat the question.

 6              MS. HUNKER:  Can the court reporter repeat the

 7  question?

 8              COURT REPORTER:  Yeah.  Let me see.  Actually,

 9  you didn't complete that question.  I'm pretty sure you were --

10              MS. HUNKER:  Okay.

11              COURT REPORTER:  It started with:  To your

12  knowledge, was the provision corrected in --

13  BY MS. HUNKER (resuming):

14      Q    To your knowledge --

15              COURT REPORTER:  Yeah.

16  BY MS. HUNKER (resuming):

17      Q    -- was your concern addressed in Senate Bill 7?

18              MR. BLEDSOE:  Object to form.

19  BY THE WITNESS (resuming):

20      A    I don't know, because you still -- if my concern at

21  that time was the fact that you had to observe it, then no,

22  because the bill that was heard on May 6th, 2021, it wasn't the

23  bill that was on the calendar.  It wasn't the same bill that we

24  actually were considering on the last days of the session.  So

25  I -- you know, sometimes you don't have -- they don't have to



1   correct it; they can just say what our [sic] intent is and then

2   the courts can decide whether -- you have to fight it out in

3   court.  So that's a concern.  So if you don't correct it or if

4   you don't make the changes and make it clear in the actual law,

5   then it's -- you know, too much interpretation and you have to

6   -- they can go back to legislative intent and then this could

7   be referenced.  But I don't recall if it was changed in the

8   ultimate bill, because my understanding is that you still have

9   to have a witness.  You have to witness the violation.

10       Q    And so you don't know for certain if it was changed

11  or not changed in response to your comments; is that correct?

12       A    Well, this -- okay.  So, then, what we are talking

13  about here in the actual record here, the transcript, the

14  transcript was talking about will this bill permit a presiding

15  judge to remove a watcher.  I gave some additional stuff, but

16  that's because of what I remember, but I don't know if this is

17  what that's referring to.  So what -- what was resolved is that

18  -- will this allow a presiding judge to remove a watcher who

19  causes physical harm to a voter, and Chairman Cain said yes.

20       Q    Okay.  And let's look down to Line 23, same page.

21       A    And what -- are we on 82?

22       Q    Yes, we're on 82.

23       A    Okay.

24       Q    Actually, let's look at -- start at Line 20 --

25       A    Okay.



1     Q     -- where it says, Representative Collier:  Well,

2  because you limit it in the bill.  You said, A poll watcher may

3  only be -- can only be -- and then Chairman Cain responds:

4  Okay.  Here you go.  276.001 says, A person commits an offense

5  if in retaliation against a voter, is a voter --

6     A     Is voter.

7     Q     -- for or against --

8     A     Is voter for...

9     Q     -- is voter for or against -- it's -- you know, it's

10 illegal to harm or threaten -- to harm a voter already under

11 Chapter 276.  And then you respond:  So physical harm?

12 Chairman Cain responds back:  To harm or threaten to harm.  Did

13 I read that correctly?

14    A     Yes.

15    Q     And then you continue that line of questioning, if

16 you look at Line 13.  Representative Collier:  Okay.  So then

17 your bill will allow a presiding judge to have a poll worker

18 removed if they cause physical harm to a voter?  Chairman Cain:

19 Yeah, a watcher -- yes, I believe so.  Did I read that

20 correctly?

21    A     That's what that says.

22    Q     Okay.  And looking at Senate Bill 1, is it your

23 understanding that a presiding judge would be able to remove a

24 poll worker -- sorry -- a poll watcher removed if they cause

25 physical harm to a voter or threaten harm to a voter?



 1              MR. BLEDSOE:  Objection, form.  I request that
 2    you allow her to see the provision in the new bill.
 3              THE WITNESS:  Yeah.  Can you show -- I -- I
 4    wasn't there when they negotiated that one.
 5              MS. HUNKER:  Okay.  And we are going to talk
 6    about it, but I'll talk about it a little later so we can do
 7    the whole section on poll watchers.
 8              THE WITNESS:  Okay.
 9    BY MS. HUNKER (resuming):
10         Q    Let's look at Page 85, Line 22.  But since you do
11    bring it up, I am going to distribute copies of the bill so we
12    can have them in front of us.
13         A    Which bill?
14         Q    Both Senate Bill 7 and Senate Bill 1.
15              MS. HUNKER:  Are we on Exhibit 14 or 15?
16              COURT REPORTER:  Your next one is 15.
17              MS. HUNKER:  Thank you.
18    BY MS. HUNKER (resuming):
19         Q    And I'm going to represent to you that this is the
20    engrossed version that came out of the Senate and was being
21    considered by the House.
22         A    That's Senate Bill 7 --
23         Q    Yes.
24         A    -- from the 87-R?
25         Q    Correct.



1      A     Okay.  This is the engrossed version.  This is not
2  the committee version -- not the conference committee version.
3      Q     No.  This is the one that is coming out of the
4  engrossed version, the one that came out of the Senate.
5      A     That came from the Senate over and then -- then it
6  went to conference committee.
7      Q     Correct.
8      A     Okay.
9      Q     Yes, so this is not the conference committee version.
10     A     Okay.
11     Q     I'm also going to introduce Exhibit 16, which is
12  Senate Bill 1.  And if you look at the last page for Senate
13  Bill 1, you'll see where it's signed President of the Senate
14  and Speaker of the House.
15     A     Yes.
16     Q     It also has the stamp from the secretary of state's
17  office, and so I'm going to represent to you that this is the
18  enrolled version of Senate Bill 1, so the one that was enacted
19  and signed into law.
20     A     Okay.
21     Q     And so if we look at Line 23 on Page 85, it reads --
22     A     Are we back on Exhibit --
23     Q     We are.
24     A     -- 14?
25     Q     My apologies.



1    A    Okay.

2    Q    -- So does this bill prohibit poll watchers from

3    videotaping voters inside the polling places?  Chairman Cain

4    says:  It does not, but current law does.  And you respond:

5    I'm sorry?  Representative Cain [sic] says:  Current law does,

6    so it's already illegal under current law.  And you ask:  Okay.

7    So this bill would not change that?  Chairman Cain says:

8    That's correct.  Did I read that correctly?

9    A    That's what it says, yes.

10    Q    Okay.  Were you concerned about poll watchers being

11    able to record at the polling sites?

12    A    I was concerned about a lot of things.  I wanted to

13    get clarity because whenever -- you know, as a legislator,

14    we're writing the law, we're changing the law, and so even if

15    the law says one thing now, we can change it, and so that's

16    what I was concerned about.  So as a legislator, I am just

17    trying to get an understanding because there was so many

18    differences of this bill, reiterations and errors -- you know,

19    remember the quotation mark? -- and so I just wanted to make

20    sure that if there was something that was in there that they

21    didn't intend to that we address it and get it removed at this

22    time.  Also, there were things in there that they claimed they

23    didn't have the intention of doing and it wasn't removed or

24    things that were not in there that they meant to put in there,

25    so I think it's important.  And that's what this floor process



1    is for, is for us to try to discuss and get a better

2    understanding of what changes to the law that the legislation

3    has.

4          Q    Okay.  So your questions were directed to get

5    clarification to see what SB 7 would do with respect to

6    videotaping by poll watchers in polling locations?

7          A    No.  I wanted to know if it changed the current law,

8    if it changed the law on videotaping inside the polling

9    location.

10         Q    Okay.  And let's turn to Page 87 --

11         A    Okay.

12         Q    -- specifically Line 22.

13         A    Line 22.  Okay.

14         Q    And you say:  Okay.  Let me just give you an

15   explanation because the [sic] provided this document to talk

16   about Operation Eagle Eye.  And then you say:  The Republican

17   National -- Committee recruited tens of thousands of volunteers

18   to show up at polling places in communities of colors and

19   challenge voters' eligibility, taking unwelcome photographs,

20   loudly described voters on two-way radios and summoned

21   Republican-friendly police officers, and in Texas, there were

22   over 10,000 volunteers alone to do that as poll watchers.  You

23   weren't familiar with that?  Did I read that correctly?

24         A    Yes.

25         Q    And so what is Operation Eagle Eye?



1    A    What I just said, what it reads right there.

2    Q    Okay.  And when was Operation Eagle Eye?

3    A    It says -- I don't know if I put that in there.

4    Maybe in the '80s or '90s.  I don't know.  I mean, they still

5    do it today.  They still have people that come out -- I know

6    they still have concerns.  I think that there was an

7    organization that reported some irregularities with poll

8    watchers from that previous election, that people were

9    concerned about -- that if you give them more freedom, then

10   there could be an increase -- increased intimidation of -- of

11   potential voters.

12   Q    And so when you're talking about Operation Eagle Eye,

13   that was in reference to a program or something that occurred

14   in the '80s or '90s, you said?

15   A    I don't remember the exact date, but I recall that it

16   still -- the concept still happens, and it was -- it was

17   actually, like, sanctioned.  Like, it was reported by the

18   Republican National Committee.

19   Q    So let me specifically ask:  When you say Operation

20   Eagle Eye, you're not referencing any specific operation that

21   occurred in 2020; is that correct?

22   A    I don't know if it was called Operation Eagle Eye,

23   but I -- I know that there were efforts to increase, you know,

24   watchers -- in 2020?  You're talking about 2020?

25   Q    Yes, 2020.



1     A    I'm sorry.  This is before this happened.  I don't

2  know if it was called Operation Eagle Eye, but I would -- I

3  would defer to the advocates.  They know -- they have a better

4  understanding and data on that, but at the time that I asked

5  this question, there was recent reports of this same type of

6  behavior, but I just don't know the name of the -- but there

7  were advocates that did that.

8     Q    Okay.

9     A    I don't know if it was called Operation Eagle Eye,

10  but it was similar to that tactic.

11     Q    And which advocates are you referring to?

12     A    There was one in particular -- I know the NAACP, they

13  do a lot of research on -- in -- in voter protection.  What was

14  the name of that group?  I don't know.  Maybe I'll get to it in

15  here.  Maybe we'll keep reading.

16     Q    Are you aware of any specific incident in Texas over

17  the last five years where a poll watcher was acting --

18  intimidated or threatened voters?

19     A    Yes.  I know that there's reports of it, and it was

20  recent, and that's why I brought this up.

21     Q    And where were those instances?  Where did they --

22  where would they -- where were they?

23     A    I don't know if it was in Harris County or Waller

24  County.  I -- I just don't remember exactly where, but they

25  were in Texas.



1      Q      Okay.

2      A      It wasn't outside of Texas.  They were in Texas.

3      Q      And do you have any personal knowledge about these

4   incidences?

5      A      Other than what I was -- what -- the information that

6   advocates shared with me and what I read in the newspapers?

7      Q      Yes.

8      A      That's it.

9      Q      Okay.  So the information you have regarding alleged

10  instances of voter intimidation/harassment by poll watchers

11  came from either newspapers or advocates?

12     A      From journalists, yes, who were supposed to

13  investigate these things, yeah.

14     Q      And you had mentioned that there is still efforts at

15  organizing poll watchers.  Did I -- am I recalling your

16  testimony correctly?

17     A      I don't think I said -- what do you mean organizing

18  poll watchers?

19     Q      Oh, you had mentioned something about how efforts at

20  securing -- of having poll watchers go to sites.

21     A      I don't remember saying it like that.

22     Q      Okay.  Are you aware of any efforts to organize poll

23  watchers?

24     A      Organize?  Like, how do you mean organize?

25     Q      So you had raised Operation Eagle Eye and you had



1  mentioned that this continues to this day.

2       A    Yes.

3       Q    And so that's what I'm trying to get at.  Are you --

4       A    The tactic of intimidation.

5       Q    Yes.  Are you aware of any specific attempts at

6  organizing such an operation like --

7       A    I thought that's --

8       Q    -- Operation Eagle Eye even if it's not called that?

9       A    I thought that's what we just had the discussion

10 about.  That's what I was -- the whole discussion we just had

11 was what --

12      Q    So that was specific incidents.  I'm now asking if

13 you're aware of any efforts to organize that type of activity.

14      A    I don't think they would include me in those

15 discussions, so, no, I'm not.

16      Q    Okay.  When you were talking with advocates or

17 reading newspapers, did any of those sources of information

18 indicate that there was some sort of organized effort at, you

19 know, channeling poll watchers to intimidate or harass voters

20 in Texas?

21      A    There was an organized effort?

22      Q    Yes.

23      A    I -- I don't recall.

24      Q    Okay.  Let's look at Page 101.

25      A    (Complies with request.)  Okay.



1    Q    And so at some point during the time on the House
2  floor, Representative Gonzalez asked you if he could ask you
3  questions; is that correct?
4    A    Representative Gonzalez asked -- say that again.
5    Q    So if we look at the description, it says -- it
6  starts:  What purpose?  Will the gentlelady yield for some
7  questions?
8    A    I ask the speaker, so that means I was at the back
9  mic.
10    Q    Okay.  And if you can just explain what that means by
11  being at the back mic.
12    A    So whoever's presenting, whether it's a bill or
13  amendment, typically would present that -- or lay their bill
14  out at the front mic, which is where the DIAS is, where the
15  speaker's -- you know, is located.  And then there's a back mic
16  closer to the door where there's opportunity to ask questions
17  if allowed, if you're recognized.
18    Q    Okay.  And so --
19    A    Or ask questions to the person that's laying out the
20  bill or the amendment or the provision.
21    Q    And so in this case was Representative Gonzalez
22  laying out an amendment and you were asking if you could ask
23  questions of him about that amendment?
24    A    I don't know what it -- because I didn't get to read
25  what was before.  So is there something that says, The chair



1  recognizes Representative Gonzalez?  (Reviewing.)  Oh, yeah.

2  It does say an amendment if you go back to Page 93.  I guess

3  this is a consecutive order -- oh, no, it's not, so I don't

4  know.

5        Q    Okay.

6        A    Sorry.  I don't know.

7        Q    That's fine.  At the very least, you were engaging in

8  questions with Representative Gonzalez; is that correct?

9        A    Yes, it appears so.  And I'm assuming this is

10 Jessica Gonzalez, because we have two Gonzalezes on the floor.

11       Q    And so if we turn to Page 102 --

12       A    Uh-huh.

13       Q    -- you say:  I want to -- I want to ask you about the

14 bill -- information about your amendment to strike, the entire

15 amendment.  On the committee, you heard --

16       A    Where are you at on Page 102?

17       Q    Line 2.

18       A    Okay.

19       Q    On the committee, you heard information -- you heard

20 testimony from the attorney general's office and did -- did

21 they provide you with evidence of widespread voter fraud in

22 Texas?  Representative Gonzalez responds with:  No, ma'am.  Did

23 I read that correctly?

24       A    I don't know what the entire amendment is, but you

25 read what it said.



Nicole Collier                                January 30, 2023
                                                    Page 143

```
 1      Q    Okay.

 2      A    But I don't know what this is in reference to.

 3      Q    Is it your understanding that the attorney general's

 4 office did not provide evidence of voter fraud during the --

 5 during the committee?

 6              MR. BLEDSOE:  Objection to form,

 7 mischaracterizes statement.

 8 BY THE WITNESS (resuming):

 9      A    Did they provide you with evidence of widespread

10 voter fraud in Texas --

11      Q    Uh-huh.

12      A    -- and the answer provided by Representative Gonzalez

13 was no.

14      Q    Okay.  And then you ask:  Did they provide you with

15 evidence of issues with fraud and limited integrity?  Did I

16 read that correctly?

17      A    That's what that says.

18      Q    Okay.  Representative Gonzales --

19      A    Well, finish the question.

20      Q    Okay.  (Reading.)  Like, did they show you where --

21 or did they provide information about where the purity of the

22 ballot box is in question?  Did I read that correctly?

23      A    Yes, and that purity in the ballot box is in

24 reference to the Page 1 on your document -- or page -- where

25 Cain -- Chairman Cain talked about that on Page 3 --
```



```
 1      Q    Yes.

 2      A    -- preserve the purity of the --

 3      Q    My question's --

 4      A    -- the ballot box.

 5      Q    -- pretty specific:  Did I read that correctly?

 6      A    Yes.

 7      Q    And then you ask:  Did they provide you with any
 8  information about those that they are currently investigating?
 9  That starts on Line 23.

10      A    Yes, I see that.

11      Q    And she responded:  They did.  They were -- well,
12  they personally didn't at first when we requested it at our
13  organizational meeting.  They had just given us a blanket
14  number.  I believe it was like 500 and something, seemingly
15  making it look like they were investigating 500 individual
16  cases, but in reality it was offenses, and that the reason that
17  that number had spiked so much was because it was -- there were
18  individual people that were getting charged with all of these
19  offenses; right?  Some that were overlapping like conspiracy
20  and things of that nature, and so it was very misleading to the
21  members on the committee because it made it sound like they
22  were investigating that many people, when, in reality, if I'm
23  recalling correctly, those -- all of those offenses broke up
24  into about five or six people.  Did I read that correctly?

25      A    Pretty much, yes.
```



1    Q    Were you at the committee hearing where the attorney

2    general's office was providing this information to the

3    committee?

4    A    I think so.

5    Q    And is that your recollection?

6    A    I did see a document where they had a lot of

7    offenses, and based on -- once you start reviewing it and

8    breaking it down, they were, like, a limited number of people.

9    So it wasn't like it was 500 people.  It was a limited number.

10   And I -- I believe it was like five or six or seven or -- it --

11   it wasn't like it was 500 people that they were investigating;

12   it was 500 offenses with one person being charged with multiple

13   offenses.

14   Q    And do you know how many votes those individual

15   offenses affected?

16   A    How many votes?

17   Q    Yes.

18   A    I don't know.  Were they all -- I mean, this is just

19   investigating.  They -- they didn't -- they weren't done.

20   Q    Okay.  And so you don't know how many votes would

21   have been affected by the individuals that the attorney

22   generals were investigating.

23   A    It was an investigation, so -- I mean, it wasn't

24   complete.

25   Q    But you didn't get any understanding of how many



 1  votes were affected by the conversation the attorney general's

 2  office representative had during this meeting with committee --

 3                  MR. BLEDSOE:  Object to the form.

 4  BY MS. HUNKER (resuming):

 5      Q    -- members; is that correct?

 6      A    I don't think the attorney general's office discussed

 7  this publicly, an active investigation.  And that attorney

 8  (ph), you know, they're not going to tell us that.

