Carol Alvarado                                        October 06, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LA UNION DEL PUEBLO ENTERO,      )
et. al.,                         )
                                 )
        Plaintiffs,              )
                                 )    CIVIL ACTION NO.
                                 )    5:21-CV-00844-XR
v.                               )
                                 )
GREGORY W. ABBOTT, et al.        )
-----------------------------------------------------------

ORAL & VIDEO DEPOSITION OF CAROL ALVARADO

October 6, 2022
-----------------------------------------------------------

        Oral & video deposition of Carol Alvarado, produced

as a witness at the instance of the plaintiffs, and

duly sworn, was taken in the above-styled and numbered

cause on the 6th day of October, 2022, before

Patrick Stephens, Certified Court Reporter, at

209 West 14th Street, Ground Floor Conference Room,

Austin, Texas 78701.



Defendant's
Exhibits

431

```
 1              COURT REPORTER:  Okay.  Great.  You may take
 2   over.
 3        (Whereupon,
 4                   CAROL ALVARADO
 5        was called as a witness herein and, having first been
 6        duly sworn, was examined and testifies as follows on:)
 7                   CROSS-EXAMINATION
 8   Q    Good morning, Senator.
 9   A    Good morning.
10   Q    Thank you for coming today.
11   A    Sure.
12   Q    And I hope you had a good drive in.
13   A    Uh-huh.
14   Q    My name is Kathleen Hunker.  I'm an attorney with the
15   office of attorney general in Texas, representing the State
16   defendants.  For the record, could you just please state and
17   then spell your name?
18   A    Sure.  Carol, C-a-r-o-l, Alvarado, A-l-v-a-r-a-d-o.
19   Q    Senator, I'm going to start with some instructions and
20   introductory questions.  After that's done, I'll move on to the
21   main subject of the deposition.  Have you been deposed before?
22   A    No.
23   Q    Have you testified in court before?
24   A    No.
25   Q    You understand that you are under oath, though;
```



```
 1      A    Yes.

 2      Q    And what is it?

 3      A    It's from the Senate website.

 4      Q    And so this is a printout of your bio on your Texas

 5 Senate website; correct?

 6      A    Uh-huh, yes.

 7      Q    Now, it mentions here that in 2008 you were elected to

 8 the Texas House of Representatives; is that correct?

 9      A    Right.

10      Q    And it says that you served five terms representing

11 District 145; is that correct?

12      A    Right.

13      Q    And you since ran for Texas Senate in 2018; is that

14 correct?

15      A    Yes.

16      Q    And you won that particular race; correct?

17      A    Yes.

18      Q    And so you've now -- did you run for reelection?

19      A    Yes.

20      Q    And which cycle did you run for reelection?

21      A    2020 and then now, 2022.

22      Q    Now, when you were a member of the Houston City

23 Council, was that a partisan position?

24      A    No.

25      Q    When you ran for the Texas House of Representatives,
```



 1    that is a partisan position; correct?

 2         A    Yes.

 3         Q    And you ran as a Democrat.

 4         A    Yes.

 5         Q    And when you ran for the Texas Senate, you also ran as

 6    a Democrat; correct?

 7         A    Yes.

 8         Q    All right.  Were you a member of any caucuses while

 9    you were a member of the Texas House of Representatives?

10         A    Well, I was a member of the Mexican-American

11    Legislative Caucus, I was a member of the Women's Health Caucus,

12    the Sportsmen's Caucus and, of course, the Democratic Caucus.

13         Q    And what about the caucuses that you're a part of as a

14    member of the Texas Senate?

15         A    Well, I lead the Senate Democratic Caucus, I might

16    still be a member of the Sportsmen's Caucus.  I don't -- I

17    haven't participated in that, but I believe I'm still a member

18    of that group, and then we have the -- I'm a member of the

19    Senate Hispanic Caucus.

20         Q    And how long were you a leader of the Texas Democratic

21    Caucus?

22         A    The Senate Democratic Caucus?

23         Q    That's correct.

24         A    I have led that since 2019.

25         Q    And what are your responsibilities as the head of the



```
 1        Q    Uh-huh.

 2        A    -- or voter ID in the House, I was engaged in debate

 3   on those issues.

 4        Q    So I guess, then, I should maybe rephrase it.  So you

 5   haven't -- you don't typically file elections legislation with

 6   the exception of your electronic-voter registration bill; is

 7   that correct?

 8        A    The bill that I have filed continuously has been the

 9   online voter registration.  That's it.

10        Q    You don't get -- hold yourself out as being a voting-

11   rights specialist; correct?

12        A    I would say voting-rights advocate.

13        Q    And -- and this is just asking your familiarity.

14        A    Uh-huh.

15        Q    So what is your familiarity with the Voting Rights

16   Act?

17        A    Well, I know it's been diminished as time has passed

18   and various sections have been done away with.

19        Q    Have you, let's say, read the case law surrounding the

20   Voting Rights Act?

21        A    No, I've not read any case law.

22        Q    And have you read any of the case law surrounding

23   Section 2 of the Voting Rights Act?

24        A    No, I've not read the cases.

25        Q    And you are not an attorney; correct?
```



```
 1        A     Right.

 2        Q     All right.  All right.  We can put this document

 3   aside.

 4                   MR. GOLANDO:  Do you want to mark it?

 5                   COURT REPORTER:  I have the marked copy.

 6                   MR. GOLANDO:  You have the marked copy?

 7                   COURT REPORTER:  Yes, I have that one.

 8                   MS. HUNKER:  I tried to printout enough of them.

 9   BY MS. HUNKER (resuming):

10        Q     So we're going to move on to another exhibit.  And I

11   will say we'll be going back to this exhibit on and off through

12   some of the deposition, so even if you put it aside, [sic] not

13   to move it too far.

14                   MS. HUNKER:  (Provides exhibit.)

15                   MR. GOLANDO:  Thank you.

16   BY THE WITNESS (resuming):

17        A     Okay.

18        Q     Do you have the document in front of you?

19        A     Yes.

20        Q     Can you see on the top where it says, Senate Journal

21   87th Legislature, Regular Session; correct?

22        A     Uh-huh, yes.

23        Q     And do you see where it says addendum?

24        A     Uh-huh, yes.

25        Q     And then you'll see below it says, 40th day, Saturday,
```



1    May 29th, 2021.

2        A    Yes.

3        Q    And then it goes:  The following remarks regarding

4    SR 547 and SB7 were ordered reduced in writing and printed in

5    the journal.  Did I read that correctly?

6        A    Yes.

7        Q    And you're aware that occasionally members of the

8    legislature can ask that the, I guess, debate get transcribed

9    for the record; correct?

10       A    Yes.

11       Q    And you're aware that that usually comes through an

12   addendum in the Senate Journal; correct?

13       A    Yes.

14       Q    And so I'm going to represent to you that this is the

15   addendum and Senate transcript of the debate over SB7 on May

16   29th, 2021.  Do you have any reason to doubt my description of

17   the document?

18       A    No.

19       Q    I will also represent that I've only included the

20   pages that are going to be relevant for the deposition, so this

21   is not the full transcript.  And so I want to turn to Page 56.

22       A    Uh-huh.

23       Q    Okay.  And we're going to go to where it says, Senator

24   Alvarado, let's talk about.

25       A    Uh-huh.



1    Q    Do you see that?

2    A    Yes.

3    Q    Okay.  And so it says:  Let's talk about the big

4  elephant in the room, and I'm not talking about party mascot;

5  I'm talking about Harris County.  Did I read that correctly?

6    A    Yes.

7    Q    Senator Hughes replies:  All right.  And you respond

8  with:  Okay.  This is about Harris County.  Would you agree?

9  Did I read that correctly?

10   A    Yes.

11   Q    And before we talk about this particular exchange, let

12 me take a step back.  So you spoke, I believe, on what's called

13 the back mic when Senate Bill 7 was up for consideration; is

14 that correct?

15   A    There's not a back mic in the Senate.

16   Q    Oh, there's not.  My apologies --

17   A    You just --

18   Q    -- for getting the terminology wrong.

19   A    -- do it from the chair, yeah.

20   Q    So let me rephrase that.  During the consideration of

21 Senate Bill 7, you asked questions of Senator Hughes; is that

22 correct?

23   A    Yes.

24   Q    And this would have been when the conference committee

25 report would have been up for consideration in the Senate.



Carol Alvarado                                    October 06, 2022
                                                          Page 24

 1   Would you agree with that?
 2       A    Yes.  Just a minute.  I'm looking at the previous
 3   page. (Reviewing.)  Okay.  Yes, that was at 2 o'clock in the
 4   morning on -- very early on Sunday morning during Memorial
 5   weekend, yes.
 6       Q    And so you were talking about the impetus in this case
 7   of Senate Bill 7; is that right?
 8       A    Yes.
 9       Q    Okay.  And so it's your belief that election
10   legislation that was introduced during the 87th Legislature was
11   in response to the actions taken by Harris County.  Is that a
12   fair description?
13       A    Partly.
14       Q    You'd agree that at least some provisions then in
15   Senate Bill 7 and then ultimately Senate Bill 1 were in response
16   to the actions taken by Harris County.
17       A    Yes.
18       Q    Okay.  And so specifically, it was the actions taken
19   by Harris County in the 2020 election; is that right?
20       A    Yes.
21       Q    Now, you would agree with me that in 2020, in March,
22   the United States and the world got hit with the coronavirus --
23       A    Yes.
24       Q    -- COVID-19 pandemic; correct?
25       A    Uh-huh, yes.



Carol Alvarado                                    October 06, 2022
                                                        Page 25

1      Q    And that introduced a significant number of challenges

2  for the administration of a successful election; is that right?

3      A    Yes.

4      Q    And so a lot of counties had to take innovative steps

5  in order to conduct a successful election; is that correct?

6      A    Yes.

7      Q    And as part of this innovation, some counties

8  introduced practices that had not yet been seen in Texas; is

9  that right?

10     A    Yes.

11     Q    The county clerk in Harris County during part of this

12 time was Chris Hollins; correct?

13     A    Yes.

14     Q    And do you know Chris Hollins at all?

15     A    Yes, I do.

16     Q    And where do you know him from?

17     A    Just politics, being in the community.

18     Q    And so did you know him before he was county clerk?

19     A    Yes.  Yeah, I don't know -- remember where I met him,

20 but we knew each other.

21     Q    Okay.  So you knew each other, but it was not like a

22 -- a strong relationship.  It seems to be more casual; is that

23 correct?

24     A    That's correct.

25     Q    And so, during the 2020 elections, Chris Hollins



1    introduced a number of innovative practices in Harris County

2    with respect to voting; is that correct?

3         A    Yes.

4         Q    And so I want to talk a little bit about those

5    innovations.

6         A    Sure.

7         Q    You can put that aside, but I wouldn't put it too far

8    aside.

9         A    Okay.  Is it okay to mark this or --

10        Q    Yes.

11        A    Okay.

12        Q    It's your copy.

13        A    Okay.

14             MR. GOLANDO:  That's actually the actual exhibit.

15             COURT REPORTER:  The witness's copy will be

16   the --

17             MS. HUNKER:  Yes.

18             MR. GOLANDO:  You can mark this one.

19             COURT REPORTER:  -- actual exhibit.

20             THE WITNESS:  Okay.  I can mark -- so mark this?

21             MR. GOLANDO:  (Nonverbal response.)

22             THE WITNESS:  Okay.

23             MS. HUNKER:  (Provides exhibit.)

24             MR. GOLANDO:  Thank you.

25   BY MS. HUNKER (resuming):



1    Q    And do you have the document in front of you?

2    A    Yes.

3    Q    Okay.  Do you see on top where it says State of Texas,

4    Ruth R. Hughs, Secretary of State?

5    A    Yes.

6    Q    And do you see that this is from the election division

7    in the top left corner?

8    A    Yes.

9    Q    And that this is a letter addressed to Chris Hollins,

10   Harris County Clerk, on August 27th, 2020?

11   A    Yes.

12   Q    And if you turn the page, you will see it was signed

13   by Keith Ingram, director of elections.  Do you see that?

14   A    Yes.

15   Q    Do you know Keith Ingram at all?

16   A    No.  I mean, I -- just by name.  I don't know him.

17   Q    And so you haven't had many interactions with him?

18   A    No.

19   Q    Okay.  And so would you agree with my description that

20   this is a letter dated August 27th from Keith Ingram, director

21   of elections at the secretary of state's office, to Chris

22   Hollins, the Harris County Clerk?

23   A    Yes.

24   Q    And so I'm going to start with the first paragraph.

25   A    Uh-huh.



1    Q    It reads:  It has come to our attention that Harris

2   County intends to send an application to vote by mail to every

3   registered voter in the county.  Such action would be contrary

4   to our office's guidance on this issue and an abuse of rights

5   under the Texas Election Code Section 31.005.  Did I read that

6   correctly?

7    A    Yes.

8    Q    Were you aware that Harris County made an attempt to

9   send an application to vote by mail to every registered voter in

10  the county?

11   A    Yes.

12   Q    Were you aware that the secretary of state had sent a

13  letter advising Mr. Collins [sic] that this was contrary to the

14  secretary of state's guidance on the issue?

15   A    I wasn't aware that there was a letter.  I was aware

16  that there -- that there was some -- that the State weighed in

17  on it, but I didn't know in which way.

18   Q    Okay.  So you knew the secretary of state's office had

19  commented on the -- Harris County's intention to send an

20  application to vote by mail to every registered voter in the

21  county, but not that it had taken the form of a letter.

22   A    Right.

23   Q    But you'd agree with me that the letter does state

24  that the secretary of state's office thought that Chris Hollins'

25  actions in trying to send a letter -- for an application to vote



 1  by mail to every registered voter in the county would be against

 2  their guidance on the issue and an abuse of rights under the

 3  election code.

 4       A     According to what I'm reading, yes.

 5       Q     And if you move to the next paragraph, it states:  As

 6  you know, the Texas Election Code requires that voters have a

 7  qualifying reason to vote by mail.  They must be 65 years or

 8  older, disabled, out of the country while voting is occurring or

 9  confined in jail but otherwise eligible to vote.  Did I read

10  that sentence correctly?

11       A     Yes.

12       Q     And you're aware that Texas limits voting by mail to

13  those four categories; correct?

14       A     Yes.

15       Q     And the letter continues:  It is not possible that

16  every voter in Harris County will satisfy one or more of these

17  requirements.  Did I read that correctly?

18       A     Yes.

19       Q     And then if we go to the next paragraph:  By sending

20  applications to all voters, including many who do not qualify

21  for voting by mail, your office may cause voters to provide

22  false information on the form.  Did I read that correctly?

23       A     Yes.

24       Q     Were you aware that this was a concern by the

25  secretary of state's office regarding Chris Hollins' intention



1  to send an application to vote by mail to every registered voter

2  in the county?

3      A    Which part?

4      Q    The part of -- that it may cause voters to provide

5  false information on the forms.

6      A    No, I was not aware.

7      Q    And then we go to Paragraph 4, it reads:  At a

8  minimum, sending an application to every registered voter will

9  confuse voters about their ability to vote by mail.  Earlier

10 this year and continuing, there have been a number of lawsuits

11 challenging the fact that Texas law requires a reason to vote by

12 mail.  Thus far, the challenged law remains the same in spite of

13 these lawsuits.  An official application from your office will

14 lead many voters to believe they are allowed to vote by mail

15 when they do not qualify.  Did I read that correctly?

16     A    Yes, you read that correctly.

17     Q    Were you aware that there were lawsuits filed during

18 the coronavirus pandemic, specifically in 2020, about expanding

19 voting by mail in Texas as a response to the pandemic?

20     A    I don't recall.

21     Q    Were you aware the secretary of state's office had

22 voiced a concern that Chris Hollins' intention to send an

23 application of vote by mail to every registered voter in the

24 county could confuse voters about their ability to vote by mail?

25     A    No.



1    Q    And were you aware that the Texas secretary of state's

2    office was concerned that if Mr. Hollins sent an application to

3    vote by mail to every registered voter in the county that it

4    would lead many voters to believe that they are allowed to vote

5    by mail when they do not qualify?

6    A    I don't recall.

7    Q    Okay.  Would you agree with me, though, that based on

8    this letter, the secretary of state did communicate to

9    Mr. Hollins that it had a concern that his actions of sending

10   an application to vote by mail to every registered voter in the

11   county could cause voter confusion and could cause voters to

12   believe they are allowed to vote by mail when they do not

13   qualify?

14           MR. GOLANDO:  Objection, compound.  Answer if you

15   can.

16   BY THE WITNESS (resuming):

17   A    I can't say.

18   Q    Okay.  Would you agree with me, then, that based on

19   this letter, the secretary of state communicated to Mr. Hollins

20   that his intention to send out an application to vote by mail to

21   every registered voter in the county would confuse voters?

22   A    Based on what I'm reading, it -- it looks that way.

23   Q    And would you agree with me that based on this letter

24   that the secretary of state's office communicated to Mr. Hollins

25   that they were concerned that his intention to send an



 1 application to vote by mail to every registered voter in the

 2 county would lead many voters to believe they are allowed to

 3 vote by mail when they do not qualify?

 4      A     Just based on -- based on what I'm reading, it looks

 5 that way.

 6      Q     And we can put this document aside.

 7      A     Okay.

 8      Q     Do you have the document in front of you?

 9      A     Yes.

10      Q     And so this is Exhibit 4.  Do you see on top where

11 there's a stamp, and it says, District Clerk, Harris County, and

12 then there's a date, August 31st, 2020?

13      A     Yes.

14      Q     And do you see that there's a case caption on top of

15 this, which is the State of Texas v. Chris Hollins?

16      A     Yes.

17      Q     And if we turn to Page 12, you'll see that it is

18 signed and dated August 31st, 2020, and then it contains a list

19 of attorneys from the attorney general's office; is that

20 correct?

21      A     Yes.  Is that your name I see on there?

22      Q     It is.

23      A     Okay.  Yes.

24      Q     And do you see on -- if you go back to the front page

25 that the title of this document reads, Plaintiff's Original



 1       A    Yes, you read that correctly.

 2       Q    Okay.  And then if we move to the next page, last

 3  paragraph -- this last full paragraph --

 4       A    Okay.

 5       Q    -- it reads, We conclude the election code does not

 6  authorize the mailing proposed by the Harris County Clerk.

