Transcript of the Testimony of

# Rafael Anchia

## Date:

August 22, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Defendant's
Exhibits

432

1      Q.    What is Civitas Capital?

2      A.    It's a real estate investment group.

3      Q.    You are associated with the Mexican American

4    Legislative Caucus; is that correct?

5      A.    Yes.

6      Q.    If I refer to that as "MALC" for short, will

7    you know what I mean?

8      A.    Yes.

9      Q.    Are you the chairman of MALC?

10      A.    Yes.

11      Q.    What are the duties of the chairman of MALC?

12      A.    To preside over the organization, to assist

13    the membership in achieving either legislative,

14    administrative or judicial goals, to protect the

15    voting rights of Latinos in the state of Texas, and,

16    among others, to preside over the executive board of

17    the organization.

18      Q.    Did you vote in the March 1st, 2022,

19    democratic primary?

20      A.    I believe I did.

21      Q.    Do you remember how you voted?

22             For example, by mail or in person?

23      A.    I believe I voted in person.

24      Q.    Do you have any reason to believe that your

25    ballot was not counted?

1      A.    I don't.

2      Q.    Did you encounter any problems as a voter

3  that you attribute to Senate Bill 1?

4      A.    In my personal ballot, no.

5      Q.    And do you know what I mean when I refer to

6  Senate Bill 1?

7      A.    I do.

8      Q.    This was a piece of legislation that passed

9  during the second special session of the 87th

10  Legislature; correct?

11      A.    Yes.

12      Q.    When you were voting, did you witness any

13  problems for other voters that you attribute to SB 1?

14      A.    Yes.

15      Q.    What did you witness?

16      A.    My daughter had difficulty casting her

17  ballot.  She had to come back, I think, twice because

18  her name was not on the list of voters.  Even though

19  we had duly registered -- she had her voter

20  registration card, she had her passport -- she was

21  turned away, I believe -- I believe, just once, and we

22  had to come back later that afternoon.

23      Q.    And was that for the March 1st, 2022,

24  democratic primary?

25      A.    Yes.

1        Q.   So, to your understanding, the people at the

2    polling place were able to confirm that she was, in

3    fact, registered to vote?

4        A.   Yes.  Ultimately, yes.

5        Q.   Do you know why the list the people at the

6    polling place had didn't include her name if she was

7    registered to vote?

8        A.   I don't.

9        Q.   Is it fair to say you don't know whether

10   Senate Bill 1 had anything to do with that issue?

11       A.   I don't.

12       Q.   You don't know whether it did?

13       A.   I don't know one way or the other.

14       Q.   So, other than the experience you just

15   described with your daughter, are you -- did you

16   witness anyone else as a voter having problems during

17   the March 1st, 2022, democratic primary that you

18   attribute to Senate Bill 1?

19       A.   I -- I did not.

20       Q.   Can you identify any would-be voter who was

21   not able to vote in either the democratic or the

22   republican primary in 2022 as a result of Senate Bill

23   1?

24       A.   You -- you would -- just to clarify, you

25   would like me to provide an example or the name of a

1    voter that was unable to vote or whose vote was not --

2    ultimately not counted?

3          Q.    I'm asking whether you are able to provide

4    the name of any voter who was not able to vote in the

5    primary elections as a result of Senate Bill 1.

6          A.    I -- I'm unaware.

7          Q.    Did you vote in the May 24th, 2022,

8    democratic primary runoff?

9          A.    I would say that's a safe bet.  Although,

10   I -- I -- I don't recall.

11         Q.    Do you recall having any problems voting in

12   that election?

13         A.    No.

14         Q.    To the extent you voted, do you have any

15   reason to think that your ballot wasn't counted?

16         A.    I have no basis to -- to think that, no.

17         Q.    Did you witness any voters during the May

18   24th, 2022, primary elections for the runoffs have any

19   problems voting?

20         A.    I did not.

21         Q.    Can you identify any would-be voter who was

22   not able to vote in either the democratic primary

23   runoff or the republican party primary runoff as a

24   result of Senate Bill 1?

25         A.    I'm not.

Rafael Anchia                                              August 22, 2022
                                                                Page 16

1          Q.   Was that "No"?

2          A.   I -- I -- I'm unable to, yes.  No.

3          Q.   Do you remember if you voted in the May 7th,

4     2022, election?

5          A.   I don't recall.

6          Q.   In case it helps, I'll just represent to you

7     that would have been an election with constitutional

8     amendments on the ballot and potentially some local

9     races.

10         A.   Okay.

11         Q.   To the best of your recollection, did you

12    have any problems voting in that election as a -- as a

13    result of Senate Bill 1?

14         A.   I don't recall.

15         Q.   Do you recall witnessing any other voters

16    have problems during that election as a result of

17    Senate Bill 1?

18         A.   No.

19         Q.   Can you identify any would-be voter who was

20    not able to vote in the May 7th, 2022, election as a

21    result of Senate Bill 1?

22         A.   No.

23         Q.   Other than the elections we just talked

24    about, the primary, the primary runoff, the May 7th

25    election, have you voted in any other elections since

1    Senate Bill 1 took effect?

2          A.    Not that I can recall.

3          Q.    Are you aware of any would-be voter who was

4    not able to vote in any other election as a result of

5    Senate Bill 1?

6          A.    No.

7          Q.    You're a member of the House of

8    Representatives; right?

9          A.    I am a member or do I remember?

10         Q.    Sorry.  You are a member --

11         A.    I am.

12         Q.    -- of the Texas House of Representatives?

13         A.    I -- yes.

14                    MR. QUESADA:  If you remember that.

15                    THE WITNESS:  Yes.

16         Q.    (By Mr. Thompson)  And you participated in

17   House proceedings related to Senate Bill 1; correct?

18         A.    Yes.

19         Q.    You're not a member of the Texas Senate;

20   correct?

21         A.    Correct.

22         Q.    Did you have any participation in Senate

23   proceedings related to Senate Bill 1?

24         A.    I did not.

25         Q.    Did you have any involvement with the Office

1    suggesting that this current law permits them or gives

2    them the option to cast their ballot without someone

3    watching?  So -- I -- I'm sorry.

4        Q.   (By Mr. Thompson)  Let me try it again.

5        A.   Yeah.

6        Q.   Do you understand that under Texas law

7    voters are able to cast their ballots in secret

8    without poll watchers seeing who they're voting for?

9        A.   Certainly.

10                  (Exhibit Number 6 marked.)

11       Q.   (By Mr. Thompson)  I'm going to hand you

12   what's been marked as Exhibit 6.

13                  In the top right-hand corner of Exhibit

14   6, does it "S.B. No. 1"?

15       A.   Yes.

16       Q.   I'll represent to you this is a copy of

17   Senate Bill 1 as it was enacted.

18                  If you'd just flip over to the back

19   page, you'll see signatures from the president of the

20   Senate, speaker of the House, Secretary of State, the

21   chief clerk of the House and the governor; correct?

22       A.   Yes.

23       Q.   Do you have any reason to dispute that this

24   is an accurate copy of Senate Bill 1?

25       A.   I do not.

1        Q.    If you'd flip to Page 2, please.

2                    Starting in Line 11 of Page 2, do you

3    see Section 1.04?

4        A.    Yes.   On -- on Line 11 you were asking;

5    correct?

6        Q.    Yes, starting on Line 11.

7        A.    Yes.

8        Q.    And Section 1.04 of SB 1 adds Section 1.0015

9    to the election code; correct?

10        A.    Yes.

11        Q.    And that section is labeled "Legislative

12    Intent;" correct?

13        A.    Yes.

14        Q.    In Lines 16 and 17, does SB 1 include

15    protecting the secrecy of the ballot as part of the

16    legislature's intent?

17        A.    Yes.

18        Q.    Have you ever served as a poll watcher?

19        A.    Not that I'm aware.   No, I don't recall.

20        Q.    Do you know how poll watchers are selected?

21        A.    By campaigns.

22        Q.    Has your campaign ever selected poll

23    watchers?

24        A.    Not that I'm aware of.

25        Q.    Do you know whether the Texas Democratic

1    Party uses poll watchers?

2        A.    I imagine they do, yes.

3              (Exhibit Number 7 marked.)

