Page 6

1  get on to the meat and potatoes of the deposition.
2      Does that sound good?
3  A. I'm ready.
4  Q. Okay. Have you been deposed before?
5  A. Yes.
6  Q. How many times?
7  A. I don't know.
8  Q. Do you have a rough approximation?
9  A. At least once.
10  Q. Twice?
11  A. Maybe.
12  Q. Okay. What was the one that you can recall that
13  you were disposed in? What case was that?
14  A. It was a case against Texaco and gas stations,
15  related to ADA compliance for helping people to pump gas
16  into their accessible vehicles for people in wheelchairs
17  who could not reach the pumps, nor lift them, nor put
18  them in their vehicle. And we won that lawsuit. If
19  you've been by any gas station, there's a label that
20  says, If you need help, just honk.
21      So that one is -- was a very memorable one.
22  Q. So we have you to thank for that. And what year
23  was that?
24  A. I don't know. It was within the last 32 years.
25  Q. Okay.

Page 7

1  A. I know that.
2  Q. Okay. All right. Thank you.
3      And any other cases that you've been involved in
4  that you can remember, in which you've been deposed?
5  A. I believe I was deposed in Yellow Cab suit with
6  Civil Rights Project. They helped us with accessible
7  taxi service.
8  Q. And a rough sense of what year that was?
9  A. No.
10  Q. That's okay.
11      Any other ones you can think of?
12  A. Not right off.
13  Q. Okay. You understand you're under oath today,
14  right?
15  A. Yes.
16  Q. For the court reporter, especially since our
17  court reporter today is virtual -- she's on the
18  computer -- it's especially important that you provide
19  "yes or no" answers rather than just nodding your head
20  or shaking your head. This also has a little extra
21  importance today, too, because we have, you know,
22  attorneys and other people participating remotely who,
23  maybe they're just dialing in, and they can't see you.
24      Does that make sense?
25  A. It does.

Page 8

1  Q. Okay. It also helps the court reporter if we
2  don't talk over each other. I feel like we've been
3  doing a pretty good job of that so far, so I will do my
4  best to let you answer a question before I try and ask
5  you something else, and I ask that you do the same for
6  me.
7      Does that make sense?
8  A. It does.
9  Q. Okay. If you don't understand the question, just
10  let me know. If you do answer a question, I'm going to
11  assume that you understood the question.
12      Does that make sense?
13  A. It does, yes.
14  Q. Okay. If you need a break at any point, just let
15  me know. That's totally fine. My only request is that
16  if you're in the middle of answering the question, you
17  finish answering the question, then we can go off the
18  record and take a break.
19      Is that okay?
20  A. Yes.
21  Q. Okay. Mandatory question: Are you aware of
22  anything that would affect your ability to testify
23  truthfully today?
24  A. No.
25  Q. And have you consumed any alcohol or drugs today?

Page 9

1  A. No.
2  Q. Okay. I'm going to start us off by introducing
3  our first exhibit of the day. I'm going to be marking
4  it as Exhibit 1.
5      If you flip to the second page, you'll see that
6  this is -- reads, "Plaintiff's Second Amended
7  Complaint." Reads, "Plaintiffs Houston Justice, Houston
8  Area Urban League, Delta Sigma Theta Sorority, Inc.,
9  The Arc of Texas, Mi Familia Vota, Marla López,
10  Marlon López, Paul Rutledge, and Jeffrey Lamar Clemmons
11  (collectively, "Plaintiffs") file this Complaint for
12  Declaratory and Injunctive Relief to challenge the
13  constitutionality and legality of Texas Senate Bill 1,
14  and allege
15  as follows."
16      Did I read that correctly?
17      (Exhibit 1 marked.)
18  A. I didn't catch you. I was looking up here.
19  Q. (BY MR. HERBERT) Oh, that's okay. So the first
20  paragraph --
21  A. Okay.
22  Q. -- it lists as plaintiffs The Arc of Texas, and
23  it refers to challenging the constitutionality and
24  legality of Texas Senate Bill 1.
25      Did I represent that accurately?

Defendant's
Exhibits

435

Nancy Crowther

Page 22

1  Page 4.  Let's look at Paragraph 9 of the Complaint.
2      It reads, "Each of the Plaintiffs named below has
3  members -- including REVUP members like
4  Ruben Fernandez, Amy Litzsinger, and Laura Halvorson --
5  who are qualified individuals with
6  disabilities within the meaning of the ADA because they
7  have physical and/or mental impairments
8  that substantially limit one or more of their major life
9  activities, including but not limited to 'caring
10 for oneself, performing manual tasks, seeing, hearing,
11 eating, sleeping, walking, standing, lifting,
12 bending, speaking, breathing, learning, reading,
13 concentrating, thinking, communicating, and/or
14 working.'"
15     Did I read that correctly?
16 A.  Yes, you did.
17 Q.  Okay.  Are you familiar with Ruben Fernandez --
18 strike that --
19     Do you know Ruben Fernandez?
20 A.  If he is the Rubin that resides in El Paso, then
21 yes, I know him -- or of him.
22 Q.  Do you know the nature of his disability?
23 A.  No, I do not.
24 Q.  Okay.  What about Amy Litzsinger?
25 A.  I do know her.

Page 23

1  Q.  Do you know the nature of her disability?
2  A.  No, I do not.
3  Q.  And Laura Halvorson, do you know her?
4  A.  Yes.
5  Q.  And do you know the nature of her disability?
6  A.  No, I do not.
7  Q.  So can you personally testify to any challenges
8  that Laura Halvorson has faced while voting -- strike
9  that --
10     Do you have any personal knowledge about
11 challenges that Laura Halvorson has faced while voting?
12 A.  No.
13 Q.  Do you have any personal knowledge about
14 challenges that Amy Litzsinger has faced while voting?
15 A.  No.
16 Q.  And do you have any personal knowledge about
17 challenges that Ruben Fernandez has faced while voting?
18 A.  And the only reason that I respond "no" in
19 this -- this direction is that I know they have
20 disabilities, I just don't know that I've ever seen them
21 vote.
22 Q.  So that's a "no" for Ruben Fernandez too?
23 A.  So that's no.
24 Q.  Okay.  Thank you.
25     And do you yourself have any disabilities within

Page 24

1  the meaning of the ADA?
2  A.  Yes, I do.
3  Q.  Could you tell me the nature of your disability?
4  A.  I have a progressive neuromuscular disease that
5  makes me extremely weak, and it's progressive, so I'm
6  getting weaker as time goes by.  It -- I have all the
7  definitions of disability in accordance with the law,
8  and more.  I do require assistance with an attendant and
9  multiple mobility devices and durable medical equipment
10 to maintain my major life activities.
11 Q.  Can you tell me about some of the challenges to
12 your major life activities that you face and how you
13 deal with those challenges?
14     MS. SIFUENTES-DAVIS:  Objection, form.
15 A.  I'll have to just take you through a day.  I need
16 attendant services.  I use a hospital bed.  I can't sit
17 up by myself, so my attendant helps me.  To go to the
18 bathroom, I need assistance in that form.  For getting
19 dressed I need 100 percent assistance with that.  Being
20 transferred from my bed to my wheelchair, I use a lift,
21 which my attendant puts under me and guides me into my
22 wheelchair.  I have an electric wheelchair that reclines
23 so that I can stretch out during the day.  I cannot read
24 above my ears, so everything I have has to be kind of
25 right in front of me.  I use electronics [sic]

Page 25

1  technology to turn on lights.  I use my cell phone to
2  turn on lights and do what else I can do through
3  whatever app there is available.
4      Let's see.  I utilize, certainly, you know,
5  sidewalks.  I use my accessible public transit to get
6  around.  My attendant goes with me for the majority of
7  my activities to either of escort me, open doors, get me
8  water, food.  She helps me at night with my CPAP
9  machine.  So many things.  Plugging in my wheelchair.
10 Everything -- feeding my cat.  That's not on the list of
11 duties, but taking care of a lot of the household
12 things.
13     I can't even really fold laundry anymore.  As I
14 said earlier, it's a progressive disability.  I used to
15 be able to cook.  I can't cook anymore, for safety
16 reasons and for the weakness.  I used to be able to open
17 doors on my own, and because it's progressed, I'm
18 needing help doing that.  I find myself dropping things
19 more, which my attendant helps me with.  Actually, we
20 just go around the house picking up things.
21     We do as many normal things as possible,
22 including going to church activities and to -- lifting
23 things.  I can't lift anything.  I shouldn't lift
24 anything because she'll have to pick it up.  It's a
25 pretty devastating type of disease.  To imagine the

Nancy Crowther

June 17, 2022
Pages 30 to 33

Page 30

1    Q.  And how long have you been registered to vote?
2    A.  Since I was 22.  Do the math.
3    Q.  And --
4    A.  But as soon as I could, I got registered.
5    Q.  And you're currently registered to vote in
6  Travis County, right?
7    A.  Correct.
8    Q.  Do you have a rough sense for how long you've
9  been registered in Travis County?
10    A.  Forty years.
11    Q.  Okay.  And you vote frequently, right?
12    A.  Yes.
13    Q.  You mentioned about the 2020 instance in which
14  you attempted to vote by mail, and we will circle back
15  to that, but I assume that means, then, that you've
16  voted in person, as well, right?
17    A.  No.
18    Q.  You have not voted in person before?
19    A.  I have voted in person as often, but the mail-in
20  ballot was a different issue.
21    Q.  Right.  Sorry, I'm -- I apologize -- strike
22  that -- let me restate my question.
23    A.  Okay.
24    Q.  You have also voted in person before, right?
25    A.  Yes.

Page 31

1    Q.  Okay.  And have you ever used an assister to
2  vote?
3    A.  I have one available.  My attendant is available
4  to assist when needed.
5    Q.  And have you used the help of your attendant or
6  anybody else to help you vote?
7    A.  In situations where I've dropped the ballot, I
8  had need for help getting the adaptive equipment to use
9  the voting machine disconnected from the Velcro; just in
10  those instances.
11    Q.  Okay.  Have you ever requested an accommodation
12  at a polling location?
13    A.  The only accommodation I recall asking for has
14  been the high-enough, wide-enough booth to accommodate
15  my wheelchair.
16    Q.  Do you have a rough sense for when that was?
17    A.  It's generally every election.
18    Q.  Okay.  So it's fair to say that you're familiar
19  with voting practices in Travis County, right?
20    A.  Yes.
21    Q.  Okay.  And you're familiar with the voting
22  options that Travis County has offered in the past,
23  right?
24    A.  Voting options?  What do you mean by that?
25    Q.  You're familiar with the voting practices in

Page 32

1  Travis County in the past, too, right?
2    A.  I'm still not sure what you're asking.
3    Q.  Sure.
4        You know how voting practice works -- strike
5  that --
6        You know how voting works in Travis County,
7  right?
8        MS. SIFUENTES-DAVIS:  Objection, form.
9    A.  Yeah.  I'm still having --
10    Q.  (BY MR. HERBERT)  It's okay.
11    A.  -- trouble with that question.
12    Q.  I think if I can rephrase it in a moment.
13    A.  Okay.
14    Q.  So we're probably gonna touch on the 2020
15  instance a couple of times here.  So we don't -- my
16  question just for right now is:  Were you able to vote
17  in 2020?
18    A.  Yes.
19    Q.  Okay.  And did you vote in the 2020 general
20  election?
21    A.  Yes.
22    Q.  Okay.  Did you vote in the 2020 primary election?
23    A.  I don't recall.
24    Q.  Did you vote in the 2020 special election in July
25  of 2020?

Page 33

1    A.  I don't recall.
2    Q.  Did you vote in the 2020 July primary runoff?
3    A.  Specifically, I don't recall.  This was all
4  during COVID, and it's kind of a blur, but I don't
5  recall.
6    Q.  Okay.  Do you know if you voted -- strike that --
7        Did you vote in the 2021 November -- the
8  November 2021 constitutional amendment election?
9    A.  Yes.
10    Q.  Okay.  And let's talk about 2022.
11        Did you vote in the 2022 primary election on
12  March 1st?
13    A.  Yes.
14    Q.  Okay.  Which party's primary did you vote in?
15    A.  Democratic.
16    Q.  And have you voted in Texas Democratic primaries
17  before?
18    A.  Yes.
19    Q.  Do you have a rough estimate on how many times?
20    A.  Not really.
21    Q.  Okay.  Have you ever voted in the Republican
22  primary in Texas?
23    A.  Yes.
24    Q.  Do you have a rough sense for when that was?
25    A.  No.

Nancy Crowther

Page 34

1    Q.  Okay.  Do you have a rough sense for how many
2  times?
3    A.  No.
4    Q.  In the 2022 primary election on March 1st, the
5  Democratic primary election, did you vote by mail or in
6  person?
7    A.  In person.
8    Q.  Okay.  Did your attendant help you that day?
9    A.  No.
10    Q.  Okay.  Did you have anyone else help or assist
11  you that day in voting?
12    A.  I required the assistance of one of the poll
13  workers to help remove the adaptive equipment from the
14  side of the machine so that I could work the voting --
15  but she had trouble, too.  It's a very strong Velcro.
16  It's got to be 50 pounds or something.  But yes, she
17  assisted removing that device so that I could vote.
18    Q.  Okay.  And what about the May 7th local and
19  constitutional election?  Did you vote in that election
20  in 2022?
21    A.  I voted in the early voting, yes.
22    Q.  And did you vote in person for that?
23    A.  Yes.
24    Q.  And what about the most recent May 24th
25  Democratic primary runoff?  Did you vote in that?

