10

1  Zoom, can you identify yourselves, please.
2       MR. MALHI:  Hi.  This is Jaywin Singh
3  Malhi on behalf of the Department of Justice.  And
4  along with me is a student intern, Camryn Pac.
5       THE WITNESS:  That's the USD attorney?
6       MR. FOMBONNE:  Yeah.
7       MS. YEOMANS:  This is Georgina Yeomans
8  on behalf of the HAUL plaintiffs.
9       MR. WILDER:  This is William Wilder on
10  behalf of the Lupac plaintiffs.
11       MS. ROSENBAUM:  Laura Rosenbaum on the
12  phone on behalf of the Mi Familia Vota plaintiffs.
13       THE VIDEOGRAPHER:  Everybody has
14  introduced themselves on Zoom?
15       (No answer)
16       THE COURT REPORTER:  Okay.  We'll take
17  that as a yes.
18       Will you raise your right hand,
19  please.
20       THE WITNESS:  (Complies).
21       MR. CHRISTOPHER G. HOLLINS,
22  having been first duly sworn, testified as follows:
23            EXAMINATION
24       Q. (BY MR. SWEETEN)  Good afternoon,
25  Mr. Hollins.  I'm Patrick Sweeten with the Texas

11

1  Attorney General's Office representing the State
2  Department in this case.
3       Can you state and spell your full
4  name.
5       A. Yeah, Christopher George Hollins,
6  C-H-R-I-S-T-O-P-H-E-R, G-E-O-R-G-E, H-O-L-L-I-N-S.
7       Q. Okay.  What is your job title
8  currently?
9       A. I'm a principal attorney of Hollins Law
10  Group.
11       Q. Okay.  And where is -- where is the
12  principal office of Hollins Law Group, in Houston?
13       A. Northwest Houston.
14       Q. Okay.  Do you have any other -- any
15  other employment besides that?
16       A. I don't think I'm W-2'd from anywhere,
17  if that is the question.
18       Q. Okay.  Do you have any -- are you -- do
19  you realize any income from any other businesses or
20  operations?
21       A. I have some real estate business.  I
22  think I'm of counsel in a couple of cases that are
23  not held by my law firm.
24       Q. Okay.  All right.  So you -- have you
25  been deposed before today?

12

1       A. In life, yes; in this matter, no.
2       Q. Okay.  So not in this matter, in life,
3  tell me when you were deposed.
4       A. Probably about six, seven years ago, I
5  was deposed in a civil matter about discrimination at
6  a -- at a nightclub.
7       Q. Okay.  Who were the plaintiffs or
8  defendants in that case?
9       A. I was one of the plaintiffs.
10       Q. Okay.  And what -- do you remember the
11  nightclub?
12       A. I believe it was Clé, which is right
13  here in town.
14       Q. Okay.
15       A. C-L-É is the spelling.
16       Q. Was that a -- do you recall what the
17  cause of action was?
18       A. They wouldn't let us into the club
19  because we were black.
20       Q. Okay.  And you were -- did you sue
21  based on the Civil Rights Act or Section 1983?  What
22  was the basis of that?
23       A. I believe so.
24       Q. Okay.  All right.  Any other times
25  you've been deposed?

13

1       A. Not to my knowledge.  I can't recall.
2       Q. Okay.  It's my understanding you've
3  testified in matters before?
4       A. Sure.
5       Q. Okay.  Can you tell me about your --
6  your experience testifying.
7       A. As County Clerk, I have definitely
8  testified at least once, maybe a second time, in
9  matters related to -- to my service as County Clerk.
10       Q. Okay.  And that occurred during the
11  2020 election year, correct?
12       A. That's correct.
13       Q. All right.  So you've been deposed
14  before, but I'll just go ahead and just run through a
15  few ground rules on it.
16       First, you're under oath at all times.
17  You understand that, correct?
18       A. Yes.
19       Q. All right.  Second, I may be asking
20  questions.  Our court reporter is going to be taking
21  down what I say and what you say.  So if we can make
22  an agreement that I'll -- I'll try to let you finish
23  your answer, and then in turn, when I'm asking a
24  question, let me finish the question.  I may
25  anticipate or you may anticipate what I'm going to



Defendant's
Exhibits

437

4 (Pages

14

```
1    say, but let us complete the thoughts so we don't
2    have a record that when we go back and read it, that
3    we don't -- we don't understand what we were saying
4    to each other, okay?
5         A. Sure.
6         Q. All right. Along those lines she can't
7    take down shakes of the head, "uh-huhs" or "huh-uhs,"
8    that sort of thing. It's normal in conversation, but
9    she -- she can't get that, and so there may be times
10   when -- if we're talking in that way that I may just
11   ask you a yes or no, and the reason is to try to
12   maintain a clear record, okay?
13        A. Sure.
14        Q. We can take breaks during the afternoon
15   as you need them. If there's a question pending on
16   the table, if you'd answer it and then we take a
17   break right after that, okay?
18        A. Absolutely.
19        Q. All right. And if you don't understand
20   a question that I ask or don't hear it, then just let
21   me know and I will repeat it, okay?
22        A. All right.
23        Q. Oh, I guess the last thing is your
24   counsel may from time to time object. If you would
25   go ahead and answer the question after the question
```

15

```
1    is asked, despite the objection, unless he instructs
2    you not to answer. We would -- a lot of times people
3    stop when the objection occurs and don't know what to
4    do, but go ahead and answer after the question is
5    asked and the objection is asserted, okay?
6         A. All right.
7         Q. All right. So I want to know a few
8    things about your background. I -- I think I have a
9    pretty good understanding of it, though.
10        But I guess the first thing is that
11   you were -- you are a member of the democratic party,
12   correct?
13        A. I'm a democrat.
14        Q. Okay. You voted in the democratic
15   primary, correct?
16        A. Yes.
17        Q. Okay. You -- you have served
18   previously as the vice chair of the Texas Democratic
19   Party, correct?
20        A. I serve currently as the vice chair of
21   the Democratic Party.
22        Q. And -- and so -- did you -- was
23   your previous title vice chair or that's always been
24   your title?
25        A. It's the only title I've ever held with
```

16

```
1    the party.
2         Q. And that's the statewide party,
3    correct?
4         A. That's correct.
5         Q. All right. You also at one time
6    interned in the Obama Administration, correct?
7         A. That's correct.
8         Q. What -- what did you -- what -- what
9    areas did you intern?
10        A. I was in the Office of Presidential
11   Personnel.
12        Q. Okay. Now, you are currently a
13   candidate for mayor?
14        A. That's correct.
15        Q. All right. You announced your
16   candidacy in February of 2022, correct?
17        A. Yes.
18        Q. All right. And you are currently, I
19   assume, on the campaign trail?
20        A. Yeah.
21        Q. Okay. And -- and that race is in -- is
22   that for the 2023 race? Is that correct?
23        A. Yes.
24        Q. Will that take place in November of
25   2023?
```

17

```
1         A. Yes.
2         Q. Okay. All right. So you were born on
3    July 8th, 1986; is that right?
4         A. Yes. (Nods).
5              THE COURT REPORTER: Out loud.
6              THE WITNESS: Yes.
7         Q. (BY MR. SWEETEN) Okay. And your father
8    was -- worked for the Houston Police Department,
9    right?
10        A. That's correct.
11        Q. You went to -- you attended Eisenhower
12   in Missouri City, Eisenhower High School?
13        A. Hightower High School.
14        Q. Hightower High School, okay.
15             And when did you graduate from
16   Hightower High School?
17        A. May 31st, 2003.
18        Q. Okay. Is -- is that a new school out
19   there?
20        A. I think I was in the third graduating
21   class.
22        Q. Okay.
23        A. It's no longer a new school.
24        Q. Is it 4 or 5A, 6A?
25        A. It was 5A then. I'm not sure what it
```

18

1    is now.
2        Q.  Did you go -- right after Hightower
3    High School, did you attend Morehouse College?
4        A.  I did.
5        Q.  When did you graduate Morehouse
6    College?
7        A.  2007.
8        Q.  Okay.  And then you -- you hold a BA in
9    political science; is that correct?
10       A.  That's correct.
11       Q.  All right.  You have earned a JD Law
12   from Yale Law School, correct?
13       A.  That's correct.
14       Q.  And then an MBA from Harvard Business
15   School, correct?
16       A.  That's correct.
17       Q.  All right.  When did you -- in what
18   states are you licensed?
19       A.  Texas.
20       Q.  Okay.  And how long have you been
21   licensed in Texas?
22       A.  Since 2014.
23       Q.  Okay.  Are you a -- have you ever
24   practiced in the area of voting rights law?
25       A.  No.

19

1        Q.  Okay.
2        A.  Not to my knowledge.
3        Q.  All right.  You don't hold yourself out
4    as being a voting rights specialist?
5        A.  No.
6        Q.  You're not an expert in that area,
7    correct?
8        A.  As someone who has served as an
9    election administrator, I would probably qualify as
10   an expert.  But I'm not a voting rights lawyer, if
11   that's the question.
12       Q.  Well, I guess I'm asking you about your
13   familiarity with the Voting Rights Act.  Are you
14   familiar with Section 2?
15       A.  Not deeply.
16       Q.  Okay.  Section 208?
17       A.  Not deeply.
18       Q.  Okay.  I assume you have familiarity
19   with the 14th Amendment?
20       A.  Sure.
21       Q.  Okay.  Are you -- I mean, have you read
22   Arlington Heights, for example?  Do you recall what
23   that holding said?
24       A.  Not off the top of my head.
25       Q.  Okay.  So with respect to being --

20

1    you're not an expert in voting rights; is that right?
2        A.  If you describe that as, you know,
3    knowing Article -- Section 2 or whatever you just
4    described, then the answer's no.
5        Q.  Okay.
6        A.  I haven't reviewed those as of late.
7        Q.  Okay.  So your -- your -- let's talk
8    about your jobs up until now.
9            You're an attorney.  You're -- what
10   was your first job out of law school?
11       A.  A management consultant.
12       Q.  Okay.  And you worked for -- was it
13   Goldman or Mackenzie?
14       A.  Mackenzie & Company.
15       Q.  Okay.  And then how long did you work
16   for them?
17       A.  I worked for them over the course of 11
18   years, with -- stopped to attend graduate school and
19   work in the White House.
20       Q.  Okay.  And then -- so when did you
21   leave Mackenzie?
22       A.  Late '17/early '18.
23       Q.  When you were with Mackenzie, what
24   office were you in?
25       A.  I started in Atlanta and later on was

21

1    in the Houston office.
2        Q.  Okay.  At some point you were at
3    Goldman Sachs?
4        A.  Correct.
5        Q.  Was that after 2017?
6        A.  No, it was before.  It was while I was
7    in graduate school.
8        Q.  Okay.  And tell me the times you were
9    at Goldman Sachs.
10       A.  2012.
11       Q.  Okay.  Now, other than the internship
12   with the Obama Administration, prior to becoming the
13   Harris County Clerk -- we'll talk about that in a
14   minute -- had you held any political offices,
15   Mr. Hollins?
16       A.  No.
17       Q.  Okay.  So is it the case that your
18   first political appointment, then, after -- after
19   being an intern was on -- began on May 16th, 2020,
20   when the Commissioners Court for Harris County voted
21   you in as the interim clerk for Harris County?
22       A.  Are you classifying an elective office
23   as political office?
24       Q.  I -- I'm classifying elected officer,
25   even a political appointment as political office, I



22

1  guess, so -- maybe let me ask it that way.
2       I guess the question I'm asking is
3  your political -- your -- your -- your political
4  life, I want to get into that a little bit.
5       And so we have talked about the fact
6  that you were an intern with the Obama
7  Administration.  By the way, how long did you work as
8  an intern there?
9       A.  From May until August of 2009.
10      Q.  Okay.  All right.  Worked in the White
11 House?
12      A.  Yes.
13      Q.  And --
14      A.  Sorry, I don't classify government
15 service as political --
16      Q.  Okay.
17      A.  -- life.  That's -- that's the --
18      Q.  That's fine.  Maybe we can just call it
19 government service.
20      A.  Perfect.
21      Q.  I'm not particular on that.  I'm just
22 trying to get a sense --
23      A.  Okay.
24      Q.  -- of what you've done now.
25           You were appointed then -- is the next

23

1  time you -- you had government service or when you --
2  you served with the government, was that when you
3  were appointed the Harris County Clerk?
4       A.  Full-time, yes.  I was also appointed
5  to serve on a tax increment reinvestment zone here in
6  Houston.
7       Q.  Okay.  Tell me what that is.
8       A.  It is a zone identified by locality
9  that allows a tax revenue after a certain point in
10 time to be reinvested back in that area instead of
11 going into the general fund of the local government.
12      Q.  Okay.  How long did you serve?
13      A.  I was appointed early in the pandemic,
14 so I -- let's call it April of 2020, perhaps, and I
15 still serve today.
16      Q.  Okay.  Is that a paid position?
17      A.  It's not.
18      Q.  Okay.  And you served with how many
19 other board members, if you know?
20      A.  Seven to nine.  I'm not sure of the
21 makeup of the board.
22      Q.  Okay.  All right.  So you were
23 appointed, as I understand it -- was the position as
24 I stated it, the Harris County -- the interim clerk
25 for Harris County?  Is that right?

24

1       A.  The County Clerk for Harris County.
2       Q.  County Clerk for Harris County.  Were
3  you interim or were you full-time?
4       A.  I was full-time.
5       Q.  Okay.  So you were not the interim at
6  any point?
7       A.  I was appointed to serve in the role.
8  I think I served for an interim period, but I -- I
9  don't know what the classification of "interim"
10 means.  I was the County Clerk.
11      Q.  You were the County Clerk?
12      A.  Yes.
13      Q.  Okay.  And in fact, you were the County
14 Clerk, as I understand it, from June 1st, 2020 until
15 November of 2020, right?
16      A.  That's correct.
17      Q.  When did you leave the office in
18 November of 2020?
19      A.  I believe it was the 17th.  But after
20 the 2020 election was certified, there was an elected
21 County Clerk, and -- and that person became the
22 County Clerk.
23      Q.  And who was that?
24      A.  Teneshia Hudspeth.
25      Q.  Okay.  So is she still the County

25

1  Clerk?
2       A.  Yes.
3       Q.  All right.  So as I understand it, in
4  your job -- and so let's -- let me count how many
5  months that was.  That was June, July, August,
6  September, October, and about half of November.
7           So you were the Harris County Clerk
8  for about five and a half months, correct?
9       A.  That's correct.
10      Q.  All right.  And as I understand it,
11 among other duties, like administering permits, that
12 sort of thing, you were -- you manage -- you're
13 responsible for managing elections in Harris County;
14 is that right?
15      A.  Yes.
16      Q.  Okay.  And that was as the County
17 Clerk?
18      A.  Yes.
19      Q.  All right.  How did you -- now, I
20 understand the Commissioner's Court appointed you?
21      A.  Uh-huh.
22      Q.  Is that "yes"?
23      A.  Yes.  Sorry.
24      Q.  That's okay.  And you were appointed --
25 was it a party line vote, three to two?



26

1    A. Yes.
2    Q. Okay. And -- and when you were
3 appointed, how -- how did you come to be appointed to
4 that position?
5    A. I applied. I submitted my résumé.
6    Q. Did you submit your résumé yourself or
7 did you go through someone else?
8    A. Through a portal system.
9    Q. All right. So you went -- did you go
10 through an interview process?
11    A. Yes.
12    Q. Okay. Did you have any prior election
13 experience prior to taking that position?
14    A. Not in administration of elections.
15    Q. Okay. What other -- what experience
16 would you have had in elections?
17    A. Working on campaigns, volunteering.
18    Q. Okay. What campaigns did you work on?
19    A. There have been a lot.
20    Q. Okay. Well, let's start -- I mean,
21 presidential campaigns at any point?
22    A. I don't think I have ever volunteered
23 on a presidential campaign.
24    Q. Okay. Have you ever volunteered to
25 work on a senatorial campaign?

