## Page 6

1    P R O C E E D I N G S
2        THE VIDEOGRAPHER: This is the
3 deposition of Rivelino Lopez, Dallas County
4 Elections Administrator, in the matter of La Union
5 Del Pueblo Entero, et al., vs. Gregory W. Abbott, et
6 al.
7        All our location is 500 Elm Street,
8 Dallas, Texas.
9        Today's date is April 13, 2023. The time
10 is 9:15 a.m.
11        My name is Kristen Geoffrion.
12        Would all persons present please introduce
13 themselves for the record.
14        MS. PERALES: For the plaintiffs,
15 LUPE, et al., Nina Perales.
16        MR. STEWART: Michael Stewart for the
17 United States.
18        MS. HUNKER: Kathleen Hunker from the
19 Office of the Texas Attorney General representing
20 state defendants and individual legislators.
21        MR. STOOL: Ben Stool from the
22 Criminal District Attorney's Office of Dallas
23 County, Texas, representing defendant Michael
24 Scarpello, the elections administrator, Dallas,
25 County, Texas.

## Page 7

1        MR. SCHUETTE: Jason Schuette, Dallas
2 County District Attorney's Office with Mr. Stool.
3        THE WITNESS: Rivelino Lopez, Dallas
4 County Elections Department, voter registration
5 manager.
6            RIVELINO LOPEZ,
7       having been first duly sworn,
8          testified as follows:
9              EXAMINATION
10 BY MS. PERALES:
11  Q.  You just took care of my first question.
12      Good morning, Mr. Lopez.
13  A.  Good morning.
14  Q.  Now that you're sworn in, I'll have to ask
15 you again.
16      If you could, state your name for the
17 record?
18  A.  Rivelino Lopez.
19  Q.  And I know you've had your deposition taken
20 before because we did this, something similar last
21 year. But I'll ask you, have you had your
22 deposition taken since the last time you were in a
23 deposition for this case?
24  A.  No.
25  Q.  Okay. So I'm going to go quickly through

## Page 8

1 the ground rules since you are experienced.
2      Do you understand that you're under oath?
3  A.  Yes.
4  Q.  Do you understand that the oath that you
5 took today to tell the truth is the same as if you
6 were in court telling the truth in front of a judge?
7  A.  Yes.
8  Q.  Is there anything today that would prevent
9 you from giving me your full attention and
10 responding accurately; for example, illness or
11 taking any kind of medication that makes you fuzzy?
12  A.  No.
13  Q.  Okay. Thank you.
14      Is there anything today that would prevent
15 you from understanding my questions or answering
16 them fully?
17  A.  No.
18  Q.  And if you recall, you can take a break at
19 any time. This is your deposition. The only
20 request that I make is that if you want to ask to
21 take a break, that you answer whatever question may
22 be out on the table before we take the break as
23 opposed to letting the question be hanging while
24 we're on the break. Is that okay?
25  A.  Yes.

## Page 9

1  Q.  Now, one of the lawyers here in the room
2 may make an objection during the deposition, and,
3 generally, when that happens, you're still going to
4 go ahead and answer unless one of the lawyers
5 instructs you not to answer. And if that happens,
6 please don't answer, and we will sort out among
7 ourselves what to do about that. Okay?
8  A.  Yes. Okay.
9  Q.  You're already very good at this, but I'll
10 remind you to allow one speaker at a time. I will
11 let you finish your answer before I ask my next
12 question, and I'll ask for you to allow me to finish
13 my question before you answer. Is that okay?
14  A.  Yes.
15  Q.  Thank you.
16      Will you agree to be -- to make your
17 answers out loud as opposed to nods or shrugs?
18  A.  Yes.
19  Q.  If you don't understand a question, please
20 ask me to rephrase it.
21      And with respect to information, I'm
22 entitled to your best estimate, but I don't want you
23 to guess. Is that all right?
24  A.  Yes.
25  Q.  Do you have any questions about this

