## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

### <u>MEMORANDUM OPINION</u>[1]

On this date, the Court considered the motions for summary judgment as to the Section 101 Materiality Provision claims filed by the United States (ECF No. 609), the OCA Plaintiffs (ECF No. 611), and the Intervenor-Defendants (ECF No. 608), and the responses and replies thereto. After careful consideration, the Court issues the following order.

## BACKGROUND

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). In the weeks that followed, numerous private plaintiffs, including OCA-Greater Houston, League of Women Voters of Texas, and REVUP-Texas (collectively, the "OCA Plaintiffs"), and the United States filed suit, challenging various provisions of S.B. 1 under the United States Constitution and federal civil rights statutes.[2]

---

[1] This memorandum opinion supplements the Court's earlier summary ruling on these motions issued in August 2023. *See* ECF No. 724.

[2] For the purposes of judicial economy, the Court consolidated these cases under the above-captioned lead case. *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR (W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021)); *United States v. Texas*, No. 5:21-CV-1085-XR (W.D. Tex. Nov. 4, 2021), ECF No. 13.

The United States and the OCA Plaintiffs (collectively, "Plaintiffs") allege that various provisions of S.B. 1 adding an identification ("ID") number-matching requirement to Texas's mail-in voting process violate Section 1971 of the Civil Rights Act of 1964 ("CRA"), now codified under 52 U.S.C. § 10101(a)(2) ("Section 101"). *See* ECF No. 200 at 45–46; ECF No. 131 at 16–17.[3] The "Materiality Provision" of Section 101 states:

> (2) No person acting under color of law shall—
>     (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B). The CRA defines the term "vote" broadly: it includes "all action necessary to make a vote effective including, but not limited to . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." *Id.* §§ 10101(a)(3)(A), 10101(e). Section 101, therefore, prohibits state actors from denying a person's right to make their vote effective based on an error or omission that is not material to determining whether they are qualified to vote under state law.

The OCA Plaintiffs attack the number-matching framework as a whole,[4] while the United States merely challenges the provisions requiring election officials to reject applications to vote by mail and mail-in ballots bearing ID numbers that do not match voter registration records—Sections 5.07 and 5.13 of S.B. 1. *See* ECF No. 200 at 45–46; ECF No. 131 at 16–17. Plaintiffs seek injunctions barring enforcement of the provisions they challenge and a declaration that the challenged provisions violate the Materiality Provision. *See id.*

---

[3] When citing to the parties' filings, the Court refers to ECF pagination, which may not reflect the pages numbers of the underlying documents.

[4] In their motion, the OCA Plaintiffs state that they seek to challenge Sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14 of S.B. 1 and have voluntarily withdrawn their challenge to Section 5.06. ECF No. 611 at 8 n.1. Although it will not meaningfully affect the disposition of the Section 101 claims, the Court observes that the Second Amended Complaint does not appear to include any references to Sections 5.08, 5.13, or 5.14 of S.B. 1.

I.      **Voter Qualifications and Registration Records**

S.B. 1 did not change voter eligibility requirements in Texas. Texas law defines a "qualified voter" as an individual who is 18 years of age or older, is a United States citizen, is a resident of the state of Texas, has not been adjudged mentally incompetent, has not been convicted of a felony (unless they have completed their term of sentence or received a pardon), and is registered to vote. TEX. ELEC. CODE ("TEC") § 11.002(a); *see also* Tex. Const. art. VI, § 2(a).

The official Texas voter registration form prepared by the Texas Secretary of State ("SOS") enumerates all of these qualifications and asks applicants to confirm their eligibility as to each of them.[5] *See* ECF No. 609-3 at 108 (Texas Voter Registration Application). An applicant must affirm, by checking the applicable boxes on the form, that she is a U.S. citizen and will be 18 years of age by the date of the next election. *See id.* The applicant must also provide her date of birth, residential address, and sign and date a statement, under penalty of perjury, affirming that she is a resident of the county identified on the form, is a U.S. citizen, and satisfies the requirements related to felony convictions and mental incompetence. *See id.* The form also requires the applicant to provide (1) a Texas Driver's License or Personal Identification number ("DPS number"), (2) "if no [DPS number]," the last four digits of her Social Security Number ("SSN4"), or (3) a statement that she has not been issued either identification number.[6] *See id.*

Texas did not require voter-registration applicants to provide an ID number until January 1, 2004, in compliance with the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq. See* ECF No. 609-1 (DOJ's Statement of Uncontested Facts ("SUF")) ¶ 11; TEC § 13.002(c)(8)(A); 52 U.S.C. § 21083(d) (requiring states to comply with relevant HAVA requirements by January 1,

---

[5] An applicant can submit a registration application in order to register to voter for the first time or to inform the registrar of a change of address or other information. *See* ECF No. 609-3 at 108.
[6] The form also contains spaces for "optional" information, including the applicant's gender and telephone number. *See* ECF No. 609-3 at 108.

2004). Congress enacted HAVA in the wake of the November 2000 presidential election and its attendant controversies. One of HAVA's main goals was to "modernize and improve registration nationwide" by "[r]equiring states to develop statewide databases" to track voter registration. H.R. REP. 107-329(I), 2001 WL 1579545, at *35–36.

Under HAVA, states were directed to establish "a single, uniform, official, centralized, interactive computerized statewide voter registration list . . . contain[ing] the name and registration information of every legally registered voter in the State and assign[ing] a unique identifier to each legally registered voter in the State." *See* 52 U.S.C. § 21083(a)(1)(A). HAVA also imposed additional ID number requirements on *new* voter registration applications. Specifically, HAVA provides that applicants must provide a current and valid driver's license number or, if they have not been issued such a number, their SSN4, which the state must then compare with the SSA database or DOL database. *See* 52 U.S.C. § 21083(a)(5)(A)(i). Applicants who indicate that they have neither a driver's license number nor an SSN4 must be assigned a unique identification number on the state's computerized database, which will "serve to identify the applicant for voter registration purposes." *See id.* § 21083(a)(5)(A)(ii).

Texas's statewide voter registration database, maintained by the Texas SOS, is known as the Texas Election Administration Management ("TEAM") system. SUF ¶ 81. TEAM should contain only one record for each registered voter in Texas. SUF ¶ 128. Each record is assigned a Voter Unique Identification Number ("VUID"), which may itself be associated with up to two other ID numbers. *Id.* Specifically, each VUID may be associated with (1) <u>one</u> number issued by the Texas Department of Public Safety ("DPS") on a driver's license, personal identification card, or election identification certificate (collectively, a "DPS number"), (2) <u>one</u> SSN4, (3) both a DPS number and an SSN4, or (4) neither number. *See* SUF ¶¶ 129–30.

## II.     Voting-by-Mail in Texas Generally

Texas authorizes several categories of voters to vote by mail. These include voters who are 65 years of age or older, disabled voters who cannot vote in person on Election Day "without the likelihood of needing personal assistance or injuring [their] health," voters absent from their home counties for the entire in-person voting period, and voters who expect to give birth near Election Day. SUF ¶ 17; TEC §§ 82.001–004, .007–.008.

A qualified voter seeking to obtain a mail ballot must first submit a signed application for a ballot by mail ("ABBM") to their county's early voting clerk. TEC §§ 84.001, 84.007. The ABBM includes "the applicant's name and the address at which the applicant is registered to vote," information demonstrating the voter's eligibility for a mail ballot, "an indication of each election for which the applicant is applying for a ballot," and a mailing address, if different from the address of registration. *See* TEC § 84.002.

If the early voting clerk determines that the application does not "fully comply with the applicable requirements," the clerk is generally required to mail the applicant a new application with a written notice that identifies the defects in the application and explains to the applicant how the defects may be corrected. *Id.* § 86.008. Upon receiving a timely and non-defective ABBM, the clerk sends the voter an official ballot by mail ("BBM"), a ballot envelope in which to place the ballot, and an official carrier envelope in which to place the ballot envelope. *Id.* §§ 86.001–002, .012–.013.

To vote by mail, a voter must then (1) place his BBM in the official ballot envelope, (2) seal the ballot envelope, (3) place the ballot envelope in the official carrier envelope, (4) seal the carrier envelope, (5) sign the certificate on the carrier envelope, and (6) return the ballot materials

to the early voting clerk, either by mail or common or contract carrier or in-person on election day, with an acceptable form of photo identification. *Id.* § 86.005–.06, .013.[7]

In every election, each county in Texas convenes an Early Voting Ballot Board ("EVBB"), which opens the carrier envelopes and determines whether to accept individual BBMs based on, *e.g.*, whether the voter's ABBM stated a legal ground for voting by mail and whether the signature on the carrier envelope matches the signature on the ABBM.[8] *Id.* § 87.041(b). An optional Signature Verification Committee ("SVC") may also be appointed to carry out the same functions. *Id.* §§ 87.027(a), (i).

At the direction of the Texas Legislature, the SOS has developed an online tool for tracking ABBMs and mail ballots, which "must . . . for each carrier envelope, record or assign a serially numbered and sequentially issued barcode or tracking number that is unique to each envelope." *See id.* § 86.015(c)(2) (the "Ballot Tracker"). Accordingly, carrier envelopes now bear a unique number that links them to an associated voter and their ABBM. Counties are responsible for entering the information used to track ABBMs and mail ballots into the Ballot Tracker.

## III.    S.B. 1's Identification-Number Requirements

S.B. 1's number-matching framework, codified in Sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14 of S.B. 1, superimposes a new requirement on the mail-in voting process, at both the application and voting stages. To have their ballots counted under S.B. 1, Texans voting absentee must write an ID number that matches an ID number in TEAM on both their ABBM and BBM materials.

---

[7] Military voters, military family members, and overseas citizens may also use a Federal Post Card Application to apply for a mail ballot and a Texas-issued signature sheet to accompany a mail ballot in lieu of a carrier envelope, both of which must comply with SB1's requirements. *See* TEC §§ 101.052(e), 101.057, 101.107; SUF ¶¶ 27, 48–49.
[8] The voter's ABBM and carrier envelope signatures may also be compared with other signatures on file with the county clerk or voter registrar. TEC §§ 87.027(i), 87.041(e).

At the application stage, Section 5.02 requires voters to write one of three pieces of information on their ABBM:

(1) the applicant's DPS number;

(2) if the applicant "has not been issued" a DPS number, his or her SSN4; or

(3) if the applicant lacks both a DPS ID number and an SSN4, a statement to that effect.

TEC § 84.002(a)(1-a). An applicant is permitted to use an expired DPS ID number, if the number is otherwise valid, for purposes of fulfilling these requirements. *Id.* § 84.002(b-1). To implement this new requirement, Section 5.03 of S.B. 1 directs the SOS to create a space for this information on its "officially prescribed" ABBM. TEC § 84.011(a), (a)(3-a); *see id.* § 31.002.

At the voting stage, Section 5.08 further requires that the carrier envelope in which the ballot envelope is mailed include a space, hidden from view when sealed, for the voter to enter the same identification number information required under Section 5.02. TEC § 86.002(g).

Under Sections 5.07 and 5.13 of S.B. 1, an ABBM or mail ballot must be rejected if the voter fails to provide a DPS number or SSN4 that identifies "the same voter identified on the applicant's application for voter registration." *See* TEC § 86.001(f) (codifying Section 5.07, which provides that early voting clerks "shall reject" mail ballot applications that do not include a matching ID number); TEC § 87.041(b)(8) (codifying Section 5.13, which establishes that a mail ballot "may be accepted only if" it includes a matching ID number).

