**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | Case No. 5:21-cv-844-XR |
| v. | § | [Consolidated Cases] |
| | § | |
| GREGORY W. ABBOTT, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**STATE DEFENDANTS' AND INTERVENOR-DEFENDANTS'
POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
ADA CLAIMS**

1

TABLE OF CONTENTS

Introduction ................................................................................................................ 8

Proposed Findings of Fact .......................................................................................... 8

    I.     Parties ...........................................................................................................8

         A.     State Defendants...........................................................................8

         B.     Intervenor-Defendants...............................................................14

         C.     County Defendants ....................................................................17

         D.     Private Plaintiffs .......................................................................21

    II.    Relevant State Witnesses ......................................................................... 24

          A.     Keith Ingram – Former Director of Elections............................. 24

          B.     Christina Adkins – Director of Elections ....................................25

          C.     Samuel M. Taylor – Former Assistant Secretary of State for Communications ...................................................................... 26

          D.     Jonathan White – Chief of the Election Fraud Section.................27

          E.     Frank Phillips – Denton County Election Administrator ............. 29

          F.     Dr. Mark Hoekstra – Expert Witness ........................................ 30

    III.   Relevant Plaintiff Witnesses ....................................................................30

    IV.   Voters with Disabilities Have Many Meaningful Opportunities to Vote in Texas. .................................................................................................... 42

    V.    Texas Has an Interest in Ensuring All Ballots Legally Cast by Voters with Disabilities are Counted....................................................................53

    VI.   SB 1 Satisfied that Interest by Preserving and Providing Meaningful Opportunities for Voters with Disabilities.............................................55

    VII.  The Challenged Provisions. ..................................................................... 57

    VIII. Efficacy of SB 1's Provisions...................................................................65

Proposed Conclusions of Law .....................................................................................79

IX.     SB 1 Does Not Discriminate Against Disabled Voters. .........................................79

X.      Even If Plaintiffs Established a Prima Facie Case, Plaintiffs' Requested Relief Represents an Unreasonable Modification..................................................86

XI.     Neither the ADA nor the Rehabilitation Act Demand that Defendants Acquiesce to Plaintiffs' Choice of Accommodations...........................................88

Certificate of Service................................................................................................ 90

INDEX OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Alexander v. Choate,*
    469 U.S. 287 (1985) ..............................................................................82, 83

*Cadena v. El Paso Cnty.,*
    946 F.3d 717 (5th Cir. 2020) ................................................................ 80, 86

*Clark v. Dep't of Pub. Safety,*
    63 F.4th 466 (5th Cir. 2023) ........................................................................87

*Cmty. Coll. v. Davis,*
    442 U.S. 397, 99 S. Ct. 2361, 60 L. Ed. 2d 980 (1979) ...............................79, 86, 88

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022) .................................................................... 89

*Green Valley Special Util. Dist. v. City of Schertz,*
    969 F.3d 460 (5th Cir. 2020) .................................................................. 88

*Griffin v. United Parcel Serv., Inc.,*
    611 F.3d 216 (5th Cir. 2011) .................................................................. 86

*Halpern v. Wake Forest Univ. Health Scis.,*
    669 F.3d 454 (4th Cir. 2012) .................................................................. 81

*Johnson v. Callanen,*
    608 F. Supp. 3d 476 (W.D. Tex. 2022) .................................................. 84, 88

*Johnson v. Gambrinus Co./Spoetzl Brewery,*
    116 F.3d 1052 (5th Cir. 1997) ...............................................................86, 87

*League of Women Voters of Fla., Inc. v. Lee,*
    595 F. Supp. 3d 1042 (N.D. Fla. 2022) .................................................. 88

*Lewis v. Scott,*
    28 F.4th 659 (5th Cir. 2022) ................................................................... 9

*Lightbourn v. Cnty. of El Paso, Tex.,*
    118 F.3d 421 (5th Cir. 1997) ..............................................................9, 12, 80

*Lockhart v. Sys. Made Simple, Inc.,*
    66 F. Supp. 3d 847 (W.D. Tex. 2014) .................................................... 81

*Nat'l Fed'n of the Blind v. Lamone,*
    813 F.3d 494 (4th Cir. 2016) .................................................................. 81

*Ostrewich v. Tatum,*
    72 F.4th 94 (5th Cir. 2023) .............................................................. 8, 9, 10, 13

*Richardson v. Flores*,
28 F.4th 649 (5th Cir. 2022) ................................................................................ 8

*Riel v. Elec. Data Sys. Corp.*,
99 F.3d 678 (5th Cir. 1996) ................................................................................ 81

*Saldano v. State*,
70 S.W.3d 873 (Tex. Crim. App. 2002) ............................................................. 13

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*,
938 F.3d 1259 (11th Cir. 2019) ..................................................................... 86, 88

*Shaikh v. Lincoln Mem'l Univ.*,
608 F. App'x 349 (6th Cir. 2015) ....................................................................... 81

*Smith v. Harris Cnty., Texas*,
956 F.3d 311 (5th Cir. 2020) ................................................................... 80, 81, 84

*State v. Stephens*,
663 S.W.3d 45 (Tex. Crim. App. 2021) ............................................................. 13

*Tennessee v. Lane*,
541 U.S. 509 (2004) ...................................................................................... 86, 89

*United States v. Mississippi*,
82 F.4th 387 (5th Cir. 2023) ............................................................................... 80

*US Airways, Inc. v. Barnett*,
535 U.S. 391 (2002) ...................................................................................... 81, 87

*Valentine v. Collier*,
978 F.3d 154 (5th Cir. 2020) ............................................................................. 81

*Waldman Pub. Corp. v. Landoll, Inc.*,
43 F.3d 775 (2d Cir. 1994) ................................................................................ 88

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ................................ 80

*Windham v. Harris Cnty., Texas*,
875 F.3d 229 (5th Cir. 2017) ....................................................................... 81, 84

**Statutes**

52 U.S.C. § 30101(14) ................................................................................... 15, 16

Tex. Const. art. VI, § 1 ...................................................................................... 13
Tex. Const. art. VI, § 22 .................................................................................... 13

Tex. Elec. Code § 1.011(a) –(d) ........................................................................ 52
Tex. Elec. Code § 1.022 ....................................................................... 53, 82, 83
Tex. Elec. Code § 31.003 ................................................................................... 11
Tex. Elec. Code § 31.004 ................................................................................... 11
Tex. Elec. Code § 32.071 ................................................................................... 10

Tex. Elec. Code § 32.075 ........................................................................................... 10
Tex. Elec. Code § 33.001 ....................................................................................... 14, 15
Tex. Elec. Code § 33.003 ....................................................................................... 14, 15
Tex. Elec. Code § 43.034(a)(1)–(5) .......................................................................... 43
Tex. Elec. Code § 61.006(a) ...................................................................................... 49
Tex. Elec. Code § 61.013(b) ...................................................................................... 12
Tex. Elec. Code § 64.009 ............................................................................... 44, 45, 69
Tex. Elec. Code § 64.031 ........................................................................................... 47
Tex. Elec. Code § 64.032(a) ...................................................................................... 45
Tex. Elec. Code § 64.032(b) ...................................................................................... 46
Tex. Elec. Code § 64.032(c) ........................................................................... 46, 49, 50
Tex. Elec. Code § 64.032(d) ...................................................................................... 46
Tex. Elec. Code § 64.033(a) ...................................................................................... 46
Tex. Elec. Code § 64.033(b) ...................................................................................... 46
Tex. Elec. Code § 64.034 ............................................................................ 47, 48, 50, 61
Tex. Elec. Code § 64.036 ........................................................................................... 48
Tex. Elec. Code § 64.036(a)–(d) ............................................................................... 49
Tex. Elec. Code § 64.037 ........................................................................................... 49
Tex. Elec. Code § 64.0322 ......................................................................................... 60
Tex. Elec. Code § 81.001(a) ...................................................................................... 43
Tex. Elec. Code § 82.002(a) ...................................................................................... 51
Tex. Elec. Code § 82.003 ........................................................................................... 52
Tex. Elec. Code § 82.005 ........................................................................................... 43
Tex. Elec. Code § 83.001(a) ........................................................................................ 9
Tex. Elec. Code § 84.002 ........................................................................................... 57
Tex. Elec. Code § 84.002(a)(1-a) ......................................................................... 58, 59
Tex. Elec. Code § 84.003(a)–(d) ............................................................................... 52
Tex. Elec. Code § 84.004(a) ...................................................................................... 53
Tex. Elec. Code § 84.007 ........................................................................................... 10
Tex. Elec. Code § 84.011(a) ...................................................................................... 58
Tex. Elec. Code § 84.0041(a)–(b) ............................................................................. 53
Tex. Elec. Code § 84.035 ........................................................................................... 58
Tex. Elec. Code § 86.001 ............................................................................... 10, 58, 59
Tex. Elec. Code § 86.0052 ......................................................................................... 51
Tex. Elec. Code § 86.0052 (b)(1)–(2) ....................................................................... 51
Tex. Elec. Code § 86.0052(c) .................................................................................... 51
Tex. Elec. Code § 86.010(a)–(g) ............................................................................... 50
Tex. Elec. Code § 86.013(b) ...................................................................................... 63
Tex. Elec. Code § 86.013(b)(2) ................................................................................. 50
Tex. Elec. Code § 86.010 ........................................................................................... 61
Tex. Elec. Code § 86.015(c) ...................................................................................... 59
Tex. Elec. Code § 86.0105 ......................................................................................... 62
Tex. Elec. Code § 87.027 ........................................................................................... 10
Tex. Elec. Code § 87.0271 .................................................................................... 59, 83
Tex. Elec. Code § 87.0271(b) ............................................................................... 59, 60
Tex. Elec. Code § 87.0271(e) .................................................................................... 60
Tex. Elec. Code § 87.041 ..................................................................................... 10, 83
Tex. Elec. Code § 276.015 ......................................................................................... 63
Tex. Elec. Code § 276.017 to the Texas Election Code ........................................... 64
Tex. Elec. Code § 276.018 to the Texas Election Code ........................................... 64
Tex. Elec. Code § 276.019 to the Texas Election Code ........................................... 64

Tex. Pen. Code § 37.02 ........................................................................................ 48, 61
Tex. Pen. Code § 38.01 .............................................................................................. 62

**Other Authorities**

House Bill 206......................................................................................................... 62
Senate Bill 1................................................................................................. passim
Senate Bill 1750 ....................................................................................................19

**INTRODUCTION**

Pursuant to the Court's October 20, 2023, in-trial scheduling request, State Defendants and Intervenor-Defendants submit the following proposed findings of fact and conclusions of law for the Court's resolution of this case on the merits.

**PROPOSED FINDINGS OF FACT**

## I.    Parties

### A.  State Defendants[1]

#### i.    Jane Nelson, in her official capacity as Texas Secretary of State

1. State Defendant Jane Nelson is the Secretary of State ("the Secretary") of the State of Texas.

2. The Texas Secretary of State is one of six officials named in the Texas Constitution that forms the executive department. Sept. 22, 2023 Tr. at 1825:12–17. The Secretary of State is appointed by the Governor of Texas and confirmed by the Texas Senate. *Id*. at 1825:18–20.

3. Among other things, the Secretary of State is the Chief Election Officer for Texas. Sept. 22, 2023 Tr. at 1825:21–23. As such, the Secretary is charged with "broad duties to oversee administration of Texas's election laws." *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (quoting *Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022)).

4. The Secretary delegates her responsibilities to the Elections Division in her office. Sept. 22, 2023 Tr. at 1869:6–9. The Elections Division is divided into two primary groups: the Administrative Section and the Legal Section. The Administrative Section maintains the Texas Election Administration Management database, which contains Texas' official voter

---

[1] Although a party to this consolidated action, the State of Texas and Governor Greg Abbott were not named as Defendants to Plaintiffs ADA and Rehabilitation claims.

registration list. Oct. 17, 2023 Tr. at 4317:6–9, 17–23. The Legal Section handles the Secretary's advisory role. Oct. 18, 2023 Tr. at 4527:22–6.

5. Despite the Secretary's broad duties, the Election Code gives the Secretary only limited authority over how Texas elections are run. *See* Oct. 17, 2023 Tr. at 4312:1–9.

6. "Texas has a highly decentralized election system," where significant local control is exercised. Sept. 22, 2023 Tr. at 1848:24–1849:11; *see also Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022).

7. Accordingly, "the Secretary does not conduct elections." *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 428 n.7 (5th Cir. 1997); *see also* Oct. 17, 2023 Tr. at 4312:10–17. "Rather, the state's 3,000 or so political subdivisions run general and special elections, while the political parties conduct primary elections." *Lightbourn*, 118 F.3d at 428 n.7; *see also* Oct. 17, 2023 Tr. at 4312:12–17.

8. In accordance with this division of responsibility, the Secretary does "not directly enforce the electioneering laws, but only provides interpretive guidance." *Ostrewich*, 72 F.4th at 101. Instead, Texas operates a decentralized election system under which counties manage the conduct of elections. Sept. 22, 2023 Tr. at 1827:3–5. 1848:24–1849:1. The Election Code specifies that the early voting clerk "shall conduct the early voting in each election." Tex. Elec. Code § 83.001(a); *see also* Oct. 12, 2023 Tr. at 3812:19–25 (testifying that early voting clerk is responsible for mail and in-person early voting).

9. The Election Code also specifies that "the presiding judge is in charge of and responsible for the management and conduct of the election at the polling place of the election precinct that the judge serves." Tex. Elec. Code § 32.071. It is thus the presiding judge, along with

alternative judge and clerks—not the Secretary—that checks in voters and assistors, executes the oath of assistance, provides assistance to voters on request, and enforces the Election Code at the polling place. *See Ostrewich*, 72 F.4th at 100 (citing Tex. Elec. Code § 32.075 ("In Texas, presiding judges are exclusively entrusted with enforcing the electioneering laws at polling locations")).

10.    In addition, the Secretary does not provide, manage, or oversee a county's voting-by-mail program. The Election Code specifies that applications for ballot by mail (ABBM) must be submitted to the early voting clerk, Tex. Elec. Code § 84.007, who shall review each application to determine whether it contains all requisite information. Tex. Elec. Code § 86.001. It is thus the early voting clerk—not the Secretary—who makes the decision to accept or reject a voter's ABBM.

11.    The Election Code also specifies that the Early Voting Ballot Board (EVBB) or Signature Verification Committee (SVC) shall open each carrier envelope and make a determination whether it complies with all stipulated requirements. Tex. Elec. Code §§ 87.027, 87.041. It is thus the EVBB or SVC—not the Secretary—who makes the decision to accept or reject a voter's mail ballot.

12.    The Secretary's role regarding elections is instead principally one of '"[o]ffering advice, guidance, or interpretive assistance' to local officials," albeit one which falls short of enforcement. *Ostrewich*, 72 F.4th at 100–101.

13.    Under Section 31.003 of the Election Code, the Secretary is tasked with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of this code and of the election laws outside this code." Oct. 17, 2023 Tr. at 4311:21–25, 4318:17–4319:3.

14. In performing this duty, the Secretary prepares detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code. Oct. 17, 2023 Tr. at 4319:4–9. This includes, among other things, election advisories, election calendars, mass emails, handbooks, and training materials. Oct. 18, 2023 Tr. at 4564:1–13.

15. The Secretary principally issues election advisories in response to ambiguities in the Election Code that need clarification and legislation that instructs the Secretary to prescribe additional procedures.

16. Election advisories do not bind local election authorities, *see* Oct. 18, 2023 Tr. at 4536:21–4537:2, 4537:15–4538:5, but they are viewed as highly persuasive by Texas election offices and are generally given deference by courts. Oct. 18, 2023 Tr. at 4554:20-4555:1.

17. In addition, the Secretary maintains an informational hotline for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties. Tex. Elec. Code § 31.004; *see also* Oct. 17, 2023 Tr. at 4322:12–4323:17; Oct. 18, 2023 Tr. at 4568:15–4569.

18. The Secretary maintains a separate toll-free number to provide advice and assistance to voters. Oct. 17, 2023 Tr. at 4322:12–17.

19. The Secretary also conducts seminar, conferences, and trainings for election officials about election administration, as part of her duty to obtain uniformity. The Secretary hosts its principal conference in the summer, at which it advises county officials of legislative updates and best practices. The Secretary holds smaller conferences throughout the year for other

stakeholders, such as cities and municipal utility districts, who also have their own election responsibilities.

20.    The Secretary will often invite experts from the disability community to give educational presentations at these conference about ADA compliance to county election officials. Oct. 18, 2023 Tr. 4597:2–5.

21.    The ADA is not an election law. *Lightbourn*, 118 F.3d at 430. When the Secretary receives questions of law that pertain to issues outside of elections, the Secretary advises election officials to consult with their local county or district attorney. The Secretary follows this practice when it receives questions about a county or other election authority's compliance with the ADA.

22.    Because the Secretary does not administer elections, the Secretary refers a request for accommodation to the election authority that is conducting the election. Oct. 18, 2023 Tr. at 4595:1–13; *see also* Tex. Elec. Code § 61.013(b) (specifying that voters with a disability desiring an accommodation to submit the request "with the early voting clerk").

23.    That said, the Secretary did not receive any request for accommodation from any voter regarding any of the statutory provisions challenged in this consolidated action. *See*, *e.g.*, Oct. 18, 2023 Tr. at 4417:22–4418:7; 4423:18–25; 4424:15–22; 4431:5–4432:2, 4432:8–1.

24.    Defendant Nelson is sued in her official capacity as Secretary of State.

ii.    **Warren Ken Paxton, in his official capacity as Attorney General of Texas.**[2]

25.    State Defendant Warren Ken Paxton is the 51st Attorney General of the State of Texas.

---

[2] Earlier in litigation, the Court dismissed all ADA claims against Defendant Paxton but declined to extend that ruling to Plaintiffs' Rehabilitation Act claims. *See* ECF 447 at 73, ECF 448 at 61, ECF 449 at 69.

26. The Attorney General is one of six officials named in the Texas Constitution that forms the executive department. Tex. Const. art. VI, § 1. The Attorney General is elected for a four-year term by the qualified voters of the State at the time and places of election for members of the Legislature. *Id.* at. §§ 22–23.

27. As Attorney General, Defendant Paxton is the state's chief law enforcement officer. Tex. Const. art. VI, § 22. His role as Attorney General includes representing the state of Texas "in all suits and pleas." *See id.*

28. However, the Attorney General "has no independent authority to prosecute election-related offenses." *Ostrewich*, 72 F.4th at 101. The Texas Court of Criminal Appeals held that the Attorney General "can prosecute with the permission of the local prosecutor but cannot initiate prosecution unilaterally." *State v. Stephens*, 663 S.W.3d 45, 55 (Tex. Crim. App. 2021), *reh'g denied*, 664 S.W.3d 293 (Tex. Crim. App. 2022); Oct. 16, 2023 Tr. at 3908:21–23.

29. "We resolutely concluded at the end of this discussion that the Attorney General has no independent criminal prosecution authority: "The attorney general . . . has no criminal prosecution authority. Rather, he is limited to representing the State in civil litigation." *Id.* (quoting *Saldano v. State*, 70 S.W.3d 873, 880 (Tex. Crim. App. 2002)).

30. Defendant Paxton is sued in his official capacity as Attorney General.

31. The former Chief of the Election Fraud Section Jonathan White testified as both a corporate representative for the Office of Attorney General and as a fact witness with personal knowledge of election crimes committed in Texas. *See infra* II.D.

### B. Intervenor-Defendants

#### i. Harris County Republican Party

32. Intervenor-Defendant Harris County Republican Party promotes and assists Republican candidates in Harris County, Texas. It has made significant contributions and expenditures to support Republican candidates during many election cycles and will do so again in 2024.

33. The Harris County Republican Party works to accomplish this purpose by, among other things, devoting substantial resources towards educating, mobilizing, assisting, training, and turning out voters, volunteers, and poll watchers in Harris County. *See, e.g.*, Harris County GOP, Take Action Now, https://bit.ly/3pDazuW (last visited Dec. 28, 2023).

34. In accordance with Texas law, the Harris County Republican Party also expends significant resources to recruit, train, and appoint poll watchers "to observe the conduct of ... election[s]" in Texas. Tex. Elec. Code 33.001; *see also* Tex. Elec. Code § 33.003 (authorizing "each [county] political party that has one or more nominees on the ballot" to "appoint 4 watchers"); Harris County GOP, Become A Volunteer, https://bit.ly/3DtAM3G (last visited Dec. 28, 2023).

#### ii. Dallas County Republican Party

35. Intervenor-Defendant Dallas County Republican Party promotes and assists Republican candidates in Dallas County, Texas. It has made significant contributions and expenditures to support Republican candidates during many election cycles and is doing so again in 2024.

36. The Dallas County Republican Party works to accomplish this purpose by, among other things, devoting substantial resources towards educating, mobilizing, assisting, training, and turning out voters, volunteers, and poll watchers in Dallas County. *See, e.g.*, Dallas County Republican Party, Get Involved, *https://dallasgop.org* (last visited Jan. 18, 2023).

37.    In accordance with Texas law, the Dallas County Republican Party also expends significant resources to recruit, train, and appoint poll watchers "to observe the conduct of . . . election[s]" in Texas. Tex. Elec. Code § 33.001; *see also id.* § 33.003 (authorizing "each [county] political party that has one or more nominees on the ballot" to "appoint watchers").

### iii.    Republican National Committee ("RNC")

38.    Intervenor-Defendant RNC is the national committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

39.    The RNC manages the Republican Party's business at a national level, including development and promotion of the Party's national platform and fundraising and election strategies; supports Republican candidates for public office at all levels across the country, including those on the ballot in Texas; and assists state and local parties throughout the country, including in Texas, to educate, mobilize, assist, and turn out Republican voters, candidates, volunteers, and poll watchers.

40.    The RNC has made significant contributions and expenditures in support of Republican candidates up and down the ballot and in mobilizing voters and volunteers in Texas in the past many election cycles and is already doing so again for the 2024 election cycle.

### iv.    National Republican Senatorial Committee ("NRSC")

41.    Intervenor-Defendant NRSC is the national senatorial committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

42.    Its mission is to elect Republican candidates to the U.S. Senate from across the United States, including from Texas. It works to accomplish this mission in Texas by, among other

things, providing direct and indirect financial contributions and support to candidates and other Republican Party organizations; providing technical and research assistance to Republican candidates and party organizations; engaging in voter registration, voter education, and voter turnout programs; and conducting other Republican party-building activities, including funding recruiting, education, and support activities for poll watchers.

43. The NRSC has made significant contributions and expenditures in support of Republican congressional candidates in Texas in many past election cycles and is doing so again in 2024.

### v.    National Republican Congressional Committee ("NRCC")

44. Intervenor-Defendant NRCC is the national congressional committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

45. Its mission is to elect Republican candidates to the U.S. House of Representatives from across the United States, including from Texas. It works to accomplish this mission in Texas by, among other things, providing direct and indirect financial contributions and support to candidates and other Republican Party organizations; providing technical and research assistance to Republican candidates and party organizations; engaging in voter registration, voter education, and voter turnout programs; and conducting other Republican party-building activities, including funding recruiting, education, and support activities for poll watchers.

46. The NRCC has made significant contributions and expenditures in support of Republican congressional candidates in Texas in many past election cycles and is doing so again in 2024.

### C. County Defendants

#### i. Harris County District Attorney–Kim Ogg

47. Defendant Kim Ogg is sued in her official capacity as Harris County District Attorney. By virtue of her position, Defendant Ogg is charged with investigating and prosecuting criminal violations of the Texas Election Code.

48. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action that impose criminal penalties, including SB 1 §§ 6.04 and 6.05. Defendant Ogg did not testify at trial.

49. Ms. Ogg was named as a Defendant by HAUL Plaintiffs and OCA-GH Plaintiffs.

#### ii. Bexar County District Attorney–Joe Gonzales

50. Defendant Joe Gonzales is sued in his official capacity as Bexar County District Attorney. By virtue of his position, Defendant Gonzales is charged with investigating and prosecuting criminal violations of the Texas Election Code.

51. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 6.04, 6.05, and 6.06. Defendant Gonzales did not testify at trial.

52. He was named as a Defendant by HAUL Plaintiffs.

#### iii. Dallas County District Attorney–John Creuzot

53. Defendant John Creuzot is sued in his official capacity as Dallas County District Attorney. By virtue of his position, Defendant Creuzot is charged with investigating and prosecuting criminal violations of the Texas Election Code.

54. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 6.04, 6.06, and 7.04. Defendant Creuzot did not testify at trial.

55. Mr. Creuzot was named as a Defendant by LUPE Plaintiffs.

### iv. El Paso County District Attorney–Bill D. Hicks

56. Defendant Bill D. Hicks is sued in his official capacity as the District Attorney for the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. By virtue of his position, Defendant Hicks is charged with investigating and prosecuting criminal violations of the Texas Election Code.

57. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 6.04, 6.05, 6.06, and 7.04. Defendant Hicks did not testify at trial.

58. Mr. Hicks was named as a Defendant by LUPE Plaintiffs.

### v. Travis County District Attorney–José Garza

59. Defendant José Garza is sued in his official capacity as Travis County District Attorney. By virtue of his position, Defendant Garza is charged with investigating and prosecuting criminal violations of the Texas Election Code.

60. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 6.04, 6.05, 6.06, and 7.04. Defendant Garza did not testify at trial.

61. He was named as a Defendant by LUPE Plaintiffs and OCA-GH Plaintiffs.

### vi.  Harris County Clerk–Teneshia Hudspeth

62.  Defendant Teneshia Hudspeth is the County Clerk of Harris County—a position she has occupied since January 1, 2021.  Her office assumed control over Harris County's election responsibilities when Senate Bill 1750 took effect on September 1, 2023.

63.  Defendant Hudspeth is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance.

64.  Defendant Hudspeth did not testify at trial. However, Plaintiffs called two witnesses from the Harris County Election Administrator Office: former Election Administrator Isabel Longoria and Director of Logistics Rachelle Obakozuwa.

65.  Defendant Hudspeth was named as a Defendant by OCA-GH Plaintiffs.

### vii.  Bexar County Election Administrator–Jacquelyn Callanen

66.  Defendant Jacquelyn Callanen is the Election Administrator for Bexar County. Sept. 19, 2023 Tr. at 987:2–4. She has occupied this position since 2005. Sept. 19, 2023 Tr. at 987:22–23.

67.  Defendant Callanen is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance. Defendant Callanen testified at trial. She was the only person from her office to do so.

68.  Defendant Callanen was named as a Defendant by HAUL Plaintiffs.

### viii.    Dallas County Elections Administrator-Michael Scarpello

69.    Defendant Michael Scarpello is the Elections Administrator for Dallas County and has occupied this position since December 2020. Sept. 12, 2023 Tr. at 376:15–21.

70.    Defendant Scarpello is being sued in his official capacity for his role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance. Defendant Scarpello testified at trial, as did Mail Ballot Supervisor Tacoma Phillips.

71.    Defendant Scarpello was named as a Defendant by LUPE Plaintiffs.

### ix.    El Paso County Elections Administrator-Lisa Wise

72.    Defendant Lisa Wise is the Elections Administrator of El Paso County. Sept. 11, 2023 Tr. at 161:9–10.

73.    Prior to her position in El Paso County, Defendant Wise worked as the Deputy Election Commissioner in Douglas County, Nebraska, holding that position for around 8 years. *Id.* at 161:20–25. Altogether, Defendant Wise has worked in election administration for about 17 years. *Id.* at 162:1–3.

74.    Defendant Wise is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance. Defendant Wise testified at trial. She was the only person from her office to do so.

75.    Defendant Wise was named as a Defendant by LUPE Plaintiffs.

### x.    Travis County Clerk-Dyana Limon-Mercado

76.    Defendant Dyana Limon-Mercado is the current County Clerk of Travis County—a position she has occupied since January 1, 2023.

77.    Defendant Limon-Mercado is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance.

78.    Defendant Limon-Mercado did not testify at trial, but Plaintiffs called three fact witnesses from her office: Former County Clerk Dana DeBeauvoir; as well as Director of Elections Bridgette Escobedo and Assistant Director Dan Hayes, both from the Travis County Elections Division.

79.    Defendant Limon-Mercado was named as a Defendant by OCA-GH Plaintiffs.

### D.  Private Plaintiffs

### i.    OCA-Greater Houston ("OCA-GH") Plaintiffs

80.    The only party among the OCA-GH Plaintiffs to bring claims under Title II of the Americans with Disability Act and Section 504 of the Rehabilitation Act is the organization REVUP-Texas. Specifically, it challenges Sections 5.02, 5.03, 5.07, 5.10, 5.12, and 6.04 of SB 1 under both statutes. Sept. 11, 2023 Tr. at 234:20–234:22.

81.    Plaintiff REVUP-Texas, which stands for "Register, Educate, Vote, Use Power," is a statewide, non-partisan, nonprofit organization. It advocates on issues related to individuals with disabilities through voter registration and assistance, issue advocacy, mobilization, and organizing.

82.    Bob Kafka testified on behalf of REVUP-Texas. Mr. Kafka is the president and state coordinator of REVUP-Texas. Oct. 11, 2023 Tr. at 3618:15–17. He testified about internal

structure of the organization, as well as the alleged impact of SB 1 on REVUP-Texas and the individuals it classifies as members.

83. REVUP-Texas has a board of directors, but the individuals who comprise of the board are not elected by members. Instead, the existing board of directors elects new board members. Oct. 11, 2023 Tr. at 3630:12–15.

84. REVUP-Texas does not have a concrete membership structure.  It has no membership list, no membership dues, and no membership application. Oct. 11, 2023 Tr. at 3630:16–3631:8. According to Mr. Kakfa, the group "consider[s] you a member" "if you're interested in the mission of RevUp." *Id.* at 3620:13–18.

85. Multiple individuals claiming to be members of REVUP-Texas testified in support of the organization's ADA and Rehabilitation Act claims: Terry Saltzman, Jennifer Miller, Lydia Nunez Landry, Amy Litzinger, Laura Halvorson, Cathy Cranston, and Nancy Crowther.

### ii.    Houston Area Urban League ("HAUL") Plaintiffs

86. The only party among the HAUL Plaintiffs to bring claims under Title II of the Americans with Disability Act and Section 504 of the Rehabilitation Act is the organization Arc of Texas. Specifically, it challenged Sections 5.02, 5.03, 5.06, 5.07, 5.10, 6.03, 6.04 6.05, and 6.07 of SB 1 under both statutes. Sept. 11, 2023 Tr. at 230:21–232:15.

87. Plaintiff Arc of Texas is a disability rights organization focused on "community, inclusive education, competitive integrated employment, and civil rights and justice." Oct. 11, 2023 Tr. at 3499:23–1.

88. Jennifer Martinez, the group's chief executive officer, testified as the Arc of Texas's organizational representative.  Oct. 11, 2023 Tr. at 3490:8. She testified about the internal

structure of the organization, as well as the alleged impact of SB 1 on Arc of Texas and the individuals it classifies as members.

89.    The same six individuals who testified on behalf of REVUP-Texas, also claim to be members of Arc of Texas: These witnesses include: Terry Saltzman, Jennifer Miller, Lydia Nunez Landry, Amy Litzinger, Laura Halvorson, and Cathy Cranston.

### iii.    Plaintiff La Unión Del Pueblo Entero ("LUPE")

90.    Plaintiff La Unión Del Pueblo Entero ("LUPE") is a membership organization which advocates on behalf of its members on a range of issues. Sept. 11, 2023 Tr. at 58:8–12. LUPE is based out of the Rio Grande Valley, primarily serving the four-county area of Hidalgo County, Cameron County, Starr County, and Willacy County. Sept. 11, 2023 Tr. at 58:14–16.

91.    LUPE's two primary advocacy activities are community organizing and social services. Sept. 11, 2023 Tr. at 60:7–9. LUPE challenges Sections 6.03, 6.04, 6.05, 6.06, and 7.04 under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Sept. 11, 2023 Tr. at 230:4–20.

92.    LUPE's executive director Tania Chavez Camacho testified as LUPE's organizational representative. Sept. 11, 2023 Tr. at 57:19–22. She testified about the internal structure of the organization, as well as the alleged impact of SB 1 on LUPE and the individuals it classifies as members.

93.    In addition, LUPE also had Juanita Valdez Cox, its former executive director, Sept. 11, 2023 Tr. at 135:10–11; and Cristela Rocha, a LUPE community organizer testify, Sept. 11, 2023 Tr. at 142:14–15.

## II.    Relevant State Witnesses

94.    State Defendants called seven witnesses at trial, six of whom are directly relevant to Plaintiffs'
ADA and Rehabilitation Act Claims: Keith Ingram, Christina Adkins, Samuel Taylor,
Jonathan White, Frank Phillips, and Dr. Mark Hoekstra.

95.    State Defendants also called Jacqueline Doyer to testify about the audit conducted of the
November 2020 general election. Her testimony is discussed at length in State Defendants
and Intervenor-Defendants' larger findings of fact.

### A.  Keith Ingram – Former Director of Elections

96.    Mr. Ingram is a licensed attorney who, after working for three private law firms, worked in
Governor Rick Perry's office for approximately four years, after which he transferred to the
Secretary of State's Office. Sept. 22, 2023 Tr. at 1866:25–1867:18.

97.    When Mr. Ingram joined the Secretary of State's Office in 2012, he was hired as Director of
the Elections Division, the most senior position within that division. Sept. 22, 2023 Tr. at
1867:20–25. Mr. Ingram served in this role for over eleven years until he transitioned into
special projects. Sept. 22, 2023 Tr. at 1868:2–8. 25; *see also* Oct. 17, 2023 Tr. at 4310:13–14.

98.    Mr. Ingram reported to the Deputy Secretary of State and the Secretary of State. Sept. 22,
2023 Tr. at 1869:1–5. He managed and oversaw the Elections Division, which was roughly
30 employees. *Id*. at 1868:18–23.

99.    As Director of Elections, Mr. Ingram was involved in the development of the advice and
assistance the Elections Division provided local election offices. Oct. 17, 2023 Tr. at 4313:14–
4314:2. He was also involved in developing the Secretary's interpretation of new legislation.
*Id.* at 4314:18–4315:2, 4315:18–24.

100. Mr. Ingram is therefore familiar with not only the Elections Division's process for developing advice and assistance, but also the substance of the Secretary's guidance, including that issued in response to SB 1. Oct. 17, 2023 Tr. 4314:3–17. Mr. Ingram helped the Secretary prepare for and ultimately implement SB 1. Sept 22, 2023 Tr. at 1869:10–12.

### B. Christina Adkins – Director of Elections

101. Christina Adkins is a licensed attorney employed with the Texas Secretary of State's Office, where she began in the Elections Division as a staff attorney in June of 2012. Her duties included overseeing the certification program for electronic voting system equipment. Sept. 22, 2023 Tr. at 1822:21–1823:6.

102. In December 2017, Ms. Adkins was promoted to Legal Director of the Elections Division. Oct 18, 2023 Tr. at 4527:19–20. She occupied this position for over six years until March 2023 when she became the Acting Director of Elections. On April 26, 2023, she was officially named Director of Elections. Sept. 22, 2023 Tr. at 1823:7–18.

103. As Legal Director, Ms. Adkins oversaw the Legal Section in the Elections Division. Her team of attorneys and trainers were responsible for developing and communicating advice and assistance to election officials, candidates, members of the public, and "anybody that has questions about the laws that pertain to elections in Texas." Oct. 18, 2023 Tr. at 4527:21–6.

104. To that end, Ms. Adkins and the Legal Section would draft and publish election advisories and election law calendars, conduct web-based trainings, organize and host election law seminars, and answer questions received through the Secretary's informational hotline. Oct. 18, 2023 Tr. at 4528:20–4529:18.

105. Following the enactment of SB 1, Ms. Adkins helped oversee the law's implementation. She and her team were responsible for updating "every piece of guidance, every handbook,

hundreds of prescribed forms, to comport with the requirements of SB 1." Oct. 18, 2023 Tr. at 4549:9–11.

### C. Samuel M. Taylor – Former Assistant Secretary of State for Communications

106. Samuel Taylor worked as head of communications for the Texas Secretary of State, from January 2017 to June 2019, and again from September 2021 to March 2023. Oct.18, 2023 Tr. at 4607:11–13. His official title was Assistant Secretary of State for Communications.

107. Mr. Taylor testified that his duties as head of communications included acting as the spokesperson on behalf of the agency, communicating all agency services to the public and directing voter education. Oct. 18, 2023 Tr. at 4608:21-4609:15.

108. Following SB 1's passage, Mr. Taylor oversaw the $3.5 million statewide voter education campaign designed to educate voters about SB 1's ID Number Requirement. The campaign occurred over the course of the 2022 election cycle and involved educational efforts in English, Spanish, and other languages when appropriate. Oct. 18, 2023 Tr. at 4608:21–4609:15.

109. Voters with disabilities were among the subgroups specifically targeted by the education campaign. Oct. 18, 2023 Tr. at 4627:20–4628:6

110. The voter education campaign "involved primarily paid media, which are traditional TV, radio advertisements purchased, purchasing airtime for those advertisements to run," as well as digital advertisements. Oct. 18, 2023 Tr. at 4613:6–17. The advertisements and materials developed for the campaign were run in both English and Spanish. *Id.*

111. The campaign involved outdoor advertisements such as billboards, bus stops, gas pump toppers. Oct. 18, 2023 Tr. at 4613:6–17. All advertisements directed voters' attention to

'Vote Texas.Gov,' which contained detailed explanations about how to comply with the new requirements and how to navigate the cure process if necessary. *Id*. at 4613:6–23.

112. In addition, the vendor hired to implement the campaign conducted a "grassroots tour," which visited community events throughout Texas. Oct. 18, 2023 Tr. at 4613:24–4614:7.

113. The Secretary conducted research when developing the content for its voter education campaign. Oct. 18, 2023 Tr. at 4631:23–25. To ensure that voters with disabilities found the content accessible and helpful, the Secretary partnered with the Coalition for Texans with Disabilities, who helped organize focus groups to provide feedback. *Id*. at 4631:23–4632:7. The results of these focus groups "guided how [the Secretary] executed the content and delivery of that content for the remainder of the campaign." *Id*. at 4632:8–10.

114. There was a specific VoteTexas.Gov page addressing the concerns of people with disabilities, which highlighted that curbside voting was still available. Oct. 18, 2023 Tr. at 4631:12–4632:10.

115. When asked why his office took care to specifically target voters with disabilities in the Secretary's voter education campaign, Mr. Taylor testified that it was because his office wanted "to make sure that voters with disabilities had the same information, accurate information, so that they could vote independently or with the assistance." Oct. 18, 2023 Tr. at 4632:18–22. His office want[ed] to make sure they had all the same opportunities" to vote. *Id*. at 4632:23–24.

### D. Jonathan White – Chief of the Election Fraud Section

116. Jonathan White is a licensed attorney who has been employed by the Office of the Attorney General ("OAG") for the State of Texas for approximately 15 years. Oct. 16, 2023 Tr. at 3903:18.

117. Mr. White first worked in the Criminal Prosecution Division, which encompassed election crimes as part of the White Collar Crime and Public Integrity caseload section. Oct. 16, 2023 Tr. at 3903:12–17.

118. Mr. White was appointed to the Chief of the Election Fraud Section of the Texas Attorney General's Special Prosecutions Division—ultimately titled the Election Integrity Division—which was created to investigate and prosecute election offenses and pursue justice with regard to those offenses in Texas. Oct. 16, 2023 Tr. at 3905:8–15.

119. As Division Chief, Mr. White investigated and prosecuted a variety of offenses related to voter fraud, including but not limited to ballot harvesting, illegal voting, and illegal ballot assistance. Oct. 16, 2023 Tr. at 3915:1–8.

120.  In the course of these responsibilities, Mr. White personally reviewed the original election records, listened to any interviews, and reviewed any evidence of the alleged election offenses before bringing charges. Oct. 16, 2023 Tr. at 3906:4–20.

121. Additionally, Mr. White supervised a group of attorneys, legal assistants, research specialists, and helped guide investigations by identifying factual and evidentiary issues at the investigation phase to determine if it was a viable case. Oct. 16, 2023 Tr. at 3906:4–20.

122. During the 87th Texas Legislature, Mr. White appeared before the House Constitutional Rights & Remedies, Select Committee and the Senate State Affairs Committee, where he testified about SB 1 and its predecessor bills. Oct 16, 2023 Tr. at 4038:20–22.

123. The subject of his legislative testimony examined the type and frequency of election crimes in Texas, including the voting assistance, common modus operandi that election crimes

followed, and loopholes that could be closed to better protect vulnerable voters. Oct 16, 2023 Tr. at 3929:12-15.

### E.    Frank Phillips – Denton County Election Administrator

124.    Frank Phillips is the Elections Administrator for Denton County. Oct. 12, 2023 Tr. at 3810:5-7. Mr. Phillips has worked in his current role since 2009. Oct. 12, 2023 Tr. at 3810:16–18. Prior to working for Denton County, Mr. Phillips worked in law enforcement for the Shreveport Police Department, before moving to Texas and working for the Farmer's Branch Police Department in Denton County. Oct. 12, 2023 Tr. at 3811:5–14. Mr. Phillips was also the election administrator for Tarrant County from 2014 to 2016. Oct. 12, 2023 Tr. at 3810:22–25. Overall, Mr. Phillips has worked in Texas elections for 14 years. Oct. 12, 2023 Tr. at 3811:1–2.

125.    In his current position as elections administrator for Denton County, Mr. Phillips' testified that his responsibilities are two-fold. First, as voter registrar, he handles all voter registration matters, and, additionally, as election administrator he manages all elections. Oct. 12, 2023 Tr. at 3811:17–22. Specifically, Mr. Phillips testified that as voter registrar, that means his office registers people to vote, and at the same time cancel their registrations if they move to another county or out of the State. Oct. 12, 2023 Tr. at 3812:3–6. As for his election administrator duties, Mr. Phillips explained his office is the early voting clerk for Denton County, meaning he is responsible to for managing early voting, which includes mail and in-person voting. Oct. 12, 2023 Tr. at 3812:19–25.

126.    Mr. Phillips said his office found election fraud that had occurred during the November 2020 general election. Oct. 12, 2023 Tr. at 113:7–14. Among these instances of election fraud, Mr. Phillips reported that one Zul Mohammed, a mayoral candidate, had been discovered to have

submitted at least 84 fraudulent applications for mail ballot. Oct. 12, 2023 Tr. at 113:15–114:10, 119:16-24.

### F. Dr. Mark Hoekstra – Expert Witness

127. "Professor Hoekstra is the Private Enterprise Research Center Rex B. Grey Associate Professor of Economics at Texas A&M University, a Research Fellow at Institute of Labor Economics, and a Research Associate at the National Bureau of Economic Research.

128. Professor Hoekstra was recognized as an expert in statistics and methodologies and causal inferences used to answer questions in economics and other social sciences. Oct. 19, 2023 Tr. at 4676:22–4678:12.

129. He testified on the impact of SB1 on racial and ethnic minorities, the acceptance and rejection of mail-voting applications and mail ballots, and the conclusions reached in Drs. Hersh, McDaniel, and Grose's expert reports prepared for Plaintiffs.

## III.   Relevant Plaintiff Witnesses

### A. Terry Saltzman

130. Terry Saltzman is a voter with visual impairment, who resides in Travis County. Oct. 10, 2023 Tr. at 3346:17–20, 3347:4–5. She testified regarding Section 5.07 and 5.13, but she suffered no cognizable injury under the ADA or Rehabilitation Act.

131. In the 2022 primary election, her mail ballot application was rejected because county election officials mistakenly sent her the wrong application form.  Oct. 10, 2023 Tr. at 3354:10–13. She admitted at trial that the rejection "had nothing to do with the numbers" required by SB 1. *Id*. Ms. Saltzman then successfully submitted a new application and was issued a mail ballot.  *Id*. at 3355:19–24.

132. Ms. Saltzman also testified that she did not check a box on her carrier envelope, resulting in the initial denial of her ballot. Oct. 10, 2023 Tr. 3357:7–9. That requirement was not related to SB 1's identification number requirement. Ms. Saltzman contacted the Travis County Election Office, who walked her through the Ballot Tracker to cure her ballot. Oct. 10, 2023 Tr. 3357:10-3358:10. The Election Office informed Ms. Saltzman that her ballot had been cured. Oct. 10, 2023 Tr. 3358:10–12.

133. Ms. Saltzman testified that she utilized curbside voting to cast her ballot in the May 2022 election. Oct. 10, 2023 Tr. 3359:4–7. She chose to vote by mail again in the November 2022 general election. Oct. 10, 2023 Tr. 3360:2–4. The Travis County Election Office informed her that her ballot was accepted. Oct. 10, 2023 Tr. 3362:8–10.

134. Ms. Saltzman did not ask for a reasonable accommodation. Oct. 10, 2023 Tr. at 3367:10–12.

### B. Jennifer Miller

135. Jennifer Miller resides in Austin, Texas with her daughter, Danielle Miller. Oct. 10, 2023 Tr. at 3194:19–3195:13. HAUL and OCA Plaintiffs consider her testimony relevant regarding Section 5.02, 5.03, 5.06, 5.07, 5.20, 5.12, 6.03, 6.04, 6.05, and 6.07. *Id.* However, neither Ms. Miller nor her daughter suffered a legally cognizable injury under the ADA.

136. Danielle Miller suffers from autism-related dysgraphia and dyslexia. Oct. 10, 2023 Tr. at 3195:24–3196:25. Ms. Miller regularly assists her daughter with voting. *Id.* at 3199:10–15.

137. During 2022, Ms. Miller helped her daughter apply for a mail ballot but after receiving a rejection notice for a mail ballot, Ms. Miller drove her daughter to an in-person voting location where her daughter was able to vote. Oct. 10, 2023 Tr. at 3210:21–3212:9.

138. Ms. Miller and her daughter had neglected to re-register Danielle's permission to vote by mail, as has been required by state law since before SB1's enactment. Oct. 10, 2023 Tr. at 3225:3–8. When Danielle had voted by mail in 2020, her annual registration had been submitted in advance, and Ms. Miller had not encountered any problems with assisting her daughter to vote by mail. *Id.*

139. Ms. Miller stated that her daughter had been able to vote on every occasion she had to cast a ballot since the passage of SB1. Oct. 10, 2023 Tr. at 3227:9–13.

### C. Lydia Nunez Landry

140. Lydia Nunez Landry resides in Harris County and is a regional representative at REVUP-Texas. Oct. 10, 2023 Tr. at 3229:15–18. She has also performed some work on behalf of Arc of Texas, including assisting people with voter registration. *Id.* at 3230:9.

141. HAUL and OCA-GH Plaintiffs deem her testimony relevant to their claims against Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.03, 6.04, 6.05, and 6.07. *Id.* at 3228:7–8. However, Ms. Landry has not suffered a legally cognizable injury under the ADA.

142. While Ms. Landry opined that assisting disabled voters had become more difficult after passage of SB1 (*see, e.g.*, Oct. 10, 2023 Tr. at 3232:1–2), she could not identify any person who had been negatively affected by SB1's mandatory oath of assistance. *Id.* at 3261:10–3262:16.

143. During the November 2022 election, Ms. Landry was able to vote in person and even receive help from election workers at the polling site. Oct. 10, 2023 Tr. at 3262:25–3263:20. No one at the polling site prevented Ms. Landry from receiving assistance from her partner, her preferred assister. *Id.* at 3261:2–9.

144. Prior to voting in 2022, Ms. Landry called the ADA coordinator for Harris County and was informed that she could receive assistance as a disabled voter. Oct. 10, 2023 Tr. at 3265:21–3266:1.

145. Ms. Landry did not recall requesting an accommodation from either the Secretary of State or the Attorney General. Oct. 10, 2023 Tr. at 3267:15–3268:14.

### D. Amy Litzinger

146. Amy Litzinger resides in Travis County and is a member of the Arc of Texas as well as REVUP-Texas. Oct. 10, 2023 Tr. at 3273:25–3274:17. Ms. Litzinger suffers from cerebral palsy, which renders her unable to walk or drive. *Id*. at 3275:18–24.

147. HAUL and OCA-GH Plaintiffs consider her testimony relevant regarding their claims against Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.03, 6.04, 6.05, and 6.07. *Id*. at 3272:16–17. Nonetheless, Ms. Litzinger has not suffered a legally cognizable injury under the ADA.

148. Ms. Litzinger testified that she felt her personal assistants were less comfortable offering her help inside polling locations after enactment of SB1. Oct. 10, 2023 Tr. at 3294:10–17.

149. Ms. Litzinger recounted two occasions during 2022 when she decided not to ask for assistance while voting. On one occasion, during the May 2022 election, Ms. Litzinger had entered the polling site while wearing a mobility-limiting chest strap. She did not ask someone to help her remove it. *Id*. at 3290:6.

150. Nor did Ms. Litzinger ask whether removing the strap constituted voter assistance, as defined by the Election Code, thereby requiring her attendant to take the oath of assistance. Oct. 10, 2023 Tr. at 3303:22–3304:5.

151.  On the second occasion, during the November 2022 election, Ms. Litzinger's personal care attendant accompanied her inside the polling location but did not render voting assistance, and they decided the assistant would not take the oath. Oct. 10, 2023 Tr. at 3290:24–3292:17. Ms. Litzinger did not avail herself of the option of having an election worker assist her instead.

152.  Ms. Litzinger successfully voted by personal appearance in every statewide election conducted since the passage of SB 1. Oct. 10, 2023 Tr. at 3302:20–3, 3304:6–10; 3304:25–3305:1. She testified that at no point since the implementation of SB 1 had she been prevented from casting a ballot. Oct. 10, 2023 Tr. at 3305:17–20.

153.  Ms. Litzinger testified that she did not ask for a reasonable modification from the county or the State. Oct. 10, 2023 Tr. at 3301:1–3.

### E.  Laura Halvorson

154.  Laura Halvorson resides in San Antonio. Oct. 10, 2023 Tr. at 3310:18. Ms. Halvorson suffers from muscular dystrophy that causes her to rely on an electric wheelchair and a breathing machine. Oct. 10, 2023 Tr. at 3311:13–3312:6.

155.  HAUL and OCA-GH Plaintiffs consider Ms. Halvorson's testimony relevant to their claims against Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.03, 6.04, 6.05, and 6.07. However, Ms. Halvorson has not suffered a legally cognizable injury under the ADA.

156.  Ms. Halvorson has utilized curbside voting in previous elections, when the COVID-19 pandemic was worse. Oct. 10, 2023 Tr. at 3334:10–14, 23–25.

157.  Ms. Halvorson voted by mail during the March 2022 primary elections. Oct. 10, 2023 Tr. at 3318:25-3319:2. It was the first time she had voted by mail in years. Oct. 10, 2023 Tr. 3335:6–18.

158.  Ms. Halvorson testified that her caregiver was uncomfortable taking the oath of assistance for fear of committing perjury, combined with the provisions that limited assistance to reading the ballot, marking the ballot, or directing the voter to read or mark the ballot. Oct. 10, 2023 Tr. at 3335:19–3336:5.

159.  Ms. Halvorson therefore completed her ballot herself. Oct. 10, 2023 Tr. at 3319:7-13. She remembers entering both her SSN and driver's license number onto the carrier envelope. Oct. 10, 2023 Tr. at 3319:23–3320:3.

160.  Ms. Halverson used the Secretary's online Ballot Tracker to keep updated on her ballot's status. The website indicated that the ballot was received on February 26, 2022. Oct. 10, 2023 Tr. at 3321:8-14, 3337:5-15. The Ballot Tracker later indicated that her ballot was accepted. Oct. 10, 2023 Tr. at 3321:8–17.

161.  Ms. Halvorson also voted in the November 2022 general election in person. Oct. 10, 2023 Tr. at 3322:5–10. During the November election, Ms. Halvorson did not request voting assistance but was attended by her caregiver who monitored her breathing machine. Oct. 10, 2023 Tr. at 3322:11-18. She successfully cast her ballot. Oct. 10, 2023 Tr. at 3340:4–6.

162.  Ms. Halvorson was not aware that prior to SB1 state law imposed the penalty for perjury for violating the previous version of the oath of assistance. Oct. 10, 2023 Tr. at 3336:10–21.

163.  Ms. Halvorson understands that the oath of assistance no longer contains the language about reading the ballot, marking the ballot, or directing the voter to do the same. Oct. 10, 2023 Tr. at 3336:6–9.

164.  Ms. Halvorson did not request an additional accommodation or modification while voting. Oct. 10, 2023 Tr. at 3340:1–3.

165.  Ms. Halvorson was able to vote in both elections she participated in that took place after enactment of SB1. Oct. 10, 2023 Tr. at 3340:13–16. She testified that since the passage of SB 1, she never has been prevented from casting a ballot in an election in the state of Texas. Oct. 10, 2023 Tr. at 3340:13–16.

### F.  Cathy Cranston

166.  Cathy Cranston resides in Austin where she works as a personal care attendant. Oct. 11, 2023 Tr. at 3549:10. She has provided voting assistance in Texas elections. Oct. 11, 2023 Tr. at 3575:14–24.

167.  HAUL and OCA-GH Plaintiffs conder her testimony relevant to their claims against Sections 5.02, 5.07, and 6.04. Ms. Cranston has not suffered a legally cognizable injury under the ADA.

168.  Ms. Cranston testified to having "angst" about section 6.04's voter assistance oath because "if [she] do[es]n't get [something] right, [she] could be at risk." Oct. 11, 2023 Tr. at 3560:1– 9. Ms. Cranston elaborated that an assistor could inadvertently disclose an assistor's voting choice to close family or friends. Oct. 11, 2023 Tr. at 3568:2-12.

169.  Despite these concerns, Ms. Cranston provided voting assistance to an individual during the March 2022 primaries. Oct. 11, 2023 Tr. at 3575:14-24. Ms. Cranston stated the reason she

did not assist voters during other 2022 elections was because although she was on hand to assist no one requested that she do so. Oct. 11, 2023 Tr. at 3576:4–22.

170. Ms. Cranston stated that she never researched the meaning of the oath of assistance or contacted either Travis County officials or the Secretary of State to clarify the meaning and ramifications of the oath. Oct. 11, 2023 Tr. at 3579:18–3580:23

171. Ms. Cranston is not aware of anyone who has been punished or prosecuted for violating the oath. Oct. 11, 2023 Tr. at 3580:24-3581:4

172. Ms. Cranston also acknowledged personal care attendants were hesitant to "assist voters before 2022 because of the oath." Oct. 11, 2023 Tr. at. 3567:20–23.

173. Ms. Cranston testified about the SB 1's ID Number Requirement but admits that she "never personally assisted an individual filling out an application for ballot by mail." Oct. 11, 2023 Tr. at 3571:2–4.

174. Ms. Cranston testified that in a healthy relationship between a personal attendant and an individual that needs assistance, the power is supposed to reside in the person who needs assistance. Oct. 11, 2023 Tr. at 3570:15–3571:9. However, she acknowledged that there are some individuals who do not understand or appreciate that dynamic. *Id.*

175. Ms. Cranston admits that there is an opportunity for a personal care attendant or assister to exploit or pressure a voter with a disability while assisting them with casting their ballot. Oct. 11, 2023 Tr. at 3574:6–10.

176. Ms. Cranston agrees that each person's disability is different from another person's disability, Oct. 11, 2023 Tr. at 3577:6–9, and that because of this variety, individuals with disability need different things to lead full lives. Oct. 11, 2023 Tr. at 3577:10–13. Accordingly,

while there might be "certain commonalities," accommodations need to be individualized to a person's disability and needs.

177. Ms. Cranston is aware that a voter does not need to provide proof of disability in order to secure assistance at the polls. Oct. 11, 2023 Tr. at 3575:1–5.

178. Ms. Cranston has a disability but has never requested assistance to vote because, in her words, she "do[es]n't need it." Oct. 11, 2023 Tr. at 3571:5–9. She agrees that not every person with a disability wants assistance while voting. Oct. 11, 2023 Tr. at 3577:18–20.

179. Ms. Cranston successfully voted in elections that were conducted post SB 1's enactment. Oct. 11, 2023 Tr. at 3571:13–3572:13. She has never requested an ADA accommodation while voting. Oct. 11, 2023 Tr. at 3571:10-12.

### G. Nancy Crowther

180. Nancy Crowther resides in Travis County and is a member of both Arc of Texas and REVUP-Texas. June 17, 2022 Nancy Crowther Dep. at 11:19–20; 17:4–5; 18:3–9. Ms. Crowther did not testify at trial; the testimony she gave when deposed did not communicate a legally cognizable injury under the ADA.

181. Ms. Crowther suffers from a progressive degenerative disease. June 17, 2022 Nancy Crowther Dep. at 23:25–24:10. Her condition prevents her from walking, and she can lift small objects only with difficulty. June 17, 2022 Nancy Crowther Dep. at 25:1–17. She employs attendants and relies on mobility equipment. *Id.*

182. Ms. Crowther expressed concerns that the oath of assistance could create legal liability for an attendant who provides assistance with voting and would "jeopardize the relationship with my attendant." June 17, 2022 Nancy Crowther Dep. at 52:23–53:7.

183. Ms. Crowther decided not to ask her personal care attendant to accompany her inside the polling pace when she voted in the May 7, 2022 runoff election and voted without an assister. June 17, 2022 Nancy Crowther Dep. at 54:1–14.

184. Nonetheless, Ms. Crowther was accompanied by her attendant when she voted in the March 2022 primaries, June 17, 2022 Nancy Crowther Dep. at 88:10–15, and her attendant provided some help in casting her ballot. June 17, 2022 Nancy Crowther Dep. at 87:4–9.

185. In both elections her attendant drove her to the polling location. June 17, 2022 Nancy Crowther Dep. at 114:8–11.

186. When asked to expand on her concerns with the oath, Ms. Crowther admitted that she found any oath problematic, even if its content permitted her to receive the assistance she needed. June 17, 2022 Nancy Crowther Dep. at 112:15–22. Ms. Crowther said she did not want her attendant to swear an oath that would create or acknowledge legal liability for violating it. June 17, 2022 Nancy Crowther Dep. at 98:8–14.

187. Ms. Crowther did not contact any county official, any lawyer or the Secretary of State to ask clarifying questions about the oath or the limits of lawful voting assistance. June 17, 2022 Nancy Crowther Dep. at 90:1–8.

188. Ms. Crowther never made a request for an accommodation from Travis County or the Secretary of State. June 17, 2022 Nancy Crowther Dep. at 117:8–21.

### H. Toby Cole

189. Toby Cole resides in Harris County. Sept. 13, 2023 Tr. at 695:6–7. LUPE Plaintiffs believe that Mr. Cole's testimony is relevant to their claims against Sections 6.03, 6.04 and 6.05.

Sept. 13, 2023 Tr. at 694:20–21. However, Mr. Cole failed to describe an injury that is cognizable under the ADA.

190. Mr. Cole suffers from quadriplegic paralysis that has left him unable to move his arms or legs to any degree. Sept. 13, 2023 Tr. at 697:2–21.

191. Nonetheless, Mr. Cole exclusively votes in person because he enjoys "the feeling of voting" Sept. 13, 2023 Tr. at 701:23–702:5. Mr. Cole always relies on an assister that he knows personally to help him vote. Sept. 13, 2023 Tr. at 722:7–11.

192. Mr. Cole stated that he took offense towards the portion of the oath of assistance that requires the assister to have been informed of the assistee's eligibility to receive assistance, because, in his view, this indirectly requires him to disclose private details about his disability. Sept. 13, 2023 Tr. at 710:4–19.

193. Mr. Cole never recounted a specific instance in which he had to describe his disability before receiving assistance. Moreover, he acknowledged that he could request voting assistance by giving a generic representation of his eligibility without explaining the particulars of his disability. Sept. 13, 2023 Tr. at 724:10–17. Additionally, Mr. Cole mentioned that the fact of his eligibility tended to be obvious to assisters upon observing him. Sept. 13, 2023 Tr. at 709:24–710:2.

194. Mr. Cole also stated that the oath made voting more difficult because it did not allow his assisters to remind him how he planned to vote, Sept. 13, 2023 Tr. at 710:20–711:11, and that he felt "uncertainty" concerning the provision of the oath that prohibits voter coercion. Sept. 13, 2023 Tr. at 712:6–713:7.

195. Mr. Cole testified that he has always been able to vote curbside and that he has never been unable to cast a ballot. Sept. 13, 2023 Tr. at 723:2–6.

196. Mr. Cole did not state that he was a member of any plaintiff organization.

## I. Cris Rocha

197. Cris Rocha (full name Maria Cristela Gonzalez Tobias) resides in Hidalgo County and is an employee-member of LUPE for whom she works as a community organizer. Sept. 11, 2023 Tr. at 142:1–19. LUPE Plaintiffs consider her testimony relevant to their claims against Sections 6.03, 6.04, 6.05, and 6.06. Sept. 11, 2023 Tr. at 141:10–15. However, Ms. Rocha failed to describe a legally cognizable injury under the ADA suffered by either herself or another person.

198. Ms. Rocha assists voters by accompanying them to the polls and offering assistance preparing their ballot when asked to do so. Sept. 11, 2023 Tr. at 145:25–146:9.

199. Ms. Rocha testified that SB1's oath of assistance has caused her to not want to provide assistance. Sept. 11, 2023 Tr. at 148:4–8. Ms. Rocha clarified that she remains willing to offer assistance but prefers to be a voter's "last choice" of assister. Sept. 11, 2023 Tr. at 156:12–18.

200. After the passage of SB1, Ms. Rocha has continued going to the polls as an assister, but she recounted two incidents where she did not provide assistance to voters. Ms. Rocha discussed an incident where a Mr. Cabello was assisted with voting by an election worker instead of Ms. Rocha. Sept. 11, 2023 Tr. at 150:12–14. Mr. Cabello did not testify, and Ms. Rocha's testimony did not establish why Mr. Cabello voted with assistance from an election worker instead of Ms. Rocha. Similarly, without explaining why, Ms. Rocha also testified that an

election worker, rather than Ms. Rocha, assisted a Mr. Garcia. Sept. 11, 2023 Tr. at 150:19–25.

### J.  Tonia Chavez Camacho

201.  Tonia Chavez Camacho is the executive director of LUPE. Sept. 11, 2023 Tr. at 57:19–22. LUPE Plaintiffs believe her testimony is relevant to their claims against Section 7.04. Sept. 11, 2023 Tr. at 56:14–16. However, Ms. Camacho did not describe a legally cognizable injury under the ADA suffered by either herself or another person.

202.  Ms. Camacho testified that LUPE usually does not provide voter assistance inside polling locations unless requested to do so by one of its members in advance. Sept. 11, 2023 Tr. at 116:22–117:2.

203.  Ms. Camacho testified about an incident where a Mr. Omar Garcia, who suffers from cerebral palsy and was assisted by his mother in casting his ballot, felt uncomfortable due to being observed by an election worker. Sept. 11, 2023 Tr. at 108:7–23. Nonetheless, Mr. Garcia was able to cast his ballot successfully. *Id.* This incident was the only occasion of a problem related to voting she could specifically recall.

204.  Ms. Camacho testified that she was not aware that any LUPE member or employee had violated the oath of assistance, either before or after enactment of SB1. Sept. 11, 2023 Tr. at 118:6–15.

## IV.    Voters with Disabilities Have Many Meaningful Opportunities to Vote in Texas.

### A.  Voters with Disabilities Can Vote In Person.

205.  In Texas, voters may vote by personal appearance on Election Day or during the early voting period. Sept. 19, 2023 Tr. at 1084:11–16. Per the Texas Election Code, "early voting shall be

conducted by personal appearance at an early voting polling place and by mail" for each

election in Texas. Tex. Elec. Code § 81.001(a); STATE Ex. 246 at 44.

206. Texas has an open early voting period, Sept. 19, 2023 Tr. at 1084:17–18, where early voting

is available to any voter who is voting in person. Tex. Elec. Code § 81.001(a). Indeed, "[a]ny

qualified voter is eligible for early voting by personal appearance." Tex. Elec. Code § 82.005;

Sept. 19, 2023 Tr. at 1084:19–22 (discussing no-excuse early voting).

207. Texas requires that all polling places must be "accessible to and usable by the elderly and

persons with physical disabilities." Tex. Elec. Code § 43.034(a); STATE Ex. 236 at 1–2.

208. A polling place is accessible when (1) the polling place is "on the ground-level floor or be

accessible from the ground-level floor by an elevator with doors that provide an opening of

at least 36 inches in width;" (2) "doors, entrances, and exits used to enter or leave the polling

place [] have a minimum width of 32 inches;" (3) "any curb adjacent to the main entrance

to a polling place [has] curb cuts or temporary nonslip ramps;" (4) "any stairs necessary to

enter or leave the polling place [] have a handrail on each side of the stairs and a nonslip

ramp;" and (5) the polling place does not have "a barrier that impedes the path of a person

with physical disabilities to the voting station," such as gravel, automatically closing gates,

closed doors without lever-type handles, or any other barrier. Tex. Elec. Code

§ 43.034(a)(1)–(5); STATE Ex. 236 at 1–2.

209. Polling places must further meet such "strict accessibility standards" by having voting

systems that are "accessible to voters with physical disabilities and can accommodate no

vision, low vision, no hearing, low hearing, limited manual dexterity, limited reach, limited

strength, no mobility, low mobility, or any combination of the foregoing (except the combination of no hearing and no vision)." STATE Ex. 236 at 2.

210. Each polling place also offers at least one type of accessible voting equipment that allows voters with disabilities to vote directly on the system or assist them in marking the paper ballot. STATE Ex. 236 at 2. Such voting equipment could include the use of headphones or other assistive devices to ensure that voters can cast their ballot independently and secretly. STATE Ex. 236 at 2.

211. In practice, counties take their responsibility under the ADA very seriously. *See, e.g.*, Sept. 12, 2023 Tr. at 308:19–22; Oct. 12, 2023 Tr. at 3861:21–23. Counties work to ensure that its voting program is accessible to voters with disabilities (*see, e.g.*, Sept. 12, 2023 Tr. at 308:15–18; Oct. 12, 2023 Tr. at 3861:24–3862:5), and counties in Texas will not select a polling location for early voting or for Election Day if that location is not in compliance with the ADA. *See, e.g.*, Sept. 12, 2023 Tr. at 286:10–17; Sept. 12, 2023 Tr. at 444:10–13, Oct. 12, 2023 Tr. at 3861:24–3862:5.

212. Moreover, voters with disabilities may utilize what is colloquially known as curbside voting at polling locations. Tex. Elec. Code § 64.009(a); Sept. 12, 2023 Tr. at 345:14–347:20.

213. Specifically, "[i]f a voter is physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health," then "an election officer shall deliver a ballot to the voter at the polling place entrance or curb" at the voter's request. Tex. Elec. Code § 64.009(a) (Sept. 1, 1997); STATE Ex.246 at 38. "The regular voting procedures may be modified by the election officer to the extent necessary to conduct" curbside voting. Tex. Elec. Code § 64.009(b) (Sept. 1, 1997); STATE Ex. 246 at 38.

214. Then, "[a]fter the voter is accepted for voting, the voter shall mark the ballot and give it to the election officer who shall deposit it in the ballot box." Tex. Elec. Code § 64.009(c) (Sept. 1, 1997); STATE Ex. 246 at 38. Further, "a person accompanying the voter shall be permitted to select the voter's ballot and deposit the ballot in the ballot box." Tex. Elec. Code § 64.009(d) (Sept. 1, 1997).

215. The Election Code requires that at each polling place, the election authority reserve at least one parking space for curbside voting. The area must be clearly marked with a sign in large font indicating that the space is reserved for curbside voting and displaying a telephone number that a voter may call to request assistance. Sept. 12, 2023 Tr. at 346:1–13. Counties will continue to offer curbside voting in future elections. *See, e.g.*, Sept. 12, 2023 Tr. at 347:1–22; Sept. 14, 2023 Tr. at 827:4–22.

**B. Voters with Disabilities Can Obtain Voting Assistance.**

216. Voters with disabilities may receive voting assistance to vote. Sept. 19, 2023 Tr. at 1099:12–14. When a voter requests assistance to vote, the voter can be provided assistance by the election worker at the polling location, Sept. 19, 2023 Tr. at 1099:15–18; October 12, 2023 Tr. at 3859:18–20, or the voter can request assistance from a third party, Sept. 19, 2023 Tr. at 1099:19–21; Oct. 12, 2023 Tr. at 3860:4–5.

217. Specifically, when a voter requests for assistance in marking his or her ballot, "two election officers shall provide the assistance." Tex. Elec. Code § 64.032(a) (Jan. 1, 1986); *see also* Sept. 19, 2023 Tr. at 1099:15–18; Sept. 12, 2023 Tr. at 305:16–19.

218. "If a voter is assisted by election officers in the general election for state and county officers, each officer must be aligned with a different political party unless there are not two or more

election officers serving the polling place who are aligned with different parties. Tex. Elec. Code § 64.032(b) (Jan. 1, 1986).

219. Moreover, "[i]f a voter is assisted by election officers, one of them shall read the entire ballot to the voter," but if the voter tells the officer that the voter desires to vote only on certain offices or measures," then "the officer shall read those items on the ballot specified by the voter." Tex. Elec. Code § 64.033(a) (Sept. 1, 1997).

220. The voter may also "be assisted by any person selected by the voter" as long as it is not "the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." Tex. Elec. Code § 64.032(c) (Jan. 1, 1986); Sept. 19, 2023 Tr. at 1099:19–20.

221. When a person of the voter's choice is assisting the voter, "an election officer shall enter the person's name and address on the poll list beside the voter's name." Tex. Elec. Code § 64.032(d) (Jan. 1, 1986); *see also* Oct. 18, 2023 Tr. at 4424:5–14.

222. And "[i]f a voter is assisted by a person of the voter's choice, an election officer shall ask the voter being assisted whether the voter wants the entire ballot read to the voter," and if that is the case, then "the officer shall instruct the person assisting the voter to read the entire ballot to the voter." Tex. Elec. Code § 64.033(b) (Sept. 1, 1997).

223. Voting assistance has a specific definition under the Election Code. For an act to constitute voting assistance under the Election Code, and trigger the oath and reporting obligations, the assistor must be interacting with the ballot. Oct. 18, 2023 Tr. at 4419:25–4420:2. Otherwise, the conduct is classified as general assistance.

224. Thus, for example, voter assistance does not include opening the door for a voter in a wheelchair at a polling location, Oct. 18, 2023 Tr. at 4419:9–12; wheeling a voter with a disability to a polling station or helping position that voter so that he or she could access the voting equipment, *id*. at 4419:13–16; or releasing the strap on the wheelchair of a voter who was struggling to maneuver so that he or she could better access the voting equipment. *Id*. at 4419:17–20.

225. Generally, "[a] voter is eligible to receive assistance. . . if the voter cannot prepare the ballot because of: (1) a physical disability that renders the voter unable to write or see; or (2) an inability to read the language in which the ballot is written." Tex. Elec. Code § 64.031 (Jan. 1, 1986) (codifying federal standard).

226. In practice, if a voter states that he or she is eligible for assistance, the Texas Secretary of State's Office advises counties that they should accept the representation of the voter. Oct. 18, 2023 Tr. at 4418:16–20. Indeed, a county or an election worker is not permitted to question the voter about whether the voter qualifies for voter assistance, *id*. at 4418:21–23, and they are not permitted to question the voter about the nature of the voter's disability. *Id*. at 4418:24–4419:2.

227. Counties even leave it up to the voter to decide whether he or she is eligible to receive assistance. Sept. 19, 2023 Tr. at 1099:22–24.

228. Before a person may provide assistance to a voter, that person must take an oath that is administered by an election officer at the polling place. Tex. Elec. Code § 64.034 (Sept. 1, 2013); Oct. 16, 2023 Tr. at 3974:4–6; Sept. 19, 2023 Tr. at 1099:25–1100:2.

229. As part of that oath, the person assisting the voter must provide his or her name and signature. Sept. 19, 2023 Tr. at 1100:3–5. But prior to SB 1, assistors did not provide their address, relationship to the voter, or whether they received compensation from a candidate, campaign, or political committee. *Id.* at 1100:6–9.

230. Thus, before SB 1, the assistor's signature was not tied to a person. *Id.* at 1100:10–12. It did not have the assistor's address. *Id.* at 1100:13–14. It did not identify who the assistor was assisting. *Id.* at 1100:15–16. So, it was not very helpful. *Id.* at 1100:17–18.

231. Prior to SB 1, the oath of assistance was under the penalty of perjury. Tex. Pen. Code § 37.02; Oct. 16, 2023 Tr. at 3974:7–3975:7; Oct. 18, 2023 Tr. at 4426:18–20. It specifically stated:

> "I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs; and I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." Tex. Elec. Code § 64.034

232. The Election Code prohibits assistors from taking certain actions that can harm the voters' right. Oct. 16, 2023 Tr. at 3923:21–3924:3. The Election Code defines this as "Unlawful Assistance." *See* Tex. Elec. Code. § 64.036; Oct. 18, 2023 Tr. at 4428:6–10. SB 1 did not create or amend this title. *See generally* JOINT Ex. 1.

233. Specifically, a person commits a Class A misdemeanor if the person knowingly (1) "provides assistance to a voter who is not eligible for assistance;" (2) "prepares the voter's ballot in a way other than the way the voter directs or without direction from the voter" while assisting the voter; (3) "suggests by word, sign, or gesture how the voter should vote" while assisting the voter; (4) "provides assistance to a voter who has not requested assistance or selected

the person to assist the voter;" or (5) assists the voter as the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs. Tex. Elec. Code § 64.036(a)–(b), (d); Tex. Elec. Code § 64.032(c); Oct. 16, 2023 Tr. at 3924:5–14.

234. Likewise, an election officer commits a Class A misdemeanor if the election officer "knowingly permits a person to provide assistance[] (1) to a voter who is not eligible for assistance;" or (2) as the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs. Tex. Elec. Code § 64.036(c)–(d); Tex. Elec. Code § 64.032(c).

235. The Secretary of State's Office understands that pressuring or coercing a voter into choosing someone as an assistor constitutes unlawful assistance. Oct. 18, 2023 Tr. at 4428:15–18; Oct. 16, 2023 Tr. at 3925:4–6.

236. The Election Code states that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted. Tex. Elec. Code § 64.037; Oct. 18, 2023 Tr. at 4429:25–4430:13. This provision predated SB1. *See generally* JOINT Ex. 1.

237. A person commits an offense if the person was in a polling place for any purpose other than voting and knowingly communicates to another person information that the person obtained at the polling place about how a voter has voted. Tex. Elec. Code § 61.006(a); *see also* Oct. 18, 2023 Tr. at 4429:10–17.

238. Turning to voting by mail, if a voter is casting a ballot by mail and would be eligible to receive assistance at a polling place, that voter "may select a person as provided by Section 64.032(c) to assist the voter in preparing the ballot." Tex. Elec. Code § 86.010(a).

239. When a person is assisting a voter in the vote-by-mail context, the person "must sign a written oath prescribed by Section 64.034 that is part of the certificate on the official carrier envelope." Tex. Elec. Code § 86.010(c). The person must "enter the person's signature, printed name, and residence address on the official carrier envelope of the voter." Tex. Elec. Code § 86.010(e).

240. A space was required to be placed on the reverse side of the official carrier envelope for "entering the signature, printed name, and residence address of a person other than the voter who deposits the carrier envelope in the mail or with a common or contract carrier." Tex. Elec. Code § 86.013(b)(2).

241. If the assistor knowingly fails to sign the oath or enter the required information on the official carrier envelope, then the person commits a state jail felony, Tex. Elec. Code § 86.010(f)–(g) and "the voter's ballot may not be counted," Tex. Elec. Code § 86.010(d).

242. A person commits an offense if the person: (1) "compensates another person for depositing the carrier envelope in the mail or with a common or contract carrier as provided by Section 86.0051(b), as part of any performance-based compensation scheme . . ."; (2) "engages in another practice that causes another person's compensation from or employment status with the person to be dependent on the number of ballots deposited . . . "; or (3) "with knowledge that accepting compensation for such activity is illegal, accepts compensation" for a performance-based scheme. Tex. Elec. Code § 86.0052. SB 1 did create or amend the offense. *See generally* JOINT Ex. 1.

243. Generally, such an offense constitutes a misdemeanor that is punishable by "(1) confinement in jail for a term of not more than one year or less than 30 days; or (2) confinement described

by Subdivision (1) and a fine not to exceed $4,000." Tex. Elec. Code § 86.0052 (b)(1)–(2). However, "if it is shown on the trial of an offense under this section that the defendant was previously convicted two or more times under this section," then an offense under this section is a state jail felony. Tex. Elec. Code § 86.0052(c).

244. In short, before SB1, assisting a voter who is not eligible for assistance or did not ask for assistance, voting differently than the voter wished or directed, and suggesting to the voter during voting process how the voter should vote were all illegal prior to SB1. Oct. 16, 2023 Tr. at 3924:2–14. Mr. White testified that an assistor voting differently than the voter wished or directed was "something that we would look at regularly" prior to SB1. *Id*. at 3924:4–14.

245. Prior to SB1, it was illegal for a person who provides assistance to a voter to try to influence or coerce the voter. Oct. 16, 2023 Tr. at 3925:4–6. To "mark someone else's ballot in a direction that they did not . . . direct or approve" is defined as a type of illegal voting, meaning by someone who "had the requisite *mens rea* for the crime." *Id*. at 3925:7–15.

### C. Voters with Disabilities Can Vote by Mail.

246. Voters with disabilities can also vote by mail. *See* Tex. Elec. Code § 82.002(a). Per the Texas Election Code, a voter is eligible to vote by mail if the voter "(1) has a sickness or physical condition that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health; or (2) is expecting to give birth within three weeks before or after election day." *Id*.

247. A qualified voter is also eligible for early voting by mail if the voter is 65 years of age or older on election day. Tex. Elec. Code § 82.003.

248. If the voter cannot sign the application form because of a physical disability or illiteracy, then the application form may be signed for the voter by a witness in the presence of the voter.

Tex. Elec. Code § 1.011(a), (e). In that instance, the voter who cannot sign must affix the voter's mark to the application form to which the witness must attest, and if the voter cannot make the mark, then the witness must state that fact on the application form. Tex. Elec. Code § 1.011(b).

249. The witness must also include on the application (1) the name of the voter who cannot sign in printed form; (2) the witness's own signature on the application form; (3) the witness's own name near the signature in printed form; and (4) the witness's residence address, unless the witness is an election officer, in which case the witness must state the witness's official title. Tex. Elec. Code § 1.011(c)–(d).

250. When an application is signed by a witness that is not the early voting clerk or a deputy, then the application form "must indicate the witness's relationship to the [voter] or, if unrelated, indicate that fact." Tex. Elec. Code § 84.003(a). This requirement predated SB 1.

251. If a person is related to the voter within the second degree by affinity or the third degree by consanguinity or is registered to vote at the same address as the voter, Tex. Elec. Code § 84.003(d), noncompliance with these requirements does not constitute a misdemeanor, Tex. Elec. Code § 84.003(b)–(c). Otherwise, for witnesses who are not closely related or registered at the same address, noncompliance is a class A misdemeanor. *Id.*

252. A person further commits a Class B misdemeanor if he or she (1) "signs an application for a ballot to be voted by mail as a witness for more than one application in the same election;" or (2) "signed an application for annual ballots by mail as a witness for more than one applicant in the same calendar year." Tex. Elec. Code § 84.004(a).

253. A person also commits a state jail felony by (1) knowingly providing false information on an ABBM, (2) intentionally causing false information to be provided on an ABBM, (3) knowingly submitting an ABBM without the knowledge or authorization of the voter, or (4) knowingly altering information provided by the voter on an ABBM without the voter's authorization. Tex. Elec. Code § 84.0041(a)–(b).

### D. Voters with Disabilities Can Receive Accommodations.

254. Voters with disabilities have the option of requesting an ADA accommodation or a change to a voting practice or procedure. Sept. 19, 2023 Tr. at 1099:1–4.

255. Texas law specifically prohibits election officials from interpreting the Texas Election Code so as "to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law or rule that the individual is entitled to request under federal or state law." Tex. Election Code § 1.022.

256. When a voter requests such an accommodation, counties do their best to provide one. Sept. 19, 2023 Tr. at 1099:5–7. However, what constitutes a reasonable accommodation depends on both the county's resources and the needs of the specific voter since different disabilities pose different challenges to different people. Sept. 13, 2023 Tr. at 725:7–13. Moreover, some people with the same disability may cope with the disability differently. *Id.* at 725:22–24.

257. Even if a county is unable to comply with a request, the county election office would still work with the voter to make sure that the voter could vote. October 3, 2023 Tr. at 2350:7-11.

## V. Texas Has an Interest in Ensuring All Ballots Legally Cast by Voters with Disabilities are Counted.

258. Ms. Dana DeBeauvoir agreed it was important that voters not be harassed in the polling place, ballot in hand. Sept. 14, 2023 Tr. at 903:23–25. Ms. DeBeauvoir also agreed it was important that, wherever a voter has a ballot in hand, you don't want people telling them how to vote while they are filling out that ballot. *Id.* at 904:5–11.

259. Ms. Cranston agreed that there are some individuals who don't understand or appreciate the proper power dynamics between a personal attendant and an individual who needs assistance. Oct. 11, 2023 Tr. at 3574:3–5. Ms. Cranston agreed that there is potentially an opportunity for a personal care attendant or assister to exploit or pressure a voter with a disability while assisting them in casting their ballot. *Id.* at 3574:6–10. Ms. Cranston was asked whether she could see her work as a personal care attendant affected by the prohibition in the oath "I will not communicate information about how the voter has voted." Ms. Cranston gave the following example in her reply: "I could see this happening in certain families – want to know how a person voted, and in that way, because of the family dynamics, that could potentially cause an attendant to break – to break the oath." *Id.* at 3567:24–3568:12.

260. Mr. Kafka agreed that Texas has a legitimate interest in preventing and protecting against abuse by community attendants and caretakers. Oct. 11, 2023 Tr. at 3638:1–4. Mr. Kafka stood by his deposition testimony that REVUP-Texas had seen abuse by caretakers against their clients. *Id.* at 3637:9–25.

261. Ms. Martinez could not say whether Arc of Texas was aware of anyone who had personally experienced cuing being misinterpreted as pressure or coercion. Oct. 11, 2023 Tr. at 3539:8–25. Ms. Martinez agreed that voters should not be pressured or coerced. *Id.* at 3540:1–4.

When talking about the vulnerability of voters with IDD to pressure or coercion from direct service professionals, Ms. Martinez stated: "Direct supports and services with folks that are members of the Arc of Texas are incredibly engaged in the political process. They are grass roots advocates themselves." *Id.* at 3540:5–12. Ms. Martinez agreed, however, that it would not be the correct kind of support of a voter with IDD if their assister of choice was pressuring or coercing them. *Id.* at 3540:22–25. Ms. Martinez testified that when balancing between self-determination for IDD voters and ensuring IDD voters have the help they need "we're always going to side with self-determination, right? That's the cornerstone." *Id.* at 3534:9–10. The support needs of a particular person with IDD will be typically unique to that person. *Id.* at 3535:14–17. When asked whether it was dangerous to draw hard and fast rules for IDD across the board, Ms. Martinez testified "everyone is unique within the confines of some of those standard things we know are often needed." *Id.* at 3535:18–24.

262. Ms. Rocha didn't know if other assistors follow the rules. Sept. 11, 2023 Tr. at 155:21–23.

263. The Elections Division might sometimes update a form to make it more accessible to voters. When asked to provide an example of something that makes a form more accessible, Ms. Christina Adkins replied, "There are a couple of things. Like, the font that's used on a form. There's recommendations on the types of font that you use. You know, san serif fonts in particular. There's recommendations on sizing of the font that's contained on a form itself. The use of graphics or boxes to delineate different parts of a form; a number of different items like that that, you know, we've taken into consideration when we redesign different forms that we have." Oct. 18, 2023 Tr. at 4560:10–22.

## VI.    SB 1 Satisfied that Interest by Preserving and Providing Meaningful Opportunities for

**Voters with Disabilities.**

264. Texas Senate Bill 1, 87th Leg., 2d Called Session (2021) ("SB 1") is a commonsensical and constitutional law enacted to "to prevent fraud in the electoral process," promote "voter access," "increas[e] the stability of [] constitutional democracy," and make "the conduct of elections . . . uniform and consistent throughout [Texas]." SB 1 §§ 1.03, 1.04, 4.02.

265. SB 1 preserved and even enhanced preexisting opportunities for voters with disabilities. For example, Section 1.08 of SB1 added a section to the Election Code titled "Reasonable Accommodation or Modification. Sept. 12, 2023 Tr. at 309:21–310:4. The new Election Code Section is 1.022. Joint Exhibit 1. The new section reads: "A provision of this code may not be interpreted to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard practice or procedure amended by law or rule that the individual is entitled to request under federal or state law." Sept. 12, 2023 Tr. at 310:5–11.

266. Senate Bill 1 also introduced a cure process for mail ballots. Sept. 12, 2023 Tr. at 327:14–16. One way a voter can do so is through the Ballot Tracker. Sept. 22, 2023 Tr. at 1841:16–18. And while the Elections Division received complaints about voters not being able to use the Ballot Tracker because of the residence address field in the authentication portion of it, *id.* at 1841:19–24—and while SB 1 required the residence address field, *id.* at 1842:3–5; 1860:4–7—the Texas Legislature changed that requirement in the most recent legislative session. *Id.* at 1860:8–9. Specifically, instead of their address, voters are now using their date of birth for the Ballot Tracker because it constitutes an easier field for data entry purposes. *Id.* at 1860:10–15. The cure process can be used to correct defects on a mail ballot other than just

a missing or mismatched ID number. Sept. 12, 2023 Tr. at 327:17–328:1. Voters can cure four other ballot defects through the process: failure to sign the carrier envelope, a signature on the carrier envelope that cannot be certified as that of the voter, missing statement of residence, and incomplete information with respect to a witness. *Id.* at 328:8–25. Voters in El Paso utilized this cure process. *Id.* at 329:20–25.

## VII.    The Challenged Provisions.

### A.  Article 5 – Mail-In Voting

#### i.    Section 5.02

267.  Section 5.02 of SB 1 amended Section 84.002 of the Texas Election Code to add subsection (a)(1-a), which requires that an application for a ballot by mail include:  "(A) the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety" [hereinafter collectively "DPS number"]; or "(B) if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number" [hereinafter SSN4]; or "(C) a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B)."

268.  Subsection (b-1) of Section 84.002(a) allows a person to "use the number of a driver's license, election identification certificate, or personal identification card that has expired for the purpose of fulfilling the requirement under Subsection (a)(1-a) if the license or identification is otherwise valid.

269.  Subsection (f-1) of Section 86.001 of the Texas Election Code requires that if a mail ballot application is rejected, the clerk must provide notice to the voter with information

"regarding the ability to correct or add information required under Section 84.002(a)(1-a) through the online tool described by Section 86.015(c)."

270.  Subsection (f-2) of Section 86.001 of the Texas Election Code provides that "[i]f an applicant corrects an application for a ballot to be voted by mail online and that application subsequently identifies the same voter identified on the applicant's application for voter registration, the clerk shall provide a ballot to the applicant as provided by this chapter."

       **ii.    Section 5.03**

271.  Section 5.03 of SB 1 amended Section 84.011(a) of the Election Code to require the officially prescribed application form for an early voting ballot to include space to enter the information required under Section 84.002(a)(1-a), which was amended by Section 5.02 of SB 1.

       **iii.    Section 5.06**

272.  Section 5.06 of SB 1 amended Texas Election Code Section 84.035 to provide that a voter who has already been sent a mail ballot, and who cancels their vote by mail application but fails to return their mailed ballot to the early voting clerk, may be permitted by an election judge "to vote only under a provisional ballot under Section 63.011."

       **iv.    Section 5.07**

273.  Section 5.07 of SB 1 amended Section 86.001 of the Texas Election Code to require the clerk to reject an application for an early voting ballot if the personal identifying information included on the application as required under Section 86.001 of the Texas Election Code (amended by Section 5.02 of SB 1) does not identify the same voter identified on the applicant's application for voter registration.

### v.    Section 5.10

274. Section 5.10 of SB 1 amended Texas Election Code Section 86.015(c) to require that the state's mandated online ballot tracker "allow a voter to add or correct" an omitted number required by SB 1 on a mail ballot application or a driver's license number, election identification certificate number, personal identification card number, or the last four digits of a Social Security Number that does not match the numbers contained in voter registration records.

### vi.    Section 5.12

275. Section 5.12 of SB 1 adds Section 87.0271 to Texas Election Code to provide curative procedures for ballots that the signature verification committee determines are incomplete due to missing a signature on the carrier envelope certificate, statement of residence, other required information contained in Section 84.002(a)(1-a) or Section 86.002, incomplete required information regarding a witness, or "for which it cannot immediately be determined whether the signature of the carrier envelope certificate is that of the voter."

276. Section 87.0271(b) of the Texas Election Code provides that, with regard to early voting ballots voted by mail, "[n]ot later than the second business day after a signature verification committee discovers a defect . . . and before the committee decides whether to accept or reject a timely delivered ballot under Section 87.027, the committee shall: (1) determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day; and (2) return the carrier envelope to the voter by mail, if the committee determines that it would be possible for the voter to

correct the defect and return the carrier envelope before the time the polls are required to close on election day."

277. Section 87.0271(b) of the Texas Election Code provides that, if the signature verification committee determines under Subsection (b)(1) that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the committee may notify the voter of the defect by telephone or e-mail and inform the voter that the voter may request to have the voter's application to vote by mail canceled in the manner described by Section 84.032 or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect.

278. Section 87.0271(e) of the Texas Election Code provides that "[a] poll watcher is entitled to observe an action taken under Subsection (b) or (c)."

### B. Article 6 – Voting Assistance

#### i. Section 6.03

279. Section 6.03 of SB 1 added Section 64.0322 of the Texas Election Code to require a person, other than an election officer, who assists a voter to complete a form stating: (1) the name and address of the person assisting the voter; (2) the relationship to the voter of the person assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee. The form must be incorporated into the official carrier envelope if the voter is voting by mail ballot and receives assistance or must be submitted to an election officer at the time the voter casts a ballot at a polling place and receives assistance.

280. In addition, Section 37.02 of the Texas Penal Code explains that swearing to the truth of a false statement with the intent to deceive is a crime. Oct. 4, 2023 Tr. at 2554:4–11. Thus,

prior to SB 1, a voter assistor was required to swear that they were doing things right under the law. *Id.* at 2555:9–14. And while Section 6.04 of SB 1 added the penalty-of-perjury language, *Id.* at 2554:14–2555:4, all that the addition accomplished was making the penalty-of-perjury aspect explicit. *Id.* at 15–17.

### ii.    Section 6.04

281. Section 6.04 of SB 1 amended the assistor oath required under Texas Election Code Section 64.034. The new oath requires an assistor to swear, under penalty of perjury, that the voter "represented to [the assistor that] they are eligible to receive assistance," and that the assistor did not "pressure or coerce" the voter to choose them as the assistor.

### iii.    Section 6.05

282. Section 6.05 of SB 1 amended Texas Election Code Section 86.010 to require that a person who assists a voter in preparing a ballot to vote by mail include on the official carrier envelope: (1) the person's signature, printed name, and residence address, (2) the relationship of the person providing the assistance to the voter, and (3) whether the person received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance.

### iv.    Section 6.06

283. Section 6.06 of SB 1 amended Section 86.0105 of the Texas Election Code to make it a state jail felony, for a person who is not an attendant or caregiver previously known to the voter, to: (1) offer to compensate another person for assisting voters, or (2) solicit or receive compensation for assisting voters. Under Section 6.06 of SB 1, "compensation" is an economic benefit as defined by Section 38.01, Penal Code.

284. While Section 6.06 makes it a state jail felony for a person to compensate or offer to compensate another person or to solicit, receive, or accept compensation for assisting voters, Sept. 22, 2023 Tr. at 1899:2–6—and while Section 6.03 requires an assistor to complete an oath form stating, among other things, that they have not received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee—it was already a crime to do so before SB 1. *Id.* at 1899:7–16. Indeed, the felony listed under Section 6.06 likely existed since 2013 when House Bill 206 created that prohibition. *Id.* at 1900:19–25. Moreover, it bears mention that a crime only occurs under Section 6.06 if money or anything of value is provided "in exchange for the assistance." *Id.* at 1901:11–17. Therefore, for example, the Secretary of State's Office believes that an assistor can have their expenses reimbursed, such as by accepting a bus fare, without violating Section 6.06 because it is not payment and only keeps the assistor from "going [in the] negative." *Id.* at 1903:23–1904:2. Likewise, if an assister receives payment to canvass for voters and then happens to assist a voter, that is not necessarily implicated by Section 6.03 because whether an assistor violated or lied under the oath depends on why the assistor was paid. *Id.* at 1902:9–22.

285. Section 6.06(f) of SB 1 provides that the prohibition on compensating assistors does not apply if the person assisting the voter is an attendant or caregiver previously known to the voter. *Id.* at 1906:23–1907:2. Notably, it does not matter how long the voter has known the attendant or caregiver before voter assistance is provided under this provision of SB 1—as long as the assistor's job is something other than assisting a voter, then such assistance is fine. *Id.* at 1909:14–22. It does bear mentioning, however, that SB 1 does not define the term "attendant," *Id.* at 1907:3–4, and it does not define the term "caregiver." *Id.* at 1907:5–6.

And while the Secretary of State's Office has not published any guidance or trainings on how to interpret the terms "attendant" or "caregiver," it has not received any questions about these terms, and thus, there has not been any perceived need to do any such training or education. *Id.* at 1908:3–7, 17–24.

> **v.    Section 6.07**

286.  Section 6.07 of SB 1 amended Section 86.013(b) of the Texas Election Code to require carrier envelopes to include a space for assistors to indicate his or her relationship to the voter being assisted.

> **C. Article 7 – Vote Harvesting & Expanded Protection for Workers**

287.  Section 7.04 of SB 1 adds Section 276.015 to the Texas Election Code, which makes it a felony of the third degree for a person, directly or through a third party, to knowingly: (1) provide or offer to provide vote harvesting services in exchange for compensation or other benefit; (2) provide or offer to provide compensation or other benefits to another person in exchange for vote harvesting services; or (3) collect or possess a mail ballot or official carrier envelope in connection with vote harvesting services. Section 7.04 of SB 1 defines "benefit" as "anything reasonably regarded as gain or advantage… whether to a person or another party whose welfare is of interest to the person." The provision defines "vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."

288.  Section 7.04 of SB 1 adds Section 276.017 to the Texas Election Code, which prohibits the early voting clerk or other election officials from knowingly mailing or providing early voting

by mail ballot materials to any person who the official knows did not submit an application for a ballot to be voted by mail.

289. Section 7.04 of SB 1 adds Section 276.018 to the Texas Election Code, which makes it an offense to make a false statement or swear to the truth of a false statement on a voter registration application or in an oath, declaration, or affidavit.

290. Section 7.04 of SB 1 adds Section 276.019 to the Texas Election Code, which prohibits election officials from creating, altering, modifying, waiving, or suspending any election standard, practice, or procedure in a manner not expressly authorized by the Texas Election Code.

291. Generally, Section 7.04 codifies several felony offenses relating to vote harvesting. Sept. 22, 2023 Tr. at 1910:16–19. Specifically, however, Section 7.04 makes it unlawful to knowingly provide or offer to provide vote harvesting service in exchange for compensation or other benefit, *id*. at 1911:1–4, and it makes it unlawful to provide or offer to provide compensation in exchange for those vote harvesting activities. *Id*. at 1911:5–8. A "benefit" under this provision generally means "anything reasonably regarded as a gain or advantage." *Id*. at 1911:9–11. And it defines "vote harvesting" to mean "any in-person interaction with one or more voters in the physical presence of an official ballot or a ballot voted by mail intended to deliver votes for a specific candidate or measure." *Id*. at 12–18. Thus, for vote harvesting to occur under Section 7.04, the activity must be (1) an in-person interaction with one or more voters, and (2) it must be in the physical presence of an official ballot or ballot voted by mail. *Id*. at 1911:19–24. Concerning this first requirement, the Office of the Secretary of State's view is that a telephone discussion between two individuals would not satisfy the in-person

requirement. *Id.* at 1912:3–7. And concerning this second element, the whole point of this element is that harvesting occurs whenever the harvester makes sure that the voter checks a particular candidate's box as the voter and the harvester are reviewing the ballot together. *Id.* at 1915:12–16. Indeed, Section 7.04 is implicated whenever a harvester has a particular mission to deliver a particular number of votes for a particular candidate and makes sure that the voter checks a particular box, meaning that the ballot has to be in front of the voter and the harvester so that both can see the ballot—it is not a situation where someone can be caught by accident. *Id.* at 1915:17–25. According to the Secretary of State's Office, anything other than that falls within the First Amendment. *Id.* at 1914:25–1915:16. That's why it does not apply, for example, when the ballot is in the kitchen, the voter and harvester are in the living room, and both people are talking about their preferred candidates. *Id.* at 1914:25–1915:11. Of course, it bears mention that a prosecutor may or may not agree with the case-by-case judgment of the Secretary of State's Office. *Id.* at 1917:10–19.

## VIII.    Efficacy of SB 1's Provisions.

### A. The Oath of Assistance Form Prescribed by Section 6.03 Has Not Resulted in Longer Wait Times At Polling Places.

292.    When asked about the most common barriers for people with disabilities at polling places, Dr. Kruse stated: "The most common difficulty that both people with and without disabilities mentioned was difficulty in waiting in line." Oct. 12, 2023 Tr. at 45:24–46:6. According to Dr. Kenneth Mayer, wait times in any individual polling place turn on the characteristics and processing time at that particular location. Oct. 2, 2023 Tr. at 2051:14–17. For example, the average wait time during the early voting period in El Paso County for the November 2022 General Election was around 10 to 15 minutes, which is typical for a

midterm election. Sept. 12, 2023 Tr. At 285:24–286:5. Ms. Lisa Wise was not aware of any voter who was required to wait a significant amount of time because of a shortage of personnel during the November 2022 General Election. *Id*. at 286:6–9. El Paso County had teams dedicated to just curbside voting to make sure that those voters did not have to wait for an election worker to come out from inside the polling place. *Id*. at 348:1–7.

293. The average wait time for Dallas County during the November 2022 General Election was 1.2 minutes during early voting and 3.7 minutes on Election Day. *Id*. at 469:3–25. Dallas County received fewer than 20 complaints about wait times following the 2022 primary election. *Id*. at 462:1–25.

294. Ms. Rachelle Obakozuwa testified that Harris County complied with all provisions of SB 1, and she is unaware of a single voter in Harris County who could not vote in person during the November 2022 General Election because of SB 1. Sept. 19, 2023 Tr. at 1204:6–12. Mr. Toby Cole, a resident of Harris County, Sept. 13, 2023 Tr. at 695:6–7, testified that curbside voters are assisted "usually within five or ten minutes." *Id*. at 704:19–705:12.

295. El Paso County moves voters with mobility impairments to the front of the line at the polling place to vote. Sept. 12, 2023 Tr. at 269:15–18. El Paso County had a training with Texas Disability Rights to discuss assisting and assistance requirements, "also with the idea to move the voter if they have lack of mobility to the front of the line." *Id*. at 278:18–25.

### B. There is no evidence that anybody—much less, a voter with a disability—was unable to vote because of Article 6 of SB 1.

296. There is no evidence that anybody was unable to vote because of Article 6 of S.B.1. Take, for example, the testimony of several counties. Mr. Frank Phillips of Denton County was not aware of any incidents in the November 2022 General Election where an election worker

refused to take the oath of assistance. Oct, 12, 2023 Tr. at 3859:25–3860:3. Mr. Phillips was not aware of any voter who was unable to obtain assistance from the person of their choice. *Id.* at 3860:6–8. Mr. Phillips was not aware of any incidents in the November 2022 General Election where a third party refused to assist a voter after the voter requested their assistance. *Id.* at 3860:9–12. Mr. Phillips was not aware of any incidents in the November 2022 General Election where a third party refused to take the oath of assistance. *Id.* at 3860:13–16. Mr. Phillips was not aware of any instance where a voter was unable to receive voting assistance because of SB1. *Id.* at 3860:17–19.

297. Mr. Phillips was not aware of any individual who refused to transport seven or more individuals to a polling location to vote curbside because of the requirement that they fill out the form. *Id.* at 3860:24–3861:3. Mr. Phillips was not aware of any voter who was unable to find transportation to the polls because of the requirement that a person who transports seven or more people to a polling location to vote curbside fill out the form. *Id.* at 3861:4–8. Mr. Phillips was not aware of his office receiving any calls from voters expressing concern about the voting assistance provisions in SB1. *Id.* at 3861:13–16. Mr. Phillips was not aware of his office receiving any calls from voters exhibiting confusion about the voting assistance provisions in SB1. *Id.* at 3861:17–20. When asked whether his staff would go to a voter's car to help them complete the corrective action process if that voter was unable to enter the office because of a disability, Mr. Phillips responded "Absolutely." *Id.* at 3862:25–3863:4. When asked whether his staff would go to a voter's home to help them complete the corrective action process if that voter was homebound and unable to come to the Denton

County Elections Office because of a disability, Mr. Phillips responded "We would." *Id.* at 3863:5–9.

298. Ms. Lisa Wise believed SOS had sent out an advisory on vote assistance for mail voting. Sept. 11, 2023 Tr. at 178:24–179:4. Ms. Wise was unaware of any instance where a voter in El Paso County was unable to obtain voting assistance in the November 2022 General election. Sept. 12, 2023 Tr. at 306:18–21. Ms. Wise was not aware of any incident in the November 2022 General Election where an election worker refused to assist a voter after the voter requested assistance. *Id.* at 305:20–23. Ms. Wise was not aware of any incident in the November 2022 General Election where the election worker refused to take the oath of assistance. *Id.* at 305:24–306:2. Ms. Wise was not aware of any incident in November 2022 General Election where a third party refused to assist a voter after the voter requested their assistance. *Id.* at 306:6–9. Ms. Wise was also unaware of any third party refusing to take the oath of assistance. *Id.* 306:10–13. Ms. Wise was unaware of any incidents in November 2022 General Election where a third party refused to provide their relationship to the voter. *Id.* at 306:14–17. Ms. Wise was unaware of any individual who refused to transport seven or more individuals to a polling location because of a requirement that they fill out the form stipulated in Section 64.009 of the Election Code. *Id.* at 306:22–307:1. Ms. Wise was unaware of any voter who was unable to find transportation to the polls because of the requirement that a person who transports seven or more people to a polling place fill out the form stipulated in Section 64.009. *Id.* at 307:2–6. Ms. Wise further was unaware of any person who transported seven or more individuals to a polling location to vote curbside and was required to fill out a form, pursuant to Section 64.009.  *Id.* at 307:15–18.

299. Mr. Michael Scarpello was not aware of any assister providing transportation to seven or more curbside voters since the enactment of SB1. *Id.* at 489:3–5. A priority for Mr. Scarpello since he has become a Dallas County election official is to bring disability access into the 21st century for voting. *Id.* at 491:17–22. Mr. Scarpello was not aware whether his office had received requests for disability accommodation regarding the oath that assisters must provide when providing assistance. *Id.* at 492:18–21. Despite having complaint forms at every polling location, Mr. Scarpello was not aware of any complaints regarding any SB1 voting assistance provision. *Id.* at 492:22–493:6. Mr. Scarpello was not aware of any incident in the November 2022 General Election where an election worker refused to assist a voter after the voter requested assistance. *Id.* at 493:10–13. Mr. Scarpello was not aware of any voter who was unable to obtain assistance from the person of their choice in the November 2022 election. *Id.* at 493:14–17. Mr. Scarpello was unaware of any instance where a voter was unable to receive assistance in voting. *Id.* at 493:18–20. Mr. Scarpello was unaware of any voter who was unable to find transportation to the polls because of requirements that a person who transports seven or more people to a polling location via curbside fill out the forms now required. *Id.* at 493:21–25.

300. Ms. Jacquelyn Callanen was unaware of anyone in Bexar County who was unable to vote in person during the November 2022 General election because of Senate Bill 1—she would even consider the November 2022 General election to be a success. Sept. 19, 2023 Tr. at 1105:1–10.

301. Ms. Rachelle Obakozuwa testified that Harris County complied with all provisions of SB 1, and she is unaware of a single voter in Harris County who could not vote in person during the November 2022 General Election because of SB 1. *Id.* at 1204:6–12.

302. Consider, also, the testimony of several private plaintiffs and individuals. Specifically, LUPE usually doesn't assist voters at the polls who haven't previously reached out for help. Sept. 11, 2023 Tr. at 77:17–24. LUPE makes sure that their staff abides by the law in providing voter assistance. *Id.* at 78:3–15. None of the LUPE staff violated the oath of assistance prior to SB1. *Id.* at 117:11–14.

303. Ms. Jennifer Miller is a member of Arc of Texas, Oct. 10, 2023 Tr. at 3197:14–18, who signed the oath of assistance when her daughter voted in-person. *Id.* at 3226:10–17: Ms. Miller testified that she will continue assisting her daughter with voting in the future. *Id.* at 3227:6–8.

304. Ms. Jodi Nunez Landry was able to cast her ballot in-person in the March 2022 election. October 10, 2023 Tr. at 54:5-8. Ms. Nunez Landry did not require assistance in voting, only putting her paper ballot into the ballot box. October 10, 2023 Tr. at 51:1-4. She received assistance from a poll worker in putting her paper ballot into the ballot box. October 10, 2023 Tr. at 69:8-14. Ms. Nunez Landry agreed that nobody at a polling location has ever prevented her partner from assisting her. October 10, 2023 Tr. at 71:2-5. When asked whether her partner would provide her with assistance at a polling location if she requested, Ms. Nunez Landry responded, "Yes. I think so, yes." October 10, 2023 Tr. at 71:6-8. Ms. Nunez Landry voted in the November 2022 election. October 10, 2023 Tr. at 54:16-18. She requested assistance from a poll worker in that election. October 10, 2023 Tr. at 55:15-16. The

assistance she requested was that a poll worker lift the voting machine remote control and hand it to her. October 10, 2023 Tr. at 54:23-55:4. A poll worker handed her the remote control when she asked him. October 10, 2023 Tr. at 54:23-55:4. Ms. Nunez Landry was able to vote in the November 2022 election. October 10, 2023 Tr. at 56:13-15. Ms. Nunez Landry agreed that someone could be eligible for assistance and not know it. October 10, 2023 Tr. at 59:4-8. In neither the March 2022 election nor the November 2022 election did Ms. Nunez Landry request a reasonable accommodation or reasonable modification. October 10, 2023 Tr. at 65:19-67:4. Ms. Nunez Landry did not know whether she had made any requests for accommodation to the Secretary of State's Office. October 10, 2023 Tr. at 77:15-19. She was also not sure whether she had requested an accommodation from the Attorney General's Office. October 10, 2023 Tr. at 77:20-78:14. Ms. Nunez Landry was asked whether she believed anybody would waive the oath requirement for her, if she requested it. She responded, "I don't know that they would know, I don't think so, but I have no idea." October 10, 2023 Tr. at 82:1-4.

305. Ms. Amy Litzinger was able to prepare a mock-up ballot on the League of Women Voters' website "without having to involve my attendants or assisters in any way so I can make my own choices." October 10, 2023 Tr. at 93:23-94:11. Ms. Litzinger testified that sometimes she will require an assistor to put her ballot into the voting machine or ballot box, but "[t]hey don't need to provide any assistance actually choosing on the touchscreen." October 10, 2023 Tr. at 95:15-23. When asked to describe the emotional condition of her attendants, Ms. Litzinger testified "Nobody has outright said no, I can't help you, or I won't help you make sure that you can go vote." October 10, 2023 Tr. at 105:9-17. When asked whether her post-

SB1 experiences would impact how or whether she would vote in the future, Ms. Litzinger responded "I'm definitely going to vote. I don't think it's possible to be as involved in politics and have all the knowledge that I have and not vote." October 10, 2023 Tr. at 106:6-10. Ms. Litzinger testified that she wasn't sure during the May 2022 election if taking off her chest strap counted as assistance but agreed that she never asked a poll worker whether that would count as assistance. October 10, 2023 Tr. at 113:16-114:5. Ms. Litzinger agreed that she was ultimately able to cast her ballot. October 10, 2023 Tr. at 114:9-10. Ms. Litzinger agreed that she has not been prevented from casting a ballot since the implementation of SB1. October 10, 2023 Tr. at 115:18-20.

306. Ms. Laura Halvorson voted by mail in the March 2022 election. October 10, 2023 Tr. at 128:25-129:2. Her attendant would not sign the oath, in part because of the language limiting assistance to reading the ballot, marking the ballot, or directing to read or mark the ballot. October 10, 2023 Tr. at 145:19-146:5. Ms. Halvorson was aware that the oath no longer includes that language. October 10, 2023 Tr. at 146:6-9. Ms. Halvorson learned that this ballot was accepted by using the Secretary of State's ballot tracker. October 10, 2023 Tr. at 131:5-14. Ms. Halvorson voted in-person for the November 2022 General Election. October 10, 2023 Tr. at 132:5-10. Before voting, she had her father go to her polling place in Bexar County to confirm that they had remote controls for people with limited mobility. When her father went to the polling site, the poll workers "said they did" have the remote controls. October 10, 2023 Tr. at 132:11-133:9. Ms. Halvorson surrendered her mail ballot in order to vote in-person. October 10, 2023 Tr. at 149:1-5. Due to her prior research using the website "Vote411," Ms. Halvorson "was able to figure out which candidates (she) was voting for."

October 10, 2023 Tr. at 137:12-137:3. Ms. Halvorson had some trouble reading the ballot on the voting machine, because the font was too large to fit on the screen. October 10, 2023 Tr. at 149:12-25. Ms. Halvorson was able to successfully cast her vote during the November 2022 election. October 10, 2023 Tr. at 150:4-6. Since the implementation of SB1, Ms. Halvorson has never been prevented from casting a ballot in an election in the state of Texas. October 10, 2023 Tr. at 150:13-16. Ms. Halvorson never requested an accommodation for her disability to modify or waive any requirement of SB1. October 10, 2023 Tr. at 140:23-141:1.

307. Ms. Teri Saltzman voted in the May 24, 2022 primary runoff election. October 10, 2023 Tr. at 176:15-17. She decided to vote curbside in the May 2022 election. Ms. Saltzman testified that "the guy comes running out with a laptop," but that she could not see well enough to use the screen herself. October 10, 2023 Tr. at 169:3-14. Ms. Saltzman testified that her husband assisted her in voting by reading the ballot and that she told him to "push that" with her selections. October 10, 2023 Tr. at 169:2-23. Ms. Saltzman agreed that her ballot for the May 2022 primary runoff was accepted. October 10, 2023 Tr. at 176:15-19. Ms. Saltzman agreed that she has never requested a reasonable accommodation in Texas. October 10, 2023 Tr. at 177:10–22.

308. Ms. Cathy Cranston agreed that personal care attendants were hesitant to take the oath to assist voters prior to 2022. October 11, 2023 Tr. at 80:20-23. When asked what she understood the penalty of perjury to mean, Ms. Cranston replied "To me, it means that if I'm telling a lie that I will be penalized, that it's a criminal penalty." October 11, 2023 Tr. at 77:7–9. Ms. Cranston was aware that a voter does not need to provide proof of disability in order to secure assistance at the polls. October 11, 2023 Tr. at 90:1–5. Ms. Cranston testified

that not all of the people she has worked with have identified as people with disabilities. October 11, 2023 Tr. at 80:21-23. Ms. Cranston agreed that she has never assisted an individual in filling out an application for ballot by mail. October 11, 2023 Tr. at 86:2–4. Ms. Cranston testified that she has only assisted a voter in dropping off a mail ballot once. October 11, 2023 Tr. at 87:14–19. Ms. Cranston agreed that if she knew the person she was an attendant to, that she would already be aware that they had a disability. October 11, 2023 Tr. at 90:6–10. Ms. Cranston agreed that no voter has been unable to vote due to a problem related to her concerns about SB1. That "there was not an individual person that asked me directly for. . .my assistance." October 11, 2023 Tr. at 91:23-92:5. Ms. Cranston agreed that each person's disability is different from another person's disability. October 11, 2023 Tr. at 92:6-8. Ms. Cranston agreed that accommodations need to be individualized to a person's disability and needs, with the caveat that "there are some certain commonalities that go across the board." October 11, 2023 Tr. at 92:14-17. Ms. Cranston did not read any guidance materials on the oath of assistance from Travis County or any other county. October 11, 2023 Tr. at 94:11-22. Ms. Cranston did not contact the Travis County Clerk's office about interpreting any provision within SB1. October 11, 2023 Tr. at 94:23-95:1. Ms. Cranston did not contact the Travis County District Attorney's office about interpreting any provision within SB1. October 11, 2023 Tr. at 95:2-5. Ms. Cranston did not contact the Secretary of State's office about interpreting any provision of SB1. October 11, 2023 Tr. at 95:12-14. Ms. Cranston continues to provide personal care attendant services to people in Travis County. October 11, 2023 Tr. at 97:9-13.

309.   Ms. Jennifer Martinez testified that Arc of Texas was concerned that making cues to persons with IDD could violate prohibition against suggesting by word, sign, or gesture how the voter should vote. October 11, 2023 Tr. at 34:22-35:5. Ms. Martinez agreed that Arc of Texas knows of no assister who was prevented from cuing under SB1. October 11, 2023 Tr. at 54:3-6. When asked whether Arc of Texas had any evidence that a county has denied a request for reasonable accommodation to a voter with IDD, Ms. Martinez testified "We wouldn't know one way or the other." October 11, 2023 Tr. at 51:17-25. Ms. Martinez was asked whether Arc of Texas had any information of an instance where an assister was cuing a voter and was prevented from curing that voter. Ms. Martinez replied "that's not something we're going to have to share unfortunately," but that they had heard "that there is fear and that there is concern." October 11, 2023 Tr. at 52:10-21. Ms. Martinez agreed that it was "true" that a direct support professional would know from prior discussions and interactions what kind of help that person needs. October 11, 2023 Tr. at 53:15-19. Ms. Martinez was not aware of a voter with IDD whose vote did not count because of the oath of assistance. October 11, 2023 Tr. at 56:4-9. Arc of Texas could not provide an example of an assister who declined to provide assistance on account of concerns of criminal penalties of SB1. October 11, 2023 Tr. at 60:2–7.

310.   Ms. Cris Rocha testified that if she was somebody's last option, she would assist them. September 11, 2023 Tr. at 156:16–18.

311.   During the March 2022 primary, Ms. Marla Lopez walked with an elderly couple to a polling location, where an election worker assisted the elderly couple. October 10, 2023 Tr. at 191:22–192:21.

312.   Ms. Sharon Watkins Jones was not aware of any member of Delta Sigma Theta who was unable to vote because of Section 6.05. October 3, 2023 Tr. at 2218:18-2219:8.

### C. There is no evidence of prosecutions under Article 6 of SB 1.

313.   To date, there has been no investigations or prosecutions under Article 6 of SB 1. Indeed, Ms. Elaine Jones is not aware of any investigations into any alleged violations of SB 1's criminal provisions, Sept. 22, 2023 Tr. at 1781:9-11, and she is not aware of any prosecutions that have occurred under SB 1. Sept. 22, 2023 Tr. at 1781:12-14. Further, Ms. Jones herself has not been criminally charged with violating SB 1, Sept. 22, 2023 Tr. at 1807:13-15, and she has not been assessed a civil penalty for violating SB 1. Sept. 22, 2023 Tr. at 1807:16-18.

314.   Mr. James Lewin testified that he was unaware of anyone who received a civil penalty or criminal penalty for violating section 4.09 or anyone who was subject to criminal investigation. Sept. 13, 2023 Tr. at 581:2-9; 592:3-8.

315.   Mr. Richard Ertel was not aware of any individual who was prosecuted or charged for knowingly preventing a watcher from observing an activity or procedure in violation of Section 4.09, and he is also not aware of any individual who was prosecuted or charged for knowingly refusing to accept a poll watcher. Sept. 13, 2023 Tr. at 9/13/23, 633:4-19.

316.   Ms. Rachelle Obakozuwa was unaware of anyone who was prosecuted or threatened with prosecution because of anything in SB 1 in connection with the November 2022 election in Harris County. Sept. 19, 2023 Tr. at 1211:1-4.

317.   No LUPE staff or members have been prosecuted for violating SB1's assistance provisions. Sept. 11, 2023 Tr. at 117:25-118:5. Ms. Tonia Chavez Camacho was unable to point to any LUPE member prosecuted or threatened with prosecution regarding 6.05. Sept. 11, 2023 Tr. at 119:20-120:25.

318. Ms. Tonia Chavez Camacho could only identify one instance of a problem since the passage of SB1 related to voter assistance, and that voter was still able to vote. Sept. 11, 2023 Tr. at 108:7-23. This instance was during the 2022 General Election. Sept. 11, 2023 Tr. at 109:17–20.

319. No Texas AFT members have been investigated or prosecuted because of anything in SB1, nor have they been threatened with such. Sept. 14, 2023 Tr. at 955:5–11.

320. Ms. Miller has never been charged with a crime for signing the oath of assistance. Oct. 10, 2023 Tr. at 37:4-5. Ms. Miller has not talked to anybody at Arc of Texas about how to interpret the language in the oath of assistance. Oct. 10, 2023 Tr. at 33:4-8. Ms. Miller has also not sought legal advice on how to interpret the terms of the oath of assistance. Oct. 10, 2023 Tr. at 32:22-33:2. Ms. Miller testified that she had used the Travis County Clerk's website to check on the status of her daughter's mail ballot. Oct. 10, 2023 Tr. at 33:17-21. When ask whether she had also checked the Travis County Clerk's website for guidance on how to understand the oath of assistance, she first replied that she did not recall, then said "a lot of this occurred during the lockdown in 2020 and there weren't a lot of people to get assistance from I'm afraid." Oct. 10, 2023 Tr. at 33:22-34:4.

321. While registering voters at the Houston Abilities Expo, Ms. Nunez Landry encountered people "that confused drive-thru with curbside voting. They didn't think we had that anymore. I mean, curbside, because those two terms were conflated." Oct. 10, 2023 Tr. at 40:18-41:9. Ms. Nunez Landry agreed that when a proposed law or constitutional amendment does not immediately make sense, she will go and try to educate herself. Oct. 10, 2023 Tr. at 68:17-69:1. Ms. Nunez Landry could not identify anyone who had been

prosecuted for providing the type of assistance that she requires. Oct. 10, 2023 Tr. at 71:20-25. Ms. Nunez Landry was asked whether she was concerned about what constitutes "pressure" and "coercion" under SB1. She stated she was concerned that the definition of those terms had "not been made explicit." Oct. 10, 2023 Tr. at 72:17-24. Ms. Nunez Landry called the ADA administrator at Harris County Elections Office, Disability Rights Texas, and files a complaint with the Department of Justice after her 2022 voting experience. Oct. 10, 2023 Tr. at 64:24-65:10. She made these calls, in part, because she witnessed "older people who couldn't stand up anymore in that election and they were leaving." Oct. 10, 2023 Tr. at 65:13-18. While Ms. Nunez Landry was speaking with the Harris County ADA administrator, they told her "you're good." Oct. 10, 2023 Tr. at 74:10-17. And Ms. Nunez Landry agreed that at the end of the phone call with the ADA administrator it was her understanding from Harris County that she could receive assistance as a disabled voter. Oct. 10, 2023 Tr. at 74:18-76:1. Ms. Nunez Landry could not remember whether she had called the Secretary of State's office to ask about provisions she did not understand. Oct. 10, 2023 Tr. at 76:2-24. When asked whether she was concerned that SB1 would prevent poll workers from providing assistance, Ms. Nunez Landry responded, "I'm not really concerned." Oct. 10, 2023 Tr. at 79:25-80:8.

322. Mr. Bob Kafka was not aware of any threatened prosecutions under SB1's voter assistance provisions. Oct. 11, 2023 Tr. at 150:21-23.

323. Ms. Martinez, on behalf of Arc of Texas, could not provide any evidence to the Court about any assister who has been investigated or prosecuted for helping someone with a disability vote in Texas. Oct. 11, 2023 Tr. at 60:8-61.

324.  Moreover, the Attorney General's office may no longer instigate prosecutions of election crimes on its own authority. Sept. 14, 2023 Tr. at 897:5-23.

## PROPOSED CONCLUSIONS OF LAW

325.  Plaintiffs have failed to allege, much less prove, any valid injury under Title II of the ADA or Section 504 of the Rehabilitation Act. As a matter of law, Texas provides individuals with ample opportunities to vote. Further, Plaintiffs have (1) failed to identify any Plaintiff excluded from voting by reason of disability, (2) failed to show any Plaintiff *asked* for an accommodation, and (3) fail (even now) to identify a reasonable accommodation. Their request to enjoin Texas from enforcing a host of duly-enacted laws—even with respect to voters who do not need reasonable accommodations—constitutes an impermissible "fundamental alteration" to Texas's laws and violates fundamental remedial rules. *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410, 412, 99 S. Ct. 2361, 60 L. Ed. 2d 980 (1979). Judgment must be entered against Plaintiffs.

## IX.  SB 1 Does Not Discriminate Against Disabled Voters.

### A.  Legal Standard

326.  To make "a prima facie case of discrimination under the ADA," a plaintiff must demonstrate: "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020).

327. The Rehabilitation Act has the same requirements, except it is stricter in two respects. *First*, the causation requirement is more demanding. The exclusion, denial, or discrimination must be "solely by reason" of plaintiff's disability." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 n.1 (5th Cir. 2020). *Second*, the Rehabilitation Act requires "that the specific program or activity with which [the plaintiff is] involved receives or directly benefits from federal financial assistance." *Lightbourn*, 118 F.3d at 427.

328. Recently, the Fifth Circuit reaffirmed that, to establish a valid claim under Title II of the ADA or Section 504 of the Rehabilitation Act, it is insufficient for plaintiffs to show a mere risk of future violations; individualized evidence of actual violations must be proven. *United States v. Mississippi*, 82 F.4th 387, 392 (5th Cir. 2023).

329. It also is insufficient for plaintiffs to show a mere statistical possibility or likelihood of violations; individualized evidence of actual violations must be proven. *Id.*; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (Title VII).

330. If Plaintiffs establish a prima facie case of discrimination, Plaintiffs must then propose a facially reasonable modification to the challenged provision that will allow them the meaningful access they seek. *See Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996) (requiring Plaintiff to propose reasonable accommodations in employment context); *see also, e.g.*, *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016).

331. An accommodation is not reasonable "if it either imposes 'undue financial and administrative burdens on a grantee, or requires a 'fundamental alteration in the nature of [the] program.'" *Lockhart v. Sys. Made Simple, Inc.*, 66 F. Supp. 3d 847, 857 (W.D. Tex. 2014).

332. The determination of the reasonableness is often fact specific. *Valentine v. Collier*, 978 F.3d 154, 165 (5th Cir. 2020). Courts have ruled in favor of defendants when "a plaintiff failed to present evidence . . . that the accommodation is reasonable on its face" and when the defendant establishes that "the proposed modification will cause 'undue hardship in the particular circumstances.'" *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)); *see also Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 355 (6th Cir. 2015).

333. In order to establish a valid claim under Title II of the ADA or Section 504 of the Rehabilitation Act, a plaintiff must show that his or her "disability and its consequential limitations were known to the covered [governmental defendant] entity. *Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020); *Windham v. Harris Cnty., Texas*, 875 F.3d 229, 236 (5th Cir. 2017).

### B. There Is No Evidence Disabled Voters Were Unable to Vote Because of SB 1.

334. Plaintiffs have failed to establish that SB 1 discriminates against any disabled voters.

335. To start, no provision in SB 1 expressly discriminates against Texas voters with disabilities in any way. To the contrary, SB 1 prohibits all state and local officials from interpreting the Texas Election Code so as "to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law or rule that the individual is entitled to request under federal or state law." Tex. Elec. Code § 1.022. If any state or local official fails to give a reasonable accommodation required by federal law, he has also violated SB 1.

336. Further, no Plaintiff or member of a Plaintiff group testified they were unable to vote, by reason of their disability, because of any challenged SB 1 provision. And certainly, no

Plaintiff or Plaintiff group member testified they were unable to vote because of something a particular Defendant did.

337.  Plaintiffs must show particular individuals with disabilities have been denied "meaningful access" to voting. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). But, as a matter of law, Plaintiffs cannot make that showing.

*338.*  After all, Texas provides *ample* opportunities for individuals with disabilities to vote. Individuals voting in person (during early voting or on Election Day) can obtain assistance both from election workers and from an assister of their choice. Indeed, multiple witnesses at trial testified to receiving assistance from election workers at polling places. *See, e.g.*, Oct. 10, 2023 Tr. 2387:5-10.

339.  Further, individuals with disabilities can vote curbside. At trial, several witnesses acknowledged they successfully voted using this method. *See, e.g.*, Oct. 10, 2023 Tr. 3316:24-3317:2.

340.  And individuals with disabilities can vote by mail. Indeed, SB 1 took steps to give voters with disabilities greater access to voting.

341.  For the first time in Texas history, SB 1 provided Texas voters who are disabled with processes to cure any defects in their mail-in ballots and ensure that their votes are counted. Tex. Election Code §§ 87.0271, 87.0422. For example, Terri Saltzman was able to cure a mistake on her mail ballot using Ballot Tracker. Oct. 10, 2023 Tr. 3358:3-12. SB 1, for the first time in Texas history, provided Texas voters who are disabled and, as a result, are unable to provide signatures that match prior signatures a workable way to verify their identities to election officials. Tex. Election Code § 87.041.

342. And, again, SB 1 *explicitly reaffirms* that election officials *must* give voters with disabilities reasonable accommodations and prohibits officials from interpreting the Election Code to prohibit an accommodation. Tex. Election Code § 1.022.

343. All of this proves that Texas gives individuals with disabilities "meaningful access" to voting. *Alexander*, 469 U.S. at 301.

### C. Neither Plaintiffs Nor Their Members Requested a Reasonable Accommodation.

344. Texas has held four state-wide elections since SB 1 took effect—this is in addition to a number of local and special elections scheduled in that time. Yet, the record shows that neither Plaintiffs nor the members that Plaintiffs identified at trial requested an accommodation from any Defendant with respect to the changes ushered in by the new law.

345. There is no evidence in the trial record that any Texas voter with a disability—let alone a Plaintiff or member of a Plaintiff group—has requested any accommodation with respect to voting from any Defendant since the effective date of SB 1. *See* Oct. 18, 2023 Tr. at 4417:22-4418:7, 4431:5-12, 4431:17–4432:2, 4432:8-17.

346. That dooms Plaintiffs' claims. To prevail under the ADA, they must "request[] an accommodation in direct and specific terms." *Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020). Here, they have not done so.

347. There is thus no evidence that any Defendant *knew* that a Texas voter needed an SB 1-related accommodation in order to vote, meaning there is no evidence on an essential element of Plaintiffs' claims. *See Windham*, 875 F.3d at 236; *cf. Johnson v. Callanen*, 608 F. Supp. 3d 476, 481–82, 486 (W.D. Tex. 2022) (highlighting clear evidence plaintiffs had explained their disability and necessary accommodation to defendant). And without such knowledge,

"it would be impossible for [a defendant] to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances." *Windham*, 875 F.3d at 236.

348. There is also no evidence in the trial record that any Defendant has failed or refused to provide any reasonable requested accommodation with respect to voting from a Texas voter with a disability since the effective date of SB 1. *See id.* Nor is there any evidence Defendants directed a local official to deny a reasonable accommodation. *Id.*

349. To the contrary, the Secretary issued guidance to counties highlighting certain accommodations that county election officials could offer voters to help them navigate new requirements. *See generally* JOINT Ex. 6.

350. For example, in its February 11, 2022, Election Advisory, the Secretary advised early voting clerks that the Election Code authorizes them to return a noncompliant carrier envelope in person and conduct the cure process at the voter's home. *See* JOINT Ex. 6 at 3.

351. Mr. Garza testified that his office utilizes this option in Cameron County to accommodate voters with physical impairments. Sept. 13 Tr. 748:18-22. Mr. Phillips testified that his office would do the same if requested by a Denton County voter. Oct. 12 Tr. 3863:5–9.

352. The Texas Secretary of State's Office also regularly invites experts from the disability community to join in their educational presentations to county officials about how to make Texas elections more accessible. Oct. 18, 2023 Tr. at 4597:2–5.

353. The Secretary also coordinated a substantial publicity campaign designed, in substantial part, to educate individuals with disabilities about SB 1's new requirements.

354. In addition, the vast majority of counties did not receive a request for accommodation regarding any of the challenged provisions. Sept. 12, 2023 Tr. at 308:23–20; Sept. 19, 2023 Tr. at 1099:1–11; Oct. 3, 2023 Tr. at 2350:3-6; Oct. 22, 3862:6–24. *See also* ECF 810-14 at 22:3–23 (Lauren Smith designations).

355. The only exception was Harris County. Ms. Longoria testified that her office received about a dozen requests from voters with disabilities, asking that an election worker visit a voter's home to implement the cure process. Sept. 20, 2023 Tr. at 1367:9–16. Ms. Longoria admitted that although the option was available, her office chose not to take it. *Id.* But none of those individuals in Harris County were identified as Plaintiffs or members of Plaintiff groups.

356. Further, the evidence shows that county officials would work with individuals with disabilities to ensure they could vote *if* they did ask for accommodations. Oct. 3, 2023 Tr. at 2350:7–11 (Yvonne Ramon unaware of any voter requesting a reasonable accommodation for any SB 1 provision but committing to work with anyone who asked for an accommodation). "There is simply no evidence that [election officials are] unwilling to engage in a good-faith, interactive process [with Plaintiffs] regarding [their potential] request[s] for a reasonable accommodation." The Court cannot assess whether election officials "engage[d] in a good faith interactive process that leads to a failure to reasonably accommodate." Griffin v. United Parcel Serv., Inc., 611 F.3d 216, 225 (5th Cir. 2011).

357. There is no evidence in the trial record that any Plaintiff has been unable to vote in a Texas election because any Defendant failed or refused to provide any reasonable requested accommodation with respect to voting from a Texas voter with a disability since the effective date of SB 1.

**X.    Even If Plaintiffs Established a Prima Facie Case, Plaintiffs' Requested Relief Represents an Unreasonable Modification.**

358.    The ADA and Rehabilitation Act do not give Plaintiffs the power to rewrite and decommission laws and policies that they disfavor. The statutes only require that public entities make "reasonable modifications" that would not fundamentally alter the nature of the service or activity at issue or impose undue fiscal or administrative hardship. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004); *Davis*, 442 U.S. at 410, 412 (accommodation not reasonable if it requires "a fundamental alteration in the nature of a program" or imposes "undue financial and administrative burdens"); *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1267 (11th Cir. 2019) (ADA does not require accommodations amounting to "a fundamental alteration"); *Cadena*, 946 F.3d at 724.

359.    For this reason, courts tend to employ the *Riel* framework for allocating burdens of proof in ADA cases, where Plaintiffs have the obligation to: (1) propose a reasonable modification, and (2) introduce evidence that the modification is reasonable. *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) (noting that "plaintiff bears the ultimate burden of proof on the issue"). The burden of proof then shifts if the requisites are met, and Defendants must either make the modification or establish that the request would constitute a fundamental alteration or impose an undue burden. *Id.*

360.    For Plaintiffs to meet their burden, they must show that the modification requested with the Court is reasonable "ordinarily or in the run of cases." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002); *Clark v. Dep't of Pub. Safety*, 63 F.4th 466, 471 (5th Cir. 2023) (applying standard to Title II).

361. In this case, Plaintiffs' requested relief is facially unreasonable because Plaintiffs' proposed modification far exceeds any alleged harm caused by the Challenged Provisions and is unreasonable as a matter of law.

362. Plaintiffs seek to enjoin a dozen or so separate provisions of SB 1 in their entirety. This means that the injunction would apply to all Texas voters, with no distinction being made between voters with legitimate ADA and § 504 claims and voters who lack qualifying disabilities, were not denied access to voting because of those disabilities, or could have had their exclusion cured with a more modest adjustment to Defendants' practices, policies, and procedures.

363. That fails to constitute a modification that is reasonable "ordinarily or in the run of cases." *US Airways, Inc.*, 535 U.S. at 401; *Clark*, 63 F.4th at 472 (applying standard to Title

364. II).. Accordingly, Plaintiffs cannot prove that their proposed modification would be reasonable in the run of cases and thus cannot prove that it would be reasonable in this case.

365. However, even if Plaintiffs had met their burden, Plaintiffs' proposed modification fundamentally alters Texas policy. Unlike the plaintiffs in *Johnson v. Callanen*, who sought a limited exception to state policy for certain voters, Plaintiffs in this case seek to fully enjoin thirteen separate provisions of the Texas Election Code against all Texas voters. 608 F. Supp. 3d 476, 481 (W.D. Tex. 2022).

366. This "undermines the basic purpose of the law, no matter what that purpose is." *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1158 (N.D. Fla. 2022), *aff'd in relevant part by* 66 F.4th 905 (11th Cir. 2023) (noting that "[t]he expansive scope of the proposed modification, both in applying to all voters and in seeking to enjoin the entire provision, has the effect of fundamentally altering the law").

367.    The elimination of state policy invariably constitutes a fundamental alteration of that policy. *Id.*; *see Davis*, 442 U.S. at 410, 412; *Schaw*, 938 F.3d at 1267.

368.    Further, the Court cannot issue an injunction so loosely tailored to the injuries of the Plaintiffs before it. *See, e.g.*, *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) ("[A] court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." (cleaned up)). Enjoining operation of the Challenged Provisions as to *all* voters—the vast majority of whom do not need a reasonable accommodation—would not "be narrowly tailored to fit specific legal violations" and thus unlawful. *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994).

## XI.    Neither the ADA nor the Rehabilitation Act Demand that Defendants Acquiesce to Plaintiffs' Choice of Accommodations.

369.    Although the ADA and Rehabilitation Act impose an affirmative obligation to make reasonable modifications when necessary to avoid discrimination on the basis of disability, neither law mandates that public entities adopt a particular technology or accommodation, so long as individuals with qualifying disabilities have "meaningful access" to government programs. *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022); *see Lane*, 541 U.S. at 532 (noting that "the reasonable modification requirement can be satisfied in a number of ways").

370.    To the contrary, "[i]t's well settled that *defendants*—not plaintiffs—get to choose between reasonable accommodation(s), and plaintiffs' preferences between reasonable accommodation(s) are irrelevant" to the calculus. *E.T.,* 41 F.4th at 517 (emphasis in original). The fact that Plaintiffs sought relief from the Court first—before and in lieu of

asking Defendants for an accommodation—does not expand Defendants' obligations under the ADA or § 504.

Date: January 19, 2024

Respectfully submitted.

KEN PAXTON
Attorney General

/s/ Ryan G. Kercher
RYAN G. KERCHER
Deputy Chief, Special Litigation Division
Tex. State Bar No. 24060998

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

RALPH MOLINA
Deputy Attorney General for Legal Strategy

WILLIAM D. WASSDORF
Assistant Attorney General
Tex. State Bar No. 24103022

RYAN D. WALTERS
Chief, Special Litigation Division

ZACHARY W. BERG
Special Counsel
Tex. State Bar No. 24107706

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
will.wassdorf@oag.texas.gov
zachary.berg@oag.texas.gov
ethan.szumanski@oag.texas.gov

ETHAN SZUMANSKI
Special Counsel
Tex. State Bar No. 24123966

COUNSEL FOR STATE DEFENDANTS

John M. Gore
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

COUNSEL FOR INTERVENOR-DEFENDANTS

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on January 19, 2024, and that all counsel of record were served by CM/ECF.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER