# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., Plaintiffs, | § § § § | |
| v. | § § | Case No. 5:21-CV-0844-XR |
| GREGORY W. ABBOTT, et al., Defendants. | § § § | |
| OCA-GREATER HOUSTON, et al., Plaintiffs, | § § § | |
| v. | § § | Case No. 1:21-CV-0780-XR |
| JANE NELSON, et al., Defendants. | § § § | |
| HOUSTON JUSTICE, et al., Plaintiffs, | § § § | |
| v. | § § | Case No. 5:21-CV-0848-XR |
| GREGORY WAYNE ABBOTT, et al., Defendants. | § § § | |
| LULAC TEXAS, et al., Plaintiffs, | § § § § | |
| v. | § § | Case No. 1:21-CV-0786-XR |
| JANE NELSON, et al., Defendants | § § § | |
| MI FAMILIA VOTA, et al., Plaintiffs, | § § § § | |
| v. | § § | Case No. 5:21-CV-0920-XR |

GREG ABBOTT, et al.,                    §
        Defendants.                §
                       §

---

UNITED STATES OF AMERICA,               §
        Plaintiff,                  §
                       §
v.                                      §       Case No. 5:21-CV-01085-XR
                       §
STATE OF TEXAS, et al.,                  §
        Defendants.                 §

---

### **PLAINTIFFS OCA-GREATER HOUSTON, LEAGUE OF WOMEN VOTERS OF TEXAS, AND REVUP TEXAS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

PROPOSED FINDINGS OF FACT ........................................................................ 2

   I.   Plaintiffs ....................................................................................................... 2

      A.   League of Women Voters of Texas ...................................................... 2

      B.   OCA-Greater Houston ........................................................................ 7

   II.   Defendants ................................................................................................ 11

      A.   Texas Secretary of State .................................................................. 11

      B.   Texas Attorney General .................................................................. 15

      C.   Harris County District Attorney ................................................... 20

      D.   Harris County Clerk ........................................................................ 22

      E.   Travis County District Attorney .................................................... 23

      F.   Travis County Clerk ........................................................................ 24

   III.   Factual Background Relevant to all Claims ................................... 25

      A.   SB 1 Factual Background ................................................................ 25

      B.   Procedural History .......................................................................... 26

   IV.   Facts Relevant to SB1 Section 7.04 .................................................. 27

      A.   The League ........................................................................................ 28

      B.   OCA-GH ............................................................................................ 30

      C.   LUPE ................................................................................................. 32

      D.   MABA-TX .......................................................................................... 36

      E.   State and Local Officials ................................................................. 37

PROPOSED CONCLUSIONS OF LAW ............................................................. 42

   I.   Jurisdiction ............................................................................................... 42

   II.   Standing ................................................................................................... 43

      A.   Each organization possesses organizational standing to challenge Sections 6.06 and 7.04. ..................................................................................... 43

      B.   Plaintiffs possess associational standing to challenge Sections 6.06 and 7.04.  46

   III.   Defendants are proper parties. ......................................................... 49

A.    The Secretary is a proper party. ................................................................. 49

B.    The Attorney General is a proper party. ................................................... 50

C.    Harris County Elections and Travis County Elections are proper parties. 51

D.    The Harris County DA and Travis County DA are proper parties. .......... 53

IV.    Section 7.04 violates the First Amendment and Fourteenth Amendment pursuant to 42 U.S.C. § 1983. ................................................................................. 55

A.    Legal Standard .......................................................................................... 55

B.    Application of Legal Standard: Section 7.04 ............................................ 57

# TABLE OF AUTHORITIES

**Cases**

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,*
    564 U.S. 721 (2011) ......................................................................... 56

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 564 (2002) ......................................................................... 56

*Association of Community Organizations For Reform Now v. Fowler,*
    178 F.3d 350 (5th Cir. 1999) ..................................................... 44, 46

*Brnovich v. Democratic National Committee,*
    141 S. Ct. 2321 (2021) ..................................................................... 62

*Buckley v. American Constitutional Law Foundation,*
    525 U.S. 182 (1990) ......................................................................... 58

*Center for Individual Freedom v. Carmouche,*
    449 F.3d 655 (5th Cir. 2006) ........................................................... 56

*City of Austin v. Paxton,*
    943 F.3d 993 (5th Cir. 2019) ..................................................... 43, 51

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ..................................................................... 43

*Department of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery
    Commission,*
    760 F.3d 427 (5th Cir. 2014) ........................................................... 56

*Eu v. San Francisco County Democratic Central Commission,*
    489 U.S. 214 (1989) ......................................................................... 58

*Ex parte Young,*
    209 U.S. 123 (1908) ................................................................... 49, 54

*Harding v. Edwards,*
    484 F. Supp. 3d 299 (M.D. La. 2020) .............................................. 46

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ......................................................................... 43

*Hiett v. United States,*
  415 F.2d 664 (5th Cir. 1969) .................................................................... 57

*Hill v. Colorado,*
  530 U.S. 703 (2000) .................................................................................... 57

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982) .................................................................................... 57

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ................................................................................. 57, 58

*In re Abbott,*
  956 F.3d 696 (5th Cir. 2020) .................................................................... 50

*Johnson v. United States,*
  576 U.S. 591 (2015) .................................................................................... 57

*Keyishian v. Board of Regents of University of State of New York,*
  385 U.S. 589 (1967) .................................................................................... 57

*Longoria v. Paxton,*
  585 F. Supp. 3d 907 (W.D. Tex. 2022) .............................................. 53, 54

*Louisiana ACORN Fair Housing v. LeBlanc,*
  211 F.3d 298 (5th Cir. 2000) .................................................................... 43

*Meyer v. Grant,*
  486 U.S. 414 (1988) .......................................................................... 56, 58, 59

*Monitor Patriot Co. v. Roy,*
  401 U.S. 265 (1971) .................................................................................... 58

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) .................................................................................... 43

*Morris v. Livingston,*
  739 F.3d 740 (5th Cir. 2014) .............................................................. 42, 54

*NAACP v. Button,*
  371 U.S. 415 (1963) .................................................................................... 59

*National Press Photographers Association v. McCraw,*
  504 F. Supp. 3d 568 (W.D. Tex. 2020) .................................................... 55

*OCA-Greater Houston v. Texas,*
    867 F.3d 604 (5th Cir. 2017) ........................................................................ 44, 46

*Quern v. Jordan,*
    440 U.S. 332 (1979) ............................................................................................. 42

*Roark & Hardee LP v. City of Austin,*
    522 F.3d 533 (5th Cir. 2008) ............................................................................. 57

*Seamon v. Upham,*
    536 F. Supp. 931 (E.D. Tex.) ............................................................................ 25

*Secretary of State of Maryland v. Joseph H. Munson Co.,*
    467 U.S. 947 (1984) ............................................................................................ 56

*State v. Stephens,*
    No. PD-1032-20, 2021 WL 5917198 .......................................................... 16, 21

*Texas Alliance for Retired Americans v. Scott,*
    28 F.4th 669 (5th Cir. 2022) ............................................................................. 43

*Texas Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ............................................................................. 54

*Thomas v. Collins,*
    323 U.S. 516 (1945) ............................................................................................ 58

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................................................ 56

*United States v. Stevens,*
    559 U.S. 460 (2010) ............................................................................................ 56

*United States v. Students Challenging Regulatory Procedures,*
    412 U.S. 669 (1973) ............................................................................................ 44

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ............................................................................. 25

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ............................................................................................ 56

*Whole Woman's Health v. Jackson,*
    595 U.S. 30 (2021) .............................................................................................. 54

## Statutes

H.B. 17 § 1 ........................................................................................................ 22

Tex. Code Crim. P. art. 2.01 ............................................................... 21, 23

Tex. Code Crim. Proc. Ann. art. 2.07(a). ................................................ 17

Tex. Const. art. 5, § 21 .......................................................................... 21, 23

Tex. Crim. App. 2021 .................................................................................. 21

Tex. Crim. App. 2022 .................................................................................. 16

Tex. Elec. Code § 273.001 .......................................................................... 15

Tex. Elec. Code § 273.001(b) ..................................................................... 53

Tex. Elec. Code § 276.015 ............................................................................ 2

Tex. Elec. Code § 276.015(a)(2) ........................................................... 55, 58

Tex. Elec. Code § 276.015(b) ...................................................................... 55

Tex. Elec. Code § 276.015(b) ...................................................................... 28

Tex. Elec. Code § 276.015(c) ...................................................................... 30

Tex. Elec. Code § 31.001(a) ........................................................................ 11

Tex. Elec. Code § 31.002 ............................................................................. 49

Tex. Elec. Code § 31.003 ............................................................................. 11

Tex. Elec. Code § 31.004 ............................................................................. 13

Tex. Elec. Code § 31.005 ............................................................................. 14

Tex. Elec. Code § 31.006 ....................................................................... 14, 49

Tex. Elec. Code § 83.001 ................................................................. 23, 24, 52

Tex. Elec. Code § 83.002 ............................................................................. 23

Tex. Elec. Code § 86.0105 ............................................................................. 1

Tex. Elec. Code § 276.013 ................................................................. 42

Tex. Elec. Code § 64.012 ................................................................... 42

Tex. Elec. Code § 64.036 ................................................................... 42

Tex. Gov't Code § 43.180(b) ............................................................. 21

Tex. Gov't Code § 402.028 ................................................................ 17

Tex. Penal Code § 37.10 .................................................................... 19

**Other Authorities**

Texas Tribune (Apr. 4, 2022) ............................................................. 26

Texas Tribune (Aug. 12, 2021) .......................................................... 25

Texas Tribune (Oct. 15, 2021) ........................................................... 26

# **INTRODUCTION**

OCA Plaintiffs[1] challenged Sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, 5.14, 6.04, 6.06, and 7.04 of Texas Senate Bill 1 ("SB1") because they violate federal law by restricting Plaintiffs' right to vote.[2] A bench trial concluded on October 20, 2023.

1.      Plaintiffs respectfully submit the following Proposed Findings of Fact and Conclusions of Law as a general outline of facts adduced at trial and proposed legal conclusions. This brief addresses the League's and OCA-GH's standing to challenge SB1 Sections 6.06 and 7.04, and the merits of the League's, OCA-GH's, La Unión del Pueblo Entero ("LUPE") and Mexican American Bar Association of Texas ("MABA-TX") Plaintiffs' claims challenging Section 7.04.

Section 6.06 criminally prohibits offering or providing compensation to, or accepting compensation from, "another person for assisting" mail-in voters. Tex. Elec. Code § 86.0105.

---

[1] OCA Plaintiffs include the League of Women Voters of Texas (the "League"), the Organization of Chinese Americans, Greater Houston ("OCA-GH"), and Register, Educate yourself Vote, Use your, Power, Texas ("REVUP"). REVUP filed its complaint along with the OCA-GH and the League. REVUP asserts claims different from OCA-GH and the League for SB1 violations: namely for violations of Title II of the Americans with Disabilities Act Amendments Act and Rehabilitation Act of 1973. REVUP asserts these claims as an organization and through associational members, and its Findings of Fact and Conclusions of Law can be found in its contemporaneous joint filing titled "PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT AND SECTION 208 OF THE VOTING RIGHTS ACT."

[2] This Court resolved Plaintiffs challenges to Section 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14 in its November 29, 2023 order. ECF No. 820.

Section 7.04 imposes criminal and civil penalties on anyone who gives or receives some "compensation or other benefit" for "knowingly provid[ing] or offer[ing] to provide vote harvesting services," which is defined as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015(b); § 276.015(a)(2).

Further, OCA Plaintiffs join Plaintiffs' Joint Proposed Findings of Fact and Conclusions of Law on Section 208 of the Voting Rights Act addressing claims challenging Section 6.06 of SB1. OCA Plaintiffs likewise join Plaintiffs' Proposed Findings of Fact and Conclusions of Law for claims under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Section 208 of the Voting Rights Act addressing OCA Plaintiff REVUP's claims challenging SB1 Sections 6.04 and 6.06. Finally, OCA Plaintiffs join Plaintiffs' Joint memorandum on Legal Standards supporting OCA Plaintiffs' claims against Section 6.06 and 7.04.

## PROPOSED FINDINGS OF FACT

## I.    Plaintiffs

### A. League of Women Voters of Texas

2.    The League challenges Sections 6.06 and 7.04 of SB1. Grace Chimene, Trial Tr. 1576:20–1577:2. The League was founded in San Antonio in 1919. *Id.* Trial Tr. 1577:17–21. It is a non-partisan organization that supports "everyone being able to vote." *Id.* Trial Tr. 1579:23–25. Its mission is empowering voters and defending

democracy. *Id.* Trial Tr. 1580:1–4. The League collaborates with nonpartisan organizations that support voting and elections. *Id.* Trial Tr. 1581:19–23.

3.     Grace Chimene is a current League member, has been a member since 2012, and served as president of the League for four years. Grace Chimene, Trial Tr. 1578:1–8. Ms. Chimene served in leadership roles since joining the League. *Id.* Trial Tr. 1580:9–1581:1. She first became an issue chair, *id.*, then served as legislative director on the League's board, then as the board's advocacy chair, before finally serving as League president from June 2018 to June 2022. *Id.*

4.     The League is a membership-driven organization, with League members electing their leaders at a convention every two years. Grace Chimene, Trial Tr. 1581:4–8, 1586:20–1587:5. League membership is open to any Texas resident over 16 years old. *Id.* Trial Tr. 1587:13–18. The League's 3,050 members pay membership dues, *id.* Trial Tr. 1585:18–22, 1587:19–21, and the organization has members in Harris and Travis Counties. *Id.* Trial Tr. 1586:7–19.

5.     The League actively works to register eligible citizens to vote, ensure that voters' ballots count, help voters obtain mail-in ballots, vote by mail, and obtain language assistance when needed. Grace Chimene, Trial Tr. 1580:1–8, 1581:9–18, 1589:12–15, 1589:25–1590:3. The League assists thousands of Texas voters across the state every year. *Id.*; s*ee also id.* Trial Tr. 1587:19–21.

6.     The League educates its members and Texas voters about the voting process through resources it creates, like the League's voter's guide, get out the vote ("GOTV") events for every election, and voter education materials on the League's social media,

3

videos, and website. Grace Chimene, Trial Tr. 1583:22–1584:16, 1606:23–1608:10.

7.  Most League members are volunteers who joined the League "because empowering voters and defending democracy is really important to them and they want to belong to a non-partisan organization that does this work." Grace Chimene, Trial Tr. 1582:2–6. Ms. Chimene testified with excitement that she always says, "yay," after stating the League's mission of empowering voters and defending democracy. *Id.* Trial Tr. 1580:1–4. To Ms. Chimene, "[e]mpowering voters means . . . making sure that everyone has the knowledge and the right and the ability and the access to vote in every election." *Id.* Trial Tr. 1580:5–8. Ms. Chimene volunteers for the League because of her love for its mission and belief that the League's work is vital in Texas. *Id.* Trial Tr. 1582:13–19.

8.  League members are Texas residents and include voters who are 65 and over, voters with disabilities, people who vote by mail, and people who are more comfortable speaking non-English languages. Grace Chimene, Trial Tr. 1587:22–1588:17. The League also has members who use assistants when they vote by mail and who assist voters with their ballot by mail. *Id.* Trial Tr. 1589:12–1590:3.

9.  SB1 forced the League to shift resources from its regular election work. The League "[n]ormally … tr[ies] to help young members who are new to voting and explain the voting process to them" by "trying to encourage them to get out and vote and be a part of our democracy." Grace Chimene, Trial Tr. 1593:20–23. But following SB1's enactment, the League shifted from focusing on new voters to voters who are older and have been voting for years. *Id.* Trial Tr. 1592:12–17, 1594:4–11. Some of

those older voters include those who need assistance voting by mail, like voters with disabilities. *Id.* Trial Tr. 1593:23–1594:3. This shift included diverting resources to educate its members about Section 6.06's and 7.04's criminal provisions to protect its members and voters from criminal liability. *Id.* Trial Tr. 1602:23–1603:9.

10.    This substantial diversion in resources caused by the challenged provisions affected the League's organizational work furthering its core mission. Grace Chimene, Trial Tr. 1625:23–1626:2. For example, the League spent money on voter education outreach efforts to educate League members and Texas voters about SB1 before and after SB1 passed into law. *Id.* Trial Tr. 1609:12–1610:11. The organization "created PowerPoints," "videos," "social media" posts, "write-ups," *id.* Trial Tr. 1583:4–11, "Zoom meetings with other organizations," *id.* Trial Tr. 1628:6–15, and hired additional staff, *id.* Trial Tr. 1603:17–1604:2, all in response to the challenged SB1provisions, which cost the League valuable resources it otherwise would have dedicated to other voter education issues and turning out new voters, *Id.* Trial Tr. 1593:11–14; 1628:22–1629:22. In sum, the League's diverted resources were not just financial; it also reallocated services and the limited time of League members, volunteers, and staff. *Id.* Trial Tr. 1615:6–20.

11.    Section 6.06 specifically caused the League to divert resources from registering new voters to creating materials about the assistance-related provisions and educating members about new limits on compensating assistants. Grace Chimene, Trial Tr. 1593:3–7. The League "created PowerPoints[,] handouts[,]" and held discussions with local League leaders and other organizations about the assistance

provisions' impact. *Id.* Trial Tr. 1592:23–1593:2. Developing these resources in response to the assistance restrictions "took time" and "finances" that would have otherwise gone towards activities like "trying to help young members who are new to voting" in Texas. *Id.* Trial Tr. 1593:8–1594:3. Moreover, Section 6.06 frustrated the League's ability to fulfil its mission of empowering voters, including those in assisted care centers. *Id.* Trial Tr. 1592:12–22, 1626:3–16. Assisted care centers across Texas discouraged the League from sending volunteer assisters "because of their concern with this change to the law." *Id.* Texans who League members had assisted for years were now unable to obtain help from the assister of their choice. *Id.*

12.     The League shifted resources from its other activities to educate Texans about the problems Section 7.04's in-person interaction prohibition posed as well. Grace Chimene, Trial Tr. 1620:2–6. One such problem arose at League-sponsored candidate forums, where any League member or prospective voter in attendance may have their vote-by-mail ballot with them. *Id.* Trial Tr. 1620:7–1621:1. The League would have to turn away attendees at their candidate forums who have their ballots with them, thus frustrating their mission. *Id.* Trial Tr. 1620:10–1621:4, 1627:11–1628:1. The League prepared training sessions via PowerPoint presentations and held Zoom meetings for organizations who serve voters to help them avoid violating Section 7.04. *Id.* Trial Tr. 1628:2–15.

13.     In addition to these injuries, *supra* ¶ 9–12, the League indefinitely postponed a planned study on election security because of the resources diverted to address Sections 6.06 and 7.04 of SB1. Grace Chimene, Trial Tr. 1603:10–16, 1621:5–11,

1630:9–18.

### B. OCA-Greater Houston

14.    OCA-GH also challenges Sections 6.06 and 7.04 of SB1. Deborah Chen, Trial

Tr. 1684:8–12. OCA-GH is a membership-driven organization dedicated to advancing

the social, political, and economic well-being of Americans of Asian and Pacific Island

descent ("AAPIs") primarily in Harris, Brazoria, and Fort Bend counties. *Id.* Trial Tr.

1685:1–3, 1686:16–17, 1688:10–14. The organization has between 160–200 dues

paying members who serve on and elect the organization's board, as well as hundreds

of additional volunteer members. *Id.* Trial Tr. 1686:19–1687:7, 1688:7–9.

15.    The organization's mission is comprised of four main goals: (1) advocate for

social justice, equal opportunity, and fair treatment; (2) promote civic participation,

education, and leadership; (3) advance coalitions and community building; and (4)

foster cultural heritage. Deborah Chen, Trial Tr. 1689:6–13.

16.    The Greater Houston area AAPI community is mostly composed of first-

generation immigrants, of whom many speak limited English. Deborah Chen, Trial

Tr. 1687:15–18. A substantial portion of OCA-GH's membership and the community

it serves are elderly and have Limited English proficiency ("LEP"). *Id.* Trial Tr.

1687:11–21, 1691:3–8. These individuals require assistance to vote in person or by

mail.

17.    Deborah Chen is OCA-GH's civic engagement programs director. Deborah

Chen, Trial Tr. 1686:6–1687:1. Prior to SB1, she personally provided language

assistance to LEP voters who previously brought their mail-in ballots to OCA-GH

candidate forums. *Id.* Trial Tr. 1697:13–18. Other OCA-GH members provided similar assistance to voters at OCA-GH candidate forums. *Id.* Trial Tr. 1698:16–21.

18.     OCA-GH's civic engagement programs help empower the AAPI community in the Greater Houston region. Deborah Chen, Trial Tr. 1684:25–1685:3. Its voting-related activities are carried out by volunteers and paid staff, all of whom are OCA-GH members. *Id.* Trial Tr. 1687:22–1688:6, 1693:21–25. For example, OCA-GH regularly hosts in-person candidate forums each election cycle that hundreds of people attend. *Id.* Trial Tr. 1694:21–1696:8. Before SB1, attendees brought their mail-in ballots to these candidate forums and received assistance with them, including language assistance, from OCA-GH volunteers and staff. *Id.* Trial Tr. 1696:9–1697:8, 1697:22–1699:7.

19.     OCA-GH would also host "AAPI meet-and-greets" before SB1, where hundreds of community members would meet AAPI political candidates. Deborah Chen, Trial Tr. 1699:24–1702:2. OCA-GH volunteers and staff offered language assistance to voters who brought their mail-in ballots to these meet-and-greets. *Id.* Trial Tr. 1700:1–1702:2. OCA-GH engaged in canvassing efforts as well, where volunteers and staff knocked on voters' doors to provide information about voting. *Id.* Trial Tr. 1702:3–17. Bilingual OCA-GH canvassers assisted voters who requested language assistance with their mail-in ballots. *Id.* Trial Tr. 1703:17–20.

20.     In addition to candidate forums, meet-and-greets, and canvassing, OCA-GH did exit-polling at polling locations, where voters would bring their mail-in ballots and receive assistance from bilingual assisters. Deborah Chen, Trial Tr. 1706:4–11,

1723:6–13. OCA-GH would also conduct voting machine demonstration events where voters sometimes had their mail-in ballots present. *Id.* Trial Tr. 1706:12–1707:3.

21.    OCA-GH has endorsed and advocated for certain ballot measures. Deborah Chen, Trial Tr. 1711:8–19, 1712:17–1713:3. It is likely to endorse ballot measures in the future. *Id.* 1713:8–11, 1726:8–14.

22.    Before SB1, OCA-GH served its members and AAPI voters at the events listed above by offering assistants who read and speak languages in addition to English to assist voters with understanding their ballots. OCA-GH volunteers and staff assisted LEP voters with "helping to read" "translate or" "explain" what was on their voting materials. Deborah Chen, Trial Tr. 1696:21–1697:8, 1693:11–20. OCA-GH provided their multilingual assistants with benefits like food and beverage refreshments at in-person events where they assisted LEP voters. *Id.* Trial Tr. 1694:4–20, 1697:22–25.

23.    SB1 made OCA-GH reasonably concerned that its volunteers and staff would be criminally prosecuted for violating Sections 6.06 or 7.04 if it continued hosting in-person activities where assisters provided voters assistance with mail-in ballots. Deborah Chen, Trial Tr. 1730:14–1731:8. OCA-GH pays its staff and provides volunteers with food as compensation for their work. *Id.* Trial Tr. 1717:14–23. Similarly, OCA-GH provides its canvassers with benefits like Gatorade and water "to canvass in the Texas heat of a hundred degrees or more" because staying hydrated is necessary. *Id.* Trial Tr. 1718:1–5. OCA-GH's standard practice is to provide staff, volunteers, and attendees with refreshments at its voting-related activities. *Id.* Trial Tr. 1694:11–20.

24.    After SB1's enactment, OCA-GH diverted its resources to create new training materials for volunteers, independent contractors, members, and employees about SB1's new requirements and prohibitions on assisting mail-in voters. Deborah Chen, Trial Tr. 1724:3–15. OCA-GH invested time and resources on new training for its volunteers. *Id.* Instead of training volunteers on how to help mail-in voters, OCA-GH now instructs volunteers to avoid assisting mail-in voters altogether to avoid the risk of criminal prosecution. *Id.* Trial Tr. 1723:14–19.

25.    Sections 6.06 and 7.04 have also directly harmed OCA-GH as an organization. OCA-GH stopped its in-person candidate forums because of these provisions, Deborah Chen, Trial Tr. 1718:20–24, and instead directed its time and resources toward replanning and redesigning civic engagement programs and election work trainings to avoid putting their staff and volunteers at risk of criminal liability. *Id.* Trial Tr. 1692:23–25, 1723:14–1724:15. Because of SB1 Sections 6.06 and 7.04, OCA-GH stopped recruiting voter assistants. *Id.* Trial Tr. 1724:16–1726:3.

26.    SB1 "decimated [OCA-GH's] ability" to provide in-person assistance at the polls and set up tables at its candidate forum to provide mail-in ballot assistance, to avoid the risk of exposing members to criminal and civil penalties under Sections 6.06 and 7.04. Deborah Chen, Trial Tr. 1717:5–13, 1721:2–4, 1718:20–24, 1719:3–8.

27.    Sections 6.06 and 7.04 have "impact[ed] almost every program area" of OCA-GH's work and made it "nearly impossible" to carry out its organizational mission. Deborah Chen, Trial Tr. 1726:15–20. Since Sections 6.06 and 7.04 went into effect, OCA-GH assisters like Deborah Chen have not provided any language assistance to

LEP voters. *Id.* Trial Tr. 1726:21–1727:6. OCA-GH would continue offering language assistance but for Sections 6.06 and 7.04 of SB1. *Id.* Trial Tr. 1727:7–12. As a result of these SB1 provisions, voters who would have otherwise chosen OCA-GH staff and volunteers to assist them with their mail-in ballots have not done so. *Id.* Trial Tr. 1745:10–13, 1746:4–10.

## II.    Defendants

### A. Texas Secretary of State

28.    The Texas Secretary of State (the "Secretary") is the Chief Election Officer of Texas and has authority to enforce Section 6.06 of SB1. Tex. Elec. Code § 31.001(a). Their job is to obtain and maintain uniformity in the interpretation, application, and operation of the election code and election laws outside the election code. Tex. Elec. Code § 31.003; Christina Adkins, Trial Tr. 1827:6–12; Keith Ingram, (Oct. 17, 2023 PM) Trial Tr. 49:22-25. These responsibilities include "prescribing official forms" for elections. Christina Adkins, Trial Tr. 1834:2–12. The Secretary routinely issues guidance, directives, orders, instructions, and handbooks to county registrars of all 254 Texas counties, as well as to district attorneys, political candidates, and voters, on various election procedures, including changes implemented in SB1. Keith Ingram, (Oct. 17, 2023 PM) Trial Tr. 51:11–13, 52:18–23, 57:4–9; Christina Adkins, (Oct. 18, 2023) Trial Tr. 119:24–120:6, 125:4–21, 128:14–20, 129:3–14, 143:15–18, 159:9–160:11; Christina Adkins, 1831:7–14, 1875:5–10, 1875:18–25.

29.    The Secretary disseminates guidance through written advisories and mass emails, Christina Adkins, Trial Tr 1828:10-15, in addition to more informal

individualized email and phone communications with county elections officials, *see id.* 1829:16–1831:5, *see also* Keith Ingram (Oct. 17, 2023 PM) Trial Tr. 56:14–58:4.

30.    According to the Secretary, their "advisories do have some kind of binding authority" on counties. Christina Adkins, (Oct. 18, 2023) Trial Tr. 129:15–22.[3] Indeed, the Secretary's position is that "sometimes to make a statute work, it has to be interpreted [by the Secretary's Office] around the edges a little bit . . . to obtain and maintain uniformity in the interpretation of the Election Code…." Christina Adkins, Trial Tr. 1874:1–7.  Moreover, the Secretary declined to admit that advisories have "no legal effect." *Id.* Trial Tr. 1861:10–20.

31.    For example, the Secretary advises local elections offices on how to implement enacted legislation affecting elections. Keith Ingram, (Oct. 17, 2023 PM) Trial Tr. 52:18–23. This guidance includes advising counties how to implement Section 6.06's changes to assistance with mail-in voting. Christina Adkins, (Oct. 18, 2023) Trial Tr. 121:10–122:6.

32.    Trial testimony from county officials confirmed that counties treat the Secretary's advisories as binding. For example, Dallas County Election Administrator, Michael Scarpello, testified that the election advisories from the Secretary are "critical" to implementing the new provisions of SB1, Michael Scarpello, Trial Tr. 459:1–25. Bridgette Escobedo, who has worked in Travis County's Elections

---

[3] In response to questions from the Court about the legal effect of the Secretary's advisories, counsel for the State represented that "they are to give basically guardrails and bench rails for the county so that they know the best practices and they get the full experience of the attorneys within the election office of the . . . Office of the Secretary of State." Richard Ertel, Trial Tr. 629:16–630:2.

Division for four years, including serving currently as Director of Elections, could not recall a time when Travis County declined to follow the Secretary's advisories. Bridgette Escobedo, Trial Tr. 1575:4–6.

33.    Additionally, when a "law [] says that the [Secretary] shall prescribe procedures," the Secretary considers it a "specific legislative direction to add some additional steps" and provide procedures to have uniformity and "clarity in the law." Christina Adkins, (Oct. 18, 2023) Trial Tr. 129:15–22. The Secretary has issued instructions and directives through advisories, including procedures for SB1. *Id.* Trial Tr. 127:24–128:20.

34.    The Secretary also conducts seminars, conferences, and training for election officials to maintain uniformity. Keith Ingram, (Oct. 17, 2023 PM) Trial Tr. 61:18–62:20; Christina Adkins, (Oct. 18, 2023) Trial Tr. 124:12–127:23. Through seminars, the Secretary instructs local election officials on the proper interpretation of Texas's election code. Keith Ingram, (Oct. 17, 2023 PM) Trial Tr. 62:8–20.

35.    Under Section 31.004, the Secretary must advise local officials on election laws and "maintain an informational service"—a hotline—"for answering inquiries of election authorities relating to the administration of . . . election laws or the performance of their duties." Tex. Elec. Code § 31.004. The Secretary maintains this hotline to maintain statewide uniformity. Keith Ingram, (Oct. 17, 2023 PM) Trial Tr. 60:12–61:7; Christina Adkins, (Oct. 18, 2023) Trial Tr. 160:15–163:11. The Secretary is also empowered to issue formal legal opinions, which does happen on occasions. Christina Adkins, Trial Tr. 1828:2–1829:15.

13

36.    The Secretary can order election authorities to correct conduct that impedes Texans' free exercise of their voting rights. Tex. Elec. Code § 31.005. For example, the Secretary can seek enforcement of their orders by seeking injunctive relief in court obtained through the Office of the Attorney General ("OAG"). *Id.*

37.    As discussed below, *infra* ¶ 42, the Secretary routinely collaborates with the OAG to enforce election laws. Jonathan White, Trial Tr. 3913:9–19, 4054:16–4055:8; Keith Ingram, (Oct. 18, 2023) Trial Tr. 45:15–18, 56:2–6. The Secretary evaluates complaints related to elections to determine whether a reasonable cause exists to suspect a crime has occurred, and if so, refer it to the OAG for criminal prosecution. Keith Ingram, Trial Tr. 1876:24–1877:8, 1880:1–25; Tex. Elec. Code § 31.006. This process includes referring allegations related to mail ballot "vote harvesting," which the Secretary has referred to the OAG both before and after the passage of SB1's Sections 6.06 and 7.04. Keith Ingram, Trial Tr. 1914:1–6.

38.    Under the Election Code, if the Secretary determines "there is reasonable cause to suspect that criminal conduct occurred, the Secretary *shall* promptly refer the information to the attorney general." Tex. Elec. Code § 31.006 (emphasis added). In practice, whether complaints are determined to meet this standard and are referred is a judgment call made by the Secretary. Keith Ingram, Trial Tr. 1881:1–9. "If it's a close call, [the Secretary of State's Office] refer[s] it anyways, because it's better to err on the side of making sure that crimes are prosecuted." *Id.* Trial Tr. 1877:14–21. Sometimes, the Secretary will also ask the complainant for additional information. *Id.* Trial Tr. 1876:24–1879:21. The Secretary logs each complaint

14

received. Keith Ingram, (Oct. 17, 2023 PM) Trial Tr. 56:7–11. The Secretary serves as "a gathering point for election complaints from individuals and election officials." Keith Ingram, Trial Tr. 3913:12–19.

39.     The Secretary similarly refers cases to and cooperates with local prosecutors on complaints. *See* OCAPX-225 at 5 (Harris DA interrogatory describing a "matter[] involving a complaint, referral, and/or investigation . . . [that] involved communications with the "SOS"").

### B. Texas Attorney General

40.     The Texas Attorney General is sued in his official capacity as the chief law enforcement officer of the State of Texas and chief officer in the OAG. The Criminal Investigations Division of the OAG has an Election Integrity Unit that focuses on investigating election-related allegations. Jonathan White, Trial Tr. 3904:7–15, 4041:6–15.

41.     The OAG has authority to enforce Sections 6.06 and 7.04 of SB1. The OAG regularly investigates and prosecutes Texas Election Code violations. The OAG possesses the same investigative powers as state police, including the ability to investigate alleged election-related crime. Jonathan White, Trial Tr. 4041:11–17. The OAG considers certain investigative duties to be "statutorily required" or "mandatory" for election-related allegations. *Id.* Trial Tr. 4041:18–4042:25; Tex. Elec. Code § 273.001. The OAG's investigations of alleged election law violations continue to this day. Jonathan White, Trial Tr. 4042:14–17.

42.     The OAG regularly receives referrals of election-related allegations for

investigation from the Secretary, Jonathan White, Trial Tr. 3913:9–19, 4054:16–4055:8; Keith Ingram, (October 18, 2023) Trial Tr. 56:12–23, local law enforcement offices, local prosecutors, election officials, and individuals, Jonathan White, Trial Tr. 3913:12–19. The OAG investigates allegations of elections crimes based on these referrals. *Id.* Trial Tr. 4042:11–22. For example, in 2020, the OAG's Criminal Investigations Division spent at least 14,266.08 hours investigating allegations or potential instances of election-related criminal offenses. OCAPX-472 at 4.

43.    The OAG has continued to conduct investigations of election-related allegations after *State v. Stephens*, 664 S.W.3d 293 (Tex. Crim. App. 2022) ("*Stephens*"). Jonathan White, Trial Tr. 4042:11–17. It is the OAG's practice to communicate with local prosecutors about investigations the OAG is conducting of elections-related allegations in a county. *Id.* Trial Tr. 4042:18–22, 4055:9–17. This practice continues even after *Stephens*. *Id.* Trial Tr. 4042:23–25. The OAG also assists counties with their ongoing investigations of election code-related offenses. *Id.* Trial Tr. 3914:8–18, 3950:22–3951:2. For example, in 2020, the OAG investigated election offenses after the Denton County Sheriff's Office asked the OAG for assistance. *Id.*

44.    The OAG specifically pursues allegations related to the challenged provisions of SB1. Two of the three most common elections-related allegations that the OAG pursues are "vote harvesting" and "assistance fraud." Jonathan White, Trial Tr. 3915:3–8. For the November 2022 elections, the OAG established a 2022 General Election Integrity Team and publicly stated it was "prepared to take action against unlawful conduct where appropriate," while highlighting potential offenses related to

voter assistance and vote harvesting. OCAPX-383. As of March 17, 2023, the OAG had conducted eight (8) investigations of possible violations of the SB1 provisions challenged in this matter. LULAC-86. Two of these investigations involved allegations of vote harvesting in violation of SB1 Section 7.04, which remained open cases as of March 2023. *Id.* Another of these investigations concerned an allegation regarding voter assistance with a mail-in ballot carrier envelope, which also remained an open case as of March 2023. *Id.*

45.    The OAG has a lengthy history of devoting resources to prosecuting election crimes. Jonathan White, Trial Tr. 3903:7–3904:15. The OAG has regularly prosecuted election-related allegations, including cases that local prosecutors refer to the OAG because they consider the cases controversial. *Id.* Trial Tr. 146:5–18.

46.    Even post-*Stephens*, the OAG continues to operate the Criminal Prosecutions Division unit that prosecutes election-related allegations, known as the Election Integrity Division. Jonathan White, Trial Tr. 3903:23–3905:4, 3905:11–15, 4039:14–19. After OAG investigations conclude, the OAG typically refers potential election-related prosecutions to local prosecuting attorneys and/or offers to assist local prosecutors with prosecutions. *Id.* Trial Tr. 3909:1–12; 4043:21–4045:21. Local prosecutors can deputize the OAG to handle a prosecution, *id.* Trial Tr. 3909:13–17, 3968:18–24, 4046:10–12; Tex. Gov't Code § 402.028 or appoint the OAG as a District Attorney Pro Tem, *id.* Trial Tr. 3909:13–17, 3964:7–17, 4045:22–4046:12; Tex. Code Crim. Proc. Ann. art. 2.07(a).

47.    After the initial *Stephens* opinion issued, the OAG started working more

closely with local district attorneys on election-related allegations and potential prosecutions. Jonathan White, Trial Tr. 4051:1–6. The OAG's practice shifted towards seeking opportunities to obtain appointments from local prosecutors, including by encouraging local prosecutors to invite the OAG to assist with elections-related prosecutions on specific cases. *Id.* Trial Tr. 4051:7–10, 4051:11–18, 4051:22–25. The OAG's practices have resulted in continued partnerships with certain local district attorneys in the prosecution of election-related crimes. *Id.* Trial Tr. 3909:8–12.

48.    The OAG's existing relationships with local prosecutors on elections cases facilitates the OAG's ongoing engagement in election-related prosecutions. Even before *Stephens*, the OAG generally had some form of cooperation from local prosecutors on elections cases it prosecuted. *See* Jonathan White, 4048:25–4049:5; *see also* OCAPX-377. The OAG has working relationships with local prosecutors in counties where it has prosecuted elections allegations. *Id.* Trial Tr. 4047:5–24. The OAG has specifically identified prior prosecutions in which it participated, and that were prosecuted by or with the assistance of local district and/or county attorneys, in at least the following counties: Nolan County, Limestone County, Hidalgo County, Harris County, Navarro County, Brewster County, Gregg County, and Starr County. OCAPX-377; *id.* at 17 (noting certain cases that were "[p]rosecuted by or with assistance of local district/county attorney"). These prosecutions include types of allegations related to Sections 6.06 and 7.04 of SB1. For example, in 2020, the OAG assisted the Gregg County District Attorney's Office with a prosecution for

allegations of vote harvesting. Jonathan White, Trial Tr. 3940:21–24, 3942:6–7, 3946:20–24; State 91.

49.    Local prosecutors have continued to appoint OAG prosecutors on election-related cases, even after *Stephens*. In 2022, the Texas Secretary of State referred an election-related allegation to the OAG that led to it investigating defendant Mark Whittaker. Jonathan White, Trial Tr. 4054:1–3, 4054:16–4055:8. On October 6, 2022, the Collin County Criminal District Attorney appointed Joseph O'Neill, an attorney with the OAG's Election Integrity Division, as a special prosecutor in the prosecution of Mark Whittaker for an election-related allegation. *Id.* Trial Tr. 4057:2–17. The Collin County Criminal District Attorney appointed current OAG Election Integrity Division Director Geoff Barr as a special prosecutor on the case as well on August 8, 2023, in the election-related prosecution of Mark Whittaker. *Id.* Trial Tr. 4057:18–4058:11.

50.    As of September 26, 2023, Mr. Barr was also the lead prosecutor on a criminal prosecution in Johnson County for charges filed against Jennifer Thompson for allegedly tampering with a government record related to a ballot application. ECF. No. 802; Text Order on October 19, 2023. Tampering with a governmental record is a crime under Section 37.10 of the Texas Penal Code, which the OAG considers enforceable related to elections-related allegations and can include allegations of false statements made on an Oath of Assistance document, relating to voter assistance. Jonathan White, Trial Tr. 3974:22–3975:7; Tex. Penal Code § 37.10.

51.    The OAG's use of privilege makes it impossible to determine whether these

disclosed investigations of election code offenses are only a drop in the bucket. The OAG has maintained that information it possesses related to *ongoing* investigations or prosecutions of criminal allegations under SB1 are covered by the investigative privilege and could not be disclosed in discovery. Keith Ingram, (Oct. 18, 2023) Trial Tr. 52:9–18. The OAG has not disavowed or refused to participate in any investigation or prosecution relating to crimes arising under SB1. *Id.* Trial Tr. 53:12–17. Nor has the OAG promised that it will not prosecute people for violating SB1, Grace Chimene, Trial Tr. 1624:25–1625:3, or that it will not enforce the provisions of SB1, Deborah Chen, Trial Tr. 1746:16–18. It is possible that prosecutors within the State of Texas will prosecute offenses arising under SB1 in the future. Keith Ingram, (Oct. 18, 2023) Trial Tr. 55:2–8.

52.    After *Stephens*, the OAG dismissed two election-related prosecutions that it pursued in Montgomery County against defendants who were residents of Harris County and referred those cases to the Harris County District Attorney's Office. Jonathan White, Trial Tr. 4058:17–4059:2, 4059:15–18, 4060:23–25, 4063:3–16; OCAPX-377. Although there is no evidence that the Harris County District Attorney pursued either of those allegations before the referral, the District Attorney subsequently presented election-related charges against the same two defendants to grand juries. *Id.* Trial Tr. 4062:7–21; 4063:17–25.

### C. Harris County District Attorney

53.    Defendant Kim Ogg is the Harris County District Attorney ("Harris DA") and is sued in her official capacity. Plaintiffs bring claims against the Harris DA

challenging Sections 6.06 and 7.04 of S.B.1.

54.    The Harris DA is tasked with enforcement of the State's criminal laws and represents the State of Texas in all criminal matters within Harris County, unless conflicts arise. Tex. Const. art. 5, § 21; Tex. Code Crim. P. art. 2.01; *see* Tex. Gov't Code § 43.180(b). This prosecutorial authority includes prosecution of criminal violations of the Texas Election Code. *See generally State v. Stephens*, No. PD-1032-20, 2021 WL 5917198 (Tex. Crim. App. 2021). Additionally, under Section 273.001 of the Texas Election Code, "[i]f two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney *shall* investigate the allegations" (emphasis added).

55.    The Harris DA has not disavowed prosecuting violations of either Section 6.06 or 7.04 of SB1 and no evidence otherwise was entered at trial. Ms. Chimene testified that no prosecutor in Texas has promised that they will not prosecute people for violating SB 1. Grace Chimene, Trial Tr. 1624:14–16. Specifically, it is uncontested that the Harris County District Attorney has refused to promise that she "will not prosecute people for violating SB 1." *Id.* Trial Tr. 1624:17–20. Additionally, Deborah Chen testified she is not aware of any disavowal from the Harris DA "of an attempt to enforce the provisions of SB1." Deborah Chen, Trial Tr. 1746:11–13.

56.    Further, the Harris DA has stipulated that: "The [Harris DA] has not (1) adopted a policy refusing to prosecute any class or type of criminal offenses under state law, (2) instructed law enforcement to refuse to arrest individuals suspected of

committing any class or type of offense under state law, or (3) permitted an assistant prosecutor to take either of the foregoing actions." ECF No. 781, ¶ 5.

57.    The evidence further demonstrated that the Harris DA has previously prosecuted alleged violations under the Election Code and/or related to elections, including under provisions that were amended or enacted by SB1. The Harris DA has jointly prosecuted at least two election-related cases alongside the OAG in the past. OCAPX-377 at 17 (noting certain cases that were "[p]rosecuted by or with assistance of local district/county attorney," including Harris County); *id.* at 14 (identifying joint prosecution of Anthony Rodriguez with Harris County in 2019); OCAPX-225 at 4 (Harris DA interrogatories identifying prosecution of Anthony Rodriguez under a provision amended or enacted by SB1); OCAPX-377 at 6 (identifying joint prosecution of Avery Ayers with Harris County in 2015). The Harris DA further acknowledged prosecuting two other election-related violations in 2020 under provisions enacted or amended by SB1. OCAPX-225 at 4 (identifying prosecutions of Richard Bonton and Natasha Demming).

58.    Moreover, newly enacted law House Bill 17 ("H.B. 17") emphasizes the duty of district attorneys like Harris DA to enforce Texas criminal laws. H.B. 17, which went into effect on September 1, 2023, establishes that district attorneys may be removed from office if they adopt any policy that "prohibits or materially limits the enforcement of any criminal offense." H.B. 17 § 1.

### D. Harris County Clerk

59.    Defendant Harris County Clerk Teneshia Hudspeth ("Harris Elections") is

sued in her official capacity. She is sued for helping enforce Section 6.06.

60.    Harris Elections is the Early Voting Clerk for Harris County. The Early Voting Clerk is specifically charged under the election code with "conduct[ing] the early voting in each election" and has "the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting, except as otherwise provided by [Title 7 of the Election Code]." Tex. Elec. Code § 83.001.

61.    When Harris Elections was run by an Elections Administrator, it administered elections and voter registration for the county. Isabel Longoria, Trial Tr. 1215:15–19. Harris Elections, under the current County Clerk, only administers election matters for the county. Tex. Elec. Code § 83.002; Isabel Longoria, Trial Tr. 1222:3–14.

62.    Harris Elections oversees training for staff to ensure that Section 208 of the Voting Rights Act ("VRA") is followed when administering elections. Rachelle Obakozuwa (Sept. 19, 2023) Trial Tr. 1169:7–25.

### E.  Travis County District Attorney

63.    Defendant Jose Garza is the Travis County District Attorney ("Travis DA") and is sued in his official capacity. Plaintiffs bring claims against the Travis DA challenging Sections 6.06 and 7.04 of SB1.

64.    The Travis DA represents the State of Texas in all criminal matters within Travis County, unless conflicts arise. Tex. Const. art. 5, § 21; Tex. Code Crim. P. art. 2.01. Under Section 273.001 of the Texas Election Code, "[i]f two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having

jurisdiction in that territory, the county or district attorney *shall* investigate the allegations," (emphasis added).

65.    The trial evidence demonstrates that the Travis DA previously carried out investigations of elections-related allegations. OCAPX-377. There was no evidence that the Travis DA disavowed prosecuting anyone under either Section 6.06 or 7.04. The uncontroverted evidence at trial is that the Travis DA will prosecute violations of Section 6.06 and 7.04 of SB 1. Grace Chimene, Trial Tr. 1624:21–24. Further, as noted above, newly enacted HB 17 constrains any prosecutor from adopting a position to decline prosecuting SB1 offenses.

### F.  Travis County Clerk

66.    Defendant Travis County Clerk Dyana Limon-Mercado ("Travis Elections") is sued in her official capacity. She is sued for helping implement Section 6.06.

67.    Travis Elections is the Early Voting Clerk for Travis County. The Early Voting Clerk is specifically charged under the Election Code with "conduct[ing] the early voting in each election" and has "the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting, except as otherwise provided by [Title 7 of the Election Code]." Tex. Elec. Code § 83.001. Travis Elections considers Section 6.06 as prohibiting a nonprofit organization from paying someone to assist voters. Bridgette Escobedo, Trial Tr. 1549:2–5. Travis Elections believes buying someone lunch, giving a cup of tea, paying for someone's parking, and many other types of offers could be considered compensation under Section 6.06. *Id.* Trial Tr. 1549:6–1550:21.

## III.    Factual Background Relevant to all Claims

### A.  SB 1 Factual Background

68.    Texas is no stranger to violations of its residents' voting rights. In 1975, Congress applied the preclearance provisions in Section 5 of the VRA to Texas, as it did every review cycle thereafter. Congress did so because of extensive legislative testimony about Texas's long history of voting discrimination. *See Veasey v. Abbott*, 830 F.3d 216, 240 n.29 (5th Cir. 2016) (en banc) (*Veasey II*) (quoting *Seamon v. Upham*, 536 F. Supp. 931, 989 (E.D. Tex.) (citations omitted), *vacated on other grounds*, 456 U.S. 37, 102 (1982)).

69.    Texas's history of discrimination is especially troubling considering the 2020 U.S. Census revealing that 95% of Texas's population growth since the 2010 Census had been in communities of color. Alexa Ura, et. al., *People of color make up 95% of Texas' population growth, and cities and suburbs are booming, 2020 census shows*, Tex. Tribune  (Aug. 12, 2021), https://www.texastribune.org/2021/08/12/texas-2020-census/. Since 2010, Texas's "Hispanic, Black and Asian populations all significantly outgrew the white population . . . ." *Id.* Of all these groups, Texas saw the greatest growth in its Asian population—about 60% growth over the past ten years. *Id.* The 2020 general election saw the greatest increase in voter turnout that Texas has seen in decades. Even through a devastating pandemic, Texas counties developed methods of helping their residents vote with minimal transmission risk, such as allowing mail-in ballots to be dropped off at multiple locations in person and drive-thru voting. The state's response to these innovations and the increased voter turnout they drew was to roll back each initiative and shrink access to the ballot box.

70.    Texas legislators began to laser in on "election integrity" measures after the 2020 election and concurrent release of Census results. These measures were advertised to increase public confidence in elections. In reality, they increased voter suppression and intimidation throughout the state. The debate in the 88th Texas Legislature on election bills was contentious, with concerns raised over discriminatory redistricting maps that remain subject to suit,[4] to fiery exchanges regarding Jim-Crow era language referring to the "purity of the ballot box" in earlier drafts of SB1. Eventually, after one regular Session and two special sessions, SB1 passed the Legislature and Texas Governor Greg Abbott signed it into law. Jt. Ex. 1.

71.    The effect of SB1's passage was felt almost immediately as election officials scrambled to understand its requirements and implement them by the December 2021 effective date. Voters and voter-advocacy organizations tried to understand new offenses like vote harvesting, and the implications of the new voter assistance restrictions for voters with disabilities and LEP voters. The March 2022 primary election following SB1's passage resulted in over 20,000 mail-ballots getting rejected as both voters and election officials grappled with SB1's requirements. ECF No. 820.

## B. Procedural History

72.    OCA Plaintiffs filed their second amended complaint in January 2022. ECF

---

[4] See Alexa Ura, *Texas is quietly using redistricting lawsuits to launch a broader war against federal voting rights law*, Tex. Trib. (Apr. 4, 2022), https://www.texastribune.org/2022/04/04/texas-redistricting-voting-rights-act/; see also, Alexa Ura & Mandi Kai, *With surgical precision, Republicans draw two congressional districts that dilute power of Hispanic and Asian voters*, Tex. Trib. (Oct. 15, 2021), https://www.texastribune.org/2021/10/15/texas-redistricting-dallas-fort-worth/.

No. 200. State Defendants filed a motion to dismiss all of OCA Plaintiffs claims, ECF 240, which this Court granted in part and denied in part. ECF No. 448. OCA Plaintiffs continued to pursue their remaining claims under the First Amendment, Civil Rights Act of 1964 ("CRA"), VRA, Americans with Disabilities Act (ADA), and the Rehabilitation Act ("RA") challenging SB1's vote harvesting and voter assistance provisions. *See* ECF No. 200. In August 2023, the Court granted in part OCA Plaintiffs' motion for summary judgment on their CRA claims challenging immaterial requirements on mail-in vote materials. ECF No. 611; ECF No. 820. Private Plaintiffs proceeded to trial in September 2023 on the remaining claims.

73.    The Court held a bench trial from September 11 through October 20, 2023. The Parties laid an extensive record before the Court, including hundreds of exhibits and a total of 66 witnesses (59 of whom were for the Plaintiffs), ECF No. 815.  These witnesses included county and election officials, employees of the Secretary of State's Office, and affected voters, voter assistants, and the representatives of the organizations who filed this suit. *Id.* Documentary evidence included voter complaints at the Secretary's Office, and investigative files, publicly available prosecution records, and spreadsheets that tracked voter fraud prosecutions that the OAG was pursuing during the 2020 and 2022 elections. LULAC-61.

## IV.    Facts Relevant to SB1 Section 7.04

74.    Section 7.04 imposes criminal and civil penalties on anyone who gives or receives some "compensation or other benefit" for "knowingly provid[ing] or offer[ing]

27

to provide vote harvesting services." Tex. Elec. Code § 276.015(b). The Texas Election Code defines "vote harvesting" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *Id.*, § 276.015(a)(2). Anyone who engages in "vote harvesting"—as Section 7.04 defines it—risks a third-degree felony conviction. *Id.*, § 276.015(f). That penalty subjects violators to a 2–10 year term of imprisonment. Section 7.04 also gives rise to a civil penalty for damages to candidates purportedly harmed by activities § 276.015 prohibits.

### A. The League

75.    Former League President Grace Chimene testified to Section 7.04's chilling effect on the organization's activities. Candidate forums are one such activity, where members—some of whom vote by mail, Grace Chimene, Trial Tr. 1588:10–17—and candidates engage in question-and-answer sessions. *Id.* Trial Tr. 1595:16–24. Hundreds of people attend these candidate forums, *id.* Trial Tr. 1599:12–16, which often occur during election cycles after mail-in ballots are sent out because that is when individuals are most interested in learning about candidates and issues on their ballot. *Id.* Trial Tr. 1599:17–21. The League does not track whether candidate forum attendees have their mail-in ballots with them at candidate forums. *Id.* Trial Tr. 1600:6–16, 1620:7–1621:4, 1627:11–1628:1. The League also hosts other in-person events that provide election information and answer voters' questions about upcoming elections. *Id.* Trial Tr. 1607:7–14.

76.    Ms. Chimene testified that Section 7.04 increasingly frustrated the League's

ability to engage in its mission of empowering voters in Texas. Section 7.04 raised the League's genuine concern that they will be unable to fulfill its mission and serve its constituents because the law threatens its assisters with criminal liability. Grace Chimene, Trial Tr. 1604:3–19. For example, Ms. Chimene described how Section 7.04 frustrates the League's ability to serve its members and Texas voters at League-sponsored candidate forums, where any League member or prospective voter in attendance can have their mail-in ballot with them. *Id.* Trial Tr. 1620:7–1621:1. The League would turn away members with their mail-in ballots from candidate forums, which would leave attendees unable to participate in the forums, thus defeating the League's mission to empower voters. *Id.* Trial Tr 1620:2–1621:4, 1627:11–1628:1. Ms. Chimene explained on cross examination that because of the risk of criminal liability associated with Section 7.04 from being in the presence of a ballot, she "wouldn't ask anybody to do anything with their ballot," leaving members and volunteers at candidate forums exposed to criminal liability for interacting with voters who have their mail-in ballots with them. *Id.* Even before Section 7.04 became law, the League was "very concerned" that SB1's changes "would impact and make it harder for voters to be able to vote here in Texas." *Id.* Trial Tr. 1588:21–1589:2.

77.    The League's in-person events like candidate forums are volunteer driven, with volunteers receiving benefits for interacting with community members in attendance. Grace Chimene, Trial Tr.1597:18–1598:9. Since Section 7.04 became law, the League has understood hosting in-person events to be possible Section 7.04 violations, making the organization and its members susceptible to civil and criminal penalties.

*Id.* Trial Tr. 1597:11–13, 1601:2–8, 1601:12–1602:1. Based on the League's understanding, the benefits volunteers receive—from food to letters of recommendation—can be considered "compensation or other benefit[s]," Tex. Elec. Code § 276.015(c), because neither "compensation" nor "other benefit" are defined anywhere in Section 7.04. Grace Chimene, Trial Tr. 1598:23–1599:1.

78.     The League also understands Section 7.04 to criminalize actions perceived as intending to deliver votes for a specific candidate or measure at its in-person events. Grace Chimene, Trial Tr. 1601:2–1602:1. The League has endorsed particular ballot measures in the past. *Id.* Trial Tr. 1600:17–23. Although it does not endorse political candidates, the League has previously been accused of supporting a particular candidate at its candidate forums and is likely to be perceived this way again. *Id.* Trial Tr. 1596:17–1597:17.

### B. OCA-GH

79.     OCA-GH is concerned that its staff and volunteers will face criminal liability under Section 7.04 if OCA-GH continues to hold in person events where: (1) voters are likely to bring their mail-in ballot, (2) OCA-GH volunteers and staff are compensated, and (3) OCA-GH periodically endorses ballot measures or are likely to be perceived as trying to deliver votes for a particular candidate. Deborah Chen, Trial Tr. 1717:5–13.

80.     Prior to Section 7.04, OCA-GH offered seniors rides to the polls, Deborah Chen, Trial Tr. 1722:23–1723:5, hosted candidate forums, *id.* Trial Tr. 1694:21–1695:14, hosted AAPI candidate meet and greets, *id.* Trial Tr. 1701:5–16, provided language

assistance at the polls and for mail-in ballot voters, *id.* Trial Tr. 1705:5–24, 1706:4–11, and canvassed, *id.* Trial Tr. 1693:9–20, 1703:14–20, across Greater Houston. These events included in-person interactions with voters in the physical presence of the mail-in ballots. *Id.* Trial Tr. 1716:23–1717:4.

81.    OCA-GH has endorsed and advocated for certain ballot measures. Deborah Chen, Trial Tr. 1711:8–19, 1712:17–1713:3. It is likely to endorse ballot measures in the future. *Id.* Trial Tr. 1713:8–11, 1726:8–14. OCA-GH is also reasonably concerned that it will be perceived as supporting a particular political candidate if it hosts candidate forums or meet-and-greets with only AAPI candidates. *Id.* Trial Tr. 1718:9–19, 1720:1–6.

82.    After Section 7.04 passed, OCA-GH became seriously concerned about the law's impact. OCA-GH provides what can be considered "compensation" to volunteers who assist LEP individuals. Deborah Chen, Trial Tr. 1714:13–16. OCA-GH routinely offers volunteers benefits that could be considered compensation in the form of meals, beverages, snacks, academic credit, shirts, and other nominal gifts. *Id.* Trial Tr. 1717:24–1718:5, 1714:13–22, 1716:14–22, 1694:11–20. OCA-GH also pays independent contractors for literature-drop canvassing. *Id.*

83.    Section 7.04 forced OCA-GH to cease conducting its in-person civic engagement activities where members and other voters have historically brought mail-in ballots. For instance, in March 2022, OCA-GH did not host it's in person candidate forum because of Section 7.04, Deborah Chen, Trial Tr. 1718:20–24, and has hosted its AAPI candidate meet and greets virtually, at which attendance has been "fairly abysmal"

in comparison to prior events, *id*. Trial Tr. 1720:1–15.

84.    To avoid any potential accusation of violating Section 7.04, OCA-GH's canvassers no longer communicate with voters in any meaningful way (including no longer offering voters assistance), nor offer senior voters rides to their polling place. Deborah Chen, Trial Tr. 1722:3–16. OCA-GH no longer assists LEP members and other voters at early voting centers or community centers, just to avoid the possibility of being present with a voter carrying a mail-in ballot. *Id*. Trial Tr. 1722:17–1723:5. OCA-GH is deeply concerned about exposing student volunteers to criminal charges. *Id*. Trial Tr. 1721:2–10.

85.    Section 7.04 is written so broadly that it arguably covers all of OCA-GH's civic engagement and assistance work. Its criminal consequences can ruin the economic future of any OCA-GH employee or volunteer. Deborah Chen, Trial Tr. 1721:11–25–1722:22. A fundamental part of OCA-GH's mission is to educate and develop a pool of future leaders, and SB1 increases the likelihood that young volunteers will face criminal prosecution. *Id*. Trial Tr. 1721:7–10.

### C. LUPE

86.    Section 7.04 also restricts LUPE, which is a non-partisan membership organization headquartered in San Juan, Texas, with members primarily in Hidalgo, Cameron, Willacy, and Starr Counties, Texas. ECF No. 208, at 7. Tania Chavez is LUPE's executive director who offered testimony about the harms Section 7.04 afflicts on her organization.

87.    LUPE members serve as staff and volunteers who are compensated to speak

to voters on issues promoted by LUPE; this outreach includes urging voters to vote in support of or against non-partisan ballot measures. Tania Chavez, Trial Tr. 88:1–7.

88. One example of LUPE's ballot issue advocacy to voters is a bond that was on the ballot around 2011–2012 that would have implemented drainage in the colonias. The drainage bond passed in that election. Another example is the ballot issue of creating a health care district in Hidalgo that has no public hospitals. The health care district proposal was defeated in the election. Tania Chavez, Trial Tr. 88:8–24.

89. LUPE plans to urge voters to support a health care district ballot measure in the future because Hidalgo County has high rates of poverty and high rates of obesity and diabetes. LUPE believes that a health care district is needed to improve the quality and availability of health care in Hidalgo County. Tania Chavez, Trial Tr. 88:25–89:6.

90. LUPE advocates to voters and urges voters to support certain ballot measures because it is LUPE's goal to have its members and other residents of colonias advocate to improve their own quality of life. LUPE supports ballot measures that reflect the greatest needs of community members. These needs are determined by a colonias event with community members that LUPE hosts every two years to identify solutions on the issues community members want to advocate for, and if a ballot measure is part of those issues, that's how LUPE validates its position for or against a specific ballot measure. Tania Chavez, Trial Tr. 89:19–90:3.

91. LUPE planned to advocate on a number of measures in the November 2023

Constitutional Amendment election, but trained its staff not to advocate on the ballot measures in the presence of a mail ballot. Tania Chavez, Trial Tr. 3681:6–3682:8. In this election, LUPE sought to advocate to voters in favor of a proposition to expand broadband access because many colonias in South Texas lack broadband access and LUPE seeks to draw funds to South Texas to increase access. *Id.* Trial Tr. 3680:7–3681:5. Similarly, LUPE sought to advocate to voters in favor of water projects to increase drainage infrastructure in colonias. *Id.* These are issues that matter to LUPE and the community that it represents and advocating on these issues is core to LUPE's work. *Id.* Trial Tr. 3680:7–3682:8.

92.    When advocating to the community on ballot measures, LUPE expects that on at least some occasions they will advocate in the presence of a mail-in ballot.  Tania Chavez, Trial Tr. 91:15–91:17.

93.    As LUPE organizers, who can be staff or volunteers, canvass neighborhoods to urge support for ballot measures, mail-in ballot voters invite LUPE organizers into their homes. While the organizer is advocating on a measure, the voters produce their mail-in ballots and ask the organizer for assistance. Tania Chavez, Trial Tr. 71:1–72:15, 75:11–75:17, 119:20–120:18. Because this has happened in the past, LUPE expects in the future that its organizers will find themselves advocating on ballot measures in the presence of a mail-in ballot. *Id.* Trial Tr. 119:20–120:18.

94.    LUPE expects that its members will bring mail-in ballots to meetings at the LUPE offices or union halls. Section 7.04 inhibits LUPE's speech on ballot measures because LUPE knows that community members can walk into LUPE's offices with

34

mail-in ballots, or bring mail-in ballots to a LUPE-hosted house meeting where the major topic is a ballot measure. Mail-in ballot voters bring their ballots to LUPE offices and meetings to ask for assistance completing the ballot. Tania Chavez, Trial Tr. 90:4–24.

95.    LUPE's staff and leadership have a concrete fear of investigation and prosecution for vote harvesting because LUPE's routine activities fall within the scope of the prohibition of Section 7.04. Section 7.04 has caused LUPE to cease ballot issue advocacy to voters when a mail ballot might be or is present. Tania Chavez, Trial Tr. 91:18–92:24, 3674:22–3675:11, 3684:13–3685:11, 3685:5–11.

96.    LUPE organizers who are canvassing door to door will stop advocating on a ballot measure upon learning that they are in the presence of a mail-in ballot. This prevents LUPE from speaking on the ballot measure and hinders LUPE's ability to secure resources for South Texas on the issues LUPE supports. Tania Chavez, Trial Tr. 3684:13–3685:4. Speaking to voters at their homes is an essential part of LUPE's activities because it ensures that hard-to-reach voters in the colonias have the information they need to vote to improve their communities.  *Id.* Tr. 3686:1–20.

97.    Section 7.04's ban on in-person canvassing has had a similar impact on other non-profit community-based organizations. *See, e.g.*, Zeph Capo, Trial Tr. 928:17–19 (testifying that Texas AFT does not engage in block-walking unless "there's special circumstances"); Judy Bryant, Trial Tr. 1765:19–1766:23 (testifying that TARA does not engage in any in-person advocacy after the first week of October because that is when mail-in ballots are generally sent out to voters).

98.    Although LUPE plans to try again to secure passage of a ballot measure to create a health care district, LUPE staff and volunteers are prohibited from urging voters to support the measure in the presence of a mail ballot.  LUPE staff and volunteers who knock on doors of voters, particularly doors of elderly and disabled voters, know that the mail ballot could be sitting in the voter's living room. As a result, LUPE staff and volunteers cannot speak in their door to door Get Out the Vote efforts to raise awareness and urge support for ballot measures.  As explained by Ms. Chavez, "So we can't[,] to make sure that our staff members do not feel that they will end up in jail[,] because now we are advocating for a ballot measure in the presence of a ballot by mail." Tania Chavez, Trial Tr. 91:18–92:16. This is also true when LUPE members bring their mail-in ballots to the LUPE offices or to meetings at the union hall.  *Id.* Trial Tr. 90:4–24.

99.    LUPE often compensates its volunteers with t-shirts or gas cards, particularly because there is little public transportation in the Rio Grande Valley. Tania Chavez, Trial Tr. 122:3–19. LUPE is concerned that providing gas cards to volunteers would be compensation that would place volunteers in jeopardy under SB1. *Id.* Trial Tr. 122:3–23.

### D. MABA-TX

100.    The Mexican American Bar Association of Texas ("MABA-TX") is a professional membership association of Latino lawyers across Texas that Section 7.04 also harms.

101.    MABA-TX members routinely encourage voters to support a candidate or measure. Jana Ortega, Trial Tr. 2542:6–8. MABA-TX members are concerned that

36

they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while performing these activities. Jana Ortega, Trial Tr. 2542:6–20. MABA-TX has difficulty recruiting members to table events in support of candidates because of SB1 and because members fear that they might inadvertently commit a crime. *Id.* Trial Tr. 2543:1–2544:16.

### E. State and Local Officials

102.    Experienced elections officials expressed concerns over Section 7.04's vagueness and potentially sweeping interpretation. For example, Dallas County Elections Administrator Michael Scarpello testified "I don't know what ballot harvesting means," "it could be interpreted a lot of different ways based on the definition . . . put into the law." Michael Scarpello, Trial Tr. 496:5–8. Likewise, former Harris County Elections Administrator Isabel Longoria testified to SB1 provisions like Section 7.04 limiting the pool of people willing to assist others to vote with the threat of criminal charges looming over them. Isabel Longoria Trial Tr. 1310:14–1312:11.

103.    Additionally, former Travis County Clerk Dana Debeauvoir found "vote harvesting" in Section 7.04 unclear because "it doesn't make the distinction between legal assistance to a person who is qualified to receive it." Dana Debeauvoir, Trial Tr. 841:21–842:9. Ms. Debeauvoir agreed that the definition of "vote harvesting" in Section 7.04 criminalizes "paying someone to encourage people to vote for a measure but . . ." not against that same measure. *Id.* Trial Tr. 844:1–12.

104.    Elections Administrators also testified that they were not aware of voter

assistance as a source of misconduct or fraud. For example, Ms. Debeauvoir does not recall, nor is she aware of, any instances of a paid assister coercing, intimidating, or engaging in any kind of fraud or misconduct. Dana Debeauvoir, Trial Tr. 846:16–847:8; *See also* Bridgette Escobedo, Trial Tr. 1547:4–24; Lisa Wise, Trial Tr. 177:3–6; Michael Scarpello, Trial Tr. 433:10–14, 433:23–434:2, Dana DeBeauvoir, Trial Tr. 846:16–847:3; Jacquelyn Callanen, Trial Tr. 1059:1–4; Isabel Longoria, Trial Tr. 1317:11–19.

105.    Elections Administrators likewise testified that no voters have been confused or improperly influenced by paid canvassers for community-based organizations who advocated in the presence of mail-in ballots. For example, Ms. Wise testified that she was unaware of anyone with a nonprofit or community organization trying to commit fraud with a mail voter and a mail ballot in El Paso County. Lisa Wise, Trial Tr. 260:17–21. Ms. DeBeauvoir similarly testified that she had no reason to believe that an assister who was paid by a nonprofit organization to help voters would be more likely to engage in misbehavior than an assistor who is not paid. Dana DeBeauvoir Trial Tr. 847:4–8.

106.    Instead, Elections Administrators testified that Section 7.04 would prohibit conduct and speech that is not fraudulent, misleading or unlawful. For example, Mr. Garza testified that work by non-partisan organizations in the Rio Grande Valley that assist voters who are homebound could be interpreted as violating Section 7.04's ban on in-person canvassing.  Remi Garza, Trial Tr. 758:8–19, 758:22–759:12. Ms. DeBeauvoir testified that Section 7.04 does not distinguish between prohibited

conduct and legal assistance to a person who is qualified to receive it, and "criminalized very innocent process that helped often our most vulnerable voters, voters who were shut in who really relied on vote by mail to be able to participate in democracy.". Dana DeBeauvoir Trial Tr. 841:15–842:9, 844:13–25; *see also* Michael Scarpello Tr. 496:2–8.

107. The Secretary also effectively conceded that Section 7.04 sweeps in legitimate First Amendment protected activity. Specifically, Mr. Ingram acknowledged the First Amendment right to "pay canvassers to go solicit votes for our preferred candidate." Keith Ingram, Trial Tr. 1915:17–18; *see also id.* Trial Tr. 1901:23–25. He conceded that "[i]f the ballot is in the kitchen, and we're in the living room, and we're talking about our preferred candidates, that's First Amendment [protected activity]. . . What's going on is a perfectly normal—I'm trying to persuade you to vote for my candidate. I can get paid for that. I can go do it all day long[.]" *Id.* Trial Tr. 1915:3–11. After conceding that canvassers' advocacy for ballot measures in the presence of a mail ballot "is First Amendment [protected activity]," Mr. Ingram claimed, contrary to the language of Section 7.04, that illegal vote harvesting is limited to "whenever the voter and the harvester get together and they're reviewing the ballot together, and then they get down to that candidate, and the harvester makes sure they check the right box[.]" *Id.* Trial Tr. 1915:12–16.

108. The Secretary claims to follow Section 7.04 as written but cannot interpret it without adding non-existent terms. For example, Mr. Ingram testified that the Secretary's Office "go[es] with the statute," Keith Ingram, Trial Tr. 1924:7–10, and

that vote harvesting involves "physical presence, intimidation, making sure that a voter marked one box one way," *Id.* Trial Tr. 1914:1–6, and that "vote harvesting has a meaning and that meaning is when somebody puts pressure on a voter to vote a particular way on a particular race[.]" Keith Ingram, Trial Tr. 4427:7–18. However, Section 7.04 says nothing about "intimidation," "making sure the voter marked one box one way," or putting "pressure on a voter." Jt. Ex. 1.

109.   Mr. Ingram testified that the Secretary's Office has not put out any written guidance to set forth the definition of vote harvesting that he provided to the Court and he further testified that the Secretary's Office has not issued any guidance about what paid canvassers are or are not permitted to do under SB1 because "that's beyond our scope." Keith Ingram, Trial Tr. 1924:7–10, 1926:10–13.

110.   The language of Section 7.04 is so broad that the State's chief voter fraud prosecutor conceded that he would need to do legal research to determine what types of economic benefits would violate the provision. Jonathan White, Trial Tr. 3993:19–21. With respect to prohibited compensation for mail ballot assistance, Mr. White could only testify that if he was asked whether "anything of value" could encompass a gift bag, for example, with a t-shirt in it, he would need to go and do some research and see if there's any case law to flesh that out, and that "reviewing case law would always be a good decision in that context." Jonathan White, Trial Tr. 3992:20–3993:18. Mr. White testified further that he would potentially review case law to answer the question whether prohibited compensation includes an assister receiving a meal or bus fare. *Id.* Trial Tr. 3993:19–21. Moreover, Mr. White testified that

Section 7.04 does not limit the offense of vote harvesting to persons who are being paid by a candidate, campaign or PAC. *Id.* Trial Tr. 4001:1–23.

111.    Mr. White additionally testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is used as a subterfuge for voter fraud, and "we'd be looking for the fraud at the bottom of things, yes, ma'am." Jonathan White, Trial Tr. 3995:11–24.

112.    This testimony comes despite Mr. White's additional testimony that he had never dealt with circumstances in which a community organization paid an organizer to persuade mail ballot voters in person in the presence of the ballot to vote for a ballot measure. Jonathan White, Trial Tr. 4000:11–17.

113.    Mr. White likewise testified that, prior to SB1, the Texas Election Code already criminalized: assisting a voter who is not eligible for assistance or did not ask for assistance; voting a ballot differently than the voter wished or directed the assistant to voter the ballot; and an assistant suggesting to the voter during the voting process how the voter should vote. Jonathan White, Trial Tr. 3923:21–3924:14. Mr. White also testified that before SB1 it was illegal for a person who provided assistance to a voter to try to influence or coerce the voter. *Id.* Trial Tr. 3925:4–6.

114.    Mr. White explained that if an assister disregards a voter's preference when marking the ballot, prosecutors can charge them under existing criminal provisions in the Texas Election Code, including unlawful assistance, illegal voting, and election fraud. Jonathan White, Trial Tr. 3989:17–3990:1 (discussing Tex. Elec. Code

§§ 64.036, 64.012, 276.013). Mr. White testified that if an assister tried to influence or coerce a voter's vote, the assister could be charged with unlawful assistance and possibly election fraud. *Id.* Trial Tr. 3990:2–7. All these provisions existed in the Texas Election Code before SB1. *Id.* Trial Tr. 3990:8–10. Mr. White further testified that all the resolved prosecutions in his OAG spreadsheet for unlawful assistance were charged under criminal statutes that existed before SB1. *Id.* Trial Tr. 4027:17–20; LULAC-61.

## PROPOSED CONCLUSIONS OF LAW

### I.  Jurisdiction

115.  This Court has subject matter jurisdiction pursuant to 28. U.S.C. §§ 1331, and 1343(a); 42 U.S.C. §§ 1983 and 1988; and 52 U.S.C. § 10101(d).

116.  This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

117.  Courts can "enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979). It is undisputed that a particular state official is a proper defendant from whom to seek such relief so long as the official bears "'some connection with the enforcement of the act' in question or [are] 'specially charged with the duty to enforce the statute' and [are] threatening to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (citation omitted).

118.  "The text of the challenged law need not actually state the official's duty to

enforce it . . . ." *City of Austin v. Paxton*, 943 F.3d 993, 997–98 (5th Cir. 2019). And the needed "connection" to enforcement is generally met if the officer is duty-bound and willing to "compel or constrain" someone "to obey the challenged law." *Texas Alliance for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022). Under these circumstances, an action to enjoin implementation of the statute or for declaratory relief is available against the state official. *Id.*

## II.    Standing

119.    Plaintiffs have Article III standing. ECF No. 448, at 49. A plaintiff has Article III standing to bring a claim if the plaintiff suffered a cognizable injury that is "fairly traceable to the challenged action" and "redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

120.    Article III requires only one of these plaintiffs to have standing to proceed. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

### A. Each organization possesses organizational standing to challenge Sections 6.06 and 7.04.

121.    The League and OCA-GH have organizational standing. ECF No. 448, at 49–50. An organization suffers an injury sufficient to confer standing under Article III if its ability to pursue its mission is "perceptibly impaired" by the challenged conduct. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). An organization can prove standing through "a drain on its resources resulting from counteracting the effects of the defendant's actions." *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000) (citing *Ass'n. of Comty. Orgs. For Reform Now v. Fowler*, 178 F.3d 350, 360

(5th Cir. 1999)).

122.    An organization suffers a drain on its resources where it devotes resources "toward mitigating [the] real-world impact" of the challenged conduct. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017). "[T]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *Id.* (cleaned up); *see also United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973) (explicitly rejecting a requirement that an injury be significant and noting that injuries such as "a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax" are sufficient to constitute an injury-in-fact (internal citations omitted)).

123.    Here, as in *OCA-Greater Houston*, each plaintiff "went out of its way to counteract the effect" of Sections 6.06 and 7.04. 867 F.3d at 612. As a result of the need to respond to these challenged provisions, Plaintiffs diverted valuable and limited resources to non-routine activities that impaired the organizations' ability to carry out their missions. Lowered confidence about and heightened concern about risks associated with the vote-by-mail and assistance process also undermines the League's efforts to encourage eligible voters to vote by mail, use assistants, and attend League events.

124.    For example, the League shifted away from its routine practice of engaging younger and new voters who generally needed more explanation about the voting process and often needed to register to vote, to instead help longtime voters navigate the post-SB1 election landscape with new additional League staff. *Supra* ¶ 9–13. The

44

League shifted towards non-routine practices of educating longtime voters about added criminal penalties related to vote-by-mail procedures under Section 6.06 and 7.04. *Id.* This involved spending time and finances on creating new materials and educating voters, instead of engaging in routine activities such as outreach to younger and new voters. *Id.* This diversion of resources impaired the League's ability to carry out its mission of "empowering voters and defending democracy" by limiting its empowerment of new and young voters. *Supra* ¶ 7, 9–13.

125.    The League likewise shifted away from routine activities when it indefinitely postponed a planned study on election security, *supra* ¶ 13, which also limited the League's activities relevant to its mission. Similarly, the League has been discouraged from assisting voters at assisted care facilities, which harms its ability to reach voters there and fulfill its mission. *Supra* ¶ 11.

126.    Sections 6.06 and 7.04 have "impacted almost every area" of OCA-GH's work and made it "nearly impossible" to carry out its organizational mission. *Supra* ¶ 22–27. SB1 forced OCA-GH to divert time and resources to "counteract[ing] the effect" Sections 6.06 and 7.04 had on the organization too. OCA-GH created new training materials for volunteers, staff, and independent contractors, advising them all to stop assisting voters to avoid risking felony charges. *Id.* Sections 6.06 and 7.04 also frustrated OCA-GH's mission of promoting voting, a core tenant of civic participation that OCA-GH works to promote in the AAPI community. *Supra* ¶ 15, 22–27.

127.    Each Plaintiff's diversion of resources is concrete: the League ceased engaging with new voters to increase resources devoted to helping longtime voters cast their

ballots. *Supra* ¶ 9. Both the League and OCA-GH diverted resources to educating its members on "mitigating [SB1's] real-world impact[.]" *OCA-Greater Houston*, 867 F.3d at 612. OCA-GH also cut back on setting up tables at candidate forums where volunteers and staff could assist members and other voters with mail-in ballots. *Supra* ¶ 23, 26. Sections 6.06 and 7.04 threatened those assisters, forcing OCA-GH to pull back from one of its core civic engagement activities. *Supra* ¶ 23–25. Plaintiffs have established that the increased cost of voter engagement responding to SB1's election law changes required a shift of their limited resources from other voter activities, which is sufficient to establish injury-in-fact for standing purposes. *OCA-Greater Houston*, 867 F.3d at 612; *Fowler*, 78 F.3d at 360; *see also Harding v. Edwards*, 484 F. Supp. 3d 299, 316 (M.D. La. 2020) (finding standing where organizations demonstrated "concrete spending changes and new initiatives in response to Defendants' actions"). SB1's cumbersome effect on the Plaintiffs' members also "frustrates," "complicates," and fundamentally impairs their core missions to increase power in historically marginalized communities, further reinforcing the organizations' standing. *OCA-Greater Houston*, 867 F.3d at 610.

### B. Plaintiffs possess associational standing to challenge Sections 6.06 and 7.04.

128.   The League and OCA-GH have associational standing on behalf of their members. An organization has associational standing if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The League and OCA-GH each meet these requirements.

129.    As a threshold matter, the League is a traditional membership organization to which associational standing applies. League members, like Grace Chimene, serve as and elect its leadership, and pay dues that are used to fund the organizations' activities. *Supra* ¶ 3–4. Members of local leagues are also automatically members of the League. *Supra* ¶ 4.

130.    The League further satisfies each *Hunt* factor. First, the League has members who could otherwise challenge Sections 6.06 and 7.04 in their own right. *Supra* ¶ 3, 8. It has members who are eligible to vote by mail and intend to vote by mail in the future, as well as members who use assistants or assist other voters for voting by mail and are harmed by the criminal provisions in Section 6.06. *Supra* ¶ 8. The League also has members who attend and volunteer at in-person events, like candidate forums and canvassing, that are harmed by the criminal consequences in Section 7.04. *Supra* ¶ 7, 75–77. League members, like Ms. Chimene, volunteer for the League because of their love for its mission and belief that the League's work is vital in Texas. *Supra* ¶ 7. League members have a genuine fear of prosecution because of the challenged provisions, and because their "desired conduct" is "arguably proscribed" under a "plausible reading" of Sections 6.06, and 7.04, they have adequately pleaded this element of their injury for Article III standing. *See Barilla v. City of Houston*, 13 F.4th 427, 433 (5th Cir. 2021).

131.    Second, as the Fifth Circuit has previously held, "protecting the strength of votes" is an interest that can be "germane" to an organization's mission. *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 197 (5th Cir. 2012).

132.    Third, participation of individual members is not required because the League seeks prospective and injunctive relief, not individualized damages. *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023). The Court should therefore hold that the League has associational standing.

133.    OCA-GH also has associational standing. OCA-GH has members, like Deborah Chen, who serve on and elect its leadership, and who pay dues that are used to fund the organization's activities. *Supra* ¶ 17.

134.    OCA-GH also has members who can challenge Sections 6.06 and 7.04. Some OCA-GH members vote by mail and use assistants or provide assistance to mail-in voters harmed by the criminal consequences of Sections 6.06 and 7.04. *Supra* ¶ 16– 17. OCA-GH also has members who attended and sought assistance at in-person events, that have either been paused or no longer provide assistance because of Sections 6.06 and 7.04. *Supra* ¶ 16–17, 25–27. Member volunteers at these events are also harmed because of the criminal consequences in Sections 6.06 and 7.04 chilling their ability to assist LEP and mail-in voters. *Id.*

135.    Finally, OCA-GH seeks to protect voting interests germane to its mission, and its members need not participate in this lawsuit. *Hancock Cnty. Bd. of Supervisors*, 487 F. App'x at 197; *Consumer Data Indus. Ass'n*, 2023 WL 4744918 at *4 n.7.

## III.     Defendants are proper parties.

### A. The Secretary is a proper party.

136.    The League and OCA-GH have standing for their claim regarding Section 6.06 against Jane Nelson in their official capacity as the Secretary. The Secretary is a properly named defendant and is not immune from injunctive and declaratory relief under 42 U.S.C. § 1983, Section 208 of the VRA, and *Ex parte Young,* 209 U.S. 123 (1908).

137.    The Secretary enforces Section 6.06 because they have a duty to evaluate alleged criminal violations of the Election Code to determine when there is "reasonable cause to suspect a crime has occurred" warranting referral to the OAG. *Supra* ¶ 37–38; Tex. Elec. Code § 31.006. They also refer criminal allegations to local prosecutors. *Supra* ¶ 39. The Secretary therefore plays an integral gatekeeping role in many criminal allegations that are referred to the OAG or local prosecutors that are often prosecuted. *Supra* ¶ 37–39.

138.    In practice, the Secretary continues to receive complaints of allegations of election code violations that are referred to the OAG or local prosecutors for investigation and prosecution, often in partnerships between the OAG and local officials after *Stephens. Supra* ¶ 37–39, 42–43, 47. Many of the complaints the Secretary refers are related to voter assistance and mail-in-voting, as well as vote harvesting.  *Supra* ¶ 37.

139.    The Secretary also prescribes the design and content of forms—like mail-in vote materials—that are necessary for administering the election code and include Section 6.06's new voter assistance requirement. Tex. Elec. Code § 31.002; *supra* ¶ 28.

140.    Additionally, the Secretary routinely provides guidance, directives, instructions, trainings, and advice to local elections officials, local prosecutors, and the OAG interpreting election code provisions. *Supra* ¶ 28–35. These actions determine how Section 6.06 is interpreted by other officials and is a meaningful part of how Section 6.06 is enforced.

### B. The Attorney General is a proper party.

141.    The League and OCA-GH have standing for their claims regarding Sections 6.06 and 7.04 against Ken Paxton in his official capacity as Attorney General of Texas. Defendant the OAG is properly named and is not immune from injunctive and declaratory relief under 42 U.S.C. § 1983, Section 208 of the VRA, and *Ex parte Young*.

142.    The OAG has expressed a willingness to prosecute the types of criminal statutes at issue here, under similar circumstances, which goes beyond speculation. *Cf. In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgement vacated sub nom*. The OAG has been publicly outspoken about its specific willingness and intent to prosecute allegations related to voter assistance and vote harvesting, even after *Stephens*. *Supra* ¶ 44.

143.    The OAG has acted on this willingness by habitually prosecuting allegations related to voter assistance, mail voting, and the offense of tampering with a government record, which are each relevant to Plaintiffs' claims challenging Sections 6.04 and 6.06.  *See supra* ¶ 44, 48, 50. This likewise includes habitually prosecuting allegations related to "vote harvesting" and mail-in ballots, which are relevant to

Plaintiffs' claims challenging Section 7.04, also known as the "vote harvesting provision." *See supra ¶ Id.*

144.    The OAG has a demonstrated and current ability to prosecute the types of criminal statutes at issue here, including SB1 Sections 6.06 and 7.04, in cooperation with local prosecutors. *See supra ¶ 41–52.* The OAG consistently investigates violations of the Texas Election Code and collaborates with and refers these investigations to local prosecutors. *Id.* The OAG has a sustained practice of offering to provide assistance to local prosecutors and soliciting invitations to prosecute from local prosecutors on particular cases. *Id.*

145.    In certain counties, the OAG has continued to prosecute election-related crimes where local prosecutors appoint the OAG as a prosecutor and are likely to continue to do so in the future. *See supra ¶ 46–52.* The OAG is likely to continue offering to assist counties on election-related prosecutions, while certain counties are likely to continue inviting and/or appointing the OAG to prosecute election-related cases.

146.    The OAG has engaged in enough compulsion or constraint of local officials for the *Ex parte Young* exception to apply. *See City of Austin*, 943 F.3d at 1002 (When "an official can act, and there's a significant possibility that he or she will act to harm a plaintiff, the official has engaged in enough 'compulsion or constraint' to apply the *Young* exception.").

### C. Harris County Elections and Travis County Elections are proper parties.

147.    The League and OCA-GH have standing for their claim regarding Sections 6.06

against Defendant Hudspeth in her official capacity as Harris Elections and Defendant Limon Mercado in her official capacity as Travis Elections. Defendants Harris Elections and Travis Elections are properly named and are not immune from injunctive and declaratory relief under Section 208 of the Voting Rights Act and *Ex parte Young*.

148.   Plaintiffs and their members are harmed within Harris and Travis Counties, where Defendants are located. OCA-GH operates within and has members in Harris County. *Supra* ¶ 14. The League also has members in Harris and Travis Counties. *Supra* ¶ 4. Evidence at trial demonstrates that they have been sufficiently harmed to have associational and organizational standing, *see supra* ¶ 2–27, which includes harms within Harris and Travis Counties.

149.   Harris and Travis Elections both enforce Section 6.06, which affects assistance for mail in voting, because they run early voting on the county level. Tex. Elec. Code § 83.001. Counties likewise oversee compliance with Section 208 of the VRA, which Plaintiffs assert is violated by the implementation of Section 6.06. *Supra* ¶ 59–62, 67.

150.   Evidence showed that Travis Elections interprets 6.06 to mean that "compensation" under the statute could include providing an assistant with lunch, a cup of tea, or paying for their parking. *Supra* ¶ 67. This demonstrates that Travis Elections interprets the language in Section 6.06 in a manner that is harmful to and enforceable against Plaintiffs because of its vagueness and overbreadth.

### D. The Harris County DA and Travis County DA are proper parties.

151. The League and OCA-GH have standing for their claims regarding Sections 6.06 and 7.04 against Defendant Ogg in her official capacity as Harris DA and Defendant Jose Garza in his official capacity as Travis DA. Defendants Harris DA and Travis DA are properly named and are not immune from injunctive and declaratory relief under 42 U.S.C. § 1983, Section 208 of the Voting Rights Act, and *Ex parte Young*.

152. Defendants Harris DA and Travis DA have enforcement authority over sections 6.06 and 7.04 of SB1 through their responsibility for criminal prosecutions. This includes all criminal cases pending in those courts, including those arising not only under the Texas Penal Code, but also those arising under other sections of Texas law that contain criminal law provisions, including but not limited to the Texas Election Code. *Supra* ¶ 54–58, 63–65. In addition, Tex. Elec. Code § 273.001(b) provides that "[a] district or county attorney having jurisdiction . . . may conduct an investigation on the officer's own initiative to determine if criminal conduct occurred in connection with an election."  Defendants Harris DA and Travis DA "indisputably has the statutory authority within the boundaries of Harris County [and Travis County] to prosecute cases under any and all Texas statutes that set out criminal offenses."  ECF No. 344 at 9. Thus, Plaintiffs' claims against them fall within the exception to *Ex parte Young*. *Longoria v. Paxton*, 585 F. Supp. 3d 907, 926 (W.D. Tex. 2022), *vacated and remanded on other grounds*, No. 22-50110, 2022 WL 2208519 (5th Cir. June 21, 2022).

153.    Plaintiffs and their members are harmed within Harris and Travis Counties, where Defendants are located. OCA-GH operates within and has members in Harris County. *Supra* ¶ 14. The League has members in Harris and Travis Counties. *Supra* ¶ 4. Plaintiffs have provided evidence demonstrating that they have been sufficiently harmed by the threat of enforcement of criminal penalties under Sections 6.06 and 7.04 sufficient to have associational and organizational standing, *see supra* ¶ 2–27, which includes within Harris and Travis Counties.

154.    Plaintiffs need not have already been prosecuted under the challenged provisions to bring suit. *See Ex parte Young*, 209 U.S. at 148 (rejecting the notion that a party should have to suffer the risk of imprisonment and fines in order to test the validity of the rates at issue); s*ee also Whole Woman's Health v. Jackson*, 595 U.S. 30, 45–46 (2021) (finding *Ex parte Young* satisfied as to "licensing official[s] who may or must take enforcement actions against petitioners if they violate the terms of" the challenged law).

155.    Instead, both "the language of the Election Code and [*State v.*] *Stephens* confirms that county and district attorneys have authority to compel or constrain a person's ability to violate the law." *Longoria v. Paxton*, 585 F. Supp. 3d at 926 *(*citing *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020)). "This is sufficient to establish that county and district attorneys, by virtue of their office, have 'some connection' with enforcement of the Election Code beyond a 'general duty to see that the laws of the state are implemented.'" *Id.* (citing *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014); *Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568,

583 (W.D. Tex. 2020)).

156.    Nonetheless, Defendant Harris DA has demonstrated a willingness for enforcement through prior prosecutions of alleged elections violations, and neither the Harris DA nor the Travis DA have promised they will not enforce Sections 6.06 or 7.04 of SB1. *Supra* ¶ 54–58.

## IV.    Section 7.04 violates the First Amendment and Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

157.    OCA Plaintiffs the League and OCA-GH, as well as LUPE Plaintiffs, challenge Section 7.04 as impermissibly vague and an unconstitutionally overbroad infringement of the protected guarantees of freedom of speech, expression, and association under the First and Fourteenth Amendments. Section 7.04 imposes criminal and civil penalties on anyone who gives or receives some "compensation or other benefit" for "knowingly provid[ing] or offer[ing] to provide vote harvesting services," which is defined as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015(b); § 276.015(a)(2).

### A.    Legal Standard

158.    The substantial "overbreadth doctrine" requires courts to invalidate a statute based on overbreadth if a significant number of its applications are unconstitutional, considering the statute's intended scope. *United States v. Stevens*, 559 U.S. 460, 473

(2010); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (a plaintiff "need only show that a statute or regulation might operate unconstitutionally under some conceivable set of circumstances").

159.    A "law imposing criminal penalties on protected speech is a stark example of speech suppression," *Ashcroft v. Free Speech Coal.*, 535 U.S. 564, 573 (2002), and the overbreadth doctrine permits courts to invalidate laws with civil or criminal penalties that might chill or dampen expressive activity of members of the public at large. Overbroad laws "may deter or 'chill' constitutionally protected speech," and if would-be speakers remain silent, society will lose their contributions to the "marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

160.    Laws that burden political speech are subject to strict scrutiny, and the State must prove that the restriction furthers a compelling state interest and is narrowly tailored to achieve that interest.  *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011); *see also Dep't of Texas, Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438–39 (5th Cir. 2014) (en banc). Similarly, laws that put "a limitation on political expression" are subject to "exacting scrutiny." *Meyer v. Grant*, 486 U.S. 414, 420 (1988).  Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984).

161.    A law is impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Johnson v. United States*, 576 U.S. 591, 612 (2015) (citation omitted). When a statute "authorizes or even encourages arbitrary and discriminatory enforcement," it is a telltale sign of its unconstitutional vagueness. *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Hiett v. United States*, 415 F.2d 664, 670 (5th Cir. 1969) ("another reason for holding vague statutes void . . . is that they furnish insufficient checks on Government discretion"). "When a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–04 (1967) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression . . . Because First Amendment freedoms need breathing space to survive."); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008) (cleaned up) ("[A] more stringent vagueness test should apply where a law threatens to inhibit the exercise of constitutionally protected rights," especially when it is "capable of reaching expression sheltered by the First Amendment.").

### B. Application of Legal Standard: Section 7.04

162.    The "vote harvesting" provision of Section 7.04—codified at Section 276.015 of the Texas Election Code—violates the First Amendment and Fourteenth Amendment of the United States Constitution. For the reasons explained below, the Court finds

Section 7.04 (1) infringes on First Amendment rights, (2) is overly broad, and (3) is vague in violation of the First and Fourteenth Amendments because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," and is "so standardless that it authorizes or encourages seriously discriminatory enforcement," *Humanitarian Law Project*, 561 U.S. at 18 (citation omitted).

163.    First, the vote harvesting provision of 7.04 implicates First Amendment protected speech. The vote harvesting provision strikes at core political speech. It prohibits "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure" where the person who interacts with the voter receives a compensation or a benefit. Tex. Elec. Code § 276.015(a)(2). On its face, Section 7.04 regulates core political speech—creating a criminal offense related to persuasive interactions with voters that are in favor of a campaign, candidate or measure.

164.    "Core political speech" that warrants heightened protection includes "interactive communication concerning political change." *Meyer*, 486 U.S. 414 at 421–22; *see also Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 223 (1989) ("[T]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971))); *NAACP v. Button*, 371 U.S. 415, 437 (1963) ("Free trade in ideas [sic] means free trade in the opportunity to persuade to action . . . ." (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945))); *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 186-87 (1990). The League, OCA-GH, LUPE, and MABA-TX

Plaintiffs all encourage and assist voters in their communities to vote, which is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22; *Supra* (League) ¶ 5–6, 76; (OCA-GH) ¶ 15–18, 85; (LUPE) ¶ 87–92; (MABA-TX) ¶ 101. These Plaintiffs "persuade to action" their community members on ballot initiatives, candidates, and anything else they might vote on. *NAACP v. Button*, 371 U.S. 415, 437 (1963). Based on past experience, Plaintiffs reasonably expect mail-in ballots to be present at any of Plaintiffs' events, threatening both the organizations and their members with the risk of felony charges. *Supra* (League) ¶ 76, 76; (OCA-GH) ¶ 83; (LUPE) ¶ 94; (MABA-TX) ¶ 101. Section 7.04 therefore chills "core political speech" in violation of the First Amendment.

165.    Second, the vote harvesting provision is overly broad. The law's prohibition on certain "in-person interaction[s]" is broad, sweeping in both verbal and non-verbal expressive conduct supporting political engagement. Ostensibly, this provision is aimed at deterring the efforts of some to coerce individuals to vote a particular way. *Supra* ¶ 114. However, in so doing, the statute sweeps entirely too broadly and prohibits vast swaths of protected First Amendment activity.

166.    Most obviously, Section 7.04 criminalizes normal door-to-door campaign activity if an individual happens to have a mail ballot. Any compensated person campaigning on behalf of a candidate or ballot measure commits an offense if they engage in core political speech around someone who happens to have a mail-in ballot. That is why organizations like OCA-GH and LUPE have ceased many of their civic

engagement activities altogether. *Supra* (OCA-GH) ¶ 83–84; (LUPE) ¶ 95. Further, the staff of advocacy organizations like OCA-GH and LUPE are prohibited from advocating in support of ballot measures under Section 7.04. *Supra* (OCA-GH) ¶ 81–85; (LUPE) ¶ 96–98. As a result, both organizations have ceased conducting in-person civic engagement activities. *Id.* Moreover, the League would have to turn away attendees at their candidate forums who have their ballots with them, thus frustrating their mission. *Supra* ¶ 76.

167.   The overbreadth of Section 7.04 is compounded by the uncabined scope of "compensation or benefit" as used in the statute. Compensation is entirely undefined and "benefit" is defined to include "anything reasonably regarded as a gain or advantage." Both the League and OCA-GH offer volunteers and staff "compensation" under this definition, including food, drinks, clothing, and intangible valuables like academic credit and letters of recommendation. *Supra* (League) ¶ 77; (OCA-GH) ¶ 82. LUPE and MABA-TX have offered volunteers similar benefits—like clothing and gas cards—that reasonably fall under "compensation" in the statute. *Supra* (LUPE) ¶ 99; (MABA-TX) ¶ 101. Section 7.04's overbreadth exposes the organizations' members and non-member volunteers to criminal prosecution simply for engaging in protected political speech and accepting an "advantage" or "gain" in return.

168.   Many of the OCA Plaintiffs and LUPE Plaintiffs' non-partisan expressive activities—like knocking on doors to inform voters about a bill, ballot initiative, or interacting with voters at in-person events, and outreach at polling locations where voters may bring mail-in ballots with them—are subject to the threat of prosecution

and civil penalties under Section 7.04. *Supra* (League) ¶ 75–76; (OCA-GH) ¶ 79–84; (LUPE) ¶ 88–98; (MABA-TX) ¶ 101. Plaintiffs have attempted to change some of their non-partisan expressive activities in response to Section 7.04, but the threat of prosecution—especially of their student volunteers—remains. *Id.*

169.    Third, Section 7.04 is impermissibly vague. The testimony established that election officials—including Dallas County Elections Administrator Mr. Scarpello and former Travis County Clerk Ms. Debeauvoir—are not sure how to interpret the vote harvesting provision. *Supra* ¶ 102–104. It is not surprising then that OCA-GH, the League, and LUPE, among other non-profit election advocacy organizations, are unsure how to interpret the provision. Specifically, plaintiffs are unsure how physically proximate a ballot must be to a volunteer or employee to fall under Section 7.04. *Supra* (League) ¶ 75–76, 78; (OCA-GH) ¶ 84; (LUPE) ¶ 94–97. Given the vagaries of the "vote harvesting" definition itself, it is unclear what actions conducted "in connection with" it entails. *Id.* The failure to clearly define what "compensation or other benefit" is makes it unclear to Plaintiffs whether providing volunteers food, water, or academic credit for their advocacy work is unlawful. *Id.* Section 7.04 fails to define compensation at all. It defines benefit as "anything reasonably regarded as a gain or advantage"—but this definition merely defines a term through its synonym. Stating that a benefit is a gain does not help a reasonable person to understand what is or is not permitted under the statute.

170.    OCA-GH, the League, and LUPE's testimony showed that they are unable to determine from the text of Section 7.04 whether it prohibits their organization's

activities. This ambiguity has chilled Plaintiffs' willingness to conduct in-person community events and political outreach to voters where a mail-in-ballot might be present. *Supra* (League) ¶ 75–76; (OCA-GH) ¶ 79, 83–84; (LUPE) ¶ 94–98. Section 7.04 must be enjoined because its vagueness bars Plaintiffs from engaging in activities that even the Secretary concedes are protected under federal law. *Supra* ¶ 107–108.

171. Fourth, Section 7.04 is neither necessary to serve a compelling state interest, nor narrowly tailored to serve any such interest. States have an "important state interest" in "[e]nsuring that every vote is cast freely." *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2341 (2021). Measures that inhibit voters' ability to freely cast their ballots are inapposite to this interest.

172. Evidence at trial demonstrated that Section 7.04 does nothing to "[e]nsur[e] that every vote is cast freely" by preventing election fraud and misconduct. Instead, Section 7.04 prevents voters from engaging with Plaintiffs to advance their electoral interests, in violation of the First and Fourteenth Amendment. For example, elections administrators testified that they were not aware of voter assistance being a source of misconduct or fraud. *Supra* ¶ 104–106. Jonathan White, former chief of the OAG Election Integrity Division, testified that he had never dealt with circumstances where a community organization paid an organizer to persuade mail-in ballot voters in the presence of their ballot to vote for a ballot measure. *Supra* ¶ 112. There is no evidence that voters have been confused or improperly influenced by paid canvassers for community-based organizations who advocated in the presence of mail-in ballots.

*Supra* ¶ 104–106, 112. There is no evidence that the pre-existing limitations on mail-in ballot assistance were insufficient to identify and prosecute the few alleged instances of misconduct in the State. *Supra* ¶ 113–114.

173.    Even if Section 7.04 served a compelling state interest in preventing misconduct—which it does not—the statute is not narrowly tailored to do so because it is not limited to conduct or speech that is fraudulent, misleading, or unlawful. *Supra* ¶ 106–111. Enjoining Section 7.04 is accordingly appropriate for all the reasons discussed above.


*Respectfully submitted,*

/s/ Dayton Campbell-Harris

Dayton Campbell-Harris**
Washington State Bar No. 59692
Adriel I. Cepeda Derieux*
New York State Bar No. 4919163
Ari Savitzky*
New York State Bar No. 5060181
Sophia Lin Lakin*
New York State Bar No. 5182076
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
Phone: (212) 284-7334
Fax: (212) 607-3318
dcampbell-harris@aclu.org
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org

Zachary Dolling
Texas Bar No. 24105809
Hani Mirza
Texas Bar No. 24083512
Sarah X. Chen*
California Bar No. 325327
Veronikah Warms*
Texas Bar No. 24132682
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
Phone: 512-474-5073
zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
39 Drumm St.
San Francisco, CA 94111

Phone: (415) 343-0781
smizner@aclu.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Edgar Saldivar
Texas Bar No. 24038188
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Phone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Brian Dimmick*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
915 15th St. NW
Washington, D.C. 20005
Phone: (202) 731-2395
bdimmick@aclu.org

Lucia Romano
Texas State Bar No. 24033013
Peter Hofer
Texas Bar No. 09777275
Christopher McGreal
Texas State Bar No. 24051774
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
Phone: (512) 454-4816
Fax: (512) 454-3999

64

lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
Phone: (212) 966-5932
Fax: (212) 966 4303
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Alex S. Trepp*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 639-6000
jamunson@jenner.com
atrepp@jenner.com

*COUNSEL FOR OCA-GREATER
HOUSTON PLAINTIFFS*
  *admitted *pro hac vice*
**practice is limited to federal court

Nina Perales
Texas Bar No. 24005046
Julia R. Longoria
Texas Bar No. 24070166
Fátima L. Menéndez
Texas Bar No. 24090260
Kenneth Parreno
MA BBO No. 705747

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND**
110 Broadway, Suite 300
San Antonio, TX 78205
Phone: (210) 224-5476
Fax: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org
kparreno@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
**FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON LLP**
One New York Plaza
New York, New York 10004
Phone: (212) 859-8000
Fax: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com

*ATTORNEYS FOR PLAINTIFFS
LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT, MEXICAN
AMERICAN BAR ASSOCIATION OF
TEXAS, TEXAS HISPANICS ORGANIZED
FOR POLITICAL EDUCATION, JOLT
ACTION, WILLIAM C. VELASQUEZ
INSTITUTE, FIEL HOUSTON INC.*
*admitted *pro hac vice*

Leah J. Tulin*
**BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW**
1140 Connecticut Avenue NW, Suite
1150 Washington, DC 20036
Phone: (202) 650-6397
tulinl@brennan.law.nyu.edu

Sean Morales-Doyle
Jasleen K. Singh*
Patrick A. Berry*
Robyn N. Sanders*
**BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW**
120 Broadway, Suite 1750
New York, NY 10271
Phone: (646) 292-8310
Fax: (212) 463-7308
sean.morales-doyle@nyu.edu
jasleen.singh@nyu.edu
patrick.berry@nyu.edu
rs8592@nyu.edu

Elizabeth Y. Ryan
Texas Bar No. 24067758
**WEIL, GOTSHAL & MANGES LLP**
200 Crescent Court, Suite 300
Dallas, Texas 75201
Phone: (214) 746-8158
Fax: (214)746-7777
liz.ryan@weil.com

***ATTORNEYS FOR PLAINTIFFS
FRIENDSHIP-WEST BAPTIST
CHURCH, TEXAS IMPACT, JAMES
LEWIN***
*admitted *pro hac vice*

66

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 19, 2024, the foregoing document was filed electronically through CM/ECF and that all counsel of record were served by CM/ECF.

/s/ Dayton Campbell-Harris