**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTIONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>GREGORY W. ABBOTT, et al.,<br><br>*Defendants.* | 5:21-cv-844-XR |
| LULAC TEXAS, et al.,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>JANE NELSON, et al.,<br><br>*Defendants.* | 1:21-cv-0786-XR |

**LULAC PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ V

PROCEDURAL HISTORY ............................................................................................... 1

PROPOSED FINDINGS OF FACT ................................................................................. 3

I.    Background ................................................................................................................ 4

II.   Senate Bill 1. ............................................................................................................. 5

    A.   Enactment of SB 1 ......................................................................................... 5

    B.   Absentee voting ............................................................................................. 6

         1.   Process for voting by mail in Texas. ................................................ 6

         2.   SB 1's mail ballot identification provisions. ................................... 8

         3.   Curing absentee applications and ballots. ....................................... 9

    C.   Drive-thru voting ......................................................................................... 10

         1.   Drive-thru voting before SB 1. ...................................................... 10

         2.   SB 1's drive-thru voting ban. ......................................................... 12

    D.   Voting hours ................................................................................................ 12

         1.   Voting hours before SB 1. .............................................................. 12

         2.   SB 1's restrictions on voting hours. ............................................... 14

III.  Impact of SB 1's mail ballot identification requirements. ........................... 14

    A.   The March 2022 primary election. .............................................................. 15

    B.   The November 2022 general election. ......................................................... 16

    C.   Other elements of SB 1 that exacerbate the burdens imposed on absentee voters. ......................................................................................... 20

         1.   Confusing instructions for voters. .................................................. 20

         2.   Missing identification numbers and outdated records .................... 21

         3.   Disproportionate impact on minority voters. ................................. 24

         4.   Restrictions on submitting mail ballots in person. ......................... 24

         5.   Restrictions on drive-thru voting. .................................................. 26

         6.   Restrictions on voting hours. .......................................................... 27

IV.  Impact of SB 1's restrictions on in-person voter engagement ..................... 28

    A.   Section 7.04 criminalized certain voter interactions. .................................. 28

    B.   Section 7.04 has chilled Plaintiffs' voter engagement efforts. .................. 29

V.   SB 1 injured LULAC Plaintiffs and their members. ..................................... 32

A.   LULAC ............................................................................... 32

B.   AFT ..................................................................................... 36

C.   TARA .................................................................................. 40

D.   Voto Latino ......................................................................... 47

**VI.  State interests purportedly furthered by SB 1. .............................. 52**

A.   Fraud prevention. ............................................................... 53

1.   General allegations of fraud. ................................... 53

2.   Alleged mail ballot fraud. ....................................... 54

B.   Uniformity in election administration. .............................. 55

C.   Public confidence and election integrity. ......................... 56

**PROPOSED CONCLUSIONS OF LAW ............................................. 57**

**I.   LULAC Plaintiffs have standing to obtain relief against Defendants. ................. 57**

A.   Legal standard ................................................................... 57

1.   Injury-in-fact. ......................................................... 58

2.   Causation and traceability. ..................................... 61

3.   Redressability. ........................................................ 62

B.   LULAC Plaintiffs have shown injury in fact. ................... 63

1.   LULAC ................................................................... 63

2.   AFT ......................................................................... 66

3.   TARA ...................................................................... 69

4.   Voto Latino ............................................................. 71

C.   LULAC Plaintiffs' injuries are traceable to Defendants. ................ 74

D.   LULAC Plaintiffs have shown redressability. ................... 77

**II.  The challenged provisions unduly burden the right to vote. .................... 77**

A.   Legal standard for *Anderson-Burdick* claims. ................ 78

B.   SB 1's mail ballot identification provisions burden voters without advancing any state interest. ...................................... 82

1.   SB 1's mail ballot identification provisions unduly burden voters. ................ 82

2.   The burdens created by SB 1's mail ballot identification provisions are not justified by any legitimate state interest. ................ 87

C.   SB 1's restrictions on in-person delivery of mail ballots effectively eliminates drop boxes and burdens voters without advancing any state interest. ................ 89

**III. SB 1 Section 7.04 violates LULAC Plaintiffs' First Amendment right to freedom of speech. ...................................................... 91**

A.   Strict scrutiny applies to content-based regulations, as well as laws that burden political speech. ................................................................................................ 91

B.   SB 1 Section 7.04 is subject to strict scrutiny because it is a content-based regulation of political speech. ........................................................................ 95

C.   SB 1 Section 7.04 restricts LULAC Plaintiffs' core political speech. .................... 98

D.   SB 1 Section 7.04 fails strict scrutiny. ........................................................... 99

**IV.  SB 1 Section 7.04 violates Section 208 of the Voting Rights Act. ........................... 101**

**JUDGMENT** ........................................................................................................... **101**

**CERTIFICATE OF SERVICE** .................................................................................. **104**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ...........................................................................61, 63, 66, 69

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ...............................................................................78, 81, 82, 87

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ...........................................................................60

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
  178 F.3d 350 (5th Cir. 1999) ...........................................................................57

*Bennett v. Spear*,
  520 U.S. 154 (1997).........................................................................................62

*Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*,
  70 F.4th 914 (5th Cir. 2023) ...........................................................................61

*Buckley v. Am. Const. L. Found., Inc.*,
  525 U.S. 182 (1999) (Thomas, J., concurring) .................................................92, 96

*Burdick v. Takushi*,
  504 U.S. 428 (1992).............................................................................78, 79, 82, 87

*Campbell v. Buckley*,
  203 F.3d 738 (10th Cir. 2000) ...........................................................................94, 98

*Caractor v. City of New York Dep't of Homeless Servs.*,
  No. 11 CIV. 2990 DLC, 2013 WL 2922436 (S.D.N.Y. June 14, 2013)................................61

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010).........................................................................92, 93, 95, 96

*City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*,
  96 U.S. 61 (2022)..........................................................................................91, 96

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022)..........................................................................................91, 95

*Cotham v. Garza*,
  905 F. Supp. 389 (S.D. Tex. 1995) ...................................................................92, 96

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008)..................................................................................78, 79, 80, 81

*Ctr. for Individual Freedom v. Carmouche*,
  449 F.3d 655 (5th Cir. 2006) ....................................................................................77

*Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*,
  760 F.3d 427 (5th Cir. 2014) ........................................................................... *passim*

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
  489 U.S. 214 (1989)...................................................................................................92

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ................................................................................81

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ................................................................................74

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
  695 F.3d 330 (5th Cir. 2012) ....................................................................................57

*Fusaro v. Cogan*,
  930 F.3d 241 (4th Cir. 2019) ..............................................................................94, 98

*Gitlow v. New York*,
  268 U.S. 652 (1925)...................................................................................................91

*Green Party of Tennessee v. Hargett*,
  791 F.3d 684 (6th Cir. 2015) ..............................................................................89, 90

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)..............................................................................................59, 60

*Houston Justice v. Abbott*,
  No. 5:21-cv-848 (W.D. Tex.).......................................................................................1

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Brock*,
  477 U.S. 274 (1986)...................................................................................................60

*James v. Hegar*,
  86 F.4th 1076 (5th Cir. 2023) ...................................................................................62

*KVUE, Inc. v. Moore*,
  709 F. 2d 922 (5th Cir. 1983), *aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S.
  1092 (1984)................................................................................................................76

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*,
  82 F.4th 345 (5th Cir. 2023) .....................................................................................59

*La Unión del Pueblo Entero v. Abbott*,
    No. 5:21-cv-844 (W.D. Tex. Sept. 30, 2021). ECF No. 31 ..................................................1

*Larson v. Valente*,
    456 U.S. 228 (1982)....................................................................................................62

*League of Women Voters of Fla., Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018)........................................................................80

*Lerman v. Bd. of Elections in City of New York*,
    232 F.3d 135 (2d Cir. 2000)........................................................................................82

*Lewis v. Hughs*,
    475 F. Supp. 3d 597 (W.D. Tex. 2020)........................................................................59

*Lewis v. Scott*,
    28 F.4th 659 (5th Cir. 2022) .......................................................................................59

*Lichtenstein v. Hargett*,
    83 F.4th 575 (6th Cir. 2023) ..................................................................................94, 98

*Louisiana ACORN Fair Housing v. LeBlanc*,
    211 F.3d 298 (5th Cir, 2000) ......................................................................................75

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................................................57

*LULAC Texas v. Esparza*,
    No. 1:21-cv-00786 (W.D. Tex. Sept. 7, 2021), ECF No. 1 ............................................1

*LUPE v. Bettencourt*,
    No. 23-50201 (5th Cir.) ................................................................................................3

*LUPE v. Scott*,
    No. 22-50775 (5th Cir. Dec. 9, 2022), ECF No. 62......................................................76

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007)....................................................................................................61

*Mazo v. New Jersey Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76
    (2023)...................................................................................................................94, 98

*McAllen Grace Brethren Church v. Salazar*,
    764 F.3d 465 (5th Cir. 2014) ......................................................................................58

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)...............................................................................92, 93, 96, 97

*Meyer v. Grant*,
    486 U.S. 414 (1988) ................................................................................................ *passim*

*Mi Familia Vota v. Abbott*,
    No. 5:21-cv-920 (W.D. Tex) ................................................................................................ 1

*Mi Familia Vota v. Ogg*,
    No. 22-50732 (5th Cir. Sept. 19, 2022), ECF 42 ................................................................ 2

*NAACP v. Button*,
    371 U.S. 415 (1963) ................................................................................................ 92, 98

*Nat'l Press Photographers Ass'n v. McCraw*,
    No. 22-50337, 2024 WL 105019 (5th Cir. Jan. 10, 2024) .................................................. 62

*Nat'l Press Photographs Ass'n v. McCraw*,
    504 F. Supp. 3d 568 (W.D. Tex. 2020), *aff'd*, No. 22-50337, 2024 WL 105019
    (5th Cir. Jan 10, 2024) ................................................................................................ 77

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
    508 U.S. 656 (1993) ................................................................................................ 61, 74, 75

*Netsphere, Inc. v. Baron*,
    703 F.3d 296 (5th Cir. 2012) ................................................................................................ 62

*Norman v. Reed*,
    502 U.S. 279 (1992) ................................................................................................ 79, 91

*OCA-Greater Houston v. Esparza*,
    No. 1:21-cv-780 (W.D. Tex.) ................................................................................................ 1

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ................................................................................................ *passim*

*Ohio State Conf. of N.A.A.C.P. v. Husted*,
    768 F.3d 524 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 WL
    10384647 (6th Cir. Oct. 1, 2014) ........................................................................................ 81

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ................................................................................................ 95

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ................................................................................................ 91, 93, 96

*Serafine v. Branaman*,
    810 F.3d 354 (5th Cir. 2016) ................................................................................................ 93, 97

*Serv. Emps. Int'l Union, Loc. 5 v. City of Houston,*
   595 F.3d 588 (5th Cir. 2010) ....................................................................................91, 95

*Soltysik v. Padilla,*
   910 F.3d 438 (9th Cir. 2018) ..............................................................................................81

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ....................................................................................................57, 58, 77

*State v. Stephens,*
   663 S.W.3d 45 (Tex. Crim. App. 2021) ..................................................................2, 75, 76

*Storer v. Brown,*
   415 U.S. 724 (1974) ........................................................................................................80, 81

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ............................................................................................58, 61, 63, 66

*Tashjian v. Republican Pty. of Conn.,*
   479 U.S. 208 (1986) ........................................................................................................81, 90

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007) ..............................................................................................................57

*Texas Indep. Party v. Kirk,*
   84 F.3d 178 (5th Cir. 1996) ................................................................................................78

*Texas State LULAC v. Elfant,*
   52 F.4th 248 (5th Cir. 2022) ..............................................................................................73

*Town of Chester, N.Y. v. Laroe Ests., Inc.,*
   581 U.S. 433 (2017) ..............................................................................................................58

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
   517 U.S. 544 (1996) ..............................................................................................................68

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) ..................................................................................................93, 95, 96

*United States v. State of Texas,*
   No. 5:21-cv-1085 (W.D. Tex.) ............................................................................................1

*Uzuegbunam v. Preczewski,*
   592 U.S. 279, 141 S. Ct. 792 (2021) ....................................................................................62

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) (en banc) ........................................................................79, 87

*Vote.org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ...................................................................59, 60, 80

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ............................................................... *passim*

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...........................................................................60, 61, 66

*Zimmerman v. City of Austin, Tex.*
    881 F.3d 378 (5th Cir. 2018) .......................................................................58, 93

**Statutes**

42 U.S.C. § 1988 ...........................................................................................102

Tex. Elec. Ann. Code § 85.006 .........................................................................14

Tex. Elec. Code Ann. § 13.002 ...........................................................................4

Tex. Elec. Code Ann. § 31.001 .........................................................................77

Tex. Elec. Code Ann. § 31.003 .........................................................................77

Tex. Elec. Code Ann. § 31.031 .........................................................................75

Tex. Elec. Code Ann. § 31.043 .........................................................................75

Tex. Elec. Code Ann. § 43.031 .........................................................................12

Tex. Elec. Code Ann. § 64.012 .......................................................................101

Tex. Elec. Code Ann. § 82.001 .................................................................4, 6, 23

Tex. Elec. Code Ann. § 82.002 .................................................................4, 6, 23

Tex. Elec. Code Ann. § 82.003 .............................................................4, 6, 23, 45

Tex. Elec. Code Ann. § 82.004 .................................................................4, 6, 23

Tex. Elec. Code Ann. § 82.005 .................................................................4, 6, 23

Tex. Elec. Code Ann. § 82.006 .................................................................4, 6, 23

Tex. Elec. Code Ann. § 82.007 .................................................................4, 6, 23

Tex. Elec. Code Ann. § 82.008 .................................................................4, 6, 23

Tex. Elec. Code Ann. § 83.002 ....................................................................7, 75

Tex. Elec. Code Ann. § 84.001 .................................................................................6

Tex. Elec. Code Ann. § 84.002 ...........................................................................6, 21

Tex. Elec. Code Ann. § 84.007 .................................................................................6

Tex. Elec. Code Ann. § 84.008 .................................................................................6

Tex. Elec. Code Ann. § 84.011 .................................................................................6

Tex. Elec. Code Ann. § 85.005 ...............................................................................14

Tex. Elec. Code Ann. § 85.061 ...............................................................................12

Tex. Elec. Code Ann. § 85.062 ...............................................................................12

Tex. Elec. Code Ann. § 86.001 ...........................................................................9, 75

Tex. Elec. Code Ann. § 86.002 .................................................................................7

Tex. Elec. Code Ann. § 86.005 .................................................................................7

Tex. Elec. Code Ann. § 86.006 ...................................................................7, 25, 75

Tex. Elec. Code Ann. § 86.007 .................................................................................7

Tex. Elec. Code Ann. § 86.008 .................................................................................9

Tex. Elec. Code Ann. § 86.013 .................................................................................7

Tex. Elec. Code Ann. § 86.015 .........................................................................23, 86

Tex. Elec. Code Ann. § 87.041 .............................................................................7, 9

Tex. Elec. Code Ann. § 87.0222 ...............................................................................8

Tex. Elec. Code Ann. § 87.0411 ...............................................................................9

Tex. Elec. Code Ann. § 273.001 .............................................................................76

Tex. Elec. Code Ann. § 273.002 .............................................................................76

Tex. Elec. Code Ann. § 276.013 ...........................................................................101

Tex. Elec. Code Ann. § 276.015 .............................................................................29

Tex. Elec. Code § 85.062(f-1) ................................................................................12

Tex. Loc. Gov't Code Ann. § 87.011(3)(B) ...........................................................76

Tex. Penal Code Ann. § 12.34 ...................................................................29

Texas Election Code, Chapter 276...........................................................28

Voting Rights Act, § 2 .................................................................................2

Voting Rights Act, § 208 ...........................................................2, 101, 102

**Other Authorities**

Fed. R. Civ. P. 25(d) .....................................................................................1

Fed. R. Civ. P. 52(c) .....................................................................................3

Texas House Bill 6.........................................................................................5

Texas Senate Bill 1 ................................................................................ *passim*

Texas Senate Bill 7 .......................................................................................5

# PROCEDURAL HISTORY

1.      Shortly after Governor Greg Abbott signed SB 1 into law, Plaintiffs LULAC Texas ("LULAC"), Voto Latino, Texas Alliance for Retired Americans ("TARA"), and Texas AFT ("AFT") (together, "LULAC Plaintiffs") filed a complaint alleging violations of Sections 2 and 208 of the Voting Rights Act, and the First and Fourteenth Amendments to the U.S. Constitution. *LULAC Texas v. Esparza*, No. 1:21-cv-00786 (W.D. Tex. Sept. 7, 2021), ECF No. 1.

2.      LULAC Plaintiffs named as Defendants the Texas Secretary of State and the Attorney General (together, "State Defendants"), as well as the elections administrators in Bexar County, Harris County, Hidalgo County, Dallas County, and El Paso County, and the Travis County Clerk (together, "County Defendants").[1]

3.      Early in the litigation, the Court consolidated LULAC Plaintiffs' action with four other cases brought by several plaintiffs (together with LULAC Plaintiffs, "Plaintiffs") challenging SB 1: *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex.); *Houston Justice v. Abbott*, No. 5:21-cv-848 (W.D. Tex.); *Mi Familia Vota v. Abbott*, No. 5:21-cv-920 (W.D. Tex); and *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex. Sept. 30, 2021). ECF No. 31. Shortly thereafter, the Court consolidated a sixth case, *United States v. State of Texas*, No. 5:21-cv-1085 (W.D. Tex.). *United States v. State of Texas*, No. 5:21-cv-1085 (W.D. Tex. Nov. 9, 2021), ECF No. 13. The Dallas County Republican Party, Harris County Republican Party, National Republican Congressional Committee, National Republican Senatorial Committee, and Republican National Committee (together, "Intervenors") later intervened.

---

[1] Over the course of the litigation, several Defendants have been substituted pursuant to Federal Rule of Civil Procedure 25(d).

4.     In January 2022, LULAC Plaintiffs filed their Second Amended Complaint. ECF No. 207 ("Amended Complaint"). The Amended Complaint made two changes: First, it added additional defendants in light of the Texas Court of Criminal Appeals' decision in *State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021), which held that the Texas Attorney General can only prosecute criminal violations of the Texas Election Code in partnership with county or district attorneys.[2] Second, it amended Count II to identify additional burdens on voters requesting mail ballots, as well as burdens on voters submitting mail ballots. ECF No. 207.

5.     State Defendants moved to dismiss the Second Amended Complaint, ECF No. 243, but the Court denied the motion. The Court ruled that Plaintiffs' claims against the Attorney General and Secretary of State were not barred by sovereign immunity; that Plaintiffs plausibly alleged associational and organizational standing; and that Plaintiffs stated claims for relief under Sections 2 and 208 of the Voting Rights Act. ECF No. 444.

6.     Harris County District Attorney Kim Ogg also moved to dismiss LULAC Plaintiffs' Second Amended Complaint, ECF No. 344, but the Court denied the motion. The Court ruled that Plaintiffs had standing to sue District Attorney Ogg; that sovereign immunity did not bar Plaintiffs' claims against her; and that Plaintiffs plausibly alleged claims for relief. ECF No. 450. District Attorney Ogg sought a stay of the Court's order both from this Court and the Court of Appeals. ECF No. 452; *Mi Familia Vota v. Ogg*, No. 22-50732 (5th Cir. Sept. 19, 2022), ECF 42. Both stay requests were denied. ECF No. 466; Aug. 15, 2022 Text Order (denying motion to stay at ECF No. 452). District Attorney Ogg's appeal, ECF No. 451, remains pending.

---

[2] Specifically, the Second Amended Complaint added District Attorneys from Bexar, Travis, Harris, Hidalgo, Dallas, and El Paso Counties (collectively, the "District Attorney Defendants"). ECF No. 207.

7.     Intervenors, State Defendants, and District Attorney Ogg all moved for summary judgment. ECF Nos. 608, 614, 616. Intervenors moved for summary judgment on Plaintiffs' First Amendment and Section 208 claims. ECF No. 608. State Defendants joined in Intervenors' motion. ECF No. 610. District Attorney Ogg moved for summary judgment on all claims brought against her. ECF No. 614. Those motions remain pending.

8.     At this phase of trial, LULAC Plaintiffs challenge six of SB 1's provisions: sections 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04. Tr. at 232:17–233:11. These provisions introduced new mail ballot identification requirements, procedures for returning mail ballots in person (Sections 4.12, 5.02, 5.03, 5.07, and 5.08), and restrictions on in-person voter interactions (Section 7.04).[3]

9.     Trial commenced on September 11, 2023.[4] The parties to the consolidated cases called 70 witnesses and admitted more than 800 exhibits. After LULAC Plaintiffs rested their case, State Defendants, Intervenors, and District Attorney Ogg moved for judgment under Federal Rule of Civil Procedure 52(c). Tr. at 4165:13–21, 4487:10–12, 4495:21–4496:1. The Court took the motions under advisement. Tr. at 4207:11–20 Trial concluded on October 20, 2023.

## PROPOSED FINDINGS OF FACT

Having reviewed the full evidentiary record submitted by Plaintiffs, Defendants, and Intervenor-Defendants, and having considered all evidence without limitation submitted to the

---

[3] Before trial, LULAC Plaintiffs withdrew their challenges to SB 1 Sections 4.01, 4.02, 4.06, 4.07, and 4.09 (previously challenged under LULAC Plaintiffs' VRA Section 2 and *Anderson-Burdick* claims), and Section 5.01 (previously challenged under LULAC Plaintiffs' VRA Section 2 claim). ECF No. 753 at 7 n.10.

[4] The parties presented evidence on all claims during the September 11 Phase I trial with the caveat that the trial record remains open with respect to claims for intentional discrimination pending resolution of an appeal of the Court's order granting LUPE Plaintiffs' motion to compel discovery from Intervenor Harris County Republican Party, *LUPE v. Bettencourt*, No. 23-50201 (5th Cir.), and any related subsequent discovery, consistent with the Court's Amended Order. *See* ECF No. 700 at 2 n.2. Specifically, the record remains open to Plaintiffs' Voting Rights Act ("VRA") Section 2 claim, *see* ECF No. 207 ¶¶ 249–56 (Count I). ECF No. 753 at 2 n.2.

Court as well as the parties' written and oral arguments, the Court makes the following findings of fact:

## I.    Background.

10.    Even before SB 1 was enacted, it was harder to register and vote in Texas than in any other state. Tr. at 3143:7–3144:5. Indeed, Texas has historically been one of the most restrictive states in which voters could register to vote, Tr. at 2405:2–2406:5, and ranks near the bottom of all states in voting accessibility according to the Cost of Voting Index. Tr. at 3143:7–3144:5; *see also* LULAC Ex. 5 at 42.

11.    In Texas, voters cannot register to vote online, nor can they register at their polling place. Tex. Elec. Code Ann. § 13.002(a). Even if voters manage to register, Texas is "a highly restrictive state with respect to barriers to using vote by mail," Tr. 2727:22–2728:4, and does not offer no-excuse absentee voting; only voters over the age of 65, sick and disabled voters, those confined in jail but otherwise eligible, those expected to give birth within three weeks of election day, and voters who will be out of the county during the voting period, are eligible to vote absentee. Tex. Elec. Code Ann. §§ 82.001–.008.

12.    Many voters and elections officials were concerned about how to make voting accessible during the 2020 general election, which took place amidst a global pandemic. Tr. at 275:15–25, 276:15–277:6; Tr. at 822:14–18; Tr. at 1222:15–1223:7; Tr. at 2288:20–2289:9, 3236:24–3237:14. To address these issues, state and county officials adopted innovative election administration procedures to help Texans cast ballots safely. HAUL-MFV Ex. 332 ¶ 40.

13.    For example, some election officials created drive-thru voting centers and offered extended early voting hours. HAUL-MFV Ex. 332 at ¶ 40; Tr. At 2839:7–23; LULAC Ex. 5 at 80.

14.    As a result of their efforts, the 2020 general election was "smooth and secure," and resulted in historically high voter turn-out rates, particularly among minority voters. Tr. at 4456:6–

11; *see also* LULAC Ex. 5 at 61; Tr. At 2651:8–24. In fact, voter turnout in Texas increased from 51.4 percent in 2016 to a record high 60.4 percent in 2020. LULAC Ex. 5 at 61.

## II.     Senate Bill 1.

### A.     Enactment of SB 1.

15.     Despite the success of the 2020 election, the Legislature promptly embarked on a mission to enact additional voting restrictions during the regular 87th legislative session in 2021, many of which were eventually folded into two separate omnibus election bills, House Bill 6 ("HB 6"), and Senate Bill 7 ("SB 7")—and finally into SB 1. LULAC Ex. 5 at 62; HAUL-MFV Ex. 332 at ¶ 45.

16.     SB 1 was ultimately passed during a second special session after the legislature failed to pass predecessor election laws, including after significant procedural and substantive deviations by Republicans in both the House and Senate, significant public testimony against its predecessor bills, HB 6 and SB 7, and after House Democrats broke quorum by fleeing to Washington, D.C. to prevent the bill's passage. HAUL-MFV Ex. 332 at ¶¶ 48–55; LULAC Ex. 5 at 61–78.

17.     Several Republican members of the legislature justified the enactment of SB 1 by making claims of widespread and systematic fraud. Tr. at 2820:6–16, 2823:12–14, 2826:5–14, 2844:21–2845:3.

18.     Despite the "so-called voter fraud that Republican legislators repeatedly pointed to justify the passage of SB 1[,]" LULAC Ex. 5 at 61, "[t]here was no testimony to that effect at all" in the lead-up to the bill's passage. Tr. at 2844:21–2845:3. And State Defendants have effectively disclaimed any state interest beyond those articulated by the Legislature. *See* LULAC Ex. 86 at 4.

19.     While SB 1 introduced sweeping revisions impacting nearly all methods of voting, LULAC Plaintiffs' claims focus on SB 1's changes to the following categories of reforms: absentee

voting, drive-thru voting, procedures for returning mail ballots in person, extended voting hours, and SB 1's new regulations on in-person communications or advocacy with voters.

**B.      Absentee voting**

1.      *Process for voting by mail in Texas.*

20.      Unlike many states, Texas does not have no-excuse absentee voting. Tr. at 1977:17–1978:1; Tex. Elec. Code Ann. §§ 82.001–.008.

21.      Absentee voting is reserved for individuals who: (1) are 65 or older; (2) will be absent from their county on election day; (3) are expecting to give birth within three weeks of election day; (4) are confined to jail; or (5) are involuntarily civilly committed. Tex. Elec. Code Ann. §§ 82.001–.008.

22.      To request a mail ballot, a voter must submit an application to vote absentee. Tex. Elec. Code Ann. § 84.001(a). Before SB 1, the voter would include on their application (1) their name; (2) their address; (3) an indication of which election they were applying to vote absentee in; (4) an indication of their eligibility to vote absentee; and, (5) if the voter had a disability, an attestation that their disability prevented them from voting in person. Tex. Elec. Code Ann. § 84.002. Voters are also required to sign their applications and certify that the contents of the application are true. Tex. Elec. Code Ann. § 84.011(a)(1).

23.      Voters can submit applications to vote absentee until the 11th day before the election in which they wish to vote. Tex. Elec. Code Ann. § 84.007(c). Some eligible voters can also submit an annual application to vote absentee which, when successfully completed, provides them with a mail ballot for every election during the same year. Tr. at 311:1–11. Voters can return their applications by mail, common carrier, or in person. Tex. Elec. Code Ann. §§ 84.007, .008.

24.     Once a voter has received and marked their mail ballot, they must place it inside a ballot envelope, seal it, and place the sealed ballot envelope inside a second carrier envelope. Tex. Elec. Code Ann. § 86.005.

25.     This carrier envelope contains instructions for the voter on how to vote absentee. Tex. Elec. Code Ann. §§ 86.002, .013(d). Before SB 1, voters included their name, address, and signature on the carrier envelope. Tex. Elec. Code Ann. §§ 86.002, .013. Voters relying on assisters also recorded the assistor's name, address, signature, and relationship to the voter on the carrier envelope. LULAC Ex. 29. For their vote to count, a voter must comply with the instructions on the carrier envelope. Tex. Elec. Code Ann. § 86.005.

26.     Eligible voters can return their completed mail ballots by mail, by common carrier, or in person to their Early Voting Clerk's office while polls are open on election day if they present acceptable identification. Tex. Elec. Code Ann. § 86.006. Each County has an Early Voting Clerk responsible for reviewing absentee voting applications and ballots. HAUL-MFV Ex. 277 at 2. County Election Administrators typically perform the role of Early Voting Clerk. Tex. Elec. Code Ann. § 83.002.

27.     Voters must ensure their county elections office receives their marked ballot before polls close on election day or by 5 p.m. the day after election day if they sent their ballot by mail and it was post-marked before 7 p.m. on election day. Tex. Elec. Code Ann. § 86.007.

28.     Mail ballots are collected by the Early Voting Clerk and kept in a ballot box until they are turned over to the county's Early Voting Ballot Board. Tr. at 1053:20–22. Each county has an Early Voting Ballot Board responsible for reviewing the information the voter filled out in their carrier envelope and determining whether the voter complied with all of the carrier envelope's instructions such that their ballot can be accepted. Tex. Elec. Code Ann. § 87.041(a). The Early

Voting Board decides when to meet to review submitted mail ballots, but their first meeting must happen "not later than the ninth day before election day." Tex. Elec. Code Ann. § 87.0222(a). It can continue to meet and review new submitted mail ballots "between the end of the ninth day before election day and the closing of the polls on election day." Tex. Elec. Code Ann. § 87.0222(a-1).

      2.    *SB 1's mail ballot identification provisions.*

29.    SB 1 Sections 5.02, 5.03, 5.07, and 5.08 created new voter identification requirements for mail ballots and applications in Texas. Joint Ex. 1 at 33–36, 38–40.

30.    Section 5.02 mandates that applicants for mail ballots include "the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety" on their applications. Joint Ex. 1 at 33. "If the applicant has not been issued" any of those identification numbers, they must include "the last four digits of [their] social security number" on their application. If a voter has also not been issued a social security number, they must provide a statement that they have none of the required identification numbers. Joint Ex. 1 at 33–34.

31.    Section 5.03 requires that mail ballot applications include a space for the voter to enter the identification numbers required by section 5.02. Joint Ex. 1 at 35.

32.    Section 5.07 in turn requires a county's Early Voting Clerk to compare the newly required identification number on mail ballot applications with the identification number in the applicant's voter registration file. Joint Ex. 1 at 38–39. Where the Clerk cannot match the identification number, they "shall reject the application" but give the voter the ability to cure their mail ballot application. Joint Ex. 1 at 38–39; *see also infra* Findings of Fact, Section II.B.3.

33.    Section 5.08 applies the same identification and matching requirements as Sections 5.02, 5.03, and 5.07 to the carrier envelopes of mail ballots. Joint Ex. 1 at 39–40.

34.     As with mail ballot applications, counties must now reject mail ballots—even if the voter successfully applied to vote absentee—if carrier envelopes do not contain a voter's identification number or contain an identification number not in the voter's voter registration file. Tex. Elec. Code Ann. § 87.041(b)(8), (d).

3.      *Curing absentee applications and ballots.*

35.     SB 1 also established procedures to allow voters to cure defects in their mail ballot applications and ballots. Tex. Elec. Code Ann. §§ 86.001(f-1), 86.001(f-2), 87.0411.

36.     To cure an application to vote absentee, a voter can (1) submit a new mail ballot application; (2) use the state's online Ballot by Mail Tracker to validate their personal information; or (3) submit a new voter registration application with updated identification numbers. HAUL-MFV Ex. 277 at 4. Once an applicant has corrected the deficiency on their application, the county's Early Voting Clerk sends them a mail ballot. *Id*. Applicants have until "the 11th day before election day" to validate their identification number on the Ballot by Mail Tracker or for their Early Voting Clerk to receive their new application to vote absentee in order to receive a mail ballot. HAUL-MFV Ex. 277 at 5; Tex. Elec. Code Ann. § 86.008(a-1).

37.     To cure a mail ballot, a voter can complete and return a Corrective Action Form for Defective Carrier Envelope along with their initial carrier envelope; Corrective Action Forms allow voters to provide information that was incorrect or missing on their mail ballot carrier envelope. These forms can be "highly complex," "verbiage rich," "long," and "very difficult for a voter to use." Tr. at 410:5–24.

38.     Voters who wish to cure a mail ballot can also (1) visit their Early Voting Clerk's office to correct the defect in person no later than the sixth day after election day; (2) validate the missing information using the Ballot by Mail Tracker; or (3) cancel their mail ballot application and vote in person. Tex. Elec. Code Ann. § 87.0411(b)–(b-1), (e-1); HAUL-MFV Ex. 277 at 8–11,

18–19, 22–23; LUPE Ex. 349 at 10, 12–13; Tr. at 205:23–206:6, 208:24–210:1; Tr. at 744:25–745:8.

### C.   Drive-thru voting

#### 1.   *Drive-thru voting before SB 1.*

39.   Voters who were especially vulnerable to COVID-19—or had family members that were immunocompromised—were more likely to sit out the 2020 general election out of concern for their and their family's safety. *See, e.g.*, Tr. at 2838:14–22; 2839:24–2840:11; 1259:15–1260:7.

40.   Because of this, local elections officials worked tirelessly to develop innovative options for voters to exercise their right to vote without risking health and safety. *See, e.g.*, HAUL-MFV Ex. 332 ¶ 40; Tr. at 1223:19–1226:4.

41.   Multiple counties—including Harris, Tom Green, and Bee Counties—offered voters the opportunity to cast a ballot from their vehicles ("drive-thru voting"), a procedure that was not prohibited by the Texas Election Code. Tr. at 1223:19–1226:4, 1380:3–6; LULAC Ex. 5 at 80.

42.   Drive-thru voting allowed voters to cast a ballot from inside their vehicles at certain designated locations. Tr. at 1228:10–19. A voter would drive-up, check-in, obtain and mark their ballot, deposit the ballot into a scanner, and drive away. Tr. at 1228:10–19; Tr. at 1153:4–14.

43.   This "creative approach," as the Secretary of State's former Director of the Elections Division called it, provided another means to vote in person during a global pandemic while minimizing the risk of exposure to COVID-19. Tr. at 4481:6–10; *see also* Tr. at 2702:15–22.

44.   Drive-thru voting was especially critical for individuals who would otherwise have trouble voting in a normal polling location. For example, it offered opportunities for those with young children or family members with disabilities to vote while those family members sat in the car. Tr. at 3592:6–22; Tr. at 941:24–942:11; Tr. at 2703:15–19.

45.     As both county officials and experts testified, drive-thru voting also mobilized minority communities, most notably Black and Latino voters. *See* Tr. at 2700:6–9, 2700:12–24, 2701:18–2702:7, 2703:15–19, 2706:9–21, 2707:1–8, 2708:16–2709:2, 2767:3–7;[5] *see also* Tr. at 1353:2–11; Tr. at 1958:14–20, 1969:10–17, 1970:21–24.

46.     Plaintiffs' expert, Dr. Ken Mayer, analyzed data from the 2020 general election and testified that 77,000 minority voters used drive-thru voting during that election, compared to about 48,000 White voters. Tr. at 1970:25–1971:6.[6]

47.     Likewise, as AFT President Zeph Capo testified, approximately 2,000 AFT members voted at drive-thru polling locations during the 2020 general election. Tr. at 942:18–23. These thousands of AFT members included significant numbers of Black and Latino voters, as each group constitutes approximately a third of AFT's membership in Harris County. Tr. at 943:9–16.

48.     In Harris County in particular, approximately 130,000 Harris County voters used drive-thru voting locations during the 2020 general election. Tr. at 1968:13–16. More voters used drive-thru voting than any other form of early voting in Harris County. Tr. at 2842:9–16. This contributed to the highest voter turnout rates the County had seen in decades. Tr. at 1226:2–1228:9.

---

[5] The Court also accepted Dr. Dan Smith, professor and chair of the political science department at the University of Florida, Tr. at 2670:10–12, as an expert in voting and elections in the American States, Tr. at 2676:1–5. The Court finds Dr. Smith's analysis methodologically sound and his conclusions reliable. In addition, based upon his demeanor at trial, and his straightforward and candid responses to questions posed to him by the parties and by the Court, the Court finds Dr. Smith to be highly credible. The Court credits Dr. Smith's testimony and conclusions, including his analysis regarding the mobilization of minority communities through drive-thru voting.

[6] The Court accepted Dr. Ken Mayer, a tenured professor of political science at the University of Wisconsin, Tr. at 1954:8–18, as an expert in election administration, voting methods, and voter fraud, Tr. at 1956:18–25, and the Court finds Dr. Mayer's analysis methodologically sound and his conclusions reliable. As a result, the Court credits Dr. Mayer's testimony and conclusions.

49.     Furthermore, there was no evidence of undue influence, impersonation, or any other form of fraud associated with drive-thru voting. Tr. at 2702:15–22; *see also* Tr. at 1974:5–9. Nor did the State have any reason to suspect that drive-thru voting impaired or was "abusing voters' rights." Tr. at 4358:1–8; *see also* Tr. at 4481:6–17.

    2.     *SB 1's drive-thru voting ban.*

50.     Nevertheless, and despite the success of drive-thru voting, SB 1's Sections 3.04, 3.12, and 3.13 banned this means of accessing the franchise. *See* Joint Ex. 1 at 14–15, 19–20.

51.     SB 1 Sections 3.04, 3.12, and 3.13 prohibit the type of drive-thru voting locations that Harris and other counties provided during the 2020 primary and general elections. *See* Joint Ex. 1 at 14–15, 19–20 (amending Tex. Elec. Code §§ 43.031(b), 85.061(a), and 85.062(b) and adding Tex. Elec. Code § 85.062(f-1)).[7]

**D.     Voting hours**

    1.     *Voting hours before SB 1.*

52.     Before 2020, most counties regularly offered in-person early voting between 8 AM and 6 PM.

---

[7] Prior to SB 1, Texas Election Code, Section 43.031(b), only required that each polling place be located inside a building. Joint Ex. 1 at 14. SB 1 Section 3.04 amended Section 43.031(b) to effectively eliminate drive-thru voting by imposing the restriction that "[n]o voter may cast a vote from inside a motor vehicle[,]" unless a voter is physically unable to enter a polling place without personal assistance or likelihood of injuring the voter's health pursuant to Section 64.009. *Id*.

Section 3.12 of SB 1 amended Section 85.061(a) to require that early voting polling places must be located "inside" county clerk branch offices; Section 3.13 amended Section 85.062(b), requiring that polling places "may be located inside any building" but "may not be located in a movable structure[.]" Joint Ex. 1 at 19.

Sections 3.04, 3.12, and 3.13 work in conjunction to prohibit the types of drive-thru voting locations that Harris County and other jurisdictions offered to expand access to the franchise during the 2020 primary and general elections. See SB 1 §§ 3.04, 3.12–3.13 (amending Tex. Elec. Code §§ 43.031(b), 85.061(a), and 85.062(b) and adding Tex. Elec. Code § 85.062(f-1)). Prior to SB 1, Texas law allowed counties to operate early voting within "any stationary structure" or "a movable structure." Tex. Elec. Code § 85.062.

53.     In response to the risks facing voters during the COVID-19 pandemic, some counties extended those hours. Harris County, for instance, offered periods of "24-hour" in-person early voting. Tr. at 4366:18–22.

54.     Beyond making it safer to vote during the pandemic, extended voting hours also generally made voting more accessible. Tr. at 277:1–6; Tr. at 2338:23–25; Tr. at 2339:1–9; Tr. at 944:13–14; *see also* Tr. at 1552:18–23 (recommending extended hours to "expand access to voting"); Tr. at 2338:10–17. Extended voting hours created opportunities for voters who otherwise would have had difficulty voting during regular early voting hours. Tr. at 276:1–4; Tr. at, 3591:14–24.

55.     Minorities, most notably Black and Latino voters, relied on extended voting hours, including 24-hour voting, more than White voters. Tr. at 1268:21–1269:9, 1352:6–12; Tr. at 1647:9–24; Tr. at 1958:21–25, 1969:10–17; Tr. at 2711:25–2712:12, 2712:22–2713:4, 2713:5–14; Tr. at 2841:12–21, 2841:25–2842:3. Nearly 50 percent of all Texas voters who used early in-person voting were non-White voters. Tr. at 1970:19–20, 1972:22–25. Over 60 percent of voters who used 24-hour voting in Harris County were non-White voters, most notably Black and Latino voters. Tr. at 1972:19–25; *see also* Tr. at 2047:24–2048:1, 2048:2–7.

56.     Twenty-four-hour voting led to more Latino voters—including LULAC members—voting in the 2020 general election than in previous elections. Tr. at 1647:9–24.

57.     Though not all counties relied on extended or 24-hour voting, those decisions related to each individual county's administrative needs and resources, and not any inherent difficulty in extended and 24-hour voting. Tr. at 1026:7–1027:1; Tr. at 1556:6–18; Tr. at 826:21–24; *see also* Tr. at 4367:13–4368:8; Tr. at 276:5–14. There is no evidence, for example, that extended or 24-hour voting result in voter fraud. Tr. at 1974:5–9.

58.     As El Paso County Election Administrator Lisa Wise put it, there was no concern that implementing 24-hour voting could lead to voter fraud because election officials "process a voter at 1:00 a.m. the sa[m]e way" that a voter would be processed "at 1:00 pm." Tr. at 276:8–14.

2.     *SB 1's restrictions on voting hours.*

59.     SB 1's Sections 3.09 and 3.10 prohibit counties from operating early voting before 6:00 a.m. or later than 10:00 p.m. on every day except Sunday, which has its own set of early voting hours restrictions. See Joint Ex. 1 at 16–19 (amending Tex. Elec. Code §§ 85.005 and 85.006(b), (e)). SB 1 sections 3.09 and 3.10 therefore reduced extended voting hours in many counties and eliminated 24-hour voting in Harris County. Joint Ex. 1 at 16–19.[8]

60.     Although Section 3.09 amended Texas Election Code Section 85.005 to require in-person early voting at polling places each weekday of early voting for at least nine or four hours depending on the size of a given county, it prohibited voting from being conducted earlier than 6 am or later than 10 pm. Joint Ex. 1 at 16. SB 1 Section 3.10 prohibited in-person voting earlier than 9 am or later than 10 pm on the last Sunday of early voting. Joint Ex. 1 at 18.

## III.   Impact of SB 1's mail ballot identification requirements.

61.     SB 1's mail ballot identification requirements led to a dramatic increase in rejection rates for mail ballots and applications in the March 2022 primary and November 2022 general election, leaving voters scrambling to cure their ballots or disenfranchised altogether. *See infra* Findings of Fact, Section III.A–B.

---

[8] SB 1 requires a minimum of four hours of early in-person voting within a window of time beginning at 6 AM and ending at 10 PM, however, thereby requiring counties with more limited early voting hours to expand their offerings. Tr. at 1673:7–12, 1673:13–20.

**A.    The March 2022 primary election.**

62.    The March 2022 primary was the first election administered under SB 1's mail ballot identification requirements. Tr. at 1397:13–15.

63.    As early as January 2022, county election officials began receiving mail ballot applications from voters seeking to vote in the March 2022 primary election and rejecting them at unprecedented rates. Tr. at 850:9–22. For example, in Travis County, around 50 percent of early mail ballot applications were rejected despite typical rejection rates being between one to one and a half percent. *Id.*

64.    The historically high application rejection rates were directly attributable to SB 1; most applications were rejected because the applicant either did not provide an identification number on their application or wrote a number that was not in the applicant's voter registration file. Tr. at 1513:6–14; Tr. at 2339:12–19; Tr. at 211:24–212:9; Tr. at 520:4–521:4, 524:10–16; Tr. at 1285:5–8.

65.    Indeed, many voters struggled "to guess the magic number" in their voter file, Tr. at 849:8–12, and submitted multiple applications that continued to be rejected, Tr. at 1044:16–19. Some voters, for example, provided their social security number, but only the voter's driver's license number was on file, and vice versa. Some voters provided both numbers—but their county had neither. Tr. at 211:24–212:9; Tr. at 851:6–11.

66.    Because of SB 1, counties were forced to reject all applications with identification number issues, even when election officials were certain of the applicant's identity. Tr. at 747:5–13.

67.    The March 2022 primary mail ballots were also plagued with astronomically high rejection rates. In some counties, the identification requirement resulted in a 100-fold increase in mail ballot rejections. LULAC Ex. 2 at 1. Indeed, the statewide rejection rate across Texas's ten

most populous counties was 12.4 percent, which expert testimony showed was more than 20 times greater than the 2020 mail ballot rejection rate. Tr. at 1979:6–16; LULAC Ex. 3 at 2, 4.

68.     In Harris County, for example the mail ballot rejection rate skyrocketed from 0.27 percent in the 2018 primary (pre-SB 1) to almost 19 percent in the March 2022 primary. Tr. at 1286:23–1287:14, 1288:6–11. Similarly, in Bexar County, the mail ballot rejection rate was over 20 percent, Tr. at 1106:10–25, which is 35 times greater than Bexar County's 2020 mail ballot rejection rate, LULAC Ex. 3 at 4.

69.     Like with mail ballot applications, the reason for the high mail ballot rejection rate was SB 1's identification requirements. Tr. at 1516, 7–17; Tr. at 277:7–10; Tr. at 2339:20–23; Tr. at 524:10–16; Tr. at 1049:18–23; Tr. at 1285:5–8. Expert testimony established that 90 percent of ballots rejected in Harris and Tarrant County during the March 2022 primary were rejected due to SB 1, a number nine times greater than all other rejection reasons combined. Tr. at 1983:6–23; LULAC Ex. 3 at 5.

## B.     The November 2022 general election.

70.     Mail ballot application rejection rates remained high during the November 2022 general election. Tr. at 1993:19–1994:1, 1994:21–1995:3.

71.     While overall rejection rates went down from what they were during the March 2022 primary election, they remained significantly higher than in pre-SB 1 elections. Tr. at 1991:6–9, 1993:12–22; *see also* Tr. at 1551:10–17; Tr. at 1160:24–1161:3.

72.     The reason for the high rejection rates continued to be SB 1's voter identification requirements. Tr. at 1996:12–1997:8; *see also* Tr. at 1516:18–22; Tr. at 277:11–14; Tr. at 1049:18–23. For example, of the November 2022 mail ballot applications Harris County flagged for rejection because of a defect of any kind, 63.6 percent had a voter identification defect. LULAC Ex. 100 at 4.

16

73.     Similarly, while mail ballot rejection rates during the November 2022 general election were lower than mail ballot rejection rates during the March 2022 primary election, they were still significantly higher than pre-SB 1 elections. Tr. at 2007:7–11; Tr. at 1543:24–1544:3; Tr. at 250:24–251:2; Tr. at 439:5–8; Tr. at 1160:4–6.

74.     The statewide rejection rate for mail ballots for the November 2022 general election was 3.4 percent. Tr. at 1991:6–9; LULAC Ex. 106 at 4. By comparison, the statewide rejection rate for mail ballots for the November 2020 general election was 0.84 percent, four times lower than in 2022. Tr. at 1993:12–18. Texas's 3.4 percent rejection rate was "more than twice the national average," giving Texas "the third highest mail ballot rejection rate in the country." Tr. at 1993:23–1994:1, 1994:21–1995:3.

75.     The increase in rejection rates was more acute in certain counties. In El Paso County, the mail ballot rejection rate more than doubled between the 2018 and the 2022 general elections. Tr. at 251:11–14; LULAC Ex. 103 at 7–9. In Harris County, mail ballot rejection rates during the November 2022 general election were more than 34 times greater than during the November 2020 general election. HAUL-MFV Ex. 94 at 3.

76.     Put differently, three quarters of the mail ballots rejections during the November 2022 general election in Harris, Dallas, and Hidalgo Counties were the result of SB 1's requirements. LULAC Ex. 4 at 5. In Harris County specifically, "82 percent of the rejected mail ballots . . . were rejected specifically because of SB 1." Tr. at 1997:2–5; LULAC Ex. 4 at 5.

77.     Despite efforts by the counties to educate voters about SB 1's new mail ballot rules, as well as the fact that the law had already been in place for an election, SB 1's mail ballot identification requirements continued to drive up rejection rates. Tr. at 1160:24–1161:7; Tr. at 277:15–17; Tr. at 1551:10–17; Tr. at 1516:23–1517:6; Tr. at 439:14–17; Tr. at 1048:24–1049:2.

78.     Due to SB 1, in Hidalgo County, "the aggregate rejection rate in the 2022 General [Election] was almost twice what it was in 2020, and higher than it was in any other election since 2018, other than the 2022 Primary where it was almost 20 percent." Tr. at 2001:24–2002:6; LULAC Ex. 4 at 10.

79.     The high rejection rates resulted in the disenfranchisement of many voters, as nearly half of the voters whose applications were rejected during the November 2022 general election did not ultimately vote. Tr. at 2737:11–15; *see also* Tr. at 2743:2–10, 2744:8–12. Some voters were disenfranchised despite providing both of their identification numbers, Tr. at 1050:21–25, while others' applications and mail ballots were rejected on multiple occasions, Tr. at 1653:12–1654:1.

80.     Even voters who successfully complied with SB 1's identification requirements when applying to vote absentee—thus confirming their identities by using the correct number on their applications forms—subsequently forgot to enter their identification numbers on their mail ballots, or used the wrong number and had their mail ballots rejected. Tr. at 1813:1–8, 1814:10–17; Tr. at 212:10–14; Tr. at 2326:10–17; Tr. at 256:16–24.

81.     Ms. Elaine Jones, for example, testified that even after she successfully applied to vote absentee, she forgot to include her identification number on her mail ballot carrier envelope. Tr. at 1793:11–1794:20. Ms. Jones was familiar with SB 1, having spent months educating TARA members on the bill's new voting requirements, including its identification number provisions. *Id.* Nevertheless, she found herself "[h]umiliated, angry, [and] embarrassed" when she mistakenly forgot to write her identification number under the flap of her ballot carrier envelope. *Id.* She testified that SB 1's voter identification requirement is "just another hurdle" that makes voting by mail more difficult. *Id.*

82.     SB 1's restrictions on absentee voting also led voters to distrust the absentee voting process, alienating individuals for whom voting by mail would otherwise have been less burdensome than in-person voting. Tr. at 1814:23–1815:4, 1816:10–16; *see also* Tr. at 1767:6–12; Tr. at 2927:3–13. Unsurprisingly, overall mail ballot turnout was lower during the November 2022 general election than expected: while close to 550,000 Texas voters voted by mail during the 2018 election, only 350,000 elected to do so in 2022. Tr. at 2740:22–2742:8. The number of absentee voters dropped significantly despite the fact that voter registration increased between 2018 and 2022 and the 2022 elections were competitive. *Id*.

83.     The higher-than-average rejection rates of the November 2022 general election will likely persist through future elections as new sets of voters become eligible to vote absentee and encounter SB 1's burdensome identification requirements for the first time. Tr. at 1920:16–21; Tr. at 1051:1–17, 1051:21–1052:20; Tr. at 421:21–422:9; Tr. at 4646:4–23; Tr. at 1161:8–10; *see also* Tr. at 2007:15–2008:9, 2033:13–20, 2076:13–17.

84.     The same is true for the voters who only vote during presidential elections—they too will encounter SB 1's identification requirements for the first time in 2024. Tr. at 271:11–18; Tr. at 1051:1–17; Tr. at 757:21–758:3; Tr. at 3601:23–3602:6. Tr. at 421:21–422:5.

85.     Even voters who have already voted under SB 1 and understand its rules will continue to be burdened in future elections—anyone can make identification-related mistakes that result in subsequent mail ballot applications and ballots being rejected. Tr. at 538:25–539:5. Indeed, some voters who successfully voted during the March 2022 primary election had their ballots rejected during the November 2022 general election. *Id*.

C. **Other elements of SB 1 that exacerbate the burdens imposed on absentee voters.**

1. *Confusing instructions for voters.*

86. SB 1's voter identification requirements also required election officials to adopt new mail ballot application forms and ballot carrier envelopes with confusing instructions that made it even harder for voters to comply.

87. Voters and administrators alike complained that the application forms and carrier envelopes are not user friendly and make it easy for voters to miss crucial information, like requests and instructions for identification numbers. Tr. at 210:2–10; Tr. at 413:5–11, 415:8–20; Tr. at 1046:8–23.

88. This cluttering of instructions on the mail ballot application and carrier envelope was mandated by SB 1 itself, which required that specific and complicated language be added to both form and envelope. The Court heard extensive testimony confirming that this made both the application and envelope more difficult to understand. Tr. at 770:19–771:3.

89. Moreover, both the application form and carrier envelope instruct voters to list their Texas driver's license, Texas personal identification card number, or election identification certificate number or, *if they do not have one of these identification numbers*, the last four digits of their social security number. Joint Ex. 1 at 33–34; LUPE Ex. 119 at 1; LUPE Ex. 9 at 3. Neither the application form nor the carrier envelope instruct voters to write *both* identification numbers. Tr. at 1838:17–19; Tr. at 1034:6–15. Because of the instruction, voters with driver's license numbers are likely to write only that number on their forms and carrier envelopes, even if they have a social security number on their voter registration record. Tr. at 1855:9–1856:3.

90.     Under SB 1 Sections 5.02 and 5.08, neither the counties nor the Secretary of State's office can alter the mail ballot (or application) instructions to require voters to write both numbers. Tex. Elec. Code Ann. § 84.002(a)(1-a)(A), (B); Tr. at 1938:13–1939:13; Tr. at 1843:8–1844:25.

91.     Adding to the confusion, some counties have included separate inserts with the mail ballot materials they send voters instructing them to put both their driver's license number and the last four digits of their social security numbers, despite the instructions mandated by SB 1. Tr. at 1038:7–11.

2.     *Missing identification numbers and outdated records*

92.     The State lacks identification numbers for thousands of voters, making it impossible for these voters to comply with SB 1's voter identification requirements.

93.     Texas has a statewide voter registration database—Texas Election Administration Management system or "TEAM"—which is maintained by the Secretary of State's office. Tr. at 202:8–14. TEAM stores the information voters supply in their registration forms, including identification numbers. TEAM can also be updated with information provided from state agencies, like the Texas Department of Public Safety, which issues driver's licenses and personal identification numbers. Tr. at 409:22–25; Tr. at 222:25–223:7.

94.     All counties rely on the information stored on TEAM. Texas's smaller counties use TEAM directly to maintain their voter registration databases. Tr. at 202:15–20. Texas larger counties—including Bexar, El Paso, Dallas, Harris, Hidalgo, and Travis—predominantly use outside vendors because their voter registration databases are too large but can nevertheless access and edit the information on TEAM. Tr. at 202:21–203:17, 203:22–204:6, 221:16–222:1; Tr. at 994:7–12, 1021:2–8; Tr. at 409:10–13; Tr. at 1161:11–14; Tr. at 2311:22–24; Tr. at 853:1–20; Tr. at 729:2–7.

95.     However, some voters do not have identification numbers stored on TEAM or any other county voter registration database. Some older voters registered to vote before identification numbers were required on voter registration forms. Tr. at 213:23–215:2, 215:25–216:8; Tr. at 1011:3–17; Tr. at 747:17–24.

96.     As a result, counties cannot match these voters' identification numbers against their registration records. Tr. at 213:23–215:2; Tr. at 1011:3–17.

97.     When SB 1 went into effect ahead of the March 2022 primary election, around 700,000 registered voters had only a driver's license or social security number, but not both, in their voter registration records on TEAM, while 100,000 registered voters had neither. Tr. at 1845:8–16.

98.     As of December 2022, the state's last mass update to TEAM, over 450,000 voters had no Texas driver's license number, while nearly 400,000 voters had no social security number, in their voter registration records. Tr. at 1896:22–1897:4. And, as of December 2022, there were still 93,867 voters who had neither a valid driver's license nor social security number in their voter registration record. Tr. at 1897:22–1898:4; LULAC Ex. 75. In all, there are 667,685 voters who can write a valid driver's license number or the last four digits of their Social Security number on a mail ballot application form or ballot, yet still have their application or ballot rejected because the number was not in their voter registration record. Tr. at 1920:3–7; LULAC Ex. 75; *see also* Tr. at 224:11–16; Tr. at 441:22–443:9.

99.     While the Secretary of State's office has supplemented TEAM identification number data through annual updates of its voter registration rolls, hundreds of thousands of voters continue to have limited identification in the database or none at all. Tr. at 1896:22–1897:4, 1897:22–1898:4, 1920:3–7; LULAC Ex. 75.

100.    And although SB 1 in some instances allows voters to cure applications or ballots with missing or mismatched identification numbers, the cure procedures are not accessible to many voters whose identification numbers are not stored on TEAM cannot. Tr. at 2006:20–2007:2; Tr. at 1542:22–1543:7; Tr. at 750:8–11; *see also supra* at Findings of Fact, Section III.C.2. In order to use the Ballot by Mail Tracker, voters need to provide both the last four digits of their Social Security number and either their driver's license number or personal identification number. Tex. Elec. Code Ann. § 86.015(b); Tr. at 1031:4–1032:7. If a voter's registration record does not contain both of these numbers, or if the voter has only been issued one, they cannot access the Ballot by Mail Tracker to cure their applications or ballots. Tr. at 1020:5–12, 1032:2–15; Tr. at 227:15–25, 243:24–244:2; Tr. at 2329:21–25.

101.    Moreover, many voters are unable to visit their county's election office, Tr. at 486:4–10; Tr. at 218:7–219:12, 220:2–9, which is one of the main reasons for voting absentee in the first place. Indeed, absentee voting in Texas is available only to voters who: (1) have disabilities, (2) are over the age of 65, (3) are absent from the county on election day, (4) expect to give birth within three weeks of election day, or (5) are confined to jail, or are civilly committed—in short, voters who may have difficulty getting to their polling place or county's elections office. Tex. Elec. Code Ann. §§ 82.001–.008; *see also* Tr. at 1300:20–1301:25.

102.    Consequently, voters over the age of 65 are also more likely to have registered well before identification numbers were required as part of the registration process, and thus more likely to have identification numbers missing from TEAM. Tr. at 213:23–215:2, 215:25–216:8. These voters would not be able to cure their ballots online.

103.    Only a small percentage of voters whose ballots were rejected due to SB 1's identification provisions ultimately voted in person. For example, in Travis County, only 27 out of

hundreds of voters whose ballots were rejected for identification number issues ahead of the November 2022 general election voted in-person by provisional ballot. Tr. at 1517:7–14.

        3.    *Disproportionate impact on minority voters.*

104.    SB 1's voter identification requirements disproportionately impact minority voters. Dr. Mayer explained that "the SB 1 rejection rate was uniformly higher for every minority group compared to non-Hispanic Whites" during the March 2022 primary election. Tr. at 1985:13–17; *see also* Tr. at 2723:9–12, 2728:24–2729:3, 2729:21–2730:3, 2733:5–7.

105.    Expert testimony established that during the November 2020 general election, Black absentee voters in Harris County were 82 percent more likely than White absentee voters to have their mail ballot rejected due to SB 1. Tr. at 1998:24–2000:1; LULAC Ex. 4 at 8. In Dallas County, Black absentee voters were 87 percent more likely than White absentee voters to have their mail ballot rejected due to SB 1. Tr. at 2001:9–18; LULAC Ex. 4 at 9.

106.    Expert testimony further established that Latino absentee voters during the November 2020 general election in Harris County were 86 percent more likely than non-Hispanic White absentee voters to have their ballot rejected due to SB 1. Tr. at 1998:24–2000:1; LULAC Ex. 4 at 8. While Asian absentee voters in Harris County were 71 percent more likely than non-Hispanic White absentee voters to have their mail ballot rejected due to SB 1. Tr. at 1998:24–2000:1; LULAC Ex. 4 at 8.

107.    Black and Latino voters whose mail ballot applications were rejected during the 2022 general election were also less likely to turn out to vote. Tr. at 2775:14–16.

        4.    *Restrictions on submitting mail ballots in person.*

108.    At the same time that SB 1 was making it more difficult for Texans to vote absentee, the law also restricted methods of casting or submitting a ballot in person, compounding the law's mail identification provisions' burdensome effects on voters. *See infra* Findings of Fact,

Section III.C.5–6. For example, Section 4.12 imposed new requirements on in-person delivery of mail ballots. Prior to SB 1, the Texas Election Code allowed "in-person delivery by the voter who voted the ballot," with few restrictions on how those ballots must be received. But now, SB 1 requires that ballots be "received by an election official at the time of delivery," and the receiving election official must record the voter's name, signature, and type of identification provided, along with an attestation that the delivery complied with Section 86.006 of the Election Code. Joint Ex. 1 at 30.

109.    And despite the fact that election officials are required to record the voter's name, signature, and form of identification when the voter returns their mail ballot in person, Tr. at 1052:21–1053:19, 1852:23–1853:18, that ballot may still be rejected if the identification number on the carrier envelope is missing or incorrect, Tr. at 1053:20–1054:23, 1055:8–11, 1853:19–1854:9.

110.    Section 4.12, therefore, prevents election officials from setting up drop boxes to streamline the return of mail ballots by requiring those officials to contemporaneously record the voter's name, signature, and type of identification provided, Tr. at 3593:2–17; and yet SB 1 still subjects these voters to disenfranchisement for missing or incorrect identification numbers on their mail ballots—even after they have presented identification to election officials *in person*. *See supra* Findings of Fact, Section III.C.1–3.

5. *Restrictions on drive-thru voting.*

111. SB 1 also targeted voting methods or practices that expanded opportunities for Texas voters to participate in the 2020 presidential election, further compounding the burdens on the right to vote.[9]

112. First, SB Sections 3.04, 3.12, and 3.13 effectively banned drive-thru voting, which allowed voters to cast a ballot at certain designated polling locations from inside their vehicles during the 2020 elections. Tr. at 1228:10–16.

113. Drive-thru voting made it easier for individuals who would otherwise have trouble voting in a normal polling location, including for instance, individuals with young children or family members with disabilities. Tr. at 3592:6–22; Tr. at 942:2–11; Tr. at 2703:15–19. It similarly allowed voters with long commutes to vote during their commute to or from work. Tr. at 942:2–11; Tr. at 2696:4–7. A voter could drive up to the polling location, check-in, obtain and mark their ballot, deposit the ballot into a scanner, and drive away, all without ever leaving their vehicle. Tr. at 1228:10–19; Tr. at 1153:4–14.

114. Drive-thru voting proved extremely. In the 2020 general election, approximately 130,000 voters used drive-thru voting in Harris County. Tr. at 1968:13–16.

115. Drive-thru voting was also popular among Plaintiffs AFT's and LULAC's members. Approximately 2,000 AFT members in Harris County voted at drive-thru polling

---

[9] While LULAC Plaintiffs do not challenge SB 1's drive-thru and extended hour voting restricting provisions, SB 1 §§ 3.04, 3.09, 3.10, 3.12, and 3.13, under its undue burden claim, LULAC Plaintiffs provide this evidence during phase 1 of trial as necessary to contextualizing the cumulative burdens SB 1's mail ballot restrictions, SB 1 §§ 4.12, 5.02, 5.03, 5.07, and 5.08, caused voters. Additional evidence on all of these provisions will be presented during phase two of the trial when parties litigate their discriminatory intent claims.

locations during the 2020 general election. Tr. at 942:18–23. And drive-thru voting was also widely used by LULAC's members in Harris County. Tr. at 1648:9–21.

116.     The Court heard extensive testimony that drive-thru locations made voting more accessible, particularly for minorities. *See*, Tr. at 3592:6–22; Tr. at 2842:9–16; Tr. at 1958:14–20. The Court also heard expert testimony that drive-thru in Harris County was disproportionately used by Black and Latino voters, contributing to record high turnout among those populations in the 2020 general election. *See* Tr. at 1353:2–11; Tr. at 2700:6–9, 2700:21–24, 2701:19–23, 2702:1–7, 2703:15–19, 2706:12–21, 2707:1–3, 2707:4–8, 2708:16–25, 2767:3–7; Tr. at 1958:17–20, 1969:10–17, 1970:21–24.

117.     Approximately 130,000 drive-thru voters in Harris County, over 77,000—or approximately 62 percent—were non-white voters, a share substantially above the non-white population of Harris County. Tr. at 1970:25 –1071:6; Tr. at 2694:4–19.

118.     The Court also heard testimony that drive-thru voting did not pose any added risk of fraud and that no evidence of fraud occurred in the 2020 election. Tr. at 1156:2–4; Tr. at 1255:17–23.

6.     *Restrictions on voting hours.*

119.     In addition to eliminating drive-thru voting, SB 1 Sections 3.09 and 3.10 restricts the hours during which counties can offer in-person early voting. Specifically, SB 1 prohibits early in-person voting before 6 AM or after 10 PM, limiting the ability of counties to offer extended voting hours and eliminating 24-hour voting in Harris County. Joint Ex. 1 at 16–19.[10]

---

[10] SB 1 requires a minimum of four hours of early in-person voting within a window of time beginning at 6 AM and ending at 10 PM, requiring counties with more limited early voting hours to expand their offerings. Tr. at 2922:4–12; Tr. at 1673:7–12, 1673:13–20. But in Harris County, which is the largest and most diverse county in Texas, where election officials offered 24-hour

120.    The Court heard and credits testimony from county officials that expanding early in-person voting hours made voting more accessible, particularly to individuals with demanding daytime work obligations. Tr. at 277:1–6; Tr. at 2338:23–25, 2339:1–9; Tr. at 944:13–14; *see also* Tr. at 1552:18–23 (recommending extended hours to "expand access to voting"); Tr. at 2338:12–17.

121.    County officials also testified that the process for voting is the same in the middle of the night as it is during regular business hours. *See, e.g.*, Tr. at 1552:12–17; Tr. at 276:5–7, 276:8–14. Thus, extended hour voting (or 24-hour voting) does not increase the risk of fraud.[11]

122.    Unsurprisingly, like the other voting methods targeted by SB 1, extended early voting hours were disproportionately used by Black and Latino voters. Tr. at 1298:21–1269:9; 1352:6–12; Tr. at 1647:10–24; Tr. at 1958:21–25, 1969:10–17, 1970:19–20, 1972:22–25, 2047:24–2048:1, 2048:2–7; Tr. at 2712:7–12, 2712:22–2713:4, 2713:5–14; Tr. at 2841:12–19, 2841:25–2842:3.

## IV.    Impact of SB 1's restrictions on in-person voter engagement.

123.    Beyond targeting methods of voting, SB 1 also created new criminal sanctions that make it more difficult to engage and assist voters.

### A.    Section 7.04 criminalized certain voter interactions.

124.    SB 1 Section 7.04 amended Chapter 276 of the Texas Election Code to criminalize innocuous interactions with voters meant to facilitate engagement and turnout. Joint Ex. 1 at 58–60.

---

early voting in 2020, SB 1 has *reduced* the number of voting hours available to the public. Tr. at 1156:9–22.

[11] The county officials who chose not to implement 24-hour voting, did so for reasons unrelated to any risk of fraud. Tr. at 2379:14–19, 2378:24–2379:1; Tr. at 1021:19–1022:22, 1026:13–20, 1026:21–1027:1, 1128:16–1128:4.

125.     Section 7.04 prohibits any in-person interaction with a voter that takes place "in the physical presence of an official ballot or a ballot voted by mail" with intent to deliver votes for a specific candidate or measure, if the individual conducts such activities in exchange "for compensation or other benefit," with "benefit" defined as "anything reasonably regarded as a gain or advantage." Joint Ex. 1 at 58–60 (adding Tex. Elec. Code § 276.015).

126.     Section 7.04 thus applies to any speaker receiving a "benefit" who engages in speech "intended to deliver votes for a specific candidate or measure" if they happen to be "in the physical presence" of a ballot. Joint Ex. 1 at 58–60.

127.     Violating Section 7.04 is punishable by up to ten years in prison and a fine of up to $10,000. Joint Ex. 1 at 59; Tex. Penal Code Ann. § 12.34.

128.     The Secretary of State has not provided any guidance on the meaning of Section 7.04. Tr. at 1914:7–14, 1924:7–18. Nor has the Attorney General's office. Tr. at 1924:24–1925:3.

129.     Section 7.04 does not define what it means for an individual to be in the "physical presence" of a ballot. Tr. at 1914:18–20.

130.     Moreover, the law does not indicate whether the speaker must even be aware of the ballot's presence.

**B.     Section 7.04 has chilled Plaintiffs' voter engagement efforts.**

131.     The Court finds that Section 7.04, by its own plain text, made ordinary and routine interactions with voters a felony and limited the ability of civic organizations, including Plaintiffs, and individuals to assist voters, as well as the ability of voters to select assisters of their choice.

132.     The Court heard persuasive testimony further explaining how Section 7.04's breadth and vagueness compound the chill on speech by making it difficult for Plaintiffs and their members to know precisely what kinds of interaction with voters may be permissibly engage in. Tr. at 1654:20–1655:5, 1655:19–1656:18; Tr. at 928:2–9, 934:15–21.

133.    Section 7.04 has created an environment in which advocates fear that they risk criminal sanction for assisting or speaking with voters. Tr. at 1657:13–19; Tr. at 924:25–925:7.

134.    Section 7.04 has also harmed Plaintiffs' voter engagement efforts by discouraging the use of paid canvassers or volunteers who receive any modest form of compensation. For example, AFT President Zeph Capo described in detail how his organization has rolled back its use of volunteer block-walkers due to concerns about exposing members and volunteers to criminal liability for ordinary political volunteer work. Tr. at 925:12–14, 928:10–929:3; Tr. at 1654:10–19, 1656:19–1657:12.

135.    Before SB 1's enactment, AFT relied on large numbers of paid and volunteer block-walkers and Temporary Political Organizers—short-term employees who speak with members about voting and supporting AFT's political organizing—to engage with voters in person, advocate for candidates and issues important to the organization, and remind voters to cast their mail ballots. Tr. at 929:6–930:5. Volunteers are not paid but they are compensated in other ways including gas cards, free food, raffles for gift certificates, and organizational swag. Tr. at 929:14–930:5.

136.    AFT block-walkers and Temporary Political Organizers ("TPOs") spoke with members at their homes while canvassing neighborhoods ahead of elections—a scenario that it is likely to bring the canvasser within proximity of a ballot. Tr. at 926:5–10, 927:6–12, 927:21–23, 929:14–930:5.

137.    As a result of Section 7.04, AFT has "had to identify new and different ways to compensate for reduction in the amount of canvassing or door-to-door block-walking that" it does, to minimize in-person interactions. Tr. at 924:25–925:7, 925:12–14, 928:17–22, 929:1–3, 934:7–21; *see also* Tr. at 924:21–22 (AFT has "had to shift [its] main methods of communication with [its] members.")

138.    In particular, AFT has significantly scaled back in-person interactions with its members and relied more on phone calls and texting, methods that are less effective for reaching members. Tr. at 928:10–929:3. Not only has Section 7.04 detracted from the "quality of the conversations" AFT is able to have with voters, Tr. at 930:11–21, but AFT must now also warn block-walkers and TPOs to limit their interactions with voters so as to not risk criminal penalties. Tr. at 928:2–9.

139.    Consequently, the reduction of in-person assistance due to concerns over Section 7.04 has diminished the efficacy of AFT's voter assistance programming. Tr. at 931:14–20.

140.    LULAC President Domingo Garcia similarly explained that Section 7.04 has already impaired LULAC's voter engagement. Ahead of municipal elections in Houston in November 2023, LULAC volunteers "scaled . . . down" their "get-out-the-vote effort" and decided they're "not going to touch any seniors" for "fear that they could be subject to prosecution if they help seniors vote by mail." Tr. at 1655:10–18. While LULAC's volunteers are not paid, they are compensated for their time with food and drink, gas credit, or other modest forms of compensation, exposing them to liability under Section 7.04. Tr. at 1655:19–1656:6, 1656:11–18.

141.    Similarly, LULAC's local councils in Tarrant County once operated get-out-the-vote efforts for its senior members, many of whom have physical disabilities and require assistance voting. Tr. at 1654:20–1655:5. But because of fear of criminal prosecution and the challenge of recruiting volunteers for such programs, LULAC halted these programs in Tarrant County altogether. Tr. at 1650:10–18, 1654:10–19, 1656:19–1657:12.

142.    Judy Bryant provided similar testimony regarding her own paid political engagement work on behalf of TARA. Tr. at 1765:19–1766:9, 1766:10–14. TARA has been forced to curtail its in-person advocacy efforts, especially in the run up to election day, because of the

risks of criminal liability under Section 7.04 for members who may unknowingly assist a voter with a ballot in their possession. *Id.*

143.    The Court finds that the widespread concern about the impact of Section 7.04 is well founded. County election officials testified to their own lack of clarity about the law, and in fact advised civil organizations to seek legal counsel before assisting voters with mail ballots. Tr. at 179:5–10. This reflects the serious concern among Plaintiffs, as well as their volunteers and members, about inadvertently falling with Section 7.04's ambit for ordinary political volunteer efforts.

## V.    SB 1 injured LULAC Plaintiffs and their members.

### A.    LULAC

144.    LULAC is a national Latino civil rights organization founded in 1929 in Corpus Christi, Texas. Tr. at 1632:9–11. Its current president is Domingo Garcia. Tr. at 1632:3–5, 13–16.

145.    While LULAC has a national membership, Texas has more LULAC members than any other state. Tr. at 1634:1–5. The group has approximately 4,000 to 5,000 dues-paying members within Texas, as well roughly 80,000 to 90,000 "eMembers" in the state. The organization has approximately 30 to 40 LULAC Councils in Texas, including in Dallas, San Antonio, Houston, and El Paso. Tr. at 1634:6–20, 1637:3–7. LULAC's Councils include constituency-specific councils across Texas, including high school LULAC Councils and councils on college campuses. Tr. at 1634:6–20.

146.    LULAC's mission is "to improve the lives of Latino families throughout the United States" and "to protect their civil rights in all aspects" such that the nation's promise of "liberty and justice for all" includes "all Latinos and Latino citizens in the United States." Tr. at 1633:10–18. LULAC is dedicated to protecting the civil rights of all Latinos. Tr. at 1633:19–21. Recruiting new members is an important part of LULAC's operation and mission. Tr. at 1640:9–22.

147.    Mr. Garcia testified that promoting the right to vote is "crucial" to LULAC's mission because when Latinos are "allowed to vote, they are able to choose candidates of their choice" who "will stand and work on issues that are important to them." Tr. at 1645:4–15.

148.    LULAC pursues its mission in many ways, including by providing educational programming that prepares students for elementary school and college, as well as health care programming that assists families in obtaining public health care resources. Tr. at 1638:25–1639:18. LULAC also has programming to assist immigrants and refugees. Tr. at 1639:19–1640:8. LULAC participates in community response initiatives after tragedies like the Uvalde mass shooting, and further works with law enforcement to address hate crimes against Latinos in Texas. Tr. at 1641:5–1642:3.

149.    Since its founding in 1929, LULAC has also dedicated significant resources to protecting the right of Latinos to vote and promoting voting in the Latino community. Over its history, LULAC has filed lawsuits challenging the poll tax and the whites-only Democratic primary. Tr. at 1642:11–19. It also led a lawsuit barring Mexican Americans from serving on grand juries in Texas. Tr. at 1642:20–24. LULAC also filed suit to expand the protection of the Voting Rights Act to include Texas and Spanish language minorities. Tr. at 1642:24–1643:6.

150.    Beyond these litigation efforts, "LULAC has volunteers that engage in voter registration and get out the vote efforts" every year. Tr. at 1645:23–1646:5. These efforts often focus on community members who face greater challenges voting, including elderly Latinos and those who do not speak or write English. Tr. at 1649:7–24. Accordingly, LULAC has historically run a voter assistance program for seniors, including many who are not literate or have physical disabilities. Tr. at 1654:20–1655:5. LULAC's members and volunteers who participate in these

get-out-the-vote and voter assistance efforts often receive food and drink, gas credit, or other modest forms of compensation for their efforts. Tr. at 1655:19–1656:10, 1656:11–18.

151.    Given the importance of voting to its mission, LULAC began monitoring SB 1 as it made its way through the Texas legislature. Tr. at 1643:16–18. LULAC was concerned the bill targeted minority voters, particularly those in Harris County, where LULAC has a significant membership. Tr. at 1643:19–1644:10. Harris County has the largest Latino population in Texas, and accordingly one of the largest concentrations of LULAC members in the state. Tr. at 1647:7–15. In fact, LULAC divides Harris County into two districts because of the size of its membership there and LULAC has numerous councils across Harris County. Tr. at 1647:7–15, 1648:2–8.

152.    The Court credits Mr. Garcia's testimony that SB 1's targeting of voting methods employed in Harris County harmed LULAC and its members who live in Harris County. During the 2020 elections, LULAC advised members about both expanded in person voting hours, as well as drive through voting. Tr. at 1648:9–21. LULAC directly observed that the availability these voting methods in the 2020 election helped to increase the number of Latinos who were able to vote, particularly working-class Latinos working shifts. Tr. at 1647:9–24. Indeed, Latino and Black voters generally used drive-thru voting more than other forms of voting. Tr. at 1256:10–21. This included several LULAC members who used drive-thru voting during the 2020 general election. Tr. at 1648:9–21. LULAC observed a decrease in voting by Latinos in Harris County in 2022 after these methods were banned. Tr. at 1660:13–19.

153.    The Court credits Mr. Garcia's testimony that the law's mail ballot identification provisions have also harmed LULAC's get-out-the-vote effort. Tr. at 1649:9–24. Because many of the community members LULAC serves lack a driver's license, they face greater risk of having their mail ballots rejected. *Id.* This negatively impacts LULAC's mission—if Latinos "are not able

to get [their] vote out" then they are "not able to get what candidates the community wants and []
represents their interest." Tr. at 1649:25–1650:5.

154.    LULAC has sought to mitigate the impact of SB 1's mail ballot identification rules
by diverting resources to a voter education campaign. Tr. at 1650:6–19. For example, LULAC
launched an unprecedented statewide bus tour to hold town hall meetings educating its members
on these new requirements. *Id.* This effort required significant monetary resources, as well as staff
and volunteer time that could have been used for other purposes. Tr. at 1650:20–1651:7.

155.    While LULAC's statewide voter education campaign also touched on another
recently-enacted voter suppression law—SB 1111—the Court credits Mr. Garcia testimony that it
was primarily focused on SB 1 and that most of LULAC's diverted resources went towards
combatting that statute. Tr. at 1668:2–9, 1680:5–17.

156.    The Court also credits Mr. Garica's testimony that the "thousands of dollars"
dedicated to this voter education campaign otherwise would have been spent on LULAC's
"education programs, scholarship programs, programs regarding voter registration" and
"naturalization and citizenship events." Tr. at 1652:16–24.

157.    This voter education campaign is not a one-time cost to LULAC. LULAC
anticipates having to repeat these efforts—a statewide voter education program it had never
untaken before—"every year." Tr. at 1652:25–1653:11; 1679:21–1680:4 (explaining LULAC's
effort was different from prior voter engagement efforts).

158.    The Court credits Mr. Garcia's testimony that SB 1's mail ballot identification rules
have not only harmed LULAC as an organization, but also its individual members. For example,
LULAC member Rosalyn Weisfeld repeatedly had her mail ballot application rejected due to SB

1. Tr. at 1653:12–1654:1. LULAC contacted the Hidalgo County election office to assist the voter. *Id.*

159.    SB 1 Section 7.04 has also injured LULAC because it puts their members and volunteers at risk of prosecution for ordinary voter assistance and get-out-the-vote activities. As a result, LULAC has scaled back its voter assistance program across Texas. Tr. at 1656:19–1657:12.

160.    For example, LULAC Councils within Tarrant County ceased get-out-the-vote and voter assistance efforts focused on seniors altogether ahead of city elections due to fear of prosecution. Tr. at 1654:8–19, 1655:10–18.

### B.    AFT

161.    Texas AFT ("AFT") is a 501(c)(5) designated labor union representing K-12 public school employees and higher education employees in the State of Texas. Tr. at 920:16–20. Its current president is Zeph Capo. Tr. at 920:14–15.

162.    AFT has approximately 66,000 members in the State of Texas. Its members come from a variety of racial and ethnic backgrounds and are equally diverse in terms of geographic location and age. Tr. at 923:19–25. About two-thirds of AFT members are Black or Latino. Tr. at 924:3–6. AFT's membership in Harris County is, like the county itself, particularly racially diverse. Tr. at 942:24–943:13.

163.    Its mission is to advocate for good working conditions for the members and families that it serves. AFT advocates for increased funding for public schools, for programming that treats children as holistic individuals and seeks to remove external barriers to receiving a high-quality education, and for capping class sizes at a reasonable number so that all students get appropriate attention from their teacher. Tr. at 922:2–22.

164.    To advance its mission, AFT also participates in the political process by regularly engaging with its membership about the candidates and issues that best align with the organization's values. Tr. at 923:2–15.

165.    Prior to SB 1, AFT's primary way of communicating with its members about advocacy issues and endorsed candidates was door-knocking. Tr. at 924:13–20. Most of the time, these were member-to-member conversations where an AFT member would knock on the door of a fellow union member, introduce themselves, and then discuss the issues and candidates that the organization was endorsing and why. Tr. at 926:5–10.

166.    Some of the members who would engage in this type of door knocking—or block-walking—for AFT were paid staff members. Others were volunteers who would receive benefits such gas and meal cards in exchange for their work. Tr. at 929:6–24.

167.    While these conversations between members and AFT block-walkers would unfold, members would sometimes have their ballots with them, either because they were home and had questions about how to fill them out or because they were gathering with other members to fill out their ballots as a group. Tr. at 927:21–23.

168.    The Court credits Mr. Capo's testimony that since SB 1 became law, AFT has been forced to shift the way it communicates with its members away from block-walking to communicating over the phone, video, and text message. Tr. at 928:17–24.

169.    The Court credits Mr. Capo's testimony that despite AFT's belief that in-person interactions are the most effective way to reach members, it made this decision to avoid putting its staff and volunteers in legal jeopardy. Tr. at 930:6–9, 930:11–21. Due to SB 1 Section 7.04, Mr. Capo and the organization's leadership are concerned about the potential that its staff and

volunteers would be prosecuted if they happened to be block-walking while a member had their mail ballot out. Tr. at 924:25–925:7.

170.    AFT's Temporary Political Organizers—its staff members who were previously responsible for coordinating its block-walking efforts and who continue to be responsible for recruiting and training the organization's volunteers and sharing information about the organization's priorities—have had to find creative ways to reach the same number of members they were able to reach on the doors. Tr. at 936:4–937:5. To keep up with this increased demand, AFT has had to hire double the number of Temporary Political Organizers that it had prior to SB 1. Tr. at 937:15–938:9. AFT anticipates that it will have to continue to do this for as long as SB 1 remains law. Tr. at 938:7–21.

171.    To pay for these new Temporary Political Organizers, AFT had to cut several cities out of its statewide campaign focused on the teacher staffing crisis. Tr. at 939:4–21.

172.    Now, when AFT's Temporary Political Organizers and volunteers are talking with members on the phone or at events, they attempt to keep the substance of their communications the same as it was on the doors, focusing on candidates and issues. But as Mr. Capo testified, AFT found that members had an influx of new questions about how SB 1 would change their experience voting. Tr. at 932:1–10. Members wanted to know when and how they could vote and what else they needed to do to comply with the law. *Id*.

173.    The Court finds that the time AFT staff and volunteers now have to spend answering questions about SB 1 has harmed its ability to focus on its mission and to advocate for the issues the organization supports. Instead of talking about what kind of support teachers need to maintain a successful classroom or how to advocate for more school funding, staff and volunteers are now spending their time answering questions about voting under SB 1. Tr. at 932:11–23. Because AFT

now must spend time addressing these questions, it has less time to dedicate to developing partnership institutes that engage parents in the public education process, implementing community schools, which provide outside-of-school support for students and families, and general organizing efforts so that AFT can engage and recruit new members. Tr. at 939:22–940:13.

174.    The Court also finds that SB 1 has not only harmed AFT as an organization—it has also harmed AFT's members. Because AFT members work in schools—and often schools located in different areas from where they live—they often relied on extended hour voting and drive-thru voting to be able to cast a ballot. Tr. at 942:6–11, 944:13–14. This was especially true in Harris County where many of AFT's most diverse members were impacted by the elimination of these voting methods. Tr. at 946:14–948:2

175.    The Court credits Mr. Capo's testimony that AFT members have had their mail ballots rejected because of SB 1's mail ballot provisions. For example, AFT members Alice Penrod and Elaine Jones[12] both had their mail ballots rejected because of SB 1. Tr. at 945:10–18. Alice Penrod is not sure she will ever be comfortable voting by mail again because of the additional hurdles the law imposes on absentee voting. Tr. at 1815:10–1816:16. Elaine Jones also worries that she may have trouble complying with SB 1's mail ballot provisions in the future. Tr. at 1793:21–1794:20. SB 1 has also had a chilling effect on AFT members' willingness to volunteer with the organization. They are often uncertain about how to properly comply with the law, and thus fear the risk they would assume if they were to misinterpret it. Tr. at 934:7–21.

176.    Likewise, as Mr. Capo testified, approximately 2,000 AFT members voted at drive-thru polling locations during the 2020 general election. Tr. at 942:18–23. These thousands of AFT

---

[12] Elaine Jones is a member of both AFT and TARA. Tr. at 1786:7–15.

members included significant numbers of Black and Latino voters, as each group constitutes approximately a third of AFT's membership in Harris County. Tr. at 943:6–16.

### C.   TARA

177.   The Texas Alliance for Retired Americans ("TARA") is the Texas state member of the National Alliance for Retired Americans, an organization with 4.5 million members that works on issues that affect seniors and retirees. Tr. at 1761:4–10. This includes work on issues like social security, Medicare, Medicaid, and pensions. *Id*. Many members of TARA are retired union members. Tr. at 1761:21–1762:1.

178.   TARA itself has chapters throughout Texas, including in Dallas, Fort Worth, Austin, Houston, San Antonio, Corpus Christi, Beaumont, and Port Author. Tr. at 1761:14–18. It is a non-partisan organization with a mission to ensure that seniors and retirees can enjoy the dignified retirement they have earned. Tr. at 1762:2–7.

179.   TARA educates and mobilizes its members and volunteers around issues impacting seniors, including the government pension offset for social security and the expansion of Medicaid within Texas. Tr. at 1762:8–19. To advance its views on these issues, TARA educates its members, including through monthly chapter meetings across Texas with members. Tr. at 1762:20–1763:4. TARA also holds rallies and community events to promote its views, and also uses social media and email to educate its members and the public. *Id*.

180.   TARA also asks its members to contact local, state, and federal officials to make sure their voices are heard on issues the group cares about. Tr. at 1763:9–15. This effort includes direct visits to legislative offices. *Id*.

181.   While TARA relies upon members and volunteers for its organizing work, it relies in particular on the efforts of its sole paid field organizer, Judy Bryant. Tr. at 1763:16–18. Ms. Bryant is a retiree living in Dallas who spent 32 years teaching in Texas schools. Tr. at 1760:4–10.

She has served as field organizer—a part-time paid position—for eleven years. Tr. at 1760:15–19, 1781:21–24. She is supported in her role by TARA's state president, its executive board, as well as chapter presidents across the state. Tr. at 1763:19–23. She also relies on the assistance of the TARA projects committee, which is made up of chapter presidents and other dedicated volunteers. Tr. at 1767:18–25. In addition to her salary, Ms. Bryant also has her travel expenses reimbursed by the organization. Tr. at 1781:25–1782:2.

182.    Although TARA is non-partisan organization, it does engage in issue advocacy and endorses local and state candidates based on their positions on issues relevant to TARA. Tr. at 1764:3–10. It also advocates for or against ballot measures impacting TARA's areas of concern. *Id.*

183.    As TARA's sole field organizer, Ms. Bryant is often responsible for this advocacy work, which frequently requires her to give presentations at the meetings of organizations with similar goals, speak or present at conventions, or table at non-TARA events and gatherings to advocate on issues. Tr. at 1764:11–18. While TARA also uses digital communication and phone calls for its advocacy, the organization (and Ms. Bryant) have found in-person advocacy to be most effective for engaging voters. Tr. at 1764:19–25. Also, while TARA is able to communicate on their action network email listserv, in-person advocacy allows it to reach non-TARA audiences. Tr. at 1765:1–10.

184.    Ms. Bryant herself does the "largest share" of this in-person advocacy for TARA, though chapter presidents sometimes participate as well. Tr. at 1765:11–18. She is personally familiar with how provisions of SB 1, such as Section 7.04, have impacted TARA's advocacy. Tr. at 1765:19–23.

Case 5:21-cv-00844-XR   Document 849   Filed 01/19/24   Page 54 of 116

185.    The Court finds that SB 1 has impacted TARA's advocacy efforts in two ways. First, Ms. Bryant is no longer willing to "accept or set up any tabling invitations or events" once "mail ballots go out" because she does not want to take the chance of a person "having a mail ballot" when she advocates on behalf of TARA. Tr. at 1765:24–1766:5. She is concerned "that would be against the provisions of this law," particularly since she is compensated for her work. *Id*. As a result, Ms. Bryant plans to cease any in-person advocacy "after the first week in October" before an election "because mail ballots are generally going out by that time in most counties." Tr. at 1766:6–9. But for SB 1, Ms. Bryant would engage in this work "right up to and including Election Day." Tr. at 1766:10–14.

186.    The Court finds that this restriction on TARA's in-person advocacy severely impacts its mission, particularly because voter engagement and advocacy efforts are most critical in the weeks leading up to an election. As Ms. Bryant explained, "the closer you can do some education and information sharing the closer to the time of someone voting" the more effective it will be, "because people tend to forget or not be familiar with an issue" and speaking with them "closer to actually [] voting makes a big difference." Tr. at 1766:15–23.

187.    The Court also finds that SB 1's mail ballot identification provisions have also harmed TARA and its members. TARA members reported that they were afraid to even apply for a ballot due to the complications imposed by the new process. TARA also heard from members who made a mistake on their application for a ballot, or ballot itself, and then had their application or ballot rejected. Tr. at 1767:6–12.

188.    Elaine Jones, a founding member of TARA, is an example of one of these TARA members who faced challenges voting by mail due to SB 1. Tr. at 1787:22–25 (testifying she is

currently a member and was a founding member in 2006). Ms. Jones is eighty years old and resides in San Patrico County, Texas. Tr. at 1785:25–1786:6. She is a lifelong resident of Texas. *Id*.

189.    Ms. Jones worked as a public-school teacher in Robstown, Texas, where she taught computer programming. Tr. at 1788:12–1789:2. She also spent 11 years teaching advanced academic honors computer programming in night school classes at a local junior college. Tr. at 1789:3–11. Since retiring as a teacher, she has continued to regularly work as a campaign manager for local candidates. Tr. at 1789:12–25. In the run up to an election, her work as a campaign manager means she "would be working seven days a week, ten hours a day." Tr. at 1791:10–19.

190.    Ms. Jones grew up in "a family that believed in voting" and registered to vote as soon as she was able. Tr. at 1790:3–8. She has been voting in Texas for approximately sixty years and considers herself a regular voter. Tr. at 1790:11–14.

191.     In the 2016, 2018, and 2020 elections, Ms. Jones voted by mail, in part because her continuing work as a local campaign manager makes it difficult to vote on election day. Tr. at 1790:25–1791:19. "So tak[ing] off time for voting" would mean "losing time from work," Tr. at 1791:10–19, for which she would not be compensated, Tr. at 1791:20–21; *see also* Tr. at 1792:3–7 (explaining she is assigned to work on election day).

192.    Ms. Jones describing voting by mail in these elections as "Very plain. Very ordinary. No problems." Tr. at 1791:8–9. She testified that, at least prior to her experiences in 2022, she preferred voting by mail. Tr. at 1798:10–11.

193.    Because of these positive experiences, Ms. Jones chose to again apply for a mail ballot for the 2022 election cycle. Tr. at 1793:11–12. She was familiar with the new mail ballot identification provisions of SB 1 through debates in the Texas legislature. Tr. at 1792:8–21. She

included her identification number on the ballot application when she returned it. Tr. at 1793:13–17.

194.     After submitting her application, Ms. Jones received her ballot for the March 2022 primary election. After returning the ballot, Ms. Jones received a notice telling her that she had failed to include the necessary identification number on her ballot. Tr. at 1793:21–1794:4. Ms. Jones felt "[h]umiliated, angry, [and] embarrassed" because she had been familiar with the provision and, as described below, had in fact been helping to educate other TARA members about the requirement. Tr. at 1794:5–8.

195.     Despite knowing about the identification requirement, missed the relevant field on the ballot because it was located under the envelope flap. Tr. at 1794:9–14. She is "very hesitant to say that it's impossible for [her] to make the mistake again" because she thought it would be "impossible for [her] to make the mistake the first time" given her knowledge of the law. Tr. at 1794:15–20. But as she explained, it is "just another hurdle" for those completing the application. *Id.*

196.     After receiving notice of the rejection, Ms. Jones attempted to cure her ballot online using a website provided on the notice. Tr. at 1794:21–1795:2.

197.     Ms. Jones assumed this would be simple for her—having taught computer programming for over three decades, she was "not scared of computers." *Id*. But after completing all the requirements on the website, including "[f]ill[ing] out all the forms," Ms. Jones said she received a "page not found" response. Tr. at 1795:3–9. She assumed she "did something wrong" and "tried it again" but received the same response after a second and third attempt. Tr. at 1795:10–12.

198.    Concerned about being able to cure her ballot in time March 2022 primary election the following week, Tr. at 1796:9–12, Ms. Jones took the ballot cure form to her local post office, which told her they could not guarantee delivering it by the following Monday—the last day to correct her ballot for it to count ahead of the next week's election. Tr. at 1795:19–23. As a result, she had to pay to send her cure form by FedEx in order for it to be delivered on time. Tr. at 1795:24–1796:8, 1804:22–1805:3 (explaining she lacked time to drive the paper form to her county seat, which was approximately 30 miles away).

199.    The Court credits Ms. Jones's testimony, finding her experience illustrates the harm SB 1's the mail ballot identification provisions pose to TARA because Texas law restricts absentee mail ballot voting to specific groups, including those 65 years of age or older—TARA's core constituency. Tex. Elec. Code Ann. § 82.003. Because many of TARA's members rely upon absentee voting, TARA undertook a massive education campaign for its membership to ensure they understood SB 1's new rules for absentee voting. Tr. at 1767:13–17.

200.    This education project required the TARA projects committee to focus on preparing content—including emails and social media posts—to communicate with members. Tr. at 1768:1–10. It also required members of the committee to spend time assisting chapters in distributing this content to members. *Id*. The projects committee also "planned and carried out three different webinars about applying for the ballot and voting a ballot." *Id*. Members like Elaine Jones helped distribute and present these different chapters, as well as other groups of seniors and retirees, who were concerned about the law. Tr. at 1792:22–1793:10.

201.    Ms. Bryant estimates the projects committee spent roughly 125 to 150 hours on this effort—a very considerable time for a relatively small organization whose volunteers are retirees. Tr. at 1768:11–16. This is far more time than TARA volunteers typically give to the organization,

but it was motivated by a fear of the impact SB 1's mail ballot provisions would have on TARA's older membership. Tr. at 1768:17–21. In fact, prior to SB 1, TARA typically just reminded members to vote but it did "not spend anywhere near this amount of time helping [members] navigate" the voting process. Tr. at 1768:22–1769:4; *see also* Tr. at 1782:9–17 (explaining TARA "had never gone into such detail" with efforts to educate members about voting). For example, prior to SB 1, TARA simply sent "one or two" emails to members in January to remind them to apply for mail ballots for the year, Tr. at 1782:18–24, as compared to its new extensive efforts.

202.    Having to redirect the project committee's efforts towards SB 1's mail ballot rules significantly harmed other TARA advocacy efforts. Historically, TARA had "[p]robably just two" people work on reminding members about mail ballot application deadlines, Tr. at 1782:25–1783:2, as compared to dedicating its entire projects committee to the effort. As a result, the committee abandoned efforts related to encouraging members to write and visit elected officials about the Social Security Fairness Act—a key TARA concern. Tr. at 1769:5–13. The group also had to "pull back" on advocacy efforts related to the expansion of Medicaid in Texas, Tr. at 1769:5–13, and also "cut back" on efforts related to pensions and cost of living adjustments, Tr. at 1777:18–1778:2.

203.    The Court finds that this diversion of staff and volunteer time towards absentee voting will continue going forward. TARA is already planning a similar voter education campaign for January and February 2024, when Texans will be applying for mail ballots for the year's elections—including the 2024 presidential election. Tr. at 1769:24–1770:4.

204.    Even though some TARA members gained familiarity with SB 1's new rules during the 2022 election cycle, many will be encountering these rules for the first time in 2024, including

"a great number of people turning 65 each year" and joining the organization. Tr. at 1770:5–16; *see also* Tr. at 1783:11–13 (testifying TARA will have to do this again even after 2024).

205.    Accordingly, SB 1's burdens on absentee voting will continue to require TARA to divert resources from its advocacy efforts around issues "like [Cost Of Living Adjustments], Medicaid, Medicare, social security," to assist members in navigating the voting process. Tr. at 1783:14–23.

### D.    Voto Latino

206.    Voto Latino is a 501(c)(4) non-profit social welfare organization dedicated to educating and empowering a new generation of Latino voters so that the Latino community can realize its full political power in the United States. Tr. at 3585:19–25.

207.    The Court heard testimony from Voto Latino's managing director, Ameer Patel, Tr. at 3585:11–12, who is responsible for overseeing the organization's day-to-day operations and ensuring the group carries forth its mission and programming, Tr. at 3586:1–5.

208.    As Mr. Patel explained, Voto Latino advances its mission by enfranchising Latino voters across its core states, including Texas. Tr. at 3586:6–17. Voto Latino's work involves direct communication with potential Latino voters via digital advertising, mail, SMS outreach, and in-person engagement. *Id*.

209.    Organizing in Texas is a major priority for Voto Latino because Latino voter participation in Texas trails national numbers for Latino turnout. Tr. at 3586:18–3587:6. For example, in the 2020 presidential elections, only 2.7 million of Texas's 6 million eligible Latinos cast a ballot—roughly 10 percent below the national Latino turnout rate of 54 percent. *Id*. Texas also has a rapidly growing Latino population and there will be 800,000 new Latino voters who will become eligible to vote in Texas ahead of the 2024 presidential election. *Id*. Voto Latino's mission involves helping to register those voters and ensuring they turnout to vote. *Id*.

210.   Voto Latino pursues its mission in Texas through three main bodies of work. The first is voter registration, where its objective is to connect with young Latinos in Texas who are unregistered to vote, and to provide them with the information necessary to successfully register to vote and make it on to the voter file. Tr. at 3587:16–22.

211.   Second, Voto Latino pursues get-out-the-vote activities where it communicates directly with Latino voters in Texas who are already registered to vote, and provides them with information necessary to cast a ballot successfully. Tr. at 3587:23–3588:2.

212.   Third, Voto Latino engages in voter advocacy work by communicating with Latino voters about issues important to the Latino community. Tr. at 3588:3–7. This involves informing Latino voters about where candidates stand on key issues, as well as informing them about upcoming ballot measures. *Id*.

213.   Voto Latino dedicates significant resources to each of these areas of work. This includes spending monetary resources on digital advertising and communications, Spanish language radio, texts, and other messaging, and staff time. Tr. at 3588:17–3589:10.

214.   Voto Latino first learned about SB 1 from local partners in Texas and closely monitored the bill as it made its way through the Texas legislature due to concerns about how it would impact Voto Latino's programming and the Latino community more broadly. Tr. at 3589:20–3590:19.

215.   In particular, Voto Latino was concerned that SB 1's restrictions on early voting options, including expanded hours voting, would harm Voto Latino's mission and Latino voters in Texas. Tr. at 3591:14–24. The Court credits Mr. Patel's testimony that Latino voters are disproportionately likely to hold hourly wage jobs that require them to be onsite during business hours, including in fields like hospitality, food services, and construction. *Id*. And that Voto Latino

48

believes access to expanded early voting hours is critical to enfranchising these members of the Latino community. Tr. at 3591:14–3592:5.

216.    Likewise, Voto Latino was concerned that the elimination of drive-through voting would make it harder for the voters with children or disabled family members that are part of the communities Voto Latino serves to exercise the franchise. Tr. at 3592:6–22. As Mr. Patel, testified, Voto Latino focused on promoting drive-thru voting as part of its Harris County voter education programming leading up to the 2020 general election. Tr. at 3588:8–16, 3589:11–19, 3592:6–22.

217.    And due to SB 1's restrictions on in-person mail ballot delivery (which effectively bans drop boxes), Voto Latino was concerned that SB 1 would place additional burdens on an already challenging mail ballot process—which Latino voters have not been able to utilize at the same rates as other voters—and thereby deter and prevent Latino voters from successfully voting absentee. Tr. at 3593:2–17.

218.    Voto Latino was also concerned about SB 1's mail ballot provisions and the additional barriers it adds to an already burdensome mail ballot process. Tr. at 3593:22–3594:9.

219.    As soon as SB 1 was enacted into law, Voto Latino redirected significant staff resources away from its traditional advocacy and get-out-the-vote programming to develop a response to the law's impact on Latino voters in Texas, as well as Voto Latino's operations in the state. Tr. at 3594:10–22.

220.    Voto Latino created digital content to disseminate to Latinos in Texas in order to alert them to how the law impacted their voting options in future elections. *Id*. These efforts required a significant reallocation of staff time from other important work. Tr. at 3594:23–3595:6. For example, Voto Latino pulled staff resources from work in Virginia and New Jersey—states

with rapidly-approaching gubernatorial elections at the time of SB 1's enactment in September 2021—in response to SB 1. Tr. at 3595:7–19.

221.    The Court finds SB 1's restrictions on various forms of early voting and absentee voting have significantly impacted Voto Latino's ongoing get-out-the-vote programming in Texas by restricting the methods by which Latinos can vote. Tr. at, 3595:7–19. This, in turn, has required Voto Latino to retool its get-out-the-vote efforts, including to inform voters that voting methods available to them in the past no longer exist or are restricted. Tr. at 3592:6–3593:1.

222.    SB 1 will require Voto Latino to continue diverting resources towards its get-out-the-vote programming—at the expense of its voter registration and voter advocacy programming—because Voto Latino expects more Latino voters to turn out to vote for the 2024 presidential election as compared to the 2022 election. Tr. at 3595:20–3596:5, 3601:23–3602:6. Accordingly, many Latino voters who voted in the 2020 presidential election under Texas's pre-SB 1 regime will only encounter SB 1's restrictions for the first time in 2024. Tr. at 3595:20–3596:5. Voto Latino therefore plans to spend significant resources educating Latino voters in Texas about SB 1's changes and the resulting limitations on their voting options. Tr. at 3595:20–3596:5.

223.    As a result of Section 4.12's ban on drop boxes, Voto Latino has had to alter its programming to focus on communicating information about the mail ballot return process to voters, while trying to find balance between communicating the details of how to comply with SB 1 to voters with ensuring that those details do not overwhelm voters to the point of deterring them from voting. Tr. at 3593:2–21.

224.    Voto Latino is specifically planning on launching three programs in 2024 in direct response to SB 1. The first is a program to target voters who requested a mail ballot but have not returned that ballot, based on data available from county and state officials. Tr. at 3596:6–17. Voto

Latino plans to engage these voters through targeted digital advertising, texting, and mail to provide them with information about how to successfully turn in their ballot. *Id.*

225.    The second initiative involves a "series of partnerships with influencers" who can reach young Latino voters, including local influencers in Texas, college athletes, and local DJs to help promote election-related materials to audiences in Texas, including about how to vote in light of SB 1.Tr. at 3596:18–23.

226.    Third, Voto Latino is building a campaign focused specifically on alerting voters who voted in Texas in the 2020 presidential election about SB 1's changes to election procedures. Tr. at 3596:24–3597:6. The purpose of this campaign is to inform voters about how certain methods of voting they used previously—such as drive-through voting or expanded early voting hours—may no longer be available. *Id.*

227.    Each of these initiatives were created to combat the impact of SB 1 on voters in 2024 and would not have come to pass but-for SB 1's sweeping changes to Texas's voting laws. Tr. at 3597:7–9, 3598:12–15; 3612:10–19; 3613:8–17.

228.    The Court similarly credits Mr. Patel's testimony that these efforts are different in kind from past changes Voto Latino has made to its programming in response to new election laws. Tr. at 3597:20–3598:11. SB 1 has "far-reaching impacts on almost all aspects of early voting" and burdens "a larger audience of Latino voters in the state that have utilized methods of voting in past elections that are no longer available to them." *Id.*

229.    Because Voto Latino has "not received extra funding as a result of SB 1," Tr. at 3598:16–3599:6; 3609:10–17, and does not have the resources to hire additional staff, these new initiatives will be funded and otherwise supported by diverting staff time from Voto Latino's voter registration efforts and issue advocacy. Tr. at 3590:20–3591:13, 3594:23–3595:6.

230.     As a result, Voto Latino expects to register fewer Latino voters in Texas in 2024 than it did in 2020 due to the diversion of its resources to get-out-the-vote efforts for already-registered voters burdened by SB 1. Tr. at 3598:16–3599:6.

231.     Voto Latino also expects "to reach fewer votes in the state of Texas for voter advocacy" work and have fewer "contacts or touch points" with voters about policies and candidates due to the diversion of resources to get-out-the-vote efforts. Tr. at 3598:16–3599:6; 3603:11–21.

232.     Enjoining those provisions of SB 1 that restrict or eliminate various forms of early and absentee voting would relieve Voto Latino of this ongoing diversion of resources. Tr. at 3601:10–18. If "methods [of voting] that Latinos have used in the past can remain intact," "those three additional campaigns . . . would no longer be required." *Id*.

233.     Voto Latino's diversion of resources from voter registration and voter advocacy work towards get-out-the-vote work is specifically due to SB 1. Tr. at 3604:18–24, 3606:21–3607:8. While other election laws were enacted in Texas around the same time as SB 1, like SB 1111, they impacted "different parts of [Voto Latino's]" mission. Tr, at 3606:21–3607:3. For example, SB 1111 impacted Voto Latino's "voter registration programming," not its get-out-the-vote and voter mobilization efforts. Tr. at 3612:10–25.

## VI.     State interests purportedly furthered by SB 1.

234.     Defendants and Intervenors assert that SB 1's challenged provisions promote three interests: (1) prevention, deterrence, and detection of election fraud; (2) uniformity in election administration; and (3) public confidence in election integrity. The evidence adduced at trial in fact shows SB 1 furthers none of these interests.

## A.    Fraud prevention.

### 1.    *General allegations of fraud.*

235.    The record at trial revealed little to no evidence of voter fraud in Texas. Tr. at 2009:11–18, 19–25. The rates of election fraud indictments and convictions in Texas is infinitesimally small, on the scale of "several 10 thousandths of one percent." Tr. at 2818:16–2819:5; *see also* Tr. at 2816:21–2817:11, 2818:5–9.

236.    The Court credits expert evidence showing that there have been only a few documented convictions of voter fraud across fifteen years and tens of millions of votes cast in Texas elections. Tr. at 2816:16–2817:11 (an investigation by then-Attorney General Greg Abbott revealed that from 2006 to 2009, approximately eight million people voted in Texas, but there were only five voter fraud convictions); Tr. at 2817:19–2818:9 (for the 11-year period from 2002 to 2012, approximately 35 million votes were cast in Texas in statewide or state legislative elections only, but there were only 18 convictions for individual voter fraud ); Tr. at 2818:16–2819:5 (for the 20-year period from 2012 to 2021, nearly 87 million people voted in Texas, but there were only 108 convictions or settlements of voter fraud).

237.    There was no evidence of systematic statewide fraud following the 2020 general election. Tr. at 4454:4–4455:16; *see also* Tr. at 2819:6–24 (noting investigation Harris County "found no evidence of systematic fraud").

238.    The Court also credits evidence from the State's own officials, notably former Election Division Director Keith Ingram, who testified that even during a global pandemic and a contentious presidential election, the 2020 general election was "smooth and secure." Tr. at 4456:6–11; *see also* Tr. at 4454:4–4455:16 (noting that Texas elections pre-SB 1 were in "good shape" and functioning as intended); *see also* Tr. at 2819:6–24, 2861:18–2862:2.

239.     As Mr. Ingram testified, the 2020 general election did not reveal any broad systemic statewide fraud concerning mail ballots in the state of Texas, and Texas has "never had any evidence of a systemic statewide fraud" regarding mail ballots. Tr. at 4454:4–9.

240.     As Mr. Ingram further testified during trial, the rate of fraud concerning mail ballots did not increase in Texas during the 2020 general election. Tr. at 4454:4–4455:16.

241.     Similarly, and significantly, "[t]he Secretary of State's Office did an analysis of the 2020 Election in four of the most populous counties, including Harris County and Collin County . . . and found no evidence of systematic fraud at all." Tr. at 2819:6–24.

242.     The Court credits the testimony from county election officials that there was, and is, no fraud emergency in Texas, *see* Tr. at 1006:21–1007:9, and that in their experience, voter fraud "is extremely rare and in most cases unintentional." Tr. at 856:11–19; *see also* , 856:6–10, 856:25–857:3, 914:13–915:1; Tr. at 1548:3–10; Tr. at 1006:21–1007:9, 1008:20–22; Tr. at 3823:4–3824:9, 3892:22–3893:1; Tr. at 1356:12–1357:9.

243.     As Dr. Mayer testified, "the provisions of SB 1 did not contribute to increased election security, largely because there's no evidence of any material levels of voter fraud, and no evidence that the requirements of SB 1 would have prevented instances of voter fraud." Tr. at 1959:9–14; *see also* Tr. at 2002:12–17 (SB 1 "was not related to or would have no effect on rates of voter fraud and wouldn't reduce the rate of voter fraud which was already vanishingly close to zero.").

2.     *Alleged mail ballot fraud.*

244.     The absentee voting rules in place before SB 1 already provided robust security checks against fraudulent voting. Tr. at 1940:3–25, 1941:9–11; Tr. at 3878:20–25, and there is "almost no evidence" of mail-related voter fraud before SB 1 was passed. Tr. at 2825:3–7; *see also*

Tr. at 1547:4–20; Tr. at 855:5–13; Tr. at 1296:3–7; Tr. at 3880:25–3881:8; *see also* Tr. at 1277:16–19; Tr. at 260:17–21.

245.    The State's generic concern that mail ballots are more susceptible to fraud because they are outside the control of election officials is not addressed at all by SB 1—the relevant provisions do not change the fact that mail ballots are outside the physical control of elections officials while in the custody of voters. Tr. at 3884:13–24.

246.    Similarly, any concerns that unsupervised drop boxes could be subject to risk of tampering or arson, *see* Tr. at 3854:21–3855:8, is undermined by the fact that countless voters in Texas (and around the country) deposit their ballots in mailboxes without the need for supervision, *see* Tr. at 4390:12–19.

**B.    Uniformity in election administration.**

247.    Texas comprises 254 geographically and demographically diverse counties. Tr. at 3140:5–12. And there is significant racial and economic diversity both across and within Texas counties. Tr. at 3022:14–22, 3058:25–3059:13; *see* Tr. at 3885:16–3888:21 (Denton County); Tr. at 162:4–163:4 (El Paso County); Tr. at 378:12–22 (Dallas County); Tr. at 3064:18–23 (Harris County); *see also* Tr. at 2832:14–2834:24 (describing demographic shifts and urbanization trends in Texas).

248.    Consequently, Texas counties have widely varying election-administration and resource needs. *See* Tr. at 884:5–16; *see also* Tr. at 4325:8–14 (recognizing benefits of granting flexibility)

249.    As current Director of Elections Christina Adkins agreed, "what works in Harris County may not work in Loving County." Tr. at 1827:10–18.

250.    Residents in different counties may vary in their English proficiency, access to broadband internet, and in their household resources, thereby affecting their need for voter

assistance, ability to obtain election information, and options for exercising their right to vote. *See* Tr. at 3890:1–25.

251.    Consequently, given the significant variation in the geography and demography across its 254 counties, Texas adopted a highly decentralized system of election administration, in which counties exercise significant control over the conduct of elections. Tr. at 1848:20–1849:11.

252.    In fact, SB 1's own changes to the rules governing early voting hours resists uniformity and sets *different* required times based on county population size. Tr. at 1575:13–18 (noting that SB 1's changes to early voting hours do not impose identical early voting hours on all counties); Joint Ex. 1 at 16–18, 18–19.

### C.    Public confidence and election integrity.

253.    To start, the Court credits both expert and county election officials' testimony that public confidence in Texas elections is generally high. Tr. at 3116:10–3117:6, 3139:6–19; Tr. at 2845:6–2846:3; Tr. at 3883:5–20.

254.    Texans "overwhelmingly concluded that the Texan election results were accurate" in 2020, regardless of party affiliation, with "76 percent of Republicans believ[ing] that the Texas election results were accurate." Tr. at 2845:21–2846:3.

255.    Nonetheless, when asked whether there are people *purposefully* casting doubt on the legitimacy of Texas's electoral system, Mr. Ingram candidly testified that "[t]here are such people" in Texas, Tr. at 1941:16–19, and Defendants and Intervenors have nowhere explained how SB 1's restrictions on voting will deter these cynical attempts to undermine election results.

256.    The mere fact that some people in Texas have recently chosen to promote baseless conspiracy theories about Texas elections does nothing to justify SB 1's burdens. LULAC Ex. 5 at 20, 58–60, 87–91; Tr. at 1356:12–1357:9; Tr. at 1959:5–14, 2002:12–17, 2010:5–13.

## PROPOSED CONCLUSIONS OF LAW

**I.      LULAC Plaintiffs have standing to obtain relief against Defendants.**

**A.      Legal standard**

257.      In order to establish standing, an individual must satisfy three requirements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To meet these elements, Plaintiffs need only to "demonstrate that it is more likely than not that" they have suffered an injury-in-fact, that the injury is traceable to Defendants, and that a favorable decision likely will redress the injury. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 328–29 (2007) (emphasis omitted).[13]

258.      An organization may establish standing in its own name if it meets the same test applicable to individuals—meaning that the organization has suffered an injury that is traceable to the defendants and redressable by a favorable decision. *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)).

259.      An organization also has standing to sue on behalf of its members—associational standing—when: (1) its members "have standing to sue in their own right," (2) the interests the plaintiff seeks to protect "are germane to the organization's purpose," and (3) the claim does not require the "participation of individual members in the lawsuit." *Funeral Consumers All., Inc. v.*

---

[13] LULAC Plaintiffs join Mi Familia Vota Plaintiffs' Joint Proposed Findings of Fact on the Legal Framework of Plaintiffs' Claims and reproduce here the corresponding legal standard for standing for the Court's convenience. *See* ECF No. 846 at ¶¶ 4–26.

*Serv. Corp. Int'l*, 695 F.3d 330, 343 (5th Cir. 2012) (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996)).

260.     For any given claim, only one plaintiff needs standing to obtain relief. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). "It is well settled that once we determine that at least one plaintiff has standing, [the court] need not consider whether the remaining plaintiffs have standing to maintain the suit." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014).

        1.     *Injury-in-fact.*

261.     To establish injury, a plaintiff must show they "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (internal quotation marks and citation omitted).

262.     "[T]he injury alleged as an Article III injury-in-fact need not be substantial; 'it need not measure more than an "identifiable trifle."'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quoting *Fowler*, 178 F.3d at 358).

263.     As such, "changing one's . . . plans . . . in response to an allegedly injurious law can itself be a sufficient injury to confer standing" if the change is "in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin, Tex.* 881 F.3d 378, 390 (5th Cir. 2018).

264.     Injury-in-fact can be shown where an individual intends to engage in future conduct "affected with a constitutional interest" that is "arguably proscribed" by law, and where "the threat of future enforcement…is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–64 (2014).

265.     Organizations can establish standing in one of two ways: by making a showing of organizational or associational standing. *OCA-Greater Houston*, 867 F.3d at 610.

266.     Organizational standing.An organization suffers an injury in its own right where a challenged law imposes a "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

267.     For an organization to show injury-in-fact under an organizational standing theory, it must show a "concrete and demonstrable injury" to its activities. The Supreme Court has held that "there can be no question" such a showing is made where a defendant's behavior has "perceptibly impaired" an organization's ability to fulfill its mission. *Id.* at 379.

268.     Accordingly, "[a]n entity can show an organizational injury by alleging that it must divert resources from its usual activities in order to lessen the challenged restriction's harm to its mission." *Lewis v. Hughs*, 475 F. Supp. 3d 597, 612 (W.D. Tex. 2020) (citing *Havens*, 455 U.S. at 379); *see also OCA-Greater Houston*, 867 F.3d at 612 *aff'd and remanded*, No. 20-50654, 2020 WL 5511881 (5th Cir. Sept. 4, 2020), *order withdrawn*, No. 20-50654, 2020 WL 6066178 (5th Cir. Oct. 2, 2020), and *rev'd and remanded sub* nom; *Lewis v. Scott*, 28 F.4th 659 (5th Cir. 2022).

269.     In the Fifth Circuit, spending money or resources on litigation itself, or on activities that are "routine," does not constitute injury-in-fact. But a demonstration "that diversion of resources ... concretely and 'perceptibly impair[s]' the [organization's] ability to carry out its purpose" is sufficient. *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 351, 353 (5th Cir. 2023) (alterations in original) (citation omitted). And that diversion need not be significant; an organization need only show that "it had to expend additional time beyond . . . routine activities" and to "divert resources away from particular projects." *Vote.org v. Callanen*, 89 F.4th 459, 471 (5th Cir. 2023) (internal quotation marks and cite omitted).

270.     Where an organization whose mission is to promote civic engagement and voter turnout is able to reach fewer voters because of defendant's behavior, this impact on the group's mission is sufficient to constitute injury in fact. *Id.* at 354. Similarly, an organization whose mission is to "provide counseling and referral services for low-and moderate-income homeseekers" has been perceptibly impaired where a defendant's racial steering practices drained the organization's resources, thus allowing it to provide services to fewer community members. *Havens*, 455 U.S. at 379.

### i.     Associational standing.

271.     The test for associational standing requires the group to show its individual members have standing, and that "the interests the association seeks to protect [are] germane to its purpose." *OCA-Greater Houston*, 867 F.3d at 610.

272.     "Even in the absence of injury to itself" an organization "may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). When asserting associational standing, an organization does not need to show that all of its members have been injured. *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 284–85 (1986). Rather, the organization may show that "any one of [its members]" is suffering the type of injury "that would make out a justiciable case had the members themselves brought suit." *Warth*, 422 U.S. at 511.

273.     Individual members also do not need to participate in the proceedings so "long as resolution of the claims benefits the association's members and the claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010). Indeed,

the participation of any individual member is only required to the extent that "whatever injury may have been suffered is peculiar to the individual member." *Warth*, 422 U.S. at 515.

274.    "Organizations, like individuals, [also] enjoy rights to free speech, free exercise, and equal protection of the laws." *Caractor v. City of New York Dep't of Homeless Servs.*, No. 11 CIV. 2990 DLC, 2013 WL 2922436, at *3 (S.D.N.Y. June 14, 2013) (citing *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936)). Like individuals, an organization does not need to affirmatively violate a law to have standing to challenge it. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 579–82 (2023) (considering company's First Amendment pre-enforcement challenge). Instead, the plaintiff need only "aver[] that it intend[s] to do so in the future." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 927 n.23 (5th Cir. 2023) (citing *303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021)). In the First Amendment context, the injury prong is established where either an organization or an individual demonstrates "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted).

### 2.    *Causation and traceability.*

275.    To establish causation and traceability for standing, Plaintiffs need to show that there is "a causal relationship between the injury and the challenged conduct," meaning the injury can be fairly traced to Defendants' challenged conduct and did not result "from the independent action of some third party not before the [C]ourt." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 663 (1993) (internal quotation marks and citation omitted). Injuries are fairly traceable where the defendant's conduct *contributes* to a plaintiff's injuries, *even if it is not the sole cause of those injuries*. *Massachusetts v. E.P.A.*, 549 U.S. 497, 523 (2007).

276.    Similarly, the traceability requirement is not a proximate cause standard; it can be satisfied with a showing that the alleged injury was only indirectly caused by the defendant. *Bennett v. Spear*, 520 U.S. 154, 168 (1997).

3.    *Redressability.*

277.    An injury is redressable when it is "likely" as opposed to merely "speculative" that a decision in a plaintiff's favor would grant the plaintiff relief. *OCA-Greater Houston*, 867 F.3d at 610.

278.    A plaintiff does not need to demonstrate that a favorable decision will "relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). They only need to show that a decision in their favor will "relieve a discrete injury to [them]self." *Id.* Even "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 141 S. Ct. 792, 801 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)); *see also Netsphere, Inc. v. Baron*, 703 F.3d 296, 314 (5th Cir. 2012) (explaining so long as "there is some means by which [the court] can effectuate a partial remedy, [there] remains a live controversy" (citation omitted)).

279.    Plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement by "demonstrat[ing] 'continuing harm or a real and immediate threat of repeated injury in the future.'" *James v. Hegar*, 86 F.4th 1076, 1081 (5th Cir. 2023) (quoting *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992)). A threatened future injury suffices for standing so long as "there is a substantial risk that the harm will occur." *Nat'l Press Photographers Ass'n v. McCraw*, No. 22-50337, 2024 WL 105019, at *5 (5th Cir. Jan. 10, 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 158).

**B.      LULAC Plaintiffs have shown injury in fact.**

      1.      *LULAC*

280.      After careful review of the record, this Court finds that LULAC has established an injury-in-fact for each of its claims at this phase of trial.

281.      First, LULAC is suffering an ongoing injury attributable to Section 7.04. The evidence at trial showed that the organization's own speech—specifically around its voter registration, voter assistance, and get-out-the-vote efforts—has been chilled. Tr. at 1656:19–1657:12.

282.      LULAC's President testified that LULAC volunteers in Houston were "not going to touch any seniors" as part of their get-out-the-vote efforts for municipal elections because of "fear that they could be subject to prosecution if they help seniors vote by mail." Tr. at 1655:10–18. Instead of LULAC's ordinary work assisting seniors, the members in Houston are "only going to be working with those under 65 for fear that they could be subject to prosecution." *Id.*

283.      Similarly, the Court heard uncontested evidence that LULAC Councils within Tarrant County stopped get-out-the-vote programming altogether for fear of prosecution. Tr. at 1654:2–1657:19. Previously, the Councils would use volunteers to help seniors, many of whom had physical disabilities, fill out applications and ballots. *Id.* The fact that LULAC's volunteers receive modest compensation in the form of raffle tickets, food, and gasoline money, places them within reach of Section 7.04. *Id.* LULAC has thus established an intention, as an organization, to engage in conduct arguably proscribed by SB 1 Section 7.04. *See 303 Creative LLC*, 600 U.S. at 579–582; *Susan B. Anthony List*, 573 U.S. at 159. This Court also finds that LULAC has suffered a diversion of resources injury from the mail ballot identification and drop box provisions.

284.      The evidence showed that SB 1 caused LULAC to expend resources by, for the first time, creating a statewide voter education campaign to educate its members and other voters. Tr.

at 1650:6–19, 1652:25–1653:11; 1679:21–1680:4. Specifically, LULAC launched a statewide bus tour and held town hall meetings across Texas to educate its members and other voters about SB 1's mail ballot identification requirements and other restrictions on voting methods popular with Latinos. *See, e.g.*, Tr. at 1650:6–19; 1680:23–1681:3. LULAC spent "thousands of dollars" and significant staff and volunteer time to launch this voter education campaign. Tr. at 1650:20–1651:7, 1652:16–24.

285.    The evidence further showed that LULAC will have to continue these efforts in future election years to counteract the continuing and cumulative impacts of SB 1. Tr. at 1652:25–1653:11.

286.    While LULAC's voter education efforts also included limited advocacy around SB 1111, a different voter suppression law, the evidence showed that LULAC's efforts were primarily focused on SB 1. Tr. at 1668:2–9, 1680:5–17.

287.    The resources redirected to LULAC's voter education campaign were diverted from LULAC's education, scholarship, voter registration, and naturalization and citizenship programs and events. Tr. at 1652:16–24. These programs and events are important to LULAC's mission "to improve the lives of Latino families throughout the United States" and "to protect their civil rights in all aspects." Tr. at 1633:10–18. Indeed, LULAC's representative testified that the organization has regularly provided educational programming to prepare Latino students for elementary school and college, assisted families in securing public health care, participated in community response initiatives, and conducted voter registration and get-out-the-vote efforts to help members of the Latino community vote. Tr. at 1638:25–1639:18, 1641:5–1642:3, 1645:23–1646:5. These programs relevant to LULAC's mission have suffered as a result of the organization's diversion of resources to voter education programming. Tr. at 1650:9–1653:11.

288.   LULAC's diversion of resources, including money and staff and volunteer time, was sufficient to establish LULAC's injury-in-fact. *OCA-Greater Hous.*, 867 F.3d at 610–12 (explaining the injury-in-fact requirement is "qualitative, not quantitative, in nature" and that said injury does not need to be large (quoting *Fowler*, 178 F.3d at 358)).

289.   This Court also finds that LULAC's members have suffered injuries sufficient to grant LULAC associational standing.

290.   LULAC is a membership organization with approximately 4,000 to 5,000 dues-paying members and roughly 80,000 to 90,000 "eMembers" in Texas. Tr. at 1637:3–7. LULAC has approximately 30 to 40 councils across the state, including in Dallas, San Antonio, Houston, and El Paso. Tr. at 1634:6–20. A significant portion of LULAC's membership resides within Harris County. Tr. at 1648:2–8. LULAC's members range from high school students to veterans. Tr. at 1637:8–18.

291.   LULAC satisfies the first element of associational standing because its members have been, and will continue to be, injured by each of the provisions of SB 1 challenged by LULAC in this phase. Many LULAC members—particular its senior members—rely on absentee voting, which has been made more difficult for the many members who are senior or for whom English is not their first language. Tr. at 1648:22–1650:5.

292.   For example, LULAC member Rosalyn Weisfeld's mail ballot application was rejected twice due to SB 1. Tr. at 1653:12–1654:1. Ms. Weisfeld, like many LULAC members, has a disability. *Id*. The burdens LULAC members have faced voting by mail as a result of SB 1 creates an associational injury with respect to the mail ballot identification provisions.

293.   Many LULAC members and volunteers also regularly conduct, and receive compensation for, in-person get-out-the-vote, voter assistance, and advocacy efforts, but Section

7.04 has had a "chilling effect on [LULAC's] members" and their ability to participate in LULAC's voter engagement efforts. Tr. at 1654:2–1657:19. LULAC has therefore demonstrated associational injuries attributable to Section 7.04.

294.    LULAC also satisfied the remaining prerequisites to pursue relief for an injury to its members. The interests in this suit are germane to LULAC's mission of protecting the civil rights of Latino families in the U.S. and Texas, including by ensuring that Latinos are able to "choose candidates of their choice." Tr. at 1644:22–1645:15, *see also* Tr. at 1633:10–21. And no LULAC member was required to specifically participate as a party to this case because LULAC provided competent representative evidence of the injuries to its members. *Warth*, 422 U.S. at 515. Thus, LULAC has proven it has associational standing.

    2.    *AFT*

295.    The Court next finds that AFT has established an injury-in-fact for each of its claims at this phase at trial.

296.    First, with respect to its First Amendment claim challenging Section 7.04, the Court concludes AFT is injured directly as an organization because the voter interaction ban has chilled AFT's ability to communicate with its members and the public through its block-walking program.

*297.*    AFT's volunteer block-walkers knock on the doors of other AFT members to discuss the issues and candidates the union supports, and receive modest compensation for their efforts. Tr. at 928:10–929:3, 929:6–930:5. The organization's leadership was forced to shift away from block-walking due to fear that its staff and volunteers would be prosecuted for violating Section 7.04, and AFT's organizing efforts have suffered now that it has had to resort to other, less personal (and less effective) methods of reaching voters. Tr. at 924:25–925:7. AFT's representative at trial averred that the organization would like to resume its block-walking program but is chilled from doing so due to Section 7.04. *See 303 Creative LLC*, 600 U.S. at 579–582; *Susan B. Anthony*

*List*, 573 U.S. at 159. AFT has therefore suffered a direct injury to its own speech as an organization.

298.   This Court also finds that AFT has been forced to divert resources in response to the voter interaction ban, the mail ballot identification provisions, and the drop box ban, as required for organizational standing.

299.   The evidence at trial showed that, by discouraging AFT's use of volunteer block-walkers, the organization has been forced expend resources to hire additional temporary political organizers to engage members. AFT's representative testified that the need to hire these temporary political organizers has also been driven by the dramatic influx of questions the organization now receives related to SB 1, including its new mail ballot identification rules. Tr. at 937:15–17. For example, AFT staff and volunteers now spend additional time helping members determine when and how they are going to vote given SB 1's new restrictions on voting methods and extended hours voting. Additionally, AFT staff and volunteers have been forced to field calls about which forms of identification they need to reference for their mail ballots to be counted. Tr. at 931:25– 932:10. The evidence also showed that AFT will have to continue to expend resources on hiring additional staff to answer these types of questions for as long as SB 1 remains law. Tr. at 938:7– 21. The evidence therefore shows that AFT has been forced to redirect its limited resources to hire paid temporary political organizers in lieu of volunteer block-walkers.

300.   The resources AFT redirected towards doubling its number of paid temporary political organizers diverted resources away from AFT's community school programming, which provides outside-of-school support for students and families, as well as its general organizing efforts that enable AFT to recruit new members. Tr. at 939:22–940:13. These programs relate

directly to AFT's mission of advocating for good working conditions for the students and families it serves. Tr. at 922:2–22.

301.    AFT's diversion of resources, which includes both financial resources and staff and volunteer time, is sufficient to establish that it has suffered an injury-in-fact because of SB 1. *OCA-Greater Hous.*, 867 F.3d at 610–12.

302.    The Court also finds that AFT has established injuries to its own members sufficient for associational standing, specifically as to the mail ballot identification provisions and voter interaction ban.

303.    AFT is a membership organization with about 66,000 members across Texas. Tr. at 923:18–25. AFT members are diverse in terms of geography, age, race, and ethnicity. About two thirds of the AFT members who are registered to vote are Black or Latino. Tr. at 924:3–6.

304.    AFT satisfies the first element of associational standing because the evidence at trial showed that its members have been, and will continue to be, injured by the mail ballot identification rules. The Court heard direct testimony that AFT members Alice Penrod and Elaine Jones both had their mail ballots rejected as a direct result of the additional hurdles SB 1 has imposed on the voting process. Tr. at 945:7–22.

305.    AFT also satisfies the remaining prerequisites to pursue relief on behalf of its members under an associational standing theory.

306.    The interests in this lawsuit are germane to AFT's mission of advocating for high-quality public education for students, families, and communities. Tr. at 922:2–22. Ensuring that its members can vote and that candidates who support pro-education policies are elected is critical to realizing AFT's mission. *See, e.g.*, *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996).

307.    Finally, AFT's claims against SB 1 do not require the participation of its members in this lawsuit as parties, particularly since the Court heard direct testimony from two AFT members describing the harm that SB 1's mail ballot identification rules caused them.

### 3.    *TARA*

308.    The Court next finds that TARA has adequately established an injury-in-fact as to each of the provisions it challenges in Phase 1.

*309*.    TARA established at trial that its own organizational speech is chilled by Section 7.04. Specifically, TARA's paid field organizer, Judy Bryant, testified to how her advocacy work is chilled by the voter interaction ban, particularly at the point in time when mail ballots have been distributed to voters. Tr. at 1765:24–1766:14. As a result, she has been discouraged from participating in the voter engagement efforts she wishes to perform—such as tabling in public places and speaking with voters on issues critical to TARA—in the critical weeks leading up to an election. This suffices to show an injury to TARA's own speech. *See 303 Creative LLC*, 600 U.S. at 579–582. And it injures TARA as an organization since it may no longer devote its paid field organizer to certain kinds of political advocacy in the run up to an election.

310.    TARA has also established a diversion of resources injury sufficient for organizational standing. Prior to SB 1, TARA did not dedicate significant resources to educating its own members about how to vote absentee. Tr. at 1768:22–1769:4, 1782:9–24.

311.    Ms. Bryant testified that TARA dramatically expended resources on a massive education campaign for its membership to ensure members understood SB 1's mail ballot identification provisions, including by directing TARA's projects committee away from all existing projects. Tr. at 1767:13–1769:13. The evidence also showed that before SB 1, TARA did not dedicate significant time to educating its members on how to navigate the voting process, sending

only "one or two" emails reminding members to apply to vote absentee in January. Tr. at 1768:22–1769:4, 1782:9–24.

312.     The Court finds that TARA diverted these resources away from its other advocacy efforts, including its advocacy surrounding Cost of Living Adjustments, Medicaid, Medicare, and social security. Tr. at 1783:14–23. The Court also finds this diversion will continue into the future—Ms. Bryant testified that TARA is already planning similar voter education campaigns for January and February 2024, again at the expense of other priorities. Tr. at 1769:24–1770:4. The diversion reduces TARA's already limited resources and impairs its ability to work on issues that affect seniors and retirees, including social security, Medicare, Medicaid, and pensions. Tr. at 1761:4–10; 1783:14–23.

313.     TARA therefore has shown a diversion of resources injury attributable to the mail ballot identification provisions.

314.     The Court also finds that TARA has established injuries to its members sufficient for associational standing.

315.     TARA is part of the Alliance for Retired Americans, an organization with 4.5 million members. Tr. at 1761:4–10. TARA has chapters throughout Texas, including in Dallas, Forth Worth, Austin, Houston, San Antonio, Corpus Christi, Beaumont, and Port Author. Tr. at 1761:14–18. TARA has monthly chapter meetings across Texas, which are attended by its members. Tr. at 1762:20–1763:4.

316.     TARA satisfied the first element of associational standing because TARA members have been, and will continue to be, injured by SB 1. TARA's members—who are overwhelmingly retirees and seniors—rely on absentee voting.

317.    This includes members like Elaine Jones, who testified that her mail ballot was rejected during the November 2022 general election because of SB 1. Tr. at 1790:25–1791:21, 1793:21–1794:4. After being unable to cure using the State's online Ballot by Mail Tracker, Tr. at 1795:1–18, Ms. Jones was forced to pay out of pocket to mail her revised ballot to her county by Election Day. Tr. at 1795:24–1796:8, 1804:22–1805:3.

318.    Her experience is confirmed by testimony from Ms. Bryant about widespread complaints from TARA members too fearful to apply for mail ballots because of the complications SB 1 added to the mail ballot process, coupled with widespread reports of astronomic rejection rates. Tr. at 1767:6–12. Members also reported making mistakes on their mail ballot applications and ballots, leading to rejections of each. *Id.*

319.    TARA has therefore shown that its own members have suffered injuries from the mail ballot identification provisions that may be vindicated under an associational standing theory.

320.    TARA has also shown an additional associational standing injury through Ms. Bryant's own chilled speech. In addition to the harm this chill causes TARA as an organization, it is also a direct harm to one of TARA's members—Ms. Bryant herself.

321.    TARA has satisfied the remaining associational standing prerequisites to pursue relief for these injuries to its members. The interests in this suit are germane to TARA's purpose as an organization—to advocate for the political rights of its members. Furthermore, no individual TARA member was required to participate in this proceeding as a party, particularly in view of the direct testimony of two TARA members—Ms. Bryant and Ms. Jones.

### 4.    *Voto Latino*

322.    This Court also finds that Voto Latino has adequately established an injury-in-fact for each of the provisions it challenges in Phase 1.

323.    First, it has established a diversion of resources injury caused by SB 1's mail ballot and drop box provisions, which restrict methods of voting that Voto Latino promotes as part of its get-out-the-vote work. Tr. at 3593:2–21, 3593:22–3594:9.

324.    As a result, Voto Latino diverted resources from its two other major bodies of work in Texas—voter registration and advocacy—to launch three programs specifically aimed at redressing the burdens that SB 1 imposes on its get-out-the-vote efforts. The first program identifies voters who request, but do not successfully return, absentee mail ballots—a direct response to the dramatic rise in mail ballot rejection rates due to SB 1. Tr. at 3596:10–17. Once it identifies such would-be voters, Voto Latino plans to spend money on targeted digital advertising, texting, and mail to educate these voters on, and encourage them to cast, mail ballots. *Id*.

325.    The second program is "a series of partnerships with influencers" to help promote election-related materials to young Latino voters in Texas—a concern triggered by SB 1's targeting of voting methods popular with Latino voters in urban Harris County. Tr. at 3596:18–23.

326.    The third program is a campaign focused on alerting those who voted in the 2020 Presidential Election about SB 1's changes to election administration given widespread confusion about these changes. Tr. at 3596:24–3597:6.

327.    The evidence showed that these efforts were in response to SB 1 and intended to counteract SB 1's impacts on Latino voters served by Voto Latino leading into the 2024 elections. Tr. at 3597:7–9, 3598:12–15, 3612:10–19, 3613:8–17. It also showed that Voto Latino has and will continue to divert resources, including staff time, from mission-critical voter registration and voter advocacy work because of its response to SB 1's impairment of its get-out-the-vote work. Tr. at 3594:23–3595:19, 3603:11–21.

328.    This diversion has come at the expense of Voto Latino's other programming in Texas. Because of this drain on its voter registration resources, Voto Latino expects to register fewer Latino voters in Texas in 2024 than it did in 2020, Tr. at 3598:16–3599:6, and to engage with fewer voters about policies Voto Latino supports. Tr. at 3598:16–3599:6, 3603:11–21. Voto Latino must divert these resources from its voter registration work because it has "not received extra funding as a result of SB 1," Tr. at 3598:16–3599:6, nor does it have the resources to hire additional staff, Tr. at 3594:23–3595:6.

329.    While Voto Latino also diverted resources away from mission-critical work in response to SB 1111—a bill that introduced new restrictions on voter registration—in addition to SB 1, the Court finds, based on the evidence presented in this case, that each bill affected different aspects of Voto Latino's programming, and the organization's diversion of resources in response to SB 1 is clearly established. Tr. at 3606:21–3607:3, 3611:8–25, 3612:20–3613:4. SB 1111 impaired Voto Latino's voter registration activities, which are entirely distinct from SB 1's impacts on Voto Latino's get-out-the-vote efforts—indeed, the provisions of SB 1 at issue in this lawsuit do not address voter registration at all. And Voto Latino's representative credibly testified that the organization was forced to *divert resources away* from its voter registration activities to respond to SB 1. Tr. at 3598:16–3599:6. That diversion of resources—away from voter registration and advocacy, and redirected towards educating and assisting Voto Latino's constituents in navigating the voting restrictions imposed by SB 1—by definition responds to only one bill: SB 1.[14]

---

[14] Mr. Patel's testimony that Voto Latino diverted resources from its voter registration activities exclusively because of SB 1 distinguishes this case from *Texas State LULAC v. Elfant*, 52 F.4th 248 (5th Cir. 2022), where Voto Latino's representative testified that the organization diverted resources as a result of the law challenged in that case "and other" laws. 52 F.4th at 254.

330.    It is immaterial that Voto Latino's representative could not, at a granular level, identify the precise monetary diversion in response to each bill—organizations do not need to quantify the precise dollar amount or volunteer time expended because of a challenged law to establish injury. *OCA-Greater Hous.*, 867 F.3d at 610–12; *see also Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (citing the principle that "the fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury" (internal quotation omitted)).

331.    The evidence also showed that Voto Latino will continue to expend resources to combat SB 1 since it anticipates that voters who did not vote in 2022 will vote in 2024 and therefore encounter, and need to be educated about, SB 1's requirements for the first time. Tr. at 3595:20–3596:5, 3601:23–3602:6. Moreover, the evidence showed that the efforts Voto Latino employed to combat SB 1 were different from its response to prior election laws given the "far-reaching impacts on all aspects of early voting" and the large population of Latino voters SB 1 impacts. Tr. at 3597:20–3598:11.

332.    Voto Latino's diversion of resources, including money and staff and volunteer time, was sufficient to establish its injury-in-fact. *OCA-Greater Hous.*, 867 F.3d at 610–12.

**C.    LULAC Plaintiffs' injuries are traceable to Defendants.**

333.    As explained, the Court finds the LULAC Plaintiffs each demonstrated injuries-in-fact sufficient for their claims in this phase.

334.    The Court also finds that Plaintiffs' injuries are traceable to Defendants. *See Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 663.

335.    To start, the Court finds that LULAC Plaintiffs' injuries are traceable to the County Defendants because the County Defendants have a statutory duty to enforce the non-criminal

provisions of SB 1.[15] This includes responsibility for presiding over the early voting place, accepting voters for in-person voting, and "review[ing] each application for a ballot to be voted by mail." Tex. Elec. Code § 86.001(a). The County Defendants also "shall reject [an] application" of a person who does not show entitlement to vote absentee. *Id.* § 86.001(c). County Defendants also are responsible for establishing in-person drop-off of mail ballots, and they must receive "in-person delivery by the voter who voted the ballot," *id.* § 86.006(a)(3), (a-2), and are responsible for recording the voter's name, signature, identification, and attesting to the voter's compliance on an official roster, *id.* § 86.006 (a-2).

336.    The Court therefore finds that LULAC Plaintiffs' injuries caused by the mail ballot identification provisions and drop box ban are traceable to the County Defendants—the officials responsible for enforcing SB 1's restrictions on these voting methods.

337.    Any resources diverted by LULAC Plaintiffs in response to these provisions "result[ed] from counteracting" the County Defendants' enforcement of these statutory duties, *Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir, 2000), satisfying traceability for organizational standing claim. *See Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 663.

338.    Similarly, any injuries suffered by the LULAC Plaintiffs from Section 7.04 are traceable to the County District Attorney Defendants, who have "the specific duty" to prosecute "election law violations." *State v. Stephens*, 663 S.W.3d 45, 52 (Tex. Crim. App. 2021), *reh'g*

---

[15] When a county in Texas elects to create the position of Election Administrator, that office assumes the duties of, among others, the voter registrar and the county clerk. *See* Tex. Elec. Code §§ 31.031, 31.043. Likewise, the "county clerk is the early voting clerk for the county" in primary elections, general elections for state and county officers, and a special election ordered by the governor. *Id.* § 83.002.

*denied,* 664 S.W.3d 293 (Tex. Crim. App. 2022) (mem.); *see also See* Tex. Elec. Code § 273.001 (granting county and district attorney's authority to investigate election crimes).

339.    None of the County District Attorney Defendants have disavowed enforcement and, indeed, may *not* disavow such enforcement. *See* Tex. Loc. Gov't Code Ann. § 87.011(3)(B) (prohibiting district attorneys from adopting an enforcement policy of refusing to prosecute a type or class of criminal offense); *see also KVUE, Inc. v. Moore*, 709 F. 2d 922, 930 (5th Cir. 1983) (holding that plaintiffs had standing to pursue a pre-enforcement challenge in part because "the state has not disavowed enforcement"), *aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S. 1092 (1984).

340.    The chill that the LULAC Plaintiffs are directly suffering as organizations, as well as the chill suffered by their members and volunteers, is therefore traceable to the enforcement power of the County District Attorney Defendants.

341.    LULAC Plaintiffs' injuries from Section 7.04 are also traceable to the Attorney General who, even post-*Stephens*, retains "broad investigatory powers" under the Texas Election Code, State's Br. at 49, *LUPE v. Scott*, No. 22-50775 (5th Cir. Dec. 9, 2022), ECF No. 62, and may "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* Tex. Elec. Code § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them). On top of this investigatory power, "the Attorney General can prosecute with the permission of [a] local prosecutor," *Stephens*, 663 S.W.3d at 55, and no County District Attorney Defendant has disavowed a willingness to let the Attorney General pursue cases within their counties.

342.    Plaintiffs' injuries are also traceable to the Secretary of State. As the state's chief election officer, the Secretary is tasked with "obtain[ing] and maintain[ing] uniformity in the

application, operation, and interpretation" of the State's election laws, including SB 1. Tex. Elec. Code §§ 31.001(a), 31.003; *OCA-Greater Hous.*, 867 F.3d at 613 (the facial invalidity of a Texas election statute is, "without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state'" (quoting Tex. Elec. Code § 31.001(a)).

### D.    LULAC Plaintiffs have shown redressability.

343.    Finally, the Court finds each of the LULAC Plaintiffs' injuries are "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338. As numerous representatives testified for the LULAC Plaintiffs, their organizations are continuing to divert resources in response to SB 1. *See supra* Findings of Fact, Section V. Enjoining the challenged provisions of the law will relieve LULAC Plaintiffs from this ongoing diversion, *OCA-Greater Houston*, 867 F.3d at 610, 614, and further ensure that their members are no longer burdened by the mail ballot identification rules and the drop box ban.

344.    Separately, an order declaring that Section 7.04 is unlawful and enjoining its enforcement will remove the chill that the provision presently imposes on LULAC Plaintiffs and their members. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (finding "redressability prong[] of the standing inquiry . . . easily satisfied" where "[p]otential enforcement of the statute caused the [plaintiff's] self-censorship, and the injury could be redressed by enjoining enforcement of the [statute]"); *Nat'l Press Photographs Ass'n v. McCraw*, 504 F. Supp. 3d 568, 582 (W.D. Tex. 2020) (similar), *aff'd,* No. 22-50337, 2024 WL 105019 (5th Cir. Jan 10, 2024).

## II.    The challenged provisions unduly burden the right to vote.

345.    Turning to the merits of LULAC Plaintiffs' claims, the Court concludes that they have demonstrated that the mail ballot identification provisions and the drop box ban unduly

burden the right to vote, particularly when viewed with the surrounding context of SB 1's restrictions on other voting methods.

### A.    Legal standard for *Anderson-Burdick* claims.

346.    Where a state election rule restricts or burdens the right to vote, as protected by the First Amendment or Fourteenth Amendments, "courts apply a balancing test derived from two Supreme Court decisions." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190–91 (2008) (controlling op.).[16]

347.    *Anderson-Burdick* is a "flexible standard" under which a challenge to a state election practice is evaluated by balancing the character and magnitude of the burden the practice imposes on the right to vote against the justifications offered by the state in support of it. *Burdick*, 504 U.S. at 434; *Texas Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996).

348.    Under the *Anderson-Burdick* framework, courts must "weigh the 'character and magnitude of the asserted injury' . . . against 'the precise interests put forward by the State . . . ,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

349.    Because it is a "flexible standard," the *Anderson-Burdick* framework "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *Crawford*, 553 U.S. at 191 (controlling op.) (recognizing there is no "litmus test for measuring the severity of a burden that a state law imposes"). Rather, "the rigorousness of [the] inquiry . . . depends upon the extent to

---

[16] LULAC Plaintiffs join Mi Familia Vota Plaintiffs' Joint Proposed Findings of Fact on the Legal Framework of Plaintiffs' Claims and reproduce here the corresponding legal standard for the *Anderson-Burdick* claim for the Court's convenience. *See* ECF No. 846 at ¶¶ 27–37.

which a challenged regulation burdens" the right to vote. *Burdick*, 504 U.S. at 434. If the challenged law imposes a severe burden, it "must be narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But even when a law imposes only a slight burden on the right to vote, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (controlling op.) (quoting *Norman*, 502 U.S. at 288–89); *see Veasey v. Abbott*, 830 F.3d 216, 248 & n.19 (5th Cir. 2016) (en banc) (rejecting "argument that *Crawford* mandates upholding [the challenged law] simply because the State expressed legitimate justifications for passing the law"); *see also id.* at 274–75 (Higginson and Costa, JJ., concurring). Thus *any* burden imposed by the challenged restriction must be supported by "interest[s] sufficiently weighty to justify the limitation." *Norman*, 502 U.S. at 288–89.

350.    When evaluating the character and magnitude of the burdens under *Anderson-Burdick*, courts may also consider the challenged law's impact on subgroups for whom the burden is more severe, even if that involves a "limited number of persons." *Crawford*, 553 U.S. at 198–203 (controlling op.). In *Crawford*, for example, the "relevant" burdens were "those imposed on persons who are eligible to vote but do not possess a current photo identification." *Id.* at 201. The Supreme Court explained that "[t]he fact that most voters already possess a valid driver's license . . . would not save the statute." *Id.* at 202 (controlling op.). Six justices in *Crawford* agreed with this proposition. *Id.* at 199–203 (controlling op.); *id.* at 212–23, 237 (Souter, J., dissenting); *id.* at 237 (Breyer, J., dissenting); *see also Veasey*, 830 F.3d at 249 n.40 (en banc) ("The right to

vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily." (citation omitted)).[17]

351.    "Disparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1217 (N.D. Fla. 2018). When evaluating a practice that imposes disparate burdens, the *Anderson-Burdick* analysis must account for the heightened burdens encountered by identified subgroups. *Crawford*, 553 U.S. at 198 (evaluating "burdens that are relevant to the issue before [the Court,] . . . those imposed on persons who are eligible to vote but do not possess a [compliant] photo identification").

352.    Furthermore, when evaluating burdens imposed by the Challenged Provisions, that the Texas Election Code may include some unchallenged provisions that are easier for voters to satisfy is irrelevant. *Id.* ("the fact that [one] requirement was easy would not validate the second").

353.    The court should consider the cumulative impact of the Challenged Provisions in determining the burdens they impose. A number of facially valid provisions of the election laws may operate in tandem to produce "impermissible barriers to constitutional rights." *Storer*, 415 U.S. at 737. Because "[s]everal requirements of an election code may combine to make ballot access excessively burdensome," the court must evaluate the cumulative burden of the Challenged Provisions together. *Id.*

354.    *Anderson-Burdick* requires an individualized assessment of the specific state's laws in question and the burdens they impose.  That other states may employ similar laws in their election schemes cannot sufficiently justify any law at issue here.  Consistent with the Supreme

---

[17] While the Fifth Circuit has recently noted that the burden analysis cannot rely *exclusively* upon the impact on a small number of voters, *see Vote.org v. Callanen*, 89 F.4th 459, 490 (5th Cir. 2023), it does not foreclose consideration of the burdens on subgroups as a component of *Anderson-Burdick* analysis.

Court's directive that challenges to laws under this framework "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789 (citation omitted), courts recognize that states' election laws are not fungible.  State voter identification laws, for example, are not universally constitutional or unconstitutional—rather, an individual assessment of each state's law and the burdens it imposes is required.  *See, e.g., Ohio State Conf. of N.A.A.C.P. v. Husted*, 768 F.3d 524, 547 n.7 (6th Cir. 2014) (explaining, "we do not find that other states' electoral laws and practices are relevant to our assessment of the constitutionality or legality" of Ohio law), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

355.    To pass constitutional scrutiny, the state must explain what "interests make it necessary to burden a plaintiff's rights" to begin with. *Anderson*, 460 U.S. at 789; *Crawford*, 553 U.S. at 191 (controlling op.). And the interest asserted by the state must be legitimate. *See Anderson*, 460 U.S. at 801 (holding insufficient asserted interest in "political stability" and contrasting with "interest in avoiding political fragmentation" upheld in *Storer*, 415 U.S. 724); *Tashjian v. Republican Pty. of Conn.*, 479 U.S. 208, 217–18, 222–24 (1986) (holding insufficient asserted interests in administrability and in protecting the integrity of the two-party system).

356.    Moreover, even if a state interest is legitimate in the abstract, the state must put forward "concrete evidence" proving that "such an interest made it necessary to burden voters' rights."  *Fish v. Schwab*, 957 F.3d 1105, 1132–33 (10th Cir. 2020). Thus, when a challenged practice does not actually advance the state's purported goals, those asserted interests cannot justify even a slight burden on the right to vote. *See Tashjian*, 479 U.S. at 219–22 (holding inapplicable "legitimate interest[s]" in preventing party raiding and in avoiding voter confusion); *see also Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) (holding that even "important

government interest" could not justify burden because the court "struggled to understand how [the challenged] regime . . . advance[d] that goal"); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 149 (2d Cir. 2000) ("the fact that the defendants['] asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests'" (quoting *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994))).

**B.      SB 1's mail ballot identification provisions burden voters without advancing any state interest.**

1.      *SB 1's mail ballot identification provisions unduly burden voters.*

357.    At this first step, the Court must "weigh the 'character and magnitude of the asserted injury.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789). Based on the evidence, the Court finds that SB 1's mail ballot identification provisions place an undue and severe burden on Texas voters eligible to vote absentee.

358.    SB 1 Sections 5.02, 5.03, 5.07, and 5.08 impose restrictive and unnecessary identification requirements that substantially increase the likelihood that a voter's mail ballot application or ballot will be rejected by county officials—and sometimes guarantee their rejection altogether even when the voter provides correct and valid identification—simply because the State's records are not up to date. These provisions led to historically high mail ballot application and ballot rejection rates. *See supra* Proposed Findings of Fact, Section III.A–B.

359.    SB 1's mail ballot identification provisions also made the already complicated absentee voting forms even "more difficult to understand," Tr. at 770:19–771:3. This generated significant confusion among voters by requiring counties to add text and instructions to the already-crowded mail ballot application form and ballot carrier envelope. Tr. at 487:18–22; Tr. at 770:19–771:3; Tr. at 1010:1–6.

360.    For instance, SB 1 instructs counties to include language on the envelope instructing voters to provide just *one* identification number. As several state and county officials testified, the odds that a voter's application or mail ballot will be accepted increase when the voter writes both their driver's license and the last four digits of their social security numbers on their applications or mail ballot carrier envelopes. *See, e.g.*, Tr. at 216:14–21. Yet, under SB 1, the application and carrier envelope instructions create a hierarchy between the identification numbers, instructing voters to write their driver's license number and, *if they do not have one*, the last four digits of their social security number. LUPE Ex. 119 at 1; LUPE Ex. 9 at 2. Voters who follow these instructions increase the chances that their application or ballot will be rejected. Tr. at 1034:6–15; Tr. at 2328:3–9.

361.    Moreover, the rejection of a mail ballot or application—along with the accompanying burdens—are all but guaranteed for those who have no identification numbers in their voter registration records. Tr. at 1845:8–16. This includes older voters and some middle-aged voters who registered to vote before identification numbers were required on voter registration forms for the first time after the 2000 election. Tr. at 213:23–215:2, 215:25–216:8; Tr. at 1011:3–17; Tr. at 747:17–24.

362.    While the Secretary of State has been required by statute to annually update its rolls to minimize the number of registrants lacking identification numbers in their voter registration records, there were still 93,867 voters with no identification numbers as of the state's last mass voter roll update in December 2022. Tr. at 1896:22–1897:4, 1897:22–1898:4, 1920:3–7; LULAC Ex. 75.

363.    Meanwhile, hundreds of thousands of other voters have only one identification number on file. As of December 2022, 667,685 voters could write a valid driver's license number

or the last four digits of their social security number on a mail ballot application or ballot, yet nevertheless have their application or ballot rejected because they entered an identification number that was not reflected in the State's voter records. Tr. at 1920:3–7; LULAC Ex. 75; *see also* Tr. at 224:11–16; Tr. at 441:22–443:9.

364.    To make matters worse, SB 1 requires voters who return mail ballots in person to provide identification to an election official. Joint Ex. 1 at 30; Tr. at 1052:21–1053:19, 1852:23–1853:18. Yet even after the election official confirms the voter's identification in person, the voter's mail ballot will be rejected if the identification number listed on the ballot does not match (or is not listed) in the State's voter records. Tr. at 1053:20–1054:23, 1055:8–11, 1853:19–1854:9; *see also supra* Proposed Findings of Fact, Section III.C.4.

365.    The burdens imposed by SB 1's mail identification requirements disproportionately harm older voters, voters with disabilities, and communities of color who have historically faced discrimination at the ballot box. *See supra* Findings of Fact, Section III.C.2–3. They are more likely to be unable to comply with the mail ballot identification provisions—whether due to not having access to their identification numbers, or their identification numbers not being reflected in the State's voter records because they registered before Texas required identification numbers as part of the voter registration process. *See supra* Findings of Fact, Section III.C.2. These voters are also more likely to face limitations in their ability to cast their ballots in person. *See, e.g.*, Tr. at 1300:20–1301:25; Tr. at 3766:3–17; *see also supra* Findings of Fact, Section III.C.5–6.

366.    These burdens are also heightened for minority communities, most notably Black and Latino voters, illustrated by rejection rates that were "uniformly higher for every minority group compared to non-Hispanic Whites" during the March 2022 primary election. Tr. at 1985:13–17; *see also* Tr. at 2723:3–12, 2728:24–2729:3, 2729:21–2730:3, 2733:5–7. This disproportionate

burden on Black and Latino voters did not abate after the March 2022 primary—SB 1's mail ballot rules continued to disproportionately impact minority voters in the November 2022 general election. Tr. at 1997:16–1998:23; Tr. at 2777:11–18.

367.    The experiences of voters across the two major elections in 2022 demonstrates that these burdens are not only severe, but durable. Tr. at 1653:12–1654:1; Tr. at 256:16–24. Notably, some voters who understood SB 1's requirements and successfully applied to vote nevertheless had their ballots rejected for violating SB 1. For example, TARA member Elaine Jones was well aware of SB 1's requirements, having spent months educating TARA members of the bill's new requirements, including its identification number provisions. Tr. at 1793:11–1794:20. Nonetheless, she forgot to include her identification number on her mail ballot envelope. *Id.*

368.    SB 1 will continue to impact Texas voters in future elections. The Court heard uncontested testimony that many voters complied with the identification requirement March 2022 primary elections but subsequently had their ballots rejected in the 2022 general election for a missing or non-matching identification number. Tr. at 538:25–539:5. Furthermore, many low propensity voters who only vote in presidential elections will be burdened by SB 1's requirements for the first time during the 2024 election cycle. Tr. at 271:11–18; Tr. at 1051:1–17; Tr. at 757:21–758:3; Tr. at 3601:23–3602:6. Defendants are therefore wrong to argue that the burdens caused by SB 1's mail ballot identification requirements will simply abate with time.

369.    To the contrary, the burdens will extend indefinitely beyond 2024: Each election cycle, a new pool of Texas voters—including many TARA members—who turn 65 years of age become eligible to vote absentee. *See* Tr. at 1051:21–1052:20. Similarly, thousands of people move to Texas on a regular basis and will therefore encounter SB 1's requirements for the first time, each election cycle. Tr. at 4646:4–23. Extensive evidence confirms that mail ballot rejection rates are

likely to remain higher than they were before SB 1 for the foreseeable future. Tr. at 2007:15–2008:9, 2033:13–20, 2076:13–17; *see also* Tr. at 1051:1–6; Tr. at 421:21–422:5; Tr. at 1161:8–10.

370.     And SB 1 has already deterred voters from voting by mail. It has led to distrust of the mail ballot process and alienated voters. Tr. at 1814:23–1815:4, 1816:10–16; *see also* Tr. at 1767:6–12; Tr. at 2927:3–13. Nearly "50 percent of the people" whose applications were rejected during the November 2022 general election "did not turn out to vote." Tr. at 2737:11–15; *see also* Tr. at 2775:14–16 ("Black and Hispanic voters in the 2022 general election who had their applications rejected were less likely to turn out to vote."); Tr. at 2743:2–10, 2744:8–12. Thus, overall mail ballot turnout plummeted in the November 2022 general election. Tr. at 422:25–423:22; Tr. at 2740:22–2742:8.

371.     Moreover, the cure mechanism created by SB 1 does nothing to alleviate the burdens its mail ballot identification provisions inflict upon voters: Rejection rates remain high and many voters have been unable to cure their identification-related defects on their mail ballot applications and ballots. Tr. at 1542:22–1543:7; Tr. at 750:8–11; *see also supra* Proposed Findings of Fact, Section III.A–B. This is due to the limitations built into the Ballot by Mail Tracker, which requires Texas voters to enter *both* identification numbers to access it. Tex. Elec. Code Ann. § 86.015(b); Tr. at 1031:4–1032:7. It will not work for voters whose registration records do not contain *both* of these numbers—or voters who have only been issued one—and such voters therefore cannot access the Ballot by Mail Tracker to cure their applications or ballots. Tr. at 1020:5–12, 1032:2–15; Tr. at 227:15–25, 243:24–244:2; Tr. at 2329:21–25. Voters are also often caught in a "catch 22" where they cannot even access the system to update their records because their record is not up-to-date. Tr. at 227:15–25. And for those voters who manage to access the

Ballot by Mail Tracker, the system has shown to be "difficult to navigate." Tr. at 1794:21–1796:13; *see also* Tr. at 1574:15–20.

372.    At the same time, many voters who cannot access the Ballot by Mail Tracker are also unable to cure defects on their mail ballot applications and ballots in person for the same reasons they choose to vote absentee. Tr. at 486:4–10; Tr. at 218:7–219:12, 220:2–9. For example, they may have disabilities or travel difficulties. Tr. at 1300:20–1301:25; Tr. at 3766:3–17; Tr. at 3764:21–3765:8; Tr. at 747:25–748:14; Tr. at 1520:1–24, 1521:10–1522:2; Tr. at 523:24–524:6. Many of these voters end up not voting at all. Tr. at 218:7–21; Tr. at 537:7–538:6; Tr. at 1550:20–1551:9; Tr. at 1517:7–14.

373.    For these reasons, the mail ballot identification requirements—which resulted in dramatic increases in rejection rates in 2022 compared to pre-SB 1 elections, *supra* Proposed Findings of Fact, Section III.A–B, and whose impacts are not mitigated by the State's updates to administrative records or by the Ballot by Mail Tracker, *supra* Proposed Findings of Fact, Section III.C.2—impose severe burdens on the right to vote.

> 2.    *The burdens created by SB 1's mail ballot identification provisions are not justified by any legitimate state interest.*

374.    Defendants and Intervenors offer two possible state interests that they claim are furthered by the mail ballot ID provisions: preventing fraud and promoting public faith in elections.

375.    The Court finds that neither purported interest justifies the heavy burdens that SB 1's mail ballot identification rules place on Texas voters. Simply put, it is not enough to, as Defendants do here, simply "express[] legitimate justifications for passing the law," *Veasey*, 830 F.3d at 248 & n.39, without showing how the state interests "make it necessary to burden the plaintiff's rights'" in the manner imposed by SB 1. *Burdick*, 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789).

376.    *First*, the burdens SB 1's mail ballot identification provisions create are not justified by the State's purported interest in preventing fraud. Fraud associated with the mail ballot process is vanishingly rare. *See supra* Proposed Findings of Fact, Section VI.A.2. SB 1's mail ballot provisions are a solution in search of a problem that does not exist. LULAC Ex. 5 at 88–89. Tellingly, while SB 1 caused mail ballot application and rejection rates to skyrocket, there is no evidence that *any* of these thousands of rejected ballots or applications were fraudulent. Tr. at 1049:24–1050:6.

377.    *Second*, the State's purported interest in preventing voter fraud cannot justify rejecting mail ballots cast by voters who have entered correct and valid identification numbers simply because those numbers may not be reflected in the State's voter records—often through no fault of the voter. Tr. at 1920:3–7; LULAC Ex. 75; *see also* Tr. at 224:11–16; Tr. at 441:22–443:9. These rejections reflect administrative gaps, not fraud, and denying such voters the ability to cast an effective mail ballot does nothing to advance any State interest in preventing fraud or maintaining the integrity of the electoral system.

378.    *Third*, the burdens SB 1's mail ballot identification rules create are not justified by the State's purported interest in building public confidence in elections. The record shows that the provisions have induced increased confusion and fear, without any corresponding improvement in voter confidence. For example, the Court heard extensive testimony regarding how SB 1 led voters to express privacy concerns about having to write sensitive identification information on mail ballot applications and ballots placed in the mail. Tr. at 1285:5–14; Tr. at 221:6–15; Tr. at 1522:3–15; Tr. at 1049:6–8; Tr. at 1159:12–24.

379.    The testimony also shows that mail ballot provisions have led some voters to distrust the absentee voting process entirely, alienating voters who relied on absentee voting to

alleviate the significant burdens they would encounter if by attempting to vote in person. Tr. at 1814:23–1815:4, 1816:10–16; *see also* Tr. at 1767:6–12; Tr. at 2927:3–13.

380.    Because SB 1's mail ballot identification provisions do not advance and are "not justified by [] sufficiently weighty state interest[s]," *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 694 (6th Cir. 2015), they impose undue burdens on the right to vote in violation of the First and Fourteenth Amendments, even if those burdens were not severe.

### C.    SB 1's restrictions on in-person delivery of mail ballots effectively eliminates drop boxes and burdens voters without advancing any state interest.

381.    Section 4.12 mandates that all mail ballots delivered in person must be received by an election official at the time of delivery, and that the receiving official must record the voter's name, signature, and the type of identification provided. Joint Ex. 1 at 30, Tr. at 1852:23–1853:18. These additional requirements have effectively eliminated drop boxes as a method for returning mail ballots in person, and turned in-person delivery into a cumbersome process more akin to in-person voting, thus limiting access to absentee voters. *See* Tr. at 3593:2–17.

382.    This burden is further exacerbated by SB 1's additional restrictions on the number of hours that early voting sites can remain open—which, for example, now prevents Harris County from offering 24-hour voting as it did for the 2020 general election. *See supra* Findings of Fact, Section III.C.6.

383.    Yet, neither State Defendants nor Intervenors have articulated any state interest that would justify Section 4.12's additional check-stop for voters returning mail ballots in person.

384.    Any purported interest in fraud prevention, for instance, is undermined by the fact that countless voters deposit their ballots in mailboxes across the state, in other states around the country (for Texas voters living out of state), and in some cases overseas, without the need for supervision. *Compare* Tr. at 3854:21–3855:8, *with* Tr. at 4390:12–19.

385.    Furthermore, mail ballots already come with an identification requirement. So even when a voter returning a mail ballot provides identification *in-person*, which the election official reviews and accepts, the voter's mail ballot will still be rejected if the identification number on the ballot envelope does not match the State's voter records. Tr. at 1052:21–1054:23, 1055:8–11. In other words, when it comes to verifying the identity of absentee, the check-in procedure for in-person delivery is either meaningless or unnecessarily duplicative.

386.    At the same time, there is no indication that any "uniformity" achieved by Section 4.12 actually furthers a legitimate state interest. For example, Section 4.12 neither mitigates voter confusion nor does it work towards expanding voters' opportunities.[18] *Cf.* Tr. at 2760:24–2761:7 (recognizing "scholarly literature that looks at drop box placement and who it's going to be affecting").

387.    Because the restrictions on in-person mail ballot delivery—and the consequent ban on drop boxes—do not advance and are "not justified by [] sufficiently weighty state interest[s]," *Green Party of Tennessee*, 791 F.3d at 694, they impose undue burdens on the right to vote in violation of the First and Fourteenth Amendments.

---

[18] "Uniformity" for uniformity's sake alone is not a legitimate state interest under the *Anderson-Burdick* framework. *Cf. Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217–18, 222–24 (1986) (holding insufficient asserted interests in administrability and in protecting the integrity of the two-party system). To be legitimate, especially in the context of Texas's highly decentralized election system, *supra* Findings of Fact, Section VI.B, a purported interest in uniformity must itself advance a legitimate state interest, such as reducing voter confusion or expanding voters' opportunities to vote. An abstract interest in uniformity cannot justify burdens on the right to vote.

### III.    SB 1 Section 7.04 violates LULAC Plaintiffs' First Amendment right to freedom of speech.

#### A.    Strict scrutiny applies to content-based regulations, as well as laws that burden political speech.

388.    The First Amendment to the U.S. Constitution protects against laws "abridging the freedom of speech." Free speech is protected both "from abridgment by Congress" and "from impairment by the States." *Gitlow v. New York*, 268 U.S. 652, 666 (1925). Accordingly, under the First Amendment, states have "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972)).[19]

389.    Content-based restrictions on speech "single[] out specific subject matter for differential treatment." *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 96 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 169). They distinguish between "favored" and "disfavored" speech." *Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010). "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *City of Austin*, 596 U.S. at 71 (citation omitted).

390.    Courts apply "strict scrutiny" to content-based restrictions on speech. Such laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163–64.

391.    Like content-based regulations, laws "that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling

---

[19] LULAC Plaintiffs join Mi Familia Vota Plaintiffs' Joint Proposed Findings of Fact on the Legal Framework of Plaintiffs' Claims and reproduce here the corresponding legal standard for violations of the right to free speech for the Court's convenience. *See* ECF No. 846 at ¶¶ 58–68.

interest and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (internal quotation marks and citation omitted); *see also Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438–39 (5th Cir. 2014) (same).

392.    Such scrutiny is required because the First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). Efforts to encourage and assist voters constitute "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). That is because "'[f]ree trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *NAACP v. Button*, 371 U.S. 415, 437 (1963).

393.    The Supreme Court has made clear that while *Anderson-Burdick* applies to laws and regulations that "control the mechanics of the electoral process," it does not apply to "a regulation of pure speech," even in the election context. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."). Thus, when "a law burdens core political speech," courts "apply 'exacting scrutiny'" and "uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre*, 514 U.S. at 347; *see also Cotham v. Garza*, 905 F. Supp. 389, 396 (S.D. Tex. 1995) (holding that provisions governing the mechanics

of voting are subject to *Anderson-Burdick* while a "content-based restriction on core political speech" is subject to strict scrutiny).

394.     Indeed, it makes little sense that a content-based restriction of core political speech should receive *lesser* scrutiny because it happens to regulate speech during elections, when "the importance of First Amendment protections" is at its "zenith." *Meyer*, 486 U.S. at 425; *see also McIntyre*, 514 U.S. at 346–47 (noting political speech "occupies the core of the protection afforded by the First Amendment" and that "[n]o form of speech is entitled to greater constitutional protection"). Indeed, "it can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Serafine v. Branaman*, 810 F.3d 354, 361 (5th Cir. 2016) (holding content-based restriction in election context was subject to "exacting scrutiny" (citing *McIntyre*, 514 U.S. at 347)).[20]

395.     The Fifth Circuit's decision in *Voting for America Inc. v. Steen*, 732 F.3d 382, is not to the contrary. That case concerned provisions that "regulate[d] the appointment and activities of volunteer deputy registrars ('VDRs')," who are "individuals trained and empowered" by the State of Texas to collect "and deliver completed voter registration applications." *Steen*, 732 F.3d at 385. VDRs play a "carefully regulated" role in the administration of elections in Texas, and act *on behalf of the state* "to serve the citizens who register to vote as well as the public interest in the integrity of the electoral body." *Id.* at 393. The Court expressly distinguished regulations governing

---

[20] Although the Supreme Court at times has used the terms "strict" and "exacting" scrutiny interchangeably when describing the relevant standard of review for content-based restrictions, more recent Supreme Court precedent has clarified that both content-based regulations and laws that restrict political speech are subject to strict scrutiny. *See, e.g.*, *City of Austin*, 596 U.S. at 68–69 (content-based regulations warrant application of strict scrutiny); *Reed*, 576 U.S. at 164 (content-based regulations must satisfy strict scrutiny); *Citizens United*, 558 U.S. at 340 (laws burdening political speech are subject to strict scrutiny); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812–13 (2000) (subjecting content-based restriction to strict scrutiny).

such state-sponsored actors from laws governing speech meant to "further[] [the speaker's] own or the[ir] sponsor's advocacy." *Id.* The state-sanctioned speech at issue in *Steen* was therefore "qualitatively different from the political speech restricted by" laws restricting speakers "trying to persuade the voting public." *Id.* (recognizing the latter as presumably "core political speech").

396.    Misreading *Steen* to lessen the scrutiny applied to content-based restrictions on core political speech would not only violate clear Supreme Court precedent, but also would put this Court squarely at odds with the law of other circuits. As the Third Circuit recently held, for *Anderson-Burdick* to apply, "the law must primarily regulate the mechanics of the electoral process, as opposed to core political speech." *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 138 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023). The "*Anderson-Burdick* test does not apply to laws that are primarily directed at regulating 'pure speech.'" *Id.*, 54 F.4th at 142 (quoting *McIntyre*, 514 U.S. at 345); *see also Lichtenstein v. Hargett*, 83 F.4th 575, 593 (6th Cir. 2023) (explaining the Supreme Court has "applied strict scrutiny—not *Anderson-Burdick* balancing—to many election laws" implicating core political speech) (collecting cases); *Fusaro v. Cogan*, 930 F.3d 241, 258 (4th Cir. 2019) (observing the Supreme Court has "distinguished between laws that . . . regulate 'pure speech,'" and those subject to *Anderson-Burdick*); *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000) (recognizing "strict scrutiny," rather than *Anderson-Burdick*, "is applied where the government restricts the overall quantum of speech available to the election or voting process").

397.    Because the voter interaction ban is subject to strict scrutiny, Defendants are required "to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Dep't of Tex., Veterans of Foreign Wars*, 760 F.3d at 438 (quoting *Citizens United*, 558 U.S. at 340).

398.     Speech restrictions should not "sweep too broadly" if they are to be considered "narrowly tailored." *Id.* at 440 (en banc) (quoting *Republican Pty. of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc)). The government must identify an "actual problem" in need of solving, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000), and demonstrate that restricting free speech is necessary to the solution, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). In other words, "if a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813; *see also Serv. Emps. Int'l Union*, 595 F.3d at 603–04 (holding that Houston's broad restriction on the timing of parades was not narrowly tailored because the city could have advanced its interests with less restrictive alternatives); *see generally Citizens United*, 558 U.S. at 340.

**B.      SB 1 Section 7.04 is subject to strict scrutiny because it is a content-based regulation of political speech.**

399.     SB 1 Section 7.04 is subject to strict scrutiny because it is a content-based regulation "single[s] out specific subject matter"—speech intended to deliver votes for a specific candidate or measure—"for differential treatment." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 169). No other category of speech is targeted for similar disfavored treatment. *Serv. Emps. Int'l Union, Loc. 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) (holding that content-based regulations are those that distinguish between "favored" and "disfavored speech"). It does not matter that the Ban does not target speech in support of *specific* candidates or measures—a regulation is content-based "even if it does not discriminate among viewpoints within that subject matter." *Reagan Nat'l*, 596 U.S. at 71.

400.     It is further subject to strict scrutiny for the independent reason that it is a regulation of paradigmatic political speech—it targets speech "intended to deliver votes for a specific candidate or measure." SB 1 Section 7.04. The ban has restricted the ability of LULAC Plaintiffs'

members, employees, and volunteers to engage in the kind of "interactive communication[s] concerning political change" that constitute core political speech. *Meyer*, 486 U.S. at 421–22; *see also* Tr. at 924:25–925:7, 927:13–929:3; 930:6–9, 930:10–931:20; Tr. at 1765:19–1766:14.

401.    Any suggestion that SB 1 Section 7.04 is subject to the *Anderson-Burdick* standard—rather than traditional First Amendment principles—must be rejected. The Supreme Court has made clear that *Anderson-Burdick* applies to laws and regulations that "control the mechanics of the electoral process" but not to "a regulation of pure speech," even in the election context. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (controlling op.) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."). Thus, when "a law burdens core political speech," courts "apply 'exacting scrutiny'" and "uphold the restriction only if it is narrowly tailored to serve and overriding state interest." *McIntyre*, 514 U.S. at 347;[21] *see also Cotham v. Garza*, 905 F. Supp. 389, 396 (S.D. Tex. 1995) (holding that provisions governing the mechanics of voting are subject to *Anderson-Burdick* while a "content-based restriction on core political speech" are subject to strict scrutiny).

---

[21] Although the Supreme Court at times has used the terms "strict" and "exacting" scrutiny interchangeably when describing the relevant standard of review for content-based restrictions, more recent Supreme Court precedent has clarified that both content-based regulations and laws that restrict political speech are subject to strict scrutiny. *See, e.g., Reagan Nat'l*, 596 U.S., 68–69 (content-based regulations warrant application of strict scrutiny); *Reed*, 576 U.S. at 164 (content-based regulations must satisfy strict scrutiny); *Citizens United*, 558 U.S. at 340 (laws burdening political speech are subject to strict scrutiny); *United States v. Playboy Ent. Grp*., Inc., 529 U.S. 803, 812–13 (2000) (subjecting content-based restriction to strict scrutiny).

402.   Indeed, it makes little sense that a content-based restriction of core political speech should receive *lesser* scrutiny because it happens to regulate speech during elections, when "the importance of First Amendment protections" is at its "zenith." *Meyer*, 486 U.S. at 425; *see also McIntyre*, 514 U.S. at 346–47 (noting political speech "occupies the core of the protection afforded by the First Amendment" and that "[n]o form of speech is entitled to greater constitutional protection"). "[T]he constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Serafine v. Branaman*, 810 F.3d 354, 361 (5th Cir. 2016) (second alteration in original) (holding content-based restriction in election context was subject to "exacting scrutiny" (quoting *McIntyre*, 514 U.S. at 347)).

403.   The Fifth Circuit's decision in *Voting for America Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), is not to the contrary. That case concerned provisions that "regulate[d] the appointment and activities of volunteer deputy registrars ('VDRs')," who are "individuals trained and empowered" by the State of Texas to collect "and deliver completed voter registration applications." *Steen*, 732 F.3d at 385. VDRs play a "carefully regulated" role in the administration of elections in Texas, and act *on behalf of the state* "to serve the citizens who register to vote as well as the public interest in the integrity of the electoral body." *Id.* at 393. The Court expressly distinguished regulations governing such state-sponsored actors from laws governing speech meant to "further[] [the speaker's] own or th[eir] sponsor's advocacy." *Id.* The state-sanctioned speech at issue in *Steen* was therefore "qualitatively different from the political speech restricted by" laws targeting speakers "trying to persuade the voting public." *Id.* (recognizing the latter as presumably "core political speech").

404.   Misreading *Steen* to lessen the scrutiny applied to content-based restrictions on core political speech would not only violate clear Supreme Court precedent, but also would put this

court squarely at odds with the law of other circuits. As the Third Circuit recently held, for *Anderson-Burdick* to apply "the law must primarily regulate the mechanics of the electoral process, as opposed to core political speech." *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 138 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023). The "*Anderson-Burdick* test does not apply to laws that are primarily directed at regulating 'pure speech.'" *Mazo*, 54 F.4th at 142 (quoting *McIntyre*, 514 U.S. at 345); *see also Lichtenstein v. Hargett*, 83 F.4th 575, 593 (6th Cir. 2023) (explaining the Supreme Court has "applied strict scrutiny—not *Anderson-Burdick* balancing—to many election laws" implicating core political speech) (collecting cases); *Fusaro v. Cogan*, 930 F.3d 241, 258 (4th Cir. 2019) (observing the Supreme Court has "distinguished between laws that . . . regulate 'pure speech,'" and those subject to *Anderson-Burdick*); *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000) (recognizing "strict scrutiny," rather than *Anderson-Burdick*, "is applied where the government restricts the overall quantum of speech available to the election or voting process").

405.   Defendants have failed to show SB 1 Section 7.04 satisfies strict scrutiny because they have identified no "actual problem" in need of solving and because SB 1 Section 7.04 is not narrowly tailored.

### C.   SB 1 Section 7.04 restricts LULAC Plaintiffs' core political speech.

406.   Plaintiffs' in-person voter engagement activities constitute "the type of interactive communication concerning political change that [are] appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22; *see also NAACP v. Button*, 371 U.S. 415, 437 (1963) ("'Free trade in ideas' means free trade in the opportunity to persuade to action" (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945))). Urging voters to support particular measures or candidates during in-person interactions—the category of speech targeted by SB 1 Section 7.04—is fundamentally expressive, and an individual or organization that conducts such activities engages

in speech by encouraging participation in the political process. *Cf. Steen*, 732 F.3d at 390 (recognizing that "[s]oliciting, urging and persuading [a] citizen to vote are" forms of protected speech).

407.    As described above, SB 1 Section 7.04 has restricted LULAC Plaintiffs' speech. *See supra* Findings of Fact, Sections IV, V (describing Section 7.04's impact to LULAC Plaintiffs' voter advocacy and related speech, including the diminished efficacy of AFT's in-person voter assistance programming).

408.    Judy Bryant, TARA's paid field organizer, testified that in-person advocacy is essential to her organization's voter engagement efforts, including work meant to persuade voters to support specific ballot measures relevant to TARA's mission. Tr. at 1764:19–25. She personally performs much of this in-person advocacy, Tr. at 1765:11–18, but testified she is no longer willing to perform in-person advocacy work once mail ballots are distributed, because she fears—particularly as a paid employee—that she will be subject to the ban. Tr. at 1765:24–1766:14. The timing of this chill is particularly harmful because, as Ms. Bryant testified, the weeks leading up to an election are the most critical time for trying to persuade voters. Tr. at 1766:15–23.

**D.    SB 1 Section 7.04 fails strict scrutiny.**

409.    Because Section 7.04 is subject to strict scrutiny, Defendants are required "to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Veterans of Foreign Wars*, 760 F.3d at 438 (quoting *Citizens United*, 558 U.S. at 340).

410.    Defendants have fallen woefully short of that demanding standard. To start, Defendants have failed to show that Section 7.04 furthers a compelling state interest. The 2020 presidential election—the election directly preceding enactment of SB 1—did not see significant levels of fraud, never mind fraud that might be prevented by SB 1 Section 7.04. Tr. at 2823:12–14, 2816:21–2817:11, 2817:19–2818:15, 2818:16–2819:5. Indeed, Mr. Ingram acknowledged the

election was free of significant fraud and further that Texas has "never had any evidence of a systemic statewide fraud." Tr. at 4454:4–4455:16.

411.     The ban is also not "narrow[]" in any sense. *Veterans of Foreign Wars*, 760 F.3d at 440. Section 7.04 fails to clearly explain when core political speech—urging others to support a candidate or cause—is permitted and when the same exact constitutionally-protected speech constitutes a felony. For example, rather than prohibiting obviously protected expression— "intended[ed] to deliver votes for a specific candidate or measure"—the legislature could have crafted language specifically targeting speech that is "intended to defraud, confuse, unduly influence or deceive." Likewise, rather than restricting speech whenever a ballot is merely "present," the restriction at issue easily could have been limited to instances when a voter is actively completing their ballot. Instead, the Ban's broad terms extend its broad application to *any* "in-person interaction," from conversations at the voter's front door to conversations at the post office. The term "benefit" could reasonably mean anything from a campaign worker's salary, an expectation that a successful candidate may hire an earnest volunteer for a job, or a pizza-party or a happy hour to celebrate a successful day of door knocking. Any hope that the Secretary of State's office might clarify these broad and confusing terms is in vain. The Secretary's witnesses made clear that the office has not, and will not, provide such clarity. Tr. at 1914:7–14; 1917:5–14; 1924:7–18.

412.     Nor is there any doubt the law "sweep[s] too broadly." *Veterans of Foreign Wars*, 760 F.3d at 440. It is clear SB 1 Section 7.04 "could be replaced by . . . [an]other regulation that could advance the interest . . . with less infringement of speech," *id.*, such as one expressly targeting unlawful conduct, rather than constitutionally protected speech on behalf of "a specific candidate or measure." Joint Ex. 1 at 58–62. Simply put, the ban prohibits speech *whenever* a ballot is

present, effectively treating the entirety of Texas as a polling place where conversations about candidates and causes risks criminal liability.

413.    Finally, there is no dispute that existing laws already prohibit the illicit conduct the ban purports to address, undermining any effort to show the law is narrow. Texas's Election Code already imposes criminal penalties against "effort[s] to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," Tex. Elec. Code § 276.013, or voting (or attempting to vote) a ballot belonging to another person, or attempting to mark another person's ballot without their consent or specific direction, Tex. Elec. Code § 64.012. *See also*, *e.g.*, *Veterans of Foreign Wars*, 760 F.3d at 441 (holding that a statute's provision was not narrowly tailored because the purported interest it served was already met by a different provision).

414.    Because SB 1 Section 7.04 is a content-based regulation of political speech that does not pass strict scrutiny, it violates the First Amendment and must be enjoined.

**IV.    SB 1 Section 7.04 violates Section 208 of the Voting Rights Act.**

415.    LULAC Plaintiffs join LUPE Plaintiffs' Joint Proposed Findings of Fact and Conclusions of Law as to LULAC Plaintiffs' claims challenging SB 1 Section 7.04 under Section 208 of the Voting Rights Act as outlined in footnote 1 of LUPE's filing.

<strong>JUDGMENT</strong>

Based upon the above Findings of Fact and Conclusions of Law made by this Court, after trial, the following Judgment is entered by the Court:

It is hereby **ORDERED** declaring that SB 1 §§ 4.12, 5.02, 5.03, 5.07, 5.08 violate the First and Fourteenth Amendments to the U.S. Constitution.

It is hereby **ORDERED** declaring that SB 1 § 7.04 violates the First Amendment to the U.S. Constitution.

It is hereby **ORDERED** declaring that SB 1 § 7.04 violates Section 208 of the Voting Rights Act.

Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **ENJOINED** from implementing, enforcing, or giving any effect to the requirements of SB 1 §§ 4.12, 5.02, 5.03, 5.07, 5.08 that violate the First and Fourteenth Amendments to the U.S. Constitution.

Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **ENJOINED** from implementing, enforcing, or giving any effect to the requirements of SB 1 § 7.04 that violate the First Amendment to the U.S. Constitution.

Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **ENJOINED** from implementing, enforcing, or giving any effect to the requirements of SB 1 § 7.04 that violate Section 208 of the Voting Rights Act.

Defendants are **ORDERED** to pay LULAC Plaintiffs' costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988.

It is so **ORDERED**.

      **SIGNED** this __th day of _____, ____.


_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

Dated: January 19, 2023

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Christopher D. Dodge*
Michael B. Jones*
Elena A. Rodriguez Armenta*
Daniela Lorenzo*
Marcos Mocine-McQueen*
Marisa A. O'Gara*
Omeed Alerasool*
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
cdodge@elias.law
mjones@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
mmcqueen@elias.law
mogara@elias.law
oalerasool@elias.law

*Counsel for LULAC Plaintiffs*
*Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

On January 19, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta