# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | |
| STATE OF TEXAS, *et al.*, | § § | Case No. 5:21-cv-00844-XR |
| *Defendants.* | § § | [Lead Case] |
| | § | |
| HARRIS COUNTY REPUBLICAN PARTY, *et al.*, | § § § | |
| *Intervenor-Defendants.* | § | |

## PRIVATE PLAINTIFFS' JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON SECTION 208 OF THE VOTING RIGHTS ACT

# TABLE OF CONTENTS

I.      Introduction .................................................................................................1

II.     The Legal Framework ..................................................................................1

III.    Proposed Findings of Fact...........................................................................1

      A.  **Texans require assistance to vote by reason of blindness, disability
or inability to read or write**..............................................................1

           1.  Blindness.......................................................................................2

           2.  Disability.......................................................................................2

           3.  Inability to read or write (low-literacy or limited English).........5

      B.  **Before SB1, voters chose assisters and their assisters provided
appropriate assistance** ......................................................................6

           1.  Before SB1, voter assisters completed and signed an oath of
assistance promulgated by the Texas Secretary of State under
Tex. Elec. Code Sec. 64.034 ........................................................7

           2.  Assisters carry out the will of the voter and do not override the
voter's choice ...............................................................................11

      C.  **Section 6.06 prohibits assistance to mail voters by compensated assisters**.....15

           1.  Compensation is broadly defined..................................................17

           2.  Plaintiffs compensate mail ballot assisters with salary or other
things of economic value ..............................................................18

           3.  Because 6.06 prohibits compensation for mail ballot assistance,
Plaintiffs' employees no longer provide mail ballot assistance to
their members..............................................................................19

           4.  Volunteers cannot substitute for chosen assistors who are
compensated.................................................................................23

           5.  The language regarding "attendant" or "caregiver" is undefined.............23

      D.  **Section 6.04 conditions the right to assistance on the voter making a
representation of eligibility** .............................................................24

1.      Voters are not comfortable making a representation of eligibility ............25

2.      The new language in the oath of assistance does not provide enough information for voters who now have to make a representation of eligibility ............................................................................27

**E.     Sections 6.03, 6.04, 6.05 and 6.07 deter voter assisters and voters** .................29

1.      The new oath language of Section 6.04 deters assisters ...........................31

(a) Assisters are deterred by the "penalty of perjury" language ...............35

(b) Assisters are uncomfortable securing a representation of eligibility for assistance from the voter ......................................................41

(c) The existing oath language regarding "word, sign, or gesture", in combination with new penalty of perjury language, deters assisters ........44

(d) Assisters don't know what "pressure" means in the new oath ............46

(e) Assisters are concerned about "vote will not be counted" language in the oath ...............................................................................50

(f) Election officials cannot waive SB1's voter assistance provisions as an ADA accommodation ..................................................................53

**F.     Section 7.04 prohibits mail ballot voter assistance by people who are compensated to advocate for a specific candidate or measure** ........................54

1.      "Physical Presence" is undefined .............................................................55

2.      "Benefit" is broadly defined ....................................................................56

3.      Plaintiffs' compensated canvassers advocate for and against ballot measures in person and in the presence of the mail ballot ...................... 57

4.      Plaintiffs no longer provide mail ballot assistance when advocating on a measure ...............................................................................59

**G.     As a result, voters vote without their chosen assister** ........................................60

**H.     As a result, voters vote without assistance** ........................................................64

**I.     As a result, voters forego assistance to spare their assisters** ............................72

**J.     As a result, voters do not vote** ...........................................................................73

**K.**     **SB1 increases length of time for voting, thus causing voters to lose assistance from their chosen assister**......................................................................74

**IV.**   **Proposed Conclusions of Law** .......................................................................75

**A.**     **Defendants violate Section 208 when they enforce SB1's voter assistance restrictions** .............................................................................................76

    1.     Sections 6.06 and 7.04 ................................................................78

    2.     Section 6.04...............................................................................80

    3.     Sections 6.03, 6.05 and 6.07 .....................................................82

**B.**     **SB1's voter assistance provisions are preempted by Section 208**...................82

**PLAINTIFFS' JOINT PROPOSED**
**FINDINGS OF FACTAND CONCLUSIONS OF LAW**
**ON SECTION 208 OF THE VOTING RIGHTS ACT**

## I.    INTRODUCTION

1.    In this case, Plaintiffs challenge a number of provisions of Texas Senate Bill 1 (SB1) that infringe on the right of disabled, low-literate and limited English proficient voters to receive help in voting from assisters of their choice.[1]  The challenged provisions (Sections 6.03-6.07 and 7.04)[2] prohibit mail ballot voters from choosing certain categories of people as assisters, require voters to take additional steps as a prerequisite to receiving assistance, deter voters from using assistance and deter assisters from serving.  For these reasons, Defendants violate Section 208 of the federal Voting Rights Act ("Section 208") when they implement the challenged provisions, and Section 208 preempts the challenged provisions.

## II.    THE LEGAL FRAMEWORK

2.    Plaintiffs incorporate by reference the legal standards for Section 208 challenges set out in Plaintiffs' Joint Proposed Findings of Fact on the Legal Framework of Plaintiffs Claims.

## III.    PROPOSED FINDINGS OF FACT

3.    Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. §10508.

### A.  Texans require assistance to vote by reason of blindness, disability or inability to read or write

---

[1] Mi Familia Vota joins the findings of fact and conclusions of law in this brief related to sections 6.03, 6.04, 6.05, and 6.07 of SB1.  LULAC joins the findings of fact and conclusions of law in this brief related to section 7.04 of SB1. OCA Plaintiffs join the findings of fact and conclusions of law in this brief related to section 6.06 of SB1.

[2] The following private plaintiffs advance claims under Section 208 in this case: §§6.03-6.05 are challenged by LUPE, HAUL and MFV.  §6.06 is challenged by LUPE, HAUL and OCA. §6.07 is challenged by MFV.  §7.04 is challenged by LUPE and LULAC.  §6.01 is challenged by HAUL.

1.  <u>Blindness</u>

4.  Herlinda Eureste is a registered voter of Wharton County, Texas and votes with assistance. Ms. Eureste is legally blind and uses dark glasses and sometimes a cane. Ms. Eureste attempted to vote with assistance at the polls in the May 2022 Primary Runoff Election. Tr. 2480:14-2481:7 (Cardenas).

2.  <u>Disability</u>

5.  Toby Cole is a registered voter of Harris County, Texas and votes with assistance. Tr. 695:3-11; Tr. 698:14-699:19; Tr. 702:10-703:3 (Cole). Mr. Cole is a quadriplegic; he cannot do any of the daily living activities on his own that most people do daily because he cannot move his arms and legs. Tr. 696:25-697:21 (Cole).

6.  Members of La Union Del Pueblo Entero (LUPE) include voters who are disabled and vote with assistance in person and by mail. Tr. 63:19-64:6; Tr. 65:7-65:13, 96:15-97:17; Tr. 75:18-77:4; Tr. 77:17-78:2; Tr. 84:4-84:25; Tr. 85:1-85:4; Tr. 119:20-120:18; Tr. 116:22-117:7; Tr. 87:3-87:21; Tr. 3676:11-25 (Chavez). Thirty percent of LUPE members are over age 65. Tr. 63:16-63:18 (Chavez).

7.  Cris Rocha is a paid employee of LUPE who works as a community organizer. Tr. 141:25-142:21 (Rocha). As part of her job, Ms. Rocha provides voting assistance to voters who are disabled, including voters who use curbside voting or who use a cane or walker to walk. Tr. 146:13-16 (Rocha).

8.  FIEL's membership includes registered voters who are disabled and vote with assistance when voting. Tr. 2436:119-21 (Espinosa).

9.  MABA Texas members include Latino registered voters, voters with limited proficiency in English, disabled voters, voters who vote by mail, voters who vote with assistance at the

polls, voters who vote with assistance with mail ballots, and voters who have relied on paid assisters for such assistance. Tr. 2542:21-2543:13 (Ortega).

10.    Jodi Lydia Nunez Landry is a registered voter of Harris County, Texas and votes with assistance. Tr. 3236:11-17; Tr. 3234:1-6 (Nunez Landry).  Ms. Nunez Landry is a person with a rare and untreatable progressive form of muscular dystrophy. She requires assistance with most activities of daily living including bathing, dressing, cooking, and cleaning. She uses a power wheelchair to navigate. Tr. 3233:2-14; Tr. 3235:10-3236:2 (Nunez Landry).

11.    Ms. Amy Litzinger is a registered voter of Travis County and votes with assistance.  Tr. 3273:3-6; Tr. 3273:12-24; Tr. 3281:13-19; Tr. 3286:11-3287:4; Tr. 3284:12-3285:23 (Litzinger).  Ms. Litzinger has spastic quadriplegic cerebral palsy and dysautonomia.  Tr. 3275:18-24 Tr. 3275:25-3276:6 (Litzinger). There are not a lot of physical tasks that she can do for herself, but she verbally directs her attendants. *Id*. Tr. 3277:23-3278:6;  Tr. 3279:11-3280:4 (Litzinger).

12.    Laura Halvorson is a registered voter of Bexar County, Texas and votes with assistance. Tr. 3315:22-25; Tr. 3312:7-17; Tr. 3317:17-3318:2, 3333:2-8 (Halvorson).  Ms. Halvorson has Limb Girdle muscular dystrophy, chronic muscular respiratory failure, anxiety disorder, and various allergies. She describes her assistance needs as "total care" and requires assistance for almost all physical activities. Tr. 3310:17-20; Tr. 3311:10-3312:6; Tr. 3313:4-3314:10; Tr.  3315:22-25 (Halvorson).

13.    Nancy Crowther is a registered voter of Travis County and votes with assistance.  HAUL MFV 413 at 52:11-53:4; 30:5-12 (Crowther).  Ms. Crowther has a progressive neuromuscular disease and requires a personal care attendant to complete major life activities. HAUL MFV 413 at 24:25-24:10; 18:3-9, 30:5-12 (Crowther)

3

14. Cathy Cranston lives in Travis County, Texas and works as a personal care attendant. Tr. 3549:9-12; Tr. 3549:20-23 (Cranston). Ms. Cranston has provided a wide range of voting assistance to people with disabilities. She has driven individuals to the polls, assisted in handing IDs to poll workers and marking ballots for people with physical disabilities, and reading the ballot for people with cognitive or sensory disabilities. *Id.* Tr. 3558:14-3559:7 (Cranston). Ms. Cranston has worked with voters with disabilities who had memory problems and had difficulty remembering where their personal ID was located, as well as voters who had trouble writing their ID numbers legibly. Tr. 3569:1-13 (Cranston).

15. Danielle Miller is a registered voter of Travis County, Texas and votes with assistance. Tr. 3199:12-15; Tr. 3200:19-22; Tr. 3201:14-16 (Miller). Ms. Miller is a person with autism, dyslexia, and dysgraphia. Ms. Miller needs assistance with activities of daily living and her mother, Jennifer Miller, acts as her supported decision-maker. Id. Tr. 3197:21-3198:11 (Miller).

16. Voters with intellectual and developmental disabilities (IDD), including members of the Arc of Texas, can need assistance with physically accessing and navigating around a polling place, assistance to ensure they fully understand their choices in the voting process and cuing, when the voter assister has a conversation with the voter before voting to discuss the voter's candidate choices. Tr. 3491:9-20 (Martinez).

17. In Dallas County, voters who vote with assistance often include voters with disabilities. Tr. 448:23-25; Tr. 448:11-13; Tr. 448:14-16; Tr. 448:17-19 (Scarpello).

18. For additional findings of facts for the demographics of voters with disabilities in Texas, please refer to Section II.B of the Plaintiffs' Proposed Findings of Fact and Conclusions of

Law For Claims Under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Section 208 of the Voting Rights Act.

3.  <u>Inability to read or write (low-literacy or limited English proficiency)</u>

19.    Members of LUPE include voters who are limited English proficient, low-literate, or both, and who use assistance to vote in person and by mail. Tr. 63:19-64:6; Tr. 65:7-65:13; Tr. 97:11-97:17; Tr. 75:18-77:4; Tr. 77:17-78:2; Tr. 84:4-84:25; Tr. 85:1-85:4; Tr. 119:20-120:18; Tr. 116:22-117:7; Tr. 87:3-87:21; Tr. 3676:11-25 (Chavez).  Some of these members are not literate in English or Spanish. Tr. 64:7-65:6 (Chavez).  Members who choose LUPE staff or volunteers to assist them with voting include individuals who are elderly, disabled, low-literate and/or limited English proficient. Tr. 75:18-77:4 (Chavez).

20.    LUPE's membership includes elderly individuals, like Maria Gomez, who are native born U.S. citizens and who are limited English proficient despite having lived and worked in the U.S.  LUPE Ex. 284 at 6:3-21; 7:20-8:1; 18:3-19; 17:14-22; 52:17-19.

21.    LUPE's membership includes individuals who are native born U.S. citizens but are limited English proficient and not literate in English because of a lack of access to education in the U.S.  LUPE's membership also includes individuals who are immigrants to the U.S., waited to naturalize until they were eligible to take the citizenship exam in Spanish, and do not speak English.

22.    FIEL's membership includes registered voters who have limited English proficiency and vote with assistance. Tr. 2436:9-13 (Espinosa).

23.    MABA Texas members include Latino registered voters with limited proficiency in English. Tr. 2542:21-2543:13 (Ortega).

24.     Voters served by Mi Familia Vota include voters who are limited English proficient, low-literate, or both, and who vote with assistance in person and by mail. Tr. 3438:4-3439:6; Tr. 3450:1-3451:1; Tr. 3451:16-3452:13; Tr. 3455:24-3456:12 (Razo), Tr. 3382:2-3383:3; 3390:1-6 (López), Some of these voters who are limited English proficient, low-literate, or both, also require physical assistance at the polls but cannot afford to pay caretakers or attendants to meet their everyday needs.  Tr. 3457:7-11 (Razo).

25.     In El Paso County, voters who bring in assisters include: those who are visually impaired and don't want to use the audio ballot; voters who speak a language that is not English or Spanish; voters who speak Vietnamese; curbside voters; voters who speak Spanish but are limited English proficient; voters who do not hear or who communicate in sign language; voters who speak Chinese; voters who speak Tiqua. Tr. 168:24-169:14; Tr. 169:18-25; Tr. 170:22-171:19 (Wise).

26.     In El Paso County, the main groups of voters who bring assisters use that assistance for reading or language translation. Tr. 169:15-17 (Wise).  Voters can be both limited English proficient and physically disabled. As an example, an elderly Spanish-speaking voter may bring an assister both to help the voter physically navigate the polling place, but also to help understand the instructions on how to use the machine. Tr. 171:20-172:3 (Wise).

27.     In El Paso County, for example, the Tiqua language is an oral language, so Tiqua-speaking voters generally bring other people to assist them with voting. Tr. 171:6-16 (Wise).

28.     Some voters in Hidalgo County require language assistance. Tr. 2315:13-18 (Ramon) (referring here to voters who are monolingual in an Asian language). Other voters cannot read or write, and vote with assistance at the polls. Tr. 2315:19-22 (Ramon).

**B.  Before SB1, voters chose assisters and their assisters provided appropriate assistance**

1. Before SB1, voter assisters completed and signed an oath of assistance promulgated by the Texas Secretary of State under Tex. Elec. Code Sec. 64.034

29.    People who provide assistance can include friends, family, neighbors, and poll workers, as well as volunteers from other groups. Every assister has to take the oath of assistance.  Tr. 448:14-16 (Scarpello); LUPE Ex. 230.

30.    Yvonne Ramon, former Hidalgo County Elections Administrator, served as an assister for her elderly mother during the March 2022 Primary.  Ms. Ramon helped her mother vote by mail.  Tr. 2314:18-22; Tr. 2329:4-2330:17; Tr. 2337:8-18. (Ramon).

31.    Prior to SB1, LUPE provided assistance to disabled, limited English proficient and low-literate voters both in the polling place and with vote by mail.  Tr. 63:19-64:6; Tr. 64:7-65:6; Tr. 96:15-97:17; Tr 97:11-97:17; Tr. 75:18-77:4; Tr. 77:17-78:2; Tr. 84:4-84:25; Tr. 85:1-85:4; Tr. 119:20-120:18; Tr. 116:22-117:7; Tr. 87:3-87:21 (Chavez).

32.    As part of its voter assistance work, LUPE conducts voter caravans.  LUPE members come to the LUPE offices and then drive in cars to the polling place.  Before leaving the LUPE offices, LUPE offers members who request voting assistance the opportunity to choose a LUPE staff member who will assist them.  When they arrive at the polling place and exit their cars, the LUPE members and their chosen assisters walk into the polling place together so that the member can vote.  Members who choose LUPE staff or volunteers to assist them with voting include individuals who are elderly, disabled, low-literate or limited English proficient. Tr. 75:18-77:4 (Chavez). As part of her work, Cris Rocha invites voters to join the LUPE caravans to go vote by either driving their own cars or going in one of the LUPE caravan cars. Tr. 146: 5-9 (Rocha).

33.    LUPE also provides assistance to voters who call the LUPE office and request help by sending LUPE staff or volunteers either to pick up the voter or meet the voter at the polling

place and provide assistance to that voter. Tr. 77:17-78:2 (Chavez).  LUPE does not have the resources to post staff or volunteers at every polling place but instead assists voters when voters telephone for assistance or come to the LUPE offices and request assistance to vote. Tr. 116:22-117:7 (Chavez).

34.  Cris Rocha has been asked by elderly and disabled persons to help them vote and has provided that assistance in the past. Voters have asked her over the phone for help to vote. Tr. 145:16-20; Tr. 145:25-146:4 (Rocha).  When Cris Rocha encourages people to vote, some people respond by telling her that they need help, some people say they need transportation, and some people say they do not need anything. Tr. 145:13-15 (Rocha). Cris Rocha is chosen by the voters whom she assists at the polling places. Cris Rocha arrives together or separately at the polling places with voters. Tr. 146:17-21; Tr. 147:1-4 (Rocha).

35.  Before SB1, LUPE volunteer Maria Gomez assisted voters in the polling place and took the oath prior to assisting people to vote. Before SB1, voters would choose Maria Gomez to assist them in voting and she would provide that assistance. LUPE Ex. 284 at 33:7-35:9. The person who worked at the polling place would say that Ms. Gomez could help the voter. The voter would make the decision to choose Ms. Gomez as an assister and the voter would say that Ms. Gomez was their chosen assister. LUPE Ex. 284 at 33:7-35:9. Before 2021, Maria Gomez felt at liberty to help people vote and enjoyed helping people vote. Ms. Gomez helped people to vote for about 25 years. LUPE Ex. 284 at 40:24-42:2.

36.  Cesar Espinosa testified that prior to the enactment of SB1, as part of FIEL's mission of voter outreach and civic engagement, FIEL helped members at the polls by accompanying voters to the polls and assisting with translation. Tr. 2437:7-13 (Espinosa).  Mr. Espinosa

testified that prior to SB1, FIEL members would provide voter assisters at the polls. FIEL would partner with an organization providing other services at the polls, like providing transportation to the polls, and FIEL would be on site to provide translation and assister services. Tr.2438:5-16 (Espinosa).

37. MABA Texas is a membership organization that serves as a network for Latino lawyers throughout the state. MABA Texas encourages its attorney members to provide pro bono services in their local communities, including helping with voting and any other issues that may be important locally or statewide. MABA Texas's members are registered voters throughout the State of Texas. Tr. 2533:20-2534:10; Tr. 2536:14-20 (Ortega).

38. Before he goes to vote, Mr. Cole spends time with his legal assistant preparing to vote. Tr. 702:10-18 (Cole). As an attorney, Mr. Cole votes in local judicial elections, among the other contests on the ballot. Tr. 702:10-15 (Cole). Before voting, Mr. Cole goes through a sample ballot with his assistant and conducts any necessary research to educate himself with the help of his assister. Mr. Cole's assistant will write down Mr. Cole's choices. Tr. 702:10-703:19 (Cole).

39. Mr. Cole votes curbside. His legal assistant drives him to the polling station after they determine together where curbside voting is available. Tr. 704:4-705:2 (Cole).

40. Mr. Cole describes the voting process in terms of "we" because his assister is so integral to the voting process for him. He testified, "Yeah. That's -- you know, what are we doing? On the 164th, who are we going to vote for? Who am I going to vote for? Again, I say 'we' for everything. I say what are 'we' going to have for lunch. What are we going to do. I feel like I exclude myself from the people that help me if it's always I do this and I do that." Tr. 706:19-707:20 (Cole).

41.    Ms. Longoria, former Harris County Elections Administrator, testified that she has experience serving as an assister for her grandmother, who was a U.S. citizen who primarily spoke Spanish and needed access to voting in Spanish. Ms. Longoria's grandmother did not have good eyesight and did not trust computers, so she used Ms. Longoria as her assistant often. Tr. 1306:12-22 (Longoria).

42.    Ms. Longoria testified that she knows, from her own experience and from her experience working on elections, that people trust their friends and family more than government machines. Tr. 1306:23-25 (Longoria). They want someone with them that they trust to accurately translate the ballot and to accurately interpret and help them through the voting process. Tr. 1307:1-6 (Longoria).

43.    Ms. Longoria explained that "whether that is a language access issue, or a disability issue, it's important that every citizen have the right to kind of employ or select who they trust most to shepherd them through that very special process." Tr. 1307:7-10 (Longoria)

44.    Ms. Longoria testified that she believes that chosen assisters are in a better position to help the voter than poll workers.  In her testimony, Ms. Longoria described reports of election workers in Harris County prohibiting a voter's assistant of choice from providing the kind of assistance that the voter required. and reports of election workers crowding around people who require physical accommodation to vote. Tr. 1307:11-1309:20 (Longoria).

45.    Angelica Razo, National Deputy Director of Campaigns and Programs for Mi Familia Vota and former Texas state director, testified that voters with whom they work in Texas require several kinds of assistance, including assistance reading and understanding the ballot, assistance communicating with election workers at the polls, and mobility assistance in navigating the polling locations.   Mi Familia Vota also encouraged voters who needed

assistance to bring someone they trusted to the polls to assist them. Tr. 3455:24-3456:12 (Razo).

46. Cameron County is in the process of transitioning to a new ADA-compliant voting machine. Remi Garza, the Cameron County Election Administrator, testified that voters who require assistance are likely to want to bring assisters of their choice to help them navigate the new machines. Tr. 729:22-5 (Garza).

47. Polling place sign-in records in this case show that voters in Travis, El Paso and Dallas counties voted with assisters during the 2020 primary, primary runoff, and general elections. LUPE Ex. 004; LUPE Ex. 005; LUPE Ex. 006; LUPE Ex. 007; LUPE Ex. 008; LUPE Ex. 014; LUPE Ex. 286; Tr. 35:11-16 (López).

2. Assisters carry out the will of the voter and do not override the voter's choice

48. Dr. Kruse explained that when a voter with a disability uses a trusted assister, the assister is helping the voter express the views of the voter. The assistance provided does not substitute the will of the voter with a disability with the will of the assister. Tr. 3773:7-19 (Kruse). See also Tr. 3533:9-3534:16 (Martinez).

49. LUPE trains its organizers to provide voter assistance consistent with the law, to limit assistance to what is requested by the voter, and to carry out the wishes of the voter. As described by Ms. Chavez, "part of the training that we do with [staff] is often, it's making sure that they exercise the will of the voter in whatever choice the voter wants to make to be able to vote. We're only there to assist in whatever the voter needs us to assist with." Tr. 78:3-78:15 (Chavez). LUPE staff did not ever tell the voters it assisted with their mail ballots who to vote for. Tr. 85:5-85:7 (Chavez).

50.    Cris Rocha, an employee of LUPE whose duties include voter assistance, assists voters by reading the ballot to the voter at the voting booth or in their cars. Tr. 145:25-146:4 (Rocha). She does not encourage people to vote for a certain candidate.  Ms. Rocha tells people who ask her who they should vote for that neither she nor LUPE can tell them that, that the person has to decide who to vote for, and that the most important thing is to vote.  She tells people that because LUPE is not partisan to any party and only cares that people vote. Ms. Rocha wants people to make their own choice.  She wants to follow the rules about helping voters and that is how LUPE helps voters. Tr. 145:3-12; Tr. 155:2-17 (Rocha).

51.    Maria Gomez, a volunteer voter assister with LUPE, has always told voters who ask for her help that they have a right to vote and they decide who they vote for.  LUPE Ex. 284 at 38:24-39:11.

52.    LUPE members turn to LUPE for assistance in voting because they receive a variety of other services and referrals from LUPE, see LUPE organizers in their neighborhoods, and have come to trust the organization. Tr. 72:16-74:2 (Chavez).  In addition to civic engagement organizing, LUPE is a social services hub for the community and provides income tax services, language translation services and family-based immigration legal services.  Tr. 61:3-17 (Chavez).

53.    Mi Familia Vota runs a voter education program to provide support and education to voters. The voter education program focuses on supporting Latino voters who do not vote frequently.  Tr. 3431:10-22; Tr. 3434:6-3435:3 (Razo).  Mi Familia Vota is a trusted organization in the Latino communities that it serves.  Tr. 3437:12- 3438:1-3 (Razo).  It helps voters develop a plan to vote, mindful of the assistance that these voters may need.

Tr. 3388:12-22; Tr. 3389:18-3390:6 (López). Its employees are rigorously trained never to influence a person's vote. Tr. 3462:12-19 (Razo).

54. Ms. Debeauvoir is not aware of any instance in her 36 years in the Travis County Clerk's office of a paid assister being alleged to have coerced or intimidated a voter, or engaging in any kind of fraud or misconduct. Tr. 846:16-847:3 (Debeauvoir). She has never been made aware of any situation in which a paid assister harassed or intimidated a voter in any way. Tr. 917:9-12 (Debeauvoir)

55. Mr. Cole's assister assists him with curbside voting by adjusting the voting machine so that it does not rest too much on Mr. Cole's legs or too much on Mr. Cole's hands. Then the assister assists Mr. Cole by spinning the knobs on the machine and scrolling through the pages. The assister also reminds Mr. Cole of any previously selected choices that they researched together. "[I]f I don't remember who [we] are voting for, what we're voting and I don't remember I'll ask her, you know, 'what did we say we were going to do on the 164th, do you have the -- you know, will you take the notes out and see what we are doing on this area?'" The assister also helps Mr. Cole physically submit and cast his ballot. Tr. 705:20-707:10 (Cole).

56. Mr. Cole testified that being able to use the assister of his choice is important to him; he does not feel comfortable revealing how he plans on voting to a stranger and receiving assistance from an individual he did not choose is a violation of the ballot privacy. Mr. Cole testified that before SB1 an election official once prevented his assistant from helping him vote. Mr. Cole testified that having to reveal who he planned on voting for to a stranger felt like a violation. Mr. Cole feels it's his right to choose his own assister, "And that's private information, and, you know, a lot of husbands and wives don't share that

information with each other. So, as it is, a lot of times a poll worker stands close, and that's uncomfortable, but I always pick my own. I always pick my own person." Tr. 707:25-708:14 (Cole).

57.  Ms. Litzinger explained that she is not concerned that a personal care attendant might manipulate how she votes because she is always present when they are assisting her with marking the ballot and she would always make sure that she can see her ballot and verify what the attendant marks. Tr. 3296:20-3297:8 (Litzinger).

58.  Ms. Halvorson explained that she has never felt that one of her personal care attendants was trying to influence her choices or would manipulate the way her ballot was marked. Tr. 3318:3-11 (Halvorson).

59.  Ms. Martinez explained that it is important that the voter have a relationship with their assister so the assister knows "what their needs are, what their wants are, to make sure that they are being seen and heard. Tr. 3494:14-3495:14 (Martinez). This is important because people with disabilities want to know who is going to help them vote – they don't want this to be a stranger. It is critical that the assister "understands deeply why I'm making the choice I am and is able to support me to make sure that that actually happens and is successful." Tr. 3523:10-3524:1 (Martinez).

60.  Ms. Nunez Landry prefers to have her partner assist her with voting because "I can trust him and there's a certain amount of privacy there so…that would make everything a lot easier." Tr. 3243:5-25 (Nunez Landry). Her partner understands the contours of her disability and she doesn't need to go into a lengthy explanation about what she requires assistance with. Tr. 3234:2-6; Tr. 3236:24-3237:14 (Nunez Landry).

61.   Ms. Litzinger prefers to have her personal care attendant assist with voting. Since she has limited dexterity, the poll worker would have to interact with intimate parts of her body, which could be unsafe or uncomfortable for both individuals. Tr. 3286:11-87:4 (Litzinger). She also relies on her personal care attendant to get to the polling site, so she doesn't need additional help once inside the building. It is safer and faster to rely on her attendant. Tr. 3284:12-3285:23 (Litzinger).

62.   Ms. Litzinger testified that getting help from poll workers instead of her assister of choice is not smooth or easy as they are not trained to know what people with disabilities need. Tr. 3286:11-21 (Litzinger). See also Tr. 1306:12-1309:20 (Longoria) (describing the importance of a voter with Down Syndrome having the assister of their choice to help them vote).

63.   Ms. Halvorson prefers to have her attendant assist her with voting. Tr. 3312:7-17; Tr. 3317:17-3318:2; Tr. 3333:2-8 (Halvorson).

   **C.  Section 6.06 prohibits assistance to mail voters by compensated assisters**

64.   The plain language of SB1 prohibits voters who need assistance with their mail ballots from receiving assistance from compensated individuals.  Jt. Ex. 1.  Section 6.06 creates a state jail felony for offering, soliciting or receiving compensation for assisting mail ballot voters, unless the compensated assister is an "attendant or caregiver."  Jt. Ex. 1 at 54-55. "Compensation" is defined as "anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee, accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value."  *Id.*; *see also* Tex. Penal Code Section 38.01(3).

65.    Mr. White testified that offering or accepting compensation for mail ballot assistance is a
state jail felony, with a sentence of up to two years, even if there is no fraud in the assistance
and the assister marks the ballot consistent with the wishes of the voter.  Tr. 3996:8-3997:5
(White).  Mr. White explained that Section 6.06 "criminalizes compensation for assistance"
as opposed to criminalizing fraud in assistance.  Tr. 3995:25-3996:7 (White).

66.    With respect to SB1's changes to prohibited voter assistance in the Election Code, Mr.
White testified that SB1 expanded the offense by eliminating the requirement that the
payment be for performance-based work, *i.e.* paying someone to assist mail voters on a
quota basis.  Tr. 3991:18-3992:15 (White).

67.    As a result of SB1's changes to prohibited voter assistance, Mr. White testified that it is
now a crime to provide, receive or ask for compensation to assist a mail ballot voter
regardless of whether the assistance is on a per capita system.  Tr. 3992:3-7, 12-19 (White).

68.    Mr. White testified that section 6.06 "appear[s] to apply to [the] scenario" in which a paid
canvasser for a nonprofit Get Out the Vote organization engages with voters and provides
mail ballot assistance if requested.  Tr. 3993:22-3995:10 (White).

69.    Mr. White testified that if his office encountered a GOTV group that paid its organizers to
provide mail ballot assistance as a public service while canvassing, he would be concerned
that this activity is used as a subterfuge for voter fraud, and "we'd be looking for the fraud
at the bottom of things, yes, ma'am."  Tr. 3995:11-24 (White).

70.    Mr. White acknowledged that the Voting Rights Act provides a framework in which a voter
can choose any person, other than employers or labor unions, to assist the voter Tr. 3997:6-
14 (White).  Mr. White further acknowledged that as the chief prosecutor of election law
violations in Texas, he would be concerned if assistance that's guaranteed under federal or

state law is not provided, and that a system that arbitrarily disenfranchises eligible voters who cast lawful ballots and follow the rules erodes public confidence in the integrity of elections.  Tr. 3997:15-3998:2 (White).

71.    Ms. Debeauvoir, former Travis County Clerk, understands Section 6.06 of SB 1 to make it illegal to pay people to help other voters complete their by-mail ballots. Tr. 845:21-846-4 (Debeauvoir).

72.    Bridgette Escobedo, Travis County Election's Director testified that somebody who is paid by a nonprofit organization is prohibited from assisting mail ballot voters.  Tr. 1549:2-5 (Escobedo).

73.    El Paso County Election Administrator Lisa Wise would tell a nonpartisan nonprofit organization to consult an attorney if they wanted to send paid canvassers door-to-door to promote a ballot measure and simultaneously assist voters with their mail ballots. Tr. 179:5-10 (Wise).

74.    Former Director of the Elections Division in the Secretary of State's Office Keith Ingram agreed that if a voter asks a teenager in their neighborhood for assistance with completing a ballot, and the voter offers to pay the teenager for doing so, the voter and the teenager would, in the Secretary of State's view, violate Section 6.06 of Senate Bill 1. Tr. 1904:3–25. (Ingram)

    1.    <u>Compensation is broadly defined</u>

75.    Section 6.06 denies mail-in voters assistance from a compensated person of their choice even if the compensation is not monetary. For example, Keith Ingram agreed that if a "blind voter offers to and does, in fact, buy lunch for [a] friend in exchange for his assistance"

with a mail ballot, then "that would be referable" to the Office of the Attorney General for criminal prosecution under Section 6.06. Tr. 1905:1–1906:5 (Ingram).

76.   Bridgette Escobedo testified that compensation could include a cup of tea, a lunch, a parking spot, or anything else of even minimal value. Tr. 1549:2–1550:4 (Escobedo).

77.   As a result, a person could be charged with a felony if they accept an offer of refreshments for assisting a person with their mail-in ballot,  Tr. 1549:22-1550:8 (Escobedo), or even if they are the person offering those refreshments to the assistant, Tr. 1550:1-4 (Escobedo)

78.   Ms. Longoria, former Harris County Election's Administrator, finds the provisions of SB1 that prohibit payment or compensation in exchange for providing assistance to be ambiguous. Tr. 1316:1-1317:1-3 (Longoria).

2.   Plaintiffs compensate mail ballot assisters with salary or other things of economic value

79.   Before SB1, LUPE employees, as part of their job, would provide mail ballot assistance to voters including reading the ballot aloud to a voter who was elderly and had vision challenges, asking the voter for the voter's choice, and filling out the ballot for the voter. LUPE employees would also provide mail ballot assistance to a voter if requested during a house meeting in the field, or if the voter came to LUPE's offices and requested assistance. Tr. 75:18-77:4; Tr. 84:4-84:25; Tr. 85:1-85:4; Tr. 119:20-120:18; Tr. 116:22-117:7 (Chavez).

80.   In her job as a community organizer for LUPE, Cris Rocha organizes in the colonias and promotes LUPE's services, provides information about voting, and encourages people to vote by calling them on the phone or visiting their houses. Tr. 144:10-19; Tr. 154:25-155:1 (Rocha). If asked by a voter, she provides assistance in voting as part of her job.  Tr. 145:3-12; Tr. 155:2-17 (Rocha).  When Cris Rocha encourages people to vote she tells them to

go out and vote because it is very important in every election and she tells them when and where voting will take place. Tr. 144:23-145:2 (Rocha).

81. The League has members who use assistants when they vote by mail, and members who assist others with their vote by mail ballots. Tr. 1578:3-8; Tr. 1589:12-1590:3 (Chimene). League members assist mail-in voters who are family, friends, in nursing homes, in assisted living centers, or in homes where voters with disabilities live. *Id.* Tr. 1590:16-25 (Chimene). Members of the League "offer[] tea, or coffee, or water," to assisters that help them and other voters vote by mail. Tr. 1591:1-1592:5; Tr. 1590:4-12 (Chimene).

3. Because 6.06 prohibits compensation for mail ballot assistance, Plaintiffs' employees no longer provide mail ballot assistance to their members

82. Section 6.06's prohibition on compensation for mail ballot assistance has caused LUPE to stop assisting voters who request their help completing mail ballots. Tr. 119:20-120:18 (Chavez). As explained by LUPE's executive director Tania Chavez, LUPE has stopped assisting members with their mail ballots because "Being able to assist voters under the provisions of the law at the moment will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, and so we have refrained from doing so." Tr. 82:20-84:3 (Chavez).

83. Because of Sec. 6.06, now when a LUPE member comes to the LUPE office and requests help with their mail ballot, LUPE informs the member that LUPE cannot provide assistance and tells the voter that they should find help with their family or friends. Tr. 86:9-86:13; Tr. 86:14-87:2; Tr. 87:3-87:21 (Chavez). LUPE staff will not provide mail ballot assistance to LUPE members who are elderly and/or disabled or otherwise need assistance to vote by mail and choose LUPE staff as their assisters. Tr. 86:9-86:13; Tr. 86:14-87:2; Tr. 87:3-87:21 (Chavez). This is because LUPE staff and leadership are afraid of being

prosecuted for providing mail ballot assistance to LUPE members Tr. 86:9-86:13, 86:14-87:2, 87:3-87:21 (Chavez).

84.    Prior to SB1 Sec. 6.06, LUPE staff would assist members to complete their mail ballots one-on-one and provide assistance based on the voter's needs. Some LUPE members do not know how to read or write. Some LUPE members are vision impaired or have another disability. LUPE staff would help members fill out the ballot by mail, either at the LUPE offices, in house meetings at LUPE's union hall events. Some members would call LUPE and ask LUPE to go to their home to help them fill out their ballot by mail and LUPE would provide that assistance in the members' homes. Tr. 87:3-87:21; Tr. 3676:11-25 (Chavez).

85.    LUPE would provide gift cards for gas or T-shirts to its volunteers to provide mail ballot voter assistance because in the Rio Grande Valley there is no public transportation and people have to drive everywhere. However, as Tania Chavez testified, "[t]he way the legislation currently stands, any kind of compensation will unfortunately lead to potential prosecution, so even us giving them a gift card, us giving them a T-shirt could be considered a type of compensation." The threat of prosecution for providing these items to volunteers hinders LUPE in providing voter assistance and in recruiting volunteers. Tr. 122:3-23 (Chavez).

86.    Deborah Chen, civic engagement programs director for the Organization of Chinese Americans, Greater Houston ("OCA-GH"), provided language assistance to LEP voters who brought their mail-in ballots to OCA-GH candidate forums. Tr. 1697:13–18, 1686:6–1687:1 (Chen). Other OCA-GH members provided similar assistance to voters at OCA-GH candidate forums. *Id.* Tr. 1698:19–21 (Chen).

87.    Before Section 6.06, LEP voters brought their mail-in ballots to OCA-GH civic engagement events, where members assisted them with completing their mail-in ballots at different events, including: voting machine demonstrations, Tr. 1706:12–25 (Chen); canvassing, *Id.* Tr. 1703:14–20 (Chen); candidate meet and greets, *Id.* Tr. 1701:5–16 (Chen); candidate forums, *Id.* Tr. 1697:22–25 (Chen); tabling outside of polling locations, *Id.* Tr. 1705:5–24; Tr. 1706:4–11 (Chen); and while driving seniors to the polls, *Id.* Tr. 1722:23-1723:5 (Chen). LEP voters chose OCA-GH member volunteers at these events to assist them with their mail-in ballots because there were no other resources available for assistance. Tr. 1708:13–25 (Chen).

88.    After Section 6.06 passed, OCA-GH became reasonably concerned about the law's impact because OCA-GH provides volunteers things of value that can be considered compensation. Tr. 1714:13–16 (Chen). These valuables come in the form of beverages, *Id.* Tr. 1716:14–17; Tr. 1717:24–1718:5 (Chen), T–shirts, food, and paying independent contractors for literature-drop canvassing where assistance with vote-by-mail ballots is offered. *Id.*, Tr. 1714:13–22; Tr. 1716:14–22; Tr. 1694:11–20; Tr. 1717:25–1718:5 (Chen); Tr. 122:3–19 (Chavez).

89.    OCA-GH ceased conducting many of its in-person civic engagement activities where members and other voters historically sought assistance with mail-in ballots because of Section 6.06. For instance, in March 2022, OCA-GH did not host its in person candidate forum—an event where volunteers assist members and other voters with mail-in ballots— because of Section 6.06. Tr. 1718:20–24 (Chen).

90.    In November 2022, although OCA-GH co-sponsored a candidate forum, Tr. 1718:25– 1719:2 (Chen), it declined to provide mail-in ballot assistance to members and other voters

because of Section 6.06. *Id.* Tr. 1719:3–11 (Chen). OCA-GH remains fearful of assisting members and other voters with mail-in ballots at candidate forums because of the criminal prosecution risk Section 6.06 poses. *Id.* Tr. 1719:15–22 (Chen).

91.    Similarly, following Section 6.06's passage, OCA-GH has held its AAPI candidate meet-and-greets virtually to prevent voters from bringing mail-in ballots and seeking assistance from OCA-GH. Tr. 1720:1–19 (Chen). Unlike in previous years, OCA-GH declined to assist members and other voters at the candidate meet-and-greet virtual event. OCA-GH additionally no longer assists members or other voters at its exit polling survey tables. *Id.* Tr. 1723:6–13 (Chen).

92.    There are no community organizations in the Greater Houston area that provide Chinese language assistance with voting to the degree and extent that OCA-GH does. Tr. 1707:11–1708:12 (Chen). Because of SB1's changes, OCA-GH stopped recruiting voter assistors, which limits its LEP members and other voters' opportunities to receive assistance from the person of their choice. *Id.* Tr. 1724:16–1725:16; 1699:3–7 (Chen); Tr. 1310:14–1312:11 (Longoria). In turn, Section 6.06's restrictions impact OCA-GH's volunteer retention rates as well.

93.    Since Section 6.06 became law, the League of Women Voters of Texas ("LWVTX" or "the League) reasonably construes the compensation restriction on assistants to prevent voters from voting with the assistant of their choice because of the criminal liability risk. Tr. 1616:2–9; Tr. 1594:6–111; Tr. 1626:17–1627:2 (Chimene). League members who vote by mail are likely to provide provisions that can be construed as "compensation" to their assisters. *Id.*, Tr. 1591:1–1592:5; Tr. 1590:4–12 (Chimene). "Texans . . . are just really generous people," Ms. Chimene said. *Id.* "So if you've come to need [] assistance,

[LWVTX members] want to be able to provide you with something . . . to make you feel as comfortable as possible" like "offer[ing] you tea, or coffee, or water or help with your . . . parking" "because . . . that's how Texas people are. They are very grateful." *Id.*

94.    The League also offers its volunteers valuables that Texas election officials have construed as "compensation" under Section 6.06. League volunteers who assist members and other voters "often get little pens," "stickers" "cookies" "doughnuts" and "pizza" in return for volunteering.  Tr. 1598:6–15 (Chimene).  Student volunteers receive meals and office supplies as well, in addition to letters of recommendation, academic credit, and other items in return for their volunteer work. *Id.* Tr. 1598:16–22 (Chimene).  Based on the League's understanding of "compensation" in Section 6.06, members, volunteers, other voters, and the League itself may be subject to criminal penalties for allegedly compensating vote-by-mail assisters. *Id.* Tr. 1591:13–1592:5; Tr. 1598:23–1599:1 (Chimene).

   4.    Volunteers cannot substitute for chosen assistors who are compensated

95.    Because of the need to ensure adequate training and appropriate service delivery, LUPE will not use uncompensated volunteers to deliver mail ballot assistance; many of LUPE's volunteers are students or other individuals who contribute only a few hours of volunteer time. Tr. 124:14-127:13 (Chavez). In addition, even if LUPE gave gas cards to volunteers that would be compensation that would place volunteers in jeopardy under SB1. Tr. 122:3-122:23 (Chavez).

96.    Paying its workers is necessary to ensure that Mi Familia Vota can run a quality program and to ensure consistency in training, which is a big investment that Mi Familia Vota makes in its personnel. Tr. 3460:12-25 (Razo).

   5.    The language regarding "attendant" or "caregiver" is undefined

97.    Under Section 6.06(f), the prohibition on compensation does not apply if the person assisting the voter is an "attendant" or "caregiver" previously known to the voter.  Tr. 1906:23-1907:2 (Ingram).   Senate Bill 1, however, does not define "attendant" or "caregiver."  Tr. 1907:3-6 (Ingram).

98.    The Secretary of State's Office does not define the terms "attendant" or "caregiver," nor has it published any guidance or training on how to interpret either term.  Tr. 1907:7-12; 1908:17-24 (Ingram).  Further, the Secretary of State's Office does not define the phrase "previously known to the voter," nor has it published any guidance or trainings regarding how the phrase should be interpreted.  Tr. 1909:3-13 (Ingram).  In Mr. Ingram's view, it does not matter how long the voter has actually known the attendant or caregiver before providing voter assistance; it could be "15 years" or "15 minutes." Tr. 1909:14-22 (Ingram).

### D. Section 6.04 conditions the right to assistance on the voter making a representation of eligibility

99.    Section 6.04 of SB1 adds language to the assister oath. The assister, other than an election officer, must "swear under penalty of perjury" that: the voter represented to them that they are eligible to receive assistance; that the assister did not pressure or coerce the voter into choosing them to provide assistance; that the assister will not communicate how the voter has voted to another person; and the assister understands that if assistance is provided to a voter who is ineligible for assistance, the voter's ballot may not be counted. Jt. Ex. 1 at 52-53.

100.   The Texas Secretary of State issued a new oath of assistance form in July 2022, which removed the language enjoined by *OCA Greater Houston v. Texas*. LUPE Ex. 172; see also predecessor form from January 2022 at LUPE Ex. 189.

101.    The current oath of assistance includes language added by SB1 which requires the assister to swear, "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance;" Jt. Ex. 1 at 52-53.

102.    Former Chief of the Election Integrity Division in the Texas Attorney General's Office Mr. White testified that the new language in the assister oath -- "the voter I am assisting represented to me they are eligible to receive assistance" -- probably requires the assistant to obtain representation of eligibility from the voter. Tr. 3991:1-5 (White).

103.    El Paso County Election Administrator Lisa Wise testified that in order to sign the oath of assistance and avoid being charged with perjury, it is her understanding that an assister will have to secure representation from the voter that the voter is eligible to receive assistance. Tr. 173:16-20 (Wise).

104.    LUPE now trains its staff and volunteers who serve as assisters to obtain a representation from the voter that the voter is eligible to receive assistance. Tr. 3682:9-3683:8 (Chavez).

   1.    <u>Voters are not comfortable making a representation of eligibility</u>

105.    Mr. Cole testified that this provision is "offensive" because it means he has to share his private health information with his assister in order to receive the assistance he needs to vote and this is not something he is required to do in any other aspect of his life in order to receive the assistance he needs. "If I want to go buy a ticket to go to a concert, I don't have to reveal to somebody what my disability is to get access or to get, you know, assistance under the ADA." Tr. 709:5-710:19. (Cole).

106.    Mr. Cole described a friend of his who served in Iraq who has a mild brain injury that causes short-term memory issues.  Mr. Cole explained that his friend needed assistance in her daily life.  "[B]ut she would never - she would be mortified to go into a place like a

voting booth where they would say, well, tell us why, where they would question, you know, why she would need some help because it's not obvious to the whole world that she's disabled." Tr. 716:12-718:5 (Cole).

107.  Mr. Cole explained that there are voters with invisible disabilities who can physically get around the polling place, but may still want an assister.  It is Mr. Cole's understanding based on his lived experience, from his personal experience from experiences shared from friends that voters with invisible disabilities are worried that an election official will decide that they are not eligible for assistance.  Mr. Cole testified about his experience with his service dog, and how his friends with invisible disabilities who received hearing dogs had different experiences than he did. "I could go anywhere with a service dog. I could go on an airplane, but people with this invisible disability couldn't because they would be questioned, why do you need a dog in a hotel. Well, if a fire alarm goes off, or if somebody knocks on your door, you can't get alerted, and so the same thing with Andrea or with other people with invisible disabilities. They don't want to be called out, they don't want to be separated, and so it's just, don't do it, just take that out of your life and it's just – it makes the world too small." Tr. 717:3-718:5 (Cole).  Mr. Cole believes this will negatively affect whether voters with disabilities vote at all.  "They are just not going to do it. It's going to be too hard. It's going to be too embarrassing. They are just not going to do it." Tr. 717:10-718:5; Tr. 718:7-11 (Cole).

108.  Ms. Litzinger also expressed discomfort with having to give a statement of eligibility as a condition of receiving assistance.  Tr. 3289:3-9 (Litzinger).

109.  Ms. Nunez Landry also expressed discomfort with the requirement to represent eligibility in the first place and has not represented her eligibility to her partner who is her chosen

assister.  Tr. 3252:17-3253:2 (Nunez Landry). If her vote did not count because of failing to represent her eligibility, this "seems very undemocratic and I would feel disenfranchised and probably like I was a second-class citizen."  Tr. 3252:17-3253:2 (Nunez Landry).

110.    Ms. Martinez testified that these provisions are vague and have "added a hurdle. It's placed a burden on the person with an intellectual developmental disability to voice their own eligibility." Tr. 3513:16-25; Tr. 3518:1-3519:16 (Martinez).

111.    Dr. Kruse explained that requiring a voter with a disability to take the extra step of representing to the assister that they are eligible for assistance as a condition of receiving assistance would also serve as a barrier for voters with disabilities: "It doesn't sound like a big deal…but it's an extra hurdle. It's an extra thing to do. Combined with all the other barriers that people with disabilities face, it's an extra thing to -- simply to remember, but there's also an extra issue that both the assister and the person with the disability may be uncertain about. It's an extra hurdle. It kind of exacerbates the other issues that -- in combination with all the other hurdles that people with disabilities face, that they -- that may make it more difficult to exercise the right to vote." Tr. 3776:19-3777:8 (Kruse).

112.    Remi Garza, Elections Administrator of Cameron County, suspects that some voters would be uncomfortable if they have to tell the assister their basis for needing assistance. Tr. 734:13-17 (Garza). For example, some Cameron County voters require language assistance with some of the complex wording on the ballot, but may be uncomfortable explaining to an assister that their English or even their Spanish is not good enough. Tr. 734:18-735:4 (Garza). There are also voters in Cameron County who cannot read or write, and would be reluctant to explain that to their assister. Tr. 735:5-11 (Garza).

    2.    The new language in the oath of assistance does not provide enough information for voters who now have to make a representation of eligibility

113.    El Paso County Election Administrator Lisa Wise testified that the oath does not contain the criteria for eligibility for assistance of a voter. Tr. 174:8-18 (Wise).  Ms. Wise further testified that it may not be clear to a voter assister what the exact criteria is for eligibility for assistance. Tr. 174:23-175:1 (Wise).  El Paso County does not have a practice of posting in polling places signs that announce the eligibility criteria for assistance to a voter. Tr. 174:19-22 (Wise).

114.    To make matters worse, the Texas Secretary of State's "VOTER INFORMATION" poster, which election officials are required to post in every polling place and voting station, provides an incorrect and overly-narrow definition of eligibility for voter assistance:  "You have: (6) The right to assistance while casting your ballot if you cannot write, see the ballot, understand the language in which it is written, or cannot speak English, or communicate only with sign language, and want assistance in communicating with election officials." LUPE Ex. 265 (current form available at https://www.sos.texas.gov/elections/forms/pol-sub/7-36f.pdf), Tex. Elec. Code § 62.011.

115.    Ms. Nunez Landry testified that this provision is "very confusing to people" and "no one really quite understands what eligible means, what requirements make them eligible" and this will lead to confusion and fear. Voters may meet the criteria for eligibility but not understand that they do - some people think you have to have a doctor's note or that it means they have to meet the criteria for disability under SSDI. Tr. 3248:3-3249:8; Tr. 3251:16-3252:11 (Nunez Landry).

116.    People with IDD may not want to publicly state their disability, explain their diagnosis, or may be unaware if their diagnosis qualifies them as being eligible to receive assistance.

"The definition of disability isn't static" and there are different definitions of disability for different programs and services. Tr. 3518:1-3519:16 (Martinez).

117.    Mr. Ingram testified that it is a more difficult question to determine whether a person whose actions constituted general assistance, not voting assistance, would need to take the oath of assistance. Tr. 4420:18-4421:8 (Ingram).

**E.  Sections 6.03, 6.04, 6.05 and 6.07 deter voter assisters and voters**

118.    Sections 6.03, 6.05 and 6.07 deter voter assisters by requiring them to provide additional, personal information on the assistor form.

119.    Sections 6.03 and 6.05 of SB 1 require a voter assister to record and swear to their relationship to the voter and indicate whether the assister received or accepted any form of compensation or benefit from a candidate campaign or a political action committee. Tr. 2316:6-15 (Ramon); Tr. 177:12-18 (Wise). Section 6.03 creates a new form with this requirement for assisters in the polling place and Section 6.05 adds this requirement to the mail ballot carrier envelope.  Jt. Ex. 1 at 51-52, 53. Section 6.07 revises the mail ballot carrier envelope to require a person who deposits the carrier envelope in the mail to indicate that person's relationship to the voter.  Id. at 55.

120.    Potential assisters who are not relatives of the voters they assist have a well-founded concern about providing the information required by 6.03.  Jonathan White, the State's top voter fraud prosecutor, testified that in his view, "normal assistance" is a voter being assisted by caregivers or family members.  Tr 3987:15-23 (White). With respect to section 6.03, Mr. White believes that having information about assisters who are not related to the voters can help distinguish between workers with no relationship to the voter versus the

folks who are assisted by family members or caregivers, which in his view are the more typical type of legitimate assistance. Tr. 3987:1-14 (White).

121.   Ms. Longoria, former Harris County Elections Administrator explained that the relationship between voters and assisters can be personal information that voters and assisters do not want to disclose. Some voters may have complicated family histories, and it may deter a voter from asking someone they otherwise would have asked for assistance. Tr. 1316:1-1317:3 (Longoria).

122.   Ms. Longoria testified that she received reports from voters who wanted to assist people with disabilities or who require language access assistance. However, they ultimately did not serve as an assister because they did not understand the extra legal documents that they had to fill out, and what it might mean for them. They were concerned that they would go to jail because they did not know the election laws, and were afraid that even an innocent attempt to assist a family member could put them in jail. Tr. 1311:24-1312:11 (Longoria).

123.   Mr. Espinosa testified that he is concerned by the information requested by section 6.03. He also testified that he was unsure about the necessity of providing the address of the assister and wanted to know who would have access to the data and wanted to know how the information would be stored.  Mr. Espinosa testified that many times when volunteering at the polls, he provides assistance to voters with whom he has no direct relationship, that he volunteers to provide assistance to a person in need.  Mr. Espinosa explained that these concerns affect his likelihood to volunteer to assist people at the polls.  Mr. Espinosa testified that the likelihood that he will volunteer at the polls is almost nonexistent.   Tr. 2442:6-2443:9 (Espinosa).

124. SB1 has made it harder for MABA Texas as an organization to find members who are willing to assist voters, educate voters, reach out to voters, and be involved in Get Out the Vote efforts. This is because members do not want anything that they do or say to be interpreted as pressuring a voter, they don't want to attest to someone's disability or need for assistance, and they don't want taking a bottle of water as something that can be considered compensation.  Tr. 2543:14-2544:23 (Ortega).

125. Because of SB1, there is less member engagement when MABA Texas makes requests for voter assistance to its members.  Tr. 2543:21-23 (Ortega).

126. Members of The Arc of Texas' Public Policy and Advocacy Committee, which includes people with IDD, their families, and other community members, have shared that the voter assistance provisions of SB 1 have made assisters fearful of doing something wrong and unwilling to put themselves in a position that they might be criminally prosecuted for assisting someone with a disability in a way that is misunderstood. Tr. 3517:6-15; Tr. 3516:9-19 (Martinez). SB 1 has made it more difficult for members of The Arc of Texas to receive assistance and they have contacted The Arc of Texas due to difficulties they have faced voting.  Tr. 3526:18-21; Tr. 3525:5-10 (Martinez).

    1.  The new oath language of Section 6.04 deters assisters

127. Section 6.04 requires assisters to sign an oath with new language (1) made under penalty of perjury and swearing that (2) the assister obtained statement of eligibility from voter; (3) the assister did not pressure or coerce voter; and (4) the assister acknowledges that if assistance is provided to a voter who is not eligible, the ballot will not count. Jt. Ex. 1 at 52-53.

128. Dr. Kruse testified that requiring assisters to take an extra step to provide assistance also poses barriers to voters with disabilities. Tr. 3777:22-3778:9 (Kruse). Dr. Kruse "conclude[d] with a reasonable degree of certainty…that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to obtain the assistance they require given the restrictions imposed by section 6.04. Therefore, I conclude that section 6.04 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB Ex. 1." LUPE Ex. 002, para. 101.

129. Tania Chavez testified that LUPE's staff and volunteers who assist voters are frightened by the new oath language, and as a result LUPE's staff and volunteers have restricted their assistance to voters. Tr. 80:2-82:12 (Chavez).

130. Marla López testified that she declined to provide assistance to two elderly monolingual Spanish-speaking voters who asked for her assistance during the 2022 primary election because she did not understand the new law and was concerned about signing the oath. Tr. 3382:2-3383:3 (López).

131. Mr. Espinosa testified that he assisted voters at the polling place prior to the enactment of SB1. Tr. 2443:10-13 (Espinosa). When Mr. Espinosa assisted voters before the enactment of SB1, he would sometimes provide companionship for voters who felt uneasy about entering the polling place by themselves. A lot of times he would assist people who had limited English proficiency. Sometimes the assistance would be as simple as directing the voter and guiding them through the polling place. Tr. 2439:8-16 (Espinosa).

132.    Since the enactment of SB1, Mr. Espinosa has not assisted voters at the polling place.  Tr. 2439:6-7 (Espinosa).

133.    Mr. Espinosa testified that he had many concerns about the assister oath. Tr. 2439:21-23 (Espinosa).

134.    Mr. Espinosa testified that although he assisted voters before SB1, including FIEL members, after SB1 those voters must now vote without him, even though he may be their assister of choice. Tr. 2444:24-2445:7 (Espinosa).

135.    Mr. Espinosa testified that members are less likely to volunteer to assist individuals at the polls.  Tr. 2444:10:14 (Espinosa).  For example, prior to SB1 Debany Gonzales, a FIEL member, was very active in assisting at the polls.  Since the enactment of SB1 Ms. Gonzalez no longer participates in the assistance program.  Tr. 2444:15-2444:23 (Espinosa). Prior to SB1, Ms. Gonzales volunteered to assist voters who were FIEL members.  Now there are FIEL members who must vote without Ms. Gonzales' assistance. Tr. 2445:8-22 (Espinosa).

136.    Mr. Espinosa testified that before SB1, Tonya Rodriguez, a FIEL member with limited English proficiency, requested and voted with an assister.  After SB1, Ms. Rodriguez requested a FIEL member to assist her with voting, but because of SB1, she ended up voting without an assister.  Ms. Rodriguez found the process very cumbersome and very overwhelming.  She requested translation services from a FIEL member so she would feel more comfortable in her native tongue.  Ms. Rodriguez was not able to vote with the assister of her choice, a FIEL member.  Mr. Espinosa testified that Ms. Rodriguez had more difficult time entering the polling place, finding her way around, and that she felt very

anxious about whether she was interpreting or reading things correctly. Tr. 2445:23-2446:22; Tr. 2447:6-13 (Espinosa).

137. Mi Familia Vota is a national nonpartisan organization whose mission is to increase political representation and power of the Latino community.  Tr. 3425:25-3426:6 (Razo).  In addition to its issue-based programs, Mi Familia Vota carries out election-related work to build and support the Latino electorate in Texas, focusing on Latino voters who are considered unlikely to vote. Tr. 3426:7-16; Tr. 3434:6-3435:3 (Razo).  These include voters who face language barriers to voting due to their limited English proficiency, who require assistance that they cannot always get at their polling locations. 10/10 Tr. 3438:4-3439:6; Tr. 3450:1-3451:1; Tr. 3451:6:3452:13 (Razo). Angelica Razo, who served as the Texas state Director of Mi Familia Vota from November 2019 to September 2023, testified that Mi Familia Vota no longer encourages voters to bring trusted assisters with them to vote and that the new oath requirement is a concern to voters and to assisters.  Tr. 3456:16-3457:6 (Razo). They let voters know about the new assister requirements, and spend a great deal of time with voters who require assistance before they get to the polls to educate them about what to expect and how to navigate the voting machines and the voting process, to decrease the likelihood that they would need to rely on assistance at the polls.  Tr. 3456:16-3457:6 (Razo).

138. Isabel Longoria, former Harris County Elections Administrator, testified that the oath of assistance, as expanded by SB 1, instills an atmosphere of fear for assisters who try to assist family members. Tr. 9/20/23 1312:25-1314:9 (Longoria).  She further testified that voters and assisters have reason to be concerned about what poll watchers or election workers

will assume if the assister and voter are speaking a different language. Tr. 1312:25-1314:9 (Longoria).

139.    Ms. Longoria's office received reports from their call center and from community groups that voters who need assistance were intimidated and confused by section 6.03 of SB 1. Tr. 1310:13-23 (Longoria).

(a)    Assisters are deterred by the "penalty of perjury" language

140.    Mr. White, the State's top voter fraud prosecutor, testified that the new penalty of perjury language in the assister oath "absolutely would" alert the assister who is not familiar with the oath that the assister is taking the oath under penalty of perjury. Tr. 3990:18-25 (White).

141.    Because of the new language in the assister oath, Mr. Joe Cardenas understands that he would be liable under criminal law for inadvertently doing something wrong. Tr. 2484:14-21 (Cardenas). He is concerned that swearing under penalty of perjury would adversely affect him or the voter, explaining "Well, that concern is that I can be accused of doing something wrong, that, in my opinion, I didn't do anything wrong for inadvertently might have done that I didn't intend to do." Tr. 2484:22-2485:11 (Cardenas).

142.    In the May 2022 Primary Run-off Election, Mr. Joe Cardenas sought to assist Ms. Herlinda Eureste with casting her ballot at the polling place located at the Wharton civic center. Ms. Eureste is vision impaired; she uses dark glasses and sometimes uses a cane. Tr. 2480:14-2481:7 (Cardenas). Mr. Cardenas picked up Ms. Eureste and drove her to the polling place. Tr. 2481:15-17 (Cardenas). When they arrived at the polling place, Mr. Cardenas helped Ms. Eureste to sign in. Tr. 2481:18-20 (Cardenas). The Election Judge required Ms. Eureste to complete a new voter registration card before allowing her to vote. Tr. 2481:21-

2482:1 (Cardenas).  Ms. Eureste could not see the numbers on her Texas identification card and Mr. Cardenas assisted Ms. Eureste by reading those numbers to her as she filled out the new voter registration card.  Tr. 2482:2-11 (Cardenas).  Mr. Cardenas also assisted Ms. Eureste by pointing to the place on the voter registration card where Ms. Eureste had to put her signature.  Tr. 2482:4-17 (Cardenas).

143.    When Ms. Eureste arrived at the voting station, she could not see the ballot.  Tr. 2482:18-22. (Cardenas).  Mr. Cardenas assisted Ms. Eureste to press an icon on the screen to enlarge the text but the icon did not work and the text on the screen did not become bigger.  Tr. 2482:23-2483:6 (Cardenas). Because Ms. Eureste could not read the ballot and mark her choices, Mr. Cardenas read the ballot to her. Tr. 2483:7-9. (Cardenas). Ms. Eureste told Mr. Cardenas which candidate she wanted to vote for and Mr. Cardenas pointed to the box next to that candidate's name so she could mark that box.  Tr. 2483:7-16 (Cardenas).

144.    Even though Ms. Eureste could not read the ballot, Mr. Cardenas did not mark the ballot for Ms. Eureste because he was afraid of doing something wrong.  Tr. 2483:17-23. (Cardenas)

145.    Mr. Cardenas is also aware of another member of Texas HOPE, Ms. Jennifer Cantu, who will not provide voter assistance in the future because she will not sign the new oath of assistance under penalty of perjury.  Tr. 2487:6-2488:3 (Cardenas).

146.    In the wake of SB1, the stream of volunteers for Texas HOPE who are willing to assist voters at the polls has dwindled significantly.  Tr. 2488:4-11 (Cardenas).  When fewer people are willing to volunteer with Texas HOPE to assist voters, this reduces the number of people who participate in the elections process and undermines the goals of Texas HOPE.  Tr. 2488:24-2489:3 (Cardenas).  As explained by Mr. Cardenas, "Well, the

response is that because of the vagueness of the bill, even when we attempt to give an interpretation, or to explain to people that it doesn't deal with a specific -- or it doesn't make something specifically criminal, they have a hard time I guess believing what we're saying. You know, there's always that shadow of a doubt there because of the vagueness of the language in the bill and also because of the perjury part of it." Tr. 2488:4-23 (Cardenas).

147.  Maria Gomez, a LUPE volunteer, decided not to assist voters anymore because of SB1. LUPE Ex. 284 at 13:19-14:15; 32:2-8; 17:2-13. Ms. Gomez does not understand the oath under SB1 and she does not want to risk doing something that she feels she is not able to do. LUPE Ex. 284 at 35:10-37:17. Maria Gomez is afraid SB1 will hurt her for helping people vote. LUPE Ex. 284 at 18:20-20:9. In 2021, Maria Gomez does not want to continue assisting voters because she did not want to make a mistake. LUPE Ex. 284 at 41:24-42:24; 11:15-12:10; 15:17-20; 29:9-12.  She would help people vote today if she did not fear that the law would affect her personally. LUPE Ex. 284 at 20:16-21:6.

148.  Since SB1, Maria Gomez has not tried to go with anyone inside the voting poll to help them vote because of her fear of being a vote assister. LUPE Ex. 284 at 37:18-38:10; 46:13-21; 47:1-5; 47:18-22. Before 2021, Maria Gomez felt at liberty to help people to vote and enjoyed helping people vote. Maria Gomez helped people to vote for about 25 years. LUPE Ex. 284 at 40:24-42:2.

149.  Despite having helped people to vote for 25 years, Maria Gomez has a fear so strong about the changes in SB1 that it made her stop helping people to vote. Maria Gomez used to assist people with voting as part of her work as a volunteer with LUPE before 2021 but she does not feel able to do that now. LUPE Ex. 284 at 41:24-42:24; 11:15-12:10; 15:17-20; 29:9-12.

150. Cris Rocha understands the penalty of perjury in the voter assister oath to mean that if she does something wrong that she will go to jail. The swearing under penalty of perjury in the vote assister oath makes Ms. Rocha not want to give assistance anymore because she is afraid that if she does something wrong, it will hurt her or the voter. Tr. 147:10-148:8 (Rocha).

151. The new voter assister oath language has made Cris Rocha not want to assist voters anymore and other people have told her they do not want to do it anymore either. Tr. 150:1-5 (Rocha).

152. Many disabled voters rely on direct support professionals who are deterred by the new oath language.  As explained by Ms. Martinez:  "There are criminal provisions and those are of a concern to our members. You are asking someone who is already overworked and underpaid to then take on perhaps a criminal -- it's just mind-boggling to me…the criminal piece of this is very disadvantageous to my members… It just feels like a lot to ask of somebody who is likely not comfortable in a criminal justice setting and see something like 'perjury' or big words that scare them, and it scares them away from supporting our staff and our teams."  Tr. 3516:3-8; Tr. 3520:6-18; Tr. 3524:2-3525:4 (Martinez).  See also  Tr. 3522:23-3523:9; Tr. 3521:1-9; Tr. 3515:11-20; Tr. 3516:3-19; Tr. 3517:17-25; Tr. 3520:6-18; Tr. 3524:7-18; Tr. 3524:21-3525:4 (Martinez).

153. Mr. Cole is concerned about the assister oath, specifically with the penalty of perjury.   "I don't know what and how I'm going to do different when I have to go this next time because I either have to choose to put somebody in harm's way or I've got to choose that I can't have the things that I need to make sure I can vote properly."  Tr. 719:21-720:5 (Cole).

154.    Mr. Cole feels that the part of the oath that states, "I will not suggest by word, sign, or gesture how the voter should vote," will force him to either change how he votes or require his assister to commit perjury.  Tr. 710:20-711:11 (Cole).

155.    Mr. Cole testified that he has been able to vote only because he has resources and is persistent.  "So, yeah, I can vote because I have resources and I have the ability and I have the persistence, but if I had limited resources and I didn't have the ability to go to the polling place and spend 45 minutes or an hour, however long it took, then I wouldn't be able to vote."  Tr. 722:12-723:16 (Cole).

156.    Mr. Kafka testified similarly that attendants, who are already in short supply, are unlikely to deliver assistance "especially if they think by some chance that they may end up being criminally accused. And so the oath really is something that has shown to be inhibiting finding people, attendants, that would be willing or even less willing to do it because of the threat of perjury." Tr. 3625:5-22 (Kafka).

157.    Ms. Miller testified that the language in the oath makes her more nervous to assist her daughter, Danielle, with voting than the previous oath. When asked how she slept on the night after she took the oath, she responded: "…it made me really nervous. The word 'perjury,' is in there. I know I'm doing everything right but it sounds very threatening and intimidating." Tr. 3208:9-17; Tr. 3217:12-3218:1 (Miller).

158.    Ms. Cranston testified: "We don't get paid enough money as it is and here we are being asked by the State of Texas to take this oath when we don't even know the detail of the specifics and I don't want to make a mistake…for me a lot could be at stake, even my job could be at stake…. Tr. 3561:2-3562:22 (Cranston). See also Tr. 3559:23-3560:9 (Cranston).

159. Mr. Espinosa testified that he is concerned with the assister oath and feels uneasy about the words, "penalty of perjury." Tr. 2439:24-2440:10 (Espinosa). Mr. Espinosa explained since the enactment of SB1 he has not volunteered to assist at the polls because in addition to all of his other concerns, he is concerned about the penalty of perjury, "[T]hen it just makes us - it makes me feel very uneasy about going into that space and potentially making a mistake that could affect me in the future. Tr. 2443:10-19 (Espinosa). Mr. Espinosa testified that members of FIEL have expressed a shared sense of uneasiness about the assister oath, regarding the language, "penalty of perjury." Mr. Espinosa also testified that the oath raises questions for him regarding how someone would know if a voter is eligible for assistance if they are not familiar with the process. Tr. 2443:20-2444:14 (Espinosa).

160. Ms. Ortega has assisted voters at the polling place. Ms. Ortega has not assisted any voters since SB1 was enacted. Tr. 2539:3-6 (Ortega). Ms. Ortega testified that she does not feel comfortable with the language, "swearing under penalty of perjury." Tr. 2540:21-23 (Ortega). As an attorney, Ms. Ortega understands that the words, "swear under penalty of perjury" carry great liability for whatever information the person is swearing or affirming. Tr. 2539:7-11 (Ortega). Having to swear under penalty of perjury affects Ms. Ortega's willingness to assist someone voting because she does not want to put her reputation and license on the line or possibly be subjected to criminal penalties. Ms. Ortega testified that as much as she loves to help, she will no longer be assisting voters. Tr. 2539:12-19 (Ortega).

161. Members of MABA Texas are concerned about the word "perjury" in SB1. MABA Texas members find this language alarming because they don't want to subject themselves to the consequences of being accused of perjury. Tr. 2538:8-14 (Ortega).

162.    El Paso County Election Administrator Lisa Wise testified that a potential assister may be concerned that if they make a mistake in giving either the wrong kind of assistance or assistance to an ineligible voter, that voter's ballot may not be counted. If this potential assister is aware of SB1, they may be concerned they will be accused of perjury for either mistake for having signed the oath before delivering assistance. Tr. 175:6-10; Tr. 176:2-8 (Wise).   She further testified that people can be intimidated by additional required information on a form or talk of a penalty under law. Tr. 175:6-176:8 (Wise).

163.    Remi Garza, Cameron County Election's Administrator testified that he personally would not sign an oath under penalty of perjury if he were not sure if he were complying with the oath. Tr. 735:25-736:5 (Garza).

164.    Ms. Longoria, former Harris County Election's Administrator testified that an oath is under penalty of perjury is a very intimidating threshold for a layperson. Tr. 1312:25-1314:9 (Longoria).

        (b) Assisters are uncomfortable securing a representation of eligibility for assistance from the voter

165.    Mr. White, Former Chief of the Election Integrity Division in the Texas Attorney General's Office, testified that the assister oath does not directly set out the criteria for eligibility for assistance, and that you cannot look at someone and know whether or not they have a disability because "some disabilities are certainly invisible." Tr. 3991:6-13.  Mr. White testified further that some eligible voters receiving assistance at the polling place appear to be able-bodied.  Tr. 3991:14-17 (White).

166.    In the May 2022 Primary Runoff Election, Mr. Joe Cardenas took the oath of assistance before assisting Ms. Herlinda Eureste to vote, but he cannot remember if, before he took the oath, Ms. Eureste told him that she was eligible for voter assistance.  Mr. Cardenas did

41

not ask Ms. Eureste if she was eligible for voter assistance. Tr. 2484:2-13 (Cardenas). Mr. Cardenas does not want to have to secure a representation from Ms. Eureste of her eligibility for voter assistance because he believes it would be embarrassing for both of them. Tr. 2485:12-22 (Cardenas). But Mr. Cardenas believes that if he doesn't secure the representation of eligibility from a voter, his signing of the assister oath could be construed as perjury. Tr. 2485:23-2486:1 (Cardenas). Although he does not want to have to secure a representation from Ms. Eureste of her eligibility for voter assistance, Mr. Cardenas is afraid that someone could say that he violated the oath of assistance if Ms. Eureste did not represent to him that she was eligible for voter assistance. Tr. 2496:14-18 (Cardenas).

167. Ms. Ortega is nervous about having to secure a representation of eligibility from a voter that she assists. She testified that she is nervous because, in combination with the requirement to obtain a statement of eligibility, she has to swear under penalty of perjury. She does not feel that this is something she should have to do, but if she provides assistance without securing a representation of eligibility from the voter, she would be committing perjury. Tr. 2539:20-2540:10 (Ortega).

168. Members of MABA Texas are concerned because they do not feel that they can really guarantee that they have the knowledge to attest to someone's disability, nor do they necessarily want to attest to a voter's disability or need for assistance. Tr. 2543:21-16 (Ortega).

169. Cris Rocha does not understand what the voter assister oath means when it says that "The voter I am assisting represented to me they are eligible to receive assistance." She does not ask the voter to state that they are eligible for assistance. Ms. Rocha gets nervous to provide assistance now. Tr. 148:9-149:3 (Rocha).

170. Cris Rocha knows the voter has selected her as their assister because the voter tells her that they need her help because they do not know how to read or they cannot see too well. Ms. Rocha does not know if that is enough under SB1 to satisfy the requirement for a representation of eligibility. Tr. 147:1-9 (Rocha).

171. Cris Rocha does not know who decides if a voter is ineligible to receive assistance. In Ms. Rocha's view, the voter should decide if the voter needs assistance. Tr. 149:20-25 (Rocha).

172. The requirement that a voter state their eligibility for assistance delves into sensitive topics such as lack of literacy or invisible disabilities such as mental disabilities. A voter may be afraid to share their literacy limitation, or why they are not literate. In the wake of SB1, LUPE trains its voter assisters to obtain a representation of eligibility from voters, but "because we have to actively ask the voter whether or not they actually qualify to receive assistance, it dives into territory that our organizers -- our civic engagement organizers are not as confident." Tr. 3682:9-3683:8 (Chavez).

173. According to El Paso County Election Administrator Lisa Wise, a potential assister may have concerns about securing a representation from the voter that the voter needs assistance. Tr. 175:2-5 (Wise).

174. Cameron County Elections Administrator Remi Garza testified that he believed "some people would be hesitant to…confess to a disability" and that an assister may be reluctant to sign the oath if they weren't sure what the eligibility criteria is for assistance. Tr. 734:8-735:24 (Garza).

175. Ms. Cranston expressed concern about this provision since there is no criteria included in the oath to explain who is eligible to receive the assistance. Tr. 3561:2-3562:22; Tr. 3575:1-10 (Cranston). She testified that the "burden falls on the attendant to make sure they get it

right" and this is "more than what we've signed up for." It may be confusing because, for example, some people with disabilities may not identify as such (i.e., the deaf community) and therefore may be unclear about their eligibility and not receive the help they need. Tr. 3565:2-3566:18 (Cranston).

176.   Ms. Miller testified that she felt the language regarding eligibility for assistance was "pretty vague." Given that there is nothing in the oath or the instructions to the assister that would explain who is eligible for assistance, she did not think it would be clear what her daughter would have to say to a potential assister so they could assist her without violating the oath. Tr. 3205:19-3206:10 (Miller).

(c)   The existing oath language regarding "word, sign, or gesture", in combination with new penalty of perjury language, deters assisters

177.   Although SB1 did not add the language about "word, sign, or gesture" to the assister oath, assisters are deterred by this language in combination with new penalty of perjury language and are reluctant to provide assistance.

178.   Ms. Martinez testified that she is concerned that cuing, a common method of assisting voters with IDD, may be misconstrued under this provision. Tr. 3519:17-3520:5 (Martinez).

179.   Mr. White testified that, with respect to interpreting this part of the statute, it's a "tough" question whether the statute is violated when a voter with a memory or cognitive impairment has worked with the assister in advance to go and vote and the assister is in the polling place providing a reminder as to what they had discussed previously. Tr. 3988:1-22 (White).

180.   Mr. White further testified that it is an interesting question whether the activity of the assister to provide somebody with a memory or cognitive impairment with a reminder or a

prompt of a past conversation would potentially technically violate the Election Code.  Tr. 3988:23-3989:4 (White).

181.    To the extent that this type of assistance would violate 6.04, Mr. White also testified that there might be a "conflict there" between "the intent of the law [] versus the actual language."  Tr. 3989:5-9 (White).

182.    Mr. White also testified that with respect to whether an assister, before signing the oath of assistance, has to determine for themselves whether reminding or prompting a voter about their past choices violates the oath of assistance, "anyone who takes this oath is determining what that means to them."  Tr. 3989:10-16 (White).

183.    Mr. White also testified that "it would certainly be the interpretation of the D.A. in that county where [the potential] offense took place" that would determine whether an assister would be prosecuted.  Tr. 4105:13-21 (White).  Mr. White testified that he understood that if the assister was unlucky and got the prosecutor that decided to bring the case in the tough cases, the assister would go up in front of the jury.  Tr. 4105:22-4106:5 (White).

184.    Mr. Cole testified that the part of the oath that states, "I will not suggest by word, sign, or gesture how the voter should vote," will make it harder for him to vote.  Mr. Cole testified that he doesn't remember things the way that he did when he was younger.  Tr. 710:20-711:4 (Cole).  Mr. Cole specifically requests that his assister remind him how he decided to vote.  Tr. 710:25-11 (Cole).  Mr. Cole requires his assister to remind him of his choices for different elections because the ballot can be lengthy and because he does not remember things the way he did when he was younger. Tr. 710:25-711:22 (Cole).

185.    Mr. Espinosa explained that he feels very uneasy about the language of the assister oath, "I will not suggest by word, sign, or gesture how the voter should vote," because he feels

like he has to police himself while assisting the voter regarding what he says, does, and how he moves because "sign or gesture" can mean many different things.  This adds an extra layer of complexity to an already complex exercise.  Tr. 2440:11-25 (Espinosa).

186.    Mr. Espinosa testified that he understood Ms. Gonzales, a FIEL member who used to assist FIEL member voters but who no longer provides assistance, to be wary and concerned about the language on the oath of assistance, specifically, the language "under penalty of perjury," "who is eligible to receive assistance," and "I will not suggest by word, sign, or gesture how a voter should vote."  Tr. 2445:4-22 (Espinosa).

(d) <u>Assisters don't know what "pressure" means in the new oath</u>

187.    Cris Rocha does not know what the voter assister oath language means when it says "I did not pressure the voter into choosing me to provide assistance." She does not know what it means to "pressure" a voter because the word pressure is very broad and very confusing. Tr. 149:7-14 (Rocha).  Cris Rocha does not know if she has pressured a voter into choosing her to assist them if she calls the voter to tell them to vote. Tr. 149:15-19 (Rocha).

188.    Joe Cardenas, who assisted a blind voter in the May 2022 Primary Runoff Election, is concerned that the new language in the assister oath which states that the assister did not "pressure" the voter is very subjective and "what I wouldn't see as pressure someone else may see as pressure, pressuring the voter."  Tr. 2486:2-10 (Cardenas).

189.    Mr. Cardenas is concerned that if he provides assistance to a voter, an election judge or other poll worker may claim that they witnessed him pressuring that voter, and he could be accused falsely of committing a crime.  Tr. 2498:22-2499:8 Cardenas).

190.    Mr. Cole explained his concern that this provision "leaves out the complexity of what it's like to have caregivers…there's pressure back and forth. I'm lucky. I can afford to hire

people to do the things I need to do. Not everybody can do that. So there is pressure in both

directions." Tr. 711:24-713:4 (Cole). Mr. Cole also highlighted the discrepancies between

the barriers he is now required to deal with to access voting and other areas of his life:

> I'm not required to do any of this if I want to go get health care, or if
> I want to go get groceries, or if I want to work, or...if I want to come
> talk in this courtroom…no one makes sure that [my attendant] didn't
> put undue pressure on me to come here, but when I want to go
> exercise my right to vote, then…all of a sudden I need the State of
> Texas to put restrictions on how I do that. Tr. 713:5:14 (Cole).

191. Mr. Espinosa testified that he feels uneasy about the language of the assister oath "I did not

pressure or coerce the voter into choosing me to provide assistance," because FIEL

encourages people to seek assistance if they need it. FIEL and its members would not want

their encouragement to be misinterpreted as pressuring voters to choose them as assisters.

Tr. 2441:1-11 (Espinosa). Mr. Espinosa personally feels very uneasy and uncomfortable

with this language of the oath, because he is concerned that if a monolingual speaker

overhears him assisting a voter in Spanish, he may be misinterpreted as trying to influence

the voter. Because of these concerns, he is less inclined to provide assistance, just to avoid

issues. Tr. 2441:12-2442:5 (Espinosa).

192. Members of MABA Texas are concerned that anything they say or do may be interpreted

as pressuring a voter. Therefore, they are unwilling to engage or assist voters. Tr.

2543:21-9 (Ortega).

193. As an attorney, Ms. Ortega would like to see a definition or context for the words

"pressure" or "coerce." Ms. Ortega feels that the words are subject to interpretation. Tr.

2540:11-16 (Ortega). For instance, Ms. Ortega testified that calling a voter multiple times

to ask them if they plan to vote and then later acting as that voter's assister might be viewed

as pressuring a voter. Tr. 2540:11 (Ortega).

194.   SB1's assistance provisions negatively affect Ms. Ortega's community by eliminating their first choice assisters.  "That means there are fewer of us, …that may be able to assist, and even if a person wants us to, and as attorneys we do have, we have clients, we have neighbors, we have co-workers, we have family members that trust us, and even if they - we would be the assister of their choice, we still may not feel comfortable doing that."  Tr. 2541:12-25 (Ortega).

195.   Ms. Cranston shared an experience where she found out only after the fact that a person with a disability for whom she worked as a personal care attendant felt intimidated by her. She is, thus, concerned that a lack of clarity on what these words mean could subject personal care attendants to penalties for behavior they may not even realize they are engaging in. Tr. 3563:4-3565:1 (Cranston).

196.   Ms. Miller testified about her concerns regarding the vagueness of this provision and that she has "no idea" how to interpret it, making her uncomfortable signing the oath that includes this language:

> …[P]ressure or coerce sounds like, hey, I'm going to give you a dollar to go vote. I would never do that. That's illegal. That's very cut and dry, but…when Danielle is like we plan to vote on Tuesday and maybe we plan to go at 3:00, and as I stated, she doesn't like abrupt changes, maybe my schedule has changed and I can no longer go at 3 and I said, hey, it's Tuesday, it's 1:00, let's go vote now instead. Is that coercion? I don't know. What does that mean?  Tr. 3206:11-3207:4 (Miller). *See also* Tr. 3207:20-25; Tr. d3214:13-3215:9 (Miller).

197.   Ms. Martinez testified that this language is confusing and could be easily misunderstood: "...it puts a lot of the burden on low-wage overworked direct support professionals…if you don't have a direct support professional who you know well, there could be some

confusion. It just, it's all very unclear and burdens my members in ways that scare them." Tr. 3520:19-3521:18 (Martinez).

198. Ms. Nunez Landry elaborated that the reality for many people with disabilities is that they cannot maintain care attendants and this prevents people from being employed and having the supports they need "because we depend on them for everything." This language in the oath of assistance makes the relationship more fraught and nursing home staff who assist residents are also likely to be concerned about it. Tr. 3249:15-3251:2 (Nunez Landry).

199. The Arc of Texas is concerned that the assistance a voter with IDD may need may be misunderstood as pressure or coercion and that a direct support professional who helps a voter with IDD may face criminal liability as a result. Tr. 3521:14-18 (Martinez). The Arc of Texas is concerned that this misunderstanding could cost a voter with a disability the ability to cast their ballot. Tr. 3522:12-22 (Martinez).

200. El Paso County Election Administrator Lisa Wise testified that based on the Election Code, she could not state whether "pressure" as used in SB1 would encompass a neighbor telling a voter three days in a row that early voting is happening and they can give the voter a ride to the polls and help them. Tr. 173:21-174:7 (Wise)

201. Ms. Ramon, former Hidalgo County Elections Administrator, testified that her office did not receive any guidance from the Secretary of State about what "pressure" means with regard to the oath of assistance. Tr. 2317:1-7 (Ramon).

202. Ms. Ramon testified that her office did not receive any guidance from the Secretary of State about what "pressure" means with regard to the oath of assistance. Tr. 10/3/23; Tr. 2317:1-7 (Ramon).

203. Cameron County Election Administrator Remi Garza testified that he believed the "I did not pressure" language in the oath could make people hesitant to provide assistance based on the fear that they could be understood to be pressuring the voter to take their assistance: "The wording is vague enough where …they might be concerned that they are going to violate the oath if they signed it." Tr. 733:21-734:7 (Garza).

(e) <u>Assisters are concerned about "vote will not be counted" language in the oath</u>

204. Voter assisters rely on Texas election materials that incorrectly narrow eligibility for assistance, both in the polling place and on the mail ballot carrier envelope. The Texas Secretary of State's "VOTER INFORMATION" poster, which election officials are required to post in every polling place and at every voting station, states: "You have . . . (6) The right to assistance while casting your ballot if you cannot write, see the ballot, understand the language in which it is written, or cannot speak English, or communicate only with sign language, and want assistance in communicating with election officials." LUPE Ex. 265 (current form available at https://www.sos.texas.gov/elections/forms/pol-sub/7-36f.pdf), Tex. Elec. Code § 62.011. The Texas Secretary of State's mail ballot carrier envelope instructs the assistant: "A voter may only be assisted with reading or marking the ballot if the voter has a physical disability that renders the voter unable to write or see, or has an inability to read the language in which the ballot is written." HAUL-MFV Ex. 297 (current form available at https://www.sos.state.tx.us/elections/forms/pol-sub/6-25f.pdf).

205. Lisa Wise testified that in El Paso County, a potential assister may be concerned that if they make a mistake in giving either the wrong kind of assistance or assistance to an

ineligible voter, that voter's ballot may not be counted. However, the oath does not contain the eligibility criteria. Tr. 175:6-10; Tr. 176:2-8 (Wise); Tr. 735:12-20 (Garza).

206. Remi Garza believes that an assister may be reluctant to sign the oath, if they are not sure what the eligibility criteria are. Tr. 735:21-24 (Garza).

207. Jonathan White, former Chief of the OAG Voter Integrity Division, agreed that the new assister oath does not set out the criteria for eligibility for assistance. He further agreed that some disabilities are invisible and some eligible voters receiving assistance at the polling place appear to be able-bodied. Tr. 3991:1-17 (White).

208. Ms. Miller expressed concern that this language is unclear regarding who would decide if her daughter's ballot would or would not be counted based on eligibility for assistance. Her daughter's disability is not always visible and perhaps this could lead this to someone who is uninformed deciding that her daughter was not eligible to receive assistance when, in fact, she was. Ms. Miller testified that she believes that the person with a disability who needs the assistance should be the one to decide if she is eligible to receive it. Tr. 3215:10-3216:4 (Miller).

209. Joe Cardenas testified that new language in the oath of assistance does not say *who* decides if a voter is eligible for assistance, when it requires the assister to swear that "I understand that if assistance is provided to a voter who is not eligible for assistance the voter's ballot may not be counted." Jt. Ex. 1; Tr. 2486:11-21 (Cardenas). Mr. Cardenas testified, "I certainly wouldn't want to in any way damage my reputation or that of the voter because I know that their vote can actually be disallowed." Tr. 2484:22-2485:11 (Cardenas). Mr. Joe Cardenas testified that he believes the voter should decide if the voter needs assistance. Tr. 2486:22-24 (Cardenas).

210.    Voter assister Cris Rocha similarly testified that the voter should decide if they are eligible for assistance. Tr. 149:20-25 (Rocha).

211.    Mr. Cole testified that he is terrified by the phrase in the assister oath, "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." Tr. 713:15-23 (Cole).   Although he has a visible disability because he uses a wheelchair and cannot use his arms or legs, he also relies on verbal assistance from his assistant to remember his candidate selections. Tr. 709:21-710:3; Tr. 710:20-711:11 (Cole). Mr. Cole testified that he worries that after he votes someone will come back later and decide that his vote is invalid because he did not comply with some part of the oath without realizing it., "It means that some person later may came back and tell me that what I did - that my vote doesn't count…you didn't what, you didn't follow our rules right, and so your vote doesn't count." Tr. 713:24-714:4 (Cole). "I don't know who can come in and say, you know - it just says "I understand that if assistance is provided to a voter who is not eligible for assistance."" Tr. 714:5-16 (Cole).  Mr. Cole is concerned that someone will determine that he is ineligible for the assistance he is requesting, or that other people with invisible disabilities will be determined ineligible for assistance.  Tr. 717:10-718:11 (Cole).

212.    Mr. Cole testified that it should be up to the voter to decide if they are eligible for assistance and the type of assistance that they are eligible for. "[I]n every other aspect when someone is disabled they get to decide what help they need, how they need the help. We do that with employment laws. You know, you get to decide what you want to tell your employer, what you don't want to tell your employer. You get to decide if you need assistance. You get to decide all those things, when you go get health care, all those things you get to decide. And

then when it comes to voting, all of a sudden you don't get to decide that anymore, someone else gets to decide that for you." Tr. 718:12-23 (Cole).

213. Ms. Tania Chavez shared an incident, reported by a LUPE member, in which a poll worker suspected that a disabled voter was not eligible for assistance and that he should not be voting at all, leading the poll worker to hover over the voter and his mother/assister while they were voting, which made it "a lot more stressful for her child to be able to cast the vote." Tr. 108:7-19 (Chavez).

214. Ms. Ortega is concerned with the many subjective provisions of the oath and with running afoul of any of the language of the oath, and so will not assist anyone. Tr. 2541:12-17 (Ortega). Ms. Ortega testified that as a voter assister, she is negatively affected by the language in the oath, including the language that states "that I understand if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."; because she is unsure who determines if a voter is eligible for assistance. Tr. 2540:24-2541:8 (Ortega).

215. Ms. Ortega has previously assisted voters at the polling place but has not assisted anyone since SB1 was enacted. She has decided not to assist voters anymore because there is too much to misinterpret in the language of the oath and she would not want any of her actions to be viewed as running afoul of the oath. Tr. 2539:3-6; Tr. 2542:1-5 (Ortega).

      (f) <u>Election officials cannot waive SB1's voter assistance provisions as an ADA accommodation</u>

216. Election officials in Bexar County, Harris County, and Hidalgo County testified that they work to grant requests for accommodations from disabled voters, but they also confirmed that if a voter with a disability asks for a change to SB1's requirement that the assister complete the oath of assistance, the counties cannot grant that accommodation even if it

means the voter cannot vote with that assister or cannot otherwise receive the assistance they need. Tr. 1044:20-23; Tr. 1058:21-25 (Callanen); Tr. 1171:4-18 (Obakozuwa); Tr. 1312:12-15; Tr. 1296:8-1297:16; Tr. 1317:4-10 (Longoria); Tr. 2336:13-17, Tr. 2337:2-5 (Ramon).

**F. Section 7.04 prohibits mail ballot voter assistance by people who are compensated to advocate for a specific candidate or measure**

217.    Section 7.04 creates a third degree felony for providing or offering to provide vote harvesting services, or providing or offering to provide "compensation or other benefit" in exchange for vote harvesting services." Jt. Ex. 1 at 58. An offense under this section carries a penalty of a minimum of two years (and up to ten years) of jail time and a fine of up to $10,000.  Section 7.04 (f); *see also* Tex. Penal Code § 12.34.

218.    Section 7.04 defines "Vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *Id.* at 59.

219.    Mr. Scarpello agreed that if someone is going door to door to canvas voters to encourage them to vote for school bond, that person is having a face-to-face interaction with a voter, and if the person is urging voters to vote for school bond, that person's intent is to convince the voter to vote a certain way. Tr. 423:23-424:14 (Scarpello).

220.    Based on his experience, Mr. Scarpello agreed that if that individual is canvassing and talking to the voter in the doorway, and the voter says they have their mail ballot right here on the table and continue the conversation, he would perceive that as being in the presence of the mail ballot. Tr. 424:15-425:14 (Scarpello).

221.    Cameron County Election Administrator Remi Garza testified that in the Rio Grande Valley there are organizations not affiliated with political campaigns that assist voters who

might be homebound to complete their mail ballots, some of whom pay their staff or reimburse volunteers for doing this work. Mr. Garza thinks that this could be interpreted as committing an offense under SB1.  Tr. 758:8-759:12 (Garza).

222.    Jonathan White, Former Chief of the Election Integrity Division in the Texas Attorney General's Office, testified that 7.04 does not limit the offense of vote harvesting to persons who are being paid by a candidate, campaign or PAC.  Tr. 4001:1-23 (White).

223.    He further testified that a community organization paying an organizer to persuade mail ballot voters in person in the presence of the ballot to vote for a ballot measure comes awfully close to paid vote harvesting efforts. Tr. 4000:5-10 (White).  He further testified that "it would be possible for an outside organization" including a non-partisan, non-PAC, to violate 7.04 by engaging in the elements of "vote harvesting" as defined by 7.04.  Tr. 4001:1-16 (White).  Mr. White then claimed that he had never dealt with circumstances in which community organizations did this kind of voter outreach.  Tr. 4000:11-17 (White).

224.    Former Travis County Elections Clerk Dana DeBeauvoir testified that Section 7.04 does not distinguish between legal assistance for people who are eligible to receive it and others and "criminalized a very innocent process that helped often our most vulnerable voters, voters who were shut in who really relied on vote by mail to be able to participate in democracy[.]" Tr. 841:12-842:9; Tr. 844:13-25 (DeBeauvoir).

   1.   "Physical Presence" is undefined

225.    Section 7.04 does not define what it means for a ballot to be physically present.  Tr. 1914:15–20 (Ingram).  The Secretary of State's Office has not published guidance defining what constitutes a ballot being physically present. Tr. 1914:7–14 (Ingram).  For example, the Secretary of State's Office has not published guidance or trainings specifying how close

to each other two individuals must be for an interaction to be considered in person.  Tr. 1914:7–14 (Ingram).

226.    Section 7.04 says nothing regarding the proximity within which a ballot must be to a conversation for it to be deemed physically present. Tr. 1914:21–24 (Ingram).  Indeed, when asked, Mr. Ingram could not "put a number" on the distance. Tr. 1912:17–1913:13 (Ingram).

227.    Although Mr. Ingram believes that Section 7.04's "physical presence" requirement requires both parties to be aware that a ballot is present, he admitted that his personal interpretation is not codified anywhere in Section 7.04. Tr. 4466:12-4467:6 (Ingram).

228.    The Secretary of State's Office has no official opinion as to whether a ballot being ten feet from a discussion, for example, is close enough to constitute physical presence to implicate Section 7.04. Tr. 1916:1-12 (Ingram).

2.    "Benefit" is broadly defined

229.    Section 7.04 defines "benefit" as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." Jt. Ex. 1 at 59.

230.    The "benefit" language of 7.04 is so broad that the State's chief voter fraud prosecutor conceded that he would have to do legal research to determine what types of benefit would violate the provision.  With respect to prohibited compensation for mail ballot assistance, Mr. White testified that if he was asked whether "anything of value" could encompass a gift bag, for example, with a T-shirt in it, he would go and do some research and see if there's any case law to flesh that out and "reviewing case law would always be a good

decision in that context." Tr. 3992:20-3993:16. Mr. White testified further that he would potentially review case law to answer the question whether prohibited compensation includes an assister receiving a meal or bus fare. Tr. 3993:19-21 (White).

3. Plaintiffs' compensated canvassers advocate for and against ballot measures in person and in the presence of the mail ballot

231.  LUPE advocates to its members, including mail ballot voters, on ballot measures. One example of LUPE's ballot issue advocacy to voters is a drainage bond that was on the ballot around 2011-2012 that would have implemented drainage in the colonias. The drainage bond passed in that election. Another example is the ballot issue of creating a health care district in Hidalgo which has no public hospitals. The health care district proposal was defeated in the election. Tr. 88:8-88:24 (Chavez). LUPE plans to urge voters to support a health care district ballot measure in the future because Hidalgo County has high rates of poverty, and high rates of obesity and diabetes, and LUPE believes that a health care district is needed to improve the quality and availability of health care in Hidalgo County. Tr. 88:25-89:6 (Chavez).

232.  LUPE paid staff and paid canvassers advocate to voters on ballot issues when knocking on doors, out in the neighborhoods, at house meetings, at LUPE events, at the union hall, at tabling events, and in the LUPE offices because LUPE wants to make sure that everybody is educated about the ballot measure and understands the position that LUPE advocates for that measure. Tr. 89:7-89:18 (Chavez).

233.  LUPE staff and volunteers interact in person with one or more voters when advocating on ballot measures. Tr. 90:25-91:17 (Chavez). The goal of this interaction and advocacy is to urge people to vote a certain way on a ballot measure, for example a drainage bond or

health care district. *Id.* (Chavez). LUPE expects that its employees or canvassers will advocate on ballot measures in the presence of a mail ballot. *Id.* (Chavez).

234.    LUPE expects that its members will bring mail ballots to meetings at the LUPE offices or union hall. Mail ballot voters bring their ballots to LUPE offices and meetings to ask for assistance completing the ballot. Tr. 90:4-90:24 (Chavez). As LUPE organizers canvass neighborhoods to urge support for ballot measures, mail ballot voters invite LUPE organizers into their homes and then while the organizer is advocating on a measure, the voters produce their mail ballots and ask the organizer for assistance. Tr. 71:1-72:15; Tr. 75:11-75:17; Tr.119:20-120:18 (Chavez). Because this has happened in the past, LUPE expects in the future that its organizers will find themselves advocating on ballot measures in the presence of mail ballots. Tr. 119:20-120:18 (Chavez).

235.    LUPE staff and volunteers who knock on doors of voters, particularly doors of elderly and disabled voters, know that the mail ballot could be sitting in the voter's living room. Tr. 3684:13-3685:4 (Chavez).

236.    Before SB1, LULAC councils would conduct get-out-the vote efforts with seniors in which LULAC members would conduct advocacy and provide voter assistance to senior voters. Mr. Garcia testified that many of their seniors have physical disabilities like Parkinson's, while others have glaucoma, still others cannot write. Tr. 1654:2-1655:9 (Garcia). Mr. Garcia testified that LULAC sometimes provides volunteers with tokens of appreciation for their efforts. For example, LULAC will sometimes raffle off tickets to a Cowboys game, a Rangers game, an Astros game, or a Spurs game, or provide tickets to Six Flags. Tr. 1654:2-1655:9; Tr. 1656:11-18 (Garcia).

58

237. MABA Texas members routinely encourage voters to support a candidate or measure. Tr. 2542:6-8 (Ortega). Members are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while performing these activities because a member may inadvertently be in the presence of a mail ballot without knowing. Tr. 2542:6-20 (Ortega). MABA Texas has difficulty recruiting members to table events in support of candidates because of SB1 and because members fear that they might inadvertently commit a crime. Tr. 2543:14-2544:23 (Ortega).

4. Plaintiffs no longer provide mail ballot voter assistance when advocating on a measure

238. Sec. 7.04's prohibition on compensated interaction with a voter, in the presence of the mail ballot and with the intent to deliver votes for a measure, has caused LUPE staff and volunteers who are paid to advocate to cease assisting voters with completing their mail ballots. Tr. 120:19-120:25 (Chavez).

239. Since SB1, LULAC councils in Tarrant County are no longer doing get-out-the vote efforts with seniors. Mr. Garcia explained that the members of these LULAC councils are afraid they could be subjected to criminal indictments for providing volunteers with reimbursements for gas, or for providing foods and drinks. Mr. Garcia explained that prior to SB1, volunteers would assist these voters. However, because of SB1, LULAC is concerned that an overzealous district attorney or attorney general might decide to prosecute. Tr. 1654:2-1655:9 (Garcia).

240. Because of section 7.04 of SB1, during the November 7, 2023 Houston mayoral and city elections, LULAC made the decision only to work with voters under the age of 65 years old. Mr. Garcia testified that the vagueness of section 7.04 of SB1 could subject LULAC and its members to prosecution. Tr. 1655:10-1656:10 (Garcia). Mr. Garcia explained,

"And that's a heavy burden for volunteers, especially volunteers with LULAC, that could be facing that. You know, don't want some college kid or some high school kid to go to jail because they helped a senior vote." Tr. 1655:19-1656:7-10 (Garcia).

**G. As a result, voters vote without their chosen assister**

241.    Section 6.06's prohibition on compensation for mail ballot assistance has caused LUPE to stop assisting voters who request their help completing mail ballots. Tr. 119:20-120:18 (Chavez).   LUPE members no longer complete their mail ballots with the assistance of their chosen assister because, in order to avoid prosecution, LUPE staff and volunteers turn away voters who ask for their assistance. Tr. 96:15-97:17; Tr. 111:10-111:20; Tr. 3671:3-24 (Chavez).

242.    Section 6.06's prohibition on compensated mail ballot assistance in practice severely limits the universe of potential assistants that a mail-in voter can choose from because of their fear of prosecution. Tr. 1725:17–1726:3 (Chen), Tr. 2439:4-2445:22.

243.    Out of fear of prosecution pursuant to 6.03, 6.04 and 6.05, LUPE staff and volunteers turn away voters who ask for their assistance. Tr. 111:10-111:20; Tr. 118:16-119:4 (Chavez). LUPE members are confused when they request polling place assistance from their chosen assister at LUPE and the assister tells them to ask a family member or a friend, or somebody else, before asking LUPE.  LUPE members who request assistance become confused about whether their chosen assisters are willing to provide assistance. Tr. 82:1-82:12 (Chavez). When LUPE voters are unable to secure assistance from a LUPE organizer, they either vote with the assistance of someone who is not their chosen assister or they don't vote at all. Tr. 82:13-82:19 (Chavez).

244.    The new oath of assistance in Section 6.04 has caused LUPE staff and volunteers to limit their assistance to voters out of fear of prosecution.    The limits that LUPE staff and volunteers have placed on their voter assistance activities include offering themselves as assisters only as the last option, or transporting voters to the polling place but not going inside to help the voters as requested. Tr. 79:18-81:11; Tr. 117:11-117:24 (Chavez). LUPE's voter assisters now believe that if an election worker thinks that the assister is not complying with the oath of assistance, the assister can be prosecuted.  Tr. 109:21-110:12 (Chavez).

245.    Since SB1 passed, when a voter asks Cris Rocha for assistance she responds that the voter should find either a relative or a friend who can take them to vote and if the voter cannot find anyone, then to call LUPE. Although she is the assister of choice of the voters who ask for her help, Ms. Rocha will only be a voter assister if she is the last person the voter can use as an assister. Tr. 145:21-24; Tr. 148:22-149:3; 156:12-18 (Rocha).  Prior to SB1, Ms. Rocha did not tell voters who asked her for assistance to ask other people for assistance. Tr. 148:9-149:6; Tr. 155:24-156:3; 158:15-159:2 (Rocha).

246.    Twice when Cris Rocha has attempted to assist voters after passage of SB1, those voters voted without her assistance.

247.    In one example, Rocha took LUPE member Mr. Cabello to the polling place to vote. Because Mr. Cabello is elderly, someone at the polling location told Mr. Cabello to have a seat while Ms. Rocha went to stand in a separate voter assister line in order to complete the voter assister form. There were two other people in front of Ms. Rocha in the vote assister line. By the time she finished filling out the new required form and taking the expanded oath of assistance, Mr. Cabello was voting with an assister other than Ms. Rocha whom he

had chosen.  Mr. Cabello told the ladies working at the polling place that he wanted Ms. Rocha to assist him with voting but he did not vote with Ms. Rocha's assistance. Tr. 150:6-18; Tr. 151:3-14; Tr. 152:6-153:3; Tr.153:4-17 (Rocha). Instead of standing in the voter line with the voter who needs assistance, which was the previous practice, since SB1 Ms. Rocha has been required to stand in a separate assister line to fill out the new form and take an expanded oath of assistance before she can join the voter.   Tr. 153:4-12, Tr. 154:4-6 (Rocha).

248.    In another example, during early voting in the November 2022 election, Cris Rocha attempted to assist LUPE member Mr. Garcia to vote from the car with curbside voting. Someone told Ms. Rocha to go inside the building to fill out the vote assister form with her information and it took her a while to do that. When Ms. Rocha went back outside, Mr. Garcia was being assisted by a poll worker. Ms. Rocha asked if she was the one who was supposed to assist Mr. Garcia with voting and the poll worker said no that the poll worker could do it. Ms. Rocha continued to state that she was the chosen assister and a police officer came over.   The police officer decided that he would assist Mr. Garcia and proceeded to do that. Because the police officer assisted Mr. Garcia, Mr. Garcia did not vote with Ms. Rocha, his assister of choice. Tr. 150:9-12; Tr. 150:14-151:2; Tr. 157:14-158:9 (Rocha).

249.    Before SB1, voters would choose Maria Gomez to assist them in voting and she would provide that assistance. LUPE Ex. 284 at 33:7-35:9. After SB1, when voters ask Ms. Gomez for assistance voting at the polls, she drops the voters at the curb and tells them that there are people inside who can help them.  Since SB1's new oath provisions went into effect, because she no longer provides voter assistance, Maria Gomez has only given

people general information about when and where to vote, given people information on how to apply for a mail ballot and given rides to the polling location. LUPE Ex. 284 at 21:13-19; 22:7-23:18; 46:13-47:9 47:18-22; 54:3-15; 57:21-58:19.

250.    Now, voters will look for Maria Gomez to assist them but she does not feel able to help them vote. Maria Gomez understands the impact of SB1 on voters to be that the trust of the community has been lost because of the fear that voters have to go vote and to not find anybody to help them vote. Voters used to look out for assisters because they are one with the community. People in her community are different since SB1 passed. LUPE Ex. 284 at 49:14-50:20.

251.    Ms. Nunez Landry testified that in the November 2022 election, she did not ask her partner for assistance because "I just don't want to put him in jeopardy…I don't want to draw any attention to myself. I don't want people to think that…I'm being coerced or whatever…the common assumptions tend to be about disabled people."  Ms. Nunez Landry could not access the remote that would allow her to vote independently and, once obtained, it was not working properly. She asked a poll worker for help, but he lacked experience with remotes and did not understand the problem. He brought others to help, but Ms. Nunez Landry did not know who they were. They "made me really nervous" and "they all voted with me, much to my chagrin and frustration" since they were not able to help her. Ms. Nunez Landry was frustrated by her lack of privacy in voting and, had she been able to receive assistance from her partner, "he could have touched the screen and it would have all been rather effortless." When she finally finished voting, "I was very, very angry." Tr. 3244:5-4247:19 (Nunez Landry).

252. Ms. Nunez Landry anticipates that she will face the same issue with the remote in future elections. Since her disability is progressive, she will be able to do less and less independently. Tr. 3253:20-3254:5 (Nunez Landry).

253. Sec. 7.04's prohibition on compensated interaction with a voter, in the presence of the mail ballot and with the intent to deliver votes for a measure, has caused LUPE staff and volunteers to fear prosecution and to stop assisting voters when they are canvassing on a ballot measure. As explained by Tania Chavez, "Well, we have rejected community members. How do we help them fill out that ballot? Then maybe I will be sharing a different story, but at the time we are rejecting community members from being able to help them fill out those ballots." Tr. 120:19-120:25 (Chavez).

254. LUPE now trains its staff that "if they're aware of any ballot being present in any of our events, that either they have to ask the community member to put their ballot away somewhere else outside our building, whether that is their car or drive back home and come back; ask a community member to leave; or we have to stop doing the work that we're doing." Tr. 3681:6-3682:8 (Chavez).

### H. As a result, voters vote without assistance

255. Because LUPE no longer assists its members to complete mail ballots, LUPE has instead resorted to conducting group meetings in which it displays slides on the wall, and discusses in general terms how to complete a mail ballot. Tr. 83:14-84:3; Tr. 96:2-96:14; Tr. 3673:21-3674:14; Tr. 3700:13-3701:13 (Chavez). In these presentations, LUPE staff refrains from answering specific questions about voter's ballot. Tr. 3673:21-3674:14 (Chavez). LUPE members do not receive direct assistance in filling out the mail ballot that

they previously received, but instead are left to fill out the mail ballot on their own. Tr. 96:2-96:14 (Chavez).

256.    These LUPE members require one-one-one assistance in filling out their mail ballots because they are elderly, vision-impaired and/or illiterate. Tr. 96:15-97:17 (Chavez).  As explained by Tania Chavez, "So the only thing we could do for them is project on the screen and so walk them through the process of what they needed to do in order to cast that ballot. Again, even in us doing that, it didn't fulfill their needs because projecting on the screen for somebody that is visually impaired, projecting on the screen for somebody who has a challenge with reading, it's also difficult, and so we were able to help some but even in us doing that presentation we weren't able to help all the needs and accommodate all the needs of the disabled community members that we serve." Tr. 96:15-97:17 (Chavez).  With respect to illiterate voters, Tania Chavez explained, "[B]ecause part of the challenge with community members is that some of them are unable to read or write, and if you are unable to read or write how are you supposed to fill out the ballot, if you don't know how to write. And so that's part of the obstacles that SB 1 imposes to us."  Tr. 97:11-97:17 (Chavez).

257.    LUPE's change from direct voter assistance with mail ballots to general presentations has resulted in voters not receiving assistance from their chosen assisters.  Tr. 96:15-97:17; Tr. 3673:21-3674:14; Tr. 3675:13-3676:10 (Chavez).  In addition to the general presentations being insufficient, LUPE also turns away voters who request assistance from LUPE in casting their mail ballots.  Tr. 3677:1-20; Tr. 3675:13-3676:10 (Chavez).  As explained by Tania Chavez, "When they're coming to LUPE, to any of our offices, any of our centers, it's because they want to receive the help that they need. And when we have to turn them away and tell them 'We cannot help you on this particular piece that you're asking us to

do,' it demoralizes our staff; more than anything, it demoralizes the community member that is seeking the help because we're asking them to cast their ballot, and we can't even help them to do that." Tr. 3675:13-3676:10 (Chavez).

258.    Cesar Espinoza testified that he is aware of FIEL members who before SB 1 voted in person with an assister, but who after SB 1 voted in person but without an assister. For example, before SB1 one FIEL member who is limited English proficient used an assister to vote. After SB1 she found the process of voting "very cumbersome and very overwhelming." This voter "had a more difficult time entering the polling place, finding her way around, and she felt very anxious about was she going to fill in the right thing, [and] was she interpreting what she was reading correctly." Tr. 2445:23-2447:13 (Espinoza).

259.    All of Ms. Litzinger's attendants have voiced to her that they do not feel comfortable taking the oath and none of them was willing to assist Ms. Litzinger or take the oath in the 2022 elections. Tr. 3293:17-24 (Litzinger). When Ms. Litzinger voted in May 2022, she had an issue with the chest clip that she uses to help her remain upright. She needed to have it unclipped in order to lean forward enough to reach the voting machine, but only realized this after entering the polling place alone. She did not ask for assistance with removing it because "it wasn't clear to me whether or not that would be considered assistance with voting to ask because it's not clear when the act of voting starts and stops." Since she was unable to unclip the chest strap herself, it was "very, very difficult for me to vote" and she had to elevate herself to mitigate the restricted arm reach which was "quite painful." If the ballot had been longer, "I probably would have had the most extreme form of ballot fatigue you have ever seen. I probably wouldn't have finished it." Tr. 3289:20-3290:22 (Litzinger).

260. Because of her concerns about the oath, in the November 2022 election, Ms. Litzinger also did not receive the assistance she needed to vote which made voting take longer than usual. Ms. Litzinger brought her personal care attendant to the polling place and they had a lengthy conversation about the oath. They decided together that the attendant would not take the oath because "We were both nervous because we were unclear if the help I receive would be included under the oath, and…when the process of voting starts and stops." As a result, Ms. Litzinger only received assistance in getting to the polling place, but did not receive the assistance she needed once at the polling place. Tr. 3290:23-3992:3 (Litzinger). See also Tr. 3295:9-17 (Litzinger) (sharing that her attendants were concerned about the oath given the penalty of perjury and being unclear on what types of assistance fall under the oath).

261. Since her attendant was with her but not assisting her, this caused confusion for poll workers and made it "difficult to have three people debating whether I needed assistance the entire time I was voting." Tr. 3292:4-3293:7 (Litzinger).

262. Ms. Litzinger testified that overall, the oath of assistance has "impacted my ability to be confident that my vote will be counted and confident that I'm going to be able to find someone to assist me and they have impacted my ability to trust that poll workers are going to listen to me when I tell them when I do and do not need assistance and what qualifies as assistance." Tr. 3298:20-3299:3 (Litzinger). Ms. Litzinger felt that her ballot was not private in November because several people were watching her. Her voting experience was more difficult than it had been prior to SB 1. Tr. 3292:18-3293:7 (Litzinger).

263. Ms. Halvorson was not able to receive the assistance she needed to vote by mail in March 2022 due to the new assister oath which is "intimidating, especially the part about the

penalty of perjury." Tr. 3324:9-14 (Halvorson). As a green card holder, her personal care attendant was not comfortable taking an oath under penalty of perjury that could risk her green card status. This was the first time a personal care attendant ever declined to assist Ms. Halvorson in voting. Tr. 3318:12-3319:16 (Halvorson). Ms. Halvorson testified that her experience voting by mail without assistance in March 2022 required her to fill out the ballot in "10- or 15-minute increments throughout the course of two days. I would fill out a little bit and then have to take a break. Especially with my hip fracture, it was very hard to sit up in my wheelchair and fill out that ballot." Trying to get her hands to cooperate to be able to insert the ballot into the envelope was also very challenging without assistance. Tr. 3320:19-25; Tr. 3321:1-4 (Halvorson).

264.   This experience caused Ms. Halvorson physical pain: "It was very difficult. My very limited mobility and pain levels…I have a lot of contractures in my hands, just very little muscle movement and strength. And so trying to hold a pen and mark my ballot and have enough pressure to where I could mark my ballot was very painful and time-consuming." Tr. 3319:17-3320:12 (Halvorson). If she had been able to receive assistance from her attendant, she would not have had to worry about her handwriting and would not have experienced physical pain while voting. Tr. 3342:24-3343:9 (Halvorson).

265.   Ms. Halvorson chose to vote in person in November 2022 and the experience without having the assistance she needed caused her "lots of anxiety." Tr. 3330:10-15 (Halvorson). Again she did not use an assister because she did not want to put her caregiver at risk since a poll worker might think that her caregiver was influencing her vote in some way and could then face criminal charges. Tr. 3322:5-3323:9; Tr. 3323:10-24 (Halvorson).

266.    Ms. Halvorson testified that the accessible remote was not operating properly and it was difficult to see if the choices were highlighted on the ballot since the candidates' names and party affiliations were cut off and it kept switching back to the previous screen. The poll workers' suggestions did not fix the problem. After many attempts she was finally able to complete the ballot. Because she had no assistance, she was required to raise her wheelchair to submit the ballot into the Scantron machine and, due to limited wrist mobility, it took her several minutes to wiggle the ballot into the machine. Had Ms. Halvorson's attendant been with her, she could have avoided having to use the malfunctioning remote since her attendant could have just made the selections for her and submitted the ballot into the Scantron in "five seconds or less." With assistance, "I probably could have been in and out of there in…a third of the time." Instead, voting took nearly 45 minutes and a poll worker remarked to her as she was leaving the polling place "I'm going to give you two stickers because you had to work twice as hard as everyone else to vote." Ms. Halvorson remarked that it was "exhausting" having to press all the buttons and put the ballot in the Scantron herself. Tr. 3325:25-3330-15 (Halvorson).

267.    Ms. Crowther testified that she received the help she needed to vote prior to SB 1 but did not receive this assistance when she voted in March 2022 due to her concerns about the oath. HAUL-MFV Ex. 413: 84:3-89:25 (Crowther).   Ms. Crowther did not take her attendant with her to vote in May 2022 because of this fear. HAUL-MFV Ex. 413: 54:7-14 (Crowther).

268.    Ms. Nunez Landry testified that in the March 2022 primary, she had issues with the paper feed and had to call the poll worker for help and she could not locate an accessible remote which she required because she did not have the assistance she needed from her partner

due to their concerns about the oath. The lack of remote required her to reach far, lean out of her chair to press the screen, and hold up her arm to fill out a "very long" ballot. Ms. Nunez Landry testified: "…my arms get very heavy and shake and so I had to take breaks, but then I was worried that if I took a break too long that maybe -- I don't know whether the machines time out or not but I was concerned about it. But it was a very arduous process and I had a lot of cramping. It was just unnecessarily difficult and…. I was really not happy after that…It's very hard for me to hold up my hands to do anything." This led Ms. Nunez Landry to experience physical pain while voting. Ms. Nunez Landry would have preferred receiving assistance from her partner because "I can trust him and there's a certain amount of privacy there so…that would make everything a lot easier." Tr. 3243:5-19 (Nunez Landry).

269.    Because of her concerns about the oath, Ms. Nunez Landry did not ask her partner for assistance:

> I think oftentimes people with disabilities are sort of viewed as a suspect class. There's a social narrative that we are malingerers or we're trying to get something for some nefarious reason that other people don't get…I'm already pretty conspicuous in a power chair but I don't like to draw attention to myself, especially now when it's a very volatile political atmosphere. And I don't want to put my partner through any type of risk…and I don't want to put myself through that, but I'm really afraid of losing assistants. I mean, it's hard work…and you just don't want to ask people too much, they are already doing a lot, and you don't know what that tipping point is going to be and I mean my worst fear is being forced into a nursing home and losing all of my rights.  Tr. 3240:3-3242:23 (Nunez Landry).

270.    In the May 2022 Primary Runoff Election, because her assister Mr. Cardenas was deterred from marking the ballot as part of his assistance, Ms. Eureste, who is blind, was required to touch the ballot screen where she believed the name of her preferred candidate was

located.  Tr. 2483:24-2484:1 (Cardenas). Although Ms. Eureste intended to use the voting machine's technology to cast her ballot on her own, when the machine malfunctioned she did not receive assistance in marking the ballot but instead had to mark the ballot on her own because Mr. Cardenas was afraid to do more than tell her the area on the ballot where her preferred candidate was located.  Tr. 2482:23-2484:1 (Cardenas). Mr. Cardenas did not mark the ballot for Ms. Eureste because he was afraid of doing something wrong.  Tr. 2483:17-23 (Cardenas).

271.    Mr. Cardenas testified that if he had paid more attention to the language in the oath of assistance, he would not have provided assistance to Ms. Eureste at all.  Tr. 2497:13-19 (Cardenas).  As a result of the new language in the oath of assistance, in future elections Mr. Cardenas will limit his assistance to voters he knows very well because he is concerned that he will be accused of doing something wrong.  Tr. 2486:25-2487:5 (Cardenas).

272.    Grace Chimene testified that the criminalization of assistance makes it harder for members of the League of Women Voters to get the assistance they need to vote. These penalties may mean that people who need assistance cannot vote. Tr. 1626:3-16 (Chimene).

273.    Prior to SB1 and as a LUPE volunteer, Maria Gomez used to help people to vote by mail. LUPE Ex. 284 at 41:24-42:1. Since SB1 passed, Maria Gomez gives people who request mail ballot assistance a number to call and ask for assistance. LUPE Ex. 284 at 30:2-7; 15:25-16:8.

274.    Angelica Razo of Mi Familia Vota testified that voters are voting without assistance because they have concerns about the oath requirement. Mi Familia Vota is attempting to provide pre-voting support by teaching voters how to navigate the polls to decrease the

likelihood that they would have to ask for assistance from a poll worker. Tr. 3456:16-3457:6 (Razo).

**I.    As a result, voters forego assistance to spare their assisters**

275.    As described in the preceding section, voters who need assistance to vote, in an attempt to spare their assisters the risk of prosecution, vote without assistance.

276.    Mr. Cole testified that SB1 forces him to go without assistance or put his assister in harm's way because the assister will have to swear under perjury that she does not indicate to him how to vote even though she performs that action to remind him of how he decided to vote: "I don't know what and how I'm going to do different when I go next time because I either have to choose to put somebody in harm's way or I've got to choose that I can't have the things that I need to make sure I can vote properly." Tr. 719:12-720:5 (Cole).

277.    Ms. Halvorson stated that if one of her caregivers was subject to a criminal penalty for violating the oath of assistance for helping her vote, "That would make me feel horrible and very angry…because I know…they're not doing anything wrong. It's just the fact others can perceive them as doing something wrong." She expressed concerns about her primary caregiver who is a green card holder and could lose her citizenship. Finding replacement caregivers is "hard enough" without criminal penalties being added to the mix of what they are being asked to do. Tr. 3331:1-18 (Halvorson).  Ms. Halvorson stated that many of her friends with disabilities are worried about their caregivers facing these issues with the penalty of perjury and "[s]ome of them may not be going out and voting like they used to, due to it."  Tr. 3332:11-18 (Halvorson).

278.    Ms. Crowther explained that her disability is progressive and she will need more and more help over time. She is concerned that the penalty provision will jeopardize her relationship

with her attendant: "I would be mortified…if they were to get in trouble just for helping me." HAUL-MFV Exh. 413 at 52:11-53:4; 207-208.    Ms. Crowther explained that SB 1 has hampered her ability to receive assistance in voting because it puts her attendants in a position of "danger" that "they aren't paid for" and she would not want to put them in a situation that has legal ramifications despite the fact that she will need more and more help over time as her disability progresses. HAUL-MFV Exh. 413 at 80:8-81:8; 98:6-22.

279.    Mr. Kafka testified that REV UP Texas members have experienced problems related to the oath and that the organization gets questions from attendants and voters with disabilities who don't want to put their attendants in jeopardy. He stated, "We get questions from attendants, but we also get questions from people with disabilities who don't want to put their attendant in jeopardy. It's a very close, symbiotic relationship between the attendant and the person with a disability." Tr. 3628:8-16 (Kafka).

280.    Cameron County Election Administrator Remi Garza testified that if a community-based organization stops helping voters vote by mail because they are concerned about this new crime, there would be less assistance available to voters in Cameron County who vote by mail. Mr. Garza would be concerned if there was less of this non-partisan community-based outreach to people who vote by mail as a result of SB1. Tr. 759:13-22 (Garza)

**J.    As a result, voters do not vote**

281.    Mr. Cole testified that each provision of SB1 that makes voting marginally harder for disabled people makes it less likely that they will vote: "Well, it just makes it hard. You know, the thing that we have, and I talk to a lot of people after they get disabled, is as you make things harder, you just start cutting things out. You know, it's too hard to find someone to feed me, or it's embarrassing, so I don't want to go to dinner. It's too hard to

get on an airplane to go travel, so I just don't do that. And so every time you put even one little road bump or one little barrier in front, it just makes it that much harder, and so you don't do it." Tr. 714:17-715:15 (Cole).

282. Because mail voters are denied help from their chosen assisters at LUPE, turnout goes down in the geographic area served by LUPE because voters do not turn in their mail ballots, and voters' ballots go uncounted because of errors in completing the ballots. Tr. 3677:21-3678:13 (Chavez).

283. Mr. Garcia explained that section 7.04 has a chilling effect on LULAC's ability to get seniors to vote because of the danger that someone could wind up indicted, arrested, and have their lives and careers destroyed for helping a senior to vote. Tr. 1657:13-19 (Garcia).

**K. SB1 increases length of time for voting, thus causing voters to lose assistance from their chosen assister**

284. Sections 6.03, 6.04 and 6.05's new requirements have also increased polling place wait times in the Rio Grande Valley. Instead of waiting in line with the voter they will assist, and taking the oath, LUPE's voter assisters now must go into a separate line in order to fill out the additional information and take the expanded oath of assistance. Tr. 81:12-81:25 (Chavez).

285. Cris Rocha, in order to serve as an assister, now has to get in a separate line than the voter at the polling place. She spends more time filling in the information on the vote assister form now than she did in 2020 and before then. Tr. 154:1-3 (Rocha). She has seen longer lines at polling places where there are also other voters with assisters in line. Tr. 153:4-12; Tr. 154:4-6 (Rocha).

286.  When Cris Rocha took a voter to vote during the November 2022 General Election, the vote assister line to complete the oath and fill out the vote assister form was very long. It takes longer now for vote assisters to fill out the form with additional information required by SB1.  Tr. 150:9-151:2; Tr. 153:2-154:6 (Rocha).

287.  Cameron County Election Administrator Remi Garza testified that SB 1 has made the oath of assistance longer, which means it takes longer for the presiding judge to administer each oath. Judges and clerks have reported that it is taking a long time to get through each oath. To prevent lines, the judges and clerks have to ask voters to step out of line so that their assister can take the oath. Tr. 732:8-733:17 (Garza).

288.  Dallas County Elections Administrator Michael Scarpello confirmed that if an assister assists two people—for example, their mother and their aunt—that assister would be required to fill out information on the form twice and to take the oath of assistance twice. Tr. 383:14-384:4 (Scarpello).

289.  In Bexar County, the election judge will sometimes read the oath to the assister and have them read it back, or sometimes will just have the assister read the oath and swear it is correct, and the assister has to complete the paperwork. Tr. 1057:12-21 (Callanen). The process makes lines longer at polling places. Tr. 1057:22-24 (Callanen).  In contrast, poll workers sign an oath at the beginning of their day, just once, and can assist voters all day long. Tr. 1057:25-1058:7 (Callanen).

290.  In Hidalgo County, it now takes longer to get assisters through the oath process. Poll workers are now being trained to expect this process to take longer. Tr. 2316:16-20 (Ramon).

## IV.    PROPOSED CONCLUSIONS OF LAW

291.    SB1 Sections 6.03-6.07 and 7.04 ("voter assistance restrictions") subvert the protections of Section 208 by imposing burdensome requirements on voters and voter assisters, and by denying mail voters assistance by compensated assisters.  The voter assistance restrictions deny assistance to voters unless they meet additional conditions, deter voters from using assisters, deter assisters from serving, make it impossible for a mail voter to use the assister of his or her choice when that assister is compensated or receives any economic benefit, and increase the time it takes to vote with assistance.

292.    Section 208 of the federal Voting Rights Act prohibits states from limiting voters' right to assistance and preempts conflicting state laws.  By enforcing SB1, Defendants violate Section 208 in the following ways:

- Sections 6.06 and 7.04 deny mail voters the ability to choose assisters who are compensated or receive "anything reasonably regarded" as an economic gain or advantage.

- Section 6.04 requires voters to represent to their assisters that they are eligible for assistance as a condition of receiving assistance.

- Section 6.04 deters voter assisters by requiring them to swear, under penalty of perjury, to additional information, including that they did not pressure or coerce the voter into choosing them to assist, and that they obtained a representation of eligibility of assistance from the voter. Section 6.04 also deters voters from using their chosen assisters for fear of placing them at risk of criminal prosecution.

- Sections 6.03, 6.05 and 6.07 deter voter assisters by requiring them to complete additional forms and/or provide additional information as a prerequisite to giving voter assistance.

**A. Defendants violate Section 208 when they enforce SB1's voter assistance restrictions**

293.    Section 208 of the federal Voting Rights Act of 1965 ("VRA") guarantees to certain groups of voters, *i.e.* "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" the right to receive "assistance by a person of the voter's choice,

other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. §10508.[3]   In enacting Section 208, the Senate concluded that to "avoid denial, or infringement of [the covered voter's] right to vote, the committee has concluded that they must be permitted to have the assistance of a person of their own choice." 1982 – S. Rep. No. 97-417.

294.    The terms "vote" and "voting" include "all action necessary to make a vote effective in any [election], including, but not limited to, registration . . . or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly[.]" 52 U.S.C. § 10310.1.   The "broad definition" of voting in Section 208 plainly contemplates more than just "in-person voting" and "encompasses voting by absentee ballot" as well as "early voting." *Ray v. Texas*, No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021, at *6 (E.D. Tex. Aug. 7, 2008) (court "reject[ed] the State's argument that Section 208 does not apply to early voting"); *see also OCA-Greater Hous.*, 867 F.3d at 615 (rejecting argument that Section 208 "refers only to the literal act of marking the ballot" and explaining that voting "plainly contemplates more than the mechanical act of filling out the ballot sheet" and "includes steps in the voting process before entering the ballot box.").

295.    Prior to SB1, voters exercised their right to vote with the help of their chosen assisters, and those assisters provided appropriate assistance, including helping with "navigating the polling location and communicating with election officials" as well as reading and marking the ballot.  *OCA-Greater Houston v. Tex.*, 867 F.3d at 614 and 52 U.S.C. § 10310(c)(1)).  *See* supra III. B.   As a result of Defendants' enforcement of SB1 sections 6.03-6.07 and

---

[3] Section 208 permits private enforcement. *See, e.g.*, *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 609–614 (5th Cir. 2017); *Ark. United v. Thurston*, 517 F. Supp. 3d 777, 790, 798 (W.D. Ark. 2021); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1301 (N.D. Ga. 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 233–36 (M.D.N.C. 2020); *Florida State Conference of NAACP v. Lee*, 576 F.Supp.3d 974, 988-90 (N.D. Fla 2021).

7.04, voters who previously voted with the help of their chosen assisters now vote with the assistance of others, vote without assistance, or not vote at all, in violation of Section 208. *See* supra III. G-J.

1. <u>Sections 6.06 and 7.04</u>

296.    Section 6.06 prohibits mail ballot assistance by individuals who are compensated or receive "anything reasonably regarded" as an economic gain or advantage. Section 7.04 prohibits mail ballot assistance by individuals who are compensated or receive "anything reasonably regarded as a gain or advantage" when the compensated individual advocates in-person, for or against a ballot measure, in the presence of the mail ballot.  Excluding these categories of persons as assisters, which include employees and volunteers of non-profit civic engagement organizations, denies voters who use assistance the ability to choose these persons as assisters and "impermissibly narrows the right guaranteed by Section 208 of the VRA." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614-15 (5th Cir. 2017).

297.    Section 208's only limitations on who can serve as a voter assister are stated in the statute: the assister may not be an employer, union officer or an agent of an employer or union officer.  By further limiting who may serve as a chosen assistor to individuals who are not compensated or otherwise receive an economic benefit, sections 6.06 and 7.04 violate Section 208.

298.    Plaintiffs' employees and volunteers offered mail ballot assistance and include members who used that assistance to vote. *See* supra Section III. C. For example, prior to enactment of SB1 Sec. 6.06, LUPE staff would assist members to complete their mail ballots one-on-one and provide assistance based on the voter's needs at the LUPE offices, in house meetings, and at LUPE's union hall events.  Some members would call LUPE and ask LUPE

to go to their home to help them fill out their ballot by mail and LUPE would provide that assistance in the members' homes. *See* Supra III. B. 1 and C. 3. Because of Sec. 6.06, now when a LUPE member requests help with their mail ballot, LUPE informs the member that LUPE cannot provide assistance. *See* Supra III. C. 3.

299. The League has members who use assistants when they vote by mail, and members who assist others with their vote by mail ballots. League members assist mail-in voters who are family, friends, in nursing homes, in assisted living centers, or in homes where voters with disabilities live. Members of the League "offer[] tea, or coffee, or water," to assisters that help them and other voters vote by mail. *See* Supra Section III. C. 2. Likewise, the League offers assisters "little pens," "stickers," "cookies," "doughnuts," and "pizza" for their work, and letters of recommendation and academic credit to student assisters. *See* Supra Section III. C. 3. Travis County Director of Elections Ms. Escobedo testified that items like "a cup of tea," meals, and "paying for someone's parking" are all compensation prohibited under Section 6.06. *See* Supra Section III. C. 1.

300. OCA-GH acts similarly: assisting its LEP members and voters in the AAPI community who request assistance with mail-in ballots. *See* Supra Section III. C. 3. Some assisters OCA-GH paid for their work, in addition to offering beverages and meals to other assisters. *Id.* By prohibiting assisters from receiving "anything of value," League members, OCA-GH members and LUPE members are impaired in their ability to obtain assistance from the person of their choice at their membership organizations. *Id.*

301. OCA-GH ceased in-person civic engagement activities where voters have sought assistance with mail-in ballots. *Id.* Nor does OCA-GH recruit people anymore to assist LEP and elderly members with voting by mail, out of fear of prosecution. *Id.* Institutions like

Assisted Care Centers that historically welcomed the League as assisters now discourage the League from sending people to assist residents. *See* Supra Section III. C. 2. Texans—including League members—residing in these facilities who relied on the League for years are no longer able to obtain assistance voting from the individuals of their choice. *Id.* Section 6.06 therefore abridges Plaintiffs' and their members' rights to assistance in voting from a person of their choice protected under Section 208.

302. With respect to 7.04, LUPE paid staff and paid canvassers advocate to voters on ballot issues when knocking on doors, out in the neighborhoods, at house meetings, at LUPE events, at the union hall, at tabling events, and in the LUPE offices because LUPE wants to make sure that everybody is educated about the ballot measure and understands the position that LUPE advocates for that measure. LUPE staff and volunteers interact in person with one or more voters when advocating on ballot measures and expect that in many instances a mail ballot will be present. *See* Supra III. F. 3-4. Sec. 7.04's prohibition on compensated interaction with a voter, in the presence of the mail ballot and with the intent to deliver votes for a measure, has also caused LUPE staff and volunteers who are paid to advocate to cease assisting voters with completing their mail ballots. *See* Supra III. F. 4.

   2. Section 6.04

303. Defendants violate Section 208 when they enforce Section 6.04, which conditions voter assistance on the voter taking the additional step of making a representation of eligibility for assistance to the prospective assister. *See* Supra III. D. Section 208 does not require the voter to take any steps as a prerequisite for receiving assistance. In particular, Section 208 does not require a voter to state that she is eligible for assistance before being entitled to that assistance. The requirement that a voter state their eligibility for assistance delves

into sensitive topics such as lack of literacy or invisible disabilities such as mental disabilities and voters who use assistance are reluctant to share this very personal information. *Id*. In addition, neither Section 6.04 nor the remainder of the oath of assistance explains who is eligible for assistance, and Texas election materials incorrectly narrow the scope of eligibility for assistance, leaving the voter without information about whether he or she qualifies to make the required representation. *See Supra* III. D. 2; Jt. Ex. 1, Tex. Elec. Code Sec. 64.034.

304. Defendants also violate Section 208 by depriving voters their assisters of choice through Section 6.04's new oath language. Assisters who used to provide help to voters who are blind, disabled, low-literate and/or limited English Proficient are no longer willing to do so because they fear prosecution for signing an assistor oath when they are not sure they have complied with the oath. *See Supra* III. E. 1. Assisters who encourage voters to turn out and who offer themselves as assisters are afraid to sign the oath with the "did not pressure" language in it. *See Supra* III. E. 1. d. Assisters who are reluctant to demand a representation of eligibility from voters are afraid to sign the oath with the "represented to me that they are eligible" language in it. *See Supra* III. E. 1. b. Assisters who do not see any posted criteria for eligibility for assistance are afraid to sign the oath with the "the voter 's ballot may not be counted" language in it. *See Supra* III. E. 1. e. Although SB1 did not add the language about "word, sign, or gesture" to the oath, assisters are deterred by this language in combination with new penalty of perjury language and are reluctant to provide assistance. *See Supra* III. E. 1. c. Voters who need and use assisters are afraid to put their assisters at risk by signing the new oath and forego assistance. *See Supra* III. I.

305. Because the new oath language of Section 6.04 deters voter assisters and voters, and causes

voters to vote without their chosen assisters, Section 6.04 interferes with voters' ability to vote with assistance and violates Section 208.

    3.   Sections 6.03, 6.05 and 6.07

306.   Sections 6.03, 6.05 and 6.07 deter assisters by requiring them to complete additional forms and/or provide additional information. *See* Supra III. E.  Sections 6.03, 6.04 and 6.05's new requirements have also increased polling place wait times in the Rio Grande Valley. *See* Supra III. K.  In doing so, sections 6.03, 6.05 and 6.07 abridge voters' assistance right guaranteed by Section 208.

**B.  SB1's voter-assistance provisions are preempted by Section 208**

307.   For the same reasons that SB1 violates Section 208, SB1 is conflict preempted by Section 208.

308.   The voter assistance provisions in SB1 sections 6.06 and 7.04 make it an "impossibility" for an eligible voter to choose an assistor who is permitted by Section 208 but disqualified by SB1 because that assister is compensated (or receives an economic benefit) either to provide mail ballot assistance or to advocate for a ballot measure. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963).  Section 208's only limitations on voter assistance are stated in the statute: the assister may not be an employer, union officer or an agent of an employer or union officer.

309.   SB1's voter assistance provisions are also conflict preempted because they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 132 S. Ct. 2492, 2495, 183 L. Ed. 2d 351 (2012) (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67) (1941).  The purpose of Section 208 is to afford voters the ability to vote with the assistance of their chosen individual.  By

categorically excluding compensated mail ballot assisters, imposing additional and intimidating requirements on voters who need assistance (to provide a representation of eligibility) and assisters (more personal information, an unclear oath sworn under penalty of perjury), SB1's voter assistance provisions undermine the purposes and objectives of Congress to ensure that voters could vote with the help of their chosen assisters.

310.   Even if SB1 purports to share the goal with Section 208 of preventing voter coercion, Congress decided that an assistor of choice, as opposed to an election official, would best ensure that the voter's intent is carried out when marking the ballot.  *See* H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) (discussing need to deter coercion of voters by election officials).  Thus, SB1's voter assistance provisions "involve[] a conflict in the method of enforcement.  The Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'"  *Arizona v. United States*, 567 U.S. at 406 (2012) (*quoting Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971)).

311.   By taking away trusted and capable assisters from the voters who choose them, SB1's voter assistance provisions thwart the intent of Congress to ensure that voters who need assistance vote with assisters of their choice and "creates a conflict with the plan Congress put in place." *Arizona v. United States*, 567 U.S. at 403.  For these reasons, SB1's challenged provisions are preempted by Section 208.

Dated:  January 19, 2024                                 Respectfully submitted,

/s/ *Nina Perales*
Nina Perales (TX Bar No. 24005046)
Julia R. Longoria (TX Bar No. 24070166)
Fátima L. Menéndez (TX Bar No. 24090260)
Kenneth Parreno (MA BBO No. 705747)
MEXICAN AMERICAN LEGAL DEFENSE

/s/ *Sean Morales-Doyle*
Sean Morales-Doyle
Patrick A. Berry*
Jasleen K. Singh*
Robyn N. Sanders*
BRENNAN CENTER FOR JUSTICE AT

AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Tel: (210) 224-5476; Fax: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org
kparreno@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Tel: (212) 859-8000; Fax: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

*Attorneys for Plaintiffs*

**LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT, MEXICAN
AMERICAN BAR ASSOCIATION OF
TEXAS, TEXAS HISPANICS ORGANIZED
FOR POLITICAL EDUCATION, JOLT
ACTION, WILLIAM C. VELASQUEZ
INSTITUTE, FIEL HOUSTON INC.**

*Admitted pro hac vice*

/s/ _Dayton Campbell-Harris_
Dayton Campbell-Harris**
Washington State Bar No. 59692
Adriel I. Cepeda Derieux*
New York State Bar No. 4919163
Ari Savitzky*
New York State Bar No. 5060181
Sophia Lin Lakin*
New York State Bar No. 5182076
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
Tel: (212) 284-7334; Fax: (212) 607-3318

NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310; Fax: (212) 463-7308
sean.morales-doyle@nyu.edu
patrick.berry@nyu.edu
jasleen.singh@nyu.edu
rs8592@nyu.edu

Leah J. Tulin*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW, Suite 1150
Washington, DC 20036
(202) 650-6397
tulinl@brennan.law.nyu.edu

Elizabeth Y. Ryan (TX Bar No. 24067758)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Tel: (214) 746-8158; Fax: (214)746-7777
liz.ryan@weil.com

*Attorneys for Plaintiffs*

**FRIENDSHIP-WEST BAPTIST CHURCH,
TEXAS IMPACT, JAMES LEWIN**

*Admitted pro hac vice*

Brian Dimmick*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
915 15th St. NW
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org

Lucia Romano
Texas State Bar No. 24033013
Peter Hofer
Texas Bar No. 09777275
Christopher McGreal
Texas State Bar No. 24051774

dcampbell-harris@aclu.org
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org

Zachary Dolling
Texas Bar No. 24105809
Hani Mirza
Texas Bar No. 24083512
Sarah X. Chen*
California Bar No. 325327
Veronikah Warms*
Texas Bar No. 24132682
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Edgar Saldivar
Texas Bar No. 24038188
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel: (713) 942-8146; Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
Tel: (415) 343-0781
smizner@aclu.org

**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
Tel: (512) 454-4816; Fax: (512) 454-3999
lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
Tel: (212) 966-5932; Fax: (212) 966 4303
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Alex S. Trepp*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6000
jamunson@jenner.com
atrepp@jenner.com

***COUNSEL FOR OCA-GREATER HOUSTON
PLAINTIFFS***
*admitted *pro hac vice*
**practice is limited to federal court

*/s/ Wendy J. Olson*
Wendy J. Olson (*admitted pro hac vice*)
wendy.olson@stoel.com
Elijah M. Watkins (*admitted pro hac vice*)
elijah.watkins@stoel.com
Mark L. Bieter (*admitted pro hac vice*)
mark.bieter@stoel.com
101 S. Capitol Blvd., Suite 1900
Boise, ID 83702
Tel: 208.389.9000; Fax: 208.389.9040

Bradley R. Prowant (*admitted pro hac vice*)
bradley.prowant@stoel.com
33 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Tel: 612.373.8800; Fax: 612.373.8881

Laura E. Rosenbaum (*admitted pro hac vice*)
laura.rosenbaum@stoel.com
760 SW Ninth Avenue., Suite 3000
Portland, OR 97205
Tel: 503.224.3380; Fax: 503.220.2480

Courtney Hostetler (*admitted pro hac vice*)
chostetler@freespeechforpeople.org
Ben Clements (*admitted pro hac vice*)
bclements@freespeechforpeople.org
John Bonifaz (*admitted pro hac vice*)
jbonifaz@freespeechforpeople.org
Ronald A. Fein (*admitted pro hac vice*)
rfein@freespeechforpeople.org
Amira Mattar (*admitted pro hac vice*)
amira@freespeechforpeople.org

**FREE SPEECH FOR PEOPLE**
1320 Centre St., #405
Newton, MA 02459
Tel: 617.249.3015

LYONS & LYONS, PC

Sean M. Lyons
sean@lyonsandlyons.com
Clem Lyons
clem@lyonsandlyons.com
237 W. Travis St., Suite 100
San Antonio, TX 78205

***ATTORNEYS FOR MI FAMILIA VOTA PLAINTIFFS***

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Christopher D. Dodge*
Michael B. Jones*
Elena A. Rodriguez Armenta*
Daniela Lorenzo*
Marcos Mocine-McQueen*
Marisa A. O'Gara*
Omeed Alerasool*
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
Tel: (202) 968-4490
unkwonta@elias.law
cdodge@elais.law
mjones@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
mmcqueen@elias.law

mogara@elias.law
oalerasool@elias.law

ATTORNEYS FOR LULAC PLAINTIFFS

*Admitted Pro Hac Vice

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this document with this Court using the CM/ECF system, which provides notice of this filing to all registered CM/ECF users on the 19th day of January 2024.

*/s/ Nina Perales*
Nina Perales