# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, *ET AL.*,

     *PLAINTIFFS,*

V.

     CASE NO. 5:21-CV-00844-XR

GREGORY W. ABBOTT, *ET AL.*,

     *DEFENDANTS.*

### STATE DEFENDANTS' POST-TRIAL PROPOSED CONCLUSIONS OF LAW

This matter came before the Court for bench trial on _____. Plaintiffs asserted the following claims: _____. The Court ordered parties to submit their findings of fact and conclusions of law. State Defendants filed their proposed findings of fact on _____ (ECF ____). State Defendants now submit the following conclusions of law.

PROPOSED CONCLUSIONS OF LAW

## I.    Sovereign immunity bars Plaintiffs' claims again State Defendants.

1.    Familiar principles of sovereign immunity bar Plaintiffs' claims against State Defendants. "The doctrine of state sovereign immunity recognizes the 'residua[l] and inviolable sovereignty' retained by the states in the Constitution's wake." *Russell v. Jones*, 49 F.4th 507. 512 (5th Cir. 2022) (quoting Alden v. Maine, 527 U.S. 706, 715 (1999)).

2.    "This principle, partially embodied in the Eleventh Amendment, is commonly distilled to the proposition that individuals may not sue a state—either in its own courts, courts of other states, or federal courts—without the state's consent." *Id.* Thus, "unless the state has waived sovereign immunity or Congress has expressly abrogated it," the state sovereign immunity doctrine will bar the suit. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019).

3.    "The Supreme Court, however, carved out an exception to state sovereign immunity in *Ex parte Young* . . . permitting suits against state actors whose conduct violates federal law." *Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (per curiam).

4.    "'The rule is based on the legal fiction that a sovereign state cannot act unconstitutionally,' and therefore, when 'a state actor enforces an unconstitutional law, he is stripped of his official clothing and becomes a private person subject to suit.'" *Id.* (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)).

5.    At the motion to dismiss stage, the district court relied on both *Ex parte Young,* 209 U.S. 123 (1908), and Congressional-abrogation exceptions to conclude that Plaintiffs could overcome State Defendants' sovereign immunity. State Defendants appealed. To preserve these arguments, State Defendants briefly raise them here.

6.      State Defendants maintain that judgment on Plaintiffs' claims is premature and improper until the Fifth Circuit has had a chance to resolve whether sovereign immunity applies.

### A. *Ex Parte Young* Exception.

7.      For a state official to be a proper defendant in a suit seeking injunctive relief under *Ex parte Young*, that official "must have '*some* connection with the enforcement of the [challenged] act.'" *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *Ex parte Young*, 209 U.S. at 157) (emphasis and alterations original).

8.      Although "[h]ow much of a 'connection' has been hard to pin down," this Court has identified three "guideposts." *Id.* "*First*, an official must have more than 'the general duty to see that the laws of the state are implemented.'" *Id.* (quoting *City of Austin*, 943 F.3d at 999-1000). "*Second*, the official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Id.* (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) ("*TDP II*")).  "*Third* 'enforcement' means 'compulsion or constraint.'" *Id.* (quoting *City of Austin*, 943 F.3d at 1000).

9.      Plaintiffs have not met their burden establishing that these three principles are met here. Accordingly, the claims fail.

### i.    The Secretary of State does not have a sufficient enforcement connection to the Challenged Provisions for the *Ex Parte Young* exception to apply.

10.      The Fifth Circuit has decisively indicated that "the Texas Election Code delineates the authority of the Secretary of State and local officials." *Tex. All. for Retired Ams.*, 28 F.4th at 672 (quoting *TDP II,* 978 F.3d at 179). And although Plaintiffs take aim at a dizzying array of S.B. 1's provisions, the required "provision-by-provision analysis" demonstrates a common flaw: Each challenged provision is enforced by local election officials, not the Secretary. *See id.*

11.     Article II, for example, which pertains to voter registration and the maintenance of voter rolls, receipt of information, or sharing of information, provides the Secretary of State no mechanism through which he has a "duty to enforce" through "compulsion or constraint." *Cf. City of Austin*, 943 F.3d at 1000.

12.     Instead, Sections 2.06, 2.07, and 2.08 all concern the Secretary's sharing of information. The Secretary's mere provision of information to voter registrars, DPS, and the Attorney General does not "compel or constrain anyone" to do any-thing, much less the plaintiffs here. *Tex. All. for Retired Ams.*, 28 F.4th at 672.

13.     Article III, which consists of provisions concerning the conduct and security of elections, again possess no language indicating how the Secretary has a "duty to enforce" through "compulsion or constraint." *Cf. City of Austin*, 943 F.3d at 1000. Those sections of SB 1 enact procedures that are implemented at precinct-level polling places throughout the State.

14.     Section 3.04 does not task the Secretary with enforcing the motor-voting prohibition, and Sections 3.09, 3.10, 3.12, and 3.13, all of which concern early voting procedures, charge the "early voting clerk"—not the Secretary—with responsibility for conducting early voting. *See Tex. Democratic Party v. Hughs*, 997 F.3d 288, 291 & n.16 (5th Cir. 2021) ("*TDP III*") (citing Tex. Elec. Code §§ 83.001, 83.002, 83.005); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 468 (5th Cir. 2020).

15.     Section 3.15, which states that "[v]oting system ballots" that are arranged to permit "a political party's candidate to be selected in one motion or gesture," are not enforced by the Secretary. "[T]he authority charged with preparing the ballot" lies with "a county clerk, county

party chair, city secretary, or other local official, depending on the type of election," not the Secretary. *Tex. All. for Retired Ams.*, 28 F.4th at 673; SB 1 § 3.04, 3.09, 3.10, 3.12, 3.13, 3.15.

16.     The Secretary has even less of a connection to the challenged provisions of Article 4: these provisions uniformly address local officials like early voting clerks and presiding election judges. *Cf. City of Austin*, 943 F.3d at 1000.

17.     In particular, Sections 4.01, 4.06, 4.07, and 4.09 relate to offenses related to the obstruction of poll watchers. Because the Secretary does not have prosecutorial authority, which is instead vested with local prosecutors, who are specifically charged with enforcement of the particular criminal prohibitions in the Election Code, no enforcement connection exists. *Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022).

18.     Section 4.12 provides that an early voting ballot delivered in person must be "received by an election official" who must record the voter's name, signature, and type of identification used. That is overseen by the early voting clerk, not the Secretary, so again, no enforcement connection can be demonstrated.

19.     Article V, which amends the procedures relating to voting by mail, includes no language indicating how the Secretary has a "duty to enforce" through "compulsion or constraint." *Cf. City of Austin*, 943 F.3d at 1000. Instead, the Election Code expressly tasks the "early voting clerk" and local officials with the responsibilities under this Article; they do not provide the Secretary with any enforcement authority. *See TDP III*, 997 F.3d at 291.

20.     To be sure, one provision challenged by plaintiffs—Section 5.10—requires an online Ballot Tracker created by the Secretary to allow a voter to add or correct information required by sections 5.02 and 5.08. But nothing about Section 5.10 imbues the Secretary with

power to "compel or constrain anyone to obey," *Tex. All. for Retired Ams.*, 28 F.4th at 672; indeed, section 5.10 merely requires the Secretary to provide an option for voters to "add or correct information required" by sections 5.02 and 5.08 in the online tool. SB 1 § 5.10.

21.    Article VI, which concerns voter assistance, eligibility requirements for giving or receiving assistance, and related procedures, includes no language indicating how the Secretary has a "duty to enforce" through "compulsion or constraint." *Cf. City of Austin*, 943 F.3d at 1000.

22.    In the case of Section 6.01, an individual who simultaneously transports seven or more curbside voters to the polling place must fill out a form provided by the local election officer—not the Secretary. And while that form must be later "delivered to the secretary of state," nothing about this sharing of information means that the Secretary "compel[s] or constrain[s] anyone to obey," *Tex. All. for Retired Ams.*, 28 F.4th at 672, these voter-assistance provisions.

23.    Sections 6.03, 6.04, and 6.05 establish procedures for voter assistors, specifically by requiring the assistor to provide information through a form at the polling place (Section 6.03) or on the carrier (Section 6.05) and by requiring the assistor to take a revised oath of assistance (Section 6.07). Section 6.06 makes it a felony to compensate someone, offer to compensate someone, or solicit, receive, or accept compensation for assisting voters. For each provision, enforcement resides with local election officials or local prosecutors.

24.    Finally, Articles VII and VIII define new election-law crimes and describe the enforcement of SB 1, respectively, but do not include any language providing the Secretary with an enforcement connection. *Cf. City of Austin*, 943 F.3d at 1000. Since the Secretary does not have prosecutorial power, and no provision vests the Secretary with a duty to enforce a civil penalty

provision, the provisions within Articles VII and VIII fail to include an enforcement connection for the Secretary. *See TDP III*, 997 F.3d at 291.

> ### ii.   The Attorney General does not have a sufficient enforcement connection to the Challenged Provisions for the *Ex Parte Young* exception to apply.

25.   The Attorney General often does not constitute an appropriate defendant when a state law is challenged. *E.g.*, *City of Austin*, 943 F.3d at 999–1003.

26.   Even in a case involving a state law preempting a municipal ordinance, for example, just because the Attorney General has a "habit" (as characterized by the Plaintiffs) of filing suit against municipalities to enforce the supremacy of state law does not mean that the Attorney General has the requisite enforcement connection. *Id.* at 1000–02. The mere fact that the Attorney General *has* the authority to enforce a state law (by filing suit against a municipality) cannot be said to constrain the City from enforcing its particular ordinance. *Id.*

27.   Here, the Attorney General does not even have the enforcement authority in question. In *State v. Stephens*, the Texas Court of Criminal Appeals held that the granting unilateral prosecutorial authority to the Attorney General violated the Texas Constitution's Separation of Powers Clause. *State v. Stephens*, Nos. PD-1032-20, PD-1033-20, 2021 WL 5917198, at *1 (Tex. Crim. App. Dec. 15, 2021), *reh'g denied*, 2022 WL 4493899 (Tex. Crim. App. Sept. 28, 2022). Therefore, the Attorney General cannot enforce many of the Articles referenced by Plaintiffs.

28.   Furthermore, the Attorney General does not enforce section 8.01's civil-penalty provision, as state law grants district and county attorneys the authority to represent the state "in the [d]istrict and inferior courts in their respective counties." Tex. Const. art. IV, § 21. The Attorney General has even indicated that he does not enforce section 8.01's civil-penalty provision. *See Paxton v. Longoria*, 646 S.W.3d 532, 541–42 (Tex. 2022). Nor do investigations or decisions

"to defend *different* statutes under different circumstances," qualify as enforcement. *City of Austin*, 943 F.3d at 1002 (emphasis original); *Tex. All. For Retired Ams.*, 28 F.4th at 672; *cf. Twitter, Inc. v. Paxton*, 26 F.4th 1119, 1124 (9th Cir. 2022).

29.    Finally, at trial, parties theorized that the Attorney General might be deputized by a local prosecutor to assist with prosecutions of Election Code violations, an avenue expressly left open by *Stephens*. ROA.10626-28, 10686-89, 10759-61; *see also Stephens*, 2021 WL 5917198, at *9-10. But "[s]peculation that he might be asked by a local prosecutor to 'assist' in enforcing" criminal laws "is inadequate to support an *Ex parte Young* action against the Attorney General." *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (citing *City of Austin*, 943 F.3d at 1000), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021).

### B. Plaintiffs failed to establish an alternative exception to sovereign immunity.

30.    Sovereign immunity bars Plaintiffs' claims unless they show that sovereign immunity has been "waived by the state, abrogated by Congress, or an exception applies." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (citing *City of Austin*, 943 F.3d at 997) (*TDP II*). The *Ex parte Young* exception does not apply for the reasons above, and Plaintiffs have not established waiver or abrogation by Congress that would permit their claims to proceed.

31.    "Plaintiff bears the burden of showing Congress's unequivocal waiver of sovereign immunity." *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009) (citations omitted); *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377 (1994) (finding the same); *Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.,* 362 F.3d 333, 336 (5th Cir.2004) (finding the same).

#### i.    The VRA does not abrogate sovereign immunity for the State.

32.    Although *OCA-Greater Houston v. Texas* held that the VRA abrogates State sovereign immunity, 867 F.3d at 614, its perfunctory, one-sentence analysis of this issue is wrong. "Congress did not unequivocally abrogate state sovereign immunity under Section 2 of the Voting Rights Act." *Ala. State Conference of the NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (Branch, J., dissenting). Nor did it do so in section 208.

33.    When the VRA authorizes relief against States, it does so through suits brought by the United States Attorney General, *see, e.g.*, 52 U.S.C. § 10308(d), which the Supreme Court has held are not subject to sovereign immunity. *See West Virginia v. United States*, 479 U.S. 305, 311 n.4 (1987); *United States v. Mississippi*, 380 U.S. 128, 140 (1965).

34.    Despite this, the State Defendants recognize that this Court is bound by *OCA-Greater Houston* and rejected State Defendants earlier in litigation; they raise this argument to preserve it for appeal and possible reconsideration by an *en banc* Court. State Defendants note, though, that the *OCA-Greater* Houston decision does not relieve Plaintiffs of their burden to show Article III standing. Because the State Defendants do not enforce the challenged provisions, Plaintiffs cannot show traceability or redressability, as explained below.

#### ii.    The ADA and Rehabilitation Act do not abrogate sovereign immunity.

35.    The Supreme Court "established a three-part test for determining whether Title II validly abrogates states' sovereign immunity." *Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 617 (5th Cir. 2020). A court must determine, on a "claim-by-claim basis":

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.* (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)). Under *Georgia*, if the plaintiff alleges no conduct that violates Title II, sovereign immunity applies. *Id.* at 617–19.

36.    Plaintiffs have not established conduct by State Defendants violating Title II, as the challenged provisions do not discriminate based on disability and State Defendants do not enforce the Challenged Provisions in any event.[1] *See* ECF 449 at 69 (dismissing "any and all claims under Title II" of the ADA against the Attorney General); *see also* Sept. 22, 2023 Tr. at 1827:3-15; 1848:24-1849:3; 1881:10–22 (affirming that counties retain local control over elections, and counties can refer complaints to any county or district attorney). State Defendants are therefore entitled to sovereign immunity.

37.    In addition, although a defendant can "waive[] sovereign immunity under § 504 of the Rehabilitation Act," Plaintiffs have failed to establish that the Attorney General made such a waiver. *Block*, 952 F.3d at 619. Plaintiffs needed to demonstrate that "the specific program or activity with which [the Attorney General] was involved receives or directly benefits from federal financial assistance." *Id.* There is no evidence in the record to that effect.

## II.    Plaintiffs Have Failed to Establish Standing to Sue

### a.    The Legal Standard for Standing

38.    This Court's jurisdiction is strictly limited to "Cases" and "Controversies" between adverse parties.  U.S. Const. Art. III, § 2.  An irreducible constitutional minimum of the

---

[1] Plaintiffs complain about local noncompliance with the ADA and the Rehabilitation Act, neither of which are election laws. Recognizing this distinction, the Fifth Circuit has already held "that the ADA is not an election law" that could trigger the Secretary's limited powers. *Lightbourn v. Cty. of El Paso*, 118 F.3d 421, 430 (5th Cir. 1997).

case-or-controversy requirement is that plaintiffs prove "[s]tanding to sue." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

39.    A plaintiff has standing to sue if she demonstrates (1) a concrete and cognizable "injury in fact" that was (2) "caused by the defendant" and (3) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

40.    "[S]tanding is not dispensed in gross." *Id.* at 2208. Instead, in multi-plaintiff cases, each plaintiff bears the burden of proving her standing "for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

41.    Accordingly, where, as here, plaintiffs seek to bar a State from enforcing its duly enacted statute, each plaintiff must prove a concrete and cognizable injury traceable to each statutory provision she challenges. *See id.*; *see also In re Gee*, 941 F.3d 153, 161–62  (5th Cir. 2019) ("To ensure that standing is not dispensed in gross, the district court must analyze Plaintiffs' standing to challenge each provision of law at issue.").

42.    Moreover, once a suit proceeds to trial, each plaintiff must establish her standing with evidence "adduced at trial." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

43.    An organization can satisfy Article III by proving associational or organizational standing. *See La. Fair Housing Action Ctr., Inc. v. Azalea Garden Props., LLC*, 82 F.4th 345, 350–51  (5th Cir. 2023).

44.    "Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the

relief requested requires participation of individual members." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006).

45.     To satisfy that test's first prong, an organization must point to "evidence in the record showing that a *specific member*" has suffered a concrete and cognizable injury traceable to the challenged provision. *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (emphasis added); *Summers*, 555 U.S. at 498–99.

46.     An organization that lacks members or fails to prove associational standing "can establish standing in its own name"—*i.e.*, organizational standing—"if it meets the same standing test that applies to individuals." *OCA-Greater Houston v. Tex.*, 867 F.3d 604 (5th Cir. 2017).

### b. Plaintiffs' Evidence Is Insufficient To Prove Standing

47.     The trial record establishes that Plaintiffs have failed to discharge their burden to prove standing for one simple reason: Plaintiffs adduced no evidence that they suffered cognizable injuries from any SB 1 provision at the time they filed their complaints.

48.     Nor could they have done so: Two of the complaints were filed *before* SB 1 was even signed into law—and all were filed *before* SB 1's effective date.

49.     Plaintiffs therefore lacked standing when they filed their suits, and no evidence of any post-filing injury can cure that jurisdictional defect.

50.     Even if Plaintiffs could overcome this threshold defect in their suits, they still have failed to establish standing with respect to a broad swath of parties and claims in this case.

51.     In particular, Plaintiffs failed to establish standing to challenge sections 2.05, 2.06, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.02, 5.03, 5.04, 5.06, 5.07, 5.08, 5.10, 5.12, 5.13, 6.01, 6.03, 6.04, 6.05, 6.07, 7.02, and 8.01. *See* Exhibit A.

52.    Several common but fatal standing defects infect many of Plaintiffs' claims. *First*, many of the organizational plaintiffs failed to prove associational standing because they did not identify "a specific member" who suffered a cognizable injury from the challenged provision. *City of Kyle*, 626 F.3d at 237; *see Summers*, 555 U.S. at 498–99.

53.    Second, many Plaintiffs allege non-cognizable injuries (like the ordinary voting inconveniences) that have no "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2200 (cleaned up); *see Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198  (2008) (explaining that "usual burdens of voting" do not impose constitutional injury).

54.    *Third*, when alleging organizational resource-diversion injuries, many Plaintiffs failed to specify the amount of resources diverted, the activities those resources were diverted from, or which "projects or causes" Plaintiffs were forced to forego as a result of the alleged diversion. *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500  (5th Cir. 2020). They also frequently alleged that resources were diverted to "routine activit[ies]" that they engage in regardless of SB 1 and, thus, that are insufficient to confer standing to challenge SB 1. *Azalea Garden Props.*, 82 F.4th at 352.

55.    *Fourth*, Plaintiffs bore the burden to establish "standing to challenge each provision of [SB 1] at issue," but consistently failed to trace their alleged injuries to any *specific* challenged SB 1 provision. *In re Gee*, 941 F.3d at 161–62.

### c.  Plaintiffs Failed to Establish Standing to Sue at the Time They Filed their Complaints

56.    A plaintiff must have Article III standing from "the outset of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Thus, in a case that

proceeds to trial, a plaintiff must adduce evidence at trial proving that she had standing to sue at the time she filed the complaint. *See id.* In other words, "a plaintiff who lacks standing from the start [of a case] cannot rely on factual changes during the suit to establish it." *Fox v. Saginaw Cnty., Mich.*, 67 F.4th 284, 295 (6th Cir. 2023); *Castro v. Scanlan*, 86 F.4th 947 (1st Cir. 2023).

57.    No Plaintiff offered at trial any evidence of a cognizable injury flowing from any provision of SB 1—much less of standing to sue—at the time it filed its complaint.

58.    Accordingly, all Plaintiffs failed to discharge their burden to prove standing, and all of the complaints must be dismissed. *See Friends of the Earth*, 528 U.S. at 180; *Fox*, 67 F.4th at 295; *Castro*, 86 F.4th at 954.

59.    Nor could any Plaintiff have discharged that burden, had it tried. Two Plaintiff groups—the LUPE Plaintiffs and OCA Plaintiffs—filed their complaints *before* SB 1 was even signed into law. *See* ECF No. 1 (LUPE Plaintiffs' complaint filed on September 3); No. 1:21-cv-780, ECF No. 1 (OCA Plaintiffs' complaint filed on September 3). Two other Plaintiff groups—the HAUL Plaintiffs and the LULAC Plaintiffs—filed their complaints on the day Governor Abbott signed SB 1 into law. *See* No. 5:21-cv-848, ECF No. 1 (HAUL Plaintiffs' complaint filed on September 7); No. 1:21-cv-786, ECF No. 1 (LULAC Plaintiffs' complaint filed on September 7). The other Plaintiff group filed its challenge a few weeks later. No. 5:21-cv-920, ECF No. 1 (Mi Familia Vota Plaintiffs' complaint filed on September 27). SB 1 did not become effective until December 2, 2021.

60.    No provision of SB 1 could have harmed any Plaintiff before it took effect, much less before it was even signed into law. Accordingly, no Plaintiff suffered a "concrete" and "imminent" injury at the time it filed its complaint. *TransUnion*, 141 S. Ct. at 2203.

61.     Plaintiffs offered evidence regarding alleged harm from provisions of SB 1 during Texas's 2022 elections, but such post-filing factual developments "cannot . . . establish" standing to sue. *Fox*, 67 F.4th at 295; *Castro*, 86 F.4th at 954.

62.     Accordingly, all of Plaintiffs' complaints and claims must be dismissed for failure to prove standing at the time of filing. *See Friends of the Earth*, 528 U.S. at 180; *Fox*, 67 F.4th at 295; *Castro*, 86 F.4th at 954.

### d.  Plaintiffs Failed to Establish Standing on the Overwhelming Majority of their Challenges to SB 1

63.     Even if Plaintiffs could rely on post-filing evidence, they have failed to establish standing to pursue the overwhelming majority of their claims.

64.     In particular, Plaintiffs lack standing to challenge:

   a.  2.05-2.07 (Voter Registrars): Mi Familia Vota (MFV) challenged Sections 2.05, 2.06, and 2.07, which regulate state officials and voter registrars, but offered no evidence regarding any of these provisions. It therefore failed to establish standing to challenge them.

   b.  Sections 3.04, 3.12, and 3.13 (Drive-Through Voting) and Sections 3.09 and 3.10 (Early-Voting Times): LULAC Texas, Texas American Federation of Teachers (Texas AFT), Voto Latino, Texas Alliance of Retired Americans (TARA), Houston Area Urban League (HAUL), Delta Sigma Theta (Delta), MFV, Marlon Lopez, Marla Lopez, and Paul Rutledge challenged sections 3.04. 3.12, and 3.13 insofar as they prohibit drive-through voting, and sections 3.09 and 3.10, which expand early-voting opportunities overall and standardize early-voting hours statewide by preventing counties from offering early voting between 10:00 P.M. and

6:00 A.M. However, no Plaintiff has identified anyone unable to vote due to these provisions. Moreover, the only alleged burdens they identify are the ordinary burdens of voting, which bear no "close relationship" to "traditional[]" standing injuries. *TransUnion*, 141 S Ct. at 2203; *see Crawford*, 553 U.S. at 198.

c. Section 3.15 (Straight-Ticket Voting): HAUL and Delta challenge this provision, which reinforces an existing ban on automatic straight-ticket voting enacted by the legislature in 2017. *See Tex. Alliance for Ret. Ams. v. Hughs*, 976 F.3d 564, 565-66 (5th Cir. 2020). They lack standing because section 3.15 did not materially alter the law, *see* Oct. 3, 2023 Tr. at 2213:16–21, and automatic straight-ticket voting would remain banned even if section 3.15 were enjoined, *see Tex. Alliance for Ret. Ams.*, 976 F.3d at 565–566; *TransUnion*, 141 S. Ct. at 2208 (standing requires cognizable injury caused by challenged law and redressable by judicial order invalidating it).

d. Sections 4.01, 4.07, 4.06, 4.07, and 4.09 (Poll Watchers): Various LUPE, MFV, and HAUL Plaintiffs challenge some or all of these provisions, which entitle properly credentialed poll watchers to access polling stations, to have free movement in the polling place (subject to specific rules in the Election Code), to observe election activity, and to remain in the polling station absent special circumstances. Several witnesses, like James Lewin and Jeffrey Clemmons, claimed they are afraid of being prosecuted under these provisions, but their claimed fears are far too speculative to be "imminent." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256–57 (5th Cir. 2022). In order for anyone to be prosecuted, several speculative things would need to happen: (1) she would need to serve with a disruptive poll watcher; (2) she would

need to take an action a poll watcher believes violates a challenged provision; (3) she would fail to mediate with the poll watcher; (4) a poll watcher would need to report the violation, and (5) a prosecutor would need to exercise discretion to bring charges.  Plaintiffs presented *zero* evidence that any of this happened in Texas since SB 1's enactment, reinforcing that their claims are far too "speculative" and "depend[ent] . . . on the actions of third-part[ies]" to confer standing. *Zimmerman v. Austin*, 881 F.3d 378, 390  (5th Cir. 2020).

e.   Section 4.12 (Drop Boxes): LULAC Texas, Texas AFT, Voto Latino, TARA, HAUL, Delta, and MFV challenge this provision, which prohibits ballots from being dropped at unmanned drop boxes. No Plaintiff proved they were unable to vote because of this provision, and the ordinary process of voting at a traditional polling place is not a cognizable injury. *See TransUnion*, 141 S Ct. at 2203; *Crawford*, 553 U.S. at 198.

f.   Section 5.04 (Unsolicited Mail Ballots): MFV challenges this prohibition on election officials sending out unsolicited mail ballots, but MFV's witnesses offered no testimony about how this provision harmed it.

g.   Section 5.07 (Identification Number for Mail Ballot Applications): Almost every Plaintiff challenges section 5.07, which requires election officials to reject mail ballot applications that lack a proper voter identification number.  The record

evidence does not identify a Plaintiff or Plaintiff organization member who was unable to ultimately receive a mail ballot because of section 5.07.[2]

h.  Section 5.13 (Identification Number for Mail Ballots): The LUPE and MFV Plaintiffs challenge section 5.13, which requires election officials to reject mail ballots that lack a proper identification number. The record evidence does not establish that a Plaintiff or Plaintiff organization's member had their ballot rejected under this provision.[3]

i.  Sections 5.02, 5.03, 5.04, 5.06, 5.08, and 5.10 (Provisions Implementing Mail Ballot Identification Requirements): No Plaintiff has standing to challenge these provisions—which merely help implement the requirements of sections 5.07 and 5.13—because none impose a cognizable injury. As the Court recognized in its summary judgment opinion, none of these provisions "require the rejection of any

---

[2] Contrary to the Court's prior suggestion, ECF No. 820 at 22–23, the fact that an organization's members face a "risk" of having their applications rejected cannot confer standing. *See City of Kyle*, 626 F.3d at 237. Also contrary to the Court's prior suggestion, ECF No. 820 at 22–23, it is insufficient that an organizational plaintiff probably had members whose applications were rejected. Plaintiffs must identify specific members with standing to sue. *Summers*, 555 U.S. at 498–99; *City of Kyle*, 626 F.3d at 237. The example provided by the Court in its summary judgment ruling—Terri Saltzman—does not satisfy that burden, because her mail ballot application was rejected for a non-SB 1 reason. Oct. 10, 2023 Tr. at 167:8. Even if Plaintiffs can identify individuals whose applications were rejected but successfully cured those applications, that is not a cognizable injury because mere inconveniences during voting have no "close relationship" to "traditional[]" legal injuries. *TransUnion*, 141 S Ct. at 2203; *Crawford,* 553 U.S. at 198. *TransUnion* also forecloses reliance on *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009), which the Court previously cited for the proposition that a voter suffers an Article III injury merely by having to show identification to vote. *See* ECF No. 820 at 23.

[3] In its summary judgment opinion, the Court suggested Terri Saltzman's mail ballot was rejected, but Ms. Saltzman testified that she successfully used Ballot Tracker to cure her ballot. Oct. 10, 2023 Tr. at 168:3-12. And needing to cure a ballot is not a cognizable injury because mere inconvenience in voting bears no "close relationship" to "traditional[]" legal injuries. *TransUnion*, 141 S Ct. at 2203; *see Crawford*, 553 U.S. at 198.

voting materials." ECF No. 820 at 26. Any other alleged injury bears no "close relationship" to "traditional[]" legal injuries. *TransUnion*, 141 S Ct. at 2203; *see Crawford*, 553 U.S. at 198.

j.  Section 6.01 (Requirement that Individuals Transporting Seven or More Voters to Receive Curbside Assistance Fill Out Form): HAUL, Delta, and the Arc of Texas challenge this provision, which requires a person who transports seven or more voters to receive curbside assistance to fill out a form providing their name, address, and whether they are providing additional assistance. Section 6.01 also allows poll watchers to observe that form being filled out.  But no relevant Plaintiff offered evidence that it actually transported seven or more voters to the polls to receive curbside assistance.  Even if it had, the obligation to fill out a form bears no "close relationship" to "traditional[]" legal injuries. *TransUnion*, 141 S Ct. at 2203; *see Crawford*, 553 U.S. at 198.

k.  Section 6.03 (Additional Information from Voter Assistants): MFV, the LUPE Plaintiffs, and three of the HAUL Plaintiffs challenge this provision, which requires those providing voter assistance at a polling place to fill out a form providing certain information. No Plaintiff has standing to challenge this provision because the obligation to provide two additional pieces of noninvasive information on a standard form bears no "close relationship" to "traditional[]" legal injuries.  *TransUnion*, 141 S Ct. at 2203; *see Crawford*, 553 U.S. at 198.

l.   Section 6.04 (Supplemented Voter Assistance Oath): As relevant to this litigation,[4] this provision (challenged by the LUPE Plaintiffs, HAUL, Delta, Arc of Texas, and MFV) adds three required representations in the voter assistance oath. Assisters must attest that (1) the assisted voter represented they were eligible for assistance, (2) they did not "pressure or coerce the voter into choosing [them] to provide assistance," and (3) they will not "communicate information about how the voter has voted to another person." Plaintiffs claimed a fear of prosecution because of this provision, but that fear is far too "speculative" to confer standing. *Tex. State LULAC*, 52 F.4th at 256–57. No Plaintiff has alleged any intent to engage in conduct "arguably proscribed" by this provision. *Id.* at 256. Even if a Plaintiff did violate the oath, several more unlikely things would need to happen for anyone to be prosecuted: (1) someone would discover that violation, (2) someone would report the violation to a prosecutor, and (3) the prosecutor would have to exercise discretion to bring charges. Any fear of prosecution is under section 6.04 is far too "speculative" and "depend[ent] . . . on the actions of third-part[ies]" to confer standing. *Zimmerman*, 881 F.3d at 390. Moreover, any fear of perjury charges not tethered to a specific revision to the oath is not *caused* by section 6.04 because the voter-assistance oath has been under penalty of perjury since 1973. *See* Tex. Penal Code § 37.02.

---

[4] This Court previously held that Plaintiffs' challenges to other parts of the oath are moot. *See* ECF No. 444 at 2-3 & n.3; *OCA Greater Houston v. Texas*, No. 1:15-cv-679, 2022 WL 2019295, at (W.D. Tex. June 6, 2022).

m.  Section 6.05 (Disclosure Requirement for Mail-Ballot Assistance): MFV, HAUL, Delta, Arc of Texas, and the LUPE Plaintiffs challenge section 6.05, which requires anyone who assists a voter to prepare a mail ballot to list, on the ballot carrier envelope, their relationships to the voter and whether they accepted compensation for providing that assistance. Again, however, no individual suffers a cognizable injury from the inconvenience associated with listing these two items on a standard form—a minor irritation that bears no "close relationship" to "traditional[]" Article III harms. *TransUnion*, 141 S Ct. at 2203; *see Crawford*, 553 U.S. at 198.

n.  Section 7.02 (Expansion of Voting Leave for Employees): Challenged by the MFV Plaintiffs, this provision *expands* the requirement for employers to grant their employees leave to vote. The MFV Plaintiffs offered no evidence that this provision injured them or anyone else.

o.  A host of Plaintiffs challenge section 7.04, which bans vote harvesting and bars election officials from sending out unsolicited mail-ballot applications. With respect to the latter rule, no Plaintiff has standing because section 7.04 merely codified well-established preexisting state law.  In 2020, the Texas Supreme Court held that county officials lacked authority in the Texas Election Code to send out unsolicited mail-ballot applications. *See State v. Hollins*, 620 S.W.3d 400, 403 (Tex. 2020). All Plaintiffs thus lack standing to challenge section 7.04's ban on sending unsolicited mail-ballot applications because any potential injury would not be redressed by an order from this Court.  *See TransUnion*, 141 S. Ct. at 2208.

p. Section 8.01 (Establishing Civil Penalties Against Election Officials Who Violate Law): No Plaintiff has proven injury from this provision because no Plaintiff identified themselves as an election official who can lose their state employment.

65. Defendants now offer a Plaintiff-by-Plaintiff analysis. As an Appendix to this Brief, and to further assist the Court, Defendants provide a chart linking Plaintiffs to challenged provisions of SB 1. *See* Appendix A.

### i. The LULAC Plaintiffs Lack Standing To Challenge Sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, and 5.08.

#### 1. LULAC Texas

66. LULAC Texas is the Texas chapter of the League of United Latin American Citizens. Sept. 21, 2023 Tr. at 1632:9–11, 1634:1–5.

67. Its mission is to "protect the civil and voting rights of Latinos." Sept. 21, 2023 Tr. at 1633:19–21. LULAC Texas has engaged in voter education since the 1930s. Sept. 21, 2023 Tr. at 1665:10–18. Today, "educating voters about election law changes is a regular part of LULAC's work." Sept. 21, 2023 Tr. at 1665:20–22. Get-out-the-vote and voter registration efforts are regular, longstanding LULAC activities. Sept. 21, 2023 Tr. at 1666:24–1667:4.

68. LULAC Texas challenges SB 1 sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04. Sept. 11, 2023 Tr. at 232:17-233:11.

69. LULAC Texas offered no testimony or other evidence regarding section 4.12, so it failed to establish standing to challenge that section. *See Summers*, 555 U.S. at 493; *In re Gee*, 941 F.3d at 161–62.

70. LULAC Texas attempted to establish standing to challenge the other SB 1 sections through the testimony of its President, Domingo Garcia. Mr. Garcia's testimony fails to establish

either associational standing or organizational standing to challenge Sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, and 5.08.

     **a.**     **LULAC Texas Did Not Prove Associational Standing.**

71.     Mr. Garcia could not identify a single member of LULAC Texas who was unable to vote as a result of any provision in SB 1. *See* Sept. 21, 2023 Tr. at 1665:3–9. Mr. Garcia could not identify any member of LULAC Texas who was unable to vote because of SB 1 sections 3.04, 3.12, and 3.13. *Id.* at 1660:1–4, 20–23. Nor could he identify a member unable to vote because of the regulation of early-voting hours in sections 3.09 and 3.10, or indeed any member whose working hours overlapped completely with the early-voting hours permitted by SB 1. *Id.* at 1661–1662:8, 1662:21–23.

72.     Mr. Garcia did not identify any member who had a negative voting experience because of sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, or 7.04. Sept. 21, 2023 Tr. at 1659:14–16.

73.     LULAC Texas therefore has failed to establish associational standing to challenge sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, or 7.04. *See City of Kyle*, 626 F.3d at 237.

74.     Mr. Garcia asserted that sections 5.02, 5.03, 5.07, and 5.08 make it harder for LULAC Texas members to vote. Sept. 21, 2023 Tr. at 1648:22–1650:5.

75.     Mr. Garcia testified that LULAC Texas member Rosalee Weisfeld attempted three times to acquire a mail ballot during the March 2022 Primary Election. Sept. 21, 2023 Tr. at 1653:16–1654:1. He further testified, however, that Ms. Weisfeld ultimately received a mail ballot and voted successfully. *Id.* at 1658:24–1659:17.

76.     Mr. Garcia also testified that member Gracie Cortez was "concerned" about voting by mail but ultimately successfully did so. Sept. 21, 2023 Tr. at 1664:14–1665:2.

77.    LULAC Texas therefore has failed to identify any "specific member" who suffered a concrete and cognizable injury traceable to—and, thus, failed to establish associational standing to challenge—sections 5.02, 5.03, 5.07, or 5.08.  City *of Kyle*, 626 F.3d at 237.

**b.    LULAC Texas Did Not Prove Organizational Standing.**

78.     Mr. Garcia testified generally that SB 1 caused LULAC Texas to spend resources on registering, educating, and turning out voters. Sept. 21, 2023 Tr. at 1666:1–23.

79.    Mr. Garcia testified that sections 3.04, 3.12, and 3.13 (which prohibit drive-through voting) forced LULAC Texas to "divert resources" to promoting voter turnout. Sept. 21, 2023 Tr. at 1645:24–1646:14.

80.    Mr. Garcia further testified that Sections 3.09 and 3.10 (early-voting hours) injured LULAC Texas by "impact[ing] [its] ability to get [its] vote out" in Harris County. Sept. 21, 2023 Tr. at 1647:7–24.

81.    Mr. Garcia also testified that sections 5.02, 5.03, 5.07, and 5.08 (mail-ballot identification-number provisions) forced LULAC Texas to hold "public events" and "town hall meetings" to "educate [its] members and [its] volunteers" about these provisions and, thus, diverted funds from other "education programs, scholarship programs, programs regarding voter registration, programs regarding town halls [related to] naturalization." Sept. 21, 2023 Tr. at 1650:9–1652:24.

82.    Mr. Garcia's testimony regarding LULAC Texas's purported diversion of resources toward voter registration, voter education, and get-out-the-vote efforts is insufficient to establish organizational standing for four basic reasons.

83.    *First*, voter registration, voter education, and get-out-the-vote efforts are "routine" parts of LULAC Texas's regular activities. *Azalea Garden Props.*, 82 F.4th at 352–53; *see* Sept. 21, 2023 Tr. at 1665:20–1667:2-4 (Mr. Garcia acknowledging that LULAC Texas has "regularly" engaged in these activities for many years). Because LULAC Texas would have engaged in these activities regardless of SB 1, its decision to do so did not "perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

84.    *Second*, Mr. Garcia offered no detail about *how much* money Texas LULAC spent in response to any challenged SB 1 provision. His vague resource-diversion testimony does not establish a "concrete" and "particularized" injury. *TransUnion*, 141 S Ct. at 2203.

85.    Third, Mr. Garcia failed to provide any evidence of any specific "projects or causes" that LULAC Texas was "required to forego" due to its alleged diversion of resources caused by a challenged provision of SB 1. *Tenth St. Residential Ass'n*, 968 F.3d at 500; *see City of Kyle*, 626 F.3d at 239. Mr. Garcia admitted that he could not identify a specific activity or event that LULAC Texas had to forego because of the challenged provisions or any resulting resource diversion. Sept. 21, 2023 Tr. at 1669:19–1670:24. There is also no evidence that LULAC Texas reduced its budget with respect to any other program or activity due to its response to any provision of SB 1. Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" LULAC Texas's activities or its ability to achieve its mission, and its resource-diversion theory of standing fails. *Azalea Garden Props.*, 82 F.4th at 353.

86.    *Fourth*, Mr. Garcia's testimony failed to establish that LULAC Texas's alleged injuries are "likely caused" by any provision of SB 1 or "would likely be redressed by judicial relief" against any provision of SB 1. *TransUnion*, 141 S. Ct. at 2203.

87.     LULAC Texas has two causation problems. To start, Mr. Garcia never attempted to explain what parts of LULAC Texas's alleged resource diversion injuries were caused by each of these provisions. For example, he could not say how much money was spent in response to SB 1's drive-through voting provisions. Sept. 21, 2023 Tr. at 1670:2–5. In fact, none of Mr. Garcia's testimony establishes how much LULAC Texas spent in response to any challenged provision. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and LULAC Texas's attempt to seek cumulative standing in this case fails.

88.     Further, Mr. Garcia could not identify which of LULAC Texas's alleged injuries were caused by any challenged provision of SB 1, as opposed to provisions of another election law enacted around the same time, SB 1111, that LULAC has challenged in another lawsuit. *See Tex. State LULAC*, 52 F.4th at 253 (noting LULAC Texas's argument that SB 1111 caused it to divert resources from "scholarship and law-reform programs").

89.     In his deposition in the SB 1111 litigation, Mr. Garcia testified that LULAC Texas "had no plans to spend a million or 2 million in Texas on voter registration and get-out-the-vote until SB 1 and SB 1111 passed." Sept. 21, 2023 Tr. at 1683:9–16. He also testified in that deposition that he was not "able to tease out how much [the organization was] spending on account of SB 1111 versus how much [it was] spending . . . on account of SB 1." Sept. 21, 2023 Tr. at 1668:22–1669:3.

90.     Based on that testimony, the Fifth Circuit concluded that LULAC Texas lacked a cognizable resource-diversion injury—and therefore standing—to challenge SB 1111 because it failed to disaggregate its resource expenditures in response to SB 1 and SB 1111 and, thus, could not "link any diversion of resources *specifically to SB 1111*." *Tex. State LULAC*, 52 F.4th at 254 (emphasis added).

91.     Indeed, to establish standing on a resource-diversion theory, "[a]n organizational plaintiff must show it diverted resources 'as a direct result of' the challenged law—not as a result of the challenged law and others like it." *Id.* (quoting *Ass'n of Cmty. Orgs for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999)). Mr. Garcia's testimony in this case fails to establish standing for the same reason.

92.     Indeed, Mr. Garcia admitted that the organization's 2022 voter mobilization campaign was "partially" in response to *both* SB 1 and SB 1111. Sept. 21, 2023 Tr. at 1667:24–1668:1. Mr. Garcia also admitted that "some" of LULAC Texas's resource diversion was "partly in response to SB 1111," Sept. 21, 2023 Tr. at 1669:13–18, that LULAC Texas's fundraising "from late 2021 onward [was] in response to both SB 1 and SB 1111 together," Sept. 21, 2023 Tr. at 1669:4–12, and that LULAC Texas's "decision to redeploy resources resulted from multiple changes in Texas voting law since late 2021, including SB 1 and SB 1111," Sept. 21, 2023 Tr. at 1668:2–5.

93.     LULAC Texas has failed to establish organizational standing and must be dismissed. *See City of Kyle*, 626 F.3d at 238; *TransUnion*, 141 S Ct. at 2203; *Tenth* St. *Residential Ass'n*, 968 F.3d at 500; *Azalea Garden Props.*, 82 F.4th at 353; *Tex. State LULAC*, 52 F.4th at 254.

### 2. Texas AFT

94.     Texas AFT is a statewide labor union that represents various public-school employees. Sept. 14, 2023 Tr. at 920:18–20. Texas AFT regularly engages in voter registration and voter turnout activities. *Id.* at 935:3–936:17.

95.     Texas AFT challenges SB 1 sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04. Sept. 11, 2023 Tr. at 232:17–233:11.

96. Texas AFT offered no testimony or other evidence regarding section 4.12, so it lacks standing to challenge that provision. *See Summers*, 555 U.S. at 493; *In re Gee*, 941 F.3d at 161–62.

97. Texas AFT attempted to prove associational and organizational standing to challenge the other SB 1 sections through the testimony of its president, Zeph Capo. Sept. 14, 2023 Tr. at 920:14–15.

98. Texas AFT lacks standing to challenge sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, and 5.08.

**a.    Texas AFT Did Not Prove Associational Standing.**

99. Mr. Capo did not identify a specific member of Texas AFT injured by sections 3.04, 3.09, 3.10, 3.12, 3.13, or 3.14.

100. Mr. Capo could not identify any member of Texas AFT who was unable to vote because of SB 1 sections 3.04, 3.12, and 3.13. Sept. 14, 2023 Tr. at 960:3–8. Mr. Capo also could not identify any member of Texas AFT who was unable to vote due to SB 1's regulation of early-voting hours. *Id.* at 958:5–959:23.

101. Mr. Capo identified only two specific members of Texas AFT he claimed were injured by SB 1's mail-ballot identification provisions: Elaine Jones and Alice Penrod. Sept 14 Tr. at 945:13–945:22.

102. Elaine Jones, a member of Texas AFT and TARA, Sept. 22, 2023 Tr. at 1786:7–13, was not injured by any challenged provision. She applied for a mail ballot in 2022, but it was rejected because she forgot to check a box indicating why she was eligible to vote by mail. *Id.* at

1801:16–21. That requirement was not created by SB 1, *id.* at 1803:8–10, so any injury is not traceable to the challenged provisions.

103.    Ms. Jones also had to cure her mail ballot during the 2022 General Election because she "had forgotten about the [identification] number," Sept. 22, 2023 Tr. at 1794:3–4, 1796:5–8, but that testimony is irrelevant to standing because neither organizational Plaintiff of which she is a member (Texas AFT and TARA) challenges section 5.13 (the provision that requires rejection of mail ballots that do not comply with the identification-number requirement).

104.    Alice Penrod, a member of Texas AFT, Sept. 22, 2023 Tr. at 1810:13, was also not injured by any challenged provision. Ms. Penrod applied for a mail ballot in 2022 with no "issues," *id.* at 1813:1–8, so she was not injured by section 5.07. Ms. Penrod's mail ballot was initially rejected during the 2022 primary election, but she successfully cured it using Ballot Tracker. *Id.* at 1813:9–11, 1813:20–1814:2, 1819:9–13. That evidence, however, is irrelevant to Texas AFT's standing because it does not challenge section 5.13.

**b.    Texas AFT Failed to Prove Organizational Standing.**

105.    Mr. Capo claimed that Texas AFT diverted funds to educating and turning out voters following SB 1. Sept. 14, 2023 Tr. at 924:7–940:13, 946:14–947:14. He also testified that, after SB 1, Texas AFT hired more temporary political organizers to engage in voter outreach. *Id.* at 938:7–9. Because of those efforts, Texas AFT allegedly diverted money from hosting focus groups to understand teacher concerns. *Id.* at 939:10–21.

106.    Most of Mr. Capo's testimony about diversion of resources to voter education and voter turnout seemed to be directed only to section 7.04. Sept. 14, 2023 Tr. at 924:7–940:13 (discussions in response to original question about section 7.04).

107.    Even assuming that testimony relates to the other challenged provisions of SB 1, Texas AFT's resource diversion theory is insufficient to establish standing for four basic reasons.

108.    *First*, voter education and voter turnout activities are a "routine" part of Texas AFT's efforts. *Azalea Garden Props.*, 82 F.4th at 352–53; *see, e.g.*, Sept. 14, 2023 Tr. at 935:3–936:17 (discussion by Capo of such efforts pre- and post-SB 1).  Because Texas AFT would have engaged in these activities regardless of SB 1, its decision to do so did not "perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

109.    Second, Mr. Capo provided no detail about how *much* money Texas AFT spent in response to any challenged provision. This vague resource-diversion allegation is not "concrete" and "particularized." *TransUnion*, 141 S Ct. at 2203.

110.    *Third*, Mr. Capo did not identify any event or activity Texas AFT had to forego because of any challenged provision. Mr. Capo suggested funds were diverted from a program in which Texas AFT hosts focus groups with teachers, Sept. 14, 2023 Tr. at 939:10–21, but he provided no details about the cost of those focus groups either before or after SB 1. Therefore, the Court cannot even know whether Texas AFT's budget for the focus-group program decreased. *Cf. Tenth St. Residential Ass'n*, 968 F.3d at 500.  Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" LULAC Texas's activities. *Azalea Garden Props.*, 82 F.4th at 353.

111.    *Fourth*, Texas AFT failed to prove its resource-diversion injuries were caused by sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, or 5.08. Mr. Capo offered no testimony establishing how much Texas AFT diverted in response to SB 1 as a whole—let alone (as it must) in response to each challenged provision. "Standing is not dispensed in gross," *TransUnion*, 141

S. Ct. at 2208, and Texas AFT has therefore failed to prove any challenged SB 1 provision caused its alleged resource-diversion injury.

### 3. TARA

112.    TARA is a nonprofit organization that focuses on "major issues that affect seniors and retirees." Sept. 22, 2023 Tr. at 1761:6–10. TARA's "parent organization" is the American Federation of Labor and Congress of Industrial Organizations. *Id.* at 1760:24.

113.    TARA has long encouraged its members to vote. In particular, TARA has "always, as an organization, conducted efforts by social media [and] direct contact to encourage people to vote by mail in Texas." Sept. 22, 2023 Tr. at 1773:15–18. Before SB 1, TARA had conducted multiple "campaigns" to encourage people to vote by mail. *Id.* at 1773:6–11.

114.    TARA challenges SB 1 sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04.  Sept. 11, 2023 Tr. at 232:17–233:11.

115.    TARA offered no testimony or evidence that it was injured by sections 3.04, 3.09, 3.10, 3.12, 3.13, or 4.12, so it failed to establish standing to challenge those sections. *See Summers*, 555 U.S. at 493; *In re Gee*, 941 F.3d at 161–62.

116.    TARA attempted to prove associational and organizational standing to challenge sections 5.02, 5.03, 5.07, and 5.08 through the testimony of Judy Bryant, the field organizer for TARA. Sept. 22, 2023 Tr. at 1760:13–14. That effort fails.

#### a.    TARA Failed to Establish Associational Standing.

117.    Ms. Bryant did not "know of anyone who was unable to vote" as a result of SB 1. Tr. at Sept. 22, 2023 1772:24–1773:3. Ms. Bryant was also unable to identify a member of TARA who was unable to ultimately vote successfully by mail. *Id.* at 1773:2–5.

118.    Because Ms. Bryant failed to identify a specific member injured by any challenged

provision, TARA lacks standing as to all challenged provisions. *See City of Kyle*, 626 F.3d at 237.

**b.    TARA Failed to Establish Organizational Standing.**

119.    Ms. Bryant testified that TARA engaged in voter education efforts to help voters

comply with sections 5.02, 5.03, and 5.08 of SB 1. Sept. 22, 2023 Tr. at 1767:1–17. She claimed that

the time spent on helping voters navigate the mail ballot identification rules resulted in TARA

spending less time on organizing members to visit legislators and advocating for Medicaid

expansion. *Id.* at 1769:8–13.

120.    That alleged resource-diversion injury is insufficient to establish standing for four

basic reasons.

121.    First, voter education and voter turnout activities are a "routine" part of TARA's

efforts. *Azalea Garden Props.*, 82 F.4th at 352–53; *see* Sept. 22, 2023 Tr. at 1773:6–11, 15–18

(discussion by Bryant of pre-SB 1 efforts). As Ms. Bryant acknowledged, "in 2022 [Tara was] doing

the same kind of thing [it was] in 2020, namely educating and encouraging [its] members and [its]

audiences to comply with the applicable voter ID requirements." *Id.* at 1774:22–1775:1. Because

TARA would have engaged in these activities regardless of SB 1, its decision to do so did not

"perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

122.    *Second*, Ms. Bryant offered insufficient detail about *how many* resources were

diverted because of SB 1's mail ballot ID provisions (or any other provisions). The only detail she

gave is that TARA devoted "between 125 and 150 hours" to helping people apply for and vote by

mail. Sept. 22, 2023 Tr. at 1775:24–1776:4. But Ms. Bryant was unsure when that time was devoted,

and she suggested it occurred several months *before* SB 1 was even passed. *Id.* at 1776:9–17. She

also provided no testimony suggesting that 125 to 150 hours was *more* than the time TARA had traditionally spent on advising people on mail balloting. The Court therefore has no idea whether TARA in fact devoted more resources to voter education and get-out-the-vote efforts after SB 1 than before SB 1. TARA's vague resource-diversion allegation is not "concrete" and "particularized." *TransUnion*, 141 S Ct. at 2203.

123.    Third, Ms. Bryant did not identify a specific activity or event TARA had to forego because of any challenged SB 1 provision. She suggested that less time was spent organizing legislator visits or pushing for Medicaid expansion. Sept. 22, 2023 Tr. at 1769:8–13. However, Ms. Bryant acknowledged that "those efforts did continue" even after SB 1, *id.* at 1777:6–7, so TARA did not forego those activities. Although she claimed those efforts were "diminished," she provided no detail on *how much* less time or money was spent on those activities. *Id.* at 1777:4–6. The Court cannot know whether less time and money were spent on those activities before versus after SB 1. *Cf. Tenth St. Residential Ass'n*, 968 F.3d at 500. Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" TARA's activities. *Azalea Garden Props.*, 82 F.4th at 353.

124.    *Fourth*, TARA cannot prove that its resource diversion injuries were caused by any specific challenged provisions. Ms. Bryant never identified how much money TARA spent in response to *any* provision of SB 1, or in response to SB 1's provisions in combination. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and TARA has therefore failed to prove any specific challenged SB 1 provision *caused* its alleged injury.

#### 4. Voto Latino

125.    Voto Latino's three primary bodies of work" are "voter registration," "voter turnout," and voter education. Oct. 11, 2023 Tr. at 102:18–103:7. Those efforts have been a regular part of Voto Latino's work since before SB 1 was passed. Id. at 115:12–19, 117:18–118:10.

126.    Voto Latino challenges SB 1 sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04. Sept. 11, 2023 Tr. at 232:17–233:11.

127.    Voto Latino does not have members. Oct. 11, 2023 Tr. at 115:19–23. Voto Latino therefore asserts only organizational standing. Voto Latino attempted to prove organizational standing through the testimony of Ameer Patel, the organization's managing director. Id. at 100:11–12.

128.    Voto Latino lacks organizational standing to challenge sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, and 5.08.

129.    Mr. Patel testified that Voto Latino devoted resources to "combat SB 1." Oct. 11, 2023 Tr. at 106:3. He testified that "the shift of resources within Voto Latino [was] primarily to Get Out the Vote efforts," and away from "voter registration" and "voter advocacy." Id. at 118:14–24. Mr. Patel also testified that Voto Latino plans, in the future, to engage in various voter education efforts in Texas designed to encourage voting by mail. Id. at 111:6–112:6.

130.    Voto Latino's claimed resource-diversion injury is inadequate for several reasons. First, voter education and voter turnout activities are a "routine" part of Voto Latino's efforts. Azalea Garden Props., 82 F.4th at 352–53; see Oct. 11, 2023 Tr. at 115:12–19, 117:18–118:10. When asked how Voto Latino's post-SB 1 activities would be different than pre-SB 1 efforts, Mr. Patel's only explanation was that the "timing" of Voto Latino's efforts in 2024 would "perhaps" be

different and that the campaign would be "intentional." Oct. 11, 2023 Tr. at 112:25–113:11. That testimony is insufficient to demonstrate any challenged provision "perceptibly impaired" Voto Latino's organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

131.     *Second*, Mr. Patel offered no detail about how many resources were diverted because of the challenged provisions. Voto Latino has thus not proven it spent more on voter education and get-out-the-vote efforts after SB 1 than before SB 1. Voto Latino's vague resource-diversion allegation is not "concrete" and "particularized." *TransUnion*, 141 S Ct. at 2203.

132.     Third, Mr. Patel did not identify a specific activity or event Voto Latino had to forego because of any challenged SB 1 provision. Indeed, Mr. Patel acknowledged he could not give "exact examples" of any "specific event or activity that Voto Latino had to forego entirely because of the diversion of resources to SB 1." Oct. 11, 2023 Tr. at 125:20–25. Instead, Patel vaguely claimed that Voto Latino diverted resources from efforts related to elections in Virginia and New Jersey. *Id.* at 110:111–14. When pressed to provide information on how many resources were diverted from such efforts, Patel could not provide any details. *Id.* at 125:6–19.  Voto Latino has therefore failed to prove that fewer resources were spent on those activities before versus after SB 1. *Cf. Tenth St. Residential Ass'n*, 968 F.3d at 500.  Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" Voto Latino's activities. *Azalea Gardens*, 82 F.4th at 353.

133.     *Fourth*, Voto Latino cannot prove that its resource-diversion injuries were caused by any challenged SB 1 provision. Mr. Patel offered no testimony attempting to explain what parts of Voto Latino's alleged resource-diversion injuries were caused by each of these provisions. He never identified how much money Voto Latino spent in response to any provision of SB 1, let alone

in response to SB 1's provisions in combination. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and Voto Latino has therefore failed to prove any challenged SB 1 provision caused its alleged resource-diversion injury.

134.    Relatedly, Voto Latino cannot prove its resource diversions were caused by SB 1 instead of other election laws. Around the same time Voto Latino joined this lawsuit against SB 1, it also joined a lawsuit against SB 1111, alleging diversions of resources highly similar to those alleged in this case. *Tex. State LULAC*, 52 F.4th at 253. In a deposition in that case, the president of Voto Latino repeatedly claimed that Voto Latino had to divert resources in response to both SB 1 and SB 1111. Oct. 11, 2023 Tr. at 121:5–16, 121:11–23:3, 124:1–5.

135.    The Fifth Circuit found that Voto Latino lacked a cognizable resource diversion injury to challenge SB 1111 because it could not "link any diversion of resources specifically to SB 1111." *Tex. State LULAC*, 52 F.4th at 254. That was so because Voto Latino could not adequately differentiate between its expenditures in response to SB 1111 and SB 1. See id.

136.    Voto Latino has the same problem here. When asked if she "kn[e]w approximately how much of the expenditure diversions [were] a result of SB 1111 versus SB 1," Voto Latino's president acknowledged she "c[ould]n't really tease out one or the other" because Voto Latino needed "to educate [voters] on the suite of the changes of the law." Oct. 11, 2023 Tr. at 122:22–123:3. Ms. Kumar also testified that Voto Latino raised money "for SB 1111 and SB 1" together. *Id.* at 124:19–21. "An organizational plaintiff must show it diverted resources as a direct result of the challenged law—not as a result of the challenged law and others like it." *Tex. State LULAC*, 52 F.4th at 254 (cleaned up). Voto Latino failed to meet that burden in this case.

> ii. **The HAUL Plaintiffs Lack Standing On All Their Claims (Sections 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.25, 5.02, 5.03, 5.06, 5.07, 5.10, 6.01, 6.03, 6.04, 6.05, and 6.07).**

137. The HAUL Plaintiffs are HAUL, Delta, Arc of Texas, and Jeffrey Lamar Clemmons.

138. HAUL and Delta challenge section 3.15, but they lack standing to do so because the ban on straight-ticket voting predates SB 1 and, thus, any injuries from that ban are not caused by section 3.15 or redressable by an order enjoining it. *See Tex. All. for Retired Ams.*, 976 F.3d at 565–566; *TransUnion*, 141 S. Ct. at 2208; *supra* ¶ 36(c). As explained below, the HAUL Plaintiffs lack standing on the remainder of their claims.

### 1. HAUL

139. HAUL's mission is "creat[ing] better social and economic conditions . . . for black people." Oct. 3, 2023 Tr. at 2229:18–20. As part of its voting-related work, HAUL conducts voter registration drives and engages in voter education. Id. at 2230:25–2231:7.

140. HAUL challenges SB 1 sections 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.02, 6.01, 6.03, 6.04, 6.05, and 6.07. Sept. 11, 2023 Tr. at 230:21–232:15.

141. HAUL attempted to prove standing through the testimony of Ray Shackelford, a consultant who works with HAUL. Oct. 3, 2023 Tr. at 2229:4–10.

142. An organization can assert associational standing only if it has members. *See Azalea Garden Props.*, 82 F.4th at 350-51. HAUL does not have members and therefore is only "challenging SB 1 on an organizational basis." Oct. 3, 2023 Tr. at 2264:15–19.

143. Accordingly, Mr. Shackelford's testimony regarding alleged harms "to the communities that HAUL serves" cannot establish standing. Oct. 3, 2023 Tr. at 2243:3-9 (drive-through voting), 2244:9–15 (24-hour voting), 2245:11–17 (mail voting), 2245:22–2446:8 (drop-

boxes), 2248:8–25 (straight-ticket voting), 2249:1–2250:5 (voter assistance provisions); *see Azalea Garden Props.*, 82 F.4th at 350–51. Nor can the testimony of Deion Dorsett, who (incorrectly) claimed to "belong to" HAUL. Oct. 3, 2023 Tr. at 2281:10–2282:12; *see also id.* at 2285:13–19, 2288:21–25, 2289:12–25, 2294:5–10, 2303:12–14.

144.    Mr. Shackleford also offered testimony in support of HAUL's organizational standing claim. Mr. Shackleford testified that SB 1 caused HAUL to expend resources on educating voters and training volunteers to do so.  Oct. 3, 2023 Tr. at 2252:2–2253:12.

145.    As part of those efforts, Mr. Shackleford suggested HAUL had to "shorten" presentations at schools so it could educate audience members about voting-related rules. Oct. 3, 2023 Tr. at 2256:5–24. Mr. Shackleford said the portions of those presentations addressing non-voting related topics included the "same information but more succinctly and so it wasn't as robust." *Id.* at 2257:2–4.

146.    Mr. Shackleford testified that HAUL's focus on SB 1 "impact[ed its] ability to do some of [its] voting registration and deputization activities." Oct. 3, 2023 Tr. at 2258:21–22.  He explained that HAUL "still did" those activities, but claimed it was "not able to reach the numbers that [it] would have liked" because of the organization's focus on SB 1. *Id.* at 2258:21–25.

147.    When asked how HAUL's SB 1-related voter education work was "different from the normal civil engagement work or voter educational work that HAUL would do," Mr. Shackleford said old efforts "typically" involved less "time and effort," though he provided no detail to substantiate that claim. Oct. 3, 2023 Tr. at 2259:24–2260:7. Mr. Shackleford further testified that, as a result of SB 1, HAUL hired additional employees to work on voting-related

matters. *Id.* at 2271:10–13. He acknowledged that, "in all likelihood," HAUL would retain those employees regardless of whether "SB 1 is overturned." *Id.* at 2271:14–20.

148.    HAUL lacks organizational standing as to all of its claims. HAUL's evidence fails to establish a cognizable resource-diversion theory of standing for several reasons.

149.    First, voter education activities are a "routine" part of HAUL's organizational work. *Azalea Garden Props.*, 82 F.4th at 352-53. When asked how HAUL's SB 1-related voter education work was "different from the normal civil engagement work or voter education work that HAUL would do," Mr. Shackleford could say only that pre-SB 1 efforts "typically" involved less "time and effort." Oct. 3, 2023 Tr. at 2259:24–2260:7. Such testimony is too vague to establish standing. *See Azalea Garden Props.*, 82 F.4th at 354 (organization failed to establish standing when the evidence suggested that the defendant's actions required it to devote more time and effort to testing for discrimination, an activity it routinely engaged in).

150.    *Second*, Mr. Shackleford failed to detail the *amount* of resources diverted because of the challenged provisions. Mr. Shackleford provided no information suggesting that the budget for one of HAUL's pre-SB 1 activities was reduced. The only potentially relevant detail Mr. Shackleford offered on this point was his testimony that HAUL hired additional employees to work on voting-related matters. Oct. 3, 2023 Tr. at 2271:10–13. Even if that were a cognizable injury and actually caused by SB 1, Mr. Shackleford acknowledged that, "in all likelihood," HAUL would retain those employees regardless of whether "SB 1 is overturned." *Id.* at 2271:14–20. Thus, that alleged injury is not "likely be redressed by judicial relief" against any provision of SB 1. *TransUnion*, 141 S. Ct. at 2203.

151.    Further, it is not clear that those additional employee hires represent *diverted* resources. Mr. Shackleford acknowledged that HAUL's gross receipts dramatically increased between 2019 and 2021. Oct. 3, 2023 Tr. at 2268:20–22. Those hires could have simply been paid for by the new funding—and not with funds diverted from pre-SB 1 activities. Therefore, the Court cannot any challenged provision "perceptibly impaired" HAUL's preexisting activities. *City of Kyle*, 626 F.3d at 238.

152.    *Third*, HAUL did not identify any specific "projects or causes" it was "required to forego" because of any challenged SB 1 provision. *Tenth St. Residential Ass'n*, 968 F.3d at 500. Mr. Shackleford stated that, following SB 1, presentations on non-voting related topics were more "succinct" so that more time could be spent on voting-related topics, but he admitted that the presentations still covered the same materials. Oct. 3, 2023 Tr. at 2257:2–4. Similarly, his testimony that SB 1 "impact[ed HAUL's] ability to do some of [its] voting registration and deputization activities" fails to establish resource diversion because he acknowledged that HAUL "still did" those activities. *Id.* at 2258:21–22.

153.    Fourth, HAUL did not prove that its alleged resource-diversion injury was "caused by" any challenged provision of SB 1. *TransUnion*, 141 S. Ct. at 2208. Mr. Shackleford provided no testimony to quantify the amount of resources allegedly diverted as a result of SB 1 as a whole or any specific SB 1 provision. HAUL has therefore failed to prove any specific challenged SB 1 provision caused its alleged resource-diversion injury. *See id.* at 2208.

## 2.    Delta Sigma Theta

154.    Delta is a "national service sorority" primarily consisting of black female members. Oct. 2, 2023 Tr. at 2080:12–16. Delta regularly engages in voter registration and voter education programs. *Id.* at 2086:21–2087:8, 2146:2–5.

155.    Delta challenges SB 1 sections 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.12, 6.01, 6.03, 6.04, and 6.05. Oct. 3, 2023 Tr. at 2180:16–2181:5.

156.    Delta offered the testimony of Michelle Brown, who served as Delta's southwest regional director from 2018 to 2022, Oct. 2, 2023 Tr. at 2084:15–20, and Sharon Jones, the organization's "state social action lead," id. at 2142:20, to attempt to establish standing.

157.    Ms. Brown acknowledged that Delta as an "organization" did not "suffer[] any sort of injury" as a result of the provisions eliminating 24-hour voting. Oct. 2, 2023 Tr. at 2121:16–2122:1. Thus, by its own admission, Delta lacks standing to challenge sections 3.09 and 3.10.

158.    Delta failed to establish associational standing or organizational standing for all challenged provisions.

**a.    Delta Failed To Prove Associational Standing.**

159.    Ms. Brown could not identify any Delta member unable to vote in 2022 because of any challenged SB 1 provision. Oct. 2, 2023 Tr. at 2125:13–15.

160.    With respect to the provisions regulating voter assistance, Ms. Brown failed to identify any specific members actually subject to those provisions—let alone members who stopped providing voting assistance as a result of them. Oct. 2, 2023 Tr. at 2125:9–12 (acknowledgment that Delta has not identified any person "who has refused to provide voter assistance because of any provision in SB 1"); 2123:23–2124:1 (failure to identify anyone who has transported seven or more voters to the polls), 2124:8–19 (failure to identify anyone who decided

to stop providing voter assistance or refused to fill out forms required by section 6.03), 2124:20–2125:7 (failure to identify anyone who refused to comply with or provide assistance under terms of section 6.05). Ms. Jones also failed to identify any specific Delta member who refused to comply with the voting-assistance provisions or stopped providing voting assistance because of any challenged provision. Oct. 3, 2023 Tr. at 2223:25–2224:10; *see also id.* at 2196:21–2198:16, 2199:9–2203:21.

161.    Ms. Jones did identify a few Delta members she claimed were affected by SB 1, but none support Delta's standing.

162.    First, Ms. Jones claimed that Rose McGowan made mistakes when submitting her mail ballot and therefore had to vote in person, Oct. 2, 2023 Tr. at 2153:4–13, but Delta does not challenge any SB 1 provision related to voting by mail, see id.at 2180:16–2181:5.

163.    Second, Ms. Jones identified three Delta members who had previously used drive-through voting with their elderly parents. Oct. 3, 2023 Tr. at 2194:7–2195:6. After SB 1, Delta members with disabilities were able to vote curbside, while their healthy family members were able to vote according to normal in-person voting rules. *Id.* at 2194:7–2195:6. The ordinary inconveniences of voting are not cognizable standing injuries. *See TransUnion*, 141 S. Ct. at 2205; *Crawford*, 553 U.S. at 198.

164.    Third, Ms. Jones told the story of a voter who got into a car accident after voting. Oct. 3, 2023 Tr. at 2196:11–20. Ms. Jones did not claim that voter ever used 24-hour voting—merely that 24-hour voting would have been "more convenient." *Id.* at 2196:19–20. Indeed, Ms. Jones acknowledged she could not identify any Delta voter who took advantage of 24-hour voting. *Id.* at 2223:14–21.

b.      **Delta Failed to Establish Organizational Standing.**

165.    Ms. Brown and Ms. Jones also attempted to establish an organizational injury. They testified that Delta devoted resources to educating voters about SB 1. Oct. 2, 2023 Tr. at 2100:15–19 (Brown); *Id.* at 2153:15–23 (Jones). They claimed this money was diverted from Delta's chapter budgets. *Id.* at 2102:2–3, 11–14, 2156:25–2157:12.

166.    This alleged resource-diversion injury is inadequate for several reasons. *First*, voter education activities are a "routine" part Delta's organizational work. *Azalea Garden Props.*, 82 F.4th at 352–53. Delta regularly engaged in these activities before SB 1 was passed, and they are a "regular core part of the work that Delta [] does." Oct. 2, 2023 Tr. at 2125:22–2126:3 (Brown). For example, Ms. Brown acknowledged that, whenever voting hours are changed, Delta "would communicate that change to its members and the public." *Id.* at 2126:4–7, Oct. 3, 2023 Tr. at 2220:6–22. When asked by her own lawyer how Delta's voter education activities in response to SB 1 differed from its "routine" voter education activities, Ms. Brown could only say that Delta "just had to do more of it." Oct. 2, 2023 Tr. at 2101:3–10. Because Delta would have engaged in these activities regardless of SB 1, its decision to do so did not "perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

167.    *Second*, neither Ms. Brown nor Ms. Jones offered sufficient detail about the amount of resources diverted because of the challenged provisions. Ms. Brown acknowledged she did not know how much Delta spent on voter education as a result of SB 1. Oct. 2, 2023 Tr. at 2128:7–13. Ms. Jones testified that one Delta chapter increased its voter education budget by $300. That is not enough to show Delta (a national organization with a serious budget) "diverted significant resources to counteract the defendant's conduct." *City of Kyle*, 626 F.3d at 238.

168.    *Third*, HAUL offered insufficient detail about where it supposedly diverted resources from. When asked where the "additional resources" to educate voters about SB 1 came from, Ms. Brown said it came from Delta's "chapter budgets," but she provided no detail as to that claim. Oct. 2, 2023 Tr. at 2102:2–3, 11–14. Ms. Jones provided essentially the same testimony—again with no meaningful details. *Id.* at 2156:25–2157:12. When asked if Delta had to "divert any resources away from its other voting activities because of SB 1," Ms. Brown said: "We just added to those budgets." *Id.* at 2102:4–6.

169.    Indeed, Ms. Brown could not "identify a specific part of Delta['s] normal programming that Delta [] had to forego solely because of SB 1." Oct. 2, 2023 Tr. at 2129:14–17. This admission reinforces Delta's failure to prove it diverted resources in response to SB 1. *See Tenth St. Residential Ass'n*, 968 F.3d at 500. Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" LULAC Texas's activities. Azalea Garden Props., 82 F.4th at 353.

170.    Fourth, Delta also cannot prove that its alleged resource-diversion injury was *caused* by any challenged provision of SB 1. Delta did not even try to calculate the extent to which its undefined injury was caused by specific provisions *within* SB 1. Ms. Brown repeatedly claimed that Delta had to educate the public about various challenged provisions. *See, e.g.*, Oct. 2, 2023 Tr. at 2014:25–2105:2, 2106:3-8, 2107:12–15, 2111:2–4. But those claims tell the Court nothing about how much such efforts cost and whether those costs were *diverted* from something else. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and Delta has therefore failed to prove any challenged SB 1 provision caused its alleged resource-diversion injury.

### 3.    Arc of Texas

171.    Arc of Texas is disability rights organization focused on "community, inclusive education, competitive integrated employment, and civil rights and justice." Oct. 11, 2023 Tr. at 3499:24–3500:1.

172.    Arc of Texas challenges SB 1 sections 5.02, 5.03, 5.06, 5.07, 5.10, 6.01, 6.03, 6.04, 6.05, and 6.07.

173.    Jennifer Martinez, the group's chief executive officer, testified as the Arc of Texas's organizational representative. Oct. 11, 2023 Tr. at 3490:8. Additionally, several members of the Arc of Texas testified about their experiences voting: Terri Saltzman, Jennifer Miller, Jodi Nunez Landry, Amy Litzinger, Laura Halvorson, and Cathy Cranston.

174.    Arc of Texas lacks standing as to all claims.

**a.    Arc of Texas Lacks Associational Standing.**

175.    Several Arc of Texas members testified, but none suffered injuries that can confer standing on Arc of Texas.

176.    First, Terri Saltzman testified regarding SB 1 sections 5.07 and 5.13, but suffered no cognizable injury. In the 2022 primary election, her mail ballot application was rejected because county election officials mistakenly sent her the wrong application form. Oct. 10, 2023 Tr. at 3354:10–13. Even she admitted the rejection "had nothing to do with the numbers" required by SB 1. *Id.* She then successfully submitted a new application and was issued a mail ballot. *Id.* at 3355:19–22. During the 2022 primary election, her mail ballot was not accepted because she failed to check a box, *id.* at 3357:8—a requirement not implemented by SB 1. Ms. Saltzman therefore suffered no injury traceable to any challenged provision.

177.    *Second*, Jennifer Miller testified about SB 1 sections 5.07 and 6.04, but she identified no injury. Ms. Miller testified about her experience voting with her daughter, Danielle, who has "level one autism." Oct. 10, 2023 Tr. at 3195:25–6:1. Ms. Miller testified that her daughter's mail ballot application was rejected because it was not received on time—an injury not traceable to any SB 1 provision. *Id.* at 3210:23–3210:20. Ms. Miller also claimed she is worried about taking the voter assistance oath because of potential perjury charges. *Id.* at 3207:2–4. But her fear of prosecution based on section 6.04's revisions to the voter assistance oath is far too speculative to be "imminent." *Tex. State LULAC*, 52 F.4th at 257. There is no evidence Ms. Miller has been threatened with prosecution. There is also no evidence she intends to engage in conduct arguably prescribed by SB 1, that someone would discover that violation, that someone would report the violation to a prosecutor, and the prosecutor would exercise discretion to prosecute a mother for assisting her daughter. *See supra* ¶ 36(l). In any event, the voter assistance oath has been under penalty of perjury since 1973, *see* Tex. Penal Code § 37.02, so any fear of perjury charges was not caused by SB 1.

178.    Third, Jodi Nunez Landry testified about section 6.04, but she did not suffer a cognizable injury. She has "muscular dystrophy." Oct. 10, 2023 Tr. at 3528:8. She testified that she thought her "partner" would have assisted her if she had asked, so SB 1 did not prevent her from obtaining assistance. *Id.* at 3556:6–9. Instead, she declined to ask for assistance in the 2022 primary and general elections because she did not "want to put him in jeopardy" for violating section 6.04's voter assistance oath. *Id.* at 3535:4–3536:16, 3536:24–3537:5, Tr. at 3542:1–6. The risk of prosecution, however, is far too "speculative" to establish an imminent injury, *see Tex. State LULAC*, 52 F.4th at 25, and any fear of perjury charges is not traceable to SB 1. *See supra* ¶ 36(l).

179.    *Fourth*, Amy Litzinger testified about section 6.04's voter assistance oath, but she lacks a cognizable injury. Ms. Litzinger has "spastic quadriplegic cerebral palsy" and "dysautonomia." Oct. 10, 2023 Tr. at 3570:15–3571:6. Although no assistant has said they "can't help" her, *id.* at 3590:12–17, Ms. Litzinger declined to ask for assistance when she voted in person during the 2022 primary and general elections, *id.* at 3585:1–10, 3586:4–25, because she was concerned an assistant could face a "possible felony" charge from providing voter assistance. *Id.* at 3587:1–3, 3588:22–24. The risk of prosecution, however, is far too "speculative" to establish an imminent injury, *see Tex. State LULAC*, 52 F.4th at 25, and any fear of perjury charges is not traceable to SB 1. See supra ¶ 36(l).

180.    Fifth, Laura Halvorson testified about section 6.04's voter assistance oath, but she lacks a cognizable injury. She has "Limb-Girdle muscular dystrophy" and "chronic muscular respiratory failure." Oct. 10, 2023 Tr. at 3606:13–18. During the March 2022 primary election, her personal care attendant declined to assist her with voting by mail because she was worried about "any sort of penalty or perjury that could risk her green card status." *Id.* at 129:9–16. When she voted in person during the 2022 general election, Ms. Halvorson declined to ask for assistance because she worried her attendant could face "criminal charges." *Id.* at 133:13–18. But here again, any fear of prosecution is far too "speculative" to establish an imminent injury, *see Tex. State LULAC*, 52 F.4th at 25, and any fear of perjury charges is not traceable to SB 1. *See supra* ¶ 36(l).

181.    *Sixth*, Cathy Cranston testified about section 6.04's voter assistance oath, but she lacks any cognizable injury. She testified to having "angst" about section 6.04's voter assistance oath because "if [she] do[es]n't get [something] right, [she] could be at risk." Oct. 11, 2023 Tr. at 3560:2–9. She testified the oath was "scary" even though she "follow[s] the law." *Id.* at 3561:25.

She also acknowledged personal care attendants were hesitant to "assist voters before 2022 because of the oath." *Id.* at 3567:20–23. But again, any fear of prosecution is far too "speculative" to establish an imminent injury, *see Tex. State LULAC*, 52 F.4th at 25, and any fear of perjury charges is not traceable to SB 1. *See supra* ¶ 36(l).

b.    **Arc of Texas Lacks Organizational Standing.**

182.    During direct examination, Ms. Martinez claimed Arc of Texas was injured by SB 1 because its decision to provide voter education resulted in the organization being less "focused" on other issues, like Medicaid waivers, "inclusive education issues," and "competitive integrated employment." Oct. 11, 2023 Tr. at 3506:19–3507:12, 3509:4–7.

183.    During cross-examination, Ms. Martinez acknowledged that the Arc of Texas did not reallocate its resources in response to SB 1. Oct. 11, 2023 Tr. at 3531:17–24 ("[I]t wasn't a reallocation."). This admission alone disproves organizational standing.

184.    Moreover, even if shifting "focus" can constitute a resource-diversion injury, Arc of Texas's claimed diversion injury is not cognizable for several reasons.

185.    First, voter education is a "routine" part of Arc of Texas's mission. *Azalea Garden Props.*, 82 F.4th at 352–53. As Ms. Martinez acknowledged, before SB 1, Arc of Texas engaged in voter education. Oct. 10, 2023 Tr. at 3215:13–18. Indeed, Ms. Martinez offered no explanation as to how the group's activities changed after SB 1, except to vaguely say that staff members had to respond to voters' fears. *Id.* at 3215:13–18. Because Arc of Texas would have engaged in voter education regardless of SB 1, its decision to continue doing so did not "perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

186.    *Second*, Arc of Texas offered no detail about the amount of resources diverted because of the challenged provisions. Indeed, Ms. Martinez acknowledged that Arc of Texas's budget was not reallocated after SB 1. Oct. 11, 2023 Tr. at 3531:17–24. Her failure to quantify any amount of resources diverted due to a challenged provision means Arc of Texas's claimed injury is not "concrete" and "particularized." *TransUnion*, 141 S Ct. at 2203.

187.    *Third*, Arc of Texas offered no detail about where resources were diverted from. Ms. Martinez vaguely claimed that Arc of Texas had to shift its "focus" away from other issues, Oct. 11, 2023 Tr. at 3506:19–3507:12, 3509:4–7, but she provided no detail about the amount of resources diverted from those other issues. Relatedly, Arc of Texas did not identify a specific activity or event it had to forego because of any challenged SB 1 provision. *Cf. Tenth St. Residential Ass'n*, 968 F.3d at 500. Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" LULAC Texas's activities. *Azalea Garden Props.*, 82 F.4th at 353.

188.    Arc of Texas's claimed resource-diversion injury also suffers from two causation problems. In the first place, the record reflects that Arc of Texas's claimed inability to "focus" on other priorities may have been caused not by SB 1, but by a decrease in staff Ms. Martinez identified, Oct. 11, 2023 Tr. at 3509:20–25, which she acknowledged was not caused by SB 1, *id.* at 3533:4–8.

189.    Moreover, Arc of Texas made no effort to identify which challenged SB 1 provisions caused its resource-diversion injury. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and Arc of Texas cannot allege that SB 1 as a whole injured it.

### 4. Jeffrey Lamar Clemmons

190.     Jeffrey Clemmons challenges sections 4.06, 4.07, and 4.09.  Sept. 13, 2023 Tr. at 644:3–4.

191.     Mr. Clemmons is a resident of Austin, Texas.  Sept. 13, 2023 Tr. at 644:24–25.  He served as an election judge during the 2020 primary election in Texas. *Id.* at 648:14–17. He did not work as an election judge during the 2020 general election because he was "employed with the Travis County Democratic Party." *Id.* at 651:18–23.

192.     As of trial, Mr. Clemmons had not served as an election judge since 2020. When asked why he had not served as an election judge since the 2020 primary, Mr. Clemmons cited a variety of reasons—including SB 1. Sept. 13, 2023 Tr. at 652:21–653:5. But he also stated he did not serve as an election judge during the 2022 primary election because he was moving to Washington and "missed the deadline to register." Id.. at 674:12–15.

193.     Mr. Clemmons testified that he was "signed up" to serve as an election judge in the November 2023 elections. Sept. 13, 2023 Tr. at 674:16–23.

194.     Mr. Clemmons testified that he was worried about facing criminal charges because of sections 4.06, 4.07, and 4.09. Sept. 13, 2023 Tr. at 661:9–15. But he lacks standing to challenge all three provisions.

195.     Mr. Clemmons cannot establish a risk-of-prosecution injury "because there is no credible threat [he] will be prosecuted." *Tex. State LULAC*, 52 F.4th at 257. He has never been investigated or prosecuted under any SB 1 provision; nor has he been threatened with investigation or prosecution. Sept. 13, 2023 Tr. at 673:4–13.

196.     It is also highly speculative that Mr. Clemmons would ever face a legal penalty from serving as an election judge. "Consider all the dominoes that would have to fall" for Mr.

Clemmons to be prosecuted. *Tex. State LULAC*, 52 F.4th at 257. While serving as an election judge, a poll watcher would have to behave inappropriately, something he did not see happen when he served previously. Sept. 13, 2023 Tr. at 691:15–19; *Allen, 468 U.S. at 759* (standing likely lacking where injury would "result[] from the independent action of some third party not before the court"). Mr. Clemmons would then presumably have to fail at reasoning with the poll watcher or obtaining mediation from another election officials. If the poll watcher persists in misbehaving, Mr. Clemmons would have the authority to remove him for a host of reasons. Moreover, Mr. Clemons would have to, with sufficient mens rea, remove the poll watcher for an improper reason. *But see* Sept. 13, 2023 Tr. at 688:15–18 (Clemmons acknowledging he wouldn't try to remove poll watcher "if they weren't intimidating voters"). Then the poll watcher or someone else would have to report the violation. Then a prosecutor would need to determine Mr. Clemmons violated a challenged provision. Then the prosecutor would need to "exercise[] his discretion to bring charges." *Tex. State LULAC*, 52 F.4th at 257. Clemmons cannot prove injury based on such a speculative risk of prosecution. *See supra* ¶ 36(d).

197.    Even if Mr. Clemmons' unsubstantiated concerns were sufficient to confer standing, he has failed to prove sections 4.07 (guaranteeing poll watchers "free movement") and 4.09 (guaranteeing "reasonably effective" watching) caused his injuries. He testified he was afraid of getting prosecuted because it is unclear how election officials are supposed to enforce sections 4.07 and 4.09. Sept. 13, 2023 Tr. at 667:3–10, 668:4–11; Sept. 13, 2023 Tr. at 670:4–24. But these sections amended preexisting laws, and pre-SB 1 law guaranteed that a "watcher is entitled to sit or stand conveniently near the election officials conducting the observed activity." Sept. 13, 2023 Tr. at 585:7–19. During cross-examination, Mr. Clemmons acknowledged he was not precisely sure

how to apply the pre-SB 1 rule either. Sept. 13, 2023 Tr. at 689:25–690:6, 690:18–691:9. These admissions suggest that Mr. Clemmons' alleged injury derives not from sections 4.07 or 4.09, but from unchallenged preexisting laws.

### iii.   The Mi Familia Vota Plaintiffs Lack Standing On All Claims (Sections 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, 4.12, 5.02, 5.03, 5.04, 5.07, 5.08, 5.13, 6.03, 6.04, 6.05, 6.07, 7.02, and 7.04).

#### 1. Mi Familia Vota

198.    MFV is a "national civic engagement organization." Oct. 10, 2023 Tr. at 3426:3–4.

199.    MFV's "election related work [] is to educate voters and also to encourage them to participate in elections." Oct. 10, 2023 Tr. at 3426:8–15. As part of that work, MFV's "voter education program is focused on helping people make sure if they are eligible to register to vote" and "checking voter registration status." *Id.* at 3431:10–22. MFV also encourages people to "make a plan to vote" and provides information to facilitate voting. *Id.* at 3432:21–3433:9.

200.    MFV challenges sections 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, 4.12, 5.02, 5.03, 5.04, 5.07, 5.08, 5.13, 6.03, 6.04, 6.05, 6.07, 7.02, and 7.04 of SB 1. Oct. 4, 2023 Tr. at 2557:7–25.

201.    MFV does not have members. Oct. 10, 2023 Tr. at 3467:3–5. Therefore, it asserts only organizational standing.

202.    MFV tried to prove organizational standing through the testimony of Angelica Razo, the organization's deputy director of campaigns and programs. Oct. 10, 2023 Tr. at 3425:1–2.

203.    Ms. Razo said nothing in her testimony about sections 2.05, 2.06, 2.07, 3.15, 4.12 (the mail ballot identification requirements), section 6.01 (the transportation of voters to vote

curbside), or 7.02 (the expansion of opportunities for workers to vote). MFV has therefore failed to prove standing to challenge these provisions.

204.    Ms. Razo argued MFV was worried about 7.04's vote harvesting ban. Oct. 10, 2023 Tr. at 3462:23–3463:4. However, MFV lacks standing to challenge section 7.04 because MFV offered no evidence it engages in canvassing where it presses individuals to vote for particular candidates or ballot measures. Indeed, Ms. Razo testified that MFV's canvassers merely "encourag[e] people to go vote" and are "trained to not influence votes." *Id.* at 3461:22–3462:25.

205.    Ms. Razo also claimed that MFV "diverted human resources" to responding to SB 1. Oct. 10, 2023 Tr. at 3205:18–3206:3. Ms. Razo claimed that MFV staff "were using a lot of their time to be able to understand SB 1 to make sure that they were prepared to give the most accurate information they could as they are engaging with voters during the election cycle." *Id.*

206.    However, MFV's claimed resource-diversion injury is insufficient to establish organizational standing for several reasons.

207.    First, voter education activities are a "routine" part of MFV's organizational work. *Azalea Garden Props.*, 82 F.4th at 352–53. MFV regularly engaged in these activities before SB 1 was passed. Oct. 10, 2023 Tr. at 3426:8–15, 3431:10-22; *Id.* at 3415:8 (acknowledging that voter education and associated staff trainings were a "perennial activity of [MFV]"). Ms. Razo offered no explanation as to how MFV's post-SB 1 voter education activities were meaningfully different from what it would have been doing regardless of SB 1's existence. Because MFV would have engaged in voter education regardless of SB 1, its decision to continue doing so did not "perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

208.    *Second*, MFV offered no detail about the amount of resources diverted because of the challenged provisions. MFV offered no evidence about its voter education budget in any year before or after SB 1. And during her deposition, Ms. Razo stated that MFV was not financially impacted by SB 1. Oct. 10, 2023 Tr. at 3472:9–3473:4. MFV has thus failed to carry its burden of showing any financial injury, and its vague resource-diversion allegation is not "concrete" and "particularized." *TransUnion*, 141 S Ct. at 2203.

209.    *Third*, MFV did not identify a specific activity or event MFV had to forego because of any challenged SB 1 provision. *Cf. Tenth St. Residential Ass'n*, 968 F.3d at 500. Ms. Razo identified only one activity that MFV engaged in before, but ceased after, SB 1's effective date: recommending that people become poll workers. She suggested MFV made this decision primarily because of fears that poll workers would be accused of unlawful behavior. Oct. 10, 2023 Tr. at 3452:14–3453:8. While she suggested financial considerations also played a role, she provided insufficient detail to permit the Court to conclude that MFV diverted resources from poll worker recruitment. *Id.* at 3452:14–3453:8. Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" MFV's activities. *Azalea Garden Props.*, 82 F.4th at 353.

210.    *Fourth*, MFV also cannot prove that its alleged resource-diversion injury was caused by any challenged provision of SB 1. Again, MFV provided no information on how many resources were diverted as a result of SB 1 as a whole. It also did not even try to calculate the extent to which its undefined injury was caused by specific provisions within SB 1. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and MFV has therefore failed to prove any challenged SB 1 provision caused its alleged resource-diversion injury.

### 2.  Marlon and Marla Lopez

211.    Marlon Lopez and Marla Lopez challenge 3.04, 3.09, 3.10, 3.12, 3.13, and 4.07 of SB 1. Haul 2nd Am. Compl. ¶¶ 67-67. Additionally, Marla Lopez challenges section 4.01 of SB 1.  *Id.* ¶ 68.

212.    Marla Lopez lives in Brownsville, Texas and is the daughter of Marlon Lopez.  Oct. 10, 2023 Tr. at 3372:1.  Marla testified about how she and Marlon used drive-through voting in 2020. *Id.* at 3378:7–12. Marla also testified about her experience as an election judge in the 2021 general election. *Id.* at 3383:22–3384:1. Marla and Marlon Lopez lack standing as to all their claims.

213.    Marla Lopez offered no testimony that she needed drive-through or 24-hour voting to vote. In fact, she admitted that no provision of SB 1 prevented her from voting. Oct. 10, 2023 Tr. at 3408:20–23.

214.    Marla Lopez also lacks standing to challenge sections 4.01 and 4.07—relating to poll watchers. Her claimed injury is an unwillingness to serve as an election worker because of the risk of being prosecuted due to violating SB 1's poll watcher provisions. Oct. 10, 2023 Tr. at 3418:5–9. But this threat of prosecution is far too speculative and dependent on the actions of third parties not before the Court to be "imminent." *Tex. State LULAC*, 52 F.4th at 256–57; *see Allen, 468 U.S. at 757* (standing likely lacking where injury would "result[] from the independent action of some third party not before the court"); *supra* ¶ 36(d).

215.    For his part, Marlon Lopez did not testify at trial.  Marla Lopez only attempted to establish Marlon's standing to challenge SB 1's elimination of drive-through voting, but that effort fails.

216.    Marla Lopez did not know whether Marlon had voted since SB 1 was passed and she did not know his work schedule in 2020. Oct. 10, 2023 Tr. at 3381:1–2, 3406:20, 3406:23–

3407:5. She was also quite unsure about other details—such as the time of day they voted in 2020. *Id.* at 3405:5–25.

217.    At one point, Marla suggested Marlon might not have been able to vote in 2020 without drive-through voting. Oct. 10, 2023 Tr. at 3380:22–25. But when pressed during cross-examination, Marla did not have sufficient knowledge about her father's work schedule to make that claim; she could not testify that he was scheduled to work during all the days of early voting. *Id.* at 3406:23–3407:5. Indeed, Marla also suggested Marlon voted drive-through simply because it was "more convenient." *Id.* at 3404:10–21. At most, then, the Court can only find that Marlon Lopez was inconvenienced by the lack of drive-through voting. But enduring the ordinary burdens of voting that any voter in Texas has always experienced (except for one election in Houston) is not a cognizable standing injury because it has no "close relationship" to a "traditional[]" harm. *TransUnion*, 141 S. Ct. at 2200; *see Crawford*, 553 U.S. at 198.

### 3. Paul Rutledge

218.    Paul Rutledge is a named Plaintiff in the MFV Plaintiff group. HAUL 2nd Am. Compl. ¶ 69. Mr. Rutledge did not testify at trial, and no evidence related to his circumstances was introduced. Therefore, Mr. Rutledge lacks standing as to all his claims and must be dismissed.

### iv.    The LUPE Plaintiffs Lack Standing to Challenge Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, and 8.01.

219.    Several LUPE Plaintiffs—Anti-Defamation League Austin, Southwest Voter Registration Education Project, Jolt Action, and the William Velasquez Institute—offered no standing evidence at trial, so the Court should dismiss them for lack of standing. *See Gladstone Realtors*, 441 U.S. at 115 n.31.

220.    As explained below, the remaining LUPE Plaintiffs also lack standing to challenge sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, and 8.01.

## 1. LUPE

221.    La Union del Pueblo Entero (LUPE) is a membership organization with members living in Hidalgo, Cameron, Willacy, and Starr Counties. Sept. 11, 2023 Tr. at 65:19–21. LUPE does "voter education, voter registration, and get out the vote efforts." *Id.* at 70:5–8. LUPE engages in door-to-door canvassing in order to conduct voter education. *Id.* at 71:22–72:4. Among other things, LUPE's canvassers press its members and other members of the public to vote for particular ballot measures. Id. at 71:13–18, 88:2–24.

222.    LUPE challenges sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB 1. Sept. 11, 2023 Tr. at 230:5–20.

223.    LUPE attempted to prove associational and organizational standing through the testimony of Tania Chavez Camacho, its executive director, Sept. 11, 2023 Tr. at 57:19–22; Juanita Valdez Cox, its former executive director, *id.* at 135:10–11; and Cristela Rocha, a LUPE community organizer, *id.* at 142:14–15.

224.    LUPE lacks standing to challenge sections 4.09, 5.07, 5.13 6.03, 6.04, 6.05, and 8.01. In any event, to the extent LUPE has standing for any of its claims, it only has standing to challenge the actions of defendants in Hidalgo, Cameron, Willacy, and Starr Counties—because those are the only counties where LUPE members live. Sept. 11, 2023 Tr. at 65:19–21.

### a. LUPE Lacks Associational Standing.

225.    LUPE's witnesses did not identify a member who was unable to receive and cast a mail ballot, so it lacks standing to challenges sections 5.07 and 5.13. *See Summers*, 555 U.S. at 493;

*In re Gee*, 941 F.3d at 161–62. LUPE witness Louis Perales had his mail ballot rejected during the 2022 Primary and did not accept an invitation to cure it, Oct. 3, 2023 Tr. at 2173:3–7,11–12, but there is no evidence he is a LUPE member in any event.

226.    LUPE lacks associational standing to challenge sections 6.03 and 6.05 because it failed to identify any member injured by these provisions. Ms. Camacho testified that section 6.03, which requires voter assisters to fill out a form providing certain information, resulted in "larger lines at the polls." Sept. 11, 2023 Tr. at 81:24–25; *see also id.* at 153:7–17 (Rocha complaining about waiting a "longer time" to provide assistance), 154:6 ("It's just that the lines are now longer."). But the obligation to provide information on a form—a process that takes less than a minute—and modestly longer wait times are not cognizable injures for standing purposes because they bear no "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2200 (cleaned up); *Crawford*, 553 U.S. at 198.

227.    To the extent LUPE is arguing that it has standing to challenge sections 6.03 and 6.05 because a member was unable to obtain voter assistance, this argument fails. Ms. Rocha discussed an incident where a Mr. Cabello was assisted with voting by an election worker instead of Ms. Rocha. Sept. 11, 2023 Tr. at 150:12–14. Mr. Cabello did not testify, and Ms. Rocha's testimony did not establish why Mr. Cabello voted with assistance from an election worker instead of Ms. Rocha. Ms. Rocha seemed to claim that election officials improperly provided assistance to Mr. Cabello instead of to her, *id.* at 152:23–153:3, even though she also testified that she wanted to be the "last option" to someone seeking assistance. *Id.* at 148:6–8, 149:1–3, 156:18. Her testimony on this point was, at best, uncertain and confusing. *Id.* at 152:16–21. At most, Ms. Rocha's testimony suggests an election worker deviated from proper procedure from a reason completely

unrelated to SB 1. In any event, LUPE has failed to prove that Mr. Cabello voted with assistance from an election worker because of any challenged SB 1 provision.

228.    Ms. Rocha also testified that an election worker, rather than Ms. Rocha, assisted a Mr. Garcia. Sept. 11, 2023 Tr. at 150:19–25. Again, Ms. Rocha did not explain *why* Mr. Garcia accepted help from an election worker. So LUPE has failed to prove that any SB 1 provision—as opposed to Mr. Garcia simply being willing to accept help from an election worker or the election worker deviating from proper procedure for a non-SB 1 reason—caused any harm to a LUPE member.

229.    LUPE has also failed to identify a member injured by section 6.04's two revisions to the voter assistance oath. Tobi Cole claimed that section 6.04 would burden voters who need assistance. Sept. 13, 2023 Tr. at 720:1–5. But Mr. Cole did not testify that he was a member of any Plaintiff group, so he cannot support associational standing for LUPE or anyone else. In any event, Mr. Cole has not been injured by any provision of SB 1. He testified that his assistant remained happy to help him after SB 1 was enacted and that he always successfully received assistance in each election after SB 1. *Id.* at 719:19–20, 722:2–8, 723:2–4.

230.    Moreover, LUPE identified no member who has been investigated or prosecuted because of any SB 1 provision—let alone section 6.04. Sept. 11, 2023 Tr. at 118:6–15. To the extent a LUPE member claims a fear of prosecution, that injury is far too speculative to be "imminent." *Tex. State LULAC*, 52 F.4th at 256; *supra* ¶ 36(d).

231.    Further, LUPE's testimony that the voter assistance oath frightened people because it is sworn under penalty of perjury is irrelevant for standing purposes because the voter-assistance oath was sworn under penalty of perjury long before SB 1. See Tex. Penal Code 37.02.

232.    LUPE also failed to identify any member harmed by section 4.09. LUPE's executive director, Ms. Camacho, acknowledged she could not identify any LUPE member unable to vote because of any SB 1 provision—let alone section 4.09. Sept. 11, 2023 Tr. at 109: 10–16. LUPE also failed to identify any member who served as an election worker—let alone one who could satisfy the demanding standard for fear-of-prosecution standing.

        **b.**      **LUPE Lacks Organizational Standing.**

233.    LUPE also lacks organizational standing to challenge sections 4.09, 5.07, 5.09, 6.03, 6.04, 6.05, and 8.01. Ms. Camacho, Valdez-Cox, and Rocha did not discuss sections 4.09 and 8.01, so LUPE lacks standing to challenge them for failure of proof. *See Gladstone Realtors*, 441 U.S. at 115 n.31.

234.    As for sections 5.07, 5.13, 6.03, 6.04, and 6.05, LUPE claimed the need to divert resources to educating volunteers and staff about these provisions. *See* Sept. 11, 2023 Tr. at 118:11–15 (Camacho), 156:9–11 (Rocha). But that is not a cognizable injury for several reasons.

235.    *First*, the need to educate volunteers about rules governing voter assistance and to educate the public about voting rules is a "routine" part of LUPE's organizational work. *Azalea Garden Props.*, 82 F.4th at 352–53.  LUPE regularly trained its volunteers and employees on how to provide voter assistance before SB 1 was passed. Sept. 11, 2023 Tr. at 78:3–15. And it regularly provided voting information to its members and the public before SB 1 was passed. *Id.* at 71:1–21; Oct. 11, 2023 Tr. at 3694:3–5 (agreeing that Lupe has "engage[d] in voter education activities both before and after SB 1").  Because LUPE would have engaged in these activities regardless of SB 1, its decision to do so did not "perceptibly impair[]" its organizational effectiveness or mission. *Azalea Garden Props.*, 82 F.4th at 353.

236.     *Second*, LUPE witnesses offered insufficient detail about the amount of resources diverted because of the challenged provisions. Ms. Camacho testified that LUPE's overall get-out-the-vote budget increased by between $50,000 and $100,000. Sept. 11, 2023 Tr. at 98:12–16.  She also testified that LUPE hired two additional staff members. Oct. 11, 2023 Tr. at 3672:1–3. However, LUPE's overall budget also substantially increased—by between 1.1 and 1.6 million dollars. Sept. 11, 2023 Tr. at 102:4–10. This evidence suggests that LUPE's increased spending on get-out-the-vote and voter education efforts simply resulted from an increased budget—and that it was not diverted from some other effort because of sections 5.07, 5.13, 6.03, 6.04, or 6.05.

237.     Third, no LUPE witness identified where the allegedly diverted resources were diverted from. Relatedly, no LUPE witness identified a specific activity or event LUPE had to forego because of sections 6.03, 6.04, or 6.05. *Cf.  Tenth St. Residential Ass'n*, 968 F.3d at 500. Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" LUPE's activities. *Azalea Garden Props.*, 82 F.4th at 353.

238.     *Fourth*, LUPE cannot prove its alleged resource-diversion injury was caused by sections 5.07, 5.13, 6.03, 6.04, or 6.05. LUPE suggested it increased its spending on voter education and get-out-the-vote efforts by between $50,000 and $100,000 dollars. Sept. 11, 2023 Tr. at 98:12–16. Assuming (without evidence) that money was diverted from some other activity, LUPE also offered no evidence as to how much (if any) of that diversion was caused by each of sections 5.07, 5.13, 6.03, 6.04, or 6.05 on its own. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and LUPE has failed to prove a resource-diversion injury traceable to each of sections 6.03, 6.04, and 6.05.

## 2.  James Lewin

239.    James Lewin challenges sections 4.09 and 8.01 of SB 1. Sept. 13, 2023 Tr. at 550:18–22.

240.    Mr. Lewin lives in Austin, Texas.  Sept. 13, 2023 Tr. at 551:1–3. He served as an election judge in the 2020 general election, the November 2021 election, the 2022 primary election, and the 2022 general election. *Id.* at 551:10–13, 553:4–7.

241.    Mr. Lewin testified he had "concerns" about serving as an election worker in 2022 because there were provisions in SB 1 he found "ambiguous and potentially problematic," making him doubt his "ability to execute all the tasks and perform in [his] role as an election judge effectively." Sept. 13, 2023 Tr. 553:18–23. In particular, Mr. Lewin complained that he was unsure what activities poll watchers were allowed to watch under section 4.09. *Id.* at 558:20–559:8.

242.    Despite having never had a negative interaction with a poll watcher, Mr. Lewin expressed concern that "provisions in SB 1 . . . might increase the chances of that happening." Sept. 13, 2023 Tr. at 561:21–25. And if that happened, Mr. Lewin expressed concern that he could be subject to criminal or civil charges. Id. at 562:18–563:2, 566:1–13.

243.    Mr. Lewin lacks standing to challenge sections 4.09 and 8.01 because his alleged injury—fear of criminal and civil charges—is utterly speculative and not "imminent." *See Tex. State LULAC*, 52 F.4th at 256. Among other things, there is no evidence Mr. Lewin intends to engage in conduct "arguably proscribed by the challenged policy." *Id.* The Court would need to make far too many speculative assumptions in order to find Lewin faces an "imminent" injury. *See supra* ¶ 36(d).

244.    Even if Mr. Lewin had a cognizable injury, he cannot prove sections 4.09 or 8.01 caused his injury. Central to Mr. Lewin's theory of injury is that election officials cannot know how

close poll watchers are allowed to stand to election activities they are allowed to watch; he does not know, for example, whether 5 feet is close enough. Sept. 13, 2023 Tr. at 570:4–13 ("I don't know a distance."). But pre-SB 1 law as to poll watchers did not provide that clarity either; prior law said that a "watcher is entitled to sit or stand conveniently near the election officials conducting the observed activity." *Id.* at 585:7–19. As Mr. Lewin acknowledged, that language also does not give election workers specific guidance as to the precise location a poll watcher may occupy. *Id.* at 585:20–24. Therefore, Lewin's claimed injury is not truly caused by sections 4.09 and 8.01, and it would not be remedied by an order from this Court.

### 3. Texas Impact

245.    Texas Impact is a "membership organization for [Texas's] mainline Protestant, Jewish, and Muslim denominations." Oct. 11, 2023 Tr. at 157:1–2. Texas Impact regularly engages in voter education. *Id.* at 162:24–163:1. It also regularly tries to recruit poll workers. Id. at 163:4–5.

246.    Texas Impact challenges sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB 1. Sept. 11, 2023 Tr. at 230:5–20.

247.    Texas Impact attempted to establish standing through the testimony of Josh Houston, the organization's advocacy director. Oct. 11, 2023 Tr. at 3641:10. The organization's former president, Richard Ertel, also testified about his fear of serving as an election worker. Sept. 13, 2023 Tr. at 597:15–22, 608:22–25, 609:7–10. Texas Impact lacks standing as to all claims.

### a. Texas Impact Lacks Associational Standing.

248.    Mr. Houston mentioned only two specific Texas Impact members allegedly harmed by SB 1: Richard Ertel and Sadia Tirmizi. Neither suffered a cognizable injury.

249.    Mr. Ertel's only asserted injury—fear of criminal prosecution or civil penalties for violating section 4.09—is far too speculative to be "imminent." *Tex. State LULAC*, 52 F.4th at 256; *supra* ¶ 36(d). Notably, Mr. Ertel himself was unwilling to "speculat[e]" that "there are some problematic poll watchers," let alone ones he will interact with. Sept. 13, 2023 Tr. at 620:14–16.

250.    Even if Mr. Ertel had a cognizable injury, he cannot prove sections 4.09 or 8.01 caused it. Central to his theory of injury is that it is unclear to him (and other election officials) how close poll watchers are allowed to stand to election activities they are allowed to watch.  Sept. 13, 2023 Tr. at 606:14.  But pre-SB 1 law as to poll watchers did not provide that clarity either; prior law said that a "watcher is entitled to sit or stand conveniently near the election officials conducting the observed activity." Sept. 13, 2023 Tr. at 585:7–19. That standard provides no more guidance as to the issues Mr. Ertel expressed concern about than section 4.09 does. Therefore, Mr. Ertel's claimed injury is not caused by sections 4.09 and 8.01, and it would not be remedied by a court order.

251.    Ms. Tirmizi did not testify at trial. Mr. Houston offered hardly any detail about Ms. Tirmizi. He said only that Ms. Tirmizi's parents "were having trouble with the application." Oct. 11, 2023 Tr. at 3657:3–9. The Court cannot know whether Tirmizi's parents are members of Texas Impact, and there is insufficient detail to understand whether and why they were injured in any event.

**b.**    **Texas Impact Lacks Organizational Standing.**

252.    Texas Impact lacks organizational standing for all claims. Mr. Houston suggested Texas Impact suffered a resource diversion injury because it diverted resources from other

activities to voter education, Oct. 11, 2023 Tr. at 3659:11–23, but this is insufficient to confer standing for several reasons.

253.    *First*, voter education activities are a "routine" part Texas Impact's organizational work. *Azalea Garden Props.*, 82 F.4th at 352–53. Mr. Houston acknowledged that the organization regularly engages in "a lot of education efforts around . . . whatever election it may be to help try to get out the vote to remind folks to participate." Oct. 11, 2023 Tr. at 3647:24–3648:1. Mr. Houston also stated that Texas Impact ran advertisements to be poll workers, but that was also an activity Texas Impact engaged in before SB 1. *Id.* at 3656:2–5. Because Texas Impact would have engaged in voter education and recruiting poll workers regardless of SB 1, its decision to do so did not "perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

254.    Second, Texas Impact offered insufficient detail about the amount of resources diverted because of the challenged provisions. Mr. Houston suggested the group spent between $25,000 and $30,000 on a program called Ballot Ready. Oct. 11, 2023 Tr. at 3660:3–11. But he also said that investment was replacing a prior publication the group distributed, and he did not say how much the old publication cost. *Id.* Ballot Ready may have even cost less than the prior publication, as Mr. Houston said Ballot Ready was the "more economical" and "more efficient" option. *Id.* at 3660:8. The Court therefore cannot conclude that Texas Impact "diverted significant resources." *City of Kyle*, 626 F.3d at 238.

255.    *Third*, Texas Impact offered insufficient detail about where resources were diverted *from*. Mr. Houston did not identify any event or activity Texas Impact had to forego because of any challenged SB 1 provision. *Cf. Tenth St. Residential Ass'n*, 968 F.3d at 500.  Accordingly, there is

no basis for this Court to conclude that SB 1 "perceptibly impaired" LULAC Texas's activities. *Azalea Garden Props.*, 82 F.4th at 353.

256.    Fourth, Texas Impact also cannot prove that its alleged resource-diversion injury was caused by any challenged provision of SB 1. Even assuming Texas Impact provided sufficient evidence to prove SB 1 as a whole injured it, Texas Impact provided no testimony about how specific provisions injured the organization. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and Texas Impact cannot argue SB 1 as a whole injured it.

257.    Mr. Houston also gestured at a different theory of injury, suggesting Texas Impact was harmed because it discontinued a program encouraging people to vote by mail. Oct. 11, 2023 Tr. at 3658:7–3659:10. But Mr. Houston offered no explanation as to why SB 1 required Texas Impact to discontinue that program. Merely encouraging people to vote by mail—as Texas Impact did before SB 1—cannot possibly be understood to violate any challenged provision.  The Court cannot conclude any challenged provision caused that voluntarily-incurred "injury."

#### 4. FIEL Houston

258.    FIEL Houston (FIEL) focuses on helping students in the Greater Houston area "attain higher education." Oct. 4, 2023 Tr. at 2430:23–25. "[E]ducating its members and the public about voting rules" has been part of FIEL's mission "for a long time." *Id.* at 2469:11–13.

259.    FIEL challenges sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB 1.

260.    FIEL attempted to establish standing through the testimony of Cesar Espinosa, FIEL's executive director. Oct. 4, 2023 Tr. at 2430:1. Plaintiffs' counsel stated that Mr. Espinosa's testimony was only relevant to the claims against sections 4.09, 6.03, and 6.04. – at 2429:10–12.

Because FIEL offered no evidence related to sections 5.07, 5.13, 6.05, 6.06, 7.04, and 6.01, it lacks standing as to those claims.

### a.    FIEL Lacks Associational Standing.

261.    FIEL lacks standing to challenge section 4.09. Mr. Espinosa could not identify a FIEL member who refused to serve as a poll worker after SB 1. Oct. 4, 2023 Tr. at 2464:9–11, 15–22. To the extent the Court finds it credible, based on Mr. Espinosa's vague testimony, that any member of FIEL is actually worried about being prosecuted, that risk is far too speculative to "imminent." *Texas State LULAC*, 52 F.4th at 256; *see supra* ¶ 36(d).

262.    There is also no evidence that any FIEL member was injured by sections 6.03 or 6.04. Mr. Espinosa claimed he and Ms. Gonzales (a FIEL member) were afraid of getting prosecuted for violating the voter-assistance rules, Oct. 4, 2023 Tr. at 2441:18–22, 2445:14–22, but these claimed fears are far too speculative to be "imminent," *Texas State LULAC*, 52 F.4th at 256; *see supra* ¶ 36(l).

263.    Mr. Espinosa suggested a FIEL member, Ms. Rodriguez, was injured by these provisions because she voted without an interpreter in 2022 after she had used one in 2020. Oct. 4, 2023 Tr. at 2446:2–2447:13. But there is no evidence Ms. Rodriguez ever asked a FIEL member (or anyone else) to assist her. There is also no evidence that Ms. Rodriguez was unable to obtain assistance from someone else she could have chosen. Thus, FIEL failed to prove Ms. Rodriguez suffered any kind of cognizable injury—let alone one caused by the challenged provisions.

### b.    FIEL Lacks Organizational Standing.

264.    Mr. Espinosa did not claim that FIEL diverted resources to educating the public about section 4.09, so standing is clearly lacking as to that claim.

265.    Mr. Espinosa did claim that FIEL diverted resources to educating members about sections 6.03 and 6.04, Oct. 4, 2023 Tr. at 2453:6–24 (referring only to oath and "assister form"), but that injury cannot confer standing for several reasons.

266.    First, voter education is merely a "routine" activity FIEL would be engaging in regardless of SB 1. *Azalea Garden Props.*, 82 F.4th at 352–53. Mr. Espinosa acknowledged that "educating its members and the public about voting rules" has been part of FIEL's mission "for a long time." Oct. 4, 2023 Tr. at 2469:11–13. And while Mr. Espinosa claimed that FIEL was injured by providing information about voting on flyers and hosting forums to discussion election rules, *id.* at 2448:7–23, 2453:6–24, FIEL conducted those activities before SB 1. With respect to the candidate forums, for example, Mr. Espinosa acknowledged that FIEL "had to just invest a little more time and resources into [its] forums [than] in the past." *Id.* at 2449:13–14. Because FIEL would have engaged in these voter education activities regardless of SB 1, its decision to continue doing so did not "perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

267.    *Second*, Mr. Espinosa offered insufficient detail on how many resources were diverted to voter education because of the challenged provisions. Mr. Espinosa claimed that resources were diverted to forums along with printing flyers and handouts. Oct. 4, 2023 Tr. at 2448:7–23, 2453:6–24. With respect to the forums, Espinosa did not say how many more resources FIEL committed. He only said that FIEL "had to just invest a little more time and resources into [its] forums [than] in the past." *Id.* at 2449:13–14. As for Espinosa's claim that FIEL's printing costs "doubled or tripled" because FIEL provided information on flyers and handouts about the voter assistance oath and 6.03's revision to the voter assistance form, *id.* at 2454:9–12, that is

simply implausible. Educating voters about election rules has long been part of FIEL's mission, and those provisions represent a tiny fraction of the election rules FIEL would likely educate its members about. *Id.* at 2470:5–18. It is simply unbelievable that educating the public about the modest changes in sections 6.03 and 6.04 "doubled" or "tripled" FIEL's printing costs. *Id.* at 2454:9–12. Indeed, when pressed on cross examination, Mr. Espinosa could not say how much FIEL spent on voter education because of SB 1. *Id.* at 2469:23–25. Therefore, FIEL has not proved a "concrete" and "particularized" injury. *TransUnion*, 141 S Ct. at 2203.

268.    *Third*, FIEL offered insufficient detail about where the resources were diverted from. Mr. Espinosa acknowledged he could not "identify a specific part of FIEL Houston's normal programming that [it] had to forego altogether because of SB 1." Oct. 4, 2023 Tr. at 2473:12–17; *cf. Tenth St. Residential Ass'n*, 968 F.3d at 500.

269.    Mr. Espinosa did testify that FIEL reorganized its programming on higher education—shifting from four functions in four events to the same functions in two events. Oct. 4, 2023 Tr. at 2458:8–2460:10. But that consolidation simply represents a more efficient way to offer the same activities—Mr. Espinosa acknowledged that FIEL did not omit any of the four "steps" covered in FIEL's prior four-event structure. *Id.* at 2472:7–2473:11. But even if the Court finds that FIEL had to forego a preferred four-event format, FIEL did not prove that money was diverted from FIEL's higher-education programming because of SB 1. Such a claim is especially dubious because FIEL's budget increased after SB 1. *Id.* at 2472:1–6. FIEL might simply have chosen to use its extra resources toward new activities unrelated to SB 1.

### 5.  Texas Hope

270.    Texas Hispanics Organized for Political Education (Texas Hope) is an organization pursuing "civic engagement, civic education, and outreach" for Hispanics. Oct. 4, 2023 Tr. at 2475:16–19. Texas Hope has approximately 50 members. *Id.* at 2479:1–4.

271.    Texas Hope challenges SB 1 sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01.

272.    Texas Hope attempted to prove standing through the testimony of Joe Cardenas, the group's chair. Oct. 4, 2023 Tr. at 2475:11. Mr. Cardenas offered no testimony suggesting Texas Hope has suffered an organizational injury from any challenged provision. Mr. Cardenas offered only testimony to support a claim of associational standing. Mr. Cardenas offered testimony only relevant to section 6.04's voter assistance oath, so Texas Hope's challenges to all other provisions fail for want of evidence of standing. *See Gladstone Realtors*, 441 U.S. at 115 n.31.

273.    Texas Hope also lacks standing to challenge section 6.04. Mr. Cardenas testified that he and another organizational member, Ms. Cantu, are worried about being prosecuted under section 6.04. But this injury is not cognizable because it is far too speculative to be "imminent." *Tex. State LULAC*, 52 F.4th at 256; *see supra* ¶ 36(l). In the case of Mr. Cardenas, for example, the voter he assisted asked for assistance and had previously received assistance from relatives. Oct. 4, 2023 Tr. at 2481:8–11. As Mr. Cardenas admitted on cross-examination, there was "no question in [his] mind" that she was eligible for assistance—in part because she was visibly blind. *Id.* at 2495:12–23.

### 6. Friendship West Baptist Church

274.    Friendship West Baptist Church (Friendship West) is a church in the Dallas/Fort Worth area that encourages its members to be politically active. Oct. 4, 2023 Tr. at 2501:16–17.

275.    Friendship West challenges sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB 1.

276.    Friendship West attempted to establish standing through the testimony of Danielle Ayers, its Pastor of Justice. Oct. 4, 2023 Tr. at 2501:18–19.

### a.    Friendship West Lacks Associational Standing.

277.    Friendship West lacks associational standing for all claims because Ms. Ayers did not identify any specific member of Friendship West harmed by any challenged provision. Oct. 4, 2023 Tr. at 2522:2–2523:5 (acknowledging this). A group cannot have associational standing if it does not identify a specific member injured by each challenged provision. *See Summers*, 555 U.S. at 493; *In re Gee*, 941 F.3d at 161–62.

### b.    Friendship West Lacks Organizational Standing.

278.    Ms. Ayers testified that, after SB 1, Friendship West diverted resources from "training" and organizing legislator visits to educating voters. Oct. 4, 2023 Tr. at 2518:10–25. That claimed diversion of resources is insufficient to establish standing for several reasons.

279.    *First*, voter education is merely a "routine" activity Friendship West would be engaging in regardless of SB 1. *Azalea Garden Props.*, 82 F.4th at 352–53. Ms. Ayers acknowledged that Friendship West "has been educating its members and the public about voting rules for a long time," and that it's a "regular and important part of the church's work." Oct. 4, 2023 Tr. at 2523:15–25. Because Friendship West would have engaged in these voter-education activities regardless of SB 1, its decision to continue doing so did not "perceptibly impair[]" its organizational effectiveness or mission. *City of Kyle*, 626 F.3d at 238.

280.    *Second*, Ms. Ayers offered no detail on how many resources were diverted to voter education.  Indeed, she did not know what Friendship West's budget for voting-related activities was in 2020 or 2022. Oct. 4, 2023 Tr. at 2529:21–2530:1. Friendship West's vague resource-diversion allegation is not "concrete" and "particularized." *TransUnion*, 141 S Ct. at 2203.

281.    Third, Ms. Ayers offered no detail about how many resources were diverted from "training" and legislator visits. Indeed, Ms. Ayers did not know how much Friendship West spent on either volunteer trainings or legislative advocacy either before or after SB 1. Oct. 4, 2023 Tr. at 2526:19–2527:1, 2530:24–2531:7. She also failed to identify a specific activity Friendship West had to forego because of any challenged SB 1 provision. *Cf. Tenth St. Residential Ass'n*, 968 F.3d at 500. Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" Friendship West's activities. *Azalea Garden Props.*, 82 F.4th at 353.

282.    *Finally*, Friendship West failed to prove that injury was caused by any of the challenged provisions. Ms. Ayers made no attempt to tether Friendship West's claimed injuries to specific provisions within SB 1, so Friendship West cannot prove causation. After all, "[s]tanding is not dispensed in gross." *TransUnion*, 141 S. Ct. at 2208.

### 7.    Mexican-American Bar Association of Texas

283.    The Mexican-American Bar Association of Texas (MABA) is a "group of Latino lawyers." Oct. 4, 2023 Tr. at 2533:21.

284.    MABA challenges SB 1 sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01.

285.    MABA attempted to prove standing through the testimony of Jana Ortega, the group's president. Oct. 4, 2023 Tr. at 2533:19. MABA lacks standing for all claims.

286.    Ms. Ortega suggested that certain unnamed members of MABA were concerned about prosecution under SB 1's poll watcher and voter-assistance provision. Oct. 4, 2023 Tr. at 2537:5–9, 2538:8–14. Ms. Ortega did not identify any specific member who was worried about prosecution. The failure to identify any specific member is fatal to MABA's associational standing. *See Summers*, 555 U.S. at 493*; In re Gee*, 941 F.3d at 161. Even if the Court considers unnamed members of MABA worried about being prosecuted, any fear of prosecution is far too speculative to be an "imminent" injury. *Tex. State LULAC*, 52 F.4th at 257; *see supra* ¶ 36(d), (l). Ms. Ortega did not testify that any challenged SB 1 provision inflicted a resource-diversion injury on MABA, so MABA lacks organizational standing as to all claims.

### v.    The OCA Plaintiffs Lack Standing to Challenge Sections 5.02, 5.03, 5.07, 5.10, 5.12, and 6.03.

### 1. REVUP

287.    REVUP was "developed to empower people with disabilities to get more involved in the disability and political process to be able to influence issues of concern to the disability community." Oct. 11, 2023 Tr. at 131:19–23.

288.    REVUP challenges sections 5.02, 5.03, 5.07, 5.10, 5.12, and 6.04 of SB 1. Sept. 11, 2023 Tr. at 234:20–23.

289.    REVUP attempted to prove standing through the testimony of Bob Kafka, the group's founder. Several people who testified that they were members of Arc of Texas also testified that they were members of REVUP: Jennifer Miller, Lydia Nunez Landry, Amy Litzinger, Laura Halvorson, and Cathy Cranston. *See supra* ¶¶ 170-76.

290.    REVUP lacks associational and organizational standing to challenge sections 5.02, 5.03, 5.07, 5.10, 5.12, and 6.04.

### a. REVUP lacks associational standing.

291.    REVUP cannot have associational standing because it does not have a sufficiently concrete membership structure. It has no membership list, no membership dues, and no membership application. Oct. 11, 2023 Tr. at 145:16–146:8. Mr. Kakfa testified that the group "consider[s] you a member" "if you're interested in the mission of REVUP." *Id.* at 135:13–18. Such an organization cannot be considered a membership organization—at least beyond its actual officers. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (asking if alleged group members "possess all the indicia of membership in an organization"); *Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x. 693 (2nd Cir. 2015) (rejecting associational standing for that reason).

292.    Several people who testified that they were members of Arc of Texas also testified that they are members of REVUP: Jennifer Miller, Lydia Nunez Landry, Amy Litzinger, Laura Halvorson, and Cathy Cranston. As discussed above, none of these members have standing to challenge any relevant SB 1 provision. *See supra* ¶¶ 170-76.

### b.    REVUP Lacks Organizational Standing.

293.    Mr. Kafka testified that "answering questions about SB 1 . . . took time away from our education tactic." Oct. 11, 2023 Tr. at 141:2–3. He suggested that those efforts took "time away from REVUP being able to fully educate its members and the public about . . . housing affordability" and voter registration. *Id.* at 141:13–16, 142:3–5. He also testified that REVUP devoted four podcast episodes to discussing SB 1, along with making Facebook posts and Zoom calls. *Id.* at 141:4–12.

294.    REVUP's resource-diversion theory fails to establish standing for several reasons. *First,* voter education activities are a "routine" part REVUP's organizational work. *Azalea Garden*

73

*Props.*, 82 F.4th at 352–53. Mr. Kafka acknowledged that REVUP has engaged in voter education "from [its] very beginning." Oct. 11, 2023 Tr. at 146:21–23.

295.    Second, REVUP offered insufficient detail about the *amount* of resources diverted because of the challenged provisions. Mr. Kafka could not state how much money REVUP spent on voter education following SB 1. Oct. 11, 2023 Tr. at 149:12–25. Mr. Kafka suggested that time was spent because SB 1, but he did not say how much time was devoted to SB 1-related efforts. REVUP's vague resource-diversion allegation is not "concrete" and "particularized." *TransUnion*, 141 S Ct. at 2203.

296.    *Third*, REVUP offered insufficient detail about where resources were diverted *from*. Mr. Kafka suggested that SB 1-related efforts took "time away from REVUP being able to fully educate its members and the public about . . . housing affordability" and voter registration. Oct. 11, 2023 Tr. at 141:13–16, 142:3–5. But he offered no detail explaining how those efforts were actually impaired. And he did not identify a specific event or activity REVUP had to forego because of the challenged provisions. *Cf. Tenth St. Residential Ass'n*, 968 F.3d at 500. Accordingly, there is no basis for this Court to conclude that SB 1 "perceptibly impaired" REVUP's activities. *Azalea Garden Props.*, 82 F.4th at 353.

297.    *Fourth*, REVUP also cannot prove that its alleged resource-diversion injury was caused by any challenged provision of SB 1. Even assuming REVUP provided sufficient evidence to prove SB 1 *as a whole* injured it, Rev-Up provided no testimony about how *specific* provisions injured the organization. "Standing is not dispensed in gross," *TransUnion*, 141 S. Ct. at 2208, and REVUP cannot challenge SB 1 as a whole.

### III.    Senate Bill 1 Complies with Americans with Disabilities Act and Rehabilitation Act.

298.    Towards the end of trial, the Court indicated its preference that the Parties submit their analysis of Plaintiffs' claims under Title II of the Americans with Disabilities Act in separate briefing. Oct. 19, 2023 Tr. at 221:21–6. In accordance with the Court's statement, State Defendants and Intervenor-Defendants have drafted separate Findings of Fact and Conclusions of Law targeted at issues relevant to these claims. In addition, because the elements largely overlap, State Defendants and Intervenor-Defendants addressed in this briefing Plaintiffs' claims under Section 504 of the Rehabilitation Act.

299.    Those arguments, which echo the points raised in State Defendants' motion for summary judgment, ECF 616, are incorporated by reference.

### IV.    Senate Bill 1 is Constitutional under *Anderson-Burdick*

#### A.  Legal Standard for *Anderson-Burdick* Analysis

300.    The *Anderson-Burdick* test is a balancing test for evaluating the constitutionality of laws regulating ballot access set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), and utilized in the Fifth Circuit in which the Court must weigh the burden that a state regulation imposes on the right to vote against the state's interest in enacting the regulation.

301.    The Supreme Court in *Burdick* acknowledged the fundamental nature of the right to vote but recognized it does not follow "that the right to vote in any manner ... [is] absolute." 504 U.S. at 433. State laws governing the administration of elections will "invariably impose some burden upon individual voters," so courts must employ a balancing analysis for constitutional challenges to such laws. *Burdick*, 504 U.S. at 433–34.

302.     Specifically, courts should "weigh 'the character and magnitude of the asserted injury'" to voting rights "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789). The Supreme Court further instructed in *Anderson* that courts "must not only determine the legitimacy and strength of each of those interests" but also "consider the extent to which those interests make it necessary to burden the plaintiff's rights." 460 U.S. at 789.

303.     "The rigorousness of the inquiry into the propriety of the state election law depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (citing *Burdick*, 504 U.S. at 434.

304.     Provisions that "impose 'severe restrictions' ... must be 'narrowly drawn' and support 'compelling' state interests, whereas 'reasonable, nondiscriminatory restrictions' require only 'important regulatory interests' to pass constitutional muster." *Meyer v. Texas*, No. H-10-3860, 2011 WL 1806524, at *3 (S.D. Tex. May 11, 2011) (quoting *Burdick*, 504 U.S. at 434, 112 S. Ct. 2059).

305.     However, "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). When the burden imposed by a state-election law is reasonable and nondiscriminatory, as opposed to severe, "the State's important regulatory interests are generally sufficient to justify" that burden. *Burdick*, 504 U.S. at 434.

306.     Because Plaintiffs bring facial challenges, they "bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200. The laws will only be invalidated when they are

"unconstitutional in all of [their] applications" and have no "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008). , 449

307.    Accordingly, courts must analyze the burden on the Texas electorate as a whole and not the burden the law creates on a discrete subset of voters. *See Richardson v. Tex. Sec'y of State, 978 F.3d 220, 235–36* (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008)). A burden that falls on some voters cannot justify the invalidation of the entire state law. *See Crawford*, 553 U.S. at 203.

308.    Notably, the Supreme Court has distinguished "the right to vote" from the "claimed right" to vote by a specific method, such as by absentee ballot. *McDonald v. Bd. of Election Comm'rs of Chi.,* 394 U.S. 802, 807 (1969). The "right to vote is not 'at stake'" if Texas is not prohibiting a plaintiff "from voting by all other means." *Tex. Democratic Party v. Abbott,* 961 F.3d 389, 404 (5th Cir. 2020) ("*TDP I*").

309.    For this reason, among others, this Court cannot assess the Challenged Provisions in isolation. *Tex. Democratic Party v. Scott*, 617 F. Supp. 3d 598, 614  (W.D. Tex. 2022), *aff'd sub nom. Cascino v. Nelson*, No. 22-50748, 2023 WL 5769414 (5th Cir. Sept. 6, 2023). The burden must also be considered together with State-provided alternatives to the challenged election law. *See*, *e.g.*, *Crawford*, 553 U.S. at 199.

310.    At the same time, because different election laws produce different burdens, the burdens produced by a single election law should be viewed individually. *Eu. v. San Francisco Cnty. Democratic Comm.*, 489 U.S. 214 (1989) (evaluating each challenged election law separately). , 222–33

### B. Drive-Thru Voting (Sections 3.04, 3.12, and 3.13)

311.    The right to vote does not entail a right to "affirmative accommodations offered by the state and 'designed to make voting more available'" *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 144 n.6  (5th Cir. 2020) (quoting *McDonald*, 394 U.S. at 807–08). Thus, Sections 3.04, 3.12 and 3.13, which clarify when votes may be cast from within an automobile do "not implicate the right to vote at all." *McDonald*, 394 U.S. at 807.

312.    When a statute limits the availability of affirmative accommodations rather than the fundamental right to vote itself, rational basis review applies, not the comparatively onerous *Anderson-Burdick* standard. *See TDP I*, 961 F.3d at 403–06.

313.    Whichever framework is applied, judgment is warranted in favor of State Defendants, because Sections 3.04, 3.12 and 3.13 serve important state interests without significantly burdening the public's right to vote.

314.    Section 3.04 prohibits any voter from casting a ballot inside a "motor vehicle" unless the voter is physically unable to enter the polling place without personal assistance or a high risk of injuring their health. Section 3.12 requires that early voting sites be located inside the branch office of the county clerk or within the same building as the branch office. Section 3.13 adds a bright-line prohibition on placing early voting locations inside "movable structures."

315.    When a regulation "imposes only 'reasonable, nondiscriminatory restrictions'...'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S., at 788).

316.    "[S]triking [] the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not

interfere unless strongly convinced that the legislative judgment is grossly awry." *Scott*, 617 F. Supp. 3d at 615.

       i.   The Burden on Voters is Slight

317.    Drive thru voting has a short history, having been deployed by only a few counties during a single election year. Drive thru voting had not been used before the 2020 elections and because of SB 1's enactment in December 2021, has not been used since then. Sept. 19, 2023 Tr. at 1229:21–25; Oct. 17, 2023 Tr. at 4245:14–20.

318.    During the 2020 general election, most counties did not provide drive thru voting. *See, e.g.*, Sept. 12, 2023 Tr. At 352:14–16, 489:13–15; Oct. 12, 2023 Tr. at 147:21–22 (witnesses stating that Dallas, El Paso and Denton counties never offered drive thru voting). Among those counties that did, drive thru voting was not the main method of casting a ballot. Harris County established only 10 drive thru voting locations out of more than 130 total polling locations. *See* Sept. 19, 2023 Tr. at 1241:10–17.

319.    Thus, drive thru voting has never been a major form of voting in Texas; few Texas voters have ever used it. Given its brief history of use and rarity while in use, the electorate cannot have come to rely on drive thru voting. Any burden on the right to vote must be slight when it concerns a practice seldom used.

320.    While some voters might conceivably benefit from access to drive thru voting, courts evaluate the impact of new restrictions based on the entire electorate, rather than specific groups. *See Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 235–36; *see also Crawford*, 553 U.S. at 203.

321.    Even so, SB 1 permits voting from within an automobile for voters who face physiological impediments to voting indoors. *See* Tex. Elec. Code §§ 3.04, 64.009. Thus, the class of voters that would arguably benefit the most from drive thru voting enjoys access to a near equivalent. *See TDP I*, 961 F.3d at 404–05 (upholding Texas's right to restrict mail voting to groups whose need renders them most convenienced by absentee voting).

322.    In fact, prohibiting drive thru voting allows curbside voting to more effectively accommodate physically impaired voters. Drive thru voting can lead to long lines and wait times while limited curbside voting prioritizes those with a medical reason to remain in their car.

323.    All voters benefit from SB 1's expanded early voting hours, whereby polling locations open two weeks prior to an election day for at least six hours each day. Tex. Elec. Code § 85.005 (2021). By enlarging early voting hours, SB 1 provides an alternative to drive thru voting.

324.    Plaintiffs have failed to identify any voter whose ability to vote will be hindered due to SB 1's prohibition on drive thru voting. "An election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting more difficult for that person than it was before the law was enacted or enforced" *TDP II*, 978 F.3d 168, 190–91. Therefore, plaintiffs have produced no evidence showing that these Sections of SB 1 burden anyone's right to vote.

      ii.   These Sections Advance Important State Interests

325.    "Texas 'indisputably has a compelling interest in preserving the integrity of its election process.'" *Richardson*, 978 F.3d at 234 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)).

326.    "Ballot secrecy is a core principle in our country." *Miller v. Doe*, 422 F. Supp. 3d 1176, 1185 (W.D. Tex. 2019); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 393 (5th Cir. 2013) (treating voter privacy as an important consideration in upholding election code provision under Anderson-Burdick). Voter privacy is undermined by drive thru voting. Automobiles with multiple passengers are a shared space where privacy cannot be effectively provided. Multiple voters would often come to a drive thru in the same car and would have opportunity to influence one another's voting decisions. *See* Sept. 20, 2023 Tr 1252:15–1254:3. For example, Zeph Capo, head of the AFT labor union, mentioned that he rode with union members in a "caravan." Sept. 14, 2023 Tr. 941:15–23. A union boss riding along with union members to the polls implies a power imbalance or influence opportunity that raises the prospect of voter intimidation. Despite cursory attempts, Harris County election workers sometimes failed to provide privacy folders at drive thru locations. Oct. 3, 2023 Tr. at 2300:8–17.

327.    Courts have recognized that states have a compelling interest in preventing voter fraud, *see Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), and in ensuring that an individual's right to vote is not undermined by fraud in the election process, *see Burson v. Freeman*, 504 U.S. 191, 199 (1992). Texas has demonstrated evidence of fraud in elections prior to SB 1, but even without any evidence of actual fraud, the Supreme Court has held that a state's interest in fraud prevention is compelling under the *Anderson-Burdick* standard. *See Crawford*, 553 U.S. at 204.

328.    Election integrity is not only threatened by inadequate voter privacy but also by failures of election workers to accurately tabulate votes that have been cast. *See Vote.org, 2023 WL 8664636 at 22* (finding Texas's interest in ensuring "reliability" of voter registration numbers was "substantial"). To be fair and honest, an election must count every man's vote and count it only

once. *Moore v. Ogilvie*, 394 U.S. 814, 818–19 (1969) (noting the "one man, one vote" basis of representation). Utilizing voting methods that return a reliably accurate vote count and avoiding those that do not is essential to administering fair elections.

329.    Similarly, the state has an interest in promoting public confidence that the results of elections accurately reflect voter participation. *See Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016).

330.    Inaccurate vote counts plagued drive thru voting in Harris County. All of the County's drive thru polling locations faced significant reconciliation difficulties. Oct. 17, 2023 Tr. at 4306:16–18 (Ms. Doyer agreeing that all Harris County drive thru locations had discrepancies between votes cast and votes counted). For example, none of the drive thru locations were able to match expected votes cast with recorded votes. *Id.* at 4242:17–4243:2. According to the State's forensic audit, there was a more than 800-vote discrepancy, either positive or negative, at the drive-thru locations used by Harris County in the 2020 General Election. *Id.* at 4243:10–14. Many of these votes represent voters whose ballot was never counted and who therefore were disenfranchised during the 2020 election. Id. at 4240:14–25.

331.    Moreover, the need to continually redeploy voting machines and ancillary equipment to conduct drive thru voting renders it especially susceptible to error. Oct. 17, 2023 Tr. at 4236:18–4237:23. High staffing needs may have led to mobile ballot boxes not being tabulated. *Id.* at 4240:5–8. Courts uphold voting regulations that are reasonably prophylactic, *Hughs*, 978 F.3d at 147, much less reactive to actual abuses. Clear evidence of actual miscounts due to drive thru voting establishes a strong basis for regulations that curtail this method of voting.

332.    The "uniformity and predictability" of election administration is an important state interest in its own right. *Hughs*, 978 F.3d at 147. The Election Code imposes a duty on the Secretary of State to ensure uniform application of Texas election laws. Tex. Elec. Code § 31.003. During the 2020 election some counties instituted drive thru voting while many did not. This means that a limited number of voters had the opportunity to vote by drive thru and also that a limited number of county election workers had to handle the challenges of counting drive thru votes.

333.    Through Section 3.04 et al., Texas intends to "establish[] a uniform rule for the entire State" thereby ensuring that voters and election workers alike face a similar experience no matter where in Texas a ballot is cast. *Hughs*, 978 F.3d at 148. By offering every voter a comparable opportunity to vote, Texas enables all its citizens to exercise their right to vote on an equal footing.

334.    Additionally, the difficulties Harris County election workers faced attempting to implement drive thru voting implicate the State's interest in the efficient use of resources for election administration. The State's "interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process." *Crawford*, 553 U.S. at 196. Drive thru voting required relatively high amounts of staffing. *See* Sept. 20, 2023 Tr. at 1253:17–20 (Ms. Longoria stating that each drive thru "voting station" was staffed by an election worker whereas indoor workers could and did supervise multiple stations). Election workers will be able to administer elections more effectively and economically by limiting automobile voting to the relatively small number of voters who cannot physically vote indoors without assistance or injury.

335.    Finally, Texas has a compelling interest in seeing that its laws are properly followed. All states have a compelling interest in "the exercise of sovereign power over individuals and

entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999).

336.    Texas maintains that state law never authorized counties to offer drive thru voting on the premise that as creatures of the state legislature, counties have permission to do only what state law affirmatively allows. *See generally Hotze v. Hollins*, 2020 WL 6437668 (S.D.Tex., 2020). Prior to SB 1, Texas election law was silent in regards to drive thru voting, and some counties mistook this silence for permission sub silentio. By expressly limiting automobile voting to the inform, SB 1 clarifies that any county that liberally provides automobile voting acts unlawfully. This added clarity will help ensure that county election officials abide by state law.

337.    To the extent that Section 3.04 et al. burdens the right to vote, its burden is slight. Under the *Anderson-Burdick* framework, "where the burden of an election law is reasonable—instead of severe—the state must show only a 'legitimate interest[]' that is 'sufficient to outweigh the limited burden' imposed by the regulation." *TDP II*, 978 F.3d at 240 (citing *Burdick*, 504 U.S. at 440). Texas has several legitimate interests advanced by these sections. Therefore, they survive Plaintiffs' challenges under the *Anderson-Burdick* standard.

### C. Voting Hours (Sections 3.09 and 3.10)

338.    Sections 3.09 and 3.10 changed requirements for early voting by (1) prohibiting voting outside of the hours between 6 a.m. and 10 p.m.; (2) requiring polling sites remain open at least 9 hours per weekday during the two-week early voting period and 12 hours on the final Saturday of the early voting period; (3) adding a mandatory six hours of Sunday voting; (4) changing the population threshold for counties to be subject to the Election Code's early voting provisions to 55,000 people. Tex. Elec. Code §§ 85.005, 85.006(e) (2021). Tex. Elec. Code)

339.    For most counties, the challenged provisions resulted in an expansion of voting hours or had no effect. S*ee*, *e.g.*, Oct. 3, 2023 Tr. at 2314:6–12, 2354:10–23.; *see also* Sept. 19, 2023 Tr. at 1128:16–1130:3; Oct. 22, 2023 Tr. at 3855:15–3856:17. To put things in perspective, of the eight counties whose election officials testified at trial, seven experienced no decrease in voting hours. The county that had its hours reduced—Harris County—was only precluded from scheduling a program that it offered at approximately eight locations on one night in November 2020. Sept. 20, 2023 Tr. at 1262:2–1263:3; see also STATE Ex. 141.

340.    A statute that "makes it e*asier* for others to vote does not abridge any person's right to vote." *TDP II*, 978 F.3d at 191 (emphasis in original). A legal provision that expands opportunities to vote overall does not constitute a burden under *Anderson-Burdick* even if it also restricts some voting options. *See Tex. LULAC*, 978 F.3d at 144–45 (upholding proclamation that expanded time for mail voting while limiting ballot drop-off locations).

### i.   The Burden is Slight

341.    The challenged sections indirectly prohibit 24-hour voting. During the 2020 election Harris County briefly utilized 24-hour voting. Sept. 20, 2023 Tr. at 1262:25–1263:1.

342.    The burden to Texas voters due to the ban on 24-hour voting will be small. First, only Harris County decided to implement 24-hour voting. Other counties weighed the possibility of opening 24-hour polling locations but decided against it due to the high costs to county resources. *See e.g.* Oct. 12, 2023 Tr. at 3856:18–3857:6 (Denton County did not implement 24-hour voting owing to its costs and the prediction that few would use it); Sept. 14, 2023 Tr. at 826:25–827 (Cameron County decided to forego 24-hour voting). Second, even in Harris County, 24-hour

voting was a "one day, one time" decision. Oct. 3, 2023 Tr. at 2273:21–2274:2. The prohibition of a voting method that was only ever used one time by one county does not pose a significant burden.

343.    Restricting voting hours to between 6 a.m. and 10 p.m. is not likely to burden the right to vote. An overwhelming majority of voters will be able to find an opportunity to cast their ballot in the early voting period allocated by SB 1. *See, e.g.*, Sept. 14, 2023 Tr. at 957:20–959:14 (revealing that no member of AFT had been injured by SB 1's hours rules and Mr. Capo admitting that most member will be able to vote during SB 1's hours). Conversely, few voters are likely to vote outside the 6-10 window; for example, only 3,462 votes were cast during Harris County's 24-hour voting period outside of regular hours. Oct. 2, 2023 Tr. at 2047:1–4. This accounted for a mere 0.28 percent of countywide votes. *Id.* at 2047:8–19.

344.    States have broad discretion to establish the time, place and manner of elections. *See Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). Under the Elections Clause of the Constitution, States "are given . . . a wide discretion in the formulation of a system for the choice by the people of representatives in Congress." *U.S. v. Classic*, 313 U.S. 299, 311 (1941). Voters are not disenfranchised if they fail to heed reasonable time, place, and manner restrictions. *See e.g. Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973) (upholding registration deadline as reasonable restriction that did not disenfranchise voters who failed to meet it).

ii.    Section 3.09 and 3.10 Advance Important State Interests.

345.    Meanwhile, the State's interest in regular, uniform voting hours that are manageable to implement outweighs any incidental burden standardized voting hours cause.

346.    Under Sections 3.09 and 3.10 every county in Texas provides similar voting hours. This advances the State's interest in a uniform voting regime. Courts have recognized that

"preserving electoral integrity is not limited to combating fraud." *John Doe No. 1 v. Reed*, 561 U.S. 186, 198 (2010). "That interest also extends more generally to promoting transparency and accountability in the electoral process." Id.

347.    More specifically, unform voting hours minimizes voter confusion. States have an interest in preventing "misrepresentation and electoral confusion . . . ." *Norman v. Reed*, 502 U.S. 279, 290 (1992); *accord Tex. LULAC*, 978 F.3d at 147–48. "We have never required a State to make a particularized showing of the existence of voter confusion . . . prior to the imposition of reasonable [voting regulations]." *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986).

348.    Voters often are confused when neighboring counties have very different voting hours. Oct. 17, 2023 Tr. at 4367:24–4368:8. According to Former Director Ingram's testimony, confusion is especially acute when voters expect 12-hour voting on the last Saturday of the early voting period. *Id.* The Bexar County Election Administrator reported that voters often get confused when neighboring counties have different polling hours. Sept. 19, 2023 Tr. at 1130:7–19. This is particularly true for residents that live in subdivisions that span multiple counties. Id.

349.    By standardizing hours and increasing the number of counties that must provide 12-hour voting, SB 1 will reduce the propensity of differences in schedule to confuse voters. Sept. 19, 2023 Tr. at 1130:17–19.

350.    Limiting the number of hours and keeping hours within the 6-10 range ensures staffing needs remain at reasonable levels. *See* Sept. 12, 2023 Tr. at 351:11–15 (extension of hours increases staffing needs). This not only preserves government resources but also reduces chain of custody problems. When polls remain open for a 24-hour or comparable period, shift changes in personnel can confuse the chain of custody over ballots. The State's forensic audit uncovered

extensive chain of custody issues that occurred at Harris County's 24-hour locations. Oct. 17, 2023 Tr. at 4231:7–4232:12.

351.    Curtailing hours past 10 p.m. also protects the physical safety of voters and election workers. *See* Sept. 19, 2023 Tr. at 1021:9–1022:22 (testifying that 24-hour voting would jeopardize safety of election workers due to late hours); Oct. 12, 2023 Tr. at 3857:7–9 (having concern about the safety of election workers "especially at night").

### D. Poll Watchers (Sections 4.01 and 4.07)

352.    Sections 4.01 and 4.07, which clarify the standards for where poll watchers may observe voting activities and when poll watchers may be removed from a voting location, do "not implicate the right to vote at all." *McDonald*, 394 U.S. at 807. When a statute does not limit the right to vote itself, rational basis review applies, not the comparatively onerous *Anderson-Burdick* standard. *See TDP I,* 961 F.3d at 403–06. Under either framework, judgment for State Defendants is appropriate because Sections 4.01 and 4.07 serve important state interests without significantly burdening the public's right to vote.

353.    Section 4.01 clarifies election judges' prerogative to order a poll watcher removed from a voting location: an election judge may remove a poll watcher if the judge or other election official observes the poll watcher violate the Election Code, if the poll watcher breaches the peace, or if the poll watcher violates the Penal Code; notwithstanding the foregoing, an election judge may summon law enforcement to remove a poll watcher for breaching the peace or violating the law. Section 4.07 clarifies poll watchers' prerogative to observe election activities: poll watchers move freely where election activity at the location occurs and may sit or stand near enough to see and hear election activity.

354.    When a regulation "imposes only 'reasonable, nondiscriminatory restrictions' . . . 'the State's important regulatory interests are generally sufficient to justify' the restrictions" *Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S., at 788). "[S]triking [] the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Scott*, 617 F. Supp. 3d at 615.

### i.    The Burden on Voters is Slight

355.    The change from permitting poll watchers to be "conveniently near" enough to observe election activity to "near enough to see and hear" the activity did not meaningfully change the law. Sept. 22, 2023 Tr. at 1883:12–20; *see* Tex. Elec. Code art. 3.07(d) (1981). Similarly, it was already a crime to obstruct the free movement of poll watchers while they are performing their duties. Sept. 22, 2023 Tr. at 1888:1–8, 1883:21–1884:4, 1886:16-23; Tex. Elec. Code § 33.061 (1985). This change in language provided a clarification and reflected how the Secretary of State already understood the existing provisions. Oct. 17, 2023 Tr. at 4386:5–4387:24. Section 4.01 does mean poll watchers are suddenly unrestrained under the Election Code, and Plaintiffs' arguments to the contrary ignore the broader Election Code restrictions on poll watcher activity. *Id.* at 4387:24–4388:5.

356.    Plaintiffs have failed to identify any voter whose ability to vote will be hindered due to SB 1's prohibition on drive thru voting. "An election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting more difficult for that person than it was before the law was enacted or enforced." *TDP II*, 978 F.3d 168, 190–91. Therefore,

plaintiffs have produced no evidence showing that these sections of SB 1 burden anyone's right to vote.

357.    Plaintiffs' concerns that SB 1's poll watcher provisions will burden voters by disincentivizing volunteer election workers ("The watchers and the watched don't always get along." Sept. 12, 2023 Tr. at 477:25–478:5) prove overblown. *First*, some counties—including Dallas County—were already taking steps to allow poll workers greater freedom in central counting stations in order to improve transparency. *Id.* at 473:10–12; 473:25–474:9. *Second*, even large counties, such as Dallas County, experienced only three or four incidents of poll watcher disruption in the May 2022 election. *Id.* at 472:12–14. Most poll watchers understood and abided by Texas poll watcher regulations, including those in SB 1, and only a small percentage ignored the rules or misunderstood them. *Id.* at 472:15–20. If poll watchers make election workers uncomfortable, counties have a variety of ways to investigate such instances. *Id.* at 472:7–11. Perhaps most illustratively, Dallas County was able to staff all 469 voting locations for the November 2022 general election, and even had 324 surplus workers; the county was likewise able to staff all 52 of its early voting locations in the same election. *Id.* at 469:3–10. Plainly, the first major general election test following SB 1 did not chill volunteer election workers based on concerns about poll watchers running rampant.

358.    Plaintiffs' fears that SB 1's poll watcher restrictions would result in a rash of prosecuted election judges has likewise proven unfounded. Keith Ingram testified that he is unaware of any election judge prosecuted under Section 4.07, and Plaintiffs presented evidence of no such prosecutions. Oct. 17, 2023 Tr. at 4388:6–8. Plaintiffs likewise presented no testimony from local prosecutors that the dearth of prosecutions resulted from an unwillingness to enforce

Section 4.07; as such, there is no reason to believe that the lack of election judge prosecutions for Section 4.07 violations results from anything other than judges, election workers, poll watchers, and law enforcement collectively working to constructively implement and abide by SB 1's commonsense clarification of Texas election laws balancing these various interests. Any alleged chilling effect on voters or poll workers, to the extent such effect would impact voters, is therefore minimal—if not nonexistent.

359.    Plaintiffs presented no evidence of decreased voting resulting from SB 1's poll watcher provisions. Indeed, testimony indicated there was no such decrease. Sept. 12, 2023 Tr. at 481:15–18.

ii.  These Sections Advance Important State Interests

360.    "Texas 'indisputably has a compelling interest in preserving the integrity of its election process.'" *Richardson*, 978 F.3d at 239 (quoting *Eu. v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)). Courts should "weigh 'the character and magnitude of the asserted injury'" to voting rights "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id.* At 434 (quoting *Anderson*, 460 U.S. at 789). The Supreme Court further instructed in *Anderson* that courts "must not only determine the legitimacy and strength of each of those interests" but also "consider the extent to which those interests make it necessary to burden the plaintiff's rights." 460 U.S. at 789.

361.    States have a compelling interest in preventing voter fraud, *see Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), and in ensuring that an individual's right to vote is not undermined by fraud in the election process, *see Burson v. Freeman*, 504 U.S. 191, 199 (1992). Texas has demonstrated evidence of fraud in elections prior to SB 1, but even without any evidence of actual fraud, the

Supreme Court has held that a state's interest in fraud prevention is compelling under the *Anderson-Burdick* standard. See Crawford, 553 U.S. at 204.

362.    Election integrity is threatened by the failure of election workers to accurately tabulate votes that have been cast. *See Vote.org, 2023 WL 8664636 at 22* (finding Texas's interest in ensuring "reliability" of voter registration numbers was "substantial"). Similarly, the state has an interest in promoting public confidence in results election results. *See Veasey*, 830 F.3d at 231; Oct 17, 2023 Tr. at 4379:1–7.

363.    Texas has a strong interest in preserving order, preventing breaches of the peace and violations of law at polling places, and allowing poll watchers to observe elections to prevent fraud and ensure transparency and faith in the election process. Texas' poll watcher regime promotes transparency and voter confidence in election results by allowing citizens to patrol their own elections for impropriety by voters and election officials alike.

364.    Finally, Texas has a compelling interest in seeing that its laws are properly followed. All states have a compelling interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son*, 458 U.S. at 601; *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d at 449. The added clarity provided by Section 4.01 and 4.07 will help ensure that county election officials apply, and abide by, state law. Those provisions also help clarify existing law; for example, after SB 1, election workers are more keenly aware of the fact that obstructing poll watchers is unlawful. Sept. 12, 2023 Tr. at 481:6–9.

365.    To the extent that Sections 4.01 and 4.07 burden the right to vote, any such burden is slight. Under the *Anderson-Burdick* framework, "where the burden of an election law is

reasonable—instead of severe—the state must show only a 'legitimate interest[]' that is 'sufficient to outweigh the limited burden' imposed by the regulation." *TDP II*, 978 F.3d at 240 (citing *Burdick*, 504 U.S. at 440). Texas has several legitimate interests advanced by these sections. Therefore, they survive Plaintiffs' challenges under the *Anderson-Burdick* standard.

### E. In-Person Delivery of Mail Ballots (Section 4.12)

i. Section 4.12 did not change rules regarding drop-boxes.

366.    Section 4.12 does not unconstitutionally deny or abridge the right to vote.

367.    Judgment is warranted in favor of Defendants because Section 4.12 has not made voting more difficult for voters. In their Complaint and at trial, Plaintiffs have asserted that Section 4.12 eliminated drop-boxes in Texas. This is incorrect. The law and factual record make clear that the Election Code has never permitted, and Texas counties have never offered, drop-box voting. *See*, *e.g.*, Oct. 12, 2023 Tr. at 3855:9–10; Oct. 17, 2023 Tr. at 4390:14–24. Section 4.12 did not change the law in this regard.

368.    The confusion springs from Plaintiffs' conflation of drop-box voting with the in-person delivery option permitted under Section 86.006(a) of the Election Code, but they each refer to distinct voting practices. *See* Oct. 12, 2023 Tr. at 3854:18–20. The term drop-box has a specific meaning with respect to elections. It references unattended boxes, often placed throughout the community, where voters can deposit the ballot anonymously. *See* Oct. 17, 2023 Tr. at 4390:25–4391:9.

369.    Texas, in contrast, permits voters to deliver their marked mail ballot in person but only at the early voting clerk's office while polls are open on election day. Tex. Elec. Code § 86.006(a-1); *see also* Sept. 12, 2023 Tr. at 343:19–344:11. Furthermore, Texas voters may not deliver their ballot anonymously. The voter must present an acceptable form of identification to an

election worker, who then takes the mail ballot to be processed. *Id.*; *see, e.g.,* Sept. 12, 2023 Tr. at

353:12–21. The Election Code does not let voters drop off their ballot in an unattended box.

370.    Contrary to Plaintiffs' assertion, these rules pre-date S.B. 1.

371.    *First,* the requirements that voters deliver their ballots to the early voting clerk's

office and present identification originated with House Bill 1927 in 2015, when Texas first

permitted in-person delivery of mail ballots. *See* Acts 2015, 84th Leg., ch. 1050 (H.B. 1927), § 7,

eff. Sept. 1, 2015. All Section 4.12 did was codify a best practice that many counties already

followed, which was to have election officials record the voter's name, signature, and the type of

identification provided on a roster when they received a mail ballot. *See, e.g.,* Sept. 12, 2023 Tr. at

353:12–21; *see also* Oct. 17, 2023 at 4391:14–4392:13.

372.    *Second*, Texas counties are "legal subdivisions of the State" and "possess only such

powers and privileges as have been expressly or impliedly conferred upon them." *Hollins*, 620

S.W.3d at 403–04 (quoting *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 430 (Tex.

2016)). Notwithstanding Section 4.15, the Election Code only permits counties to offer voters

three option in which to return a ballot: mail, common or contract carrier, or in-person delivery to

the early voting clerk's office. *See* Tex. Elec. Code § 86.006(a), (a-1). Drop-boxes are not one of

them. Thus, even if this Court granted an injunction, the action would not confer on counties the

power to implement a fourth option the Legislature omitted.

373.    Plaintiffs next contend that Section 4.12 precludes Texas counties from having

multiple in-person delivery locations, but this allegation, again, flows from a misapprehension of

Texas election law. Section 86.006(a-1) of the Texas Election Code stipulates that the mail-ballot

must be delivered in-person to the early voting clerk office. For most counties, particularly those

in which early voting clerk is an election administration, the early voting clerk has only one office. *See* Sept. 12, 2023 Tr. at 352:17–353:11, Sept. 14, 2023 Tr. at 825:8–21. Enjoining Section 4.12 will not change this preexisting rule.

374.    In their Complaint and at trial, Plaintiffs point to Harris County, which organized multiple in-person delivery locations on Election Day during the November 2020 general election. However, the early voting clerk in Harris County at the time was the county clerk, who had a number of annexes located throughout the county. Harris County argued these annexes satisfied Section 86.006(a-1). *See* Chris Hollins' Response to Petition for Writ of Mandamus, *In re Hotze*, 2020 WL 5900494, at *20 (Tex. 2020). This Court offers no opinion on whether an annex complies with Section 86.006(a-1). It only notes that the question of whether the Election Code permits multiple in-person delivery locations in Texas turns on the interpretation of "early voting clerk's office," not Section 4.12. *See* Oct. 17, 2023 Tr. at 4392:18–4393:13.

375.    All of this to say that Plaintiffs have failed to establish that Section 4.12 made voting harder as compared to what came before. "[T]o 'abridg[e]' the right to vote means to 'place a barrier or prerequisite to voting, or otherwise make it more difficult to vote.'" *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 145 (5th Cir. 2020) (quoting *TDP II*, 978 F.3d at 191). Because Section 4.12 did not make it "more difficult to vote, relative to the baseline," it has not abridged the right to vote in violation of the Constitution. *Id.*

ii.    Section 4.12 does not unduly burden the right to vote.

376.    Even assuming Section 4.12 made it more difficult to vote, judgment in favor of Defendants is still warranted because (1) Section 4.12 does not implicate the right to vote; and (2)

Section 4.12 codified a reasonable, non-discriminatory rule whose burdens are justified by important regulatory interests.

377.    *First*, the Election Code grants voters numerous options by which to return their marked ballots, Tex. Elec. Code § 86.006(a), as well as the ability to cancel their mail ballots and vote in person.  *Id.* at § 84.032. The law in this Circuit distinguishes between "the right to vote" and the "claimed right to receive absentee ballots." *TDP I*, 961 F.3d at 409 (quoting *McDonald* 394 U.S. at 807). Where, as here, "plaintiffs are welcome and permitted to vote, and there is no indication that they 'are in fact absolutely prohibited from voting *by the State*,' . . . the right to vote is not at stake." *TDP I,* 961 F.3d at 404 (emphasis in original) (internal citations omitted). Judgment in favor of Defendants is warranted on this ground alone.

378.    Second, Section 4.12 passes the balancing test laid out Ander*son-Burdick*.

    a.    The burden is slight.

379.    In *Tex. League of United Latin Am. Citizens*, the Fifth Circuit considered the Governor's October 1, 2020 Proclamation. 978 F.3d 1at 144–48. The question before the court was whether having voters deliver their ballots at a central location, as opposed to multiple locations, imposed an unconstitutional burden. *Id.* The court determined that it did not. Instead, the Fifth Circuit found "no more than a *de minimis* burden on the right to vote." *Id.* at 145. *See also Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 920 (Tex. 2020) (assessing same Proclamation under *Anderson-Burdick* analysis).

380.    The Fifth Circuit's analysis in *Tex. LULAC* controls. Texas provides voters with multiple options in which to cast a ballot. Texans can vote early in-person or on Election Day; they can drop an absentee ballot in the mail; or they can hand deliver a marked ballot to the early voting

clerk on Election Day. *See Tex. LULAC*, 978 F.3d at 144–48. S.B. 1 even expanded voters' opportunity to cancel their application for ballot by mail and vote in-person. *See* Joint Ex. 1 at 38 (Section 5.06 codifying Tex. Elec. Code § 84.035(b)).

381.    Although Plaintiffs introduced evidence that some voters may find a single delivery location to be challenging, "mail-in ballot rules that merely make casting a ballot more inconvenient for some voters are not constitutionally suspect." *Tex. LULAC*, 978 F.3d at 146 (citing *TDP I*, 961 F.3d at 405). "The possibility of such 'usual burdens of voting' does not, on its own, cast any constitutional doubt on an otherwise nondiscriminatory voting regulation." *Anti-Defamation League*, 610 S.W.3d at 922 (quoting *Crawford*, 553 U.S. 181, 198 (2008)).

382.    Nor have Plaintiffs established that the roster on its own constitutes a severe burden. Even prior to Section 4.12, election officials receiving the ballot took the voter's name and checked identification. Section 4.12 merely has county election officials record that information, along with the voter's signature, on a roster. Tex. Elec. Code § 86.006(a-2). The election official then attests that the delivery complied with these requisites. *Id.* Plaintiffs did not show that the roster requirement added substantially to the time it took voters deliver their ballots or that it inconvenienced voters in different way.

b.  The State Interests are Significant

383.    In light of these facts, the burden imposed is *de minimis*; Texas need only articulate an important interest to which Section 4.12 is rationally related, which it has.

384.    After reviewing the record, it is clear that Texas meets its burden. "States have critically important interests in the orderly administration of elections and in vigilantly reducing opportunities for voting fraud." *Tex. LULAC*, 978 F.3d at 146; *see also Crawford*, 553 U.S. at 195-

96 (finding that the state has a legitimate and important interest "in orderly administration and accurate recordkeeping"). Section 4.12 advances this interest by having counties maintain a record of how ballots were delivered, which allows election officials to check that is everything is above board in the event of an irregularity or complaint. Oct. 17, 2023 Tr. at 4391:19–4392:8.

385.    Texas's policy regarding drop-boxes and having a single, centralized mail-ballot delivery location also advances this interest and ballot security generally. As the Fifth Circuit observed in *Tex. LULAC*, "centralizing delivery locations, and deploying" resources, such as poll watchers, there can help "maximize ballot security." 978 F.3d at 147. Drop-boxes, meanwhile, pose unique risks, not present at an election office. Because drop-boxes are unattended, they are susceptible to sabotage and destruction, potentially disenfranchising voters. Oct. 12, 2023 Tr. at 3854:21–3855:8. While Plaintiffs may debate whether Texas's policies are the most effective at addressing election integrity, "the propriety of [Texas] doing so is perfectly clear," *Crawford*, 553 U.S. at 196.

386.    Additionally, Texas has important regulatory interests in both uniformity and transparency, which Section 4.12 promotes. Courts have recognized that "preserving electoral integrity is not limited to combating fraud." *John Doe No. 1 v. Reed*, 561 U.S. at 198. "That interest also extends more generally to promoting transparency and accountability in the electoral process." *Id.* Section 4.12 does just that. It standardizes recordkeeping across Texas counties and thus ensures that election officials and the public have the same access to information should they wish to audit election records. This in turn improves accountability as well as public confidence in the elections. *See*, *e.g*, Oct. 17, 2023 Tr. at 4391:25–6.

387.     Lastly, Texas has an interest in avoiding voter confusion. The record shows that having standardized rules help voters navigate the voting process. It decreases the chance of confusion as well as concern on the part of the voter that something is amiss. *See, e.g.*, Oct. 17, 2023 Tr. at 4324:21–4325. Texas therefore has an interest in voters across the state having the same experience when returning their marked ballot. This interest not only justifies Section 4.12, which prescribes a standardized roster, but it also justifies Section 86.008(a-1) of the Election Code—a provision not challenged in this case—which stipulates the location where a ballot delivered in person may be received.

### F.  ID Number Requirement (Sections 5.02, 5.03, 5.07, 5.08, and 5.13)

  i.  Texas's ID Number requirement does not unduly burden the right to vote.

388.     Sections 5.02, 5.03, 5.07, 5.08, and 5.13 do not unconstitutionally deny or abridge the right to vote.

389.     Judgment in favor of Defendants is warranted because Texas's ID Number Requirement does not implicate the right to vote. "For nearly a century, mail-in voting has been the exception—and in-person voting the rule—in Texas." *TDP I*, 961 F.3d at 414 (Ho, J., concurring). The Election Code is therefore structured to reflect "[t]he Legislature's expectation that most Texans will vote in person." *Hollins*, 620 S.W.3d at 409.

390.     To that end, the Election Code grants voters numerous options by which to vote outside of absentee voting. This includes voting by personal appearance during the two-week early voting period and on Election Day. Texas has adopted county-wide voting, which allows Texans to vote at whichever location in the county is most convenient. *See* Tex. Elec. Code § 43.007. In Texas's most populous counties, voters can have their pick from hundreds of polling sites.

391.    Furthermore, voters who are "physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health" may utilize the curbside voting option and vote without ever leaving the inside of their car. Tex. Elec. Code § 64.009(a). In accordance with the Election Code, each polling location in Texas is obliged to offer this option. *Id.* at § 64.009(a-1). The designated area must be "clearly marked with a sign," displaying "in large font" a telephone number a voter may call or text to receive assistance. *Id.* at § 64.009(a-2).

392.    Thus, even if absentee voting became for some reason inaccessible, the Election Code would still grant Texans a full panoply of alternatives.

393.    The law in this Circuit distinguishes between "the right to vote" and the "claimed right to receive absentee ballots." *TDP I*, 961 F.3d at 409 (quoting *McDonald* 394 U.S. at 807). Where, as here, "plaintiffs are welcome and permitted to vote, and there is no indication that they 'are in fact absolutely prohibited from voting *by the State*,' . . . the right to vote is not at stake," *TDP I,* 961 F.3d at 404 (emphasis in original) (internal citations omitted), and voters' constitutional rights have not been infringed. Plaintiffs' claim fails on this ground alone.

394.    However, even assuming SB 1's ID Number Requirement implicated the right to vote, judgment in favor of Defendants is still warranted because 5.02, 5.03, 5.07, 5.08, and 5.13 codified reasonable, non-discriminatory rules whose burdens are justified by important and compelling regulatory interests.

ii.    The Burden Imposed by the ID Number Requirement is Slight.

395.    *First*, the burden imposed by S.B. 1's ID Number Requirement is minimal. In *Richardson v. Tex. Sec'y of State*, the Fifth Circuit considered Texas's signature comparison procedures, which prior to S.B. 1, was the exclusive method Texas relied on to verify the identity

of absentee voters. *Richardson v. Tex. Sec'y of State,* 978 F.3d 220, 225-26 (5th Cir. 2020). One of the questions before the court was whether these procedures, which could result in the rejection of a mail-ballot, imposed an unconstitutional burden. *Id.* at 226. As part of that analysis, the plaintiffs there argued that Texas's signature-verification procedures imposed a severe burden on the right to vote because "voters who have their ballots rejected due to a perceived signature mismatch are provided untimely notice of rejection and no meaningful opportunity to cure." *Id.* at 235–236.

396.    But the court rejected that argument and determined that Texas's signature verification process was not a severe burden. *Id.* at 235–238. Indeed, the court explained that plaintiffs' argument regarding the rejection of mail ballots and the absence of a cure process "mistakenly focuse[d] only on the burden to the plaintiffs—instead of voters as a whole—and (2) neglect[ed] meaningfully to analyze binding precedent concerning what constitutes a 'severe' burden on the right to vote." *Id.* at 236. After all, the Fifth Circuit looked to the Supreme Court's decision in *Crawford* and determined that Texas's signature verification requirement was no more burdensome on the right to vote than the photo-ID mandate upheld in that case, *id.* at 237, and that rejecting a mail ballot without providing the voter with an opportunity to cure was "'neither so serious nor so frequent as to raise any question about the constitutionality" of the requirement," *id.* at 236 (citing *Crawford*, 553 U.S. at 197).

397.    The Fifth Circuit's analysis in *Richardson* forecloses Plaintiffs' claim.

398.    For one, like *Crawford* and *Richardson*, SB 1's identification number requirements help to ensure the veracity of a ballot by "identifying eligible voters." *Id.* at 236–37, and it does so in a minimally burdensome way. S.B. 1's ID Number Requirement constitutes a carefully drawn

statutory scheme. It builds off the Help America Vote Act by obliging voters to enter the same numbers that federal law requires voters to provide when registering to vote—namely, their SSN or Texas ID number—on their ABBM or carrier envelope. If the number match voters' registration record, the submission is accepted.

399.    Further like *Richardson*, SB 1 "mitigates the burden of its [identification number] requirement in [several] ways." *Richardson*, 978 F.3d at 237. For example, to facilitate voters' navigation of this process, Texas enacted multiple mitigation procedures that lessen the burden of compliance. *See id.* at 237 (citing mitigation procedures as evidence of minor burden). This includes allowing a voter can update their registration record online through Texas.gov, at DPS when conducting a transaction, or by submitting a new voter registration form to the county registrar.

400.    In addition, Texas permits voters who qualify to vote by mail for reasons of age or disability to submit an annual application, reducing the number of times these voters must submit the requisite information. Voters may submit their ABBM as early as January 1st for any election in that calendar year. This gives voters eleven months to get their ABBM accepted and on file for the November general election.

401.    Voters can also choose to vote in person at any time during Texas's two-week early voting period and on election day. *See supra* at ¶ 353 (listing in-person voting options); *see also Richardson*, 978 F.3d at 237 (citing in-person voting as evidence of small burden). S.B. 1 even expanded voters' opportunity to cancel their application for ballot by mail and vote in-person. *See* Joint Ex. 1 at 38 (Section 5.06 codifying Tex. Elec. Code § 84.035(b)).

402.    Moreover, SB 1 introduced a cure process for mail ballots. Sept. 12, 2023 Tr. at 327:14–16. Thus, if a voter's personal identification number is missing or incorrect on the application for ballot by mail, the voter will have the opportunity to cure or correct the defect. Sept. 22, 2023 Tr. at 1841:12–15.  And that the cure process can be used to correct defects on a mail ballot other than just a missing or mismatched ID number. Sept. 12, 2023 Tr. at 327:17–328:1. Voters can cure four other ballot defects through the process, including (1) failure to sign the carrier envelope, (2) a signature on the carrier envelope that cannot be certified as that of the voter, (3) missing statement of residence, and (4) incomplete information with respect to a witness. *Id.* at 328:8–25.

403.    The Former Hidalgo County Election Administrator testified that giving mail voters the opportunity to cure their ballot was a positive change by SB 1. Oct. 3, 2023 Tr. at 2314:3–5. Likewise, counties utilized this cure process created by SB 1, *see, e.g.*, Sept. 12, 2023 Tr. at 329:20–25, and some individuals who had their ABBM rejected for ID mismatch were given an opportunity to cure their ABBM and did so. Oct. 3, 2023 Tr. at 2360:1–7.

404.    This option was not available when the Fifth Circuit deemed the signature verification process to be a minor burden.

405.    Furthermore, the evidence introduced at trial establishes that both the burden and effects of the ID Number Requirement have improved since S.B. 1 was first enacted and will continue to do so. *First*, in addition to educating voters about S.B. 1's identification requirements, the Texas Secretary of State's Office adapted the so-called H.B. 2512 process. Oct. 17, 2023 Tr. at 4400:14–17. The H.B. 2512 process allows the Texas Secretary of State's Office to harvest SSNs and Texas ID numbers from the DPS database system.

406.    The Texas Secretary of State's Office adopted that process to reduce the number of voter records that only had one—or sometimes, none—of the identification numbers required under SB 1. Oct. 17, 2023 Tr. at 4400:22–4401:1. This attempt ultimately reduced the number of voters without numbers in their voter registration record, Sept. 12, 2023 Tr. at 243:17–23, 245:1–6, and helped them successfully navigate the mail voting process. Oct. 17, 2023 Tr. at 4401:2–7.

407.    *Second*, the Legislature enacted multiple statutes this last legislative session designed to further improve the cure process. For example, H.B. 315 authorizes election officials to access a wider range of contact information for voters, allowing them to contact a larger share of voters to inform them of defective ballots and to cure them. *See* Act of May 24, 2023, 88th Leg. R.S., H.B. 315, § 1. Sept. 22, 2023 Tr. at 1838:17–1839:12.

408.    SB 1599 expands the range of corrective actions that voters can take using the Ballot Tracker. Act of May 22, 2023, 88th Leg. R.S., SB 1599, § 5. Sept. 22, 2023 Tr. at 1841:12–18. And H.B. 357, meanwhile, improves voter access to the State's Ballot Tracker by allowing voters to access the Ballot Tracker by using their date of birth as opposed their street address. See Act of May 29, 2023, 88th Leg. R.S., H.B. 357, § 2. *See Id.* at 1860:1–15.

409.    *Third*, voters and election officials have a better understanding of the new rules, Oct. 5, 2023 Tr. at 2990:20–22, resulting in less confusion and a stronger emphasis on best practices on the part of counties. *Id.* at 2991:10–12. [Additional Citations].

410.    Because of these efforts, the rejection rates post-SB 1 have declined each statewide election, ultimately dropping to pre-SB 1 rates, if not lower. Multiple county election officers shared their observations that mail-in rejection rates have returned to historic levels. Denton County's Election Administrator stated that with the general election rejection rates in his county

are virtually back to normal. Oct. 12, 2023 Tr. 3844:25–3845:8. Likewise, Bexar County's Election Administrator testified that while in a normal election the county will experience "a rejection rate of three percent, four percent," in November 2022 the county's rejection rate was only 1.7 percent. Sept. 19, 2023 Tr. at 1038:4–6; *see also id.* at 1106:10-1106:24; [Cite Ingram too]

### *b.* The State's Interests are Significant and Compelling.

411.     "Texas 'indisputably has a compelling interest in preserving the integrity of its election process.'" *Richardson*, 978 F.3d at 239 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)). And States have a compelling interest in preventing voter fraud, *see Purcell*, 549 U.S. at 4, and in ensuring that an individual's right to vote is not undermined by fraud in the election process, *see Burson v. Freeman*, 504 U.S. 191, 199 (1992). Texas has demonstrated evidence of fraud in elections prior to SB 1, but even without any evidence of actual fraud, the Supreme Court has held that a state's interest in fraud prevention is compelling under the *Anderson-Burdick* standard. *See Crawford*, 553 U.S. at 204. As recently as last month, the Fifth Circuit held that "Texas's interest in voter integrity is substantial" and that interest extends "to the qualifications to vote—are the registrants who they claim to be?" *Vote.Org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023).

412.     Similarly, the state has an interest in promoting public confidence in results election results. *See Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016). Here, SB 1 specifically addresses that interest by protecting vulnerabilities in Texas's vote-by-mail system. Prior to SB 1, voting by mail had been recognized as uniquely susceptible to fraud and error. *See* Oct. 12, 2023 Tr. at 3834:24–3835:11. [Citation] Unlike in-person voting, election officials cannot supervise mail ballots throughout the voting process. Oct. 12, 2023 at 3884:13–3885:5. Election workers lose custody of

mail ballots when they are sent to recipients until they are return delivered. *See id.* Specifically, voter impersonation can occur when an actor applies to vote by mail on behalf of other voters, receives mail ballots addressed to those voters, then fills and submits their ballots himself. *See* Jonathan White Decl. at ¶ 17.

413.    For example, during the 2020 elections, a mayoral candidate was alleged to have impersonated other voters to collect at least 100 (84) ABBMs and cast or attempted to cast the ballots in his favor. *See* Oct. 12, 2023 Tr. at 3823:4–17; [Oct. 16, 2023 Tr. at 3952:11–19.] In this particular case, the scheme was detected because the elections office had paid close attention to red flags, Oct. 12, 2023 Tr. at 3824:12–3825:7, but not all counties are as diligent or have the same resources. *See id.* at 3831:20–3832:5 (elections administrator testifying that it is likely that the fraud would have gone undetected "if there weren't so many ABBMs routed through the same commercial address"); *see also id.* at 3834:24–3835:2. The election administrator who uncovered it did testify to his belief that SB 1 voter ID requirements will make this sort of voter impersonation more difficult if not impossible to achieve. *Id.* at 3836:19–3837:4. This is because prior to SB 1 election officials had no way to verify a voter's identity at the application stage. *Id.* at 3832:9–21. The election administrator also testified that mail-in voting is "absolutely" "more vulnerable to fraud than in-person voting." *Id.* at 3831:1–3.

414.    Election integrity is also threatened by the failure of election workers to accurately maintain records. *See Vote.org, 2023 WL 8664636 at 2* (finding Texas's interest in ensuring "reliability" of voter registration numbers was "substantial"). Aside from fraud, mail voting suffered from clerical errors that led to mail ballots being cast contrary to state law. For example, the Secretary of State's 2020 Election Audit of Collin, Dallas, Harris, and Tarrant Counties (the

state's most populous counties) discovered hundreds of ballots that were incorrectly issued on

account of age to voters who did not qualify for a mail ballot on that basis. [Citation].  Many of

these recipients did not qualify on any basis. [Citation]

### G.  Transporting Voters to Vote Curbside (Section 6.01)

#### 1.  Section 6.01 does not unconstitutionally deny or abridge the right to vote.

415.    Judgment in favor of Defendants is warranted because Section 6.01 does not

implicate the right to vote. Curbside voting, like absentee voting, is an "affirmative

accommodation[] offered by the state and 'designed to make voting more available.'" *Tex.*

*LULAC*, 978 F.3d at 144 n.6. Even if it became inaccessible, the Election Code would still grant

Texans numerous options by which to vote. This includes voting inside a polling location on

Election Day or during the two-week early voting period, and it includes voting by mail, for which

curbside voters qualify. *See* Tex. Elec. Code §§ 64.009(a), 82.002(a)(1) (applying same eligibility

standard).

416.    The law in this Circuit distinguishes between "the right to vote" and the "claimed

right" to vote by a specific method. *TDP I*, 961 F.3d at 409 (quoting *McDonald* 394 U.S. at 807).

Where, as here, "plaintiffs are welcome and permitted to vote, and there is no indication that they

'are in fact absolutely prohibited from voting *by the State*,' . . . the right to vote is not at stake," *Id.,*

961 F.3d at 404 (emphasis in original) (internal citations omitted), and voters' constitutional rights

have not been infringed. Judgment in favor of Defendants is warranted on this ground alone.

417.    However, even assuming Section 6.01 implicated the right to vote, judgment in

favor of Defendants is still warranted because Section 6.01 codified reasonable, non-discriminatory

rules whose burdens are justified by important regulatory interests.

> i. The Burden is Slight – Tex. Elec. Code §§ 64.009(f), (f-1)

418.    Addressing the form requirement first, the evidence at trial shows that Section 6.01's form requirement had little to no practical impact on voters. Neither Plaintiffs nor county witnesses could identify voters who had their request for transportation or assistance denied because of Section 6.01. Likewise, neither Plaintiffs nor county witnesses could identify a person who refused to transport or otherwise assist voters because of Section 6.01. Sept. 12, 2023 Tr. at 306:22–307:1; Sept. 12, 2023 Tr. at 493:21–25; [Citation]

419.    Instead, Plaintiffs rely on conjecture that the additional paperwork requirement *could* deter someone from transporting voters to the polls, but that argument fails. Not only is such an injury not "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), but the argument fails to take into account alternative options voters have when securing transportation or casting their ballot, such as absentee voting or voting inside the polling place. *See Tex. LULAC*, 978 F.3d at 145 (assessing options available to voter).

420.    The evidence at trial in fact shows that only rarely do individuals transport simultaneously seven or more voters to vote curbside. Oct. 18, 2023 Tr. at 4423:15–17; *cf.* Oct. 2, 2023 Tr. 2123:14–22. The vast majority of voters transported to the polls in large groups—through a church or nursing home, for example—go inside the building to vote. Section 6.01 does not apply on those occasions. *See*, *e.g.*, Sept. 12, 2023 Tr. at 30:7–14; Oct. 18, Tr. at 4422:20–25.

421.    In their Complaint and at trial, Plaintiffs emphasized the subset of voters who may struggle to utilize an alternative if their access to curbside voting is disrupted; individual hardships, however, do not salvage their claim. "[R]ules that merely make casting a ballot more inconvenient for some voters are not constitutionally suspect." *Tex. LULAC*, 978 F.3d at 146 (citing *TDP I*, 961

F.3d at 405). Courts must "consider only the statute's broad application to all [Texas] voters," not its possible application to voters with peculiar circumstances. *Crawford*, 553 U.S. at 203.

422. To the extent that Section 6.01's form requirement imposes a burden on voters, that burden is *de minimis*. Texas need only articulate an important interest to which the form requirement is rationally related, which it has.

ii. The Burden is Slight – Tex. Elec. Code § Section 64.009(e)

423. Turning to Section 6.01's poll watcher provision, Section 6.01 did not usher in any change to the law. Section 33.056(a) of the Election Code already stated that poll watchers were "entitled to observe any activity conducted at the location at which the watcher is serving." All Section 6.01 did was clear up an ambiguity by specifying that "activity," as understood in Section 33.056(a), included curbside voting.

424. []To 'abridg[e]' the right to vote means to 'place a barrier or prerequisite to voting, or otherwise make it more difficult to vote.'" *Tex. LULAC*, 978 F.3d at 145 (quoting *TDP II*, 978 F.3d at 191. Because this provision of Section 6.01 did not make it "more difficult to vote, relative to the baseline," it has not abridged the right to vote in violation of the Constitution. *TDP II*, 978 F.3d at 191.

425. What's more, Plaintiffs contend that Section 6.01 authorizes poll watchers to observe persons assisting voters, but this is incorrect. Section 6.01 expressly subjects poll watchers to the limitation provided in Section 33.057 of the Election Code, which states that "a poll watcher may not be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice."

426.    Any poll watcher that observes curbside voting remains subject to the limitations stipulated elsewhere in the Election Code, including bans against communication with the voters, Tex. Elec. Code. § 33.058; intimidation of voters, *id.* at § 276.013(a)(1); and retaliation against voters. *Id.* at § 276.001. Having a poll watcher observe curbside voting is therefore no more onerous on voters than having poll watchers observe voting inside the polling place.

427.    To the extent that Section 6.01's poll watcher provision imposes a burden on voters, that burden is *de minimis*. Texas need only articulate an important interest to which the poll watcher provision is rationally related, which it has.

### iii.  The State Interests are Significant

428.    Regardless of the level of review, the State's regulatory interests more than justify any burden on voters.

429.    Section 6.01 advances Texas's "critically important interests in the orderly administration of elections and in vigilantly reducing opportunities for voting fraud." *Tex. LULAC*, 978 F.3d at 146; *see also Crawford*, 553 U.S. at 195–96 (finding that the state has a legitimate and important interest "in orderly administration and accurate recordkeeping"), as well as its "interest in preserving ballot secrecy and preventing 'undue influence, fraud, ballot tampering, and voter intimidation.'" *Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 394 (9th Cir. 2016) (quoting *Miller v. Picacho Elementary Sch. Dist. No. 33*, 179 Ariz. 178, 180 (1994)).

430.    The evidence at trial shows that although curbside voting helps expand access to the franchise, it can also present a risk to both voter privacy and election integrity. Multiple county election officials testified that the set-up of curbside voting allowed individuals within the vehicle to see and hear how voters cast their ballot. *See, e.g.*, Sept. 19, 2023 Tr. at 1102:16–22 (Bexar

County Election Administrator); Sept. 14, 2023 Tr. at 828:19–829:2 (Cameron County Election Administrator); *see also* Oct. 18, 2023 Tr. at 4423:1–10 (Former Director Ingram).

431.    The Bexar County Election Administrator provided specific examples of incidents where "campaigns br[ought] vans of voters to vote curbside," but then voting was "not private" because "the driver would not exit the van." Sept. 19, 2023, Tr. 1102:16–1103:2. The driver would thus "hear which party ballot the voter . . . pick[ed]." *Id.* at 1103:3–5. She expressed concern that, on several occasions, "the person driving the van was forcing people to vote a certain way." *Id.* at 1103:6–116.

432.    Section 6.01 addresses these concerns. The form requirement creates a paper trail, recording the name and address of the person transporting the voter. In the event an election worker or poll watcher observes misconduct, or the voter files a complaint, the authorities can use this information to initiate an investigation. In addition, Section 6.01 instructs counties to deliver the completed forms to the Secretary of State, who "shall make the form available to the attorney general for inspection upon request." *See* Joint Ex. 1 at 51 (codifying Tex. Elec. Code § 64.009(f-1)). This ensures that records are readily accessible by state investigators if needed.

433.    Texas's policy of allowing poll watchers to observe the curbside voting process also "decreases the opportunity for fraud." *Anti-Defamation League*, 610 S.W.3d at 922. The presence of third-party observers deters misconduct, and when it does occur, poll watchers can report it and other regularities to proper authorities. *See*, *e.g.*, Tex. Elec. Code § 33.058(b). In addition, even outside of the context of fraud, poll watchers help further the State's interest in election integrity. *See John Doe No. 1*, 561 U.S. at 198 (recognizing that "electoral integrity is not limited to combating fraud").

434.    Their presence, for example, allows courts to dispel doubts about how an election was conducted. *See, e.g., Reyes v. City of Laredo*, 794 S.W.2d 846 (Tex. App.—San Antonio 1990, no writ) ("At every stage of this election . . . poll watchers and/or representatives of the parties have been present to prevent precisely the sort of occurrence which appellant now speculates must have occurred."); *Wooley v. Sterrett*, 387 S.W.2d 734, 742 (Tex. Civ. App.—Dallas 1965, no writ) (relying on the testimony of a poll watcher). And it gives the public assurance that procedures were followed, thereby increasing confidence in the results.

435.    When confronted with the Governor's October 1, 2020 Proclamation, which instructed the early voting clerk to "allow[ ] poll watchers the opportunity to observe" in-person ballot deliveries, the Fifth Circuit found the policy to be "a reasonable, nondiscriminatory measure" justified by the Governor's goal to "maximize ballot security" and the State's "important interests in election integrity." *Tex. LULAC*, 978 F.3d at 147.  So too here.

### H.  Voting Assistance (Sections 6.03, 6.04, 6.05, 6.06, and 6.07)

436.    Sections 6.03-07 violate make changes to Texas' regulation of voter assistors. Specifically, Plaintiffs contend that §§ 6.01 and 6.03-07 require those transporting groups of seven or more curbside voters and those assisting voters with their applications and ballots to complete a form with their name, address, relationship to the voter, whether they received compensation for providing assistance, and to sign an oath. *Id*. at 233–38.

437.    Section 6.03 generally provides that a person, other than an election officer, who assists a voter in reading or marking a ballot because the voter is either unable to write or see the ballot due to a physical disability or the voter is unable to read the language the ballot is written in, must complete a form giving their name and address, their relationship to the voter, and whether

they received any form or compensation or other benefit from a candidate, campaign, or political committee. Tex. Elec. Code § 64.0322.

438.    Section 6.04 amends the oath for those assisting voters voting by mail to clarify that it is under penalty of perjury and the person providing assistance will not share how the voter voted and that they did not pressure the voter into choosing them to provide assistance.[5] Tex. Elec. Code § 64.034.

439.    Section 6.05 generally adds the requirement that a person assisting the voter in preparing a ballot to submit by mail must disclose their relationship to the voter and whether they received any form or compensation or other benefit from a candidate, campaign, or political committee. Tex. Elec. Code § 86.010.

440.    Section 6.06 amended the prior prohibition on compensating persons assisting voters voting by mail as part of a performance-based scheme to, instead, prohibit solicitating, receiving, or accepting compensation for assisting voters submitting ballots by mail, except when the person assisting a voter is an attendant or caregiving previously known to the voter. Tex. Elec. Code § 86.0105.

441.    Section 6.07 adds a space on the carrier envelope for persons assisting voters voting by mail to indicate their relationship with the voter. Tex. Elec. Code § 86.013.

    i.    Any Burden on Voters is Slight.

---

[5] When first enacted, Section 6.04 had assistors also affirm that the assistor will confine their assistance to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." However, this language has been since enjoined in *OCA Greater Houston v. Tex.*, which rendered any claim against it moot. *See* ECF No. 444 at 2-3 & n.3; *OCA Greater Houston v. Texas*, No. 1:15-cv-679, 2022 WL 2019295, at * (W.D. Tex. June 6, 2022).

442.    Sections 6.01 and 6.03-07 impose minimal burdens on voters and those assisting voters. Those assisting voters voting are *already* required to give their name, address, take an oath, and disclose their relationship to the voter. Oaths are already under penalty of perjury and those assisting voters are prohibited from influencing their votes.

443.    The evidence adduced at trial demonstrated that voters are entitled to whatever assistance is necessary in order to vote. Oct. 18, 2023 Tr. at 4419:3–8. Voter assistance differs from simply aiding a voter's movement in that voter assistance requires actually interacting with the ballot. *Id*. at 4419:21–4420:2. Commonplace help to aid a voter's movement (e.g., opening the door for a voter using a wheelchair, wheeling that voter to voting equipment, or releasing a strap on the wheelchair to better access voting equipment) does not—without more—constitute voter assistance. *Id*. at 4419:9–20. This understanding and definition of voter assistance predates SB 1. *Id*. at 4420:3–4.

444.    Voters needing help to move around the polling place, but who don't need voter assistance, have two avenues of obtaining access to the voting location for their helper: (1) the helper can take the Oath of Assistance, as would an actual assistor; or (2) the voter can seek an accommodation from the election judge at the voting location. Oct. 18, 2023 Tr. at 4420:18–4421:8.

445.    Rather than erecting new requirements for assistors, Article 6 largely informs voters and assistors of regulations that pre-date SB 1. For instance, Section 6.03 amends Election Code Section 64.032, which required election workers to collect an assistor's name and address pre-SB 1. Oct. 18, 2023 Tr. at 4424:5–14. Section 6.04 adds the words "under penalty of perjury" to the Oath of Assistance; the oath has always been under penalty of perjury, but SB 1 ensures assistors

are aware of the oath's graven by making these underlying laws explicit. *Id.* at 4427:8–11; Tex. Penal Code § 37.02; Tex. Elec. Code § 276.013.

446.    Similarly, prior to SB 1, it was already unlawful for assistors to pressure or coerce voters into choosing a particular assistor to prepare a ballot as an assistor contrary to the directions of the voter. Oct. 18, 2023 Tr. at 4428:3–14, 4427:22–4428:10; Tex. Elec. Code § 64.036. It was also unlawful prior to SB 1 to divulge the contents of the voter's ballot. Oct. 18, 2023 Tr. at 4429:10–17; Tex. Elec. Code § 61.006.

447.    Texas' prohibition on compensated voter assistance pre-dates SB 1. Sept. 22, 2023 Tr. at 1900:19–25. Section 6.06 alters the nature of the offense to clarify that solicitation of payment must be for assisting voters. *Id.* at 1901:11–17. Section 6.06 does not implicate situations where a voter pays someone for assistance unrelated to voting. *Id.* at 1901:1–10. The Texas Secretary of State received no requests for accommodation under Section 6.06. Oct. 18, 2023 Tr. at 4431:13–22. Likewise, the Texas Secretary of State has received no requests for accommodation under Section 6.07. *Id.* at 4432:81–7. Indeed, the Texas Secretary of State has received no questions about SB 1's voting assistance provisions whatsoever, including the Oath of Assistance. *Id.* at 4432:18–24.

448.    Plaintiffs' concerns that SB 1's voter assistance provisions would increase voting time have not materialized. In the Dallas County November 2022 general election, for example, wait times for early voting averaged 1.2 minutes, and wait times for Election Day voting averaged 3.7 minutes. Sept. 12, 2023 Tr. at 469:18–23.

         i.    The State Interest is Strong

449.    Texas undeniably has a strong interest in preventing fraud and promoting trust in elections. Sections 6.01 and 6.03–07 further those interests by collecting information from those assisting voters necessary to investigate and prevent voter trafficking. The Secretary of State's office has received concerns from poll watchers concerning situations where one person transports multiple voters to vote curbside. Sept. 18, 2023 Tr. at 4423:1–5.

450.    The State also has a self-evident interest in discouraging would-be "assistors" from waylaying voters in parking lots outside voting locations and demanding they be allowed to assist. Sept. 18, 2023 Tr. at 4427:22–4428:2. SB 1's amendments to the assistor oath aid that state interest. Id.

451.    The State has an interest in educating voters about conditions under which a vote may not be counted. The voter assistance oath has an important role in that education. Sept. 18, 2023 Tr. at 4429:25–4430:6; 4430:16–17. SB 1's amendments to the oath not only informs voters of this information, but assistors as well. Id. at 4430:18–4431:4. The amended oath also informs voters and assistors that, as has been the case since before SB 1, knowingly providing assistance to ineligible voters is unlawful. Id. at 4428:6–25.

452.    To the extent that Sections 6.03 and 60. burden the right to vote, any such burden is slight. Under the *Anderson-Burdick* framework, "where the burden of an election law is reasonable—instead of severe—the state must show only a 'legitimate interest[ ]' that is 'sufficient to outweigh the limited burden' imposed by the regulation." *TDP II*, 978 F.3d at 240 (citing *Burdick*, 504 U.S. at 440). Texas has several legitimate interests advanced by these sections. Therefore, they survive Plaintiffs' challenges under the *Anderson-Burdick* standard.

## I. Time Off Work to Vote (Section 7.02)

453.    Section 7.02 is challenged by MFV Plaintiffs, specifically MFV and Mr. Rutledge. The claim is without merit. Not only does MFV and Mr. Rutledge lack standing, *see infra _____,* but Plaintiffs misinterpret the law. Section 7.02 expands voter protections and therefore imposes no burden on voters. It does not unconstitutionally deny or abridge the right to vote.

### i. Section 7.02 expands opportunities to vote.

454.    Judgment is warranted in favor of Defendants because Section 7.02 has not made voting more difficult for voters. In their Complaint and at trial, Plaintiffs have asserted that Section 7.02 decreases the amount of leave time an employer must provide an employee to vote. This is incorrect. The law and factual record make clear that Section 7.02 expanded an employer's obligation under the Election Code to provide their workers with the opportunity to vote during working hours. *See, e.g.*, Sept. 13, 2023 Tr. at 779:17–780:5; Oct. 18, 2023 Tr. at 4433:11–24; Def-State Ex. 296 at 51–52 (Leg. Tr. of Aug. 11th Senate Session) (Sen. Hughes describing Section 7.02).

455.    Prior to S.B. 1, the Election Code only demanded that employers permit time off on election day. Following its passage, that obligation now includes the early voting period. *See* Oct. 18, 2023 Tr. at 4433:11–22. (Former Director Ingram). "[T]o 'abridg[e]' the right to vote means to 'place a barrier or prerequisite to voting, or otherwise make it more difficult to vote.'" *Tex. LULAC*, 978 F.3d at 145 (quoting *TDP II*, 978 F.3d at 191). Because this provision of Section 7.02 did not make it "more difficult to vote, relative to the baseline," it has not abridged the right to vote in violation of the Constitution. *TDP II*, 978 F.3d at 191.

456.    In response, Plaintiffs argue that Section 7.02 "has an exception which swallows the rule." *See* Oct. 17, 2023 Tr. at 4206:10–20. However, not only have Plaintiffs failed to identify

a single state or county official who shares Plaintiffs' misinterpretation, but the Election Code provision that Section 7.02 amends—Tex. Elec. Code § 276.004—is part of a statutory scheme "designed to make voting more available to some groups who cannot easily get to the polls." *TDP I*, 961 F.3d at 403 (quoting *McDonald*, 394 U.S. at 807). "[S]uch laws increase options—not restrictions. They do not themselves deny [voters] the exercise of the franchise.'" *Id.*, 961 F.3d at 403 (Ho, J., concurring) (quoting *McDonald*, 394 U.S. at 807).

    ii.    Section 7.02 does not unduly burden the right to vote.

457.    Even assuming Plaintiffs' interpretation was correct, judgment in favor of Defendants would be still warranted because (1) Section 7.02 does not implicate the right to vote; (2) Plaintiffs failed to identify a cognizable burden; and (3) the zero to *de minimis* burden is justified by the State's important and compelling interest in expanding protections and voting opportunities to workers.

458.    *First*, the fact that the protections provided in Section 276.004 of the Election Code "[are] not as broad as Plaintiffs would wish does not mean that [the protections] ha[ve] illegally *limited* their voting rights." *Tex. LULAC*, 978 F.3d at 148. The statutory scheme that guarantees employees time off work is an "affirmative accommodation[] offered by the state." *Tex. LULAC*, 978 F.3d at 144 n.6. Thus, even if the Legislature decided to curtail or eliminate it, the Election Code would still grant Texans the full measure of voting options, including two weeks of early voting, election day voting, and for those that qualify, mail-in voting.

459.    The law in this Circuit distinguishes between "the right to vote" and the "claimed right" to vote in a specific manner. *TDP I*, 961 F.3d at 409 (quoting *McDonald* 394 U.S. at 807). Where, as here, "plaintiffs are welcome and permitted to vote, and there is no indication that they

'are in fact absolutely prohibited from voting *by the State*,' . . . the right to vote is not at stake," *Id.,* 961 F.3d at 404 (emphasis in original) (internal citations omitted), and voters' constitutional rights have not been infringed. Judgment in favor of Defendants is warranted on this ground alone.

460.    *Second,* Plaintiffs have failed to establish any impediment to voting attributable to Section 7.02. The evidence at trial shows that Section 7.02's had no adverse impact on voters. According to Former Director Ingram, the Secretary of State received no complaints during his time at the Elections Division—a timeframe that would have spanned three statewide elections following SB 1's passage. Oct. 18, 2023 Tr. at 4434:3–6. At the same time, Plaintiffs failed to identify a single voter who was unable to secure time off work on account of Section 7.02 or an employer who interpreted Section 7.02 as justification for refusing to grant their employees time off work.

461.    Instead, Plaintiffs rely on conjecture that an employer could construe Section 7.02 as an excuse to deny their employees their request for time off, which in turn could hinder or prevent the employee from voting depending on their personal schedule. That argument fails. Not only is such an injury not "certainly impending," *Clapper*, 568 U.S. at 409, but "rules that merely make casting a ballot more inconvenient for some voters are not constitutionally suspect." *Tex. LULAC*, 978 F.3d at 146 (citing *TDP I*, 961 F.3d at 405); *see also Crawford*, 553 U.S. at 203 (instructing court to "consider only the statute's broad application to all [Texas] voters").

462.    "[T]here will always be [] voters for whom, through no fault of the state, getting to the polls is 'difficult' or even 'impossible.'" *TDP I*, 961 F.3d at 415 (Ho, J., concurring) (quoting *McDonald*, 394 U.S. at 810). But "that is a matter of personal hardship, not state action. For courts to intervene, a voter must show that *the state* 'has in fact precluded [voters] from voting,'" which

Plaintiffs have not done. *TDP I*, 961 F.3d at 415 (Ho, J., concurring) (quoting *McDonald*, 394 U.S. at 810); *see also McDonald*, 394 U.S. at 810 n.8 (providing example of voters whose circumstances make it difficult to vote).

463.    To the contrary, the record shows that SB 1 further accommodated voters with busy and fluctuating schedules by expanding minimum voting hours, both on weekdays and Sundays (Sections 3.09, 3.10); lowering the population threshold that trigger a county's obligation to provide longer voting hours (Sections 3.09, 3.10); guaranteeing that voters in line when the polls close have the opportunity to vote, even during the early voting period (Section 3.09); and most relevant here, increasing protections for employees so that these voters have additional opportunities to vote during their working hours, *id.* at 57 (Section 7.02).

464.    In any event, any uncertainty prompted by Section 7.02 is justified by Texas's important regulatory interest of protecting workers and expanding opportunities to vote.

### J.    Vote Harvesting (Section 7.04)

465.    Section 7.04, which criminalizes vote harvesting, does "not implicate the right to vote at all." *McDonald*, 394 U.S. at 807. When a statute does not limit the right to vote itself, rational basis review applies, not the comparatively onerous *Anderson-Burdick* standard. *See TDP I*, 961 F.3d at 403–06. Under either framework, judgment for State Defendants is appropriate because Section 7.04 serves important state interests without significantly burdening the public's right to vote.

466.    Section 7.04 adds a provision to the Election Code prohibiting vote harvesting, whether directly or through a third party, which it defines as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015. The prohibition

does not apply to activities not performed for compensation or benefit and interactions that do not occur in the presence or a ballot or during the voting process, that do not directly involve an official ballot or ballot by mail, that are not conducted in person with a voter, and activities that are not designed to deliver votes for or against a specific candidate or measure. Tex. Elec. Code § 276.015.

i. Any Burden Imposed on Voting by Section 7.04 is Slight

467.    It has long been in illegal in Texas to influence voters by "indicat[ing] by word or sign how he desires a citizen to vote or not vote," Tex. Elec. Code § 15.24 (1981), or while assisting a voter preparing their ballot to suggest by word, sign, or gesture how they should vote, *id*. at § 15.30, or by furnishing a voter with "any paper or ballot on which is marked the names of anyone for whom he has agreed to vote or for whom he has been request to vote," *id*. at § 15.51, or for election officials "while in discharge of his duties as such, by violence or threats of violence, attempt to influence the voter of an elector for or against any particular candidate, *id*. at § 15.26, or for corporations to "directly or indirectly give, pay, expend or contribute any money or thing of value in order to aid or hinder" elections, *id*. at § 15.17, or, with limited exceptions, to "hire any vehicle or hire any person to operate a vehicle for the purpose of conveying voters to the polling place or rewards any person in money or other thing of value for procuring a vehicle or a driver for such purpose," *id*. at § 15.71 (cleaned up).

468.    Today, Texas law still prohibits persons from retaliating against voters for how they voted or for refusing to reveal how they voted, Tex. Elec. Code § 276.001 (2024), absent a written procurement contract it prohibits the buying, offering to buy, selling, or offering to sell "an official ballot, official ballot envelope, official carrier envelope, signed application for an early voting mail

ballot, or any other original election record," *id*. at § 276.010, organized vote harvesting activities, *id*. at § 276.012, engaging in voter fraud, id. at § 276.013.

469.    Prohibitions on vote harvesting do not limit voting in any way. To the contrary, Section 7.04 protects voters from incentive structures that increase the likelihood of improper pressure on voters from parties in pursuit of partisan or ideological ends.

470.    The evidence at trial also shows that Plaintiffs overstate Section 7.04's impact and reach. The ban on vote harvesting only applies in specific circumstances: namely, when the activity is performed in exchange for compensation and when the activity is designed to deliver votes for or against a specific candidate or measure. *See generally* Tex. Elec. Code § 276.015(e). It does not pertain to non-profits or their volunteers engaging in voter education and canvassing, or to voter assistance. Sept. 19, 2023 Tr. at 1914:25–1915:25. For purposes of vote harvesting, the meaning "physical presence" does not mean simply in the same house or within a particular distance, it means a vote harvester going through the ballot with a voter and ensuring the voter chooses the harvester's candidate. *Id*. Plaintiffs have not established the extent that voters rely on the former as compared to the latter.

471.    Instead, much of Plaintiffs' objection to Section 7.04 turns on the assumptions that local prosecutors will take a broad interpretation of the ban and that non-profits and individuals will pull back from assisting voters in fear of criminal prosecution. However, abstract and idiosyncratic fears that that the government will misapply the law fail to meet Plaintiffs' high burden under the *Anderson-Burdick* framework. That is particularly true here, where Plaintiffs failed to establish that anyone has been prosecuted for vote harvesting under Section 7.04. There is simply no basis to believe that the dearth of prosecutions evidences a reluctance to enforce, or a

lack of vote harvesting; instead, it is just as likely that Section 7.04's criminalization of vote harvesting has effectively chilled conduct that has long been illegal in the State of Texas.

472.    And while Plaintiffs presented limited, anecdotal evidence of individuals uncomfortable providing assistance following SB 1, they have presented no statistical evidence of an overall reduction in the number of available assistors. Plaintiffs likewise failed to identify a single voter who was unable to vote due to Section 7.04 or its putative effects on voter assistance.

473.    To the extend Section 7.04 implicates the right to vote at all, it only implicates voting by mail. But the right to vote is distinct from a "claimed right" to vote by a specific method, such as by absentee ballot. *McDonald,* 394 U.S. at 807. The "right to vote is not 'at stake'" if Texas is not prohibiting a plaintiff "from voting by all other means." *TDP I,* 961 F.3d at 404. Even assuming Section 7.04 implicates the right to vote, it only does so to the extent a voter chooses to vote by mail—and there is no constitutional right to vote by mail. *Richardson v. Sec. of State*, 978 F.3d 220, 224 (5th Cir. 2020) ("Though it is not constitutionally required to do so, Texas offers qualifying citizens the option to vote by mail."); *TDP I*, 961 F.3d at 403; *McDonald* 394 U.S. at 807.

ii.    Section 7.04 Advances Important State Interests

474.    "Texas 'indisputably has a compelling interest in preserving the integrity of its election process.'" *Richardson*, 978 F.3d at 239 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)). Courts should "weigh 'the character and magnitude of the asserted injury'" to voting rights "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id*. at 434 (quoting *Anderson*, 460 U.S. at 789). The Supreme Court further instructed in *Anderson* that courts "must not only determine the legitimacy and

strength of each of those interests" but also "consider the extent to which those interests make it necessary to burden the plaintiff's rights." 460 U.S. at 789.

475.    States have a compelling interest in preventing voter fraud, *see Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), and in ensuring that an individual's right to vote is not undermined by fraud in the election process, *see Burson v. Freeman*, 504 U.S. 191, 199 (1992). Vote harvesting, also known as mail ballot fraud, is the practice of campaign workers or other operatives proliferate mail ballots through applications and collect the ballots while ensuring the voter chose the "correct" candidate. Oct. 16, 2023 Tr. at 3915:9–18. It is among the most common type of election crime in Texas. *Id.* at 3915:1–8. Vote harvesting typically occurs in two phases: seeding and harvesting. *Id.* at 3915:2–6; State Exh. 89, p. 15. The seeding phase consists of applying for mail ballots by collecting or forging applications; the harvesting phase consists of collecting the ballots filling them out to ensure the voter selects the harvester's preferred candidate. Oct. 16, 2023 Tr. at 3915:20– 3516:24, 3920:22–3921:3. Where the same name and address appear on family members' applications or ballots, investigators find such repetition innocuous; however, vote harvesting can involve the same name and address appearing dozens, and even hundreds, of times. *Id.* at 3919:1– 18. Small, local elections are most susceptible to the impact of vote harvesting. *Id.* at 3922:2–11.

476.    Texas has demonstrated evidence of fraud in elections prior to SB 1, but even without any evidence of actual fraud, the Supreme Court has held that a state's interest in fraud prevention is compelling under the *Anderson-Burdick* standard. *See Crawford*, 553 U.S. at 204. Ballot privacy protects voters from manipulation. Sept. 12, 2023 Tr. at 254:15–17.

477.    Accordingly, Section 7.04 of S.B. 1 does not abridge or deny voters their right to vote. The challenged provision merely precludes prospective assistors imposing a condition on the

assistance they provide voters: specifically, Section 7.04 bans paid vote harvesting, which the statute defines as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."

478.    Section 7.04 serves the State interest in protecting voters by destroying incentives to usurp citizen votes and does not burden the right to vote. Judgment for State Defendants is therefore appropriate on this claim.

### K.  Unlawful Solicitation and Distribution of ABBMs (Section 7.04)

479.    The only Plaintiff challenging Section 7.04's codification of Tex. Elec. Code § 276.016, entitled Unlawful Solicitation and Distribution of Application to Vote by Mail, is MFV.[8] The claim, however, is without merit. Not only does MFV lack standing, *see infra _____,* but counties lacked the authority under the Election Code to issue and distribute unsolicited ABBMs before S.B. 1. Section 7.04 did not change that. Section 7.04 therefore does not unconstitutionally deny or abridge the right to vote.

> i.  Section 7.04 did not change the rules regarding unsolicited applications for ballot by mail.

480.    Judgment is warranted in favor of Defendants because Section 7.04 did not affect a legal change on whether counties could distribute unsolicited applications for ballot by mail. Following the Harris County Clerk's attempt to send unsolicited mail-in-ballot applications to every registered voter in the county, regardless of whether the voter was qualified to vote by mail, the Texas Supreme Court took up the question of when an early voting clerk may furnish an ABBM. It concluded that "the Election Code does not authorize an early-voting clerk to send an

application to vote by mail to a voter who has not requested one." *Hollins*, 620 S.W.3d at 410; *S*

"[A] clerk's doing so [would] result in irreparable injury to the State." *Id.*; *see also* Sept. 12, 2023

Tr. at 496:18–13.

481.    The Texas Supreme Court explained, Texas counties are "legal subdivisions of the

State" and "possess only such powers and privileges as have been expressly or impliedly conferred

upon them." *Hollins*, 620 S.W.3d at 403–04 (quoting *Wasson Interests*, 489 S.W.3d at 430. In this

case, the Election Code "expressly contemplates that ballot applications are to be requested by

voters," *id.*, at 408, stating "[t]he early voting clerk shall mail without charge an appropriate

official application form for an early voting ballot to each applicant *requesting* the clerk to send the

applicant an application form." Tex. Elec. Code § 84.012 (emphasis added).

482.    The Texas Supreme Court's decision in *State v. Hollins* predated SB 1 and remains

good law. Sept. 12, 2023 Tr. at 496:22–25. To the extent that Plaintiffs' objection centers on county

election officials being unable to issue ABBMS unprompted, Section 7.04 did not create---and

enjoining Section 7.04 will not alter—this preexisting constraint on county authority. "[T]o

'abridg[e]' the right to vote means to 'place a barrier or prerequisite to voting, or otherwise make

it more difficult to vote.'" *Tex. LULAC*, 978 F.3d at 145 (quoting *TDP II*, 978 F.3d at 191. Because

Section 7.04 did not make it "more difficult to vote, relative to the baseline," it has not abridged

the right to vote in violation of the Constitution. *TDP II*, 978 F.3d at 191.

ii.    The rule regarding unsolicited ABBMS does not unduly burden the right to vote.

483.    Even assuming Section 7.04 made it more difficult to vote, judgment in favor of

Defendants is still warranted because (1) Section 7.04 does not implicate the right to vote; and (2)

Section 7.04 codified a reasonable, non-discriminatory rule regarding unsolicited ABBMs whose burdens are justified by important regulatory interests.

484.    First, the Constitution does not include a freestanding right to vote in whatever manner Plaintiffs deem most convenient. *See TDP I*, 961 F.3d at 409 (citing *McDonald* 394 U.S. at 807) (distinguishing between the right to vote" and the "claimed right to receive absentee ballots"). The Election Code grants voters multiple alternatives by which to procure an ABBM, *see*, *e.g.*, Tex. Elec. Code §§ 84.001(c), 84.012, 276.016(c), as well as the option to vote by personal appearance. Where, as here, "plaintiffs are welcome and permitted to vote, and there is no indication that they 'are in fact absolutely prohibited from voting *by the State*,' . . . the right to vote is not at stake." *TDP I,* 961 F.3d at 404 (emphasis in original) (internal citations omitted). Judgment in favor of Defendants is warranted on this ground alone.

485.    *Second*, the challenged provision passes the balancing test laid out in *Anderson-Burdick*.

a.    Any Burden on Voters is Slight

486.    In *Crawford*, the Supreme Court considered an Indiana state law that required voters to present government-issued photo identification when voting. The Supreme Court noted that for voters without ID, the law would impose on them "the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph. *Crawford*, 553 U.S. at 198. Nonetheless, it concluded that the inconveniences "do[] not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." Id.

487.    The inconvenience posed by Section 7.04 is far less than what voters experience in *Crawford*. Here, if voters want to obtain an ABBM from an election official, all they need do is ask

for one, whether that be by phone, email, letter, or in person. Voters may download an ABBM from the county's election website or the Secretary of State's website. *See* Tex. Elec. Code § 84.0121 (requiring early voting clerk to post ABBM online in format that allows person to easily complete the application before printing); *see also id.* at § 276. 016(c). Voters also have the option of creating their own ABBM and submitting that to the early voting clerk. The Election Code expressly states that voters are "not required to use an official application form." Tex. Elec. Code § 84.001(c). So long as the ABBM contains the required information, and the voter is eligible to vote by mail, the early voting clerk will accept the voter's unofficial ABBM.

488.     In addition, Section 7.04 is narrowly drawn. It only regulates public officials and election officials acting in their official capacity because that was where—in the State's determination—the highest risk of voter confusion originated. *See infra ____.* It does not prevent campaigns, political parties, or non-profits from circulating ABBMs to voters that they know are qualified to vote by mail. The record in fact shows that campaigns and political parties regularly submit public information requests to obtain lists of registered voters who are eligible to vote by mail and then send those voters ABBMs unprompted. Sept. 20, 2023 Tr. at 1276:12–14; [Citation] The record also shows that non-profits will often distribute ABBMs to their members and constituencies. [Citation]

489.     Plaintiffs contend the prohibition on public expenditures to "facilitate third-party distribution" of ABBMs undermine the ability of non-profits to disseminate ABBMs to voters. *See* Joint Ex. 1 at 60 (Section 7.04 codifying Tex. Elec. Code § 276.016. The Constitution, however, does not confer on states or local governments a positive obligation to fund non-profits, even in the context of elections. The record shows that Texas provides voters with a medley of options by

which to obtain an ABBM that involve little to no effort on their part. Texas need not "afford every voter multiple infallible ways to vote." Tex. LULAC, 978 F.3d at 146.

490.    Plaintiffs also contend that some voters may find the act of requesting a ballot difficult, but "mail-in ballot rules that merely make casting a ballot more inconvenient for some voters are not constitutionally suspect." *Tex. LULAC*, 978 F.3d at 146 (citing *TDP I*, 961 F.3d at 405). "[T]here will always be [] voters for whom, through no fault of the state, getting to the polls is 'difficult' or even 'impossible.'" *TDP I*, 961 F.3d at 415 (Ho, J., Concurring) (quoting *McDonald*, 394 U.S. at 810). "[T]hat is a matter of personal hardship, not state action." *TDP I*, 961 F.3d at 415 (Ho, J., Concurring) (quoting *McDonald*, 394 U.S. at 810).

b.    The State's Interests are Significant

491.    Because Section 7.04's rule regarding unsolicited ABBMs imposes little to no burden on voters, Texas only has to articulate an important regulatory interest to which the challenged provisions is rationally related. Texas meets that burden.

492.    The challenged provision serves Texas's interest in enforcing its laws and clarifying ambiguities in the Election Code. *See La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 412 (W.D. Tex. 2022) (quoting *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015)) (finding that Texas has an "intrinsic right to enact, interpret, and enforce its own laws"); *see also Hollins,* 620 S.W.3d at 410. The record shows that despite the lack of authority in the Election Code, multiple county election offices were taking *ultra vires* action by distributing ABBMs to voters who had not requested one. On some occasions, county election administrators were going so far as conduct a mass mailing. Section 7.04 addresses this problem by making the prohibition on unsolicited

ABBMs explicit and attaching penalties to any public official or election official who, in their official capacity, flouts this limitation.

493.    In addition, "[t]he Code's text and history [] reflect the Legislature's . . . intent that voting by mail be the exception, rather than the rule." *Hollins*, 620 S.W.3d at 409; *see In re State*, 602 S.W.3d 549, 558 (Tex. 2020) ("The history of absentee voting legislation in Texas shows that the Legislature has been both engaged and cautious in allowing voting by mail."). Mass mailing of ballot applications undercuts this "very deliberate[]" statutory scheme, particularly to the extent these mailings pick up voters who are ineligible to vote absentee. *See Hollins*, 620 S.W.3d at 409 (quoting *In re State*, 602 S.W.3d at 558). Texas therefore has an interest in eliminating a practice that undermines its decision "to authorize only discrete categories of Texans to vote by mail, and its intent that submission of an application be an action with legal gravity." *Id.*

494.    Relatedly, the challenged provision promotes Texas's interests in uniformity. *See Tex. LULAC*, 978 F.3d at 147–48 (recognizing uniformity and predictability in election administration as important government interests.). The record establishes that despite the Supreme Court's decision in *Hollins,* counties had diverging practices regarding the distribution of ABBMs, *compare* Sept. 19, 2023 Tr. at 1131:15–1 and Sept. 13, 2023 Tr. at 760:6–20, which undermined Texas's goal of "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of [the election] code." Tex. Elec. Code § 31.003. Section 7.04 addresses this by making explicit what was previously silent in the Election Code and imposing penalties on officials that violate the rule on sending unsolicited applications.

495.    The challenged provision also advances Texas's important interest in reducing voter confusion and voter fraud. The record shows that voters treat official communications from

government officials differently than they treat the mail they receive from a campaign or nonprofit. Oct. 18, 2023 Tr. at 4447:3–23. Accordingly, there is a risk that voters may mistakenly believe that they are qualified to vote by mail if they receive an ABBM from a government official and enter false information on the ABBM, which is a criminal offense. Oct. 18, 2023 Tr. at 4438:16–4439:23, 4446:16–4447:23; *see also* Tex. Elec. Code § 276.013(a)(3)(B) (defining voter fraud as including false information on ABBM). That risk is not as acute when campaigns or non-profits circulate ABBMs or when ABBMs are posted for a general audience on a website.

496.    Furthermore, the evidence submitted at trial shows that vote harvesters, as part of the "seeding phase," work to proliferate as many ABBMs as possible in order to create a pool of ballots that can be harvested from. Oct. 16, 2023 Tr. at 3915:9–3916:24. Mass mailings of ABBMs could help facilitate the seeding phase, allowing vote harvesters to intercept ABBMs. *See* Sept. 19, 2023 Tr. at 1132:2–18. The record establishes—and the Supreme Court and the Fifth Circuit have both recognized—that "mail-in voting" is "far more vulnerable to fraud" than other forms of voting. *Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (en banc); *see also Crawford*, 553 U.S. at 195–96 & n.12; *Veasey v. Perry*, 71 F. Supp. 3d 627, 676 (S.D. Tex. 2014) (finding that "[m]ail-in ballots are not secure"). Texas therefore has "an indisputably . . . compelling interest" in addressing vulnerabilities in its mail-voting program and "preserving the integrity of its election process." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2347 (2021) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).

497.    Finally, printing ABBMs and distributing them to voters who have not requested them can incur a significant expense that the legislature deemed unnecessary given the limited resources counties have when conducting elections. Accordingly, by prohibiting public officials

and election officials from both issuing unsolicited ABBMs and funding the efforts of third parties to distribute ABBMs, Section 7.04 promotes the important government interest in the efficient use of resources for election administration. Oct. 18, 2023 Tr. at 4446:16–22; *see Crawford*, 553 U.S. at 196 (recognizing interest in orderly administration); *see also SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 277–78 (2d Cir. 2021) (recognizing interest in conserving limited resources).

498.    These interests justify Section 7.04's provision related to unsolicited ABBMs regardless of the level of review.

## V.    Senate Bill 1 Does Not Violate the Fourteenth and Fifteenth Amendments.

499.    A Fourteenth Amendment equal protection claim premised on a facially neutral law requires a plaintiff to prove by a preponderance of the evidence that the legislature enacting the challenged statute had a discriminatory intent and that the legislation had a discriminatory effect. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977) ("*Arlington Heights*"); U.S. Cons. amend. XIV, § 1.

500.    Similarly, the Fifteenth Amendment enfranchised voters nationwide, regardless of race or color, and is an independent source of authority to protect against discrimination in voting. "The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy . . . not to be discriminated against as voters in elections to determine public governmental policies or to select public officials . . . ." *Terry v. Adams*, 345 U.S. 461, 467 (1953).

501.    Discriminatory intent for Fourteenth and Fifteenth Amendment claims requires proof that the defendants used race as a motivating factor in their decisions. *Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality opinion) (citing *Arlington Heights*, 429 U.S. at 265).

502.    "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Veasey* II, 830 F.3d at 230 (quoting *Arlington Heights*, 429 U.S. at

265). "Racial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Id.* (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). While discriminatory intent need not be the only motive, a violation occurs when the evidence shows that the entity adopted a policy at issue "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

503.    If an inference is required for the evidence to be probative as to discriminatory animus, then the evidence is circumstantial—not direct. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897–98 (5th Cir.2002).

504.    Courts apply the Arlington Heights factors when assessing circumstantial evidence to determine whether there is discriminatory intent. Under *Arlington Heights*, the "starting point" of the inquiry is whether the challenged action "bears more heavily on one race than another." 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). If the disparate impact is clearly "unexplainable on grounds other than race," then a court may infer racial animus. *Id.* If not, the court must perform "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.*

505.    The Supreme Court has provided five *Arlington Heights* factors to guide this inquiry: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Id.*; *see also Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir.

2016) (en banc) (plurality opinion) (quoting Overton v. City of Austin, 871 F.2d 529, 540 (5th Cir. 1989)).

506.    These factors are not exhaustive, and the ultimate determination requires examining "the totality of the circumstances." *Veasey*, 830 F.3d at 230, 235 (plurality opinion). Legislators' awareness of a discriminatory effect "is not enough: the law must be passed because of" that discriminatory effect. *Id*. at 231.  The challenger must show that the discriminatory effect was "a substantial or motivating factor" leading to the enactment of the statute. *Id*. (quotation marks omitted). If the challenger meets that burden, defendants must "demonstrate that the law would have been enacted without this factor." *Id*.

507.    In meeting the *Arlington Heights* factors a plaintiff must overcome the "presumption of legislative good faith." *Wal-Mart, 945 F.3d at 214*. Further, the Fifth Circuit has made clear that legislators' "awareness of a discriminatory effect is not enough: the law must be passed because of that discriminatory effect." *Id*. (internal quotation marks omitted).

508.    Plaintiffs "bear the burden to show that racial discrimination was a substantial or motivating factor behind enactment of the law; if they meet that burden, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Veasey*, 830 F.3d at 231 (cleaned up, with emphasis added) (quoting *Hunter*, 471 U.S. at 228).

### A.  The historical background of SB 1.

509.    "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 267, but the Supreme Court has cautioned that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value," *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20  (1987) (resolving that laws in force during and just after the Civil War were

not probative of the legislature's intent many years later). Supreme Court in *Shelby County* recently counseled against undue reliance on noncontemporary evidence of discrimination in the voting rights context. *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 535–36, 556–57 (2013) (striking down Section 4(b) of the Voting Rights Act because "the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions").

510.    In *Abbott*, the Texas legislature enacted a 2013 redistricting plan in response to a challenge to its original 2011 plan. *Abbott v. Perez*, 138 S. Ct. 2305, 2310 (2018). A three-judge Texas court invalidated the 2013 plan on the ground that it was tainted by the legislature's discriminatory intent in passing the predecessor 2011 plan. *Id.* at 2318. The Supreme Court reversed, stating "there can be no doubt about what matters: It is the intent of the 2013 Legislature." *Id.* at 2325. Because "it was the plaintiffs' burden to overcome the presumption of legislative good faith and show that the 2013 Legislature acted with invidious intent," the Texas court erred in reversing the burden of proof and imposing on the state "the obligation of proving that the 2013 Legislature had experienced a true 'change of heart' and had 'engage[d] in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.'" *Id.* (citation omitted). There is no requirement that the government show that a subsequent legislature "somehow purged the 'taint'" of a prior legislature, such as by expressly disavowing the earlier body's discriminatory intent. *Id.* at 2324. Rather, as stated in *Abbott*, all that matters is the intent of the legislature responsible for the enactment at issue, and it is the "plaintiffs' burden to overcome the presumption of legislative good faith and show that" the legislative body "acted with invidious intent." *Id.* at 2325.

**B. The specific sequence of events leading up to SB 1.**

511.    In *Arlington Heights*, the Supreme Court explained that courts should look to whether, for example, a legislative decision was precipitated by a sudden change in circumstances that suggests race was a motivating factor. *See id*. at 267 & n.16, 97 S. Ct. 555 (collecting cases and providing as an example a sudden change in zoning laws after learning of plans to erect integrated housing).

512.    Senate Bill 1 was passed in response to the irregularities during the 2020 election caused by the COVID-19 pandemic.

513.    The November 2020 election took place during the COVID-19 pandemic and was an unusual election. September 12, 2023 Tr. at 335:1–5. That election had one of the highest turnouts on record. *Id.* at 18-20.

514.    Several incidents occurred during the 2020 election that warranted legislative attention. During the 2020 Election, the Secretary of State's Office received complaints about how Travis County handled poll watchers at that Central Count Station. October 18, 2023 Tr. at 4591:2–6. Harris County, in particular, had numerous issues during the 2020 election, including the use of drive through voting for all voters and mailing unsolicited ABBMs to voters. Id. at 4437:5–9.

515.    The Secretary had to seek a restraining order against Harris County to prevent it from engaging in the aforementioned *ultra vires* acts during the 2020 election. Oct. 18, 2023 Tr. at 4441:7–12. It became apparent to the Legislature that revisions were needed to clarify existing provisions in the Election Code.

516.    Plaintiffs presented no evidence that the Legislature was reacting to anything other than the electoral disputes that arose during the COVID-19 pandemic.

## C. Departures from the normal procedural sequence during the decision-making process when passing SB 1.

517.    Plaintiffs failed to meet their burden showing that the Legislature departed from normal procedures in passing SB 1.

518.    Consideration of procedural departures is a difficult inquiry, because on the one hand, "[d]epartures from the normal procedural sequence ... might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. On the other hand, "objection[s] to typical aspects of the legislative process in developing legislation," such as increasing the number of votes a law requires for passage, may not demonstrate an invidious intent, standing alone. *Cf. Operation Push*, 932 F.2d at 408–09, 408 n.6. Yet, context matters, and evidence of procedural departures provides one potential link in the circumstantial totality of evidence the district court must consider. *Veasey v. Abbott*, 830 F.3d 216, 237 (5th Cir. 2016).

519.    The Fifth Circuit in *Veasey*, 830 F.3d at 237–38, found that "virtually unprecedented" actions in the Legislature that could lend credence to an inference of discriminatory intent, including: : (1) getting special permission to file the bill under a low number reserved for the Lieutenant Governor's legislative priorities; (2) Governor Perry's decision to designate the bill as emergency legislation so that it could be considered during the first sixty days of the legislative session; (3) suspending the two-thirds rule regarding the number of votes required to make SB 14 a "special order"; (4) allowing the bill to bypass the ordinary committee process in the Texas House and Senate; (5) passing SB 14 with an unverified $2 million fiscal note despite the prohibition on doing so in the 2011 legislative session due to a $27 million budget shortfall; (6) cutting debate short to enable a three-day passage through the Senate; and (7) passing resolutions

to allow the conference committee to add provisions to SB 14, contrary to the Legislature's rules and normal practice.

520.    None of the unusual procedural maneuvers in *Veasey* were present in the passage of SB 1.

521.    Governor Abbott ordered the second special session of the 87th Texas Legislature in August 2021 after Democrats left the state to deprive the Legislature of a quorum during regular session and the first special session, and again listed legislation strengthening the integrity of elections in Texas as a topic for consideration. St. Defs. Ex. 293, p. 4:22–25.

522.    The normal House rules were observed in the passage of SB 1. St. Defs. Ex. 432, p. 91:16–21. The House held a 13-hour floor debate regarding SB 1 on August 26, 2021. HAUL-MFV Ex. 106, p. 4:10–15. During that floor debate, the house considered amendments to Senate Bill 1. *See generally* HAUL-MFV Ex. 179, pp. 79:13–322:25; St. Defs. Ex. 192, pp. 1–2. The House passed SB 1, as amended, on August 27, 2021, with 80 yeas, 41 nays, and 1 present not voting. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903; HAUL-MFV Ex. 106, p. 57:8–16; St. Defs. Ex. 301, p. 59:4–5. The House and Senate convened a conference committee on August 29, 2021. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903. The House adopted the conference committee report for SB 1 on August 31, 2021, with 80 yeas, 41 nays, and 1 present not voting. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903; HAUL-MFV Ex. 105, p. 13:12–19. The Senate adopted the conference committee report for SB 1 on August 31, 2021, with 18 yeas and 13 nays. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903. Senate Bill 1 was approved on

September 7, 2021, and became effective on December 2, 2021. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903.

523.    Plaintiffs, unable to identify procedural departures in the passage of SB 1 during the second special session, focus on alleged procedural errors relating to predecessor bills debated during the preceding regular session. Those bills, however, were not passed, none of the alleged procedural departures rose to the level of those identified in *Veasey*, and each attempt to deviate from normal procedure allegedly received bipartisan pushback.

524.    The Court finds that the second *Arlington Heights* factor weighs in favor of Defendants because there is no evidence that the Legislature departed from normal procedures when passing SB 1.

### D. Departures from the normal substantive factors during the decision-making process when passing SB 1.

525.    Plaintiffs failed to meet their burden showing that the Legislature discounted substantive factors that it had considered in the past when passing SB 1.

526.    In evaluating whether a law was passed with discriminatory intent, courts may look to substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267.

527.    The *Arlington Heights* Court cited, as an example of substantive departures *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970), where a city refused to rezone the site of a former school so the plaintiffs could build low-income housing on the site when all the surrounding area was zoned for high-density residential buildings. *See also Familias Unidas Por La Educacion v. El*

*Paso Indep. Sch. Dist.*, 633 F. Supp. 3d 888 (W.D. Tex. 2022) , 899  (discussing alleged substantive

departures by a school district in selecting predominately Mexican American schools for closure).

528.    Here, there are no allegations by Plaintiffs that the Legislature failed to consider

substantive factors related to election integrity that it had considered in the past during the second

special session that passed SB 1.

### e.  The legislative history of SB 1.

529.    "The legislative or administrative history may be highly relevant, especially where

there are contemporary statements by members of the decisionmaking body, minutes of its

meetings, or reports." *Arlington Heights*, 429 U.S. at 268. "In some extraordinary instances the

members might be called ... to testify concerning the purpose of the official action ...." *Id.* As the

Supreme Court has long recognized, however, "[p]lacing a decisionmaker on the stand is ...

'usually  to  be  avoided'" because  "judicial  inquiries  into  legislative  or  executive  motivation

represent a substantial intrusion into the workings of other branches of government." *Id.* at 268

n.18.

> 1.  Courts must also consider the evidence in context. In evaluating "contemporary
>
> statements by members of the decisionmaking body, minutes of its meetings, or
>
> reports," *Arlington Heights*, 429 U.S. at 268, a court must be aware that the
>
> statements of a handful of lawmakers may not be probative of the intent of the
>
> legislature as a whole. *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What
>
> motivates one legislator to make a speech about a statute is not necessarily what
>
> motivates scores of others to enact it ...."); *see also League of Women Voters of Fla.*
>
> *Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 939 (11th Cir. 2023) ("[A] statement or
>
> inquiry by a single legislator would constitute little evidence of discriminatory intent

on the part of the legislature."). And the views of an earlier legislature are generally not probative of the intent of a later legislature, *see, e.g., Abbott*, 138 S. Ct. at 2325; *United States v. Dumas*, 64 F.3d 1427, 1430 (9th Cir. 1995), particularly when the subsequent legislature has "a substantially different composition," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 n.22, (2021) (citation and quotation marks omitted).

## VI.    Senate Bill 1 Complies with Section 208 of the Voting Rights Act.

### A.  Legal Standard for Section 208 Right to Assistance

2.  "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019); *see also Henrikson v. Guzik*, 249 F.3d 395, 398 (5th Cir. 2001) ("When interpreting a statute, the starting point is the statute's text.").

3.  If the text is subject to differing interpretations, the court then examines "its legislative history, predecessor statutes, pertinent court decisions, and any post-enactment administrative interpretations" for guidance. *Salazar v. Mamon*, 750 F. 3d 514, 518 (5th Cir. 2014) (quoting *Rogers v. San Antonio*, 392 F. 3d 758, 761 (5th Cir. 2004)).

4.  Section 208 of the VRA states that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by *a person* of the voter's choice, other than the voter's employer or agent of that

employer or officer or agent of the voter's union." 52 U.S.C. § 10508 (emphasis added).

5.  Congress's use of an indefinite article in Section 208 is significant. Section 208 mentions assistance from "*a* person of the voter's choice," *id.* (emphasis added), and "does not say that a voter is entitled to assistance from *the* person of his or her choice or *any* person of his or her choice." *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020).

6.  "In other words, the statute employs the indefinite article 'a' which by its very term is non-specific and non-limiting, as opposed to the definite article 'the,' which by its terms is specific and limiting." *Id.*

7.  The Supreme Court explained in *McFadden v. United States*, "[w]hen used as an indefinite article, 'a' means '[s]ome undetermined or unspecified particular.'" 576 U.S. 186, 191 (2015) (quoting Webster's New International Dictionary 1 (2d ed. 1954)).

8.  Applying that meaning here, Section 208 recognizes that covered voters have the right to select a someone as an assistor, as opposed to having one chosen for them, but it does not guarantee them their first choice; nor does it foreclose Texas from enacting reasonable regulations on whom might assist voters and the procedural prerequisites assistors must follow. *See Priorities USA*, 487 F. Supp. 3d at 619.

9.  Instead, the key question is whether covered voters retain a real choice in who helps them navigate the electoral process. *See Ray v. Tex*as, No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008) (upholding Texas

statute that made it a criminal offense if a person signed multiple ABBMs as a witness); *Democracy N. C. v. N. C. State Bd. of Elections*, 476 F. Supp. 3d 158, 233–36 (M.D.N.C. 2020) (enjoining a statute that limited assistance to a voter's near relative or legal guardian when requesting an absentee ballot.)

10. Throughout this litigation, Plaintiffs have raised several arguments in support of a contrary interpretation of Section 208. None are persuasive.

     i.    The language of Section 208 permits reasonable regulations.

11. *First*, Plaintiffs contend that Section 208's "other than" clause—which states that a covered voter's right to an assistor excludes their employer or labor union—should be read as a prohibition on "all other limitations." ECF 643 at 23. The problem with this position is that courts "must construe statutes so as to give meaning to all terms," *In re McBryde*, 120 F.3d 519, 525 (5th Cir. 1997), yet Plaintiffs would have this Court ignore Congress's decision to employ the indefinite article "a" when describing covered voters' selection of potential assistors.

12. The Court "cannot accept" a construction that renders statutory text "mere surplusage," *id.*, particularly when the statute demonstrates that Congress, if it wanted, knew how express a lack of restriction when selecting one of a specified class. Congress stipulated that "a*ny* voter who requires assistance" has a right pursuant to Section 208, but it characterized that right as being "given assistance by *a person* of the voter's choice." 52 U.S.C. § 10508 (emphasis added).

13. This textual distinction (between "any" and "a") "must be given meaning," and it "suggests that some state law limitations on the identity of persons who may

assist voters [are] permissible." *Priorities USA*, 487 F. Supp. 3d at 619*; see VanDerStok v. Garland,* 86 F.4th 179, 203 n. 5 (5th Cir. 2023) (noting that "textual distinction" was "particularly powerful" because Congress knew how to use another term when it wanted). After all, the word "any" encompass any person within a class, while the word "a" anticipates that some options within a class may be unavailable.

14. The other problem with Plaintiffs' argument is that it leads to absurd results. Under Plaintiffs' interpretation, Texas could not even ban felons from providing voter assistance because that could "deprive voters of their chosen assistors" by preventing them from choosing a felon. ECF 644 at 20 (emphasis added).

15. The better interpretation of Section 208 is that by specifically exempting them, Congress permitted States to categorically bar covered voters' employers and labor-union agents from acting as assistors. All other restrictions are subject to a reasonableness analysis to determine whether the regulation abridges or denies covered voters' right to assistance of a person of their choice and whether the burden is sufficiently justified by state interests. *See Ray*, 2008 WL 3457021, at *7 (applying *Anderson-Burdick* analysis); *cf. Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

16. This interpretation not only gives effect to the entirety of Section 208, but also avoids imputing to Congress a radical intent that is unsupported in the statute's text and legislative history.

ii.   Legislative history acknowledges the need for States to protect voters from exploitation and abuse.

530.

17.  *Second*, Plaintiffs contend that the history of Section 208 demonstrates an intent to preclude any restrictions on voting assistance. This assertion, however, contradicts the legislative history. Congress explained when enacting Section 208 that it preempts state election laws "only to the extent that they unduly burden the right recognized in [Section 208], with that determination being a practical one dependent upon the facts." S. REP. NO. 97-417, at 63 (1982).

18.  In fact, the Senate Judiciary Committee acknowledged that voters who need assistance "are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." S. Rep. No. 97–417, at 62 (1982). The Committee thus recognized that Section 208 did not interfere with "the legitimate right of any State to establish necessary election procedures" so long as they are "designed to protect the rights of voters." *Id.* at 63.

19.  Instead, the legislative history shows Congress intended to preempt state laws that "unduly burdened" a covered voter's right such that the voter lacked a genuine choice when selecting an assistor. That history does *not* show an appetite to upend state election laws designed to protect voters and reasonably regulate assistance.

20.  Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). If Congress intended to preempt States from regulating voting assistance entirely, it would have said so expressly in Section

208's text and in the legislative history. Congress would not have sought "to effect such a fundamental change in law through circuitous means." *Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017).

21. Congress, however, said or did no such thing. Section 208 does not preempt all other limitations on voting assistance.

    iii.    Plaintiffs' Precedents Do Not Support Their Arguments.

22. *Third,* Plaintiffs rely upon the Fifth Circuit's decision in *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), as purported authority that Section 208 does not permit any limitation or regulation of either who may serve as an assistor or the prerequisites an assistor must meet before she may be selected. This reliance is misguided, as *OCA Great Houston* turned on a narrow statutory question not implicated by the Challenged Provisions.

23. In *OCA-Greater Houston*, the Fifth Circuit addressed a state law purporting to limit the type of assistance an interpreter could provide covered voters when not in the presence of a ballot. *Id.* at 614–15. The court therefore had opportunity to comment on the scope of voting assistance contemplated by Section 208—specifically, whether the statute's protections extended to acts outside the ballot box. *Id.* at 614–16.

24. Indeed, the Fifth Circuit characterized the question presented in *OCA-Greater Houston* as "at bottom . . . how broadly to read the term 'to vote' in Section 208 of the VRA." *Id.* at 614. The lower court, likewise, stated that "[t]he question at the heart of this case is whether Section 208 of the VRA . . . is confined to the ballot-

box activities of reading and marking the ballot, or covers polling place activities beyond the ballot box." *OCA-Greater Houston v. Texas*, No. 1:15-CV-00679-RP, 2016 WL 9651777, at *8 (W.D. Tex. Aug. 12, 2016).

25. Ultimately, the Fifth Circuit concluded that the term "vote" has an expansive definition under the VRA, which "plainly contemplate[d] more than the mechanical act of filling out the ballot sheet." *OCA-Greater Houston*, 67 F.3d at 615. Assistance to vote therefore "include[d] steps in the voting process before entering the ballot box, . . . and it include[d] steps in the voting process after leaving the ballot box[.]" *Id.*; *see also* ECF 424 at 28.

26. The Challenged Provisions here, unlike the Election Code provision at issue in *OCA-Greater Houston*, do not predicate the assistance voters can receive on the various steps in the voting process. Instead, the Challenged Provisions set conditions and procedural prerequisites a person must meet before serving as a voter assistor, such as providing county election officials with their name and relationship to the voter, which the court, in *OCA-Greater Houston*, did not address. *See*, *e.g.*, §§ 6.01, 6.03, 6.05, 6.07.

27. Arguing to the contrary, ECF 643 at 22, Plaintiffs partially cite a single line from the Fifth Circuit's opinion, which reads, "In combined effect, these provisions grant to physically disabled and English-limited Texas voters the right to select any assistor of their choice, subject only to the restrictions expressed in Section 208 of the VRA itself." *OCA-Greater Houston*, 867 F.3d at 608. The sentence, however, refers to Chapters 61 and 64 of the Texas Election Code, which the Fifth Circuit

had described in detail in the preceding paragraphs. *Id.* at 607–08. The Fifth Circuit drew no conclusions about whether Section 208 permitted States to enact regulations of who may serve as an assistor or what prerequisites assistors must satisfy. *Id.*

28. Moreover, even if the sentence referred to Section 208, the observation "has the distinctive earmarks and weaknesses of dictum." *Matter of Cajun Elec. Power Co-op., Inc.*, 109 F.3d 248, 256 (5th Cir. 1997). Not only could it "have been deleted without seriously impairing the analytical foundations of the [Fifth Circuit's] holding," but "being peripheral" it likely did not "receive the full and careful consideration of the court that uttered it." *Id.* (citing *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1084 (7th Cir.1986)).  For these reasons as well, the quoted line in *OCA-Greater Houston* is not controlling here.

29. Under a proper understanding of Section 208, Plaintiffs' claims must fail.

**B. Transporting Voters to Vote Curbside (Section 6.01)**

30. Section 6.01 of SB 1 does not abridge or deny covered voters their right to receive assistance from a person of their choice.

31. It merely sets out procedural prerequisites that a person must follow when assisting a covered voter: specifically, it requires a person who "simultaneously" provides seven or more curbside voters with transportation to complete and sign a form reporting their name, address, and whether they are only providing transportation or also serving as an assistant to the voters.

32. Accordingly, Section 6.01 does not limit the scope of assistance voters may receive; nor does it predicate the assistance voters can receive on where they are in the

voting process. Once the assistor satisfies the procedural perquisite by completing and signing the specified form, the person assisting the voter may perform any action necessary to make a vote effective.

33. In addition, Section 208 of the VRA does not prohibit States from imposing reasonable limits on whom voters can select as an assistor. *Ray*, 2008 WL 3457021, at *7; *Qualkinbush v. Skubisz*, 357 Ill. App. 3d 594, 610 (2004).

34. However, even if Section 208 precluded such laws, Section 6.01 would pass muster since the challenged provision does not prohibit any individual or category of individuals from acting as an assistor. *See*, *e.g.*, s *Arkansas United v. Thurston*, 626 F. Supp. 3d 1064, 1088 (W.D. Ark. 2022) (upholding law tracking names and addresses of assistors).

35. Any person who otherwise satisfies Tex. Elec. Code § 64.032(c)—in that the person is not the "voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs"—may act as an assistor upon request once he or she provides the stipulated form and information.

36. While it is possible that some assistors may refuse to comply with Section 6.01, nothing in Section 208 of the VRA guarantees voters their first choice of assistor. If anything, Section 208 acknowledges that the person the voter selects may refuse to provide assistance. 52 U.S.C. § 10508 (stating the voter "*may* be given assistance of by *a person* of the voter's choice") (emphasis added).

37. Compliance with both federal and state regulation therefore is not "a physical impossibility." *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

The two statutes can "operate harmoniously." *Arkansas United*, 626 F. Supp. 3d at 1088.

38. The other form of conflict preemption arises when "state law presents an obstacle to federal law." *Univ. of Tex. Sys. V. Alliantgroup* LP, 400 F. Supp. 3d 610, 616 (S.D. Tex. 2019). However, the evidence presented at trial shows that Section 6.01 does not stand in the way of "the accomplishment and execution of the full purposes and objectives of Congress" when it enacted Section 208. *Gade*, 505 U.S. at 98.

39. *First*, Section 6.01 advances Section 208's objective that voters who are blind, have a disability, or are unable to read and write are able to vote without "fear of intimidation and manipulation;" it does not impede that objective. S. Rep. 97–417, at 241; *See Qualkinbush*, 357 Ill. App. 3d at 610 (noting the purpose of Section 208 was to protect the voter from undue influence and manipulation).

40. In fact, Section 6.01 advances that objective.

41. For example, the evidence developed at trial shows that curbside voting can expose covered voters to misconduct and abuse. Multiple county election officials testified that the set-up of curbside voting allowed individuals within the vehicle to see and hear how voters cast their ballot. *See, e.g.*, Sept. 19, 2023 Tr. at 1102:16–22, Sept. 14, 2023 Tr. at 828:19–829; (expressing "concerns about privacy of voters when utilizing curbside voting"); *see also* Oct. 18, 2023 Tr. at 4423:1–10 (noting that the Secretary "received concerns about voters' privacy when a person transports voters to vote curbside but does not exit the vehicle").

42. The Bexar County Election Administrator also provided specific examples of incidents where "campaigns br[ought] vans of voters to vote curbside," but then voting was "not private" because "the driver would not exit the van." Sept. 19, 2023 Tr. at 1102:16–1103:2. The driver would thus "hear which party ballot the voter . . . pick[ed]." *Id.* at 1103:3–5. She also expressed concern that, on several occasions, "the person driving the van was forcing people to vote a certain way." *Id.* at 1103:6–16.

43. Section 6.01 addresses these vulnerabilities by giving county election officials the name and address of the person transporting and assisting the voter. In the event an election worker observes misconduct, or the voter files a complaint, the authorities can use this information to initiate an investigation. That is why the Bexar County Election Administrator thought Section 6.01 "increased the protection of voters." Sept. 19, 2023 Tr. at 1104:22–25.

44. Indeed, Section 6.01 protects the right of voters. It is exactly the type of "voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote" that Congress intended to "be established" when it enacted Section 208.  S. Rep. 97–417, at 241.

45. *Second,* any burden imposed on prospective assistors by 6.01 is minor. All Section 6.01 requires is that a person who transports seven or more voters to vote complete and sign a prescribed form.

46. Even if some potential assistor objects to furnishing the information, the text and legislative history of Section 208 make clear that Section 208 does not preempt

state law simply because someone somewhere has an idiosyncratic fear or objection. Section 208 instead preempts laws that "unduly burden" a voter's right to choose an assistor of their choice. S. REP. NO. 97-417, at 63 (1982). A commonplace reporting requirement does not meet that threshold.

47. In any event, the evidence at trial shows that any resulting inconvenience did not deter individuals from acting as assistors in practice.

48. Plaintiffs "offer[ed] no examples of instances in which [] voters have been deprived of voting assistance" due to Section 6.01's requirement that a person transporting seven or more curbside voters complete and sign a form. *Priorities USA*, 487 F. Supp. 3d at 620. Neither they nor county witnesses could identify voters who had their request for transportation or assistance denied because of Section 6.01. Plaintiffs, likewise, could identify no individual who refused to transport or otherwise assist voters because of Section 6.01.

49. Plaintiffs' failure to establish that Section 6.01 deprived voters of their preferred assistor is fatal to their claim under any construction of Section 208.

50. Plaintiffs also did not establish that Section 6.01 is likely to discourage assistors from aiding voters in future elections. Although some people may be weary of providing county election officials with their name and address, Plaintiffs did not demonstrate that such sentiment was reasonable or pervasive. Indeed, other parts of the Election Code already require assistors in other contexts to furnish similar information. *See*, *e.g.*, Tex. Elec. Code §§ 64.032; 86.010(e)(2). Plaintiffs have not adequately

explained why a requirement to provide information would dissuade potential assistors in one context but not the other.

51. The Court therefore finds that Section 6.01 does not pose an obstacle to Section 208 of the VRA and is not preempted by it.

## C. Identifying Relationship to Voter (Sections 6.03, 6.05, and 6.07)

52. Sections 6.03, 6.05, and 6.07 of SB 1 do not abridge or deny voters their right to receive assistance from a person of their choice. The challenged provisions merely set out procedural prerequisites that a person must follow when assisting a voter.

53. Specifically, Section 6.03 requires that an assistor submit a form reporting the assistor's name, address, relationship to the voter, and whether the assistor received compensation from a candidate, campaign, or political committee. Section 6.05 requires a person who assists a voter in preparing a mail ballot to enter on the official carrier envelope the assistor's relationship to the voter and whether the assistor received compensation from a candidate, campaign, or political committee. Section 6.07 states that a space must appear on the reverse side of the official carrier envelope for a person helping the voter to indicate that person's relationship to the voter.

54. Accordingly, Sections 6.03, 6.05, and 6.07 do not limit the scope of assistance voters may receive; nor do they predicate the assistance voters can receive on where they are in the voting process. Once the assistor satisfies the procedural perquisites in 6.03 or 6.05, the person assisting the voter may perform any action necessary to make a vote effective. Further, Section 6.07 does not limit the action of any

potential assister; it merely requires the creation of a space on the carrier envelope for information to be provided.

55. Moreover, in all events, Section 208 of the VRA does not prohibit States from imposing reasonable limits on whom voters can select as an assistor. *Ray*, 2008 WL 3457021, at *7; *Qualkinbush*, 357 Ill. App. 3d at 610.

56. However, even if Section 208 precluded such laws, Sections 6.03, 6.05, and 6.07 would pass muster since the challenged provisions do not prohibit any individual or category of individuals from acting as an assistor. *See, e.g., Arkansas United*, 626 F. Supp. 3d at 1088 (upholding law tracking names and addresses of assistors).

57. Any person who otherwise satisfies Tex. Elec. Code § 64.032(c)—if that person is not the "voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs"—may act as an assistor upon request once he or she provides the information required by Sections 6.03, 6.05, and 6.07.

58. While it is possible that some assistors may refuse to comply with Section 6.03 and 6.05, nothing in Section 208 of the VRA guarantees voters their first choice of assistor. If anything, Section 208 acknowledges that the person the voter selects may refuse to provide assistance. 52 U.S.C. § 10508 (stating the voter "*may* be given assistance of by *a person* of the voter's choice") (emphasis added).

59. Compliance with both federal and state regulation is not "a physical impossibility." *See Gade,* 505 U.S. at 98. The two statutes can "operate harmoniously." *Arkansas United*, 626 F. Supp. 3d at 1088.

60. The other form of conflict preemption arises when "state law presents an obstacle to federal law." *Alliantgroup*, 400 F. Supp. 3d at 616. The evidence, however, shows that Sections 6.03, 6.05, and 6.07 do not stand in the way "to the accomplishment and execution of the full purposes and objectives of Congress" when it enacted Section 208. *Gade*, 505 U.S. at 98.

61. *First*, Congress enacted Section 208 "to avoid possible intimidation or manipulation of the voter." S. Rep. 97–417, at 240 (1982). To facilitate this aim, Congress exempted the "voter's employer or agent of that employer or officer or agent of the voter's union" from the pool of potential assistors because it recognized the influence these individuals could exert on voters.

62. Rather than impede federal policy, Sections 6.03 and 6.05 help *enforce* it by having assistors articulate their relationship to the voter, which lets county election officials flag violations of the law. Section 6.07 also helps enforce it by creating space for individuals assisting voters with mail ballots to identify their relationship to the voter.

63. *Second*, the burden imposed on potential assistors by is minor. All that Sections 6.03 and 6.05 require is that individual who assist a voter provide basic information about themselves and the assistance they provided. Section 6.07 imposes no burden on assistors.

64. Further, the evidence at trial shows that any resulting inconvenience did not deter individuals from acting as assistors in practice.

65. Plaintiffs "offer[ed] no examples of instances in which [] voters have been deprived of voting assistance" due to the requirement that assistors submit the stipulated form and information. *Priorities USA*, 487 F. Supp. 3d at 620. Neither they nor county witnesses could identify voters who had their assistance denied because of Sections 6.03, 6.05 or 6.07. Plaintiffs, likewise, could identify no individual who refused to transport or otherwise assist voters because of Sections 6.03, 6.05, or 6.07.

66. Plaintiffs' failure to establish that Sections 6.03, 6.05, or 6.07 deprived voters of their preferred assistor is fatal to their claim under any construction of Section 208.

67. Plaintiffs also did not establish that Sections 6.03, 6.05, or 6.07 are likely to discourage assistors from aiding voters in future elections. While some people may be weary of providing county election officials with the requested information, Plaintiffs did not demonstrate that such sentiment was either reasonable or pervasive.

68. To the contrary, the corporate representatives for Delta Sigma Theta and FIEL Houston testified that they were aware of no member who had refused to provide assistance to voters because of the relevant requirements. *See* Oct. 2, 2023 Tr. at 2124:8–19, 2124:25–2125:7; Oct. 4, 2023 Tr. at 2465:5–7. Plaintiffs have not adequately explained why fear of providing the requested form or information would deter third parties from offering assistance when it did not deter Plaintiffs' members.

69. Sections 6.03, 6.05, and 6.07 therefore do not pose an obstacle to Section 208 of the VRA and are not preempted by it.

## D. Oath of Assistance (Section 6.04)

70. Section 6.04 of SB 1 does not abridge or deny voters their right to receive assistance from a person of their choice.

71. Section 6.04 merely sets out procedural prerequisites that a person must satisfy when assisting a voter. *Cf. Arkansas United*, 626 F. Supp. 3d at 1088. Specifically, it amends the oath that a person must take before providing assistance to include the following affirmations:

(1)     the oath is under penalty of perjury;

(2)     the voter represented that he or she is eligible to receive assistance;

(3)     the assistor did not pressure or coerce the voter into choosing the assistor to provide assistance;

(4)     the assistor will not communicate information about how the voter has voted to another person; and

(5)     the assistor understands that if assistance is provided to someone ineligible for assistance, the voter's ballot may not count. *See* Tex. Elec. Code § 64.034.

72. Accordingly, Section 6.04 does not limit the scope of assistance voters may receive in violation Section 208; nor does it predicate the assistance voters can receive on where they are in the voting process. Once the assistor satisfies the procedural perquisite by taking the revised oath, the person assisting the voter may perform any action necessary to make a vote effective.

73. In their pleadings, Plaintiffs contend that the revisions made to the oath of assistance limit the type of assistance that voters can receive filling out their ballot. But this argument fails for at least two reasons.

74. *First*, even assuming the oath constrains assistors, nothing described in the revised oath constitutes protected conduct.

75. In accordance with the Fifth Circuit's ruling in *OCA-Greater Houston*, Section 208 encompasses any action necessary to make a vote effective. 67 F.3d at 615. Section 208 does not extend to actions that are both irrelevant to a ballot's effectiveness and violative of the voter's rights, such as informing a third-party about how the voter voted or pressuring the voter to accept someone as an assistor.

76. In addition, Section 208 only proscribes states from denying the right of voters who are blind, disabled, or unable to read and write to choose an assistor. If a voter does not meet these qualifications, then Section 208 does not apply, and the State may prohibit such a voter from receiving assistance and impose a penalty on noncompliance.

77. *Second*, Section 6.04 does not impose any new limitations on assistors. Even before SB 1, the Election Code made it an offense to "provid[e] assistance to a voter who is not eligible for assistance" or "to a voter who has not requested assistance or selected the person to assist the voter." Tex. Elec. Code § 64.036(a)(1), (4) ("Unlawful Assistance"); *see* Oct. 18, 2023 Tr. at 4427:8–11 (Keith Ingram confirming that was "an offense pre-SB 1 for a person to knowingly provide assistance to a voter who is not eligible for assistance").

78. A separate provision stipulated, "[i]f assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." *Id.* at § 64.037 ("Unauthorized Assistance Voids Ballot"); Oct. 18, 2023 Tr. at 4430:7–14 (Keith Ingram confirming that Election Code already stated that a voter's ballot may not be counted if the voter received assistance but was not eligible).

79. Similarly, the Election Code prohibited a person "in a polling place for any purpose other than voting" to "knowingly communicate[] to another person information that the person obtained at the polling place about how a voter has voted." Tex. Elec. Code § 61.006(a). ("Unlawfully Divulging Vote"); *see* Oct. 18, 2023 Tr. at 4429:1–17 (Keith Ingram confirming that it was "already an offense for an assistor to communicate information about how a voter voted").

80. And the Election Code made it an offense to cause any false or intentionally misleading statement, representation, or information to be provided to an election official, including through the oath of assistance. Tex. Elec. Code § 276.013; *see also* Tex. Penal Code § 37.02 ("Perjury"); Oct. 18, 2023 Tr. at 442:18–22 (Keith Ingram confirming "the assister oath [was] already under the penalty of perjury" before SB 1).

81. To the extent any improper limit on assistance exists, it originated with these underlying statutes, which Plaintiffs do not challenge. The revised oath simply informs assistors of their preexisting obligations, but it does not independently constrain assistors.

82. Furthermore, Section 208 of the VRA does not prohibit states from imposing reasonable limits on whom voters can select as an assistor. *Ray*, 2008 WL 3457021, at *7; *Qualkinbush*, 357 Ill. App. 3d at 610.

83. However, even if Section 208 precluded such laws, Section 6.04 would pass muster since the challenged provision does not prohibit any individual or category of individuals from acting as an assistor. *See, e.g.*, *Arkansas United*, 626 F. Supp. 3d at 1088 (upholding law tracking names and addresses of assistors).

84. Any person who otherwise satisfies Tex. Elec. Code § 64.032(c)—in that the person is not the "voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs"—may act as an assistor upon request once he or she swears or affirms the revised oath.

85. While it is possible that some assistors may object to the revised oath, nothing in Section 208 of the VRA guarantees voters their first choice of assistor. If anything, Section 208 acknowledges that the person the voter selects may refuse to provide assistance. 52 U.S.C. § 10508 (stating the voter "*may* be given assistance of by *a person* of the voter's choice") (emphasis added).

86. Compliance with both federal and state regulation is therefore not "a physical impossibility." *See Gade,* 505 U.S.at 98. The two statutes can "operate harmoniously." *Arkansas United*, 626 F. Supp. 3d at 1088.

87. The other form of conflict preemption arises when "state law presents an obstacle to federal law." *Alliantgroup*, 400 F. Supp. 3d at 616. The evidence, however, shows that Section 6.04 does not stand in the way "to the accomplishment and execution

of the full purposes and objectives of Congress" when it enacted Section 208. *Gade*, 505 U.S. at 98.

88. To the contrary, having assistors swear or affirm that they did not pressure or coerce the voter into choose them as an assistor squarely advances Congress's core objective: that voters who are blind, disabled, or unable to read or write avoid "fear of intimidation and manipulation" by choosing as an assistor someone they trust. S. REP. 97-417, at 241 (1982). If the person ultimately selected pressured or coerced the voter, then the choice no longer falls to the voter.

89. The remaining changes do not implicate federal policy, as Section 208 guarantees assistance only to voters who are blind, have a disability, or are unable to read or write and protects only actions necessary to make a vote effective. Texas has full authority to regulate conduct outside of these categories, such as reminding prospective assistors that assisting a voter who is ineligible for assistance and disclosing how the voter voted violate Texas law.

90. They are exactly the type of "voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote" that Congress intended to "be established" when it enacted Section 208. *Id.*

91. What's more, evidence at trial shows that the burden imposed on potential assistors by Section 6.04 is minor. Texas has required an oath of assistance for decades. *See* Acts 1985, 69th Leg., ch. 211, § 1, eff. Jan. 1, 1986. Yet there is no evidence the oath deterred individuals from becoming assistors prior to the recent controversy.

Plaintiffs instead contend that the problem lies in the substance of Section 6.04's changes, but there are multiple problems with this argument.

92. *First*, the revised affirmations track preexisting rules in Texas law that govern voting assistance and government oaths. The evidence developed at trial does not show that the underlying statutes impeded voters from finding assistors, and Plaintiffs have not argued that these statutes violate Section 208. It cannot be that informing assistors of their obligations under the law constitutes a violation of Section 208, but the obligation itself does not.

93. *Second*, Plaintiffs' witnesses who testified about Section 6.04 attributed the alleged deterrence to a fear of criminal prosecution. *See, e.g.*, Oct. 4, 2023 Tr. at 2537:5–9, 2538:8–14. But Plaintiffs did not establish that this fear was reasonable or pervasive. *See supra* at xx; *Texas State LULAC*, 52 F.4th at 256–57.

94. In the almost two years since SB 1 took effect, Plaintiffs could not identify a single person who was wrongly prosecuted pursuant to the oath of assistance. *See, e.g.*, Oct. 4, 2023 Tr. at 2467:16–19, 2496:14–2497:4. And while county district attorneys have not disavowed enforcement, Plaintiffs have not identified anyone with an intent to engage in conduct "arguably proscribed" by Section 6.04. *Id.* at 256. And they did not show that any county attorney interprets Section 6.04 in such a way as to make prosecution likely. [Cite Stipulations in Footnote if Time Allows]

95. Section 208 does not preempt state law simply because someone somewhere has an idiosyncratic and abstract fear that a prosecutor will interpret a law unreasonably. If it did, then Section 208 would preclude all oaths for assistance and all criminal

statutes governing unlawful assistance since wrongful prosecutions are always possible even when they are improbable. There is no evidence in the statute or legislative record that Congress intended such a result.

96. *Third,* the evidence at trial showed that Section 6.04 had limited—if *any*—impact on voters seeking assistance in practice. Overall, the county witnesses did not report election workers or third-party assistors refusing to take the oath during the 2022 elections, while Former Director Ingram testified that the Secretary of State's Office did not receive any questions from voters, assistors, or counties about the revised oath of assistance. *See* Oct. 18, 2023 Tr. at 4432:18–24. Any fear or hesitation does not appear to be widespread outside Plaintiff groups.

97. Section 6.04 therefore does not pose an obstacle to Section 208 of the VRA and is not preempted by it.

## E. Compensated Voter Assistance (Section 6.06)

98. Section 6.06 of SB 1 does not abridge or deny voters their right to receive assistance from a person of their choice.

99. Section 6.06 merely precludes individuals from deriving financial benefit from assisting voters: specifically, Section 6.06 makes it an offense to (1) compensate or offer to compensate another for assisting the voter and (2) solicit, receive, or accept compensation for assisting the voter. JOINT Ex. 1 at 54–55 (amending Tex. Elec. Code § 86.0105).

100.    Accordingly, Section 6.06 does not limit the scope of assistance voters may receive; nor does it predicate the assistance voters can receive on where they are in the voting process. So long as the person assisting the voter does not solicit, receive,

or accept compensation for that assistance, the assistor may perform any action necessary to make a vote effective.

101.    In addition, Section 208 of the VRA does not prohibit states from imposing reasonable limits on whom voters can select as an assistor. *Ray*, 2008 WL 3457021, at *7; *Qualkinbush*, 357 Ill. App. 3d at 610; *but see Arkansas United*, 626 F. Supp. 3d at 1085.

102.    However, even if Section 208 precluded such laws, Section 6.06 would pass muster since the challenged provision does not prohibit any individual or category of individuals from acting as an assistor, *see*, *e.g.*, *Arkansas United*, 626 F. Supp. 3d at 1088 (upholding law tracking names and addresses of assistors), and assistors have no right under Section 208 to impose conditions on their assistance, such as a demand for compensation.

103.    Any person who otherwise satisfies Tex. Elec. Code § 64.032(c)—in that the person is not the "voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs"—may act as an assistor upon request so long as he or she does not solicit, receive, or accept compensation for the assistance.

104.    While it is possible that some assistors may object to assisting the voter without a financial return, nothing in Section 208 of the VRA guarantees voters their first choice of assistor. If anything, Section 208 acknowledges that the person the voter selects may refuse to provide assistance. 52 U.S.C. § 10508 (stating the

voter "*may* be given assistance of by *a person* of the voter's choice") (emphasis added).

105.     Compliance with both federal and state regulation is therefore not "a physical impossibility." *See Gade*, 505 U.S. at 98. The two statutes can "operate harmoniously." *Arkansas United*, 626 F. Supp. 3d at 1088.

106.     The other form of conflict preemption arises when "state law presents an obstacle to federal law." *Alliantgroup*, 400 F. Supp. 3d at 616. However, the evidence presented at trial shows that Section 6.06 does not stand in the way "to the accomplishment and execution of the full purposes and objectives of Congress" when it enacted Section 208. *Gade*, 505 U.S. at 98.

107.     To the contrary, Section 6.06 protects voters from incentive structures that increase the likelihood of assistors applying pressure on the voter in pursuit of partisan or ideological ends. It therefore advances Section 208's objective that voters who are blind, have a disability, or are unable to read and write are able to vote without "fear of intimidation and manipulation;" it does not impede that objective. S. Rep. 97–417, at 241; *See Qualkinbush*, 357 Ill. App. 3d at 610 (noting the purpose of Section 208 was to protect the voter from undue influence and manipulation).

108.     Indeed, for years, Texas has banned performance-based compensation for assistors, which conditioned payment on the number voters assisted or the number of carrier envelopes deposited with a common carrier because it incentivized misconduct. *See* Acts 2013, 83rd Leg., ch. 846 (H.B. 148), § 2, eff. Sept. 1, 2013;

Tex. Elec. Code § 86.0052. The Legislature expanded this prohibition to include all compensation because it determined that additional protections were needed to safeguard voters from undue influence. HAUL Ex. 109 at 207.

109.     These are exactly the type of "voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote," that Congress intended to "be established" when it enacted Section 208. *Id.*

110.     The evidence at trial also shows that Plaintiffs overstate Section 6.06's impact and reach. The ban on compensation applies only in the narrow circumstance when an individual is paid specifically to assist the voter with their ballot. *See* Sept. 22, 2023 Tr. at 1902:4–8. It does not prevent individuals from being reimbursed for their expenses, Sept. 22, 2023 Tr. at 1903:10–1904:2, and it does not prevent individuals with paid jobs, such as canvassing, from assisting the voter in due course. *See*, *e.g.*, Oct. 16, 2023 Tr. at 3994:14-23. The Legislature, in fact, expressly exempted attendants or caregivers previously known to the voter to ensure that Section 6.06 would not interfere with their duties. *See* Tex. Elec. Code § 86.0105(f).

111. Like their objection to SB 1's revisions to the oath of assistance, Plaintiffs' objection to Section 6.06 hinges on the assumptions that county prosecutors will broadly interpretation the compensation ban and that assistors will refrain from assisting voters for fear of criminal prosecution. However, Plaintiffs have failed again to establish that county prosecutors are likely to take that approach when both Office

of Attorney General and Secretary of State interpret more narrowly. *See*, *e.g.*, September 22, 2023 Tr. at 1901:23-1902:8; October 16, 2023 Tr. at 3994:14-23.

112.    In any event, Section 208 does not preempt state law simply because someone has an idiosyncratic and abstract fear that a prosecutor will interpret a law unreasonably. If it did, then Section 208 would preclude all criminal statutes governing unlawful assistance since wrongful prosecutions are always possible even when they are improbable. The Court does not find evidence in the statute or legislative record that Congress intended such a result.

113.    Section 6.06 therefore does not pose an obstacle to Section 208 of the VRA and is not preempted by it.

## F.  Vote harvesting (Section 7.04)

114.    Section 7.04 of SB 1 does not abridge or deny voters their right to receive assistance from a person of their choice.

115.    Section 7.04 merely precludes prospective assistors from imposing a condition on the assistance they provide voters: specifically, Section 7.04 bans paid vote harvesting, which the statute defines as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."

116.    Vote harvesting is not an "action necessary to make a vote effective," so it is not "assistance" within the meaning of Section 208. *OCA-Greater Houston*, 867 F.3d at 614–15. Accordingly, Section 7.04 does not limit the scope of assistance voters may receive; nor does it predicate the assistance voters can receive on where they are in the voting process. So long as the person assisting the voter complies

with Section 7.04, the person assisting the voter may perform any action necessary to have the voter's ballot be counted.

117.    In addition, Section 208 of the VRA does not prohibit states from imposing reasonable limits on whom voters can select as an assistor. *Ray*, 2008 WL 3457021, at *7; *Qualkinbush*, 357 Ill. App. 3d at 610; *but see Arkansas United*, 626 F. Supp. 3d at 1085.

118.    However, even if Section 208 precluded such laws, Section 7.04 would pass muster since the challenged provision does not prohibit any individual or category of individuals from acting as an assistor, *see*, *e.g.*, *Arkansas United*, 626 F. Supp. 3d at 1088 (upholding law tracking names and addresses of assistors), and assistors have no right under Section 208 to impose conditions on their assistance, such as a demand for compensation.

119.    Any person who otherwise satisfies Tex. Elec. Code § 64.032(c)—in that the person is not the "voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs"—may act as an assistor upon request so long as he or she does not engage in paid vote harvesting

120.    While it is possible that some assistors may object to assisting the voter without a financial return, nothing in Section 208 of the VRA guarantees voters their first choice of assistor. If anything, Section 208 acknowledges that the person the voter selects may refuse to provide assistance. 52 U.S.C. § 10508 (stating the voter "*may* be given assistance of by *a person* of the voter's choice") (emphasis added).

121.     Compliance with both federal and state regulation is therefore not "a physical impossibility." *See Gade*, 505 U.S. at 98. The two statutes can "operate harmoniously." *Arkansas United*, 626 F. Supp. 3d at 1088.

122.     The other form of conflict preemption arises when "state law presents an obstacle to federal law." *Alliantgroup*, 400 F. Supp. 3d at 616. However, the evidence presented at trial shows that Section 7.04 does not stand in the way "to the accomplishment and execution of the full purposes and objectives of Congress" when it enacted Section 208. *Gade*, 505 U.S. at 98.

123.     To the contrary, Section 7.04 protects voters from incentive structures that increase the likelihood of assistors applying pressure on the voter in pursuit of partisan or ideological ends. The evidence developed at trial established that vote harvesters have attempted and succeeded in the past to get between voters and their vote in order to benefit the candidate or proposition they support. *See, e.g.*, Oct. 16, 2023 Tr. at 3915:13-18, 3919:3-18. The evidence also shows that the misconduct is often related to the compensation voter harvesters receive for their services. *See id.*

124.     Section 7.04 therefore addresses the elements of vote harvesting most likely to result in the disenfranchisement of voters. It advances Section 208's objective that voters who are blind, have a disability, or are unable to read and write are able to vote without "fear of intimidation and manipulation;" it does not impede that objective. S. Rep. 97–417, at 241; *See Qualkinbush*, 357 Ill. App. 3d at 610 (noting the purpose of Section 208 was to protect the voter from undue influence and manipulation).

125.     The evidence at trial also shows that Plaintiffs overstate Section 7.04's impact and reach. The ban on vote harvesting only applies in specific circumstances: namely, when the activity is performed in exchange for compensation and when the activity is designed to deliver votes for or against a specific candidate or measure. *See* Sept. 22, 2023 Tr. at 1912:22-1913:13, 1915:3-25, 1917:23-1918:3*; see generally* Tex. Elec. Code § 276.015(e). It does not pertain to non-profits or their volunteers engaging in voter education and canvassing. *See* Sept. 22, 2023 Tr. a 1915:17-19. Plaintiffs have not established the extent that voters rely on the former as compared to the latter.

126.     Instead, much of Plaintiffs' objection to Section 7.04 turns on the assumptions that county prosecutors will take a broad interpretation of the ban and that non-profits and individuals will pull back from assisting voters in fear of criminal prosecution. However, Plaintiffs have not established that county prosecutors are likely to take that approach, and Section 208 does not preempt state law simply because someone somewhere has an abstract and idiosyncratic fear that that the government will misapply the law.

127.     Section 208 preempts laws that "unduly burden" a voter's right to choose an assistor of their choice. S. REP. NO. 97-417, at 63 (1982). A law that protects voters by breaking up the incentives that lead individuals to usurp a voter's vote does not meet that threshold. Assistors do not have free rein under Section 208 to exact conditions on their assistance. To hold otherwise would give assistors a quasi-

veto over state legislation. There is no evidence in the statute or legislative record that Congress intended such a result.

128.     Section 7.04 therefore does not pose an obstacle to Section 208 of the VRA and is not preempted by it.

## G. No Private Right of Action[6]

129.     Plaintiffs do not have a private right of action allowing them to sue under the VRA.

130.     Section 208 is instead enforced through other mechanisms. The VRA requires "[t]he chief election officer of each State" to "provide public notice[] . . . of the availability of . . . assistance under section [208]," 52 U.S.C. § 20104(c), and it expressly authorizes "the United States Attorney General or a person who is personally aggrieved" by noncompliance with section 20104 to "bring an action for declaratory or injunctive relief," *id.* § 20105(a).  The existence of this enforcement scheme "suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

131.     It also suggests Congress did not intend for litigants to challenge violations of Section 208 through 42 U.S.C. § 1983. "[T[he existence of a more restrictive private remedy [in the statute itself] for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not." *Health and Hosp. Corp. of*

---

6 State Defendants and Intervenor-Defendants recognize that the Court has already rejected this argument, *see* ECF 448 at 58-60, but raise it again here to preserve the argument for appeal.

*Marion Cnty v. Talevski*, 143 S. Ct. 1444, 1460 (2023) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005)).

132.    In addition, assuming that the statute creates any rights at all, it does so for certain "voter[s] who require[] assistance." 52 U.S.C. § 10508. The statute does not create any rights in non-voting entities like Plaintiffs. Given the Supreme Court's guidance in *Alexander v. Sandoval*, which adopts a strict approach to recognizing private right of actions, this Court should not expand "the scope of [an] implied right" from one type of plaintiff to another. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998).

## VII.    Plaintiffs' Have Failed to Establish a Section 2 Violation of the Voting Rights Act

### A.    Legal Standard for Section 2 Claims

133.    Section 2 of the Voting Rights Act prohibits state political processes that are "not equally open to participation" by minority voters, such that those voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301.

134.    This case involves facially neutral time, place, and manner regulations.

135.    In *Brnovich*, the Supreme Court has held that certain guideposts should be considered in § 2 challenges to election laws involving time, place, and manner regulations, such as those governing how ballots are collected and counted. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2238-40 (2021).

136.    The *Brnovich* guideposts are: (1) the size of the burden imposed by a challenged voting rule; (2) the degree to which a voting rule departs from standard practice in 1982; (3) the size of any disparities in a rule's impact on members of

different racial or ethnic groups; (4) the opportunities provided by a State's entire system of voting; and (5) the strength of the state interest served by the challenged rule. *Id.*

137.    *First*, the size of the burden is highly relevant because § 2 prohibits "obstacles and burdens that block or seriously hinder voting." *Id.* at 2338. Voting necessarily requires some effort and compliance with some rules. *Id.* (citing *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 198 (2008) (opinion of STEVENS, J.)). "Mere inconvenience cannot be enough to demonstrate a violation of § 2." *Id.*

138.    *Second*, "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982 is a relevant consideration." *Brnovich*, 141 S. Ct. at 2238. "Because every voting rule imposes a burden of some sort, it is useful to have benchmarks with which the burdens imposed by a challenged rule can be compared." *Id.* So, "the degree to which a challenged rule has a long pedigree or is in widespread use in the United States is a circumstance that must be taken into account." *Id.* at 2329.

139.    *Third*, the "size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Id.* But the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote. The size of any disparity matters." *Id.* The Supreme Court has warned against allowing very small differences to be artificially magnified. *Id.*

173

140.     *Fourth*, "courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision." *Brnovich* , 141 S. Ct. at 2339. "Thus, where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." *Id.*

141.     *Fifth*, "the strength of the state interests served by a challenged voting rule is also an important factor that must be taken into account." *Id.* "[E]very voting rule imposes a burden of some sort, and therefore, in determining 'based on the totality of circumstances' whether a *rule goes too far, it is important to consider the reason for the rule. Rules that are supported by strong state interests are less likely to violate § 2." *Id.* at 2339-40.

142.     The Supreme Court has also held that, while their relevance is much less direct than in a voter dilution case analyzing the factors set forth in *Thornburg v. Gingles*, 478 U.S. 30, 37 (1986), courts analyzing facially neutral time, place and manner regulations may also consider whether minority groups suffered discrimination in the past and whether effects of that discrimination persist. *Id.* at 2340.

143.     After applying the *Brnovich* guideposts, the Court should find that SB 1 does not violate § 2 of the VRA.

## B.  Maintenance of Voter Rolls (Sections 2.05 and 2.07)

144.     MFV Plaintiffs challenge Sections 2.05 and 2.07 of SB 1. ECF 199 at ¶¶ 62, 196, 260, 309. Plaintiffs contend that the Sections 2.05 & 2.07 violate Section 2 of the VRA because it disproportionately burdens Black and Latino voters by

"establishing additional voter roll purges, focusing primarily on allegations of noncitizenship, requiring targeted voters to satisfy onerous requirements to defeat erroneous removal from the voter rolls." *Id*. at ¶ 309.

145.　　These claims are without merit.

### i.　Statutory Background

146.　　Texas election law in 1981 stated that registrars could "utilize *any means* available to determine whether a registered voter's current legal address may be other than that indicated as the voter's legal residence on the registration records." Tex. Elec. Code art. 5.18a, subd. 5(a) (1977) (emphasis added). County registrars shared information with each other and would cancel a registrant's voter registration certificate in a county where they were formerly registered upon receiving notification that they had registered to vote in another county in Texas. Tex. Elec. Code art. 5.18a, subd. 4 (1977).

147.　　Registrars were required to notify the registered voters and request verification of information showing their eligibility to vote or their registration would be cancelled in 60 days. Tex. Elec. Code art. 5.18a, subd. 5(b) (1977). A voter whose registration was cancelled could appeal the decision and could continue to vote until a final decision was made. Tex. Elec. Code art. 5.18a, subd. 5(c) (1977). Registrars were required to provide the Secretary with a list of all persons whose voter registrations were cancelled. Tex. Elec. Code art. 5.14a, subd. 2(b) (1981).

148.　　In 1993, Congress passed the National Voter Registration Act imposing numerous requirements on registrars to regularly update the voter polls. *See* 52 U.S.C. § 20507. It required, *inter alia*, that every state "conduct a general program

that makes a reasonable effort to remove the names of ineligible voters from the official list of eligible voters by reason of… a change in the residence of the registrant…." 52 U.S.C. § 20507(a)(4)(B). States could comply with the law by establishing a program whereby registrars cancel a voter's registration based on information provided by the Postal Service showing that the voter had moved out of the county. 52 U.S.C. § 20507(c)(1).

149.     In 1997, the Texas Legislature adopted a state law that required court clerks to maintain a list with the name and address of each person excused or disqualified from jury service because they are not a citizen of the U.S. Tex. Gov't Code § 62.113 ("Compilation of List of Noncitizens"). Court clerks were directed to provide the information on a monthly basis to the county registrar for cancellation of their voter registration. Tex. Gov't Code § 62.113(b) (1997). The law was amended in 2011 to add that the information must also be shared with the Secretary and the county or district attorney. Tex. Gov't Code § 62.113(b).

150.     Also, in 1997, the Texas Legislature adopted a law that required registrars, upon notification that a registered voter was excused or disqualified from jury service because of citizenship status, to provide the registrant with notice by mail that they must provide proof of U.S. citizenship within 30 days, or their voter registration would be cancelled. Tex. Elec. Code 16.0332 (1997) ("Cancellation Because of Citizenship Status"). The law was amended in 2011 to state that the registrant could prove U.S. citizenship in the form of a certified copy of their birth

certificate, passport, a certificate of naturalization or any other form prescribed by the Secretary. Tex. Elec. Code 16.0332 (2011)(a).

151.    In 2005, the Texas Legislature adopted a state law that required court clerks to maintain a list with the name and address of each person excused or disqualified from jury service because they are not a resident of the county. Tex. Gov't Code § 62.114 ("Compilation of List of Nonresidents"). Court clerks were directed to provide the information on a monthly basis to the county registrar. Tex. Gov't Code § 62.114. The registrar was required to notify each person that they were being placed on the county's suspense list because they had been excused or disqualified from jury service based on nonresidence in the county and to provide the voters with how they could restore their voter registration. Tex. Gov't Code § 62.114(d). Voters on the suspense list have their voter registrations cancelled on November 30 following the second general election after they were placed on the suspense list. Tex. Elect. Code § 16.032. Section 2.11 of SB 1, which is *not* being challenged in this lawsuit, requires the court clerk to also share the list with the Secretary. Tex. Elec. Code § 62.114(b)(2).

152.    In 2011, the Texas Legislature adopted a law required the Secretary to compare, on a quarterly basis, the lists of noncitizens and nonresidents it receives from the registrars with the statewide computerized voter registration database. Tex. Elec. Code § 18.068 ("Comparison of Information Regarding Ineligibility"). "If the secretary determines that a voter on the registration list is deceased or has been excused or disqualified from jury service because the voter is not a citizen, the

secretary shall send notice of the determination to the voter registrar of the counties considered appropriate by the secretary." Tex. Elec. Code § 18.068 (2011).

153.    **None of these election laws are being challenged by Plaintiffs**. *See* ECF 199 at ¶¶ 62, 196, 260, 309. Plaintiffs, instead, challenge §§ 2.05 & 2.07 of SB 1.

154.    Section 2.05 amended the Cancellation Because of Citizenship Status law to require the Secretary to enter into an agreement with DPS to compare the two databases on a monthly basis to verify the accuracy of citizenship status information previously provided on voter registration applications. Tex. Elec. Code § 16.0332(a-1). When the Secretary identifies a conflict between the citizenship information provided by the voter in databases then then she notifies to the registrar where the voter resides. Tex. Elec. Code § 16.0332(a). The Secretary, importantly, was direct by § 2.05 to collect information on how many voter registrations were cancelled pursuant to the law. Tex. Elec. Code § 16.0332(e).

155.    Section 2.07 clarified the Comparison of Information Regarding Ineligibility law by adding a provision that the Secretary is "not required" to notify local registrars about registered voters exempt from jury service. Tex. Elec. Code § 18.068(a-1). Persons can be exempt from jury service because: (1) they are over the age of 75; (2) they have legal custody of a child under 12 for whom jury service would require leaving the child without adequate supervision; (3) they are a student in secondary school; (4) they are attending an institution of higher education; (5) they are an officer or employee of the legislative branch; (6) they have already served as a juror in the preceding  24-month period if they are summoned in a

county with a population of more than 200,000; (7) they are the primary caretaker of a person unable to care for themselves; (8) they have already served as a juror in the preceding three-year period if they are summoned in a county with a population of more than 250,000; or (9) they are a member of the military serving on active duty and deployed outside the county. Tex. Gov't Code § 62.106(A).

156.    The exemptions from jury service are *categorically different* than a person being excused or disqualified from jury service because they are either a noncitizen or nonresident of the county. *Compare* Tex. Gov't Code § 62.106(A) *with* Tex. Gov't Code §§ 62.113-.114. Section 2.07 did not prompt the Secretary nor the counties to make *any* changes to their policies, practices, or procedures. Oct. 17, 2023, Tr. at 4354:5-12.

**ii.    Brnovich Guideposts**

**a.** The Burdens Imposed by Sections 2.05 and 2.07 are *De Minimis*.

531.

157.    Section 2.05 required the Secretary to regularly compare the statewide voter registration database with the DPS statewide database to identify those self-identifying as noncitizens and for those identified as such, to notify the registrar where they reside. Tex. Elec. Code § 16.0332(a-1).

158.    Texas has 17,119,632 registered voters. *Voter Registration Figures*, Tex. Sec. St. (Jan. 2022), available online from https://www.sos.state.tx.us/elections/historical/jan2022.shtml; *see also* Oct. 19, 2023 Tr. at 4762:21–4763:3.

159.    In 2021, the system resulted in 382 registered voters having their voter registrations cancelled after confirming that they were not citizens, and 2,170

registered voters having their voter registrations cancelled because they failed to provide proof of citizenship within 30 days. https://www.sos.texas.gov/elections/laws/registraton-cancellation-report.shtml.

160.     In 2022, the system resulted in 139 registered voters having their voter registrations cancelled after confirming that they were not citizens, and 120 registered voters having their voter registrations cancelled because they failed to provide proof of citizenship within 30 days. https://www.sos.state.tx.us/elections/laws/voter-registration-cancellation-due-to-non-citizenship.shtml.

161.     The evidence, therefore, shows that the § 2.05 has successfully identified 502 individuals who are ineligible to vote because they are noncitizens. *Id*.

162.     Plaintiff, on the other hand, has failed to provide evidence showing that *any* the 2,290 registered voters who had their registrations cancelled because they failed to respond within 30 days were erroneously identified as noncitizens.

163.     Plaintiff failed to show how, and to what extent, § 2.05 disproportionately impacts minorities. And, even if they had, it would represent a *de minimus* figure. The 2,290 registered voters who've had their registrations cancelled because they failed to prove citizenship within 30 days represent approximately 0.013% out of the 17 million registered Texas voters.

164.     Section 2.07 imposes *no burden*.

165.     It merely clarifies that the Secretary is not required to notify registrars about registered voters exempt from jury services for one of the enumerated reasons in

Tex. Gov't Code § 62.106. Exemptions from jury service are *categorically different* than being excused or disqualified from jury service because a person is either a noncitizen or nonresident of the county. *Compare* Tex. Gov't Code § 62.106(A), *with* Tex. Gov't Code §§ 62.113-.114.

166.    Section 2.07 does not require the Secretary to do anything. Tex. Elec. Code § 18.068(a-1). Moreover, even assuming *arguendo* § 2.07 didn't exist and the Secretary was sharing jury service exemptions lists with local registrars, it would have *no impact* because none of the exemption grounds are grounds for suspension or cancellation of a voter's registration. Tex. Gov't Code § 62.106(A).

167.    In sum, § 2.05 imposes, at most, a *de minimus* burden, whereas § 2.07 imposes no burden at all.

b.    Section 2.05 & 2.07 do not represent a significant departure from standard practice in 1982.

532.

168.    Texas election law in 1981 provided that registrars "utilize *any means* available to determine whether a registered voter's current legal address may be other than that indicated as the voter's legal residence on the registration records." Tex. Elec. Code art. 5.18a, subd. 5(a) (1977) (emphasis added).

169.    Section 2.05 departs from standard practice in 1982 only insofar as technology now permits it, and DPS, to maintain a statewide database from which to compare information citizenship and residency records that they can share with registrars. Tex. Elec. Code § 16.0332(a-1).

170.    There is a long history in Texas of comparing voter registration ineligibly lists and sharing information among government officials to ensure their accuracy. Tex. Elec. Code art. 5.18a, subd. 4 (1977).

171.    Texas was required by the National Voter Registration Act, beginning in 1993, to establish a system for registrars to regularly check the accuracy of voter registration lists. 52 U.S.C. § 20507. The National Voter Registration Act provides for information sharing between the Postal Service and registrars to compare addresses to identify and remove those who are no longer residents in a county. 52 U.S.C. § 20507(c)(1).

172.    Since 1997, Texas has had an information sharing process for registrars to cancel or suspend voter registrations of those excused or disqualified from jury service because they self-identified as either a noncitizen or nonresident of the county. Tex. Gov't Code §§ 62.113-.114 (1997). These laws have continued to develop over the decades as technology improves and permits greater information sharing and comparisons among governmental officials and statewide computerized databases. Tex. Gov't Code § 62.114 (2005); *see* Tex. Elec. Code 16.0332(a) (2011); *see also* Tex. Elec. Code § 18.068 (2011).

173.    In sum, there is a long tradition of information sharing in Texas to ensure the accuracy of registered voter lists.

174.    Section 2.07, similarly, does not deviate significantly from standard practice in 1981 because the Secretary has *never* been required to provide registrars with information about persons exempt from jury services. Tex. Elec. Code § 18.068

(2011). Section 2.07 clarified that the Secretary is not required to share information with registrars about persons exempt from jury service. Tex. Elec. Code § 18.068(a-1).

175.     However, no evidence was presented by Plaintiffs showing that the Secretary has ever shared exempt juror lists with registrars nor have Plaintiffs pointed to any legal requirement for the Secretary to do so. Thus, the law today is the same as it was in 1982—the Secretary is not required to share exempt juror lists with registrars.

c.  Sections 2.05 and 2.07 Caused Little to No Disparities Among Members of Different Racial and Ethnic Groups.

533.

176.     Section 2.05 does not have a disparate impact on racial or ethnic minorities and, even if it did, the impact is *de minimus*.

177.     Texas does not collect race and ethnicity information on voter registrations. Tr. at 2755:4-8. No evidence was presented at trial showing that § 2.05 had a disparate impact on any identifiable racial or ethnic group. No evidence was presented at trial showing that the 2,290 registered voters who had their registrations cancelled because they failed to respond within 30 days were erroneously identified as noncitizens were members of a particular racial or ethnic group.

178.     The 2,290 registered voters who've had their registrations cancelled because they failed to prove citizenship within 30 days represent approximately

0.013% out of the 17 million registered Texas voters. So, even assuming *arguendo* all 2,290 persons were all members of a particular race or ethnic group had their voter registrations erroneously cancelled, the *size* of the disparity would still weigh in favor of Texas because it is *de minimus*.

179.     Section 2.07 had *no impact* on any voters, so necessarily, it could not have had a disparate impact on a particular racial or ethnic group.  Oct. 17, 2023, Tr. at 4354:5-12 (Section 2.07 did not prompt the Secretary nor the counties to make *any* changes to their policies, practices, or procedures).

d.  Texas's Election System Provides Numerous Opportunities and Protections for Registered Voters

534.

180.     The impacts of §§ 2.05 and 2.07, in the broader context of Texas' entire voting system, do not violate § 2 of the VRA.

181.     Section 2.05 occurs within a system where voters who've self-identified as noncitizens on their DPS records sometime after they've registered to vote are given 30 days to present identification proving citizenship prior to cancellation. Tex. Elec. Code § 16.0332(a).

182.     Cancelled registrants have the right to challenge their cancellation, Tex. Elec. Code § 16.061, and are entitled to notice and a hearing on their challenge, Tex. Elec. Code §§ 16.062, 16.064-65, and to reinstatement of their registration while their challenge is pending, Tex. Elec. Code § 16.063. The registrant must be

reinstated if the registrar subsequently determines after their cancellation that the registrant should not have been cancelled. Tex. Elec. Code § 16.037.

183.    And, importantly, nothing prevents the registrant from re-registering again in the future. This system is substantially the same as the system that existed in 1982. *See* Tex. Elec. Code art. 5.18a, subd. 5(b)-(c) (1977).

184.    Section § 2.07 has no impact on voters.

185.    More broadly, Texas's entire system of voting provides numerous opportunities and protections for registered voters, as discussed in State Defendants and Intervenor-Defendants' finding of fact. *See* ECF _____. Cite to the FOF discussing Texas's system of voting.

e.    Sections 2.05 and 2.07 Advance Important Interests

186.    Texas undeniably has a strong interest in maintaining accurate registered voter rolls and in orderly elections. *Tex. LULAC*, 978 F.3d at 146 (noting that "[s]tates have critically important interests in the orderly administration"). Texas, moreover, is required to maintain updated voter rolls to comply with the National Voter Registration Act. See 52 U.S.C. § 20507.

187.    Section 2.05 furthers these interests by comparing citizenship information in the DPS statewide database and notifying local registrars when a person, after registering to vote, self-identified to DPS as a noncitizen. Tex. Elec. Code § 16.0332(a-1).

188.    Indeed, the evidence shows that it has successfully identified at least 502 persons who on the voter registration polls who were ineligible because they were

noncitizens, and it identified another 2,290 who failed to timely provide proof of citizenship.

189.    Section 2.07 furthers these interests by clarifying that the Secretary is not required to provide registrars with information about persons exempt from jury service. Exemption from jury service is irrelevant in determining whether a registered voter is eligible to vote, unlike being excused or disqualified due to non-citizenship or non-residence in the county.

190.    Section 2.07 furthers Texas' interest in accurate voter rolls and orderly elections by ensuring that those exempt from jury service and those excused or disqualified because they are noncitizens or nonresidents of the county are not conflated. *C.f. Tex. LULAC*, 978 F.3d at 146

## C.  Monitoring Register Compliance (Section 2.06)

191.    MFV Plaintiffs challenge Section 2.06 of SB 1. ECF 199 at ¶¶ 62, 196, 309. Plaintiffs contend that the §§ 2.06 violates § 2 of the VRA by "penalizing voter registrars alleged to be noncompliant with the purging requirements." *Id.* at ¶ 309.

192.    This claim is without merit.

### i.    Statutory Background

193.    Texas election law in 1981 required the Secretary to monitor registrars to ensure their compliance with Texas's voter registration reporting requirements and voter registration program. Tex. Elec. Code art. 5.19b, subd. 3 (1975). The Secretary was required to notify the comptroller when it determined a registrar was noncompliant. *Id.* Once notified, the comptroller was prohibited from releasing funding appropriate by the Legislature to defray the costs of registering voters to

the county, until notified by the Secretary that the registrar had come into compliance. Tex. Elec. Code art. 5.19b, subds. 2-4 (1975).

194.    In 1985, when the Election Code was recodified, the Legislature directed the Secretary to "monitor each registrar for compliance with the rules implementing the [voter] registration service program." Tex. Elec. Code § 18.065(a) (1985). It too, provided that the Secretary when the Secretary determined that a registrar was noncompliant it could prevent them from receiving state funds allocated to defray the costs of registering voters until they came into compliance. Tex. Elec. Code §19.002 (1985).

195.    In 2003, Texas' amended the law to require the Secretary to "monitor each registrar for substantial compliance" with the suspense, cancellation, and register voters reporting requirements, and for their compliance with the laws and rules relating to the statewide computerized voter registration list. Tex. Elec. Code § 18.065(a) (2003).

196.    In 2011, the law was amended to require the Secretary to provide in the written notice of noncompliance to a registrar a description of the violation, an explanation of the action necessary for substantial compliance, and notify them of the consequences of noncompliance. Tex. Elec. Code § 18.065(b) (2011). It transferred the authority to withhold voter registration funding for noncompliant registrars from the comptroller to the Secretary. Tex. Elec. Code § 19.002 (2011).

197.    Section 2.06 grants the Secretary additional penalties to ensure compliance with the suspense and cancellation reporting requirements, and for their

compliance with the laws and rules relating to the statewide computerized voter registration program. Tex. Elec. Code § 18.065(a); Oct. 17, 2023 Tr. at 4351:4–4352:3. Now, in addition to withholding voter registration funding, the Secretary can impose sanctions after determining that a registrar is not substantially complying with the reporting requirements or the statewide computerized voter registration program. Tex. Elec. Code § 18.065(e).

### ii.   Brnovich Guideposts

**a.**   Section 2.06 Imposes No Burden on Voters.

198.      Section 2 of the VRA prohibits "obstacles and burdens that block or seriously hinder voting." *Brnovich*, 141 S. Ct. 2321 at 2338. Section 2.06, meanwhile does not impose *any* burden on voters. It, instead, gives the Secretary expanded authority to sanction registrars who are noncompliant with their suspense and cancellation list reporting requirements and with the laws and rules relating to the statewide computerized voter registration program. Tex. Elec. Code § 18.065.

199.      Critically, the Secretary **already** had sanctioning authority in the form of withholding state voter registration funding to noncompliant registrars. Tex. Elec. Code § 19.002(d). Plaintiffs produced no evidence at trial showing that the expanded sanctioning authority in § 2.06 creates an obstacle or burden that blocks or seriously hinders voting or even changed county practices. *See*, *e.g.* Oct. 17, 2023 Tr. at 4352:4–24, 4353:6–15.

**b.**   Section 2.06 does not represent a significant departure from standard practice in 1982.

535.

200. In 1982, the Secretary had the monitoring and sanctioning authority to cause state voter registration funding to be withheld from registrars who were noncompliant with their reporting requirements and the voter registration program. Tex. Elec. Code art. 5.19b, subds. 2-4 (1975). The Secretary has essentially the same monitoring and sanctioning authority to this day. Tex. Elec. Code § 19.002(d); Tex. Elec. Code § 18.065.

201. Section 2.06 does not change the Secretary's monitoring authority; instead, it merely adds to the available sanctions she can impose. Now, instead merely withholding funding, the Secretary can also require noncompliant registrars to participate in training, undergo an audit, and if they refuse to substantially comply with state law, the state may seek civil penalties of $1,000 a day. Tex. Elec. Code § 18.065(e), (f).

202. Section 2.06 does not alter the Secretary's authority to monitor and sanction noncompliant registrars—it instead merely bolsters to the available sanctions that the Secretary can impose. Thus, it does not substantially depart from standard practice in 1982, which was for the Secretary to monitor and sanction registrars who were noncompliant with either their reporting requirements or the state's voter registration program. Tex. Elec. Code art. 5.19b, subds. 2-4 (1975).

203. The sanctions in § 2.06 are less severe than the criminal penalties federal authorities can pursue against election officials who fail to comply with their recordkeeping obligations. 52 U.S.C.A. § 20701.

    c.  Sections 2.05 and 2.07 Caused Little to No Disparities Among Members of Different Racial and Ethnic Groups.

536.

    204.      Plaintiffs produced no evidence at trial that § 2.07 has had any impact on an identifiable group of voters—much less a disparate impact on different racial or ethnic groups.

    d.  Texas's Election System Provides Numerous Opportunities and Protections for Registered Voters

537.

    205.      Texas's entire system of voting provides numerous opportunities and protections for registered voters, as discussed in State Defendants and Intervenor-Defendants' finding of fact. *See* ECF _____. Cite to the FOF discussing Texas's system of voting.

    **e.  Section 2.06 Advance Important Interests**

    206.      Texas has a strong interest in maintaining accurate voter rolls and conducting orderly elections *Tex. LULAC*, 978 F.3d at 146 Section 2.06 furthers that interest by giving the Secretary additional sanctions he can impose on registrars to ensure they substantially comply with the state's suspense and cancellation reports and the statewide voter registration program.

**D.  Drive-Thru Voting (Sections 3.04, 3.13, and 3.13)**

    207.      LULAC Plaintiffs, HAUL Plaintiffs, MFV Plaintiffs challenge Sections 3.04, 3.12, and 3.13 of SB 1. *See* ECF 199 at ¶¶ 26, 200-212, 309-13; 207 at ¶¶ 160,

168-70, 252, 249-56. Specially, Plaintiffs contend that these sections violated the VRA by prohibiting drive-through voting. Id.

208.     These claims are without merit.

### i.     Statutory Background

209.     Texas allowed curbside in 1982, between 8 a.m. and 2 p.m. on election day, for those who were ill or disabled "and thus cannot, without injury to his health or without personal assistance, cast his vote in the regular manner." Tex. Elec. Code art. 5.05, Subd. 3c (1977).

210.     Polling places were defined as "the location designated for the conduct of an election." Tex. Elec. Code art. 1.01(a)(41) (1981). Voting booths were defined as an "enclosure in which a voter may mark his ballot in secret, the dimensions of which are prescribed by Section 67 of this Code." Tex. Elec. Code art. 1.01a(57) (1981). Polling places were required to have one voting booth or place for every 70 registered voters in the precinct. Tex. Elec. Code art. 7.02 (1981).

211.     "Each polling place, whether provided with voting booths or not, shall be provided with a guard rail, so constructed and placed that only such persons as are inside of such guard rail can approach the ballot boxes or compartments, places or booths… [and] no person outside of the guard rail can approach nearer than six feet of the place where the voter prepares his ballot." Id. The voters and ballot boxes must be visible to the those outside the guard rail, but far enough removed so they can vote in secrecy. Id.

212.     Voting booths were required to "have three (3) sides closed and the front side open, shall be twenty-two (22) inches wide on the inside, thirty-two (32) inches

deep and six (6) feet four (4) inches high, contain a shelf for the convenience of the voter in preparing his ballot; and shall be so constructed with hinges that they can be folded up for storage when not in use." *Id.*

213.    The voting booths shall be so arranged that there shall be no access to them through any doors, window or opening except through the front of the booth; and the same care shall be observed in precincts where there are no booths in protecting the voter from intrusion while he is preparing his ballot. *Id.*

214.    "No person, except those admitted to vote, shall be admitted *within the room where the election is being held*, except the judges, clerks, persons admitted by the presiding judge to preserve order, inspectors, watchers, and children under 10 years old who accompany a parent who is admitted to vote." Tex. Elec. Code art. 8.17 (1977) (emphasis added).

215.    Moreover, "[n]ot more than one person at the same time shall be permitted to occupy any one compartment, voting booth or place prepared for a voter… except when a voter is unable to prepare the same because of the voter's inability to read the language in which the ballot is printed or because of some bodily infirmity which renders the voter physically unable to write or to see…." Tex. Elec. Code art. 8.13 Subd. 1 (1979).

216.    Finally, where feasible, "all persons waiting to vote at the time for official closing of the polls shall be required to enter the polling place, *and the door to the polling place shall be closed and locked*, and each such person shall remain inside the

polling place until he has voted." Tex. Elec. Code art. 2.01 (1975) (emphasis added).

217.    In 1984, Congress passed the Voting Accessibility for the Elderly and Handicapped Act which required states to make polling places handicapped accessible or provide alternative means for casting a ballot on election day. 52 U.S.C.A. § 20102.

218.    In 1985 Texas adopted a law permitting voters physically unable to enter a polling place on election day without personal assistance or the likelihood of injuring their health could, upon request, have an election official deliver a ballot to them at the polling place entrance or curb. Tex. Elec. Code §§ 64.009, 82.002, 104.001-005 (1985).

219.    The Legislature also clarified that polling places must be located "inside a building." Tex. Elec. Code § 43.031 (1985). If a public building was unavailable, the County could purchase or construct one for use as a polling place. Tex. Elec. Code § 43.032. Polling places had to be handicap accessible. Tex. Elec. Code § 43.034 (1985).

220.    Plaintiffs are **not** challenging these provisions.

221.    No evidence was presented at trial showing, prior to 2020, that curbside voting was allowed for anyone other than those physically unable to enter a polling place without personal assistance or the likelihood of injuring their health. Tex. Elec. Code §§ 64.009, 82.002.

222.    Harris County used drive-by voting at tent locations for *all voters* during the 2020 election. Oct. 2, 2023 Tr. at 1968:10–12. Harris County's drive-by voting scheme permitted all voters to vote without exiting their vehicles. Oct. 4, 2023 Tr. at 2703:2–3; Oct. 2, 2023 Tr. at 1968:10–12. Voters would pull into the tent and election officials inside the tent would have them an e-slate to cast their vote from inside their vehicle. [Citation]. Many times, the votes were cast by multiple people in the same vehicle. Sept. 19, 2023 Tr. 1190:17– 1191:14.

223.    Harris County's drive-by voting scheme violated numerous election laws. Harris County allowed more than one person in a vehicle at its drive-by voting tents in violation of Tex. Elec. Code § 64.002(a) (prohibiting more than one person at a time in a voting station). [Citation].

224.    The voting stations were not in full view of the election official, poll watchers, and those waiting in line, separated from those waiting in line, and with adequate lighting and only accessible through a single entrance in violation of Tex. Elec. Code § 62.004. [Citation]. Harris County also failed to ensure that firearms were not brought into the drive-by voting booths in violation of Tex. Pen. Code § 46.03(a)(2). [Citation].

225.    On October 16, 2020, Attorney General Ken Paxton issued a letter to election officials advising them that drive-by voting for all voters was not permitted, unless they were physically unable to enter a polling place without personal assistance or the likelihood of injuring their health, and that tents erected outside

could not serve as polling places because they were not "buildings." STATE Ex. 138.

226.    In response to the actions of Harris County, the Legislature passed SB 1—which did not change the law but, instead, added clarifying language. Oct. 17. 2023 Tr. at 4382:1–10 (The challenged provisions instead used "more words" to clarify preexisting standards); *see also* Oct. 16, 2023 Tr. at 3927:21–3928:3; Oct. 16, 2023 Tr. at 3971:20–3972:2; Sept. 22, 2023 Tr. at 1882:17–25; Oct. 18, 2023 Tr. at 4444:8–11.

227.    Section 3.04 clarified that the *only* voters permitted to vote inside of their vehicles are those physically unable to enter the polling place without personal assistance or likelihood of injuring their health. Tex. Elec. Code § 43.031(b); *see also* Tex. Elec. Code §§ 64.009, 82.002, 104.001-005.

228.    Sections 3.12 and 3.13 clarified that voters can early vote *inside* permanent and temporary branch polling place buildings. Tex. Elec. Code §§ 85.061(a), 85.062(b).

### ii.    Brnovich Guideposts

**a.**    Section 2.06 Imposes Little to No Burden on Voters

229.    Sections 3.04, 3.12, and 3.13 do not burden voters, *see generally supra* ▢ (discussing burden in *Anderson-Burdick* context), because they do not change the law in Texas. The only Texans permitted to vote from inside their vehicles are those physically unable to enter the polling place without personal assistance or likelihood of injuring their health pursuant. Tex. Elec. Code §§ 43.031, 64.009, 82.002,

104.001-005. Senate Bill 1 did not change this. *Hotze*, 16 F.4th 1121 at 1128 (Oldham, J., dissenting).

230.    The argument that because it wasn't explicitly prevented in the Election Code prior to SB 1 is unavailing. *First*, it violates the principle that the expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*). See ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107–11 (2012). In § 64.009, the Texas Legislature clearly specified that voters with special physical disabilities or health risks be permitted to vote without entering a polling place. By extending the accommodation to that group only, the Legislature impliedly excluded everyone else. *Hotze*, 16 F.4th 1121 at 1128-29 (Oldham, J., dissenting).

231.    *Second*, reading the Election Code to permit drive-through voting for all voters renders § 64.009 meaningless: There is no need for a special accommodation if the voters covered by § 64.009—like everyone else—can vote from their vehicles. And an interpretation that reads § 64.009 right out of the Code cannot be correct. *See Marx v. Gen Revenue Corp.*, 568 U.S. 371, 385 (2013) (surplusage canon is "strongest when an interpretation would render superfluous another part of the same statutory scheme"); Scalia & Garner, *supra*, (No provision should "be given an interpretation that causes it ... to have no consequence.") *Hotze*, 16 F.4th 1121 at 1129 (Oldham, J., dissenting).

232.    Similarly, SB 1 did not change the requirement that polling places must be inside buildings—not in the tents Harris County erected to accommodate drive-by

voting for all voters and not inside of vehicles. The Texas Election Code states that polling locations "may be located in any stationary structure," including a "movable structure." Tex. Elec. Code § 85.062(b) (1985). As Texas Supreme Court Justice Devine found:

538.    First, the Code likely contemplates that "structure" is a place one enters to get to the polling place; the structure itself is not the polling place. For instance, the Code prohibits electioneering "within 100 feet of an outside door through which a voter may enter the building or structure *in which* the early voting polling place is located." Tex. Elec. Code § 85.036(a) (emphasis added). The prepositional phrase "in which" indicates that the polling place is to be inside of a building or structure. The structure itself cannot be the polling place and the voting station rolled into one.

539.

540.    Even harder to understand is how one's vehicle could qualify as a "polling place," as it is not a "structure" as commonly understood. Nor can one's vehicle be a "voting station," which is a specific location designated for voters to cast a ballot. Station, WEBSTER'S NEW COLLEGIATE DICTIONARY (1975) ("[A] place established to provide a public service." (emphasis added)). Hollins' expansion of the statute manifests itself in the absurd result that every voter's vehicle is a "polling place" or "voting station." *In re Hotze*, 610 S.W.3d 909, 910 (Tex. 2020) (Devine, J., dissenting from denial of petition).

541.

233.    Sections 3.04, 3.12, and 3.13 had no impact on voters because they did not change the law; instead, these provisions merely clarified what was already the law.

Moreover, even if the Court adopted Plaintiffs argument and ruled in their favor then counties, like Harris County, *still* wouldn't be able to operate drive-by voting because it would violate a host of provisions in the Election Code that are *not* challenged in this suit, including Tex. Code §§ 64.002(a), .004; Tex. Pen. Code § 46.03(a)(2). *See Hotze*, 16 F.4th 1121 at 1128-29 (Oldham, J., dissenting).

b.  Any departure from standard practice in 1982 was slight and favored the voter.

542.

234.    Sections 3.04 deviated somewhat from standard practice in 1982 because, at the time, Texas allowed curbside between 8 a.m. and 2 p.m. on election day for those who were ill or disabled "and thus cannot, without injury to his health or without personal assistance, cast his vote in the regular manner." Tex. Elec. Code art. 5.05, Subd. 3c (1977). Curbside voting is now permitted while polls are open throughout the early voting period. *See generally* Tex. Elec. Code § 64.009.

235.    Otherwise, this exception has substantially stayed the same through the present—permitting curbside voting for only those physically unable to enter a polling place on election day without personal assistance or the likelihood of injuring their health. Tex. Elec. Code §§ 64.009, 82.002, 104.001-005 (1985). No evidence was introduced at trial showing a long history of drive-by voting in Texas, nor of curbside voting being permitted for voters *other* than those physically unable to enter a polling place on election day without personal assistance or the likelihood of injuring their health. *See* Tex. Elec. Code Section 64.009; STATE Ex. 137; Oct.

3, 2023 Tr. at 2342:25–2343:5; Sept. 14, 2023 Tr. at 827:4–7; Sept. 14, 2023 Tr. at 828:11–12; Oct. 12, 2023 Tr. at 147:21–22.

236.      Sections 3.04, 3.12, and 3.13 do not deviate from standard practice in 1982 because, both then and now, vehicles could not be voting booths, Tex. Elec. Code art. 1.01a(57) (1981), and the Harris County drive-by voting locations did not have the required guardrail, accoutrement, dimensions, and three-sided enclosure required for voting booths and polling places, Tex. Elec. Code art. 7.02 (1981). In has been the case, since 1985, that voting booths and places were required to be inside a building, Tex. Elec. Code § 43.031(b) (1985), except those permitted to vote curbside because they are physically unable to enter a polling place on election day without personal assistance or the likelihood of injuring their health. Tex. Elec. Code §§ 64.009, 82.002, 104.001-005 (1985).

237.      SB 1 therefore does not substantial depart from the standard practices in Texas in 1982 and do not depart at all from the standards in place since 1985.

c.  Sections 3.04, 3.12, and 3.13 Caused Little Disparities Among Members of Different Racial and Ethnic Groups.

543.

238.      Sections 3.04, 3.12, and 3.13 do not have disparate impacts on different racial and ethnic groups because they do not change the pre-existing prohibition on voting from inside of a vehicle, except for those physically unable to enter the polling place without personal assistance or likelihood of injuring their health pursuant. Tex. Elec. Code §§ 43.031, 64.009, 82.002, 104.001-005.

239.    However, even if we isolate Harris County, who offered drive-thru voting in spite Section 64.009 of the Election Code, the record shows that minority voters utilized drive-thru voting at rate that was less than their percentage of the population. *See* ECF 810-1 at 207:21–209:322 (Sen. Alvarado Designations); *see also* STATE Ex. 290; *c.f.* Oct. 2, 2023 Tr. at 2044:25 –2045:6 (Dr. Mayer noting that majority of every racial group walked inside to vote).

240.    In contrast, White voters utilized drive-thru voting at a rate that was noticeably greater than their percentage of the population. *See* ECF 810-1 at 210:16–211:5. (Sen. Alvarado Designations); *see also* STATE Ex. 290. An expert for the Plaintiffs, Dr. Mayer, acknowledged that "more White votes use[d] drive-thru voting than voters of any other race." Oct. 2, 2023 Tr. at 2045:7–15.

241.    The Former Elections Administrator in Harris County also acknowledged that the majority of drive-thru voting locations in November 2020 were placed in minority-majority senate districts. Sept 20, 2023 Tr. at 1394:18–1396:16. Neither she nor the Harris County Election Office assessed whether the placement of these locations in minority-majority areas had an impact on the demographic distribution of voters who utilized the drive-thru voting option. Sept. 20, 2023 Tr. at 1396:19–1397:12.

d.  Texas's Election System Provides Numerous Opportunities and Protections for Registered Voters

544.

242.      Texas's entire system of voting provides numerous opportunities and protections for registered voters, as discussed in State Defendants and Intervenor-Defendants' finding of fact. *See* ECF _____. Cite to the FOF discussing Texas's system of voting.

e.   Section 3.04, 3.12, and 3.13 Advance Important Interests

545.

243.      Texas undeniably has a strong interest in preventing voter fraud and maintaining orderly elections. See *Tex. LULAC*, 978 F.3d at 146. Sections 3.04, 3.12, and 3.13 further those interests by ensuring elections take place where they can be observed by poll watchers and election officials, and in secrecy. A forensic audit of the Harris County 2020 election revealed serious discrepancies at every single drive-by voting location. Oct. 17, 2023 Tr. at 4230:10-25. Not only can these discrepancies disenfranchise voters, but they also can change the outcome of elections and undermine confidence in election results. *ECF  See supra* _____.

## E.  Voting Hours (Sections 3.09 and 3.10)

244.      LULAC Plaintiffs, HAUL Plaintiffs, and MFV Plaintiffs challenge Sections 3.09 and 3.10 of SB 1. ECF 199 at ¶¶ 200, 309-17; 207 at ¶¶ 177, 252-54. Specially, Plaintiffs contend that these sections violated the VRA by standardizing voting hours to 6 a.m. through 10 p.m, which had the effect of prohibiting 24-hour voting. *Id.*

245.      Plaintiff's claims are without merit.

### i.    Statutory Background

246.    In 1982, the polls were open on election day no earlier than 6 a.m. and closed at 7 p.m. Tex. Elec. Code art. 2.01 (1975). Voters qualifying for absentee voting could vote either by mail or by personal appearance during "regular office hours" at the clerk's office. Tex. Elec. Code art. 5.05, Subd. 1(b), (c)(ii) (1981); see Tex. Elec. Code § 81.001 (1991) (replacing "absentee" voting with "early" voting).

247.    In 1985, Texas law provided that when the voting clerk was the county clerk or city secretary than absentee voters could vote by personal appearance at the main polling place on weekdays during the hours the "during the hours that the county clerk's or city secretary's main business office is regularly open for business." Tex. Elec. Code § 85.005(a) (1985).

248.    In elections where the voting clerk was not the county clerk or city secretary, absentee voters could vote by personal appearance at the main polling place, which was required to be open at least eight hours each weekday of the absentee voting period other than legal holidays, unless the area had fewer than 1,000 registered voters, in which case the polling place had to be open at least three hours each weekday. Tex. Elec. Code § 85.005(b) (1985). The election authority could "determine which hours the voting is to be conducted." *Id.*

249.    In counties with more than 200,000 registered voters the absentee polling location had to be open for at least 12 hours on each weekday of the last week of the absentee voting period. Tex. Elec. Code § 85.005(b) (1985). The authority ordering the election could also order that the main polling place be open on one or more Saturday or Sunday during the absentee voting period. Tex. Elec. Code § 85.006(a)

(1985). "The authority ordering voting on a Saturday or Sunday shall determine the hours during which voting is to be conducted." Tex. Elec. Code § 85.006(c) (1985).

208.     In 1989, the Legislature added that in counties with a population greater than 200,000 the absentee voting clerk must permit absentee voting at the main polling location to be conducted for at least 12 hours on the last Saturday and for at least five hours on the last Sunday of the absentee voting period. Tex. Elec. Code § 85.006(e) (1989).

209.     Section 3.09 expanded the weekday early voting period from eight hours to nine hours on weekdays and for those locations with fewer than 1,000 registered voters it expanded the early voting hours from three hours to four hours on weekdays. Tex. Elec. Code § 85.005 (2021). Section 3.09 standardized weekday voting hours during the early voting period to not occur "earlier than 6 a.m. or later than 10 p.m." *Id.*

210.     Section 3.10 expanded the weekend early voting period by requiring that the main polling place be open for early voting for 12 hours on the last Saturday and from five hours to six hours on the last Sunday of the early voting period in counties with more than 55,000 residents or upon request from at least 15 registered voters. Tex. Elec. Code § 85.006 (2021). Section 3.10 limited the weekend voting hours during the early voting period to not "earlier than 6 a.m. or later than 10 p.m." *Id.*

211.     While this suit was pending the Legislature further amended the law to provide that all main polling place must be open for at least 12 consecutive hours

on weekdays during the last week of early voting and that the early voting weekend hours must be consecutive. Tex. Elec. Code § 85.005-.006 (2023).

### a. Brnovich Guideposts

**a.** The Burden Imposed on Voters is Slight

250.     Sections 3.09-10 impose little to no burden on voters. *See generally supra* ▢ (discussing burden in *Anderson-Burdick* context). It *increased* the number of required voting hours for voters during the early voting period. *See* JOINT Ex. 1 at 16–19 (amending Tex. Elec. Code § 85.005-006); *see also Texas LULAC*, 978 F.3d at 144-45 (noting that statutory scheme that expands opportunities to vote overall does not constitute a burden even if it also restricts some voting options).

251.     It standardized voting hours between 6 a.m. and 10 p.m., but there was no evidence that voting during these hours was widespread in Texas. To the contrary, Former Director Ingram, from the Secretary of State's Office, testified that in his experience, most counties offer hours within that range and the hours of 6:00 a.m. and 10:00 p.m. "capture[d] the vast majority of voters" Oct. 17, 2023 Tr. at 4368:24–4369:4.

252.     Multiple county election administrators also testified that not only did their counties' polling hours fall within the time range stipulated in Section 3.09 and 3.10, but that their offices had determined that there was not sufficient interest from voters to justify exceeding it. *See*, *e.g.*, Sept. 14, 2023 Tr. at 826:2–827:3; Sept. 19, 2023 Tr. at 1128:19–1130:7.

253.     Former Harris County Election Administrator Longoria, who organized Harris County's special projects in 2020, admitted that "[i]t didn't make sense to

use resources to have 24-hour voting for every single day of early voting." Oct. 20, 2023 Tr. at 1262:14–15.

b. The Challenged Provisions Do Not Significantly Deviate from Standard Practice in 1982.

546.

254.    Sections 3.09 and 3.10 do not depart substantially from standard practices in 1982. In 1982, Texas allowed absentee voting by personal appearance at the clerk's officer during "regular office hours." Tex. Elec. Code art. 5.05, Subd. 1(b), (c)(ii) (1981). There was no evidence presented during trial showing that clerk's officers in 1982 were open between the hours of 10 p.m. and 6 a.m. Regular office hours for governmental agencies are generally between 6 a.m. and 10 p.m., not the middle of the night.

255.    Even in Harris County, the election's office only introduced 24-hour voting in 2020, when it arranged for approximately eight locations to remain open for a single night. *See* Sept. 19, 2023 Tr. at 1156:13–22. Sept. 20, 2023 Tr. at 1262:2–1263:3; *see also* STATE Ex. 141, 151.  To put this in perspective, Harris County opened 112 voting locations during a three-week early voting period in the November 2020 election. *See* STATE Ex. 151. 24-hour voting represented a mere sliver of Harris County's overall voting program.

c. The Evidence Does Not Establish Sizeable Disparity on Different Racial and Ethnics Groups.

547.

256.    Plaintiffs failed to prove by a preponderance of the evidence that Sections 3.09 and 3.10 have a disparate impact on different racial and ethnic groups.

257.    *First*, Plaintiffs' experts and fact witnesses base their analysis on comparing data from the November 2022 election with November 2020, but a presidential election in the middle of global wide pandemic, which saw massive changes to election practices and procedures, is not a proper reference point. *See* Sept. 12, 2023 Tr. at 337:23 – 345:6 (describing differences between November 2020 and November 2022); *see also* Sept. 19, 2023 Tr. at 1127:6–1128:15, 1135:6–20; Oct. 3, 2023 Tr. at 2341:13 –2324:24.

258.    *Second*, even when you compare November 2020 and November 2022, there is little evidence that standardizing hours had adverse impact on minority voters. The decline in turnout between November 2020 and November 2022 tracks national and historic trends, given that the former was a presidential election cycle and the latter a midterm with no U.S. Senator on the Texas ballot.

259.    Dr. Hoekstra in fact shows in his expert report that larger declines in turnout among counties with larger shares of Black voters is stronger for counties *whose early voting hours were completely unaffected by SB 1*. STATE Ex. 8 at §§ 4.D, 24–32.

260.    *Third,* Plaintiffs focus almost exclusively on Harris County and minimize the impact that Sections 3.09 and 3.10, which expanded minimum voting hours, will have in the rest of the State. The Former Hidalgo County Election Administrator testified that her office had to increase its Sunday voting hours to comply with the

statute. Oct. 3, 2023 Tr. at 2314:6-12, 2354:10-23. Hidalgo County is predominately Hispanic.

261.     *Fourth,* even if we isolate Harris County, the record shows that minority voters utilized 24-hour voting at rate that was less than their percentage of the population. *See* ECF 810-1 at 207:21–209:322 (Sen. Alvarado Designations); *see also* STATE Ex. 290. In contrast, White voters utilized drive-thru voting at a rate that was noticeably greater than their percentage of the population. *See* ECF 810-1 at 210:3–25. (Sen. Alvarado Designations); *see also* STATE Ex. 290

262.     The Former Elections Administrator in Harris County also acknowledged that race played a role in her office's decision about which polling sites would remain open 24-hours, calling it "an historical and race-informed decision." Sept. 20, 2023 Tr. at 1394:2-17. None of Plaintiffs' experts assessed whether the placement of 24-hour locations affected the demographic distribution of voters who utilized a 24-hour polling location.

263.     Finally, Harris County had approximately 1.63 million voters participate in the November 2022 general election. STATE Ex. 167 at 2. Of that number, only 16,000 utilized the 24-hour voting option. HAUL Ex. 273 at 1. That's 0.98 percent. When compared to the number of Texans who voted that election, *see* STATE Ex. 155 at 1, the percentage drops to .14 percent. Section 3.09 and 3.10's impact on minority voters is negligible.

d.   Texas's Election System Provides Numerous Opportunities and Protections for Registered Voters

264.     The impacts of Sections 3.09 and 3.10, in the broader context of Texas'
entire voting system, do not violate § 2 of the VRA. Sections 3.09 and 3.10 increase
the minimum number of required hours for early voting, and they lower the
population threshold counties must before offering longer hours.. Tex. Elec. Code
§ 85.005-006 (2021).

265.     The Election Code also grants voters numerous options by which to vote
outside of 24-hour voting. This includes voting by personal appearance during a
two-week early voting period and on Election Day. This includes curbside voting
for those who qualify. *See* Elec. Code § 64.009. Texas has adopted county-wide
voting, which allows Texans to vote at whichever location in the county is most
convenient. See Tex. Elec. Code § 43.007. In Texas's most populous counties,
voters can have their pick from hundreds of polling sites.

266.     For example, Harris County in the November 2022 election—after SB 1 was
enacted—hosted 99 early voting locations and 782 election day voting locations. *See*
STATE Ex. 25 at 3; STATE Ex. 154.  This is a significant increase from as recently
as 2018 when the county only scheduled 46 early voting locations. STATE Ex. 150;
*see also* Sept. 19, 2023 Tr. at 1196:4–9, 1198:12–23.

267.     Moreover, Harris County voting locations were open a minimum of 12
hours each weekday during the early voting period and on election day in November
20233. *See* STATE Ex. 154. On the second last day of the early voting period, *all* 99
polling sites were open 15 hours, from 7:00 am to 10:00. *Id.* This, again, represents
a significant increase in voting opportunities since 2018, when polling places had

shorter hours, *compare* STATE Ex. 150 and 154, and since 2020, when only about 8 locations stayed open for 24 hours, *compare* STATE Ex. 151 and 154.

e.   Section 3.09 and 3.10 Advance Important State Interests

268.     Texas undeniably has a strong interest in orderly elections. *Tex. LULAC*, 978 F.3d at 146. Sections 3.09-10 furthers those interests by increasing the minimum number of early voting hours while restricting those hours to times when most early voting takes place, between 6 a.m. and 10 p.m. In addition, under Sections 3.09 and 3.10 every county in Texas provides similar voting hours. This advances the State's interest in a uniform voting regime. *See Id.* at 149–50.

269.     More specifically, unform voting hours minimizes voter confusion. States have an interest in preventing "misrepresentation and electoral confusion" *Norman v. Reed*, 502 U.S. 279, 112 S. Ct. 698, 706 (1992); *accord Texas LULAC*, 978 F.3d at 147-48. While courts "have never required a State to make a particularized showing of the existence of voter confusion...prior to the imposition of reasonable [voting regulations]," *Munro*, 479 U.S. at 194–95 (1986), the record shows that varying voting hours among counties often sowed confusion among voters. *See*, *e.g.*, Oct. 17, 2023 Tr. at 4367:24-4368:8.

270.     According to Former Director Ingram's testimony, confusion is especially acute when a large county is surrounded by several less-populated rural counties that have different statutory requirements. *Id.* He gave the example of voters expecting 12 hours of voting on the last Saturday of the early voting period, only to learn that their county was under the population threshold that made it mandatory.

*Id.* The Bexar County Election Administrator also reported that voters often get confused when neighboring counties have different polling hours. Sept. 19, 2023 Tr. at 1130:7–19. This is particularly true for residents that live in subdivisions that span multiple counties. *Id.*

271.     By standardizing hours and increasing the number of counties that must provide 12-hour voting, SB 1 will reduce the propensity of differences in schedule to confuse voters. Sept. 19, 2023 Tr. at 1130:17-19.

272.     Limiting the number of hours and keeping hours within the 6-10 range ensures staffing needs remain at reasonable levels. *See* Sept. 12, 2023 Tr. at 351:11-15 (numerous hours increase staffing needs). This not only preserves government resources but also reduces chain of custody problems. When polls remain open for a 24-hour or comparable period, shift changes in personnel can confuse the chain of custody over ballots. *See* Oct 17, 2023 Tr. 4367:13–21 (talking about need for shift chages).

273.     Curtailing hours past 10 p.m. also protects the physical safety of voters and election workers. *See* Sept. 19, 2023 Tr. at 1021:9-1022:22 (testifying that 24-hour voting would jeopardize safety of election workers due to late hours); Oct. 12, 2023 Tr. at 3857:7–9 (having concern about safety of election workers "especially at night").

**F. Straight-Ticket Voting (Section 3.15).**

274.     HAUL Plaintiffs challenge § 3.15 of SB 1, which they wrongly believe bans straight-party voting in Texas. ECF 199 at ¶¶ 205-206, 311-12. The claim is without merit. *First*, Section 3.15 did not eliminate straight-voting; it therefore had no effect

on the voting options counties offered voters. *Second*, even if it did, the abolition of straight-ticket voting, as a threshold matter, is not a "voting qualification or prerequisite to voting or standard, practice, or procedure" covered by Section 2. 52 U.S.C. § 10301(a). It therefore does not implicate Section 2 of the VRA. *See Mich. State A. Philip Randolph Inst. v. Johnson,* 749 F. App'x 342, 353 (6th Cir. 2018); *see also Lucas v. Townsend*, 698 F. Supp. 909 (M.D. Ga. 1988) (finding that structure of a question on a bond referendum is not a standard, practice or procedure affecting voting).

### i.    Statutory Background.

409.    In 1982, Texas permitted straight-party voting. Tex. Elec. Code art. 7.15 Subd. 11 (1981); see also Tex. Elec. Code §§ 52.071, 124.003 (1985).

410.    In 2017, the Legislature eliminated straight-ticket voting. See Tex. Elec. Code § 52.071, repealed by Act of May 20, 2017, 85th Leg., R.S., ch. 404, § 8, 2017 Tex. Gen. Laws 1081, 1083.1 ("H.B. 25"). The statute eliminating straight ticket voting took effect three years later on September 1, 2020.

411.    Following its passage, counties stopped offering voters the option "to vote for all candidates of their desired political party by making a single mark designating the selection of that political party, rather than voting for each partisan candidate individually." *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 670 (5th Cir. 2022) ("TARA"); *see*, *e.g.*, Sept 19, 2023 Tr at 1138:24–1139:18.

### a.    Brnovich Guideposts

**a.**    Section 3.15 Imposed No Burden on Voters.

412.     Section 3.15 does not impose any burdens on voters because straight-ticket voting was already prohibited in Texas.

413.     Plaintiffs are not challenging the 2017 law prohibiting straight-ticket voting *See e.g. TARA v. Scott*, 28 F.4th 669 (5th Cir. 2022) (a lawsuit challenging the 2017 law prohibiting straight-party voting). They are instead challenging a clarification that eliminated a possible loophole to the 2017 law by forbidding election authorities from arranging the ballot on a single screen in such a way as to allow the voter to mark all the candidates of a given party with a single gesture.

414.     However, the clarification did not change the options available to voters, as the Legislature banned straight-ticket voting in 2017. Oct. 17, 2023 Tr. at 4370:23–4371:12. Furthermore, no county owns election equipment capable of displaying the whole ballot on a single screen, Oct. 17, 2023 Tr. at 4371:22–4372:11, and Plaintiffs have introduced no evidence that any county is considering purchasing the equipment.

415.     Additionally, Plaintiffs failed to establish that the elimination of straight-ticket voting imposes a significant burden on voters in the first place. Multiple courts have considered statutes similar to H.B. 25 in 2017; they concluded that the repeal of straight-ticket voting had little implication for voters' access to the franchise. *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 945 (W.D. Wis. 2016); Orr v. Edgar, 298 Ill. App. 3d 432, 438 (1998); *see also See Mich. State A. Philip Randolph Inst. v. Johnson,* 749 F. App'x 342, 348 – 49 (6th Cir. 2018). This Court should do the same.

b.  Any Deviation from Standard Practices in 1982 Predated Section 3.15.

548.

416.      To the extent that Texas's current rules regarding straight-ticket voting diverges from practice in 1982, that deviation was caused by H.B. 25, not Section 3.15, which merely clarified existing law.

c.  Section 3.15 Has Caused No Disparities Among Racial and Ethnic Groups.

549.

417.      Plaintiffs failed to show by a preponderance of the evidence that Section 3.15 has a disparate impact on different racial and ethnic groups. Section 3.15 has no impact on any voters because straight-party voting was prohibited in Texas prior to Section 3.15's passage. Furthermore, Plaintiff's chief argument against the elimination of straight-ticket voting—impact on wait times—is unpersuasive. The evidence in the record establishes that wait times in November 2022 were comparable to past election cycles. *See*, *e.g.*, Sept. 12, 2023 Tr. at 285:24–286:5; Sept. 19, 2023 Tr. at 1090:12 – 1091:3. Plaintiffs failed to meet their burden that (1) abolishing straight-ticket voting increased wait times, (2) the increased wait time in fact hindered voters, and (3) these effects disproportionately fell on specific racial and ethnic groups.

d.  Texas Provides Voters Ample Opportunities to Vote.

418.      Texas's entire system of voting provides numerous opportunities and protections for registered voters, as discussed in State Defendants and Intervenor-

Defendants' finding of fact. *See* ECF _____. Cite to the FOF discussing Texas's system of voting.

e.  Section 3.15 Advances Important Interests

419.    The challenged provision serves Texas's interest in enforcing its laws and clarifying ambiguities in the Election Code. *See La Union del Pueblo Entero*, 618 F. Supp. 3d at 412 (quoting *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015)) (finding that Texas has an "intrinsic right to enact, interpret, and enforce its own laws"). Violations of the law "result in irreparable injury to the State." *Hollins,* 620 S.W.3d at 410. 3.15 Section 3.15 furthers that interest by foreclosing attempts to circumvent the Legislature's decision to eliminate straight-ticket voting. Tex. Elec. Code § 124.002(c). And while the change was made in 2017, not through Section 3.15, the decision to eliminate straight-ticket voting advances Texas's interest in a well-informed electorate that makes individualized assessment of candidates rather mass choices.

## G.  Poll Watchers (Sections 4.01 and 4.07)

420.    HAUL Plaintiffs and MFV Plaintiffs allege that Sections 4.01 and 4.07 violate Section 2 of the VRA. ECF 199 at ¶¶ 309-12. They claim that the challenged sections provide "partisan poll watchers expanded access" to polling places and counting locations, limiting election workers' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes. *Id*. These claims are without merit. Sections 4.01 and 4.07 do not grant poll watchers any new authority; nor have Plaintiffs established that the challenged provisions

affected voters, much less had a disparate impact on a particular ethnic or minority group.

### i.    Statutory Background

421.    In 1982, Texas permitted poll watchers to be appointed "to observe the conduct of an election and to report any irregularities or violations of law." Tex. Elec. Code art. 1.01a(40) (1981). Texas law at the time provided that poll watchers were:

550.    Permitted, but not required, to sit conveniently near the judges or clerks so that he can observe the conduct of the election, including but not limited to the reading of the ballots, the tallying and counting of the votes, the making out of the returns, the locking of the ballot boxes, their custody and safe return. He shall also be permitted to be present when assistance is given by any election judge in the marking of the ballot of any voter not able to mark his own ballot, to see that the ballot is marked in accordance with the wishes of the voter, but he must remain silent except in cases of irregularity or violation of the law.

551.

552.    He shall not be permitted to enter into any conversation with the judges or clerks regarding the election while it is progressing, except to call the attention of the judges or clerks to any irregularity or violation of the law that he may observe. The watcher shall call the attention of officers holding the election to any fraud, irregularity or mistake, illegal voting attempted, or other failure to comply with the laws governing such election at the time it occurs, if practicable and if he has knowledge thereof at the time, and such complaint shall be reduced to writing and a copy delivered to the election judge. Preventing a poll watcher from observing any activity including,

but not limited to, the tallying of ballots at any polling place, place of canvass, or central counting station shall constitute a Class A misdemeanor.

553.

554.    Tex. Elec. Code art. 3.07(d) (1981).

555.

422.    Presiding judges of elections while discharging their duties had the power of a district judge to "enforce order and keep the peace." Tex. Elec. Code art. 8.05 (1951). They could appoint special peace officers to act as such during elections and could issue arrest warrants "for felony, misdemeanor or breach of the peace committed at such election." *Id.* However, the Election Code did not specify when a poll watcher could be removed. *See* Oct. 17, 2023 Tr. at 4380:22 – 4381:25. An unjustified removal could constitute poll watcher obstruction, which is a misdemeanor. Tex. Elec. Code § 33.061 (1986).

423.    The laws governing poll watchers have remained largely the same through the present day. See Tex. Elec. Code §§ 32.075, 33.058 (1985).

424.    Section 4.01 clarified that presiding judges could remove poll watchers from polling places for violations of the Election Code unless, other than violations of the Penal Code, unless the violation was observed by an election judge or clerk. Tex. Elec. Code § 32.075(g). It added, however, that notwithstanding this provision, a presiding judge may call law enforcement to request that a poll watcher be removed if they commit a breach of the peace or a violation of law.  Tex. Elec. Code § 32.075(h).

425.     Section 4.07 clarified that poll watchers could not be denied free movement where election activity is occurring within the polling place and that observing election activity are entitling poll watchers to sit or stand "near enough to see and hear" the activity. Tex. Elec. Code § 33.056(a), (e). The change from permitting poll watchers to be "conveniently near" enough to observe election activity to "near enough to see and hear" the activity did not meaningfully change the law. Sept. 22, 2023 Tr. at 1883:12-20. Similarly, it was already a crime to obstruct the free movement of poll watchers while they are performing their duties. Tex. Elec. Code § 33.061 (1985); Sept. 22, 2023 Tr. at Sept. 22, 2023 Tr. at 1888:1-8; 1883:21-1884:4; 1886:16-23.

### a. Brnovich Guideposts

**a.**     Sections 4.01 and 4.07 Impose a Negligible Burden on Voters

426.     Sections 4.01 and 4.07 do not impose any burdens on voters because it did not meaningfully change the law. Section 4.01 did not change the authority of presiding judges to have anyone, including poll watchers, removed from the polling place if they breach the peace or violate the law. Tex. Elec. Code § 32.075 (1985); Tex. Elec. Code § 32.075(g)-(h) (2021); *see also* Oct. 17. 2023 Tr. at 4382:1–10. Section 4.07 did not change the prohibition on obstructing free movement of poll watchers and their ability to observe elections. *See* Tex. Elec. Code § 33.058 (1985); Tex. Elec. Code §§ 33.056(a), (e), .061 (2021); *see also* Oct. 17, 2023 Tr. at 4386:10–4387:24; *see also* Oct.12, 2023 Tr. at 3867:8–23. The challenged provisions instead used "more words" to clarify preexisting standards. Oct. 17, 2023 Tr. at 4382:1–5; *see generally supra* ____ (discussing burden in *Anderson-Burdick* context).

b. Sections 4.01 and 4.07 Do Not Represent a Departure from Standard Practice in 1982.

556.

427.    Sections 4.01 and 4.07 do not depart from standard practice in 1982. Presiding judges had the authority to have anyone removed from polling places, including poll watchers, if they breached the peace or violated the law. Tex. Elec. Code art. 8.05 (1951). The same is true today. Tex. Elec. Code § 32.075(g)-(h) (2021). Similarly, in 1982, it was a crime to obstruct the free movement of poll watchers and poll watchers were permitted to it or stand close enough to observe the election. Tex. Elec. Code art. 3.07(d) (1981). This is still the case today. Tex. Elec. Code §§ 33.056(a), (e), .061 (2021).

c. Sections 4.01 and 4.07 Have Not Caused Any Racial Disparities on Members of Different Racial and Ethnic Groups.

557.

428.    Plaintiffs failed to show by a preponderance of the evidence that §§ 4.01 & 4.07 had a disparate impact on different racial and ethnic groups. Section 4.01 and 4.07 had no impact on any voters because they did not meaningfully change the law—they merely added clarifying language. Oct. 17. 2023 Tr. at 4382:1–10, 4386:10–4387:24; *see also* Oct.12, 2023 Tr. at 3867:8–23.

429.    The evidence shows that there has always been a tension between poll watchers and election workers. While there is some indication that this tension heightened during the 2020 November election, Oct. 17, 2023 Tr. at 4375:18–

4376:2, the evidence does not show that the challenged provisions prompted any additional misconduct on the part of poll watchers. Sept. 19, 2023 Tr. at 1208:10–20; Oct. 12, 2023 Tr. at 3865:5–24.

430.     Indeed, when prompted on cross examination, county witnesses conceded that they were aware of no occasion where an election judge wished to remove a poll watcher but could not because of S.B. 1. Sept. 12, 2023 Tr. at 287:18-22; Sept. 19, 2023 Tr. at 1095:4-8; *see also* Oct 12, 2023 Tr. at 3866:20–3867:7. If anything, SB 1 improved poll watcher conduct by introducing both a poll watcher oath and mandatory training, both of which a poll watcher must take before being accepted for service.  Oct 17, 2023 Tr. at 4389:12–4390:11; *see also* Oct. 12, 2023 Tr. at 3869:3–17.

431.     Furthermore, Plaintiffs have not identified voters who were unable to vote because of the challenged poll watcher provisions. *See*, *e.g.*, Sept. 11, 2023 Tr. at 12:21-13:4 (identifying no voters prevented from voting). When prompted on cross examination, multiple election administrators conceded that they were aware of no voter that was unable to vote in person because of SB 1. *See, e.g.*, Sept. 12, 2023 Tr. at 308:8–11, 481:15–17; Sept 19, 2023 Tr. at 1104:1–4.

d.   Texas Provides Ample Opportunities to Vote

432.      Texas's entire system of voting provides numerous opportunities and protections for registered voters, as discussed in State Defendants and Intervenor-Defendants' finding of fact. *See* ECF _____. Cite to the FOF discussing Texas's system of voting.

e.  Sections 4.01 and 4.07 Advance Important State Interests

433.    Texas's policy of allowing poll watchers to observe election activity "decreases the opportunity for fraud." *Anti-Defamation League*, 610 S.W.3d at 922. The presence of third-party observers deters misconduct, and when it does occur, poll watchers can report it and other regularities to proper authorities. *See*, *e.g.*, Tex. Elec. Code § 33.058(b). In addition, even outside of the context of fraud, poll watchers help further the State's interest in election integrity. *See John Doe No. 1*, 561 U.S. at 198 (recognizing that "electoral integrity is not limited to combating fraud").

434.    Their presence, for example, allows courts to dispel doubts about how an election was conducted. *See*, *e.g.*, *Reyes v. City of Laredo*, 794 S.W.2d 846, 848 (Tex. App.—San Antonio 1990, no writ) ("At every stage of this election . . . poll watchers and/or representatives of the parties have been present to prevent precisely the sort of occurrence which appellant now speculates must have occurred."); *Wooley v. Sterrett*, 387 S.W.2d 734, 742 (Tex. Civ. App.—Dallas 1965, no writ) (relying on the testimony of a poll watcher). And it gives the public assurance that procedures were followed, thereby increasing confidence in the results. Poll watchers, however, cannot perform their purpose if they are obstructed and unable to see and hear election activity as it takes place. Oct. 17, 2023 Tr. at 4387:2–9; *see also* Sept. 13, 2023 Tr. at 783:2–5;  Oct. 12, 2023 Tr. at 3863:16–18.

435.    Finally, Texas has a compelling interest in preserving order and in seeing that its laws are properly followed. All states have a compelling interest in "the

exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999). The added clarity provided by Section 4.01 and 4.07 will help ensure that county election officials apply, and abide by, state law. Those provisions also help clarify existing law; for example, after SB 1, election workers are more keenly aware of the fact that obstructing poll watchers is unlawful. Sept. 12, 2023 Tr. at 481:6-9.

## H. In-Person Delivery of Market Ballots (Sections 4.12)

### i. Statutory Background

f.

#### a. Brnovich Guideposts

g.

## I. Identification Number Requirements (Sections 5.01, 5.02, 5.03, 5.07, 5.08)

### i. Statutory Background

h.

### a. Brnovich Guideposts

i.

558.

## J. Absentee Ballot Distribution (Sections 5.04 and 7.04)

### i. Statutory Background

j.

### a. Brnovich Guideposts

k.

## K. Mail-Ballot Acceptance (Sections 5.11, 5.12, 5.13, 5.14)

212.     MFV Plaintiffs allege that §§ 5.11-.14 violates § 2 of the VRA. ECF 199 at ¶

309-11. Specifically, Plaintiffs claim that § 5.11-.14 allows "for the rejection of

ballots without notice by either the signature verification committee or early

ballot committee if either committee determines that the signature allegedly does

not match any known signature of the voter without regard to the age of the

comparison signature." *Ibid.*

213.     The evidence shows that the opposite is true.

### i.    Statutory Background

214.    In 1982, Texas law provided that an election clerk had to compare a voter's signature on his registration certificate with the one on their ABBM before issuing a ballot. Tex. Elec. Code art. 5.05 Subd. 2c (1981). If the signatures did not match, the clerk would notify the applicant and require them to submit additional sworn information before receiving an absentee ballot. *Id*.

215.    Absentee ballots by mail received from voters would be examined by a special canvassing board "shall open the jacket envelopes, announce the voter's name, and ascertain in each case if he is qualified to vote at that election and if he has complied with all applicable provisions of this section to entitle his ballot to be cast. On ballots voted by mail, the board shall compare the signatures on the application and the carrier envelope, and in case the board finds that the signatures correspond… they shall enter his name on the official poll list… and shall place the sealed ballot envelope in the ballot box and the stub in the stub box." Tex. Elec. Code art. 5.05 Subd. 6(b) (1981).

216.    If the ballot was challenged because the signatures did not match, "the grounds of challenge shall be heard and decided according to law, including consideration of any affidavits submitted in support or against such challenge." Tex. Elec. Code art. 5.05 Subd. 6(c) (1981).

217.    Texas did not have a statewide process to cure defective mail ballots before SB 1. *See* Oct. 17, 2023 Tr. at 4255:5–8.

218.    Today, Texas's Early Voting Ballot Board ("EVBB") is responsible for processing mail-in ballots. § 87.001. The ballots are verified by the EVBB or

223

initially by a Signature Verification Committee ("SVC"), if one is appointed. §§ 87.041(a), 87.021(2), 87.022–024, 87.027(a), (h). The EVBB and the SVC compare the signatures on the ballot application and the carrier envelope certificate, as well as signatures already on file. §§ 87.041(b)–(e), 87.027(h)–(i). Either body may accept or reject ballots based on signature comparisons. §§ 87.027(i), (j), 87.041(b), (d). The EVBB, however, may overrule the SVC's rejection of a ballot and accept the ballot. § 87.027(j).

219.    Prior to SB 1, Texas law directed the SVC to compare voter signatures on the carrier envelope certificate with the signature on the ballot application. Tex. Elec. Code § 87.027(i). It further allowed the SVC to compare those signatures with two or more signatures of the voter made within the preceding six years. *Id*.

220.    Sections 5.11 and 5.13 modified the law so the SVC could compare the signatures on the envelope and application with any known signature of the voter, and not only those within the preceding six years. Tex. Elec. Code § 87.027(i).

221.    Sections 5.12 and 5.14 added an opportunity to cure defects identified by the SVC and EVBB. Tex. Elec. Code §§ 57.0271, 87.0411. Within two days of discovering a defect with an early voting ballot, the SVC or EVBB must provide notice to the voter and, before deciding whether to accept or reject the ballot, give the voter an opportunity to submit a corrective action for curing the defect by mail or in person. Tex. Elec. Code §§ 57.0271, 87.0411. Notified voters can cancel their application to vote by mail or correct the defect by submitting a

corrective action form by mail or by coming into the clerk's office within six days. Tex. Elec. Code §§ 57.0271, 87.0411.

222.     Prior to SB 1, there was not a method for the voter to correct their mail ballot. Sept. 12, 2023 Tr. at 329:1–9. Thus, if the county received a mail ballot that did not have the signature, the voter could not correct that defect. *Id.* at 329:1–4. And if the county received a mail ballot where the EVBB determined the signature to not be the signature of the voter, then the voter could not correct the issue. *Id.* at 329:5–9.

### a.  Brnovich Guideposts

**a.**  Sections 5.11-14 Imposes No Burdens on Voters.

223.     Section 5.11-.14 impose no additional burdens on voters; instead, they permit the SVC or EVBB to compare the voter's signatures on their carrier envelope and vote by mail application with *any* known signature of the voter while also creating a process for voters to correct errors. This has the effect of expanding access to voters by using more examples of signatures to compare that is likely to reduce the likelihood of a rejections based on mismatched signatures.

224.     Plaintiffs offer nothing more than speculation that more voters' ballots will be rejected if the SVC and EVBB is able to compare more versions of a voter's signatures, but logically the opposite is true. Having more signatures with which to compare would *increase*, not decrease, the likelihood of the SVC and EVBB finding a signature match if a voter has some degree of variation among their signatures, for instance having rushed and a formal versions of their signatures.

**b.**  Sections 5.11-14 Does Not Significantly Depart from Standard Practice in 1982.

209.    Sections 5.11-14 do not depart significantly from standard practice in 1982. In 1982, a voter's signature on their carrier envelope and application were compared and could be rejected based on mismatching signatures.

210.    Sections 5.11-14 adds to this that, in addition to the signatures on the application and carrier envelope, election officials can also compare any other known signature of the voter. This is not a significant departure from standard signature comparison procedures in 1982. Instead, where §§5.11-14 depart more significantly from standard practice in 1982 is in allowing voters to cure mismatched signatures, but Plaintiffs do not appear to be contesting this provision and do not seek a return to the norm in 1982 when voters were not given the opportunity to cure mismatched signatures.

211.    The Court finds that Plaintiffs have not met their burden of showing that §§ 5.11-14 departs significantly from standard practice in 1982 and, to the extent that it does, it expands voter access to the polls by creating the opportunity to cure mismatched signatures and a greater pool of signature from which the SVC and EVVB can compare.

- The size of any disparities caused by §§ 5.11-.14 on members of different racial and ethnic groups.

212.    Plaintiffs failed to show by a preponderance of the evidence that §§ 5.11-14 had a disparate impact on different voters, much less members of identifiable and quantifiable racial and ethnic groups. Cite. Specifically, Plaintiffs failed to provide evidence that identifiable groups of racial or ethnic groups have

signatures that change over time and are more likely to result is signature mismatch *and* that that this group of voters would be unable to cure the defect when notified of the mismatch.

- The opportunities provided by Texas's entire system of voting.

    213.    Texas's entire system of voting provides numerous opportunities and protections for registered voters, as discussed *supra* in _____. Cite to the FOF discussing Texas's system of voting.

    214.    Most importantly, §§ 5.12 and 5.14 provide a process for notifying voters when there is a signature mismatch and giving them an opportunity to cure the defect so that their votes are counted that did not exist before SB 1.

- The strength of Texas's interest served by §§ 5.11-.14.

    215.    Texas undeniably has a strong interest in preventing fraud and promoting public trust in elections. These interests are further by §§ 5.11-14 by strengthening the process of signature comparison and creating a process to cure any defects.

559.

## L.  Voting Assistance (Sections 6.01 and 6.03, 6.04, 6.05, 6.06, 6.07)

    216.    Plaintiffs alleged that §§ 6.01 and 6.03-07 violate § 2 of the VRA. ECF 199 at ¶ 309-11. Specifically, Plaintiffs contend that §§ 6.01 and 6.03-07 severely limit the tools and methods of voting disproportionately used by Black and Latino voters, thereby increasing the amount of time it takes for them to vote. *Id.* at ¶ 312.

### i.    Statutory Background

217.    In 1982, Texas law provided that:

560.    If a voter who is voting by mail is entitled to assistance, he may be assisted by any person 18 years of age or older, selected by the voter, subject to the restriction stated in Section 330a of this code. A person assisting a voter shall not suggest, by word or sign or gesture, how the voter shall vote and shall confine the assistance to answering the voter's questions, to stating the propositions to be voted on and to naming the candidates and the political parties to which they belong, and the person shall prepare the ballot as the voter directs. Where any assistance is rendered in marking an absentee ballot other than as allowed in this subdivision, the ballot shall not be counted but shall be void for all purposes.

Tex. Elec. Code art. 5.05a Subd. 15 (1981).

218.    It was generally illegal to hire a driver to convey voters to the polls on election day. Tex. Elec. Code art. 15.71 (1981). "Whoever hires any vehicle or hires any person to operate a vehicle for the purpose of conveying voters to the polling place, or rewards any person in money or other thing of value for procuring a vehicle or a driver for such purpose, shall be fined… This article shall not be construed to prohibit a voter from paying for the services of a vehicle or a driver for the purpose of conveying him to the polling place or to prevent him from allowing other voters to ride in the vehicle with him while he is going to the polling place in order to vote or returning therefrom after having voted." *Id.*

219.     Section 330a prohibited anyone, other than election officials, from assisting with "preparing the ballot of *more than five voters who are not related* as parent grandparent, spouse, child, brother, or sister to the person rendering the assistance." Tex. Elec. Code art. 15.30a (1981) (emphasis added).

220.     Voters receiving assistance when voting by mail had to attest "I certify that the enclosed ballot expresses my wishes, independent of any dictation or undue persuasion of any person and that I did not use any memorandum or device to aid me in the marking of the ballot." Tex. Elec. Code art. 5.05 Subd. 3b(a)(3) (1981). The person assisting the voter had to provide their name, signature, address, and disclose their kinship to the voter, if related. *Id.*

221.     In 1985, those assisting voters voting at the polls had to take the following oath before assisting voters:

561.     I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs.

Tex. Elec. Code § 64.034 (1985).

222.     In 1997, the Legislature added an oath requirement for those assisting voters voting by mail. Tex. Elec. Code § 86.010 (1997).

223.     In 2003, the Legislature added a requirement that the person assisting the voter voting by mail, in addition to the oath, provide their name, address, and signature, but that the requirement did not apply to those related within the

229

second degree of affinity or third degree of consanguinity or reside at the same address. Tex. Elec. Code § 86.010 (2003).

224.     In 2013, the Legislature prohibited those who provide assistance to voters from receiving compensation as part of a performance-based scheme and amended the oath to add a provision for assistors to attest that "I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." *Id.* (2013); Tex. Elec. Code § 86.0105 (2013).

225.     Section 6.01 of SB 1 requires a person who "simultaneously" provides seven or more voters with curbside transportation to complete and sign a form reporting their name, address, and whether they are only providing transportation or also serving as an assistant to the voters. Tex. Elec. Code § 64.009. Section 6.01 also notes that "a poll watcher is entitled to observe any activity conducted under this section." *Id.*

226.     Section 6.03 of SB 1 added § 64.0322 of the Texas Election Code to require a  person, other than an election officer, who assists a voter to complete a form stating:  (1) the name and address of the person assisting the voter; (2) the relationship to the voter of the person assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee. The form must be incorporated into the official carrier envelope if the voter is voting by mail

ballot and receives assistance or must be submitted to an election officer at the time the voter casts a ballot at a polling place and receives assistance.

227.    Section 6.04 of SB 1 amended the assistor oath required under Texas Election Code Section 64.034.  The new oath requires an assistor to swear, under penalty of perjury, that the voter "represented to [the assistor that] they are eligible to receive assistance," and that the assistor did not "pressure or coerce" the voter to choose them as the assistor.

228.    Section 6.05 of SB 1 amended Texas Election Code Section 86.010 to require that a person who assists a voter in preparing a ballot to vote by mail include on the official carrier envelope: (1) the person's signature, printed name, and residence address, (2) the relationship of the person providing the assistance to the voter, and (3) whether the person received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance.

229.    Section 6.06 of SB 1 amended Section 86.0105 of the Texas Election Code to make it a state jail felony, for a person who is not an attendant or caregiver previously known to the voter, to: (1) offer to compensate another person for assisting voters, or (2) solicit or receive compensation for assisting voters.  Under Section 6.06 of SB 1, "compensation" is an economic benefit as defined by Section 38.01, Penal Code.

230.    Section 6.07 of SB 1 amended Section 86.013(b) of the Texas Election Code to require carrier envelopes to include a space for assistors to indicate his or her relationship to the voter being assisted.

### a. Brnovich Guideposts.

**a.** Sections 6.01 and 6.03-07 Impose Minimal Burdens on Voters.

231.    Sections 6.01 and 6.03-07 imposes minimal burdens on voters.

232.    The evidence shows that it is rare for individuals to simultaneously transport seven or more voters to vote curbside. Oct. 18, 2023 Tr. at 4423:15–17; *cf.* Oct. 2, 2023 Tr. 2123:14–22. Section 6.01 does not apply to the vast majority of voters transported to the polls in large groups, such a church or nursing home, who go inside the building to vote. *See*, *e.g.*, Sept. 12, 2023 Tr. at 30:7-14; Oct. 18, Tr. at 4422:20–25.

409.    Plaintiffs were unable to identify any voters burdened by § 6.01, despite multiple elections occurring since its passage. They produced no *evidence* showing that § 6.01 burdened voters, only *speculation* on how it could hypothetically burden an unknowable number of voters if some number of unidentified drivers refused to transport seven or more voters simultaneously to vote curbside because they would have to disclose their identities.

410.    The burden on drivers subject to § 6.01 is *de minimus*. The information the drivers must provide, their name, address, and whether they are also assisting the voters with their ballots, takes mere seconds to complete, as depicted below.

| INFORMATION OF PERSON THAT PROVIDED TRANSPORTATION TO SEVEN OR MORE VOTERS FOR CURBSIDE VOTING *INFORMACIÓN DE PERSONA QUE PROVEYÓ TRANSPORTACIÓN A SIETE O MAS VOTANTES* | | | | |
|---|---|---|---|---|
| **Signature of Person that Provided Transportation** *Firma de persona que proveyó transportación* | **Printed Name of Person that Provided Transportation** *Nombre de persona que proveyó transportación en letra de molde* | **Address of Person that Provided Transportation** *Dirección de persona que proveyó transportación* | **Did the person who provided transportation function as an assistant to the voter under Chapter 64, Subchapter B in addition to providing transportation to the polling place?** *¿La persona que proveyó transportación sirvió como asistente del votante bajo 64.034 además de proveer transportación al lugar de votación?* | |
| | | | **Yes/Sí** | **No/No** |
| | | | | |

https://www.sos.state.tx.us/elections/forms/pol-sub/7-65f.pdf

411.    Sections 6.03-07, similarly, impose minimal burdens on voters and those assisting voters. Those assisting voters voting are *already* required to give their name, address, take an oath, and disclose their relationship to the voter. Oaths are already under penalty of perjury and those assisting voters are prohibited from influencing their votes.

275.    Section 6.04 places no burden on voters. It merely adds to the Oath of Assistance provisions that have been the law for at least 40 years, namely, that the oath is under penalty of perjury, Oct. 18, 2023 Tr. at at 4427:8-11; Tex. Penal Code § 37.02 (1973); Tex. Elec. Code art. 15.43 (1981), that the assistor has not pressured or coerced the voter to choose a particular assistor or filled out the ballot contrary to the voters' wishes, Tex. Elec. Code § 276.013(a)(1) (2017), Tex. Elec. Code § 64.034 (1985), Tex. Elec. Code art. 5.05a Subd. 15 (1981); Tex. Elec. Code arts. 15.24, 15.30, 15.73 (1981), and that they will not divulge the contents of the voter's ballot, Oct. 18, 2023 Tr. at 4429:10-17; Tex. Elec. Code § 61.006 (1985); Tex. Elec. Code art. 15.28 (1981).

276.    So too, §§ 6.03, 6.05, 6.07 imposes *de minimus* burdens on voters and those assisting them. Tex. Elec. Code §§ 64.0322, 86.010, 86.013(b). They require those assisting voters with preparing their ballot to disclose on the carrier envelope their

name, address, relationship with the voter, and whether they received any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance. Most of this information was already required. See Tex. Elec. Code §86.010(e) (2003) ("A person who assists a voter to prepare a ballot to be voted by mail shall enter the person's signature, printed name, and residence address on the official carrier envelope of the voter."). Plaintiffs are not challenging the prohibition on receiving compensation or other benefit from a candidate, campaign, or political committee—only the disclosure requirement from those subject to the prohibition. This is not a burden on either voters or those assisting them; instead, it simply ensures that they are aware of the law and attest that they have complied with it.

277.     Section 6.06 places no burden on voters. Previously, the law prohibited compensating persons for assisting voters as part of a performance-based scheme or for the compensation or employment status to be dependent on the number of voters assisted. Tex. Elec. Code § 86.0105 (2013). It was previously a misdemeanor offense, except it was a felony for those previously convicted of the offense. *Id*. Section 6.06 simplified the law by making it a felony to offer, solicit, or receive compensation for assisting voters. Tex. Elec. Code § 86.0105. Section 6.06 added a carveout exempting attendants or caregivers previously known to voters from the ban on compensation. Tex. Elec. Code § 86.0105(f). The evidence showed that most voter assistance involves a voter being assisted by family members, caregivers, close friends, or someone trusted. Oct. 16, 2023 Tr. at 3987:15–20. These

individuals are not subject to § 6.06. *Id.* at 4103:3–4104:11. No evidence was introduced at trial showing that this provision burdened voters nor evidence quantifying how burdensome it is.

412.    The Court finds that Plaintiffs have not met their burden of showing that §§ 6.01 and 6.03-07 imposes significant burdens on voters.

b.  Sections 6.01 and 6.06 Depart Significantly from Standard Practice in 1982, Whereas §§ 6.03-07 Do Not.

562.

413.    Plaintiffs failed to show by a preponderance of the evidence that §§ 6.01 and 6.03-07 depart significantly from standard practice in 1982.

414.    Section 6.01 departs significantly from standard practice in 1982 by permitting unrelated groups of any size to be transported to polling locations to vote curbside, provided the driver disclose his name, address, and whether they are also assisting the voters with their ballots. Tex. Elec. Code § 64.009(f). In 1982 it was illegal to hire a vehicle or person to transport groups of people to the polls to vote. Tex. Elec. Code art. 15.71 (1981). Moreover, it was illegal to assist more than five unrelated voters with their ballots. Tex. Elec. Code art. 15.30a (1981). This departure from standard practice in 1982, however, permits more opportunities for those eligible to vote curbside while adding tools to prevent and detect vote harvesting by collecting information about the drivers of vehicles containing seven or more curbside voters. *Id.* Plaintiffs are not advocating for a return to the 1982 curbside voting model.

415.     Relatedly, § 6.06 departs somewhat from standard practice in 1982 when it was a misdemeanor for a person, other than an election official, to assist more than five unrelated voters with preparing their ballots. Tex. Elec. Code art. 15.30a (1981). Section 6.06 permits a person to assist an unlimited number of persons with their ballots, however, it makes it a felony to offer, solicit, or receive compensation for doing so. Tex. Elec. Code § 86.0105. Section 6.06, like the law in 1982, has an exception for family members and adds to this exception attendants or caregivers previously known to voters. Oct. 16, 2023 Tr. at 4103:3–4104:11. Plaintiffs do not advocate for a return to the 1982 voter assistance limitations.

416.     Conversely, §§ 6.03-07 depart only slightly from standard practice in 1982. In 1982 those assisting voters voting by mail were prohibited from pressuring or coercing the voter into selecting the assistor, voting a particular way, divulging the contents of the voter's ballot, and filling out the ballot in a manner contrary to the voter's wishes. *See e.g.,* Tex. Elec. Code arts. 5.05a, 15.24, 15.28, 15.30, 15.73 (1981). The voter had to take an oath that they weren't influenced by the person assisting them, and had to disclose the name, signature, address, and kinship of the person assisting them. Tex. Elec. Code art. 5.05 Subd. 3b(a)(3) (1981). Beginning in 1997, the assistor had to complete an oath. Tex. Elec. Code § 86.010 (1997). Senate Bill 1 modified, slightly, requirements that have existed since 1982, by requiring those assisting voters to disclose their names, addresses, relationship with the voter, and attest that they have complied with the law.

417.    The Court finds that Plaintiffs have not met their burden of showing that §§ 6.01 and 6.03-07 depart significantly from standard practice in 1982 and that those changes disenfranchise voters.

c.    There is No Evidence that §§ 6.01 and 6.03-07 Created Disparities Among Members of Different Racial and Ethnic Groups.

563.

418.    Plaintiffs failed to show by a preponderance of the evidence that §§ 6.01 and 6.03-07 had a disparate impact on different voters, much less members of identifiable and quantifiable racial and ethnic groups.

419.    Plaintiffs therefore have not met their burden of showing that §§ 6.01 and 6.03-07 created a disparate impact on members of different racial and ethnic groups.

d.    **Texas's Election System Provides Numerous Opportunities and Protections for Registered Voters**

420.    Texas's entire system of voting provides numerous opportunities and protections for registered voters. *see generally supra*  __FOF_  (discussing the opportunities and protections for registered voters).

421.    The Court finds that Plaintiffs have not met their burden of showing that Texas' election system does not provide numerous opportunities and protections for registered voters.

e.    Sections 6.01 and 6.03-07 Advance Important Interests

564.

422.    Section 6.01 advances Texas's "critically important interests in the orderly administration of elections and in vigilantly reducing opportunities for voting

fraud." *Tex. LULAC*, 978 F.3d at 146; *see also Crawford*, 553 U.S. at 195-96 (finding that the state has a legitimate and important interest "in orderly administration and accurate recordkeeping"), as well as its "interest in preserving ballot secrecy and preventing 'undue influence, fraud, ballot tampering, and voter intimidation.'" *Feldman v. Arifzona Sec'y of State's Office*, 843 F.3d 366, 394 (9th Cir. 2016) (quoting to *Miller v. Picacho Elementary Sch. Dist. No. 33*, 179 Ariz. 178, 180 (1994)); *see generally supra* <mark>__Anderson-Burdick_</mark> (discussing the important state interests advanced by § 6.01).

423.    Texas' important state interests in educating voters and discouraging fraud, among others, are advanced by §§ 6.03-07.  *see generally supra* <mark>_Anderson-Burdick__</mark> (discussing the important state interests advanced by § 6.03-07).

424.    The Court finds that Plaintiffs have failed to meet their met their burden of showing that §§ 6.01 and 6.03-07 do not advance important state interests.

## M. Time-Off Work to Vote (Section 7.02)

425.    MFV Plaintiffs allege that § 7.02 violate Section 2 of the VRA. ECF 199 at ¶ 309-11. Specifically, Plaintiffs argued that § 7.02 "has an exception which swallows the rule." October 17, 2023 Tr. at 4206:10–20.

### i.    Statutory Background

426.    In 1982, Texas law stated that "Refusing Employee Privilege of Voting. Whoever refuses to an employee entitled to vote the privilege of attending the polls, or subjects such employee to a penalty or reduction of wages because of the exercise of such privilege, shall be fined not to exceed five hundred dollars." Tex. Elec. Code art. 15.14 (1981).

427.    In 1985, Texas law added that "(a) A person commits an offense if, with respect to another person over whom the person has authority in the scope of employment, the person knowingly: (1) refuses to permit the other person to be absent from work for the purpose of attending the polls to vote; or (2) subjects or threatens to subject the other person to a penalty for attending the polls to vote. (b) It is an exception to the application of this section that the person's conduct occurs in connection with an election in which the polls are open for voting for two consecutive hours outside of the voter's working hours. Tex. Elec. Code § 276.004 (1985).

428.    In 1993, the law was amended to add that the attendance at the polls must be "on election day." Tex. Elec. Code § 276.004 (1993).

429.    Section 7.02 expanding these voter protections by adding that the attendance at the polls must be "on election day or while early voting is in progress." Tex. Elec. Code § 276.004 (2024).

430.    Section 7.02, in other words, expands the period during which employers must allow employees leave from work to vote from *one day* to *two weeks*, Tex. Elec. Code § 85.001.

### a.  Brnovich Guideposts.

**a.**  Section 7.02 Imposes No Burden on Voters.

431.    Section 7.02 imposes no burden on voters.

432.    Section 7.02 adds two weeks to the period during which employers must permit employees leave to vote. Tex. Elec. Code § 276.004.

433.     Plaintiffs' objection appears to be to the exception (purportedly swallowing the rule) to the requirement on employers when polls are open for two consecutive hours outside the voter working hours, ECF 199 ¶ 309. But this exception has been in the law for 40 years and is not impacted by § 7.02.

434.     The Court finds that Plaintiffs have not met their burden of showing that § 7.02 imposes burdens on minority voters.

c.   To the Extent Section 7.02 Departs from Standard Practice in 1982, the Departure Helps Voters.

565.

435.     Section 7.02 does not depart from standard practice in 1982, except to the extent it extends the time employers must provide to employees to include time off during the early voting period to vote.

436.     The Court finds that Plaintiffs have not met their burden of showing that § 7.02 departs significantly from standard practice in 1982.

f.   There's Little to No Evidence that Section 7.02 Created Disparities Among Members of Different Racial and Ethnic Groups.

566.

437.     Plaintiffs failed to show by a preponderance of the evidence that § 7.02 had a disparate impact on different voters, much less members of identifiable and quantifiable racial and ethnic groups.

438.     Plaintiffs argued that the exception to the requirement when the polls are open for two consecutive hours had a disparate impact, but the exception has

existed for 40 years, isn't impacted by SB 1, and isn't being challenged in this lawsuit.

439.    The Court finds that Plaintiffs have not met their burden of showing that § 7.02 created a disparate impact on members of different racial and ethnic groups.

### g. Texas's Election System Provides Numerous Opportunities and Protections for Registered Voters

440.    Texas's entire system of voting provides numerous opportunities and protections for registered voters, as discussed in State Defendants and Intervenor-Defendants' finding of fact. *See* ECF █████.

441.    The Court finds that Plaintiffs have not met their burden of showing that Texas' election system does not provide numerous opportunities and protections for registered voters.

h.  Section 7.02 Advances Important Interests

567.

442.    Texas has a strong interest in ensuring access to the polls for voters and requiring employers to permit their employees time during elections to vote. Section 7.02 furthers this interest by expanding this protection beyond election day to the entire early voting period. *see generally supra* ████ (discussing the important state interests advanced by § 7.02).

443.    The Court finds that Plaintiffs have failed to meet their met their burden of showing that § 7.02 does not advance important state interests.

### VIII.    Senate Bill 1 Does Not Restrict Free Speech Rights

444.    The LUPE Plaintiffs, LULAC Plaintiffs, and OCA-GH Plaintiffs claim that Section 7.04's vote harvesting ban violates the First Amendment's free-speech guarantee. *See* Sept. 11, 2023 Tr. at 230:14-17, 232:24-233:1, 234:23-235:4. Judgment must be entered against Plaintiffs on these claims for two reasons: they are improper facial challenges and fail on the merits.

### B.    Plaintiffs' First Amendment Challenges Are Inappropriate Facial Challenges.

445.    To start, judgment is warranted because Plaintiffs' claims are improper facial challenges.

446.    No Plaintiff seeks relief applied specifically to them, *see, e.g.*, ECF 208 ¶ 313, and trial revealed that no Plaintiff has been prosecuted or threatened with prosecution under Section 7.04. *See, e.g.*, Sept. 1, 2023 Tr. at 92:17–21; Oct. 11, 2023 Tr. at 3600:3–6. Therefore, Plaintiffs must (but cannot) satisfy the "daunting" standard governing First Amendment facial challenges. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013).

447.    "Courts generally disfavor facial challenges, and for good reasons." *Id.* at 386. "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

448.    Therefore, to prevail in their challenge against section 7.04, Plaintiffs must prove that "'a substantial number of [section 7.04's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"

*Voting for Am.*, 732 F.3d at 387 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

449.     Plaintiffs failed to carry that daunting burden.

450.     Both in their complaints and at trial, Plaintiffs' attacks on section 7.04 featured farfetched hypotheticals—such as a paid persuader pushing a citizen to vote in a particular way while unaware of a ballot hidden "in the same room or in the voter's purse." ECF 208 ¶ 294; *see, e.g.*, Sept. 22, 2023 Tr. at 1780:17–1781:4.

451.     Plaintiffs, however, presented no evidence that Texas prosecutors have prosecuted, or would prosecute, such unwitting individuals.

452.     In fact, Texas prosecutors cannot prosecute unwitting individuals because section 7.04's scienter requirement limits its scope. *See* SB 1 §§ 7.04(b)-(d) (addressing only "knowing" actions, "intended to" deliver votes); *See* Tex. Penal Code § 6.02(c) (requiring a minimum scienter of recklessness for every element of a criminal offense).

453.     Thus, it is unsurprising that Plaintiffs presented no evidence at trial of anyone being investigated or prosecuted under section 7.04, let alone in situations resembling the hypotheticals they presented to the Court.

454.     In all events, the Court cannot consider Plaintiffs' "fanciful hypotheticals." *United States v. Williams*, 553 U.S. 285, 301 (2008). When assessing a First Amendment overbreadth argument, courts must consider real-word conduct, not "implausible" hypotheticals. *Id.* at 300-01. Instead of assuming that Texas prosecutors will act unreasonably, the court must give Texas a chance to

"implement[ section 7.04] in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451.

455.     Moreover, section 7.04 has a "plainly legitimate sweep." *Stevens*, 559 U.S. at 473. As former Secretary of State Keith Ingram explained at trial, section 7.04 permits organizations to "pay canvassers to go solicit votes for [their] preferred candidate." Sept. 22, 2023 Tr. at 1915:17–19. Section 7.04 instead was enacted to prevent paid partisans from haranguing Texas citizens while they fill out their mail ballots. *See, e.g.*, Sept. 22, 2023 Tr. at 1912:22–1913:13, 1915:3–25, 1917:23–1918:3.

456.     Such protection is precisely what Texas gives in-person voters by requiring campaigners and partisans to remain 100 feet away from in-person polling places. Tex. Elec. Code §§ 61.003, 85.036. This protection for in-person voting is legitimate and constitutional. *See Burson v. Freeman*, 504 U.S. 191, 210 (1992). The analogous protection section 7.04 gives to Texans voting by mail is a "plainly legitimate sweep," foreclosing Plaintiffs' facial challenge. *Stevens*, 559 U.S. at 473.

## C. Plaintiffs' First Amendment Challenges to Section 7.04 Also Fail on the Merits.

457.     Plaintiffs' First Amendment challenges to section 7.04 also fail on the merits.

458.     The Fifth Circuit has held that election rules with incidental speech effects are not subject to strict scrutiny but are instead evaluated under the Supreme Court's Anderson/Burdick framework. See Voting for Am., 732 F.3d at 387–88; see also Lichtenstein v. Hargett, 83 F.4th 575, 587-88 (6th Cir. 2023); Mazo v. New Jersey Secretary of State, 54 F.4th 124, 138, 144 (3d Cir. 2022).

459.    Under that test, courts first assess whether an election rule imposes a "severe" burden on protected speech. Id. If so, the rule "must be 'narrowly drawn to advance a state interest of compelling importance.'" Id. (quoting Burdick v. Takushi, 504 U.S. 428, 434 (1992)). Less-than-severe burdens, by contrast, can be justified by "a State's 'important regulatory interests.'" Id. (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)).

460.    Section 7.04's vote-harvesting ban withstands scrutiny under the Anderson/Burdick framework because it imposes an incidental and modest burden on speech.

461.    The statute applies only in highly specific and narrow circumstances. It applies only to individuals who are paid to press individuals to fill out their ballots—in the canvasser's presence—in particular ways. See, e.g., Sept. 22, 2023 Tr. at 1912:22–1913:13, 1915:3–25, 1917:23–1918:3. It does not apply to canvassing beyond that narrow situation. Sept. 22, 2023 Tr. at 1915: 17–19.

462.    That is why the statute applies only where an individual "know[s]" she is "in the physical presence" of a ballot—an inherently narrow range of scenarios. JOINT Ex. 1 at 59–60 (Section 7.04 codifying Tex. Elec. Code § 276.015) See also Oct. 18, 2023 Tr. at 4434:20–4436:14.

463.    It is also why that statute itself clarifies that Section 7.04 does not apply to: "an activity not performed in exchange for compensation or a benefit;" "interactions that do not occur in the presence of the ballot or during the voting process;" "interactions that do not directly involve an official ballot;"

"interactions that are not conducted in-person;" or "activity that is not designed to deliver votes." JOINT Ex. 1 at 59–60 (Section 7.04 codifying Tex. Elec. Code § 276.015).

464.    In other words, paid canvassers remain free to approach voters and push them to support candidates whenever they do not know that a mail ballot is immediately present—which will be the vast majority of the time.

465.    In this respect, section 7.04 functions much like constitutionally permissible bans on solicitation near polling places. See Burson, 504 U.S. at 210. And this modest burden is easily justified by the State's "compelling interest in protecting voters from confusion and undue influence." Id. at 199. States can justifiably worry that paid partisans will unduly pressure voters—particularly the elderly—to fill out their ballots in a particular way, and that risk is especially acute when the voter has their ballot in hand.

466.    Even if strict scrutiny applies, section 7.04 is still valid. Section 7.04 is functionally equivalent to laws in every State requiring the use of secret ballots and preventing others from trying to persuade an individual while he is voting. See id. at 206 ("[A]ll 50 States limit access to the areas in or around polling places."). The states adopted these rules because, when voting was not done privately, bystanders frequently pressured individuals to vote in a particular way. See id. at 201–02. States' interests in combatting such pressure and "protecting voters from confusion and undue influence" are "obviously . . . compelling." Id. at 199.

467.    Those interests are even more compelling in the mail ballot context. When a voter casts a mail ballot, she is more vulnerable to undue influence because, unlike with in-person voting, election officials are not present to deter heavy-handed pressure. This risk is especially acute for elderly voters. See Veasey v. Abbott, 830 F.3d 216, 239 (5th Cir. 2016).

468.    Relatedly, "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2347 (2021) (quoting Report on the Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections 46 (2005)). If every state can shield in-person voting from pressure by paid canvassers, Texas can extend the same protection to voters who fill out their ballots elsewhere.

469.    Moreover, section 7.04 is narrowly tailored to fulfill Texas's interests in preventing undue influence and pressure.

470.    Section 7.04 prohibits persuasion by compensated activists only when they are "in the physical presence of" a ballot—i.e., situations where an individual is actively voting or is being pressured to do so. Sept. 22, 2023 Tr. at 1912:22–1913:13, 1915:3–25, 1917:23–1918:3; Oct. 18, 2023 Tr. at 4434:20–4436:14. And because voting "is a weighty civic act," the state is entitled to "set it aside as an island of calm in which voters can peacefully contemplate their choices." Minn. Voters All. V. Mansky, 138 S. Ct. 1876, 1887 (2018) (quotation marks omitted).

471.    Plaintiffs have previously cited Meyer v. Grant, 486 U.S. 414 (1988), to support their claims, see ECF No. 207 ¶ 276, but section 7.04 is nothing like the law at issue in Meyer.

472.    There, the Supreme Court struck down a Colorado law prohibiting campaigns from paying persuaders to approach potential voters under any circumstances.  Meyer, 486 U.S. at 424.  Section 7.04, by contrast, leaves a vast array of situations in which Plaintiffs' employees can continue to reach potential voters. See Tex. Elec. Code § 276.015(e)(specifying when Section 7.04 does not apply). Outside the polling place, they can approach voters in any location and at any time save one: when a ballot is physically present.

473.    Simply put, section 7.04 does not "restrict[] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication."  Id.  It imposes a modest limit on the timing of that "discourse" to protect voters from undue influence.  Thus, Meyer only highlights the weakness of Plaintiffs' challenges to section 7.04 and underscores that judgment dismissing those challenges is warranted.

**IX.    Plaintiffs' Void for Vagueness Challenges Fail.**

474.     The LUPE Plaintiffs, HAUL Plaintiffs, OCA Plaintiffs, and LULAC Plaintiffs argue that section 7.04's vote-harvesting ban and three provisions regulating poll watchers (sections 4.06, 4.07, and 4.09) are unconstitutionally

vague.[7] These challenges are improper pre-enforcement facial challenges and fail on the merits.  The Court therefore enters judgment dismissing these claims.

### A. Plaintiffs' Pre-Enforcement Facial Vagueness Challenges Are Premature.

475.     Judgment is warranted on all vagueness challenges because they are premature.

476.     "In the context of pre-enforcement review . . . examining facial vagueness is often difficult, perhaps impossible, because facts are generally scarce." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 547 (5th Cir. 2008).  That is why a vagueness challenge must ordinarily be raised as a defense to prosecution.  *See Burson*, 504 U.S. at 210 n.13; *Schirmer v. Edwards*, 2 F.3d 117, 124 (5th Cir. 1993).

477.     This case is an especially appropriate one in which to enforce the rules against pre-enforcement, facial vagueness challenges.

478.     During trial, no witnesses testified that they have been prosecuted, received a civil penalty, been threatened with prosecution, or been threatened with a civil penalty under any challenged provision.  *See, e.g.*, Sept. 13, 2023 Tr. at 581:2-9, 633:4-19. Instead, Plaintiffs have offered only speculation about how Texas prosecutors and courts *might* enforce these provisions.

---

[7] The LUPE Plaintiffs also stated that section 8.01 is unconstitutionally vague.  Sept. 11, 2023 Tr. at 230:19-20.  However, their witnesses offered no testimony at trial as to how this provision is vague. At most, the LUPE Plaintiffs suggested 8.01 is unlawful because other provisions they claim are vague trigger consequences under section 8.01, which penalizes certain individuals who violate the Election Code.  *See* Sept. 13, 2023 Tr. at 566:14–567:13. The LUPE Plaintiffs, however, have never actually claimed section 8.01 is vague, so the Court should enter judgment against this undeveloped claim.

479.     With respect to section 7.04, Plaintiffs have repeatedly speculated that paid canvassers will be prosecuted for unwittingly advocating around a hidden mail ballot, *see, e.g.*, Sept. 22, 2023 Tr. 1780:17-1781:4, even though, as former Director of Elections Keith Ingram, explained, the statute does not reach such conduct, Sept. 22, 2023 Tr. at 1915: 17-19; Oct. 18, 2023 Tr. at 4434:20–4435:18.

480.     With respect to the poll-watcher provisions, Plaintiffs have speculated that election officials will be prosecuted for refusing to admit disruptive poll watchers or refusing unreasonable demands from poll watchers about where they can stand. *See, e.g.*, Sept. 13, 203 Tr. at 564:15-19. Yet not a single Plaintiff witness testified that they actually dealt with a disruptive poll watcher while serving as an election official since SB 1's enactment or effective date.  *See*, *e.g.*, Sept. 13, 2023 Tr. at 575:11–13; 683:15–23.

481.     Prosecutions under the challenged provisions in accordance with Plaintiffs' speculation are unlikely to occur.  *See, e.g.*, Sept. 22, 2023 Tr. at 1915:17–19 (explaining why Plaintiffs' suggested prosecutions under section 7.04 would not occur). And even if they do, Texas's courts can adopt a "limiting construction rather than a facial invalidation" at that time. *Burson*, 504 U.S. at 210 n.13.

482.     This Court should give Texas's courts a chance to reasonably interpret the challenged provisions instead of prematurely invalidating them based on hypotheticals and speculation that Texas prosecutors and courts will behave unreasonably. *See id.*

**B. Plaintiffs' Void-for-Vagueness Claims Fail on the Merits.**

483.     In addition to being premature, Plaintiffs' void-for-vagueness challenges fail on the merits.

484.     The Due Process Clause prohibits the enforcement of laws that do not give "'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). This standard is deferential to legislatures, and a statute is not unconstitutionally vague merely because its application is at times unclear. Indeed, "[m]any perfectly constitutional statutes use imprecise terms," *id.* at 1214, and due process "does not require impossible standards" of clarity, *United States v. Petrillo*, 332 U.S. 1, 7 (1947).

485.     Moreover, facial vagueness challenges succeed only against provisions that are "impermissibly vague in all of [their] applications." *Vill. of Hoffman Ests. V. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982). Thus, facial vagueness challenges are among "the most difficult . . . to mount successfully," *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004), and Plaintiffs have not done so here.

**i.     Vote Harvesting (Section 7.04)**

486.     The LUPE Plaintiffs, OCA, and the League claim section 7.04 is unconstitutionally vague, *see* Sept. 11, 2023 Tr. at 230:14–16, 235:1–4, but that claim fails.

487.     Section 7.04 is clear and specific about what it bans:  A person violates section 7.04 if (1) she is party to an "in-person interaction" (2) with "one or more voters" (3) "in the physical presence of an official ballot or a ballot voted by mail," in which she (4) intends "to deliver votes for a specific candidate or measure," and

(5) receives "compensation," defined as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion."

488.    Plaintiffs have previously argued that several of these elements are vague. *First*, they have professed confusion about the concept of an "in-person interaction." ECF 208 ¶ 291; *see, e.g.*, Sept. 22, 2023 Tr. at 1912:3-1913:19.

489.    But plenty of statutes use this or similar language. *See, e.g.*, 42 U.S.C. § 3030s(a) (referring to an "assessment" that "shall be administered through . . . in-person interaction"). In any event, legislatures need not use perfectly clear language, and anyone can "employ[] . . . experience and common sense" to determine whether she is interacting with someone else. *Roark & Hardee LP*, 522 F.3d at 548. The vagueness doctrine does not constitutionalize gripes about the *breadth* of pellucid terms.

490.    *Second*, Plaintiffs have argued that people cannot always know when they are "in the physical presence" of a ballot. ECF. 208 ¶¶ 140–42, 294; *see, e.g.*, Sept. 22, 2023 Tr. at 1914:18–1917:9. Building on that premise, Plaintiffs have repeatedly offered hypotheticals involving unwitting canvassers committing crimes because ballots hidden "in the same room or in the voter's purse." ECF 208 ¶ 294; *see, e.g.*, Sept. 22, 2023 Tr. at 1780:17–1781:4.

491.    But under Texas law, prosecutors must show scienter as to every element of a criminal offense, with recklessness as the default *mens rea*. *See* Tex. Penal Code § 6.02(c). To be convicted, then, a paid persuader must at least "consciously

disregard[] a substantial and unjustifiable risk" that a ballot is present. *Id.* § 6.03(c); *see also* Oct. 18, 2023 Tr. at 4434:11–4435:18 (explaining that person must have "conscious presence" of the ballot). This robust "scienter requirement … mitigate[s]" any vagueness concerns. *Vill. of Hoffman Ests.*, 455 U.S. at 499 & n.14 (collecting cases).

492.    *Third*, Plaintiffs have previously objected to the statute's requirement that a vote harvester "intend[] to deliver votes," on grounds that it reaches too many "political[ly] motivat[ed]" actions. ECF 208 ¶ 291. Here, though, Plaintiffs do not even bother to brand their disagreement with the Legislature's choice as a "vagueness" concern; instead, they are concerned about protecting "political" activities. *Id.* In any event, the specific intent element actually "undermines any assertion that this phrase is unconstitutionally vague." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th Cir. 2023).

493.    *Fourth*, Plaintiffs have assailed the statutory definition of "benefit" as unduly "wide." ECF 208 ¶ 292. But Plaintiffs have raised no meaningful argument that the provision is actually vague. They simply resent the Legislature's crystal-clear decision to prevent paid partisans from engaging in electioneering in the immediate presence of a ballot in exchange for *any* compensation.

494.    Even if section 7.04 could somehow be deemed vague, Plaintiffs cannot show that the provision is "impermissibly vague in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 495. The archetypal situation where section 7.04 applies is when a canvasser is paid to secure votes for particular candidates or measures,

and then the canvasser pressures a voter to accordingly fill out a mail ballot while the canvasser watches. Sept. 22, 2023 Tr. at 1912:22-1913:13, 1915:3-25, 1917:23-1918:3. There is nothing unclear about that archetypal application, meaning Plaintiffs' facial void-for-vagueness challenges to Section 7.04 fail.

### ii. Refusing to Accept Poll Watchers (Section 4.06)

495.    HAUL and Jeffrey Clemmons claim that section 4.06 is unconstitutionally vague, Sept. 11, 2023 Tr. at 231:9-12, but that claim fails.

496.    Section 4.06 prohibits an election judge from "intentionally or knowingly refus[ing] to accept a watcher for service when acceptance . . . is required by this section." SB 1 § 4.06 (amending Tex. Elec. Code § 33.051).

497.    HAUL and Mr. Clemmons have claimed this provision is vague because it does not specify whether an election official "can knowingly refuse to accept a poll watcher for behavior *elsewhere* prohibited in the Texas Election Code." ECF 199 ¶ 330 (emphasis added); *see* Sept. 13, 2023 Tr. at 663:9-664:15, 665:7-13.

498.    This allegation misinterprets Texas law, which specifically provides that election officials *can* remove poll watchers for violating the Penal Code, for "breach of the peace," or for any other "violation of law." Tex. Elec. Code § 32.075(g)–(h).

499.    The fact that HAUL and Jeffrey Clemmons may have misunderstood Texas law on this narrow question does not make section 4.06 vague, let alone "impermissibly vague in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 495.

500.     In addition, the Election Code expressly stipulates the exact requirements that a poll watcher must meet to be accepted for service. Tex. Elec. Code § 33.051 (listing requirements); 33.006 (defining proper certificate of appointment; *see also* Sept 13, 2023 Tr. at 785:18–786:18 Oct. 4383:19–4384:2. It therefore gives HAUL and Mr. Clemmons fair notice of the conduct the statute proscribes.

### iii.     Observing Election Activity (Section 4.07)

501.     HAUL and Jeffrey Clemmons claim that section 4.07 is unconstitutionally vague, Sept. 11, 2023 Tr. at 231:13-17, but that claim fails.

502.     Section 4.07 amends Texas Election Code 33.056, which had previously guaranteed the right of poll watchers to "sit or stand *conveniently* near the election officers conducting the observed activity." JOINT Ex. 1 at 27–28 (codifying Tex. Elec. Code § 33.056) (emphasis added).

503.     Section 4.07 added detail to preexisting law, clarifying that the position of observation must be near "enough to see and hear" "the election officers conducting the observed activity," and further that watchers cannot be "denied free movement where election activity is occurring." *Id.*; *see also* Oct. 17, 2023 Tr. at 4386:10–4387:24.

504.     To start, because only civil remedies are available for violations of section 4.07, *see* S.B. § 4.10, the Court must extend "greater tolerance" to any unclarity in section 4.07 than it would to any unclarity in a criminal statute "because the consequences of imprecision are qualitatively less severe." *Dimaya*, 138 S. Ct. at 1212-13 (cleaned up).

505.     However, Section 4.07 is not unconstitutionally vague even under a heightened standard.

506.     HAUL and Mr. Clemmons have objected that section 4.07 does not define "free movement."  ECF 199 ¶¶ 331–32; *see, e.g.*, Sept. 13, 2023 Tr. at 667:8–10, Sept. 22, 2023 Tr. at 1883:21-23.  SB 1, however, provides plenty of clarity, specifying that poll watchers are entitled to "free movement *where election activity is occurring.*"  SB 1 § 4.07 (emphasis added).

507.     Beyond that, the Election Code imposes several rules for poll watchers.  For example, Section 33.057(b) restricts their presence when a voter is preparing her ballot, and Section 33.058 of the Election Code specifies that watchers may not, "[w]hile on duty," communicate with election officials or voters.

508.     The Election Code also contains general prohibitions that apply to poll watchers, among others, such as banning intimidation of voters, *id.* at § 276.013(a)(1); retaliation against voters. *id.* at § 276.001, and removal of voted ballots from a ballot box, *id.* at § 276.003.

509.     Section 4.07's reference to "free movement" is subject to the Election Code's other, more specific provisions.  *See, e.g.*, Oct. 17, 2023 Tr. at 4387:25–4388:5).  There is nothing vague about a "general[]" rule with easily understood "exceptions."  *Knox v. Brnovich*, 907 F.3d 1167, 1183 (9th Cir. 2018).

510.     Further, section 4.07 is not "impermissibly vague in all of its applications" because it has many clear applications. *Vill. of Hoffman Ests.*, 455 U.S. at 495.  For example, election officials likely would deny "free movement" if they put watchers

"into some sort of a pen" or forced them to stay in a "designated area." Sept. 22, 2023 Tr. at 1887:8–1888:15. Accordingly, Plaintiffs' vagueness challenge to section 4.07 fails.

### iv. Obstructing Poll Watchers (Section 4.09)

511.    The LUPE Plaintiffs, HAUL, and Jeffrey Clemmons claim section 4.09 is unconstitutionally vague, Sept. 11, 2023 Tr. 230:5–6, 231:17–20, but this claim fails.

512.    Section 4.09 amends section 33.061(a) of the Election Code and prohibits election officials from preventing poll watchers from observing activities that the election official "knows the watcher is entitled to observe." JOINT Ex. 1 at 29. In particular, election officials are prohibited from "obstruct[ing]" a poll watcher's view and "distanc[ing]" the poll watcher from an activity "in a manner that would make observation not reasonably effective." *Id.*

513.    Section 4.09 amended preexisting law, which had previously guaranteed that a "watcher is entitled to sit or stand conveniently near the election officials conducting the observed activity." Sept. 13, 2023 Tr. at 585:7–19, Sept. 22, 2023 Tr. at 1882:23–1883:11. Mr. Clemmons admitted he did not know how to precisely apply that pre-SB 1 standard. *See, e.g.*, Sept. 13, 2023 Tr. at 689:25–691:8 ("I don't think I could measure [that standard] either.").

514.    Section 4.09 makes preexisting law clearer by providing specific examples of what election officials could not: obstructing a poll watcher's view and inappropriately distancing a poll watcher from what they are permitted to observe. Sept. 22, 2023 Tr. at 1882:23–1883:11. It also inserts additional scienter

257

requirements. JOINT Ex. 1 at 29 ("the person *knows* the watcher is entitled to observe) (emphasis added).

515.        Even in isolation, section 4.09's clarification of preexisting law is not unconstitutionally vague.  Plaintiffs have faulted the law for not specifying exactly how far away poll watchers may stand when election officials "know[] the watcher is entitled to observe."  SB 1 § 4.09; *see, e.g.*, Sept. 13, 2023 Tr. at 562:4-10, 566:8-13 (Lewin), 606:10-14 (Ertel), 668:4-16 (Clemmons).

516.        But many laws incorporate "qualitative" standards that must be applied "on a particular occasion," and such standards are constitutionally valid.  *Johnson v. United States*, 576 U.S. 591, 603–04 (2015) (emphasis omitted); *id.* ("the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.").

517.        A contrary conclusion would force the Legislature to impose a one-size-fits-all distance rule ill-suited to the varied circumstances of polling locations.  Indeed, Plaintiffs' own witnesses acknowledged that polling places have different layouts, *see, e.g.*, Sept. 13, 2023 Tr. at 605:10-12 (noting "unorthodox polling place "), and that it would not be feasible for the Legislature to impose uniform distancing rules for all these polling places, *see* Sept. 13, 2023 Tr. at 625:7-8 ("I think it's true that the measurements [at which poll watchers distance themselves] would have to vary.").

518.        In any event, Texas law provides more guidance than Plaintiffs admit. Chapter 33 identifies the activities poll watchers are entitled to observe, and section

33.057(b) limits poll watchers from being present when a voter is preparing her ballot. SB 1 itself states that poll watchers "may not interfere in the orderly conduct of an election," SB 1 § 4.02, and as required by SB 1, the Secretary of State created a training course that poll watchers must complete and that provides yet more guidance on applicable rules.[8] Nothing in SB 1 prevents election officials from reliably enforcing these requirements.

519.     Finally, section 4.09 is not "impermissibly vague in all of its applications" because it has many clear applications. *Vill. of Hoffman Ests.*, 455 U.S. at 495.  For example, election officials cannot stand between poll watchers and the activities they are charged with watching.  Sept. 22, 2023 Tr. at 1887:16-21. And they cannot confine them to "designated areas" or "pens" where they cannot seek activities. Sept. 22, 2023 Tr. at 1887:22–1888:3, Oct. 17, 2023 Tr. at 4374:20–23 "You have to let the poll watchers into the room to observe the activity up close. You can't keep them behind glass.").  Plaintiffs' vagueness challenge to section 4.09 fails.

## CONCLUSION

---

[8] Online     Poll     Worker     Training     Program,     Texas     Secretary     of     State, sos.state.tx.us/elections/onlinepollworker.shtml (last visited Jan. 4, 2024).

Date: January 19, 2024

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
will.wassdorf@oag.texas.gov
zachary.berg@oag.texas.gov
ethan.szumanski@oag.texas.gov

Respectfully submitted.

*/S/ Ryan G. Kercher*
RYAN G. KERCHER
Deputy Chief, Special Litigation Division
Tex. State Bar No. 24060998

KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

WILLIAM D. WASSDORF
Assistant Attorney General
Tex. State Bar No. 24103022

ZACHARY W. BERG
Special Counsel
Tex. State Bar No. 24107706

ETHAN SZUMANSKI
Special Counsel
Tex. State Bar No. 24123966

COUNSEL FOR STATE DEFENDANTS

John M. Gore
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

COUNSEL FOR INTERVENOR-DEFENDANTS

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on January 19, 2024, and that all counsel of record were served by CM/ECF.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER