**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br> *Plaintiffs*, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br> *Defendants*. | 5:21-cv-0844-XR |
| OCA-GREATER HOUSTON, et al., <br> *Plaintiffs*, <br><br> v. <br><br> TEXAS SECRETARY OF STATE JOHN SCOTT, et al., <br> *Defendants*. | 1:21-cv-0780-XR |
| aweeHOUSTON AREA URBAN LEAGUE, et al., <br> *Plaintiffs*, <br><br> v. <br><br> GREGORY WAYNE ABBOTT, et al., <br> *Defendants*. | 5:21-cv-0848-XR |

---

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**FOR CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT, SECTION 504**
**OF THE REHABILITATION ACT, AND**
**SECTION 208 OF THE VOTING RIGHTS ACT**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ viii

PLAINTIFFS' PROPOSED FINDINGS OF FACT  FOR CLAIMS UNDER THE
    AMERICANS WITH DISABILITIES ACT AND SECTION 208 OF THE VOTING
    RIGHTS ACT ........................................................................................................ 1

I.     PRELIMINARY STATEMENT ........................................................................... 1

II.    PARTIES ............................................................................................................... 1

    A.    Plaintiffs ....................................................................................................... 1

        (1)   The Arc of Texas ................................................................................... 1

        (2)   REV UP Texas ...................................................................................... 7

        (3)   Delta Sigma Theta Sorority, Inc. ........................................................ 10

        (4)   LUPE ................................................................................................... 11

        (5)   Texas Impact ....................................................................................... 12

    B.    Members of Plaintiff Organizations The Arc of Texas and Rev Up Texas Include Voters
       with Disabilities and Their Assistors ...................................................... 13

        (1)   Jennifer Miller .................................................................................... 13

        (2)   Jodi Lydia Nunez Landry ................................................................... 14

        (3)   Amy Litzinger ..................................................................................... 16

        (4)   Laura Halvorson .................................................................................. 18

        (5)   Teri Saltzman ...................................................................................... 20

        (6)   Cathy Cranston .................................................................................... 21

        (7)   Yvonne Yvette Iglesias ....................................................................... 21

        (8)   Nancy Crowther .................................................................................. 22

        (9)   Toby Cole ............................................................................................ 22

    C.    Defendants ................................................................................................ 23

III.   Voters with Disabilities in Texas ..................................................................... 24

    A.    Plaintiff's Expert, Dr. Douglas Kruse ..................................................... 24

    B.    Demographics ........................................................................................... 25

    C.    Voting Patterns of Voters with Disabilities .............................................. 27

    D.    Barriers to Voting for Voters with Disabilities ......................................... 29

    E.    Assistance Needs of Voters with Disabilities ........................................... 31

IV.   Passage of SB 1 ................................................................................................. 33

AFDOCS:199405450.4

A.  Plaintiffs Notified Defendants of the Exclusionary Effects the Challenged Provisions of SB 1 Would Have on Voters with Disabilities Prior to SB 1's Enactment.....................33

B.  The Challenged Provisions ..................................................................................34

**V.  Section 5 Mail Voting Restrictions Have Denied Plaintiffs and their Members, Voters with Disabilities, an Equal Opportunity to Participate in and Benefit From Defendants' Voting Programs ...........................................................................35**

A.  Overview.............................................................................................................35

B.  Plaintiffs and Their Members, Voters with Disabilities, Had a Harder Time Applying to Vote by Mail and Voting by Mail due to the Section 5 Mail Voting Restrictions and Defendants' Administration of These Provisions. ...........................................38

(1)  Testimony from Plaintiff Organizations...........................................................38

(2)  Testimony from Plaintiffs' Members, Voters with Disabilities and Their Assistors... 39

(3)  Testimony from Counties ..................................................................................41

C.  Plaintiffs and Their Members, Voters with Disabilities, Faced Barriers in Curing Their Ballots Due to the Section 5 Mail Voting Restrictions and Defendants' Methods of Administering the Ballot Cure Process ...............................................................42

(1)  Testimony from Plaintiff Organizations...........................................................42

(2)  Testimony from Plaintiffs' Members, Voters with Disabilities and their Assistors .... 43

(3)  Testimony from Counties ..................................................................................44

D.  Barriers to Plaintiffs and Their Members, Voters with Disabilities, Created by the Section 5 Challenged Provisions and Defendants' Administration of These Provisions Will be Ongoing. ..............................................................................................................46

**VI.  Voter Assistance Restrictions in Sections 6 and 7 of the Challenged Provisions and Defendants' Administration of these Provisions Have Denied Plaintiffs and their Members, Voters with Disabilities, an Equal Opportunity to Participate in and Benefit From Defendants' Voting Programs...............................................................47**

A.  Overview.............................................................................................................47

B.  Plaintiffs and Their Members, Voters with Disabilities, Face Barriers to Voting Due to SB 1's Requirement That Assistors Sign an Oath Under Penalty of Perjury...................50

(1)  The Penalty of Perjury ......................................................................................51

(a)  *Testimony from Organizational Plaintiffs* .................................................*51*

(b)  *Testimony from Plaintiffs' Members, Voters with Disabilities*.................................*53*

(c)  *Testimony from Plaintiffs' Members, Assistors for Voters with Disabilities*..............*56*

(d)  *Testimony from Counties* ..............................................................................*56*

(2)  How to Determine Whether a Voter is Eligible for Assistance, the Requirement to Represent Eligibility to an Assistor, and Votes not Counting Based on Eligibility..... 57

*(a)    Testimony from Organizational Plaintiffs* .................................................57

*(b)    Testimony from Plaintiffs' Members, Voters with Disabilities* ................................58

*(c)    Testimony from Plaintiffs' Members, Assistors for Voters with Disabilities* .............59

*(d)    Testimony from Counties* ...........................................................60

(3)    "I will not suggest, by word, sign, or gesture, how the voter should vote" ................ 60

(4)    "I Did Not Pressure or Coerce the Voter into Choosing Me to Provide Assistance" .. 61

*(a)    Testimony from Organizational Plaintiffs* .................................................61

*(b)    Testimony from Plaintiffs' Members, Voters with Disabilities* ................................61

*(c)    Testimony from Plaintiffs' Members, Assistors for Voters with Disabilities* .............62

*(d)    Testimony from Counties* ...........................................................63

(5)    The State has Conceded that the Language of the Oath is Vague and Confusing. ...... 63

(6)    The Oath of Assistance Prevents Plaintiffs and Their Members, Voters with Disabilities, from Receiving Assistance from the Assistor of Their Choice............... 65

(7)    The Oath of Assistance Has Made it Harder for Voters with Disabilities to Vote ...... 67

*(a)    Testimony from Organizational Plaintiffs* .................................................67

*(b)    Testimony from Plaintiffs' Members, Voters with Disabilities* ................................69

*(c)    Testimony from Plaintiffs' Members, Assistors for Voters with Disabilities* .............74

(8)    The State Is Not Complying with the OCA Injunction Pertaining to Section 6.04 ..... 75

C.    Plaintiffs and Their Members, Voters with Disabilities, Face Barriers to Voting Due to SB 1 Section 6.01 and Defendants' Administration of This Provision ...........................76

D.    Plaintiffs and Their Members, Voters with Disabilities, Face Barriers to Voting Due to SB 1 Section 6.06 and Defendants' Administration of this Provision ...........................78

E.    Plaintiffs and Their Members, Voters with Disabilities, Face Barriers to Voting Due to SB 1 Section 7.04 ...............................................................80

**VII.    Individually and Cumulatively, The Challenged Provisions of SB 1 and Defendants' Administration of These Provisions Have Denied Plaintiffs and their Members, Voters with Disabilities, an Equal Opportunity to Participate in and Benefit From Defendants' Voting Programs** ...............................................................82

**VIII.    Defendants have Used Criteria or Methods of Administration that Subject Voters with Disabilities to Discrimination** ...............................................................83

**IX.    Defendants Have Failed to Provide Reasonable Modifications to SB 1's Mail Voting and Voter Assistance Restrictions to Plaintiffs and Their Members, Voters with Disabilities** ...............................................................88

A.    Defendants Received and Denied Modification Requests from Voters with Disabilities. 88

AFDOCS:199405450.4

B.    Defendants Failed to Notify Voters with Disabilities of Their Right to Request Reasonable Modifications Under the ADA and were Unresponsive to Requests for Assistance. ................................................................................................90

**PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW FOR CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT, SECTION 504 OF THE REHABILITATION ACT, AND SECTION 208 OF THE VOTING RIGHTS ACT** ................................................................................................................94

**I.    LEGAL STANDARD FOR PLAINTIFFS' CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT** ................................................................................94

A.    Title II of the Americans with Disabilities Act ..................................................94

B.    Section 504 of the Rehabilitation Act ................................................................98

C.    Plaintiffs' Challenge Under the ADA and Section 504 .....................................99

**II.    PLAINTIFFS HAVE STANDING TO SUE** .........................................................100

A.    Plaintiffs have Established Associational Standing ..........................................100

(1)    The Members of The Arc of Texas and REV UP Texas Would Otherwise Have Standing to Sue in their Own Right .............................................................101

(2)    The Interests at Stake are Germane to the Purpose of The Arc of Texas and REV UP Texas .................................................................................................103

(3)    Neither the Claim Asserted nor the Relief Requested Requires the Participation of Individual Members in the Lawsuit ..................................................104

B.    Plaintiffs Have Also Established Organizational Standing ...........................105

**III.    THE DEFENDANTS ARE PROPER** ....................................................................107

A.    State and County Defendants are Proper Under the ADA Because They are Public Entities Who Provide the Program, Service, or Activity of Administering Elections and Enforcing the Texas Election Code ..................................................108

B.    The ADA Abrogates Sovereign Immunity ......................................................109

C.    Sovereign Immunity is Waived as to Section 504 when Public Entities Accept Federal Funds ................................................................................................111

**IV.    DEFENDANTS, IN IMPLEMENTING AND ENFORCING THE CHALLENGED PROVISIONS OF SB1, DISCRIMINATE AGAINST VOTERS WITH DISABILITIES IN VIOLATION OF THE ADA AND SECTION 504** ..................112

A.    Overview ..........................................................................................................112

B.    Defendants Have Denied Plaintiffs and Their Members, Voters with Disabilities, an Equal Opportunity to Participate in and Benefit From Defendants' In-Person and Mail Voting Programs ................................................................................114

C.   Defendants have Used Criteria or Methods of Administration that Subject Voters with Disabilities to Discrimination ......................................................................... 126

D.   Defendants Have Discriminated Against Plaintiffs By Reason of Their Disabilities ..... 131

E.   Defendants Have Failed to Provide Reasonable Modifications to SB 1's Mail Voting and Voter Assistance Restrictions to Plaintiffs and Their Members, Voters with Disabilities ....................................................................................................................................... 132

   (1)   Defendants Have Affirmative Obligations to Provide Reasonable Modifications to Plaintiffs ......................................................................................................... 132

   (2)   Defendants Received and Denied Reasonable Modification Requests from Voters with Disabilities ............................................................................................... 136

   (3)   Plaintiffs Need Not Make Reasonable Modification Requests Where Such Requests Would Be Futile ................................................................................ 138

   (4)   Section 1.08 of SB1 Does Not Remedy Plaintiffs' Reasonable Modifications Claims 140

F.   Defendants Have Interfered with Plaintiffs' and Their Members, Voters with Disabilities, Access to Defendants' Voting Programs ....................................................................... 142

G.   The Relief Plaintiffs Seek is Reasonable ................................................................... 143

H.   Defendants' Affirmative Defenses Fail ....................................................................... 145

I.   The Arguments Raised in Defendants' Motion for Judgment on Partial Findings Should be Rejected ................................................................................................................... 150

V.   **THE CHALLENGED PROVISIONS OF SB1 INTERFERE WITH A VOTER'S RIGHT TO RECEIVE ASSISTANCE FROM A PERSON OF THEIR CHOICE IN VIOLATION OF SECTION 208 OF THE VOTING RIGHTS ACT ...................... 153**

A.   Section 208 of the federal Voting Rights Act ............................................................ 154

   (1)   Section 208's Preemptive Effect. ........................................................................ 155

   (2)   The Legislative History of Section 208 Evidences the Intent of Congress to Afford Disabled, Low-literate and Limited English Proficient Voters the Right to Choose Their Assistor ....................................................................................................... 157

B.   Plaintiffs Have Standing to Sue Under Section 208 of the Voting Rights Act ............... 161

   (1)   Plaintiff The Arc of Texas Has Established Associational Standing. ...................... 161

      (a)   *Members of The Arc of Texas Would Otherwise Have Standing to Sue in their Own Right.* 162

         i.   Members' injury is concrete and particularized .................................. 162

         ii.   Injury to The Arc of Texas's members is Imminent. ......................... 164

         iii.   Injury to The Arc of Texas's members is Traceable to Defendants' Conduct and Can be Redressed by a Favorable Decision from This Court. ..................... 165

AFDOCS:199405450.4

*(b)    The Interests at Stake are Germane to the Purpose of The Arc of Texas.* ...............*165*

*(c)    Neither the Claim Asserted Nor the Relief Requested Requires the Participation of Individual Members in the Lawsuit.*....................................................................................*165*

(2)    Plaintiffs The Arc of Texas and DST have Established Organizational Standing. ..... 166

C.    SB1's Voter Assistance Restrictions on Assistance Violate and are Preempted by Section 208 of the VRA. ......................................................................................................166

(1)    Section 6.01 .................................................................................................. 168

(2)    Section 6.03 .................................................................................................. 170

(3)    Section 6.04 .................................................................................................. 172

(4)    Sections 6.05 and 6.07................................................................................. 176

**VI.    CONCLUSION** ..............................................................................................**177**

AFDOCS:199405450.4

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A Helping Hand, LLC v. Baltimore County, MD,*
515 F.3d 356 (4th Cir. 2008) ...............................................................................104

*A. ex rel. A. v. Hartford Bd. of Educ.,*
976 F.Supp.2d 164 (D. Conn. 2013) ....................................................................143

*Alexander v. Choate,*
469 U.S. 287 (1985)...............................................................................................96

*American Council of Blind of New York, Inc. v. City of New York,*
495 F.Supp.3d 211 (S.D.N.Y. 2020)..............................................................95, 118

*American Council of the Blind v. Paulson,*
525 F.3d 1256 (D.C. Cir. 2008) ..........................................................................126

*Arizona v. United States,*
567 U.S. 387 (2012).........................................................................156, 168, 178

*Arizona United v. Thurston,*
517 F.Supp.3d 777 (W.D. Ark. 2021).........................................................156, 166

*Arkansas United. v. Thurston, et al.,*
No. 5-20-CV-5193, 2022 WL 4097988 (W.D. Ark. Sept. 7, 2022) ......................163

*Armstrong v. Newsom,*
484 F.Supp.3d 808 (N.D. Cal. 2020), aff'd, 58 F.4th 1283 (9th Cir. 2023).........143

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010) ..............................................................................101

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
178 F.3d 350 (5th Cir. 1999) ..............................................................................106

*Barber ex rel. Barber v. Colo. Dep't Of Revenue,*
562 F.3d 1222 (10th Cir. 2009) ..........................................................................148

*Bennett-Nelson v. Louisiana Bd. Of Regents,*
431 F.3d 448 (5th Cir. 2005) ............................................................97, 99, 133, 146

*Bentley v. Cleveland Cnty. Bd. Of Cnty. Com'rs,*
41 F.3d 600 (10th Cir. 1994) ..............................................................................112

AFDOCS:199405450.4

*Block v. Tex. Bd, of Law Examiners,*
    952 F.3d 613 (5th Cir. 2020) .....................................................................98, 110

*Braggs v. Dunn,*
    No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020) .................96, 127, 128

*Bultemeyer v. Fort Wayne Cmty. Schs.,*
    100 F.3d 1281 (7th Cir. 1996) ..........................................................................136

*Cadena v. El Paso Cnty.,*
    946 F.3d 717 (5th Cir. 2020) ....................................................................133, 135

*Consent Decree, United States v. Hale County, TX,*
    No. 5-05CV0043-C (N.D. Tex., Apr. 27, 2006)..............................................163

*Cooper v. Aaron,*
    358 U.S. 1 (1958).............................................................................................111

*Cota v. Maxwell-Jolly,*
    688 F.Supp.2d 980 (N.D. Cal. 2010) ..............................................................127

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) (Stevens, J., controlling op.)..........................................110

*Crowder v. Kitagawa,*
    81 F.3d 1480 (9th Cir. 1996) ...........................................................................147

*Davoll v. Webb,*
    194 F.3d 1116 (10th Cir. 1999) .......................................................................136

*Delano-Pyle v. Victoria Cnty., Tex.,*
    302 F.3d 567 (5th Cir. 2002) ...........................................................................133

*Democracy North Carolina v. North Carolina State Board of Election,*
    476 F.Supp.3d 158 (M.D.N.C. 2020) ..........................................................*passim*

*Democracy North Carolina v. North Carolina State Board of Elections,*
    590 F.Supp.3d 850 (M.D. N.C. 2022) ..........................................................*passim*

*Disability Rights of Miss., et al. v. Fitch, et al.,*
    No. 3-23CV-350-HTW-LGI, 2023 WL 4748788 (S.D. Miss., July 23, 2023).....................157

*Disability Rights N. Carolina v. N. Carolina State Bd. of Elections,*
    No. 5:21-CV-361-BO, 2022 WL 2678884 (E.D.N.C. July 11, 2022)..........................155, 167

*Disabled in Action v. Bd. of Elections in Cty of N.Y.,*
    752 F.3d 189 (2d Cir. 2014)...............................................................116, 119, 121

ix

*Doe v. Rowe*,
    156 F.Supp.2d 35 (D. Me. 2001) ........................................................139

*Dopico v. Goldschmidt*,
    687 F.2d 644 (2d Cir. 1982)...............................................................126

*DSCC v. Simon*,
    No. A20-1017, 2020 WL 6302422 (Minn. Oct. 28, 2020) ..................156

*Dunn v. Dunn*,
    318 F.R.D. 652, 665 n. 12 (M.D. Ala. 2016),.......................96, 127, 128

*E.T. v. Morath*,
    571 F.Supp.3d 639 (W.D. Tex. 2021), vacated and remanded............146

*E.T. v. Paxton*,
    41 F.4th 709 (5th Cir. 2022) ......................................................117, 146

*Felder v. Casey*,
    487 U.S. 131 (1988)...................................................................156, 168

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963)...................................................................156, 168

*Fla. State Conf. of NAACP v. Lee*,
    576 F.Supp.3d 974 (N.D. Fla. 2021)..................................104, 111, 156

*Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996).........................................................................101

*Frame v. City of Arlington*,
    616 F.3d 476 (5th Cir. 2010) ...........................................................115

*Frame v. City of Arlington*,
    657 F.3d 215 (5th Cir. 2011) ................................................... *passim*

*Frazier v. Bd. of Supervisors for Univ. of Louisiana Sys.*,
    No. 21-CV-3948, 2022 WL 3592450 (W.D. La. Aug. 5, 2022)............152

*Frazier v. Bd. Of Trs. Of Nw. Miss. Reg'l Med. Ctr.*,
    765 F.3d 1278 (5th Cir. 1985) ..........................................................112

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...........................................................................101

*Fry v. Napoleon Cmty. Schs.*,
    137 S. Ct. 743 (2017)..........................................................................99

AFDOCS:199405450.4

*Gustafson v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*,
  29 F.4th 406 (8th Cir. 2022) ...................................................................................115, 116

*Hall v. Higgins*,
  77 F.4th 1171 (8th Cir. 2023) ...........................................................................................133

*Hamilton v. Ill. Cent. R. Co.*,
  894 F.Supp. 1014 (S.D. Miss. 1995)..................................................................................112

*Hargrave v. Vt.*,
  340 F.3d 27 (2d Cir. 2003)..................................................................................................148

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)............................................................................................................106

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003)................................................................................................132

*Hillman v. Maretta*,
  569 U.S. 483 (2013)............................................................................................................159

*Hindel v. Husted*,
  875 F.3d. 344 (6th Cir. 2017) .............................................................................................147

*Hunt v. Wash. State Apple Advert. Com'n*,
  432 U.S. 333 (1977)............................................................................................................162

*Danny R. ex rel. Ilan R. v. Spring Branch Indep. Sch. Dist.*,
  124 F. App'x 289 (5th Cir. 2005) .......................................................................................112

*Innovative Health Sys., Inc. v. City of White Plains*,
  117 F.3d 37 (2d Cir. 1997)...........................................................................................95, 104

*J.R. v. Austin Indep. Sch. Dist.*,
  574 F.Supp.3d 428 (W.D. Tex. 2021).................................................................................101

*Johnson v. Callanen*,
  608 F.Supp.3d 476 (W.D. Tex. 2022) (Rodriguez, J.).......................................................116

*Johnson v. Callanen*,
  610 F.Supp.3d 907 (W.D. Tex. 2022).................................................................................148

*Johnson v. Callanen*,
  No. SA-22-CV-00409-XR, 2023 WL 4374998 (W.D. Tex. July 6, 2023)...............97, 98, 146

*La Unión del Pueblo Entero v. Abbott ("LUPE")*,
  614 F.Supp.3d 509 (W.D. Tex. 2022).................................................................................101

AFDOCS:199405450.4

*League of Women Voters of Fla., Inc. v. Lee*,
  595 F.Supp.3d 1042 (N.D. Fla. 2022) ................................................................ 149

*Lewis v. Cain*,
  No. 3:15-CV-318, 2021 WL 1219988 (M.D. La. Mar. 31, 2021),
  *reconsideration denied,* No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D.
  La. Oct. 8, 2021) ................................................................................................ 128

*Lujan v. Defenders of Wildlife*,
  504 U.S. 55 (1992) ............................................................................................. 106

*Luke v. Texas*,
  46 F.4th 301 (5th Cir. 2022); ............................................................. 96, 118, 119

*Mary Jo C. v. N.Y. State & Local Ret. Sys.*,
  707 F.3d 144 (2d Cir. 2013) .......................................................................147, 148

*McDonald v. Bd. Of Election Comm'rs of Chi.*,
  394 U.S. 802 (1969) ........................................................................................... 111

*Melton v. Dallas Area Rapid Transit*,
  391 F.3d 669 (5th Cir. 2004) ............................................................................... 96

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................................... 105

*Mosley v. Kohl's Dep't Stores, Inc.*,
  942 F.3d 752 (6th Cir. 2019) ............................................................................. 139

*MX Grp., Inc. v. City of Covington*,
  293 F.3d 326 (6th Cir. 2002) ............................................................................. 104

*Nat'l Fed'n of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) ....................................................................... *passim*

*New Ga. Project v. Raffensperger*,
  484 F.Supp.3d 1265 (N.D. Ga. 2020) ................................................................ 156

*Nick v. Bethel*,
  2008 WL 11456134 (D. Alaska Jul. 30, 2008) .................................................. 155

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ....................................................................... *passim*

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999) ...........................................................................96, 132, 152

AFDOCS:199405450.4

*Oxford House, Inc. v. City of Baton Rouge, La.*,
    932 F.Supp.2d 683 (M.D. La. 2013) ................................................................140

*People First of Alabama v. Merrill*,
    491 F.Supp.3d 1076 (N.D. Ala. 2020) .......................................................... *passim*

*Pierce v. D.C.*,
    128 F.Supp.3d 250 (D.D.C. 2015) ..............................................................96, 134

*Price v. Shibinette*,
    No. 21-CV-25-PB, 2021 WL 5397864 (D.N.H. Nov. 18, 2021)..........................127

*Priorities USA v. Nessel*,
    462 F.Supp.3d 792 (E.D. Mich. 2020) ...............................................................171

*Reickenbacker v. Foster*,
    274 F.3d 974 (5th Cir. 2001) .....................................................................98, 146

*Republic of Arg. v. NML Capital, Ltd.*,
    573 U.S. 134 (2014)............................................................................................159

*Robertson v. Las Animas Cnty. Sheriff's Dep't*,
    500 F.3d 1185 (10th Cir. 2007) .............................................................133, 134

*Schaw v. Habitat for Humanity of Citrus Cnt., Inc.*,
    938 F.3d 1259 (11th Cir. 2019) .........................................................................144

*Schmidt v. Safeway Inc.*,
    864 F.Supp. 991 (D. Or. 1994) .........................................................................137

*Schwarz v. Villages Charter Sch., Inc.*,
    No. 5:12-CV-177-OC-34PRL, 2014 WL 12623013 (M.D. Fla. May 23, 2014)..................140

*Smith v. Bd. of Comm'rs of La. Stadium & Exposition Dist.*,
    385 F.Supp.3d 491 (E.D. La. 2019), aff'd in part, vacated in part sub nom. .......................146

*Smith v. France*,
    850 F. App'x 243 (5th Cir. 2021) ......................................................................139

*Smith v. Harris Cty., Texas*,
    956 F.3d 311 (5th Cir. 2020) .......................................................................99, 146

*Snider v. Pennsylvania DOC*,
    505 F.Supp.3d 360 (M.D. Pa. 2020) .................................................................143

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)...........................................................................................101

AFDOCS:199405450.4

*Steward v. Abbott,*
    189 F.Supp.3d 620 (W.D. Tex. 2016)..........................................................................104, 166

*Stringer v. Hughs,*
    Nos. SA-20-CV-46-OG, SA-16-CV-257-OG, 2020 WL 6875182 (W.D. Tex.
    Aug. 28, 2020) ......................................................................................................................101

*T.W. v. N.Y. State Bd. Of L. Exam'rs,*
    996 F.3d 87 (2d Cir. 2021).....................................................................................................112

*Tellis v. LeBlanc,*
    No. CV 18-541, 2022 WL 67572 (W.D. La. Jan. 6, 2022)...................................................128

*Tennessee v. Lane,*
    541 U.S. 509 (2004).......................................................................................................110, 111

*Travis v. Hawkins,*
    381 F.3d 407 (5th Cir. 2004) .................................................................................................166

*Trivette v. Tennessee Dep't of Corr.,*
    No. 3:20-cv-00276, 2021 WL 10366330 (M.D. Tenn. May 5, 2021) ...................................115

*U.S. Dep't of Transp. V. Paralyzed Veterans of Am.,*
    477 U.S. 597 (1986)...............................................................................................................112

*United States v. Berks Cnty.,*
    277 F.Supp.2d 570 (E.D. Pa. 2003) ......................................................................................155

*United States v. Brazos Cnty.,*
    No. H-06-2165 (S.D. Tex. June 29, 2006)............................................................................155

*United States v. City of Philadelphia,*
    No. 2:06cv4592 (E.D. Pa. June 4, 2007) ..............................................................................155

*United States v. City of Springfield,*
    No. 06-301- 23-MAP (D. Mass. Sept. 15, 2006)..................................................................155

*United States v. Fort Bend Cnty.,*
    No. 4:09-cv-01058 (S.D. Tex. Apr. 13, 2009) ......................................................................155

*United States v. Hialeah Hous. Auth.,*
    418 F. App'x 872 (11th Cir. 2011).........................................................................................137

*United States v. Kane Cnty.,*
    No. 07 C 5451 (N.D. Ill. Nov. 7, 2007) ................................................................................155

*United States v. Mississippi,*
    82 F.4th 387 (5th Cir. 2023) .................................................................................151, 152, 153

AFDOCS:199405450.4

*United States v. Orange Cnty.*,
   No. 6:02-cv-737-ORL-22JGG (M.D. Fla. Oct. 8, 2002) ......................................155

*United States v. Smith*,
   499 U.S. 160, 166-67 (1991) .............................................................................159

*Updike v. Multnomah County*,
   870 F.3d 939 (9th Cir. 2017) .............................................................................133

*Valentine v. Collier*,
   993 F.3d 270 (5th Cir. 2021) .............................................................................110

*Veasy v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) .............................................................................111

*Veasy v. Perry*,
   29 F.Supp.3d 896, 923 (S.D. Tex. 2014) ............................................................109

*Wisconsin Elections Commission*,
   No. 22-CV-402-jdp, 2022 WL 3910457 (W.D. Wis. Aug. 31, 2022) ..................157

*Wray v. Nat'l R.R. Passenger Corp.*,
   10 F.Supp.2d 1036 (E.D. Wis. 1998).................................................................143

*Zervos v. Verizon N.Y., Inc.*,
   252 F.3d 163, 171 (2d Cir. 2001).........................................................................95

**Statutes**

28 C.F.R. § 35.130.................................................................................................95

28 C.F.R. § 35.130(b)(1)(ii)....................................................................................97

28 C.F.R. § 35.130(b)(1)(iii)...................................................................................97

28 C.F.R. §§ 35.130(b)(1) and (b)(8)....................................................................115

28 C.F.R. § 35.130(b)(3)(ii).............................................................................97, 129

28 C.F.R. § 35.130(b)(7)..........................................................................97, 136, 141

28 C.F.R. § 35.130(b)(7)(i)...............................................................................98, 146

28 C.F.R. § 35.130(b)(8)..........................................................................................97

28 C.F.R. § 35.130(d)............................................................................................152

45 C.F.R. § 1232.3(d)............................................................................................108

AFDOCS:199405450.4

52 U.S.C.A. § 10303 (f)(1) ................................................................................160

52 U.S.C.A. § 10303 (f)(3) ................................................................................160

29 U.S.C § 705 ....................................................................................................99

29 U.S.C. § 794 ...................................................................................................98

29 U.S.C. § 794(a) ...............................................................................98, 99, 108

29 U.S.C. § 794(b)(1) ..........................................................................................99

29 U.S.C. § 794(b)(1)(A)-(B) ..............................................................................99

42 U.S.C. § 2000d-7(a) .....................................................................................112

42 U.S.C. § 12101(a)(2) ......................................................................................94

42 U.S.C. § 12101(a)(3) ......................................................................................94

42 U.S.C. § 12101(a)(5) ......................................................................................94

42 U.S.C. § 12101(b)(1) ....................................................................................147

42 U.S.C. § 12102(1)(A) .....................................................................................95

42 U.S.C. § 12102(2)(A) ...................................................................................102

42 U.S.C. § 12111 *et seq.* and Title III ............................................................95

42 U.S.C. § 12112(b)(5) ....................................................................................136

42 U.S.C. § 12131(1)(A)-(B) ............................................................................108

42 U.S.C. § 12131(1)(B) ............................................................................108, 109

42 U.S.C. § 12131(2) .........................................................................................102

42 U.S.C. § 12132 .......................................................................................95, 115

42 U.S.C. § 12133 ...............................................................................................98

42 U.S.C. § 12134 ...............................................................................................96

42 U.S.C. § 12181 *et seq.* ..................................................................................95

42 U.S.C. § 12188(a)(1) .............................................................................138, 139

42 U.S.C. § 12202 .............................................................................................110

42 U.S.C. § 12203 .................................................................................................98

42 U.S.C. § 12203(b) ...........................................................................................143

52 U.S.C. § 10310 ........................................................................................154, 169

52 U.S.C. § 10508 .............................................................................154, 160, 171

1982 WL 25033 (1982) .......................................................................................167

ADA, 42 U.S.C. § 12101 *et seq.* ..........................................................................94

ADA, 42 U.S.C. § 12102 ......................................................................................99

Americans with Disabilities Act, Section 504 of the Rehabilitation Act ............................ *passim*

Americans with Disabilities Act Title I .......................................................95, 136

Americans with Disabilities Act Title II ............................................................ *passim*

Arkansas Code § 7-5-310(b)(4)(B) .....................................................................163

Civil Rights Act Title VI .......................................................................................98

Fair Housing Act ..................................................................................................137

Federal Voting Rights Act ...................................................................................157

Help America Vote Act ...................................................................................... *passim*

Rehabilitation Act .............................................................................................. *passim*

Section 84.002(a)(1-a) ...........................................................................................35

Tex. Election Code Sections 61.032-034, 64.031 ................................................29

Tex. Election Code § 64.009 ........................................................................76, 170

Tex. Election Code § 64.034 ................................................................................75

Tex. Election Code § 64.0321 ..............................................................................76

Tex. Election Code § 1.022 ..........................................................................86, 141

Texas Election Code Section 87.0271 ..................................................................35

Texas Election Code Section 87.0271(e) .......................................................35, 36

Title II and Fair Housing Act ..............................................................................140

AFDOCS:199405450.4

Voting Rights Act ......................................................................................159, 160, 169

Voting Rights Act Section 208 ............................................................................ *passim*

**Other Authorities**

Eighth Amendment ...................................................................................................111

Eleventh Amendment.........................................................................................110, 112

Fourteenth Amendment ....................................................................................110, 111

Bills to Amend the Voting Rights Act of 1965: Hearings before the Subcomm. on
    the Const. of the S. Comm. on the Judicary, 97th Cong. 63 (May 4, 1982)
    (statement of Sen. Dennis DeConcini)...................................................................157

H.R. 3112 Hearing Before Subcomm. on the Constitution of the S. Comm. on the
    Judiciary, Volume 2 97th.......................................................................................160

H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) .........................................157, 158

S. Rep. No. 97-417, 97th Cong., 2d Sess. (1982) ................................................ *passim*

Senate Bill 1 ......................................................................................................... *passim*

Voting Rights Act: Hearing on S. 54, S. 1761, S. 1975, S. 1992 .......................160, 161

AFDOCS:199405450.4

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**
**FOR CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT AND SECTION**
**208 OF THE VOTING RIGHTS ACT**

## I.    PRELIMINARY STATEMENT

Plaintiffs The Arc of Texas, Delta Sigma Theta Sorority, Inc. (the "HAUL Plaintiffs"),

REV UP Texas (the "OCA Plaintiffs"), LUPE, and Texas Impact (the "LUPE Plaintiffs")

respectfully submit the following proposed post-trial findings of fact and conclusions of law with

respect to claims brought under the Americans with Disabilities Act, Section 504 of the

Rehabilitation Act, and Section 208 of the Voting Rights Act.[1]

## II.    PARTIES

### A.  Plaintiffs

#### (1) The Arc of Texas

1.      The Arc of Texas is a 501(c)(3) non-profit organization founded in 1953 by

parents of children with intellectual and developmental disabilities (IDD) to advocate for their

children to have access to education, employment, community supports, and other areas of

community life. 10/11 Tr. 3492:18-25, 3493:1-5 (Martinez). The Arc of Texas' mission is to

"promote, protect, and advocate for the human rights and self-determination of Texans with

intellectual and developmental disabilities." *Id.* 3490:23-25, 3493:7-9 (Martinez). The Arc of

Texas is an affiliate of The Arc of United States which is a separate 501(c)(3) organization, with

---

[1] HAUL Plaintiffs join the portions of this submission that relate to their ADA and Section 504 challenges to SB 1 Sections 5.02, 5.03, 5.06, 5.07, 5.10, 6.03, 6.04, 6.05, and 6.07 and their Section 208 challenges to SB 1 Sections 6.01, 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04. OCA Plaintiffs join the portions of this submission that relate to their ADA and Section 504 challenges to SB 1 Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, and 6.04. LUPE Plaintiffs join the Proposed Findings of Fact and Proposed Conclusions of Law related to their ADA challenge to SB 1 Sections 6.03, 6.04, 6.05, 6.06, and 7.04. LUPE Plaintiffs do not join the Proposed Conclusions of Law for Section 208.

AFDOCS:199405450.4

a separate board of directors. Jennifer Martinez is the Chief Executive Officer of The Arc of Texas. *Id.* 3490:7-8 (Martinez).

2.　　　The Arc of Texas has 7000 individual members and 24 local member chapters. 10/11 Tr. 3495:20-25 (Martinez). Member chapters respond to the needs of their local communities and are independent 501(c)(3) organizations. 10/11 Tr. 3496:4-24 (Martinez).

3.　　　For example, The Arc of San Antonio runs a day habilitation site where people with IDD can go to do activities during the day like cooking or playing sports; The Arc of Harris County runs programs around educational advocacy to support families in the education setting, The Arc of Dallas Fort Worth hosts conferences. Each local member chapter of The Arc of Texas has a "distinct call depending on what their community is asking for." 10/11 Tr. 3496:2-24 (Martinez).

4.　　　Previously, members of The Arc of Texas had to pay membership dues, but The Arc of Texas decided 10 years ago not to charge members a fee as it was a barrier for people with IDD being able to join the organization. The Arc of Texas is "very committed to folks with IDD being able to be members of our organization" and often people with IDD "live in poverty and don't have extra money to pay membership dues." 10/11 Tr. 3497:17-25, 3498:1-3 (Martinez).

5.　　　There are many different ways to become a member of The Arc of Texas, including by subscribing to their Disability Dispatch email, making a donation, serving on the board, or serving on a committee. 10/11 Tr. 3495:22-25, 3496:1-3, 3497:10-16 (Martinez).

6.　　　Members of The Arc of Texas receive many benefits. Local chapters and individual members benefit from The Arc of Texas' advocacy work at the Capitol during legislative sessions, including their legislative updates and digests. The Arc of Texas also

2

provides training for its members, sits on councils and boards to make sure legislation that supports people with IDD is implemented, and serves as experts in different stakeholder groups to represent the voices of people with IDD. 10/11 Tr. 3498:4-18 (Martinez).

7.      Members of The Arc of Texas engage with The Arc of Texas and meet in a variety of ways. The Arc of Texas' board meets quarterly, the Public Policy and Advocacy Committee meets monthly, and other committees meet quarterly. *Id.* 3498:19-25, 3499:1-4 (Martinez). Chapter members also meet at least monthly and there is an annual business meeting each summer where all of the chapter members meet to vote in the new officers for The Arc of Texas' board and to review and approve The Arc of Texas' financials. *Id.* 3498:19–3499:4 (Martinez). Ms. Martinez meets with the Executive Directors of the local chapters after each board meeting to keep them informed on board decisions. *Id.* 3529:22-25, 3530:1-2 (Martinez).

8.      The voice of people with IDD is present "throughout the leadership of the Arc of Texas" 10/11 Tr. 3493:25, 3494:1-4 (Martinez). The Arc of Texas has a 14-member board of directors. *Id.* 3499:8-11 (Martinez). To be a board member, a person must have experience in the disability field. *Id.* 3499:14-15 (Martinez). Per The Arc of Texas' bylaws, 51% of The Arc of Texas' Board must consist of people with disabilities or family members of people with disabilities. *Id.* 3499:17-18 (Martinez).

9.      The Arc of Texas has four public policy priorities that guide its work and are formulated by its board and Public Policy Committee: civil rights (including voting rights); inclusive education; competitive integrated employment; and community supports. 10/11 Tr. 3494:5-10 (Martinez). Voting is "the backbone" of The Arc of Texas' work. *Id.* 3499:23–3500:12 (Martinez). Voting is critical to self-determination and voting rights advocacy has been a priority since The Arc of Texas was founded. *Id.* 3499:23–3500:12 (Martinez).

3

10.     The Arc of Texas decides on its public policy priorities through its Public Policy Committee. 10/11 Tr. 3500:12-21 (Martinez). These priorities are developed through outreach to local chapters and its members. *Id.* 3547:2-16 (Martinez). The Public Policy Committee meets monthly to identify the policy issues that concern the disability community and then they bring these issues to the board for its consideration and approval. *Id.* 3500:13-21 (Martinez). The Arc of Texas' Public Policy Committee includes people with IDD, their family members, board members, local chapters, and other members of the disability community. *Id.* 3493:22–3494:10, 3499:13–3500:3, 3500:13-21 (Martinez).

11.     The Arc of Texas engages in many activities to further its mission, including grassroots advocacy to help people with IDD advocate for the issues that are important to them, public policy advocacy, and legislative advocacy. 10/11 Tr. 3493:10-21; 3494:5-10 (Martinez). Grassroots advocacy is critical to the work of The Arc of Texas and in furtherance of its mission. The Arc of Texas works to ensure that individuals with IDD are prepared and understand how to advocate for the issues that are important to them. *Id.* 3493:10-21 (Martinez).

12.     The Arc of Texas engages in legislative advocacy and has a policy staff that identifies legislation that impacts its priorities and meets with representatives to share its expertise on the consequences of legislation for the IDD community. The Arc of Texas also encourages its members to meet with their representatives and senators to share their concerns or perspectives and supports its members in preparing for and giving legislative testimony. 10/11 Tr. 3501:14-25, 3502:1-4, 3503:21-25, 3504:1-2 (Martinez).

13.     The Arc of Texas is a small non-profit and has a finite number of resources to cover its four public policy priorities. 10/11 Tr. 3506:19-23 (Martinez).

4

14.     Prior to SB 1, The Arc of Texas' voting rights work involved education and outreach on when elections would occur, deadlines that impacted voter registration, and information on how a person can find out where their polling place is located. They also partnered with the League of Women Voters, Disability Rights Texas, and other advocacy groups to do presentations in plain language for people with IDD about the voting process. 10/11 Tr. 3501:1-13, 3506:3-18 (Martinez).

15.     When The Arc of Texas receives individual complaints or questions about a voting location or issue, it refers those individuals to Disability Rights Texas for intake and review. 10/11 Tr. 3506:3-18 (Martinez).

16.     The Arc of Texas has been harmed organizationally by the Challenged Provisions of SB 1. The Arc of Texas had to "divert staff time and resources" to ensure that its members understood SB 1 changes and, as a result, did not have the resources to dedicate to its other policy priorities. 10/11 Tr. 3509:2-7, 3506:19–3509:25, 3531:13-25 (Martinez).

17.     The Arc of Texas' voting work has changed due to SB 1. Instead of providing information about where a person's polling location is and how to find out who the candidate is, The Arc of Texas has to explain what IDs people with IDD need to use and ensuring that people bring the appropriate assistor. The general tenor of The Arc of Texas' voting work has shifted from education and outreach to increase disability voting to quelling the fears of disabled voters that they won't get prosecuted for voting and assuring them that they still have a right to vote. 10/11 Tr. 3510:1-18 (Martinez). Because of SB 1, The Arc of Texas' voting work "will never go back to being simply, here's where you vote, how you vote" *Id.* 3510:1-25 (Martinez). Since "there are new 18-year-olds that become eligible every single election" The Arc of Texas is

AFDOCS:199405450.4

always going to have to do this additional work so long as SB 1 is not enjoined. *Id.* 3511:2-8 (Martinez).

18.     The Arc of Texas also missed opportunities to engage in its usual advocacy as part of its community supports priority that focused on ensuring that people with IDD have access to Medicaid waivers. The funding for Waivers has decreased and the inability to focus on that priority due to SB 1 is "a piece of why we are going backwards in that…policy priority." 10/11 Tr. 3509:11-17 (Martinez).

19.     The Arc of Texas had to reorganize its staff and reallocate their time and reorganize the policy budget away from other priorities to address the barriers to voting SB 1 created for voters with IDD. As a result, they could not address their other policy priorities. 10/11 Tr. 3506:19–3509:25, 3531:13-25 (Martinez).

20.     SB 1 affected The Arc of Texas's mission by decreasing opportunities for self-determination and voting, since "if you've taken away different options for how my members want to vote then you have taken away some of their self-determination." 10/11 Tr. 3511:11-15 (Martinez).

21.     The Arc of Texas was unable to advocate for its other policy priorities, including inclusive education issues like the restraint and seclusion of children with IDD in schools; competitive integrated employment and the opportunities for Texas to become an employment-first state, or people with IDD being able to access Medicaid waivers in a timely fashion due to the organization having to divert resources to efforts to oppose SB 1 and subsequently support and educate its members regarding the law. 10/11 Tr. 3506:21-25, 3507:1-12, 3506:21-25, 3507:1-15 (Martinez).

6

22.     Specifically, due to SB 1, The Arc of Texas missed an opportunity to advocate on its inclusive education priority to curtail the restraint and seclusion of children with IDD in schools. The Arc of Texas wanted to engage in legislative and public policy advocacy to train educators and law enforcement about how to properly support students with IDD. This was a time-sensitive issue since "if you have a kid who is being put in a closet, you want us to find a solution now. You can't wait two years." Because the Texas legislature does not meet every year and it is a different body every time, "the opportunities for us exists one time when they are altogether with particular Committee leads. That's going to change every time we have a legislative session…so we never have that opportunity again." The policy staff who typically handles this issue was instead assigned duties related to address SB 1 and was unable to engage on this issue. 10/11 Tr. 3507:16-25, 3508:1-25, 3509:1 (Martinez).

23.     The Arc of Texas' members brought their concern about SB 1 to The Arc of Texas and the board of directors agreed that The Arc of Texas' needed to participate in this litigation to protect its members. 10/11 Tr. 3526:4-7 (Martinez).

**(2) REV UP Texas**

24.     REV UP Texas is a statewide, non-partisan, grassroots, non-profit organization incorporated in Texas with an office in Austin, Texas. 10/11 Tr. 3621:2-3, 3617:15-16, 3619:2-3, 3626:1, 3619:4-5 (Kafka). REV UP stands for Register, Educate, Vote, Use Your Power. *Id.* 3616:6-17 (Kafka). REV UP Texas was founded due to the understanding that "there needed to be more involvement at the ballot box to be able to, in a non-partisan way, influence the people who actually vote on our [disability] issues." 10/11 Tr. 3618:2-5 (Kafka). REV UP is a national organization and there are REV UP affiliates across the country, including REV UP Texas. *Id.* 3618:6-14 (Kafka).

AFDOCS:199405450.4

25.     REV UP Texas has a board of directors, and the board elects new board members when there are openings. 10/11 Tr. 3630:11-15 (Kafka). Bob Kafka is REV UP Texas' Board President and State Coordinator, and he coordinates a regional network of organizational representatives throughout the state. *Id.* 3618:15-25 (Kafka). REV UP Texas does not have any paid Board members or staff. *Id.* 3619:1-8, 3634:17-18 (Kafka).

26.     REV UP Texas' mission is "to empower people with disabilities to get more involved in the disability and political process to be able to influence issues of concern to the disability community." 10/11 Tr. 3616:19-22 (Kafka). Examples of issues important to REV UP Texas' mission are "affordable integrated housing, long waiting lists for home- and community-based services, community attendants' wages and benefits that are currently just barely able to cover people's lifestyle; also, accessible transportation, durable medical equipment, assistive technology, issues that affect the very, very – disability population that makes up the disability vote." 10/11 Tr. 3617:1-7 (Kafka).

27.     REV UP Texas engages in many activities to further its mission. These activities include creating podcasts, flyers, and PSAs, websites, and presence in social media. 10/11 Tr. 3616:10-11, 3616:13-14 (Kafka).

28.     REV UP Texas has approximately 500 members statewide. 10/11 Tr. 3620:13, 19-20 (Kafka). Members do not pay dues as the organization tries to be "inclusive, not exclusive," and also because many persons with disabilities "are low-income and on supplementary security income, which the average is $675 a month, so even a $5 or $10 membership fee would be onerous." 10/11 Tr. 3619:14-22 (Kafka).

29.     REV UP Texas has "regional rep networks throughout the state to disseminate [REV UP's] information and also carry forth the mission of REV UP." 10/11 Tr. 3619:5-8

AFDOCS:199405450.4

(Kafka). The engagement of REV UP Texas' members ranges from receiving information "to those who are active in doing the various registration, education, and voting," and to "regional reps, who we engage monthly on regional phone calls." *Id.* 3620:21-25, 3639:6-10 (Kafka).

30.     REV UP Texas' mission has become more difficult to achieve post SB 1. Initially, REV UP Texas was aware of and had concerns about SB 1 before it became law in "that some of the sections of the bill would end up inhibiting the ability of people with disabilities to vote." 10/11 Tr. 3621:8-17, 3621:19-25 (Kafka). In response to REV UP Texas' concerns about SB 1, it sent out informational flyers about contacting the recipient's state senator testified at various hearings, and contacted the Governor's Office, the Governor's Committee on People with Disabilities, the Speaker of the House, and the Lieutenant Governor. *Id.* 3622:5-6, 3621:6-9 (Kafka).

31.     SB 1 impacted REV UP Texas' mission by requiring organizational representatives to answer questions about SB 1 and taking the organization's focus away from its educational tactics. 10/11 Tr. 3626:1-3 (Kafka). REV UP Texas had to produce "three or four podcasts about SB 1, which we would have done on issues like accessible, affordable, integrated housing; accessible transportation; long waiting lists; benefits for community attendants." 10/11 Tr. 3625:4-9, 3626:17-23, 3634:6-11, 3635:1-6 (Kafka);see also 10/10 Tr. 3230:15–3231:25 (Nunez Landry) (speaking about her volunteering with REV UP Texas and noting that "so many people are really confused about the provisions in SB 1…there's just a lot of confusion and misinformation and misunderstanding.").

32.     REV UP Texas also had to post information about SB 1 on Facebook and to provide information on Zoom calls to get the information out to the disability community. 10/11

Tr. 3625:10-12 (Kafka). Because of SB 1, REV UP Texas also had to take time away from time that it would have spent informing people on how to register to vote. *Id.* 3627:3-8 (Kafka).

33.    Further, REV UP Texas' mission is to build the disability vote and SB 1 not only inhibits the growth of the disability vote, but might also lower it. 10/11 Tr. 3626:15-22 (Kafka). SB 1 poses barriers for voters with disabilities to register to vote. 10/11 Tr. 3627:24–3628:2 (Kafka). Additionally, REV UP Texas continually receives phone calls regarding "the criminalization of the attendant," which takes time away from its other activities and mission goals. 10/11 Tr. 3628:10-14, 3635:23–3636:5 (Kafka).

34.    SB 1 continues to impact REV UP Texas and will continue to impact the organization into the future. 10/11 Tr. 3629:14-25 (Kafka). Since SB 1 was enacted, people have become disabled who were not disabled prior to SB 1. 10/11 Tr. 3629:1-9 (Kafka). Continued impact on REV UP Texas from SB 1 as new people turn 18 and/or become disabled, "[a]nd so that information about Senate Bill 1 might inhibit them from even starting the process to get registered, but…even if they did get registered, the ability to go out and vote, especially if they needed an attendant." Additionally, continued scarce resources diverted for each upcoming election make it difficult with the barriers imposed by SB 1. 10/11 Tr. 3628:19–3630:1 (Kafka).

35.    Going forward, SB 1 will continue to "take more of our scarce resources to start addressing those in a way that we really want to focus, again, on the issues like accessible, affordable integrated housing, wages and benefits, long waiting lists, durable medical equipment." 10/11 Tr. 3629:20-24 (Kafka).

### (3) Delta Sigma Theta Sorority, Inc.

36.    Plaintiff Delta Sigma Theta Sorority, Inc. ("DST") is a national, nonprofit, nonpartisan organization of Black, college- educated women, focused on serving the Black

AFDOCS:199405450.4

community through social action. 10/2 Tr. 2081:1-20 (Brown). DST has 75 Chapters in Texas, including chapters in Bexar, Harris, and Travis Counties.

37.     DST Chapters provide voter assistance to residents of nursing homes and senior care facilities in filling out applications for ballots by mail ("ABBMs"), filing address changes, filling out ballots by mail ("BBMs"), and voting in-person. 10/2 Tr. 2088:1-18 (Brown); 10/3 Tr. 2199:9-19 (Watkins Jones).

38.     DST members had provided transportation to the polls by participating in Souls to the Polls, a caravanning initiative that partners with churches to drive voters to their voting location. 10/2 Tr. 2088:8-15 (Brown).

39.     Members of DST include individuals that are 65 years or over and have disabilities and depend on assistance to cast their vote. 10/2 Tr. 2110:3-11 (Brown).

40.     For a detailed description of DST and its activities, *see* HAUL FOF at I.(A)(0).

### (4) LUPE

41.     LUPE is an organization of approximately 8,000 members that conducts its activities in the Rio Grande Valley—Hidalgo County, Cameron County, Starr County and Willacy County. 9/11 Tr. 63:14-15, 58:7–58:16 (Chavez Camacho).

42.     LUPE organizes its members and other colonia residents on issues that affect low-income neighborhoods, including drainage, lighting, paved roads, safety, emergency services, trash pickup, among others. In the past few years LUPE's primary organizing focus has been civic engagement and educating voters about their right to vote. 9/11 Tr. 60:10–61:2 (Chavez Camacho).

43.     Thirty percent of LUPE members are over age 65. 9/11 Tr. 63:16-18. LUPE's membership includes individuals who use assistance to vote, including elderly and/or disabled voters. *Id.* 65:7-13 (Chavez Camacho).

AFDOCS:199405450.4

44.     LUPE staff member and voter assistor Cris Rocha testified that she has been asked by elderly and disabled persons to help them vote and has provided that assistance in the past. 9/11 Tr. 145:16-20, 145:25–146:4. The voters that choose Ms. Rocha to be their assistor include LUPE members who are elderly and who use a cane or walker to walk. *Id.* 146:13-16, 150:6-18, 151:3-14, 152:6–153:3, 153:4-17. Ms. Rocha also assists LUPE members with curbside voting. *Id.* 150:9-13, 150:19–151:2, 157:14–158:9.

45.     LUPE volunteer and voter assistor Maria Gomez testified that she has assisted voters who voted by mail. LUPE 284 at 41:24–42:24, 11:15–12:10, 15:17-20, 29:9-12. She also assisted voters in the polling place. Before 2021, Maria Gomez felt at liberty to help people to vote and enjoyed helping people vote. Maria Gomez helped people to vote for about 25 years. LUPE Exh. 284 at 40:24–42:2.

46.     Plaintiffs incorporate by reference the findings of fact relating to LUPE's standing that are included in the LUPE Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

### (5) Texas Impact

47.     Plaintiff Texas Impact is a membership-based organization for the mainline Protestant, Jewish, and Muslim denominations in Texas. 10/11 Tr. 3641:24–3642:2 (Houston).

48.     Texas Impact's mission is to promote and advance public policy that is consistent with the social principles of its members. 10/11 Tr. 3642:5-7 (Houston). To do so, Texas Impact educates, equips, and mobilizes its members. *Id.* 3642:8-12 (Houston). Texas Impact also engages in lobbying. *Id.*

49.     Texas Impact engages in civic engagement work related to voting, including helping people to apply to vote by mail. 10/11 Tr. 3647:10-20 (Houston).

50.     Texas Impact has institutional members, congregational members, and individual members across the state of Texas. 10/11 Tr. 3643:1-8, 9-13, 3645:1-4 (Houston).

AFDOCS:199405450.4

51.     Texas Impact has 22,000 individual members; however, when one accounts for the total membership of all of Texas Impact's institutional and congregational members, there are around 5 million Texans who belong to Texas Impact. 10/11 Tr. 3645:5-18 (Houston).

52.     Texas Impact's membership includes Black and Latino Texans. 10/11 Tr. 3645:20–3646:6 (Houston).

53.     Texas Impact's individual members include Texans who require assistance with voting in-person and by mail because of a disability. 10/11 Tr. 3646:10-13 (Houston). Texas Impact's individual members also include Texans who have assisted others with voting, either in-person or by mail. *Id.* 3646:17-19 (Houston).

54.     Plaintiffs incorporate by reference the findings of fact relating to Texas Impact's standing that are included in the LUPE Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

### B.  Members of Plaintiff Organizations The Arc of Texas and Rev Up Texas Include Voters with Disabilities and Their Assistors

#### *(1) Jennifer Miller*

55.     Jennifer Miller and her daughter Danielle Miller are members of The Arc of Texas. They receive newsletters from The Arc of Texas and Danielle attends an arts program that The Arc of Texas runs in Austin. Danielle has taken other classes with The Arc of Texas and The Arc of Texas staff also help Danielle with case management. 10/10 Tr. 3197:14-20 (Miller); *see also id.* 3525:11-17 (Martinez). Ms. Miller and her daughter are registered to vote in Travis County. *Id.* 3199:12-15 (Miller).

56.     Ms. Miller's daughter is a person with autism, dyslexia, and dysgraphia. Danielle needs assistance with activities of daily living and Ms. Miller acts as her supported decision-maker. 10/10 Tr. 3197:21–3198:6. Danielle "isn't incompetent but she does need a little help,

AFDOCS:199405450.4

and she's over the age of 21. [S]he selected me to help her do things and help her make educated decisions in financial areas, medical things she needs help with … what she needs help with and asks for." *Id.* 3198:7-14. This allows Danielle to retain the ability to make her own decisions while receiving the support she needs. *Id.* She doesn't drive and doesn't live in an area that is accessible to public transportation. *Id.* 3198:17-24. Danielle's dysgraphia causes her handwriting to appear very rudimentary. For example, Danielle might write letters upside-down or words backwards. *Id.* 3196:19–3197:9.

57.     Danielle votes regularly and prefers to vote by mail. Jennifer assists her when voting by mail or in person. 10/10 Tr. 3200:19-21, 3201:14-16. Without Jennifer's assistance, Danielle would have trouble remembering her ID numbers and following rules for entering her ID numbers. Ms. Miller also helps Danielle access background material on candidates and complete the mail in ballot, and drives her to drop it off. *Id* 3202:4–3203:23, 3209:6-11. Danielle would have difficulty voting in person because she is sensitive to abrupt changes or alterations to routine. *Id.* 3199:2-9.

58.     Ms. Miller testified that Danielle wants to vote and practice her civic duty:

> My daughter just needs a little more help but she can vote. It's her constitutional right …. She wants to practice her civic duty and she should be able to vote …. People with disabilities are a part of our community and the fabric of our lives …. They need to be heard and why are you making it so hard for people with disabilities to vote?

10/10 Tr. 3218:17–3219:2 (Miller).

### *(2) Jodi Lydia Nunez Landry*

59.     Jodi Lydia Nunez Landry is a member of The Arc of Texas. She served as a participant in The Arc of Texas' 2022 Partners in Disability Leadership program, where she attended classes for a year. She registered voters in Houston with The Arc of Texas and received

emails from The Arc of Texas. 10/10 Tr. 3231:10-23 (Landry); see also 10/11 Tr. 3525:11-17 (Martinez).

60.     Ms. Nunez Landry is also a member and regional representative for REV UP Texas. 10/10 Tr. 3229:15 (Nunez Landry). In this role, she hosts monthly meetings, registers people to vote, and attends events where she talks to people about policy issues that impact people with disabilities. She also encourages people with disabilities to register to vote. *Id.* 3229:15 (Nunez Landry).

61.     Ms. Nunez Landry lives in and is registered to vote in Harris County. 10/10 Tr. 3236:11-17 (Nunez Landry).

62.     Ms. Nunez Landry has a rare and untreatable progressive form of muscular dystrophy. She requires assistance with most activities of daily living including bathing, dressing, cooking, and cleaning. She uses a power wheelchair to navigate. Her disability makes planning for activities important because she must consider the accessibility of the location and its surroundings. Even with careful planning unexpected barriers make travel difficult. For example, on the morning of her testimony, Ms. Nunez Landry encountered a section of the road outside the courthouse that did not have sidewalks. Her partner had to lift her power wheelchair up onto the next section of sidewalk while avoiding passing traffic.10/10 Tr. 3233:7-14, 3235:10–3236:2 (Nunez Landry).

63.     Ms. Nunez Landry has had difficulty finding personal care attendants to assist with her daily needs. She feels the impact of the home health care crisis wherein community attendants are earning low wages without benefits and can earn more money working less physically demanding jobs. Her worst fear is ending up in a nursing facility due to her inability to find care attendants. 10/10 Tr. 3234:7-23 (Nunez Landry).

15

64.      Ms. Nunez Landry prefers to have her partner assist her with voting. Her partner understands the contours of her disability and she doesn't need to go into a lengthy explanation about what she requires assistance with. She prefers to vote in person but also needs the option of voting by mail. Voting in person allows her to check if the polling sites are physically accessible and she feels it is important to be out in the community as a visibly disabled person. However, since Ms. Landry relies on so much specialized equipment, it is important to have the option to vote by mail in case something is broken or not working correctly. 10/10 Tr. 3234:2-6, 3236:24–3237:1 (Nunez Landry).

65.      Ms. Nunez Landry believes voting is fundamental to democracy. As a citizen, she believes it is her responsibility to be civically engaged and to choose the people who will be in power. Her father, a Marine in World War II, is her inspiration to vote. 10/10 Tr. 3232:11-18 (Nunez Landry).

### (3) Amy Litzinger

66.      Amy Litzinger has been a member of The Arc of Texas since around 2004. She participates in The Arc of Texas' advocacy days and in disability coalitions and state agency committees through The Arc of Texas. Being a member is important to Ms. Litzinger since, "we're stronger in numbers and our voices are stronger when we advocate together." 10/10 Tr. 3273:25–3274:15 (Litzinger); see also 10/11 Tr. 3525:11-17 (Martinez).

67.      Ms. Litzinger has also been a member of REV UP Texas for at least 5 years. As a REV UP Texas member, Ms. Litzinger educates people with disabilities about their right to vote and voting accessibility. She helps educate candidates on disability issues and helped plan and execute the organization's Disability Issues Forum and did a flash mob about disability and voting. Her REV UP Texas membership is important to her because "if you don't vote and

AFDOCS:199405450.4

educate yourself, it's harder to tell elected officials what you need." 10/10 Tr. 3274:16–3275:9 (Litzinger).

68.    Ms. Litzinger lives in and is registered to vote in Travis County. She works as a public policy specialist with a statewide disability organization. She teaches parents and disabled individuals how to advocate at the state legislature. She serves on state agency committees and helps with the implementation of new legislation. 10/10 Tr. 3273:3-6, 3273:13-24, 3281:13-19 (Litzinger).

69.    Ms. Litzinger has spastic quadriplegic cerebral palsy and dysautonomia. 10/10 Tr. 3275:20, 3276:2 (Litzinger). There are not a lot of physical tasks that she can do for herself, but she verbally directs her attendants. She cannot lift anything heavier than two pounds and can only grasp with one hand although not consistently. Her inconsistency in grip strength means her signature is uneven or illegible. *Id.* 3277:23–3278:6, 3279:11–3280:4 (Litzinger).

70.    Ms. Litzinger uses a power wheelchair but cannot always drive it independently depending on spasticity and muscle strength. 10/10 Tr. 3276:18-22. Ms. Litzinger does not drive and lives too far from the bus lines to use public transportation, so she owns a modified van. It is time consuming for her to get around because she must hire someone to drive ahead of time. *Id.* 3276:23–3277:15 (Litzinger). Travel is also challenging because she cannot be in hot or cold environments for extended periods of time and requires assistance to use the restroom. *Id.* 3278:7-21 (Litzinger).

71.    Ms. Litzinger is eligible to vote by mail but prefers to vote in person. The nature of her disability causes her signature to vary greatly in appearance and she would likely have to prove her identity in person if she attempted to vote by mail. 10/10 Tr. 3282:14-24 (Litzinger).

AFDOCS:199405450.4

72.     Ms. Litzinger prefers to have her personal care attendant assist with voting. Since she has limited dexterity, the poll worker would have to interact with intimate parts of her body, which could be unsafe or uncomfortable for both individuals. 10/10 Tr. 3286:11–3287:4 (Litzinger). She also relies on her personal care attendant to get to the polling site. It is safer and faster to rely on her attendant. Her attendant drives her accessible van, loads and unloads Ms. Litzinger from the van, ensures there are no barriers to enter the voting space, requests curbside voting, handles her ID, and places the completed ballot in the machine. *Id.* 3284:13–3285:23 (Litzinger).

73.     Ms. Litzinger also relies on an attendant when voting by mail, as she did in 2020. Ms. Litzinger needs someone to open the envelope, fill it out, and tape it down so she can sign it. 10/10 Tr. 3287:20–3288:5 (Litzinger). It is important to have both options for voting because there are days when her disability will impact her ability to vote in person and so voting by mail is the only option for her. *Id.* 3282:25–3283:7 (Litzinger).

74.     Ms. Litzinger believes that voting is the most concrete way to show elected officials what is important to her. As a disabled person she believes it is important for members of her community to see her participating and using her voice. 10/10 Tr. 3281:20–3282:24 (Litzinger).

### (4) Laura Halvorson

75.     Laura Halvorson is a member of The Arc of Texas. She uses the resources on their websites, including following different advocacy issues that affect her which The Arc of Texas covers. She gets action alerts from The Arc of Texas. 10/10 Tr. 3315:9-21 (Halvorson); *see also* 10/11 Tr. 3525:11-17 (Martinez).

76.     Ms. Halvorson is also a member of REV UP Texas. 10/10 Tr. 3314:11–3315:8 (Halvorson). After she learned that Texas has one of the lowest voter turnouts in the country, this

became a part of Ms. Halvorson's platform to make people aware of disability issues and voting. *Id.* 3314:11–3315:8 (Halvorson). As a REV UP Texas member, she shares resources and makes sure others with disabilities are registered to vote. *Id.* 3314:11–3315:8 (Halvorson).

77.    Ms. Halvorson lives in and is registered to vote in Bexar County. 10/10 Tr. 3315:22-25 (Halvorson).

78.    Ms. Halvorson has Limb Girdle muscular dystrophy, chronic muscular respiratory failure, anxiety disorder, and various allergies. She describes her assistance needs as "total care" and requires assistance for almost all physical activities. Her conditions are progressive, and she went from walking and breathing on her own to using a breathing machine and a complex rehab power wheelchair. If her breathing machine became unplugged or stopped working, she could die within minutes. Ms. Halvorson still feels the impact of the COVID-19 pandemic. Her conditions make it incredibly dangerous for her to contract COVID and she goes out in public very rarely as a result, mostly only venturing out to the doctor's office and pharmacy. 10/10 Tr. 3310:17-20, 3311:10–3312:6, 3313:4–3314:7, 3315:22-25 (Halvorson).

79.    Ms. Halvorson has three primary attendants and an additional attendant as a backup. She finds it difficult to find attendants because she needs people who will mask, are vaccinated, and who will follow 2020 COVID-19 protocols. These restrictions, in combination with the low wages the attendants receive make it challenging to find and retain help. 10/10 Tr. 3133:17-25 (Halvorson).

80.    Ms. Halvorson prefers to have her attendant assist her with voting. She cannot reach the buttons on the touchscreens, so she relies on her attendant to hand her ID to the voting assistant and then press the buttons based on her verbal commands. This is how Ms. Halvorson had her attendant assist her prior to the enactment of SB 1. Ms. Halvorson's disability is

AFDOCS:199405450.4

progressive, so she will rely on her attendant more in the future. 10/10 Tr. 3312:7-17, 3317:17–3318:2, 3333:2-8 (Halvorson).

81.    Prior to 2022, Ms. Halvorson typically voted curbside, but would occasionally vote in-person depending on her ability and energy level that day. It is important for her to have access to different methods of voting because her ability and energy levels fluctuate from day to day. Since the COVID-19 outbreak, it is much safer for Ms. Halvorson to vote by mail. However, whenever possible, she prefers to vote in person so she can see that her vote is being counted. 10/10 Tr. 3316:20–3317:16, 3321:22–3322:4, 3343:10-16 (Halvorson).

82.    Ms. Halvorson votes in every election possible because it is her duty as an American to make her voice heard. As part of the disabled community, she believes that it is important for politicians to know that people with disabilities are a powerful bloc that deserves to be heard. 10/10 Tr. 3316:6-12, 3332:19–3333:1 (Halvorson).

### (5) Teri Saltzman

83.    Teri Saltzman is a member of The Arc of Texas and joined The Arc of Texas in 2014. 10/10 Tr. 3348:21-24, 3350:10-15 (Saltzman); see also 10/11 Tr. 3525:11-17 (Martinez). Ms. Saltzman has also been a member of REV UP Texas since 2014. 10/10 Tr. 3349:16 (Saltzman).

84.    Ms. Saltzman lives in and is registered to vote in Travis County. She is a disability advocate and has worked in the field for almost 25 years. 10/10 Tr. 3346:5-10, 3346:17–3347:3 (Saltzman).

85.    Ms. Saltzman is legally blind, which affects every aspect of her life. She doesn't drive and uses assistive technology to read and use the computer. 10/10 Tr. 3347:4-25 (Saltzman). Ms. Saltzman prefers to vote by mail because it is the easiest method for her. *Id.* 3351:1-6 (Saltzman).

AFDOCS:199405450.4

### (6) Cathy Cranston

86.     Cathy Cranston is a member of REV UP Texas and participates in events like the

Texas Disability Issue Forum and recruits volunteers for the Forum. 10/11 Tr. 3553:20-21,

3556:4-22 (Cranston). Ms. Cranston lives and is registered to vote in Travis County. *Id.* 64:9-12

(Cranston).

87.     Ms. Cranston is a personal care attendant and has worked in that role on and off

for approximately 40 years. 10/11 Tr. 64:20-23 (Cranston). Ms. Cranston has provided a wide

range of voting assistance to people with disabilities. She has driven individuals to the polls,

assisted in handing IDs to poll workers and marking ballots for people with physical disabilities,

and reading the ballot for people with cognitive or sensory disabilities. *Id.* 73:14–74:7

(Cranston). She described her role in assisting disabled individuals as being an extension of their

body: "I'm there to help them fulfill their civic duty, their responsibility in voting, their right. It's

their civil right to be able to do that." *Id.* 74:17-22 (Cranston).

### (7) Yvonne Yvette Iglesias

88.     Yvonne Yvette Iglesias is a member of The Arc of Texas. HAUL-MFV 416:

19:8-14, 21:6–22:5, 25:8-15 (Iglesias). Ms. Iglesias is also a member of REV UP Texas. *Id.*

416:18:12-17 (Iglesias). She lives and is registered to vote in Hidalgo County. *Id.* 416: 18:12-17

(Iglesias).

89.     Ms. Iglesias is blind in one eye, has paraplegia, and has diabetes. She testified that

due to her disabilities, she has to travel by ambulance. Her pressure ulcers make it impossible for

her to sit. HAUL-MFV 416: 21:6–22:5 (Iglesias).

90.     Ms. Iglesias always votes by mail because she is only able to travel using

ambulance services and they are unable to take her to vote in person. HAUL-MFV 416: 29:4-11

(Iglesias).

AFDOCS:199405450.4

### (8) Nancy Crowther

91.    Nancy Crowther is a member of The Arc of Texas. HAUL-MFV 413: 16:22 (Crowther). As a member of The Arc of Texas, Ms. Crowther passes on information that she receives from The Arc of Texas, which helps the IDD community achieve inclusion. *Id.* 413: 19:4-8 (Crowther). Ms. Crowther is also a member of REV UP Texas. *Id.* 413: 16:23-25, 17:4-5 (Crowther).

92.    Ms. Crowther lives in and is registered to vote in Travis County. HAUL MFV 413: 30:5-12 (Crowther).

93.    Ms. Crowther has a progressive neuromuscular disease and requires a personal care attendant to complete major life activities. She cannot sit up by herself, so her attendant helps her get dressed, use the bathroom, transfer in and out of her wheelchair, and use her CPAP machine for her sleep apnea. Ms. Crowther also uses her attendant to complete household tasks and personal hygiene. Her attendant is with her for most of her daily activities. HAUL MFV 413: 23:25–24:8, 18:3-9, 30:5-12 (Crowther).

### (9) Toby Cole

94.    Toby Cole became disabled after diving into the shallow end of a pool when he was 18. He is now a quadriplegic, without any mobility from his shoulders down. 9/13 Tr. 696:9-17 (Cole). Though he is not a member of The Arc of Texas or REV UP Texas, he is a constituent of these organizations as a Texan with a disability. Mr. Cole is registered to vote in Harris County. 9/13 Tr. 695:6-7 (Cole).

95.    After the onset of his disability, Mr. Cole received his bachelor's degree, a Master's of Business Administration, in finance and a Juris Doctorate from the University of Houston. He started a law firm with another person and now represents people with spinal cord injuries after they are injured. 9/13 Tr. 698:2-11, 698:23–699:3 (Cole).

AFDOCS:199405450.4

96.     Mr. Cole verbally directs his care but relies on others for most of his activities of daily living. He relies on assistance to get dressed, to transfer, to eat, and to complete personal hygiene tasks. 9/13 Tr. 697:16-21 (Cole).

97.     Mr. Cole testified that if he has to be in court at 8:00 am, he will wake up at 4:00 am to complete his morning routine because what might take an able-bodied person a few minutes takes him and his assistant a few hours. 9/13 Tr. 699:25–700:11 (Cole).

98.     Mr. Cole always votes in person because he can't sign paperwork himself and doesn't want his vote to be rejected because his signature doesn't match what another person wrote at a different time. He prefers to have an assistant or his paralegal help him vote because that is what he's used to. 9/13 Tr. 704:4-24 (Cole).

99.     Mr. Cole typically votes curbside, so his assistant drives him to the polling location and hands the poll worker his identification. Then when a machine becomes available, the poll worker will bring it out. His assistant usually helps maneuver the machine into the van for Mr. Cole and then turns the knobs based on his verbal commands. If Mr. Cole has difficulty remembering who is voting for in a specific race he will ask his assistant to reference the notes he has brought with him. 9/13 Tr. 704:25–707:10 (Cole).

100.    Mr. Cole always chooses his own assistor because it is too personal to have a poll worker he's never met assist him. He testified that once when voting he wasn't allowed to bring his assistor into the booth with him and he felt like it was a violation of his privacy to have someone he didn't know in such a personal moment. 9/13 Tr. 707:11–708:14 (Cole).

## C. Defendants

101.    Plaintiffs incorporate by reference descriptions of Defendants for HAUL, OCA, and LUPE Plaintiffs that are found in the respective Proposed Findings of Fact for each party. HAUL FOF Sections I(C) and I(D); OCA FOF Section II, LUPE FOF Section I.B.

AFDOCS:199405450.4

102.    Each of these Defendants receives federal financial assistance. *See* 9/22 Tr. 1857:9-14 (Adkins) (testifying that the Secretary of State receives federal funding through the Help America Vote Act (HAVA)); 9/19 Tr. 991:15-19 (Callanen) (testifying that the Office of the Elections Administrator in Bexar County received federal funding through HAVA and the CARES Act in 2021 and 2022); 9/19 Tr. 1173:13-20 (Obakozuwa) (testifying that Harris County receives federal funding through HAVA and other means); 9/21 Tr. 1550:9-12 (Escobedo) (testifying that Travis County receives federal funding); HAUL-MFV 112 (Travis County Reports on Federal and State Awards for the Year Ended September 30, 202); HAUL-MFV 113 (Resolution of Bexar County Commissioners); HAUL-MFV 114 (Bexar County Adopted Budget Fiscal Year 2021-22); HAUL-MFV 115 (Bexar County Adopted Budget Fiscal Year 2022-23); HAUL-MFV 120 (Travis County Fiscal Year 2022 Adopted Budget); HAUL-MFV 90 (federal grant to Harris County District Attorney's Office); HAUL-MFV 98 (HAVA awards to state and counties).

## III.    Voters with Disabilities in Texas

### A.  Plaintiff's Expert, Dr. Douglas Kruse

103.    Plaintiffs' expert, Dr. Douglas Kruse, is a Distinguished Professor at Rutgers University. Dr. Kruse is also the co-director of the Program for Disability Research and the associate director of the Institute for the Study of Employee Ownership and Profit Sharing, both housed within the Rutgers School of Management and Labor Relations. Dr. Kruse received his bachelor's degree from Harvard College, his master's degree from the University of Nebraska-Lincoln, and his Ph.D. in economics from Harvard University. Outside of his positions at Rutgers, Dr. Kruse is a research associate at the National Bureau of Economic Research and is a research fellow at the IZA Institute of Labor Economics. Dr. Kruse was recognized by the court

as a "qualified expert witness in the field of voters with disabilities" without objection. 10/12 Tr. 3717:5-8, 3718:25–3719:2, 3719:8-11, 3721:10-13, 3724:11-16.

## B. Demographics

104.    At least 3 million voting-eligible Texans have disabilities. 10/12 Tr. 3738:17 (Kruse); LUPE-002 ¶¶ 14, 38. The population of voters with disabilities will increase over time because disability correlates "[v]ery, very highly" with age. 10/12 Tr. 3742:13-23 (Kruse); LUPE-002, Table 3.

105.    As of 2020, 19,425,500 Texans were voting eligible. LUPE-002 at 32, Table 1. Thus, nearly one out of every six or seven voting-eligible Texans has a disability.

106.    Dr. Kruse's testimony provided an overview of key demographics for voters with disabilities in Texas.

107.    Just over half of Texans with disabilities have a mobility impairment (1,604,700), defined as difficulty walking or climbing the stairs. 10/12 Tr. 3740:3-7 (Kruse); LUPE-002 ¶ 40, Table 1.

108.    Approximately one-third of Texans with disabilities have difficulty going outside the home alone (1,127,500). 10/12 Tr. 3740:10-16 (Kruse); LUPE-002 ¶ 40, Table 1.

109.    Approximately 1,082,500, or one-third of voting-eligible Texans with disabilities, have a cognitive impairment. Cognitive impairment is defined as difficulty remembering, concentrating, or making decisions. 10/12 Tr. 3740:19-23 (Kruse); LUPE-002 ¶ 40, Table 1.

110.    Texans with disabilities are half as likely to be employed as other working-age people without disabilities. 10/12 Tr. 3746:18-21 (Kruse); LUPE-002, Table 4.

111.    Texans with disabilities are twice as likely to be in poverty. 10/12 Tr. 3746:21-22 (Kruse); LUPE-002, Table 4.

AFDOCS:199405450.4

112.    Texans with disabilities are more likely to live alone, less likely to be married, and more likely to be separated, divorced, or widowed. 10/12 Tr. 3747:20-25; LUPE-002, Table 4.

113.    Texans with disabilities are more likely to use Social Security income, public assistance income or food stamps, and Medicaid or other low-income health plans. LUPE-002, Table 4.

114.    Black and Native American Texans are more likely to have a disability than white, non-Hispanic Texans. 10/12 Tr. 3741:11-16 (Kruse); LUPE-002 ¶ 44, Table 3.

115.    Of voting-eligible Texans with disabilities, 17.9% are Black, 17.8% are Native American, and 16.3% are white, non-Hispanic. 10/12 Tr. 3741:11-16 (Kruse); LUPE-002 ¶ 44, Table 3.

116.    The overall percentage of Hispanic voting-eligible Texans with disabilities is lower than white, non-Hispanic Texans because voting-eligible Hispanic Texans tend to be younger, and thus less likely to have a disability. When the Hispanic category is separated by age group, as Hispanic Texans age, they are more likely than white, non-Hispanic Texans to have a disability. 10/12 Tr. 3741:21-25, 3742:1-8 (Kruse); LUPE-002 ¶ 44, Table 3.

117.    Texans with disabilities are three times more likely to live in homes without internet access. In absolute numbers, an estimated 460,600 voting-eligible Texas with disabilities live in homes without internet access. 10/12 Tr. 3748:20-25, 3749:1-7 (Kruse); LUPE-002 ¶ 54, Table 6.

118.    At the individual level, Texans with disabilities are twice as likely to not use the internet, whether at home or otherwise. In absolute numbers, an estimated 832,200 Texas

AFDOCS:199405450.4

citizens with disabilities do not use the internet, whether inside or outside the home. 10/12 Tr. 3750:1-12 (Kruse); LUPE-002 ¶ 55, Table 6.

119.    Texans with disabilities are four times more likely to live in a zero-vehicle household, less likely to take trips outside the household, and less likely to be able to drive. 10/12 Tr. 3751:25, 3752:1-5 (Kruse); LUPE-002 ¶ 57, Table 7.

120.    Ten percent of voting age Texans report a disability that limits travel. LUPE 002 ¶ 57; see id. at 38, Table 7.

121.    Because Texans with disabilities are more likely to face transportation barriers, they will have a more difficult time voting in person. 10/12 Tr. 3752:9-13 (Kruse); LUPE-002 ¶ 70, Table 7, ¶ 97.

122.    People with disabilities face social stigma because of their disability. People with mental and cognitive impairments tend to face the greatest amount of stigma. 10/12 Tr. 3752:16-25, 3753:1-2 (Kruse); LUPE-002 ¶¶ 60, 61.

123.    People living in congregate settings like institutions or group homes can face barriers in exercising the right to vote because the support they receive from staff in these settings can vary tremendously. 10/12 Tr. 3752:15-22 (Kruse); LUPE-002 ¶ 91.

### C.  Voting Patterns of Voters with Disabilities

124.    People with disabilities turn out to vote at lower rates than people without disabilities. This lower turnout rate is in part because people with disabilities have lower education and income levels; are more socially isolated (which makes it less likely that they are recruited to vote and able to get to the polls); and due to psychological factors, such as feeling like the political system is not responsive to people with disabilities. These factors do not fully explain the turnout gap. Previous difficulties in voting explain the remaining gap for voters with disabilities. 10/12 Tr. 3754:3-20 (Kruse); LUPE-002 ¶ 65.

AFDOCS:199405450.4

125.    The disability turnout gap in 2020 in Texas was 5.15 percentage points. The gap is similar to the prior presidential election in 2016. COVID did not significantly affect the turnout gap because many people with disabilities were able to vote by mail. 10/12 Tr. 3797:17-25, 3798:1-16, 3798:19-22, 3800:1-5 (Kruse).

126.    Voters with disabilities are four times more likely to vote by mail based on 2020 numbers. 10/12 Tr. 3757:17-21 (Kruse).

127.    In 2016, voters with disabilities were three times more likely to vote by mail, showing that this gap between voters with and without disabilities who vote by mail existed prior to the pandemic. 10/12 Tr. 3801:10-18 (Kruse); LUPE-002 ¶ 69.

128.    In Texas, voters with disabilities qualify to vote by mail. Voting by mail in Texas is available to voters who are over 65 years old, have a disability, are confined due to childbirth, expect to be absent from the country, or are confined in jail or under an involuntary civil commitment. HAUL-MFV 395.

129.    The most common bases for eligibility for vote by mail are the "over 65" and "disability" categories. 9/19 Tr. 1158:16-22 (Obakozuwa); see also 9/12 Tr. 313:13-18 (Wise) (the most common reason for securing an annual ballot by mail application in El Paso County is age over 65); 9/20 Tr 1299:4-10 (Longoria).

130.    Voting by mail may be the only option to vote for some voters with disabilities. 9/20 Tr. 1272:13–1273:5 (Longoria).

131.    In Texas, voters with disabilities comprised 32% of all voters who voted by mail in 2020. In absolute numbers, of the estimated 1.3 million Texans with disabilities who voted in 2020, 398,000 of them voted by mail. 10/12 Tr. 3758:1-18 (Kruse); LUPE-002, Table 8.

AFDOCS:199405450.4

132.    There are more voters who have a disability and vote by mail than those who mark disability as their reason for eligibility to vote by mail. 9/20 Tr. 1299:25–1300:2 (Longoria). For example, the majority of mail voters in Harris County check "over 65" as their reason for mail voting but many also have a disability. Since marking only one eligibility option is required for mail voting, many voters with disabilities who are voting by mail are not tracked. Ms. Longoria explained that "most older folks have…permanent or temporary disabilities, breaking an arm, having a stroke, maybe even vision just gets blurry over time, those count as different levels of disability." *Id.* 1299:4-17 (Longoria).

133.    It may be easier for a voter to check the box for eligibility due to age, even when they have a disability, because the voter does not have to wonder whether their disability meets the legal standard for requesting a mail ballot. 9/20 Tr. 1299:18–1300:2 (Longoria).

134.    Some voters do not realize they are eligible to vote by mail because they may not understand that their cognitive or physical impairment qualifies them to vote by mail. 9/20 Tr. 1273:19–1275:25 (Longoria).

135.    Eligibility to receive voter assistance is also limited in Texas to those with "(1) a physical disability that renders the voter unable to write or see; or (2) an inability to read the language in which the ballot is written" as well as to voters who communicate in a language other than English. Tex. Elec. Code Sections 61.032-034, 64.031.

### D.  Barriers to Voting for Voters with Disabilities

136.    There are many barriers that people with disabilities face when voting that make the process harder for them than for non-disabled voters. Voters with disabilities are nearly twice as likely to encounter issues when voting in person (18%) compared to voters without disabilities (9.8%). 10/12 Tr. 3755:12-23 (Kruse); LUPE-002, Table 10. The most common difficulty that voters with disabilities face when voting in person is waiting in line at a polling location; 3.2% of

AFDOCS:199405450.4

voters with disabilities had difficulty getting inside the polling place compared to 0.4% for voters without disabilities; 1.2% of voters with disabilities had difficulty writing on the ballot compared to none for voters without disabilities. 10/12 Tr. 3756:1-19 (Kruse); LUPE-002, Table 10. Barriers to voting in person may lead voters with disabilities to vote by mail. 10/12 Tr. 3756:20-25 (Kruse); LUPE-002, Table 10.

137.    Additional barriers to voting in person include getting transportation to the polling place, operating voting machines, reading and understanding the ballot, and interacting with staff. 10/12 Tr. 3755:1-10 (Kruse); LUPE-002 at ¶ 70.

138.    Voters with disabilities are over twice as likely to have difficulties voting by mail than voters without disabilities. 10/12 Tr. 3759:14-23 (Kruse); LUPE-002, Table 11.

139.    Voters with disabilities face several barriers to voting by mail, including requesting a ballot, seeing and filling out the ballot, and returning the ballot. 10/12 Tr. 3758:24-25, 3759:1-13 (Kruse); LUPE-002, Table 11.

140.    Voters with visual impairments, approximately 22% of voters with disabilities, may have particular difficulty seeing and filling out the ballot. 10/12 Tr. 3759:4-8 (Kruse); LUPE-002, Table 11.

141.    Voters with dexterity issues, such as Cerebral Palsy or quadriplegia, may have difficulties writing on the ballot and putting the ballot into the envelope. 10/12 Tr. 3759:9-12, 3763:1-3 (Kruse); LUPE-002, Table 11.

142.    Voters with disabilities and others testified about the barriers they face when voting. *See, e.g.*, 10/10 Tr. 3359:3-23 (Saltzman) (describing attempting to use laptop during curbside voting in May 2022 that was completely inaccessible to her as a blind voter); 9/13 Tr. 706:17-18, 24, 708:3-14, 708:17-19, 22-24 (Cole) (describing how it takes nearly an hour to

receive curbside voting assistance and other barriers he faces while voting as a wheelchair user); 9/20 Tr. 1296:15–1297:4, 1297:17–1298:4 (Longoria) (describing lawsuit filed against Harris County Elections Administrator for ADA violations); Nancy Crowther Deposition Designation, HAUL MFV 413: 43:1–46:1 (Crowther) (describing how many polling places are not accessible to wheelchair users); 9/19 Tr. 1158:23-25 (Obakozuwa) (noting that in-person voting may be more difficult, or even impossible, for some voters who are over 65 or have a disability).

### E.  Assistance Needs of Voters with Disabilities

143.    Dr. Kruse testified about the general assistance needs of people with disabilities in daily life and in voting. Approximately 41.2% (2.3 million) of Texans with disabilities need some assistance with activities of daily living. 10/12 Tr. 3768:17-24 (Kruse); LUPE-002, Table 5. Activities of daily living include "[t]hings like getting dressed, taking a bath, preparing meals .... Basic activities that…we all have to do every day." 10/12 Tr. 3768:5-7, 11-12 (Kruse).

144.    Approximately a quarter of people with disabilities in Texas report difficulty going outside the home for errands. 10/12 Tr. 3769:5-11 (Kruse); LUPE-002, Table 5.

145.    Approximately one-third of people with disabilities receive assistance in daily tasks from family members. Approximately one-fourth receive assistance from non-family members. 10/12 Tr. 3769:14-25, 3770:1-6 (Kruse); LUPE-002, ¶ 102, Table 5.

146.    There is a high correlation between people with disabilities who require assistance with daily tasks and those who require assistance during the voting process. 10/12 Tr. 3770:7-16 (Kruse).

147.    Voters with disabilities are twice as likely to need assistance voting in person as voters without disabilities. 10/12 Tr. 3771:11-15 (Kruse).

148.    Voters with disabilities are ten times more likely to need assistance voting by mail than voters without disabilities. 10/12 Tr. 3771:16-25 (Kruse).

31

149.    Approximately one-fifth of voters with disabilities receive voting assistance from non-family members. LUPE-002, ¶ 102.

150.    Voters with disabilities may have difficulty with dexterity, seeing, or getting around the polling place. 10/12 Tr. 3770:20-25, 3771:1-4 (Kruse).

151.    Voters with IDD may need assistance with physically accessing a polling location, using assistive technology, navigating around the polling place – including navigating the sounds and number of people, noises, lighting, and waiting – and translating forms into plain language. 10/11 Tr. 3491:21–3492:17, 3512:11–3513:2 (Martinez).

152.    Voters with IDD also need voting assistance when voting in person or by mail to ensure they fully understand their choices in the voting process, which may require more time. 10/11 Tr. 3494:14-20 (Martinez). This assistance can come through cuing. Cuing refers to when the voter assistor has a conversation with the voter before voting to discuss the voter's values, priorities, and candidate choices. 10/11 Tr. 3491:9-20 (Martinez).

153.    For voters with IDD, cuing may also be needed when inside the polling location, where the voter assistor can cue the voter to recall the prior conversation to help the voter make their choices, using prompts like, "remember the conversation we had, what were the things you said were important to you, who were the individuals that you were interested in voting for." 10/11 Tr. 3491:9-20 (Martinez).

154.    Ms. Cranston has helped voters with disabilities by driving them to the polls, assisting with complying with ID requirements at the polls, reading the ballot, and physical assistance at the polls. 10/11 Tr. 3558:14–3574:22 (Cranston).

AFDOCS:199405450.4

IV.    **Passage of SB 1**

    A.    **Plaintiffs Notified Defendants of the Exclusionary Effects the Challenged Provisions of SB 1 Would Have on Voters with Disabilities Prior to SB 1's Enactment.**

155.    General efforts Plaintiffs made to oppose SB 1 and explain to the legislature the large scale harms the law imposes on a wide range of voters are incorporated by reference from the Proposed Findings of Fact of HAUL and OCA. HAUL FOF Section VI ¶ 398; OCA FOF Section II(A).

156.    Many efforts were made by Plaintiffs before the passage of SB 1 to notify the State of Texas and the Legislature of the harm that would occur to voters with disabilities should SB 1 be passed. Representatives from The Arc of Texas and REV UP Texas testified multiple times before the state legislature regarding the harms SB 1 would impose on voters with disabilities. *See* HAUL-MFV 213 (Testimony by Ginger Mayeaux Before the House Elections Committee); HAUL-MFV 214 (Testimony by Ginger Mayeaux Before the Senate State Affairs); HAUL-MFV 216 (Testimony of Alex Cogan, LMSW, Manager of Public Policy and Advocacy, The Arc of Texas, Senate State Affairs Committee, Regarding SB 1); HAUL-MFV 229 (Testimony to the Senate Affairs Committee Against SB1, Courtney Pugh, Member of the Arc of Texas); HAUL-MFV 270 (Testimony of Alex Cogan, LMSW, Manager of Public Policy and Advocacy, The Arc of Texas, Senate State Affairs Committee, Regarding SB 1); 10/11 Tr. 3621:16–3622:12 (Kafka).

157.    Many other groups, including other Plaintiffs in this action, also testified or wrote letters notifying the legislature of concerns related to how SB 1 would harm voters with disabilities. *See* HAUL-MFV 223 (Testimony of Ruei Tuo, 87th - 1st Special Session - Texas Bill SB1/HB3); HAUL-MFV 225 (Testimony on SB 1, by Emily Eby, Staff Attorney, Texas Civil Rights Project, Texas Senate State Affairs Committee); HAUL-MFV 226 (Testimony on

SB 1, By James Slattery, Senior Staff Attorney, Texas Civil Rights Project, Texas House Select Committee on Constitutional Rights & Remedies); HAUL-MFV 269 (Testimony on SB1, by Emily Eby, Staff Attorney, Texas Civil Rights Project, Texas Senate State Affairs Committee); HAUL-MFV 283 (Testimony re SB 1 by Texas Civil Rights Project).

158.    REV UP Texas also sent out fliers to its membership explaining how voters could contact their representative in the state Senate and contacted the Governor's office, the Governor's Committee on People with Disabilities, the Speaker of the House, and the Lieutenant Governor to express concerns about the harm SB 1 would impose on voters with disabilities. 10/11 Tr. 3622:1-12 (Kafka).

159.    Members of The Arc of Texas and REV UP Texas opposed SB 1 through the testimony described above and otherwise. Ms. Nunez Landry participated in multiple protests in Austin and Houston with the disability community to oppose SB 1. 10/10 Tr. 3239:14-23 (Nunez Landry).

160.    Ms. Longoria testified that she submitted a letter to the state Senate regarding the harms of SB 1 and predecessor bills and the importance of mail voting and drive-through voting for people with disabilities (and others) as well as the harm SB 1 would have on voters who need assistance. 9/20 Tr. 1346:21–1347:18, 1344:17-25, 1353:18–1354:1 (Longoria); HAUL MFV 273; HAUL MFV 274.

### B.  The Challenged Provisions

161.    Plaintiffs incorporate by reference the description of the Challenged Provisions of SB 1—including those Challenged under the ADA and Section 208 of the Voting Rights Act— 5.02, 5.03, 5.06, 5.07, 5.10, 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04—found in the Proposed Findings of Fact for the HAUL, OCA, and LUPE Plaintiffs. HAUL FOF Section II(F)-(G); LUPE Section II.

162.    Section 5.12 of SB 1 adds Section 87.0271 to the Texas Election Code to provide curative procedures for ballots that the signature verification committee determines are incomplete due to missing a signature on the carrier envelope certificate, statement of residence, other required information contained in Section 84.002(a)(1-a) or Section 86.002, incomplete required information regarding a witness, or "for which it cannot immediately be determined whether the signature on the carrier envelope certificate is that of the voter."

163.    Section 87.0271(b) of the Texas Election Code provides that, with regard to early voting ballots voted by mail, "[n]ot later than the second business day after a signature verification committee discovers a defect . . . and before the committee decides whether to accept or reject a timely delivered ballot under Section 87.027, the committee shall: (1) determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day; and (2) return the carrier envelope to the voter by mail, if the committee determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day."

164.    Section 87.0271(e) of the Texas Election Code provides that "[a] poll watcher is entitled to observe an action taken under Subsection (b) or (c)."

## V.    Section 5 Mail Voting Restrictions Have Denied Plaintiffs and their Members, Voters with Disabilities, an Equal Opportunity to Participate in and Benefit From Defendants' Voting Programs

### A.    Overview

165.    Plaintiffs incorporate by reference the general description of the harms caused by Section 5 mail voting restrictions—SB 1 Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12—

AFDOCS:199405450.4

including increased ballot rejection rates, found in the Proposed Findings of Fact for HAUL, OCA, and LUPE Plaintiffs. HAUL FOF Section VII; LUPE FOF Section V.A.

166.    Eligibility for voting by mail in Texas is limited. *See infra* ¶ 128.

167.    With regard to voters with disabilities specifically, according to Dr. Kruse, "Texas voters with disabilities were almost four times as likely as those without disabilities to vote by mail in 2020 (30.2% compared to 8.2%), so these additional requirements to be able to vote by mail, and the critical consequences if the ID number they provide does not match the ID number with which they registered, are likely to have a significant negative impact on many voters with disabilities." LUPE-002 ¶ 90. Dr. Kruse testified that the ID requirements of SB 1 may have prevented some voters with disabilities from casting a ballot entirely. 10/12 Tr. 3766:15-17 (Kruse).

168.    As a result of the challenges created by SB 1's identification requirements, rejection rates for absentee ballot applications were significantly higher during the March 2022 primary election than they had been in prior elections. LUPE-002 ¶ 94.

169.    Dr. Kruse testified that people with disabilities may have difficulty remembering and locating their ID number to include with their ballot application or ballot. Many people with disabilities are older and it may have been a long time since they registered to vote, so they may have trouble remembering what number they used. Others, particularly those with cognitive disabilities or who live in congregate settings, may have difficulty retrieving their ID number because they don't know where to find that information or it is stored or might have to retrieve it from parents who live elsewhere. 10/12 Tr. 3760:6-19, 3761:7-18 (Kruse); LUPE-002 ¶ 91.

170.    In addition, Dr. Kruse testified that voters with cognitive impairments will have difficulty complying with SB1's identification requirements because they may have difficulty

understanding the relevant instructions and requirements of the provisions. 10/12 Tr. 3761:7-18 (Kruse).

171.    Curing mail ballot applications and ballots in person poses barriers for voters with disabilities. According to Dr. Kruse, because voters with disabilities are more likely to face transportation barriers, less likely to drive, and more likely to live alone. They can face difficulties getting to a place where they can physically, in-person, correct a defective ballot. 10/12 Tr. 3764:25–3765:8 (Kruse).

172.    Even if it were possible to correct a defective ballot application or ballot by having a form sent to the voter's home, this would not be a solution for all voters with disabilities. Voters might still face difficulty reading and filling out the form, especially if they have visual disabilities, and difficulties returning the ballot to a mailbox. 10/12 Tr. 3765:9-23 (Kruse).

173.    Curing a ballot online can also be difficult for voters with disabilities. According to Dr. Kruse, because people with disabilities are less likely to have access to and to use the internet, they are more likely to face difficulty finding information on correcting and curing a mail ballot application or mail ballot online. They "are three times more likely to live in a house without internet access. They're twice as likely not to use the internet themselves…98 percent of websites are not fully accessible, so even if you do have internet access, there can be issues of whether the website is fully accessible for people with disabilities." 10/12 Tr. 3750:22–3751:10, 3764:8-20 (Kruse); LUPE-002 ¶ 56.

174.    Dr. Kruse stated that "I conclude with a reasonable degree of certainty...that Texans with disabilities are four times more likely to vote by mail, more likely to have difficulty accessing the requisite ID numbers and ensuring the numbers on the application and envelope

37

match, and less likely to be able to access the curing process online or in person. As such, the new barriers imposed by Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 will make it harder for people with disabilities to vote. Therefore, I conclude that these sections will cause some Texans with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1." LUPE-002 ¶ 95.

**B. Plaintiffs and Their Members, Voters with Disabilities, Had a Harder Time Applying to Vote by Mail and Voting by Mail due to the Section 5 Mail Voting Restrictions and Defendants' Administration of These Provisions.**

175.    Plaintiff organizations and their members—voters with disabilities and assistors for voters with disabilities—and counties described significant barriers voters with disabilities faced in voting by mail due to the Section 5 Challenged Provisions.

*(1)  Testimony from Plaintiff Organizations*

176.    Plaintiff organizations and their members have worked with voters with disabilities whose disabilities make it difficult for them to remember their ID number or which number they used to register to vote.

177.    Ms. Martinez testified that the Section 5 Challenged Provisions burden The Arc of Texas' members who face difficulty accessing and remembering the correct ID number they must put on their application and curing their ballot due to their disabilities. 10/11 Tr. 3514:4-25, 3515:1-2 (Martinez). In addition, some members of The Arc of Texas live in congregate settings and do not have access to their IDs. *Id.* 3504:6-25, 3505:1, 3504:6-11 (Martinez). Ms. Martinez testified that the Challenged Provisions have made it more difficult for the members of The Arc of Texas to vote by mail and that members have contacted the organization due to difficulty voting. *Id.* 3525:5-7, 3526:18-21.

178.    Mr. Kafka testified that based on interactions with regional representatives and members, REV UP Texas has "major concerns" regarding the Section 5 mail voting restrictions

AFDOCS:199405450.4

due to "the nature of the disability community—cognitive, intellectual, sensory, physical—the requirement to put down numbers that…they may not have, but because of their disability, may not remember or…just would be really concerned that they would make a mistake, we felt that this would have the effect of inhibiting disabled people to vote." 10/11 Tr. 3622:13–3623:2, 3623:1-2, 3623:5-12, 3623:14-18, 3628:3-7, 3623:19-25, 3624:5-11, 3624:11-12 (Kafka); see also supra ¶¶ 29-30.

179.    Mr. Kafka also testified about the cure process being inaccessible to voters with disabilities and that some voters with disabilities may not remember their ID number or may make a mistake entering it due to their disabilities. 10/11 Tr. 3624:13-25, 3623:3-12 (Kafka).

180.    Judy Bryant, field organizer for the Texas Alliance of Retired Americans, testified that, "[W]e heard from members who were afraid to even apply for a [mail-in] ballot because of it being complicated[.]" 9/22 Tr. 1767:7-8 (Bryant).

### (2) Testimony from Plaintiffs' Members, Voters with Disabilities and Their Assistors

181.    Ms. Iglesias applied to vote by mail based on her disability in both the 2022 primary and general elections, but her applications were rejected in both elections. HAUL MFV 416: 35:6-15, 39:18-21 (Iglesias). When she contacted the Hidalgo County election office, she was told that her ballot had been rejected because she failed to include an identification number, though she believes she entered her information correctly. HAUL MFV 416: 41:24–42:20 (Iglesias). She resubmitted her application, but it was again rejected and she was told it did not include an identification number. HAUL MFV 416: 44:22–45:11, 46:24–47:25 (Iglesias). She did not understand why her application had been rejected and felt lost because she did not know who to turn to for help. HAUL MFV 416: 44:22–45:11, 64:18-21 (Iglesias). She believes that the changes made by SB 1 have made it more difficult for her to vote, as she did not have problems

39

with her application being rejected before SB 1 was enacted. HAUL MFV 416: 68:25–69:7, 75:5–76:2.

182.    The additional barriers imposed by Section 5 are compounded by the general accessibility barriers voters with disabilities face. Ms. Saltzman testified regarding a number of barriers she faced voting by mail in the March 2022 primary that resulted in a "horrible" voting experience and "the worst experience I ever had in my whole life voting" due to every stage of the process being inaccessible to her as a blind voter. 10/10 Tr. 3351:11-13, 3358:20-23 (Saltzman). Ms. Saltzman had her ballot application rejected multiple times for ID related reasons and was told by Travis County to use the ballot tracker to cure her application, but the ballot tracker was inaccessible to her as a blind person. She was then informed by Travis County that the rejection was based on Ms. Saltzman using an outdated application that the County had sent her. *Id.* 3351:14–3353:6 (Saltzman). After submitting a second application, and carefully checking the ID numbers she entered there using assistive technology available to her at work, her application was accepted about one week before the March 2022 primary. *Id.* 3353:17–3355:22 (Saltzman).

183.    Ms. Saltzman then attempted to vote by mail and asked her husband to review the ballot to ensure she filled everything out properly, since the ballot was inaccessible to her as a blind person. Despite this extra review, her ballot was rejected because she missed something that needed to be filled in under the flap on the carrier envelope. Her disability prevented her from seeing the instructions about what should go under the flap since the ballot was inaccessible to her. 10/10 Tr. 3356:1–3357:1 (Saltzman). When Ms. Saltzman received her mail ballot application for the November 20222 general election, the type on the form was even smaller than it had been previously and she was not able to access it. *Id.* 3360:5–3361:8 (Saltzman).

AFDOCS:199405450.4

184.     Stella Guerrero-Mata is a 73 year old voter with limited vision. 9/14 Tr. 965:8-23 (Guerrero-Mata). Ms. Guerrero-Mata, like Ms. Saltzman, had difficulty seeing the text on the carrier envelope, and did not see that she needed to write her ID number on the envelope when she filled it out for the November 2022 election. *Id.* 971:7-15, 972:5-9 (Guerrero-Mata). Her ballot for the November 2022 general election was rejected because she did not include her ID number on the carrier envelope. She received notice of the rejection too late to cure it and she was unable to vote in that election. She is not sure that her mail ballot would be counted if she voted in the future. *Id.* 966:16–969:12. (Guerrero-Mata).

185.     Ms. Miller testified that she does not remember what ID number her daughter used to register to vote because it has been a long time since Danielle (who is now 25) registered. 10/10 Tr. 3199:22–3200:3 (Miller). Ms. Miller believes that Danielle would have difficulty remembering what number she used to register due to her disability, because it is easy for her to remember things that are important to her or that she uses regularly, but difficult to remember other things. 10/10 Tr. 3200:4-18. Ms. Miller believes the ID requirement could "absolutely" impact Danielle's ability to successfully vote by mail. *Id.* 3210:18-20.

186.     Ms. Cranston has worked with voters with disabilities who had memory problems and had difficulty remembering where their personal ID was located, as well as voters who had trouble writing their ID numbers legibly. 10/11 Tr. 3569:1-13 (Cranston).

187.     Ms. Crowther testified that after SB 1 it is much harder for persons with disabilities to vote by mail and the tension around voting is higher. Nancy Crowther Deposition Designation, HAUL MFV 413: 78:4-17.

### *(3) Testimony from Counties*

188.     Testimony from Counties aligned with the experiences of Plaintiffs and their members, voters with disabilities, described above.

189. Ms. Wise testified that a voter who successfully applied for a ballot by mail might still have the ballot itself rejected because they failed to see the space on the carrier envelope to include their ID number. 9/12 Tr. 259:7-12 (Wise).

190. Ms. Longoria testified that voters with disabilities might fail to write all of the digits in their ID number or may write illegibly so that the county would have difficulty comparing their signature or their ID number to what was on file. 9/20 Tr. 1300:3-4, 11-19 (Longoria). Not all voters in Harris County included an ID number on their voter registration form, and there were situations where the state had the wrong driver's license number for the individual. *Id.* 1300:3-4, 1302:9-15 (Longoria).

191. Mr. Scarpello testified that voters in Dallas County misunderstood the new requirements of SB 1 and that, as a result, some did not fill out their mail ballots correctly. 9/12 Tr. 432:13-19 (Scarpello).

### C. Plaintiffs and Their Members, Voters with Disabilities, Faced Barriers in Curing Their Ballots Due to the Section 5 Mail Voting Restrictions and Defendants' Methods of Administering the Ballot Cure Process

#### (1) Testimony from Plaintiff Organizations

192. Having to cure a defective ballot in person poses barriers for members of The Arc of Texas because of their difficulty accessing transportation or other disability-related issues that led them to want to vote by mail in the first place. 10/11 Tr. 3514:12–3515:2 (Martinez); *see also* 10/10 Tr. 3299:4-22 (Litzinger) (discussing barriers she faces to cure in person).

193. Members of REV UP Texas face barriers due to the cure provisions of SB 1 because it is difficult for people with disabilities, and particularly people with cognitive disabilities, to understand the complex process for curing a ballot application or ballot or even to know that this process exists, and the current process is not accessible to them. 10/11 Tr. 3624:1-12 (Kafka).

42

### (2) *Testimony from Plaintiffs' Members, Voters with Disabilities and their Assistors*

194.    Ms. Saltzman encountered significant barriers when attempting to cure her mail ballot application and mail ballot due to both the in person and online curing options being inaccessible to her as a blind person. When Ms. Saltzman's mail ballot application in the March 2022 primary election was rejected, she contacted Travis County election officials and was told that she could cure her application by coming in person into the office, but she informed them that she could not drive. 10/10 Tr. 3357:9-15 (Saltzman). She attempted to use the ballot tracker to cure her application but had difficulty because the ballot tracker website was inaccessible, as it could not be read by her assistive computer software. *Id.* 3354:17–3355:15 (Saltzman).

195.    When Ms. Saltzman's ballot was rejected in the March 2022 primary election, she had to have county election officials walk her through using the ballot tracker because the website was inaccessible to her due to her vision disability. It took her several tries working with county election officials on the phone to successfully cure her ballot through the tracker. 10/10 Tr. 3357:9–3358:12 (Saltzman).

196.    Even after Ms. Saltzman believed that she had finally successfully cured her ballot for the March 2022 primary election, she received a letter after the election stating that her ballot had been rejected. 10/10 Tr. 3358:13-19 (Saltzman).

197.    Ms. Guerrero-Mata has limited ability to drive due to her eyesight and was not able to drive to the Harris County elections office to cure her ballot after it was rejected. She also has not used her home computer in more than a year. She was therefore unable to cure her ballot and did not vote in the November 2022 general election. 9/14 Tr. 965:16-23, 967:12-17, 968:1-18 (Guerrero-Mata).

AFDOCS:199405450.4

### (3) Testimony from Counties

198.    Ms. Longoria testified that she informed state officials that she "felt that the way SB 1 was drafted created an [inherent] conflict in the ability of voters with disabilities to cure their mail ballot, and what we could provide to them." 9/20 Tr. 1300:3-10, 1304:3-5 (Longoria).

199.    The only methods available for curing a mail ballot application or ballot is for voters to come in person or to use the online database provided by the Secretary of State. 9/20 Tr. 1300:3-4, 11-19 (Longoria). According to the Secretary of State's office, an assistant for a person with a disability cannot go in person to cure that person's mail ballot application or mail ballot for them. 9/20 Tr. 1300:3-4, 1301:14-20 (Longoria).

200.    County election officials acknowledged that curing a mail ballot application or mail ballot could be more difficult for voters with disabilities. 9/12 Tr. 447:19-21 (Scarpello). For example, a voter with a physical disability that affects mobility will face barriers correcting a mail-in ballot carrier envelope in-person. 9/11 Tr. 219:4-8 (Wise); 9/12 Tr. 486:4-10 (Scarpello); 9/21 Tr. 1521:10-19 (Johnson); 9/20 Tr. 1300:3-4, 1300:20–1301:6 (Longoria).

201.    Voters in El Paso County who were told they could cancel their rejected mail ballot and vote in person at a polling place told county election staff that they could not physically go to a polling place to vote. El Paso County officials were also aware of voters who could not drop off their voted mail ballot in person because they could not physically get to the county courthouse to do so. 9/11 Tr. 218:7-16 (Wise).

202.    According to Remi Garza, Elections Administrator of Cameron County: "When the clerks were contacting the voters to let them know that there were deficiencies in their carrier envelopes, several of the voters indicated that they did not have transportation, that they no longer drove, and they didn't have anybody that would be able to help them come to the office to cure it, or some even to go to the mailbox to get it because they were in their homes, they

44

weren't as mobile, they couldn't go outside. Q. And for those voters then was it a viable alternative for them to go in person? A. No." 9/13 Tr. 747:25–748:14 (Garza).

203.    In addition, the forms sent to voters who need to cure an ID defect on their ballot application or ballot are long, confusing and difficult to use, particularly for voters with disabilities. 9/12 Tr. 410:5-24, 448:1-10 (Scarpello).

204.    County officials testified that they knew of voters who were unable to cure problems with their mail ballot applications or ballots related to SB 1's ID requirement and some were unable to vote at all. 9/21 Tr. 1551:7-9, 18-22 (Escobedo); 9/11 Tr. 218:3-6 (Wise); 9/12 Tr. 432:24–433:9 (Scarpello); see also 9/22 Tr. 1842:15-21 (Adkins).

205.    During the November 2022 general election, there were voters in Dallas County who had ID defects when attempting to vote by mail who could not vote in person because they were elderly or homebound or lacked transportation. 9/13 Tr. 537:7-13 (Phillips).

206.    The online curing process also presented barriers to voters with disabilities. Ms. Longoria testified that voters with disabilities may have difficulty using the state's online database to cure their ballot application or ballot because it requires access to and ability to use a computer and the internet, and because it requires having a correct driver's license number to access the system, which many voters with disabilities lack. 9/20 Tr. 1300:3-4, 1302:1-21 (Longoria).

207.    Travis County elections staff heard from voters who were unable to vote because they lacked a computer and internet and could not physically come to the elections office to access one, or they found the ballot tracker too confusing and difficult to use. 9/21 Tr. 1520:16–1521:9 (Johnson). In Travis County, it often takes 30-40 minutes or more for elections staff to walk a voter with a rejected ballot through the online ballot tracker process. *Id.* 1520:5-12

(Johnson). Travis County voters expressed frustration with the ballot tracker, and some voters were unable to use it successfully. These barriers did not dissipate in the November 2022 election. 9/21 Tr. 1574:15-24 (Escobedo); 9/12 Tr. 246:13-22 (Wise).

208.    Even though overseas and military voters can receive and return their ballot by e-mail, when Ms. Longoria asked the Secretary of State's office if Harris County could use this method to help voters with disabilities cure their mail ballot applications or ballots, the County was not permitted to do so. Ms. Longoria testified: "It was excruciating to know that there were tools at our disposal, tools that we regularly used for other voters that we were not allowed to apply, kind of in that reasonable accommodation to voters with certain disabilities." 9/20 Tr. 1300:3-4, 1301:7-25 (Longoria).

209.    Ms. Longoria testified that the only option offered by the state was to have county elections staff make home visits to help people cure their ballots. But having county elections staff visit each voter's home to help them cure their ballot applications or ballots was not a practical option for a large county like Harris County. 9/20 Tr. 1300:3-4, 1303:5–1304:2 (Longoria).

210.    Even if some voters might have been helped by having the option to cure their mail ballot application in person at a county elections office, these voters "were hurt by the fact that they had to do a cure to begin with, right? If they didn't have to do a cure to begin with, they wouldn't have to worry about doing the cure." 9/12 Tr. 486:21–487:6 (Scarpello).

**D.    Barriers to Plaintiffs and Their Members, Voters with Disabilities, Created by the Section 5 Challenged Provisions and Defendants' Administration of These Provisions Will be Ongoing.**

211.    The barriers to voters with disabilities created by SB 1's ID requirement will continue to harm voters in upcoming elections. In every election there will be voters who are voting by mail for the first time, and they may have difficulty remembering what ID number they

AFDOCS:199405450.4

used to register, especially if they registered many years ago. 10/11 Tr. 3657:10–3658:1

(Houston). In every election there will be new voters, and voters who newly turn 65, during that

election cycle. 10/5 Tr. 2996:8-12 (McDaniel); *see also* 9/19 Tr. 1051:10-24 (Callanen); 9/12 Tr.

271:11-15 (Wise).

212.    Ms. Martinez testified: "There's not a cohort that you are one and done. There are

new 18 year olds that become eligible every single election. So we're always going to have to

continue to do both of these types of education as folks become eligible to vote." 10/11 Tr. 26:5-

8 (Martinez).

213.    Mr. Scarpello testified that continued voter education efforts on the ID

requirement will be needed in the 2024 election because voters will turn 65 and voter

participation is generally higher in presidential elections, so voters will encounter the

requirements of SB 1 for the first time). 9/12 Tr. 421:21–422:9 (Scarpello).

214.    Defendants' expert Mark Hoekstra admitted that each year it is likely there will be

voters who become newly eligible to vote by mail, particularly as they turn 65, and who

encounter the ID requirement for voting by mail for the first time. 10/19 Tr. 4806:5-13

(Hoekstra).

**VI.    Voter Assistance Restrictions in Sections 6 and 7 of the Challenged Provisions and Defendants' Administration of these Provisions Have Denied Plaintiffs and their Members, Voters with Disabilities, an Equal Opportunity to Participate in and Benefit From Defendants' Voting Programs**

**A.  Overview**

215.    Plaintiffs challenge SB 1 Sections 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04 as

unlawfully restricting voter assistance for Plaintiffs and their members, voters with disabilities.

216.    Dr. Kruse testified that the Challenged Provisions restricting voter assistance

create "extra hurdles, extra barriers" and "makes it more difficult to get assistance. It's an extra

burden…that may make people reluctant to provide such assistance." 10/12 Tr. 3778:19-23, 3776:2-5 (Kruse); see also id. 3774:13-20, 3776:7-18, 3775:4-14 (Kruse).

217.    Dr. Kruse explained that "Because the law does not define everything that could constitute assistance, voters with disabilities as well as assistors will be unsure of what assistance is allowed, and voters may be reluctant to make use of assistance even when it is available for fear of violating the law." LUPE 002 ¶ 100.

218.    Voter assistance is not correlated with fraud or manipulation. Plaintiffs incorporate by reference the Proposed Findings of Fact pertaining to voter fraud of HAUL, OCA, and LUPE Plaintiffs. HAUL FOF Section XV; OCA FOF ¶ 83; LUPE FOF Sections V. X.C. The OAG's tracker of election crime prosecutions resolved do not list a single case of voter assistance fraud relating to assistance provided in the polling place. 10/16 Tr. 4034:16-20 (White); OCAPX 377 at 1-12.

219.    Though Defendants assert that the voter assistance restrictions are meant to prevent voter fraud and manipulation, witnesses with disabilities testified that this is not a legitimate concern based on their personal experiences using assistors to help them vote. Ms. Litzinger explained that a personal care attendant is not able to manipulate how she votes because she is always present when they are assisting her with marking the ballot and she always makes sure that she can see her ballot and verify what the attendant marks. 10/10 Tr. 3296:20–3297:8 (Litzinger).

220.    Ms. Halvorson explained that she has never felt that one of her personal care attendants was trying to influence her choices or would manipulate the way her ballot was marked. 10/10 Tr. 3318:3-11 (Halvorson).

AFDOCS:199405450.4

221.    Defendant Counties have also testified that they are not aware of any instances in which someone has tried to improperly influence a voter's decision while providing assistance and have seen no evidence of voter fraud resulting through voter assistance at the polling place. *See* 9/11 Tr. 177:3-6 (Wise) (El Paso County); 9/12 Tr. 433:10-18 (Scarpello) (Dallas County) (describing 2022 primary); 9/21 Tr. 1547:21-24 (Escobedo) (Travis County); 9/20 Tr. 1317:11-19 (Longoria) (Harris County) (describing 2020 election); 9/14 Tr. 842:10-22 (DeBeauvoir) (Travis County); 9/19 Tr. 1059:1-4 (Callanen) (Bexar County) (describing 2022 election).

222.    What voters with disabilities are concerned about, following the enactment of SB 1, is the mistaken perception of uninformed poll workers and other bystanders that voters with disabilities receiving needed assistance to which they are entitled may be improperly coerced or influenced when receiving this assistance.

223.    Ms. Halvorson testified: "I know I'm not concerned about my…caregivers influencing my vote, but other people around me, like particularly partisan poll watchers…especially if they don't have an understanding of disability…they may think…there are people out there that…have a bias against people with disabilities, thinking that…we're not able to make decisions for ourselves or we don't have the intellectual capacity to do so. And so I was just worried that other people would perceive that my caregivers were influencing my vote, if they just see from across the room someone pressing buttons for me." 10/10 Tr. 3324:15–3325:5, 3331:2-18 (Halvorson).

224.    Ms. Longoria also expressed that when a poll worker fails to understand the actions or intent of a voter receiving assistance, this assistance could mistakenly be "interpreted as a nefarious action." 9/20 Tr. 1373:19–1375:2 (Longoria).

AFDOCS:199405450.4

225.    Dr. Kruse has explained that when a voter with a disability uses a trusted assistor, the assistor is helping the voter express the views of the voter. The assistance provided does not substitute the will of the voter with a disability with the will of the assistor. 10/12 Tr. 3773:9-19 (Kruse); s*ee also* 10/11 Tr. 3533:10–3534:16 (Martinez).

### B.    Plaintiffs and Their Members, Voters with Disabilities, Face Barriers to Voting Due to SB 1's Requirement That Assistors Sign an Oath Under Penalty of Perjury

226.    SB 1 requires that assistors for voters with disabilities take the following oath in order to provide assistance to the voter:

> I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted. HAUL-MFV 89; LUPE 189.

Plaintiff organizations, voters with disabilities, those who assist voters with disabilities, and counties all testified that various aspects of this provision have created barriers for voters with disabilities.

227.    Dr. Kruse explained that requiring a voter with a disability to take the extra step of representing to the assistor that they are eligible for assistance as a condition of receiving assistance would also serve as a barrier for voters with disabilities:

> It doesn't sound like a big deal…but it's an extra hurdle. It's an extra thing to do. Combined with all the other barriers that people with disabilities face, it's an extra thing to – simply to remember, but there's also an extra issue that both the assistor and the person with the disability may be uncertain about. It's an extra hurdle. It kind of exacerbates the other issues that – in combination with all the other hurdles that people with disabilities face, that they – that may make it more difficult to exercise the right to vote.

AFDOCS:199405450.4

10/12 Tr. 3776:24-25, 3777:1-8 (Kruse).

228. Requiring assistors to take an extra step to provide assistance also poses barriers to voters with disabilities. 10/12 Tr. 3778:3-9 (Kruse).

229. Dr. Kruse "conclude[d] with a reasonable degree of certainty…that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to obtain the assistance they require given the restrictions imposed by section 6.04. Therefore, I conclude that section 6.04 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1." LUPE 002 ¶ 101.

### (1) The Penalty of Perjury

#### (a) Testimony from Organizational Plaintiffs

230. Ms. Martinez testified that this provision creates barriers for members of The Arc of Texas because many of them rely on direct support professionals to assist them with voting. These direct support professionals are underpaid and undervalued and this provision places them at risk of criminal penalty:

> There are criminal provisions and those are of a concern to our members. You are asking someone who is already overworked and underpaid to then take on perhaps a criminal -- it's just mind-boggling to me…the criminal piece of this is very disadvantageous to my members…. It just feels like a lot to ask of somebody who is likely not comfortable in a criminal justice setting and see something like "perjury" or big words that scare them, and it scares them away from supporting our staff and our teams.

10/11 Tr. 3516:3-8, 3520:8-18, 3524:2–3525:4 (Martinez).

231. According to Ms. Martinez, there is a workforce crisis for direct support professionals who are required to do "intense labor" but earn less than someone who works at

AFDOCS:199405450.4

McDonalds. "It's a very hard job and it's very low paid and a lot of folks are opting out." 10/11 Tr. 3522:23-25, 3523:1-9 (Martinez). These low-paid direct support professionals are put in a position where they need to provide detailed personal information, which "scares" them away from supporting The Arc of Texas' members. *Id.* 3521:1-9 (Martinez).

232.    The cumulative effects of filling out additional forms and signing documents that can make them criminally liable negatively impacts direct support professionals' interest in supporting The Arc of Texas' members. These provisions are "just another burden that's being placed between members and their ability to vote." 10/11 Tr. 3515:11-20, 3516:3-19, 3517:17-25, 3520:14-18, 3524:7-14, 24-25, 3525:1-4. (Martinez).

233.    Mr. Kafka explained that this provision harms members of REV UP Texas:

> The main concern is the criminalization of assisting a person with disabilities. We are currently…in a major crisis in finding attendants because of low wages, no benefits. And so the ability of the person to find somebody is…exponentially increased, especially if they think by some chance that they may end up being criminally accused. And so the oath really is something that has shown to be inhibiting finding people, attendants, that would be willing or even less willing to do it because of the threat of perjury.

10/11 Tr. 3625:5-22 (Kafka).

234.    Ms. Chavez Camacho explained that this provision harms members of LUPE: "community members who used to volunteer to assist voters at the polls… [have] chosen to no longer do so because [they are] frightened that [they] will make a mistake…[T]he fact that somebody could be prosecuted… is inhibiting the ability for community members to have an assister of choice, and also for LUPE staff to be willing to help community members in need of assistance." 9/11 Tr. 81:2-11 (Chavez Camacho). Ms. Chavez Camacho stated that LUPE is no longer willing to assist voters due to the perjury provision. *Id.* 82:9-10 (Chavez Camacho).

AFDOCS:199405450.4

235.    Grace Chimene testified that the criminalization of assistance makes it harder for members of the League of Women Voters to get the assistance they need to vote. These penalties may mean that people who need assistance cannot vote. 9/21 Tr. 1626:3-16 (Chimene).

236.    Because assistors who provide in-person assistance under Section 6.03 are required to take the oath of assistance under Section 6.04, the threat of criminal penalties has made it harder for DST members to provide assistance to elderly voters who vote in-person. 10/3 Tr. 2199:9-19 (Watkins Jones). Instead of providing one-on-one assistance, SB1 has forced DST chapters to conduct general voter education to avert criminal liability. *Id.* 2199:20–2200:3 (Watkins Jones).

237.    DST members are discouraged, intimidated, and frightened to assist voters who cast a mail ballot because Section 6.05 exposes DST members to criminal liability for failing to meet certain disclosure requirements. 10/3 Tr. 2202:9-14 (Watkins Jones). Further, because 6.05 incorporates Section 6.04, DST members are deterred by the "penalty under the penalty" language. 10/1 Tr. 2110:12–2111:1 (Brown). DST chapters have had difficulty recruiting members who are willing to place themselves at risk to provide assistance. 10/3 Tr. 2203:10-15 (Watkins Jones). Some DST Chapters have ceased assisting voters to complete BBMs because of the new criminal penalties under SB1. 10/2 Tr. 2148:25–2149:10 (Sharon Watkins Jones).

(b) *Testimony from Plaintiffs' Members, Voters with Disabilities*

238.    Mr. Cole testified:

…I talk to a lot of people after they get disabled…as you make things harder, you just start cutting things out…it's too hard to find someone to feed me, or it's embarrassing, so I don't want to go to dinner. It's too hard to get on an airplane to go travel, so I just don't do that. And so every time you put even one little road bump or one little barrier in front, it just makes it that much harder, and so you don't do it…I look at the oath and it says "I swear under the penalty of perjury."…That's a big deal. That's a scary deal. So when you put those things in front of people...if I'm undocumented, am I going to have somebody that may get

deported or thrown in jail come help me? No, I'm just not going to vote. I'm just
not going to exercise that right.

9/13 Tr. 714:6-18, 715:1-14 (Cole).

239.    Ms. Litzinger testified that, when she voted in person in November 2022, she

brought her personal care attendant and they had a lengthy conversation about the oath. They

decided together that the attendant would not take the oath because "We were both nervous

because we were unclear if the help I receive would be included under the oath, and…when the

process of voting starts and stops." As a result, Ms. Litzinger only received assistance in getting

to the polling place but did not receive the assistance she needed once at the polling place. 10/10

Tr. 3290:25–3992:3 (Litzinger); s*ee also id.* 3295:9-17 (Litzinger) (sharing that her attendants

would not take the oath given the penalty of perjury and being unclear on what types of

assistance fall under the oath).

240.    Ms. Halvorson testified that the language of the oath is "intimidating, especially

the part about the penalty of perjury." 10/10 Tr. 3324:10-14 (Halvorson). Ms. Halvorson was not

able to receive the assistance she needed to vote by mail in March 2022 due to this provision. As

a green card holder, her personal care attendant was not comfortable taking an oath under penalty

of perjury that could risk her green card status. This was the first time a personal care attendant

ever declined to assist Ms. Halvorson in voting. *Id.* 3318:14–3319:16 (Halvorson).

241.    Ms. Halvorson voted in person in November 2022 and again did not use an

assistor because she did not want to put her caregiver at risk since a poll worker might thank that

her caregiver was influencing her vote in some way and could then face criminal charges. 10/10

Tr. 3322:5-18, 3323:10-24 (Halvorson).

242.    Ms. Halvorson stated that subjecting her caregivers to a risk of criminal penalties

for helping her vote, "…make[s] me feel horrible and very angry…because I know…they're not

AFDOCS:199405450.4

doing anything wrong. It's just the fact others can perceive them as doing something wrong." Her primary caregiver is a green card holder and could lose her citizenship. Finding replacement caregivers is "hard enough" without criminal penalties being added to the mix of what they are being asked to do. 10/10 Tr. 3331:2-18 (Halvorson).

243.    Ms. Halvorson stated that many of her friends with disabilities also face similar barriers due to this provision and "[s]ome of them may not be going out and voting like they used to, due to it." 10/10 Tr. 3332:11-18 (Halvorson).

244.    Ms. Crowther explained that her disability is progressive and she will need more and more help over time. Ms. Crowther did not take her attendant with her to vote in May 2022 because of her fears about the oath and how it could jeopardize her relationship with her attendant: "I would be mortified…if they were to get in trouble just for helping me." HAUL MFV 413: 52:11–53:4, 54:7-14 (Crowther).

245.    Ms. Crowther explained that SB 1 has hampered her ability to receive assistance in voting because it puts her attendants in a position of "danger" that "they aren't paid for" and she would not want to put them in a situation that has legal ramifications despite the fact that she will need more and more help over time as her disability progresses. HAUL MFV 413: 80:8–81:8 (Crowther). As Ms. Crowther summarized:

> That something as meaningful as voting is to me, that I need assistance with…has now a bump…in the process, to where now it's become more threatening to bring an attendant in…why would I want to bring…my attendant, into that role and have them get all freaked out about, You mean to tell me if I help you do something that is not on this form…I could get in trouble? And it's just not worth it when your life is dependent on your attendant or your caregiver or your spouse or anything. It's just not worth it.

HAUL MFV 413: 98:8-22 (Crowther).

   (c) *Testimony from Plaintiffs' Members, Assistors for Voters with Disabilities*

246. Ms. Miller testified that the language in the oath makes her more nervous to assist her daughter, Danielle, with voting than the previous oath. When asked how she slept on the night after she took the oath, she responded: "…it made me really nervous. The word 'perjury,' is in there. I know I'm doing everything right but it sounds very threatening and intimidating." 10/10 Tr. 3208:9-17, 3217:12–3218:1 (Miller).

247. Ms. Cranston testified:

> [I]t's just really scary as an attendant. Penalty of perjury is a big deal. And, for me, as an attendant, one, I don't want to break the law…I follow the law, it's a great responsibility and, for me, it's more than attendants should have to take on. We don't get paid enough money as it is and here we are being asked by the State of Texas to take this oath when we don't even know the detail of the specifics and I don't want to make a mistake…for me a lot could be at stake, even my job could be at stake….

10/11 Tr. 3561:2–3562:17 (Cranston); *see also id.* 3559:23–3560:9 (Cranston).

248. Ms. Rocha, a voter assistor, stated that since the enactment of SB 1 voter assistance takes longer and she no longer wants to assist voters because she's afraid that "if I do something wrong, it's either going to hurt me or hurt the voter." 9/11 Tr. 148:6-8, 150:8 (Rocha).

   (d) *Testimony from Counties*

249. Mr. Garza testified that he would not feel comfortable signing the oath under penalty of perjury if there was uncertainty about compliance with the oath. 9/13 Tr. 736:1-5 (Garza).

250. During the 2022 election cycle, the Harris County Elections Administrators Office received complaints from voters with disabilities who were unable to obtain the assistance they needed to vote. 9/19 Tr. 1172:1-4 (Obakozuwa).

251. Ms. Longoria testified that she heard from voters and assistors in Harris County that the language of the oath scared them away and thought it could be very intimidating. Harris

AFDOCS:199405450.4

County received calls about this and met with community groups who explained that this provision poses barriers to voting. 9/20 Tr. 1310:6–1312:23 (Longoria).

252.    Ms. Longoria also testified that prospective assistants left the polling place and communicated that they did not want to provide assistance because of the perjury implications of the oath. 9/20 Tr. 1371:13-19 (Longoria); see also 9/11 Tr. 176:8 (Wise) (testifying that an assistor may not provide assistance due to the perjury provision).

> **(2)** ***How to Determine Whether a Voter is Eligible for Assistance, the Requirement to Represent Eligibility to an Assistor, and Votes not Counting Based on Eligibility.***

253.    The oath of assistance states: "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance" and "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." LUPE-189. Plaintiff organizations, voters with disabilities, those who assist voters with disabilities, and counties testified that these provisions erected barriers for voters with disabilities.

> (a) *Testimony from Organizational Plaintiffs*

254.    Ms. Martinez testified that these provisions were vague and have "added a hurdle. It's placed a burden on the person with an intellectual developmental disability to voice their own eligibility." 10/11 Tr. 3513:19-21, 3518:1–3519:16 (Martinez).

255.    People with IDD may not want to publicly state their disability, explain their diagnosis, or may be unaware if their diagnosis qualifies them as being eligible to receive assistance. "The definition of disability isn't static" and there are different definitions of disability for different programs and services. 10/11 Tr. 3518:1-25, 3519:1-16 (Martinez).

256.    Ms. Martinez further testified that these provisions undermine the right to vote for The Arc of Texas' members: "So my voter has gone to a voting location, done everything that

they are required to do in the right way, when someone who doesn't know what it looks like to appropriately support someone with IDD can make an assumption that would negate their vote, that's incredibly troublesome to me." 10/11 Tr. 3522:12-22 (Martinez).

257.    Ms. Chavez Camacho testified that she has a harder time training LUPE staff to provide assistance because of the requirement that the voter represent their eligibility for assistance, which requires getting into sensitive and private information such as disability. 10/11 Tr. 3682:9–3683:8 (Chavez Camacho).

(b) *Testimony from Plaintiffs' Members, Voters with Disabilities*

258.    Mr. Cole testified that this provision is "offensive" because it means he has to share his private health information with his assistor in order to receive the assistance he needs to vote and this is not something he is required to do in any other aspect of his life in order to receive the assistance he needs. 9/13 Tr. 709:21-25, 710:1-19 (Cole).

259.    Ms. Nunez Landry testified that this provision is "very confusing to people" and when she is registering people to vote or providing information to voters, "no one really quite understands what eligible means, what requirements make them eligible" and this will lead to confusion and fear. Voters may meet the criteria for eligibility but not understand that they do - some people think you have to have a doctor's note or that it means they have to meet the criteria for disability under SSDI. She explained that "not everybody is a disability theorist, and what constitutes disability is a very complex issue and…the average person doesn't really know what that means." Ms. Nunez Landry also explained that it could create confusion for assistors of those who don't necessarily identify as having a disability but do meet the legal definition of disability: "when I was an ombudsman there were a lot of people that don't think they have a disability. They will say something like, well, I'm just old…so to me it almost makes it like

AFDOCS:199405450.4

people may be afraid to assist someone." 10/10 Tr. 3248:8–3249:8, 3251:16-3252:11 (Nunez Landry).

260.    Ms. Nunez Landry also expressed discomfort with the requirement to represent eligibility in the first place and has not represented her eligibility to her partner. 10/10 Tr. (Morning), 3252:17–3253:2 (Nunez Landry). If her vote did not count because of failing to represent her eligibility, this "seems very undemocratic and I would feel disenfranchised and probably like I was a second-class citizen." 10/10 Tr. 3252:17–3253:2 (Nunez Landry).

261.    Ms. Litzinger explained: "I feel comfortable knowing that inherently I qualify but because the law isn't clear and is open to interpretation because of the severe penalties, even though it makes common sense to me that I would qualify, I wouldn't feel comfortable if that were disputed." 10/10 Tr. 3293:24–3294:9 (Litzinger).

262.    Ms. Litzinger also expressed discomfort with having to give a statement of eligibility as a condition of receiving assistance. 10/10 Tr. 3289:3-9 (Litzinger).

(c) *Testimony from Plaintiffs' Members, Assistors for Voters with Disabilities*

263.    Ms. Miller testified that she felt the language regarding eligibility for assistance was "pretty vague." Given that there is nothing in the oath or the instructions to the assistor that would explain who is eligible for assistance, it was not clear what her daughter would have to say to an assistor so they could assist her without violating the oath. 10/10 Tr. 3205:19–3206:10 (Miller).

264.    Ms. Miller also testified that this language is unclear regarding who decides if her daughter's ballot would or would not be counted based on eligibility for assistance. Her daughter's disability is not always visible and this could lead to someone who is uninformed deciding that her daughter was not eligible to receive assistance when, in fact, she was. Ms.

59

Miller testified that she believes that the person with a disability who needs the assistance should be the one to decide if she is eligible to receive it. 10/10 Tr. 3215:10–3216:4 (Miller).

265.    Ms. Cranston testified that there is no criteria included in the oath to explain who is eligible to receive the assistance. 10/11 Tr. 3561:2–3562:17, 3575:1-10 (Cranston). She testified that the "burden falls on the attendant to make sure they get it right" and this is "more than what we've signed up for." It may be confusing because, for example, some people with disabilities may not identify as such (i.e., the deaf community) and therefore may be unclear about their eligibility and not receive the help they need. 10/11 Tr. 3565:3–3566:18 (Cranston).

(d) *Testimony from Counties*

266.    Mr. Garza testified that he believed "some people would be hesitant to…confess to a disability" and that an assistor may be reluctant to sign the oath if they weren't sure what the eligibility criteria is for assistance. 9/13 Tr. 734:8-17, 735:18-24 (Garza).

(3) *"I will not suggest, by word, sign, or gesture, how the voter should vote"*

267.    The oath of assistance further states: "I will not suggest, by word, sign, or gesture, how the voter should vote." LUPE-189.

268.    Ms. Martinez testified that cuing, a common method of assisting voters with IDD, may be misconstrued under this provision. 10/11 Tr. 3519:17–3520:5 (Martinez); *see also supra* ¶¶ 152-153 (explaining "cuing").

269.    Mr. Cole testified that this provision is:

going to change the way I vote. It's going to make [it] harder for me to vote…I don't remember things the way I did when I was younger. I need someone to help me…I rely on my assistants to help me remind me of things. This is what I need to do. This is how I need to do it. This is where I need to do it. And so I specifically request the people that help me, that they help remind me of what I've told them I want to do and how I want to vote."

9/13 Tr. 711:1-11 (Cole).

### (4) "I did not pressure or coerce the voter into choosing me to provide assistance"

270.    The assistor oath further states: "I did not pressure or coerce the voter into choosing me to provide assistance." LUPE-189. Plaintiff organizations, voters with disabilities, those who assist voters with disabilities, and counties testified that this provision erected barriers for voters with disabilities.

#### (a) *Testimony from Organizational Plaintiffs*

271.    Ms. Martinez testified that this language is confusing and could be easily misunderstood: "...it puts a lot of the burden on low-wage overworked direct support professionals...if you don't have a direct support professional who you know well, there could be some confusion. It just, it's all very unclear and burdens my members in ways that scare them." 10/11 Tr. 3520:19–3521:18 (Martinez).

272.    Further, this provision poses barriers for members of The Arc of Texas because the assistance and support a voter with IDD needs, which is often cuing for recall, may be misunderstood as pressure or coercion and a direct support professional who helps a voter with IDD may face criminal liability as a result. 10/11 Tr. 3521:14-18 (Martinez); *see supra* ¶¶ 153-154 (for description of "cuing"). This misunderstanding could cost a voter with a disability the ability to cast their ballot. *Id.* 3522:18-22 (Martinez).

#### (b) *Testimony from Plaintiffs' Members, Voters with Disabilities*

273.    Mr. Cole explained that this provision "leaves out the complexity of what it's like to have caregivers...there's pressure back and forth. I'm lucky. I can afford to hire people to do the things I need to do. Not everybody can do that. So there is pressure in both directions." 9/13 Tr. 712:1-25, 713:1-2 (Cole). Mr. Cole also highlighted the discrepancies between the barriers he is now required to deal with to access voting and other areas of his life:

AFDOCS:199405450.4

> I'm not required to do any of this if I want to go get health care, or if I want to go get groceries, or if I want to work, or...if I want to come talk in this courtroom...no one makes sure that [my attendant] didn't put undue pressure on me to come here, but when I want to go exercise my right to vote, then...all of a sudden I need the State of Texas to put restrictions on how I do that.

9/13 Tr. 713:6-15 (Cole).

274.    Ms. Nunez Landry expressed her confusion about the language as well:

> What does pressure or coerce mean in this context? And I think especially if people...are under penalty of perjury they may be afraid, and for so many of us who don't have options on who is going to help us, is that coercion? Is that pressure? I just think there is going to be so much confusion that my fear is that people will be too afraid to help us.

10/10 Tr. 3249:21–3250:2 (Nunez Landry).

275.    Ms. Nunez Landry elaborated that the reality for many people with disabilities is that they cannot maintain care attendants and this prevents people from being employed and having the supports they need "because we depend on them for everything." This language in the oath of assistance makes the relationship more fraught, including for nursing home staff who assist residents with disabilities to vote. 10/10 Tr. 3249:15–3251:2 (Nunez Landry).

(c) *Testimony from Plaintiffs' Members, Assistors for Voters with Disabilities*

276.    Ms. Miller testified that she has "no idea" how to interpret this provision, making her uncomfortable signing the oath that includes this language:

> ...[P]ressure or coerce sounds like, hey, I'm going to give you a dollar to go vote. I would never do that. That's illegal. That's very cut and dry, but...when Danielle is like we plan to vote on Tuesday and maybe we plan to go at 3:00, and as I stated, she doesn't like abrupt changes, maybe my schedule has changed and I can no longer go at 3 and I said, hey, it's Tuesday, it's 1:00, let's go vote now instead. Is that coercion? I don't know. What does that mean? 10/10 Tr. 3206:11–3207:4 (Miller); s*ee also id.* 3207:22-25, 3214:19–3215:9 (Miller).

277.    Ms. Cranston shared an experience where she found out only after the fact that a person with a disability who she had assisted felt intimidated by her. She explained that a lack of

clarity on what these words mean could subject personal care attendants to penalties for behavior they may not even realize they are engaging in. 10/11 Tr. 3563:4–3565:2 (Cranston).

(d) *Testimony from Counties*

278.    Mr. Garza testified that this language in the oath could make people hesitant to provide assistance based on the fear that they could be understood to be pressuring the voter to take their assistance: "The wording is vague enough where …they might be concerned that they are going to violate the oath if they signed it." 9/13 Tr. 733:24-25, 734:1-7 (Garza).

### (5) *The State has Conceded that the Language of the Oath is Vague and Confusing.*

279.    The State's witnesses repeatedly conceded that the language of the oath is vague and confusing when it comes to determining what constitutes assistance and who is eligible for assistance.

280.    When asked about a number of examples "where actions constituted general assistance, not voting assistance" and whether the person helping a voter with a disability in these instances would need to take the oath of assistance, Mr. Ingram responded:

> That's a more difficult question because in order to be at the polling place you have to fall within a certain category. You have to have a reason to be there or you can't be there. And so someone that's just a general personal assistant for someone would not…be able to access the polling place to help position the voter…so they could either do one of two things. They can request an accommodation from the presiding judge to allow the personal assistant to help them maneuver the polling location or they could fill out the Oath of Assistance so that they would become an official assistant and eligible to be in the polling place. Those I think would be the two alternatives. THE COURT: I'm a little confused. Earlier you just said that it didn't require interaction with a ballot. So help me understand, if somebody needs to be using a wheelchair, and can the assistor wheel them to the actual place where they will touch the screens or does that require the oath before they are able to do even that step? THE WITNESS: ... *it's a very gray area* and kind of depends on the presiding judge. It's not voting assistance and it wouldn't strictly require the Oath of Assistance for voting assistance, it's just personal assistance, but in order to be present in the polling location you have to fall in a category. They enumerated those categories in the 2021 regular session, and so if you're not one of those, and personal assistant is not one of those that's allowed, but you could request an

accommodation so that I can do what I need to do to get the voter in position to vote without assisting them and without having to take the oath and the presiding judge would have the discretion to allow that. That's allowed by the election code because of SB 1. But the other way to do it is just take the Oath of Assistance, and whether you help the voter or not, you're in the polling place legally at that point.

10/18 Tr. 4420:18–4422:6 (Ingram) (emphasis added).

281.    Mr. White has conceded that the language of the oath is unclear with regards to

the definition of "eligibility":

Q. And you agree with me that the assister oath does not set out the criteria for eligibility for assistance for a voter, correct? A. Not directly, no, ma'am. Q. And you would agree that you cannot look at someone and know whether or not they have a disability, correct?

A. I would agree with that. Some disabilities are certainly invisible.

Q. And you would agree that some eligible voters receiving assistance at the polling place appear to be able-bodied, and thus there appears to be nothing wrong with them, correct?

A. Yes, ma'am.

10/16 Tr. 3991:1-17 (White).

282.    Mr. White also testified that the language of the oath pertaining to "suggesting by

word, sign, or gesture" was vague and unclear:

Q. Now, in a situation where a voter with a memory or cognitive impairment has worked with the assister in advance to go and vote and the assister is in the polling place providing a reminder as to what they had discussed previously, you think that's a tough question whether it violates the oath, isn't that correct?

A. In a technical sense of interpreting this statute to that specific set of facts, yeah, I think that's tough…

Q. And then you believe that the activity of the assister to provide somebody with a memory or cognitive impairment with a reminder of that or a prompt of that past conversation does potentially violate that language in the oath: "I will not suggest by word, sign, or gesture how the voter should vote," correct?"

A. In a technical sense of interpreting this statute to that specific set of facts, yeah, I think that's tough…

AFDOCS:199405450.4

Q. And then you believe that the activity of the assister to provide somebody with a memory or cognitive impairment with a reminder of that or a prompt of that past conversation does potentially violate that language in the oath: "I will not suggest by word, sign, or gesture how the voter should vote," correct?

A. In a technical sense, yes, ma'am.

Q. And you think it's an interesting question whether such assistance would potentially violate the Election Code, right?

A. Yes, because you have to look at what the intent of the law was versus the actual language and see there might be conflict there, yes, ma'am.

Q. And even though you haven't personally come to a conclusion about this question, you would agree with me that an assister, before signing the oath of assistance, has to make that determination for themselves whether that behavior would violate the oath, correct?

A. *I think that's fair to say that anyone who takes this oath is determining what that means to them*.

10/16 Tr. 3988:10–3989:16 (White) (emphasis added).

### (6) *The Oath of Assistance Prevents Plaintiffs and Their Members, Voters with Disabilities, from Receiving Assistance from the Assistor of Their Choice.*

283.    Plaintiff organizations and their members testified to the importance of voters with disabilities being able to receive assistance from their assistor of choice when voting and explained that the oath of assistance has interfered with and prevented voters with disabilities from receiving this assistance.

284.    Ms. Martinez explained that it is important that the voter have a relationship with their assistor so the assistor knows "what their needs are, what their wants are, to make sure that they are being seen and heard. 10/11 Tr. 3494:14-20, 3495:2-14 (Martinez). This is important because people with disabilities want to know who is going to help them vote – they don't want this to be a stranger. It is critical that the assistor "understands deeply why I'm making the choice I am and is able to support me to make sure that that actually happens and is successful." *Id.* 3523:10–3524:1 (Martinez).

AFDOCS:199405450.4

285.    Ms. Chavez Camacho testified that SB 1 has frightened voter assistors and has made it more difficult for community members to have the assistor of their choice help them at the polls. 9/11 Tr. 80:23-25 (Chavez Camacho). Ms. Chavez Camacho explained that these restrictions harm members of LUPE: "community members who used to volunteer to assist voters at the polls… [have] chosen to no longer do so because [they are] frightened that [they] will make a mistake…[T]he fact that somebody could be prosecuted… is inhibiting the ability for community members to have an assistor of choice, and also for LUPE staff to be willing to help community members in need of assistance." *Id.* 81:2-11 (Chavez Camacho).

286.    Ms. Nunez Landry prefers to have her partner assist her with voting because "I can trust him and there's a certain amount of privacy there so…that would make everything a lot easier." 10/10 Tr. 3243:5-19 (Nunez Landry). Her partner understands the contours of her disability and she doesn't need to go into a lengthy explanation about what she requires assistance with. 10/10 Tr. 3234:2-6, 3236:25–3237:14 (Nunez Landry).

287.    Ms. Litzinger prefers to have her personal care attendant assist with voting. Since she has limited dexterity, the poll worker would have to interact with intimate parts of her body, which could be unsafe or uncomfortable for both individuals. 10/10 Tr. 3286:11–3287:4 (Litzinger). She also relies on her personal care attendant to get to the polling site, so doesn't need additional help once inside the building. It is safer and faster to rely on her attendant. *Id.* 3284:13–3285:23 (Litzinger).

288.    Ms. Litzinger testified that getting help from poll workers instead of her assistor of choice is not smooth or easy as they are not trained to know what people with disabilities need. Post SB 1, many poll workers are also unwilling to assist: "the response I get from the majority of them is that makes sense that you need that and maybe in another context I would but

I don't know if I'm allowed to do that under SB 1." 10/10 Tr. 3295:18–3296:5 (Litzinger); see also 9/20 Tr. 1306:12–1309:20 (Longoria) (describing the importance of a voter with Down Syndrome having the assistor of their choice to help them vote)

289.    Prior to SB 1, Ms. Litzinger never had a problem getting the assistor of her choice to help her vote, but since SB 1 was enacted, she has faced barriers in getting the assistance she needs. 10/10 Tr. 3289:10-19 (Litzinger).

290.    Ms. Halvorson prefers to have her attendant assist her with voting. 10/10 Tr. 3312:7-17, 3317:17–3318:2, 3333:2-8 (Halvorson).

291.    Mr. Cole always chooses his own assistor because it felt too personal to have a poll worker he's never met assist him. He testified that once when voting he wasn't allowed to bring his assistor into the booth with him and he felt like it was a violation of his privacy to have someone he didn't know in such a personal moment. 9/13 Tr. 696:9-17, 697:16-21, 698:2-11, 698:23–699:3, 699:25–700:11, 704:4–708:14.

292.    As described in detail below, Ms. Nunez Landry, Ms. Litzinger, Ms. Halvorson, and Ms. Crowther have all been prevented from using their assistor of choice and receiving the assistance they needed since SB 1 was enacted. 10/10 Tr. 3243:5-19 (Nunez Landry); 10/10 Tr. 3293:17-24 (Litzinger); 10/10 Tr. 3330:10-15 (Halvorson); HAUL MFV 413: 84:3–89:25 (Crowther).

### (7) *The Oath of Assistance Has Made it Harder for Voters with Disabilities to Vote*

(a) *Testimony from Organizational Plaintiffs*

293.    Members of The Arc of Texas' Public Policy and Advocacy Committee, which includes people with IDD, their families, and other community members, have shared that the voter assistance provisions of SB 1 have made assistors fearful of doing something wrong and

unwilling to put themselves in a position that they might be criminally prosecuted for assisting someone with a disability in a way that is misunderstood. 10/11 Tr. 3517:9-15, 3516:9-19 (Martinez). SB 1 has made it more difficult for members of The Arc of Texas to receive assistance and they have contacted The Arc of Texas due to difficulties they have faced voting. 10/11 Tr. 3526:20-21, 3525:5-7, 8-10 (Martinez).

294.    Mr. Kafka testified that REV UP Texas members have experienced problems related to the oath and that the organization gets questions from attendants and voters with disabilities who don't want to put their attendants in jeopardy. He stated, "We get questions from attendants, but we also get questions from people with disabilities who don't want to put their attendant in jeopardy. It's a very close, symbiotic relationship between the attendant and the person with a disability." 10/11 Tr. 3628:8-16 (Kafka).

295.    Ms. Chavez Camacho testified that the LUPE staff have stopped helping community members even register to vote because of fear of making a mistake under the law and that the oath has "created a lot of confusion…for community members." 9/11 Tr. 120:3-5, 82:4-5 (Chavez Camacho). Because of the oath, LUPE was not able to "accommodate all the needs of the disabled community members that we serve." 9/11 Tr. 97:9-10, 87:9-13 (Chavez Camacho). The additional forms that the assistor has to fill out have created longer lines at the polling place and delayed the process for assisting voters. 9/11 Tr. 81:15-25 (Chavez Camacho); see also 9/12 2 Tr. 383:14-18 (Scarpello); 9/13 Tr. 732:8–733:17 (Garza); 9/19 Tr. 1057:12-24 (Callanen); 10/3 Tr. 2316:16-20 (Ramon).

296.    Ms. Chavez Camacho also recounted a specific incident in which a LUPE member was assisting her adult child with cerebral palsy to vote. The poll worker did not believe that the voter could make a choice on his own and believed that his mother would put the vote in

on his behalf leading the poll worker to hover over them while they were voting, which made it "a lot more stressful for her child to be able to cast the vote." 9/11 Tr. 108:10-16 (Chavez Camacho).

(b) *Testimony from Plaintiffs' Members, Voters with Disabilities*

297.    Ms. Nunez Landry testified that in the March 2022 primary, she had issues with the paper feed and had to call the poll worker for help and she could not locate an accessible remote which she required because she did not have the assistance she needed from her partner due to the oath. The lack of remote required her to reach far, lean out of her chair to press the screen, and hold up her arm to fill out a "very long" ballot. Ms. Nunez Landry testified: "… my arms get very heavy and shake and so I had to take breaks, but then I was worried that if I took a break too long that maybe -- I don't know whether the machines time out or not but I was concerned about it. But it was a very arduous process and I had a lot of cramping. It was just unnecessarily difficult and…. I was really not happy after that…. It's very hard for me to hold up my hands to do anything." This led Ms. Nunez Landry to experience physical pain while voting. Ms. Nunez Landry would have preferred receiving assistance from her partner because "I can trust him and there's a certain amount of privacy there so…that would make everything a lot easier." 10/10 Tr. 3243:5-19 (Nunez Landry).

298.    Because of the oath, Ms. Nunez Landry did not ask her partner for assistance:

> I think oftentimes people with disabilities are sort of viewed as a suspect class. There's a social narrative that we are malingerers or we're trying to get something for some nefarious reason that other people don't get…. I'm already pretty conspicuous in a power chair but I don't like to draw attention to myself, especially now when it's a very volatile political atmosphere. And I don't want to put my partner through any type of risk…and I don't want to put myself through that, but I'm really afraid of losing assistants. I mean, it's hard work…and you just don't want to ask people too much, they are already doing a lot, and you don't know what that tipping point is going to be and I mean my worst fear is being forced into a nursing home and losing all of my rights.

AFDOCS:199405450.4

10/10 Tr. 3240:3–3242:23 (Nunez Landry).

299.    Ms. Nunez Landry testified that in the November 2022 election, she could not access the remote that would allow her to vote independently and, once obtained, it was not working properly. She asked a poll worker for help, but he lacked experience with remotes and did not understand the problem. He brought others to help, but Ms. Nunez Landry did not know who they were. They "made me really nervous" and "they all voted with me, much to my chagrin and frustration" since they were not able to help her. Ms. Nunez Landry was frustrated by her lack of privacy in voting and, had she been able to receive assistance from her partner, "he could have touched the screen and it would have all been rather effortless." When she finally finished voting, "I was very, very angry." She did not ask her partner for assistance because "I just don't want to put him in jeopardy. I don't want to lose having someone help me…I don't want to draw any attention to myself. I don't want people to think that…I'm being coerced or whatever…the common assumptions tend to be about disabled people." Ultimately, Ms. Nunez Landry was able to cast her vote, but it "took a really long time." 10/10 Tr. 3244:5-3247:19 (Nunez Landry).

300.    When asked on cross examination whether she "chose" not to ask for her partner's assistance in voting, Ms. Nunez Landry responded: "I'm not really sure what you mean by 'chose,' in that context…I was too afraid to ask his assistance…SB 1 has implications and a chilling effect on us." 10/10 Tr. 3259:19–3260:18 (Nunez Landry). When asked on cross whether she had "too many people assisting" her to vote in November 2022, Ms. Nunez Landry replied: "there was no help. They just watched me vote and I had no privacy voting….I was a little agitated because I just don't understand why disabled people couldn't be extended…comparable rights of citizenship to do something so basic as vote in the United States." *Id.* 3263:5–3264:2 (Nunez Landry).

301.    Ms. Nunez Landry anticipates that she will face the same issue with the remote in future elections. Since her disability is progressive, she will be able to do less and less independently. 10/10 Tr. 3253:20–3254:5 (Nunez Landry).

302.    Ms. Litzinger explained that, despite working as a public policy specialist and reviewing legislation regularly, she remains confused about when the assistor provisions kick in and what specific activities the oath applies to. 10/10 Tr. 3297:9–3298:19 (Litzinger).

303.    All of Ms. Litzinger's attendants have voiced to her that they do not feel comfortable taking the oath and none of them was willing to assist Ms. Litzinger or take the oath in the 2022 elections. 10/10 Tr. 3293:17-24 (Litzinger). When Ms. Litzinger voted in May 2022, she had an issue with the chest clip that she uses to help her remain upright. She needed to have it unclipped in order to lean forward enough to reach the voting machine, but only realized this after entering the polling place alone. She did not ask for assistance with removing it because "it wasn't clear to me whether or not that would be considered assistance with voting to ask because it's not clear when the act of voting starts and stops." Since she was unable to unclip the chest strap herself, it was "very, very difficult for me to vote" and she had to elevate herself to mitigate the restricted arm reach which was "quite painful." If the ballot had been longer, "I probably would have had the most extreme form of ballot fatigue you have ever seen. I probably wouldn't have finished it." 10/10 Tr. 3289:20-3290:22 (Litzinger).

304.    Because of the oath, in the November 2022 election, Ms. Litzinger also did not receive the assistance she needed to vote which made voting take longer than usual. Since her attendant was with her but not assisting her, this caused confusion for poll workers and made it "difficult to have three people debating whether I needed assistance the entire time I was voting." 10/10 Tr. 3292:4-3293:2 (Litzinger).

AFDOCS:199405450.4

305.    Ms. Litzinger testified that SB 1 not only impacts her right to vote but also extends to other areas of her life: "…it's going to be harder to get my vote to count and have my voice be heard, but it also made me concerned that an attendant may refuse an entire shift which means I wouldn't even get out of bed that day just because I had informed them of my intention to vote." 10/10 Tr. 3294:10-3295:4 (Litzinger).

306.    Ms. Litzinger testified that overall, the oath of assistance has "impacted my ability to be confident that my vote will be counted and confident that I'm going to be able to find someone to assist me and they have impacted my ability to trust that poll workers are going to listen to me when I tell them when I do and do not need assistance and what qualifies as assistance." 10/10 Tr. 3298:20-3299:3 (Litzinger). Ms. Litzinger felt that her ballot was not private in November because several people were watching her. Her voting experience was more difficult than it had been prior to SB 1. 10/10 Tr. 3293:3-18 (Litzinger).

307.    Ms. Halvorson testified that her experience voting by mail without assistance in March 2022 required her to fill out the ballot in "10- or 15-minute increments throughout the course of two days. I would fill out a little bit and then have to take a break. Especially with my hip fracture, it was very hard to sit up in my wheelchair and fill out that ballot." Trying to get her hands to cooperate to be able to insert the ballot into the envelope was also very challenging without assistance. 10/10 Tr. 3320:19-25, 3321:1-5 (Halvorson).

308.    This experience caused Ms. Halvorson physical pain: "It was very difficult. My very limited mobility and pain levels…I have a lot of contractures in my hands, just very little muscle movement and strength. And so trying to hold a pen and mark my ballot and have enough pressure to where I could mark my ballot was very painful and time-consuming." 10/10 Tr. 3319:17-3320:12 (Halvorson). If she had been able to receive assistance from her attendant, she

AFDOCS:199405450.4

would not have had to worry about her handwriting and would not have experienced physical pain while voting. 10/10 Tr. 3342:24-3343:9 (Halvorson).

309.    Ms. Halvorson chose to vote in person in November 2022 and the experience without having the assistance she needed caused her "lots of anxiety." 10/10 Tr. 3330:10-15 (Halvorson).

310.    Ms. Halvorson testified that the accessible remote was not operating properly and it was difficult to see if the choices were highlighted on the ballot since the candidates' names and party affiliations were cut off and it kept switching back to the previous screen. The poll workers' suggestions did not fix the problem. After many attempts she was finally able to complete the ballot. Because she had no assistance, she was required to raise her wheelchair to submit the ballot into the Scantron machine and, due to limited wrist mobility, it took her several minutes to wiggle the ballot into the machine. Had Ms. Halvorson's attendant been with her, she could have avoided having to use the malfunctioning remote since her attendant could have just made the selections for her and submitted the ballot into the Scantron in "five seconds or less." With assistance, "I probably could have been in and out of there in…a third of the time." Instead, voting took nearly 45 minutes and a poll worker remarked to her as she was leaving the polling place "I'm going to give you two stickers because you had to work twice as hard as everyone else to vote." Ms. Halvorson remarked that it was "exhausting" having to press all the buttons and put the ballot in the Scantron herself. 10/10 Tr. 3326:14-3330:9, 3330:10-15 (Halvorson).

311.    Ms. Crowther testified that she received the help she needed to vote prior to SB 1 but did not receive this assistance when she voted in March 2022 due to her concerns about the oath. HAUL MFV 413: 84:3-89:25 (Crowther).

312.    In addition to speaking about her own experience voting, Ms. Nunez Landry testified about the harm SB 1 imposes on voters with disabilities more broadly noting that many voters with disabilities will have difficulties finding people to assist them with voting and "a lot of people may not be able to vote…things are already difficult as it is and this just layers on the difficulty and I fear that people will not go and vote and they will be afraid to vote." 10/10 Tr. 3253:6-19 (Nunez Landry).

(c) *Testimony from Plaintiffs' Members, Assistors for Voters with Disabilities*

313.    Ms. Miller testified that she did not experience any issues assisting her daughter with voting prior to SB 1. Since SB 1 was passed, "I felt really intimidated helping her. And it is her constitutional right to vote, she just needs a little bit of assistance. Her voice is valid and needs to be heard…" 10/10 Tr. 3210: 7-17, 3216:5-8 (Miller). When asked how her experience compares pre and post SB 1, Ms. Miller replied: "everything is really, really frustrating. It's intimidating and…do you just not want my daughter to vote?…Everything is more confusing and complicated." 10/10 Tr. 3217:12–¶3218:1 (Miller).

314.    Ms. Miller is worried that when she is no longer able to assist her daughter in voting, others will be deterred from doing so because of the oath: "I'm her mother and it intimidates me. If she had…a paid aide, or someone who helps her in the future…paid aides usually don't make that [much] money, why would they want the extra stress and liability of helping someone to vote?" 10/10 Tr. 3218:9-15 (Miller).

315.    Ms. Cranston testified that the current oath "gives me more angst" and "has created angst within my community of personal care attendants and…it's going to get in the way of…individuals with disabilities being able to get what they need in order to go vote." Prior to SB 1, she was not aware of personal care attendants who had trouble assisting voters, but now,

AFDOCS:199405450.4

she and others are hesitant to assist voters because of the oath. 10/11 Tr. 3559:23-3560:9, 3567:12-14, 3567:20-22, 3569:14-3570:4, 3584:4-11 (Cranston).

316.    Ms. Cranston noted that she has not been provided with any assurances from the state or district attorney that assistors will not be prosecuted under this law. 10/11 Tr. 3559:23-3560:9, 3567:12-14, 3567:20-22, 3569:14-3570:4, 3584:4-11 (Cranston).

### (8) *The State Is Not Complying with the OCA Injunction Pertaining to Section 6.04*

317.    In addition to all of the barriers Plaintiffs and their members, voters with disabilities and their assistors, testified to regarding SB 1's live restrictions on voter assistance, portions of Section 6.04 that have been mooted in this action due to being enjoined by another court are still being implemented in the instructions to assistants on the mail ballot carrier envelope.

318.    In June 2022, another judge in this district court enjoined portions of Section 6.04 also challenged by this action. OCA Greater Houston v. Texas, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022). The language enjoined in OCA is that which requires the assistor to attest to confining their assistance to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." Tex. Elec. Code § 64.034. The enjoined language permits assistance in "(1) reading the ballot to the voter; (2) directing the voter to read the ballot; (3) marking the voter's ballot; or (4) directing the voter to mark the ballot." Tex. Elec. Code § 64.0321. This language was enjoined because it "limits assistance-eligible voting to an impermissibly narrow set of activities." OCA Greater Houston, 2022 WL 2019295, at *4 (W.D. Tex. June 6, 2022). As such, this court held that "all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined…are moot." ECF No. 447 at 23 n.10.

75

319.    However, the carrier envelope for mail ballots retains the enjoined language in the "Instructions to Assistant" which reads: "A voter may only be assisted with reading or marking the ballot if the voter has a physical disability that renders the voter unable to write or see or has an inability to read the language in which the ballot is written." HAUL-MFV 297 (emphasis added); see also https://www.sos.state.tx.us/elections/forms/pol-sub/6-25f.pdf

320.    Ms. Halvorson and Ms. Litzinger confirmed that their understanding of these instructions was that, when voting by mail, a voter can only be assisted with reading or marking the ballot in direct contradiction to the enjoined language of the OCA injunction. 10/10 Tr. 3297:15–3298:7 (Litzinger), *Id.* 3341:3–3342:7 (Halvorson).

### C.    Plaintiffs and Their Members, Voters with Disabilities, Face Barriers to Voting Due to SB 1 Section 6.01 and Defendants' Administration of This Provision

321.    Curbside voting enables voters who are physically unable to enter a polling place without personal assistance or likelihood of injuring the voter's health to vote curbside from the convenience and safety of a vehicle during early voting or on Election Day. Tex. Elec. Code § 64.009; see 10/17 Tr. 4355:22–4356:2 (Ingram).

322.    Over 1.1 million Texans have difficulty going outside alone. LUPE-002 at 32, Table 1. Voters with disabilities Texans with disabilities are four times more likely to live in a zero-vehicle household (14.4% compared to 3.0%) and are less likely to be drivers (59.6% compared to 93.0%). LUPE-002 ¶¶ 57, 97.

323.    Dr. Kruse finds that "[b]ecause curbside voting is only available to certain voters who are far more likely to have a disability and people with disabilities are more likely to face transportation barriers and social isolation, it is my opinion that additional barriers to providing assistance in the form of group transportation for curbside voting will burden voters with disabilities." LUPE-002 ¶ 97.

324.    Dr. Kruse concludes that Section 6.01 "will create additional barriers for voters with disabilities who rely on group transportation to vote curbside." LUPE-002 ¶ 21. He "conclude[s] with a reasonable degree of certainty…that Texans with disabilities are more likely to face transportation barriers, more likely to live alone, and more likely to be socially isolated. As such, the barriers imposed by Section 6.01 on providing group transportation to the polls for curbside voting will make it harder for some Texans with disabilities to vote. Therefore, … Section 6.01 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1." LUPE-002 ¶ 98.

325.    Michelle Brown testified that SB1 Section 6.01 raises serious concerns for DST members who provide transportation assistance. 10/2 Tr. 2108:7-23 (Brown). DST members are concerned about who may gain access to the personal information disclosed on the forms required under Section 6.01. *Id.* Due to the racialized history of intimidation by poll watchers, members are even more afraid that filling out the form will invite harassment when they provide transportation assistance. *Id.*

326.    Sharon Watkins Jones testified that the Austin Alumnae Chapter of DST stopped providing transportation assistance to elderly, disabled individuals, in part, because of Section 6.01's disclosure requirement and other provisions, such as the oath of assistance, that expose assistors to criminal liability. 10/2 Tr. 2147:12–2148:3 (Watkins Jones); see SB 1 Section 6.04 (oath of assistance). The Austin Alumnae Chapter as well as the Bay Area-Houston Chapters have been unable "to recruit members who are brave enough to assist with senior voters [with transportation to the polls] because of the fear[] of criminal penalties." 10/3 Tr. 2198:2-6 (Watkins Jones). Members of the Fort Worth Chapter of DST had routinely provided

AFDOCS:199405450.4

transportation assistance to elderly voters at the Friendship Senior Center in Fort Worth, Texas. However, none of the members were willing to assist because of the burdens on assistance placed on Section 6.01 and the attendant criminal penalties assistors maybe subjected to under SB1. *Id.* 2197:3-17, 2198:20-24 (Watkins Jones).

**D.    Plaintiffs and Their Members, Voters with Disabilities, Face Barriers to Voting Due to SB 1 Section 6.06 and Defendants' Administration of this Provision**

327.    The plain language of SB1 prohibits voters who need assistance with their mail ballots from receiving assistance from compensated individuals. (Jt. Ex. 1.)

328.    Section 6.06 will discourage well-meaning assistors from providing that assistance, because any type of compensation or thank you, such as reimbursement for gas, could be construed as violating the law. LUPE-002 ¶ 104.

329.    Because voters with disabilities are more likely to be social isolated and alone, a worker or volunteer with a community or civic engagement organization, a neighbor, a friend, or another non-family member may be the best and only option to assist them with voting by mail. LUPE-002 ¶ 105.

330.    Before SB1, LUPE paid staff, as part of their job, would provide mail ballot assistance to its members including reading the ballot aloud to a voter who was elderly and had vision challenges, asking the voter for the voter's choice, and filling out the ballot for the voter. LUPE would also provide mail ballot assistance to a voter if requested during a house meeting in the field, or if the voter came to LUPE's offices and requested assistance. 9/11 Tr. 75:18–77:4, 84:4-25, 85:1-4, Tr. 116:22–117:7, 119:20–120:18 (Chavez Camacho).

331.    Section 6.06's prohibition on compensation for mail ballot assistance has caused LUPE to stop assisting voters who request their help completing mail ballots. 9/11 Tr. 119:20–120:18 (Chavez Camacho). As explained by Tania Chavez Camacho, LUPE has stopped

AFDOCS:199405450.4

assisting members with their mail ballots because "Being able to assist voters under the provisions of the law at the moment will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, and so we have refrained from doing so." *Id.* 82:20–83:13.

332.     Because of Sec. 6.06, now when a LUPE member comes to the LUPE office and requests help with their mail ballot, LUPE informs the member that LUPE cannot provide assistance and tells the voter that they should find help with their family or friends. 9/11 Tr. 86:9-13, 86:14–87:2, 87:3-21 (Chavez Camacho). LUPE staff will not provide mail ballot assistance to LUPE members who are elderly and/or disabled or otherwise need assistance to vote by mail and choose LUPE staff as their assistors. *Id.* 86:9–13, 86:14–87:2, 87:3-21 (Chavez Camacho). This is because LUPE staff and leadership are afraid of being prosecuted for providing mail ballot assistance to LUPE members. *Id.* 86:9-13, 86:14–87:2, 87:3-21 (Chavez Camacho).

333.     Prior to SB1 Sec. 6.06, LUPE staff would assist members to complete their mail ballots one-on-one and provide assistance based on the voter's needs. Some LUPE members do not know how to read or write. Some LUPE members are vision impaired or have another disability. LUPE staff would help members fill out the ballot by mail, either at the LUPE offices, in house meetings, or at LUPE's union hall events. Some members would call LUPE and ask LUPE to go to their home to help them fill out their ballot by mail and LUPE would provide that assistance in the members' homes. 9/11 Tr. 87:3-21 (Chavez Camacho); 10/11 Tr. 3676:11-25 (Chavez Camacho).

334.     Volunteers cannot substitute for LUPE's paid assistors. Because of the need to ensure adequate training and appropriate service delivery, LUPE will not use uncompensated

AFDOCS:199405450.4

volunteers to deliver mail ballot assistance; many of LUPE's volunteers are students or other

individuals who contribute only a few hours of volunteer time. 9/11 Tr. 124:14–127:13 (Chavez

Camacho). In addition, even if LUPE gave gas cards to volunteers that would be compensation

that would place volunteers in jeopardy under SB1. *Id.* 122:3-23.

### E.  Plaintiffs and Their Members, Voters with Disabilities, Face Barriers to Voting Due to SB 1 Section 7.04

335.    Section 7.04 denies voter assistance by prohibiting mail ballot assistance by

people who are compensated to advocate for a specific candidate or measure. (Jt. Ex. 1)

336.    Sec. 7.04's prohibition on compensated interaction with a voter, in the presence of

the mail ballot and with the intent to deliver votes for a measure, has caused LUPE staff and

volunteers who are paid to advocate to cease assisting voters with completing their mail ballots.

9/11 Tr. 120:19–25 (Chavez Camacho).

337.    One example of LUPE's ballot issue advocacy to voters is a drainage bond that

was on the ballot around 2011-2012 that would have implemented drainage in the colonias. The

drainage bond passed in that election. Another example is the ballot issue of creating a health

care district in Hidalgo which has no public hospitals. The health care district proposal was

defeated in the election. 9/11 Tr. 88:8-24 (Chavez Camacho). LUPE plans to urge voters to

support a health care district ballot measure in the future because Hidalgo County has high rates

of poverty, and high rates of obesity and diabetes, and LUPE believes that a health care district is

needed to improve the quality and availability of health care in Hidalgo County. *Id.* 88:25–89:6.

338.    LUPE paid staff and paid canvassers advocate to voters on ballot issues when

knocking on doors, out in the neighborhoods, at house meetings, at LUPE events, at the union

hall, at tabling events, and in the LUPE offices because LUPE wants to make sure that

everybody is educated about the ballot measure and understands the position that LUPE advocates for that measure. 9/11 Tr. 89:7-18 (Chavez Camacho).

339.    LUPE staff and volunteers interact in person with one or more voters when advocating on ballot measures. 9/11 Tr. 91:9-11 (Chavez Camacho). The goal of this interaction and advocacy is to urge people to vote a certain way on a ballot measure, for example a drainage bond or health care district. *Id.* 91:12-14.

340.    During its advocacy to community on ballot measures, LUPE expects that on at least some occasion they will advocate in the presence of a mail ballot. 9/11 Tr. 91:15-17 (Chavez Camacho).

341.    LUPE expects that its members will bring mail ballots to meetings at the LUPE offices or union hall. Mail ballot voters bring their ballots to LUPE offices and meetings to ask for assistance completing the ballot. 9/11 Tr. 90:4-24 (Chavez Camacho). As LUPE organizers canvass neighborhoods to urge support for ballot measures, mail ballot voters invite LUPE organizers into their homes and then while the organizer is advocating on a measure, the voters produce their mail ballots and ask the organizer for assistance. *Id.* 71:1–72:15, 75:11–17, 119:20–120:18. Because this has happened in the past, LUPE expects in the future that its organizers will find themselves advocating on ballot measures in the presence of mail ballots. *Id.* 119:20–120:18.

342.    LUPE staff and volunteers who knock on doors of voters, particularly doors of elderly and disabled voters, know that the mail ballot could be sitting in the voter's living room. 10/11 Tr. 3684:13–3685:4.

AFDOCS:199405450.4

VII.    **Individually and Cumulatively, The Challenged Provisions of SB 1 and Defendants' Administration of These Provisions Have Denied Plaintiffs and their Members, Voters with Disabilities, an Equal Opportunity to Participate in and Benefit From Defendants' Voting Programs**

343.    Individually and cumulatively, the Challenged Provisions of SB 1 have harmed Plaintiffs and their members, voters with disabilities. As Dr. Kruse testified:

> My overall opinion is that these provisions are going to raise the cost of voting for people with disabilities. Taken one by one…each of these may seem to be a small thing. Together, though, they compound. They can raise the cost of voting, make it more difficult to vote…there's plenty of political science research showing that when the costs of voting are higher, people are less likely to vote. Even if they do go ahead and vote, there are still higher costs being imposed. There's still extra hassle. And perhaps that's one way to think about that. It's not in terms of the…overwhelming costs, but it's extra hassle. And to the extent that there's extra hassle, people with disabilities are going to be less likely to vote. And if they do vote...it's still extra hassle that's being created by these provisions. 10/12 Tr. 69:2-17 (Kruse); *see also* LUPE-002 (Expert Report of Dr. Douglas L. Kruse, PhD, February 2022).

344.    Ms. Longoria testified that, cumulatively, SB 1 has a discriminatory impact on persons with disabilities. 9/20 Tr. 1358:22-1359:1-14 (Longoria).

345.    Ms. Obakozuwa testified that Harris County voters with disabilities were not able to receive the voting assistance they needed to vote. 9/19 Tr. 1172:1-4 (Obakozuwa).

346.    Ms. Martinez testified that SB 1 has instilled in members of The Arc of Texas a general fear that they might do something wrong when they are simply trying to vote. 10/11 Tr. 20:25-21:2, 25:2-12 (Martinez). SB 1 has created additional barriers for members of The Arc of Texas to vote, and the members feel those burdens. *Id.* 25:2-12 (Martinez).

347.    Members of DST who have disabilities and are 65 years or over experience greater difficulty finding the assistance they need to vote because SB1's onerous form and disclosure requirements deter members' assistors. 10/2 Tr. 2110:3-11 (Brown) (discussing SB 1 Section 6.03). DST members who had assisted these voters prior to SB1, declined to assist these

voters after SB1, citing Section 6.03's intimidating form and disclosure requirements. *Id.* 2124:11-16 (Brown).

348.    Ms. Halvorson testified that it has been significantly harder for her and others with disabilities to cast a ballot since SB 1 was implemented. 10/10 Tr. 3340:13-16, 3316:15-17 (Halvorson). That some voters with disabilities were ultimately able to cast their ballots does not mean that they did not face significant difficulties in the process. *Id.* 3343:17-23 (Halvorson).

349.    Ms. Nunez Landry testified that members of The Arc of Texas and the disability community were "very worried … and confused" about SB 1. 10/10 Tr. 3239:6-13 (Nunez Landry); see also id. 3295:5-8 (Litzinger). People with disabilities already encounter so many obstacles in their daily lives, and now there are going to be people who will not vote because of the new difficulties created by SB 1. *Id.* 3232:3-7 (Nunez Landry). Ms. Nunez Landry testified:

> I don't understand if people believe in our stated democratic principles why you would want to make it more arduous for older and disabled people to vote. It's inscrutable to me …. I don't understand that at all, and without any evidence of widespread fraud in our elections, to me, it seems like if you really want to have integrity … in our elections that you need to make it accessible for all eligible people. I feel like there's something fundamentally wrong with trying to prevent people to vote.

*Id.* 3254:8-23 (Landry).

## VIII.    Defendants have Used Criteria or Methods of Administration that Subject Voters with Disabilities to Discrimination

350.    The Secretary of State's office does not have familiarity with or expertise in the ADA or how it applies to voting and that any modification requests the state receives are redirected to the counties. As Ms. Adkins testified:

Q. Is the Americans with Disability [sic] Act an election law?

A. *I would say no.*

Q. What involvement does the Secretary of State have with complying with ADA requirements?

A. I always tell my attorneys to be very cautious with making any recommendations or statements or offering guidance with respect to ADA issues, *because we are not ADA experts*. I know there are many attorneys out there that have devoted their time and energy to just ADA issues, and that's not where our expertise lies. My understanding of the Americans with Disabilities Act is…there's the ability for individuals to *request* accommodations. Since we are not the ones administering elections…we would always direct those individuals to the specific county or specific individual that does have the authority to make that determination…when [we] get questions of law that *pertain to issues outside of elections*, [we] advise the county election official that's asking us to consult with their local county or district attorney or whoever advises on this area of law.

10/18 Tr. 4593:21–4594:11, 4594:19-25 (Adkins) (emphasis added).

351.    Mr. Ingram testified that he does not know what Section 504 of the Rehabilitation Act is, does not know "in detail" how the ADA applies to elections, that the Secretary of State's office has no written policies on the State's obligations under the ADA regarding the administration of elections, that the Secretary of State's office had no one responsible for monitoring the Division of Elections' compliance with the ADA for at least a year and a half, has not conducted any training of county officials on their obligations under the ADA apart from consulting with them on the physical accessibility of polling places, and is unaware of any efforts to educate voters about their right to reasonable modifications under the ADA or Section 1.08 of SB 1. 9/22 Tr. 1927:13-16, 1927:21-1928:21, 1927:13-16, 1926:14-25, 1928:14-19, 1930:22-1931:2, 1931:3-9 (Ingram).

352.    In response to a question about his familiarity with the ADA as it applies to elections, Mr. Ingram stated that his office "depended on the Coalition of Texans with Disabilities and Texans for Disability Rights" to conduct surveys and audits of polling place accessibility. 9/22 Tr. 1926:14–1927:9 (Ingram).

353.    Mr. Ingram further testified that the Secretary of State's office has not published any trainings on the term "attendant" or guidance on how to interpret the term "caregiver" under

AFDOCS:199405450.4

Section 6.06 of SB 1, commenting that "we haven't had any questions about it, so there hasn't been any perceived need to do any such training or education." 9/22 Tr. 1908:17-22 (Ingram).

354.    County officials testified that they did not receive guidance or training from the Secretary of State's office regarding how the ADA applies to the Challenged Provisions impacting voters with disabilities. 9/19 Tr. 1016:12-17 (Callanen) (no guidance on how the ADA and Section 504 apply to SB 1); 10/3 Tr. 2316:21-25, 2317:1-7 (Ramon) (no guidance on how "pressure" should be interpreted in the language of the oath); 9/14 Tr. 845:1-13, 852:19-25 (DeBeauvoir) (no guidance or response, despite multiple requests, on how the mail ballot cure process could be modified for voters with disabilities); 9/12 Tr. 279:3-6 (Wise) (no training on the impact of SB 1 on voters with disabilities).

355.    Ms. Longoria testified that voters called election officials in Harris County and asked if they could receive a modification of scanning and emailing their ballot to cure it or send their attendant to cure their rejected ballot. Ms. Longoria asked the Secretary of State's office if that was possible as a modification for voters with disabilities and was told to "read the law." County officials understood from this communication that they would not be able to grant a modification to SB 1's mail ballot ID or cure requirements, even though overseas and military voters are able to receive and return their ballots by email. Consequently, some voters were not able to cure ballots and were unable to vote. 9/20 Tr. 1304:6–1306:2 (Longoria).

356.    Ms. Longoria testified: "It was excruciating to know that there were tools at our disposal, tools that we regularly used for other voters that we were not allowed to apply, kind of in that reasonable accommodation to voters with certain disabilities." 9/20 Tr. 1300:3-4, 1301:7-25. (Longoria). Having county elections staff visit each voter's home to help them cure their

ballot applications or ballots was not a practical option for a large county like Harris

County. 9/20 Tr. 1300:3-4, 1303:5–1304:2 (Longoria).

357.    Mr. Scarpello testified that he does not know what Dallas County could do to

make voting by mail accessible to voters with disabilities under SB 1. 9/12 Tr. 444:1-4

(Scarpello).

358.    Section 1.08 of SB 1 states that the Texas Election Code cannot "limit the right of

a qualified individual with a disability from requesting a reasonable accommodation or

modification." Tex. Election Code § 1.022. Ms. Adkins testified that Section 1.08 permits voters

with disabilities to request a reasonable accommodation but admits that she does not know what

would constitute a reasonable accommodation or modification for a specific election office.

10/18 Tr. 4596:9-22 (Adkins).

359.    As this Court pointed out during Defendants' questioning of Ms. Adkins, this

provision of SB 1 merely permits disabled voters to request, but not necessarily to receive,

reasonable accommodations or modifications:

> Q. …So under this provision [Section 1.08], could the Election Code be interpreted
> to prohibit somebody from obtaining an accommodation which they were entitled
> to request under state or federal law?
>
> A. As long as the accommodation is a reasonable accommodation, this does not
> prohibit anyone from meeting that request…
>
> THE COURT: Do you mean requesting or -- the way I see that law is "anyone can
> request" doesn't mean that the request has to be granted."

10/18 Tr. 4595:21–4596:11 (Adkins).

360.    As a result of the State's lack of guidance, Defendant Counties believed that they

could not waive the oath or ID requirements of SB 1 if asked by voters with disabilities. 9/13 Tr.

539:6-14 (Phillips); 9/13 Tr. 771:19–772:1 (Garza); 9/19 Tr. 1045:3-11 (Callanen); 10/3 Tr.

AFDOCS:199405450.4

2336:18-25, 2337:1-5 (Ramon); 9/20 Tr. 1304:6–1306:2; 1311:24–1312:15, 1314:24–1317:10,

1317:4-9 (Longoria); 9/12 Tr. 270:17-25, 358:5-10 (Wise); 9/20 Tr. 1470:4-6 (Hayes).

361.    Ms. Nunez Landry testified that she had not received any guidance from the state

or Harris County on how to interpret the language of the assistance oath, but "I would be

interested in having a clarification written so we don't have people not helping us or afraid to put

other people in jeopardy." 10/10 Tr. 3251:9-15 (Nunez Landry).

362.    As a result of the State's lack of expertise on how the ADA applies to voting,

Plaintiffs seek assistance elsewhere. Ms. Martinez testified that The Arc of Texas refers voters

with disabilities who contact the organization with individual questions or problems to Disability

Rights Texas, who are "experts" and who The Arc of Texas trusts more than counties or the state

to give people accurate information and advice about their rights under federal law. 10/11 Tr.

3506:3-18, 3515:3-10 (Martinez).

363.    Though Ms. Adkins testified that the state redirects all modification requests to

counties, the attorneys for the state repeatedly suggested to voters with disabilities that they

should have contacted the Secretary of State's office to receive assistance with the Challenged

Provisions. Upon the suggestion that she should have contacted the Secretary of State's office

regarding SB 1 assistor oath requirements, Ms. Nunez Landry responded: "So I guess all

disabled people have to call the Secretary of State to find out precisely whether we're eligible to

vote and whether we're pressured or coerced? They are going to be a very busy office I would

think." 10/10 Tr. 3265:21–3266:11 (Nunez Landry).

AFDOCS:199405450.4

IX.     **Defendants Have Failed to Provide Reasonable Modifications to SB 1's Mail Voting and Voter Assistance Restrictions to Plaintiffs and Their Members, Voters with Disabilities**

>   A.  **Defendants Received and Denied Modification Requests from Voters with Disabilities.**

364.     County officials testified that they were aware of disabled voters who were not able to vote because they were not able to get a modification of SB 1 mail ballot requirements. 9/19 Tr. 1044:9–1045:8 (Callanen) (Bexar County knew of voters who were "dissuaded" from voting because of the ID provisions and voters who had more than one mail ballot application rejected because of the ID requirements).

365.     Counties and the Secretary of State's office admitted that they received a large number of complaints and requests for assistance with SB 1's new ID requirements which mostly impact voters with disabilities and older voters. 9/19 Tr. 1044:9-19, 1044:24–1045:2 (Callanen) (Bexar County received "significantly more complaints and requests for assistance than usual regarding the mail voting ID requirements" and received requests for assistance from voters with disabilities in the 2022 elections); 9/20 Tr. 1288:12–1290:24 (Longoria) (Harris County saw a huge increase in voter assistance calls in January to March 2022, approximately 8,000 per month, of which about 5,000 were confusion about mail ballot requirements); 9/11 Tr. 210:5 (Wise) (in El Paso County, voters have complained that the application for mail-in ballots and the mail-in ballot carrier envelope are not user friendly); 9/22 Tr. 1841:19-21 (Adkins) (the Secretary of State's office has received a lot of complaints about voters not being able to use the Ballot Tracker to cure their mail-in ballot application); 9/19 Tr. at 1171:19-25 (Obakozuwa) (many of the questions and complaints related to SB1's mail voting ID requirements in Harris County came from voters who were over 65 or who had a disability).

366.     There are no formal records of modification requests received, since counties do not track these requests. 9/19 Tr. 1045:3-11 (Callanen).

367.     A request for assistance, or alerting a county to an accessibility problem would be considered the same as a request for a reasonable modification, according to Ms. Longoria, who testified that "reasonable accommodation" is "a lawyer term, and we took it if people just called our office and said I need help, or this was a problem, they didn't even say they needed help, if they just said this was a problem or didn't work, we would have worked to at least correct that issue for voters in the future." Ms. Longoria explained her understanding of the term "reasonable accommodation" to be that "the election office had to make a good faith effort tool whenever a voter with disabilities reached out…whether it was getting a mail ballot printed in Braille, or an accommodation needed, some folks have things called puffers or a different kind of mechanical elements to help with maybe different physical or cognitive issues, to the best of our ability providing machines that those could plug into, or essentially just doing what we can to make sure that the tools they need to survive and live and give them autonomy would also give them autonomy in voting." 9/20 Tr. 1298:5–1299:3 (Longoria).

368.     Counties admitted that they received specific requests from disabled voters for waivers or changes to mail ballot rules imposed by SB 1, which they denied. 9/13 Tr. 542:1-18 (Phillips) (Dallas County denied modification requests for in-person visit to disabled voters for assistance to cure rejected mail ballot applications or mail ballots and transportation to the polls to vote in person because they could not cure a rejected mail ballot or application); 9/19 Tr. 1042:7-22 (Callanen) (denying modification request for mail ballot application for disabled voter and assistor and stating: "Sometimes there's the right thing to do and SB 1 has really tied our hands on that.").

AFDOCS:199405450.4

369.    Several counties testified that they lacked ADA coordinators to respond to reasonable modification requests, that they did not have written ADA policies related to voting, that they had done nothing to update their ADA policies following the enactment of SB 1, and that they did not offer training to staff on responding to reasonable modifications. 9/19 Tr. 991:24–992:1, 992:14-16 (Callanen) (no ADA coordinator; no updated ADA policies post-SB 1); 9/12 Tr. 444:14-16, 444:5-9, 444:1-4 (Scarpello) (no ADA coordinator; no written ADA policies related to voting by mail; training regarding modifications limited to allowing disabled voters to go to the front of the line or allowing them to vote curbside); id. 1523:12-18 (Johnson) (no ADA policies pertaining to mail voting); id. 278:12-17, 278:18–279:2, 279:7-10 (Wise) (no training provided to address reasonable modification needs of voters with disabilities who vote by mail following enactment of SB 1).

**B.    Defendants Failed to Notify Voters with Disabilities of Their Right to Request Reasonable Modifications Under the ADA and were Unresponsive to Requests for Assistance.**

370.    Disabled voters were deterred from requesting reasonable modifications to SB 1 requirements because of a lack of information about whether they were entitled to do so and how to make such requests.

371.    Defendant County websites do not include information on how to request reasonable modifications generally or any information regarding modifications to SB 1 specifically. 9/12 Tr. 445:10-12 (Scarpello)(The website does not contain a dedicated section where voters with disabilities can request accommodations); HAUL-MFV 9 (Bexar County Elections Department webpage re voters with disabilities); HAUL-MFV 17 (Dallas County Elections Department webpage re Voters with disabilities); HAUL-MFV 95 (Harris County Elections Administrator's Office webpage); HAUL-MFV 100 (Hidalgo County Voters with Special Needs webpage); HAUL-MFV 236 (Travis County Voters with Disabilities webpage).

AFDOCS:199405450.4

372.     Disabled voters in Travis County testified that they did not receive any information about how to request a reasonable modification when voting, nor did they locate any information on the county's website when they attempted to find out their rights. 10/10 Tr. 3300:3-17 (Litzinger) (never received information online, in the mail, or via polling place signage from Travis County on her rights as a voter with a disability in any of the times she voted since 2021); *Id.* Tr. 3362:21–3363:17 (Saltzman) (did not receive information on how to request a reasonable modification and did not see any information on county website).

373.     As a result, voters with disabilities testified that they were unaware that modifications to SB 1 requirements were possible or how to request such modifications. Ms. Halvorson "didn't know that was a thing you could do." 10/10 Tr. 3330:23–3331:1 (Halvorson). Ms. Litzinger testified that it wasn't clear how to ask and that all of the disability advocacy groups were also confused about how to address accommodations with SB 1 so they could not provide any concrete guidance. *Id.* 3301:1-14 (Litzinger).

374.     Ms. Nunez Landry did not request that the assistor oath requirements be waived or modified so that she could receive assistance from her partner because she didn't know that was an option, instead voting without needed assistance. 10/10 Tr. 3257:1-4 (Nunez Landry). She explained: "I would have liked to have had my partner assist me but I knew under SB 1 that we were going to have to go through all sorts of difficulties to do that, and…I didn't want to put him through that. I'm really afraid of losing assistance and not having anyone, and also I don't want to draw more attention to myself. Where I live, it's very politically volatile right now and that makes me very nervous drawing attention to myself." *Id.* 3256:15–3257:4 (Nunez Landry).

375.     Ms. Nunez Landry was asked on cross examination whether she had requested accommodations from the Secretary of State's office or the Attorney General's office, which she

AFDOCS:199405450.4

did not recall doing because she had called so many people about voting issues. 10/10 Tr. 3267:15–3268:14 (Nunez Landry).

376.    When voters with disabilities did attempt to contact counties for assistance outside of waiving SB 1 requirements, they did not receive any response. 10/10 Tr. 3322:19–3323:9, 3330:19-22. (Halvorson); id. 3267:15–3268:14 (Nunez Landry).

377.    Trying to locate accessible voting equipment, but getting no response from Bexar County to her inquiry, Ms. Halvorson was required to do independent research into what kind of voting machines Bexar County had, doing a "deep dive" to figure out the name of the voting machine and manufacturer to see if it came with a remote for accessibility, and eventually had her father go to the polling place a few days before and ask them if they had the remote controls for the voting machines. Ms. Halvorson was very upset about getting no response from the county, stating: "I'm very stubborn and very determined. So I was still determined to find another way to get that information, where I don't think other people – they probably would have just given up and not voted." 10/10 Tr. 3322:19–3323:9, 3330:19-22. (Halvorson).

378.    Ms. Saltzman actively tried to get assistance from Travis County several times over three elections when her mail ballot applications and mail ballots were rejected. She explained that she had a disability and that she could not come in person to cure her application and ballot and that the online system was inaccessible due to her vision impairment. The county did not offer to change or waive any SB 1 requirements or provide other modifications to Ms. Saltzman. 10/10 Tr. 3362:17–3363:7 (Saltzman).

379.    Ms. Nunez Landry alerted government officials and sought redress for problems she and others encountered in multiple ways. She called the Harris County Elections Office and spoke to the ADA coordinator there after she left the polling place because she "was not at all

AFDOCS:199405450.4

happy" about the problems she encountered and witnessed. She has also called Disability Rights Texas and filed complaints with the Department of Justice. She made these calls "Because of all the problems that I encountered and when a polling location prior to some of the problems I had witnessed then there were older people who couldn't stand up anymore in that election and they were leaving and I insisted that I be let in to speak to someone so they could go in and vote." 10/10 Tr. 3255:2-18 (Nunez Landry). When Ms. Nunez-Landry called Harris County to gain clarity on the meaning of "eligibility," she did not receive any guidance from the county. *Id.* 3249:9-14, 3252:12-16 (Nunez Landry).

AFDOCS:199405450.4

**PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW FOR CLAIMS UNDER THE
AMERICANS WITH DISABILITIES ACT, SECTION 504 OF THE REHABILITATION
ACT, AND SECTION 208 OF THE VOTING RIGHTS ACT**

I.    **LEGAL STANDARD FOR PLAINTIFFS' CLAIMS UNDER THE AMERICANS
      WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION
      ACT**

    **A.  Title II of the Americans with Disabilities Act**

      1.    Congress enacted the ADA, 42 U.S.C. § 12101 *et seq*., to provide a clear and

comprehensive mandate to eliminate discrimination against people with disabilities and to

provide strong and consistent standards for identifying and addressing such discrimination. "The

ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to

eliminate discrimination against disabled individuals, and to integrate them into the economic

and social mainstream of American life.'" *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir.

2011) (internal citations omitted).

      2.    The ADA is based on Congress's findings that, inter alia:

- "[H]istorically, society has tended to isolate and segregate individuals with disabilities,
  and, despite some improvements, such forms of discrimination against individuals with
  disabilities continue to be a serious and pervasive social problem," 42 U.S.C.
  § 12101(a)(2);

- "[I]ndividuals with disabilities continually encounter various forms of discrimination,
  including . . . relegation to lesser services, programs, activities, benefits, jobs, or other
  opportunities," 42 U.S.C. § 12101(a)(5); and

- "[D]iscrimination against individuals with disabilities persists in such critical areas as . . .
  voting." 42 U.S.C. § 12101(a)(3). *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494,
  507 (4th Cir. 2016) ("Voting is a quintessential public activity[,]" and "[e]nsuring that

AFDOCS:199405450.4

disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others helps ensure that those individuals are never relegated to a position of political powerlessness.") (citing *Tennessee v. Lane*, 541 U.S. 509, 525 (2004)).

3.      Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130.2 Title II applies to all services, programs, and activities of public entities, including voting. 42 U.S.C. § 12132.

4.      The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

5.      Courts have construed "services, programs, or activities" as a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context" and rejected "'hair splitting' arguments as to what aspects of a [public entity's] operations fall under the ADA's broad protections." Rather, any "'normal function of a governmental entity,'" including voting, is properly treated to be a service, program, or activity under the ADA and Rehabilitation Act." *Am. Council of Blind of New York, Inc. v. City of New York*, 495 F.Supp.3d 211, 230 (S.D.N.Y. 2020) (citing Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 45 (2d Cir. 1997), superseded on other grounds as recognized in *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 (2d Cir. 2001); s*ee also Frame, supra*, 657 F.3d at 225.

6.      To prevail on a claim under Title II, plaintiffs must show that (i) plaintiffs have a disability; (ii) plaintiffs are otherwise qualified to receive the benefits of a public service,

---

[2] The ADA is organized into three primary titles governing different types of entities. Title II, at issue here, covers state and local government entities, while Title I prohibits discrimination in employment, 42 U.S.C. § 12111 *et seq.* and Title III prohibits discrimination  by places of public accommodation, 42 U.S.C. § 12181 *et seq*.

AFDOCS:199405450.4

program, or activity; and (iii) plaintiffs were denied the benefits of such service, program, or

activity, or otherwise discriminated against, on the basis of their disability. *Luke v. Texas*, 46

F.4th 301, 305 (5th Cir. 2022); *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th

Cir. 2004).

7.    Notably, discrimination under the ADA and Section 504 does not require intent or

animus and encompasses a much broader set of affirmative obligations for state and local

government entities than under other civil rights statutes. *See Alexander v. Choate*, 469 U.S. 287,

295–96 (1985) ("Discrimination against the handicapped was perceived by Congress to be most

often the product, not of invidious animus, but rather of thoughtlessness and indifference – of

benign neglect…elimination of architectural barriers was one of the central aims of the act . . .

yet such barriers were clearly not erected with the aim or intent of excluding the handicapped.");

*Pierce v. D.C.*, 128 F.Supp.3d 250, 266–67 (D.D.C. 2015) ("because Congress was concerned

that '[d]iscrimination against the handicapped was ... most often the product, not of invidious

animus, but rather of thoughtlessness and indifference—of benign neglect[,]' the express

prohibitions against disability-based discrimination in Section 504 and Title II include an

affirmative obligation to make benefits, services, and programs accessible to disabled people.")

(citing Alexander); *Dunn v. Dunn*, 318 F.R.D. 652, 665 n.12 (M.D. Ala. 2016), modified sub

nom. *Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020).

8.    The ADA directed the Attorney General of the United States to promulgate

regulations enforcing Title II of the ADA and provide guidance on their content. 42 U.S.C.

§ 12134. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591 (1999) ("Congress instructed

the Attorney General to issue regulations implementing Title II's discrimination proscription.")

(citing 42 U.S.C. § 12134(a).). The regulations that the Attorney General promulgated specify, *inter alia*, that it is unlawful discrimination for a public entity to:

- "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

- "Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

- "[U]tilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii).

- "[I]mpose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the programs, services or activities of state and local governments." 28 C.F.R. § 35.130(b)(8).

9.    The ADA regulations also require public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7); *Bennett-Nelson v. Louisiana Bd. Of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (*"*In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals."); *see also Johnson v. Callanen*, No. SA-22-CV-00409-XR, 2023 WL 4374998, at *6 (W.D. Tex. July 6, 2023) (quoting *Bennett-Nelson* and citing to 28 C.F.R. § 35.130(b)(7)). "A public entity's failure

to make a reasonable modification may satisfy the second and third prongs of the prima facie case." *Block v. Tex. Bd, of Law Examiners*, 952 F.3d 613, 618 (5th Cir. 2020).

10.    Defendants must make reasonable modifications necessary to avoid discrimination on the basis of disability unless they can meet their burden to "demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i); *Johnson v. Callanen, supra*, 2023 WL 4374998, at *6 (citing *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997)); see also *Reickenbacker v. Foster*, 274 F.3d 974, 983 (5th Cir. 2001) ("The burden of proof on this affirmative defense, of course, lies with the State ..."); *Lamone, supra*, 813 F.3d at 508.

11.    The ADA further states that it is unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of...or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of" any right protected by the ADA. 42 U.S.C. § 12203.

12.    Congress specifically authorized individuals who believe their Title II ADA rights are being violated to bring an action in a United States District Court. 42 U.S.C. § 12133 (incorporating the remedies and enforcement procedures available under Title VI of the Civil Rights Act, which includes a private right of action).

### B. Section 504 of the Rehabilitation Act

13.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits discrimination against people with disabilities by any program or activity receiving federal financial assistance. 29 U.S.C. § 794. Under Section 504, otherwise qualified individuals with disabilities may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any such program. 29 U.S.C. § 794(a). A program or activity includes

"all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1).

14.    An "individual with a disability" who is "otherwise qualified" is eligible for relief under Section 504. An individual with a disability is any person who has a disability as defined in § 12102 of the ADA, as described above. 29 U.S.C § 705.

15.    Under 29 U.S.C. § 794(b)(1)(A)-(B), "a program or activity" is defined as "(A) all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government."

16.    Defendants also through their voting programs operate programs or activities as defined under 29 U.S.C. § 794(b)(1)(A)-(B) and as such term is used under 29 U.S.C. § 794(a). *See* Joint Pretrial Order (JPTO) (ECF. No. 753), at 23 ¶¶ 39-48. HAUL FOF Section I(B)-(C); LUPE FOF Section II.

### C.  Plaintiffs' Challenge Under the ADA and Section 504

17.    Section 504 and the ADA impose nearly identical substantive requirements and courts have interpreted them in tandem. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017); *Smith v. Harris Cty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020). Therefore, hereafter, unless noted otherwise, references to the ADA should be read to encompass Plaintiffs' Section 504 claims as well.[3]

---

[3] Section 504 requires that the discrimination must be "solely by reason" of plaintiff's disability, but this does *not* indicate a higher standard than the ADA. *Bennett-Nelson, supra*, 431 F.3d at 454 (explaining that there is no difference between the two because both impose upon public entities an affirmative obligation to make reasonable accommodations for individuals with disabilities).

AFDOCS:199405450.4

18.     Plaintiffs challenge Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04 of SB 1 under the ADA and Section 504. In administering, implementing, and enforcing these provisions of SB 1, Defendants have discriminated against Plaintiffs on the basis of disability in violation of Title II of the ADA and its implementing regulations.

19.     As discussed in detail below, Plaintiffs have standing to sue and have met their burden of proof on all of the elements to prove their ADA and Section 504 claims: 1) Defendants are state or local government entities and are covered entities under Title II of the ADA; 2) Defendants receive federal financial assistance and are also covered entities under Section 504; and 3) Plaintiffs and their members and constituents are qualified people with disabilities. In attempting to access Defendants' voting programs, Plaintiffs experienced discrimination on the basis of disability. Defendants have not met their burden of proof in raising a fundamental alteration defense.

## II.     PLAINTIFFS HAVE STANDING TO SUE

20.     Plaintiffs incorporate by reference the overview of associational and organizational standing found in HAUL, OCA, and LUPE Plaintiffs' Conclusions of Law. HAUL COL Section I(A); OCA COL Section II(A)-(B); LUPE COL Section I Plaintiffs have demonstrated both associational and organizational standing for their ADA and Section 504 claims.[4]

### A.  Plaintiffs have Established Associational Standing

21.     Plaintiffs have established associational standing with respect to their ADA claims against Defendants. This Court has already held as such in this action regarding REV UP

---

[4] LUPE's standing is addressed in LUPE's Conclusions of Law, Section I.

AFDOCS:199405450.4

Texas. *See* ECF No. 820 at 22-25 (holding that Rev Up Texas has established associational standing, citing *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009); *Stringer v. Hughes*, Nos. SA-20-CV-46-OG, SA-16-CV-257-OG, 2020 WL 6875182, at *9 (W.D. Tex. Aug. 28, 2020)*; Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010); *Tex. Med. Bd.*, 627 F.3d at 552; *La Unión del Pueblo Entero v. Abbott ("LUPE")*, 614 F.Supp.3d 509, 526 (W.D. Tex. 2022)).

22.     As this Court has previously recognized in this litigation, "it is well settled that an organization may sue as the representative of its members." ECF No. 447 at 47 (citing *Tex. Med. Bd., supra*, 627 F.3d at 550). An organization may invoke associational standing when "[a] its members would otherwise have standing to sue in their own right, [b] the interests at stake are germane to the organization's purpose, and [c] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *J.R. v. Austin Indep. Sch. Dist.*, 574 F.Supp.3d 428, 436 (W.D. Tex. 2021); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343 (1977)).

### (1) The Members of The Arc of Texas and REV UP Texas Would Otherwise Have Standing to Sue in their Own Right

23.     The members of The Arc of Texas and REV UP Texas would otherwise have standing to sue in their own right.

24.     A qualified individual within the meaning of Title II of the ADA is a disabled individual "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary

aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

25.     Members of The Arc of Texas and REV UP Texas include individuals with IDD and their families and other individuals with disabilities who are qualified for the programs, services, and activities offered by Defendants—including vote by mail and in person voting— because they are eligible to vote and registered to vote in Texas. FOF ¶¶ 2, 28-29, 55-93. As membership organizations serving people with disabilities across the state of Texas, The Arc of Texas and REV UP Texas have members who are people with disabilities who have impairments that substantially limit one or more of their major life activities, including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Accordingly, The Arc of Texas and REV UP Texas have members who are qualified individuals with disabilities entitled to the protections of the ADA. 42 U.S.C. § 12131(2).

26.     Specifically, The Arc of Texas and REV UP Texas members Jodi Lydia Nunez Landry, Amy Litzinger, Laura Halvorson, Teri Saltzman, Yvonne Yvette Iglesias, and Nancy Crowther each have disabilities that substantially limit one or more of their major life activities and are registered to vote in Texas. FOF ¶¶ 59-85, 88-93. As such, these members of The Arc of Texas and REV UP Texas are qualified individuals with disabilities who are entitled to the protections of the ADA. 42 U.S.C. § 12131(2).

27.     In addition, The Arc of Texas member Jennifer Miller assists her daughter Danielle, an individual with disabilities that substantially limit her major life activities, to vote in Texas. FOF ¶ 55-58. REV UP Texas member Cathy Cranston is a personal care attendant to

AFDOCS:199405450.4

individuals with disabilities who are substantially limited in major life activities and who are registered to vote. FOF ¶¶ 86-87.

28.     These members of Plaintiffs' organizations have voted in prior Texas elections and intend to vote in future Texas elections. FOF ¶¶ 57-58, 64-65, 71-74, 80-82, 85, 90, 92.

29.     Plaintiffs and their members, voters with disabilities, have been injured by the Challenged Provisions of SB 1 and denied an equal opportunity to participate in and benefit from Defendants' voting programs due to the Challenged Provisions. FOF Sections V-VIII; *infra* Section IV.

### (2) *The Interests at Stake are Germane to the Purpose of The Arc of Texas and REV UP Texas*

30.     The Arc of Texas is a statewide advocacy organization with 7,000 individual members and 24 local chapter members. The Arc of Texas is a 501(c)(3) non-profit organization founded in 1953 by parents of children with intellectual and developmental disabilities (IDD) to advocate for their children to have access to education, employment, community supports, and other areas of community life. The Arc of Texas' mission is to "promote, protect, and advocate for the human rights and self-determination of Texans with intellectual and developmental disabilities." FOF ¶¶ 1-2. Voting is the "backbone" of The Arc of Texas' work and has been a priority of The Arc of Texas since it was founded. FOF ¶¶ 9, 14. Staff and members of The Arc of Texas testified in opposition to SB 1 before the legislature. FOF ¶¶ 156, 159.

31.     REV UP Texas has a stated mission to "get out" the vote by educating and assisting voters with disabilities to register as well as educate voters about the importance of voting due to issues important to the disability community such as affordable and accessible housing, issues involving Medicaid waivers, assistive technology, accessible transportation, and

AFDOCS:199405450.4

durable medical equipment, which is relevant to the relief REV UP Texas seeks in this litigation. FOF ¶¶ 24-26.

32.    SB 1's restrictions on voter assistance and mail voting and the impact of the Challenged Provisions on voters with disabilities are thus germane to the purpose of both The Arc of Texas and REV UP Texas.

### (3) *Neither the Claim Asserted nor the Relief Requested Requires the Participation of Individual Members in the Lawsuit*

33.    Neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. Plaintiffs The Arc of Texas and REV UP Texas have members with disabilities who are harmed by the provisions of SB 1. Federal courts, including in the Fifth Circuit, routinely find that advocacy organizations representing individuals with disabilities have associational standing to challenge violations of federal laws protecting individuals with disabilities in cases seeking systemic, injunctive relief without the participation of individual members. This Court has already held as such in this action. *See* ECF No. 449 at 44 (seeing "no reason to carve out an exception" to this rule, citing *A Helping Hand, LLC v. Baltimore County, MD*, 515 F.3d 356, 362–64 (4th Cir. 2008); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–36 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 46–48 (2d Cir. 1997); *Steward v. Abbott*, 189 F.Supp.3d 620, 630–32 (W.D. Tex. 2016); *Fla. State Conf. of NAACP v. Lee*, 576 F.Supp.3d 974, 988–90 (N.D. Fla. 2021)).

34.    The crux of Plaintiffs' claims for uniform, injunctive relief is that SB 1 denies a large and diverse group of Texas voters with disabilities an equal opportunity to participate in and benefit from the state's in-person and mail voting programs. FOF Sections V-VII. Plaintiffs request injunctive relief enjoining the Challenged Provisions of SB 1. SB 1's restrictions have a systemic impact on voters with disabilities and those who assist them to such an extent that it

AFDOCS:199405450.4

would be both impracticable and insufficient to address individual claims one by one. SB 1's Challenged Provisions do apply uniformly and harm large numbers of people with disabilities across Texas. Even when the disabilities of the affected individuals vary, the law and harm that SB 1 inflicts—denying voters with disabilities an equal opportunity to participate in and benefit from the state's voting programs—is uniform. FOF Sections V-VII.

### B. Plaintiffs Have Also Established Organizational Standing

35.     Plaintiffs incorporate by reference the Conclusions of Law of the HAUL, OCA, and LUPE Plaintiffs pertaining to the general legal standards for demonstrating organizational standing. *See* HAUL COL Section I(A); OCA COL Section II(A); LUPE COL Section I.

36.     Plaintiffs have organizational standing to bring this action. In addition to associational standing on behalf of its members, an organization "can establish standing in its own name if it meets the same standing test that applies to individuals." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (citation and quotation marks omitted). A plaintiff has Article III standing to bring a claim if the plaintiff has suffered a cognizable injury that is "fairly traceable to the challenged action" and "redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

37.     Organizations must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 55, 560–61 (1992).

38.     With respect to organizational standing specifically, in the Fifth Circuit, "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Ass'n of Cmty Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). If a defendant's actions perceptibly impair an organization in such a way, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

39.     "[A]n Article III injury-in-fact need not be substantial; 'it need not measure more than an identifiable trifle.'" *OCA-Greater Houston, supra*, 867 F.3d at 612. Here, Plaintiffs have alleged more than enough as to each challenged provision.

40.     Each of the Plaintiff organizations have devoted resources to respond to the harms imposed by SB 1 and have, as a result, suffered an injury in fact.

41.     The Arc of Texas has had to divert staff time and resources to respond to the harms imposed by SB 1 and, as a result, did not have the resources it needed to dedicate to its other policy priorities. Because of the resources it diverted to SB 1, The Arc of Texas had to reorganize its staff and reallocate their time and its policy budget to address the barriers imposed by SB 1. The organization's voting work changed from providing basic information to voters about the importance of voting and how to vote to educating voters with disabilities about the new restrictions of SB 1 and quelling the fears of disabled voters and assuring them that they still have the right to vote. The Arc of Texas was unable to advocate before the legislature seeking to curtail the restraint and seclusion of children with IDD in schools. Since the legislature only meets every two years with a different legislative body each time, this was a missed opportunity that will not arise again. FOF ¶¶ 16-23.

AFDOCS:199405450.4

42.     REV UP Texas has had to divert volunteer time and resources responding to the harms imposed by SB 1. REV UP Texas volunteer time was diverted away from issues important to its mission, such as outreach and advocating for affordable integrated housing, long waiting lists for home- and community-based services, community attendants' wages, accessible transportation, durable medical equipment, and assistive technology. To address the new restrictions imposed by SB 1, REV UP Texas sent informational flyers about contacting the recipient's state senator, testified at various hearings, and contacted a number of government offices. REV UP Texas also had to spend time answering questions about SB 1, produced several podcasts about SB 1 which could have otherwise been focused on its other policy priorities, and provided information about SB 1 to its membership. The time REV UP Texas had to spend addressing SB 1 diverted resources from its ability to inform its membership on how to register to vote and generally building the disability vote. FOF ¶¶ 30-35.

43.     The Challenged Provisions of SB 1 will continue to impact Plaintiffs' organizations and force them to divert similar resources to addressing the impact of SB 1 on voters with disabilities. FOF ¶¶ 16-23; 30-35.

44.     The injuries The Arc of Texas, REV UP Texas, and LUPE have experienced and continue to experience result from the Challenged Provisions of SB 1 and are fairly "traceable to" or "redressable by" the Defendants.

## III.    THE DEFENDANTS ARE PROPER

45.     Plaintiffs incorporate by reference the sections on proper Defendants and sovereign immunity in the Conclusions of Law for HAUL, OCA, and LUPE Plaintiffs. HAUL COL Section XVI; OCA Section III; LUPE COL Section X.

AFDOCS:199405450.4

### A. State and County Defendants are Proper Under the ADA Because They are Public Entities Who Provide the Program, Service, or Activity of Administering Elections and Enforcing the Texas Election Code

46.     State and County Defendants receive Federal financial assistance for the purposes of 29 U.S.C. § 794(a). *See* FOF ¶ 102. State and County Defendants are public entities pursuant to the ADA. 42 U.S.C. § 12131(1)(A),(B); 45 C.F.R. § 1232.3(d). Under Title II of the ADA, a "Public entity" is defined as "(A) any state or local government [or] (B) any department, agency, special purpose district or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B).

47.     Defendant Jane Nelson, Secretary of State of Texas, represents a department of the State of Texas. HAUL FOF I(B)(2). The Secretary is therefore a public entity under Title II of the ADA. 42 U.S.C. § 12131(1)(B).

48.     County Defendants Jacquelyn Callanen (Bexar County Elections Administrator), Michael Scarpello (Dallas County Elections Administrator), Lisa Wise (El Paso County Elections Administrator), Teneshia Hudspeth (Harris County Clerk and Chief Election Officer for Harris County), Hilda Salinas (Hidalgo County Elections Administrator), and Dyana Limon-Mercado (Travis County Clerk) represent departments, agencies, or other instrumentalities of their respective local government counties. HAUL FOF Section I(C); OCA FOF Section III(C), (F), LUPE FOF Section I.B. The offices of the County Election Administrators are therefore public entities under Title II of the ADA. 42 U.S.C. § 12131(1)(B).

49.     Defendants Kim Ogg (Harris County District Attorney), Jose Garza (Travis County District Attorney), and Joe Gonzales (Bexar County District Attorney) each represent a department, agency, or other instrumentality of their respective local government counties. HAUL FOF Section I(C); OCA FOF Section III (D), (E). The DA offices are therefore public entities under Title II of the ADA. 42 U.S.C. § 12131(1)(B).

AFDOCS:199405450.4

50.     The administration of elections and voting, including vote-by-mail and in-person

voting are each a service, program, or activity provided by the agencies of State and County

Defendants and other political subdivision agencies. Enforcement of the Texas Election Code is

a service, program, or activity provided by Defendants Ogg, Garza, and Gonzales.

51.     This Court has previously held that "it is clear that the Secretary is responsible for

providing the service or benefit of voting and voting by mail" based on a number of statutory

duties enumerated in the Texas Election Code. ECF No. 447 at 50 (noting that State Defendants

have "acknowledged in prior litigation that the 'Secretary of State is the chief election office,

specially charged with administering elections'" *Veasy v. Perry,* 29 F.Supp.3d 896, 923 (S.D.

Tex. 2014)). This Court has also previously held that "whether the Secretary provides voting and

vote-by-mail services is not a close question. The Election Code makes clear that voting in

person and by mail are services or benefits that the Secretary provides. The Secretary has a

concrete and specific role in the administration of elections throughout Texas and oversees

voting processes and procedures...the Election Code charges the Secretary with administering

elections." ECF No. 447 at 53. This Court has held that the Secretary "is personally and

potentially liable under Title II because he must administer elections in compliance with Election

Code provisions that…discriminate against disabled voters." ECF No. 447 at 54.

52.     It is undisputed that the County Administrators provide the program, service, or

activity of administering local elections and that the County District Attorneys provide the

program, service, or activity of enforcing the Texas Election Code. HAUL FOF Section I(C);

OCA FOF Section III (C); LUPE FOF Section I(B).

### B.  The ADA Abrogates Sovereign Immunity

53.     Plaintiffs' claims under Title II of the ADA are exempt from sovereign immunity.

"Congress can abrogate this immunity if it (1) 'makes its intention to abrogate unmistakably

AFDOCS:199405450.4

clear in the language of the statute' and (2) 'acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment.'" *Block, supra*, 952 F.3d at 617. The first prong is met, as Congress clearly stated in the statute its intent to abrogate sovereign immunity. *See id*.; *see also* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court . . . for a violation of" the ADA); *Lane, supra*, 541 U.S. at 518.

54.     As to the second prong, the Supreme Court applies a three-part test to determine, on a claim-by-claim basis, whether Title II validly abrogates sovereign immunity. Block, supra, 952 F.3d at 617. It asks "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.*

55.     Plaintiffs have demonstrated that SB 1's onerous rules regarding mail-in ballots and voter assistance violate Title II of the ADA. *See infra* Section IV. Unreasonably burdening Plaintiffs' right to vote is conduct that violates both the ADA and the Fourteenth Amendment. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.); see also *Valentine v. Collier,* 993 F.3d 270, 280–81 (5th Cir. 2021) (alleged conduct that violated ADA and Eighth Amendment, which applies to the states through the Fourteenth Amendment, abrogated sovereign immunity under Title II).

56.     Moreover, though Lane pertained to court access, the Court also extended its analysis to other areas protected by Title II, including voting:

> The historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled persons by state agencies in a variety of settings, including unjustified commitment…the abuse and neglect of persons committed to state mental health hospitals…and irrational

AFDOCS:199405450.4

> discrimination in zoning decisions…The decisions of other courts, too, document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and *voting*. Notably, these decisions also demonstrate a pattern of unconstitutional treatment in the administration of justice.

541 U.S. at 524–25 (emphasis added) (citing *Doe v. Rowe*, 156 F.Supp.2d 35, 57 (D. Me. 2001) (in case challenging state guardianship law as discriminating against voters with disabilities, holding that "Court concludes that State Defendants may not invoke sovereign immunity to shield them from Plaintiffs' claims under Title II of the ADA.")) (other internal citations omitted); *see also Fla. State Conf. of the NAACP, supra*, 576 F.Supp.3d at 990 (citing *Lane* for "explaining that Title II of the ADA validly abrogated state sovereign immunity under the Fourteenth Amendment, in part, because it targeted discrimination against disabled persons in voting.").

57.    As this court has previously held: "Congress acted pursuant to a valid grant of constitutional authority in enacting Title II to prohibit discrimination in voting. Thus, state sovereign immunity presents no obstacle to…Plaintiffs' Title II claim against the Secretary." ECF No. 447 at 58 (relying on *Lane supra*, 541 U.S. at 518; *Veasy v. Abbott*, 830 F.3d 216, 316 (5th Cir. 2016); *McDonald v. Bd. Of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969); *Cooper v. Aaron*, 358 U.S. 1, 17 (1958)).

### C.  Sovereign Immunity is Waived as to Section 504 when Public Entities Accept Federal Funds

58.    As this Court has previously held, the State waives its Eleventh Amendment immunity as to claims under Section 504 by accepting federal funds. ECF No. 447 at 58 (citing *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287 (5th Cir. 2005)); see also 42 U.S.C. § 2000d-7(a); *Danny R. ex rel. Ilan R. v. Spring Branch Indep. Sch. Dist.*, 124 F. App'x 289, 289–90 (5th Cir. 2005).

59.     When an agency is Congress' intended recipient of federal funds—rather than a mere third-party beneficiary—the agency falls under the purview of Section 504 even if funds are received indirectly. *See, e.g.*, *U.S. Dep't of Transp. V. Paralyzed Veterans of Am.*, 477 U.S. 597, 606 (1986); *Frazier v. Bd. Of Trs. Of Nw. Miss. Reg'l Med. Ctr.*, 765 F.3d 1278, 1289–90 (5th Cir. 1985). Whether an agency is Congress' intended recipient of federal funds depends greatly on the language of the grant. *Hamilton v. Ill. Cent. R. Co.*, 894 F.Supp. 1014, 1020 (S.D. Miss. 1995). An agency that does not request but still receives funding from an intermediary may still be subject to suit under Section 504. *See T.W. v. N.Y. State Bd. Of L. Exam'rs*, 996 F.3d 87, 93 (2d Cir. 2021); *Bentley v. Cleveland Cnty. Bd. Of Cnty. Com'rs*, 41 F.3d 600, 604 (10th Cir. 1994).

60.     The State has conceded that it receives federal financial assistance to administer elections, thereby waiving its immunity under Section 504. FOF ¶ 102.

## IV.    DEFENDANTS, IN IMPLEMENTING AND ENFORCING THE CHALLENGED PROVISIONS OF SB1, DISCRIMINATE AGAINST VOTERS WITH DISABILITIES IN VIOLATION OF THE ADA AND SECTION 504

### A.  Overview

61.     In administering, implementing, and enforcing the Challenged Provisions of SB 1—Sections 5.02, 5.03, 5.06, 5.07, 5.10 , 5.12, 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04—Defendants have discriminated against Plaintiffs on the basis of disability in violation of Title II of the ADA and its implementing regulations by:

- denying voters with disabilities an equal opportunity to participate in and benefit from Defendants' voting programs;

- providing voters with disabilities a service that is not as effective in affording an equal opportunity to obtain the same benefit … as that provided others;

- imposing eligibility criteria that screen out or tend to screen out people with disabilities from the program and activity of voting;

- using criteria or methods of administration that subject voters with disabilities to discrimination or substantially impair accomplishment of the voting program's objectives with respect to voters with disabilities;

- failing to make reasonable modifications to their policies, practices, and procedures needed to avoid discrimination in Defendants' voting program, and

- intimidating or interfering with voters with disabilities and their assistors in the exercise or enjoyment of voting.

62.    Individually and cumulatively, the Challenged Provisions of SB 1 have harmed Plaintiffs and their members, voters with disabilities. FOF Sections V-VII. Dr. Kruse testified that, taken together, these provisions "raise the cost of voting for people with disabilities" which means that people are less likely to vote or face significant difficulties even when they ultimately are able to vote. FOF ¶ 342. Plaintiff organizations, voters with disabilities, assistors of voters with disabilities, and counties testified that SB 1 has made it harder for people with disabilities to vote and instilled an atmosphere of fear around voting. FOF Sections V-VII.

63.    Plaintiffs have demonstrated that their members are qualified individuals with disabilities, thus meeting the first two prongs of their Title II ADA claim. *See supra* Section II(A)(1). Below, Plaintiffs demonstrate how they have met the third prong of an ADA claim, that they were denied the benefits of a service, program, or activity, or otherwise discriminated against, on the basis of their disability. Specifically, Plaintiffs demonstrate that Defendants have: 1) denied Plaintiffs and their members, voters with disabilities, an equal opportunity to participate in Defendants' voting programs; 2) used criteria or methods of administration that

AFDOCS:199405450.4

have the purpose or effect of defeating the objectives of Defendants' voting programs with respect to individuals with disabilities; and 3) failed to provide Plaintiffs with reasonable modifications necessary to avoid discrimination.

**B. Defendants Have Denied Plaintiffs and Their Members, Voters with Disabilities, an Equal Opportunity to Participate in and Benefit From Defendants' In-Person and Mail Voting Programs**

64.     Plaintiffs have presented extensive evidence that voters with disabilities have been denied an equal opportunity to participate in and benefit from Defendants' voting programs—voting by mail and voting in person—due to the Challenged Provisions of SB 1. Since the enactment of SB 1, voters with disabilities, by reason of their disabilities, have been prevented from voting, encountered significant barriers in voting by mail, and faced great difficulties in receiving the assistance they need to vote. This has led voters with disabilities to experience multiple mail ballot rejections, endure physical pain when voting, take significantly longer to vote, and lose privacy in their voting experience, none of which they experienced prior to the enactment of SB 1. Plaintiffs, Plaintiffs' expert, voters with disabilities, assistors for voters with disabilities, and counties all testified that the Challenged Provisions have created an atmosphere of fear and anxiety around voting that has made voters with disabilities feel like second class citizens, and unsure if their votes will be counted. FOF Sections V-VII. Defendants have exacerbated these barriers by failing to fully comply with the injunction in *OCA Greater Houston, supra*, 2022 WL 2019295, and including instructions to assistors on the carrier envelope that improperly limit assistance, stating: "A voter may only be assisted with reading or marking the ballot…" FOF ¶¶ 316-319.

65.     As such, Defendants have denied voters with disabilities an equal opportunity to participate in and benefit from Defendants' voting programs; provided voters with disabilities a service that is not as effective in affording an equal opportunity to obtain the same benefit as that

AFDOCS:199405450.4

provided others; and imposed eligibility criteria that screen out or tend to screen out people with disabilities from the program and activity of voting, in violation of the ADA and its implementing regulations. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.130(b)(1) and (b)(8).

66.    The Fifth Circuit has held that to demonstrate discrimination under the ADA, "a plaintiff must show that a benefit is being administered in a way that 'effectively denies' individuals with qualifying disabilities 'meaningful access' to the benefits for which they are qualified." *Frame v. City of Arlington*, 616 F.3d 476, 484 (5th Cir. 2010), on reh'g en banc, 657 F.3d 215 (5th Cir. 2011) (citing other Circuits holding same).

67.    "Meaningful access," does not suggest a different or lesser standard than the equal opportunity that the ADA requires, and does not reduce the Title II inquiry to "some abstract question of de minimis 'meaningfulness.'" *Trivette v. Tennessee Dep't of Corr.*, No. 3:20-cv-00276, 2021 WL 10366330, at *11 (M.D. Tenn. May 5, 2021). "Title II is not targeted at merely guaranteeing minimally adequate services to disabled people, but to remedying 'unequal treatment of persons with disabilities by States and their political subdivisions." *Id.* Rather, meaningful access requires that public entities "must afford [disabled] persons equal opportunity to ... gain the same benefit" as people without disabilities. *Gustafson v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, 29 F.4th 406, 412 (8th Cir. 2022) (internal quotations and citations omitted).

68.    The obligation of public entities "extends beyond cases of actual exclusion to cases of constructive exclusion—i.e., a plaintiff need not show it is impossible to access the benefits, but only that…there is an unreasonable level of difficulty in accessing the benefits." *Id.* (citing *Alexander, supra*, 469 U.S. at 301; *Brennan v. Stewart*, 834 F.2d 1248, 1261 (5th Cir.1988)).

AFDOCS:199405450.4

69.     The ADA requires each of a covered entity's programs to be accessible to and

useable by people with disabilities but the Challenged Provisions have rendered both mail and

in-person voting inaccessible to Plaintiffs and their members. FOF Sections V-VII. If a state

provides voters with choices for casting a ballot, such as in-person voting at a polling place and

voting by mail, under the ADA, each option must be independently accessible to voters with

disabilities. *Lamone, supra*, 813 F.3d at 503–04 (4th Cir. 2016) ("[T]o assume the benefit is ...

merely the opportunity to vote at some time and in some way [ ] would render meaningless the

mandate that public entities may not afford persons with disabilities services that are not equal to

that afforded others…"[t]he Supreme Court has cautioned against defining the scope of a public

benefit so as to avoid questions of discriminatory effects," noting that, "'the benefit itself, of

course, cannot be defined in a way that effectively denies otherwise qualified handicapped

individuals the meaningful access to which they are entitled.'") (citing *Alexander, supra*, 469

U.S. at 301); s*ee also Disabled in Action v. Bd. of Elections in Cty of N.Y.*, 752 F.3d 189, 198–99

(2d Cir. 2014); *People First of Alabama v. Merrill*, 491 F.Supp.3d 1076, 1158–59 (N.D. Ala.

2020) (stayed pending appeal without discussion in *Merrill v. People First of Alabama*, 141 S.

Ct. 25 (2020)); *Johnson v. Callanen*, 608 F.Supp.3d 476, 484 (W.D. Tex. 2022) (Rodriguez, J.)

(holding that mail voting in Texas is "at least a benefit—if not an actual, service, program, or

activity—for which Bexar County is responsible").

70.     Defendants cannot simply point to a different method of voting that is not part of

the program at issue to defeat a discrimination claim under the ADA. *See Lamone*, 813 F.3d at

503–04; *People First, supra*, 491 F.Supp.3d at 1158–59; ECF No. 447 at 55 ("Even assuming

that the alternatives that the State Defendants identify constitute reasonable modifications under

Title II, they do nothing for eligible disabled voters who are discriminated against when voting

AFDOCS:199405450.4

by mail. Surely, voting by mail cannot be a reasonable modification when, as the HAUL Plaintiffs plausibly allege, disabled voters who are eligible to vote by mail do not have meaningful access to actually do so because of their disabilities.")[5]

71.     To prove discrimination under the ADA, Plaintiffs need not show that voters with disabilities are completely denied access to voting. Rather, they must show that they have been denied meaningful access to Defendants' voting programs. *People First of Ala., supra*, 491 F.Supp.3d at 1159 (citing *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) ("A violation of Title II…does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity.") (emphasis added)). A "partial denial of access" can be actionable. *See, e.g.*, *Lamone, supra*, 813 F.3d at 498, 506–07 (holding that even if in-person polling place machines have accessibility features for blind voters that allow them to access in-person voting, an inaccessible mail ballot still constituted denial of equal opportunity to participate in and

---

[5] To the extent that polling places may offer some accessible features for voters with disabilities, as Defendants have speculated they may, this is simply the minimum compliance that is required by federal law. It does not render in person voting as a whole accessible to all voters with disabilities, and does nothing to address the impact of the Challenged Provisions of SB 1. One aspect of a public entity's program being accessible to some people with disabilities has no bearing on determining whether an entirely separate aspect of the public entity's program is accessible. A ramp to access a building does not provide an equal opportunity to participate in and benefit from a program for a deaf individual who requires a sign language interpreter. See *Lamone, supra*, 813 F.3d at 503–04 (holding that the challenged policies were the appropriate scope for the court's ADA analysis, regardless of whether physical voting locations were accessible). Here, a number of Plaintiffs' members testified that there may be times when in-person voting was not accessible to them at all due to their disabilities. FOF Section II(B). To the extent Defendants continue to argue that Defendants, not Plaintiffs, get to choose between reasonable accommodations, this presumes that Defendants have actually proposed equally effective modifications for the Challenged Provisions that ensure meaningful access to the program at issue. One of the cases cited by Defendants, E.T. v. Paxton, 41 F.4th 709 (5th Cir. 2022) provides this example: "Take, for example, plaintiffs' analogy to 'a student who must rely on a wheelchair.' In that situation, the school might accommodate the student in a number of ways: it might install a lift, a ramp, or something else. It can choose any reasonable one. The fact that a particular student prefers a lift to a ramp is irrelevant, so long as the school picks a reasonable accommodation that provides meaningful access." As described below, Defendants have made no alternative proposals to provide equal opportunity for Plaintiffs to consider. Rather, Defendants' have mischaracterized other allegedly accessible voting options that have nothing to do with the Challenged Provisions as a modification for Plaintiffs.

AFDOCS:199405450.4

benefit from mail voting for blind voters under the ADA); *see also Am. Council of the Blind of New York, Inc., supra*, 495 F.Supp.3d at 235 (granting summary judgment to plaintiffs, blind individuals, who were denied equal opportunity to participate in and benefit from a city's pedestrian crossings because they were required to use "workarounds or alternate means" to navigate the streets, such as using guide dogs they would not otherwise need, having to wait 20 minutes at an intersection for a sighted individual to appear and help them safely cross the street, and being forced to take longer and more arduous routes and go blocks out of their way to reach their destination and stating: "…conditioning access upon arduous or costly 'coping mechanisms' and on the assistance of strangers is 'anathema to the stated purpose of the Rehabilitation Act' and the ADA.") (citing *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008)).

72.    Lack of meaningful access is itself the harm under Title II, regardless of whether additional injury follows. *Luke, supra*, 46 F.4th at 305–07. In Luke, the plaintiff, who was deaf, brought action under Title II against the State of Texas, because he was not given a sign language interpreter during his arrest, subsequent court proceedings, or his meetings with probation officers. *Id.* The State argued that the plaintiff was not denied meaningful access under the ADA despite not having access to a sign language interpreter because he "successfully participated in, availed himself of, and completed the terms of his probation." *Id.* at 306.

73.    The Fifth Circuit rejected this approach stating:

> This no-harm-no-foul theory is inconsistent with the ADA. Nothing in the statute's text or the caselaw applying it requires Luke to have alleged a bad outcome— something like being wrongly arrested, getting his bail or probation revoked, or mistakenly entering a guilty plea because of confusion without an interpreter. And for good reason: *Lack of meaningful access is itself the harm under Title II, regardless of whether any additional injury follows.* Luke's Title II injury is not being able to understand the judges and probation officers as a nondeaf defendant would.

*Luke, supra*, 46 F.4th at 306 (citing *Lane, supra*, 541 U.S. at 532–33).

74.    The presence of restrictions that might "dissuade" a voter can establish a lack of equal opportunity. *See People First of Ala., supra*, 491 F.Supp.3d at 1160, 1165 (holding that restrictions on curbside voting and photo ID requirements for absentee voting rendered in-person voting and absentee voting, respectively, inaccessible for at least some disabled voters because those restrictions "may dissuade" them from using those methods of voting).

75.    When assessing a voter's access to the service, program, or activity, courts should analyze the cumulative impacts of various different restrictions on disabled voters' access to the particular voting program, because the relevant benefit is not "merely the opportunity to vote at some time and in some way," but rather a meaningful opportunity to fully participate in that program. *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 198–99 (2d Cir. 2014) (holding that Board of Elections denied equal opportunity to disabled voters who could not access casting a private ballot in person on election day). Voting requires a number of different steps, and multiple burdens at different stages of that process can combine to dissuade voters with disabilities from participating in the process or place substantial burdens on their ability to vote.

76.    Plaintiffs have presented extensive evidence that voters with disabilities have been denied an equal opportunity to participate in and benefit from Defendants' voting programs—voting by mail and in person—due to the Challenged Provisions of SB 1. FOF Sections V-VII.

77.    The Section 5 Mail Voting Restrictions—Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 as described in HAUL FOF Section II(E), require that a mail-in voter include the voter's driver's license number or the last four digits of the voter's social security number on ABBMs and on BBM ballot carrier envelopes. These provisions have denied Plaintiffs and their

AFDOCS:199405450.4

members, voters with disabilities, an equal opportunity to participate in and benefit from Defendants' voting programs. FOF Section V. Voters with disabilities are four times more likely to vote by mail and, due to their disabilities, are among the limited categories of voters eligible to do so, and may not have any other means of voting. FOF ¶ 126-131, 166.

78.    For example, Ms. Iglesias testified that her mail ballot applications were rejected multiple times in 2022 due to ID-related reasons. FOF 180. Ms. Saltzman testified that the barriers posed by the Section 5 Mail Voting Restrictions are compounded by the general accessibility barriers voters with disabilities face. She testified that the March 2022 primary was "the worst experience I ever had in my whole life voting" due to every stage of the process being inaccessible to her as a blind voter and having multiple mail ballot applications and mail ballots rejected. FOF 181. Ms. Crowther testified that SB 1 has made it harder for voters with disabilities to vote by mail. FOF 186.

79.    The Section 5 Mail Voting Restrictions have led to a dramatic increase in mail ballot rejections. HAUL FOF 395, 415–31; *See generally* HAUL FOF Section VII(A)(1)-(2).

80.    Plaintiffs and their members, voters with disabilities, also faced barriers in curing their ballots due to Section 5.12. FOF ¶¶ 191-209. For example, both Ms. Saltzman and Ms. Guerrero-Mata faced significant barriers when attempting to cure their mail ballot applications and mail ballots due to both the in person and online curing options being inaccessible to them as blind and visually impaired individuals. FOF ¶¶ 193-196. County officials testified that they knew of voters who were unable to cure problems with their mail ballot applications or ballots related to SB 1's ID requirement and some were unable to vote at all. FOF ¶¶ 200-209; *see also* HAUL FOF Section XVII(A)(5).

AFDOCS:199405450.4

81.     The barriers to voters with disabilities created by SB 1's ID requirements will continue to deny Plaintiffs and their members, voters with disabilities, an equal opportunity to participate in and benefit from Defendants' voting programs in upcoming elections since there will be new voters and newly disabled voters in every election cycle. FOF ⁋⁋ 210-213. HAUL FOF Section VII(A)(6).

82.     The Section 6 and 7 Voter Assistance Restrictions—Sections 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04—as described in HAUL FOF Section II(G); OCA FOF Section IV; LUPE FOF Section II—deny Plaintiffs and their members, voters with disabilities, an equal opportunity to participate in and benefit from both mail and in-person voting by preventing them from receiving the assistance they need to vote, thereby making voting significantly more onerous and burdensome for voters with disabilities than it was prior to SB 1's enactment. *See* FOF Sections VI-VII.

83.     Plaintiffs and their members testified that the penalty of perjury in Section 6.04 and its adjoining provisions, Sections 6.03, 6.05, and 6.07, has intimidated assistors from assisting Plaintiffs and their members, voters with disabilities, due to fear of criminal prosecution. These provisions have also prevented voters with disabilities from receiving the assistance they need because they are not willing to put their assistors at risk. Voters with disabilities, already facing a direct support professional crisis given low pay and difficult work, now have to contend with personal care attendants being scared away from assisting them with voting due to these provisions. They face the choice of exercising their right to vote and possibly losing their needed attendant care or foregoing this fundamental right in order to receive the support they need to live safely and in their own homes. FOF ⁋⁋ 229-251.

AFDOCS:199405450.4

84.     These intimidating provisions have prevented Plaintiff organizations from finding volunteers to assist their members, voters with disabilities, in the ways they previously provided assistance with voting. FOF ¶¶ 229-236.

85.     Plaintiffs' members, voters with disabilities, testified that these provisions added an extra barrier to voting in a world that is already often inaccessible to them. As a result of these provisions, Ms. Litzinger, Ms. Halvorson, and Ms. Crowther testified that they did not receive the assistance they needed to vote. FOF ¶¶ 238-244. Ms. Miller, Ms. Cranston, and Ms. Rocha testified that, as assistors to voters with disabilities, the oath intimidated them and made them nervous to provide assistance for voters with disabilities as they had prior to SB 1. FOF ¶¶ 245-247. Ms. Longoria testified that she heard from Harris County voters that these provisions scared them away from receiving the assistance they needed to vote. FOF ¶¶ 250-251.

86.     Plaintiffs and their members, voters with disabilities, testified that the provisions of the oath regarding whether a voter is eligible for assistance, the requirement to represent eligibility to an assistor, and votes not counting based on eligibility, deny them an equal opportunity to participate in and benefit from Defendants' voting programs by adding an extra burden to voters with disabilities to represent their eligibility and disclose private medical information to their assistors. The vagueness of the definition of eligibility adds to the fear and confusion around these provisions for voters with disabilities and their assistors. FOF ¶¶ 252-265.

87.     The provisions of the oath stating: "I will not suggest, by word, sign, or gesture, how the voter should vote" and "I did not pressure or coerce the voter into choosing me to provide assistance" are vague and confusing, thereby intimidating assistors and preventing voters with disabilities from receiving the assistance they need to vote. FOF ¶¶ 266-277.

AFDOCS:199405450.4

88.     The State has conceded that the language of the oath is vague and confusing and left to voters with disabilities and their assistors to interpret without guidance Mr. Ingram referred to what constitutes assistance under the oath as "a very gray area" and Mr. White testified that, with regards to the language in the oath pertaining to not suggesting by word, sign, or gesture how the voter should vote: "I think that's fair to say that anyone who takes this oath is determining what that means to them." FOF ¶¶ 278-281.

89.     Plaintiffs and their members, voters with disabilities, also testified that the oath of assistance prevents voters with disabilities from receiving assistance from the assistor of their choice. This is important because the relationship between a person with a disability and their assistor is complex and trust and understanding are required to ensure proper assistance is provided. Without their assistor of choice, voters with disabilities testified that they lose privacy and are prevented from receiving the assistance they need to vote. Ms. Nunez Landry, Ms. Litzinger, Ms. Halvorson, and Ms. Crowther have all been prevented from using their assistor of choice and receiving the assistance they needed since SB 1 was enacted. FOF ¶¶ 282-291.

90.     The oath of assistance has made it harder for Plaintiffs' members, voters with disabilities, to vote. Because they could not receive the assistance they needed to vote under SB 1, Ms. Nunez Landry, Ms. Litzinger, and Ms. Halvorson experienced physical pain while voting and voting took much longer for them than it would have had they received the assistance they needed. When Ms. Halvorson left the polling place, a poll worker remarked: "I'm going to give you two stickers because you had to work twice as hard as everyone else to vote." FOF ¶¶ 292-311. Ms. Miller and Ms. Cranston testified that since SB 1 was enacted, they feel intimidated providing assistance to voters with disabilities. FOF ¶¶ 312-315.

AFDOCS:199405450.4

91.     In addition to all of the barriers Plaintiffs and their members, voters with disabilities and their assistors, testified to regarding SB 1's live restrictions on voter assistance, portions of Section 6.04 that have been mooted in this action due to being enjoined by another court are still being implemented in the instructions to assistants on the mail ballot carrier envelope, causing further disenfranchisement. FOF ¶¶ 316-319.

92.     SB 1 Section 6.06, in prohibiting voters who need assistance with their mail ballots from receiving that assistance from compensated individuals, denies Plaintiffs and their members, voters with disabilities, an equal opportunity to participate in and benefit from Defendants' voting programs by preventing them from receiving the assistance they need to vote. Voters with disabilities are four times more likely to vote by mail and, due to their disabilities, are among the limited categories of voters eligible to do so, and who may not have any other means of voting. FOF ¶¶ 126-130, 166. Voters with disabilities are more likely to be socially isolated and a worker or volunteer with a community organization or other non-family member may be the best and only option to assist them with voting by mail. Before SB 1, LUPE paid staff would provide mail ballot assistance to members with disabilities, but SB 1 has caused LUPE to stop providing this assistance due to fear of prosecution. Because of the need to ensure adequate training and appropriate service delivery, LUPE will not use uncompensated volunteers to provide mail ballot assistance. FOF ¶¶ 326-333.

93.     SB 1 Section 7.04, in prohibiting mail ballot assistance by people who are compensated to advocate for a specific candidate or measure, denies Plaintiffs and their members, voters with disabilities, an equal opportunity to participate in and benefit from Defendants' voting programs. Voters with disabilities are four times more likely to vote by mail and, due to their disabilities, are among the limited categories of voters eligible to do so, and who

124

may not have any other means of voting. FOF ¶¶ 126-130, 166. This provision has caused LUPE staff and paid volunteers to cease assisting voters with completing their mail ballots. When LUPE organizers canvass neighborhoods to urge support for ballot measures, mail ballot voters invite LUPE organizers into their homes and ask the organizer for assistance with completing the ballot. FOF ¶¶ 334-341.

94.     Individually and cumulatively, the Challenged Provisions of SB 1 have denied Plaintiffs and their members, voters with disabilities, an equal opportunity to participate in and benefit from Defendants' programs of voting by mail and voting in person by raising the cost of voting for voters with disabilities. FOF ¶¶ 342-348.

95.     Though some of Plaintiffs' members and constituents, Texas voters with disabilities, were ultimately able to cast their vote after incredible difficulty following the enactment of SB 1, this fact does not in any way undermine Plaintiffs' ADA claim regarding denial of equal opportunity or meaningful access to Defendants' voting programs. If a wheelchair user was required to climb up the steps of a building with great hardship to gain entry, no one would argue that this was equal or meaningful access under the ADA because that individual ultimately found a way to get in the building. *See, e.g.*, *Paulson, supra*, 525 F.3d at 1269 ("[Defendant's] argument is analogous to contending that merely because the mobility impaired may be able either to rely on the assistance of strangers or to crawl on all fours in navigating architectural obstacles, they are not denied meaningful access to public buildings. Such dependence is anathema to the stated purpose of the Rehabilitation Act.") (internal citations omitted); *Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d Cir. 1982) ("It is not enough to open the door for [those with disabilities]; a ramp must be built so the door can be reached.")

96.     The ADA demands more. Voters with disabilities in Texas should not be forced to rely on burdensome "workarounds" that require them to expend significant additional time, subject themselves to physical pain and mental stress, and work twice as hard as non-disabled voters in order to participate in the voting process and have their vote counted. However, this has become the reality for many voters with disabilities in Texas since SB 1 was enacted. Plaintiffs' evidence makes clear that this denial of equal opportunity will continue beyond the 2022 elections.

### C. Defendants have Used Criteria or Methods of Administration that Subject Voters with Disabilities to Discrimination

97.     Defendants have violated the ADA in using criteria or methods of administration that subject voters with disabilities to discrimination and substantially impair accomplishment of the voting programs' objectives with respect to voters with disabilities.

98.     This provision "applies to written policies as well as actual practices, and is intended to prohibit both 'blatantly exclusionary policies or practices' as well as 'policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate.'" *Cota v. Maxwell-Jolly*, 688 F.Supp.2d 980, 995 (N.D. Cal. 2010) (citing *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1996) ("Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability"). There is nothing in the regulation "to suggest that the discriminatory effects of a particular method of administration must be uniform in order for the method to be properly subject to challenge." *Dunn v. Dunn*, 318 F.R.D. 652, 664 n.11 (M.D. Ala. 2016), modified sub nom. *Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020) ("Consider, for example, the hypothetical prison administrator who decides whether to accept any particular accommodation request by flipping a

AFDOCS:199405450.4

coin. This method of administration will have widely varied effects, and will just as plainly be actionably unlawful. Less farcically, consider the administrator who denies any accommodation that would cost more than $20. This method of administration may result in the denial of hearing aids, sign-language interpreters, and shower grab-bars, in lots of different facilities to lots of different prisoners with lots of different disabilities. Clearly, though, they could properly raise one common joint methods-of-administration claim and offer evidence of all these denials as proof of discriminatory effects.") Courts have recognized methods of administration claims as "distinct causes of action." *Price v. Shibinette*, No. 21-CV-25-PB, 2021 WL 5397864, at *8 (D.N.H. Nov. 18, 2021) (citing *Kenneth R. ex rel. Tri-Cnty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 259–60 (D.N.H. 2013); *Day v. District of Columbia,* 894 F.Supp.2d 1, 22–23 (D.D.C. 2012)).

99.    The *Dunn* Court explained:

> The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, at least when plaintiffs can show that it has the effect of discriminating…Congress designed the Rehabilitation Act, the predecessor statute to the ADA, to address not only "invidious animus," but also, more commonly, "thoughtlessness and indifference—[ ] benign neglect." Courts have consistently explained that "Title II [of the ADA] imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled." Under the ADA, a public entity must be "proactive."

*Dunn v. Dunn, supra*, 318 F.R.D. at 665 n.12, modified sub nom. *Braggs, supra*, 2020 WL 2395987 (internal citations omitted); s*ee also Tellis v. LeBlanc*, No. CV 18-541, 2022 WL 67572, at *8 (W.D. La. Jan. 6, 2022); *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *49-50 (M.D. La. Mar. 31, 2021), *reconsideration denied,* No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021).

100.    Plaintiffs have provided ample evidence that Defendants have utilized criteria or methods of administration that have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the Defendants' voting programs with respect to individuals with disabilities.

101.    Defendants were put on notice that the Challenged Provisions in SB 1 would hurt voters with disabilities during the legislative process. Testimony alerted them to the problems SB 1 would present to disabled people. FOF ¶¶ 155-160. Yet, the state took a "know-nothing, do-nothing" approach and continued with these measures regardless.

102.    As discussed above, while each contested measure under SB 1 creates a barrier for voters with disabilities, the cumulative effect of all the contested measures must be part of the analysis. Voting by mail requires registration, applying for an absentee ballot, filling out the absentee ballot, and returning the absentee ballot – as well as getting assistance at each step if needed, and then navigating any problems that arise in the process. Voting in person requires registration, finding the polling place, transportation to the polling place, waiting in line, voting, and transportation back from the polling place – as well as getting assistance at each step if needed, and navigating any problems that arise in the process. Plaintiffs have enumerated separate burdens at different steps in detail above. FOF Sections V-VII. The burdens combine to create a method of administration that has the effect of "defeating or substantially impairing the accomplishment of the objectives" of the voting program in violation of the ADA. 28 C.F.R. section 35.130 (b)(3)(ii).

103.    Furthermore, in implementing and enforcing the Texas Election Code, the State has failed to obtain even basic knowledge about the ADA's application to voting laws, issue adequate guidance on the ADA's application to SB 1, and ensure that voters with disabilities are aware of their rights under the ADA and can receive reasonable modifications in a timely way. FOF ¶¶ 349-362.

104.    Testimony from the State suggests a "know-nothing, do-nothing policy of non-administration" such as that described in Dunn. State witnesses have conceded that they are ignorant of the State's obligations under the ADA and have provided no guidance to Defendant Counties or voters with disabilities on how the ADA applies to SB 1. Ms. Adkins conceded that the state has no expertise in the ADA, that it does not understand how the ADA applies to voting, and that any modification requests the state receives are redirected to the counties. FOF ¶ 349. Ms. Adkins further testified that Section 1.08 of SB 1 permits voters with disabilities to request a reasonable modification but admitted that she does not know what would constitute a reasonable modification for a specific election office. FOF ¶ 357.

105.    Mr. Ingram testified that he does not know what Section 504 of the Rehabilitation Act is, does not know "in detail" how the ADA applies to elections, that the Secretary of State's office has no written policies on the State's obligations under the ADA regarding the administration of elections, that the Secretary of State's office had no one responsible for monitoring the Division of Elections' compliance with the ADA for at least a year and a half, has not conducted any training of county officials on their obligations under the ADA apart from consulting with them on the physical accessibility of polling places, and is unaware of any efforts to educate voters about their right to reasonable modifications under the ADA or Section 1.08 of SB 1. FOF ¶ 350.

106.    In response to a question about his familiarity with the ADA as it applies to elections, Mr. Ingram stated that his office "depended on" outside disability advocacy organizations to conduct surveys and audits of polling place accessibility. FOF ¶ 351.

107.    County officials testified that they did not receive guidance or training from the Secretary of State's office regarding how the ADA applies to the Challenged Provisions

AFDOCS:199405450.4

impacting voters with disabilities. FOF ¶ 353. The State does not have a system in place to issue guidance in compliance with the ADA or train counties on their obligations to process requests for modifications, and some counties lack the capacity to process requests in a reasonable amount of time (resulting in voters turning to advocacy groups for aid rather than election officials). FOF ¶ 361. As is clear from their own websites, not one Defendant County includes required information regarding the rights of voters with disabilities under the ADA, including their right to reasonable modifications and how to file grievances. FOF ¶ 370.

108.    Voters with disabilities testified that they received no information from Defendants regarding their rights under the ADA, that they trusted disability advocacy groups more than Defendants to provide them with the assistance and information they needed to vote, and that when they did request help, Defendants did not respond to them in a timely way that would allow them to get the assistance they needed to vote in time for the election. FOF ¶¶ 361, 369-378.

109.    This Court has previously held that "the duty at issue is the Secretary's mandate to administer elections according to the Election Code…the Secretary is personally and potentially liable under Title II because he must administer elections in compliance with Election Code provisions that—the [] Plaintiffs allege—discriminate against disabled voters." ECF No. 447 at 54. Plaintiffs have demonstrated that State Defendants, "in administering elections according to the specific procedures and processes the Election Code contemplates" fail to meet the majority of their obligations under the ADA, and thereby utilize criteria and methods of administration that subject Plaintiffs and their members, voters with disabilities, to discrimination and substantially impair accomplishment of the voting programs' objectives with respect to voters with disabilities. ECF No. 447 at 53–54.

110.     In failing to provide notice to voters with disabilities of their rights under the ADA and failing to respond in a timely way or at all to reasonable modification requests from voters with disabilities, Defendant Counties have utilized criteria and methods of administration that subject Plaintiffs and their members, voters with disabilities, to discrimination and substantially impair accomplishment of the voting programs' objectives with respect to voters with disabilities.

### D.  Defendants Have Discriminated Against Plaintiffs By Reason of Their Disabilities

111.     To satisfy the last element of their prima facie case, Plaintiffs "must establish a causal link between their disabilities and their exclusion from voting." People First of Ala., 491 F.Supp.3d at 1161 (finding causal link between the state's blanket ban on curbside voting and the exclusionary impact this prohibition had on disabled voters vulnerable to COVID-19 exposure given "undisputed evidence" establishing that people with disabilities should minimize their contact with others outside the home and avoid people not wearing masks: "the court finds a causal connection between the plaintiffs' impairments that make them vulnerable to COVID-19 and the inaccessibility of their polling sites during the COVID-19 pandemic.").

112.     Establishing such a link does not require comparison to similarly situated individuals without disabilities. *See Olmstead, supra*, 527 U.S.at 598 ("The State argues that L.C. and E.W. encountered no discrimination 'by reason of' their disabilities because they were not denied community placement on account of those disabilities. Nor were they subjected to 'discrimination,' the State contends, because ''discrimination' necessarily requires uneven treatment of similarly situated individuals,'' and L.C. and E.W. had identified no comparison class, i.e., no similarly situated individuals given preferential treatment. We are satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the

AFDOCS:199405450.4

ADA."); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 291 (2d Cir. 2003) ("a plaintiff with disabilities suing under the ADA or Rehabilitation Act may show that he or she has been excluded from or denied the benefits of a public entity's services or programs 'by reason of such disability' even if there are other contributory causes for the exclusion or denial, as long as the plaintiff can show that the disability was a substantial cause of the exclusion or denial").

113.    Here, Plaintiffs have presented extensive, undisputed evidence that it is because of their disabilities that Plaintiffs' members, voters with disabilities, are significantly more likely to vote by mail and to require assistance voting than voters without disabilities. FOF ¶¶ 124-154. Plaintiffs have also provided extensive evidence regarding the denial of equal opportunity to participate in or benefit from Defendants' voting programs that the Challenged Provisions have caused for voters with disabilities by reason of their disabilities. FOF Sections V-VII. As such, Plaintiffs have established a causal link between their disabilities and their exclusion from Defendants' voting programs.

> **E.  Defendants Have Failed to Provide Reasonable Modifications to SB 1's Mail Voting and Voter Assistance Restrictions to Plaintiffs and Their Members, Voters with Disabilities**
>
> **(1)  *Defendants Have Affirmative Obligations to Provide Reasonable Modifications to Plaintiffs***

114.    The ADA imposes requirements that public entities must take *affirmative* steps to proactively comply with federal disability antidiscrimination mandates regardless of whether individual requests are made. According to the Fifth Circuit:

> The ADA expressly provides that a disabled person is discriminated against when an entity fails to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services...Congress intended to impose an *affirmative* duty on public entities to create policies or procedures to prevent discrimination based on disability.

*Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 575 (5th Cir. 2002) (citation and quotation marks omitted); *see also Bennett-Nelson, supra*, 431 F.3d at 454 (emphasis added); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197–98 (10th Cir. 2007).

115.    Where the individual's disability is "open and obvious," public entities must offer reasonable modifications even in the absence of individualized requests. *Robertson, supra*, 500 F.3d at 1197 (citing *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)); s*ee also Hall v. Higgins,* 77 F.4th 1171, 1182 (8th Cir. 2023); *Updike v. Multnomah County*, 870 F.3d 939, 954 n.6 (9th Cir. 2017) ("Our case law is clear on this point: there may be situations where a public entity's duty to look into and provide a reasonable accommodation may be triggered when 'the need for accommodation' is obvious,' and the public entity is on notice about a need for accommodation."). "When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim." *Robertson*, 500 F.3d at 1197 (citing *Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001)).

116.    In *Pierce v. District of Columbia*, now-Justice Jackson explained, in detail, the affirmative obligations of public entities to provide modifications with or without requests:

> …the District's insistence here that prison officials have no legal obligation to provide accommodations for disabled inmates *unless the inmate specifically requests such aid*…is untenable and cannot be countenanced…*nothing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned.* Quite to the contrary…Section 504 and Title II *mandate that entities act affirmatively* to evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access to those services…the District's suggestion that a prison facility need not act to accommodate an obviously disabled inmate if the inmate does not ask for accommodations is truly baffling as a matter of law and logic…The implications of the District's analysis are troubling, and they sweep broadly—by the District's

AFDOCS:199405450.4

reasoning, it would appear that only a specific request for a wheelchair would trigger any duty to accommodate an inmate who cannot walk, and a blind inmate would need to make a specific request for a cane or a guide if he desired to move about the prison grounds; meanwhile, prison officials could sit idly by, taking no affirmative steps to accommodate such disabled prisoners and expecting to be able to wield the inmate's failure to request accommodation like some sort of talisman that wards off Section 504 and Title II liability in any future legal action. *This imagined state of affairs is unquestionably inconsistent with the text and purpose of the Rehabilitation Act and the ADA, which means that the District must now face a stark reality: no matter how fervently it holds the belief that a public entity's duty to provide accommodations arises only by request, there is neither legal nor logical support for that proposition.*

*Pierce, supra*, 128 F.Supp.3d at 269–70 (emphasis added).

117.    Where a disabled person must request a modification, this is "merely to put the entity on notice that the person is disabled; it does not serve as a means of shifting the burden of initiating the accommodations process to the disabled individual." The request "performs a signaling function" and where the person's disability is "obvious and indisputably known to the provider of services, no request is necessary." *Pierce, supra*, 128 F.Supp.3d at 270 (D.D.C. 2015).

118.    "For this type of claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Cadena, supra*, 946 F.3d at 724.

119.    Here, the burdens SB 1 places on voters with disabilities are "open and obvious" and Defendants are aware of the discriminatory impact of the Challenged Provisions on voters with disabilities. In addition to the modification requests and complaints regarding the Challenged Provisions that Defendants received as described above, Plaintiffs and their members—voters with disabilities—also provided extensive testimony before the Texas legislature to the harms the Challenged Provisions would impose on voters with disabilities before SB 1 was enacted. FOF ¶¶ 155-160.

120.    Further, the correlation between age and disability is "open and obvious" in that it is well-established and undisputed. Defendants are certainly aware that a disproportionate number of mail voters—already a limited eligibility voting option—are voters with disabilities, including those who mark "age" as their reason for requesting a mail ballot and that voters with disabilities are four times more likely to vote by mail than voters without disabilities. FOF ¶¶ 126-133.

121.    The correlation between voter assistance and disability is also clear: voters with disabilities are twice as likely to need assistance voting in person and ten times more likely to need assistance voting by mail than those without disabilities. FOF ¶¶ 147-148.

122.    In the face of this "open and obvious" systemic injury to millions of voters with disabilities across the state, voters with disabilities—already facing a myriad of disproportionate barriers to vote—are not required to request individual modifications during each election to a law that systematically burdens and disenfranchises them. Even if such requests would not be futile, requesting modifications to remedy systemic harm on an individual basis for each and every election is an incredibly daunting prospect for a voting population that is already severely overburdened. In light of the testimony that Counties often fail to respond to modification requests in a timely way, or at all, there is also no guarantee that Plaintiffs would receive requested modifications in time to ensure their vote counted. FOF ¶¶ 363-368. The ADA demands more. Defendants are required to affirmatively propose modifications that address the denial of equal opportunity that voters with disabilities are known to be experiencing in Defendants' voting programs.[6]

---

[6] Case law relying on precedent interpreting Title I of the ADA (applying to employment actions) is inapplicable here. Unlike Title I, Title II provides no basis for requiring an

AFDOCS:199405450.4

### *(2) Defendants Received and Denied Reasonable Modification Requests from Voters with Disabilities*

123.    Defendant Counties testified that they received extensive modification requests (which they described alternatively as "complaints" and "requests for assistance" in addition to the terms "reasonable modification" and "reasonable accommodation") related to the Challenged Provisions but were unable to provide them due to their understanding, based on state guidance, that the Texas Election Code would not permit such modifications.[7] Defendant Counties testified that they were aware of voters with disabilities who faced barriers due to the assistor oath provisions and who were unable to vote because of Counties' failure to provide reasonable modifications to the mail ballot ID requirements. Defendant Counties could and should have interpreted these communications and requests from voters with disabilities as requests for modification of whatever election rules or practices were making it difficult for them to vote.

---

individualized request before considering a reasonable modification claim. Indeed, individual requests would offer no practical remedy for some of the harms caused by the Challenged Provisions cognizable under Title II. The language of the reasonable modification provision in Title II differs from the requirement to provide reasonable accommodations under Title I in a critical way. Title I requires accommodation of "known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. 12112(b)(5). Title II, on the other hand, requires that public entities must make reasonable modifications "when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. 35.130(b)(7). This language, unlike that in Title I, is not focused on the individual nature of a request and does not require any knowledge by the public entity of a specific individual's disability. It simply requires that entities take steps needed to avoid discrimination. Regardless, even under Title I standards, Plaintiffs are not required to make a reasonable modification request where such a request would be futile. *Davoll v. Webb*, 194 F.3d 1116, 1132 (10th Cir. 1999); *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996).

[7] When questioned by Defendants' counsel, some County witnesses testified that they had not received requests for reasonable modifications related to the Challenged Provisions of SB 1. *See e.g.,* 9/12 Tr. 309:2-19 (Wise); 9/12 Tr. 492:9-493:6 (Scarpello); 9/13 Tr. 541:3-9 (Phillips). This testimony is not persuasive, however, in light of the extensive requests for help they acknowledge receiving which they should have treated as, and testified thereto, as reasonable modification requests, in addition to testimony from Plaintiffs' members that they did seek modifications and assistance. FOF ¶¶ 363-367.

*See, e.g.*, *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 876 (11th Cir. 2011) ("…a plaintiff 'need not use magic words…'[w]hat matters under the ADA are not formalisms about the manner of the request…" – collecting cases and applying standard to Fair Housing Act cases); *Schmidt v. Safeway Inc.*, 864 F.Supp. 991, 997 (D. Or. 1994) ("statute does not require the plaintiff to speak any magic words. . . The [plaintiff] need not mention the ADA or even the term 'accommodation.'"). Defendant Counties further testified that they lacked ADA coordinators to respond to reasonable modification requests, did not have written ADA policies related to voting, had done nothing to update their ADA policies following the enactment of SB 1, and did not offer training to staff on responding to reasonable modifications. FOF ¶¶ 363-368.

124.    Defendant Counties testified that even when they requested guidance from the Secretary of State's office regarding how the ADA applies to the Challenged Provisions impacting voters with disabilities, they received none. When counties asked the State about what modifications would be possible for voters with disabilities, the State simply told them to "read the law" (which was understood to mean that no modification was possible). FOF ¶¶ 354-358. As a result of the State's lack of guidance, Defendant Counties believed that they could not waive or modify the oath or ID requirements of SB 1 if asked by voters with disabilities. FOF ¶ 359. Despite the State's attorneys questioning disabled witnesses throughout trial about why they didn't simply request assistance from the State regarding the Challenged Provisions, State witnesses undermined this line of questioning in testifying that the state redirects all modification requests to counties, does not itself provide reasonable modifications to voters, does not understand that the ADA covers elections, and has no in-house expertise regarding the ADA. FOF ¶¶ 349-362.

AFDOCS:199405450.4

125.    In addition, Plaintiffs provided evidence that disabled voters were deterred from requesting reasonable modifications to SB 1 requirements because neither Counties nor the State met their legal obligations to provide notice to Plaintiffs of their rights under federal disability rights laws, to explain to Plaintiffs how to make reasonable modification requests, and to train staff on their obligations under these laws. They did, however, seek out information and assistance from varied sources and in great numbers. Requests to waive or modify SB 1 rules were denied by counties, who lacked authority and expertise on ADA and Section 504 obligations to voters with disabilities. FOF Section IX.

### (3) Plaintiffs Need Not Make Reasonable Modification Requests Where Such Requests Would Be Futile

126.    Though the record demonstrates that Plaintiffs and many voters with disabilities did make reasonable modification requests, many others were clearly deterred from making such requests because of Defendants' lack of training, and lack of responsiveness.

127.    The ADA does not require individuals with disabilities to make futile gestures to state a claim. 42 U.S.C. § 12188(a)(1) ("Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions."). *See Smith v. France*, 850 F. App'x 243, 247 (5th Cir. 2021) ("'a disabled individual' seeking an injunction under the ADA, "need not engage in futile gestures before seeking an injunction; the individual must show only that [the alleged violation] actually affects his activities in some way."); *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 760 (6th Cir. 2019) (The ADA "does not require persons with disabilities to 'subject [themselves] to repeated instances of discrimination in order to invoke [its] remedial framework.'") (citing *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 305 (1st Cir. 2003) (holding that "[Defendant's argument] that a disabled

person must subject himself to repeated instances of discrimination in order to invoke the

remedial framework…of the ADA—turns the language of section 12188(a)(1) on its head. The

futile gesture provision is designed to protect a disabled plaintiff from having to shoulder an

undue evidentiary burden."); *Pickern v. Holiday Quality Foods Inc*., 293 F.3d 1133, 1136–37

(9th Cir. 2002) ("under the ADA, once a plaintiff has actually become aware of discriminatory

conditions existing at a public accommodation, and is thereby deterred from visiting or

patronizing that accommodation, the plaintiff has suffered an injury."))

128.     The Fifth Circuit has applied this concept to Title II cases. *See Frame, supra*, 657

F.3d at 235–36 (in an ADA Title II case, holding that "a disabled individual need not engage in

futile gestures before seeking an injunction..."); s*ee also Doe v. Rowe*, 156 F.Supp.2d 35, 58 (D.

Me. 2001) (in an ADA Title II voting case, holding: "…a person under guardianship for mental

illness who votes knowing that they are, in fact, prohibited from doing so subjects themselves to

criminal prosecution. Plaintiffs need not subject themselves to criminal liability in order to

present a ripe ADA claim.")

129.     Under this principle, it follows that Plaintiffs are not required to make a

reasonable modification request where such a request would be futile. *See Schwarz v. Villages

Charter Sch., Inc.*, No. 5:12-CV-177-OC-34PRL, 2014 WL 12623013, at *5 (M.D. Fla. May 23,

2014) (applying futile gesture doctrine to Title II case where Plaintiffs did not request

modifications for auxiliary aids and services because they were told by other deaf residents that

the Defendant would deny any request); *Oxford House, Inc. v. City of Baton Rouge, La.*, 932

F.Supp.2d 683, 690–91 (M.D. La. 2013) (in Title II and Fair Housing Act Case, holding: "if

making a request would be clearly futile or 'foredoomed,' then the plaintiff is not required to

make such a request.")

130.    Plaintiffs' evidence has made clear that requesting modifications to the Challenged Provisions would be futile. First, Defendant Counties have each testified that where a voter with a disability requests a modification to a requirement of SB 1, the County will not provide it per their understanding of the Texas Election Code and state guidance on this matter. FOF ¶¶ 352-355, 358. Further, voters who vote by mail may not even know they require a modification or be able to request one until their ballot has been rejected and it is too late. For others, there is no way to request a modification to curing a ballot application or ballot in person or the oath requirement if the voter with a disability cannot even enter an inaccessible polling place. FOF ¶¶ 171-173, 180-186, 195-196. In light of the testimony that Counties often fail to respond to modification requests in a timely way or at all, there is also no guarantee that Plaintiffs would receive requested modifications in time to ensure their vote counted. FOF ¶¶ 197-209.

131.    Though Plaintiffs have clearly demonstrated that Defendants received and denied reasonable modification requests related to the Challenged Provisions, Plaintiffs' reasonable modification claims prevail even without such a showing because (1) Defendants have affirmative obligations to provide reasonable modifications to Plaintiffs and (2) Plaintiffs need not make reasonable modification requests where such requests would be futile.

### (4) Section 1.08 of SB1 Does Not Remedy Plaintiffs' Reasonable Modifications Claims

132.    State Defendants make much of the fact that Section 1.08 of SB 1 states that the Texas Election Code cannot "limit the right of a qualified individual with a disability from *requesting* a reasonable accommodation or modification." Tex. Election Code § 1.022 (emphasis added). However, this section is merely a partial re-statement of federal law. It does nothing to remedy Plaintiffs' claims which require public entities not only to allow reasonable modification

AFDOCS:199405450.4

requests, but also to affirmatively "*make* reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7) (emphasis added).

133.     Section 1.08 only permits people with disabilities to request such modifications. A right they already held. It says nothing about whether any such requests will be granted. Giving voters with disabilities permission to request modifications to a state law that discriminates against them does not add to or create any additional rights, nor does it remedy a state law that undermines those same rights for disabled voters. FOF ¶¶ 357-358. ("THE COURT: Do you mean requesting or—the way I see that law is 'anyone can request' doesn't mean that the request has to be granted.")

134.     As described above, Defendants have testified that they have denied or ignored modification requests from voters with disabilities and that they would refuse to provide any modifications, if requested by a voter with a disability, to the Challenged Provisions, demonstrating that Section 1.08 does nothing to address or remedy Plaintiffs' ADA claims. FOF ¶¶ 359, 363-368. Moreover, numerous witnesses testified that they did not know that modifications to SB 1's provisions were even available, and therefore did not know they could make such requests or how to do so. FOF ¶¶ 369-374. County websites lack information on how to request reasonable modifications generally or any information regarding modifications to SB 1 specifically. FOF ¶ 370. Any rights conferred by Section 1.08 are meaningless if people are not provided with information that they exist or how to access them, and Defendants have neither the training nor the inclination to grant those rights.

AFDOCS:199405450.4

### F. Defendants Have Interfered with Plaintiffs' and Their Members, Voters with Disabilities, Access to Defendants' Voting Programs

135.    Plaintiffs have provided extensive evidence that Defendants' implementation of the Challenged Provisions of SB 1 pertaining to voter assistance have made voters with disabilities and their assistors feel threatened and intimidated, thereby interfering with the rights of voters with disabilities to access Defendants' voting programs under the ADA.

136.    Multiple voters with disabilities and assistors to voters with disabilities testified that the oath provisions of SB 1 made them feel intimidated, threatened, scared, and nervous to vote with assistance and, therefore, these voters were forced to forego assistance when voting, making their voting experience significantly more burdensome than it was prior to SB 1 and denying them meaningful access to Defendants' voting programs. FOF ¶¶ 229-230, 235-237, 239, 243-246, 250, 258, 270, 273, 292, 294, 311-313, 345-346. As a result of SB 1's voter assistance restrictions, the general tenor of The Arc of Texas' voting work has "shifted from education and outreach to increase disability voting to quelling the fears of disabled voters that they won't get prosecuted for voting and assuring them that they still have a right to vote." FOF ¶ 17. County witnesses also testified that they saw the voter assistance restrictions scaring away voters or believed that they could scare away voters. FOF ¶¶ 248-251. Dr. Kruse stated that because of the Challenged Provisions, "voters may be reluctant to make use of assistance...for fear of violating the law." FOF ¶ 216.

137.    "A violation of the ADA's anti-interference provisions, 42 U.S.C. § 12203(b), occurs where (1) a person threatens, intimidates, or coerces a person with a disability; (2) the threat, intimidation, or coercion has a nexus to the exercise or enjoyment of an ADA right; and (3) the disabled person suffers distinct and palpable injury as a result, by virtue of giving up his ADA rights or some other injury which resulted from his refusal to give up his rights, or from the

threat or intimidation or coercion itself." *Armstrong v. Newsom*, 484 F.Supp.3d 808, 828–29, 845 (N.D. Cal. 2020), aff'd, 58 F.4th 1283 (9th Cir. 2023) (finding that prison staff members interfered with a class of prisoners' rights under the ADA by intimidating threatening, or coercing them into abstaining from making requests for reasonable accommodations or filing ADA grievances); s*ee also Snider v. Pennsylvania DOC,* 505 F.Supp.3d 360, 399 (M.D. Pa. 2020); *Wray v. Nat'l R.R. Passenger Corp*., 10 F.Supp.2d 1036, 1040 (E.D. Wis. 1998). There is scant case law interpreting this provision. *Id*; s*ee also A. ex rel. A. v. Hartford Bd. of Educ.,* 976 F.Supp.2d 164, 192 (D. Conn. 2013) (finding that, in the absence of relevant precedent, "the statutory text alone is sufficient to guide its interpretation of the interference provision's applicability"); *Wray,* 10 F.Supp.2d at 1040. The language in 42 U.S.C. § 12203(b) "cuts a significantly more broad and sweeping scope than one which would merely encompass those rights which are granted by the ADA—rather, it pertains to all those rights which are protected by the ADA." *Hartford Bd. of Educ.*, 976 F.Supp.2d at 194.

138.    Plaintiffs have met the elements of an interference claim outlined above: 1) Defendants' implementation of the Challenged Provisions has intimidated Plaintiffs and their members, voters with disabilities and their assistors; 2) this intimidation has a direct nexus to an ADA right—Plaintiffs' ability to meaningfully access Defendants' voting programs; and 3) Plaintiffs and their members, voters with disabilities, have suffered distinct and palpable injury through Defendants' denial of meaningful access to their voting programs, as described in detail above.

## G.  The Relief Plaintiffs Seek is Reasonable

139.    Plaintiffs have established a prima facie case of discrimination in providing extensive evidence that Defendants have denied Plaintiffs an equal opportunity to participate in and benefit from their voting programs and used criteria and methods of administration that have

AFDOCS:199405450.4

the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the Defendants' voting programs with respect to individuals with disabilities. *See supra* Section IV(G).

140.    Plaintiffs have further demonstrated that Defendants have failed to make reasonable modifications to their policies, practices, and procedures needed to avoid discrimination in Defendants' voting programs. FOF Sections VIII-IX. Specifically: 1) Defendants received and denied reasonable modification requests from voters with disabilities; 2) Plaintiffs' reasonable modification claims prevail even without demonstrating that reasonable modification requests were made to Defendants; and 3) Section 1.08 of SB 1 does not remedy Plaintiffs' reasonable modification claims.

141.    As such, the relief Plaintiffs seek—an order enjoining specific portions of SB 1 that would simply return the law to the status quo ante—is eminently reasonable. Texas has administered successful elections with participation by Texans with disabilities without the Challenged Provisions in place. HAUL FOF Section XIV; OCA FOF Section III-IV Therefore, absent any evidence to the contrary, requiring Defendants to return to administering elections in these ways would create no fundamental alteration in the voting program. *Schaw v. Habitat for Humanity of Citrus Cnt., Inc.*, 938 F.3d 1259, 1266–67 (11th Cir. 2019) (an alteration to a program is fundamental if it would eliminate an "essential" aspect of the program and undermine "the basic purpose of the rule or policy at issue").

142.    The relief Plaintiffs seek—enjoining the Challenged Provisions—is reasonable because, as described below, both mail voting and voter assistance are limited eligibility voting options that are primarily used by voters with disabilities. Enjoining these provisions would simply return Texas elections to the previous status quo.

AFDOCS:199405450.4

143.    In addition (and in the alternative), Plaintiffs ask Defendants to meet their obligations under the ADA by using methods of administering their voting programs to provide equal opportunities for voters with disabilities to access and benefit from mail and in-person voting.

144.    Other forms of relief may be appropriate in addition to or in the alternative so long as the relief ordered is effective at addressing the discrimination caused by SB 1. For example, the Challenged Provisions could be waived or modified, in whole or in part, for all voters who indicate that they are voters with disabilities, or whom Defendants otherwise know or have reason to know have disabilities.

145.    No alternative remedies have been proposed by Defendants. In failing to offer any substantive evidence regarding how Plaintiffs' proposed modifications would fundamentally alter the nature of the service, program, or activity or offer an alternative reasonable modification to the one Plaintiffs have proposed, Defendants have entirely failed to meet their burden in raising a fundamental alteration defense, or any other defense, to the ADA violations.

### H. Defendants' Affirmative Defenses Fail

146.    To deny a modification necessary to avoid discrimination on the basis of disability, the burden is on Defendants to "demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i); *Johnson v. Callanen*, No. SA-22-CV-00409-XR, 2023 WL 4374998, at *6 (W.D. Tex. July 6, 2023) (citing to *Johnson v. Gambrinus Co., supra*, 116 F.3d at 1059); *see also Reickenbacker, supra*, 274 F.3d at 983 ("The burden of proof on this affirmative defense, of course, lies with the State ..."); *Lamone, supra*, 813 F.3d at 508.

147.    Defendants have made no substantive arguments that Plaintiffs' requested relief is a fundamental alteration. Rather they have simply made conclusory statements that modifications

AFDOCS:199405450.4

to any state law are inherently unreasonable and that Plaintiffs' requested modification is overly broad. This is incorrect. In failing to offer any substantive evidence regarding how Plaintiffs' proposed modifications would fundamentally alter the nature of the service, program, or activity, or offer any alternative reasonable modifications to the one Plaintiffs have proposed, Defendants have entirely failed to meet their burden in raising a fundamental alteration defense. *E.T. v. Morath*, 571 F.Supp.3d 639 (W.D. Tex. 2021), vacated and remanded sub nom. *E.T. v. Paxton*, 41 F.4th 709 (5th Cir. 2022) (Failure to present evidence that proposed modification of policies would fundamentally alter their program defeats defendants' affirmative defense); *Smith v. Bd. of Comm'rs of La. Stadium & Exposition Dist.*, 385 F.Supp.3d 491 (E.D. La. 2019), aff'd in part, vacated in part sub nom. *Smith, supra*, at 243 (same).

148.    Defendants' fundamental alteration defense fails for multiple reasons. First, they have offered no testimony that the practicalities of enjoining any of the Challenged Provisions would cause significant administrative or financial burden or otherwise constitute a fundamental alteration. *See People First of Ala.*, 491 F.Supp.3d at 1076 (quoting *Lane, supra*, 541 U.S. at 532; *see also Bennett-Nelson, supra*, 431 F.3d at 455 n.12. To the contrary, testimony at trial points to the significant burdens Defendant Counties have experienced only since the enactment of SB 1 as a result of the Challenged Provisions. FOF ¶ 364; *see also* HAUL FOF Section VII(A); OCA FOF Sections III-IV; LUPE FOF Section V.A.c. To the extent that Defendants argue that the Challenged Provisions are necessary to prevent voter fraud and that modifying them constitutes a fundamental alteration for this purpose, Defendants have not presented any evidence of fraud that would justify discrimination. FOF ¶¶ 217-224; *see also* HAUL FOF Section XV; OCA FOF Sections III-IV; LUPE FOF Section V.C.a. Furthermore, as explained below, such arguments are not appropriate.

AFDOCS:199405450.4

149.     The State's argument that a modification to a state law is inherently a fundamental alteration is incorrect. Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). When a conflict arises between a state or local law and the ADA's requirement that public entities make reasonable modifications to ensure equal opportunity, state and local laws must yield to the "comprehensive national mandate" of the ADA. *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 163 (2d Cir. 2013). Indeed, "[t]he 'natural effect' of Title II's 'reasonable modification' requirement . . . requires preemption of inconsistent state law when necessary to effectuate a required 'reasonable modification.'" *Id.* (emphases added). "Requiring public entities to make changes to rules, policies, practices, or services is exactly what the ADA does." *Lamone, supra*, 813 F.3d at 508–09 (citing *Jones v. City of Monroe*, MI, 341 F.3d 474, 487 (6th Cir. 2003)).

150.     An injunction of a state law can be considered a reasonable modification to rules, policies, or practices, which does not constitute a fundamental alteration of a program. *See, e.g.*, *Crowder, supra*, 81 F.3d at 1485–86 (reasonable modification requirement of the ADA can require modifying conflicting state administrative regulation); *Hindel v. Husted*, 875 F.3d. 344, 349 (6th Cir. 2017) (finding that state law requiring all voting machines to be certified did not make requested modification involving uncertified machines facially unreasonable, because "a state procedural requirement may not excuse a substantive ADA violation," and "[r]equiring public entities to make changes to rules, policies, practices, or services is exactly what the ADA does") (internal quotation marks omitted); *Lamone, supra*, 813 F.3d at 508 (rejecting the argument "that the mere fact of a state statutory requirement insulates public entities from making otherwise reasonable modifications to prevent disability discrimination"); *Hargrave v.*

AFDOCS:199405450.4

*Vt.*, 340 F.3d 27, 39 (2d Cir. 2003) (rejecting argument that enjoining state law fundamentally alters program at issue and holding the district court's injunction prohibiting enforcement of certain provisions of a civil commitment law that discriminated on the basis of disability did not constitute a fundamental alteration); *Mary Jo C., supra*, 707 F.3d at 162 (finding "nothing in the statutory phrase 'reasonable modification' to suggest that Congress intended to exclude modifications that require violation or waiver of mandatory state statutes in some circumstances"); *Barber ex rel. Barber v. Colo. Dep't Of Revenue*, 562 F.3d 1222, 1233 (10th Cir. 2009) (rejecting argument that modifying a state driving statute would be a "per se not reasonable" modification under the Rehabilitation Act, and holding that "[r]eliance on state statutes to excuse non-compliance with federal laws is simply unacceptable under the Supremacy Clause"); *Johnson v. Callanen*, 610 F.Supp.3d 907, 916 (W.D. Tex. 2022) ("even if Defendants are correct that a modification in this case would violate the Election Code, the fact remains that Title II of the ADA requires Defendants to provide a means by which Plaintiffs and their members can vote by mail privately and independently like all other eligible Texans. Thus, to the extent that the Election Code conflicts with Title II, the Election Code is preempted by Title II… Defendants are undoubtedly responsible for ensuring that Plaintiffs and their members have equal access to the benefit of voting by mail in secret and free from intimidation.") (internal citations omitted).[8]

---

[8] Defendants cite *League of Women Voters of Fla., Inc. v. Lee*, 595 F.Supp.3d 1042 (N.D. Fla. 2022) for the proposition that enjoining the Challenged Provisions of SB 1 would be a fundamental alteration. But *League* is distinguishable from the instant case. In *League*, Plaintiffs sought to enjoin a Florida law imposing new restrictions on the state's mail voting system, which was available to all of the state's voters, on the grounds that it discriminated against disabled voters. *Id.* at 1157–58. In denying the injunction, the court in *League* weighed whether Plaintiffs' requested relief would eliminate an "essential aspect" of Defendants' policy. *Id.* at 1158. The court found that Plaintiffs' relief would not have been a fundamental alteration were the policy to

AFDOCS:199405450.4

151.    Plaintiff's proposed relief is reasonable. Testimony throughout trial has made it clear that restrictions on mail voting and voter assistance primarily impact voters with disabilities and any injunction of these provisions would be narrowly tailored given that those who are eligible for voter assistance and mail voting are primarily voters with disabilities. Both voting by mail and voter assistance are available only to limited categories of voters in Texas. Voters with disabilities make up a significant portion of those eligible for each, with voters with disabilities four times more likely to vote by mail than non-disabled voters, ten times more likely to need assistance voting by mail than non-disabled voters, and twice as likely to need assistance voting in person than non-disabled voters. FOF ¶¶ 124-154; *see also* generally FOF Section III.

152.    Defendants' alleged fraud concerns do not justify their argument that an injunction would constitute a fundamental alteration. In Democracy North Carolina v. North Carolina State Board of Elections, a plaintiff who resided in a nursing facility challenged state laws that prevented him from getting the assistance he needed to vote absentee during the COVID-19 pandemic. Democracy N. Carolina v. N. Carolina State Bd. of Elections, 476 F.Supp.3d 158, 229–30 (M.D.N.C. 2020). In granting the plaintiff preliminary relief on plaintiff's ADA and Section 504 claims, the court found that the chilling effect of criminal penalties for "undue influence on vulnerable people" and "for those who unlawfully influence or interfere with elections in a variety of ways" were sufficient to overcome defendants' unsupported concerns about fraud or manipulation. *Id.* at 233. Here, as in Democracy North Carolina, defendants have presented no evidence of fraud that would justify burdening or

---

apply only to the circumscribed subcategory of "older, disabled, and compromised voters." *Id.* In Texas, mail voting and voter assistance are just so circumscribed. It is also well-established that voters with disabilities require voter assistance at ten times the rate of non-disabled voters to vote by mail and twice the rate of non-disabled voters to vote in person and that eligibility for voter assistance is limited primarily to voters with disabilities. *See generally* FOF Section III(C)-(E).

AFDOCS:199405450.4

disenfranchising disabled voters, nor evidence that existing criminal penalties for actual fraud are inadequate. *See* HAUL FOF Section XV; OCA FOF ¶ 104-106, 110; LUPE Section V.C.a.

153.    Further, enjoining the Challenged Provisions of SB 1 is reasonable because it is exactly how the state and its voters successfully operated previously. FOF ¶¶ 217-224. *See* HAUL FOF XIV(B)-(C) ("Consistent with prior elections, there is no evidence of systematic election fraud relating generally to the 2020 elections in Texas, or to the specific methods of voting restricted by SB1."); HAUL FOF ¶ 845: ("Mail voting was used at unprecedented levels in Texas during the November 2020 election…Nevertheless…there is no evidence of election fraud related to mail voting during the November 2020 general election."); HAUL FOF ¶ 850 ("State and local officials testified that mail-in voting was a secure method of voting in Texas."); OCA FOF ¶¶ 104-106, 110; LUPE FOF Section V.C.a.1, (addressing lack of fraud in voting, including mail voting and voting assistance); LUPE FOF Section V.C.a.3 (describing methods of preventing voter fraud that preexisted SB1). *See, e.g.*, *Lamone, supra*, 813 F.3d at 508 ("…the fact that a version of the tool was voluntarily implemented by defendants in the 2012 elections— 'without any apparent incident,' speaks to the reasonableness of using the tool. Additionally, because the tool has already been developed, there does not appear to be any substantial cost or implementation burden that would need to be borne by Maryland to make the tool available for use.")

### I.    The Arguments Raised in Defendants' Motion for Judgment on Partial Findings Should be Rejected

154.    At trial, Defendants made several erroneous arguments that they are entitled to Judgment on Partial Findings on Plaintiffs' ADA and Section 504 claims.

155. First, Defendants argue that because Plaintiffs' witnesses were able to cast their ballots, the Challenged Provisions do not violate the ADA. 10/18 Tr. 4487:18-20. Plaintiffs have refuted this argument in Section IV(B) supra.

156. Defendants also argue that Plaintiffs' claims fail because no witness made a request for accommodation nor was denied an accommodation and county officials testified that no requests for or denials of accommodations were made. 10/18 Tr. 4487:13-24. Defendants' arguments mischaracterize witness testimony and Plaintiffs have refuted this argument in Section IV(E) supra.

157. Defendants further argue that Section 1.08 of SB 1 "provides that no provision in the entire election code can be interpreted to prohibit or limit any accommodation or modification that an individual is entitled to request under state or federal law." 10/18 Tr. 79:25–80:4. Plaintiffs have refuted this argument in Section IV(E) supra.

158. Lastly, Defendants argue that Plaintiffs' proposed accommodation is not limited to people with disabilities and, therefore, it is not reasonable. 10/18 Tr. 4488:5-14. Plaintiffs have refuted this argument in Section IV(G) supra.

159. Defendants cite *United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023) for the proposition that "prospective risk of discrimination" is not "sufficient to state a claim under the ADA" and argue that "there has been no denial of accommodation or no denial of an individual's right to vote means there has been no actual discrimination." 10/18 Tr. 4488:15–4489:6. Defendants' argument is erroneous and based on irrelevant case law.

160. First, United States v. Mississippi does not pertain to voting and does not offer any comparable facts to the instant case. That case involved a challenge by the United States alleging that Mississippi's mental health care system violated the integration mandate of the

ADA, as interpreted by the U.S. Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581 (1999), by placing people with serious mental illness at risk of institutionalization in state institutions. *United States v. Mississippi*, 82 F.4th 387, 389–91 (5th Cir. 2023). The Fifth Circuit held that "Nothing in the text of Title II, its implementing regulations, or Olmstead suggests that a risk of institutionalization, without actual institutionalization, constitutes actionable discrimination." *Id.* at 392.

161.    However, Plaintiffs in this matter do not bring any Olmstead claims and do not argue that they have experienced discrimination because they are at "risk of institutionalization" pursuant to 28 C.F.R. § 35.130(d) (a provision of the regulations not at issue in this case). Instead, Plaintiffs provide extensive testimony that they have already been denied equal or meaningful access to Defendants' voting programs and that this denial of equal opportunity will continue into the future. FOF Sections V-VII. Under basic principles of injunctive relief, Plaintiffs can get relief for threatened future harm, even if that harm has not occurred yet, as long as Plaintiffs allege "actual or imminent" injury. *Frazier v. Bd. of Supervisors for Univ. of Louisiana Sys.*, No. 21-CV-3948, 2022 WL 3592450, at *4 (W.D. La. Aug. 5, 2022), report and recommendation adopted, No. 21-CV-3948, 2022 WL 3587974 (W.D. La. Aug. 22, 2022) ("Article III standing requires a plaintiff seeking injunctive relief to allege 'actual or imminent' and not merely 'conjectural or hypothetical' injury."); *Frame, supra*, 657 F.3d at 235. Regardless, Plaintiffs have demonstrated both actual prior harm and actual and imminent future harm.

162.    Defendants also cite United States v. Mississippi for the proposition that it rejected "sweeping program wide injunctions" and required that "the injunction be narrowly tailored to remedy individual instances of discrimination." 10/18 Tr. 4488:15-25, 4489:1-6.

AFDOCS:199405450.4

However, the proposed remedy at issue in Mississippi is not at all comparable to the one requested here. In Mississippi, the Fifth Circuit noted that the federal government sought to "rework the entire Mississippi mental health system" and "radically modif[y]" the state's existing programs, along with creating new programs, mandating minimum staffing levels, generally getting into incredible detail regarding the state's plans, and establishing a lengthy and involved monitoring process. *United States v. Mississippi*, 82 F.4th 387, 398-99 (5th Cir. 2023). In addition, the Fifth Circuit specifically analyzed the injunction with regards to an "at risk" class, which is not present here. *Id.* The proposed remedy in the instant case is simply a return to pre-SB 1 law and practice, which the state has already shown it can do. This proposed relief does not seek to impose any new requirements on Defendants and has none of the factors present in Mississippi. At no time have Plaintiffs requested that Defendants create a new program that involves extensive costs to their administration of elections nor have Plaintiffs proposed extensive and detailed monitoring of Defendants' compliance with the proposed injunction. And, as explained above, the requested injunction of the Challenged Provisions pertaining to mail voting and voter assistance primarily impact voters with disabilities. As such and following Plaintiffs' arguments above, the arguments presented in Defendants' Motion for Judgment on Partial Findings should be rejected.

## V.      THE CHALLENGED PROVISIONS OF SB1 INTERFERE WITH A VOTER'S RIGHT TO RECEIVE ASSISTANCE FROM A PERSON OF THEIR CHOICE IN VIOLATION OF SECTION 208 OF THE VOTING RIGHTS ACT

163.     For voters who have disabilities or are low-literate and/or limited English proficient ("LEP"), Section 208 ensures meaningful access to the franchise by permitting these voters to use the help of assistors when they vote.

### A. Section 208 of the Federal Voting Rights Act[9]

164.    Section 208 of the federal Voting Rights Act of 1965 ("VRA") provides that

"[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read

or write may be given assistance by a person of the voter's choice, other than the voter's

employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

165.    The VRA defines the terms "vote" and "voting" to include:

> [A]ll action necessary to make a vote effective in any primary, special, or general
> election, including, but not limited to, registration, listing pursuant to this chapter,
> or other action required by law prerequisite to voting, casting a ballot, and having
> such ballot counted properly and included in the appropriate totals of votes cast
> with respect to candidates for public or party office and propositions for which
> votes are received in an election.

52 U.S.C. § 10310.

166.    States or localities that limit the ability of disabled, low-literate or LEP voters to

receive assistance from persons of their choice violate Section 208 of the VRA. For example, in

*Democracy North Carolina v. North Carolina State Bd. of Elections*, a district court held that

plaintiffs were likely to succeed on the merits of their claim that North Carolina violated Section

by restricting who may assist voters in hospitals, clinics, nursing homes, or rest homes violated

Section 208. No. 1:20CV457, 2020 WL 4484063, at *60 (M.D.N.C. Aug. 4, 2020) (preliminarily

enjoining state law that required voter needing assistance to "rely on either a near relative, a legal

guardian, or a [multipartisan assistance team] if they are available before they may choose any

other person to assist them").[10] The court reasoned that the challenged state statute's limitation

---

[9] The legal standard duplicates the standard found in Plaintiffs Joint Brief on Legal Frameworks.
*See* Plaintiffs' Joint Legal Frameworks Brief at Section II(F)(1)The legal standard for Section 208 of the
Voting Rights Act has been included here for ease of reference.

[10] The challenged assistance restrictions were later permanently enjoined by a different district
court in *Disability Rights N. Carolina v. N. Carolina State Bd. of Elections*, No. 5:21-CV-361-
BO, 2022 WL 2678884, at *5 (E.D.N.C. July 11, 2022) ("The plain language of North Carolina's

AFDOCS:199405450.4

on assistance "does not allow Plaintiff Hutchins to choose the person who will assist him [and thus] these regulations impermissibly narrow Section 208's dictate that a voter may be assisted "by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." *Id.* (emphasis in original); *see also United States v. Berks Cnty.,* 277 F.Supp.2d 570 (E.D. Pa. 2003) (denying Spanish-speaking voters assistance by the person of their choice is a violation of Section 208); *Nick v. Bethel*, 2008 WL 11456134 (D. Alaska Jul. 30, 2008) (holding plaintiffs demonstrated a likelihood of success on their claim that the state violated Section 208 by restricting LEP voters from receiving assistance from a person of their choice).[11]

### (1) Section 208's Preemptive Effect.

167.    States may not enact laws that interfere with the guarantees of 208. "State laws are preempted when they conflict with federal law. . . . This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' . . . and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). First, a state law is preempted when it renders compliance with both state and federal law an "impossibility[.]" *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963). Second, a state law is preempted when it

---

provisions impermissibly narrows a Section 208 voter's choice of assistant from the federally authorized right to 'a person of the voter's choice'[.]")

[11] *See also* Consent Decree, Judgment, and Order, *United States v. Fort Bend Cnty.*, No. 4:09-cv-01058 (S.D. Tex. Apr. 13, 2009); Memorandum of Agreement, *United States v. Kane Cnty.*, No. 07 C 5451 (N.D. Ill. Nov. 7, 2007); Consent Decree, Judgment, and Order, *United States v. Brazos Cnty.*, No. H-06-2165 (S.D. Tex. June 29, 2006); Consent Decree, *United States v. Orange Cnty.*, No. 6:02-cv-737-ORL-22JGG (M.D. Fla. Oct. 8, 2002); Settlement Agreement, *United States v. City of Philadelphia*, No. 2:06cv4592 (E.D. Pa. June 4, 2007); Revised Agreed Settlement Order, *United States v. City of Springfield*, No. 06-301- 23-MAP (D. Mass. Sept. 15, 2006).

AFDOCS:199405450.4

"creates a conflict with the plan Congress put in place." *Arizona v. United States*, 567 U.S. at

403.[12] *see also Felder v. Casey*, 487 U.S. 131, 151 (1988) (state law preempted where it

"interferes with and frustrates the substantive right Congress created").

168.    In the context of a voter's right to assistance under Section 208, state laws are

preempted when they infringe upon a voter's ability to vote with his or her chosen assistor. The

Fifth Circuit, in striking down a Texas limitation on voting assistance as preempted by Section

208, compared the "unambiguous language" of Section 208 to the challenged provision in the

Texas Election Code and concluded that "[Texas's] limitation on voter choice impermissibly

narrows the right guaranteed by Section 208 of the VRA." *OCA-Greater Houston, supra*, 867

F.3d at 614–15 (invalidating state law requirement that an interpreter chosen by the voter must

be registered to vote in the same county as the voter).

169.    In *DSCC v. Simon*, No. A20-1017, 2020 WL 6302422, at *7 (Minn. Oct. 28,

2020), the Minnesota Supreme Court concluded that Minnesota's voter assistance restriction was

preempted by Section 208 of the VRA because it limited the number of voters an assistor was

permitted to help. *Id.* The Court explained "[a] plain-language comparison leads to the

conclusion that Minnesota's three-voter limit on marking assistance can be read to stand as an

obstacle to the objectives and purpose of section 208 because it could disqualify a person from

voting if the assistant of choice is, by reason of other completed assistance, no longer eligible."

*Id.* at 289.

---

[12] Section 208 permits private enforcement. *See, e.g.*, *OCA-Greater Houston v. Texas*, 867 F.3d
604, 609–14 (5th Cir. 2017); *Ark. United v. Thurston*, 517 F.Supp.3d 777, 790, 798 (W.D. Ark.
2021); *New Ga. Project v. Raffensperger*, 484 F.Supp.3d 1265, 1301 (N.D. Ga.
2020); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F.Supp.3d 158, 233–36 (M.D.N.C.
2020); *Florida State Conference of NAACP v. Lee*, 576 F.Supp.3d 974, 988-90 (N.D. Fla 2021).

AFDOCS:199405450.4

170.    Recently, a federal district court in Mississippi enjoined, as preempted by Section 208 of the VRA, a state law criminalizing third party mail ballot collection and regulating the "identity of allowable assistors" in the mail-in voting context. *Disability Rights of Miss., et al. v. Fitch, et al.,* No. 3-23CV-350-HTW-LGI, 2023 WL 4748788 (S.D. Miss., July 23, 2023). The court concluded that the law's ill-defined categories of exempted assistors and broad impact on the state's voting population—one in five adults lives with a disability and over 100,000 Mississippians voted by mail in 2020—"promise to deter otherwise lawful assistors from providing necessary aid to a vulnerable population." *Id.* at 1, 3; see also Carey v*, Wisconsin Elections Commission*, No. 22-CV-402-jdp, at *2, *10, 2022 WL 3910457 (W.D. Wis. Aug. 31, 2022) (holding VRA § 208 preempts state law prohibiting third-party ballot-return assistance to disabled voters who require such assistance").

### (2) The Legislative History of Section 208 Evidences the Intent of Congress to Afford Disabled, Low-literate and Limited English Proficient Voters the Right to Choose Their Assistor

171.    The legislative history of the Federal Voting Rights Act generally, and Section 208 specifically, confirms Congress's objective to protect the ability of certain groups of voters, including disabled, low-literate and limited English proficient voters, to cast a ballot with the help of their chosen assistor and without interference or coercion by election workers. Bills to Amend the Voting Rights Act of 1965: Hearings before the Subcomm. on the Const. of the S. Comm. on the Judicary, 97th Cong. 63 (May 4, 1982) (statement of Sen. Dennis DeConcini); see also H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) (discussing need to deter coercion of voters by election officials); see also H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) (discussing need to deter coercion of voters by election officials).

172.    Congress considered that the need for assistance may render such groups more susceptible to discrimination or undue influence. *Id.* Congress responded by providing the

opportunity for these potentially vulnerable voters to turn to those whom they trust for

assistance:

> Clearly, the manner of providing assistance has a significant effect on the free exercise of the right to vote by such people who need assistance. Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice. As a result, people requiring assistance in some jurisdictions are forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote. The Committee is concerned that some people in this situation do in fact elect to forfeit their right to vote. Others may have their actual preference overborne by the influence of those assisting them or be misled into voting for someone other than the candidate of their choice."

> The Committee has concluded that the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write, is to permit them to bring into the voting booth a person whom the voter trusts and who cannot intimidate him.

S. Rep. No. 97-417, at 472 (May 25, 1982). "To limit the risks of discrimination" and "avoid denial

or infringement of the right to vote," Congress mandated that such voters "be permitted to have

the assistance of a person of their own choice" during the voting process, including within the

voting booth. Senate Report at 62.

173.    Congress also considered whether to restrict who could serve as an assistor and

chose to exclude two categories of persons: employers and union representatives. In creating

these two categories of excluded individuals, Congress chose to allow all others to serve as

assistors. Generally, "[w]here Congress explicitly enumerates certain exceptions to a general

prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary

legislative intent". *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (citation omitted). Thus,

Section 208 should not be read to imply restrictions beyond those enumerated. Furthermore, the

Supreme Court has repeatedly cautioned against doing exactly what Texas has done—creating

right- limiting exceptions beyond the ones Congress created. *See, e.g.*, *Republic of Arg. v. NML*

*Capital, Ltd.*, 573 U.S. 134, 144–46 (2014); *United States v. Smith*, 499 U.S. 160, 166–67 (1991).

174.    After the provision was originally spearheaded by the National Association for the Blind, Congress decided to include other disabled voters and voters with low literacy and limited English proficiency in the protections of Section 208. *See* S. Rep. No. 97-417, 97th Cong., 2d Sess., at 62 n.207 (1982) (citing the National Federation of the Blind's concern that voting "assistance provided by election officials . . . infringes upon their right to a secret ballot"). In this way, Section 208 works in tandem with the other provisions of the Voting Rights Act, particularly with respect to providing access to the ballot for limited English proficient voters.

175.    Seven years earlier, in the 1975 amendments to the Voting Rights Act, Congress connected the need to protect Latino, Asian American, and Native American voters with the need to enforce the voting rights of those who were unable to read or write in English:

> The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens are from environments in which the dominant language is other than English. In addition they have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country, this exclusion is aggravated by acts of physical, economic, and political intimidation. The Congress declares that, in order to enforce the guarantes of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices.

52 U.S.C.A. § 10303 (f)(1).[13]

---

[13] Congress also acted to protect limited English proficient voters when it expanded federal review of new voting laws to include jurisdictions that had conducted English-only elections. 52 U.S.C.A. § 10303 (f)(3).

AFDOCS:199405450.4

176.    In 1982, Congress again amended the Voting Rights Act and added Section 208 to protect the rights of limited English proficient voters as well as other voters who require assistance to cast their ballots because of disability or an inability to read the language on the ballot. 52 U.S.C.A. § 10508.[14]

177.    The legislative history of Section 208 confirms that "inability to read or write" includes the inability to read or write because of limited English proficiency. The colloquy between Senator Denton and then-Senator Biden demonstrates lawmakers' intent to protect limited English proficient voters with Section 208:

> Senator DENTON: I just have a question here, Mr. Chairman, for those who are advocating this language, "inability to read or write." It is my understanding that the voting booths have a multilingual kind of aspect. In fact, it is my understanding that Spanish, even the Aleutian tongue is used in some of the booths, and I wonder what language is referred to when one states "inability to read or write"? I just am confused by the intent.
>
> Senator BIDEN. The answer is any language, any language whatsoever, if the person cannot understand for whom they are voting, and they just state they cannot understand that, whether it is Aleutian, or Portuguese or Swahili. If they say they cannot understand it, they cannot read or write or understand what is going on in the booth, and they need help, that is what we are talking about. It is clear on its face what we are talking about. That is what read or write means. Read or write, whatever the language is, that is in the language that the person is required to vote.

Voting Rights Act: Hearing on S. 54, S. 1761, S. 1975, S. 1992 and H.R. 3112 Hearing Before Subcomm. on the Constitution of the S. Comm. on the Judiciary, Volume 2 97th Cong. at 89-90 (1982).

178.    SB 1's voter-assistance restrictions impose limitations that violate and conflict with federal law:

---

[14] Congress also acted to protect limited English proficient voters when it expanded federal review of new voting laws to include jurisdictions that had conducted English-only elections. 52 U.S.C.A. § 10303 (f)(3).

AFDOCS:199405450.4

- Sections 6.01, 6.03-6.05, and 6.07 deter voter assistors by requiring them to complete additional forms and/or provide additional information as a prerequisite to giving voter assistance.

- Section 6.01 extends a poll watcher's ability to monitor all activities under T.E.C. section 64.009, thereby exposing vulnerable voters to harassment for activities. *Id.* at (e).

- Section 6.04 also requires voters to represent that they are eligible for assistance as a condition of receiving assistance.

- Section 6.04 also deters assistors by requiring them to swear, under penalty of perjury, to additional information, including that they did not pressure or coerce the voter into choosing them to assist.

- Sections 6.05 and 6.07 require mail-in voting assistors to provide on the ballot envelop their relationship to the voter, whether they received compensation, their contact information, and their signature.

- Sections 6.06 and 7.04 deny mail voters the ability to use as assistors individuals who are compensated.

**B. Plaintiffs Have Standing to Sue Under Section 208 of the Voting Rights Act.**

179.    Plaintiff organizations The Arc of Texas and Delta Sigma Theta Sorority, Inc. ("DST") challenge SB1 §§ 6.01, 6.03-6.05, and 6.07 under Section 208 of the Voting Rights Act. In administering, implementing, and enforcing these provisions, Defendants deny voters with disabilities the right to an assistor of their choice in violation of VRA Section 208. Organizational plaintiffs may establish standing in one of two ways: by making a showing of associational or organizational standing. *OCA-Greater Houston, supra*, 867 F.3d at 610. Here, Plaintiff The Arc of Texas has established associational standing to sue on behalf of its members. Additionally, Plaintiffs The Arc of Texas and DST have established organizational standing as an entity directly impacted by SB1's voter assistance restrictions.

*(1) Plaintiff The Arc of Texas Has Established Associational Standing.*

180.    Plaintiff The Arc of Texas has established associational standing with respect to its VRA Section 208 claim against all Defendants because (1) its members would independently

meet Article III standing requirements, (2) the interests it seeks to protect are germane to its organizational purpose, and (3) neither the claim asserted nor the relief requested require participation of individual members. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). For a discussion of the applicable legal standard for associational standing, *see supra* COL ¶ 401 and Plaintiffs' Joint Legal Frameworks Brief at Section II(A).

(a) *Members of The Arc of Texas Would Otherwise Have Standing to Sue in* their Own Right.

### i.  Members' injury is concrete and particularized.

181.    The Arc of Texas has demonstrated that the injury to its members is concrete and particularized. The Arc of Texas is a membership organization serving people with disabilities across the state of Texas. FOF ¶¶ 1-2. Its members include people with disabilities who depend on assistors of their choice to vote in Texas elections. *See* FOF ¶¶ 57 (Jennifer and Danielle Miller), 64 (Ms. Landry), 71-73 (Ms. Litzinger), 80-81 (Ms. Halvorson). Its members also include advocates who provide assistance to voters. SB1's burdens and restrictions impact the right of voters to receive assistance they are entitled to under Section 208 of the VRA and to meaningfully cast a vote, and thereby injures Plaintiff's members.

182.    Members of The Arc of Texas, who are voters with disabilities, did not receive assistance by a person of their choosing because of SB1's restrictions on assistance. For example, The Arc of Texas member, Ms. Litzinger, testified that in November 2022 she and her assistor were nervous about the consequences of violating the oath. Ultimately, Ms. Litzinger and the assistor decided the attendant would not take the oath, and Ms. Litzinger did not receive assistance while voting. FOF ¶ 239 Even if voters who require assistance do successfully cast a ballot, their right under Section 208 is violated if they voted without an assistor of their choice or forwent assistance altogether. *See Consent Decree, United States v. Hale County, TX*, No. 5-

05CV0043-C (N.D. Tex., Apr. 27, 2006) (requiring election administrators to provide language assistance to voters with limited English-language proficiency who had voted in an election in which the County failed to permit assistance to those voters); *Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 590 F.Supp.3d 850, 856, 869 (M.D.N.C. 2022) (holding legally blind plaintiff who voted absentee with his wife's assistance had standing to challenge a law restricting assistance that would prevent him from seeking assistance from staff at nursing home where he resided). Similar to Ms. Litzinger, The Arc of Texas member, Ms. Halvorson, did not use her personal care attendant to assist her while voting in the November 2022 general election, because Ms. Halvorson was concerned about putting her caregiver at risk due to SB1's criminal penalties. FOF ¶¶ 241-42; see FOF ¶ 243.

183.    By placing several burdensome form and disclosure requirements on assistors and subjecting them to criminal liability, SB 1 chills would-be assistors and impedes a voter's practical ability to receive assistance from a person of their choosing. Recognizing this link, many courts have found that laws regulating the conduct of assistors can and do violate the rights of voters under VRA Section 208. *See Arkansas United v. Thurston*, No. 5-20-CV-5193, 2022 WL 4097988, at *3, *18 (W.D. Ark. Sept. 7, 2022) (finding election law, Arkansas Code § 7-5-310(b)(4)(B), providing "no person other than [a poll worker] shall assist more than six (6) voters in marking and casting a ballot at an election" was preempted by VRA § 208); *Democracy North Carolina v. North Carolina State Board of Elections*, 590 F.Supp.3d 850, 857–60, 869, 872 No. 1:20CV457 (M.D. N.C. 2022) (holding plaintiffs alleged sufficient factual allegations to survive motion to dismiss VRA § 208 challenge to North Carolina law that restricted 208-voters to assistance from a near relative, a legal guardian, or a member of a assistance team trained and authorized by the county board of elections to assist voters); Carey v. Wisconsin Elections

Commission, supra, No. 22-CV-402-jdp, at *2 (holding VRA § 208 preempts state law prohibiting third-party ballot-return assistance to disabled voters who require such assistance"). Assistors for members of The Arc of Texas declined to provide aid at the polling place. For example, Ms. Halverson also testified that her personal care attendant declined to assist with her mail ballot in the March 2022 primary election because her personal care attendant was not comfortable taking an oath under penalty of perjury that could risk her green card status. FOF ¶ 240. The Arc of Texas member, Ms. Crowther, testified that "SB1 has hampered her ability to receive assistance in voting because it puts her attendants in a position of "danger" that "they aren't paid for" and she would not want to put them in a situation that has legal ramifications despite the fact that she will need more and more help over time as her disability progresses." FOF ¶ 245.

### ii.    Injury to The Arc of Texas's members is Imminent.

184.    The Arc of Texas has also demonstrated that the injury to its members is imminent. SB1 Section 6.04 requires voters to represent their eligibility to receive assistance. Ms. Landry, member of The Arc of Texas, testified that the burden to represent one's eligibility is confusing to voters because the eligibility criteria is not defined and may be confusing to assistors alike. FOF ¶¶ 259-60. The burden of proving one's eligibility will thus deter members of The Arc, who are voters with disabilities, from seeking assistance. *Id.* SB1 will also prevent voters from selecting their preferred assistant in the future because many assistants will continue to be unwilling to risk criminal prosecution for inadvertently violating the Oath's restrictions. *See* FOF ¶¶ 314-15.

185.    Every election creates a foreseeable risk of being denied an assistor of one's choice, of placing an assistor of one's choice at risk of criminal liability, and of having one's

vote rejected due to the burdens placed on assistance. Because voters with disabilities will require assistance in future elections, the injury to The Arc's members is imminent.

### iii. Injury to The Arc of Texas's members is Traceable to Defendants' Conduct and Can be Redressed by a Favorable Decision from This Court.

186.    The injury is traceable to the State and County Defendants, who are authorized to implement and enforce the challenged provisions where The Arc's members live and vote, and where Plaintiff operates. Absent a court order enjoining the challenged provisions to the extent that they contravene Section 208, SB 1 will continue to impair the federal rights of voters with disabilities. Thus, members of organizational plaintiff, The Arc, would have standing to sue in their own right.

### (b) The Interests at Stake are Germane to the Purpose of The Arc of Texas.

187.    The Arc of Texas's mission is to "promote, protect, and advocate for the human rights and self-determination of Texans with intellectual and developmental disabilities." FOF ¶¶ 1-2. Voting is the "backbone" of The Arc of Texas's work and has been a priority of The Arc of Texas since it was founded. FOF ¶ 9; *see id.* at ¶ 14. Thus, SB1's restrictions on voter assistance and their impact on voters with disabilities are germane to The Arc of Texas's purpose.

### (c) Neither the Claim Asserted Nor the Relief Requested Requires the Participation of Individual Members in the Lawsuit.

188.    It is well established that advocacy organizations representing individuals with disabilities, including chapters of The Arc, satisfy the test for associational standing. *See, e.g.*, *Steward v. Abbott*, 189 F.Supp.3d 620, 631-32 (W.D. Tex. 2016) (The Arc of Texas); *see also* McCarthy ex rel. *Travis v. Hawkins*, 381 F.3d 407 (5th Cir. 2004) (no standing challenge to The Arc of Texas).

AFDOCS:199405450.4

189.    Plaintiff The Arc of Texas is an advocacy organization whose members include voters with disabilities. Plaintiff's members are aggrieved by SB1's burdens on the right to assistance by a person of their choosing protected by Section 208 of the VRA. Plaintiff requests injunctive relief for SB1 Sections 6.01, 6.03-6.05, and 6.07 on behalf of its injured members. Because their Section 208 claim does not require the participation of individual members, Plaintiff The Arc of Texas has associational standing.

### (2) *Plaintiffs The Arc of Texas and DST have Established Organizational Standing.*

190.    Plaintiffs The Arc of Texas and DST have organizational standing to bring their VRA Section 208 claims. For a discussion of the applicable legal standard for organizational standing, see COL ¶¶ 415-18.

191.    Each of the Plaintiff organizations have devoted resources to respond to the harms imposed by SB 1 and have, as a result, suffered an injury in fact. Plaintiffs incorporate by reference the Conclusions of Law of HAUL pertaining to DST's diversion of resources to respond to SB1's assistance provisions. HAUL COL Section I.C. Courts have found that advocacy organizations may bring claims under Section 208 of the VRA even if a specific voter was not denied the right to vote. *Arkansas United, supra*, 517 F.Supp.3d at 377. Plaintiffs also incorporate by reference the Conclusions of Law pertaining to The Arc's diversion of resources due to SB1's assistance provisions at supra COL ¶ 420. Because Defendants' violation of Section 208 of the VRA has forced plaintiffs to divert resources in response, Plaintiffs have organizational standing to challenge SB1's assistance provisions.

### C. SB1's Voter Assistance Restrictions on Assistance Violate and are Preempted by Section 208 of the VRA.

192.    SB1 Sections 6.01, 6.03-6.07, and 7.04 ("voter assistance restrictions") obstructs the right of voters with disabilities and low-literate and/or LEP voters to an assistor of their

choice in violation of Section 208 of the Voting Rights Act.[15] Section 208's only limitations on voter assistance are stated in the statute: the assistor may not be an employer, union officer, or an agent of an employer or union officer. Here, SB1 restricts who can serve as an assistor, imposes criminal penalties that deter assistors from providing necessary aid and deter voters from seeking assistance, make assistance more difficult and time-consuming, and exposes Section 208 voters to intimidation and harassment. SB1's restrictions impermissibly narrow the right guaranteed by and in violation of § 208. *See Disability Rights N. Carolina v. N. Carolina State Bd. of Elections, supra*, 2022 WL 2678884, at *5 (E.D.N.C. July 11, 2022).

193.    Further, SB1's voter assistance restrictions conflict with Section 208 and are thus preempted. Congress granted § 208 voters an expansive right to assistance and nearly unfettered choice of an assistor. *See* S. Rep. No. 97-417, 97th Cong. 2d Sess., at 240, 1982 U.S.C.C.A.N. 177, 1982 WL 25033 (1982) ("Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice . . . The Committee is concerned that some people in this situation do in fact elect to forfeit their right to vote."). However, in Texas, while a voter obtains assistance from a person of their choice consistent with Section 208, the assistor could violate SB1 and be subject to criminal penalties; and, as a result, the voter's ballot will not get counted. Sections 6.01, 6.03-6.07, and 7.04 conflict with § 208 because of the "impossibility" of complying with both and because the voter assistance restrictions act as an obstacle to the

---

[15] The following plaintiffs advance claims under Section 208: §6.01 is challenged by HAUL. §§ 6.03-6.05 are challenged by LUPE, HAUL and MFV. § 6.06 is challenged by LUPE, HAUL, MFV and OCA. § 6.07 is challenged by HAUL. § 7.04 is challenged by LUPE and LULAC. LUPE and OCA discuss their challenges under Section 208 of the VRA in their Proposed Findings of Fact and Conclusions of Law.

AFDOCS:199405450.4

accomplishment of Congress's objectives. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963); *Arizona v. United States,* 567 U.S. 387, 399 (2012); see also *Felder v. Casey*, 487 U.S. 131, 151 (1988) (state law preempted where it "interferes with and frustrates the substantive right Congress created").

### *(1) Section 6.01*

194.    Section 6.01 places burdens on assistance by requiring a person who transports seven or more voters simultaneously for curbside voting to complete and sign a form disclosing his or her name, address, and any other assistance provided. Section 6.01(f); section 6.01(f-1) (except for certain familial relationships). Section 6.01 also amends the election code to give poll watchers express permission to watch any and all activities under this provision. Section 6.01(e).

195.    Section 6.01 impacts curbside voting, a voting modality available to certain voters who are disproportionately voters with disabilities. *See* FOF ¶ 323; *see also id.* ¶ 321. Dr. Kruse found that "Texans with disabilities are four times more likely to live in a zero-vehicle household, less likely to take trips outside the household, and less likely to be able to drive." FOF ¶ 322; *see id.* at ¶ 120. One-fifth of voters with disabilities receive assistance from non-family members. FOF ¶ 149. Disabled Texans are more likely to experience social isolation and transportation barriers. FOF ¶ 323; *see id.* at ¶¶ 112, 120-121. As a result, voters with disabilities have greater difficulty obtaining transportation to vote curbside and voting in person. FOF ¶ 324; ¶¶ 136-137; *see e.g., id.* at ¶ 142.

196.    Given the social isolation, transportation barriers, and the increased need for assistance at polling places faced by voters with disabilities, receiving transportation assistance is critical to curbside voting. *See* 52 U.S.C. § 10310 ("The terms 'vote' or 'voting' shall include all action necessary to make a vote effective[.]"); *OCA-Greater Houston, supra*, 867 F.3d at 615 (Section 208 guarantees to voters the right to receive assistance from a person of their choice

AFDOCS:199405450.4

when voting, that "plainly contemplates more than the mechanical act of filling out the ballot sheet" and includes "steps in the voting process before entering the ballot box").

197.    VRA § 208 creates a right to assistance for voters with disabilities, with only two enumerated exceptions. *See* COL ¶ 553. Yet, Section 6.01 deters would-be assistors from driving disabled voters to their polling place. *See e.g.*, FOF ¶¶ 325-336. It also increases the difficulty of finding transportation assistance for voters with disabilities, including those who rely on group transportation to vote curbside, FOF ¶¶ 323-334, or for the one-fifth of voters with disabilities whose assistors are non-relatives, FOF ¶ 149, and do not fall within the exception under § 6.01(f-1). As a result, Dr. Kruse concludes that Section 6.01 will cause "Texans with disabilities to be disenfranchised, and a further substantial number will face significant difficulties in voting that they would not otherwise face but for SB 1." FOF ¶ 324.

198.    Additionally, by expressly empowering poll watchers, SB 1 encourages the very kind of harassment that Section 208, specifically, and the Voting Rights Act, generally, were designed to restrain. *See* COL V.A.(2) ("The Legislative History of Section 208 Evidences the Intent of Congress to Afford Disabled, Low-literate and Limited English Language Proficient Voters the Right to Choose Their Assistor"). Under Section 6.01(e), "a poll watcher is entitled to observe any activity" conducted pursuant to EC § 64.009, which provides for curbside voting. Chapters of Plaintiff organization, DST, have stopped providing transportation assistance to elderly, disabled voters because Section 6.01 makes its members vulnerable to intimidation by poll watchers. FOF ¶¶ 325-326. These members are concerned about who may gain access to the personal information they are required to disclose under § 6.01(f)'s form requirement. FOF ¶ 325. In light of the history of poll watchers intimidating Black voters specifically and SB1's express authorization for poll watchers to observe curbside voting activities, DST members are

chilled from assisting voters with transportation to the poll. *Id.* As a result, elderly, disabled

voters who DST had assisted in the past, were unable to receive transportation from these trusted

assistors. *Id.*

199.    Section 6.01 violates § 208 because, by imposing additional forms and requiring

disclosure of personal information, it limits the right—arbitrarily--to assistors who drive less

than seven people to the polls. For the same reason, the plain language of Section 6.01 renders

compliance with it and § 208 impossible. Section 6.01's deterrence effect also frustrates

Congress's intent to ensure meaningful access to assistance for voters with disabilities and low-

literate and/or LEP voters. S. Rep. No. 97-417, at 241.

### *(2) Section 6.03*

200.    When a voter with disabilities receives assistance while voting in-person, Section

6.03 requires the assistor, other than an election officer, to complete a form disclosing personal

information, including his or her name, address, and relationship to the voter, and whether the

assistor received compensation or a benefit from a candidate, campaign, or political committee.

Section 6.03(a).

201.    Section 6.03 impermissibly restricts who may assist by making assistance

contingent on completing a form and disclosing personal information. The additional form

requirement caused assistors, particularly non-family direct support individuals, to be deterred

from providing assistance, resulting in voters not receiving assistance from an assistor of their

choice. Prior to SB1, members of DST had provided assistance to eligible in-person voters. FOF

¶¶ 236, 347 However, after SB1, DST chapters stopped providing assistance to these voters

because they were intimidated by Section 6.03's form and disclosure requirement. *Id.*

202.    Because Section 6.03 deters would-be assistors and necessarily limits whom

voters with disabilities and low-literate and/or LEP may choose to assist them, it cannot coexist

with Section 208, which guarantees certain voters—i.e., "voters needing assistance due to blindness, disability, or inability to read or write"—"assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508; see *Priorities USA v. Nessel*, 462 F.Supp.3d 792, 816 (E.D. Mich. 2020) (finding a conflict with Section 208, which "provides that a voter may be given assistance by anyone of that voter's choice," where the regulation did "not permit a voter to request just anyone to assist them.").

203.    Election workers, however, are not an adequate substitute for a voter's choice. In circumstances in which an election worker is a voter's last resort to receive assistance, where the alternative is to forego voting altogether, poll watchers are entitled to watch and listen to the interactions,[16] creating an intimidating atmosphere for the voter with disabilities.

204.    Defendants argue that voters with disabilities are more susceptible to intimidation and coercion and thus, Section 6.03 is necessary to protect vulnerable voters. However, testimony from state and county Defendants and other evidence shows that voter assistance, including that which is provided at the polling place, is not correlated with fraud. FOF ¶ 218, 221.

205.    At trial, voters with disabilities, who are members of Plaintiff organizations, testified that they are capable of asserting their choices in the voting booth and have never experienced their personal care attendants or other assistors influencing or manipulating their decision-making. FOF ¶¶ 219-20, 223. Especially when a voter uses a trusted assistor, the assistor aids the voter in expressing the voter's preferences. FOF ¶ 225.

---

[16] For a discussion on the language and impact of SB1's poll watcher provisions, §§ 4.01, 4.06, 4.07, and 4.09, *see* HAUL FOF VIII ("SB1s Poll Watcher Provisions Chill Voters and Election Workers and Disproportionately Harm Black and Latino Voters").

AFDOCS:199405450.4

206.    Voters with disabilities, assistors, and county election officials also testified that the form requirement, coupled with the oath of assistance (see Section 6.04), created delays during in-person voting that exacerbate existing barriers voters with disability encounter. *See* FOF ¶ 295; *see also* FOF ¶ 136 ("The most common difficulty that voters with disabilities face [during in-person voting] is waiting in line at a polling location."). Thus, Section 6.03's onerous form and disclosure requirements unduly burden the right protected by § 208 of the VRA.

### (3) *Section 6.04*

207.    Section 6.04 deters assistance by requiring assistors to take an oath under penalty of perjury and swear that they obtained a represented of eligibility for assistance from the voter, did not pressure or coerce the voter into choosing them, will not communicate how the voter has voted, and that the assistor understands that if the voter is ineligible to receive assistance the voter's ballot will not be counted. In effect, Section 6.04 also demands that voters represent that they are eligible for assistance as a condition of receiving assistance.

208.    Section 6.04 has broad impact on the right to seek and receive assistance because it is administered during in-person voting and when voting by mail. Thus, evidence of the impact of Section 6.04 on assistance is relevant to SB1 Sections 6.01, 6.03, 6.05, and 6.07.

209.    The requirement that assistors swear under "penalty of perjury" criminalizes assisting a person with disabilities. As a result of the oath, the difficulty of finding an assistor willing to take the risk "exponentially increased." FOF ¶ 233. The oath provision has prevented eligible voters from receiving assistance by a person of their choice because voters are concerned about putting direct support individuals at risk, FOF ¶¶ 239, 244-45, 297-99, 307-312, assistors are concerned about putting themselves at risk, FOF ¶¶ 234, 237, 240, 241-43, 248, 252, 285, 293, 303-04, or both, FOF ¶¶ 251, 294. County election officials agreed that the oath provision

has a deterrent effect on assistance, FOF ¶ 249, and confirmed that the oath was the 'but for' cause of voters being unable to receive assistance, FOF ¶¶ 250-52.

210.    The oath encumbers a voter's meaningful choice of an assistor. Defendants purport that if an assistor of a voter's choosing or the voter are chilled from giving/being assisted, the voter may be assisted by election officials. Defendants again argue that election officials are an adequate substitute for a voter's choice. However, witnesses testified to the harm faced when SB1 renders a voters' choice under §208 meaningless and forces them to receive assistance from an election worker. For example, when Mr. Cole was not permitted to bring his assistor to the voting booth and forced to receive assistance from an election worker, he explained that his right to privacy when voting was violated by bringing a stranger into the voting booth with him. FOF ¶ 291. For Ms. Nunez Landry, the risks now associated with receiving assistance by someone of her choice under SB1 are so high that she was forced to forego the assistance she was entitled to in both the March 2022 primary and November 2022 general elections. FOF ¶¶ 297-300. Ms. Nunez Landry was deterred from being assisted by her partner and her personal care attendant because her assistors could be subject to criminal penalty for violating the oath of assistance. FOF ¶ 298. While inside the voting booth to vote in-person in November 2022, Ms. Nunez Landry could not reach the assistive technology she needed and was forced to ask an election worker for help. FOF ¶ 299. However, the election worker lacked experience with the technology and brought others over to help, who all remained in the voting booth why she voted. She was frustrated and angered by the complete violation of her privacy while voting, FOF ¶ 299, and foresees she will experience it again, FOF ¶ 301. Because poll watchers are given an unfettered right to observe election officials assist voters, § 6.04 further infringes on a voter's right to privacy while voting.

AFDOCS:199405450.4

211.     By design, Section 6.04 exposes voters with disabilities to even greater risk of harassment and coercion. The cornerstone of federal disability law, like Section 208, is to enhance the ability of people with disabilities to participate fully and equally in society, in a manner preserving and encouraging personal autonomy. To say that voters can rely on election officials as a fall back contravenes the intent behind Section 208. Voters with disabilities prefer an assistor they know, FOF ¶ 225, and this voting population has far more confidence that their choice will be honored by a known assistor. However, Section 6.04 hinders a voter's right to assistance by a person of their choice and, thus, reduces the likelihood that a voter is able to meaningfully cast a vote.

212.     Expert Dr. Kruse also testified that "the extra step" of representing to an assistor that the voter is eligible to receive assistance acts as a barrier to getting the assistance needed. FOF ¶¶ 227-29. At trial, Plaintiffs explained that this requirement forces voters to provide their eligibility by potentially disclosing sensitive and private information about the nature of their disability, FOF ¶¶ 254-55, 257. For some voters, their disability may not be visible, see supra ¶¶ 264, 281, and voters testified that the need to disclose personal health information was "offensive," caused discomfort, and went beyond the bounds of what they have had to disclose in other contexts. FOF ¶¶ 258-262. Having to prove that the voter is eligible invites increased scrutiny of a voter's disability, promoting the very kind of harassment Section 208 was designed to thwart. *See* FOF ¶ 256.

213.     The oath introduces increased scrutiny of the assistance being received which may be erroneously interpreted as influencing a voter's choice. *See* Joint Ex. 1 at 52-53 ("Section 6.04[:]…I will not suggest by word, sign, or gesture, how the voter should vote. … I did not pressure or coerce the voter into choosing me to provide assistance."). For example, when Mr.

AFDOCS:199405450.4

Cole votes curbside, he may forget who he intends to vote for and will ask his assistor to review his notes on his ballot selections. The assistor uses the notes to help remind Mr. Cole how he intended to vote. FOF ¶¶ 99, 269. However, this may be construed as violating the oath. *See also* FOF ¶¶ 152-53 ("cuing cuing may also be needed when inside the polling location, where the voter assistor can cue the voter to recall the prior conversation to help the voter make their choices"). At trial, the State conceded that the oath's vague and unclear language would make the kind of assistance received by Mr. Cole unlawful. *See* FOF ¶¶ 280, 282.

214.   Direct support individuals may be intimidated from providing assistance because the statute lacks clarity on what constitutes lawful assistance. *See* FOF ¶ 278 (Dallas County EA Scarpello agrees to the unclear language and intimidating effect of the oath provision). Ms. Litzinger testified that the oath deterred her and her personal care attendant from providing assistance while voting in person in the November 2022 election; they were both "nervous because we were unclear if the help I receive, would be included under the oath, and…when the process of voting starts and stops." FOF ¶ 239. Due to her disability, Ms. Litzinger requires an assistant to do most physical tasks, including voting in-person. However, in the May 2022 elections, all of Ms. Litzinger's attendants were deterred by the oath and could not assist her at the polls. FOF ¶ 303. While Ms. Litzinger voted in the election, she did so with extreme difficulty and physical pain and without an assistor of her choice. *See* trial transcript cited FOF ¶ 303; *see also* FOF ¶ 304 (Ms. Litzinger discussing not receiving assistance she needed to vote in the November 2022 election) . Again, when questioned about a factual scenario nearly identical to Ms. Litzinger's experience, the State confirmed that it is a "gray area," but they contributed to the ambiguity, adding that whether assistance maneuvering a wheelchair is voting assistance "kind of depends on the presiding judge." FOF ¶ 280.

215.    As discussed above, *supra* COL ¶¶ 582-88 ("Section 6.03"), taking together the form and disclosure requirements under Section 6.03, and the confusing language and criminal penalties under the oath, SB1's voter assistance restrictions have a cumulative harmful effect on disabled voters who receive assistance at the polls. Section 6.04's vague language coupled with criminal penalties have a chilling effect on voters and their assistors alike and restricts a voter's ability to receive assistance to which they are entitled under Section 208.

### (4) Sections 6.05 and 6.07

216.    When voting by mail, Sections 6.05 and 6.07 require a voter's assistor to disclose their personal information, including their name, address, and relationship to the voter, and whether they received compensation or benefit from a candidate, campaign, or political committee in exchange for providing assistance. Section 6.05(e); Section 6.05(h)(2) (except if assistance is provided by certain familial relations). Assistors who deposit the mail ballot carrier envelope must indicate their relationship to the voter pursuant to. Section 6.07. Assistors must swear and sign the oath prescribed by Section 6.04, which is printed on the carrier envelope. Section 6.05(c); 6.05(h)(1) (except if an assistor lives with voter at the time the ballot is cast or for certain familial relations). Assistance provided without meeting these requirements is punishable as a state jail felony, § 6.05(f)-(g), and a voter's ballot will be rejected, § 6.05(d).

217.    Section 6.05 adds an additional form for assistors to sign when a voter with disabilities votes by mail and makes it a felony for failing to complete the form. This added step and the criminal penalty deters would-be assistors from assisting disabled voters--voters who are more likely to vote by mail, FOF ¶¶ 126, and ten times more likely to need assistance while voting by mail, FOF ¶ 148. There are more voters who have a disability and vote by mail than those who mark disability on their mail ballot application. FOF ¶¶ 132-33. For some voters, voting by mail may be the only option, FOF ¶ 130, and voting is only possible with assistance,

see FOF ¶¶ 138-41. Since Section 6.05 also makes it a state jail felony for knowingly failing to sign the oath, the concerns raised about the oath, FOF V.C.(3) ("Section 6.04"), are material to Sections 6.05 and 6.07. The limited exceptions under § 6.05(h), provide little if any relief for voters with disabilities who are more likely to live alone, less likely to be married, FOF ¶ 112, and receive assistance from a non-family member, such as a direct support professional, FOF ¶¶ 145, 149, 329.

218.    By chilling assistors and limiting the pool of available assistors, Sections 6.05 and 6.07, impermissibly restricts who may assist a voter with a disability.

219.    The added form coupled with the criminal penalty exacerbates existing barriers faced by voters with disabilities. The impact of Sections 6.05 and 6.07 is unduly burdensome on the right to assistance and contravenes Section 208 of the VRA.

## VI.    CONCLUSION

220.    As demonstrated above, Plaintiffs have met all of the elements to prove their ADA and Section 504 claims: 1) Plaintiffs have standing to sue on the basis of organizational injury and injury to the organization's members who are qualified individuals with disabilities; 2) Defendants receive federal financial assistance and are covered entities under Section 504; 3) Plaintiffs were discriminated against by Defendants in attempting to access Defendants' voting programs; and 4) Defendants' exclusion of Plaintiffs from Defendants' voting programs was by reason of the Plaintiffs' disabilities. Defendants have not met their burden of proof in raising a fundamental alteration defense.

221.    Further, individually and collectively, SB 1 Sections 6.01, 6.03-6.07, and 7.04 "stand as obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress" in Section 208 of the VRA. *See Arizona, supra*, 567 U.S. at 399; *see also* FOF ¶¶ 232,

AFDOCS:199405450.4

295, 326, 343-49, 599. SB 1 contravenes Section 208's language and legislative history which

confirms Congress intended to grant voters the right to seek assistance from a person of their

choice, with only two enumerated exceptions. SB1 unduly burdens the right to assistance and

impermissibly restricts who a voter may choose beyond the express limitations in § 208. Thus,

SB1's voter assistance restrictions violate and are preempted by Section 208 of the VRA.

Dated: January 19, 2024                        Respectfully Submitted,

/s/ Shira Wakschlag
Shira Wakschlag*
The Arc of the United States, Inc.
2000 Pennsylvania Ave NW., Suite 500
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org

Kenneth E. Broughton
Texas Bar No. 03087250
J. Keely Pippin
Texas Bar No. 24116306
Reed Smith LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
Facsimile: (713) 469-3899
kbroughton@reedsmith.com
kpippin@reedsmith.com

Sarah Cummings Stewart
Texas Bar No. 24094609
Reed Smith LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
sarah.stewart@reedsmith.com

Jennifer A. Holmes*

NAACP Legal Defense and Educational
Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
jholmes@naacpldf.org

Kathryn Sadasivan*
Amir Badat*
Victor Genecin*
Breanna Williams*
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
ksadasivan@naacpldf.org
abadat@naacpldf.org
vgenecin@naacpldf.org
bwilliams@naacpldf.org

*Admitted *pro hac vice*

***Counsel for Plaintiffs Houston Area Urban League; Delta Sigma Theta Sorority, Inc.; The Arc of Texas; and Jeffrey Lamar Clemmons***

178

/s/ *Nina Perales*
Nina Perales (TX Bar No. 24005046)
Julia R. Longoria (TX Bar No. 24070166)
Fátima L. Menéndez (TX Bar No. 24090260)
Kenneth Parreno (MA BBO No. 705747)
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Tel: (210) 224-5476; Fax: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org
kparreno@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Tel: (212) 859-8000; Fax: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com

***Attorneys for Plaintiffs***

**LA UNIÓN DEL PUEBLO ENTERO, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON INC.**

*Admitted pro hac vice*

/s/ *Leah J. Tulin*
Leah J. Tulin*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW, Suite 1150
Washington, DC 20036
(202) 650-6397
tulinl@brennan.law.nyu.edu

Sean Morales-Doyle
Jasleen K. Singh*
Patrick A. Berry*
Robyn N. Sanders*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310; Fax: (212) 463-7308
sean.morales-doyle@nyu.edu
jasleen.singh@nyu.edu
patrick.berry@nyu.edu
rs8592@nyu.edu

Elizabeth Y. Ryan (TX Bar No. 24067758)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
liz.ryan@weil.com

***Attorneys for Plaintiffs***

**FRIENDSHIP-WEST BAPTIST CHURCH, TEXAS IMPACT, JAMES LEWIN**

*Admitted pro hac vice*

179

 */s/ Christopher McGreal*
Christopher McGreal
Texas State Bar No. 24051774
Lucia Romano
Texas State Bar No. 24033013
Peter Hofer
Texas Bar No. 09777275
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org

Dayton Campbell-Harris**
Washington State Bar No. 59692
Adriel I. Cepeda Derieux*
New York State Bar No. 4919163
Ari Savitzky*
New York State Bar No. 5060181
Sophia Lin Lakin*
New York State Bar No. 5182076
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334 (phone)
(212) 607-3318 (fax)
dcampbell-harris@aclu.org
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org

Zachary Dolling
Texas Bar No. 24105809
Hani Mirza
Texas Bar No. 24083512
Sarah X. Chen*
California Bar No. 325327
Veronikah Warms*
Texas Bar No. 24132682

**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Edgar Saldivar
Texas Bar No. 24038188
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Brian Dimmick*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
915 15th St. NW
Washington, D.C. 20005
(202) 731-2395 (phone)
bdimmick@aclu.org

AFDOCS:199405450.4

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

***COUNSEL FOR OCA-GREATER
HOUSTON PLAINTIFFS***
   *admitted *pro hac vice*
   **practice is limited to federal court

AFDOCS:199405450.4

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 19, 2024, the foregoing document was filed electronically through CM/ECF and that all counsel of record were served by CM/ECF.

<u>/s/ Derek Ha</u>
Derek Ha

AFDOCS:199405450.4