**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | |
| | § | Case No. 5:21-cv-00844-XR |
| STATE OF TEXAS, *et al.*, | § | [Lead Case] |
| | § | |
| *Defendants.* | § | |
| | § | |
| HARRIS COUNTY REPUBLICAN PARTY, *et al.*, | § | |
| | § | |
| *Intervenor-Defendants.* | § | |

**LUPE PLAINTIFFS' PROPOSED FINDINGS OF FACT**

**AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

PROPOSED FINDINGS OF FACT .....................................................................................2

I.    The Parties ..................................................................................................................2

    A.    LUPE Plaintiffs ...............................................................................................2

        1.    Friendship West Baptist Church ...........................................................2

        2.    Texas Impact ........................................................................................8

        3.    James Lewin.........................................................................................14

    B.    The Defendants ...............................................................................................17

        1.    Texas Secretary of State .....................................................................17

        2.    Attorney General Ken Paxton..............................................................18

        3.    County Elections Administrators .........................................................18

        4.    District Attorneys ................................................................................19

II.   Challenged Provisions of SB1 ...................................................................................20

III.  LUPE Plaintiffs' Legal Claims .................................................................................24

IV.   Section 4.09 of SB1 is impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause...........................................................................................................27

    A.    Section 4.09 of SB1 lacks any ascertainable standard and fails to give poll workers fair notice of what conduct is prohibited. .................................................27

        1.    Regulated parties do not know what conduct may render a poll watcher's observation "not reasonably effective."...........................................................27

        2.    The standard set forth in Section 4.09 rests on a subjective determination by poll watchers. ...................................................................................................30

        3.    Section 4.09's ambiguity has introduced conflict and confusion at the polls...................................................................................................................31

        4.    The Secretary of State has provided insufficient guidance about how Section 4.09 should be construed and applied. ..........................................................33

    B.    Section 4.09 invites arbitrary and discriminatory enforcement. ...........................36

        1.    Regulated parties are concerned about facing prosecution for violating Section 4.09.................................................................................................................36

        2.    Election workers' concerns about being prosecuted for violating Section 4.09 are well-founded. ..........................................................................................37

3.      Recent enforcement actions confirm that the threat of arbitrary enforcement of Section 4.09 is credible...................................................41

V.    SB1 imposes undue burdens on the right to vote in violation of the First and Fourteenth Amendments (*Anderson-Burdick*). .....................................................................43

A.    Sections 5.07 and 5.13 impose severe burdens on the right to vote. ....................43

1.      Texas's statewide and county voter registration databases are inadequate to support SB1's ID requirements. ..................................................................44

2.      SB1's ID requirements cause voters to make unintentional errors or omissions.................................................................................................49

3.      Guidance from state officials on how to comply with SB1's new ID requirements is inadequate.........................................................................53

4.      Rejection rates skyrocketed due to SB1's ID requirements......................55

5.      The notice and cure process does not diminish the burden imposed by Sections 5.07 and 5.13. ..............................................................................58

6.      Sections 5.07 and 5.13 disproportionately burden voters of color and voters with disabilities. ...............................................................................64

7.      Sections 5.07 and 5.13 will continue to cause voters' ABBMs and mail ballots to be rejected. ................................................................................69

B.    Sections 6.03, 6.04, 6.05, 6.06, and 7.04 impose severe burdens on the right to vote for those who need assistance. ..........................................................................71

C.    Sections 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, and 7.04 are not rationally related to the State's purported interests in preventing voter fraud. ......................................71

1.      Pre-SB1 law already addressed the few instances of voter fraud .............71

a.      Identifying a voter who votes by mail (Sections 5.07, 5.13). ........72

b.      Voter assistance in the polling place (Sections 6.03, 6.04)............72

c.      Mail voter assistance (Section 6.04, 6.05, 6.06). ..........................74

d.      "Vote Harvesting" (Section 7.04). ................................................74

2.      Widespread election fraud does not exist in Texas. ................................75

3.      There is no connection between SB1's challenged provisions and the rare instances of voter fraud..............................................................................79

a.      Sections 5.07 and 5.13 ................................................................79

b.      Sections 6.05, 6.06, and 7.04 ......................................................81

c.      Section 6.06................................................................................82

d.      Section 7.04................................................................................83

e.      Sections 6.03 and 6.04 ................................................................85

4. Instead of making voting more secure, SB1's challenged provisions target voter outreach activity by organizations that work with under-resourced voters—many of whom are racial minorities—and reduce the information and assistance available to those voters. ...................................86

 a. Texas officials targeted legitimate election activity as voter fraud. ...................................86

 b. Texas officials associate Hispanic and Black individuals with voter fraud. ...................................89

 c. Reducing third party voter outreach and assistance deprives low income and minority voters of important voting information and assistance with voting. ...................................90

5. There are less burdensome alternatives to SB1's ID number requirements. ...................................90

VI. SB1's restrictions on voter assistance and in-person canvassing have discriminatory results on Latino and Black voters in violation of Section 2 of the Voting Rights Act of 1965. ...................................93

 A. The restrictions in Sections 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1 abridge the minority voters' opportunity to participate in the political process and exercise their constitutional right to vote. ...................................93

 B. The totality of the circumstances shows that SB1's restrictions interact with social, electoral, and historical conditions to cause an inequality in the opportunities of minority voters to participate in the political process. ...................................97

  1. Texas has a long history of official discrimination affecting the rights of Latinos to register, vote, and participate in the democratic process. (Senate Factor 1) ...................................97

  2. Latino Texans continue to bear the effects of historical discrimination in education, employment, housing, and health, hindering the ability of these groups to participate effectively in the political process. (Senate Factor 5) ...................................100

  3. The burden that SB1's restrictions place on assistance and their racially disparate impact are significant. (*Brnovich* Guideposts 1 and 3) ...................112

  4. SB1's restrictions on voter assistance and in-person canvassing do not have a long pedigree nor are they in widespread use in the United States. (*Brnovich* Guidepost 2) ...................................113

  5. The voting system in Texas does not—and indeed cannot—provide voters who require assistance with ways to cast their ballots without assistance. (*Brnovich* Guidepost 4) ...................................114

6.      SB1's restrictions on assistance do not serve any of the State's purported interests and the justifications the State has offered are tenuous at best. (Senate Factor 9 & *Brnovich* Guidepost 5)..............................................115

PROPOSED CONCLUSIONS OF LAW ...............................................................116

I.      Plaintiffs have standing to bring this lawsuit. ...............................................116

    A.      Friendship-West and Texas Impact Plaintiffs have associational standing..........116

    B.      Friendship-West and Texas Impact have organizational standing. .....................117

    C.      James Lewin has individual Article III standing....................................121

II.     The Defendants are proper. ...............................................................122

    A.      Defendants are subject to suit under the Voting Rights Act..............................122

    B.      LUPE Plaintiffs may bring their constitutional claims against the Secretary of State and the Attorney General under the *Ex parte Young* exception to sovereign immunity. ...............................................................122

    C.      LUPE Plaintiffs may sue Defendants for violations of the ADA. .......................129

III.    SB1's poll watcher provisions are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment. ................................................129

IV.     SB1's restrictions on vote by mail, voter assistance, and in-person canvassing impose an undue burden on the right to vote in violation of the First and Fourteenth Amendments. .......................................................................................136

V.      SB1's restrictions on voter assistance and in-person canvassing violate Section 2 of the VRA. .......................................................................................139

# INTRODUCTION

The Texas Legislature passed the Election Integrity Protection Act of 2021, Tex. S.B. 1, 87th Leg., 2d C.S., ch. 1 (2021) ("SB1") on August 31, 2021. LUPE Plaintiffs[1] filed suit challenging various provisions of SB1 under the U.S. Constitution, the Voting Rights Act of 1965, and the Americans with Disabilities Act against several state and county law enforcement and election officials charged with enforcing SB1. This Court held a bench trial beginning on September 11, 2023, and concluding on October 20, 2023. The trial record remains open with respect to intentional discrimination claims pending resolution of *LUPE v. Bettencourt*, No. 23-50201 (5th Cir.), and any related discovery. *See* Dkt.700.

LUPE Plaintiffs respectfully submit this filing, which includes Proposed Findings of Fact and Conclusions of Law addressing LUPE Plaintiffs' standing and the merits of their claims brought in Count I (*Anderson-Burdick*), Count IV (Section 2 of the Voting Rights Act), and Count VII (void for vagueness) of their Second Amended Complaint.[2]  Proposed Findings of Fact and Conclusions of Law for LUPE Plaintiffs' claims brought in Count V (Section 208 of the VRA), Count VI (ADA), and Counts VII (Free Speech) are addressed in joint submissions being filed contemporaneously with other Plaintiffs' groups.  *See* Plaintiffs' Joint Proposed Findings of Fact and Conclusions of Law on Section 208 of the Voting Rights Act ("Section 208 Submission"); Plaintiffs' Proposed Findings of Fact and Conclusions of Law for Claims Under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Section 208 of the Voting Rights Act ("ADA Submission"); Plaintiffs OCA-Greater Houston, League Of Women Voters Of Texas,

---

[1] LUPE Plaintiffs are La Unión del Pueblo Entero ("LUPE"), Friendship-West Baptist Church, Southwest Voter Registration Education Project, Texas Impact, Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, William C. Velasquez Institute, FIEL Houston Inc., and James Lewin.
[2] LUPE Plaintiffs also have remaining claims for intentional discrimination pursuant to Count, Count III, and Count IV of their Second Amended Complaint.  Those claims have not yet been tried.

and REVUP Texas Proposed Findings of Fact and Conclusions of Law ("OCA Submission").[3]

LUPE Plaintiffs also join in Plaintiffs' Joint Proposed Findings of Fact on the Legal Framework

of Plaintiffs' Claims ("Legal Framework Submission").  *See* Dkt. 846.

**PROPOSED FINDINGS OF FACT**

**I.    The Parties**

**A.    LUPE Plaintiffs**

1.    LUPE Plaintiffs are membership and community-based organizations, many of whom

represent the interests of Latino and Black Texans, churches, and other faith-based groups, and a

Texan who has served as an election judge.[4]

**1.    Friendship West Baptist Church**

2.    Plaintiff Friendship-West Baptist Church ("Friendship-West") is a church in Dallas, Texas.

Tr. 10/4/2023 at 2501:5-8 (Ayers).

3.    At trial, Danielle Ayers, the Pastor of Justice at Friendship-West, testified on the church's

behalf. Tr. 10/4/2023 at 2500:23-2501:4 (Ayers).

4.    Friendship-West was founded in 1976. Tr. 10/4/2023 at 2501:9-10 (Ayers).

5.    Friendship-West's mission is to be a game-changing Christian movement that connects

people to Christ and fights for justice, while also creating a beloved community. Tr. 10/4/2023 at

2501:11-14 (Ayers).

6.    At Friendship-West, the Justice Ministry is responsible for voter education, election

protection, as well as making sure that there are opportunities for Friendship-West's members to

---

[3] LUPE Plaintiffs join only in specific parts of the ADA Submission and the OCA Submission.  For clarity and ease of reference, the parts in which LUPE Plaintiffs join is indicated in those submissions.
[4] LUPE Plaintiffs will supplement their submission with additional proposed facts and conclusions of law regarding the remainder of the Plaintiffs not discussed here.

learn how to organize, engage in advocacy, and develop the legislative agendas that impact the church's community. Tr. 10/4/2023 at 2501:20-2502:1 (Ayers).

7.      As Pastor of Justice, Pastor Ayers offers pastoral care to the church's members and preaches to the congregation. Tr. 10/4/2023 at 2502:2-9 (Ayers). Pastor Ayers also develops strategies for Friendship-West to engage with political systems, as well as government and community organizations, to deal with issues that impact its members. Tr. 10/4/2023 at 2502:10-14 (Ayers).

8.      Friendship-West does not have a partisan affiliation. Tr. 10/4/2023 at 2502:17-18 (Ayers).

9.      Friendship-West has 32 full-time paid staff. Tr. 10/4/2023 at 2503:24-2504:2 (Ayers). Pastor Ayers is the only full-time employee of the church who works in the Justice Ministry. Tr. 10/4/2023 at 2504:31-7 (Ayers).

10.     Friendship-West has approximately 9,700 members. Tr. 10/4/2023 at 2502:19-2503:1-4 (Ayers).

11.     Friendship-West is a predominantly Black church; however, its membership is socioeconomically diverse and multigenerational. Tr. 10/4/2023 at 2502:19-25 (Ayers).

12.     Friendship-West's members live throughout the Dallas/Fort Worth area. Tr. 10/4/2023 at 2503:3-4 (Ayers).

13.     Friendship-West's membership includes Texans who are registered voters, who vote by mail because of their age or a disability, who require assistance with voting because of their age or a disability, who have assisted others with voting, and who have served as poll workers or election judges. Tr. 10/4/2023 at 2503:5-23 (Ayers).

14.     Pastor Ayers is a member of Friendship-West. Tr. 10/4/2023 at 2504:8-9 (Ayers).

15.    Friendship-West's members do not pay dues; however, they give contributions, and those contributions are used to carry out the church's ministry and mission. Tr. 10/4/2023 at 2504:10-13 (Ayers).

16.    Friendship-West engages in civic engagement activities, including voter education, election protection, and voter turnout work. Tr. 10/4/2023 at 2504:14-18 (Ayers).

17.    Friendship-West does voter engagement work because it is part of the tradition of the Black church. Tr. 10/4/2023 at 2505:12-15 (Ayers). Promoting its members' spiritual and social well-being also advances Friendship-West's mission because the church's members cannot take care of their social well-being without engaging in politics. Tr. 10/4/2023 at 2505:15-22 (Ayers); *see also* Tr. 10/4/2023 at 2505:23-2506:5 (Ayers).

18.    Friendship-West does voter turnout work during election season; however, it does its voter education work throughout the year. Tr. 10/4/2023 at 2504:19-21 (Ayers).

19.    Pastor Ayers develops the overall strategy for the church's voter engagement activities. Tr. 10/4/2023 at 2504:24-2505:5 (Ayers). Friendship-West also has support staff and volunteers who assist with its voter engagement work. Tr. 10/4/2023 at 2505:6-11 (Ayers).

20.    Friendship-West opposed SB1's poll watcher provisions and mail voting ID provisions because it felt those restrictions would have a significant impact on the people it serves, both in the church and outside the church. Tr. 10/4/2023 at 2506:6-2507:8 (Ayers).

21.    Friendship-West made Texas legislators – both Democrat and Republican – aware of its opposition to SB1 through legislative visits during the regular and special sessions. Tr. 10/4/2023 at 2507:9-17 (Ayers).

22.     Friendship-West also held several marches and rallies, and it educated its members about SB1 as the bill made its way through the legislature to keep church members engaged and informed. Tr. 10/4/2023 at 2507:18-21 (Ayers).

23.     As a result of Section 4.09, Friendship-West has adjusted the way and frequency by which it recruits and trains people to serve as election workers. Tr. 10/4/2023 at 2511:3-9 (Ayers). This change to the church's recruitment and training of election workers required additional staff and volunteer time. Tr. 10/4/2023 at 2520:5-7 (Ayers).

24.     To counteract Section 5.07 and 5.13, Pastor Ayers had to field members' questions about these requirements for the March and November 2022 elections. Tr. 10/4/2023 at 2511:106-2512:11 (Ayers).

25.     Friendship-West created a dedicated landing page on its website to provide accessible voter education information. Tr. 10/4/2023 at 2513:3-24 (Ayers). Friendship-West has not previously created such a dedicated web page as part of its voter education activities. Tr. 10/4/2023 at 2513:3-24 (Ayers).

26.     In response to SB1 and low turnout numbers in March 2022, Friendship-West launched a text message campaign to: (a) encourage voters who did not vote during the primary to vote in the general election; and (b) encourage voters who voted in the primary to vote again in the general election. Tr. 10/4/2023 at 2513:25-2514:11 (Ayers). Friendship West had not previously used such a text message campaign as part of its voter turnout activities. Tr. 10/4/2023 at 2514:12-21 (Ayers). To fund the text messaging campaign, Friendship-West diverted funding from its advocacy training and organizing training. Tr. 10/4/2023 at 2514:22-2515:4 (Ayers).

27.     In response to SB1, Friendship-West created three specific voter education videos about what to expect at polling locations and the ID requirements for mail ballots. Tr. 10/4/2023 at

2515:5-11 (Ayers). Prior to SB1, Friendship-West had created general voter education videos about voter registration deadlines, election dates, and election hours, but never about specific voting rules. Tr. 10/4/2023 at 2515:12-24 (Ayers); *see also* Tr. 10/4/2023 at 2528:6-17 (Ayers) (cross-examination).

28.     In response to SB1, Friendship-West abandoned its original plans for its podcast – namely, to address a broad array of topics around faith, politics, and race – to focus solely on voting so that the church's members understood the changes made by SB1. Tr. 10/4/2023 at 2515:25-2517:2 (Ayers).

29.     In response to SB1, Friendship-West conducted two surveys to assess how SB1 impacted its members, one prior to the March primary and one after the November general election. Tr. 10/4/2023 at 2517:5-2518:6 (Ayers). Friendship-West had never conducted such a survey before SB1. Tr. 10/4/2023 at 2518:7-9 (Ayers). Friendship-West diverted funding from its advocacy trainings and organizing trainings, as well as its travel expenses for legislative advocacy, to fund these surveys. Tr. 10/4/2023 at 2518:10-22 (Ayers).

30.     Because of its efforts to respond to SB1, Friendship-West struggled to meet its pastoral care responsibilities, which are integral to the church's mission as a religious institution. Tr. 10/4/2023 at 2518:23-2519:14 (Ayers).

31.     Because of SB1, Friendship-West could not adequately prepare for the 2023 legislative session in the way it usually would do in an even-numbered year. Tr. 10/4/2023 at 2519:15-22 (Ayers). Specifically, it was not able to meet with partners across the state or construct a robust legislative agenda for the church. Tr. 10/4/2023 at 2519:15-2520:4 (Ayers).

32.     Friendship-West's additional voter education efforts required staff and volunteer time. Tr. 10/4/2023 at 2520:8-10 (Ayers). The staff and volunteers that participated in those efforts are the

same staff and volunteers that would have been working on the church's other critical activities. Tr. 10/4/2023 at 2520:11-13 (Ayers).

33.     Responding to SB1 has made it more difficult for Friendship-West to conduct its operations, by diverting staff time and monetary resources away from other program areas, burdening an already understaffed justice ministry. Tr. 10/4/2023 at 2520:14-2521:4 (Ayers).

34.     Friendship-West put more resources behind voter education in response to SB1 than its voter education efforts in previous years, which required a diversion of staff and volunteer time away from its other operations. Tr. 10/4/2023 at 2520:8-16; 2531:16-25 (Ayers).

35.     Friendship-West did not do any advocacy training or organizing training in 2022 because of the church's efforts to counteract SB1. Tr. 10/4/2023 at 2527:1-3 (Ayers) (cross-examination).

36.     Friendship-West has associational standing because its members would otherwise have standing to bring suit to challenge Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04's in-person canvassing ban, and 8.01.

37.     Section 4.09 has prompted concerns among Friendship-West's members. Tr. 10/4/2023 at 2507:22-2508:5 (Ayers).

38.     One member of Friendship-West who previously served as an election judge told Pastor Ayers that she was fearful about the subjectivity around what actions were inappropriate to take against a poll watcher. Tr. 10/4/2023 at 2508:23-2510:18 (Ayers).

39.     Based on her interactions with Friendship-West's members, Pastor Ayers does not expect their concerns about Section 4.09 to go away because the law is subject to interpretation; even if someone understands the law, what action is appropriate is subjective. Tr. 10/4/2023 at 2510:20-2511:2 (Ayers).

40.     Friendship-West's members were confused about the required identification under SB1, were not sure where to place the required identification numbers, and called Pastor Ayers for help because they wanted to make sure everything was filled out correctly. Tr. 10/4/2023 at 2511:10-2512:1 (Ayers).

41.     Sections 5.07 and 5.13 create an additional step that makes it more difficult for the church's members to request, receive, and return their ABBMs and mail ballots. Tr. 10/4/2023 at 2512:1-5 (Ayers).

42.     Based on her interactions with Friendship-West's members, Pastor Ayers does not expect their concerns about 5.07 and 5.13 to wane despite the church's voter education efforts because voters will always have to make sure their mail ballot is requested, filled out, and returned properly under the SB1 regime. Tr. 10/4/2023 at 2512:12-18 (Ayers).

43.     The interests Friendship-West seeks to protect are germane to the organization's purpose.

44.     Neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit.

## 2.     Texas Impact

45.     Plaintiff Texas Impact is a membership-based organization for the mainline Protestant, Jewish, and Muslim denominations in Texas. Tr. 10/11/2023 at 3641:24-3642:2 (Houston).

46.     At trial, Joshua Houston, advocacy director of Texas Impact, testified on Texas Impact's behalf. Tr. 10/11/2023 at 3640:22-3641:15 (Houston).

47.     Texas Impact was founded in 1973 out of the Texas Conference of Churches. Tr. 10/11/2023 at 3642:3-4 (Houston).

48.     Texas Impact's mission is to promote and advance public policy that is consistent with the social principles of its member denominations. Tr. 10/11/2023 at 3642:5-7 (Houston). To do so,

Texas Impact educates, equips, and mobilizes its members. Tr. 10/11/2023 at 3642:8-12 (Houston). Texas Impact also engages in lobbying. Tr. 10/11/2023 at 3642:8-12 (Houston).

49.     Texas Impact focuses on a wide range of issues, from voting rights and public education, to healthcare, religious freedom, migration, climate, energy policy, payday lending, and foster care. Tr. 10/11/2023 at 3642:13-22 (Houston).

50.     Texas Impact does not have a partisan affiliation. Tr. 10/11/2023 at 3642:24-25 (Houston).

51.     Texas Impact has paid staff – seven of whom are full-time and two of whom are part-time. Tr. 10/11/2023 at 3646:23-3647:8 (Houston). Texas Impact also has three fellows and one intern. Tr. 10/11/2023 at 3646:23-3647:8 (Houston). Mr. Houston is one of Texas Impact's paid staff members, and all staff, including Mr. Houston, are members of Texas Impact. Tr. 10/11/2023 at 3646:23-3647:8 (Houston).

52.     Texas Impact has institutional members, congregational members, and individual members across Texas. Tr. 10/11/2023 at 3643:1-13, 3645:1-4 (Houston).

53.     Texas Impact has dozens of institutional members and approximately 1,600 congregational members. Tr. 10/11/2023 at 3643:14-18 (Houston); *see also* Tr. 10/11/2023 at 3643:21-3644:3 (Houston) (listing some of Texas Impact's institutional and congregational members).

54.     Texas Impact has 22,000 individual members in its database, approximately 400 of whom are dues-paying members. Tr. 10/11/2023 at 3645:5-18 (Houston). Accounting for the total membership of all of Texas Impact's institutional and congregational members, there are around 5 million Texans who belong to Texas Impact. Tr. 10/11/2023 at 3645:5-18 (Houston).

55.     Texas Impact's institutional, congregational, and individual members pay dues; however, the amount varies widely because Texas Impact is more interested in relationships than the money. Tr. 10/11/2023 at 3644:17-25 (Houston). Dues are a minimum of $500, $100, and $40 at the

institutional, congregational, and individual levels, respectively. Tr. 10/11/2023 at 3644:17-25 (Houston).

56.     Texas Impact's individual members span the political spectrum. Tr. 10/11/2023 at 3645:20-22 (Houston).

57.     Texas Impact's individual members include Black and Latino Texans. Tr. 10/11/2023 at 3645:23-3646:6 (Houston).

58.     Texas Impact's individual members include Texans who vote by mail because of a disability or their age, who require assistance with voting in-person or by mail because of a disability or their age, and who require assistance with voting in-person or by mail because of cultural or language barriers. Tr. 10/11/2023 at 3646:7-16 (Houston). Texas Impact's individual members also include Texans who have assisted others with voting, either in-person or by mail, and who have served as poll workers or election judges. Tr. 10/11/2023 at 3646:17-22 (Houston).

59.     Texas Impact's civic engagement work related to voting includes voter registration, helping people apply to vote by mail, conducting voter education, and encouraging people to serve as volunteer deputy registrars. Tr. 10/11/2023 at 3647:10-3648:1 (Houston). Texas Impact also helps counties recruit poll workers and encourages its members to serve as poll monitors for the Texas Election Protection Coalition. Tr. 10/11/2023 at 3648:2-14 (Houston).

60.     Texas Impact conducts this voter engagement work year-round and statewide. Tr. 10/11/2023 at 3648:15-20 (Houston). Texas Impact ramps up the intensity of this work three to six months prior to a primary or general election. Tr. 10/11/2023 at 3648:15-20 (Houston).

61.     Texas Impact does this civic engagement work related to voting because it is critical to its mission of advancing public policy. Tr. 10/11/2023 at 3649:7-18 (Houston).

62.     Texas Impact opposed SB1 because it was concerned about the effect the law's poll watcher provisions would have on people's willingness to serve as poll workers. Tr. 10/11/2023 at 3650:7-19 (Houston). Texas Impact was also concerned about SB1's mail voting provisions because it has a lot of members who vote by mail because they are over 65 or have a disability. Tr. 10/11/2023 at 3650:7-19 (Houston).

63.     Texas Impact's experience with the pandemic during the 2020 election – namely, ensuring there were enough poll workers and encouraging its members to vote by mail to try to limit long lines at the polls – informed its opposition to SB1. Tr. 10/11/2023 at 3650:20-3651:25 (Houston).

64.     Texas Impact, through Mr. Houston and its members, raised these concerns and others about SB1 with both political parties in the Legislature. Tr. 10/11/2023 at 3652:1-21 (Houston). Texas Impact also held events and did some direct social media to oppose SB1. Tr. 10/11/2023 at 3652:1-21 (Houston).

65.     To counteract Section 4.09, Texas Impact increased its efforts to recruit poll workers. Tr. 10/11/2023 at 3655:8-12 (Houston). Specifically, Texas Impact did social media ad buys, encouraged its members to serve as poll workers at events, and partnered with "Power to the Polls" so it could track the effectiveness of its poll worker recruitment efforts. Tr. 10/11/2023 at 3655:13-24 (Houston).

66.     While Texas Impact ran paid social media ads to recruit poll workers in 2020 because of the pandemic, that effort was not to the size and scope of what Texas Impact had to do post-SB1 because of the law's poll watcher provisions. Tr. 10/11/2023 at 3655:25-3656:5 (Houston).

67.     Texas Impact ceased its "Vote by Mail Captains Program" – a program it started during the pandemic in 2020 to encourage its eligible members to vote by mail – because of SB1's new ID requirements for mail voting. Tr. 10/11/2023 at 3658:2-3659:7 (Houston). Texas Impact likely

would have continued its Vote by Mail Captains Program but for SB1. Tr. 10/11/2023 at 3659:8-10 (Houston).

68.    Texas Impact's efforts to counteract SB1 – namely, running paid social media ads to recruit poll workers and holding events to educate its members about the law's ID requirements for mail voting – required staff and volunteer time, and the staff and volunteers who worked on those efforts are the same staff and volunteers who would have worked on Texas Impact's other activities. Tr. 10/11/2023 at 3659:11-20 (Houston).

69.    Rather than rewrite a major publication about voting by mail that had become obsolete because of SB1, Texas Impact purchased "Ballot Ready," an online application that attempts to be a one-stop shop for voting information. Tr. 10/11/2023 at 3659:21-3660:8 (Houston); LUPE Ex. 218. Ballot Ready cost Texas Impact around $25,000 to $30,000 per year, with a multi-year plan. Tr. 10/11/2023 at 3660:9-11 (Houston); LUPE Ex. 220.

70.    Despite being a small nonprofit, Texas Impact has a very large legislative agenda. Tr. 10/11/2023 at 3660:22-3661:9 (Houston). So, when Texas Impact is working on one thing like helping people vote because of SB1, it is not working on something else, like public education, healthcare, the electric grid, or any other items on its legislative agenda, which is set by Texas Impact's board. Tr. 10/11/2023 at 3660:22-3661:9 (Houston).

71.    The reluctance of Texas Impact's members to serve as poll workers affects its ability to accomplish its mission because if you do not have poll workers, polling locations cannot open. Tr. 10/11/2023 at 3661:10-16 (Houston). And if polling locations are not open, then people with inflexible schedules due to work, childcare, or lack of transportation get disenfranchised. Tr. 10/11/2023 at 3661:17-22 (Houston).

72.    The reluctance of Texas Impact's members to vote by mail also affects the organization's ability to accomplish its mission because there are people who have no option but to vote by mail, and if those voters have an increased risk of having their ballot being rejected, that affects their right to cast a ballot and have that ballot counted. Tr. 10/11/2023 at 3661:23-3662:5 (Houston). If Texas Impact's members' right to vote is affected, then Texas Impact's influence as an organization, which is critical for its mission, is affected. Tr. 10/11/2023 at 3661:23-3662:5 (Houston).

73.    While any voting-related bill the size of SB1 would require a large amount of education, educational materials, and educational resources for Texas Impact to fulfill its mission, Texas Impact has never experienced a voting-related bill the size and scope of SB1, or that produced the level of anxiety among its membership about exercising their most basic right. Tr. 10/11/2023 at 3666:23-3667:8 (Houston) (cross-examination).

74.    Texas Impact has associational standing because its members would otherwise have standing to challenge Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04's in-person canvassing ban, and 8.01.

75.    Texas Impact's members expressed concerns about Section 4.09 because they do not understand what the parameters are, there is a criminal penalty, and they are not sure what "reasonably effective" means. Tr. 10/11/2023 at 3652:23-3653:19 (Houston).

76.    Richard Ertel, former board president and member of Texas Impact, told Mr. Houston he was concerned about when he could engage and when he could not, if a poll watcher were to get aggressive. Tr. 10/11/2023 at 3652:22-3653:19, 3654:6-20 (Houston); *see also* Tr. 9/13/2023 at 604:15-605:19 (Ertel)

77.    Based on his interactions with Texas Impact's members, Mr. Houston does not expect their concerns about poll watchers to go away as they adjust to SB1. Tr. 10/11/2023 at 3654:22-3655:3

(Houston). Mr. Houston also noticed that the more Texas Impact educated its members about Section 4.09, the more nervous they got about poll watchers. Tr. 10/11/2023 at 3654:21-3655:3 (Houston).

78.    Texas Impact's members expressed concerns about SB1's ID requirements for mail voting because they do not remember what number with which they registered. Tr. 10/11/2023 at 3656:7-18 (Houston).

79.    Texas Impact's members are also concerned that they will forget to put their ID number on the carrier envelope, because people are not used to looking at the inside of envelopes. Tr. 10/11/2023 at 3656:19-21 (Houston).

80.    Sadia Tirmizi, a member of Texas Impact, reached out to Mr. Houston because she was having a difficult time helping her father, who had cancer, and her mother vote by mail because of SB1's new ID requirements. Tr. 10/11/2023 at 3656:22-3657:9 (Houston).

81.    Based on his interactions with Texas Impact's members, Mr. Houston does not expect their concerns about SB1's ID requirements for mail voting to dissipate because there is always going to be someone voting by mail for the first time and people do not remember what ID number they used when they registered to vote. Tr. 10/11/2023 at 3657:10-3658:1 (Houston).

82.    The interests Texas Impact seeks to protect are germane to the organization's purpose.

83.    Neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit.

### 3.    James Lewin

84.    Plaintiff James Lewin is a resident of Austin, Texas, a registered voter, and has served as an election worker and an election judge in elections held in Travis County. Tr. 9/13/2023 at 551:1-10 (Lewin).

85.    Mr. Lewin decided to work at the polls to become more active in his community, participate in the democratic process, and contribute to facilitating fair and well-run elections in Travis County. Tr. 9/13/2023 at 551:18-21 (Lewin).

86.    Mr. Lewin was first employed by Travis County as an election judge during the early voting period leading up to the November 2020 election. Tr. 9/13/2023 at 551:12-13 (Lewin). Mr. Lewin worked at the polls again in Travis County for the November 2021 General Election, the March 2022 Primary Election, and the November 2022 General Mid-Term Election. Tr. 9/13/2023 at 553:4-7 (Lewin).

87.    Mr. Lewin felt he had a clear understanding of what poll watchers could observe in 2020 when he first worked at the polls. Tr. 9/13/2023 at 555:3-6 (Lewin); *see also* Tr. 9/13/2023 at 555:11-556:2 (Lewin) (describing his understanding of what poll watchers could and could not observe in 2020).

88.    Before serving in 2020, Mr. Lewin reviewed a poll worker's manual from the Travis County Elections Division and watched a series of online training videos. Tr. 9/13/2023 at 554:924 (Lewin); LUPE Ex. 201 (Travis County Poll Worker Training Manual for the November 2020 General and Special Elections). The videos and manual that he reviewed discussed poll watchers. Tr. 9/13/2023 at 554:25-555:2 (Lewin).

89.    Mr. Lewin decided to continue working at the polls in 2021 and 2022 because he felt he could contribute to managing a well-run polling location and could contribute to those elections. Tr. 9/13/2023 at 553:10-13 (Lewin).

90.    In 2022, after the Legislature passed SB1, Mr. Lewin had concerns about working at the polls because he found some of SB1's provisions relating to poll watchers to be ambiguous and potentially problematic, and he had concerns about his ability to execute all the tasks and perform

his role as an election judge in light of those ambiguous provisions. Tr. 9/13/2023 at 553:18-23 (Lewin).

91.     Despite his concerns, Mr. Lewin decided to continue working at the polls because he believed it was important work. Tr. 9/13/2023 at 554:2-7 (Lewin). He reviewed an updated poll worker's manual and attended a Zoom call where election workers from the Travis County Elections Division played training videos and gave poll workers an opportunity to ask questions. Tr. 9/13/2023 at 556:6-17 (Lewin); LUPE Ex. 202 (Travis County Poll Worker Training Manual for the March 2022 Primary Election).

92.     Mr. Lewin did not have a clear understanding of what poll watchers could observe based on the training and the manual that he reviewed in 2022 because those materials did not explain how SB1 affected what poll watchers could observe. Tr. 9/13/2023 at 556:21-557:4 (Lewin).

93.     Mr. Lewin decided to participate in the poll watcher training and reviewed the poll watcher manual—even though he was not required to complete those trainings—so that he could gather more information about poll watchers and better advise the poll workers on his team about how to interact with poll watchers. Tr. 9/13/2023 at 557:25-558:19 (Lewin); LUPE Ex. 203 (Certificate of Completion for Texas Online Poll Watcher Training dated 2/17/22).

94.     Mr. Lewin did not have a clear understanding of what poll watchers could observe based on the poll watcher training and manual that he reviewed. Tr. 9/13/2023 at 558:20-559:8 (Lewin).

95.     Although Mr. Lewin has not encountered disruptive poll watchers at the polling locations where he has worked, he nevertheless harbors concerns that poll watchers may be disruptive in the future because the ambiguous language in SB1 and the confusion over how to interpret it might empower poll watchers to be disruptive. Tr. 9/13/2023 at 561:4-562:17 (Lewin).

96.    Mr. Lewin believes that SB1's ambiguous language about the distance a poll watcher might stand from the voter and the fact that he could be accused of running afoul of SB1 if he does not adhere to some of the ambiguous parameters in the law would empower people who sought to disrupt the election to test the limits of what is appropriate at the polling location. Tr. 9/13/2023 at 562:1-17 (Lewin).

97.    Mr. Lewin finds the language of Section 4.09 confusing and unclear. Tr. 9/13/2023 at 563:18-20 (Lewin). He is concerned about being criminally prosecuted for violating Section 4.09 because he does not know how to adjust his behavior to adhere to the law or how to adjust the instructions he gives to his team at the polls. Tr. 9/13/2023 at 566:1-13 (Lewin).

98.    Since the Legislature passed SB1, Mr. Lewin has spent more time preparing to work at the polls. Tr. 9/13/2023 at 567:14-568:3 (Lewin).

99.    Mr. Lewin has also experienced additional stress about his work at the polls because he fears that he could be prosecuted based on the ambiguous language of SB1's poll worker provisions. He also experiences stress because he does not feel that he can give good instructions to the other election workers that he supervises about how they should interact with poll watchers to avoid being prosecuted for violating SB1. Tr. 9/13/2023 at 568:4-25 (Lewin).

### B.    The Defendants

100.    LUPE Plaintiffs have brought claims against the State of Texas and a number of state and county law enforcement and election officials charged with executing SB1.

### 1.    Texas Secretary of State

101.    Defendant Jane Nelson is the Secretary of State of the State of Texas. The Office of the Secretary of State is an executive department or agency of the State of Texas. *See* Dkt. 753, Joint Pretrial Order, at 23 ¶ 39; Tr. 9/22/2023 at 1825:12-17 (Adkins).

102.    Additional proposed findings of fact regarding the Office of the Secretary of State are included in the OCA Submission. *See* OCA Submission at II.A. Rather than repeat those additional findings of fact here, LUPE Plaintiffs adopt and incorporate them by reference.

### 2.    Attorney General Ken Paxton

103.    Defendant Ken Paxton is the Attorney General of Texas. The Office of the Texas Attorney General is an executive department or agency of the State of Texas. *See* Dkt. 204-1; Dkt. 753, Joint Pretrial Order, at 23-24 ¶ 40.

104.    Additional proposed findings of fact regarding the Office of the Attorney General are included in the OCA submission. *See* OCA Submission at II.B. Rather than repeat those additional findings of fact here, LUPE Plaintiffs adopt and incorporate them by reference.

### 3.    County Elections Administrators

105.    Local election officials administer Texas elections. They receive and review ballot applications, Tex. Elec. Code § 86.001, mail carrier and ballot envelopes to voters, *id*. § 86.002, receive and process marked ballots, *id*. §§ 86.006, 86.007(b), 86.011, verify voter signatures, id. § 87.027(i), and count the results, *id*. § 87.061.

106.    Under Section 31.043 of the Tex. Elec. Code, "[t]he county elections administrator shall perform: (1) the duties and functions of the voter registrar; (2) the duties and functions placed on the county clerk by this code; (3) the duties and functions relating to elections that are placed on the county clerk by statutes outside this code, subject to Section 31.044; and (4) the duties and functions placed on the administrator under Sections 31.044 and 31.045."

107.    Under Section 83.002 of the Tex. Elec. Code, "[t]he county clerk is the early voting clerk for the county in: (1) the general election for state and county officers and any other countywide election held at county expense; (2) a primary election; and (3) a special election ordered by the governor."

18

108.    LUPE Plaintiffs have brought claims against two county election administrators.

109.    Defendant Lisa Wise is the El Paso County Elections Administrator and is responsible for the administration of elections in El Paso County. *Id*. at 24 ¶ 43; Tr. 9/11/2023 at 161:9-11 (Wise).

110.    Defendant Michael Scarpello is the Dallas County Elections Administrator and is responsible for the administration of elections in Dallas County. *Id*. at 24 ¶ 42; Tr. 9/12/2023 at 375:4-6 (Scarpello); *see also* Tr. 9/12/2023 at 425:9-426:8 (Scarpello) (testifying he sees himself as an election official and thus understands Section 8.01 to impose a civil penalty on him including loss of employment and benefits or money damages for violations of the Tex. Elec. Code).

### 4.    District Attorneys

111.    District attorneys are tasked with enforcement of the State's criminal laws and represent the State of Texas in all criminal cases in their district, unless conflicts arise. Tex. Const. art. 5, § 21; Tex. Code Crim. P. Art. 2.01; *see* Tex. Gov't Code § 43.180(b). This prosecutorial authority includes prosecution of criminal violations of the Tex. Elec. Code. *See generally Stephens*, No. PD-1032-20, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021). Additionally, under Section 273.001 of the Tex. Elec. Code, "[i]f two or more voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney *shall* investigate the allegations" (emphasis added). For the Office of the Attorney General to charge a crime under the Tex. Elec. Code, the district attorney's consent or authorization is necessary. Tr. 10/16/2023 at 3909:18-23; 3914:12-18 (White).

112.    LUPE Plaintiffs sued three district attorneys.

113.    Defendant John Creuzot is the Dallas County District Attorney and is responsible for the investigation and prosecution of alleged criminal violations of the Tex. Elec. Code in Dallas

County, including SB1 §§ 4.09, 6.04, 6.05, 6.06, and 7.04's in-person canvassing ban. Dkt. 753, Joint Pretrial Order, at ¶ 25.

114.    Defendant José Garza is the Travis County District Attorney and is responsible for the investigation and prosecution of alleged criminal violations of the Tex. Elec. Code in Travis County, including SB1 §§ 4.09, 6.05, 6.06, and 7.04's in-person canvassing ban, and the crime of perjury. *Id*. at 25 ¶ 50.

115.    Defendant Bill Hicks is the District Attorney of the 34th Judicial District, which encompasses El Paso, Hudspeth, and Culberson counties, and is responsible for the investigation and prosecution of alleged criminal violations of the Tex. Elec. Code in El Paso County, including SB1 §§ 4.09, 6.04, 6.05, 6.06, and 7.04's in-person canvassing ban, and the crime of perjury. *Id*. at 26 ¶ 57. LUPE Plaintiffs' claims against Defendant Hicks were initially brought against the former El Paso District Attorney, Yvonne Rosales. Dkt. 208, Second Am. Compl., at 20 ¶ 49.

116.    Defendants Cruzot and Garza have not announced that they will refrain from enforcing SB1's criminal provisions, that they intend to refrain from prosecuting violations of SB1, or that they intend to refrain from investigating alleged violations of SB1. LULAC Ex. 96; LULAC Ex. 94. There was no evidence that Defendant Hicks will refrain from enforcing SB1's criminal provisions, refrain from prosecuting violations of SB1, or refrain from investigating alleged violations of SB1.

## II.    Challenged Provisions of SB1

117.    LUPE Plaintiffs challenge several provisions of Texas law that were enacted through SB1 (collectively, the "Challenged Provisions").

118.    **Section 4.09** of SB1 amends Section 33.061(a) of the Tex. Elec. Code to state: "A person commits an offense if the person serves in an official capacity at a location at which the presence of watchers is authorized and knowingly prevents a watcher from observing an activity or

procedure the person knows the watcher is entitled to observe, including by taking any action to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective." *See* Joint Ex. 1. An offense under this section is a Class A misdemeanor punishable by up to one year in jail, a fine of up to $4,000, or both. *See* Tex. Elec. Code § 33.061(b); Tex. Penal Code § 12.21.

119.    **Section 5.07** of SB1 amends Section 86.001 of the Tex. Elec. Code by adding, in relevant part, Subsection (f),[5] which states: "If the information required under Section 84.002(a)(1-a) included on the application does not identify the same voter identified on the applicant's application for voter registration under Section 13.002(c)(8), the clerk shall reject the application." *See* Joint Ex. 1.

120.    **Section 5.13** of SB1 amends Section 87.041 of the Tex. Elec. Code by amending, in relevant part, Subsection (b)[6] to state: "a ballot may be accepted only if . . . the information required under Section 86.002(g) provided by the voter identifies the same voter identified on the voter's application for voter registration under Section 13.002(c)(8)." *See* Joint Ex. 1. A person commits an offense if the person intentionally accepts a ballot for voting or causes a ballot to be accepted for voting that the person knows does not meet the requirements of Subsection (b). Tex. Elec. Code § 87.041(g). An offense under this subsection is a Class A misdemeanor. Tex. Elec. Code § 87.041(g).

121.    **Section 6.03** of SB1 amends Subchapter B, Chapter 64 of the Tex. Elec. Code by adding Section 64.0322, which, in relevant part, states: "A person, other than an election officer, who assists a voter in accordance with this chapter is required to complete a form stating: (1) the name

---

[5] Section 5.07 also adds Subsections (f-1) and (f-2).
[6] Section 5.13 also amends Subsection (e) and adds Subsection (d-1).

and address of the person assisting the voter; (2) the relationship to the voter of the person assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." *See* Joint Ex. 1.

122.    **Section 6.04** of SB1 amends Section 64.034 of the Tex. Elec. Code to state: "A person, other than an election officer, selected to provide assistance to a voter must take the following oath, administered by an election officer at the polling place, before providing assistance: 'I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.'"[7] *See* Joint Ex. 1. An offense under this subsection is a state jail felony. *See* Tex. Elec. Code § 276.018(a)(2)-(b).

123.    **Section 6.05** of SB1 amends Section 86.010(e)[8] of the Tex. Elec. Code to state: "A person who assists a voter to prepare a ballot to be voted by mail shall enter on the official carrier envelope of the voter: (1) the person's signature, printed name, and residence address; (2) the relationship of

---

[7] The enforcement of the portion of the oath that requires an assister to attest to confining their assistance to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot" has been enjoined. *See OCA Greater Houston v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *4 (W.D. Tex. June 6, 2022).

[8] Section 6.05 also amends Section 86.010 (h) and (i).

the person providing the assistance to the voter; and (3) whether the person received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance." *See* Joint Ex. 1. An offense under this section is a state jail felony. *See* Tex. Elec. Code § 86.010(g).

124.    **Section 6.06** of SB1 amends Sections 86.0105(a), (c), and (e) of the Tex. Elec. Code[9] to state: "A person commits an offense if the person: (1) compensates or offers to compensate another person for assisting voters as provided by Section 86.010; or (2) solicits, receives, or accepts compensation for an activity described by Subdivision (1). An offense under this section is a state jail felony. For purposes of this section, compensation means an economic benefit as defined by Section 38.01, Penal Code." *See* Joint Ex. 1. An offense under this section is a state jail felony. *See* Tex. Elec. Code § 86.0105(c).

125.    **Section 7.04** of SB1 amends Chapter 276 of the Texas Election Code by adding Section 276.015,[10] which states: "In this section: 'Benefit' means anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person. 'Vote harvesting services' means in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure. A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit. A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote

---

[9] Section 6.06 also adds Subsection (f).
[10] Section 7.04 also adds Sections 276.016, 276.017, 276.018, and 276.019.

harvesting services. A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services. This section does not apply to: an activity not performed in exchange for compensation or a benefit; interactions that do not occur in the presence of the ballot or during the voting process; interactions that do not directly involve an official ballot or ballot by mail; interactions that are not conducted in-person with a voter; or activity that is not designed to deliver votes for or against a specific candidate or measure." *See* Joint Ex. 1. An offense under this section is a felony of the third degree." *See* Tex. Elec. Code § 276.015(f).

126.    **Section 8.01** of SB1 amends Subchapter E, Chapter 31 of the Texas Election Code by adding, in relevant part, Section 31.129, which states: "An election official may be liable to this state for a civil penalty if the official: (1) is employed by or is an officer of this state or a political subdivision of this state; and (2) violates a provision of this code. A civil penalty imposed under this section may include termination of the person's employment and loss of the person's employment benefits." *See* Joint Ex. 1.

### III.    LUPE Plaintiffs' Legal Claims

127.    LUPE Plaintiffs claim that Sections 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, and 7.04's in-person canvassing ban violate the First and Fourteenth Amendments by imposing an unjustified, severe burden on the right to vote. Specifically, Sections 5.07 and 5.13 violate the First and Fourteenth Amendments by requiring clerks to reject otherwise valid mail ballots and mail ballot applications where, for example, the voter inadvertently omits their ID number or other required information, or where the clerk lacks ID information in the voter's voter registration record, even when the clerk can verify the voter's application or mail ballot envelope through other means. Sections 6.03, 6.04, 6.05, 6.06, and 7.04's in-person canvassing ban violate these Amendments by making it more difficult for eligible voters who vote with assistance—including those with disabilities, limited

24

English proficiency, and less formal education—to receive the assistance they need. This claim is against Defendants Nelson, Paxton, Scarpello, Wise, Creuzot, Hicks, and Garza.

128.    LUPE Plaintiffs also claim Sections 6.03, 6.04, 6.05, 6.06 and 7.04's in-person canvassing ban intentionally discriminates against voters based on race in violation of the Fourteenth Amendment. These provisions of SB1 specifically target and disproportionately burden assistance to voters with limited English proficiency, who are disproportionately Latino and Asian American, and individuals with disabilities in Texas, who are disproportionately Black. This claim is against Defendants Nelson, Paxton, Scarpello, Wise, Creuzot, Hicks, and Garza.

129.    LUPE Plaintiffs also claim Sections 6.03, 6.04, 6.05, 6.06, and 7.04's in-person canvassing ban violate the Fifteenth Amendment by denying and abridging the rights of citizens of the United States to vote on account of race, color, or previous condition of servitude. These provisions specifically target and disproportionately burden assistance to voters with limited English proficiency, who are disproportionately Latino and Asian American, and individuals with disabilities in Texas, who are disproportionately Black. This claim is against Defendants Nelson, Paxton, Scarpello, Wise, Creuzot, Hicks, and Garza.

130.    LUPE Plaintiffs also claim Sections 6.03, 6.04, 6.05, 6.06, and 7.04's in-person canvassing ban violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, *et seq.*, because they create political processes that are "not equally open to participation" by minority voters, such that those voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." The burdens and restrictions of these provisions placed on voters individually—and even more so collectively—abridge the opportunity of minority voters to participate in the political process and exercise their right to vote. This claim is against all Defendants against whom LUPE Plaintiffs have filed suit.

131.    LUPE Plaintiffs also claim Sections 6.03, 6.04, 6.05, 6.06, and 7.04's in-person canvassing ban violate Section 208 of the Voting Rights Act, 52 U.S.C. § 10508 because they impede voters' practical ability to get necessary and statutorily guaranteed assistance. These provisions gut the right of a qualified voter to receive assistance from a person of their choice by increasing the likelihood that mail ballots cast by voters who receive assistance will be rejected because the assister made a clerical error (Section 6.05) and deterring individuals from providing needed assistance to voters (Sections 6.03, 6.04, 6.05, 6.06, and 7.04). This claim is against all Defendants against whom LUPE Plaintiffs have filed suit.

132.    LUPE Plaintiffs also claim Sections 6.03, 6.04, 6.05, 6.06, and 7.04's in-person canvassing ban violate Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, because they discriminate against qualified Texas voters on the basis of their disability. There is no valid justification for the burdens these provisions impose on voters with disabilities, and by making it harder for them to get necessary assistance, such restrictions will deny voters with disabilities equal access to the franchise and prevent them from exercising their fundamental right to vote. This claim is against Nelson, Scarpello, Wise, Creuzot, Hicks, and Garza.

133.    LUPE Plaintiffs also claim Sections 4.09 and 8.01 violate the Fourteenth Amendment's Due Process Clause because they are unconstitutionally vague. The conduct proscribed by Section 4.09 is broadly and imprecisely defined, making it impossible for poll workers and election officials to know whether and when they could be violating the statute. Because the poll watcher provision in Section 4.09 is unconstitutional, any civil penalty imposed under Section 8.01 cannot be predicated on a violation of Section 4.09. This claim is against Defendants Nelson, Paxton, Creuzot, Hicks, and Garza.

134.    Finally, LUPE Plaintiffs claim Section 7.04's in-person canvassing ban violates the First and Fourteenth Amendments because it is unconstitutionally vague and burdens free speech. Section 7.04's in-person canvassing ban has chilled core protected speech, causing nonpartisan community-based organizations to scale back their outreach efforts, recruiting, and voter assistance out of fears that their members or volunteers may be subjected to criminal penalties for communicating with voters about election issues in the presence of mail ballots. This claim is against Defendants Nelson, Paxton, Scarpello, Wise, Creuzot, Hicks, and Garza.

## IV.    Section 4.09 of SB1 is impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause.

### A.    Section 4.09 of SB1 lacks any ascertainable standard and fails to give poll workers fair notice of what conduct is prohibited.

#### 1.    Regulated parties do not know what conduct may render a poll watcher's observation "not reasonably effective."

135.    The phrase "reasonably effective" is not defined in SB1. Tr. 9/22/2023 at 1884:14-17 (Ingram).

136.    Election officials and election workers—i.e., the people regulated by Section 4.09—do not have adequate notice of what constitutes "obstructing" or "distancing" a poll watcher such that the watcher's observation might become "not reasonably effective." *See* Tr. 9/13/2023 at 554:2-7, 562:4-17, 563:21-565:7 (Lewin); Tr. 9/13/2023 at 604:15-606:14 (Ertel); Tr. 9/13/2023 at 656:2-13 (Clemmons); Tr. 9/19/2023 at 1175:14-22, 1176:22-1177:6 (Obakozuwa); Tr. 9/11/2023 at 195:2-25 (Wise); Tr. 10/3/2023 at 2323:20-2324:5 (Ramon).

137.    Plaintiff James Lewin, who has served as an election judge both before and after the passage of SB1, explained that prior to the passage of SB1, he understood that poll watchers were able to observe activities at a polling location but had to maintain a respectful distance without "infringing on the voter's privacy."  Tr. 9/13/2023 at 555:13-556:2 (Lewin).

138.    Mr. Lewin is confused by the new standard set forth in Section 4.09, both because he does not know what distance is permissible or "who decides what is reasonably effective." Tr. 9/13/2023 at 563:21-564:22 (Lewin).

139.    As a result of Section 4.09's subjective standard and ambiguities, Mr. Lewin does not know how to adjust his own behavior or adjust the instructions or guidance that he gives toother poll workers if a poll watcher says that they are not being permitted to stand close enough to observe. Tr. 9/13/2023 at 566:5-13, 569:1-570:13 (Lewin).

140.    Election administrators testified that because of the language added to the poll watcher provisions by SB1, they also do not know how close a watcher can stand to a voter. Tr. 9/12/2023 at 401:9-402:3 (Scarpello); Tr. 10/3/2023 at 2323:20-2324:5 (Ramon); Tr. 9/11/2023 at 189:20-192:16 (Wise).

141.    For example, Cameron County Elections Administrator Remi Garza testified that although he has not yet been challenged for requiring poll watchers to stand 6 feet away from the tabulator machine, he is concerned that a disgruntled poll watcher may claim that he was interfering with their ability to observe what was happening at a polling place and he doesn't know "how it would ultimately be interpreted." Tr. 9/13/2023 at 738:12-22 (Garza).

142.    State Defendants' witness Jonathan White was also not comfortable determining what distance from an activity at a voting machine would be reasonable or unreasonable for a poll watcher under Section 4.09. Tr. 10/16/2023 at 3980:23-3981:3 (White).

143.    Section 4.09's prohibition against rendering a poll watcher's observation "not reasonably effective" is particularly confusing in the context of polling locations of different sizes, with limited space, or challenging configurations.

144.    For example, sometimes the configuration of a polling place makes it challenging to position poll watchers in a place that they can observe without interfering with voters. *See* Tr. 9/12/2023 at 395:24-396:18 (Scarpello) (describing "different scruffs" between poll watchers and an election judge at a Dallas polling location "where it's very tight space and very limited space for watchers as well as voters").

145.    Texas Impact member Richard Ertel served as a poll worker in rural Kerr County, where one of the polling locations is in a training room within a volunteer fire department building.  Mr. Ertel described the space as "bigger than a two-car garage but maybe not quite a three-car garage," explaining that it is "pretty constrained" and "there's really not the ability to maneuver around" easily. Tr. 9/13/2023 at 598:11-599:10 (Ertel).

146.    Mr. Ertel explained why he is unable to understand how Section 4.09 applies in settings like that:

> I'm not sure how to apply the direction that you are not to obstruct the view of the watcher, distance the watcher from the activity given the, really, the unusual configurations in our polling places.
>
> I'm concerned that the polling place may not be able to be set up to the satisfaction of a poll watcher, and I'm not sure that the poll workers know when they are or aren't obstructing the view of the watcher given the configuration, and I have no idea what it means to be not reasonably effective.

Tr. 9/13/2023 at 605:20-606: 4 (Ertel).

147.    Due to the lack of clarity about SB1's poll watcher provisions, county officials have been unable to answer questions from poll workers about how to comply with SB1 and still ensure that voters can vote privately and comfortably.  Tr. 9/12/2023 at 401:9-402:3 (Scarpello); Tr. 9/19/2023 at 1175:4-1175:22 (Obakozuwa).

### 2. The standard set forth in Section 4.09 rests on a subjective determination by poll watchers.

148. One reason that poll workers do not know what could render a poll watcher's observation "not reasonably effective" is that Section 4.09 effectively puts the determination about whether there has been improper obstruction or distancing in the hands of the poll watcher, a third party. *See* Tr. 9/13/2023 at 564:12-20 (Lewin); 9/13/2023 at 609:1-6 (Ertel); Tr. 9/13/2023 at 670:17-672:3 (Clemmons).

149. As Alan Vera explained, how close a poll watcher can be to a voter depends on "how good the poll watcher['s vision and hearing is." LUPE Ex. 279 at 54:8-55:2 (Deposition Excerpts of Alan Vera).

150. Mr. Vera, who was responsible for training all poll watchers appointed by the Harris County Republican Party, testified that he would advise a poll watcher to stand as close as one foot away from a voter if they needed to do so "to see and hear everything." LUPE Ex. 279 at 50:14-20, 54:8-55:2 (Deposition Excerpts of Alan Vera); *see also* Tr. 9/22/2023 at 1889:10-16 (Ingram) (testifying that under some circumstances, asking a poll watcher to stand just one foot back from a voter could constitute a violation of Section 4.09).

151. Former Hidalgo County Election Administrator Yvonne Ramon agreed, testifying that an individual poll watcher would have to determine whether their observation was reasonably effective based on their own vision and hearing. Tr. 10/3/2023 at 2323:20-2324:5 (Ramon).

152. Similarly, the Executive Director of the Dallas County Republican Party testified that how close a poll watcher can stand to observe election activity is "a call of the poll watcher" at a "particular location." LUPE Ex. 287 at 101:10-102:13 (Deposition Excerpts of Susan Fountain).

153. Keith Ingram agrees that "[t]he determination of whether some action makes observation not reasonably effective requires a subjective assessment." Tr. 9/22/2023 at 1884:23-1885:1

(Ingram).  Mr. Ingram also agrees that what distance is close enough to see or hear are "subjective distance requirements" where it depends on the poll watcher's eyesight and hearing. Tr. 9/22/2023 at 1888:23–1889:3 (Ingram).

154.    Mr. Ingram testified that the person to make such an assessment in the first instance is the election judge. Tr. 9/22/2023 at 1884:23–1885:2 (Ingram). But he also acknowledged that the Secretary of State's Office recommends that election judges "be careful" about rejecting a poll watcher's complaint when a watcher claims that he or she is unable to observe as wrong decisions could result in criminal liability for interfering with poll watcher activity. Tr. 9/22/2023 at 1885:19–1886:15 (Ingram).

155.    Remi Garza explained that the poll watcher provisions in SB1 "significant[ly]" changed the dynamics of a polling place, because while the Election Code used to give the presiding judge the discretion to determine whether a poll watcher was inconveniently close to someone, SB1 "switched it to where the poll watcher now is the one that makes the determination to whether they can see and hear what's happening in the polling place. *So it becomes very subjective on their part.*" Tr. 9/13/2023 at 739:11-740:1 (Garza) (emphasis added); *see also* Tr. 9/11/2023 at 191:19-192:16 (Wise) (explaining that prior to SB1, she understood "conveniently located" to mean what was convenient to the poll worker).

> **3.    Section 4.09's ambiguity has introduced conflict and confusion at the polls.**

156.    Both before and after the passage of SB1, election administrators have received complaints from poll workers about poll watchers getting too close to voters, poll workers, or both.  Tr. 9/11/2023 at 183:24-184:13, 198:8-24, 200:3-16 (Wise); Tr. 9/12/2023 at 388:19-23, 405:20-406:6 (Scarpello); Tr. 10/3/2023 at 2317:10-2318:22 (Ramon); Tr. 9/19/2023 at 1070:22-1071:12; 1073:20-1074:2 (Callanen).

157.    Lisa Wise observed that poll watchers' behavior was noticeably different with more instances of serious problems, in November 2020. Tr. 9/11/2023 at 180:23-181:3 (Wise); *see also* Tr. 9/14/2023 at 858:17-859:6 (DeBeauvoir) (describing the problems created in 2020 because of suspicion about the election, including people "creating disturbances in the polling places and early voting locations and counting stations").

158.    For example, during the November 2020 election, there were at least two incidents with disruptive poll watchers in El Paso County.  One of those incidents led to Ms. Wise removing a poll watcher and the unsuccessful filing of a writ of mandamus against her. *See* Tr. 9/11/2023 at 181:4-183:23, 184:14-25, 187:7-16, 197:13-16 (Wise).

159.    Election administrators believe that SB1's changes have made it easier for poll watchers to disrupt the voting process during these incidents, and it is therefore also increasing the likelihood of these incidents. *See* Tr. 9/12/2023 at 407:25-408:4 (Scarpello) (SB1 emboldened some poll watchers to exceed their authority in the 2022 elections); Tr. 10/3/2023 at 2321:16-2323:1 (Ramon) (since SB1, a poll watcher can interrupt the check-in of a voter or the assistance of a voter by lodging a complaint with a poll worker while the poll worker is interacting with the voter); Tr. 9/19/2023 at 1070:11-1071:12 (Callanen).

160.    At the same time, the uncertainty about what might render a poll watcher's observation "not reasonably effective" under Section 4.09 has made it more difficult for poll workers and election officials to address problematic conduct by poll watchers. Tr. 9/12/2023 at 402:24-403:16 (Scarpello); Tr. 9/19/2023 at 1210:21-25 (Obakozuwa) (cross-examination); Tr. 9/13/2023 at 604:15-606:14 (Ertel).

161.    In March 2022, El Paso County poll workers were concerned about poll watchers "following them around" both because of the events of November 2020 and also because, in light

of SB1's loosened restrictions on poll watchers, they were unsure of what they could do in response to a poll watcher getting too close. Tr. 9/11/2023 at 184:14-20 (Wise).

162.    Similarly, during the November 2022 general election, some poll watchers at the Central Counting facility in Dallas County were leaning over the shoulders of poll workers and making some poll workers feel "very uncomfortable" and "harassed."  Tr. 9/12/2023 at 405:20-406:6 (Scarpello).

163.    In November 2022, an election worker in Dallas County contemplated quitting after she was followed home by a poll watcher.   Tr. 9/12/2023 at 395:3-20 (Scarpello).  Jackie Callanen described similar incidents taking place in Bexar County, with poll watchers following election officials in their cars and one election worker telling Ms. Callanen that "if something didn't change that she wasn't going to continue because she wasn't going to be run off the road into a ditch coming in." Tr. 9/19/2023 at 1072:15-22 (Callanen).

164.    Also during the November 2022 election, Michael Scarpello spoke to at least one poll worker who was accused of obstructing a poll watcher's free movement in a polling place.  The poll worker indicated that she was trying to help poll workers do their job and to protect the voters in their voting process.  Mr. Scarpello advised the poll worker that if she interfered with the poll watcher's rights, she could be subjecting herself to prosecution.  Tr. 9/12/2023 at 398:2-399:1 (Scarpello).

> **4.    The Secretary of State has provided insufficient guidance about how Section 4.09 should be construed and applied.**

165.    The Secretary of State has issued several forms of guidance that address the poll watcher provisions of SB1. *See* JOINT Ex. 5 (February 2022 Election Advisory regarding changes to poll watcher requirements from Keith Ingram to county election officials); JOINT Ex. 12 (January 2022 Poll Watcher's Guide issued by the Secretary of State); JOINT Ex. 13 (January 2022 SOS poll

watcher online training - draft); LUPE Ex. 19 (August 2023 SOS poll watcher presentation); LUPE Ex. 177 (August 2022 training for county election officials).

166.    Since the passage of SB1, the Secretary of State has not provided sufficient guidance to help regulated parties interpret and apply Section 4.09's terms to determine what conduct it prohibits.

167.    For example, none of the Secretary of State's guidance indicates where and how far from a voter a poll watcher can stand. Nor has the Secretary of State's guidance mitigated Section 4.09's subjective standard for determining whether a poll worker has taken an action that would render the poll watcher's observation "not reasonably effective."

168.    The Secretary of State has not published any materials interpreting or offering guidance on the meaning of "reasonably effective" observation; rather, the Secretary of State merely refers to the undefined statutory language. Tr. 9/22/2023 at 1884:18-22 (Ingram); *see also* JOINT Ex. 5 at 2; JOINT Ex. 12 at STATE106322; LUPE Ex. 177 at STATE140144.

169.    Indeed, longtime Director of Elections for the Secretary of State's Office Keith Ingram confirmed that the Secretary of State's Office does not have an opinion about or definition of the phrase "reasonably effective." Tr. 9/22/2023 at 1885:19-1886:9 (Ingram).

170.    Moreover, given that Mr. Ingram acknowledged that Section 4.09 includes a subjective standard, the Secretary of State's Office cannot offer any guidance on an objective standard.  *See* Tr. 9/22/2023 at 1884:23-1885:1 (Ingram).

171.    The Secretary of State's Office also does not have a concrete understanding of what actions would unlawfully "distance" a watcher from an activity or procedure being observed "in a manner that would make observation not reasonably effective" under Section 4.09. Tr. 9/22/2023 at 1888:20-1889:16 (Ingram).

172.    The Secretary of State's Office also has no position on what distance a poll watcher must be permitted to sit or stand to be "near enough to see and hear" an observed activity under Section 4.07(f). Tr. 9/22/2023 at 1888:20-1889:3 (Ingram).

173.    Election administrators confirmed that they have not received guidance from the Secretary of State on how close a poll watcher can stand to voters or poll workers or about what action by a poll worker would make observation "not reasonably effective" under Section 4.09. Tr. 9/11/2023 at 193:7-195:16 (Wise); Tr. 9/19/2023 at 1176:7-10 (Obakozuwa); Tr. 10/3/2023 at 2324:6-13 (Ramon).

174.    SB1 also added provisions that require poll watchers to be certified and take online training developed by the Texas Secretary of State. *See* JOINT Ex. 1 at 25-26. Those additional requirements, however, have not mitigated or resolved the confusion or ambiguity of Section 4.09's terms concerning what might render a poll watcher's observation "not reasonably effective."

175.    According to Bexar County Elections Administrator Jackie Callanen, the training takes approximately 20-30 minutes to complete. The first version had no test; the most recent version has a question after every two PowerPoint slides. A person taking the course can look back at the slides before answering the question that follows them. Tr. 9/19/2023 at 1061:9-1063:9 (Callanen).

176.    Plaintiff James Lewin went through the process of getting certified as a poll watcher, even though he was not required to as an election judge, so that he could "learn a little bit more" about the new poll watcher provisions and "better advise" the people on his team. Tr. 9/13/2023 at 557:25-558:19 (Lewin). However, Mr. Lewin testified that he did not have a "clear understanding of what poll watchers could observe based on the poll watcher training and manual." Tr. 9/13/2023 at 558:20-559:8 (Lewin).

177.    Despite having completed the training, there were poll watchers during the 2022 election cycle that did not know what they could or could not do under Section 4.09. Tr. 9/19/2023 at 1181:15-18 (Obakozuwa).

**B.    Section 4.09 invites arbitrary and discriminatory enforcement.**

**1.    Regulated parties are concerned about facing prosecution for violating Section 4.09.**

178.    Poll workers and election officials are concerned about facing criminal prosecution or civil penalties because they are unclear about how to comply with Section 4.09.  Tr. 9/13/2023 at 568:4-25 (Lewin); Tr. 9/13/2023 at 608:19-609:13 (Ertel); Tr. 9/13/2023 at 660:18-662:3, 672:18-673:3 (Clemmons); Tr. 9/13/2023 at 741:7-15, 742:21-743:10 (Garza); Tr. 9/11/2023 at 191:10-18 (Wise); Tr. 9/12/2023 at 385:20-23 (Scarpello); Tr. 10/3/2023 at 2325:4-7 (Ramon).

179.    Some election workers no longer want to serve because of the fear they have over the legal consequences that could occur if disputes arise with poll watchers. Tr. 9/13/2023 at 643:12-14 (Ertel); Tr. 9/13/2023 at 652:21-653:8, 655:19-656:1 (Clemmons); Tr. 9/19/2023 at 1188:18-1189:14 (Obakozuwa).

180.    Being exposed to civil liability compounds election workers' concerns. As Remi Garza explained, the new civil penalties outlined in Section 8.01 of SB1 are "very chilling" because the risk of losing money or job employment means that election officials "are being extra careful and [have] changed our behavior as to how we are interacting with the voters."  Tr. 9/13/2023 at 772:2-20 (Garza).

181.    To mitigate the risk of arbitrary enforcement under Section 4.09, election administrators have advised poll workers to be careful when engaging with poll watchers.  For example, if Harris County gets a question from a poll worker about what they can do about a poll watcher and the answer is not clear, the county tells the poll worker to err on the side of being more permissive of

36

the poll watcher "[s]o that the election worker doesn't get in trouble." Tr. 9/19/2023 at 1181:3-9 (Obakozuwa). There have also been instances where a poll worker had to get legal advice before engaging a poll watcher. Tr. 9/19/2023 at 1180:19-21 (Obakozuwa).

182.    During training and in response to poll workers contacting him with concerns about poll watchers getting too close and making workers and voters uncomfortable, Dallas County Election Administrator Michael Scarpello repeated the requirements of SB1. He advised poll workers not to obstruct the poll watchers, reminded poll workers that they could potentially face penalties for interfering with poll watchers, and reminded poll workers that poll watchers under SB1 had the freedom to roam around and observe. Tr. 9/12/2023 at 385:13-19, 400:9-401:3 (Scarpello).

183.    Mr. Scarpello believes that poll workers are likely to err on the side of not intervening on behalf of a voter who might be uncomfortable in light of the penalties they face under SB1 for interfering with poll watchers. Mr. Scarpello advises poll workers to refrain from intervening, even when they know that the voter is uncomfortable. Tr. 9/12/2023 at 402:4-23 (Scarpello). Mr. Scarpello also testified that election judges across Dallas County have "quite frequently" wanted to remove a poll watcher because of the poll watcher's behavior but have been unwilling to do so because of SB1.  Tr. 9/12/2023 at 402:24-403:16 (Scarpello).

### 2.    Election workers' concerns about being prosecuted for violating Section 4.09 are well-founded.

184.    The Secretary of State's office referred election judges to the Office of the Attorney General for potential prosecution before the passage of SB1.  *See* LUPE Ex. 156 (Letter from Keith Ingram to Jason Anderson at OAG dated June 23, 2020 requesting assistance in investigating alleged violations of Section 31.006 by 14 election judges in El Paso County); *see also* Tr. 10/18/2023 at 4453:8-18, 4464:2-21 (Ingram) (testifying that the Secretary of State has referred

election related complaints to the Attorney General's Office in the past, and that this "process of referral and then consideration by the prosecutor" is "still in place").

185.    Since the passage of SB1, the Secretary of State has received numerous complaints about poll workers allegedly obstructing poll watchers. *See* LUPE Ex. 162 (November 7, 2022 email "requesting a remedy for controversial and antagonistic behaviors by an election worker"), LUPE Ex. 163 (attachment to LUPE Ex. 162 with "supporting documentation").  At least one of these complaints explicitly referenced disputes between poll workers and poll watchers about how close poll watchers were permitted to stand to observe. *See* LUPE Ex. 163 at STATE121066-STATE121068.

186.    Election officials have been the targets of investigations by the Office of the Attorney General based on allegations of poll watcher obstruction since the passage of SB1.  *See* LUPE Ex. 182 (OAG Law Enforcement Division reports of investigation into Guadalupe County election official for alleged poll watcher obstruction during the March 2022 primary election); LUPE Ex. 183 (OAG Law Enforcement Division reports of investigation into Hays County election judge for alleged poll watcher obstruction during the November 2022 general election).

187.    From July to December 2022, the Texas Attorney General's Office's Election Integrity Unit investigated the Guadalupe County Elections Administrator Lisa Hayes for poll watcher obstruction under SB1 Section 4.09.  LUPE Ex. 182; Tr. 10/16/2023 at 3981:17-24, 3982:15-3983:13 (White).  A poll watcher made the complaint after the March 2022 Primary Election. LUPE Ex. 182.  The poll watcher had asked the Election Administrator to allow him to view certain election materials and to remain at the Central Count station after the conclusion of early voting. LUPE Ex. 182 at STATE182302-035, STATE182316-17.  The Elections Administrator consulted with the Office of the Texas Secretary of State regarding the first request and, based on their advice,

denied the request.  LUPE Ex. 182 at STATE182302-03. That evening, the Election Administrator attempted to reach the Secretary of State's Office for advice regarding the second request and, because the Secretary of State's Office didn't answer, reviewed the Election Code and denied the request.  LUPE Ex. 182 at STATE182316-179.

188.    In addition to claiming he was obstructed, the poll watcher also complained that "there were issues with the security of the tabulation equipment, the security of the devices used to transfer ballot results, and the signature verification procedures used by the early voting ballot board" LUPE Ex. 182 at STATE182305.  He further claimed to Elections Department staff that the Tex. Elec. Code entitled him to see who was winning the election at the end of early voting.  LUPE Ex. 182 at STATE182316.  Elections Department staff described the poll watcher as "a very angry person" and suspected that he had called their office "threatening to have [the Elections Administrator] arrested."  LUPE Ex. 182 at STATE182316.

189.    Although the Election Administrator followed the advice of the Texas Secretary of State's Office and adhered to her interpretation of the Election Code, and the Guadalupe County District Attorney's Office declined to charge her, (LUPE Ex. 182 at STATE182318), the OAG Election Integrity Unit subjected the Elections Administrator to a months-long criminal investigation for violating Section 4.09 and presented the investigation to the District Attorney for a probable cause determination.  LUPE Ex. 182.

190.    From November 2022 to February 2023, the OAG Election Integrity Unit investigated a Hays County poll worker for poll watcher obstruction under SB1 Section 4.09.  Tr. 10/16/2023 at 3983:20-3984:18 (White); LUPE Ex. 183.  The poll watcher made a host of complaints of "illegal activities" against 76-year-old Adan Moreno, who was serving as a polling place election judge in the November 2022 General Election, including claims that the machine counts "seemed strange,"

the number of spoiled ballots was "hard to believe" and that Mr. Moreno had refused to allow her to see election materials that had already been put in envelopes because her request was disrupting the election. LUPE Ex. 183 at STATE182320-22.

191.    The poll watcher further complained about possible hacking of the voting machines and untrustworthy election software. LUPE Ex. 183 at STATE182322-23. The complaining poll watcher was familiar to the county Election Administrator for having filed multiple complaints against her office and poll workers with local law enforcement. LUPE Ex. 183 at STATE182325.

192.    All the poll watcher's complaints were determined by the OAG to be unfounded. LUPE Ex. 183 at STATE182331. Although Mr. Moreno adhered to the Election Code, the Election Integrity Unit subjected Mr. Moreno to a months-long criminal investigation for violating SB1 Section 4.09. LUPE Ex. 183.

193.    In his job as chief of the Election Integrity Division, Mr. White dealt with local prosecutors. Tr. 10/16/2023 at 3981:4-6 (White). He experienced that local prosecutors have varied interpretations of the same language within the Texas Election Code. Tr. 10/16/2023 at 3981:7-10 (White). Mr. White testified that if a law is unclear, there are instances where prosecutorial interpretation might play a role in determining whether a prosecutor moves forward. Tr. 10/16/2023 at 3981:11-16 (White).

194.    Mr. White testified that he is no longer in charge of making prosecutorial decisions for the Election Integrity Division, and that after *Stephens*, it's perhaps largely a very large group of district attorneys who are going to be exercising that discretion in the future. Tr. 10/16/2023 at 4104:20-4105:8 (White).

195.    Neither the Travis County District Attorney nor the Dallas County District Attorney have announced that they will refrain from enforcing Section 4.09, that they intend to refrain from

prosecuting violations of SB1's provisions, or that they intend to refrain from investigating alleged violations of SB1's provisions. *See* LULAC Ex. 94, LULAC Ex. 96.

> **3.    Recent enforcement actions confirm that the threat of arbitrary enforcement of Section 4.09 is credible.**

196.    The addition of indefinite and undefined language to Section 4.09 increases the risk of arbitrary and discriminatory enforcement to a statute that has been misused in recent years.

197.    The experience of former Travis County Elections Clerk Dana DeBeauvoir illustrates the danger. In advance of the November 2020 election, Ms. DeBeauvoir and her staff took steps to make sure that poll watchers could observe activities at a Central Count location in Travis County while also maintaining safe social distancing protocols during the height of the COVID-19 pandemic.  Tr. 9/14/2023 at 862:20-863:21 (DeBeauvoir).

198.    To do so, Ms. DeBeauvoir set up an observation room with a large glass window adjoining the central count room. The room also included video and audio feeds so that poll watchers in the observation room could see and hear the activities taking place in the adjoining room.  Ms. DeBeauvoir personally tested the configuration and the audio feed to ensure she was able to see and hear as a poll watcher would. Tr. 9/14/2023 at 891:21-23, 892:8-893:22, 915:18-916:8 (DeBeauvoir).

199.    Ms. DeBeauvoir and her staff specifically sought input into and approval for the configuration from the Secretary of State's Election's Division, which is responsible for advising county election officials on compliance with the Tex. Elec. Code. Tr. 10/18/2023 at 4588:11-20, 4589:2-4590:23 (Adkins); STATE Ex. 143 at STATE092408-09.

200.    In a written response to the county's request for input into the Central Count setup, Chuck Pinney, an attorney from the Secretary of State's Elections Division responded: "[t]hose procedures are consistent with what we discussed on the phone and would be a reasonable way of

allowing poll watchers to observe the process while maintaining social distancing requirements."

STATE Ex. 143 at STATE092408.  For clarification, Mr. Pinney added:

> Poll watchers should be provided with some opportunity to directly observe the process. This does not mean all poll watchers need to be in the room simultaneously at all times, but some kind of rotation system that allows each poll watcher an opportunity to directly observe the process periodically throughout the time central count is convening would work in combination with the procedures you described in your email.

STATE Ex. 143 at STATE092408.

201.    Christina Adkins testified that she could personally see the observation room in Travis County. During that visit, Ms. Adkins had a conversation with the Travis County Elections Director confirming that they planned to allow poll watchers to rotate in and out of the main room where the counting would be taking place.  As Ms. Adkins explained:

> She showed me where she was planning on stationing some chairs so that they could be present in that room and rotate in and out, which is typically what we advise counties to do when they don't have sufficient space in their small central count room where the main computer is if they have more poll watchers than are permitted to be in that room, oftentimes because of things like fire safety regulations; that they allow them to rotate in and out of that room.

Tr. 10/18/2023 at 4590:2-20 (Adkins).

202.    During the 2020 election, poll watchers were in fact permitted to go in and out of the room where votes were being counted. Tr. 9/14/2023 at 865:19-22, 868:3-8 (DeBeauvoir).

203.    Despite these accommodations, a poll watcher at the central count station complained that she couldn't see and hear what was going on in the larger room.  Tr. 9/14/2023 at 865:4-15 (DeBeauvoir).  The poll watcher eventually became so disruptive, "screaming and yelling, and pounding her hands on the glass windows, that her fellow poll watchers turned her in to the police." Tr. 9/14/2023 at 861:8-11 (DeBeauvoir).

204.    The poll watcher involved in the incident at the central count station was eventually arrested and later, criminally charged. Tr. 9/14/2023 at 869:21-871:1, 874:17-23 (DeBeauvoir).

205.    Following the 2020 election, Ms. DeBeauvoir learned that the Attorney General had pursued an indictment against her for obstructing the disruptive poll watcher who was removed from the central count station. Tr. 9/14/2023 at 873:3-6, 874:9-14 (DeBeauvoir).

206.    Ms. DeBeauvoir received no notice of the attempted indictment, and the grand jury did not indict her for poll watcher obstruction. Tr. 9/14/2023 at 873:3-874:14 (DeBeauvoir).

207.    Notwithstanding the failed indictment, the Attorney General's investigation was upsetting to Ms. DeBeauvoir both personally and professionally. Ms. DeBeauvoir had to spend $75,000 to hire an attorney to represent her. Although she was ultimately reimbursed through the county's insurance, she did not know when she hired counsel that she would be reimbursed for the fees.  Tr. 9/14/2023 at 875:9-876:3 (DeBeauvoir).

208.    Ms. DeBeauvoir's attempted prosecution has also increased concerns about arbitrary and discriminatory prosecution for other regulated parties. Jeffrey Clemmons, who previously served as an election judge in Travis County, testified that he was aware of the investigation of former EA Dana DeBeauvoir before SB1, and he worries that the amendments to Section 4.09 will subject election officials to additional and more severe penalties. Tr. 9/13/2023 at 673:4-674:4 (Clemmons).

## V.    SB1 imposes undue burdens on the right to vote in violation of the First and Fourteenth Amendments (*Anderson-Burdick*).

### A.    Sections 5.07 and 5.13 impose severe burdens on the right to vote.

209.    Sections 5.02, 5.03, and 5.08, of SB1 require voters to provide certain identification numbers on both an Application for Ballot by Mail (ABBM) and a mail ballot. Specifically, voters must include their Texas Driver's License (DL), personal identification number, or election

identification certificate number; or if a voter does not have these numbers, the last four digits of their Social Security Number (SSN or SSN4) (collectively, IDs). If the voter has none of these identification numbers, they may check a box indicating that. *See* JOINT Ex. 1.

210.    Section 5.07 requires that an ABBM be rejected if the voter ID provided on the application does not identify the same voter identified on the applicant's application for voter registration. *See* JOINT Ex. 1.

211.    Section 5.13 requires that a mail ballot be rejected if the voter ID on the carrier envelope provided does not identify the same voter identified on the voter's application for voter registration. *See* JOINT Ex. 1.

212.    Thus, even if a voter provides their photo ID at drop-off, and the election worker confirms the voter's identity, the voter's ballot could still be rejected if they don't have a matching ID number on their carrier envelope of if they forgot to put their ID number on their carrier envelope. Tr. 9/22/2023 at 1854:2-9 (Adkins).

> **1.    Texas's statewide and county voter registration databases are inadequate to support SB1's ID requirements.**

213.    Texas's statewide voter registration database, maintained by the Texas SOS, is known as the Texas Election Administration Management ("TEAM") system. Order Granting Sum. J., Dkt. 820 at 4.

214.    Texas has "offline" and "online" counties. Offline counties, including Dallas, El Paso, and Travis maintain their voter registration database through vendors, separate from TEAM. Tr. 9/12/2023 at 409:10-410:4 (Scarpello); Tr. 9/11/2023 at 202:21-24 (Wise); Tr. 9/21/2023 at 1505:11-21 (Johnson).

215.    Offline counties regularly sync their database with the TEAM registration database. Tr. 9/12/2023 at 409:10-410:4 (Scarpello) (Dallas syncs in near real time); Tr. 9/11/2023 at 203:11-204:6, 204:3-6 (Wise) (El Paso syncs within 1-2 days); Tr. 9/21/2023 at 1506:1-9 (Johnson).

216.    Over the past several years, Texas has seen a significant growth in the number of people registering to vote. Tr. 9/22/2023 at 1854:10-16 (Adkins).

217.    Texas did not require voter registration applicants to provide an ID number until January 1, 2004, in compliance with the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.*; Order Granting Sum. J., Dkt. 820 at 3.

218.    Thus, some Texas voters do not have any identification number in their voter registration record because they registered to vote before an identification number was required to register to vote. Tr. 9/11/2023 at 215:20-216:8 (Wise); Tr. 9/13/2023 at 526:6-19 (Phillips); Tr. 9/19/2023 at 1049:9-17 (Callanen); Tr. 9/13/2023 at 746:10-18 (Garza); LUPE Ex. 325.

219.    The Texas Voter Registration Application requires applicants to provide a Texas driver's license or personal identification number ("DPS" number), the last four digits of their social security number if they do not have a DPS number, or a statement that they have not been issued either identification number. OCA Ex. 238.

220.    Thus, someone registering to vote is not required to provide both numbers on the Voter Registration Application. Tr. 9/22/2023 at 1855:18-25 (Adkins).

221.    For a person filling out the Texas Voter Registration Application with only one identification number, this number will populate in TEAM until the Elections Division receives missing information from DPS. Tr. 9/22/2023 at 1856:4-13 (Adkins).

222.    Texas voters can have multiple identification numbers issued by the Texas Department of Public Safety ("DPS"), but TEAM will only reflect the most current DPS-issued identification number. Tr. 9/22/2023 at 1846:3-15 (Adkins).

223.    The Elections Division has no plans to update TEAM so that a voter registration record can hold multiple DPS-issued identification numbers. Tr. 9/22/2023 at 1846:16-19 (Adkins).

224.    Under the "HB 2512 process," the Secretary of State's Office has access to information in driver's license files to assist with voter registration. Tr. 9/22/2023 at 1894:6–11 (Ingram).

225.    Pursuant to HB 2512, the Secretary of State's Office created an annual process where it would attempt to maximize the number of full social security numbers that it kept in its database. Tr. 9/22/2023 at 1894:12–15 (Ingram).

226.    According to Mr. Ingram, the Secretary of State's Office adopted the HB 2512 process in preparation for SB1's implementation, in part to help voters navigate SB1's identification number requirement. Tr. 10/17/2023 at 4400:14–4401:7 (Ingram).

227.    Before SB1 was implemented, approximately 2 million registered voters in Texas only had one number—either their DL or SSN—in TEAM. And around the time of implementation, approximately 700,000 registered voters in Texas did not have both identification numbers associated with their voter registration, Tr. 9/22/2023 at 1845:8-12 (Adkins), and more than 100,000 registered Texas voters had no personal identification numbers associated with their voter registration record. LUPE Ex. 124; Tr. 9/22/2023 at 1845:13-16 (Adkins).

228.    Even after several election cycles in which voters were required to provide ID information because of SB1's requirements, many voters do not have updated information in their voter files. As of January 2023, the SOS identified almost 190,000 voters who have a driver's license number, election identification certificate, or a personal identification card issued by the Department of

Public Safety" (DPS number) but do not have a DPS number in TEAM, and over 90,000 voters who have neither a DPS number nor a SSN4 associated with their voter registration record. Order Granting Sum. J., Dkt. 820 at 8-9; Tr. 9/22/2023 at 1897:5-1898:1 (Ingram). Additionally, approximately 2.4 million voters have only one of their multiple DPS numbers in TEAM. Order Granting Sum. J., Dkt. 820 at 9; *see also* Tr. 9/22/2023 at 1845:20-1846:2 (Adkins) (testifying that, as of September 2023, there were still registered voters in TEAM that either have one or no identification number associated with their voter registration).

229.    For the voters that the Elections Division cannot get the additional information for, they will only have one identification number in TEAM, and thus are at risk of having their ABBM or carrier envelope rejected if they do not use the right identification number. Tr. 9/22/2023 at 1856:14-24 (Adkins). Further, these voters will also be shut out of the Secretary of State's Ballot Tracker because they do not have both numbers in their file. Tr. 9/22/2023 at 1856:25-1857:4 (Adkins).

230.    Texas counties have also identified tens of thousands of registered Texas voters who have only one or no personal identification numbers in their voter registration record.

231.    For example, as SB1 was being implemented for the first time in January 2022, Hidalgo County identified 43,260 registered voters with no DL number associated with their voter registration records, 12,919 registered voters in Hidalgo County with no SSN associated with their voter registration, and 4,281 registered voters with no DL number or SSN associated with their voter registration records. LUPE Ex. 68.

232.    And in El Paso County alone, as of spring 2023, the county has identified 17,028 registered voters with only their SSN or SSN4 associated with their voter registration record, 10,482 registered voters with only a DL number associated with their voter registration record, and 5,675

registered voters with no SSN, no SSN4, or DL number associated with their voter registration record. Tr. 9/12/2023 at 253:15-254:17 (Wise); LUPE Ex. 26. Totaling these numbers, there were 33,455 registered voters in El Paso County as of the Spring 2023 who could have their ABBM or mail ballot rejected because of a mismatched or missing ID number. Tr. 9/12/2023 at 254:18-23 (Wise); LUPE Ex. 26.

233.    Counties do not always have access to the most up-to-date voter information. Even with regular syncing, counties can encounter issues verifying voters' ID numbers with the offline voter database or TEAM. Tr. 9/13/2023 at 536:4-537:1 (Phillips); Tr. 9/14/2023 at 853:1-20 (DeBeauvoir); Tr. 10/12/2023 at 162:10-23 (Phillips); Order Granting Sum. J., Dkt. 820 at 8-10.

234.    For example, Dallas County's mail ballot department does not update its voter registration records, so a single voter could have repeated issues with ID mismatch if the voter registration department did not receive updated information from the voter between elections. Tr. 9/13/2023 at 536:4-537:1 (Phillips).

235.    In January 2022, the Secretary of State's office updated TEAM with ID numbers from DPS. Tr. 9/11/2023 at 222:20-223:7 (Wise). But even after the DPS update, El Paso County was still unable to verify many voters' ID information. Tr. 9/11/2023 at 224:11-16 (Wise).

236.    Voters who provided both their DL number and SSN4, but have neither number in their voter record, could have their ABBM or mail ballot rejected. Tr. 9/11/2023 at 211:20-212:9 (Wise).

237.    This exact scenario occurred with one elderly voter in El Paso County, who did not have an ID number associated with her voter registration record because it was not required at the time she registered. As a result, her ABBM was rejected twice – once when she put one ID number and again when she put both her DL number and SSN. Tr. 9/11/2023 at 213:23-214:24 (Wise). That voter ended up not voting in the March 2022 primary. Tr. 9/11/2023 at 214:25-215:2 (Wise).

238.    In addition to the lack of identification numbers in TEAM and offline voter databases, voter registration records can contain typos or errors. Tr. 10/12/2023 at 3872:10-23 (Phillips); Order Granting Sum. J., Dkt. 820 at 10. For example, there are more than 60,000 state-issued ID numbers that are inconsistent with DPS records and almost 45,000 SSN4s inconsistencies between TEAM and DPS databases. Order Granting Sum. J., Dkt. 820 at 9.

239.    "[B]ecause matching a DPS number or SSN4 against incomplete and erroneous voter registration records fails to identify some voters accurately, S.B. 1 requires election officials to reject mail ballot materials from voters who provided accurate information." Order Granting Sum. J., Dkt. 820 at 11 (internal citations omitted).

240.    For example, during the November 2022 general election, Robert Benavides, a 76-year-old voter in Travis County, was unable to cure his mail ballot and was ultimately disenfranchised because the DL number in his voter registration record contained a typo. Order Granting Sum. J., Dkt. 820 at 10.

## 2.    SB1's ID requirements cause voters to make unintentional errors or omissions.

241.    Even if the statewide and county voter registration files were perfect, there are numerous reasons that SB1's ID requirements cause otherwise valid ABBMs and mail ballots to be rejected because of simple errors or omissions, notwithstanding the clerk's ability to verify the ABBM or mail ballot by other means.

242.    For example, neither the ABBM nor the carrier envelope instructs voters to list multiple identification numbers. Tr. 9/22/2023 at 1838:17-19 (Adkins). Instead, the forms generally instruct the voters to list their driver's license number and if they do not have one to put down the last four digits of their social security number.  Tr. 9/22/2023 at 1838:20-23 (Adkins).  The form also does not indicate that the ID number provided must match the voter registration record.  LUPE Ex. 119;

LUPE Ex. 120 (Spanish). Thus, some voters put down one number without knowing that it may not match the number included in their voter registration record.  9/11/2023 at 211:24-212:6 (Wise).

243.    Some voters fail to provide any ID number, either because they forget, because they do not realize it is required, or they are confused about how to comply with the ID requirement. Tr. 9/13/2023 at 520:4-521:9 (Phillips); Tr. 9/19/2023 at 1159:8-18, 1161:4-7 (Obakozuwa); Tr. 9/14/2023 at 966:16–967:11, 968:1-11 (Mata); LUPE Ex. 223.

244.    Louis Perales was one of these voters. Mr. Perales lives in San Antonio, Texas, and is retired.  He worked for 24 years as a civil servant in the United States Postal Service. Tr. 10/3/2023 at 2164:18-2165:5, 2169:13-14 (Perales).

245.    Mr. Perales, a registered voter, has voted by mail for the past five years.  He is 76 years old and is diagnosed with cirrhosis of the liver, PTSD, and diabetes with neuropathy. Tr. 10/3/2023 at 2168:20-2169:2; 2169:13-16 (Perales).

246.    Mr. Perales successfully applied for his annual ballot by mail in January of 2022. He received his mail ballot for the March 2022 Primary Election in early February 2022, but he struggled to fill out his March 2022 Primary Election ballot carrier envelope. Tr. 10/3/2023 at 2169:19-2170:1-2 (Perales).

247.    Mr. Perales did not include a phone number or email address on his March 2022 Primary Election mail ballot carrier envelope.  He also did not include his driver's license or social security number on the carrier envelope of his March 2022 Primary Election mail ballot because the location to place the information was under the flap and he did not see it. Tr. 10/3/2023 at 2170:10-2171:1 (Perales).

248.    Mr. Perales did return his mail ballot and included his signature on the carrier envelope. However, his ballot was rejected because he did not include an identification number. Tr. 10/3/2023 at 2169:13-2171:1, 2173:2-2174:1 (Perales); LUPE Ex. 277.

249.    Similarly, in the November 2022 general election, Stella Mata—who votes in Harris County—completed her mail ballot and included her signature on the carrier envelope. However, she did not include an identification number because she did not know it was required, and thus her ballot was rejected. Tr. 9/14/2023 at 966:16–967:11, 968:1-11 (Mata); LUPE Ex. 273. She had "no voice" for that election. Tr. 9/14/2023 at 968:16-969:6 (Mata).

250.    Other voters provide an identification number that is different from what is required by SB1. Tr. 10/12/2023 at 3872:10-23 (Phillips) (some voters provide VUID instead of their DL number or SSN4); Tr. 9/12/2023 at 422:10-19 (Scarpello).

251.    Still other voters provide an ID number that does not match the voter registration record. Tr. 9/13/2023 at 526:20-527:1 (Phillips); Tr. 9/19/2023 at 1159:25-1160:3 (Obakozuwa). For example, voters may provide their DL numbers, but their registration records have only their SSNs or SSN4s – or vice versa. Tr. 9/11/2023 at 211:20-212:9 (Wise); Tr. 9/14/2023 at 851:6-10 (DeBeauvoir); Tr. 9/13/2023 520:4-521:9 (Phillips).

252.    Pam Gaskin was one of these voters. For the March 2022 primary election, Ms. Gaskin, a 75-year-old voter who had been registered to vote in Fort Bend County for more than 40 years, had her ABBM rejected after she followed the instructions on the ABBM form and provided her DL number, which she later learned was not in the voter registration database. Order Granting Sum. J., Dkt. 820 at 9-10.

253.    Some voters have had their ABBMs rejected multiple times because of a mismatched or a missing ID number. Tr. 9/11/2023 at 217:22-218:6 (Wise); Tr. 9/21/2023 at 1513: 12-14 (Johnson);

Tr. 9/13/2023 at 524:23-525:2 (Phillips); Tr. 9/19/2023 at 1044:16-19 (Callanen). For example, some voters in El Paso County had their mail ballot or ABBM rejected twice for submitting the documents first with one ID, then with another, but neither could be verified. Tr. 9/11/2023 at 217:22-218:2 (Wise).

254.    Even voters who successfully submitted an ABBM nevertheless have had their mail ballot rejected under the SB1 regime because they provided a number on their carrier envelope that did not match a number that was in their record, or they missed putting their ID number on their carrier envelope. Tr. 9/13/2023 at 522:23-523:8 (Phillips); Tr. 9/11/2023 at 212:10-18 (Wise); *see also* Tr. 9/11/2023 at 259:7-260:4 (Wise); LUPE Ex. 26.

255.    Some voters make a mistake by transposing their ID numbers on the ABBM or mail ballot carrier envelope. Tr. 9/11/2023 at 218:22-219:3 (Wise).

256.    Voters may "easily" miss the area on the carrier envelope where a voter is supposed to provide their ID number. Tr. 9/11/2023 at 210:6-10 (Wise); LUPE Ex. 348; *see also* Tr. 9/12/2023 at 415:8-17 (Scarpello).  For example, Louis Perales expected the inside flap of an envelope to contain only glue and did not expect the area under the flap to request identification information.  As he put it:

> And me being a postman, I should have caught that but I didn't because who puts information on the inside of a flap.  That's for the glue to make sure that your letter is in the envelope and stays there.  When I open a letter, I usually have a letter opener that tears it open. The flap is never opened because it's glued on there.

Tr. 10/3/2023 at 2171:12-2172:2 (Perales).

257.    Some voters have been deterred from voting because of SB1's ID requirements. Tr. 9/19/2023 at 1044:13-15 (Callanen). For example, some voters in Dallas County who, after the ID number requirements were explained to them, abandoned the process. Tr. 9/13/2023 at 538:3-9 (Phillips); *see also* Tr. 9/13/2023 at 549:6-16 (Phillips) (Ms. Phillips said that when she spoke to

voters over the phone, the ones who were angry were agitated when they spoke to her, and were speaking out their feelings. In those conversations, voters told her that they were simply not going to pursue this process anymore.)

258.    Lisa Wise, the El Paso County Election Administrator, testified that it is possible that voters who had their ABBM rejected for ID reasons gave up on the process and did not vote. Tr. 9/11/2023 at 222:9-12 (Wise).

259.    Finally, some voters did not want to provide their ID number, Tr. 9/19/2023 at 1161:4-7 (Obakozuwa), including because of privacy concerns, Tr. 9/19/2023 at 1159:19-24 (Obakozuwa), and concerns that the ID requirement for ABBMs and mail ballots could expose them to identity theft. Tr. 9/11/2023 at 221:6-15 (Wise); Tr. 9/19/2023 at 1048:13-1049:8 (Callanen).

### 3.    Guidance from state officials on how to comply with SB1's new ID requirements is inadequate.

260.    The SOS's implementation of SB1 did not provide voters or election officials with adequate resources to understand or comply with SB1's ID requirements. For example, as of January 24, 2022—24 days after the ABBM period opened for 2022—the Secretary of State's website instructions reflected an old ABBM form, not the updated one required under SB1. LUPE Ex. 123. A voter wrote to the SOS asking about whether they had the correct ABBM form because the online instructions did not align with the form she had. LUPE Ex. 310.

261.    According to the Rockwall County elections office, the SOS provided conflicting advice on the use of old and new ABBM forms: 1) in December 2021, the SOS advised that old ABBM forms could be used; 2) in January 2022, the SOS advised that old ABBM forms could be used for 65+ voters if they put their ID on the application; 3) on January 18, 2022, old ABBM forms must be rejected; and 4) on January 20, 2022, old ABBM forms could be accepted if the voter wrote their ID number on the application. LUPE Ex. 311.

262.    On February 1, 2022, the Secretary of State, in responding to a voting inquiry related email, stated that the office was advising counties that it is permissible for counties to ask voters to put both numbers on their ABBM. LUPE Ex. 130; *see also* Tr. 9/22/2023 at 1838:24-1839:11 (Adkins) (testifying that at the request of "many of the counties," the Secretary of State Office approved "inserts for application materials recommending both types of ID numbers be listed"). Prior Secretary of State guidance regarding SB1's ID requirements did not advise or permit counties to tell voters to provide both their DL and SSN. LUPE Ex. 107; LUPE Ex. 125 at STATE046398, STATE046402.

263.    Indeed, according to Harris County, the Secretary of State did not provide "any" guidance on how to educate voters on SB1's ID requirements. LUPE Ex. 252 at 6.

264.    Even now, the Secretary of State has not made any changes to the ABBM or the carrier envelope to advise voters that they can include both their DL and their SSN.  Tr. 9/22/2023 at 1838:17-19 (Adkins).

265.    Nor has the Secretary of State's Office or the Elections Division issued an election advisory that tells voters or counties that both the last four of a social security number and the driver's license number can be included on an ABBM. Tr. 10/18/2023 at 4600:22-4601:3 (Adkins).

266.    When asked whether her office could amend the ABBM or carrier envelope to advise voters to include both a driver's license and a social security number, Ms. Adkins admitted that "the law I think limits us in what we can say in that area."  Tr. 9/22/2023 at 1843:8-13 (Adkins).

267.    In the absence of concerted Secretary of State voter education, some counties stepped in. To mitigate the rejection of voters' applications for ballot by mail and mail ballots due to errors or omissions in complying with SB1's ID requirements, several counties created inserts to include with the ABBM packet and mail ballot carrier envelope to advise voters to comply with the ID

requirement and to recommend that voters put both numbers to avoid having their ABBM or mail ballot rejected.  *See* JOINT Ex. 36 (Denton County); JOINT Ex. 37 (Travis County); JOINT Ex. 38 (Travis County; JOINT Ex. 39 (Travis County); JOINT Ex. 40 (Harris County); JOINT Ex. 41 (Bexar County); JOINT Ex. 42 (Kleberg County); Tr. 9/13/2023 at 771:4-18 (Garza); LUPE Ex. 351 (Cameron County).

268.    Jackie Callanen testified that Bexar County developed an insert specifically in response to the State's mail ballot forms, which were "just too verbose."  Tr. 9/19/2023 at 1037:10-14 (Callanen).  As she testified:

> So we came up with this little piece of paper. And we made it bright. We made it colorful. We made it just this size, so that - and I'm not embarrassed to say, but I'm sort of proud to say . . . that we were hoping . . . when the voters pulled this whole packet out and opened it, that this little piece of paper would fall on the floor so that they had to pick this piece of paper up.

Tr. 9/19/2023 at 1037:20-1038:2 (Callanen).

269.    After seeing what the counties had done with the inserts to education voters, the Secretary of State considered creating an official insert for use statewide but never finalized such an insert and is not currently planning to provide such an insert and is unaware of how many counties use a reminder insert with ABBMs and mail ballots. Tr. 9/22/2023 at 1838:24-1841:11 (Adkins); LUPE Ex. 170.

### 4.    Rejection rates skyrocketed due to SB1's ID requirements.

270.    The enforcement of Sections 5.07 and 5.13 has resulted in the disenfranchisement of tens of thousands of qualified voters. LUPE Ex. 301; LUPE Ex. 302.

271.    In the March 2022 primary election, over 25,000 mail ballots were rejected statewide because of a mismatched or missing ID number. Order Granting Sum. J., Dkt.  820 at 9.

272.    The rejection rate for mail ballots in Texas during the March 2022 primary was 12.38 percent statewide. LUPE Ex. 145; LUPE Ex. 263. County election officials reported that mail

ballot rejection rates were "dramatically higher" by "orders of magnitude" than prior elections. Tr. 10/2/2023 at 1957:16-19 (Mayer); LULAC Ex. 2.

273. Unprecedented rejection rates for the March 2022 primary were reflected across the counties. The rejection rate for ABBMs reached as high as 50 percent in Travis County, Tr. 9/14/2023 at 850:9-15 (DeBeauvoir); 11 percent in Dallas County, LUPE Ex. 78; at least 14 percent in El Paso County, Tr. 9/12/2023 at 320:2-4 (Wise); *see also* LUPE Ex. 241; and 18 percent in Potter County, LUPE Ex. 319. The rejection rate for mail ballots reached as high as 26 percent in Dallas County, LUPE Ex. 78; and 13.8 percent in Cameron County, LUPE Ex. 234, p. 2, 3; and 18.7 percent in Harris County, Tr. 9/20/2023 at 1286:12-1287:10 (Longoria); OCA Ex. 36.

274. Texas rejected ABBMs and ballots at these unprecedented rates for the March 2022 primary election as a "direct result" of SB1's ID requirements. Tr. 9/20/2023 at 1286:23-1287:5 (Longoria); LUPE Ex. 61 (Of the total timely received ABBMs in Dallas County, 69 percent were rejected due to an ID issue); Tr. 9/12/2023 at 277:7-10 (Wise); LUPE Ex. 338 (majority of ballots in El Paso County rejected due to ID issues); LUPE Ex. 234 at 2, 3 (same in Cameron County); Tr. 9/14/2023 at 850:23-851:5 (DeBeauvoir) (same for ABBMs in Travis County); Tr. 9/21/2023 at 1516:12-17 (Johnson) (same for mail ballots in Travis County); Tr. 9/19/2023 at 1049: 18-21 (Callanen) (same in Bexar County); Tr. 10/3/2023 at 2339:12-23 (Ramon); LUPE Ex. 72 (same for ABBMs and mail ballots in Hidalgo County).

275. The Secretary of State confirmed that SB1 was the primary cause for the March 2022 primary election rejection rates. In referencing the March 2022 primary mail ballot rejection rates, Assistant Secretary of State for Communications Sam Taylor stated, "Based on what we have heard from county election officials, the vast majority of mail-in ballot rejections were due to voters who did not provide any ID information on their carrier envelope." LUPE Ex. 151.

276.    While rejections rates decreased in the November 2022 general election, they were still higher than in elections prior to SB1's enactment.

277.    In the November 2022 general election, more than 11,000 mail ballots were rejected statewide because of a mismatched or missing ID number. Order Granting Sum. J., Dkt. 820 at 9.

278.    The rejection rate for mail ballots in Texas during the November 2022 general election was 2.7 percent. LUPE Ex. 181 at 17.  That was more than double the rejection rate of mail ballots in the November 2020 election, which was below 1 percent. LUPE Ex. 305.

279.    Individual counties likewise saw rejection rates in the November 2022 general election decrease from the March 2022 primary. For example, the ABBM rejection rate for the November 2022 general election was 3.4 percent in Hidalgo County. LULAC Ex. 93. And the mail ballot rejection rate for the November 2022 general election was approximately 4.8 percent in Hidalgo County, LULAC Ex. 93; and 2.16 percent in Travis County, Tr. 9/21/2023 at 1525:19-21 (Johnson); LULAC Ex. 90.

280.    But the rejection rates were still higher than in elections prior to SB1's enactment. Tr. 9/13/2023 at 524:10-16 (Phillips); Tr. 9/12/2023 at 439:5-8 (Scarpello); LUPE Ex. 35, LUPE Ex. 37, LUPE Ex. 39 (Dallas County); Tr. 9/21/2023 at 1525:7-11 (Johnson) (Travis County); Tr. 9/19/2023 at 1159:12-14,1160:4-6, 1160:24-1161;7 (Obakozuwa) (Harris County). For example, in Travis County, the ABBM rejection rate in the November 2022 general election was 4.86 percent, compared to only 1.33 percent in November 2020. LULAC Ex. 90, at 5-6.

281.    Like the March 2022 primary, SB1 was the primary cause of the high rejection rates of both ABBMs and mail ballots in the November 2022 general election. Tr. 9/12/2023 at 439:14-22 (Scarpello) (mail ballots in Dallas County); Tr. 9/19/2023 at 1048:24-1049:2, 1049:22-23 (Callanen) (same in Bexar County); Tr. 9/12/2023 at 277:11-14 (Wise) (ABBMs in El Paso

County); Tr. 9/21/2023 at 1516:18-22 (Johnson); Tr. 9/21/2023 at 1551:23-1552:1 (Escobedo);

LUPE Ex. 10; LUPE Ex. 11; LULAC Ex. 89 (same for ABBMs and mail ballots in Travis County);

Tr. 9/19/2023 at 1159:12-14, 25-1160:4-6, 1161:4-7 (Obakozuwa), LUPE Ex. 252 (same in Harris

County).

282.    Voters who had their ABBMs or mail ballots rejected in 2022 were eligible voters. Tr.

9/13/2023 at 527:16-21 (Phillips); Tr. 9/19/2023 at 1050:7-10, 21-25 (Callanen).

> **5.    The notice and cure process does not diminish the burden imposed by Sections 5.07 and 5.13.**

283.    The Secretary of State is statutorily mandated to provide notice to a voter whose ABBM

has been rejected due to an identification number defect. JOINT Ex. 1 (Section 5.07 (f-1)); LUPE

Ex. 96 (SOS notice of rejected ABBM and reason for rejection); LUPE Ex. 99 (SOS notice of

rejected ABBM due to missing or incorrect personal identification number; LUPE Ex. 108 (SOS

notice of rejected ABBM due to identification number not being associated with the voter's record).

The only methods available for curing an ABBM are for voters to come in person to the early

voting clerk's office or to use the online ballot tracker system provided by the SOS. Tr. 9/20/2023

at 1300:3-4, 11-19 (Longoria).

284.    The SOS is statutorily mandated to provide notice to a voter whose mail ballot has been

rejected due to an identification number defect. JOINT Ex. 1 (Section 5.12); LUPE Ex. 100 (SOS

notices of rejected mail ballot and reason for rejection; LUPE Ex. 101 (same); LUPE Ex. 27

(same); LUPE Ex. 331 (SOS corrective action form).  The only methods available for curing a mail

ballot are for voters to come in person to the early voting clerk's office or to use the online ballot

tracker system provided by the SOS. Tr. 9/20/2023 at 1300:3-4, 11-19 (Longoria).

285.    "[C]ure procedures under S.B. 1 do not protect the franchise because some voters cannot effectively use them to ensure their application is accepted and their valid ballot is counted." Order Granting Sum. J., Dkt. 820 at 42 n.30 (internal citations omitted).

286.    The cure process is difficult to understand, and voters can get confused. For example, the form describing the cure process is highly complex, long, verbiage rich, and difficult to use. Tr. 9/12/2023 at 448:4-10 (Scarpello). Further, some voters who were sent their mail ballots to be cured because of a mismatched or missing ID number threw it away because they thought it was a duplicate ballot. Tr. 9/12/2023 at 251:15-19 (Wise); *compare* LUPE Ex. 348 *with* LUPE Ex. -349. Those voters did not end up casting a ballot. Tr. 9/12/2023 at 251:20-22 (Wise).

287.    One county used house calls to help voters cure their ABBMs and mail ballots. In Cameron County, election office staff started to go to the homes of voters who were older or otherwise had difficulty curing an ABBM or mail ballot. Usually, the staff would bring ABBMs or mail ballots that needed to be cured due to an ID issue. The staff did this during work hours using one of the county vehicles. Tr. 9/13/2023 at 748:15-749:20 (Garza). The Cameron County elections office also tried contacting voters by phone before mailing back a defective mail ballot, but some voters did not have a phone number on file. Tr. 9/13/2023 at 745:9-745:18 (Garza).

288.    The Ballot Tracker is inadequate to cure ABBMs and mail ballots. Specifically,

> to access the online Ballot Tracker, a voter is required by statute to enter their name, SSN4, DPS ID number, and registration address. *See* Tex. Elec. Code § 86.015(b). This log-in process compares the information entered by the voter against the TEAM database. Accordingly, if a voter is missing either a DPS ID number or SSN4 in TEAM, or if TEAM has incorrect information for either of those numbers, the voter simply cannot log in to the tracker. The online Ballot by Mail Tracker is therefore only able to cure an SB1-related defect in scenarios where the voter (1) is in possession of a number in their TEAM record, but did not include a number on their ABBM or carrier envelope; or (2) made a transcription error on their ABBM or carrier envelope.

Order Granting Sum. J., Dkt. 820 at 42-43 n.30; Tr. 9/11/2023 at 225:9-20. (Wise); *see also* Tr. 9/22/2023 at 1851:16-22 (Adkins) (testifying that a voter whose ABBM was rejected would be unable to access the Ballot Tracker if they put down their driver's license number on the ABBM but their voter registration file only contains their social security number); Tr. 9/22/2023 at 1852:12-18 (Adkins) (testifying that voters who do not have both their social security number and their driver's license or personal ID number in their voter registration file would also be shut out of the Ballot Tracker for purposes of curing their carrier envelope for an ID defect). The process makes it so that "there's no way for the voter to comply with the law." Tr. 9/19/2023 at 1030:6-1032:15 (Callanen).

289.    The Elections Division received numerous complaints from voters about being unable to use the Ballot Tracker in part due to the residence field, which was required by SB1. 9/22/2023 at 1841:19-1842:5 (Adkins). In fact, Ms. Adkins tried using her own residential address and the Ballot Tracker could not validate it. 9/22/2023 at 1841:25-1842:2 (Adkins).

290.    Travis County received complaints from voters that the Ballot Tracker was difficult to navigate and that voters were never able to successfully use it. Tr. 9/21/2023 at 1574:15-20 (Escobedo). Voters' frustration with the ballot tracker did not dissipate between the March 2022 primary and the May 2022 election. Tr. 9/21/2023 at 1574:21-24 (Escobedo).

291.    In Hidalgo County, the ballot tracker presented issues for voters because it was "late to start working," not user friendly, and many voters did not have access to computers. Tr. 10/3/2023 at 2328:24-2330:13 (Ramon).

292.    In Cameron County, the rollout of the Ballot Tracker did not go well due to issues integrating the codes from the offline voter database vendor, VoteTech, with the Ballot Tracker. Tr. 9/13/2023 at 754:22-755:18 (Garza). This issue was likely not unique to Cameron County, as some

of the largest counties in Texas use VoteTech. Tr. 9/13/2023 at 756:23-757:1 (Garza). VoteTech clients requested VoteTech to create a working group to try to resolve the issue because it was so widespread. Tr. 9/13/2023 at 755:19-756:15 (Garza).

293.    Further, some voters do not have internet to even access the Ballot Tracker. Tr. 9/21/2023 at 1520:21-1521:9 (Johnson).

294.    For voters who could login to the Ballot Tracker, hundreds could not successfully correct a defect in their ABBM or mail ballot. LUPE Ex. 169.

295.    For example, in the March 2022 primary election, 364 voters statewide used the Ballot Tracker to correct a defect in their ABBM and only 2,628 voters statewide used it to correct a defect in their mail ballot. Of those that did use the Ballot Tracker, only a fraction of voters used it to successfully to correct a defect and either had their ABBM or mail ballot accepted or canceled their application and instead voted in person. LUPE Ex. 169; *see also* Tr. 9/11/2023 at 225:21-23 (Wise) (only 11 voters in El Paso County used the Ballot Tracker for the March 2022 primary election).

296.    A Comal County voter emailed the SOS regarding her daughter's inability to vote by mail because of SB1's ID requirements. Her daughter's ABBM for the November 2022 election - which she requested because she lives away for college - was initially rejected because she provided her DL but her voter registration record had her SSN. The rejection letter informed the daughter that she could utilize the Ballot Tracker to cure her defect. Her daughter was unable to access the tracker even when she input her DL, SSN, and residential address. She then added her SSN and DL to her voter registration via txapps.texas.gov, and was thereafter able to access the Ballot Tracker. However, the ballot tracker had no record of the daughter's ABBM. The Comal County elections office told the daughter that the issue would soon be fixed, but her daughter thereafter was unable

to log into the Ballot Tracker. The voter characterized the process as "beyond frustrating and completely unnecessary." LUPE Ex. 196.

297.    The cure process is also more difficult for voters with disabilities. *See* ADA Submission, FOF § V.C.

298.    For example, Ms. Longoria sought, and was denied, the ability to accommodate disabled voters who needed to cure their mail-in ballot, even when she proposed accommodations already granted to some voters, like deployed military personnel. "It was excruciating to know that there were tools at our disposal, tools that we regularly used for other voters that we were not allowed to apply, kind of in that reasonable accommodation to voters with certain disabilities." Tr. 9/20/23 at 1301:22-25 (Longoria).

299.    The availability of in-person voting does not diminish the burden of Sections 5.07 and 5.13, especially for voters with disabilities. For example, some voters do not have access to transportation, which would affect voters' ability to appear in person at the early voting Clerk's office to do an in-person cure or vote provisionally or regularly. Tr. 9/21/2023 at 1520:21-1521:19 (Johnson).

300.    Additional findings of fact relating to the inaccessibility of voting in person as an alternative to mail voting are included in the ADA Submission. *See* ADA Submission, FOF § III.D. Rather than repeat those additional findings of fact here, LUPE Plaintiffs adopt and incorporate them by reference.

301.    Some voters who had ID defects with their mail ballots had mobility issues preventing them from being able to go to the office to cure it, and for whom in-person voting was not a viable alternative. Tr. 9/13/2023 at 747:25-748:14 (Garza).

302.    In November 2022, only 8 people came to the El Paso County's office to correct a mail ballot. Tr. 9/11/2023 at 219:12-21 (Wise).

303.    There are voters who were never able to cure their defective ABBM or mail ballot, and ultimately did not vote. Tr. 9/13/2023 at 524:17-22 (Phillips); Tr. 9/13/2023 at 750:8-11 (Garza); Tr. 9/21/2023 at 1551:4-9 (Escobedo).

304.    Some voters whose ABBM or mail ballot was rejected due to SB1's ID requirement received their rejection notice too late to cure the defect and thus did not vote. Tr. 9/12/2023 at 432:24-433:9 (Scarpello); Tr. 9/11/2023 at 218:3-6 (Wise); Tr. 9/21/2023 at 1551:18-22 (Escobedo); *see also* Tr. 9/22/2023 at 1842:15-21 (Adkins) (agreeing that some voters whose mail ballots have been rejected because of SB1's ID requirements would not be able to cure in time due to the timing of when they are notified or when they find out about how to cure their ballot).

305.    For example, Louis Perales learned that his mail ballot was missing the required ID information when he received a phone call from the Bexar County Elections Office on Election Day of the March 2022 Primary, a couple of hours before the end of the day.  The Bexar County Elections Office advised Mr. Perales to go downtown to the voter registration office to make corrections to his carrier envelope for his ballot to count. Tr. 10/3/2023 at 2171:12-15 (Perales).  Louis Perales' wife encountered the same problems with her ballot and needed to go to the voter registration office to correct her carrier envelope for her mail ballot. Tr. 10/3/2023 at 2171:16-20 (Perales).

306.    Neither Louis Perales nor his wife went into the Bexar County Voter Registration Office on Election Day to correct the carrier envelope on their mail ballots.  Mr. Perales did not go because he felt it was too short notice and he relied on his wife to drive him.  Mr. Perales' wife did not want

to fight traffic during rush hour with their grandchildren in the car. Tr. 10/3/2023 at 2172:3-2173:7 (Perales).

307. Mr. Perales has voted by mail in all subsequent elections, but he does not trust that his mail ballot is counted. He has considered voting in person, despite his anxiety attacks and PTSD, because of his lack of confidence in voting by mail. Tr. 10/3/2023 at 2174:2-2175:10 (Perales).

### 6. Sections 5.07 and 5.13 disproportionately burden voters of color and voters with disabilities.

308. The impact of Sections 5.07 and 5.13 will be even more severe on Hispanic, Latino, and nonwhite voters.

309. Texans who require language assistance when voting are disproportionately Hispanic, Latino, and nonwhite. *See infra* Section VI.A. Because of Sections 6.06's and 7.04's prohibitions on mail ballot assistance by compensated individuals and canvassers, it is more difficult for these voters to obtain assistance from community-based organizations like LUPE.

310. For example, Tania Chavez testified that, after the enactment of SB1, LUPE's members reached out to LUPE's offices for help with their mail ballots because they were not sure which number they needed to put on their mail ballot application, or they could not remember which number they put on their voter registration application. Tr. 9/11/2023 at 94:15-96:1 (Chavez); Tr. 10/11/2023 at 3673:10-20 (Chavez).

311. LUPE no longer helps community members complete their mail ballots out of fear of criminal prosecution because of Section 7.04's in-person canvassing ban. Tr. 9/11/2023 at 119:20-120:18 (Chavez). Instead, LUPE conducts group meetings in which it displays slides on the wall and discusses in general terms how to fill out a mail ballot. Tr. 9/11/2023 at 83:14-84:3, 96:2-96:14 (Chavez); Tr. 10/11/2023 at 3673:21-3674:14, 3700:13-3701:13 (Chavez).

312.    During these presentations, LUPE's staff do not answer any specific questions about a voter's mail ballot. Tr. 10/11/2023 at 3673:21-3674:14 (Chavez). LUPE's staff also do not provide any assistance to community members with filling out their mail ballots; community members are required to fill out their mail ballots on their own. Tr. 9/11/2023 at 96:2-96:14 (Chavez).

313.    LUPE does not tell these community members to go vote in person because they are elderly, vision-impaired, and/or low-literacy and many feel more comfortable going to LUPE for assistance, rather than an election worker that they have never met. Tr. 9/11/2023 at 96:15-97:17 (Chavez).

314.    As Ms. Chavez testified:

> So the only thing we could do for them is project on the screen and so walk them through the process of what they needed to do in order to cast that ballot. Again, even in us doing that, it didn't fulfill their needs because projecting on the screen for somebody that is visually impaired, projecting on the screen for somebody who has a challenge with reading, it's also difficult, and so we were able to help some but even in us doing that presentation we weren't able to help all the needs and accommodate all the needs of the disabled community members that we serve.

Tr. 9/11/2023 at 97:1-10 (Chavez).

315.    Dr. Daniel Smith, a professor of political science at the University of Florida, reached certain conclusions regarding the impact of SB1's vote by mail provisions on Hispanic voters. *See, e.g.*, HAUL-MFV Ex. 402.  However, because Dr. Smith's analysis was based on incomplete data and unreliable assumptions about voters with Hispanic surnames, those conclusions are inconclusive and unreliable.

316.    For example, Dr. Smith relied on several data sources in conducting the analysis presented in his June 2023 report.  One of those data sources was information regarding applications for ballots by mail (ABBMs) and mail ballots (BBMs) from the 2022 general election.  This data was

extracted from the Texas Election Administration Management (TEAM) system by the Texas Secretary of State. HAUL-MFV Ex. 311 ¶¶ 19-24.

317.    Dr. Smith's report and testimony at trial make clear that the TEAM data provided by the Secretary of State had several significant limitations. *See* HAUL-MFV Ex. 311 ¶¶ 17-18, 21-24, 47.

318.    First, none of the TEAM data included information from all 254 counties in Texas. *See* HAUL-MFV Ex. 311 ¶¶ 21-24; HAUL-MFV Ex. 60 ¶ 64 n.19.

319.    For example, the TEAM data included information about the number of ABBMs *requested* in advance of the 2022 general election for 253 counties. However, the TEAM data regarding *rejected* applications only included information for 180 counties. In other words, there was no data regarding rejected ABBMs from 74 counties. Tr. 10/4/2023 at 2685:9-15 (Smith); HAUL-MFV Ex. 311 ¶¶ 21-22.[11]

320.    The TEAM data relating to accepted and rejected BBMs was also inconsistent, including information about requested BBMs from 245 counties and information about accepted BBMs from only 165 counties. *See* HAUL-MFV Ex. 311 ¶¶ 23-24.

321.    Second, although much of the TEAM data regarding rejected ABBMs included a field for "reject reason," information regarding rejection reason was missing or incomplete for 90

---

[11] The counties for which there was no data regarding rejected ABBMs were: Archer, Armstrong, Baylor, Bell, Briscoe, Burnet, Callahan, Camp, Carson, Castro, Cochran, Collingsworth, Crockett, Crosby, Dallam, Deaf Smith, Dickens, Dimmit, Eastland, Ector, Falls, Floyd, Foard, Fort Bend, Franklin, Garza, Glasscock, Hale, Hall, Hansford, Hardeman, Hartley, Hemphill, Henderson, Hudspeth, Irion, Jones, King, Kinney, Knox, Lamb, Lavaca, Leon, Lipscomb, Loving, Lynn, Martin, Mason, Midland, Motley, Nolan, Ochiltree, Panola, Reagan, Red River, Reeves, Roberts, San Saba, Schleicher, Shackelford, Shelby, Sherman, Stonewall, Sutton, Swisher, Terrell, Throckmorton, Upton, Ward, Wheeler, Wilbarger, Winkler, Yoakum, and Zapata. HAUL-MFV 311 ¶ 22 n. 5.

counties.[12]  In the absence of a rejection reason, Dr. Smith assumed that the rejection reason was a non-SB1 reason.  *See* HAUL-MFV Ex. 311 ¶ 37; STATE Ex. 449.

322.    Finally, even where county information was included in the TEAM data, some of the data was sparse to the point of being "highly implausible." HAUL-MFV Ex. 311 ¶ 53.  For example, the TEAM data from Bexar County reported "only one rejected absentee application out of 25,459 applications by voters with non-Hispanic surnames." HAUL-MFV Ex. 311 ¶ 53.  According to Dr. Smith, discrepancies such as this "underscor[e] the incomplete nature of the data that the Secretary of State's office produced." HAUL-MFV Ex. 311 ¶ 53.

323.    Notwithstanding the significant discrepancies with the TEAM data, Dr. Smith relied on that data to calculate rejection rates for ABBMs and BBMs in the 2022 general election and to analyze rates of rejection due to SB1.  *See* HAUL-MFV Ex. 311 ¶¶ 38-42.

324.    In an attempt to account for some of the issues with the data, Dr. Smith incorporated a number of assumptions into his analysis.

325.    For example, Dr. Smith assumed that if the Secretary of State's data did not include information about rejected ABBMs, then there were zero ABBMs rejected in that county. Tr. 10/4/2023 at 2685:23-2687:12 (Smith); *see also* HAUL-MFV Ex. 311 ¶ 22 ("I assume,

---

[12] Dr. Smith's report indicates explains that rejection reason was missing for "dozens of counties." HAUL-MFV 311 ¶ 37. In fact, the underlying TEAM data on which Dr. Smith relied shows that rejection reasons were missing for some or all rejected applications in 90 counties:  Anderson, Angelina, Aransas, Atacosa, Bandera, Bee, Bexar, Borden, Bowie, Brazoria, Brewster, Brooks, Brown, Caldwell, Calhoun, Cameron, Chambers, Childress, Clay, Coleman, Collin, Colorado, Comal, Concho, Coryell, Delta, Denton, Donley, Duval, Erath, Fannin, Frio, Gaines, Galveston, Gray, Harris, Hill, Hockley, Hopkins, Howard, Jasper, Jeff Davis, Jefferson, Jim Hogg, Jim Wells, Johnson, Kaufman, Kendall, Kerr, Kent, Kleberg, Lampasas, Lasalle, Lee, Liberty, Limestone, Live Oak, Matagorda, Maverick, Menard, Mills, Montague, Montgomery, Morris, Nacogdoches, Nueces, Parker, Parmer, Pecos, Polk, Potter, Presidio, Rains, Randall, San Augustine, San Jacinto, Scurry, Sterling, Travis, Trinity, Tyler, Val Verde, Van Zandt, Victoria, Walker, Wichita, Williamson, Wilson, Wise, Wood. *See* STATE 449.

conservatively, in the analysis that follows that the 74 counties that are missing from the Rejected Application file did not reject a single absentee ballot application ahead of the 2022 general election.").

326.    Using that assumption, Dr. Smith calculated ABBM rejection rates for the 2022 general election that included an actual number for the 74 counties in the denominator but an assumption of zero in the numerator. HAUL-MFV Ex. 311 ¶ 47 ("[T]he denominator includes requested applications from 253 counties . . ., but the numerator only includes data from the 180 counties that provided data to the Secretary of State about rejected applications").

327.    Dr. Smith made a similar assumption when calculating BBM rejection rates. Dr. Smith included all requested ballots in the denominator of his analysis, despite "considerable missing data" and zero rejected absentee ballots for 80 counties in the numerator. HAUL-MFV Ex. 311 ¶¶ 70, 73.

328.    According to Dr. Smith, these assumptions meant that the rejection rates he calculated were "by construction, very deflated." HAUL-MFV Ex. 311 ¶ 47.

329.    Dr. Smith used similar assumptions in his analysis of the effect of SB1 on rejection reasons. Thus, he assumed that if the TEAM data did not provide a rejection reason for an ABBM or a BBM, then the rejection was for a reason other than SB1. Tr. 10/4/2023 at 2688:18-24 (Smith); HAUL-MFV Ex. 311 ¶ 70.

330.    Similarly, in his analysis of absentee ballot rejections in the March 2022 primary election, Dr. Smith calculated a rejection rate of absentee applications with requested ballots data from 254 counties and rejected ballots data from only 163 counties. HAUL-MFV Ex. 60 ¶ 64 n.19; *id*. ¶ 23.

331.    Dr. Smith acknowledged that not having comprehensive data made it "really difficult, actually impossible, to determine whether or not an absentee ballot that was cast…was rejected

because of SB1 or because of a non-SB1 reason." Tr. 10/4/2023 at 2688:11-17 (Smith); *see also* HAUL-MFV Ex. 311 ¶ 37 (noting that where a "reject reason" was not provided, "it is not possible to determine if the rejected application was due to a requirement of S.B. 1").

332.     Dr. Smith's analysis did not account for the demographic makeup of the counties with missing or sparse rejection data.  During trial, however, Dr. Smith acknowledged that "quite a few" counties with data missing are located near the U.S.-Mexico border. Tr. 10/4/2023 at 2747:2-7 (Smith). He also testified that, had he been able to include rejection reasons for additional counties in his analysis, the rate of Hispanic voters' ABBMs and BBMs rejected because of SB1 likely would have increased. Tr. 10/4/2023 at 2746:15-23 (Smith).

333.     Additional proposed findings of fact demonstrating the disparate impact that Sections 5.07 and 5.13 have on voters of color and voters with disabilities are included in the HAUL/MFV submission and the ADA submission. *See* HAUL Submission; ADA Submission, FOF §§ VII, VIII. Rather than repeat those additional findings of fact here, LUPE Plaintiffs adopt and incorporate them by reference.

### 7.     Sections 5.07 and 5.13 will continue to cause voters' ABBMs and mail ballots to be rejected.

334.     Hundreds of new voters are registered in Texas every day. Tr. 9/22/23 at 1854:11-16 (Adkins).

335.     New voters turn 65 each year and some choose to vote by mail. Tr. 9/22/2023 at 1920:16-21 (Ingram).

336.     In November 2022, Dallas County election official Tacoma Phillips saw voter confusion from mail voters who had not voted in the 2022 March primary who were filling out ABBMs for the first time. Tr. 9/13/2023 at 538:14-19 (Phillips).

337.    Cameron County Elections Administrator Remi Garza expects voter turnout in the 2024 presidential election to be higher than in the November 2022 general election and expects to have voters voting for the first time in November 2024 under the new SB1 mail ballot ID rules. Tr. 9/13/2023 757:21-758:3 (Garza); *see also* Tr. 9/13/2023 at 538:20-24 (Phillips); Tr. 9/12/2023 at 271:11-18 (Wise). Dallas, Harris, and Bexar County election officials likewise expect that voters will continue to face problems with ABBMs and mail ballot rejections in future elections because of mismatched or missing ID numbers, including elderly voters, voters with disabilities, and voters newly eligible to vote by mail. Tr. 9/12/2023 at 439:23-25 (Scarpello); Tr. 9/19/2023 at 1161:8-10 (Obakozuwa); Tr. 9/19/2023 at 1051:1-25, 1052:1-20 (Callanen).

338.    Similarly, Tania Chavez testified that because more voters turn 65 each year, LUPE will continue to encounter voters who are newly eligible to vote by mail and who have trouble understanding SB1's ID requirements for ABBMs and mail ballots. Tr. 9/11/2023 at 122:24-124:3 (Chavez).

339.    Based on his interactions with Texas Impact's members, Mr. Houston does not expect their concerns about SB1's ID requirements for mail voting to go away because there is always going to be someone voting by mail for the first time and people do not remember what ID number they used when they registered to vote. Tr. 10/11/2023 at 3657:10-3658:1 (Houston).

340.    Based on her interactions with Friendship West's members, Pastor Ayers does not expect their concerns about Sections 5.07 and 5.13 to disappear despite the church's voter education efforts because voters will always have to make sure their mail ballot is requested, filled out, and returned properly. Tr. 10/4/2023 at 2512:12-18 (Ayers).

**B.      Sections 6.03, 6.04, 6.05, 6.06, and 7.04 impose severe burdens on the right to vote for those who need assistance.**

341.    Proposed findings of fact demonstrating the severe burdens that 6.03, 6.04, 6.05, 6.06, and 7.04 impose on voters who require assistance are included in the separate Section 208 submission and the ADA submission. *See* 208 Submission, FOF § III.C-K; ADA Submission, FOF § VI. Rather than repeat those additional findings of fact here, LUPE Plaintiffs adopt and incorporate them by reference.

**C.      Sections 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, and 7.04 are not rationally related to the State's purported interests in preventing voter fraud.**

342.    SB1's stated purpose "is to exercise the legislature's constitutional authority . . . to make all laws necessary to detect and punish [voter] fraud."  JOINT Ex. 1 at 1.  However, the challenged provisions are not connected, either by evidence or logic, to that stated purpose.

**1.      Pre-SB1 law already addressed the few instances of voter fraud**

343.    Jonathan White, the former Chief of the Election Integrity Division in the office of the Texas Attorney General, testified to the Texas Legislature that his office's document on election fraud violations, which contains just 16 convictions, would tend to show that voter fraud is not that big a deal.  Tr. 10/16/2023 at 4031:8-23 (White).

344.    According to Mr. White, probably over 150 types of election offenses exist in Texas.  Most of these election crimes have never been seen or are "one-offs." Tr. 10/16/2023 at 3914:20-3915:8 (White).

345.    Mr. White testified that the Election Integrity Division received, on average, less than 50 referrals per year going back to 2016.  Tr. 10/16/2023 at 4017:23-4018:3 (White) ("I don't imagine it would be too far off of that.").

346.    Mr. White testified that a significant number of investigations of alleged voter fraud are shut down on the investigation side and do not become prosecutions because of a lack of evidence,

or because no offense occurred. Tr. 10/16/2023 at 4018:21-4019:9 (White). Mr. White made the decision whether to charge an individual with election fraud, and he testified that "it was common" for the Election Integrity Division not to proceed with the prosecution on a given investigation into election fraud, primarily because a crime did not occur, or there was insufficient evidence that a crime occurred. Tr. 10/16/2023 at 4013: 12-17; 4018:10-20 (White).

### a.    Identifying a voter who votes by mail (Sections 5.07, 5.13).

347.    Impersonating a voter, i.e., voting another person's ballot, is prohibited by Tex. Elec. Code § 64.012 (3). Tr. 10/16/2023 at 3925:21-3926:7 (White); State Ex. 89 at 38).

348.    The OAG Election Fraud Violations spreadsheet shows only one conviction for violating § 64.012 (4) from 2006 to the present, and that conviction was obtained on August 4, 2006. OCA Ex. 377 at 1.

349.    County election administrators testified that they could not recall instances where an individual was found to have impersonated another voter in mail voting. Tr. 9/12/2023 at 244:15-19 (Wise) (aside from one investigation that she has been able to recall, she is not aware of any incidents in El Paso County where a fraudster impersonated a voter on an application for ballot by mail or mail ballot); *see also* Tr. 9/14/2023 at 855:5-8 (DeBeauvoir) (cannot recall a time when someone voted somebody else's mail ballot and returned it as if they were that person).

### b.    Voter assistance in the polling place (Sections 6.03, 6.04).

350.    The State of Texas was unable to identify *a single* conviction or guilty plea, from 2006 to the present, in which a voter assister committed voter fraud in the polling place. Mr. White, the OAG's chief election fraud prosecutor, testified that none of the resolved prosecutions in the OAG's Election Fraud Violations spreadsheet involved voter assistance in the polling place. Tr. 10/16/2023 at 4034:16-25 (White); OCA Ex. 377.

351.    Mr. White testified that voting by personal appearance is less vulnerable to fraud than mail voting because the security features that are present in in-person voting are better than those present in vote by mail.  Tr. 10/16/2023 at 3998:3-10 (White).

352.    The Texas Election Code, pre-SB1, already contained numerous provisions criminalizing assistance fraud in the polling place. With respect to unlawful voter assistance, Mr. White testified that, prior to SB1, the Texas Election Code criminalized:  assisting a voter who is not eligible for assistance or did not ask for assistance; voting a ballot differently than the voter wished or directed the assistant to vote the ballot; suggesting to the voter during the voting process how the voter should vote. Tr. 10/16/2023 at 3923:21-3924:14 (White).  Mr. White also testified that before SB1 it was illegal for a person who provided assistance to a voter to try to influence or coerce the voter. Tr. 10/16/2023 at 3925:4-6 (White).

353.    Mr. White explained that if an assister disregards a voter's preference when marking the ballot, that assister can be charged under existing criminal provisions in the Texas Election Code, including unlawful assistance [Tex. Elec. Code 64.036], illegal voting [Tex. Elec. Code 64.012] and election fraud [Tex. Elec. Code 276.013].  Tr. 10/16/2023 at 3989:17-3990:1 (White).  Mr. White testified that if an assister tried to influence or coerce a voter's vote the assister could be charged with unlawful assistance and possibly election fraud.  Tr. 10/16/2023 at 3990:2-7 (White). All these provisions existed in the Texas Election Code before SB1.  Tr. 10/16/2023 at 3990:8-10 (White).

354.    No county election administrator could recall an instance of voter fraud occurring during the delivery of assistance to voters at a polling location. Tr. 9/11/2023 at 177:3-6 (Wise); Tr. 9/12/2023 at 433:10-434:2 (Scarpello); Tr. 9/21/2023 at 1547:21-24 (Escobedo); Tr. 9/19/2023 at

1317:11-19 (Longoria); Tr. 9/14/2023 at 846:16-847:3 (DeBeauvoir); Tr. 9/19/2023 at 1059:1-4 (Callanen).

### c.    Mail voter assistance (Section 6.04, 6.05, 6.06).

355.    Unlawfully assisting a voter, *i.e.,* helping a voter who is not eligible or did not ask for help, voting the ballot differently than the voter wants or directs, or suggesting how the voter should vote, is prohibited by Tex. Elec. Code § 64.036.

356.    The most recent OAG Election Fraud Violations spreadsheet shows 11 convictions or stipulations of guilt for unlawful assistance from 2006 to the present.  OCA Ex. 377 at 3-6, 8-9. The most recent conviction was related to a municipal election in 2016.  *Id*. at 9.

357.    Regarding the OAG Election Fraud Violations spreadsheet dated April 20, 2022, Mr. White testified, with respect to charges of unlawful assistance, that he could not provide information regarding the defendants' unlawful assistance acts beyond the face of the spreadsheet and by reciting the elements of the offense; he could not say whether the voters were eligible for assistance or what specifically the defendants did to make the assistance unlawful.  Tr. 10/16/2023 at 4022:12-4027:16 (White); LULAC Ex. 61.

### d.    "Vote Harvesting" (Section 7.04).

358.    Jonathan White testified that "[m]ost of the key activities that comprise vote harvesting were prohibited under the Election Code before SB 1."  Tr. 10/16/2023 at 3921:4-6 (White).

359.    Mr. White defined "vote harvesting" as "a process where, you know, typically, campaign workers are paid operatives, proliferate mail ballots through applications for mail ballot, and then go back to collect those ballots from a voter and ensure that those are voted for the candidate."  Tr. 10/16/2023 at 3915:9-18 (White); *see also* STATE Ex. 89 at 14-31 (PowerPoint presentation by Jonathan White).

360.    The information on the OAG's Election Fraud Violations spreadsheet is insufficient to determine which convictions or guilty pleas, if any, met the State's definition of vote harvesting as provided by Mr. White.  *Compare* STATE Ex. 89 at 14-31 *with* OCA Ex. 377. As a result, there is no evidence of how widespread "vote harvesting" is, or how often it occurs.

361.    Election administrators are not aware of anyone with a nonprofit or community organization who has attempted to commit fraud with a mail voter and the mail ballot. Tr. 9/12/2023 at 260:17-21 (Wise); *see also* Tr. 9/14/23 847:4-8 (DeBeauvoir) (testifying she has no reason to believe that an assister who is paid by a nonprofit organization to help voters would be more likely to engage in misbehavior than an assister who is not paid).

## 2.    Widespread election fraud does not exist in Texas.

362.    Texas has never had any evidence of systemic statewide election fraud. Tr. 10/18/2023 at 4454:4-9 (Ingram). Indeed, voter fraud is a "unicorn" in Texas elections. Tr. 9/14/2023 at 856:11-15 (DeBeauvoir). Even State Defendants' own witness, Denton County Elections Administrator Frank Phillips, testified that voter fraud is rare and, in general, elections are secure. Tr. 10/12/2023 at 3892:22-3893:1 (Phillips).

363.    Voter fraud has never had an outcome determinative impact on any statewide election in Texas. Tr. 10/18/2023 at 4464:22-25 (Ingram).

364.    County elections officials, who are closest to the conduct of elections, testified that voter fraud is extremely rare, if it happens at all.  Tr. 9/21/2023 at 1547:4-20 (Escobedo) (not aware of any incidents of voter fraud associate with mail-in ballots in Travis County before 2022 or after the start of 2022); Tr. 9/21/2023 at 1526:8-10 (Johnson) (not aware of any instances where fraudulent voting was identified because of an ID mismatch); Tr. 10/12/2023 at 3879:21-3880:3 (Phillips) (other than the City of Carollton case, his office did not contact any law enforcement agency regarding a potential case of voter fraud between October 2020 and going up to the

November 2022 general election); Tr. 9/20/2023 at 1277:16-19 (Longoria) (not aware of any incidents of fraud involving the distribution of ABBMs to counties by registered voters who had not requested one); Tr. 9/19/2023 at 1045:13-25 (Callanen) (based on 18 years of experience as an elections administrator, no concern that there is a risk of voter fraud when an election administrator gives out multiple ABBMs and no reason to think that the prohibition in 5.04 on giving an application for ballot by mail to anyone other than the individual voter who requested it has not made Texas any safer from fraud in any way).

365.    Even the 2020 general election did not reveal any widespread fraud, including fraud concerning mail ballots. Tr. 10/18/2023 at 4458:17-19 (Ingram); Tr. 10/18/2023 at 4454:4-7 (Ingram). Nor did the levels of mail ballot fraud increase in Texas during the 2020 election. Tr. 10/18/2023 at 4454:13-16 (Ingram); *see also* OCA Ex. 377 at 11 (showing only one individual who stipulated to an election offense in the 2020 General Election).

366.    Keith Ingram, Elections Director for the Texas Secretary of State, testified to the Legislature that Texas's 2020 General Election "was smooth and secure." Tr. 10/17/2023 at 4334:15-23 (Ingram); Tr. 10/18/2023 at 4456:6-11 (Ingram).

367.    At the time of the 2020 General Election in Texas, Mr. Ingram testified that Texans should have a great deal of confidence in the state's mail ballot system and the electoral process because of the robust built-in security checks. Tr. 9/22/2023 at 1939:19-1940:2 (Ingram).

368.    The Texas Secretary of State's own forensic audit of the November 2020 general election did not yield evidence of any widespread voter fraud. LUPE Ex. 141; *see also* Tr. 10/5/2023 at 2839:1-2840:11, 2842:10-20, 2844:21-2845:3 (Kousser); HAUL-MFV Ex. 332 (no evidence of fraud for any of the safety measures counties took during COVID, including setting up large vote

centers to keep social distance; offering extended hour voting, 24-hour voting, or drive-thru voting).

369.    Before Texas enacted SB1, the Secretary of State's Office told the Texas House Committee on Elections that "Texas elections were in good shape," meaning "the elections framework in place" in the state at the time was "working the way it's supposed to." Former Director of Elections at the SOS Office Keith Ingram believed then and now that Texas has a "great" election system. Tr. 10/18/2023 at 4455:3-16 (Ingram).

370.    Even before SB1 was passed, the Secretary of State's Office believed that Texas has "free and fair elections." Tr. 10/18/2023 at 4456:4-5 (Ingram).

371.    Indeed, when it comes to election integrity concerns, the Denton County Elections Administrator Frank Phillips spends most of his time debunking conspiracy theories tied to national events rather than local matters in Denton County. Tr. 10/12/2023 at 3883:14-20 (Phillips).

372.    Although between 2006 and 2009, then-Attorney General Greg Abbott pursued an investigation into what he called an "epidemic of voter fraud," after four years of special investigations, he was able to generate only 26 indictments of individuals and 5 convictions. Tr. 10/5/2023 at 2816:16-2817:11 (Kousser); HAUL-MFV Ex. 332 at 45. The number of election code-related convictions or settlements obtained by the Attorney General, out of nearly 87 million votes cast, amounts to several ten thousandths of one percent. Tr. 10/5/2023 at 2818:16-2819:5 (Kousser).

373.    Mr. White agreed that the 76 defendants in the OAG Election Fraud Violations spreadsheet who are either convicted or go into deferred adjudication or diversion programs are a very, very,

very small fraction of a percent of the 16 million registered voters in Texas. Tr. 10/16/2023 at 4030:19-4031:1 (White); LULAC Ex. 61.

374.    During his five years as the OAG's chief prosecutor of election fraud crimes, Mr. White maintained and updated a "Election Fraud Violations" spreadsheet of pending and resolved prosecutions. Tr. 10/16/2023 at 4019:10-4020:14 (White). The spreadsheet showed the number of defendants who were involved in voter fraud prosecutions. Tr. 10/16/2023 at 4020:15-4021:3 (White).

375.    State Defendants admitted into evidence at trial an OAG Election Fraud Violations spreadsheet dated July 2022. STATE Ex. 82. However, Mr. White testified that 23 prosecutions listed as "pending" in that spreadsheet were no longer pending at the time of trial because the charges were dismissed as to 22 defendants and one defendant was acquitted following trial. STATE Ex. 82 at 112190-112191; Tr. 10/16/2023 at 4033:5-21, 4035:1-9, 4035:15-4036:4 (White).

376.    The most recent OAG Election Fraud Violations spreadsheet admitted at trial is dated September 6, 2022. OCA Ex. 377. That spreadsheet shows only 19 defendants with pending prosecutions. Tr. 10/16/2023 at 4035:1-14 (White).

377.    Mr. White testified that, without notation, he removed certain unsuccessful prosecutions from the OAG Election Fraud Violations spreadsheet, instead of indicating that they were resolved in favor of the defendant. Tr. 10/16/2023 at 4032:22-4033:4 (White). For example, the election fraud prosecution of Mr. Ricardo Molina appears on the spreadsheet admitted as STATE Ex. 82 (dated July 2022). However, the prosecution disappeared from the next spreadsheet, without any notation that Mr. Molina was acquitted after trial. Tr. 10/16/2023 at 4033:5-24 (White); OCA Ex. 377 (dated September 2022).

378.    With respect to the OAG Election Fraud Violations spreadsheet, and the cases listed as prosecutions "pending" (not resolved), Mr. White testified he was not representing to the Court that there is a conviction there, and most of those cases have been dismissed subsequent to *Stephens*. Tr. 10/16/2023 at 4073:13-19 (White).  Mr. White agreed that until a conviction is reached, a person is presumed legally innocent.  Tr. 10/16/2023 at 4022:8-11 (White).

379.    Mr. White testified that of the four cases he described in his direct examination and about which he has knowledge, 133 counts were brought by the State, and the prosecutors secured only 4 misdemeanor convictions. Tr. 10/16/2023 at 4084:22-4085:3 (White).

### 3.    There is no connection between SB1's challenged provisions and the rare instances of voter fraud.

#### a.    Sections 5.07 and 5.13

380.    SB1 sections 5.07 and 5.13 require the mail voter to provide an identification number on the ABBM and mail ballot carrier envelope that matches an identification number in the county's voter records.  JOINT Ex. 1 at 38-39 and 45-46.  Section 5.07 provides that if the identification number on the ABBM "does not identify the same voter identified on the applicant's application for voter registration under Section 13.002(c)(8), the clerk shall reject the [ABBM]."  JOINT Ex. 1 at 38.  Similarly, Section 5.13 provides that "[a] ballot may be accepted only if . . . the [identification number] provided by the voter identifies the same voter identified on the voter's application for voter registration."  JOINT Ex. 1 at 45-46.

381.    SB1's mail ballot provisions, including Sections 5.07 and 5.13, do not increase election security, are not related to, nor would have an effect on, rates of voter fraud, and would not reduce the rate of voter fraud, which is already vanishingly close to zero. Tr. 10/2/2023 at 1959:10-14, 2002:12-17 (Mayer); LULAC Ex. 4; Tr. 10/4/2023 at 2568:11-23, 2598:17-2599:24 (Tolson); Tr. 9/14/2023 at 856:6-10 (DeBeauvoir); Tr. 9/20/2023 at 1359:7-10 (Longoria).

21.     If anything, SB1's ID requirements could open the door to fraud by replacing the matching of signatures with the matching of ID numbers. Cameron County Elections Administrator Remi Garza, on behalf of the Texas Association of Election Administrators, expressed these concerns in a letter to Lt. Governor Patrick and House Speaker Phelan in July 2021. LUPE Ex. 294. The letter explained that accepting an ID number match instead of a signature match on a carrier envelope "may result in fraudulent voter impersonation." LUPE Ex. 294 at 2-3. Similarly, Mr. Garza testified:

> [S]omebody's signature is pretty unique, and, you know, how they are signing things from time to time are going to be, you know, consistent over a short period of time. It may vary as somebody ages but it's pretty much going to be their signature. Numbers are pretty static and they stay the same. They are, I think they are out there, used more often than somebody's signature, when you think about your interaction in life. We used to put our driver's licenses on our checks. We, you know, hand out all that type of information so that I just felt that a number is just a number, a signature is actually tied to a voter. . . I think it would be much easier for somebody to submit an application for ballot by mail and ultimately carrier envelope, if they were just relying on the numbers. I think those numbers are probably more readily accessible than somebody's signature, what it looks like.

Tr. 9/13/2023 at 763:4-765:4, 769:6-24 (Garza).

382.    SB1 does not address the existing system of comparing a signature on a mail ballot to the signature on the application for mail ballot, which County Elections Administrator Michael Scarpello testified is "stupid." Tr. 9/12/2023 at 484:9-15 (Scarpello). Instead, Mr. Scarpello testified that the ID requirements are "confusing to voters and . . . unnecessary." Tr. 9/12/2023 at 484:15-17 (Scarpello).

383.    The security concerns associated with mail balloting are largely related to the time that a mail ballot is neither under the control of the voter nor the elections office, but SB1 did nothing to minimize this concern, which cannot be fully dealt with without banning mail ballots altogether. Tr. 10/12/2023 at 3884:13-3885:7 (Phillips).

384.    Denton County Election Administrator Frank Phillips identified one alleged voter fraud scheme concerning the City of Carrollton mayoral special election in 2020, in which a mayoral candidate allegedly submitted multiple fraudulent applications for ballot by mail. Tr. 10/12/2023 at 3823:4-14 (Phillips).  But the Texas Attorney General announced that the defendant in that case had also registered the voters to vote, and thus he had already provided the elections office ID numbers for the voters that would match any ID requirement for the ABBM or mail ballot.  LUPE Ex. 309.  Mr. White agreed that if a vote harvester has personal identifying information about a voter, that vote harvester could forge a registration application and forge an application for ballot-by-mail for that individual.  Tr. 10/16/2023 at 4008:10-16 (White).

**b.    Sections 6.05, 6.06, and 7.04**

385.    Sections 6.05[13], 6.06,[14] and 7.04[15] do not address activity such as voting a ballot differently than the voter wished or directed, suggesting to the voter during the voting process how the voter should vote, or trying to influence or coerce the voter – acts that are already criminalized as

---

[13] Section 6.05 requires a mail ballot voter assister to enter, on the carrier envelope, the relationship of the assister to the voter and "whether the person received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance."  JOINT Ex. 1 at 53.  Failure to provide the information is a state jail felony.  Tex. Elec. Code §86.010 (g).

[14] Section 6.06 makes it a state jail felony to offer, solicit or receive compensation for assisting mail ballot voters, unless the compensated assister is an "attendant or caregiver."  JOINT Ex. 1 at 54-55.  "Compensation" is defined as "anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee, accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value."  Tex. Penal Code Section 38.01(3).

[15] Section 7.04 makes it a third degree felony to provide or offer to provide vote harvesting services, or providing or offering to provide "compensation or other benefit" in exchange for vote harvesting services."  JOINT Ex. 1 at 58-60. An offense under this section carries a penalty of a minimum of two years (and up to ten years) of jail time and a fine of up to $10,000.  Tex. Penal Code § 12.34.  Section 7.04 defines "Vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."  JOINT EX. 1 at 59.

unlawful assistance [T.E.C. 64.036], illegal voting [T.E.C. 64.012] and election fraud [T.E.C. 276.013]. Tr. 10/16/2023 at 3989:17-3990:1, 3990:2-7, 3990:8-10 (White).

386.    Instead, sections 6.05, 6.06, and 7.04 criminalize compensation (or failure to disclose information about compensation) for assisting a voter with a mail ballot or advocating in the presence of a mail ballot.

### c.    Section 6.06

387.    With respect to Section 6.06, which makes it a state jail felony to offer, solicit or receive compensation for assisting mail ballot voters (unless the compensated assister is an "attendant or caregiver"), Mr. White testified that such compensation is a crime even if there is no fraud in the assistance and the assister marks the ballot consistent with the wishes of the voter.  Tr. 10/16/2023 at 3996:8-3997:5 (White).  Mr. White explained that Section 6.06 "criminalizes compensation for assistance" as opposed to criminalizing fraud in assistance.  Tr. 10/16/2023 at 3995:25-3996:7 (White).

388.    This is because Section 6.06 expanded the offense of compensation for assisting voters by eliminating the requirement that the payment be for performance-based work, *i.e.,* paying someone to assist mail voters on a quota basis.  Tr. 10/16/2023 at 3991:18-3992:15 (White).  As a result of SB1's changes to prohibited voter assistance, Mr. White explained that it is now a crime to provide, receive or ask for compensation to assist a mail ballot voter regardless of whether the assistance is on a per capita system.  Tr. 10/16/2023 at 3992:3-7, 12-19 (White).

389.    Mr. White testified that section 6.06 "appear[s] to apply to [the] scenario" in which a paid canvasser for a non-profit Get Out the Vote organization engages with voters and provides mail ballot assistance if requested.  Tr. 10/16/2023 at 3994:14-3995:10 (White). Mr. White further characterized this activity as "people just trying to provide a public service[.]"  Tr. 10/16/2023 at 3995:11-17 (White).

#### d.    Section 7.04

390.    Mr. White testified that all the vote harvesting investigations and prosecutions he could remember dealt with paid vote harvesters working for a candidate or a slate of candidates, or family members of the candidate, or the candidates themselves.  Tr. 10/16/2023 at 4000:11-25 (White). He also testified that 7.04 does not limit the offense of vote harvesting to persons who are being paid by a candidate, campaign or PAC. Tr. 10/16/2023 at 4001:1-23 (White).  Mr. White agreed that the definition of paid vote harvesting should be defined narrowly enough so that it covers only objectionable behavior and not political speech, and he testified that in his view, political speech is fine and encouraged.  Tr. 10/16/2023 at 4001:24-4002:5 (White).

391.    Mr. White testified that a community organization paying an organizer to persuade mail ballot voters in person in the presence of the ballot to vote for a ballot measure comes awfully close to paid vote harvesting efforts. Tr. 10/16/2023 at 4000:5-10 (White).  Mr. White conceded that the elements of 7.04 could be met by a non-profit organization that is not affiliated with a political campaign or political action committee.  Tr. 10/16/2023 at 4001:1-16 (White).

392.    The "benefit" language of 7.04 is so broad that Mr. White conceded that he would have to do legal research to determine what types of benefits would violate the provision.  Mr. White testified that if he was asked whether "anything of value could encompass a gift bag, for example, with a T-shirt in it," he would go and do some research and see if there's any case law to flesh that out and "reviewing case law would always be a good decision in that context."  Tr. 10/16/2023 at 3992:20-3993:18 (White). Mr. White testified further that he would potentially review case law to answer the question whether prohibited compensation includes an assister receiving a meal or bus fare. Tr. 10/16/2023 at 3993:19-21 (White).

393.    Election administrators testified that they were not aware of compensated voter assistance as a source of misconduct or fraud. For example, Ms. DeBeauvoir does not recall, nor is she aware

of, any instances of a paid assister coercing, intimidating, or engaging in any kind of fraud or misconduct in her 36 years in office.  Tr. 9/14/2023 846:16–847:8 (Debeauvior).

394.    Election administrators testified that they were not aware of any voters having been confused or improperly influenced by paid canvassers for community-based organizations who advocated in the presence of mail-in ballots. For example, Ms. Wise testified that she was unaware of anyone with a nonprofit or community organization trying to commit fraud with a mail voter and a mail ballot in El Paso County. Tr. 9/12/2023 at 260:17-21 (Wise).  Ms. DeBeauvoir similarly testified that she had no reason to believe that an assister who was paid by a nonprofit organization to help voters would be more likely to engage in misbehavior than an assister who is not paid. Tr. 9/14/2023 at 847:4-8 (DeBeauvoir).

395.    Instead, election administrators testified that Section 7.04 would prohibit conduct and speech that is *not* fraudulent, misleading or unlawful. For example, Mr. Garza testified that work by nonpartisan organizations in the Rio Grande Valley that assist voters who are homebound could be interpreted as violating Section 7.04's ban on in-person canvassing.  Tr. 9/13/2023 at 758:8-19, 758:22-759:12 (Garza). Ms. DeBeauvoir testified that Section 7.04 does not distinguish between prohibited conduct and legal assistance to a person who is qualified to receive it, and "criminalized a very innocent process that helped often our most vulnerable voters, voters who were shut in who really relied on vote by mail to be able to participate in democracy." Tr. 9/14/2023 at 841:15-842:9, 844:13-25 (DeBeauvoir); *see also* Tr. 9/12/2023 at 496:2-8 (Scarpello).

396.    SB1's ban on compensation with respect to mail ballot assistance and advocacy in the presence of a mail ballot, in the name of preventing voter fraud, is based on a logical fallacy.  Taking the very small number of cases involving fraud in vote by mail and observing that

some (although not all) of these defendants were compensated, SB1 fallaciously bans all compensated mail ballot assistance and advocacy as voter fraud.

397.    The undistributed term is mail ballot advocacy or assistance.  Even assuming some overlap between people who commit mail ballot fraud and people who are compensated, it is not the case that all people who provide compensated mail ballot advocacy or assistance commit fraud.

398.    The fallacy of the undistributed middle term dooms Texas's claim that to prevent voter fraud, SB1 must ban issue advocacy in the presence of a mail ballot and mail ballot voter assistance by compensated individuals.

### e.    Sections 6.03 and 6.04

399.    Sections 6.03 and 6.04 add new requirements for voters and voter assisters in the polling place, including a form to collect information about assisters, a requirement that voters provide a representation of their eligibility for assistance, and new assistance oath language.  JOINT Ex. 1 at 51-53; *see also* 208 Submission at Sections III.D-E. However, as described above, Texas has documented no case of voter assistance fraud in the polling place.

400.    With respect to section 6.03, Mr. White testified that in his view, "normal assistance" is a voter being assisted by caregivers or family members.  Tr. 10/16/2023 at 3987:15-23 (White).  Mr. White, the State's top voter fraud prosecutor, testified that having the new "relationship" information about assisters can help distinguish between voters whose assisters who are unrelated to them and the voters who are assisted by family members or caregivers, which in his view are the more typical type of legitimate assistance. Tr. 10/16/2023 at 3987:5-23 (White). The requirement in 6.03 to disclose the assister's relationship to the voter, in Mr. White's view, is to identify unrelated assisters who are less legitimate.

401.    There is no evidence that voter assisters who are unrelated to the voters they assist commit fraud or are more likely to commit fraud.

402.    Section 6.04's new polling place oath requirements, which include obtaining from the voter

a statement of eligibility for assistance, acknowledging that if the voter is not eligible for assistance

the ballot may not be counted, swearing the assister did not "pressure" the voter, and swearing

under penalty of perjury, are not supported by evidence that the previous oath of assistance resulted

in voter fraud.  *See* JOINT Ex. 1 at 52-53.  In fact, Mr. White testified that voting by personal

appearance is less vulnerable to fraud than mail voting because the security features that are present

in in-person voting are better than those present in vote by mail.  Tr. 10/16/2023 at 3998:3-10

(White).

403.    In sum, "the provisions of SB1 did not contribute to increased election security…because

there's . . . no evidence that the requirements of SB1 would have prevented instances of voter

fraud." Tr. 10/2/2023 at 1959:10-14 (Mayer).

> **4.      Instead of making voting more secure, SB1's challenged provisions target voter outreach activity by organizations that work with under-resourced voters—many of whom are racial minorities—and reduce the information and assistance available to those voters.**

> **a.      Texas officials targeted legitimate election activity as voter fraud.**

404.    The State's top election fraud prosecutor, Jonathan White, testified that if his office

encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public

service while canvassing, he would be concerned that this activity is used as a subterfuge for voter

fraud, and "we'd be looking for the fraud at the bottom of things." Tr. 10/16/2023 at 3995:11-24

(White).

405.    Mr. White instructed county election administrators, at conferences sponsored by the

Secretary of State, that legitimate election outreach activities were elements of voter fraud. Mr.

White described, as a sign of illegal vote harvesting, canvassing door to door, talking to voters and

having them sign up for mail ballots if they are eligible. Tr. 10/16/2023 at 3911:9-14, 3915:9-

3916:20 (White).  Mr. White described, as a sign of illegal vote harvesting, one individual "signing up multiple individuals to vote by mail."  Tr. 10/16/2023 at 3917:1-12 (White).  However, Mr. White conceded that it is not illegal or fraudulent to show up at a voter's house and offer to help the voter complete an application for ballot by mail.  Tr. 10/16/2023 at 3999:17-21 (White).

406.    Nevertheless, Mr. White prepared and presented a slide show to election administrators in which he showed, as "Signs of ABBM Fraud," applications that were signed by witnesses who were not family members of the voters. STATE Ex. 89 at 25; Tr. 10/16/2023 at 3910:12-3911:21 (White).  The Election Integrity Division does not do any type of training for election workers beyond the slide show, which it presents at the Secretary of State's annual conferences for election officials.  Tr. 10/16/2023 at 4016:9-15 (White).

407.    Mr. White also testified that individuals who assisted a large number of non-family members to apply for mail ballots were "engaged in vote-harvesting activity."  Tr. 10/16/2023 at 3919:1-18 (White).  Mr. White described "professional assistance" as "vote harvesting."  Tr. 10/16/2023 at 3919:1-18 (White).

408.    Mr. White described in his trial testimony, as an example of voter assistance fraud:  a voter receiving transportation to the polling place and a voter being paired with an assister who walks into the polling place with the voter and takes the voter through the process from the front of the line to voting. Tr. 10/16/2023 at 3924:15-3925:3 (White).

409.    In his election integrity presentation to election administrators, Mr. White showed a slide titled "Assistance Fraud." Next to a heading titled "How it Works," Mr. White set out four components of voter assistance fraud.  STATE Ex. 89 at 34.  The first step is titled "Voter targeted," although Mr. White conceded that, within certain limitations like electioneering and while marking

the ballot, it is legal for one individual to encourage another individual to vote, and it is even political speech.  Tr. 10/16/2023 at 4003:9-18 (White).

410.    The second step in Mr. White's "Assistance Fraud . . . How it Works" is "Voter Transported to polling place," although Mr. White again conceded that it is legal for an individual to offer to provide a ride to the voter to get them to the polling place.  STATE Ex. 89 at 34; Tr. 10/16/2023 at 4003:19-21 (White).

411.    The third step in Mr. White's "Assistance Fraud . . . How it Works" is "Voter given campaign 'literature'", although Mr. White again conceded that it is legal for a nonprofit organization to provide campaign literature to a voter who is going to vote in the polling place, as long as it's outside the hundred-foot election area perimeter.  Ex. 89 at 34; Tr. 10/16/2033 at 4005:5-9 (White).

412.    The next step in Mr. White's "Assistance Fraud . . . How it Works" is "Voter . . . handed off to 'assistant'" although Mr. White again conceded that it is legal to offer to provide voter assistance to a voter.  STATE Ex. 89 at 34; Tr. 10/16/2023 at 4004:4-7 (White).  Mr. White further agreed that it is legal to provide assistance to the voter who is eligible for assistance, as long as the assister makes sure to carry out the voter's wishes and all the other requirements for assistance are met.  Tr. 10/16/2023 at 4004:8-13 (White).

413.    Mr. White admitted that he presented legal activities on his slide "Assistance Fraud . . . How it Works" and conceded that voter assistance becomes illegal only when a fraudulent assister marks the ballot inconsistent with the wishes of the voter or suggests to the voter how to vote.  Tr. 10/16/2023 at 4004:14-20, 4005:14-17 (White).

414.    In addition to telling election administrators at Secretary of State training conferences that legal voter assistance activities were signs of voter fraud, Mr. White also claimed that voter

assistance fraud existed where his office never obtained a conviction.  Mr. White testified at trial

that an individual, who was never charged with voter assistance fraud and was acquitted of

divulging information about an election, had committed voter assistance fraud.  Mr. White testified

at trial that the individual had provided unlawful assistance and "[t]hat was the entire scheme."  Mr.

White further admitted that two years after the acquittal, he testified to the Texas Legislature that

this individual committed voter fraud by "bringing voter after voter after voter into the polling

place and assisting them with their ballots."  Tr. 10/16/2023 at 4036:5-4038:22 (White).

> **b.    Texas officials associate Hispanic and Black individuals with voter fraud.**

415.    Mr. White testified that mail ballot fraud "often" includes minority voters.  Tr. 10/16/2023

at 4002:6-12 (White).  He further testified that minority communities are typically the target for

vote harvesting schemes.  Tr. 10/16/2023 at 4002:13-15 (White).

416.    Mr. White also testified that "you could be right" that the majority of defendants that he

had prosecuted, and that are listed on the OAG's prosecution sheet are Hispanic.  Tr. 10/16/2023

at 4002:23-4003:4 (White); *see also* STATE Ex. 82 (OAG spreadsheet 7/15/2022).

417.    All the "Frequent Flyer Assistants/Witnesses" on Mr. White's ABBM Fraud slide have

Spanish surnames.  STATE Ex. 89 at 25.

418.    Mr. Ingram described "vote harvesting" as "politiqueras" sitting with a voter to "make sure

that the voter checks the box for [the politiquera's] preferred candidate."  Tr. 9/22/2023 at 1912:20-

1913:6 (Ingram).

419.    Mr. White acknowledged that the OAG's prosecution of voter fraud in Gregg County,

Texas, was against four Black defendants.  Tr. 10/16/2023 at 4002:16-22 (White).

      **c.**     **Reducing third party voter outreach and assistance deprives low income and minority voters of important voting information and assistance with voting.**

420.    Cameron County Election Administrator Remi Garza testified that if a community-based organization stops helping voters vote by mail because they are concerned about this new crime, there would be less assistance available to voters in Cameron County who vote by mail. Mr. Garza would be concerned if there was less of this non-partisan community-based outreach to people who vote by mail due to SB1. Tr. 9/13/2023 at 759:13-22 (Garza).

421.    Many LUPE members are eligible to register to vote but voter turnout is low in colonias because of a lack of information.  As a result, LUPE staff conducts voter education, voter registration, and Get Out the Vote efforts in colonias.  Tr. 9/11/2023 at 69:9-70:8; 74:3-75:10 (Chavez).  The LUPE membership that lives in colonias tends to be predominantly Mexican or Mexican American, low income.  Many of the families include adults who did not finish grade school.  Tr. 9/11/2023 at 67:19-68:18 (Chavez).

422.    Because mail voters are denied help from their chosen assisters at LUPE, turnout goes down in the geographic area served by LUPE because voters do not turn in their mail ballots, and voters' ballots go uncounted because of errors in completing the ballots. Tr. 10/11/2023 at 3677:21-3678:13 (Chavez).

423.    Mr. Garcia explained that section 7.04 has a chilling effect on LULAC's ability to get seniors to vote because of the danger that someone could wind up indicted, arrested, and have their lives and careers destroyed for helping a senior to vote.  Tr. 9/21/2023 at 1657:13-19 (Garcia).

      **5.**     **There are less burdensome alternatives to SB1's ID number requirements.**

424.    Even if Sections 5.07 and 5.13 were intended to prevent mail voting fraud, there are other, less burdensome ways to identify potential mail voting fraud that preexisted SB1.

425.    Election administrators do not use the ID numbers required by Section 5.07 and 5.13 to "ensure that voters are qualified to vote or to cast a mail ballot under Texas law, to identify voters, or to flag potential fraud." Order Granting Sum. J., Dkt. 820 at 10.

426.    For example, the former Director of the Elections Division of the Secretary of State testified at a deposition that "individual eligibility criteria ha[ve] nothing to [d]o with the number." Order Granting Sum. J., Dkt. 820 at 10 (internal citations omitted).

427.    Cameron County Elections Administrator Remi Garza also testified that there are times when his staff is confident that they have verified a voter's identity, based on signature and address for example, but they cannot process the ABBM or mail ballot because it is missing the ID number. Tr. 9/13/2023 at 746:23-747:1-19 (Garza); *see also* Tr. 9/22/2023 at 1854:2-9 (Adkins) (testifying that even if a voter provides their photo ID when they drop off their mail ballot and the election worker confirms the voter's identity, the voter's mail ballot could still be rejected if the voter does not have a matching ID number on their carrier envelope or if they forgot to put their ID on their carrier envelope).

428.    SB1's ID requirements for ABBMs and mail ballots are not necessary to confirm the voter's identity. "[E]lection officials look up voters using other information on mail ballot materials—such as the voter's name, date of birth, and address—just as they did before S.B. 1. Election officials must also verify a voter's identity using the signature by which the voter attests to identity and eligibility, just as they did before S.B. 1." Order Granting Sum. J., Dkt. 820 at 10-11 (internal citations omitted).

429.    Election administrators testified that they have not experienced any problems of voter fraud associated with not requiring voters to provide their driver's license number or the last four of their social security number for mail ballots. Tr. 9/12/2023 at 244:10-14 (Wise). Election administrators

also testified that when a voter has their ABBM or carrier envelope rejected for lack of an ID match, that does not lead them to believe that the voter was trying to commit fraud. Tr. 9/19/2023 at 1050:11-20 (Callanen); Tr. 9/21/2023 at 1522:22-1523:2 (Johnson) (testifying he does not recall ever referring a voter whose ABBM or carrier envelope had an ID number that did not match their voter registration record to the Secretary of State as a potential case of voter fraud).

430.    Methods of identifying voter fraud existed and were effective prior to SB1. Tr. 9/14/2023 at 855:12-856:5 (DeBeauvoir); Tr. 10/12/2023 at 3878:23-3879:4 (Phillips).

431.    Such methods included signature verification. Tr. 9/14/2023 at 855:12-856:5 (DeBeauvoir).

432.    Signature comparison on an application for ballot by mail or mail ballot would take less time than verifying voter ID numbers. Tr. 9/19/2023 at 1048:6-9 (Callanen).

433.    Travis County conducted an audit every election to ensure no voters voted twice. If the elections office identified any indication that someone voted inappropriately, or something that could not be justified on the voter rolls, or perhaps an election judge allowed someone to vote without a provisional ballot when it was required, the office referred the incident to the county attorney. Tr. 9/14/2023 at 913:17-914:9 (DeBeauvoir).

VI.   **SB1's restrictions on voter assistance and in-person canvassing have discriminatory results on Latino and Black voters in violation of Section 2 of the Voting Rights Act of 1965.[16]**

   A.   **The restrictions in Sections 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1 abridge the minority voters' opportunity to participate in the political process and exercise their constitutional right to vote.**

434.   Proposed findings of fact demonstrating the severe burdens that 6.03, 6.04, 6.05, 6.06, and 7.04 impose on voters who require assistance are included in the separate Section 208 submission and the ADA submission. *See* 208 Submission, FOF § III.C.K; ADA Submission, FOF § VI. Rather than repeat those additional findings of fact here, LUPE Plaintiffs adopt and incorporate them by reference.

435.   Because of the demographic makeup of the Texas population that is most likely to need assistance in voting, the burdens on voter assistance imposed by SB1 have a disproportionate impact on minority voters.

436.   Texans who require language assistance because they are limited-English proficient (LEP) are disproportionately Hispanic, Latino, and nonwhite.

437.   The total Hispanic or Latino population of Texas is 10,516,441 people, making up 39.09 percent of the state's total population. Dkt. 806 ¶¶ 2, 8.

438.   About 2,909,579 Hispanic or Latino people in Texas are Limited English Proficient (LEP), meaning they speak English less than very well. This represents 82.37 percent of the total LEP population in the state. Dkt. 806 ¶¶ 5, 9.

439.   Thus, 2,909,579 of the 10,516,441 Hispanic or Latino people in Texas, or 27.7 percent of the total Hispanic or Latino population, are LEP. Dkt. 806 ¶¶ 2, 5.

---

[16] The findings of fact proposed by LUPE Plaintiffs in this Section are primarily relevant to their claim that SB1 produced discriminatory results for Latino voters. In support of their claim that SB1 produced discriminatory results for Black voters, LUPE Plaintiffs adopt and incorporate by reference the findings of fact proposed by the HAUL Plaintiffs.

440.    By comparison, only 622,593 of the 16,386,917 non-Hispanic Texans, or 3.8 percent of the total non-Hispanic population, are LEP. Dkt. 806 ¶¶ 1, 2, 4, 5.

441.    In other words, Hispanic or Latino Texans are more than 7 times as likely to be LEP than the rest of the state. Dkt. 806 ¶¶ 1, 2, 4, 5.

442.    The total Hispanic, Latino, and nonwhite population of Texas is 15,746,820 people, making up 58.53 percent of the state's total population. Dkt. 806 ¶¶ 1, 3, 8.

443.    The total Hispanic, Latino, and nonwhite LEP population of Texas is 3,403,932 people, making up 96.37 percent of the total LEP population in the state. Dkt. 806 ¶¶ 4, 6, 9.

444.    Thus, 3,403,932 of the 15,746,820 Hispanic, Latino, or nonwhite Texans, or 21.62 percent of the total Hispanic, Latino, or nonwhite population, are LEP. Dkt. 806 ¶¶ 1, 3, 4, 6.

445.    By comparison, only 128,240 of the 11,156,538 white, non-Hispanic Texans, or 1.15 percent of the total white, non-Hispanic population, are LEP. Dkt. 806 ¶¶ 3, 6.

446.    In other words, Hispanic, Latino, or nonwhite Texans are more than 18 times as likely to be LEP than the white, non-Hispanic Texans. Dkt. 806 ¶¶ 1, 3, 4, 6.

447.    Section 203 of the Voting Rights Act of 1965, 52 U.S.C. § 10503, requires States and political subdivisions to translate all voting materials they provide to voters if they have a sizeable language minority population with limited English proficiency and the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate.

448.    Texans who are LEP and live in counties that are not covered by Section 203 of the Voting Rights Act are even more disproportionately Hispanic, Latino, and nonwhite.

449.    The total Hispanic or Latino population of Texas counties that are not covered by Section 203 and therefore not required to provide voting materials in any language other than English is

2,323,782 people, making up 23.64 percent of the population of those counties. Dkt. 806 ¶¶ 13, 18.

450.    The total Hispanic or Latino LEP population of all Texas counties that are not covered by Section 203 is 476,564 people, making up 75.5 percent of the LEP population in those counties. Dkt 806 ¶¶ 16, 19.

451.    Thus, 476,564 of the 2,323,872 Hispanic or Latino people in Texas counties that are not covered by Section 203, or 20.51 percent of the total Hispanic or Latino population of those counties, are LEP. Dkt. 806 ¶¶ 13, 16.

452.    By comparison, only 154,623 of the 7,505,085 non-Hispanic people living in Texas counties that are not covered by Section 203, or 2.06 percent of the total non-Hispanic population of those counties, are LEP. Dkt 806 ¶¶ 12, 13, 15, 16.

453.    In other words, Hispanic or Latino Texans living in counties that are not covered by Section 203 are almost ten times as likely to be LEP as the rest of the population of those counties. Dkt 806 ¶¶ 12, 13, 15, 16.

454.    Therefore, Hispanic or Latino Texans are far more likely than non-Hispanic Texans to live in counties where voting materials are offered only in a language they cannot understand. As a result, they are far more likely to require language assistance when voting. Dkt. 806 ¶¶ 12, 13, 15, 16, 18, 19.

455.    The total Hispanic, Latino, and nonwhite population of Texas counties that are not covered by Section 203 is 3,952,522 people, making up 40.21 percent of the population of those counties. Dkt 806 ¶¶ 12, 14, 18.

456.    The total Hispanic, Latino, and nonwhite LEP population of all Texas counties that are not covered by Section 203 is 592,861 people, making up 93.93 percent of the LEP population in those counties. Dkt 806 ¶¶ 15, 17, 19.

457.    Thus, 592,861 of the 3,952,522 Hispanic, Latino, and nonwhite people in Texas counties that are not covered by Section 203, or 15.00 percent of the total Hispanic, Latino, and nonwhite population of those counties, are LEP. Dkt 806 ¶¶ 12, 14, 15, 17.

458.    By comparison, only 38,326 of the 5,876,345 white, non-Hispanic people in Texas counties that are not covered by Section 203, or 0.65 percent of the total white, non-Hispanic population of those counties, are LEP. Dkt. 806 ¶¶ 14, 17.

459.    In other words, Hispanic, Latino, and nonwhite Texans living in counties that are not covered by Section 203 are more than 21 times as likely to be LEP as the white, non-Hispanic people in those counties. Dkt. 806 ¶¶ 12, 14, 15, 17.

460.    Therefore, Hispanic, Latino, and nonwhite Texans are far more likely than white, non-Hispanic Texans to live in counties where voting materials are offered only in a language they cannot understand. As a result, they are far more likely to require language assistance when voting. Dkt. 806 ¶¶ 12, 14, 15, 17, 18, 19.

461.    Black and Native American Texans are more likely to have a disability than white, non-Hispanic Texans. While 16.3 percent of white, non-Hispanic adult citizens in Texas have a disability, 17.9 percent of Black adult citizens and 17.8 percent of Native American adult citizens have a disability. Tr. 10/12/2023 at 3741:8-16 (Kruse); LUPE Ex. 2 ¶ 44, Table 3.

**B.    The totality of the circumstances shows that SB1's restrictions interact with social, electoral, and historical conditions to cause an inequality in the opportunities of minority voters to participate in the political process.**

**1.    Texas has a long history of official discrimination affecting the rights of Latinos to register, vote, and participate in the democratic process. (Senate Factor 1)**

462.    The Spanish and Mexican pioneer ancestors of modern Latinos were the founders of Texas under a European type of government. These original Latino settlers are called Tejanos. Tejanos had initially come under the flag of Spain, as Mexicans after Mexican independence, and they continued to settle in Texas under the Republic of Texas. Tejanos had established the legitimate government of Texas under Spain and Mexico, but they quickly found themselves isolated by the Anglo-American wave of settlers who greatly outnumbered them. As Anglo-Americans entered Texas, they took a dominant position, isolating the Tejanos from any viable role in government and the economy. LUPE Ex. 1 at 5.

463.    As anti-Mexican sentiment spread after the Texas Revolution, the Texas government played a direct role in dispossessing Tejanos from their lands. Eventually native Tejanos established a "Peace Structure" with incoming Anglo-Texans to escape the violence. In the "Peace Structure," Anglos were allowed to dominate the government and economy, while Tejanos collaborated with them in exchange for protection from land theft and violence. In many cases, these incoming Anglo-American and European immigrants nevertheless used the anti-Mexican sentiment to acquire Tejano lands.  LUPE Ex. 1 at 5-7.

464.    The period after Reconstruction and around the turn of the century also saw an attack on the Tejano land ownership and socio-economic status, as Anglo-American commercial farmers from Midwestern states swept into South Texas. The incoming Anglo-American squatters launched large-scale vigilante raids against legitimate and prominent Tejano land grantees during the Reconstruction period after the Civil War.  The end of the 19th century would find the Tejanos

inundated not only by continuing Anglo-American immigration from the United States but by a wave of emigrant Mexicans fleeing the violence of the Mexican Revolution. Incoming Anglo-Americans continued to acquire Tejano lands in South Texas, which they called "The Rio Grande Valley." LUPE Ex. 1 at 7-10.

465.    As immigrants themselves, the Anglo Americans ironically made little distinction between the native Tejano citizens of Texas and the immigrant Mexican nationals. By taking control of the county government, Midwestern Anglo-American commercial farmers re-structured the county taxes, budgets, road and bridge construction, and education to suit the farmer at the expense of ranchers and the Mexican-American population. Landless Tejanos and Mexican immigrants were all categorized by Anglo-Americans as "Mexicans" and seen as cheap labor with no distinction in social status, education, or citizenship.  LUPE Ex. 1 at 10.

466.    During the 1900's and 1920's Progressive Era, Anglo-American politics aimed to disenfranchise and dilute minority voting power by political devices, and by intimidation and violence. LUPE Ex. 1 at , pp. 10-14.

467.    One of the main devices created specifically to disenfranchise Latinos in Texas was the poll tax. The 1903 Terrell Election Law required payment of the poll tax between October and February assuming Latinos were too poor or forgetful to comply. The state reformer, Terrell, himself said the law was intended to close "the flood gates for illegal voting as one person could buy up the Mexican and Negro votes." His proponents said Latinos could not afford the poll tax, would lose receipts, or not pay so far in advance. In 1913, for example, State Rep. Joseph O. Boehmer of Eagle Pass established the Ballot Purification League and submitted a bill admitting his intent was "to disqualify the Mexicans of the Western and Lower Rio Grande Counties." LUPE Ex. 1 at 12.

468.     The Progressives also used restrictive laws, such as the 1918 state law, to eliminate interpreters at the polls. They used the "White Man's Primary" to exclude Latino voting in the Democratic Primary elections, which were more important than the general election in a one-party state. The Dimmit County White Man's Primary Association was so effective that *Carrizo Springs Javelin*, on June 12, 1914, said it "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards." The newspaper added that it was for labor and "race control" to protect the "purity of Anglo women." LUPE Ex. 1 at 12.

469.     There were mass Anglo riots at Latino polling places in Weslaco and San Benito. Three- to four-thousand Anglo-Americans would chant, "Don't let the Mexicans vote" during these riots. Latinos who attempted to vote there would be lynched or killed. This happened until the 1940s and the last of it was a Latino was cooked alive and lynched in Rock Springs, Texas. After the violence ended, political machines, like the Callaghan in San Antonio, the George Parr in Duval County, and the Lasater, remained in effect until the 1970s. They used names like the "citizens council" and engaged in "ballot purification." Tr. 10/03/2023 at 2403:20-2407:2; 2422:19-2423:5 (Tijerina); LUPE Ex. 1 at 36-39.

470.     After the federal government eliminated the poll tax, "the state enacted the 'most restrictive voter registration procedures in the nation' to replace the poll tax." LUPE Ex. 1 at 4 ¶ 8.

471.     A Latino child born in Texas between the 1940s through the 1970s would have felt alienated and would have distrusted the American political system. This would cause them to have little vested interest in wanting to vote if they felt both candidates were racist, apathetic, or opposed to equal rights for Latinos. Tr. 10/03/2023 at 2408:7-2409:9 (Tijerina).

472.    The 1975 congressional testimony of Vilma Martinez describes exclusionary election practices and incidents of intimidation used to minimize Latino voting at that time. Tr. 10-03-2023 at 2416:4-2417:4 (Tijerina); LUPE Ex. 1 at 36-39.  As recently as 1980, an election official in Crockett County, Texas described color coding ballots for the Mexican American voting district so that she could discard them before tabulating the election results. LUPE Ex. 1 at 39.

473.    Although many of these practices have been abolished, Latino voters today still have to face many of the same people who previously excluded them from the voting process. Tr. 10/03/2023 at 2407:4-2804:4 (Tijerina); LUPE Ex. 1 at 39-40.

> **2.    Latino Texans continue to bear the effects of historical discrimination in education, employment, housing, and health, hindering the ability of these groups to participate effectively in the political process. (Senate Factor 5)**

474.    Dr. Tijerina provided expert testimony to explain how Latinos bear the legacy of exploitation and abuse by Anglo Americans who have used government, financial, and technological advantages to appropriate Latino lands, labor, and resources.  Dr. Tijerina also explained that Latinos in Texas today bear the effects of this discrimination, which hinders their ability to participate effectively in the democratic process.  LUPE Ex. 1 at 4 ¶ 9; *id.* at 39-40.

475.    As Texas cities formed, Latinos came into them. The general pattern was to segregate Latinos to the edge of town beyond a geographic barrier like a railroad track or river or some other barrier. Home property titles would say only Anglo-Saxon people could live there with the exception of certain workers like maids and gardeners. This was common in Harris County, Bexar County, and San Antonio. Posted signs would also say "no Mexicans, no dogs, or violence." Bankers and insurance and real estate agents would also prevent Latinos from owning homes and properties in nicer neighborhoods in San Antonio, Houston, Dallas, or other Texas cities. The

segregation of Texas cities was most pronounced from 1910-1980s. Tr. 10/03/2023 at 2396:25-2398:12; (Tijerina) LUPE Ex. 1 at 18-23.

476.    Latinos were segregated to the less desirable part of town, known as the barrio. The barrios did not have a hospital, government buildings, schools, county or city services, health services or law enforcement. The barrios lacked utilities, electricity, water, gas, storm sewers, or paved streets. In the 1970s and 1980s, San Antonio had some of the worst disease, tuberculosis, and infant mortality rates in the U.S. There is also a lack of access to education and higher-paying jobs. Tr. 10/03/2023 at 2398:15-2399:11(Tijerina); LUPE Ex. 1 at 17-23.

477.    From the 1920s to the 1970s, Texas had one of the largest migrant workforces in the country. During this time, around 450,000 Latinos migrated from the Rio Grande Valley in the spring through Brazos County by the summer and ended up in the Great Plains area by November. This workforce consisted of whole families and children. They primarily worked in the cotton fields which were known as "the big swing," which was across the Blackland Prairie. The children in this transient workforce had the lowest education and highest illiteracy because they kept moving but many of the school districts were prohibited by farmers from admitting or enrolling Latino children until the harvests were picked. Tr. 10/03/2023 at 2399:12-2400:17 (Tijerina); LUPE Ex. 1 at 14-17.

478.    Shortly after the government of Texas was taken over by Anglo-Americans, it enacted pro-English and anti-Spanish policy, including in education. In the 1840s and 1850s, Texas passed laws suspending the printing of laws in Spanish and prohibiting Spanish in the courts in most circumstances. In 1858 and 1870, respectively, the state legislature made English the principal language of instruction in the schools, mandating English instruction in all public schools. LUPE Ex. 1 at 23-24.

479.    This policy of devaluing the Spanish language and Latino culture persisted in the twentieth century. In the 1920s, the state superintendent of public instruction, Annie Webb Blanton, promoted a policy of Anglo-conformity in the schools, proclaiming, "if you wish to preserve, in our state, the language and the custom of another land, you have no right to this." In 1925, the state legislature passed a law specifying that schools "shall use the English language exclusively" in public education. With the formal policy equating English with loyalty, Texas schools began exclusively to teach Latino students hygiene, English, drawing, and music with the assumption that they needed to be clean and divest themselves of their Spanish accent and "all things Mexican." LUPE Ex. 1 at 24, 27.

480.    At the same time, Latino students were segregated from Anglo students and the Latino students, and their schools were neglected. State superintendent Blanton endorsed or condoned both policies. By 1920, 70% of Latino school-age children in Texas were not enrolled as opposed to only 22% of the Anglo non-enrolled students. In 1928, only 4% of Latino students were attending junior high and high school as opposed to 60% of the Anglo students. While school attendance had been required by law since the 1880s in Texas, many South Texas school officials and principals in Nueces County and Dimmit County reported that they simply did not enforce Latino student enrollment or attendance. LUPE Ex. 1 at 24.

481.    Latinos in Texas during the 1940s and 1950s often attended barrio schools. Barrio schools were underfunded, dilapidated, and had teachers who were underpaid and perhaps not even credentialed. The school resources were worse than the Anglo-American part of town. The "Mexican schools" in Texas had many grades all in one classroom or many grades in one school and many schools only went up to the sixth grade. After sixth grade, Latinos were prohibited from schools in many cities. By the 1970s and 1980s, studies by federal agencies or Congress reported

that Latinos had much lower literacy and education rates, and there were lower numbers of Latino teachers and school administrators. Tr. 10/03/2023 at 2400:18-2401:17(Tijerina); LUPE Ex. 1 at 23-27.

482.    Even after *Brown v. Board of Education* in 1954, and *Delgado* in 1948, segregated school districts in Texas circumvented the decisions by using the rationale that Latinos were not proficient enough in English to attend regular schools. Throughout the 1970s and into the 1990s, Latino students continued to be segregated from Anglo-American students even while in integrated schools, even within a building. This happened in schools in Dallas, Plano, and other cities. Tr. 10/03/2023 at 2401:18-2402:25 (Tijerina); LUPE Ex. 1 at 27-33.

483.    The continuing effect of the discrimination of Latinos in schools is that many of the districts are still de facto segregated with many still being majority Latino or majority Anglo-Americans. The segregation started in the 1820s through the 1920s by ordinance, but the differences in funding persist. Tr. 10/03/2023 at 2403:1-19 (Tijerina); LUPE Ex. 1 at 27-34.

484.    Latinos in Texas still bear the effects of this historical discrimination. The social and academic vestiges of systematic discrimination and segregation of Latinos also continue to yield statistics that place Texas in an unenviable position among other states. A 1977 report issued by the U.S. Commission on Civil Rights reported that 19 percent of the Latinos over age 25 in Texas—people who are today are over age 72—were illiterate. Latinos had twice the Anglo unemployment rate, and 15 percent of them still lived in overcrowded housing with inadequate plumbing as compared to the Anglo 1.7 percent. A clear holdover to the Texas "Mexican town" was the 70 percent of Latinos in Texas who still lived in barrios. In San Antonio, for example, a 1980 study concluded that the limited residential access of middle-class Latinos to the three affluent northern

census tracts tended also to limit their educational access. Tr. 10/03/2023 at 2407:4-2408:1 (Tijerina); LUPE Ex. 1 at 39-40.

485.    There is also a long history of racism in law enforcement directed at Latinos in Texas and used to enforce segregation and other oppressive policies. In the 1840s and 1850s, government officials authorized vigilante violence to drive Latinos out of the counties they governed. For example, in Austin in 1850, the city council authorized a Vigilante Committee, comprised in part of local officials, to "inflict punishments without resorting to trials" on Black people and to "clear" Latinos from the area. Raids aimed at driving away Latinos were also conducted by law enforcement and people deputized as law enforcement and acting under color of law in Refugio and Corpus Christi. In Corpus Christi, they systematically killed all of the Tejano patriarchs and "every adult male that was present." This "reign of terror" reached its peak at the turn of the century, when between 500 and 5,000 Tejanos died, "many of them innocent, at the hands of the local posses, peace officers, and Texas Rangers." LUPE Ex. 1 at 6-9.

486.    In the early twentieth century, law enforcement used vagrancy laws and county passes to control and oppress the Latino labor force. In Willacy County, for example, Latino laborers traveling in search of higher wages were systematically arrested for not having the approved "county passes" signed by an Anglo employer or county official. After being convicted, they were then paroled as "convict labor" to Anglo-American growers. LUPE Ex. 1 at 14-15.

487.    During this period, and up until the 1960s, the Texas Rangers helped enforce this oppression of Latino labor by breaking strikes and using intimidation, arrests, and violence to harass protestors. LUPE Ex. 1 at 16.

488.    The Texas Rangers also historically used their status as armed law enforcement to intimidate Latinos to discourage voting, including through intimidation related to English literacy.

The Rangers warned Latinos that "if they couldn't read and write they would be sent to the penitentiary if they voted." The selectively "investigated" Latino voters and spread "a spirit of terrorism." They established an armed presence at polling locations. These tactics were in some instances quite successful in deterring Latinos from voting. LUPE Ex. 1 at 12-13.

489.    In some cases, the violence of the Rangers went further as they participated in lynchings. In one small town, the Rangers dragged 15 Latinos from their homes and executed them in front of their families. Texas Rangers reportedly killed 102 Latinos in "cold-blooded murder." LUPE Ex. 1 at 13.

490.    Dr. Tijerina believes historians objectively study, then interpret and write history based on historical facts. This does not mean that the present is not affected by the past. He believes the racial discrimination described in his expert report has continuing effects today. Those events leave a legacy and Latinos in Texas today bear the effects of the invidious and pervasive discrimination that has been found in educational, government, and historical Texas records for decades. As reported by the U.S. Congress, much of it had the sole purpose of perpetuating discrimination against Latinos and discouragement of Latino participation in the electoral process. Tr. 10/03/2023 at 2423:14-2424:23 (Tijerina).

491.    Texas Latino voters who are over age 65 grew up and lived as young adults in the conditions to which Latinos were subjected in the 1950s and later.  Some of these voters testified at trial about their personal experiences with discrimination, and their experiences illustrate the ongoing effects of that discrimination on Latino voters in Texas.

492.    For example, Maria Gomez is 74 years old. She was born in Pharr, Texas and lives there today. Prior to working at LUPE, Maria Gomez worked in the fields as a farmworker and worked

at Union de Campesinos, an agricultural workers union. LUPE Ex. 284 at 6:3-8:1 (Deposition Excerpt Maria Gomez).

493.    Before SB1, Ms. Gomez assisted voters in the polling place and took the oath prior to assisting people to vote. The person who worked at the polling place would say that she could help the voter. The voter would make the decision and say that Maria was their chosen assister. Ms. Gomez did not have a problem with the oath before SB1. LUPE Ex. 284 at 33:7-35:9.

494.    Ms. Gomez no longer provides voter assistance because she feels that she does not understand SB1 that well. LUPE Ex. 284 at 29:13-16.  After SB1, Ms. Gomez would go to meetings to learn more about voting. Ms. Gomez testified that she is ready to do anything physically possible to familiarize herself with SB so she could continue helping voters, but her mind is not able to learn enough to do that. LUPE Ex. 284 at 18:3-19; 17:14-22.  Ms. Gomez tried to familiarize herself with the restraints in SB1 but her mind did not understand a lot of it so she tries to help in other ways. LUPE Ex. 284 at 18:3-19; 17:14-22.

495.    Ms. Gomez had a fear that something would be in the law that would affect her and was worried that she would make a mistake due to not understanding the law in general that well. LUPE Ex. 284 at 28:9-22.

496.    After Ms. Gomez heard that the law changed, she did not feel okay helping people vote because she did not understand the law on voter assistance. In the last election, when people asked Ms. Gomez for help to vote, she told them that there are people inside that can help them. Ms. Gomez felt impotent because she cannot help voters who ask her for help to vote because she heard about the change in the law. LUPE Ex. 284 at 12:11-13:8.

497.    Since SB1 passed, Ms. Gomez gives people that requested assistance to vote by mail a number to call and ask for assistance. Ms. Gomez told people that she helped vote that she is no longer trained to help them. LUPE Ex. 284 at 30:2-7; 15:25-16:8.

498.    Ms. Gomez would help people vote today if she did not have the fear that the law would affect her personally. LUPE Ex. 284 at 20:16-21:6.

499.    Maria Cristela Gonzalez Tobias, who prefers to go by Cris Rocha, lives in Edinburg, Texas in Hidalgo County. She has lived in Hidalgo County since 1975.  She is currently a paid employee and member of LUPE who works as a community organizer. She began her employment at LUPE in 2008. Tr. 9/11/2023 at 141:25-142:21 (Rocha).

500.    Cris Rocha grew up in San Juan, Texas in an area where there is a lot of agriculture. Her parents worked in agriculture in the stores and fields and she would help them. Tr. 9/11/2023 at 142:22-143:5 (Rocha).

501.    Cris Rocha attended school through the sixth grade. School was difficult for Ms. Rocha because she attended school at night so she could work during the day in agriculture. She stopped going to school because she would be very tired from work and she had to help take care of her siblings. After she left school, Ms. Rocha worked in the fields, cleaned houses and took care of children. She also worked as a caretaker of elderly people and worked for the county. Tr. 9/11/2023 at 143:6-21 (Rocha).

502.    Cris Rocha currently lives in a colonia, which is a place on the outskirts of the city that does not have public lighting or streets. Tr. 9/11/2023 at 143:22-144:9 (Rocha).

503.    Because of her limited education and prior work in the fields, Cris Rocha does not understand several aspects of SB1 and this has caused her to stop assisting voters who need assistance in Hidalgo County.

504.    In her job as a community organizer, Cris Rocha organizes in the colonias and promotes LUPE's services, provides information about voting, and encourages people to vote by calling them on the phone or visiting their houses. Tr. 9/11/2023 at 144:10-19; 154:25-155:1 (Rocha). When Cris Rocha encourages people to vote, she tells them to go out and vote because it is very important in every election, and she tells them when and where voting will take place. Tr. 9/11/2023 at 144:23-145:2 (Rocha). When Cris Rocha encourages people to vote, some people respond by telling her that they need help, some people say they need transportation, and some people say they do not need anything. Tr. 9/11/2023 at 145:13-15 (Rocha).

505.    Cris Rocha has been asked by elderly and disabled persons to help them vote and has provided such assistance in the past. Tr. 9/11/2023 at 145:16-20; 145:25-146:4 (Rocha).  The voters that chose Cris Rocha to be their assister are elderly and they use a cane or walker to walk. Tr. 9/11/2023 at 146:13-16 (Rocha).

506.    Cris Rocha understands the penalty of perjury in the voter assister oath to mean that if she does something wrong that she will go to jail. The swearing under penalty of perjury in the vote assister oath makes Ms. Rocha want to forego giving assistance in the future because she is afraid that if she does something wrong, it will hurt her or the voter. Tr. 9/11/2023 at 147:10-148:8 (Rocha).

507.    Cris Rocha does not understand what the voter assister oath means when it says that "The voter I am assisting represented to me they are eligible to receive assistance." Ms. Rocha provides assistance when a voter asks for it if she is the last person the voter can use as an assister.  She does not ask the voter to state that they are eligible for assistance. Ms. Rocha gets nervous to provide assistance now. Prior to SB1, Ms. Rocha did not tell voters who asked her for assistance to ask other people for assistance. Tr. 9/11/2023 at 148:9-149:6; 155:24-156:3; 158:15-159:2 (Rocha)

508.    Cris Rocha does know what the voter assister oath language means when it says "I did not pressure the voter into choosing me to provide assistance." She does not know what it means to "pressure" a voter because the word pressure is very broad and very confusing. Tr. 9/11/2023 at 149:7-14 (Rocha). Cris Rocha does not know if she has pressured a voter into choosing her to assist them if she calls the voter to tell them to vote. Tr. 9/11/2023 at 149:15-19 (Rocha).

509.    Since SB1 passed, when a voter asks Cris Rocha for assistance, she responds that the voter should find either a relative or a friend who can take them to vote and if the voter cannot find anyone, she tells the voter to call LUPE. Although she is the assister of choice of the voters who ask for her help, Ms. Rocha will only be a voter assister if she is the last person the voter can use as an assister. Tr. 9/11/2023 at 145:21-24; 148:22-149:3; 156:12-18 (Rocha). Before SB1 passed, Cris Rocha did not tell voters who asked her for assistance to ask other people for assistance. Tr. 9/11/2023 at 149:4-6 (Rocha).

510.    Louis Perales is 76 years old.  Tr. 10/03/2023 at 2168:20-25:6 (Perales).  He was born in Floresville, Texas, and was raised on a sharecropping farm in Poth, Texas. He began working as a migrant farm worker to contribute to his family's household income at the age of 12 years old, forcing him to miss up to three months of school a year. He attended predominantly Anglo schools and struggled to keep up with the curriculum because of the number of months missed each year working in the fields, and the long hours spent working on the family farm. Tr. 10/03/2023 at 2165:6-17; 2165:11-2167:3; 2166:1-25 (Perales).  When in high school, Louis Perales was kicked out of a restaurant and was told that "no Mexicans or dogs [were] allowed."  This moment was a setback for him.  Tr. 10/03/2023 at 2167:23-2168:6 (Perales).

511.    Louis Perales attended school through the 10th grade and then joined the Marine Corps where he worked guarding bombs and then spent a year of combat in Vietnam. Tr. 10/03/2023 at

2167:7-15 (Perales). When Louis Perales served in the military, he stopped at a restaurant near Abilene, Texas, and was refused service.  Mr. Perales was wearing his Marine Corps uniform when he was refused service.   Tr. 10/03/2023 at 2168:7-19 (Perales).

512.    Louis Perales struggled to fill out his March 2022 Primary Election ballot carrier envelope. Tr. 10/03/2023 at 2170:1-2 (Perales).  Louis Perales did not include his driver's license or social security number on the carrier envelope of his March 2022 Primary Election mail ballot because the location to place the information was under the flap and he did not see it.  Tr. 10/03/2023 at 2170:23-2171:1 (Perales). Louis Perales' mail ballot was not accepted or counted in the March 2022 Primary election.   Tr. 10/03/2023 at 2173:11-12 (Perales).

513.    Stella Guerrero Mata is 73 years old.  She is Mexican-American and only spoke Spanish when she began elementary school. When she was in the first grade, the teacher asked what the students had for breakfast. Stella answered the question in Spanish. She heard a scream and was yelled at; this gave her low self-esteem and she understood that she should not talk any more. Tr. 9/14/2023 at 964:1-12, 965:8-9 (Mata).

514.    Ms. Mata thought she had voted in the November 2022 General Election, but her vote was rejected. Stella found the mail ballot difficult to fill out. Tr. 9/14/2023 at 966:1-20 (Mata). She included her signature on the carrier envelope but did not include her driver's license number or her social security number on the carrier envelope. Stella Guerrero Mata did not see that she was supposed to put an ID number on the carrier envelope when she filled it out. Tr. 9/14/2023 at 966:24-967:11; 972:4-9 (Mata).

515.    Juanita Valdez-Cox was born in Mercedes, Texas in the Rio Grande Valley.   She is 76 years old. Tr. 9/11/2023 at 129:7-129:14 (Valdez Cox)

516.     Ms. Valdez-Cox grew up in a family of migrant farm workers and joined her parents in the fields when she was ten years old. Tr. 9/11/2023 at 129:15-130:3 (Valdez Cox).  As a young person, Ms. Valdez-Cox lived in the Colonia Seca which had no running water, sewerage, street paving, gas lines, or street signage. Tr. 9/11/2023 at 131:12-133:2 (Valdez Cox).  The neighborhood was comprised of Latino migrant workers and their families. Tr. 9/11/2023 at 133:3-133:6 (Valdez Cox).

517.     As a migrant farm worker, Ms. Valdez-Cox and her siblings had to leave school early, in April and returned in the fall after the school term had already started. Tr. 9/11/2023 at 131:1-131:11 (Valdez Cox).  Ms. Valdez-Cox and the other children from her colonia were bused to an elementary school where students were punished for speaking Spanish and mocked for being Mexican American and migrant farm workers. Tr. 9/11/2023 at 133:7-133:25 (Valdez Cox). Ms. Valdez-Cox dropped out of school in the 10th grade to help her family in the fields.  Tr. 9/11/2023 at 134:1-134:6 (Valdez Cox). After she married and started her own family, she returned to school and eventually completed a GED and an Associate's degree.  Tr. 9/11/2023 at 134:7-135:5 (Valdez Cox).

518.     Juanita Valdez-Cox is a registered voter in Hidalgo County.  She voted by mail for the first time in 2022. Tr. 9/11/2023 at 135:18-135:24 (Valdez Cox). Although Ms. Valdez-Cox successfully completed the application for ballot by mail and received a mail ballot, when she received her mail ballot she found it hard to understand. Tr. 9/11/2023 at 136:2-136:16 (Valdez Cox).  Although she completed the mail ballot, she was not confident that she had filled it out correctly.  Tr. 9/11/2023 at 136:23-137:13 (Valdez Cox).  She took it twice to the county elections office to ask them to accept the ballot.  Tr. 9/11/2023 at 137:14-138:17 (Valdez Cox).  Eventually, she turned in her ballot to a polling place and it was counted.  Tr. 9/11/2023 at 138:18-139:8 (Valdez Cox); Tr.

9/11/2023 at 139:9-139:19 (Valdez Cox); Tr. 9/11/2023 at 139:20-140:12 (Valdez Cox). Ms. Valdez-Cox has since voted in person because she didn't want to have a future experience like the one she had when she voted by mail. Tr. 9/11/2023 at 139:20-140:12 (Valdez Cox).

519. The members of LUPE include individuals who live in colonias, which are unincorporated community neighborhoods that usually have substandard housing and a lack of infrastructure such as drainage and street lighting. Tr. 9/11/2023 at 58:21-59:21 (Chavez). The LUPE membership that lives in colonias tends to be predominantly Mexican or Mexican American, low income. Many of the families include adults who did not finish grade school. Many other adults did not finish high school. Tr. 9/11/2023 at 67:22-68:18 (Chavez).

520. LUPE members include registered voters who are limited English proficient, low-literate and/or disabled. Many of LUPE's members who are disabled or low-literate are also elderly. Tr. 9/11/2023 at 63:19-64:6 (Chavez).

521. LUPE's membership includes individuals who are native born U.S. citizens but are limited English proficient and not literate in English because of a lack of access to education in the U.S. LUPE's membership includes individuals who are not literate in English or Spanish. Tr. 9/11/2023 at 64:7-65:6. Thirty percent of LUPE members are over age 65. Tr. 9/11/2023 at 63:16-63:18 (Chavez).

### 3. The burden that SB1's restrictions place on assistance and their racially disparate impact are significant. (*Brnovich* Guideposts 1 and 3)

522. Proposed findings of fact demonstrating the severe burdens that 6.03, 6.04, 6.05, 6.06, and 7.04 impose on voters who require assistance are included in the separate Section 208 submission and the ADA submission. *See* 208 Submission, FOF § III.C-K; ADA Submission, FOF § VI. Rather than repeat those additional findings of fact here, LUPE Plaintiffs adopt and incorporate them by reference.

523.     LUPE Plaintiffs incorporate by reference their their findings of fact concerning the racial disparity of the impact in Section VI.A. above.

**4.     SB1's restrictions on voter assistance and in-person canvassing do not have a long pedigree nor are they in widespread use in the United States. (*Brnovich* Guidepost 2)**

524.     Congress amended the Voting Rights Act in 1982 to guarantee voters' right to assistance. *See* 52 U.S.C. §10508.  Congress took such action because it determined that some states, including Texas, had not been providing such assistance, which it concluded conflicted with the anti-discriminatory policy of the Voting Rights Act, including its ban on literacy tests. Indeed, the congressional record for Section 208 expressly references a Texas prohibition on assistance for voters with literacy limitations.  S. Rep. 97-417 at 62-64 & n.210 (citing *Garza v. Smith*, 320 F. Supp. 131 (W.D. Tex. 1970), remanded, 450 F.2d 790 (5th Cir. 1971), injunction granted, Civ. No. SA 70-CA-169 (W.D. Tex., Dec. 6, 1971) (striking down Texas's prohibition on assistance for voters with literacy limitations)).

525.     The prohibition on compensated assistance in SB1 does not have a long pedigree. Before SB1, passed in 2021, Texas only prohibited compensation for assistance based on the number of voters assisted. Even that limitation was not imposed until 2013. 2013 Tex. Sess. Law Serv. Ch. 846 (H.B. 148), § 2.

526.     Nor is SB1's prohibition on compensated assistance in widespread use in the United States. Like Texas prior to SB1, Mississippi and South Dakota prohibit compensation for assistance only when it is based on the number of voters assisted. Miss. Code Ann. § 23-15-753; S.D. Codified Laws § 12-19-54. Those limitations on compensation were not imposed by Mississippi and South Dakota until 1999 and 2005, respectively. 1999 Miss. Laws Ch. 420 (H.B. 914), § 6; 2005 South Dakota Laws Ch. 91 (HB 1085), §§ 3 & 4.

527.    Similarly, while four other states prohibit compensation in exchange for ballot collection services in at least some circumstances, they do not prohibit compensation for the broad and ill-defined activities defined to constitute "vote harvesting" in SB1, namely, "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *See* Cal. Elec. Code § 3017 (prohibiting compensation for return of mail ballots based on the number of ballots that the person returns); 21–A Me. Rev. Stat. Ann. § 791(2)(A) (making it a crime to receive compensation for collecting absentee ballots); Mich. Comp. Laws § 168.931 (prohibiting compensation to induce a person to "both distribute absent voter applications to voters and receive signed absent voter ballot applications from voters"); N.D. Cent. Code § 16.1–07–08(1) (prohibiting a person to receive compensation for acting as an agent for an elector). While the prohibition in North Dakota appears to date back some time, the prohibitions in California, Maine, and Michigan became effective in 2017, 1994, and 1996, respectively. 2016 Cal. Legis. Serv. Ch. 832 (S.B. 450), § 2.5; 1993 Me. Legis. Serv. Ch. 473 (S.P. 478) (L.D. 1477); 1995 Mich. Legis. Serv. P.A. 261 (H.B. 4242), § 1.

### 5.    The voting system in Texas does not—and indeed cannot—provide voters who require assistance with ways to cast their ballots without assistance. (*Brnovich* Guidepost 4)

528.    Texas is the most difficult state to vote in because its entire voting system is restrictive. Tr. 10/5/2023 at 2836:7-12 (Kousser); HAUL-MFV Ex. 332; Tr. 10/5/2023 at 2996:13-19 (McDaniel).

529.    Many voters with limited English proficiency or disabilities require assistance to vote, meaning there are no alternative methods of voting available to them in Texas or anywhere else. *See* 208 Submission, FOF § III.J; ADA Submission, FOF § III.E.

**6.    SB1's restrictions on assistance do not serve any of the State's purported interests and the justifications the State has offered are tenuous at best. (Senate Factor 9 & *Brnovich* Guidepost 5).**

530.    Proposed findings of fact setting forth why the State's purported justifications for SB1 are neither legitimate nor justified are included above.  *See supra* Section V.C.

531.    In addition, the State's purported interest in preventing voter fraud is illegitimate because it is racially motivated. Tr. 10/5/2023 at 2820:6-2823:14 (Kousser); HAUL-MFV Ex. 332.

532.    For example, during the debates over a previous voter ID law in Texas, there were plentiful charges about the identity of people who were supposedly fraudulent voters, including that such individuals were "illegal aliens." Tr. 10/5/2023 at 2820:6-2823:14 (Kousser); HAUL-MFV Ex. 332.

533.    Additionally, there was a charge by the Harris County Republican Party that Black members of the state legislature had planned to submit 700,000 fake ballots. They brought a case before the Texas State Supreme court, which found no evidence of the alleged conspiracy. Tr. 10/5/2023 at 2820:17-24 (Kousser).

534.    And it was a Black woman, Crystal Mason, who was the poster child for illegal voting because she tried to vote in an election before 2020 not knowing she was ineligible after serving time in prison. Her vote was never counted but she was prosecuted and given a five-year sentence. She was not part of any larger conspiracy; she just did not know that she was ineligible to vote. Dr. Kousser testified that if Ms. Mason was the poster child for voter fraud, that was indicative of how little evidence of fraud there is. Tr. 10/5/2023 at 2820:6-2823:14 (Kousser); HAUL-MFV Ex. 332 at 78-79.

535.    Jonathan White, the State's top election testified that mail ballot fraud "often" includes minority voters. Tr. 10/16/2023 at 4002:6-12 (White).  He further testified that minority communities are typically the target for vote harvesting schemes.  Tr. 10/16/2023 at 4002:13-15

115

(White).  Mr. White acknowledged that the OAG's prosecution of voter fraud in Gregg County, Texas, was against four Black defendants. Tr. 10/16/2023 at 4002:16-22 (White).  Mr. White also testified that "you could be right" that the majority of defendants that he had prosecuted, and that are listed on the OAG's prosecution sheet, are Hispanic.  Tr. 4002:23-4003:4; *see also* State Ex. 82 (OAG spreadsheet 7/15/2022).

## PROPOSED CONCLUSIONS OF LAW

### I.    Plaintiffs have standing to bring this lawsuit.

#### A.    Friendship-West and Texas Impact Plaintiffs have associational standing

536.    Friendship-West and Texas Impact have associational standing on behalf of their members.

537.    An organization has associational standing when (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Ass'n of Am. Physicians v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

538.    Friendship-West and Texas Impact each meet these requirements.

539.    Friendship-West has approximately 9,700 members who live throughout the Dallas/Fort Worth area. Friendship-West's members do not pay dues; however, they give contributions, and those contributions are used to carry out the church's ministry and mission.

540.    Friendship-West has members who could otherwise challenge Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB1 in their own right.

541.    Friendship-West has members who are registered voters, who vote by mail because of their age or a disability, who require assistance with voting because of their age or a disability, who have assisted others with voting, and who have served as poll workers or election judges.

542.    One member of Friendship-West who previously served as an election judge told Pastor Ayers that she was fearful about serving again because of Section 4.09's subjectivity around what actions were inappropriate to take against a poll watcher.

543.    Texas has 22,000 individual members in its database, approximately 400 of whom are dues-paying members. Accounting for the total membership of all of Texas Impact's institutional and congregational members, there are around 5 million Texans across the State who belong to Texas Impact.

544.    Texas Impact has members who could otherwise challenge Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB1 in their own right.

545.    Texas Impact has individual members who vote by mail because of a disability or their age, who require assistance with voting in-person or by mail because of a disability or their age, and who require assistance with voting in-person or by mail because of cultural or language barriers. Texas Impact's individual members also include Texans who have assisted others with voting, either in-person or by mail, and who have served as poll workers or election judges.

546.    Texas Impact has members, like Richard Ertel, who are reluctant to serve as poll workers because of Section 4.09.

547.    Friendship-West and Texas Impact seek to protect voting interests germane to its mission, and its members need not participate in this lawsuit. *Hancock Cnty. Bd. of Supervisors*, 487 F. App'x 189, 197 (5th Cir. 2012); *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. 2023).

### B.    Friendship-West and Texas Impact have organizational standing.

548.    Friendship-West's mission includes voter outreach and civic education.

549.    Friendship-West diverted time, money, and resources to "spend extra time and money educating its members about" SB1's challenged provisions "and how to avoid their negative effects." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017)

550.    Friendship-West fielded questions from its members, created a dedicated landing page on its website to provide accessible voter education information, changed the original plans for its podcast so it could focus on voting, and created voter education videos to decrease the likelihood that their members' ABBMs and/or mail ballots would be rejected because of Sections 5.07 and 5.13.

551.    Prior to SB1, Friendship-West had never created a dedicated landing page on its website for voting information, had never created voter education videos about specific voting rules, and had never engaged in a text messaging campaign as part of its voter turnout activities.

552.    Friendship-West also adjusted the way and frequency by which it recruits and trains people to serve as election workers and created voter education videos about what to expect at polling locations because of Section 4.09.

553.    Friendship-West also launched a text message campaign to encourage community members to vote and conducted two surveys to assess how SB1 impacted its members. To fund this text messaging campaign and its surveys, Friendship-West had to divert funding from its advocacy training and organizing training. Friendship-West had never conducted such a text message campaign or conducted such a survey before SB1.

554.    These efforts to counteract SB1 required additional staff and volunteer time, and the staff and volunteers at Friendship-West who participated in these efforts are the same staff and volunteers that would have been working on the church's other critical activities.

555.    SB1 has "concretely and perceptibly impair[ed]" Friendship-West's mission. *See LaFHAC,* 82 F.4th at 351. Responding to SB1 made it more difficult for Friendship-West to conduct its operations, by diverting staff time and monetary resources away from other program areas, burdening an already understaffed justice ministry.

556.    Because of Friendship-West's efforts to respond to SB1, Friendship-West struggled to meet its pastoral care responsibilities, which are integral to the church's mission as a religious institution. Friendship-West also did not do any advocacy training or organizing training in 2022 because of the church's efforts to counteract SB1.

557.    Friendship-West's injuries are a direct result of SB1, and a favorable ruling would prevent Defendants from exercising enforcement power that causes Friendship-West's injuries. Thus, Friendship-West has established the necessary traceability and redressability that Article III standing requires.

558.    Texas Impact's mission includes voter outreach and civic education.

559.    Texas Impact diverted time, money, and resources to "spend extra time and money educating its members about" SB1's challenged provisions "and how to avoid their negative effects." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017)

560.    Texas Impact held events to educate its members about Sections 5.07 and 5.13 to decrease the likelihood that their ABBMs and/or mail ballots would be rejected.

561.    Texas Impact also increased its efforts to recruit poll workers, purchased social media ad buys, and partnered with "Power to the Polls" so it could track the effectiveness of its recruitment efforts. And while Texas Impact had run paid social ads before to recruit poll workers for the 2020 election, that effort was not the size and scope of what Texas Impact had to do because of Section 4.09.

562.    These events to counteract SB1 required staff and volunteer time, and the staff and volunteer who worked on those efforts are the same staff and volunteers who would have worked on Texas Impact's other activities.

563.    Moreover, in lieu of rewriting a publication about voting by mail that had become obsolete because of SB1, Texas Impact purchased "Ballot Ready," an online application that attempts to be a one-stop shop for voting information. Ballot Ready cost Texas Impact around $25,000 to $30,000 per year, with a multi-year plan.

564.    Texas Impact also ceased its "Vote by Mail Captains Program" – a program it started during the pandemic in 2020 to encourage its eligible members to vote by mail – because of Sections 5.07 and 5.13. But for SB1, Texas Impact likely would have continued its Vote by Mail Captains Program.

565.    SB1 has "concretely and perceptibly impair[ed]" Texas Impact's mission. *see LaFHAC,* 82 F.4th at 351. Because of Texas Impact's efforts to counteract SB1, Texas Impact was not able to work on other legislative priorities, like public education, healthcare, the electric grid.

566.    The reluctance of Texas Impact's members to serve as poll workers and to vote by mail affects its ability to accomplish its mission because the ability of Texas Impact's members to exercise the franchise impacts Texas Impact's influence as an organization.

567.    Texas Impact's injuries are a direct result of SB1, and a favorable ruling would prevent Defendants from exercising enforcement power that causes Friendship-West's injuries. Thus, Friendship-West has established the necessary traceability and redressability that Article III standing requires.

568.    Friendship-West and Texas Impact have established that the increased cost of voter education, poll worker recruitment, and get-out-the-vote initiatives responding to SB1 required a

shift of their limited resources from other activities, which is sufficient to establish injury-in-fact for standing purposes. *OCA-Greater Houston*, 867 F.3d at 612; *Fowler*, 78 F.3d at 360; *see also Harding v. Edwards*, 484 F. Supp. 3d 299, 316 (M.D. La. 2020) (finding standing where organizations demonstrated "concrete spending changes and new initiatives in response to Defendants' actions").

569.    Accordingly, Friendship-West and Texas Impact have organizational standing regarding their claims challenging Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB1.

### C.    James Lewin has individual Article III standing.

570.    Mr. Lewin previously served as a poll worker and an election judge in Travis County, Texas elections and intends to do so in the future.

571.    Because Mr. Lewin cannot determine what conduct he is permitted to engage in under Section 4.09, he must choose either to not serve as an election judge or poll worker again or to serve in either capacity in future elections under the threat of Section 4.09's arbitrary enforcement and criminal penalties.

572.    Mr. Lewin's desire to continue serving as an election judge in future elections is sufficient to confer standing for a facial vagueness challenge to Section 4.09. *See, e.g.*, *Doe I v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018) (affirming that two plaintiffs had standing for a facial vagueness challenge because they "sufficiently expressed a 'serious interest' in returning to" conduct that was undoubtedly affected by the challenged act). Like the two *Doe I* plaintiffs that the Fifth Circuit held had standing for a facial vagueness challenge, Mr. Lewin has previously served in a position regulated by the challenged provision and expressed a desire to continue doing so in the future.

573.    The threat of arbitrary or discriminatory enforcement of Section 4.09 against Mr. Lewin, an individual regulated by the law, is substantial. As a former poll worker and election judge who

intends to serve in these capacities in future elections, Mr. Lewin's fears of prosecution, coupled with the history of the law's enforcement, is credible for standing purposes.

574.    Mr. Lewin's injuries are traceable to Defendants in this case. SB1 and its enforcement is the direct cause of these injuries.

575.    Mr. Lewin's injuries are capable of judicial redress because a favorable ruling will prevent the Defendants and the District Attorney of Travis County, where Mr. Lewin resides, from enforcing the law.

576.    Thus, Mr. Lewin has established the injury-in-fact, traceability, and redressability requirements for Article III standing.

## II.    The Defendants are proper.

### A.    Defendants are subject to suit under the Voting Rights Act.

577.    Sovereign immunity does not shield Defendants from liability under the VRA. It is well-established that the VRA abrogates sovereign immunity. *See MFV v. Abbott*, 977 F.3d 461, 469 (5th Cir. 2020); *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017). Thus, LUPE Plaintiffs may bring claims against Defendants under the VRA.

### B.    LUPE Plaintiffs may bring their constitutional claims against the Secretary of State and the Attorney General under the *Ex parte Young* exception to sovereign immunity.

578.    Under *Ex parte Young*, 209 U.S. 123 (1908), "a litigant may sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 735 (5th Cir. 2020).

579.    The Supreme Court has counseled that, "[i]n determining whether the *Ex parte Young* doctrine avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief

properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alterations on original) (citation omitted). "The Supreme Court has also made clear that, for the *Ex parte Young* exception to apply, the state official, by virtue of his or her office, must have 'some connection with the enforcement' of the challenged law." Dkt. 449 at 7 (quoting *Ex parte Young*, 209 U.S. at 157).

580.    An official is properly named in a suit under the *Ex Parte Young* exception where that official "*may* or must take enforcement actions against" the plaintiffs. *Whole Women's Health v. Jackson*, 595 U.S. 30, 45 (2021). The Fifth Circuit has further explained that plaintiffs must "show the defendant has the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted).

581.    "Enforcement typically means compulsion or constraint." *Id.* (citation omitted). "A scintilla of enforcement by the relevant state official with respect to the challenged law will do." *Id.* (citation omitted). And under Fifth Circuit precedent, the requisite "scintilla of enforcement" may be found in state law other than the specific statute at issue in the litigation. *Tex. Democratic Party II*, 978 F.3d at 179-80.

582.    In short, "if an official *can* act, and there's a significant possibility that he or she *will* … , the official has engaged in enough compulsion or constraint to apply the *Young* exception." *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 401 (5th Cir. 2020) (emphasis in original) (citation omitted).

### 1.    Secretary of State Nelson

583.    The Secretary of State has some connection to the enforcement of Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB1.

584.    First, the Secretary has a duty to enforce the Challenged Provisions.

585.    As discussed above, Sections 4.09, 5.13, 6.04, 6.05, 6.06, and 7.04 of SB1 codified several new criminal offenses.

586.    "The Election Code now authorizes the Secretary to 'refer a reported violation of law for appropriate action to the attorney general … or to a prosecuting attorney having jurisdiction.'" Dkt. 449 at 23 (quoting Tex. Elec. Code § 34.005(a)). "It also *requires* the Secretary to report suspected election law offenses to the Attorney General." *Id.* (quoting Tex. Elec. Code § 31.006(a)). "The Secretary certainly has the authority to compel or constrain others when [she] not only has the authority to refer, but also the obligation to report election law offenses under sections … 4.09, 6.04, 6.05, 6.06, and 7.04." *Id.*

587.    "Further, under section 8.01, an election official is now civilly liable if they violate an Election Code provision." *Id.* at 24 (quoting Tex. Elec. Code § 31.129(b)). "Civil penalties may include termination and loss of employment benefits." *Id.* (quoting Tex. Elec. Code § 31.129(c)). "In light of [her] duty to report violations, the Secretary now has a specific role in ensuring that election officials comply with the Election Code." *Id.* "The Secretary's authority to report violations of the Election Code to the Attorney General also empowers [her] with the authority to compel or constrain election officials who, in turn, may credibly fear civil prosecution by way of the Secretary's referral to the Attorney General." *Id.*

588.    "Section 5.07 provides that an early voting clerk must reject the applicant's vote-by-mail application if the required identification information on their application is either missing or does not match the identification information that the applicant previously provided on their voter registration application." Dkt. 449 at 14 (citing Tex. Elec. Code § 86.001(f)).

589.    In addition, "[t]he Election Code now generally provides that a voter must submit their driver's license, election identification certificate, or personal identification card number on their mail ballot carrier envelope." *Id.* (citing Tex. Elec. Code § 86.002(g)). "It makes clear that a mail ballot carrier envelope 'must include a space that is hidden from view when the envelope is sealed for the voter to enter' the required identification information." *Id.* at 14-15 (quoting Tex. Elec. Code § 86.002(g)). "Section 5.13, in turn, requires an early voting clerk to reject a mail-in ballot if the required identification information on the mail ballot carrier envelope is either missing or does not match the identification information that the voter previously provided on their voter registration application." *Id.* at 15 (citing Tex. Elec. Code § 87.041(b)(8)).

590.    Section 6.03 "requires an assister to complete a form stating their name and address, their relationship to the voter, and whether they 'received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee.'" *Id.* at 17-18 (quoting Tex. Elec. Code § 64.0322(a)).

591.    As this Court previously held, "the Secretary is statutorily required to prescribe the design and content of 'the forms necessary for the administration' of the Election Code." *Id.* at 14 (quoting Tex. Elec. Code § 31.002(a)). "Local officials must then use these forms, except in an emergency." *Id.* (citing Tex. Elec. Code § 31.002(d)).

592.    "It therefore follows that the Election Code requires the Secretary to modify vote-by-mail applications" and "mail ballot carrier envelopes," "so that they include the statutorily-required space for [voters] to enter the identification information that the Election Code now requires." *Id.* at 14-15. Likewise, "the Secretary must prescribe the required form" that must be completed by voter assisters. *Id.* at 18. "Consequently, as in *Texas Democratic Party II*, the Secretary has the

authority to compel or constrain local officials based on the actions [she] takes with respect to vote-by-mail applications," "mail ballot carrier envelopes," and voter assister forms. *Id.* at 14-15.

593.    Second, the Secretary of State has demonstrated willingness to exercise her duties under SB1.

594.    The Court heard evidence that more than half of referrals related to voter fraud complaints come from the Election Integrity Division within the Secretary's office. The Secretary has also issued the forms that local officials must use for vote-by-mail applications, mail ballot carrier envelopes, and voter assister forms. Thus, the Secretary has already, pursuant to her statutory responsibilities, taken significant enforcement actions to implement SB1.

595.    In short, the Secretary of State has some connection to the enforcement of the Challenged Provisions of SB1.

### 2.    Attorney General Paxton

596.    The Attorney General has some connection to the enforcement of Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB1.

597.    First, the Attorney General can enforce the Challenged Provisions.

598.    As this Court has previously explained, "the Attorney General is statutorily tasked with prosecuting criminal offenses prescribed by the Election Code." Dkt. 449 at 29 (quoting Tex. Elec. Code § 273.021). "He is Texas' chief law enforcement officer, with a freestanding sovereign interest in enforcing Texas law." *Id.* (citation omitted). "The Attorney General's role in enforcing the election laws includes statewide investigation authority and concurrent prosecution authority with local elected prosecutors over the election laws of the State." *Id.* at 29-30 (citation omitted).

599.    Therefore, as this Court has already held, the Attorney General "has the authority to compel or constrain under sections … 4.09, 6.04, 6.05, 6.06, and 7.04—all of which establish one or more election law offenses." *Id.* at 30.

600.    "Moreover, the Attorney General is expressly tasked with compelling or constraining under section 8.01, the provision that authorizes the Attorney General to collect a civil penalty from an election official who 'violates a provision of this code.'" *Id.* (quoting Tex. Elec. Code § 31.129(b)).

601.    The Attorney General "also has the authority to compel and constrain any and all election officials who are subject to civil prosecution for violations of sections … 5.07, 5.13, … and 6.03—all of which establish requirements for election officials as defined under the Election Code, violations of which may result in civil prosecution." *Id.*

602.    Second, "the Attorney General has a 'demonstrated willingness' to exercise his duty to enforce the S.B. 1 provisions that [Plaintiffs] challenge on constitutional grounds to establish that the Attorney General will enforce those provisions." *Id.* at 31 (quoting *Tex. Democratic Party II*, 978 F.3d at 181).

603.    Indeed, the Attorney General has prosecuted alleged violations of Texas's election laws alongside, or instead of, local district attorneys. *See* OCA Submission FOF § II.B. The Attorney General has also promised to prosecute election law violations. *See id.*

604.    Further, the Attorney General has a sufficient connection to the enforcement of the Challenged Provisions, even though he may not unilaterally prosecute election law offenses under *State v. Stephens*, 663 S.W.3d 45, 57 (Tex. Crim. App. 2021).

605.    In *Stephens*, "the Texas Court of Criminal Appeals held that this delegation of unilateral prosecutorial authority violated the separation-of-powers clause of the Texas Constitution." Dkt. 449 at 32. Nevertheless, as this Court previously held, "the surviving provisions of the Election

127

Code still envision, and likely require, the Attorney General's participation in enforcement activities." *Id.* This Court also held that "*Stephens* does not foreclose the Attorney General's authority to prosecute election law offenses, including those prescribed by the S.B. 1 provisions challenged here." *Id.*

606.    Thus, the Attorney General is a state official who both "may" and "must" enforce SB1. *See Whole Women's Health*, 595 U.S. at 45. The Attorney General has some connection to the enforcement of the Challenged Provisions and is a proper defendant for Plaintiffs' constitutional claims.

### 3.    The elections administrators and district attorneys administer and enforce SB1.

607.    Under the Texas Election Code, Defendants Scarpello, Wise, Creuzot, Garza, and Hicks are responsible for implementing and enforcing the Challenged Provisions in their respective counties.

608.    In general, local election officials administer Texas elections. They receive and review ballot applications, Tex. Elec. Code § 86.001, mail carrier and ballot envelopes to voters, *id.* § 86.002, receive and process marked ballots, *id.* §§ 86.006, 86.007(b), 86.011, verify voter signatures, *id.* § 87.027(i), and count the results, *id.* § 87.061.

609.    Under Section 31.043 of the Texas Election Code, "[t]he county elections administrator shall perform: (1) the duties and functions of the voter registrar; (2) the duties and functions placed on the county clerk by this code; (3) the duties and functions relating to elections that are placed on the county clerk by statutes outside this code, subject to Section 31.044; and (4) the duties and functions placed on the administrator under Sections 31.044 and 31.045."

610.    Under Section 83.002 of the Texas Election Code, "[t]he county clerk is the early voting clerk for the county in: (1) the general election for state and county officers and any other

countywide election held at county expense; (2) a primary election; and (3) a special election ordered by the governor."

611.    Thus, as county elections administrators, Defendants Scarpello and Wise are responsible for implementing and administering the Challenged Provisions.

612.    In addition, under Section 273.001(a) of the Texas Election Code, "[i]f two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney shall investigate the allegations." Similarly, under Section 273.001(b) of the Texas Election Code, "[a] district or county attorney having jurisdiction or the attorney general may conduct an investigation on the officer's own initiative to determine if criminal conduct occurred in connection with an election."

613.    The Election Code also states that the Attorney General "may direct the county or district attorney serving the county in which the offense is to be prosecuted to prosecute an offense that the attorney general is authorized to prosecute under Section 273.021 or to assist the attorney general in the prosecution." Tex. Elec. Code Ann. § 273.022.

614.    Thus, as district attorneys, Defendants Creuzot, Garza, and Hicks are responsible for investigating and prosecuting violations of the Texas Election Code in their respective counties.

### C.    LUPE Plaintiffs may sue Defendants for violations of the ADA.

615.    Conclusions of Law regarding the propriety of LUPE's ADA claims against Defendants can be found in the ADA Submission. *See* ADA Submission, COL Section III.A-B.

### III.    SB1's poll watcher provisions are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

616.    "In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

617.    Section 4.09 is unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause and cannot be enforced.

618.    A criminal statute is unconstitutionally vague and violates due process for either of two reasons: first, if "it fails to give ordinary people fair notice" of what is proscribed; and, second, if it is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 629 (2015).

619.    A criminal law provides constitutionally inadequate notice where it lacks "any ascertainable standard," *Smith v. Goguen*, 415 U.S. 566, 578 (1974), and the meaning of its terms depends on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008).

620.    Section 4.09 lacks any ascertainable standard because "no standard of conduct is specified at all." *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

621.    Instead, a violation of Section 4.09 hinges on the subjective experience of a poll watcher. Because a violation of Section 4.09 depends solely on a poll watcher's subjective experiences, the provision, in effect, prescribes no standard of conduct for regulated parties at all. The law criminalizes "any action" taken by a poll worker if that action causes a particular subjective experience for a poll watcher that renders a poll watcher's observation "not reasonably effective."

622.    It is impossible for poll workers to anticipate whether their actions will have the subjective effect of rendering a poll watcher's observation "not reasonably effective." It is therefore impossible for poll workers to conform their conduct to the law and avoid criminal liability. *See Coates v. City of Cincinnati*, 402 U.S. at 614 (holding as unconstitutionally vague an ordinance criminalizing conduct "annoying to persons passing by" because "[c]onduct that annoys some

people does not annoy others"); *City of Chicago v. Morales*, 527 U.S. 41, 62 (1999) (plurality opinion) (holding an anti-loitering ordinance void for vagueness where whether someone had "no apparent purpose" for standing on a sidewalk was "inherently subjective"); *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th Cir. 2023).

623.    Section 4.09's expansive, subjective terms therefore violate the fair notice element of the void-for-vagueness doctrine, whose "purpose is to enable the ordinary citizen to conform his or her conduct to the law." *City of Chicago*, 527 U.S. at 58; *see also Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.").

624.    Because the language of Section 4.09 is vague on its face, its unconstitutionality cannot be cured by interpretive guidance from enforcement authorities because when scrutinizing an allegedly vague statute, the court is "relegated, . . . to the words of the [statute] itself." *Coates v. Cincinnati*, 402 U.S. 611, 612 (1971).

625.    Rewriting the text of Section 4.09 based on interpretive guidance from enforcement authorities violates separation of powers principles. *Cf. Sessions v. Dimaya*, 138 S. Ct. 1203, 1212 (2018) ("[T]he [vagueness] doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not").

626.    In any event, even if interpretive statutory guidance may, to some degree, inform the Court's evaluation of a statute, neither the Secretary of State nor any other agent of the State has provided guidance that cures Section 4.09's vagueness or disavowed the law's subjective standard.

627.    The Secretary of State's office acknowledges that Section 4.09 sets forth a subjective standard, so there is no interpretive guidance that could remove this constitutional defect.

131

628.    Even if the subjectivity of Section 4.09's standard was not fatal, the statute also fails to define the subjective "reasonably effective" standard, thereby exacerbating the provision's notice problem.

629.    Because Section 4.09's standard for liability does not define conduct that is criminal, but rather criminalizes conduct based on the subjective effect it has on others, Section 4.09's *mens rea* standard for "knowingly prevent[ing] a watcher from observing any activity" does not remedy the law's failure to meet the demand of fair notice. Because "knowingly preventing" a watcher's observation is defined to include "any action" that renders the watcher's observation "not reasonably effective," "any action" that a poll worker takes "knowingly" may subject them to criminal liability if the poll watcher claims that their subjective experience observing election activity was "not reasonably effective." "The hazard of being prosecuted for knowing but guiltless behavior nevertheless remains." *Baggett v. Bullitt*, 377 U.S. 360, 373 (1964); *See Kramer v. Price*, 712 F.2d 174, 178 (5th Cir. 1983), *reh'g granted*, 723 F.2d 1164 (5th Cir. 1984) ("Specifying an intent element does not save [a statute] from vagueness [when] the conduct which must be motivated by intent, as well as the standard by which that conduct is to be assessed, remain vague."); *cf. League of Women Voters of Fla.*, 66 F.4th at 947-48 (rejecting the argument that a state court interpreting the law would impose a *mens rea* requirement as a means of saving a law from vagueness, and explaining that "the promise of due process later on does not obliterate the vagueness doctrine altogether").

630.    Courts require stricter adherence to the Fourteenth Amendment's Due Process requirements when a statute involves speech in order "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2309−10 (2012); *Hoffman Estates*, 455 U.S.

at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.").

631.    Where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964), it 'operates to inhibit the exercise of (those) freedoms.' *Cramp v. Board of Public Instruction*, 368 U.S 278 (1961).

632.    Section 4.09 implicates First Amendment freedoms because it regulates election workers who help administer safe elections free from intimidation and assist citizens engaged in voting, which the U.S. Supreme Court has long held is a fundamental constitutional right. *See Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society."); *see also Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159-64 (2014) (noting that an Article III injury can be shown where an individual intends to engage in future conduct "affected with a constitutional interest" that is "arguably proscribed" by law).

633.    Section 4.09 also creates a chilling effect on poll workers' expressive conduct—such as communicating with voters to help them cast legal ballots and providing information about the voting process—which is protected by the First Amendment. *See Voting for America II*, 732 F.3d at 389 ("The state does not deny that some voter registration activities involve speech—'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters to fill out their forms; and 'asking' for information to verify that registrations were processed successfully.").

634.    The Fifth Circuit has recognized that "[s]oliciting, urging and persuading . . . citizen[s] to vote" are protected forms of political speech for a "canvasser." *Voting for Am., Inc. v. Steen* (*Voting for America II*), 732 F.3d 382, 390 (5th Cir. 2013); *see also Voting for Am., Inc. v. Andrade* (*Voting for America I*), 488 F. App'x 890, 897 (5th Cir. 2012) ("[T]he primary act of simply encouraging citizens to vote constitutes core speech and would be protected under the First Amendment.").

635.    Section 4.09 also fails to "establish minimal guidelines to govern law enforcement[,]" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted), authorizing arbitrary and discriminatory enforcement.

636.    Before Section 4.09's enactment, the Attorney General's office attempted to enforce the crime of poll watcher obstruction in an arbitrary and discriminatory manner against then-Travis County Clerk Dana DeBeauvoir. But the State could not secure an indictment under the version of the statute that predated Section 4.09, which provided a standard of conduct.

637.    The new, subjective, and undefined standard enshrined in Section 4.09 creates a serious risk that such arbitrary enforcement will occur again and result in convictions.

638.    Indeed, there have already been several criminal investigations conducted of poll workers engaged in legitimate conduct to regulate poll watchers under this new standard, and the Attorney General, who has enforcement power under state law, has not affirmatively stated that Section 4.09 will not be enforced.

639.    The poll workers and election officials who testified at trial about their concerns that they might be prosecuted for good faith and legitimate attempts to regulate poll watchers and protect voters reasonably fear such prosecution given the subjective and undefined standard provided by Section 4.09 and the history of the statute's enforcement (both before and after Section 4.09's enactment).

640.    The consequences of Section 4.09's unconstitutional vagueness are especially severe because the statute imposes criminal penalties for a violation. *Cf. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498−99 (1982) ("The Court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.").

641.    Because Section 4.09 creates a real risk of arbitrary enforcement, it is the proper subject of a pre-enforcement facial challenge because "[t]he question is not whether discriminatory enforcement occurred [in the case] . . . but whether [the statute] is so imprecise that discriminatory enforcement is a real possibility. *Gentile State Bar of Nev.*, 501 U.S. 1030, 1051 (1991).

642.    Section 4.09 is properly challengeable on facial grounds because injured Plaintiffs who are regulated by Section 4.09 have expressed a sincere interest in continuing to engage in conduct that is affected by the provision, namely, service as an election worker. *See, e.g. Doe I v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018) (affirming that two plaintiffs had standing for a facial vagueness challenge because they "sufficiently expressed a 'serious interest' in returning to" conduct that was undoubtedly affected by the challenged act).

643.    Moreover, Section 4.09 is also appropriately subject to a pre-enforcement challenge because it implicates conduct protected by the First Amendment. *See Kolender*, 461 U.S. at 358 n.8 (affirming the validity of facial vagueness challenges if the law "reaches a substantial amount of constitutionally protected conduct").

644.    A pre-enforcement facial challenge to a statute on vagueness grounds is proper, where, as here, regulated parties must decide whether to forego engaging in lawful conduct aimed at protecting fundamental constitutional rights or risk prosecution for engaging in conduct that violates Section 4.09. *See Zimmerman v. City of Austin, Tex.* 881 F.3d 378, 390 (5th Cir. 2018) (holding that "changing one's…plans…in response to an allegedly injurious law can itself be a sufficient injury to confer standing").

645.    Because Section 4.09 is unconstitutionally vague, civil enforcement of the statute through Section 8.01 of SB1 is also unconstitutional.

**IV.    SB1's restrictions on vote by mail, voter assistance, and in-person canvassing impose an undue burden on the right to vote in violation of the First and Fourteenth Amendments.**

646.    Sections 5.07 and 5.13 of SB1 ("mail ballot ID requirements") severely burden the right to vote by requiring that election administrators reject ABBMs and mail ballots from otherwise qualified voters when a voter does not provide an ID number on the ABBM or mail ballot that precisely matches information in the voter registration file.

647.    Sections 5.07 and 5.13 impose a severe burden on the right to vote because they have and will continue to disenfranchise tens of thousands of voters:

    a.   despite the fact that the voters are eligible to vote;

    b.   despite the fact that the voters strictly followed the process for voting;

    c.   without and adequate cure process;

    d.   without viable alternative options for the voters to successfully cast their ballots.

648.    The mail ballot ID requirements also impose a severe burden on the right to vote because they disparately impact voters with disabilities and voters of color.

649.    Sections 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1 ("voter assistance restrictions") severely burden the right to vote by imposing burdensome requirements on voters and voter assisters and by denying mail voters assistance by compensated assisters.

650.    The voter assistance restrictions increase the time it takes to vote with assistance, deter assisters from serving, deter voters from using assisters, deny assistance to voters unless they meet additional conditions, and make it impossible for a mail voter to use the assister of his or her choice when that assister is compensated or receives any economic benefit.

651.    The voter assistance restrictions severely burden voters who need assistance in the following ways:

a. Sections 6.06 and 7.04 deny mail voters the ability to choose as assisters individuals who are compensated or receive "anything reasonably regarded as an economic gain or advantage."

b. Section § 6.04 requires voters to represent to their assister that they are eligible for assistance as a condition of receiving assistance.

c. Section 6.04 deters voter assisters by requiring them to swear, under penalty of perjury, to additional information, including that they did not pressure or coerce the voter into choosing them to assist, and that they obtained a representation of eligibility of assistance from the voter.

d. Sections 6.03, 6.05 and 6.07 deter voter assisters by requiring them to complete additional forms and/or provide additional information as a prerequisite to giving voter assistance.

652. Because Section 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, and 7.04 impose a severe burden, they "must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

653. The state offers no compelling interest to justify the severe burdens imposed by Section 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, and 7.04.

654. While preventing voter fraud may be a compelling state interest, the challenged provisions are not narrowly drawn to advance that interest.

655. Prior to SB1's enactment, voter fraud was extremely rare.

656. The law prior to SB1 already adequately addressed voter fraud.

657. Prior to SB1's enactment, voter impersonation—that is, voting a ballot for someone else— was already prohibited and extremely rare.

658.    Prior to SB1's enactment, there was essentially zero fraud in the polling place, whether incident to a voter being given assistance or otherwise.

659.    Prior to SB1's enactment, fraud related to mail voting, whether involving voter assistance or not, was extremely rare.

660.    Prior to SB1's enactment, there was no indication that compensated assistance or compensated canvassing was a source of fraud.

661.    The Challenged Provisions do nothing to prevent the rare instances of fraud that occurred in Texas prior to SB1.

662.    Sections 5.07 and 5.13 are less effective at identifying voter fraud than the previous method for identifying a mail voter through signature matching.

663.    In fact, the procedures required by Section 5.07 and 5.13 increase the risk of voter impersonation rather than preventing it.

664.    Sections 6.03, 6.04, 6.05, 6.06, and 7.04 prohibit a great deal of activity that is not fraudulent and the fraudulent conduct they do prohibit was already prohibited prior to SB1's enactment.

665.    In fact, by limiting voters' access to voters of their choice, Sections 6.03, 6.04, 6.05, 6.06, and 7.04 make voters more reliant on people they do not choose for assistance, thereby increasing their vulnerability to undue influence.

666.    Instead of making voting more secure, SB1's challenged provisions target voter outreach activity by organizations that work that work with less resourced voters, many of whom are racial minorities, and reduce the information and assistance available to those voters.

667.    Even if SB1 did help prevent voter fraud—and it does not—that does not justify the severe burden in places on voters because there are less burdensome ways to prevent voter fraud.

668.    Stated differently, even if these provisions imposed only a "slight burden" on the right to vote, the state's purported interests are not "sufficiently weighty" to justify the burden. *Crawford*, 553 U.S. at 191 (2008) (controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

669.    Because they prohibit voters from voting even if they provide accurate information identifying themselves, Sections 5.07 and 5.13 disenfranchise more eligible voters than they do prevent voter fraud.

670.    Moreover, the signature matching procedures that predated SB1 were better designed to prevent voter fraud.

671.    Section 6.03, 6.04, 6.05, 6.06, and 7.04 prohibit a wide swath of activity that is not in any way fraudulent, and are therefore far more likely to deprive voters of the assistance than they need than they are to prevent voter fraud.

672.    Section 6.03, 6.04, 6.05, 6.06, and 7.04 prohibit a wide swath of activity that is not in any way fraudulent and are therefore far more likely to deprive voters of the assistance they need than they are to prevent voter fraud.

## V.    SB1's restrictions on voter assistance and in-person canvassing violate Section 2 of the VRA.

673.    Section 2 of the Voting Rights Act of 1965 can be enforced by private parties.  *See* Legal Framework Submission at II.C.1.

674.    Sections 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1 ("voter assistance restrictions") severely burden the right to vote by imposing burdensome requirements on voters and voter assisters and by denying mail voters assistance by compensated assisters.  *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2338 (2021) (noting that the size or severity of the burden is relevant to an assessment of a Section 2 claim).

675.    The voter-assistance restrictions increase the time it takes to vote with assistance, deter assisters from serving, deter voters from using assisters, deny assistance to voters unless they meet additional conditions, and make it impossible for a mail voter to use the assister of his or her choice when that assister is compensated or receives any economic benefit.

676.    The voter assistance restrictions severely burden voters who need assistance in the following ways:

    a.  Sections 6.06 and 7.04 deny mail voters the ability to choose as assisters individuals who are compensated or receive "anything reasonably regarded as an economic gain or advantage."

    b.  Section 6.04 requires voters to represent to their assister that they are eligible for assistance as a condition of receiving assistance.

    c.  Section 6.04 deters voter assisters by requiring them to swear, under penalty of perjury, to additional information, including that they did not pressure or coerce the voter into choosing them to assist, and that they obtained a representation of eligibility of assistance from the voter.

    d.  Sections 6.03, 6.05, and 6.07 deter voter assisters by requiring them to complete additional forms and/or provide additional information as a prerequisite to giving voter assistance.

677.    Because a much larger percentage of Hispanic and Latino voters require language assistance than non-Hispanic voters, Hispanic and Latino voters disproportionately bear the burden of the voter assistance restrictions. This disparity is significant. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2339 (2021) (noting that the size of the disparity is relevant to an assessment of a Section 2 claim).

678.    SB1's voter assistance restrictions interact with social and historical conditions to cause an inequality in the opportunities of minority voters to participate in the political process. *See Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

679.    Texas has a long history of official discrimination affecting the rights of Latinos to register, vote, and participate in the democratic process. *See Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (quoting S.Rep., at 28–29, U.S.Code Cong. & Admin. News 1982, pp. 206–207); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2340 (2021) (acknowledging relevance of Senate Factor One to analysis of challenges to time, place, and manner regulations).

680.    Latino and Black Texans continue to bear the effects of historical discrimination in education, employment, housing, and health, hindering the ability of these groups to participate effectively in the political process. *See Thornburg v. Gingles*, 478 U.S. 30, 37 (1986) (quoting S.Rep., at 28–29, U.S.Code Cong. & Admin. News 1982, pp. 206–207); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2340 (2021) (acknowledging relevance of Senate Factor Five to analysis of challenges to time, place, and manner regulations).

681.    As a result of this historical discrimination and its present-day effects, Latino and Black Texans are more likely to require assistance voting and more likely to be burdened by these restrictions.

682.    The mere fact that voting materials are offered primarily in English and that Spanish-speakers must rely on assistance is itself a vestige of the history of discrimination in Texas, where Spanish was once the predominant language.  The government devalued and even prohibited Spanish in official and legal settings, as well as in schools, and then used that policy to justify segregation of the schools and the neglect of Latino students. At least partially because of this

history, Latinos today are less likely to speak the language in which voting materials are written and more likely to have low literacy, including low English literacy.

683.    There is also a long history in Texas of state-sponsored violence and phony "investigations" by law enforcement aimed at deterring Latinos from participating in the political process through organization, protest, and voting. That history includes threats to prospective Latino voters that voting with low English literacy could get them arrested. That history contributes to the disparate burden that the threat of prosecution for improper assistance places on Latino voters and their prospective assisters.

684.    The frequency with which states imposed similar restrictions on voter assistance to those in SB1 in 1982 is irrelevant to the analysis of whether these restrictions violate Section 2 of the Voting Rights Act because Congress found there was a problem with states' approach to voter assistance in 1982 when it codified the right to voter assistance. *Cf. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2338-39 (2021) (finding the typical practices of states in 1982 generally to be a useful benchmark only because the Court doubted that Congress intended to "uproot" widespread practices when it amended Section 2 in 1982).

685.    SB1's restrictions on voter assistance and in-person canvassing do not have a long pedigree nor are they in widespread use in the United States. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2338-39 (2021).

686.    The accessibility of the entire system of voting in Texas—and the degree to which the state makes multiple methods of voting available—is irrelevant to the analysis of whether these restrictions violate Section 2 of the Voting Rights Act, because the availability of other methods of voting does not remedy or reduce the burden that restrictions on assistance place on voters who require assistance. In other words, for voters who require assistance, voting with assistance is not

just "one of the available options" among others. Texas cannot provide voters who require assistance with ways to cast their ballots without assistance. *Cf. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2339 (2021) (finding the accessibility of a state's entire system of voting to be relevant to understand the relative impact of a burden on voters who "choose one of the available options" for voting when others are available).

687.    The entire voting system in Texas is restrictive. It is the most restrictive voting system in the country.

688.    SB1's restrictions on assistance do not serve any of the State's purported interests. Stated differently, the State's purported interests do not support the restrictions in SB1. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2339-40 (2021).

689.    SB1's restrictions on assistance do not reduce the likelihood of fraud in elections.

690.    SB1's restrictions on assistance do not protect voters from undue influence. In fact, restricting voters' access to assistance from the person of their choice increases the likelihood that those voters will be subjected to intimidation and undue influence from poll workers and others. SB1's restrictions on voting undermine the State's interest in ensuring that every vote is cast freely.

691.    At best, any of the State's interests in imposing restrictions on assistance in SB1 are tenuous. *Thornburg v. Gingles*, 478 U.S. 30, 37 (1986) (quoting S.Rep., at 28–29, U.S.Code Cong. & Admin. News 1982, pp. 206–207).

692.    Based on the totality of circumstances, and because of SB1's voter assistance restrictions, the political processes leading to nomination or election in Texas are not equally open to participation by Latino and Black citizens. Latino and Black citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301.

693.    Based on the totality of the circumstances, the requirement in Sections 6.03 and 6.05 of SB1, codified at Tex. Elec. Code §§ 64.0322 and 86.010, respectively, that a person who assists a voter complete a form stating "the relationship to the voter of the person assisting the voter," and "whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee" results in a denial or abridgment of the right of citizens of the United States to vote on account of race or color, and therefore violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

694.    Based on the totality of the circumstances, the requirement in Section 6.04 of SB1, codified at Tex. Elec. Code § 64.034, that any person assisting a voter must take an oath "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance" results in a denial or abridgment of the right of citizens of the United States to vote on account of race or color, and therefore violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

695.    Based on the totality of the circumstances, the requirement in Section 6.04 of SB1, codified at Tex. Elec. Code § 64.034, that any person assisting a voter must take an oath "under penalty of perjury" that "I did not pressure…the voter into choosing me to provide assistance" results in a denial or abridgment of the right of citizens of the United States to vote on account of race or color, and therefore violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

2.    Based on the totality of the circumstances, the requirement in Section 6.04 of SB1, codified at Tex. Elec. Code § 64.034, that any person assisting a voter must take an oath "under penalty of perjury" that "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted" results in a denial or abridgment of the right of citizens of the United States to vote on account of race or color, and therefore violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

696.     Based on the totality of the circumstances, taken together, the requirements in Section 6.04 of SB1, codified at Tex. Elec. Code § 64.034, that any person assisting a voter must take an oath "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance," that "I did not pressure…the voter into choosing me to provide assistance," and that "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted," result in a denial or abridgment of the right of citizens of the United States to vote on account of race or color, and therefore violate Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

697.     Based on the totality of the circumstances, Section 6.06 of SB1, codified at Tex. Elec. Code § 86.0105, which makes it a crime to compensate, or to offer, solicit, receive, or accept compensation for voter assistance, and defines compensation to mean "an economic benefit as defined by Section 38.01, Penal Code," results in a denial or abridgment of the right of citizens of the United States to vote on account of race or color, and therefore violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

Dated: January 20, 2024

Respectfully Submitted,

/s/ *Nina Perales*
Nina Perales (TX Bar No. 24005046)
Julia R. Longoria (TX Bar No. 24070166)
Fátima L. Menéndez (TX Bar No. 24090260)
Kenneth Parreno (MA BBO No. 705747)
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Tel: (210) 224-5476; Fax: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org
kparreno@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Tel: (212) 859-8000; Fax: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com

**Attorneys for Plaintiffs**

**LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT, MEXICAN
AMERICAN BAR ASSOCIATION OF
TEXAS, TEXAS HISPANICS
ORGANIZED FOR POLITICAL
EDUCATION, JOLT ACTION,
WILLIAM C. VELASQUEZ INSTITUTE,
FIEL HOUSTON INC.**

*Admitted pro hac vice*

/s/ *Leah J. Tulin*
Leah J. Tulin*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW, Suite 1150
Washington, DC 20036
(202) 650-6397
tulinl@brennan.law.nyu.edu

Sean Morales-Doyle
Jasleen K. Singh*
Patrick A. Berry*
Robyn N. Sanders*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310; Fax: (212) 463-7308
sean.morales-doyle@nyu.edu
jasleen.singh@nyu.edu
patrick.berry@nyu.edu
rs8592@nyu.edu

Elizabeth Y. Ryan (TX Bar No. 24067758)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
liz.ryan@weil.com

**Attorneys for Plaintiffs**

**FRIENDSHIP-WEST BAPTIST
CHURCH, TEXAS IMPACT, JAMES
LEWIN**

*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 20h day of January 2024.

*/s/ Leah J. Tulin*

Leah J. Tulin