**IN THE UNITED STATES DISTRICT
COURT WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| STATE OF TEXAS, *et al.*, | § | Case No. 5:21-cv-00844-XR |
| | § | [Lead Case] |
| *Defendants.* | § | |
| | § | |
| HARRIS COUNTY REPUBLICAN PARTY, *et al.*, | § | |
| | § | |
| | § | |
| *Intervenor-Defendants.* | | |

## LUPE PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO STANDING

**I.    LUPE Plaintiffs Have Established Associational Standing.**

A. *The members of LUPE Organizational Plaintiffs would otherwise have standing to sue in their own right,*

1. Voter Assistance Restrictions

1. Plaintiffs challenge provisions of SB1 that restrict voter assistance (sections 6.03-6.06 and 7.04) under Sections 2 and 208 of the federal Voting Rights Act, and Title II of the Americans with Disabilities Act.

2. Plaintiffs' members have standing to bring these claims in their own right.

.

    a. Members are eligible for and vote with assistance

3. Many LUPE members are registered voters, including elderly and disabled voters.  Tr. 63:19-20, 63:24-64:1.  Many LUPE members who are registered voters use assistance to vote, including because of disability or age.  Tr. 65:8-13 (Chavez).

1

4. Many LUPE members who are registered voters and who are disabled or limited in literacy are elderly community members.  Tr. 64:4-6 (Chavez).  Approximately thirty percent of LUPE's members are over the age of sixty-five years old.  Tr. 63:16-18 (Chavez).

5. Many LUPE members who are registered voters are also limited English proficient, and many of those individuals are monolingual Spanish speakers.  Tr. 63:21-23 (Chavez).

6. Many LUPE members who are registered voters are limited in their literacy, including registered voters who are not literate in any language.  Tr. 64:24-65:6 (Chavez).

7. Many FIEL members who are registered voters have limited English proficiency and vote with assistance.  Tr. 2436:9-13 (Espinosa).  Further, there are FIEL members who are registered voters who are disabled and vote with assistance.  Tr. 2436:12-18 (Espinosa).

8. MABA Texas members include Latino registered voters, voters with limited proficiency in English, disabled voters, voters who vote by mail, voters who require assistance at the polls, voters who require assistance with mail ballots, voters who have relied on paid assistors for such assistance, and poll workers. Tr. 2542:21-2543:13; 2536:23-24 (Ortega).

     <u>b. Members have been unable to vote with their chosen assister because of SB1's challenged assistance provisions</u>

9. There are FIEL members who, before the enactment of SB1, voted in person with an assistor who voted without an assistor after the enactment of SB1.  Tr. 2445:23-2446:1 (Espinosa).  For example, one FIEL member, Tania Rodriguez, requested an assistor who was also a FIEL member because of her limited English proficiency, and voted with that assistor.  Tr. 2446:2-13 (Espinosa).  Specifically, Ms. Rodriguez received translation assistance when voting prior to the enactment of SB1.  Tr. 2446:15-18 (Espinosa).  However, after the enactment of SB1, Ms. Rodriguez was not able to vote with the assistor

of her choice, who was a FIEL member.  Tr. 2446:19-22 (Espinosa).  Although Ms. Rodriguez did vote after the enactment of SB1, she did so without an assistor, and the process was more difficult she was more anxious about interpreting what she read at the ballot box.  Tr. 2447:6-13 (Espinosa).

10. LUPE employee Cris Rocha took LUPE member Mr. Cabello to the polling place to vote sometime during 2022. Someone at the polling location told Mr. Cabello to have a seat because he is elderly while Ms. Rocha filled out the vote assister form. There were two other people in front of Ms. Rocha in the vote assister line. By the time she finished filling out the new required form and taking the expanded oath of assistance, Mr. Cabello was voting with another assister who was not the person he chose to assist him – Ms. Rocha. Mr. Cabello told the ladies working at the polling place that he wanted Ms. Rocha to assist him with voting. Mr. Cabello did not vote with the assister of his choice. Tr. 150:6-18; Tr. 151:3-14; Tr. 152:6-153:3; Tr. 153:4-17; Tr. 157:22-158:3 (Rocha).

11. LUPE employee Cris Rocha was assisting LUPE member Mr. Garcia to vote from the car with curbside voting. Someone told Ms. Rocha to go inside to fill out the vote assister form with her information and it took her a while to do that inside. When Ms. Rocha went back outside, Mr. Garcia was being assisted by a poll worker. Ms. Rocha asked if she was the one who was supposed to assist Mr. Garcia with voting and the poll worker said no that the poll worker could do it. Someone called a police officer over and then the police officer assisted Mr. Garcia to vote. Mr. Garcia did not vote with the assister of his choice. Ms. Rocha remembers the incident with Mr. Garcia occurred during early voting during the November 2022 election. She reported the incident with Mr. Garcia to the county and the

county has not told her anything about that incident report.Tr. 150:9-13; Tr. 150:19-151:2; Tr. 157:14-158:9 (Rocha).

12. Since SB1 passed, when a voter asks Cris Rocha for assistance she responds that the voter should find either a relative or a friend who can take them to vote and if the voter cannot find anyone, then to call LUPE. Although she is the assister of choice of the voters who ask for her help, Ms. Rocha will only be a voter assister if she is the last person the voter can use as an assister. Tr. 145:21-24; Tr. 148:22-149:3; Tr. 156:12-18 (Rocha). Prior to the passage of SB1, Cris Rocha did not tell voters who asked her for assistance to ask other people for assistance. Tr. 149:4-6 (Rocha).

13. After 2021, LUPE volunteer Maria Gomez has not personally helped anyone with registering to vote, the mail ballot process, or assistance at the polls. Maria Gomez has only told people when it is time to vote and about where to vote. LUPE Exh. 284 at 10: 11-14; 54:3-15. Since SB1 passed, Maria Gomez gives people that requested assistance to vote by mail a number to call and ask for assistance. Maria Gomez communicated to people that she previously helped vote that she is not trained anymore to be able to help them. LUPE Exh. 284 at 30:2-7; 15:25-16:8. When people ask Maria Gomez for help to vote, she tells them that there are people inside that can help them. LUPE Exh. 284 at 12:11-13:8.

14. After the enactment of SB1, however, LUPE staff ceased providing one-on-one assistance to voters, including LUPE members, who vote by mail.  Tr. 83:5-8 (Chavez), 87:3-13, 18-25 (Chavez).  Ms. Chavez Camacho testified that LUPE has asked its employees or other compensated staff to stop helping community members on with their ballot by mail in light of SB1.  Tr. 85:8-15 (Chavez).  As to the effect of SB1 on this change, Ms. Chavez Camacho testified, "Being able to assist voters under the provisions of the law at the

moment will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, so we have refrained from doing so." Tr. 83:9-12 (Chavez). After the enactment of SB1, when a LUPE member comes to the office seeking assistance with a mail ballot, LUPE staff inform that member that they cannot help and that the member should find help with another individual. Tr. 86:9-87:2 (Chavez).

15. Because LUPE no longer assists its members to complete mail ballots, LUPE has instead resorted to conducting group meetings in which it displays slides on the wall, and discusses in general terms how to complete a mail ballot. Tr. 83:14-84:3; Tr. 96:2-96:14; Tr. 3673:21-3674:14; Tr. 3700:13-3701:13 (Chavez). In these presentations, LUPE staff refrains from answering specific questions about voter's ballot. Tr. 3673:21-3674:14 (Chavez). These LUPE members require one-on-one assistance in filling out their mail ballots because they are elderly, vision-impaired and/or illiterate. Tr. 96:15-97:17 (Chavez).

16. Ms. Chavez Camacho testified that the new language introduced by Section 6.03 of SB1 has frightened LUPE members and staff and has made it more difficult for community members to have the assistor of choice help them at the polls. Tr. 80:21-81:1 (Chavez), 82:1-12 (Chavez).

17. Mr. Espinosa testified that although he assisted voters before SB1, including FIEL members, after SB1 those voters must now vote without him, even though he may be their assistor of choice. Tr. 2444:24-2445:7 (Espinosa). Since the enactment of SB1, Mr. Espinosa has not assisted voters at the polling place. Tr. 2439:6-7 (Espinosa).

18. As a result of their concerns about the assister oath, FIEL members are less likely to volunteer to assist other people—including FIEL members—at the polls.  Tr. 2444:10-14 (Espinosa), 2444:24-2445:7 (Espinosa). Because some FIEL members, including Mr. Espinosa and Ms. Gonzales, no longer volunteer to assist voters at the polls, there are now FIEL members who must vote without the assistance of FIEL members.  Tr. 2445:8-13 (Espinosa).

19. Ms. Ortega has previously assisted voters at the polling place but has not assisted anyone since SB1 was enacted. She has decided not to assist voters anymore because there is too much to misinterpret in the language of the oath and she would not want any of her actions to be viewed as running afoul of the oath. Tr. 2539:3-6, 2542:1-5 (Ortega).

20. SB1's assistance provisions negatively affect Ms. Ortega's community by eliminating their first choice assistors.  "That means there are fewer of us, …that may be able to assist, and even if a person wants us to, and as attorneys we do have, we have clients, we have neighbors, we have co-workers, we have family members that trust us, and even if they - we would be the assistor of their choice, we still way not feel comfortable doing that."  Tr. 2541:12-25 (Ortega).

c. Members include persons who are Latino

21. The LUPE membership that lives in colonias tends to be predominantly Mexican or Mexican American, low income.  Many of the families include adults who did not finish grade school.  Many other adults did not finish high school. Tr. 67:22-68:18 (Chavez).

22. Texas HOPE members consist of approximately 50 community leaders from around Texas that are leaders in other organizations. The members are registered voters. The mission of Texas HOPE focuses on the Hispanic community. The "HOPE" in Texas HOPE stands for

Hispanics Organized for Political Education. Tr. 2475:23-2476:14; Tr. 2479:8-9; Tr. 2475:20-22; Tr. 2475:12-13 (Cardenas).

23. MABA Texas is a membership organization of Latino lawyers. MABA Texas has approximately 500 members and the members include Latino registered voters. Tr. 2533:20-2534:8; Tr. 2534:11-12; Tr. 2542:21-22 (Ortega). MABA Texas's activities are to serve as a network and communication outlet for local attorneys that are MABA Texas members on issues. MABA Texas shares information through the members that is important to the Latino community. MABA Texas encourages members to help Get Out the Vote in local communities and to encourage and educate voters. MABA Texas is a non-partisan organization and encourages people to exercise their rights. Tr. 2535:11-20 (Ortega).

### 2. Voter Identification for Vote by Mail

24. Plaintiffs challenge provisions of SB1 that impose onerous new identification requirements for mail ballots (sections 5.07 and 5.13) as imposing an undue burden on the right to vote

25. Plaintiffs' members have standing to bring these claims in their own right.

26. Juanita Valdez-Cox voted by mail for the first time in 2022. Tr. 135:18-135:24 (Valdez-Cox).  Although Ms. Valdez-Cox successfully completed the application for ballot by mail and received a mail ballot, when she received her mail ballot she found it hard to understand and set it aside for several days. Tr. 136:2-136:16. Eventually Ms. Valdez-Cox completed her mail ballot after discussing it with her husband. Tr. 136:17-136:22 (Valdez-Cox).  However, because she could not recall if she had written her identification number under the flap of the carrier envelope, she did not mail the ballot, and instead

kept it with her. Tr. 136:23-137:13 (Valdez-Cox). She took the mail ballot on two separate occasions to the Hidalgo County Elections Office, which refused to accept the ballot. Tr. 137:14-25; Tr. 138:1-17 (Valdez-Cox). Ms. Valdez-Cox then took her mail ballot to a polling place in Pharr where she asked questions of an election worker before finally surrendering her ballot. Tr. 138:18-139:8 (Valdez-Cox).  Ms. Valdez-Cox was worried that her ballot would not be counted and told the election worker "Ma'am, I hope that my vote counts."  Tr. 139:9-139:19 (Valdez-Cox).

27. Other members of LUPE experienced confusion and needed help understanding how to satisfy the new mail ballot ID provisions.  Ms. Chavez Camacho testified that, "One of the challenges that we have is that oftentimes folks become confused as to which is the number that they're supposed to put on the application."  Tr. 3673:13-15 (Chavez).

28. During the March 2022 primary election, there was confusion among some LUPE members who voted by mail about which number the members needed to put inside of the flap of the carrier envelope.  Tr. 95:16-96:1 (Chavez).

3.  Restriction on Voter Outreach

29. Plaintiffs challenge a provision of SB1 (7.04) that restricts political speech in violation of the First Amendment Free Speech guarantees

30. Plaintiffs' members have standing to bring these claims in their own right.

31. LUPE paid staff and paid canvassers advocate to voters on ballot issues when knocking on doors, out in the neighborhoods, at house meetings, at LUPE events, at the union hall, at tabling events, and in the LUPE offices because LUPE wants to make sure that everybody is educated about the ballot measure and understands the position that LUPE advocates for that measure.  Tr. 89:7-89:18 (Chavez). As LUPE organizers canvass

neighborhoods to urge support for ballot measures, mail ballot voters invite LUPE organizers into their homes and then while the organizer is advocating on a measure, the voters produce their mail ballots and ask the organizer for assistance. Tr. 71:1-72:15; Tr. 75:11-75:17; Tr. 119:20-120:18 (Chavez). Because this has happened in the past, LUPE expects in the future that its organizers will find themselves advocating on ballot measures in the presence of mail ballots. Tr. 119:20-120:18 (Chavez). LUPE organizers who are canvassing door to door will stop advocating on a ballot measure upon learning that they are in the presence of a mail ballot. This prevents LUPE from speaking on the ballot measure and hinders LUPE's ability to secure resources for South Texas on the issues LUPE supports.  Tr. 3684:13-3685:4 (Chavez).

32. MABA Texas members routinely encourage support for a candidate or measure but they are now concerned that a member may inadvertently be in the presence of a mail ballot without knowing. Tr. 2542:6-8 (Ortega).  Members are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while performing these activities. Tr. 2542:6-20 (Ortega).  MABA Texas has difficulty recruiting members to table events in support of candidates because of SB1 and because members fear that they might inadvertently commit a crime.  Tr. 2543:14-2544:23 (Ortega).

### 4.  Criminalization of Poll Workers

33. Plaintiffs challenge provisions of SB1 that create new offenses for poll workers (4.09 and 8.01) as void for vagueness under the Fourteenth Amendment.

34. Plaintiffs' members have standing to bring these claims in their own right.

35. MABA Texas has members who are poll workers and who are now reluctant to act as poll workers since the enactment of SB1. Tr. 2536:21-2537:9; 2545:25-2546:4 (Ortega).

36. Ms. Ponce, a MABA Texas member and attorney who lives in Austin, is reluctant to work as a poll worker because of Section 4.09 of SB1. Tr. 2547:1-8; 2547:25-2548:6 (Ortega). Ms. Ponce served as a poll worker two or three times prior to SB1. Tr. 2547: 9-11 (Ortega). Ms. Ponce is not sure what some of the phrases in Section 4.09 mean or could be interpreted to mean, and she does not want to subject herself to that provision. Tr. 2548:7-18 (Ortega). Ms. Ponce has only served once as a poll worker since SB1 was enacted. Tr. 2548:19-22. When she served as a poll worker after SB1, Ms. Ponce had difficulty understanding the training materials. Tr. 2547:12-18 (Ortega).

37. FIEL members have expressed concerns about 4.09 of SB1. Tr. 2546:12-15 (Espinosa). FIEL members are concerned about the things that could potentially go wrong. Tr. 2546:12-20 (Espinosa). These concerns negatively affect the likelihood that members will volunteer to be poll workers. It has greatly decreased the likelihood that people will volunteer to work as a poll worker. Tr. 2546:21-2547:1 (Espinosa). Before SB1, FIEL encouraged, recruited, and trained members to work as poll workers. Tr.2456:12-2457:14 (Espinosa). Mr. Espinosa testified that Section 4.09 of SB1 has hindered FIEL's efforts to recruit and train members to work as poll workers. Since SB1, there has been a lack of people interested in working as poll workers. Tr. 2547:15-20 (Espinosa). Mr. Espinosa testified that members expressed concerns about 4.09's procedures being a lot more restrictive. Tr. 2547:21-24 (Espinosa).

B. *The interests at stake are germane to the purpose of LUPE Organizational Plaintiffs.*

38. LUPE is a membership-based organization.  Tr. 58:7-12 (Chavez).  LUPE stands for La Union Del Pueblo Entero, which in English means a union of entire community.  Tr. 58:4-6 (Chavez).  LUPE has approximately 8,000 members.  Tr. 63:14-15 (Chavez).

39. LUPE primarily serves the region of the Rio Grande Valley, primarily in the four-county area of Hidalgo County, Cameron County, Starr County, and Willacy County.  Tr. 58:13-16 (Chavez).

40. LUPE employs an organizing model in which its employees meet with members and other community members in their homes.  LUPE organizes primarily in colonias, unincorporated community neighborhoods that usually have substandard housing and a lack of infrastructure such as drainage and street lighting.  LUPE focuses its organizing on 50-60 colonias at a time.  Tr. 58:21-59:21 (Chavez).

41. LUPE organizes its members and other colonia residents on issues that affect low-income neighborhoods, including drainage, lighting, paved roads, safety, emergency services, trash pickup, among others.  In the past few years LUPE's primary organizing focus has been civic engagement and educating voters about their right to vote. Tr. 60:10-61:2 (Chavez).

42. LUPE has multiple primary goals as an organization.  One primary goal is being able to build [electoral] power in the Rio Grande Valley.  Tr. 62:6-14 (Chavez).  LUPE also seeks to make sure that community members understand their own political powers so that they are better served by their government. Tr. 62:15-17 (Chavez).  Another primary goal is for LUPE to help legal permanent residents in the Rio Grande Valley area go through immigration services to become U.S. citizens, and to eventually walk those individuals through to registering to vote, helping them to turn out to vote, and aiding them in casting their vote.  Tr. 62:18-25 (Chavez).  In addition, LUPE has a primary goal of providing

leadership development to community membership, so that they may be able to speak in public and learn how government works, among other things.  Tr. 63:2-10 (Chavez).

43. Dues for LUPE membership are $40 a year for an individual, $60 a year for couples, and $20 a year for minors or elderly community members.  Tr. 65:14-18 (Chavez).  LUPE has an executive director.  Tr. 57:18-22 (Chavez).  LUPE's membership sets an agenda for the organization every two years based on the issues that matter to the members.  Tr. 3688:1-7.  (Chavez)

44. FIEL is an immigrant-led civil rights organization in Harris County.  Tr. 2430:5-8 (Espinosa).  "FIEL" is an acronym, in Spanish, for "Familias Inmigrantes Estudiantes Luchar," which in English means "Immigrant Families and Students in the Fight."   Tr. 2430:12-19 (Espinosa).  FIEL is located in southwest Houston, Texas.  Tr. 2430:20-22 (Espinosa).

45. FIEL is a membership organization.  Tr. 2431:21-22 (Espinosa).  FIEL has approximately 16,000 members in the Greater Houston area.  Tr. 2431:23-25 (Espinosa).  These members include community members who want to be involved with and who needs the services of FIEL.  Tr. 2432:1-6 (Espinosa).  A large part of FIEL's membership includes immigrants, including immigrants who are newly arrived and immigrants who have been in the United States for a long time.  Tr. 2432:17-20 (Espinosa).

46. FIEL members pay annual membership dues.  Tr. 2432:1-3 (Espinosa).  Individual membership dues for FIEL are $60 a year.  Tr. 2433:7-15 (Espinosa).  Membership dues for a couple are $120 a year.  Tr. 2433:7-15 (Espinosa).  Membership dues for children are $20 a year per child.  Tr. 2433:7-15 (Espinosa).

47. FIEL employs eight paid staffers.  Tr. 2433:18-22 (Espinosa).  FIEL's paid staff includes an executive director, Tr. 2430:1-4 (Espinosa), 2434:18-20 (Espinosa), whose responsibilities include overseeing day-to-day operations, managing staff, being out in the community to do presentations, making sure that FIEL's programs are running the way they are intended to, Tr. 2431:6-20 (Espinosa).  FIEL employs other paid staffers, including paralegals, individuals with management roles, and two community organizers who go out and talk to the community to educate the community members on their rights and try to empower them, Tr. 2434:9-17 (Espinosa).

48. FIEL has a board that oversees the direction of the organization's mission and that ensures that the organization is fulfilling its mission.  Tr. 2433:18-22 (Espinosa), 2434:1-4 (Espinosa).  FIEL's board consists of five individuals, who are FIEL members elected to the board by the FIEL membership.  Tr. 2433:24-2434:8 (Espinosa).  Board members are elected on staggered terms.  Tr. 2434:5-8 (Espinosa).

49. FIEL's mission is to organize and empower people, and to make sure that people know their rights and that they exercise their rights in the community.  Tr. 2434:21-2435:1 (Espinosa).  As to its organizational mission, FIEL focuses on work related to access to higher education, community organizing, and civic engagement.  Tr. 2435:2-5 (Espinosa).

50. FIEL's mission also includes voter outreach and civic engagement. Tr. 2435:12-14 (Espinosa).

51. Prior to the enactment of SB1, FIEL furthered its mission of voter outreach and civic engagement by discussing with members how to vote and the importance of voting by visiting members' homes, talking with members in FIEL's office, or engaging with FIEL's

members by phone, social media, or other electronic channels. Tr. 2437-5-2438:4 (Espinosa).

52. Prior to the enactment of SB1, FIEL furthered its mission of voter outreach and civic engagement by assisting its members in voting at the poll. Tr. 2438:9-11 (Espinosa); Tr. 2444:24-2445:3 (Espinosa). FIEL would usually partner up with another organization, take people to vote, and provide translation and other assistance at the poll. Tr. 2438:12-16 (Espinosa). That assistance included companionship for voters who felt uneasy about entering the voting space by themselves. Tr. 2439:8-12 (Espinosa). The assistance also included support for voters who had limited English proficiency, and FIEL would go with these voters to the poll and provide translation services or guide them through the voting process. Tr. 2439:8-20 (Espinosa).

53. MABA Texas is a membership organization that serves as a network for Latino lawyers throughout the state. MABA Texas encourages its attorney members to provide pro bono services in their local communities, including helping with voting and any other issues that may be important locally or statewide. MABA Texas's members are registered voters throughout the State of Texas. Tr. 2533:20-2534:10; 2536:14-20 (Ortega).

54. MABA Texas members pay dues. Tr. 2534:13-14 (Ortega). MABA Texas's leadership consists of a statewide board of directors that are elected by the general membership at one of the organization's statewide meetings. Tr. 2534:17-24 (Ortega).

55. MABA Texas serves as a network and communication outlet for local MABA attorneys on issues. MABA Texas encourages people to vote and its Get Out the Vote activities include tabling events at local community events and candidate forums. It also includes voter education that consists of voters' rights, polling locations and hours, and information on

resources available to get people to and from polling locations. Tr. 2535:11-2536:5 (Ortega).

## II.    LUPE Organizational Plaintiffs Have Established Organizational Standing

*A. SB1 makes it more difficult or costly for LUPE Organizational Plaintiffs to conduct their operations.*

56. SB1 has made it more difficult for LUPE to conduct its operations.  Tr. 3669:23-25 (Chavez).

57. LUPE conducts voter engagement activities, including voter education, voter registration, and get-out-the-vote efforts.  Tr. 70:5-8 (Chavez).

58. LUPE's voter education efforts occur year round, both during election time and not during election time.  Tr. 71:4-6 (Chavez).  This work includes talking to community members about when and where to register to vote, who is eligible to register to vote, and what are the relevant voting-related deadlines.  Tr. 71:7-12 (Chavez).  This work also includes discussing upcoming races and ballot measures, as well as asking community members to support or oppose ballot measures that LUPE may be working on.  Tr. 71:13-18 (Chavez).

59. LUPE uses the house [meeting] model in conducting its voter education efforts, meaning that its staff organizers hosts voter education meetings in the neighborhoods of its members.  Tr. 71:22-72:4 (Chavez).  Each organizer works on five to ten different neighborhoods and builds relationships with those community members.  Tr. 73:9-74:2 (Chavez).

60. In addition, LUPE hosts voter education meetings with community members in its meeting hall, during which LUPE answers voting-related questions that members ask.  Tr. 72:5-12 (Chavez).  In its meeting hall, LUPE can host approximately 100 to 200 people.  Tr. 72:5-8 (Chavez).

61. LUPE's get-out-the-vote efforts are nonpartisan, and through those efforts, LUPE aims to educate community members about the timing of the election season and to advocate for community members to go and cast their vote on issues that most to the community that LUPE serves.  Tr. 74:21-75:7 (Chavez), 75:8-10 (Chavez).  These get-out-the-vote efforts typically begin somewhere between six and twelve weeks before an election.  Tr. 74:3-9 (Chavez).

62. LUPE's get-out-the-vote efforts entail identifying voters in the neighborhoods that LUPE is working in; calling or texting voters; and running advertisements on the radio on billboards in the neighborhoods where voters live.  Tr. 74:10-20 (Chavez).  These efforts also occur in LUPE's offices, including answer voting-related questions members may have, organizing voter caravans, and assisting individuals with a mail ballot.  Tr. 75:18-76:17 (Chavez).

63. Through these get-out-the-vote efforts, LUPE also identifies community members who may need assistance with voting, including members who are elderly, who do not speak English, or who are disabled.  Tr. 76:18-23 (Chavez); 77:20-24 (Chavez).  When a LUPE member who is a registered voter requests assistance with voting, LUPE works to make sure somebody is available to assist the member with voting if the member so chooses.  Tr. 76:24-77:4 (Chavez).

64. LUPE receives requests from community members, including by phone or in the neighborhoods of those community members, for assistance, and LUPE staff will either pick up those members or meet them in LUPE's offices and then assist them with voting.  Tr. 77:20-78:2 (Chavez).  LUPE's assistance efforts include providing translation services at the polls.  Tr. 78:5-10 (Chavez).

65. LUPE trains its staff to provide assistance in accordance with any election-related statutes, and to make sure that staff are exercising the will of the voter in whatever choice the voter wants to make.  Tr. 78:11-15 (Chavez).

66. The new oath of assistance has resulted in longer lines at the polling place.  Tr. 81:12-17 (Chavez).  As a result of SB1, LUPE staff who are assisting voters at those voters' request must go to a separate line to go through the oath and must fill out all of the information on the oath of assistance, resulting in delays for LUPE staff in assisting voters.  Tr. 81:18-25 (Chavez).

67. LUPE's civic engagement staff, who were hired after the enactment of SB1, helps voters request applications for ballot by mail.  Tr. 98:17-22 (Chavez), 3673:4-6 (Chavez).

68. LUPE staff must now spend more time than they did prior to SB1 assisting voters to complete applications for ballot by mail.  Tr. 3673:7-20 (Chavez).  Ms. Chavez Camacho testified that, "One of the challenges that we have is that oftentimes folks become confused as to which is the number that they're supposed to put on the application."  Tr. 3673:13-15 (Chavez).

69. During the March 2022 primary election, there was confusion among some LUPE members who voted by mail about which number the members needed to put inside of the flap of the carrier envelope.  Tr. 95:16-96:1 (Chavez).

70. Following the enactment of SB1, LUPE holds meetings for community members to educate those individuals about the ID number requirement for ballot by mail.  Tr. 96:2-14 (Chavez), 97:1-3 (Chavez), 3673:23-3674:6 (Chavez).  During those meetings, LUPE staff projects a blank mail ballot on a screen for community members to view, and go over the areas that are supposed to be filled out.  Tr. 3673:23-3674:6 (Chavez).  Prior to SB1, LUPE

did not routinely hold this meeting for members.  Tr. 3674:12-14 (Chavez).  The civic

engagement staff, which LUPE added after the enactment of SB1, performs the work of

talking to voters about the areas of the mail ballot that must be filled out.  Tr. 3674:19-21

(Chavez).

71. Ms. Chavez Camacho testified that "part of the reason we were doing that is because the

statutes of SB1 prohibits us from helping or aiding any community member from filling

out a ballot by mail, so we resorted to doing public gatherings where we were showing a

sample ballot by mail instead of walking community members as to how they were

supposed to fill out an application."  Tr. 96:7-14 (Chavez).

72. The number of questions related to the requirements for mail ballots by LUPE members

has elongated meeting times.  Tr. 3674:7-14 (Chavez).

73. The change from individual one-on-one assistance with the mail ballot to the projection of

the ballot on the wall reduced the quality of service LUPE delivers to its members.  Tr.

3675:14-23 (Chavez).  For example, Ms. Chavez Camacho testified that, "Whenever we

don't have the ability to actually sit down with the voter and help them fill out the ballot,

it becomes an issue." Tr. 3675:18-23 (Chavez).  In addition, Ms. Chavez Camacho testified

that this change hindered LUPE's ability to help community members with limited literacy

or vision impairment, and demoralized LUPE staff and community members.  Tr 3675:18-

3676:10 (Chavez).

74. The change from individual one-on-one assistance with the mail ballot to the projection of

the ballot on the wall affected LUPE's routine activities.  Tr. 3676:11-25 (Chavez).  For

example, since the enactment of SB1, LUPE has turned away members who came to the

office for assistance with voting. Tr. 3677:1-8 (Chavez).  In addition, whereas before SB1,

LUPE staff would assist a voter who sought one-on-one assistance with their mail ballot, after the enactment of SB1, LUPE staff—including the new civic engagement staff—do not help a voter seeking that form of assistance.  Tr. 3677:1-20 (Chavez).

75. These changes in LUPE's practices have negatively affected LUPE's ability to carry out its mission of voter outreach and civic engagement.  Tr. 3677:21-3678:13 (Chavez).

76. To further its voter outreach and civic engagement mission, FIEL's work includes holding community forums and talking to individuals one-on-one.  Tr. 2435:15-22 (Espinosa). FIEL not only hosts specific forums dealing with specific topics, but also speaks with individuals who come to their office or at those individuals' homes.  Tr. 2435:23-2436:5 (Espinosa).

77. Prior to the enactment of SB1, FIEL furthered its mission of voter outreach and civic engagement by providing voter outreach forums and voter education forums for members. Tr. 2437:7-15 (Espinosa).  During these forums, FIEL would provide small civics lessons, including on how voting works, what members needed to do to vote, and how members' votes would be counted.  Tr. 2437:14-20 (Espinosa).  FIEL took time during these forums to teach first-generation or first-time voters the importance of their vote.  Tr. 2437:20-22 (Espinosa).

78. The enactment of SB1 made it more difficult to conduct voter outreach forums and voter education forums with FIEL members.  Tr. 2447:14-20 (Espinosa).  As Mr. Espinosa testified, "[i]n all the time that I have been executive director of FIEL, we have never seen what we perceive to be such an intrusive or complex law or change" with the enactment of SB1.  Tr. 2447:21-2448:1 (Espinosa).

79. As a result of SB1, the time FIEL spent having conversations with FIEL members during these forums doubled or even tripled compared to the length of those conversations prior to the enactment of SB1.  Tr. 2447:24-2448:4 (Espinosa).  For example, after FIEL members explained portions of SB1, there was a lot of uncertainty among FIEL members, and FIEL members had more questions about what could or could not be done under SB1 than they routinely would have before an election.  Tr. 2448:5-13 (Espinosa).  Those questions by FIEL members included questions about the oath of assistance.  Tr. 2448:5-13 (Espinosa).  As a result of these questions regarding SB1, the forums went "a lot slower," and the questions "increased the time" that FIEL had "to do Q and A," thereby extending the length of these forums.  Tr. 2448:19-23 (Espinosa).

80. The enactment of SB1 hindered FIEL's ability to achieve its organizational mission.  Tr. 2448:24-2449:3 (Espinosa).  As a result of SB1, FIEL had to invest more time and resources into voter outreach and education forums than it routinely did.  Tr. 2449:4-9 (Espinosa).

81. FIEL was unable to reach out to as many people through its voter outreach and education efforts as it had in the past because it had to spend more time at forums with people who needed extra guidance and explanations regarding SB1.  Tr. 2449:4-9 (Espinosa).

82. FIEL does not anticipate organizing in-person voter assistance efforts for the 2024 general election because of the reduction of individuals volunteering to assist following the enactment of SB1.  Tr. 2452:24-2453:5 (Espinosa).

83. SB1 thus frustrated FIEL's organizational mission.  As Mr. Espinosa testified, "if we are able to assist less people," "then we know that less people may be more inclined to participate."  Tr. 2452:20-23 (Espinosa).

84. Prior to the enactment of SB1, FIEL would conduct a caravan to the polls for its members. Tr. 2449:15-18 (Espinosa).  After the enactment of SB1, FIEL no longer does so.  Tr. 2449:23-2450:1 (Espinosa).  FIEL no longer conducts these caravans because FIEL's members feel uneasy about running afoul of requirements put in place by SB1, including the oath of assistance and the assistor form. Tr. 2450:3-20 (Espinosa).  And for those same reasons, FIEL does not anticipate organizing any caravan efforts for the 2024 general election. Tr. 2451:6-13 (Espinosa).

85. SB1's effect on FIEL's caravan efforts undermines FIEL's organizational mission.  Tr. 2450:21-25 (Espinosa).  Without these caravans to the polls, FIEL is unable to engage as many voters and help them actively participate in the voting process.   Tr. 2451:1-5 (Espinosa).

86. Prior to the enactment of SB1, FIEL encouraged eligible members to work as poll workers, Tr. 2457:2-8 (Espinosa), including by recruiting members to volunteer as poll workers and training them to be poll workers, Tr. 2457:9-14 (Espinosa).  SB1 has hindered those efforts by FIEL, including because of a lack of people interested in volunteering to be poll workers because of Section 4.09.  Tr. 2457:15-24 (Espinosa).

87. LUPE delayed its canvassing efforts for the 2023 November elections because of training related to SB1 requirements, compared to when LUPE would ordinarily begin its canvassing efforts.  Tr. 3685:12-25 (Chavez).

88. Canvassing is important to LUPE's work because it ensures that community members in the colonias have the information they need on issues that affect them.  Tr. 3686:1-20 (Chavez).   Ms. Chavez Camacho stated that, when LUPE does not canvass, LUPE

members and community members do not get that information, and voter turnout will be reduced.  Tr. 3686:21-3687:2 (Chavez).

89. The primary goals of Texas HOPE are civic engagement, civic education, and outreach in the Hispanic community. Tr. 2475:16-22. (Cardenas)

90. Texas HOPE's purpose in gathering community leaders is to come up with a list of best practices that the community leaders can disseminate to their organizations and the community with the goal of more civic engagement. Texas HOPE wants more people to become voter registrars and to carry out Get Out the Vote strategies. Tr. 2476:15-2477:16 (Cardenas).

91. In the wake of SB1, the stream of volunteers for Texas HOPE who are willing to assist voters at the polls has dwindled significantly.  Tr. 2488:4-11 (Cardenas).  As explained by Mr. Cardenas, "Well, the response is that because of the vagueness of the bill, even when we attempt to give an interpretation, or to explain to people that it doesn't deal with a specific -- or it doesn't make something specifically criminal, they have a hard time I guess believing what we're saying. You know, there's always that shadow of a doubt there because of the vagueness of the language in the bill and also because of the perjury part of it." Tr. 2488:4-23 (Cardenas).  When fewer people are willing to volunteer with Texas HOPE to assist voters, this reduces the number of people who participate in the elections process and undermines the goals of Texas HOPE.  Tr. 2488:24-2489:3 (Cardenas).

*B. SB1 causes LUPE Organizational Plaintiffs to divert resources.*

92. Ms. Chavez Camacho testified that LUPE must now help community members apply for ballot by mail as early as January in a given election year, unlike before the enactment of SB1, when LUPE would wait until election season.  Tr. 98:23-99:3 (Chavez).

93. LUPE has made significant changes to training staff and paid canvassers as a result of SB1. Tr. 3678:14-16 (Chavez), 3679:7, 20-22 (Chavez).  For example, LUPE has to provide staff and paid canvassers training on how not to directly help a voter fill out an application for ballot by mail.  Tr. 3679:7-15 (Chavez).  Regarding these changes to training, Ms. Chavez Camacho testified, "It takes more time to prepare for the trainings.  It takes more time – it has taken a lot more time to make sure that the folks that are supervising canvassers, that they're 100-percent certain of the provisions of SB1 that we need to be in compliance with."  Tr. 3679:22-3680:1 (Chavez), 3680:2-6 (Chavez).

94. LUPE also has changed its training as a result of SB1's requirements regarding the oath of assistance, including on asking voters to represent that they are eligible for assistance.  Tr. 3682:9-3683:11 (Chavez). This training regarding the oath of assistance was not part of LUPE's routine activities prior to the enactment of SB1.  Tr. 3683:12-18 (Chavez).

95. The changes to LUPE's training have significantly hindered LUPE's ability to get out the vote in a timely manner.  Tr. 3683:12-20 (Chavez).

96. LUPE has also been financially affected by changes made by SB1.  Tr. 98:8-10 (Chavez). Prior to the enactment of SB1, LUPE would spend approximately $50,000 on get-out-the-vote efforts.  Tr. 98:12-14 (Chavez).

97. After the enactment of SB1, LUPE has spent approximately $100,000 to $150,000 on get-out-the-vote efforts, depending on the campaign.  Tr. 98:14-16 (Chavez).  Part of that increase is a result of hiring additional LUPE staff, including hiring new civic engagement organizers and an in employee who runs LUPE's civic engagement teams.  Tr. 98:17-22 (Chavez).

98. After the enactment of SB1, in January 2023, LUPE added a specific department to be available to voters at all times and to provide any voter education that is needed, including on requirements around registering to vote, applying for a ballot by mail, or filling out a mail ballot.  Tr. 98:17-22 (Chavez), 3670:22-23 (Chavez), 3671:3-15 (Chavez), 3671:16-24 (Chavez).  LUPE created this department to ensure compliance with SB1's requirements.  Tr. 3671:22-24 (Chavez).

99. LUPE hired a director for this new department.  Tr. 3670:24-3671:2 (Chavez).  In September 2022, LUPE hired a civic engagement organizer for this department.  Tr. 3670:7-14 (Chavez).  In January 2023, LUPE hired a second civic engagement organizer for this department.  Tr. 3670:17-20 (Chavez).

100.    Because of SB1, LUPE has shifted away organizational resources from other LUPE priority areas.  Tr. 3687:3-7 (Chavez).  For example, Ms. Chavez Camacho testified that she has to spend time that she otherwise would not have to on working closely with the civic engagement staff regarding SB1 compliance, and doing so takes time away from other work that LUPE does.  Tr. 3687:8-13 (Chavez).  In addition, Ms. Chavez Camacho testified that, unlike prior to the enactment of SB1, she now must spend time on fundraising for the civic engagement department.  Tr. 3687:3-8 (Chavez).  Further, because LUPE now devotes a greater percentage of its time and attention on civic engagement work because of SB1, LUPE's work in its other advocacy areas, including advancing broadband infrastructure for colonia residents, has been hindered.  Tr. 3687:14-17 (Chavez).

101.    Ms. Chavez Camacho testified that "it is important that every other department gets equal attention and support from" her.  Tr. 3687:14-22 (Chavez).  However, because of LUPE's efforts in response to SB1, Ms. Chavez Camacho has not been able to do so.  Tr.

3687:22-23 (Chavez). For example, Ms. Chavez Camacho has had to lead SB1 compliance training for LUPE's civic engagement staff that she would not have to if SB1 did not exist. Tr. 3688:8-13 (Chavez).

102.     Because of SB1, FIEL has had to take resources away from other programs to fulfill needs in response to SB1. Tr. 2458:2-11 (Espinosa).

103.     For example, because of SB1, FIEL has had to divert resources away from its higher education program, in which it helps students apply for college or apply for financial aid for college and universities. Tr. 2458:11-15 (Espinosa). Prior to the enactment of SB1, each school year, FIEL would hold four meetings leading up to the financial aid season: one in October, one in November, one in December, and one in January. Tr. 2458:16-23 (Espinosa). The first meeting provided an introduction on how students could get access to financial aid; the second meeting served as an introduction to the parents, as many of the students were first-generation college applicants; the third meeting involved gathering documents; and the fourth meeting was aimed at filling out financial aid forms. Tr. 2458:24-2459:12 (Espinosa).

104.     This structure—that is, four meetings each application cycle—was intentional and important. As Mr. Espinosa testified, "our community requires more assistance when it comes to understanding the systems and it's almost like having to explain to them step by step on what needs to be done to make them feel comfortable and help them understand these systems, which can be very complex." Tr. 2459:13-19 (Espinosa), 2472:10-24 (Espinosa).

105.     Prior to SB1, FIEL would serve about 4,000 students each year with this program. Tr. 2459:20-22 (Espinosa).

106.     After the enactment of SB1, FIEL reduced the number of forums each application cycle from four to two, Tr. 2459:23-2460:10 (Espinosa), and the number of students FIEL served through this program decreased by about 1500 students, Tr. 2460:11-15 (Espinosa).

107.     FIEL had to reduce the number of forums for its higher education efforts because of the time needed for its voter outreach and civic engagement forums in response to SB1. Tr. 2459:23-2460:4 (Espinosa), 2460:16-18 (Espinosa). More specifically, FIEL redirected the time and resources from two of the higher education forums towards two additional forums that addressed voting requirements. Tr. 2459:23-2460:4 (Espinosa), 2460:16-18 (Espinosa).

108.     The reduction in the number of students assisted undermined FIEL's organization mission, as the organization is not able to assist and empower as many people. Tr. 2460:19-23 (Espinosa), 2461:9-13 (Espinosa).

109.     FIEL anticipates keeping only two financial aid forums going forward, in light of limited funding and the need to spend more time explaining requirements around voting in light of SB1. Tr. 2460:24-2461:8 (Espinosa).

110.     Prior to the enactment of SB1, FIEL created resources that were handed out to voters, like flyers, to address some requirements around voting. Tr. 2438:5-8 (Espinosa), 2453:6-14 (Espinosa). After the enactment of SB1, FIEL continued to make those types of flyers. Tr. 2453:6-10 (Espinosa).

111.     FIEL had to double or even triple the amount of information that was printed on these flyers after the enactment of SB1, including to address the requirements regarding the oath of assistance and assistor form and recurring questions members had regarding SB1's requirements. Tr. 2453:11-21 (Espinosa), 2454:13-2455:1 (Espinosa).

112.    As a result, the enactment of SB1, these flyers doubled or tripled in terms of number of pages.  Tr. 2453:22-2454:6 (Espinosa).  Because FIEL had to print out more pages for each flyer following the enactment of SB1, FIEL increased its costs of printing flyers, doubling or tripling the cost of printing flyers.  Tr. 2454:7-12 (Espinosa).

113.    Because of these increased costs in response to SB1, FIEL was unable to dedicate as many resources—including money—to other programs run by the organization.  Tr. 2455:2-7 (Espinosa).  In addition, FIEL had to find different means to provide documents from other departments, like FIEL's legal department, to FIEL's members.  Tr. 2461:14-23 (Espinosa).  Some of these departments ceased providing hard copies of documents to FIEL's members.  Tr. 2462:5-7 (Espinosa).

114.    Eliminating the provision of hard copies of documents to FIEL members hindered the organization's ability to achieve its mission.  For example, many FIEL members have limited English proficiency and have a hard time accessing a computer or the internet, and they therefore had difficulty accessing information that was available only in digital format.  Tr. 2462:16-2463:14 (Espinosa).

*C.  LUPE Organizational Plaintiffs have established organizational standing regarding their chilled speech claims.*

115.    LUPE staff conducts outreach to voters to urge support for a ballot measure in a nonpartisan manner.  Tr. 88:2-7 (Chavez).  For example, around 2011 or 2012, LUPE reached out to voters to support a drainage bond in the colonias.  Tr. 88:8-12 (Chavez).

116.    LUPE staff and canvassers, who are paid, will advocate for its support of any ballot measures in a variety of settings, including when meeting with community members in neighborhoods, at LUPE events, at union halls, and in the LUPE offices.  Tr. 89:7-18 (Chavez).  Ms. Chavez Camacho testified that some LUPE members will bring their mail ballots to big

meetings where LUPE staff urges support for a ballot measure.  Tr. 90:7-11 (Chavez), 91:5-17 (Chavez).

117.    Ms. Chavez Camacho also testified that "part of the reason why SB1 is so worrisome for us" is "because it would inhibit our ability to be able to advocate for a ballot measure in the presence of a ballot by mail[.]"  Tr. 90:7-20 (Chavez).  Ms. Chavez Camacho further testified that "it's problematic, one, because we can't help [LUPE members] fill out the [mail] ballot, and two, because it's . . . now against the law for us to speak on the ballot measure in the presence of the actual ballot."  Tr. 90:21-24 (Chavez).

118.    Ms. Chavez Camacho testified that Section 7.04 of SB1 will prohibit LUPE's plans to advocate for ballot measures, such as a ballot measure to create a health care district in the region that LUPE serves.  Tr. 91:18-92:16 (Chavez).  Ms. Chavez Camacho stated that, "whenever we cannot do advocacy in the presence of the ballot by mail, it will prohibit the ability to freely do Get Out the Vote efforts in the presence of the ballot by mail."  Tr. 92:6-8 (Chavez).  Ms. Chavez Camacho emphasized that LUPE ceased advocacy for these ballot measures after the enactment of SB1 "to make sure that our staff members do not feel that they will end up in jail because now we are advocating for a ballot measure in the presence of a ballot by mail."  Tr. 92:6-16 (Chavez).

119.    LUPE often tells members attending LUPE meetings not to bring their mail ballots.  Tr. 3674:22-3675:6 (Chavez).  LUPE does so because it performs some advocacy regarding ballot measures during these meetings, and wishes to prevent any implications that LUPE has violated SB1.  Tr. 3675:2-11 (Chavez).

120.    For the 2023 November election, LUPE advocated support for some constitutional amendments.  Tr. 3680:7-9 (Chavez).  Unlike during elections prior to the enactment of SB1,

LUPE is providing instruction to its staff on what to say to a community member when the staff member becomes aware that a community member has a ballot present at an event where the staff member advocates for a ballot measure.  Tr. 3681:13-25 (Chavez).  Ms. Chavez Camacho testified that, in that case, staff are instructed to tell community members to move their ballot outside of the building, to ask the community members to leave, or to stop doing the work that that the staff is doing.  Tr. 3681:17-25 (Chavez).

121.    Ms. Chavez Camacho testified that stopping LUPE's advocacy on a ballot measure because of the presence of a mail ballot hinders LUPE's ability to advocate for those measures and its ability to draw resources to South Texas on issues that LUPE supports.  Tr. 3684:25-3685:4 (Chavez).

## Proposed Conclusions of Law

An organization "may have standing either by showing it can sue on behalf of its members ('associational' standing) or sue in its own right ('organizational' standing)."  *Texas State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022); *see also* Dkt. 846 ¶¶ 5-6, Plaintiffs' Joint Proposed Findings of Fact on the Legal Framework of Plaintiffs' Claims ("Plaintiffs' Proposed Joint Framework").  For any given claim, only one plaintiff need establish standing to obtain relief for that claim. *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017); Dkt. 846 ¶ 7, Plaintiffs' Proposed Joint Framework.

For the foregoing reasons, Plaintiffs have demonstrated that they have standing to assert their claims against SB1.

### I.  Associational Standing

Plaintiffs have associational standing to challenge SB1.  First, members of Plaintiffs "have standing to sue in their own right."  *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d

330, 344 (5th Cir. 2012) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also* Dkt. 846 ¶ 6, Plaintiffs' Proposed Joint Framework.  For example, members of Plaintiff organizations have been unable to vote with the assistance to which they are entitled because of SB1. *See* supra at I.A.1.  In a similar vein, members of Plaintiffs have standing to sue regarding the other sections of SB1 that LUPE Plaintiffs challenge, including:

- Section 4.09 *See* supra at I.A.4 .

- Section 5.07 *See* supra at  I.A.2.

- Section 5.13 *See* supra at  I.A.2.

- Section 7.04 *See* supra at I.A.3.

- Section 8.01 *See* supra at  I.A.4.

Second, the interests at stake "are germane to the organization[s'] purpose." *Funeral Consumers All., Inc.*, 695 F.3d at 344 (quoting *Hunt*, 432 U.S. at 343); *see also* Dkt. 846 ¶ 6, Plaintiffs' Proposed Joint Framework.  Plaintiffs all have organizational goals of voter outreach, voter education, and civic engagement. *See* supra at  I.B.  In furtherance of that mission, Plaintiffs have conducted get-out-the-vote drives, held voter education meetings, canvassed in neighborhoods for voter outreach, and provided assistance with in-person and mail ballot voting. *Id.* Thus, SB1's provisions—including mail ballot ID requirements and restrictions on voter assistance—and their impact on voters are germane to Plaintiffs' purpose.

Third, Plaintiffs' claims do not require the "participation of individual members in the lawsuit." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) (quoting *Hunt*, 432 U.S. at 343); *see also* Dkt. 846 ¶ 6, Plaintiffs' Proposed Joint Framework.

Accordingly, the Court finds that Plaintiffs have associational standing regarding their claims challenging Sections 4.09, 5.07, 5.13, 6.03-6.06, 7.04, and 8.01 of SB1.

## II. Organizational Standing

Plaintiffs also have organizational standing to challenge SB1 under a diversion-of-resources theory, a chilled-speech theory, and an impairment theory.

### A. Diversion of Resources

As an initial matter, the Fifth Circuit's analysis in *OCA-Greater Houston*, 867 F.3d 604 (5th Cir. 2017) requires that the Court conclude that Plaintiffs have organizational standing.  In *OCA-Greater Houston*, the Fifth Circuit held that an organizational plaintiff whose mission included "voter outreach and civic education" had organizational standing to challenge a Texas law restricting limited English proficient voters' use of interpreters at the polls.  867 F.3d at 610.  Further, the Fifth Circuit noted that the organizational plaintiff "calibrated its outreach efforts to spend extra time and money educating its members about" the challenged "Texas provisions and how to avoid their negative effects."  *Id.*  For example, the organizational plaintiff "undertook to educate voters about Texas's assistor-versus-interpreter distinction to reduce the chance that . . . voters would be denied their choice of interpreter," "an undertaking that consumed its time and resources in a way that they would not have been spent absent the Texas law."  *Id.* at 612.  Thus, and as the Fifth Circuit recently emphasized, "[t]he challenged law forced [the organizational plaintiff] to spend more time explaining the law in each conversation, voter by voter, which 'frustrate[d] and complicate[d] its routine community outreach activities,' and reduced the number of people that it could speak to on a given day."  *Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*, 82 F.4th 345, 354 (5th Cir. 2023) (quoting *OCA-Greater Houston*, 867 F.3d at 610).  Because the organizational plaintiff "could 'reach fewer people in the same amount of time,'" the Fifth Circuit "found that 'the Texas statutes at issue perceptibly impaired [the organizational plaintiff's] inability' to achieve its mission of getting out the vote," and therefore

the was "an injury supporting Article III standing." *Id.* (quoting *OCA-Greater Houston*, 867 F.3d at 610, 612).

As in *OCA-Greater Houston*, Plaintiffs have organizational standing here.  For example, LUPE's mission likewise includes voter outreach and civic engagement, Tr. 62:15-17 (Chavez); Tr. 3677:21-3678:13, and it furthers that mission by conducting voter engagement activities, including voter education and assistance, voter registration, get-out-the-vote, and canvassing efforts.  Tr. 70:5-8 (Chavez), Tr. 75:18-76:17 (Chavez), Tr. 76:18-23 (Chavez), Tr. 3686:21-3687:2 (Chavez).  In response to SB1, LUPE has made significant changes for its staff and paid canvassers, and even created new training, to help with compliance with SB1's requirements.  Tr. 3685:12-25 (Chavez), Tr. 3678:14-16 (Chavez), 3679:7, 20-22 (Chavez); Tr. 3683:12-18 (Chavez).  These changes to LUPE's trainings have in turn significantly hindered LUPE's ability to get out the vote in a timely manner.  Tr. 3683:12-20 (Chavez).  Indeed, Ms. Chavez testified that, for the 2023 November elections, LUPE had delayed its canvassing efforts, compared to when it would ordinarily do so, because of staff training in response to SB1's requirements.  Tr. 3685:12-25 (Chavez).  Ms. Chavez also testified that canvassing is important to LUPE's mission because it ensures its members receive voter education, and that voter turnout is reduced when canvassing is reduced.  Tr. 3686:21-3687:2 (Chavez).  Consistent with *OCA-Greater Houston*, LUPE has organizational standing.

FIEL's mission includes voter outreach, voter education, and civic engagement.  Tr. 2435:2-5 (Espinosa); Tr. 2435:12-14 (Espinosa); Tr. 2437-5-2438:4 (Espinosa); Tr. 2437:7-15 (Espinosa).  To further that part of its mission, FIEL holds community forums and talks to individual members one-on-one, including on how voting works, what members need to do to vote, and how members' votes would be counted.  Tr. 2437:7-15 (Espinosa).  In response to SB1,

FIEL invested more time and resources into voter outreach and education forums than it routinely did.  Tr. 2448:24-2449:3 (Espinosa).  For example, FIEL staff spent double or even triple the amount of time in conversations with voters, including at community forums held by FIEL.  Tr. 2447:24-2448:4 (Espinosa); Tr. 2447:21-2448:1 (Espinosa).  Further, Mr. Espinosa testified that the questions at these forums addressed, among other things, SB1's requirements regarding voter assistance and the oath of assistance.  Tr. 2448:19-23 (Espinosa).  As such, FIEL was unable to reach as many people through its voter outreach and education efforts as it had prior to SB1 because it had to spend more time in conversations with members who needed extra guidance and explanations regarding SB1.  Tr. 2449:4-9 (Espinosa) and Tr. 2449:4-9 (Espinosa). Accordingly, like the organizational plaintiff in *OCA-Greater Houston*, FIEL has organizational standing to challenge SB1.

Thus, because SB1 "perceptibly impaired" Plaintiffs' "ability to 'get out the vote' among its members," Plaintiffs have organizational standing under the law of this Circuit.  *OCA-Greater Houston*, 867 F.3d at 612; *see also Louisiana Fair Hous. Action Ctr., Inc.*, 82 F.4th at 354 (emphasizing that, in *OCA-Greater Houston*, organizational plaintiff's "diversion perceptibly impaired the effectiveness of [the organization's] efforts to further its mission because [the organization] was able to reach fewer voters").

Even setting aside the direct factual overlap with *OCA-Greater Houston*, Plaintiffs still have organizational standing under this Circuit's precedent.  First, Plaintiffs' responses to SB1 "consumed [their] time and resources in a way they would not have been absent [SB1],"  *OCA-Greater Houston*, 867 F.3d at 612,  and their responses to SB1 "differ from their routine activities." *Louisiana Fair Hous. Action Ctr., Inc.*, 82 F.4th at 351 (cleaned up).  As discussed, Plaintiffs have had to significantly modify and create new training for paid staff in light of SB1, (*see* supra II.A

and B.), and have spent double or even triple as much time as they ordinarily would speaking to individual voters about their SB1-related questions during individual conversations and community fora. *Id.* Indeed, as to the effect of SB1 on these new efforts, Mr. Espinosa testified that, "[i]n all the time I have been executive director of FIEL, we have never seen what we perceive to be such an intrusive or complex law or change." Tr. 2447:21-2448:1 (Espinosa). In addition, LUPE created a new department—its civic engagement department—in response to SB1 to provide voter education as needed, including on requirements around registering to vote, applying for a ballot by mail, or filling out a mail ballot. *See* supra II.A and B. LUPE also created this department to ensure compliance with SB1's requirements, and hired new staff that it otherwise would not have hired absent SB1. Tr. 98:17-22 (Chavez); Tr. 3670:22-23 (Chavez); Tr. 3670:17-20 (Chavez).

Second, Plaintiffs have also identified specific efforts or projects that the organization shifted away from for the expenditures on efforts in response to SB1, *Louisiana Fair Hous. Action Ctr., Inc.*, 82 F.4th at 353; *Elfant*, 52 F.4th at 253, and Plaintiffs have "link[ed]" their "diversion of resources specifically to [SB1]," not simply to SB1 and other similar statutes. *Elfant*, 52 F.4th at 254. For example, because of redirecting resources in response to SB1, FIEL has reduced the number of financial aid forums its puts on for members from four to two each application cycle, (*see* supra II.B) and it has ceased regularly providing physical copies of documents from departments outside of its voter engagement department to members. *Id.* As another example, LUPE has delayed its canvassing efforts during its campaign season because of needing to spend more time training staff and paid canvassers on the requirements of SB1. *See* supra II.A.

Third, and finally, Plaintiffs have shown that their diversions of resources "perceptibly impaired [their] ability to achieve" their organizational mission. *Louisiana Fair Hous. Action Ctr.,*

34

*Inc.*, 82 F.4th at 353.    As discussed above, both FIEL's and LUPE's "diversion" of resources regarding their voter outreach, voter engagement, and civic engagement efforts "perceptibly impaired the effectiveness of [their] efforts to further [their] mission because [they were] able to reach fewer voters." *Id.* at 354;  Tr. 2449:4-9 (Espinosa) and Tr. 2449:4-9 (Espinosa); Tr. 3686:21-3687:2 (Chavez)]; Tr. 3685:12-25 (Chavez)].    As. Mr. Espinosa testified, the diversion of time and resources from FIEL's financial aid forums reduced the number of students FIEL assisted by about 1500 students, and that reduction undermined FIEL's organizational mission because it was no longer to to assist and empower as many people in their higher education needs.  Tr. 2459:20-22 (Espinosa); Tr. 2460:11-15 (Espinosa); Tr. 2459:23-2460:4 (Espinosa)].  Further, the elimination of the provision of hard copies of documents unrelated to voting has hindered the organization's mission, especially because FIEL members with limited English proficiency and who have a hard time accessing computer now have greater difficulty accessing the information and educational resources FIEL provides.  Tr. 2462:5-7 (Espinosa); Tr. 2462:16-2463:14 (Espinosa).  In addition, because LUPE now devotes a greater percentage of its time and attention on civic engagement work in response to SB1, LUPE's work in its other priority areas, such as advancing broadband infrastructure for colonia residents, has been hindered.  Tr. 3687:14-17 (Chavez).

Accordingly, Plaintiffs have organizational standing regarding their claims challenging Sections 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB1.

### B.  *Chilled Speech*

Plaintiffs have also shown that they have organizational standing based on their chilled speech regarding their claims challenging Section 7.04 of SB1.  *Elfant*, 52 F.4th at 256.  "To assess standing on this basis," courts determine "(1) whether the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest; (2) whether that conduct is arguably

proscribed by the challenged policy; and (3) whether the threat of future enforcement is substantial." *Elfant*, 52 F.4th at 256.

LUPE satisfies all three elements.  First, LUPE advocates for voters to support certain nonpartisan ballot measures, as it has regularly done through door-to-door canvassing efforts and at LUPE meetings.  Tr. 88:2-7 (Chavez); Tr. 88:8-12 (Chavez); Tr. 89:7-18; Tr. 91:18-92:16 (Chavez); Tr. 3674:22-3675:6 (Chavez); Tr. 3680:7-9 (Chavez); Tr. 3681:13-25 (Chavez).  LUPE plans again to advocate for a ballot measure to create a hospital district in Hidalgo County. LUPE conducts its advocacy through paid canvassers, including in person with voters and in the presence of mail ballots.  LUPE therefore intends to engage in a course of conduct affected with a constitutional interest.  *Elfant*, 52 F.4th at 256.

Second, LUPE's advocacy of nonpartisan ballot measures in the presence of the mail ballot is prohibited by Section 7.04.  *Elfant*, 52 F.4th at 256.  Jonathan White, who prosecuted election code offenses for the OAG, testified that "it would be possible for an outside organization" including a non-partisan, non-PAC, to violate 7.04 by engaging in the elements of "vote harvesting" as defined by 7.04.  Tr. 4001:1-16 (White).

Third, the threat of enforcement against LUPE staff and members is substantial.  *Elfant*, 52 F.4th at 256.  Ms. Chavez testified that she is "most definitely worried" about LUPE being investigated or prosecuted for violating Section 7.04 of SB1.  Tr. 92:17-24 (Chavez); Tr. 83:9-12 (Chavez); Tr. 90:21-24 (Chavez).  Indeed, the threat is so severe that LUPE often tells members who attend LUPE meetings not to bring their mail ballots, as LUPE performs advocacy regarding ballot measures during these meetings and wishes to prevent any implications that LUPE has violated Section 7.04.  Tr. 3674:22-3675:6 (Chavez); Tr. 3675:2-11 (Chavez).

Consequently, and as Ms. Chavez testified, whenever LUPE "cannot do advocacy in the presence of the ballot by mail, it will prohibit the ability to freely do Get Out the Vote efforts in the presence of the ballot by mail," Tr. 92:6-8 (Chavez), and that has "inhibit[ed] our ability to be able to advocate for a ballot measure in the presence of a ballot by mail," Tr. 90:7-20 (Chavez).

### C.  Impairment

In addition, Plaintiffs have shown that they have organizational standing based on an impairment theory, as SB1 "make[s] it more difficult or costly for [Plaintiffs] to conduct [their] operations." *Louisiana Fair Hous. Action Ctr., Inc.*, 82 F.4th at 357 (Ho, J., concurring); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If . . . [defendant's] steering practices perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); *Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994).

SB1 has made it more difficult and costly for LUPE to conduct its operations.  Tr. 3677:1-20 (Chavez).  For example, LUPE no longer assists members individually with their mail ballots because of SB1, although they would routinely provide that form of one-on-one assistance prior to the enactment of SB1.  Tr. 96:7-14 (Chavez); Tr. 3675:14-23 (Chavez); Tr. 3675:18-23 (Chavez); Tr 3675:18-3676:10 (Chavez); Tr. 3677:1-20 (Chavez).  Instead, LUPE held meetings for its members where it would project a blank mail ballot on the screen, and simply go over the areas that were supposed to be filled out.  Tr. 96:2-14 (Chavez); Tr. 97:1-3 (Chavez); Tr. 3673:23-3674:6 (Chavez); Tr. 3673:23-3674:6 (Chavez); Tr. 3674:12-14 (Chavez); Tr. 3674:19-21 (Chavez).  The change from individual assistance with mail ballots to a general meeting on mail ballot requirements hindered LUPE's civic engagement efforts, particularly with members with

limited literacy or vision impairment.  Tr. 3675:14-23 (Chavez); Tr. 3675:18-23 (Chavez); Tr 3675:18-3676:10 (Chavez).  Indeed, since the enactment of SB1, LUPE has turned away members who came to the office for one-on-one assistance with mail ballots.  Tr. 3677:1-8 (Chavez). Further, as discussed above, Section 7.04 of SB1 has hindered LUPE's plans to advocate for ballot measures.  *See supra*, Section II.B (Organizational Standing - Chilled Speech).

SB1 has also made it more difficult and costly for FIEL to conduct its operations.  As already discussed, because of SB1, FIEL spent more time in conversations with members answering questions regarding SB1's requirements, including questions about the oath of assistance. Tr. 2447:24-2448:4 (Espinosa); Tr. 2448:5-13 (Espinosa); Tr. 2448:19-23 (Espinosa). FIEL had to spend more time at forums with people who needed extra guidance and explanations regarding SB1, Tr. 2449:4-9 (Espinosa), and therefore was unable to reach out to as many people through its voter outreach and education efforts, Tr. 2449:4-9 (Espinosa), and had to invest more time and effort in its voter outreach and education forums that it routinely would, Tr. 2449:4-9 (Espinosa).

In addition, FIEL no longer conducts its caravan to the poll efforts because FIEL's members feel uneasy about running afoul of SB1's requirements regarding the oath of assistance and assistor form.  Tr. 2449:15-18 (Espinosa); Tr. 2449:23-2450:1 (Espinosa); Tr. 2450:3-20 (Espinosa); Tr. 2451:6-13 (Espinosa).  In a similar vein, the number of FIEL members volunteering to provide in-person voter assistance at the polls has dropped significantly since the enactment of SB1 in light of FIEL members' concerns about the oath of assistance, the assistor form, and language regarding the penalty of perjury. Tr. 2444:10-14 (Espinosa), 2444:24-2445:7 (Espinosa); 2451:19-25 (Espinosa), 2452:7-11 (Espinosa); Tr. 2452:1-6 (Espinosa).  Indeed, Mr. Espinosa testified that, whereas before SB1 about 100 FIEL members volunteered to assist voters at the poll,

in 2022, there were at most 20 members who did so.  Tr. 2470:22-25 (Espinosa).  Without these caravans to the polls and with a reduction of members volunteering to assist voters in person, FIEL is unable to engage as many voters and help them participate in the voting process.  Tr. 2450:21-25 (Espinosa); Tr. 2451:1-5 (Espinosa); Tr. 2452:20-23 (Espinosa).  Further, FIEL no longer is able to recruit members to volunteer as poll workers as result of Section 4.09 of SB1.  Tr. 2457:2-8 (Espinosa); Tr. 2457:9-14 (Espinosa); Tr. 2457:15-24 (Espinosa).

SB1 also made it more difficult for Texas HOPE to conduct its operations.  As Mr. Cardenas testified, the stream of volunteers for Texas HOPE who are willing to assist voters at the polls have dwindled significantly.  Supra FOF 54.  Because fewer people volunteer to assist voters with Texas HOPE, fewer people in turn participate in the elections process, thereby undermining the goals of Texas HOPE.  *Id.*

Accordingly, Plaintiffs have also shown organizational standing under an impairment theory.  *See Louisiana Fair Hous. Action Ctr., Inc.*, 82 F.4th at 357 (Ho, J., concurring); *Havens Realty Corp.*, 455 U.S. at 379.

Dated:  January 20, 2024

Respectfully submitted,

/s/ *Nina Perales*
Nina Perales (TX Bar No. 24005046)
Julia R. Longoria (TX Bar No. 24070166)
Fátima L. Menéndez (TX Bar No. 24090260)
Kenneth Parreno (TX Bar No. 24130477)
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Tel: (210) 224-5476; Fax: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org
kparreno@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Tel: (212) 859-8000; Fax: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

*Attorneys for Plaintiffs*

**LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER REGISTRATION**

**EDUCATION PROJECT, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON INC.**

*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this document with this Court using the CM/ECF system, which provides notice of this filing to all registered CM/ECF users on the 20th day of January 2024.

/s/ Nina Perales
Nina Perales