# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., *Plaintiffs*, v. GREGORY W. ABBOTT, et al., *Defendants*. | 5:21-cv-0844-XR |
| OCA-GREATER HOUSTON, et al., *Plaintiffs*, v. TEXAS SECRETARY OF STATE JOHN SCOTT, et al., *Defendants*. | 1:21-cv-0780-XR |
| HOUSTON AREA URBAN LEAGUE, et al., *Plaintiffs*, v. GREGORY WAYNE ABBOTT, et al., *Defendants*. | 5:21-cv-0848-XR |
| LULAC TEXAS, et al., *Plaintiffs*, v. JOHN SCOTT, et al., *Defendants*. | 1:21-cv-0786-XR |
| MI FAMILIA VOTA, et al., *Plaintiffs*, v. GREG ABBOTT, et al., *Defendants*. | 5:21-cv-0920-XR |

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><div align="right">*Plaintiff*,</div><br>v.<br><br>STATE OF TEXAS, et al.,<br><div align="right">*Defendants*.</div> | 5:21-cv-1085-XR |

**HAUL AND MFV PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ix

PRELIMINARY STATEMENT ............................................................................................. 1

**PROPOSED FINDINGS OF FACT** ................................................................................... 1

I.    THE PARTIES ................................................................................................................ 1

    A.    The HAUL Plaintiffs ............................................................................................ 1

        1.    Delta Sigma Theta Sorority, Inc. ("DST") ............................................... 1

        2.    Houston Area Urban League .................................................................... 4

        3.    The Arc of Texas ...................................................................................... 8

        4.    Jeffrey Clemmons ................................................................................... 8

    B.    The MFV Plaintiffs ............................................................................................. 9

        1.    Mi Familia Vota ....................................................................................... 9

        2.Marlon López ................................................................................................ 12

        3.    Marla López ............................................................................................. 13

    C.    The State Defendants .......................................................................................... 15

        1.    Ken Paxton, as Attorney General of Texas ............................................. 15

        2.    Jane Nelson, as Secretary of State of Texas ........................................... 18

    D.    The County Defendants ...................................................................................... 19

        1.    Harris County Clerk Teneshia Hudspeth .................................................. 19

        2.    Bexar County EA Jacquelyn Callanen .................................................... 19

        3.    Harris County District Attorney Kim Ogg ............................................... 20

        4.    Travis County District Attorney José Garza ............................................ 21

II.    THE PROVISIONS OF SB1 CHALLENGED BY THE HAUL PLAINTIFFS (THE "CHALLENGED PROVISIONS") ...................................................................................... 22

    A.    SB1's Prohibition of Drive-Thru Voting ......................................................... 22

    B.    SB1's Prohibition of 24-Hour Voting ............................................................... 22

    C.    SB1's Elimination of Straight-Ticket Voting .................................................... 23

    D.    SB1's Poll Watcher Provisions ......................................................................... 23

    E.    SB1's Restrictions on In-Person Delivery of Mail-In Ballots .......................... 24

    F.    SB1's Identification Number Requirements for Mail-In Voting ....................... 24

    G.    SB1's Restrictions on Persons Who Assist Voters ........................................... 26

    H. SB1's Restrictions on Distribution of ABBMs ................................................. 27

I.    SB1's Restrictions on Canvassing ................................................................. 27

III.    THE LONG HISTORY OF VOTING DISCRIMINATION IN TEXAS CONTINUES IN THE PRESENT ............................................................................................. 29

    A.    Plaintiffs' Experts ......................................................................................... 29

    B.    Texas's History of Voting Discrimination from 1865 to the Voting Rights Act of 1965 (the "VRA") ........................................................................................ 30

    C.    Voting Discrimination after the Voting Rights Act ...................................... 35

    D.    Extent of Voting Practices that Tend to Enhance Opportunity for Discrimination ...... 39

IV.    RACIALLY POLARIZED VOTING HAS CONCENTRATED MINORITY VOTING POWER IN URBAN CENTERS AND LED TO UNRESPONSIVE ELECTED OFFICIALS OUTSIDE OF THOSE AREAS ............................................................. 43

    A.    Voters of Color Disproportionately Reside in Large, Urban Centers .......................... 43

    B.    Texas Has Entrenched Patterns of Racially Polarized Voting ...................... 44

    C.    Political Implications of Racially Polarized Voting and Demographic Changes ......... 45

    D.    Black and Latino Texans are Underrepresented in Public Office .................. 46

    E.    Discrimination Across Many Areas of Life Hinders Black and Latino Texans' Ability to Participate in the Political Process and Demonstrates Elected Officials' Lack of Responsiveness to Their Needs. ................................................................ 46

    F.    Racial Appeals ............................................................................................... 51

V.    THE 2020 GENERAL ELECTION ............................................................... 52

    A.    Expanded Access to Voting .......................................................................... 53

        1.    DTV ......................................................................................................... 54

            a.    Mechanics of DTV ............................................................................. 56

            b.    Selection of DTV Sites ...................................................................... 59

            c.    Ballot Security at DTV Locations ..................................................... 60

            d.    Voters and Election Officials Reacted Favorably to DTV. ............... 62

            e.    Racial and Ethnic Breakdown of DTV Voters .................................. 67

            f.    Legal Challenges to DTV ................................................................. 71

            g.    Reconciliation Issues ......................................................................... 72

        2.    24-Hour Voting ...................................................................................... 74

            a.    Mechanics of 24-Hour Voting ........................................................... 75

            b.    Selection of 24-Hour Voting Sites ..................................................... 75

            c.    Voters and Election Officials Reacted Favorably to 24-Hour Voting. ............... 76

      d.   Racial and Ethnic Breakdown of Voters Who Used 24-Hour Voting .................. 79

   3.   Encouraging Mail-In Voting by Sending Unsolicited ABBMs to Eligible Voters.... 83

   4.   The Governor's Proclamations ................................................................. 84

B.   Unprecedented Turnout, Particularly Among Black and Latino Voters...................... 85

C.   Problems with Poll Watchers During the 2020 Election ............................................. 86

   1.   Complaints About Poll Watchers .............................................................. 87

   2.   Investigations and Legal Actions Against Election Workers Based on Poll Watcher
Complaints ................................................................................................................ 90

D.   Public Confidence in Elections .................................................................................... 91

VI.     THE PASSAGE OF SB1 ............................................................................................ 92

VII.   SB1's IDENTIFICATION NUMBER REQUIREMENTS FOR ABBMS AND
BALLOT CARRIER ENVELOPES MAKE VOTING MORE DIFFICULT FOR ALL MAIL-
IN VOTERS AND DISPROPORTIONATELY BURDEN BLACK AND LATINO VOTERS
   94

A.   SB1's ABBM and BBM Identification Number Requirements Burden All Texas
Voters................................................................................................................................ 94

   1.   Voters Find SB1's Identification Number Requirements Confusing and Difficult .. 95

   2.   SB1's Identification Number Requirements Resulted in Rejection of Large Numbers
of ABBMs and BBMs in 2022 ........................................................................................ 98

   3.   Statutorily Mandated Instructions on Secretary of State Forms Increase the Chances
that Voters' ABBMs and BBMs Will Be Rejected ......................................................... 105

   4.   The TEAM System Lacks Identification Numbers for Many Texas Voters and is
Riddled with Errors........................................................................................................ 107

   5.   SB1's "Cure Provisions" Do Not Permit Voters to Fix Identification Number
Problems. ......................................................................................................................111

   6.   Problems with SB1's Identification Number Requirements Will Persist .............. 116

   7.   SB1's Mail Ballot Identification Provisions Chill Mail-In Voting and Suppress Votes
   117

B.   SB1's Identification Number Requirements for ABBMs and BBMs Disproportionately
Burden Black and Hispanic Voters.................................................................................... 118

   1.   March 2022 Primary Election - ABBM Rejection Rates....................................... 120

   2.   March 2022 Primary Election - BBM Rejection Rates ......................................... 124

     a.   County Data on BBM Rejections .................................................................... 125

     b.   Secretary of State's TEAM Data on BBM Rejections....................................... 131

3.  November 2022 General Election - ABBM Rejection Rates.................................. 134

4.  November 2022 General Election - BBM Rejection Rates ................................... 135

    a.  County data on BBM Rejections ...................................................... 135

    b.  TEAM Data Concerning BBM Rejections in the November 2022 Election ...... 138

*C.*  Overall Conclusions.................................................................................... 141

*D.*  The Hispanic Voters that Mi Familia Vota Serves Will be Adversely Impacted by SB1's Requirements Related to Mail-in Ballots................................................. 142

VIII.  SB1's POLL WATCHER PROVISIONS CHILL VOTERS AND ELECTION WORKERS AND DISPROPORTIONATELY HARM BLACK AND LATINO VOTERS 143

A.  SB1's Poll Watcher Provisions Permit Disruptions of the Electoral Process that Burden All Texas Voters. ........................................................................... 143

    1.  SB1's Poll Watcher Provisions Are Vague and Ambiguous.................................... 143

    2.  Election Workers and County Officials Do Not Know What is Permitted or Prohibited Under SB1's Poll Watcher Provisions.......................................... 153

    3.  Election Officials Fear the Poll Watcher Provisions Will Be Enforced Against Them, and Many Have Become Reluctant to Serve ............................................. 154

    4.  The Poll Watcher Training Mandated by SB1 is Not a Corrective to the Abuses .. 156

    5.  SB1's Poll Watcher Provisions Have Exposed Polling Places and Election Offices to Aggressive, Disruptive Poll Watchers ........................................... 157

B.  SB1's Poll Watcher Provisions Disproportionately Affect Black and Latino Voters  162

IX.  SB1'S PROHIBITION OF DRIVE-THRU VOTING BURDENS ALL TEXAS VOTERS AND DISPROPORTIONATELY BURDENS BLACK AND LATINO VOTERS 165

A.  SB1's Prohibition of DTV Burdens All Texas Voters................................................ 165

B.  SB1's Prohibition of DTV Has Racially Disparate Impacts...................................... 167

X.  SB1'S PROHIBITION OF 24-HOUR VOTING BURDENS ALL TEXAS VOTERS AND DISPROPORTIONATELY BURDENS BLACK AND LATINO VOTERS ............. 169

A.  SB1's Prohibition of 24-Hour Voting Burdens All Texas Voters ............................. 169

*B.*  SB1's Prohibition of 24-Hour Voting Has Racially Disparate Impacts .................... 171

XI.  SB1's RESTRICTIONS ON THOSE WHO ASSIST VOTERS BURDEN ALL TEXAS VOTERS WHO NEED ASSISTANCE AND DISPROPORTIONATELY BURDEN BLACK AND LATINO VOTERS ........................................................................ 173

XII.  SB1's RESTRICTIONS ON IN-PERSON DELIVERY OF BBMs MAKE VOTING BY MAIL MORE DIFFICULT FOR ALL MAIL VOTERS AND DISPROPORTIONATELY BURDEN BLACK AND LATINO VOTERS ...................................................... 179

XIII.    SB1'S RESTRICTIONS ON DISTRIBUTION OF ABBMS BURDEN ALL TEXAS VOTERS AND PLACE DISPROPORTIONATE BURDENS ON BLACK AND LATINO VOTERS .................................................................................................. 181

A.    SB1's Restrictions on Distribution of ABBMs Burden All Texas Voters.................. 181

XIV.    SB1's RESTRICTIONS ON CANVASSING BURDEN ALL TEXAS VOTERS AND PLACE DISPROPORTIONATE BURDENS ON BLACK AND LATINO VOTERS 186

XV.    ABSENCE OF ELECTION FRAUD ........................................................ 197

A.    Election Fraud is Virtually Non-Existent in Texas. ..................................... 198

1.    OAG Data on Election Fraud .............................................................. 198

2.    Election Officials Report Essentially No Election Fraud ........................ 201

B.    There is No Evidence of Election Fraud in the 2020 Elections, Much Less with Respect to the Voting Methods Targeted by SB1 ......................................... 203

C.    Existing Protections Safeguarded Against Voter Fraud. ............................... 208

D.    The Challenged Provisions Would Be Ineffective Against Fraud If It Did Occur ..... 210

XVI.    UNIFORMITY ...................................................................................... 214

XVII.    INJURIES TO ORGANIZATIONAL PLAINTIFFS AND THEIR MEMBERS .. 216

A.    Houston Area Urban League ................................................................ 216

B.    Delta Sigma Theta Sorority, Inc. ("DST")............................................... 223

C.    Mi Familia Vota ................................................................................ 234

D.    Marlon López .................................................................................... 241

E.    Marla López ...................................................................................... 242

**PROPOSED CONCLUSIONS OF LAW** ........................................................ 244

I.    PLAINTIFFS HAVE STANDING TO SUE ................................................. 244

A.    Legal Standard .................................................................................. 244

B.    Houston Area Urban League ................................................................ 245

C.    Delta Sigma Theta Sorority, Inc. .......................................................... 247

D.    Jeffrey Clemmons ............................................................................... 249

E.    Mi Familia Vota ................................................................................ 250

II.    THE DEFENDANTS ARE PROPER ........................................................ 254

A.    The VRA Abrogates Sovereign Immunity ................................................ 254

B.    Plaintiffs' Constitutional Claims Against Defendants May Proceed Under the *Ex parte Young* Exception to Sovereign Immunity ................................................ 254

1.    Legal Standard .................................................................................. 254

2.  State Defendants ........................................................................ 255

    a.  Secretary of State .............................................................. 255

    b.  Attorney General............................................................... 256

    c.  District Attorney Ogg......................................................... 258

III.  THE CHALLENGED PROVISIONS OF SB1 UNDULY BURDEN THE RIGHT TO VOTE IN VIOLATION OF FIRST AND FOURTEENTH AMENDMENTS..................... 259

A.  Legal Standard ........................................................................... 259

B.  The Challenged Provisions Unduly Burden Texas Voters' Right to Vote ................ 263

  1.  Ban on DTV (3.04, 3.12, 3.13) ......................................................... 263

    a.  The Ban on DTV Imposes Severe Burdens on Voters ....................................... 263

    b.  The Ban on DTV Disproportionately Burdens Black and Hispanic Voters........ 265

  2.  Ban on 24-Hour Voting (3.09, 3.10) ........................................................ 267

    a.  The Ban on 24-Hour Voting Imposes Severe Burdens on Voters ...................... 267

    b.  The Ban on 24-Hour Voting Disproportionately Burdens Black and Hispanic Voters ................................................................................ 268

  3.  Restrictions on In-Person Drop Off of Mail Ballots (4.12) .................................... 269

    a.  The Restrictions on In-Person Drop Off of Mail Ballots Impose a Severe Burden on Voters ................................................................................ 269

    b.  The Restrictions on In-Person Drop Off of Mail Ballots Disproportionately Burden Black and Latino Voters .................................................................. 270

  4.  SB1 Poll Watcher Provisions (4.01, 4.07) ......................................................... 270

    a.  The Poll Watcher Provisions Impose a Severe Burden on Voters....................... 270

    b.  The Poll Watcher Provisions Disproportionately Burden Black and Latino Voters 271

  5.  SB1's Regulation of Absentee Ballot By Mail Through ID Provisions.................. 272

  6.  SB1's Restriction on Assistance Provisions......................................................... 273

    A.  The Restriction on Assistance Provisions Impose a Severe Burden On Voters.. 273

  7.  SB1's Regulation of Time Off Work to Vote ........................................................ 276

  8.  Restrictions on Canvassing and on Solicitation of ABBMs (7.04)......................... 277

    A.  SB1 § 7.04 Imposes a Severe Burden On Voters by Restricting Canvassing and Restricting the Solicitation of ABBMs. .................................................... 277

  9.  The Cumulative Effect of the Challenged Provisions Impose Severe Burdens on Voters, Particularly Black and Hispanic Voters ............................................. 279

C.    The State's Purported Interests in the Challenged Provisions Are Pretextual ........... 281

    1.    Voter Fraud ........................................................................................................ 281

    2.    Uniformity .......................................................................................................... 284

    3.    "Irregularities" ................................................................................................... 286

    4.    The Significant Burdens Imposed by the Challenged Provisions Outweigh the Weak and Tenuous Purported State Interests ................................................................. 287

IV.    THE CHALLENGED PROVISIONS OF SB1 RESULT IN THE DENIAL AND ABRIDGEMENT OF THE RIGHT TO VOTE OF BLACK AND LATINO TEXANS IN VIOLATION SECTION 2 OF THE VRA ......................................................................... 289

A.    Section 2 of the VRA Establishes a Private Right of Action ...................................... 290

B.    Legal Standard .......................................................................................................... 291

C.    The Challenged Provisions of SB1 Impose a Discriminatory Burden on Black and Latino Voters ............................................................................................................. 295

    1.    Ban on DTV (3.04, 3.12, 3.13) .......................................................................... 296

    2.    Ban on 24-hour Voting (3.09, 3.10) .................................................................. 300

    3.    Poll Watcher Provisions (4.01, 4.07) ................................................................ 303

    4.    Absentee Ballot By Mail Provisions –5.02, 5.03, 5.04, 5.07 and 5.08 ................. 305

    5.    Restrictions on Voter Assistance – 6.01, 6.03, 6.04, 6.05, 6.07 ............................ 307

    6.    Regulation of Time Off Work to Vote – 7.02 ...................................................... 308

    7.    Restrictions on Canvassing and Access to ABBMs – 7.04 .................................... 308

D.    The Burden on Black and Latino Voters is Linked to Discriminatory Social and Historical Conditions ................................................................................................ 309

    1.    History of Discrimination in Voting (SF1) ......................................................... 309

    2.    Racially Polarized Voting (SF2) ........................................................................ 311

    3.    Extent of Voting Practices That Tend to Enhance Opportunities for Discrimination (SF3) .............................................................................................................. 312

    4.    Effect of Discrimination in Other Areas (SF5) ..................................................... 313

    5.    Racial Appeals (SF6) ......................................................................................... 314

    6.    Extent to Which Minorities Have Been Elected (SF7) .......................................... 315

    7.    Lack of Responsiveness of Elected Officials to the Needs of Minority Groups (SF8) 315

    8.    Tenuousness of the State Policy (SF9) ................................................................ 316

E.    The *Brnovich* Guideposts Weigh in Plaintiffs' Favor ................................................ 318

1.   Size of the Burden ................................................................... 318

2.   The Size of the Disparity ......................................................... 320

3.   Opportunities Provided by the State's Entire System of Voting ............................. 322

4.   Strength of the State Interest .................................................. 323

V.   THE POLL WATCHER PROVISIONS OF SB1 ARE VOID FOR VAGUENESS
UNDER THE DUE PROCESS CLAUSE ........................................................ 323

A.   Legal Standard ...................................................................... 324

B.   Application to 4.06, 4.07, 4.09 ................................................... 328

1.   4.06 ................................................................................. 330

2.   4.07 ................................................................................. 333

3.   4.09 ................................................................................. 337

CONCLUSION ................................................................................. 342

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. State Bd. of Elections*,
    393 U.S. 544 (1969)................................................................292

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)....................................................259, 261, 262

*Babbitt v. Farm Workers*,
    442 U.S. 289 (1979)....................................................327, 328

*Brnovich v. Democratic Nat'l Comm.*
    141 S. Ct. 2321 (2021).................................................. *passim*

*Burdick v. Takushi*,
    504 U.S. 428 (1992)....................................................259, 260

*Chisom v. Roemer*,
    501 U.S. 380 (1991)....................................................291

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) .......................................255

*City of El Cenizo v. State*,
    264 F. Supp. 3d 744 (W.D. Tex. 2017), *aff'd in part, vacated in part on other*
    *grounds*, 890 F.3d 164 (2018) ....................................337

*Coates v. Cincinnati*,
    402 U.S. 611 (1971)....................................................334

*Coca v. City of Dodge City*,
    No. 22-1274-EFM, 2023 WL 2987708 (D. Kan. April 18, 2023), *motion to*
    *certify appeal denied*, No. 22012740EFM, 2023 WL 3948472 (D. Kan. June
    12, 2023) ....................................................................290

*Crawford v. Marion Cnty. Election Bd.*
    553 U.S. 181 (2008).................................................. *passim*

*Ctr. for Individual Freedom v. Carmouche*,
    449 F.3d 655 (5th Cir. 2006) .......................................328

*Doe I v. Landry*,
    909 F.3d 99 (5th Cir. 2018) .........................................249, 250, 324

*Dream Defs. v. DeSantis*,
    559 F. Supp. 3d 1238 (N.D. Fla. 2021)................................................................327

*Fusilier v. Landry*,
    963 F.3d 447 (5th Cir. 2020) ...............................................................................254

*Garza v. Smith*,
    320 F.Supp. 131 (W.D. Tex.1970), *vacated and remanded on procedural
    grounds*, 401 U.S. 1006 (1971)...........................................................................323

*Gilmore v. Greene Cnty. Democratic Party Exec. Comm.*,
    435 F.2d 487 (5th Cir. 1970) ...............................................................................323

*Grovey v. Townsend*,
    295 U.S. 54 (1935).................................................................................................34

*Hamer v. Ely*,
    410 F.2d 152 (5th Cir. 1969) ...............................................................................323

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..............................................................................................245

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
    599 U.S. 166 (2023)..............................................................................................290

*Hill v. Colorado*,
    530 U.S. 703 (2000)..........................................................................324, 332, 340

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...........................................................................................325, 328

*Hollinger v. Home State Mut. Ins. Co.*,
    654 F.3d 564 (5th Cir. 2011) .................................................................................48

*Hotze v. Hollins*,
    No. 4:20-cv-03709, 2020 WL 6437668 (S.D. Tex. Nov. 2, 2020), *aff'd in part,
    vacated in part sub nom. Hotze v. Hudspeth, 16 F.4th 1121 (5th Cir. 2021)*....71, 72, 216, 286

*In re Hotze*,
    610 S.W.3d 909 (Tex. 2020)........................................................71, 72, 216, 286

*Johnson v. United States*,
    576 U.S. 591 (2015).........................................................................................324, 327

*Kolender v. Lawson*,
    461 U.S. 352 (1983)..................................................................324, 325, 329

*La. Fair Housing Action Ctr. Inc. v. Azaela Garden Properties, L.L.C.*
    82 F.4th 345 (5th Cir. 2023) ........................................................ *passim*

*League of United Latin Am. Citizens v. Abbott*,
    No. EP-21-CV-00259, 2021 WL 5762035 (W.D. Tex. Dec. 3, 2021) ................................290

*League of Women Voters of Fla. Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018)..............................................................260

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
    66 F.4th 905 (11th Cir. 2023) ...................................................... *passim*

*Lerman v. Bd. of Elections in City of New York*,
    232 F.3d 135 (2d Cir. 2000)..............................................................262

*Loving v. Virginia*,
    381 U.S. 1 (1967)..............................................................47

*LULAC v. Abbott*,
    617 F. Supp. 3d 622 (W.D. Tex. 2022)..............................................................48

*LUPE v. Abbott*,
    614 F. Supp. 3d 509 (W.D. Tex. 2022) (ECF No. 444)..............................................27

*LUPE v. Abbott*,
    618 F. Supp. 3d 449 (W.D. Tex. 2022) (ECF No. 447)............................................23, 255, 257

*MedImmune, Inc. v. Genentech, Inc.*
    549 U.S. 118 (2007)..............................................................327

*MFV v. Abbott*,
    977 F.3d 461 (5th Cir. 2020) ..............................................................254

*MFV, et al. v. Kim Ogg*,
    No. 22-50732 (5th Cir. Oct. 19, 2022)..............................................................258

*Miss. State Chapter, Operation Push v. Allain*,
    674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd sub nom. Miss. State Chapter,*
    *Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991) ..............................301

*Mississippi State Chapter, Operation Push, Inc. v. Mabus*,
    932 F.2d 400 (5th Cir. 1991) ..............................................................292

*Moore v. Brown*,
    868 F.3d 398 (5th Cir. 2017) ..............................................................324

*Morse v. Republican Party of Va.*,
    517 U.S. 186 (1996) (plurality opinion) ..............................................................290

*Munro v. Socialist Workers Party*,
  479 U.S. 189 (1986)...................................................................................283

*N.C. Conf. of the NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ...............................................................294, 312

*Nat'l Rifle Ass'n of Am. Inc. v. McCraw*,
  719 F.3d 338 (5th Cir. 2013) ...........................................................................327

*Nixon v. Condon*,
  286 U.S. 73 (1932).............................................................................................34

*Nixon v. Herndon*,
  273 U.S. 536 (1927)...........................................................................................34

*Norman v. Reed*,
  502 U.S. 279 ...................................................................................................260

*OCA of Greater Houston. v. Texas*,
  No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022)....................27

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ....................................................244, 248, 254, 290

*Ohio State Conf. of N.A.A.C.P. v. Husted (Husted III)*,
  768 F.3d 524 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014
  WL 10384647 (6th Cir. Oct. 1, 2014)................................................................261

*Patino v. City of Pasadena*,
  230 F. Supp. 3d 667 (S.D. Tex. 2017) ........................................................311, 312

*Perez v. Abbott*,
  250 F. Supp. 3d 123 (W.D. Tex. 2017)..............................................................310

*Perez v. Abbott*,
  253 F. Supp. 3d 864,972-73 (W.D. Tex. 2017) ..................................................310

*Perez v. Abbott*,
  253 F. Supp. 3d 864 (W.D. Tex. 2017)..............................................................311

*Perez v. Abbott*,
  No. 5:11-cv-360, 2017 WL 962686 (W.D. Tex. Mar. 10, 2017)...........................48

*Pilcher v. Rains*,
  853 F.2d 334 (5th Cir. 1988) ...........................................................................261

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) ....................................................324, 325, 326

*Rost v. United States*,
  No. 1:19-CV-0607-RP, 2021 WL 5190875 (W.D. Tex. Sept. 22, 2021), *aff'd*,
  44 F.4th 294 (5th Cir. 2022), *reh'g denied*, No. 21-51064, 2022 WL 16569594
  (5th Cir. Oct. 11, 2022) ................................................................................................ 325

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) (Gorsuch, J. concurring) ...................................................... 325, 326

*Shelby County v. Holder*,
  570 U.S. 529 (2013) ...................................................................................................... 38, 289

*Smith v. Allwright*,
  321 U.S. 649 (1944) ............................................................................................................. 34

*Soltysik v. Padilla*,
  910 F.3d 438 (9th Cir. 2018) ............................................................................................. 262

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ..................................................................................... 258, 328

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................................. *passim*

*State v. Stephens*,
  663 S.W.3d 45 (Tex. Crim. App. 2021) ..................................................... 16, 17, 257, 258

*Storer v. Brown*,
  415 U.S. 724 (1974) ................................................................................................... 47, 262

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ......................................................................................... 244, 249, 327

*Tashjian v. Republican Party of Connecticut*,
  479 U.S. 208 (1986) ........................................................................................................ 262

*Tex. LULAC v. Whitley*,
  SA-19-CA-074-FB (W.D. Tex. 2019) ....................................................... 39, 309, 310, 311

*Texas Alliance for Retired Americans v. Scott*,
  28 F.4th 669 (5th Cir. 2022) ........................................................................................... 256

*Texas Democratic Party v. Abbott*,
  978 F.3d 168 (5th Cir. 2020) ................................................................................... 255, 256

*Texas Indep. Party v. Kirk*,
  84 F.3d 178 (5th Cir. 1996) ............................................................................................. 259

*Texas v. Holder*,
　888 F. Supp. 2d 113 (2012) ...................................................................................38

*Thornburg v. Gingles*,
　478 U.S. 30 (1986) ....................................................................... *passim*

*Turtle Mountain Band of Chippewa Indians v. Jaeger*,
　No. 3:22-CV-22, 2022 WL 2528256 (D.N.D. July 7, 2022) *stay denied*, *Turtle*
　*Mountain Band of Chippewa Indians v. Howe*, No. 23-3655 (8th Cir. Dec. 15,
　2023) ....................................................................................................291

*U.S. v. Texas*,
　252 F. Supp. 234 (W.D. Tex. 1966), *aff'd*, 384 U.S. 155 (1966) ......................................33, 34

*United States v. Abbott*,
　85 F.4th 328 (5th Cir. 2023) ...............................................................................255

*United States v. Brooks*,
　681 F.3d 678 (5th Cir. 2012) ...............................................................................325

*United States v. Clinical Leasing Serv. Inc.*
　925 F.2d 120 (5th Cir. 1991) ...............................................................................326

*United States v. Davis*,
　139 S. Ct. 2319 (2019).....................................................................................324

*United States v. L. Cohen Grocery Co.*
　255 U.S. 81 (1921)........................................................................................326

*United States v. Marengo Cnty. Comm'n*,
　731 F.2d 1546 (11th Cir. 1984) ........................................................291, 292, 314

*United States v. Palmer*,
　356 F.2d 951 (5th Cir. 1966) ...............................................................................292

*Veasey v. Abbott*,
　249 F. Supp. 3d 868 (S.D. Tex. 2017) ...........................................................39, 310

*Veasey v. Abbott*,
　830 F.3d 216 (5th Cir. 2016) (en banc) *cert. denied*, —— U.S. ——, 137 S. Ct.
　612........................................................................................... *passim*

*Veasey v. Abbott*,
　888 F.3d 792 (5th Cir. 2018) ...............................................................................39

*Veasey v. Perry*,
　29 F. Supp. 3d 896 (S.D. Tex. 2014) .....................................................................290

*Veasey v. Perry*,
71 F. Supp. 3d 627 (S.D. Tex. 2014) ..............................................38, 295, 300, 303

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
455 U.S. 489 (1982).....................................................................326, 336, 337

*Vote.Org v. Callanen*,
89 F.4th 459 (5th Cir. 2023......................................................................291

*Vote.Org v. Callanen*,
No. 22-50536, 2023 WL 8664636 (5th Cir. 2023) ......................................245, 283

*Voting for Am., Inc. v. Steen*,
732 F.3d 382 (5th Cir. 2013) ......................................................................284

*White v. Regester*,
412 U.S. 755 (1973) 343 F. Supp. 704 (W.D. Tex. 1972), *partially rev'd and
remanded sub nom. White v. Register*, 412 U.S. 755 (1973), 422 U.S. 935
(June 30, 1975), *further proceedings sub nom. Graves v. Barnes*, 378 F. Supp.
640 (W.D. Tex 1974), 408 F. Supp. 1050 (W.D. Tex. 1976), 446 F. Supp. 560
(W.D. Tex. 1977)..................................................................................37, 40

*Whole Women's Health v. Jackson*,
595 U.S. 30 (2021)....................................................................254, 255, 258

*Women's Med. Ctr. of Nw. Houston v. Bell*,
248 F.3d 411 (5th Cir. 2001) ......................................324, 326, 339, 340

*Zimmerman v. City of Austin, Tex.*
881 F.3d 378 (5th Cir. 2018) ......................................................................244

## Statutes

42 U.S.C. § 1983.....................................................................................290, 296

42 U.S.C. §§ 1983 and 1988......................................................................296

52 U.S.C. § 10301(a) ...............................................................................291, 299

52 U.S.C. § 10301(b) ...............................................................................292

52 U.S.C. § 10303(f)(2) ...........................................................................291

EC § 124.002 ...........................................................................................23

EC § 13.002(c) .........................................................................................105

EC § 13.002(c)(8)(A).................................................................................107

EC §§ 273.001 & 273.002 ..................................................................16

EC § 276.015(2) ............................................................................188

EC § 276.015(a)(1) ..........................................................................28

EC § 276.015(a)(2) ..........................................................................28

EC § 276.015(a)(2) & (b) ...........................................................27, 186

EC § 276.015(a)(2), (c) ..............................................................28, 186

EC § 276.015(e)(1) ..........................................................................28

EC § 276.015(f) ........................................................................28, 186

EC § 276.015(g) ..............................................................................28

EC § 276.106(a) ..............................................................................28

EC § 276.106(b) ..............................................................................29

EC § 31.001(a) ................................................................................18

EC § 31.002(a) ................................................................................18

EC § 31.006(a) ................................................................................15

EC §§ 31.006, 273.001, 273.002, 273.022 ......................................258

EC § 31.050 ....................................................................................19

EC §§ 31.128, 129, 130 ...................................................................16

EC § 31.129(b) ................................................................................16

EC § 32.075 .............................................................143, 145, 331, 332

EC § 32.075(g) .........................................................23, 143, 332

EC § 33.008 ....................................................................................18

EC § 33.051 ...........................................................................145, 331

EC § 33.051(g) ........................................................................23, 144

EC § 33.052 ..................................................................................144

EC § 33.056 ..................................................................................336

EC § 33.056(f) ................................................................................23, 146

E.C.§ 33.061 ................................................................................146, 337

EC § 33.061(a) ........................................................................24, 149, 336

EC § 43.031(b) ......................................................................................22

EC § 48.0111 .........................................................................................27

EC §§ 64.009(e), (f) ..............................................................................26

EC § 64.0322 ........................................................................................26

EC § 64.034 ....................................................................................26, 27

EC § 7260.04(a-b) ...............................................................................196

EC § 84.002(1-a) ..................................................................................24

EC § 84.011(a)(3-a) ..............................................................................25

EC § 85.005 ........................................................................................169

EC § 85.005(a) ....................................................................................169

EC § 85.005(b) ....................................................................................169

EC § 85.005(c) ......................................................................................22

EC § 85.006(e) ......................................................................................22

EC § 85.061(a) ......................................................................................22

EC § 85.062(b) ......................................................................................22

EC § 86.001(1) ....................................................................................111

EC § 86.001(f) ...............................................................................25, 111

EC § 86.001(g) ....................................................................................111

EC § 86.001(h) ....................................................................................111

EC § 86.001(i) .....................................................................................111

EC § 86.001(j) .....................................................................................111

EC § 86.001(k) ....................................................................................111

EC § 86.002(g) .................................................................................................................25

EC §§ 86.002(h) ...............................................................................................................25

EC §§ 86.002(i) ................................................................................................................25

EC § 86.006(a) .........................................................................................................180, 209

EC § 86.006(a-2) ...........................................................................................24, 179, 180, 269

EC § 86.010(e) .................................................................................................................26

EC § 86.013(b) .................................................................................................................26

EC § 86.015(c) .......................................................................................................25, 111, 114

EC §§ 87.0271, 87.041, 87.0411 ......................................................................................25

EC § 87.041(b)(8) ............................................................................................................26

Tex. Loc. Gov't. Code § 3(B) .........................................................................................21

**Other Authorities**

Harris County, Texas, available at
    https://data.census.gov/table?text=s0201&t=001:005:400:451&g=050XX00U
    S48201 .......................................................................................................................48

88th Leg. R.S. Senate Bill 1750........................................................................................19

SoS Form 5-6, "Signature Roster-Election Day Hand Delivery of Ballot by Mail," .................180

Statement to the House Committee on Constitutional Rights & Remedies Chair
    Trent Ashby (July 9, 2021) ......................................................................................206

testimony of Stephanie Gomez, Common Cause, at Aug. 23 2021 hearing of
    House Select Committee on Constitutional Rights and Remedies ..........................87

## PRELIMINARY STATEMENT

Plaintiffs Delta Sigma Theta Sorority, Inc., the Houston Area Urban League, and Jeffrey Clemmons (the "HAUL Plaintiffs), [1] and Plaintiffs Mi Familia Vota, Marlon López, and Marla López (the "MFV Plaintiffs"),[2] respectfully submit the following proposed post-trial findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

### I.    THE PARTIES

#### A.  The HAUL Plaintiffs

##### 1.  *Delta Sigma Theta Sorority, Inc. ("DST")*

1.      Plaintiff Delta Sigma Theta Sorority, Inc. ("DST") is a national, nonprofit, nonpartisan organization of Black, college-educated women, focused on serving the Black community through social action. 10/2 Tr. 2081:1-20 (Brown).

2.      DST was founded in 1913 by 22 Black women at Howard University in response to social injustices, and one of the Sorority's first public acts was to participate in the women's suffrage march. *Id*. 2080:11-21 (Brown).  The organization has participated in voting rights efforts for more than 110 years. *Id.* 2082:23–2083:8 (Brown).

3.      The Sorority organizes its work pursuant to what it calls its "Five Point Programmatic Thrust": educational development, economic development, international awareness

---

[1] The HAUL Plaintiffs also include the Arc Texas, which has filed proposed findings of fact and conclusions of law related to claims under the Americans with Disabilities Act, the Rehabilitation Act, and Section 208 of the Voting Rights Act in a separate submission.

[2] The Mi Familia Vota plaintiffs also join in and incorporate by reference the Findings of Fact and Conclusions of Law: (1) filed by the LULAC Plaintiffs regarding the undue burden on voters imposed by SB1 §§ 4.12, 5.02, 5.03, 5.07, 5.08; (2) filed by LUPE Plaintiffs regarding the undue burden on voters imposed by SB1 §§ 5.07, 5.13, 6.03, 6.04, 6.05, 7.04; (3) filed by LULAC Plaintiffs regarding violation of the Voting Rights Act, Section 2 by SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 5.02, 5.03, 5.07, 5.08, 7.04; and (4) filed by LUPE Plaintiffs regarding violation of the Voting Rights Act, Section 2 by SB1 §§ 6.03, 6.05, 7.04.

and involvement, physical and mental health, and political awareness and involvement.  It achieves

its programmatic goals through social action in all of these areas. *Id.* 2081:7-13 (Brown).

4.      DST has approximately 300,000 members worldwide, including 21,450 members

who are registered to vote in Texas. *Id*. 2083:13-25 (Brown). These 21,450 members comprise 75

Chapters in Texas, including Chapters in Bexar, Harris, and Travis Counties.

5.      DST Chapters' civic engagement programs include:

    a.      Voter registration drives; *Id*. 2086:21–2087:15 (Brown)

    b.      Voter education; *d*. 2086:21–2087:15 (Brown)

    c.      Candidate forums; *Id*. 2086:21–2087:15 (Brown)

    d.      Legislative advocacy, through organizing meetings with state
    representatives in Austin and national legislators in Washington D.C., reviewing
    policy, producing letters of support or opposition to submit to the legislature, and
    attending legislative sessions to provide legislative testimony.  *Id*. 2089:8–2090:9
    (Brown).

6.      All Texas Chapters of DST are active in voter registration and voter education and

work to make sure that people know how to vote and are aware of the issues and the candidates on

the ballot. 10/2 Tr. 2086:19–2087:15 (Brown); *see also* 10/2 Tr. 2144:17-21 (Watkins-Jones).

7.      DST Chapters have provided voter assistance, for example by helping nursing

home residents to fill out applications for ballots by mail ("ABBMs"), to file address changes, and

to complete their ballots by mail ("BBMs"). They have also provided transportation to the polls.

10/2 Tr. 2088:1-18 (Brown).

8.      The challenged provisions of SB1 make it substantially more difficult for DST to pursue its social action mission, as the organization has been forced to divert financial resources and human capital in response to this new law.

9.      The poll watcher provisions of SB1 have deterred DST members who had previously served as poll workers and election judges from continuing to serve because the members and their family members fear intimidation from poll watchers that have been emboldened by SB1. 10/2 Tr. 2155:9-20 (Watkins-Jones).

10.     The voter assistance provisions of SB1 have hindered DST's ability to pursue its mission because members have been deterred from volunteering to assist voters. *Id*. 2108:7–2109:3, 2109:9–2110:2; 2110:12–2111:1 (Brown); 10/3 Tr. 2203:10-15; 2223:22–2224:4 (Watkins-Jones). In fact, entire DST Chapters have shied away from certain types of assistance post-SB1. 10/3 Tr. 2199:20-24 (Watkins-Jones).

11.     In response to members' fear of prosecution under SB1, DST has been forced to divert time to analyze SB1 and train members about how they can serve the community without running afoul of new requirements. 10/2 Tr. 2101:23–2103:12 (Brown).

12.     The changes wrought by SB1 also required DST's Texas Chapters to reorganize their public voter education efforts. *Id.* 2100:15-19 (Brown). DST has had to devote more time, more resources, and more volunteers to the trainings that it has offered to the community. *Id.* 2100:19–2101:1, 2101:19–2102:20 (Brown).  As Sharon Watkins-Jones testified, "Deltas will endure the hardships that are put in front of us to vote, and while burdensome we will vote but many of the communities that we serve are so concerned and may not have our same conviction and so it is our duty to help to educate them so that they press through." 10/3 Tr. 2222:4-9 (Watkins-Jones).  These DST members would otherwise have devoted that time to other DST

efforts. 10/2 Tr. 2105:25–2106:16 (Brown). This training differed from the training that DST routinely offered because the organization had not typically done reeducation of existing voters. *Id*. 2112:6-9 (Brown).

13.    DST Chapters increased their budgets for voter education in response to SB1. 10/3 Tr. 2204:15-24 (Watkins-Jones).

14.    To devote more time and resources to training on SB1, DST Chapters diverted resources from its existing capacity to pursue other legislative advocacy during the 2021 session. *Id*. 2157:13–2158:7 (Watkins-Jones). DST also diverted time from voter mobilization efforts to focus on voter education in response to SB1. 10/3 Tr. 2204:25–2205:19.[3]

### 2. *Houston Area Urban League*

15.    Plaintiff Houston Area Urban League ("HAUL") is a 501(c)(3) organization founded in 1968 to promote economic, social, and civic participation among Black people and other marginalized communities in Houston. HAUL is an affiliate of the National Urban League, which was established in 1910 to create better social and economic conditions for Black individuals. *Id*. 2229:14–2230:3 (Shackelford).

16.    HAUL's programs today cover housing, jobs, education, health, and social justice education and advocacy. *Id*. 2230:4-9 (Shackelford). The organization employs 20 full-time employees. *Id*. 2234:19 (Shackelford).

17.    HAUL has two membership-based auxiliaries: the Young Professionals ("HAUL YP"), whose members are aged from 21 to 40, and the HAUL Guild, whose members are 40 and

---

[3] Additional facts showing how SB1 has injured DST as an organization are described below in Section XVII "Injuries to Organizational Plaintiffs and Their Members."

older. *Id*. 2236:4-13 (Shackelford). The auxiliaries support HAUL through volunteerism, fundraising, advocacy, and developing members. *Id.*

18.     To become a member of either the HAUL YP or HAUL Guild, one completes a membership form and pays an annual fee. *Id*. 2236:16-22 (Shackelford).

19.     HAUL YP has 414 members; HAUL Guild has 175 members. *Id*. 2237:6-8 (Shackelford). More than 95% of the membership is African-American, and more than 60% of members are women *Id.* 2237:9-13 (Shackelford).

20.     The Dallas/Fort Worth Urban League Young Professionals is part of HAUL as well, as there is no National Urban League affiliate in Dallas. *Id.* 2236:4-13 (Shackelford).


21.     HAUL's clients receive direct services, such as workforce orientation, from the organization. *Id.* 2235:24-25 (Shackelford). During the past year, HAUL has served 16,681 clients. *Id.* 2235:24-25 (Shackelford). 39% of HAUL's clients have annual incomes under $10,000; 35% have incomes between $10,000 and $40,000. HAUL's clients are 57% African-American and 53% Hispanic. Sixty-seven percent of the people served by HAUL are women. Four percent of its clientele are unhoused; 76% are employed; and 8-9% are seniors. HAUL also serves people who identify as veterans, individuals with disabilities, and immigrants. *Id*. 2234:20–2235:17 (Shackelford).

22.     HAUL's clients complete an intake process before receiving direct service support. *Id.* 2235:13-23 (Shackelford).

23.     Civic engagement is a cornerstone of HAUL's activities. Ray Shackelford, social action consultant for HAUL, testified that "when you think about when [the National Urban League] was founded, Black people did not have the right to vote. . . [W]hen you look at HAUL,

we were founded right after [Black] people received the right to vote in the heart of the Civil Rights Movement, and it still wasn't welcomed at that time[.]. . . [A]s we seek to create social and economic parity for the underserved, the people we serve in the community, voting is one of the key tools that allows us to do that and allows community members to make sure their voice is heard." *Id.* 2230:12-24 (Shackelford).

24.     HAUL's civic engagement programs include:

    a.  Voter registration drives;

    b.  A 12-week civic engagement course for Houston youth called "Advocacy U";

    c.  Speaking engagements in high schools about civic engagement advocacy;

    d.  Legislative advocacy, through organizing meetings with state representatives in Austin, reviewing policy, producing letters of support or opposition to submit to the legislature, and training on giving legislative testimony. 10/3 Tr. 2230:23–2231:18 (Shackelford).

25.     HAUL's Center for Social Justice & Education (the "Center") was created with funding that HAUL received in the aftermath of the murder of George Floyd. *Id.* 2232:19-25 (Shackelford). Its purpose is to provide information to the communities HAUL serves about the importance of voting, how to engage in advocacy, and how to read and understand public policy. The Center aspires to "train a better generation of leaders than ourselves." *Id.* 2233:1-11 (Shackelford).

26.     HAUL is challenging SB1 "because it has created harm to us as an organization in terms of diversion of financial resources, as well as human capital." *Id.* 2241:16-19 (Shackelford).

27.     After SB1 was enacted, HAUL hosted a virtual event with the CEO of the National Urban League and a post-election livestream with Rep. Jasmine Crockett. Though HAUL regularly

hosts post-election events, the virtual event in response to SB1 was unique because the National CEO does not typically attend such events.  *Id.* 2251:17–2252:1 (Shackelford).

28.    HAUL was obliged to reduce its voter registration work so that it could provide SB1-related training to its volunteers. *Id.* 2258:18–2259:9 (Shackelford).

29.    HAUL also increased its commitment to voter education in response to SB1*Id.* 2251:20–2252:23 (Shackelford).  National CEO Ray Judson diverted time from fundraising efforts to voter education in response to the fear and confusion that pervaded the community after SB1. *Id.* 2260:21–2261:9 (Shackelford).

30.    Ray Shackelford was hired by HAUL as a social impact consultant, *Id.* 2229:4-5 (Shackelford), to help with a Census project, *id*. 2263:1–2263:12 (Shackelford), facilitate HAUL's youth cohort, *id*. 2231:19-23 (Shackelford), advise HAUL's senior leadership team, i*d*. 2231:19–2232:9 (Shackelford), and assist HAUL's senior leadership team with developing a strategic plan for the Center for Social Justice & Education, *id*. 2252:10–2252:23 (Shackelford).  After SB1 was passed, Mr. Shackelford diverted time from the projects that he had been hired to pursue to educate himself on SB1 by participating in specialized trainings provided by the Harris County Elections Administrator ("EA") and attending one-on-one meetings with officials. *Id.* 2254:20–2255:19 (Shackelford). HAUL then had Mr. Shackelford devote a substantial amount of time to educating HAUL employees and HAUL clients about SB1. *Id.* 2252:10-23 (Shackelford).

31.    To compensate for the work that Mr. Shackelford could no longer perform since his efforts had been diverted to SB1 response, HAUL transferred an employee from its Workforce Department to the Center for Social Justice & Education; because that employee was transferred to the Center, HAUL hired two additional full-time equivalents to fill her original position. *Id.* 2253:19–2254:6 (Shackelford).

32.     HAUL shortened its family and community engagement program, which includes presentations usually focused on literacy, to provide SB1-related content to the community; this condensing impaired the quality of the presentation. *Id*. 2256:3–2257:4 (Shackelford).

33.     HAUL also completely altered the Advocacy U curriculum so that the 12-week program focused on SB1 rather than Diversity, Equity, and Inclusion. *Id*. 2257:5–2258:3 (Shackelford).[4]

### 3.  *The Arc of Texas*

34.     Plaintiff The Arc of Texas is a 501(c)(3) non-profit organization founded in 1953 by parents of children with intellectual and developmental disabilities (IDD) to advocate for their children to have access to education, employment, community supports, and other areas of community life. 10/11 Tr. 3492:18-25; 3493:1-5 (Martinez). The Arc of Texas' mission is to "promote, protect, and advocate for the human rights and self-determination of Texans with intellectual and developmental disabilities." *Id*. 3490:23-25; 3493:7-9 (Martinez).

35.     The Arc of Texas is filing its own proposed Findings of Fact and Conclusions of Law, in which the organization is more fully described.

### 4.  *Jeffrey Clemmons*

36.     Plaintiff Jeffrey Clemmons served as an election judge in Travis County during the 2020 Primary Runoff in July 2020. 9/13 Tr. 648:14–649:3 (Clemmons)

37.     Mr. Clemmons participated in a 3-hour training hosted by Travis County before he served as an election judge. This training focused on the election process and the duties of an

---

[4] Additional facts showing how SB1 has injured HAUL as an organization and its members are described below in Section XVII "Injuries to Organizational Plaintiffs and Their Members."

election judge to ensure order in the polling location and provide oversight to poll watchers. *Id*. 650:16–651:14 (Clemmons).

38.    Mr. Clemmons is concerned about serving as an election judge now that SB1 is in effect. *Id*. 652:21–653: 8 (Clemmons).  In particular, he finds SB1's poll watcher provisions to be unclear and is worried about violating them and facing civil or criminal penalties. *Id*. 662:19– 664:15, 666:16–669:22 (Clemmons); *see also* 670:4–673:3 (Clemmons). He is also unsure about how to abide by those provisions while also discharging his other election judge duties, such as maintaining order in the polling place and preventing voter harassment and intimidation. *Id*. 663:19–665:13 (Clemmons); 9/13 Tr. 668:21–669:14 (Clemmons).

39.    Mr. Clemmons declined to serve as an election judge during the 2022 election cycle because of these concerns and the absence of clarity in SB1's poll watcher provisions. *Id*. 652:21– 653:8,655:13–656:13 (Clemmons); *see id*. 661:9–652:3 (Clemmons). He has remained on the Travis County Clerk's email list and on other election-related listservs, however, so that he will continue to receive notifications about volunteer shortages and opportunities to serve. *Id*. 651: 24 – 652: 14 (Clemmons).

40.    Mr. Clemmons now plans to serve again as an election judge during the 2024 election cycle despite his ongoing fears related to SB1, and he has signed up to serve. *Id*. 674:16– 674:24 (Clemmons).

### B.  The MFV Plaintiffs[5]

#### 1. *Mi Familia Vota*

41.    Plaintiff Mi Familia Vota ("MFV") is a national, non-profit civic engagement organization with operations in several states including Texas. MFV's mission is to increase

---

[5] MFV Plaintiff Paul Rutledge was unable to testify at trial.  MFV Plaintiff's voluntarily dismiss Mr. Rutledge from the case.

political representation and power of the Latino community.  10/10 Tr. 3426: 3-6 (Razo). MFV has demonstrated injury in fact by showing that the challenged provisions of SB1 have required the organization to divert resources in a manner that "concretely and perceptibly impaired" its ability to fulfil its mission. *LaFHAC,* 82 F.4th at 351.

42.    The Texas office of MFV is part of the national organization. 10/10 Tr. 3426: 17-19 (Razo).

43.    Angelica Razo is MFV's National Deputy Director of Campaigns and Programs. From November 2019 to May2023, she was Texas State Director for MFV. 10/10 Tr. 3425:8-13 (Razo). Organizational decisions about MFV's programs in Texas are made by the Texas State Director, who sets state strategy, the annual plan and budget, program priorities and goals, decides where in the state these programs will operate, determines the number of staff members the programs will need, and manages the Texas leadership team. 10/10 Tr. 3426:4–3427:1 (Razo).

44.    The State Director also focuses on fundraising for the organization's Texas budget and serves as the media spokesperson and representative for the organization for the state. 10/10 Tr. 3426: 2-5 (Razo). . The funding consequences of SB1 came clearly into focus in the second half of 2022, when MFV carried out its work during a major mid-term election, the first since SB1 went into effect. Ms. Razo and her staff saw how great the need was to divert resources to MFV's election work to address the impacts of SB1. 10/10 Tr. 3483:8-19 (Razo). Since the passage of SB1, MFV has had to change its fundraising practices. 10/10 Tr. 3428: 18-25, 3429:1-2 (Razo). SB1 has required MFV to start raising support funds for general operations. 10/10 Tr. 3429: 5-7, 14-18 (Razo).

45.     In Texas, MFV operates in-person programs in Harris and Dallas Counties, and offers remote and digital programs in Hidalgo, Cameron, and Bexar Counties. MFV provides

additional resources that are accessible to people across the state, including online resources, campaigns to educate voters by text, and a voter hotline that it operates during the election season. (Razo, 3426:2-5, 3434:3-5). MFV conducts door-to-door canvassing, phone banking, and text banking. It also staffs tables at community events, and provides workshops for schools and community colleges. 10/10 Tr. 3433:18-25, 3434:1-3 (Razo). SB1 eliminated voting options, such as DTV (§§3.04, 3.12, 3.13) and 24-hour voting §§3.09, 3.10) ending MFV's efforts to work with county officials to implement voting options to suit their communities. 10/10 Tr. 3447:4-12 & 3448:1-4 (Razo). Changes to poll watcher regulations under SB1 (§§4.01 and 4.07) impacted MFV recruitment of poll workers. Before SB1, MFV encouraged community members, especially young people, to serve as poll workers. 10/10 Tr. 3451:13-15, 3452:3-4 (Razo).

46.    MFV runs voter mobilization campaigns and election-related work to educate voters and encourage them to participate in elections. 10/10 Tr. 3426:13-16 (Razo). MFV's programming includes a year-round youth leadership development program, and issue-based programs, including programs on environmental justice, immigration, access to affordable health care, educational equity, voting rights, worker's rights, and reproductive justice. 10/10 Tr. 3426:8-9, 3430:17-24 (Razo). The organization advocates about issues that disproportionately impact the Latino community. 10/10 Tr. 3426:9-12 (Razo). MFV focuses on individuals who are considered low-to-mid-propensity voters.  Because they are classified as unlikely to vote, campaigns, political parties, and other organizations are not likely to try to contact them. 10/10 Tr. 3434: 18-23 (Razo).

47.    MFV has 40-50 full-time employees nationwide; additionally, during election cycles it will typically onboard part-time employees who will work on election-related activities through Election Day. 10/10 Tr. 3427: 7-24 (Razo).

48.    MFV has 6 permanent employees in Texas; during an election cycle, it will hire approximately 30 part-time employees there. 10/10 Tr. 342:15-24 (Razo).

49.    MFV's annual budget for activities in Texas is between $900,000 and $1.1 million. 10/10 Tr. 3428:8-12 (Razo). SB1 strains MFV's staff and financial resources, limiting its ability to carry out its non-election-related projects. 10/10 Tr. 3430:25, 3431:1-4 (Razo).

### 2.Marlon López

50.    Plaintiff Marlon López is a registered voter who resides in Harris County, Texas. 10/10 Tr. 3376:12-23 (López). He is the father of Plaintiff Marla López. 10/10 Tr. at 3376:9-12 (López).

51.    Mr. López works a physically demanding job as a welder. His job often requires him to work twelve hours a day. 10/10 Tr. 3376:12-23 (López). He does not typically have weekends off. His schedule depends on the specific project he is working on; for example, he might work twelve days and then get two days off. 10/10 Tr. 3377:20-23 (López).

52.    During the trial of this case, Mr. López was working on a project that required him to work out of state. 1010 Tr. 3366:14-25 (López).   Thus, he was unable to testify.   1010 Tr. 3377:14-17 (López).

53.    Even when Mr. López has a day off, he has other responsibilities, including responsibility for his young daughter, Marla López's sister. 10/10 Tr. 3377:24-25, 3378:24-3379:1 (López).

54.    Mr. López often works on contracts outside of Texas. When he works outside of Texas, he usually lives in his camper near the work site. 10/10 Tr. 3377:1-10 (López).

55.    When he has a project in Harris County, he often has a commute of at least an hour. 10/10 Tr. 3377:11-13 (López).

56.    During the 2020 general election period, Mr. López worked more than seven days in a row, got a few days off, then had to restart the cycle. 10/10 Tr. 3406:20-23 (López).

57.    Mr. López was able to vote in the 2020 general election because Harris County offered extended voting hours and a drive-thru location. Because of his complicated work schedule and his family obligations, he needed those options to be able to make a voting plan that worked for him. 10/10 Tr. 3378:7-12, 3380:18-25 (López). In fact, a change in his work schedule prevented him from voting as he planned, and he had to find a different day to vote. 10/10 Tr. 3407:1-5 (López). On the one day he was able to vote, he had to care for his young daughter (Ms. López's sister), who was in the car with them while they voted. 10/10 Tr. 3404:18-21; 3378-3379:1 (López).

58.    In the 2020 general election, Mr. López's daughter, Marla López, helped him make a plan to vote despite his long work hours. 10/10 Tr. 3377:18-3378:6 (López).

59.    The passage of SB1 has eliminated important options such as drive-thru voting and 24-hour voting, making it difficult for voters such as Mr. López to make a voting plan that works for them. 10/10 Tr. 3389:22–3390:4 (López).

60.    Mr. López tried to make a plan to vote after SB1 went into effect, but has not been able to vote. 10/10 Tr. 3409:2-4 (López).

### 3. Marla López

61.    Plaintiff Marla López is a registered voter who resides in Harris County, Texas.

62.    Marla López is a 26-year-old resident of Texas. 10/10 Tr. at 3371:7-8, 21-24 (López). Her father is plaintiff Marlon López. 10/10 Tr. at 3376:9-12 (López).

63.    Ms. López grew up in Brownsville Texas, having moved there from Atlanta, Georgia when she was three or four years old. 10/10 Tr. at 3371:23-25, 3372:1 (López).

64.     Ms. López worked for MFV from November 2019 to April 2022, first as its census organizer and then as the Houston coordinator. 10/10 Tr. at 3371:15-18 (López).

65.     In the 2020 general election, Ms. López helped her father make a plan to vote, which was difficult because of his long work hours and family obligations. They had to change plans a few times because of his work schedule. When they did vote, they voted on a Saturday in the late afternoon or early evening in a single car with Mr. López, Ms. López, and Mr. López's other young daughter. 10/10 Tr. 3378:7-12, 15-25 (López).

66.     Ms. López voted for the first time in 2016, while on her college campus. The option to vote on campus enabled her to vote. Because of her work schedule, her class schedule, and the fact that she did not have a car, she would not have been able to vote if voting had not been available on campus. 10/10 Tr. 3381:5-19, 3421:21–3422:6 (López).

67.     During the 2022 primaries, Ms. López was working for MFV when she received a call from an elderly, monolingual, Spanish-speaking couple who wanted help to find their closest polling place. *Id.* 3382:3-14 (López). To help them, she went to see them in person and walked with them from their apartment to the voting location. *Id.*. Once they arrived, the couple asked Ms. López to assist them in voting; however, Ms. López did not feel comfortable providing them with assistance because of SB1. She did not want to sign the oath, provide personal information about herself, and risk being prosecuted or sued. *Id.* 3382:22–3383:3 (López).

68.     Ms. López served as an election worker in Harris County on election day during the spring of 2021. *Id.* 3383:7-20 (López). She also served as an election judge in Harris County on election day in November 2021. *Id.* 3383:21–3384:3 (López). She chose to serve as an election judge because EAs informed her that they needed an election judge or they would not be able to operate that voting location. *Id.* 3384:5-12 (López).

69.     Ms. López has decided not to serve as an election judge again that SB1 is in effect. *Id.* 3386:20-22 (López) She is concerned that she could be prosecuted or a poll watcher could sue her, and she would have no protection as an election judge, just for trying to make sure that her voting location was safe for voters. *Id.* 3386:24–3387:6, 3417:18–3418:6 (López). Ms. López is concerned that even if she followed the law to the best of her training and knowledge, someone might still perceive her actions as wrong. *Id.* 3386:12-16; 3412:7-12; 3417:18–228:6 (López).

70.     Ms. López is also concerned that she could face criminal sanctions if she were accused of interfering with a poll watcher. *Id.* 3421:6-8 (López)

71.     Ms. López now has greater fear of poll watchers because of SB1. *Id.* 3412:7-12 (López).

72.     SB1 has limited Ms. López's options for voting and left her with less time to vote. *Id.* 3420:15 (López). Though she has figured out how to vote despite these barriers so that she can have a say in who represents her, it has not been easy to access voting. *Id.* 3420:18-22 (López).

### C.  The State Defendants

#### 1.  *Ken Paxton, as Attorney General of Texas*

73.     Defendant Ken Paxton is Attorney General of the State of Texas (the "AG").  The AG has statutory duties for certain aspects of SB1's enforcement scheme. SB1 §§ 4.06, 4.09, 6.04, 6.05, 6.06 & 7.04.

74.     The Office of the Attorney General of Texas ("OAG") is an executive department or agency of the State of Texas. Joint Pretrial Order ("JPTO") (ECF No. 753), ¶ 40.

75.     Defendant Jane Nelson, Texas Secretary of State, (the "Secretary") is required under the law to report suspicions of criminal conduct in connection with an election to the AG. SB1 § 2.08 (Tex. Elec. Code ("EC") § 31.006(a)); 10/16 Tr. 3909:8-17 (White).  Accordingly, the AG plays a role in enforcing the criminal provisions of SB1.

76.     SB1 § 8.01 (EC § 31.129(b)) authorizes the AG to assess civil penalties against local officials who violate the law by failing to enforce certain provisions of SB1, including provisions that Plaintiffs challenge.

77.     The AG is tasked to enforce SB1 against election officials who are subject to civil prosecution for violations of sections of SB1 which establish requirements for election officials as defined under the Texas Election Code ("EC"). SB1 § 8.01 (EC §§ 31.128, 129, 130); *see also* 9/13 Tr. 772:2-6 (Garza).

78.     SB1 permits and, in some cases, mandates, the AG to assist any District Attorney ("DA") to enforce SB1. 10/16 Tr. 3909:8-17 (White); EC §§ 273.001 & 273.002.

79.     The AG has demonstrated a willingness to enforce, and has actually enforced, the EC, including SB1. 10/16 Tr. 3909:8-17, 3913:9–3914:16 (White).

80.     The AG publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud. *See, e.g.*, OCAPX-384, 385, 386.

81.     Although the AG may no longer unilaterally prosecute allegations of election-related crimes, *State v. Stephens*, 663 S.W.3d 45, 51-55 (Tex. Crim. App. 2021), the OAG continues to be involved in the enforcement of criminal election offenses through other mechanisms.

82.     OAG continues to partner with DAs to prosecute such allegations through deputization by a DA or appointment *pro tem* by a district judge or the DA. 10/16 Tr. 3908:21–3909:17 (White).

83.     Texas Government Code § 402.028 governs how a representative of the AG may be deputized to serve under the direction of a DA 10/16 Tr. 3968:18–3969:4 (White).

84.    Texas Code of Criminal Procedure Art. 207 governs the pro tem process, under which an Assistant Attorney General (an "AAG") steps into the shoes of the county's DA. 10/16 Tr. 3964:4–3965:6 (White).

85.    Post-*Stephens*, "an AAG might be appointed by a DA as a Special Assistant District Attorney and serve [in a manner analogous to the pro tem process]. [The OAG has] had prosecution assistants divisions going back decades . . . [as] a resource for local prosecutors when they need special expertise or they need to get out of a case because of a court conflict." 10/16 Tr. 3965:21–3966:2 (White).

86.    Since the *Stephens* decision, OAG's practice is to seek opportunities to obtain appointments from local prosecutors. 10/16 Tr. 4051:2-10 (White). This practice is exemplified by two Collin County matters: the "Whitaker/O'Neill deputation" and the "Whitaker/Barr deputation," in each of which the DA deputized OAG to prosecute allegations of election-related crimes. 10/16 Tr. 4057:2–4058:11 (White).

87.    Moreover, *Stephens* did not alter the authority of the AG to investigate allegations of election-related crimes, and, in some cases, the AG is statutorily required, by "shall investigate" language, to investigate election-related allegations. 10/16 Tr. 4041:6–4042:1 (White).

88.    OAG continues to investigate alleged elections violations post-*Stephens*. 10/16 Tr. 4042:11-17 (White).

89.    Finally, OAG may refer cases to local prosecutors for prosecution. 10/16 Tr. 3914:8-11; 4058:14-16 (White). For example, after the prosecution of Hervis Rogers was dismissed in Montgomery County, OAG referred the case to the Harris County DA, who brought charges against Mr. Rogers before a grand jury. *Id.* 4058:17–4059:24, 4062:7-12 (White). The same procedure was used in the prosecution of Ignacio González Beltrán. The case against Mr.

González Beltrán was dismissed in Montgomery County, and thereafter referred by the OAG to Harris County, where it was presented to a Harris County grand jury. 10/16 Tr. 4063:3–4064:6 (White).

### 2. *Jane Nelson, as Secretary of State of Texas*

90.    Defendant Jane Nelson, the Secretary of State of the State of Texas (the "Secretary"), is the "chief election officer of the state." *See* EC § 31.001(a), 9/22 Tr. 1825:21-23 (Adkins). The Office of the Secretary of State ("SoS") is an executive department or agency of the State of Texas. 9/22 Tr. 1825:12-17 (Adkins).

91.    The Secretary oversees the Elections Division of SoS, which is charged with administering the EC. 9/22 Tr. 1823:20–1824:4, 1825:24–1826:1 (Adkins)

92.    SB1, Art. II mandates the Secretary to engage in information sharing, voter roll supervision, and reporting of election-related offenses. *See* SB1 §§ 2.06–2.10.

93.    SB1, Art. III requires the Secretary to adopt rules implementing restrictions that Plaintiffs challenge concerning voting from vehicles and early voting hours. *See* SB1 §§ 3.04–3.09.

94.    It is the Secretary's responsibility to prescribe the design and content of "the forms necessary for the administration" of the EC. EC § 31.002(a).

95.    The EC requires the Secretary to modify ABBMs so that they include the statutorily required space for applicants to enter the identification information that the EC now requires pursuant to SB1. 9/22 Tr. 1834:5-7 (Adkins).

96.    The Secretary is responsible for the design and content of BBM carrier envelopes. *See* 9/22 Tr. 1843:4-7 (Adkins).

97.    SB1 requires the Secretary to "develop and maintain a training program for [poll] watchers." SB1 §§ 4.01, 4.05 (EC § 33.008).

98.    The Secretary's training program constrains poll watchers by requiring them to obtain a certificate of completion from SoS's website. 9/19 Tr. 1061:9-22 (Callanen).

99.    SB1 also requires the Secretary to report potential violations of any of the election-related crimes created or amended by SB1 §§ 4.06, 4.09, 6.04, 6.05 & 7.04 (the "Criminal Provisions") to the AG. SB1 § 2.08. SoS has demonstrated a willingness to enforce, and has actually enforced, the EC, including SB1. For example, SoS is the primary source of referrals of allegations of election crimes to OAG. 10/16 Tr. 3913:9-19 (White).

100.    More than 50% of referrals to OAG concerning voter fraud complaints come through SoS. *Id.* 4008:17-22 (White).

### D.  The County Defendants

#### 1.  *Harris County Clerk Teneshia Hudspeth*

101.    Defendant Teneshia Hudspeth is the Harris County Clerk and chief election officer for Harris County and is responsible for the administration of elections in Harris County. JPTO ¶ 45. Previously, the Harris County Elections Administrator, Clifford Tatum, was responsible for the administration of elections in Harris County.  The Harris County Elections Administrator's office was abolished on September 1, 2023, pursuant to 88th Leg. R.S. Senate Bill 1750 (amending EC § 31.050). JPTO ¶ 44 & n.12. Subsequently, Ms. Hudspeth was substituted as a Defendant in this action for Mr. Tatum. *See* Sept. 11, 2023 Text Order Granting Motion to Substitute Party.

#### 2.  *Bexar County EA Jacquelyn Callanen*

102.    Defendant Jacquelyn Callanen is the Bexar County EA and responsible for the administration of elections in Bexar County. JPTO ¶ 41. She oversaw the implementation of SB1's changes to election procedures within Bexar County, including by responding to voter requests for ABBMs, providing forms, conducting training of EA staff and election workers, and procuring

ABBM and BBM forms, including BBM carrier envelopes. *See* 9/19 Tr. 1008:23–1009:14, 1040:15–1041:1 (Callanen).

### 3. *Harris County District Attorney Kim Ogg*

103.     Defendant Kim Ogg is the elected Harris County DA, a position she had held since 2017. Stipulation (ECF No. 781) ("Ogg Stip.") ¶ 1.

104.     The Harris County DA's Office ("HCDAO") represents the State of Texas in criminal cases in Harris County, including those arising under the EC. Ogg Stip. ¶ 2.

105.     The HCDAO has not (1) adopted a policy refusing to prosecute any class or type of criminal offenses under state law, (2) instructed law enforcement to refuse to arrest individuals suspected of committing any class or type of offense under state law, or (3) permitted an assistant DA to take either of the foregoing actions. Ogg Stip. ¶ 5. This includes criminal offenses under the EC.

106.     To charge a crime under the EC, including a crime created or amended by SB1, the DA's consent or authorization is necessary. 10/16 Tr. 3909:18-23; 3914:12-18 (White).

107.     Defendant Ogg's office regularly receives reports of alleged violations of the EC. *See* Ogg Ex. 3 (Ogg's First Am. Resp. to OCA-GH's Second Set of Interrogs.) at Nos. 1, 2.

108.     For example, the OAG referred the alleged violations of the EC by Hervis Rogers (a Black voter) and Ignacio González Beltrán (a Latino voter) to HCDAO, which then brought charges against each of them before a grand jury. 10/16 Tr. 4062:7-12; 4063:3–4064:6 (White).

109.     Since SB1 went into effect, Defendant Ogg has received at least twelve reports of alleged violations of criminal sections of the EC that were changed or added by SB1. *See* Ogg Ex. 4 (Ogg's Resp. to LULAC Pls.' Discovery Requests (Ex. B)) at No. 1.

110.     Ogg has expressly refused to "disavow any intent to prosecute any person for conduct that violates SB1." *Id.*

111.    House Bill 17 ("HB17") further emphasizes the duty of DAs to enforce criminal provisions of the EC. Under the new law, effective September 1, 2023, a DA who adopts any policy that "prohibits or materially limits the enforcement of any criminal offense" may be removed from office. HB17 § 1 (adding Tex. Loc. Gov't. Code § 3(B)). In other words, even if Defendant Ogg wished to abjure enforcement of SB1's criminal provisions—and she has made clear that she has no such wish—state law now compels her to enforce SB1's Criminal Provisions.

### 4. *Travis County District Attorney José Garza*

112.    José Garza is the elected Travis County DA. The Travis County DA's Office represents the State of Texas in criminal cases, including those arising under the EC. JPTO Ex. 3 at ¶ 2.

113.    Defendant Garza is responsible for the investigation and prosecution of alleged criminal violations of the EC in Travis County, including those created or amended by SB1. *See* LULAC Ex. 95 (Jose Garza's Obj. and Resp. to LULAC Pls.' First Set of Interrogs.) at Nos. 1-4.

114.    To charge a crime under the EC, the DA's consent or authorization is necessary. 10/16 Tr. 3909:18-23; 3914:12-18 (White).

115.    Defendant Garza declined to disavow intent to prosecute violations of SB1. *See* LULAC Ex. 95 at Nos. 1-4. To the contrary, Defendant Garza stated, "the Travis County DA intends to accept all complaints under this section of the EC, investigate the allegations or refer the complaint to the appropriate investigatory agency." *Id.*

116.    Defendant Garza has made no announcement that he will refrain from enforcement, prosecution, and investigation of alleged violations of the criminal provisions of SB1. *Id.* Indeed, he admits that he has no intent of refraining from investigating or prosecuting violations of SB1's criminal provisions. LULAC Ex. 94 (Jose Garza's Obj. and Resp. to LULAC Pls.' First Set of Requests for Admissions) at Nos. 2, 3.

117.    Defendant Garza further "intends to accept all complaints under [sections of the EC affected by SB1], investigate the allegations or refer the complaint to the appropriate investigatory agency." *See* LULAC Ex. 95 at Nos. 1, 2, 4.

## II.    THE PROVISIONS OF SB1 CHALLENGED BY THE HAUL PLAINTIFFS (THE "CHALLENGED PROVISIONS")

118.    The HAUL and MFV Plaintiffs challenge various provisions of SB1.

### A.    SB1's Prohibition of Drive-Thru Voting

119.    SB1 §§ 3.04, 3.12 & 3.13 of SB1 ban drive-thru voting ("DTV") and eliminate DTV centers.

120.    SB1 § 3.04 (EC § 43.031(b)) provides states that "no voter may cast a vote from inside a motor vehicle….".

121.    SB1 § 3.12 (EC § 85.061(a)) limits early voting locations to the building in which the county clerk's branch office is located.

122.    SB1 § 3.13 (EC § 85.062(b)) prohibits temporary polling locations located within any "movable structure."

### B.    SB1's Prohibition of 24-Hour Voting

123.    SB1 §§ 3.09 & 3.10 ban 24-hour voting.

124.    SB1 § 3.09 (EC § 85.005(c)) restricts the scheduling of early voting hours, providing that "voting may not be conducted earlier than 6 a.m. or later than 10 p.m."

125.    SB1 § 3.10 (EC § 85.006(e)) limits voting hours in counties with populations greater than 55,000, prohibiting early voting before 6 a.m. or after 10 p.m. on the last Saturday of the early voting period, and before 9 a.m. or after 10 p.m. on the last Sunday.

### C. SB1's Elimination of Straight-Ticket Voting

126.    SB1 § 3.15 (EC § 124.002) completes the elimination of straight-ticket voting by prohibiting ballots from being "arranged in a manner that allows a political party's candidates to be selected in one motion or gesture."

127.    In 2017, House Bill 25 ("HB25") repealed the sections of the EC that permitted straight-ticket voting in Texas elections. HB25, 85th Leg. § 8 (2017). SB1 finishes what HB25 started by affirmatively banning electronic ballots structured so that a voter may exercise the option of voting simultaneously for all the candidates of one of the parties on the ballot. HB25's mandate to the Secretary to adopt rules and procedures that give effect to the elimination of permissions for straight-ticket voting now also requires the Secretary to enforce section 3.15 of SB1. *LUPE v. Abbott*, 618 F. Supp. 3d 449, 472 (W.D. Tex. 2022) (ECF No. 447).

### D. SB1's Poll Watcher Provisions

128.    SB1 §§ 4.01, 4.06, 4.07 & 4.09 loosen regulations that apply to poll watchers, allow them to roam freely around polling locations, and subject election officials to a range of penalties if they impede poll watchers' conduct.

129.    SB1 § 4.01 (EC § 32.075(g)) prohibits a presiding election judge from removing a poll watcher for a violation of the EC unless the poll watcher's unlawful conduct was observed by an election judge or clerk.

130.    SB1 § 4.06 (EC § 33.051(g)) introduces a new class A misdemeanor into the EC, establishing criminal liability for an election officer who "intentionally or knowingly refus[es] to accept a watcher for service."

131.    SB1 § 4.07 (EC § 33.056(f)) requires that poll watchers be permitted to "sit or stand near enough to see and hear" any election activity they are observing, and provides that "a watcher

may not be denied free movement where election activity is occurring within the location at which the watcher is serving."

132.    SB1 § 4.09 (EC § 33.061(a)) adds to the criminal offense of obstructing a poll watcher, making it illegal to "tak[e] any action to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective."

### E.  SB1's Restrictions on In-Person Delivery of Mail-In Ballots

133.    SB1 § 4.12 (EC § 86.006(a-2)) restricts in-person delivery of a BBM by adding, in relevant part, the following requirements:

> An in-person delivery of a marked ballot . . . must be received by an election official at the time of delivery. The receiving official shall record the voter's name, signature, and type of identification . . . on a roster prescribed by the secretary of state. The receiving official shall attest on the roster that the delivery compiles with this section.

### F.  SB1's Identification Number Requirements for Mail-In Voting

134.    SB1 §§ 5.02, 5.03, 5.07 & 5.08 require voters to enter certain state-issued identification numbers on ABBMs and require rejection of an ABBM on which the voter has not entered a number that matches the number in the SoS's records.

135.    SB1 § 5.02 (EC § 84.002(1-a)) provides that each ABBM must include:

> (A)    the number of the applicant's driver's license, election identification certificate, or personal identification card issued by DPS;
>
> (B)    if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number; or
>
> (C)    a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B)….

136.    SB1 § 5.03 (EC § 84.011(a)(3-a)) mandates the Secretary to create an updated ABBM form that requires voters to fill in the information required by SB1 § 5.02.

137.    SB1 § 5.07 (EC § 86.001(f)) amends the EC to require rejection of ABBMs that do not meet SB1's identification number requirements, with notice of a method of "curing" the application using an online tool known as the "Ballot Tracker."

138.    SB1 §§ 5.08, 5.10, 5.12, 5.13 & 5.14 require a mail-in voter to enter the same state-issued identification numbers on the voter's BBM carrier envelope as are required on the ABBM, and require rejection of an BBM on which the voter has not entered a number that matches the number in SoS's records.

139.    SB1 § 5.08 (EC §§ 86.002(g)-(i)) requires that the same identification number information be entered on a BBM carrier envelope that SB1 §§ 5.02 & 5.03 require on the ABBM.

140.    SB1 § 5.10 (EC § 86.015(c)) requires the online tracking tool for ABBMs and BBMs allow voters to enter or correct information enumerated by the identification number requirements.[6]

141.    SB1 §§ 5.12, 5.13 & 5.14 (EC §§ 87.0271, 87.041, 87.0411) require the rejection of a voter's ballot if the identification numbers on the carrier envelope are missing or do not meet SB1's requirements.

---

[6] But note that SB1 § 5.10 amended EC §86.015(c) to require the Ballot Tracker to allow voters to add or correct their identification numbers while leaving unchanged the language in EC §86.015 (c) that limits access to the Tracker to voters who enter *both* their SSN/4 *and* their TDL/TID. Thus, a voter for whom SoS's system does not have both numbers is shut out of the Tracker for purposes of curing an ABBM or a BBM carrier envelope. 9/19 Tr. 1020:2-12 (Callanen).

142.    SB1 § 5.13 (EC § 87.041(b)(8)) provides that a ballot by mail is valid only if the carrier envelope's identification information "identifies the same voter identified on the voter's application for voter registration…"

### G. SB1's Restrictions on Persons Who Assist Voters

143.    SB1 § 6.01 (EC §§ 64.009(e), (f)) requires that any person who "simultaneously" provides transportation to the polls for curbside voting for seven or more voters complete and sign a form reporting the transporter's name, address, and whether he or she is solely providing transportation or is also serving as an assistant to the voters.  The form states that "a poll watcher is entitled to observe any activity conducted under this section."

144.    SB1 §§ 6.03, 6.05 & 6.07 require a person who assists a voter to disclose and document information previously not required by the EC.

145.    SB1 § 6.03 (EC § 64.0322) requires a person who assists a voter to complete a form stating:

(1) the name and address of the person assisting the voter;
(2) the relationship to the voter of the person assisting the voter; and
(3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee.

146.    SB1 § 6.05 (EC § 86.010(e)) requires a person who assists a mail-in voter to enter the information required by SB1 § 6.03 on the assisted-voter's BBM carrier envelope.

147.    SB1 § 6.07 (EC § 86.013(b)) mandates that BBM carrier envelopes include spaces to enter assister information.

148.    SB1 § 6.04 (EC § 64.034) amends as follows the oath that a person assisting a voter is required to swear:

> I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my

assistance to <u>reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot;</u> [answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties;] I will prepare the voter's ballot as the voter directs; I <u>did not pressure or coerce the voter into choosing me to provide assistance;</u> [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; <u>I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.</u>

149.    The requirement that a person who assists a voter must confine assistance to reading the ballot, marking the ballot, and directing the voter to do the same was enjoined in *OCA of Greater Houston. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 at *4 (W.D. Tex. June 6, 2022) (enjoining enforcement of those parts of EC § 64.034 that require assisters to attest to confining their assistance to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot."). Accordingly, this Court held that "all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined…are moot." *LUPE v. Abbott*, 614 F. Supp. 3d 509, 513 n.3 (W.D. Tex. 2022) (ECF No. 444).

### H. SB1's Restrictions on Distribution of ABBMs

150.    SB1 §5.04 (EC § 48.0111) prohibits EAs and other government officials from distributing ABBMs unless a voter requests one,  and it prohibits EAs and other government officials from using public funds to facilitate distribution of EAs by another person; however, a political entity or candidate may distribute ABBMs to individuals who did not request them.

### I. SB1's Restrictions on Canvassing

151.    SB1 § 7.04 (EC § 276.015(a)(2) & (b)) prohibits any person, either directly or through a third party, from knowingly having an in-person interaction with one or more voters, in the

physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure, "in exchange for compensation or other benefit." The described activity is defined as "vote harvesting." Tex. Elec. Code § 276.015(a)(2).

152. SB1 § 7.04 (EC § 276.015(a)(1)) defines "benefit" as including "anything reasonably regarded as a gain or advantage."

153. SB1 § 7.04 (EC § 276.015(a)(2), (c)) also prohibits any person, either directly or through a third party, from knowingly providing or offering to provide compensation or other benefit to another person in exchange for "vote harvesting services."

154. The provision does not apply to an activity that is not performed in exchanged for compensation or benefit. EC § 276.015(e)(1).

155. A "vote harvesting" offense, as defined by SB1 § 7.04, is a felony of the third degree. EC § 276.015(f).

156. In investigating alleged "vote harvesting" offenses, law enforcement may request records from election officers, who must then provide those records in unredacted form. EC § 276.015(g).

**I.    SB1's Restrictions on Solicitation and Distribution of ABBMs**

157. SB1 § 7.04 (EC § 276.106(a)) also prohibits public officials or election officials from soliciting, distributing, or authorizing the distribution of, application to vote by mail (ABBMs).  A public official or election official is prohibited from:

> (1) soliciting the submission of an ABBM from a person who did not request it;

> (2) distributing an ABBM to a person who did not request it, unless distribution is expressly authorized by another provision of the Election Code;

(3) authorizing or approving the use of public funds to facilitate third-party

distribution of an ABBM to a person who did not request it; or

(4) completing any portion of an ABBM and distributing it to the applicant.

158.    An offense under this section is a state jail felony. EC § 276.106(b).

## III.    THE LONG HISTORY OF VOTING DISCRIMINATION IN TEXAS CONTINUES IN THE PRESENT

### A. Plaintiffs' Experts

159.    Professors Allan Lichtman, Franita Tolson, J. Morgan Kousser, Eric McDaniel, and Christian Grose were qualified as experts during the trial of this case.[7]

160.    Prof. Tolson was qualified as an election law expert and an expert in voting practices in Texas.  10/4 Tr. 2565:10–2566:1 (Tolson).

161.    Prof. Kousser was qualified as an expert witness in the history of racial discrimination and voting, minority voting rights and voting patterns, political and legal history, and political analysis. 10/5 Tr. 2795:17-22 (Kousser).

162.    Prof. Eric McDaniel was qualified as an expert in race and political behavior. 10/5 Tr. 2921:9-13 (McDaniel).

163.    Prof. Christian Grose was qualified as an expert on race and voting. 10/5 Tr. 3008:22-3009:1 (Grose).

164.    Prof. Lichtman was qualified as an expert in American political history and analysis, quantitative and historical methodology, and voting rights. 10/6 Tr. 3086:3–3088:9 (Lichtman).

---

[7] Prof. Andres Tijerina was also qualified as an expert during trial. For facts related to Prof. Tijerina's testimony, Plaintiffs refer the Court to the proposed findings of fact and conclusions of law filed by the LUPE Plaintiffs.

### B. Texas's History of Voting Discrimination from 1865 to the Voting Rights Act of 1965 (the "VRA")

165.    The history of racial and ethnic discrimination in the state of Texas is long and deep. HAUL-MFV 332 (Kousser Report) at 9. Texas was a slave state before it seceded from the Union. *Id.*

166.    When the Civil War ended and the Emancipation Proclamation was made effective, slaveholders in Texas ensured that enslaved people in the state were the last in the country to be made free. HAUL-MFV 332 at 19.

167.    Texas rejected the Thirteenth and Fourteenth Amendments, and its first post-Civil War legislature and constitutional convention imposed a Black Code in which freed persons had no rights to vote, hold office, serve on juries, testify against white people, attend schools supported by white taxes, or travel with white people on first-class railroad cars. *Id.*

168.    Texas political leaders of the post-Civil War era expressed deeply racist attitudes specifically regarding Black people's right to vote. HAUL-MFV 332 at 20. For example, Alexander Terrell, the father of Texas' poll tax, referred to elections not "controlled by 'intelligence and property' as 'the most terrible enemy'" and characterized the Fifteenth Amendment as "the political blunder of the century." *Id.*

169.    Since Reconstruction, Texas has sought to disenfranchise Black and Latino Texans, and create a cohesive white majority through poll taxes, an all-white Democratic primary, and restrictive voting registration systems, among other efforts. HAUL-MFV 59    at ¶ 5 (Tolson Report).

170.    The movement for suffrage restriction in Texas in the 19th and 20th centuries occurred incrementally, with multiple, successive restrictions creating "effects [that] were larger than individual effects of separate provisions would likely have been." HAUL-MFV 332 at 9.

171.    Historically, Texas has restricted its electorate through facially discriminatory laws and practices—coupled with violence, intimidation, and fraud—that purged the electorate of minority voters and poor white voters who supported third parties, leaving a predominantly white, one-party system in place. The state has also used facially neutral laws to maintain a white electorate, relying on discriminatory application of the law by local EAs to target minority voters for exclusion; by legally restricting practices disproportionately used by minority voters to cast their ballots (also known as "colorblind targeting"); and by adopting voting practices such as at-large elections, majority vote requirements, and multimember districts to dilute the political power of minority communities. HAUL-MFV 59 at ¶ 13.

172.    The Texas legislature often draws on lessons of the past and looks for techniques that were useful in disenfranchising individuals historically. 10/4 Tr. 2569:7-13 (Tolson); [10/5 Tr. 2806:15-2807:14 (Kousser).

173.    During Reconstruction, politics in Texas was similar to politics in the other states of the former Confederacy:  the white planter class felt itself to have been politically displaced by Black men who were newly enfranchised by the Constitution and federal statutes, and was aggressive and violent in its efforts to reclaim control of state governments from the Republican Party. HAUL-MFV 59 at ¶ 11.

174.    The Texas Constitution of 1876, for example, disenfranchised any individual who had been convicted of a felony. As was true in most southern states during this period, enforcement discretion ensured that many of the qualifying felonies in Texas were those perceived to be more likely to be committed by Black people, while exceptions were made for those crimes committed predominantly by white offenders. HAUL-MFV 59 at ¶ 25.

175.    To avoid disenfranchising white, Democratic voters, the Texas legislature practiced geographically targeted restrictions. In the 1870s and 1880s, the legislature adopted the Australian ballot (also known as the secret ballot) for the ten largest urban areas in the state. HAUL-MFV 59 at ¶ 26.

176.    In practice, the secret ballot law acted as a literacy test because it required that only election officials, not friends or advisors, were allowed to provide any assistance to those who were illiterate in English to vote. 10/5 Tr. 2808:13-19 (Kousser); HAUL-MFV 332 at 20-21. In 1890, when the secret ballot law was instituted, 60.6% of Black men over 20 were illiterate, compared to only 5.1% of white men. HAUL-MFV 332 at 20-21. The law disproportionately affected Black men and functioned as a literacy test. HAUL-MFV 332 at 20-21.

177.    In 1891, the legislature passed a law applicable to cities of more than 10,000 people that made it easier to challenge voters at the polls, requiring anyone whose vote was challenged to provide the oath of "a well known resident." *Id.*

178.    The Texas Democratic Party also relied on violence, intimidation, and fraud, particularly in the "black belt" counties in East Texas, and in South Texas counties with large populations of Latino Americans, who were threatened with bodily harm or loss of employment and housing. HAUL-MFV 59 at ¶ 33.

179.    Public lynchings were effective mechanisms for deterring Black people from voting. There were 335 lynchings in Texas between 1889 to 1918. Most occurred in rural counties with sizable Black populations. HAUL-MFV 59 at ¶ 45.

180.    The history of lynching in Texas has repercussions that last to the present. Of the twelve counties with the highest number of recorded instances of intimidation in the 2000 election, 75% had at least one recorded lynching in their history. HAUL-MFV 333 at 15 (McDaniel Report).

181.    As far back as the 1880s, Texas's majority Black counties faced intimidation by poll watchers. 10/4 Tr. 2596:10-14 (Tolson). Harrison County, majority Black in the 1880s, was subject to federal oversight because Black voters were intimidated from voting there. *Id.* In Grimes County in 1899 Black voters were simply turned away entirely by intimidating people watching the polls. *Id.*

182.    In Houston, incidents of poll watcher intimidation of voters in Texas stretched back to the 1920s, but they intensified during the national Republican Party's "Operation Eagle Eye" in the 1960s and 70s. HAUL-MFV 332 at 15-16 ¶ 42.

183.    In 1903, the poll tax became a prerequisite for jury service and for voting in primary and general elections. Tolson Report ¶ 59. The institution of a poll tax resulted in an almost immediate decline in Black voters' participation in Texas elections. In the 1902 election, 36% of Black voters cast ballots, but by 1904, that number was already down to just 15% of Black voters casting ballots. Tolson Report ¶ 59.

184.    The poll tax was a tax imposed on all residents of the State between the ages of twenty-one and sixty as of January 1 of the previous tax year. *U.S. v. Texas*, 252 F. Supp. 234, 239 (W.D. Tex. 1966), *aff'd*, 384 U.S. 155 (1966). The amount of the tax was $1.50, but Texas counties were authorized to require payment of an additional $.25 and cities were authorized to impose an additional tax of $1.00 as a precondition to voting in city elections. *Id.* The deadline to pay the poll tax to be eligible to vote in federal elections in November was nine months prior, in January of that year. *Id.* Notably, persons over sixty who lived in small towns or rural areas were allowed to vote without paying poll taxes or obtaining a certificate of exemption. *Id.* These provisions disproportionately affected Black Texans "whose income potential has been stymied by lack of educational opportunity." *U.S. v. Texas*, 252 F. Supp. at 241-42. In 1964, the U.S. Justice

Department demonstrated that in 187 out of 254 counties, 57.3% of eligible white voters paid the poll tax while only 45.3% of eligible Black voters paid. *Id.*; HAUL-MFV 332 at 25. The poll tax was also used to control the Latino population. 10/4 Tr. 2572:17-22 (Tolson).

185.    In response to the Twenty-Fourth Amendment's invalidation of poll taxes in 1966, Texas amended its constitution to require voters to reregister every election year; a federal court struck the amendment down in 1971. HAUL-MFV 332 at 10; Tolson Report, ¶ 75.

186.    When the state legislature instituted the poll tax and made the secret ballot a statewide requirement in 1903, it also passed a local option white primary. Tolson Report ¶¶ 55-58; HAUL-MFV 332 at 9.

187.    "Perhaps no set of laws or legal cases better captures the strength and resilience of white supremacy in Texas than the waves of legal cases challenging the all-white primary that broke four times over the U.S. Supreme Court from 1927 to 1944." HAUL-MFV 332 at 24, citing, *e.g.*, *Nixon v. Herndon*, 273 U.S. 536 (1927); *Nixon v. Condon*, 286 U.S. 73 (1932); *Grovey v. Townsend*, 295 U.S. 54 (1935); *Smith v. Allwright*, 321 U.S. 649 (1944).

188.    Another discriminatory device that Texas used was at-large elections in areas with large, but not majority Black and Latino populations. HAUL-MFV 332 at 10. At-large legislative elections in all of the state's major cities were struck down by federal courts, including the U.S. Supreme Court, in the 1970s.

189.    In more recent decades, the Texas legislature has created voting structures to dilute the voting strength of minority populations through the use of multi-member districts and a strict majority vote requirement. Tolson Report ¶¶ 67-68. Strict majority voting provided that if no candidate received a majority of the votes in a primary, there would be a runoff between the two

highest vote-getters. *Id.* ¶ 68. The runoff ensured that Democrats would coalesce around a single candidate, who was almost always white and would invariably win in the general election. *Id.* ¶ 69.

### C. Voting Discrimination after the Voting Rights Act

190.    Texas was not a "covered jurisdiction" under Section 5 of the VRA as it passed in 1965. HAUL-MFV 332 at 10. Texas did not initially fall within the coverage formula of VRA § 4: in 1965, covered states had literacy tests plus a turnout in the 1964 Presidential Election of under 50%. Although Texas had a turnout of less than 50% in 1964, it did not have a formal literacy test, even though the state's secret ballot law functioned as a literacy test. 10/5 Tr. 2808:7-12 (Kousser).

191.    When persistent political discrimination attracted the attention of Congress, the Texas legislature sought to head off federal regulation by passing a "Texas Voting Rights Act." Pro-civil rights congressional leaders were not fooled, and amendments to the VRA brought Texas under Section 5 in 1975. HAUL-MFV 332, at 10, 26. In 1976, Texas passed SB300, requiring a purge of the voting rolls and a reregistration of every voter. HAUL-MFV 332 at 26-27. Voter purges have historically been used to disenfranchise minority voters. 10/4 Tr. 2591:14–2592:24 (Tolson). Before SB300 could be put into effect, the U.S. Department of Justice refused to preclear it under Section 5. HAUL-MFV 332 at 26-27; 10/5 Tr. 2809:24-2810:8 (Kousser).

192.    In the four years after 1975, when the coverage formula of Section 4 was expanded to include Texas, 115 voting rights cases were brought successfully against the state. 10/5 Tr. 2810:11-18 (Kousser); HAUL-MFV 332, at 10.

193.    Texas election laws had discriminated against the state's Black and Latino citizens before 1975, but bringing Texas under the coverage of Section 5 made it possible for that discrimination to be revealed. 10/5 Tr. 2810:19-23 (Kousser).

194.    From 1975 through 2013, the U.S. DOJ issued 211 objections to Texas under Section 5.  These were based on  the main on four types of state action: redistricting, annexations, changes to the method of election, and changes to voting procedures. Between 1982 and 2006, moreover, Texas led the nation in Section 2 and Section 5 violations. Tolson Report ¶ 78. Jurisdictions within Texas consistently and defiantly circumvented the requirements of the VRA, forcing plaintiffs to expend time and resources to protect minority political power. *Id.* ¶ 80.

195.    Between 1957 and 2020, nearly a quarter of the voting rights lawsuits, settlements of lawsuits, and objections to discriminatory laws or practices in the United States concerned Texas – 67% more than in any other state. *Id.*

196.    Prof. Kousser created a database documenting discriminatory events in the United States between 1957 and 2020. His database includes every successful case arising under VRA § 2, VRA § 5, VRA § 203, VRA § 208, the Fourteenth and Fifteenth Amendments, the 1957 and 1960 Civil Rights Acts, successful Section 5 objections, and DOJ information requests that resulted in a change in or withdrawal of a submission. 10/5 Tr. 2811:8–2812:4 (Kousser).

197.    Prof. Kousser's database reveals that Texas has had more "events where it has been proven that there was discrimination" than any other state in the United States. *Id.* 2812:5-8 (Kousser); HAUL-MFV 332 at 27-28 & fig. 1.

198.    The number of discriminatory events in Texas is disproportionate to its size:  Texas accounts for 6.8% of the population of the United States, but 24.5% of proven instances of voting discrimination occurred in the state. *See* 10/5 Tr. 2812:16-23 (Kousser).

199.    Of the 1021 voting rights actions Prof. Kousser documented in Texas, 193 successfully challenged districting plans as racially discriminatory. HAUL-MFV 332 at 30.

200.    For example, every Texas statewide redistricting plan since 1971 has been challenged in court, and in every decade the plans have been found violative of either the VRA or the 14th and/or 15th amendments by courts or the Justice Department.  This record indicates racial discrimination in election arrangements so long and regular that each legislative session at which redistricting is considered has become merely a staged drama preparatory to the real contest in the courts and/or the Department of Justice. *See* 10/5 Tr. 2813:4-7 (Kousser); HAUL-MFV 332 at 29.

201.    Most of the 1021 voting rights actions that Prof. Kousser documented in Texas arose at the county or municipal or special district level. Of the 984 non-statewide actions, 358 concerned at-large elections, which make it much more difficult for minorities to win where there is racial polarization. In the 1970s, multimember districts in Dallas and Bexar Counties were ruled illegal because they unlawfully discriminated against Black and Latino Texans. *See White v. Regester*, 412 U.S. 755 (1973) 343 F. Supp. 704 (W.D. Tex. 1972) (three-judge court), *partially rev'd and remanded sub nom. White v. Register*, 412 U.S. 755 (1973), 422 U.S. 935 (June 30, 1975), *further proceedings sub nom. Graves v. Barnes*, 378 F. Supp. 640 (W.D. Tex 1974), 408 F. Supp. 1050 (W.D. Tex. 1976), 446 F. Supp. 560 (W.D. Tex. 1977). On remand from the Supreme Court, the same three-judge court heard extensive evidence and ruled that seven additional multimember legislative districts were illegal because they discriminated against Blacks and/or Latinos. 10/5 Tr. 2813:4-7 (Kousser); HAUL-MFV 332 at 25.

202.    Prof. Kousser also documented 147 non-statewide actions in Texas involving vote denial, including polling place changes, voting materials available only in English, and other actions that impeded individuals' right to vote. *See* 10/5 Tr. 2813:4-9 (Kousser); HAUL-MFV 332, at 30.

203.    Poll watchers also continued to be a source of voter discrimination in Texas. In 2010, the Harris County Attorney requested the U.S. Justice Department to send in election monitors to observe the voting process in response to complaints that poll watchers were "hovering" over voters, "getting in their face," and talking to election workers. HAUL-MFV 332, at 77 ¶ 176. Some alleged that 300 poll watchers trained by a group called the King Street Patriots had been sent to minority voting precincts in an "effort to intimidate and keep people from voting." HAUL-MFV 332, at 77 ¶ 176. The King Street Patriots spread out nationally to become True the Vote. In 2009 and 2010, the group focused its effort to purge Black and Latino voters from the voter rolls in the Houston Congressional district represented by Sheila Jackson Lee, a Black Democrat. HAUL-MFV 332, at 77 ¶ 176. True the Vote also sent white poll watchers to majority-Black precincts during the 2010 elections to create friction with Black voters. HAUL-MFV 332 at 77 ¶ 176.

204.    Less than a decade before the passage of SB1, Texas's voter ID law, SB14, was found to be discriminatory by multiple courts.  The District Court of the District of Columbia held that SB14 would have a retrogressive effect under Section 5 of the VRA and was intentionally discriminatory. *Texas v. Holder*, 888 F. Supp. 2d 113 (2012); *see* 10/5 Tr. 2813:4-9 (Kousser).  Although *Texas v. Holder* was vacated following *Shelby County v. Holder*, 570 U.S. 529 (2013), a separate district court also held that the photo ID law had a discriminatory effect on Black and Latino voters and that it was enacted with discriminatory intent. *Veasey v. Perry*, 71 F. Supp. 3d 627, 694 (S.D. Tex. 2014).  The Fifth Circuit *en banc* affirmed the district court's ruling that Texas's photo ID law had an unlawful disparate impact on Black and Hispanic voters in violation of Section 2 of the VRA, but reversed the district court's ruling that the law was enacted with a discriminatory purpose, and remanded the case. *Veasey v. Abbott*, 830 F.3d 216 (5th Cir.

2016) (en banc) *cert. denied*, —— U.S. ——, 137 S. Ct. 612. On remand, the district court reweighed the evidence and again held that the photo ID law was passed with discriminatory intent. *Veasey v. Abbott*, 249 F. Supp. 3d 868, 875-76 (S.D. Tex. 2017). This liability finding was not disturbed on appeal. *See Veasey v. Abbott*, 888 F.3d 792, 800 (5th Cir. 2018).

205.    In 2019, then Acting Secretary of State Dave Whitley instituted a voter purge by sending Texas county EAs a list of of 95,000 registered voters who the SoS claimed had not been citizens when they registered with the Texas Department of Public Safety ("DPS"). HAUL-MFV 332, at 29. The list was flawed:  more than half of the names in Harris and Williamson counties, nearly one-fifth of those in Dallas County, and many of those listed in other counties were found after examination to belong to individuals who had become citizens.  *Id.* Civil rights groups filed suit; after much backtracking by SoS, a settlement was reached and the purging process was extensively reformed. *Tex. LULAC v. Whitley*, SA-19-CA-074-FB (W.D. Tex. 2019).

206.    Prof. Kousser concluded that the very large number of court findings of discrimination in Texas demonstrate the scope and depth of racial discrimination in Texas political history during the last 64 years. HAUL-MFV 332 at 30.

### D.  Extent of Voting Practices that Tend to Enhance Opportunity for Discrimination

207.    The Texas electoral landscape at the state and local level has included at-large practices in particular, among others, that enhance the opportunity for discrimination against Black and Latino Texans. Between 1957 and 2020, at-large election systems were struck down in 358 jurisdictions through legal or threatened legal action, as were 193 instances of racial gerrymandering, and another 147 cases involved polling place changes, voting materials available only in English, or other instances of "vote denial." HAUL-MFV 332 at 124 ¶ 280.

208. Unusually large multimember districts were also a hallmark of the Texas electoral landscape as of 1972. In *Graves v. Barnes*, a three-judge panel of the Western District of Texas considered whether the apportionment system of the Texas legislature that then provided for the election of representatives and senators by single-member districts in Harris County and multimember districts in other Texas cities, particularly Dallas and San Antonio, infringed the constitutional rights of Black and Latino Texans. HAUL-MFV 332 at 1; *Graves*, 343 F. Supp. 704 (W.D. Tex. 1972).

209. That Court found that Dallas County's multi-member district was approximately three times as large as a congressional district in Texas and had a population greater than that of fifteen states. *Graves*, 343 F. Supp at 725.

210. Texas state legislators from Dallas and Bexar Counties were elected in multimember districts in which endorsements by white slating groups effectively determined the nominees. HAUL-MFV 332 at 25 ¶ 69; *Graves v. Barnes*, 343 F. Supp. 704, 726 (W.D. Tex. 1972). Those representatives, once elected, were completely unresponsive to the Black and Latino communities in those counties. HAUL-MFV 332 at 25 ¶ 69; *Graves*, 343 F. Supp. at 726 (noting that State legislators from Dallas County, elected county-wide, led the fight for segregation in the 1950's and that hostility towards Black people was still an integral part of Dallas County politics in 1972.)

211. Under the multi-member district covering Bexar County, Latino Texans faced segregation in Corpus Christi schools, a property ownership requirement to vote in city council elections in Crystal City, discrimination in jury selection in El Paso, general anti-Mexican-American "discrimination and treatment in the fields of education, employment, economics, health, politics and others," and striking socioeconomic disparities between Mexican-American

and other residents of Bexar County. HAUL-MFV 332, at 1 (quoting *Graves*, 343 F. Supp. at 728-32).

212.    During the 1975 Senate hearings about expanding Section 5 coverage to Texas, testimony demonstrated that "racial gerrymanders, the imposition of majority vote or numbered place requirements, discriminatory annexations, last-minute changes of polling places (for instance, placing a polling place for a majority-Black precinct in a segregated white hunting club), and registration forms and ballots available only in English" enhanced the opportunities for discrimination against Black and Latino Texans. HAUL-MFV 332 at 25 ¶ 70; 1975 Senate Hearings, at 465. Many of these measures had been recently implemented in direct response to growing political participation by Black and Latino Texans. HAUL-MFV 332, at 25 ¶ 70; 1975 Senate Hearings, at 239 (testimony of Rep. Barbara Jordan), 285 (testimony of Texas Secretary of State Mark White), and 473-82 (testimony of Korbel).

213.    The past is not so distant for many Black Texans. As Sharon Watkins-Jones, a Houston resident, testified, whole generations of Texans have lived through various iterations of the same discriminatory tactics. Ms. Watkins-Jones' grandmother is 103 years old and still tells vivid "stories of having to pay poll taxes" which, for "her family, as farmers," was "a great sacrifice and a great burden to pay . . . in order to vote." 10/2 Tr. 2141:1-4 (Watkins-Jones). Her grandmother remembers the "great burden to vote" placed on voters "when there were intimidation tactics at the polls" and recalled "times when there were members of Ku Klux Klan waiting outside the polls and being very menacing when voters would go especially voters of color." *Id.* 2141:5-9 (Watkins-Jones). Ms. Watkin Jones's parents met in college in the '60s and told her stories of how when they went "to register to vote, sometimes mysteriously there wouldn't be any registration

applications available, and . . . they would have to return repeatedly in order to register." *Id.* 2141:15-20 (Watkins-Jones).

214.    Nor is the past so distant for Latino Texans. As Marla López testified, the area in which she grew up—Brownsville, Texas and its environs—has a long history of immigration and Mexican heritage. 10/10 Tr. 3372:2-10 (López). The city and its surrounding area experience both poverty and militarization. 10/10 Tr. 3372:11-16, 19-23 (López). Police and U.S. Immigration and Custom Enforcement (ICE) presence was common in Brownsville, made her feel unsafe as a child, and made people in her community distrustful of government officials to such an extent that people would avoid seeking out relief resources from the government even during natural disasters. 10/10 Tr. 3372:19-23, 3373:1-9, 3374:4-13 (López). Because government officials and police were often present at locations where relief resources were being made available, people in the Latino communities were hesitant to seek out those resources. 10/10 Tr. 3374:4-13 (López). . She explained that people also had "a lot of fear around surveillance in giving information." 10/10 Tr. 3373:7-9 (López).

215.    Ms. López also testified that, as a student in Brownsville public schools, she experienced the separation that existed between students who spoke English and students who did not. 10/10 Tr. 3374:18-25 (López). Students who spoke Spanish were seen as troublemakers, so Ms. López made a point of telling people that she was from Atlanta and not speaking Spanish or Spanglish in school so that teachers would see her as a good student, deserving of their attention and support. 10/10 Tr. 3375:1-12 (López).

IV.    **RACIALLY POLARIZED VOTING HAS CONCENTRATED MINORITY VOTING POWER IN URBAN CENTERS AND LED TO UNRESPONSIVE ELECTED OFFICIALS OUTSIDE OF THOSE AREAS**

216.    Texas has undergone tremendous demographic changes since 1980. The state experienced large population growth, including a significant growth in non-Anglo Texans. Texas's growth and diversification has changed the makeup of its rural and urban areas and also had political impacts, particularly because of the pattern of racially polarized voting in the state. However, despite their growing numbers and potential voting strength, Texans of color still disproportionately bear the effects of discrimination across many areas of society and elected officials are often not responsive to their needs.

**A.  Voters of Color Disproportionately Reside in Large, Urban Centers**

217.    Between 1980 and 2020, the population of Texas more than doubled, from 14.2 million to more than 29.1 million. HAUL-MFV 332 at 31.

218.    At the same time, there was a dramatic change in the racial and ethnic composition of the population. 10/5 Tr. 2832:14-18 (Kousser).  In 1980, nearly two-thirds of Texans were Anglo (non-Hispanic whites), but by 2020 the proportion of Anglo voters had fallen to 41.2%. HAUL-MFV 332 at 32 & fig. 2. During the same period, the Latino population nearly doubled from 21.0% to 39.7%, and the Asian American population grew sharply from 1.9% to 5.2%. *Id.* Meanwhile, the Black population remained stable, growing modestly from 12.0% to 12.9%. *Id.* By 2020, Texas had become a majority-minority state. 10/5 Tr. 2832:25–2833:5 (Kousser); HAUL-MFV 332 at 32.

219.    Texans of color are not evenly located throughout the state but disproportionately concentrated in urban areas. HAUL-MFV 332 at 32-33. Although 21.7% of Anglo Texans live in the state's ten largest cities, a much higher proportion of the state's Latino population (37.3%),

Black population (37.5%), and Asian American population (32.5%) live in those same cities.[8] *Id.* at 33. Collectively, racial and ethnic minorities are roughly 75% of the population of Texas's largest cities, which have also grown in size as Texas has become more urban. 10/5 Tr. 2833:4-22 (Kousser). For example, according to the 2020 Census, Harris County, which is the most populous county, is majority-minority, with a population that is 44.4% Latino and 20.3% Black. State Ex. 290. Roughly 2.1 million Latinos and more than 960,00 Black Texans reside in Harris County. 9/19 Tr. 1218:11-1220:7 (Longoria).

220.    Because of these demographic shifts, a law that was purportedly uniform across the state could have a different impact on the more sprawling, populous cities in Texas compared to more rural areas. HAUL-MFV 332 at 33-34.  And because Texans of color are much more concentrated in urban areas, "any provisions of election law that make it more difficult to vote in cities than in less urbanized places will have a disproportionately negative impact on the minorities." HAUL-MFV 332 at 33; *see also* 10/5 Tr. 2834:14-24 (Kousser) ("[A]ny law that was directed at the larger metropolitan areas would necessarily have been directed disproportionately at people of color. . . . [and] would have necessarily a larger disproportionate impact on people of color.").

### B.  Texas Has Entrenched Patterns of Racially Polarized Voting

221.    Historically, voting in Texas is racially polarized, and this pattern continues today. HAUL-MFV 332 at 115-116, 124.

222.    As demonstrated by an analysis by Prof. Kousser, there is a correlation between race and party selection that exists in both state and presidential elections: Since the 2000 election, between 63% and 98% of Black Texas voters supported Democratic candidates based on exit

---

[8] These cities are Houston, San Antonio, Dallas, Austin, Fort Worth, El Paso, Arlington, Corpus Christi, Plano, and Laredo. HAUL-MFV 332 at 33.

polling data. *Id.* at 116 & tbl. 3. Indeed, with the exception of the 2006 gubernatorial election in which significant support went to third-party candidates, Black support for Democrats consistently exceeded 80%. *Id.* Latino voters have also supported Democratic candidates, albeit at lower numbers: on average 63.2% of Latino voters went for Democrats in presidential, gubernatorial, and U.S. senate elections between 2000 and 2020. *Id.* By contrast, white Texans tended not to support Democrats, with only between 24% and 33% voting for Democratic candidates between 2000 and 2020.[9] *Id.*

### C. Political Implications of Racially Polarized Voting and Demographic Changes

223.    Texas's pattern of racially polarized voting meant that changes in the state's demographics in turn caused political shifts that impacted the electoral fortunes of the parties. For example, the success of Democratic candidates in the 2018 midterm election in areas such as Dallas/Fort Worth and Houston "was distinctly connected to the growth of minority populations there." 10/5 Tr. 2834:25-2835:10 (Kousser). Democrats picked up 12 seats in the Texas House and two seats in the Senate; half of the Democratic pickups in the House and both in the Senate were in the Dallas/Fort Worth suburbs. HAUL-MFV 332 at 53.

224.    In Dallas, Democrats also swept partisan judgeship races for the first time in 26 years, and in Harris County, voters elected a slate of 17 Democratic, Black female judges (the "Black Girl Magic" ticket), who were among the many other Democrats who unseated white Republican incumbents. *Id.* at 54.  Prof. Kousser attributed the success of the Black Girl Magic slate of judges to the demographic changes in Harris County, as well as the availability of straight-ticket voting, which made it easier to quickly vote for down-ticket races on a long ballot. 10/5 Tr.

---

[9] Exit polling from Asian American voters was limited and often lumped together with other groups in an "Other" category, but the data showed that between 48% and 72% of Asian American or Other voters supported Democratic candidates in the four elections included in Prof. Kousser's analysis. HAUL-MFV 332 at 116 & tbl. 3.

2835:19-22 (Kousser); HAUL-MFV 332 at 53-54. Dr. Kousser described Harris County as the "center of minority political power in the state." HAUL-MFV 332 at 94. Based on his analysis, he concluded that "[a]s the area became more heavily Black, Hispanic, and Asian-American, it voted for candidates who were of the parties to which those groups adhered." 10/5 Tr. at 2835:10-12 (Kousser). Senator John Cornyn called the 2018 election "a wake-up call" for Texas Republicans. HAUL-MFV 332 at 53.

### D. Black and Latino Texans are Underrepresented in Public Office

225.    Although Texas is a majority-minority state, the majority of its public office holders are white. HAUL-MFV 332 at 113-114 & tbl. 2, 126. Of the twenty-seven statewide elected officials, only two are Latino and none are Black. *Id.* Sixty-five percent of state and federal elected officials are white, 9.8% are Black, 22.8% are Latino, and 1.6% are Asian American. *Id.* Compared to the population, Anglos are overrepresented in public office and minority groups are underrepresented. *Id.*

226.    As with voting, the party affiliation of public office holders is also racially polarized. Of the 160 white elected officials, only 18 are Democrats. Of the 25 Black elected officials, all but one are Democrats. Among Latino elected officials 50 of 56 are Democrats, and the Asian American elected officials are split evenly between the two parties. *Id.* at 113-114 & tbl. 2. Mirroring the racial and partisan makeup of the voters, Republican office holders in Texas are overwhelmingly white and Democratic office holders are predominantly people of color.

### E. Discrimination Across Many Areas of Life Hinders Black and Latino Texans' Ability to Participate in the Political Process and Demonstrates Elected Officials' Lack of Responsiveness to Their Needs.

227.    Black and Latino Texans continue to bear the effects of discrimination across many areas of life such as socioeconomic status, education, housing, health, interactions with law enforcement, and internet access. In their testimony and reports, multiple Plaintiffs' experts

discussed the history of official discrimination and segregation in Texas and the modern-day echoes of that history that perpetuate the burden on minorities today. A few examples are highlighted here.

228.    Modern-day disparities have historical antecedents in Texas. For example, Black students were subjected to state-sponsored segregation in inferior schools. HAUL-MFV 332 at 9. Texas public schools were also "almost completely segregated for years after *Brown*." *Id.* Interracial marriage was banned in Texas beginning in 1838; that ban was abrogated in 1877 and then was reinstated by law in 1881. Texas banned interracial marriage until 1967, when *Loving v. Virginia*, 381 U.S. 1 (1967) was decided. Texas mandated segregation on passenger railroad trains starting in 1891, and all public accommodations in Texas were segregated until the post-*Brown* decisions. HAUL-MFV 332 at 9. Some municipal laws required residential segregation on a block-by-block basis, and state law banned integrated swimming pools. *Id.* HAUL-MFV 332 at 9-10.

229.    Today, Black and Latino Texans are less affluent than their white counterparts. At $53,286, the median income for white Texans is nearly 50% greater than Black ($36,464) or Latino ($37,019) median income. HAUL-MFV 332 at 125. They are also more likely to experience poverty, have inflexible job schedules, and lack adequate childcare. HAUL-MFV 332 at 111-112; HAUL-MFV 124 at 3. According to Census data, the percentages of Texans holding management, business, science, and arts occupations is 35.8% for employed white Texans, compared to 29.3% for employed Black Texans, and 18.8% for employed Latino Texans. HAUL-MFV 332 at 112. In Harris County, the respective percentages are 58.2% (white), 37.8% (Black), and 21.9% (Latino); as for occupations that tend to employ hourly wage workers, in Harris County, 18.7% of employed

Black Texans and 21.3% of employed Latino Texans work in service occupations, compared to just 7.9% of employed white Texans.[10].

230.    Black and Latino Texans also have lower educational attainment: 27.4% of white Texans have at least a bachelor's degree, compared to 11.2% of Latinos and 18.9% of Black people.   HAUL-MFV 332 at 12. Racial disparities in education are connected to Texas's educational policies, especially the state's lack of investment in public education in a state where about three-quarters of public-school enrollment is minority. 10/6 Tr. 3105:4-15 (Lichtman) (noting a 2021 study showed out of all states, Texas ranked third from last in its support for public education). Texas schools remain highly segregated and plagued by unequal funding across school districts.   HAUL-MFV 332 at 23, 126. Within schools, there are significant racial and ethnic disparities in school discipline, which disrupted minority students' education.   10/6 Tr. 3105:15-18 (Lichtman).

231.    Black and Latino Texans have fewer healthcare resources and higher rates of disability. In 2018, 14% of white adults under 65 in Texas were uninsured, compared to 21% of Black adults and 37% of Latino adults. HAUL-MFV 332 at 125.  Black and Latino Texans lack a regular source of healthcare (e.g. a doctor, clinic, or HMO) at higher rates than white Texans, despite also having higher prevalence of disabilities when adjusted for age.  *Id.*; 10/12 Tr. 31:8-16 (Kruse). In addition to the historical discrimination driving these disparities, one ongoing cause is Texas's refusal to expand Medicaid under the Affordable Care Act, despite the fact that the cost

---

[10] American Community Survey 2022 1-year Summary, Table S0201 – Harris County, Texas, available at https://data.census.gov/table?text=s0201&t=001:005:400:451&g=050XX00US48201. The Court may take judicial notice of Census data. *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 572-73 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice."). This includes the Census Bureau's American Community Survey (ACS). *See, e.g.*, *LULAC v. Abbott*, 617 F. Supp. 3d 622, 631 & n. 2 (W.D. Tex. 2022) (three-judge court); *Perez v. Abbott*, No. 5:11-cv-360, 2017 WL 962686, at *1 (W.D. Tex. Mar. 10, 2017) (three-judge court).

of the program would be borne almost entirely by the federal government, not the state. HAUL-MFV 332 at 125.

232.    Texas law allows landlords to refuse to rent to people receiving federal housing assistance—who are disproportionately minority—preempting any municipal law that sought to prohibit this type of source-of-income discrimination. *See* 10/6 Tr. 3107:11-20 (Lichtman).

233.    Minorities in Texas are disproportionately policed and incarcerated, and thus disproportionately bear the effects of being in the criminal justice system, such as disruption to their lives, felony disenfranchisement and disruption to their lives and livelihoods. *Id.* 3108:5-14 (Lichtman). Because of the state's restrictive immigration laws, which allow law enforcement to ask for proof of immigration status in connection with unrelated traffic stops or other violations, Texas is the state with the most interior arrests (i.e. arrests not on the border) for immigration offenses. *Id.* at 3106:20–3107:4. Almost all of the arrestees are non-Anglo. *Id.*

234.    Finally, Black and Latino Texans face a digital divide. Only 2.9 % of white households lack a computer and 4.9% lack an internet subscription, whereas the numbers for Black households are 5.7% and 8.8%, respectively, and for Latino households, 5.7% and 9.6%, respectively. HAUL-MFV 332 at 111.

235.    As the reports and testimony of Plaintiffs' experts demonstrate, Texans of color face ongoing, pervasive discrimination in critical areas of life, which hinders their ability to participate effectively in the political process. *See* 10/6 Tr. 3107:21–3108:22 (Lichtman); HAUL-MFV 332 at 111-112. Moreover, as discussed above, many of these disparities are tied to laws or policies put in place or maintained by elected officials. Because of racially polarized voting, many elected officials, especially statewide office holders can ignore the needs of Black and Latino Texans without suffering electoral consequences.  Although Black and Latino Texans have gained

some political power in the large, urban counties in which they are more concentrated, statewide officeholders and Texas Republicans have often expressed disdain for policies in those counties and sought to overturn them. During the legislative debates concerning SB1 and its predecessor bills, many legislators recognized that the bills—in particular the bans on DTV and 24-hour voting—were aimed at undoing voting practices employed by Harris County that were very popular among the county's diverse residents. HAUL-MFV 332 at 93-94; HAUL-MFV 176 at 43:16-25 (Hr'g Before House Select Comm. on Constitutional Rights and Remedies). Lt. Governor Dan Patrick was more explicit in his animosity for Texas's most diverse county, remarking "I have news for Harris County: You're not the capital of Texas." HAUL-MFV 332 at 93. A across different policy areas, Texas officials have repeatedly shown a lack of responsiveness to the particularized needs of Black and Latinos residents in their state. HAUL-MFV 332 at 126; 10/6 Tr. 3129:21-25 (Lichtman).

236.    This phenomenon is demonstrated by an audit study of Texas legislators conducted by Dr. Grose in 2020. HAUL-MFV 347 at 7-13. In the study, all members of the Texas legislators were sent email inquiries asking for assistance in the 2020 election. The emails contained the subject line, "Can I vote?," with a query:

> I have heard a lot in the news lately about identification being required at the polls.
> I do not have a driver's license. Can I still vote in November? Thank you for your
> help.

Each legislator received an identical email, except the queries were randomized to be either in Spanish or English. Each legislator had equal probability of being contacted by a constituent who was perceived by the legislator to be Latino—signaled by the Spanish message—versus a constituent who was perceived to be white, as signaled by the English message. *Id.* at 9. Although the audit emails were sent in 2020, all legislators serving in 2021 when SB1 was passed were included in the study.

237.     Dr. Grose's randomized audit study shows that Texas state legislators who voted for SB1 were discriminatory in their responses to Latino constituents relative to Anglo/white constituents. Specifically, supporters of SB1 were 29.4% less likely to respond to the email inquiries written in Spanish than in English, while non-supporters of SB1 showed no statistical difference in responding to Latino constituents. *Id.* at 10-11; 10/5 Tr. 3018:2-7 (Grose). That difference in responses to Spanish-language queries is significantly higher than other randomized audit studies Dr. Grose has conducted, where the difference in the discrimination metric has typically been around 4% to 8%. 10/5 Tr. 3019:25-3020:17. The randomized audit study is designed to exclude all other explanations for how a legislator responds other than intent to discriminate. 10/5 Tr. 3020:18-3021:20 (Grose).

### F.  Racial Appeals

238.     Racial appeals are a familiar part of Texas politics, where race-related issues are deployed to agitate and polarize voters. The pervasive controversy in the Texas Legislature, school boards, and public libraries around "critical race theory" functions as a modern analog to the many historical racial appeals used to defeat Black candidates and legislation responsive to the needs of Black Texans. HAUL-MFV 332 at 125 ¶ 283. The 87th sessions of the Texas Legislature featured some of the most conservative politics in the state's history. HAUL-MFV 332 at 117-18 ¶ 257. During the First Special Session in 2021, Senator Hughes authored and the Senate passed a bill that amended Texas law to remove a requirement that certain women and people of color be taught in Texas's K-12 social studies curriculum including Cesar Chavez, Dolores Huerta, Martin Luther King, Jr. Susan B. Anthony, and Frederick Douglass. HAUL-MFV 332 at 119 ¶ 259. Senator Hughes's bill also removed the requirement to teach "the history of white supremacy, including but not limited to the institution of slavery, the eugenics movement, and the Ku Klux Klan, and the ways in which it is morally wrong." HAUL-MFV 332 at 119 ¶ 259

239.     That session, the Texas Senate killed a bill proposed by Rep. Garnet Coleman (D-Houston), who is Black, to restore the state Office of Minority Health Statistics and Engagement, which had been defunded in 2017 and to "centralize information about health disparities by race and gender, organize funding and grants, and work with existing local and federal agencies to promote access to care." HAUL-MFV 332 at 117-18 ¶ 257. When Representative Coleman's bill was considered in the House, Representative Jeff Carson, who is white, objected to the establishment of an agency to study health disparities saying "[t]oday, we gather here voting on legislation that assumes our health care system is institutionally racist, and that certain people are oppressed when receiving health care because of their gender or color of their skin. No one in America is turned away from a hospital. Health care has been open to all who seek it." HAUL-MFV 332 at 118 ¶ 257.

240.     In a similar vein, a discussion at the University of Texas about the book *Forget the Alamo: The Rise and Fall of an American Myth* had to be canceled because of pressure from Lieutenant Governor Dan Patrick. *Id.* And unlike many other southern states, the Texas Legislature has rejected calls to remove Confederate monuments in the state. *Id.* To protect Confederate monuments in the Texas Capitol, Senator Hughes co-sponsored a bill during the 2021 Regular Session which would "have required supermajority votes in the Legislature to remove monuments, plaques, and portraits that were placed in the Capitol complex 25 or more years ago." HAUL-MFV 332 at 118 ¶ 258. At the same time, the Legislature refused to consider a bill by Representative Anchia of Dallas that would have removed seven Confederate monuments at the Capitol. HAUL-MFV 332 at 118 ¶ 258.

## V.    THE 2020 GENERAL ELECTION

241.    In October 2020, the Texas Tribune reported on political science research that showed that Texas election laws made Texas the most difficult state in which to vote. HAUL-MFV 332 at 31; Ross Ramsey, *Analysis: It's harder to vote in Texas than in any other state. Voting laws in Texas are the most restrictive in the country. And voter turnout here is among the lowest, too. Maybe those facts are related*., Texas Tribune, Oct. 19, 2020.

> The study, first published in 2018 and updated through the middle of 2020, applies sophisticated statistical methods to develop an index of the difficulty of registering and casting a ballot in each of the 50 states. The measures used include whether voters may register online, whether there is no-excuse "absentee" voting, how many days and hours of early voting are provided, the restrictions on third-party registration organizations, the strictness of voter ID laws, 35 other facets of state election codes.

HAUL-MFV 332 at 31 (citing Quan Li, Michael J. Pomante, and Scot Schraufnagel, *The Cost of Voting in the American States*, 17 Election Law J. 234-47 (2018); Scot Schraufnagel, Michael J. Pomante II, and Quan Li, *Cost of Voting in the American States: 2020*, 19 Election Law J. 503-09 (2020)); HAUL-MFV 310 ¶ 18 (Smith Report).

242.    In 2016, Texas had the 5th most restrictive laws, and its rank in ease of voting had dropped from 1996 through 2016 more than all but two other states. That is, in comparison to other states, Texas had eased voting less, and/or restrained it more during that 20-year period than nearly all the rest of the states. By 2020, Texas had become the most difficult state in the nation in which to cast a ballot. HAUL-MFV 332 at 31.

### A. Expanded Access to Voting

243.    Prior to SB1, counties had the ability to choose how best to meet the needs of the electorate in their county. Before SB1 removed these opportunities 10/10 Tr. 3447:21-25 (Razo), in 2020, Texas election officials took several steps to expand access to the ballot box, particularly in Harris County. 9/19 Tr. 1222:21–1223:7 (Longoria).  Isabel Longoria served as a special advisor to the Harris County Clerk during the lead-up to the 2020 elections. 9/19 Tr. 1216:3–9 (Longoria).

In that capacity, she oversaw the development and implementation of the Clerk's programs for drive-thru voting ("DTV"), 24-hour voting, improvements in mail-in voting, and poll watchers during the 2020 primary run-off and general elections. 9/19 Tr. 1216:10-18 (Longoria).

244.    Ms. Longoria worked closely with key stakeholders, including Harris County's Democratic and Republican Committees and advocacy and community organizations, to develop voting programs that were responsive to voter needs, encouraged turnout, and promoted efficient administration of elections. 9/19 Tr. 1224:7–1225:3 (Longoria).

245.    Ms. Longoria organized teams to implement each voting initiative and sought representatives from stakeholder groups on each team. Members of the Harris County Republican Committee and Democratic Committee were active participants on the teams. 9/19 Tr. 1225:19–1226:1 (Longoria).

246.    When her office piloted some of the initiatives, including DTV, during the 2020 July Primary Run-off Election, Ms. Longoria met regularly with the teams who provided feedback or raised concerns about the implementation of the initiatives, and her team made improvements in real-time based on the comments and suggestions they received. 9/19 Tr. 1225:4-18; 1243:17-19 (Longoria).

### 1.  *DTV*

247.    The Harris County Clerk implemented DTV in 2020 to expand accessibility and opportunities to vote for voters in Harris County in 2020 and during future elections. 9/19 Tr. 1154:24-1155:5 (Obakozuwa); 9/20 Tr. 1256:4-9 (Longoria).

248.    The Clerk adopted DTV as one way of addressing the large number of voters in the electorate who were expected to participate in the 2020 2020 election. 9/19 Tr 1224:19–1225:3 (Longoria).  In addition, DTV was a voting method that would accommodate health concerns during the pandemic. *Id.* 1228:1–1228-9, 1229:2-20 (Longoria).

249.    DTV enabled voters to "engage in in-person voting from the safety and convenience of their vehicle." *Id.* 1228:14-16 (Longoria). Voters could elect to stay in their car or step just outside of it, check-in, and vote. *Id.* 1228:16-19 (Longoria); *see id.* 1153:4-14 (Obakozuwa).

250.    DTV differed from curbside voting in that DTV was available to all registered voters in the counties that provided it; curbside voting is available only to voters who are physically unable to enter the vote center without likelihood of injury or without an assistant. *Id.* 1152:1-13, (Obakozuwa); *see id.* 1229:2-12; 1237:21-25 (Longoria). Harris County has offered curbside voting at least since 2015. *Id.* 1152:17-18 (Obakozuwa)

251.    Harris County is a car-centric county, and its largest city, Houston, is a "car city" where residents "do everything in their cars." *Id.* 1229:15-20 (Longoria). Harris County elections officials wanted to extend "what people are used to, to voting as well." *Id.* 1229:15-20 (Longoria).

252.    DTV was piloted successfully at one location in Harris County during the July 2020 primary runoff election. *Id.* 1231:22–1232:4 (Longoria). It was expanded to ten early-voting locations across Harris County for the entire early voting period of the November 2020 general election. *See* State Ex. 142; 9/19 Tr. 1238:19-24 (Longoria).

253.    DTV was used in multiple additional elections following the November 2020 general election before it was banned by SB1. *Id.* 1155:22–1156:1 (Obakozuwa); 9/20 Tr. 1255:24–1256:3 (Longoria).

254.    Other counties also implemented drive-thru voting during the November 2020 election, including Tom Green County, where *every* polling location was a DTV site, 9/20 Tr. 1380:3–6 (Longoria), and Bee County. 10/4 Tr. 2763:18-22 (Smith).

###### a. Mechanics of DTV

255.    Below is a diagram of a DTV site that was utilized during the July 2020 primary runoff election. 9/19 Tr. 1231:16-21 (Longoria).



*Photots of the layout of the HCC West Loop polling location provided by the Elections Administrator's Office (2020)*
HAUL-MFV 399.

256.    On this diagram, black ovals represent vehicles. *Id.* 1233:15-17 (Longoria). Blue lines represent generators and extension cords that plugged into voting machines. *Id.*1232:12-14 (Longoria). Vehicles entered on the left. *Id.* 1232:16 (Longoria). Two welcome stations staffed by election workers were located at the entrance where the election workers welcomed voters and directed each vehicle to pull into a parking spot where a voting station, as indicated by the red circles, was located. *Id.* 1232:17-21 (Longoria).

257.    Unlike in walk-up voting locations, each DTV voting station had its own designated election worker and the equipment necessary for voter check-in and for voting. *Id.* 1232:21-23

(Longoria). At each voting station, it was possible to vote either from inside or outside a vehicle. *Id.* 1232:24–1233:7 (Longoria).

258.    After a vehicle parked in the voting station, the election worker asked which passengers were there to vote. *Id.* 1234:6-7 (Longoria). The election worker then checked in each person who intended to vote by examining the prospective voter's identification and checking the voter rolls to ensure that the voter was registered. *Id.* 1234:7-10 (Longoria).

259.    Registered voters who were successfully checked in would receive a unique randomized number called a ballot access code generated by the judge booth controller "JBC." *Id.* 1234:10-13 (Longoria); 9/20 Tr. 1405:22–1406:12 (Longoria). That number would allow the voting machine, called an eSlate, to pull up the correct ballot for that voter. 9/20 Tr. 1405:22–1406:12 (Longoria).

260.    The election worker would bring the eSlate machine on a dolly to the voter's car to allow the voter to vote. 9/19 Tr. 1234:13-17 (Longoria). Voters made their selections and hit "cast ballot." 9/19 Tr. 1234:25-1235:2 (Longoria).

261.    The completed vote would be stored electronically on the eSlate and transmitted back to the JBC via a cable. 9/19 Tr. 1405:22–1406:12 (Longoria). For DTV, each voting booth had its own eSlate machine and its own JBC. 9/19 Tr. 1232: 4-1233:12 (Longoria). The eSlate voting machines used for DTV were the same machines used for all voting—early voting and election day voting, whether curbside or walk-up. 9/19 Tr. 1236:10-19 (Longoria).

262.    For the first two or three days of DTV during the early voting period in November 2020, the eSlate machines were not connected to the JBC when voters made their selections. 9/20 Tr. 1251:8–1252:14 (Longoria). As is the practice in curbside voting, the eSlate was unplugged, brought to the voter, and then plugged back in after the ballot was marked. *Id.* Concerns were

raised about this procedure by the Republican Party, and the Clerk initiated the use of longer cables to keep the eSlate machines connected to the JBCs at all times. 9/20 Tr. 1251:8–1252:14 (Longoria). Maintaining this connection also avoided any potential problems with bent pins, "stranded votes," or "crossed" eSlates and JBCs, which Ms. Doyer testified could have been potential issues with DTV but conceded would be prevented by keeping the eSlates plugged in. 10/17 Tr. 4237:1-10; 4295:15–4296:6 (Doyer).

263.    Both curbside voting and DTV allow a voter to cast a ballot from a vehicle, but the two methods differ in some respects. To vote curbside, the voter must press a buzzer located outside the polling station. The buzzer alerts election workers inside the polling station that someone wants to vote curbside. The election worker goes outside, receives the voter's ID, and takes it inside the polling place to perform the poll book check-in process. 9/19 Tr. 1237:8-13 (Longoria); *id*. 1152:19–1153:3 (Obakozuwa). If the voter is eligible to vote, the election worker receives a ballot access code and removes an eSlate machine from the tablet to make the tablet mobile. The election worker takes the code and tablet outside to the voter, who marks the ballot from inside the vehicle. *Id*. 1237:13-20 (Longoria). The marked ballot is printed, and the election worker returns inside the polling center to insert the printed ballot into a scanner to tabulate the vote. *Id*. 1152:19–1153:3 (Obakozuwa).

264.    There was no difference between DTV and curbside voting in the type of voting machine used, how a voter marks the ballot, or in how election officials process ballots. *Id*. 1153:15-22 (Obakozuwa). Nor was there a difference in terms of election security precautions taken by Harris County. *Id*. 1153:23–1154:1 (Obakozuwa).

265.    Unlike DTV, curbside voting requires the eSlate machine to be disconnected from the JBC, brought outside, and exposed to the elements; DTV is sheltered. *Id*. 1237:21–1238:6

(Longoria).  To vote curbside, moreover, the voter must give up the voter's identification card, and the election worker must walk inside the polling location and then back outside to the voter. Similarly, the election worker must take the curbside voter's completed, printed ballot inside the polling place to insert it into the scanner out of view of the voter. With DTV, the voter pulls up to the booth and the machines are there; thus, the voter maintains visual access to the entire process.  *Id.* 1238:7-11 (Longoria); *see also id.* 1154:10-16 (Obakozuwa).

### b.  Selection of DTV Sites

266.    The Harris County Clerk's Office selected the DTV sites for the November 2020 general election. *Id.* 1239:16–1240:21 (Longoria).

267.    Each DTV site was required to: (1) be sufficiently large to allow for safe movement of vehicles and people; (2) be co-located with a high-traffic walk-up voting site; (3) be accessible to voters in a reasonable amount of time; and, (4) have owners who agreed to the operation of a DTV site on their property. *Id.*. DTV sites were always located in a structure that had a roof to protect workers, voters, and equipment from weather conditions. *Id.*1233:24–1234:3 (Longoria).

268.    All DTV was conducted at early voting locations that also served as walk-up voting sites. *Id.* 1233:2-7 (Longoria). Thus, a voter who arrived at a DTV site but wanted to vote inside a polling location could choose to park and go to the walk-up location next to each DTV location. *Id.*.

269.    The locations of DTV sites were not selected based on the racial demographics of the State Senate districts in which they were located. *See* 9/20 Tr. 1396:17-18 (Longoria). Ms. Longoria testified that Black, Latino, and Asian neighborhoods often did not have large enough spaces with sufficient parking lots for DTV sites. *Id.* 1396:19–1397:3 (Longoria).

270.    Daniel A. Smith, Ph.D is a Professor of Political Science and chair of the Department of Political Science at the University of Florida. 10/4 Tr. 2670:4-17 (Smith).  During

trial he was qualified as an expert on voting and elections in the American states.  (Tr. 2676 (Smith).

271.    Prof. Smith's expert reports are in evidence as HAUL-MFV 310; HAUL-MFV 60; OCAPX 255; HAUL-MFV 313; HAUL-MFV 311; and HAUL-MFV 394. The PowerPoint presentation that Prof. Smith used with his trial testimony is in evidence as HAUL-MFV 401.

272.    Among the topics on which Prof. Smith provided expert testimony was his analysis of the locations of all ten Harris County DTV sites used in the November 2020 general election against a map showing the density of Black voting age population ("BVAP") by precinct. HAUL-MFV 402 at 14. He found that almost all DTV sites were not placed in precincts where African-American voters predominate. 10/4 Tr. 2695:15–2696:3 (Smith)

273.    All voting locations were available to all voters within Harris County under county-wide voting. 9/20 Tr. 1395:15–1397:12 (Longoria).

274.    Prof. Smith testified that in these circumstances, there is very little scholarly evidence to suggest that the demographics of the area surrounding a polling place would impact the demographics of the people who voted early at that location. 10/4 Tr. 2767:21–2768:5 (Smith). He explained that people may vote on their way to work or after dropping their children at school, *id*., and that DTV would be convenient for people who are driving to or from work. *Id.* 2696:4-7 (Smith).

### c.  Ballot Security at DTV Locations

275.    The Harris County Clerk's office worked to ensure that DTV was as secure as any other type of voting. It employed the same ballot security and privacy measures at DTV sites as it did for any other type of in-person voting. 9/19 Tr. 1242:21–16 (Longoria). The machines and check-in procedures were the same. 9/19 Tr. 1243:7–1243:16 (Longoria).

276. Voting booths were spaced out to ensure voters could not see or hear what other voters were doing. 9/19 Tr. 1242:21–1243:16 (Longoria). If there were multiple people in a vehicle, none of the occupants was allowed to speak or motion to the others from check-in through submission of ballots. 9/19 Tr. 1235:8-16 (Longoria); 9/20 Tr. 1253:6–1254:3 (Longoria); 10/3 Tr. 2290:21–25 (Dorsett).

277. Each voting booth at a DTV site had its own election worker. 9/20 Tr. 1254:1–1254:3 (Longoria). Election workers checked each voter's identification. 10/10 Tr. 3379:4-6, 3380:12-13 (López). Election workers remained in close proximity to the vehicle, approximately one or two feet away, observing the entire voting process. 9/20 Tr. 1253:6–1254:3 (Longoria); 10/3 Tr. 2290:21–2291:6 (Dorsett); 10/10 Tr. 3380:9-17 (López). A voter's ballot selections were not visible to the election worker. 9/19 Tr. 1235:23–1236:9 (Longoria).

278. Deion Dorsett, a member of Plaintiff HAUL who used DTV with his wife, testified that they were required to vote one at a time, and that election workers instructed each of them to look away while the other one voted. 10/3 Tr. 2290:21–2291:6 (Dorsett). Phones were not allowed to be out during the voting process. 10/3 Tr. 2291:7-11 (Dorsett). Folders or cardboard partitions, which were used for voters with disabilities casting a ballot at an indoor voting location, were available to voters at DTV stations to ensure privacy. 9/19 Tr. 1235:23–1236:9 (Longoria); *id.* 1243:10-16 (Longoria); 9/20 Tr.1386:25–1387:8 (Longoria).  Ms. Marla López, who used DTV with her father Marlon López, testified that the election worker checked both her and her father's identification, and stayed beside the car while they each voted in close enough proximity to hear or see if either Ms. López or Mr. López attempted to do anything they were not allowed to do. 10/10 Tr. 3379:1-6, 14-25, 3380:9-17 (López).

279.     Credentialed poll watchers were permitted to be present at DTV locations, just as they were at all other voting locations. 9/20 Tr. 1255:7–16 (Longoria). Ms. Longoria, who was the point person for poll watchers within the Harris County Clerk's office during the November 2020 election, testified that "[p]oll watchers were positioned wherever they wanted to be positioned" at DTV locations. *Id.* 1255:7–16 (Longoria). They were permitted to "go in and out of any booth that they wanted" and "[t]hey could be right next to the voters and the machines . . . within … maybe six inches or a foot of where the voting machines were." 9*Id.*

280.     In an effort to obtain feedback about DTV, the County Clerk's office "spent weeks and weeks talking with community groups and political parties." *Id.* 1242:21–1243:6  (Longoria). This effort included "a pilot set up of a DTV site that all the [political] parties attended and community partners just to see how it worked in person." *Id.* (Longoria) Representatives from both the Democratic and Republican parties attended. *Id.* 1243:17-19 (Longoria).

281.     Ms. Longoria testified that she did not remember any objection by either party to Harris County's conducting DTV. *Id.* 1243:20-22 (Longoria).

282.     The Republican Party did suggest keeping the eSlate machines plugged into the JBCs. *Id.* 1243:23–1244:1 (Longoria).  The County obtained longer cords to ensure the eSlate machines would stay plugged into the JBCs throughout the day. *Id.* 1244:11-22 (Longoria).

283.     The Republican Party also noted that poll watchers might not be able to observe everything at the DTV site from a single location at one time. *Id.* 1244:23–1245:9 (Longoria). As this was also the case at large walk-up locations, the County Clerk's office did not consider it a major concern. *Id.*.

### d.  Voters and Election Officials Reacted Favorably to DTV.

284.     Voters expressed overwhelmingly positive feedback about the DTV option. 9/19 Tr. 1155:6-21 (Obakozuwa); 9/20 Tr. 1254:4-22 (Longoria); 10/10 Tr. 3444:11-15 (Razo).

285.     A survey of DTV voters in Harris County showed that voters greatly appreciated the ease of the DTV option, particularly those voters with children or elderly family members who did not have to leave their cars in order to vote. 9/20 Tr. 1254:4-22 (Longoria). Prof. Smith explained that DTV "lowers the time, transportation, and health costs on voters, as voters are able to cast their ballots from the convenience of a car, avoiding having to stand and wait in line at a traditional polling location." HAUL-MFV 310 ¶ 33.

286.     Some voters would not have voted had it not been for the DTV option. 9/19 Tr. 1155:6-21 (Obakozuwa); *see* 9/20 Tr. 1254:4-22 (Longoria).

287.     Sharon Watkins-Jones, a member of DST, testified that she knew of two members of the Sorority who utilized DTV in Harris County. 10/3 Tr. 2194:5-18 (Watkins-Jones). Both members had parents with physical impairments, and DTV "made it possible for [them] to vote together without the burden of navigating separately to vote or having to take their elderly parents inside the voting polls." *Id.* The parents could have voted curbside, but in that situation, the DST members would have had to park and go inside the polling place to vote.  Doing so would have been "burdensome, cumbersome, and could have been dangerous for their parents." *Id.* 2194:19–2195:6 (Watkins-Jones).

288.     Ray Shackelford, a consultant for HAUL, testified that the availability of DTV was important to the predominantly Black and Hispanic communities that UL serves. *Id.* 2242:13–2243:2 (Shackelford).

289.     Mr. Shackelford explained that members of the communities HAUL serves "have limitations in terms of their availability based on their employers," and as a result, "they need every hour they can get to make sure that they keep their lights on and feed families." *Id.* 2242:13–2243:2 (Shackelford). DTV eliminated some of the time burden on those voters. *But see id.* 2243:3-

9 (Shackelford). The ban on DTV burdened the ability of voters in the communities that HAUL serves to cast their ballots, and in some circumstances, prevented them from doing so altogether. *Id*.

290.    In addition to concerns about the pandemic, HAUL member Mr. Dorsett testified that he was motivated to use DTV to shield himself and his wife from people yelling at or intimidating them at a walk-up polling location. *Id*. 2289:10-19 (Dorsett). They also found the DTV site at the Toyota Center in downtown Houston to be "centrally located" for himself and his family members. *Id.* 2289:20-25 (Dorsett).

291.    Mr. Dorsett testified that his DTV experience was "seamless." 10/3 Tr. 2290:1-5 (Dorsett). He and his wife were able to complete the entire DTV process in "five to ten minutes." *Id.* 2291:4-6 (Dorsett). Mr. Dorsett had such a positive experience using DTV that he and his wife called family members to encourage them to use it as well. *Id*. 2291:15-25.

292.    Mr. Dorsett's positive DTV experience was in stark contrast to some of his other voting experiences. During the March 2020 primary election, he and his young daughter, who suffers from panic attacks, had to wait in a four-hour line at Texas Southern University. *Id*. 2284:20–2288:16 (Dorsett). During the November 2022 election, he and his wife felt uncomfortable and unsafe at the polling location: they were shouted at by individuals at the location. *Id.* 2295:25–2296:24 (Dorsett).

293.    Mr. Dorsett testified that if SB1 had not been enacted and DTV were available, he would have used DTV during the March 2022 and November 2022 elections, as well as in future elections. *Id*. 2293:23–2294:12, 2295:22–24 (Dorsett); *see also id*. 2296:25–2297:2 (Dorsett). He testified that DTV would have helped him avoid the difficulties he experienced during other elections. *Id.* 2297:3-14 (Dorsett).

294.    DTV also provided critical pathways for people in the Latino communities in Harris County to vote. Mi Familia Vota works with voters with long hours and long commutes, including commutes that take them out of their county, such as truckers or people who work in the oil and gas field, and who cannot find time to vote between 7am and 7pm. 10/10 Tr. 3441:21-3442:2, 3446:1-12 (Razo). They may have young children or other household members with them when they have to vote. 10/10 Tr. 3446:12-18 (Razo). Harris County also does not have a good public transit system, and traffic can be bad. 10/10 Tr. 3446:12-18 (Razo).

295.    DTV was a critical option that made voting possible for Latino voters in Harris County. As Ms. Razo explained about the Latino voters that MFV serves, they "are shift workers, they're working twelve-hour shifts, they're working more than one job, they are getting off work at irregular hours," and that they likely have family obligations and face long commutes and traffic in a county without good public transportation systems. 10/10 Tr. 3446:7-14 (Razo). Voters in multigenerational householders were able to make use of DTV. 10/10 Tr. 3441:11-14 (Razo). Ms. Razo testified that one staff member was able to vote for the first time using DTV with both her mother and her grandmother. 10/10 Tr. 3441:15-18 (Razo). Ms. López testified that DTV and 24-hour voting options made it possible for her to make a plan to vote with her father, who worked long, irregular hours in a physically demanding job as a welder and who often had to take care of his other young daughter when he wasn't working. 10/10 Tr. 3376:12-23, 3377:20-25, 3378:15-25, 3380:18-25 (López).

296.    Curbside voting does not make up for the loss of DTV. There are people who do not qualify for curbside voting who still face challenges when they have to wait in a long line to vote. Tr. 10/10/23 3447:4-7 (Angelica Razo). For example, Ms. López testified that her father is physically able, but works a physically demanding job that often left him tired and injured. 10/10

Tr. 3376:12-23, 3381:3-4 (López). In addition, it does not serve individuals who rely on public transportation, or who are driven by able-bodied voters.

297.    Many voters, especially new voters or voters who require language assistance, may not be aware of the curbside voting option. For example, during the 2022 election, Ms. Razo observed an elderly person wait in a 30 to 60-minute line at a polling place in Harris County. Ms. Razo let her know about curbside voting, which she had never heard about. She was able to limit her time in line only when other voters volunteered to let her move to the front of the line. 10/10 Tr. 3445:14-24 (Razo).

298.    DTV fit the needs of the electorate that Mi Familia Vota serves in Harris County. 10/10 Tr. 3446:1-12 (Razo). Taking away counties' authority to establish voting methods that meet the needs of the electorate are not merely a matter of convenience, but was in fact about necessity. 10/10 Tr. 3408:16-19 (López); 1010 Tr. 3442:12-17 (Razo). SB1 poses a stumbling block on the ability of many voters—especially Latino voters—from being able to vote at all. 10/10 Tr. 3442:12-17 (Razo).

299.    Election officials also viewed DTV favorably. Keith Ingram, the Elections Director for the SoS during the November 2020 general election stated that his office thought DTV was a "creative" form of voting that would minimize contact between poll workers and voters. 10/17 Tr. 4357:4–14 (Ingram); 10/18 Tr. 4481:6–10 (Ingram). He also testified that the SoS "didn't see any way in the world that DTV was abusing voters' rights" or "impair[ing]" those rights. 10/17 Tr. 96:1-8 (Ingram); 10/18 Tr. 4481:11-13 (Ingram).

300.    County election officials who considered implementing DTV but did not, such as Denton County EA Frank Phillips, decided against it because of concerns regarding staffing, budget, usage, and site availability. *See, e.g.* 10/12 Tr. 185:8–186:15: (Phillips); *see also* 9/19 Tr.

1021:9–1022:22 (Callanen). Mr. Phillips testified that although it was impractical for Denton County, it may be practical for another county. 10/12 Tr. 186:9-22 (Phillips).

301.    Voters who utilized DTV did not express discomfort about voting from the same vehicle as someone else. 9/20 Tr. 1254:4-22 (Longoria).

302.    Mr. Dorsett testified that he had no concerns about the secrecy of his ballot at any time during the DTV process. 10/3 Tr. 2291:12-14 (Dorsett).

303.    If a voter were uncomfortable voting while another person was in the same vehicle, the voter could exit the car and vote on the machine in the DTV parking space, or go inside the walk-up polling location. 9/20 Tr. 1254:23–1255:6 (Longoria). Ms. Longoria testified that after SB1 eliminated DTV, her office received "constant questions" from voters about "where they could drive-through vote" and why DTV wasn't available. 9/20 Tr. 1256:4-9 (Longoria); *id.* 1259:15–1260:7 (Longoria).

304.    Had SB1 not banned DTV, Harris County would have continued to utilize it in future elections. *Id.* 1256:4-9 (Longoria).

305.    Had SB1 not banned DTV and other voting options that include 24-hour voting and drop boxes, Mi Familia Vota would have worked to encourage election officials to introduce these options as a long-term solution in other counties. 10/10 Tr. 3347:21-3348:9 (Razo).

### e.  Racial and Ethnic Breakdown of DTV Voters

306.    More than 127,000 Harris County voters utilized DTV during the 2020 general election. HAUL-MFV 310 ¶¶ 10, 34, 35 (Smith May 13, 2022 Report); HAUL-MFV 273; 9/19 Tr. 1242:8-15 (Longoria); Tr. 2694:8-19 (Smith).

307.    In that election, DTV represented approximately one out of every ten ballots cast early in person in Harris County. HAUL-MFV 310 ¶ 34 (Smith May 13, 2022 Report); *accord* 9/19 Tr. 1242:16-19 (Longoria); 10/4 Tr. 2694:8-19 (Smith).

308.    More than 77,000 minority voters used DTV in the November 2020 general election in Harris County, and 48,000 non-Hispanic white voters used DTV. 10/2 Tr. 1970:25–1971:6 (Mayer); *see also* LULAC Ex. 2 at 13, tbl. 4 (Mayer Report).

309.    Prof. Smith's May 13, 2022 report explains that DTV "reduced the cost of voting" for each voter who used it. HAUL-MFV 310 ¶ 34.

310.    Prof. Smith and Prof. Kenneth Mayer, who was retained by the LULAC Plaintiffs and recognized by this Court as an expert in election administration, voting methods, and voter fraud, 10/2 Tr. 1956:18–25 (Mayer), each applied accepted methods of empirical analysis to the records of Harris County DTV voters. Both professors concluded that minority voters disproportionately relied on DTV during the November 2020 general election. HAUL-MFV 310 ¶ 52; LULAC Ex. 2, at 13, tbl. 4.

311.    Texas does not record individual-level race data for each registered voter. Consequently, Professors Smith and Mayer used empirical methods to infer race and determine the extent to which voters of different races used DTV. HAUL-MFV 310 ¶¶ 40, 43, 47-48; LULAC Ex. 2, at 3-5.

312.    Analytical methods employed by Prof. Smith demonstrated that "Black and Hispanic registered voters in Harris County were more likely to utilize DTV than White registered voters in the 2020 General Election." HAUL-MFV 310 ¶¶ 38-42, 52.

313.    For example, using linear regression analysis based on voting age population ("VAP") by race as supplied by the US Census, Prof. Smith found that "the greater the rate of Black VAP in a Census block, the greater the rate of DTV utilized by early in-person voters in that Census block," HAUL-MFV 310 ¶ 41; HAUL-MFV 402 at 16, as demonstrated by the positive slope of the regression line in the following graph:



HAUL-MFV 310, fig. 2; HAUL-MFV 402 at 16.

314.    Prof. Smith further found that "voters in Census blocks with higher rates of Hispanic VAP were more likely to utilize DTV than voters in other Census blocks." HAUL-MFV 310 ¶ 42. HAUL-MFV 402 at 18.  The graph below shows this result:



HAUL-MFV 310, fig. 3; HAUL-MFV 402 at 18.

315.     For white voters, by contrast, Prof. Smith found the inverse of the results for Black and Hispanic voters:  as the percentage white VAP in a Census block increased, the rate of DTV usage decreased, as shown by the downward slope of the regression line in the following graph:



HAUL-MFV 402 at 17.

316.     Prof. Smith's method-of-bounds analysis confirmed the results of his regression analysis:  the "logical bounds for the percent of DTV ballots cast in nearly homogenous Black and nearly homogenous Hispanic precincts [were] consistently greater than the comparable bounds for nearly homogenous White precincts." HAUL-MFV 310 ¶¶43-46 & tbl. 2; HAUL-MFV 402 at 20.

317.     The analyses performed by Prof. Mayer confirm Prof. Smith's conclusions. Using Bayesian Improved Surname Geocoding, an accepted methodology to infer race at an individual level, Prof. Mayer concluded that in Harris County, voters of color disproportionately relied on DTV compared to non-Hispanic whites. 10/2 Tr. 1958:15-20 (Mayer). This finding was statistically significant. *Id.* 1971:22–1972:9.

318.     Although non-Hispanic white voters accounted for 53.5% of all in-person early votes, moreover, Prof. Mayer found that a much lower percentage (38.1%) of DTV voters were non-Hispanic white.  By contrast, 46.5% of early in-person voters were non-white, but 62% of DTV voters were non-white. 10/2 Tr. 1970:11–1971:4 (Mayer); LULAC Ex. 2, at 13, tbl. 4.

319.     These experts confirm the conclusions of the Harris County Clerk's Office and of advocates that minority voters disproportionately utilized DTV in 2020.  Analyses performed by the Harris County Clerk's Office and presented to the legislature during hearings concerning SB1 showed Black and Hispanic voters were more likely than white voters to use DTV, *see, e.g.*, HAUL-MFV 273, Ex. 13; HAUL-MFV 274, Ex. 13; 9/20 Tr. 1353:2-11 (Longoria), and Black and Hispanic voters were more likely to use DTV than other methods of early voting. *Id.* 1256:10-21 (Longoria).

320.     Advocacy organizations also presented analyses and testimony to the legislature during the 2021 session demonstrating that Black and Hispanic voters were more likely to use DTV than white voters in November 2020. *See, e.g.*, HAUL-MFV Ex. 225 at 6, 8 (Texas Civil Rights Project analysis of DTV usage by race/ethnicity); HAUL-MFV 176 at 70:6–23 (legislative testimony by Adrian Shelley of Public Citizen that "we had more minority voters voting with the drive-through option").

### f.   Legal Challenges to DTV

321.     After Harris County announced it would utilize DTV in the November 2020 election, several individuals and the Republican Party filed lawsuits contesting DTV, and, later, seeking to invalidate the more than 127,000 ballots cast at DTV polling sites. *See In re Hotze*, 610 S.W.3d 909 (Tex. 2020); *Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668 (S.D. Tex. Nov. 2, 2020)*, aff'd in part, vacated in part sub nom. Hotze v. Hudspeth, 16 F.4th 1121 (5th Cir. 2021).*

322.    The principal merits question raised by these suits was whether the tents used at most DTV sites satisfied the requirements of the EC that early voting take place in a "structure" and that Election Day voting take place in a "building." *See Hotze*, 2020 WL 6437668, at *3, 4.

323.    Federal and state courts separately and categorically rejected each of the lawsuits challenging DTV. *Hotze*, 2020 WL 6437668, at *4; *In re Hotze*, 610 S.W.3d 909 (Tex. 2020).

324.    Keith Ingram, then Elections Director at SoS, testified in a court hearing in 2020 that "DTV was a creative approach that was probably okay legally." 10/18 Tr. 4481: 14-17. (Ingram).

325.    In the instant case, Mr. Ingram testified in response to a question from this Court that there was nothing "in statute that prohibited a county from doing DTV" prior to SB1. 10/17 Tr. 4357:4-14 (Ingram). This was the Secretary's position in 2020. 10/17 Tr. 4357:4-14 (Ingram).

### g. Reconciliation Issues

326.    Approximately two years after the November 2020 general election, the Secretary of State's newly created "Forensic Audit Division" published a final report on the November 2020 general election that raised issues related to ballot reconciliation at DTV sites in Harris County. 10/17 Tr. 4229:20-25 (Doyer); 10/17 Tr. 4230:1-25 (Doyer). As described below, FOF § XV.B., the report specifically targets Harris County and is severely flawed.

327.    The report describes ballot reconciliation discrepancies at polling locations in each of the four counties on which it focuses. State Ex. 23 at 165-170. Jacqueline Doyer, the Legal Director of the Forensic Audit Division, described the discrepancies at DTV locations as "irregularities." 10/17 Tr. 4219:16-22 (Doyer).

328.    According to Ms. Doyer, the discrepancies at DTV locations resulted from issues with the connection between the eSlate voting machines and the JBCs. When election officials connected the eSlates to the JBCs, sometimes the pins would bend, preventing a vote cast on the

eSlate from being transmitted to the JBC. 10/17 Tr. 4237:1-5 (Doyer). On some occasions, an eSlate would be disconnected from one JBC and then reconnected to a different JBC, causing a discrepancy between the number of voters checked in and the number of votes cast during the day. 10/17 Tr. 4237:11-16(Doyer); 10/17 Tr. 4224:9-14 (Doyer). In short, "the point of [Ms. Doyer's] testimony" with respect to DTV was that "the technology was not up to snuff" and "the paper trail was less desirable than we would all like." 10/17 Tr. 4238:2-5 (Doyer).

329.    Ms. Doyer was not aware that after the first two or three days of early voting, Harris County kept all the eSlate machines plugged into the JBCs throughout each day. 10/17 Tr. 4295:15-17 (Doyer); *see* Tr. 1244:11-22 (Longoria) (procedure changed to keep the eSlates plugged into the JBCs). Ms. Doyer testified that keeping the eSlates plugged in would prevent the "stranded vote" and "crossed eSlate" problems, so long as the pins were reading correctly. 10/17 Tr. 4295:25 (Doyer); 10/17 Tr. 4296:1-5 (Doyer). Ms. Doyer conceded that the "bent pins" problem could happen with curbside voting as well, 10/17 Tr. 4296: 7-9(Doyer), as eSlate machines used for curbside voting are plugged and unplugged from JBCs throughout the day (9/19 Tr. 1237:21–1238:6 (Longoria).

330.    Ms. Doyer further conceded that discrepancies between the number of voters who checked in and the number of votes tabulated were not unique to DTV locations, nor were they unique to Harris County. 10/17 Tr. 4296:11-16 (Doyer); . Her Division's final report shows that nearly all non-DTV early voting locations and a significant number of non-DTV Election Day polling locations in each of the four subject counties had ballot reconciliation discrepancies. State Ex. 23 at 166–70 (listing non-DTV early voting locations ("SRD" poll codes) and non-DTV Election Day locations that had ballot reconciliation discrepancies); State Ex. 23 at 173 (30 of 43 non-DTV early voting sites and 29 of 102 non-DTV Election Day locations in Collin County had

ballot reconciliation discrepancies); State Ex. 23 at 174–76 (same for 56 of 60 non-DTV early voting locations and 131 of 463 non-DTV Election Day locations in Dallas County); State Ex. 176-78 (same for 118 of 122 non-DTV early voting locations and 327 of 798 non-DTV Election Day locations in Harris County); State Ex. 23, at 178-79 (same for 52 of 59 non-DTV early voting locations and 106 of 331 non-DTV Election Day locations in Tarrant County).

331.    The elimination of DTV did not eliminate ballot reconciliation discrepancies. During the March 2022 primary election, when SB1 had already outlawed DTV, a preliminary post-election report showed that Harris County had a nearly 10,000 ballot reconciliation discrepancy. 10/17 Tr. 4246:16-23(Doyer); 9/20 Tr. 1404:1–5 (Longoria). This discrepancy was temporary, and subsequent reports brought this number down considerably. 9/20 Tr. 1404:6–5.

332.    Ms. Doyer also conceded that SB1 addressed ballot reconciliation discrepancies at all polling locations with a number of measures that did not require the elimination of DTV, including requiring paper-backed ballots, submission of tabulation audit logs, completion of reconciliation forms, and video surveillance. 10/17 Tr. 4246:16-25 (Doyer).

### 2. *24-Hour Voting*

333.    Before SB1, the EC did not cap the number of early voting hours a county could provide on a given day, 9/20 Tr. 1261:13–21 (Longoria), and counties generally provided early voting during normal business hours. Early voting sites in large counties like Harris County were generally open from 7 a.m. to 7 p.m. *See* 9/20 Tr. 1391:9–13 (Longoria); 9/20 Tr. 1269:13–18 (Longoria); 10/17 Tr. 105:5–8 (Ingram)..

334.    Recognizing that many voters had difficulty getting to the polls during these hours because of multiple jobs, extended work hours, or childcare obligations, the Harris County Clerk implemented 24-hour voting in 2020 to expand voting opportunities and accessibility. 9/20 Tr. 1260:8–1261:2 (Longoria); 9/19 Tr. 1154:24–1155:5 (Obakozuwa).

335.    Harris County piloted 24-hour voting during the July 2020 primary run-off election. 9/20 Tr. 1261:22–1262:1 (Longoria). It then expanded it to eight early voting locations during the November 2020 general election. *Id.* 1261:3–12, 1262:25–1263:11 (Longoria); State Ex. 141. One of those locations, NRG Arena, was also a DTV location. OCAPX-354.

### a.  Mechanics of 24-Hour Voting

336.    A 24-hour location remained open "essentially for 36 hours straight." 9/20 Tr. 1261:3-12 (Longoria). It would open at 7 a.m., remain open through the night, and close the next day at 7 p.m., with a 30-minute pause from 11:30 p.m. to midnight to allow election judges to do state-mandated end-of-day reporting and for the machines to be reset for the next day. *Id.* 1261:3-12; 1265:7–1266:23 (Longoria); 9/19 Tr. 1156:13–16 (Obakozuwa).

337.    The voting process at a 24-hour location was exactly the same as the voting process at any other early voting location. 9/20 Tr. 1265:7–1266:23 (Longoria). There was no difference in how ballots were processed or in the measures taken to ensure ballot security. 9/19 Tr. 1157:1-12 (Obakozuwa); 9/20 Tr. 1266:23–1267:12 (Longoria). Poll watchers were able to observe 24-hour voting in the same way they could observe early voting during all other hours. 9/20 Tr. 1267:13-17 (Longoria).

### b.  Selection of 24-Hour Voting Sites

338.    The Harris County Clerk's Office spaced 24-hour voting sites around the county so that voters in all parts of the county would not have to drive far to reach the locations. The County selected high-traffic early voting sites in places where voters in the vicinity would need a 24-hour voting option, such as "law enforcement, who have those second and third shifts," and "medical workers who were working around the clock and equally have those late night shifts." Finally,  the facilities selected had to have security officers to ensure poll worker safety. 9/20 Tr. 1263:12–1264:17 (Longoria).

339.    Ms. Longoria testified at trial that race did not drive the selection of locations for 24-hour sites. *Id.* 1394:2-13 (Longoria). The County recognized that individuals who have later working hours or who work overnight shifts tend to have lower incomes, and therefore tend to be minorities; accordingly, expanding opportunities for such workers to vote might have a positive effect on turnout by minority voters. *Id.* 1394:2-13 (Longoria). Thus, the selection of 24-hour voting sites was not a "race-based" decision but was a "historical and race-informed" decision. *Id.* 1394:14-17 (Longoria).

340.    Prof. Smith's analysis confirms that 24-hour locations were not placed primarily in minority neighborhoods. HAUL-MFV 402 at 14. The yellow highlighted locations in the map on the left represent 24-hour locations. When compared to the darker shaded areas, which represent Census blocks with higher Black VAPs, in the map on the right, it is apparent that most 24-hour locations were not placed in heavily Black neighborhoods. HAUL-MFV 402 at 14.

### c. Voters and Election Officials Reacted Favorably to 24-Hour Voting.

341.    The evidence shows that 24-hour voting was an important option for people who work irregular hours, or who have both work and school. 10/10 Tr. 3446:19-24 (Razo). Ms. Razo noted that her sister is a nurse who works twelve-hour shifts and has a commute of one to one and a half hours; on her days off, she is a caretaker. 10/10 Tr. 3442:3-7 (Razo). These are typical stories and experiences that she sees in her community. 10/10 Tr. 3442:8-9. Ms. Razo testified that she gets texts from voters who get off work and want to vote. When she got those texts during 24-hour voting, she had a place to direct them to go. Within an hour, they were able to cast their ballot. 10/10 Tr. 3446:19-24 (Razo). Ms. López testified that the option to use 24-hour voting and DTV helped her make a plan with her father to vote that worked with his schedule. 10/10 Tr. 3380:18-25, 3406:20-23, 3407:1-5 (López).

342. When these options to vote are taken away from voters, they may be left with no opportunities in their schedule to vote. 10/10 Tr. 3441:5-10 (Razo). For example, Mr. López tried to make a plan to vote after SB1 went into effect, but was not able to vote. 10/10 Tr. 3409:2-4 (López).

343. The 24-hour voting option fits the needs of the electorates that Mi Familia Vota, HAUL, and DST serve in Harris County. 10/10 Tr. 3446:1-12 (Razo); Taking away counties' authority to establish voting methods that meet the needs of the electorate are not merely a matter of convenience. The pose a stumbling block on the ability of many voters—especially Latino voters—from being able to vote at all. 10/10 Tr. 3442:12-17 (Razo).

344. Members of DST and HAUL are also part of communities that need 24-hour voting. Ray Shackelford of HAUL testified that 24-hour voting was important to the predominantly Black and Hispanic communities that HAUL serves. *See* 10/3 Tr. 2243:20-22 (Shackelford). He explained that shift workers "don't always have a shift that aligns with them being able to go vote during the normal voting hours. You know, sometimes they may have to bid for a shift ahead of time and then by the time election time comes around they can't necessarily move or get off." *Id*. 2243:20–2244:4 (Shackelford). Being able to vote without taking time off of work, which could negatively "impact … their salary or compensation was definitely very beneficial." *Id*. 2244:5-8 (Shackelford). The elimination of 24-hour voting made voting more difficult for the communities that HAUL serves, and in some circumstances, prevented them from voting at all. *Id.* 2244:9-15 (Shackelford).

345. Sharon Watkins-Jones testified that DST's Houston Alumnae Chapter polled its membership and found that many of the 240 members polled are shift workers, medical

professionals, and law enforcement for whom 24-hour voting would reduce the burden of voting. 10/3 Tr. 2195:13-21 (Watkins-Jones).

346.    Ms. Watkins-Jones provided an example of how 24-hour voting could have eliminated burdens on DST member Lisa Newman and her family. Ms. Newman's husband is a medical professional who worked 12-hour shifts. During an election after the prohibition of 24-hour voting, he went to vote immediately after getting off work. He waited in line for five hours, and on his way home he was injured in a car accident caused by the lack of rest. An option to vote after traditional early voting hours would have allowed him to rest before voting. *Id.* 2196:11–2196:20 (Watkins-Jones).

347.    Harris County would have utilized 24-hour voting again for future elections if SB1 had not outlawed it. 9/20 Tr. 1268:2-20 (Longoria). Ms. Longoria explained that Texas law provides that employers may provide employees time off to vote, but that 24-hour voting allowed people to cast ballots who otherwise could not take that time off, or whose employers imposed a work culture of not being able to ask for time to vote. *Id.*. 1269:22–1270:18.

348.    Harris County was the only county that used 24-hour voting during the 2020 elections. 10/17 Tr. 104:23–25 (Ingram).. Election officials in other counties who considered implementing 24-hour voting, such as Denton County EA Frank Phillips, decided against it because of staffing, budget, or usage concerns. *See, e.g.* 10/12 Tr. 185:8–186:5 (Phillips); *see also* 9/19 Tr. 1021:9–1022:22 (Callanen). These EAs did not cite concerns about election fraud as a reason they declined to offer 24-hour voting in their counties. Mr. Phillips testified that although 24-hour voting was impractical for Denton County, it may be practical for another county. county. 10/12 Tr. 186:9-22 (Phillips). Travis County EA Bridgette Escobedo testified that, setting aside

limitations imposed by SB1, she would recommend offering extended hours early voting to expand access to voting in future elections. 9/21 Tr. 1552:18–23 (Escobedo).

349.    One county election official testified that having different hours for early voting in different counties may cause voter confusion. 9/21 Tr. 1557:23– 1558:7 (Escobedo). The same official acknowledged that SB1 permits, and in some cases imposes, differences in among counties in early voting hours, 9/21 Tr. 1575:13– 15 (Escobedo)., For exapmle, SB1 requires counties with populations greater than 55,000 people to permit early voting for at least 12 hours between 6 a.m. and 10 p.m., while allowing counties with less than 55,000 people to provide fewer than 12 hours of early voting per day. SB1 §3.09; 10/17 Tr. 105:24–106:8 (Ingram). Neighboring counties can thus continue to provide different early voting hours even after SB1, risking voter confusion. 9/21 Tr. 1575:16–18 (Escobedo); 10/17 Tr. 105:24–106:8 (Ingram)..

### d. Racial and Ethnic Breakdown of Voters Who Used 24-Hour Voting

350.    Prof. Smith presents an analysis of 24-hour voting by race and ethnicity in his May 13, 2022 expert report. HAUL-MFV 310 ¶¶ 53–61; HAUL-MFV 402 at 24–27. SB1 restricts early voting hours to the hours between 6 a.m. and 10 p.m. Accordingly, Prof. Smith analyzed only those ballots cast at the eight 24-hour voting sites between 10 p.m. and 6 a.m. during the one night, October 28-29, that Harris County offered 24-hour voting. HAUL-MFV 310 ¶ 55. His analysis shows that 1,490 voters cast ballots during those hours. HAUL-MFV 310 ¶ 55; HAUL-MFV 402 at 24.

351.    Prof. Smith found that Black and Hispanic voters were more likely than white voters to use 24-hour voting. He determined the relationship between the rates of Black, Hispanic, and white VAP in Harris County precincts and the rate of 24-hour voting usage using linear regression analysis. HAUL-MFV 310 ¶¶ 57, 59, figs. 4 & 5; HAUL-MFV 402 at 25–27.

352.    He found that "as the percentage of Black VAP in a precinct (X-axis) increases, so too does the percentage in the precinct who [used 24-hour voting]." HAUL-MFV 310 ¶ 57. This finding is demonstrated by the positive slope of the regression line in the graph below:



HAUL-MFV 310, fig. 4; HAUL-MFV 402 at 25.

353.    Linear regression analysis revealed similar results for Hispanic voters. Prof. Smith found that "as the percentage of Hispanic VAP in a precinct (X-axis) increases, so too does the percent of voters in the precinct who [used 24-hour voting]," HAUL-MFV 310 ¶ 59, as shown by the following graph:



HAUL-MFV 310, fig. 5; HAUL-MFV 402 at 26.

354.    As the percentage of white VAP in Harris County precincts increased, however, the percentage of voters who used 24-hour voting declined, as shown by the downward slope of the regression line in the figure below:



HAUL-MFV 402, at 27.

355.    Prof. Smith's linear regression analyses of 24-hour voting by race and ethnicity are, as he testified, "very conservative" in that the denominator he uses to calculate the percentages of 24-hour voters is the total of *all* in-person early voting ballots, not just the ones cast over the two-day period when 24-hour voting was available (October 29-30, 2020). HAUL-MFV 310 ¶ 60.

356.    Based on his analyses, Prof. Smith concluded that "Black and Hispanic voters in Harris County were more likely to utilize after-hours voting than White voters in the 2020 General Election." HAUL-MFV 310 ¶ 61.

357.    For his part, Prof. Mayer concluded that the data show, to a statistically significant degree, that "24-hour early voting was . . . relied on disproportionately by voters of color compared to non-Hispanic whites." 10/2 Tr. 1969:10-17; 1973:6-12 (Mayer); LULAC Ex. 2 at 14, tbl. 5. Using the same methodology used in his DTV analysis, he found that the participation of white voters (who represented 52.1% of those who voted early during regular hours) dropped to 40% in

the overnight hours, while Black voters (19% of regular hours early voters) constituted 25.1% of the 24-hour turnout, and Hispanic voters (22.1% of regular hours early voters) were 28.9% of 24-hour voters. 10/2 Tr. 1972:19-25 (Mayer); LULAC Ex. 2, at 15, tbl. 5.

358.    These experts confirm the conclusions of the Harris County Clerk's Office and of advocates that minority voters disproportionately utilized DTV in 2020.  Analyses performed by the Harris County Clerk's Office and presented to the legislature during the hearings concerning SB1 demonstrated that Black and Hispanic voters were more likely than white voters to use 24-hour voting (*see, e.g.* HAUL-MFV 273, Ex. 10; HAUL-MFV 274, Ex. 10; 9/20 Tr. 1353:2-11 (Longoria).

359.    In an analysis presented to the legislature during the consideration of SB1 and its predecessor bills, the Texas Civil Rights Project ("TCRP") also concluded that Hispanic voters were more likely to use 24-hour voting than white voters in the November 2020 general election. HAUL-MFV 225. TCRP's analysis found that Hispanic voters were approximately 20% of all early voters in the November 2020 general election, but they represented approximately 36% of 24-hour voters. HAUL-MFV 225 at 6, 7.

### 3.    *Encouraging Mail-In Voting by Sending Unsolicited ABBMs to Eligible Voters*

360.    The Harris County Clerk's Office mailed ABBMs to all voters who were age 65 or older, all of whom were eligible to vote by mail. Tr. 1274:23-24 (Longoria).

361.    Recognizing how difficult the mail-in voting process is in Texas, the Harris County Clerk's office wanted to reduce the burdens on voters of using BBMs. Tr. 1273:19–1274:7 (Longoria). Voting by mail also allowed voters more time to think about their ballots and make informed decisions. Tr. 1274:25–1275:22 (Longoria). In addition, reducing the barriers to voting

by mail would encourage voters to use that option rather than appearing to vote in person, reducing the risk of spreading COVID. Tr. 1274:25–1275:22 (Longoria).

362.     Approximately 179,000 voters in Harris County filed BBMs during the November 2020 election. HAUL-MFV 273; Tr. 1273:6-18 (Longoria). This represented an increase of nearly 70,000 mail voters from the 2016 election. HAUL-MFV 273, Ex. 3 (comparing number of mail voters in each Senate district in Harris County in 2016 with same number in 2020). . Ms. Longoria testified that she was not aware of any incidents of fraud resulting from the distribution of ABBMs by county officials to eligible registered voters who had not requested ABBMs. Tr. 1277:16-19 (Longoria).

### 4.  *The Governor's Proclamations*

363.     In response to concerns regarding the pandemic, Governor Abbott issued two proclamations ahead of the November 2020 general election that affected  early voting options in Texas. State Ex. 128 (July 27, 2020 Proclamation); State Ex. 129 (Oct. 1, 2020 Proclamation).

364.     At the urging of Harris County Clerk Chris Hollins, *see* State Ex. 127, the Governor's first proclamation, issued on July 27, 2020, extended the early voting period by one week. State Ex. 128, at 2. It also extended the number of days a voter could hand deliver a BBM to the early voting clerk's office. *Id.* The extra week of early voting and extended BBM drop off days only applied during the November 2020 election and were not available to voters in subsequent elections pre- or post SB1. State Ex. 129. Under the EC, voters may deliver BBMs in person only on election day. TEC § 86.006(a-1).

365.     After the Governor issued his July 27 proclamation, the Harris County Clerk announced that the county would open twelve drop-off locations at early voting clerk satellite offices across the county. .

366.   In response to the Harris County Clerk's announcement, the Governor issued a second proclamation on October 1, 2020 that limited counties from providing more than one BBM drop-off location. State Ex. 129 at 3.  Black and Latino bear a disproportionate burden due to SB1's drop-off location provisions. HAUL-MFV 310 ¶¶ 65–71. The ability to drop off a mail ballot in person is important to the predominantly Black and Latino communities that HAUL serves. FOF § XVII. A.. But because Black and Latino voters are generally more likely to have their mail ballots rejected, and thus would have greater need to drop off their mail ballots before the submission deadline, SB1's restrictions on drop-off locations have a disproportionate impact on those voters. HAUL-MFV 310 ¶ 65. With only one available drop-off location in many counties, these voters may have to travel long distances, wait in longer lines, and expose themselves to greater potential health risk to drop off their ballots. HAUL-MFV 310 ¶¶ 66–69.

## B.    Unprecedented Turnout, Particularly Among Black and Latino Voters

367.   An unprecedented number of Texas voters – approximately 11 million – cast ballots in the November 2020 general election, an increase of approximately 2 million votes over any other election in Texas history. State 245, at 3. The turnout rate was approximately 64%. State 245, at 3.

368.   Defendant Secretary of State celebrated the "resounding success" of the 2020 general election and "commended" the state's voters for "turnout among registered voters [that] was the highest in 28 years." LUPE Ex. 261. Keith Ingram testified that the 2020 general election should give Texans a great deal of confidence in the electoral process. 9/22 Tr. 1939:24–1940:2 (Ingram).

369.    For its part, Harris County experienced a historic turnout rate of 65.86%, with nearly 1.7 million registered voters casting ballots, the most voters in Harris County ever to have voted in a Texas election. State 167.

370.    Harris County's surge in turnout was driven in large part by increases in the turnout of Black and Hispanic voters because of the expanded voting options offered by the County. HAUL-MFV 273 (letter from Harris County to the Texas legislature) ("Despite a global pandemic, Harris County had a historic 1.68 million voters participate in the elections in a safe, accessible, transparent, and equitable manner. This turnout was driven by innovations such as DTV (128,000 voters), 24-hour voting (16,000 voters), and a robust mail program (179,000 voters)."); 9/19 Tr. 1227:17–1228:9 (Longoria) (additional voting options offered in Harris County "got more people voting," including "more minority folks" and "more women"); *see* 10/3 Tr. 2237:19-25 (Shackelford). As Mr. Shackelford of HAUL testified, these options "allowed many of the communities that HAUL serves to have historic turnout" because they reduced barriers. 10/3 Tr. 2239:2-10 (Shackelford).

371.    Turnout in 2020 varied significantly across counties, State 156–173, reflecting the variety of factors specific to each locality that influences turnout.

### C.  Problems with Poll Watchers During the 2020 Election

372.    The "resounding success," LUPE Ex. 261, of the November 2020 general election in Texas was marred by a surge of aggressive and intimidating activity by partisan poll watchers.

373.    The 2020 election was the first Presidential election in more than three decades in which a consent decree was not in place restraining poll watcher activity by the Republican National Committee because of its prior use of election monitoring methods to challenge and intimidate Black and Latino voters. HAUL-MFV 123 at 4; HAUL-MFV 124 at 9.

374.    Lifting the consent decree led to extensive activity by partisan poll watchers to "fuel misinformation and distrust in our elections" across the country, including in Texas. HAUL-MFV 176 (testimony of Stephanie Gomez, Common Cause, at Aug. 23 2021 hearing of House Select Committee on Constitutional Rights and Remedies).

### 1. *Complaints About Poll Watchers*

375.    County election officials testified at length about aggressive and disruptive partisan poll watchers in the 2020 general election.

376.    Ms. Longoria, who was the primary point of contact for poll watchers across Harris County in November 2020, testified that poll watchers at the BBM drop-off location at NRG Arena would attempt to "wedge themselves in between the election worker and the vehicle, or the voter, or would touch the election worker to try and move them over, or would frequently pick up the clipboards of voter information to copy that information." 9/20 Tr. 1320:18–1322:21 (Longoria).

377.    Multiple voters informed Ms. Longoria about poll watchers who were "aggressive" and "rude to the election workers." 9/20 Tr. 1324:19–1325:13 (Longoria). Voters also complained about poll watchers "reading over their shoulder" and "standing too close to them at a voting location." 9/20 Tr. 1324:19–1325:13 (Longoria). When asked by voters to move back, "the poll watchers wouldn't move back." 9/20 Tr. 1324:19–1325:13 (Longoria). Voters were particularly wary of poll watcher activity in "Black and brown communities because of that history of who are these people, what are they doing, and how can I get them to just leave me alone when voting." 9/20 Tr. 1324:19–1325:13 (Longoria).

378.    Ms. Longoria recalled two poll watchers whom she warned repeatedly, both verbally and in writing, because of their aggressive behavior. Ultimately, she decided to remove them "because they started shouting, they started becoming aggressive with our election workers

and being more aggressive in trying to insert themselves between the election workers and the voters." 9/20 Tr. 1322:11-16 (Longoria).

379.    Ms. Longoria also testified that the lead poll watcher for the Republican Party informed her on multiple occasions "that they had been instructed to write down the name and driver's license numbers of voters and that they felt they needed to be close enough to be able to see those names and driver's license numbers." 9/20 Tr. 1320:18–1322:21 (Longoria).

380.    Yvonne Ramón, the EA of Hidalgo County, testified that poll watchers were aggressive and disruptive during the 2020 general election. Tr. 2319:24–2320:23 (Ramón). One poll watcher demanded to see identification from a voter who "did not look like a U.S. citizen." Tr. 2317:10–2318:6 (Ramón). Poll watchers also gathered outside near a curbside voting location and took pictures of people in their cars and of their license plates. Tr. 2318:7–2319:23 (Ramón).

381.    Poll watchers have also insisted, when poll workers are assisting Spanish-speaking voters, on having the poll worker translate the discussion into English for them; such translation is not needed to assist the voter, but only because the poll watcher demands it. 9/19 Tr. 1059:8-17 (Callanen).

382.    The Bexar County EA described a practice that began during the 2020 election: poll watchers have multiple photocopies of their appointment certificates, including the candidate information and signature. The poll watcher can use these certificates to enter as many polling places as the poll watcher may wish, filling in his or her personal information and each new polling place name. 9/19 Tr. 1065:25–1066:21, 1069:20–1070:2 (Callanen). The process of qualifying a poll watcher at a polling location can be time-consuming and must take place immediately, each time a poll watcher enters a polling place, disrupting the voting process. *Id.* 1065:20-24; 1068:5–1069:1 (Callanen). In addition, a poll watcher may exit the polling place, step past the 100-foot

line, engage in electioneering, and then cease electioneering and reenter the polling place as a poll watcher. *Id.* 103:13-19 (Callanen).

383.     Many poll watchers in Bexar County did not respect the County's COVID protocols and distancing requirements at polling locations. Tragically, a number of election workers were hospitalized due to COVID after the election, and one election worker died. Tr. 1060:7–1061:6 (Callanen).

384.     In El Paso County, a poll watcher told voters to take their masks off and that COVID was "a hoax." This poll watcher intentionally touched surfaces immediately after they had been disinfected, demanded to see voters' IDs, and interfered with vote counting at the county elections office. Another poll watcher who repeatedly demanded to see voters' IDs eventually had to be removed by law enforcement. 9/11 Tr. 181:4–183:7 (Wise). He subsequently filed a writ of mandamus against the El Paso County EA, which was denied. 9/11 Tr. 183:8–12 (Wise).

385.     Dana DeBeauvoir, former EA of Travis County, testified that in recent years, poll watchers have become increasingly partisan and aggressive. 9/14 Tr. 859:16–860:9 (DeBeauvoir).

386.     She recalled a "very bad situation" from the November 2020 general election. The main rooms at the Travis County central count station could not accommodate all poll watchers at the same time because of fire regulations, so Ms. DeBeauvoir set up a separate room specifically designed for observation, with a large glass window and a microphone into the main rooms so that poll watchers could always see and hear what was happening. Tr. 865:8–866:25 (DeBeauvoir). One poll watcher, however, "behaved so badly, screaming and yelling, and pounding her hands on glass windows, that her fellow poll watchers turned her in to the police." Tr. 861:5-11; 862:10-14 (DeBeauvoir).

387.    In Travis County as in Bexar County, election officials had to cope with poll watchers who refused to wear masks and follow COVID protocols. 9/14 Tr. 862:17-863:24, 871:25-872:4 (DeBeauvoir). The Travis County EA set up clear plastic sneeze guards between election workers and poll watchers at the central count station, 9/14 Tr. 863:9-21 (DeBeauvoir), and in response, the Travis County Republican Party filed a complaint against the sneeze guards and other anti-COVID measures. 9/14 Tr. 871:2–872:14 (DeBeauvoir). The suit was resolved with an agreement that precluded the County from using the sneezeguards. State Ex. 147 (Rule 11 agreement). The EA then dressed the election workers in full hazard suits. 9/14 Tr. 863:16-21, 871:2–872:14 (DeBeauvoir) Despite these efforts, a Travis County election worker died from COVID. 9/14 Tr. 863:22-24 (DeBeauvoir).

## 2.    *Investigations and Legal Actions Against Election Workers Based on Poll Watcher Complaints*

388.    Beginning in 2020, there was a "surge" of complaints by poll watchers against election officials alleging improper exclusion of poll watchers from polling locations. 10/16 Tr. 3984:20–3985:4 (White); 10/17 Tr. 113:18–24 (Ingram). At trial, multiple election officials testified about complaints by poll watchers that election workers were unduly limiting poll watchers' ability to observe the voting process. 9/20 Tr. 1320:18–1322:16, 1323:20–1324:9 (Longoria); *see also id.* 1330:23–1331:16 (Longoria); 9/14 Tr. 865:8-15 (DeBeauvoir); 9/11 Tr. 179:25–180:4 (Wise); 9/11 Tr. 186:11–13 (Wise).

389.    Poll watchers' complaints were generally not well-founded. The EAs of Bexar and El Paso Counties testified that, in November, 2020, poll watchers complained that the election judge's signature on the back of the ballot voided the ballot, even though the election judge's signature is required by the EC. Poll watchers in El Paso County told voters they should demand

new ballot sheets, unsigned by the election judge.   9/11 Tr. 185:9-186:16 (Wise); 9/19 Tr. 1059:18–1060:6 (Callanen).

390.    None of the complaints Ms. Longoria or Ms. Wise received from poll watchers during the November 2020 general election was valid. 9/20 Tr. 1324:10-18 (Longoria); 9/11 Tr. 186:7–10 (Wise). Rather, they came from poll watchers who "had been repeatedly notified that whatever they wanted to do was not within their right and that they were escalating for the purpose of kind of feeling disgruntled about it." *Id.* ; 9/11 Tr. 186:11–13.

391.    Nevertheless, complaints by poll watchers resulted in investigations and legal action taken against election officials.   OAG pursued an indictment against Ms. DeBeauvoir in Williamson County, adjacent to Travis County, in connection with the arrest of the poll watcher who was pounding on the glass observation window in the central count facility. 9/14 Tr. 873:3-20; 874:3-11 (DeBeauvoir). Ms. DeBeauvoir had to retain counsel at her personal expense; her legal fees totaled approximately $75,000. *Id.* 873:3-20; 875:14-20 (DeBeauvoir). Ultimately, the grand jury did not indict her. *Id.* 873:25–874:2 (DeBeauvoir). The investigation negatively affected Ms. DeBeauvoir personally, and it impaired her ability to perform her duties as EA. *Id.* 875:9-13 (DeBeauvoir). Similarly, a disruptive poll watcher filed a writ of mandamus against El Paso County EA Lisa Wise that was ultimately dismissed. 9/11 Tr. 183:8–12 (Wise). Nevertheless, poll workers during the March 2022 primary in El Paso were concerned about performing their duties due to the lawsuit against Ms. Wise. 9/11 Tr. 184:14–25 (Wise).

### D.  Public Confidence in Elections

392.    The experience of the November 2020 election led state and county officials to conclude that Texans should have great confidence in the state's elections. Mr. Ingram testified before the Texas House that the 2020 election was "smooth and secure." 10/17 Tr. 4210:15-23 (Ingram). It was his opinion, moreover, that Texans could have a great deal of confidence in the

electoral process in Texas, including in the state's mail-in voting procedures. 9/22 Tr. 1939:19–1940:2 (Ingram).

393.    A February 2021 University of Texas/Texas Tribune poll demonstrated that at the beginning of the 2021 legislative session, the public shared these views: approximately 78% of Texas voters trusted the results of the 2020 General Election in Texas.  State Ex. 256 ("Proactive Communication Strategies for Local Election Officials" by Sam Taylor, Assistant Secretary of State for Communications, Election Law Seminar, November 30, 2022), at STATE148647. Approximately 76% of Republicans and 78% of Democrats thought official election results in Texas were very accurate or somewhat accurate, and only 6% of Republicans and 5% of Democrats thought the results were "very inaccurate." HAUL-MFV 332 ¶ 188.  Notably, the public's confidence in *Texas* elections was high; its distrust was focused on elections that took place outside of Texas. HAUL-MFV 332 ¶ 188 n.287. Confirming this phenomenon, the Denton County EA testified that voter conspiracy theories and concerns related to election integrity are based on national events rather than anything happening in Denton County. 10/12 Tr.3883:14–20 (Phillips).

394.    The rhetoric of Republican political leaders, however, became more extreme and polarizing as the legislative session moved forward after SB7 failed. That rhetoric influenced the public, making Republicans more supportive of stricter voting laws and Democrats less supportive. HAUL-MFV 332 ¶ 188 (Kousser Report).

## VI.    THE PASSAGE OF SB1

395.    According to its bill title, SB1 is a law "Relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses." Joint Ex. 1 at 1.

396.    SB1 was passed by the Texas Legislature during the 87th legislative session in 2021. Over the course of the regular session and two special sessions, the House and Senate also considered predecessor bills to SB1, including Senate Bill 7, House Bill 6, and House Bill 3, that contained many similarities to the provisions ultimately passed in SB1.  State Ex. 300 at 194, 19; HAUL-MFV 183 at 597.

397.    Senator Bryan Hughes and Representative Andrew Murr were the lead sponsors of these bills. 10/5 Tr. 2829: 10-11; 2093: 14 (Kousser).

398.    In written and oral testimony, many organizations that represent minority voters and promote voting rights opposed SB1 and its predecessor bills, citing the harmful impact on Black and Latino Texans. *See, e.g.*, HAUL-MFV 124; HAUL-MFV 126; HAUL-MFV 130, HAUL-MFV 134, HAUL-MFV 135; HAUL-MFV 136; HAUL-MFV 224; HAUL-MFV 225. For example, Michelle Brown testified before a House committee on behalf of DST about how the bill would harm Black voters, but Representative Murr did not stay to hear her testimony despite pledging that he looked forward to hearing every witness's testimony.  10/2 2096:23-2097:24 (Brown).

399.    During the legislative session, Representatives Murr and Cain acknowledged that the bill sponsors and proponents did not commission or conduct a study to study the racial impact of the bills on different communities. HAUL-MFV 179 at 34:17-24; HAUL-MFV 108 at 13:19-14:17; 56:16-22; HAUL-MFV 176 at 46:5-13; HAUL-MFV 109 at 40:11-41:2. SoS also did not conduct any studies of the bills' racial impact during the legislative session or since SB1's implementation. State Ex. 293 at 22:1-7; 9/22 Tr. 1920:23-1921:15 (Ingram).

400.    SB1 passed the Senate on August 12, 2021, and passed the House on August 27, 2021.  JPTO ¶¶ 3-6. The Governor signed SB1 into law on September 7, 2021, and SB1 went into effect on December 2, 2021. JPTO ¶¶ 9-10.

## VII.    SB1's IDENTIFICATION NUMBER REQUIREMENTS FOR ABBMS AND BALLOT CARRIER ENVELOPES MAKE VOTING MORE DIFFICULT FOR ALL MAIL-IN VOTERS AND DISPROPORTIONATELY BURDEN BLACK AND LATINO VOTERS

### A.    SB1's ABBM and BBM Identification Number Requirements Burden All Texas Voters

401.    SB1's requirement that a mail-in voter include the voter's driver's license number ("TDL") or the last four digits of the voter's social security number on ABBMs and on BBM ballot carrier envelopes has made voting more burdensome, especially for Black and Latino voters, resulting in a dramatic increase in ballot rejections.

402.    In November 2022, 200,000 fewer BBMs were cast than in the most recent comparable election, in November 2018. HAUL-MFV 402 at 54 (approximately 350,000 BBMs cast in November 2022); 10/4 Tr. 2741:1-7 (Smith) (approximately 550,000 BBMs cast in November 2018). Meanwhile, in the four years that separated these two elections, Texas added nearly two million voters to its rolls. *Cf.* State Ex. 155 at 2 (15,793,257 registered voters in Texas for the November 2018 election); LUPE 272 at 1 (17,672,143 registered voters in Texas for the November 2012 election). During this period, the eligibility criteria to file a BBM were not changed. 10/4 Tr. 2741:14-18. It is unlikely that the number of registered individuals eligible to vote by mail has declined so starkly. *See id.* 2741:19-22 (Smith). Accordingly, Prof. Smith explained, the dramatic decline in mail-in voter turnout between 2018 and 2022 illustrates SB1's deterrent effect and the hurdles this statute erects for mail-in voters. *Id.* 2741:22–2742:3 (Smith).

### 1.  *Voters Find SB1's Identification Number Requirements Confusing and Difficult*

403.    The identification number matching requirement has made voting by mail more difficult for voters..  9/11 Tr. 244:20-24 (Wise); 9/19 Tr. 1048:18-23 (Callanen).  It has also made elections more difficult for election officials. 9/19 Tr. 1048:18-23 (Callanen).

404.    The instructions on the BBM carrier envelope are in tiny type, and the spaces for the voter to enter the identification numbers are hidden under the flap. State Ex. 217. Voters complain that the ABBM and BBM forms are not user-friendly.  The forms do not draw enough attention to the identification number requirements, so the spaces to enter the numbers are easy to miss.  9/11 Tr. 210:2-11 (Wise).

405.    Some voters did not see the instruction to place their identification number under the flap on the BBM carrier envelope, and some called the EA's office to say that they believed an identification number was unnecessary on the BBM carrier envelope because they had already supplied one with their ABBM. *Id.* 212:15-18 (Wise).

406.    DST members, particularly DEARs (members over 65), have found SB1's ABBM/BBM process "cumbersome." Member Rose Mary McGowan of Houston, who is in her 90s, had her BBM rejected because she did not fill in the required information under the flap. Her BBM was not returned in time for her to re-mail it, so she voted in person, despite the risks to her health and safety at her advanced age. 10/2 Tr. 2152:19–2153:13 (Watkin-Jones).

407.    Juanita Valdez Cox, former Executive Director of LUPE, is 76 years of age.  She testified that she tried mail-in voting for the first time in the March, 2022 primary elections. She had already sealed her carrier envelope when her husband told her that there were additional instructions under the flap that she had missed. She did not mail her  BBM; instead, she took it to the Hidalgo County elections office, where she was told that she had to take it to a polling place.

She took her BBM to the elections office a second time, and again was told to take it to a polling place. She accompanied a LUPE caravan to a polling place, and, while there, presented her BBM to the election judge, who accepted it and told her that it would end up where it needed to be. Later, she called the County and learned that her vote in the primary had been counted, but her experience with mail-in voting was so difficult and time-consuming that Ms. Valdez Cox voted in person in the runoff and the 2022 general election and will continue to vote in person in the future. 9/11 Tr. 135:8-140:14 (Valdez-Cox).

408.    Louis Perales testified that his and his wife's BBMs were rejected because they did not put their identification number information under the flap on the envelope. 10/3 Tr. 2170:7–2171:1, 2171:16–2172:2 (Perales). They tried to go in person to vote on election day, but were unable to make it to a polling place because of rush hour traffic and their obligation to take care of their grandchildren. *Id.* 2172:3-22 (Perales).

409.    Alice Penrod testified that her BBM was rejected in March, 2022 because she had not entered her TDL under the flap.  Her ABBM, a month before, had been successful.  When she learned that her BBM had been rejected, she went online to cure it.  Her husband's BBM was also rejected after his ABBM had been accepted without any problem.  9/22 Tr. 1812:19–1814:17 (Penrod).

410.    Melynn Huntley, Potter County EA, wrote to Sam Taylor of the Division of Elections, SoS, on February 2, 2022 to advise that voters were overlooking the space to write their identification numbers on the BBM carrier envelope:

> I think that the voters are sealing the ballot carrier envelope and THEN they begin to fill out the back of the envelope. So they never see the information that they need to complete that is under the flap!

LUPE Ex. 152.

411.    On March 11, 2022, Sam Taylor of SoS responded to a request for comment from Adam Brewster of CBS News concerning BBM rejection rates of approximately 15.3% in 14 counties because of issues with complying with SB1. Mr. Taylor wrote, "Based on what we have heard from county election officials, the vast majority of mail-in ballot rejections were due to voters who did not provide any ID information on their carrier envelope." LUPE Ex. 151.

412.    In 2022, the Bexar County EA received significantly more complaints and requests for assistance than usual because of the mail voting identification number requirements of SB1. 9/19 Tr. 1044:9-15 (Callanen).

413.    Harris County received more than 35,000 discrete contacts (questions or complaints) from voters or election workers from April 2022 (*i.e.* after the March, 2022 primaries) through the November 2022 general election. HAUL-MFV 91 (Harris County Call Log). During this period, more than 10,000 of the call log entries were coded as VBM-General, VBM-Apps, or VBM-Ballots, that is, they concerned issues with voting by mail. For the November 2022 general election, Harris County received more than 21,000 contacts, including 8,700 that concerned voting by mail. (HAUL-MFV 91).

414.    There was voter confusion concerning SB1's identification number requirements during January 2022 in Denton County; voter confusion was especially acute for voters who had been voting by mail for many years. 10/13 Tr. 160:19-161:9 (Phillips). Denton County received complaints from voters about SB1's identification number requirements during the March 2022 primary elections.  Some voters forgot to enter any identification number, or provided a VUID, or had a mismatch. There were typos in some voters' registration records; some voters miswrote their identification number. *Id.* 160:23–161:23 (Phillips).

415.     There were voters in Bexar County who were unable to vote by mail despite having provided both their TDL and their SSN on their ABBM or BBM.  9/19 Tr. 1050:21-25 (Callanen).

416.     Some voters in El Paso County inserted their TDL on their ABBMs, but their voter records only had their SSN; other voters inserted their SSN/4, but their voter records only had their TDL; and some voters put in both numbers, but their voter records had neither. 9/11 Tr. 211:24–212:9 (Wise). Some voters in El Paso County submitted successful ABBMs, on which they noted a number that election officials could match, but then, when they submitted their BBMs, they put their other number, which could not be matched. *Id*. 212:10-14 (Wise).

417.     With each rejection notice for an ABBM, the El Paso County EA sent an application to register to vote, in the hope that the voter would return the registration form with an identification number or numbers that could be entered into SoS's system.  The EA received many calls from voters who were confused by the inclusion of the registration application, as they were already registered to vote.  *Id*. 217:6-21 (Wise).

418.     One such voter, who was unable to vote in March 2022, subsequently told the El Paso County EA that she did not fill out the new registration form that the EA had sent with her ABBM rejection notice because she was already registered. *Id*. 214:21–215:7 (Wise).

419.     In the November, 2022 general election, El Paso County voters who wanted to vote by mail continued to struggle with SB1's identification number requirements.  *Id.* 246:9-12 (Wise).

### 2.   *SB1's Identification Number Requirements Resulted in Rejection of Large Numbers of ABBMs and BBMs in 2022*

420.     The ID number provided on the ABBM must match the ID number in the voter registration database.  According to information from SoS, in summer 2021, approximately 2 million registered voters in Texas only had one ID number in their voter registration record. LUPE

124. As of December 20, 2021, approximately 737,000 registered voters in Texas only had one number in their voter registration record. *Id.*. Additionally, approximately 106,911 voters had neither DL or SSN in their voter registration record. LUPE-124. As of February 16, 2022, 844,340 registered voters in Texas have either only one or no ID in their voter registration record. *Id.*.

421.    There are multiple ways that ABBMs could fail to meet the SB1 requirements. For example:

> **a.**  A voter could fail to provide any ID number either by mistake or because they ae not aware of the requirement. 9/13 Tr. 520:4-521:9 (Phillips); 9/19 Tr. 1159:15-18, 1161:47 (Obakozuwa).

> **b.**  A voter could provide the wrong type of ID number or an ID number that does not match their voter registration. Tr. 520:14-521:4 (Phillips); 9/12 Tr. 422:10-19 (Scarpello); 9/13 Tr. 526:20-527:1 (Phillips); 9/19 Tr. 1159:25-1160:3 (Obakozuwa); 9/11 Tr. 211:20-212:9 (Wise); 9/14 Tr. 851:6-10 (DeBeauvoir); 9/13 Tr. 520:4-521:9 (Phillips).

> **c.**  A voter could inadvertently transpose numbers of their ID, which could give rise to a mismatch with county registration records 9/11 Tr. 218:22-219:3 (Wise).

422.    Some voters were able to successfully submit matching numbers in one election and then the same voter experienced a mismatch in a subsequent election. 9/13 Tr. 538:25-539:5 (Phillips).

423.    The Texas-wide mail ballot rejection rate for the March 2022 Primary was 12.4 percent, twenty times higher than in 2020. 10/2 Tr. 1879:6-16 (Mayer). In Harris County, the March 2022 rejection rate was even higher – 20.2 percent. 10/2 Tr. 1980:9-11 (Mayer).

424.    In Harris County and Tarrant Counties, in the March 2022 Primary, 90 percent of the rejected ballots were rejected because of missing, incomplete, or non-matching ID numbers as required by SB1.  10/2 Tr. 1983:12-18) (Mayer).

425.    Louis Perales  learned that his vote and his wife's vote did not count in the March 2022 election because there was a mistake on the ballot, and they did not learn of the mistake in time to go in person to correct the problem.  10/3 Tr. 2169:1-8, 2171:13-24, 2173:13-24 (Perales).

426.    Despite education efforts and voter experience, ballots are likely to continue to be rejected due to ballot mismatch issues.  For example, some 2024 voters may not have voted since SB1 passed and so may not be familiar with the ID requirements for ballot by mail.  9/13 Tr. 757:21-758:3 (Garza); 9/13 Tr. 538:20-24 (Phillips).

427.    Dr. Kenneth Mayer was recognized by the Court as an expert on election administration, voting methods, and voter fraud.  10/2 Tr. 1956:18-25 (Mayer).  Prof. Mayer concluded that the increase in mail ballot rejections rates was attributable to the mail ballot ID requirements in SB1.  10/2 Tr. 1958:9 (Mayer).  He also concluded that these ID requirements significantly burdened voters in Texas.  10/2 Tr. 1958-10-13 (Mayer).

428.    The voters Mi Familia Vota serves experienced these difficulties.  SB1 complicated an already complex process in Texas of registering to vote, applying to vote by mail, and voting by mail. 10/10 Tr. 3392:13-19 (Lopez). After the passage of SB1, voters experienced a high rate of ABBM application rejections. 10/10 Tr. 3391:34-25, 3392:8-9 (Lopez). Elderly voters, people who had been voting by mail for a long time, or people who accessible issues who relied on voting by mail, often did not remember what number they used when they registered to vote. 10/10 Tr. 3392:4-9 (Lopez).

429.    There were voters who had more than one ABBM rejected because of SB1's identification number requirements.  9/19 Tr. 1044:16-19 (Callanen).  In addition, most of the ballots rejected in Bexar County in the 2022 Primary and General Election were rejected because of the identification number requirements. 9/19 Tr. 1048:24–1049:2, 1049:18-23 (Callanen).

430.    The majority of BBMs rejected in the March, 2022 primary elections in El Paso County were rejected because of identification number issues.  The majority of ABBMs rejected in the general election in 2022 were also rejected because of identification number issues, as were the majority of BBMs rejected in that election.  9/11 Tr. 277:7-17 (Wise).

431.    BBM rejection rates in January, 2022 and March, 2022 were higher than normal in Denton County.  Tr. 161:10-22 (Phillips).

432.    The statewide rejection rate for BBMs in the March 2022 Democratic primary was 12.9%; the rate for the Republican primary was 11.8%.  10/18 Tr. 4413:10-24 Ingram); Joint Ex. 8.  Keith Ingram, former Director of the Elections Division of SoS considers the rejection rates for BBMs in the 2022 primaries to have been unacceptable. 10/18 Tr. 4413:10-24 (Ingram).

433.    "Dramatically higher" BBM rejection rates in March, 2022 resulted from SB1's identification number requirements. 10/2 Tr. 1984:14–18 (Mayer).   The BBM rejection rate in the March, 2022 primaries was 20 times higher statewide in 2022 than in 2020; 10/2 Tr. 1979:10-16 (Mayer); 66 times higher in Harris County; 10/2 Tr. 1980:1-5 (Mayer); and 30 times higher for the 10 largest counties by population.  10/2 Tr. 1980:6-8 (Mayer).

434.    Hundreds of Travis County mail ballots were rejected in the March 2022 and November 2022 elections, the majority because of SB1 Requirements.  9/21 Tr. 1516:7–1518:6 (Johnson).   The rejection rate for mail ballots in Travis County in 2022 was 2.16 percent,

significantly higher than before SB1.  The rejection rate was 0.42 percent in November 2020 and 0.47 percent in November 2018.  9/21 Tr. 1525:12–1526:7 (Johnson).

435.    In January 2022, Travis County was rejecting half of the mail ballot applications that were submitted because of an ID mismatch.  This was an "extremely high" and "unusual" rejection rate for mail ballot applications.  9/14 9/14 Tr. 850:9-19 (Garza).

436.    Some voters communicated to the Travis County elections division that they were unable to vote at all in an election after the mail ballot applications were rejected. 9/21 Tr. 1550:20-1551:9 (Escobedo).

437.     In Harris and Tarrant Counties, more than 90% of BBM rejections in March, 2022 resulted from the identification number requirements of SB1: this was nine times greater than the next most common reason. 10/2 Tr. 1983:12-23 (Mayer).

438.    In the March, 2022 primary elections in Harris County, 6888 BBMs were rejected out of 36,878 BBMs filed.  In the March, 2018 Harris County primaries, by contrast, 135 of 48,473 BBMs were rejected. OCAPX 36. The rejection rate in the 2022 Harris County primaries was thus nearly 19%, versus 0.27% in 2018. OCAPX 36.  The entire difference is attributable to SB1.  9/20 Tr. 1286:12-1288:11 (Longoria).

439.    Defendants assert that the statewide BBM rejection rate for the November, 2022 general election was 2.7%, State Ex. 22, and that this rate is comparable to past elections. 10/18 Tr. 4413:25-6:17 (Ingram).

440.    However, that rejection rate for BBMs in El Paso County more than doubled, from 0.93% in the 2018 general election, to 2.01% in the 2022 general election. 9/12 Tr. 251:3-14 (Wise); *see also* LUPE Ex. 350.

441.    Harris County's rejection rate for timely-received BBMs in the November 2022 election, moreover, was 4.16%.  This rejection rate was 9.2 to 34.6 times greater than in the previous five general elections:

      a.  2012: 0.17%
      b.  2014: 0.31%
      c.  2016: 0.48%
      d.  2018: 0.45%
      e.  2020: 0.12%

HAUL-MFV 94 (Harris County's Supp. Resps. to State Defs.' Second Set of Interrogs.) at No. 4.

442.    The rejection rates of mail ballots in Dallas County went up after the enactment of SB1, and a significant percentage of these rejections were due to ID-matching defects 9/12 Tr. 439:5-22 (Scarpello).

443.    The Dallas County EA advised voters to include two types of ID numbers on their mail ballot because the EA was concerned about the high rejection rates for mail ballots.  9/12 Tr. 408:14-23 (Scarpello).

444.    Some voters in Dallas County received their rejection notices so late that they did not have an opportunity to cure their request to vote by mail in time to vote by mail.  9/12 Tr. 432:24-433:9 (Scarpello); 9/13 Tr. 523:4-13 (Phillips).

445.    The ID number matching requirement also made voting by mail more difficult for voters in El Paso County.  9/12 Tr. 244:20-24 (Wise)

446.    Voters who had successfully voted in the past by mail complained that the rejections for failure to match ID numbers was impacting their ability to apply to vote by mail. 9/13 Tr. 749:21-750:7 (Garza).

447.    Stella Guerrero Mata, a retired school bus driver who grew up in a low-income, primarily Hispanic neighborhood, had her mail ballot rejected because the ID numbers did not

match, and there was not time for her to fix the issue before the 2022 general election. As a result, her vote was rejected. 9/14 Tr. 962:25-963:18; 966-16-168:21 (Guerrero Mata).

448.    In November 2022, the mail ballot of a Tarrant County voter was rejected because of ID number matching concerns. LUPE-223.

449.    State Defendants introduced into evidence two expert reports by DOJ expert Professor Eitan Hersh of the Department of Political Science at Tufts University. State Exs. 200 & 201.

450.    Prof. Hersh analyzed SoS's voter files from after the November, 2022 general election to determine the statewide rejection rate for BBMs in that election. He found that of 332,281 BBMs submitted, 13,638 were rejected, a rate of approximately 4.1%, higher than SoS's publicly reported rate of 2.7%. State Ex. 200 (Hersh Report February 3, 2023) at 6-9, ¶¶12-19.

451.    Professor Mayer testified that he calculated the statewide BBM rejection rate in Texas in the November, 2022 general election to have been 3.4%, higher than SoS's publicly-reported rate, and four times higher than the BBM rejection rate in 2020 (0.84%). 10/2 Tr. 1993:12-1994:1 (Mayer).

452.    After SB1, the rate of mail ballot rejections increased significantly. For example, in Harris County, it went from a rejection rate of 0.27 percent to 19 percent in the 2022 Primary. 9/20 Tr. 1288:6-11 (Longoria).

453.    The reject rates after SB1 contrast starkly with the less than one percent mail ballot rejection rate in November 2020 before SB1 passed. LUPE-305.

454.    After SB1, ballots were rejected because of an ID mismatch, even though the ID mismatch did not give the EA's office any reason to believe that the person was not actually qualified to vote or that the individual was engaged in fraud. 9/19 Tr. 1049:24-1050:10 (Callanen).

455.    For the November, 2022 general election, Harris County received 82,276 ABBMs; 1,556 were flagged for identification number defects (omission or mismatch); 732 were cured. HAUL-MFV 38 (Harris County Am. Resps. & Objs. to LULAC Pls.' Third Set of Interrogs.) at No. 3.

456.    In the November, 2022 general election, approximately 3.7% of ABBMs were rejected in Harris County. State Ex. 25 at 16.

457.    SB1's identification number requirements accounted for 82% of the BBM rejections in the November, 2022 election in Harris County. 10/2 Tr. 1997:2-5 (Mayer).

458.    Texas's BBM rejection rate in November, 2022 was more than twice the national average. *Id.* 1994:21-1995:3 (Mayer).

459.    Thousands of qualified voters have been disenfranchised because of Sections 5.07 and 5.13. *See, e.g.*, LUPE-301, LUPE-302.  In March 2022, more than 25,000 mail ballots were rejected because of the ID requirements.  ECF No. 820 at 9.  In November 2022, more than 11,000 were rejected for that reason.  ECF No. 820 at 9.

460.    Rejecting valid BBMs because of a mismatched identification number can impact the outcome of close elections 10/12 Tr. 3884:9-12 (Phillips)

### 3.    *Statutorily Mandated Instructions on Secretary of State Forms Increase the Chances that Voters' ABBMs and BBMs Will Be Rejected*

461.    Consistent with EC § 13.002(c), the Texas Voter Registration Application instructs the registrant to enter a TDL/TID "*or*" SSN4, as does Row 9 of the Application, which provides blanks for entry of those numbers.  OCAPX 283.

462.    Christina Adkins, the current Director of SoS's Elections Division, testified that a registrant is not required to enter both TDL/TID and SSN, and conceded that, if one enters a TDL/TID and not an SSN, or vice versa, it is reasonable to expect that the second number is not

required.  Although SoS "work[s] with DPS to try to obtain missing information," voters for whom DPS does not provide the second number risk rejection of their ABBMs, or their BBM carrier envelopes, if they fail to enter the number that is saved in SoS database known as TEAM.  9/22 Tr. 1854:10–1857:4 (Adkins).

463.    The current ABBM form states that the voter must provide *either* a TDL/TID *or* an SSN/4, not both.  (HAUL-MFV 296). SoS cannot amend the ABBM form to advise voters to include both the TDL/TID *and* the SSN/4 because doing so would be inconsistent with the alternative language of SB1.  9/22 Tr. 1843:5-17 (Adkins).

464.    The instructions on the BBM carrier envelope call for the voter to enter *either* a TDL/TID *or* an SSN/4.  State Ex. 217. SoS cannot amend the BBM carrier envelope to advise voters to include both numbers because doing so would be inconsistent with the alternative language of SB1. 9/22 Tr. 1838:17-23 (Adkins).

465.    Denton County recommends that voters enter both TDL/TID and SSN/4 to reduce the risk of a mismatch. 3874:17-25 (Phillips).

466.    The Harris County EA considered encouraging voters to enter *both* TDL/TID *and* SSN/4 on their ABBM and BBM forms as part of its voter education programs, but decided not to do so because of fear that such education might count as solicitation under the provision criminalizing solicitation of BBMs by elections officials.  9/20 Tr. 1284:2-22 (Longoria).

467.    SB1 "disenfranchised and scared voters from participating in mail ballots, and [the Harris County EA's office was] further handicapped by [its] inability to be as proactive as [it] wanted to be in educating voters.  9/20 Tr. 1295:19-22 (Longoria).

468.    The voter who enters just one number on an ABBM form is gambling that the number he or she enters will be the one that is in TEAM. 9/19 Tr. 1033:23-1034:19; 1034:21-1035:19 (Callanen).

469.    On February 1, 2022 the SoS Election Division Staff responded to a query from the US Department of Defense Voter Assistance Program concerning which identification number (TDL/TID or SSN/4) should be filled in on an FPCA ballot application by explaining "the counties and our office are telling voters it is permissible to put both numbers if they are not sure" because "many voters do not remember which number they originally gave the county when they registered." LUPE 130).

### 4.    *The TEAM System Lacks Identification Numbers for Many Texas Voters and is Riddled with Errors.*

470.    Voter registration applicants in Texas were required to provide an identification number starting on January 1, 2004, in compliance with the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq*.; EC § 13.002(c)(8)(A). Accordingly, Texas voters who registered in 2003 or earlier, who could be as young as 38 years old today, registered without listing an identification number.

471.    A voter with a DPS-issued identification number not listed in TEAM can enter that number correctly on an ABBM or BBM and the ABBM/BBM will be rejected because it will not match the TEAM system. 9/11 Tr. 213:23–214:20 (Wise); 9/19 Tr. 1011:3-24 (Callanen).

472.    Prof. Hersh found 457,441 Texas voters in the TEAM file dated January 3, 2023 whose TEAM records did not list any DPS-issued number. State Ex. 200 (Hersh Report February 3, 2023) at 18, Appendix A ¶10).  Prof. Hersh found DPS records for 189,095 of these voters. If any of these 189,095 voters fills out an ABBM or BBM with his or her correct DPS-issued

identification number, and follows the instructions to put only that number, that voter's mail-in materials will be rejected.  State Ex. 200 at 19-20, Appendix A ¶ 16.

473.    It is possible, moreover, for a registered voter to have multiple identification numbers issued by DPS; TEAM, however, lists only one DPS-issued identification number per voter and there are no plans to update TEAM to include multiple DPS-issued identification numbers. 9/22 Tr. 1846:3-19 (Adkins).

474.    The State Defendants concede that, as of the time of trial in this case, 667,685 Texas voters could put a valid TDL/TID or SSN/4 on a BBM and not have it match their voter registration record in TEAM. 9/22 Tr. 1920:3-7 (Ingram); *see* LULAC Ex. 75).

475.    The true scale of the problem is more than three times larger than the State Defendants concede:  the study conducted by Prof. Hersh of the TEAM file dated January 3, 2023 reveals that 2,394,435 Texas voters (14.10% of all registered voters in the state) have one DPS-issued identification number in TEAM, but their DPS files list multiple identification numbers.  Any of these voters could insert a correct DPS-issued identification number on an ABBM or BBM and have their application or ballot rejected because the number they inserted was not the one in their TEAM record. State Ex. 200 at 22, Appendix A, ¶ 22.

476.    There are also many voters who have no DPS-issued identification number:  given Prof. Hersh's findings that TEAM lists 457,441 voters with no DPS-issued number, of whom 189,095 in fact have a DPS number, there are 268,346 registered voters in TEAM who lack a DPS number.

477.    After SB1 became effective, voters who are older, who never drove, who were born outside traditional hospitals, or who have disabilities, have had difficulties because their identification numbers are not on file. 9/20 Tr. 1281:23–1282:13 (Longoria).  Although the law

permits entry of a TID, "in [the] experience [of the Harris County EA's Office,] if you're not driving then you probably don't have an ID number." 9/20 Tr. 1281:14-15 (Longoria).

478.    HB2512, passed in 2013, amended the Texas Transportation Code to enable SoS to access information in the Texas Driver's License file from DPS. Each December, SoS performs an annual download from DPS. 9/22 Tr. 1894:6-20; 1898:2-10 (Ingram).

479.    As of December 20, 2021, before the HB2512 matching process for 2021, the number of active and suspense voting records in SoS's TEAM system that did not include a TDL was greater than 1.3 million. After matching with the DPS records, the number was 493,823. 9/22 Tr. 1894:21-1895:24 (Ingram); LUPE Ex. 289).

480.    After the HB2512 matching process in December, 2021, TEAM had 106,911 active and suspense voting records not associated with either a TDL or an SSN. 9/22 Tr. 1896:2-8 (Ingram); LUPE Ex. 289).

481.    After the HB2512 matching process in December, 2022 – the most recent one to be conducted as of the trial in this case – the TEAM system had 463,393 voters with no TDL associated with their records, 392,084 voters with no SSN associated with their records and 93,867 Texas voters who had neither a TDL nor an SSN associated with their voter records. 9/22 Tr. 1896:16-1898:1; 1919:6-1920:7 (Ingram); LULAC Ex. 75.

482.    The El Paso County EA's analysis of the county's voter rolls, conducted during the spring of 2023, found that 5361 active and 314 suspense voters have no SSN, SSN/4, or TDL associated with their voter record. In addition, 9,658 active El Paso County voters and 824 suspense voters have only a TDL listed in their registration records. There are 14,789 active voters and 2259 voters on the suspense list in El Paso County who have only an SSN or SSN/4 associated with their voter records. 9/12 Tr. 252:21–254:17 (Wise).

483.    As of September 8, 2023, there were 12,000 voters in Bexar County who had no TDL/TID listed in TEAM, and 7500 voters who did not have an SSN/4 listed in TEAM.  9/19 Tr. 1020:13-21; 1049:9-17 (Callanen).

484.    There were voters in Denton County who had identification number mismatches on their ABBMs or BBM carrier envelopes because election officials transposed digits of their identification numbers when entering them from their original voter registration applications. 10/12 Tr. 138:7-16 (Phillips)).

485.    Prof. Hersh analyzed TEAM and DPS records three times during the period from February, 2022, just before the first election held under SB1, through January, 2023, after the 2022 general election.  During this period, Prof. Hersh found, **more than 15% of TEAM voter records - representing 2.6 to 2.7 million voters – were consistently affected by issues that could lead to ABBMs or BBMs being rejected because of the identification number requirements of SB1, even if the voters carefully followed the instructions on the forms**.  State Ex. 200 at 5-6, tbl. A, 9-11.

486.    Based on the most recent data available to Prof. Hersh, dated January 3, 2023, approximately 15% of the registered voters in Texas - 2,690,344 individuals - are "at risk" for rejection of their ABBMs and BBMs even if the voters complete the forms correctly as instructed, because of deficiencies in SoS's records.  *Id.*  Prof. Hersh found:

a.    189,095 voters who had no DPS-issued identification number in TEAM, who did have an identification number in the DPS system;

b.    2,394,435 voters who had a single DPS identification number in TEAM, but who had multiple numbers listed in the DPS system;

c. 62,461 voters whose TEAM records had typographical or other errors in the DPS identification number listed; and,

d. 44,353 voters whose TEAM records had typographical or other errors in the SSN/4 listed.

State Ex. 200 at 5, tbl. A.

### 5. *SB1's "Cure Provisions" Do Not Permit Voters to Fix Identification Number Problems.*

487. SB1 § 5.07(f-1) (EC § 86.001(f-1) requires the Early Voting Clerk to provide notice to the voter whose ABBM has been rejected because of an identification number defect.

488. The ABBM rejection form does not specify which identification number the voter entered on the rejected ABBM. HAUL-MFV 396-A.

489. In correspondence with Christina Adkins of SoS, the Denton County Deputy EA wrote, "We both know that voters can't remember how they filled out the defective [ABBM] once it's sent." 10/12 Tr. 165:25–166:6 (Phillips); LUPE Ex. 194). Ms. Adkins similarly recognized in her trial testimony that, after submitting an ABBM, a voter may not remember which number he or she entered. 9/22 Tr. 1842:6-14 (Adkins).

490. The ABBM rejection notice mandated by SB1 § 5.07 (f-1) must include information regarding the ability to correct or add information through the online tool described by EC § 86.015(c) (the "Ballot Tracker"). No other method of cure is required to be noticed. *Id.*

491. SB1 § 5.10 amended EC § 86.015(c) to require the Ballot Tracker to allow voters to add or correct their identification numbers, but left intact the language in EC § 86.015 (c) that limits access to the Tracker to voters who enter **both** their SSN/4 **and** their TDL/TID.

492.    A voter for whom SoS's system does not have both required numbers is shut out of the Tracker for purposes of curing an ABBM or a BBM carrier envelope. This is a statutory requirement that SoS cannot modify. 9/22 Tr 1850:21–1852:22 (Adkins).

493.    A citizen is not required to enter both TDL/TID and SSN when registering to vote, and a registrant who enters a TDL and not an SSN, or vice versa, reasonably believes that the second number is not required. SoS looks to DPS to provide missing information, but voters for whom the second number is not provided by DPS will be shut out of the Ballot Tracker.  9/22 Tr. 1854:10–1857:4 (Adkins).  SoS received many complaints about voters not being able to use the Ballot Tracker. 9/22 Tr. 1841:19-20 (Adkins).

494.    Because the Ballot Tracker requires voters to sign in with their TDL/TID and SSN, the Bexar County EA would advise voters to fill out a new voter registration card that the county sent them; in those cases the county's "advice is that [voters] do something that's not provided for here in the law because there's no way for the voter to comply with the law." *See* 9/19 Tr. 1032:2-7& & 12-15 (Callanen).

495.    The Ballot Tracker requires a person to have a computer and the ability to use it. One cannot, moreover, access the Tracker if the State has one's numbers wrong.  9/20 Tr. 1300:2-1303:4 (Longoria). The only alternative method of cure is for the voter to go to the EA's Office in person, but many BBM voters need BBMs because they cannot go to the EA's office in person. The Harris County EA asked SoS to permit disabled voters to vote by email, as members of the military are allowed to do, but SoS denied the request, and denied the request to allow disabled voters to cure defective BBMs by email ballot. SoS takes the position that the law is strict:  there is no way for disabled voters to correct their BBMs except in person or with the Ballot Tracker, and no assister may do this for the voter.  *See* 9/20 Tr 1300:3–1301:25 (Longoria).

496.    Bridgette Escobedo, Travis County Elections Division director, testified that her office received complaints from voters that the Ballot Tracker was difficult to navigate:  some voters were never able to use it successfully and were unable to cure ballot deficiencies. 9/21 Tr. 1551:18-22, 1574:15-20 (Escobedo). She did not observe voter frustration dissipate from the March 2022 and May 2022 elections. *Id.* 1574:21-24 (Escobedo).

497.    Travis County attempted to walk voters through the process of curing their ballot through the Ballot Tracker; those efforts took 30-40 minutes per voter or longer, and there were voters who still could not cure online. *id*. 1520:1–1521:19 (Johnson). There were ballots, moreover, that were received too late to be cured. *id*. 1521:20–1522:2 (Johnson).

498.    There were instances in Cameron County in which the EA was confident the correct voter's address and signature matched up, but the voter's ABBM or ballot was rejected because the voter had not included identification numbers. 9/13 Tr. 747:5-9 (Garza). It was "extremely likely" that those voters were over 65. *Id*. 747:20-24 (Garza).

499.    On February 19, 2022, Christina Adkins of the Elections Division of SoS, wrote to Keith Ingram, then-Director of the Division, forwarding an email from the Tarrant County Democratic Party advising SoS that voters could not update their own identification numbers in either the county or the TEAM system. LUPE 166.

500.    Christina Adkins herself tried to use the Ballot Tracker, inputting her own residence address, but the Ballot Tracker could not verify it.  The residence address field was required by SB1.  9/22 Tr. 1841:22–1842:5 (Adkins).  The requirement that a voter enter his or her address to access the Ballot Tracker was abrogated in 2023 by HB357, which requires the voter to enter date of birth instead of the residence address. State Ex. 195.   HB357 left intact the requirement that the

Ballot Tracker be accessible only to a voter who enters the SSN/4 **and** TDL/TID that TEAM has for the voter. State Ex. 195; 9/12 Tr. 365:17-21 (Wise).

501.    Unlike other Texas voters, an FCPA voter may access the Ballot Tracker with name, date of birth, and county of residence.  State Ex. 257.  FCPA voters, unlike other Texas voters, may provide corrections to identification numbers by e-mail.  9/12 Tr. 319:4-22 (Wise).

502.    SoS promotes its online Ballot Tracker for voters to cure a missing identification number, 9/19 Tr. 1039:19–1040:14 (Callanen). The Ballot Tracker, however, cannot be accessed without **both** a TDL/TID **and** an SSN/4.  (EC § 86.015(c); *see* 9/11 Tr. 225:16-20 (Wise). The EC requires that the Tracker be set up to make it possible for the voter to correct the numbers, but, at the same time, the Tracker cannot be accessed without the numbers. 9/19 Tr. 1020:2–1021:1; 1030:22–1032:15; 1033:8-14 (Callanen). Thus, a voter cannot update her record unless the record is already updated.  9/11 Tr. 227:15–25.

503.    For the March, 2022 election, only 11 voters in El Paso County used the Ballot Tracker. 9/11 Tr. 225:21–23 (Wise).

504.    As of the date of the Bexar County EA's testimony in this case, only 39 Bexar County voters had been able to make successful use of the Tracker.  9/19 Tr. 1040:4-14 (Callanen).

505.    As of September 8, 2023, more than 19,000 Bexar County voters lacked one number or the other in TEAM, and therefore would be blocked from access to the Ballot Tracker to cure defective identification numbers for an ABBM or BBM.  9/19 Tr. 1020:2–1021:1 (Callanen).

506.    It was very difficult for the Harris County EA to contact voters who entered identification numbers that could not be verified.  Only 30% of voters entered a phone number when submitting a BBM. 9/20 Tr. 1280:19–1281:8 (Longoria).

507.    SoS advised that Harris County could send election staff to any house to cure a defective BBM, but this could not be done in such a large county, with so many voters who needed help.  SB1 impeded people with disabilities from curing their BBMs and having them t. *Id*. 1303:5–1304:5 (Longoria).

508.    Christina Adkins of SoS acknowledged that a voter whose BBM has been rejected because of the identification number requirement may not be able to cure in time because the voter has been notified of the defects too late.  9/22 Tr. 1842:15-21 (Adkins).

509.    Elaine Jones taught advanced academic-honors computer programming for 11 years. 9/22 Tr. 1789:3-11 (Jones).  She voted by mail in 2016, 2018 and 2020 with no problems.  *Id*. 1790:25-1791:9 (Jones). She submitted an ABBM in 2022, received a BBM, filed it and it was rejected.  She forgot about having to enter the identification numbers under the flap: "I would have said it was impossible for me to make the mistake the first time, so I'm very hesitant to say it's impossible for me to make the mistake again."  *Id*. 1793:11-20 (Jones).

510.    The notification to cure advised about the State's Ballot Tracker.  Ms. Jones tried three times, and each time, the result was "Page Not Found."  She tried again, three times, the following night, with the same results.  The next day, she filled out the paper form. The Postal Service could not guarantee Monday delivery, so she went to FedEx and spent $12.50 to re-file her BBM. 9/22 Tr. 1794:21–1796:8 (Jones).

### 6. *Problems with SB1's Identification Number Requirements Will Persist*

511.    Hundreds of new voters are registered in Texas every day. 9/22 Tr. 1854:11-16 (Adkins).

512.    New voters turn 65 each year and some choose to vote by mail.  9/22 Tr. 1920:16-21 (Ingram).

513.    There will be voters new to the ABBM/BBM process in each future election, such as voters turning 65 or who are newly disabled, who will be confronting the identification number requirements for the first time, and who will have their ballots rejected because of those requirements. 9/19 Tr. 1051:1–1052:5 (Callanen).

514.    Turnout is significantly higher in presidential election years, and there will be many voters in Bexar County and elsewhere in Texas who will be encountering the ABBM/BBM identification number requirements for the first time in 2024 and will experience many of the same problems.  9/19 Tr. 1052:6-20 (Callanen); 9/12 Tr. 271:11-18 (Wise); 9/13 Tr. 757:21–758:7 (Garza).

515.    Harris County nearly doubled the staff in its call center to handle the increased volume of calls occasioned by the identification number requirements.  The County expects to have to maintain that increased staffing in future elections.  9/19 Tr. 1165:16–1166:12 (Obakozuwa), *see also* 9/20 Tr. 1288:12–1291:7 (Longoria) (The Harris EA had the funds to double its staff but needed to treble or quadruple it).

516.    The identification number requirement increased the cost of elections in Bexar County.  In 2022, the EA had to spend an additional $218,000 for temporary employees, largely because of the requirement of verification of identification numbers. That additional expense will

be higher in 2024, a presidential election year. 9/19 Tr. 1008:23–1009:21, 1014:4–1015:7 (Callanen).

517.    Rejections of ABBMs and BBMs will continue in future elections. 9/19 Tr. 1161:8-10 (Obakozuwa)

### 7. *SB1's Mail Ballot Identification Provisions Chill Mail-In Voting and Suppress Votes*

518.    98.4% of voters whose BBMs were rejected in Harris County in the November, 2022 general election did not thereafter cast a ballot by any means in that election. (Tr. 2074:22–2075:2 (Mayer).

519.    Tacoma Phillips, Dallas County election administrator, testified that starting in January 2022, her office received many ABBMs that did not have numbers matching the voters' registration numbers, or that did not include the voter's driver's license number or last four digits of their social security number. *See* Tacoma Phillips testimony at 520:4–521:4. When that happened, her office would send a notice of defect and a new ABBM. *See id.* at 522:2-5. In some cases, there was not enough time for voters to cure their ABBM defects. *See id.* at 523:9-13. There were "quite a few" voters who abandoned the mail-in voting process when they could not cure the defects in time or were homebound. *See id.* at 538:3-13.

520.    Some voters in El Paso County reported discarding their returned BBMs rather than attempting to cure those ballots.  (9.12 251).

521.    The mail voting identification number requirements of SB1 dissuade voters from voting by mail.  (Callanen, 1044:9-15).

522.    Judy Bryant is the field organizer for the TX Alliance for Retired Americans ("TARA").  (Bryant, 1760:13-14).  TARA members were afraid to apply for BBMs, and members had their ABBMs and BBMs rejected.  TARA had to undertake a major education

project about mail-in voting for its members. (Bryant, 1766:24–1767:17). The organization is currently planning a campaign for early 2024 to help people with their ABBMs for the 2024 elections because large numbers of people turn 65 each year. (Bryant, 1769:25–1770:16).

523. Alice Penrod voted in the 2022 General Election in person because she no longer trusted voting by mail. (Penrod, 1814:24–1815:9).

524. Ms. Penrod feels it would be less burdensome for her to vote by mail, but given the current requirements, she will go in person to the polls. (Penrod, 1816:10-16).

525. The percentage of voters submitting BBMs in 2022 declined from 5.6% in the March, 2022 primary elections to 4.4% in the November, 2022 general election. State Ex. 200 (Hersh February 3, 2023 Report) at 11, ¶ 24).

### B. SB1's Identification Number Requirements for ABBMs and BBMs Disproportionately Burden Black and Hispanic Voters[11]

526. As Plaintiffs' expert Dr. Eric McDaniel testified, SB1's mail ballot provisions will have a disproportionate impact on Black voters, who vote by mail at a higher rate than other racial groups. *See* HAUL-MFV 333 at 6-9; 10/5 Tr. 2923:20-23 (McDaniel). Dr. McDaniel found that half of Black voters choose to vote by mail, compared to 32.9% of white voters and 36.5% of Hispanic voters. *See* HAUL-MFV 333 at 6; 10/5 Tr. 2925:7-11 (McDaniel). Black voters under 65 are more than two times more likely than White voters under 65 to vote by mail. *Id.* This higher rate of Black voters who vote by mail was not unique to COVID-19 concerns in the 2020 election. In 2016, mail ballot rates for Black voters were roughly equivalent to those in 2020. 10/5 Tr. 2925:23-2926:3 (McDaniel).

---

[11] The ID requirements in Section 5 of SB1 also have a disparate impact on disabled voters. Plaintiffs refer to and incorporate by reference the simultaneously filed Section 208 briefing that provides findings of fact on that issue.

527.    Dr. McDaniel opined that SB1 will decrease the chance for Black voters to vote by mail. 10/5 Tr. 2926:21-24 (McDaniel). In fact, mail-in ballots decreased from the 2020 to 2022 elections in counties with large Black populations. 10/5 Tr. 2927:3-13 (McDaniel).

528.    By making mail-in voting more difficult, SB1 disproportionately had a negative impact on the Black community.  10/5 Tr. 2926:21-2927:13 (McDaniel).  Voters whose BBMs are rejected because of SB1 may be compelled to show up to the polls in person, further crowding those locations and creating longer lines. HAUL-MFV 310 ¶ 78.

529.    Notably, the change in SB1 to increase voter identification requirements for voters by mail coincided in Texas with a transition from mail-in voters being primarily non-Hispanic Whites to being minority voters.  10/6 Tr. 3113:6-21, 3128:10-3129:1 (Lichtman).  As Professor Lichtman noted in his testimony, "[w]hen things shifted, so minorities predominated in mail-in voting, even though there was no evidence of a new emergence of fraud in mail-in voting, the legislature shifted that established policy to put the new restrictions in.  And they did it in secret, as we know, in the conference committee." *Id.*

530.    Prof. Smith analyzed the effects of SB1's identification number requirements on ABBMs submitted and BBMs filed in the March, 2022 primary and November, 2022 general elections. 10/4 Tr. 2663:10–2666:10; 2677:2-9, 15-21 (Smith); *see* HAUL-MFV 60; OCAPX 255; HAUL-MFV 313; HAUL-MFV 311; HAUL-MFV 394; HAUL-MFV 402 (demonstrative). He also examined whether voters whose ABBMs were rejected were able thereafter to vote in the same election. 10/4 Tr. 2677:22–2678:1, 10-17 (Smith).

531.    Prof. Smith found that SB1's identification number requirements have disparate impacts on Black and Hispanic mail-in voters, compared with white mail-in voters, and that the

majority of Hispanic voters whose ABBMs were rejected did not thereafter vote in the election for which their ABBMs were rejected. OCAPX 255 at 39, tbl. 6; HAUL-MFV 394 at 4, tbl. 1.

### 1. *March 2022 Primary Election - ABBM Rejection Rates*

532. Prof. Smith used statewide data files from the TEAM database maintained by SoS to study the effects of SB1's identification number requirements on ABBMs rejected in the March 2022 primary election. 10/4 Tr. 2682:18-20, 2683:2 (Smith). He found that SB1 "negatively affected the ability of Black and Hispanic registered voters in Texas to request or cast a valid absentee ballot in the March 1, 2022 primary election." OCAPX 255 at 4, ¶ 6.

533. Because the SoS data was incomplete, Prof. Smith first determined the total number of ABBMs submitted in order to calculate the rate of ABBM rejections in the March 2022 primary election.[12],. He did not exclude counties with missing data points, but, rather, calculated the denominator "conservatively" by adding the number of voters whose ABBMs were rejected to the number of voters who successfully applied for an absentee ballot, meaning those voters who filed a BBM.   OCAPX 255 at 17, ¶ 36.

534. Based on statewide data from the SOS, a total of 8,150 ABBMs were rejected in the March 2022 primary election. Of the rejected ABBMs, Prof. Smith found that 6,140 (75%) were rejected because of the identification number requirements of SB1. HAUL-MFV 402 at 39 (citing OCAPX 255 at 19, tbl. 3).

535. To determine the effect of SB1's identification requirements on Black voters who voted by mail, Prof. Smith used the regression line method, a statistical modeling process previously used by Prof. Smith to analyze the effects of SB1's elimination of drive-thru voting. *See* 10/4 Tr. 2725:8-12 (Smith). By plotting the percentage of Black VAP in a census block against

---

[12] The SoS' files on the March 2022 primary election, were missing data on ABBM rejections for 88 counties and on ABBMs received for all 254 counties. *See* 10/4 Tr. 2684:23-2685:3 (Smith).

the percentage of voters in the census block who had their application for an absentee ballot rejected, the regression line method shows the relationship between ABBM rejections and densely populated BVAP census blocks. HAUL-MFV 060 ¶ 37. Using this method, Prof. Smith is able to conclude with a reasonable degree of certainty the rate of ABBM rejections for Black voters.[13].

536.    The regression analysis for ABBMs submitted by Black voters that were rejected for any reason, including SB1, in Texas's March 2022 primary election shows a positive relationship:



OCAPX 255 at 23, fig. 1 As Black VAP increased in Census blocks statewide, ABBM rejections increased as well. OCAPX 255 at 22, ¶ 47, 23, fig. 1. In Census blocks with nearly all-Black VAP, 10% of ABBMs were rejected for any reason, compared to 5% for Census blocks with no Black VAP. OCAPX 255 at 22, ¶ 47; *id.* at 23, Fig. 1. Based on the small number of records of rejected ABBMs in the SOS' dataset, which itself is incomplete, Prof. Smith did not find a significant number of ABBMs filed by Black voters that were rejected because of SB1. 10/4 Tr. 2725:8-16

---

[13] Prof. Smith used the same method to show the effect of SB1 on Black voters who submitted mail ballots, plotting the percentage of Black VAP in a Census block against the percentage of voters in the Census block who had their BBM rejected. 10/4 Tr. 2729:8-20 (Smith).

(Smith) (discussing HAUL-MFV 402 at 38) (noting that Census blocks with limited data on ABBMs in the March 2022 primary had voters who submitted ABBMs in prior to the election).

537.    To analyze the impact on Hispanic voters, Prof. Smith matched voters from the SoOS' ABBM rejection file to the Texas voter registration file. The latter includes a Spanish Surname flag, based on the U.S. Census' list of Spanish surnames, which Prof. Smith uses as an indicator of Hispanic ethnicity. 10/4 Tr. 2754:14-16 (Smith).  By matching the files, Prof. Smith was able to identify mail-in voters in the March 2022 primary election who had a Spanish surname flag. Prof. Smith explained that U.S. Census' Spanish Surname list is underinclusive and excludes individuals who identify as Hispanic but whose surname does not appear on the list. 10/4 Tr. 2706:18-2708:3 (Smith). In this way, his analysis is "very conservative because I know that I'm missing individuals who would otherwise identify as Hispanic, say, you know, a Martinez who identifies as Hispanic who now marries a Smith and is not then going to be identified by the U.S. Census as Hispanic by surname alone." 10/4 Tr. 2708:4-8 (Smith). In addition, another category of voters who do not have the Spanish Surname flag is not limited to white voters, but also includes Black voters, Asian voters, and voters of other races and ethnicities. 10/4 Tr. 2708:22-25 (Smith).

538.    The majority (59.68%) of voters with a Spanish Surname flag whose ABBMs were rejected because of SB1 did not ultimately vote by any method in the March 2022 primary election, "belying the notion that voters can easily 'substitute' one mode of voting for another mode when confronted with institutional barriers."  10/4 Tr. 2726:25-2727:23 (Smith); HAUL-MFV 402 at 41 (citing OCAPX at 39, tbl. 6).

539.    Although the data show that 58.57% of voters without a Spanish Surname flag whose ABBMs were rejected because of SB1 did not vote thereafter by any method, Prof. Smith observes that voters with a Spanish Surname flag are undercounted in the SOS data, which does

not include voters from counties with large Hispanic populations, such as "Hidalgo County who had their applications rejected because of SB1 and who are disproportionately Hispanic." OCAPX 255 at 255 at 39, ¶ 71.

540.    In addition to the fact that Black voters are more likely to vote by mail – and thus Black voters are statistically more likely to be negatively impacted by any burden on the right to vote by mail,  10/5 Tr. 2926:21-2927:13 (McDaniel) – Black and Hispanic voters also had their ABBMs rejected at higher rate than non-Hispanic White voters.

541.    Elections expert Dr. Kenneth Mayer analyzed the March 2022 election data and found that the mail ballot rejection rate in Harris County as a result of SB1 was "uniformly higher for every minority group compared to non-Hispanic Whites" and the distinction was statistically significant.  10/2 Tr. 1985:13-19 (Mayer).

542.    The disparate impact on minority voters was similar in Tarrant County.  10/2 Tr. 1985:20-21 (Mayer).  For example, for the March 2022 election, the SB1-related rejection rate was 5.2 percent for non-Hispanic White voters, but it was 17.4 percent for Black voters and 12.4 percent for Hispanic voters.  10/2 Tr. 1985:24-1986:13 (Mayer).

543.    Although Black voters submitted 22 percent of the returned mail ballots but of the total mail ballots rejected due to SB1, 30 percent belonged to Black voters.  Similarly, Hispanic voters submitted only 9.8 percent of the mail ballots but experienced 14.1 percent of the SB1 rejected ballots.  These data – which show that Black and Hispanic voters had their mail ballots rejected at higher levels than White voters because of SB1 – are statistically significant.  10/2 Tr. 1998:3-23 (Mayer) (citing LULAC Ex. 3, Table 3).

544.    In fact, a Black voter who submitted a mail ballot was 82 percent more likely than a White voter to have their ballot rejected, and a Hispanic voter was 86 percent more likely to have their ballot rejected than a non-Hispanic White voter.  10/2 Tr. 1997:7-19 (Mayer).

545.    As a result of his analysis, Prof. Mayer concluded that SB1 mail ballot ID requirements imposed an "onerous burden" that resulted in increased rejection rates for all voters and far higher rejection rates for minority voters.  10/2 Tr. 1987:16-23 (Mayer).

546.    This trend continued in 2022, when Black voters in Dallas County were 87 percent more likely than non-Hispanic White voters to have their mail ballot rejected and a Hispanic voter was 36 percent more likely to have that experience.  10/2 Tr. 2001:5-18 (Mayer); Ex. 3 Table 6).

547.    Harris County conducted their own analysis of mail ballot rejections for the March 2022 primary; they found that voters from predominantly Black zip codes were 44 percent more likely to have their mail ballot rejected than those in predominantly white zip codes. LUPE-252 at 4.

## 2.  *March 2022 Primary Election - BBM Rejection Rates*

548.    To analyze the effects of SB1's identification number requirements on BBMs in the March 2022 primary election, Prof. Smith relied on two data sources: (1) datasets maintained by each of five counties: Harris, Dallas, Tarrant, El Paso, and Hidalgo; HAUL-MFV 060 at 10, ¶ 14; and, (2) the incomplete statewide datasets maintained by SoS. OCAPX 255 at 8-11, ¶¶ 17-24.[14] The two sources were studied separately; together they provide complementary pictures of the impact of SB1.

---

[14] The SOS' files were missing data on BBM rejections for multiple counties the March 2022 Primary Election. Smith does not know whether the SoS had the missing data and failed disclose it or if the counties failed to report the missing data to the SoS. *See* 10/4 Tr. 2685:16-20 (Smith). The SOS data did not include BBM accepted by two of Texas's counties, and BBMs rejected for 73 of Texas's counties. 10/4 Tr. 2685:11-22 (Smith).

### a. County Data on BBM Rejections

549.    Harris, Dallas, Tarrant, El Paso, and Hidalgo Counties are just five of Texas's 254 counties, but as a group they account for 38% of the total VAP, 46% of the Hispanic VAP, and 52% of the Black VAP of Texas. 10/4 Tr. 2714:8-21 (Smith).

550.    The data for these five counties studied by Prof. Smith included a reason for the rejection of each BBM that was rejected. In each of the five, Prof. Smith found, "SB1's ID-match requirements for voters casting absentee ballots drastically increased the rejection rate of returned absentee ballots, particularly for Black and Hispanic voters, in the 2022 March primary election." HAUL-MFV 060 at 7, ¶ 9.

### 1) Harris County

551.    In Harris County, 7,601 BBMs – 20.2% of total BBMs submitted – were rejected for any reason in the March 2022 primary election, an eight-fold increase from March 2018, the most recent comparable election, in which 2.5% of BBMs were rejected. HAUL-MFV 060 at 17, tbl. 1. Of the rejected BBMs, 6,872 or 18.26% were rejected because of SB1. HAUL- MFV 060 at 17 tbl. 1.

552.    In March 2022, 18.26% of Harris County's BBMs or 6,872 ballots were rejected because of SB1. HAUL-MFV 060 at 17 tbl. 1.

553.    To determine the effect of SB1's identification number requirements on Black voters who voted by mail in Harris County's March 2022 primary elections, Prof. Smith used the linear regression analysis based on VAP by race. 10/4 Tr. 2715:12-2716:15 (Smith) (discussing HAUL-MFV 402 at 25). FOF § VII.B.1. The following graph shows the regression line for BBMs submitted by Black voters that were rejected solely because of SB1 in Harris County's March 2022 primary election.



10/4 Tr. 2715:13-22 (discussing HAUL-MFV 402 at 31 (citing HAUL-MFV 060 at 24, fig. 1)).

554.    The graph demonstrates that, in Harris County, the larger the Black VAP of a Census block, the greater the rate of SB1-related BBM rejections. 10/4 Tr. 2717:1-5 (Smith). In Census blocks with no or almost no Black VAP, roughly 18% of BBMs were rejected, compared to nearly 30% of BBMs rejected in Census blocks with nearly all-Black VAP. HAUL-MFV 060 at ¶ 37. In some of the outlying counties with close to 80% Black VAP, over three-quarters of ABBMs were rejected. 10/4 Tr. 2717:5-8 (Smith).  Prof. Smith concluded that "[g]iven that Harris County includes approximately 25% of the Black VAP in the entire state of Texas, these results are especially indicative of the disproportionate effect that S.B. 1's provisions have on Black voters in Texas." HAUL-MFV 060 at ¶ 37 (emphasis added).

555.    To determine the effect of SB1's identification number requirements on Spanish surname voters who voted by mail in Harris County's March 2022 primary election, Prof. Smith analyzed data from 22 elections and identified Hispanic mail voters using the Spanish Surname flag. *See supra* FOF § VII.B.1; 10/4 Tr. 16-19 (Smith).

556.    Prof. Smith found that 22.43% of voters with a Spanish surname flag who attempted to vote by mail had their BBMs rejected, and that the identification number matching requirements of SB1 were the reason for the rejection of the BBMs submitted by 20.61% of voters with Spanish surnames. 10/4 Tr. 2720:2-8 (Smith) (discussing HAUL-MFV 402 at 34); HAUL-MFV 060 at 21, ¶¶ 32-33. Thus, 91.90% of the rejected BBMs of Harris County voters flagged by Texas as having Spanish surnames were rejected because of SB1. *See* HAUL-MFV 060 at 21, tbl. 2, ¶¶ 32-33.

557.    By comparison, 19.23% of all BBMs submitted by non-Spanish surname voters, a category that includes all Black voters, were rejected, and 17.45% of BBMs submitted by those voters were rejected because of SB1. HAUL-MFV 060 at 21, tbl. ¶¶ 32-33. Prof. Smith explains that because that voters without a Spanish Surname flag includes Black voters who were also more likely to have their BBMs rejected, his findings on the disparate impact of SB1 on voters with Spanish surnames voters are comparatively conservative. HAUL-MFV 060 at 20, ¶ 34; *see* 10/4 Tr. 2721:1-6, 19-2722:3 (Smith).

### 2) Tarrant County

558.    For Tarrant County, the linear regression analysis based on VAP by race again demonstrates that the BBMs of Black voters were more likely than the BBMs of white voters to be rejected in the March 2022 primary election. HAUL-MFV 060 at 28, ¶ 44. The graph below shows the regression line for Tarrant County's rejected BBMs for Black voters in the March 2022 primary election.



10/4 Tr. 2717:14–2718:1 (Smith) (discussing HAUL-MFV 402 at 32 (citing HAUL-MFV 060 at 29, Fig. 2)). The regression line extends only partially across the x-axis because no Census block in Tarrant County has more than 35% Black VAP. HAUL-MFV 060 ¶ 44; *see* 10/4 Tr. 2717:18-21 (Smith). The graph shows a clear positive relationship: the larger the Black VAP in a Census block, the greater the rate of BBM rejection. HAUL-MFV 060 ¶ 44; *see* 10/4 Tr. 2718:2-6 (Smith).

559.    For Tarrant County's voters with a Spanish Surname flag, Prof. Smith found that "absent SB1, the rejection rates…would have been less than in previous primary elections." HAUL-MFV 060 ¶ 45; HAUL-MFV 060 at 26, tbl. 4. In the March 2022 primary election, 10.43%

of voters with a Spanish Surname flag had their BBMs rejected, and 9.71% of these voters had their BBMs rejected because of SB1. 10/4 Tr. 2720:17-25 (Smith); HAUL-MFV 402 at 35 (citing at HAUL-MFV 060 at 26, tbl. 4) (citation corrected).  Thus, 93.10% of rejected BBMs submitted by voters with a Spanish Surname flag were rejected because of SB1. HAUL-MFV 402 at 35 (citing at HAUL-MFV 060 at 26, tbl. 4 (citation corrected)).. By contrast, 6.53% of voters who did not have a Spanish Surname flag had their absentee ballots rejected; and 5.56% of all absentee ballots cast by these voters were rejected because of SB1. *Id.*

### 3) Dallas County

560.    For the March 2022 primary election in Dallas County, the linear regression analysis based on VAP by race demonstrates that the BBMs of Black voters were more likely than the BBMs of white voters to be rejected, HAUL-MFV 060 ¶ 51, as shown by the following graph:



HAUL-MFV 402 at 33 (citing HAUL-MFV 060 at 34, fig. 3); *see* FOF § VII.B.1. The regression line for Dallas County is not as dramatic as the regression lines for Harris and Tarrant Counties; the graph nonetheless shows a positive relationship: the larger the Black VAP in a Census block,

the greater the rate of BBM rejection in Dallas County's March 2022 primary election. 10/4 Tr. 2718:8-15 (Smith). HAUL-MFV 060 ¶ 50.

561.    More than 10.5% of Dallas County voters with a Spanish Surname flag had their BBMs rejected while 9.47% of voters with non-Spanish surnames had their absentee ballots rejected; 6.60% of all BBMs cast by voters with Spanish Surnames voters were rejected because of SB1, and 5.93% of all absentee ballots cast by non-Spanish Surname voters were rejected because of SB1. HAUL-MFV 402 at 36 (citing HAUL-MFV 060 at 32, tbl. 66); *see* 10/4 Tr. 2723:22-25 (Smith).

### 4)  Hidalgo County

562.    Data provided by Hidalgo County revealed that more than 21.5% of BBMs cast by voters with Spanish surnames, compared to only 12.54% of BBMs submitted by voters with non-Spanish surnames, were rejected in the March 2022 primary election because of SB1. 10/4 Tr. 2692:24–2693:6 (Smith); HAUL-MFV 060 at 36, tbl. 8. Almost all of the rejections of BBMs cast by voters with Spanish surnames were based on SB1's identification number matching requirements. *See* HAUL-MFV 060 at 36, tbl. 8; *see* OCA-PX 255 at 29, n.17. In Hidalgo County, SB1's identification match requirements made rejections of BBMs significantly more likely for voters with Spanish Surnames than other voters in the March 2022 primary. HAUL-MFV 060 ¶ 56.

563.    Because of minimal data, Prof. Smith was not able to find meaningful results concerning SB1's impact on Black voters who cast BBMs in Hidalgo County.  HAUL-MFV 060 ¶ 55.

### 5) El Paso County

564. Hispanic voters were more likely than other registered voters to have their absentee ballots rejected in El Paso County's March 2022 primary election. HAUL-MFV 060 ¶ 62. Based on County data, Prof. Smith found that 16.28% of voters with Spanish surnames in El Paso County had their BBMs rejected in the March 2022 primary election because of SB1, compared to 12.75% of voters with non-Spanish surnames in that County. HAUL-MFV 060 at 38, tbl. 10.

565. As was true for Hidalgo County, El Paso County's dataset was too small to provide meaningful statistics concerning SB1's impact on Black voters who cast BBMs. HAUL-MFV 060 at 39, ¶ 61.

### b. Secretary of State's TEAM Data on BBM Rejections

566. To analyze the racial and ethnic impacts of SB1's identification number requirements on the acceptance and rejection of BBMs in the March 2022 primary election, Prof. Smith also studied statewide data files produced from SoS's TEAM database. 10/4 Tr. 2682:18-21, 2683:2-6 (Smith); *see* OCAPX 255 at 8-10, ¶¶ 17-24. For rejected BBMs, the SoS data files include a reason for the rejection.

567. Prof. Smith addressed the problem of missing quantitative data[15] by assuming that the counties that reported BBMs accepted, but not BBMs rejected, did not reject any ABBMs. 10/4 Tr. 2685:9-15 (Smith). Consistent with his conservative approach to the data, Prof. Smith did not exclude counties with missing data points, but calculated rejection rates by including in the denominator the numbers of BBMs accepted by all counties that reported BBMs accepted. 10/4 Tr. 2685:9-2686:12 (Smith).    Any counties that reported accepted BBMs but not rejected BBMs

---

[15] The SoS' files on the March 2022 primary election, contained data on BBM rejections for 181 counties but were missing data on BBM rejections for 73 counties. *See* 10/4 Tr. 2685:9-15 (Smith) (discussing HAUL-MFV 402 at 5). The SoS' files were contained data on BBMs accepted by 252 counties and was missing data from two counties. *Id.*

was included in the numerator with a "0" value. *Id.* Prof. Smith also included in the denominator BBMs that were rejected but did not include a corresponding reject reason. *See* 2687:23-2689:1 (Smith).

568.    Prof. Smith did not use the county data described above to supplement data missing from the files provided by SoS. *See* 10/4 Tr. 2692:21–2693:25 (Smith), *supra* FOF § XV.B. For example, Hidalgo County provided data concerning rejections of BBMs in the March 2022 primary elections. HAUL-MFV 060 ¶¶ 52-56. The SoS data for the March 2022 primary, however, had no BBM rejection data for Hidalgo County, but did include data on BBMs accepted. 10/4 Tr. 2693:7-12 (Smith). Prof. Smith did not use the rejection data provided by Hidalgo County to complement the missing data in the SoS data set. 10/4 Tr. 2746:8-14 (Smith). Instead, he assumed in his analysis of the SoS dataset that Hidalgo County did not reject any BBMs. 10/4 Tr. 2733:8-15 (Smith).

569.    If Prof. Smith had used Hidalgo County's rejection data to supplement the data from TEAM, his statewide rejection rates for voters with Spanish surname flags would have been higher. 10/4 Tr. 2693:18-25 & 2746:15-23 (Smith). Hidalgo County has a voting age population of 608,225 voters; 549,880 are Hispanic and 4,605 are Black. HAUL-MFV 402 at 30. Data produced by the County shows that more than 21% of voters with Spanish surnames had their BBMs rejected. 10/4 Tr. 2734:11-17 (Smith); *see supra* FOF¶ § VII.A.7.

570.    Applying the linear regression analysis based on VAP by race to SoS's statewide data, Prof. Smith found that SB1's identification number requirements caused disproportionate numbers of rejections of BBMs filed by Black Texans in the March 2022 primary election. OCAPX 255 at 35, ¶ 65; HAUL-MFV 402 at 43. The following graph shows the regression line:



HAUL-MFV 402 at 43 (citing OCAPX 255 at 36, Fig. 4).

571.    The regression analysis shows that in Census blocks with higher proportions of Black VAP, a higher percentage of BBMs were rejected due to SB1. For example, in Census blocks in which the VAP is all Black, 20% of BBMs were rejected because of SB1; by comparison in Census blocks with zero Black VAP, only 13% of BBMs were rejected because of SB1. OCAPX 255 at 35, ¶ 65. The regression analysis also shows that the BBMs rejected for any reason in all-Black VAP Census blocks was also 20%, indicating that in heavily Black areas, SB1 was responsible for roughly all rejections of BBMs statewide in the March 2022 primary. *Compare* OCAPX 255 at 35, fig. 4, *with id.* at 32-33, Fig. 3.

572.    The statewide data further reveal that 16.57% of BBMs submitted by voters with Spanish surname flags were rejected for all reasons, compared to 11.72% of BBMs filed by voters who do not have Spanish surnames. HAUL-MFV 402 at 44 (c column 5); *see* FOF §VII.B.1 (discussing methodology). Nearly 12% of BBMs filed by voters with Spanish surnames were rejected because of SB1's identification number requirements, while 9.44% of those filed by voters who do not have Spanish surnames were rejected because of SB1. *Id.* (column 3).

573.    Prof. Smith used the SOS's TEAM data to analyze the disparate impact of SB1 on voters in the ten counties with the largest number of active registered voters. 10/4 Tr. 2732:15-18 (Smith) (discussing HAUL-MFV 402 at 45 (listing Harris, Dallas, Tarrant, Bexar, Travis, Collin, Denton, Fort Bend, El Paso, and Hidalgo Counties)). Pooling the data of the ten counties, Prof. Smith found overall that voters with Spanish surnames were more likely to have their BBMs rejected due to SB1 than voters with non-Spanish surnames. *See* 10/4 Tr. 2733:5-7 (Smith); *see* OCAPX 255 at 30, ¶ 59. Nearly 15% of voters with Spanish surnames had their BBMs rejected compared to the 12.81% of non-Spanish surname voters. HAUL-MFV 402 at 45. "It is important to note that voters in the non-Hispanic group include registered voters who identify as Black, Asian-American, and other racial and ethnic groups." OCAPX 255 at 30, ¶ 58.

### 3.  *November 2022 General Election – ABBM Rejection Rates*

574.    To analyze the racial and ethnic impact of SB1's identification number requirements on the acceptance and rejection of ABBMs in the November 2022 election, Prof. Smith studied statewide data from the SoS' TEAM database. 10/4 Tr. 2735:14-18 (Smith). He also studied county level data provided by Harris and Travis Counties.

575.    The State has access to race and ethnicity data from DPS but failed to include that data in its production. 10/4 Tr. 2690:1-2691:16 (Smith).

576.    Prof. Smith analyzed the effects of SB1's identification number requirements on ABBMs in the November 2022 election using SoS data.[16] 10/4 Tr. 2734:24-2735:3 (Smith).

577.    Prof. Smith found that Census blocks with nearly all Black VAP had no more or less ABBM rejections overall or SB1-related than Census blocks with no-Black VAP. HAUL-

---

[16] The SOS' data on ABBM rejections in the November 2022 general election was incomplete. The dataset was missing data on ABBMs received from one county and on ABBMs rejected from 74 counties. 10/4 Tr. 2686:13-23 (Smith) (discussing HAUL MFV 402 at 5).

MFV 311 at 31, ¶ 60. The increase in Black VAP did not affect the rate of ABBM rejections, and the rejection rates are consistent across Census blocks. 10/ 4 Tr. 2735:8-13 (Smith) (discussing HAUL-MFV 402 at 47).

578.    SoS data shows that voters who have the Spanish surname flag were marginally less likely than voters who do not have that flag to have their ABBMs rejected for all reasons, or for SB1-related reasons. 10/4 Tr. 2735:14–2736:1 (Smith). Prof. Smith explains the ABBM rejection rates are very conservative because he had ABBM rejection data from 180 counties and was missing data on 74 or nearly one-third of Texas's counties. HAUL-MFV 311 at 23, ¶ 47; 10/4 Tr. 2686:21-22 (Smith).

579.    The data reveal, however, that 51.4% of voters with Spanish surnames whose ABBMs were rejected because of SB1 did not vote in the November 2022 election by any other means, compared to 47.6% of voters who do not have the Spanish surname flag. 10/4 Tr. 2736:12-2738:22 (Smith); HAUL-MFV 402 at 51 (citing HAUL-MFV 394 at 4, tbl. 1).

### 4.  *November 2022 General Election – BBM Rejection Rates*

580.    To analyze the effects of SB1's identification number requirements on the acceptance and rejection of BBMs in November 2022, Prof. Smith relied on two data sources; each source was studied separately, and both provided unique and complementary pictures of the impact.

### a.  County data on BBM Rejections

581.    The first set is data provided by Harris and Travis Counties. HAUL-MFV 313 at 8, ¶ 15; 10/4 Tr. 2692:16-20 (Smith). Prof. Smith found that nearly all rejected BBMs filed in the November 2022 election by Black voters in Harris County, and by Hispanic voters in both Harris

and Travis Counties, in the November 2022 general election were rejected because of SB1. *See supra* ¶¶ 180-82, 186.

### 1)  Harris County

582.    In Harris County, nearly 4% of BBMs cast in the November 2022 election were rejected because of SB1's identification number requirements. HAUL-MFV 313 at 15, ¶ 32, & tbl. 1.

583.    Prof. Smith found that in Census blocks with higher percentages of Black VAP in Harris County, SB1-related BBM rejection rates were notably higher than for voters in other Census blocks, HAUL-MFV 313 at 6, ¶ 9, as shown in the graph below:



HAUL-MFV 313 at 21, fig. 2.

584.    The regression line shows a clear positive relationship: the larger the Black VAP in a Census block, the greater the rate of BBM rejection because of the identification number requirements of SB1. HAUL-MFV 313 at 20, ¶ 39. For example, approximately 4% of BBMs filed by voters in Census blocks with no Black VAP, or almost no Black VAP, were rejected because

of SB1. HAUL-MFV 313 at 20, ¶ 39. The BBMs of voters in Census blocks with 75% Black VAP were rejected at a rate of approximately 7.5%. HAUL-MFV 313 at 20, ¶ 39.

585.    The majority of rejected BBMs from voters with addresses in Census blocks in Harris County with higher proportions of Black VAP were rejected because of the identification number requirements of SB1. *See* HAUL-MFV 313 at 20, ¶ 30; *compare id.* at 19, fig. 1, *with id.* at 21, fig. 2.

586.    5.74% of BBMs filed by voters with Spanish surname flags were rejected because of SB1, compared to 3.77% of BBMs cast by non-Hispanic voters. HAUL-MFV 313 at 15, tbl. 1. "Nearly all (98.1%) of rejected absentee ballots cast by Hispanic voters in Harris County in the 2022 General Election were rejected because of SB1." HAUL-MFV 313 at 16, ¶ 34.

587.    Prof. Smith observed that "[a]lthough the overall, and S.B. 1, rejection rates for Hispanic voters (and non-Hispanic voters) who cast absentee ballots in the November 2022 election are lower than the comparable rejection rates of absentee ballot[s] cast in the March 2022 election in Harris County, the disparate rejection rate between voters with Spanish surnames and those with non-Spanish surnames persists in the November 2022 election." HAUL-MFV 313 at 16-17, ¶ 35.

### 2)  Travis County

588.    In Travis County, 1.7% of BBMs submitted in the November 2022 election were rejected because of SB1's identification number requirements. HAUL-MFV 313 at 22, ¶ 41. Prof. Smith found that Black voters in Travis County were more likely to have their BBMs rejected for any reason, including SB1. When he focused on voters whose BBMs were rejected because of SB1, however, he found that as the Black VAP in a Census block increased, BBM rejections did

not increase. *Compare* HAUL-MFV 313 at 26, fig. 3 (overall rejections), *with id.* at 28, fig. 4 (SB1 rejections).

589.    For voters with Spanish surname flags in Travis County, 2.50% of BBMs were rejected because of SB1, compared to 1.48% of BBMs rejected for voters without Spanish surname flags. HAUL-MFV 313 at 22, tbl. 2; *id.* at 23, ¶ 43. "Nearly all (94.8%) of the rejected absentee ballots cast by Hispanic voters in Travis County in the 2022 General Election were rejected because of S.B. 1." HAUL-MFV 313 at 23, ¶ 43.

590.    "Although the overall, and S.B. 1, rejection rates for Hispanic voters (and non-Hispanic voters) who cast absentee ballots in the November 2022 election are lower than the comparable rejection rates of absentee ballot cast in the March 2022 election in Travis County[, *see* HAUL-MFV 060 at 31, tbl. 5,] disparate rejection rate between voters with Spanish surnames and those with non-Spanish surnames persists in the November 2022 election." HAUL-MFV 313 at 23, ¶ 23.

                                                           **b.**    TEAM Data Concerning BBM Rejections in the November 2022 Election

591.    To analyze the effects of SB1's identification number requirements on the acceptance and rejection of BBMs in the November 2022 election, Prof. Smith also studied statewide data from the TEAM database.[17] 10/4 Tr. 2738:24–2739:9 (Smith). Prof. Smith's findings on BBM rejections in the November 2022 election using SoS data are consistent with his findings on BBM rejections using data provided by Harris and Travis Counties. *See* HAUL-MFV 311 at 5, ¶ 7. Prof. Smith found that "S.B. 1 negatively affected the ability of voters of color across the State of Texas to both request an absentee ballot, and more severely, negatively affected the

---

[17] The SoS' TEAM files on the November 2022 general election were missing data on BBMs rejected from 89 counties and on BBMs received from nine counties. 10/4 Tr. 2686:25-2687:3 (Smith); HAUL-MFV 402 at 5.

ability of voters of color to cast a valid absentee ballot in the 2022 general election because of the new personal identification number requirements of S.B. 1." HAUL-MFV 311 at 6, ¶ 9.

592.    SB1 caused disproportionate numbers of BBMs filed by Black Texans in the November 2022 election to be rejected. *See* 10/4 Tr. 2739:23–2740:2 (Smith); HAUL-MFV 311 at 42-43, ¶¶ 80-82; *compare id.* at 41, fig. 3, *with* HAUL-MFV 402 at 53.

593.    The graph below, based on available statewide data, shows the relationship between the proportion of Black VAP in Census blocks and BBM rejections in the November 2022 election on account of SB1's identification number requirements:



10/4 Tr. 2738:24-2739:4, 14-18 (Smith) (discussing HAUL-MFV 402 at 53 (citing HAUL-MFV 311 at 44, fig. 4). *See also id.* at 2687:6-16 (explaining method of accounting for missing data will deflate the rate of BBM rejections); 2739:6-21 (discussing missing data).

594.    The regression line shows a clear positive relationship: across Texas in the November 2022 election, the larger the Black VAP in a Census block, the greater the rate of BBM rejections. 10/4 Tr. 2739:23-2740:2 (Smith). Approximately 8% of the BBMs filed by voters living in Census blocks with nearly all-Black VAP were rejected because of SB1. HAUL-MFV 311 at

42-43, ¶ 80. By comparison, approximately 2% of the BBMs filed by voters living in Census blocks with no, or nearly no Black VAP were rejected because of SB1. HAUL-MFV 311 at 42-43, ¶ 80.

595.    For voters with Spanish surname flags, Prof. Smith found that the statewide BBM rejection rate because of SB1 was 2.94%. 10/4 Tr. 2740:3-13 (Smith) (discussing HAUL-MFV 402 at 54). SB1 accounted for 80.2% of the rejections of BBMs submitted by Hispanic voters in the November 2022 election. HAUL-MFV 402 at 54. The rejection rate of BBMs because of SB1 for voters with non-Spanish surnames was 1.98%. 10/4 Tr. 2740:3-13 (Smith) (discussing HAUL-MFV 402 at 54). Prof. Smith emphasized that the rejection rate for voters with Spanish surnames is probably an undercount because the Spanish Surname list is underinclusive of surnames for individuals who identify as Hispanic and given the SOS' incomplete data on BBM rejections from the missing counties. 10/4 Tr. 2740:14-18 (Smith).  In addition, the rate of rejection for voters who do not have Spanish surname flags is probably inflated because this category includes "non-Anglos, such as Black voters who are more likely to have their ballots rejected." 10/4 Tr. 2740:14-18 (Smith).

596.    In nine of the ten counties with the largest number of active voters, the BBM rejection rate in the November 2022 election was higher for voters with Spanish surname flags than for those who lack the Spanish surname flag. 10/4 Tr. 2742:9-12, 17-20 (Smith) (discussing HAUL-MFV 402 at 55) (listing Harris, Dallas, Tarrant, Bexar, Travis, Collin, Denton, Fort Bend, El Paso, and Hidalgo counties)). SB1 was the reason for the rejection of the majority of BBMs submitted by voters with Spanish surname flags in the top ten counties, except Denton. HAUL-MFV 311 at 39, ¶ 74.

### C. Overall Conclusions

597.    Prof. Smith's analyses of various datasets demonstrate the impact of SB1's identification requirements on Black and Hispanic voters.[18] The SoS statewide data show that more than half of Hispanic voters voters whose ABBMs were rejected because of SB1 did not vote by any other means—59.56% of voters with Spanish surnames did not vote in the March 2022 primaries after their ABBMs were rejected, and 51.40% of Spanish surname voters did not vote in the November 2022 election after their ABBMs were rejected. 10/4 Tr. 2743:23–2744:12 (Smith); HAUL-MFV 402 at 41, 51.

598.    County and statewide data both demonstrate that SB1's identification number requirements caused the BBMs of Black and Hispanic voters to be rejected at higher rates than other groups of voters. 10/4 Tr. 2744:13-21 (Smith).

599.    Prof. Smith's conclusions are confirmed by Dr. Grose, who showed that the identification number matching requirements of SB1 have already had a disproportionate impact on minority voters:  in the 2020 general election, Latino voters represented 16.4% of the vote-by-mail electorate; by the March 2022 primary election, Latino voters were 14.1% of mail-in voters.; HAUL-MFV 353 at 4-5. The reduction was repeated during the 2022 general election, when the percentage of Latinos voting by mail was 1.7% lower than it was in 2020. *Id.* at 5. That decline occurred even though the overall Latino voting-eligible population in the state grew by 0.6% from 2020 to 2021. *Id.* at 5-6.

---

[18] In some of Prof. Smith's analyses, the racial disparities in ABBM and BBM rejection rates were modest. However, Prof. Prof. Smith explained how limitations in the data would deflate certain rejection rates. *See* 10/4 Tr. 2684:17-2687:22 (Smith) (explaining method of accounting for missing data will deflate the rate of ABBM and BBM rejections); FOF § VII.B.1 (describing Spanish surname flag as underinclusive), 533 n.10, 576 n.14, 591 n.16.

### D.  The Hispanic Voters that Mi Familia Vota Serves Will be Adversely Impacted by SB1's Requirements Related to Mail-in Ballots

600.    When their ballots are rejected due to the identification number match issue, voters may be dissuaded from voting in the future. Hispanic voters – like those with whom Mi Familia Vota works – may be easily discouraged from the voting process.  Angelica Razo testified that if the voters with whom Mi Familia Vota works have difficulty casting their vote by mail or make a mistake, they "don't know how to problem solve through that" and it "definitely dissuades them" from voting.  10/10 Tr. 3436:17-25 (Razo).  The voters with whom Mi Familia Vota works experience "long-term" impact from this type of difficulty voting and may "sit out multiple elections" as a result.  10/10 Tr. 3437:1-6 (Razo).

601.    Before the passage of SB1, Mi Familia Vota encouraged eligible voters in the Latino community to vote by mail. Eligible voters include elderly people and voters who worked outside of their counties or outside of the state. 10/10 Tr. 3391:13-19 (Lopez).

602.    Ms. Razo testified that many voters showed interest in voting by mail in 2020. 10/10 Tr. 3450:6-13 (Razo). In 2020, she saw that many voters in MFV's target community who were eligible to vote by mail required a lot of assistance. Ms. Razo observed that Latino voters may not have anyone else in their household who is eligible to vote by mail, so it is harder to pool resources and they need more external assistance. 10/10 Tr. 3450:6-13 (Razo). Many elderly Latino voters also deal with language challenges when voting by mail. 10/10 Tr. 3450:13 (Razo).

603.    In Ms. Razo's and Ms. Lopez's experience, if a voter tries to vote by mail and cannot cast their ballot, it will dissuade them from trying again. 10/10 Tr. 3450:21-24 (Razo); 10/10 Tr. 3392:9-10, 17-30 (Lopez). Therefore, due to SB1, MFV has been hesitant to encourage voters to vote by mail, even when they are eligible and when it might otherwise have been their

best option to vote. 10/10 Tr. 3391:20-23 (Lopez). As a result, MFV has shifted its focus to encouraging voters to vote early and in person. 10/10 Tr. 3391:20-23 (Lopez).

### VIII.   SB1's POLL WATCHER PROVISIONS CHILL VOTERS AND ELECTION WORKERS AND DISPROPORTIONATELY HARM BLACK AND LATINO VOTERS

#### A. SB1's Poll Watcher Provisions Permit Disruptions of the Electoral Process that Burden All Texas Voters.

604.    The testimony at trial established that the challenged poll watcher provisions conflict with the election judge's responsibility under the EC for maintaining order in the polling place, EC § 32.075, *see* 9/22 Tr. 1891:16-17 (Ingram), and make the work of election officials more difficult and even impossible.

#### 1.   *SB1's Poll Watcher Provisions Are Vague and Ambiguous.*

605.    SB1 § 4.01 (EC § 32.075(g)) forbids an election official from removing a poll watcher for a violation of the EC unless the official has personally observed the unlawful conduct. Isabel Longoria testified that voter intimidation is rarely a Penal Code violation, so SB1 "does not allow us to believe voters when they are victims of harassment." 9/20 Tr. 1325:14–1327:4 (Longoria). In effect, if a voter complains about a poll watcher, SB1 § 4.01 forbids election officials from taking action against the poll watcher unless the election official also observed the misconduct. 9/19 Tr. 1070:3-10 (Callanen).

606.    Ms. Longoria further testified that in her experience, SB1 § 4.01's requirement that an election worker personally observe an EC violation before removing a poll watcher is "a little bit ludicrous," because election workers are too busy checking voters in, doing provisional ballot paperwork, and performing other administrative tasks to keep every poll watcher under observation. 9/20 Tr. 1325:14–1326:21 (Longoria).  Similarly, Ms. Razo of MFV testified that election officials have many things to do and cannot be everywhere at once in a polling place;

accordingly, they cannot be expected to monitor poll watchers for misbehavior. 10/10 Tr. 3453:4-6 (Razo).

607.    SB1 § 4.06 (EC § 33.051(g)) is a new criminal provision that punishes election officers for "intentionally or knowingly refus[ing] to accept a watcher for service when acceptance of the watcher is required by this section." Violation of SB1 § 4.06 is punishable as a Class A misdemeanor. *Id.* Election judges are included within the regulated group of "election officers" in Section 4.06. 10/16 Tr. 3978:11-18 (White). Under this section, an election judge may refuse to accept a poll watcher who presents a certificate of appointment and a certificate of completion of SOS's poll watcher training only if the poll watcher uses a recording device inside the polling place, is ineligible, or if the maximum number of poll watchers from the appointing party, campaign, or candidate are present at the polling place. *See* Joint Ex. 001 at 26 (SB1 § 4.06(b)).

608.    When a poll watcher arrives at a polling place or election office, the watcher must be qualified immediately.  The process is time consuming and takes the presiding judge away from duties related to the elections process. 9/19 Tr. 1064:11–1065:24 (Callanen).

609.    In 2023, the Texas Legislature amended EC § 33.052 so that it no longer requires a poll watcher to serve five consecutive hours at a polling place or election office at which the poll watcher has been qualified. Under the current law, a poll watcher need not stay in a polling place for any minimum time; instead, a poll watcher may stay for as brief a time as a few minutes, then leave and return later.  In such a case, the poll watcher must be requalified by the presiding judge, must be sworn in again, and must countersign his or her certificate of appointment once more, stopping the flow of work at the polling site. Despite the disruption, under section 4.06, an election judge may not refuse to accept a poll watcher upon arrival. The only limitation on the number of poll watchers is that each candidate on the ballot and each group sponsoring or opposing a ballot

initiative is allowed a maximum of two poll watchers per polling place. With 45 candidates/initiatives on the ballot, there could be 90 watchers. *Id.* 1066:22–1069:19 (Callanen).

610.    Plaintiff Jeffrey Clemmons, who previously served as an election judge, testified to the difficulty of reconciling the mandate of SB1 § 4.06 to accept poll watchers with the election judge's duty to maintain decorum in the polling place in a situation in which a poll watcher has the proper identification and credentials but there are other grounds to refuse to accept him or her. 9/13 Tr. 663:9–665:13 (Clemmons). Mr. Clemmons is concerned about whether SB1 § 4.06 would permit him to refuse to accept a poll watcher who is wearing partisan apparel, is causing trouble or creating disruptions in the polling place by behaving belligerently, or is otherwise making voters and his election clerks uncomfortable. 9/13 Tr. 664:16–665:6 (Clemmons).

611.    Mr. Clemmons and other election workers cannot look to other EC sections to resolve the vagueness of SB1 § 4.06. For example, EC § 32.075(g)-(h) concern election judges' power to *remove* a poll watcher.  But language applicable to removal of "a watcher *duly accepted for service*" does not give guidance concerning an election judge's authority to *accept* or reject a poll watcher in the first instance. EC § 32.075(g).  Indeed, Sen. Hughes, who sponsored SB1, asserted that SB1 § 4.06 provides for a "new offense for refusing to accept a watcher" distinct from the provision governing removal of a poll watcher. HAUL-MFV 182 at 7:8-13); *compare* EC § 33.051 (as amended by SB1 § 4.06), *and* EC §32.075.

612.    SB1 § 4.06 has created confusion and uncertainty for election judges, who are concerned about potential criminal liability. Ms. Longoria testified that SB1 § 4.06's "ambiguous" language has caused fear among election workers who are unsure what it means to "knowingly or intentionally reject a poll watcher." 9/20 Tr. 1328:23–1330:16 (Longoria).  In Harris County, approximately 600 experienced election judges declined to serve in the 2022 election cycle, citing

their fears of the legal consequences that could stem from SB1's poll watcher provisions. 9/19 Tr. 1187:6-14, 1188:7–1189:2 (Obakozuwa). The criminal penalties associated with violating SB1 § 4.06 have made Mr. Clemmons concerned about serving as an election judge in the future. 9/13 Tr. 666:2-13 (Clemmons).

613.    SB1 § 4.06(h) requires the poll watcher to "swear (or affirm)" that he or she will "will not disrupt the voting process or harass voters." Neither SB1 nor the EC defines "disrupt" or "harass."

614.    Keith Ingram, former Director of the Elections Division of SoS, testified that, trying to see what's on a voter's ballot is harassment; however, standing too close may "just be what [a poll watcher has] to do to have a reasonable observation of the check-in process."  9/22 Tr. 1889:24–1891:12 (Ingram).

615.    SB1 § 4.07 (EC § 33.056(f)) empowers poll watchers to "sit or stand near enough to see and hear" any election activity they are observing. Before SB1, poll watchers were entitled to sit or stand "conveniently near" election activity.

616.    The EC criminalizes the act of "knowingly prevent[ing] a watcher from *observing* an activity." Elec. Code § 33.061 (emphasis added).

617.    Legislators intended for the change in statutory language from "conveniently near" to "near enough to see and hear" to expand the rights of poll watchers within the polling place. S*ee* HAUL–MFV 175 (87th 2nd special, House Select Committee on Constitutional Rights and Remedies Aug. 23, 2021) at 31:15–33:13 (explaining the purpose of similar language regarding "free movement" in a predecessor bill to SB1: "[I]t gives free movement to poll watchers within the polling place. Right now they don't have free movement. We're changing that. Right now they can be designated to an area.").

618.    Election judges, State and County election officials, political party officers, and the OAG's former Elections Fraud chief testified that SB1 § 4.07 does not inform election workers or poll watchers about how close a poll watcher may stand to voters, polling place staff, or the voting booth. LUPE Ex. 279 (Vera Dep.) at 53:9-20; 9/13 Tr. 666:16–667:18 (Clemmons); 9/19 Tr. 1175:14-22 (Obakozuwa); 10/16 Tr. 3980:23–3981:3 (White); 9/22 Tr. 1882:17-1883:5 (Ingram); 9/20 Tr. 1330:17–1331:6 (Longoria).

619.    As Isabel Longoria testified, the poll watcher's entitlement to stand near enough to see and hear was "quite often an item of tension between poll watchers and election judges."  The statutory language became "a basis for a lot of controversy at the polls" because election judges who believed they were providing poll watchers a reasonable opportunity to observe an activity still faced allegations from poll watchers who claimed that they could not see or hear. 9/20 Tr. 1330:24–1331:16 (Longoria).

620.    Section 4.07I also provides that watchers may not be denied "free movement" where there is "election activity."  This provision has been particularly problematic at the Harris County Election Technical Center.  The statute is vague as to what constitutes "election activity" and whether that includes packing materials for an election in the warehouse area where some election equipment and machinery is stored at this location. The Harris County EA does not have enough personnel to follow poll watchers who try to wander throughout the warehouse, and those poll watchers could get into secure areas and "act in a nefarious manner." 9/20 Tr. 1331:17–1333:6 (Longoria).

621.    Since the enactment of SB1, SoS has not provided any guidance about the distance that poll watchers must maintain from voters. 9/19 Tr. 1175:23–1176:10 (Obakozuwa); 9/11 Tr. 192:22–195:25 (Wise); 9/19 Tr. 1070:11-15 (Callanen); 10/3 Tr. 2323:16–2324:22 (Ramón).

622.    SoS has not published any guidance on the scope of lawful poll watcher activity that implicates a voter's privacy, for example, on the appropriate distance between poll watchers and voters in the voting booth. 9/19 Tr. 1175:23–1176:10, 1176:22–1177:21 (Obakozuwa).

623.    Mr. Ingram testified that SB1 § 4.07(f), which entitles a poll watcher to "sit or stand close enough to see and hear" and SB1 § 4.09, which makes it a crime to knowingly "distance or prevent a poll watcher from observing an activity that would make observation not reasonably effective" do not "change anything substantively" in the law. 9/22 Tr. 1882:12-24 (Ingram). According to Mr. Ingram, the former language, "conveniently near," means the same thing as the present formulation, "close enough to see and hear," and the new sections do not change the relationship between watchers and election workers. 9/22 Tr. 1882:12-1883:20 (Ingram).

624.    According to Mr. Ingram, the former language, "conveniently near," means the same thing as the present formulation, "close enough to see and hear," and the new sections do not change the relationship between watchers and election workers. 9/22 Tr. 1882:12-1883:20 (Ingram).

625.    Mr. Ingram further testified that SoS has no position about what distance is "'near enough to see and hear' . . . It's just as subjective as 'conveniently near.'" (Ingram, 1888:20–1889:9).

626.    Nor has OAG issued an Opinion defining "near enough to see and hear." (Ingram, 1925:12–1926:6).

627.    Alan Vera, an official of the Harris County Republican Party who trained poll watchers, believed that under SB1, the allowable distance varied according to "how good the poll watcher's vision and hearing is." LUPE Ex. 279 (Vera Dep.) at 54:16-17.

628.     Plaintiff Clemmons testified that the language of SB1 § 4.07(f), mandating that poll watchers be able to stand "near enough to see and hear" is vague:  he is unable to discern how well another person can see or hear from any given distance. He stated that, "I would be concerned about whether or not I can do anything to ensure that the voter feels confident that they are not having that right violated, and so I think this gets to the comfortability of voters as well, since I don't think the law gives me much leeway to intervene there." 9/13 Tr. 667:19–669:14).

629.     In addition, Mr. Clemmons testified that he would not know how to implement the "free movement" mandate of SB1 § 4.07 as an election judge, because the phrase "free movement" is not defined in the statute. 9/13 Tr. 666:16–667:18 (Clemmons).

630.     The fact that a violation of SB1 § 4.07 is punishable by a civil penalty rather than a criminal one does not provide comfort for Mr. Clemmons, who is wary of violating any section of the EC. *Id.* at 669:15–670:3 (Clemmons).

631.     Lisa Wise, El Paso County EA, testified that her office has received no guidance from SoS as to SB1's poll watcher provisions, including what constitutes "free movement" for poll watchers or how close they may be to voters. *See* 9/12 Tr. 193:11–195:2 (Wise).

632.     Remi Garza, Cameron County EA, testified that his office and election workers were concerned about asking a poll watcher to stand six feet away from a voter when the voter inserts his or her ballot into a tabulator; a disgruntled poll watcher could report the election worker as violating SB1. Tr. 738:12-22 (Garza).

633.     SB1 § 4.09 (EC § 33.061(a)) creates a criminal offense for a person who "tak[es] any action to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective."

634.    Multiple election officials testified to concerns about the vague language through which SB1 purports to impose criminal liability for "obstructing" the view of poll watchers and about the lack of definition of the "free movement" poll watchers must be allowed. *See* Lisa Wise testimony at 189:9 – 190:3, 191:19 – 193:6; Yvonne Ramón testimony at 23:22–2323:1, 2323:16–2324:22; Remi Garza testimony at 747:7-11, 742:17-24, 743:1-10.

635.    Neither SB1 nor the EC contain any definition of the phrase "not reasonably effective," nor do they give any guidance about who makes that determination.  Election officials testified that the words "not reasonably effective" appear to insert a subjective standard that they would be unable to apply. 9/13 Tr. 670:19–672:3 (Clemmons); 9/13 Tr. 609:1-6 (Ertel); 10/3 Tr. 2323:20–2324:9 (Ramón). They believe the language of SB1 § 4.09 "leaves a lot up in the air for both the watcher and the election judge." 9/13 Tr. 671:23–672:3 (Clemmons); *see also* 9/13 Tr. 609:1-6 (Ertel).

636.    Dana DeBeauvoir, former Travis County Clerk, testified that she does not think she knows what it means to take any action that would make observation not reasonably effective. 9/14 Tr. 877:10–877:20 (DeBeauvoir).

637.    Mr. Ingram testified that the phrase "reasonably effective," as used in SB1 § 4.09, is not defined in SB1 or elsewhere in the EC.  9/22 Tr. 1884:18–1885:9 (Ingram).

638.    Mr. Ingram testified that "reasonably effective" is a subjective judgment. *Id*.

639.    SoS's publications simply refer the reader to the statutory language.   In Mr. Ingram's view, the determination whether an action renders observation "not reasonably effective" is subjective: the one deciding, in the first instance, is the election judge. According to Mr. Ingram, the statute explains, with more words than it previously used, what is expected. For its part, Mr. Ingram testified, SoS has not interpreted the statute; rather, it advises election judges to use their

best judgment, and to consult their county election officials or their county attorney when in doubt. Mr. Ingram said that, when election judges contacts SoS to ask whether to take action against poll watchers, SoS reminds them that an election judge commits a crime if the action is not justified. SoS has referred complaints by poll watchers of being obstructed in central count offices to OAG. 9/22 Tr. 1884:14–1887:7 (Ingram).

640.    SoS could not say whether certain activity would violate section 4.09. Standing between a poll watcher and election activity *could* violate SB1 § 4.09. 9/22 Tr. 1887:16-21 (Ingram,). Asking a poll watcher to stand ten feet back from voting booths *could* constitute a violation of SB1 § 4.09 9/22 Tr. 1888:20–1889:9 (Ingram). SoS cannot say whether an election worker would violate SB1 § 4.09 by demanding that a watcher stand one foot away from a voter. 9/22 Tr. 1889:10-16 (Ingram) ("It could be unreasonable. It could render their service unusable, but in most cases I don't think it would."). When it comes to determining whether an election official has obstructed a poll watcher by distancing the poll watcher from an activity, "[SoS has] got a spectrum from more effective to less effective, and the further you get toward less effective, that's when you get into not reasonably effective."

641.    obstruction of view because watchers took this section to mean that poll workers were required "to actively move out of their way or give deference to poll watchers." 9/20 Tr. 1333:7-1334:9 (Longoria). "The culmination of these laws shifts power to the poll watchers . . . if a poll watcher is alleging that they can't see or hear, … that they can't look over your shoulder at a form, and now … you don't want to be accused of taking action that could then incur a criminal penalty against you, it's shifting, again, those power dynamics to poll watchers."  (Longoria, 1333:7–1335:15).

642.    Jeffrey Clemmons testified that he would be unsure how to determine whether a poll watcher's observation was "reasonably effective" because that determination seems to hinge on the poll watcher's subjective experience. 9/13 Tr. 670:19–672:3 (Clemmons).

643.    Mr. Clemmons was aware of the investigation of former Travis County Clerk Dana DeBeauvoir before SB1, and he worries that SB1 § 4.09 will subject election officials to additional and more severe penalties. 9/13 Tr. 673:4–674:4 (Clemmons).

644.    Dana DeBeauvoir testified that poll watchers in Travis County objected to clear plastic sneeze guards that she had installed in the counting station and that another poll watcher claimed that she could not see or hear from a room specifically designed for such observation. 9/14 Tr. 863:16–863:18, 865:8–865:15

645.    The criminal penalties associated with violating SB1 § 4.09 have made Mr. Clemmons concerned about serving as an election judge in the future. 9/13 Tr. 672:18–673:3 (Clemmons).

646.    Ms. Razo testified that MFV discontinued its election worker training program in part because of SB1. 10/10/23 Tr. 3452:14-19 (Razo). She testified that the law is vague as to the power and freedom to move that poll watchers have, which puts election workers in a risky scenario. 10/10 Tr. 3453:4-8 (Razo). They might be subject to accusations and investigation, which would have negative effects on election workers even if the investigations did not result in a conviction or a prosecution. 10/10 Tr. 3454:17-20 (Razo). She agreed that accusations may negatively affect poll workers, even if the investigation did not result in a conviction or a prosecution. 10/10 Tr. 3454:17-20 (Razo). She explained that it is "a very traumatizing experience for people in our community to get accused of wrongdoing and I can see it having a bad impact on

their school life as they are thinking about college, as they are thinking about work experience that they are trying to build out." 10/10 Tr. 3454:16-20 (Razo). .

647.    Jonathan White believes SB1 § 4.09(a) is based on a "reasonable person" standard but could not say what distance from an activity at a voting machine would be reasonable or unreasonable. 10/16 3980:23–3981:3).

648.    Mr. White does not know what action would obstruct the view of a watcher under SB1 § 4.09. It could be "any action that fulfills that element of the offense." 10/16 Tr. 3978:19–3979:3). Mr. White does not know what it would mean to "distance the watcher" under 4.09. It "could be any number of things." 10/16 Tr. 3979:4-6 (White).

## 2.    *Election Workers and County Officials Do Not Know What is Permitted or Prohibited Under SB1's Poll Watcher Provisions.*

649.    The lack of clarity in SB1's poll watcher provisions has made it difficult for county officials to provide adequate training and advice to election workers who administer elections. Harris County tells its election workers that poll watchers must be able to get close enough to see and hear but is unable to specify a distance to help election workers implement the law. 9/19 Tr. 1175:14–1176:10 (Obakozuwa).

650.    When training election workers for the November 2022 election, Harris County was unable to answer election workers' questions about poll watchers. 9/19 Tr. 1210:21-25 (Obakozuwa).

651.    County EAs testified that SB1's poll watcher provisions are vague and have shifted power to poll watchers, who have become increasingly partisan. El Paso County EA Lisa Wise testified that the provisions are vague, 9/11 Tr. 189:24 (Wise); the election workers are scared and feel this, and SoS has given no guidance to counties, 9/11 Tr. 192:22–195:25 (Wise).

652.    Election workers had difficulty applying SB1's provisions regarding poll watchers during the 2022 election cycle, and particularly with understanding how close a poll watcher could be to a voter. *See* 9/19 Tr. 1176:22–1177:6 (Obakozuwa).

653.    Harris County is unable to give election workers any more clarity on lawful poll watcher activity than what is in the text of SB1. 1174:1–1175:22 (Rachelle Obakozuwa)

654.    Plaintiff Clemmons and other election workers feel unsure whether they can ask a poll watcher to move or otherwise intervene in circumstances where poll watcher behavior or proximity to a voter makes the voter uncomfortable or crosses into harassment or intimidation. 9/13 Tr. 668:22–669:14 (Clemmons). Marla López testified that she feared being subject to lawsuits and prosecution merely for trying to make sure that her voting location was safe for voters. 10/10 Tr. 3386:24-3387:6 (López).

655.    The uncertainty created by SB1's poll watcher provisions hinders election workers' ability to fulfill their duties at the polls, especially protecting voters from harassment and intimidation. 10/3 Tr. 2323:20–2325:18 (Ramón).

### 3.    *Election Officials Fear the Poll Watcher Provisions Will Be Enforced Against Them, and Many Have Become Reluctant to Serve*

656.    EAs view SB1's poll watcher provisions as shifting power from election workers to poll watchers and protecting poll watchers rather than voters. 9/20 Tr. 1333:7–1335:17 (Longoria).

657.    EAs are also concerned about how the SB1 poll watcher provisions affect the safety of election workers. Travis County added a de-escalation portion to its election worker training about how to approach poll watchers after SB1 was passed. 9/14 Tr. 879:15-24 (DeBeauvoir).

658.    Cameron County EA Remi Garza expressed concern that a disgruntled poll watcher might complain about being moved away from a ballot tabulator, for example. 9/13 Tr. 738:12-19

(Garza). If a poll watcher objects that the poll watcher is not close enough to see or hear, an election worker would be reluctant to disagree for fear of penalties or criminal referral. 9/20 Tr. 1333:7–1335:15 (Longoria).

659.    Harris County lost 600 election workers in March 2022, a substantial turnover of experienced election workers as a result of the tremendous stress and uncertainty caused by SB1's poll watcher provisions. 9/19 Tr. 1187:24–1189:17 (Obakozuwa).

660.    Harris County had had no difficulty recruiting election workers for the 2020 election.  For the 2022 election cycle, by contrast, Harris County had to double its recruiting staff from 20 to 40 to recruit replacements for election workers. *See* Rachelle Obakozuwa testimony at 1186:18–1188:2.

661.    Harris County expects that recruitment and retention of election workers will continue to be a challenge in the future. 9/19 Tr. 1186:18–1189:17 (Obakozuwa).

662.    Plaintiff Jeffrey Clemmons testified that he is concerned about serving as election judge in the future if the poll watcher provisions of SB1 remain in effect. 9/13 Tr. 673:4–674:4 (Clemmons).

663.    Plaintiff Marla López, who previously worked for MFV, served as an election judge in Harris County in the spring 2021 elections, during the pandemic.  Many of the election workers who usually helped were older, and many were monolingual English speakers. Ms. López thought that she could offer help as a Spanish speaker in good health. 10/10 Tr. 3383:7-20 (Lopez). She also served as an election judge in Harris County on election day in 2021. 10/10 Tr. 3383:21–3384:3 (Lopez).

664.    Plaintiff López would not serve as an election judge now that SB1 is in effect. 10/10 Tr. 3386:20-22 (Lopez). She does not understand what poll watchers are allowed to do and

understands that poll workers could sue her or she could be subject to criminal prosecution and have no protection for her as an election judge even if she were acting in accordance with her best training and knowledge. 10/10 Tr. 3386:12-16, 3386:24–3387:6, 3417:18-3418:6 (Marla López). She also is concerned that even if she is in the right, a poll watcher might incorrectly perceive her actions as being against the law and still subject her to a lawsuit. 10/10 Tr. 3417:18-3418:6 (López).

665.    SB1 has caused Ms. López to have greater fear of intimidation by poll watchers because they are allowed to bring lawsuits against election workers and to have free movement in the polling location. 10/10 Tr. 3410:14-20 & 3412:2-12 (López).

666.    Similarly, DST members, particularly Delta DEARS (senior members) have been reluctant to serve as election workers because of poll watcher provisions. Some members who were election judges have been warned by family members not to resume their positions because of fear of poll watchers. 10/2 Tr. 2156:9-19 (Watkins-Jones).

667.    Jonathan White testified that local prosecutors have varied interpretations of the same language within the EC, and when a law is unclear, this uncertainty can play a role in whether a prosecution moves forward because of prosecutorial discretion. 10/16 3981:4–3981:16 (White).

### 4.  *The Poll Watcher Training Mandated by SB1 is Not a Corrective to the Abuses*

668.    The poll watcher training mandated by SB1 §§ 4.04-4.05 is insufficient.

669.    Bexar County EA Callanen testified that the official poll watcher training, available online from SoS, takes approximately 20 to 30 minutes to complete. The first version had no test; the most recent version has a question after every two PowerPoint slides. A person taking the

course can look back at the slides before answering the question that follows them. There is no comprehensive test at the end of the training. 9/19 Tr. 1061:9–1063:9 (Callanen).

670.    Bexar County's training for election judges, by contrast, takes eight hours, in addition to the one-hour SoS training on equipment. There is an examination at the end of the Bexar County's election judge training, and not all candidates pass.  9/19 Tr. 1063:10-23 (Callanen).

671.    A poll watcher downloads a certificate at the end of SoS's training, but does not know how an election is run; they lack the legal training that election judges receive, and they lack the training on the voting equipment. 9/19 Tr. 1063:24–1064:10 (Callanen); *see also id*. 1181:10-18 (Obakozuwa).

672.    Since the enactment of SB1, poll watchers have not notified the Bexar County EA of any irregularities. 9/19 Tr. 1073:2-12 (Callanen).

673.    El Paso County EA Lisa Wise could not recall an instance in which a poll watcher reported an irregularity that was substantiated. 9/11 Tr. 186:7-10 (Wise).

### 5. *SB1's Poll Watcher Provisions Have Exposed Polling Places and Election Offices to Aggressive, Disruptive Poll Watchers*

674.    Since the enactment of SB1, poll watchers have made voters and election workers uncomfortable, and complained of "irregularities" that were not actually irregularities at all. 9/12 Tr. 388:19–392:1 & 401:9–402:14 (Scarpello).  Ms. Callanen testified about poll watchers that "with the advent of the new rule where they had free movement, all of a sudden they were intrusive" and her office received "tons of complaints that the poll watchers were intrusive and the voters felt intimidated because the poll watcher now would come and stand behind them as they were voting." 9/19 Tr. 1070:22-1071:1 (Callanen). Ms. Callanen explained that "we like to think that they have all the privacy in the world, but depending on, you know, how close that vote—the

poll watcher was, it was disturbing." 9/19 Tr. 1070:11-1071:4 (Callanen). And Ms. Obakozuwa testified that with Harris County's voting machines, it is possible that a poll watcher standing behind a voter can see what the voter is marking on their ballot and that after SB 1, her office has seen complaints from poll workers or voters who found poll watchers who were standing close to them. 9/19 Tr. 1178:5-12 (Obakozuwa).

675.    SB1's ambiguous wording has shifted the power dynamics from the election workers to the poll watchers. *See* 9/19 Tr. 1333:14–1335:17.

676.    Poll watchers can now move freely within the polling place, and there is no area that is off limits to them. *See* Remi Garza testimony at 740:11-22.

677.    The entitlement of watchers to sit or stand near enough to see and hear has turned the watchers "intrusive;" there have been "tons of complaints" that voters feel "intimidated because the poll watchers now would come and stand behind them as they are voting." (Callanen, 1070:11–1071:4); see also (Obakozuwa, 1178:5-12).   During the 2022 election cycle, Harris County voters complained about how close the poll watchers were standing to them while they voted, and that poll watchers were reading their ballots. Tr. 1178:9-17; 1179:2-16; 1183:11-20; 1207:5-7 (Obakozuwa).

678.    In the November 2022 election, in Harris County, a poll watcher ordered an assistor to leave the polling place, despite having no authority to do so. 9/19 Tr. 1182:19–1183:10 (Obakozuwa). The Harris County Elections Administrator's Office investigated a complaint from a language assistor affiliated with the Asian American Legal Defense Fund who was prevented from providing critical translation assistance and removed from a polling place by a person she believed was an election worker. 9/19 Tr. 1182:11–1183:10 (Obakozuwa). However, during its

investigation, the County reviewed video footage showing that a poll watcher, not a poll worker, instructed the assistor to leave the polling location. *Id.*

679.    In the November 2022 general election in El Paso County, a poll watcher stood too close to voters needing assistance and had to be told to stand back. 9/11 Tr. 198:8-25 (Wise).

680.    Also during the November 2022 general election, Melissa Rosales, Elections Information & Resources Coordinator for the El Paso County EA's Office, wrote to the EA to advise that an election judge was trying to cope with two poll watchers who were "targeting voters who needed assistance and would stand right behind our voters." LUPE 185

681.    Election workers were forced to confront poll watchers about potential violations of SB1. For example, the Harris County EA received a call from an election worker who said a poll watcher would not stop talking to voters. (Tr. 1179:17–1180:12 (Obakozuwa).

682.    Poll watchers have become partisan.  They are much more intent on supporting their particular party, their particular candidate, or their particular measure, and they are aggressive. Dana DeBeauvoir testimony at 860:3-9.

683.    At a polling site in Bexar County, a watcher told voters they had to show him their ballots before feeding them into the tabulator; the sheriff had to be called. (Callanen, 1071:5-12).

684.    In the 2022 primary elections in El Paso County, a poll watcher got into a box of ballots and law enforcement had to be called.  The election worker who had to deal with the problem was so upset that she contemplated quitting and no longer serving as an election worker (9.12 1563:-20).

685.    In the 2022 primary elections in Dallas County, a poll watcher, along with one of the election judges, opened boxes of ballots at the polling place.  This was not a permitted task for the poll watcher.  The other election judge tried to stop this activity. 9/12 Tr. 387:6-16 (Scarpello).

686.    Also in the Dallas County 2022 primaries, a poll watcher got into a box of ballots, and an election worker confronted the poll watcher to get the poll watcher to stop.   Law enforcement had to be called. 9/12 Tr. 394:24–395:9 (Scarpello). The election worker was so upset, she considered resigning. 9/12 Tr. 395:16-20 (Scarpello).

687.    Some five days after the November 2022 election, the Dallas County EA discovered that a poll watcher had tampered with election records. 9/12 Tr. 406:13-24 (Scarpello).

688.    Poll watchers disrupt end-of-election day procedures. Poll watchers slow down the process for closing the polling place and make the officials very nervous. They follow the election officials in their cars. One official told the Bexar County EA that she w'sn't going to continue doing the work because "she wasn't going to be run off the road into a ditch coming in." 9/19 Tr. 1072:10-23 (Callanen).

689.    In November 2022 in Harris County, there were disruptions of "central count," located at the NRG Arena. As election judges were dropping off ballots and election equipment, poll watchers attempted to stop cars so they could inspect the seals on the ballot equipment. The watchers also took photos of election judges' cars. Harris County officials attempted to remind the watchers that they were supposed to be in the central count area, but the watchers did not comply. *See* Rachelle Obakozuwa testimony at 1184:20–1186:17.

690.    In El Paso County during the March 2022 election, election workers were concerned about poll watchers following them around; the election workers were unsure how they could respond. *See* Lisa Wise testimony at 184:14-25.

691.    During 2022, election workers in Dallas County repeatedly reported that they were very scared and frustrated because of the presence of many poll watchers, and that many voters were being made nervous as well.  The EA's Office could do no more than remind the election

workers that they could face criminal liability under SB1 for interfering with a poll watcher. 9/12 Tr. 399:14–401:3 (Scarpello).

692.    The Dallas County EA's Office advises election workers to refrain from intervening with a poll watcher even when they know a voter is uncomfortable. 9/12 Tr. 401:9–402:14 (Scarpello).

693.    In 2022, the ambiguities in the SB1 poll watcher provisions caused Harris County and Dallas County to advise election workers to err on the side of being more permissive to poll watchers and refraining from intervening to restrain them, even if voters were uncomfortable. 9/19 Tr. 1181:3-9 (Obakozuwa); 9/12 Tr. 402:4–403:16 (Scarpello).

694.    Poll watchers in Harris County refused to comply with requests of election workers to desist from conduct that violated the Election Code. The Harris County EA has advised election workers to consult with the county's "legal line" before engaging with watchers. 9/19 Tr. 1179:17–1180:21 (Obakozuwa).

695.    Nothing can be done to limit poll watchers who make the election officials anxious. 9/19 Tr. 1072:24–1073:1 (Callanen).

696.    Poll watcher complaints have resulted in criminal charges against election workers. A criminal charge was brought against the Guadalupe County EA for obstructing a poll watcher in March 2022 LUPE 182.

697.    A criminal charge was brought against an election judge in Hays County who refused to accept a poll watcher for service in the early voting period of the November 2022 general election. LUPE 183.

### B. SB1's Poll Watcher Provisions Disproportionately Affect Black and Latino Voters

698.    Historically, poll watchers have not been "benign overseers," but have engaged in intimidation, voter challenges, and other harassing behavior toward minority voters. *See supra* FOF §§ III.B, III.C; 10/4 Tr. 2595:19–2596:18 (Tolson).

699.    Some legislators were concerned about SB1's poll watcher provisions because they knew that poll watchers acted in an intimidating manner in Black and Latino communities. (Ex. HAUL-MFV 176 at 21:5-17; 23:16-24:10, (SB1 [8]7th 2nd special, House Select Committee on Constitutional Rights and Remedies Aug. 23, 2021, Hearing Transcript).

700.    Rep. Senfronia Thompson reminded her fellow legislators that in a prior election the King Street Patriots had come into her predominately Black and Latino district in Houston as poll watchers and made voters uncomfortable by hovering over them as they cast their ballots. (HAUL-MFV 176 at 21:5-17).

701.    Rep. Thompson observed that

[O]ne of the King Street Patriots that came to my neighborhood . . . said . . . True vote is what they were concerned about, and they didn't care about whether or not [voters] were being intimidated or not. And I just think that because the right to vote is so sacred and is very important…that people should have a right to have a say in their government without being intimidated by persons who feel like that they may have a different point of view from them on a particular candidate or candidates. And I am concerned that we are giving a lot of authority to poll watchers and we're – and – and if they break the law, we're not doing anything to them.

HAUL-MFV 176 at 23:16-24:10.

702.    Stephanie Gomez of Common Cause Texas, testified in the same hearing;

Common Cause Texas continues to be concerned with the provisions of Senate Bill 1 that grant partisan poll watchers unhinged levels of influence over our elections. Granting poll watchers disproportionate power over our elections will only weaponize our election processes and undermine the bipartisan cooperation between election judges and workers who run our elections. Partisan poll watchers' activities often target Black and brown neighborhoods. There are examples throughout our history, both recent and, like, back in the day. Dating back to at least

2010, there are documented reports of poll watchers in Harris County and other parts of the state intimidating voters, primarily Black and brown voters and election workers at the polls. And most recently in 2020, we saw partisan poll watchers fuel misinformation and distrust in our elections, filing affidavits across the country that did not hold up in court and helping to lay the foundation for the deadly white supremacist attack on our nation's Capitol. Any legislation that would grant u[n]checked power to partisan poll watchers cannot ignore this recent and long history of poll watching being weaponized as a tool for intimidation, misinformation, and partisan gain.

(HAUL-MFV 176 at 204:20-205:21).

703.    SB1's poll watcher provisions have negatively impacted Black and Latino voters. 10/10/23 Tr. 3452:14-19 (Razo); 10/3 Tr. 2191:12–2193:6-22 (Watkins-Jones).

704.    In 2022 in Harris County, aggressive conduct by poll watchers occurred especially in Black and Brown communities. (Longoria, 1324:19–1325:13). After SB1 was enacted, Plaintiff MFV abandoned its program of recruiting election workers in the communities it serves in part because of its concerns about SB1's poll watcher provisions. MFV did not want to put the young Latino community members it was encouraging to volunteer in elections in a situation where they could be accused of wrongdoing. 10/10 Tr. 3452:14-21, Tr. 3455:4-11  (Razo).

705.    SB1 is vague as to the power and freedom to move that poll watchers have, which puts election workers in a risky scenario. Poll watchers can make serious allegations against an election worker, and even an unfounded accusation may harm poll workers even if the investigations don't ultimately result in prosecution or conviction. 10/10 Tr. 3452:24-3453:8 (Razo); 10/10 Tr. 3417:18-3418:6 (López).

706.    MFV is concerned about the long-term impact on the individual who might be accused, and is concerned that it could lose the trust it has built with community members. 10/10 Tr. 3455:12-15 (Razo).

707.    DST member Sharon Watkins-Jones, who is Black, testified to her discomfort during the November 2022 election with poll watchers who were "getting too close, acting as if

they are trying to catch" voters doing something wrong. Ms. Watkins-Jones described a poll watcher who loomed about a foot away from her while she was voting and followed her as she placed her voted ballot into the tabulator. 10/3 Tr. 2191:12–2192:10 (Watkins-Jones). She testified that she "did not feel like [she] had privacy and did not feel as if she had safety or security either as [she] passed [her] ballot." She did not believe that an election worker would be able to help her if the worker had not witnessed the incident. 10/3 Tr. 2193:5–2193:12 (Watkins-Jones); 10/2 Tr. 2156:7-19 (Watkins-Jones).

708.    Ms. Watkins-Jones testified that her experience in November 2022, was "unsettling . . . [because of] the freedom with which the poll watcher could loom behind voters . . . It was a totally different feeling from voting before . . . It reminded me of some of the things that I learned from my parents and grandparents about feeling intimidated or frightened while casting a vote." 10/3 Tr. 2193:6-22 (Watkins-Jones).

709.    The poll watcher provisions of SB1 have also negatively impacted DST members and the organization's ability to pursue its civic engagement mission. Ms. Watkins-Jones testified that "intimidation [because of the poll watcher provisions] has been very real to our members." 10/2 Tr. 2155:9-20 (Watkins-Jones).

710.    The poll watcher provisions of SB1 have deterred DST members, especially Delta DEARS, senior members older than 65, who have served as election workers in the past, from continuing to work at the polls because they fear the poll watchers. *Id.*

711.    DST members who served in the past as election judges have been entreated by their family members after the passage of SB1 not to work on elections anymore because they feared what could happen if the election judges were watched or followed in a vehicle while they were completing their official duties. *Id.*

IX. **SB1'S PROHIBITION OF DRIVE-THRU VOTING BURDENS ALL TEXAS VOTERS AND DISPROPORTIONATELY BURDENS BLACK AND LATINO VOTERS**

A. **SB1's Prohibition of DTV Burdens All Texas Voters**

712.     Together, SB1 §§ 3.04, 3.12, and 3.13 prohibit DTV.

713.     Approximately 128,000 Harris County voters used DTV in the 2020 General Election. (Tr. 1242:5-15 (Longoria); *see also* HAUL-MFV 310 ¶¶ 10, 35 (Smith May 13, 2022 Report) (estimating more than 127,000 voters utilized DTV in Harris County); HAUL-MFV 273.

714.     Of the approximately 1.27 million people who voted early in the November, 2020 election in Harris County, one in ten used DTV. HAUL-MFV 310 ¶ 34; Tr. 1242:16-19 (Longoria); Tr. 2694:8-19 (Smith).

715.     Prof. Smith explained in his May 13, 2022 report that DTV "reduced the cost of voting" for each voter who used it. HAUL-MFV 310 ¶ 34. According to Prof. Smith, because the ban on DTV requires more voters to use traditional voting locations, it creates longer lines and longer wait times, imposing a "time tax" that increases the cost of voting not only for voters who otherwise would have voted via one of the methods that SB1 prohibits, but also those who wish to vote at a traditional early voting site or on Election Day. HAUL-MFV 310 ¶ 75. Prof. Smith explains that long wait times "can cause reneging, that is, voters leaving a slow-moving line, or balking, that is, not joining the line in the first place upon observing a long queue." HAUL-MFV 310 ¶ 79. One study of the 2012 general election estimates that there were between 500,000 and 700,000 "lost votes" because of long lines. *Id*. Prof. Smith describes that long lines can also have "downstream electoral effects," discouraging voters from voting in future elections. *Id*. (citing study showing "that voters who spend more time waiting in line at the polls in a given election—that is, as the

cost of voting becomes more onerous—their likelihood of turning out in a future election decreases").

716.    Voters overwhelmingly reacted positively and with excitement to the option of DTV; many would not have voted had it not been for this option. 9/19 Tr. 1155:6-21 (Obakozuwa); *see* 9/20 Tr. 1254:4-22 (Longoria).

717.    Corisha Rogers of Houston testified on August 23, 2021 before the Texas Senate State Affairs Committee:

> I'm here on behalf of Houstonians who are not able to attend today, who as time and time again, we are having to fight against this bill that is restricting access to our democratic process in an era that we need to make it more accessible . . . Allowing this bill to pass will hurt the people who work multiple jobs to make ends meets and to try to have their voice heard. I'm here on behalf of a personal experience of contracting COVID last summer and still want to be able to vote safely out of fear of ever catching it again or passing it onto someone who couldn't recover as well as I was. And that was by using the drive-thru voting method.

(HAUL-MFV 178 at 11:10).

718.    Also on August 23, 2021, Claudia Yoli Ferla, Executive Director of MOVE Texas Action Fund, testified before the Texas Senate State Affairs Committee.  She described her organization as "working to build the political power of young people in our state…to serve millennials and Gen-Zers who in Texas comprise the largest and most diverse piece of the electorate and who shattered turnout records in the most recent presidential elections." (HAUL-MFV 178 at 65:12-23). Ms. Ferla continued:

> Instead of focusing on the real issues, you continue to prioritize some of the most restrictive voting rights legislation filed in the country. From giving partisan poll watchers special rights to intimidate young voters and banning drive-thru voting, it couldn't be more clear that the number-one priority in your anti-democratic playbook is to suppress the power of young Texans. Thousands of us have shown up during the regular sessions to testify, protest and speak out against bad voting bills.

*Id.* at 66:9-21.

719.    Theresa Boisseau of Texas Rising testified before the Senate State Affairs Committee on August 23, 2021 that "banning drive-thru voting takes the rights from some of our elders and some of our disabled. Are they not proud Texans? Should they not have the right to vote?" *Id.* at 69:18-24.

720.    Deion Dorsett testified before this Court that eliminating DTV sends the message "that we don't want everyone to be a part of the process. I can only conclude that . . . when you start taking things off the table after it has been proven to work…." (Tr. 2297:17–2298:1 (Dorsett).

### B. SB1's Prohibition of DTV Has Racially Disparate Impacts

721.    More than 77,000 minority voters used DTV in the November 2020 general election in Harris County, while approximately 48,000 non-Hispanic white voters used DTV. Tr. 1970:25–1971:6; LULAC Ex. 2, at 13, tbl. 4.

722.    Prof. Smith explained in his May 13, 2022 report that DTV "reduced the cost of voting" for each voter who used it. HAUL-MFV 310 ¶ 34.

723.    Minority voters disproportionately relied on DTV during the November 2020 general election. HAUL-MFV 310 at ¶ 52; LULAC Ex. 2, at 13, Table 4.

724.    As described above, ¶¶____-____, Prof. Smith used multiple different methods of empirical analysis that each led to the same conclusion: "Black and Hispanic registered voters in Harris County were more likely to utilize DTV than White registered voters in the 2020 General Election." HAUL-MFV 310 ¶¶ 38, 52.

725.    With respect to Black voters, Prof. Smith found that "the greater the rate of Black VAP in a Census block, the greater the rate of DTV utilized by early in-person voters in that Census block." HAUL-MFV 310 ¶ 41; HAUL-MFV 402, at 16.

726.    With respect to Hispanic voters, "voters in Census blocks with higher rates of Hispanic VAP were more likely to utilize DTV than voters in other Census blocks." HAUL-MFV 310 ¶ 42. HAUL-MFV 402, at 18.

727.    As the percentage of white VAP in a Census block increased, by contrast, the rate of DTV usage decreased.  HAUL-MFV 402, at 17.

728.    In addition, Prof. Smith found that "the rates of DTV ballots cast by early in-person voters in nearly homogeneous Black and Hispanic precincts in Harris County were consistently greater than the rates of those in nearly homogeneous White precincts." HAUL-MFV 310 ¶ 46.  ¶ 46.  SB1's ban on DTV creates "greater downstream pressures" on Black and Latino voters, who must now vote at traditional sites, creating longer lines and wait times for Black and Latino voters, who already experience longer wait times at the polls. HAUL-MFV 310  ¶ 85; HAUL-MFV 310 ¶¶ 75-76 (describing the "ample scholarly evidence that Black and Hispanic voters face longer wait times when casting a ballot in person," including one study that "estimate[s] that voting locations that are predominantly Black or non-white are associated with wait times that are approximately twice as long as those in predominantly White locations." HAUL-MFV 310 ¶ 76. Prof. Smith's analysis of wait times using the Spanish surname tag demonstrates empirically that Latino voters faced longer wait times at in-person early voting locations in 2020 than non-Hispanic voters. HAUL-MFV 310 ¶¶ 80-86.

729.    Analyses by Prof. Kenneth Mayer confirm Prof. Smith's conclusions. Using Bayesian Improved Surname Geocoding to infer race at the individual level, Prof. Mayer concluded that, to a statistically significant degree, voters of color disproportionately relied on DTV compared to non-Hispanic whites. 10/2 Tr. 1958:15-20 &  1971:22–1972:9 (Mayer).

730.    Although 53.5% of all in-person early voters were non-Hispanic white, only 38.1% of DTV voters were non-Hispanic white, while nearly 62% of DTV voters were non-white.  Non-white voters represented approximately 46.5% of early in-person voters. *Id.* 1970:11–1971:4 (Mayer); *see* LULAC Ex. 2, at 13, tbl. 4.

731.    These experts' work confirms the conclusions of the Harris County Clerk's Office, presented to the legislature during the hearings concerning SB1, that Black and Hispanic voters were more likely than white voters to use DTV. HAUL-MFV 273, Exs. 6, 13; HAUL-MFV 274, Exs. 6, 13; 9/20 9/20 Tr. 1352:25–1353:11 (Longoria). Similarly, Black and Hispanic voters were more likely to use DTV than they were to use other methods of early voting. 9/20 Tr. 1256:10–121 (Longoria).

## X.    SB1'S PROHIBITION OF 24-HOUR VOTING BURDENS ALL TEXAS VOTERS AND DISPROPORTIONATELY BURDENS BLACK AND LATINO VOTERS

### A.    SB1's Prohibition of 24-Hour Voting Burdens All Texas Voters

732.    Together, SB1 §§ 3.09 and 3.10 prohibit 24-hour voting by restricting the scheduling of early and late voting hours.

733.    Prior to SB1, early voting polling places were required to remain open during the hours the county clerk or city secretary's main business office was regularly open for business. Counties with more than 1,000 registered voters were required to remain open for at least eight hours. *See* EC § 85.005(a)-(b) (2020); 9/20 Tr. 1261:13-21 (Longoria). There was no maximum number of hours a polling place could remain open on a given day for early voting. *See* EC § 85.005 (2020) (taking subsections (a) and (b) together to mean polling places must remain open for a minimum of eight hours).

734.    In the 2020 elections, Harris County offered "24-hour voting," operating eight of its polling locations for 36 hours straight during the last two days of early voting; those locations opened at 7 a.m. on October 28, 2020, remained open through the night, and closed the next day, October 29, at 7 p.m.  9/20 Tr. 1262:25–1263:3 (Longoria).

735.    The Harris County Clerk intended 24-hour voting to expand voting opportunities and accessibility for individuals who had multiple jobs, extended work hours, or childcare obligations. 9/20 Tr. 1260:8–1261:2 (Longoria); 9/19 Tr. 1154:24–1155:5 (Obakozuwa). Among those who took advantage of 24-hour voting were nurses, ambulance drivers, doctors, warehouse workers, performers, and "a wide variety of people who usually sleep during the day and work at night."  9/19 Tr. 1157:23-1158:2 (Obakozuwa).

736.    Isabel Longoria testified that the unavailability of 24-hour access to voting in the March 2022 elections meant that "People literally could not vote." 9/20 Tr. 1269:22-24 (Longoria). She continued,

> … [W]e've got the Port of Houston, and talking about folks who work 24 hours, that was the number six busiest coast activity location, you just 'an– -- you know, I hear a lot of, yes, there is a law on the books that says your employer is supposed to allow you to go vote and you are supposed to ask for that time off, et cetera, but if 'ou're working at the Port of Houston, a longshoreman, et cetera, there is not a culture of being able to ask for 30 minutes off.
>
> Most employers 'on't even [know] about those laws, so people, and I get it, 'on't want to risk their job and livelihood to upset a manager to go vote, you know, for 30 minutes or an hour, so I think the lack of 24-hour means there are people, again, whose lives, even just kids or parents with kids who cannot physically get there, and, you know, without risking their job, or their livelihood, or something else, so I think the lack of this opportunity at least once per election stops people from voting.
>
> 9/20 Tr. 1270:1-18 (Longoria).

737.    Yvonne Ramón, Hidalgo County EA, testified that Hidalgo County could benefit from 24-hour voting because there are lines at the polls at the early voting closing time. See 10/3

Tr. 2338-39 (Ramón). According to Prof. Smith, because the ban on 24-hour voting requires more voters to use traditional hours, it creates longer lines and longer wait times, imposing a "time tax" that increases the cost of voting not only for voters who otherwise would have voted via one of the methods that SB1 prohibits, but also those who wish to vote at a traditional early voting site or on Election Day. HAUL-MFV 310 ¶ 75. Prof. Smith explains that long wait times "can cause reneging, that is, voters leaving a slow-moving line, or balking, that is, not joining the line in the first place upon observing a long queue." HAUL-MFV 310 ¶ 79. One study of the 2012 general election estimates that there were between 500,000 and 700,000 "lost votes" because of long lines. *Id*. Prof. Smith describes that long lines can also have "downstream electoral effects," discouraging voters from voting in future elections. *Id*. (citing study showing "that voters who spend more time waiting in line at the polls in a given election—that is, as the cost of voting becomes more onerous—their likelihood of turning out in a future election decreases").

738.    El Paso County EA Lisa Wise testified that her county had considered using 24-hour voting and was not concerned about fraud because voting can be conducted the same way at all hours. EA Wise believes that keeping polls open longer makes them more accessible. See Lisa Wise testimony at 276-77.

### *B.*   SB1's Prohibition of 24-Hour Voting Has Racially Disparate Impacts

739.    The Harris County EA found that more voters who used 24-hour voting lived in State Senate Districts that were Black majority, Hispanic majority, or mixed race; 9/20 Tr. 1352:7-9 (Longoria); and that voters aged 18-30 were "the most likely to use 24-hour voting."  9/20 Tr. 1268:13-14 (Longoria).  Isabel Longoria testified that, with 24-hour voting "we had finally tapped into something that would get young Latinos voting."  9/20 Tr. 1268:15-17 (Longoria).

740.    Prof. Smith analyzed the use of 24-hour voting by race and ethnicity in his May 13, 2022 expert report. HAUL-MFV 310 ¶¶ 53–61; HAUL-MFV 402, at 24-27.

741.    SB1 limits early voting to the hours to 6 a.m. to 10 p.m.  Accordingly, Prof. Smith analyzed ballots cast at the eight 24-hour voting sites between 10 p.m. and 6 a.m. during the one night, October 28-29, 2020, that Harris County offered 24-hour voting. HAUL-MFV 310 ¶ 55. He found that 1,490 voters cast ballots during this time period. HAUL-MFV 310 ¶ 55; HAUL-MFV 402, at 24.

742.    Prof. Smith found that, "as the percentage of Black VAP in a precinct increases, so too does the percentage in the precinct who [used 24-hour voting]." HAUL-MFV 310 ¶ 57 & fig. 4; HAUL-MFV 402, at 25; Tr. 2712:8-12 (Smith).

743.    Prof. Smith further found that "as the percentage of Hispanic VAP in a precinct increases, so too does the percent of voters in the precinct who [used 24-hour voting]." HAUL-MFV 310 ¶ 59 & fig. 5; HAUL-MFV 402, at 26; Tr. 2712:8-12 (Smith).

744.    Correspondingly, as the share of the white, non-Hispanic population increased in a precinct, that precinct's share of votes cast by 24-hour voting in the 2020 general election went down. (HAUL-MFV 402, at 27 & Tr. 2713:9-14 (Smith).

745.    As Prof. Smith emphasized, his analysis of 24-hour voting by race is "very conservative":  the denominator in his calculations is *all* in-person early voting ballots cast during the early voting period, rather than just those cast during the two days when 24-hour voting was available (October 29-30, 2020). HAUL-MFV 310 ¶ 60.

746.    Prof. Smith concluded that "Black and Hispanic voters in Harris County were more likely to utilize after-hours voting than White voters in the 2020 General Election." HAUL-MFV 310 ¶ 61. SB1's ban on 24-hour voting creates "greater downstream pressures" on these voters, who must now vote during traditional hours, creating longer lines and wait times for Black and Latino voters, who already experience longer wait times at the polls. HAUL-MFV 310 ¶ 85;

HAUL-MFV 310 ¶¶ 75-76 (describing the "ample scholarly evidence that Black and Hispanic

voters face longer wait times when casting a ballot in person," including one study that "estimate[s]

that voting locations that are predominantly Black or non-white are associated with wait times that

are approximately twice as long as those in predominantly White locations." HAUL-MFV 310 ¶

76. Prof. Smith's analysis of wait times using the Spanish surname tag demonstrates empirically

that Latino voters faced longer wait times at in-person early voting locations in 2020 than non-

Hispanic voters. HAUL-MFV 310 ¶¶ 80-86.

> Prof. Mayer confirms that, to a statistically significant degree, "24-hour early voting was
> . . . relied on disproportionately by voters of color compared to non-Hispanic whites."
> 10/2 Tr. 1969:10–17 & 1973:6–12 (Mayer); LULAC Ex. 2, at 13-14. Prof. Mayer's
> analysis of voter turnout on October 28-29, 2020 between the hours of 10 p.m. and 6 a.m.
> (the hours that SB1 now forbids voting to take place) shows that white voters, who were
> 52.1% of those who voted early during regular hours, were  40% of the overnight voters,
> while the participation of Black voters (19% of regular hours early voters) jumped up to
> 25.1% of the 24-hour turnout, and Hispanic voters (22.1% of regular hours early voters)
> were 28.9% of 24-hour voters. ___Tr. 1972:19-25 (Mayer); LULAC Ex. 2, at 15, tbl. 5.
> Prof. Mayer also performs an analysis showing that Black and Latino voters are more
> likely than white voters to vote later in the day, and are thus more likely to wait in longer
> lines because wait times tend to be longest later in the day. LULAC 2, at 10-1

747.   2.

## XI.   SB1's RESTRICTIONS ON THOSE WHO ASSIST VOTERS BURDEN ALL TEXAS VOTERS WHO NEED ASSISTANCE AND DISPROPORTIONATELY BURDEN BLACK AND LATINO VOTERS

748.   SB1 §§ 6.01, 6.03-6.05, 6.07 place restrictions on people who provide assistance to

voters.

749.   SB1 § 6.01 requires a person who "simultaneously" provides transportation to the

polls for seven or more curbside voters to complete and sign a form disclosing personal

information and entitles "a poll watcher is entitled to observe any activity conducted under this section."

750.    SB1 § 6.03 requires a person providing voting assistance to complete a form disclosing personal information, their relationship to the voter, and whether they received any compensation. SB1 § 6.05 requires a person who assists a mail-in voter to provide the same information on the voter's BBM carrier envelope, and SB1 § 6.07 mandates that BBM carrier envelopes include spaces to enter assister information.

751.    SB1 § 6.04 requires assisters to swear an oath under "penalty of perjury" that the voter represented to the assister that he or she is eligible to receive assistance, that the assister did not pressure or coerce the voter into choosing them, that the assister will not communicate how the voter has voted to another person, and that the assister understands that if assistance was provided to someone not eligible for assistance, the voter's ballot may not be counted.

752.    Violations of SB1 §§ 6.04 or 6.05 may be charged with a state jail felony and the assisted voter's ballot may be rejected.

753.    Plaintiffs incorporate by reference The Arc of Texas's Proposed Findings of Fact describing the negative effects of SB1 §§ 6.01, 6.03-6.05, 6.07 (the "assistance provisions") upon organizational Plaintiffs The of Arc and DST, upon voters with disabilities, and upon voters who need language assistance.[19]. Plaintiffs also incorporate by reference Plaintiffs' Proposed Findings of Fact on Section 208 of the Voting Rights Act.

754.    Members of DST who are over 65 years old and have disabilities experience greater challenges receiving assistance at the polls because the onerous form and disclosure requirements of SB1 § 6.03, deter DST's members who would assist them. 10/2 Tr. 2110:3-11 (Brown).

---

[19] These can be found in Sections V.A.; V.C.1-2; V.D.1-2; VF1-2; V.G.; V.H.; V.I.1-2; and V.J. of the Proposed Findings of Fact submitted by the Arc of Texas.

755.    In addition, SB1 § 4.12 negatively affects DST's members and voters in the communities it serves by complicating the process for delivering BBMs in person. In the 2020 general election, DST members delivered BBMs to county Early Voting Clerks to assist voters unable to make the delivery themselves. (Tr. 2107:16–2108:1 (Brown).  Under SB1, this type of assistance can no longer be provided.

756.    Plaintiffs incorporate by reference The Arc Texas's Proposed Findings of Fact Sections V.C.3; V.D.3; ¶235; V.F.3; V.I.3] as well as Plaintiffs' Proposed Findings of Fact on Section 208 of the Voting Rights Act on the effects of SB1's assistance provisions on assisters.[20]

757.    Michelle Brown testified that SB1 § 6.01 raises serious concerns for DST members who provide transportation assistance. 10/2 Tr. 2108:7-23 (Brown). Members are worried about who may gain access to the personal information disclosed on the forms required under SB1 § 6.01. 10/2 Tr. 2108:7-23 (Brown). The history of race-based intimidation by poll watchers makes DST's members concerned that filling out the form will invite harassment, or worse.  10/2 Tr. 2108:7-23 (Brown).

758.    Members of DST's Fort Worth Alumnae Chapter routinely provided transportation to the polls for elderly voters at Fort Worth's Friendship Senior Center. Under SB1, the members are no longer willing to provide this assistance. 10/ 3 Tr. 2196:21–2197:17, 2198:20-24 (Watkins-Jones).

759.    Sharon Watkins-Jones testified that the Austin Alumnae Chapter of DST also stopped providing transportation to the polls for elderly and disabled individuals.  The Chapter was chilled from helping voters by SB1 § 6.01's disclosure requirements and by other provisions,

---

[20] These can be found in Sections V.C.3; V.D.3; ¶235; V.F.3; V.I.3 of the Proposed Findings of Fact submitted by the Arc of Texas.

such as the oath of assistance, that menace assisters with criminal liability. 10/2 Tr. 2147:12–2148:3 (Watkins-Jones).

760.    Prior to SB1, DST members had assisted voters who cast their vote in person. SB1's § 6.03 form and disclosure requirements have caused DST members to decline to participate in their organization's voter assistance activities and to provide in-person assistance. *See* 10/2 Tr. 2124:11-16 (Brown); 10/3 Tr. 2199:9–2200:3 (Watkins-Jones).

761.    The Austin Alumnae and Bay Area-Houston Chapters of DST have been unable "to recruit members who are brave enough to assist with senior voters [with transportation to the polls] because of the fear[] of criminal penalties." 10/3 Tr. 2198:2-6 (Watkins-Jones)

762.    SB1 §§ 6.05 & 6.07 deter DST members from helping mail-in voters because these provisions threaten assisters with criminal liability for failing to meet certain disclosure requirements or violating the oath set forth in SB1 § 6.04. 10/3 Tr. 2202:9-14 (Watkins-Jones). SB1 § 6.05 incorporates SB1 § 6.04, moreover, and DST members are deterred by the "under the penalty of perjury" language of the oath. 10/2 Tr. 2110:12–2111:1 (Brown). DST chapters have had difficulty recruiting members who are willing to place themselves at risk to provide assistance. 10/3 Tr. 2203:10-15 (Watkins-Jones).

763.    Mi Familia Vota serves voters who are limited English proficient, low-literate, or both, and require assistance to vote. 10/10 Tr. 3438:11-13, 3450:6-13, 3451:22-3452:2, 3455:24-3456:5 (Razo), 10/10 Tr. 3382:3-25, 3383:1-3, 3391:1-7 (López). More than other groups, Latino voters are more likely to require language assistance. 10/10 Tr. 3450:8-13 (Razo). According to Census data, 26.89% of Latinos in Texas speak English "less than very well," compared to 1.1%

of Anglo Texans.[21] Some of these voters require assistance reading and understanding the ballot, communicating with election workers, and also physical assistance to navigate the polling locations, but cannot afford to pay caretakers or attendants to meet their everyday needs. 10/10 Tr. 3455:24–3456:5, 3457:7-11 (Razo). Elderly voters who qualify to vote by mail also require assistance and may be facing language limitations. 10/10 Tr. 3449:23–3450:13 (Razo). Due to SB1, assisters and voters are concerned about the new oath requirements. 10/10 Tr. 3456:16-24 (Razo). Therefore, Mi Familia Vota no longer encourages voters to use trusted assisters to help them vote. Instead, Mi Familia Vota tries to provide significant additional support to voters who qualify for assistance before they go to the polls or vote by mail, to limit the likelihood that they will need to rely on the assistance for which they qualify. 10/10 Tr. 3456:25–3457:6 (Razo).

764.    Marla López testified that because of SB1, she was deterred from providing language assistance to voters who were qualified for such assistance. During the 2022 primary elections, Ms. López was working for Mi Familia Vota when she received a call from an elderly monolingual Spanish-speaking couple on the Mi Familia Vota voter hotline. They did not know how to find a voting location. Ms. López visited them in person to walk them over to the polling location. The couple asked Ms. López to provide them with language assistance while voting, but because of SB1, Ms. López declined. She did not want to sign the oath, provide personal information, and risk being sued or prosecuted because she didn't understand the law. 10/10 Tr. 3382:2-3383:3 (López).

---

[21] American Community Survey 2022 1-year Summary, Table S0201 – Texas, available at https://data.census.gov/table?text=s0201&t=001:005:400:451&g=040XX00US48. The Court may take judicial notice of Census data. *See supra* n.9.

765.    Plaintiffs incorporate by reference The Arc of Texas's Proposed Findings of Fact describing the effects of SB1's restrictions on the voter assistance provided by county election officials.[22]

766.    During the 2022 election cycle, the Harris County EA received complaints from voters with disabilities who were unable to obtain the assistance they needed to vote. 9/19 Tr. 1172:1-4 (Obakozuwa). Harris County voters and assisters notified the EA that they were deterred from being assisted or providing assistance by the oath requirements. 9/20 Tr. 1310:6–1312:23 (Longoria).

767.    The oath required by SB1 § 6.04 can create problems for a disabled voter whose chosen assister is undocumented or unable to register to vote.  Such an assister might be concerned about making such an oath and entering personal information on a government form. *See id*. 1310:6–1311:1 (Longoria).

768.    The requirement of SB1 § 6.04 that the assister swear that the voter being assisted is eligible to receive assistance and that the assister did not coerce or pressure the assister into accepting the assistance may encompass innocent efforts by, for example, family members to assist a voter in understanding a particular race. Potential assisters will hesitate to help, especially as SB1 also permits poll watchers free movement around polling places. *See id*. 1312:16–1314:9. The Hidalgo County EA noted that her office had received no guidance from SoS concerning would constitute "pressure" in the context of the assister oath. *See* 10/3 Tr. 2316:21–2317:7 (Ramón).

769.    Election officials cannot waive SB1's ABBM or mail vote ID requirements to accommodate a disabled person. They also cannot waive SB1's assister oath requirement for a

---

[22] These can be found in Sections V.C.4; V.D.4; V.F.4 of the Proposed Findings of Fact submitted by the Arc of Texas.

disabled person. *See* 9/19 Tr. 1171:8-18 (Obakozuwa); 9/20 Tr. 1312:12-15, 1317:4-10 (Longoria).

770.    Plaintiffs incorporate by reference The Arc Texas's Proposed Findings of Fact Section VI on the cumulative impact of the assistance provisions.

771.    The assistance provisions individually and cumulatively impact voter assistance. All of Plaintiff DST's GOTV activities – transportation assistance for seniors, voting in-person assistance, and help with casting a mail ballot –are separately and cumulatively inhibited by the assistance provisions.

772.    Jennifer Martinez testified that members of The Arc of Texas are harmed by the cumulative impact of the burden caused by the assistance provisions because assisters are fearful of aiding its members. 10/11 Tr. 3516:9-19, 3517:9-15 (Martinez). "The cumulative effect of [the] difficulty of navigating filling out additional forms, having assisters sign documents that can make them criminally liable, those are all things that have a sort of freezing effect on the assisters' interest in supporting our members." 10/11 Tr. 3516:13-17 (Martinez).

## XII.    SB1's RESTRICTIONS ON IN-PERSON DELIVERY OF BBMs MAKE VOTING BY MAIL MORE DIFFICULT FOR ALL MAIL VOTERS AND DISPROPORTIONATELY BURDEN BLACK AND LATINO VOTERS

773.    Pursuant to SB1 § 4.12 (EC § 86.006(a-2), only the voter himself or herself may deliver the voter's BBM in person, and the voter must present identification to the election official who receives the ballot, who in turn must record the voter's information on a log.

774.    A voter who has completed a BBM may deliver it in person to the Early Voting Clerk only on Election Day while the polls are open. The voter must present an ID as if voting at a polling place, even though the BBM carrier envelope will still be reviewed for the required

identification numbers, and will be rejected if the number on the carrier envelope does not match the number listed for the voter in TEAM. (Adkins, 1852:23–1854:9).

775.    If a voter does not present ID when delivering his or her BBM to the Early Voting Clerk, the BBM will not be counted. The instructions for SoS Form 5-6, "Signature Roster-Election Day Hand Delivery of Ballot by Mail," provide, *inter alia*:

> If the voter does not have an approved form of ID to complete the Ballot by Mail hand-delivery process, he or she can return home and obtain one or go to an Election Day voting site and surrender the Carrier Envelope to vote in person. There is no provisional voting process for a hand-delivered Ballot by Mail.

> If the voter insists on leaving the Carrier Envelope without presenting an approved form of ID, the ballot will be treated as a ballot not timely returned and therefore, not counted.

State Ex. 211 (SoS Form 5-6: SIGNATURE ROSTER – ELECTION DAY HAND DELIVERY OF BALLOT BY MAIL Instruction #7). Thus, voters who deliver their BBMs in person are subject to an additional identification hurdle that can result in their ballot being rejected.

776.    By contrast, a voter who returns a completed BBM through the mail or a common or contract carrier is not required to present an ID and may also return BBMs completed by other voters. EC § 86.006(a).

777.    When a voter has delivered a BBM in person, the BBM remains in its carrier envelope and is turned over to the Early Voting Ballot Board for matching of the identification numbers, even though the voter presented his or her ID to the election official as if voting in person at a polling place. Thus, voters who deliver their BBMs in person and are satisfactorily identified by the receiving election officer will nonetheless have their BBMs rejected if their carrier envelope information is incomplete or does not match the numbers in SoS's records. (Callanen, 1052:21–1055:17). In addition, a person cannot submit a BBM for anyone else, even though BBMs received by mail and BBMs delivered in person are handled in the same way. (Callanen, 1052:21–1055:17).

778.    In Harris County, the single BBM drop-off location is in downtown Houston, located on a busy road with no free parking, making it difficult for voters to park, go inside, and engage in the cumbersome drop-off process, which each voter can only do for his or her own BBM. Many voters who would choose to vote that way do not want to drive downtown. *See* Rachelle Obakozuwa testimony at 1162:14–1163:10.

779.    Limiting drop-off locations and complicating the drop-off process impact racial groups differently. Black and Latino bear a disproportionate burden due to SB1's drop-off location provisions. HAUL-MFV 310 ¶¶ 65–71. Because Black and Latino voters are generally more likely to have their mail ballots rejected, and thus have greater need to drop off their mail ballots before the submission deadline, SB1's restrictions on drop-off locations have a disproportionate impact on those voters. HAUL-MFV 310 ¶ 65. With only one available drop-off location in many counties, these voters may have to travel long distances, wait in longer lines, and expose themselves to greater potential health risk to drop off their ballots. HAUL-MFV 310 ¶¶ 66–69. Plaintiffs' expert Dr. Eric McDaniel opined that Hispanic Texans were more likely to drop off their absentee ballots at a specified location as opposed to using the mail. Almost one quarter of Hispanic voters submitted their absentee ballots at polling places or elections centers, compared to 17% of white voters and 18.5% of Black voters. *See* HAUL-MFV 333 at 12.

## XIII.    SB1'S RESTRICTIONS ON DISTRIBUTION OF ABBMS BURDEN ALL TEXAS VOTERS AND PLACE DISPROPORTIONATE BURDENS ON BLACK AND LATINO VOTERS

### A.  SB1's Restrictions on Distribution of ABBMs Burden All Texas Voters

780.    SB1 § 5.04 forbids County Clerks and EAs to distribute an ABBM a person who did not request one, while permitting political parties to do so.

781.    SB1 § 7.04 makes it a "state jail felony" for an election official to solicit submission of an ABBM from a person who did not request it, to distribute an ABBM to someone who did not request it, or to use public funds for such distribution.

782.    A state jail felony is punishable by a jail sentence of 6 months to 2 years, or a term of probation if the defendant has no prior record. (Tr. 3996:17-21 (White).

783.    The Dallas County EA understands SB1 §§ 5.04 & 7.04 to prohibit his office from sending out ABBMs to voters who have not requested them. Before SB1, the office had planned to send ABBMs to make voting by mail easier for voters. (Tr. 188:6-23 9/12 Tr. 427:6-20 (Scarpello).

784.    For many years prior to the enactment of SB1, the El Paso County EA sent an ABBM with a letter in January to each voter aged 65 or older who had voted an annual BBM during the preceding year to invite the voter to sign up for an annual BBM. 9/12 Tr. 261:10-18 (Wise).  After SB1 became effective, the El Paso County EA decided, based on advice of counsel, not to risk violating the anti-solicitation provisions of SB1 §§ 5.04 & 7.04 by writing to prior-year BBM voters to advise them they could request ABBMs.  9/12 Tr. 265:6–266:11 (Wise). The office received many calls from voters asking why they had not received their ABBMs, and answered those calls by explaining that SB1 no longer allowed the EA to send ABBMs proactively, but that voters had to request them. *See* Lisa Wise testimony at 263:16–267:9. The El Paso County EA also felt that she had to be cautious about what she told voters about mail ballots to avoid violating SB1, and whereas before she was comfortable encouraging voters to ask for an ABBM, she no longer feels she can do so.  9/12 Tr. 266:22-267:9 (Wise).

785.    Similarly, the Hidalgo County EA used to distribute ABBMs to all voters over 65, but now must be "very careful" about mailing out ABBMs. That office no longer allows voters to pick up ABBMs for their spouses. Tr. 2331-33 (Ramón).

786.    Before SB1, the Bexar County EA's office distributed ABBMs to voters, civic organizations and church groups. Now, the office can give an ABBM only to the individual voter who requests one. The Bexar County EA testified that formerly the county could send multiple ABBMs if a voter requested them on behalf of family members; now, the county may only send one to the voter who asked for it. Voters lose time that they might have had to submit their ballots. *See* 9/19 Tr. 1041:5-25 (Callanen).

787.    The Bexar County EA testified that SB1 §§ 5.04 & 7.04 required her to tell a mother who requested an ABBM for her paralyzed son, who could not speak on the phone, that her office could not provide that ABBM. *Id.* 1042:7-20 (Callanen).

788.    SB1 §§ 5.04 & 7.04 prevent distribution of ABBMs to legal voters, civic groups and church groups.  Meanwhile, this prohibition does not apply to political parties, which remain free to distribute ABBMs.  9/12 Tr. 267:10-20 (Wise); 9/19 Tr. 1042:23–1043:17 (Callanen).

789.    The prohibition in SB1 § 5.04 and the felony imposed by SB1 § 7.04 do not make Texas safer from fraud in any way; 9/19 Tr. 1045:19-25 (Callanen); however, they have made it more difficult for Texans to vote.  9/19 Tr. 1046:1-7 (Callanen).

790.    The Harris County EA made ABBMs available to community organizations prior to SB1.  Now, this is illegal. Organizations continue to request ABBMs; such requests now must be rejected.  9/19 Tr. 1161:23–1162:13 (Obakozuwa).

791.    The Harris County EA would have continued mailing ABBMs to eligible voters if SB1 had not prohibited it. Political campaigns often send ABBMs to voters, including multiple

ABBMs and ABBMs that are incorrect, with boxes marked that should not be marked, or that set forth incorrect information. Voters prefer an official ABBM from the government, as more secure and reliable.  9/20 Tr. 1275:23–1277:15 (Longoria). These restrictions in SB1 magnified the negative impact of SB1's mail ballot votIr identification requirements.  For example, the Harris County EA considered sending voter education programs encouraging voters to insert all their identification numbers on the ABBM and BBM forms, but the office was concerned, because of the provision forbidding solicitation of ABBMs, that such education might count as solicitation.  9/20 Tr.1284:2-22 (Longoria).

792.    Because the Harris County EA is no longer able to mail ABBMs to eligible voters or make ABBMs available to community organizers to provide to their communities, community organizations must either take the cost on themselves, or the eligible voters in their communities will lose an important source of information about their vote-by-mail options. MFV used its own, already limited financial resources that it would not otherwise have used to send mailers to people over 65 years of age in the communities it serves because Harris County no longer could do so. 10/10 Tr. 3451:2-12 (Razo). MFV could afford to send these mailers only to eligible voters in Harris County, and was not able to provide this important information to voters in other counties, whose election officials are also prohibited from sending ABBMs to eligible voters.

793.    Before the March, 2022 primary elections, Texas Lieutenant Governor Patrick sent numerous unsolicited ABBMs to voters.  The return address on those ABBMs was that of the SoS.  An ABBM, however, is properly addressed to the voter's County Clerk or EA.  (Tr. 267:21–268:8 (Wise).

794.    El Paso County stopped sending automatic reminders to people to request their ballots by mail for the year, as SB1 §§ 5.04 & 7.04 now makes it illegal to do so. The County

elected to err on the side of caution and not send letters informing people that they could submit ABBMs. The El Paso County EA's Office received many calls from voters who wanted the official county form. These voters said, in substance, "We'don't want to give this Candidate So-and-so or this party our information, whether that's public or not, which in our office most of that is public, but they 'idn't want to use this candidate's application, and they 'idn't want to use that candidate's application, and they are used to using our form."  Tr. 268:10-24 (Wise). Ms. Wise is afraid to tell voters to "call us to apply," or to give someone eligible an application.  The threat of criminal liability has caused the office to limit its statements to: "there is an application on our website." 9/12 Tr. (24-28) (Wise).

795.    Approximately 179,000 voters in Harris County filed BBMs during the November 2020 election. HAUL-MFV 273; 9/20 Tr. 1273:6-18 (Longoria). This represented an increase of nearly 70,000 mail voters from the 2016 election. HAUL-MFV 273, Ex. 3 (comparing number of mail voters in each Senate district in Harris County in 2016 with same number in 2020).

796.    El Paso County EA's office has not experienced any issues of voter fraud associated with not requiring voters to provide their driver's license or social security numbers on mail ballots. 9/12 Tr. 244:10-14 (Wise).

797.     Before SB1, the Travis County clerk was not aware of anyone trying to return a mail ballot for someone else fraudulently claiming it was their own. 9/14 Tr. 1296:3-7 (DeBeauvoir).

798.    The assistant director of the Travis County Elections Division could not identify a single incidence of ID matching uncovering evidence of fraud. 9/21Tr. 1526:8-10 (Johnson).

799.    Elections expert Kennth Mayer concluded that the provisions of SB1 did not contribute to increased election security and there is no evidence of any material level of voter fraud that SB1 could have addressed.  10/2 Tr. 1959:5-14 (Mayer).

800.    Ms. Longoria testified that she was not aware of any incidents of fraud involving the distribution of ABBMs by counties to registered voters who had not requested one. Tr. 1277:16-19 (Longoria).

## XIV.    SB1's RESTRICTIONS ON CANVASSING BURDEN ALL TEXAS VOTERS AND PLACE DISPROPORTIONATE BURDENS ON BLACK AND LATINO VOTERS

801.    Pursuant to SB1 §7.04 (EC § 276.015(a)(2), (b)), it is a criminal offense of "vote harvesting" to knowingly have an in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure, "in exchange for compensation or other benefit." It is also a criminal offense to provide compensation or other benefit to a person in exchange for "vote harvesting services." EC § 276.015(a)(2), (c).

802.    A "vote harvesting" offense, as defined by SB1 § 7.04, is a felony of the third degree. EC § 276.015(f).

803.    Jonathan White, Chief of the Election Fraud Section of the Texas Attorney General's Special Prosecutions Division, testified that vote harvesting involves "campaign workers [who] are paid operatives [who] proliferate mail ballots through applications for mail ballot, and then go back to collect those ballots from a voter and ensure that those are voted for the candidate." According to Mr. White, vote harvesting is a two-step process that involves first generating ABBMs and later collecting the resulting ballots and "get[ting] those voted for the candidate that you are supporting." 10/16 Tr. 3915:13-18, 22-25, 3916:1-6 (White). SB1 § 7.04

does not define "vote harvesting" to require this two phase process, nor does it require that the person interacting with the voter collect the ballot and ensure that it is voted a specific way.

804.    Mr. White testified that all investigations that he carried out regarding vote harvesting prior to SB1 involved the candidates themselves, or paid vote harvesters working with candidates, a slate of candidates, or a family of the candidates. 10/16 Tr. 4000:14-17 (White). Mr. White recognized, however, that under SB1 § 7.04, prosecution for vote harvesting is not limited to candidates or to vote harvesters hired by candidates, a slate of candidates, or a candidate's family member. 10/16 4001:1-23 (White). Mr. White acknowledged that an organizer for a community organization who is paid to persuade voters to vote for a ballot measure while in the presence of their mail ballots could satisfy the elements of vote harvesting. 10/16 Tr. 4000:5-10 (White).

805.    Keith Ingram, who previously served as the Elections Director for SoS, testified that SoS has not published any guidance or trainings that specify how close voters must be for an interaction to be considered "in-person" under SB1 § 7.04. 9/22 Tr. 1912:17-22; 1914:7-14 (Ingram). He testified:

> 15 feet apart or close, it doesn't really matter. The point is that the vote-harvester is trying to do is to make sure that on that particular candidate or measure, the voter goes a particular way. And that can be done from 15 feet, it can be done from 5 feet. I'm not going to put a number on it.

9/22 Tr. 1913:7-8 (Ingram).

806.    SoS has also not defined what it means for a ballot to be physically present, and has not designated the proximity within which the ballot would be deemed to be physically present. 9/22 Tr. 1914:18-24, 1916:1-12, 1917:5-9 (Ingram)

807.    Mr. Ingram asserted that vote harvesting involves "physical presence, intimidation, making sure the voter marked one box one way." 9/22 Tr. 1914:1-6 (Ingram).

Neither "intimidation" nor "making sure the voter marked one box one way" are elements of the law. SB1 § 7.04.

808.    Mr. Ingram further testified that the crime of vote harvesting requires that "the ballot has to be in front of both of you and you both have to know it's there and you both have to be looking at it." 9/22 Tr. 1915:21-24 (Ingram). None of these requirements are elements of the vote harvesting crime established by SB1 § 7.04.

809.    Mr. Ingram testified that it is his opinion that the "physical presence requirement means the conscious presence. Both parties need to be aware that the ballot is there and they need to be discussing it." 10/17 Tr. 4434:24-4435:1 (Ingram). Mr. Ingram acknowledged that this language is not in the statute. 10/17 Tr. 4467:4-6 (Ingram). SB1 § 7.04 does not contain the phrase "conscious presence," it does not define "physical presence," nor require that the canvasser and voter be discussing the ballot.

810.    Mr. Ingram testified that "vote harvesting has a meaning and that meaning is when somebody puts pressure on a voter to vote a particular way on a particular race . . . ." 10/17 Tr. 4435:7-12 (Ingram). Mr. Ingram's definition, however, does not match the definition established by SB1 § 7.04, which defines "vote harvesting services" as an "in-person interaction with one or more voters, in the physical presence of an official ballot or ballot voted by mail, intended to deliver votes for a specific candidate or measure." SB1 7.04 (EC § 276.015(2)).

811.    Mr. Ingram also testified that he believes vote harvesting to occur "whenever the voter and the harvester get together and they're reviewing the ballot together, and then they get down to that candidate, and the harvester makes sure they check the right box, that's harvesting," and that "anything other than that is First Amendment." 9/22 Tr. 1915:12-16 (Ingram).  SB1 § 7.04 does not require that the voter and the canvasser review the ballot together, nor does § SB1

§ 7.04 require that the canvasser verify that the voter has checked any particular box on the ballot. SB1 § 7.04. SB1 § 7.04 criminalizes interactions that Mr. Ingram recognizes would violate the canvassers' First Amendment rights.

812.    Mr. Ingram admitted that SoS has not published any written guidance setting forth the definition of vote harvesting that he provided to the Court, and that SoS "go[es] with the statute." 9/22 Tr. 1924:7-12 (Ingram).

813.    Mr. Ingram also testified that SoS has not issued any written guidance concerning the activities paid canvassers are permitted or prohibited to do.  Such guidance, Mr. Ingram testified, would be "beyond our scope." 9/22 1926:7-12 (Ingram)

814.    When SoS receives a complaint concerning possible election crimes, and SoS believes there is reasonable cause to suspect a crime occurred, or if it believes it is a "close call," SoS refers the matter to the AG for further action.  Mr. Ingram's preference was to err on the side of ensuring that a violation of the election law is prosecuted. 9/22 Tr. 1876:24-1877:6, 1877:19-21, 1880:15-25 (Ingram).

815.    Mr. Ingram also testified that any person may report allegations of violations of SB1 § 7.04 or other sections of the EC to any county attorney or DA and lodge a complaint. In addition, if two or more voters swear in writing to the facts they allege, then it becomes mandatory for the DA to investigate. 9/22 Tr. 1881:10-22; 10/17, Tr. 4436:1-14 (Ingram).

816.    Mr. Ingram testified that SoS has no control over prosecutorial decision-making. 9/22 Tr. 1910:6, 10-12 (Ingram).

817.    Mr. Ingram acknowledged that canvassers may be paid to solicit votes for a preferred candidate, and that this activity is protected by the First Amendment. 9/22 Tr. 1916:1-12, 1917:5-9 (Ingram). He also recognized, in connection with another criminal provision of

SB1, that "door-knocking and shoe leather is part of the election experience in America." 9/22 Tr. 1901:23-25 (Ingram).

818.    Dana DeBeauvoir, former Clerk of Travis County, is concerned that SB1 § 7.04 "criminalized [a] very innocent process that helped often our most vulnerable voters, voters who were shut in who really relied on vote by mail to be able to participate in democracy." 9/14 Tr. 844:13-25 (DeBeauvoir).

819.    Michael Scarpello, Dallas County EA, testified that he does not understand what is meant by "ballot harvesting" under the new law: it can be interpreted in a lot of different ways based on the definition in the law. 9/12 Tr. 496:4-8 (Scarpello).

820.    The "vote harvesting" behavior described by both Mr. White and Mr. Ingram was illegal even prior to the passage of SB1. Mr. Ingram testified that he had referred alleged vote harvesting complaints to the AG before SB1 became law. 9/22 Tr. 1914:1-6 (Ingram). Mr. White testified that he prosecuted alleged vote harvesting schemes prior to SB1. 10/16 Tr. 3938:14-16, 3939:1-5, 3940:23-3941:3 (White).

821.    Ms. DeBeauvoir similarly testified that harassing and intimidating voters was illegal in Texas before SB1. 9/14 Tr. 917:13-20 (DeBeauvoir).

822.    Lisa Wise, El Paso County EA, testified that she had never heard of anyone with a nonprofit or community organization trying to commit fraud with a mail voter and a mail ballot. 9/12 Tr. 260:17-21 (Wise).

823.    SB1, § 7.04 criminalizes a much broader set of voter-canvasser interactions than those described by Mr. Ingram and Mr. White as vote harvesting. SB1 § 7.04 impinges upon and chills the constitutional work of canvassers in Texas, which in turn burdens Latino and Black

voters by cutting them off from important information that they receive about elections from organizations that serve their communities.

824.    Angelica Razo, who served as the state director of MFV until September 2023, testified that MFV hires canvassers to conduct door-to-door visits in predominantly Latino neighborhoods in the months, weeks, and days leading up to elections in Texas. 10/10 Tr. 3457:15-3458:3, 3458:13-17 (Razo).

825.    MFV serves the Latino community at large, but also focuses on Latino voters who do not vote frequently. 10/10 Tr. 3434:6-11 (Razo). Ms. Razo testified that these voters face barriers to voting, including informational barriers and that "[t]here's a huge information gap in our community about the election information," including election and early election dates, and when and where people can vote. 10/10 Tr. 3438:6-10 (Razo). She also testified that these voters face language barriers because they need information in Spanish, and cultural barriers. 10/10 Tr. 3438:11-21 (Razo). Ms. Razo testified that when voters they support in her community "receive that one-on-one support and that, we, as an organization, a trusted messenger helping them through that, that they are more than likely going to cast a ballot." MFV may be the only organization that tries to contact and educate these infrequent voters about voting 10/10 Tr. 3434:18-23, 3435:1-3 (Razo). Ms. Razo testified that it takes many conversations and contacts to encourage such voters to become consistent voters. 10/10 Tr. 3435:10-17, 3436:7-16 (Razo).

826.    Going door-to-door and being present in places where community members will be, such as community events, are important means that MFV uses to reach voters. 10/10 Tr. 3433:18-3434:1 (Razo). Starting approximately four weeks from each election, MFV undertakes its most intense voter education and outreach efforts to help voters make a plan to vote. 10/10 Tr. 3433:14-17 (Razo).

827.    Ms. Razo testified that MFV pays most of its canvassers so that it can run a quality field program and be sure that canvassers have received consistent training. MFV invests significant resources in training, and wants to ensure the retention of its canvassers for the entirety of a campaign. 10/10 Tr. 3460:12-19 (Razo).

828.    Canvassers work between 20-30 hours per week.  Canvass leads, who direct each team of canvassers, work 40 hours per week. Many people in the community served by MFV could not afford to do this work as volunteers; and if MFV relied solely on volunteers, it would have less time to reach the voters that it wants to reach. 10/10 Tr. 3460:20-25 (Razo).

829.    MFV provides gear to its paid workers and to its unpaid volunteers that include t-shirts, bags, and a hat identifying them as being with MFV. 10/10 Tr. 3458:18-20 (Razo). It also provides food to its volunteers. 10/10 Tr. 3461:1-8 (Razo). Ms. Razo testified that the organization supplies MFV-branded clothing and bags to its canvassers to make them easily identifiable as being with MFV, 10/10 Tr. 3459:20-24 (Razo), because it is important for the organization to maintain high quality control. 10/10 Tr. 3460:1-4, 10-11 (Razo). In addition, MFV works in and with communities where canvassers do not typically go; the distinctive MFV gear helps community members know that the person at their door is from a trusted organization. 10/10 Tr. 3460:5-10 (Razo).

830.    MFV canvassers have conversations with voters about elections and encourage them to vote. (Razo, 3461:17-25). Canvassers do not know who might have already received a BBM and whether that BBM is close by.  At community events, MFV's canvassers would not know if the voters with whom they speak have their BBMs with them. 10/10 Tr. 3462:1-11 (Razo).

831.    MFV is concerned that its canvassers will be accused of vote harvesting. 10/10

Tr. 3461:17-25 (Razo). Although MFV trains its canvassers not to influence voters, 10/10 Tr.

3462:12-19 (Razo), Ms. Razo testified that MFV's leadership remains concerned that someone

who sees or hears a portion of the conversation might develop a misperception about MFV

canvassers or employees. 10/10 Tr. 3462:20-25, 3463:1-4 (Razo).

832.    The additional training that MFV must provide to canvassers because of SB1

takes time away from the canvassers that they would otherwise spend with voters.  MFV

onboards at least 30 canvassers before each election. Each hour spent training them on SB1 is an

hour less that each canvasser has to contact voters; canvassers contact approximately eight to ten

voters per hour. 10/10 Tr. 3458:13-17 (Razo).

833.    MFV has suffered undeserved scrutiny in the past because it is a Latino

organization that serves the Latino community. Ms. Razo has been told at various times that she

cannot conduct voter registration in Latino-prominent schools and communities because her

organization is too political, even though it is a non-profit, non-partisan organization. At these

same events, non-Latino organizations have been allowed to conduct voter registration drives.

10/10 Tr. 2463:9-22, 2464:1-7 (Razo).

834.    MFV also already had at least one complaint that their nonpartisan get-out-the-

vote work is vote harvesting. Prior to the November 2020 election, Mi Familia Vota sent a

postcard to voters, recommending that they check their voter registration and directing voters to

the Secretary of State's online tool or to the El Paso County Elections office. Someone

complained about the postcard to the Secretary of State in an email entitled "Illegal or just

inapperception?" The complainant informed the Secretary of State of the postcard, falsely accused

Mi Familia Vota of providing an erroneous voter registration website URL, and complained that

"with artwork stating "VOTE, for our lives, reclaim Our Vote!; plus the erroneous voter registration site, it just seems someone is trying to use the site to influence and/or harvest voters primarily directed at Latinos." HAUL-MFV 372.

835.    Ms. DeBeauvoir testified that, as Travis County Clerk, she received complaints from voters who claimed they had witnessed someone interfering in another voter's vote.  As an example, she noted that she had received questions from third-parties about seeing a child assist a voter. In each case, she found that it was "all just routine assistance with a voter, usually for very obvious reasons." 9/12 Tr. 842:14-22 (DeBeauvoir).

836.    Latino-led organizations, Latino canvassers, and people who canvas or otherwise support Latino voters have reason to be concerned that they will be subject to complaint and investigation.

837.    Ms. Razo testified that being subject to investigation for vote harvesting would negatively impact her employees, even if they were not ultimately prosecuted or convicted. 10/10 Tr. 3465:1-9, 17-20 (Razo).

838.    MFV is a nonpartisan organization, but its employees nonetheless vulnerable to allegations of vote harvesting, a felony under SB1. The interpretations offered by Mr. Ingram and Mr. White will not provide any defense against allegations that their canvassing efforts satisfy the elements of vote harvesting pursuant to SB1 § 7.04. The statute chills MFV from its mission to activate new voters, and voters who already face informational, language, and cultural barriers to voting are deprived of critical information about elections from a community organization on which they rely and trust. 10/10 Tr. 3437:22-3438:3, 3438:4-21 (Razo)

839.    Judy Bryant, field organizer for the Texas Alliance for Retired Americans, testified that although TARA has no partisan affiliation, it sometimes endorses local and state

candidates and supports the work of its national organization in endorsing national candidates. TARA also endorses positions on ballot initiatives. 9/21 Tr. 1764:3-10 (Bryant). As part of its work, TARA would often conduct presentations or tabling at events. Ms. Bryant testified that in-person events are more effective than calls or emails. 9/21 Tr. 1764:14-25 (Bryant).

840.    SB1's restriction on in-person advocacy has impaired what TARA can do at its in-person events. Ms. Bryant no longer accepts invitations for tabling events held during the weeks after BBMs are mailed to voters: she does not want to risk an encounter with a voter who has a BBM on his or her person. 9/21 Tr. 1765:19-1766:5 (Bryant). TARA has stopped conducting in-person advocacy right after the first week of October, whereas the organization, prior to SB1, did in-person advocacy right up to and including Election Day. 9/21 Tr. 1766:6-14 (Bryant).

841.    Pulling back on in-person advocacy before elections will harm TARA's work, because it has found that the best time to educate and inform voters is close to the time that they vote. 9/21 Tr. 1766:15-23 (Bryant).

842.    Zeph Capo, president of Texas AFT, also testified that the vote harvesting provisions of SB1 have had a "chilling effect" on people who might otherwise have volunteered to block walk on behalf of AFT. The organization's members are "school employees, teachers primarily, and by nature, they're rule followers." Given the uncertainty concerning SB1's restrictions on canvassing, AFT volunteers now decline to participate in canvassing. 9/14 Tr. 934:2-25 (Capo).

843.    Tonia Chavez, executive director of LUPE, testified that SB1 § 7.04 interferes with LUPE's ability to conduct in-person advocacy for important ballot measures, an essential part of LUPE's work. 10/11 Tr. 3681:9-12, 3686:12-20 (Chavez).

844.    LUPE now trains its staff members that, if they become aware that a voter has brought a BBM to a community event that LUPE has organized, the voter must take the BBM outside the building and leave the event, or the LUPE employees must stop the work that they are doing at that event. 10/11 Tr. 3681:14-25 (Chavez).

845.    LUPE's canvassers, prior to SB1, brought important information to voters in hard-to-reach communities, such as the *colonias*, that no one else took to them. 10/11 Tr. 3686:1-12 (Chavez).  If LUPE cannot canvass, Latino voters in the communities that LUPE serves will not get the information they need, they will not feel confident about casting their vote, and ultimately voter turnout in these communities will decline. 10/11 Tr. 3686:21-3687:2 (Chavez).

## XV.    SB1 MAKES IT MORE DIFFICULT FOR VOTERS TO OBTAIN TIME OFF FROM WORK TO VOTE

846.    Before SB1 was enacted, EC § 7260.04(a-b) required an employer to provide time off from work to vote, except that no time off was required if the employee had two consecutive hours off work to vote when the polls were open on election day.

847.    SB1 § 7.02(b) expanded the exception so broadly as to swallow the rule. The law now provides that time off is not required if an employee has two consecutive hours off from  work to vote either *on election day or while early voting is in progress.* SB1 § 7.02(b).

848.    As a result of this amendment, individuals working multiple jobs may not be given time off:  each employer can now take the position that with respect to their particular employment, the employee has two hours off either on election day or some other early voting day.

849.    This change will negatively impact voters that MFV serves. As Ms. Razo testified about the communities that MFV serves, "People . . . are shift workers, they're working

twelve-hour shifts, they're working more than one job, they are getting off of work at irregular hours where they get off work and they have family responsibilities that they have to attend to and they have a long commute home." 10/10 Tr. 3446:7-11 (Razo). She also testified that Harris County doesn't have a good public transit system, and traffic can be bad. 10/10 Tr. 3446:12-14 (Razo).

850. The mission of Mi Familia Vota to engage and activate voters manifests in, among other ways, voter assistance to prepare voter plans.  Tr. 3431:10-22; 3432:21-3433:11 (A. Razo).  As a result, this change to SB1 § 7.02(b) impedes MFV's work.

851. Voters may have to go straight from one job to the next.  Tr. 3442:21-25 (A. Razo).

852. Although employers are required to give two hours off, lines in Harris County have at times been longer than two hours.  Tr. 3419:23-3420:2 (López).

853. The burden created by SB1 § 7.02 is further amplified by the other restrictions in SB1, all of which, taken together, make it more difficult for voters to find voting options that work for their schedule.  Tr. 10/10/23 3390:5-7 (López).  As a result, many voters are discouraged and do not vote.  Tr. 10/10/23 3390:5-17 (López).

## XV.    ABSENCE OF ELECTION FRAUD

854.    The purported justification for SB1's provisions is to prevent election fraud. However, as described below, the evidence at trial shows there has never been widespread, systemic fraud in Texas elections. Election officials described election fraud as a "unicorn" and "conspiracy theories." *See* 9/14 Tr. 856:11–19 (DeBeauvoir); 10/12 Tr. 3883:5-17 (Phillips); State Ex. 294; Tr. 91:4-7 (Longoria); 9/20 Tr. 1356:12–1357:9 (Longoria). Consistent with prior elections, there was no evidence of widespread fraud during the 2020 election. 10/18 Tr. 4458:17-

19 (Ingram). The evidence at trial also demonstrates that the Challenged Provisions are ineffective at addressing even the infinitesimal number of election fraud incidents that have actually occurred in Texas.

### A. Election Fraud is Virtually Non-Existent in Texas.

855.    Data from the OAG and the testimony of experienced election officials make clear that election fraud is exceedingly rare in Texas.

#### 1. *OAG Data on Election Fraud*

856.    The State of Texas has expended considerable time and resources to uncover evidence of election fraud. Then Attorney General Greg Abbott's investigation into voter fraud from 2006-2009 resulted in a handful of indictments and convictions compared to the voting population in Texas. 10/5 Tr. 35:16–36:11 (Kousser). PolitiFact's investigation into Abbott's records for convictions for individual voter fraud in 2002 through 2012 found similarly scant evidence of fraud. 10/5 Tr. 36:19–37:9 (Kousser).

857.    The evidence of election fraud prosecutions presented by the State in this case tells the same story. The OAG maintains a tracker of election prosecutions resolved and pending. *See, e.g.*, State Ex. 82 (version of tracker updated as of July 2022). Mr. White, who was personally responsible for maintaining the tracker, testified that it provides "as complete and accurate a list of resolved prosecutions that the OAG resolved" during the time period represented on the tracker. Tr. 3931:18-25.

858.    The most recent version of the tracker, updated as of September 6, 2022, lists a total of *only* 156 election-related cases "resolved" since the 2004 election. OCAPX 377 at 1-11. A "resolved" prosecution is defined to include a conviction through plea or jury trial, a deferred adjudication, or agreement to participate in a pretrial diversion program. Tr. 3933:6-14 (White). The total excludes cases with dispositions listed as "no bill." OCAPX 377 at 1-11.

859.    The tracker does not include prosecutions that resulted in an acquittal or where charges were dropped. Tr. 4032:22–4033:24 (White).

860.    According to Mr. White, it would be "incorrect" to say that hundreds of convictions have resulted because of election fraud cases brought by the Attorney General. Tr. 4085:23–4086:3.

861.    Of the 156 cases listed on the tracker, only 16 appear to have been resolved with the defendant being convicted at trial, with at least one of those convictions being reversed on appeal. 10/16 Tr. 4029:17-20 (White); *see, e.g.*, OCAPX 377 at 5.

862.    Only a fraction of the entries on the tracker involved election procedures relevant to this case. For example, the tracker includes 9 "prosecutions resolved" related to voter registration, which is not relevant to any of the HAUL Plaintiffs' Challenged Provisions. OCAPX 377 at -1011. Most of the 147 other entries lack sufficient detail to know whether the misconduct alleged was relevant to any of the issues in this case.

863.    Mr. White testified that the tracker does not include a single resolved or pending prosecution related to DTV or 24-hour voting. 10/16 Tr. 4087:25–4088:7 (White); 10/16 Tr. 4090:18-21 (White).

864.    Mr. White also testified that none of the "prosecutions resolved" on the chart involved unlawful voter assistance that happened inside a polling place. Tr. 4027:21–4029:7 (White); Tr. 4034:16-25 (White).

865.    Ultimately, the *only* relevant evidence of fraud presented by the State in the OAG tracker is *at the most*, 147 cases of resolved election fraud crimes potentially related to BBMs since 2004. Of those 147 cases, only 16 defendants were convicted at trial.   In other words, on average

since 2004, less than one defendant per year has been convicted at trial for an election fraud crime that could even potentially be relevant to a subset of the Challenged Provisions.

866.    Moreover, the number of "offenses prosecuted" listed in the tracker grossly inflates the actual number of election fraud incidents adjudicated. The September 2022 version of the tracker purports to show 696 "offenses prosecuted" since the 2004 election. OCAPX 377 at 12. This number reflects every offense *charged* rather than every offense for which a conviction was obtained, which is much lower. OCAPX 377 at 12.

867.    For example, the 696 "offenses prosecuted" include *133 felony counts* charged against four defendants: Marlena Roseanne Jackson, Charlie Burns, Jr. DeWayne Ward, and Shannon Everette Brown—all of whom are Black. OCAPX 377 at 11–12; 10/16 Tr. 4082:3–4084:21 (White); 10/16 Tr. 4086:4–9 (White). But ultimately, these defendants pled guilty to just *one misdemeanor each*. 10/16 Tr. 4082:3–4084:21 (White); OCAPX 377 at 12.

868.    Of the 696 "offenses prosecuted," 235 (one-third of the total) were charged against just 10 defendants. OCAPX 377 at 11-12.

869.    The OAG's tracker also lists 401 "counts/offenses pending prosecution" as of September 2022. OCAPX 377 at STATE112172-76. These unadjudicated prosecutions are, of course, subject to the presumption of innocence. 10/16 Tr. 4022:8-11 (White); *see also* Tr. 3961:6-8, 19-25 (White). As such, they do not constitute evidence of fraud.

870.    As of July 2021, 386 offenses were in various stages of investigation by the Elections Integrity Division. 10/16 Tr. 3911:9-16, 3912:22–3913:1 (White). Generally, "a significant number" of investigations do not lead to prosecutions because of a lack of evidence and "a lot" because no offense occurred. 10/16 Tr. 4018:21–4019:9 (White); *see also id.* at 4018:10-

13 (White) ("[I]t was common for us to not proceed with the prosecution on a given investigation.").

871.     When considering the hundreds of millions of votes that have been cast since 2004, the extent of proven voter fraud in Texas is infinitesimal. *See* State Ex. 155 (Turnout and Voter Registration Figures 1970-Current, Texas Secretary of State (as of May 5, 2022)).

### 2. *Election Officials Report Essentially No Election Fraud*

872.     Throughout trial, election officials with hundreds of years of collective experience administering elections in Texas testified unanimously that fraud is extremely rare in Texas.

873.     Multiple county election officials described allegations of election fraud as "conspiracy theories." *See* 10/12 Tr.3883:5-17 (Denton County EA Phillips testifying at trial that he spends the majority of his time "debunking conspiracy theories or answering public information requests relating to conspiracy theories" about election fraud); State Ex. 294, Tr. 91:4-7 (Harris County EA Longoria testifying before Senate Committee on State Affairs asking Committee "to stop giving in to the conspiracy theories" about election fraud); 9/20 Tr. 1356:12–1357:9 (Harris County EA Longoria testifying at trial that legislature has presented no evidence of election fraud in its consideration of SB1).

874.     Based on her 36-year career as an election official, former Travis County Clerk Dana DeBeauvoir described voter fraud as a "unicorn" because it is "so very rare." 9/14 9/14 Tr. 856:11-19 (DeBeauvoir). Even though she conducted investigations into potential misconduct and referred fraud allegations to law enforcement "many times," she could not recall a single instance in her career in which a referral resulted in a prosecution or conviction. *Id.* 856:20–857:3 (DeBeauvoir).

875.    Bexar County EA Jacquelyn Callanen testified that there was no voter fraud emergency in Texas when SB1 was passed. 9/19 Tr. 1007:3-9 (Callanen). In her last ten years of experience as an EA, she knows of "maybe two" instances of voter fraud. *Id.* 1006:21–1007:1 (Callanen).

876.    Denton County EA Frank Phillips agreed that election fraud is rare and generally elections are secure. 10/12 Tr. 182:18–183:1 (Phillips).

877.    Election officials testified that fraud is extremely rare even with respect to mail voting, which Defendants contend is more vulnerable to fraud than in-person voting. *See Id.* 174:13-15 (Phillips).

878.    In his 14 years of experience as EA in Tarrant County and Denton County, Mr. Phillips has referred only *one* case of alleged mail voter fraud—the still-pending Zul Mohamed case—to law enforcement. *Id.* 169:21–170:3, 170:21–171:3 (Phillips).

879.    Indeed, most of the election concerns Mr. Phillips hears from voters are not related to mail voting, but rather voting systems more generally. 10/12 Tr. 172:21-73:4 (testifying that only about 10% of concerns he hears regarding fraud are about BBMs). These concerns relate to events outside of Texas rather than in Denton County. 10/12 Tr. 3883:14-19 (Phillips) (testifying that he understands through conversations with voters that their election fraud concerns stem from national events rather than circumstances inside Denton County.

880.    Dana DeBeauvoir did not recall a single incident in her career when a person committed BBM impersonation fraud. 9/14 Tr. 855:1-8 (DeBeauvoir).

881.    Former Harris County EA Isabel Longoria is not aware of any incidents involving someone fraudulently submitting a BBM for someone else. 9/20 Tr. 1296:3-7 (Longoria).

882.    Bridgette Escobedo, Director of Elections at the Travis County Clerk's Office, is not aware of any incidents of voter fraud associated with mail-in ballots in Travis County. 9/21 Tr. 1547:4-15 (Escobedo).

883.    Lisa Wise, the El Paso County EA has not experienced any problems of voter fraud associated with not requiring voters to provide a TDL or SSN/4 in connection with voting by mail. . 9/12 Tr. 244:10-14 (Wise). Similarly, she has never heard of anyone with a nonprofit or community organization trying to commit fraud in El Paso County with a mail voter and the BBM. 9/12 Tr. 260:17-21 (Wise).

884.    As for voter assistance county election officials testified that they have seen no evidence of voter fraud resulting through a person providing assistance to a voter. *See* 9/11 Tr. 177:6 (Wise) (El Paso County); 9/12 Tr. 433:10-18 (Scarpello) (Dallas County); 9/21 Tr. 1547:21-24 (Escobedo) (Travis County); 9/20 Tr. 1317:11-19 (Longoria) (Harris County); 9/14 Tr. 842:10-22 (DeBeauvoir) (Travis County).

885.    OAG records and election officials' testimony was supported by expert evidence. Prof. Mayer explained that the rate of voter fraud is virtually zero across states. 10/2 Tr. 2009:13-18 (Mayer). Although the perception of voter fraud is created by misleading claims that fraud exists, *id*. 2009:8-13 (Mayer), there is "no evidence of any material levels of voter fraud, and no evidence that the requirements of SB1 would have prevented instances of voter fraud." *id*. 1959:10-14 (Mayer).

## B. There is No Evidence of Election Fraud in the 2020 Elections, Much Less with Respect to the Voting Methods Targeted by SB1

886.    Consistent with prior elections, there is no evidence of systematic election fraud in connection with the 2020 elections in Texas or the specific methods of voting restricted by SB1.

887.   There have been extensive efforts to uncover election fraud during the November 2020 general election. In 2021, the Attorney General spent $2.2 million to open an Election Integrity Unit that, based on the OAG tracker as of September 2022, has only "resolved" one prosecution for election fraud, in Medina County, during the November 2020 general election. OCAPX 377 at 11.  No evidence of additional resolved prosecutions related to the November 2020 general election was presented at trial.

888.   After extensive investigation, an Election Security Task Force for Harris County "found no proof" of election fraud during the November 2020 election. HAUL-MFV 332 ¶ 121.

889.   After the 2020 election, Lieutenant Governor Dan Patrick announced a bounty of $10,000, up to a total of $1 million, for each proven instance of election fraud brought to him from the November 2020 election. HAUL-MFV 332 ¶¶ 27, 122. Thus far, only one incident was brought to him of a voter who mistakenly double voted. HAUL-MFV 332 ¶ 122.

890.   The Secretary of State ordered a "Forensic Audit" of the November 2020 general election in four counties:  Harris, Dallas, Collin, and Tarrant. 10/17 Tr. 4210:1-7(Doyer). Prepared and finalized approximately two years after the November 2020 election, *Id.* 4264:1-5 (Doyer), "[a]n audit of this nature ha[d] not been undertaken anywhere in the country." State Ex. 23 at 5 (Final Audit Report).

891.   No professional auditors performed the "audit," and it adhered to no professional auditing standards or practices. Jacqueline Doyer, the Legal Director of the Forensic Audit Department and one of the named authors of the final "audit" report, testified that none of the named authors of the report is an auditor. 10/17 Tr. 4219:3-9 (Doyer); *see id.* 4268:15-16 (Doyer); *id*. 4269:11-15 (Doyer). Ms. Doyer testified that the "audit" was not performed to conform with any promulgated auditing or accounting standards *Id.* 4270:12-14 (Doyer), and that she was not

familiar with any such standards or even looked at them in preparing the audit *Id.* 4270:15-19 (Doyer); *see id.* 4270:20-25-4271:1-3 (Doyer); *Id.* 8:11-13, 8:19–9:2 (Doyer). The entire "audit" procedure was conducted without the Secretary of State having proposed or adopted any rules to govern the conduct of the Forensic Audit Division. *Id.* 4282:1-8 (Doyer).

892. The final "audit" report is tainted with political motives. The "audit" was not one of the randomized audits required by SB1. *Id.* 4272:24-25-42731-48 (Doyer). What is more, the Governor, whose office was not part of the "audit" team, *Id.* 4285:7-10 (Doyer), reviewed and recommended changes to the executive summary of the final report before it was issued, 10/17 Tr. 4284:17-25-4285:1-2- (Doyer). Despite being the Legal Director of the Forensic Audit Division and one of the named authors of the final report, Ms. Doyer was not part of the conversations with the Governor's office regarding its edits to the final report. 10/17 Tr. 4285:7-10 (Doyer). The involvement of the Governor's office in preparing the final report is not disclosed anywhere in the report. 10/17 Tr. 4286:13-25-4287:1-3 (Doyer).

893. Despite its flaws and political motivations, the final "audit" report, published in December 2022, uncovered no evidence of election fraud. State Ex. 23. The final report made no conclusions about fraud during the November 2020 general election. 10/17 Tr. 4294:7-10 (Doyer); 10/17 Tr. 4303:2-14 (Doyer); 10/17 Tr. 4304:2-17 (Doyer).

894. While HB3, the House version of SB1, was under consideration, the Legislative Budget Board reported to the Committee on Constitutional Rights & Remedies that for Texas fiscal years 2018, 2019, and 2020, there were a total of 45 arrests for election-related offenses. During those same years, fewer than ten individuals were placed in a prosecution diversion program for election-related offenses in each fiscal year, and fewer than ten individuals were admitted into a correctional facility for an election-related offense. LUPE Ex. 198 (Jerry McGinty, Legislative

Budget Board, Criminal Justice Impact Statement to the House Committee on Constitutional Rights & Remedies Chair Trent Ashby, (July 9, 2021).

895.    No county or state election official testified at trial about a single instance of election fraud that occurred during the November 2020 general election. Rather, they confirmed that there was no systematic fraud during the November 2020 general election. For example, Keith Ingram, the Elections Director for the Secretary of State's office, testified before the Texas House of Representatives in February 2021 that the November 2020 general election was "smooth and secure." 10/17 Tr. 4210:15–23 (Ingram) . Although he attempted to backtrack on this statement during his testimony in the State's case, 10/17 Tr. 4210:24–4211:21 (Ingram), he provided no testimony about evidence of election fraud during the November 2020 general election.

896.    There is no evidence of election fraud related to any of the methods of voting targeted by SB1.

897.    **DTV**: The trial record contains no evidence of election fraud at any DTV locations, or that any voter felt coerced or pressured during the DTV experience.  Instead, multiple witnesses, including those for the State, testified that there was no evidence of voter fraud related to DTV in Texas. 10/18 Tr. 4454:17-23 (Ingram); 10/6 Tr. 4087:25–4088:7 (White); 9/20 Tr. 1255:17-19 (Longoria); 9/19 Tr. 1155:10-12 (Obakozuwa); Tr. 1155:22–1156:4 (Obakozuwa). Ms. Longoria testified that she was not aware of any incidents in which a voter felt coerced or pressured to vote a certain way while using DTV. 9/20 Tr. 1255:20-23 (Longoria).

898.    **24-Hour Voting:** The trial record similarly contains no evidence of election fraud at any 24-hour voting locations. Several witnesses, including witnesses for the State, testified that there was no evidence of voter fraud related to 24-hour voting in Texas. 10/18 Tr. 4454:24–4455:2 (Ingram); 10/16 Tr. 4090:18-21 (White); Tr. 1158:3-4 (Obakozuwa); 1267:18–20 (Longoria).

County election officials, including those who decided not to implement 24-hour voting in 2020, testified that they did not have any voter fraud concerns related to 24-hour voting or extended hour voting. 9/12 Tr. 276:1-14 (Wise) (El Paso County); Tr. 1021:12-17 (Callanen) (Bexar County); Tr. 1158:3-4 (Obakozuwa) (Harris County); Tr. 1552:12-14 (Escobedo) (Travis County); *see* 10/12 Tr. 146:18–147:9 (Phillips testifying that he chose not to implement 24-hour voting in Denton County because of concerns related to staffing, budget, number of voters who would use it, and poll worker safety; and not listing election fraud concerns); Tr. 275:15-25 & 351:13-15 (Wise testifying that El Paso County did not implement 24-hour voting because of staffing concerns); *see also* LUPE Ex. 286, 41:23-25, 42:9-12 (Lopez Dep.) (Dallas County).

899.    **Mail Voting:** Mail voting was used at unprecedented levels in Texas during the November 2020 election. *See* HAUL-MFV 273, Ex. 3 (comparing number of mail voters in each Senate district in Harris County in 2016 with same number in 2020 and showing a nearly 70,000 voter increase in mail voting). . Nevertheless, apart from the single incident in Medina County listed in the OAG tracker, OCAPX 377 at 11, there is no evidence of election fraud related to mail voting during the November 2020 general election. Further, even though drop-off locations were available for a longer period than during any previous election, (*see* State Ex. 128), there is zero evidence of election fraud at BBM drop-off locations during the November 2020 general election. Instead, Mr. Ingram testified that at the time of the 2020 election, the Texas BBM system had robust built-in security checks. Tr. 1940:3–5 (Ingram). Ms. Longoria was not aware of any incidents of voter fraud related to distribution of ABBMs to eligible voters who had not requested them. Tr. 1277:16–19 (Longoria). As referenced above, multiple election officials testified that they had never encountered mail-ballot fraud during their entire careers, or had only encountered a tiny number of instances over many years, including during the November 2020 general election.

10/12 Tr. 169:21–170:3, 170:21–171:3 (Phillips); 9/14 Tr. 855:1-8 (DeBeauvoir); Tr. 1296:3-7 (Longoria); Tr. 1547:4-15 (Escobedo); Tr. 244:10-14 (Wise); Tr. 260:17-21 (Wise).

900.    The State relies heavily on a pending prosecution in Denton County against Mr. Zul Mohamed for allegedly submitting multiple fraudulent ABBMs. 10/12 Tr. 113:4-17. However, Mr. Mohamed has been convicted of nothing. 10/12 Tr. 113:18–114:9. Because a defendant is entitled to the presumption of innocence unless convicted, the case against him is not evidence of fraud. *See* 10/16 Tr. 4022:8-11 (White); *see also* Tr. 3961:6-8, 19-25 (White).

### C. Existing Protections Safeguarded Against Voter Fraud.

901.    The meager evidence of election fraud in Texas comes at no surprise. Before SB1, the EC and procedures implemented by county officials already included extensive protections against fraud.

902.    **<u>DTV:</u>** As discussed above, DTV employed the same fraud-protection measures as other forms of in-person voting. *See supra* FOF § V.A.1.c.. In particular, Harris County employed the same ballot security and privacy measures 9/19 Tr. 1242:21–1243:16 (Longoria); it used the same machines and check-in procedures *Id.*; it spaced voting booths out to ensure voters could not see or hear what other voters were doing *Id*. 1242:21–1243:16 (Longoria); it prohibited multiple voters in a single vehicle from speaking or motioning to each other *Id*. 1235:4-16 (Longoria); *see id*. 1253:6–1254:3 (Longoria); Tr. 2290:21-25 (Dorsett); it required multiple voters in a single vehicle to vote one at a time and look away while another voter is voting (Tr. 2290:21–2291:6 (Dorsett); it prohibited the use of phones during the voting process (Tr. 2291:7-11 (Dorsett); it offered voters folders or cardboard partitions to ensure privacy 9/19Tr. 1235:20-25 (Longoria); 9/20 Tr. 1242:21–1243:16 (Longoria); 9/20 Tr. 1386:25–1387:8 (Longoria); it positioned an election worker at each voting booth to observe the entire voting process 9/19 Tr. 1235:17-22

(Longoria); 9/20 Tr. 1253:6–1254:3 (Longoria); 10/3 Tr. 2290:21–2291:6 (Dorsett); and it allowed poll watchers to be present and observe the entire process 9/20 Tr. 1255:7-16 (Longoria).

903.    **24-Hour Voting:** Harris County employed identical fraud-protection measures during 24-hour voting as it did during early voting at any other time of day. *See supra* FOF §V.A.2.a. The voting process was exactly the same 9/20 Tr. 1265:7–1266:23 (Longoria), and there was no difference in how ballots were processed or in the measures taken to ensure ballot security 9/19 Tr. 1157:1-12 (Obakozuwa); 9/20 Tr. 1266:23–1267:12 (Longoria). Poll watchers were able to observe 24-hour voting in the same way they observed early voting during normal hours. 9/20 Tr. 1267:13-17 (Longoria).

904.    **Mail Voting:** State and local officials testified that mail-in voting was a secure method of voting in Texas. For example, Mr. Ingram testified that at the time of the 2020 election, the Texas BBM system had robust built-in security checks. Tr. 1940:3-5 (Ingram). Counties had existing processes to identify mail voting fraud pre-SB1. 10/12 Tr. 168:23-25 (Phillips). Election officials confirmed that each person who applied to vote by mail was, in fact, registered to vote before issuing them a ballot. Tr. 1940:6-9 (Ingram). They would verify the voter's identity through signature matching. Tr. 1940:10-25 (Ingram); 9/19 Tr. 1047:3–1048:12 (Callanen); 9/19 Tr. 1078:10-21 (Callanen). If a voter who successfully applied for an absentee ballot attempted to vote in-person, the county database would flag the voter during check-in at voter qualification table. If flagged, the voter is not permitted to vote unless he or she meets other requirements that include returning the absentee ballot to the election worker. 9/19 Tr. 1000:11–1003:1 (Callanen). The EC prior to SB1 provided that only the voter himself or herself may deliver the voter's BBM in person at a drop-off location, and the voter must present proper identification to the election official who receives the ballot at the time of drop-off. EC § 86.006(a), (a-1).

905.    The EC also already included extensive criminal penalties to deter and punish election fraud prior to SB1. As Mr. White testified, prior to SB1, there was no wrongful election-related activity that could not be prosecuted and punished under one or more of Texas's 100+ election-related criminal laws.  10/16 Tr. 3914:20-24 (White) (citing State Ex. 89); 10/16 Tr. 3921:4-6 (White testifying that most of the key activities comprising vote harvesting were prohibited under the EC before SB1). Indeed, all of the charges listed in the OAG tracker were brought pursuant to criminal statutes that preexisted SB1. 10/16 Tr. 4027:17-20 (White).

906.    The OAG has identified multiple criteria unrelated to SB1 that it uses to detect potential vote harvesting. 10/16, 3917:1–3919:18 (White). These indicators include the same name, address, and signature appearing on multiple ABBMs; similar handwriting on multiple ABBMs; signatures that do not match the voter's signature in the county's database or the presence of electronic signatures; multiple electronically completed ABBMs, particularly from the same precinct; and individuals who assist multiple voters with an ABBM and who are unrelated to the voter. *Id.*; *e.g.*, State Ex. 89 at 21-25.

907.    These criteria allowed Denton County to identify alleged election fraud in the case of Zul Mohamed, who allegedly submitted multiple ABBMs using the same address. 10/12 Tr. 168:23–169:20 (Phillips); 10/12 Tr. 121:20–122:5 (Phillips); 10/16 Tr. 3950:24–3951:4, 3952:11-19 (White). Mr. Mohamed was arrested and charged with offenses codified before SB1. 10/12 Tr. 113:24-25 (Phillips, Denton County); 10/16 Tr. 4016:6-8 (White).

### D.  The Challenged Provisions Would Be Ineffective Against Fraud If It Did Occur

908.    Defendants claim that SB1 prophylactically addresses fraud before it takes place. Evidence at trial established, however, that the Challenged Provisions do not address even a risk

of future fraud. 10/2 Tr. 1959:10-14 (Mayer) (Prof. Mayer testifying that there is "no evidence that the requirements of SB1 would have prevented instances of voter fraud").

909.    Election officials testified that the Challenged Provisions do not address any problems or gaps in the voting process that present a risk of fraud, nor do they add anything to the already extensive safeguards against election fraud. In Ms. Callanen's view, no section of SB1 addresses any fraud problem in Bexar County. 9/19 Tr. 1008:20-22 (Callanen); *id.* Tr. 1078:17-21 (Callanen).. Similarly, SB1 does not address any problems related to fraud that Ms. Longoria experienced in her time administering elections in Harris County. 9/20 Tr. 1359:7-13 (Longoria). Ms. Escobedo was not aware of any decreases in voter fraud in Travis County after SB1 went into effect. 9/21 Tr. 1547:16–24 (Escobedo).

910.    County election officials believe SB1's BBM identification requirements are particularly ineffective. For example, Ms. Callanen believes that the people who had BBMs rejected because of identification number mismatches since SB1 came into effect were, in fact, eligible voters, and there is no reason to believe they were involved in fraud. 9/19 Tr. 1049:24–1050:10 (Callanen). In addition, identification numbers are not necessarily secure: SSNs, for example, are on file in nursing homes and hospitals. 9/19 Tr. 1030:16-21 (Callanen).

911.    As the Court noted during trial, "someone nefarious could go to the dark web and get Social Security numbers or driver's licenses and so they can still accomplish the nefarious deed," and thus "the State 'asn't done anything" to prevent fraud, but, as EA Scarpello testified, it has "done something to make life a little tougher for some of the voters and for administrators." 9/12 Tr. at 484:18-485:1.

912.    SB1's identification number requirements for ABBMs and BBMs have resulted in no resolved prosecutions for election fraud. Mr. Phillips has not referred any allegations of voter

fraud in Denton County to law enforcement based on any of SB1's mail voting provisions. 10/12 Tr. 171:5-11 (Phillips). Similarly, Charlton Johnson, head of the Elections Division for the Travis County Clerk, did not recall referring a single case of mismatched identification numbers on ABBMs or carrier envelopes to SoS or law enforcement as possible voter fraud. *Id.* 1522:23–1523:6 (Johnson). Nor was he aware of any instances in which voter fraud was identified because of a mismatched identification number. *Id.* 1523:7-10 (Johnson); *Id.* 1526:8-10 (Johnson).

913.    SB1's identification requirements for voting by mail may compromise privacy and security in some circumstances. Some voters refused to vote by mail because they were concerned about exposing themselves to identity theft by placing their identification numbers on an ABBM or BBM.  9/11 Tr. 221:6-15 (Wise); 9/19 Tr.1049:6-8 (Callanen); 9/19 Tr. 1159:19-24 (Obakozuwa); 9/20 Tr. 1285:5–1286:11 (Longoria).

914.    In addition, SB1 doubled the processing time of signature verification committees.  In Harris County, before SB1, two people on the signature verification committee, one Democrat and one Republican, could resolve about 1,000 ballots per day. After SB1, each pair could resolve only 400 to 500 ballots per day. Consequently, the mail ballot staff was too small, resulting in pressure on the entire system because so many more individuals were needed for the ballot verification process. There is now no time available for the mail ballot team to take on other tasks.  9/20 Tr. 1278:20–1280:18 & 1294:5-25 (Longoria).

915.    SB1's mail ballot drop-off provision similarly fails to advance any protections against election fraud. Prior to SB1, the EC already required a person who hand delivered BBMs to present a photo ID, and further required that an election official be present to take possession of the BBMs. 10/12 Tr. 144:5-8 (Phillips); 10/18 Tr. 4475:12-17 (Ingram). A voter dropping off a BBM in person was already a "fully identified voter." 10/18 Tr. 4475:22–4476:2 (Ingram).

916.    The "vote harvesting" behavior described by both Mr. White and Mr. Ingram was illegal prior to the passage of SB1 and Mr. Ingram testified that he had referred alleged vote harvesting complaints to the AG before SB1 became law. 9/22 Tr. 1914:1-6 (Ingram). Mr. White testified that he prosecuted alleged vote harvesting schemes prior to SB1. 10/16 Tr. 3938:14-16, 3939:1-5, 3940:23-3941:3 (White). SB1 § 7.04 criminalizes a broader and different set of voter-canvasser interactions.

917.    Ms. DeBeauvoir similarly testified that harassing and intimidating voters was illegal in Texas before SB1. 9/14 Tr. 917:13-20 (DeBeauvoir).

918.    Ms. Lisa Wise, the El Paso County EA, testified that she had never heard of anyone with a nonprofit or community organization trying to commit fraud with a mail voter and a mail ballot. 9/12 Tr. 260:17-21 (Wise).

919.    Ms. DeBeauvoir testified that she did not know of an instance in her 36 years in the Travis County Clerk's Office in which a paid assister was alleged to have coerced or intimidated a voter, or to have engaged in any kind of fraud or misconduct. 9/14 Tr. 846:16-25, 847:1-3 (DeBeauvoir). Nor was she ever made aware of any situation in which a paid assister harassed or intimidated a voter in any way. 9/14/23 Tr. 917:9-12 (DeBeauvoir).

920.    Based on her experience, Ms. DeBeauvoir testified that she has no reason to think that an assister paid to provide assistance by a nonpartisan nonprofit organization is more likely to engage in misbehavior than one who is not paid. 9/14 Tr. 847:4-8 (DeBeauvoir).

921.    As for SB1's poll watcher provisions, EAs testified that since the enactment of SB1, poll watchers have not reported any irregularities that were substantiated in their counties, and still less have they let along detected proven fraud. 9/19 Tr. 1073:2-12 (Callanen); 9/11 Tr. 186:7-10 (Wise).

## XVI.     UNIFORMITY

922.    Defendants may also assert that the Challenged Provisions address the desire for uniformity in the administration of elections across counties. .

923.    For the bulk of the Challenged Provisions, there is no evidence in the record indicating counties were administering elections differently. For example, there is no evidence in the record indicating that counties applied different voter assistance rules, that counties were verifying mail ballot voters' identities in different ways, or that counties were administering mail-ballot drop-off locations differently. Therefore, uniformity cannot be the justification for the Challenged Provisions related to those activities.

924.    In fact, SB1's mail-ballot identification requirements have *decreased* uniformity. To mitigate the post-SB1 problem of ABBM and BBM rejections due to missing or mismatched identification numbers, some counties have prepared individual inserts to their ABBM and BBM packets that are sent to voters recommending entry of ***both*** the voter's driver's license number and SSN/4. SoS has no way to know how many counties provide such inserts, nor can it require all counties to provide inserts, nor can it require all counties to provide inserts, but has lauded these counties' efforts. 9/22 Tr. 1839:3–1840:12; 1843:4-17 (Adkins).  For Ms. Adkins, this is an issue of local control. *Id.* 1841:8-11; 1845:1-7 (Adkins). SoS has no plans to change the ABBM application or carrier envelope or to include its own standardized insert.

925.    SB1 did eliminate 24-hour voting and DTV, which were employed only in certain counties prior to SB1. However, state and county officials testified that although uniformity is valuable, it is also important to permit counties to adopt voting practices that work best for their voters. 9/19 Tr. 1078:22-25 (Callanen); 9/22 Tr. 1827:6-18 (Adkins). Christina Adkins, Director of Elections for the Secretary of State, testified that local control of elections is a critical principle of election administration in Texas, and by necessity, elections will differ county-to-county. Tr.

1848:24-1849:11 (Adkins). Texas's decentralized election system enables counties to administer elections in a way that is responsive to local needs. 9/19 Tr. 1848:24–1849:11 (Adkins); Tr. 1078:22-25 (Callanen testifying that "different counties in Texas should be free, subject to the election law, to adopt different voting options that work best for them").

926.    For example, 24-hour voting met the unique needs of certain counties, particularly large ones such as Harris County, whose populations had significant numbers of shift workers who could not access voting during normal hours. *See* Tr. 9/20 1270:22–1271:9 (Longoria testifying about Harris County voters who were members of law enforcement, health care workers, and Port of Houston workers who needed 24-hour voting); *Id.* 1263:21–1264:7 (Longoria testifying that they chose 24-hour locations based on where there were large populations of voters who would be working a late-night shift); 10/3 10/3 Tr. 2243:20–2244:4 (Shackelford) (testifying about how 24-hour voting meets specific needs of communities that HAUL serves in Harris County).

927.    Similarly, DTV met the specific needs of voters in Harris County, a massive jurisdiction spanning more than 1,700 square miles and containing a population of nearly 5 million residents. 9/19 Tr. 1217:22-25 (Longoria); *see also id.* 1221:10-17 (Longoria); State Ex. 290. Ms. Longoria described Harris County and Houston as a "car city" where "[p]eople do everything in their cars. 9/19 Tr. 1229:13–20 (Longoria); 1256:4–9 (Longoria testifying that DTV was well-suited to voters' needs because Houston is a "car city"). Providing the drive-through option was "giv[ing] people what they want in Harris County." 9/19 Tr. 1229:13-20 (Longoria).

928.    Moreover, SB1's elimination of 24-hour voting does not actually create uniformity. SB1 requires counties with populations above 55,000 to permit early voting for at least 12 hours between 6 a.m. and 10 p.m., and it allows counties with less than 55,000 people to provide fewer than 12 hours of early voting per day. SB1 § 3.09. Therefore, one county could allow early voting

from 6 a.m. to 6 p.m., while the adjacent county could provide early voting from 10 a.m. to 10 p.m. or 7 a.m. to 9 p.m., or if it were a county with fewer than 55,000 people, from 9 a.m. to 5 p.m. 9/21 Tr. 1575:13-18 (Escobedo); 10/17 Tr. 105:24-106:8 (Ingram).  SB1's elimination of 24-hour voting does not address the purported risk of voter confusion from neighboring counties offering different early voting hours. 9/21 Tr. 1575:13-18 (Escobedo); 10/17 Tr. 105:24-106:8 (Ingram).

929.    For DTV, Defendants contend that the state of the law was unsettled as to the question of whether a county could provide voters a DTV option. To eliminate any ambiguity and ensure uniformity in application of the EC, Defendants claim that the legislature decided to clarify that voting could only occur inside a building. As an initial matter, each lawsuit that was brought in 2020 contending that DTV was illegal failed. *Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668 (S.D. Tex. Nov. 2, 2020); *In re Hotze*, 610 S.W.3d 909 (Tex. 2020). Moreover, if the legislature wanted to clarify the law, it could have simply made explicit that DTV *was* permitted, 10/18 Tr. 4210:18-25 (Ingram) , which would have avoided imposing the disparate burdens on Black and Hispanic voters that were made clear with extensive evidence during the legislative hearings and debates.

## XVII.    INJURIES TO ORGANIZATIONAL PLAINTIFFS AND THEIR MEMBERS

### A.  Houston Area Urban League

930.    SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, and 4.12 cumulatively cause significant harm to the Houston Area Urban League's members and clients. 10/3 Tr. 2251:1-7 (Shackelford). Taken together, these provisions limit the methods that voters can use to cast their votes, by among other things, restricting the times that polling places can be open for early voting, eliminating 24-hour voting, prohibiting DTV, fully eliminating straight ticket voting, and restricting BBM drop-off sites. *Id*. 2241:24–2243:9, 2243:20–2244:15 (Shackelford); *see also id*. 2245:18–2246:8

(Shackelford); *see also id*. 2247:10–2248:25 (Shackelford). These provisions restricted or eliminated election procedures that promoted ease of access to voting and "allowed many of the communities that HAUL serves to have historic turnout." *Id*. 2238:25–2239:6 (Shackelford).

931.    These provisions of SB1 also make the process of voting more complicated and confusing for HAUL's members and clients. As Ray Shackelford testified, "even now there's still confusion about the voting process . . . they don't know what to do because of all these different changes they don't understand and ultimately in some cases it's going to suppress the vote. People will not vote. For others, it's going to make it that much more challenging." *Id*. 2251:1-16 (Shackelford).

932.    DTV is important to HAUL's members and its clients because it made the voting process more accessible and more convenient. *Id*. 2242:13–2243:2 (Shackelford). The ban on drive-thru voting in SB1 sections 3.04, 3.12, and 3.13 has "suppressed the vote to where some individuals will no longer be able to vote because of obstacles that's placed in front of them. For other individuals, it's made it much more challenging and just created a lot of confusion honestly." *Id*. 2243:3-9 (Shackelford).

933.    Deion Dorsett and his wife, who are members of HAUL, voted drive-thru in November 2020. 10/3 Tr. 2281:10-12; 2288:17–2291:6; 2292:6–2292:13 (Dorsett).

934.    DTV appealed to the Dorsetts because it was a safe method of voting during the pandemic, and they were able to avoid intimidation at the polls in light of the politically polarizing political environment. *Id* 2289:10-19 (Dorsett). Some of the Dorsetts' family members also used DTV, especially medical professionals. *Id*. 2291:15–2292:5 (Dorsett).

935.    Were SB1 not enacted, Deion Dorsett would have used DTV in future elections. *Id*. 2293:23–2294:12, 2295:22-24 (Dorsett); *see also id*. 2296:25–2297:2 (Dorsett).

936.    Mr. Dorsett did not have the opportunity to use DTV in the November 2022 General Election. *Id*. 2296:25–2297:2 (Dorsett). He and his wife felt very uncomfortable voting in person because there were people shouting and it was unclear to Mr. Dorsett who was in charge. *Id*. 2295:25–2296:24, 2297:3–2297:14 (Dorsett).

937.    Sections 3.09 and 3.10 of SB1 have negatively affected HAUL members and HAUL clients, particularly those who are shift workers, by restricting the times when early voting may take place, thereby making voting less convenient and less accessible. *Cf. id*. 2243:20–2244:8 (Shackelford).. The elimination of 24-hour voting through SB1 has "created confusion with a lot of individuals" in the communities that HAUL serves, and others "will not be able to vote going forward" because of the jobs and schedules that they have. *Id*. 2244:9-15 (Shackelford).

938.    Deion Dorsett benefitted from the availability of extended hours for early voting. Mr. Dorsett works at the United States Department of Labor as an equal opportunity specialist, and there have been days where he has worked from 5:00 AM to 10:00 PM. *Id*. 2278:4-17 (Dorsett).

939.    SB1 § 3.15, which eliminates straight-ticket voting, negatively impacts voters in Harris County because that county is one of the largest in Texas and as such, it tends to have one of the longest ballots. The elimination of straight-ticket voting has complicated the voting process and made that process more confusing, challenging, and frustrating for the communities that HAUL serves. *Id*. 2247:19–2248:10 (Shackelford). Mr. Shackelford testified that the elimination of straight-ticket voting "has made it to where some people don't want to vote anymore." *Id*. 2248:11-14 (Shackelford). The additional burden associated with long wait times and long, complicated ballots in Harris County could be enough to discourage voters on the margins, such as the "average everyday person that has different responsibilities and just trying to keep the lights

on." *Id*. 2248:19-25 (Shackelford). Mr. Dorsett expressed a similar sentiment regarding the negative impact that long wait times have on voters when he described his experience voting in the March 2020 Primary Election. *Id*. 2284:20–2288:16 (Dorsett). There were some issues with the Democratic voting machines at his polling place, and during the four hours that Mr. Dorsett and his family waited to vote, he "saw throughout the entire process people walking and leaving the line, you know, being discouraged from voting at that point." *Id*. 2287:13–2288:2 (Dorsett).

940.    The opportunity to vote by mail is important for several of HAUL's clients who are senior citizens aged 65 and older and people with qualifying disabilities because "[i]t allows them to cut down confusion, not feel rushed," and avoid intimidation at polling locations. *Id*. 2244:23–2245:10 (Shackelford).

941.    The provisions of SB1 that changed the identification number requirements for ABBMs and BBMs have "created confusion with those populations that [HAUL] serve[s], and in some cases made it to where they won't be able to vote going forward." *Id*. 2245:11-17 (Shackelford). Members of the Houston community, such as Pamela Gaskin, who registered to vote 40 years ago, have had BBMs rejected because they could not remember which ID they used to register to vote. *Id*. 2246:18-21 (Shackelford).

942.    Section 4.12 of SB1 adds certain requirements to the process for in-person drop-off of BBMs and negatively affects HAUL's clients by complicating the process for dropping off a BBM, making it more time-consuming and confusing. *Id*. 2245:22–2246: 8 (Shackelford); *see also id*. 2247:7–2247:9 (Shackelford).

943.    The voter assistance provisions of SB1 have made people in the communities that HAUL serves fearful and confused because "they don't know what's going to happen if they do try to help someone." *Id*. 2250:10-18 (Shackelford).

944.    In addition to the negative impact that SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, and 4.12 have had on HAUL's members and clients, SB1 has also created harm to HAUL as an organization by causing a diversion of financial resources and human capital. *Id*. 2241:17–2241:23 (Shackelford). The challenged provisions of SB1 make it substantially more difficult for HAUL to pursue its social and economic mission, as the organization has been forced to divert resources to respond to this new law.

945.    After the passage of SB1, HAUL hosted a virtual event with its National President/CEO to discuss the changes that the challenged provisions of SB1 made to the voting process in Texas. *Id*. 2251:17–2252:9 (Shackelford). HAUL hosts virtual meetings periodically, but the event in response to SB1 was unique because the National President/CEO attended and that is "not a normal thing." *Id*. 2251:17–2252:1 (Shackelford).

946.    Usually, after an election, HAUL holds a post-election recap to discuss next steps going forward. However, because of the mass confusion and fear expressed by the community because of SB1, HAUL had to change the contents and medium of the recap. *Id*. 2252:2–2253:12 (Shackelford). Instead of discussing next steps following the election results, HAUL partnered with Radio One to conduct a live streamed discussion on the future of voting featuring State Representative Jasmine Crockett and State Senator Carol Alvarado. *Id.*

947.    Furthermore, HAUL employees have had to divert time from other projects because of SB1. *Id*. 2252:10-23 (Shackelford).  CEO Judson Robinson has been forced to divert time from fundraising to responding to confusion and fear in the community prompted by SB1. *Id*. 2260:21–2261:9 (Shackelford).

948.    Ray Shackelford was hired by HAUL in August 2019 as a social impact consultant. *Id*. 2229:4-5 (Shackelford); *see also id*. 2232:16-18 (Shackelford). When he was hired, Mr.

Shackelford's job responsibilities included facilitating HAUL's Advocacy U and youth cohorts, advising the CEO and senior leadership team on civic engagement, advocacy, and policy issues to prepare them for testimony or other public speaking engagements, and working with HAUL's senior leadership to develop a strategic plan for HAUL's Center for Social Justice & Education. *Id*. 2231:19–2232:9 (Shackelford); *see also id*. 2252:10-23 (Shackelford).  He was also brought in to help with a Census project, with the goal of transitioning to redistricting work in 2021 when the Census was finished. *Id*. 2263:1-12 (Shackelford).

949.    The purpose of HAUL's Center for Social Justice & Education is to provide information to the communities HAUL serves about the importance of voting, how to engage in advocacy, and how to read and understand public policy. *Id*. 2232:19–2233:11 (Shackelford). The Center for Social Justice & Education was not originally intended to address SB1. *Id*. 2275:7-16 (Shackelford).

950.    Addressing SB1 was not intended to be a part of Mr. Shackelford's role, but such work has consumed a great deal of his time, "and as a result taken away from other activities that I would have been . . . expected to perform normally." 10/3 Tr. 2252:10-15 (Shackelford). Because he has had to take on additional responsibilities related to SB1, Mr. Shackelford testified that he has not been able to do many of the things that he was hired to do such as develop strategy with senior leadership for building out the Center for Social Justice & Education. *Id*. 2252:10-23 (Shackelford). SB1 also decreased the amount of time that Mr. Shackelford would have devoted to HAUL's voter registration activities. *Id*. 2259:4-9 (Shackelford).

951.    Instead, Mr. Shackelford has diverted time away from the consulting projects that HAUL originally hired him to pursue in order to receive training on SB1 from the EA's Office, now Harris County Clerk, self-educate on the provisions of SB1, connect with state elected

officials, schedule trainings for HAUL staff and members, provide recurring and supportive training to HAUL staff and members, and go out into the community and educate others. *Id*. 2252:10-23 (Shackelford); *id*. 2254:9–2256:2 (Shackelford).

952.    Because of the changes to Mr. Shackelford's duties, HAUL has had to reorganize its staff to bring on additional support by moving Cornell Walker from the United Way Thrive Program to exclusively work on the Center for Social Justice & Education as a full-time employee, *id*. 2253:19-25 (Shackelford), and hiring two additional full-time equivalent staff members to manage the United Way Thrive Program to fill the gap in capacity and experience left by Walker. *Id*. 2254:1-6 (Shackelford). Because of Walker's absence from the United Way Thrive Program, HAUL has "suffered in our ability to service as many clients through that program." *Id*.

953.    HAUL shortened its staff meetings so that Mr. Shackelford could conduct internal trainings and discussions about SB1. *Id*. 2255:20–2256:20 (Shackelford). HAUL also abbreviated external presentations in order to present information about SB1 to the community. As an example, John Robinson had to significantly shorten his presentation on family and community engagement in education and literacy to yield that time to Mr. Shackelford so that he could educate community members on SB1 and answer questions. *Id*. 2256:3-24 (Shackelford). The abbreviation of the family and community engagement presentation impaired the quality of the presentation. *Id*.

954.    SB1 also forced HAUL to change the curriculum for its Advocacy U program, the core training program for community advocates. *Id*. 2255:8-19 (Shackelford); *see also id*. 2257:21–2258:3. The Advocacy U curriculum for Fall 2021 was originally going to focus on diversity, equity, and inclusion. *Id*. 2257:21–2258:3. However, because of the confusion that HAUL staff heard the community express about SB1, HAUL discarded the original curriculum and developed a new 12-week curriculum focused on SB1. *See id*.

955.    During his four years as a social impact consultant and his nearly 20 years with HAUL, Mr. Shackelford does not recall any other time where HAUL has had to do this type of specialized training. *Id*. 2255:8-19 (Shackelford). In fact, Mr. Shackelford described the type of one-on-one and group training that HAUL engaged in after the passage of SB1 as "very unique and outside of the normal scope of what we do from a civic engagement perspective." *Id*.

956.    SB1 also negatively affected HAUL's ability to pursue its voter registration and deputization activities because the HAUL volunteers who usually do the bulk of this work had to participate in supplemental training on SB1. Because of this additional training, HAUL lost some essential capacity from all of its volunteers and others were completely deterred. 10/3 Tr. 2258:7-25 (Shackelford). HAUL still attempted to facilitate these programs, but they were less effective and ultimately the organization was "not able to reach the numbers that we would have liked, if we did not have to focus as much on SB1." *Id*. 2258:18–2259:3 (Shackelford).

957.    HAUL anticipates that it will have to continue investing resources into addressing the confusion and fear that SB1 has inspired in the community because the organization is finding that multiple training sessions are often required in order for an individual to understand the changes in SB1 and some voters will encounter the provisions of SB1 for the first time during the 2024 General Election. 10/3 Tr. 2259:10–2260:20 (Shackelford).

### B.  Delta Sigma Theta Sorority, Inc. ("DST")

958.    SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.12, 6.01, 6.03, and 6.05 cumulatively have harmed the members of Delta Sigma Theta Sorority, Inc. and the communities the organization serves. These provisions limit the methods that voters can use to cast votes, by among other things, restricting the times that polling places can be open for early voting, eliminating 24-hour voting, prohibiting DTV, fully eliminating straight-ticket, restricting BBM drop-off sites, and by placing additional requirements on voter assistance. These provisions restricted or eliminated

election procedures that encouraged people who had not been consistent voters before 2020 to vote and "g[a]ve them an opportunity to vote." 10/2 Tr. 2103:15–2111:12 (Brown).

959.    These provisions of SB1 also made the process of voting more complicated and confusing for DST members and the people they serve. 10/3 Tr. 2206:8–2206:12 (Watkins-Jones). As Sharon Watkins-Jones testified, "[w]e still find that members are confused as to what they can and can't do and what the penalties are, and as well as the general public or rather the communities that we serve need a lot of explaining of SB1." *Id.*

960.    DST members used DTV when it was available in Harris County, and these members are negatively affected by the elimination of DTV. 10/2 Tr. 2103:15–2104:19 (Brown). DTV is important to DST's members and people the organization serves in the community because it made the voting process more accessible and more convenient, especially for single parents and people who work irregular hours such as healthcare workers. *Id.* 2103:20–2104:10 (Brown).

961.    Sharon Watkins-Jones offered three specific examples of DST members who used DTV in 2020 so that they could vote with their elderly parents. When DTV was in effect, Kimberly Baker and Sonia Baker, members of the Bay Area Alumnae Chapter of DST, were able to transport their parents, one of whom is mobility challenged, to the polling place and all four of them could vote from the car. Janine Johnson, member of the Houston Alumnae Chapter of DST, similarly used DTV when she took her visually impaired mother to vote. 10/3 Tr. 2194:5-18 (Watkins-Jones). But now, post-SB1, the process of voting has become "burdensome [and] cumbersome" for these DST members and "could . . . be[]dangerous for their parents" because the members must now park and leave their parents in the car for an indeterminate amount of time because of the line while they vote because they are not eligible to vote curbside. *Id.* 2194:1–2195:6 (Watkins-Jones).

962.    Sections 3.09 and 3.10 of SB1 have negatively affected DST members and people in the communities that DST serves, particularly those with irregular hours such as workers at plants and chemical facilities, by restricting the times when early voting may take place thereby making voting less convenient and less accessible. 10/2 Tr. 2105:3-24 (Brown). The elimination of 24-hour voting through SB1 has created confusion for many members and people in the communities that DST serves. *Id*. 2105:25–2106:8 (Brown).

963.    The Houston Alumnae Chapter of DST polled 240 of its members and reported that 84% of them voted early. 10/3 Tr. 2195:7-19 (Watkins-Jones). The group of early voters included members who work in positions that are likely to have irregular hours such as shift workers, medical professionals, and law enforcement officers. *Id*. 2195:22–2196:3 (Watkins-Jones). These types of professionals benefitted from 24-hour voting.

964.    Sharon Watkins-Jones offered an example of how the ban on extended early voting hours burdened DST member Lisa Newman and her family. *Id*. 2196:11-20 (Watkins-Jones). Because polls could not stay open for 24 hours after SB1, Mrs. Newman's husband, a medical professional, went to his polling place to vote directly after finishing his 12-hour shift, waited five hours to vote, and was injured in a car accident caused by fatigue after leaving the poll. *Id*.

965.    SB1 § 3.15 regarding the elimination of straight-ticket voting negatively impacts DST members in Texas, especially Harris County, because that county is one of the largest in Texas and as such, it tends to have one of the longest ballots. The elimination of straight-ticket voting may create longer lines at the polls. 10/2 Tr. 2106:17–2107:11 (Brown).

966.    Section 4.12 of SB1 adds certain requirements to the process for in-person drop-off of BBMs and negatively affects DST's members and voters in the communities it serves by complicating the process for dropping off BBMs.

967.    The voter assistance provisions of SB1 have made it harder for DST members to assist the members of DST who are senior citizens and other elderly community members. *See id*. 2107:16–2108:1 (Brown).

968.    SB1 § 6.01 has prevented members of DST from providing transportation to the polls. *E.g*., 10/3 Tr. 2196:21–2197:3-7 (Watkins-Jones).

969.    SB1 §§ 6.03 & 6.05 frustrate DST's get-out-the-vote ("GOTV") efforts: DST members do not want to provide the information that SB1 demands from those who assist voters, and the statute does not give a clear definition of "compensation." 10/2 Tr. 2109:9–2110:2, 2110:12–2111:1 (Brown).

970.    The SB1 voter assistance provisions have made DST members who would normally be willing to assist voters afraid to do so because "people are le[e]ry of providing their personal information because they don't know what will happen with it . . . they don't understand." *Id*. 2109:9–2110:2 (Brown); *see also id*. 2108:7–2109:3, 2110:12–2111:1 (Brown). There are DST members who have said that they are going to stop providing voter assistance because of the additional information that assisters are now required to disclose under SB1. *Id*. 2124:11-16 (Brown). Additionally, there are DST members who have been intimidated and discouraged from providing in-person voter assistance because of the revised oath requirements of SB1. *Id*. 2110:12–2111:1 (Brown).

971.    The opportunity to vote by mail is important for several of DST's members who are senior citizens aged 65 and older and people with qualifying disabilities. 10/2 Tr. 2110:3-4 (Brown). But DST members, particularly DEARS (DST members over 65) have found SB1's absentee mail voting process "cumbersome." 10/2 Tr. 2152:19–2153:13 (Watkins-Jones).

972.    The provisions of SB1 that changed the identification number requirements for ABBMs and BBMs, especially the requirement that voters must write their personal information under the flap of the BBM carrier envelope, have created confusion for DST members who vote by mail and made the process of voting by mail more cumbersome. *Id.* DST members, such as Rose Mary McGowan of the Houston Alumnae Chapter, have had their BBMs rejected because they have failed to include the required identification information under the flap of their mail ballot. *Id.* Ms. McGowan, a 90-year-old voter, did not receive notice of the rejection in time to cure her ballot and vote by mail, so she risked her health and safety to go vote in person. *Id.*

973.    Prior to SB1, the members of the San Antonio Alumnae Chapter of DST distributed ABBMs that they obtained from Bexar County election officials. 10/2 Tr. 2148:4-24 (Watkins-Jones); 10/3 Tr. 2216:25-2217:13 (Watkins-Jones). The Chapter has ended that practice now because SB1 prohibits election officials from distributing ABBMs without a direct request from an eligible voter. *Id.* This provision of SB1 applies to election officials, but it also stifles DST's ability to pursue the social action prong of its civic engagement mission because the San Antonio Alumnae Chapter would now be required to print its own applications for distribution, which would require additional funds to cover printing costs, and those printed ABBMs would lack many features of the official ABBM form. *Id.*

974.    The poll watcher provisions of SB1 have also negatively impacted DST members and the organization's ability to pursue parts of its mission related to civic engagement. Sharon Watkins-Jones, member of the Bay Area Houston Alumnae Chapter of DST, 10/2 Tr. 2142:11-13 (Watkins-Jones), testified that she had a negative experience with a poll watcher during the November 2022 election after SB1 went into effect. 10/3 Tr. 2191:7–2193:22 (Watkins-Jones). The poll watcher loomed about a foot away from her while she was voting and followed her as she

placed her voted ballot into the tabulator. 10/3 Tr. 2191:12–2192:10 (Watkins-Jones). Ms. Watkins-Jones testified that the experience with the poll watcher was "unsettling" and "uncomfortable" because she "did not feel like [she] had privacy and [she] did not feel as if she had safety or security either as [she] passed [her] ballot." Further, she did not believe that an election worker would be able to help her if the election judge had not witnessed the incident. 10/3 Tr. 2193:5–2193:12 (Watkins-Jones); 10/2 Tr. 2156:7-19 (Watkins-Jones).

975.    Ms. Watkins-Jones also testified that "intimidation [because of the poll watcher provisions] has been very real to our members." 10/2 Tr. 2155:9-20 (Watkins-Jones). The poll watcher provisions of SB1 have deterred DST members, especially Delta DEARS, senior members aged 65 and older, who have served as poll workers in the past from continuing to work the polls because they fear intimidation from poll watchers. 10/2 Tr. 2155:9-20 (Watkins-Jones). Furthermore, DST members who previously served as election precinct judges have had their family members ask them not to return to their positions after SB1 because they feared what could happen if the election judges were watched or followed in a vehicle while they were completing their official duties. *Id.*

976.    In addition to the negative impact that SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.12, 6.01, 6.03, and 6.05 have had on DST's members and the communities it serves, as described below, the challenged provisions of SB1 have also harmed DST as an organization by a diversion of human capital and making it more difficult for DST to recruit members to volunteer for its social action projects.

977.    Though the witnesses from DST were not aware of anyone who had been prosecuted under SB1 for assisting voters, "SB1 is the threat." 10/3 Tr. 2216:1-6 (Watkins-Jones); *see also* 10/2 Tr. 2124:11-19 (Brown).. The challenged provisions of SB1 have deterred DST

chapters from organizing voter assistance activities because "chapters have difficulty finding members who would risk the penalties." 10/3 Tr. 2203:10-15 (Watkins-Jones); *see also* 10/3 Tr. 2223:22–2224:4 (Watkins-Jones). Senior DST members, Delta DEARS, usually form the largest cadre of Deltas who provide voting assistance, but since SB1 has gone into effect "it has been very difficult to help to assuage their fears and engage them in ways that normally are second nature to us." 10/3 Tr. 2203:22–2204:6 (Watkins-Jones).

978.    The threat of criminal penalties incorporated into SB1 sections 6.03 and 6.04, which require people providing in-person assistance to voters to disclose personal information on a form and swear an oath under penalty of perjury, confuse and intimidate DST members. 10/3 Tr. 2199:16-19 (Watkins-Jones). In fact, these provisions have caused entire DST Chapters to shy away from one-to-one assistance because there has been a dearth of members willing to assist. *Id.* 2199:20-24 (Watkins-Jones).

979.    The provision that requires a person who assists seven or more voters for curbside voting to fill out a form with identifying information "has really made it difficult to recruit members to do this because of the fear of legal repercussion if there are mistakes made or if they inadvertently break the law." 10/3 Tr. 2196:21–2197:7 (Watkins-Jones). DST members and community members who would typically provide transportation are afraid to complete these forms because "they don't know what's going to happen to the information that they put on those forms." 10/2 Tr. 2108:7–2109:3 (Brown).

980.    As a few examples, the Fort Worth Chapter of DST routinely assisted seniors at Friendship Senior Center, but none were willing to continue to do so once SB1 went into effect because of fear associated with penalties. 10/3 Tr. 2197:3–2197:16 (Watkins-Jones). The Austin Alumnae Chapter of DST assisted voters with disabilities and voters in nursing homes by

providing transportation to the polls, but even though SB1 only requires drivers to sign a form if they transport seven or more curbside voters, the Chapter is now unwilling to provide any transportation assistance at all because the members are confused about the requirement. 10/3 Tr. 2147:9–2148:3 (Watkins-Jones).

981.    The Austin Alumnae and Bay Area Houston Chapters have also reevaluated the types of assistance they provide because "they have not been able to recruit members who are brave enough to assist with senior voters because of the fears of criminal penalties." 10/3 Tr. 2197:17–2198:6 (Watkins-Jones).

982.    Because of SB1, DST is devoting more time and more resources to its voting activities. 10/2 Tr. 2102:15-16 (Brown). Internally, DST has spent more of its time training its own members about SB1, especially regarding the potential criminal penalties. *Id.* 2101:2–2103:12 (Brown). This training has required a substantial diversion of human capital from DST's other efforts because, "[i]t's not just one or two provisions that we have to reeducate our members through, but it's a whole myriad of provisions." *Id.* 2111:8-12 (Brown).

983.    Ms. Watkins-Jones testified that, "[b]ecause of the fears associated with it, the criminal penalties associated with some of the assistance that traditionally we've given to voters, as well as some of the prohibitions of the different ways that members have before been able to exercise their right to vote, we've had to spend a lot of time, an inordinate amount of time reviewing the provisions of SB1 so that our members and the people that we serve feel as if they can be safe and secure when they vote." 10/2 Tr. 2158:8-19 (Watkins-Jones).

984.    Since the passage of SB1, DST has "been burdened to try to become experts ourselves," so in addition to reviewing and analyzing the bill, officers and members of the organization have also researched websites and materials, invited attorneys to speak on webinars,

reached out to the SoS, partnered with the League of Women Voters, and conducted one-on-ones with members. 10/3 Tr. 2200:4–2201:1 (Watkins-Jones).

985.    Additionally, DST has spent more time on individual conversations with members who would normally have volunteered to assist voters trying to convince them that they can continue to transport voters to the polls under the provisions of SB1. 10/3 Tr. 2204:25–2205:9 (Watkins-Jones).

986.    In addition to increasing its internal efforts to train members and officers regarding the challenged provisions of SB1, DST was also forced to reorganize its education efforts and enhance its external training to prepare community members to exercise the right to vote after the enactment of SB1. 10/2 Tr. 2100:11–2101:11, 2102:11-14 (Brown). Ms. Watkins-Jones testified that SB1 "make[s] it difficult because of the enhanced education and enhanced assuaging of fears that we have to do." 10/3 Tr. 2203:16-21 (Watkins-Jones).

987.    SB1 required DST to "fundamentally alter[]" its voter education programs. 10/3 Tr. 2225:5–2225:9 (Watkins-Jones). The impact that SB1 has had on DST's voter education efforts is different from the organization's routine response to changes in voting laws because "SB1 had so many new provisions and so many reasons to be fearful." 10/3 Tr. 2220:23–2221:5 (Watkins-Jones).

988.    Because SB1 inspired confusion and fear regarding the voting process, "all the work that [DST has] done up to this point to get people out to vote has been impacted." 10/2 Tr. 2100:14–2101:1 (Brown). DST had to reeducate existing voters about voting methods that were available to them in 2020 that are no longer available post-SB1. *Id.* 2111:6–2112:9 (Brown); 10/3 Tr. 2204:25–2205:9 (Watkins-Jones). Additionally, DST had to develop supplemental trainings to encourage people who SB1 had discouraged participating in the political process generally, 10/2

Tr. 2100:11–2101:1 (Brown), or discouraged from serving as assisters, 10/3 Tr. 2202:9-2202:25 (Watkins-Jones). 10/3 Tr. 2200:17–2201:1 (Watkins-Jones). To address the community's concerns about poll watchers, DST's enhanced trainings for voters post-SB1 to educate voters about their rights, poll watchers' authority and limitations, and what to do if they feel intimidated at the polls. 10/2 Tr. 2154:22–2155:8 (Watkins-Jones). To address concerns from people who SB1 deterred from providing voter assistance, DST developed webinars and in-person education seminars to address concerns and educate them about the requirements in SB1 so that they can feel more confident providing assistance. 10/3 Tr. 2202:9–2202:16 (Watkins-Jones).

989.    DST members have invested a substantial amount of time in developing trainings, webinars, and videos for other DST members and the broader community to mobilize voters and assisters post-SB1, 10/2 Tr. 2105:25–2106:16 (Brown), so other projects that are a normal part of DST's voting work such as its voter mobilization efforts lost essential volunteer time, 10/3 Tr. 2204:25–2205:19 (Watkins-Jones). As Sharon Watkins-Jones testified, "[b]efore SB1 [DST] could focus 100 percent of our time on registration and mobilization. After SB1, probably 50 percent of that time is spent on education." 10/3 Tr. 2205:20–2205:25 (Watkins-Jones). SB1 prompted this shift from voter mobilization to voter education because, "SB1 was such a paradigm shift and had so many provisions that were of concern that our time was skewed toward explaining SB1." 10/3 Tr. 2206:1–2206:7 (Watkins-Jones).

990.    Before SB1, DST's voter education efforts would typically center solely on "how to vote or where to vote, and polling locations, . . . things of that nature." 10/3 Tr. 2203:1-9 (Watkins-Jones). But because "SB1 was intimidating and scary and different," DST had to enhance its voter education trainings and shift resources to focus more of its voter education efforts on explaining how people can still register to vote, cast a ballot and have it count, and assist voters

without running afoul of the criminal penalties in SB1. 10/2 Tr. 2153:14-23, 2156:23–2157:3 (Watkins-Jones).

991.    Additionally, some DST Chapters have leaned more into voter education as they have shied away from providing one-to-one voter assistance. 10/3 Tr. 2199:20-24 (Watkins-Jones).

992.    This diversion of time from voter mobilization to voter education about SB1 is likely to persist, as "[DST] still find[s] that members are confused as to what they can and can't do and what the penalties are, and as well as, the general public or rather the communities that we serve need a lot of explaining of SB1." 10/3 Tr. 2206:8–2206:12 (Watkins-Jones).

993.    SB1 also forced DST Chapters to divert time from other legislative efforts to focus on SB1. 10/2 Tr. 2102:11-14 (Brown). Ms. Watkins-Jones testified that "SB1 pretty much sucked up the oxygen from most of what we were advocating for" during the 2021 legislative session. 10/2 Tr. 2157:13–2158:7 (Watkins-Jones). "As a result of SB1, [DST] asked our members to travel to Austin to testify and to be in opposition of SB1 so frequently during that legislative session, that – in ways that we did not ask them to come for the other bills that were being considered because it was such a looming disturbance to us," so DST's advocacy in terms of health, women's rights, and education suffered. *Id.*

994.    In addition to diverting time from its voter mobilization efforts and non-voting legislative advocacy, DST Chapters also had to divert money from "existing capacity" for other projects in response to SB1. 10/2 Tr. 2157:4-12 (Watkins-Jones). DST's resources are finite, and SB1 sucked financial resources away from other projects that the organization would have wanted to pursue: "[C]hapters would have budgets for their registration activities, for education activities, for, you know, anything related to social action chapters would have budgets for that and allotted

resources for that. And whatever those resources were, they would, after SB1, be spent primarily on educating voters about SB1." *Id.*

995.    DST Chapters have had to allocate more money in their budgets for voter training in order to pursue the organization's purpose of mobilizing voters since SB1 was enacted. 10/3 Tr. 2204:7-14 (Watkins-Jones). For instance, the Bay Area Houston Chapter of DST allocated $700 per election cycle to voter registration drives and mobilization efforts before SB1, but the added training and enhanced education required to respond to the challenges presented by SB1 necessitated a budget increase to $1,000 for the 2022-2023 election cycle. *Id.* 2204:15-21 (Watkins-Jones). Other DST Chapters likely similarly increased their budget allocations for voter mobilization post-SB1. *Id.* 2204:22-24 (Watkins-Jones).

### C.  Mi Familia Vota

996.    SB1 sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, 4.12, 5.02, 5.03, 5.04, 5.07, 5.08, 5.13, 6.03, 6.05, 6.07, 7.02 and 7.04 cumulatively harm Mi Familia Vota and the communities the organization serves. First, the organization's diversion of funding to respond to the scope of SB1 harmed both the election and non-election programming delivered by MFV to support Latino communities. Responding to the scope of SB1 required MFV to seek additional and harder-to-obtain funding to support its SB1-responsive election assistance programs. Next, the activities prohibited by SB1 impeded the organization's ability to assist voters, both in terms of the number of eligible voters assisted and the type of voting assistance available after SB1. Also, the staff required to accomplish the organization's objectives is compromiseD By SB1, both in terms of capacity to execute current programming and willingness to serve under the conditions created by SB1.

997.    MFV serves the Texas Latino community at large. It advocates for issues that disproportionately impact the Latino community and runs a year-round youth leadership

development program as well as issue-based programs like its environmental justice, immigration, access to affordable health care, educational equity, worker's rights, and reproductive justice programs. 10/10 Tr. 3426:8-12, 3430:17-24 (Razo). MFV also runs a voting rights program, a voter mobilization campaign, and carries out election-related work to educate voters and encourage them to participate in elections. 10/10 Tr. 3426:13-16 (Razo).

998.    MFV is not a membership organization. To achieve its organizational purposes, MFV raises funds from various donation and grant funding sources. MFV's funding typically comes from grants, foundations, and other philanthropic institutions, with a small portion coming from individual donors, donor advice funds, and sometimes from unions. 10/10 Tr. 3428:13-17 (Razo).

999.    Since the passage of SB1, MFV has had to change its fundraising practices. Most of MFV's grants are from grant-specific and program-specific funds, with deliverables attached. The grants require MFV to use the funds for defined programmatic activities, such as youth leadership development or environmental justice. 10/10 Tr. 3428: 18-25, 3429:1-2 (Razo). This money cannot be used to respond to SB1's new policies. 10/10 Tr. 3429:3-5 (Razo).

1000.    SB1 has required MFV to start raising support funds for general operations. 10/10 Tr. 3429: 5-7, 14-18 (Razo). Ms. Razo testified that while she was the Texas state director of MFV, she reallocated her time to build an operational budget with money that could be used to help voters in the aftermath of SB1; she and her coworkers had less ability to look for issue-specific grants. 10/10 Tr. 3429:14-18 (Razo).

1001.    MFV now must obtain general operational support to deal with SB1, but such funds are difficult to obtain, and are more time-consuming to obtain than program- or issue-specific grants. 10/10 Tr. 3482:10-25 (Razo).

1002.   MFV has had to pull back on seeking issue-specific funding, because such grants would limit MFV's staff to doing issue-specific work, at a time when the staff is needed to do election work responsive to SB1. 10/10 Tr. 3482:10-25 (Razo).

1003.   The funding consequences of SB1 came clearly into focus in the second half of 2022, when MFV carried out its work during a major mid-term election, the first since SB1 went into effect. Ms. Razo and her staff saw how great the need was to divert resources to MFV's election work to address the impacts of SB1. 10/10 Tr. 3483:8-19 (Razo).

1004.   MFV also had to reallocate staff time away from other duties because of SB1. All staff members had to be aware of the effects of SB1, as it might be necessary for any of them to have discussions with voters about the law. 10/10 Tr. 3429: 18-22 (Razo), 10/10 Tr. 3391:2-7 (López). It was time intensive to train MFV staff. 10/10 Tr. 3440:13-17 (Razo). In addition, MFV has program-specific deliverables in connection with its program-specific grants, and the staff has not been able to focus on the deliverables because of the need to spend time on SB1. 10/10 Tr. 3440:18-23 (Razo).

1005.   SB1 has been in effect for two years, but MFV still cannot shift its resources back, and Ms. Razo anticipates that SB1 will cause a long-term shift in MFV's resources. 10/10 Tr. 3440:6-12 (Razo). Ms. Razo explained that MFV will scale up its election work significantly in 2024. MFV will work with voters who have not voted since 2020 and will expect to be able to use DTV, or who otherwise do not yet understand the impact of voting under SB1. 10/10 Tr. 3440: 15-24 (Razo). MFV will need to dedicate staff time and resources to reach many voters whose options have been restricted by SB1. 10/10 Tr. 3440:24–3441:4 (Razo).

1006.   SB1 strains MFV's staff and financial resources, limiting its ability to carry out its non-election-related projects. 10/10 Tr. 3430:25, 3431:1-4 (Razo).  MFV is putting more time into

addressing voter concerns about SB1 and more time into helping voters make plans to vote, and therefore cannot run the high-skill, issue-based programming that it formerly did, and would continue to do, had SB1 not become law. 10/10 Tr. 3431: 5-9 (Razo).

1007.   MFV focuses on the Latino community generally, but specifically works to engage and support Latino voters who do not vote frequently. These include voters who may not have grown up in a voting household or with a culture of voting, who may have  recently aged into the electorate, or who are recently naturalized. 10/10 Tr. 3434:6-16 (Razo).

1008.   MFV focuses on individuals who are considered low-to-mid-propensity voters. Because they are classified as unlikely to vote, campaigns, political parties, and other organizations are not likely to try to contact them. 10/10 Tr. 3434: 18-23 (Razo). MFV may be the only organization reaching out to them. 10/10 Tr. 3434:23-25, 3435:1-3 (Razo).

1009.   Ms. Razo testified that MFV must  reach each of these voters multiple times in order to successfully educate and support them through the voting process. 10/10 Tr. 3435:24-3436:16 (Razo). Furthermore, if these voters go through the many steps it takes to vote and are not successful, they become discouraged and it takes even more support and work through many election cycles to provide them with the tools and encouragement they need to try to vote again. 10/10 Tr. 3436:19-3437:21 (Razo); 10/10 Tr. 3392:4-21 (López). Failures also tend to become stories told in the community that further dissuades Latino people from trying to become a voter. 10/10 Tr. 3437:4-6 (Razo).

1010.   MFV has always helped voters to make a plan to vote; doing so is harder after SB1. 10/10 Tr. 3389:18-22 (Marla López).

1011.   Each conversation with a voter takes longer because of SB1, so MFV staff help fewer people. 10/10 Tr. 3393:25–3394:10 (Marla López).

1012.   MFV's conducts door-to-door visits and tabling at community events during the election season, particularly after BBMs have been delivered to voters. 10/10 Tr. 3443:3-4, 3457:15-23, 3459:7-12, 3461:17-25, 3462:1-11 (Razo), 10/10 Tr. 3393:11-16 (Marla López).

1013.   Under SB1 § 7.04 MFV canvassers risk being accused of vote harvesting. 10/10 Tr. 3461:17-25 (Razo). MFV trains its canvassers rigorously, 10/10 Tr. 3462:12-19 (Razo), but someone who sees or hears only a portion of a conversation between a canvasser and a voter may misunderstand and make accusations. 10/10 Tr. 3462:20-25, 3463:1-4 (Razo); HAUL-MFV 372.

1014.   Consequently, MFV now must spend additional training time with canvassers. Canvassers are paid for training time, and each hour spent training them on SB1 is also an hour less that each canvasser connects with voters. During elections, MFV hires at least 30 canvassers, who, once trained, can contact between eight and ten voters per hour. 10/10 Tr. 3458:13-17 (Razo).

1015.   MFV pays its canvassers, and provides gear to its workers, including t-shirts, bags, and that identify them as working for MFV. 10/10 Tr. 3458:18-20 (Razo). By paying for gear, MFV ensures that its block walkers are identifiable as being part of MFV, an organization that the community trusts. 10/10 Tr. 3460:1-10 (Razo).

1016.   . MFV also has found that paying canvassers is important to running a quality field program and to ensuring consistency in training. 10/10 Tr. 3460:15-19 (Razo). Canvassers work 20 to 30 hours per week, and canvas leads work 40 hours per week. The community members MFV hires could not afford to be volunteers. 10/10 Tr. 3460:20-25 (Razo). When MFV uses volunteers, it provides them with clothes and food. 10/10 Tr. 3461:1-8 (Razo).

1017.   SB1 eliminated voting options, such as DTV (§§3.04, 3.12, 3.13) and 24-hour voting §§3.09, 3.10) ending MFV's efforts to work with county officials to implement voting options to suit their communities. 10/10 Tr. 3447:4-12 & 3448:1-4 (Razo). Before SB1, each

county had the ability to think creatively about how to meet the needs of the electorate in that county. SB1 took that liberty off the table. 10/10 Tr. 3447:21-25 (Razo).

1018.   SB1 §§5.02, 5.03, 5.04, 5.07, 5.08, 5.13 also changed how MFV interacted with elderly voters or other voters who were eligible to vote by mail. 10/10 Tr. 3449:23-25 (Razo), 10/10 Tr. 3391:13-19 (Marla López). Voters assisted by MFV may have their ABBM or BBM rejected and be dissuaded from voting. 10/10 Tr. 3450:21-24 (Razo). Accordingly, although MFV still educates voters about all voting options, the organization has shifted its focus to preparing voters to vote in person. 10/10 Tr. 3451:24-25, 3452:1 (Razo), 10/10 Tr. 3391:20-23 (Marla López).

1019.   MFV also has had to expend resources to make up for the gap that SB1 created in county communication to voters. Prior to SB1, Harris County sent ABBMs to all voters who were eligible to vote by mail. The County is no longer allowed to do this. 10/10 Tr. 3451:2-6 (Razo). As a result, MFV is using its own resources to send mailers to people who are over 65, letting them know how to request an ABBM. 10/10 Tr. 3451:8-12 (Razo).

1020.   Changes to poll watcher regulations under SB1 (§§4.01 and 4.07) impacted MFV recruitment of poll workers. Before SB1, MFV encouraged community members, especially young people, to serve as poll workers. 10/10 Tr. 3451:13-15, 3452:3-4 (Razo). Because voters in their communities have had bad experiences at polling places, MFV's  goal was to ensure that polling places in their communities would be staffed, that voters could get the assistance they needed, and that polling places were staffed by people who spoke Spanish. 10/10 Tr. 3451:17-25, 3452:1-2 (Razo). Young people who served as poll workers were able to get a paying job, become familiar with the election process, and become resources for their families and communities. 10/10 Tr. 3451:5-15 (Razo). MFV stopped running this program after SB1 went into effect, in part because

the organization no longer had the staff capacity or financial resources, and in part because it was concerned that poll watchers could accuse young poll workers240rongdoingdoing. 10/10 Tr. 3452:14-19 (Razo).

1021.   Ms. Razo and the organization's leadership did not want to encourage community members to serve as poll workers if it meant placing them in a situation where they might be accused of wrongdoing. 10/10 Tr. 3452:218-21 (Razo).

1022.   Ms. Razo understands that an accusation and investigation would negatively affect a poll worker, even if the investigation does not result in a prosecution or conviction. 10/10 Tr. 3454:17-20 (Razo). It is traumatic to be accused of wrongdoing, and an accusation can have a negative impact on a young person's school life, college, and employment. 10/10 Tr. 3455:16-21(Razo).

1023.   MFV's mission is to create a safe voting culture to give people the opportunity to be involved in civic life and civic responsibilities. 10/10 Tr. 3455:4-11 (Razo). If MFV encouraged community members to serve as poll workers and those workers faced investigation, lawsuits, or prosecutions, this would have long-term negative consequences for the accused individual and undermine MFV's reputation as an organization in the community. 10/10 Tr. 3455:12-15 (Razo).

1024.   For similar reasons, following enactment of §§6.03, 6.05, 6.07, MFV no longer encourages people who need assistance to vote to ask someone they trust. 10/10 Tr. 3456:6-12 (Razo). Instead, MFV informs voters that they can ask for assistance from a poll worker. 10/10 Tr. 3456:6-12 (Razo).

1025.   For example, during the 2022 primary election, Marla López, while working for Mi Familia Vota and manning the Mi Familia Vota voter hotline, answered a call from an elderly monolingual Spanish-speaking couple who needed assistance in finding their polling location. Ms.

López met the couple at their home and walked with them to their polling location. However, when they asked her to assist them in voting, Ms. López declined due to SB1's requirements that she sign an oath and provide information to the polling location; she was afraid that she did not understand the new law and might face a lawsuit or prosecution. The couple instead had to rely on an election worker for assistance, who was not an assister of the voters' choice. 10/10 Tr. 3382:3-3383:3 (López).

1026.  Accordingly, as MFV no longer encourages voters to bring a trusted assister with them because of SB1, MFV instead spends more time preparing voters who are eligible to receive assistance to vote without that assistance, a lengthy process that takes time and resources away from work MFV might otherwise be doing. 10/10 Tr. 3457:1-6 (Razo).

### D.  Marlon López

1027.  Marlon López is a Latino man who lives in Harris County, Texas. He has several children, including Plaintiff Marla López. He works a physically demanding job as a welder. 10/10 Tr. 3376:12-23 (López). His job requires him to work long hours. A typical schedule might require him to work twelve days in a row with two days off, which may not coincide with the weekend. 10/10 Tr. 3377:20-23 (López). When he does have days off, he does not have a lot of time off and often has other responsibilities, including the care of his young daughter, who is Ms. Marla López's sister. 10/10 Tr. 3377:24-25, 3404:18-21 (López).

1028.  His work contracts often take him outside of Texas  or weeks at a time. He usually lives in a camper near the worksite. 10/10 Tr. 3377:1-10 (López).

1029.  When Mr. López has a contract in Harris County, his commute is often at least an hour. 10/10 Tr. 3377:11-13 (López).

1030.  In 2020, Ms. Marla López assisted Mr. López in establishing a plan for him to vote. They had to change the plan several times due to his work schedule. Mr. López and Ms.

López ultimately opted to vote drive-through on a Saturday in the late afternoon in a single car while taking care of Mr. López's young daughter. 10/10 Tr. 3378:15-25 (López).

1031.   Mr. López was able to vote because Harris County offered drive-through and extended hour voting options. The options allowed Mr. López to make plans to vote despite his long work hours. 10/10 Tr. 3380:18-25 (López).

1032.   Mr. López is not eligible to vote by mail in all elections. 10/10 Tr. 3381:3-4 (López).

1033.   SB1 has made it more difficult for Mr. López to vote either in person or by mail in the elections he might qualify to vote by mail. Mr. López tried to make a plan to vote after SB1 went into effect, but was not able to vote. 10/10 Tr. 3409:2-4 (López).

### E.  Marla López

1034.   Ms. Marla López is a 26-year-old Latina woman who lives in Harris County, Texas. She worked for Mi Familia Vota from November 2019 to April 2022. 10/10 Tr. 3371:7-8, 15-18, 21-24 (López). At the time of trial, she was working on a political campaign. 10/10 Tr. 3371:13-14 (López).

1035.   In 2020, she helped her father, plaintiff Marlon López, make a plan and carry out that plan to vote by voting with him via drive-through voting on a weekend, while Mr. López was caring for his young daughter.

1036.   Ms. López knows that SB1 may interfere with her ability to vote in the future. 10/10 Tr. 3412:17-22 (López). She often works out of the county where she is registered to vote; she may have to attempt to vote by mail and risk having her ballot rejected. 10/10 Tr. 3412:24-3413:3 (López). She also has on several occasions only voted while assisting others in getting to the polls. 10/10 Tr. 3413:4-5 (López). SB1 has already limited Ms. López's options to vote and left her with less time in which to vote. 10/10 Tr. 3420:15 (López). She has figured out ways to vote anyway

because she knows that if she doesn't vote, she won't have a say about who is in office, but it is not easy to access the ballot. 10/10 Tr. 3420:18-22 (López).

1037.        Ms. López served as an election worker and then as an election judge in Harris County during the 2021 elections. She opted to serve as an election worker in the spring of 2021 because it was during the pandemic, and many of the election workers who usually helped were older, and many were monolingual English speakers. She wanted to help as a Spanish speaker in good health. 10/10 Tr. 3383:7-20 (López). She then served as an election judge on Election Day in November 2021 because an election administrator told her that the voting location would not open unless someone was willing to serve as an election judge there. 10/10 Tr. 3384:5-12 (López).

1038.        Due to SB1, Ms. López now has greater fear of intimidation by poll workers because they can bring civil lawsuits against workers and because they have free movement in polling locations. 10/10 Tr. 3410:14-20 (López).

1039.    Ms. López testified that even if she acted to the best of her training and knowledge, a poll worker might still perceive her actions as wrong. 10/10 Tr. 3386:12-16 (López). A poll worker might sue her and she would be "left out to dry" merely for doing her job and attempting to keep her polling location safe for voters. 10/10 Tr. 3386:24–3387:6 (López). She also is concerned that she might face criminal sanctions if she is accused of interfering with a poll watcher. 10/10 Tr. 3421:6-8 (López). For these reasons, Ms. López testified that she is unlikely to serve as an election judge again while SB1 is in effect. 10/10 Tr. 3386:20-23 (López).

## PROPOSED CONCLUSIONS OF LAW

### I.  PLAINTIFFS HAVE STANDING TO SUE

#### A.  Legal Standard

1.      In order to establish standing, an individual must satisfy three requirements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

2.      "[T]he injury alleged as an Article III injury-in-fact need not be substantial; 'it need not measure more than an 'identifiable trifle.'" *OCA-Greater Houston v. Texas,* 867 F.3d 604, 612 (5th Cir. 2017) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999).

3.      Injury in fact can be shown where an individual intends to engage in future conduct "affected with a constitutional interest" that is "arguably proscribed" by law, and where "the threat of future enforcement…is substantial." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159-64 (2014).

4.      As such, "changing one's…plans…in response to an allegedly injurious law can itself be a sufficient injury to confer standing" if the change is "in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin, Tex.* 881 F.3d 378, 390 (5th Cir. 2018).

5.      Organizations can establish standing in one of two ways: by making a showing of organizational or associational standing. *OCA-Greater Houston, 867 F.3d* at 610.

6.      The test for organizational standing is the same as it is for individuals. The test for associational standing requires the group to show its individual members have standing, and that "the interests the association seeks to protect [are] germane to its purpose." *Id.*

7.    For an organization to show injury-in-fact under an organizational standing theory, it must show a "concrete and demonstrable injury" to its activities. The Supreme Court has held that "there can be no question" such a showing is made where a defendant's behavior has "perceptibly impaired" an organization's ability to fulfil its mission. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982).

8.    In the Fifth Circuit, spending money on resources on litigation itself, or on activities that are "routine" does not constitute injury-in-fact. But a demonstration "that diversion of resourI ... concretely and 'perceptibly impair[s]' the [organ'zation's] ability to carry out its purpose" is sufficient. *La. Fair Housing Action Ctr. Inc. v. Azaela Garden Properties, L.L.C.* 82 F.4th" 345, [3]51 (5th Cir. 2023) (hereinafter "*LaFHAC*"). And that diversion need not be significant; an organization need only show that "it had to expend additional time beyond…routine activities" and to "divert resources away from particular projects." *Vote.Org v. Callanen,* No. 22-50536, 2023 WL 8664636 a[t] *4 (5th Cir. 2023) (internal cites omitted)

9.    By way of example, where an organization whose mission is to promote civic engagement and voter turnout is able to reach fewer voters because of defendant's behavior, this impact on the group's mission is sufficient to constitute injury in fact. *Id.* at 354.

10.    Similarly, an organization whose mission is to "provide counseling and referral services for low-and moderate-income home seekers" has been perceptibly impaired where a defendant's racial steering practices drained the organization's resources, thus allowing it to provide services to fewer community members. *Havens,* 455 U.S. at 379.

### B.  Houston Area Urban League

11.    Plaintiff Houston Area Urban League ("HAUL") has established organizational standing.

12.     HAUL iI 501(c)(3) organization with a mission of promoting economic, social, and civic participation amongst the Black community and other marginalized groups. HAUL considers voting a "key tool" in enabling it to complete its work and runs several programs aimed at boosting voter turnout amongst its members including, but not limited to, voter registration drives, civic engagement courses for young members, and speaking engagements directed at young audiences. FOF § I.A.2.

13.     HAUL has demonstrated injury in fact by showing that SB1 has required the organization to divert resources in a manner that "concretely and perceptibly impaired" its ability to fulfil its mission.  FOF §I.A.2.; *see LaFH[AC], 82 F.4th at 351.*

14.     HAUL consultant Ray Shackelford testified that despite being hired to develop HAUL's Center for Social Justice & Education, he has been unable to do so, because his time has been spent responding to SB1. The Center was intended to educate HAUL's constituent community about the importance of voting and how to engage in advocacy but HAUL's diversion of resources has left the Center largely undeveloped.  FOF §§ I.A.2., I.A.4.*¶*.

15.     Additionally, HAUL's literacy and school to prison pipeline trainings have been curtailed in order to allow for time during presentations to respond to SB1.  FOF § I.A.4.

16.     In addition, because of the need to respond to SB1, HAUL has been able to "reach fewer [voters] in the same amount of time," because of the "reduced…number of people that it [can] speak to on a given day." *See LaFH[AC], 82 F.4th at 354; FOF § I. A.2.*

17.     HAUL has been able to recruit fewer volunteers to conduct voter outreach and education because of the additional training hours needed to train volunteers in the wake of SB1. FOF § I.A.2 .

18.     Thus, because of SB1, HAUL has been forced to divert resources away from non-voting programming, and its voting activity has also suff suffered because volunteers have diminished ability to reach voters. This establishes injury to the organization. FOF § I.A.2; *see LaFH^AC,* 82 F.4th at 351..

19.     HAUL's injuries are traceable to the Defendants' implementation and enforcement of SB1, which is the direct cause of the organization's resource drain and subsequent decline in community members reached. FOF § I.A. 2; *see Spokeo,* 578 U.S. at 338

20.     Moreover, because HAUL operates in Houston, it is within Defendant Ogg's jurisdiction and therefore subject to her criminal enforcement as well as state defendants' statewide authority. *See* FOF § I.D.3.

21.     A favorable ruling enjoining Defendants from enforcing the challenged provisions of SB1 would effectively redress HAUL's injuries recited above. S*ee Spokeo,* 578 U.S. at 338.

### C. Delta Sigma Theta Sorority, Inc.

22.     Delta Sigma Theta Sorority, Inc. ("DST") has established organizational standing.

23.     DST is a national organization of Black, college-educated women that utilizes social action to serve the Black community. DST has 75 Chapters in Texas alone. alone.  FOF § I.A.1.

24.     As part of DST's voting rights work, every Chapter is active in registering new voters, educating voters, and ensuring that voters are knowledgeable about the voting process, candidates, and issues for upcoming elections. Additionally, many Chapters aid voters in the voting process, ensuring ballots and ABBMs are completed correctly, providing transportation to the polls, and providing voter assistance. assistance.  FOF § I.A.1.

25.     SB1 has "concretely and perceptibly impair[ed]" DST's mission. SB1 has forced DST to divert resources away from voter mobilization and towards educating more voters about SB1's provisions, including by engaging more member-volunteers. These additional resources have had to come from existing resources, meaning less money has been spent on other social action projects, which in turn, has decreased DST's ability to reach as many people with those projects. *See LaFHAC*, 82 F.4th at 351; FOF § I.A.1.

26.     Additionally, similar to the cognizable injury of "reaching fewer voters" in *OCA-Greater Houston*, DST's voting activities have been rendered less effective because of SB1. *See OCA-Greater Houston,* 867 F.3d at 610.

27.     DST's get out the vote efforts have been able to recruit fewer member-volunteers, who are now confused about what constitutes improper "compensation" under the law.  FOF § I.A.1¶ 10.  DST members in San Antonio and elsewhere are also no longer able to distribute ABBMS, as county officials no longer provide them to third parties to distribute under SB1.  FOF § I.A.1.*; see, e.g*., FOF §XIII.A . As a result, DST reaches fewer voters in its GOTV and assistance efforts.

28.     The criminal penalties of SB1 have also forced DST members in Austin and Fort Worth to stop providing assistance to voters in nursing homes and senior centers, and DST members statewide to stop providing voters assistance in completing their BBMs. DST has been able to recruit fewer members willing to assist with voter transportation because of fear of prosecution as well.  FOF § I.A.1.

29.     SB1 All the activities described above are central to DST's mission, and thus, the organization has been perceptibly impaired because it has "been able to reach fewer voters in its

GOTV and voting assistance efforts," thus clearing the standing bar. FOF § I.A.1; s*ee LaFHAC,* 82 F.4th at 354.

30.     Similar to HAUL, DST injuries are a direct result of the Defendants' implementation and enforcement of SB1, and a favorable ruling enjoining Defendants would redress DST's injuries. Thus, DST has established the necessary traceability and redressability that Article III standing requires.  S*ee Spokeo,* 578 U.S. at 338

### D.  Jeffrey Clemmons

31.     Jeffrey Clemmons has established individual standing.

32.     Mr. Clemmons previously served as an election judge in his home county of Travis and wishes to do so in the future.  FOF § I.A.4.¶

33.     Because Mr. Clemmons is "unable to ascertain whether his duties as an election judge…will require him to violate the EC as amended by SB1," he must now "choose between refraining from serving as an election judge in the future and serving as an election judge while being subjected to arbitrary enforcement and criminal penalties" as per SB1.  FOF § I.A.4..

34.     Mr. Clemmons plans to serve as an election judge during the 2024 election but is uncertain if he will be able to do so without violating SB1 or other provisions of the EC, and thus intends to engage in future conduct that is "arguably proscribed" by law. FOF § I.A.4; *see Driehaus,* 573 U.S. at 162.

35.     Mr. Clemmons's desire to return to service as an election judge in 2024 is sufficient to confer standing for a facial vagueness challenge to the poll watcher provisions in SB1. *See, e.g. Doe I v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018) (affirming that two plaintiffs had standing for a facial vagueness challenge because they "sufficiently expressed a 'serious interest' in returning to" conduct that was undoubtedly affected by the challenged act). Similar to the two *Doe I*

plaintiffs that the Fifth Circuit found had standing for a facial vagueness challenge, Mr. Clemmons has previously served in a position regulated by the challenged legislation, remained engaged in a similar business, and expressed a desire to return to his former vocation. *Id.*

36.     Moreover, the threat of enforcement is substantial, as the Secretary of State "is statutorily required to report election-related offenses to the Attorney General who has enforcement power under state law, has demonstrated a willingness to enforce the election code, and who publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud. FOF § I.C.2; *see also* FOF § I.C.1.   Indeed, such referrals constitute the primary source of election law-related criminal referrals received by the Attorney General's office. FOF § I.C.2. Thus Mr. Clemmons's fear of enforcement is credible.

37.     As with the other Plaintiffs, Defendants' implementation and enforcement of SB1 is the direct cause of Mr. Clemmons's injuries. A favorable ruling enjoining State Defendants and DA Garza of Travis County, in which Clemmons resides, from enforcing the law would allow Mr. Clemmons to serve as an election judge without fear of prosecution. Thus, Mr. Clemmons has established both the traceability and redressability required for Article III standing. *Spokeo,* 578 U.S. at 338.

## E.  Mi Familia Vota

38.     Plaintiff MFV has established organizational standing.

39.     MFV is a national civic engagement organization. Its mission is to increase political representation and power of the Latino community. FOF § I.B.1.  It has a year-round youth leadership development program, and runs issue-based programs in areas that include environmental justice and access to health. FOF § I.B.1.  MFV also runs voter mobilization campaigns and election-related work to register voters, educate voters, and encourage them to

participate in elections.  An important part of this work is helping voters a plan to vote. FOF XVII.C..

40.     MFV focuses its attention on low propensity Latino voters, and is often the only organization or campaign that spends time educating and connecting with these potential voters. FOF  XVII.C..

41.     MFV has demonstrated injury in fact by showing that the challenged provisions of SB1 have required the organization to divert resources in a manner that "concretely and perceptibly impaired" its ability to fulfil its mission. *LaFHAC,* 82 F.4th at 351. FOF § I.B.1, XVII.C.

42.     Former MFV state director of Texas, Angelica Razo, h testified that MFV has had to shift its financial, programmatic, and human resources toward responding SB1. MFV relies on program-specific grants. However, because MFV needed to divert financial and human resources toward responding to SB1, it had to seek general operating funds to do that work, which are harder to obtain than program-specific grants. Ms. Razo had to divert significant resources toward raising general operating funds and she and her colleagues had less time to apply for and to fulfil program-specific grants. FOF § VII.D., XVII.C.

43.     MFV has had fewer resources to carry out its election and non-election areas because its money and employee time has been diverted toward addressing SB1. FOF XVII.C.

44.     Due to SB1, MFV must spend more time training its employees who will interact with voters, which takes away time that the employees would otherwise spend with voters. In addition, each conversation with a voter takes longer because voting has become more difficult due to SB1. They spend more time helping voters develop a plan to vote because there are fewer voting options, more time preparing voters to vote without assistance even if they are qualified to receive that assistance, and more time trying to troubleshoot the more difficult processes of voting

by mail. In addition, MFV is expending more resources to encourage, educate, and support voters who have been dissuaded by the burdens that SB1 has placed on voting. FOF § XVII.C. MFV also has had to do additional training for canvassers, which takes away time the canvassers would otherwise spend with voters. FOF § XIV.

45.     MFV has also stopped running its program to encourage members of the community to become poll workers, which harms its overall mission of increasing Latino civic participation in Texas. FOF§ XVII.C.

46.     SB1 being the direct cause of the diversion of MFV's resources and the decrease in the number of community members that it can reach, MFV has sufficiently established traceability between the challenged law and its injuries.

47.     MFV also carries out activities or would carry out activities that are subject to criminal enforcement due to SB1. *See, e.g.*, FOF § I.B.3.

48.     Because MFV operates in Houston, which is within Defendant Ogg's jurisdiction and therefore subject to her criminal enforcement as well as state defendants' statewide authority. Thus, a favorable ruling would effectively redress the injuries recited above.

### F.  Marlon López

49.     Plaintiff Marlon López has established individual standing to challenge SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, and 6.01.

50.     Mr. López is a Harris County resident and a registered voter who can show that he "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). FOF §XVII.D.

51.     Due to his work schedule, Mr. López was able to make a plan to vote and to actually vote in 2020 because Harris County offered drive-through voting and 24-hour voting ptions. FOF

§ XVII.D. Because SB1 forecloses these options, Mr. López's legally protected interest in voting has been harmed. Mr. López must also contend with poll watchers without protection of poll workers, who under SB1 may not be able to protect voters without risking lawsuits or prosecution.

52.     Mr. López already attempted to vote in 2022 and was unable to do so. FOF § XVII.E.

53.     SB1 is the direct cause of these injuries and a favorable ruling will prevent Defendants from enforcing the law. Thus, Plaintiff Marlon López has established both the traceability and redressability required for Article III standing.

### G.  Marla López

54.     Marla López has established individual standing to challenge SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, and 6.01.

55.     Ms. López is a registered voter in Texas who can show that she "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).

56.     Ms. López is a 26- year-old Latina registered voter in Texas. FOF § XVII.C ¶. In both 2020 and 2022, she found time to vote while helping other voters get to polling locations. In 2020, she was able to vote drive through on a weekend with her father, Plaintiff Marlon López, while he was taking care of his daughter (Ms. López's sister). FOF §§ I.B.3.; XVII.C. In 2022, Ms. López voted after helping an elderly monolingual Spanish-speaking couple get to their local polling location. FOF § I.B.3.

57.     Ms. López is intimidated by poll watchers because she is aware that poll workers risk being sued or prosecuted if they intervene to protect voters from poll watchers at polling locations. FOF §§ I.B.3VIII.A.3664.

58.    Ms. López has thus far found a way to vote despite having limited access to the polls because she wants to have a say in who is in office. FOF § I.B.3. However, she knows that SB1 may interfere with her ability to vote in the future. FOF § XVII.C. Because SB1 forecloses her voting options and subjects her to intimidation by poll watchers, Mr. López's legally protected interest in voting has been harmed.

59.    SB1 is the direct cause of these injuries and a favorable ruling will prevent Defendants from enforcing the law. Thus, Plaintiff Marla López has established both the traceability and redressability required for Article III standing.

## II.  THE DEFENDANTS ARE PROPER

### A.  The VRA Abrogates Sovereign Immunity

60.    It is well-established that the VRA abrogates sovereign immunity. *See MFV v. Abbott*, 977 F.3d 461, 469 (5th Cir. 2020); *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017).

61.    Thus, as a matter of law, none of the defendants is insulated from Plaintiffs' claims arising under the VRA.

### B.  Plaintiffs' Constitutional Claims Against Defendants May Proceed Under the *Ex parte Young* Exception to Sovereign Immunity[23]

#### 1.  *Legal Standard*

62.    As to Plaintiff's constitutional claims, *Ex parte Young* "recognized a narrow exception" to traditional sovereign immunity that allowed "certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Women's Health v. Jackson*, 595 U.S. 30, 39 (2021).

---

[23] Defendants Harris County, Bexar County, and DA Garza have not raised sovereign immunity defenses.

63.     To fall under the exception, a state official, must be "charged with enforcement" of the law and there must be some "threatened future enforcement action." *United States v. Abbott*, 85 F.4th 328, 334 (5th Cir. 2023).

64.     There need only be "a scintilla of enforcement" by the relevant state official, and the "text of the challenged law need not actually state the official's duty to enforce it." *City of Austin v. Paxton*, 943 F.3d 993, 997-98, 1002 (5th Cir. 2019).

65.     The Supreme Court has clarified that an official is properly named in a suit under the *Ex parte Young* exception where that official "*may* or must take enforcement actions against" the plaintiffs. *Whole Women's Health*, 595 U.S. at 45 (emphasis added).

66.     In the Fifth Circuit, "enforcement" is defined as "typically involving compulsion or constraint," such that "if an official *can* act, and there's a significant possibility that he or she will ... the official has engaged in enough compulsion or constraint to apply the *Young* exception." *LUPE*, 618 F. Supp. 3d at 520 (internal cites omitted) (emphasis in original).

67.     Finally, and importantly, under Fifth Circuit precedent, the requisite "scintilla of enforcement" may be found in state law other than the specific statute at issue in the litigation. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020) ("*TDP II*").

### 2. *State Defendants*

68.     The Secretary of State and Attorney General are both proper defendants because under any logical reading of state law, both officials are statutorily required to enforce SB1 and the broader EC.

### a.  Secretary of State

69.     First, SB1 and the state's EC both task the Secretary with specific enforcement actions.

70.     SB1 mandates that the Secretary engage in: information sharing, voter roll supervision, and reporting of election-related offenses (Article 2); adopting rules implementing restrictions on voting from vehicles and early voting hours (Article 3); and reporting any of the numerous election-related offenses created or amended by SB1 to the Attorney General (found throughout). SB1 also depends on the Secretary's duties under the broader EC, including her duty to: design and distribute election materials, including BBMs, ABBMS, mail ballot carrier envelopes, and "forms necessary for the administration" of the EC.

71.     Both Circuit precedent and the factual record in this case demonstrate the link between these specific statutory provisions and SB1's enforcement.

72.     Under Circuit precedent, the Secretary's responsibility to design and furnish election materials gives her the "authority to compel or constrain local officials," thus establishing the requisite enforcement connection for defeating sovereign immunity. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020) ("*TDP II*"); *see also Texas Alliance for Retired Americans v. Scott* ("*TARA*"), 28 F.4th 669, 673 (5th Cir. 2022) (holding that where local officials are required to make use of the Secretary's work product, the Secretary can be said to compel or constrain).

73.     Moreover, the Court heard evidence that more than half of referrals related to voter fraud complaints come from the Election Integrity Division within the Secretary's office. FOF § I.C.2. Thus, the Secretary has already, pursuant to her statutory responsibilities, taken significant enforcement actions to implement SB1.

### b.  Attorney General

74.     The Attorney General is also a state official charged with SB1's enforcement as demonstrated by the text of both the broader EC and SB1 itself.

75.     First, this Court has already found that the EC "envision[s], and likely require[s], the Attorney General's participation in enforcement activities." *LUPE*, 618 F. Supp. 3d at 536.

76.     In so holding, this Court ruled that *State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021), does not change the analysis because "the surviving provisions of the EC" not struck down by the *Stephens* Court "still envision, and likely require, the Attorney General's participation in enforcement activities." *LUPE*, 618 F. Supp. 3d at 411. Nor does *Stephens* "foreclose the Attorney General's authority to prosecute election law offenses," this Court held. *Id.* at 412.

77.     Moreover, post-*Stephens*, the law permits and, in some cases mandates, the Attorney General to assist any local DA in enforcing SB1. Far from removing the Attorney General from the prosecutorial sphere, *Stephens* described in detail the ways in which Texas law envisions both the Attorney General and local officials sharing prosecutorial power. *See, e.g.*, *Stephens*, 663 S.W.3d. at 56 (stating the "[c]oncurrent jurisdiction certainly may exist," and describing the shared enforcement regime."). Assistant Attorneys General have prosecuted election violations through these avenues of enforcement in the past and provide no evidence that they intend stop. FOF § I.C.1.

78.     To the contrary, the Attorney General himself has forcefully promised to prosecute election law violations. FOF § I.C.1. This Court has already found that this kind of conduct—the Attorney General's past behavior, testimony before the state legislature, and social medial activity—provide the requisite willingness to enforce the law needed to establish his propriety as a defendant in this litigation. *See LUPE*, 618 F. Supp. 3d at 410-14.

79.     Second, SB1 itself expressly deputizes the Attorney General with its enforcement. SB1 §§ 4.06, 4.09, 6.04, and 6.05, which Plaintiffs challenge, all add or amend criminal offenses to the EC, which the Attorney General is tasked with enforcing. FOF § I.C.1.

80. Thus, the Attorney General is a state official who both "may" and "must" enforce SB1 and is a proper defendant for Plaintiffs' constitutional claims. *See Whole Women's Health*, 595 U.S. at 45.

### c. District Attorney Ogg

81. DA Ogg is a properly named defendant.

82. First, under state law, "prosecut[ing] election law violations" is "the specific duty of county and district attorneys." *Stephens*, 663 S.W.3d at 52.

83. Moreover, state law permits both the Secretary of State and the Attorney General to deputize Defendant Ogg in their enforcement activities. *See* EC §§ 31.006, 273.001, 273.002, 273.022.

84. Indeed, Defendant Ogg's concession before the Fifth Circuit that she has the authority to enforce criminal laws, Br. of Appellant Kim Ogg at 14-15, *MFV, et al. v. Kim Ogg*, No. 22-50732 (5th Cir. Oct. 19, 2022), is sufficient to end the inquiry under *Whole Women's Health*'s "may or must" standard. *See* 595 U.S. at 45.

85. Ogg has also displayed a willingness to enforce SB1.[24]

86. Although Ogg's office initially offered to stipulate that she would refrain from enforcing SB1's criminal provisions until Plaintiff's claims were adjudicated to finality, Ogg has never promised to abide by a final ruling on the merits, avoid investigating SB1-related offenses presented to her by two or more Harris County voters, or refuse to cooperate with criminal investigations brought to her by the state Attorney General. Ogg Ex. 1.

---

[24] Moreover, in the context of a pre-enforcement challenge on First Amendment grounds, such as this, courts "assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335-36 (5th Cir. 2020) (emphasis added). A plaintiff in such a context "need not show that the authorities have threatened to prosecute him" because the "threat is latent in the existence of the statute" at issue. *Id.* at 336.

87.    Additionally, Ogg has previously prosecuted election offenses, both acting independently and based on criminal referrals brought to her from the OAG's office, demonstrating her willingness to do so in the future. FOF § I.D.3.

88.    Accordingly, Ogg is a proper defendants for Plaintiffs' constitutional claims.

### III. THE CHALLENGED PROVISIONS OF SB1 UNDULY BURDEN THE RIGHT TO VOTE IN VIOLATION OF FIRST AND FOURTEENTH AMENDMENTS

#### A. Legal Standard[25]

89.    Where a state election rule restricts or burdens the right to vote, as protected by the First Amendment or Fourteenth Amendments, "courts apply a balancing test derived from two Supreme Court decisions." *Crawford v. Marion Cnty. Election Bd.* 553 U.S. 181, 190–91 (2008) (controlling op.) (citing *Anderson v. Celebrezze,* 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

90.    *Anderson-Burdick* is a "flexible standard" under which a challenge to a state election practice is evaluated by balancing the character and magnitude of the burden the practice imposes on the right to vote against the justifications offered by the state in support of it. *Burdick*, 504 U.S. at 434; *Texas Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). It "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789 (quoting Storer *v. Brown*, 415 U.S. 724, 730); *Crawford v. Marion Cnty. Election Bd.* 553 U.S. 181, 191 (2008) (controlling op.) (recognizing there is no "litmus test for measuring the severity of a burden that a state law imposes").

---

[25] The legal standards set out herein concerning Plaintiffs' undue burden, VRA § 2, and void for vagueness claims repeat the legal standards set forth in Plaintiffs' Joint Proposed Findings of Fact on the Legal Framework of Plaintiffs' Claims (ECF No. 846). They are duplicated here for the Court's convenience."

91.     Under the *Anderson-Burdick* framework, courts must "weigh the 'character and magnitude of the asserted injury' . . . against 'the precise interests put forward by the State . . . ,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789).

92.     "Under this standard, the rigorousness of [the] inquiry . . . depends upon the extent to which a challenged regulation burdens" the right to vote. *Burdick*, 504 U.S. at 434. If the challenge law imposes a severe burden, it "must be narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 ((1992)). But even when a law imposes only a slight burden on the right to vote, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (2008) (controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992).  Thus *any* burden imposed by the challenged restriction must be supported by "interest[s] sufficiently weighty to justify the limitation." *Norman*, 502 U.S. at 288-89.

93.     "Disparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla. Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1217 (N.D. Fla. 2018). When evaluating the character and magnitude of the burdens under *Anderson-Burdick*, courts must consider the challenge law's impact on subgroups for whom the burden is more severe, even if that involves a "limited number of persons." *Crawford*, 553 U.S. at 198-203 (controlling op.). In *Crawford*, for example, the "relevant" burdens were "those imposed on persons who are eligible to vote but do not possess a current photo identification." *Id.* at 201. The Supreme Court explained that "[t]he fact that most voters already possess a valid driver's license . . . would not save the statute" if it imposed burdens on obtaining a new identification. *Id.* at 202 (controlling op.). Six justices in *Crawford* agreed with

this proposition. *Id.* at 199–203 (controlling op.); *id.* at 212-23, 237 (Souter, J. dissenting); *id.* at 237 (Breyer, J. dissenting).

94.      In evaluating burden, the court must consider only the impact of the Challenged Provisions. *Pilcher v. Rains*, 853 F.2d 334, 336 (5th Cir. 1988) (holding that "[t]he district court in the instant case quite properly focused on the ballot regulation at issue" rather than the "totality of the Texas minor party registration scheme" (internal quotation marks omitted)). The fact that the Texas Election Code may include some unchallenged provisions that are easier for voters to satisfy is irrelevant to the analysis of the burden imposed by the Challenged Provisions. *Id.* ("[T]he fact that [one] requirement was easy would not validate the second.")

95.      The court should consider the cumulative impact of the Challenged Provisions in determining the burdens they impose. *Id.* ( "[A] number of facially valid provisions of the election laws may operate in tandem to produce impermissible barriers to constitutional rights." (quoting *Storer*, 415 U.S. at 737)). Because "[s]everal requirements of an election code may combine to make ballot access excessively burdensome," the court must evaluate the cumulative burden of the Challenged Provisions together. *Id.*

96.      *Anderson-Burdick* requires an individualized assessment of the specific state's laws in question and the burdens they impose.  That other states may employ certain facially similar provisions in their election schemes cannot sufficiently justify any law at issue here.  Consistent with the Supreme Court's directive that challenges to laws under this framework "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789, courts recognize that states' election laws are not fungible.  State voter identification laws, for example, are not universally constitutional or unconstitutional—rather, an individual assessment of each state's law and the burdens it imposes is required.  *See, e.g. Ohio*

*State Conf. of N.A.A.C.P. v. Husted (Husted III)*, 768 F.3d 524, 547 n.7 (6th Cir. 2014) (explaining, "we do not find that other states' electoral laws and practices are relevant to our assessment of the constitutionality or legality" of Ohio law), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

97.    To pass constitutional scrutiny, the state must explain what "interests make it necessary to burden a plaintiff's rights" to begin with. *Anderson*, 460 U.S. at 789; *Crawford*, 553 U.S. at 191 (controlling op.). And the interest asserted by the state must be legitimate. *See Anderson*, 460 U.S. at 801 (holding insufficient asserted interest in "political stability" and contrasting with "interest in avoiding political fragmentation" upheld in *Storer v. Brown*, 415 U.S. 724 (1974)); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 222-24 (1986) (holding insufficient asserted interests in administrability and in protecting the integrity of the two-party system).

98.    *When* a challenged practice does not actually advance the state's purported goals, those asserted interests cannot justify even a slight burden on the right to vote. *See Tashjian*, 479 U.S. at 219–22 (1986) (holding inapplicable "legitimate interest[s]" in preventing party raiding and in avoiding voter confusion). *Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) (holding that even "important government interest" could not justify burden because the court "struggled to understand how [the challenged] regime . . . advance[d] that goal"); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 149 (2d Cir. 2000) ("[T]he fact that the defendants asserted are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests'" (quoting *Turner Broadcasting Sys. Inc. v. F.C.C.* 512 U.S. 622, 664 (1994)).

### B. The Challenged Provisions Unduly Burden Texas Voters' Right to Vote

99.    Plaintiffs DST, HAUL, and MFV assert that the Challenged Provisions violate the First and Fourteenth Amendments for the further reasons below.

100.    The evidence adduced at trial demonstrates that the Challenged Provisions impose severe burdens on the members of DST and those they serve, on the members of HAUL and its clients, on MFV and the communities they serve, and on all Texas voters, and that those burdens are severe. In addition, each of the Challenged Provisions increases the cost of voting for Black and Latino voters. Taken together, the effects of the Challenged Provisions are even more severe. These burdens magnify the challenges to voting in Texas, the state that already had the *highest* costs of voting before SB1 was enacted. HAUL-MFV 310 ¶ 18 (Smith Report).

#### 1. *Ban on DTV (3.04, 3.12, 3.13)*

##### a. The Ban on DTV Imposes Severe Burdens on Voters

101.    DTV was a popular, secure, and widely used method of voting in Texas in 2020. More than 127,000 voters used DTV in Harris County during the 2020 election—nearly one in ten early voters. HAUL-MFV Ex. 310 ¶¶ 10, 34, 35 (Smith May 13, 2022 Report); HAUL-MFV Ex. 273; Tr. 1242:8-19 (Longoria); Tr. 2694:8–19 (Smith). Voters in at least two other counties—Bee and Tom Green County—utilized the option as well. Tr. 1380:3-6 (Longoria); Tr. 2763:18-22 (Smith).

102.    Harris County offered DTV in multiple elections after the November 2020 election and would have done so again had SB1 not imposed a total ban on DTV in Texas by requiring that voting must occur inside a building. 9/19 Tr. 1155:22–1156:1 (Obakozuwa); 9/20 Tr. 1255:24–1256:3, 1256:4-9 (Longoria).

103.    The elimination of DTV has and will continue to burden voters. Prof. Smith explained that DTV "lowers the time, transportation, and health costs on voters, as voters are able

to cast their ballots from the convenience of a car, avoiding having to stand and wait in line at a traditional polling location." HAUL-MFV 310 ¶ 33.

104.    SB1's ban on DTV increases the cost of voting for multiple categories of voters. For example, it burdens voters with children or elderly family members who did not have to leave their cars when they used DTV in 2020. 9/20 Tr. 1254:4-22 (Longoria). Ms. Watkins-Jones of DST testified about two members of the sorority for whom DTV made it less burdensome to vote because they could vote together with their parents who had physical impairments "without the burden of navigating separately to vote or having to take their elderly parents inside the voting polls." 10/3 Tr. 2194:5–2195:6 (Watkins Jones).

105.    The ban on DTV also imposes burdens on voters whose work commitments make it difficult or impossible to find time to vote. Mr. Shackelford explained that members of the communities HAUL serves "have limitations in terms of their availability based on their employers," and as a result, "they need every hour they can get to make sure that they keep their lights on and feed their families." *Id.* 2242:13–2243:2 (Shackelford).

106.    The elimination of DTV also increases the risk that voters will be harassed or intimidated when voting in person. Mr. Dorsett testified that he and his wife used DTV in November 2020 to shield themselves from people yelling at or intimidating them at a walk-up polling location. *Id.* 2289:10-19 (Dorsett).  During the November 2022 election, when DTV was no longer available, Mr. Dorsett and his wife experienced the burden of not having DTV as an option when they were yelled and shouted at by individuals at an in-person voting location. Tr. 2295:25–2296:24 (Dorsett).

107.    The elimination of DTV acutely burdens voters in large counties, such as Harris County, where there are large, sprawling populations and residents "do everything in their cars." 9/19 Tr. 1229:15-20 (Longoria).

108.    Some voters would not have voted in 2020 had it not been for the DTV option. Tr. 1155:6-21 (Obakozuwa); *see* 1254:4-22 (Longoria).

### b. The Ban on DTV Disproportionately Burdens Black and Hispanic Voters

109.    The impact of the elimination of DTV will be even more severe on Black and Hispanic voters, who were more likely to use DTV when it was offered in Harris County in 2020.  Both expert evidence and fact witness testimony support this conclusion.

110.    Using several different widely accepted methods of analysis, Prof. Smith and Prof. Mayer both concluded that minority voters disproportionately relied on DTV during the November 2020 general election. HAUL-MFV Ex. 310 ¶ 52 (Smith May 13, 2022 Report); LULAC Ex. 2, at 13, tbl. 4 (Mayer).

111.    Prof. Smith performed three separate analyses that each found that Black and Hispanic voters disproportionately used DTV in November 2020. First, he performed linear regression analyses, which found that the greater the proportion of Black VAP or Hispanic VAP in a given Census block, the greater the rate of DTV utilized by early-in person voters in that Census block. HAUL-MFV 310 ¶¶ 41, 42; HAUL-MFV 402, at 16, 18. On the other hand, as white VAP by Census block increased, the rate of DTV use decreased. HAUL-MFV 402, at 17. Second, he performed a method-of-bounds analysis of nearly racially homogenous precincts and found that the rate of DTV use was consistently higher in nearly homogenous Black and Hispanic precincts compared to nearly homogenous white precincts. HAUL-MFV 310 ¶¶ 45–46, tbl. 2; HAUL-MFV 402, at 20. Finally, Prof. Smith's analysis of Spanish surnames shows that more than 26,000 voters

with Spanish surnames utilized DTV during the November 2020 general election, constituting approximately 10.5% of all early in-person ballots cast by Hispanic voters in Harris County. HAUL-MFV 310 ¶ 49. Meanwhile, only 9.9% of Harris County voters without a Spanish surname used DTV. HAUL-MFV 310 ¶ 50. Importantly, voters without Spanish surnames include not only white voters, but also voters of other racial categories (including Black voters), thus inflating the DTV usage rate of this broad category. HAUL-MFV 310 ¶ 50.

112.    Prof. Mayer's analyses reach the same conclusions. Although 53.5% of all in-person early voters were non-Hispanic white, only 38.1% of DTV voters were non-Hispanic White. In contrast, approximately 46.5% of early in-person voters were non-white, compared to about 62% of DTV voters. 10/2 1970:11–1971:4 (Mayer); LULAC Ex. 2, at 13, tbl. 4 (Mayer Report). In raw numbers, Prof. Mayer found that more than 77,000 minority voters used DTV in the November 2020 general election in Harris County, while only about 48,000 non-Hispanic white voters used DTV. 10/2 Tr. 1970:25–1971:6 (Mayer); LULAC 2, at 13, Table 4 (Mayer Report).

113.    These experts' conclusions confirmed analyses that the Harris County Clerk's office and advocates performed and presented to the legislature showing that Black and Hispanic voters disproportionately utilized DTV in 2020. 9/20 Tr. 1256:10–121 (Longoria); HAUL-MFV 273 (Harris County letters to Senators); HAUL-MFV 274 (Harris County letters to Representatives); HAUL-MFV 225, at 6, 8 (TCRP study); HAUL-MFV 176, 70:6–23 (Public Citizen testimony).

114.    Mr. Shackelford of HAUL testified that the availability of DTV was important to the predominantly Black and Hispanic communities that HAUL serves because it reduced the time cost of voting for members of those communities. Tr. 2242:13–2243:2 (Shackelford).

115.    Angelica Razo of MFV testified that the availability of DTV in 2020 was important to the Hispanic communities that MFV served and that, after SB1, MFV would have to train its staff and educate voters that DTV was no longer available. 10/10 Tr. 3440: 15-24 (Razo).

116.    Marlon López, who is Latino, was able to vote in the 2020 general election because Harris County offered extended voting hours and DTV. 10/10 3378:7-12, 3380:18-25, 3404:18-21, 3407:1-5 (López). Because of the passage of SB1, and its elimination of important options like DTV and 24-hour voting, it is difficult for voters like Mr. López to make a voting plan that works for them. 10/10 Tr. 3389:22-3390:4 (López).

## 2. *Ban on 24-Hour Voting (3.09, 3.10)*

### a. The Ban on 24-Hour Voting Imposes Severe Burdens on Voters

117.    Recognizing that many voters had difficulty getting to the polls during normal hours because of multiple jobs, extended work hours, or childcare obligations, the Harris County Clerk implemented 24-hour voting in 2020 to expand voting opportunities and accessibility. 9/20 Tr. 1260:8–1261:2 (Longoria); Tr. 1154:24–1155:5 (Obakozuwa).

118.    In its one night of operation on October 28-29, approximately 16,000 voters utilized the option, HAUL-MFV 273 (Harris County letter to Senators); HAUL-MFV 274 (Harris County letter to Representatives), including at least 1,490 voters who cast ballots between 10 p.m. and 6 a.m. that night. HAUL-MFV Ex. 310 ¶ 55; HAUL-MFV 402, at 24.

119.    SB1 outlawed 24-hour voting by prohibiting counties from offering early voting before 6 a.m. or after 10 p.m., and on Sundays before 9 a.m. or after 10 p.m. SB1§§ 3.09, 3.10. Harris County would have utilized 24-hour voting again for future elections if SB1 had not eliminated it. 9/20 Tr. 1268:2-20 (Longoria).

120.    The 24-hour voting option eased burdens on voting for shift workers and those who have trouble taking time off work. The Houston Alumnae Chapter of DST polled their membership

and found that of the 240 members polled, 84% voted early, including members who are shift workers, medical professionals, and law enforcement. 10/3 Tr. 2195:13-21 (Watkins-Jones). Similarly, Mr. Shackelford of HAUL testified that 24-hour voting was particularly important for shift workers who "don't always have a shift that aligns with them being able to go vote during the normal voting hours." Tr. 2243:23–2244:4 (Shackelford). Being able to vote without taking time off of work, which could negatively "impact … their salary or compensation was definitely very beneficial." Tr. 2244:5-8 (Shackelford).

121.    Importantly, even though Texas law provides that employers must provide employes time off to vote in certain circumstances, employees can only take advantage of that requirement if they have to work during the entire early voting period. SB1§ 7.02(b). In other words, if a voter has two hours off at any time when polls are open during the entire early voting period or on Election Day, their employer is not required to given them time off work to vote. SB1 § 7.02(b). Therefore, 24-hour voting allowed people to vote who otherwise could not take time off work or whose employers imposed a work culture of not being able to ask for time. 9/20 Tr. 1269:22–1270:18 (Longoria).

### b.  The Ban on 24-Hour Voting Disproportionately Burdens Black and Hispanic Voters

122.    Both expert testimony and accounts from Plaintiffs demonstrate that SB1's prohibition on 24-hour voting disproportionately burdens Black and Hispanic voters. Prof. Smith's linear regression analyses show that Black and Hispanic voters were more likely than white voters to use 24-hour voting. HAUL-MFV Ex. 310 ¶¶ 57, 59, figs. 4 & 5; HAUL-MFV 402, at 25–27. In three precincts, including those in which the VAP is at least 50 percent Black, one out of every 100 early in-person ballots cast by voters in those precincts were during hours no longer permissible under SB1, and in dozens more precincts, at least one in 200 early in-person ballots

were cast during hours no longer permissible. HAUL-MFV Ex. 310 ¶¶ 58, 60. Importantly, Prof. Smith's analysis of 24-hour voting by race is "very conservative" because the denominator he uses for his calculation is *all* in-person early voting ballots, rather than just those cast on the days 24-hour voting was available. HAUL-MFV Ex. 310 ¶¶ 58, 60.

123.    Prof. Mayer also concluded that "24-hour early voting was . . . relied on disproportionately by voters of color compared to non-Hispanic whites." Tr. 1969:10–17 (Mayer); LULAC Ex. 2, at 14, tbl. 5. This finding was statistically significant. Tr. 1973:6–12. In particular, using the same methodology used in his DTV analysis, Prof. Mayer finds that <u>the participation of white voters (who represented 52.1% of those who voted early during regular hours) dropped to 40% in the overnight hours, while Black voters (19% of regular hours early voters) constituted 25.1% of the 24-hour turnout, and Hispanic voters (22.1% of regular hours early voters) were 28.9% of 24-hour voters</u>. Tr. 1972:19–25 (Mayer); LULAC Ex. 2, at 14, tbl. 5.

124.    As referenced above, 24-hour voting was important for members of DST, clients of HAUL, and the community members Plaintiff MFV serves, who are predominantly Black or Hispanic. 10/10 Tr. 3389:22-3390:4 (López).

### 3. *Restrictions on In-Person Drop Off of Mail Ballots (4.12)*

#### a. The Restrictions on In-Person Drop Off of Mail Ballots Impose a Severe Burden on Voters

125.    SB1's addition of extra procedures for voters dropping off their BBMs in person impose additional burdens on voters who already face significant barriers to voting. SB1 § 4.12 requires the election official to record on a roster the voter's name, signature, and type of identification, and to attest on the roster that the delivery of the BBM complies with that section. EC § 86.006(a-2). Requiring voters to sign the roster creates an additional step, imposing an

additional time tax, and creating another hurdle in an already burdensome process. 10/3 Tr. 2245:22–2246:8 (Shackelford); HAUL-MFV 310 ¶¶ 65–71.

126.    The majority of voters who vote by mail are aged 65 or older or have a disability. 9/20 Tr. 1299:4–17 (Longoria); *see also* 10/12 Tr. 3758:1–18 (Kruse); LUPE-002, tbl 8 . For these voters, returning a BBM in person may already be a major barrier, but may be the only option that enables them to vote as the submission deadline for BBMs approaches, particularly when their mail ballot may have already been rejected. *See* 10/3 Tr. 2245:22–2246:8 (Shackelford); 10/3 Tr. 2246:22–2247:9.

### b. The Restrictions on In-Person Drop Off of Mail Ballots Disproportionately Burden Black and Latino Voters

127.    Black and Latino bear a disproportionate burden due to SB1's drop-off location provisions. HAUL-MFV 310 ¶¶ 65–71. The ability to drop off a mail ballot in person is important to the predominantly Black and Latino communities that HAUL serves. 9/20 Tr. 2245:22–24 (Shackelford). But because Black and Latino voters are generally more likely to have their mail ballots rejected, and thus would have greater need to drop off their mail ballots before the submission deadline, SB1's restrictions on drop-off locations have a disproportionate impact on those voters. HAUL-MFV 310 ¶ 65. With only one available drop-off location in many counties, these voters may have to travel long distances, wait in longer lines, and expose themselves to greater potential health risk to drop off their ballots. HAUL-MFV 310 ¶¶ 66–69.

### 4. *SB1 Poll Watcher Provisions (4.01, 4.07)*

### a. The Poll Watcher Provisions Impose a Severe Burden on Voters

128.    SB1's poll watcher provisions increased voters feeling intimidated in voting without recourse or likely assistance from poll workers. 9/19 Tr. 1070:11-1071:4 (Callanen); 9/19 Tr. 1178:5-12 (Obakozuwa).

129.     Because section 4.07 allows a poll watcher to stand "near enough to see and hear" a voter but does not otherwise provide guidance regarding what distance is "near enough to see and hear," and § 4.01 places limits on poll workers' and election judges' abilities to remove poll watchers, voters must endure poll watchers approaching within one foot of them as they go through the voting process. 10/3 2191:12 – 2192:10 (Watkins-Jones).

130.     Voters are unduly burdened by poll watchers who are close enough to read their ballots, 9/19 Tr. 1183:11-20, 1207:5-7 (Obakozuwa) or observe their ballots being fed into a ballot tabulator. 9/19 Tr. 1071:5-12 (Callanen).

### b.  The Poll Watcher Provisions Disproportionately Burden Black and Latino Voters

131.     Poll watchers have historically been deployed in a racially targeted manner, and incidents of poll watcher intimidation of Black and Latino voters continue today. 10/4 Tr. 2575:20-21 (Tolson).

132.     Legislators expressed concern about SB1's poll watcher provisions because they knew poll watchers had behaved in an intimidating manner in Black and Latino communities prior to the passage of SB1. (HAUL-MFV 176 at 21:5-17; 23:16-24:10) (SB1 87th 2nd special, House Select Committee on Constitutional Rights and Remedies Aug. 23, 2021, Hearing Transcript).

133.     SB1's poll watcher provisions have a disproportionate impact on Black and Latino voters. 10/2 Tr. 2156:1-11, 10.3 2192:17-24 (Watkins-Jones)). Because poll watchers can approach voters so closely without fear of repercussion, it reminds Black voters of historical incidents where they were intimidated or frightened while casting a vote. 10/3 Tr. 2193:6-22 (Watkins-Jones).

134.    The poll watcher provisions also have reduced election worker participation among the Latino communities MFV serves, thereby reducing MFV's ability to provide a welcome voting environment for the Latino communities it serves. (Tr. 10/10/23 3452:14-21; 3455:4-11 (Razo).

### 5.  *SB1's Regulation of Absentee Ballot By Mail Through ID Provisions*

135.    SB1 §5.04 creates an undue burden by making it more difficult for eligible voters to obtain ABBMs.

136.    Voters 65 and over and voters with disability are eligible to vote by mail.  E.C. §.§ 82.002, 82.003.  Before SB1, many counties reached out to eligible voters to inform them that they could vote by mail and, in many cases, to send them ABBM applications.   FOF § XIII.A.

137.    In addition, before SB1, some election administrators also made ABBMs available to community organizations for distribution, but they no longer do so for fear of violating SB1 FOF § XIII.A.

138.    EAs are now prohibited from providing ABBM applications for a voter to give to the voter's spouse or other family members.  FOF § XIII.A.

139.    EAs now feel restricted in the information they can share with voters about ABBMs, for fear of running afoul of § 5.04. FOF§ XIII.A.

140.    Each of these restrictions makes it more difficult for eligible voters to obtain information and applications to enable them to exercise their right to vote.

141.    Because voters with disabilities and Black voters 65 and older are more likely to vote by mail, this undue burden falls disproportionately on disabled and Black voters. FOF § VII.B..

142.    The Voter ID requirements of SB1 have led to the rejection of thousands of mail ballot applications and mail ballots.  For example, in March 2022, more than 25,000 mail ballots were rejected because of the ID requirements.  In November 2022, more than 11,000 were rejected

for that reason.   FOF § VII.A.2. The rejection rate of mail ballots was significantly higher after SB1 than the rejection rate for mail ballots before SB1.  FOF § VII.A.2.

143.    Although Eas often offered voters an opportunity to cure the voter ID issues, requiring voters to submit new applications placed additional burden on the voters.  In addition, in some cases voters did not have sufficient notice to correct the deficiencies and were unable to vote as a result. 9/12 Tr. 432:24-433:9 (Scarpello); 9/13 Tr. 523:4-13 (Phillips); 9/14 Tr. 962:25-963:18; 966-16-168:21 (Guerrero Mata).

144.    This poses an undue burden on voters who are eligible to vote by mail and may find it difficult or impossible to visit the polls in person. See, e.g., FOF § VII.A.2., FOF § VII.B., FOF §§ VII.D., § XVII.C.

145.    As discussed extensively in the Findings of Fact, above, the ID requirements in SB1 led to the rejection of tens of thousands of ballots. FOF § VII.A.2.

146.    In addition, because of their lived experience, many of the voters with whom MFV works may be easily discouraged if they have difficulty meeting the ID matching requirements. 10/10 Tr. 3436:17-25 (Razo).  These voters may experience "long-term" impact from this type of difficulty voting and may "sit out multiple elections" as a result.  10/10 Tr. 3437:1-6 (Razo).

147.    Prof. Mayer, one of the election experts who testified, concluded based on his analysis that the ID requirements in SB1 significantly burdened Texas voters. FOF § VII.A.2.

### 6.  *SB1's Restriction on Assistance Provisions*

#### A.  The Restriction on Assistance Provisions Impose a Severe Burden On Voters

148.    SB1 §§ 6.03, 6.05, and 6.07 impose a severe burden on Texan voters who are entitled to and require assistance in completing a mail ballot in order to be able to exercise their right to vote. FOF § XI.

149. Voters who require physical assistance or language assistance—which may include voters with mobility limitations, deaf voters, visually impaired voters, voters with cognitive or sensory disabilities, voters with limited English proficiency, and low-literacy voters—are severely burdened by provisions of SB1 that place onerous requirements on assisters, thereby making assisters unwilling to provide that assistance to people they would otherwise be willing to assist. FOF § XI.

150. Assisters and organizations that provided assisters to voters who requested such assistance have testified that they are unwilling to serve as assisters to voters due to the requirements of SB1, which require them to complete paperwork, attest to their relationship to the voter, and attest to whether they have received compensation or benefit from a candidate, campaign, or political committee. FOF § XI.

151. Because SB1 has also created additional burdensome requirements on the vote-by- by-mail process, *see* FOF § XIII. A. And COL § III.B.5, the burden of being eligible to receive but not being able to obtain an assister becomes even more severe.

### B. The Restrictions on Assistance Provisions Disproportionately Burden Black and Latino Voters.

152. Although SB1 § 6.03, 6.05, and 6.07 burden all Texas voters who are eligible to vote by mail and who require assistance, the provisions disproportionately burden Black and Latino voters.

153. Ms. Angelica Razo testified that Latino voters who are eligible to vote by mail require language assistance, as well. FOF § XI. They may not have anyone else in their household who is eligible to vote by mail or can share information or resources. They are likely to require language assistance, as well. 10/10 Tr. 3450:8-13 (Razo). They face significant risk of missing one

of the complex steps required to complete a mail ballot and for the ballot be counted. 10/10 Tr. 3450:21-25 (Razo).

154.    The Latino community is more likely to be working with voters who are naturalized citizens and voters who face language barriers. 10/10 Tr. 3438:11-13 (Razo). Elderly voters who qualify to vote by mail also require assistance and be facing language limitations. 10/10 Tr. 3449:23-3450:13 (Razo).

155.    At the same time, people in the Latino community who might otherwise be willing to serve as assisters fear the government and fear being subject to investigations which could have serious negative repercussions, even if the investigations do not result in a conviction. 10/10 Tr. 3454:17-3455:21 (Razo).

156.    In their testimony and reports, Plaintiffs' experts demonstrated that Black and Latino Texas face ongoing, pervasive discrimination in interactions with law enforcement. FOF §They are disproportionately policed and incarcerated, and thus shoulder the collateral consequences that stem from interaction with the criminal justice system. FOF §. They are targeted for enforcement of restrictive immigration laws, especially Latinos. FOF §.

157.    As a result, Latino people are wary of acting in a way that might bring them into contact with the police. For example, Ms. López testified that fear of surveillance, police, and government officials are enough to keep many Latino people in the community in which she grew up from seeking relief during natural disasters. FOF § III.B. It can be traumatizing for Latino people to face accusations of wrongdoing for trying to provide voter assistance. FOF § VIII.A.1.

158.    Therefore, Latino voters face severe burden if they are entitled to vote with assistance but cannot obtain that assistance, while potential Latino assisters are vulnerable to accusations to disproportionate policing and incarceration and therefore are less likely to be willing

to risk providing assistance to a voter in his or her community. The combination places a disproportionate burden on Latino voters.

### 7. *SB1's Regulation of Time Off Work to Vote*

159.    SB1 § 7.02 creates an undue burden on the right to vote by reducing the circumstances under which employers have to provide employees time off of work to vote.

160.    Under section 7.02, an employer need not allow an employee time off to vote if the employee has two consecutive hours off work when the polls are open *either* on election day or during early voting.  SB1 § 7.02(b).

161.    Employees who work more than one job may not receive time off from any of their employers.

162.    Many of the voters that MFV serves work multiple jobs and may have to go straight from one job to the next or may have lengthy commutes. FOF § XIV.    Indeed, even the two hours provided may be insufficient in some cases because poll lines can be longer than two hours in some places, such as Harris County. FOF § XIV.

163.    The burden created by section 7.02 is further amplified by the other restrictions in SB1, all of which taken together make it more difficult for voters to find voting options that work for their schedules and more difficult for Mi Familia Vota to execute on its mission.   FOF §§ VII.A-XIII.A.

164.    As a result, SB1's amendments to section 7.02 make it difficult if not impossible for some voters to access the polls without jeopardizing their employment and this additional burden reduces the likelihood that these voters will be able to vote.

8. *Restrictions on Canvassing and on Solicitation of ABBMs (7.04)*

A. **SB1 § 7.04 Imposes a Severe Burden On Voters by Restricting Canvassing and Restricting the Solicitation of ABBMs.**

165.    SB1 § 7.04 imposes severe burdens on voters who already seek significant barriers to voting. SB1 § 7.04 creates new felony offenses in the Texas Election Code that (1) prohibit efforts by election officials to provide ABBMs to qualified voters or to invite qualified voters to request an ABBM; and (2) criminalize in-person interactions between canvassers and voters while in the presence of a ballot.

166.    Many voters who would receive ABBMs or solicitation to apply for an ABBM have limitations that would limit or prevent their ability to vote in person, including elderly voters or voters who have a disability. E.C. §§ 82.002, 82.003; FOF § VII.B. Texas now *prevents* election officials from making mere applications for a vote by mail ballot available to these voters, or from proactively inviting these voters to vote by mail. FOF § XIII.A.

167.    Section 7.04 also limits voters' ability to communicate with, and obtain important information about elections from, trusted community organizations. FOF § XIV. These burdens are greater now because SB 1 has introduced significant new barriers to voting, and have otherwise limited voting options that previously had been made available to voters. FOF §§ VII.A-XIII.A. SB 1 § 7.04 burdens voters by limiting their ability to engage in-person with voting organizations that could educate them and help them navigate these new rules.

B. **SB1 § 7.04 Disproportionately Burden Latino Voters by Restricting Canvassing and Restricting the Solicitation of ABBMs.**

168.    SB1 § 7.04 disproportionately impacts Latino voters.

169.    Black and Latino voters already face significant barriers to voting, and under SB1 face additional severe burdens on their right to vote. By restricting canvassing under the guise of preventing "vote harvesting," SB1 § 7.04 further burdens Latino voters by limiting their access to

community organizations that might have helped them navigate the barriers to voting that they must surmount in order to vote. FOF § XIV.

170.     Mi Familia Vota targets Latino voters who are considered unlikely to vote, and therefore are unlikely to be targeted by campaigns, political parties, or other organizations. These voters include newly naturalized citizens and Latino U.S. citizens who face language, informational, and cultural barriers to voting. FOF § XIV, FOF §XVII.C.

171.     The vague language of SB1 § 7.04 encompasses a broad range of in-person interactions that organization employees may have with voters. And though the law defines these interactions as "vote harvesting," Jonathan White and Keith Ingram both testified that vote harvesting is not only a narrower set of behaviors, but are also a set of behaviors that had been unlawful even before SB 1. The expansive definition of "vote harvesting" in SB 1 § 7.04 chills canvassers who provide important services to the Latino community. FOF § XIV.

172.     The chilling effect is most severe on Black and Latino communities. As discussed *supra,* in their testimony and reports, Plaintiffs' experts demonstrated that Black and Latino Texas face ongoing, pervasive discrimination in interactions with law enforcement. FOF § IV.E.. 233. They are disproportionately policed and incarcerated, and thus shoulder the collateral consequences that stem from interaction with the criminal justice system. FOF § IV.E. They are targeted for enforcement of restrictive immigration laws, especially Latinos. FOF § IV.E.

173.     As a result, as discussed *supra*, Latino people are wary of acting in a way that might bring them into contact with the police. For example, Ms. López testified that fear of surveillance, police, and government officials are enough to keep many Latino people in the community in which she grew up from seeking relief during natural disasters. FOF § III.D. . It

can be traumatizing for Latino people to face accusations of wrongdoing for trying to provide voter assistance. FOF § VIII.A.1.

174.    Furthermore, Mi Familia Vota has already faced at least one accusation of "vote harvesting" for merely encouraging votes to check their registration status. And the organization has been denied access to schools and other community events to carry out voter registration, even where other, non-Latino-led organizations are given access to carry out similar programs in the same spaces. Mi Familia Vota's concern that the organization and its canvassers will be subject to accusations of vote harvesting are well founded. FOF § XIV.

175.    The burden caused by §7.04 is disproportionately felt by Latino voters who face severe burdens when deprived of the information that canvassers and election officials might have provided to them about elections and voting, while Latino canvassers are more vulnerable to incarceration and policing that their white counterparts, and therefore are more likely to be chilled from carrying out their canvassing efforts by the criminal provisions of SB1 §7.04.

### 9.  *The Cumulative Effect of the Challenged Provisions Impose Severe Burdens on Voters, Particularly Black and Hispanic Voters*

176.    The cumulative burdens imposed by the Challenged Provisions are significant, unnecessary, and could result in outright disenfranchisement.

177.    Harris County election officials testified that DTV, 24-hour voting, and encouraging mail voting were intended to ease the traffic at in-person voting locations. 9/19 Tr. 1222:21–1223:7 (Longoria); 9/20 Tr. 2356:4-9 (Longoria); 1154:24-1155:5 (Obakozuwa). The DTV Ban, 24-Hour Voting Ban, and Drop-Off Location Requirement result in more individuals voting in person at traditional early voting sites or on Election Day. HAUL-MFV 310 ¶ 75. This means longer lines and longer wait times, imposing a "time tax" that increases the cost of voting

not only for voters who otherwise would have voted via one of the methods that SB1 prohibits, but also those who wish to vote at a traditional early voting site or on Election Day. *Id.*

178.    This is especially true for Black and Latino voters, who already experience longer wait times at the polls. HAUL-MFV 310 ¶¶ 75-76. Prof. Smith describes the "ample scholarly evidence that Black and Hispanic voters face longer wait times when casting a ballot in person," including one study that "estimate[s] that voting locations that are predominantly Black or non-white are associated with wait times that are approximately twice as long as those in predominantly White locations." HAUL-MFV 310 ¶ 76.

179.    Using the Spanish surname tag, Prof. Smith demonstrates empirically that Hispanic voters faced longer wait times at in-person early voting locations in 2020 than non-Hispanic voters. HAUL-MFV 310 ¶¶ 80-86. Prof. Mayer performs a similar analysis showing Black and Latino voters are more likely than white voters to vote later in the day, and are thus more likely to wait in longer lines because wait times tend to be largest later in the day. LULAC 2, at 10–12. Prof. Smith concludes that SB1's elimination of DTV and 24-hour voting will cause Latino voters to "likely face greater downstream pressures, including those who already are more likely to wait in line to cast traditional early-in person ballots." HAUL-MFV ¶ 85.

180.    SB1's mail-ballot ID provisions place further strain on lines at in-person locations. Voters whose BBMs are rejected because of SB1 may be compelled to show up to the polls in person, further crowding those locations and creating longer lines. *See* HAUL-MFV 310 ¶ 78. This only exacerbates the burden of voting in person.

181.    Prof. Smith explains that long wait times "can cause reneging, that is, voters leaving a slow-moving line, or balking, that is, not joining the line in the first place upon observing a long queue." HAUL-MFV 310 ¶ 79. One study of the 2012 general election estimates that there were

between 500,000 and 700,000 "lost votes" because of long lines. *Id.* Prof. Smith describes that long lines can also have "downstream electoral effects," discouraging voters from voting in future elections. *Id.* (citing study showing "that voters who spend more time waiting in line at the polls in a given election—that is, as the cost of voting becomes more onerous—their likelihood of turning out in a future election decreases").

182.    The Poll Watcher provisions add to these burdens by subjecting voters to intimidation and harassment when they do appear at in-person polling places. FOF § VIII.B.

183.    Thus, the cumulative impact of the provisions of SB1 amounts to a signification and severe burden that increases the cost of voting and potentially leads to disenfranchisement.

### C. The State's Purported Interests in the Challenged Provisions Are Pretextual

184.    The State's proffered interests in the Challenged Provisions are tenuous at best, and pretextual at worst. Lacking a serious, valid justification, the burdens the Challenged Provisions impose on voters are unconstitutional under the First and Fourteenth Amendments.

#### 1. *Voter Fraud*

185.    Despite the State's repeated invocation of voter fraud as a justification for the Challenged Provisions, there simply was no evidence whatsoever of voter fraud adduced at trial or in the legislative record related to DTV, 24-hour voting, or mail voting via drop-off locations. Indeed, of the handful of proven incidents of voter fraud compiled by the OAG, there are *zero* incidents of voter fraud related to in-person voting, such as DTV, 24-hour voting, or voting via mail-ballot drop-off locations. 10/16 Tr. 4087:25–4088:7 (White); 10/16 Tr. 4090:18-21 (White).

186.    With respect to DTV and 24-hour voting, multiple witnesses, including those for State Defendants, testified that there was no evidence of voter fraud related to these methods of voting. 10/18 Tr. 4454:17–23 (Ingram) (on DTV); Tr. 4087:25–4088:7 (White on DTV); 9/20 Tr.

1255:17-19 (Longoria on DTV); Tr. 1155:10-12 (Obakozuwa on DTV); Tr. 1155:22–1156:4 (Obakozuwa on DTV); 10/18 Tr. 4454:24–4455:2 (Ingram) (on 24-hour); 10/16 Tr. 4090:18-21 (White on 24-hour); Tr. 1158:3-4 (Obakozuwa on 24-hour); 1267:18-20 (Longoria on 24-hour).

187.    And there is good reason for this. The risk of voter fraud is exceedingly small, and that is especially true for in-person voting. 9/14 Tr. 856:11-19 (DeBeauvoir); 10/12 Tr. 182:18–183:1 (Phillips). Harris County implemented the same, if not more stringent, ballot security and privacy measures at DTV and 24-hour voting locations as it did at other in-person voting locations. 9/19 Tr. 1242:21–1243:16 (Longoria); *id*. 1157:1-12 (Obakozuwa); *see also* 9/20 Tr. 1266:23–1267:17 (Longoria). In fact, Keith Ingram testified that the SoS "didn't see any way in the world that DTV was abusing voters' rights" or "impair[ing]" those rights. 10/17 Tr. 4358:1-8 (Ingram); 10/18 Tr. 4210:11-13 (Ingram).

188.    With respect to voting via mail-ballot drop-off locations, the risk of voter fraud is the same as it is for in-person voting because, even prior to SB1, only the voter (or a family member in certain circumstances) could drop off his or her own BBM, and the voter is required to present photo ID to an election official, just as the voter would be required to do at an in-person voting location. 10/12 Tr. 144:5-8 (Phillips); 10/18 Tr. 4475:12-17 (Ingram). Thus, a voter dropping off a BBM in person was already a "fully identified voter." 10/18 Tr. 4475:22–4476:2 (Ingram).

189.    With respect to the voter assister provisions, there is no evidence of fraud, or that the new provisions of SB1 are likely to prevent fraud. For example, Ms. DeBeauvoir testified that she is not aware of any instance in her 36 years in office of a paid assistor being alleged to have coerced or intimidated a voter, or engaged in any kind of fraud or misconduct. 9/14 Tr. 846:16-847:3 (DeBeauvoir). Furthermore, Ms. DeBeauvoir testified that harassing and intimidating voters was illegal in Texas before SB1. 9/14 Tr. 917:13-20 (DeBeauvoir).

190.    There is similarly no evidence of fraud that will be prevented by SB § 7.04. County officials routinely provided qualified voters with blank ABBMs or solicited ABBMs from voters; each voter still had to complete the ABBM accurately and follow every other step of the voting-by-mail process.

191.    The canvassing provision of SB1 7.04 similarly does not prevent fraud. Ms. Wise, Elections Administrator for El Paso County, testified that she had never heard of anyone with a nonprofit or community organization trying to commit fraud with a mail voter and a mail ballot. 9/12 Tr. 260:17-21 (Wise). And Mr. White testified that every vote harvesting case he had ever seen involved the candidates themselves, or paid harvesters working with candidates, a slate of candidates, or a candidate's family—not non-profits or community organizations. 10/16 Tr. 4000:14-17 (White). Moreover, vote harvesting was already illegal in Texas prior to SB1. 9/22 Tr. 1914:1-6 (Ingram), 10/16 Tr. 3938:14-16, 3939:1-15, 3940:23-3941:3 (White).

192.    Given the absence of evidence of fraud, Defendants may claim that fraud does not have to take place for lawmakers to address it prophylactically. While evidence of prior fraud in Texas is not necessary to make out a defense to an *Anderson-Burdick* claim, the bare invocation of election fraud as the justification for a burdensome measure is insufficient. *See Crawford*, 553 U.S. at 194–97 (citing recent examples of the relevant type of voter fraud in other states and evidence of the state's inflated voter rolls as part of the rationale for Indiana's photo ID law); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986) ("Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."). There State must demonstrate why fraud is a risk in this context and how the Challenged Provisions address that risk. *See id.*; *see also Vote.Org v. Callanen*, No.

22-50536, 2023 WL 8664636, at *22 (5th Cir. Dec. 15, 2023) (explaining that Texas's wet signature requirement could dissuade ineligible individuals from registering to vote); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 395 (5th Cir. 2013) (explaining how state residency and county appointment requirements for volunteer deputy registrars address the risk of voter registration fraud).

193.    Here, the weight of the evidence establishes, however, that the Challenged Provisions do not address any risk of future fraud. For example, former Harris County EA Isabel Longoria testified that the provisions of SB1 do not address any problems related to fraud that she has experienced in her time administering elections in Harris County. 9/20 Tr. 1359:7-10 (Longoria). Similarly, Bexar County EA Jacqueline Callanen testified that before SB1, Bexar County had safeguards in place to verify voters' identity, and that there was no problem of fraud that was addressed by any provision of SB1. 9/19 Tr. 1078:10-21 (Callanen). Prof. Mayer also testified that there is "no evidence that the requirements of SB1 would have prevented instances of voter fraud." 10/ 2 Tr. 1959:10-14 (Mayer).

### 2. *Uniformity*

194.    Defendants may assert that the Challenged Provisions address the desire for uniformity in the administration of elections across counties.

195.    As an initial matter, given the local nature of election administration in Texas, uniformity is not a significant state interest that can justify the burdens described above. Election officials testified that election administration in Texas occurs at the local level. 9/22 Tr. 1848:24-1849:11 (Adkins). Given the differences in the needs of voters between counties, which differ greatly in geography, demographics, and population, it is important for local election officials to have discretion in administering elections to meet the unique needs of their voters. 9/19 Tr. 1078:22-25 (Callanen); 9/22 Tr. 1827:6-18 (Adkins).

196.    Moreover, the text of SB1 recognizes that uniformity for the sake of rigid sameness is not a legitimate state interest in and of itself. Section 1.04 of SB1 states that the legislature's intent is that "the application of [the EC] and the conduct of elections be uniform and consistent throughout this state," but it goes on to describe that uniformity is as means "to reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the ballot, promote voter access, and ensure that all legally cast ballots are counted." SB1 § 1.04.

197.    None of the provisions at issue here advance any of these stated goals. As detailed extensively above, these provisions do not reduce the likelihood of (already non-existent) fraud or protect the secrecy of the ballot. They certainly do not promote voter access, as they eliminate methods of voting utilized by thousands of Texas voters and will result in longer lines and wait times, as described above. FOF § X.A-B.. To the extent Defendants may argue that the elimination of DTV and 24-hour voting helped address voter confusion caused by the availability of those methods of voting in certain counties, they presented no evidence of voter confusion. Finally, the Challenged Provisions in no way impact the ballot counting process, which remains exactly the same after the implementation of the Challenged Provisions at issue here.

198.    Even if uniformity for uniformity's sake were a legitimate state interest on its own, SB1 does not advance that interest with respect to the elimination of 24-hour voting. SB1 still gives counties discretion to choose when to open and close early voting locations. SB1 §§ 3.09, 3.10. For example, one county can open early voting locations from 6 a.m. to 6 p.m., while the neighboring county can open them from 10 a.m. to 10 p.m. SB1's elimination of 24-hour voting does not address the risk that neighboring counties will offer different early voting hours, resulting in voter confusion. *See* 9/21 Tr. 1575:13–18 (Escobedo); 10/17 Tr. 105:24–106:8 (Ingram)

199.    For DTV, Defendants contend that the state of the law was unsettled as to the question of whether a county could provide voters a DTV option. In order to eliminate any ambiguity and ensure uniformity in application of the EC, Texas decided to clarify that voting could only occur inside a building. As an initial matter, each lawsuit that was brought in 2020 contending that DTV was illegal failed. *See Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668 (S.D. Tex. Nov. 2, 2020); *In re Hotze*, 610 S.W.3d 909 (Tex. 2020). Moreover, if the State wanted to clarify the law, it could have simply made explicit that DTV *was* permitted 10/18 Tr. 4210:18-25 (Ingram), which would have avoided imposing the disparate burdens on Black and Hispanic voters that were made clear with extensive evidence during the legislative hearings and debates.

200.    Finally, both state and county election officials testified that although uniformity is valuable, it is also important to permit counties to adopt voting practices that work best for their voters. 9/19 Tr. 1078:22-25 (Callanen); 9/22 Tr. 1827:6-18 (Adkins).

### 3. *"Irregularities"*

201.    Finally, State Defendants' suggestion at trial that purported "irregularities" with respect to the ballot reconciliation process for DTV justified SB1's outright ban on DTV is clearly pretextual. They base this argument on findings in the forensic "audit" report performed by non-professionals with no auditing experience. FOF § XV.B.  Eliminating "irregularities" is not a significant state interest, and regardless, the ban on DTV would not achieve it. Ballot reconciliation discrepancies existed at nearly all polling locations across Texas, not just DTV locations, and continued to exist after SB1's enactment. FOF § V.A.1.g There is no evidence that purported discrepancies at DTV locations were different from discrepancies observed at any other voting location in Texas or were specific to any characteristic of DTV. Moreover, Harris County addressed the source of the purported discrepancies at DTV locations—that eSlate machines did

not remain plugged into JBCs, which occurs at curbside voting locations as well—within a few days of the start of early voting in November 2020 by keeping the eSlate machines plugged into the JBCs throughout the day. FOF § V.A.I.a. Therefore, eliminating DTV did nothing to address the issue of reconciliation discrepancies. Had the legislature wished to address the purported issue of ballot reconciliation discrepancies caused by needing to plug and unplug eSlate machines from JBCs, it could have enacted a law requiring them to remain plugged in at DTV locations.

        **4.**   ***The Significant Burdens Imposed by the Challenged Provisions Outweigh the Weak and Tenuous Purported State Interests***

202.    The bans on DTV and 24-Hour voting and the restrictions on drop-off locations impose significant burdens on voters, particularly Black and Latino voters, but they do little, if anything, to advance any state interest.

203.    The ban on DTV increases the burden of voting for at least the approximately 128,000 voters who utilized it in Harris County in 2020, the voters who utilized it in Tom Green and Bee Counties in 2020, and the voters who waited in shorter lines at traditional polling locations because DTV eased congestion. Meanwhile, it does nothing to address any existing or future risk of fraud, and even if it did have some prophylactic impact on fraud, the very significant burden imposed on Texas voters, primarily Black and Latino voters, outweighs that interest. Similarly, the ban on DTV does not address any of the objectives laid out in SB1 Section 1.04, and achieving uniformity on its own cannot outweigh the significant burdens imposed on tens of thousands of voters. Finally, any purported ballot reconciliation issues associated with DTV cannot justify its elimination, particularly when the purported source of the issue was addressed by keeping the machines plugged in.

204.    The ban on 24-hour voting similarly imposes significant burdens on voters that far outweigh any purported state interests advanced by Defendants. At least, 1,390 voters utilized 24-

hour voting in the eight-hour period it was offered in one county in 2020. For these voters and others, the elimination of 24-hour voting made it significantly more cumbersome to cast their ballots, but failed to address any present or future risk of fraud, advance uniformity in a meaningful way, or address any irregularities in the voting system. These tenuous, abstract state interests cannot justify the real burdens imposed on voters by SB1's 24-hour voting ban.

205.    The additional restrictions on voting by mail via a drop-off location similarly impose burdens on mail voters that far outweigh any purported state interest. Like the elimination of 24-hour voting and DTV, there is no evidence that these restrictions would address any present or future risk of fraud, nor how they would increase uniformity in a meaningful way or address any purported "irregularities." The burdens faced by mail voters, who already face significant burdens in voting, far outweigh these purported state interests.

206.    The additional ID requirements for ABBMs and BBMs impose burdens on mail voters that far outweigh any purported state interest.

207.    The provisions that restrict voter assistance impose additional burdens on mail voters that far outweigh any purported state interest. There is no evidence that these restrictions address any present or future risk of fraud, increase uniformity in a meaningful way, or address any purported "irregularities." Instead, it deprives vulnerable voters of the assistance that they need to be able to navigate and complete the complex process of voting by mail.

208.    The provision that allows employers to deprive voters of time off work to vote on Election Day if that voter has any two-hour window off of work while polls are open during the whole early election period does nothing to prevent fraud or establish uniformity. It does place significant burdens voters and disproportionately harms Black and Latino voters, who are most

likely to work multiple jobs, face long commutes, or otherwise be limited in being able to get to the polls even in hours they are not working one of their jobs.

209.    By limiting voters' access to important information about voting and elections by criminalizing efforts by county election officials and by non-profit organization canvassers to share information with voters, SB1 §7.04 places significant burdens on voters and cannot be justified by the state's weak interest in the law. County election officials do not risk fraud by sending blank ABBMs to, or soliciting ABBMs from, qualified voters. And the provision undermines uniformity because organizations and political parties remain free to selectively send and encourage ABBMs, which may result in a patchwork of voters getting information that other voters do not. Furthermore, there is no evidence that canvassing by non-profit organization poses a threat of vote harvesting, and vote harvesting was already unlawful in Texas prior to SB1. The severe burden imposed on burden by SB1 § 7.04 outweighs the state's weak interest in expanding the definition of "vote harvesting" to include behavior that, by the state defendants' own admission, is not the type of behavior it is concerned with.

### IV. THE CHALLENGED PROVISIONS OF SB1 RESULT IN THE DENIAL AND ABRIDGEMENT OF THE RIGHT TO VOTE OF BLACK AND LATINO TEXANS IN VIOLATION SECTION 2 OF THE VRA

210.    Section 2 of the Voting Rights Act ("VRA") imposes a "permanent, nationwide ban on racial discrimination in voting," *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013), under which private parties are empowered to sue. As discussed below, provisions of SB1 banning DTV, banning 24-hour voting, preventing the regulation of poll watchers, and restricting assistance to voters have a discriminatory result on Black and Latino voters, providing them less opportunity to participate in the political process.

### A. Section 2 of the VRA Establishes a Private Right of Action

211.    Binding Fifth Circuit precedent dictates that private parties have a right of action under Section 2 of the Act.  In *Robinson v. Ardoin*, this Circuit directly considered "whether Section 2 can be enforced by private parties" and concluded that private parties are "aggrieved persons" entitled to bring a claim under Section 2. 86 F.4th 574, 587-88 (5th Cir. 2023), *pet. for rehr'g en banc denied*, No. 22-30333, (5th Cir. Dec. 15, 2023).  The Court in *Robinson* relied on the Supreme Court's statement  that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965," *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality opinion) (citations omitted); *id.* at 240 (Breyer, concurring), and a prior decision in which the Circuit recognized that the VRA validly abrogated sovereign immunity, *OCA-Greater Houston*, 867 F.3d 604, 614 (5th Cir. 2017). The *Robinson* panel reasoned that "Congress should not be accused of abrogating sovereign immunity without some purpose" and that the purpose was to allow for a state to be sued by an "aggrieved person." 86 F.4th at 587-88. Accordingly, courts within this Circuit routinely adjudicate Section 2 claims brought by private litigants. *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259, 2021 WL 5762035, at * 1 (W.D. Tex. Dec. 3, 2021) (three-judge court) (declining "to break new ground" and holding that Section 2 contains a private right of action); *Veasey v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014) (same). Dec. 3, 2021) (declining "to break new ground" to find Section 2 lacks a private right of action).

212.    Federal laws are also privately enforceable under 42 U.S.C. § 1983. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 184-86 (2023). *Section* 2 is also enforceable by private parties through § 1983 to redress violations of the statute committed by persons acting under color of state law. *See Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 2987708, at *5-6 (D. Kan. April 18, 2023), *motion to certify appeal denied*, No. 22012740EFM, 2023 WL

3948472 (D. Kan. June 12, 2023) ("Plaintiffs may alternatively assert a Section 2 claim under § 1983); *Turtle Mountain Band of Chippewa Indians v. Jaeger*, No. 3:22-CV-22, 2022 WL 2528256, at *3 (D.N.D. July 7, 2022) ("[Section] 1983 provides a private remedy for violations of Section 2 of the VRA"), *stay denied*, *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 23-3655 (8th Cir. Dec. 15, 2023); *see also* <u>Vote.Org v. Callanen</u>, 89 F.4th 459, 478 (5th Cir. 2023) (concluding that a voting rights provision within the Civil Rights Act of 1964 is privately enforceable under § 1983).. .

### B. Legal Standard

213.    Section 2 of the VRA prohibits voting qualifications, prerequisites to voting, and voting standards, practices, or procedures that result in the denial or abridgement of the right of any citizen to vote on account of race, color or membership in a language minority group. 52 U.S.C. § 10301(a); 52 U.S.C. § 10303(f)(2). Plaintiffs need not prove discriminatory intent to prevail on this claim. *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991) (to prevail on a Section 2 claim, Plaintiffs can "either prove [discriminatory] intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process").

214.    "'The essence of a Section 2 claim . . . is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities' of minority and non-minority voters to elect their preferred representatives." *Brnovich v. Democratic Nat'l Comm.* 141 S. Ct. 2321, 2333 (2021) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). "[E]ven a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984) (citation omitted). The VRA "was aimed at the subtle, as well as the obvious, state

regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Bd. of Elections*, 393 U.S. 544, 565 (1969); *see, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 251, 259 (5th Cir. 2016) (affirming that a state voter photo ID law violated Section 2, in part, because minority voters were poorer and less likely to own cars needed travel long distances to the limited locations that offer the required photo ID); *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 403, 409 (5th Cir. 1991) (affirming that a state law, which limited the hours and locations for registration, violated Section 2 because a "significant percentage of Mississippi's black citizens" lacked access to transportation and the "type of jobs that would allow them to leave work during business hours to register to vote," resulting in Black citizens registering to vote at lower rates than white citizens); *Marengo*, 731 F.2d at 1570 (noting that a county registrar's limited hours and single, inconvenient location discriminated against Black voters, who were more likely to be unregistered and live in rural areas, by impairing their ability to register to vote); *United States v. Palmer*, 356 F.2d 951, 952 (5th Cir. 1966) (same).

215.    A violation of Section 2 is established if "based on the totality of the circumstances," it is shown that the political processes leading to election in the State "are not equally open to participation" by members of a protected class listed above "in that its members have less opportunity . . . to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The Supreme Court has instructed that "the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Gingles*, 478 U.S. at 45 (citation and internal quotation marks omitted). Even if elections are "equally open," Section 2's "equal

opportunity" principle indicates that a court's analysis must "include consideration of a person's ability to use the means that are equally open." *Brnovich*, 141 S. Ct. at 2337-38.

216.    The Senate Judiciary Committee report accompanying the 1982 amendments to the VRA provided a non-exclusive list of factors that a court may consider as part of the totality of the circumstances analysis (the "Senate Factors"):

1. The extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

2. The extent to which voting in government elections is racially polarized;

3. The extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group;

4. Exclusion of minorities from a candidate slating process;

5. The extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

6. The use of overt or subtle racial appeals in political campaigns;

7. The extent to which minorities have been elected to public office in the jurisdiction.

8. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the minority group

9. Whether the policy underlying the use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36-37 (citation omitted); *Veasey v. Abbott*, 830 F.3d 216, 245 (5th Cir. 2016) (en banc).

217.    In a vote denial case, some Senate Factors are less relevant than others, such as the racial appeals, but the Supreme Court "d[id] not suggest that these factors should be disregarded." *Brnovich*, 141 S. Ct. at 2340. The Supreme Court recognized, for example, that Senate Factors One and Five remain relevant to show that "minority group members suffered discrimination in the past (factor one) and that effects of that discrimination persist (factor five)" in a manner that might make it more difficult for minority voters to participate in elections. *Id.*.

218.    In addition, "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Brnovich*, 141 S. Ct. at 2338. Other potentially relevant considerations recognized by the Supreme Court include the "size of the burden imposed by the challenged voting rule," the "degree to which a voting rule departs from" standard practice in 1982, the "size of any disparities in a rule's impact on members of different racial or ethnic groups," the "opportunities provided by a State's entire system of voting," and the "strength of the state interests served by the challenged voting rule." *Id.* at 2338-40.

219.    Finally, under a totality of the circumstances analysis, a court should not ignore the "*cumulative impact* of the challenged provisions." *N.C. Conf. of the NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016) (emphasis added) (citing *Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J. concurring) ("A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition."). Each voting restriction should not be evaluated in isolation, but rather in the context of the "entire system of voting." *Brnovich*, 141 S. Ct. at 2339; *see also McCrory*, 831 F.3d

at 214 ("In holding that the legislature did not enact the challenged provisions with discriminatory intent, the court seems to have missed the forest in carefully surveying the many trees.").

220.    In *Veasey v. Abbott*, the Fifth Circuit set forth a two-part framework to evaluate Section 2 results claims that allege the right to vote has been denied or abridged (as opposed to a vote dilution claim). 830 F.3d 216 at. First, "[t]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* Second, "[t]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.* The Senate Factors should be evaluated to determine whether there is "a sufficient causal link" between the disparate burden imposed and the social and historical conditions produced by discrimination." *Id.* at 245. Because *Brnovich* "decline[d] . . . to announce a test" for Section 2 vote denial claims, 141 S. Ct. at 2336, the Fifth Circuit's two-part framework adopted in *Veasey* remains the proper framework for this Court to apply when assessing Plaintiffs' Section 2 discriminatory results claim.

### C. The Challenged Provisions of SB1 Impose a Discriminatory Burden on Black and Latino Voters

221.    Plaintiff DST challenged SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, 6.01, 6.03, 6.04, 6.05, and 6.07, and Plaintiff HAUL challenged SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07 under Section 2 of the VRA,[26] and MFV Plaintiffs challenge SB1 §§ 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, 5.02, 5.03, 5.04, 5.07, 5.08, 6.03, 6.05, 6.07, 7.02, 7.04. As discussed above, these Plaintiffs are empowered to sue under Section 2 of the VRA based on its right of action. In the

---

[26] Plaintiffs DST and HAUL also challenge SB1 §3.15 under Section 2 of the VRA, but solely under an intentional discrimination theory.

alternative, Plaintiffs may enforce Section 2 through 42 U.S.C. § 1983. *See* Second Am. Compl. ¶ 29 (ECF No. 199) ("Plaintiffs bring this civil rights action under 42 U.S.C. §§ 1983 and 1988 for violations of their rights under . . . Sections 2 and 208 of the Voting Rights Act of 1965 . . .").

222.    The trial record established that SB1's ban on drive-thru voting, ban on 24-hour voting, poll watcher provisions, restrictions on voter assistance, mail ballot provisions, and prohibitions on canvassing, individually and cumulatively, impose a discriminatory burden on Black and Latino voters that linked to the effects of discriminatory social and historical conditions that have affected those groups.

### 1.  *Ban on DTV (3.04, 3.12, 3.13)*

223.    SB1's ban on drive-thru voting, a method of voting favored by Black and Latino voters, disproportionately burdens those groups, denying them an equal opportunity to participate in political process as a result. The elimination of DTV almost exclusively impacted voters in Harris County, the most populous and most diverse county, in which more than three million Black and Latino Texans reside. State Ex. 290. Even within Harris County, as demonstrated by the analysis of experts Prof. Smith and Prof. Mayer, Black and Hispanic voters disproportionately relied on drive-thru voting when it was available and are most burdened by its removal. FOF § V.A.1.e.

224.    Using a regression analysis, Prof. Smith found that as the percentage of Black or Hispanic VAP in a Harris County precinct increased, so did the percentage of voters who used drive-thru voting, whereas the reverse was true for white VAP: Whiter precincts relied on drive-thru voting at lower rates. FOF § V.A.1.e Prof. Smith's method of bounds analysis further supported the conclusion that the rates of usage of drive-thru voting among Black and Hispanic precincts were disproportionately higher than in white precincts. FOF § V.A.1.e

225.    Using a different analysis, Prof. Mayer also showed Black and Hispanic voters disproportionately used DTV. Non-Anglo voters were 46.5% of all in-person early voters in Harris County, but they were 62% of early voters who used DTV. FOF § V.A.1.e. By contrast, non-Hispanic white voters were 53.5% of in-person early voters, but only 38% of DTV voters. *Id.* In terms of raw numbers, Prof. Mayer found that more than 77,000 minority voters used DTV in the November 2020 election in Harris County, compared to 48,000 non-Hispanic white voters. FOF V.A.1.e.

226.    Prof. Smith's other methods and Prof. Mayer's analysis demonstrate Black and Hispanic voters disproportionately used DTV.

227.    The expert findings confirmed analyses by the Harris County Clerk's Office and civil rights advocates presented to the legislature when SB1 and its predecessor bill were under consideration. Those analyses informed the Legislature that Black and Hispanic voters disproportionately relied on DTV compared to white voters. FOF § V.A.1.e. The bill sponsors of SB1 or its predecessor bills did not commission or conduct any racial impact study when considering the bill. [HAUL-MFV 109 at 40:11-42:16] Nor has the SoS conducted a study of the racial impact of SB1 since its implementation. (Ingram, 1920:23–1921:15).

228.    Likewise, Defendants have provided no alternative expert analysis in this case that contradicts the finding by Prof. Smith and Prof. Mayer.  At most, Defendants put forth Dr. Hoekstra who purported to rebut Prof. Mayer, but did not offer an alternative method showing a smaller disparity and did not address Prof. Smith's analysis at all. *See* State Ex. 10 ¶¶ 61-76 (Hoekstra April 5, 2023 Report).

229.    Complementing the expert evidence is testimony from organization that serve Black and Latino voters about the burdens the elimination of DTV has caused their members and the organizations themselves.

230.    DTV made voting more accessible, convenient, and safe for HAUL's members and clients, who are primarily Texans of color. FOF § XVII.A. HAUL member Deion Dorsett's testimony illustrates the burden of voting without a DTV option: in the March 2020 primary he waited in a four-hour line with his young daughter and in November 2022, he and his wife felt uncomfortable and unsafe inside the polling location where they were shouted at by other people. FOF § V.A.1.d . Neither election offered DTV.  By contrast, in November 2020, Mr. Dorsett and his wife voted from the privacy and safety of their car in a seamless process that took five to ten minutes. FOF § V.A.1.d. Mr. Dorsett relied on DTV in that election to shield himself and his wife from people yelling or intimidating them at a traditional polling location.  FOF § V.A.1.d. While SB1's ban on DTV has made voting more challenging and confusing for some HAUL members, for others, it has "suppressed the vote to where some individuals will no longer be able to vote." FOF § XVII.A.

231.    Plaintiff DST and its members are also burdened by the ban on DTV. Some members used DTV to vote with their elderly parents, but post-SB1, the process of voting has become burdensome, cumbersome, and potentially dangerous because only the parents are eligible to vote curbside so the DST member must park and leave their parents in the car for an indeterminate amount of time while she votes inside the polling location. FOF §§ V.A.1.d, XVII.B. DTV was also a lifeline for parents—especially single parents—who could easily vote with their children in the car rather than arranging childcare or bringing the child inside in a potentially intimidating environment or long line. FOF § V.A.1.d.

232.    At trial, witnesses testified to the greater security voters feel casting a ballot from their car. FOF § §V.A.1, V.A.1.d Unlike their white counterparts, Black and Latino voters have historically faced intimidation when trying to vote in Texas, FOF §§ III.B, III.C, III.D, and DTV offered these communities a measure of refuge from that threat because they were less exposed to aggressive poll watchers, unruly electioneers, and others. Thus, the ban on DTV is not merely an inconvenience but prevents a way to help mitigate a long-standing issue that particularly menaces minority voters.

233.    Because of the passage of SB1, and the elimination of important options like DTV, it is more difficult for voters whom MFV serves to make a voting plan that works for them. FOF § I.B.

234.    To be sure, many Black and Latino voters in areas that previously offered DTV were able to vote in post-SB1 elections, especially particularly dogged and dedicated voters such as members of DST who "will endure the hardships that are put in front of [them] to vote." FOF That some voters overcame the burdens imposed by SB1 does not render those burdens non-existent or preclude a Section 2 violation. As the Fifth Circuit has observed, "in previous times, some people paid the poll tax or passed the literacy test and therefore voted, but their rights were still abridged." *Veasey*, 830 F.3d at 260 n.58. Section 2 prohibits both the "denial *or abridgement*" of the right to vote. 52 U.S.C. § 10301(a) (emphasis added).

235.    As at trial, some Defendants may claim that Black and Latino reliance on DTV occurred because DTV locations were intentionally sited in minority areas within Harris County. This argument fails for three reasons: First, the selection of DTV involved a number of factors, but race was not one of them. FOF §§ V.A.1, V.A.1.d.  Second, almost all DTV sites were not placed in predominantly Black precincts. FOF §§ III.B, III.C, III.D.   And third, as Prof. Smith

testified, in a county-wide early voting system such as Harris County's, people often vote on their way to work or after dropping their children at school, not necessarily at a location near where they live, particularly if voting from their car. FOF §. The Court should reject this argument.

236.    For these reasons, Plaintiffs' trial evidence establishes that SB1's ban on DTV imposed a discriminatory burden on Black and Latino voters' ability to participate in the political process, satisfying the first prong of *Veasey*.

### 2.    *Ban on 24-hour Voting (3.09, 3.10)*

237.    The analysis related to SB1's ban on 24-hour voting largely mirrors that of the ban on DTV.  24-hour voting was a method favored by Black and Latino voters in Harris County, and both expert evidence and lay testimony establish that those groups are disproportionately burdened by its removal.

Analyzing votes cast in the November 2020 election between 10 p.m. and 6 a.m. on the days 24-hour voting was available, Prof. Smith conducted a regression analysis that showed as the percentage of Black or Hispanic VAP in a Harris County precinct increased, so did the percentage of voters who used 24-hour voting, whereas the reverse was true for white VAP. FOF § V.A.2.d. As such, Prof. Smith concluded "Black and Hispanic voters in Harris County were more likely to utilize after-hours voting than White voters in the 2020 General Election." FOF §V.A.2.d. Using a different analysis, Prof. Mayer arrived at a similar conclusion: the participation of white voters (who represented 52.1% of those who voted early during regular hours) dropped to 40% in the overnight hours, while Black voters (19% of regular hours early voters) constituted 25.1% of the 24-hour turnout, and Hispanic voters (22.1% of regular hours early voters) were 28.9% of 24-hour voters. FoF § V.A.2.d.

238.    As with DTV, these expert findings concerning 24-hour voting confirmed analyses by Harris County and civil rights advocates that were presented to the Legislature during the 2021

legislative session and showed Black and Latino voters disproportionately relied on 24-hour voting. FOF § V.A.2.d.

239.   Neither the bill sponsors of SB1 or its predecessor bills or the SoS studied the racial impact of banning 24-hour voting or any of SB1's provisions either before or after the bill went into effect. FOF § VI.

240.   Likewise, Defendants have provided no alternative expert analysis in this case that contradicts the finding by Prof. Smith and Prof. Mayer.  Defendants' primary rebuttal expert, Dr. Hoekstra, did not address Prof. Smith's analysis at all and only addressed Prof. Mayer's March 6, 2023 report, which did not discuss 24-hour voting. *See* State Ex. 10

241.   The elimination of 24-hour voting voting burdened Black and Latino voters because they disproportionately serve in hourly wage jobs with less flexibility to take time off to vote: in Harris County, 18.7% of employed Black Texans and 21.3% of employed Latino Texans work in service occupations, compared to just 7.9% of employed white Texans.  FOF § IV.E.; *cf. Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1256 (N.D. Miss. 1987), *aff'd sub nom. Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991) ("[B]lack workers in Mississippi predominate in blue-collar and service worker positions in which they are likely to be working for an hourly wage and are less likely to be able to take off from work to register to vote during the regular office hours that the circuit clerk's and municipal clerk's offices normally are opened."). In Harris County, 58.2% of employed white Texans, compared to 37.8% of employed Black Texans and 21.9% of employed Latino Texans, work in management, business, science, and the arts, which are typically salaried professions that can offer more flexible time off to vote. FOF § IV.E.

242.    As a result, SB1's ban on 24-hour voting has burdened organizations that serve Black and Latino communities and their members. Many HAUL members and clients are shift workers who benefitted from the expanded voting hours offered by 24-hour voting. FOF § V.A.2.c. HAUL member Mr. Dorsett testified that there are days he works from 5 a.m. to 10 p.m. which would make voting during the hours mandated by SB1 impossible. FOF § V.A.2.c.¶. The elimination of 24-hour voting has caused confusion in a lot of the communities HAUL serves, and some with not be able to vote going forward because of their schedules. FOF § XVII.A.

243.    Similarly, DST members and the communities they serve—largely the Black community—include many voters with irregular work hours who would benefit from 24-hour voting, including shift workers, medical professionals, law enforcement, and workers at plants and chemical facilities. FOF V.A.2.c. The flexibility offered by 24-hour voting alleviated the burden on these voters of trying to fit voting into their restrictive schedules.

244.    As with DTV, the elimination of important options like 24-hour voting made it more difficult for voters whom MFV serves to make a voting plan that works for them. FOF § I.B.

245.    Even where voters are still able to vote during the hours mandated by SB1, the burden can be great, as evidenced by the husband of a DST member who worked a 12-hour shift as a medical professional, rushed directly to a polling location, waited five hours to vote, and was then in a car accident because of fatigue. FOF § V.A.2.c. Their rights are still abridged even if they have not been completely disenfranchised. *Veasey*, 830 F.3d at 260 n.58.

246.    As at trial, some Defendants may argue that Black and Latino reliance on 24-hour voting occurred because 24-hour voting locations were intentionally sited in minority areas within Harris County. Again, the Court should reject this incorrect argument. As Prof. Smith showed in his analysis, most of the 24-hour voting locations were not in heavily Black neighborhoods. FOF

302

§ V.A.2.b.  Ms. Longoria explained that site selection for 24-hour voting locations was not driven by race, but she recognized that individuals who might take advantage of 24-hour voting would be those with later working hours or overnight shifts, which tend to be those with lower incomes. FOF § V.A.2.b.  Thus she expected that expanding opportunities for these workers might have a positive effect on minority voters regardless of the location for the 24-hour polling places. FOF § V.A.2.b. Indeed, she was correct; despite the 24-hour locations not being in predominantly Black areas, Black and Latino voters disproportionately used them.

247.    For these reasons, Plaintiffs' trial evidence establishes that SB1's ban on 24-hour voting imposed a discriminatory burden on Black and Latino voters' ability to participate in the political process, satisfying the first prong of *Veasey*.

### 3.  *Poll Watcher Provisions (4.01, 4.07)*

248.    Two of SB1's poll watcher provisions, sections 4.01 and 4.07 also disproportionately burden Black and Latino voters.  There is a long history of partisan poll watchers not being neutral observers, but instead intimidating Black and Latino voters going back to the 1880s and continuing through the twentieth century.  FOF §§ III.B, III.C Voter challenges by poll watchers have historically been deployed in a racially discriminatory manner. FOF § VIII.B. In Harris County specifically there are documented incidents of poll watcher intimidation of Black and Latino voters going back to 2009 FOF § III.C.

249.    Given this history, as well as present-day incidents, many voters and poll workers of color are wary of poll watchers.

250.    SB1 § 4.01's rule that an election judge may not remove a poll watcher unless that poll watcher's violation of the election code was personally witnessed by an election judge or clerk gives poll watchers license to commit violations—including voter intimidation—so long as they are outside of the view of an election official.  By limiting when a poll watcher can be removed,

Section 4.01 potentially leaves voter reports or concerns about poll watcher conduct unaddressed and constrains election officials' ability to safeguard voters and the voting process. As Ms. Longoria testified, "the law does not allow us to believe voters when they are victims of harassment." FOF § VIII.A.1. Black and Latino voters, the traditional targets of rogue poll watchers, FOF §§ III.B., III.C., are burdened by section 4.01's change in the law because they will be more exposed more intimidation and harassment so long as it is done surreptitiously.

251. SB1 § 4.07 compounds the burden on Black and Latino by guaranteeing poll watchers "free movement" in the polling location. Although the exact meaning of this phrase is vague, its thrust is clear—more autonomy and less regulation of poll watchers, and election workers can face consequences if they overstep in attempting to restrict poll watcher behavior. This section also serves to remove guardrails around poll watcher conduct and embolden bad actors who seek intimidate voters of color.

252. Ms. Watkins-Jones testified that poll watcher "[i]ntimidation has been very real to [DST's] members." FOF VIII.B¶. For example, Ms. Watkins-Jones testified that during the November 2022 election, a poll watcher loomed about a foot away from her while she was voting and followed her as she placed her marked ballot into the tabulator, an unsettling and uncomfortable experience that made her feel that her safety and the privacy of her ballot were compromised. FOF § VIII.A. Because of SB1, Ms. Watkins-Jones did not think an election worker would be able to help her since they did not witness the incident. *Id.* Moreover, it's not clear whether asking a poll watcher to move more than a foot from a voter would constitute denying the watcher free movement. FOF § VIII.A. This experience reminded Ms. Watkins-Jones of accounts from her parents and grandparents about feeling intimidated or frightened while casting a vote. 10/3 Tr. 2193:6-22 (Watkins-Jones).

253.    The poll watcher provisions have further burdened DST members, many of whom serve as election workers, by discouraging them from continuing to work the polls. FOF § VIII.B.

254.    Similarly, Mi Familia Vota canceled its poll worker program, which had encouraged young Latino community members to serve as poll worker, after SB1 took effect, in part because of the fear that they would face accusations from poll watchers. FOF §§ VIII.A.1, XVII.C.   The program had been created because MFV wanted to see more polling places in their communities, and because voters in their communities have had bad experiences at polling places, including issues with language at the polls. (Tr. 10/10/23 3452:1-25 (Razo).

255.    Plaintiff Marla López also stopped serving as an election judge after SB1 went into effect because of a greater fear of intimidation by poll watchers. FOF § VIII.A.3¶. When she served prior to SB1, she found her fluent Spanish was valuable because many other poll workers were mono-lingual English speakers.  FOF § VIII.A.3¶.

256.    By exposing Black and Latino voters to great intimidation or misconduct by poll watchers and discouraging Texans of color from voting and serving as election workers sections 4.01 and 4.07 impose discriminatory burdens on Black and Latino voters, satisfying *Veasey's* first prong.

### 4. *Absentee Ballot By Mail Provisions –5.02, 5.03, 5.04, 5.07 and 5.08*

257.    Because Black voters are more likely to take advantage of mail-in voting, they are disproportionately impacted by the SB1 provisions that make it more difficult to do so.

258.    § 5.04 is one such provision that has a disparate impact because it makes it more difficult to obtain an ABBM.

259.    Black voters are more likely to vote by mail than non-Hispanic White voters and other groups.  FOF § VII.B.1.  For example, 50 percent of Blacks over 65 vote by mail, as compared to 35 percent of Whites in the same age group.  FOF § VII.B.1.

260.    Based on his expert analysis, McDaniel concluded that by making mail-in voting more difficult, SB1 disproportionately negatively impacts Black voters.  FOF § VII.B.1.

261.    The other absentee ballot by mail ID requirements pose a burden that falls disproportionately on voters of color.   In particular, the ID requirements that SB1 added to Section 5 disproportionately burden Black voters.  Not only are Black voters 65 and older more likely than other groups to vote by mail, they are also more likely to have their ABBMs rejected. Half of Black voters choose to vote by mail, compared to 32.9% of white voters, and Black voters under 65 are more than two times more likely than white voters under 65 to vote by mail. FOF § VII.B.

262.    Elections expert Prof. Mayer found that the mail ballot rejection rate in Harris County in March 2022 as a result of SB1 was "uniformly higher for every minority group compared to non-Hispanic Whites" and the distinction was statistically significant.  FOF § VII.B.1. Similarly, in Tarrant Conty, the rejection rate of ballots for Black and Hispanic voters was two to three times the rejection rate for non-Hispanic White voters. FOF § VII.B.1.

263.    Professor Mayer concluded that the difference in mail ballot rejection rates for Black and Hispanic voters were higher than the rejection rates for White voters was significantly significant.  FOF § VII.B.1.

264.    In fact, a Black voter who submitted a mail ballot was 82 percent more likely than a White voter to have their ballot rejected, and a Hispanic voter was 86 percent more likely to have their ballot rejected than a non-Hispanic White voter.  FOF § VII.B.1.

265.    As a result of his analysis, Prof. Mayer concluded that SB1 mail ballot ID requirements imposed an "onerous burden" that resulted in far higher rejection rates for minority voters than for White voters.  FOF § VII.B.1.

266.    This trend continued in 2022, when Black voters in Dallas County were 87 percent more likely than non-Hispanic White voters to have their mail ballot rejected and a Hispanic voter was 36 percent more likely to have that experience.  FOF § VII.B.1.

### 5.  *Restrictions on Voter Assistance – 6.01, 6.03, 6.04, 6.05, 6.07*

267.    Although SB1's burdens from restrictions on voter assistance cut across race, Black and Latino Texans are particularly impacted. Black and Latino Texans have higher rates of disability than their white counterparts when adjusted for age. FOF § IV.E . And many Latino voters have limited English language fluency.  And Latino voters are more likely to require language assistance given that 26.89% of Latinos in Texas speak English "less than very well," compared to 1.1% of Anglo Texans. FOF § XI. As such, these communities disproportionately rely on voter assistance due to disability or language limitations and are greatly impacted by the requirements of SB1 that make it more difficult to obtain such assistance.

268.    Testimony from Michelle Brown and Sharon Watkins-Jones about the experience of DST, an organization whose members both provide and receive voter assistance, illustrates the harm. Delta "DEARS" (DST members 65 and older), some of whom have disabilities, have had greater challenges obtaining the voting assistance they need due to SB1. FOF § XI. DST members have declined to participate in the organization's voter assistance efforts due to SB1's disclosure requirements and the criminal penalties associated with the oath. FOF § XVII.B. And DST has also curtailed its voter transportation and assistance efforts in its Fort Worth and Austin Alumnae Chapters due to the section 6.01's disclosure requirements. FOF § XVII.B.. Overall, SB1's voter assistance provisions have significantly burdened this organization comprised of Black women that primarily serves voters of color.

269.    Testimony from Mi Familia Vota further illustrates the harm. Latino voters in communities served by Mi Familia Vota who vote by mail often require assistance, in part to

provide language support. But the Latino assisters that these voters trust are disproportionately likely to face discrimination in interactions with law enforcement and are disproportionately policed and incarcerated. FOF §§ III.D, IV.E. The voter assistance provisions discourage would-be Latino assisters from providing that assistance, and limit Latino voters' access to language assistance and other forms of assistance that they may need to navigate the complex process of voting by mail.

### 6. *Regulation of Time Off Work to Vote – 7.02*

270.    Due to historic and pervasive socioeconomic disparities, Latino and Black voters are less affluent than their white counterparts and are more likely to have inflexible job schedules and lack adequate childcare. FOF IV.E.

271.    Ms. Razo testified that Latino people in the communities that Mi Familia Vota serves often have long work hours, work multiple jobs, and to have a long commute. FOF § V.A.1.d

272.    The provision of SB1 that allows employers to refuse voters time off work to vote on Election Day if that employee has any two hours off work during the period in which early voting polling locations are open imposes a discriminatory burden on Black and Latino voters who historically have to fill those hours with additional jobs, a long commute, and family care obligations.

### 7. *Restrictions on Canvassing and Access to ABBMs – 7.04*

273.    SB1 §7.04 imposes a discriminatory burden on Black and Latino voters

274.    Black and Latino voters already face significant barriers to voting, and under SB1 face additional severe burdens on their right to vote. By restricting canvassing under the guise of preventing "vote harvesting," SB1 § 7.04, and by preventing county officials from sharing with voters the ABBMs that they need to complete in order to vote by mail, SB1 further burdens Latino

voters by limiting their access to election officials and to community organizations that might have helped the voters navigate the barriers to voting that they must surmount.

275.    The expansive definition of "vote harvesting" in SB1 § 7.04 chills canvassers who provide important services to the Latino community. FOF § XIV. The chilling effect is most severe on Black and Latino communities who face ongoing, pervasive discrimination in interactions with law enforcement. FOF §§ III.D, IV.E. By chilling those who would provide assistance and information to voters, SB § 1 burdens Black and Latino voters who relied upon that information.

### D. The Burden on Black and Latino Voters is Linked to Discriminatory Social and Historical Conditions

276.    Under Veasey's second prong, an analysis of the Senate Factors demonstrates that the discriminatory burden on Black and Latino voters from the challenged provisions of SB1 is "linked to social and historical conditions that have or currently produce discrimination against" these groups." 830 F.3d at 244.

#### 1.   *History of Discrimination in Voting (SF1)*

277.    The long history of voting discrimination in Texas was catalogued thoroughly in expert reports and testimony from Dr. Kousser, Professor Tolson, and Dr. Lichtman.[27] FOF §§ III.A-D. Defendants may dispute the relevance of older historical evidence, but the Fifth Circuit has instructed that "it cannot be ignored in the discriminatory effect analysis, because even these seemingly remote instances of State-sponsored discrimination continue to produce socioeconomic conditions" that cause racial disparities in the impact of the law at issue. *Veasey*, 830 F.3d at 257 & n.53; *accord LULAC*, 548 U.S. at 439-40 (considering evidence of Texas's use of poll taxes and

---

[27] Plaintiffs incorporate by reference the findings of fact submitted by the LUPE Plaintiffs that describe expert evidence from Andres Tijerina concerning the history of discrimination against Latino voters.

white primary laws in the 1960s and 1950s, respectively, as evidence of a Section 2 violation in 2006). Nor is such history so far removed from the present. DST member Ms. Watkins-Jones, whose family has been in Texas for generations, testified that her grandmother, who is still living, can recall having to pay poll taxes and suffer intimidation tactics at the polls in order to vote. FOF § III.D. Decades later, her parents had to repeatedly attempt to register to vote in the face of a recalcitrant registrar. FOF § III.D.

278.    In any event, Texas's voting discrimination is not relegated to the distant past but continued into the present. Indeed, Dr. Kousser's database demonstrates that there were more than a thousand formally recognized contemporary instances of voting discrimination by Texas officials in the second half of the 20th Century through 2020. FOF § III.C. Indeed, at least two findings of intentional discrimination in voting occurred in the last fifteen years—concerning the 2011 photo ID law, *Veasey v. Abbott*, 249 F. Supp. 3d 868, 875-76 (S.D. Tex. 2017), *rev'd on other grounds*, 888 F.3d 792 (5th Cir. 2018) (reversing remedial relief, but declining to disturb the finding of discriminatory intent), and the 2011 congressional and state legislative redistricting plans, *Perez v. Abbott*, 250 F. Supp. 3d 123, 218-19 (W.D. Tex. 2017); *Perez v. Abbott*, 253 F. Supp. 3d 864,972-73 (W.D. Tex. 2017). As the Supreme Court explained, this "accumulation of discrimination" within a state from Reconstruction to the present acts as a barrier to effective participation by minority voters in the electoral process. *Gingles*, 478 U.S. at 44 n.9.

279.    Moreover, experts at trial testified that SB1 contained familiar echoes of discriminatory voting laws from Texas's past. FOF § III.B. Discrimination rarely announces itself openly, and most of the discriminatory voting laws in Texas's history, as in the instant case, took the form of facially neutral election regulations. FOF § III.C. SB1 was enacted following an election cycle with high turnout and strong participation among Black and Latino voters, FOF §

V.B , similar to other discriminatory measures passed as backlash to the empowerment of minority voters, such as Texas's purge and re-registration requirement passed as a reaction to amendments to the VRA that brought Texas under the scope of Section 5. FOF § III.C. And as discussed above, SB1's ban on DTV and 24-hour voting, poll watcher provisions, and voter assistance restrictions disproportionately burdened Black and Latino voters, as with so many past discriminatory voting laws. *See Gingles*, 478 U.S. at 44 n.9 ("[V]oting practices and procedures that have discriminatory results perpetuate the effects of past purposeful discrimination.") Placed in historical context, SB1 fits the familiar pattern of prior voting discrimination in Texas.

280.    SB1's poll watcher provisions are illustrative of this pattern.  Texas has a well-established history of poll watchers acting not as neutral observers but as citizen vigilantes and agents of intimidation toward Black and Latino voters. FOF § III.B.  Given this history and present-day misconduct from some poll watchers, many minority voters are reasonably wary of them. Facially neutral provisions of SB1 that grant poll watchers free rein and make it more difficult for election workers to regulate them interact with this historical and social dynamic in ways that discourage Black and Latino Texans from participating in the political process, either as voters or election workers. FOF §§ VIII.A.3., VIII.B.

281.    Accordingly, Senate Factor 1 weighs in Plaintiffs' favor.

### 2. *Racially Polarized Voting (SF2)*

282.    Dr. Kousser's analysis of exit polls showed that voting in Texas is racially polarized. FOF § IV.B. Several recent court decisions have also found racially polarized voting throughout Texas. *See LULAC*, 548 U.S. at 427; *Veasey*, 830 F.3d at 258; *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 694 (S.D. Tex. 2017).

283.    Here, the strong correlation between race and party interacted with demographic changes in the state. As the population of Texans of color grew and became more concentrated in Texas's most populous cities and counties, their political power grew in those areas and those areas became more Democratic. FOF § IV.C. For example. Dr. Kousser described Harris County as the "center of minority political power in the state." FOF § IV.C. By contrast, less urban areas, where white Texans predominated, supported Republicans. *Id.*; *see Veasey*, 830 F.3d at 258 (finding similar evidence of racial polarization relevant in a vote denial case). Because Republicans rely on the support of white voters, they have an incentive to make it more difficult for Black and Latino Texans to vote. *See McCrory*, 831 F.3d at 222 ("[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose."). One mechanism would be state laws that target large, urban centers, which would disproportionately impact the Black and Latino residents who lived there. .

284.    Accordingly, Senate Factor 2 weighs in Plaintiffs' favor.

### 3. *Extent of Voting Practices That Tend to Enhance Opportunities for Discrimination (SF3)*

285.    Throughout its history, Texas has employed many voting practices at the state and local level that enhance the opportunity for discrimination against Black and Latino Texans, including at-large election systems, large multimember districts, racial gerrymanders, polling place changes, and English-only voting materials. FOF § IV.D. These practices diluted the voting power of Black and Latino voters and made voter more confusing or less accessible to them.

286.    SB1 continues this trend by enacting voting practices that also tend to burden Black and Latino voters. Because these groups are less likely to have flexible working hours, they are more likely to benefit from—and indeed did disproportionately rely on—the expanded voting hours available in 24-hour voting that SB1 banned.  FOF §§ IV.E., V.A.2.d.  Latino voters are

more likely to require language assistance when voting and thus will disproportionately be harmed by SB1's restrictions that discourage voter assistance. FOF § X.I . Moreover, by empowering poll watchers and more tightly regulating election worker interactions with them, SB1 has elevated a voting practice—the use of poll watchers—that has historically been ripe for abuse and discrimination. Finally, SB1's prohibition of the distribution of ABBMs by election officials means third party groups such as DST can no longer obtain ABBMs to distribute to the communities they serve. FOF § XIII.A  Voters must personally request an ABBM from their county or print it out themselves, disadvantaging those without a computer, internet, and a printer, who are more likely to be voters of color. FOF § IV.E.

287.    Accordingly, Senate Factor 3 weighs in favor of Plaintiffs.

### 4. *Effect of Discrimination in Other Areas (SF5)*

288.    In their testimony and reports, Plaintiffs' experts demonstrated that Black and Latino Texas face ongoing, pervasive discrimination in critical areas of life beyond voting. FOF § IV.E. Stemming from official laws and policies, these racial disparities are present in socioeconomic status, education, housing, health, interactions with law enforcement and internet access. FOF § IV.E. Compared to their white counterparts, Black and Latino Texans have lower incomes, lower educational attainment, fewer healthcare resources, higher rates of disability, fewer housing opportunities, and less internet access. FOF §. They are disproportionately policed and incarcerated, and thus shoulder the collateral consequences that result from interaction with the criminal justice system. FOF § IV.E. They are also targeted for enforcement of restrictive immigration laws, especially Latinos. FOF § IV.E.

289.    The effects of discrimination make it more difficult for Black and Latino voters to participate in the voting process, particularly using traditional in-person voting methods. For example, higher rates of disability make them more reliant on voting by mail or DTV. Lower

paying jobs with inflexible schedules make it more difficult for them to vote in-person during traditional work hours, making 24-hour voting and voting by mail helpful options. FOF § IV.E. Higher rates of disability, lower education levels, and limited English skills made them more reliant on voter assistance.  SB1, however, banned these forms of voting or made them more burdensome.

290.    Accordingly, Senate Factor 5 weighs in Plaintiffs' favor.

### 5.  *Racial Appeals (SF6)*

291.    Evidence of racial appeals "can be very significant if it is present. But its absence should not weigh heavily against a plaintiff proceeding under the results test of section 2." *Marengo Cnty.*, 731 F.2d at 1571. The 2021 legislative session was rife with racial appeals. A "critical race theory" bill, authored by Senator Hughes, passed the legislature, removing the requirement that the history of white supremacy, as well as various female, Black and Latino historical figures be taught in public school curriculum. FOF § IV.F. Meanwhile, the Legislature rejected a bill that would have restored the Office of Minority Health Statistics and Engagement, which collected information on health disparities in Texas. FOF § IV.F. Together, the outcome of these bills sent the message that the legislature did not support learning or studying race, discrimination, or racial disparities.

292.    During the session, the Legislature also refused to pass two bills that would have deemphasized official celebrations of Texas's confederate history by eliminating a state holiday called Confederate Heroes Day and removing seven Confederate monuments from the state Capitol. FOF § IV.F.

293.    Accordingly, Senate Factor 6 weighs in favor of Plaintiffs.

### 6. *Extent to Which Minorities Have Been Elected (SF7)*

294.    The lack of success on the part of Black candidates, or other candidates of color, in running for office in a jurisdiction is probative of discriminatory results under Section 2. *Gingles*, 478 U.S. at 75; *Veasey*, 830 F.3d at 261. Although Texas is a majority-minority state, the majority of its public office holders are white. FOF §. There are zero Black statewide elected officials and only two Latinos. FOF §. This pattern follows the pattern of racially polarized voting and lack of responsiveness from elected officials—in major urban centers where Black and Latino voters disproportionately live, local candidates of color have been elected, primarily as Democrats. But on a statewide basis, they are almost nonexistent. Those positions are dominated by white Republicans.  Accordingly, Senate Factor 7 weighs in Plaintiffs' favor.

### 7. *Lack of Responsiveness of Elected Officials to the Needs of Minority Groups (SF8)*

295.    Senate Factor 8, the responsiveness of elected officials to the needs of minority group, is closely related to racially polarized voting in this case because "[v]oting along racial lines . . . allows those elected to ignore [B]lack [and Latino] interests without fear of political consequences." *Rogers*, 458 U.S. at 623.

296.    There are many examples of Texas elected officials' disregard for the views of minority voters and the policies that would improve their lives.  In one illustrative moment, during a hearing on HB6 (a predecessor to SB1), bill sponsor Rep. Andrew Murr did not stay to hear testimony from DST member Michelle Brown about how the bill would harm Black voters, despite pledging that he looked forward to hearing every witness's testimony. FOF § VI.

297.    To be sure, large urban centers, which are disproportionately populated by Black and Latino Texans, have increasingly elected those residents' candidates of choice to local offices. But statewide officeholders and Texas Republicans have often expressed disdain for policies in

those counties and sought to overturn them. During the legislative debates concerning SB1 and its predecessor bills, many legislators recognized that the bills—in particular the bans on DTV and 24-hour voting—were aimed at undoing voting practices employed by Harris County that were very popular among the county's diverse residents. [Kousser report at 93-94] Lt. Governor Dan Patrick was more explicit in his animosity for Texas's most diverse county, remarking "I have news for Harris County: You're not the capital of Texas." [Kousser report at 93]

298.    Outside of the voting context, statewide officeholders and Texas Republicans are also unresponsive to the needs of minority voters as shown through disinvestment in public education (which has a disproportionately minority enrollment), refusal to expand Medicaid (which would benefit low-income Texans, who are disproportionately minority), adoption of restrictive and aggressive immigration laws (which primary target non-Anglos), and even preemption of a municipal law that sought to prohibit landlords from refusing to rent to housing voucher holders. FOF § IV.E.

299.    Accordingly, Senate Factor 8 weighs in Plaintiffs' favor.

### 8.  *Tenuousness of the State Policy (SF9)*

300.    The fifth Circuit explained that "a tenuous fit between the expressed policy and the provisions of [a] law bolsters the conclusion that minorities are not able to equally participate in the political process," because, without past or present discrimination, "a law not meaningfully related to its expressed purpose would be abandoned or ameliorated to avoid imposing a disparate impact . . ." *Veasey*, 830 F.3d at 262-63.

301.    Here, the state's justifications for SB1 are tenuous as best and are not actually achieved by the provisions of the law. As set forth above, the state's claimed policy interests behind SB1, preventing election fraud and promoting uniformity, were unsubstantiated. *Supra* FOF §§ XV, XVI.  While Plaintiffs acknowledge that a state does not have to wait for fraud to occur before

enacting election security measures, if those measures do not address actual demonstrated gaps or vulnerabilities in election administration, then they are ineffective at best and pretextual at worst.

302.    Despite considerable state time and resources devoted to uncovering and prosecuting it, election fraud is nearly non-existent in Texas.  During decades of elections with hundreds of millions of votes cast, only 16 individuals were convicted of election fraud related to voting practices regulated by the provisions of SB1 that Plaintiffs challenge here. FOF § XV.A.1. . Testimony by county elections officials confirms that election fraud is exceedingly rare.  FOF § XV.A.2.. Even the State's own election audit report uncovered no evidence of election fraud in the 2020 election in the counties it examined. FOF § XV.B. State Defendants can point to no proven fraud associated with DTV, 24-hour voting, or voter assistance. FOF § XV.B Nor has the state put forth evidence of proven, unaddressed vulnerabilities or risks associated with these voting method, which already incorporated many protections against fraud. FOF § XV.D. As for voting by mail, the state relies heavily on the example of the Zul Mohamed case, but that case has not led to a conviction. FOF § XV.B. Moreover, implementation of SB1's identification number requirements for voting by mail have considerably tripped up eligible voters and resulted in ABBM and BBM rejections, but the state has not demonstrated that they deterred or detected any fraud. FOF § XV.D.

303.    As for the proffered justification of uniformity, many of the challenged provisions do nothing to promote uniformity in election administration, and there is evidence questioning whether rigid uniformity is even desirable. SB1's identification number requirements have decreased uniformity by encouraging counties to adopt different instructions and inserts to mitigate the problems caused by the requirements. FOF § XVI.  Likewise, SB1's ban on 24-hour voting did not achieve uniformity because it still left in place various options for poll hours in different sized

counties. FOF § XVI. Instead, it only banned the hours option adopted by Texas's most diverse county. FOF § XVI.  Finally the stated goal of uniformity runs counter to Texas's decentralized election system and general preference for local control.  FOF § XVI. State and county officials testified to the importance of allowing counties the flexibility to adopt practices that work best for their populations, casting doubt on the legitimacy of the state's uniformity rationale. FOF § XVI.

304.    In light of this evidence, the justifications behind the challenged provisions of SB1 are weak, theoretical, and tenuous reasons for maintaining a law with a disparate racial impact. Accordingly, Senate Factor 9 weighs in Plaintiffs' favor.

## E.  The *Brnovich* Guideposts Weigh in Plaintiffs' Favor

305.    The provisions of SB1 challenged here are vastly different from the Arizona laws that the Supreme Court in *Brnovich* held did not violate Section 2. Against a backdrop of a voting system that generally made it easy to vote, the *Brnovich* Court reasoned that the Arizona laws imposed only modest burdens not beyond the usual burdens of voting, had small disparate impacts on minority voters, and served state interests. 141 S. Ct. at 2346, 2348. That is not the case here, and four of *Brnovich*'s five "guideposts" weigh in Plaintiffs' favor.

### 1.  *Size of the Burden*

306.    Under *Brnovich*'s first consideration, the size of the burden imposed by the challenged rule, the cumulative burden of SB1's provisions and the sheer number of affected voters support Plaintiffs' claim. In a single bill, SB1 simultaneously restricted or eliminated multiple voting methods, and the burdens imposed by these provisions are overlapping and cumulative. For example, without 24-hour voting, a shift worker who cannot get to the polls during traditional hours will face the burdens of SB1's identification number requirements if she attempts to vote by mail as an alternative, assuming she is even eligible to vote by mail. A disabled voter unwilling to risk having his mail ballot rejected due to mismatched identification numbers may prefer to vote

in-person but be unable to find someone to assist because the would-be assister is wary of SB1's disclosure requirements and additions to the oath she must swear under penalty of perjury. Without DTV, Mr. Dorsett waited four hours to vote in a walk-up location and also exposed himself to potential harassment and intimidation from poll watchers who have been granted free rein under SB1. FOF § V.A.1.d. Because of SB1, voters face overlapping burdens that impede the various modalities of voting. The law's burdens should not be viewed in isolation; they have a multiplier effect. *See supra* Section III.B.9 (The Cumulative Effects of the Challenged Provisions Impose Severe Burdens on Voters, Particularly Black and Hispanic Voters).

307.    In addition, the sheer numbers of affected voters must be considered. More than 127,000 voters in Harris County used DTV in November 2020, a figure that does not include the additional DTV voters in Bee and Tom Green counties or the number of DTV voters in subsequent elections. More than 1,400 voters used 24-hour voting in Harris County in November 2020. FOF § V.A.2.d. These voters were impacted by SB1's ban on these voting methods.  Moreover, after SB1 imposed identification number requirements for voting by mail, the proportion of rejected BBMs ballooned to roughly 12% statewide in the March 2022 election, compared to 0.84% pre-SB1. FOF § VII.A.2.  The State asserts that by the November 2022 election, the ballot rejection rate decreased to 2.7%, but the DOJ's and Plaintiffs' experts calculated the rejection rate as 3.4% or 4.1%. FOF § VII.A.2. Under any of the three figures, many thousands of voters had their ballots rejected. ECF No. 820 at 9.  Measured another way, during the November 2022 election, Harris County received more than 8,700 contacts from voters or election workers with questions or complaints concerning voting by mail. FOF § VII.A.1.  The county had to nearly double the staff in its call center to handle the increased volume of calls related to problems with SB1's identification number requirements. FOF § VII.A.6.

308.    Finally, the court heard testimony about the enormous burden SB1's restrictions on voting assistance have placed on voters who require it. These voters endured immense physical challenges to vote without assistance, or felt great anguish and fear about whether to expose their assister of choice to potential criminal penalties in rending assistance.

309.    These figures, along with the qualitative accounts of the hurdles voters have faced post-SB1, confirm that the burdens impose by the challenged provisions far exceed the "usual burdens of voting," such as "traveling to an assigned polling place." *Brnovich*, 141 S. Ct. 2346. The size of the burden from SB1's challenged provisions is significant even for those who are ultimately able to vote.

## 2. *The Size of the Disparity*

310.    Both statistical evidence and fact testimony at trial demonstrate that the size of the disparities caused by the challenged provisions is significant. *Brnovich* found that the racial disparities associated with the Arizona laws at issue there were either "small in absolute terms" or not quantified by statistical evidence. 141 S. Ct. at 2344, 2346.

311.    Here, using multiple statistical analyses, Plaintiffs' experts demonstrated that Black and Latino voters were far more impacted by SB1's bans on DTV and 24-hour voting because they used those voting methods at much higher rates than white voters. FOF § V.A.1.e. For example, in November 2020, non-Hispanic white Texans were the majority (53.5%) of in-person early voters, but only 38.1% of DTV voters. Minority voters were only 46.5% of early in-person voters, but 61% of DTV voters. Black voters were 19% of regular hours early in-person voters, but 25.1% of 24-hour voters, and Hispanic voters were 22.1% of regular hours early in-person voters, but 28.9% of 24-hour voters. FoF V.A.2.d. The considerable difference in rates of DTV and 24-hour usage between white and minority voters far exceeds the 0.5 percentile difference at issue in *Brnovich*. 141 S. Ct. at 2345. Further, this analysis is complemented by regression analyses and a

method-of-bounds analysis (DTV only) that demonstrated Black and Hispanic voters in Harris County were more likely to use DTV and 24-hour voting in the November 2020 election, despite the conservative assumptions underlying those analyses. Finally, the sizable disparities shown by statistical evidence were borne out through testimony from Plaintiff organizations that serve Black communities describing the burdens imposed by SB1's elimination of DTV and 24-hour voting on the organizations, their members, and communities they serve. FOF § XVII.A-C.

312.    SB1's identification number requirements for voting by mail also disparately harmed Black and Latino voters. Although Black voters submitted 22% of the returned mail ballots but of the total mail ballots rejected due to SB1, 30% belonged to Black voters.  Similarly, Hispanic voters submitted only 9.8% of the mail ballots but experienced 14.1% of the SB1 rejected ballots. FOF § VII.B.1; *see also* FOF §§ VII.A,2.b, VII.C (summarizing other Plaintiffs' analyses showing a disparity).

313.    The disparate impact on Black and Latino voters from SB1's poll watcher provisions and restrictions on voter assistance are more difficult to quantify, but the powerful testimony from Black and Latino serving organizations shows that meaningful disparities are still present. First, the disparity in the impact of the poll watcher provisions on voters of color cannot be divorced from the history, including recent history, of poll watchers targeting Black and Latino voters for intimidation. Due to fear of legal penalties or wrongful accusations under the poll watcher provisions, MFV canceled its poll worker training program, which sought to encourage Latino young people to work elections. Many DST members were also discouraged from continuing to serve as poll workers, and some have personally faced harassment from poll watchers since SB1 went into effect.

314.    As for SB1's restrictions on voting assistance, the higher rates of disability among Black and Latino voters, the greater need for language assistance among Latino voters, and the chilling effect on minority serving institutions that often coordinate transportation and assistance for voters demonstrate that the disparate burdens from these provisions are not de minimis.

### 3.    *Opportunities Provided by the State's Entire System of Voting*

315.    Another *Brnovich* guidepost, the "opportunities provided by the State's entire system of voting" also weighs in Plaintiffs' favor. In *Brnovich*, the Supreme Court considered two parts of "Arizona voting law, which generally makes it quite easy for residents to vote." 141 S. Ct. at 2333. That is not the case in Texas. As discussed above, Texas has one of the most restrictive election law regimes in the country. FOF § V. For example, unlike Arizona, Texas does not allow all voters to vote by mail, Texas does not permit voters to drop off completed mail ballots at drop boxes, and Texas allows voters to hand deliver completed mail ballots to an EA or clerk's office only on election day itself, not during the early voting period. *Compare Brnovich*, 141 S. Ct. at 2346*, with* FOF § XII.  In Arizona, by request of the voter, county officials will deliver a ballot to a voter and return it on the voter's behalf if the voter cannot go to the polls due to illness or disability, *id.*; Texas does not offer a similar service.  Although the Governor expanded opportunities to vote during the pandemic, through proclamations adding a week of early voting and permitting voters to hand deliver completed mail ballots throughout the early voting period, those opportunities applied only in November 2020 and are no longer in place. FOF § V.A.2.4. Texas also has an in-person voter ID law that as initially passed was "the strictest . . . voter ID law in the country." *Veasey*, 830 F.3d at 256 n.52.

316.    The challenged provisions of SB1 must be considered in the context of Texas's already restrictive election system. Many Texans, particularly those who are not eligible to vote by mail, do not have multiple options for how to vote, and SB1 eliminated two popular ones—

DTV and 24-hour voting. For those who are eligible to vote by mail, SB1's identification number requirements make this more difficult and increase the likelihood that one's ABBM or BBM will be rejected. With the lack of voting options in Texas's system, it is no surprise that when voters face a barrier voting by one method, most do not "substitute" a different method of voting—for example, nearly 60% of voters whose ABBMs were rejected in the March 2022 primary, did not ultimately vote by any method. FOF § VII.B.

### 4. *Strength of the State Interest*

317.    Finally, the strength of the state interest served by the challenged provisions of SB1 is weak. As discussed above under Senate Factor 9, the proffered rationales behind the law's restrictions—preventing fraud and promoting uniformity—are unsupported and also not achieved by its provisions.[28] *See supra* FOF § IV.D.8 (Tenuousness of the State Policy).

318.    Evidence relevant to the *Brnovich* guideposts complements the Senate Factor evidence to create a full picture of the totality of the circumstances that supports a violation of Section 2:  the Challenged Provisions of SB1 burden Black and Latino voters in a sizable and disparate manner that intersects with the historical and social discrimination against these groups. As a result, Black and Latino voters' right to vote is abridged because they have less opportunity to participate in the political process in Texas.

### V.  THE POLL WATCHER PROVISIONS OF SB1 ARE VOID FOR VAGUENESS UNDER THE DUE PROCESS CLAUSE

---

[28] Regarding the "degree to which a voting rule departs from what was standard practice when Section 2 was amended in 1982," Plaintiffs acknowledge that not all of the methods of voting impacted by SB1 were available in 1982. However, since the passage of the literacy test ban in the VRA, courts have recognized a longstanding right of certain illiterate and disabled voters to have assistance in voting from a person of their choice. *Gilmore v. Greene Cnty. Democratic Party Exec. Comm.*, 435 F.2d 487, 490 (5th Cir. 1970); *Hamer v. Ely*, 410 F.2d 152, 155 (5th Cir. 1969); *Garza v. Smith*, 320 F.Supp. 131 (W.D. Tex.1970) (three-judge court), *vacated and remanded on procedural grounds*, 401 U.S. 1006 (1971), *on appeal after remand*, 450 F.2d 790 (5th Cir.1971).  was explicitly recognized in 1982 through amendments to the VRA that created Section 208.

### A. Legal Standard

319.   Vague laws contravene the first essential of due process of law that statutes must give people of common intelligence fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019).  "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).   First, a law is unconstitutionally vague if "it fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited." *Moore v. Brown*, 868 F.3d 398, 406 (5th Cir. 2017); *Johnson v. United States*, 576 U.S. 591, 595 (2015).  Although "'perfect clarity and precise guidance' are not required," *Doe I v. Landry*, 909 F.3d 99, 117 (5th  Cir. 2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), the law must provide "*sufficient definiteness* that ordinary people can understand what conduct is prohibited," *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Thus, the Fifth Circuit has recognized that a law is "unconstitutionally vague on its face when it subjects [people] to sanctions based not on their own objective behavior, but on the subjective viewpoints of others." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001).

320.   Second, a law is vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732; *Johnson v. United States*, 576 U.S. 591, 595 (2015).  "A state's legislative enactment is void for vagueness under the due process clause of the fourteenth amendment if it is inherently standardless, enforceable only on the exercise of an unlimited, and hence arbitrary, discretion vested in the state." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001).  Without "such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974).  For example, in *Kolender*, the Supreme Court held that a statute requiring persons who

loiter or wander on the streets to provide "credible and reliable" identification was unconstitutionally vague because it "encourage[d] arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute." 461 U.S. at 361.

A Stringent Vagueness Standard Applies to Criminal and Quasi-Criminal Statutes

321.     Statutes with criminal enforcement components are generally subject to a more stringent standard than civil statutes. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008). Likewise, a more stringent vagueness test applies when "a law 'threatens to inhibit the exercise of constitutionally protected rights.'" *Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* 455 U.S. 489, 499 (1982); *see, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (stricter vagueness test applies when a statute interferes with First Amendment rights of free speech or free association). Under the more stringent standard, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

322.     Though the standard is generally more stringent for criminal cases and cases involving constitutionally protected conduct, courts have held civil laws to the same stringent vagueness standard as criminal laws. *See, e.g. Rost v. United States*, No. 1:19-CV-0607-RP, 2021 WL 5190875, at *6 (W.D. Tex. Sept. 22, 2021), *aff'd*, 44 F.4th 294 (5th Cir. 2022), *reh'g denied*, No. 21-51064, 2022 WL 16569594 (5th Cir. Oct. 11, 2022) (applying vagueness standard to IRS disclosure requirements enforced by civil penalties); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1228 (2018) ("[I]n the criminal context this Court has generally insisted that the law must afford ordinary people fair notice of the conduct it punishes. And I cannot see how the Due Process

Clause might often require any less than that in the civil context either.") (Gorsuch, J. concurring) (cleaned up). This is especially true where the law in question has a quasi-criminal dimension. *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (applying the stricter criminal standard for vagueness to quasi-criminal regulations that carry "significant civil and administrative penalties"). In *Hoffman*, the Supreme Court ultimately applied the more exacting standard to the civil ordinance at issue. 455 U.S. at 499–500. The Court reasoned that a prohibition on the sale without a license of paraphernalia or other items marketed for use with illegal drugs was "quasi-criminal," and its "prohibitory and stigmatizing effect" warranted the stricter vagueness test. *Id.*; *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1212-13 (2018) (applying the most exacting vagueness standard to a provision governing civil removal of an alien because of the severity of the penalty and the intimate relationship between removal proceedings and the criminal process); *United States v. Clinical Leasing Serv. Inc.* 925 F.2d 120, 122-23 (5th Cir. 1991) (applying strict vagueness test to federal statute imposing civil penalties for distribution of controlled substances without registration because "its prohibitory effect is quasi-criminal").

323. Undefined, standardless terms in economic regulations and laws enforced by civil penalties can still be challenged as unconstitutionally vague under the Due Process Clause even if a provision is not subject to the more stringent standard for vagueness applicable to criminal statutes, quasi-criminal statutes, and cases involving constitutionally protected conduct. *See, e.g. United States v. L. Cohen Grocery Co.* 255 U.S. 81, 89-93, (1921) (holding that a law prohibiting grocers from charging an "unjust or unreasonable rate" was unconstitutionally vague). In such cases, a plaintiff will prevail in a facial vagueness challenge "if the enactment is impermissibly vague in all of its applications," *Roark*, 522 F.3d at 548, but the Supreme Court has squarely

rejected the argument that "a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602.

Plaintiffs' Vagueness Challenge is Not Premature

324.    A plaintiff need not wait for an actual arrest, prosecution, or enforcement action to challenge a vague law. *See, e.g. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014) (collecting cases); *MedImmune, Inc. v. Genentech, Inc.* 549 U.S. 118, 128-29 (2007) ("[W]e do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced."). Rather, a pre-enforcement suit is appropriate when the plaintiff intends to engage in activity that is arguably covered by the statute and there is a credible threat of enforcement. *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979).

325.    Courts frequently adjudicate pre-enforcement vagueness challenges. *See, e.g. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298-303 (1979); *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 944-48 (11th Cir. 2023) (hereinafter "*Lee*"); *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1264-65 (N.D. Fla. 2021). "When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" *Babbitt*, 442 U.S. at 298 (alteration in original) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-61 (2014) (collecting pre-enforcement cases); *Nat'l Rifle Ass'n of Am. Inc. v. McCraw*, 719 F.3d 338, 345 (5th Cir. 2013) (allowing pre-enforcement Second Amendment challenge to a criminal statute). The *Babbitt* Court rejected the assertion that a pre-enforcement challenge to a criminal penalty provision was not justiciable even though "the criminal penalty provision has not

yet been applied and may never be applied[.]" 442 U.S. at 302 ("when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.'"); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 336 (5th Cir. 2020) ("[A] lack of past enforcement does not alone doom a claim.").

326.    And for good reason: "the mere existence of an allegedly vague . . . statute" can cause "sufficient" pre-enforcement injury, especially if it chills participation in the electoral process. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006). Laws that curb associative conduct and political activity are properly challenged before they are enforced. *Cf. Speech First*, 979 F.3d at 330–31 (The Fifth Circuit "has repeatedly held, in the pre-enforcement context, that chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." (internal quotations omitted). A regulated party should not have to choose between abstaining from the desired conduct and the hope that a later court will adopt a limiting construction in an enforcement proceeding. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (Plaintiffs "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") (quoting *Babbitt*, 442 U.S. at 302); *Lee*, 66 F.4th at 948 ("[T]he promise of due process later on does not obliterate the vagueness doctrine altogether.").

### B.  Application to 4.06, 4.07, 4.09

327.    The provisions of SB1 that curtail the authority of election workers to regulate poll watchers (SB1 §§ 4.06, 4.07, 4.09) do not provide fair notice of how election workers can comply but expose them to criminal or civil sanctions should they guess incorrectly.

328.    SB1's poll watcher provisions dissuade election workers from serving or from carrying out their duties fully when they do serve, curtailing the participation of these officials, who are appointed by political parties and are integral to the smooth administration of elections.

Plaintiff Jeffrey Clemmons has declined to serve as an election judge since SB1 went into effect, citing fears about the poll watcher provisions and associated penalties. *See* 9/13 Tr. 666:2–666:13 (Clemmons); 9/13 Tr. 669:15–669:22 (Clemmons); 9/13 Tr. 672:18–673:3 (Clemmons). Harris County lost 600 election workers in March 2022 because of the tremendous stress and uncertainty caused by SB1's poll watcher provisions. 9/19 Tr. 1187:24–1189:2 (Obakozuwa). Such chilling of political activity is precisely what the vagueness doctrine is intended to prevent. The resultant election worker shortages, moreover, have made it more difficult for counties to administer elections.

329.    "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered," *Kolender*, 461 U.S. at 355 (quoting *Hoffman*, 455 U.S. at 494). However the Texas state courts, SoS, or OAG have issued no such limiting constructions of the poll water provisions in SB1. The SoS, moreover, has not provided clear guidance defining or prescribing the scope of SB1's ambiguous and subjective terms, nor would such guidance have the force of law. 9/11 Tr. 189:24–190:3, 192:20–195:25 (Wise); 9/19 Tr. 1175:23–1176:10; 1176:22–1177:21 (Obakozuwa). The SoS admits to having no position on many questions concerning the application of the poll watcher provisions or the scope of conduct prohibited. 9/22 Tr. 1888:20–1889:3 (Ingram). County officials, election workers, and partisan poll watchers have all criticized the SoS's poll watcher training course as unhelpful and inadequate. 9/19 Tr. 1061:7–1063:9 (Callanen). The lack of definitions or standards exposes election workers to arbitrary enforcement and makes their jobs more difficult, particularly in the context of elections where tensions can run high.

330.    Given the absence of standards in the law, regulated parties present conflicting interpretations or do not understand how to order their conduct to abide by SB1. County EAs are

unable to train election workers on how to determine whether poll watchers are too close to voters, despite receiving complaints from voters that poll watchers were hovering over them and making them uncomfortable. 9/12 Tr. 401:9–402:3 (Scarpello); 9/19 Tr. 1174:1–1175:22 (Obakozuwa). Election judges are hesitant to restrain poll watchers even when they think such action is required by their responsibility for the proper operation of the polling place, in some cases resorting to asking the poll watcher's opinion concerning compliance with the law. 9/13 Tr. 662:21–665:13 (Clemmons); 9/12 Tr. 402:4–403:16 (Scarpello); 9/19 Tr. 1181:3–1181:9 (Obakozuwa). According to the SoS, this fear is well founded, given the law's criminal penalties, and election workers should consider seeking advice from a county attorney before taking action concerning a poll watcher. 9/22 Tr. 1886:24–1887:4 (Ingram).  A law that requires the help of an attorney to be understood is not one that puts an ordinary person on notice of what it prohibits.

331.    Local prosecutors have varied interpretations of the same language within the EC, which can play a role in whether a prosecution moves forward in instances where a law is unclear. 10/16 3981:4–3981:10 (White).

### 1. *4.06*

332.    SB1 § 4.06 created a new offense for refusal to accept a poll watcher, and designated it a Class A misdemeanor, with a maximum penalty of one year in jail and a $4000 fine.  *See* HAUL-MFV 182 at 6:4–13:2.

224.    Pursuant to SB1 § 4.06, an election officer can be held criminally liable for intentionally or knowingly refusing to accept a poll watcher for service, "when acceptance of the watcher is required by this section." SB1 § 4.06(g).

225.    Section 4.06(b) requires acceptance of a poll watcher who presents himself or herself at the proper time with the necessary certificates "unless the person is ineligible to serve or the number of appointees to which the appointing authority is entitled have already been accepted."

Section 4.06(b). No other language in SB1 § 4.06, or Section 33.051 of the EC, which was modified by SB1 § 4.06, further clarifies when acceptance of a poll watcher is required.

226. The term "an election officer" in Section 4.06 includes election judges at the polling place. 10/16 Tr. 3978:11-18 (White). Other sections of the EC impose obligations on election judges, including Section 32.075 of the EC, which makes the election judge responsible for maintaining order in the polling place. 9/22 Tr. 1891:16–1891:17 (Ingram). Section 4.06 fails to inform election judges about how the newly imposed obligation not to refuse a poll watcher when acceptance is required by that section interacts with the duties imposed on election judges elsewhere in the EC.

227. SB1 § 4.06 fails to inform election judges of the scope of their authority to refuse poll watchers for service, placing them at legal risk: to exceed their authority is a criminal offense. Under 4.06, the only permissible grounds for refusal are a poll watcher's use of a recording device, ineligibility, or if the maximum number of poll watchers are already present in the polling place. *See* SB1 § 4.06(b). The section is silent on whether election judges may refuse to accept a poll watcher whose behavior violates other provisions of the EC.

228. Election judges are thus in the dark when deciding whether to accept poll watchers while also carrying out their other duties, including preventing voter intimidation. Jeffrey Clemmons testified that as an election judge, he would be concerned and confused about how the requirement to accept a poll watcher in section 4.06 interacts with the election judge's obligation to maintain decorum or order within the polling place in instances where potential poll watchers have the proper ID and credentials but there is some other reason to object to them. 9/13 Tr. 663:9–665:13 (Clemmons).

229.    Although the concern about a vague enactment's failure to provide notice may be ameliorated by a scienter requirement in the statute at issue, *Hill* at 732, the intent requirement in SB1 § 4.06 does not make the provision less vague, as it is unclear to election workers what it means to "knowingly or intentionally reject a poll watcher." 9/20 Tr. 1328:23–1330:1 (Longoria).

230.    The evidence at trial shows that section 4.06 and the other penalty provisions related to poll watchers has sown fear in election workers.  Former Harris County EA Isabel Longoria testified that she knows at least two longstanding judges who decided to no longer work elections because of section 4.06 and other sections that added penalties for subjective standards. 9/20 Tr. 1330:2–1330:16 (Longoria). Jeffrey Clemmons similarly testified that the criminal penalties associated with violating section 4.06 make him concerned about serving as an election judge in the future. 9/13 Tr. 666:2- 666:13 (Clemmons). This concern is well-founded and non-speculative because the OAG has initiated investigation against an election judge in Hays County who refused to accept a poll watcher for service. LUPE Ex. 182.

231.    Portions of the EC concerning election judges' power to *remove* a poll watcher do not add clarity to the scope of authority under section 4.06 to refuse to *accept* a poll watcher for service. Section 32.075(g) applies only to "a watcher *duly accepted for service*," EC § 32.075(g), begging the question of how election judges can be certain of the lawful grounds for refusing to accept the poll watcher in the first instance. Indeed, section 32.075 only adds to the confusion: which scope of authority would apply in a criminal proceeding against an election judge for wrongfully refusing to accept a poll watcher? Defendants can point to no interpretative guidance within SB1 or the EC that explains how section 4.06's regulations for acceptance of poll watchers interact with an election judge's power to remove a poll watcher. Must an election judge accept a disorderly, threatening, or violent poll watcher who presents himself for service and then wait until

the poll watcher exhibits such behavior again before removing him? The implication that election judges' power to remove a poll watcher for a violation of the penal code, breach of the peace, or violation of the law should be read into the scope of election judges' authority to accept or refuse a poll watcher has only been articulated during the present litigation.

232.    In light of the evidence adduced at trial regarding election judges preexisting responsibility to maintain order in the polling place, the language of SB1 § 4.06 that makes it an offense to "knowingly or intentionally reject a poll watcher" is unconstitutionally because it fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited.

### 2. *4.07*

233.    Section 4.07 concerns poll watchers' entitlement to "observe," stating that they "may not be denied free movement" and are "entitled to sit or stand near enough to see and hear" an election activity. SB1 § 4.07(a), (e)-(f).  Before SB1, the legal standard was that poll watchers were entitled to sit or stand "conveniently near," but this provision replaced that language with the requirement that a poll watcher be "close enough to see and hear" the election activity. SB1 § 4.07(a).

234.    Though Keith Ingram testified that the changes to the statutory language in section 4.07 specifying that poll watchers are entitled to sit or stand near enough to see and hear the activity and may not be denied free movement did not change the substantive meaning of the law, 9/22 Tr. 1882:17-1884:4 (Ingram), legislators intended for this language to expand the rights of poll watchers within the polling place, *see* HAUL – MFV 175 87th 2nd special, House Select Committee on Constitutional Rights and Remedies Aug. 23, 2021 31:15–33:13 (transcript noting that similar language regarding "free movement" in a predecessor bill to SB1 was intended to change the substantive meaning of the law: "[I]t gives free movement to poll watchers within the

333

polling place. Right now they don't have free movement. We're changing that. Right now they can be designated to an area").

235.    SB1 § 4.07 fails to put ordinary people serving as election workers on notice of the conduct that is prohibited when they interact with poll watchers. SB1 and the EC contain no definitions for the term "free movement," creating doubt and confusion about how election workers can carry out responsibilities such as maintaining order and preventing voter intimidation in situations in which a poll watcher is the source of the problem. *See* 9/13 666:16–667:18 (Clemmons) (Jeffrey Clemmons testified that he is unclear about how he would have to implement the "free movement" portion of section 4.07 as an election judge.).

236.    Nor does the language that poll watchers must be "near enough to see and hear" provide clarity. *See* 9/13 667:19–669:14 (Clemmons). Because one person's ability to see and hear is different from another's, the statutory language provides no guiding principle for election workers to comport their conduct to the law. 9/20 Tr. 1330:17–1331:6 (Longoria). For example, Jeffrey Clemmons testified that the statutory requirement that poll watchers be able to stand "near enough to see and hear" is unclear to him because he is unable to discern how well another person can see or hear from any given distance. 9/13 Tr. 667:19–669:14 (Clemmons). Whether a poll watcher's observation is reasonably effective, and whether he or she can see and hear, are subjective matters that vary according to the visual and auditory abilities of the individual poll watcher. The Supreme Court has held that a law based on similarly subjective perceptions by potential complainants—an ordinance prohibiting conduct that was "annoying to persons passing by"—was unconstitutionally vague. *Coates v. Cincinnati*, 402 U.S. 611, 612 (1971) ("But the court did not indicate upon whose sensitivity a violation does depend—the sensitivity of the judge or jury, the sensitivity of the arresting officer, or the sensitivity of a hypothetical reasonable man…

In our opinion this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard."). Recently, the Eleventh Circuit similarly held a law banning conduct that would have "the effect of influencing"' a voter is unconstitutionally vague. *Lee*, 66 F.4th at 947.

237.    It is unclear whether the standard for determining whether a poll watcher is near enough to see or hear the election activity is objective or subjective, and if the standard is subjective, there is further uncertainty regarding whether the standard is based on the election worker's ability to see and hear or the poll watcher's. Misalignment between poll watchers' and election judges' expectations and abilities to see and hear from a particular distance have formed the basis of "a lot of controversy at the polls, even for well-meaning election judges and poll watchers," as election judges who believed they were providing poll watchers a reasonable opportunity to observe an activity still faced allegations from particular poll watchers who claimed that they could not see or hear. 9/20 Tr. 1331:7–1331:6 (Longoria).

238.    County poll worker trainings, guidance from the SoS, and advisory opinions from the OAG have failed to provide clarification on the meaning of the phrase "near enough to see and hear." Harris County's poll worker training instructs workers that poll watchers must be able to get close enough to see and hear, but these trainings cannot provide clarity about how close a poll watcher can be in hopes of getting close enough to see and hear. The SoS has no position about what distance is close enough to see or hear. 9/22 Tr. 1888:20–1889:3 (Ingram); 9/19 Tr. 1176:7–1176:10 (Obakozuwa). Mr. Ingram testified that "near enough to see and hear" is a subjective distance requirement that "depend[s] on how well their eyesight is and how well their hearing works before they're close enough to see and hear," 9/22 Tr. 1888:20–1889:3 (Ingram). Neither has the OAG issued an Opinion about the meaning of the "near enough to see and hear" language.

9/22 Tr. 1926:3-9 (Ingram).  Other language of the EC—that free movement applies only "where election activity is occurring" and to watchers "while on duty," and that poll watchers may not communicate with election officials or voters—does little more than state the basics of serving as a poll watcher.

239.    Section 4.07(e) provides that poll watchers may not be denied "free movement" where "election activity" is occurring, but the scope of the term "election activity" is also unclear. This vagueness in terms of what constitutes an "election activity" has led to conflict between poll watchers and election officials in Harris County because election officials do not know if poll watchers must have free movement to observe certain activities such as preparing packing materials for elections in the warehouse. 9/20 Tr. 1330:17–1333:6 (Longoria).

240.    SB1 § 4.07 sets forth no objective standard, basing the legality of an election worker's conduct on information that the election worker cannot know except by asking poll watchers whether they can see and hear and whether their observation is reasonably effective. "If the best—or perhaps only—way to determine what activity" obstructs a poll watcher or denies them free movement "is to ask the [poll watcher], then the question of what activity has that effect is a 'wholly subjective judgment without statutory definition, narrowing context, or settled legal meaning.'" *Lee*, 66 F.4th at 947 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008).

241.    Section 4.07 regulates conduct that is closely linked to criminalized activity, just as did the laws at issue in *Hoffman* and *Clinical Leasing Service*, giving its application "quasi-criminal" effect. The section applies to conduct that overlaps or is closely intertwined with criminal provisions of the EC, such as section 33.061(a) (Unlawfully Obstructing Watcher). Section 4.07 amends the EC section describing poll watchers' entitlement to observe (EC § 33.056), by adding the free movement language and characterizing the verb to "observe" as establishing an entitlement

to "sit or stand near enough to see or hear the activity." Elsewhere, the EC criminalizes the act of "knowingly prevent[ing] a watcher from *observing* an activity." EC § 33.061 (emphasis added). Section 4.07 thus provides the definition, albeit a vague and subjective one, for a key term in the corresponding criminal provision and also prohibits similar conduct. Thus, the statute has a quasi-criminal effect: the vague language of section 4.07 not only exposes election workers to arbitrary civil enforcement[29] but can also impact criminal enforcement under other provisions. The "consequences of imprecision" in section 4.07 are not "qualitatively less severe" than a criminal statute, *Hoffman*, 455 U.S. at 498-99, and the stringent vagueness test should apply.  Under the stringent vagueness test, the language of § 4.07 that guarantees poll watchers "may not be denied free movement" and are "entitled to sit or stand near enough to see and hear" an election activity is unconstitutionally vague because it fails to provide "*sufficient definiteness* that ordinary people can understand what conduct is prohibited" and because the subjective nature of the terms allows for arbitrary enforcement. *Kolender*, 461 U.S. at 357 (citing *Hoffman*, 455 U.S. 489 (1982)).

242.    Even under the more lenient standard for vagueness, section 4.07 is still impermissibly vague in all of its applications for the reasons discussed above..

### 3.  *4.09*

243.    Section 4.09 of SB1 adds to the offense of "obstructing" a poll watcher to indicate that "taking any action to obstruct the view of a watcher or distance the watcher from the activity" that "would make observation not reasonably effective" constitutes a violation. SB1 § 4.09(a). This

---

[29] The civil penalties attached to section 4.07 are severe, including termination of employment and loss of benefits, *see* SB1 §8.01(c), enhancing its prohibitory effect in a manner that also renders the provision quasi-criminal in nature. *See City of El Cenizo v. State*, 264 F. Supp. 3d 744, 786–87 (W.D. Tex. 2017), *aff'd in part, vacated in part on other grounds*, 890 F.3d 164 (2018) (holding that the civil penalties for violating the law at issue—fines "between $1,000 and $25,500 per violation and removal from office of local elected and appointed officials"—were quasi-criminal).

offense is designated a Class A misdemeanor, punishable by a maximum penalty of one year in jail and a fine of up to $4,000.

244.     SB1 § 4.09 forbids actions that prevent "reasonably effective" observation, but section 4.09 fails to put ordinary people serving as election workers on notice of the conduct that is prohibited when they interact with poll watchers. 9/14 Tr. 877:10–877:20 (DeBeauvoir) (Dana DeBeauvoir, former Travis County Clerk, testified that she does not think she knows what it means to take any action that would make observation not reasonably effective).  Materials produced by the SoS exacerbate the issue by referring only to the statutory language without any additional information to clarify the meaning of the phrase "reasonably effective." 9/22 Tr. 1884:14–1884:22 (Ingram).

245.     The phrase "reasonably effective" is not defined in SB1 or the EC, and even officials in the OAG and the SoS do not agree on how an election official must determine whether observation is reasonably effective.  Jonathan White testified that SB1 § 4.09(a) is based on an objective reasonable person standard, 10/16 Tr. 3980:23–3981:3 (White), but former Director of the Elections Division of SoS, Keith Ingram, testified that the determination of whether observation was "reasonably effective" was a subjective assessment. 9/22 Tr. 1884:14–1885:2 (Ingram).

246.     The determination whether an action renders observation not reasonably effective is subjective: the one deciding, in the first instance, is the election judge. 9/22 Tr. 1885:19–1887:7 (Ingram). However, neither SB1, the EC, nor the SoS inform election judges on how to make that determination. The SoS has not interpreted the statute; instead, in responding to questions, it tells election judges to use their best judgment and to call their county election officials or their county attorney.  According to Mr. Ingram, ultimately, it's the election judge's call, but if a judge seeks

advice from the SoS about taking action against a poll watcher, SoS will remind the judge that it is a crime if the judge's action are not justified. 9/22 Tr. 1884:14–1887:7 (Ingram).

247.    SB1 § 4.09 sets forth no objective standard, basing the legality of an election worker's conduct on information that the election worker cannot know except by asking poll watchers whether they can see and hear and whether their observation is reasonably effective. *See* 10/3 Tr. 2323:20–2324:9 (Ramón); *see also* 9/14 Tr. 863:16–863:18, 865:8–865:15 (DeBeauvoir) (former Travis County Clerk Dana DeBeauvoir testified that poll watchers objected to clear plastic sneeze guards that she had installed in the counting station and that another poll watcher claimed that she could not see or hear from a room specifically designed for such observation). Former election judge Jeffrey Clemmons testified that he would be unsure how to determine whether a poll watcher's observation was "reasonably effective" because that determination seems to hinge on the poll watcher's subjective experience. 9/13 Tr. 670:19–672:3 (Clemmons).

248.    If the only way to for an election judge to determine if their conduct violates the law is to ask the poll watcher, then the law is then the question of what activity has that effect is a 'wholly subjective judgment without statutory definition, narrowing context, or settled legal meaning.'" *Lee*, 66 F.4th at 947 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008).

249.    Former election judge Jeffrey Clemmons testified that he would be unsure how to determine whether a poll watcher's observation was "reasonably effective" because that determination seems to hinge on the poll watcher's subjective experience. 9/13 Tr. 670:19–672:3 (Clemmons).

250.    In *Women's Med. Ctr. of Nw. Houston v. Bell*, the Fifth Circuit  affirmed that three quasi-criminal statutes were unconstitutionally vague on their face because they "impermissibly subject[ed] physicians to sanctions based not on their own behavior, but on the subjective

viewpoints of others… measur[ing] compliance by the subjective expectations or requirements of an individual patient as to the enhancement of her dignity or self-esteem." 248 F.3d 411, 422 (5th Cir. 2001). SB1 § 4.09 likewise threatens to subject an election official to a criminal penalty if he renders "observation not reasonably effective" from a poll watcher's subjective viewpoint.

251. Although the concern about a vague enactment's failure to provide notice may be ameliorated by a scienter requirement in the statute at issue, *Hill* at 732, the intent requirement in SB1 § 4.09 does not make the provision less vague because it is not clear to ordinary people what actions an election worker could "knowingly" take to obstruct the view of a watcher. Jonathan White, did not know what action would obstruct the view of a watcher under section 4.09; he simply stated that it could be "any action that fulfills that element of the offense." 10/16 Tr. 3978:19–3979:3 (White). Isabel Longoria noted that she believed large or tall election workers could be accused of obstructing a poll watcher's view because their body blocked the e-poll book or form because poll watchers had been emboldened to believe that poll workers were required to actively move out of their way and give deference to them. 9/20 Tr. 1333:7–1334:23 (Longoria). Keith Igram similarly testified that it was the SoS's view that an election worker could violate section 4.09 by simply standing between the watcher and the activity to be viewed. 9/22 Tr. 1887:16–1887:21 (Ingram). Though Ms. Longoria and Mr. Ingram testified that such behavior may run afoul of the new provision of SB1, it may be necessary for poll workers to take such action in order to protect voters from intimidation. As an example, in November 2022, an election worker in El Paso County reported standing in front of a poll watcher and attempting to get the watcher to stand back six feet from voters on the advice of counsel in order to keep the watcher from continuing to make voters uncomfortable. 9/11 Tr. 198:8–198:25 (Wise).

252.    The statutory prohibition on distancing the watcher in Section 4.09 is similarly unclear. Ordinary people cannot discern how close or far a poll watcher must be from an activity to render observation unreasonable and therefore cannot conform their conduct to avoid prosecution. Jonathan White testified that any number of things could violate Section 4.09's prohibition on distancing the watcher in such a way that would make observation not reasonably effective, but he was not comfortable describing what distance from an activity at a voting machine would be reasonable or unreasonable. 10/16 Tr. 3979:4–3981:3 (White). Keith Ingram similarly testified that in terms of obstructing a poll watcher's view or distancing a poll watcher from activity, "we've got a spectrum from more effective to less effective, and the further you get toward less effective, that's when you get into not reasonably effective," but he could not offer any governing principle that would help an ordinary person discern how he should comport his conduct to the law. During Mr. tenure, the SoS could not say whether an election worker violates 4.09 by demanding that a poll watcher stand one foot away from a voter; in that case, Mr. Ingram stated that "It could be unreasonable… but in most cases I don't think it would." 9/22 Tr. 1887:8–1889:16 (Ingram). Harris County GOP Ballot Security Chairman Alan Vera testified in his deposition that because the statute does not specify exactly how far away a poll watcher must stand away from the voting booth, the distance at which observation would be rendered unreasonably effective will depend on "how good the poll watcher's vision and hearing is." LUPE Ex. 279 53:9-54:17.

253.    Jeffrey Clemmons testified that, as an election judge, he worries about violating SB1 § 4.09 in the future. 9/13 Tr. 673:4–674:4 (Clemmons). Mr. Clemmons was aware of the investigation of former Travis County clerk Dana DeBeauvoir for obstructing a poll watcher before SB1 went into effect, and he worried that this provision of SB1 would leave election officials even more vulnerable to prosecution and criminal penalty. *Id.* The OAG's investigation of Dana

DeBeauvoir forced her to cover the cost of $75,000 in attorney's fees before she was reimbursed, and also hampered Ms. DeBeauvoir's ability to carry out her duties as county clerk. 9/14 Tr. 875:8–875:22 (DeBeauvoir).  Mr. Clemmons's concern is well-founded and non-speculative because the SoS has referred poll watcher's complaints of obstruction in central count offices to the Attorney General, 9/22 Tr. 1884:14–1887:7 (Ingram), and the OAG has initiated investigation against an EA in Guadalupe County for obstructing a poll watcher in March 2022. LUPE Ex. 182.

254.    For the reasons described above, the language of Section 4.09 that criminalizes "taking any action to obstruct the view of a watcher or distance the watcher from the activity" that "would make observation not reasonably effective" is unconstitutionally vague because there is no guidance that provides "sufficient definiteness" to allow ordinary people to understand what conduct would render another person's observation "not reasonably effective."  Further, the subjective nature of "reasonably effective" observation allows for arbitrary and discriminatory enforcement.

## CONCLUSION

HAUL Plaintiffs and MFV Plaintiffs respectfully request that the Court adopt the proposed findings of fact and conclusions of law set forth above.

Dated: January 19, 2024                                  Respectfully Submitted,

*/s/ Wendy Olson*                                        */s/ Jennifer A. Holmes*
                                                         Jennifer A. Holmes*
Wendy Olson*                                             NAACP LEGAL DEFENSE AND
Elijah Watkins*                                          EDUCATIONAL FUND, INC.
Mark Bieter*                                             700 14th Street NW, Suite 600
STOEL RIVES LLP                                          Washington, DC 20005
101 S. Capital Boulevard, Suite 1900                     Telephone: (202) 682-1300
Boise, ID 83702                                          Facsimile: (202) 682-1312
Telephone: (208) 389-9000                                jholmes@naacpldf.org
wendy.olson@stoel.com
elijah.watkins@stoel.com                                 Amir Badat*

mark.bieter@stoel.com

Bradley Prowant*
John Katuska*
STOEL RIVES LLP
33 S. Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone: (612) 373-8800
bradley.prowant@stoel.com
john.katuska@stoel.com

Laura Rosenbaum*
STOEL RIVES LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
laura.rosenbaum@stoel.com

Sean Lyons
Clem Lyons
LYONS & LYONS, P.C.
237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 225-5251
sean@lyonsandlyons.com

Courtney Hostetler*
Ron Fein*
John Bonifaz*
Ben Clements*
FREE SPEECH FOR THE PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
rfein@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org


*Admitted *pro hac vice*

*Counsel for Plaintiffs Mi Familia Vota,
Marla López, Marlon López, and Paul
Rutledge ("MFV Plaintiffs")*

Victor Genecin*
Breanna Williams*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
abadat@naacpldf.org
vgenecin@naacpldf.org
bwilliams@naacpldf.org

Shira Wakschlag*
THE ARC OF THE UNITED STATES,
INC.
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org

Kenneth E. Broughton
Texas Bar No. 03087250
REED SMITH LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
Facsimile: (713) 469-3899
kbroughton@reedsmith.com
kpippin@reedsmith.com

Sarah Cummings Stewart
Texas Bar No. 24094609
REED SMITH LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
sarah.stewart@reedsmith.com

J. Michael Showalter*
ARENTFOX SCHIFF LLP
South Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: (312) 258-5561
j.michael.showalter@afslaw.com

343

*Admitted *pro hac vice*

*Counsel for Plaintiffs Houston Area Urban League; Delta Sigma Theta Sorority, Inc.; The Arc of Texas; and Jeffrey Lamar Clemmons ("HAUL Plaintiffs")*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served on January 20, 2024 upon all counsel of record by CM/ECF.

*s/ Jennifer A. Holmes*
Jennifer A. Holmes