 9      Q    And let's look at Page 106.

10      A    Okay.

11      Q    Okay.  You say on Line 4:  And do poll watchers take

12  an oath now to be a poll watcher?  Representative Gonzalez

13  says:  No.  Did I read that correctly?

14      A    Yes, you did.

15      Q    Okay.  And you then say:  Okay.  Are poll watchers

16  trained?  And you respond -- and -- sorry -- Representative

17  Gonzalez responds:  No.  Is that correct?

18      A    That's what it says, yes.

19      Q    And then you say:  They're not trained, but the

20  presiding judge is trained.  Representative Gonzalez responds:

21  I believe so, yes.

22      A    That's what she said --

23      Q    Did I read that --

24      A    -- yes.

25      Q    Okay.  Did you at all advocate for poll watchers



1 being required to take an oath during the discussion of HB 6 or

2 SB 7?

3     A    I don't know if I -- I advocated for an oath, but

4 training definitely, and then also for reciprocal penalties.  I

5 mean, if they can -- if they can make false claims, then why

6 can't the person that they made false claims against?  So we

7 were trying to get some reciprocity.  It didn't make it into

8 the bill.

9     Q    Okay.

10    A    But I believe the oath -- I think that the oath -- it

11 seemed like that's something they offered up later on, in -- in

12 terms of the person who did the bill or the -- during the

13 process.

14    Q    So you did not advocate for poll watchers to have to

15 take an oath, but you did advocate for poll watchers to have

16 training; is that correct?

17    A    Well --

18        MR. BLEDSOE:  Object to form.

19 BY THE WITNESS (resuming):

20    A    -- I wasn't the only one involved, so somebody else

21 on the Democratic side could have been advocating for it.  But

22 I don't remember.  I can't -- I may have.  I don't remember.  I

23 mean, there was a lot of stuff that I was advocating for,

24 again, with the criminal penalties, reducing the criminal

25 penalties against -- because they were doing enhanced penalties



1  and then also it was like the poll watcher could do anything

2  and not be penalized, but yet, if it was false, I mean,

3  literally, there was no consequences.  There were no

4  consequences for -- if they made false statements or something.

5       Q    And let's look further down.  So looking at Line 16,

6  you say:  The election judge is trained.  They receive a

7  training, they take an oath, but the poll watcher does not take

8  an oath.  So let's talk about the criminal penalties that you

9  mentioned that you say are necessary --

10      A    Unnecessary.

11      Q    -- unnecessary.  Under this bill -- well, let me ask

12  you this:  In your -- based on the information that you have

13  and based on your experiences with elections, traditionally,

14  has it been difficult to enlist poll workers?

15  Representative Gonzalez responds:  Yes.  Did I read that

16  correctly?

17      A    Yes, because she actually practiced election law.

18      Q    And you respond:  And I'm talking about poll workers,

19  people who are at the clerk's -- the clerks and the presiding

20  judge.  Has it been difficult to do that?  Representative

21  Gonzalez:  Yes, very difficult.  And you respond:  And so the

22  criminal penalties that are in this bill, do you believe that

23  that would further limit participation and volunteerism as a

24  poll worker?  Did I read that correctly?

25      A    And as -- as a poll worker, yes.



1      Q     And Representative Gonzalez responds:  Absolutely.

2  You know, some of these folks, it is -- it is a part-time job.

3  It's not like they -- they make a ton of money working the --

4  you know, the polls when we need them.  It's very difficult for

5  polling locations to fill those -- those positions, and when

6  you put a person in a situation that they can accidentally

7  commit a crime, it's going to discourage people from taking

8  these positions and make it even harder for people to be able

9  to employ folks at the polling location where we need them.

10  Did I read that correctly?

11     A     Hang on.  I think I got lost.  Employ folks at the --

12  yes.

13     Q     Okay.

14     A     And pretty much.  I mean, I got the gist of what you

15  read.

16     Q     Okay.  And so after Senate Bill 1 was implemented,

17  did you come across any evidence that SB 1 reduced the number

18  of poll workers or election judges willing to volunteer?

19     A     Yes.  In fact, in Tarrant County, there was a -- it

20  was pretty hard to find people to volunteer to participate.  A

21  lot of people were concerned about criminal penalties.  Usually

22  it's -- when I've been to the vote -- to vote, it's a senior

23  that is there, you know, volunteering and -- and doing their

24  civic duty to participate in the -- the process, but then I

25  noticed because -- you know, I could appoint somebody, the



Nicole Collier

January 30, 2023
Page 150

1    parties can appoint somebody.  It was hard to find people to

2    fill up these locations, and I recall that there was an issue

3    about Tarrant County being able to staff all of the polling

4    locations.

5        Q    And do you know if Tarrant County had trouble filling

6    these volunteer positions in 2020?

7        A    Not -- I didn't hear about it like I did in 2022 --

8    is it 2021?  2020 -- when was that election?  This last -- when

9    this was implemented, I didn't hear about it like that because

10   the party chair was even, like, pleading to make sure that

11   everybody -- you know, Find people to work these polls.

12       Q    And that was your experience in the primary election

13   in 2020?

14       A    It was both.  Literally, we had trouble with both,

15   the primary and the general election.  In 2021.  I'm sorry.

16       Q    In 2021.

17       A    In this last -- I'm sorry -- this last election.  Was

18   that in 2022?

19       Q    Yes.

20       A    From the 20 -- after SB 1, because you asked me about

21   SB 1.

22       Q    Yes --

23       A    Yeah.

24       Q    -- post-SB 1.

25       A    Yeah.



Nicole Collier                                            January 30, 2023
                                                                Page 151

1       Q      Okay.

2       A      They had trouble for the primary and the general

3   after SB 1 was implemented.

4       Q      Okay.  And what evidence do you have that it was

5   because of SB 1 that caused --

6       A      Well, we didn't have these increased criminal

7   penalties and we didn't have freedom to move around.

8       Q      So is it simply the correlation of the changes in law

9   with the decrease?

10      A      I don't know.  I -- you know what?  I feel like even

11  the party chair, Allison Campolo, made a reference to the --

12  the difficulty.  I don't remember exactly the wording of it,

13  but it led me to believe that it was because of all of these

14  additional new provisions that people didn't have time to come

15  -- become comfortable with.

16      Q      But you didn't talk to any volunteer --

17      A      Oh, yes.  So when I go to the neighborhood meetings,

18  I talk to seniors in -- in the neighborhood, you know,

19  associations, and they -- I had one lady tell me she wasn't

20  going to volunteer anymore.  She said, Y'all ain't gon' get me.

21      Q      Are you aware of Tarrant County having to close any

22  polling locations in response to the changes?

23      A      I don't know exactly the number, but I do remember

24  Allison Campolo, who is the Democratic Party chair, mentioning

25  that it was going to be difficult to staff every location, and



1  it was down to the wire.

2      Q    And so you're not aware of Tarrant County having to

3  close any polling locations in response to these poll watcher

4  provisions following SB 1.

5      A    Not off the top of my head.

6      Q    And so did you look at any studies that tracked the

7  number of individuals who were willing to volunteer post-SB 1

8  compared to pre-SB 1?

9      A    I don't know if there's been any studies.

10     Q    So you haven't looked at any studies.  Is that fair

11 to say?

12     A    Are there studies?

13     Q    Well, have you looked at any?

14     A    I don't know if there's any studies to look at.

15     Q    And have you looked at any other counties besides

16 Tarrant County on whether there was any decrease in the number

17 of volunteers at polling locations during election post-SB 1?

18     A    No.

19     Q    Let's quickly turn to Page 109.

20     A    Okay.

21     Q    Line 10, please.

22     A    All right.

23     Q    And it says, Representative Collier:  So do you

24 believe that this bill if passed would have the impact of

25 increasing arrests for individuals?  Representative Gonzalez:



1    Absolutely.

2         A    So I asked the question, Representative Collier, and

3    then Representative Gonzalez responded.  Yes, that's what it

4    says.

5         Q    Okay.  Are you aware if there was any increase in the

6    number of arrests following the passage of SB 1?

7         A    Am I aware?

8         Q    Yes.

9         A    I haven't looked for any.

10        Q    So you haven't looked to see whether or not the

11   changes passed in SB 1 regarding poll watchers increased the

12   number of arrests.  Is that fair to say?

13        A    I -- I don't know if there -- if there is evidence of

14   that.

15        Q    And we can put this document aside.

16        A    Okay.

17        Q    So I'm going to introduce our next exhibit.  And so

18   this, you see on top, says House Journal, 87th Legislature,

19   Regular Session; is that correct?

20        A    House Journal, 87th -- yes.

21        Q    And then it says, Wednesday, May 19th, 2021.

22        A    51st day, Wednesday, May 19th, 2021.  Yes.

23        Q    Okay.  And if we turn the page over to where it says

24   SB 7 --

25        A    (Complies with request.)



1    Q    Now the House Journal, that records votes and actions

2    from the legislative floor; is that correct?

3    A    Say that again.

4    Q    The House Journal, that records actions that were

5    taken on the House floor; is that correct?

6    A    Actions that were taken.  You mean it provides a

7    written -- and it's not all of it because not everything goes

8    into the -- the House Journal.  I'm sorry.  I'm thinking of the

9    -- well, not everything is in here, like -- like, the

10    transcript, like, you're talking about.

11    Q    Uh-huh.

12    A    Yeah, that's not in there.

13    Q    So it's not a transcript, but it does -- it does

14    record the actions taken by the House such as votes or motions;

15    is that correct?

16    A    I believe so.

17    Q    Okay.  And so if we look at the top of -- where it

18    says 3431, it says:  SB 7 request of Senate granted, conference

19    committee appointed.

20    A    Yes.

21    Q    On motion of Representative Cain, the House granted

22    the request of the Senate for the appointment of a conference

23    committee on SB 7.  Did I read that correctly?

24    A    Yes.

25    Q    And then it says:  The chair announced the



1    appointment of the following conference committee on part of

2    the House on SB 7; Cain, chair; Canales, Clardy, Collier and

3    Jetton.  Did I read that correctly?

4         A    Yes.

5         Q    And so you were a member of the conference committee

6    for SB 7; is that correct?

7         A    Yes.

8         Q    And so this conference committee for SB 7 had two

9    Democrats to -- what was the breakdown per party?  I should

10   say.

11        A    There was two Democrats.

12        Q    Two Democrats?

13        A    And then three Republicans, it looks like.

14        Q    And the other Democrat was Representative Canales; is

15   that correct?

16        A    Yes, Chair Canales, uh-huh.

17        Q    Now, did you volunteer to go onto this committee?

18        A    I did not -- I mean, you're at the service, so -- I

19   didn't know I was going to get appointed to it, if that's what

20   you're asking.

21        Q    Yes.

22        A    I did not know.

23        Q    And what was discussed at the conference committee

24   regarding the reconciliation of the bill?  Can you kind of just

25   give me a quick overview?



```
 1            MR. BLEDSOE:  Object to form, assumes facts not

 2   in evidence.

 3   BY THE WITNESS (resuming):

 4       A    The conference committee?  I mean, literally, the --

 5   that presupposes that there is a committee that meets.  I mean,

 6   it doesn't meet like a traditional committee.

 7       Q    So then how does a conference committee operate?

 8       A    I think it's -- what you would expect it to be is

 9   that there is a actual meeting of everyone to discuss the bill,

10   but that's not how this started out.  So immediately, once I

11   learned I was on this conference committee, I reached out to

12   Chair Cain and offered my assistance and said that I would be

13   -- you know, would like to meet with him to discuss the bill.

14            And so that didn't happen.  And he said, Okay, I'll be in

15   touch with you, and then -- let's see.  What -- he said, I'll

16   be in touch with you, and then I just so happened to call him,

17   because I didn't hear back from him, and he said that him and

18   Clardy were already discussing the bill.  And I said, You are?

19   And then I said, Well, I'm coming down, and I went over to his

20   office.  And it was him, Clardy and another lady who was a

21   lawyer, and she had been involved in helping them.  She said

22   she drafted the bill pretty much.

23            And so I did not get invited.  I just so happened -- like,

24   when I spoke with Cain, he said that they were meeting then,

25   and I wouldn't even call that an actual conference committee
```



1  because I tried to get Canales, but he wasn't there.  But,

2  yeah, I don't think Jetton was in that -- he wasn't in that

3  meeting either.

4       Q    And so did you have any exchanges with

5  Representative Cain via E-mail or phone call about the

6  conference committee bill?

7       A    I don't -- like, what do you mean?  Like, did we,

8  like, E-mail each other about the bill?  I don't think so.  I

9  think everything was more -- like, if I called, it was to --

10 for logistics, like, Where are you at, or, Come up here, or

11 something like that.

12      Q    Uh-huh.

13      A    But in terms of the content, I don't -- I can't

14 remember if I did.  I don't think so.  I don't think so.

15      Q    And did you speak to any of the Senate members about

16 SB 7 as part of your being part of the conference committee?

17      A    I did.

18      Q    And who did you speak to?

19      A    Senator Beverly Powell.

20      Q    And what topics were discussed?

21      A    Well, she was also appointed to the conference

22 committee in the Senate on the bill, and I asked her if she had

23 a chance to meet with the conference and she said no, they did

24 not speak with her, so she didn't know what was going on with

25 the bill.



1       Q     And did you make any proposals regarding the
2   conference committee bill?
3       A     Yes.
4       Q     And were any of those proposals accepted?
5       A     Some of them.  I believe some of them were accepted.
6   A lot were not.
7       Q     Can you recall which ones were accepted?
8       A     And when you say me, I may not have done it, but it
9   was the, you know, Democratic faction.  It was something that
10  we -- we worked with our advocates with and the Sunday voting,
11  you know, limiting Sunday, Souls to the Polls was an issue.  We
12  still needed to work through the poll watcher provisions.
13  There was something about the hours that the polls would be
14  open.  Let's see here.  What else?  What were we talking about?
15
16      The mail-in ballot.  The -- I don't know if it was during
17  this time, but there was a provision that said that you had to
18  put the -- either your Social Security number or your driver's
19  license on the inside -- I mean on the outside-inside (ph)
20  envelope, and that was new, and it -- it was confusing.  Like,
21  where -- what if you don't remember which one -- we brought
22  that up and they still didn't do anything with that.  What if
23  you don't remember which one you used to vote -- register to
24  vote, and that was not addressed.  There was one senator that
25  they said that they -- they had some provisions -- oh, what was



 1  the senator's name? -- that they couldn't negotiate with, that
 2  -- like, they had to stay in.  Let's see here.  Besides that,
 3  if I -- give me a minute.  I can think about some of the other
 4  things that were in that bill.  The criminal penalties --
 5      Q    Uh-huh.
 6      A    -- that was an issue.  I'm trying to think what else.
 7  Is this the bill?
 8      Q    That's --
 9      A    -- SB 1?
10      Q    -- SB 1.
11      A    Oh, SB 7.
12      Q    It's the other one.
13      A    Yeah, let me look at this one because it --
14  literally, it changed.  It literally increased like 10 pages.
15  I mean, the bill kept getting bigger and bigger, and then there
16  were multiple reiterations that we had of the bill --
17      Q    Okay.
18      A    -- that changed.  But, yes, I did, myself and -- and
19  -- and Canales -- and it wasn't just us two, actually.
20  Chair Turner got to go to the back and got -- discussed this
21  bill, so did Speaker Pro Tem Moody, John Bucy eventually got
22  involved -- who else?  I mean, there were -- the committee
23  literally -- I know the night before they provided a last -- I
24  mean, like, their last version and it was different from the
25  one that we saw that morning literally.  It was a different



1    version.  And at that setting, it was like 10 at night, they

2    called us back in, but Turner was there -- meaning Chris Turner

3    -- Bucy was there, I feel like -- well, no, Bucy may not have

4    been at that one but Moody was there and I was there, Jetton

5    was there, somebody from the OAG's office was there, Jay Dyer

6    was there.  I'm trying to think.  Who else was there?  Cain.

7    And I remember there was something in the bill that Cain wanted

8    and it didn't make it in and he was very upset.

9          Q    Okay.  I want to move now on to Senate Bill 1.

10         A    Senate Bill 1, which one is that one?

11         Q    That's the one that was enacted, and it should be 16.

12         A    Okay.  And I was not there.

13         Q    Yes.

14         A    My mother died and I was not -- during that session,

15    I was not there.

16         Q    Because that's actually what I was going to clarify,

17    because you had mentioned a few times that you were not

18    participating in Senate Bill 1 during the special session, and

19    I'm very sorry to hear about your mother's loss.  I know from

20    personal experience that losing a parent is grievous and

21    demoralizing.  But I wanted to ask you:  Were you involved at

22    any point at the -- were you absent the entire second special

23    session?

24         A    Yes.

25         Q    Okay.  And so you did not participate in any of the



 1   -- or attend any of the committee hearings; is that correct?

 2        A    That is correct.

 3        Q    Okay.  And you didn't attend any of the floor

 4   meetings; is that correct?

 5        A    That is correct.

 6        Q    And so you're not aware of -- let me -- let me take

 7   that back.  Did you offer any amendments to Senate Bill 1 or

 8   proposals to Senate Bill 1 even though you were not during --

 9   there during the special session?

10        A    No, I did not.

11        Q    And did you communicate any post amendments or

12   proposals to other Texas Democrat Caucus members?

13        A    No, because I was literally the only one handling my

14   mother's arrangements, so no.

15        Q    And did you look at any of the testimony that came

16   from Senate Bill 1 after the fact?

17        A    No.

18        Q    And did you read any of the floor debate at any time

19   after Senate Bill 1 was enacted?

20        A    No.

21        Q    Okay.  And so you didn't look at any of the data that

22   was presented to the legislature for Senate Bill 1 in the

23   second special session; is that correct?

24        A    I did -- no, I did not, yeah, that's correct.

25        Q    And did you look at the procedure that was followed



1  during the passage of Senate Bill 1?

2      A    No.

3      Q    And do you know the -- did you speak to any of your

4  colleagues about Senate Bill 1 while it was being considered?

5      A    I don't think so.  What date was it being considered?

6  I don't remember.

7      Q    It would have been during the second special session.

8      A    I don't think so.

9      Q    And you don't know the intent of any of the

10 individuals who voted in favor of Senate Bill 1; is that

11 correct?

12              MR. BLEDSOE:  Objection to form.

13 BY THE WITNESS (resuming):

14     A    I do not, no.  I don't even know who voted for it or

15 against it.

16              MS. HUNKER:  Representative Collier, we've going

17 -- been going about an hour and 15 minutes.  Did you want to

18 take a break or did you want to continue?

19              THE WITNESS:  I'm fine.

20              MS. HUNKER:  Okay.  We'll continue.

21              COURT REPORTER:  I would like to take a break.

22              THE WITNESS:  Okay.

23              COURT REPORTER:  I need to change this also.

24              THE WITNESS:  Do you have to say we'll go off?

25              VIDEOGRAPHER:  Going off the record at 6:02 p.m.



Nicole Collier                                          January 30, 2023
                                                        Page 163

```
 1                    (A recess is taken.)
 2                    VIDEOGRAPHER:  We are back on the record at
 3    6:22 p.m.
 4    BY MS. HUNKER (resuming):
 5         Q    Representative Collier, so after the conference
 6    committee for Senate Bill 7 came back, that bill never passed
 7    the House; correct, the conference committee version?
 8         A    The conference committee version never passed the
 9    House, that's correct.
10         Q    Okay.  And I believe that Texas Democrats broke
11    quorum in part to ensure that that particular bill would not go
12    through; is that correct?
13                    MR. BLEDSOE:  Objection to form,
14    mischaracterizes the testimony.
15    BY MS. HUNKER (resuming):
16         Q    Let me rephrase the question:  Did the Texas
17    Democrats break quorum during the regular 87th Legislature?
18         A    There were some, not all of the Democrats.
19         Q    Some Democrats.
20         A    Well, the majority of them, but not all of the
21    Democrats.
22         Q    Okay.  A majority of Democrats broke quorum at the
23    end of the 87th Regular Session; is that correct?
24         A    They used a procedural rule that's in the House rules
25    that requires a certain number of members to be on the floor to
```



1  conduct business, and that's what they -- the Democrats,

2  including myself as part of that --

3     Q    Okay.

4     A    -- used to stall the implementation of the provisions

5  of SB 7.

6     Q    And you said you were a part of that quorum break.

7     A    I did leave the legislature, the House, by the way,

8  the floor.

9     Q    And so the Governor convened a special session

10 following the close of regular session; is that correct?

11    A    There was --

12    Q    Was there a special session?

13    A    There was a special session.

14    Q    Okay.  And a large portion of Democrats broke quorum

15 for the first special session; is that correct?

16    A    Yes, they did a quorum break.

17    Q    And you were a part of that quorum break.

18    A    I was.

19    Q    And during that quorum break, Democrats went to

20 Washington DC; is that correct?

21    A    A certain number of the House Democrats did.

22    Q    And were you among them?

23    A    Yes.

24    Q    And the Democrats returned -- do you know when the

25 Democrats returned or when quorum, I should say, was



 1  reconvened?
 2       A    I don't.  I think that it was when Chair Coleman and
 3  -- you mean for the second special session?
 4       Q    Yes.
 5       A    Or the first special -- I'm sorry.
 6       Q    Well, do you remember -- when did you come back to
 7  Texas?
 8       A    I came back -- oh, to Texas?
 9       Q    Or when did you decide to report?
10       A    For the third.  After I did my mom's funeral, I came
11  back to the session.
12       Q    Okay.
13       A    The third special session.
14       Q    And do you know when quorum was reached?
15       A    You mean for the first special session?
16       Q    Or second or for the first.
17       A    Oh, okay.  So, no, the first -- you're right.  The
18  first special session ran out.
19       Q    Right.
20       A    Yes.  It's a 30-day time period and it ran out.  I
21  don't remember -- I do remember that it was -- when a -- a few
22  Democrats did return, I think it was three.
23       Q    And were you part of the discussions between
24  Democrats and Republicans to get the Democrats to come back to
25  Texas and meet quorum?



1      A    I -- no, because I didn't even know there was a

2  discussion.

3      Q    Okay.  And so I want to introduce our next exhibit.

4            COURT REPORTER:   18.

5  BY MS. HUNKER (resuming):

6      Q    -- Exhibit Number 18.  Do you have Exhibit 18 in

7  front of you?

8      A    Yes.

9      Q    And do you recognize this exhibit?

10     A    No.

11     Q    Okay.  Do you see where it says For Immediate

12  Release, August 23rd, 2021?

13     A    Yes.

14     Q    And then it says Texas House Democrats Correct House

15  GOP Members' Misrepresentation of Special Session Quorum

16  Cautioning:  A Quorum is Not Perpetual.  Did I read that title

17  correctly?

18     A    Yes.  Members -- okay.  Texas House Democrats Correct

19  House GOP Members' Misrepresentation of Special Session Quorum

20  Cautioning:  A Quorum is Not Perpetual.  Okay.

21     Q    Okay.  And so it starts with:  Last Thursday, Texas

22  voters witnessed a gleeful GOP celebrate and misrepresent the

23  existence of a constitutional quorum on the House floor.  This

24  staged quorum production was not only premeditated but also

25  premature.  We remind our colleagues that there is no such



1  thing as a perpetual quorum.  Did I read that correctly?

2      A    Yes, I see that.

3      Q    Okay.  It continues:  Specifically, there must always

4  be a minimum of 100 members present on the House floor to

5  establish the quorum necessary to vote on every single piece of

6  legislation.  There is no indication or commitment from any

7  Texas House Democrat that this will occur.  Did I read that

8  correctly?

9      A    (Reading.)  There's no indication or commitment from

10 any Texas House Democrat that this will occur.

11     Q    Okay.  And so if you see -- did I read that

12 correctly?

13     A    No.  You said that, That will occur.

14     Q    Okay.  Well, how about you read that particular --

15 from specifically to occur.

16     A    (Complies with request.)  Okay.  I've read it.

17     Q    Okay.  Can you read it out loud?

18     A    Oh, okay.  (Reading.)  There is no indication or

19 commitment from any Texas House Democrat that this will occur.

20     Q    Okay.

21     A    Okay.  That's what it says.

22     Q    And so if we look to the next paragraph --

23     A    Uh-huh.

24     Q    -- it has a list of Texas State Representatives.

25     A    Right.



1    Q    Do you see that?

2    A    Yes.

3    Q    And do you see your name, Nicole Collier?

4    A    I do.

5    Q    Okay.  Did you sign on to this press release?

6    A    I would -- I guess so, if my name's there.  I don't

7    remember, but I would think I did.

8    Q    And did you agree with the statement that there is no

9    such thing as a perpetual quorum?

10   A    A perpetual quorum?  I -- I don't think you can have

11   a -- I mean, if you adjourn, then you have to have a -- that

12   means you ended the day.  You need to have a new quorum for the

13   next day.  Now, there have been times where they recessed and

14   the quorum is still in place from the recess, like we did for

15   the inauguration for the Governor this last time.  We recessed

16   on the House floor and then we walked outside and did a joint

17   session with the Senate for the inauguration of the Lieutenant

18   Governor.  So that was a recess, but it wasn't a perpetual --

19   it's not like you can go from day to day once you adjourn, so I

20   don't think that that's -- yeah, I agree with that.

21   Q    So the date August 23rd, 2021, that was during the

22   second special session; is that correct?

23   A    I don't remember the dates of it.

24   Q    Okay.  You'd agree it was after the first special

25   session, would [sic] you?



1      A    Can you tell me the dates of the special sessions?

2      Q    (Reviewing.)  Was it understood among House Democrats

3  that they will -- that they would break quorum -- that there

4  was a possibility that they would break quorum again during the

5  second special session, to your knowledge?

6      A    That they would break quorum again?

7      Q    Yes.

8      A    I don't think so.  I don't know.  I can't say.

9      Q    Okay.  Did Texas House Democrats threaten to break

10  quorum at any point to your knowledge during the second special

11  session?

12     A    I wasn't there, no.  I don't know.

13     Q    So according to the Texas Reference Library --

14     A    Uh-huh.

15     Q    -- the first special session was from July 6th --

16  sorry -- July 8th, 2021, to August 6th, 2021 --

17     A    Oh, wait.  You said July 6th?

18     Q    July 8th.

19     A    Oh, July 8th till August --

20     Q    August 6th.

21     A    Okay.

22     Q    -- and the second special session was August 7th

23  through September 2nd.

24     A    So, then, yes, this -- August 23rd is -- is the

25  second special.



1    Q    Okay.  And so during the second special session,

2  members of the Texas Democratic Caucus issued a press release

3  stating that there is no indication or commitment from any

4  Texas House Democrat that a -- that this will occur in

5  reference to a quorum, as you said.

6                MR. BLEDSOE:  Object to the form --

7  BY THE WITNESS (resuming):

8    A    I --

9                MR. BLEDSOE:  -- mischaracterizes the evidence.

10 BY THE WITNESS (resuming):

11   A    Yes, I see that.  There was certain members of the

12 Democratic caucus, not all of them.

13   Q    We can put that aside.

14   A    Okay.

15   Q    Okay.  So you had mentioned that you went to

16 Washington DC in the summer of 2021; is that correct?

17   A    Summer of -- yes.

18   Q    And during that time, you testified before Congress;

19 is that right?

20   A    Yes.

21   Q    And so I'm going to introduce Exhibit Number 19.  And

22 do you see the top where it says 117th Congress, Congress of

23 the United States House of Representatives?

24   A    Yes.

25   Q    And it's the committee on oversight reform; correct?



 1      A    Yes, I see that.

 2      Q    And do you see that this is an announcement regarding

 3  a subcommittee hearing?

 4      A    It's a memorandum.  I don't know if it's --

 5      Q    Okay.  So it's a memorandum dated July 26th, 2021; is

 6  that correct?

 7      A    It's a -- yes.

 8      Q    And then it says:  To members of subcommittee on

 9  civil rights and civil liberties from subcommittee staff.  Did

10  I read that [sic]?

11      A    Yes.

12      Q    And then it says Hearing, the topic being on

13  Democracy in Danger, the Assault on Voting Rights in Texas.

14  Did I read that correctly?

15      A    Yes.

16      Q    And this hearing was held on Thursday, July 29th,

17  2021, at 10 a.m.; is that correct?

18      A    I think so.  I hadn't seen this document.

19      Q    And so if we turn the page on Page 2, a list of

20  witnesses including the Honorable Severino (ph) Thompson, the

21  Honorable Nicole Collier, the Honorable Diego Bernal and

22  Nina Perales; is that correct?

23      A    Yes, that's Senfronia Thompson.

24      Q    Thank you.  And who asked you to testify during the

25  hearing?



1       A    I don't know who asked me.  I was just told that my

2  name was submitted and -- I don't know who asked me to testify.

3       Q    Okay.  And we can put that away.

4       A    (Complies with request.)

5       Q    And so we're going to look at Exhibit Number 20.

6       A    Okay.

7       Q    Do you have Exhibit 20 in front of you?

8       A    Yes.

9       Q    And do you recognize this particular exhibit?

10      A    Oh, did they type this up?  Was this my testimony?

11      Q    If you notice, this is your written testimony.

12      A    Oh, okay.  All right.

13      Q    Well, do you recognize this as your written

14 testimony?

15      A    I don't remember it, but I'm glad somebody wrote it

16 down because I -- I had, like, notecards that I lost.  Who --

17 was this in the record?

18      Q    (Affirmative response.)

19      A    Oh, okay.

20      Q    And so since -- and can you please take just a quick

21 read through and then I'm going to ask if this is a accurate

22 recollection of your opening remarks or testimony.

23      A    Okay.  Let's see here.  (Reviewing.)

24           MR. BLEDSOE:  Now, you didn't say that -- she

25 didn't -- she said she doesn't recall that maybe she did this.



```
 1  Is this a transcript -- do you think this is a transcription of
 2  your verbal testimony?  Do you know?
 3                  THE WITNESS:  I don't think it is, because --
 4                  MS. HUNKER:  So I have a transcript of her
 5  verbal testimony.  This tends to be the written testimony
 6  that's submitted to the committee or sometimes the opening
 7  statement that is recorded.
 8                  THE WITNESS:  So I -- it's hard --
 9                  MR. BLEDSOE:  Okay.  But you don't remember it;
10  right?
11  BY MS. HUNKER (resuming):
12     Q    So I will say:  Do you recall submitting written
13  testimony to the committee?
14     A    No, but, I mean, somebody could have done it for us,
15  you know, submitted this actual -- I don't know if this is a
16  transcript or if somebody submitted this.
17     Q    Okay.  So you don't recall submitting this particular
18  document to the committee before Congress; is that correct?
19     A    No, but you have staff and they help you -- make you
20  look better, and so, literally, I have a team of people that
21  help me and I don't do everything, so I can't say that I did
22  this.  No, I did not.
23     Q    Okay.
24     A    But I'm reading it now.  You want me to read it.
25     Q    Well --
```



```
 1      A    It doesn't sound like -- I mean, you see how I'm
 2  talking to you?  This is how I testify, too, so if there was a
 3  script, I probably went off and -- so...
 4      Q    My impression was that this was a written testimony
 5  you submitted; however, if you do not recall it, I'm going to
 6  put it aside and we'll work on your verbal testimony.
 7      A    It might be better than my verbal testimony, so I
 8  don't know.  I could read it.  Do you want me to finish reading
 9  it?
10      Q    You can, but I'm just going to ask:  You don't recall
11  if your staff submitted this particular written testimony on
12  your behalf?
13      A    I mean, if it's there, somebody submitted it for me.
14  If it was not my staff, it was somebody.
15      Q    Okay.  So somebody submitted this written testimony
16  on your behalf, but you don't recall doing so; is that correct?
17  You yourself.
18      A    No, I did not.
19      Q    Okay.  And you don't know if it was your staff who
20  submitted this testimony on your behalf; is that correct?
21      A    I don't know.
22      Q    Okay.  Then we're going to put this document aside.
23      A    Oh, okay.
24      Q    (Provides exhibit.)  And we're going to introduce --
25      A    Oh.
```



```
 1       Q     -- Exhibit 2021 -- or Exhibit 21.
 2       A     Okay.
 3                  MR. BLEDSOE:  Did your memory get jogged?
 4                  MS. HUNKER:  Yeah.
 5                  THE WITNESS:  Yeah, I just read --
 6                  MR. BLEDSOE:  (Crosstalk.)
 7                  THE WITNESS:  -- some part down here.  This is
 8  something that I did say.  I do remember saying these things.
 9  I don't ever say these things.  (Reading.)  Suppression can
10  also happen in subtle ways, like when your polling location
11  continues to change or the hours the polls are open vary, long
12  lines or harsh criminal penalties for people who make simple
13  mistakes.  All of that disrupts the voting process and makes it
14  less likely for people to participate.
15       Q     Okay.
16       A     Voting does not have to be hard, but it should be
17  fair and free.  Communities should be able to freely elect the
18  candidate of their choice -- I did say that.
19       Q     Okay.  You did say that.
20       A     Yes.
21       Q     Okay.  So you don't recall submitting this specific
22  written testimony, but you do recall making these statements.
23  Is that fair to say?
24       A     Well, I just looked at that section.  Do you want me
25  to go back?
```



1      Q    No, that's okay.  We'll focus on that section.

2      A    Okay.

3      Q    All right.  Well, you mentioned in this section that

4  you recalled -- statement will focus on that section?

5      A    Oh, wait.  Did you see this, this data here?  It

6  says:  In the November 2020 general election, Texas [sic] saw

7  the largest voter turnout in Texas since 1992 with 66.8 percent

8  of eligible voters casting their ballot, including the highest

9  turnout in 10 years of Black, Brown and Asian eligible voters.

10      Q    So my first question to you would have been where you

11  got the statistics from.

12      A    Probably advocates, people who do -- know elections

13  better than me.

14      Q    Okay.

15      A    But I'm the kind of person -- I like -- I like to see

16  it, too, so I'm sure they --

17      Q    So you don't recall what the source was of that

18  specific statistics [sic].

19      A    It was an expert.  I don't -- I won't repeat anything

20  unless it's somebody that I can look at and see.

21      Q    And that would have been the number statewide; is

22  that correct?

23      A    It's -- it's exactly what it says:  Texas saw the

24  largest voter turnout in -- and, look, it even says in November

25  2020 election -- general election, Texas saw the largest voter



1    turnout in Texas.  I mean, where else would it -- sorry.  I'm

2    just...

3         Q     And so the line that starts with however --

4         A     However.  Okay.

5         Q     You say:  However, suppression can also happen in

6    subtle ways, like when your polling location continues to

7    change or how the hours the polls are open vary, long lines or

8    harsh criminal penalties for people who make simple mistake.

9    Did I read that correctly?

10        A     Yes.

11        Q     Okay.  So what did you mean by, The hours the polls

12   are open vary?  How does that tie to voter suppression?

13        A     Well, I mean, people are -- are creatures of habit,

14   and so they're used to having a polling location at a certain

15   place, I always vote downstairs at -- you know, down this hall

16   or whatever, or this location.  The polls on some days may be

17   open from 9 to 5 and sometimes it's open from 7 to 7, and so

18   that can -- you know, or on Sundays, maybe it's 12 until 5 or

19   12 till 6, and so that could disrupt the process.  And, you

20   know, certain locations like at a university, sometimes they

21   have even less hours because of the location.

22        Q     And so when a single county had different polling

23   hours on different days, does that, to your knowledge, confuse

24   voters?

25                    MR. BLEDSOE:  Objection, form, and --



```
 1  BY THE WITNESS (resuming):
 2       A    I don't --
 3                 MR. BLEDSOE:   -- mischaracterizes the testimony.
 4  BY THE WITNESS (resuming):
 5       A    I said it can be so -- I mean, it could lead to that,
 6  yes.
 7       Q    Okay.
 8       A    In conjunction with a bunch of other stuff that
 9  you've compounded, because Texas -- I think one of the things
10  that -- I don't know if I said it in here, but Texas already
11  had the strictest voting laws at the time.  Now other states
12  have started implementing some of the same provisions.
13       Q    And when you say Texas had the strictest voting
14  laws --
15       A    Some of the --
16       Q    -- is that --
17       A    Restrictive, restrictive.
18       Q    -- most restrictive, is that in reference to a study?
19       A    Well, they -- it was reported widely that we already
20  had restrictive voting laws.  Like, there was a lot of
21  restrictions.
22       Q    Do you know the metrics that were used to make that
23  determination?
24       A    I guess the number of rules that you have.
25       Q    Okay.
```



1      A    Like, some states may not have as many.

2      Q    So I'll give you an example:  Do you know if the

3 State of New York had early voting?

4      A    I wouldn't say New York is like Texas.  I would say

5 maybe like Florida and Georgia may be more of something that

6 you would look at as a comparable state, but I don't know.  But

7 -- I just know what I read.

8      Q    Okay.  So you read that Texas had the most

9 restrictive voting laws.

10     A    We had some of the most restrictive.

11     Q    Some of the most restrictive voting laws.

12     A    Uh-huh.  Like, before, but now states are doing the

13 same thing.

14     Q    But you haven't individually looked to compare how

15 Texas voting laws --

16     A    Well, there was a --

17     Q    -- compare.

18     A    No, there was -- there was something in there.  I

19 just don't -- can't tell you -- like, recite it right now, but

20 there were data to show that -- how Texas had some of the most

21 restrictive laws on the books.

22     Q    Okay.  And do you remember what states it was

23 comparing it to?

24     A    I don't, huh-uh.

25     Q    Okay.  And do you remember what specific laws it was



1   referring?

2       A    No.

3       Q    Okay.

4       A    Not off the top of my head.

5       Q    And do you think it would confuse or result in voter

6   confusion if adjacent counties had inconsistent hours?

7                MR. BLEDSOE:  Objection to form.

8   BY THE WITNESS (resuming):

9       A    I don't know.  I didn't say that in here.

10      Q    Well, I'm just asking generally.

11      A    Oh, I wouldn't know because I haven't seen the data

12  on that.

13      Q    Okay.  And so you -- have you ever looked at whether

14  or not a county -- adjacent counties having different hours

15  resulted in voter confusion?

16      A    Well --

17               MR. BLEDSOE:  Objection to form, asked and

18  answered.

19  BY THE WITNESS (resuming):

20      A    Well, Texas doesn't have open voting.  You have to

21  vote in the county that you're -- you're registered, so I don't

22  know how that would -- how that would play into Texas.

23      Q    Okay.  Let's think of -- the city of Arlington, is

24  that entirely within Tarrant County?

25      A    I don't know.



 1     Q     Are there any districts --

 2     A     Fort Worth?  No.  You know what?  Fort Worth is not

 3  even entirely in Tarrant County.

 4     Q     Okay.  What other counties is it in?

 5     A     I believe that there's some, like, parts of

 6  Tarrant County -- Denton County, but there may not be people

 7  there.

 8     Q     Have you ever asked whether Denton County and

 9  Tarrant County having different hours confuse voters who were

10  in the city of Fort Worth --

11                MR. BLEDSOE:  Objection to form.

12  BY MS. HUNKER (resuming):

13     Q     -- in not knowing necessarily which county they

14  should --

15     A     I don't think there's people that -- I don't know.  I

16  -- no, because that's not in my -- my area.

17     Q     Do you think it would help voters to have consistent

18  hours?

19                MR. BLEDSOE:  Objection to the form.

20  BY THE WITNESS (resuming):

21     A     I think there's a lot of things that could help

22  voters.  I don't know if that's the only thing that could help

23  them.

24     Q     Do you think it's one thing that would help them?

25                MR. BLEDSOE:  Objection to form.



 1  BY THE WITNESS (resuming):

 2       A    I don't know.  I mean, do we have data on that?

 3       Q    Have you looked at data on that?

 4       A    No, so I don't know.

 5       Q    And let's put that aside.

 6       A    (Complies with request.)

 7       Q    And so now I'm going to introduce Exhibit 21.

 8       A    Okay.

 9       Q    And do you see at the top it says Democracy in

10  Danger:  The Assault on Voting Rights in Texas?  And then it

11  has the Hearing Before Subcommittee On Civil Rights and

12  Civil Liberties.  Did I read that correctly?

13       A    Yes.  The title, I love it.  It's just -- I didn't --

14  hadn't even seen that title.

15       Q    And then if you see the next page, it lists the

16  Senate -- I'm sorry -- the members who were on the committee on

17  oversight reform and then the members who are on subcommittee

18  on civil rights and civil liberties; is that right?

19       A    I -- yeah, I guess.  Is this public?  Where do I get

20  this?  I hadn't seen it.

21       Q    You can get this from the -- Congress's website.

22       A    It's on the -- online?

23       Q    Yep.

24       A    Sorry.

25       Q    That's okay.



 1          A     I did not see this.

 2          Q     And --

 3          A     So it's -- actually a transcript from everything

 4   that's said, like what he's doing?

 5          Q     (Affirmative response.)

 6          A     Okay.

 7          Q     And do you see on the next page it has the contents

 8   listed?

 9          A     Yes.

10          Q     And then it talks about the -- it lists the different

11   individuals -- the witnesses.

12          A     Yes.

13          Q     And their opening statements.

14          A     (Reviewing.)

15          Q     And so let's turn to Page 11.

16          A     Okay.

17          Q     And do you see on the bottom where it says, Statement

18   of the Honorable Nicole Collier, Texas State Representative and

19   Chair of Texas Legislative Black Caucus?

20          A     I do.

21          Q     And just take a quick perusal, and would you agree

22   with me that that -- that this is a transcribed version of your

23   opening statement?

24          A     If you -- I haven't seen it, so I would take your

25   word that it is.



1    Q    Okay.

2    A    (Reviewing.)  It is different than Exhibit 20.  I'm

3  looking at it -- my testimony.  The transcript is.

4    Q    Uh-huh.  And so when you're talking in this

5  particular testimony, you're talking about SB 7 and HB 6; is

6  that correct?

7    A    I don't think the other ones had been considered at

8  that time.

9    Q    Okay.  And so when you are talking about proposed

10  legislation, you're talking about HB 6 and SB 7; is that right?

11    A    The conference committee report that -- the last --

12  latest version, yes, from the 87th Regular Session.

13    Q    And so I want to go to Page 13 --

14    A    Okay.

15    Q    -- further into the paragraph where it says, Under

16  the provisions of this bill.

17    A    (Reviewing.)  Oh, you don't have the entire testimony

18  in here.

19    Q    I have the opening statements of the members as well

20  as any of the testimony that involved you.

21    A    Well, I don't know because it stops right here on

22  Page --

23    Q    Yeah, it's --

24    A    -- 13.

25    Q    It's the portions of the transcript that I was going



 1   to discuss with you today.

 2       A    But how do I know if -- am I done on Page 13?  That's

 3   all of it?

 4       Q    Well, Page 12 is right before it.

 5       A    I know, but is it 11, 12 and 13 that's the entirety

 6   of my testimony?

 7       Q    No.

 8       A    Oh, okay.

 9       Q    There is back-and-forth between you and different

10   members of the committee.

11       A    Oh, okay.  You didn't include that in here.

12       Q    No.  It's also other -- I only included, as I said,

13   the sections that were relevant to today's deposition.

14       A    Okay.  13.

15       Q    Okay.  And if you can read that paragraph to

16   yourself.

17       A    (Complies with request.)  That is true.  Oh, sorry.

18   All right.  (Reading.) ... and she would not even know that her

19   ballot had been -- that's true, yes.

20       Q    Okay.

21       A    That was what I said.

22       Q    Okay.  And so you expressed concern in this paragraph

23   about a voter who may not remember which number, driver's

24   license or Social Security number, that that individual put on

25   their registration form; is that correct?



1      A      Right.

2      Q      And then your concern was that that would cause the

3  ballot to be rejected; is that right?

4      A      Yes.

5      Q      Okay.  Were you aware that under Senate Bill 1 the

6  voter only needs to match one number?

7      A      Yes, but it has to be the one that they have on file,

8  so if I gave you one of those numbers and you don't have it on

9  file, meaning the secretary of state, it gets rejected.

10     Q      Okay.  And are you aware that the secretary of

11 state's office pulled numbers from DPS to get driver's license

12 and Social Security numbers?

13     A      When?

14            MR. BLEDSOE:  Objection, form.

15            THE WITNESS:  Okay.

16 BY THE WITNESS (resuming):

17     A      When?

18     Q      Well, were you aware that the process even occurred?

19     A      When?  At the time I testified?  When did that

20 happen?

21     Q      No, after.

22     A      Okay.  When did they do that?

23     Q      Well, I'm asking you if you're aware of it.

24            MR. BLEDSOE:  Objection, form.

25 BY MS. HUNKER (resuming):



 1        Q     If you're not aware of it, that's fine, but...

 2        A     I have no idea when they did that.  I don't know.

 3        Q     Were you aware that they engaged in that process

 4   regularly?

 5              MR. BLEDSOE:  Objection to form.

 6   BY THE WITNESS (resuming):

 7        A     What process?

 8        Q     The process of pulling driver's license numbers and

 9   Social Security numbers --

10              MR. BLEDSOE:  Objection to form.

11   BY MS. HUNKER (resuming):

12        Q     -- into voters' files from DPS.

13              COURT REPORTER:  Allow the question to conclude

14   and then --

15              MR. BLEDSOE:  I'm sorry.  I apologize.

16              COURT REPORTER:  Okay.  Repeat the --

17              MR. BLEDSOE:  My apologies.

18              MS. HUNKER:  Yes.

19              COURT REPORTER:  No problem.

20   BY MS. HUNKER (resuming):

21        Q     Were you aware that the secretary regularly pulled

22   numbers from DPS to get driver's license numbers and Social

23   Security numbers into a voter's registration file?

24              MR. BLEDSOE:  Objection to form.

25   BY THE WITNESS (resuming):



```
 1      A    I don't -- okay.  Into?  What do you mean?  Like,
 2  they --
 3      Q    To --
 4      A    -- merged them?
 5      Q    -- add those numbers to the file.
 6                MR. BLEDSOE:  Objection to form.
 7  BY THE WITNESS (resuming):
 8      A    Not at the time of this testimony, and it wasn't in
 9  the bill.
10      Q    And you don't know if that was a pre-existing
11  practice by the Texas Secretary of State's office.
12                MR. BLEDSOE:  Objection, form.
13  BY THE WITNESS (resuming):
14      A    I don't think they would -- no, I -- I don't think it
15  was.  I don't know.
16      Q    And you don't know if they engaged in that practice
17  after the implementation of Senate Bill 1; is that correct?
18                MR. BLEDSOE:  Objection, form.
19  BY THE WITNESS (resuming):
20      A    But what do you mean pull it into the voter file?
21  What does that mean?
22      Q    That they are seeking files, voter registration, with
23  DPS to pull in driver's license numbers or Social Security
24  numbers so that they can add those numbers to the voter
25  registration record.
```



1    A    But the bill read it had to match the number that you

2  submitted when you originally voted, so even if they did pull

3  it, if -- if it didn't match the number that you submitted when

4  you originally registered to vote, they would have to reject

5  it.  Now, if there was some provision that said either one that

6  they had, but at the time it only said it had to be the number

7  that you submitted when you originally voted, so that is not in

8  line with the secretary -- I mean the voter -- sorry --

9  secretary of state having both numbers because it doesn't

10  matter.  It has to be the number that they had when you

11  originally voted --

12    Q    Okay.  So that language is in reference --

13    A    -- registered to vote.

14    Q    -- to Senate Bill 7; correct?

15    A    Senate Bill 7?  Oh, yes.  I'm confusing 1 and 7.

16    Q    Okay.  Have you looked at that particular requirement

17  in Senate Bill 1?

18    A    I know that now it doesn't.  They fixed it.  They --

19  they did address that, yes --

20    Q    Okay.

21    A    -- but this is something we did bring up during the

22  discussions.  We were talking about an opportunity to cure.  I

23  think one of those amendments may have been that opportunity to

24  cure.

25    Q    And so after you brought up this point --



1       A     It wouldn't be me.  I --

2       Q     Okay.

3       A     -- didn't do everything.  Can't do everything.  It

4   was a collective effort.

5       Q     Yes.  After legislators raised the point that a

6   person may not remember which number they registered to vote,

7   that provision was changed in Senate Bill 1; is that correct?

8       A     I don't know if it was changed in Senate --

9             MR. BLEDSOE:  Objection to form.

10  BY THE WITNESS (resuming):

11      A     At some point it got changed where they provided an

12  opportunity to cure, and even then -- remember earlier in the

13  deposition I was telling you about what is the policy, the

14  process that the secretary of state is going to share on how to

15  address voting by mail, and it was at that point that they were

16  telling people, Put both numbers down just in case.

17      Q     Uh-huh.

18      A     And so, again, that was like right before the

19  election of -- I mean the implementation of -- no, that was

20  after the -- that was after the bill passed in September, you

21  know, became law, and then it was right before early voting,

22  and that's when they were telling people, Oh, just put both

23  numbers down to be safe, but there was a provision about

24  opportunity to cure added.

25      Q     And so let's talk about opportunity to cure.



1      A      Okay.

2      Q      Prior to Senate Bill 1, are you aware if there was

3 any process in which a voter could cure their ballot -- mail-in

4 ballot if there was a defect on that ballot?

5                  MR. BLEDSOE:  Objection to form.

6 BY THE WITNESS (resuming):

7      A      I -- I believe so.  There should have been something,

8 like, you could -- like, if -- like vote by mail?

9      Q      Yes.

10     A      I don't know on vote by mail, not off the top of my

11 head.  To cure your ballot, the vote-by-mail ballot if it was

12 rejected --

13     Q      Prior to Senate Bill 1.

14     A      I don't.  I don't know.

15     Q      Would it surprise you to learn that there was no cure

16 process prior to Senate Bill 1?

17                  MR. BLEDSOE:  Objection to form,

18 mischaracterizes the evidence.

19 BY THE WITNESS (resuming):

20     A      Well, there wasn't as many requirements on it, too.

21 I mean, you give more chances to mess up when you keep putting

22 more rules on it.

23     Q      And so you raise in your testimony the fact that

24 there would be no opportunity to cure in the event a voter

25 either put the wrong number down or the number didn't match; is



1  that correct?

2      A    Yes, because that wasn't a requirement before.

3      Q    And that was -- a cure process was added to the final

4  bill when Senate Bill 1 was enacted --

5      A    Well, you didn't have --

6           MR. BLEDSOE:  Objection --

7  BY MS. HUNKER (resuming):

8      Q    -- right?

9           MR. BLEDSOE:  I'm sorry.  Object to form.

10 BY THE WITNESS (resuming):

11     A    I don't believe you had to put your number in so many

12 different places.

13     Q    So my question's a little different.

14     A    Oh, okay.

15     Q    I'm just asking about the cure process.

16     A    Oh, okay.  I'm sorry.

17     Q    So you had mentioned that the cure -- an opportunity

18 to cure was added; is that correct?

19     A    I mentioned -- say that again.

20     Q    An opportunity to cure was added.

21     A    Under the provisions of the bill, if she put down the

22 other number -- for this particular situation, yes, an

23 opportunity to cure for this particular situation.

24     Q    So in Senate Bill 1, there is now an opportunity to

25 cure for that specific situation that you raised in your



1  congressional testimony; is that correct?

2      A    Yes, I believe so.

3      Q    Okay.  And then you also referenced that the voter

4  may not even know that her ballot had been rejected; is that

5  correct?

6      A    I don't believe there was a provision in there that

7  said you're going to tell them that their ballot was rejected.

8      Q    And that, too, was corrected during Senate Bill 1; is

9  that correct?

10            MR. BLEDSOE:  Object to form.  I request that

11  you show her a copy of it.  You're asking her to talk about a

12  bill that she didn't vote on.  Show her the provision.

13  BY MS. HUNKER (resuming):

14      Q    All right.  Let's turn to Senate Bill 1.

15      A    Oh, look it that.  Here's something on Page 43.  I

16  just opened -- like, flipped to it.  It says Opportunity to

17  Correct Defect.  Oh, no, this is something else maybe.

18            MR. BLEDSOE:  It's on signature verification.

19            THE WITNESS:  Oh, is it?  That is it.

20  (Reviewing.)

21            MS. HUNKER:  Sorry.  Give me a second.

22  (Reviewing.)

23  BY MS. HUNKER (resuming):

24      Q    All right.  I'm going to bring you that bill at the

25  next break just so we don't waste time on it.  But I am going



1  to have you look at Section 5.10 on Page 40.

2      A    (Complies with request.)  Okay.

3      Q    Okay.  And do you see where it says:  An online tool

4  used under this section much, for each election, record each

5  application for a ballot to be voted on by mail and received by

6  the clerk?

7      A    All right.  Well, say that again.  5.10?

8      Q    5.10 --

9      A    Line?

10     Q    -- (c), Line 12.

11     A    Okay.  That's a new provision.

12     Q    (Reading.)  An online tool used under this section

13  must, for each election, record:  A, each application for a

14  ballot to be voted by mail received by the clerk; and B, each

15  carrier envelope sent to a voter by the clerk.  Did I read that

16  part correctly?

17     A    Yes, that's what it says.

18     Q    And then two:  For each carrier envelope, record or

19  assign a serially numbered and sequentially issued barcode or

20  tracking number that is unique to each envelope; three, update

21  the applicable Internet website as soon as practicable after

22  each of the following events occurs:  Receipt by the

23  early-voting clerk of the person's application for a ballot to

24  be voted by mail, acceptance or rejection of -- by the

25  early-voting clerk of the person's application for a ballot to



1  be voted by mail; C, placement in the mail by the

2  early-voting clerk of the person's official ballot; D, receipt

3  by the early-voting clerk of the person's marked ballot; and E,

4  acceptance or rejection of the early-voting ballot board of a

5  person's marked ballot.  Did I read that correctly?

6      A    It says, By the early-voting ballot board.

7      Q    Outside of that one error in reciting it, did I read

8  this correctly?

9      A    Yes, but did you say Section 5.10, Section 86.015(c),

10  election code as effective September 1st, 2021 --

11      Q    2021.

12      A    -- is amended.  So this is all new, I guess.

13      Q    You'd agree with me that this section was effective

14  as of September 1st, 2021.

15      A    Yes.

16      Q    Okay.  And that would've been after your testimony

17  before Congress; correct?

18      A    September 1st, yes.

19      Q    Okay.  And so after your testimony, a law came into

20  effect that has a tracking system where a voter can know

21  whether or not their vote by mail was accepted or rejected; is

22  that correct?

23      A    There is a system, yes.

24      Q    And then if we look at 4, which is underlined:  Allow

25  the voter to add or correct information required under



1    Section 84.002(a)(1)(a) or Section 86.002(g).  Do you see that?

2        A    Yes.

3        Q    And do you -- do you agree that this provision under

4    SB 1 allows a voter to add or correct information?

5                MR. BLEDSOE:  Object to form, speculation.

6    BY THE WITNESS (resuming):

7        A    I assume that because I don't know what those other

8    numbers are, but I don't see in here -- in the transcript -- I

9    do recall that there was a back-and-forth between myself and

10   Congressman Pat Fallon, and he told me at that time that they

11   were working on -- on the cure provision, but I -- I was not

12   aware of that.

13       Q    Okay.  Now, I know you were not at the legislature

14   when SB 1 was under consideration.  When did you first read

15   SB 1?

16       A    Entirely?

17       Q    Yeah.

18       A    Probably December.  I mean, I don't know if I -- I

19   know I read it before the -- and I don't know if it was the

20   entire thing.  I know I read key provisions because I did a

21   townhall on it right before the election, and that was my

22   issue.  I was trying to get the best information to my

23   constituents, and I was trying to figure what the procedure

24   was, so I said -- asked my office to call Heidi Garcia, they

25   didn't have it, so we reached out to the secretary of state and



1 then they were kind enough to provide information, very

2 transparent, saying that, you know, they were still working on

3 giving more guidance, and then they came out with something.

4 But I reached out because I was holding a townhall and I wanted

5 to make sure that my information was accurate and that -- you

6 know, based on the bill.  I wanted to see how they were going

7 to interpret it.

8       Q    And so after SB 1 was enacted and you wanted -- and

9 you were having a townhall, you became familiar with the

10 provisions of SB 1; is that correct?

11      A    Well, for the most part.  Not all of it.  I mean,

12 it's a very long bill.  76 pages.

13      Q    And so let's look at Page 26.

14      A    (Complies with request.)  Okay.

15      Q    Okay.  And looking at your -- in the last paragraph

16 where it starts with, Thank you for the question.

17      A    Oh, oh, you -- I'm sorry.  I was on this bill.  Now

18 you were going where?

19      Q    Looking at Page 26 of your -- of the transcript where

20 it says, Ms. Collier -- we will look at the question before,

21 which is by Ms. Kelly.

22      A    I don't see the part where -- so there was a section

23 in here where someone questioned what I said.  Did you get the

24 complete transcript where the chairman came back and clarified

25 everything and showed that I did not mislead the committee?



```
 1       Q     Do you know what that was particularly about?

 2       A     Well, if you go back to Page 13, and it says,

 3  Mr. Sessions, and it was about a COLA.  I said something about

 4  a COLA and he said that I gave not truthful -- this is not

 5  truthful, and then Mr. Raskin said, I'm sure that there will be

 6  a clarification if there was any misstatement, and then there

 7  -- there was a clarification.

 8       Q     Okay.  I did not print out the clarification --

 9       A     Well, I think that's -- I mean, literally, if you're

10  going to leave something in there like that, I'd like to have

11  the whole concept, because I don't want to leave people

12  thinking that I did not -- that I was giving a misstatement

13  there or not truthful.

14       Q     I didn't include it because that wasn't what I was

15  looking at --

16       A     Well, to me, it matters.

17       Q     -- but my apologies for not including it.

18       A     Oh, okay.

19       Q     If you can turn, though, to Page 26.

20       A     All right.  And so Ms. Kelly says:  Thank you,

21  Representative Thompson, Representative Collier.  You also

22  represent rapidly growing cities.  According to the census,

23  Houston, which is going to overtake Chicago if you're not

24  careful, and Dallas Metro areas had the largest population

25  gains of any metro region between 2010 and 2020.
```



1  Representative Collier, have you seen voter suppression efforts

2  in Austin intensify in response to this population growth?  And

3  then -- did I read that correctly?

4       A    That's what -- yes.

5       Q    Okay.

6       A    Rep. Collier, yeah.

7       Q    And you then say:  Thank you for the question.  In

8  fact, too often we look for overt and obvious signs of

9  suppression, but suppression can be emulated in long lines; it

10 could be creating harsher penalties for making simple mistakes.

11 So it may not look like the poll tax and the literacy test of

12 old time, but suppression can rear it's ugly head in various

13 subtle forms.  And so going back to the question about if we

14 have ballots that have multiple languages on them, the only

15 reason that we have that is because of the protections of the

16 Voting Rights Act of 1965.  Did I read that part correctly?

17      A    Yes.

18      Q    (Reading.)  In 1975, the State of Texas was required

19 to provide multiple languages in the ballot only because we

20 have the protections under the Voting Rights Act, which only

21 elevates and shows the need for having this type of provision

22 again.  So Texas was made to do these multiple languages, it

23 wasn't on its own, and so unless we have federal intervention,

24 we will continue to see a chipping away of our rights.  Did I

25 read that correctly?



 1        A      Yes.

 2        Q      Okay.  So I wanted to go towards a line that you

 3   said, which is, It could be creating harsher penalties for

 4   making simple mistakes, and can you please tell me what you

 5   meant with that particular statement?

 6        A      I don't remember.  It's a lot of things that the bill

 7   did that would criminalize simple mistakes.

 8        Q      Okay.  I want to turn to SB 1, and looking at

 9   Section 9.03.

10        A      What page is that?

11        Q      And that's going to be starting on 72.

12        A      Okay.

13        Q      Yes.

14        A      (Reviewing.)  Okay.

15        Q      And so we see that this says -- starting on Line 8,

16   Section 64.012, Election Code, is amended.  And if we look at

17   A, it says:  A person commits offense if the person knowingly

18   or intentionally.  Did I read that correctly?

19        A      Yes.

20        Q      And so knowingly or intentionally are underlined;

21   correct?

22        A      Yes.

23        Q      And that means that language was added to the bill;

24   is that correct?

25        A      Yes, because we discussed that --



1    Q    Okay.

2    A    -- in the -- HB 6.

3    Q    And so was this a provision that you supported -- a

4  change that you supported?

5    A    I think it -- it increased the -- was it mens rea or

6  the knowledge level?  So it wasn't just, You did it recklessly,

7  or something.  It -- it had to be knowingly and intentional.

8  So what is that?  The standard, I guess, or -- or the -- it --

9  it made it -- it increased it, so -- but this is SB 1.  What

10  was it in SB 7?

11    Q    Well, I was just asking -- we're trying to compare

12  some of the concerns you have regarding SB 7.

13    A    I know, but if you compare my testimony from this

14  date, which was before SB 1, then that's not the same at the

15  time when I was giving the statement.

16    Q    And I recognize that.

17    A    Oh, okay.

18    Q    I am simply asking whether after you gave your

19  testimony the legislature added language that said, A person

20  commits an offense if the person knowingly or intentionally.

21    A    But I think we discussed that before.  I feel like we

22  discussed that during the conference committee about that --

23  that standard, knowingly or intentionally.

24    Q    And so that standard that you discussed in the

25  conference committee was added to Section 9.03 in SB 1; is that



 1  correct?

 2      A    I don't know if -- I mean, I --

 3              MR. BLEDSOE:  Objection to form,

 4  mischaracterizes testimony.

 5  BY THE WITNESS (resuming):

 6      A    I feel like that may have been in the -- the -- SB 7

 7  already.  The -- let's see here.  I don't know, but I know --

 8  because I know we discussed that.  Like, is it knowingly and

 9  intentionally or intentionally, knowing and intentionally or if

10  it's recklessly, negligently.

11      Q    Would you agree that adding language that makes it --

12  the offense only applicable if a person knowingly or

13  intentionally commits the offense helps ensure that you don't

14  have somebody being convicted for a simple mistake?

15              MR. BLEDSOE:  Objection to form; the question is

16  misleading.

17  BY THE WITNESS (resuming):

18      A    I think that it provides -- I mean, literally, you

19  can get arrested and then explain later, so I think that it --

20  it could reduce, but it doesn't eliminate because this is

21  subjective and they have to prove that you knowingly or

22  intentionally did it.  So that's an arrest now, explain later,

23  to me.

24      Q    Okay.  Before conviction, it increased the standard;

25  is that correct?  It increased the mens rea?



1    A    For a conviction?  I mean, but it doesn't eliminate

2 the process.  I mean literally there could be people that get

3 caught up in that whole system and then they have to prove --

4 or they have to -- well, I know the prosecution, they have to

5 prove the case, but then literally it takes a lot of time to

6 try to disprove or -- or wait for them to prove out their case.

7 I think it doesn't eliminate the chances of because it's so

8 subjective.  To me, it seems like you could still get arrested

9 for that.

10    Q    Well, do you think it reduces the chances?

11    A    I --

12          MR. BLEDSOE:  Objection to form.

13 BY THE WITNESS (resuming):

14    A    I don't know if it reduces.  I think -- I don't know.

15 I'd like to think it did, but I don't -- I don't -- I can't say

16 that it will.

17    Q    Is this a change that you think is a positive change

18 to the Texas Election Code?

19          MR. BLEDSOE:  Objection to form.

20 BY THE WITNESS (resuming):

21    A    It was better than -- well, because, again, we don't

22 have the votes to -- to -- to do away with it, so a lot of

23 things that Democrats do is we -- we compromise and we try to

24 enhance or improve or limit the harmful effect that bills will

25 have on the people that we represent.  And so, in my view,



1 increasing or heightening the standard is better than what a

2 regular standard -- you know, a lower standard, if that makes

3 any sense.  Lower -- you know, you don't want it to be so low,

4 so you -- you work with what you got, and we didn't have the

5 votes to just say, Remove it.

6     Q    And let's look at the next page where it has, B, an

7 offense under this subsection.

8     A    Okay.

9     Q    And it reads:  An offense under this section is

10 classified as Class A misdemeanor.  Did I state that correctly?

11     A    Right.

12     Q    Okay.  And Class A misdemeanor is underlined;

13 correct?

14     A    Yes.

15     Q    And so that was language that was added to the

16 election code; is that correct?

17     A    Yes.

18     Q    And let's look at what was stricken.  (Reading.)

19 Felony of the second degree unless the person is convicted of

20 an attempt.  In that case, the offense is a state jail felony.

21 Did I read the stricken language correctly?

22     A    Felony -- yes.

23     Q    Okay.  So prior to Senate Bill 1, an offense under

24 this particular provision was considered a felony; is that

25 correct?



1       A    Well, no, because this provision added Section 5, so

2  it's -- we're not comparing the same ones.

3       Q    Okay.  To your knowledge --

4       A    Oh, that's what it was, they added intentionally.

5  Okay.  Go ahead.  I'm sorry.

6       Q    So if we look at -- you have Section 5 -- one, two

7  and -- one, two, three, four --

8       A    Section 5.  Okay.  On Page 72?

9       Q    Yeah.  So let's look at Number A -- let's look at

10 Letter A.

11      A    Okay.

12      Q    (Reading.)  So the person commits an offense if the

13 person knowingly or intentionally.  It then lists five types of

14 offenses or actions that can constitute an offense; is that

15 correct?

16      A    Yes.

17      Q    Okay.  The first four are not underlined; is that

18 correct?

19      A    Well, there's one that struck something from it.

20 They struck the knowingly of the --

21      Q    But these four provision -- these four actions that

22 could be considered offenses preexisted SB 1; is that correct?

23      A    Yes --

24      Q    Okay.

25      A    -- the four of them did.



1      Q    Yes, and that includes:  Votes or attempts to vote in
2    an election which the person knows the person is not eligible
3    to vote; two, votes or attempts to vote more than once in an
4    election; three, votes or attempts to vote a ballot belonging
5    to another person or by impersonating another person; four,
6    marks or attempts to mark any portion of another person's
7    ballot without the consent of that person or without specific
8    direction from that person how to mark the ballot.  Did I read
9    those four correctly?
10     A    Yes, because you removed the word knowingly from each
11   one of them.
12     Q    And so those four offenses preexisted Senate Bill 1;
13   correct?
14     A    The four offenses, yes, the votes or attempts to vote
15   -- I guess they didn't have the knowingly on the votes or
16   attempts to vote, but they added the knowingly or intentionally
17   to it at the top on the first one.
18     Q    And so then SB 1 added a fifth act that could
19   constitute an offense, and that is:  Votes or attempts to vote
20   in an election in the state after voting in another state in an
21   election in which a federal office appears on the ballot and
22   the election day for both states is the same day.
23     A    Yeah, I don't know how that happens, but, yes, I see
24   that.
25     Q    Okay.  And so when we look at B, where it says, An



1  offense under this section is a Class A misdemeanor as opposed

2  to a felony of the second degree, it made the four preexisting

3  offenses a misdemeanor as opposed to a felony, which it was

4  before SB 1; is that correct?

5      A    I think that may have been Cain who wanted that

6  because they increased some and then they reduced some.

7      Q    But the statement that, An offense under this section

8  is a Class A misdemeanor, covers the four actions that were

9  considered offenses prior to the existence of Senate Bill 1; is

10  that correct?

11      A    That were felony of the second degree.  Do we still

12  have that?  Do we still have second-degree felonies in Texas?

13  I think we do.

14      Q    I couldn't state.

15      A    Oh.

16      Q    I only can say --

17      A    Well, sometimes they would --

18      Q    -- with respect to the election.

19      A    Well, sometimes they changed that because we no

20  longer have that offense, but, okay, a Class A misdemeanor.

21      Q    And so you'd agree with me that this provision in

22  Senate Bill 1 changed to a Class A misdemeanor for pre-existing

23  election offenses that were listed in Section A.

24              MR. BLEDSOE:  Objection to form --

25  BY THE WITNESS (resuming):



```
 1        A     What?  Say that --
 2                    MR. BLEDSOE:  -- mischaracterizes the
 3   testimony (ph).
 4   BY THE WITNESS (resuming):
 5        A     For pre-existing?
 6        Q     You stated that Provisions 1 through 4 preexisted
 7   Senate Bill 1 and were offenses under this section; correct?
 8        A     They were already in the election code, yes.
 9        Q     Yes.  And so where Provision B, which says, An
10   offense under this section is a Class A misdemeanor, that
11   reduced the level of -- from felony to a misdemeanor the four
12   offenses that existed in that provision of the election code
13   prior to Senate Bill 1.
14        A     I don't know.
15                    MR. BLEDSOE:  Objection, form.
16   BY THE WITNESS (resuming):
17        A     I don't know if it did all of that, because literally
18   I wasn't there to flesh this part out.
19        Q     Okay.  Do you --
20        A     But I -- I do remember, again, there were some parts
21   that Cain -- Chair Cain wanted to reduce and then there was
22   other parts where they wanted to enhance the penalties.
23        Q     And do you know who sponsored Senate Bill 1 in the
24   House offhand?
25        A     Oh, no, I wasn't there.  I don't know.
```



1      Q     And you don't know if it was Senate -- if it was

2  Representative Cain who sponsored it -- correct? -- or some

3  other representative.

4      A     I don't think he did, though.

5      Q     You don't think he sponsored Senate Bill 1; correct?

6      A     No, I don't.

7      Q     Okay.  Do you consider reducing the offenses from a

8  felony, the second-degree, to a Class A misdemeanor as a way of

9  helping to ensure that a voter is not convicted of -- simply by

10 making a mistake?

11            MR. BLEDSOE:  Objection to form.

12 BY THE WITNESS (resuming):

13     A     Do I -- what -- what is the question?

14     Q     That it reduces the chances of an individual being

15 caught up as a result of a simple mistake.

16            MR. BLEDSOE:  Objection to form.

17 BY MS. HUNKER (resuming):

18     Q     It, in this case, being a reduction from a Class 2

19 Felony to a Class A misdemeanor.

20            MR. BLEDSOE:  Objection to the form of the

21 question.

22 BY THE WITNESS (resuming):

23     A     I'm going to tell you what I heard your question to

24 mean -- this is what I think you asked me:  Do I believe that

25 changing the penalties from a class -- I mean from a



1  second-degree felony to a Class A misdemeanor provides -- it

2  helps people from being convicted of -- of the -- one of these

3  offenses.

4      Q    As a result of a simple mistake.

5      A    I don't -- that's not a proper question.  I -- I

6  don't even see how that even works because, changing the

7  penalty, I can't see how that would do that.

8      Q    Okay.

9      A    Changing the penalty?

10     Q    Well, so you say here it could be creating harsher

11 penalties for making a simple mistake.  Would you agree that

12 this is creating lesser penalties for making a simple mistake?

13     A    No, because you added another provision to get caught

14 up on, if that's what you're -- I mean, you've got -- now

15 you've got five.  You had four and now you have five.

16     Q    So the four that preexisted, do you think it is

17 creating a less-harsh penalty for making a simple mistake?

18               MR. BLEDSOE:  Objection to form.

19 BY THE WITNESS (resuming):

20     A    Well, we're not working under those circumstances.

21 We're working under five.

22     Q    We're working with respect to those four.

23     A    No, that's speculation, because literally we're

24 working under five, and if you look at the totality of this,

25 there's multiple ways that somebody can have a criminal penalty



 1  launched against them or charges filed against them in this

 2  bill.

 3       Q    And we can put that document aside.

 4       A    (Complies with request.)

 5       Q    So are you aware of how poll workers are assigned?

 6       A    Poll workers?

 7       Q    Sorry -- poll watchers are assigned.

 8       A    Poll watchers.  You mean before or after this bill?

 9       Q    Is it your understanding that how poll watchers were

10  assigned change under SB 1?

11       A    Well, I think it did.

12       Q    Did your campaign seek to appoint poll watchers?

13       A    No.

14       Q    Has your campaign ever appointed a poll watcher?

15            MR. BLEDSOE:  Objection to form.

16  BY THE WITNESS (resuming):

17       A    I don't think so

18       Q    (Provides exhibit.)

19            THE WITNESS:  I think it's Exhibit 22.

20            MR. BLEDSOE:  Yeah.

21            THE WITNESS:  Is she on 22?

22            COURT REPORTER:  Oh, yeah.  22 is your next one,

23  yeah.

24  BY MS. HUNKER (resuming):

25       Q    I'm introducing Exhibit 22.  And so do you have the



 1  document in front of you?

 2      A    Yes.  Exhibit 22, yes.

 3      Q    Okay.  And have you ever visited the

 4  TexasDemocrats.org website?

 5              MR. BLEDSOE:  Can I have a courtesy copy of it?

 6              MS. HUNKER:  Oh, sorry.  (Provides exhibit.)

 7  BY THE WITNESS (resuming):

 8      A    You said have I ever?

 9      Q    Yes.

10      A    I have, yes.

11      Q    Okay.  And do you see on the bottom where it has the

12  URL code?

13      A    The who?

14      Q    URL code, the website name.

15      A    You mean this webarchive.org, forward slash, web 20

16  -- is that --

17      Q    Yes.

18      A    Okay.

19      Q    And then it says, https www.TexasDemocrats.org.

20      A    Yes.

21      Q    Okay.  Do you see on top where it says Work with

22  Us/Texas Democrat Party?

23      A    It says Our Part (ph) -- oh, up here.  Yes.

24      Q    And --

25              MR. BLEDSOE:  That says Texas Democratic Party.



```
 1  BY THE WITNESS (resuming):
 2       A    Yes, Democratic Party.
 3              MR. BLEDSOE:  You said Democrat party.
 4  BY MS. HUNKER (resuming):
 5       Q    Democratic Party.  And are you familiar with this
 6  portion of the Texas Democratic Party's website?
 7       A    No, I don't -- I haven't seen this one.
 8       Q    Okay.  And so if we turn to Page 2, it says Current
 9  Job Openings.  Do you see that?
10       A    You mean just the next page; correct?
11       Q    Yes, the next page over.
12       A    All right.  Current Job Openings.  Okay.
13       Q    And do you see it has a list of positions?
14       A    All right.
15       Q    Okay.  And so if we turn the next page, you'll see
16  Voter Protection Organizer.  Do you see that?
17       A    I see that on the front page, Voter Protection
18  Organize [sic].
19       Q    Okay.  And let's look at the second paragraph:  We
20  seek a talented voter protection organizer to build a strong
21  team of volunteer attorneys, legal professionals and advocates
22  to observe polling places in all corners of the state.  Did I
23  read that correctly?
24       A    Yes.  Oh, wait.  (Reviewing) ... and advocates to
25  observe -- yes.
```



1    Q    Okay.  And then you see where it says below What

2 You'll Do?

3    A    I see that word -- that -- that phrase, What You'll

4 Do.

5    Q    And then the next paragraph reads:  As our voter

6 protection organizer, you will spearhead the statewide poll

7 watcher program, which will involve -- and then it lists a

8 number of things that are involved with spearheading the

9 statewide poll watcher program.  Is that a fair assessment?

10    A    I have never seen this.  I don't even know what this

11 is.  So what -- what you said is exactly what it says.

12    Q    Were you aware that the Texas Democratic Party hired

13 an individual to spearhead the statewide poll watcher program?

14    A    No, I was not.

15    Q    Were you aware the Texas Democratic Party organizes

16 volunteer poll watchers in Texas?

17    A    No, I did not --

18    Q    Okay.

19    A    -- know that.

20    Q    And do you know whether the Texas Democratic Party

21 sought to organize poll watchers in any of the elections

22 following SB 1?

23    A    I worked with my local Democratic chair.  I don't

24 know if they did, like, if the Texas Democratic Party did, to

25 coordinate anything, but I know that there was -- it was hard



 1  to find election workers, whether that was a -- you know,
 2  somebody to work at the poll like as a -- is it a clerk or
 3  something?  Everything.  They couldn't find people for any of
 4  that.  But I didn't know about this.  This is new to me.  I
 5  think that's -- this is new.
 6      Q    Were you aware that democratic campaigns will assign
 7  poll watchers to polling locations in Texas?
 8      A    I knew that I could and a party could assign
 9  somebody, if you get a volunteer that does all of the stuff,
10  like takes the oath and all of that stuff for the poll watcher
11  stuff --
12      Q    And you don't know --
13      A    -- and takes a class.
14      Q    -- the distribution of poll watchers in terms of the
15  number that would be Republican versus Democrat at any
16  particular polling.
17      A    You know what?  So that was another question that we
18  had when we were getting ready for the townhall that I was
19  putting on, because it -- it wasn't very clear as to how many.
20  So say, for instance, all the people that are on the ballot
21  wanted to appoint one person to, you know, be at that
22  particular location and it seemed like you could have 45
23  people, you know, and then if you think about that one small
24  location that I was telling you about in Tarrant County, and it
25  just wouldn't be feasible to have that many people, but when



1  the secretary of state notified us that there is a limit on the
2  number of people that could be appointed at one location as a
3  poll watcher.
4      Q    And do you know the distribution in the state of
5  Texas, whether there are more Democrat poll watchers or
6  Republican poll watchers?
7      A    So that was another question I asked, because if you
8  reached that limit, who gets to decide if -- like, if -- who's
9  there, and they said it would be up to the election judge, but,
10 you know, typically it's first-come, so everybody that's -- if
11 democratic is there first, then that could be filled up, but
12 they said it would be left to the election judges is what I
13 recall.  But I don't know the exact number in a particular
14 election.
15     Q    And so you had to look statewide to see what -- what
16 the distribution would be between Republican and Democratic
17 poll watchers; is that correct?
18     A    Where would I find that?
19     Q    I'm just wondering if you've looked.
20     A    I would if I could find it.
21     Q    And so you haven't found it.
22     A    But I don't know where I would look.
23     Q    We can put that aside.
24     A    Okay.
25     Q    And were you aware of any controversies in 2020



1 regarding poll watchers being sequestered from polling -- for

2 voting activities?

3     A    What do you mean by sequestered?

4     Q    Have you heard of poll watchers being put in a

5 separate room from the polling -- voting activities that are

6 ongoing?

7     A    The poll watchers --

8     Q    Yes.

9     A    -- being put in a separate room?  I don't know what

10 that means.

11     Q    Did you hear of any controversy regarding

12 Dana DeBeauvoir, 5, the Travis County -- County Clerk regarding

13 sequestering of poll watchers?

14     A    No, I didn't.  I'm not aware of anything.

15     Q    When you were considering HB 6 and Senate Bill 7, did

16 that topic come up for conversation?

17     A    I don't recall.

18     Q    And have you read any of the election advisories

19 regarding poll watchers that were issued by the secretary of

20 state after the 20 -- after the implementation of Senate

21 Bill 1?

22     A    Yes.  I read -- what do you mean by -- they gave out,

23 like, training because, remember, I was asking for it and they

24 did do it.

25     Q    Okay.  And so let's actually look at Senate Bill 1



 1   again --

 2        A    Okay.

 3        Q    -- and I just want to make sure we're talking about

 4   the same provision --

 5        A    Oh, okay.

 6        Q    -- before we move on.

 7        A    Senate Bill 1?

 8        Q    Yes.  I believe it to be 4-something.  Yes.  4 --

 9             COURT REPORTER:  It's Exhibit 16.

10             THE WITNESS:  16.  Thank you.

11   BY MS. HUNKER (resuming):

12        Q    -- 44 --

13        A    Just hang on.  I had put it back in order, so I have

14   to find it.  And what page?

15        Q    Page 25, looking at Section 4.04 and then we're going

16   to look at Section 4.5.

17        A    25.  (Reviewing.)  Okay.  I'm at 25, and 4.?

18        Q    -- 04.

19        A    Okay.

20        Q    It starts on Line 15.

21        A    Uh-huh.

22        Q    And so this amends event Section 33, and it says

23   Training Program.

24        A    Yes.

25        Q    (Reading.)  The secretary of state shall develop and



1  maintain a training -- training program for watchers.  The

2  training program must:  1, be available; (A), entirely via the

3  Internet; and (B), at any time, without a requirement for prior

4  registration; and 2, provide a watcher who completes the

5  training with a certificate of completion.  Did I read that

6  correctly?

7        A     Yes.

8        Q     And so was this the training program you were

9  referencing?

10             MR. BLEDSOE:  Object to form.

11 BY THE WITNESS (resuming):

12       A     No, but that's part of it.

13       Q     Okay.

14       A     So there's a whole thing about how to implement --

15 like, what does it look like to reject a ballot, what does it

16 look like -- that, you know, how do you actually cure the --

17 you know, what is the process that a local election department

18 uses.  So there is model -- whether there's guidelines and --

19 and instruction, but, yes, this is part of it, too, because

20 this hadn't been done either at that time, but that's not the

21 only thing I was referencing.

22       Q     Okay.  So the training program that's referenced by

23 Section 4.04 for poll watchers, that was added by

24 Senate Bill 1 --

25             MR. BLEDSOE:  Objection to form.



 1  BY MS. HUNKER (resuming):

 2      Q    -- correct?

 3               MR. BLEDSOE:  Objection to form.

 4  BY THE WITNESS (resuming):

 5      A    I don't -- it could have been in -- well, I mean, the

 6  engrossed version?  I assume that was in this bill.  I don't

 7  know if it was in HB 6.

 8      Q    So let's talk specifically about Senate Bill 1.

 9      A    Okay.  I see it right here.  This is Senate Bill 1

10  that I'm reading --

11      Q    Okay.

12      A    -- and it's in here.

13      Q    And so the language is underlined; correct?

14      A    Yes, that's -- that means it's new.

15      Q    Okay.  So training programs are added; is that right?

16      A    This part, yes.

17      Q    Now, did you get a chance to review the secretary of

18  state's training program -- or training materials?

19      A    I didn't, like, take the program -- I didn't take the

20  class, but it was available.  But it was literally up until the

21  deadline.  It wasn't much time in the March primary of 2022 for

22  this information to be out, but they did -- literally, they

23  were working under tight deadlines.  I mean, this bill became

24  effective September of 2021; right?

25      Q    Do you think the implementation period was too short



1  for the secretary of state's office to fully implement the

2  regulations to the extent it did implement them?

3      A    Well --

4              MR. BLEDSOE:  Objection to form, calls for

5  speculation.

6  BY THE WITNESS (resuming):

7      A    I would be guessing this -- on this one, but if you

8  think about the magnitude of Texas and as many departments that

9  the secretary of state would be responsible for contacting,

10  it's a large task for them, but there's no knock at them for

11  that.  I mean, they tried.

12      Q    In your experience with Tarrant County, did you think

13  Tarrant County didn't have enough time to implement

14  Senate Bill 1?

15              MR. BLEDSOE:  Object to the form, calls for

16  speculation.

17  BY THE WITNESS (resuming):

18      A    I don't know.

19      Q    Okay.  And did you happen to look at any of the

20  training material after the March primary, such as for the

21  primary runoff or in the summer?

22      A    I don't think so.

23      Q    And did you talk to any poll watcher who went through

24  training?

25      A    You can't talk to poll watchers.



1      Q     I meant after, not during --

2      A     Oh.

3      Q     -- the actual election.

4      A     I don't think so.

5      Q     Did you talk to any election worker or presiding

6  judge about the training programs' effect on poll watchers?

7      A     I don't think we talked about that specifically.

8      Q     Okay.  And if we look at Section 4.05 --

9      A     Okay.  Yes.

10     Q     -- it says Amends Section 33.031 of the Election

11  Code:  In addition to the requirements of Subsection A, to be

12  eligible to serve as a watcher, a person must complete training

13  under Section 33.008.  Did I read that correctly?

14     A     Yes, that's what it says.

15     Q     Okay.  And were you referencing this provision as

16  well when we were discussing the additional requirement for

17  training?

18               MR. BLEDSOE:  Objection to form, calls for

19  speculation.

20  BY THE WITNESS (resuming):

21     A      In addition to -- I don't know.  Would that -- I

22  mean, I guess this is a old -- in order to serve, you have to

23  be trained.  I guess they made sure that that was a

24  requirement.  I think this is what they're doing.

25     Q     Okay.  And that language is underlined; correct?



1    A    Yes.

2    Q    And so the requirement that a poll watcher undergo

3    training was added under SB 1; correct?

4              MR. BLEDSOE:  Objection to form.

5    BY THE WITNESS (resuming):

6    A    It could have been and they just changed it up.  I

7    mean, the underline doesn't mean that it's -- it -- it means

8    that it could be revised.  Maybe they just changed how it was

9    worded, so...

10   Q    Were you aware of any requirement that poll watchers

11   undergo training prior to SB 1?

12   A    I was not.

13   Q    You mentioned that you were pushing the training

14   program; is that right?

15   A    No.  I supported that.  I mean, there should be some

16   training because if you're going to have -- if they have the

17   ability -- I was pushing for training and penalties for them,

18   too.  Because, like, if you go on Page 27, you get more

19   penalties -- this is a new penalty for an election officer, G,

20   Line 12.  They get a Class A misdemeanor.  And so, again,

21   they're creating more penalties here.

22   Q    So let's look at Subsection 8 -- sorry -- H:  Before

23   accepting a watcher, the officer presented with a watcher's

24   certificate of appointment shall require the watcher take the

25   following oath, administered by the officer, I swear or affirm



1  that I will not disrupt the voting process or harass voters in

2  the discharge of my duties.  Did I read that correctly?

3      A    That's what it says.

4      Q    And so, if you remember back when you were discussing

5  Senate Bill 7, there was a conversation between you and

6  Representative Cain about the oath -- about an oath for poll

7  watchers.  If you don't recall, we can --

8      A    An oath for poll -- maybe I did.  I don't know.  You

9  mean in the transcript that you gave me?

10     Q    Yes.

11     A    In here?  Was it the testimony that we had back and

12  forth on the floor?

13     Q    Yes.

14     A    Okay.  Yes, I remember seeing -- I remember something

15  like that.

16     Q    Okay.

17     A    Oh, so we talked about whether poll watchers -- it

18  wasn't an oath, was it?  I -- I felt like it was something else

19  that we talked about on the floor.

20     Q    Were you aware if -- that poll watchers -- were you

21  aware if poll watchers had to take an oath prior to SB 1?

22              MR. BLEDSOE:  Objection to form.

23  BY THE WITNESS (resuming):

24     A    I'm not sure.  They probably -- I know they had to

25  wear a tag -- a name tag.



1    Q    So you don't know if they had to take an oath before
2  SB 1; correct?
3    A    I -- I don't think it had the same intention like it
4  did with this, if they did.  I don't know.
5    Q    We can put that aside for now.
6    A    Okay.
7    Q    And so I want to take a look at one of the election
8  advisories that was --
9    A    23, it looks like.
10                  MR. BLEDSOE:  It's 23?
11                  MS. HUNKER:  Yes.
12  BY MS. HUNKER (resuming):
13    Q    Have you looked at -- have you seen this particular
14  election advisory before?
15    A    I don't think so.
16    Q    Okay.  And you see on the top where it says Texas
17  Secretary of State; correct?
18    A    Yes.
19    Q    And you see where it says Election Advisory 2022-09?
20    A    Yes.
21    Q    Okay.  And the date of this is February 4th, 2022.
22    A    Yes, and I think early voting started like
23  February 16th or something like that.
24    Q    And so you -- let's look at Purpose and Duty of
25  Poll Watchers.  This states:  Section 33.0015 of the code



1   provides:  It is the intent of the legislature that poll

2   watchers duly accepted for service under Chapter 33 be allowed

3   to observe and report on irregularities in the conduct of any

4   election, but may not interfere in the orderly conduct of an

5   election.  Did I read that sentence correctly?

6        A    That's what it says --

7        Q    Okay.

8        A    -- but I don't know how they could think (ph) -- does

9   it say that in our bill -- the bill?  It says the intent?

10       Q    Let's look at that particular section.  If you go

11  back to Senate Bill 1 --

12       A    Well, not our bill.  It's the state bill, not mine.

13  I didn't -- I wouldn't have voted for it.  Where -- where are

14  you going to?

15       Q    We're going to look at Page 24 of SB 1.

16       A    Okay.  24.  (Reviewing.)  Okay.

17       Q    And we're looking at -- sorry -- Section 4.02.

18       A    Okay.

19       Q    And so if we read Section 4.02, it says it amends

20  Section 33.0015 of the election code.  Do you see that?

21       A    Yes.

22       Q    And it says:  The purpose of this chapter is to

23  preserve the integrity of the ballot box in accordance with

24  Section 4, Article 6, of the Texas Constitution by providing

25  for the appointment of watchers.  Did I read that correctly?



```
 1        A    Yes.

 2        Q    (Reading.)  It is the intent of the legislature that

 3   watchers duly accepted for service under this chapter be

 4   allowed to observe and report on irregularities in the conduct

 5   of the election, but may not interfere in the orderly conduct

 6   of the election.  Did I read that correctly?

 7        A    Yes, that's what it says.

 8        Q    Okay.  And would you agree that that is the section

 9   that the secretary of state is referencing in Election Advisory

10   2022-09?

11             MR. BLEDSOE:  Objection to form --

12   BY THE WITNESS (resuming):

13        A    I don't --

14             MR. BLEDSOE:  -- calls for speculation.

15   BY THE WITNESS (resuming):

16        A    I don't know.

17        Q    Would you agree with me that at the beginning of that

18   paragraph that we read that said Purpose and Duty of

19   Poll Watcher says Section 33.0015 of the code?

20        A    I mean, it's written there.  It says Section 33.0015

21   of the code.  That's what it says, but I don't know if that was

22   the intent.  I don't know.

23        Q    And let's look at removal of a poll watcher, which is

24   on the reverse side.

25        A    (Complies with request.)
```



1    Q    Do you see where it says Removal of the Poll Watcher?

2    A    What -- oh, down here at the bottom.  Okay.

3    Q    Okay.

4    A    I was looking up here because I see a arrow.  Because

5  up here it says, B, a poll, and then there's a big space, and

6  it goes down to the next line, so I was like -- that caught me,

7  like, what happened there.  Why did the sentence -- like,

8  something's missing at the top.  Like, is there something

9  missing from that statement?  But okay.  Now I see at the

10 bottom, Removal of a Poll Watcher.

11   Q    Okay.  And if we look at the last sentence, it says:

12 A presiding judge may call a law enforcement officer to request

13 that a poll watcher be removed if the poll watcher commits a

14 breach of the peace or a violation of law.  Did I read that

15 correctly?

16   A    Yes.  It says, May call a law enforcement officer to

17 request that a poll watcher be removed if the poll watcher

18 commits a breach of the peace.

19   Q    And have you at any time looked to see what

20 violations of the law were referenced by the code?

21   A    I have not looked at it.

22   Q    Okay.  And have you looked to see what the definition

23 of breach of the peace means in -- with respect to the election

24 code?

25   A    Not in terms of SB 1.



1      Q      Okay.  And did you look at any of those referenced

2   provisions prior to SB 1?

3      A      I feel like we discussed that during the conference

4   committee about what that was, and I think that gets to what I

5   was asking Chair Cain on the floor about the -- if -- if a -- I

6   mean if there is a -- somebody causes physical harm, if they

7   could be removed.

8      Q      And are you aware of an incident where a presiding

9   judge wanted to remove a poll watcher but could not because of

10  Senate Bill 1?

11     A      I have not looked into that.

12     Q      And are you aware of any incidents since the passage

13  of Senate Bill 1 where a poll watcher either harassed or

14  intimidated a voter?

15     A      I have not looked into that.

16     Q      And we can put that aside.

17     A      (Complies with request.)

18            MS. HUNKER:  If you want, Representative

19  Collier, we can take a quick 10-minute break and let me look at

20  my notes, but I think we're pretty close to being finished.  I

21  might only have one small thing.

22            THE WITNESS:  Okay.

23            VIDEOGRAPHER:  Going off the record at 7:47 p.m.

24            (A recess was taken.)

25            VIDEOGRAPHER:  We are back on the record at



```
 1   8:08 p.m.
 2   BY MS. HUNKER (resuming):
 3       Q    Representative Collier, I really thank you for your
 4   patience.  I think we're in the final stretch --
 5       A    Okay.
 6       Q    -- so hopefully we'll be wrapping this up pretty
 7   soon.  So would you agree that the State has a legitimate
 8   interest in preventing voters from being coerced into casting a
 9   vote for or against a particular candidate?
10       A    Coerced?
11              MR. BLEDSOE:  Object to the form of the
12   question.
13   BY THE WITNESS (resuming):
14       A    I -- I -- I don't understand.  What do you mean
15   coerced?  That the State should -- say that again.
16       Q    Do you agree the State has a legitimate interest in
17   preventing voters from being coerced into casting a vote for or
18   against a particular candidate or proposition?
19              MR. BLEDSOE:  Object to the form of the
20   question.
21   BY THE WITNESS (resuming):
22       A    I -- I can't -- I -- I don't agree with the -- the
23   statement.
24       Q    Okay.  What don't you agree about it?
25       A    The way it's -- it's -- the way -- okay.  So we
```



1  should make sure that people can vote -- can elect the

2  candidate of their choice.

3      Q    Okay.  Would you agree that the State has a

4  legitimate interest in ensuring that voters can elect their

5  candidate of their choice?

6      A    Yes.

7      Q    Do you think the State has an interest in protecting

8  the secrecy of the ballot?

9      A    I don't know what that word means -- that phrase

10  means, secrecy of the ballot.  What -- what do you mean by

11  that?

12      Q    I mean that no one would be able to see who or what

13  you voted for.

14      A    Well, I mean, I think that some of those provisions

15  may allow for that.

16      Q    Would you agree the State has an interest in

17  protecting the secrecy of the ballot, though?

18      A    Like, your vote should be your vote.  I think that

19  that is very important, so that should be a priority and it's

20  -- yeah.

21      Q    Do you think the State has a legitimate interest in

22  assuring [sic] that the person casting the vote is the person

23  registered to vote?

24      A    And -- and when you say legitimate interest, can you

25  explain that to me?



1      Q    Simply, do you think the State has an interest in

2  advancing this particular objective?

3      A    Advancing -- well, I mean --

4      Q    So does the State have an interest in ensuring that

5  the person casting the vote is the person registered to vote?

6      A    I wouldn't say an interest.  Maybe have a role, but

7  it may not be an interest.

8      Q    Do you think the State has a role in ensuring that

9  the person casting the vote is the person registering to vote?

10     A    In the context of enacting laws, I would think that

11  that has a -- that plays a part into that question.

12     Q    And so I want to introduce Exhibit 24.

13     A    Okay.

14     Q    All right.  Do you see that this says House Journal?

15     A    Yes.

16     Q    And it says the 80th Legislature Regular Session; is

17  that correct?

18     A    Yes, that's what it said.

19     Q    And then we see the date of Monday, April 23rd, 2007.

20     A    Okay.

21     Q    And so I want to go -- turn the page where on the top

22  it has 2224.

23     A    (Complies with request.)  All right.

24     Q    And then do you see where it says HB 218 remarks?

25     A    Yes.



1    Q    Now, Representatives are allowed to put written
2  remarks explaining why they did or did not vote toward a bill;
3  is that correct?
4    A    I don't know if it's -- like, I don't know how they
5  would put it down as remarks, but there is ability for you to
6  say, you know, why you voted a certain way on a bill or you can
7  give a speech, I guess.
8    Q    Okay.  And do you see where it says
9  Representative Anchia?
10   A    Yes.
11   Q    Okay.  And so I want to look to the third paragraph
12  where it says, We know that there is no.
13   A    Yes.
14   Q    Okay.  It says:  We know that there is no evidence of
15  it, but if this body wants to create an opportunity for voter
16  fraud, then vote for HB 218.  In fact, that Section 3, Part A,
17  of HB 218 creates a wonderful opportunity for people at a
18  low-cost to be able to impersonate someone else by saying that
19  this is valid employee ID and no poll worker, election worker,
20  no election judge will be to discern a valid from an invalid
21  ID.  Did I read that correctly?
22   A    That's what that says.
23   Q    Okay.  And let's look at the next sentence where it
24  says, Furthermore.
25   A    Okay.  Yes.  Well, hang on.  (Reviewing.)  Yeah.



```
 1        Q    (Reading.)  Furthermore, there's another wonderful
 2   loophole in this bill that creates a glaring weakness that
 3   essentially allows vote by mail to continue without voter
 4   identification.  Vote by mail that we know is the greatest
 5   source of voter fraud in this state.  In fact, all of the
 6   prosecutions by the attorney general -- I shouldn't say all,
 7   but a great majority of the prosecutions by the attorney
 8   general occur with respect to vote by mail.  Did I read that
 9   correctly?
10        A    Yes.
11        Q    Were you aware -- actually, I'm going to take a step
12   back.  Do you agree with Representative Anchia's statement that
13   vote by mail is the greatest source of voter fraud in the
14   state?
15             MR. BLEDSOE:  Objection to form, assumes facts
16   not in evidence.
17   BY THE WITNESS (resuming):
18        A    This is what I remember:  Somebody brought this up to
19   Chairman Anchia, and if I recall correctly, there was -- but it
20   didn't take into account the totality of the circumstances, and
21   I don't know if this was taken out of context or what, but I'm
22   not going to speculate on what he said and what he meant by
23   what he said because you can ask him.
24        Q    Okay.  Do you think that vote by mail is a source of
25   voter fraud in this state?
```



Nicole Collier

January 30, 2023
Page 235

1        A     The secretary of state has not made that statement.

2        Q     Okay.  And are you only basing it off the secretary

3   of state's represent --

4        A     Well, they're in charge of -- the secretary of state

5   is in charge of our elections, so we look to the secretary of

6   state to collect the data and the information.  I don't recall

7   -- and then I guess the attorney general's office does the

8   prosecutions, so I -- I don't know.

9        Q     So I'm asking do you think, though, that voter

10  fraud --

11              MR. BLEDSOE:  Object to form.

12  BY MS. HUNKER (resuming):

13       Q     -- vote by mail is a source of voter fraud in the

14  state?

15              MR. BLEDSOE:  Object to form.

16  BY THE WITNESS (resuming):

17       A     I would need to review the data and -- and the -- the

18  reports to see if -- if that is true.

19       Q     Okay.  And you haven't reviewed any data regarding

20  the prevalence of fraud in vote by mail in Texas.

21       A     I remember Governor Abbott made a statement before

22  this was done, and he said, Texas does not have widespread

23  voter fraud.

24       Q     And so I wasn't asking about widespread voter fraud.

25  I was asking specifically if -- have you looked at any data



1    regarding voter fraud in vote-by-mail context in Texas?

2        A    Well, I mean, the Governor didn't qualify it, and I

3    -- I -- we've got to rely on what he says, and assuming people

4    are giving him good information, and if he says that we don't

5    have widespread voter fraud, it -- it seems that includes every

6    type -- any way to vote.

7        Q    And so does the statement there's no widespread voter

8    fraud mean that there's no voter fraud in specific areas or

9    discrete incidents?

10                MR. BLEDSOE:  Objection to form.

11   BY THE WITNESS (resuming):

12       A    It means what it said, there's no widespread voter

13   fraud, like, no widespread voter fraud.

14       Q    And so are you aware of any voter fraud that occurred

15   that wasn't widespread but isolated to a specific area of the

16   state of Texas or a specific election?

17       A    I'm familiar with the investigations that the

18   attorney general said that they had with those people, the 500

19   offenses for the five or six -- seven or eight people they

20   had --

21       Q    And did you --

22       A    -- but I don't know what happened with that.

23       Q    Did you look at any other data regarding voter fraud

24   that occurs in the vote-by-mail context in the state of Texas?

25       A    Well, I hope they would have brought it to me at that



```
 1  time.  That was their chance to do it.
 2       Q    Outside of that, have you independently looked at
 3  whether or not voter fraud exists?
 4                 MR. BLEDSOE:  Object to form.
 5  BY THE WITNESS (resuming):
 6       A    Are you talking about, like, today, right now?
 7       Q    Let's say since 2020 onward --
 8       A    Okay.
 9       Q    -- have you looked at data on your own initiative
10  about the prevalence of voter fraud in the vote-by-mail context
11  in Texas?
12       A    The prevalence, meaning like if there's -- if it's
13  rampant, going --
14       Q    Just frequency.
15                 MR. BLEDSOE:  Objection to form.
16  BY THE WITNESS (resuming):
17       A    I -- I don't recall seeing anything that said it was
18  rampant --
19       Q    Well --
20       A    -- or widespread.
21       Q    -- I didn't say rampant --
22       A    Okay.
23       Q    -- I said --
24       A    Prevalence.
25       Q    -- simply do you know what the prevalence was.
```



```
 1      A    Prevalence meaning like the -- when you say
 2 prevalence, do you mean the -- often -- how often it happens or
 3 if it happens?
 4      Q    Just the rate at which it happens, to the extent it
 5 does happen.
 6      A    I --
 7               MR. BLEDSOE:  Objection to the form of the
 8 question.
 9 BY THE WITNESS (resuming):
10      A    I wouldn't say that it doesn't happen because I'm
11 sure it does happen, but it's not widespread, it's not rampant.
12 I mean, I don't think you can eradicate anything, a type of
13 crime, like, completely.  Like, for human trafficking, it's
14 going to be very -- nearly impossible just to say, No human
15 trafficking in Texas, but we want that; right?  We want no
16 voter fraud in Texas, but it happens.  So I think that you try
17 to do your best efforts and -- and try to share information and
18 create provisions that will allow people to comply without
19 harming -- you know, without, you know, tricking them or trying
20 to do a gotcha moment.  It's like everybody's doing the same
21 and -- and -- and so to enforce order in our state, we have the
22 rules.  And so I think that, you know, there is always the
23 ideal of eliminating voter fraud, but it happens just like
24 human trafficking.
25      Q    And so have you looked to see if there are any
```



1  instances of voter fraud in Tarrant County?

2      A   Have I looked to see?  Well, I don't know.  Did

3  Crystal Mason live in Tarrant County?  I feel like she was in

4  Tarrant County at the time.  She was convicted for some type of

5  voter fraud, and there was an intent to try to correct or

6  address that because it wasn't intentional, but she still was

7  arrested for voting.  And Hervis Rogers, if you remember in

8  Harris County -- I know you talked about Harris County a lot,

9  it was -- I think he was --

10      Q   Well, I was --

11      A   -- voting at TSU --

12      Q   -- focusing on Tarrant County in this case.

13      A   Oh, okay.  Well, I was just going to say that there

14  was -- he was also arrested.  So then that's two that I can

15  think of.

16      Q   So I want to introduce Exhibit 25.

17              COURT REPORTER:  24, is that --

18              THE WITNESS:  Oh, no, it's 25.  She's right.

19  It's sitting right here next to me.  Uh-oh, this came apart.

20  Here, you want to put this back together?  Oh, did you give me

21  two copies of it?

22              MS. HUNKER:  I might have accidentally given you

23  two copies.

24              THE WITNESS:  Okay.  See if that's the same.  Is

25  it just two pages?



```
 1                    MS. HUNKER:  Yes.
 2                    THE WITNESS:  Okay.
 3    BY MS. HUNKER (resuming):
 4        Q    Do you see on the top of this page where it says
 5    Office of the Attorney General, Election Frauds, Violations,
 6    Prosecutions Resolved?
 7        A    (Reviewing.)  Office of the Attorney General,
 8    Election Fraud Violations, Prosecutions Resolved.  Okay.
 9        Q    And do you see the Bates number on the bottom where
10    it says State-087323?
11        A    Yes, and it says, Information as of 4/20/2022.
12        Q    That's correct.
13        A    And so this was not available when I went to discuss
14    HB 6.
15        Q    So my question for you is:  Did you see a variation
16    of this chart when you were discussing HB 6, one that would
17    have had information as of that date, that era, that timeframe?
18        A    I don't think it looked just like this, but it was
19    something where they said pending.  It wasn't -- these were
20    pending cases, and this says these are resolved.
21        Q    Okay.  And so let's turn to Page 17 --
22        A    Okay.
23        Q    -- and you'll see that -- the state number on the
24    bottom is State-087335.
25        A    Yes.
```



```
 1      Q    Okay.   And that, if you notice, says Prosecutions
 2  Pending.  Do you see that?
 3      A    Yeah, pending?
 4      Q    Yes.
 5      A    Oh, at the top.  Yes, I do see that.
 6      Q    Okay.
 7      A    Okay.
 8      Q    And so did you see a variation of this chart where
 9  it's prosecutions pending when you were considering?
10      A    I don't know if this is the same.
11      Q    Okay.
12      A    But -- you know what?  It looks kind of like this,
13  but I don't know if it was the same.
14      Q    And you don't know if the Office of Attorney General
15  gave a variation of this chart, the one that would have been
16  relevant at the time, to members of the legislature during the
17  consideration of SB 7 or HB 6.
18      A    I recall that Representative Gonzalez asked for it
19  and it took a while, and then -- because I think that was in
20  the testimony that you provided, and they finally gave it to
21  her, which we -- they shared with us, members of the -- well,
22  the people that were on that committee hearing at that time.
23      Q    Okay.  And we can put that aside.
24      A    Do you want me to answer any questions about the
25  people?  I don't know them.  It looks like it was all from one
```



1  election.

2      Q    So if you go to Page 9 --

3      A    9?  Oh, I thought you were talking about Tarrant

4  County.

5      Q    I am talking about Tarrant County --

6      A    Okay.

7      Q    -- where it says 087331.

8      A    Uh-huh.

9      Q    Do you see where it has Tarrant County?

10     A    Yes.  I see one Tarrant County.

11     Q    Yes, and the defendant is Charles Jackson.

12     A    Yes.  I don't know who that is.

13     Q    What?

14     A    I said, yes, I don't know who that is.

15     Q    Okay.  And it says:  False statement on application,

16  mail-ballot fraud, vote harvesting, forged voter signature.  Do

17  you see that -- the allegation described as I just provided?

18     A    Yes, from the 2016 primary, so that probably -- well,

19  I don't know when it was resolved.  When was it resolved?  I

20  see that.  Oh, that should have been on the list if this is for

21  -- if it was resolved 4/6/2019, because the hearing was in

22  2021, so this person should have been on that list.  We can

23  compare that and make sure.

24     Q    I don't have the list that was provided to

25  Representative Gonzalez.



1    A    It should -- no, it should be -- like, isn't it -- I

2 think it was an exhibit in the committee hearing.  We can

3 compare to see if this person was on there.

4    Q    Were you aware of this particular incident?

5    A    No.  No, this is my first time seeing it.

6    Q    Okay.

7    A    But I have heard about those other ones, Leticia,

8 those -- I have heard about that.  Are those -- those are

9 pending still; right?  They haven't been resolved?

10 (Reviewing.)  Yeah, I -- I have heard of these.  Oh, it's the

11 same year, 2016.  Theirs haven't been resolved, but the other

12 one, Charles Jackson, was.  So then they have multiple charges,

13 like Leticia has 17 counts alone that they're looking into.

14    Q    And do you know how many ballots -- or let's -- it

15 says, False statement on mail-ballot application.  Correct?

16    A    Who are you looking at now?

17    Q    You said Leticia --

18    A    Okay.  Yes.

19    Q    -- so it is --

20    A    Number 17.  And there's two Leticia Sanchez, so --

21    Q    So looking at the second --

22    A    Oh, the second person.

23    Q    -- that says, False statement on mail-ballot

24 application; correct?

25    A    Oh, because I was looking at the first one, but yes,



 1  they both --

 2      Q    And they have that one, too --

 3      A    Yeah.

 4      Q    -- just on the bottom.

 5      A    Okay.

 6      Q    Do you know how many applications to vote by mail

 7  that individual had submitted?

 8      A    No, because it doesn't say what -- it just says nine

 9  counts, but they were charged with multiple offenses, so I

10  don't know what that is.

11      Q    Okay.  Let's --

12      A    And you know what else that concerned me?  So

13  Hervis Rogers -- you -- you -- I had to bring him up because

14  they claim -- you know, there's an assertion that he committed

15  an offense, but they didn't charge him until right before this

16  happened, the election bill.

17              MS. HUNKER:  So I'm going to object to it as

18  nonresponsive only because I don't have that information in

19  front of me.

20              THE WITNESS:  Well, it should be on here.

21  You've got these pending cases.  It should be on here.  Can you

22  give it to me?  I'll find it.  Let's see.

23              MS. HUNKER:  I would like to move on to just

24  talk a little bit about Leticia Sanchez since you raised her.

25  BY MS. HUNKER (resuming):



1    Q    You said you were aware of that specific incident.

2    A    No, I read about the name --

3    Q    You read about her name.

4    A    -- and I've also read about Hervis Rogers, because

5    that was a contentious issue at the time of the bill of HB 6

6    that it was opportune to arrest him or charge him right before

7    this, even though that the alleged violation happened years ago

8    or something like that.

9    Q    So I'm going to talk now about --

10                   MR. BLEDSOE:  87338.

11   BY MS. HUNKER (resuming):

12   Q    -- Exhibit 26.

13                   THE WITNESS:  87338.

14                   MR. BLEDSOE:  At the bottom.

15                   THE WITNESS:  Yeah.  Okay.  There he is.

16                   MS. HUNKER:  And I'm going to object as

17   nonresponsive.  I asked about a specific individual.

18                   THE WITNESS:  I just wanted to see if it was on

19   here.  Sorry.

20                   MS. HUNKER:  That's all right.

21                   THE WITNESS:  And, see, he was charged in June

22   from a 2018 election.  How do you wait that long?

23   BY THE WITNESS (resuming):

24   A    Okay.  So I'm going to go back to 26 -- oh, we're

25   going to go on to 26.  Will I be able to get -- keep this?



1    Q    I --
2    A    Can I keep -- I mean, if you can give me a copy of
3  this, I'd like to look at it at a later date.
4    Q    So if we look at Exhibit 26, you'll see where it has
5  the title Documents Showing More People Connected to
6  Vote-Harvesting Scheme in Tarrant County --
7    A    Okay.
8    Q    -- and it's dated October 25th, 2018; is that right?
9    A    I see that, yes.
10   Q    And do you see on the bottom where it has the website
11  name from CBS News?
12   A    Is that the local CBS News or the national CBS News?
13   Q    It does have slash, DFW News.
14   A    Okay.
15              MR. BLEDSOE:  Is that a new exhibit?
16              MS. HUNKER:  Yes.
17  BY MS. HUNKER (resuming):
18   Q    And so if you look at the top where it's -- says
19  CBS -- SDFW.com?
20   A    Uh-huh.
21   Q    Do you see on top?
22   A    (Nonverbal response.)
23   Q    (Reading.)  Court documents filed in this week [sic]
24  named more people, the State of Texas says, were connected to a
25  vote-harvesting scheme in Tarrant County.  Did I read that



1  correctly?

2       A    It said court documents filed in this week, but it

3  says -- on your other thing, it says that they were charged on

4  the 10th -- October 10th, so that wouldn't be right.  Well, I

5  don't know.  This says -- this date, October 25th, 2018, and it

6  said court documents filed in this week name more people.  If

7  you're talking about the Sanchez, your documents says that they

8  were charged October 10th, 2018, so that's more than the same

9  week.  But okay.

10      Q    I'm simply -- did I read that correctly?

11      A    Yeah, that's what it said.

12      Q    Yes.  And so let's look at the description of the

13 event.  It says:  The State indicted four women this month who

14 prosecutors said were requesting mail-in ballots and filling

15 them out for the Democratic Party.  Did I read that correctly?

16      A    That's what it said.

17      Q    Okay.  And then it says:  New documents say

18 Leticia Sanchez was receiving money to pay the other women for

19 votes they collected.  Did I read that correctly?

20      A    (Reading.)  New documents say Leticia Sanchez was

21 receiving money to pay the other women for votes they

22 collected.  That's what it says.

23      Q    Yes.  And then if you look at the last paragraph, it

24 lists the individuals involved.

25      A    Yes.  Oh, and it does say Wednesday, October 10 --



```
 1   10th.

 2        Q    Yes.

 3        A    It says:  Leticia Sanchez -- Leticia Sanchez

 4   Tepichin, Maria Solis and Laura Parra -- yes, I see that.

 5        Q    Okay.  And then if we go to the next page, it says:

 6   Paxton's office said the women harvested votes by filling out

 7   applications for mail-in ballots with forged signatures, then

 8   they would either assist the voter with filling out the ballot

 9   or fill it out themselves and use deception to get the voter to

10   sign the envelope, the ballot would be sent back in.  Did I

11   read that correctly?

12        A    That's what it said.

13        Q    Now, you had mentioned that you were familiar with

14   this case to some extent.

15        A    It was during this.  I didn't know about it -- like,

16   I didn't know in 2018, but I remember seeing it in the time

17   that this bill was coming up.

18        Q    Okay.  So you became aware of this incident in

19   Tarrant County during the consideration of HB 6 and SB 7; is

20   that correct?

21        A    Yes.

22        Q    Okay.  And were you aware of any other -- actually,

23   I'll take that back.  Did you learn any more -- anything more

24   about this case in the ensuing months following your

25   consideration of HB 6 and Senate Bill 7?
```



1      A     Well, it's a pending investigation, so there's --

2      Q     I just wondered if you had read more information

3  about it in the news.

4      A     No, because it's pending.  I haven't seen any, like,

5  updates on it.

6      Q     Okay.  We can turn (ph) that aside.

7      A     (Complies with request.)

8      Q     And so I want to introduce Exhibit 27.  And just a

9  quick question regarding the vote harvesting we had just

10  discussed with the four women:  Did you consider that incident

11  when you were reviewing HB 6 and Senate Bill 7?

12      A     I don't get these specific incidents to mean

13  widespread voter fraud.  I would agree with the Governor's

14  statement that Texas does not have widespread voter fraud.

15      Q     And so I want to turn to Exhibit 27.  Do you have

16  that in front of you?

17      A     Yes.

18      Q     And it says:  Election Fraud.  Suspicion First Arose

19  with 11 Duplicate Applications.  Did I read the title

20  correctly?

21      A     Yes.

22      Q     And do you see the date of October 9th, 2020?

23      A     Yes.

24      Q     Okay.  And do you see where it has the website name,

25  the DentonRC.com?



1    A    I see that.  I don't know what that is, though.

2    Q    And so let's look to the first paragraph.  It says:

3 11 duplicate mail-in ballot requests in the names of voters

4 whose applications had already been received are what first

5 piqued the interest of the Denton County Elections

6 Administration in the election-fraud case announced Thursday,

7 according to the sheriff's office documents.  Did I read that

8 correctly?

9    A    Yes.

10    Q    The Denton County Sheriff's Office on Tuesday

11 arrested and charged 39-year-old Zul Mirza Mohamed, a

12 Carrollton mayoral candidate with 109 felonies related to voter

13 fraud.  Did I read that correctly?

14    A    Yes.

15    Q    And so I want to go to the next page to the third

16 paragraph.

17    A    (Complies with request.)  Okay.

18    Q    (Reading.)  According to an arrest warrant, the

19 election -- sorry -- the county elections office met with the

20 sheriff's office on September 23rd regarding possible

21 fraudulent applications for mail-in ballots.  The warrant says

22 Elections Administrator Frank Phillips said, The signatures on

23 about 70 requests for mail-in ballots had similar handwriting

24 and 11 of them were duplicates for an application that had

25 already been sent in.  Did I read that correctly?



 1      A    Yes.

 2      Q    Were you aware of the allegation against the mayoral

 3 candidate in Carrollton for mail-in ballot fraud?

 4      A    When?

 5      Q    Well, have you -- before today's deposition, had you

 6 heard of this particular incident?

 7              MR. BLEDSOE:  Objection to form.

 8 BY THE WITNESS (resuming):

 9      A    Well, let me say it like this:  I don't know what --

10 all of this stuff happened prior to 2021 when the election bill

11 was being considered, so I would think that the leader of our

12 state, the Governor, would have known about this when he said

13 there is no widespread voter fraud in the state of Texas.  So

14 these isolated incidents that you are bringing up do not

15 support that there is widespread voter fraud.  We cannot

16 eliminate this -- these -- this crime, I think, just like human

17 trafficking.  So I'm not sure -- I still stand by what the

18 Governor said, that there's no widespread voter fraud in Texas.

19      Q    And do you know when he said that, what you've been

20 stating?

21      A    Yes, it was in 2021.  It was actually right before

22 the bill was being brought up.  It was in 2021.

23      Q    Now, you mentioned the human-trafficking analogy a

24 couple of times now.  Now --

25      A    That's a bad crime, too.  All of it is bad.



1      Q    Would you agree that the State should continue to

2  pass legislation trying to eliminate human trafficking?

3      A    I don't know if you can eliminate something.

4      Q    Well, working towards reducing --

5      A    There you go.

6      Q    -- working towards reducing human trafficking even if

7  they can't fully eliminate it?

8      A    Yeah, you need to work to reduce the -- yeah, the

9  human trafficking.

10     Q    And so legislation could also work to reduce voter

11  fraud even if they can't eliminate it in its entirety; is that

12  correct?

13     A    They need --

14          MR. BLEDSOE:  Objection to form.

15  BY THE WITNESS (resuming):

16     A    Well, they need to think about the impact.  Without

17  having -- it -- it needs -- it shouldn't be harmful to certain

18  groups.  So if you're going to implement a provision, you need

19  to be thoughtful and -- and then also take the time to study or

20  examine the consequences or the -- the effect that that

21  legislation will have on certain sections or sectors of our

22  population.

23     Q    And so would you agree then that the legislature

24  should look towards reducing voter fraud but keeping in mind

25  the impact that that legislation would have on different groups



 1  in the state?

 2                  MR. BLEDSOE:  Objection to form.

 3  BY THE WITNESS (resuming):

 4      A    I don't agree with that if that -- and you're asking

 5  me if that's what they did?  I don't --

 6      Q    No, I'm --

 7      A    -- agree with that.

 8      Q    -- asking if you think that's what they should do.

 9                  MR. BLEDSOE:  Objection to form.

10  BY THE WITNESS (resuming):

11      A    Okay.  So I think that they should take into --

12  there's so many factors that you should take into consideration

13  when you're drafting legislation, and one of them is examining

14  the negative or harmful impact that your provision will have

15  and whether it's constitutional.  I mean, you've got to think

16  about how it's going to impact the people that you represent.

17      Q    So would you consider it a balancing task when a

18  legislature looks at reducing voter fraud, but should also look

19  at the negative consequences the proposal could have on voters

20  and the state of elections?

21      A    I think everybody does it differently.  I don't know

22  if it's a balancing, but you need to take into totality of the

23  circumstances and look at every -- you know, as much as you

24  can.

25      Q    Would you agree that reasonable people can disagree



 1  about what the best balance is between seeking to reduce voter

 2  fraud and the impact that that -- those provisions may have?

 3      A    In what circumstance?  Like, on how it impacts people

 4  of color?

 5      Q    No, just generally.

 6      A    Well, I think that they -- see, that's another thing.

 7  That's -- I mean, did they even consider how it would impact

 8  people of color.

 9      Q    And so you don't know if they considered whether it

10  would impact voters of color.

11      A    Well, I don't know that -- that scenario you just

12  gave me, you said do I think that the legislature should

13  consider implementing rules that would preserve voting or

14  something, and then --

15      Q    Well, my last question was actually:  Do you think

16  that legislators can reasonably disagree on the balance of

17  interest that goes into reducing voter fraud versus the

18  consequences that those reforms could have on demographic

19  groups in the state?

20      A    That's assuming --

21           MR. BLEDSOE:  Objection to form.

22  BY THE WITNESS (resuming):

23      A    -- that they took that into consideration in the

24  first place.

25      Q    But if they did consider it and take that



```
 1  consideration in the first place, do you think that reasonable
 2  people can disagree --
 3                  MR. BLEDSOE:  Objection to form.
 4  BY MS. HUNKER (resuming):
 5      Q    -- about the impact?
 6                  MR. BLEDSOE:  Objection --
 7  BY THE WITNESS (resuming):
 8      A    Okay.  So then I would say to what extent, because I
 9  can say I took it, like, I accepted the data, but I didn't
10  actually utilize it in formulating my opinion.
11      Q    And so let's look again at that third paragraph.  It
12  says:  11 of them were duplicates for applications that already
13  had been sent in.  Do you see that?
14      A    Are you still on Page 2?
15      Q    Yes.
16      A    11 of them.  What paragraph are you on?
17      Q    Third paragraph, the last clause.
18      A    Okay.  Sorry.
19      Q    And 11 of them --
20      A    Yes.  Now I see it.
21      Q    If a voter submits an application to vote by mail but
22  one had been sent by another individual, that could prevent the
23  voter from being able to vote; correct?
24      A    I don't -- I mean, you're just giving me a scenario.
25  I don't know how to answer that.
```



1      Q    And then if we look at where it says, In total -- do

2  you see that?

3      A    Yes.

4      Q    It says:  The warrant says 84 applications for

5  mail-in ballots were fraudulent.  Did I read that correctly?

6      A    That's what it says.

7      Q    Okay.  And so in this case, you had one person

8  allegedly submitting 84 fraudulent ballots; correct?

9      A    Allegedly submitting 80 -- I don't know.  Is this

10 about the same person?  (Reviewing.)  This is about the same --

11 it says:  In total, the warrant says 84 application for mail-in

12 ballots were fraudulent.

13     Q    And so if you read the article, you'll see it only

14 references the one specific individual.

15     A    Okay.  Well, I didn't read the whole article.  You

16 kept me going -- just different paragraphs.

17     Q    Do you know how many counties in Texas have a

18 population of under 10,000?

19     A    Under 10,000?

20     Q    Yes.

21     A    No, but I do remember there was a provision that

22 Chair Cain had in HB 6 that differentiated how certain counties

23 would handle elections based on the size.

24     Q    And so you don't know how many counties have a

25 population of under 10,000.



1        A    I feel like we talked about that.  I just don't

2   remember off the top of my head.

3        Q    Do you know how many counties have a population of

4   under a thousand in Texas?

5        A    I know that came up, too, I mean, because I think

6   that there was some -- HB 6, I mean, we worked really hard to

7   try to come up with something, and there was more discussion

8   with -- you know, with me being involved, and I felt like we

9   did flesh out -- as you can see the changes that were made, but

10  not everything made it over to the Senate side.  I know we have

11  254 counties.

12       Q    That's correct.  And do you know if, in your

13  experience, some elections are decided on a very small margin

14  of votes?

15       A    Yes.  Donna Howard, I think she won by like one or

16  two or three votes in one of her elections.  It was like --

17  yes, it can come down to that.

18       Q    And would you agree that in -- for close elections,

19  voter fraud, even if it only effects a handful of votes, can

20  change the outcome of an election?

21       A    Even if it could change the outcome of the election?

22  I don't know.

23       Q    Do you think a few votes can decide an election in

24  the case of Donna Howard's election?

25       A    It can get critical, yeah, every vote counts.



1            MS. HUNKER:  Representative Collier, I wanted to

2     thank you for coming today.  I think that's all of the

3     questions I have, and I really appreciate your patience as well

4     as your willingness to come in what is relatively inclement

5     weather for a Texas winter.

6            THE WITNESS:  Thank you.

7            MR. BLEDSOE:  Are all of the people off online

8     or --

9            COURT REPORTER:  No, I'm going to speak to them

10    first.

11           MR. BLEDSOE:  Okay.

12           COURT REPORTER:  Okay.  If you guys can hear me

13    online, I'm going to go ahead and take your transcript requests

14    if you have any.  This is the court reporter.

15           THE WITNESS:  There is a chatroom there.

16    Somebody does have a chat.

17           COURT REPORTER:  Yeah, if you do want to request

18    a transcript, now would be the time to do that.  You can either

19    verbally say it or drop it in the chat.  Actually, you have to

20    do it verbally.  Sorry.  Let me see.  And while I'm waiting for

21    them, Ms. Hunker, your standing order, I assume.

22           MS. HUNKER:  Yes, that's correct.

23           COURT REPORTER:  Okay.  And then did you need a

24    copy of this transcript at all?

25           MR. BLEDSOE:  I think you're going to send it to



 1  sign -- to her, so I'm not going to.

 2            COURT REPORTER:  Okay.

 3            THE WITNESS:  Can I get a copy of this

 4  Exhibit 25?

 5            MR. BLEDSOE:  E-mail it -- E-mail it to me and

 6  I'll get it to her.

 7            THE WITNESS:  Okay.

 8            MR. BLEDSOE:  Okay.

 9            COURT REPORTER:  Are there any transcript

10  requests at this time?  I'm going to drop my E-mail if you want

11  to think about it.  You can do it later.  We are going to go

12  off the record, though.

13            MR. BLEDSOE:  Any of them still on?

14            COURT REPORTER:  Yeah, they're still here,

15  but --

16            MR. BLEDSOE:  So what's -- what's the protocol?

17  Do they -- do they ask questions or they just --

18            COURT REPORTER:  No, we're concluded.  They

19  typically don't ask questions.

20            MR. BARNES:  Yeah, I -- I haven't seen them ask

21  questions yet.

22            MR. BLEDSOE:  Okay.

23            VIDEOGRAPHER:  This concludes the deposition.

24  We are going off the record at 8:44 p.m.

25            (Whereupon, the proceedings were concluded.)



Nicole Collier

January 30, 2023
Page 260

```
 1                    CHANGES AND SIGNATURE

 2   WITNESS NAME:  NICOLE COLLIER

 3   DATE OF DEPO:  JANUARY 30, 2023

 4   PAGE      LINE      CHANGE                    REASON

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1           I, NICOLE COLLIER, have read the

2   foregoing deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5

6                       NICOLE COLLIER, Witness

7   THE STATE OF _____        )

8   COUNTY OF                       )

9        Before me,                    , on this day

10  personally appeared NICOLE COLLIER, known to me (or proved to

11  me under oath of through                    ) (description of

12  identity card or other document) to be the person whose name is

13  subscribed to the foregoing instrument and acknowledged to me

14  that they executed the same for the purposes and consideration

15  therein expressed.

16          Given under my hand and seal of office this

17  day of                    ,            .

18

19

20

21                  NOTARY PUBLIC IN AND FOR

22                  THE STATE OF

23

24

25



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
V.                               )  Case No. 5:21-cv-00844-XR
                                 )
GREGORY W. ABBOTT, et al.,       )
                                 )
Defendants.                      )
 ------------------------------------------------------------

REPORTER'S CERTIFICATE
ORAL & VIDEO DEPOSITION OF NICOLE COLLIER
JANUARY 30, 2023


     I, Patrick A. Stephens, Certified National Court Reporter,
hereby certify to the following:


     That the witness, NICOLE COLLIER, was duly sworn and that
the transcript of the deposition is a true record of the
testimony given by the witness;


     That pursuant to information given to the deposition
officer at the time said testimony was taken, the following
includes all parties of record and the amount of time used by
each party at the time of the deposition:



Mr. Gary Bledsoe (0 mins)

    Attorney for Representative Nicole Collier

Ms. Kathleen Hunker (5 hrs 20 mins)

    Attorney for State Defendants


I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

    Certified to by me on this 16th day of February, 2023.

        *
        *
        *
        *
        *
        *

PATRICK A. STEPHENS
NVRA NO. 5462
Expiration: 06/01/2023
Magna Legal Services
Firm Registration No.633
16414 San Pedro Ave.,
Ste. 900
San Antonio, TX  78232