 7  Accordingly, we grant the State's petition for review, reverse

 8  the Court's [sic] Appeals judgment and remand the case to trial

 9  to issue a temporary injunction prohibiting the Harris County

10  Clerk from mass-mailing unsolicited ballot applications to

11  voters.  Did I read that correctly?

12       A    You read that correctly.

13       Q    Would you agree with me that the Texas Supreme Court

14  stated that the Harris County Clerk did not have the authority

15  to send out unsolicited vote-by-mail applications?

16       A    According to what I'm reading, yes.

17       Q    If you remember, we had talked about the date on the

18  last page, Page 14 --

19       A    Uh-huh.

20       Q    -- that this opinion was delivered.

21       A    Uh-huh.

22       Q    This was on October 7th, 2020; correct?

23       A    Yes.

24       Q    And that's within a month of the election; correct?

25       A    Yes.



1  Session; correct?

2      A    Yes.

3      Q    And when I say Senate Bill 1, I am referring to the

4  omnibus elections bill that was enacted in the second special

5  session.

6      A    Okay.

7      Q    If I am referring to Senate Bill 1 that was proposed

8  in the first special session, I will state so specifically, but

9  I will state in advance that anytime I'm referring to Senate

10  Bill 1 without that clarification, I am referring to the one in

11  the second special session.

12      A    Okay.

13      Q    Does that makes sense?

14      A    Yes.

15      Q    Now, I know there were some companion bills, but I

16  don't think I will be addressing them specifically during this

17  deposition.

18      A    (Nonverbal response.)

19      Q    And so Senate Bill 1 addressed county election

20  officials being able to send out unsolicited vote-by-mail

21  applications; correct?

22      A    That, among other -- other things in the bill.

23      Q    And so would you agree that Senate Bill 1 addressed

24  the concern that was raised in the litigation we were talking

25  about over what authority the county clerk had to send



1    unsolicited ballot-by-mail applications?

2        A    Partly.

3        Q    We're going to move on to our next exhibit.

4                MS. HUNKER:  (Provides exhibit.)

5                MR. GOLANDO:  Thank you.

6    BY MS. HUNKER (resuming):

7        Q    Do you have the document in front of you?

8        A    Yes.

9        Q    Do you see on the top where it says, Isabel Longoria,

10   elections administrator?

11       A    Yes.

12       Q    And then there's a little seal next to it that says

13   Harris County elections.

14       A    Yes.

15       Q    And if we turn to the next few pages, you'll see that

16   it has, Elections division, contact us, along with E-mail

17   addresses and other information from the Harris County Elections

18   Division; is that correct?

19       A    Yes.

20       Q    Now, would you agree with me -- oh, I'm going to

21   represent to you that this is a printout of the elections

22   administrator website on Harris County.  Do you have any reason

23   to doubt or -- doubt my representation?

24       A    No.

25       Q    And so if we turn to Page 2, it says, Purpose --



1        A      Uh-huh.

2        Q      -- Drive-through voting was created in the wake of the

3    COVID-19 pandemic as a safer and socially distant alternative to

4    walk-in voting for all voters.  Harris County is the first

5    jurisdiction in Texas history to create this new method of

6    voting at scale that allows any registered voter to cast their

7    ballot without leaving the comfort of their vehicle.  Did I read

8    that correctly?

9        A      Yes.

10       Q      Okay.  Now, were you aware that Harris County

11   introduced drive-through voting during the 2020 elections?

12       A      Yes.

13       Q      And were you aware that Harris County considers itself

14   to be the first jurisdiction in Texas to offer this method of

15   voting at scale?

16       A      That's what it says in this document.

17       Q      Do you know of any other county that offered drive-

18   through voting prior to Harris County?

19       A      Not that I'm aware of.

20       Q      To your belief, is Harris County the first county to

21   offer drive-through voting in Texas?

22       A      That's what I'm reading on the document you provided.

23       Q      You can put that aside.

24       A      (Complies with request.)

25              MR. GOLANDO:  Thank you.



```
 1              THE WITNESS:  Uh-huh.
 2    BY MS. HUNKER (resuming):
 3         Q    Now, did you use drive-through voting in Harris
 4    County?
 5         A    No.
 6         Q    Did you ever go to one of the drive-through voting
 7    sites while they were operating?
 8         A    No.
 9         Q    Did you talk to election -- sorry -- Election County
10    Clerk, Chris Hollins, about drive-through voting at all?
11         A    I don't recall.
12         Q    Did you speak to anybody in the Harris County Clerk's
13    office about drive-through voting?
14         A    I don't recall.
15         Q    And I'm only going to specify because they changed the
16    titles of the office.  Did you talk to anybody in the election
17    administrator's office in Harris County about drive-through
18    voting?
19         A    I don't recall.
20         Q    And so where do you have -- where did you receive your
21    information about drive-through voting?
22         A    What was reported in the press, in the news and people
23    who used it.
24         Q    So is it fair to say that you received the information
25    from news and voters that you communicated to?
```



```
 1        A     Correct.

 2        Q     Okay.  And how many voters did you speak with about

 3   drive-through voting?

 4        A     I don't know.

 5        Q     Okay.  Do you remember when?

 6        A     No.

 7        Q     But you have no personal experience with how drive-

 8   through voting operated in Harris County; is that correct?

 9        A     Just what I saw on the news as people were going

10   through, and they're talking to people who actually used it.

11        Q     So I am going to introduce our next exhibit.

12              MS. HUNKER:  (Provides exhibit.)

13              MR. GOLANDO:  Thank you.

14   BY MS. HUNKER (resuming):

15        Q     Do you have the document in front of you?

16        A     Yes.

17        Q     And do you see on top where it says, Ken Paxton,

18   Attorney General of Texas, along with the seal of the attorney

19   general?

20        A     Yes.

21        Q     And do you see that it is dated October 16th, 2020?

22        A     Yes.

23        Q     And do you see where it's addressed to Texas election

24   officials?

25        A     Yes.
```



1  specifically, the code makes no provision for drive-through
2  voting at which any voter may cast a ballot from his or her
3  vehicle regardless of physical condition.  Did I read that
4  correctly?
5         A    Yes.
6         Q    Okay.  So before I ask you some questions specifically
7  about the content of the letter, I just want to make sure that
8  we are using the same terminology.
9         A    Okay.
10        Q    And so you do understand that curbside voting is
11 distinct from drive-through voting; is that correct?
12        A    Yes.
13        Q    Okay.  And curbside voting in Texas is limited to
14 individuals who have certain physical ailments or disability; is
15 that right?
16        A    Yes.
17        Q    And then drive-through voting, in contrast, was the
18 option offered by Harris County that would let any individual
19 vote using their car; is that correct?
20        A    Yes, and I will add that this form of voting, along
21 with some other forms of voting, was proposed, agreed to by a
22 bipartisan committee --
23        Q    Uh-huh.
24        A    -- or counsel, whatever it's called.  I believe there
25 were people from both parties, the Republican Party of Harris



Carol Alvarado                                    October 06, 2022
                                                        Page 48

 1    County and the Democratic Party, involved in this decision-

 2    making.

 3         Q    Okay.  So I'm going to ask you about that in a minute.

 4         A    Okay.

 5         Q    So, now, have you ever voted curbside?

 6         A    No.  I have, during my role as a precinct chair,

 7    assisted.

 8         Q    And so curbside voting is still available today;

 9    correct?

10         A    Yes.  It is different than when I was involved in it,

11    yes.

12         Q    Okay.  And curbside voting was allowed in 2020;

13    correct?

14         A    Yes.

15         Q    Okay.  And so, in curbside voting, a person pulls up

16    to the voting location; correct?

17         A    Yes.

18         Q    And then usually there's either a phone number or some

19    sort of signal to communicate to those inside that there's

20    somebody waiting to do curbside; is that correct?

21         A    Yes.

22         Q    Okay.  And then the poll workers will bring the device

23    to the car; is that correct?

24         A    Yes.

25         Q    And a person can cast their ballot from inside their



Carol Alvarado                                          October 06, 2022
                                                             Page 49

1   car.

2        A    Yes.

3        Q    Okay.  And so that's curbside voting; correct?

4        A    Yes.

5        Q    Okay.  All right.  So let's look back at this letter.

6   So would you agree with me that in this letter the attorney

7   general communicated to Texas election officials his belief that

8   the election code makes no provision for drive-through voting

9   centers at which a voter may cast a ballot from his or her

10  vehicle regardless of physical condition?

11       A    Yeah, I can't say.

12       Q    Would you agree with me that in this letter, the

13  attorney general, Ken Paxton, is communicating to Texas election

14  officials that he believes drive-through voting is illegal?

15       A    I'm reading.  I'm reading to find if it says that.

16  (Reviewing.)  I -- I can't say that.

17       Q    Okay.  So let's look at two sentences, the last

18  sentence in Paragraph 2:  More specifically, the code makes no

19  provision for drive-through voting centers at which any voter

20  may cast a ballot from his or her vehicle regardless of physical

21  condition.  Did I read that correctly?

22       A    You did.

23       Q    And so the attorney general told Texas election

24  officials that it's -- it was his belief that the election code

25  makes no provision for drive-through voting centers at which any



```
 1   voter may cast a ballot from his or her vehicle regardless of
 2   physical condition; is that correct?
 3        A    Yes.
 4        Q    Okay.  Now, let's look at the last sentence of
 5   Paragraph 3:  But if a voter could enter the polling place on
 6   his or her own without a likelihood of injury, then it is
 7   unlawful for an election official to allow that voter to cast a
 8   ballot outside of the voting place.  Did I read that correctly?
 9        A    Yes.
10        Q    Would you agree with me then that Attorney General Ken
11   Paxton communicated to Texas election officials that he believed
12   that if a voter could enter the polling place on his or her own
13   without a likelihood of injury, then it would be unlawful for
14   the election official to allow that voter to cast a ballot
15   outside the polling place?
16        A    I can't say that.
17        Q    What, then, do you think he meant by that last
18   sentence in Paragraph 3?
19        A    I'm not sure.
20        Q    We can put this document aside.
21        A    (Complies with request.)
22             MS. HUNKER:  (Provides exhibit.)
23             MR. GOLANDO:  Thank you.
24   BY MS. HUNKER (resuming):
25        Q    Do you have the document in front of you?
```



1  that nine of the tented sites did not meet the Texas Election

2  Code requirement that polling places be inside a building.  Did

3  I read that correctly?

4       A    Yes.

5       Q    Okay.  Were you aware that Harris County had shut down

6  9 of its 10 election day drive-through voting sites for election

7  day?

8       A    I was aware that some were shut down.  I don't know --

9  I don't recall the exact number.

10      Q    Okay.  Were you aware of the reason they were shut

11  down when they were shut down?

12      A    To some extent.

13      Q    So you were aware that they were shut down because of

14  an ongoing concern that the lawsuits that were challenging the

15  drive-through voting sites would be successful; is that concern

16  -- is that correct?

17      A    I knew it had to do something with the definition of a

18  structure or building.

19      Q    Okay.  So you knew it had to do with interpretation of

20  the election code.

21      A    I knew that it had to do something with the definition

22  of a structure or polling location.

23      Q    Okay.  And so you knew it had to do with a

24  definitional question that had yet to be resolved.  Is that fair

25  to say?



Carol Alvarado                                    October 06, 2022
                                                           Page 65

 1    the days leading to election day; is that correct?

 2         A    Re -- restate that.

 3         Q    Sure.  Let me rephrase.

 4         A    Yes.

 5         Q    Would you agree that in order for counties to be able

 6    to successfully run an election, they need to have clarity over

 7    what their obligations are?

 8         A    That's pretty broad.  Can you be more specific?

 9         Q    Okay.  Do you think in order for an election official

10    to be able to successfully run an election, they would need to

11    have clarity over what the definition of a structure or polling

12    place is?

13         A    I -- I don't know.

14         Q    Do you think that having confusion over the definition

15    of a polling place and/or structure could result in difficulties

16    administering elections?

17         A    I'm not sure.

18         Q    We can set this aside.  Now, you had talked about the

19    bipartisan committee --

20         A    Uh-huh.

21         Q    -- being responsible for -- or let me rephrase.  You

22    had referenced a bipartisan committee with respect to the

23    creation of drive-through voting; is that correct?

24         A    An assortment of proposals, yes.

25         Q    And so who was this bipartisan committee?



 1      Q      And so where did you learn about this bipartisan
 2  committee?
 3      A      I believe it was in the -- in the press, in the media,
 4  yeah.
 5      Q      So your information about the bipartisan committee
 6  that you believe was the impetus for drive-through voting, the
 7  ideas behind drive-through voting, you got that information from
 8  the press?
 9      A      Yes, and the Harris County administrator at the time
10  of the committee hearing, Isabel Longoria, during her testimony,
11  she made a point to mention that it was a bipartisan group.
12  This was a committee that I sat in a hearing of.
13      Q      And do you happen to recall when this testimony would
14  have taken place, or at least in -- with respect to which bill?
15      A      No.
16      Q      Okay.  Drive-through voting was addressed in Senate
17  Bill 1; correct?
18      A      Yes.
19      Q      And Senate Bill 1 clarified that drive-through voting
20  would not be permitted; correct?
21      A      Yes.
22      Q      I'm going to move on to Exhibit 11.
23             MS. HUNKER:  (Provides exhibit.)
24             MR. GOLANDO:  Thank you.
25  BY MS. HUNKER (resuming):



1      Q      Do you have the exhibit in front of you?

2      A      Yes.

3      Q      Okay.  And do you see on top where it says Chris

4  Hollins, County Clerk, recording the mayor events -- major

5  events of your life and protecting your right to vote?

6      A      Yes.

7      Q      And do you see where it has the seal, County Clerk,

8  Harris County, Texas?

9      A      Yes.

10     Q      And do you see the date is July 22nd, 2020?

11     A      Yes.

12     Q      And that the letter is addressed to Governor Greg

13  Abbott?

14     A      Yes.

15     Q      And that it is signed by Chris Hollins, County Clerk

16  of Harris County, on the bottom?

17     A      Yes.

18     Q      Okay.  Would you agree with me that this is a letter

19  sent by Chris Hollins, county clerk from Harris -- yeah -- Texas

20  to Governor Greg Abbott dated July 22nd, 2020?

21     A      Yes.

22     Q      And so I am going to draw your attention to the third

23  paragraph where it says, I write.  Do you see that?

24     A      Yes.

25     Q      Okay.  It says:  I write today to ask two things of



1  you:  One, please provide by the end of July the new start date

2  of early voting for the November election; and, two, please

3  increase early voting by at least one week to begin no later

4  than Tuesday, October 13th, 2020.  Did I read that correctly?

5      A    Yes.

6      Q    And I want to look a little bit at Paragraph 2 as

7  well.

8      A    Okay.

9      Q    Do you see in the top of the paragraph, it reads:

10  Acknowledging the difficulty of voting during the ongoing

11  pandemic, you moved the May primary runoff elections to July and

12  also increased the days of early voting for July elections.  Did

13  I read that correctly?

14      A    Yes.

15      Q    Were you aware that Governor Abbott extended early

16  voting for the primary runoff in 2020 by an additional week?

17      A    Yes.

18      Q    Now, would you agree with me that in this letter,

19  Chris Hollins is asking Governor Abbott to increase early voting

20  by at least a week for the November 2020 election?

21      A    That's what it says here, yes.

22      Q    Okay.  And we can put this down.

23      A    Okay.  (Complies with request.)

24      Q    And I'm going to produce Exhibit Number 12.

25          MS. HUNKER:  (Provides exhibit.)



1    bottom?

2        A    Yes.

3        Q    All right.  And now let's look at the substance of the

4    proclamation.  And, actually, before I do that, you'll agree

5    with me that the document I've given you is a copy of the

6    proclamation issued by Governor Greg Abbott on July 27th, 2020,

7    in response to the COVID-19 pandemic.

8        A    Yes.

9        Q    Okay.  And so let's look where it says, Now, therefore

10   I, Greg Abbott --

11       A    (Complies with request.)  Okay.

12       Q    -- under the authority vested in me by the

13   constitution and laws of the State of Texas do hereby suspend

14   Section 85.001(a) of the Texas Election Code to the extent

15   necessary to require that for any election ordered or authorized

16   to occur on November 3rd, 2020, early voting by personal

17   appearance shall begin on Tuesday, October 13th, 2020, and shall

18   continue through the fourth day before election.  Did I read

19   that correctly?

20       A    Yes.

21       Q    Okay.  And so in this proclamation, Governor Greg

22   Abbott extends early voting by one week during the November 2020

23   election; is that correct?

24       A    Yes.

25       Q    And so he abided by the request of County Clerk



1   Chris Hollins, who requested an additional week of early voting;

2   is that correct?

3        A    I'm not sure he -- it was done because of the -- that

4   request.  I don't know.

5        Q    You'd agree, though, that Governor Greg Abbott's

6   actions aligned with Chris Hollins' request that early voting be

7   extended one week?

8        A    I -- I don't know.

9        Q    And then let's look at the next sentence:  I further

10  suspend Section 86.006(a-1) --

11       A    Uh-huh.

12       Q    -- of the Texas Election Code for any election ordered

13  or authorized to occur on November 3rd, 2020, to the extent

14  necessary to allow a voter to deliver a marked mail ballot in

15  person to the early-voting clerk's office prior to and including

16  on election day.  Did I read that correctly?

17       A    Yes.

18       Q    Were you aware of -- of when a voter could deliver in

19  person their marked mail ballot prior to the proclamation?

20       A    Not exactly, no.

21       Q    Okay.  So you were not aware that prior to the

22  proclamation, the only date a voter could return their marked

23  mail ballot in person was on election day.

24       A    No, I wasn't aware.

25       Q    Would you agree that Governor Greg Abbott's order



1    extended the number of days that a voter could deliver in person

2    a marked mail ballot?

3        A    According to this, yes.

4        Q    Okay.  And so Governor Greg Abbott, in response to the

5    COVID-19 pandemic, took steps to make voting easier in light of

6    the challenges presented; is that correct?

7                MR. GOLANDO:  Objection, form.

8    BY THE WITNESS (resuming):

9        A    Can you restate that, please?

10       Q    Sure.  Would you agree with me that based on this

11   document, Governor Greg Abbott took steps to alleviate the

12   burdens that COVID-19 would have on voters trying to vote?

13       A    I don't know if that was the intent.  According to

14   this, two changes were made.

15       Q    Would you agree that he responded to the COVID-19

16   pandemic by expanding early-voting period and by expanding the

17   number of days an individual can deliver their marked mail

18   ballot in person?

19       A    According to this proclamation, he made two changes.

20       Q    And those are the two changes; correct?

21       A    Yes, these two.

22       Q    And so you would agree with me that in response to the

23   COVID-19 pandemic, Governor Greg Abbott took at least two

24   actions with respect to elections:  The first, extending the

25   number of days of early voting by one week; and, second,



 1  extending the number of days that an individual could return

 2  their marked mail ballot in person?

 3      A    That's what it says in the proclamation.

 4      Q    We can put this aside.  Were you aware that Harris

 5  County sought to increase the number of locations in which an

 6  individual can deposit their marked mail ballot in person?

 7      A    Yes.

 8      Q    So I'm going to introduce Exhibit Number 13.

 9              MS. HUNKER:  (Provides exhibit.)

10              MR. GOLANDO:  Thank you.

11              THE WITNESS:  Thank you.

12  BY MS. HUNKER (resuming):

13      Q    Do you have the document in front of you?

14      A    Yes.

15      Q    Okay.  And so you read where it says, In the Supreme

16  Court of Texas, and then it has, In re Hotze, M.D., Harris

17  County Republican Party.

18      A    Yes.

19      Q    And it also has Justice Devine dissenting from the

20  Court's order, denying the petition of writ of mandamus and

21  motion to stay.

22      A    Yes.

23      Q    And if we turn to the last page, you'll see the

24  opinion is delivered on October 7th, 2020; is that correct?

25      A    Yes.



Carol Alvarado                                      October 06, 2022
                                                         Page 82

 1  the early-voting clerk is the county's election administrator
 2  who maintains only one office.  My understanding is that the
 3  Fort Bend County intended to use other county annexed offices in
 4  addition to the election administrator's office to accept in-
 5  person delivery of mail ballots under Section 86.006(a-1).  Did
 6  I read that correctly?
 7       A    Yes.
 8       Q    Okay.  And so you had -- you had not heard that in at
 9  least one case, Fort Bend County, they had intended to use
10  offices that were not the early-voting clerk's office; is that
11  correct?
12       A    Yeah, I don't -- I didn't know.  I'm not aware.
13       Q    Now, we had already established that you don't know
14  what occurs when a ballot is cast at an illegal voting site; is
15  that correct?
16       A    Correct.
17       Q    We can put this aside.
18       A    (Complies with request.)
19       Q    Now, Senate Bill 1 addressed the number of locations
20  that mail-in ballots could be delivered; is that correct?
21       A    Yes.
22       Q    And so Senate Bill 1 addressed the question that was
23  presented by litigation over what was a proper delivery site; is
24  that correct?
25                 MR. GOLANDO:  Objection, to the extent it calls



1  for a legal conclusion.  If you have an opinion, you may offer

2  it.

3  BY THE WITNESS (resuming):

4       A    Can you restate --

5       Q    Sure.

6       A    -- the question?

7       Q    So Senate Bill 1 addresses the concern that was raised

8  in litigation over what the definition of a proper ballot-

9  delivery site was.

10      A    I -- I'm not aware.

11      Q    Okay.  Now, did you talk to any election official --

12  when I say election official, I'm talking about the county

13  clerk's office -- during the 2020 election about how multiple

14  ballot-delivery locations operated in Harris County in 2020?

15      A    No, I don't believe so.

16      Q    And did you talk to any voters about their experience

17  using the multiple ballot-delivery sites in the July 2020

18  runoff?

19      A    No.

20      Q    And so you don't know any, like, logistical problem

21  that may have occurred with the in person -- multiple in-person

22  delivery sites; is that correct?

23      A    That's correct.

24      Q    And did you inquire over whether any logistical

25  concerns had come about in response to the multiple in-person



1      A    Yes.

2      Q    And so, according to this document, Harris County had

3  only six locations that were open for 24 hours on October 29th;

4  is that correct?

5      A    Yes.

6      Q    And this is out of, I believe, 112 locations; is that

7  correct?

8      A    (Reviewing.)  Yes.

9      Q    And so Harris County offered early -- let me take that

10  back.  Harris County offered 24-hour voting at six locations one

11  day out of its 112 early-voting locations; is that correct?

12     A    (Reviewing.)  It appears that way.

13     Q    Okay.  Are you aware of any other county that offered

14  24-hour voting in the 2020 election?

15     A    I'm not.

16     Q    Are you aware of any county that offered 24-hour

17  voting prior to the November 2020 election?

18     A    I'm not aware.

19     Q    To your knowledge, is Harris County the first county

20  in Texas that would have offered 24-hour voting?

21     A    Yes.

22     Q    And did you talk to any of the election officials in

23  the county clerk's office about how 24-hour voting was

24  conducted?

25     A    No.



1  regarding voters knowing which locations offered the 24-hour

2  voting?

3       A    No.

4       Q    And did you inquire as to whether there was any voter

5  confusion on voters not knowing which sites had the extended

6  hours?

7       A    No.

8       Q    All right.  We can put that aside.  Senate Bill 1

9  addressed 24-hour voting; correct?

10      A    Yes.

11      Q    I believe Senate Bill 1 standardized the hours that

12  each county could offer in-person voting; is that correct?

13      A    Yes.  And, again, you are referring to Senate Bill 1

14  in the second special session?

15      Q    That's correct.

16      A    Yes.

17      Q    Let's refer back to that exhibit in the beginning that

18  had the Senate Journal, which was Exhibit Number 2.

19                MR. GOLANDO:  (Provides exhibit.)

20                THE WITNESS:  Thank you.

21                MR. GOLANDO:  Yes, ma'am.

22  BY THE WITNESS (resuming):

23      A    Uh-huh.  (Reviewing.)

24      Q    Now, specifically, I want to turn to Page A-56.

25      A    Okay.



1    Q    Do you have that in front of you?

2    A    Yes.

3    Q    Okay.  So I'm looking at the second to last statement

4  that you would have given, which reads, Okay, so let's -- do you

5  see that?

6    A    The one that says, Okay, so let's talk?

7    Q    Yes.

8    A    Yes.

9    Q    So it reads:  Senator Alvarado, okay.  So let's talk

10  about the drive-through voting.  This bill would eliminate

11  voting in tents or garages, those type of structures or anything

12  else that could be considered drive-through voting.  Is that

13  accurate?  Senator Hughes, I believe that is fair.  The idea is

14  that drive-through voting was not specifically provided for in

15  the election code before, and so this is clarifying that's not

16  what's in the code.  Did I read that correctly?

17    A    Yes.

18    Q    Now, we had discussed that there was litigation over

19  whether or not drive-through voting was permitted by the code;

20  correct?

21    A    Right.

22    Q    And so Senator Hughes here is referring to that

23  question of whether or not the election code previously before

24  Senate Bill 1 allowed drive-through voting; is that correct?

25    A    Say that again.



1    Q    So Senator Hughes here is stating that --

2              MS. HUNKER:  Actually, will the court reporter be

3    able to repeat my question?

4              COURT REPORTER:  Yes.  Okay.  Question:  And so

5    Senator Hughes here is referring to that question of whether or

6    not the election code previously before Senate Bill 1 allowed

7    drive-through voting; is that correct?

8    BY THE WITNESS (resuming):

9    A    I'm not sure.

10    Q    Okay.  Would you agree that he referenced the question

11    over whether drive-through voting was allowed under the code

12    previously when he was explaining his reasons for having

13    provisions in the omnibus elections bill that excluded drive-

14    through voting?

15    A    Yes.  According to this journal, he does reference the

16    election code.

17    Q    Okay.  And if we turn to Page 58, Senator Hughes

18    states in the middle:  Well, I remember reading where the

19    election official in charge of this in Harris County said that

20    we stopped doing it before election day because we were

21    concerned the votes wouldn't count.  That sounds like a real

22    problem.  Did I read that correctly?

23    A    You did.

24    Q    And we had talked about Chris Hollins had shut down

25    several drive-through voting sites before election day; correct?



 1  aren't accounted for?  Did I read that correctly?

 2      A    Yes.

 3      Q    And so let's quickly jump to Page 100.

 4      A    (Complies with request.) Uh-huh.

 5      Q    Actually, I'm sorry.  Can we go back to Page 98?  I

 6  missed a line.

 7      A    Uh-huh.

 8      Q    So Senator Bettencourt continues:  In fact, it's a

 9  one-and-a-half percent error rate.  Did I read that correctly?

10      A    (Reviewing.)

11      Q    No, we're down -- further down.

12      A    Oh, okay.  Okay.  Yes.

13      Q    Senator Eckhardt, wouldn't you like to hold an

14  election, Senator Buckingham, with a one-and-a-half percent

15  error rate that you can't verify who voted?  You don't know who

16  the names are and you are not even sure that your vote totals

17  match your own figures, much less what you sent to the secretary

18  of state.  That's what the record of Harris County is.  It's not

19  a record, Dean, of success, it's a record of failure, because

20  they had a one-and-a-half percent error rate in the -- in that

21  drive-through voting system.  Did I read that correctly?

22      A    Yes.

23      Q    And so in this long soliloquy, Senator Bettencourt is

24  stating that -- or alleging that there was a one-and-a-half

25  percent error rate in the vote totals through drive-through



1  voting; is that correct?

2      A    That's what he says here.

3      Q    Yeah.  And so he's alleging this on the floor;

4  correct?

5      A    Yes.

6      Q    Had you heard of any concerns in Harris County about

7  an inability to reconcile the numbers for drive-through voting?

8      A    I don't recall.

9      Q    Okay.  Now let's turn to Page A-100.

10     A    (Complies with request.)

11     Q    And we're going to go towards the middle where it

12 says, So, members, we've heard a lot.

13     A    Yes.

14     Q    So, members, we've heard a lot, but facts are stubborn

15 things, and these are the facts of what the real Harris County

16 experiment is:  Even today we've got 1,884 unaccounted-for

17 votes.  And why does that matter?  Well, two election cycles ago

18 we had a state rep when by 47 votes and another one lose by 117.

19 This last election cycle we had a -- had win [sic] by 300.  In

20 the same -- in the same race, the other guy lost by 300.  So

21 1,884 votes means something.  An error rate of one --

22 one-and-a-half percent affects the outcome of these elections,

23 and the public won't tolerate it, and that's why I support

24 Senate Bill 7.  Did I read that correctly?

25     A    Yes.



Carol Alvarado                                              October 06, 2022
                                                                    Page 95

1      Q    And so you'd agree that in this discussion,
2  Senator Bettencourt expresses a concern that an error rate in
3  drive-through voting could change the totals of a close
4  election.
5      A    That's what he states here.
6      Q    And do you have any reason to doubt the veracity of
7  his belief?
8      A    I -- I can't say.
9      Q    We can put this aside, but we will be coming back to
10 it.
11     A    Okay.
12     Q    And so would you agree that the state has an interest
13 in ensuring that every vote legally cast is counted?
14     A    Sure.
15     Q    Now, I actually want to introduce Exhibit Number 16,
16 but it's going to be Clip Number 2.
17                    (Video playing.)
18 BY MS. HUNKER (resuming):
19     Q    Were you able to hear that clip?
20     A    Barely.
21     Q    Were you able to make out its contents?
22     A    Yes.
23     Q    That was a clip of the filibuster you gave in
24 Senate Bill 1; correct?
25     A    Yes.



1    Q    And in it, you say that Texas Democrats support

2  election integrity; is that correct?

3    A    Yes.

4    Q    And do you still hold that position?

5    A    Yes.

6    Q    And do you support election integrity?

7    A    Yes.

8    Q    And so you'd agree that election integrity is a

9  interest of the state; correct?

10    A    It's an interest of mine.

11    Q    And would you agree the state has an interest in

12  advancing election integrity?

13    A    Yes.

14    Q    And so I'm going to introduce Exhibit 17 as another

15  clip.

16              (Video playing.)

17  BY MS. HUNKER (resuming):

18    Q    Were you able to hear that clip?

19    A    Yes.

20    Q    Okay.  And that was also a clip from your filibuster

21  of Senate Bill 1; correct?

22    A    Yes.

23    Q    And in it, you talk about the ability of the Texas

24  Senate to have respectful disagreement; is that correct?

25    A    Yes.



Carol Alvarado

October 06, 2022
Page 97

1    Q    And so we had talked about your interest in election

2 integrity and that you support election integrity; correct?

3    A    Yes.

4    Q    And we talked about how the Texas Democrats have an

5 interest in election integrity and that they support election

6 integrity; correct?

7    A    Yes.

8    Q    You'd agree, though, that people can disagree about

9 the best way of advancing election integrity; correct?

10    A    Yes.

11    Q    And that in the Texas Senate, it could be respectful

12 disagreement; is that correct?

13    A    Yes.

14    Q    Now, would you agree that the State of Texas has an

15 interest in ensuring that voters have confidence in the

16 election?

17    A    Yes.

18    Q    And would you agree that voters losing confidence in

19 the election can have a negative impact on our Democratic

20 system?

21    A    Yes.

22    Q    And would you agree that for some members of the

23 public, advancing election integrity is a way of advancing

24 confidence in the voters' confidence in the election?

25    A    Could be.



Carol Alvarado                                          October 06, 2022
                                                              Page 98

1       Q    And would you agree that some members of the Texas
2   Senate believe that advancing election integrity is a way of
3   advancing voters' confidence in the election?
4       A    It could be.  It's open for interpretation.
5       Q    Would you agree that it is important that elections
6   are conducted securely?
7       A    Yes.
8       Q    And would you agree that the State of Texas has an
9   interest in ensuring that elections are conducted securely?
10      A    Yes.
11      Q    Do you believe it is important that the State of Texas
12  discourage and prevent voter fraud?
13      A    Yes.
14      Q    Do you agree that the State of Texas has a significant
15  interest in preventing voter fraud from occurring?
16      A    Yes.
17      Q    Would you agree that privacy is important with regards
18  to elections, specifically the ability to cast a ballot in
19  secret?
20      A    Yes.
21      Q    And do you support the secret ballot?
22      A    Yes.
23      Q    Would you agree that the State of Texas has a
24  legitimate interest in protecting the secrecy of the ballot?
25      A    Yes.



```
 1        Q      Would you agree that the State has a legitimate
 2   interest in preventing voters from being coerced into casting a
 3   vote for or against a particular candidate or proposition?
 4        A      Say that again.
 5        Q      Would you agree that the State has a legitimate
 6   interest in preventing voters from being coerced into casting a
 7   vote for or against a particular candidate or proposition?
 8        A      I -- I don't know.  I'm not sure.
 9        Q      Let me rephrase the question, since it might have
10   been --
11        A      Yeah.
12        Q      -- confusingly stated.  Would you agree that the State
13   has a legitimate interest in preventing voters from being
14   coerced into voting a specific way?
15        A      Yes.
16        Q      Would you agree that a voter is unable to fully
17   exercise his or her right to vote if he or she is coerced into
18   voting a specific way?
19        A      Possibly.
20        Q      Would you agree that there's a possibility that a
21   voter can be coerced at home when filling out a mail-in ballot?
22        A      I don't know.
23        Q      Would you agree that it's possible for a voter to be
24   coerced when voting in a car by other passengers who can see the
25   voter's ballot?
```



```
 1                VIDEOGRAPHER:  On the record at 1:39.
 2    BY MS. HUNKER (resuming):
 3        Q     Senator, did you have a good break?
 4        A     Yes, it was nice to get some fresh air.
 5        Q     Glad to hear it.  So when we were closing up our last
 6    session, we were talking a bit about the quorum break that
 7    occurred in the summer of 2021; correct?
 8        A     Uh-huh.
 9        Q     Were you part of the negotiations to get Texas
10    Democrats back into quorum?
11        A     No.
12        Q     And did you communicate with anybody while those
13    negotiations were ongoing with respect to the negotiations?
14        A     No -- about the negotiations, no.  I kept in
15    communication with some of my house colleagues.
16        Q     Uh-huh.  Do you know the ultimate reason why the Texas
17    House Democrats came back?
18        A     No.
19        Q     So I'm going to introduce what I believe is
20    Exhibit 21.
21                MS. HUNKER:  (Provides exhibit.)
22                MR. GOLANDO:  Thank you.
23                THE WITNESS:  Thank you.
24    BY MS. HUNKER (resuming):
25        Q     Do you have the document in front of you?
```



MAGNA
LEGAL SERVICES

1      A     Yes.

2      Q     And do you recognize this document?

3      A     Uh-huh, yes.

4      Q     And what is it?

5      A     It has a list of amendments.

6      Q     And so this is from the Texas Legislature Online --

7      A     Yeah.

8      Q     -- is that correct?

9      A     Yes.

10     Q     And do you know what Texas Legislature Online is?

11     A     Yes.

12     Q     And that's a place where legislative record is
13  compiled; is that correct?

14     A     Yes.

15     Q     And so here I have a list of amendments for Senate
16  Bill 1, which you can see from the legislative session, it was
17  during the second special session.

18     A     Uh-huh.

19     Q     Would you agree with that description?

20     A     Yes.

21     Q     Okay.  Now, you did not file an amendment for Senate
22  Bill 1; is that correct?

23     A     Right.

24     Q     Okay.  The other Democrats did propose amendments;
25  correct?



1    A    Yes.

2    Q    And a few of those amendments proposed by Texas

3  Democrats were adopted; is that correct?

4    A    Yes.

5    Q    And so we can see, if going down to Number 11,

6  Senator Bucy had an amendment that was adopted; correct?

7    A    Yes.

8    Q    And -- sorry -- House Member Bucy.

9    A    Uh-huh.

10   Q    And Bucy's a member of the House Texas Democratic

11  Caucus; correct?

12   A    Yes.

13   Q    And then if we look at the Senate amendments, on top

14  we see West on F-9 and Zaffirini for F-7 and F-5.  They had

15  amendments adopted; correct?

16   A    Yes.

17   Q    And Senator West is a Democrat; correct?

18   A    Yes.

19   Q    And Senator Zaffirini is a Democrat, too; correct?

20   A    Yes.

21   Q    And so the Texas Legislature accepted amendments from

22  Texas Democrats for Senate Bill 1; correct?

23   A    A few, a -- some, not near as many as Republican

24  amendments.

25   Q    They did -- the Texas Legislature did accept some



1    Texas-Democrat amendments -- correct? -- for Senate Bill 1.

2        A    Some, not many.

3        Q    Now, even though you did not propose an amendment, you

4    did have an effect on the content of the final document;

5    correct?

6        A    Yes.

7        Q    Okay.  And so let's talk a little bit about some of

8    the provisions that you are responsible for either their

9    introduction or removal.

10       A    Okay.

11       Q    And so I want to go back -- you can put this document

12   aside -- to Exhibit Number 2.

13       A    Exhibit Number 2?

14       Q    Yes.  This is the Senate Journal that we have been --

15       A    Okay.

16       Q    -- using occasionally.

17       A    All right.

18       Q    And we're going to be looking at Page 57.

19       A    Uh-huh.

20       Q    Specifically starting with, So you are saying.

21       A    Okay.

22       Q    Let me know when you -- when you see it.

23       A    I have it.

24       Q    Okay.  You state:  So you are saying you made some

25   changes based on a conversation you had with me or Senator Miles



Carol Alvarado                                          October 06, 2022
                                                             Page 114

 1  or Senator Whitmire.  Senator Hughes says:  Yes.  You said:
 2  What is that change?  Senator Hughes replies:  Senator, you and
 3  I had lengthy discussions when we were discussing on Senate Bill
 4  7 when it was originally -- when it was in the Senate
 5  originally, and we talked about those early-voting locations in
 6  urban counties and you recalled a provision that was going to
 7  require them to be distributed evenly based on population.  Did
 8  I read that correctly?
 9      A    Yes.
10      Q    And then there's a rapid exchange where you say:
11  Yeah, we had -- we had quite an exchange on that.
12      A    Uh-huh.
13      Q    And then he replies:  As you probably noticed, that
14  provision is not in the conference committee report.  Did I read
15  that correctly?
16      A    Yes.
17      Q    And so I am going to introduce Exhibit Number 22.
18              MS. HUNKER:  (Provides exhibit.)
19              MR. GOLANDO:  Thank you.
20              THE WITNESS:  There's something in this room that
21  triggers my allergies.  I don't know what it is.  I know I have
22  them.
23              MR. GOLANDO:  It's probably me.
24              MS. HUNKER:  No comment.
25  BY THE WITNESS (resuming):



1    A    Okay.

2    Q    So this is a copy of Senate Bill 7; correct?

3    A    Yes.

4    Q    And I'll represent to you that this was the engrossed

5    copy printed from the Texas Legislative Online website.  Do you

6    have any reason to doubt my representation?

7    A    No.

8    Q    Okay.  And so let's look at Page 14.

9    A    Okay.

10    Q    And you'll see where it says Subsection 2.

11    A    Yes.

12    Q    And this reads:  In a county with a population of 1

13    million or more, the number of polling places located in each

14    state-representative district included in the territory of the

15    county is calculated by deriving the number of eligible voters

16    residing in that district by the total number of eligible voters

17    residing in the county and using the number generated as a

18    percentage to allocate the same percentage of polling-place

19    locations, rounding up to the nearest whole number if necessary.

20    Did I read that correctly?

21    A    Yes.

22    Q    And was this the provision you were referring to that

23    had to do with the urban counties and requiring polling places

24    to be distributed evenly based on population?

25    A    Yes.  We had quite a lengthy discussion on it in



1    debate, and I had to go through a lot of numbers and facts

2    during the debate to show -- to demonstrate to Senator Hughes

3    what I saw as something that was an unfair process.

4        Q    And Senator Hughes responded favorably to your points,

5    removing a provision from Senate Bill 7; is that correct?

6        A    After a lengthy discussion --

7        Q    Yes.

8        A    -- yes.

9        Q    So after a lengthy discussion, he removed it.

10       A    After my -- mostly my lengthy discussion pointing out

11   the errors and the flaws.

12       Q    So after you pointed out the errors and the flaws in a

13   lengthy discussion with Senator Hughes --

14       A    Yes.

15       Q    -- Senator Hughes agreed to take out the provision; is

16   that correct -- from Senate Bill 7?

17       A    Yes.

18       Q    Okay.  And that provision remained excluded in Senate

19   Bill 1, which was introduced and enacted during the second

20   special session; correct?

21       A    Yes.

22       Q    And so your discussion with Senator Hughes about the

23   distribution of early-voting locations bore fruit in the final

24   bill that was passed by the legislature?

25       A    Yes.  Again, after I pointed out the many flaws,



 1        A     Yes.

 2        Q     Now, I'm going to represent to you that this is a copy

 3   of the engrossed version of Senate Bill 1, taken from the Texas

 4   Legislative Online website.  Do you have any reason to doubt my

 5   description?

 6        A     No.

 7        Q     And can you just for the record and clarity tell me

 8   what an engrossed copy is?

 9        A     Both -- it's passed both chambers.

10        Q     Passed both or only one?

11              MR. GOLANDO:  You said engrossed; right?

12              MS. HUNKER:  Yes.

13   BY MS. HUNKER (resuming):

14        Q     Engrossed means it only passed one; correct?  One

15   chamber?

16        A     Yes.  I'm sorry.  Well, in this case, yeah, the

17   Senate.

18        Q     And so I want to turn to Page 42.

19        A     42.  Okay.

20        Q     So if you look on 41 -- so if you look at 41 at

21   Section 5.04, and this is the oath that an assistor would take

22   when providing assistance to a voter; is that correct?

23        A     Yes.

24        Q     And just for clarity of the record, you're aware that

25   whenever words are underlined, that means that the language has



1    been added to the bill; correct?

2        A    Yes.

3        Q    And if language has a strike through it, that means

4    that's been removed; correct?

5        A    Right, right.

6        Q    And if we look at the oath, one of the changes in the

7    middle on Page 42, it says:  I did not encourage, pressure or

8    coerce the voter into choosing me to provide assistance.  Did I

9    read that correctly?

10       A    Yes.

11       Q    And was this the revision you were referring to in

12   your filibuster testimony?

13       A    Yes.

14       Q    And so your concern was over the word encourage; is

15   that correct?

16       A    Right.

17       Q    And so now I want to give to you Exhibit, I think, 25.

18            MS. HUNKER:  Am I correct?

19            MR. GOLANDO:  No, I think you're on 24.

20            THE WITNESS:  We're on -- this is 24.

21            COURT REPORTER:  Yeah.

22            MS. HUNKER:  So 25.

23            THE WITNESS:  Yeah, that's 25 there.

24            MS. HUNKER:   (Provides exhibit.)

25            MR. GOLANDO:  Thank you.



1   BY MS. HUNKER (resuming)

2       Q      And you see this is Senate Bill 1; correct?

3       A      Yes.

4       Q      And if you turn to the back, you'll see that it's

5   signed by the president of the Senate and the Speaker of the

6   House; correct?

7       A      Yes.

8       Q      As well as signed by the Governor.

9       A      Yes.

10      Q      And there's also a little stamp that says it was filed

11  in the office of the secretary of state on September 7th.

12      A      Yes.

13      Q      And so would you agree with me that this is an

14  enrolled version of the Senate Bill 1 which was enacted by the

15  legislature?

16      A      Yes.

17      Q      And so this is the version that would have taken

18  effect and become law; correct?

19      A      Yes.

20      Q      And so let's turn to Page 53.

21      A      (Complies with request.)

22      Q      The oath actually starts on Page 52, just to

23  acknowledge that this is also in reference to the oath, and now

24  let's look at that provision.  It reads:  I did not pressure or

25  coerce the voter into choosing me to provide assistance.  Did I



Carol Alvarado                                    October 06, 2022
                                                  Page 121

1   read that correctly?

2        A    Which page are we on?  I'm sorry.

3        Q    50 --

4             MR. GOLANDO:  It's right here.

5             THE WITNESS:  Okay.

6   BY MS. HUNKER (resuming):

7        Q    53.

8        A    (Reviewing.)  Yes.

9        Q    Okay.  And so between the enrolled version, which

10  passed the Senate, and the enacted version, which was passed by

11  both Houses, signed by the Governor and effected into law, they

12  removed the word encouraged; correct?

13       A    Yes.

14       Q    And so Senator Hughes responded to your criticism by

15  removing the -- the -- the specific word and language that you

16  objected to; is that correct?

17       A    I don't know if it was mine alone, but possibly.

18       Q    Okay.  But at the very least, he responded to

19  something you -- you and possibly others had objected to

20  regarding the language of the oath provision; is that correct?

21       A    Yes.

22       Q    And I'm going to show you another clip, and this is

23  being introduced as Exhibit Number 26.

24             (Video playing.)

25  BY MS. HUNKER (resuming):



Carol Alvarado                                    October 06, 2022
                                                  Page 122

1      Q     Were you able to hear the clip?

2      A     Yes.

3      Q     And was that a statement -- an exchange that you had

4  with Senator Blanco during the filibuster?

5      A     Yes.

6      Q     And so in the clip you mentioned a need for training

7  of poll watchers; is that correct?

8      A     Yes, and I do mention that he had brought it up in

9  previous discussions with Republicans and Democrats in a mixed

10 audience, so this issue of the training had been discussed

11 multiple times.

12     Q     And so the addition of a training program was

13 something you and multiple other senators had recommended get

14 added to the bill; is that correct?

15     A     Yes, several times.

16     Q     And I want to go now to Senate Bill 1 --

17     A     Uh-huh.

18     Q     -- on Page 25.

19           MR. GOLANDO:  Which version of Senate Bill 1?

20           MS. HUNKER:  The one that was enacted, so the

21 enrolled version.

22 BY THE WITNESS (resuming):

23     A     Okay.  Page 25?

24     Q     Uh-huh.

25     A     Okay.



1    Q    And if you see Section 4.04, which amends Section

2  33.008 of the election code, it says:  Training program, the

3  secretary of state shall develop and maintain a training program

4  for watchers.  The training must, one, be available; A, entirely

5  be of the Internet; and, B, at any time without a requirement

6  for prior registration; and, two, provide a watcher who

7  completes the training with a certificate of completion.

8    A    Uh-huh.

9    Q    Did I read that correctly?

10   A    Yes.

11   Q    And then if you move on to Section 4.05 of Senate

12  Bill 1 --

13            THE WITNESS:  I'm sorry.  Who -- we had somebody

14  new join us.  Who is -- who are you?

15            MR. ATALLAH:  I'm just an intern.

16            MS. HUNKER:  This is Will Atallah.  He is a

17  intern in my office.

18            THE WITNESS:  Okay.

19            MS. HUNKER:  Like I mentioned earlier --

20            THE WITNESS:  Okay.

21            MS. HUNKER:  -- he might join us.

22            THE WITNESS:  All right.  That's fine.  Okay.  Go

23  ahead.

24  BY MS. HUNKER (resuming):

25   Q    And so if we look at Page 25, Section 4.05 of Senate



1  Bill 1, which amends Section 33.031 of the election code, it

2  reads: In addition to the requirements of Subsection A to be

3  eligible to serve as a watcher, a person must complete training

4  under Section 33.008.

5      A    Yeah.

6      Q    Did I read that correctly?

7      A    You did.

8      Q    And so the final version of Senate Bill 1 added a

9  training program that you and other senators had recommended be

10  added; is that correct?

11     A    Yes, but that was done in the House, not the Senate

12  where we, on multiple locations, stressed the need for mandatory

13  training, and quite frankly we were ignored, so it wasn't until

14  it went to the House that that was done.

15     Q    Okay.  And the Senate ultimately passed the version of

16  the bill that contained the training requirement; is that

17  correct?

18     A    Yes.

19     Q    And so the provision that you had recommended was

20  ultimately accepted by the Texas Senate with respect to the

21  training of poll watchers?

22     A    After multiple occasions of trying to make the point

23  of why it was necessary and then it going to the House and a

24  House member putting [sic] on the bill, then ultimately, yes, it

25  was passed by the Senate.



1        Q     And I'm going to introduce another audio clip as an

2   exhibit, 27.

3        A     Okay.

4                    (Video playing.)

5   BY MS. HUNKER (resuming):

6        Q     Were you able to hear the clip?

7        A     Yes.

8        Q     Okay.  And this was a statement you had given during

9   your filibuster of Senate Bill 1; correct?

10       A     Yes.

11       Q     Now, this was talking about signature-match

12  requirements; is that correct?

13       A     Yes.

14       Q     Now, the signature-match requirement predated Senate

15  Bill 1; correct?

16       A     I believe so.

17       Q     Okay.  And you were talking in the clip about the need

18  for an opportunity to cure; is that correct?

19       A     Yes.

20       Q     And so I want to go back to Senate Bill 1, the version

21  that was enacted, Page 46.

22       A     (Complies with request.)

23       Q     Now, you stated in the clip that there was no

24  opportunity to cure a mismatched signature; is that correct?

25       A     Yes.



1    Q    And you also, I believe, stated that there was no

2  opportunity to correct a carrier envelope that did not have a

3  signature; is that correct?

4    A    Yes.

5    Q    And so prior to Senate Bill 1, there was no way to

6  cure -- or for a voter to cure a mismatched or omitted

7  signature; is that correct?

8    A    Yes.

9    Q    And so let's look at Page 46, Section 5.12, which

10  amends Section 87.0411.  Do you see that?

11    A    (Reviewing.)

12    Q    Towards the bottom of the page, starting on Line 16.

13    A    Okay.  5.12?

14    Q    5.14.  You're on the wrong page.  Oh, we can -- let's

15  do 5.12.  That's on Page 43.

16    A    Okay.

17    Q    Opportunity to Correct Defect, which amends Section

18  87.0271.

19    A    Okay.

20    Q    And so this is talking about the signature-

21  verification committee; correct?

22    A    Yes.

23    Q    And it says:  This section applies to an early-voting

24  ballot voted by mail:  One, for which the voter did not sign the

25  carrier-envelope certificate; two, for which it cannot be



1   immediately determined whether the signature on the carrier

2   envelope is that of the voter; three, missing any required

3   statement of residence; four, missing information or containing

4   incorrect information required under Section 84.002 or Section

5   86.002; or five, containing incomplete information with respect

6   to a witness.  Did I read that correctly?

7       A    Yes.

8       Q    Okay.  And so, if we continue, it says:  Not later

9   than the second business day after a signature-verification

10  committee discovers a defect described by Subsection A and

11  before the committee decides whether to accept or reject a

12  timely delivered ballot under Section 87.08 -- 027.  The

13  committee shall, one, determine if it would be possible for the

14  voter to correct the defect and return the carrier envelope

15  before the time the polls are required to close on election day;

16  and, two, return the carrier envelope to the voter by mail if

17  the committee determines that it would be possible for the voter

18  to correct the defect and return the carrier envelope before the

19  time the poles are required to close on election day.  Did I

20  read that correctly?

21      A    Yes.

22      Q    And so then the rest of this talks about what the

23  signature-verification committee should do to provide notice to

24  the voter; is that correct?

25      A    Yes.



Carol Alvarado

October 06, 2022
Page 128

1    Q    And so it says that:  The committee may notify the

2 voter of the defect by telephone or E-mail and inform the voter

3 that the voter may request to have the voter's application to

4 vote by mail canceled in the matter described by Section 84.032

5 or come to the early-voting clerk's office in person not later

6 than the sixth day after election day to correct the defect.

7 Did I read that correctly?

8    A    Yes.

9    Q    And so this provides a opportunity to cure certain

10 defects on carrier envelopes; is that correct?

11    A    Yes.

12    Q    And among the defects that it allows to be cured is

13 the mismatched signature or the failure to include a signature;

14 correct?

15    A    Yes.

16    Q    And so your concern that was voiced in the filibuster

17 was addressed to a degree in the final version of Senate Bill 1;

18 is that correct?  Regarding the opportunity to cure a mismatched

19 signature.

20    A    Well, and, again, this issue had been brought up other

21 times by Senate Democrats.

22    Q    And so you said it was brought up multiple times by

23 Senate Democrats; is that correct?

24    A    Yes.

25    Q    And it was ultimately adopted into the final version



Carol Alvarado

October 06, 2022
Page 129

1   of Senate Bill 1; correct?

2       A     After being advocated for by -- on multiple occasions

3   by Senate Democrats.

4       Q     So after it was advocated multiple times by Senate

5   Democrats, the addition of a cure process was added to the final

6   version of Senate Bill 1; correct?

7       A     Yes.

8       Q     And I want to look at Section 5.13.

9       A     What page?

10      Q     45.  It's the one right immediately after.

11      A     (Reviewing.)  Okay.

12      Q     And so it's actually -- so this is to show you at

13  Section 5.13, which amends Section 87.041 of the election code.

14

15      A     Uh-huh.

16      Q     And so let's look at Subsection D1, which is on the

17  next page, 46.

18      A     (Complies with request.)

19      Q     And Section D1 states:  If a voter provides the

20  information required under Section 86.002(g) and identifies the

21  same voter identified on the voter's application for voter

22  registration under Section 13.002(c)(8), the signature on the

23  ballot application and on the carrier-envelope certificate shall

24  be presumed to be the signatures of the voter.  Did I read that

25  correctly?



1      A    Yes.

2      Q    And so Senate Bill 1 also added a presumption in favor

3  of the voter that the signature would be a match; is that

4  correct?

5      A    Yes.

6      Q    So I'm going to introduce Exhibit 28.

7           MS. HUNKER:   (Provides exhibit.)

8           MR. GOLANDO:   Thank you kindly.

9  BY MS. HUNKER (resuming):

10     Q    Do you have the document in front of you?

11     A    Yes.

12     Q    Okay.  And so is this your Twitter handle, Carol For

13 Texas?

14     A    Yes.

15     Q    And so this is a tweet that you would have sent out on

16 August 11th, 2021; correct?

17     A    Yes.

18     Q    And then it says:  For the third time, TX Leg.

19 Republicans are attempting to enact deliberate voting barriers

20 to silence Texans' voices.  Anti-voter SB1 is likely to be on

21 the Texas Senate Floor today; tune in at 9 a.m.

22     A    Right.

23     Q    Did I read that correctly?

24     A    Yes.

25     Q    And then there's also a -- a diagram and photo



Carol Alvarado                                          October 06, 2022
                                                        Page 131

1    attached to this tweet; correct?

2         A    Uh-huh.

3         Q    And so, because of its size, I included a blow-up --

4    blown-up version of that on the next page.

5         A    Okay.

6         Q    And so I want to look at where you say, Easier to

7    intimidate, your fourth provision.  It says --

8         A    Uh-huh.

9         Q    -- Creates excessive criminal penalties for honest

10   mistakes by community members serving as poll workers and

11   assistants.  Did I read that correctly?

12        A    Yes.

13        Q    And so can you tell me what you meant there?

14        A    Well, it seemed like there was a lot of burden put on

15   the poll workers and assistants and making it easy for poll

16   watchers to file complaints on poll workers, so that's -- I

17   mean, obviously, you know, you can't go into a full explanation

18   here.  I'm making bullet points.  So that was -- that was one of

19   my concerns.

20        Q    All right.  And so it had to do with the criminal

21   liability that could come if a poll worker interfered with a

22   poll watcher; is that correct?  Is that a fair assessment or...?

23        A    Say that again now.

24        Q    Did this point have to do with the criminal liability

25   a poll worker would face --



1      A    Uh-huh.

2      Q    -- for interfering with a poll watcher?

3      A    Possibly.

4      Q    Okay.  So I want to turn -- this is going back to

5  Senate Bill 7.

6      A    Exhibit 22?

7      Q    Yes.

8      A    Okay.

9      Q    Page 13.

10     A    (Reviewing.)  Okay.

11     Q    And you'll see Subsection -- I'm sorry -- 3 -- Section

12  3.04, which amends Section 33.061 of the election code.  Do you

13  see that?

14     A    Yes.

15     Q    And it says:  An offense under Subsection A includes

16  an action taken to distance or obstruct the view of a watcher in

17  any way that makes observation reasonably ineffective.  Did I

18  read that correctly?

19     A    Yes.

20     Q    And so was this one of the provisions that you were

21  referring to when you were saying, Creates excessive criminal

22  penalties for honest mistakes by community members serving as

23  poll workers and assistants?

24     A    Yeah, one of them.

25     Q    Okay.  And so let's compare that version with the one



1    on Senate Bill 1, and that's going to be on Page 29 of the

2    enrolled version.

3         A    (Reviewing.)

4                   THE WITNESS:  Wait.  Which one of these?

5                   MR. GOLANDO:  It's the enrolled version.

6                   MS. HUNKER:  I believe Exhibit 25.

7    BY THE WITNESS (resuming):

8         A    Okay.  Okay.  Where on Page 29?

9         Q    We're going to be looking at the top, where it says,

10   Section 4.09 --

11        A    Okay.

12        Q    -- which amends Section 33.061(a) --

13        A    Okay.

14        Q    -- of the election code.  And so this used -- looks

15   more at the full Subsection A, and it reads:  A person commits

16   an offense if the person serves in an official capacity at a

17   location at which the presence of watchers is authorized and

18   knowingly prevents a watcher from observing an activity or

19   procedure a person knows the watcher is entitled to observe,

20   including by taking any action to obstruct the view of a watcher

21   or distance the watcher from the activity or procedure to be

22   observed in a manner that would make the observation not

23   reasonably effective.  Did I read that correctly?

24        A    Yes.

25        Q    Okay.  And so would you agree with me that



Carol Alvarado                                        October 06, 2022
                                                      Page 134

1   Section 33.061(a) of the election code had already stated that,
2   A person commits an offense if the person serves in an official
3   capacity at a location at which the presence of a watcher is
4   authorized and knowingly prevents the watcher from observing an
5   activity the watcher is entitled to observe, based on the
6   language that's --
7        A    Based on the language, yes.
8        Q    Okay.  And so that -- the offense preexisted Senate
9   Bill 1; correct?
10       A    Yes.
11       Q    Okay.  Now, if we look at the difference between
12  Senate Bill 7 and Senate Bill 1 --
13       A    Okay.
14       Q    -- we see that in Senate Bill 1, it includes the
15  phrase, The person knows the watcher is entitled to observe.
16       A    Yes.
17       Q    Do you see that?
18       A    Yes.
19       Q    And so this knowing requirement is not in the version
20  for Senate Bill 7; is that correct?
21       A    Right.
22       Q    And so Senate Bill 1 adds the requirement that the
23  poll worker know that they are obstructing the poll watcher and
24  engaging -- from them -- from engaging in the activities.
25       A    Say that again.



Carol Alvarado                                      October 06, 2022
                                                    Page 135

1       Q     Let me rephrase.

2       A     Uh-huh.

3       Q     And so Senate Bill 1 --

4       A     Uh-huh.

5       Q     -- added the requirement --

6       A     Uh-huh.

7       Q     -- that a person know that they are obstructing what a

8    poll watcher is entitled to observe; is that correct?

9       A     Yes.

10      Q     And so it adds a mens rea requirement; is that

11   correct?

12            MR. GOLANDO:  Objection, to the extent it calls

13   for a legal conclusion.  I'm sorry.  Restate it.

14            MS. HUNKER:  Yeah.

15   BY MS. HUNKER (resuming):

16      Q     It requires that a person have a certain state of

17   mind; is that correct?

18            MR. GOLANDO:  Same objection.

19   BY THE WITNESS (resuming):

20      A     I don't know.

21      Q     Okay.

22      A     Yeah.

23      Q     Would you agree that this somewhat addresses your

24   concern that Senate Bill 1 would create excessive criminal

25   penalties for honest mistakes by community members serving as



```
 1   poll workers and assistants?
 2       A    Somewhat.  And, again, there's -- there's a pattern
 3   here.  You know, these issues had been brought up multiple times
 4   and then in a 15-hour filibuster, so it seemed like a lot of
 5   these things, we had to keep pushing --
 6       Q    Uh-huh.
 7       A    -- many -- there had to be many attempts to convince.
 8       Q    And so after many attempts of attempting to convince
 9   Senate Republicans and House Republicans to add this protective
10   language, and it sounds like after including it in your
11   filibuster, Senate Republicans did approve of language that
12   addressed in part your concern that Senate Bill 1 would create
13   excessive criminal penalties for honest mistakes by community
14   members?
15       A    After many exhausting attempts, yes.
16       Q    And you can put this document aside.
17       A    (Complies with request.)
18              MR. GOLANDO:  Thank you.
19              THE WITNESS:  Uh-huh.
20   BY MS. HUNKER (resuming):
21       Q    And so let's go back to Exhibit 2.  It's the --
22       A    Journal.
23       Q    -- journal.
24       A    Okay.
25       Q    And we're going to be turning to Page 56.
```



Carol Alvarado
October 06, 2022
Page 137

```
1        A     (Reviewing.)  Okay.
2        Q     And, actually, it might be easier if we went to your
3   question ahead of time, so let's turn quickly to Page 55 and add
4   that into the record as well.
5        A     Uh-huh.
6        Q     So you say:  So in March, I noted that we were --
7        A     Wait a minute.  (Reviewing.)  Okay.  Go ahead.
8        Q     So you say:  So in March, I noted that League of Women
9   Voters, NAACP, MALDEF, LULAC, ACLU were all opposed to this bill
10  and all of these organizations still oppose this bill.  Are you
11  aware of that?  Senator Hew (ph) [sic] replies:  Well, Senator,
12  I know that some of the suggestions made by some of those groups
13  are reflected in the conference committee report.  Senator
14  Blanco and I were talking about cameras and whether poll
15  watchers would have cameras.  That has been removed from the
16  bill, and as, I think, a number of the groups you mentioned
17  testified against that provision, and so you know how the
18  process works.  At every step, the bills hopefully get better
19  based on input, based on criticisms we've heard from groups all
20  across the spectrum.  Did I read that correctly?
21       A     Yes.
22       Q     And so in this exchange, Senator Hughes states that
23  they had received opposition from League of Women Voters, NAACP,
24  MALDEF, LULAC and ACLU about whether poll watchers would be
25  allowed to take cameras with them to polling places; is that
```



1    correct?

2        A    Well, he says some of the suggestions and some of the

3    groups, so I wouldn't say it was all of them.

4        Q    Would you agree that he's stating that some of these

5    groups have brought up opposition to Senate Bill 7 in part

6    because of the provision that would have allowed cameras to be

7    taken inside polling places?

8        A    Yes.

9        Q    Okay.  And he says that that had been removed from the

10   bill; is that correct?

11       A    Yes, and, again, after several times the Democrats

12   brought up the issue of the cameras.  So, again, the -- the

13   pattern continues where we had to keep advocating on many

14   occasions for certain things.

15       Q    And was this one of the provisions that you also

16   objected to in Senate Bill 7?

17       A    Yes.

18       Q    And did you object to its inclusion in Senate Bill 1?

19       A    Yes.

20       Q    Okay.  And did you communicate that objection to

21   Senator Hughes and other Texas Republicans?

22       A    It was communicated by -- by many senators.

23       Q    And so that provision was ultimately left out of

24   Senate Bill 1; correct?

25       A    Yes.  Again, after many attempts.



1       A      (Complies with request.)

2       Q      Specifically, we're going to go towards the bottom,

3   the last statement you had given on this page.  Do you see --

4       A      Okay.

5       Q      -- where it says Section 2?

6       A      Yes.

7       Q      Okay.  So it reads:  Senator Alvarado, Section 2 of

8   the Voting Rights Act, this is what really concerns me because

9   we -- every time the legislature passes something to do with

10  elections and voting, it's not making it easier and more

11  accessible.  Do you know that I have filed bills numerous times

12  for online voter registration just to be able to register

13  online?  Are you aware of that?  Did I read that correctly?

14      A      Yes.

15      Q      Senator Hughes responds:  Senator, I am, and

16  Senator Buckingham also had an online voter registration bill

17  this session, and those provisions were in Senate Bill 7 as it

18  left the Senate, and so that issue has been discussed quite a

19  bit, and as you know, if we're talking about making it easier to

20  vote, Senate Bill 7, the conference committee report before us

21  and the version that left here, for the first time says that in

22  early voting in Texas, if you're in line when the polls close,

23  you get to vote no matter how long it takes.  Also says you're

24  going to have a paperback for electronic voting.  Did I read

25  that correctly?



Carol Alvarado                                          October 06, 2022
                                                        Page 141

 1      A     Yes.

 2      Q     And so this is in reference to the legislation you had

 3 mentioned earlier in our deposition; correct?

 4      A     Uh-huh, yes.

 5      Q     Okay.  And is this accurate that when Senate Bill 7

 6 passed the Senate, it did include a provision regarding online

 7 voter registration?

 8      A     It didn't reflect the online voter registration --

 9 straight-up online voter registration like my bill that I'd been

10 filing.

11      Q     Did it include a variation of it?

12      A     It -- it had some form of being able to register

13 online.

14      Q     Okay.  And do you know how that provision got removed

15 from Senate Bill 7?

16      A     No.

17      Q     All right.  So I want to look at Senate Bill 1,

18 specifically Page 6.

19             MR. GOLANDO:  This is the enrolled version?

20             MS. HUNKER:  This is the enrolled version.

21 BY THE WITNESS (resuming):

22      A     Oh, I'm sorry.  What page?

23      Q     Page 6.  I think we can put the engrossed version

24 aside.  I don't believe I have any more references to it.

25             MR. GOLANDO:  Thank you very kindly.



1   BY THE WITNESS (resuming):

2       A   (Reviewing.)  Okay.

3       Q   And so, looking at Section 2.03, which amends

4   Section 15.021 -- do you see that?  On Page 6, Line 2.

5       A   Yes.

6       Q   Okay.  We're going to look at Subsection D, which is

7   on Line 11.  It reads:  A voter -- and then it crosses out --

8   who continues to reside in the county in which the voter is

9   registered may correct information under this section by digital

10  transmission of the information under a program administered by

11  the secretary of state and the Department of Information

12  Resources.  Did I read that correctly?

13      A   Yes.

14      Q   And so by removing the language, Who continues to

15  reside in the county in which the voter is registered, that

16  means a voter may correct their information online regardless of

17  the circumstances as long as they're registered; correct?

18      A   Yes.

19      Q   And so it while it will not complete online electronic

20  registration, it does provide some form of voter registration

21  for -- for individuals who want to correct their registration

22  records; is that correct?

23      A   I -- I don't see it that way.

24      Q   How do you see it?

25      A   I mean, it's just correcting information.  It doesn't



1    mean they are registering online.

2         Q    And so would this include voters, let's say, who move

3    from one place to another?

4         A    Possibly.

5         Q    Okay.

6         A    But they could be correcting anything, a misspelling

7    of their name or something, a digit that's wrong in the address.

8         Q    Uh-huh.  Would you consider it an improvement that

9    voters would be able to correct their information online as

10   opposed to doing it through mail?

11        A    How fast?  It's barely.

12        Q    Is it an improvement?

13        A    Barely an improvement.

14        Q    So I'm going to pull up our next exhibit, which is 29.

15                  MS. HUNKER:  (Provides exhibit.)

16                  MR. GOLANDO:  Thank you.

17                  THE WITNESS:  Thanks.

18   BY MS. HUNKER (resuming):

19        Q    Do you have the document in front of you?

20        A    Yes.

21        Q    And this is a tweet that was sent from your Twitter

22   account; correct?

23        A    Yes.

24        Q    And it was on August 11th, 2022.

25        A    Yes.



1  of ID or driver's license on one -- on one piece of -- one

2  document and maybe not the other.

3      Q    And so did you look at the different ways that a voter

4  could update their voter-registration file?

5      A    No, not at that time.

6      Q    Okay.  And are you aware that Senate Bill 1 provides

7  for multiple avenues by which a voter may update their

8  voter-registration record to include ID numbers?

9      A    Yes.  I think that's what you were trying to refer to

10 as online voter registration.

11     Q    That's one -- one way.  If you want, we can -- let me

12 look at the -- so I'm going to introduce another exhibit.

13             MS. HUNKER:  (Provides exhibit.)

14             MR. GOLANDO:  Thank you.

15             THE WITNESS:  Thanks.

16 BY MS. HUNKER (resuming):

17     Q    Do you have the document in front of you?

18     A    Yes.

19     Q    And so this says:  Texas Secretary of State

20 John B. Scott on top; correct?

21     A    Right.

22     Q    And then it also says Election Advisory Number

23 2022-08; is that correct?

24     A    Yes.

25     Q    With the date of January 28, 2022.



Carol Alvarado

October 06, 2022
Page 150

1       A       Yes.

2       Q       And the subject is, New Law, Senate Bill 1,

3  Opportunity to Correct Defects On Application for a Ballot By

4  Mail and Carrier Envelope.  Did I read that correctly?

5       A       Yes.

6       Q       And were you aware of what election advisory is?

7       A       No.

8       Q       Okay.  I will represent to you that election

9  advisories are the way the secretary of state communicates

10 interpretation information regarding counties' responsibilities

11 under the election code.  Do you have any reason to doubt or

12 object to my description --

13      A       No.

14      Q       -- or representation?

15      A       No.

16      Q       Okay.  Now, let's look at Page 3, which is Opportunity

17 to Correct Rejection of ABBM.

18      A       Okay.

19      Q       Well, actually, before we do that, let's talk a little

20 bit just about what the requirements of Senate bill 1 is with

21 respect to voter ID numbers.  And so if we look at Page 1 where

22 it says, New Requirements for Application to Vote By Mail --

23      A       Uh-huh.

24      Q       -- you'll see it says:  As amended by Senate Bill 1,

25 Section 84.002 of the election code provides that a voter who



1  seeks to vote by mail must include one of the following on their

2  ABBM, that is the number of applicants driver's license,

3  election-identification certificate or personal-identification

4  card issued by the department of public safety, the last four

5  digits of the applicant's Social Security number if the

6  applicant has not been issued a DPS number or a statement that

7  the applicant has not been issued one of these numbers.  Did I

8  read that correctly?

9      A     Yes.

10     Q     And so a person who is applying to vote by mail can

11 provide any one of these numbers and have other application

12 accepted so long as there's a match; is that correct?

13     A     Yes.

14     Q     Okay.  And now let's talk about the opportunity to

15 correct the rejection of an ABBM.

16     A     Uh-huh.

17     Q     And so this says on Page 3:  As described above, if

18 the early-voting clerk rejects an ABBM because the voter failed

19 to provide any of the required information or the information

20 included on the ABBM does not match the voter's

21 voter-registration record, the early-voting clerk must provide

22 the voter with notice of the rejection in accordance with

23 Section 86.001; is that correct?

24     A     Yes.

25     Q     And then it says:  The notice must include information



1  explaining how to correct the defect by using the online

2  ballot-by-mail tracker available at www.votetexas.gov.  Is that

3  correct?

4      A    Yes.

5      Q    And then it says:  If the -- if the applicant corrects

6  the missing incorrect information by validating the required

7  information through the ballot-by-mail tracker and this

8  information subsequently identifies the voter identified on the

9  applicant's voter-registration record, the early-voting clerk

10  shall provide a ballot to the applicant.  Did I read that

11  correctly?

12      A    Yes.

13      Q    And let's move on to the next paragraph where it says:

14  If the early-voting clerk rejects an ABBM because the voter's

15  voter record does not contain any of the personal-identification

16  number provided on the ABBM, the clerk must offer the voter an

17  opportunity to correct this defect.  The notice must include

18  instructions on how the voter can update their

19  voter-registration record to include one or more of the required

20  identification numbers by submitting a voter-registration

21  application to the registrar or by validating their personal

22  identification numbers on Texas.gov.  Did I read that correctly?

23      A    Yes.

24      Q    Okay.  Were you aware that a voter can correct their

25  information via the online ballot-by-mail tracker?



Carol Alvarado

October 06, 2022
Page 153

1      A    Yes.

2      Q    And were you aware that a voter can also update their

3  information by submitting a updated voter-registration form?

4      A    Yes.

5      Q    Are you aware that once the voter updates -- submits

6  the voter-registration form with the new information, that

7  information will forever be in their registration file?

8      A    Yes.

9      Q    And so, for a voter who had their application to vote

10  by mail rejected because the number was not in their file --

11      A    Uh-huh.

12      Q    -- that number would be in their file for subsequent

13  elections.  Are you aware of that?

14      A    I am now.

15      Q    Are you aware that the secretary of state's office

16  conducted a syncing process with the department of public safety

17  in order to add additional Social Security numbers and driver

18  license numbers to voter-registration records?

19      A    No, I wasn't.

20      Q    Are you aware that after --

21      A    When did that occur?

22      Q    That would have occurred in December of 2021.

23      A    Okay.

24      Q    Were you aware that after the secretary of state

25  conducted that process, the number of individuals who did not



Carol Alvarado                                                    October 06, 2022
                                                                 Page 158

1      A    Right, I don't recall.

2      Q    Now, the 19 percent, do you know if that includes the

3  number of individuals who were later able to cure the defect in

4  their ballot?

5      A    I don't know.

6      Q    Now, you had, I believe, discussed on the floor --

7      A    Uh-huh.

8      Q    -- during your filibuster some of your concerns

9  regarding the signature-match requirement; is that right?

10      A    Yes.

11      Q    Okay.  I believe you said that individuals with

12  disabilities, that their signature can change --

13      A    Yes.

14      Q    -- is that correct?

15      A    Yes.

16      Q    And so one of your concerns is that a voter would have

17  their signature rejected because their disability would cause

18  their signature not to be the same election to election; is that

19  correct?

20      A    Right.

21      Q    A voter-ID number does not change; is that correct?

22      A    Right.

23      Q    And so do you think some voters with disabilities

24  would find it easier to include their voter-ID number as a

25  method of identification as opposed to signature match?



1       A     Uh-huh.  Okay.

2       Q     All right.  And so this is a document -- as you can

3   see from the bottom, it says State-087323 that was disclosed in

4   this case, and if you see on top, it's from the office of

5   Attorney General of Texas, election-fraud violations,

6   prosecutions result.  Do you see that on top?

7       A     Yes.

8       Q     Have you seen this document before?

9       A     No.

10      Q     Were you aware that this document was circulated among

11  members of the legislature?

12      A     I don't recall.  I'm not aware.

13      Q     Were you aware that the document was referred to

14  during committee testimony?

15      A     In the Senate -- in state affairs in the Senate?

16      Q     I believe it was in the House and also used in the

17  Senate as well.

18      A     I don't recall.

19      Q     Okay.  And so you can see that this is prosecutions

20  resolved from the attorney general's office; correct?

21      A     Yes.

22      Q     And so then it lists the county, the defendant and the

23  allegation; is that right?

24      A     Yes.

25      Q     And the it also talks about the election that was



Carol Alvarado                                          October 06, 2022
                                                        Page 163

1    involved; is that right?

2         A    Right.

3         Q    And then it talks about the case-number description as

4    well as the number of defendants charged and the charges that

5    were brought; is that right?

6         A    Yes.

7         Q    Okay.  And we can -- I also want to show that on the

8    bottom it says information as of April 20th, 2022.  Do you see

9    that?

10        A    Yes.

11        Q    And so this document is only as accurate as

12   April 20, 2022.  Does that make sense?

13        A    Yes.

14        Q    Okay.  And so if we look through the document, we'll

15   see different types of offenses, and so let's turn to Page 5.

16        A    (Complies with request.)

17        Q    You can see that there are, on the bottom, in Cameron

18   County, vote harvesting, mail-ballot fraud, assistance fraud,

19   influencing voter.  Do you see that?

20        A    Yes.

21        Q    And do you see that it talks about the different

22   charges that were brought; correct?

23        A    Yes.

24        Q    And we can look elsewhere.  If you turn to Page 6,

25   we'll see that there's one from Harris County, forgery and



Carol Alvarado                                          October 06, 2022
                                                             Page 164

1    tampering with petition of candidacy from the 2014 election; is

2    that correct?

3         A    Hold on.  What page?

4         Q    Page 6.

5         A    (Reviewing.)  Okay.

6         Q    And if we turn to Page 9 and then going into 10 --

7         A    Wait a minute.  Okay.  Say that Harris County -- so

8    there's one charge?

9         Q    On that particular one, yes.

10        A    Out of how many votes cast?

11        Q    I'm just talking about the incidences themselves.

12        A    Okay.

13        Q    And so if we turn to Page 9 and 10 --

14        A    Okay.

15        Q    -- do you see a number of charges brought in different

16   actions in Harris County?

17        A    (Reviewing.)

18        Q    The entire Page 10 is --

19        A    Oh, I'm sorry, 10.  (Reviewing.)

20        Q    And so this -- the first one is a false statement on

21   registration application, illegal voting, tampering with

22   government records, election fraud, false registration address.

23   Did I read that correctly?

24        A    Yes.

25        Q    And then if you can see, there's a similar description



1    for each of the entries on this page.

2         A    Yes.

3         Q    And then you can see that each -- each has a number of

4    defendants charged or offenses charged and there's -- that's

5    listed as well.

6         A    (Reviewing.)

7         Q    You're aware that an individual who conducts illegal

8    election activity can affect multiple ballots cast; correct?

9         A    Yes.

10        Q    Do you know how many jurisdictions in Texas have less

11   than 10,000 people?

12        A    No.

13        Q    Any jurisdictions in Texas have less than a thousand?

14        A    No.

15        Q    Would you agree with me that election fraud has the

16   most likely -- is most likely to effect the results in a small

17   election?

18        A    I -- I don't know.

19        Q    Would you agree with me that Texas has a lot of small

20   jurisdictions?

21        A    Yes.

22        Q    Would you agree with me that the Attorney General of

23   Texas has brought charges relating to voter fraud in Harris

24   County?

25        A    It appears so according to this document.



1     Q    And would you agree with me that the Texas Attorney

2 General has brought charges against -- for illegal voting or

3 election fraud in other counties as well?

4     A    According to this, yes.

5     Q    Are you aware that election -- election-fraud

6 prosecutions are also brought by county district attorneys?

7     A    Yes.

8     Q    Do you know the amount of charges that are brought by

9 these district attorneys each year?

10    A    No.

11    Q    I also want to turn to Page 30 -- sorry -- Exhibit 32.

12    A    (Complies with request.)

13    Q    And you'll see that there's a caption, Lupe v. Texas.

14 Do you see that?

15    A    Yes.

16    Q    And do you see where it says, United States' Responses

17 to Texas' First Set of RFPs-Privilege Log?

18    A    Yes.

19    Q    And I want to look towards the privilege basis that's

20 brought for some of these documents.

21    A    Okay.

22    Q    And do you see where -- the third entry down, it says,

23 Complaint alleging voter fraud via text message.

24    A    Yes.

25    Q    And do you see the next one down says, Voicemail



Carol Alvarado                                        October 06, 2022
                                                      Page 167

 1  complaint alleging voter fraud in Texas?

 2      A    Yes.

 3      Q    And do you see how there are other entries here that

 4  also state that there were complaints received by the United

 5  States regarding election fraud in Texas?

 6      A    Yes.

 7      Q    We can put these two documents aside.  I'm going to

 8  introduce Exhibit 33.

 9              MS. HUNKER:  (Provides exhibit.)

10              MR. GOLANDO:  Thank you.

11  BY MS. HUNKER (resuming):

12      Q    Do you have the exhibit in front of you?

13      A    Yes.

14      Q    Do you see it says House Journal?

15      A    Yes.

16      Q    And do you see this is from Monday, April 23rd, 2007;

17  is that correct?

18      A    Yes.

19      Q    And so I'm going to turn -- ask you to turn the page

20  to 2224, and I will represent to you that I've only included the

21  portions of this House Journal that were relevant to our

22  deposition for today.  And so do you see where it says

23  Representative Anchia?

24      A    Yes.

25      Q    Do you know who Representative Anchia is?



Carol Alvarado
October 06, 2022
Page 168

1    A    Yes.

2    Q    And he's a Democrat; correct?

3    A    Yes.

4    Q    And did you work with him when you were in the Texas

5 House?

6    A    Yes.  And just to be clear, I was not in the House

7 during this time, during 2007.

8    Q    And I want to go to the third paragraph, where it

9 starts with, Furthermore.

10    A    Okay.

11    Q    Actually, let's do the whole paragraph.  Let's start

12 with, We know.  It says:  We know that there's no evidence of

13 it, but if this body wants to create an opportunity for voter

14 fraud, then vote for HB218.  In fact, that Section 3 Part A of 2

15 -- HB218 creates a wonderful opportunity for people at a low

16 cost to be able to impersonate someone else by saying that this

17 is a valid employee ID and no poll worker, no election worker,

18 no election judge will be able to discern a ballot from invalid

19 ID.  Did I read that correctly?

20    A    Yes.

21    Q    Furthermore, there's another wonderful loophole in

22 this bill that creates a glaring weakness:  It essentially

23 allows vote by mail to continue without voter identification.

24 Vote by mail, as we know, is the greatest source of fraud --

25 voter fraud in this state.  In fact, all of the prosecutions by



1  the attorney general -- I shouldn't say all, but a great

2  majority of the prosecutions by the attorney general occur with

3  request to vote by mail.  Did I read that correctly?

4      A    Yes.

5      Q    Would you agree with me that in this statement on the

6  floor, Representative Anchia said that vote by mail is the

7  greatest source of voter fraud in this state?

8      A    According to what I'm reading, that -- that's what he

9  said.

10     Q    Okay.  And would you agree with me that he is talking

11 about fraud in vote-by-mail context -- sorry.  Let me rephrase

12 that.  Would you agree with me that he is talking about fraud

13 through vote by mail in the context of photo ID?

14              MR. GOLANDO:  Objection, form.

15 BY THE WITNESS (resuming):

16     A    I don't know.

17     Q    Okay.  Would you agree with me that he's comparing

18 vote by mail from in-person voting with respect to photo IDs?

19              MR. GOLANDO:  Same objection.

20 BY THE WITNESS (resuming):

21     A    I don't know.

22     Q    Would you agree with me that he says that the bill

23 would create a wonderful loophole because it allows vote by mail

24 to continue without photo identification?

25     A    I'm not sure.



 1      Q     Okay.  Would you agree that he says there's another

 2 wonderful loophole in this bill that creates a glaring weakness:

 3 It essentially allows vote by mail to continue without photo

 4 identification?

 5      A     (Reviewing.)  That's what I'm reading.

 6      Q     And let's go to introduce the next exhibit, which is

 7 34.

 8            MS. HUNKER:  (Provides exhibit.)

 9            MR. GOLANDO:  Thank you.

10 BY MS. HUNKER (resuming):

11      Q     And you see that this is a letter from Judith

12 Zaffirini, State Senator, District 21?

13      A     Yes.

14      Q     And Senator Zaffirini is a Democrat; correct?

15      A     Yes.

16      Q     And this letter was sent on December 3rd, 2018; is

17 that correct?

18      A     Yes.

19      Q     And it's directed to Senator Hughes, chair of the

20 select committee on election security.

21      A     Yes.

22      Q     Okay.  I want to look at page -- Paragraph 1 where it

23 says, This letter, however, let me know when you've arrived.

24      A     Yes, I have it.

25      Q     Okay.  It reads:  This letter however is to record my



1    concerns regarding the need to, one, provide concrete

2    recommendations to address mail-in ballot fraud.  Did I read

3    that correctly?

4         A    Yes.

5         Q    And now let's look at the next paragraph:  During the

6    last several sessions, many legislators have focused on voter-ID

7    laws intended to prevent in-person voter fraud, but not on [sic]

8    increasingly serious problem of mail-in ballot fraud.  Our

9    committee heard troubling testimony regarding the state of

10   election security related to the latter.  Did I read that

11   correctly?

12        A    Yes.

13        Q    It continues:  The report's recommendation that the

14   legislature needs to find a solution to the vexing issue of

15   mail-in ballot fraud.  At nursing homes and assisted-living

16   facilities is a good start, but we must take all possible steps

17   to address voting irregularities caused by fraudulent mail-in

18   ballots.  Did I read that correctly?

19        A    Yes.

20        Q    And so would you agree that in this letter she states

21   that the legislature needs to provide concrete recommendations

22   to address mail-in ballot fraud?

23        A    (Reviewing.)

24        Q    Based on the first paragraph.

25        A    Well, if the -- that's what it reads here.



Carol Alvarado                                      October 06, 2022
                                                    Page 172

1      Q     Would you agree with me that she said that:
2  Legislators are focused on voter-ID laws intended to prevent
3  in-person voter fraud, but not on the increasing serious problem
4  of mail-in ballot fraud.
5      A     That's what I read.
6      Q     And you'd agree that she said that she heard troubling
7  testimony regarding the state of election security related to
8  mail-in ballot fraud.
9      A     That's what it reads here.
10     Q     The voter-ID number requirement introduces a voting --
11 let me take -- let rephrase that.  The requirement that a voter
12 provide either their Social Security number or driver's license
13 or voter ID on their mail-in ballot adds a voter-ID component to
14 mail-in ballots; is that correct?
15     A     I suppose so.
16     Q     Would you agree that it addresses the concern raised
17 by Senator Zaffirini that legislators are focused on voter-ID
18 laws intended to prevent in-person voter fraud, but not on the
19 increasing serious problem of mail-in ballot fraud?
20     A     I -- I don't know.  I can't say.
21     Q     We can put that document aside.  So we had discussed
22 earlier about some of your concerns regarding poll watchers;
23 correct?
24     A     Yes.
25     Q     And do you have concerns regarding poll watchers with



Carol Alvarado

October 06, 2022
Page 174

1      Q    Now, poll watchers are selected by political parties
2  or campaigns; is that correct?
3      A    Yes.
4      Q    And have [sic] your campaign ever utilized a poll
5  watcher?
6      A    A long time ago.
7      Q    So at some point your campaign had volunteer poll
8  watchers.
9      A    Yes.
10     Q    And are you aware of other Texas Democrats who use
11 poll watchers as part of their campaign?
12     A    Yeah, in various campaigns, and -- but this was a long
13 time ago.
14     Q    And are you aware that the Texas Democrats' website
15 asked for volunteers for poll watchers?
16     A    No, I don't remember.  When -- when is that?  When was
17 that in effect?
18     Q    I'll bring it up.  I'm going to introduce Exhibit
19 Number 35.  Do you have the document in front of you?
20     A    Yes.
21     Q    And do you see on the top where it says Texas
22 Democrats?
23     A    Yes.
24     Q    And it says, Sign up to help Texas -- to help Texas
25 Democrats get elected.



1        A    Yes.

2        Q    And that it includes a space for contact

3   information --

4        A    Well --

5        Q    -- is that correct?

6        A    Yes.

7        Q    And if you look at the back, you'll see information

8   towards the bottom that says it's copyrighted, 2021, Texas

9   Democratic Party, Political Ad.

10        A    Yes.

11        Q    Okay.  And it says it's paid by the Texas Democratic

12   Party, www.tx --

13        A    Yes.

14        Q    Okay.

15        A    What is the date of this?  Do you know?  When was

16   this --

17        Q    So I will represent to you that I pulled this from the

18   Texas Democratic Party website yesterday.

19        A    Okay.

20        Q    Do you have any reason to doubt my representation?

21        A    No.

22        Q    And so if you look at where it says volunteer

23   information on Page 2 --

24        A    Uh-huh.

25        Q    -- it asks:  Are you interested in serving as a poll



1   watcher during the 2022 general election.

2       A    Yes.

3       Q    And so would you agree with me that on the Texas

4   Democrat website, there is an option asking for volunteers to be

5   a poll watcher during the 2022 general election?

6       A    Yes.

7       Q    And we can put that aside.  And you had heard that

8   there was a controversy in Travis County regarding poll watchers

9   being sequestered from the central counting location.

10      A    I'm not aware.

11              MS. HUNKER:  (Provides exhibit.)

12              MR. GOLANDO:  Thank you.

13  BY MS. HUNKER (resuming):

14      Q    And so this is Exhibit Number 36.

15      A    Okay.

16      Q    Do you have it in front of you?

17      A    Yes.

18      Q    And so this is a news article, as you can see, from

19  KXN.com, and it reads:  Second criminal investigation into

20  Travis County clerk requested over November election.  Did I

21  read that correctly?

22      A    Yes.

23      Q    And if you look at the second paragraph, it reads:

24  After review of the submitted documentation, we believe

25  information regarding offenses warrant a submission for criminal



Carol Alvarado                                          October 06, 2022
                                                        Page 178

1        Q    Now, you agree with me that this occurred before

2   Senate Bill 1 would have taken effect; correct?

3        A    Let's see.  This was -- yes.  Yes.

4        Q    And so it was a Class A misdemeanor to obstruct a poll

5   watcher before Senate Bill 1 took effect; correct?

6        A    Okay.  Yes.

7        Q    And if we turn the page, we can see a black-and-white

8   photo, and I am going to give to you as Exhibit 37 a blown-up

9   version of that photo.

10       A    Okay.

11       Q    And you agree with me that this is the same photo as

12  the one in the news article; correct?

13       A    Yes.

14       Q    Okay.  And you can see in the photo that the poll

15  watchers are -- are in a room sequestered; correct?

16       A    I just see that they're in a room.

17       Q    Okay.  And you can see that they are looking through a

18  window.

19       A    I see one person looking through a window.

20       Q    And so let's read what's described in the news

21  article.  It says:  Photographic evidence collected by Fleck

22  during her poll watcher assignment inside the counting station

23  shows poll watchers sequestered inside a media room.  The room

24  is separated from the counting station where election workers

25  were tabulating and counting ballots.  Did I read that



Carol Alvarado                                    October 06, 2022
                                                  Page 180

1       Q      Do you have the exhibit in front of you?

2       A      Yes.

3       Q      Okay.  And do you see where it says Election Advisory

4    2022-09?

5       A      Yes.

6       Q      And that this would have been issued February 4th,

7    2022?

8       A      Yes.

9       Q      And the subject of this is, New Law, Changes to Poll

10   Watcher Requirements under House Bill 3107 and Senate Bill 1; is

11   that correct?

12      A      Yes.

13      Q      And would you agree with me that this was issued by

14   the secretary of state?

15      A      Yes.

16      Q      And so I want to turn first to where it says, Purpose

17   and duty of poll watchers.

18      A      Okay.

19      Q      It says:  Section 33.0015 of the code provides that it

20   is the intent of the legislature that poll watchers, duly

21   accepted for service under Chapter 33, be allowed to observe and

22   report on irregularities in the conduct of any election but may

23   not interfere in the orderly conduct of an election.  Did I read

24   that correctly?

25      A      Yes.



Carol Alvarado                                          October 06, 2022
                                                        Page 181

1      Q    It continues:  A poll watcher appointed under

2  Chapter 33 shall observe without obstructing the conduct of an

3  election and can call to the attention of an election officer

4  any observed or suspected irregularity or violation of law in

5  the conduct of the election.  Did I read that correctly?

6      A    You did.

7      Q    And do you agree with this description of what a poll

8  watcher should be doing?

9      A    Say that again.

10      Q    Do you agree with this description of what a poll

11  watcher's purpose and duty should be?

12      A    To some extent

13      Q    To what extent?

14      A    Let's see.  Well, that they're to observe and report.

15      Q    And so you'd agree with me that the secretary of state

16  has stated that poll watchers are allowed to observe and report

17  on irregularities, but they may not intervene in the orderly

18  conduct of an election.

19      A    Right.

20      Q    And you would agree with me that the secretary of

21  state advised this after the passage and SB1 taking effect.

22      A    Yes.

23      Q    Now, we talked a little bit about the training

24  requirements for poll watchers, so I'm going to skip that --

25      A    Yes.



Carol Alvarado                                        October 06, 2022
                                                            Page 182

1        Q      -- section and go to 04, poll watchers.  It says:
2    Before accepting a watcher, an election officer shall require
3    the watcher to take the following oath:  I swear or affirm that
4    I will not disrupt the voting process or harass -- harass voters
5    in the discharge of my duties.  Did I read that correctly?
6        A      Yes.
7        Q      And then it continues:  This oath has been added to
8    the certificate of appointment that the poll watcher presents
9    and signs in the presence of the presiding judge.  Did I read
10   that correctly?
11       A      Yes.
12       Q      Would you agree with me that this oath provision was
13   added by Senate Bill 1?
14       A      Yes.
15       Q      Do you consider this to be a good provision that was
16   added?
17       A      It's a provision that -- again, that we advocated for
18   some reform and -- or some changes to be made on multiple
19   occasions.
20       Q      Okay.  And so this was a provision that the Texas
21   Democrats had advocated for on multiple occasions; is that
22   correct?
23       A      Among others --
24       Q      And this --
25       A      -- multiple times.



Carol Alvarado                                          October 06, 2022
                                                        Page 183

1      Q      And this provision requiring an oath for poll watchers
2  was added to Senate Bill 1; correct?
3      A      After multiple and multiple exhausting discussions.
4      Q      Okay.  And so I want to flip the page --
5      A      (Complies with request.)
6      Q      -- and it says:  While a poll watcher may be present
7  if an election worker is assisting a voter, a poll watcher may
8  not be present at the voting station when a voter is preparing
9  the voter's ballot or is being assisted by a person of a voter's
10 choice, including by a person also serving as an interpreter at
11 the voting station.  Did I read that correctly?
12     A      Yes.
13     Q      And so according to this, a poll watcher is not
14 allowed to observe a voter when preparing their ballot or when
15 they're being assisted by a person of their choice; is that
16 correct?
17     A      Yes, but it wasn't the case in the original bill.
18 This was a very, very significant point of contention for many
19 of us.
20     Q      And so was this also a provision that was advocated by
21 Texas Democrats, including yourself?
22     A      It was advocated by -- by many members quite a bit.
23 There was a lot of convincing -- I mean there was a lot of
24 discussion about it -- about this particular part.
25     Q      Okay.  Now, this provision, I should say, that a poll



Carol Alvarado                                           October 06, 2022
                                                              Page 184

 1   watcher may not be present at the voting station when a voting
 2   -- voter is preparing the ballot or being assisted by a person
 3   of their choice --
 4        A     Uh-huh.
 5        Q     -- that preexisted Senate Bill 1; is that right?
 6        A     Say that again.
 7        Q     So we can look at this -- if you want, I can bring up
 8   the election code, but to clarify, this provision did -- that
 9   the poll watcher may not be present at the voting station when a
10   voter is preparing the voter's ballot or is being assisted by a
11   person of the voter's choice --
12        A     Uh-huh.
13        Q     -- was already in the election code prior to Senate
14   Bill 1.
15        A     I believe so.
16        Q     And so your advocacy in this provision was to keep the
17   provision as it existed; is that correct?
18        A     Yes.
19        Q     And then if we look to the next sentence, it says:  A
20   poll watcher does not have the right to free movement in other
21   areas of an election code -- in other areas of an election
22   office that is not being used to -- used for designated
23   activities.  Did I read that correctly?
24        A     Yes.
25        Q     And so under Senate Bill 1, poll watchers are limited



Carol Alvarado                                          October 06, 2022
                                                        Page 185

1  in their movement in areas that are not being used for

2  designated activities; is that correct?

3       A    It's -- it's what was in the -- it's what preexisted

4  before, yes.

5       Q    Okay.  And if we go back to where it says, Removal of

6  Poll Watchers, it says --

7       A    Down here on the bottom?

8       Q    Down here on the bottom.

9       A    Uh-huh.

10      Q    -- it says:  A presiding judge may not have a poll

11 watcher removed from a polling place for violating the Texas

12 Election Code for any other law relating to the conduct of an

13 election other than a violation of the penal code unless the

14 violation was observed by an election judge or clerk.  Did I

15 read that correctly?

16      A    Yes.

17      Q    And it says:  A presiding judge may call a law

18 enforcement officer to request that a poll watcher be removed if

19 the poll watcher commits a breach of the peace or a violation of

20 law.  Did I read that correctly?

21      A    Yes.

22      Q    So I want to look at Chapter 33 --

23      A    Okay.

24           COURT REPORTER:  (Provides exhibit.)

25           THE WITNESS:  Thank you.



```
 1   BY MS. HUNKER (resuming):
 2        Q     -- and we're going to be turning to Page 10 and 11.
 3                    MR. GOLANDO:  There are no page numbers.
 4                    MS. HUNKER:  Say what?
 5                    MR. GOLANDO:  There are no --
 6                    THE WITNESS:  There are no page numbers.
 7                    MS. HUNKER:  Oh, I'm sorry.
 8   BY THE WITNESS (resuming):
 9        A     Let's see.  One, two, three, four --
10        Q     We're going to be turning to where it says Section
11   33.057.
12                    MR. GOLANDO:  57?
13                    MS. HUNKER:  Yes.
14                    THE WITNESS:  Okay.
15   BY MS. HUNKER (resuming):
16        Q     It's titled, Observing Preparation of Voter's Ballot.
17        A     Okay.
18        Q     Now, it says:  A watcher -- if you look at
19   Subsection B -- may not be present at the voting station when a
20   voter is preparing the voter's ballot or being assisted by a
21   person of the voter's choice.  Correct?
22        A     Yes.
23        Q     And then if we look at the next one down, next
24   section, it's Section 33.058, it says:  While on duty, a watcher
25   may not converse with an election officer regarding the election
```



1    except to call attention to irregularity or a violation of law,

2    converse with a voter or communicate in any manner with a voter

3    regarding the election.  Did I read that correctly?

4        A    Right, yes.

5        Q    And so according to the election code, even under

6    Senate Bill 1, a poll watcher may not converse with an election

7    officer regarding the election except to call attention to

8    irregularity or violation of law; is that correct?

9        A    Yes.

10       Q    And the election code, even under Senate Bill 1, a

11   poll watcher may not converse with a voter; correct?

12       A    Yes.

13       Q    And according to the election code under -- even under

14   Senate Bill 1, a poll watcher may not communicate in any manner

15   with a voter regarding the election; is that correct?

16       A    Yes.

17       Q    Now you can put that aside.

18       A    (Complies with request.)

19       Q    And we're going to be starting -- looking at another

20   provision of the election code next.  Do you see this is Chapter

21   276 of the election code?

22       A    Yes.

23       Q    And it says, Retaliation Against Voter; correct?

24       A    Yes.

25       Q    And it says:  A person commits an offense of



1   retaliation against a voter who has voted for or against a

2   candidate or measure or a voter who has refused to reveal how

3   the voter voted.  The person knowingly harms or threatens the

4   voter by an unlawful act.  Did I read that correctly?

5       A    Yes.

6       Q    And so if you remember when we were looking at the

7   election advisory for removal of a poll watcher, it says that a

8   poll watcher may be removed if the poll watcher commits breach

9   of the peace or a violation of law; correct?

10      A    Yes.

11      Q    And then a violation of the law is knowingly harms or

12  threatens a voter by [sic] unlawful act; is that correct?

13      A    Yes.

14      Q    And so a poll watcher can be removed if they seek to

15  knowingly harm or threaten a voter; is that correct?

16      A    Yes.

17      Q    And we can put that aside.

18      A    (Complies with request.)

19      Q    Now, did you have any concerns regarding poll watchers

20  -- let me take that back.  Let me go to the actual language.  So

21  while I'm looking for the particular provision, I'm going to

22  play a clip from your filibuster and introduce it as an exhibit.

23              (Video playing.)

24  BY MS. HUNKER (resuming):

25      Q    Did you hear that clip?



Carol Alvarado

October 06, 2022
Page 189

 1    A    Yes.

 2    Q    And that was a clip from your filibuster; correct?

 3    A    Yes.

 4    Q    And in it, you said that the standard that existed for

 5 poll watchers ahead of time conveniently close you thought was

 6 sufficient; is that correct?

 7    A    Yes.

 8    Q    Is it your understanding that Senate Bill 1 changed

 9 that particular standard?

10    A    I don't recall.

11    Q    Okay.

12    A    No.

13    Q    Okay.  Do you not have an opinion on whether or not

14 Senate Bill 1 revised or altered that standard?

15    A    No.

16    Q    Okay.  When you were voting, in your -- in your

17 experience, have you ever experienced harassment or intimidation

18 from a poll watcher?

19    A    No.

20    Q    Are you aware of any individual who has?

21    A    No.

22    Q    Have you heard of any incidents following the

23 enactment of Senate Bill 1 regarding intimidation or harassment

24 by poll watchers to voters?

25    A    No.



1    Q    Have you heard any indication that the number of
2  incidences of harassment or intimidation of voters went up since
3  the passage of Senate Bill 1?
4    A    No.
5    Q    I want to quickly talk about voter assistance.  You
6  had mentioned a few times during your filibuster that you were
7  concerned regarding voting-assistance provisions in SB1; is that
8  correct?
9    A    Yes.
10    Q    And what exactly were your concerns?
11    A    Well, people that were assisting might not even
12  knowingly be committing something that could be seen as wrong or
13  in violation of something.
14    Q    And have you, since Senate Bill 1's enactment --
15    A    Uh-huh.
16    Q    -- spoken to voters who've had problems with attaining
17  assistance to vote because of Senate Bill 1?
18    A    No.
19    Q    And have you talked to any assistors who were subject
20  to some sort of either criminal penalty or investigation because
21  of provisions in Senate Bill 1?
22    A    No.
23    Q    And are you aware of any voter who was unable to vote
24  because of the assistance provisions in Senate Bill 1?
25    A    No.



Carol Alvarado                                              October 06, 2022
                                                                  Page 191

1      Q    Now, you are aware that some of the provisions
2  regarding assistance in Senate Bill 1 were enjoined by a federal
3  courts; correct?
4      A    I believe so.
5      Q    I'd like to introduce an exhibit.  We're going to be
6  looking at Page 46, Section D, where it says, Rendering
7  Assistance to Voters, but before I do, I should probably just
8  talk a little bit about what the document is.
9      A    Okay.
10      Q    Do you see it says, Qualifying Voters on Election Day,
11  2022?
12      A    Yes.
13      Q    And it says it's a handbook for election judges and
14  clerks; correct?
15      A    Yes.
16      Q    And then it says it was issued by the office of the
17  Texas Secretary of State Elections Division.
18      A    Yes.
19      Q    And you'll see on the bottom that there's a Bates
20  number.  It says State-110976.
21      A    Yes.
22      Q    Did I read that correctly?
23      A    Yes.
24      Q    And are you aware of what the handbook for election
25  judges and clerks is?



1      A     Yes.  It's a guide.

2      Q     And so let's look at Section D on Page 46, and if you

3  look on the top, it says:  The person who is to provide

4  assistance must first taken an oath of assistance administered

5  by one of the election officers; is that correct?

6      A     Yes.

7      Q     And then if you go to the next -- so two paragraphs

8  down, it says:  In its June 6th order, the district court

9  enjoined the State of Texas and the secretary of state along

10  with their employees, agents and successors in office and all

11  persons acting in concert with them from enforcing Sections

12  64.031 or 64.0321 of the Texas Election Code.  Did I read that

13  correctly?

14      A     Yes.

15      Q     And it says:  The district -- it continues:  The

16  district court also prohibited the enforcement of the portion of

17  Section 64.034, stating, I will confine my assistants to reading

18  the ballot to the voter, directing the voter to read the ballot,

19  marking the voter's ballot or directing the voter to mark the

20  ballot.  Did I read that correctly?

21      A     Yes.

22      Q     Was this the particular provision within Senate Bill 1

23  that you were concerned about that it would limit assistance

24  that voters could obtain?

25      A     Possibly.



Carol Alvarado                                    October 06, 2022
                                                  Page 193

 1       Q      Okay.  Are you aware of any other provisions offhand
 2   that you thought could have affected a voter's ability to obtain
 3   assistance?
 4       A      Maybe issues dealing with language barriers.
 5       Q      Okay.
 6       A      Yeah -- yes.
 7       Q      And if we go to the next paragraph, it says:  The
 8   district court further ordered the State of Texas and the
 9   secretary of state shall revise training and instruction
10   material for state and county election officials to remove
11   language that reflects the substance of Sections 64.031, 64.0321
12   or the portion of 64.034 identified above.  Did I read that
13   correctly?
14       A      Yes.
15       Q      And because this references the sections of the
16   election code, it might be helpful if we just quickly reference
17   Senate Bill 1 just so you can see what those are referring to.
18   And so we're going to be looking at Sections 6.02 and 6.04 of
19   Senate Bill 1.
20       A      What page did you say?
21       Q      I'm about to tell you.  (Reviewing.)  50 -- 52 and
22   also 51.
23       A      (Reviewing.)  Okay.
24       Q      And so specifically if you see Section 6.02, which is
25   what amends Section 64.031 of the election code --



1      A     Okay.

2      Q     -- and so the part that was stricken is:  A voter is

3   eligible to receive assistance in marking or reading the ballot

4   as provided by this chapter if the code -- if the voter cannot

5   prepare or read the ballot because of.

6      A     Okay.  What line are you on?  I'm sorry.  I lost it.

7      Q     It's all right.  Lines 19 through 27.

8      A     Okay.

9      Q     I'm just kind of giving --

10     A     Okay.

11     Q     -- a general overview.

12     A     All right.

13     Q     And then the oath provision is Section 6.04, and

14   that's on Page 52 --

15     A     Yep.

16     Q     -- and you can see what the oath reads there.

17     A     Okay.

18     Q     And so were these two provisions that were enjoined by

19   the Court what your principal concern was regarding voter

20   assistance?

21     A     Yes, some, yes.

22     Q     Okay.  And so the fact that these provisions have been

23   enjoined, they are no longer a concern of yours; is that

24   correct?

25     A     Yes, these are not a concern.



1    Q    Okay.  Then we can close that, then.  One last thing

2  on the handbook.  If you look where it's bolded --

3    A    What page?

4    Q    46.

5    A    Okay.

6    Q    It says:  An eligible voter is entitled to receive

7  assistance from a person of their choosing so long as that

8  person is eligible to provide assistance under Section 2.08 of

9  the Voting Rights Act and that assistance is not limited to

10  marking or reading the ballot or otherwise limited to conduct

11  that occurs in the voting booth.  Did I read that correctly?

12    A    Yes.

13    Q    Okay.  And have you talked to any of the election

14  officials in Harris County about the implementation of this

15  particular injunction?

16    A    No.

17    Q    Okay.  And have you talked to the election officials

18  in Harris County about whether or not any of the other

19  provisions have affected assistants who also serve as

20  interpreters?

21    A    No.

22    Q    Are you aware of any voter who was unable to secure

23  the assistance of an interpreter?

24    A    No.

25              MS. HUNKER:  I think this would be a good spot to



 1  take a break since I'm about to end this section.

 2                    THE WITNESS:  Okay.

 3                    VIDEOGRAPHER:  Off the record at 4:06.

 4              (A recess is taken.)

 5                    VIDEOGRAPHER:  Back on the record at 4:20.

 6  BY MS. HUNKER (resuming):

 7       Q    All right.  So I had actually missed over one of the

 8  election advisories I wanted to go over with you and so I'm

 9  going to do that now before we move on to our next subject.

10       A    Okay.

11       Q    And do you have the document in front of you?

12       A    Yes.

13       Q    And do you see how it says, Texas Election Advisory

14  Number 2022-12?

15       A    Yes.

16       Q    This was issued February 11th, 2022.

17       A    Yes.

18       Q    And it says:  Additional procedures regarding

19  correction of defects on application for ballot by mail or

20  carrier envelope.

21       A    Yes.

22       Q    Would you agree with my -- agree with my description

23  that this is an election advisory issued to election officials

24  from the secretary of state's office regarding additional

25  procedures for mail-in ballots and carrier envelopes?



Carol Alvarado                                          October 06, 2022
                                                           Page 197

1        A     Yes.

2        Q     Okay.  So we're going to turn to Page 2 where it says,

3   Returning the Carrier Envelope to Voter.

4        A     Uh-huh.

5        Q     It states here:  If the early-voting clerk discovers

6   that the carrier envelope is missing the voter's signature, has

7   an incomplete signature, have a missing or incomplete witness or

8   assistant information or has missing or incorrect

9   personal-identification information --

10       A     Uh-huh.

11       Q     -- the early-voting clerk may deliver the carrier

12  envelope in person or by mail to the voter so that the voter may

13  correct the defect.  Did I read that correctly?

14       A     Yes.

15       Q     Were you aware that the early-voting clerk has the

16  option of returning the carrier envelope to the voter in person?

17       A     No.

18       Q     And if we go to the next paragraph where it says, Upon

19  receipt, do you see that?

20       A     Next paragraph?  (Reviewing.)  Oh, yes --

21       Q     Okay.

22       A     -- midway through, uh-huh.

23       Q     It says:  Upon receipt of the carrier envelope, the

24  voter may correct the defect immediately and surrender the

25  carrier envelope to the early-voting clerk personnel who'd



1    return to the clerk's office with a corrected carrier envelope.

2    Did I read that correctly?

3        A    Yes.

4        Q    Now, were you aware that voters could return their

5    corrected carrier envelope to the personnel of the early-voting

6    clerk in person when the early-voting clerk delivered the defect

7    ballot?

8        A    No.

9        Q    And then it says:  Alternatively, the early-voting

10   worker could leave the carrier envelope in the voter's

11   possession and allow the voter to either make the correction on

12   their own and mail the ballot to the early-voting clerk or

13   cancel their mail ballot and vote in person.  Did I read

14   correctly?

15       A    Yes.

16       Q    And then if you look at the next paragraph, it reads:

17   The early-voting clerk may return defective carrier envelopes by

18   mail under Section 86.011(d) up to the point when the SVC, EVBB

19   -- or signature-verification committee, early-voting ballot

20   board -- begins notifying voters of defects by phone or E-mail.

21   Did I that correctly?

22       A    Yes.

23       Q    Do you know if Harris County will be delivering defect

24   ballots to voters in person so that they may correct?

25       A    I don't know.



1  polls by outside organizations?  Could there be multiple

2  individuals in the car that do not have a pre-existing close

3  relationship?

4       A    From my experience, it's usually been senior citizens

5  and they all know each other, they all gather daily, they know

6  [sic] one another for many years.

7       Q    Do you think Senator Hughes was genuine in his concern

8  over the lack of privacy in drive-through voting?

9       A    I don't know.

10                COURT REPORTER:  So to clarify the record, the

11  last clip that you played, was that Exhibit 44?

12                MS. HUNKER:  Yes.

13                COURT REPORTER:  Okay.

14                MS. HUNKER:  And this one will be Exhibit 45.

15                COURT REPORTER:  Gotcha.  Okay.

16                (Video playing.)

17  BY MS. HUNKER (resuming):

18       Q    Did you hear that clip?

19       A    Yes.

20       Q    And was this from your filibuster for Senate Bill 1?

21       A    Yes.

22       Q    And I'll repeat the numbers since I know it went

23  pretty quick.

24       A    Uh-huh.

25       Q    You put down for 24-hour voting it was used by -- 33



Carol Alvarado                                              October 06, 2022
                                                                  Page 206

1    -- 36 percent were Hispanic, 12 percent were African-American, 8

2    percent Asian; and for drive-through voting, you stated 23

3    percent were Hispanic, 22 percent were African-American and 8

4    percent were Asian.

5        A     Uh-huh.

6        Q     My first question for you is where you got the

7    numbers.

8        A     From Harris County.

9        Q     And so this was from Harris County itself?

10       A     Uh-huh.

11       Q     And do you know how Harris County determined the race

12   of the individual who --

13       A     I don't.

14       Q     And so you don't know if they obtained the numbers

15   through an outside source; is that correct?

16       A     I don't know.

17       Q     And you don't know the methodology that was used to

18   determine the numbers; is that correct?

19       A     I don't know.

20       Q     Okay.  Harris County is a minority-majority

21   district --

22       A     Right.

23       Q     -- county; correct?

24       A     Yes.

25       Q     Now, you have stated that 24-hour voting and



Carol Alvarado                                          October 06, 2022
                                                        Page 207

 1  drive-through voting, that elimination of these practices would

 2  have a disproportionate effect on minorities; is that correct?

 3       A    The disabled and seniors.

 4       Q    Okay.  And were these numbers the basis for that

 5  determination?

 6       A    Somewhat, to some extent.

 7       Q    And what was the other basis?

 8       A    Just hearing about -- knowing the people who had used

 9  either one.

10       Q    Okay.  And did you have an -- because Harris County

11  was the only county to do drive-through --

12       A    Uh-huh.

13       Q    -- and 24-hour voting, you did not have the

14  opportunity to compare Harris County's numbers with a majority

15  White county --

16       A    Right.

17       Q    -- exercising the same programs --

18       A    Right.

19       Q    -- is that correct?

20       A    Right.

21       Q    So I want to introduce Exhibit Number 47 --

22            COURT REPORTER:  46.

23  BY MS. HUNKER (resuming):

24       Q    -- 46, and do you see on top where it says, United

25  States Census Bureau?



Carol Alvarado                                    October 06, 2022
                                                       Page 208

1        A     Yes.

2        Q     And that this is quick facts from Harris County,

3   Texas?

4        A     Yes.

5        Q     And so I want to look at the percentages for Black or

6   African-American alone, which is 20.3 percent.  You can see it's

7   darkened.

8        A     Yes.

9        Q     Okay.  And then two lines down, it says, Asian alone,

10  7.4 percent, and then Hispanic or Latino is 44.4 percent; is

11  that correct?

12       A     Yes.

13       Q     And so let's add that together.

14                   MR. GOLANDO:  These are population numbers?

15                   MS. HUNKER:  That's correct.

16                   THE WITNESS:  Not voting; right?

17                   MS. HUNKER:  That's correct.  I'm doing the

18  numbers that were provided to me by the US Census.

19  BY MS. HUNKER (resuming)

20       Q     Now, when I added the numbers together, I got 72.1

21  percent.  Is that what you got?

22       A     Yes.

23       Q     Okay.  And if we add the numbers of those who utilized

24  24-hour voting --

25       A     Uh-huh.



Carol Alvarado

October 06, 2022
Page 209

```
1      Q    -- the 36 percent, the 12 percent and the 8 percent --
2      A    Right.
3      Q    -- we have 56 percent --
4      A    Right.
5      Q    -- is that correct?
6      A    Yes.
7      Q    And 56 is less than 72.1; correct?
8      A    Right.
9      Q    And so minority voters used 24-hour voting at a rate
10   that was less than their representation in the population of
11   Harris County; is that correct?
12     A    Yes.
13     Q    And if we go through drive-through voting and we add
14   the 23 percent, 22 percent and 8 percent, we get 53 percent; is
15   that correct?
16     A    Right.
17     Q    And 53 percent is less than 72.1 percent; correct?
18     A    Yes.
19     Q    So based on these numbers, minority voters utilized
20   drive-through voting at a rate that was less than the
21   representation of the population; is that correct?
22     A    Yes.
23     Q    What --
24     A    And we did make clear that these are -- these are just
25   straight-up population numbers --
```



Carol Alvarado

October 06, 2022
Page 210

1        Q      That's correct.

2        A      -- not registered voters.

3        Q      And so the number, based on the process of

4    elimination, about 44 percent of individuals who utilized

5    24-hour voting would have been -- 44 percent White alone; is

6    that correct?

7        A      On which one?  I'm sorry.

8        Q      So by process of elimination --

9        A      Uh-huh.

10       Q      -- since 56 percent of minorities utilized 24-hour

11   voting --

12       A      Right.

13       Q      -- it goes to say that 44 percent would have been

14   White; is that correct?

15       A      Yes.

16       Q      And then for drive-through voting, Whites would have

17   utilized drive-through voting at 47 percent; correct?

18       A      Yes.

19       Q      And so if we look at where it says, White alone, not

20   Hispanic/Latino, on the US Census Bureau facts, it says 27.7

21   percent; correct?

22       A      Yes.

23       Q      And so White voters utilized 24-hour voting at a rate

24   that was higher than the representation of the population in

25   Harris County; correct?



```
 1     A     Yes.
 2     Q     And White voters utilized drive-through voting at a rate
 3   that was higher than their percentage in the population in Harris
 4   County; correct?
 5     A     Yes.
 6     Q     We can put that document aside.
 7     A     Okay.
 8     Q     Now, I believe you had mentioned also that the actions
 9   taken by Chris Hollins to introduce drive-through voting,
10   24-hour voting as well as the multiple ballot delivery locations
11   had led to Harris County having a higher voter turnout; is that
12   correct?
13     A     I don't know if I said it quite like that, but Harris
14   County did have record-breaking turnout.
15     Q     Okay.  And do you escribe the record-breaking turnout
16   to any of the voting practices such as 24-hour voting,
17   drive-through voting and multiple in-person delivery locations?
18     A     Possibly.  It was a high-profile election.
19     Q     Okay.  And so you don't know whether or not 24-hour
20   voting contributed to Harris County having record-breaking
21   numbers; is that correct?
22           MR. GOLANDO:  Objection to form.
23   BY THE WITNESS (resuming):
24     A     I don't know.  It could have.
25     Q     So you don't know one way or the other whether 24-hour
```



 1  voting would have contributed to Harris County having

 2  record-breaking turnout.

 3                  MR. GOLANDO:  Objection to form.

 4  BY THE WITNESS (resuming):

 5      A    Say that again.

 6      Q    You don't know one way or the other whether 24-hour

 7  voting would have contributed to Harris County having

 8  record-breaking turnout?

 9      A    It -- it could have.

10      Q    And you don't know one way or the other whether

11  drive-through voting would have contributed to Harris County

12  having record-breaking voter turnout.

13      A    Same thing, it could have.

14      Q    So I want to look at a few documents.

15                  MS. HUNKER:  (Provides exhibit.)

16                  MR. GOLANDO:  Thank you.

17  BY MS. HUNKER (resuming):

18      Q    Do you have the document in front of you?

19      A    Yes.

20      Q    Okay.  And you see where it says Harris County Voter

21  Registration Figures; correct?

22      A    Yes.

23      Q    And then there's also the percent who voted.  Do you

24  see that?

25      A    Uh-huh.



1    Q    Let's turn the page where it has the 2020 election --

2    A    (Complies with request.)

3    Q    -- and it has the percent of registered voters who

4    voted at 68.86 percent; correct?

5    A    Say that number again.

6    Q    I misread the number.

7    A    Uh-huh.

8    Q    It had the percent voted in the 2020 election at 65.86

9    percent?

10   A    Yes.

11   Q    And that is of registered voters; correct?

12   A    Yes.

13   Q    And so let's look at a few adjacent counties.  And

14   before I continue, I should have more established the documents.

15   Do you see where it says, Texas Secretary of State John B.

16   Scott?

17   A    Yes.

18   Q    And would you agree with me that this is a copy of a

19   website on the secretary of state's webpage?

20   A    Yes.

21   Q    Okay.  And that was true also of Harris County's

22   numbers; correct?

23   A    Yes.

24   Q    And so let's look at the percent voted in 2020 from

25   Fort Bend County.  And we see that in Fort Bend, the number --



Carol Alvarado                                    October 06, 2022
                                                          Page 214

```
 1   the percentage of registered voters who voted was 73.99 percent;
 2   correct?
 3        A    Yes.
 4        Q    And that's higher than Harris County; correct?
 5        A    Yes.
 6        Q    And let's look at -- next what I have, which is from
 7   Galveston County.  And you'd agree this was also taken from the
 8   Texas Secretary of State's --
 9        A    Yes.
10        Q    -- website; correct?
11        A    Yes.
12        Q    And if we look at the percent of registered voters who
13   voted in 2020, we have 67.33 percent; correct?
14        A    Yes.
15        Q    And that's higher than Harris County; correct?
16        A    Yes.
17        Q    And we're going to look at -- the next county on the
18   list that I have is Montgomery County.
19        A    Okay.
20        Q    And Montgomery County is also from the -- taken from
21   the secretary of state's webpage; correct?
22        A    Yes.
23        Q    And the percent of voters -- registered voters who
24   voted in the 2020 election was 73.28 percent; correct?
25        A    Uh-huh, yes.
```



Carol Alvarado
October 06, 2022
Page 215

1      Q      And that is also higher than Harris County; correct?

2      A      Yes.

3      Q      Montgomery County, Fort Bend County and Galveston

4 County, they border Harris County, do they not?

5      A      Right.

6      Q      And so bordering counties to Harris County had a

7 higher percentage of voter turnout; correct?

8      A      Yes.

9      Q      And those counties did not have the same voting

10 practices such as 24-hour voting, drive-through voting or

11 multiple in-person delivery locations; is that correct?

12      A      Yes.

13      Q      And so these counties have higher voter turnout

14 without utilizing those practices; is that correct?

15      A      Yes.

16      Q      And so let's also do a little bit of comparison in

17 terms of the percentage of increase between 2018 and 2020.

18      A      For Harris County?

19      Q      For Harris County, yes.

20      A      Okay.

21      Q      And so I have that as an increase of 13.86 percent.

22      A      Okay.  I'm sorry.  Between 20 --

23      Q      2018 and 2020.  So it's the difference between 52

24 percent and 65.86 percent.

25      A      Okay.  All right.



Carol Alvarado                                                    October 06, 2022
                                                                        Page 216

1        Q    And I have that as 13.86 percent.

2        A    Okay.

3        Q    And if we look at Montgomery County --

4        A    Okay.

5        Q    -- the difference between 2018 and 2020 is a

6   difference of 14.28 percent.

7        A    Okay.

8        Q    And then Fort Bend County, we see a difference of

9   13.99 percent.

10       A    Okay.

11       Q    Now, these numbers are either larger or comparable to

12  the increase seen in Harris County; correct?

13       A    Yes.

14       Q    And these counties, again, did not utilize the same

15  innovative voting practices as Harris County such as

16  drive-through voting, 24-hour voting or multiple in-person

17  delivery locations; is that correct?

18       A    Yes.

19       Q    And so they had similar increases, if not greater

20  increases, between 2018 and 2020 with respect to voter turnout

21  despite not having the innovative practices such as

22  drive-through voting, 24-hour voting and multiple in-person

23  delivery locations; is that correct?

24       A    Yes.

25       Q    And we can put these documents aside.



1      A     (Complies with request.)

2      Q     Do you think that the State has an interest in

3  promoting uniformity in the interpretation, application and

4  operation of the election code?

5      A     Possibly.

6      Q     So I want to turn to another Senate Journal entry, and

7  I'm going to introduce that as an exhibit.  This is a different

8  Senate Journal --

9                  MS. HUNKER:  (Provides exhibit.)

10                 MR. GOLANDO:  Thank you.

11 BY MS. HUNKER (resuming):

12     Q     -- than the one we've been utilizing.  Do you have the

13 document in front of you?

14     A     Yes.

15     Q     And do you see where it says, Senate Journal, 87th

16 Legislature, Second-called Special Session?

17     A     Yes.

18     Q     And do you see where it says the date, Wednesday,

19 August 11th, 2021?

20     A     Yes.

21     Q     Okay.  And so if we turn to Page 83 -- and I will

22 again represent to you that only included the sections of the

23 journal that were relevant to our deposition today.

24     A     Okay.

25     Q     -- on the bottom of the page, you'll see where it



1        A    Yeah, I'm not in that chamber.  I don't -- I don't

2   know.

3        Q    Okay.  We can put that aside.

4        A    Uh-huh.

5        Q    Were you aware that Senate Bill 1 allows voters to

6   vote if they are in line when polls close during early-voting

7   period?

8        A    Yeah.

9        Q    Are you aware that that was added by Senate Bill 1 and

10  did not pre-exist it with respect to early voting?

11       A    Yes.

12       Q    And were you aware that Senate Bill 1 expands

13  protection for voters against employer penalties during the

14  early-voting period?

15       A    I wasn't aware of that part.

16       Q    Let's quickly look then at page -- Section 702 [sic]

17  of Senate Bill 1.

18            MR. GOLANDO:  What page is that?

19  BY THE WITNESS (resuming):

20       A    What page did you say?

21       Q    Section 7.02.  It's going to be on Page 57.

22       A    Okay.

23       Q    Okay.  And it says:  This Section 7.02, which amends

24  Sections 276.004(a) and (b) of the election code --

25       A    Uh-huh.



Carol Alvarado                                          October 06, 2022
                                                              Page 234

 1      Q    -- and if you see A, which already existed:  A person
 2  commits an offense if, with respect to another person over whom
 3  the person has authority in the scope of employment, the person
 4  knowingly refuses or permit the other person to be absent from
 5  work election day.  And then Senate bill 1 adds:  Or while early
 6  voting is in progress for the purpose of attending the polls to
 7  vote.  Did I read that correctly?
 8      A    Yes.
 9      Q    It also says that the person would be committing an
10  offense if they knowingly -- subjects, threatens to subject the
11  other person to a penalty for attending the polls on election
12  day or -- or while early voting is in progress to vote, and
13  Senate Bill 1 added, Or while early voting is in progress.  Did
14  I read that correctly?
15      A    Yes.
16      Q    Okay.  And so would you agree with me that here,
17  Senate Bill 1 extended protections to workers to take time to
18  vote during the early-voting period?
19      A    Possibly, yes, yes.
20      Q    Is that a yes?
21      A    Yes.
22      Q    Okay.  Also, since we're getting towards the end of
23  the deposition, I was hoping that we can now introduce your
24  notes --
25      A    Sure.