4        Q.    (By Mr. Thompson)  I'm handing you what's

5    been marked as Exhibit 7.  Oh, sorry.

6        A.    That's all right.

7        Q.    7.

8              MR. QUESADA:  Thank you.

9        Q.    (By Mr. Thompson)  Representative Anchia,

10   does Exhibit 7 appear to be a printoff from the

11   texasdemocrats.org website?

12       A.    That -- yes.  That's what it says at the

13   bottom.

14       Q.    And is Exhibit 7 labeled "2020 Series:

15   Voter Protection by Rose Clouston, Voter Protection

16   Director"?

17       A.    That is what it says, yes.

18       Q.    If you could turn to Page 9, please.  The

19   page number's in the bottom right-hand corner of this

20   document.

21             At the bottom of Page 9 it says "The

22   Texas democrats voter protection team in conjunction

23   with our full-time staffers and volunteers is

24   recruiting volunteer poll watchers across Texas to be

25   at polling places on election day?"

Rafael Anchia

August 22, 2022
Page 30

1           Do you see that?

2        A.    Yes.

3        Q.    And then if you flip to Page 10, it says "In

4    order to make sure Texans' voting rights are not being

5    violated when they head to their polling location to

6    cast a ballot, Texas democrat poll watchers will

7    observe the voting process, report any voting

8    irregularities and advocate on voter's behalf should

9    they encounter any confusion or issues while voting;"

10   correct?

11       A.    Yes.

12       Q.    Fair to say that the Texas Democratic Party

13   uses poll watchers to monitor the regularity of

14   elections?

15       A.    It appears so.

16       Q.    There's nothing nefarious about that; right?

17       A.    Not on its face, no.

18       Q.    Do you think it's a responsible thing for

19   the Texas Democratic Party to do?

20       A.    It's permitted by law.  Certainly.

21       Q.    Are you aware of any problems that Texas

22   Democratic Party poll watchers caused in 2020?

23       A.    I'm not aware of any.

24       Q.    Are you aware of any other -- other problems

25   caused by any poll watchers in 2020?

1    recall.

2         Q.    Do you know whether any --

3         A.    Or -- or maybe to law enfor -- law enfor --

4    I apologize.  She did report it to law enforcement,

5    but I don't recall where else that might have -- she

6    might have reported it.

7         Q.    Do you know which law enforcement agency?

8         A.    I don't.

9         Q.    And, just to be clear, you weren't present

10   when this happened; right?

11        A.    No.  This is the basis of a phone call.

12        Q.    Now, if we wanted to get in touch with

13   Ms. Orenstein, do you know how we might be able to do

14   that?

15        A.    She's an upstanding member of the bar and,

16   I'm sure, would be easily identifiable for the Dallas

17   Bar Association.

18        Q.    Do you have an understanding of what poll

19   watchers are supposed to do?

20        A.    Generally.

21        Q.    What is your general understanding?

22        A.    They are supposed to observe the -- the

23   goings-on under the auspices of the election judge.

24   They are not to -- they -- they have a designated area

25   is my recollection where they're supposed to observe.

1    They're supposed to stay away from -- from voters, not
2    engage in campaigning.  Those are gener -- that's
3    generally my understanding of their role.
4         Q.   So part of their role is to observe the
5    conduct of the election to see if there is anything
6    inappropriate happening; is that fair?
7         A.   Yes.
8         Q.   They're not able to perform that function if
9    they can't see what's happening; correct?
10        A.   I don't understand the question.  Can you
11   repeat it?
12        Q.   It's a tad tautological, so that may be why
13   it's confusing.
14             But if they're supposed to observe the
15   election and for some reason they can't see what's
16   happening in the conduct of an election, then they're
17   not able to perform their function; correct?
18             MR. QUESADA:  Let me object to the form
19   of the question.  You may answer.
20        A.   So -- so within -- within reason.  But
21   because these are partisans, whether they be democrats
22   or republicans, their activities can also get in the
23   way of the conduct of an election or it can border on
24   campaigning, I would imagine.
25             It can potentially intimidate voters,

1    and -- and that's -- that's why I carried my

2    amendment.  Because, yes, while -- while legislative

3    intent here is -- is -- is correct, and I'm glad they

4    include it, it seems to be at odds with a complete

5    free movement of a watcher at an election location.

6              When you -- when you have partisans who

7    are in an election contest with -- with no limits,

8    oftentimes in cramped spaces, right, having been in --

9    in polling locations that are no bigger than a -- you

10   know, than a portable and not placing -- I felt that

11   this Subsection (e) in this amendment that I sought to

12   strike was at odds with existing law and legislative

13   intent.  And so, yes, I saw it as -- as a -- in

14   conflict.

15             MR. THOMPSON:  Objection,

16   nonresponsive.

17        Q.   (By Mr. Thompson)  Are you familiar with any

18   past controversies in which poll watchers in Texas

19   were not permitted to view what election workers were

20   doing?

21        A.   No.

22                  (Exhibit Number 8 marked.)

23        Q.   (By Mr. Thompson)  I'm going to hand you

24   what's been marked as Exhibit 8.

25        A.   Thank you.

1                    MR. QUESADA:  Thank you, sir.

2          Q.    (By Mr. Thompson)   Representative Anchia, is

3    Exhibit 8 a letter from the Secretary of State's

4    Office to the Director of Law Enforcement at the

5    Office of the Attorney General?

6          A.    Yes.

7          Q.    Is it dated September 2, 2020?

8          A.    Yes.

9          Q.    This was before SB 1 was enacted; right?

10         A.    Yes.

11         Q.    Take a look at the first paragraph.  The

12   Secretary of State's Office requests assistance "...in

13   reviewing allegations of poll watchers being

14   obstructed from observing activity at the Travis

15   County central counting station for the July 14, 2020,

16   election."

17                    Do you see that?

18         A.    I do.

19         Q.    The beginning of that paragraph says the

20   letter is being sent pursuant to Section 31.006 of the

21   Texas Election Code; correct?

22         A.    It does.

23         Q.    Are you familiar with 31.006 of the Texas

24   Election Code?

25         A.    Not by number.

Rafael Anchia                                    August 22, 2022
                                                        Page 38

1       Q.    Sure.  Are you aware the Secretary of

2    State's Office has the authority under the election

3    code to refer matters to the Office of the Attorney

4    General when allegations of criminal conduct relating

5    to an election have been made?

6       A.    Yes.

7       Q.    Are you aware that before SB 1 became law

8    there were potential criminal consequences for

9    obstructing the activities of a poll watcher in Texas?

10      A.    Yes, I seem to recall that.

11               (Exhibit Number 9 marked.)

12      Q.    (By Mr. Thompson)  I'm handing you what has

13   been marked --

14      A.    Thank you.

15      Q.    -- as Exhibit 9.

16               MR. QUESADA:  Thank you, sir.

17      Q.    (By Mr. Thompson)  Based on the URL at the

18   bottom of the page, does Exhibit 9 appear to be a news

19   article from KXAN Austin?

20      A.    It does.

21      Q.    Is it headlined "State requests criminal

22   investigation into alleged election violations inside

23   Travis County Clerk's Office"?

24      A.    Yes.

25      Q.    And is the article dated November 2, 2020?

Rafael Anchia                                                    August 22, 2022
                                                                      Page 39

 1          A.    Yes.

 2          Q.    Again, this is before the legislature passed

 3    SB 1; correct?

 4          A.    Yes.

 5          Q.    All right.  So let's take a look at Page 2.

 6                Now, based on the first paragraph this

 7    article seems to be mentioning the letter from the

 8    Secretary of State's Office asking for a criminal

 9    investigation related to the poll watcher incident in

10    Travis County; correct?

11          A.    Yes.

12          Q.    And according to the second sentence of the

13    first paragraph there were republican poll watchers

14    who claimed the clerk's office kept them from doing

15    their jobs; correct?

16          A.    Yes, that was their claim.

17          Q.    If you look at Paragraph 2, Sentence 2, the

18    article reports "One poll watcher said he wasn't

19    allowed into the counting room at all."

20                Do you see that?

21          A.    Yes.

22          Q.    And then the next sentence says "Another two

23    poll watchers said they were sequestered into a 'media

24    room' at the clerk's office, unable to hear and see

25    ballot tabulations and counts the night the polls

```
 1    closed in July."

 2                  Do you see that?

 3        A.    Yes.

 4        Q.    And, finally, look at the last paragraph on

 5    this page.  It quotes a poll watcher named John Wood

 6    who said, "I was in this glass box.  I could not hear

 7    any conversation.  People were doing something, which

 8    I could not identify what.  All video screens of their

 9    information were out of my sight."

10                  Do you see that?

11        A.    Yes.

12        Q.    And according to this article, again, "Wood

13    is one of the three complainants listed in the

14    Secretary of State's criminal investigation request;"

15    correct?

16        A.    Yes.

17        Q.    Turn to Page 3, Article -- continues to

18    quote Wood in Paragraph 2, "'So I was absolutely

19    useless,' Wood said.  'There was nothing I could tell

20    about the process.  It was opaque to me, a watcher,

21    and I found very discouraging.'"

22                  Do you see that?

23        A.    Yes.

24        Q.    Now, you don't know whether these

25    allegations are true, do you?
```

Rafael Anchia                                        August 22, 2022
                                                          Page 41

```
 1        A.    I have no basis.
 2        Q.    But, as a legislator, it would concern you
 3   if poll watchers were prevented from seeing election
 4   activities in Travis County; correct?
 5        A.    Anywhere, yeah.
 6        Q.    Sorry.  Just to make sure I get it clear on
 7   the record, you're saying it would concern you if poll
 8   watchers were prevented from seeing election
 9   activities in any county in Texas; is that fair?
10        A.    Well, if -- if they were prevented from
11   seeing electric -- election activities in their role
12   as -- as -- as watchers and -- and if they, in fact,
13   are behaving in a way that watchers are -- are to
14   behave.  Impossible to know from this article, and
15   I -- and -- and difficult to see.  I don't think
16   there's any final disposition here or -- so...
17        Q.    All right.  If we can just quickly turn to
18   Page 5 of the article.
19        A.    Yeah.
20        Q.    Do you see at the very top of the page it
21   says...
22              Well, excuse me.
23              Before I read that, do you know who
24   Dana DeBeauvoir was or is?
25        A.    Is -- yes, I do.
```

 1      Q.    Who is Dana DeBeauvoir?

 2      A.    She is the former elections administrator, I

 3   believe, for Travis County.

 4      Q.    And I'll just represent to you, I -- I think

 5   at the time her title was county clerk, but that she

 6   had the role of overseeing the election process.

 7      A.    That's right.

 8      Q.    Does that sound right to you?

 9      A.    That sounds right to me.

10      Q.    Okay.  So on Page 5 of this article, at the

11   top of the page it says "DeBeauvoir did not deny

12   corraling the poll watchers in her building's media

13   room;" correct?

14      A.    Where are you reading from?  I'm sorry.  I

15   may -- I may have missed that.

16      Q.    I'm sorry.  Page 5.  It's at the very top of

17   the page.  It's above a large color photograph.

18      A.    Oh, oh, oh, sorry.  Yes.

19      Q.    So you see -- you see that it says

20   "DeBeauvoir did not deny corraling the poll watchers

21   in the building's media room;" correct?

22      A.    Correct.

23      Q.    Do you think it's reasonable for Texas

24   legislators to be worried about the allegations in

25   this article?

Rafael Anchia                                                August 22, 2022
                                                                    Page 43

1              MR. QUESADA:  I'm going to object to

2     the form of the question.

3         A.   I think it's reasonable for them to

4     investigate the allegations.

5         Q.   (By Mr. Thompson)  In your role as a

6     legislator, you sometimes run across issues because of

7     press reports; right?

8         A.   Yes.

9         Q.   And sometimes as a result of those press

10    reports, you pursue legislation on a particular topic;

11    is that fair?

12        A.   If it turns out that the allegations were

13    substantiated, yes, and -- and -- and if there was

14    sort of a persistent problem rather than a one-off.

15    Yeah, there are all kinds of factors that would go

16    into that.  But rarely -- rarely just based on

17    allegations.  That often makes bad policy.

18        Q.   Earlier I handed you Chapter 33 of the

19    election code.

20             Do you still have that in front of you?

21        A.   I do.

22        Q.   And, just for the clarity of the record,

23    what exhibit number is on the front of that?

24        A.   Exhibit 5, I believe.  It's Chapter 33 of

25    the election code.

Rafael Anchia                                            August 22, 2022
                                                              Page 44

```
 1        Q.    Let's take a look at the first page of
 2   Exhibit 5.
 3        A.    I'm there.
 4        Q.    Okay.  Do you see Section 33.0015?
 5        A.    Yes.
 6        Q.    Entitled "Chapter Purpose and Watcher Duty;"
 7   correct?
 8        A.    "Chapter Purpose and Watcher Duty," yes.
 9        Q.    Okay.  The first sentence says "The purpose
10   of this chapter is to preserve the integrity of the
11   ballot box in accordance with Section 4, Article VI,
12   Texas Constitution, by providing for the appointment
13   of watchers."
14              Do you see that?
15        A.    Yes.
16        Q.    And the Texas Constitution imposes a duty on
17   the legislature to preserve the integrity of the
18   ballot box; correct?
19        A.    Yes.
20        Q.    The next sentence says "It is the intent of
21   the legislature that watchers duly accepted for
22   service under this chapter be allowed to observe and
23   report on irregularities in the conduct of any
24   election, but may not interfere in the orderly conduct
25   of an election."
```

Rafael Anchia

August 22, 2022
Page 45

1                     Do you see that?

2          A.    Yes.

3          Q.    You support that intent, don't you?

4          A.    Certainly.

5          Q.    It's good for poll watchers to be able to

6    observe and report on irregularities?

7          A.    Yes.

8          Q.    But it's also important that they not

9    interfere in the orderly conduct of an election;

10   correct?

11         A.    Yes.

12         Q.    Now, the final sentence in that section says

13   "To effect that purpose, a watcher appointed under

14   this chapter shall observe without obstructing the

15   conduct of an election and call to the attention of an

16   election officer any observed or suspected

17   irregularity or violation of law in the conduct of the

18   election."

19                     Do you see that?

20         A.    Yes.

21         Q.    And do you understand this provision to

22   define the duties of a poll watcher in part?

23         A.    Ask that question again.  Do I understand --

24   I'll repeat it back to you just to make sure I've got

25   it.  Do -- do I understand this to be in part the

1    duties of a poll watcher?

2          Q.    Yes.

3          A.    Yes.

4          Q.    So in this provision the legislature is

5    instructing poll watchers to avoid obstructing the

6    conduct of an election; fair?

7          A.    Ask the question again kindly.

8          Q.    Sure.   In this provision the legislature is

9    instructing poll watchers to avoid "obstructing the

10   conduct of an election"?

11         A.    Yes.

12         Q.    And this is a provision that was added to

13   the election code by Senate Bill 1; correct?

14         A.    It appears to be, yes.

15         Q.    Are you aware of any instances in which poll

16   watchers have prevented an eligible Texas voter from

17   voting?

18         A.    I'm unaware.

19         Q.    Are you aware of any instances in which poll

20   watchers have obstructed an election in Texas?

21         A.    I'm unaware.

22         Q.    Are you aware that the Secretary of State's

23   Office provides training for poll watchers in Texas?

24         A.    Yes.

25         Q.    Are you aware that that is a consequence of

1    Senate Bill 1?

2        A.    I'm unaware.  It was my impression that they

3    did -- that the Secretary of State's Office also did

4    watcher training in advance of SB 1.

5        Q.    Do you still have Senate Bill 1 in front of

6    you?

7        A.    I do.

8        Q.    Let's turn to Page 25.

9              On Page 25, Line 13, do you see Section

10   4.04 of Senate Bill 1?

11       A.    Yes.

12       Q.    Does it amend Chapter 33 of the election

13   code by adding Section 33.008?

14       A.    Yes.

15       Q.    And does that provision say, starting in

16   Line 15, "The Secretary of State shall develop and

17   maintain a training program for watchers"?

18              Is that what it says?

19       A.    Yes.

20       Q.    And then it has various requirements for the

21   training program under that; correct?

22       A.    Yes.

23       Q.    One of them is that the training program

24   must be available on the internet?

25       A.    Yes.

```
 1        Q.   So within --
 2        A.   Oh, the knowing s -- knowing standard on --
 3   on Line 7.  Sorry.  And I just overtalked.  You were
 4   about to tell me where it was, but I think I see.  I
 5   see it now.
 6        Q.   That is what I'm referring to, the -- the
 7   requirement that the person knows the watcher is
 8   entitled to observe an activity in Line 7.
 9        A.   Yes.
10        Q.   So that mens rea requirement didn't exist in
11   that provision of the election code before SB 1;
12   correct?
13        A.   It is new language that is being added,
14   correct.
15        Q.   And the criminal act, the criminal offense
16   specified in that provision, is one that relates to a
17   person serving in an official capacity preventing a
18   watcher from observing an activity or procedure the
19   person knows the watcher is entitled to observe;
20   correct?
21        A.   Yes.
22        Q.   Without the knowing requirement added by
23   Senate Bill 1, more conduct would be made criminal by
24   the election code; correct?
25                   MR. QUESADA:  Object to the form of the
```

1    question.

2        Q.    (By Mr. Thompson)   If that didn't make sense

3    I can rephrase it.

4        A.    If you don't mind.

5        Q.    Adding the mens rea requirement narrows the

6    scope of limit -- of criminal liability under the

7    election code; correct?

8        A.    Yes.

9        Q.    Are you familiar with something called voter

10   information posters in Texas elections?

11       A.    Yes.

12       Q.    I have various documents I can put in front

13   of you if this would be helpful.

14              But do you recall sponsoring or --

15   excuse me -- jointly offering a bill about voter

16   information posters?

17       A.    In what year?

18       Q.    There's a bill called HB719.  I need to look

19   up the exact year.

20       A.    So the short answer is, no, I don't recall

21   this.

22       Q.    Probably have a lot of bills that you're

23   responsible for; is that fair?

24       A.    Yes.

25              (Exhibit Number 10 marked.)

1    Q.    (By Mr. Thompson)  I'm going to hand you

2    what's been marked as Exhibit 10.

3    A.    Thank you.

4         MR. QUESADA:  Thank you.

5    Q.    (By Mr. Thompson)  Does Exhibit 10 appear to

6    be a printoff from the Texas Legislature's website?

7    A.    Yes.

8    Q.    And does Exhibit 10 relate to House Bill 719

9    from the 79th regular session?

10    A.    It appears to, yes.

11    Q.    Are you listed as a joint author of House

12    Bill 719 in the 79th regular session?

13    A.    Yes.  On March 17th, 2005.

14    Q.    Okay.

15    A.    My first session.

16         (Exhibit Number 11 marked.)

17    Q.    (By Mr. Thompson)  I'm going to hand you

18    what's been marked as Exhibit 11.

19    A.    Thank you.

20         MR. QUESADA:  Oh, thank you so much.

21    Q.    (By Mr. Thompson)  Now, do you see that

22    Exhibit 11 is a form prescribed by the Secretary of

23    State according to the top right-hand corner of the

24    document?

25    A.    Yes.

Rafael Anchia

August 22, 2022
Page 53

1     Q.   And the bold header at the top says "Voter

2   Information;" correct?

3     A.   Yes.

4     Q.   And right below that it lists a series of

5   rights that voters have.

6            Do you see that?

7     A.   Yes.

8     Q.   The second right says "You have the right to

9   cast your vote in secret and free from intimidation;"

10  correct?

11    A.   Yes.

12    Q.   And that is a right that voters have under

13  Texas law; correct?

14    A.   Yes.

15    Q.   Are you aware that each polling place in

16  Texas posts this form in a prominent location?

17    A.   I'm not aware that every polling location in

18  the state does so, but that there's a requirement to

19  do so.

20    Q.   You're aware that they're legally required

21  to post these voter information posters --

22    A.   Yes, sir.

23    Q.   -- correct?

24    A.   Yes, sir.

25    Q.   And you're not aware of any that refused to

1    post them; correct?

2         A.    I have no basis.

3         Q.    How long have you lived in Dallas County?

4         A.    Ooh.  1986, I guess.

5         Q.    Where did you move from when you moved to

6    Dallas County?

7         A.    From Miami, Florida to go to college.  I was

8    17 years old.

9         Q.    I guess you would have left -- forgive me.

10              So you moved to Dallas in 1986 to go to

11   SMU; correct?

12        A.    Yes.

13        Q.    And then after you graduated from SMU, you

14   spent a few years at Tulane Law School?

15        A.    (Witness nods head.)

16        Q.    Correct?

17        A.    Uh-huh, yeah.

18        Q.    So, other than your years in law school,

19   have you lived in Dallas County since 1986?

20        A.    Yeah.  And I returned every summer to --

21   to -- to work in Dallas even when I was in law school.

22        Q.    Have you been a Dallas County voter since

23   1986?

24        A.    Ooh.  I don't recall.

25        Q.    Have you been a Dallas County voter for a

 1    long time?

 2         A.   Yes.

 3         Q.   To the best of your knowledge, Dallas County

 4    has never offered drive-thru voting; correct?

 5         A.   That's correct.

 6         Q.   To the best of your knowledge, had any Texas

 7    county used drive-thru voting before the November 2020

 8    general election?

 9         A.   I'm unaware.

10         Q.   To the best of your knowledge, how many

11    Texas counties offered drive-thru voting during the

12    November 2020 general election?

13         A.   I'm unaware.

14         Q.   Are you aware of any?

15         A.   I believe Harris County.

16         Q.   Any others?

17         A.   I'm not.

18         Q.   To the best of your knowledge, has any Texas

19    county offered drive-thru voting since the November

20    2020 general election?

21         A.   Let me amend my answers.  If by -- if by

22    "drive-thru voting" you mean exclusively drive-thru

23    without any sort of disability or impediment, because

24    I believe all -- all counties should offer it to

25    people -- under existing law for people who are --

```
 1          A.   Yes, that's my understanding.

 2          Q.   I mean, it didn't -- it didn't close at the

 3    end of any kind of normal business hours; correct?

 4          A.   I don't know.  I don't know.  I couldn't say

 5    whether they cl -- whether they closed at all.

 6          Q.   To the best of your knowledge, Dallas County

 7    has never offered 24-hour voting; correct?

 8          A.   I'm unaware.

 9          Q.   To the best of your knowledge, had any Texas

10    county used 24-hour voting before the November 2020

11    general election?

12          A.   I'm unaware.

13          Q.   To the best of your knowledge, how many

14    Texas counties offered 24-hour voting during the

15    November 2020 general election?

16          A.   I'm only aware of Harris County.

17          Q.   To the best of your knowledge, has any Texas

18    county offered 24-hour voting since the November 2020

19    general election?

20          A.   I'm not aware.

21          Q.   You haven't had any personal involvement

22    with drive-thru voting; correct?

23          A.   No.

24          Q.   And you haven't had any personal involvement

25    with 24-hour voting; correct?
```

Rafael Anchia                                                      August 22, 2022
                                                                         Page 59

1          A.    No.

2          Q.    I'm sorry.  I'm going to have to clarify

3    those because of the ambiguities in the negative

4    question and then a "No" answer.

5                    MR. QUESADA:  Ask it in one question

6    and he'll answer to all in one.

7                    MR. THOMPSON:  Great.

8          Q.    (By Mr. Thompson)  If you don't mind

9    answering this "Correct" or "Incorrect," I think it

10   will make things clear.

11         A.    Correct.

12         Q.    You have not had any personal involvement

13   with either drive-thru voting or 24-hour voting;

14   correct?

15         A.    Correct.

16         Q.    Thank you.  And we can take a break now if

17   you want.  I'm about to switch topics.  Whatever you

18   prefer.

19         A.    At your pleasure.

20                    MR. THOMPSON:  Okay.  Let's go off the

21   record real quick.

22                    THE VIDEOGRAPHER:  We're off the record

23   at 10:41 a.m.

24                    (Break.)

25                    THE VIDEOGRAPHER:  We're back on the

1    seen that?

2          A.    I don't remember the exact number.   More

3    than one.

4          Q.    What is the first instance you can remember

5    of seeing that?

6          A.    I don't recall details.

7          Q.    Let me try it more broadly and then we'll

8    drill down.

9                Have you ever witnessed a voter with a

10   disability seek assistance for voting, but then not be

11   able to vote for any reason?

12         A.    No.

13         Q.    Have you ever witnessed anything that you

14   would consider inappropriate in the context of people

15   at a polling place reacting to a voter's request for

16   assistance based on a disability?

17         A.    No.

18         Q.    Can you identify any voters who have been

19   prevented from voting as a result of the Senate Bill 1

20   provisions related to assistance for voters with

21   disabilities?

22         A.    I'm unaware.

23         Q.    Are you aware of any problems in that

24   regard?

25         A.    I'm unaware.

Rafael Anchia                                        August 22, 2022
                                                            Page 62

```
 1        Q.    Have you ever voted by mail?
 2        A.    I don't believe so.
 3        Q.    You haven't voted by mail since Senate Bill
 4   1 took effect; correct?
 5        A.    No.
 6        Q.    And you haven't attempted to vote by mail
 7   since Senate Bill 1 took effect; correct?
 8        A.    No.
 9        Q.    Have you witnessed anyone attempting to vote
10   by mail since Senate Bill 1 took effect?
11        A.    No.
12        Q.    Can you identify any voters who were
13   prevented from voting as a result of Senate Bill 1's
14   provisions related to voting by mail?
15        A.    No.
16        Q.    Do you have any personal knowledge of any
17   problems related to voting by mail that you would
18   attribute to Senate Bill 1?
19        A.    No.
20        Q.    You're represented by counsel for purposes
21   of this litigation; right?
22        A.    Say -- say it one more time.
23        Q.    You're represented by counsel for purposes
24   of this litigation --
25                    MR. QUESADA:  Well, for this --
```

1          A.    My counsel.

2                      MR. QUESADA:  Yeah.  Don't answer if

3     it -- if it involves attorney-client.

4                      THE WITNESS:  Okay.

5                      MR. QUESADA:  Just tell him it involves

6     attorney-client.

7                      THE WITNESS:  It involves

8     attorney-client.

9          Q.    (By Mr. Thompson)  Other than conversations

10    with counsel, you don't have any knowledge about being

11    listed as a witness; is that fair?

12         A.    That's fair.

13         Q.    Do you have any plans to testify at the

14    trial in this matter?

15         A.    Not at the present time.

16                      (Exhibit Number 12 marked.)

17         Q.    (By Mr. Thompson)  I'll hand you Exhibit 12.

18         A.    Thank you.

19                      MR. QUESADA:  Thank you.

20         Q.    (By Mr. Thompson)  Representative Anchia,

21    does the front of Exhibit 12 say "House Journal,

22    Eighty-Second Legislature, Regular Session"?

23         A.    It does.

24         Q.    Is it dated Monday, March 21, 2011?

25         A.    It is.

Rafael Anchia                                      August 22, 2022
                                                          Page 66

1        Q.    Does this appear to be a copy of the House

2    Journal published by the Texas Legislature?

3        A.    It does.

4        Q.    Can you flip to Page 914?

5              The page numbers are on the top-left

6    and right-hand corners, sort of booklet style.

7        A.    I'm on Page 914.

8        Q.    According to this excerpt from the House

9    Journal, about the middle of the page you are quoted

10   as saying "Yet this bill doesn't deal with the type of

11   voter fraud that we've seen most prevalently in the

12   state of Texas, which is mail-in ballots."

13             Do you see that?

14       A.    Yes.

15       Q.    Is that an accurate reporting of what you

16   said?

17       A.    Yes.  Those are the words I said in the

18   journal, as reflected in the journal.

19       Q.    This was in the context of a debate about a

20   voter ID bill; correct?

21       A.    Yes.  A strict photo ID bill, correct.

22       Q.    And you were opposing that bill; correct?

23       A.    That's correct.

24       Q.    That bill dealt with a voter showing photo

25   identification in order to vote in person; correct?

1      A.   Correct.

2      Q.   And I believe some supporters of the bill

3  said that the bill would be helpful for combating or

4  preventing in-person voter-impersonation fraud --

5      A.   Right.

6      Q.   -- is that right?

7      A.   Correct.

8      Q.   And you explained to your colleagues that

9  that type of voter-impersonation fraud was less common

10  than fraud related to voting by mail; correct?

11      A.   Virtually nonexistent.

12                MR. THOMPSON:  Do you want to --

13                MR. QUESADA:  I'm sorry, go ahead.  It

14  says whatever it says.  I'm going to object to the

15  form of the question.  I don't think that's -- I don't

16  think that's what Chairman Anchia said on the record.

17      Q.   (By Mr. Thompson)  Now, at the bottom of

18  this Page 914 --

19      A.   Yes.

20      Q.   -- you're quoted saying, "If you have opened

21  the door to the integrity of elections, then I think

22  it's fair game to discuss that type of fraud, which we

23  actually do see in the state of Texas."

24                Do you see that?

25      A.   Yes.

1        Q.   And you were referring to mail-in ballot

2    fraud; correct?

3        A.   Yes.

4        Q.   Can you flip to Page 915?

5             The second set of remarks from you on

6    this page says, "I actually chair the select committee

7    on that, and I've had in the past mail-in ballot

8    bills.

9             Do you see that?

10       A.   Yes.

11       Q.   Do you recall what bills you were referring

12   to in those remarks?

13       A.   I don't.

14       Q.   Based on what you remember today, have you

15   offered bills in the past related to mail-in ballots?

16       A.   I think I was a joint author on mail-in

17   ballot bills in the past.

18       Q.   Would this have been a bill authored by

19   Representative Oliverson...

20       A.   I don't recall.

21       Q.   ...where he would have --

22       A.   I don't recall.

23       Q.   To the best of your recollection, what was

24   the purpose of the bills related to mail-in ballots

25   that you were offering?

1        A.    I don't recall.

2        Q.    Let me go to the next comment from you on

3   that page.  It's the third one, "Here's the quandary

4   for this body.  If you say passing this bill is going

5   to restore integrity of elections, you do nothing in

6   this bill to deal with mail-in ballots and 70 percent

7   of all the prosecutions by the Attorney General have

8   been mail-in ballots, then you're really not restoring

9   integrity of elections because people, like they have

10  for the last six years, will be reading about mail-in

11  ballot fraud, mail-in ballot fraud, mail-in ballot

12  fraud."

13              Do you see that?

14       A.    I do.

15       Q.    Do you generally conduct research to support

16  the factual statements that you make on the floor of

17  the House of Representatives?

18       A.    Yes.

19       Q.    Do you think you've researched the

20  prosecutions brought by the Attorney General related

21  to voter fraud?

22       A.    Yes.

23       Q.    And your research showed that 70 percent of

24  the Attorney General's prosecutions related to voter

25  fraud were about mail-in ballots?

1        A.    At the time.

2        Q.    Do you know whether those numbers are

3    similar or different now?

4        A.    I don't, I don't.  I recall that they were

5    low -- very low at the time.  So 70 percent of a low

6    number.  I don't recall that exact number.  But my

7    whole point in -- just for further context because,

8    you know, folks have tried to take this language out

9    of context on the House floor.  So I figured I'd offer

10   an explanation, some context here.

11                  Number one is an acknowledgment that

12   voter fraud in the state of Texas is a very s -- a

13   very small number.  It's like a rou -- I think I

14   described it at one point as a rounding error of a

15   rounding error.  You're more -- you're more likely to

16   get struck by lightning.  To the extent it exists, it

17   is not in -- it was not found in voter impersonation,

18   which undercut the -- the pretext that was being given

19   by the legislature at that time about the need to have

20   strict -- a strict photo ID standard in the state, and

21   ultimately we won this in court.

22                  But it undercut their argument to

23   suggest that in-person voter impersonation was about

24   the integrity of election when at the time they were

25   not doing anything about mail-in ballot fraud, which

1    was the one place where we did see some, not much, but

2    some.

3                    And of the cases that the Attorney

4    General had prosecuted, they had all been in that

5    area.  So it seemed to suggest that their pretext for

6    bringing that photo identification bill was -- was not

7    sincere, and that's what I was pointing out here.

8         Q.   I certainly don't mind you offering context.

9                    MR. THOMPSON:  I will, nonetheless,

10   have to object as nonresponsive.

11        A.   Okay.

12        Q.   (By Mr. Thompson)  It's nothing personal, of

13   course.

14        A.   No, of course.  None -- no personal...

15        Q.   Okay.

16        A.   Nothing -- nothing personal taken, Will.

17                  (Exhibit Number 13 marked.)

18        Q.   (By Mr. Thompson)  Good.  I'm going to hand

19   you what's been marked as Exhibit 13.

20                  Exhibit 13 is an excerpt from the House

21   Journal of the Eightieth Legislature, Regular Session;

22   correct?

23        A.   Yes.

24        Q.   And it's dated Monday, April 23, 2007;

25   correct?

1          A.    Yes.

2          Q.    If you could flip to Page 2224, please.

3          A.    I am with you.

4          Q.    That Page 2224 contains remarks from you

5     about House Bill 218; correct?

6          A.    Yes.

7          Q.    Take a look down at the third paragraph of

8     your remarks, and then halfway through that paragraph

9     there's a sentence that begins "Furthermore..."

10                    Do you see that?

11         A.    Yes.

12         Q.    I'm going to read that and ask you to

13    confirm that I read it correctly.

14         A.    Yes.

15         Q.    "Furthermore, there's another wonderful

16    loophole in this bill that creates a glaring weakness

17    that essentially allows vote by mail to continue

18    without photo identification.  Vote by mail, that we

19    know, is the greatest source of voter fraud in this

20    state.  In fact, all of the prosecutions by the

21    Attorney General -- I shouldn't say all, but a great

22    majority of the prosecutions by the Attorney General

23    occur with respect to vote by mail."

24                    Do you see that?

25         A.    Correct.

1        Q.    And this is an accurate transcription of

2    what you said in those remarks; correct?

3        A.    Correct.

4                   (Exhibit Number 14 marked.)

5        Q.    (By Mr. Thompson)  I'd like to show you a

6    new exhibit.  This is marked Exhibit 14.

7        A.    Thank you.

8                   MR. QUESADA:  Thank you, guy.

9        Q.    (By Mr. Thompson)  Representative Anchia, is

10   Exhibit 14 -- I'm sorry.  Before we get going, I just

11   want to make sure.  There's a printer error on my

12   copy, and it's a little bit hard to read.

13                   Does your copy look clear?

14       A.    It does.

15       Q.    Okay, perfect.  Then I'll just use a

16   different copy.

17                   Exhibit 14 is an excerpt from the House

18   Journal of the Eighty-Seventh Legislature, Second

19   Called Session; correct?

20       A.    Yes.

21       Q.    And it's dated Tuesday, August 31, 2021;

22   correct?

23       A.    Yes.

24       Q.    Okay.  If you flip to Pa -- the next page is

25   Page 316 in the top left-hand corner.

1        A.    Correct.

2        Q.    That's what happened in the case of SB 1;

3   right?

4        A.    Correct.

5        Q.    So the House vote adopting the conference

6   committee report on SB 1 would be the last to vote of

7   the Texas House of Representatives before the bill

8   went to the governor; is that correct?

9        A.    Yes.

10       Q.    Now, if you'll turn to Page 319 in this

11  excerpt from the House Journal, we can see the -- the

12  vote on adopting the conference committee report;

13  correct?

14       A.    Yes.

15       Q.    And this reports that there were 80 yeas, 41

16  nays and one member present not voting; correct?

17       A.    Yes.

18       Q.    You can see the list of all the

19  representatives who voted in favor of SB 1 here;

20  right?

21       A.    Yes.

22       Q.    Can you identify any member of the Texas

23  House of Representatives who voted in favor of Senate

24  Bill 1 with a racially discriminatory intent?

25       A.    I can't look into their hearts or minds, so

1    I'm unable to say either way.

2          Q.    You're not a mind-reader; right?

3          A.    I am not a mind-reader.

4          Q.    You don't know what your colleagues were

5    thinking about when they voted for Senate Bill 1?

6          A.    I don't, I don't.

7          Q.    Did any of your colleagues -- outside of

8    what they said on the public record on the House floor

9    or something, did any of your colleagues tell you why

10   they were voting in favor of Senate Bill 1?

11         A.    No.

12         Q.    Did you hear any of your colleagues say

13   anything in the context of Senate Bill 1 that you

14   thought reflected an intent to racially discriminate?

15         A.    No.

16         Q.    There was an election bill that the Texas

17   House of Representatives was considering toward the

18   end of the 87th regular session; correct?

19         A.    Say that one more time.  There was an

20   election bill that the House of Representatives was

21   considering...

22         Q.    ...at the end of the 87th regular session?

23         A.    Yes.

24         Q.    It did not pass; correct?

25         A.    Ooh.  I imagine a number of different

1   election bills did not pass at the end of the -- of

2   the 87th session, regular session.

3        Q.   Do you recall democratic members of the

4   Texas House of Representatives leaving Texas at the

5   end of the 87th regular session?

6        A.   No.

7        Q.   Do you recall them leaving the House

8   chamber?

9        A.   Yes.

10       Q.   Did that deprive the Texas House of

11  Representatives of a quorum to conduct business?

12       A.   Yes.

13       Q.   Was that the intent of the members who were

14  leaving?

15       A.   Yes.

16       Q.   Was the goal to prevent passage of the

17  election bill that was then pending on the House

18  floor?

19       A.   If we're referring to, I think, SB 7, then

20  the answer's, yes.

21       Q.   And, just for clarity of the record, could

22  you briefly describe what...

23            Oh, don't worry about it.

24            SB 7 was an election bill that had some

25  similarities with SB 1, but also had some differences;

1    correct?

2         A.    Yes.

3         Q.    At what point did members of the Texas House

4    of Representatives who were democrats decide to leave

5    the state after the close of the 87th regular session?

6              MR. QUESADA:    I'm going to object to

7    the form of the question.

8         A.    I don't recall the exact date.

9         Q.    (By Mr. Thompson)    Were you a member who

10   left the state?

11        A.    Yes.

12        Q.    When did you leave?

13        A.    I don't recall exactly.

14        Q.    Was it before the first special session was

15   called?

16        A.    Yes.

17        Q.    Was it --

18        A.    I don't recall.  I don't recall if it was

19   after the call itself or in anticipation of the call

20   itself.  I don't recall.

21        Q.    But you left with the purpose of not being

22   present for the first called special session; is that

23   correct?

24        A.    I was already out of the state.  So I want

25   to make sure I'm technically -- it's tech -- my -- it

Rafael Anchia                                    August 22, 2022
                                                 Page 80

1          A.    I did.

2          Q.    Do you know when you did that?

3          A.    I don't remember the exact date.

4          Q.    Do you remember approximately when it was?

5          A.    In the summer.

6          Q.    Do -- when you were out of the state, did

7    you communicate with any republican colleagues about

8    when you would be returning?

9          A.    I don't recall.

10         Q.    Do you know whether your democratic

11   colleagues, any of them, were communicating with

12   republican colleagues about when they would return?

13         A.    I don't recall.

14         Q.    Is it fair to say that, to the best of your

15   knowledge, the republicans didn't know when the House

16   would have quorum again?

17         A.    Yes, to the best of my knowledge.

18         Q.    When did you return to Austin?

19         A.    I don't remember.

20         Q.    Do you remember approximately?

21         A.    I'd have to go back and look at my dates.

22         Q.    Do you think it was during the second called

23   special session?

24         A.    Yes.

25         Q.    And you think it was after the special

Rafael Anchia                                                    August 22, 2022
                                                                       Page 81

1    session started?
2        A.    That's my recollection, yes.
3        Q.    Did you return to the House chamber only
4    after a quorum had been established?
5        A.    That's my recollection.
6        Q.    At that point, did you communicate to any
7    republican members whether you would stay or leave
8    again?
9        A.    I don't recall.
10       Q.    Is it fair to say that, to the best of your
11   knowledge, republican members of the House didn't know
12   whether democratic members of the House might break
13   quorum again?
14       A.    I don't know.
15       Q.    Do you read the Dallas Morning News?
16       A.    Yes.
17       Q.    Forgive me if I mispronounce this.
18             But have you ever heard of a Dallas
19   Morning News writer named Gromer, G-r-o-m-e-r,
20   Jeffers?
21       A.    Yes.
22       Q.    Who is that?
23       A.    He's a reporter for the Dallas Morning News.
24   He's a Cubs fan.
25       Q.    Do you have any knowledge about whether he's

```
 1   an honest man?

 2        A.    I don't know.

 3              MR. QUESADA:   He said he was a Cubs

 4   fan.

 5              (Exhibit Number 15 marked.)

 6        Q.    (By Mr. Thompson)   I'm going to hand to you

 7   what's been marked as Exhibit 15.

 8        A.    Yeah.

 9              MR. QUESADA:   Thank you.

10        Q.    (By Mr. Thompson)   Is Exhibit 15 an article

11   from the Dallas Morning News entitled "Texas needs

12   tougher laws to reel in mail-in vote fraud"?

13        A.    Yes.

14        Q.    Is it written by Gromer Jeffers, Jr.?

15        A.    Yes.

16        Q.    Is it dated April 26th, 2017?

17        A.    Yes.

18        Q.    Do you see in the first paragraph of

19   Mr. Jeffers it says "Let's face it.  Mail-in ballot

20   voting, a necessary and noble process, is vulnerable

21   to fraud"?

22        A.    Yes.

23        Q.    Do you see in the second paragraph he says

24   "Residents --," referring to residents of West

25   Dallas, "-- there have complained about receiving
```

1    absentee ballots they didn't request, raising the

2    possibility that someone is casting votes for them."

3              Do you see that?

4         A.   Yes.

5         Q.   Do you have any knowledge one way or the

6    other about whether residents were receiving absentee

7    ballots they didn't request?

8         A.   I'm unaware.

9         Q.   Do you know one way or the other whether

10   someone was casting votes for them?

11        A.   I'm unaware.

12        Q.   If you could flip to Page 2, please.  Up at

13   the top says -- it has a quote from Mayor Mike

14   Rawlings.

15              Do you see that?

16        A.   Yes.

17        Q.   Excuse me.  The quote is also jointly

18   authored by Representative Eric Johnson; correct?

19        A.   Yes.

20        Q.   And they said, "We ask that you devote

21   additional resources to verify the integrity of each

22   mail-in ballot in Texas."

23              Do you see that?

24        A.   Yes.

25        Q.   And they wrote that in a letter to the

 1    Dallas County Elections Department; correct?

 2        A.    Yes.

 3        Q.    Were you involved at all in the Dallas

 4    County Elections Department's response to that letter?

 5        A.    Not that I recall.

 6        Q.    Do you recall communicating with Mayor

 7    Rawlings, Representative Johnson or anyone from the

 8    Dallas County government about this issue at the time?

 9        A.    Not that I recall.

10        Q.    If you'll look in Paragraph 3, Mr. Jeffers

11    says, "Voter fraud, even with mail-in ballots, does

12    not occur on a large scale.  But in low-turnout

13    elections, stealing just a few votes can be the

14    difference between winning and losing."

15              Do you see that?

16        A.    I do.

17        Q.    Are you aware of the fact that some elected

18    officials in Texas are elected by just a few votes in

19    a very close race?

20        A.    Yes.

21        Q.    You've had colleagues in the House of

22    Representatives who won by just a handful of votes;

23    right?

24        A.    Yes.

25        Q.    And so even a very small amount of mail-in

1    ballot fraud in those elections could alter the

2    outcome; correct?

3         A.   Certainly, or a small amount of voters being

4    turned away at the polls.

5         Q.   Who is Representative Steve Wolens?

6         A.   Steve Wolens is a lawyer, a former state

7    representative and my predecessor in office.  I

8    call -- I would consider him a friend.

9         Q.   He was a knowledgeable public servant?

10        A.   Quite.

11        Q.   He's quoted in the fourth paragraph on Page

12   2 as saying "'You have to have a conversation in order

13   to prevent coercion and fraud,' said former Rep --

14   former State Rep. Steve Wolens, who in 2003 sponsored

15   legislation to overhaul the state's mail-in ballot

16   system, 'Then you tailor-make a new law that deals

17   with abuse and opens up voting.'"

18             Do you see that?

19        A.   I do.

20        Q.   If you look at the seventh paragraph on Page

21   2, it uses a Spanish term "politiqueros".

22             Do you see that?

23        A.   Yes.

24        Q.   Are you familiar with that term?

25        A.   Vaguely.

Rafael Anchia

August 22, 2022
Page 86

1      Q.    What is your understanding of the term

2    "politiqueros"?

3      A.    People who are involved in political

4    campaigns.

5      Q.    Here Mr. Jeffers says "The law also devised

6    ways to track mail-in vote operatives, called

7    "politiqueros," in Hispanic neighborhoods where

8    absentee campaigns are aggressive."

9           Do you see that?

10   A.    I do.

11     Q.    Are you familiar with allegations that

12   people identified as "politiqueros" have

13   inappropriately stolen people's votes?

14     A.    No.

15     Q.    You don't know one way or the other?

16     A.    No.  I'm unaware of any allegations.

17     Q.    Do you know whether any of your colleagues

18   in the Texas Legislature read this piece by

19   Mr. Jeffers in the Dallas Morning News?

20     A.    I don't.

21     Q.    Do you recall Representative Lozano

22   referring to it on the floor when the legislature was

23   debating SB 1?

24     A.    To this specific piece?  Is that the

25   question?

Rafael Anchia                                                    August 22, 2022
                                                                       Page 87

1        Q.    Yeah.

2        A.    No.

3        Q.    Do you recall your colleagues more generally

4    talking about newspaper articles on the topic of

5    mail-in ballot fraud?

6        A.    I don't.

7                  (Exhibit Number 16 marked.)

8        Q.    (By Mr. Thompson)   I'm going to hand you

9    what's been marked as Exhibit 16.

10       A.    Thank you.

11                 MR. QUESADA:   Thank you, sir.

12       Q.    (By Mr. Thompson)   Does Exhibit 16 appear to

13   be an article from the Dallas Observer entitled "City,

14   County Investigate Possible Voter Fraud In Upcoming

15   Council Election"?

16       A.    Yes.

17       Q.    Is it authored by Stephen Young?

18       A.    Yes.

19       Q.    Is it dated April 24, 2017?

20       A.    Yes.

21       Q.    And in the bottom right-hand corner on Page

22   1, do you see a Bates stamp MS007397?

23       A.    Yes.

24       Q.    And I'll just represent to you that there's

25   some highlighting in this document.  My understanding

1    is that this highlighting came from the party that

2    produced the document and that the highlighting

3    probably was not in the original publication.

4                    Are you able to read the document okay

5    despite the highlighting?

6         A.    Correct.

7         Q.    Okay.  Do you read the Dallas Observer?

8         A.    On occasion.

9         Q.    Do you know whether any of your colleagues

10   in the legislature read the Dallas Observer?

11        A.    I don't.

12        Q.    If you could turn to the second page of this

13   exhibit, which is Bates stamped MS007398, in the

14   second full paragraph it says "Earlier this month

15   several senior citizens in West Dallas and Oak Cliff

16   complained to WFAA-TV that they'd received mail-in

17   ballots without having asked for one."

18                    Do you see that?

19        A.    I do.

20        Q.    You represent part of West Dallas; correct?

21        A.    Correct.

22        Q.    Do you represent Oak Cliff?

23        A.    I do.

24        Q.    Did your office receive any complaints on

25   this topic?

Rafael Anchia                                          August 22, 2022
                                                       Page 89

1        A.    Not that I'm aware.

2        Q.    Do you have any reason to doubt that senior

3    citizens from West Dallas and Oak Cliff complained to

4    the local TV station that they had received mail-in

5    ballots without having asked for one?

6        A.    No.

7        Q.    Would you agree that receiving a mail-in

8    ballot that you did not request would reasonably cause

9    one to wonder whether some sort of irregularity was

10   occurring?

11       A.    Error or irregularity.  Certainly error.

12       Q.    In Texas you're not supposed to receive a

13   mail-in ballot without having asked for one; right?

14       A.    That's right.

15       Q.    So when senior citizens receive a mail-in

16   ballot without having asked for one, they know

17   something's gone wrong; correct?

18       A.    Yes.

19              MR. THOMPSON:  Do you need to take a

20   break or anything?

21              MR. QUESADA:  Nope.

22       Q.    (By Mr. Thompson)  If you look toward the

23   bottom of this page, the second-to-the-last paragraph,

24   second sentence, it says "As the Dallas Observer has

25   documented for well over a decade, Dallas' council

1    races, especially in the city's low-turnout districts

2    like West Dallas' District 6, can come down to which

3    candidate better executes its absentee ballot

4    Strategy.   In 2015 incumbent Monica Alonzo, whose

5    campaign didn't return a request to comment for this

6    story, won her District 6 seat despite receiving only

7    958 votes."

8              Do you see that?

9        A.   I do.

10       Q.   Do you know whether it's true that Dallas

11   City Council races can come down to which candidate

12   better executes an absentee ballot strategy?

13       A.   I don't.

14       Q.   Do you know anything about Monica Alonzo's

15   election in 2015?

16       A.   No.   Other than she was elected, no.

17       Q.   No reason to dispute that it was a

18   relatively low-turnout election?

19       A.   No.

20       Q.   Is that common for District 6 in Dallas?

21       A.   I have no basis.

22       Q.   Do you know whether any of your colleagues

23   in the legislature read this article when they were

24   considering Senate Bill 1?

25       A.   I don't.

1          MR. THOMPSON:  All right.  If we can

2    take a short break, I think we can wrap up here.

3          MR. QUESADA:  Okay.

4          THE VIDEOGRAPHER:  We're off the record

5    at 11:36 a.m.

6                    (Break.)

7          THE VIDEOGRAPHER:  We're back on the

8    record at 11:48 a.m.

9      Q.   (By Mr. Thompson)  Chairman Anchia, are you

10   familiar with any irregularities since the passage of

11   Senate Bill 1?

12     A.   Since the passage of Senate Bill 1?  Is that

13   what you said?

14     Q.   No, sir.

15     A.   I apologize.

16     Q.   Was the process used for passing Senate Bill

17   1 into law irregular in any respect?

18     A.   No.

19     Q.   Everybody was following the normal House

20   rules when they considered the bill?

21     A.   It seems so, yes.

22     Q.   Have you studied the impacts, if any, of

23   SB 1 on voters in Texas?

24     A.   We have not.  We -- we asked for that to be

25   included as part of the bill, but that -- those

```
 1    amendments were rejected.  So the answer's, no.

 2         Q.    Who's the "we" you're referring to?

 3         A.    The offerers of amendments and those persons

 4    who voted for the amendments, the requesting racial

 5    impact studies, et cetera.

 6         Q.    I think I recall seeing those.

 7         A.    Yeah.

 8         Q.    Is it fair to say that the amendments to

 9    which you're referring would have required Texas

10    officials to study the impacts of SB 1 and assess if

11    those impacts were different for members of different

12    racial groups?

13         A.    Yes.

14         Q.    And those amendments were not adopted;

15    correct?

16         A.    That's correct.

17         Q.    I believe your colleagues indicated that

18    they had not looked at the racial impacts of the bill

19    prior to drafting it; is that correct?

20         A.    Even -- even after they had drafted it as

21    well.  So not -- not just prior, but during the

22    drafting and during the legislative process.

23         Q.    I'm sorry.  Just to make sure I understand,

24    your understanding is that your colleagues in the

25    House had not studied the racial impacts of the bill
```

1      at any point; is that right?

2            A.    That -- that's what I believe specifically I

3      had this conversation with Representative Cain during

4      the first regular session, and he said "No".  I don't

5      recall what the answers were for the special -- for

6      the second called special legislative session...

7            Q.    Okay.

8            A.    ...on that issue.

9            Q.    And apart from these studies, you don't have

10     personal knowledge of what the impacts of SB 1 have

11     been --

12           A.    I -- I do not.

13           Q.    -- on voters; correct?

14           A.    I do not.

15           Q.    Would you identify any of your colleagues in

16     the Texas House of Representatives as racists?

17           A.    Would I?  Could I?  What was the question?

18           Q.    Would you describe any of your colleagues in

19     the House of Representatives as racists?

20           A.    Oh, I can't -- I can't look in their hearts.

21     I'll -- I'll say I -- I -- I couldn't say one way or

22     the other.

23           Q.    Is that also true for members of the Texas

24     Senate?

25           A.    Yes.

1          A.    That's right.

2          Q.    Have you heard of the voter file?

3          A.    Yes.

4          Q.    Do you understand the voter file to be a

5    database of information about vote -- about voters

6    that is maintained at the state level by the Secretary

7    of State or at the local level by county officials?

8          A.    Yes.

9          Q.    The voter file is public information that

10   people can request from the government; correct?

11         A.    That's my understanding.  But -- but not all

12   of the information.  I think there's some information

13   that's redacted, if I'm not mistaken, to protect the

14   identity of -- of the voter.  Can be, I should say.

15   Can be redacted.

16         Q.    My understanding is, that's correct, that

17   there's some -- I'll just represent to you there's

18   some information in the voter file that's publicly

19   released and some that conceivably could be redacted.

20         A.    Yes, correct.

21         Q.    Do you understand that campaigns request the

22   public versions of the voter file sometimes?

23         A.    Yes.

24         Q.    Has your campaign done that?

25         A.    I don't -- no, not my campaign.  Not that

Rafael Anchia                                    August 22, 2022
                                                        Page 97

1    I'm aware of at least.

2          Q.    And sometimes campaigns hire consultants who

3    have a copy of the voter file; correct?

4          A.    That's right.

5          Q.    Is that something your campaign does?

6          A.    Correct.

7          Q.    And the public version of the voter file

8    that a campaign or somebody could get includes a

9    voter's name and address; correct?

10         A.    Yes.

11         Q.    But a voter's ID numbers are not public

12   information; correct?

13         A.    That is my understanding, that is correct.

14         Q.    So before Senate Bill 1 when an application

15   for a ballot by mail did not require an ID number, all

16   the information required by the form could have been

17   gleaned from the publicly available voter file;

18   correct?

19         A.    That sounds right.

20         Q.    But after Senate Bill 1 the application for

21   a ballot by mail requires a voter to provide nonpublic

22   information; correct?

23         A.    Yes.

24         Q.    Do you know whether other laws besides SB 1

25   required voters to provide either a driver's license

```
 1    the applicant to whom clause (ii) applies), the last 4

 2    digits of the applicant's social security number"?

 3                    Do you see that?

 4        A.   Yes.

 5        Q.   Do you know whether your colleagues in the

 6    legislature decided to use the driver's license or

 7    social security number requirement based on its

 8    similarity to this provision of federal law?

 9        A.   I don't.

10        Q.   And do you recall speaking with

11    Representative Lozano on the House floor during the

12    debate over SB 1?

13        A.   Vaguely, yes.

14        Q.   Representative Lozano said, "We need to

15    verify that people are who they are before they vote."

16    And you responded, "Stipulated, stipulated," according

17    to the House Journal.

18                    Do you agree that we need to verify who

19    people are before they vote?

20        A.   Yes.

21        Q.   That's always been your --

22        A.   Stipulated.

23        Q.   That's always been your position, hasn't it?

24        A.   Sure.

25                    MR. THOMPSON:  No further questions.
```