Page 35

1    A.  Yes.
2    Q.  Okay.  And you voted in person, right?
3    A.  Yes.
4    Q.  Okay.  Did you receive help from your attendant
5  during the May 7th local and constitutional election?
6    A.  Yes.
7    Q.  And what did she do?
8    A.  She helped me with the Velcro.
9    Q.  The recurring Velcro issue?
10    A.  The recurring Velcro.
11    Q.  Okay.
12    A.  But also getting into the facility.
13    Q.  Okay.  And same question, but for the May 24th
14  primary runoff.
15        Did you receive help from your attendant on that
16  day?
17    A.  Yes.
18    Q.  And what did she do for you?
19    A.  Same thing.
20    Q.  Okay.  And you were able to vote successfully,
21  both in the May 24th runoff and the May 7th local
22  election?
23    A.  Yes.
24    Q.  And the same is true for the March 1st primary?
25    A.  Yes.

Page 36

1    Q.  Senate Bill 1 was in effect for the
2  March 1st, 2022, primary, correct?
3    A.  I believe so.
4    Q.  And same for the May 7th local election, correct?
5    A.  I believe so.
6    Q.  And same for the May 24th runoff election, right?
7    A.  Yes.
8    Q.  Okay.  Since 2016, how many times have you voted
9  in the Democratic primary elections?
10    A.  There is no way I can tell you an answer to that.
11    Q.  That's okay.  Do you have a rough idea?
12    A.  We'll just say that I vote at every opportunity
13  through issues that come up on the ballot --
14    Q.  Okay.
15    A.  -- in Travis County.
16    Q.  And did you vote in a Republican primary since
17  2016?
18    A.  I don't recall.
19    Q.  Okay.  Let's now -- let's now step back to before
20  the enactment of Senate Bill 1.
21        So you had mentioned that you had issues voting
22  by mail in the 2020 general election; is that right?
23    A.  That's correct.
24    Q.  Is that the only time that you had issues voting
25  in 2020?

Page 37

1    A.  By mail?
2    Q.  In general -- strike that --
3        Let's take a step back.  Tell me about that time
4  in November 2020 where you had issues voting by mail.
5    A.  I placed -- sent in my application by the
6  deadline to receive a ballot by mail.  Close to the
7  deadline, I received my ballot by mail, but I also
8  received notice that there was an error on the ballot by
9  mail through the Travis County voting folks.  So I had
10  to wait for a second one, and that one came even closer
11  to the deadline of the vote-by-mail timelines.  This is
12  all during COVID.  I want to keep that in the record
13  because that was a whole different time where I was
14  confined to my home for health reasons.
15        When I received the correct ballot, at that time,
16  the mail service began to mess up, and there were some
17  issues going on locally with our mail service, which
18  made me rather nervous.  I personally experienced
19  getting mail for other people, and also reading in my
20  neighborhood news issues with mail, which kind of
21  concerned me that -- how safe would my ballot be if I
22  mailed it from my mailbox on time?  Would it get there
23  on time?
24        After many reports of problems with the mail, not
25  only locally but nationally, I took it upon myself to go

Nancy Crowther

June 17, 2022
Pages 38 to 41

Page 38

1  take it -- my ballot -- and I did everything right;
2  signed it, licked it, signed it, everything.  I took it
3  upon myself, even though it went against my better
4  judgment, to go out, to find the box that I could put my
5  ballot in.
6        At one time there were four boxes in Travis
7  County, and then I found out there was only one box in
8  Travis County, and that was over on Airport Boulevard,
9  which was a substantial number of miles away from my
10  house.  And I had to get masked up, gloved up, warmed
11  up, everything, and I had my ballot tucked in my seat
12  belt so I wouldn't lose it.  And because of the mail
13  service, I took it.  I went to the bus stop; I got on a
14  bus; I got off; I transferred.  This whole transaction
15  took more than an hour and a half getting there.
16        When I got off on Airport Boulevard, I had to --
17  I'm not familiar with the area, but got off, got into
18  some construction.  They had to lift a guide wire up so
19  I could go under it to keep on the sidewalk to get to
20  where they told me the white box was to drop off my
21  mail-in ballot.
22        I got to the area, and there were some cars in
23  line, and I thought to myself, I thought, this must be
24  the line for dropping off your ballot.  Most people
25  drive.  I don't drive anymore, so I got in line, and

Page 39

1  after about 20 minutes of following the cars and heading
2  toward the front, one of the employees came over and
3  said, Ma'am, where's your car?
4        And I was like, I came by bus.
5        He said -- and he saw my ballot tucked in my
6  belt, and he goes, Oh are you here to drop that off?
7        And I said, Yes isn't this the line?
8        He said, No, and he pointed all the way across
9  the parking lot, which was pretty extensive.  And he
10  goes, You see that white tent?
11        I said, Okay.
12        So I left that line, walked a distance that was
13  pretty extensive, and holding on to my ballot, I made it
14  to the tent -- or the canopy.  And there, first, they
15  wanted my signature, my ID, and sign in, and do
16  everything else.  Meanwhile, I'm holding on to this
17  ballot, and it become more and more crucial to me to get
18  this ballot into that white box.  And they said, Here
19  let us do it for you.
20        I said, Oh, no.  I have traveled all this way to
21  make sure my vote counts.
22        And so they thought, Okay, we'll let you put it
23  in.
24        And actually, my attendant was with me and helped
25  raise my arm up with my ballot in it and put it in the

Page 40

1  box.  And everybody cheered, because they knew it was
2  quite the endeavor to get there.  So I turned around and
3  just repeated the whole process to get home.  Overall,
4  it was about a three-hour adventure.  Exposing myself to
5  potential COVID, I was mortified by that, because I had
6  been confined at home for so long, and I thought maybe
7  the mail-in ballot situation would keep me safe, but all
8  that turned to chaos, and I couldn't even trust our mail
9  system.  So that's why I took it upon myself to go and
10  do it the way I did it.  And it did get into the one
11  white box that was in Travis County.  And I got my
12  sticker and left.
13        Q.  So in November 2020, you had heard about problems
14  with the mail due to COVID, and for that reason, you
15  decided not to submit your ballot by mail, right?
16        A.  I don't believe the problem with the mail was due
17  to COVID.  I think there was a change in the business
18  with the mail service that has caused all the problems.
19  I still had my mail-in ballot, so it was, do I put it in
20  the mail, or do I deliver it?  And the mail became an
21  issue nationally and locally.
22        Q.  Okay.
23        A.  So --
24        Q.  Sorry, let me rephrase that, then.
25        So in November 2020, due to problems with the

Page 41

1  post office that you perceived, you decided not to drop
2  your ballot in the mail, but instead to go vote in
3  person, right?
4        MS. SIFUENTES-DAVIS:  Objection, form.
5        A.  Can you clarify what you just said.
6        Q.  (BY MR. HERBERT)  Sure.
7        So to recap, in November 2020, instead of posting
8  your mail-in ballot, you decided to go drop it off in
9  person because of problems that you perceived with the
10  USPS, right?
11        A.  They weren't perceived; they were real.
12        Q.  Okay.  I'll rephrase it.
13        A.  I had an experience --
14        Q.  I'll rephrase it.
15        So in November 2020, you decided not to post your
16  mail-in ballot, but instead, to take it and drop it off
17  in person because of problems with the USPS, right?
18        A.  Correct.
19        Q.  Okay.  And in November 2020, you did successfully
20  vote, correct?
21        MS. SIFUENTES-DAVIS:  Objection, form.
22        A.  Yes, I did.
23        Q.  (BY MR. HERBERT)  Okay.  I'm going to go ahead
24  and introduce another exhibit, which I will mark as
25  Exhibit 4.

Nancy Crowther

Page 42

1          (Exhibit 4 marked.)
2     A. I'm --
3     Q. (BY MR. HERBERT) So this is a -- I apologize.
4     A. I may need you to read it for me.
5     Q. I'll do that.
6        So, this is a page on the Travis County Clerk
7  website. In the center of the page, it says, "Voters
8  with disabilities."
9     A. Okay.
10    Q. Do you see that?
11    A. Yes.
12    Q. Okay. And the first three sentences right below
13  that read, "The Travis County Clerk's office is
14  committed to creating a 'safe haven' for voters so that
15  they can exercise their right to vote in a polling place
16  with a non-intimidating, supportive environment. We
17  believe in making all polling places fully accessible,
18  and we are seeking input from the community to ensure
19  that accessibility. We believe that all voters have the
20  right to cast their ballot independently and privately."
21       Did I read that right?
22    A. Yes.
23    Q. Okay. So you would agree that polling places in
24  Travis County are accessible, right?
25       MS. SIFUENTES-DAVIS: Objection, form.

Page 43

1     A. My experience with voting in different polling
2  places, they are not all accessible, because they can't
3  see you at the door, and you can't open the door to get
4  in. So, you know, it's your definition of where you're
5  at, as far as being able to have accessibility. Now, I
6  would say that it's getting better, but it just depends
7  on the individual. When I'm short, people don't see me
8  out windows unless I get someone to open the door for
9  me. So that is an access issue. It will always be an
10  access issue to get into the polling place.
11    Q. (BY MR. HERBERT) In other words, for people who
12  need accommodations, there's no such thing as a
13  one-size-fits-all accommodation, right?
14       MS. SIFUENTES-DAVIS: Objection, form.
15    A. It has been my experience. It doesn't fit
16  everybody. But the -- it has tried to fit everybody,
17  but not all shoes fit the same person.
18    Q. (BY MR. HERBERT) And you had mentioned the issue
19  of accessibility for getting into a polling place and
20  the situation of doors or folks not being able to see
21  you.
22       Has that happened to you before?
23    A. Yes.
24    Q. When did that happen?
25    A. Quite a few times, if I've been by myself without

Page 44

1  my attendant or if not another person shows up to vote
2  behind me or comes out from voting. So there's some
3  times there -- so I -- I can't give you a number of how
4  many times that's happened, but it does happen quite
5  frequently.
6     Q. When was the most recent time that's happened?
7     A. I believe it was at a facility I wasn't familiar
8  with, and it was, I think, sometime this year, because I
9  went with my attendant, and she had to open the door,
10  and we had to go down a long hallway, and I said, If you
11  weren't here, I wouldn't have gotten in, because the
12  people that were voting were exiting through different
13  areas. I could have been sitting there a long time.
14    Q. So that was in 2022?
15    A. As far as I can recall. I believe it was a
16  primary.
17    Q. Was it the March 2022 primary?
18    A. I believe it was.
19    Q. Okay. Did it happen any other times in 2022?
20    A. No.
21    Q. Okay. Did it happen anytime in 2021? There was
22  the November 2021 election. Did it happen at that
23  election?
24    A. No. That was the one where I carried it, right?
25    Q. Are you referring to the November 2022 -- sorry.

Page 45

1  Strike that --
2        Are you referring to the November 2020 general
3  election that we previously talking about, how you
4  waited in line with cars?
5     A. I've gotten lost on the question.
6     Q. Sorry about that. Let me restate it.
7        So you'd mentioned that at the March 2022
8  Democratic primary, when you went to vote, you were not
9  able to open the door by yourself, and you would not
10  have otherwise been able to open the door but for your
11  attendant who was there with you, right?
12    A. Correct.
13    Q. Did that also happen to you in the November 2021
14  election?
15    A. Now, which one was that?
16    Q. That would be the November 2021 constitutional
17  amendment election.
18    A. Oh, yes.
19    Q. It happened to you then, as well?
20    A. Yes.
21    Q. And was your attendant there with you?
22    A. No.
23    Q. But you were able to vote, right?
24    A. I had to rely on another person to hold the door
25  open -- or open the door so I could get access into the

Nancy Crowther

Page 46

1  polling place.
2      Q.  And did that happen during the November 2020
3  general election?
4      A.  Well, you heard the story on that one.
5      Q.  Oh, that's right.  So it did not happen in the
6  November 2020 -- November election, right?  The issue of
7  not being able to get through doors because no one was
8  at the door to see you?
9      A.  Well, finding the location of the white box, I
10 think would be equivalent --
11     Q.  Okay.
12     A.  -- to not being able to get into a building,
13 because sitting in a line of cars while you're in a
14 wheelchair is rather intimidating, but...
15     Q.  I imagine so, and I didn't mean to make any
16 statement about that.  I just meant to say I'm --
17     A.  You're right.
18     Q.  -- trying to talk, specifically, just about the
19 door issue.  And we can talk about all of those, but the
20 door issue didn't happen in the 2020 election --
21     A.  Correct.
22     Q.  Did it happen in the July 2020 Democratic primary
23 runoff?
24     A.  July 2020?  No.
25     Q.  Did it happen any other times in 2020?

Page 47

1      A.  I don't believe so, because there were a few of
2  the elections, as I stated earlier, that I didn't vote
3  in because of COVID.
4      Q.  But you did vote in the March 2020 Democratic
5  primary, correct?
6      A.  Yes.
7      Q.  Okay.  And you voted in person, right?
8      A.  Yes.
9      Q.  Did you face that issue of door access in the
10 2020 March Democratic primary?
11     A.  I don't believe so.
12     Q.  Okay.  So just to sum up, you faced door-access
13 issues in the March 2022 primary, and you also faced
14 door-access issues in the November 2021 constitutional
15 amendment election, correct?
16     A.  Correct.
17     Q.  Okay.  So Senate Bill 1 did not have any affect
18 on whether or not you faced door-access issues, correct?
19     A.  In what way?
20     Q.  Senate Bill 1 was not in effect during the time
21 of the November 2021 constitutional amendment election,
22 and it was in effect during the time of the March 2022
23 Democratic primary, so Senate Bill 1 did not affect any
24 door-access issues, correct?
25     A.  I had electric doors at that primary, so doors

Page 48

1  weren't an issue.
2      Q.  Okay.  So if we look back to Exhibit 4, which is
3  in front of you, and you flip to the second page -- it's
4  printed on both sides -- you'll see a header that reads,
5  "Voters with Disabilities/Curbside Voting."
6          Do you see that?
7      A.  Yes.
8      Q.  Okay.  The first paragraph reads, "Voters who are
9  physically unable to enter the polling location without
10 assistance or likelihood of injury to the voter's health
11 may ask the presiding election official to allow them to
12 vote outside the polling location.  The election officer
13 will deliver a ballot to the voter at the polling place,
14 entrance, or curb."
15         And then it cites TEC Section 64.009.
16         Did I read that accurately?
17     A.  You did.
18     Q.  The second paragraph, right below that, reads,
19 "Voters who are planning to vote curbside are encouraged
20 to contact us upon their arrival at the polling
21 location.  Call 512-238-VOTE -- in parentheses, 8683 --
22 or 512-854-4996."
23         Did I read that correctly?
24     A.  Yes.
25     Q.  Okay.  So you'd agree that curbside voting is

Page 49

1  available in Travis County, right?
2      A.  In my opinion?  I know that curbside voting, in
3  my history, was providing people the access to voting
4  within the vehicle, and so I'm not sure if they're
5  saying this is outside the vehicle or not.
6          So that's my clarification issue that I would
7  have, but otherwise, that's what it's stating, that
8  people can vote inside or outside their vehicle -- it's
9  not clarified there, unless it's in that section of the
10 TEC.  I don't know.
11     Q.  Okay.  Have you ever called the polling location
12 or -- strike that --
13         Have you ever called a polling location about
14 curbside voting?
15     A.  No.
16     Q.  If you look to the next page, there's another
17 heading called, "Receiving assistance at the polls."
18         Do you see that?
19     A.  Yes.
20     Q.  It reads, "You're entitled to receive assistance
21 if you cannot read or write or if you have a physical
22 disability that prevents you from reading or marking the
23 ballot.  You may be assisted by a person of your choice
24 who is not your union representative or employer.  Under
25 certain circumstances, election workers are also

Nancy Crowther

June 17, 2022
Pages 50 to 53

Page 50

1  available upon request to assist you."
2      Did I read that correctly?
3  A. Yes.
4  Q. Okay. And if you flip back to the first page, at
5  the very top of the page, in the upper right-hand
6  corner, there is a phone number listed, correct?
7      In the top right-hand corner in the black bar at
8  the top of the right page --
9  A. Okay.
10  Q. -- there's a phone number listed, correct?
11  A. Yes.
12  Q. Have you ever called this phone number?
13  A. No.
14  Q. Have you ever called the Travis County Clerk?
15  A. No.
16  Q. Have you ever asked the Travis County Clerk for
17  assistance at the polls?
18  A. No.
19  Q. Have you ever called the Travis County Clerk for
20  an accommodation?
21  A. No.
22  Q. Okay. I'm going to introduce one more exhibit,
23  which I will mark as Exhibit 5?
24      So, this is a notice posted on the Travis County
25  Clerk website. Do you see at the top of the page, where

Page 51

1  it reads, "Notice to voters with disabilities"?
2          (Exhibit 5 marked.)
3  A. Yes.
4  Q. (BY MR. HERBERT) And in the first box, the first
5  two sentences read as follows: "The Americans with
6  Disabilities Act, ADA, requires that Travis County's
7  elections be accessible to individuals with
8  disabilities. For any complaints regarding
9  accessibility, the Travis County Elections Division has
10  a plan of action to promptly resolve any complaints
11  received."
12      Did I read that correctly?
13  A. Yes.
14  Q. Now, in the bottom right-hand conner -- in the
15  bottom right-hand box of this notice, it reads as
16  follows: "ADA coordinator, Tim Moore" -- and then it
17  includes, below that, a phone number and an e-mail
18  address.
19      Did I represent that accurately?
20  A. Yes.
21  Q. Have you ever reached out to the Travis County
22  Elections Division about accessibility?
23  A. Way prior to 2020.
24  Q. Okay.
25  A. Several decades. I worked with them on

Page 52

1  implementing ADA requirements, so I have vast knowledge,
2  and I don't need to speak with Mr. Moore. I dealt with
3  Dana Dubois directly.
4  Q. And when was that? You said a long time before
5  2020; is that right?
6  A. Yes.
7  Q. Okay. And you -- just to be clear, you never
8  called or contacted Mr. Tim Moore, the ADA coordinator,
9  right?
10  A. No.
11  Q. Okay. Let's talk about SB1.
12      Do you contend that SB1 has harmed you?
13  A. I don't feel like I have full knowledge -- or I
14  haven't read the whole bill to understand it. I'm not a
15  lawyer.
16  Q. Some might say that to be a good thing.
17  A. Yeah. There are jokes about that.
18      But to the basic knowledge, I know that it
19  would -- because of my disability that is progressive, I
20  will need more and more help, and the help that I will
21  be needing is going to be going through more, I want to
22  say, threatening issues that could -- how should I say
23  this? It could jeopardize the relationship with my
24  attendant because of the, What you can do; what you
25  can't do. If you instinctively pick up a ballot and

Page 53

1  it's not in the rule to pick up the ballot off the
2  floor, you know, those types of things, I would be
3  mortified for them if they were to get in trouble just
4  for helping me.
5  Q. So your concern is about the future effect of
6  Senate Bill 1 on your ability to vote, correct?
7  A. Yes.
8  Q. Has Senate Bill 1 thus far affected your ability
9  to vote?
10  A. Not to my knowledge. If I had not done any -- I
11  haven't tried any mail-in voting or whatever else they
12  asked for in SB1 that I know of.
13  Q. Okay. Before we move on and go more in depth, do
14  you have any personal knowledge of anyone else for whom
15  SB1 has affected their ability to vote? Or are the --
16  only personal knowledge you have about yourself?
17  A. My own knowledge is all I have right now.
18  Q. Okay. So just to be clear, you do not have any
19  personal knowledge about anybody other than yourself who
20  has been affected by SB1 for the ability to vote,
21  correct?
22  A. I would have to say, yes.
23  Q. Okay. And also, just to be clear, you do not
24  have any reason to believe that Senate Bill 1 affected
25  your ability to vote in the March 2022 primary only,

Page 54

1  correct?
2      A.  Me personally?  No.
3      Q.  Okay.  And I'm just going to ask a couple more
4  questions like that before we move on to talking a
5  little bit more about SB1 specifically.
6      A.  Okay.
7      Q.  But again, just to clarify, you do not have any
8  basis to believe that SB1 harmed your ability to vote in
9  the May 7th local election specifically, correct?
10     A.  To clarify your question, I did not take my
11 attendant me on that election because I did not
12 want to jeopardize their relationship with me based on
13 the new requirements, so I didn't take her.  So it has
14 impacted me.
15         Was that the question?
16     Q.  Sorry.  Not quite.  I'm trying to ask just a
17 little bit -- something different.  I understand that
18 you have concerns about the -- about certain ways in
19 which you believe that SB1 will affect you.  So I'm just
20 trying to make sure that I understand in what context
21 you're talking about those things.
22         My question is a little bit more just about --
23 you had said that you were concerned about the future
24 affect of SB1 because of the progressive nature of your
25 disability.

Page 55

1      A.  Uh-huh.
2      Q.  And so I'm just trying to clarify that for the --
3  just with respect -- only with respect to the May 7th
4  local election and the May Democratic primary runoff,
5  that you have no personal experience that would suggest
6  that SB1 prevented you from voting, correct?
7      A.  That would be correct.
8      Q.  (BY MR. HERBERT)  Okay.  So let's talk a little
9  bit about SB1, moving forward.
10         I'm going to introduce another exhibit, which I
11 will mark as Exhibit 6.  On the first page of this
12 document, the bold and underlined caption or header
13 reads, "Plaintiff -- Plaintiffs Houston Justice, et al.,
14 responses to State Defendants' first set of requests for
15 admission, requests for production, and
16 interrogatories."
17         Correct?
18         (Exhibit 6 marked.)
19     A.  Yes.
20     Q.  (BY MR. HERBERT)  In that first paragraph, it
21 reads, "Come Now Plaintiffs Houston Justice, Houston
22 Area Urban League, Delta Sigma Theta Sorority, Inc., The
23 Arc of Texas," and it continues on, correct?
24     A.  Yes.
25     Q.  If you would flip to Page 7, at the top of the

Page 56

1  page, second line down, it reads, "Interrogatory No. 1:
2  Identify each Texas Election Code provision that
3  Senate Bill 1 amended and that you are challenging by
4  the relevant section number of each Texas Election Code
5  provision."
6          Did I read that correctly?
7      A.  Yes.
8      Q.  And do you see, the line right after that begins,
9  quote, "Response:  Plaintiffs are challenging the
10 following provisions in the Texas Election Code that
11 were amended by Senate Bill 1."
12         It then continues on to list a whole set of
13 provisions; 19 provisions on this page, and one more on
14 the following page at the very top.
15         Did I represent that accurately?
16     A.  Yes.
17     Q.  Okay.  So if I use the term "challenged
18 provisions," I'm talking about these challenged
19 provisions within SB1.
20         Does that make sense?
21     A.  Yes.
22     Q.  Okay.  And just to be clear, as far as you're
23 aware, you are not alleging that any particular
24 provision, of Senate Bill 1, aside from the challenged
25 provisions have harmed you, right?

Page 57

1      A.  I'm not aware of what these provisions are.  I
2  don't recognize them.  And I'm not a legislative person
3  that would be writing all this stuff, so I'm not
4  familiar with what they are.  So I really can't answer
5  that.
6      Q.  That's okay.  Thank you.
7          So let's talk about some of the provisions of
8  Senate Bill 1.  And to help guide our conversation, I'm
9  going to introduce another exhibit, which I'm going to
10 mark as Exhibit 7.  We can just keep it on hand and
11 handy as a reference.  You may not flip to it all the
12 time, but I might ask you to look at it now and then,
13 okay?
14         (Exhibit 7 marked.)
15     A.  Okay.
16     Q.  (BY MR. HERBERT)  So this is a copy of the signed
17 Senate Bill 1, and as we look at this document, I'll
18 represent to you that any language that the Texas
19 legislature removed from the previously enacted statute
20 has been crossed out.  Any language that is new -- that
21 has been added -- is underlined, and any words that just
22 appear normally, that's language that has just stayed
23 the same.
24         Does that make sense?
25     A.  Yes.

Nancy Crowther

June 17, 2022
Pages 58 to 61

Page 58

1    Q.  Okay.  So before we look at Senate Bill 1 a
2  little bit more, has SB1 harmed you in your ability to
3  vote by mail in future elections?
4    A.  From my understanding of SB1, the requirements
5  have changed.  That you have to give proof of disability
6  in order to apply for an absentee -- or a ballot by
7  mail, as they call it.  And there was some other part of
8  it that I think impacted me, but I can't recall it right
9  now.
10   Q.  Do you believe that you had -- strike that --
11       Do you believe that you did not have to show a
12  disability to vote by mail before SB1?
13   A.  Yes.
14   Q.  Yes, you do not believe that, or yes, you did?
15       Sorry, my own question.  Let me rephrase it.
16       Before SB1, did you have to show proof of
17  disability to vote by mail?
18   A.  No.
19   Q.  Okay.  Let's flip to Page 33 of Exhibit 7.
20       So if you look, you'll see on Line 16, it says,
21  "Section 5.02."
22   A.  Okay.
23   Q.  This section amends the Texas Election Code and
24  states what an early voting application -- an early
25  voting ballot application must include.  Specifically,

Page 59

1  it requires, from Line 22, quote, "The following
2  information:  A.  The number of the applicant's driver's
3  license, election identification certificate, or
4  personal identification card issued by the Department of
5  Public Safety.
6       "B.  If the applicant has not been issued a
7  number described by Paragraph A, the last four digits of
8  the applicant's" -- continued onto the next page --
9  "Social security number, or --
10       "C.  A statement by the applicant that the
11  applicant has not been issued a number described by
12  Paragraph A or Paragraph B."
13       Did I read that correctly?
14   A.  Yes.
15   Q.  Okay.  The requirement to include your personal
16  identification number as discussed just here, that does
17  not harm you, correct?
18   A.  I don't recall having to do it -- use it before,
19  and I would not like my identifying information being
20  out in the mail at this point for absentee voting, and I
21  don't recall ever having to do that before.
22   Q.  Okay.  I'm going to briefly introduce another
23  exhibit, which I'm going to mark as Exhibit 8.
24       So, this is an article from Vox, entitled,
25  "Here's How Hard it is to Vote in Texas" from

Page 60

1  July 22, 2021.
2       Did I represent that accurately?
3           (Exhibit 8 marked.)
4    A.  What is VOX?
5    Q.  (BY MR. HERBERT)  This is an article from a
6  website called Vox?
7       Do you see where it's entitled, "Vox," at the top
8  left-hand corner?
9    A.  Uh-huh.
10   Q.  Okay.  And do you see in the center of the page,
11  the title that says, "Here's How Hard it is to Vote in
12  Texas"?
13   A.  Yes.
14   Q.  And just underneath that, it includes the date,
15  July 22, 2021; is that right?
16   A.  Yes.
17   Q.  Okay.  I'll have you turn to Page 5, if you don't
18  mind.  Oh, it's not numbered.  I apologize.  But if you
19  flip one more page --
20   A.  There we are.
21   Q.  There you are.
22       Do you see in the middle of the page where it has
23  a picture of you, and it reads, toward the top, quote,
24  "People with disabilities also have a right to a private
25  vote," quote.

Page 61

1    A.  Yes.
2    Q.  "Nancy Crowther, 64, Travis County."
3       Did I read that correctly?
4    A.  That is correct.
5    Q.  What follows is a statement made by you, right?
6    A.  It's an article written.
7    Q.  By you, correct?
8       MS. SIFUENTES-DAVIS:  Objection, form.
9    A.  Yeah, I think the author did it.
10   Q.  (BY MR. HERBERT)  Do you see in the first
11  sentence under your name it says, "I live in Austin,
12  Texas, and I'm a person with a disability who uses a
13  motorized wheelchair to get around."
14   A.  Yes.
15   Q.  Did I read that correctly?
16   A.  Yes.
17   Q.  So this is a publication of something you said;
18  is that right?
19   A.  Yes.
20   Q.  Okay.  If you flip to the next page -- sorry, if
21  you just turn to the next page, toward the bottom, in
22  the second-to-last paragraph, right near the bottom, it
23  reads, "Then when I finally got there, I had to sign my
24  life away.  I had to provide an ID card.  My signature
25  on the envelope apparently wasn't enough, so I had to

Nancy Crowther

June 17, 2022
Pages 62 to 65

---

Page 62

1  add my signature to a form on a clipboard.  I was then
2  wondering if they wanted a blood sample.  I was willing
3  to offer them whatever they needed, because I wanted to
4  get my vote counted.  It was important to me."
5          Did I read that correctly?
6      A.  Yes, you did.
7      Q.  And this is in reference to that 2022 November
8  general election, correct?
9      A.  Correct.
10     Q.  Okay.  So you're talking about when you got
11  there, as in, when you got to the polling location to
12  drop off your ballot, correct?
13     A.  My mail-in ballot, yes.
14     Q.  Yes.
15         So you're saying that providing identification
16  card information and signing twice is cumbersome; is
17  that right?
18     A.  Yes.
19     Q.  And you were still able to vote in that election,
20  though, correct?
21     A.  Yes.
22     Q.  So you did, in fact, provide your identification,
23  correct?
24     A.  I had to.
25     Q.  And they did, in fact, make you sign; is that

---

Page 63

1  right?
2      A.  Yes.
3      Q.  And you did, in fact, sign, correct?
4      A.  Yes.
5      Q.  So Senate Bill 1's requirements for
6  identification numbers and signature requirements have
7  not encumbered you any more than the pre-existing
8  identification and signature requirements, correct?
9      A.  The issue I had with the mail-in ballot and
10  getting there and these changes, to me, what I recall
11  hearing was that signatures must match.  And I thought,
12  you know, I don't think I sign my name the same way
13  twice, exact match, and that's -- that was one of my
14  concerns.  So it was an unnecessary but truthful concern
15  of mine, that I had to sign.
16     Q.  And just to be clear --
17     A.  And I had --
18     Q.  -- this was in 2020, right?
19     A.  Correct.
20         And I had my mail-in ballot, and I said, Are you
21  going to compare the two?
22         And she said, No.
23     Q.  Okay.  So my question -- we'll talk about the
24  signature matching.  I do want to talk about that.  But
25  just briefly, before we go on, my question is just a

---

Page 64

1  little bit different.
2          The signature and identification provisions in
3  2020 versus the signature and identification
4  requirements in 2022 under Senate Bill 1, those are both
5  equally cumbersome to you, correct?
6      A.  Yes.
7      Q.  Okay.  So let's talk a little bit about the
8  matching signatures.
9          You had mentioned that sometimes you sign your
10  name one way, and the next time it's a little different;
11  is that right?
12     A.  Uh-huh.
13     Q.  So let's say a voter votes by mail -- let's --
14  hypothetical.  Let's say that a voter votes by mail, and
15  let's say that the personal identification numbers on
16  her ballot, on her carrier envelope, those numbers match
17  the numbers in her voter registration application.
18  Should her signature just be presumed to be legitimate?
19         MS. SIFUENTES-DAVIS:  Objection, form.
20     A.  I don't even understand the question.
21     Q.  (BY MR. HERBERT)  Sorry about that.  Let me try
22  and rephrase it.
23         Let's say that somebody votes by mail, and let's
24  say that the personal identification numbers, her
25  driver's license whatever she uses, let's say that those

---

Page 65

1  match what is in the system for her.
2          Should we assume that her signature is
3  legitimate?
4      A.  No.
5      Q.  Would it be good if we assume that her legitimate
6  -- that her signature is legitimate if her ballot
7  numbers match her voter application numbers?
8          MS. SIFUENTES-DAVIS:  Objection, form.
9      A.  No.
10     Q.  (BY MR. HERBERT)  Can I ask why?
11     A.  Because you don't know who filled out that form.
12     Q.  Okay so if Senate Bill 1 created a rule saying,
13  Hey, if the identification numbers on your ballot match
14  the identification numbers in your voter registration
15  application, then we will assume that your signature is
16  valid, would that not help your concern about maybe you
17  sign your name slightly differently one time versus
18  another time?
19     A.  And this is just for people with disabilities?
20     Q.  I'm just asking a hypothetical question.
21     A.  Okay.
22     Q.  For you specifically.
23     A.  For me specifically, when I use a table, my
24  signature is almost perfect.  When they give me a
25  clipboard, it's different.  When I'm at a polling place,

---

Page 66

1  they use a table, so that's different.  And now they use
2  some kind of a flip keyboard thing that I have to do
3  with my finger or something, or a stylus or whatever,
4  that's up above, where I can't really write well, and
5  that's different.  It just depends on where I am in
6  my -- in the need, so comparing signatures is not really
7  a fair -- whatever you want to call it -- a fair part of
8  having to vote, so I find it cumbersome.
9      Q.  Okay.  And just to be clear, my question is just
10  a tiny little bit different.  Just with respect to you.
11      A.  Uh-huh.
12      Q.  For you, if the Texas legislator -- strike
13  that --
14      If the Texas legislature required that you,
15  Nancy Crowther, we're not going to scrutinize whether
16  your signatures match if the identification numbers you
17  gave us match what's in your voting file.
18      Would that help you?
19      A.  That would help tremendously.
20      Q.  Okay.  And let me ask -- let me ask another
21  related question here.
22          MS. SIFUENTES-DAVIS:  Are we getting towards
23  a good stopping point for lunch?
24          MR. HERBERT:  Yeah, sorry.  I was actually
25  going to bring that up.  You know, we haven't quite made

Page 67

1  as much progress as I'd like, but now is as good of a
2  time as any to stop for lunch, if you-all would like to
3  do that.
4          THE VIDEOGRAPHER:  We are off the record at
5  12:21.
6          (Off the record.)
7          THE VIDEOGRAPHER:  We are back on the record
8  at 12:58.
9      Q.  (BY MR. HERBERT)  I hope you had a nice lunch,
10  Ms. Crowther.
11      A.  I did.
12      Q.  We were talking before we broke for lunch about
13  vote-by-mail provisions and how you fear they might
14  affect you in the future, particularly SB1's
15  vote-by-mail provisions.
16      Before we continue on along those lines, I did
17  just want to confirm something that I believe I already
18  got, but I just want to double-check.
19      You did vote in the 2022 March Democratic
20  primary, correct?
21      A.  Yes.
22      Q.  And that was in person, correct?
23      A.  Yes.
24      Q.  And you did vote in the May 2022 constitutional
25  amendment election, right?

Page 68

1      A.  Yes.
2      Q.  And that also was in person, right?
3      A.  Yes.
4      Q.  And lastly, you did vote in the May 24, 2022,
5  Democratic primary runoff election, correct?
6      A.  Yes.
7      Q.  And likewise, that also was in person, right?
8      A.  Yes.
9      Q.  Okay.  Great.
10      So turning back to voting by mail, moving
11  forward, under SB1, you have voted only in person in
12  2022 thus far, so you have not had any application to
13  vote by mail rejected in 2022, correct?
14      A.  Correct.
15      Q.  Let's say that a voter -- let me ask you a
16  hypothetical question.
17      A.  Okay.
18      Q.  Let's say that a voter canceled her application
19  to vote by mail, but failed to return her mail-in
20  ballot.  So she applied to vote by mail, she received
21  her mail-in ballot, but she then canceled her
22  application to vote by mail.  Should she be allowed to
23  vote provisionally --
24          MS. SIFUENTES-DAVIS:  Objection, form.
25      Q.  (BY MR. HERBERT)  -- in person?

Page 69

1      A.  Yes.
2      Q.  That would be a good thing?
3      A.  Yes.
4      Q.  Okay.  Would you agree that voters should not be
5  allowed to vote twice, right?
6      A.  Correct.
7      Q.  And so you would agree that it's good for the
8  State to make sure that voters, in fact, do not vote
9  twice, right?
10      A.  Yes.
11      Q.  Let me ask you another hypothetical.
12      Let's say that an identification number on a
13  voter's application to vote by mail -- let's say that
14  that identification number did not match what was in the
15  voter's registration file.
16      Should the clerk have to notify that voter and
17  give that voter a chance to correct it?
18      A.  I believe that would be the most appropriate
19  thing because, frankly, I don't remember what I used to
20  register.  So I don't always think people will remember
21  what they used.
22      Q.  Do you intend to vote by mail in the future?
23      A.  If the need arises because either my disability
24  progresses to a point where I can't get out more
25  independently or if we have another pandemic, you know,

Nancy Crowther

Page 70

1  whatever would limit me from being able to get out.
2      Q. So yes, you might?
3      A. I might.
4      Q. Okay. Quick aside, knock on wood that we don't
5  have another pandemic?
6      A. Please.
7      Q. So, talking about this situation, this
8  hypothetical, where somebody's voter identification
9  numbers on the application don't match what they have in
10  their registration file. If the Texas legislature
11  required an opportunity -- strike that --
12         If the Texas legislature required that the clerk
13  notify you and give you the chance to correct it, would
14  that help you?
15      A. Of course.
16      Q. Okay. And I'm going to give you another
17  hypothetical question. Let's say that a voter's
18  personal identification card, maybe their driver's
19  license, has been -- it is -- strike that --
20         Let's say that a person's personal identification
21  card, for example, a driver's license, has expired.
22  Should that person be able to still use that number even
23  if it's expired?
24      A. I don't even know the legality with that, so I
25  can't answer that.

Page 71

1      Q. Okay. Let me try and ask something slightly
2  different, then.
3         Let's say that somebody tries to vote by mail,
4  and let's say that she fills out her mail-in ballot
5  after receiving it, and her driver's license has
6  expired. Would it -- would you find it helpful in that
7  scenario for you still to be allowed to use that expired
8  driver's license number for purposes of voting by mail?
9      A. I can't really speak to that, because we don't
10  know why they haven't gotten it renewed. It could be
11  suspended or some other legal reason, so I really
12  couldn't speak to that. If it were me, and the person
13  called me and said, Your license is expired; do you have
14  another form of identification, because we can accept
15  that over the phone, then they can take care of it then.
16  But we don't know why an expired driver's license would
17  be, unless it was -- I don't know all the legal
18  ramifications.
19      Q. Of course. I'm not trying to ask you that. I
20  just meant for your own personal use, would that be
21  helpful? So I guess my question is: You wouldn't find
22  that necessary, to be able to use your expired driver's
23  license; is that right?
24      A. Right.
25      Q. But would it hurt you, personally, to have that

Page 72

1  option?
2      A. To be able to use it?
3      Q. Yeah.
4      A. Would it hurt me? I don't believe it would.
5  Only because I know mine would expire because I let it
6  expire, you know I mean, too circumstance -- too many
7  circumstances in that question.
8      Q. Okay. Let me ask a different hypothetical, then.
9  Should -- should the legislature require that voters
10  have the ability to go online and correct information on
11  their file that they got wrong?
12         MS. SIFUENTES-DAVIS: Objection, form.
13      A. I personally would love it if we could register
14  online to vote and -- but again, you know, for me, it's
15  an accessibility issue. I wouldn't have to write it, I
16  could just, you know, send it out over the computer. So
17  it's just a matter of preference and accessibility.
18      Q. (BY MR. HERBERT) Of course. And I'm sorry, I
19  don't mean to press back. I just -- just to clarify,
20  you had mentioned, you know, you'd love the ability to
21  register online. I just want to make sure we're talking
22  about registering or, rather, that we're talking about
23  applying to vote by mail or voting by mail. And so,
24  with regards to that, would it be helpful for you if the
25  Texas legislature required that there be an online way

Page 73

1  for voters to go on and correct or enter information?
2      A. For voter registration?
3      Q. I'm sorry, that's what I'm just trying to
4  clarify. So for applications to vote by mail --
5      A. Oh, okay.
6      Q. -- would it be good for the Texas legislature to
7  require that there be an online way for you to go on and
8  correct information?
9      A. Yes.
10      Q. Okay. And I'm almost running out of
11  hypotheticals, but I got another one for you. Well,
12  actually -- okay. So I know this is probably a
13  redundant question. I just want to make sure that we're
14  on the same page, though.
15      A. Uh-huh.
16      Q. So far in 2022 nobody has rejected your
17  signature, right?
18      A. Correct.
19      Q. And when you voted in person, dropping your -- or
20  strike that --
21         Rather, in 2020, the November general election,
22  when you went and dropped off your ballot in person --
23      A. Yes.
24      Q. -- nobody rejected your signature, right?
25      A. Correct.

Nancy Crowther

June 17, 2022
Pages 74 to 77

Page 74

```
1    Q.  Okay.  Okay.  I do have more hypotheticals for
2  you.  Let's say that a voter voted early by mail, and
3  let's say that her ballot had a defect in it.  It would
4  be good if she had the chance to correct that defect,
5  right?
6    A.  Which defect -- I personally got the wrong ballot
7  one time.  It wasn't my defect.
8    Q.  Fair enough.  Fair enough.  I guess my question
9  is just a little bit different.  Just a hypothetical
10  first.  So I'm not accusing you --
11    A.  Right.
12    Q.  -- of messing up your ballot.  But I'm saying
13  let's say somebody else had a defect in hers.  Let's say
14  she voted early by mail, and let's say that there was a
15  defect in her ballot.  She should still have the chance
16  to correct that defect, right?
17    A.  What kind of defect?
18    Q.  Well, let's say she wrote the wrong number; it's
19  a typo.  She should have the chance to correct that,
20  right?
21    A.  Certainly.
22    Q.  So if the Texas legislature passed a law that
23  required the early voting ballot board to tell somebody
24  that, Hey, your ballot is defective.
25        And to do that in time for that person either to
```

Page 75

```
1  correct it or to go vote in person, would that resolve
2  some of those concerns with SB1?
3        MS. SIFUENTES-DAVIS:  Objection, form.
4    A.  In order for the vote to be cast --
5    Q.  (BY MR. HERBERT)  So I can restate it.  Would
6  that be helpful?
7    A.  Yeah that would be helpful, yes.
8  Hypotheticals --
9    Q.  Yeah, I'm sorry to bog you down with these.  I'll
10  try and make them a little bit slimmer.
11        Okay.  You had said that if somebody has a ballot
12  in her -- I'm sorry.  Strike that --
13        If somebody had a defect in her ballot, she
14  should have had the chance to fix it, right?
15    A.  Correct.
16    Q.  And so I'm saying, you would agree that if the
17  Texas legislature passed a law requiring that she has a
18  chance to fix that defect, that would be a good thing,
19  right?
20    A.  Yes.
21    Q.  Okay.  Do you have any concerns about -- strike
22  that --
23        Do you have any other concerns about voting by
24  mail under SB1, moving forward?
25    A.  I believe the delivery system, whether it be
```

Page 76

```
1  through the mail or in a box, in the entire county is a
2  concern.
3    Q.  So it sounds like two, two concerns; mail and
4  drop offs.
5    A.  And also the signature and anticipating whether
6  or not you're going to be applying by mail or if you're
7  going to go in person.  It's a big difference between
8  the two, and when push comes to shove, I'd rather go in
9  person.
10    Q.  Okay.  So we'll talk about in person.  I don't
11  mean to cut you off from that.
12    A.  Right.
13    Q.  But I'm just trying to make sure that I have a
14  full sense of what you're concerned about with
15  vote-by-mail specifically.  So we had already talked
16  about the signatures a little bit.
17    A.  Right.
18    Q.  Do you have any other concern about the signature
19  requirement for voting by mail, or do you feel that
20  you've explained your -- okay.
21        So then you had mentioned issues with voting by
22  mail and the actual mail itself, USPS --
23    A.  Uh-huh.
24    Q.  -- and then you'd also mentioned issues of voting
25  by mail and the drop box.
```

Page 77

```
1    A.  Right.
2    Q.  Okay.  So for the mail issue, as in -- for the
3  USPS issue -- let's call it that, right?
4    A.  Uh-huh.
5    Q.  You would agree that SB1 has no effect on that,
6  right?
7    A.  It does have an effect on that.
8    Q.  Okay.  Tell me how SB1 affects your ability to
9  mail something by the USPS?
10    A.  Well, the -- to me, I don't find it safe to mail
11  something as important as a ballot, or with a vote in
12  it, through a system that is not reliable.
13    Q.  Is the system not reliable because of SB1, or
14  because of other reasons?
15    A.  The system become unreliable during the changes
16  in the lawmaking for mail delivery that related to --
17  and I mean, we're going to go all over the place, but it
18  does all come back to SB1, because it goes back out to
19  mailing, so it is all inter-related and a catch-22-type
20  situation.
21    Q.  But you can vote by mail through the USPS before
22  SB1, right?
23    A.  Yes.
24    Q.  Okay.  And you can vote by mail through the USPS
25  after SB1, right?
```

Page 78

1    A.  I could, if I chose.
2    Q.  Okay.  So then my questions is --
3    A.  My -- I'm sorry.
4        My hesitancy is, prior to SB1, I felt more free
5  to do it, whereas now, after SB1, I feel as if it's more
6  difficult because of the stress it puts on the voter to
7  make sure everything gets done right for that one single
8  vote to get to be counted.
9    Q.  Okay.
10   A.  And --
11   Q.  Sorry.
12   A.  -- so I have to anticipate things differently
13  than you would.  You can fill it out, throw it in the
14  mailbox, and go.  Me, I have to get help.  I have to do
15  this.  I have to do that, and it's a lot harder for me.
16  So now, the tension is higher because now we have a new
17  law, so --
18   Q.  Okay.  So I'm -- I guess what I'm trying to get
19  at is that -- and I'm not trying to put words in your
20  mouth, so please do correct me if I'm wrong, but it
21  seems that there are independent concerns that you have
22  with the USPS, which the Texas legislature does not
23  control, on the one hand, and then you also have
24  concerns about what voting by mail looks like under SB1;
25  is that right?

Page 79

1    A.  Yes.
2    Q.  Okay.  So you would agree that the Texas
3  legislature has no effect on the USPS's quality of
4  service, right?
5    A.  In all actuality, if you're going to do a mail-in
6  vote, you have to go through the USPS; is that correct?
7    Q.  You're asking me questions, now.
8    A.  I'm saying that, yeah, it has an effect, because
9  it changes people's trust level on whether or not they
10  want to go through mail ballots or in person, if they
11  can, or if they have to go to a drop box.
12   Q.  Okay.  So just to make sure I'm understanding,
13  you're saying that, yes -- when you say yes, you're
14  saying, Yes the Texas legislature does have an effect on
15  the USPS's mail service, right?
16   A.  Yes.
17   Q.  Okay.  So then, can you explain to me also now --
18  you had mentioned a drop box issue when it comes to
19  vote-by-mail.
20       What is your qualm with Senate Bill 1's effect on
21  drop boxes, if any?
22   A.  I'm not real sure when it all changed, but the
23  drop -- the number of polling places, the drop boxes for
24  mail-in ballots, all shrank in number, in access.  And
25  so now -- now I say, because I only found one in Travis

Page 80

1  County, and I had to hunt that one down, because there
2  were initially going to be four, and then they shrunk it
3  down to one.  So once you find that, you have to figure
4  out how you're going to get there, who's going to go
5  with you if you need someone to go with you, what you're
6  going to need, what the weather is, how much time it's
7  going to take, and that's just -- it's a big issue.
8    Q.  Okay.  You had mentioned earlier -- all right.
9  Let me make sure I get this right.  Okay.  I think we
10  can put a pin in the vote-by-mail questions for now.
11  Let's move on to talk about -- I might have us come back
12  and ask a little bit more about that, if I can remember
13  my question.  But let's talk a little bit about your
14  attendant and actually going and voting in person.  Has
15  SB1 hampered your ability to have help at the polls?
16   A.  With my attendant, I feel that at -- you know,
17  having to sign whatever the paperwork is puts her more
18  in a position of -- of -- I don't want to say danger,
19  but in a position that, frankly, they aren't paid for,
20  you know.  They're not paid to -- you know, they're here
21  to help me do whatever I need done and -- but now it's
22  become a big issue on who's helping you and what they
23  can help you do.  Now, I've already talked about what I
24  can and cannot do, and that's just where I'm at now.  In
25  a year or so, who knows where I'll be at.  It will be

Page 81

1  worse.  My needs will be more, so -- but I don't want to
2  put my attendant, who I value greatly, into that type of
3  a situation where, God forbid, you know, they should be
4  whatever the legal ramifications are for overstepping
5  the bounds of the requirements of SB1 to pick up my
6  ballot off the floor because I dropped it.
7    Q.  Right.
8    A.  I mean, it's just not fair.
9    Q.  Okay.  Let's talk a bit about this.  As we get
10  into it, I just want to introduce a brief exhibit, just
11  to make sure I understand the whole universe of things
12  here.
13       I'm going to mark this exhibit as
14  Exhibit Number 9.
15       (Exhibit 9 marked.)
16   Q.  (BY MR. HERBERT)  So this is a Texas Tribune
17  article from February 16, 2022.  Do you see at the top,
18  the title reads, "Texans with disabilities fear new
19  restrictions on voting could help" -- strike that --
20  sorry.  Let me reread that.
21       Do you see at the top where it reads, "Texans
22  with disabilities fear new restrictions on voting help
23  could mean criminal charges at polls."
24       Did I read that right?
25   A.  That's correct.

Page 90

1          MS. SIFUENTES-DAVIS:  Objection, form.
2     A.  Correct.
3     Q.  (BY MR. HERBERT)  Okay.  And did you consult a
4  lawyer about this question?
5     A.  No.
6     Q.  Did you talk to anybody from the Secretary of
7  State's Office?
8     A.  No.
9     Q.  Did you talk to the Texas Secretary of State
10  himself?
11     A.  No.
12     Q.  Did you check the secretary of state website?
13     A.  No.
14     Q.  Did you talk to -- did you ask anybody from an
15  advocacy group about this question?
16     A.  That's possibly where I learned the information
17  on the ramifications of this requirement, or potential
18  ramifications.  And, frankly, my life depends on my
19  attendant, and I'll protect them in any way I need to.
20        So whatever it has to do with, knowing the law --
21  you know, you don't run red lights, but I didn't consult
22  the Secretary of State on that.  So I just want to
23  protect those that are taking care of me.
24     Q.  Do you remember the advocacy group that you
25  believe may have given you this information?

Page 91

1     A.  It could have been Adapt.  It could have been
2  REVUP.  It could have been one of my others.  AARP, we
3  talk about that a lot.
4     Q.  Okay.  But you can't say for sure?
5     A.  No.
6     Q.  That's okay.
7     A.  No.  Too many conversations.
8     Q.  Fair enough.
9        Did you talk to the Travis County election
10  administrator about this question?
11     A.  No.  It's actually -- you know, in light of these
12  questions, I'm thinking, you would have to have already
13  been within the -- the confines of the voting area to
14  go, Oh, is that a problem?
15        So you would have to anticipate all this prior to
16  getting there.
17     Q.  When did you first learn about the potential
18  legal consequences that you believe your attendants
19  might face from SB1?
20     A.  After SB1 was passed.
21     Q.  Did you learn about it before you went to vote?
22     A.  May have.  I don't recall when I learned it.
23     Q.  So why did you -- did you learn it the first time
24  that you voted in the March 2022 Democratic primary,
25  that you believe that there may be legal consequences

Page 92

1  for the help that your attendant might provide you in
2  the future?
3     A.  Yes.
4     Q.  So you --
5     A.  I knew some of it, but I'm not a lawyer, and
6  so -- again, it's like, you have to -- you have to know
7  the law before you get into the voting poll, and I
8  didn't know everything, but I knew that segment.
9     Q.  Okay.  But you also said that it was an advocacy
10  group who told you about the potential legal
11  consequences, right?
12     A.  Right.
13     Q.  And you also said that you learned about the
14  potential legal consequences while you were voting.
15     A.  Right.
16     Q.  So then, was the advocacy group there while you
17  were voting?
18     A.  No, during the voting time.  You know, the
19  open -- absentee voting time, those two-weeks?  That was
20  when I learned about it.
21     Q.  Okay.  So I'm just trying to make sure I
22  understand, because you had also said that you could
23  only learn about these things once you were at the
24  polling location voting, right?
25     A.  Well, I'm talking about when you get ready to go

Page 93

1  vote, you got to know who you're voting for, right?
2  These are all things you have to prepare for.  You need
3  to know where your polling place is; you need to know
4  how you're going to get to the polling place; you've got
5  to figure out if someone is going to drive you to the
6  polling place, all those things.  So I don't know how I
7  would know what would apply, until I was at the polling
8  place, to anticipate that ramification of that part of
9  the bill.  And then it was like, Oh, maybe I shouldn't
10  have them here.
11     Q.  Okay.  So to clarify -- and please correct me if
12  I'm wrong -- you were aware of potential legal
13  consequences for your attendant during the early voting
14  period, but before you actually went in person to cast a
15  vote; is that right?
16     A.  Yes.
17     Q.  Okay.  So with that in mind, before you went in
18  to vote -- just to be clear and double-check, and please
19  correct me if I'm wrong -- you did not talk to a lawyer;
20  is that right?
21     A.  No.
22     Q.  And you did not talk to anyone from the office of
23  the secretary of state; is that right?
24     A.  No.
25     Q.  And you did not check the secretary of state's

Page 94

1  website; is that right?

2      A.  Correct.

3      Q.  And you did not talk to the Travis County

4  election administrator?  You did not call them up; is

5  that right?

6      A.  That's correct.

7      Q.  And setting all of that aside now, do you know of

8  any attendants -- or do you know of anybody -- strike

9  that --

10      Do you know anybody who, since SB1 has been

11  enacted, has been prosecuted or faced legal consequences

12  for providing help to disabled voters at the polls?

13      A.  I only know my own situation and have not --

14  everything else is hearsay, so I haven't heard anything.

15      Q.  Okay.  So to be clear, you don't know of anybody

16  who's been prosecuted under SB1 --

17      A.  Huh-uh.

18      Q.  -- right?

19      A.  That's correct.

20      Q.  Okay.  Have -- strike that --

21      Your assisters are paid, right?

22      A.  My sisters?

23      Q.  Strike that -- excuse me.  I'll enunciate a

24  little bit better.

25      Your attendants, they're salaried; is that right?

Page 95

1      A.  Yes.

2      Q.  Okay.  And in the past, in 2020 and before SB1,

3  your attendants were paid, right?

4      A.  Yes.

5      Q.  And after 2020, this year, here in 2022, your

6  attendants are still paid; is that right?

7      A.  Yes.

8      Q.  Okay.  Does that element, that they are paid,

9  does that cause you any concern -- strike that -- let me

10  reiterate.

11      Does the fact that your attendants are paid make

12  you fear that they might face legal consequences under

13  SB1?

14      A.  No.

15      Q.  Okay.

16      A.  The fact that they could be fired because of any

17  ramifications from that would be my greatest fear.

18      Q.  Can you elaborate on that a little bit?  What do

19  you mean by the fact that they could be fired?  What are

20  you referring to there?

21      A.  Because they broke a law that the State just

22  made.

23      Q.  I see.

24      A.  Potentially.

25      Q.  So let me just clarify to make sure I'm

Page 96

1  understanding you.

2      A.  Yeah.

3      Q.  One of the concerns that you have is that if the

4  company that your attendants are typically employed by,

5  if they found out that your attendants had broken a law

6  in providing you help at the polls, you believe that the

7  company might fire them; is that right?

8      A.  That's correct.

9      Q.  Okay.  If there were an exception in

10  Senate Bill 1 that expressly said that, Hey, attendants

11  or caregivers -- you can get help from attendants and

12  caregivers under SB1, and it doesn't matter whether

13  they're compensated or whether they're paid?

14      Would that make you feel better?

15      MS. SIFUENTES-DAVIS:  Objection, form.

16      A.  Would they still need to sign the form?

17      Q.  (BY MR. HERBERT)  Let me try this hypothetical a

18  little bit differently.

19      Let's say that if the Texas legislature were to

20  pass a law saying that, at least with respect to the

21  question of being paid -- just talking about being

22  paid -- that it's okay for people to help you at the

23  polls, who are being paid to do so, so long as they're

24  your attendants or your caregivers.

25      Would that alleviate some of your concerns?

Page 97

1      MS. SIFUENTES-DAVIS:  Objection, form.

2      A.  It really doesn't matter if they're paid or

3  unpaid.  They're providing me in this, some assistance.

4  And they still had to sign an oath of some sort --

5      Q.  Okay.

6      A.  -- to -- so, I mean, I can't answer that

7  truthfully or honestly.

8      Q.  Did your attendants not have to provide an oath

9  in the past?

10      A.  No.

11      Q.  So the oath requirement under SB1 is something

12  new that your attendants would have to do moving

13  forward; is that right?

14      A.  It's my understandings, yes.

15      Q.  Okay.  Let's talk a little bit about -- let's

16  talk a little bit about that oath.

17      What is your specific concern about the oath?

18      A.  It's a -- from my understanding and my limited

19  legal background, it would be a legal document that has

20  their signature and could jeopardize -- if something

21  were to happen, could jeopardize their well-being.

22      Q.  Is it -- are you concerned -- and again, please

23  correct me if I'm wrong.  I'm just trying to understand

24  your concern with those.  Are you concerned that the

25  oath that they would sign prevents them from giving you

Nancy Crowther

June 17, 2022
Pages 106 to 109

Page 106

1    A. I do take issue that there's an oath that they
2  have to sign.  We haven't had to do it in the past,
3  although it was there, and I really don't know what the
4  contents of that oath was, that we -- we never had
5  opportunity to view.  I mean, in my thought, we hadn't
6  had to sign it because it wasn't enforced, so I don't
7  remember what was on it, if there was anything on it.
8    Q. Okay.  Now --
9    A. And now I know what this SB1 oath says.
10    Q. Okay --
11    A. Because it shows that it's new.
12    Q. Okay.  And I apologize for going on and on about
13  this, Ms. Crowther --
14    A. No.
15    Q. -- I'm really not trying to.  I just want to make
16  sure that I really understand what your qualms are.
17    A. No.
18    Q. And so it sounds like you just said that you
19  still are concerned by the fact that there even is an
20  oath that would be enforced, regardless of what the oath
21  said, the very fact that there is an oath.
22    A. It's not --
23    Q. Or is it the case that it's not so much that
24  there is an oath, it's more about what the oath says?
25    A. Yes.

Page 107

1    Q. Okay.  So it's the latter of the two?
2    A. I believe it might be the latter, if I understand
3  correctly.  And it just depends on the requirements of
4  the oath.
5    Q. Okay.  So it's not so much that there is an oath,
6  it's what does that oath prevent your attendants from
7  doing; is that right?
8        MS. SIFUENTES-DAVIS:  Objection, form.
9    A. It's what it would prevent them from doing.
10    Q. (BY MR. HERBERT) So is that is "yes"?
11    A. Yes.
12    Q. So let's talk about that.  I'm going to introduce
13  another exhibit, and I promise you, we are getting
14  toward the end of the exhibits, here.
15        This is -- I'm going to mark this exhibit as
16  Exhibit No. 10.
17        (Exhibit 10 marked.)
18        MR. HERBERT:  I also see that we're getting
19  close to about an hour from when we started; is that
20  right?
21        MS. SIFUENTES-DAVIS:  Yeah.  Do you want to
22  ask questions about this exhibit and then take a break?
23        MR. HERBERT:  Yeah, that would be perfect.
24  This shouldn't take too long.
25    Q. (BY MR. HERBERT) So this is a copy of the

Page 108

1  deposition of Keith Ingram, the director of the
2  elections division of the Texas Secretary of State.
3        I'm going to have to you turn to Page 2 of the
4  document.  On this page, I'm gonna have you look at
5  Line No. 13.  And you'll see a question, and it reads,
6  "If a voter asks an assister to provide physical
7  assistance in attaching an assistive device to a voting
8  machine" --
9    A. Hold on.
10    Q. Oh, I'm sorry.  I'll stop.
11    A. I don't think we have the same --
12    Q. Oh, it's very confusingly paginated.  I apologize
13  for that.
14        So if you look at the cover page and you flip to
15  the next page, it's -- at the top right, you'll see it's
16  internally paginated.  Page 60.  Top right.
17    A. Okay.  Bottom.
18    Q. Oh, and bottom right, too.  There you go.
19    A. Okay.
20    Q. Bottom right, it says Page 60.
21    A. Okay.
22    Q. I apologize for that.  I just gave you an excerpt
23  so we don't have to go through the whole thing.
24    A. Okay.
25    Q. So if you look on this page at Line 13, on the

Page 109

1  left-hand side, you'll see there are numbers.
2    A. Yes.
3    Q. Number 13.  It reads -- the question -- it reads,
4  "If a voter asks an assister to provide physical
5  assistance in attaching an assistive devise to a voting
6  machine and to confirm once the device is attached,
7  would the assister violate the oath if she did so?"
8        Did I read that correctly?
9    A. Yes.
10    Q. And just below that, on Line No. 19, there's an
11  answer.  It reads, quote, "No."
12        And following that, beginning on Lines 20 to 21,
13  there's another question, and it reads, "Is this
14  consistent with the plain language of the oath" -- and
15  it continues on to Line 23 -- "under SB1."
16        And then in Line 25, the answer reads, "It is."
17        Did I represent that accurately?
18    A. If -- that's what this says, yeah.
19    Q. Okay.  So you would agree that the office of the
20  Texas Secretary of State says that the oath provision
21  under SB1 does not prevent you from receiving physical
22  assistance, right?
23        MS. SIFUENTES-DAVIS:  Objection, form.
24    A. They can assist with physical help with the
25  machine; that is correct.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900        San Antonio, Texas 78232
210-697-3400                                                      210-697-3408

Nancy Crowther

June 17, 2022
Pages 110 to 113

Page 110

1    Q. (BY MR. HERBERT)  Okay.  So the oath provision
2  under SB1 does not prevent your attendants from giving
3  you physical assistance in the future, right?
4         MS. SIFUENTES-DAVIS:  Objection, form.
5    A. Correct.
6    Q. (BY MR. HERBERT)  Okay.  What injury -- strike
7  that --
8       What does the oath provision under SB1 prevent
9  your assisters from doing in the future?
10    A. This isn't it.  This isn't the oath, correct?
11    Q. Correct.  I'm having you look at the excerpt of
12  the deposition transcript --
13    A. Okay.
14    Q. -- of Keith Ingram, the director of the elections
15  for the Texas Secretary of State.  We can set this
16  aside.  We had previously been looking at another
17  exhibit, which is the enacted Senate Bill 1 itself.
18  That's Exhibit No. 7, which we had been looking at.
19    A. Okay.
20    Q. So I'm not asking you about the transcript
21  anymore.  What I'm asking is:  What are you concerned --
22  under the new -- strike that --
23       What are you concerned about the new oath under
24  SB1 in terms of how it will prevent your attendants from
25  giving you the help that you need in the future?

Page 111

1    A. To my understanding, there are four major things
2  they can help you with.  They can read the information
3  to you; they can, I think, ask you -- now, this is just
4  my understanding -- ask you which position the person
5  wants to vote on if they have trouble doing it; and
6  then -- and then go through the choices that the person
7  made, but can't make it for them; and then, you can't
8  change anything or -- what was it? -- falsely change any
9  votes, I believe.
10       It all has to do with using the screen and not
11  with, really, the whole layout and the whole process
12  getting it.  So, I can't reach the screen, so I have to
13  use the control.  My concern is eventually I can't do
14  that, and they have to read it out loud, that it won't
15  become a private vote anymore; it will become an
16  everybody-can-hear-it kind of vote.  And that's --
17  that's one of my issues.
18       But what if they do something outside of that
19  type of assistance?  That worries me.
20    Q. And if you had some assurance from the Texas
21  legislature or from the Texas Secretary of State that
22  they were still allowed to provide you physical
23  assistance?  Would that resolve your concerns with the
24  oath?  Not with everything else, but with the oath?
25    A. I would still have to say it would not resolve my

Page 112

1  issues with the oath.
2    Q. And why is that?
3    A. Because they're really only doing it to me and my
4  attendant.  I don't foresee anybody else having to do
5  that, and that's an issue for me.
6    Q. Could you elaborate on that?  I'm not sure that I
7  follow.
8    A. What I, as a person with a disability, and my
9  attendant have to do at the polling place.  Nobody else
10  really has to do that because they don't need the
11  assistance.  That's kind of focusing in on my disability
12  and, frankly, breaking the line of process -- due
13  process, and the line, and everything else, because I
14  have a disability.
15    Q. Okay.  So, please correct me if I'm wrong, but it
16  sounds to me like you're saying that if the new oath
17  allowed your attendant to give you physical assistance
18  at the polls, and whatever else assistance that you need
19  at the polls, that would fix some of the problems, but
20  there would still be the problem that your attendant
21  even has to take an oath under SB1; is that right?
22    A. That's correct.
23    Q. Okay.  Let's switch gears a little bit.
24         MS. SIFUENTES-DAVIS:  Is now a good stopping
25  point?

Page 113

1         MR. HERBERT:  Oh, yes, it is.  It is a good
2  stopping point.  Thank you so much.  I didn't mean to --
3  I lost track of time.  Let's go off the record.
4         THE VIDEOGRAPHER:  We are off the record at
5  2:10 p.m.
6         THE VIDEOGRAPHER:  We are back on the record
7  at 2:24 p.m.
8    Q. (BY MR. HERBERT)  So, your attendants drove you
9  to the polls in the May 2022 Democratic primary runoff
10  election; is that right?
11    A. Yes.
12    Q. Okay.  And that was after Senate Bill 1 was in
13  effect, right?
14    A. Yes.
15    Q. So Senate Bill 1 has not affected your ability to
16  be driven to the polls, right?
17    A. Actually, it has affected my ability to find out
18  where my polling place is.
19    Q. Okay.  Sorry, I'm just going to object as
20  nonresponsive.
21    A. I'm sorry.
22    Q. That's okay.  We can -- I want to talk about
23  that, but my question is just a little different.
24    A. Yeah, because --
25    Q. So my question is -- to reiterate -- your

Nancy Crowther                                                    June 17, 2022
                                                               Pages 114 to 117

Page 114

1  attendants drove you to the polls in the March 20 --
2  pardon me -- in the May 2022 Democratic primary runoff
3  election, right?
4     A. Yes.
5     Q. Okay. And SB1 was in effect at that time,
6  correct?
7     A. Yes.
8     Q. Okay. So the act of driving you to the polls,
9  SB1 did not affect your ability -- or the ability of
10 your attendants to do that; is that right?
11    A. Correct.
12    Q. Okay. Now, you had mentioned that SB1 affected
13 your ability to find poll locations, right?
14    A. Yes.
15    Q. You had just said that, I believe?
16    A. Yes.
17    Q. Could you tell me a little bit about that?
18    A. There used to be a lot of polling places that
19 were very close to me, within blocks. I mean, three
20 different locations where I could just roll and be more
21 independent. And now I either have to take a bus to it
22 or have my attendant drive. And on that particular one,
23 I believe it was at that school recreation center, we
24 had to drive, because there wasn't any bus service. So
25 those are three main ways for me to get to my voting

Page 115

1  location.
2     Q. Okay. So you're saying that you noticed that
3  there are fewer polling locations near you; is that
4  right?
5     A. Yes.
6     Q. And when did you first notice that?
7     A. Almost -- it seems like it was pretty immediate,
8  let's see, 2021.
9     Q. The November 2021 election?
10    A. I think so, yeah.
11    Q. Okay. And that's when you first noticed it?
12    A. Yeah.
13    Q. Did you notice it in the -- you did not notice
14 that issue in the November 2020 primary; is that
15 right -- pardon me -- I'm sorry. Strike that -- let me
16 rephrase.
17       You did not notice that in the November 2020
18 general election; is that right? Or did you notice it
19 then, too?
20    A. No, because I took -- based on where I was, I
21 went to the polling place that I knew was there. If I
22 was at home, then the ones that are closest to my home
23 were no longer available.
24    Q. Okay. I'm going to introduce another exhibit,
25 which I will mark as Exhibit No. 11.

Page 116

1     This is a copy of the Texas Election Code,
2  specifically Chapter 11, and I would like you to look at
3  the very last section, which is on the very last page.
4  So you can literally just flip it all over, because it
5  is double-sided.
6        Do you see the top line, where it reads,
7  "Section 1.022, Reasonable Accomodation or
8  Modification"?
9        (Exhibit 11 marked.)
10    A. Uh-huh.
11    Q. (BY MR. HERBERT) Okay. This section reads, "A
12 provision of this code may not be interpreted to
13 prohibit or limit the right of a qualified individual
14 with a disability from requesting a reasonable
15 accommodation or modification to any election standard
16 practice or procedure mandated by law or rule that the
17 individual is entitled to request under federal or state
18 law."
19       Did I read that accurately?
20    A. Yes.
21    Q. Did you know that Texas's election law prohibits
22 election authorities from denying voters reasonable
23 accommodations?
24       MS. SIFUENTES-DAVIS: Objection, form.
25    A. It may prohibit them. It doesn't mean it doesn't

Page 117

1  happen.
2     Q. (BY MR. HERBERT) Have you yourself ever been
3  denied an accommodation that you requested?
4     A. When you're outside the building, it's hard to
5  make an accommodation request. Think about it. Because
6  if I can't get into a building -- but I think they've
7  been fairly reasonable in helping or modifying.
8     Q. Okay. So just to be clear -- and this is not to
9  skirt the point that you just raised, because I will ask
10 about that, but you have not been denied reasonable
11 accommodation requests before, have you?
12       MS. SIFUENTES-DAVIS: Objection, form.
13    A. I haven't asked for one.
14    Q. (BY MR. HERBERT) Okay. You have not asked?
15    A. I've only asked for the piece to come off the end
16 of the voting machine.
17    Q. Okay. And that was not denied, was it?
18    A. No.
19    Q. Okay. And have you ever called to request a
20 reasonable accommodation?
21    A. No.
22    Q. Okay. Have you ever relied on somebody else to
23 distribute or give to you an application to vote by
24 mail, or have you just gone online and gotten it
25 yourself?

Page 118

1    A. Oh, application for voting by mail?  I have
2  gotten it myself online and mailed it in.
3    Q. And has anybody ever approached you to give you
4  an application to vote by mail?
5    A. No.
6    Q. Okay.  What about for an early voting ballot or
7  ballot materials?  Has anybody ever approached you to
8  give you those things, or have you always, when you've
9  voted by mail, applied by yourself?
10   A. I've applied by myself.
11   Q. Okay.
12   A. There is one thing about the application by mail
13  off the computer; it is difficult to read.  My elderly
14  neighbor requested one more for me because she knew I
15  had done it, and I gave it to her not realizing she had
16  a visual impairment.
17   Q. Sorry.  I didn't quite follow that.  Are you
18  saying that your elderly neighbor needed help getting an
19  application to vote by mail, and you did it for her?
20   A. I printed one out, and then she told me she
21  couldn't read it, and I went, Oh, no.
22   Q. Do you know if she was able to eventually vote?
23   A. Yes.
24   Q. Okay.  So let me talk about early voting.  And I
25  know we're hopping around here a little bit.  But I

Page 119

1  assure you that's a good sign.  I'm getting through the
2  rest of my questions here.  So we're going to hop around
3  a little bit.  Let's talk about early voting a bit.
4        You would agree that increasing the minimum hours
5  for early voting would be a good thing, right?
6    A. What -- what do you mean there?
7    Q. So, let's say that the minimum early voting hours
8  used to be four per day, that there had to be minimum
9  early voting hours, and it would be a good thing to
10  increase the minimum early voting hours per day.
11       You would agree with that, right?
12   A. I've always known them to be 7:00 to 7:00.
13   Q. Okay.  Would it be a good thing to make them even
14  more?
15   A. Sure.
16   Q. Okay.  Let's -- and you don't contend that -- you
17  don't think that Senate Bill 1 has hampered your ability
18  to vote early, do you?
19   A. I don't think so.
20   Q. Okay.  Senate Bill 1 has not -- strike that --
21       Let's talk about poll watchers.
22       Do you believe that poll watchers should be
23  allowed?
24   A. Personally, no.
25   Q. Why is that?

Page 120

1    A. Because it's just creepy.  That's technical, but
2  I already have a hard time when people walk by my booth,
3  because I'm short, and they can see over my head as to
4  what my voting is, and it's not private as really I
5  thought private voting should be, so just to have
6  someone watching you is just more nerve-wracking to me.
7    Q. So you believe that it's important for voters to
8  have the ability to vote in private or in secret; is
9  that right?
10   A. Yes.
11   Q. Okay.  The secrecy of the ballot prevents voters
12  from being penalized for their vote, right?
13   A. Being penalized from their vote?
14   Q. For.
15   A. For their vote.
16       I don't know.
17   Q. Well, the secrecy of the ballot protects those
18  from being pressured or coerced or judged into making
19  certain choices, right?
20   A. True.
21   Q. Okay.  So the State has a legitimate interest in
22  protecting your secrecy and your privacy as a voter,
23  right?
24   A. Correct.
25   Q. Okay.  And have you ever experienced any

Page 121

1  poll-watching behavior that prevented you from or
2  hampered you in casting a vote?
3    A. Not by an official poll watcher, but other
4  persons waiting on the booth behind me looking over my
5  head.  But that hasn't prevented me from voting.
6    Q. Okay.
7    A. But it is very uncomfortable.
8    Q. Since the enactment of SB1, has there been any
9  poll-watching activity that has hampered your ability to
10  vote?
11   A. Not that I'm aware of.
12   Q. Okay.  On the other hand, you would agree that
13  the State has a real interest in making sure that the
14  person who's casting the vote is the person who's
15  registered to vote, right?
16   A. Yes.
17   Q. Okay.  As well as in ensuring that only those
18  people who are eligible to vote do in fact vote, right?
19   A. Yes.
20   Q. Okay.  I'd like you to take a look back at
21  Exhibit Number 8.  That's the Vox article.
22   A. Yeah.
23   Q. And if you flip to the 7th page -- and sorry,
24  these are double-sided.
25   A. Yeah.

Nancy Crowther

June 17, 2022
Pages 122 to 125

Page 122

1  Q.  Okay.  So you're on the page where your section
2  begins.  You flip to the next page.
3  A.  Uh-huh.
4  Q.  The page after that, the last paragraph in your
5  section.
6      Do you see that?
7  A.  Yes.
8  Q.  Okay.  It reads, "When it comes to the greater
9  power Republican lawmakers want to give to poll
10 watchers, yuck.  I am so annoyed about that.  As a
11 person with disabilities, everyone is already trying to
12 be your helper.  I don't want people interfering by
13 intimidating voters by their mere presence.  People with
14 disabilities also have a right to a private vote.  I use
15 a wheelchair, and if someone is standing there, they're
16 two or three feet taller than me.  They're towering over
17 me.  All they have to do now, because we're in Texas and
18 it is legal, is have a gun on them.  That is
19 intimidation to scare away the voters.  For anybody with
20 a disability or mental illness, it can cause undue
21 stress.  I want my vote to be private, just like
22 everyone else."
23     Did I read that right?
24 A.  Yes.
25 Q.  Okay.  So when you made this statement in

Page 123

1  July 2021, the date of this article, had you seen a poll
2  watcher with a firearm at the election polls?
3  A.  No.
4  Q.  Okay.  And since the enactment of SB1, have you
5  seen a poll watcher with a firearm at the polls?
6  A.  Not to my knowledge.
7  Q.  Okay.  So since the enactment of SB1, have you
8  ever been scared away from voting by a poll watcher?
9  A.  No.
10 Q.  And just to be clear, you've never been scared
11 away by a poll watcher, since the enactment of SB1, who
12 was carrying a firearm, right?
13 A.  Well, I've never experienced that, so I wouldn't
14 know.
15 Q.  You've never seen somebody -- a poll watcher with
16 a firearm; is that right?
17 A.  No.
18 Q.  Okay.
19 A.  And the statement behind that is related to the
20 no-permit requirement for concealed weapons, so that was
21 also something that came to light this year.
22 Q.  Okay.  Why do you believe that poll watchers may
23 have a gun on them at the election polls?
24 A.  To protect themselves in the event of an active
25 shooter.

Page 124

1  Q.  Do you believe that poll watchers are allowed to
2  do that, to carry a firearm?
3  A.  No.
4  Q.  Okay.  So you had said all they -- quote, "All
5  they" -- they being poll watchers -- "have to do now,
6  because we're in Texas and it is legal, is have a gun on
7  them."
8      So are you saying that you do not believe that
9  poll watchers are allowed to carry a firearm at the
10 polls?
11 A.  Right.
12 Q.  They are not?
13 A.  I'm saying that's all we need now is for them to
14 have a gun on them, meaning they had just passed the law
15 where you didn't have to have a permit for open carry,
16 or whatever it is, and you could carry a gun with it.
17 Q.  But not --
18 A.  I have seen people with guns, you know.
19 Q.  But not at a polling location, right?
20 A.  No.
21 Q.  And not a poll watcher?
22 A.  No.
23 Q.  Okay.  Do you believe that poll watchers are
24 allowed to carry a firearm?  Not as -- in their capacity
25 as a poll watcher, but do you believe that a poll

Page 125

1  watcher who has the right to carry a firearm may carry a
2  firearm while he or she is acting as a poll watcher?
3  A.  Personally, I don't think it's appropriate,
4  because it is threatening.
5  Q.  Not quite my question, though.  I appreciate your
6  response, but not quite my question.
7      Do you believe -- not whether they should, but
8  whether they are allowed.  Do you believe that poll
9  watchers are allowed to carry a firearm?
10 A.  Yes.  And so am I.
11 Q.  And what's the basis for that belief?  Why do you
12 think that?
13 A.  Because of the ruling that you can carry a
14 weapon.
15 Q.  Okay.  I'm going to introduce our final exhibit
16 of the day.  Exhibit No. 12 -- I'll mark this as
17 Exhibit No. 12.
18     (Exhibit 12 marked.)
19 Q.  (BY MR. HERBERT)  So this is a copy of an
20 election advisory issued by the Texas Secretary of State
21 on September 21st, 2018.  At the top of the page, it
22 reads, quote, "Election Advisory, No. 2018-29."
23     Do you see that?
24 A.  Yes.
25 Q.  Okay.  And at the top of the page, it shows that

Nancy Crowther

June 17, 2022
Pages 126 to 129

Page 126

1  this is from Keith Ingram, the director of elections.
2      Did I represent that accurately?
3  A. Yes.
4  Q. And the subject line reads, "Handguns in polling
5  places," in parentheses, "KP-0212."
6      Did I read that correctly?
7  A. Yes.
8  Q. Okay. The third page -- if you would look to the
9  third page, you see there is a subject header in the
10  middle of the page that reads, "General prohibition of
11  firearms in polling place."
12      Did I read that correctly?
13  A. Yes.
14  Q. Okay. The first two sentences of that first
15  paragraph of that section reads as follows:
16  "Section 46.03(a) of the Texas Penal Code generally
17  prohibits a person from bringing a firearm onto the
18  premises of a polling place. In addition to the
19  circumstances described above, this prohibition does not
20  apply to a peace officer, regardless of whether the
21  peace office is on or off duty."
22      Did I read that correctly?
23  A. Yes.
24  Q. Okay. So you would agree that, unless you're a
25  peace officer, you actually may not carry a firearm at

Page 127

1  the polls; is that right?
2  A. This was done in 2018, and the law that went into
3  effect recently says you can carry a gun.
4  Q. Okay. So you believe that Texas's constitutional
5  carry law overrides this prohibition of firearms; is
6  that right?
7  A. That would be my understanding.
8  Q. But that would have nothing to do with
9  Senate Bill 1, right? It would have to do with the
10  constitutional carry law, right? In other words -- I
11  can rephrase that.
12      So you do not believe that Senate Bill 1 permits
13  the carrying of firearms; you believe that
14  constitutional carry is what permits the carrying of
15  firearms by poll watchers, right? I can rephrase it
16  again if you'd like.
17  A. I can't even --
18  Q. Sure, sorry.
19  A. Yeah, I can't even answer that question.
20  Q. That's okay.
21      If Senate Bill 1 had a provision that allows for
22  law enforcement to remove a poll watcher who is
23  committing a breach of the peace or any other violation
24  of law, would that be a good thing?
25  A. Yes.

Page 128

1  Q. Okay. And if the Texas legislature required that
2  for a poll watcher to serve as a poll watcher, he or she
3  would have to present a certificate and sign an oath
4  swearing that they would not disrupt the electoral
5  process, would that be a good thing?
6  A. Only if it's a note that says under penalty of --
7  but yes.
8  Q. Okay. Let's talk about -- let's talk about your
9  communication. Let's talk about your talk. Let's talk
10  about your communications about Senate Bill 1.
11      Have you spoken with any Texas election officials
12  about SB1?
13  A. Yes.
14  Q. Who?
15  A. Let's see -- to be honest, I don't remember all
16  who I have spoken with, but I didn't make a number of
17  calls to the capital.
18  Q. I'm sorry, could you repeat that for me? You did
19  or did not?
20  A. I did.
21  Q. Okay.
22  A. And I actually didn't get to speak with the
23  legislators. I spoke with their aides, primarily.
24  Q. And when was this?
25  A. Prior to the SB1 going into law.

Page 129

1  Q. Okay. And do you remember which legislative
2  aides or which legislators' offices you contacted?
3  A. No. It's been a little while.
4  Q. What were those conversations like? What did the
5  legislator aides say in those conversations?
6  A. To paraphrase, they understood our concerns -- my
7  concerns, and they'll speak with the senator or
8  legislator regarding my concerns and pass them along.
9  And that was basically what everybody said, which is
10  consistent with questions or concerns I've brought
11  before other legislators.
12  Q. And did anybody say anything different than that,
13  or that's what everybody said?
14  A. Yeah.
15  Q. Okay. Did you talk to anybody from the office of
16  the Texas Secretary of State about Senate Bill 1?
17  A. No.
18  Q. Did you speak with any county officials about
19  SB1?
20  A. I don't recall speaking to any county officials.
21  Q. Did you write your House member or your senator?
22  A. No.
23  Q. Did you speak to anybody from the office of the
24  governor?
25  A. No.

Nancy Crowther                                                    June 17, 2022
                                                                 Pages 130 to 133

Page 130

1    Q. What about the office of the lieutenant
2  governor --
3    A. No.
4    Q. Did you speak to anybody from the office of the
5  lieutenant governor?
6      Did you -- did you testify before the adoption of
7  SB1 in front of the legislature?
8    A. No, I did not.
9    Q. Could you describe to me your involvement in the
10  political process leading up to the enactment and
11  signing into law of Senate Bill 1?
12    A. Let's see. I know we passed along a lot of
13  information online, and how to contact your legislators
14  with any concerns or non-concerns. I do know that -- I
15  think I watched legislation online on a few of the
16  hearings.
17      But I think that was -- a lot of work we did was
18  just promoting the information that was going out and
19  when the hearings were and such.
20    Q. Did you do anything else to make sure your voice
21  was heard when SB1 was being considered?
22    A. I'm sure I signed a few petitions. I'm sure I
23  did those group letters to legislators, but I can't tell
24  you when, but I know I did some work on it. Generally
25  speaking, my -- I would have electronic testimony

Page 131

1  provided or sign on to a letter related to the position
2  of one of my groups.
3    Q. Do you have a rough sense for how many of those
4  letters there were?
5    A. No.
6    Q. Okay. That's all right. And I don't think I
7  asked you this, but are you affiliated with a political
8  party?
9    A. As in -- as in --
10    Q. Are you a member or affiliated with a political
11  party?
12    A. How do I vote? Is that the question?
13    Q. No. Are you a member of any political party?
14    A. The Democratic party. Am I?
15    Q. And --
16    A. If that's what you wanted.
17    Q. Well, I'm -- only if that's the case.
18    A. I was like, party?
19    Q. Are you a member of the Democratic party, or are
20  you --
21    A. I am a democrat.
22    Q. Okay. And have you ever donated to political
23  campaigns?
24    A. Yes, I have.
25    Q. Which campaigns; do you remember?

Page 132

1    A. Mayoral and Democratic or Senate positions, and
2  now gubernatorial.
3    Q. Have those all been Democratic campaigns?
4    A. No.
5    Q. Have you ever -- have you ever worked for or
6  volunteered for any political campaigns?
7    A. Yes.
8    Q. Which ones?
9    A. The Lightrail Project Connect. So many of the
10  city ones -- mostly municipal ones. And just voting --
11  promoting voting.
12    Q. So, just a few more questions, I think. We might
13  be able to wrap up early and get out -- well, not early,
14  but we might be able to wrap up soon.
15      You had mentioned that one of your concerns about
16  SB1 was that if you're voting by mail you have to prove
17  that you're disabled; is that right?
18    A. Well, that's just on the mail-in ballot, period.
19    Q. Okay. If you did not have to prove that you were
20  disabled but could simply attest to your being disabled
21  for an application to vote my mail, would that be
22  better?
23    A. I -- personally, I don't know why you would have
24  to say you have a disability. If you want an absentee
25  ballot, you should be able to get one if you're going to

Page 133

1  be absent or you want to vote by mail. It should not be
2  related to a person's disability.
3    Q. So your belief is that before SB1, after SB1, you
4  could -- any voter who is eligible to vote should be
5  able to vote by mail, no matter what; is that right?
6    A. Not no matter what.
7    Q. Okay. Let me clarify, I'm sorry.
8    A. But not based on their disability --
9    Q. Okay. So you --
10    A. -- or lack thereof.
11    Q. So then -- so then, what should the criteria be
12  for somebody to vote by mail?
13    A. They need to vote by mail for any other reason.
14    Q. And disability is not one of those reasons?
15    A. It could be. But so could work, travel,
16  everything else. A disability is getting a little
17  personal.
18    Q. So it's your issue -- strike that --
19      So your concern is more that you have to specify
20  why you need to vote by mail; is that right?
21    A. Yes.
22    Q. Okay. You don't believe that the Texas
23  legislature engaged in intentional discrimination when
24  it passed Senate Bill 1, do you?
25    A. That's a loaded question. I believe the intent

Nancy Crowther

June 17, 2022
Pages 134 to 137

Page 134

1  was to change the law to make it more difficult for
2  different groups to be able to vote by mail.
3     Q.  Sorry, I'm just going to object as nonresponsive,
4  just because I'm not sure that I'm following here, and I
5  think my question is just a little bit different -- and
6  please correct me if I'm wrong, but you do not believe
7  that the Texas legislature, in passing SB1,
8  intentionally discriminated, correct?
9     A.  The way you're saying it is kind of confusing me.
10  You have a double negative in there.
11     Q.  Okay.  Let me rephrase that.
12        When the Texas legislature passed SB1, you would
13  agree that they were not intentionally discriminating,
14  correct?
15     A.  Not correct.
16     Q.  You do believe that the Texas legislature was
17  intentionally discriminating; is that right?
18     A.  Yes.
19     Q.  Okay.  What is the basis for that belief?
20     A.  The limitations placed on the mail-in ballot, the
21  restrictions at the polls.
22     Q.  Anything else?
23     A.  The certification under penalty of law that was
24  added into the statement.
25     Q.  The oath statement?

Page 135

1     A.  The oath.
2     Q.  Anything else?
3     A.  That's all I can think of.
4     Q.  Okay.  So it would be fair to say, then, that
5  your reason for believing that the Texas legislature was
6  initially discriminating is from Senate Bill 1 itself,
7  the language of Senate Bill 1 itself; is that right?
8     A.  Yes.
9     Q.  Okay.  Do you have any other reason to believe
10  that the Texas legislature acted intentionally
11  discriminatory?
12     A.  Any other reason to believe that they acted
13  discriminatory?  I would only have to say that it's been
14  my experience that I've seen over the years as I
15  participated in various other bills that were designed.
16     Q.  Okay.  But to be clear, I'm talking about
17  Senate Bill 1.
18        So are you saying that -- are you saying that
19  your basis for believing that the Texas legislature was
20  intentionally discriminating when it passed SB1 --
21     A.  Yes.
22     Q.  -- is solely based on the Texas Senate Bill 1
23  itself, as well as the Texas legislature's previous laws
24  that were unrelated to Senate Bill 1?
25     A.  Yes.

Page 136

1     Q.  Okay.  Did you speak to any -- strike that --
2        Nothing in Senate Bill 1 expressly mentions race
3  as far as you're aware; is that right?
4     A.  Huh-uh.  I'm sorry.  No, not that I recall.
5     Q.  And nothing in Senate Bill 1, as far as you're
6  aware of, expressly mentions -- strike that --
7        To reiterate, you did not talk to anyone from the
8  secretary of state's office about SB1, correct?
9     A.  Correct.
10     Q.  So you're belief about Texas's discriminatory
11  intent is not informed by any conversation with the
12  Secretary of State's Office, right?
13     A.  Right.
14     Q.  And, again, to reiterate, you did not talk to any
15  House members about SB1, correct?
16     A.  Correct.
17     Q.  So your reason for believing that SB1 is
18  intentionally discriminatory does not have to do with
19  conversations that you had with House members; is that
20  right?
21     A.  That would be correct.
22     Q.  And it's not based on any statements that members
23  of the Texas House made; is that right?
24     A.  No.
25     Q.  And you did not talk to any members of the Texas

Page 137

1  Senate about SB 1, right?
2     A.  Correct.
3     Q.  And so your reason for believing that the Texas
4  legislature was intentionally discriminatory in passing
5  SB 1, that has nothing to do with any conversations or
6  statements by Texas senators; is that right?
7     A.  It's the production of the law that indicates to
8  me that it was a discriminatory act based on my
9  experience with previous voting laws.
10     Q.  So to be clear, not based on a conversation you
11  had with a Texas senator or a statement that a Texas
12  senator made?
13     A.  No.
14     Q.  And --
15     A.  By following the law.
16     Q.  And not based on any conversations that you had
17  with the office of the governor or any statements by the
18  office of the governor?
19     A.  No.
20     Q.  And not based on any conversations you had with
21  the lieutenant governor or any statements by the
22  lieutenant governor, right?
23     A.  Correct.
24     Q.  Okay.  Let's take a five-minute break.  I think
25  I'm about done, but I just want to check my notes, if