27

1    A. Not to my knowledge.
2    Q. Okay. Have you worked on a
3 Congressional campaign?
4    A. I remember I volunteered for Lizzie
5 Fletcher in 2018.
6    Q. And I'm not familiar with who
7 that is.
8    A. She's -- we might be in her district
9 right now. She is a -- she is a Congresswoman
10 representing a big chunk of Houston and now Fort Bend
11 County.
12    Q. Okay. And she's democrat?
13    A. She is.
14    Q. Okay. So we have -- have we exhausted
15 all your Presidential, Senatorial, and Congressional
16 campaign experience?
17    A. I believe so. I can't fully recall.
18    Q. Okay. So now I want to ask you: Have
19 you worked on any Texas Senate campaigns?
20    A. State Senate?
21    Q. State Senate, yeah.
22    A. I'm not certain.
23    Q. Okay. Texas House members, have you
24 worked on any Texas House campaigns?
25    A. On a volunteer basis, I believe I may

28

1 have knocked doors or something of that nature for
2 somebody.
3    Q. Do you recall who that was?
4    A. Not off the top of my head.
5    Q. Okay. So then the next question is:
6 And -- and so have we exhausted all the Texas House
7 campaigns that you remember working on?
8    A. Yes.
9    Q. Okay. Now I want to ask about local
10 politics. Have you worked on a mayoral campaign?
11    A. I've supported Mayor Sylvester Turner
12 as volunteer.
13    Q. Okay. And that was during his last
14 campaign for mayor?
15    A. Both, I believe. Well, not both.
16 He's -- he's -- he's had many campaigns. Both of his
17 successful campaigns, yes.
18    Q. Got it. So, I mean, these are
19 four-year terms, mayoral terms, correct?
20    A. That's correct.
21    Q. So doing my arithmetic, 2019 to 2015;
22 does that sound right?
23    A. That's correct.
24    Q. All right. Council races, have you --
25 have you worked on council races?

29

1    A. I believe so.
2    Q. Okay. Do you recall who -- for whom?
3    A. I believe in 2015, I supported Amanda
4 Edwards.
5    Q. Okay.
6    A. In 2019 I believe I supported Isabel
7 Longoria.
8    Q. All right. Any other cam -- council
9 campaigns that you can recall working on,
10 Mr. Hollins?
11    A. Probably, but I can't recall
12 specifically.
13    Q. Okay. Any other political campaigns
14 that you recall working on?
15    A. Yes. I worked on a school board race
16 in Desoto ISD --
17    Q. Okay.
18    A. -- for Aubrey Hooper. I have worked on
19 a mayoral campaign for a man by the name of Randall
20 Woodfin in Birmingham, Alabama. I have worked on the
21 campaign of a gentleman named Nate Fleming running
22 for shadow representative in Washington D.C. I've
23 worked on a mayoral campaign for a gentleman by the
24 name of Ceasar Mitchell running in Atlanta, Georgia.
25 Those are the ones I can recall off the top of my



30

```
1   head.
2        Q.  Okay.  Now, during your term -- pardon
3   me.
4        During your term as the Harris County
5   Clerk, you -- that term, that five and a half months
6   that you served in that capacity, you were working
7   during the Covid -- Covid-19 pandemic, correct?
8        A.  Yes.
9        Q.  Okay.  Let me just ask you:  Why did
10  you leave on November 17th of 2020?
11       A.  Again, there was someone who had been
12  elected to that position, and by law, my term
13  ended and that person's term began --
14       Q.  Okay.
15       A.  -- when the vote was certified.
16       Q.  You did tell me that.  All right.
17  Thank you.
18       Now, so back to 2020 when you were
19  serving, and during the five and a half months that
20  you served as the clerk, there were -- it was an
21  election year, correct, a Presidential election year,
22  right?
23       A.  Yes.
24       Q.  Now, you were not in office and did not
25  administer the -- the March primary, correct?
```

31

```
1        A.  That's correct.
2        Q.  Okay.  So is it the case that -- was
3   the first -- was there a runoff for the March primary
4   that you had to administer?
5        A.  Yes.
6        Q.  Okay.  And when did that runoff occur?
7        A.  I believe the date was July 14th.
8        Q.  Okay.  And so your first election to
9   administer was a runoff race in July of 2020,
10  correct?
11       A.  That's correct.
12       Q.  Okay.  How did it go?
13       MR. FOMBONNE:  Object to the form.
14       THE WITNESS:  Can you repeat that?
15       Q. (BY MR. SWEETEN) Yeah.  Would you say
16  that the election went smoothly, successfully?
17       A.  Yes.
18       Q.  Okay.  Were there any issues that
19  happened in July of 2020?
20       A.  I think there are always issues in an
21  election administration.  I can't recall any issues
22  with specificity.
23       Q.  Okay.  Since we are in July, so your
24  next election, then, was when, after July of 2020?
25       A.  November of 2020.
```

32

```
1        Q.  Okay.  So your next one was a big one,
2   a Presidential election?
3        A.  That's correct.
4        Q.  And Presidential elections, you would
5   agree, are typically the highest turnout elections
6   that are held?
7        A.  That's correct.
8        Q.  Okay.  Now, I want to -- and I'm going
9   to start by giving you an exhibit.
10       MR. SWEETEN:  Can I get some exhibit
11  stickers?
12       THE COURT REPORTER:  Uh-huh.
13       MR. SWEETEN:  Do you mind if I just
14  pull them off here?
15       THE COURT REPORTER:  (Nods).
16       Q. (BY MR. SWEETEN) Before I give you this
17  one, you understand that you're here pursuant to a
18  notice that the Texas Attorney General was provided,
19  and then there was a cross-notice of your deposition
20  sent by one of the partner's groups, right?
21       Is that what you understand?
22       A.  That is my understanding.
23       Q.  All right.  You were -- you were issued
24  a subpoena and served; is that right?
25       A.  That's correct.
```

33

```
1        Q.  Okay.  And you're here because of that
2   subpoena, right?
3        A.  That's correct.
4        Q.  Okay.  Get that out of the way.
5        All right.  So Mr. Hollins, I'm going
6   to hand you what we'll mark as Exhibit Number 1.
7        (Exhibit 1 marked)
8        Q. (BY MR. SWEETEN) And I want to ask you
9   if you would look at that.
10       MR. FOMBONNE:  Do you have any copies,
11  Counsel?
12       MR. SWEETEN:  I do.
13       MR. FOMBONNE:  I don't want to reach
14  over.  Thank you.
15       Q. (BY MR. SWEETEN) Okay.  Have you had a
16  chance to look at Exhibit 1, Mr. Hollins?
17       A.  I have.
18       Q.  Now, you recognize Exhibit Number 1,
19  because that's a letter that you wrote, right?
20       A.  I did.
21       Q.  And the letter that you wrote was a
22  letter to Governor Greg Abbott; is that right?
23       A.  That's correct.
24       Q.  And this would -- was this the first
25  correspondence you had written to Governor Abbott in
```



34

1  the -- in the two months that you served your -- let
2  me ask it a better way.
3          You're here in the second month of
4  your tenure as the Harris County Elections Clerk,
5  correct, when you're writing this letter, right?
6      A. That's correct.
7      Q. You have one election under your belt,
8  which is the July 14th runoff, right?
9      A. That's correct.
10     Q. And is this the first letter that you
11  had written to Governor Greg Abbott?
12     A. I believe so.
13     Q. Okay.
14     A. I don't know for sure.
15     Q. Now, you ask two things in the letter
16  of Governor Abbott, correct?
17     A. Yes.
18     Q. And those two things are, one, you say,
19  "Please provide by the end of July the new start date
20  of early voting for the November election."
21          Right?
22     A. Uh-huh, yes.
23     Q. Okay. And, "Please increase early
24  voting by at least one week to begin no later than
25  Tuesday, October 13th, 2020."

35

1      Q. Did I read that right?
2      A. That's correct.
3      Q. Okay. Now I'm going to show you, then,
4  a proclamation that was then issued by the Governor.
5          You understand that the Governor
6  during that time was -- had issued a number of
7  Governor's orders and some of them related to
8  elections, correct?
9      A. Yes.
10     Q. And you're here on July 22nd, and
11  you're asking the Governor to do two things related
12  to elections, right?
13     A. Yes.
14     Q. And when you asked the Governor to do
15  those things, the Governor then issues -- five days
16  later, the Governor issues a proclamation, doesn't
17  he, that -- that impacts elections, correct?
18     A. I have to wait to see the exhibit.
19     Q. Okay. Forgive the bend on -- on 2.
20          (Exhibit 2 marked)
21     Q. (BY MR. SWEETEN) But that will -- I
22  will hand you what's been marked as Exhibit 2, and
23  you would agree that that's the -- that is a -- a
24  letter and proclamation issued by Governor Abbott on
25  July 27th, 2020, right?

36

1          MR. FOMBONNE: Counsel, do you have a
2  copy?
3          MR. SWEETEN: I do.
4          THE WITNESS: That's correct.
5          MR. FOMBONNE: Thank you.
6          MR. SWEETEN: Have I read the one,
7  okay. All right.
8      Q. (BY MR. SWEETEN) All right. Now, I
9  want to have you turn, if you would, to page two; and
10  particularly I want you to look at the second to the
11  last paragraph. Do you see that where it starts,
12  "Now, therefore, I, Greg Abbott?"
13     A. I do.
14     Q. Okay. So you say, "Now, therefore, I,
15  Greg Abbott" -- it says, sorry, "Governor of Texas
16  under the authority vested in me by the Constitution
17  and the laws of the State of Texas do hereby suspend
18  Section 85.001(a) of the Texas Election Code to the
19  extent necessary or required for any election order
20  authorized to occur on November 3rd. Early voting by
21  personal appearance shall begin on Tuesday,
22  October 13th, 2020."
23          And I'll stop there and just ask you:
24  Is it the case that five days after the letter that
25  you wrote that a proclamation is issued that does

37

1  that -- that -- that does exactly what you have asked
2  for in the first request in the document dated
3  July 22nd, 2020, correct?
4      A. Yes.
5      Q. Okay. And then if you look further,
6  let's keep going, it says, "And shall continue
7  through the fourth day before Election Day. I
8  further suspend Section 860.006(a-1) of the Texas
9  Election Code for any election ordered or authorized
10  to occur on November 3rd, 2020, to the extent
11  necessary to allow a voter to deliver a marked mail
12  ballot in person to the early Voting Clerk's Office
13  prior to and including on Election Day."
14          Did I read that correctly?
15     A. I wasn't listening to you word for
16  word. I was reading.
17     Q. Okay. That's okay. I can do it again.
18  It is no problem.
19          So you say -- it says here in the
20  proclamation, "I further suspend Section 86.006(a-1)
21  of the Texas Election Code for any election ordered
22  or authorized to occur on November 3rd, 2020, to the
23  extent necessary to allow a voter to deliver a marked
24  mail ballot in person to the Early Voting Clerk's
25  Office prior to and including on Election Day."



## 38

1   Did I read that right?

2   A. You did.

3   Q. All right. So let's go back to your

4   letter on July 22nd. You've already told me that of

5   the two things you asked for that this proclamation,

6   it responded in full to number one. So now let's see

7   if -- if -- if it did to number two.

8   On your request that early voting be

9   increased by at least one week, you would agree that

10  this proclamation did that, correct?

11  A. Yes.

12  Q. Okay. So, Mr. Hollins, two months into

13  your tenure as a -- as a new County Clerk, you write

14  the Governor and you ask for two things; five days

15  after you sent this letter, those two things were

16  granted by proclamation, correct?

17  A. That's correct.

18  Q. All right. But it wasn't just that,

19  right, there was more granted in that proclamation

20  than your letter asked for, right?

21  A. Yes.

22  Q. Okay. In fact, what was granted in the

23  proclamation was that -- that in that last sentence

24  that I read you, that the Election Code was expanded

25  to allow for ballots to be dropped off during a term

## 39

1   of early voting, correct?

2   A. That's correct.

3   Q. And you agree with me that under the

4   prior Election Code that the only date that you could

5   have dropped off ballots before this proclamation was

6   on Election Day?

7   A. That's correct.

8   Q. Okay. Now I want to hand you what I

9   will mark as Exhibit Number 3.

10  (Exhibit 3 marked)

11  Q. (BY MR. SWEETEN) Actually, I will be

12  sure to do that. Okay. So when that was granted,

13  what were your plans for location for early -- for

14  where ballots could be dropped off?

15  A. At our offices.

16  Q. Okay. And -- and you agree that that

17  you interpreted -- or your office interpreted that to

18  mean that you could drop it -- off ballots at more

19  than one location, correct?

20  MR. FOMBONNE: Objection: Form.

21  THE WITNESS: What it says here is

22  that a voter can deliver the marked mail ballot in

23  person to the Early Voting Office, so we interpret

24  that to mean our offices.

25  Q. (BY MR. SWEETEN) Okay. So how did --

## 40

1   how many offices total did you have as the -- as the

2   Harris County Election Clerk?

3   A. Somewhere between 11 and 13.

4   Q. Okay. So you had 11 to 13 offices

5   throughout Harris County; is that right?

6   A. That's correct.

7   Q. Okay. And -- and do you -- but you

8   would agree that the proclamation doesn't say

9   "offices," it says "office;" but you interpreted it

10  as being "offices," right?

11  A. Yes.

12  Q. Okay. And were you contacted about

13  your plans to do that?

14  A. By whom?

15  Q. Did -- did anybody criticize or contact

16  you about concerns about doing that?

17  A. I don't recall.

18  Q. Okay. Do you recall hearing any sort

19  of concerns being expressed to the media about that

20  issue?

21  A. I don't recall.

22  Q. Okay. Do you know what the practice of

23  other counties was in the state of Texas regarding

24  how they interpreted that proclamation?

25  A. I don't.

## 41

1   Q. Okay. Do you know if Harris County was

2   the only county that was accepting dropoff ballots at

3   multiple locations?

4   A. I don't.

5   Q. Okay. Don't know one way or the other,

6   right?

7   A. That's correct.

8   Q. Okay. All right. So now I'm going to

9   hand you -- now I'm going to do Exhibit 3. Do you

10  know when you made that announcement, Mr. Hollins?

11  A. What announcement?

12  MR. FOMBONNE: Object to the form.

13  Yeah.

14  Q. (BY MR. SWEETEN) Do you know when you

15  made -- when you communicated the decision to accept

16  those dropoff ballots at multiple locations?

17  MR. FOMBONNE: Object to the form.

18  THE WITNESS: I do not.

19  Q. (BY MR. SWEETEN) Okay. When would you

20  have made -- because going into the election, you had

21  a lot of decisions to make. I know that

22  administrating an election is a pretty complicated

23  endeavor, isn't it?

24  A. Yes, it is complicated.

25  Q. When would you suspect that you began

42

1  allowing -- or that you first communicated the
2  decision to allow them to be -- ballots to be dropped
3  off at each location?
4          MR. FOMBONNE:  Object to the form.
5          THE WITNESS:  I believe that, in
6  general, we started communicating to voters about the
7  November election as soon as possible after the
8  July 14th election concluded.  So either late July or
9  early August is when we started to communicate to
10  voters.
11         Q. (BY MR. SWEETEN)  Okay.  And I would
12  assume that you communicated to the voters that those
13  would be -- I mean, is it your belief that you
14  communicated to voters that multiple ballot locations
15  would be accepted for the dropoff?
16         A. We communicated that they could dropoff
17  vote-by-mail applications at our offices.
18         Q. Okay.  And do you think that was --
19  you -- you've pegged that about July or August of
20  2020, you think?
21         A. I don't know for sure.  I said, in
22  general, we started communicating to voters about
23  expectations for the November election in late July
24  or early August.  On that particular item, I couldn't
25  tell you.

43

1          Q. Okay.  I mean, can you tell me a date
2  when you -- you know it was before that date?
3          MR. FOMBONNE:  Object to the form.
4          THE WITNESS:  Whatever day mail
5  ballots were sent out to voters, I imagine that we
6  communicated where they could drop them off before
7  that.
8          Q. (BY MR. SWEETEN)  Okay.  And would that
9  be -- isn't that typically 45 days in advance of the
10  election at the latest?
11         A. I don't recall.  That sounds about
12  right.
13         Q. Okay.  Since we know that the
14  election -- it looks like it was November.  Was it
15  November 3rd, Mr. Hollins, in 2020?
16         A. I believe so, yes.
17         Q. Okay.  So that would put -- when
18  ballots are being sent out, that would put that
19  sometime in mid September, right?
20         A. Correct, 45 days before November 3rd.
21         Q. Okay.  And so just to kind of round out
22  I think what we've talked about, so is it your belief
23  that at least by some time in mid September that you
24  would communicate that we would be accepting multiple
25  ballots dropoff locations?

44

1          A. Most likely, yes.
2          Q. Okay.  So now I'm going to show you
3  Exhibit 3.  This is the next Governor's proclamation.
4  It's dated October 1st, 2020.  If you could just look
5  at it and let me know if you've seen that before.
6          MR. SWEETEN:  Gentlemen.
7          MR. FOMBONNE:  Thank you.
8          Q. (BY MR. SWEETEN)  So after having just
9  looked at it, do you recognize that as Governor
10  Abbott's proclamation of October 1st, 2020?
11         A. I do.
12         Q. Okay.  Can you turn to the -- the last
13  page of the -- actually, I'm sorry, page three before
14  the signatures page, so page three of the -- of the
15  proclamation.
16         A. I'm looking at it.
17         Q. Okay.  So I'm -- I'm looking at the
18  second paragraph starting at, "I further."  Do you
19  see where it says, "I further suspend 86 --
20  Section 860.006(a-1) of the Texas Election Code for
21  any election ordered or authorized to occur on
22  November 3rd, 2020, to the extent necessary to allow
23  a voter to deliver a marked mail ballot in person to
24  the Early Voting Clerk's Office prior to and
25  including on Election Day; provided, however, that

45

1  beginning on October 2, 2020, this suspension applies
2  only when" -- and if you look below it says, "(1),
3  the voter delivers the" marked ballot -- "marked mail
4  ballot at a single Voting Clerk's Office location
5  that is publically designated by the Voting Clerk for
6  the return of marked mail ballots by
7  Section 86.006(a-1) of this suspension"?
8          Did I read the second and third
9  paragraphs correctly, Mr. Hollins?
10         A. I believe so, yes.
11         Q. Okay.  And -- and so what happened --
12  so this was a proclamation entered -- that was issued
13  by the Governor approximately -- approximately a
14  month and maybe a week after the last proclamation
15  that clarified where those locations could be -- or
16  which -- that -- that it was a single location,
17  correct?
18         A. I think it is more than a month or so
19  ascribed.  I wouldn't describe it as "clarifying."  I
20  would describe that as -- as changing his previous
21  proclamation.
22         Q. Okay.  Be that as it may, that -- that
23  with this second proclamation in October 1st -- and
24  you're right, it is two months and a week, I think,
25  right, after the first -- after the last



46

```
1    proclamation, right?
2         A.  Sure.
3         Q.  And so -- so what is still allowed are
4    the things that you asked for in your letter, which
5    are the -- that -- that -- that mail-in ballots can
6    be dropped off, that they can be dropped off during
7    early -- during the entire period of early voting,
8    and that they -- and that the early voting had been
9    expanded by a week for the presidential election.
10        All those things are correct, right?
11        A.  So am I requested in reference mail
12   ballots at all?   The piece about early voting
13   starting earlier is -- appears to be unaffected by
14   this next proclamation.
15        Q.  Okay.  So then let me put it another
16   way.  The second -- the October 1st proclamation of
17   Governor Abbott's continued the practice of having an
18   additional week for early voting, as you had
19   requested, right?
20        A.  Yes.
21        Q.  The October 1st, 2020 proclamation also
22   had continued the fact that there was a set Election
23   Day, correct, for early voting?
24        A.  Again, it doesn't -- it doesn't talk
25   about early voting --
```

47

```
1         Q.  Okay.
2         A.  -- in this second proclamation to my
3    knowledge.
4         Q.  So the two things that you had
5    requested in your July letter are still intact,
6    correct?
7         A.  Correct.  I mean, one was just give us
8    an answer, which he had done already, so, yes, of
9    course that's not going to change; and then the
10   second one was extend early voting by at least one
11   week, and that was unchanged by this second
12   proclamation.
13        Q.  Okay.  But there was a -- and I think
14   you have said you call it a change, but it basically
15   limits to one location where ballots can be dropped
16   off, right, Mr. Hollins?
17        A.  Yes.  And then it also appears to
18   empower, you know, poll watchers to observe activity
19   at -- at that location.
20        Q.  All right.  So were you, then, yourself
21   or your office involved in any litigation about the
22   October 1st, 2020 proclamation?
23        A.  I don't recall.
24        Q.  Okay.  Do you recall giving an
25   affidavit for any -- any litigant about the issues
```

48

```
1    that we've talked about from the October 1st, 2020
2    proclamation?
3         A.  I don't, but it wouldn't surprise me if
4    I gave one.
5         Q.  Okay.
6         (Exhibits 4 and 5 marked)
7         Q.  (BY MR. SWEETEN) All right.  I'm going
8    to hand you what I have marked as Exhibit 4 and 5.
9    And just take a few moments to get familiar with
10   that, and I will get copies to your counsel.
11        MR. FOMBONNE:  This is 4, 5?
12        MR. SWEETEN:  That one is 4.
13        MR. FOMBONNE:  4.
14        MR. SWEETEN:  And I will get you 5.
15   Here is 5.
16        MR. DILLARD:  Thank you.
17        Q.  (BY MR. SWEETEN)  Okay.  So I'm not
18   going to get into a whole lot about this Exhibit 4,
19   which is the Complaint for Declaratory Relief.  I do
20   have just a few questions for you about it, though,
21   okay?
22        A.  All right.
23        Q.  So if we look at Exhibit 4 together,
24   you agree that this -- the top of the -- of the style
25   shows that it was filed in federal court in Austin,
```

49

```
1    correct?
2         A.  Yes.
3         Q.  Okay.  And this was filed by the Texas
4    League of United Latin American Citizens, and it's
5    against Greg Abbott, correct?
6         A.  It's also against me.
7         Q.  And it's against you as well, correct?
8         A.  Yes.
9         Q.  Now, would you agree that this says
10   that -- that in paragraph two -- and I will start at
11   the second sentence.  "On October 1st, 2020, Governor
12   Abbott issued an order forcing county election
13   officials to the offer their absentee voters no more
14   than one physical dropoff location at which to return
15   their ballot."
16        Did I read that first sentence
17   correctly?
18        A.  I believe so.
19        Q.  "In the state's largest counties,
20   including Harris and Travis, see the October 1st
21   order amend that the number of dropoff locations
22   would respectively be reduced from 11 in four
23   locations."
24        Did I read that right?
25        A.  Yes.
```

50

1    Q. Okay. And then if -- if one were to go
2    on, you would see that -- that there are causes of
3    action claiming a violation of plaintiff's
4    fundamental right to vote, that's on page 15; on page
5    17, arbitrary disenfranchisement in violation of the
6    14th Amendment; and then on page three, count three,
7    race and language minority discrimination.
8        Did I accurately describe that -- the
9    allegations, the counts that are listed in the -- in
10   the complaint that was filed?
11   A. You did.
12   Q. Okay. And so you would agree -- we're
13   not going to re-litigate this now, just but -- but
14   you would agree that at the time -- that the filing
15   date of this complaint was actually 10/1/20, so the
16   same date as the Governor's proclamation, right?
17   A. Yes.
18   Q. Okay. Now, in that litigation -- so
19   I've handed you Exhibit Number 5. And do you know
20   who Brian Keith Ingram is?
21   A. I do.
22   Q. Do you think Brian Keith Ingram is --
23   he is the director of elections of the -- for of
24   state, correct?
25   A. I will take your word on the title, but

51

1    yes, yes, he is the director of elections.
2    Q. Okay. And have you met Mr. Ingram?
3    A. I know that we haven't ever met in
4    person, but we have met virtually on multiple
5    occasions.
6    Q. Right. Because the SOS has election
7    seminars and that sort of thing; is that right?
8    A. Yeah. And -- and we also interact
9    directly with them.
10   Q. Okay. You have spoken with Mr. Ingram
11   before on the Zoom platform, correct?
12   A. And on the phone, yes.
13   Q. And on the phone, all right.
14       Do you know how long Mr. Ingram has
15   been serving in that position?
16   A. I don't.
17   Q. Okay. It sounds like you don't know
18   Keith Ingram very well; is that right?
19   A. I don't know what you mean by "very
20   well." I -- I know him in his position as director
21   of elections.
22   Q. Okay. Has he provided you information
23   in the past about conducting of elections?
24   A. When I was serving as County Clerk,
25   yes.

52

1    Q. And that was during the -- that was
2    during 2020, right?
3    A. Yes.
4    Q. Okay. All right. So let's look at
5    the -- at an affidavit that was filed in another
6    case. It looks like the Laurie-Jo Straty, and I'm
7    just going to ask you about three paragraphs that he
8    stated, okay?
9    A. All right.
10   Q. The first one is paragraph five, and
11   here Mr. Ingram says that, "As a result of the
12   Governor's July 27th, 2020 proclamation, the
13   opportunities for in-person early voting increased by
14   six days."
15       Now, do you have any reason to
16   disagree with that?
17   A. I do not.
18   Q. And, in fact, that is true, isn't it?
19   A. I believe so, yes.
20   Q. Okay. "Moreover, because counties
21   began sending mail ballots on or before
22   September 19th, 2020, the proclamation increased the
23   opportunities for voters to hand-deliver their marked
24   mail ballots from only one day, Election Day, to over
25   40 days."

53

1        You agree that that is a true
2    statement, too. I think I have already said it,
3    right?
4    A. Yeah. Generally speaking, yes. I
5    don't know the 40-day part of it, but yes.
6    Q. Okay. That's fair.
7        But there is nothing incorrect about
8    what he's saying that, "The Governor's proclamation
9    increased opportunities to vote in person by six days
10   and by approximately 40 days for -- to deliver your
11   mail-in ballots," right?
12   A. Yes.
13   Q. Okay. So then he goes to paragraph
14   eight, and it says, "During the July 14th primary
15   runoff, Harris County became the first county in
16   Texas, to my knowledge, to ever offer multiple
17   locations for in-person delivery of mail ballots
18   pursuant the Section 86.006(a-1) of the Election
19   Code."
20       Did I read that right?
21   A. Yes.
22   Q. Now, do you have any reason to dispute
23   that Harris County was the first county to offer
24   multiple locations for in-person delivery of mail
25   ballots, not just the central office?



54

1    A. I don't know one way or the other.
2    Q. Okay. Do you -- let me ask it a
3    different way, then. Do you know of any or counties
4    that prior to July 14th, 2020 had ever employed it?
5    A. I have not looked into that.
6    Q. Okay. Fair. Let's go now to paragraph
7    10, if we could. On paragraph 10, Mr. Ingram's
8    affidavit says, "Out of 254 counties, I am only aware
9    of four counties that intended to utilize more than
10   one location for in-person delivery of mail ballots."
11          And he lists Harris County, Travis,
12   Fort Bend, and Galveston, right?
13   A. Yes.
14   Q. Okay. And -- and do you have any
15   reason to believe that's -- do you know of any others
16   other than those four?
17   A. Again, I have not looked into it.
18   Q. Okay. But you're not here -- you
19   don't -- you don't have contrary information to that
20   assertion, correct?
21   A. No.
22   Q. Okay. By statute, and even under the
23   July 27th proclamation, some of these locations would
24   not have been authorized sites to deliver a marked
25   ballot in person because they did not constitute a,

55

1    quote, "Early Voting Clerk's Office."
2    Did I read his assertion correctly?
3    A. Yes, you read what was on the paper.
4    Q. Okay. And would -- would you -- would
5    you have any reason to dispute that statement, that
6    there were -- of those four counties, there were some
7    locations that did not constitute an Early Voting
8    Clerk's Office?
9    A. I have no idea.
10   Q. Okay. And then the final sentence on
11   this document that I'm going to ask you about is
12   there in paragraph ten, and it says, "For example, in
13   Fort Bend County, the Early Voting Clerk is the
14   County's Elections Administrator who maintains only
15   one office. My understanding is that Fort Bend
16   County intended to use other county annex offices in
17   addition to the election administrator's office to
18   accept in-person delivery of mail ballots under
19   Section 86 006(a-1)."
20   Did I read that sentence -- those two
21   sentences correctly?
22   A. Yes.
23   Q. Okay. And do you know -- I think
24   you've pretty much said that today that you're not
25   familiar with other county's experience.

56

1          Do you have any knowledge of
2    Fort Bend's plans around what they were planning to
3    do with respect to ballot dropoff locations?
4          MR. FOMBONNE: Object to the form.
5          THE WITNESS: I do not recall ever
6    knowing Fort Bend's mail ballot delivery plans, nor
7    do I understand the makeup of their offices.
8    Q. (BY MR. SWEETEN) Okay. That's fair. I
9    got an objection so I will just want to ask it
10   another way. I think I know why he was objecting.
11         So I just want to say: You don't know
12   what Fort Burn -- Bend County's plans were with
13   respect to mail-in ballot locations during the 2020
14   cycle, correct?
15   A. No, I do not.
16   Q. So do you know how that lawsuit
17   resolve -- how the lawsuit surrounding the
18   October 1st proclamation resolved?
19   A. I do not.
20         MR. FOMBONNE: Object to the form.
21   Q. (BY MR. SWEETEN) Okay. As a factual
22   matter, did Harris County change their practice to
23   accept ballot dropoff -- ballot dropoffs only at the
24   central office location?
25   A. Yes. After the October proclamation,

57

1    we went from having multiple dropoff locations at
2    each of our County Clerk's Offices to only having
3    one.
4    Q. Okay. And that didn't change early
5    voting or Election Day, correct?
6    A. Meaning did we ever return to multiple?
7    Q. That's -- that's the question.
8    A. In early voting, we did not. I believe
9    that on Election Day, we may have returned to all of
10   our offices, but I don't recall.
11   Q. Okay. Do you know -- I mean, does that
12   indicate to you whether or not the challenge to
13   Governor Abbott's October 1st proclamation was
14   successful or not?
15         MR. FOMBONNE: Object to the form.
16         THE WITNESS: Again, I don't recall
17   the outcome of --
18   Q. (BY MR. SWEETEN) Okay.
19   A. -- these -- this suit.
20   Q. Needless to say, you followed the
21   October 1st proclamation?
22   A. We followed all Texas laws.
23   Q. Okay.
24         MR. FOMBONNE: You okay?
25         THE WITNESS: I'm good.



58

1    Q. (BY MR. SWEETEN)  Let me ask you --
2    A. I was hoping you crossed off more.
3    Q. Yeah, no, it's a good thing.  It's a
4  good thing.
5    So I forgot to ask you what you did to
6  prepare for the deposition.  Do you --
7    A. I talked to my attorney for 15 minutes
8  yesterday, I believe.
9    Q. Okay.  Mr. --
10    MR. SWEETEN:  If I get this wrong, I'm
11  sorry, Fombonne?
12    MR. FOMBONNE:  Yes, that's right.
13    Q. (BY MR. SWEETEN)  And so did you meet
14  with anyone else other than Mr. Fombonne?
15    A. No.
16    Q. Okay.  You understand that there are
17  multiple plaintiffs in this lawsuit, right?
18    A. I believe that to be the case.
19    Q. And you understand the lawsuit that
20  we're talking about here is the challenge to S.B. 1,
21  correct?
22    A. Generally, yes.
23    Q. Okay.  And so had -- did you talk with
24  any of the other plaintiff's groups prior to your
25  deposition here today?

59

1    MR. FOMBONNE:  Object to the form.
2    THE WITNESS:  Before I was subpoenaed,
3  I -- somebody from the Brennan Center reached out to
4  me and told me that I might be subpoenaed --
5    Q. (BY MR. SWEETEN)  Okay.
6    A. -- and -- and I told them thanks, and
7  that was sort of that conversation.
8    Q. Okay.  Is that the entirety of the
9  conversation?
10    A. They gave me a little bit more
11  information.  Like -- like they told me the time
12  frame in which -- I think they told me what the
13  discovery deadline was.  They said it might happen in
14  this time frame if it's going to happen, that kind of
15  thing.
16    Q. Okay.  Did you ever work with Mark
17  Ilias' (ph) law firm or talk to them about this
18  litigation at any point?
19    A. This litigation?
20    Q. Yeah.
21    A. No.
22    Q. Okay.  Have you worked with Mark Ilias'
23  law firm in the past regarding voting cases brought
24  by -- by that law firm?
25    A. I know who he is.  I think we've had a

60

1  couple of conversations in life.  I don't recall ever
2  working with him.  I know that the -- the drive-thru
3  voting case, you know, November 2nd, 2020 was the
4  hearing here in the Southern District.  He had some
5  staff working on that.
6    Q. Okay.
7    A. I don't know if they were -- I don't
8  think they were working with us.  I think they were
9  codefendants or co-plaintiffs or intervenors or
10  something of that nature.
11    Q. Okay.  All right.  But with respect to
12  that S.B. 1 lawsuit, you have not spoken with
13  Mr. Ilias' law firm; is that correct?
14    A. I have not.
15    Q. Okay.  All right.  I want to stay with
16  2020 and talk about another issue and that is the
17  issue of mail-in ballots.
18    THE WITNESS:  Can we break for 90
19  seconds so I can fill this glass of water up?
20    MR. SWEETEN:  You bet.  Come on, I
21  will take you where you can get it.
22    THE VIDEOGRAPHER:  The time is 2:47.
23  Off the record.
24    (Recess taken)
25    (Exhibit 6 marked)

61

1    THE VIDEOGRAPHER:  The time is 2:58.
2  Back on the record.
3    Q. (BY MR. SWEETEN)  Okay.  Mr. Hollins,
4  we're back on the record after the first break.
5    **So do you recall if Harris County**
6  **elections had a Twitter feed at Harris votes?**
7    A. Yes.
8    Q. Okay.  Let me hand you a Tweet that's
9  been marked as Exhibit 6, and I am particularly
10  interested in the one on the top.
11    MR. FOMBONNE:  Thank you.
12    Q. (BY MR. SWEETEN)  Okay.  Do you
13  recognize that Tweet?
14    A. I do.
15    Q. Okay.  And can you read it for us, just
16  the top Tweet?
17    A. "Update:  Our office will be mailing
18  every registered voter an application to vote by
19  mail.  To learn more about voting by mail in Harris
20  County, please vote harrisvotes.com/votebymail."
21    Q. And what is the date of that Tweet,
22  Mr. Hollins?
23    A. August 25th of 2020.
24    Q. And when the -- when the Tweet was
25  issued -- let me ask you:  Are you aware of any



62

1  County of the 254 counties in Texas that had ever
2  sent every registered violator an application to vote
3  by mail?
4      A.  Again, I'm unaware of other county's
5  practices.
6      Q.  Okay.  And -- but it's the case that at
7  your office you made the decision to -- to send out a
8  mail-in ballot to every -- or an application to every
9  registered voter in Harris County, correct?
10     A.  The Harris County Commissioner's Court
11  approved the practice and the budget in which to do
12  so.
13     Q.  Okay.  And -- and you announced here in
14  August of 2020 that you were going to do that, right?
15     A.  Correct.
16     Q.  And you would agree with me that --
17  that there is somewhere between -- there was at the
18  time somewhere between 2.3 and 2.4 million registered
19  voters in Harris County, correct?
20     A.  I think it was between 2.4 and 2.5 --
21     Q.  Okay.
22     A.  -- but ballpark, correct.
23     Q.  Okay.  And do you -- and obviously
24  litigation -- let me back up.
25         When you did that, when you made that

63

1  announcement, you would agree that you were contacted
2  by the Secretary of State's Office, correct, about
3  that intended practice?
4      A.  At some point thereafter, yes.
5      Q.  Okay.  And -- and when you -- when you
6  made the decision to do that, did you believe that
7  that was authorized by the Texas Election Code?
8         MR. FOMBONNE:  Objection.
9         I'm just going to instruct you not to
10  answer to the extent it would reveal communications
11  with counsel.  Otherwise, you can answer.
12         THE WITNESS:  Okay.  The Texas
13  Election Code did not prevent us from doing it.
14     Q.  (BY MR. SWEETEN)  Okay.  That was your
15  view at the time you made that announcement, correct?
16         MR. FOMBONNE:  Same instruction.
17         THE WITNESS:  Correct.
18     Q.  (BY MR. SWEETEN)  Okay.  Now I'm going
19  to hand you, then, what we will mark as Texas'
20  original petition.  So this will be marked as
21  Exhibit 7.
22         (Exhibit 7 marked)
23     Q.  (BY MR. SWEETEN)  So I have handed you
24  Exhibit 7.
25         MR. SWEETEN:  And I just want to turn

64

1  your attention to a couple of statements in this
2  petition, gentlemen.
3      Q.  (BY MR. SWEETEN)  Now, so Texas, let's
4  first look at the top.  You can see "In the District
5  of Harris County" is on the style and you can see the
6  filing at the very top right that says that this --
7  this petition -- this Plaintiff's Original Verified
8  Petition and Application for a TRO, temporary
9  injunction and permanent injunction, was filed on
10  8/31/2020, correct?
11     A.  That's correct.
12     Q.  All right.  And did you see this when
13  it was filed?
14     A.  Meaning was I aware that I was sued?
15     Q.  Correct.
16     A.  Yes, I was aware that I was sued.
17     Q.  All right.  And if we look on page
18  four, in the factual background it talks about the
19  Tweet we just looked at, right?  It says that on
20  October (sic) 5th, 2020, "The Harris County Clerk
21  announced on Twitter, 'Update:  Our office will be
22  mailing every registered voter an application to vote
23  by mail," and it continues.
24         That was the Tweet that we just looked
25  at, right?

65

1      A.  Correct.
2      Q.  That is referenced here in paragraph
3  14, right?
4      A.  Correct.
5      Q.  All right.  And then it says -- on 15
6  it says, "Currently, there are approximately
7  2.37 million registered voters in Harris County.
8  During the 2016 general election, based on votes cast
9  for Presidential candidates, a little over 100,000
10  voters in Harris County voted by mail."
11         Did I read that right?
12     A.  You did.
13     Q.  And I think you have corrected me that
14  you think it was somewhere closer to 2.4 and 2.5
15  million, but other than the number of registered
16  voters, do you have anything -- any reason to
17  disagree with what's in that first sentence -- those
18  first two sentences?
19     A.  Yeah, I believe it was generally
20  accurate.
21     Q.  Okay.  All right.  And then you would
22  agree with -- well, let's look on the next page, page
23  five, just the first sentence.  It says, "As of
24  July 1st, 2019, only 10.9 percent of the Harris
25  County population is 65 years or older."



**66**

1  Did I read that right?
2  A. Yes.
3  Q. Okay. Now, I want to talk about
4  something that had occurred prior to this without
5  going into great detail, but you realize that there
6  had been litigation before this about whether or not
7  fear of Covid constituted a disability under the
8  Texas Election Code?
9  There was litigation about that issue
10 before this was sent, correct?
11 A. Yes.
12 Q. Okay. And you -- you understand that
13 the Supreme Court found that it was not, right? You
14 knew that?
15 A. Fear of Covid alone did not count as a
16 disability.
17 Q. Okay. But your office made the
18 decision in August of 2020 to send applications for
19 mail-in ballots to all voters, correct?
20 A. Our office announced that we would be
21 doing so in that Tweet on August 25th, 2020.
22 Q. And -- and that was a decision
23 that you're not aware of any other county doing,
24 right?
25 A. I'm not aware of the practices of other

**67**

1  counties.
2  Q. And this case was then litigated?
3  A. Yes.
4  Q. In the court, right?
5  A. Yes.
6  Q. And when I say "this case," I mean the
7  mail-in ballots case that Texas -- the State of Texas
8  filed against you on August 1st, 2020; is that right,
9  Mr. Hollins?
10 A. That's correct.
11 Q. Okay. Now I'm going to show you -- the
12 next exhibit will be Exhibit Number 8. I just very
13 briefly want to show you this.
14 (Exhibit 8 marked)
15 (Phone rings)
16 MR. SWEETEN: 8.
17 MR. FOMBONNE: Thank you.
18 Q. (BY MR. SWEETEN) Okay. Have you seen
19 this document before, Mr. Hollins?
20 A. I'm not sure.
21 Q. Okay. You would agree that this is
22 written on -- this is written on letterhead of the
23 Attorney General of Texas, and the top right corner
24 you can see this is -- this was filed. There was a
25 file stamp, much like the petition, that says

**68**

1  8/31/2020 at 6:00 p.m.
2  Do you see that?
3  A. Yes.
4  Q. And I know that you don't do
5  litigation, but you know what a Rule 11 Agreement is,
6  don't you?
7  A. I do do litigation.
8  Q. Okay.
9  A. I am a litigator.
10 Q. Okay. Oh, okay. I apologize.
11 A. And now having looked at this, I do
12 recognize this particular letter.
13 Q. Okay. Very good. You know what a Rule
14 11 Agreement is, which is an agreement by the parties
15 to litigation, correct?
16 A. Yes.
17 Q. All right. And you would agree that
18 this -- that this Rule 11 Agreement provided that
19 that while this case was being litigated that Harris
20 County would not send applications of vote by mail to
21 registered voters under the age of 65 who had not
22 requested them until five days after a ruling on an
23 application for a temporary injection?
24 Did I read that right?
25 A. That is correct.

**69**

1  Q. "The parties will request a temporary
2  injunction hearing at a mutually agreeable time. The
3  Office of the Attorney General will not seek a
4  temporary restraining order, and representatives from
5  the Harris County Clerk and the Secretary of State
6  will discuss this matter at a mutually agreeable
7  time."
8  That was the -- those are the terms of
9  the agreement, right?
10 A. Yes, correct.
11 Q. And of course, in the first paragraph,
12 which we won't go back over because we have already
13 talked about it, but it references again your Tweet
14 from the Harris County Clerk's Office of August 25th,
15 2020, right?
16 A. The office's Tweet, correct.
17 Q. The office's Tweet, correct. You
18 didn't write that Tweet, that was -- somebody does
19 your Twitter account; is that right?
20 A. That's correct.
21 Q. All right. So that matter ultimately
22 was resolved, correct, this matter about the
23 mailing -- the mailing of applications to all
24 registered voters, right?
25 MR. FOMBONNE: Object to the form.

**70**

1       Q. (BY MR. SWEETEN)  Do you know?

2       A.  Yes, this made its way up to the

3 Supreme Court, and the Supreme Court made a ruling.

4       Q.  Okay.  So -- and so it went all the way

5 to the Texas Supreme Court, as you said, and they

6 came out with an opinion.

7       (Exhibit 9 marked)

8       Q. (BY MR. SWEETEN)  And I'm going to hand

9 you Exhibit 9.  We are not going to go over this

10 exhaustively but I just want to ask you a couple of

11 questions about the opinion of the -- from the Texas

12 Supreme Courts.

13       Now, first of all, if you look on page

14 three, the Supreme Court in kind of the prefatory

15 remarks in their opinion, they say, "The Legislature

16 has made only five categories of voters eligible to

17 vote by mail:  One, those who expect to be absent

18 from the county during the voting period; two, those

19 with a disability as defined by Section 82.002 and

20 our decision in In re State; three, those who will be

21 65 or older on Election Day; four, those confined in

22 jail at the time their application is submitted; and

23 crime victims whose addresses are confidential by

24 law."

25       Did I read that sentence from the

**71**

1 Texas Supreme Court correctly?

2       A.  Yes.

3       Q.  Okay.  It also says, if you look on the

4 bottom of page six under paragraph two under Roman

5 Numeral II, "The authority vested in Texas counties -

6 and county officials - is limited.  Political

7 subdivisions of the state - such as counties,

8 municipalities, and school districts - share in the

9 state's inherent immunity.  But they represent no

10 sovereignty distinct from the state and possess only

11 such powers and privileges as has been expressly or

12 impliedly conferred upon them."

13       Did I read the Supreme Court's opinion

14 at six and seven correctly?

15       A.  Yes.

16       Q.  Okay.  And then finally it -- the last

17 portion I want to read is on page eight.  It says,

18 "Section 83.001(a) provides generally that an 'early

19 voting clerk,' such as Hollins, 'shall conduct the

20 early voting in each election.'  Hollins argues that

21 his duty to conduct early voting gives him the

22 implied authority to mass-mail unsolicited ballot

23 applications to registered voters, without regard to

24 whether any particular voter is eligible to vote by

25 mail.  But Hollins' proposed mailing is unprecedented

**72**

1 in Texas elections and thus cannot be said to ever

2 have been considered necessary and indispensable."

3       Did I read that correctly?

4       A.  Yes.

5       Q.  Ultimately the Supreme Court,

6 Mr. Hollins, said that you could -- that it was --

7 its interpretation was that of the Texas Elections

8 Code that it did not provide the authority of a clerk

9 to send ballot applications unless they were

10 requested, correct?

11       MR. FOMBONNE:  Object to the form.

12       THE WITNESS:  I haven't read fully

13 through this, so I don't know if it said that

14 particularly.

15       Q. (BY MR. SWEETEN)  Okay.  But you -- you

16 don't disagree that the Court -- and we can pull it

17 back out, but you don't disagree that the Court

18 indicated that it was not appropriate for -- for you

19 going forward to send unsolicited ballot applications

20 to all Harris County voters, right?

21       A.  I'm still a little unclear.  I will say

22 that during the midst of this, we were able to send

23 for the second time vote-by-mail applications to

24 every senior over the age of 65 in the county and

25 then this ruling prevented us from sending

**73**

1 applications to voters under 65 in the county.

2       Q.  Okay.  So let's go to the top of page

3 11 where the Supreme Court says, "Without resolving

4 this difference, and confining ourselves to the text,

5 we think the only fair inference from Code's express

6 recognition of private distribution of ballot

7 applications and its silence on any official

8 distribution is that the latter is unauthorized."

9       Did I read that correctly?

10       A.  Yes.

11       Q.  And then let's go to page 13.  It is

12 the first paragraph but I'm just going to read the

13 last sentence, okay?

14       It says, "We hold that an early voting

15 clerk lacks authority under the Election Code to

16 mass-mail applications to vote by mail.  The State

17 has demonstrated success on the merits of its ultra

18 vires claim."

19       Did I read that correctly?

20       A.  Yes.

21       Q.  Okay.  So the Supreme Court found that

22 that action wasn't authorized, in other words, that

23 action being sending a ballot -- mail-in ballot

24 applications to all registered voters in Harris

25 County; that's what they found, right?

74

1             MR. FOMBONNE: Object to the form.
2             THE WITNESS:  Well, what we just read
3    together was accurate of what they wrote.
4             Q. (BY MR. SWEETEN)  Okay.  And is -- you
5    don't disagree that they -- that the Supreme Court
6    basically found that that was -- you were not
7    authorized to do that --
8             MR. FOMBONNE: Object to the form.
9             Q. (BY MR. SWEETEN) -- "that" being
10   sending every registered voter in Harris County a
11   mail-in ballot application?
12            MR. FOMBONNE: Still my same
13   objection.
14            Q. (BY MR. SWEETEN)  Okay.
15            A. I will repeat that, you know, during
16   the process and under this Rule 11 Agreement, we were
17   able to send every senior in Harris County a
18   vote-by-mail application.  This ruling prevented us
19   from sending those under the age of 65 a mail-in
20   ballot application.
21            Q. Okay.  And so the final -- let's just
22   go to paragraph 14, one more sentence I want to
23   read.  Then it says, "We hold that the Election Code
24   does not authorize an early-voting clerk to send an
25   application by mail to a voter who has not requested

75

1    one and that a clerks doing so results in irreparable
2    injury to the State."
3             Did I read that correctly?
4    A. Yes.
5             Q. Okay.
6    A. Yes.
7             Q. All right.  So there was another
8    practice that you initiated in Harris County that had
9    not been previously -- that had not previously been
10   employed; is that correct?
11            MR. FOMBONNE: Object to the form.
12            THE WITNESS:  If you want to clarify
13   what you're talking about.
14            Q. (BY MR. SWEETEN) Yeah.  So you would
15   agree that you employed drive-thru voting as a method
16   of voting in Harris County, and that was done for the
17   first time in 2020, correct?
18            MR. FOMBONNE: Object to the form.
19            THE WITNESS:  I'm not sure if we did
20   it for the first time.  We did have drive-thru voting
21   in Harris County in 2020.
22            Q. (BY MR. SWEETEN)  Okay.  So --
23            (Phone beeps)
24            MR. SWEETEN:  Is that me or you guys?
25            MR. FOMBONNE: Must be you.

76

1             MR. SWEETEN: All right.
2             Q. (BY MR. SWEETEN)  All right.  So I
3    think -- let me just show you an exhibit.  This comes
4    from a website, the Harris County website, and I will
5    ask you about it.
6             (Exhibit 10 marked)
7             Q. (BY MR. SWEETEN)  And this is Exhibit
8    Number 10.  Let me make sure there is no writing on
9    it.
10            MR. FOMBONNE: Thanks.
11            Q. (BY MR. SWEETEN)  Now, the part that --
12   so first of all, you would agree that this says on
13   the top "Isabel Longoria Elections Administrator,"
14   correct?
15            A. Yes.
16            Q. And if you look -- and who is -- is
17   Isabel Longoria?  That is, she's Harris County's
18   Election Administrator, correct?
19            A. That's correct.
20            Q. All right.  Now, it says the purpose --
21   if you look on the second page of Exhibit Number 10
22   it says, "drive-thru voting was created in the wake
23   of the Covid-19 pandemic as a safer, socially distant
24   alternative to walk-in voting for all voters.  Harris
25   County is the first jurisdiction in Texas history to

77

1    create a method of voting at scale that allows any
2    registered voter to cast their ballot without leaving
3    the comfort of their vehicle."
4             Did I read that correctly from the
5    website?
6    A. Yes.
7             Q. Do you have any reason to dispute
8    that -- that Harris County was the first jurisdiction
9    in Texas history to create this method of voting,
10   drive-thru voting?
11            A. I think you left out the last two
12   words.  I think we were the first to do it "at
13   scale."
14            Q. Okay.  So you -- you think -- you hold
15   out a possibility that someone else has done it,
16   correct?
17            A. It's very likely to my knowledge that
18   someone else has done it, but I do think we were the
19   first ones to do it at scale.
20            Q. All right.  And by "scale," that means
21   what to you?
22            A. We had 130,000 folks vote that way.
23            Q. Okay.  So, I mean, then to
24   substantially use it; is that another way to say it?
25            MR. FOMBONNE: Object to the form.

1       THE WITNESS: I would think "at scale"
2 speaks for itself.
3       Q. (BY MR. SWEETEN) Okay. Well, let me
4 ask you: Do you have any personal knowledge of any
5 other jurisdiction of the 254 counties that it
6 employed drive-thru voting before Harris County
7 employed it in 2020?
8       A. Not personal knowledge. I have been
9 told of stuff.
10       Q. Okay. Do you recall who told you?
11       A. An election administrator in south
12 Texas.
13       Q. Okay. So you think there -- some
14 election administrator in south Texas may have told
15 you of some effort to do this?
16       A. That this -- that something like
17 drive-thru voting had taken place in south Texas
18 previously.
19       Q. Okay. In any event, you would agree
20 with me that -- that it is -- was not -- drive-thru
21 voting was certainly not widely used in the state of
22 Texas before 2020, right?
23       A. At scale, no.
24       Q. Okay. Do you know any other county
25 other than talking to an election administrator from

1 south Texas -- by the way who was that, do you know?
2       A. I don't recall. It was a female, but I
3 don't recall her name.
4       Q. Okay. Do you know if she was Hidalgo
5 County, Cameron County?
6       A. I don't recall.
7       Q. All right. Can you name any other
8 county that's ever it utilized it at scale or not at
9 scale?
10       A. Again, I don't have firsthand
11 knowledge.
12       Q. Okay. So you would agree it wasn't
13 widely used in the state of Texas, to your knowledge?
14       A. At scale, no.
15       Q. What about other than at scale?
16       A. I don't have personal knowledge.
17       Q. Okay. In any event, this caused --
18 this application of drive-thru voting at scale
19 resulted in litigation about that practice, right,
20 Mr. Hollins?
21       A. That's correct.
22       Q. All right. And, in fact, an individual
23 by the name of Steven Hotze, M.D., Harris County
24 Republican Party, Honorable Keith Nielsen, and Sharon
25 Hemphill filed a Petition for Writ of Mandamus to the

1 Harris County -- to the Harris County Clerk with the
2 Texas Supreme Court in October of 2020, right?
3       A. Yes.
4       Q. All right. And we are not going to
5 spend a lot of time on this but I just want to
6 identify this. This appears to be their Petition for
7 Writ of Mandamus. I am marking it as Exhibit
8 Number 11.
9       (Exhibit 11 marked)
10       MR. SWEETEN: And a copy to
11 counselors.
12       MR. FOMBONNE: Thank you.
13       Q. (BY MR. SWEETEN) If we could just
14 go -- okay. Let's look at the nature of case on page
15 one. And it says "Respondent Hollins has announced
16 that the Harris County Clerk's Office will allow any
17 and all Harris County Registered voters - regardless
18 of whether they are permitted to do so under the
19 Texas Election Code - to engage in early and Election
20 Day drive-thru or curbside voting."
21       Did I read that correctly?
22       A. Yes.
23       Q. All right. And then they allege -- on
24 page 12 they say, "Respondent Hollins" -- or let me
25 give you time to get there.

1       A. Page 12?
2       Q. Yes, sir, the middle of the page on
3 page 12. So I will read it.
4       It says, "Respondent Hollins has
5 implemented a countywide drive-thru voting program
6 for every registered voter in Harris County. A true
7 and correct transcription of the pertinent excerpt
8 from a press conference where Respondent Hollins
9 identifies the program is attached to the Appendix to
10 this Mandamus Petition," and then there is a cite.
11       Do you see that where -- what I just
12 read?
13       A. I do.
14       Q. And did I read it correctly,
15 Mr. Hollins?
16       A. Yes.
17       Q. Okay. And then you say -- then it
18 says, "Respondent Hollins said the following," and
19 there is a quote that is attributed to you, and I
20 just want to ask you: Is this a true and accurate
21 quote, okay?
22       It says that you said "Drive-thru
23 voting is an option for all voters who would like to
24 be able to vote from the safety and comfort of your
25 vehicle. Drive-thru voting allows those who don't

82

```
 1   qualify to vote by mail to minimize your exposure to
 2   other voters and to election workers.  While we hope
 3   to have short lines across the country, drive-thru
 4   voters waiting in line will be able to wait in the
 5   comfort of your vehicle where you can listen to the
 6   radio or converse with loved ones until you are
 7   pointed to your drive-thru voting booth.  We hope
 8   that Harris County voters will consider utilizing
 9   drive-thru voting."
10         Did I read -- first, did I read that
11   correctly, Mr. Hollins?
12      A. You read it correctly.
13      Q. And second, is that something you said
14   at a press conference?
15      A. It is very likely something I said at a
16   press conference.
17      Q. Okay.  So finally if we go just go to
18   the next page, and this is part of their allegations
19   that they made to the Supreme Court, and they say,
20   "Because Respondent Hollins is allowing Harris County
21   registered voters to vote curbside without regard to
22   whether they're eligible to vote curbside, and
23   because of the very clear threat of imminent harm
24   which will result from the ineligible curbside voting
25   taking place in violation of the Election Code.
```

83

```
 1   Relators bring this Mandamus Petition to mandate
 2   compliance by the Respondent with his clear and
 3   nondiscretionary ministerial duties."
 4         And then it finally says, "As will be
 5   shown below, Respondent's directive is in conflict
 6   with the Texas Election Code and should not be
 7   countenanced by this Court."
 8         Did I read that correctly,
 9   Mr. Hollins?
10      A. You did.
11      Q. You can put that aside.
12         So basically this is a lawsuit filed
13   with the Texas Supreme Court over this practice of
14   allowing drive-thru voting, right?  That's what this
15   tells us?
16      A. That's correct.
17      Q. All right.  And the lawsuit resulted,
18   as I understand it, in a stay of the lawsuit -- of
19   the -- I'm sorry.
20         There is an order issued by the Texas
21   Supreme Court denying the Petition for Writ of
22   Mandamus and Motion to Stay, right?
23      A. That's correct.
24      Q. And then there was a dissenting opinion
25   by one of the Justices, I believe it's Justin Divine,
```

84

```
 1   about that issue.  Do you recall that?
 2      A. I don't recall specifically.  I do
 3   recall that he dissented.
 4      Q. Okay.  So you had a party out there
 5   that petitioned the Supreme Court about this practice
 6   that you utilized, correct?
 7      A. Correct.
 8      Q. All right.  And then there was also
 9   federal litigation about this issue, right?
10      A. Correct.
11      Q. Okay.  And that litigation, I will just
12   hand you very quickly the order from Judge Hanen that
13   was issued on November 2, 2020, okay?
14      A. (Nods).
15      Q. And as I understand it, Harris County
16   was represented in that case -- or you were
17   represented in that case by Richard Mithoff; is that
18   correct?
19      A. He is one of the many attorneys on that
20   case.
21      Q. Okay.  How about Mr. Fombonne?
22      A. I don't --
23         MR. FOMBONNE:  Are you asking me?
24         THE WITNESS:  I don't believe
25   Mr. Fombonne was in private practice at that time --
```

85

```
 1      Q. (BY MR. SWEETEN)  Okay.
 2      A. -- and not at the County Attorney's
 3   Office.
 4         MR. FOMBONNE:  That's correct.
 5         MR. SWEETEN:  I know Richard, he is
 6   good guy.  Here you go.
 7         MR. FOMBONNE:  Thank you.
 8         (Exhibit 12 marked)
 9      Q. (BY MR. SWEETEN)  All right.  So I'm not
10   going to spend a lot of time on this, but I just want
11   to read the order --
12         THE VIDEOGRAPHER:  (Hands mic).
13         MR. SWEETEN:  Oh, thank you.
14      Q. (BY MR. SWEETEN)  -- from -- this is
15   Judge Hanen's Order issued you can see on the top
16   right November 2nd, 2020, right?
17      A. Yes.
18      Q. All right.  And if we look on page
19   five, picking up kind of in the middle of
20   Judge Hanen's opinion he says, "This Court finds" --
21   this is the first sentence of the second paragraph,
22   "This Court finds that there is a difference between
23   the voting periods presented to it."
24         And then if we skip down to try to get
25   to the kernel of it, "The Court finds, after
```

86

1  reviewing the record, the briefing, and considering
2  the arguments of counsel, that the tents used for
3  drive-thru voting qualify as 'moveable structures'
4  for purposes of the Election Code.  The Court is
5  unpersuaded by Plaintiff's argument that the voters'
6  vehicles, and not the tents, are the polling places
7  under the drive-thru voting scheme.  Consequently,
8  the Court finds that drive-thru voting was
9  permissible during early voting."
10        Did I read that correctly?
11     A. That's correct.
12     Q. The Court then later says on page -- on
13  the bottom of page seven, "The Court finds the issue
14  as to Election Day to cut the opposite direction.  On
15  Election Day, as opposed to early voting, there is no
16  legislation authorization for movable structures as
17  polling places.  The Election Code makes clear that,
18  on Election Day, each polling place shall be located
19  inside a building, Texas Election Code 43.031(b)."
20        Did I read that right?
21     A. Yes.
22     Q. Okay.  So this practice of -- of -- of
23  24-hour -- I'm sorry.
24        This practice of drive-thru voting, it
25  got kind of a mixed ruling from Judge Hanen, correct?

87

1     A. I'm not sure what you would describe as
2  a "mixed ruling."
3     Q. Okay.  Well, he -- Judge Hanen
4  basically in his ruling, as we have just read,
5  basically said that in his view, he thought it was
6  permissible to do drive-thru voting for early voting
7  but on Election Day not, correct?
8        MR. FOMBONNE:  Object to the form.
9        THE WITNESS:  That's not what he said.
10  What he said was that you can use tents for
11  drive-thru voting before Election Day.  So in early
12  voting, you can use tents.  He said on Election Day,
13  you need to have it inside buildings.
14     Q. (BY MR. SWEETEN)  Okay.  Now, as a
15  result of this -- and first, going into this
16  litigation, these private plaintiffs that sued you,
17  there were -- there had been something to the order
18  of 100,000, 120,000 votes cast using that drive-thru
19  voting, correct?
20     A. That's correct.
21     Q. And one of the remedies that these
22  plaintiffs asked for from the Court was to invalidate
23  the 120,000 votes, right?
24     A. That's correct.
25     Q. Now, that relief they did not achieve,

88

1  correct?
2     A. That's correct.
3     Q. But that's what they were asking for,
4  correct?
5     A. Correct.
6     Q. And you -- obviously that was
7  litigated, that was before the Court, and the Court
8  had to make a decision as to whether that practice
9  was okay or not under the existing Election Code,
10  right?
11     A. That's correct.
12     Q. All right.  Now, as a result of that
13  ruling, it's my understanding that Harris County did
14  not employ drive-thru voting on Election Day; is that
15  right?
16     A. That's incorrect.
17     Q. Okay.  Did you employ drive-thru voting
18  on Election Day?
19     A. Yes.
20     Q. Okay.  There were no changes made to
21  your policies on drive-thru voting?
22     A. Because of concerns regarding -- let me
23  take a step back.
24        As you're probably aware, everything
25  that Judge Hanen wrote in here was -- he was saying

89

1  what he would rule on if given a chance.  Now, he had
2  already tossed the case on standing grounds, all
3  right?  So he says, but it's going to go to the 5th.
4  If they kick it back, I'm just going to tell the 5th
5  what I'll do right here, sort of in theory so that
6  they know and we can kind of expedite this whole
7  thing, right?
8        So he says in early voting, voting --
9  you know, drive-thru voting can take place in tents
10  according to this as movable structures, right?  Then
11  he says, but if they were to ask me about Election
12  Day, I would -- I would rule that this building is
13  different than a tent.  And then in here on page
14  eight he uses Black's Law Dictionary and says it's a
15  structure with walls and a roof, a permanent
16  structure.  And so he says because of that, if the
17  5th Circuit kicked this back down to me and asked
18  pre-to rule on Election Day, I would say that you
19  cannot have drive-thru voting in tents but you can
20  have it in a building; and thus, we discounted
21  drive-thru voting in tents on Election Day and we
22  continued it inside buildings on Election Day to
23  comply with what Judge Hanen would have ruled if the
24  5th Circuit had kicked it back down to him for a
25  ruling.

MAGNA
LEGAL SERVICES

90

1   Q. Okay. And so you made those
2   adjustments in light of the interpretation of the
3   Texas Election Code that Judge Hanen expressed in
4   this order, right?
5   A. That's --
6   MR. FOMBONNE: Object -- objection.
7   I'll instruct you not to answer to the
8   extent that you're revealing a conversation with
9   counsel.
10   THE WITNESS: Sure.
11   I guess I'll just repeat. We kept
12   drive-thru voting going when it was in buildings and
13   we discontinued it in tents on Election Day because
14   of what Judge Hanen said and wrote down --
15   Q. (BY MR. SWEETEN) Okay.
16   A. -- in this -- in this holding.
17   Q. Okay. That's helpful. Thank you,
18   Mr. Hollins. Now, you played another --
19   THE WITNESS: Can we take a break.
20   MR. SWEETEN: Yes, of course.
21   THE WITNESS: Thanks.
22   THE VIDEOGRAPHER: The time is 3:32.
23   Off the record.
24   (Recess taken)
25   THE VIDEOGRAPHER: The time is 3:50.

91

1   Back on record.
2   Q. (BY MR. SWEETEN) Okay. So when we --
3   when we left to take our second break, we were
4   talking about the drive-thru voting lawsuit and the
5   outcome of that. And so I wanted to ask you a
6   question, Mr. Hollins.
7   I mean, during the time that that
8   litigation was going on, were you -- were you
9   concerned about the 120,000 votes that had been cast
10   and whether or not -- and those efforts by the
11   private plaintiffs to invalidate those votes?
12   MR. FOMBONNE: Object to the form.
13   THE WITNESS: I was concerned about
14   every vote in Harris County that was cast.
15   Q. (BY MR. SWEETEN) So including those
16   that had voted at drive-thru voting, you were -- you
17   were particularly concerned about these, correct?
18   MR. FOMBONNE: Object to the form.
19   THE WITNESS: It was my job to ensure
20   that every -- every registered voter in Harris County
21   had full access to the ballot and to the franchise,
22   and it was my duty to ensure that once they cast
23   those ballots, every single one of them counted.
24   Q. (BY MR. SWEETEN) Now, were there a
25   total -- was 120 the final total?

92

1   Do you know the total of votes cast in
2   the drive-thru voting?
3   A. It was somewhere around 130.
4   Q. Okay. Do you know, of the 130,000,
5   have you gone through the day to just sort of figure
6   out what percentage were Republican or democrat, for
7   example?
8   A. I have not.
9   Q. Okay.
10   A. I don't know that there's any way to --
11   to look into that. Every vote is a secret vote.
12   Q. Okay. Do you have any idea of what
13   percentage of, for example, you know, white voters,
14   African-American voters, Latino voters, Asian voters
15   utilized that had 24-hour drive-thru?
16   MR. FOMBONNE: Object to the form.
17   THE WITNESS: Estimates have been
18   done, not by myself but by other groups.
19   Q. (BY MR. SWEETEN) Have you done an
20   estimate or reviewed data that -- that was performed
21   to identify that information?
22   A. I have not done an estimate myself. I
23   have reviewed data but not detailed data. Like, I
24   have seen a statistic, which is like the summary of
25   others data analysis.

93

1   Q. Do you know who did the data analysis?
2   A. I believe the Texas Civil Rights
3   project.
4   Q. Okay. And do you know the methodology
5   that they utilized?
6   A. I do not.
7   Q. Okay. Do you know who at the Texas
8   Civil Rights project did that, performed that
9   analysis?
10   A. I do not.
11   Q. Okay. As far as the methodology
12   utilized, though, it sounds like that's not something
13   that you have any information on; is that right?
14   A. That's correct.
15   Q. All right. And so do you know what
16   those -- what the figures that you reviewed that were
17   performed by someone else state as far as what
18   percentage of voters were voting in drive-thru
19   voting?
20   A. Can you rephrase the question?
21   Q. Yeah. Just off the top of your head,
22   can you recall what those -- the numbers that you
23   reviewed, what they were?
24   A. I reviewed estimates of the racial and
25   ethnic background of voters who used drive-thru



1  voting.
2      **Q.  Okay.  Do you know, for example, how**
3  **many American Indians utilized or Native Americans**
4  **utilized it?**
5      A.  I do not.
6      **Q.  Do you know how many Asian voters**
7  **utilized 24-hour?**
8      A.  I do not.
9      **Q.  Do you know how many white voters**
10  **utilized 24-hour voting?**
11      A.  The estimate that I saw was that
12  47 percent of the voters who used drive-thru voting
13  were white.
14      **Q.  Okay.  And is that fairly consistent**
15  **with the overall Harris County population?**
16      A.  It's directionally consistent.
17      Q.  Uh-huh.
18      A.  Let me take a step back.
19      Are you asking about the --  the
20  population of Harris County or are you talking about
21  the folks who vote in Harris County?
22      **Q.  I guess let's say registered voters, if**
23  **you know?**
24      A.  Are you talk about registered voters or
25  are you talking about the folks who vote in Harris

1  County?
2      **Q.  I guess let's start with people that**
3  **vote.**
4      A.  I believe that the broader popu --  the
5  broader voting population of Harris County is more
6  than 47 percent white generally.
7      **Q.  Okay.  And then with respect to**
8  **registered voters, would 47 percent white be about**
9  **the same as the registered voters in Harris County?**
10      A.  I haven't seen that data, I don't
11  believe.
12      **Q.  Okay.  What about total population of**
13  **Harris County?**
14      A.  I don't have that data readily in my
15  mind.
16      Q.  Okay.  So --
17      MR. FOMBONNE:  And, Counsel, if
18  you're --  if you're on the Zoom, would you mind
19  muting yourself.
20      MR. DILLARD:  I'm just going to turn
21  it down so they don't hear them.
22      (Discussion off record)
23      **Q.  (BY MR. SWEETEN)  So as --  with respect**
24  **to the numbers that you've looked at, do you think --**
25  **are you saying that the number --  if we were to**

1      **compare the number of people that voted in drive-thru**
2      **voting with the number of registered voters, you**
3      **don't know those compare?**
4      A.  That is correct.
5      **Q.  Okay.  If we were to compare the**
6      **numbers that you've seen from the other study the**
7      **Texas Civil Rights Group produced and that you've**
8      **reviewed, as far as total population figures of**
9      **Harris County and how --  and whether --  how that**
10      **relates to the 47 percent that voted, you don't know**
11      **whether that would be consistent; is that right?**
12      MR. FOMBONNE:  Object to the form.
13      THE WITNESS:  That's correct, I
14  believe.
15      **Q.  (BY MR. SWEETEN)  Okay.**
16      A.  Now, what I have seen is:  Here is the
17  breakdown of folks who voted in drive-thru voting,
18  here is the breakdown of folks who voted generally.
19  Those are the two datasets that I have seen summaries
20  of.
21      **Q.  Okay.  When you say "voted generally,"**
22  **what does that mean?  Is that as compared to another**
23  **presential election?**
24      A.  No, that's early voting in 2020.
25      Q.  I'm not sure I understand.

1      **So you're saying the numbers that you**
2      **have seen are that 47 --  from the Texas Civil Rights**
3      **project are that 47 percent of the people that used**
4      **drive-thru voting were --  were white, correct?**
5      A.  Correct.
6      **Q.  You are then saying that --  that you're**
7      **comparing --  the other date that you've reviewed**
8      **would have been the early voting data from the**
9      **Presidential election in 2020.  How is that different**
10      **from the drive-thru voting I guess is --**
11      A.  Because there were a hundred --
12      MR. FOMBONNE:  Hang on.  I am going to
13  object to the form.
14      **Q.  (BY MR. SWEETEN)  Okay.  Go ahead.**
15      A.  Not every early voter in 2020 used
16  drive-thru voting.  That's why they're different.
17      **Q.  Got it.  So you're comparing with other**
18  **methods of voting?**
19      A.  I'm comparing it with voting in
20  general.
21      **Q.  In the 2020 Presidential election?**
22      A.  Yes.
23      **Q.  And are you saying that as compared to**
24  **other methods of voting, not the drive-thru voting,**
25  **as compared to those early voters, where does the**



102

```
1        A.  I believe through press release and
2    through social media.
3        Q.  Okay.  I assume your office was
4    hurriedly trying to get the word out to Harris County
5    voters that there were going to be some changes on
6    Election Day when you were doing it the day before;
7    is that correct?
8            MR. FOMBONNE:  Object to the form.
9            THE WITNESS:  I wouldn't say we were
10   hurriedly doing it.  Immediately after making the
11   decision, we made our decision known to the public.
12       Q. (BY MR. SWEETEN)  Okay.  All right.  Now
13   I'm going to hand you what's been marked as Exhibit
14   Number 13.
15           (Exhibit 13 marked)
16       Q.  (BY MR. SWEETEN)  It's two pages.  And
17   can you tell me what these two pages are?
18       A.  The first page says "November 3rd, 2020
19   General and Special Elections Early Voting Schedule."
20           The second page says the same thing.
21   So one -- it's a continuation of them.  So this --
22   this lists 112 different voting locations across
23   Harris County.
24       Q.  Okay.  Now, one thing that's notable --
25   and so that's how many you had, just to be clear, in
```

103

```
1    the 2020 Presidential election was 112 voting
2    locations throughout Harris County, correct?
3        A.  I believe that -- so this counts to
4    112.  I believe that internally we -- we were
5    counting them as 122.  Because at the 10 drive-thru
6    voting sites, there was also a walk-in voting site,
7    and we treated them as two different sites.
8        Q.  Okay.  All right.
9        A.  But for the ease of this, right, we
10   didn't -- I think it would have been confusing to
11   show duplication and that sort of thing.
12       Q.  I see.  So ten of these were drive-thru
13   voting sites, correct?
14       A.  They were all drive-thru voting sites,
15   in addition to being walk-in sites, correct.
16       Q.  Okay.  How many total drive-thru voting
17   sites did you utilize?
18       A.  Ten.
19       Q.  All right.  And how do we know, like,
20   which one is a drive-thru voting, is it -- is it
21   apparent from this chart?
22       A.  Yes, it is a blue square.
23       Q.  Okay.  And what methodology did you
24   employ to decide where the 24-hour -- I'm sorry,
25   where the drive-thru voting sites would be placed?
```

104

```
1        A.  We were -- so drive-thru voting
2    requires -- it's a large logistical operation.
3        Q.  Uh-huh.
4        A.  And so you had to either have a parking
5    garage with ample space or a parking lot with ample
6    space, and the people who owned said parking garage
7    or parking lot had to be willing to give that to us
8    to use; and so this -- the -- the options for
9    drive-thru voting were limited to those places which
10   were few and far between.
11           From there, we sought to ensure that
12   each precinct had drive-thru voting sites.  And so
13   we -- we made sure that there were two in each
14   precinct with the approval of those commissioners,
15   and then we also had two headquartered sites, one
16   which was at NRG and the other which was at Toyota
17   Center.
18       Q.  Okay.  I mean, there were -- it looks
19   like there were areas of north and west Houston --
20   let's just start with west Houston that did not have
21   any drive-thru voting sites.  Is that accurate?
22       A.  Can you refrain (sic) your question.
23       Q.  Yeah.  So if we look at what appears to
24   me to be the Sam Houston Tollway, were there any --
25   it looks like there was one drive-thru voting site
```

105

```
1    west of the Sam Houston Tollway in Harris County; is
2    that correct?  And that's in South Houston.
3        A.  That looks to be correct.
4        Q.  All right.  And then if we look at --
5    if we look at, again, west of the Sam Houston Tollway
6    and anything north of I-10, you would agree that
7    there were no drive-thru voting sites in that
8    location?
9        A.  West of the tollway and north of I-10?
10       Q.  Yes, sir.
11       A.  Correct.
12       Q.  All right.  So now I want to talk about
13   24-hour voting.  Would you agree with me that on this
14   sheet, on this Exhibit 13, that the areas where
15   24-hour voting sites were located are listed in red?
16       A.  Yes.
17       Q.  And those 24-hour voting sites, it
18   appears that the legend tells us that they were open
19   for 24 hours on October 29th; is that right?
20       A.  That's correct.  Well, they opened at
21   7:00 a.m. on the 29th and they -- they did not close
22   that evening and then they were open until 7:00 p.m.
23   on the 30th.  So it's -- that's hard to write down
24   succinctly, but yes, what it says is open 24 hours on
25   October 29th.
```

MAGNA
LEGAL SERVICES

106

```
 1          Q.  Okay.  So when you -- as far as
 2   offering 24-hour voting, it looks like you -- in
 3   Harris County, 24-hour voting was offered -- one,
 4   two, three, four, five -- six places.
 5          Did I get that right?
 6          A.  I recall there being eight, but I do --
 7   when I am looking at this, I see that there are six
 8   that are highlighted fully in red.
 9          Q.  Okay.  And as to those -- so six are
10   highlighted in red.  Do you know what the other two
11   locations were?  Are they noted in some other way?
12          A.  I don't recall what the other two were.
13   Well, number one, so NRG Arena, which was our
14   headquarters, it's location number one, was certainly
15   a 24-hour voting site.
16          Q.  Uh-huh.
17          A.  I don't know off the top of my head
18   what the other one would have been.
19          Q.  Okay.
20          A.  But given how this is set up, I imagine
21   that it was one of the drive-thru voting sites.
22          Q.  Okay.
23          A.  Because that's -- you know, the re -- I
24   am -- I know y'all don't want me to speculate.  I
25   believe that the reason NRG is not red is because
```

107

```
 1   it's blue, right?
 2          Q.  Uh-huh.
 3          A.  So I'm guessing that one of the other
 4   run blue ones was also a 24-hour site.
 5          Q.  Okay.  To be clear, then, you think --
 6   your recollection is that there were eight 24-hour
 7   voting sites during the 2020 Presidential election,
 8   right?
 9          A.  Correct.
10          Q.  And that those 24-hour voting sites
11   were open for one 24-hour period starting on
12   October 29th and ending on October 30th; is that
13   right?
14          A.  That's correct.
15          Q.  All right.  So the next question, then,
16   is --
17          A.  Oh, sorry.  It was a -- it was a
18   36-hour period.  Again, opened at 7:00 a.m. on the
19   29th and did not close until 7:00 p.m. on the 30th.
20          Q.  Okay.  So -- but only one night in
21   eight places was -- was the -- was the center open
22   the entire -- the eve -- that -- that whole night,
23   correct, and early morning hours?
24          A.  Correct.
25          Q.  Okay.  Had you used -- had Harris
```

108

```
 1   County ever used 24-hour voting before it was
 2   instituted during your -- your term in 2020?
 3          A.  Not to my knowledge.
 4          Q.  All right.  Had any other county in the
 5   state of Texas that you're aware of utilized 24-hour
 6   voting?
 7          A.  I'm not sure of the practice of other
 8   counties.
 9          Q.  During the 2020 election cycle, did you
10   receive complaints about ballot -- about poll
11   watchers being able to -- having issues with being
12   able to observe voting activities?
13          A.  None that I'm aware of --
14          Q.  Okay.
15          A.  -- of significance.
16          Q.  Did you -- any at all complaints that
17   you're aware of about poll watchers at some location
18   in the Harris County area not being allowed to have
19   full access to observe there held?
20          A.  No, not that I'm aware of.
21          Are we done with this?
22          Q.  Yeah, you can put that aside.
23          Do you understand the reason for --
24   and by the way, when coming into the 2020 election,
25   there already were existing statutes that allowed
```

109

```
 1   poll watchers to observe election activities,
 2   correct?
 3          MR. FOMBONNE:  Object to the form.
 4          THE WITNESS:  Yes, the Election Code
 5   included provisions for poll watching before 2020.
 6          Q.  (BY MR. SWEETEN)  Okay.  And -- and
 7   that -- and those protections are there for what
 8          What is the reason that poll watchers
 9   are allowed under the Election Code in your view?
10          MR. FOMBONNE:  Object to the form.
11          THE WITNESS:  My general understanding
12   is that it gives, you know, campaigns a peace of mind
13   because they have someone who they trust observing
14   the process and ensuring that it's a fair process.
15          Q.  (BY MR. SWEETEN)  So it -- would you say
16   that it is something that is provided for to aid the
17   overall integrity of the election process?
18          MR. FOMBONNE:  Object to the form.
19          THE WITNESS:  I would say that it aids
20   peace of mind for individual campaigns or parties.
21          Q.  (BY MR. SWEETEN)  Would you say it aids
22   competence in the election process?
23          MR. FOMBONNE:  Object to the form.
24          THE WITNESS:  I think it provides
25   peace of mind to the parties involved or the
```

MAGNA
LEGAL SERVICES

110

1 candidates involved.
2 **Q. (BY MR. SWEETEN)  And does it naturally**
3 **follow that also it provides them com -- more**
4 **confidence in the election process?**
5           MR. FOMBONNE:  Object to form.
6           THE WITNESS:  Yes, I would imagine
7 that -- that peace of mind also gives them confidence
8 in the process.
9 **Q. (BY MR. SWEETEN)  Okay.  Now, you would**
10 **agree with me that -- that poll watchers are**
11 **typically unpaid volunteers, right?**
12      A. I don't know if they're paid or unpaid.
13 **Q. Okay.  Was there -- do you recall**
14 **controversy about this effort to operate 24-hour**
15 **voting sites in Houston, Texas --**
16      A. No.
17 **Q. -- Harris County, Texas?**
18      A. No.
19 **Q. Okay.**
20      A. In fact, I believe it was one of the
21 only things that we did that we didn't get sued over.
22 **Q. Okay.  Would you agree that if a poll**
23 **watcher has to be at a location for the entirety of a**
24 **24-hour period, that that is harder to assemble poll**
25 **watchers to observe that during that time period?**

111

1           MR. FOMBONNE:  Object to form.
2           THE WITNESS:  I don't think there's
3 any situation in which any poll watcher has to do 24
4 hours of anything.
5 **Q. (BY MR. SWEETEN)  Do you -- do you**
6 **think -- I mean you've told me that there are 122**
7 **election sites in Harris County, right?**
8      A. Yes, if you include the drive-thru
9 voting sites as two separate sites.
10 **Q. Okay.  And if someone were to want to**
11 **make sure that all of those locations are -- are --**
12 **that poll watchers exist at all those locations, that**
13 **that is a -- that that's quite a lift from a manpower**
14 **perspective?**
15      A. Harris County is a very large county.
16 **Q. Yeah.  So, among other things, you**
17 **would agree that having somebody -- a candidate or a**
18 **party having poll watchers at 122 locations in and of**
19 **itself is a mammoth task?**
20           MR. FOMBONNE:  Object to the form.
21           THE WITNESS:  Harris County is a large
22 county with a lot of voting locations.
23 **Q. (BY MR. SWEETEN)  And to -- in other**
24 **words, to staff the poll watchers is a massive -- is**
25 **a -- is quite an undertaking, isn't it?**

112

1           MR. FOMBONNE:  Object to the form.
2           THE WITNESS:  It would require over a
3 hundred poll watchers.
4 **Q. (BY MR. SWEETEN)  Okay.  And certainly**
5 **if you extend those hours over a lengthy period of**
6 **time, would you agree that it -- I mean it's**
7 **objective fact that would take more time and more --**
8 **more poll watchers to observe that time period,**
9 **right?**
10           MR. FOMBONNE:  Object to the form.
11           THE WITNESS:  In addition to the 122
12 locations -- or, pardon me, in addition to the 122
13 poll watchers, it would require eight additional poll
14 watchers.
15 **Q. (BY MR. SWEETEN)  Okay.  But you just**
16 **told me that you probably wouldn't be manned by one**
17 **person, right, it would be other people -- it would**
18 **be multiple people?**
19      A. If you're covering a 7:00 p.m. to 7:00
20 a.m. period --
21 **Q. Uh-huh.**
22      A. -- which is what we did, and all we did
23 was add 12 hours of voting in between the other
24 12-hour shifts in eight locations --
25 **Q. Uh-huh.**

113

1      A. -- you could just send eight more
2 people to have a 12-hour shift.
3 **Q. Would you agree with me that uniformity**
4 **of elections is -- I mean, you were a clerk and you**
5 **were governed by the Election Code, right, when you**
6 **came in for that five-and-a-half-month period, right?**
7      A. I was the clerk --
8 **Q. All right.**
9      A. -- and I followed the Election Code.
10 **Q. And you had to have familiar --**
11 **familiarity with the Election Code and its**
12 **provisions, right, to -- to -- in order to administer**
13 **an election, right?**
14      A. You have to follow the Election Code.
15 **Q. Okay.  And you would agree with me that**
16 **the Election Code Section 31.003 requires the**
17 **Secretary of State to obtain and maintain uniformity**
18 **in the application, operation, and interpretation of**
19 **the Election Code, right?**
20      A. I'm not familiar with every single
21 clause of -- of the Election Code personally.
22 **Q. Uh-huh.**
23      A. So if that's what 3103 says, then I
24 would view it as what 3103 says.
25 **Q. And that existed prior to the 2020**

122

1  term.  At that -- I guess at that hearing, Briscoe
2  Cain violated some point of order or something of
3  that nature and the hearing had to be shut down and
4  so I wasn't -- I wasn't able to testify.
5      Q.  Okay.  And that was -- that was in the
6  regular session --
7      A.  That's correct.
8      Q.  -- what you're describing?
9          So you came over to testify in the
10 regular session but because the committee, there was
11 some Parliamentary and procedural issue that happened
12 that it didn't -- the committee hearing didn't
13 continue, right?
14     A.  That's correct.
15     Q.  So you were unable to testify in the
16 regular session?
17     A.  That's correct.
18     Q.  Did you attempt to testify in the first
19 special session?
20     A.  No.
21     Q.  Did you attempt to testify in the
22 second special session?
23     A.  No.
24     Q.  Do you -- would -- was there any reason
25 you were prohibited from doing it or you chose not to

123

1  do so in this first and second special sessions?
2      A.  I don't believe I was prohibited from
3  doing so.
4      Q.  Okay.  Did you monitor, did you watch
5  video of the -- of the hearings in the regular
6  session?
7      A.  Yes.
8      Q.  Did you watch video of the proceedings
9  in the first special session?
10     A.  No, not to my knowledge.
11     Q.  Did you watch proceedings in the second
12 special session?
13     A.  I believe so.
14     Q.  Okay.  Do you recall what you watched
15 in the second special session?
16     A.  I believe that I watched not committee
17 meetings, but sessions of the Senate.  You know,
18 general sessions of the -- general meetings of the
19 Senate, and then similarly, when some of these -- I
20 guess what would have been S.B. 1 at that time was in
21 front of the House, I think I watched some of those
22 proceedings also.
23     Q.  So you watched -- and were the
24 proceedings the committee or the floor hearings?
25     A.  The floor hearings.

124

1      Q.  Okay.
2      A.  That's what I mean to say.
3      Q.  Okay.  So you watched some of the
4  Senate floor debate and some of the House floor
5  debate?
6      A.  Correct.
7      Q.  Okay.  You did not watch the committee
8  meetings in either of those, correct?
9      A.  I don't believe so.
10     Q.  Okay.  Now, it sounds like you were --
11     A.  I --
12     Q.  Go ahead.
13     A.  I think I might have seen some.
14     Q.  Okay.  It sounds like you were over
15 there for more of the regular session than the first
16 or second special sessions, correct?
17     A.  Correct.
18     Q.  All right.  Did you travel to Austin
19 during the first session or second session, special
20 sessions?
21     A.  Not from my recollection.
22     Q.  Okay.  How many times did you travel to
23 Austin for the first regular session, meaning the
24 regular session?
25     A.  Three or so.

125

1      Q.  Okay.  And have you told me all the
2  members that you -- you can recall meeting with?
3      A.  Yes.
4      Q.  Okay.  Now, you've been critical of
5  S.B. 1, right?
6      A.  Yes.
7      Q.  Okay.  I want to talk about a few
8  issues that S.B. 1 addresses, okay?
9          Now, you would agree with me that
10 S.B. 1 addresses the issue of 24-hour voting,
11 correct?
12     A.  Yes, S.B. 1 makes 24-hour voting
13 illegal.
14     Q.  Okay.  You would agree with me that
15 S.B. 1 addresses the issue that was subject to a
16 lawsuit here, which is mail-in -- mailing ballot --
17 mail-in ballot applications to -- to voters who do
18 not request one?
19     A.  Yeah, S.B. 1 makes it illegal for
20 election administrators to send vote-by-mail
21 applications proactively to voters.
22     Q.  You would agree that S.B. 1 addresses
23 another issue that was -- that you employed here,
24 which is drive-thru voting, correct?
25     A.  S.B. 1 makes drive-thru voting illegal.



126

1     Q.  Okay.  You would agree that S.B. 1
2  deals with the issue of poll observers, correct?
3     A.  S.B. 1 does change the rules regarding
4  poll watchers, yes.
5     Q.  As the former Harris County Clerk, do
6  you believe that integrity of elections is an
7  important thing?
8     A.  Yes.
9     Q.  Do you believe that preventing fraud is
10  an important concern for the legislature?
11     MR. FOMBONNE:  Object to the form.
12     THE WITNESS:  I believe that we want
13  to have elections without fraud.  Whether or not
14  that's important I think pertains to if fraud is
15  actually happening; and so if fraud is not happening,
16  then I don't believe it's very important to address.
17     Q.  (BY MR. SWEETEN)  Okay.  Is it your
18  view that fraud doesn't happen in elections?
19     A.  It is my view based on data that fraud
20  is extraordinarily rare in elections.
21     Q.  Okay.  You're not -- you're not
22  asserting that fraud doesn't occur in elections, are
23  you?
24     A.  I'm asserting that it's extraordinarily
25  rare.

127

1     Q.  Okay.  But you're not saying it doesn't
2  happen, right?
3     A.  I am not saying it doesn't happen.
4     Q.  I want to show you an article.
5     Do you know who James -- well, I will
6  mispronounce his name -- but Barragán for the -- for
7  the Dallas Morning News, do you know who that is?
8     A.  Yes.
9     Q.  Okay.
10     MR. SWEETEN:  I will get it.  Thank
11  you.
12     (Exhibit 15 marked)
13     Q.  (BY MR. SWEETEN)  I am going to hand you
14  what's been marked as Exhibit Number 15.  That's a
15  picture of you on the bottom, right?
16     A.  On page one, yes, sir.
17     Q.  Yes, sir.  And this is an article that
18  was in the Dallas Morning News.  We can find a date
19  on here, I hope.  Okay.  You can see it on the -- on
20  the second page.  It says, "By James" --
21     MR. SWEETEN:  And for the court
22  reporter, B-A-R-R-A-G-I- or G-A-N.
23     Q.  (BY MR. SWEETEN)  And the title of the
24  article and the date -- did I say the date?
25  April 16th, 2021 at 2:09 p.m., this shows it was

128

1  being posted.  Do you recall reading this article
2  when it came out?
3     A.  I'm not sure if I've read it before.
4     Q.  Okay.  It's got your picture.  Now,
5  surely -- surely somebody sent it to you, didn't
6  they?
7     A.  There are a lot of articles that have
8  my picture on it.
9     Q.  Okay.  All right.  You can see the
10  headline on this is "Former Harris County Clerk, no
11  regrets over voting programs that sparked Texas
12  Legislative backlash."
13     I did read that right?
14     A.  Yes.
15     Q.  Does that accurately report, do you
16  have -- do you have any regrets about any of the --
17  of the voting measures that you instituted for the
18  first time here in Harris County?
19     MR. FOMBONNE:  Object to form.
20     THE WITNESS:  I do not regret
21  providing unparalleled access to registered voters in
22  Harris County and protecting their right to vote.
23     Q.  (BY MR. SWEETEN)  Okay.  Let's read the
24  first sentence together.
25     It says, "The former Harris County

129

1  Clerk who experimented with expanded voting programs
2  during the November election says he has no regrets,
3  even though those actions have led to a severe
4  backlash from lawmakers who want to tighten voting
5  rules in the state."
6     Did I read that correctly?
7     A.  Yes.
8     Q.  Now, he's reporting about your view.
9  So I guess I'm asking:  Is that your view, that you
10  have no regrets and that you believe that there was a
11  backlash from law -- lawmakers as a result of some of
12  your actions here in Harris County?
13     MR. FOMBONNE:  Object to the form.
14     THE WITNESS:  Laws like S.B. 1 are
15  being passed across the country in plenty of states,
16  all except one that do not contain Harris County.
17  And so laws like this I believe would have been
18  passed regardless of what's happened in Harris County
19  in 2020.
20     Q.  (BY MR. SWEETEN)  Well, but I mean, you
21  don't disagree that some of the measures that you
22  employed are addressed in S.B. 1?  We just went over
23  several, right?
24     A.  I do not disagree with that.
25     Q.  Okay.  Now, S.B. 1 has some provisions



130

1 that you like, I assume, right?
2 MR. FOMBONNE: Object to the form.
3 THE WITNESS: As I mentioned
4 previously, I haven't read all the way through
5 S.B. 1.
6 Q. (BY MR. SWEETEN) Okay.
7 A. There is one provision in S.B. 1 that
8 codifies online tracking of mail ballots, which I
9 think is helpful to voters.
10 Q. Okay. What about the provision that
11 expands hours -- I mean, we can look at if you want,
12 but that expands minimum hours for counties over
13 50,000 from 8:00 to 9:00, do you think that's a good
14 provision?
15 A. Generally speaking, yes.
16 Q. Do you think that the provision in
17 smaller counties that -- to raise the minimum hours
18 for early -- early voting from 3:00 to 4:00 is a good
19 provision?
20 A. Generally speaking, yes.
21 Q. Okay. Do you think the protections --
22 let me just ask you this: When you were the clerk,
23 you would agree that the Election Code provided
24 protections for Election Day voting for employees, in
25 other words, an employer couldn't penalize them for

131

1 taking some time off on Election Day to vote, right?
2 A. That's my understanding, yes.
3 Q. Do you agree that S.B. 1 actually
4 extended those provisions to early voting as well?
5 A. I am not aware of that provision, but
6 if that is the case, I think that's generally a good
7 thing.
8 Q. Okay. And I'll let you see it just so
9 you can -- we can -- if I can find mine.
10 A. (Hands document).
11 Q. Oh, thank you. Mine's marked. So you
12 keep yours. Oh, wait. No, that's a poll observer.
13 All right. I can't read my writing on some of this.
14 Bear with me guys. Okay. Here we go. It should be
15 on page 27 of your copy.
16 A. All right.
17 Q. No, that is not it. Hold on. Let me
18 see if I can get some help here.
19 (Discussion off record)
20 THE WITNESS: As I said before, if
21 that provision exists in here, I think that's a
22 generally good provision.
23 Q. (BY MR. SWEETEN) Okay.
24 A. I don't think we need to flip through
25 this document.

132

1 Q. All right. That's fine. Then we
2 won't -- we won't go find it.
3 Now, the issues -- I think we have
4 talked about some of the things that you wanted to
5 implement. So I want to ask: In the context of
6 S.B. 1, what are your particular -- and I know you
7 said you hadn't read the whole thing, but what are
8 your particular criticisms of S.B. 1?
9 We have talked about 24-hour voting.
10 Is that one of them?
11 A. Yes.
12 Q. We have talked about drive-thru
13 voting --
14 A. Yes.
15 Q. -- and its impact on that?
16 We have talked about -- we have talked
17 about applications for mail-in ballots, that someone
18 has to request those and that -- and that S.B. 1
19 addressed that issue, correct?
20 A. To be more clear, we talked about, you
21 know, yeah, what's in this bill is the inability of
22 nonpartisan election administrators to share
23 vote-by-mail applications proactively with their
24 voters, while any private citizen or even noncitizen
25 in America can, without limitation, send vote-by-mail

133

1 applications to anybody that they want. I think
2 that's a big problem.
3 Q. Okay. And that's your interpretation
4 of S.B. 1?
5 A. No, that's --
6 MR. FOMBONNE: Object to the form.
7 THE WITNESS: -- that's what S.B. 1
8 says.
9 Q. (BY MR. SWEETEN) Okay. So let me ask
10 you, we have gone over those three? What other --
11 what other criticisms do you have of S.B. 1?
12 A. Again, I have not read fully through
13 it. There are the provision in here that empower
14 poll watchers to intimidate voters; the provisions in
15 here that make it harder to transport seniors who
16 need transportation to the polls, I think that's a --
17 a big problem. Those are a couple. There's I
18 imagine more, but those are a couple that come to
19 mind.
20 Q. Okay. And your problem with that is
21 what? Because it --
22 MR. FOMBONNE: Object to the form.
23 Q. (BY MR. SWEETEN) Do you know what
24 S.B. 1 -- how -- the number that -- of people that
25 can be brought to the polls, do you know if it



142

1       MR. FOMBONNE: Object to the form.
2       THE WITNESS: As I stated before
3  election fraud in Texas is extraordinarily rare. And
4  I will state further that in my quick review of these
5  very, very few Harris County cases over the last 17
6  years, nothing in S.B. 1 addresses anything that
7  would actually, you know, make it easier to address
8  these cases.
9       MR. SWEETEN: All right. I'm going to
10  object to that part as nonresponsive.
11      Q. (BY MR. SWEETEN) Let me ask you:
12  Because of the existence of S.B. 1, would -- would
13  would you in the future send unsolicited mail-in
14  ballot applications to people in Harris County if you
15  were the election administrator?
16      MR. FOMBONNE: Object -- object to the
17  form.
18      THE WITNESS: By doing so is a felony.
19  I don't -- I don't believe that any election
20  administrator would -- would want to willingly commit
21  a felony.
22      Q. (BY MR. SWEETEN) Okay. In any event,
23  it's clear from S.B. 1 that sending unsolicited
24  mail-in applications to people that haven't asked
25  them from a public official is illegal now; that's

143

1  clear from the statute itself, right?
2       A. Yes. S.B. 1 changed Texas law to make
3  that illegal.
4       Q. Okay.
5       MR. SWEETEN: All right. I'm going to
6  take a quick break and then I will be back. Do you
7  want to take about a five-minute deal?
8       MR. FOMBONNE: All right.
9       MR. SWEETEN: Okay.
10      THE VIDEOGRAPHER: The time is 4:53.
11       (Recess taken)
12      THE VIDEOGRAPHER: The time is 5:06.
13  We're back on the record.
14      Q. (BY MR. SWEETEN) Okay. So hopefully
15  the last hour of the deposition, Mr. Hollins. Thank
16  you. You've been hanging in there.
17      I want to go over turnout figures for
18  the state. Now, you would agree that 2020 was a high
19  turnout year for really all of Texas, right?
20      A. Yes.
21      Q. Okay. And in fact, I'm just going to
22  show you a few figures, some turnout figures in
23  Texas. Here they are, so --
24       (Exhibit 18 marked)
25      Q. (BY MR. SWEETEN) So I will start

144

1  with -- with the Texas -- the general Texas figures,
2  and so you would agree that that reflects in the 2020
3  Presidential elections, the second column, that in
4  Texas, the percentage of turnout for registered
5  voters according to the Secretary of State was
6  66.73 percent, right?
7       A. Yes.
8       Q. Okay. And that the -- I'm going to
9  show you different counties. So here's Fort Bend
10  County.
11       (Discussion off record)
12      Q. (BY MR. SWEETEN) All right. So this
13  is Exhibit 19, Mr. Hollins, and you would agree that
14  these figures are for -- these are Fort Bend County
15  but I got to show you where that is.
16      Okay. So you can see the counties.
17  It's marked -- it's in bold there on the map.
18      Do you see that?
19      A. You mean the geographic location of the
20  county?
21      Q. Yes, sir.
22      A. Sure.
23      Q. That's Fort Bend County, right, that
24  geographic location?
25      A. Yes.

145

1       Q. And you would agree that the numbers
2  show that the total turnout was 74.12 percent, right?
3       A. Yes.
4       MR. FOMBONNE: Can I get a copy?
5       MR. SWEETEN: Of course.
6       Q. (BY MR. SWEETEN) And you can see
7  over -- when it says "search county" it says "Fort
8  Bend" over the top right?
9       A. Yes.
10      Q. Okay. And then I will show you a
11  couple more. So this one is Exhibit 21 -- 20.
12       (Exhibit 20 marked)
13      Q. (BY MR. SWEETEN) And you would agree
14  that this one shows Denton County's total turnout,
15  correct?
16      A. Yes.
17      Q. And Denton's -- Denton is up in the
18  Dallas area, correct?
19      A. Yes.
20      Q. And as far as whether or not Denton
21  County -- their turnout was 73.96 percent, according
22  to these figures, correct?
23      A. Yes.
24      Q. All right. And then we will look at
25  Tarrant County, and Tarrant County, the figures there

1    are -- this is Exhibit 21.
2            (Exhibit 21 marked)
3            Q. (BY MR. SWEETEN)  Oh, I will just give
4    you this marked one.  Would you agree that Exhibit 21
5    shows that -- can you read off what the turnout was
6    for Tarrant County?
7            A. This highlighted figure's
8    68.84 percent.
9            Is this your copy?
10           Q. That's -- yeah, but you can keep that
11   in the exhibit pile.
12           A. Okay.
13           Q. She'll need those at the end.
14           And then we got Galveston --
15   neighboring Galveston County, but let's just -- let's
16   look at Harris County's figures.
17           Would you agree that these reflect
18   here in Exhibit 22 that the voter turnout was 66.15,
19   right?
20           (Exhibit 22 marked)
21           THE WITNESS:  Yes, that's what's here
22   on this sheet is 66.15.
23           Q. (BY MR. SWEETEN)  Do you know where
24   those -- how those figures compared to the 2016
25   election, by chance?

1            A. I don't remember specifically.  I want
2    to say we were in the low 60s in 2016.
3            Q. Okay.  But you don't disagree that in
4    2020 in the state of Texas, there was a whole lot of
5    interest in the Biden/Trump race and that more people
6    turned out than any other election?
7            A. That's --
8            MR. FOMBONNE:  Object -- object to the
9    form.
10           THE WITNESS:  I agree that -- that
11   2020 was a high turnout year in Texas.
12           Q. (BY MR. SWEETEN)  Okay.  I want to ask
13   you about the implementation of S.B. 1.  Now, look,
14   you haven't -- you were not the Harris County Clerk
15   during the implementation phase of the bill, right?
16           A. That's correct.  And, in fact, the
17   Harris County Clerk no longer administers elections
18   in Harris County.
19           Q. Okay.  So that would be administered by
20   the elections --
21           A. Administrator.
22           Q. Administrator.  And that is -- you've
23   told me her name twice.
24           A. Isabel Longoria.
25           Q. Okay -- Isabel Longoria.

1            And so if I were to ask you if -- if
2    there were issues in the March 1st election related
3    to any matter that S.B. 1 discussed, that -- you
4    wouldn't -- you're not privy to that data; is that
5    correct?
6            A. I have read the news, so I know what's
7    in the news.
8            Q. Okay.  So other than -- and I know that
9    you're an interested observer and you read the news
10   and -- but other than what you've read in -- in the
11   newspaper, you don't have personal knowledge of the
12   implementation of -- of S -- of S.B. 1 or any issues
13   that have -- that have been found on the ground,
14   other than the news, correct?
15           A. Correct.
16           Q. Okay.  Do you agree that -- that --
17   were there any new election bills that were passed
18   that you had to implement in 2020 that had been
19   passed by the legislature, the previous session?
20           A. I'm not sure.
21           Q. Okay.
22           A. Yeah, I'm not -- I don't know that.
23           Q. Okay.  Let me ask you:  We have talked
24   about S.B. 1 now today and you've told me the
25   provisions that you disagree with.  As you're sitting

1    here, are there any others --
2            A. A non-exhaustive list.
3            Q. A non-exhaustive list.  And I think
4    you've also said it's the case, right, that you
5    haven't -- you're not familiar with every provision
6    of S.B. 1, right?
7            A. Correct.
8            Q. So I just want to make sure that we
9    have talked about the provisions that you have
10   concerns about.
11           Are there any other concerns that you
12   have about the bill other than what you've
13   articulated that you can say as you're sitting here?
14           A. I think I have given a couple of
15   examples.
16           Q. Okay.  And so let's -- let's try to get
17   a list of those, okay?
18           You have concerns about its impact on
19   24-hour voting, right?
20           A. (Nods).
21           Q. Is that a "yes"?
22           A. Yes.
23           Q. You have concerns about its impact
24   on -- on absentee, in other words, being able to send
25   applications for mail-in ballots, and its

---

**170**

1  have minimal to no impact.  So like, as an example,
2  the first Harris County case, illegal voting
3  impersonation of a deceased voter, I don't think
4  S.B. 1 would in any way impact a case like that,
5  right?  It's always been wrong to impersonate
6  deceased people and it will be wrong tomorrow.
7  S.B. 1's not going to change that.  And the other --
8  there's other stuff like that.
9          The -- he was referencing earlier some
10  stuff on the back pages.  They're all about false
11  statements on a registration application, using a
12  false registration address.  I don't think S.B. 1
13  affects anything like that and what it's meant to
14  impact.  And that one, in particular, the false
15  statement on registration seems to be like the most
16  common thing on here, right?  And so we're looking
17  at, I don't know, a couple of dozen charges that are
18  listed on this table, and that one seems pretty
19  common here.  And again, this law doesn't -- doesn't
20  affect this at all.
21          Q. (BY MR. DILLARD)  Okay.  Thank you for
22  that answer.  I now have what I would like to
23  introduce as Exhibit --
24          MR. DILLARD:  What number are we on?
25          THE COURT REPORTER:  (Hands sticker).

**171**

1          (Exhibit 25 marked)
2          MR. DILLARD:  Here you go.  And to
3  you.
4          Q. (BY MR. DILLARD)  It's a report that's
5  titled "Braking the Status Quo."
6          Have you seen this report or have you
7  ever reviewed this report before today?
8          A. I have not, no.
9          Q. Well, it's a report that is pretty
10  much -- it goes into drive-thru voting, which we
11  spoke about earlier, and, you know, I wanted to know
12  if you would maybe go through it just to -- just for
13  your own edification, but I want to -- I want to
14  ask -- let me strike that.
15          I want to ask you a simple question as
16  in:  In your experience in drive-thru vote -- voting
17  as a Harris County clerk, did you recognize or -- did
18  you recognize any voter fraud through drive-thru
19  voting in the 2020 election?
20          A. No.
21          Q. Did you receive any complaints about
22  voter fraud through the drive-thru voting in the 2020
23  election?
24          A. No direct complaints.  There were
25  allegations when we got sued.

**172**

1          Q. Pardon me, I am just going through my
2  notes to make sure of everything.
3          All right.  In your opinion with
4  drive-thru voting, was there any harm?
5          MR. FOMBONNE:  Object to the form.
6          THE WITNESS:  No, I don't think any
7  harm was done during drive-thru voting.
8          MR. DILLARD:  All right.  I have no
9  further questions.
10          MR. SWEETEN:  Okay.  So I just have a
11  couple.
12          FURTHER EXAMINATION
13          Q. (BY MR. SWEETEN)  If we could just pull
14  this chart up.  I'm just going to look at the first
15  two pages.  I know we all have places to go.
16          A. Fair.
17          Q. So I'm not going to belabor this but
18  let's look on the first page and particularly if you
19  look at the column called "Allegation."
20          A. Uh-huh.
21          Q. Now, you would agree on the second line
22  it says, "Vote harvesting, mail fraud, assisting
23  fraud," right?
24          A. Yes.
25          Q. Would you agree those are issues that

**173**

1  S.B. 1 dealt with generally?
2          A. This says "Possession of an official
3  ballot by another person."
4          Q. Okay.
5          A. I do not believe that S.B. 1 dealt with
6  that at all.
7          Q. You don't think that -- I mean, have
8  you read the provisions of S.B. 1 that relate to
9  influencing voters?
10          A. I have not --
11          MR. FOMBONNE:  Object to the form.
12          THE WITNESS:  I have not read every
13  provision.  The stuff that we have talked about today
14  generally hasn't touched on and that.
15          Q. (BY MR. SWEETEN)  Okay.  But I mean, to
16  be clear -- and it's okay, you're not holding
17  yourself out as an expert on this 70-some-odd-page
18  bill S.B. 1, correct?
19          A. I am not an expert on that particular
20  bill.
21          Q. Okay.  And you haven't -- you haven't
22  reviewed all of it either?
23          A. I have not reviewed all of it.
24          Q. Okay.  If we would look at the next.
25  The heading is "Vote harvesting mail ballot:  Fraud

174

1 assisting fraud." Do you see that on the next column
2 in Nueces County?
3        A. I do.
4        Q. Okay. Do you disagree that the general
5 subject matter of S.B. 1 relate to those topics?
6        A. Again, it says, "Method of returning
7 marked ballot." I don't know that S.B. 1 touches on
8 that.
9        Q. Okay. But you don't -- I mean, again,
10 that's not a provision that you have listed as
11 problematic for you, we haven't discussed that
12 provision, and you've indicated you haven't read the
13 whole bill, nor are you an expert on that bill,
14 right?
15        MR. FOMBONNE: Object to the form.
16        THE WITNESS: That's a lot of
17 statement, but generally I think, yes, I'm not an
18 expert on the bill, I have not reviewed every piece
19 of this bill.
20        Q. (BY MR. SWEETEN) Okay. Here's one in
21 Reeves County, "Vote harvesting, mail ballot fraud,
22 method of returning marked ballot." Do you agree
23 that S.B. 1 deals with that issue?
24        A. That's similar to the one above. I
25 don't agree that S.B. 1 addressed how returning --

175

1 how marked ballots are returned.
2        Q. You don't think there are provisions in
3 S.B. 1 that address when you can drop off a ballot
4 and how -- and how that's to be received and --
5 performed?
6        A. So if we're talking about mail ballots,
7 I think the law was pretty clear before S.B. 1 on how
8 you returned mail ballots, which was through the
9 mail, or on Election Day, you can bring them in
10 personally.
11        Q. And do you --
12        A. I don't think that S.B. 1 changed
13 either of those.
14        Q. Do you know if S.B. 1 had a provision
15 that required identification whenever you're
16 returning a mailed ballot and that it has to be given
17 to an election official?
18        A. Well, yeah, I think that's the biggest
19 reason why seniors and people with disabilities are
20 being disenfranchised right now is that the I.D.
21 requirement with regard to mailed ballots has tossed
22 out a ton of mail ballots.
23        Q. Can you name -- I have dropped my mic.
24        Can you name a single voter that --
25 that has not been able to cast their ballot as a

176

1 result of S.B. 1 at this point?
2        A. I have a good friend her name is Pam
3 Gaskin, she is extremely involved in politics. She's
4 very intelligent. She's very well versed in how all
5 this stuff worked. She had her mail ballot rejected
6 not once but twice because of this I.D. provision.
7        Q. How did she end up having to cast her
8 vote?
9        A. I don't know if her vote ever counted.
10        Q. Okay.
11        A. I also know that the wife of Mayor
12 Anise Parker, her vote did not count because it got
13 rejected. I also know that Mayor Anise Parker's mail
14 ballot got rejected, but she went through a curing
15 process and ultimately her vote did count.
16        Q. You would agree there is a curing
17 process in voter -- in S.B. 1, right?
18        A. I'm not familiar with it, but I do
19 believe that election administrators have to alert
20 people that their mail ballot was tossed and that
21 they -- that there's a way to get that figured out.
22        Q. Okay. So let's -- let's go over it.
23        In the state of Texas, you have two
24 weeks of early voting that you can vote in person,
25 correct?

177

1        A. Yes.
2        Q. You have -- you can vote on Election
3 Day, correct?
4        A. Yes, you can vote on Election Day.
5        Q. You can -- you can ask for an
6 application by mail-in ballot if you -- if you fit
7 the specific category of people that are allowed to
8 do that, correct?
9        A. Yes.
10        Q. If you put your -- and you understand
11 that S.B. 1 requires you to put your identification
12 numbers on the mail-in ballot, correct?
13        A. Yes.
14        Q. And if you do that on the application
15 and it's the correct number, you don't -- you don't
16 disagree that you can vote in -- through the mail-in
17 ballot process, right?
18        MR. FOMBONNE: Object to the form.
19        THE WITNESS: I agree that -- that
20 most votes cast through mail-in ballots were counted
21 in March of 2022.
22        Q. (BY MR. SWEETEN) You can even bring
23 under the election -- and that's not my question, but
24 I was just saying: You agree that if you put your
25 identification numbers on your ballot and send it in



1  and they match what's with the election
2  administrator, then those -- then those ballots will
3  count under S.B. 1, correct?
4        A. Yes.
5        Q. All right. Let's go back to the two
6  examples you gave me.
7        Is there some reason that Ms. Parker's
8  spouse could not vote in person?
9        A. I am not familiar with this specific
10 situation.
11       Q. Do you know if she did vote in person
12 ultimately?
13       A. No, she ultimately did not vote at all.
14       Q. Do you know if she tried to bring her
15 mail ballot in person?
16       A. I do not know the circumstances that
17 took place after she received notice of rejection.
18       Q. Do you know why she didn't vote during
19 the two-week early voting period?
20       A. No, I don't. But she has the right to
21 vote by mail. So there's no reason that needs to be
22 given for that.
23       Q. And do you know why she couldn't vote
24 on Election Day?
25       A. Again, she has the right to vote by

1  mail. She doesn't have to give an excuse as to why
2  she can't vote on Election Day.
3        Q. Well, the point is that there are
4  multiple -- there are multiple ways to cast your
5  ballot in the state of Texas. We have gone over
6  them, haven't we?
7        A. And one of them is by mail.
8        Q. And many -- and some of it is by in
9  person?
10       A. Absolutely.
11       Q. Some of it curbside voting, if you --
12 if you're allowed -- if you fit within the category
13 of folks that can utilize curbside voting, right?
14       A. Yes.
15       Q. You could do early voting, you could do
16 Election Day voting?
17       A. Yes.
18       Q. And you can do mail-in voting if you
19 fill out your numbers on your mail-in ballot?
20       A. Yes.
21       Q. Okay. Now, are you familiar -- you
22 were the Harris County Clerk. Are you familiar with
23 other states and their voting processes?
24       A. Not deeply familiar, but I have -- I
25 have -- I have visited other states to observe their

1  voting processes and I have done, you know, light
2  homework on other state's processes.
3        Q. Are you familiar with the fact that
4  there are multiple states that all they have is
5  Election Day voting and mail-in voting, not early
6  voting?
7        MR. FOMBONNE: Object to the form.
8        THE WITNESS: I know that practices
9  vary across the country in terms of how many days
10 people can vote and the methods with which they can
11 vote.
12       Q. (BY MR. SWEETEN) Do you know that in
13 the state where system of our opponents live, for
14 example, the Brennan Center and other plaintiffs and
15 the State of New York and that up until 2019 they had
16 no early voting in place?
17       A. I am familiar with that.
18       Q. Okay. Certainly it's better to have
19 two weeks of early voting than none, correct?
20       A. Yes.
21       Q. Okay. Now, back to this sheet, it is
22 the case, isn't it, this is an 11-page spreadsheet,
23 correct?
24       A. Yes.
25       Q. So you've told us already that you

1  haven't read all of S.B. 1 and are not an expert on
2  it, right?
3        A. Yes.
4        Q. I assume it's the case, since you said
5  that you've never seen this before today, that you
6  don't know the details and facts of all of this 12
7  pages of -- of election fraud violations that are
8  listed here in this exhibit, correct?
9        A. That's correct.
10       Q. All right. So with respect to your
11 ability to offer an opinion on any of these, you
12 would agree there are people that are in a better
13 place -- better position to offer those, those with
14 knowledge of these cases, correct?
15       A. There are certainly people who know
16 more about S.B. 1 than I do.
17       Q. Okay. And more about these violations
18 as well that are listed here, correct?
19       A. Yes.
20       MR. SWEETEN: Okay. I don't have
21 anything else. Thank you.
22       MR. FOMBONNE: Nothing from me.
23       THE VIDEOGRAPHER: And no one on Zoom?
24 Probably not.
25       THE WITNESS: Y'all got any questions?