10

1  deposition before we begin?
2     A.  No.
3     Q.  Do you understand today that you're
4  testifying as a representative of the Dallas County
5  Elections Administrator office?
6     A.  Yes.
7     Q.  So when I say "you," will you understand
8  that "you" means the Dallas County Elections
9  Administrator office?
10    A.  Yes.
11    Q.  If I say "the County," will you understand
12 that to mean Dallas County?
13    A.  Yes.
14    Q.  If I say "your office," will you understand
15 that to mean the office of the Dallas County
16 Elections Administrator?
17    A.  Yes.
18    Q.  I may use some terms interchangeably in
19 today's deposition.
20        If I use the terms "Latino" and
21 "Hispanic," will you understand that to mean the
22 same thing?
23    A.  Yes.
24    Q.  If I use the term "limited English
25 proficient," will you agree with me that for the

11

1  purpose of this deposition, the term means that
2  English is not that person's primary language and
3  they have difficulty communicating effectively in
4  English?
5     A.  Yes.
6     Q.  What steps did you take to prepare for the
7  deposition today?
8     A.  I met with Mr. Stool yesterday.  He just
9  gave me a heads on --
10    Q.  Stop right there.  It's okay just to say
11 you met with Mr. Stool.
12    A.  Okay.
13    Q.  And because he's your lawyer for this
14 deposition --
15    A.  Okay.
16    Q.  -- you're entitled to privacy in terms of
17 what he said to you and what you said to him.
18    A.  Okay.
19    Q.  So we'll just leave it as you met with
20 Mr. Stool.  And I'll just ask you for about how much
21 time did you meet with Mr. Stool?
22    A.  An hour.
23    Q.  Did you meet with anybody else to prepare
24 for the deposition?
25    A.  No.

12

1     Q.  Did you review any documents to prepare for
2  the deposition?
3     A.  The questions that I was going to be
4  responsible for.
5     Q.  Okay.  Did you review any other materials
6  besides the questions?
7     A.  No.
8     Q.  I'm sorry, I cut you off.  I just wanted to
9  make sure that we respected the privacy between you
10 and Mr. Stool.
11    A.  Yeah, no problem.
12    Q.  Did you bring any materials with you today
13 to the deposition?
14    A.  The questions that went over yesterday,
15 yes.
16    Q.  Did you bring anything else:  Reports,
17 materials, notes, anything like that?
18    A.  No.
19        (Exhibit No. 1 marked.)
20 BY MS. PERALES:
21    Q.  Mr. Lopez, I'm handing you what has been
22 marked Deposition Exhibit No. 1.  Do you recognize
23 this document?  You may not have seen this document,
24 but I'll represent to you that it's plaintiff's
25 amended notice of Rule 30(b)(6) deposition of the

13

1  Office of the Dallas County Elections Administrator.
2  The reason it says "amended" is because we sent a
3  new one yesterday with the correct room in it.
4         Are you generally familiar with the notice
5  of deposition for today's deposition?
6     A.  Generally, yes.  I can't say that I've gone
7  through it and read it word for word.
8     Q.  Okay.  And I'm noticing now that Ms. Hunker
9  wasn't the only person having printer challenges
10 yesterday.  This document was printed so that the
11 flip is on the short side.  So I'll just ask you to
12 turn the pages that way.
13        All right.  I am going to go over with you
14 the topics that I believe you are designated for in
15 today's deposition just to make sure that we've got
16 it right.  Okay?
17    A.  Okay.
18    Q.  If you turn to page 9 of the exhibit, and
19 you see Topic No. 29, sub B, "The means by which
20 your office determined that each such person is not
21 eligible to vote and registered to vote or voted in
22 the election."
23        Do you see that there?
24    A.  Yes.
25    Q.  Do you understand that you're designated to

14
1  talk on that?
2     A.  Yes.
3     Q.  And then the topic after that, C, "Whether
4  and when each such person was removed from the voter
5  role."
6        Do you understand that you're designated
7  to speak on that topic?
8     A.  Yes.
9     Q.  And then topic 30, "Any changes in
10 practice, policy or procedure of your office in
11 response to Section 2.06 of SB1."
12       Do you understand that you're designated
13 to testify on that topic?
14    A.  Yes.
15    Q.  And then Topic 31, "Any changes in
16 practice, policy or procedure of your office in
17 response to Section 2.07 of SB1."
18       Do you understand that you're designated
19 to speak on that topic?
20    A.  Yes.
21    Q.  Are there any other topics on which you
22 believe you are designated to testify?
23    A.  No.
24       MR. STOOL:  Well, I'm going to -- I
25 think No. 28.

15
1        MS. PERALES:  Yes, that's right.
2  BY MS. PERALES:
3     Q.  If you look at Topic No. 28 in your
4  document, Mr. Lopez, "Any changes in practice,
5  policy or procedure of your office in response to
6  Section 2.04 of SB1."
7        Do you understand that you're designated
8  to testify on that topic?
9     A.  Yes.
10    Q.  Thank you.
11       And then, finally, do you understand that
12 you are testifying here today in this deposition
13 pursuant to the notice that is Exhibit 1?
14    A.  Yes.
15    Q.  I would like to ask about any changes in
16 your personal background since we last spoke about a
17 year ago.  Have you had any changes in the education
18 that you've received?  Like, any degrees or
19 trainings that you've had or certifications?
20    A.  No.
21    Q.  And did you say that you're the voter
22 registration manager?
23    A.  Yes.
24    Q.  And that is the same title that you held
25 last year when you were deposed?

16
1     A.  Yes.
2     Q.  Since you were deposed last, have there
3  been any changes in your duties as the voter
4  registration manager?
5     A.  No.  Same duties.
6        (Exhibit No. 2 marked.)
7  BY MS. PERALES:
8     Q.  I am handing you what has been marked
9  Deposition Exhibit No. 2.  And I will represent to
10 you that this is the enrolled version of the statute
11 that we know as SB1.
12    A.  Okay.
13    Q.  Okay.  If you would, turn forward in the
14 document to page 7.  If you look at the second line
15 from the top, it says, "Section 2.04."  Do you see
16 that there?
17    A.  Yes.
18    Q.  And there's some words that are struck out
19 and there are some words that are underlined.  Do
20 you see that there?
21    A.  Yes.
22    Q.  And so you -- with the strikeout and the
23 underline, it represents the changes that were made
24 to the election code by SB1.  And so in
25 Section 2.04, you'll see that there are some changes

17
1  made to the election code, Section 15.028.  Do you
2  see that there?
3     A.  Yes.
4     Q.  Do you understand that as a result of SB1's
5  passage, that voter registrars, if they determine
6  that a person who is not eligible to vote and
7  registered to vote or voted in election shall
8  deliver to the Attorney General, the Secretary of
9  State and the County an affidavit stating those
10 facts?  Do you see that language there?
11    A.  Yes.  Yes.
12    Q.  Has your office made any changes in its
13 practices, policies or procedures related to this
14 Section 2.04?
15       MS. HUNKER:  Objection; form.
16    A.  No.
17 BY MS. PERALES:
18    Q.  Have you delivered any affidavits to the
19 Attorney General, Secretary of State and County or
20 district attorney under Section 2.04 of SB1?
21    A.  No.
22    Q.  Does your office have a procedure for how
23 to respond if you find out that an individual is
24 registered to vote but should not be registered to
25 vote?

18

1   A.  Yes, we follow the Texas Election Code.
2   Q.  Okay.  And can you describe that procedure
3 for me?
4   A.  If we find out -- if they're already
5 registered and we find out, for whatever reason
6 they're not eligible, we'll have to submit something
7 in writing, an affidavit, let the attorneys know,
8 and they would proceed with -- you know, we give
9 them all the evidence, hey, this is what we see, and
10 then we would follow what the attorneys say as far
11 as, okay, they need to be removed or, you know, what
12 the -- what the process is next.  So. . .
13   Q.  In your experience, is it the case that
14 from time to time somebody is registered to vote by
15 accident or inadvertently and they didn't mean to
16 register to vote and they're ineligible?
17   A.  There have been times where the voter has
18 actually notified us, said for whatever reason they
19 filled out an application, they got registered.
20 They may say, "I'm not a citizen, please remove me
21 from the voter rolls," and we remove them
22 immediately.
23   Q.  And do you deliver any information about
24 that voter, then, to your attorneys?
25   A.  Not on those.  We send a cancellation that

19

1 they've been canceled to the voter.
2   Q.  So that's basically in response to the
3 voter requesting a cancellation?
4   A.  Correct.
5   Q.  Have you ever through interactions with
6 voters learned that somebody registered to vote by
7 accident?
8   A.  How do you mean "by accident"?
9   Q.  Have you ever come to learn that a voter
10 registered to vote, for example, at the motor
11 vehicles office but they did not realize that they
12 were registering to vote and then they find out
13 later?
14   A.  I don't believe so, because, I mean, that
15 question is asked at the DMV, and they have a
16 checkbox if they want to answer.  So I don't believe
17 there's been any instances.
18   Q.  Are you familiar with any other situations
19 where an individual who is not eligible to register
20 registered to vote by accident or inadvertently?
21   A.  Not for us because if they're sending in an
22 case, we're just processing that application.  So if
23 they tell us -- you know, they check all the right
24 boxes and they fill it out completely, we're going
25 to process it.  So we wouldn't know.

20

1   Q.  And have you ever had an interaction with a
2 voter requesting cancellation who explained how they
3 came to be registered to vote inadvertently?
4   A.  Yeah.  In the example I said, they -- they
5 got registered, say, as a high school student and
6 didn't realize they need to be -- they're a resident
7 and not a citizen or something like that, and they
8 say, "I was just registering with my other students,
9 my classmates.  Please remove me."  Or something
10 like that.
11   Q.  Okay.  Have you ever had anyone request
12 cancellation because they registered to vote in
13 Dallas but they were already registered to vote
14 somewhere else and they were not a Dallas resident?
15   A.  Yes.  We have voters that request to be
16 canceled because they no longer live in Dallas, yes.
17   Q.  If you would, turn forward in this Exhibit
18 No. 2, SB1, and look with me to the bottom of page 8
19 where it starts with Section 2.06, and then it flows
20 up onto page 9.  And all of that -- do you see all
21 of that, the underlined language there?
22   A.  Yes.
23   Q.  Are you aware that SB1 added a process for
24 the Secretary of State to take action against voter
25 registrars for failure to follow certain list

21

1 maintenance practices?
2   A.  Yes.
3       MR. STOOL:  Nina, it's not an
4 objection.  I just got an e-mail from Lisa Cubriel,
5 there's a bad echo on the Zoom.  I don't know how to
6 fix that.  I just was notified of it, is all.
7       MS. PERALES:  Are you muted?
8       MR. STEWART:  I am muted.
9       MS. PERALES:  Is anybody else here in
10 the Zoom?  I am not.
11       MR. STOOL:  I am.  Let me make sure
12 I'm muted.  Oh, it may be my fault.  Excuse me for
13 interrupting.
14       MS. PERALES:  No, I'm glad we got that
15 worked out.  Gives the witness a break too.
16 BY MS. PERALES:
17   Q.  So if we look together at page 9, you'll
18 notice that on line 5 it provides that the Secretary
19 of State can require the registrar to attend a
20 training course.
21       Do you know if the Secretary of State has
22 required your office to attend a training course
23 under this provision?
24   A.  No.
25   Q.  Do you know if the Secretary of State has

22

1  audited the voter registration list for Dallas
2  County to determine actions needed to achieve
3  substantial compliance?
4      A.  No.
5      Q.  Do you know if the Secretary of State has
6  reported Dallas County to the Attorney General for
7  being out of compliance with this provision?
8      A.  No.
9      Q.  Do you know if Dallas County has been
10 assessed a civil penalty of $1,000 per day for
11 failure to perform list maintenance activities under
12 this section?
13     A.  No.
14     Q.  Do you know if your office has made any
15 changes in its policies or practices to make sure
16 that it complies with these list maintenance
17 obligations?
18     A.  No changes.
19     Q.  Okay.  Do you receive information from your
20 jury clerk about jurors who are excused from jury --
21 let me try that again.
22         Do you receive information from your jury
23 clerk about individuals who are excused from jury
24 duty because they don't live in Dallas County?
25     A.  Yes.

23

1      Q.  And what do you do with that information?
2      A.  We work them.  We have to work them.  They
3  come each month, and we send out a confirmation
4  notice.  And if they don't respond within 30 days of
5  the confirmation notice, they go into a suspense
6  status.
7      Q.  And how long do they stay on suspense?
8      A.  If they don't update their record and two
9  federal elections pass, they -- they'll get purged.
10     Q.  Okay.  So in addition to getting that type
11 of information from your jury clerk, do you also get
12 that information from the Secretary of State?
13     A.  Yes.
14     Q.  And do you use the same process with the
15 information that you get from the Secretary of State
16 where you send the individual a confirmation notice?
17     A.  Yes.
18     Q.  Have you seen people respond to the
19 confirmation notice and say, yes, I am still a
20 resident of Dallas County?
21     A.  Rarely they do.  But most of them have
22 already moved, yes.
23     Q.  And so how long have you been doing this
24 practice of sending confirmation notices to people
25 for whom the jury clerk sends you information about

24

1  that person being excused from jury duty because
2  they're not a resident?
3      A.  At least ten years.  It's been a while.
4  It's been the same practice for a while, yeah.
5      Q.  Is it possible that an individual could be
6  permanently living in Dallas County but they would
7  be excused from jury duty for not being in Dallas
8  County, for example, because they are away at
9  college?
10         MS. HUNKER:  Objection; form.
11     A.  You said is it possible?
12 BY MS. PERALES:
13     Q.  Yes.
14     A.  Yes.
15     Q.  Have you ever seen that happen in your
16 office's experience?
17     A.  I don't think I've seen it, because if
18 they're on the list, then we're going to send a
19 confirmation, and they would need to reply to the
20 confirmation.
21     Q.  Same thing for somebody who might be living
22 away from Dallas County to care for a sick parent
23 for perhaps several months, that could also happen
24 where they would get excused from jury duty for not
25 being in the county, correct?

25

1      A.  Correct.
2      Q.  But you would still send that person a
3  confirmation notice to their Dallas address?
4      A.  Correct.  Yes.
5          MS. PERALES:  Can we go off the record
6  for a second?
7          THE VIDEOGRAPHER:  We're off the
8  record.  The time is 9:50 a.m.
9          (Break taken, 9:50 a.m. to 9:55 a.m.)
10         THE VIDEOGRAPHER:  We're back on the
11 record.  The time is 9:55 a.m.
12 BY MS. PERALES:
13     Q.  Mr. Lopez, I wanted to ask you a few
14 questions related to questions that you answered in
15 your last deposition.  And I will state for the
16 record that you have not been designated on these
17 topics, which are Topic 13F, as in "Frank," Topic 14
18 in certain aspects, and Topic 27.  But you did have
19 some information about those topics in your last
20 deposition, and so I would like to ask you a few
21 questions.
22     A.  Okay.
23     Q.  If you don't know the answer, please just
24 tell me and I'll ask somebody else those same
25 questions.  Okay?

26

1  A.  Okay.
2      MS. PERALES:  Mr. Stool, did you want
3  to make any statement on the record?  Or
4  Mr. Schuette?
5      MR. STOOL:  I don't think so.
6      MS. PERALES:  Okay.  Thank you.
7      MR. STOOL:  I think -- I think you've
8  covered it.  It's just that he was not designated to
9  speak on those topics.  Okay.
10 BY MS. PERALES:
11 Q.  Mr. Lopez, for the 2022 general election,
12 do you know how many voters in Dallas County had one
13 ID number in the -- in your system but not two ID
14 numbers in your system?
15 A.  I do not.
16 Q.  Do you know how many vote centers Dallas
17 County operated in the 2022 general election?
18 A.  I do not.
19 Q.  In your last deposition, you testified that
20 the e-pollbook kept information about voters who
21 voted in person in the polling place and either used
22 an interpreter or used an assister, for example, for
23 physical disability.  Do you remember that
24 testimony?
25 A.  Yes.

27

1  Q.  Okay.  Are you familiar with the e-pollbook
2  system and how poll workers use it at the polling
3  place?
4  A.  Yes.
5  Q.  Do you train poll workers on using the
6  e-pollbook?
7  A.  I do not.
8  Q.  Do you know the -- whether the e-pollbook
9  has a screen for the poll worker to check a box that
10 the voter is using an interpreter?
11 A.  Yes.
12 Q.  And are you aware whether the -- and does
13 it have a box for the poll worker to check that a
14 voter is using an interpreter?
15 A.  Yes.
16 Q.  And are you aware that the e-pollbook also
17 has a box for the poll worker to check if the voter
18 is using voter assistance?
19 A.  Yes.
20 Q.  How many Dallas County polling places in
21 the 2022 general election used the e-pollbook?
22 A.  All of them.
23 Q.  So would it be fair to say, then, that the
24 ExpressPoll Connect software could tell us how many
25 voters in the 2022 general election used an

28

1  interpreter to vote at the polls?
2  A.  Yes.
3  Q.  And the ExpressPoll Connect software would
4  tell us how many voters in the 2022 general election
5  used an assister or used voter assistance; is that
6  correct?
7  A.  Yes.
8  Q.  Do you know if those reports were produced
9  in this case to us?
10 A.  They were not.
11     MS. PERALES:  Okay.  I'll say that I
12 believe it falls under the document production
13 obligations of Dallas County to produce those
14 reports.  So. . .
15     MR. STOOL:  State again -- could you
16 state again exactly which -- because I thought they
17 were.  Could you state again which --
18     MS. PERALES:  Well, we'll follow up
19 after the deposition.
20     MR. STOOL:  All right.
21     MS. PERALES:  But I'll just say for
22 the -- for the record, we will want to make sure
23 that we received those reports for the 2022 general
24 election.
25     MR. STOOL:  And which reports?

29

1      MS. PERALES:  They are reports from
2  ExpressPoll Connect, which I understand is your
3  e-pollbook software.
4      MR. STOOL:  That state?
5      MS. PERALES:  That can generate
6  reports on voters who used an interpreter and voters
7  who used voter assistance.
8      MR. STOOL:  Okay.
9  BY MS. PERALES:
10 Q.  My last question for you has to do with
11 voter registration outreach.  Do you still have an
12 individual called the outreach coordinator?
13 A.  We do.
14 Q.  And what is that person's name?
15 A.  Esmeralda Garcia.
16 Q.  Okay.  Is she the same person who was the
17 outreach coordinator the last time we spoke back in
18 2022?
19 A.  Yes.
20 Q.  Okay.  You mentioned that Ms. Garcia and
21 that your office in the past had attended
22 naturalization ceremonies to offer in-person voter
23 registration.  Do you recall that testimony?
24 A.  Yes.
25 Q.  Does your office still do that?

30

1  A.  Yes.
2  Q.  For the time period since last May 2022, do
3  you know approximately how many naturalization
4  ceremonies your office has attended to offer voter
5  registration?
6  A.  I do not.
7  Q.  I want to thank you for your time today.
8  I'm not the only person who is going to ask you
9  questions, but I think I'm done.  So thank you.
10          MS. PERALES:  And I pass the witness.
11      Do you want to take a break or keep going?
12          MR. STEWART:  We can keep going.  Do I
13  put the mic on?  Let's go off the record for one
14  minute while I. . .
15          THE VIDEOGRAPHER:  We're off the
16  record.  The time is 10:02 a.m.
17          (Break taken, 10:02 a.m. to 10:03 a.m.)
18          THE VIDEOGRAPHER:  We're back on the
19  record.  The time is 10:03.
20              EXAMINATION
21  BY MR. STEWART:
22  Q.  Thanks, Mr. Lopez.  I'm Mike Stewart for
23  the United States.  I just have some very brief
24  questions for you.
25      Does your office ever receive registration

31

1  forms or registration requests from voters who are
2  already registered to vote?
3  A.  Yes.
4  Q.  How do you handle those?
5  A.  We still process them as duplicate in our
6  system, and they would get a new voter registration
7  application -- I mean, registration certificate.
8  Q.  But will it be the same record in your
9  voter registration database?
10  A.  Yes.
11  Q.  Is there a date or deadline before a given
12  election that you will not process those for the
13  upcoming election?
14  A.  No.
15  Q.  Okay.  Thank you.
16          MR. STEWART:  I'll pass the witness.
17          MS. HUNKER:  Are there any plaintiffs
18  on the Zoom who want to ask questions of the
19  witness?
20              EXAMINATION
21  BY MS. HUNKER:
22  Q.  In that case, good morning, Mr. Lopez.
23  A.  Good morning.
24  Q.  My name is --
25          THE VIDEOGRAPHER:  If you'll also get

32

1  the microphone.
2  BY MS. HUNKER:
3  Q.  My name is Kathleen Hunker with the State.
4  It's good to see you again.  I have very few
5  questions for you.
6      Do you recall discussing with counsel
7  about voters who may have accidentally registered to
8  vote?
9  A.  Yes.
10  Q.  In the case of a high school student who
11  accidentally registered to vote with their class but
12  was not eligible, you're not aware of any of these
13  students being prosecuted for being registered; is
14  that correct?
15  A.  Correct.
16  Q.  In the case of a voter informing you that
17  they're no longer a resident of Dallas County but
18  are still registered to vote in Dallas County,
19  you're not aware of any of these voters facing
20  prosecution for being registered to vote in Dallas
21  County; is that correct?
22  A.  Correct.
23  Q.  And you're not aware of any voter facing
24  prosecution for otherwise being accidentally
25  registered to vote in Dallas County; is that

33

1  correct?
2  A.  Correct.
3          MS. PERALES:  Before you answer, I
4  just want to object for the purpose of the record
5  that the witness is not designated on the topic of
6  who is being prosecuted -- or the office's awareness
7  of who's being prosecuted.
8  BY MS. HUNKER:
9  Q.  Which sub-office are you in within the
10  office of election administrator?
11  A.  Voter registration.
12  Q.  And has the county attorney or county
13  district attorney ever contacted your specific
14  office about any prosecutions that were being
15  considered regarding a voter who was accidentally
16  registered to vote?
17  A.  No.
18          MS. HUNKER:  No further questions.
19          MS. PERALES:  None here.
20          MR. STOOL:  I don't have any
21  questions.  So if there's -- is there anybody on the
22  Zoom?  Are we through with Mr. Lopez?
23          MS. PERALES:  I believe we are.  Shall
24  we go off the record?
25          THE VIDEOGRAPHER:  This will conclude