Finally, S.B. 1 establishes notice-and-cure procedures for ABBMs and mail ballots that are rejected based on the number-matching requirements. Section 5.10 requires the SOS Ballot Tracker to "allow a voter to add or correct information" on her ABBM or carrier envelope as required by S.B. 1's matching-number requirement. TEC § 86.015(c)(4). Sections 5.12 and 5.14 amend the responsibilities of the EVBB (and any SVC, if appointed), to include notifying the voter

of any carrier envelope flagged for rejection for a variety of reasons, including pursuant to S.B.

1's number-matching requirement. *See* TEC §§ 87.0411; 87.0271.[9]

## IV.    Implementation of S.B. 1's Number-Matching Requirements

To implement S.B. 1's number-matching requirement at the application stage, the SOS

prepared an official ABBM with the following instructions:

> YOU MUST PROVIDE ONE of the following numbers. . . Texas Driver's License,
> Texas Personal Identification Number or Election Identification Certificate
> Number issued by the Department of Public Safety (NOT your voter registration
> VUID#) . . . If you do not have a Texas Driver's License, Texas Personal
> Identification Number or a Texas Election Identification Certificate Number, give
> the last 4 digits of your Social Security Number[.]

SUF ¶ 92; *see also* TEC § 84.011(a), (a)(3-a) (codifying Section 5.03's requirement that the SOS

create a space for this information on its "officially prescribed" ABBM.).

To implement S.B. 1's requirements at the voting stage, the SOS prepared a carrier

envelope with identical instructions under the flap of the envelope. SUF ¶ 93; TEC § 86.002(g).

(codifying Section 5.08's requirement that the carrier envelope in which the ballot envelope is

mailed include a space, hidden from view when sealed, for the voter to enter the same identification

number information required under Section 5.02).

Following S.B. 1's effective date, the SOS identified that incomplete records in the TEAM

system could interfere with the ability of many qualified voters to cast a mail ballot that would be

counted under the new requirements. SUF ¶ 131. As of January 3, 2023, nearly 190,000 Texas

---

[9] When initially enacted, Sections 5.12 and 5.14 instructed the SVC and EVBB, respectively, to determine within two business days of identifying a defect whether it would be possible for the voter to correct the defect and return the carrier envelope before polls closed on election day. If so, the SVC and EVBB had the option of returning the carrier envelope to the voter by mail or to the early-voting clerk, who could contact the voter directly. If not, Sections 5.12 and 5.14 authorized the SVC and EVBB to contact voters by telephone or e-mail and inform them of their options to either cancel their mail-in ballot and vote in person or to correct the carrier envelope in person at the early voting clerk's office within six days after the election. The Legislature has since enacted a provision, effective September 1, 2023, allowing the SVC and EVBB to mail back a corrective action form to the voter as opposed to the carrier envelope. Tex. S.B. 1599, 88th Legis., R.S., § 8, sec. 87.0271(b), 2023 Tex. Gen. Laws.

voters who have been issued DPS identification still lacked a DPS number in TEAM records, and more than 90,000 Texas registered voters had neither a DPS number nor a SSN4 affiliated with their voter registration record. SUF ¶¶ 140–41. In addition, roughly 2.4 million Texas voters have only one of their multiple DPS numbers in TEAM. SUF ¶ 142. The TEAM database also contains tens of thousands of errors, including over 60,000 DPS numbers inconsistent with DPS records and nearly 45,000 SSN4s inconsistencies between TEAM and DPS databases. SUF ¶¶ 143–44. In light of these inadequacies, both the SOS and county officials have directed duly registered and qualified Texas voters whose registration records are incomplete or erroneous for S.B. 1 purposes to submit new voter registration applications. SUF ¶ 105.

TEAM lacks records adequate to determine the number of ABBMs rejected statewide on account of S.B. 1. SUF ¶¶ 149, 151. Although the parties disagree about the precise number of ABBMs and mail ballots that have been rejected (and cured) since S.B. 1's effective date, it is undisputed that the total is in the thousands. *See, e.g.*, ECF No. 646 (State Opp. to OCA MSJ) (asserting that "nearly half of the 11,430 voters whose records indicated an initial rejection on SB 1 grounds were able to cure or vote in-person"). Data produced by Bexar County and Harris County alone document over 3,000 ABBM rejections in the November 2022 General Election for failure to meet S.B. 1 requirements, only about 1,200 of which were successfully cured. SUF ¶ 152(b)-(c). In the March 2022 primary election, more than 25,000 ballots were rejected statewide based on a mismatched or missing DPS numbers or SSN4s. SUF ¶¶ 153–54. In the November 2022 general election, S.B. 1 required officials across Texas to reject more than 11,000 mail ballots. SUF ¶ 161.

The individual experiences of voters and county officials illustrate S.B. 1's widespread effects. For example, in the 2022 primary election, Ms. Pam Gaskin, a 75-year-old voter who had

been registered to vote in Fort Bend County for over 40 years, had her ABBM rejected after she followed the form's instructions and submitted her Texas Driver License number, which she later learned was not in the voter registration database. SUF ¶¶ 180–81. And in the general election, Mr. Roberto Benavides, a 76-year-old voter in Travis County, attempted to respond to a notice of mail ballot rejection, but his efforts to cure were unsuccessful and his vote went uncounted. SUF ¶¶ 182–85. Local election officials eventually informed Mr. Benavides that the Texas Driver License number in his voter registration record contained a typo. SUF ¶ 184. County election officials reported voter confusion and frustration, including cases of voters discarding carrier envelopes that election officials had returned due to a failure to meet S.B. 1 requirements rather than taking additional steps to overcome the ballot rejection. SUF ¶¶ 99, 186.

In response to the pervasive confusion and rejection of ABBMs and mail ballots, election officials took action to mitigate S.B. 1's impact on voters. SUF ¶ 122. For example, although S.B. 1's text establishes a hierarchy of identification—with voters who have a DPS number being required to provide that number and only voters who lack a DPS number being permitted to provide a SSN4, *see* TEC §§ 84.002(a)(1-a), 86.002(g); SUF ¶¶ 32, 50—officials have accepted a SSN4 from voters with a DPS number on file. SUF ¶ 96. Similarly, state officials have recommended that voters provide both a DPS number and SSN4, and some counties have added inserts to mail voting materials with similar guidance. SUF ¶¶ 97, 123.

Election officials confirmed that the DPS numbers and SSN4s required by S.B. 1 are not used to ensure that voters are qualified to vote or to cast a mail ballot under Texas law, to identify voters, or to flag potential fraud. Keith Ingram, then serving as Director of the Elections Division of the SOS, acknowledged in a 2022 deposition that "individual eligibility criteria ha[ve] nothing to [d]o with the number." SUF ¶ 15. Nor do election officials ordinarily use these numbers to look

up voter records, and the SOS does not instruct them to do so. SUF ¶¶ 118–20. Rather, election officials look up voters using other information on mail ballot materials—such as the voter's name, date of birth, and address—just as they did before S.B. 1. SUF ¶ 120. Election officials must also verify a voter's identity using the signature by which the voter attests to identity and eligibility, just as they did before S.B. 1. TEC § 87.041(b)(2); SUF ¶ 65. Further, the SOS and county officials do not consider a DPS number or SSN4 mismatch or omission to be evidence of fraud. SUF ¶¶ 187–91. And because matching a DPS number or SSN4 against incomplete and erroneous voter registration records fails to identify some voters accurately, S.B. 1 requires election officials to reject mail ballot materials from voters who provided accurate information. SUF ¶¶ 34–36, 51, 92–94, 100–103, 131, 134–37, 139–46, 180–85.

## V.    Procedural History

Plaintiffs allege that S.B. 1's number-matching provisions violate Section 101 of the CRA because they require the rejection of vote-by-mail applications and mail ballot carrier envelopes based on errors or omissions that are not material to determining whether a person is qualified to vote under Texas law.

In November 2021, the United States filed an amended complaint, its operative pleading, against Texas and its Secretary of State ("SOS") in his official capacity, alleging that Sections 5.07 and 5.13 of S.B. 1 violate Section 101 of the CRA. ECF No. 131. Texas and the SOS filed a motion to dismiss claims of the United States in December 2021, *see* ECF No. 145, which the Court denied in all respects in May 2022. *La Union del Pueblo Entero v. Abbott ("LUPE (USA)")*, 604 F. Supp. 3d 512, 517 (W.D. Tex. 2022).

The OCA Plaintiffs filed their Second Amended Complaint in January 2022, asserting eight claims, including their Section 101 claim, against the Texas SOS and the Texas Attorney General

(together with Texas and the SOS, the "State Defendants"), in their official capacities, and several county officials in Travis County and Harris County.[10] ECF No. 200. The State Defendants moved to dismiss the OCA Plaintiffs' claims in February 2022. ECF No. 240. In August 2022, the Court entered an order, which, in relevant part, denied the State Defendants' motion with respect to the OCA Plaintiffs' claim under Section 101 of the CRA. *La Union del Pueblo Entero v. Abbott ("LUPE (OCA)")*, 618 F. Supp. 3d 388, 398 (W.D. Tex. 2022).

The OCA Plaintiffs and the United States both moved for summary judgment as to their Section 101 claims. *See* ECF No. 609 (DOJ MSJ); ECF No. 611 (OCA MSJ). Plaintiffs' motions are opposed by both the State Defendants and the Intervenor-Defendants—the Harris County Republican Party, the Dallas County Republican Party, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee (collectively, the "Committees" or the "Intervenor-Defendants"). *See* ECF No. 645 (State Opp. to DOJ MSJ); ECF No. 646 (State Opp. to OCA MSJ); ECF No. 634 (GOP Opp. to DOJ MSJ); ECF No. 635 (GOP Opp. to OCA MSJ). The Intervenor-Defendants also independently filed a cross-motion for partial summary judgment, asserting that the Section 101 claims brought by the United States and the OCA Plaintiffs fail as a matter of law.[11] *See* ECF No. 608 (GOP MSJ) at 13–23.

---

[10] The OCA Plaintiffs have also sued, in their official capacities, Travis County Clerk, Travis County District Attorney, Harris County Elections Administrator, and Harris County District Attorney. ECF No. 200 ¶¶ 48–51.

[11] The Committees first sought to intervene in this action in October 2021. ECF No. 57. The Court denied their motion, concluding that the Committees had not established a legally protectable interest at stake in this litigation or that the State Defendants' representation of their purported interests would be inadequate. *See* ECF No. 122 at 2–7. The Fifth Circuit reversed the Court's order concluding that the Committees' interest in S.B. 1's provisions concerning party-appointed poll watchers—an interest raised for the first time on appeal—warranted intervention. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022). In accordance with the Fifth Circuit's mandate, in May 2022, the Court granted the Committees' renewed motion to intervene. *See* Text Orders dated May 13, 2022 and May 18, 2022. It is not clear to the Court that the Committees' interest in the provisions applicable to *partisan* poll watchers establishes a commensurate interest in vote-by-mail procedures. Nonetheless, given that the State Defendants incorporate many of the Committees' arguments by reference in their responses to Plaintiffs' motions, the Court considers the Intervenor-Defendants' motion and briefing. The Intervenor-Defendants' briefing appears to universally misidentify S.B. 1's provisions requiring that ABBMs and BBMs be rejected for failure to satisfy the number-

In August 2023, in advance of the bench trial of this case scheduled for September 2023, the Court entered a summary ruling on the parties' motions for summary judgment as to Plaintiffs' Section 101 claims. *See* ECF No. 724. For the reasons stated in the Court's summary ruling and set out more fully in this memorandum opinion, the Court granted the United States' motion for summary judgment (ECF No. 609) in full and granted the OCA Plaintiffs' motion for summary judgment (ECF No. 611) with respect to their challenge to Section 5.07 of S.B. 1 only.

## LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden.

---

matching requirement as Sections 5.02 and 5.08. *See* ECF Nos. 608, 634, 635, 663. The Court construes the Intervenor-Defendants' arguments to apply to the correct provisions—Sections 5.07 and 5.13.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## DISCUSSION

To violate Section 101, a state law must (1) deny the right of any individual to "vote" in an election (as defined), (2) based on an "error or omission" on a "record or paper relating to any application, registration, or other act requisite to voting," (3) that is not "material in determining whether" that "individual is qualified under State law to vote in such election." 52 U.S.C. §

10101(a)(2)(B); *see also Migliori v. Cohen*, 36 F.4th 153, 162 & n.56 (3d Cir. 2022) (Section 101 violated when error or omission not material to state-law voter qualifications used as basis not to count mail ballot), *judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022);[12] *see also Pa. State Conf. of the NAACP v. Schmidt*, No. 1:22-cv-339, 2023 WL 3902954, at *5–7 (W.D. Pa. June 8, 2023) (rejecting nearly identical arguments by Intervenor-Defendants).

Because there is significant overlap among the parties' motions and accompanying responses, the Court will address their arguments bearing on Sections 5.07 and 5.13 of S.B. 1 and the proper scope of the Materiality Provision collectively. Before turning to the primary question presented in the parties' motions—the materiality of the number-matching requirement to voter qualifications—the Court will briefly address the relevance of certain summary judgment evidence and several issues specific to the OCA Plaintiffs.

## I.   Evidence of the Intent and Impact of the Number-Matching Requirements

As a preliminary matter, the Court observes that parties on both sides of this dispute have devoted dozens of pages of briefing to legislative intent and estimates of the past and future impact of the number-matching requirement on voters in Texas. To the extent that this evidence bears on the wisdom of the number-matching provisions, it is entirely irrelevant to the Court's analysis of Plaintiffs' Section 101 claims on the merits.[13] Unlike many other causes of action in the voting-

---

[12] In *Migliori*, a unanimous Third Circuit panel affirmed the application of the Materiality Provision in the mail ballot context and held that voters who had omitted an immaterial date on mail-ballot related paperwork must have their votes counted. 36 F.4th at 156–57. The candidate seeking to prevent qualified voters' votes from being counted sought a stay in the U.S. Supreme Court, which rejected the stay application over the dissent of three justices, in effect allowing the contested votes to be counted. *Ritter v. Migliori*, 142 S. Ct. 1824 (Mem) (2022). The Supreme Court vacated *Migliori* after the underlying dispute became moot. *See Ritter v. Migliori*, 143 S. Ct. 297 (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)). Despite this vacatur, the substantive analysis in *Migliori* remains convincing. *See Gutierrez v. Saenz*, 565 F. Supp. 3d 892, 903–04 (S.D. Tex. 2021); *see also, e.g., United States v. Ambriz*, 727 F.3d 378, 384 n.8 (5th Cir. 2013) (relying on "a case that was vacated for other reasons"); *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 427 (3d Cir. 2020) (relying on vacated opinion whose "prior analysis continues to resonate").

[13] Defendants lodge a number of objections in response to the Statement of Uncontested Facts attached to the United States' motion for summary judgment. *See* ECF No. 634 at 22–25 (GOP Opp. to DOJ MSJ); ECF No. 645-1 (State Response to SUF). Many of these "objections" constitute legal arguments in the guise of a factual dispute. *See, e.g.,*

rights context, the Materiality Provision is not a burden-interest balancing statute. Materiality Provision violations are prohibited no matter their policy aim.

For their part, the State Defendants and, to a lesser extent the Intervenor-Defendants, repeatedly direct the Court's attention to the purported purpose of the number-matching requirement—to prevent voter fraud. *See, e.g.*, ECF No. 646 at 4–13, 24–25, 27, 37. While Texas undoubtedly has an interest in deterring and preventing voter fraud, that interest must yield to a qualified voter's right, under Section 101 of the CRA, to have their ballot counted despite immaterial paperwork errors. *See Schwier v. Cox* (*Schwier II*), 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (rejecting contention that any information that "could help to prevent voter fraud" is material), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (adopting district court's reasoning); *Migliori*, 36 F.4th at 163 ("[W]hatever sort of fraud deterrence or prevention [a] requirement may serve," it is irrelevant under Materiality Provision if it is not material to determining voter qualifications); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1266, 1270 (W.D. Wash. 2022) (rejecting state's argument that number-matching voter registration scheme would help prevent voter fraud).

---

645-1 ¶ 105 (asserting that voters must provide a matching ID number in order to be "qualified" to vote by mail). Others, as discussed herein are simply irrelevant because they bear on disputes about the magnitude of harm caused by S.B. 1's number-matching requirements. *See, e.g.*, ECF No. 634 at 23–25. Others still object to statements in the SUF without proffering any contradictory evidence. *See* ECF No. 645-1 ¶ 104 (objecting to the use of the word "directed" to the extent that it implies the SOS's advisories or guidance have the force and effect of law or are in any way authoritative or binding); *id.* ¶¶ 119–20 (objecting to testimony by county election officials because the United States did not elicit testimony from officials in every county in Texas, without identifying any contrary testimony from any other election officials). Defendants' subjective disagreement with Plaintiffs' characterization of the evidence—or the SOS's guidance—does not create a genuine dispute of fact. Finally, while the State Defendants contend that the SUF is "incomplete," the addition of redundant or minimally relevant materials do not establish genuine issues for trial. *See, e.g.*, ECF No. 645-1 ¶¶ 7, 11–12, 21–22, 26–27, 31, 35–37, 41, 49, 58, 62–63, 67.

To the extent that the Court order does not rely on the United States' statements of fact, Defendants' objections are moot. To the extent that this order does rely on Plaintiffs' factual assertions, Defendants' objections are overruled because they have failed to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In short, none of the "factual disputes" identified in Defendants' briefing fail in turn to articulate disputes based on actual evidence that could "affect the outcome of the action" under the appropriate legal standard. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).

Likewise, all of the parties address the substantial measures that elections officials have taken to reduce S.B. 1's impact on voters, the adequacy (or inadequacy) of S.B. 1's cure provisions, and the relative rejection rates before and after S.B. 1's enactment and officials' various mitigation efforts. *See* ECF No. 609 at 10 (noting that S.B. 1 "continues to disenfranchise Texas voters at historic rates" and that the post-cure rejection rate of 2.7% in the November 2022 general election was "nearly three times the national average and well above historical rejection rates in Texas"); ECF No. 611 at 20–25 (identifying "massive increases in the number of rejected ABBMs and mail ballots" in elections after S.B. 1 and observing that, due to deficiencies in the cure process and "most voters whose ABBMs or ballots were rejected [based on S.B. 1] were not able to cure the issue and cast an effective vote"). The State Defendants assert that the Materiality Provision cannot demand "perfection," because "all systems are prone to some error." ECF No. 645 at 18. But this case has nothing to do with election officials' inadvertent rejection of ABBMs and mail ballots; Sections 5.07 and 5.13 of S.B. 1 *require* election officials to reject voting materials for failure to satisfy the number-matching provisions. The Defendant-Intervenors similarly insist that the Court should uphold the number-matching requirements because "the sky is not falling in Texas." ECF No. 634 at 25. But that is not the standard for relief under Section 101.

The magnitude of S.B. 1's impact is simply not relevant to the question of whether the number-matching provisions require election officials to disenfranchise voters for errors that are immaterial to their eligibility. The Materiality Provision does not demand that Plaintiffs satisfy a balancing test or demonstrate some threshold number of votes denied. *See* 52 U.S.C. § 10101(a)(2)(B). It is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many." *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *see also Migliori*, 36 F.4th at 158, 162–64 (finding Materiality Provision

violation where 257 of about 22,000 ballots rejected). The Court thus reserves any questions as to the burdens that S.B. 1's number matching requirements have imposed on voters and the likelihood of future harm to its analysis of Plaintiffs' claim for injunctive relief.

Nor will the Court consider the wisdom of any voting practices beyond the purview of this litigation, or the theoretical application of the Materiality Provision to those practices. Both the State Defendants and Defendant-Intervenors suggest that granting Plaintiffs' requested relief would have catastrophic consequences on voting in Texas and across the nation, enumerating a whole host of voting regulations that, in their view, would be "on the chopping block." *See, e.g.*, ECF No. 635 at 16 (addressing prohibitions on overvoting and signature requirements); ECF No. 645 at 7 (addressing ID requirements and signature-comparison procedures in other states). Although there are reasons to doubt that the Materiality Provision would invalidate the regulations cited in Defendants' briefing,[14] the mere existence of other voting requirements in Texas and elsewhere is simply irrelevant. Those requirements are not currently before the Court and have not, to the Court's knowledge, survived a Section 101 challenge in any forum with the authority to bind this Court.

## II.   The OCA Plaintiffs' Standing and Challenges to §§ 5.02, 5.03, 5.08, 5.10, 5.12–5.14

Before it can reach the merits of the OCA Plaintiffs' motion for partial summary judgment, the Court must be assured of its subject matter jurisdiction over their claims, including their standing to challenge S.B. 1's number-matching requirements.

---

[14] *See, e.g.*, ECF No. 637 at 30 (arguing that the Materiality Provision would not apply to prohibitions on overvoting ballot—marking it for too many candidates—because the voter's ballot would still be counted in that election, even though her ballot in that particular contest would be treated as unmarked, since election officials would be unable to determine the voter's preference).

### A.  The OCA Plaintiffs have standing to challenge the ID-matching requirements

The State Defendants do not meaningfully challenge the Article III standing of any of the OCA Plaintiffs, and largely recycle arguments from their motion to dismiss that have already been rejected. *See* ECF No. 646 at 51–55; ECF No. 448 at 49–50.[15] Indeed, in their response to the OCA Plaintiffs' motion for partial summary judgment, the State Defendants assert a single sentence that OCA Plaintiffs have not established associational standing "because there is a triable question of fact regarding their injury for many of the reasons described in State Defendant's motion to dismiss." ECF No. 646 at 55. As the OCA Plaintiffs point out, however, this argument ignores the factual evidence demonstrating associational standing raised in their motion and fails to satisfy the State Defendants' burden on summary judgment. *See* ECF No. 665 at 41 n.54. Nonetheless, given the OCA Plaintiffs' burden on summary judgment and the Court's duty to review its subject-matter jurisdiction, the Court will address the evidence offered in support of the OCA Plaintiffs' standing to challenge S.B. 1's number-matching provisions.

### 1.  Legal Standard

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

---

[15] The Court declines the State Defendants' and Intervenor-Defendants' invitations, to reverse its conclusion that the OCA Plaintiffs can challenge the number-matching provisions directly under both the private right of action created by Section 101 and 42 U.S.C. § 1983. *See* ECF No. 646 at 51–56, ECF No. 608 at 14 n.2 (suggesting that only the Attorney General has a right to sue under Section 101); *LUPE (OCA)*, 618 F. Supp. 3d at 434 ("[C]aselaw clearly establishes that organizations, like the OCA-GH Plaintiffs, have historically been able to enforce [Section 101].").A plaintiff proceeding under § 1983 need only show that the federal law includes a private right; after that, § 1983 presumptively supplies a remedy. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002). Indeed, the Supreme Court recently confirmed that the presumption cannot be rebutted merely by pointing to a parallel government enforcement scheme that allows suits by the Attorney General. Rather, "§ 1983 can play its textually prescribed role as a vehicle for enforcing [federal] rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not 'incompatible' with Congress's handiwork." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 189 (2023).

challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* On summary judgment, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" showing an injury resulting from the defendant's conduct, "which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting FED. R. CIV. P. 56(e)). Where multiple plaintiffs seek injunctive relief, only one needs to establish standing for each claim asserted. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

"[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury" for the self-evident reason that "injunctive and declaratory relief 'cannot conceivably remedy any past wrong.'" *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

To constitute an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 720–21 (citations omitted). The injury must be "imminent . . . to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* at 721 (quoting *Lujan*, 504 U.S. at 564 n.2). For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Nonetheless, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted). "This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Id.* (quotations omitted).

Juridical entities may establish standing under an associational or organizational theory of standing. *Id.* at 610.

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 836–37 (5th Cir. 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous.*, 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)). For example, an organization, like any other party, can satisfy the injury-in-fact requirement by demonstrating financial harm. *See, e.g.*, *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693 (5th Cir. 2011) (hospice care provider had standing to challenge federal regulation governing calculation of annual Medicare hospice provider cap by demonstrating financial harm it suffered through use of the regulation). An organization can likewise establish a likely future injury if it intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979).[16]

---

[16] *See also Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 439 (5th Cir. 2014) (charitable organizations had standing to challenge statute prohibiting their use of bingo proceeds for political

An organization can also demonstrate the requisite injury with evidence that its "ability to pursue its mission is 'perceptibly impaired' because it has 'diverted significant resources to counteract the defendant's conduct[.]'" *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (quoting *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)). But "an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct." *El Paso Cnty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020). "Rather, the Article III injury comes when that diversion of resources concretely and 'perceptibly impairs' the organization's ability to carry out its purpose. Put differently, the 'perceptible impairment' to an organization's ability to carry out its mission, not the 'drain on the organization's resources,' is the 'concrete and demonstrable injury' for organizational standing." *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) (citations and alteration marks omitted) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

## 2.   Analysis

Based on the summary judgment record, the Court concludes that at least one of the OCA Plaintiffs, REV-UP, has established associational standing.[17]

With respect to associational standing, it is undisputed that REV-UP is a membership organization and that it has members in Texas who vote by mail. *see* ECF No. 611 at 41.[18] It is

---

advocacy as an unconstitutional burden on their political speech); *S. Christian Leadership Conf. v. Sup. Ct. of State of La.*, 252 F.3d 781, 878–788 (5th Cir. 2001) (concluding that "at least some" of the plaintiffs—law students and faculty and community and student organizations—had standing to challenge a Louisiana Supreme Court rule restricting representation by student-practitioners because "[t]he operations of law-school clinics were directly regulated" and "[s]everal of the client organizations would be unable to obtain representation by the clinics"); *cf. Lujan*, 504 U.S. at 561–62 ("When the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

[17] Although only one of the OCA Plaintiffs must establish standing to assert a claim under Section 101, *see Rumsfeld*, 547 U.S. at 47, 52 n.2, it appears more likely than not that OCA-Greater Houston and LWVTX have standing on the same bases, *see* ECF No. 611 at 32–37 (LWVTX); *id.* at 38–41 (OCA-Greater Houston).

[18] As the Supreme Court recently clarified, the burden of establishing the requirement for "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the

also undisputed that REV-UP members had their ABBMs and/or mail ballots rejected based on S.B. 1's number matching requirement and are at risk of having their voting materials rejected again on the same basis in future elections. *See id.* at 44–45 (describing Teri Saltzman a legally blind voter in Travis County whose March 2022 ABBM and mail ballot and November 2022 mail ballot were rejected based on the number-matching requirement). REV-UP has also presented undisputed evidence that its members have been deterred from voting by mail out of fear that their ABBMs or mail ballots will be rejected due to S.B. 1's matching-number requirement. *See id.* at 44–45. These are sufficient injuries to confer Article III standing. *See, e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing," as is requiring a registered voter to obtain a photo identification, irrespective of how easy it may be to comply with that requirement); *Stringer v. Hughes*, Nos. SA-20-CV-46-OG, SA-16-CV-257-OG, 2020 WL 6875182, at *9 (W.D. Tex. Aug. 28, 2020) (violation of federal statutory right to simultaneously apply for voter registration and driver's license constituted injury "regardless of whether the individual plaintiffs have been registered to vote by alternative means").

Thus, these individual members would have independent standing to challenge the number-matching provisions under Section 101 because they have suffered an injury-in-fact; the harm they have suffered is fairly traceable to the number-matching provisions of S.B. 1 requiring the rejection of certain voting materials; and the injunctive relief requested by the OCA Plaintiffs—barring enforcement of the number-matching requirements—would redress their harm. *Spokeo*, 578 U.S. at 338 (2016).

---

organization operates." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023).

With respect to the second element of associational standing, the interests REV-UP seeks to protect by challenging S.B. 1's number matching requirements are undoubtedly germane to its mission "to empower persons with disabilities through voter registration and assistance, issue advocacy, mobilization, and organizing." ECF No. 611 at 41; *see La Union del Pueblo Entero v. Abbott ("LUPE")*, 614 F. Supp. 3d 509, 526 (W.D. Tex. 2022).

Finally, REV-UP's claims do not require the participation of its members. This "prong of the associational standing test" focuses on "matters of administrative convenience and efficiency," *Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996), and is "solely prudential," *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). The OCA Plaintiffs' claims "can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry," *Tex. Med. Bd.*, 627 F.3d at 552, and there is no question that it is "more administratively convenient and efficient to assert such a challenge in a representative capacity." *LUPE*, 614 F. Supp. 3d at 527.

The Court concludes that the OCA Plaintiffs have met their initial burden on summary judgment with respect to REV-UP's associational standing to assert its Section 101 claim on behalf of its members. Thus, Defendants must either set forth facts to create a material issue or specifically demonstrate why, under the undisputed material facts, the OCA Plaintiffs are not entitled to summary judgment; they cannot simply assert that an issue remains. *Celotex*, 477 U.S. at 322 (1986) (Rule 56(e) of the Federal Rules of Civil Procedure "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial" (cleaned up)). That burden is not discharged by "mere allegations or denials." *Id.* at 322 n.3; FED. R. CIV. P. 56(e). Defendants have failed to discharge their burden.

Accordingly, the Court concludes that there is no genuine dispute of material fact as to the OCA Plaintiffs' standing to challenge S.B. 1's number-matching framework under the Materiality Provision, and turns to the merits of the OCA Plaintiffs' claims.

### B.  Challenges to §§ 5.02, 5.03, 5.08, 5.10, and 5.12–5.14

Although the OCA Plaintiffs have standing to challenge the number-matching framework generally, their motion for partial summary judgment as to their Section 101 claim must be denied to the extent that it challenges Sections 5.02, 5.03, 5.08, 5.10, 5.12, 5.13, and 5.14 of S.B. 1, for both procedural and substantive reasons.

Procedurally, the OCA Plaintiffs failed to raise any challenges to Sections 5.08, 5.13, and 5.14 in their Second Amended Complaint. *See* ECF No. 200 ¶ 646. *See Solferini as Tr. of Corradi S.p.A. v. Corradi USA, Inc.*, No. 20-40645, 2021 WL 3619905, at *2 (5th Cir. Aug. 13, 2021) (determining that a movant was precluded from raising a claim at the summary judgment stage when he failed to plead that claim in his complaint).

Regardless of any procedural error, the OCA Plaintiffs' challenges to Sections 5.02, 5.03, 5.08, 5.10, 5.12, and 5.14 of S.B. 1 fail on the merits because none of those provisions require that mail-in ballot applications or mail-in ballots be rejected on any basis. Rather, those provisions merely address the procedures for collecting, tracking, and correcting the relevant identification numbers. *See* TEC §§ 84.002(a)(1-a), 84.011(a), (a)(3-a), 86.002(g), 86.015(c)(4), 87.0411, 87.0271. The Materiality Provision only prohibits actions that "*deny* the right of any individual to vote in any election because of an error or omission on any record or paper[.]" 52 U.S.C. § 10101(a)(2)(B) (emphasis added). It does not, as the State Defendants correctly point out, prevent Texas from otherwise prescribing the form of ballot materials or collecting and reviewing information that may be immaterial to voter eligibility. *See* ECF No. 646 at 47. Indeed, the OCA

Plaintiff's Second Amended Complaint explicitly concedes that "the State may legally request this information from voters (for example, as an optional data point that would prevent the need for a signature review)." ECF No. 200 at 45.

The OCA Plaintiffs nonetheless seek to enjoin these provisions because, even if they do not require election officials to reject any voting materials, they "contribute to the implementation and enforcement of SB 1's matching-number requirement." ECF No. 665 at 37. But these provisions cannot violate the materiality provision because they do not require the rejection of any voting materials. To extent that the OCA Plaintiffs challenge those provisions as unduly burdensome and confusing to voters, the Court does not dispute that being deterred from voting by mail is a harm, or even a legally cognizable harm, but because "deterrence" does not constitute a "denial" based on an "error or omission," the Materiality Provision is simply not the appropriate vehicle for such a claim.

## III. Plaintiffs' Challenges to Sections 5.07 and 5.13

### A. Whether the ID numbers in TEAM are material to voter qualifications

The Court must determine at the outset whether a voter's ability to provide the ID number associated with her voter registration record is material to her qualification to vote in a given election. It is not.

The State Defendants tautologically argue that "Texas law deems [ID] numbers material; therefore, they are material." ECF No. 646 at 30–33. As the OCA Plaintiffs point out, "[t]his logic would erase the Materiality Provision from existence, by defining *whatever* requirements might be imposed by state law in order to vote, no matter how trivial, as being 'material in determining whether such individual is qualified under State law to vote in such election.'" ECF No. 665 at 24 (citing 52 U.S.C. § 10101(a)(2)(B) and *United States v. Mississippi*, 380 U.S. 128, 137–38 (1965)

(phrase "otherwise qualified by law" in Section 10101(a)(1) cannot include invalid statutes; Congress "obviously" meant "qualifications required of all voters by valid state or federal laws")).

To determine whether an error or omission is material, the information required must be compared to state-law qualifications to vote. *See Migliori*, 36 F.4th at 162; *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308–09 (N.D. Ga. 2018). Qualifications are substantive voter attributes. *See, e.g.*, *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51 (1959) (residence, age, criminal record); TEC § 11.002(a) (age, citizenship, mental capacity, criminal record, residence, and prior registration). They are distinct from rules governing the conduct of elections, including the manner of determining qualifications. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13–17 (2013); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966) (distinguishing qualifications and compliance with poll tax).

It is self-evident that a voter's ID number is not material to her eligibility to vote under Texas law. Indeed, by itself, a voter's DPS number or SSN4 cannot offer any information about a voter's substantive eligibility to vote—or even to vote by mail—in the state of Texas because those numbers are static. For example, a person's SSN4 does not change when he turns 18, registers to vote, moves into or out of the state of Texas, is convicted of a felony or judged mentally incompetent, or even dies, even though all of those factors bear on his eligibility to vote in Texas. Nor does a person's SSN4 change when she turns 65, becomes disabled, changes her travel plans, or suffers a miscarriage, even though all of those factors could impact her eligibility to vote by mail in Texas.

Further, the text of S.B. 1 itself acknowledges that even *possession* of a DPS number or SSN4 is immaterial to voter eligibility by permitting applicants and voters to represent on their ABBMs and BBMs that they have "not been issued [such] a number." *See* S.B. 1 §§ 5.02, 5.08;

TEC § 84.002(a)(1-a). The presumably tiny fraction of Texas residents who fall into this category are not disqualified from voting on this basis. Nor are the over 90,000 voters registered in Texas who, regardless of whether they have been issued a DPS number or SSN4, have neither ID number associated with their TEAM record. *See* SUF ¶¶ 140–41. Those voters presumably have neither ID number associated with their TEAM record because they registered to vote before 2004, when Texas began requiring a DPS number or SSN4 on its voter registration form in compliance with HAVA.[19]

Not even HAVA's ID number requirement renders the relevant DPS numbers or SSN4s "material" to voter qualifications.[20] To begin, HAVA did not direct states to purge all existing voters from state rolls and force them to re-register in accordance with the new federal requirements.[21] Indeed, HAVA does not even require states to *implement* a registration process. *See* 52 U.S.C. § 21083(a)(1)(B) (exempting states without voter registration requirements from HAVA's ID number and database provisions).[22] And, as with S.B. 1, HAVA does not prohibit individuals who do not possess a state ID number or SSN4 from registering to vote, but rather directs states to assign those voters unique identification numbers. As a result, even following HAVA, thousands of qualified voters have neither a DPS number nor an SSN4 associated with their TEAM record. SUF ¶ 141 (indicating that, as of January 2023, over 90,000 Texas registered

---

[19] Given the number of errors in the TEAM database, a voter's ability to correctly guess the incorrectly recorded version of their ID number could hardly be considered material to either their eligibility to vote or their identity.

[20] HAVA's ID requirements apply "notwithstanding any other provision of law," which avoids any potential conflict with Section 101. *Id.* § 21083(a)(5)(A)(i); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1174, (11th Cir. 2008); 52 U.S.C. § 21145(a) (omitting the Civil Rights Act of 1964 from list of laws not to be superseded by HAVA).

[21] Such a requirement would almost certainly violate the constitution. *See, e.g.*, *Beare v. Smith*, 321 F. Supp. 1100, 1103 (S.D. Tex. 1971) (concluding that Texas's annual voter registration requirement amounted to an unconstitutional poll tax in violation of the Equal Protection Clause of the Fourteenth Amendment).

[22] *See also Browning*, 522 F.3d at 1183 n.17 (Barkett, J., dissenting in part) ("The [ID number] information also cannot be *per se* material if a state such as North Dakota is allowed to hold federal elections without any registration requirements.").

voters had neither a DPS number nor a SSN4 affiliated with their voter registration record). Thus, having a DPS number or SSN4 associated with one's registration record cannot be material to voter *eligibility*.

For the argument that HAVA renders ID numbers *per se* material to voter eligibility, the State Defendants rely on the majority opinion in *Florida State Conf. of N.A.A.C.P. v. Browning*, which concluded:

> The fact that HAVA section 303(a) requires states to obtain the applicant's identification numbers before accepting a registration application and also to "determine whether the information provided . . . is sufficient to meet [that] requirement[ ]" indicates that Congress deemed the identification numbers material to determining eligibility to register and to vote.

522 F.3d 1153, 1174 (11th Cir. 2008). The Court is neither bound nor persuaded by this reasoning, which is undermined by the text of HAVA itself.

As the concurrence in *Browning* and at least one other court have pointed out, HAVA does not require states to verify the accuracy of an applicant's identifying number before registration:

> If a state is not required to verify an applicant's identifying number, then HAVA does not automatically make such information material because an individual in a state without a matching scheme could provide her driver's license or social security number and even though she may have transposed two numbers of her application, that immaterial error would not prevent her from voting in that state. Furthermore, the information cannot be *per se* material because HAVA provides for the assignment of a unique identifying number, which does not have to be matched, for those individuals who do not have a driver's license or social security number.

*Browning*, 522 F.3d at 1183 n.17 (Barkett, J., dissenting in part); *see also Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1268–69 ("It is clear from the language of the statute and by looking at legislative history that HAVA's matching requirement was intended as an administrative safeguard for 'storing and managing the official list of registered voters,' and not as a restriction on voter eligibility. This is evidenced by the requirement that a person who has no driver's license or social

security number be given a unique identifying number, but not be matched, prior to registering to vote.") (citations omitted). Texas's failure to verify the validity of the ID numbers provided on voters' original registration forms is manifest in the thousands of errors in TEAM. As a matter of common sense, a qualified voter's ability to correctly guess the incorrect DPS number associated with her voter registration record in TEAM cannot be material to her eligibility to vote.

Whatever the force of the *Browning* panel's decision with respect to the materiality of providing (or being assigned) an ID number upon registration, that is not what is at issue in this case. Voters who seek to vote by mail in Texas have already complied with HAVA and the Texas Election Code when they registered to vote. SB 1's matching-number requirement superfluously duplicates HAVA's registration-stage requirement to *provide* an ID number at *both* the ABBM and mail ballot stages, and it then *also* requires the number to match the voter's file in the TEAM database, which is riddled with errors.

The State Defendants assert that the ID number requirement is material to voter eligibility because it confirms the identity of the voter and that the person casting the ballot is in fact the registered voter.[23] ECF No. 645 at 15–22. Here again, the State Defendants have confused voters'

---

[23] The State Defendants suggest that S.B. 1's number-matching requirement constitutes a "decision to bring mail-in voting into conformity with requirements already employed for in-person voting: that voters offer proof of identification by means of a government issued ID." ECF No. 645 at 5. S.B. 1, they argue ,"requires voters to provide a number that identifies them in a similar way a photo ID would identify them if they appeared in person because it is unique to them, and that for reasons unrelated to voting is unlikely in anyone else's possession." *Id.* at 17. The comparison to in-person voter ID requirements is inapt.

Under Texas law, voters who cast a ballot in person can provide one of seven forms of photo ID. TEC § 63.0101(a) (enumerating the following acceptable forms of photo IDs: a U.S. military ID card, a U.S. passport book or card, a U.S. citizenship certificate, and a driver's license, personal ID card, election ID certificate, or handgun license issued by the Texas DPS). A voter can provide an expired photo ID, so long as it has not been expired for over four years. *Id.* In addition, a voter who does not possess and cannot reasonably obtain an acceptable photo ID can still cast a ballot by filling out a declaration at the polls and providing one of seven alternative supporting forms of ID. *See id.* § 63.0101(b) (voter may alternatively provide a current utility bill, bank statement, government check, paycheck, birth certificate, or any other government document showing the voter's name and address).

Any of these forms of identification will suffice for in-person voters, regardless of the specific ID number associated with their TEAM records. S.B. 1, on the other hand, requires absentee voters to recall and produce the very same identification number(s) they provided on a registration form months or years earlier—assuming that the numbers were correctly recorded in TEAM. S.B. 1 not only permits voters to provide expired DPS numbers but *requires* voters

substantive qualifications with the methodology for identifying voters in order to administer an election. *See* 52 U.S.C. §§ 20504(c)(2)(B)(ii), 20508(b)(1) (distinguishing between information necessary "to enable the appropriate State election official to assess the eligibility of the applicant" and information needed "to administer voter registration"); *see also* Tex. Const. art. 6, § 2(a) (defining "qualified voter"), and "The Times, Places and Manner of holding Elections," U.S. Const. art. I, § 4 cl. 1; *see also* Tex. Const. art. 3, § 27 (permitting regulation of elections by law).

As a practical matter, the undisputed evidence confirms that election officials do *not* use the ID numbers on ABBMs and BBMs to confirm voters' identities but to reject their voting materials. While he was serving as the Director of the Elections Division of the Texas SOS, Keith Ingram acknowledged that "individual eligibility criteria ha[ve] nothing to [d]o with the number."[24] SUF ¶ 15. The Travis County Clerk further testified that Travis County is "able to associate [an ABBM] applicant with their voter even in the absence" of an identification number, because they "have to look up [the voter's] file to see if [the voter] ha[s] a number in the first place*." See* ECF No. 611-1, Ex. 18, Charlie Johson Dep. at 28:19–29:2. This is logical—to compare the DPS number or SSN4 on mail ballot materials with a voter's registration record, as S.B. 1 requires, officials must have already discerned the identity of the voter "identified on the applicant's application for voter registration" or "the voter's application for voter registration."[25] TEC §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 119–20.

---

to provide an expired DPS number whenever their TEAM record contains an expired number. *Cf.* SUF ¶ 142 (noting that roughly 2.4 million Texas voters have only one of their multiple DPS numbers in TEAM).

Thus, the proper analogy in the in-person voting context would be requiring in-person voters to search their closets, filing cabinets, and couch cushions for the long-expired, possibly misplaced, photo ID that happened to be in their possession when they registered to vote (perhaps decades earlier) or else be turned away at the polls.

[24] In *Migliori*, the Third Circuit considered a similar statement from the Pennsylvania Deputy Secretary for Elections & Commissions that the date on the carrier envelope "[was] not used 'to determine the eligibility' (i.e., qualifications) of a voter." *Migliori*, 36 F.4th at 164. "This, without more," the panel concluded, "slams the door shut on any argument that this date is material." *Id.*

[25] The State Defendants insist that the ID numbers could be used to distinguish between two individuals with similar names and personal information, such as a "junior" and "senior" living in the same household. *See* ECF No. 645 at

Similarly, even if the Court were to conclude that S.B. 1's matching-number requirement does not violate Section 101 at the ABBM stage, the duplicative requirement that a voter who has successfully obtained a mail ballot by matching the ID number on their ABBM to their voter file must do so *again* on the carrier envelope to have their vote counted would still be unlawful. After all, the provision of the ballot itself indicates that the voter has already been identified and found qualified by an election official. *See Martin*, 347 F. Supp. 3d. at 1309 (enjoining requirement that voters hand-write their birth year on absentee ballot because "the qualifications of the absentee voters" were "not at issue because [county] elections officials have already confirmed such voters' eligibility through the absentee ballot application process"); *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021) (state law requiring absentee voters to submit duplicative information at mail-ballot stage, after voters had already correctly provided the information at the application stage, under threat of being disenfranchised on the basis of a mismatch or omission, gave rise to a materiality violation).

Once election officials have determined an applicant or voter's identity, additional requirements that confirm identity are not material to determining whether the applicant or voter is qualified to vote or vote by mail and compounds the chance for error and disenfranchisement. *See Schwier v. Cox (Schwier I)*, 340 F.3d 1284, 1294 (11th Cir. 2003). Section 101 does not permit

---

17–18. But Plaintiffs do not dispute that the ID numbers can be *useful* in affirmatively identifying voters. *See* ECF No. 200 at 45 (conceding that "the State may legally request this information from voters (for example, as an optional data point that would prevent the need for a signature review)"). Rather, they challenge S.B. 1's ability to accurately and reliably exclude voters as unqualified for failing to satisfy the ID-matching requirement. Furthermore, even after S.B. 1, election officials continued to rely on other, publicly available information (also provided on the ABBM) to confirm voters' identities. For example, Mr. Ingram testified that, under S.B. 1, a county clerk can provide a voter with her ID number on file so long as the voter validates their identity by providing "information that would be in their voter record," like "name, date of birth, [and] address," all of which were required on ABBMs before S.B. 1. ECF No. 611-1 at 435–36 (Ex. 20, Ingram Dep. at 104:21–105:10). Likewise, an Election Advisory from the SOS instructs county officials to "confirm the voter's identity using publicly available information" in carrying out the cure processes, *i.e.*, without the use of ID numbers, *id.* at 1155 (Ex. 70, Election Advisory No. 2022-08). In short, the State Defendants' assertion that DPS numbers and SSN4s *could* be used to help confirm a voter's identity does not create a genuine dispute of fact as to whether the ID numbers are required to confirm a voter's eligibility.

state actors to require voters to recite redundant information that confirms a known identity, even as a prophylactic against voter impersonation. *See Schwier II*, 412 F. Supp. 2d at 1276 (rejecting contention that any information that "could help to prevent voter fraud" is material to qualifications). Thus, courts have found a wide range of information—such as a driver's license number matching state records, *Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1266, 1270; a social security number, *Schwier v. Cox* (*Schwier III*), 439 F.3d 1285, 1286 (11th Cir. 2006) (mem. op.); or a birth year on an absentee ballot envelope, *Martin*, 347 F. Supp. 3d at 1308–09—not to be material to determining a voter's qualifications, even though this information could conceivably confirm a voter's identity.

Thus, the Court concludes as a matter of law that a voter's ability to provide the ID number associated with her voter registration record on TEAM is not material to her voter qualifications under Texas law.

### B.  Whether Section 101's protections extend to S.B. 1's mail-in voting process

The State Defendants and Intervenor-Defendants maintain that Sections 5.07 and 5.13 do not even *implicate* the Materiality Provision because they govern the procedures for requesting and casting a mail-in ballot rather than voter registration. *See* ECF No. 608 at 13–23; ECF No. 634 at 15–18; ECF No. 635 at 13–17; ECF No. 645 at 11–12 (incorporating by reference the arguments in Intervenor-Defendant's MSJ); ECF No. 646 at 29–30 (same). The Materiality Provision, they argue, prohibits states from refusing to register voters *during the voter-registration process* based on violations of rules that seek information immaterial to assessing state-law voter qualifications.

Here, Defendants seek to reassert an argument already rejected in the Court's order denying the State Defendants' motion to dismiss the United States' materiality claim:

> [T]he preparation and submission of an application to vote by mail, as well as the preparation and submission of a mail ballot carrier envelope, are actions that voters

must take in order to make their votes effective. Section 101, as a result, does not only apply when a voter is absolutely prohibited from voting. It also reaches the actions contemplated under sections 5.07 and 5.13.

*LUPE (USA)*, 604 F. Supp. 3d at 541.

Intervenor-Defendants nonetheless argue that their construction is supported by the canon of *ejusdem generis*, which provides that "where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980). Intervenor-Defendants contend that the terms "application" and "registration" relate to an initial qualification determination, and that the term "other act requisite to voting" must "therefore refer[] only to the functional equivalents of 'application' and 'registration'—i.e., the initial processes to assess voter qualifications." ECF No. 608 at 20. Not so.

The CRA's capacious definition of "vote" easily dispenses with the Intervenor-Defendants' position that "all evidence indicates . . . that Congress was concerned with registration when it passed the materiality provision, not other stages of the electoral process." ECF No. 663 at 19. If Section 101 was intended only to protect qualified voters' right to *register* and be added to the voter rolls and not their right to actually cast a ballot and have it counted, Congress could have said so. It did just the opposite: the statute protects an individual's right to *vote*, broadly defined to include "*all action necessary* to make a vote effective including, . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes." 52 U.S.C. §§ 10101(a)(2)(B), (a)(3)(A) (emphasis added).

The text of the Materiality Provision further confirms that the "right to vote" is evaluated on an election-by-election basis. It protects a qualified individual's right to vote "*in any election*" regardless of paperwork errors that are immaterial to their qualification to vote "*in such election*."

52 U.S.C. § 10101(a)(2)(B) (emphasis added). In other words, denying the statutory right to vote based on an error or omission that disqualifies a voter from only a *single* election violates Section 101. This language cannot reasonably be interpreted to mean Congress forbade denying the right to vote only for errors that affect whether the voter is qualified "to register," or to vote "in elections generally." Section 101 prohibits denial of the right to vote in a single election just as thoroughly as it prohibits wholesale refusal to register a voter. *Cf. Migliori*, 36 F.4th at 163 ("[M]ateriality is limited to errors or omissions determining qualification 'to vote in *such* election,' not future elections.").

More importantly, canons of construction such as *ejusdem generis* are applied only to resolve ambiguity, not create it. *See Harrison*, 446 U.S. at 588 (citing *United States v. Powell*, 423 U.S. 87, 91 (1975)). Congress's use of the phrase "any other" when introducing a broadening provision is "expansive language" that "offers no indication whatever that Congress intended [a] limiting construction" of the general phrase constrained by more specific preceding examples. *Harrison*, 446 U.S. at 589.[26] And the Supreme Court has counseled that courts should not "woodenly apply limiting principles every time Congress includes a specific example along with a general phrase," In any event, we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase. *Ali v. Fed. Bureau of Prisons,* 552 U.S.

---

[26] In *Harrison*, the Supreme Court declined to apply a narrowing construction to § 307(b)(1) of the Environmental Protection Act, providing for direct review by a federal court of appeals of administrative actions under several specifically enumerated provisions of the Act and of "any other final action" of the Administrator. 446 U.S. at 587–92. The Court declined to apply the canon of *ejusdem generis* because there was "no uncertainty in the meaning of the phrase, 'any other final action'."

> When Congress amended the provision in 1977, it expanded its ambit to include not simply "other final action," but rather "any other final action." This expansive language offers no indication whatever that Congress intended the limiting construction of § 307(b)(1) that the respondents now urge. Accordingly, we think it inappropriate to apply the rule of ejusdem generis in construing § 307(b)(1). Rather, we agree with the petitioners that the phrase, "any other final action," in the absence of legislative history to the contrary, must be construed to mean exactly what it says, namely, any other final action.

*Id.* at 588–89.

214, 227 (2008). The Court does not find any uncertainty in the phrase "other act requisite to voting" and concludes that the phrase encompasses the completion of both ABBMs and the carrier envelopes. An ABBM is an "application" "requisite to voting" for most individuals who seek to cast a mail ballot. *See* TEC § 84.001(a); SUF ¶ 36. Similarly, preparation of a carrier envelope[27] is "an act requisite to voting" for individuals who cast a mail ballot. *See* TEC §§ 86.005(c), 86.006, 101.057, 101.107; SUF ¶¶ 48, 63, 70.

In support of their position that the Materiality Provision should be limited to the registration stage, the Intervenor-Defendants rely on statements in two non-binding, non-precedential opinions. *See, e.g.*, ECF No. 608 at 17 (citing *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay) and *Vote.org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) (stay opinion)). The motions panel in *Vote.org* suggested in a footnote that "[a] plausible argument can be made that [Section 101] is tied to only voter registration specifically and not to all acts that constitute casting a ballot." 39 F.4th at 305 n.6. The panel relied on reasoning in Justice Alito's reasoning in dissent, that even after qualifying and registering, a voter who "does not follow the rules" may be unable to cast a vote for "any number of reasons":

> A voter may go to the polling place on the wrong day or after the polls have closed. A voter may go to the wrong polling place and may not have time to reach the right place before it is too late. A voter who casts a mail-in ballot may send it to the wrong address.

*Ritter*, 142 S. Ct. at 1825 (Alto, J., dissenting). Thus, the panel reasoned, "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" the Materiality Provision. (5th Cir. 2022)*.* And that is literally correct: only refusals to count a voter's ballot for *immaterial errors on voting-related paperwork* are actionable under the statute's plain terms.

---

[27] Or, with respect to military and overseas voters, a signature sheet.

It is not clear to the Court how any of the errors cited by the motions panel—going to the wrong polling place, sending a ballot to the wrong address, or failing to cast an in-person or mail ballot by the relevant deadline—constitutes an "error or omission" on "any paper or record" that would fall within the scope of the Materiality Provision. *See Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 55 (S.D.N.Y. 2022) (distinguishing between errors regarding a voter's assigned polling place and errors "on any record or paper"); *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1372–73 (S.D. Fla. 2004) (declining to issue an injunction under Section 101 requiring counting of absentee ballots received after a deadline, noting that this was not an error or omission "on any record or paper"). fMore importantly, none of those provisions are at issue in this litigation.

Finally, at odds with the plain text, Intervenor-Defendants insist that the Materiality Provision must be limited to voter registration to avoid constitutional problems, because Congress sought with the Materiality Provision to prevent "racially discriminatory practices in *voter registration*." ECF No. 608 at 15–16; *see also id.* at 7–8. In enacting Section 101, Congress considered "the practice of requiring unnecessary information for voter registration"—such as listing the registrant's "exact number of months and days in his age"—"with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." ECF No. 608 at 14 (citing *Schwier I*, 340 F.3d at 1294)*.* "Such trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants." *Browning*, 522 F.3d at 1173; *see* H.R. Rep. No. 88-914, pt. 2, at 5 (1963) ("[R]egistrars [would] overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting" an African-American's application "for the same or more trivial reasons."). The Intervenor-Defendants'

argument—that Section 101 is limited to voter registration because Congress considered discrimination in the registration process—fails, for at least two reasons.

First, because the language of the Materiality Provisions is unambiguous, neither the canon of constitutional avoidance nor legislative history can defeat the text. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 494 (2001) ("[T]he canon of constitutional avoidance has no application in the absence of statutory ambiguity."); *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1750 (2020) ("[L]egislative history can never defeat unambiguous statutory text[.]"). Even assuming that Congress intended to limit the Materiality Provision to errors and omissions at the registration stage, the text simply does not permit that construction. The Supreme Court has counseled that, "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock*, 140 S. Ct. at 1737; *see also id.* ("Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result. . . . But the limits of the drafters' imagination supply no reason to ignore the law's demands.").[28] "Ours is a society of written laws. Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations." *Id.* at 1754.

Second, in addition to its power to regulate federal elections under the Elections Clause, U.S. Const. art. I, § 4, the Reconstruction Amendments authorize Congress to enact prophylactic legislation to protect the right to vote in particular, as the Supreme Court has repeatedly confirmed. *E.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (noting the validity of Congress's "suspension of literacy tests and similar voting requirements" as well as "other measures protecting

---

[28] Likewise, with respect to the CRA's expansive definition of "voting," the Supreme Court has explained that, "[w]hen a statute includes an explicit definition of a term, [courts] must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020)) (internal quotation marks omitted).

voting rights" and collecting cases). When legislating pursuant to its Fifteenth Amendment powers, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966).

While Congress surely intended to prevent abuses in the voter registration process, *see, e.g.*, *Schwier I*, 340 F.3d at 1294, nothing in Section 101's statutory language nor its legislative purpose indicates that Congress chose to *allow* them at other stages in the process between voter registration and completing all legal requirements requisite to voting an effective ballot.[29] Indeed, a rule protecting voter *registration* only, but allowing registered voters to still be denied an *effective* vote based on irrelevant paperwork errors, would not have accomplished Congress' broader, well-documented aim of eradicating all manner of arbitrary and discriminatory denials of the right to vote. *E.g.*, H.R. Rep. No. 88-914 (1963), *reprinted at* 1964 U.S.C.C.A.N. 2391, 2394, 2485–87, 2491. Thus, Congress used expansive language in crafting a prophylactic rule that protects "the right of any individual to vote in any election" and that extends to "all action necessary to make a vote effective." 52 U.S.C. §§ 10101(a)(2)(B) & (e). The broad definition of the "right to vote" further undermines Intervenor-Defendants' position. It would not make sense for Congress to capaciously define the right to vote to include all actions necessary to render a vote effective but limit the application of the statute's protections to the initial act of *registering* to vote.

The "rational means" of combatting racial discrimination in voting is not limited to solving a problem—disenfranchisement based on immaterial errors on voting paperwork—on a form-by-form basis. Indeed, Congress's enactment of a broader rule is entirely rational: after identifying a

---

[29] In general, courts should not construe statutes based on what Congress failed to say in legislative history. *See Harrison*, 446 U.S. at 591–92 ("The respondents also rely on what the Committee and the Congress did *not* say about the 1977 amendments to § 307(b)(1). . . . [But] it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute. In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark.").

record of a problem at the registration stage, Congress was not limited to crafting a solution with an obvious loophole allowing officials to use forms at later stages in the same way, and for the same purpose. *See Katzenbach*, 383 U.S. at 309 (describing "voluminous legislative history" addressing "unremitting and ingenious defiance of the Constitution"); *Browning*, 522 F.3d at 1173 ("[W]e recognize that Congress in combating specific evils might choose a broader remedy. . . . The text of the [Materiality Provision], and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning congressional intent."). To the extent that the Intervenor-Defendants seek to challenge the wisdom of the Materiality Provision's expansive reach as a policy matter, "[that] is an argument to be addressed to Congress, not to this Court." *Harrison*, 446 U.S. at 593.

In short, the Court concludes that completing an ABBM is an "application" "requisite to voting" for most individuals who seek to cast a mail ballot. *See* TEC § 84.001(a); SUF ¶ 36. Similarly, preparation of a carrier envelope is "an act requisite to voting" for most individuals who cast a mail ballot. *See* TEC §§ 86.005(c), 86.006, 101.057, 101.107; SUF ¶¶ 48, 63, 70. Thus, the Materiality Provision reaches Sections 5.07 and 5.13 of S.B. 1 because failure to satisfy the number-matching requirements constitutes an "error or omission" on an ABBM or carrier envelope—a "record or paper"—relating to a voter's application to vote by mail or mail-in ballot—an "application, registration, or other act requisite to voting" under Section 101.

### C.  Whether Sections 5.07 and 5.13 result in a denial of the right to vote in an election

Denial of the statutory right to vote under Section 101 is complete when a particular application or carrier envelope is rejected; an opportunity to cure the rejection, submit another application, or cancel a mail ballot does not negate the denial of the statutory right to vote. *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541; *see also Vote.org v. Ga. State Election Bd.*, No.

1:22-cv-1734, 2023 WL 2432011, at *7 (N.D. Ga. Mar. 9, 2023) (rejecting the "argument that the opportunity to cure an error rehabilitates any potential violation"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (same).

Recycling arguments that were already rejected at the motion-to-dismiss stage, the State Defendants and Intervenor-Defendants insist that Sections 5.07 and 5.13 do not violate the Materiality Provision because they do not deny the right to vote. *See* ECF No. 608 at 16–18, ECF No. 634 at 9–15, ECF No. 635 at 7–13, ECF No. 663 at 8–11, ECF No. 645 at 22–26, ECF No. 646 at 41–50.

Defendants reassert that the opportunity to cure a rejection or vote in person after a rejection satisfies their obligation not to deny the statutory right to vote protected by Section 101. *See* ECF No. 646 at 20– 23, 41–47; ECF No. 634 at 9–10. But the Court has already recognized that cure procedures do not absolve an initial violation. *See LUPE (USA)*, 604 F. Supp. 3d at 541. Indeed, the efficacy of any cure procedure is irrelevant to the question under the Materiality Provision, which is violated whenever an ABBM or mail ballot is rejected based on an immaterial error or omission. Section 101 requires paperwork with an immaterial error or omission to be accepted, not rejected with an invitation to try again. If a qualified voter fails to cure an immaterial error or omission on her voting materials, she is unable to cast a ballot and have her vote counted— she was denied the right to vote in that election based on the error or omission.

Nor does the availability of in-person voting negate S.B. 1's denial of the statutory right to vote for failure to satisfy the number-matching requirements. Section 101 protects against rejection of mail voting materials. *See LUPE (USA)*, 604 F. Supp. 3d at 541 n.20; *see also Migliori*, 36 F.4th at 156–57. This is because Section 101 applies to "any individual" participating in "any election" and to "any record or paper" relating to "any application, registration, or act requisite to voting."

52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see also, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (explaining that "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (quoting Webster's Third New International Dictionary 97 (1976))). Having made mail ballot voting available, Texas is not permitted to refuse to count mail ballots solely because of an insignificant paperwork error. *See In re Georgia Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *10 (N.D. Ga. Aug. 18, 2023) ("The text of the Materiality Provision does not distinguish between . . . 'an act requisite to voting *absentee*' and 'an act requisite to voting *in person*.' Instead, the statute prohibits the denial of the right to vote.").

S.B. 1 provides that mail ballot materials must be rejected if the materials lack an ID number matching voter registration records, preventing an applicant from casting a mail ballot or have that ballot counted. *See* TEC §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 32–35, 50–51, 63. The existence of additional, more onerous procedures that voters could use to try to overcome the rejection does not negate the original denial. Section 101's plain text does not permit election officials to reject mail ballot materials based on errors or omissions not material to voter qualifications *unless and until* voters successfully provide the requested information or the State fixes its own database errors or omissions. *See* 52 U.S.C. § 10101(a)(2)(B); *LUPE (USA)*, 604 F. Supp. 3d at 541. Ultimately, even with a cure process, the fact remains that S.B. 1 requires rejection of mail ballot materials if a voter does not submit an identification number that matches voter registration records. *See* TEC §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 37, 39, 61, 63, 67–68. That rejection denies the statutory right to vote.[30]

---

[30] Even assuming that the Court considered the cure procedures to be legally relevant—and it does not—cure procedures under S.B. 1 do not protect the franchise because some voters cannot effectively use them to ensure their application is accepted and their valid ballot is counted. *Cf. Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030–31 (N.D. Fla. 2018) (finding cure provisions inadequate to resolve due process concerns when "the opportunity to cure has proven illusory"); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2014) (same). For example, to access the online Ballot Tracker, a voter is required by statute to enter their name, SSN4, DPS ID number, and registration address. *See* TEC § 86.015(b). This log-in process compares the information entered by the voter

The number-matching provisions of S.B. 1 require election officials to deny the CRA's broadly defined right to vote based on errors or omissions on ABBM's and carrier envelopes that are not material to voter qualifications under Texas law. In short, it is difficult to imagine a clearer violation of the Materiality Provision than S.B. 1's number-matching requirement. Nonetheless, in an effort to narrow the scope of the Materiality Provision, the State Defendants and Intervenor-Defendants advance a number of unpersuasive interpretations of the text, which the Court will briefly address.

### D. Defendants' wholly unpersuasive interpretations of the Materiality Provision

#### 1. The Materiality Provision reaches "neutral, evenly applied" state law.

The State Defendants contend that the Materiality Provision does not apply to non-discriminatory, "neutrally applied" state laws such as Sections 5.07 and 5.13. ECF No. 645 at 9–11; ECF No. 646 at 27–29. Here, State Defendants rely on language from another provision of Section 101, arguing that, "[l]ooking at 10101(a)(2) as a whole . . . it *becomes apparent* that the Materiality Provision functions as a safeguard against the discriminatory application of state voter qualification and registration rules." ECF No. 645 at 9. It is far from "apparent" that the Materiality Provision applies only to discriminatory applications of state voting rules. Indeed, the exception that the State Defendants ask the Court to recognize, which appears nowhere on the face of Section 101's text, would swallow the rule set forth in the Materiality Provision.

---

against the TEAM database. Accordingly, if a voter is missing either a DPS ID number or SSN4 in TEAM, or if TEAM has incorrect information for either of those numbers, the voter simply cannot log in to the tracker. The online Ballot by Mail Tracker is therefore only able to cure an SB 1-related defect in scenarios where the voter (1) is in possession of a number in their TEAM record, but did not include a number on their ABBM or carrier envelope; or (2) made a transcription error on their ABBM or carrier envelope.

In its entirety, Section 10101(a)(2) provides:

> No person acting under color of law shall –

(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure ***different from*** the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision which have been found by State officials to be qualified to vote;

(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election; or

(C) employ any literacy test as a qualification for voting in any election unless (i) such test is administered to each individual and is conducted wholly in writing, and (ii) a certified copy of the test and of the answers given by the individual is furnished to him within twenty-five days of the submission of his request made within the period of time during which records and papers are required to be retained . . . .

52 U.S.C. § 10101(a)(2).

The State Defendants argue that, because they serve a common function, common tools of statutory construction require the three provisions of section 10101(a)(2) to be read *in pari materia*.[31] ECF No. 645 at 9. As Plaintiffs point out, however, *in pari materia* is a tool used to *resolve* textual ambiguities, not a basis for creating them. ECF No. 670 at 7 (citing *Erlenbaugh v. United States*, 409 U.S. 239, 245 (1972)). Indeed, even where two provisions were "both parts of a comprehensive federal legislative effort" and "enacted by the same legislative body at the same time," one provision cannot be leveraged through the *in pari materia* canon "to introduce an

---

[31] The State Defendants rely on *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), for the proposition that "only racially motivated deprivations of rights are actionable" under the Materiality Provision. ECF No. 646 at 29. But *Broyles* mistakenly cited *Kirksey* v. *City of Jackson*, 663 F.2d 659 (5th Cir. 1981)—which involved claims under Section 2 of the Voting Rights Act—for its conclusion that 42 U.S.C. § 1971 (now 52 U.S.C. § 10101) requires a showing of racial discrimination. *See Broyles*, 618 F. Supp. 2d at 697; *Kirksey*, 663 F.2d at 664–665; *see also Vote.org v. Callanen*, No. SA-21-CV-00649-JKP-HJB, 2021 WL 5987152, at *3 (W.D. Tex. Dec. 17, 2021) (rejecting argument that Materiality Provision claims require showing of racial discrimination and noting that *Broyles* mistakenly invoked *Kirksey* in stating otherwise).

exception to the coverage of the [other] where none is now apparent." *Erlenbaugh*, 409 U.S. at 244–45.

While Subsection (A) and the Materiality Provision may have been enacted to address a common problem, one should not limit the other where they "play different roles in achieving these broad, common goals." *Id.* Indeed, as a matter of common sense, it is simply incorrect to assume that tools directed at the same goal must operate by the same means. Umbrellas, goloshes, and raincoats, for example, all work toward the same purpose—protection from the elements— but function in completely different ways. To assume that, because an umbrella works by "opening," we should likewise "open" our boots and coats in the face of a storm would be nonsensical and even—with respect to the raincoats—counterproductive.

By selectively applying language in Subsection (A) to other provisions, State Defendants would restrict all three subsections of 52 U.S.C. § 10101(a)(2) to accomplish only the purpose of Subsection (A), rendering the other provisions fully redundant. *Compare* 52 U.S.C. § 10101(a)(2)(A) (preventing an official from applying "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals") with ECF No. 645 at 10 (suggesting the Materiality Provision is applicable only to "prevent individuals acting under color of law from applying state laws relating to voting differently with respect to some citizens than to others so as to deny or abridge the right of all citizens to vote" (emphasis in original)).

The State Defendants' interpretation would violate the "obligation to give effect to every provision of [a] statute." *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009). Congress's choice not to include the same disparate treatment requirement of Subsection (A) when drafting the Materiality Provision must be given effect because "when Congress includes particular language in one section

of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (citation and internal quotation marks omitted); *Migliori*, 36 F.4th at 162 n.56 (the Materiality Provision "does not mention racial discrimination" and "we cannot find that Congress intended to limit this statute to either instances of racial discrimination or registration").

While the provisions of Section 101 fall well within the scope of Congress's broad legislative power under the Reconstruction Amendments, *Katzenbach*, 383 U.S. at 324, it is worth remembering that, in enacting the CRA, Congress also relied on its authority under the Elections Clause. *See* Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 74 Stat. 241, 241 (1964) (applying Section 101 only to federal elections); Voting Rights Act of 1965, Pub. L. No. 89–110, § 15(a), 79 Stat. 437, 445 (1965) (expanding Section 101 to cover state and local elections). Thus, regardless of any racial considerations, Congress had the power to require that votes in federal elections be counted despite immaterial paperwork errors, so long as those errors had nothing to do with voters' qualifications under state law. "[B]y tying the federal franchise to the state franchise instead of simply placing it within the unfettered discretion of state legislatures, the Framers avoided 'render[ing] too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone.'" *Inter Tribal Council of Ariz.*, 570 U.S. at 17 (quoting The Federalist No. 52, at 326 (J. Madison)); *see also id.* (overturning, as inconsistent with the NVRA, an Arizona law requiring voter-registration officials to "reject" any application for registration, including a federal form, not accompanied by documentary evidence of citizenship). In other words, it is entirely possible that Congress sought to vindicate the federal franchise

generally by preventing state officials from rejecting voting materials for minor paperwork errors, regardless of the racial impact of the officials' conduct.

### 2. The Materiality Provision applies *because* S.B. 1's requirements are immaterial

The Intervenor-Defendants admit what the State Defendants will not: that a DPS number or SSN4 appearing in state databases is not material to voter qualifications. ECF No. 634 at 15; ECF No. 608 at 20 ("[T]he United States . . . may point out that the personal identification numbers on an application or mail ballot are 'not material' to determining an individual's qualifications to vote. That is entirely correct." (internal citations omitted)). That should end the inquiry. Nonetheless, the Intervenor-Defendants suggest, contrary to both the text and purpose of the Materiality Provision, that that the number-matching provisions of S.B. 1 fall outside of Section 101's purview *because* DPS numbers and SSN4s are *not* used to determine voter qualifications. In other words, the Intervenor-Defendants assert that Section 101 applies only where the error or omission *is* material to a voter's qualifications under state law. "It is because sections 5.02 [sic] and 5.08 [sic] do not regulate voter qualification determinations that they fall *outside* the materiality provision." ECF No. 634 at 21.

A judge in the Northern District to Georgia recently rejected the same argument:

> Contrary to Responding Defendants' position, the fact that the outer envelope is not used to determine voter qualifications merely reinforces the immateriality of the Birthdate Requirement. It has never been the law that the Materiality Provision only applies to that initial determination of whether a voter is qualified to vote. Moreover, interpreting the Materiality Provision in the manner Responding Defendants suggest would essentially render the provision meaningless. In other words, a state could impose immaterial voting requirements yet escape liability each time by arguing that the very immateriality of the requirement takes it outside the statute's reach.

*In re Georgia Senate Bill 202*, 2023 WL 5334582, at *10. The Court agrees.

The Republican Committees suggest that, following successful registration, states and election officials are free to intentionally reject ballots cast by eligible voters for any reason whatsoever, so long as it does not disqualify the voter from attempting to vote in future elections. The interpretation does violence not only to the clear text of the Materiality Provision but to the civil rights of every qualified voter in the State of Texas and to the fundamental premise of our democracy.

## IV.    Plaintiffs are entitled to permanent injunctive relief

A party seeking a permanent injunction must prove: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). The Court addresses each factor in turn.

First, for the reasons set forth in this order, the Court concludes that Sections 5.07 and 5.13 of S.B. 1 violate the Materiality Provision. Plaintiffs have thus succeeded on the merits of their challenge to Sections 5.07 and 5.13 of S.B. 1 under Section 101 of the Civil Rights of 1964, 52 U.S.C. § 10101(a)(2)(B).

Second, the Court concludes that failure to grant the requested injunction will result in irreparable injury to voters in Texas. "The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm." *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020). "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (recognizing the "strong interest in exercising the fundamental political right to vote") (citing *Dunn v.*

*Blumstein*, 405 U.S. 330, 336 (1972)). Given the text of Sections 5.07 and 5.13 (mandating the rejection of mail ballot materials for immaterial paperwork errors and omissions), the thousands of ABBMs and mails ballots that have been rejected thus far, and the persistent ID errors in the TEAM records, the Court concludes that, without the requested injunctive relief, future denials of ABBMs and mail-in ballots in violation of the Materiality Provision are not only likely but certain.

Third, the injury to Plaintiffs and voters in Texas outweighs any damage the injunction will cause to the State Defendants and election officials. The injury to Plaintiffs and voters in Texas is great: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). On the other hand, enjoining the rejection of otherwise valid voting materials would impose at most a *de minimis* burden on the State Defendants and election officials. The State Defendants can comply with this Order through minor modifications to their election administration practices. Any injunction would not direct the State Defendants to change the *process* for applying to vote by mail or the deadline or eligibility requirements for doing so. Texas election officials could continue to use the form ABBM and carrier envelopes prescribed by the SOS in administering elections, and could even follow the same cure process outlined under Texas law (in an effort to correct outstanding TEAM errors). Rather, the injunction would merely require officials to accept otherwise valid ABBMs and mail ballots that failed to satisfy S.B. 1's number matching requirements.

Finally, it is clear to the Court that the injunction would not disserve the public interest, and, to the contrary, will serve the public interest by protecting individuals' fundamental right to vote. *See Dunn*, 405 U.S. at 336 (stating that protecting the right to vote is of particular public

importance because it is "preservative of all rights.") (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)); *see also Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1271 ("Given Washington's most recent governor's election, where the winner was decided by just hundreds of votes, the Court finds that the public interest weighs strongly in favor of letting every eligible resident of Washington register and cast a vote."). Moreover, it is the public policy of the State of Texas to construe any constitutional or statutory provision which restricts the right to vote liberally: "[a]ll statutes tending to limit the citizen in his exercise of this right should be liberally construed in [the voter's] favor." *Owens v. State*, 64 Tex. 500, 502 (1885).

Even recognizing the importance of the fundamental right to vote, a court must weigh any protective action against the potential for confusion and disruption of the election administration under the "*Purcell* principle." *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). The *Purcell* principle provides that, as a general rule, federal courts "should not alter state election laws in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered six weeks before the general election)). In *Purcell*, the Supreme Court reversed a lower court's order enjoining the implementation of a proposition, passed by ballot initiative two years earlier, that required voters to present identification when they voted on election day. Reversing the lower court, the Court emphasized that the injunction was likely to cause judicially-created voter confusion in the face of an imminent election. *Purcell*, 549 U.S. at 2, 6.

The Supreme Court has recognized that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. The *Purcell* principle's logic extends only to injunctions that affect the mechanics and

procedures of the act of voting. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm. ("RNC v. DNC")*, 140 S. Ct. 1205, 1207 (2020) (extension of absentee ballot deadline); *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (mask mandate exemption for voters); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (new ballot type eliminating straight-ticket voting); *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. at 31 (extension of absentee ballot deadline).

Plaintiffs' requested injunction does not affect the procedures for voting by mail from a voter's perspective. Enjoining election officials from rejecting ballot materials will not affect the forms or deadlines that voters have used to apply for and vote by mail since 2022. Accordingly, it is unlikely that the proposed preliminary injunction would lead to the kind of voter confusion envisioned by *Purcell*. To be sure, at least some voters might be confused by the fact that ABBMs and carrier envelopes continue to solicit ID numbers despite a court order enjoining the ID-number requirement. But unlike confusion about other voting procedures, such as deadlines, polling locations, and S.B. 1's number-matching requirement itself, this "confusion" about the applicability of the ID-number requirements would not disenfranchise anyone—voters will be able to apply for and cast mail-in ballots regardless of their ability to provide a matching ID number. Thus, any voter's potential, subjective confusion is clearly outweighed by the irreparable harm that other voters will suffer absent injunctive relief.

Likewise, the time considerations set forth in *Purcell* are inapplicable here, given that the November 2023 general election has already occurred and the 2024 primaries are months away The Supreme Court has upheld stays of injunctions entered days, weeks, and months before primary or general elections. *See Wis. State Legislature*, 141 S. Ct. at 28; *Raysor v. DeSantis*, 140 S. Ct. 2600 (2020) (upholding Eleventh Circuit's stay of injunction entered three months before

primary election); *RNC v. DNC*, 140 S. Ct. at 1208 (staying preliminary injunction entered five days before primary election); *Veasey v. Perry*, 574 U.S. 951 (2014) (upholding stay of injunction entered 24 days before general election day).

Therefore, Plaintiffs' request for injunctive relief is granted.

## CONCLUSION

For the reasons stated herein, the United States' motion for summary judgment (ECF No. 609) is **GRANTED**. The OCA Plaintiffs' motion for summary judgment (ECF No. 611) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted with respect to the OCA Plaintiffs' challenge to Section 5.07 and 5.13 of S.B. 1 and denied in all other respects.

The Court concludes as a matter of law that Sections 5.07 and 5.13 of Senate Bill 1, codified in Sections 86.001(f) and 87.041(b)(8) of the Texas Election Code, require officials to reject mail ballot applications and mail ballots based on errors or omissions on a record or paper relating to an act requisite to voting that is not material in determining whether voters are qualified under Texas law to vote or to cast a mail ballot. Such rejections deny the statutory right to vote protected by Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).

The Court therefore **DECLARES** that Section 5.07 and Section 5.13 of Senate Bill 1 violate Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).

The Court also finds that a permanent injunction of Sections 5.07 and 5.13 of Senate Bill 1 is warranted.

It is therefore **ORDERED** that the State Defendants, the Harris County Elections Administrator, and the Travis County Clerk, their agents and successors in office, and all persons acting in concert with them are **PERMANENTLY ENJOINED** from enforcing the requirements

of Section 5.07 and 5.13 of Senate Bill 1 that violate Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).

The Court finally orders that OCA Plaintiffs are entitled to recover their reasonable attorney's fees and expenses, subject to a reduction in recovery for hours expended on these unsuccessful claims unless the district court finds a "common core of facts" or "related legal theories." *Fessler v. Porcelana Corona De Mexico, S.A. DE C.V.*, 23 F.4th 408, 417 (5th Cir. 2022) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 434–35 (1983)).

The United States, the OCA Plaintiffs, and the State Defendants, are hereby **ORDERED** to meet and confer concerning an appropriate remedial plan and, **by no later than December 15, 2023**, to file a proposed order or a joint advisory indicating points of disagreement.

It is so **ORDERED**.

**SIGNED** this 29th day of November, 2023.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE