**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| | § | Case No. 5:21-cv-844-XR |
| v. | § | [Consolidated Cases] |
| | § | |
| GREGORY W. ABBOTT, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**STATE DEFENDANTS AND INTERVENOR DEFENDANTS'**
**AMENDED POST-TRIAL PROPOSED FINDINGS OF FACT**

TABLE OF CONTENTS

Table of Contents ..................................................................................................... ii

Index of Authorities .................................................................................................. vi

Introduction ...............................................................................................................1

Proposed Findings of Fact .........................................................................................1

I.  Parties ...........................................................................................................1

    A.  State Defendants ...............................................................................1

        i.  State of Texas .......................................................................1

        ii.  Gregory Abbott, in his official capacity, as Governor of Texas ....................................................................................1

        iii.  Jane Nelson, in her official capacity as Texas Secretary of State ......................................................................................1

        iv.  Warren Ken Paxton, in his official capacity as Attorney General of Texas. ................................................................. 4

        v.  Intervenor-Defendants.........................................................5

    B.  Private Plaintiffs ............................................................................. 11

        i.  OCA Plaintiffs .................................................................... 11

        ii.  OCA-Greater Houston ....................................................... 17

        iii.  League of Women Voters of Texas .....................................18

        iv.  REVUP-Texas ......................................................................19

        v.  HAUL Plaintiff ................................................................... 20

II.  State Witnesses .............................................................................................26

    A.  Jonathan White – Chief of the Election Fraud Section ........................... 26

    B.  Keith Ingram – Former Director of Elections ..............................................27

    C.  Christina Adkins – Director of Elections .................................................. 28

    D.  Jacqueline Doyer – Deputy and Legal Director for Forensic Audit Division ............................................................................................... 29

    E.  Samuel Taylor – Former Assistant Secretary of State for Communications ......................................................................................... 30

    F.  Frank Phillips – Denton County Election Administrator .......................... 31

III.    Texas Election History. ...................................................................32

        A.    Election Integrity Has Been Key to Securing the Franchise in Texas.
              ....................................................................................................32

IV.     Rules Governing Texas Elections. .........................................................34

        A.    Voter Registration. ................................................................34

        B.    In-Person Voting. .................................................................43

        C.    Voting Assistance..................................................................52

        D.    Poll Watchers. .....................................................................56

        E.    Mail-in Voting. ....................................................................60

        F.    Straight-Ticket Voting. ..........................................................81

V.      Problems with Texas Election in Modern Era. .........................................83

        A.    Mail-in Voting Susceptible to Voter Fraud..............................83

        B.    Evidence at Trial Shows that Vote Fraud is a Pertinent State
              Interest. ..............................................................................92

        C.    Vote Harvesting Often Targets Voters Who Need Assistance ...............96

        D.    2018 clean up of voter registration polls. ...............................102

VI.     Controversies in the Immediate Lead Up to Senate Bill 1. .............................104

        A.    The 2020 Presidential Election Was Both Atypical and Challenging
              ..................................................................................104

        B.    Governor Abbot Expanded Voting Opportunities in 2020.....................105

        C.    Travis County Allegedly Sequestered Poll Watchers 20200..................105

        D.    Harris County Sought to Mail Out Unsolicited ABBMs. ......................107

        E.    Harris County Introduced the Illegal Practice of Drive-Thru Voting.
              ..................................................................................109

        F.    Harris County Introduces 24-Hour Voting for the First Time in
              Texas History...................................................................118

        G.    Multiple In-Person Delivery Locations....................................121

        H.    Fraud in Denton County Shows Vulnerabilities of Mail-in Voting .........122

        I.    Proffer of Proof .................................................................130

VII.    Forensic Audit of the 2020 Election .........................................................132

        A.    Summarizing the Audit's Chief Findings ..................................133

B.      Drive-Thru Voting Irregularities ..................................................134

C.      Voting-by-Mail Irregularities ......................................................136

D.      Poor Data Tracking by Counties..................................................138

E.      Summarizing the Audit's Chief Findings ....................................139

VIII.   Legislative History ...................................................................................140

J.      Mail Ballot Tracker (HB 382) ....................................................140

K.      Regular Session Predecessor Bills SB 7, SB 1509, HB 6) .........141

L.      First Special Session (HB 3 and SB 1)........................................146

M.      Senate Bill 1 in the Second Special Session...............................147

IX.     Summary of Senate Bill 1 ........................................................................150

N.      The Legislature Enacted SB 1 to Increase Both Election Integrity
        and Voter Access. ........................................................................150

O.      General Description of Bill (Size, Topics, Scope) ......................159

P.      SB 1 Contains Numerous Helpful Provisions Not Challenged in this
        Action...........................................................................................159

Q.      The Challenged Provisions Most Clarify Ambiguities and Codify
        Best Practices ..............................................................................162

X.      Implementation.........................................................................................190

R.      The Scale of Changes Required by SB 1 .....................................190

S.      SB 1's Perfect Storm ...................................................................192

T.      Actions Taken by Secretary of State............................................194

U.      Actions Taken by Counties..........................................................197

XI.     Efficacy .....................................................................................................201

V.      Voter Registration .......................................................................201

W.      In Person Voting ......................................................................... 205

X.      Voting Assistance.........................................................................218

Y.      Poll Watchers .............................................................................. 231

Z.      Mail-Voting..................................................................................247

AA.     Mail Voting by Race .................................................................... 249

BB.     Rejection Rates ........................................................................... 250

CC.    Rejection Rates are Likely to Continue their Decline ..............................251

DD.    How many Ballots were Rejected in November 2022? ..........................252

EE.    Cause of Rejections cannot be Ascertained ...........................................253

XII.    Expert Witnesses ..........................................................................................255

A.    Dr. Mark Hoekstra ...............................................................................255

B.    Plaintiffs' Experts ................................................................................265

Certificate of Service..............................................................................................291

INDEX OF AUTHORITIES

## Cases

*Bruni v. Hughs,*
  468 F. Supp. 3d 817 (S.D. Tex. 2020) ...............................................................82, 83

*City of Austin v. Paxton,*
  943 F.3d 993 ....................................................................................................1

*Hotze v. Hollins,*
  2020 WL 6437668 (S.D.Tex., 2020) ...............................................................110

*Hotze v. Hudspeth,*
  16 F.4th 1121 (C.A.5 (Tex.), 2021) ................................................................110

*In re Abbott,*
  956 F.3d 696 (5th Cir. 2020)..............................................................................1

*In re Hotze,*
  610 S.W.3d 909 (Tex. 2020) ...........................................................................111

*Lewis v. Scott,*
  28 F.4th 659 (5th Cir. 2022) ...............................................................................2

*Lightbourn v. Cty. of El Paso, Tex.,*
  118 F.3d 421 (5th Cir. 1997) ...............................................................................2

*Mich. State A. Philip Randolph Inst. v. Johnson,*
  833 F.3d 656 (6th Cir. 2016) ............................................................................82

*Morris v. Livingston,*
  739 F.3d 740 (5th Cir. 2014) ...............................................................................1

*Ostrewich v. Tatum,*
  72 F.4th 94 (5th Cir. 2023) ........................................................................2, 3, 5

*Planned Parenthood Center for Choice v. Abbott,*
  141 S. Ct. 1261 (2021)........................................................................................1

*Richardson v. Flores,*
  28 F.4th 649 (5th Cir. 2022) ...............................................................................2

*Saldano v. State,*
  70 S.W.3d 873 (Tex. Crim. App. 2002) ..............................................................5

*St. Bus. Partners LLC v. Abbott,*
  No. 1:20-cv-706-RP, 2020 WL 4274589 (W.D. Tex. July 24, 2020)........................1

*State v. Stephens,*
  663 S.W.3d 45 (Tex. Crim. App. 2021), *reh'g denied,* 664 S.W.3d 293 (Tex. Crim. App. 2022).5

*Summers v. Earth Island Inst,*
  555 U.S. 488 (2009) .........................................................................................24

*Tex. Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) ...............................................................................1

*Texas All. for Retired Americans v. Scott,*
  28 F.4th 669 (5th Cir. 2022) ...............................................................................82, 83

*Vote.org v. Callanen,*
  No. 22-50536, 2023 WL 8664636 (5th Cir. Dec. 15, 2023) ...............................35, 36

## Statutes

Tex. Elec. Code  33.001 ....................................................................................................5, 6

Tex. Elec. Code § 86.01 ....................................................................................................255

Tex. Elec. Code §§ 87.0271(a), 87.0411(a) ....................................................................255

Tex. Elec. Code Section 1.011(a), (e)..............................................................................65

Tex. Elec. Code Section 1.011(b) .....................................................................................65

Tex. Elec. Code Section 1.011(c)–(d) ..............................................................................65

Tex. Elec. Code Section 11.001(a)(1), 11.002(a)(6) .......................................................34

Tex. Elec. Code Section 12.001 ........................................................................................36

Tex. Elec. Code Section 12.031 ........................................................................................36

Tex. Elec. Code Section 13.001 ........................................................................................35

Tex. Elec. Code Section 13.001(a) ....................................................................................34

Tex. Elec. Code Section 13.002(a) ..............................................................................35, 36

Tex. Elec. Code Section 13.002(b) ...................................................................................36

Tex. Elec. Code Section 13.002(c)(1)–(7), (9)–(10) ........................................................35

Tex. Elec. Code Section 13.002(c)(8)...............................................................................35

Tex. Elec. Code Section 13.007 ........................................................................................36

Tex. Elec. Code Section 13.031, 13.038, 13.041 .............................................................37

Tex. Elec. Code Section 13.071(a) ....................................................................................38

Tex. Elec. Code Section 13.071(b) ...................................................................................38

Tex. Elec. Code Section 13.072(a) ....................................................................................38

Tex. Elec. Code Section 13.072(c) ....................................................................................39

Tex. Elec. Code Section 13.073(a) ....................................................................................39

Tex. Elec. Code Section 13.073(b) ...................................................................................39

Tex. Elec. Code Section 13.101(a) ....................................................................................39

Tex. Elec. Code Section 13.101(c) ....................................................................................39

Tex. Elec. Code Section 13.102(a) ....................................................................................39

Tex. Elec. Code Section 13.102(b) ...................................................................................39

Tex. Elec. Code Section 13.102(d) ...................................................................................39

Tex. Elec. Code Section 15.021.........................................................................................160

Tex. Elec. Code Section 15.021.........................................................................................160

Tex. Elec. Code Section 15.021(d-1) ................................................................................160

Tex. Elec. Code Section 15.022, 15.024, 15.027 .............................................................193

Tex. Elec. Code Section 15.081(a) ....................................................................................41

Tex. Elec. Code Section 16.032 ........................................................................................41

Tex. Elec. Code Section 16.0332 ......................................................................................162

Tex. Elec. Code Section 16.0332(a-1) ..............................................................................163

Tex. Elec. Code Section 16.0332(d) .................................................................................163

Tex. Elec. Code Section 16.0332(e) .................................................................................163

Tex. Elec. Code Section 18.061 ..................................................................................38, 41

Tex. Elec. Code Section 18.061(b)....................................................................................38

Tex. Elec. Code Section 18.065 ........................................................................................163

Tex. Elec. Code Section 18.065(a) ....................................................................................40

Tex. Elec. Code Section 18.065(e)....................................................................................163

Tex. Elec. Code Section 18.065(f) ............................................................................164
Tex. Elec. Code Section 18.068 ...............................................................................164
Tex. Elec. Code Section 18.068(a) .............................................................................41
Tex. Elec. Code Section 18.068(a-1) ........................................................................164
Tex. Elec. Code Section 20.001, 20.031 ...........................................................34, 36
Tex. Elec. Code Section 31.002 ...............................................................................190
Tex. Elec. Code Section 31.004 ...................................................................................4
Tex. Elec. Code Section 31.0055 ...............................................................................70
Tex. Elec. Code Section 31.130 ...............................................................................189
Tex. Elec. Code Section 32.071 ...................................................................................3
Tex. Elec. Code Section 32.075 ...............................................................................190
Tex. Elec. Code Section 32.075(a) .............................................................................60
Tex. Elec. Code Section 33.001 .......................................................................56, 168
Tex. Elec. Code Section 33.0015 .............................................................................168
Tex. Elec. Code Section 33.003 .............................................................................5, 6
Tex. Elec. Code Section 33.031(a) .............................................................................57
Tex. Elec. Code Section 33.031(a)(1) .........................................................................57
Tex. Elec. Code Section 33.031(a)(2) .........................................................................57
Tex. Elec. Code Section 33.031(a)(3) .........................................................................57
Tex. Elec. Code Section 33.051(a) .............................................................................57
Tex. Elec. Code Section 33.051(b) .............................................................................57
Tex. Elec. Code Section 33.051(c) .............................................................................58
Tex. Elec. Code Section 33.051(e) .............................................................................58
Tex. Elec. Code Section 33.051(f) .............................................................................58
Tex. Elec. Code Section 33.056 ...............................................................................169
Tex. Elec. Code Section 33.056(a) .............................................................................58
Tex. Elec. Code Section 33.056(b) .............................................................................58
Tex. Elec. Code Section 33.056(c) .............................................................................58
Tex. Elec. Code Section 33.056(d) ......................................................................58, 59
Tex. Elec. Code Section 33.057(a) .............................................................................59
Tex. Elec. Code Section 33.057(b) .............................................................................59
Tex. Elec. Code Section 33.058 .................................................................................59
Tex. Elec. Code Section 33.058(a)(1)–(3) ..................................................................59
Tex. Elec. Code Section 33.058(b) .............................................................................60
Tex. Elec. Code Section 33.061(a) ...........................................................................170
Tex. Elec. Code Section 33.061(a)–(b) .......................................................................60
Tex. Elec. Code Section 41.031(a) .............................................................................45
Tex. Elec. Code Section 41.031(b) .............................................................................45
Tex. Elec. Code Section 41.032(a) .............................................................................45
Tex. Elec. Code Section 41.032(b) .............................................................................46
Tex. Elec. Code Section 41.032(c) .............................................................................46
Tex. Elec. Code Section 41.033 .................................................................................45
Tex. Elec. Code Section 42.001(a) .............................................................................46
Tex. Elec. Code Section 42.002(a) .............................................................................46

Tex. Elec. Code Section 43.001 ........................................................................... 46
Tex. Elec. Code Section 43.007(a) ...................................................................... 46
Tex. Elec. Code Section 43.007(e) ......................................................................47
Tex. Elec. Code Section 43.007(f) .......................................................................47
Tex. Elec. Code Section 43.007(f)(1)–(2) ........................................................... 48
Tex. Elec. Code Section 43.007(g) ......................................................................47
Tex. Elec. Code Section 43.007(h) ......................................................................47
Tex. Elec. Code Section 43.007(m)(1)–(2) ..........................................................47
Tex. Elec. Code Section 43.007(n) ......................................................................47
Tex. Elec. Code Section 43.007(o) ......................................................................47
Tex. Elec. Code Section 43.031(a) ...................................................................... 48
Tex. Elec. Code Section 43.031(b) .............................................................. 48, 164
Tex. Elec. Code Section 43.031(c) ...................................................................... 48
Tex. Elec. Code Section 43.031(d) ...................................................................... 48
Tex. Elec. Code Section 43.034(a) ...................................................................... 48
Tex. Elec. Code Section 43.034(a)(1)–(5) ........................................................... 48
Tex. Elec. Code Section 52.071(b) .......................................................................81
Tex. Elec. Code Section 63.001(b) ...................................................................... 51
Tex. Elec. Code Section 63.001(b)(1) ..................................................................52
Tex. Elec. Code Section 63.0101(a)(1)–(5) .........................................................52
Tex. Elec. Code Section 63.0101(b)(1)–(3) .........................................................52
Tex. Elec. Code Section 63.0101(b)(2)(i) ............................................................52
Tex. Elec. Code Section 64.009 .........................................................................165
Tex. Elec. Code Section 64.009(a) ...................................................................... 49
Tex. Elec. Code Section 64.009(b) ...................................................................... 49
Tex. Elec. Code Section 64.009(c) ...................................................................... 50
Tex. Elec. Code Section 64.009(d) ...................................................................... 50
Tex. Elec. Code Section 64.031 ...........................................................................53
Tex. Elec. Code Section 64.032(a) .......................................................................53
Tex. Elec. Code Section 64.032(b) .......................................................................53
Tex. Elec. Code Section 64.032(c) ................................................................ 53, 55
Tex. Elec. Code Section 64.032(d) .......................................................................53
Tex. Elec. Code Section 64.0321 .........................................................................52
Tex. Elec. Code Section 64.0322 .......................................................................183
Tex. Elec. Code Section 64.0322 .......................................................................183
Tex. Elec. Code Section 64.033(a) .......................................................................53
Tex. Elec. Code Section 64.033(b) .......................................................................54
Tex. Elec. Code Section 64.034 ................................................................ 54, 55, 184
Tex. Elec. Code Section 64.036(a)–(b), (d) .........................................................55
Tex. Elec. Code Section 64.036(c)–(d) .................................................................55
Tex. Elec. Code Section 81.001(a) .......................................................................43
Tex. Elec. Code Section 82.001, 82.002, 82.003, 82.004, 82.007, 82.008 .................61
Tex. Elec. Code Section 82.005 ...........................................................................43
Tex. Elec. Code Section 83.001(a) ........................................................................ 2

Tex. Elec. Code Section 84.001(a)–(b), (f) ..................................................................61
Tex. Elec. Code Section 84.001(c) ...............................................................................63
Tex. Elec. Code Section 84.001(d) ...............................................................................61
Tex. Elec. Code Section 84.001(e) ............................................................................... 64
Tex. Elec. Code Section 84.002 ..................................................................................174
Tex. Elec. Code Section 84.002(a) ..............................................................................174
Tex. Elec. Code Section 84.002(a) ............................................................................... 64
Tex. Elec. Code Section 84.003(a) ...............................................................................65
Tex. Elec. Code Section 84.003(b)–(c) ...................................................................65, 66
Tex. Elec. Code Section 84.003(d) ...........................................................................65, 66
Tex. Elec. Code Section 84.004(a) ...........................................................................65, 66
Tex. Elec. Code Section 84.004(b) ............................................................................... 66
Tex. Elec. Code Section 84.004(c) ............................................................................... 66
Tex. Elec. Code Section 84.004(d) ............................................................................... 66
Tex. Elec. Code Section 84.0041(a)–(b) ......................................................................65
Tex. Elec. Code Section 84.007 .....................................................................................3
Tex. Elec. Code Section 84.007(a)–(b) ........................................................................ 66
Tex. Elec. Code Section 84.007(b-1) ............................................................................67
Tex. Elec. Code Section 84.007(c) ................................................................................67
Tex. Elec. Code Section 84.007(d) ................................................................................67
Tex. Elec. Code Section 84.008(a) ...........................................................................66, 67
Tex. Elec. Code Section 84.009(a) ............................................................................... 66
Tex. Elec. Code Section 84.010 ....................................................................................67
Tex. Elec. Code Section 84.011(a) .......................................................................... 63, 175
Tex. Elec. Code Section 84.011(b) ................................................................................63
Tex. Elec. Code Section 84.0111 .................................................................................176
Tex. Elec. Code Section 84.012 ................................................................................... 62
Tex. Elec. Code Section 84.013 ................................................................................... 62
Tex. Elec. Code Section 84.014 ................................................................................... 64
Tex. Elec. Code Section 84.035 ..................................................................................176
Tex. Elec. Code Section 85.001(a) ................................................................................43
Tex. Elec. Code Section 85.001(b) ................................................................................43
Tex. Elec. Code Section 85.001(c) ............................................................................... 44
Tex. Elec. Code Section 85.001(d) ............................................................................... 44
Tex. Elec. Code Section 85.001(e) ................................................................................43
Tex. Elec. Code Section 85.005 ..................................................................................165
Tex. Elec. Code Section 85.005(a) ............................................................................... 44
Tex. Elec. Code Section 85.005(b) ............................................................................... 44
Tex. Elec. Code Section 85.005(c) ...........................................................................44, 45
Tex. Elec. Code Section 85.005(d) ................................................................................45
Tex. Elec. Code Section 85.006(e) ..............................................................................166
Tex. Elec. Code Section 85.061(a) ..............................................................................167
Tex. Elec. Code Section 85.062 ..................................................................................167
Tex. Elec. Code Section 85.062(f-1) ............................................................................167

Tex. Elec. Code Section 86.001 ................................................................. 3, 176
Tex. Elec. Code Section 86.001(a) ...................................................................... 68
Tex. Elec. Code Section 86.001(b) ...................................................................... 68
Tex. Elec. Code Section 86.001(c) ...................................................................... 68
Tex. Elec. Code Section 86.001(d) ...................................................................... 68
Tex. Elec. Code Section 86.001(e) ...................................................................... 68
Tex. Elec. Code Section 86.001(f-1) .................................................................. 174
Tex. Elec. Code Section 86.001(f-2) .................................................................. 174
Tex. Elec. Code Section 86.001(g) ...................................................................... 71
Tex. Elec. Code Section 86.0015(a) ..................................................................... 64
Tex. Elec. Code Section 86.002 ........................................................................ 177
Tex. Elec. Code Section 86.002(a) .................................................................. 69, 71
Tex. Elec. Code Section 86.002(b) ...................................................................... 71
Tex. Elec. Code Section 86.002(c) ...................................................................... 71
Tex. Elec. Code Section 86.002(g) .................................................................... 177
Tex. Elec. Code Section 86.002(h) .................................................................... 177
Tex. Elec. Code Section 86.003(a) ...................................................................... 71
Tex. Elec. Code Section 86.003(b) .................................................................. 71, 72
Tex. Elec. Code Section 86.003(c) ...................................................................... 71
Tex. Elec. Code Section 86.003(c)(1) .................................................................. 71
Tex. Elec. Code Section 86.003(c)(2) .................................................................. 71
Tex. Elec. Code Section 86.003(c)(3) .................................................................. 71
Tex. Elec. Code Section 86.003(c)(4) .................................................................. 72
Tex. Elec. Code Section 86.003(d) ...................................................................... 72
Tex. Elec. Code Section 86.004(a) ...................................................................... 72
Tex. Elec. Code Section 86.004(b) ...................................................................... 72
Tex. Elec. Code Section 86.005(a) ...................................................................... 73
Tex. Elec. Code Section 86.005(b) ...................................................................... 73
Tex. Elec. Code Section 86.005(c) ...................................................................... 73
Tex. Elec. Code Section 86.005(e) ...................................................................... 74
Tex. Elec. Code Section 86.006 ........................................................................ 172
Tex. Elec. Code Section 86.006(a) ...................................................................... 74
Tex. Elec. Code Section 86.006(a)–(a-1) .............................................................. 74
Tex. Elec. Code Section 86.006(b) ...................................................................... 74
Tex. Elec. Code Section 86.006(c) ...................................................................... 74
Tex. Elec. Code Section 86.006(d) ...................................................................... 75
Tex. Elec. Code Section 86.006(d)(1)–(4) ............................................................ 75
Tex. Elec. Code Section 86.006(f) .................................................................. 75, 76
Tex. Elec. Code Section 86.006(f)(1)–(6) ............................................................ 76
Tex. Elec. Code Section 86.006(g) ...................................................................... 76
Tex. Elec. Code Section 86.006(h) ...................................................................... 75
Tex. Elec. Code Section 86.006(h)(1)–(2) ............................................................ 75
Tex. Elec. Code Section 86.007(a) ...................................................................... 76
Tex. Elec. Code Section 86.007(b) ...................................................................... 77

Tex. Elec. Code Section 86.007(c) ................................................................78
Tex. Elec. Code Section 86.007(d)(1)–(3) ....................................................77
Tex. Elec. Code Section 86.007(d-1) ............................................................77
Tex. Elec. Code Section 86.007(e)(1)–(2) .....................................................77
Tex. Elec. Code Section 86.007(f) .................................................................76
Tex. Elec. Code Section 86.008(a) ................................................................ 68
Tex. Elec. Code Section 86.008(b)(1)–(3) ..................................................... 68
Tex. Elec. Code Section 86.008(c) ................................................................ 69
Tex. Elec. Code Section 86.008(d) ................................................................ 69
Tex. Elec. Code Section 86.009(a) ................................................................73
Tex. Elec. Code Section 86.009(b)(1)–(2) .....................................................73
Tex. Elec. Code Section 86.009(c) ................................................................73
Tex. Elec. Code Section 86.009(d) ................................................................73
Tex. Elec. Code Section 86.009(e)(1) ............................................................73
Tex. Elec. Code Section 86.009(e)(2) ............................................................73
Tex. Elec. Code Section 86.009(f) .................................................................73
Tex. Elec. Code Section 86.010 ...................................................................185
Tex. Elec. Code Section 86.010(a) ................................................................55
Tex. Elec. Code Section 86.010(b) ................................................................55
Tex. Elec. Code Section 86.010(c) ................................................................55
Tex. Elec. Code Section 86.010(d) ................................................................56
Tex. Elec. Code Section 86.010(e) ................................................................55
Tex. Elec. Code Section 86.010(f)–(g) ..........................................................56
Tex. Elec. Code Section 86.013(d)(1)–(5) .................................................... 70
Tex. Elec. Code Section 86.013(g)(1)–(2) ..................................................... 70
Tex. Elec. Code Section 86.0105 .................................................................186
Tex. Elec. Code Section 86.0105(a)(1)–(3) ...................................................56
Tex. Elec. Code Section 86.0105(b)(1)–(2) ...................................................56
Tex. Elec. Code Section 86.0105(c) ..............................................................56
Tex. Elec. Code Section 86.0105(e) ..............................................................56
Tex. Elec. Code Section 86.011(a) ..........................................................76, 78
Tex. Elec. Code Section 86.011(b) ................................................................78
Tex. Elec. Code Section 86.011(b)(1)–(2) .....................................................78
Tex. Elec. Code Section 86.011(c) ................................................................78
Tex. Elec. Code Section 86.011(d) ................................................................78
Tex. Elec. Code Section 86.012(a) ................................................................ 69
Tex. Elec. Code Section 86.012(b)(1)–(4) ..................................................... 69
Tex. Elec. Code Section 86.013(a) ................................................................ 69
Tex. Elec. Code Section 86.013(b) ............................................................... 70
Tex. Elec. Code Section 86.013(b) .............................................................187
Tex. Elec. Code Section 86.013(b)(2) ...........................................................56
Tex. Elec. Code Section 86.013(c) ............................................................... 70
Tex. Elec. Code Section 86.013(f) ................................................................ 70
Tex. Elec. Code Section 86.013(g) ............................................................... 70

Tex. Elec. Code Section 86.015(c) ................................................................... 177
Tex. Elec. Code Section 87.001 ........................................................................ 78
Tex. Elec. Code Section 87.002(a) .................................................................... 78
Tex. Elec. Code Section 87.021(2), (5) ............................................................. 79
Tex. Elec. Code Section 87.0241(a) .................................................................. 79
Tex. Elec. Code Section 87.0241(b)(1)–(2) ...................................................... 80
Tex. Elec. Code Section 87.027 ...................................................................... 179
Tex. Elec. Code Section 87.027, 87.041 ............................................................. 3
Tex. Elec. Code Section 87.027(a)–(a-1) ......................................................... 80
Tex. Elec. Code Section 87.027(h) .................................................................... 80
Tex. Elec. Code Section 87.027(i) ..................................................................... 80
Tex. Elec. Code Section 87.027(j) ..................................................................... 80
Tex. Elec. Code Section 87.0271 .................................................................... 179
Tex. Elec. Code Section 87.0271(b) ........................................................ 179, 180
Tex. Elec. Code Section 87.0271(e) ................................................................ 180
Tex. Elec. Code Section 87.041 ...................................................................... 180
Tex. Elec. Code Section 87.041(a) .................................................................... 79
Tex. Elec. Code Section 87.041(d) .................................................................... 81
Tex. Elec. Code Section 87.041(e) .......................................................... 79, 180
Tex. Elec. Code Section 87.041(f) ..................................................................... 79
Tex. Elec. Code Section 87.041(g) .................................................................... 81
Tex. Elec. Code Section 87.0411 .................................................................... 181
Tex. Elec. Code Section 87.0411(c) ................................................................ 181
Tex. Elec. Code Section 87.0411(e) ................................................................ 181
Tex. Elec. Code Section 87.0431(a) .................................................................. 81
Tex. Elec. Code Section 87.0431(b) .................................................................. 81
Tex. Elec. Code Section 101.001 ...................................................................... 61
Tex. Elec. Code Section 101.001(2)(A)–(B-1) ................................................. 73
Tex. Elec. Code Section 101.051 ...................................................................... 61
Tex. Elec. Code Section 101.052(a) .................................................................. 67
Tex. Elec. Code Section 101.052(a-1) ............................................................... 67
Tex. Elec. Code Section 101.052(b) .................................................................. 67
Tex. Elec. Code Section 101.052(e) .................................................................. 67
Tex. Elec. Code Section 101.053(a) .................................................................. 65
Tex. Elec. Code Section 101.053(b) .................................................................. 64
Tex. Elec. Code Section 101.054(a) .................................................................. 64
Tex. Elec. Code Section 101.054(b) .................................................................. 64
Tex. Elec. Code Section 101.055(a)(1)–(2) ...................................................... 62
Tex. Elec. Code Section 101.055(b) .................................................................. 62
Tex. Elec. Code Section 101.055(c) .................................................................. 62
Tex. Elec. Code Section 101.057(a) .................................................................. 74
Tex. Elec. Code Section 101.057(b) .................................................................. 73
Tex. Elec. Code Section 101.107(b) .................................................................. 74
Tex. Elec. Code Section 101.107(c) .................................................................. 74

Tex. Elec. Code Section 101.107(d) ............................................................... 76, 77
Tex. Elec. Code Section 124.002 .......................................................................... 167
Tex. Elec. Code Section 127.131 .......................................................................... 161
Tex. Elec. Code Section 272.001 ............................................................................ 50
Tex. Elec. Code Section 272.002 ...................................................................... 50, 51
Tex. Elec. Code Section 272.003(a) ....................................................................... 50
Tex. Elec. Code Section 272.004 ............................................................................ 50
Tex. Elec. Code Section 272.005 ............................................................................ 51
Tex. Elec. Code Section 272.009 ............................................................................ 51
Tex. Elec. Code Section 272.009(a) ....................................................................... 51
Tex. Elec. Code Section 272.010 ............................................................................ 51
Tex. Elec. Code Section 276.017 .......................................................................... 188
Tex. Elec. Code Section 276.018 .......................................................................... 188
Tex. Elec. Code Section 276.019 .......................................................................... 188
Tex. Pen. Code Section 37.02 ................................................................................. 54

## Other Authorities

Act of May 24, 2021, 87th Leg., R.S., ch. 317,
    2021 Tex. Gen. Laws 656, 658 ................................................................ 140, 141
Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1,
    2021 Tex. Gen. Laws 3873, 3873–903 .................................................. 142, 144
Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1,
    2021 Tex. Gen. Laws 3873, 3903 ........................................................... 149, 150
Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 2.03, 3.03, 5.14, 7.02,
    2021 Tex. Gen. Laws 3873, 3875–95 ................................................................ 145
Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 3.09, 3.10,
    2021 Tex. Gen. Laws 3873, 3879–80 ................................................................ 142
Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 3.09, 4.04, 4.06,
    2021 Tex. Gen. Laws 3873, 3880–84 ................................................................ 143
Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 4.01, 4.02, 6.06,
    2021 Tex. Gen. Laws 3873, 3882–95 ................................................................ 146
Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 5.12, 5.14, 7.04, 9.03,
    2021 Tex. Gen. Laws 3873, 3890–902 ............................................................... 144
Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 5.13, 6.01, 7.04,
    2021 Tex. Gen. Laws 3873, 3890–96 ................................................................ 147
Act of May 22, 2023, 88th Leg. R.S., S.B. 975, § 1 ....................................... 251, 252
Act of May 22, 2023, 88th Leg. R.S., SB 1599, § 5 ............................................... 252
Act of May 24, 2023, 88th Leg. R.S., HB 315, Section 1 ...................................... 251
Act of May 29, 2023, 88th Leg. R.S., H.B. 357, § 2 .............................................. 252


Tex. Const. art. VI, Section I ...................................................................................1
Tex. Const. art. VI, Section X ..................................................................................1
Tex. Const. art. VI, Section 22 ................................................................................5
Tex. Const. art. VI, Section 4 ............................................................................144

Tex. Const. art. VI, § 1 ................................................................................. 4

Tex. Const. art. VI, §§ 22–23 ....................................................................... 4

## **Regulations**

52 U.S.C. Section 10303(f)(4) ....................................................................... 51

52 U.S.C. Section 10503(b) ........................................................................... 51

52 U.S.C. Section 10503(b)(1)–(2)(A) ......................................................... 51

52 U.S.C. Section 10503(b)(3)(A) ................................................................ 51

52 U.S.C. Section 20507(a)(4) ...................................................................... 40

52 U.S.C. Section 20507(b)(2) ...................................................................... 40

52 U.S.C. Section 21083(a)(1)(A) ................................................................ 38

52 U.S.C. Section 21083(a)(5)(A) ................................................................ 35

INTRODUCTION

1.      Pursuant to the Court's October 20, 2023 in-trial scheduling request, State Defendants submit the following proposed findings of fact and conclusions of law for the Court's resolution of this case on the merits.

PROPOSED FINDINGS OF FACT

## I.  Parties

### A.  State Defendants

#### i.   State of Texas

2.      State Defendant State of Texas is one of these United States of America.

#### ii.   Gregory Abbott, in his official capacity, as Governor of Texas.

3.      State Defendant Gregory Wayne Abbott is the 48th Governor of the State of Texas and is the state's chief executive officer. Tex. Const. art. VI, Section I. Defendant Abbott is charged to ensure Texas are "faithfully executed" Tex. Const. art. VI, Section X. However, as governor, he has only a general role regarding elections, with that duty residing with the Secretary of State, and "it is not enough that the official have a 'general duty to see that the laws of the state are implemented." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400–01 (5th Cir. 2020) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).

4.      Defendant Abbott is sued in his official capacity as governor, but no provision of SB 1 gives the Governor enforcement responsibilities. "If the official sued is not 'statutorily tasked with enforcing the challenged law,' the requisite connection is absent and '[the] Young analysis ends.'" *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (quoting *City of Austin v. Paxton*, 943 F.3d 993 at 998), *vacated as moot*, *Planned Parenthood Center for Choice v. Abbott*, 141 S. Ct. 1261 (2021); accord Tex. Democratic Party, 961 F.3d at 401; *Sixth St. Bus. Partners LLC v. Abbott*, No. 1:20-cv-706-RP, 2020 WL 4274589, at *3–4 (W.D. Tex. July 24, 2020).

#### iii.   Jane Nelson, in her official capacity as Texas Secretary of State

1

1.      State Defendant Jane Nelson is the Secretary of State ("the Secretary") of the State of Texas. The Texas Secretary of State is one of six officials named in the Texas Constitution that forms the executive department. Sept. 22, 2023 Tr. at 1825:12-17. The Secretary of State is appointed by the Governor of Texas and confirmed by the Texas Senate. *Id.* at 1825:18-20.

2.      Among other things, the Secretary of State is the Chief Election Officer for Texas. Sept. 22, 2023 Tr. at 1825:21-23. As such, the Secretary is charged with "broad duties to oversee administration of Texas's election laws." *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (quoting, *Richardson v. Flores*, 28 F.4th 649 at 654 (5th Cir. 2022)).

3.      The Secretary delegates her responsibilities to the Elections Division in her office. Sept. 22, 2023 Tr. at 1869:6–9. The Elections Division is divided into two primary groups: the Administrative Section and the Legal Section. The Administrative Section maintains the Texas Election Administration Management database, which contains Texas' official voter registration list. Oct. 17, 2023 Tr. at 4317:6–9, 17–23. The Legal Section handles the Secretary's advisory role. Oct. 18, 2023 Tr. at 4527:22–6.

4.      Despite the Secretary's broad duties, the Election Code gives the Secretary only limited authority over how Texas elections are run. *See* Oct. 17, 2023 Tr. at 4312:1–9. "Texas has a highly decentralized election system," where significant local control is exercised. Sept. 22, 2023 Tr. at 1827:3-5, 1848:24–1849:11; *see also Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022).

5.      Accordingly, "the Secretary does not conduct elections." *Lightbourn v. Cty. of El Paso, Tex.,* 118 F.3d 421, 428 n.7 (5th Cir. 1997); *see also* Oct. 17, 2023 Tr. at 4312:10–17. "Rather, the state's 3,000 or so political subdivisions run general and special elections, while the political parties conduct primary elections." *Lightbourn*, 118 F.3d at 428 n.7; *see also* Oct. 17, 2023 Tr. at 4312:12–17. In accordance with this divisions of responsibility, the Secretary does "not directly enforce" laws "but only provides interpretive guidance." *Ostrewich*, 72 F.4th at 101.:1.

6.      The Election Code specifies that the early voting clerk "shall conduct the early voting in each election." Tex. Elec. Code Section 83.001(a); *see also* Oct. 12, 2023 Tr. at 3812:19–25 (testifying that early voting clerk is responsible for mail and in-person early voting). It is thus

the early voting clerk, not the Secretary, that schedules polling hours and selects the number, location, and set up of the available polling places.

7.      The Election Code also specifies that "the presiding judge is in charge of and responsible for the management and conduct of the election at the polling place of the election precinct that the judge serves." Tex. Elec. Code Section 32.071. It is thus the presiding judge, along with alternative judge and clerks—not the Secretary—that checks in voters and assistors, executes the oath of assistance, provides assistance to voters on request, and enforces the Election Code at the polling place. *See*, *e.g.*, *Ostrewich*, 72 F.4th at 100.

8.      In addition, the Secretary does not provide, manage, or oversee a county's voting-by-mail program. The Election Code specifies that applications for ballot by mail (ABBM) must be submitted to the early voting clerk, Tex. Elec. Code Section 84.007, who shall review each application to determine whether it contains all requisite information. *Id.* at Section 86.001. It is thus the early voting clerk—not the Secretary—who makes the decision to accept or reject a voter's ABBM.

9.      The Election Code also specifies that the Early Voting Ballot Board (EVBB) or Signature Verification Committee (SVC) shall open each carrier envelop and make a determination whether it complies with all stipulated requirements. Tex. Elec. Code Section 87.027, 87.041. It is thus the EVBB or SVC—not the Secretary—who makes the decision to accept or reject a voter's mail ballot.

10.     The Secretary's role regarding elections is principally one of ''"[o]ffering advice, guidance, or interpretive assistance' to local officials," albeit one which falls short of enforcement. *Ostrewich v.*, 72 F.4th at 100–101.

11.     Under Section 31.003 of the Election Code, the Secretary is tasked with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of this code and of the election laws outside this code." Oct. 17, 2023 Tr. at 4311:21–25, 4318:17–4319:3.

12.     In performing this duty, the Secretary prepares detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this

code. Oct. 17, 2023 Tr. at 4319:4–9. This includes, among other things, election advisories, election calendars, mass emails, handbooks, and training materials. Oct. 18, 2023 Tr. at 4564:1-13.

13.    The Secretary principally issues election advisories in response to ambiguities in the Election Code that need clarification and legislation that instructs the Secretary to prescribe additional procedures. Election advisories do not bind local election authorities, *see* Oct. 18, 2023 Tr. at 4536:21–45366:2, 4537:15–4538:5, but they are viewed as highly persuasive by Texas election offices and are generally given deference by courts. Oct. 18, 2023 Tr. at 4554:20-4555:1.

14.    In addition, the Secretary maintains an informational hotline for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties. Tex. Elec. Code Section 31.004; *see also* Oct. 17, 2023 Tr. at 4322:12–4323:17; Oct. 18, 2023 Tr. at 4568:15–4569. The Secretary maintains a separate toll-free number to provide advice and assistance to voters. Oct. 17, 2023 Tr. at 4322:12–17.

15.    The Secretary also conducts seminars, webinars, conferences, and trainings for election officials about election administration, as part of her duty to obtain uniformity. The Secretary hosts its principal conference in the summer, at which it advises county officials of legislative updates and best practices. The Secretary holds smaller conferences throughout the year for other stakeholders, such as cities and municipal utility districts, who also have their own election responsibilities.

16.    Defendant Nelson is sued in her official capacity as Secretary of State.

iv.    **Warren Ken Paxton, in his official capacity as Attorney General of Texas.**

17.    State Defendant Warren Ken Paxton is the 51st Attorney General of the State of Texas.

18.    The Attorney General is one of six officials named in the Texas Constitution that forms the executive department. Tex. Const. art. VI, § 1. The Attorney General is elected for a four-year term by the qualified voters of the State at the time and places of election for members of the Legislature. *Id.* at. Section 22–23.

19.     As Attorney General, Defendant Paxton is the state's chief law enforcement officer. Tex. Const. art. VI, Section 22. His role as Attorney General includes representing the state of Texas "in all suits and pleas." *See id.*

20.     However, the Attorney General "has no independent authority to prosecute election-related offenses." *Ostrewich*, 72 F.4th at 101. The Texas Court of Criminal Appeals held that the Attorney General "can prosecute with the permission of the local prosecutor but cannot initiate prosecution unilaterally." *State v. Stephens*, 663 S.W.3d 45, 55 (Tex. Crim. App. 2021), *reh'g denied*, 664 S.W.3d 293 (Tex. Crim. App. 2022); Oct. 16, 2023 Tr. at 3908:21–23.

21.     It resolutely concluded at the end of this discussion that the Attorney General has no independent criminal prosecution authority: "The attorney general . . . has no criminal prosecution authority. Rather, he is limited to representing the State in civil litigation." *Id.* (quoting *Saldano v. State*, 70 S.W.3d 873, 880 (Tex. Crim. App. 2002)).

22.     Defendant Paxton is sued in his official capacity as Attorney General.

v.     **Intervenor-Defendants**

**Harris County Republican Party**

23.     Intervenor-Defendant Harris County Republican Party promotes and assists Republican candidates in Harris County, Texas. It has made significant contributions and expenditures to support Republican candidates during many election cycles and will do so again in 2024.

24.     The Harris County Republican Party works to accomplish this purpose by, among other things, devoting substantial resources towards educating, mobilizing, assisting, training, and turning out voters, volunteers, and poll watchers in Harris County. *See, e.g.*, Harris County GOP, Take Action Now, https://bit.ly/3pDazuW (last visited Dec. 28, 2023).

25.     In accordance with Texas law, the Harris County Republican Party also expends significant resources to recruit, train, and appoint poll watchers "to observe the conduct of ... election[s]" in Texas. Tex. Elec. Code 33.001; *see also* Tex. Elec. Code Section 33.003 (authorizing "each [county] political party that has one or more nominees on the ballot" to

"appoint 4 watchers"); Harris County GOP, Become A Volunteer, https://bit.ly/3DtAM3G (last visited Dec. 28, 2023).

### Dallas County Republican Party

26.    Intervenor-Defendant Dallas County Republican Party promotes and assists Republican candidates in Dallas County, Texas. It has made significant contributions and expenditures to support Republican candidates during many election cycles and is doing so again in 2024.

27.    The Dallas County Republican Party works to accomplish this purpose by, among other things, devoting substantial resources towards educating, mobilizing, assisting, training, and turning out voters, volunteers, and poll watchers in Dallas County. *See, e.g.*, Dallas County Republican Party, Get Involved, *https://dallasgop.org* (last visited Jan. 18, 2023).

28.    In accordance with Texas law, the Dallas County Republican Party also expends significant resources to recruit, train, and appoint poll watchers "to observe the conduct of . . . election[s]" in Texas. Tex. Elec. Code Section 33.001; *see also id.* Section 33.003 (authorizing "each [county] political party that has one or more nominees on the ballot" to "appoint watchers").

### Republican National Committee ("RNC")

29.    Intervenor-Defendant RNC is the national committee of the Republican Party as defined by 52 U.S.C. Section 30101(14).

30.    The RNC manages the Republican Party's business at a national level, including development and promotion of the Party's national platform and fundraising and election strategies; supports Republican candidates for public office at all levels across the country, including those on the ballot in Texas; and assists state and local parties throughout the country, including in Texas, to educate, mobilize, assist, and turn out Republican voters, candidates, volunteers, and poll watchers.

31.     The RNC has made significant contributions and expenditures in support of Republican candidates up and down the ballot and in mobilizing voters and volunteers in Texas in the past many election cycles and is already doing so again for the 2024 election cycle.

### National Republican Senatorial Committee ("NRSC")

32.     Intervenor-Defendant NRSC is the national senatorial committee of the Republican Party as defined by 52 U.S.C. Section 30101(14).

33.     Its mission is to elect Republican candidates to the U.S. Senate from across the United States, including from Texas. It works to accomplish this mission in Texas by, among other things, providing direct and indirect financial contributions and support to candidates and other Republican Party organizations; providing technical and research assistance to Republican candidates and party organizations; engaging in voter registration, voter education, and voter turnout programs; and conducting other Republican party-building activities, including funding recruiting, education, and support activities for poll watchers.

34.     The NRSC has made significant contributions and expenditures in support of Republican congressional candidates in Texas in many past election cycles and is doing so again in 2024.

### National Republican Congressional Committee ("NRCC")

35.     Intervenor-Defendant NRCC is the national congressional committee of the Republican Party as defined by 52 U.S.C. Section 30101(14).

36.     Its mission is to elect Republican candidates to the U.S. House of Representatives from across the United States, including from Texas. It works to accomplish this mission in Texas by, among other things, providing direct and indirect financial contributions and support to candidates and other Republican Party organizations; providing technical and research assistance to Republican candidates and party organizations; engaging in voter registration, voter education, and voter turnout programs; and conducting other Republican party-building activities, including funding recruiting, education, and support activities for poll watchers.

37.     The NRCC has made significant contributions and expenditures in support of Republican congressional candidates in Texas in many past election cycles and is doing so again in 2024.

### County Defendants

### Harris County District Attorney–Kim Ogg

38.     Defendant Kim Ogg is sued in her official capacity as Harris County District Attorney. By virtue of her position, Defendant Ogg is charged with investigating and prosecuting criminal violations of the Texas Election Code. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action that impose criminal penalties.

39.     Defendant Ogg entered into a stipulation with Plaintiffs that the Harris County District Attorney Office has not adopted a policy of refusing to prosecute any class or type of criminal offenses under state law. *See* ECF 781. The stipulation, however, offers no insight into Defendant Ogg's interpretation of the challenged provision; nor does indicate that Defendant Ogg will prosecute criminal offenses created or amended by SB 1 in the broad manner that Plaintiffs fear.

40.     Defendant Ogg was named as a Defendant by OCA-GH Plaintiffs, HAUL Plaintiffs, and MFV Plaintiffs.

### Bexar County District Attorney–Joe Gonzales

41.     Defendant Joe Gonzales is sued in his official capacity as Bexar County District Attorney. By virtue of his position, Defendant Gonzales is charged with investigating and prosecuting criminal violations of the Texas Election Code.  He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties. Defendant Gonzales was named as a Defendant by LULAC Plaintiffs and HAUL Plaintiffs.

### Dallas County District Attorney–John Creuzot

42.     Defendant John Creuzot is sued in his official capacity as Dallas County District Attorney. By virtue of his position, Defendant Creuzot is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he

implements the provisions of SB 1 challenged in this action that impose criminal penalties.. Defendant Creuzot was named as a Defendant by LUPE Plaintiffs and LULAC Plaintiffs.

### El Paso County District Attorney–Bill D. Hicks

43.     Defendant Bill D. Hicks is sued in his official capacity as the District Attorney for the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. By virtue of his position, Defendant Hicks is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties. DefendantHe is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties. Mr. Hicks was named as a Defendant by LUPE Plaintiffs.

### Travis County District Attorney–José Garza

44.     Defendant José Garza is sued in his official capacity as Travis County District Attorney. By virtue of his position, Defendant Garza is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 Section 6.04, 6.05, 6.06, and 7.04. Defendant Garza was named as a Defendant by LUPE Plaintiffs, LULAC Plaintiffs, OCA-GH Plaintiffs, and HAUL Plaintiffs.

### Hidalgo County District Attorney – Toribio "Terry" Palacios

45.     Defendant José Palacios is sued in his official capacity as Travis County District Attorney. By virtue of his position, Defendant Palacios is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties. Defendant Palacios was named as a Defendant by LULAC Plaintiffs.

### Harris County Clerk–Teneshia Hudspeth

46.     Defendant Teneshia Hudspeth is the County Clerk of Harris County—a position she has occupied since January 1, 2021. Her office assumed control over Harris County's election responsibilities when Senate Bill 1750 took effect on September 1, 2023. Defendant Hudspeth is

being sued in her official capacity for her role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance.

47.     Defendant Hudspeth is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions. Defendant Hudspeth was named as a Defendant by LULAC Plaintiffs, OCA-GH Plaintiffs and MFV Plaintiffs.

### Bexar County Election Administrator–Jacquelyn Callanen

48.     Defendant Jacquelyn Callanen is the Election Administrator for Bexar County. Sept. 192023 Tr. at 987:2–4. She has occupied this position since 2005. Sept. 19, 2023 Tr. at 987:22–23. Defendant Callanen is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions. Defendant Callanen Defendant Callanen is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance. Defendant Callanen testified at trial. She was the only person from her office to do so.

49.     was named as a Defendant by LULAC Plaintiffs, HAUL Plaintiffs, and MFV Plaintiffs.

### Dallas County Elections Administrator-Michael Scarpello

50.     Defendant Michael Scarpello is the Elections Administrator for Dallas County and has occupied this position since December 2020. Sept. 12, 2023 Tr. at 376:15–21.Defendant Scarpello is being sued in his official capacity for his role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance.. Defendant Scarpello was named as a Defendant by LUPE Plaintiffs and LULAC Plaintiffs.

### El Paso County Elections Administrator-Lisa Wise

51.     Defendant Lisa Wise is the Elections Administrator of El Paso County. Sept. 11, 2023 Tr. at 161:9–10. Prior to her position in El Paso County, Defendant Wise worked as the

Deputy Election Commissioner in Douglas County, Nebraska, holding that position for around 8 years. *Id.* at 161:20–25. Altogether, Defendant Wise has worked in election administration for about 17 years. *Id.* at 162:1–3. Defendant Wise is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions. Defendant Wise Defendant Wise is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance. Defendant Wise testified at trial. She was the only person from her office to do so.

52.     Lisa Wise was named as a Defendant by LUPE Plaintiffs.

### Travis County Clerk-Dyana Limon-Mercado

53.     Defendant Limon-Mercado is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions, including, but not limited to, SB 1's Identification Number Requirement and SB 1's amendments to the laws governing voting assistance.

54.     Defendant Dyana Limon-Mercado is the current County Clerk of Travis County— a position she has occupied since January 1, 2023. Defendant Limon-Mercado is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions. Defendant Limon-Mercado was named as a Defendant by LULAC Plaintiffs and OCA-GH Plaintiffs.

### Hidalgo County Election Administrator Hilda Salinas

55.     Defendant Hilda Salinas is the current Election Administrator of Hidalgo County— a position she has occupied since September, 2023. Defendant Salinas is being sued in her official capacity for her role implementing and enforcing the Challenged Provisions. Defendant Salinas was named as a Defendant by LULAC Plaintiffs.

### B. Private Plaintiffs

#### i.     OCA Plaintiffs

56.     Jacqueline Doyer is a licensed attorney who worked as a felony prosecutor for Comal County for approximately seven years. Oct. 17, 2023 Tr. at 4209:8–10. Ms. Doyer was hired by the Texas Secretary of State to work in the Forensic Audit Division ("FAD") in April 2022. *Id.* at 4209:15–23. In November 2022, Ms. Doyer became the deputy and legal director for the division. *Id.* at 4210:11–12. SB 1 created a requirement for randomized county audits of election procedures and FAD is tasked with conducting those audits. *Id.* at 4210:1–7.

57.     The audit of the 2020 General Election was not ordered by SB 1; it was separately directed by the Texas Secretary of State, as the section of SB 1 which created the randomized audits did not become effective until December of 2021. Oct. 17, 2023 Tr. at 4211:2–6. The Secretary of State conducted the audit of the 2020 General Election ("the audit") to ensure that Texans had confidence in the election in the state, and that if there were any irregularities that were identified, counties could learn and make improvements and so other counties could learn and also make improvements. *Id.* at 4219:16–22.

58.     Keith Ingram is a licensed attorney who, after working for three private law firms, worked in Governor Rick Perry's office for approximately four years, after which he transferred to the Texas Secretary of State's Office. Sept. 22, 2023 Tr. at 1866:25–1867:18. When Mr. Ingram joined the Secretary of State's Office in 2012, it was as director of the Elections Division, the most senior position. *Id.* at 1867:20–25. Mr. Ingram served in this role for over ten years until he transitioned into a special projects role. *Id.* at 1868:2–8. In the role as Director of the Elections Division, Mr. Ingram managed and oversaw the Elections Division, which was roughly 30 employees. *Id.* at 1868:18–23. Mr. Ingram reported to the Deputy Secretary of State and the Secretary of State. *Id.* at 1869:1–5. As director, Mr. Ingram was tasked assisting the Secretary of State fulfil their responsibilities as chief elections officer of the State of Texas. As part of this role, Mr. Ingram helped the Secretary prepare for and ultimately implement SB 1. *Id.* at 1869:6–13.

59.     Prior to SB 1's enactment, Mr. Ingram and his office met with legislative staff to discuss voting legislation, including SB 7, HB 6, and SB 1. Mr. Ingram testified before several

legislative committees, in which he advised legislators, their staff and the committees about the language in the bills. Sept. 22, 2023 Tr. at 1869:13–1870:3.

60.     Samuel Taylor worked as head of communications for the Texas Secretary of State, also referred to as the communications director and "Assistant Secretary of State for Communications" from January 2017 to June 2019, leaving for two years, and again from September 2021 to March 2023. Oct. 18, 2023 Tr. at 4607:11–13. Mr. Taylor testified to that his duties in this role included acting as the spokesperson on behalf of the agency, communicating all agency services to the public and directing voter education. This included a $3.5 million statewide voter education campaign about the SB 1 ID number requirement. This campaign occurred over the course of the 2022 election cycle and involved educational efforts in English, Spanish, and other languages when appropriate. *Id.* at 4608:21–4609:15.

61.     As noted in State Defendants' Designation of Rebuttal Experts, "Professor Graves is the Abraham J. Siegel Professor of Management and a Professor of Operations Management at the Massachusetts Institute of Technology Sloan School of Management. He holds a joint appointment with the MIT Department of Mechanical Engineering. Professor Graves is expected to testify on the impact of SB 1 on the time it takes to vote and the conclusions reached in Dr. Mayer's expert report prepared for Plaintiffs." ECF 347.

62.     As noted in State Defendants' Designation of Rebuttal Experts, "Professor Hoekstra is the Private Enterprise Research Center Rex B. Grey Associate Professor of Economics at Texas A&M University, a Research Fellow at Institute of Labor Economics, and a Research Associate at the National Bureau of Economic Research. Professor Hoekstra is expected to testify on the impact of SB 1 on racial and ethnic minorities, the acceptance and rejection of mail-voting applications and mail ballots, and the conclusions reached in Drs. Hersh, McDaniel, and Grose's expert reports prepared for Plaintiffs." ECF 347.

63.     Defendant Kim Ogg is sued in her official capacity as Harris County District Attorney. By virtue of her position, Defendant Ogg is charged with investigating and prosecuting criminal violations of the Texas Election Code. She is sued for the manner in which she implements

the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 Section 4.06, 4.09, 6.04, and 7.04. Ms. Ogg did not testify at trial.

64.     Defendant John Creuzot is sued in his official capacity as Dallas County District Attorney. By virtue of his position, Defendant Creuzot is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 Section 4.06, 4.09, 6.04, and 7.04. Mr. Creuzot did not testify at trial.

65.     Tacoma Phillips is the Mail Ballot Supervisor with the Dallas County Election Administrator. Sept. 13, 2023 Tr. at 518:8–12. Her duties included supervising the processing of applications for ballot by mail, as well as process mail ballot carrier envelope. *Id.* at 519:4–9. Ms. Phillips testified to the administration of vote by mail in Dallas County before and after the enactment of SB 1 and facts regarding the effect of SB 1 on voters attempting to vote by mail in Dallas County. Ms. Phillips testified that prior to SB 1, the verification process for applications for ballot by mail required extra work and SB 1 made this process easier. *Id.* at 543:2–544:10. Additionally, Ms. Phillips testified that prior to SB 1, her office would verify based on information that was publicly available, but after SB 1, the verification process now includes ID numbers, which are not publicly available. *Id.* at 545:1–6.

66.     Defendant Yvonne Rosales is sued in her official capacity as the District Attorney for the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. By virtue of her position, Defendant Rosales is charged with investigating and prosecuting criminal violations of the Texas Election Code. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 Section 4.06, 4.09, 6.04, and 7.04. Ms. Rosales did not testify at trial.

67.     County Defendant Ricardo Rodriguez. Jr. is sued in his official capacity as Hidalgo County District Attorney. By virtue of his position, Defendant Rodriguez is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose

criminal penalties, including, SB 1 Section 4.06, 4.09, 6.04, and 7.04. Mr. Rodriguez did not testify at trial.

68.     County Defendant José Garza is sued in his official capacity as Travis County District Attorney. By virtue of his position, Defendant Garza is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 Section 4.06, 4.09, 6.04, and 7.04. Mr. Garza did not testify at trial.

69.     County Defendant Isabel Longoria is sued in her official capacity as the former Harris County Elections Administrator, a position she held from November 2020 to July 2022. Sept. 19, 2023 Tr. at 1216:1–2. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the placement and management of drive-thru voting locations, and the determination of hours for early voting locations.

70.     Rachelle Obakozuwa is the Director of Logistics for the Harris County Elections Administrator. She testified about the administration of elections in Harris County after SB 1 including the impact of SB 1's poll watcher provisions. Ms. Obakozuwa testified that Harris County complied with all provisions of SB 1 and that she was unaware of a single voter in Harris County who could not vote in person during the November 2022 General Election because of SB 1. Sept. 19, 2023, Tr. 1204: 6–12.

71.     County Defendant Jacquelyn Callanen is sued in her official capacity as the Bexar County Elections Administrator. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the placement and management of drive-thru voting locations, and the determination of hours for early voting locations.

72.     Jacqueline Callanen is the Elections Administrator for Bexar County. Jacqueline Callanen testified about the administration of elections in Bexar County before and after the enactment of SB 1 and facts regarding the effect of SB 1 on voters in Bexar County. Ms. Callanen testified that she is not aware of anyone in Bexar County who was unable to vote in person during the November 2022 General election because of Senate Bill 1; she stated she considered the November 2022 General election to be a success. Sept. 19, 2023, Tr. at 1105:1–10. Ms. Callanen also stated that voters tend to react negatively when there are changes to election laws, that voters being frustrated or irate about a change is not unusual when it comes to changes in election code, and that the majority of people tend to calm down once they know the rules. She also admitted that one of the reasons people were upset about SB 1 was because of the attention surrounding it, not necessarily the actual provisions themselves. *Id.* at 1119:10–1120:1. Ms. Callanen's most significant criticism of SB 1 was the difficulty of implementation and the lack of time to implement the changes made by the bill. Sept. 11, 2023, Tr. 1121:3–12. Many of the problems she experienced with SB 1 did not stem from the content of the law itself, but with the time available in which to implement it. Sept. 19, 2023, Tr. 1123:14–1124:18.

73.     Michael Scarpello is sued in his official capacity as the Dallas County Elections Administrator. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the placement and management of drive-thru voting locations, and the determination of hours for early voting locations. Mr. Scarpello testified that including his position as Dallas County Elections Administrator, which he has held since December 2020, his experience administering both voter registration and voting spanned over 23 years. Sept. 12, 2023 Tr. at 376:15–21.

74.     Lisa Wise is sued in her official capacity as the El Paso County Elections Administrator. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the

placement and management of drive-thru voting locations, and the determination of hours for early voting locations.

75.     Defendant Dana DeBeauvoir is sued in her official capacity as the former Travis County Clerk. Ms. DeBeauvoir served as Chair of the Elections Committee for the County and District Clerks' Association of the Legislative Committee. Sept. 14, 2023 Tr. at 838:5–18. Ms. DeBeauvoir is sued for her implementation of the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the placement and management of drive-thru voting locations, and the determination of hours for early voting locations. Ms. DeBeauvoir testified that she conducted investigation into election misconduct every election she served as clerk and frequently referred allegations to law enforcement. *Id.* at 856:20–24. Ms. DeBeauvoir stated that every few years, her investigation revealed individuals voting twice. *Id.* at 857:18–19. Among her other responsibilities, Ms. DeBeauvoir stated she managed poll watchers and stated her office always had a positive relationship with poll watchers. *Id.* at 859:16–22. Ms. DeBeauvoir testified she did not believe Section 4.07 of SB 1 was a significant change. *Id.* at 876:17–24. Moreover, she stated that she had no concerns about Section 4.09, *id.* at 878:21–24, never received any questions about it while she was clerk Sept. 14, 2023 Tr. at 878:25–879:2, and was never concerned that anybody in her office was going to be accused of obstructing the view of poll watchers under Section 4.09. *Id.* at 880:6–13.

76.     Bridgette Escobedo is the Director of Elections for Travis County Elections Division. Sept. 21, 2023 Tr. at 1545:18–19. The Travis County Elections Division is a division in the Travis County Clerk's Office, a position she has held since January 2020. *Id.* at 1545:21–25. In this role, Ms. Escobedo supervises 30 staff members. *Id.* at 1546:7–8. Including her prior roles, Ms. Escobedo testified she has 16 years of experience working in elections in Texas. *Id.* at 1546:23–24. Ms. Escobedo testified on the administration of elections in Travis County before and after the enactment of SB 1 and the effects of SB 1 on elections in Travis County.

    **ii.**    OCA-Greater Houston

17

77.     Plaintiff OCA-Greater Houston ("OCA-GH") is a non-partisan civil rights organization which seeks to advocate and advance issues related to the Asian American and Pacific Islander ("AAPI") community, primarily in Harris, Brazoria, and Fort Bend counties. OCA-GH has 19 board members, approximately 160-dues paying members, and several hundred volunteer members who work to fundraise and implement OCA-GH programs throughout the greater Houston area. Sept. 21, 2023 Tr. at 1686:9–20.

78.     These programs include advocacy campaigns, facilitating voting (including by providing rides to the polls and hosting candidate forums), voter registration drives, and advocacy for national and local public policy. As part of its efforts to increase voter participation, OCA-GH engages in and promotes a wide variety of voter registration, voter engagement, voter education, get-out-the-vote, exit polling, and election protection efforts across Greater Houston, including in the Sugar Land region of Fort Bend County. *Id.* at 1685:13–14.

79.     On behalf of REVUP-Texas, OCA-GH challenges Section 5.02, 5.03, 5.07, 5.10, 5.12, and 6.04 of SB 1. Sept. 11, 2023 Tr. at 234:20–234:22. On behalf of the League of Women Voters of Texas and itself, OCA-GH challenges 6.06 and 7.04. *Id.* at 234:24–235:4.

80.     Deborah Chen is the Civic Engagement Programs Director for OCA-Greater Houston (OCA-GH).  She testified on the impact of SB 1 on OCA-GH and its members. Ms. Check joined as a member in 1998, has served on the board of Directors since 1999, and has served as president for the organization. Sept. 21, 2023 Tr. at 1688:24–1689:2. Ms. Chen's duties in her current role include planning, executing, managing, and reporting on all of the organization's civil engagement-related work. *Id.* at 1689:14–17.

**iii.**    League of Women Voters of Texas

81.     Plaintiff League of Women Voters of Texas ("LWVTX") is a traditional membership organization which educates voters and provides training materials on voting. LWVTX also organizes and runs voter registration drives, informs voters of their ability to cast mail ballots, and explains the rules and deadlines related to mail ballots, and educates voters on

issues and candidates on each the ballot. LWVTX has approximately 3,000 members across the state who pay dues to finance the organization's activities.

82. Grace Chimene is the former President of the League of Women Voters of Texas (LWVTX). She testified on behalf of LWVTX regarding the impact of SB 1 on LWVTX and its members. Sept. 21, 2023 Tr. 1577:12–13.

   **iv.** REVUP-Texas

83. Nancy Crowther is a Travis County voter with a disability and member of REVUP-Texas and The Arc of Texas who was designated to testify to the impact SB 1 on voter assistors and voters with disabilities. She did not testify at trial. Bob Kafka testified on behalf of REVUP-Texas.

84. Mr. Kafka is the president and state coordinator of REVUP-Texas. Oct. 11, 2023 Tr. at 3618:15–17. He testified the impact of SB 1 on REVUP-Texas and its members.

85. Plaintiff REVUP-Texas, which stands for "Register, Educate, Vote, Use Power," is a statewide, non-partisan, nonprofit organization. It advocates on issues related to individuals with disabilities through voter registration and assistance, issue advocacy, mobilization, and organizing.

86. Bob Kafka testified on behalf of REVUP-Texas. Mr. Kafka is the president and state coordinator of REVUP-Texas. Oct. 11, 2023 Tr. at 3618:15–17. He testified about internal structure of the organization, as well as the alleged impact of SB 1 on REVUP-Texas and the individuals it classifies as members.

87. REVUP-Texas has a board of directors, but the individuals who comprise of the board are not elected by members. Instead, the existing board of directors elects new board members. Oct. 11, 2023 Tr. at 3630:12–15.

88. REVUP-Texas does not have a concrete membership structure. It has no membership list, no membership dues, and no membership application. Oct. 11, 2023 Tr. at 3630:16–3631:8. According to Mr. Kakfa, the group "consider[s] you a member" "if you're interested in the mission of RevUp." *Id.* at 3620:13–18.**4.**

v.    **HAUL Plaintiff**

a.    **Houston Area Urban League ("HAUL")**

89.    Plaintiff Houston Area Urban League ("HAUL") is a nonpartisan, nonprofit corporation with its principal office in Houston, Texas. Founded in 1968 as a 501(c)(3) agency, Haul advocates for and provides social services for individuals, and through its president, contract employees, and clients, Haul engages in voter registration, education, and other activities with the goal of increasing voter turnout in the Houston area. HAUL does not have members and therefore is only "challenging SB 1 on an organizational basis."  Oct. 3, 2023 Tr. at 2264:15-19.  HAUL challenges Section 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.02, 6.01, 6.03, 6.04, 6.05, and 6.07 of SB 1. Sept. 11, 2023 Tr. 230:22-232:15.

b. **Delta Sigma Theta Sorority Inc**

90.    Plaintiff Delta Sigma Theta Sorority, Inc. is a national, nonpartisan, not-for-profit membership service organization, comprised predominantly of Black women. Delta Sigma Theta sorority engages in civic engagement, voter registration, and voter education campaigns. Oct. 2, 2023 Tr. at 2080:12–16. Delta Sigma Theta Sorority, Inc. challenges Section 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.12, 6.01, 6.03, 6.04, and 6.05 of SB 1.

c. **The Arc of Texas**

91.    Plaintiff The Arc of Texas is a statewide advocacy and membership organization with 6,000 individual members and 27 local member chapters throughout the state of Texas. The Arc of Texas advocates on behalf of individuals with intellectual and developmental disabilities ("IDD"), and focuses on issues including inclusive education, integrated employment, community-based services, and related civil rights for those in the IDD community.

92.    The Arc of Texas provides advocacy training to its members. In 2020, the Arc of Texas provided trainings and social media outreach to its members and the general public on how to register to vote, learn how to access disability accommodations when voting, how to receive assistance when voting, and access the election protection hotline.

93.     The Arc of Texas has participated in Register, Educate, Vote-Use your Power ("REV UP"), a statewide volunteer organization in Texas which prioritizes the voting rights of Texans with disabilities. The Arc of Texas challenges Section 5.02, 5.03. 5.06, 5.07, 5.10, 6.03, 6.04, 6.05, and 6.07 of SB 1.

### d.  Jeffrey Lamar Clemmons

94.     Mr. Clemmons is a resident of Austin, Texas.  Sept. 13, 2023 Tr. at 644:24–25.  He served as an election judge during the 2020 primary election in Texas. *Id.* at 648:14–17. He did not work as an election judge during the 2020 general election because he was "employed with the Travis County Democratic Party." *Id.* at 651:18–23.

95.     As of trial, Mr. Clemmons had not served as an election judge since 2020. When asked why he had not served as an election judge since the 2020 primary, Mr. Clemmons cited a variety of reasons—including SB 1. Sept. 13, 2023 Tr. at 652:21–653:5. But he also stated he did not serve as an election judge during the 2022 primary election because he was moving to Washington and "missed the deadline to register." *Id.*. at 674:12–15.

96.     Mr. Clemmons testified that he was "signed up" to serve as an election judge in the November 2023 elections. Sept. 13, 2023 Tr. at 674:16–23. Mr. Clemmons challenges Section 4.06, 4.07, and 4.09. Sept. 13, 2023 Tr. at 644:3–4.

### i.  MFV Plaintiffs

### b.  Mi Familia Vota

97.     Plaintiff Mi Familia Vota ("MFV") is a national, non-profit civil engagement organization that advocates on behalf of Latino, immigrant, and related communities. MFV's "election related work [] is to educate voters and also to encourage them to participate in elections." Oct. 10, 2023 Tr. at 3426:8–16. As part of that work, MFV's "voter education program is focused on helping people make sure if they are eligible to register to vote" and "checking voter registration status." *Id.* at 3431:10–22. MFV also encourages people to "make a plan to vote" and provides information to facilitate voting. *Id.* at 3431:12-23.

98.     MFV is not a membership organization. Oct. 10, 2023 Tr. at 3467:3–5. MFV challenges Section 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, 4.12, 5.02, 5.03, 5.04, 5.07, 5.08, 5.13, 6.03, 6.04, 6.05, 6.07, 7.02, and 7.04 of SB 1. Oct. 4, 2023 Tr. at 2557:7–25.

### b. Marla Lopez

99.     Marla Lopez is a registered voter who worked for Mi Familia Vota from November 2019 to April 2022 and testified for the organization at trial. Oct. 10, 2023 Tr. at 3371:15–18. She later worked for a state candidate political campaign during the 2022 elections. *Id.* at 3371:14. Ms. Lopez testified about how she and her father used drive-through voting in 2020. *Id.* at 3378:7–12. Ms. Lopez also testified about her experience as an election judge in the 2021 general election. *Id.* at 3383:22–3384:1. Ms. Lopez challenge 3.04, 3.09, 3.10, 3.12, 3.13, and 4.07 of SB 1. Haul 2nd Am. Compl, ECF 199 ¶¶ 67-67.

### c. Marlon López

100.     Marlon López is a registered voter who utilized drive-thru voting in 2020 *Id.* at 3378:7–12 He is the father of Marla Lopez. Mr. López did not testify at trial. Mr. Lopez challenges 3.04, 3.09, 3.10, 3.12, 3.13, and 4.07 of SB 1. Haul 2nd Am. Compl, ECF 199 ¶¶ 67-67.

### d. Paul Rutledge

101.     Paul Rutledge is a registered Texas voter and a resident of Montgomery County, Texas. Although Mr. Rutledge is a named Plaintiff in the MFV Plaintiff group, HAUL 2nd Am. Compl, ECF 199 ¶ 69, Mr. Rutledge did not testify at trial, and no evidence related to his circumstances was introduced.

### ii.     LULAC Plaintiffs

### a. Texas LULAC

102.     Plaintiff LULAC is the Texas chapter of the League of United Latin American Citizens, a civil rights organization. Sept. 21, 2023 Tr. at 1632:4–5. LULAC's mission is to protect the civil and voting rights of Latinos. Sept. 21, 2023 Tr. at 1633:19–21. LULAC has more than 8,000 members across Texas, including registered members. One of LULAC's regular activities

involves voter registration, voter education, and other activities and programs designed to increase voter turnout among its members and their communities. "[E]ducating voters about election law changes is a regular part of LULAC's work." *Id.* at 1665:20–22. LULAC challenges Section 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04 of SB 1. Sept. 11, 2023 Tr. 232:17–233:11.

### b. Voto Latino

103.    Plaintiff Voto Latino is a 501(c)(4) nonprofit organization that works to assist Latino communities across the United States in the voting process. Oct. 11, 2023 Tr. at 3585:23–25. Latino's three primary bodies of work" are "voter registration," "voter turnout," and voter education. Oct. 11, 2023 Tr. at 102:18–103:7. Those efforts have been a regular part of Voto Latino's work since before SB 1 was passed. *Id.* at 115:12–19, 117:18–118:10. Voto Latino does not have members. Oct. 11, 2023 Tr. at 115:19–23. It challenges SB 1 Section 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04. Sept. 11, 2023 Tr. at 232:17–233:11.

### c. American Federation of Teachers (Texas AFT)

104.    Texas AFT is a statewide labor union that represents various public-school employees. Sept. 14, 2023 Tr. at 920:18–20. Texas AFT regularly engages in voter registration and voter turnout activities. Id. at 935:3–936:17. Texas AFT challenges SB 1 Section 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04. Sept. 11, 2023 Tr. at 232:17–233:11.

### d. Texas Alliance for Retired Americans ("TARA")

105.    TARA is a nonprofit organization that focuses on "major issues that affect seniors and retirees." Sept. 22, 2023 Tr. at 1761:6–10. TARA's "parent organization" is the American Federation of Labor and Congress of Industrial Organizations. *Id.* at 1760:24. TARA and its individual members expend resources on voter registration, phone banking, and get-out-the-vote activities, as well as activities with the goal of expanding the Alliance, such as recruiting new members. TARA challenges SB 1 Section 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04.  Sept. 11, 2023 Tr. at 232:17–233:11.

### iii.    LUPE Plaintiffs

### a.   La Unión Del Pueblo Entero (LUPE)

106.   LUPE is a membership organization with members living in Hidalgo, Cameron, Willacy, and Starr Counties.  Sept. 11, 2023 Tr. at 65:19–21. LUPE does "voter education, voter registration, and get out the vote efforts." *Id.* at 70:5–8.  LUPE engages in door-to-door canvassing in order to conduct voter education. *Id.* at 71:22–72:4. Among other things, LUPE's canvassers press its members and other members of the public to vote for particular ballot measures. *Id.* at 71:13–18, 88:2–24. LUPE challenges Section 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB 1. Sept. 11, 2023 Tr. at 230:5–20.

### b. Friendship-West Baptist Church

107.   Plaintiff Friendship-West Baptist Church is a non-partisan religious organization in Dallas that serves a predominantly Black congregation of more than 12,000 members. Friendship-West Baptist Church serves as a polling place, provides voter education, and encourages its congregants and others to register, to vote, and to serve as poll workers. Notably, however, Friendship-West Baptist Church did not identify at trial as a membership organization and did not "identify members who have suffered the requisite harm" to establish injuries in fact. *Summers v. Earth Island Inst*, 555 U.S. 488 at 499 (2009). Those associated with Friendship-West do not pay dues. Oct. 4, 2023 Tr. at 2503:1–2504:10. Friendship West challenges Section 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB 1.

### c.   Texas Impact

108.   Texas Impact is a "membership organization for [Texas's] mainline Protestant, Jewish, and Muslim denominations." Oct. 11, 2023 Tr. at 157:1–2. Texas Impact regularly engages in voter education. *Id.* at 162:24–163:1. It also regularly tries to recruit poll workers. *Id.* at 163:4–5. Texas Impact challenges Section 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB 1. Sept. 11, 2023 Tr. at 230:5–20.

### d. FIEL Houston

109.    FIEL Houston Inc. is a nonprofit organization focuses on helping students in the Greater Houston area "attain higher education." Oct. 4, 2023 Tr. at 2430:23–25. FIEL Houston conducts organizing for the betterment of the communities it serves, including voter registration and education, phone-banking, census outreach, and other advocacy efforts. Oct. 4, 2023 Tr. at 2431:2–5. "[E]ducating its members and the public about voting rules" has been part of FIEL Houston's mission "for a long time." *Id.* at 2469:11–13. FIEL Houston challenges Section 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of SB 1.

### e. Texas Hispanics Organized for Political Education ("Texas HOPE")

110.    Texas HOPE is an organization pursuing "civic engagement, civic education, and outreach" for Hispanics. Oct. 4, 2023 Tr. at 2475:16–19. Texas Hope has approximately 50 members. Id. at 2479:1–4. Texas Hope challenges SB 1 Section 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01.

### f. Plaintiff Mexican American Bar Association of Texas ("MABA-TX")

111.    MABA-TX is a professional association of Latino lawyers located in Texas. Its corporate representative suggested that certain unnamed members of MABA-TX were concerned about prosecution under SB 1's poll watcher and voter-assistance provisions. MABA-TX challenges SB 1 Section 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01.

### g. Southwest Voter Registration Education Project ("SVREP")

112.    SVREP is a nonprofit and non-partisan organization that offered no standing evidence at trial.

### h. Plaintiff William C. Velasquez Institute ("WCVI")

113.    WCVI is a nonprofit and non-partisan public policy analysis organization. It offered no standing evidence at trial.

### i. Jolt Action

114.    Jolt Action is a nonprofit organization that offered no standing evidence at trial.

### j. James Lewin

115.    Plaintiff James Lewin is a Texas voter residing in Austin, Texas. Sept. 13, 2023 Tr. at 551:1–3. Mr. Lewin worked as a deputy election judge during the October 2020 early voting period, and again in the November 2021 election, the 2022 primary election, and the 2022 general election. *Id.* at 551:10–13, 553:4–7.

116.    Mr. Lewin decided to work at the polls because he observed well-intentioned election workers giving voters incorrect information in previous elections. Mr. Lewin wanted to ensure that polling places were staffed with informed workers who could provide correct information and guidance so that eligible voters could properly cast ballots that would count. Sept. 13, 2023 Tr. at 551:1–552:7.

117.    Mr. Lewin testified he had concerns about poll watchers potentially disrupting poll sites. *Id.* Tr. at 559:20–560:6. However, Mr. Lewin testified he has never experienced poll watchers disrupting polling locations. Sept. 13, 2023 Tr. at 561:4–6. Mr. Lewin also testified he is not aware of anyone who has been subject to criminal investigation or prosecuted under SB 1. Sept. 13, 2023 Tr. at 592:3–8. Mr. Lewin challenges Section 4.09 and 8.01 of SB 1. Sept. 13, 2023 Tr. at 550:18–22.

## II.  State Witnesses

### A.  Jonathan White – Chief of the Election Fraud Section

118.    Jonathan White is a licensed attorney who has been employed by the Office of the Attorney General ("OAG") for the State of Texas for approximately 15 years. Oct. 16, 2023 Tr. at 3903:18.

119.    Mr. White first worked in the Criminal Prosecution Division, which encompassed election crimes as part of the White Collar Crime and Public Integrity caseload section. Oct. 16, 2023 Tr. at 3903:12–17.

120.    Mr. White was appointed to the Chief of the Election Fraud Section of the Texas Attorney General's Special Prosecutions Division—ultimately titled the Election Integrity

26

Division—which was created to investigate and prosecute election offenses and pursue justice with regard to those offenses in Texas. Oct. 16, 2023 Tr. at 3905:8–15.

121. As Division Chief, Mr. White investigated and prosecuted a variety of offenses related to voter fraud, including but not limited to ballot harvesting, illegal voting, and illegal ballot assistance. Oct. 16, 2023 Tr. at 3915:1–8.

122. In the course of these responsibilities, Mr. White personally reviewed the original election records, listened to any interviews, and reviewed any evidence of the alleged election offenses before bringing charges. Oct. 16, 2023 Tr. at 3906:4–20.

123. Additionally, Mr. White supervised a group of attorneys, legal assistants, research specialists, and helped guide investigations by identifying factual and evidentiary issues at the investigation phase to determine if it was a viable case. Oct. 16, 2023 Tr. at 3906:4–20.

124. During the 87th Texas Legislature, Mr. White appeared before the House Constitutional Rights & Remedies, Select Committee and the Senate State Affairs Committee, where he testified about SB 1 and its predecessor bills. Oct 16, 2023 Tr. at 4038:20–22.

125. The subject of his legislative testimony examined the type and frequency of election crimes in Texas, the common modus operandi that election crimes followed, and the loopholes that could be closed to better protect vulnerable voters. Oct 16, 2023 Tr. at 3929:12-15.

### B. Keith Ingram – Former Director of Elections

126. Mr. Ingram is a licensed attorney who, after working for three private law firms, worked in Governor Rick Perry's office for approximately four years, after which he transferred to the Secretary of State's Office. Sept. 22, 2023 Tr. at 1866:25–1867:18.

127. When Mr. Ingram joined the Secretary of State's Office in 2012, he was hired as Director of the Elections Division, the most senior position within that division. Sept. 22, 2023 Tr. at 1867:20–25. Mr. Ingram served in this role for over eleven years until he transitioned into special projects. Sept. 22, 2023 Tr. at 1868:2–8. 25; *see also* Oct. 17, 2023 Tr. at 4310:13–14.

128.    Mr. Ingram reported to the Deputy Secretary of State and the Secretary of State. Sept. 22, 2023 Tr. at 1869:1–5. He managed and oversaw the Elections Division, which was roughly 30 employees. *Id*. at 1868:18–23.

129.    As Director of Elections, Mr. Ingram was involved in the development of the advice and assistance the Elections Division provided local election offices. Oct. 17, 2023 Tr. at 4313:14–4314:2. He was also involved in developing the Secretary's interpretation of new legislation. *Id*. at 4314:18–4315:2, 4315:18–24.

130.    Mr. Ingram is therefore familiar with not only the Elections Division's process for developing advice and assistance, but also the substance of the Secretary's guidance, including that issued in response to SB 1. Oct. 17, 2023 Tr. 4314:3–17. Mr. Ingram helped the Secretary prepare for and ultimately implement SB 1. Sept 22, 2023 Tr. at 1869:10–12.

131.    Mr. Ingram testified before multiplel legislative committees, in which he advised legislators, their staff and the committees as a resources witness about elections bills up for consideration in the 87th Legislature. Sept. 22, 2023 Tr. at 1869:13–1870:3.

### C.  Christina Adkins – Director of Elections

132.    Christina Adkins is a licensed attorney employed with the Texas Secretary of State's Office, where she began in the Elections Division as a staff attorney in June of 2012. Her duties included overseeing the certification program for electronic voting system equipment. Sept. 22, 2023 Tr. at 1822:21–1823:6.

133.    In December 2017, Ms. Adkins was promoted to Legal Director of the Elections Division. Oct 18, 2023 Tr. at 4527:19–20. She occupied this position for over six years until March 2023 when she became the Acting Director of Elections. On April 26, 2023, she was officially named Director of Elections. Sept. 22, 2023 Tr. at 1823:7–18.

134.    As Legal Director, Ms. Adkins oversaw the Legal Section in the Elections Division. Her team of attorneys and trainers were responsible for developing and communicating advice and

assistance to election officials, candidates, members of the public, and "anybody that has questions about the laws that pertain to elections in Texas." Oct. 18, 2023 Tr. at 4527:21–6.

135.    To that end, Ms. Adkins and the Legal Section would draft and publish election advisories and election law calendars, conduct web-based trainings, organize and host election law seminars, and answer questions received through the Secretary's informational hotline. Oct. 18, 2023 Tr. at 4528:20–4529:18.

136.    Following the enactment of SB 1, Ms. Adkins helped oversee the law's implementation. She and her team were responsible for updating "every piece of guidance, every handbook, hundreds of prescribed forms, to comport with the requirements of SB 1." Oct. 18, 2023 Tr. at 4549:9–11.

### D. Jacqueline Doyer – Deputy and Legal Director for Forensic Audit Division

137.    Jacqueline Doyer is a licensed attorney who worked as a felony prosecutor for Comal County for approximately seven years. Oct. 17, 2023 Tr. at 4209:8–10.

138.    Ms. Doyer was hired by the Texas Secretary of State to work in the Forensic Audit Division ("FAD") in April 2022. *Id.* at 4209:15–23. In November 2022, Ms. Doyer became the deputy and legal director for the division. *Id.* at 4210:11–12.

139.    The Secretary of State conducted the audit of the 2020 General Election ("the audit") to ensure that Texans had confidence in the election in the state, and that if there were any irregularities that were identified, counties could learn and make improvements and so other counties could learn and also make improvements. *Id.* at 4219:16–22.

140.    The audit was conducted in two phases: phase one was completed prior to Ms. Doyer's employment and phase two began when FAD was created. Oct. 17, 2023 Tr. at 4211:10–13. The audit was 359 pages and encompassed the four largest counties, Collin Dallas, Harris, and Tarrant. *Id.* at 4212:8–13.

141.    As the attorney and deputy director, Ms. Doyer was tasked with was the shaping the audit and was one of the authors of the audit report. *Id.* at 4212:16–19. She testified about its

findings, specifically irregularities the audit identified in Drive-Thru voting and voting by mail. Ms. Doyer also explained how many of the reforms introduced by SB 1 will resolve these problems and thereby improve election integrity.

### E.   Samuel Taylor – Former Assistant Secretary of State for Communications

142.   Samuel Taylor worked as head of communications for the Texas Secretary of State, from January 2017 to June 2019, and again from September 2021 to March 2023. Oct.18, 2023 Tr. at 4607:11–13. His official title was Assistant Secretary of State for Communications.

143.   Mr. Taylor testified that his duties as head of communications included acting as the spokesperson on behalf of the agency, communicating all agency services to the public and directing voter education. Oct. 18, 2023 Tr. at 4608:21-4609:15.

144.   Following SB 1's passage, Mr. Taylor oversaw the $3.5 million statewide voter education campaign designed to educate voters about SB 1's ID Number Requirement. The campaign occurred over the course of the 2022 election cycle and involved educational efforts in English, Spanish, and other languages when appropriate. Oct. 18, 2023 Tr. at 4608:21–4609:15.

145.   Voters with disabilities, along with ethnic and language minorities, were among the subgroups specifically targeted by the education campaign. Oct. 18, 2023 Tr. at 4627:20–4628:6

146.   The voter education campaign "involved primarily paid media, which are traditional TV, radio advertisements purchased, purchasing airtime for those advertisements to run," as well as digital advertisements. Oct. 18, 2023 Tr. at 4613:6–17. The advertisements and materials developed for the campaign were run in both English and Spanish. *Id.*

147.   The campaign involved outdoor advertisements such as billboards, bus stops, gas pump toppers. Oct. 18, 2023 Tr. at 4613:6–17. All advertisements directed voters' attention to 'Vote Texas.Gov,' which contained detailed explanations about how to comply with the new requirements and how to navigate the cure process if necessary. *Id*. at 4613:6–23.

148.   In addition, the vendor hired to implement the campaign conducted a "grassroots tour," which visited community events throughout Texas. Oct. 18, 2023 Tr. at 4613:24–4614:7.

The Secretary conducted research when developing the content for its voter education campaign. Oct. 18, 2023 Tr. at 4631:23–25.

### F. Frank Phillips – Denton County Election Administrator

149.    In addition, the vendor hired to implement the campaign conducted a "grassroots tour," which visited community events throughout Texas. Oct. 18, 2023 Tr. at 4613:24–4614:7. The Secretary conducted research when developing the content for its voter education campaign. Oct. 18, 2023 Tr. at 4631:23–25.

150.    Frank Phillips is the Elections Administrator for Denton County. Oct. 12, 2023 Tr. at 3810:5-7. Mr. Phillips has worked in his current role since 2009. Oct. 12, 2023 Tr. at 3810:16–18. Prior to working for Denton County, Mr. Phillips worked in law enforcement for the Shreveport Police Department, before moving to Texas and working for the Farmer's Branch Police Department in Denton County. Oct. 12, 2023 Tr. at 3811:5–14. Mr. Phillips was also the election administrator for Tarrant County from 2014 to 2016. Oct. 12, 2023 Tr. at 3810:22–25. Overall, Mr. Phillips has worked in Texas elections for 14 years. Oct. 12, 2023 Tr. at 3811:1–2.

151.    In his current position as elections administrator for Denton County, Mr. Phillips' testified that his responsibilities are two-fold. First, as voter registrar, he handles all voter registration matters, and, additionally, as election administrator he manages all elections. Oct. 12, 2023 Tr. at 3811:17–22. Specifically, Mr. Phillips testified that as voter registrar, that means his office registers people to vote, and at the same time cancel their registrations if they move to another county or out of the State. Oct. 12, 2023 Tr. at 3812:3–6. As for his election administrator duties, Mr. Phillips explained his office is the early voting clerk for Denton County, meaning he is responsible to for managing early voting, which includes mail and in-person voting. Oct. 12, 2023 Tr. at 3812:19–25.

152.    Mr. Phillips said his office found election fraud that had occurred during the November 2020 general election. Oct. 12, 2023 Tr. at 113:7–14. Among these instances of election

fraud, Mr. Phillips reported that one Zul Mohammed, a mayoral candidate, had been discovered to have submitted at least 84 fraudulent applications for mail ballot. Oct. 12, 2023 Tr. at 113:15–114:10, 119:16-24.

### III. Texas Election History.

#### A. Election Integrity Has Been Key to Securing the Franchise in Texas.

153.    SB 1 must be understood against the backdrop of election integrity in Texas. For much of the 20th century, private political machines and bosses—many using innocuous names, such as "citizens council" or "Good Voter Council"—engaged in voter slating, intimidation, and related tactics. Oct. 3, 2023 Tr. at 2406:8–2407:2. The intent of these groups was to disenfranchise Texas Latinos and African Americans. *Id.* Political machines defrauded and disenfranchised minority voters by, inter alia, marking ballots for illiterate or non-English-speaking voters. Oct. 4, 2023 Tr. at 2602:20–22. In some places, these practices resisted progress into the 1970s and 80s. Oct. 3, 2023 Tr. at 2406:8–2407:2; Oct. 4, 2023 Tr. at 2604:16–21. Vilma Martinez testified in Congress during the 1970s about an employer who threatened clients and dictated how they should vote. Oct. 3, 2023 Tr. at 2416:4–2417:4.

154.    Texas elections well into the 20th century suffered from ballot box stuffing and fraud. Oct. 4, 2023 Tr. at 2597:3–24. In 2001, mail ballot forgeries led to a state district judge voiding the result of a Dallas city council race. Oct. 5, 2023 Tr. at 2873:9–12. The scheme involved someone, using identical handwriting, repeatedly requesting absentee ballots on behalf of voters who never sought them. *Id.* at 2873:13–18. Such schemes, limited to local elections with small turnout, can alter election results through the manipulation of relatively few mail ballots. *Id.* at 2873:25–2874:4. Another election fraud scandal in a Texas city council race emerged as recently as 2017. *Id.* at 2875:5–7. A single person applied for numerous ballots by mail on behalf of senior citizens. *Id.* at 2875:8–10.

155.    While the parties disagree about whether SB 1 effectively improves election integrity, Plaintiffs' experts concede that the victims of election fraud are disproportionately

32

minorities. Oct. 4, 2023 Tr. at 2597:21–2598:7. Those experts also agree that this history of voting fraud against minorities may inform modern legislative decisions. *Id.* at 2605:4–7.

### A. Modern Texas Voting Laws Reject the Discrimination of the Past.

156.    Racially discriminatory voting practices under Jim Crow are well documented; however, the freedom of voting rights in 2021 stand in stark contrast to the ugly days of the early and mid-20th century. *Id.* at 2600:25–2602:3; 2607:23–2608:8; Oct. 6, 2023 Tr. at 3177:14–19. The history of voting rights in Texas includes improvements in minority voting, a "slow and steady march towards an inclusive democracy." Oct. 4, 2023 Tr. at 2606:17–22.

157.    For example, the use of violence to disenfranchise Latinos in the 1920s simply did not exist when SB 1 was passed. Oct. 3, 2023 Tr. at 2413:6–13. Experts agree that 2021, in the context of voting rights, is not reasonably contemporaneous with the greater part of the 20th century—from 1900 until at least 1960. *Id.* at 2414:1–12. In contrast to conditions prior to the Civil Rights movement of the 1960s, Texas law enforcement has not discouraged Latino voting in the past half century. *Id.* at 2417:5–10.

158.    Moreover, even Plaintiffs' experts acknowledge that legislative discrimination patterns from as recently as the 1970s did not inform the actions of future legislatures. Oct. 4, 2023 Tr. at 2582:1–2583:13. In 2016, there was an enormous upsurge in Texas' Latino population, and in that population's electoral participation. *Id.* at 2618:9–12. By 2020, minority registration and participation in Texas elections was high, and minority candidates held both local and statewide elected positions. *Id.* at 2583:14–21; 2609:5–16; 2610:4-15. The 2020 election was the largest in Texas history by voter turnout. *Id.* at 2619:3–8. Since the passage of SB 1, Texas voter registration has risen by some 20%, rising from 41st in the nation to 27th in terms of voter registration over the course of just three years. *Id.* at 2622:20–2624:6. In raw numbers, Texas' over 13 million registered voters in 2023 was the second highest in the country. *Id.* at 2627:7–9.

159.    Plaintiffs point to the history of objections brought by the U.S. Department of Justice in Texas under Section 5 of the VRA as evidence of discriminatory intent behind SB 1. Oct. 4, 2023 Tr. at 2611:21–2612:9. However, although the United States brought narrow materiality

claims in this case, it alleged no racial discrimination. Plaintiffs' experts note a partisan shift on election integrity in the 21st century; e.g., Democratic State Representative Anchia in 2007 called the lack of voter identification requirement for mail-in voting a "glaring weakness." Oct. 6, 2023 Tr. at 3168:2–11.

## IV. Rules Governing Texas Elections.

### A. Voter Registration.

160.    Like in many states, an individual in Texas must be registered to vote to cast a ballot. Tex. Elec. Code Section 11.001(a)(1), 11.002(a)(6). A person is eligible to register to vote when he or she (1) is 18 years of age or older; (2) is a United States citizen; (3) has not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote; (4) has not been finally convicted of a felony or, if so convicted, must have had his or her sentence fully discharged, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court, or been pardoned or otherwise released from the resulting disability to vote; and (5) is a resident of the county in which application for registration is made. Tex. Elec. Code Section 13.001(a).[1]

161.    In Texas, it is easy for voters to register to vote. Oct. 17, 2023 Tr. at 4337:2–3. A voter may simply request a voter registration form to being the process of registering to vote. Oct. 17, 2023 Tr. at 4337:20–23. The voter may request this voter registration form from the Texas Secretary of State's Office or the local voter registrar, or the voter may pick up the form at a library or other voter registration entity. Oct. 17, 2023 Tr. at 4337:2–4338:5. Indeed, the application form is available both online and at government offices designated as "voter registration agencies," such as the Department of Public Safety and public libraries. Tex. Elec. Code Section 20.001, 20.031. The Secretary of State and county registrars will also, upon request, mail applicants a postage-paid

---

[1] While a person must be 18 years of age or older to be eligible to *register* to vote in Texas, Tex. Elec. Code Section 13.001(a), a person may nonetheless be eligible to *apply* for voter registration as long as the person is at least 17 years and 10 months on the date the registration application is submitted to the registrar and otherwise meets the qualifications to register to vote, *id.* Section 13.001(b).

application form. *Vote.org v. Callanen*, No. 22-50536, 2023 WL 8664636, at *1 (5th Cir. Dec. 15, 2023).

162.    All voter registration applications must contain some general information about the applicant, including (1) the applicant's first name, middle name, if any, last name, and former name, if any; (2) the applicant's date of birth; (3) a statement that the applicant is a United States citizen; (4) a statement that the applicant is a resident of the county; (5) a statement that the applicant has not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote; (6) a statement that the applicant has not been finally convicted of a felony or that the applicant is a felon eligible for registration under Section 13.001; (7) the applicant's residence address or, if the residence has no address, the address at which the applicant receives mail and a concise description of the location of the applicant's residence; (8) if the application is made by an agent, a statement of the agent's relationship to the applicant; and (9) the city and county in which the applicant formerly resided. Tex. Elec. Code Section 13.002(c)(1)–(7), (9)–(10); see also STATE Exhibit 30–31.

163.    Moreover, in line with the federal requirements for voter registration applications created through the Help America Vote Act ("HAVA"), see 52 U.S.C. Section 21083(a)(5)(A), the Texas Election Code requires that voter registration applications include (1) the applicant's Texas driver's license number or the number of a personal identification card issued by the Department of Public Safety; (2) if the applicant has not been issued such a driver's license number or a personal identification card, the last four digits of the applicant's social security number; or (3) a statement by the applicant that the applicant has not been issued a driver's license number, a personal identification card, or a social security number described above, Tex. Elec. Code Section 13.002(c)(8); see also STATE Exhibit 30–31.

164.    Once a person receives and completes the voter registration application, he or she must submit that application. Tex. Elec. Code Section 13.002(a). That application "must be in writing and signed by the applicant." Tex. Elec. Code Section 13.002(b); STATE Exhibit 246 at

27. Notably, if an individual knowingly made a false statement on a voter registration application or requested, commanded, or attempted to induce another person to make a false statement on the application, that person committed a Class B misdemeanor. Tex. Elec. Code Section 13.007 (Sept. 1, 1995).

165.    In Texas, individuals have several ways to submit their registration applications. *Vote.org*, 2023 WL 8664636, at *1. Specifically, an individual may submit their registration application "by personal delivery, by mail, or by telephonic facsimile machine." Tex. Elec. Code Section 13.002(a); see also HAUL-MFV 111 at 3 (listing some ways individuals may register to vote in Texas); STATE Exhibit 229 (explaining that an individual may register to vote when (1) obtaining a Texas driver's license or Texas ID card at the Texas Department of Public Safety; (2) renewing, replacing, or updating his or her Texas driver's license or Texas ID card online; or (3) completing, signing, and sending a voter registration application to the appropriate county voter registrar); STATE Exhibit 246 at 27.

166.    An individual must also submit that application "to the registrar of the county in which person resides." Tex. Elec. Code Section 13.002(a). The voter registrar for the county is usually the county tax assessor-collector, but that could change if the position of county elections administrator is created or if the county clerk is designated as the voter registrar. Tex. Elec. Code Section 12.001. The commissioners court may also designate the county clerk as the voter registrar for the county if the county clerk and county tax assessor-collector agree to the designation. Tex. Elec. Code Section 12.031.

167.    In addition to voter registrars, voter registration agencies "shall provide a voter registration application form to each" qualified individual "in connection with the person's application for initial services" and "any recertification, renewal, or change of address, unless the person declines in writing." Tex. Elec. Code Section 20.031. If the voter utilizes this service, then the voter registration agency must accept the completed registration applications and deliver them to the county registrar. Tex. Elec. Code Section 20.001, 20.035. Counties may also appoint

"volunteer deputy registrars" to distribute and accept applications on the county registrar's behalf. Tex. Elec. Code Section 13.031, 13.038, 13.041.

168.    Once a completed voter registration form is received, most county registrars will enter the person's information directly into the statewide voter registration database, known as the Texas Election Administration Management ("TEAM") system. STATE Exhibit 229 at 3; Oct. 17, 2023 Tr. at 4341:19-4342:1. Other counties—typically the larger counties—will use a third-party vendor to facilitate their voter registration system. Oct. 12, 2023 Tr. at 3812:9–18; STATE Exhibit 229 at 3. When these so-called "off-line counties" use their own third-party vendor, the information included in the third-party vendor's database is communicated or ultimately transferred to the TEAM system to ensure that all the voter registration information is updated in a timely manner in the statewide database. STATE Exhibit 229. In other words, if an off-line county enters the voter registration data into its own registration database, that data is transferred to the TEAM system. Oct. 17, 2023 Tr. at 4342:2–4.

169.    Texas is required to have this TEAM system because HAVA mandates that states maintain an electronic database of the voter registrations in the state and the current status of voter registrations. Oct. 17, 2023 Tr. at 4317:10–16. Specifically, the National Voter Registration Act ("NVRA") and HAVA govern "the process for maintaining voter registration rolls and the standard ways by which individuals can register to vote," and together, they "require states to adopt a computerized statewide voter registration list, create uniform requirements for the locations where individuals should be offered the opportunity to register to vote, and establish the process by which states maintain their voter registration rolls." JOINT-068 at 26.2 HAVA particularly requires each state to implement "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the

---

[2] Page citations refer to the PDF page number, not the document's internal pagination.

State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. Section 21083(a)(1)(A).

170.    Pursuant to these federal laws, the Texas Election Code requires the Texas Secretary of State to "implement and maintain a statewide computerized voter registration list that serves as the single system for storing and managing the official list of registered voters in the state." Tex. Elec. Code Section 18.061. In Texas, the Elections Division of the Texas Secretary of State's Office is the entity that maintains Texas's official voter registration list. Oct. 17, 2023 Tr. at 4317:6-9. And per the Texas Election Code, that voter registration list must "(1) contain the name and registration information of each voter registered in the state; (2) assign a unique identifier to each registered voter; and (3) be available to any county election official in the state through immediate electronic access." Tex. Elec. Code Section 18.061(b). However, the voter registration list does not contain an individual's race or ethnicity. Oct. 4, 2023 Tr. at 2755:9-11; see also STATE Exhibits 30–31, because individuals in Texas do not include their race or ethnicity on their voter registration application, Oct. 4, 2023 Tr. at 2755:4–8, as is the case in thirty-seven out of fifty states. Oct. 4, 2023 Tr. at 2755:16–23. After an individual's registration information is entered into the TEAM system, the county registrar must then review the voter registration form to ensure that it contains the necessary information, Tex. Elec. Code Section 13.071(a), and within seven days of the date the voter registration application was submitted, the registrar must determine whether the application is sufficient. Tex. Elec. Code Section 13.071(b).

171.    During this review, there is also a "live check" process that verifies the individual's driver's license, identification numbers, or partial Social Security number with the Texas Department of Public Safety and the Social Security Administration. STATE Exhibit 229 at 3. This live check process is required by required by HAVA. Oct. 17, 2023 Tr. at 4343:2–13.

172.    If the registrar determines that the voter registration application complies with the Texas Election Code and contains the necessary identification numbers required by HAVA, the registrar shall approve the application. Tex. Elec. Code Section 13.072(a). However, if the registrar determines that the voter registration application does not comply with the legal requirements,

then the registrar shall reject the voter registration application. Tex. Elec. Code Section 13.072(c). If the registrar rejects an applicant's voter registration application, "the registrar shall deliver written notice of the reason for the rejection of an application to the applicant not later than the second day after the date of rejection." Tex. Elec. Code Section 13.073(a). If the registrar rejects a voter registration application in the presence of the applicant, then "the registrar shall orally inform the applicant of the reason for the rejection" at that time. Tex. Elec. Code Section 13.073(b). Finally, "[i]f the rejection is for incompleteness, the registrar shall return the application to the applicant for completion and resubmission." Tex. Elec. Code Section 13.073(b).

173.    The registrar must maintain a file that contains the approved voter registration applications, Tex. Elec. Code Section 13.101(a), a file that contains the rejected applications, Tex. Elec. Code Section 13.102(a), and a separate file that contains the canceled applications, Tex. Elec. Code Section 13.102(b). Each accepted voter registration application must be retained in the file "during the time the registration is effective," Tex. Elec. Code Section 13.101(c), and each rejected or canceled voter registration application must be retained in the file "for two years after the date of rejection or cancellation[.]" Tex. Elec. Code Section 13.102(d). Overall, county voter registrars must maintain a copy of each voter list prepared for each countywide election for 2 years (24 months) after Election Day. LUPE-090 at 40.

174.    In practice, most people in Texas register to vote when they receive a driver's license from the Texas Department of Public Safety and use that information to register to vote or update their voter registration information. Oct. 17, 2023 Tr. at 4336:11–23. Specifically, any time a person has a reason to go to the Texas Department of Public Safety online or in person—such as when the person is obtaining a new driver's license, renewing their driver's license, updating their address, changing their name, or surrendering a driver's license to obtain a personal identification card instead—the person is typically asked whether they would like to use the information they provide to register to vote or to update their voter registration. Id. at 4339:4–19. If the voter agrees to that question on the form, that information is then automatically transmitted to the Texas Secretary of State's Office. Id. at 4339:4–11. That is because the information the voter provides to

the Texas Department of Public Safety is the information that is sent to the Texas Secretary of State's Office. Id. at 4340:18–20. Thus, in addition to registering to vote, a voter may amend or update their voter registration records at the Texas Department of Public Safety as well. Id. at 4340:3–5.

175.     Moreover, as part of maintaining the voter registration list, the NVRA requires each state to increase voter registration while also removing ineligible voters from the voter rolls to keep the rolls "clean." Oct. 17, 2023 Tr. at 4344:6–16. A person might become ineligible to vote if they die, change their address without informing the registrar's office, or become a felon. *Id*. at 4344:17–20. Thus, to maintain voter registration lists, the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—(A) the death of the registrant; or (B) a change in the residence of the registrant." 52 U.S.C. Section 20507(a)(4). The NVRA accordingly means that these so-called "voter purges" are mandated by federal law. Oct. 4, 2023 Tr. at 2628:3–8.

176.     The NRVA then lays out the procedures that a state must follow in order to remove a voter from the voter registration list. Oct. 17, 2023 Tr. at 4346:1–4. For instance, if a voter does not respond to a notice of address confirmation, the NVRA requires that the voter be inactive and remain inactive for two federal elections before he or she may be removed from the voter registration list. *Id*. at 4345:6–15, 4346:7–12; 52 U.S.C. Section 20507(b)(2). If the voter then attempts to vote anytime during that suspense period, that voter may still be able to vote if they fill out a statement of residence that updates their address information. *Id*. at 4345:6–15.

177.     Texas complies with these procedures. Oct. 17, 2023 Tr. at 4346:13–14. In fact, the Texas Election Code states that the Texas Secretary of State "shall monitor each registrar for substantial compliance" "with rules implementing the statewide computerized voter registration list" and with three different Section of the Election Code: Section 15.083, 16.032, and 18.061 and with rules implementing the statewide computerized voter registration list." Tex. Elec. Code Section 18.065(a).

178.    The first provision explains that the Texas Secretary of State "may require the registrar to deliver a copy of the suspense list" to the Texas Secretary of State. Tex. Elec. Code Section 15.083. The suspense list is the responsibility of the registrar, and it includes the name of voters (1) who fail to respond to the registrar's notice that confirms the voter's current residence under section 15.053; (2) whose renewal certificate is returned to the registrar as undeliverable; or (3) "who appears on the list of nonresidents of the county provided to the registrar under Section 62.114, Government Code." Tex. Elec. Code Section 15.081(a).

179.    The second provision generally states that, unless a registered voter's name is deleted from the voter registration list in certain circumstances, "the registrar shall cancel the voter's registration" if the registered voter's name still appears on the suspense list "on November 30 following the second general election for state and county officers that occurs after the date the voter's name [was originally] entered on the suspense list." Tex. Elec. Code Section 16.032.

180.    Finally, as stated above, the third provision requires the Texas Secretary of State to "implement and maintain a statewide computerized voter registration list that serves as the single system for storing and managing the official list of registered voters in the state." Tex. Elec. Code Section 18.061.

181.    In line with federal and state requirements, the Texas Secretary of State removes deceased voters from the rolls, and it sends information to the counties so that the counties may determine whether a voter that falls into a different category of ineligibility may be removed from the voter registration list. Oct. 17, 2023 Tr. at 4343:22–4344:5. Texas has also removed noncitizens from the voter registration rolls. *Id.* at 4346:15–17. Indeed, the Texas Election Code requires the Texas Secretary of State to compare its voter registration list with the list of Texans exempted from jury service because of a lack of citizenship and to "send notice of the determination to the voter registrar." *Id.* at 4353:23–4354:4; Tex. Elec. Code Section 18.068(a) (Sept. 1, 2013).

182.    In the past, however, the Texas Secretary of State has mistakenly challenged a voter registration on the genuine believe that a voter was a noncitizen. Oct 17, 2023 Tr. at 4346:18–21. Specifically, in January of 2019, the Attorney General announced that "about 95,000 individuals

identified by the Department of Public Safety as non-U.S. citizens have a matching voter registration record in Texas, and roughly 58,000 of them have voted in one or more Texas Elections." STATE Exhibit 126 at 2.

183.     But the Texas Secretary of State quickly discovered some issues with the data. Oct. 17, 2023 Tr. at 4347:6–13. Specifically, the actual number turned out to be less than 95,000 but more than zero, STATE Exhibit 126 at 2, so some voters received a notice that their voter registration might have been challenged when it should not have been. *Id*. at 4347:6–13.

184.     This mistake led to litigation. Oct. 17, 2023 Tr. at 4347:14–15. This litigation revealed that the estimate was inflated because the Department of Public Safety had issued driver's licenses to green card holders who subsequently became naturalized citizens. STATE Exhibit 126 at 2.

185.     Ultimately, however, that litigation ended with a settlement agreement. Oct. 17, 2023 Tr. at 4347:16–17. In response to this settlement agreement, the Texas Secretary of State's office changed its procedures. *Id*. at 4348:9–11. Specifically, under the settlement agreement, the Texas Secretary of State could continue its removal of noncitizens from the voter registration list, but if a voter goes to the Texas Department of Public Safety for a driver's license, for example, that voter must prove their citizenship or lawful presence. *Id*. at 4347:18–4348:8. A person is able to indicate a lack of citizenship status in connection with a motor vehicle or the Texas Department of Public Safety because, with the institution of the Real ID Act,[3] a person must show that they are eligible to be a driver in Texas, and that requires a showing of citizenship or non-citizenship with lawful presence. *Id*. at 4349:3–10. The person thus must positively assert that he or she is not a citizen. *Id*. at 4349:11–13.

186.     If the voter proves that he or she is not a citizen, that information is then provided to the Texas Secretary of State's Office, which can then match the information to the voter rolls

---

[3] The REAL ID Act is a federal law that requires states to collect certain documentation before issuing a driver's license or state identification card, including legal status and Social Security number. STATE Exhibit 126 at 2.

and send that information to the counties. Oct. 17, 2023 Tr. at 4347:18–4348:8. Indeed, every week, the Texas Secretary of State's Office receives information about the number and identify of such people, and it compares that information to the voter list to determine whether any of them were previously registered to vote. *Id*. at 4349:14–19. The Texas Secretary of State's Office then sends that information to the counties, which in turn send the voter a notice of examination of citizenship that informs the voter of the need to prove their citizenship within the next thirty days. *Id*. at 4349:20–25.

### B. In-Person Voting.

187.    In Texas, voters may vote by personal appearance on Election Day or during the early voting period. Sept. 19, 2023 Tr. at 1084:11–16. Per the Texas Election Code, "early voting shall be conducted by personal appearance at an early voting polling place and by mail" for each election in Texas. Tex. Elec. Code Section 81.001(a); STATE Exhibit 246 at 44. Texas has an open early voting period, Sept. 19, 2023 Tr. at 1084:17–18, where early voting is available to any voter who is voting in person. Tex. Elec. Code Section 81.001(a). Indeed, "[a]ny qualified voter is eligible for early voting by personal appearance." Tex. Elec. Code Section 82.005; Sept. 19, 2023 Tr. at 1084:19–22 (Ms. Callanen confirmed that anyone can vote during the early voting period, and no excuse is required).

188.    For in-person voting, early voting generally "begins on the 17th day before election day and continues through the fourth day before election day." Tex. Elec. Code Section 85.001(a); STATE Exhibit 246 at 44. But "[f]or a special runoff election for the office of state senator or state representative or for a runoff primary election, the period begins on the 10th day before election day," Tex. Elec. Code Section 85.001(b); STATE Exhibit 246 at 44, and "[f]or an election held on the uniform election date in May and any resulting runoff election, the period for early voting by personal appearance begins on the 12th day before election day and continues through the fourth day before election day," Tex. Elec. Code Section 85.001(e); STATE Exhibit 246 at 44. Moreover, if the prescribed start date for the early voting period is a Saturday, Sunday, or legal state holiday,

then "the early voting period begins on the next regular business day," Tex. Elec. Code Section 85.001(c); STATE Exhibit 246 at 44, and if "it is not possible to begin early voting by personal appearance on the prescribed date, the early voting period shall begin on the earliest date practicable after the prescribed date as set by the authority ordering the election," Tex. Elec. Code Section 85.001(d). These election dates mean that Texas nearly has two weeks of early voting for general elections and primary elections. Sept. 19, 2023 Tr. at 1085:13–17.

36.     The Texas Election Code further requires that "early voting by personal appearance at the main early voting polling place shall be conducted on the weekdays of the early voting period and during the hours that the county clerk' or city secretary's main business office is regularly open for business" when it is "an election in which a county clerk or city secretary is the early voting clerk." Tex. Elec. Code Section 85.005(a) (Sept. 1, 2005). And when that requirement does not apply, then "early voting by personal appearance at the main early voting polling place shall be conducted at least eight hours each weekday of the early voting period that is not a legal state holiday," but if "the territory covered by the election has fewer than 1,000 registered voters," then "the voting shall be conducted at least three hours each day." Tex. Elec. Code Section 85.005(b) (Sept. 1, 2005). Overall, in such an election, "[t]he authority ordering the election, or the county clerk if that person is the early voting clerk, shall determine which hours the voting is to be conducted." Tex. Elec. Code Section 85.005(b) (Sept. 1, 2005).

189.     Notably, however, in a county with a population of 100,000 or more,

1.  the voting in a primary election or the general election for state and county officers shall be conducted at the main early voting polling place for at least 12 hours on each weekday of the last week of the early voting period,

and in a special election ordered by the governor, the voting "shall be conducted at the main early voting polling place for at least 12 hours on each of the last two days of the early voting period." Tex. Elec. Code Section 85.005(c) (Sept. 1, 2005). And if at least fifteen registered voters of a county with a population less than 100,00 submit a written request for such extended voting hours,

then voting shall be conducted in accordance with the above requirements. Tex. Elec. Code Section 85.005(c) (Sept. 1, 2005).

190.    Moreover, "[i]n an election ordered by a city, early voting by personal appearance at the main early voting polling place shall be conducted for at least 12 hours" (1) for "one weekday, if the early voting period consists of less than six weekdays;" or (2) for "two weekdays, if the early voting period consists of six or more weekdays." Tex. Elec. Code Section 85.005(d) (Sept. 1, 2005).

191.    In practice, counties previously had more discretion about when the polls were going to be open during the early voting period. Oct. 3, 2023 Tr. at 2353:11–14. Thus, counties were not required to open polls on the weekends. *Id.* at 2353:15–16. And counties were not required to open the polls for any particular number of hours during the day. *Id.* at 2353:17–21.

192.    For example, during the final week of early voting in 2020, El Paso County did not close any of their polls later than 10:00 p.m., Sept. 12, 2023 Tr. at 348:20–22, 349:18–19, and the earliest that they opened the polls was 7:00 a.m. *Id.* at 349:20–23. Likewise, during the first week of early voting for a midterm election, Denton County typically opened the polls from 8:00 a.m. until 5:00 p.m., and during the second week of early voting, Denton County typically opened polling places from 8:00 a.m. until 5:00 p.m. on the first few days and from 7:00 a.m. until 7:00 p.m. on the last two days. Oct. 12, 2023 Tr. at 3855:15–3856:4.

193.    Relatedly, on Election Day in Texas, the polls must generally "be opened at 7 a.m. for voting and shall be closed at 7 p.m." Tex. Elec. Code Section 41.031(a); STATE Exhibit 246 at 45. However, certain entities "may close the polls before 7 p.m. in an election" if "(1) the entity has fewer than 50 qualified voters; and (2) the number of ballots cast in the election equals the number of qualified voters." Tex. Elec. Code Section 41.033. And while "[v]oting may not be conducted after the time for closing the polls," Tex. Elec. Code Section 41.031(b), "[a] voter who has not voted before the time for closing the polls is entitled to vote after that time if the voter is inside or waiting to enter the polling place at 7 p.m.," Tex. Elec. Code Section 41.032(a). Moreover, "[i]f voters are waiting to enter the polling place at closing time, the presiding judge

shall direct them to enter the polling place and shall close it to others," but "if that procedure is impracticable, at closing time the presiding judge shall distribute numbered identification cards to the waiting voters and permit entry into the polling place for voting after closing time only by those possessing a card." Tex. Elec. Code Section 41.032(b). Overall, "[t]he presiding judge shall take the precautions necessary to prevent voting after closing time by persons who are not entitled to do so." Tex. Elec. Code Section 41.032(c).

194.    Generally, concerning in-person voting in Texas, each commissioners court must "divide all the territory of the county into county election precincts" that are "compact and contiguous." Tex. Elec. Code Section 42.001(a). These county election precincts are the election precincts for (1) the general election for state and county officers; (2) a special election ordered by the governor; (3) a primary election; (4) a countywide election ordered by the commissioners court, county judge, or other county authority, except an election subject to Section 42.062(2); and (5) any other election held by a political subdivision on a uniform election date, as provided by Section 42.0621. Tex. Elec. Code Section 42.002(a).

195.    Per the Texas Election Code, "[e]ach election precinct established for an election shall be served by a single polling place located within the boundary of the precinct." Tex. Elec. Code Section 43.001. This so-called precinct-based voting only allows a voter to vote in their assigned precinct. Sept. 12, 2023 Tr. at 282:20–24.

196.    In contrast to precinct-based voting, countywide voting allows a voter to vote by personal appearance from any polling location in the county. Sept. 12, 2023 Tr. at 282:17–19. Specifically, the Texas Election Code allows each commissioners court to participate in the countywide program "to eliminate county election precinct polling places and establish countywide polling places" for certain elections. Tex. Elec. Code Section 43.007(a) (Sept. 1, 2021). El Paso County, for example, provides countywide voting. *Id.* at 282:15–16. That means a voter in El Paso County can cast his or her ballot at any polling location in the county during the early voting period and on Election Day. *Id.* at 282:25-283:6. Under this countywide voting program, "[e]ach countywide polling place must allow a voter to vote in the same elections in which the voter would

be entitled to vote in the county election precinct in which the voter resides." Tex. Elec. Code Section 43.007(e) (Sept. 1, 2021).

197.    When a county is selecting countywide polling places, the county "must adopt a methodology for determining where each polling place will be located." Tex. Elec. Code Section 43.007(f) (Sept. 1, 2021). In adopting such a methodology, the county must "solicit input from organizations or persons located within the county who represent minority voters." Tex. Elec. Code Section 43.007(h) (Sept. 1, 2021). The county must also ensure that "(1) each county commissioners precinct contains at least one countywide polling place; and (2) the total number of polling places open for voting in a county commissioners precinct does not exceed more than twice the number of polling places in another county commissioners precinct." Tex. Elec. Code Section 43.007(m)(1)–(2) (Sept. 1, 2021).

198.    Moreover, "[t]o the greatest extent possible, countywide polling places shall be located in a precinct where the political party that received the greatest number of votes in the last gubernatorial election is the same political party with which the presiding judge is affiliated." Tex. Elec. Code Section 43.007(n) (Sept. 1, 2021). A county participating in the countywide voting program must also "establish a plan to provide notice informing voters of the changes made to the locations of polling places under the program." Tex. Elec. Code Section 43.007(g) (Sept. 1, 2021). That plan required that "notice of the location of the nearest countywide polling place be posted on election day at each polling place used in the previous general election for state and county officers that is not used as a countywide polling place." Tex. Elec. Code Section 43.007(g) (Sept. 1, 2021). Indeed, "[e]ach countywide polling place must post a notice of the four nearest countywide polling place locations by driving distance." Tex. Elec. Code Section 43.007(o) (Sept. 1, 2021).

199.    There is also a minimum number of polling places required under the countywide program. *See* Tex. Elec. Code Section 43.007(f) (Sept. 1, 2021). Specifically, the total number of countywide polling places may not be less than (1) "50 percent of the number of precinct polling places that would otherwise be located in the county for that election;" or (2) "for an election held

in the first year in which the county participates in the program, 65 percent of the number of precinct polling places that would otherwise be located in the county for that election." Tex. Elec. Code Section 43.007(f)(1)–(2) (Sept. 1, 2021).

200.    Nonetheless, regardless of whether a county is participating in precinct-based voting or countywide voting, "[e]ach polling place shall be located inside a building." Tex. Elec. Code Section 43.031(b) (June 20, 2003). And if it is "practicable," the building "shall be a public building." Tex. Elec. Code Section 43.031(c) (June 20, 2003). A "public building" is defined as "a building owned or controlled by the state or a political subdivision." Tex. Elec. Code Section 43.031(a) (June 20, 2003). However, "[i]f a suitable public building is unavailable, the polling place may be located in some other building." Tex. Elec. Code Section 43.031(d) (June 20, 2003).

201.    In addition, Texas requires that all polling places must be "accessible to and usable by the elderly and persons with physical disabilities." Tex. Elec. Code Section 43.034(a); STATE Exhibit 236 at 1–2. A polling place is accessible when (1) the polling place is "on the ground-level floor or be accessible from the ground-level floor by an elevator with doors that provide an opening of at least 36 inches in width;" (2) "doors, entrances, and exits used to enter or leave the polling place [] have a minimum width of 32 inches;" (3) "any curb adjacent to the main entrance to a polling place [has] curb cuts or temporary nonslip ramps;" (4) "any stairs necessary to enter or leave the polling place [] have a handrail on each side of the stairs and a nonslip ramp;" and (5) the polling place does not have "a barrier that impedes the path of a person with physical disabilities to the voting station," such as gravel, automatically closing gates, closed doors without lever-type handles, or any other barrier. Tex. Elec. Code Section 43.034(a)(1)–(5); STATE Exhibit 236 at 1–2. Polling places further meet such "strict accessibility standards" by having voting systems that are "accessible to voters with physical disabilities and can accommodate no vision, low vision, no hearing, low hearing, limited manual dexterity, limited reach, limited strength, no mobility, low mobility, or any combination of the foregoing (except the combination of no hearing and no vision)." STATE Exhibit 236 at 2. Each polling place also offers at least one type of accessible voting equipment that allows voters with disabilities to vote directly on the system or assist them

in marking the paper ballot. STATE Exhibit 236 at 2. Such voting equipment could include the use of headphones or other assistive devices to help a voter cast their ballot independently and secretly. STATE Exhibit 236 at 2.

202.    In practice, counties take their responsibility under the ADA very seriously. *See, e.g.*, Sept. 12, 2023 Tr. at 308:19–22 (Ms. Wise confirmed that the Paso County Election Administrator's Office works to ensure that its voting program is accessible to votes with disabilities and takes responsibilities under the ADA seriously); Oct. 12, 2023 Tr. at 3861:21–23 (Mr. Phillips agreed that Denton County "[a]bsolutely" takes its responsibilities under the ADA seriously). Indeed, counties work to ensure that its voting program is accessible to voters with disabilities*, see, e.g.*, Sept. 12, 2023 Tr. at 308:15–18 (Ms. Wise admitted that the El Paso County Election Administrator's Office works to ensure that its voting program is accessible to voters with disabilities); Oct. 12, 2023 Tr. at 3861:24–3862:5 (Mr. Phillips confirmed the same), and counties in Texas will not select a polling location for early voting or for Election Day if that location is not compliance with the ADA. *See, e.g.*, Sept. 12, 2023 Tr. at 286:10–17 (Ms. Wise confirmed that, in El Paso County, a location will not be selected as an early polling location or a polling location on Election Day if the location is not ADA compliant); Sept. 12, 2023 Tr. at 444:10–13 (Mr. Scarpello explained that Dallas County conducted an extensive survey of their over 550 locations for ADA access to make sure they are in compliance at polling places with the ADA for in person voting); Oct. 12, 2023 Tr. at 3861:24–3862:5 (Mr. Phillips testified that Denton County ensures each polling site is ADA compliant before using it).

203.    Moreover, "[i]f a voter is physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health," then "an election officer shall deliver a ballot to the voter at the polling place entrance or curb" at the voter's request, Tex. Elec. Code Section 64.009(a) (Sept. 1, 1997); STATE Exhibit 246 at 38, and "[t]he regular voting procedures may be modified by the election officer to the extent necessary to conduct" this so-called curbside voting, Tex. Elec. Code Section 64.009(b) (Sept. 1, 1997); STATE Exhibit 246 at 38. Then, "[a]fter the voter is accepted for voting, the voter shall mark the ballot and give it to the

election officer who shall deposit it in the ballot box." Tex. Elec. Code Section 64.009(c) (Sept. 1, 1997); STATE Exhibit 246 at 38. Moreover, "a person accompanying the voter shall be permitted to select the voter's ballot and deposit the ballot in the ballot box." Tex. Elec. Code Section 64.009(d) (Sept. 1, 1997).

204.    In practice, counties implemented curbside voting by having parking areas reserved for curbside voting at every polling location. *See, e.g.*, Sept. 12, 2023 Tr. at 347:1–22 (Ms. Wise confirmed the implementation of curbside voting in El Paso County); Sept. 14, 2023 Tr. at 827:4–22 (Mr. Garza confirmed the same for Cameron County). But some counties had privacy concerns about voters utilizing curbside voting because multiple would come together and remain in a vehicle. *See, e.g.*, Sept.14, 2023 Tr. at 828:22–829:2 (Mr. Garza agreed that he had privacy concerns about curbside voting and multiple people being in a vehicle together).

205.    In addition to the ADA, counties and election officials must comply with minority language requirements. *See* STATE Exhibit 208; STATE Exhibit 210. These minority language requirements include (1) the translation of bilingual election materials and (2) the appointment of bilingual election clerks. STATE Exhibit 208 at 1–2; STATE Exhibit 210 at 1–2.

206.    In regards to the translation of bilingual election materials, federal law and state law require that all voting materials that are provided in English also be provided in Spanish and any other required minority languages. *See* Tex. Elec. Code Section 272.001; STATE Exhibit 208 at 1–2; STATE Exhibit 210 at 1–2. Generally, Texas law requires bilingual election materials to be used "in each election precinct situated wholly or partly in a county in which five percent or more of the inhabitants are persons of Spanish origin or descent," Tex. Elec. Code Section 272.002,[4] and Texas law extends this requirement to the early voting period, Tex. Elec. Code Section 272.004. Similarly, federal law requires that a state or political subdivision provide voting material in the applicable minority language if more than five percent of its voting-age citizens (or 10,000

---

[4] But "if official census information or other information indicates that persons of Spanish origin or descent comprise less than five percent of the precinct's inhabitants," then an election precinct may be exempted from that bilingual requirement. Tex. Elec. Code Section 272.003(a).

of its voting-age citizens) are members of a designated language minority group and are "limited-English proficient" and if "the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate." 52 U.S.C. Section 10503(b)(1)–(2)(A). These state and federal language requirements apply to instruction posters, ballots, official affidavit forms and other official forms that voter are required to sign in connection with voting, the official application forms for early voting ballots, written instructions furnished to early voting voters, the balloting materials furnished to voters in connection with early voting by mail, registration and voting notices, assistance, and other materials or information relating to the electoral process. Tex. Elec. Code Section 272.005; Tex. Elec. Code Section 272.010; 52 U.S.C. Section 10503(b)(3)(A); 52 U.S.C. Section 10303(f)(4); *see also* STATE Exhibit 208 at 2; STATE Exhibit 210 at 2.

207.    In addition to the translation of voting materials, federal and state law require the appointment of bilingual election clerks. *See* Tex. Elec. Code Section 272.009; 52 U.S.C. Section 10503(b); 52 U.S.C. Section 10303(f)(4); STATE Exhibit 208 at 1; STATE Exhibit 210 at 1. Pursuant to Texas law, the presiding judge "shall make reasonable efforts to appoint a sufficient number of election clerks who are fluent in both English and Spanish to serve the needs of the Spanish-speaking voters of the precinct" when that precinct is "situated wholly or partly in a county in which five percent or more of the inhabitants are persons of Spanish origin or descent." Tex. Elec. Code Section 272.009(a); Tex. Elec. Code Section 272.002. And pursuant to federal law, all assistance relating to the voting process must be provided in English and the applicable minority language. 52 U.S.C. Section 10503(b); 52 U.S.C. Section 10303(f)(4).

208.    Moreover, when a voter is voting in person at a polling location, Texas law mandates that the voter must present some form of identification to an election officer at the polling place. Tex. Elec. Code Section 63.001(b). Specifically, a voter may present a valid form of photo identification, such as (1) "a driver's license, election identification certificate, or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no earlier than four years before the date of presentation;" (2) "a United States military identification card that contains the person's photograph that has not expired or that

expired no earlier than four years before the date of presentation;" (3) "a United States citizenship certificate issued to the person that contains the person's photograph;" (4) "a United States passport book or card issued to the person that has not expired or that expired no earlier than four years before the date of presentation;" or (5) "a license to carry a handgun issued to the person by the Department of Public Safety that has not expired or that expired no earlier than four years before the date of presentation." Tex. Elec. Code Section 63.001(b)(1); Tex. Elec. Code Section 63.0101(a)(1)–(5).

209.    However, if a voter does not meet those identification requirements, then the voter must "execute[] a declaration declaring the voter has a reasonable impediment to meeting the requirement for [such] identification" and provide other documentation to prove identity, such as "(1) a government document that shows the name and address of the voter, including the voter's voter registration certificate;" (2) documents that shows the name and address of the voter, such as a copy of a current utility bill, a bank statement, a government check; or a paycheck; or "(3) a certified copy of a domestic birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity." Tex. Elec. Code Section 63.0101(b)(2)(i); Tex. Elec. Code Section 63.0101(b)(1)–(3).

## C.  Voting Assistance.

210.    Assisting a voter involves "conduct by a person other than the voter that occurs while the person is in the presence of the voter's ballot or carrier envelope," and it includes "(1) reading the ballot to the voter; (2) directing the voter to read the ballot; (3) marking the voter's ballot; or (4) directing the voter to mark the ballot." Tex. Elec. Code Section 64.0321 (Jun. 20, 2003). In essence, voter assistance requires that the assistor interact with the ballot for it to constitute voter assistance. Oct. 18, 2023 Tr. at 4419:25–4420:2. Thus, for example, voter assistance does not include opening the door for a voter in a wheelchair at a polling location, *id.* at 4419:9–12, wheeling a voter with a disability to a polling station or helping position that voter so that he or she could access the voting equipment, *id.* at 4419:13–16, or releasing the strap on the

wheelchair of voter who was struggling to maneuver so that he or she could better access the voting equipment. *Id.* at 4419:17–20. Generally,

> [a] voter is eligible to receive assistance in marking the ballot . . . if the voter cannot prepare the ballot because of: (1) a physical disability that renders the voter unable to write or see; or (2) an inability to read the language in which the ballot is written.

Tex. Elec. Code Section 64.031 (Jan. 1, 1986). In practice, if a voter states that he or she is eligible for assistance, the Texas Secretary of State's Office advises counties that they should accept the representation of the voter. Oct. 18, 2023 Tr. at 4418:16–20. Indeed, a county or an election worker is not permitted to question the voter about whether the voter qualifies for voter assistance, *id.* at 4418:21–23, and they are not permitted to question the voter about the nature of the voter's disability. *Id.* at 4418:24–4419:2.

211.     When a voter requests for assistance in marking his or her ballot, "two election officers shall provide the assistance." Tex. Elec. Code Section 64.032(a) (Jan. 1, 1986); *see also* Sept. 12, 2023 Tr. at 305:16–19 (Ms. Wise confirmed that, if a voter requests assistance to vote, the voter can be provided assistance by the election worker at the polling location). "If a voter is assisted by election officers in the general election for state and county officers, each officer must be aligned with a different political party unless there are not two or more election officers serving the polling place who are aligned with different parties." Tex. Elec. Code Section 64.032(b) (Jan. 1, 1986). Moreover, "[i]f a voter is assisted by election officers, one of them shall read the entire ballot to the voter," but if the voter tells the officer that the voter desires to vote only on certain offices or measures," then "the officer shall read those items on the ballot specified by the voter." Tex. Elec. Code Section 64.033(a) (Sept. 1, 1997).

212.     However, the voter may also "be assisted by any person selected by the voter" as long as it is not "the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." Tex. Elec. Code Section 64.032(c) (Jan. 1, 1986). When a person of the voter's choice is assisting the voter, "an election officer shall enter the person's name and address on the poll list beside the voter's name." Tex. Elec. Code Section 64.032(d)

(Jan. 1, 1986). And "[i]f a voter is assisted by a person of the voter's choice, an election officer shall ask the voter being assisted whether the voter wants the entire ballot read to the voter," and if that is the case, then "the officer shall instruct the person assisting the voter to read the entire ballot to the voter." Tex. Elec. Code Section 64.033(b) (Sept. 1, 1997).

213.    Before a person may provide assistance to a voter, that person must take an oath that is administered by an election officer at the polling place. Tex. Elec. Code Section 64.034 (Sept. 1, 2013); Oct. 16, 2023 Tr. at 3974:4–6 (Mr. White testified that there was an oath of assistance that preexisted SB 1). That oath was under the penalty of perjury, Tex. Pen. Code Section 37.02; Oct. 16, 2023 Tr. at 3974:7–3975:7 (Mr. White explained that the oath of assistance was already under penalty of perjury before SB 1 under other provisions of state law); Oct. 18, 2023 Tr. at 4426:18–20, and it specifically stated:

> "I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs; and I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs."

Tex. Elec. Code Section 64.034 (Sept. 1, 2013).

214.    Notably, in certain circumstances, voter assistance can be unlawful under the Texas Election Code. Oct. 16, 2023 Tr. at 3923:21–3924:3 (Mr. White stated that voter assistance could be unlawful under the Texas Election Code before SB 1). Specifically, a person commits a Class A misdemeanor if the person knowingly (1) "provides assistance to a voter who is not eligible for assistance;" (2) "prepares the voter's ballot in a way other than the way the voter directs or without direction from the voter" while assisting the voter; (3) "suggests by word, sign, or gesture how the voter should vote" while assisting the voter; (4) "provides assistance to a voter who has not requested assistance or selected the person to assist the voter;" or (5) assists the voter as the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which

the voter belongs. Tex. Elec. Code Section 64.036(a)–(b), (d); Tex. Elec. Code Section 64.032(c) (Jan. 1, 1986); Oct. 16, 2023 Tr. at 3924:5–14 (Mr. White confirmed that, prior to SB 1, it was illegal to assist a voter who is not eligible for assistance or did not ask for assistance, to vote a ballot differently than the voter wished or directed, and to suggest to the voter during voting process how the voter should vote). Likewise, an election officer commits a Class A misdemeanor if the election officer "knowingly permits a person to provide assistance[] (1) to a voter who is not eligible for assistance;" or (2) as the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs. Tex. Elec. Code Section 64.036(c)–(d); Tex. Elec. Code Section 64.032(c) (Jan. 1, 1986). It is also the Texas Secretary of State's understanding that pressuring or coercing a voter into choosing someone as an assistor constitutes unlawful assistance. Oct. 18, 2023 Tr. at 4428:15–18; Oct. 16, 2023 Tr. at 3925:4–6 (Mr. White agreed that, prior to SB 1, it was illegal for a person who provide assistance to a voter to try to influence or coerce the voter).

215.    In addition, if a voter is casting a ballot by mail and would be eligible to receive assistance at a polling place, that voter "may select a person as provided by Section 64.032(c) to assist the voter in preparing the ballot." Tex. Elec. Code Section 86.010(a) (Dec. 1, 2017). Such assistance is generally limited to the assistance allowed at the polling place, "except that a voter with a disability who is physically unable to deposit the ballot and carrier envelope in the mail may also select a person as provided by Section 64.032(c) to assist the voter by depositing a sealed carrier envelope in the mail." Tex. Elec. Code Section 86.010(b) (Dec. 1, 2017).

216.    When a person is assisting a voter in the vote-by-mail context, the person "must sign a written oath prescribed by Section 64.034 that is part of the certificate on the official carrier envelope," Tex. Elec. Code Section 86.010(c) (Dec. 1, 2017), and the person must "enter the person's signature, printed name, and residence address on the official carrier envelope of the voter," Tex. Elec. Code Section 86.010(e) (Dec. 1, 2017). Indeed, a space was required to be placed on the reverse side of the official carrier envelope for "entering the signature, printed name, and residence address of a person other than the voter who deposits the carrier envelope in the mail or with a common or contract carrier." Tex. Elec. Code Section 86.013(b)(2) (Sept. 1, 2013). And if

the assistor knowingly fails to sign the oath or enter the required information on the official carrier envelope, then the person commits a state jail felony, Tex. Elec. Code Section 86.010(f)–(g) (Dec. 1, 2017), and "the voter's ballot may not be counted," Tex. Elec. Code Section 86.010(d) (Dec. 1, 2017).

217.    Moreover, a person assisting a voter in the vote-by-mail context commits an offense if the person (1) compensates another person "as part of any performance-based compensation scheme based on the number of voters assisted or in which another person is presented with a quota of voters to be assisted as provided by Section 86.010;" (2) "engages in another practice that causes another person's compensation from or employment status with the person to be dependent on the number of voters assisted as provided by Section 86.010;" or (3) "accepts compensation for an activity described by Subdivision (1) or (2)" "with knowledge that accepting compensation for such activity is illegal." Tex. Elec. Code Section 86.0105(a)(1)–(3). Here, "compensation means any form of monetary payment, goods, services, benefits, or promises or offers of employment, or any other form of consideration offered to another person in exchange for assisting voters." Tex. Elec. Code Section 86.0105(e).

218.    Generally, such an offense constitutes a misdemeanor that is punishable by "(1) confinement in jail for a term of not more than one year or less than 30 days; or (2) confinement described by Subdivision (1) and a fine not to exceed $4,000." Tex. Elec. Code Section 86.0105(b)(1)–(2). However, "if it is shown on the trial of an offense under this section that the defendant was previously convicted two or more times under this section," then an offense under this section is a state jail felony. Tex. Elec. Code Section 86.0105(c).

**D.  Poll Watchers.**

219.    Broadly speaking, a poll watcher is a person appointed "to observe the conduct of an election." Tex. Elec. Code Section 33.001; STATE Exhibit 243 at 2. Poll watchers are appointed by "a candidate, political party, or the proponents or opponents of a measure." Tex. Elec. Code Section 33.001; STATE Exhibit 243 at 2. In practice, poll watchers are appointed by

both Democrats and Republicans. Oct. 12, 2023 Tr. at 3863:24–3864:1. There have also been poll watchers of every race. *Id.* at 3864:12–13. For example, there have been African American poll watchers, *id.* at 3864:2–4, Hispanic poll watchers, *id.* at 3864:5–6, and White poll watchers. *Id.* at 3864:10–11.

220.    To serve as a poll watcher, a person must be a qualified voter. Tex. Elec. Code Section 33.031(a); *see also* STATE Exhibit 243 at 3 (stating that a person must be a registered voter of the county to be eligible for appointment as a poll watcher). Specifically, when an election is primary election or is an election ordered by the governor or a county authority, the person must be a qualified voter "of the county in which the person is to serve." Tex. Elec. Code Section 33.031(a)(1). When an election is ordered by the governor or a county authority that does not cover the entire county of the person's residence, then the person must be a qualified voter "of the part of the county in which the election is held." Tex. Elec. Code Section 33.031(a)(2). Finally, when an election is ordered by an authority of a political subdivision other than a county, the person must be a qualified voter "of the political subdivision." Tex. Elec. Code Section 33.031(a)(3).

221.    When a poll watcher is "appointed to serve at a precinct polling place, a meeting place for an early voting ballot board, or a central counting station," the poll watcher "must deliver a certificate of appointment to the presiding judge at the time the watcher reports for service." Tex. Elec. Code Section 33.051(a) (Sept. 1, 2013); *see also* STATE Exhibit 243 at 3. And when a poll watcher is "appointed to serve at an early voting polling place," the poll watcher "must deliver a certificate of appointment to the early voting clerk or deputy clerk in charge of the polling place when the watcher first reports for service." Tex. Elec. Code Section 33.051(a) (Sept. 1, 2013); *see also* STATE Exhibit 243 at 3.

222.    Generally, if a poll watcher "presents himself or herself at the proper time with a certificate of appointment," then the poll watcher "shall be accepted for service unless the person is ineligible to serve or the number of appointees to which the appointing authority is entitled have already been accepted." Tex. Elec. Code Section 33.051(b) (Sept. 1, 2013). When accepting a poll watcher, "the election officer shall provide the watcher with a form of identification, prescribed by

the secretary of state, to be displayed by the watcher during the watcher's hours of service at the polling place." Tex. Elec. Code Section 33.051(f) (Sept. 1, 2013).

223.    However, a poll watcher "may not be accepted for service if the watcher has possession of a device capable of recording images or sound unless the watcher agrees to disable or deactivate the device." Tex. Elec. Code Section 33.051(c) (Sept. 1, 2013). And "[i]f a watcher is not accepted for service, the certificate of appointment shall be returned to the watcher with a signed statement of the reason for the rejection." Tex. Elec. Code Section 33.051(e) (Sept. 1, 2013).

224.    In general, poll watchers cannot fulfil their role if they are unable to observe election activities. Oct. 12, 2023 Tr. at 3863:16-18. Thus, a poll watcher "is entitled to observe any activity conducted at the location at which the watcher is serving." Tex. Elec. Code Section 33.056(a) (Jan. 1, 1986). Specifically, a poll watcher is entitled (1) "to sit or stand conveniently near the election officers conducting the observed activity," Tex. Elec. Code Section 33.056(a) (Jan. 1, 1986); (2) "to sit or stand near enough to the member of a counting team who is announcing the votes to verify that the ballots are read correctly or to a member who is tallying the votes to verify that they are tallied correctly," Tex. Elec. Code Section 33.056(b) (Jan. 1, 1986); and (3) "to inspect the returns and other records prepared by the election officers at the location at which the watcher is serving," Tex. Elec. Code Section 33.056(c) (Jan. 1, 1986).[5]

225.    A poll watcher is also allowed to make written notes while on duty. Tex. Elec. Code Section 33.056(d) (Jan. 1, 1986). However, before allowing the poll watcher in that instance to leave while the polls are open, "the presiding officer may require the watcher to leave the notes with another person on duty at the polling place, selected by the watcher, for retention until the watcher returns to duty." Tex. Elec. Code Section 33.056(d) (Jan. 1, 1986).

---

[5] *See also* STATE Exhibit 243 at 4 (stating that a poll watcher may observe "[p]olling place activities, including time before and after the polls close;" "[e]arly voting ballot board meeting activities;" "[c]entral counting station activities;" "[c]entral accumulation station activities;" "[s]ignature verification committee activities;" "[v]oter being assisted by an election official;" "[i]nspecting and securing the voting equipment;" and "[d]elivery of election results from polling place").

226.     Moreover, "when a voter is being assisted by an election officer," a poll watcher "is entitled to be present at the voting station" and "is entitled to examine the ballot before it is deposited in the ballot box to determine whether it is prepared in accordance with the voter's wishes." Tex. Elec. Code Section 33.057(a); Sept. 12, 2023 Tr. at 295:13–17 (Ms. Wise agreed that, before SB 1, a poll watcher may be present at the voting station if the voter is being assisted by an election worker). Outside of that one instance, however, a poll watcher may not be present at the voting station, Sept. 12, 2023 Tr. at 295:18–20, and the poll watcher may not watch the voter as the voter is preparing his or her ballot. *Id.* at 295:21–23. Indeed, a poll watcher may not be present at the voting station "when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice." Tex. Elec. Code Section 33.057(b); Sept. 12, 2023 Tr. at 295:24–296:1.

227.     Poll watchers are also prohibited from certain activities while on duty. *See generally* Tex. Elec. Code Section 33.058. For example, when a poll watcher is on duty, the poll watcher may not "(1) converse with an election officer regarding the election, except to call attention to an irregularity or violation of law; (2) converse with a voter; or (3) communicate in any manner with a voter regarding the election." Tex. Elec. Code Section 33.058(a)(1)–(3); *see also* STATE Exhibit 243 at 6 (stating that a poll watcher may not "[t]alk with an election officer regarding the election except to call attention to an irregularity or violation;" "[c]onverse with a voter" "[c]onverse with other watchers;" or "[c]ommunicate in any manner with a voter regarding the election"); Sept. 12, 2023 Tr. at 291:25–292:10 (Ms. Wise testified that poll watchers were not allowed to communicate with voters before SB 1, and they are not permitted to do so now after SB 1). And while a poll watcher "may call the attention of an election officer to any occurrence that the watcher believes to be an irregularity or violation of law and may discuss the matter with the officer," the election officer may then "refer the watcher to the presiding officer at any point in the discussion," and the poll watcher "may not discuss the occurrence further with the subordinate officer unless the presiding officer invites the discussion." Tex. Elec. Code Section 33.058(b).

228.    Notably, a person would commit a Class A misdemeanor "if the person serves in an official capacity at a location at which the presence of watchers is authorized and knowingly prevents a watcher from observing an activity the watcher is entitled to observe." Tex. Elec. Code Section 33.061(a)–(b) (Jan. 1, 1986); Sept. 12, 2023 Tr. at 296:23–25 (Ms. Wise stated that it has been an offense to obstruct a poll watcher even before SB 1); Sept. 12, 2023 Tr. at 480:18–22 (Mr. Scarpello agreed that, before SB 1, a person could not knowingly prevent a poll watcher from observing); Sept. 14, 2023 Tr. at 872:15–19 (Ms. DeBeauvoir confirmed that it was already a crime to obstruct a poll watcher prior to SB 1). Indeed, denying a duly-appointed poll watcher was a criminal offense before SB 1, Oct. 17, 2023 Tr. at 4383:12–14, and the Elections Division of the Texas Secretary of State's Office even advised counties and election workers that failing to accept a duly-appointed poll watcher was a criminal offense. Oct. 17, 2023 Tr. at 4383:15–18.

229.    Nonetheless, "[t]he presiding judge shall preserve order and prevent breaches of the peace and violations of this code in the polling place and in the area within which electioneering and loitering are prohibited." Tex. Elec. Code Section 32.075(a) (May 18, 2013). Thus, if a poll watcher was breaching the peace, the presiding judge had the authority to remove that poll watcher from the polls. Sept. 14, 2023 Tr. at 894:9–13 (Ms. Debeauvoir agreed that there are election law provisions that allow election judges to remove poll watchers for breaching the peace); Oct. 17, 2023 Tr. at 4380:22–4381:5 (Mr. Ingram explained that the previous version of section 32.075 of the Texas Election Code allowed the presiding judge to remove poll watchers who were breaching the peace).

230.    Overall, poll watchers serve a valuable, important role. Sept. 14, 2023 Tr. at 876:25–877:2, 889:20–21. After all, they act as the eyes and ears of the public, observing the election to make sure that all the procedures and chain of custody are followed. *Id.* at 889:13–19.

### E.   Mail-in Voting.

231.    Under Texas law, several categories of qualified voters are permitted to vote by mail: (1) those who expect to be absent during the entire voting period (including the period for in-

person early voting); (2) those who expect to give birth within three weeks of Election Day; (3) those with a disability; (4) those who will be 65 years of age or older on Election Day; (5) those confined in jail; (6) those who are involuntarily committed; and (7) certified participants in Texas's address confidentiality program. Tex. Elec. Code Section 82.001, 82.002, 82.003, 82.004, 82.007, 82.008. Moreover, if an individual is a member of the military, a family member of a member of the military, or an overseas citizen, then that person is eligible to vote by mail if "the person is qualified to vote in this state" or, if not registered to vote in this state, would be qualified if registered." Tex. Elec. Code Section 101.001.

232.    To vote by mail, an eligible individual must first request a mail ballot by submitting an application for ballot by mail ("ABBM") that is "in writing and signed by the applicant." Tex. Elec. Code Section 84.001(a)–(b), (f) (Dec. 1, 2017). That application for ballot by mail "must be submitted by mail to the early voting clerk for the election who serves the election precinct of the applicant's residence." Tex. Elec. Code Section 84.001(d) (Dec. 1, 2017). For a member of the military, a family member of a member of the military, or an overseas citizen, an application must be submitted on an official federal postcard application form ("FPCA") and "include the information necessary to indicate that the applicant is eligible to vote in the election for which the ballot is requested." Tex. Elec. Code Section 101.051. The federal postcard application also requires a voter to sign under the following statement: "The information on this form is true, accurate, and complete to the best of my knowledge. I understand that a material misstatement of fact in completion of this document may constitute grounds for conviction of perjury." STATE Exhibit 32 at 1; *see also* Tex. Elec. Code Section 101.051.

233.    Notably, when an unregistered voter submits a federal postcard application that complies with the applicable requirements, it also constitutes registration by the voter for the purpose of voting in the election for which a ballot is requested and under Title 2 of the Texas Election Code, unless "the person indicates on the application that the person is residing outside the United States indefinitely." Tex. Elec. Code Section 101.055(a)(1)–(2); *see also* Oct. 18, 2023 Tr. at 4581:5–15 (Ms. Adkins testified that such military and overseas voters can register to vote

and request a ballot-by-mail through the federal postcard application, which contains the requirements of a voter registration application and the information necessary for voting by mail). And to use the FPCA as a voter registration, they must "provide the address of the last place of residence of the person in this state or the last place of residence in this state of the person's parent or legal guardian," Tex. Elec. Code Section 101.055(b), and the registrar must then register the person at the address provided, unless "that address no longer is recognized as a residential address, in which event the registrar shall assign the person to an address under procedures prescribed by the secretary of state," Tex. Elec. Code Section 101.055(c).

234.     If a voter requests an application form from the early voting clerk, the early voting clerk must "mail without charge an appropriate official application form." Tex. Elec. Code Section 84.012. The Texas Secretary of State also must "maintain a supply of the official application forms for ballots to be voted by mail and shall furnish the forms in reasonable quantities without charge to individuals or organizations requesting them for distribution to voters." Tex. Elec. Code Section 84.013.

235.     The official form for an application for ballot by mail must include (1) the following statement immediately preceding the signature space: "I certify that the information given in this application is true, and I understand that giving false information in this application is a crime"; (2) a statement informing the voter of the offenses prescribed by Section 84.003 and 84.004; (3) spaces for entering a voter's voter registration number and county election precinct of registration, with a statement informing the voter that failure to furnish that information does not invalidate the application; (4) a space to indicate the date on or after which the voter can receive mail at the address outside the county when a voter is applying on the ground of absence from the county of residence; (5) a space for indicating the fact that a voter whose application is signed by a witness cannot make the voter's mark and a space for indicating the relationship or lack of relationship of the witness to the voter; (6) a space for entering a voter's telephone number, with a statement informing the voter that failure to furnish that information does not invalidate the application; (7) a space or box to indicate that the address to which the ballot is to be mailed is the address of a

facility or relative described by Section 84.002(a)(3), if applicable, when the voter is applying on the ground of age or disability; (8) a space or box to indicate that the address to which the ballot is to be mailed is the address of a relative described by Section 84.002(a)(4) or (7), if applicable, when the voter is applying on the ground of confinement in jail or involuntary civil commitment; (9) a space to indicate if the application is an application under Section 86.0015 when the voter is applying on the ground of age or disability; (10) spaces for entering the signature, printed name, and residence address of any person assisting the voter; (11) a statement informing the voter of the condition prescribed by Section 81.005; and (12) a statement informing the voter of the requirement prescribed by Section 86.003(c). Tex. Elec. Code Section 84.011(a) (Sept. 1, 2021). An official ABBM must also be "at least eight inches by nine inches in size and be printed in at least six-point type." Tex. Elec. Code Section 84.011(b) (Sept. 1, 2021).

236. Nonetheless, an "applicant is not required to use an official application form" to request a mail ballot. Tex. Elec. Code Section 84.001(c). Nonetheless, an application for a ballot by mail must include: (1) the name and the address at which the voter is registered to vote; (2) an indication of the ground of eligibility for early voting; (3) an indication of each election for which the applicant is applying for a ballot; (4) the address where the ballot is to be mailed if the application is requested on the ground of the voter being absent from a voter's county of residence; (5) the address of a hospital, nursing home or other long-term care facility, or retirement center or of a person related to the applicant within a certain degree of consanguinity if the application is requested on the ground of age or disability and if the applicant is living at that address and that address differs from the address at which the applicant is registered to vote; (6) the address of the jail or of a person related to the applicant within a certain degree of consanguinity if the application is requested on the ground of confinement in jail; and (7) the address of the facility operated by or under contract with the Texas Civil Commitment Office or of a person related to the applicant within a certain degree of consanguinity if the application is requested on the ground of involuntary civil commitment. Tex. Elec. Code Section 84.002(a) (Sept. 1, 2021).

237.    When a voter (1) "indicates the ground of eligible [for voting by mail] is age or disability" and (2) "does not specify the election for which a ballot is requested or has been marked by the applicant as an application for more than one election," Texas law allows an individual to apply for what is known as an annual ballot by mail, Tex. Elec. Code Section 86.0015(a), which permits the voter to "apply for ballots for the main election and any resulting runoff election on the same application," Tex. Elec. Code Section 84.001(e) (Dec. 1, 2017).

238.    Likewise, a member of the military, a family member of a member of the military, or an overseas citizen "may apply with a single federal postcard application for a ballot for any one or more elections in which the person is eligible to vote." Tex. Elec. Code Section 101.054(a). Specifically, a federal postcard application "that does not identify the election for which a ballot is requested shall be treated as if it requests a ballot for: (1) except as provided by Subdivision (3), each general election in which the clerk conducts early voting; 2) the general primary election if the application indicates party preference and is submitted to the early voting clerk for the primary; and (3) each general or special election held by a county, a municipality, or an independent school district in the calendar year in which the application is received and in which the person is eligible to vote." Tex. Elec. Code Section 101.054(b).

239.    Further,
"[i]f an [voter] provides a date of birth, driver's license number, or social security number on the [voter's] application for an early voting ballot to be voted by mail that is different from or in addition to the information maintained by the voter registrar in accordance with Title 2,[] the early voting clerk shall notify the voter registrar,"

and "[t]he voter registrar shall update the voter's record with the information provided by the [voter]." Tex. Elec. Code Section 84.014. That same is true for a voter who is a member of the military, a family member of a member of the military, or an overseas citizen. Tex. Elec. Code Section 101.053(b). Indeed, for such voters, "[t]he early voting clerk shall notify the voter registrar of a federal postcard application submitted by an applicant that states a voting residence address located outside the registrar's county." Tex. Elec. Code Section 101.053(a).

240.     Moreover, if a voter cannot sign the application form because of a physical disability or illiteracy, then the application form may be signed for the voter by a witness in the presence of the voter. Tex. Elec. Code Section 1.011(a), (e). In that instance, the voter who cannot sign must affix the voter's mark to the application form to which the witness must attest, and if the voter cannot make the mark, then the witness must state that fact on the application form. Tex. Elec. Code Section 1.011(b). The witness must also include on the application (1) the name of the voter who cannot sign in printed form; (2) the witness's own signature on the application form; (3) the witness's own name near the signature in printed form; and (4) the witness's residence address, unless the witness is an election officer, in which case the witness must state the witness's official title. Tex. Elec. Code Section 1.011(c)–(d). And when an application is signed by a witness that is not the early voting clerk or a deputy, then the application for "must indicate the witness's relationship to the [voter] or, if unrelated, indicate that fact." Tex. Elec. Code Section 84.003(a).

241.     Notably, however, unless a person is related to the voter within the second degree by affinity or the third degree by consanguinity or is registered to vote at the same address as the voter, Tex. Elec. Code Section 84.003(d), that person who knowingly fails to comply with these requirements commits a Class A misdemeanor. Tex. Elec. Code Section 84.003(b)–(c). A person further commits a Class B misdemeanor if he or she (1) "signs an application for a ballot to be voted by mail as a witness for more than one application in the same election;" or (2) "signed an application for annual ballots by mail as a witness for more than one applicant in the same calendar year." Tex. Elec. Code Section 84.004(a).

242.     A person also commits a state jail felony by (1) knowingly providing false information on an ABBM, (2) intentionally causing false information to be provided on an ABBM, (3) knowingly submitting an ABBM without the knowledge or authorization of the voter, or (4) knowingly altering information provided by the voter on an ABBM without the voter's authorization. Tex. Elec. Code Section 84.0041(a)–(b). And unless a person is related to the voter within the second degree by affinity or the third degree by consanguinity or is registered to vote at the same address as the voter, Tex. Elec. Code Section 84.003(d), a person who knowingly fails to

comply with the requirements for signing an application as a witness commits a Class A misdemeanor. Tex. Elec. Code Section 84.003(b)–(c).

243.   A person further commits a Class B misdemeanor if he or she (1) "signs an application for a ballot to be voted by mail as a witness for more than one application in the same election;" or (2) "signed an application for annual ballots by mail as a witness for more than one applicant in the same calendar year." Tex. Elec. Code Section 84.004(a). "Each application signed by the witness in violation of this section constitutes a separate offense," Tex. Elec. Code Section 84.004(d), but this offense "does not affect the validity of an application involved in the offense," Tex. Elec. Code Section 84.004(c). And the only exceptions are when a person signs applications for more than one applicant (1) "as an early voting clerk or deputy early voting clerk;" or (2) "as a parent, grandparent, spouse, child, or sibling" to the additional applicants. Tex. Elec. Code Section 84.004(b).

244.   Once completed, a voter must generally submit an application for ballot by mail via (1) mail; (2) common or contract carrier; (3) telephonic facsimile machine if a machine is available in the clerk's office; (4) electronic transmission of a scanned application containing an original signature; (5) in-person delivery to the early voting clerk; or (6) personal delivery by the jail authority or a designated subordinate of the authority to the early voting clerk if the voter is eligible for mail voting based on confinement in jail. Tex. Elec. Code Section 84.007(a)–(b); Tex. Elec. Code Section 84.008(a); Tex. Elec. Code Section 84.009(a). Such applications generally

> may be submitted at any time in the year of the election for which a ballot is requested, but not later than the close of regular business in the early voting clerk's office or 12 noon, whichever is later, on the 11th day before election day unless that day is a Saturday, Sunday, or legal state or national holiday, in which case the last day is the first preceding regular business day.

Tex. Elec. Code Section 84.007(c). However, for an ABBM submitted by telephonic facsimile machine or electronic transmission to be effective, "the application also must be submitted by mail and be received by the early voting clerk not later than the fourth business day after the

transmission by telephonic facsimile machine or electronic transmission is received." Tex. Elec. Code Section 84.007(b-1). "An application is considered to be submitted at the time of its receipt by the clerk[,]" Tex. Elec. Code Section 84.007(d), and after an election, "[e]ach early voting ballot application shall be preserved" "for the period for preserving the precinct election records," Tex. Elec. Code Section 84.010.

245.    Similarly, for a member of the military, a family member of a member of the military, or an overseas citizen, a federal postcard application "must be submitted to the early voting clerk for the election who serves the election precinct of the applicant's residence," Tex. Elec. Code Section 101.052(a), and it must be submitted via (1) mail; (2) electronic transmission of an image of the application under procedures prescribed by the secretary of state; (3) in-person delivery to the early voting clerk; or (4) common or contract carrier, Tex. Elec. Code Section 101.052(a-1); Tex. Elec. Code Section 84.008(a). A member of the military, a family member of a member of the military, or an overseas citizen may submit a federal postcard application

> at any time during the calendar year in which the election for which a ballot is requested occurs, but not later than the deadline for submitting a regular application for a ballot to be voted by mail for a voter to be entitled to receive a ballot by mail for that election.

Tex. Elec. Code Section 101.052(b). And when a member of the military, a family member of a member of the military, or an overseas citizen otherwise complies with all the applicable requirements, that voter may receive a full mail ballot if (1) the voter "submits a federal postcard application to the early voting clerk on or before the 20th day before election day;" and (2) "the application contains the information required for [voter] registration." Tex. Elec. Code Section 101.052(e); Oct. 18, 2023 Tr. at 4581:5–15 (Ms. Adkins testified that such military and overseas voters can register to vote and request a ballot-by-mail through the federal postcard application, which contains the requirements of a voter registration application and the information necessary for voting by mail).

246.     Then, after receiving a voter's application for ballot by mail, the early voting clerk must review each application. Tex. Elec. Code Section 86.001(a) (Sept. 1, 2013). If the review of the application shows that the voter is entitled to vote by mail, then the clerk shall provide an official mail ballot to the voter, Tex. Elec. Code Section 86.001(b) (Sept. 1, 2013), but if the review shows that the voter is not entitled to vote by mail, then "the clerk shall reject the application, enter on the application 'rejected' and the reason for and date of rejection, and deliver written notice of the reason for the rejection to the [voter] at both the residence address and mailing address on the application[.]" Tex. Elec. Code Section 86.001(c) (Sept. 1, 2013). In that instance, a mail ballot will not be provided to the voter because his or her application was rejected. Tex. Elec. Code Section 86.001(c) (Sept. 1, 2013). Moreover, "[i]f the application does not include the [voter's] correct voter registration number or county election precinct of residence, the clerk shall enter the appropriate information on the application before providing a ballot to the [voter]," Tex. Elec. Code Section 86.001(d) (Sept. 1, 2013), and if the voter "does not have an effective voter registration for the election, the clerk shall reject the application unless the clerk can determine from the voter registrar that the applicant has submitted a voter registration application and the registration will be effective on election day," Tex. Elec. Code Section 86.001(e) (Sept. 1, 2013).

247.     Notably, however, the clerk must mail or otherwise deliver an official application form to a voter if the early voting clerk reviewed an application that was received on or before the 18th day before Election Day and determined that the application did not fully comply with the applicable requirements. Tex. Elec. Code Section 86.008(a) (Sept. 1, 2015). When sending the official application form, the clerk must include (1) a brief explanation of each defect in the noncomplying application; (2) a statement informing the voter that the voter is not entitled to vote an early voting ballot unless the application complies with all legal requirements; and (3) instructions for submitting the second application. Tex. Elec. Code Section 86.008(b)(1)–(3) (Sept. 1, 2015). However, if an application that does not fully comply with the applicable requirements is received after the 12th day before election day and before the end of the period for early voting by personal appearance, then the clerk shall mail or otherwise deliver a notice to the

voter that only includes (1) a brief explanation of each defect in the noncomplying application; (2) a statement informing the voter that the voter is not entitled to vote an early voting ballot unless the application complies with all legal requirements; and (3) a statement that the application was late, if applicable. Tex. Elec. Code Section 86.008(c) (Sept. 1, 2015).

248.    Nonetheless, regardless of any other provision, "the clerk may deliver in person to the voter a second application if the defective original application is timely," and the clerk "may receive, before the deadline, the corrected application in person from the voter." Tex. Elec. Code Section 86.008(d) (Sept. 1, 2015). If used, however, this procedure must be applied uniformly, and the clerk shall enter a notation on the application to indicate any information added by the clerk under this provision. Tex. Elec. Code Section 86.008(d) (Sept. 1, 2015). Further, a poll watcher is entitled to accompany the clerk and observe the procedures under this provision, Tex. Elec. Code Section 86.008(d) (Sept. 1, 2015), and the Texas Secretary of State is permitted to "prescribe any of the procedures necessary to implement this subsection including requirements for posting notice of any deliveries." Tex. Elec. Code Section 86.008(d) (Sept. 1, 2015).

249.    When a ballot is provided to a voter, the early voting clerk shall provide an official ballot envelope and carrier envelope for each ballot. Tex. Elec. Code Section 86.002(a) (Sept. 1, 2021). For each officially prescribed ballot envelope for a mail ballot, the words "Ballot Envelope" must be printed on the face of the envelope. Tex. Elec. Code Section 86.012(a). And as prescribed by the Texas Secretary of States, the official ballot envelope must also contain (1) instructions for marking the ballot and returning the marked ballot to the early voting clerk; (2) the deadline for returning the marked ballot to the clerk; (3) limitations on assistance to the voter; and (4) criminal penalties for unlawful assistance in preparing the ballot. Tex. Elec. Code Section 86.012(b)(1)–(4).

250.    Moreover, for each official carrier envelope, the clerk's official mailing address, the name and official title of the early voting clerk as addressee, and the words "Carrier Envelope for Early Voting Ballot" must be printed on the face of the carrier envelope. Tex. Elec. Code Section 86.013(a) (Sept. 1, 2013). On the reverse side of the official carrier envelope, there must also be spaces that allows voters to (1) indicate the identity and date of the election; and (2) enter

the signature, printed name, and residence address of a person other than the voter who deposits the carrier envelope in the mail or with a common or contract carrier. Tex. Elec. Code Section 86.013(b) (Sept. 1, 2013). The reverse side of the official carrier envelope must also contain a certificate that requires the voter to sign across the flap of the envelope and contains the following information: "I certify that the enclosed ballot expresses my wishes independent of any dictation or undue persuasion by any person." Tex. Elec. Code Section 86.013(c) (Sept. 1, 2013). The oath of a person assisting a voter must be also included on the official carrier envelope as part of this certificate. Tex. Elec. Code Section 86.013(f) (Sept. 1, 2013).

251.    Additionally, as prescribed by the Texas Secretary of State, the reverse side of the official carrier envelope—or a separate sheet accompanying the carrier envelope—must indicate (1) the prohibition against having a carrier envelope returned in an envelope or package containing another carrier envelope; (2) the conditions for delivery by common or contract carrier prescribed by Section 81.005 and 86.006; (3) the requirements for the legal execution and delivery of the carrier envelope, including the prohibition on compensation for depositing carrier envelopes containing ballots voted by other persons under Section 86.0052; (4) the prohibition against having carrier envelopes collected and stored at another location for subsequent delivery to the early voting clerk; and (5) the offenses prescribed by Section 86.006(f) and 86.010(f). Tex. Elec. Code Section 86.013(d)(1)–(5) (Sept. 1, 2013). And by a rule, the Texas Secretary of State must require that a notice informing voters of the toll-free telephone number that allows a person to report an existing or potential abuse of voting rights. Tex. Elec. Code Section 86.013(g) (Sept. 1, 2013); Tex. Elec. Code Section 31.0055. The purpose for this telephone number must be printed on (1) the official carrier envelope; or (2) an insert enclosed with the balloting materials for voting by mail sent to the voter. Tex. Elec. Code Section 86.013(g)(1)–(2) (Sept. 1, 2013).

> If the voter's name appears on the list of registered voters with the notation 'S', or a similar notation, or the residence address on the voter's early voting ballot application is not the same as the voter's residence address on the list of registered voters, the clerk shall provide a form for a statement of residence to the voter.

Tex. Elec. Code Section 86.002(a) (Sept. 1, 2021). But before the clerk provides the balloting materials to the voter, "the clerk shall enter on the carrier envelope the identity and date of the election," Tex. Elec. Code Section 86.002(b) (Sept. 1, 2021), and the clerk shall further enter on the carrier envelope "the voter's name in printed form, a notation that a statement of residence is enclosed, if applicable, and any other information the clerk determines necessary for proper processing of the ballot[.]" Tex. Elec. Code Section 86.002(c) (Sept. 1, 2021). And when a clerk does provide a ballot to the voter, the clerk must indicate "beside the applicant's name on the list of registered voters that a ballot to be voted by mail was provided to the applicant and the date of providing the ballot unless the form of the list makes it impracticable to do so." Tex. Elec. Code Section 86.001(g) (Sept. 1, 2013).

252.    In general, the balloting materials must be provided to the voter by mail because "[a] ballot provided by any other method may not be counted." Tex. Elec. Code Section 86.003(a). Specifically, "the balloting materials shall be addressed to the applicable address specified in the voter's application," Tex. Elec. Code Section 86.003(b), and "the balloting materials must be addressed [to] the address at which the voter is registered to vote, or the registered mailing address if different[.]" Tex. Elec. Code Section 86.003(c). However, if the voter is voting by mail on the ground of being absent from the county of residence, then the balloting materials must be addressed to an address outside the voter's county of residence. Tex. Elec. Code Section 86.003(c)(1). If the voter is voting by mail on the ground of being confined in jail, then the balloting materials must be addressed to the address to the jail or of a specified relative. Tex. Elec. Code Section 86.003(c)(2). If the voter is voting by mail on the ground of age or disability and is living with a specified relative or at a hospital, nursing home, or other long-term care facility, or retirement center, then the balloting materials must be addressed to the address of that facility or relative. Tex. Elec. Code Section 86.003(c)(3). If the voter is voting by mail on the ground of involuntary civil commitment, then the balloting materials must be addressed to the address of the facility or of a specified relative. Tex. Elec. Code Section 86.003(c)(4). And "[i]f the applicable address specified in a voter's application is an address other than that" detailed above, then "the

71

voter's application shall be rejected." Tex. Elec. Code Section 86.003(d). Importantly, "[t]he election officer providing the ballot may not knowingly mail the materials to an address other than that prescribed by this section." Tex. Elec. Code Section 86.003(b). Moreover, "individuals using the Federal Postcard Application may receive their balloting materials by email." Oct. 18, 2023 Tr. at 4582:6–25.

253.     The balloting materials also must generally be mailed to a voter "not later than the seventh calendar day after the later of the date the clerk accepts the voter's application" or "the date the ballots become available for mailing." Tex. Elec. Code Section 86.004(a). However, "if that mailing date is earlier than the 37th day before election day, the balloting materials shall be mailed not later than the 30th day before election day." Tex. Elec. Code Section 86.004(a). And for elections where ballots are sent by email to voters who are a member of a member of the military, a family member of a member of the military, or an overseas citizen, then the balloting materials must be "mailed on or before the later of the 45th day before election day or the seventh calendar day after the date the clerk receives the application" when the voter "indicates on the application for a ballot to be voted by mail or the federal postcard application that the voter is eligible to vote early by mail as a consequence of the voter's being outside the United States." Tex. Elec. Code Section 86.004(b). And "if it is not possible to mail the ballots by the deadline of the 45th day before election day, the clerk shall notify the secretary of state within 24 hours of knowing that the deadline will not be met," and the Texas Secretary of State must then "monitor the situation and advise the clerk, who shall mail the ballots as soon as possible in accordance with the secretary of state's guidelines." Tex. Elec. Code Section 86.004(b).

254.     In addition, if official ballot is changed after the voter has already received the balloting material—and that change affects the choices available to the voter in the election or the validity of the ballot provided to the voter if the ballot is cast—then "the early voting clerk shall mail a corrected ballot and corresponding balloting materials to the voter unless the clerk believes that there is not sufficient time for the voter to timely return the corrected ballot to the clerk." Tex. Elec. Code Section 86.009(a). Before the clerk mails the corrected ballot to the voter,

however, "the clerk shall place a notation on the carrier envelope indicating that the ballot is a corrected ballot being provided" to the voter, and the clerk must "indicate on the voter's application that the voter was provided a corrected ballot." Tex. Elec. Code Section 86.009(c). The clerk must also "prepare a list containing the name of each voter who is provided a corrected ballot" and must "preserve the list for the period for preserving the precinct election records." Tex. Elec. Code Section 86.009(d). And when the clerk ultimately mails the corrected balloting materials, the clerk must include a written notice that contains (1) a brief explanation of the reason for providing another ballot; and (2) an instruction to destroy the defective ballot if it has not already been returned to the clerk. Tex. Elec. Code Section 86.009(b)(1)–(2).

255.    Moreover, if a voter's corrected ballot is timely returned as a marked ballot by the close of the polls on Election Day, then the voter's defective ballot that was timely returned to the clerk as a marked ballot must be treated as a ballot that was not timely returned. Tex. Elec. Code Section 86.009(e)(1). But if the voter's corrected ballot was not timely returned by the close of the polls on Election Day, then the voter's defective ballot that was timely returned to the clerk as a marked ballot must be treated as the voter's ballot for the election. Tex. Elec. Code Section 86.009(e)(2). Likewise, when a member of the military or a family member of a member of the military has their ballot corrected, then that ballot may be also counted if it is timely returned. Tex. Elec. Code Section 86.009(f); Tex. Elec. Code Section 101.057(b); Tex. Elec. Code Section 101.001(2)(A)–(B-1).

256.    When a voter receives the balloting materials, the voter may mark the mail ballot at any time. Tex. Elec. Code Section 86.005(b) (Jan. 1, 2004). But the voter must mark the mail ballot "in accordance with the instructions on the ballot envelope." Tex. Elec. Code Section 86.005(a) (Jan. 1, 2004). Once the voter marks the ballot, "the voter must place it in the official ballot envelope and then seal the ballot envelope, place the ballot envelope in the official carrier envelope and then seal the carrier envelope, and sign the certificate on the carrier envelope." Tex. Elec. Code Section 86.005(c) (Jan. 1, 2004). The carrier envelope generally may not be opened after the voter has sealed it. Tex. Elec. Code Section 86.005(e) (Jan. 1, 2004).

73

257.    The voter then must return the marked ballot in the official carrier envelope to the early voting clerk. Tex. Elec. Code Section 86.006(a) (Dec. 1, 2017). There are several ways a voter may return his or her marked ballot. Oct. 12, 2023 Tr. at 3853:24-3854:4 The carrier envelope may be delivered in another envelope, but it must be delivered by (1) mail; (2) common or contract carrier; or (3) in-person delivery by the voter, as long as the voter delivers the ballot while the polls are open on election and presents an acceptable form of identification. Tex. Elec. Code Section 86.006(a)–(a-1) (Dec. 1, 2017); *see also* October 12, 2023 Tr. at 3853:24-3854:4 (Mr. Phillips testified that a voter may return a marked mail ballot by (1) mailing it back in, (2) turning it in in-person on Election Day, or (2) even surrendering that mail ballot in a polling site during early voting to vote in person instead). Generally, "a carrier envelope may not be returned in an envelope or package containing another carrier envelope," Tex. Elec. Code Section 86.006(b) (Dec. 1, 2017), but "[t]he carrier envelopes of person who are registered to vote at the same address may be returned in the same envelope or package," Tex. Elec. Code Section 86.006(c) (Dec. 1, 2017).

258.    Likewise, a member of the military or a family member of a member of the military may return his or her mail ballot to the early voting clerk by mail, common or contract carrier, or courier. Tex. Elec. Code Section 101.107(b); Tex. Elec. Code Section 101.057(a). However, a military voter is not required to complete a carrier envelope if they have completed a signature sheet. Tex. Elec. Code Section 101.107(b). And "[e]xcept as provided by Chapter 105, the voter may not return the ballot by electronic transmission." Tex. Elec. Code Section 101.107(b). If a ballot is not returned in accordance with these requirements, then the ballot is not timely returned and is not sent to the early voting ballot board for processing. Tex. Elec. Code Section 101.107(c).

259.    Moreover, when voters return their mail ballots in person, an election official in some counties is typically present to take possession of the ballot. *See, e.g.*, Oct. 12, 2023 Tr. at 3854:5-8. Thus, in some counties, mail ballots are not dropped into unattended boxes. Oct. 12, 2023 Tr. at 3854:9-10. That is because some counties have concerns about such drop boxes being unattended and believe that somebody could destroy the drop box. Oct. 12, 2023 Tr. at 3854:21-

3855:8 (Mr. Phillips "adamantly" opposes drop boxes because "all it would take is somebody with a little bit of gasoline" to "torch[] the whole thing").

260.    When a carrier envelope is delivered by a common or contract carrier, it "must be accompanied by an individual delivery receipt for that particular carrier envelope." Tex. Elec. Code Section 86.006(d) (Dec. 1, 2017). That delivery receipt must indicate "the name and residence address of the individual who actually delivered the envelope to the carrier and the date, hour, and address at which the carrier envelope was received by the carrier." Tex. Elec. Code Section 86.006(d) (Dec. 1, 2017). Notably, a voter may not deliver a marked ballot by a common or contract carrier if the delivery originates from the address of (1) an office of a political party or a candidate in the election; (2) a candidate in the election unless the address is the residence of the early voter; (3) a specific-purpose or general-purpose political committee involved in the election; or (4) an entity that requested that the election be held, unless the delivery is a forwarding to the early voting clerk. Tex. Elec. Code Section 86.006(d)(1)–(4) (Dec. 1, 2017).

261.    If a voter returns a marked ballot in violation of these rules, then that ballot "may not be counted." Tex. Elec. Code Section 86.006(h) (Dec. 1, 2017). Specifically, "the clerk shall make a notation on the carrier envelope and treat it as a ballot not timely returned" "[i]f the early voting clerk determines that the ballot was returned in violation of this section." Tex. Elec. Code Section 86.006(h) (Dec. 1, 2017). And "if the ballot is returned before the end of the period for early voting by personal appearance," then the early voting clerk must

> "promptly mail or otherwise deliver to the voter a written notice informing the voter that: (1) the voter's ballot will not be counted because of a violation of this code; and (2) the voter may vote if otherwise eligible at an early voting polling place or the election day precinct polling place on presentation of the notice."

Tex. Elec. Code Section 86.006(h)(1)–(2) (Dec. 1, 2017).

262.    Moreover, if an individual "knowingly possess an official ballot or official carrier envelope [that is] provided under this code to another," then that person has committed an offense. Tex. Elec. Code Section 86.006(f) (Dec. 1, 2017). This offense does not apply to a person who was (1) related to the voter within the second degree by affinity or the third degree by

consanguinity; (2) physically living in the same dwelling as the voter; (3) an early voting clerk or a deputy early voting clerk; (4) a person who possesses a ballot or carrier envelope solely for the purpose of lawfully assisting a voter who was eligible for assistance; (5) an employee of the United States Postal Service working in the normal course of the employee's authorized duties; or (6) a common or contract carrier working in the normal course of the carrier's authorized duties if the official ballot is sealed in an official carrier envelope that is accompanied by an individual delivery receipt for that particular carrier envelope. Tex. Elec. Code Section 86.006(f)(1)–(6) (Dec. 1, 2017). However, those who fall within those specified categories may nonetheless commit an offense if "the person possessed the ballot or carrier envelope with intent to defraud the voter or the election authority." Tex. Elec. Code Section 86.006(f) (Dec. 1, 2017). Such an offense is generally a Class A misdemeanor, but it becomes a third-degree felony if "the defendant possessed the ballot or carrier envelope without the request of the voter." Tex. Elec. Code Section 86.006(g) (Dec. 1, 2017).

263.    Generally, the early voting clerk determines whether the return of a voter's official carrier envelope for a mail ballot is timely. Tex. Elec. Code Section 86.011(a) (Sept. 1, 2011). To be timely, a marked mail ballot must generally arrive at the address on the carrier envelope (1) "before the time the polls are required to close on election day;" or (2) "not later than 5 p.m. on the day after election day, if the carrier envelope was placed for delivery by mail or common or contract carrier before election day and bears a cancellation mark of a common or contract carrier or a courier indicating a time not later than 7 p.m. at the location of the election on election day." Tex. Elec. Code Section 86.007(a) (Sept. 1, 2017); Tex. Elec. Code Section 101.107(d) (the same is true for voters who are members of the military or a family member of a military member). The envelope must also "bear the cancellation mark or receipt mark of a recognized postal service or a receipt mark of a common or contract carrier or a courier indicating a time before the deadline." Tex. Elec. Code Section 86.007(f) (Sept. 1, 2017); Tex. Elec. Code Section 101.107(d) (the same is true for voters who are members of the military or a family member of a military member). The deadline is extended to the next regular business day, however, if the deadline for the arrival of a

mail ballot falls on a Saturday, Sunday, or legal state or national holiday. Tex. Elec. Code Section 86.007(d-1) (Sept. 1, 2017); Tex. Elec. Code Section 101.107(d) (the same is true for voters who are members of the military or a family member of a military member). And a marked mail ballot that arrives after the above timeframe is still timely if (1) "the ballot was cast from an address outside the United States;" (2) "the carrier envelope was placed for delivery before the time" that the polls are required to close on Election Day; and (3) "the ballot arrives at the address on the carrier envelope not later than the fifth day after the date of the election." Tex. Elec. Code Section 86.007(d)(1)–(3) (Sept. 1, 2017); Tex. Elec. Code Section 101.107(d) (the same is true for voters who are members of the military or a family member of a military member).

264.    Moreover, mail ballots that are delivered under subsection (a)(2) or (d) are considered timely if the carrier envelope, or the envelope containing the carrier envelope, "(1) is properly addressed with postage or handling charges prepaid; and (2) bears a cancellation mark of a recognized postal service or a receipt mark of a common or contract carrier or a courier indicating a time before the deadline." Tex. Elec. Code Section 86.007(e)(1)–(2) (Sept. 1, 2017); Tex. Elec. Code Section 101.107(d) (the same is true for voters who are members of the military or a family member of a military member).

86.    "If the early voting clerk cannot determine whether a ballot arrived before the deadline, the ballot is considered to have arrived at the time the place at which the carrier envelopes are deposited was last inspected for removal of returned ballots." Tex. Elec. Code Section 86.007(b) (Sept. 1, 2017); Tex. Elec. Code Section 101.107(d) (the same is true for voters who are members of the military or a family member of a military member).[6]

87.    Generally, "[a] marked ballot that is not timely returned may not be counted." Tex. Elec. Code Section 86.007(c) (Sept. 1, 2017). Indeed, when a mail ballot is not timely returned,

---

[6] In line with this requirement, "[t]he clerk shall check for returned ballots, at least once before the deadline, after the normal delivery time on the last day at the place at which the carrier envelopes are deposited." Tex. Elec. Code Section 86.007(b) (Sept. 1, 2017); *see also* Tex. Elec. Code Section 101.107(d).

then the clerk must enter the time of receipt on the carrier envelope, retain it for the period for preserving the precinct election records, and destroy the unopened envelope and its contents after the preservation period. Tex. Elec. Code Section 86.011(c) (Sept. 1, 2011).

265. But when a carrier envelope for a mail ballot is timely returned, then must enclose "the carrier envelope and the voter's early voting ballot application in a jacket envelope." Tex. Elec. Code Section 86.011(b) (Sept. 1, 2011). That jacket envelope must include (1) a copy of the voter's federal postcard application if the ballot is voted under Chapter 101; and (2) the signature cover sheet, if the ballot is voted under Chapter 105. Tex. Elec. Code Section 86.011(b)(1)–(2) (Sept. 1, 2011).

266. Regardless of these requirements, however, the clerk may nonetheless deliver the carrier envelope in person or by mail to the voter if the clerk receives a timely carrier envelope that does not fully comply with the applicable requirements, and the clerk may receive the corrected carrier envelope from the voter before the deadline. Tex. Elec. Code Section 86.011(d) (Sept. 1, 2011). Tex. Elec. Code Section 86.011(a) (Sept. 1, 2011). The clerk may also notify the voter of the defect by telephone and advise the voter that the voter may come to the clerk's office in person to correct the defect or cancel the voter's application and vote on election day. Tex. Elec. Code Section 86.011(d) (Sept. 1, 2011). If used, however, this procedure must be applied uniformly, and the Texas Secretary of State is permitted to "prescribe any of the procedures necessary to implement this subsection including requirements for posting notice of any deliveries." Tex. Elec. Code Section 86.011(d) (Sept. 1, 2011). Further, poll watchers are entitled to observe these procedures. Tex. Elec. Code Section 86.011(d) (Sept. 1, 2011).

88. To process the early voting by mail results in each election, an early voting ballot board ("EVBB") must be created for the territory served by the early voting clerk. Tex. Elec. Code Section 87.001. The EVBB is comprised of a presiding judge and two other members. Tex. Elec. Code Section 87.002(a) (Sept. 1, 1997). Relevant here, the early voting clerk must deliver to the EVBB, among other things, (1) the jacket envelopes containing the early voting mail ballots and (2)

a ballot transmittal form that includes a statement of the number of early voting mail ballots that are delivered to the EVBB. Tex. Elec. Code Section 87.021(2), (5).

267.     The EVBB must then open each jacket envelope for an early ballot by mail to determine whether to accept the voter's ballot. Tex. Elec. Code Section 87.041(a) (Dec. 1, 2017). A mail ballot will only be accepted if (1) the carrier envelope certificate is properly executed; (2) neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness; (3) the voter's ballot application states a legal ground for early voting by mail; (4) the voter is registered to vote, if registration is required by law; (5) the address to which the ballot was mailed to the voter, as indicated by the application, was outside the voter's county of residence, if the ground for early voting is absence from the county of residence; (6) the statement of residence is returned in the carrier envelope and indicates that the voter satisfies the residence requirements prescribed by Section 63.0011 if the statement of residence form was required to be sent to the voter; and (7) the address to which the ballot was mailed to the voter is an address that is otherwise required by Section 84.002 and 86.003. Tex. Elec. Code Section 87.041(a) (Dec. 1, 2017).

268.     When the EVBB is determining whether the signature on the ballot application or the carrier envelope is from the voter or an appropriate witness, the EVBB may "compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar to determine whether the signatures are those of the voter." Tex. Elec. Code Section 87.041(e) (Dec. 1, 2017). And when making that determination for a voter who is a member of a military, a family member to person in the military, or an overseas citizen, then the EVBB must "compare the signature on the carrier envelope or signature cover sheet with the signature of the voter on the federal postcard application." Tex. Elec. Code Section 87.041(f) (Dec. 1, 2017).

269.     In general, the early voting ballot board may determine whether to accept early voting ballots by mail at any time after the ballots are delivered to the EVBB. Tex. Elec. Code Section 87.0241(a) (Sept. 1, 2021). But the EVBB may not count the mail ballot until (1) the polls

open on election day; or (2) the end of the period for early voting by personal appearance in an election conducted by an authority of a county with a population of 100,000 or more, or conducted jointly with such a county or conducted with such a county through a contract for election services. Tex. Elec. Code Section 87.0241(b)(1)–(2) (Sept. 1, 2021).

270.    In addition to the EVBB, a signature verification committee ("SVC") may be appointed in any election. Tex. Elec. Code Section 87.027(a)–(a-1) (Sept. 1, 2019). If a signature verification committee is appointed for the election, the early voting clerk shall deliver the jacket envelopes containing the early voting mail ballots to the SVC instead of the EVBB. Tex. Elec. Code Section 87.027(h) (Sept. 1, 2019).

271.    Then, the SVC must compare the signature on each carrier envelope certificate with the signature on the voter's ballot application to determine whether the signatures are those of the voter, except if the carrier envelope was signed for a voter by a witness. Tex. Elec. Code Section 87.027(i) (Sept. 1, 2019). The SVC may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar to determine whether the signatures are those of the voter. Tex. Elec. Code Section 87.027(i) (Sept. 1, 2019). Any determination under this subsection that the signatures are not those of the voter must be made by a majority vote of the committee's membership. Tex. Elec. Code Section 87.027(i) (Sept. 1, 2019).

272.    Meanwhile, the EVBB must follow the same procedure for accepting the early voting mail ballots as in an election without a signature verification committee, except that the EVBB may not determine whether a voter's signatures on the carrier envelope certificate and ballot application are those of the same person if the SVC has already determined that the signatures are those of the same person. Tex. Elec. Code Section 87.027(j) (Sept. 1, 2019). And if the SVC has determined that the signatures are not those of the same person, the EVBB may make a determination that the signatures are those of the same person by a majority vote of the board's membership. Tex. Elec. Code Section 87.027(j) (Sept. 1, 2019).

273.    If any of the above requirements are not satisfied, then the voter's ballot must be rejected, and the EVBB must indicate that rejection by entering "rejected" on the carrier envelope and the corresponding jacket envelope. Tex. Elec. Code Section 87.041(d) (Dec. 1, 2017). And if a person intentionally accepts a ballot for voting or causes a ballot to be accepted for voting that the person knows does not meet the above requirements, that person commits a Class A misdemeanor. Tex. Elec. Code Section 87.041(g) (Dec. 1, 2017).

274.    Moreover, when a ballot is rejected, then the presiding judge of the EVBB must deliver written notice of the reason for the rejection to the voter at the residence address on the ballot application not later than the 10th day after Election Day. Tex. Elec. Code Section 87.0431(a) (Dec. 1, 2017). Likewise, "[i]f the ballot was transmitted to the voter by e-mail under Subchapter C, Chapter 101, [] the presiding judge shall also provide the notice to the e-mail address to which the ballot was sent." Tex. Elec. Code Section 87.0431(a) (Dec. 1, 2017). And the early voting clerk must deliver notice to the Office of the Attorney General when any ballot is rejected because (1) the voter was deceased; (2) the voter already voted in person in the same election; (3) the signatures on the carrier envelope and ballot application were not executed by the same person; (4) the carrier envelope certificate lacked a witness signature; or (5) the carrier envelope certificate was improperly executed by an assistant. Tex. Elec. Code Section 87.0431(b) (Dec. 1, 2017).

275.    Prior to SB 1, there was not a method for the voter to correct their mail ballot. Sept. 12, 2023 Tr. at 329:1–9. Thus, if the county received a mail ballot that did not have the signature, the voter could not correct that defect. *Id*. at 329:1–4. And if the county received a mail ballot where the EVBB determined the signature to not be the signature of the voter, then the voter could not correct the issue. *Id*. at 329:5–9.

### F.  Straight-Ticket Voting.

276.    Straight-ticket or straight-party voting occurs when a voter can "cast a vote for all the nominees of one party [] by placing an 'X' in the square beside the name of the party of [the voter's] choice." Tex. Elec. Code Section 52.071(b), *repealed by* Act of May 20, 2017, 85th Leg.,

R.S., ch. 404, Section 8, 2017 Tex. Gen. Laws 1081, 1083. Stated differently, "[s]traight-ticket voting 'allows a voter to vote for all candidates of their desired political party by making a single mark designating the selection of that political party, rather than voting for each partisan candidate individually.'" *Bruni v. Hughs*, 468 F. Supp. 3d 817, 820 (S.D. Tex. 2020) (quoting *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 660 (6th Cir. 2016)); Oct. 3, 2023 Tr. at 2365:1-3 (Ms. Ramon admitted that "straight-ticket voting is the ability to select all of the parties' candidates on a ballot at once").

277.     In 2017, in the 85th Regular Session, the Texas Legislature enacted House Bill 25 HB 25"). STATE Exhibit 317 at 1; STATE Exhibit 318. HB 25 eliminated straight-ticket voting in Texas elections. *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 670 (5th Cir. 2022); STATE Exhibit 317 at 1; STATE Exhibit 318; Oct. 2, 2023 Tr. at 2122:6–9 (Ms. Brown admitted that the Texas Legislature ended the practice of automatic straight-ticket voting in 2017); Oct. 3, 2023 Tr. at 2213:16–21 (Ms. Watkins Jones was aware that straight-ticket voting ended in 2017); Oct. 17, 2023 Tr. at 4370:23–4371:1 (Mr. Ingram testified that the Texas Legislature eliminated straight-ticket voting in 2017).

278.     HB 25 also amended the Texas Election Code to require the publication of certain notices regarding this change in the law. STATE Exhibit 317 at 1. HB 25 was signed on June 1, 2017, and it became effective three years later on September 1, 2020. *Texas All. for Retired Americans*, 28 F.4th at 670; STATE Exhibit 317 at 1; STATE Exhibit 318 at 5; Oct. 2, 2023 Tr. at 2122:12–14 (Ms. Brown admitted that, as part of H.B. 25, automatic straight-ticket voting was not permitted in the 2020 election); Oct. 3, 2023 Tr. at 2274:9–16 (Mr. Shackelford testified that straight-ticket voting "was not legal in 2020"); Oct. 3, 2023 Tr. at 2365:4–5 (Ms. Ramon agreed that straight-ticket voting is not allowed under Texas law); Oct. 17, 2023 Tr. at 4371:2–6 (Mr. Ingram explained that the law eliminating straight-ticket voting took effect before the 2020 election).

279.     On March 5, 2020, several plaintiffs—Sylvia Bruni ("Ms. Bruni"), an elected official for the Webb County Democratic Party; the Democratic Senatorial Campaign Committee

("DSCC"); the Democratic Congressional Campaign Committee ("DCCC"); the Texas Democratic Party; and Jessica Tiedt, a candidate for District 20 of the Texas House of Representatives—sued the Texas Secretary of State to challenge HB 25. *See* Amended Compl., *Bruni v. Hughs*, 468 F. Supp. 3d 817 (S.D. Tex. 2020) (5:20-CV-35), ECF No. 16. Plaintiffs specifically argued that HB 25 would cause "longer lines at polling-places, increased roll-off at polling-places, voter confusion at polling-places, and less turnout from Democratic-party voters at polling-places." *Bruni*, 468 F. Supp. 3d at 819. In response to this lawsuit, the Texas Secretary of State filed a motion to dismiss on the grounds that the plaintiffs lacked standing. *Id.* at 820; Motion to Dismiss, *Bruni v. Hughs*, 468 F. Supp. 3d 817 (S.D. Tex. 2020) (5:20-CV-35), ECF No. 32. The district court the dismissed all of plaintiffs' claims for lack of Article III standing. *Bruni*, 468 F. Supp. 3d at 820.

280.    Then, on August 12, 2020, the Texas Alliance for Retired Americans ("TARA")—along with the plaintiffs from the first lawsuit (*i.e.*, DSCC, DCCC, and Ms. Bruni)—challenged HB 25 on similar grounds: that it would lengthen polling lines and burden voting rights. *Texas All. for Retired Americans*, 28 F.4th at 670; Sept. 22, 2023 Tr. at 1778:11–14 (Ms. Judy Bryant admitted that TARA was a plaintiff in this 2020 lawsuit that sought to invalidate straight-ticket prohibitions in Texas). As part of this lawsuit, TARA and the other plaintiffs originally obtained a preliminary injunction prohibiting straight-ticket voting in Texas. Sept. 22, 2023 Tr. at 1779:6–10. Ultimately, however, the Fifth Circuit reversed the preliminary injunction and ruled against TARA and the other plaintiffs in that case. Sept. 22, 2023 Tr. at 1778:15–17; 1779:6–10; *see generally Texas All. for Retired Americans*, 28 F.4th at 670. Accordingly, straight ticket voting was eliminated before SB 1. Oct. 3, 2023 Tr. at 2365:6–13.

V.    **Problems with Texas Election in Modern Era.**

A.    **Mail-in Voting Susceptible to Voter Fraud.**

i.    **Vote Harvesting Seeks to Exploit Vulnerabilities in the Election Code.**

281.     Mr. Jonathan White, the former chief of the Attorney General's Election Integrity Division, testified that "'vote harvesting,' sometimes known as 'mail ballot fraud,' is a process where, you know, typically, campaign workers are paid operatives, proliferate mail ballots through applications for mail ballot, and then go back to collect those ballots from a voter and ensure that those are voted for the candidate." Oct. 16, 2023 Tr. at 3915:9–18. There are two parts of vote harvesting.

> The first part we would refer to as -- or it's commonly referred to as the "seeding phase," and that's the part where you would generate applications for mail ballots in your targeted precincts. And that really sets the stage for the second part of the process, but that also is the number of ballots that are generally going to be in play. And during the harvesting phase, you would go back to collect those ballots and get those voted for the candidate that you are supporting, and you would get some percentage of what you seeded. Oct. 16, 2023 Tr. at 3915:15–3916:6.

282.     When describing the "seeding phase," Mr. White testified

> I mean, it's a pretty simple process. It's just a -- I mean, the application for ballot-by-mail or mail ballot application is -- you know, it just requires basic information about the voter and the voter's signature, check boxes for which elections you are requesting mail ballots for. Contains the eligibility criteria for getting a mail ballot. And so if you're working this process from a vote-harvesting perspective, you know, you have two basic choices. One is you could actually forge those applications if you wanted to, but it isn't that difficult to go door-to-door if you're willing to do the work, talk to voters, and have them sign up for mail ballots if they are eligible. Oct. 16, 2023 Tr. at 3916:7–20.

283.     The seeding phase pertains to the application for ballot-by-mail, and the harvesting phase pertains to the actual ballot itself. Oct. 16, 2023 Tr. at 3916:21–24.

284.     Mr. White testified that a common fact pattern observed during the seeding phase that election officials could look for was when

> the same person (was) filling out applications for mail ballots for voters so that you know that there's some sort of coordinated activity going on here. You don't know exactly what at this point, but you -- similar handwriting would point out the fact that you're dealing with folks that are signing up multiple individuals to vote by mail.
>
> Oct. 16, 2023 Tr. at 3917:1–12.

285.    Another thing that might indicate mail ballot fraud were mismatches between the signature on the application for ballot by mail and the signature on the mail ballot's carrier envelope. Oct. 16, 2023 Tr. at 3917:13–20. Elections Offices also "have possession of prior signatures from a voter [that] could be compared if they felt like doing that at the application process." *Id.* at 3922:23–3923:7. Mr. White testified that another red flag for mail ballot fraud was where the text required from the voter is provided in a typed form or computer-entered form. *Id.* at 3918:14–23. "These would be atypical for something that would actually be filled out by a voter, but we would look for, you know, if these were all coming from the same precinct in large numbers, then that could be evidence that there was some organized, you know, vote-harvesting effort there." *Id.* at 3918:11–23.

286.    Mr. White testified that yet another red flag for mail ballot fraud was "frequent flyer (voter) assistance." *Id.* at 3919:3-10. Mr. White, describing three past vote-harvesting investigations, elaborated that "if you would have looked through the rest of the records, you would have seen this name, address, signature, appear dozens, and in some cases hundreds, of times. The ones in the center was, like, 700." *Id.* at 3919:1–10. Mr. White described that such frequent flyer assistors would be unrelated to the voter: "We would only be looking for those folks that appears dozens or hundreds of times, and that's what we're communicating to the election officials." *Id.* at 3919:1–18. Mr. White defined the "harvesting phase" of vote harvesting as "paid operatives going out during the early voting period and filling out and collecting mail ballots from voters to ensure that those votes are cast for certain candidates." *Id.* at 3920:22–3921:3. On being asked whether vote harvesting was illegal prior to SB 1, Mr. White answered, "[m]ost of the key activities that comprise vote harvesting were prohibited under the Election Code before, yes." *Id.* at 3921:4–6.

## B.  Ballot Harvesting Was Illegal Prior to SB 1's Section 7.04

287.    Mr. White explained the legal framework that would have made vote harvesting illegal prior to SB 1 as follows:

Starting at the application phase, Section 84.0041 addresses fraud with regard to mail ballot applications. Chapter 64.036, Unlawful Assistance, prohibits voters from being told how to vote or influenced during the voting process. Chapter 273 -- I'm sorry -- 276.013 also prohibits the influencing of a voter during the voting process, and Chapter 86.0051 and 86.010 govern the handling of mail ballots and prohibit a person from possessing a mail ballot except under certain conditions, and if certain conditions are met; as well as Chapter 86.006, which prohibits of the possession of a ballot.

Oct. 16, 2023 Tr. at 3921:7–20.

288.    Chapter 276.013 is "sort of a broader provision, which is designed to prohibit influencing a voter during the voting process, causing a voter to register, obtain a ballot or vote under false pretenses, or intentionally making a misleading statement or false statement to election officials." Oct. 16, 2023 Tr. at 3926:16–24. Prior to SB 1, it was unlawful to influence the independent exercise of the vote of another in the presence of a ballot or during the voter process. SB 1 did not change that. *Id*. at 3927:21–3928:3. Prior to SB 1, it was already a violation of 276.013 to alter the ballot of another to not reflect the intent of the voter. *Id*. at 3928:4–11. SB 1 reduced the type of offense for violating 276.013 from a Class A misdemeanor to a Class B misdemeanor for "potentially a lot of it, or all of it." *Id*. at 3928:16–3929:1 SB 1's Section 7.03 elevated the level of offense if the defendant in such a case were an elected official. *Id*. at 3929:2–5.

### C. Vote-Harvesting Follows Common Fact Patterns

289.    Mr. White agreed that it was his opinion that voting by personal appearance is less vulnerable to fraud than mail voting, because the security features that are present during in-person voting are better than those present in vote by mail. Oct. 16, 2023 Tr. at 3998:3–8. When asked to expand on why he thought mail fraud was more likely to occur than other forms of fraud, Mr. White testified "I think the reason that's reflected in the numbers is because of the lack of security mechanisms that are in place for mail ballots that are in place for other forms of voting; in-person voting, namely. And there are quite – there are quite a few of those." *Id*. at 4107:2–8. Mr. White agreed that it was his opinion that it was relatively easier to obtain a signature from a voter for an application for ballot by mail than on the mail ballot itself. *Id*. at 3999:11–16.

290.     Mr. White agreed that it is not illegal to show up at a voter's house and offer to help the voter complete an application for ballot by mail. Oct. 16, 2023 Tr. at 3999:17–21. When asked if he had investigated community organizations doing outreach as vote harvesting while at the Election Integrity Division, Mr. White said he had not: "All of the investigations in cases I recall had to -- dealt with paid vote harvesters working for a candidate or a slate of candidates or family of the candidate or the candidate themselves." *Id.* at 4000:11–17. Mr. White agreed that he could not recall prosecuting a defendant not working for a candidate campaign, slate of candidates, or their family members. *Id.* at 4000:19–25. When asked whether he agreed that Section 7.04 did not limit the offense to persons being paid by a candidate, campaign, or PAC, Mr. White replied "the crux of this is to deliver votes for a candidate or a measure, and we don't define who that entity or person would be." *Id.* at 4401:17–23. Mr. White agreed that political speech is fine and encouraged. *Id.* at 4002:3–5.

291.     When asked about the typical demographics targeted by mail ballot fraud and whether they included racial minorities, Mr. White listed "low income and elderly, but I have been asked before whether that includes minorities and it often does." Oct. 16, 2023 Tr. at 4002:6–12. When asked if minority communities were frequently targeted for vote harvesting schemes, Mr. White replied "They are a frequent target, yes." *Id.* at 4002:13–15. When asked to further explain his testimony that a plea or conviction was generally on a small number of ballots, Mr. White explained,

> In the scheme overall, not necessarily. In terms of what we made our case on, yes, it's very likely that it would be. You know, I guess what your definition of a 'small number of ballots' might be. . .When we do a plea, we would normally not even – it would normally be a reduced counts, reduced number of counts from what was originally charged. Oct. 16, 2023 Tr. at 4030:5–18.

292.     When asked about cases on the chart that were later dismissed, Mr. White explained "if it's helpful, I think the majority of these cases were dismissed as a result of the Stephens decision." Oct. 16, 2023 Tr. at 4035:25–4036:4.

293.    When asked whether voter fraud cases typically involved more than one vote, Mr.

White replied,

> In the case of illegal voting, it would be very common that it is one single vote at
> issue; but in ballot-harvesting cases, there would most often be more than one vote
> included. That doesn't mean we always got there with a prosecution. All we might
> have is that one vote. Oct. 16, 2023 Tr. at 4080:8–14.

294.    The case of Christina Lichtenberger was a vote harvesting and assistance fraud

case, involving three women. Oct. 16, 2023 Tr. at 3933:16–3924:7. Ms. "Lichtenberger pled guilty

to a count . . . of possession of a ballot and a count of unlawful assistance under Chapter 64.036,

and received a one-year deferred adjudication and a fine." *Id.* at 3934:8–14. Ms. Andrea Campos

Bierstedt received pretrial diversion probation of six months and paid $3,500 to the County. *Id.* at

3934:15–22. Defendants in any election integrity case brought by the OAG that were put in a pre-

trial diversion program were required to plea to or acknowledge guilt to some crime in order to get

the benefit of that pretrial diversion program. *Id.* at 3934:23–3935:4. Ms. Alicia Perez "pled guilty

to four counts of possession of a ballot and four counts of unlawful assistance and received

probation and fine and court costs." *Id.* at 3935:5–11.

295.    This case was resolved in 2010 and the violations "stemm[ed] from the 2008

Primary Election in Duval County." Oct. 16, 2023 Tr. at 3935:17–22. Ms. Sarah Perales "[p]led

guilty to a ballot-handling offense." *Id.* at 3938:17–20. Mr. Lupe Rivera was a candidate for city

commissioner in a 2013 municipal election, and he pled guilty to a number of ballot-harvesting

offenses, including unlawful assistance to a voter. *Id.* at 3938:21–3939:5. Mr. White could only

recall that Mr. Rivera suggested to the voter how to vote in the election. *Id.* at 4025:19–4. Mr.

Cynthia K. Gonzales was convicted of unlawful possession of a ballot and unlawfully assisting a

voter with a mail ballot under Chapter 86.010 in an Oasis County case that was brought in San

Patricio County. *Id.* at 3939:6–17. Ms. Rosita Torres Flores in Nueces County "voted this ballot

without the direction of the voter." *Id.* at 4025:19–4026:17. When asked whether he had additional

information about Cynthia K. Gonzales, Mr. White replied "[o]n this one similar to Rosa Flores,

we had an instance where she had actually voted the ballot contrary to the voter's wishes." *Id.* at 4026:25–4027:9.

### D.  Proffer (General Information on Ballot Harvesting):

296.    When asked what tactics ballot harvesters used to lower the defenses of voters to get access to ABBMs in the seeding phase, Mr. White responded,

> The seeding phase isn't - my opinion – too difficult to achieve some rapport with the voter. You know, go up, you know, 'Ms. Smith, would you like to sign up for a mail ballot, so you don't have to go to the polling place? It's very easy. Just need a signature from you.' You're going to fill out the paperwork to make it easy for the voter and that sort of thing. And providing they comply with the law and provide their information on that application, they've done nothing illegal at that point. So nothing too complicated. Oct. 16, 2023 Tr. at 4113:11–4114:16.

297.    When asked what tactics a harvester might use during the harvesting phrase, Mr. White testified,

> So that would take a little bit more skill because of what you're asking for. But something like, 'Hello, Mrs. Smith. I'm with the Elections Department' or 'I'm here to help you vote your mail ballot,' some approach like that presents you an official or semi-official capacity or you wouldn't even necessarily have to do that part. You're just here to help with the vote, help with their ballot. Bring a stamp with you. 'Do you have your ballot? Could you go inside and get it?' And walk them through the process of voting that ballot. You would normally, you know, if you could, offer to fill that ballot for them. 'I see you have some eyeglasses there. Let me help you read that ballot.' And from there they could discuss some other races. They could discuss all of the races, they could discuss the top line race and ask them who they wanted to vote for for (sic) president or whatever that line is and then vote down-ballot candidates that the voter is actually – or the harvester is actually working for.

*Id.* at 4114:17–4115:12.

298.    Mr. White has seen harvesters use gifts or trinkets in order to win voters' trust. Oct. 16, 2023 Tr. at 4115:13–15: Mr. White has "seen a number of deceased voters get swept up in mail-ballot harvesting scheme." *Id.* at 4115:16–19.

### E.  Gregg County Mail-in Voting Case Offers Example Where Voter Fraud Disenfranchised Voters

299.    The Gregg County case was prosecuted by the Gregg County District Attorney's office, with help from the OAG. Oct. 16, 2023 Tr. at 3942:3–7. In this case, Shannon Brown, in concert with Marlena Jackson, DeWayne Ward, and Charlie Burns, was charged with a violation of Election Code Chapter 276.012. *Id.* at 3943:1-6. Mr. White explained "It was patterned after the State Penal Code offense 'Engaging in organized criminal activity,' but tuned to deal with election offenses. And so if you engage in offenses under the Election Code, and you are part of a group that is dedicated to achieving those outcomes, then that's where this offense applies." *Id.* at 3942:25–3943:17. Mr. White drafted the indictment of Commissioner Brown, which was Def-State-93. *Id.* at 3941:4–10. Commissioner Brown's "scheme was to -- with intent to harm or defraud the candidate Kasha Williams, who was Mr. Brown's opponent; that election records were falsified and submitted to procure mail ballots for voters on the basis of disability when they were not disabled." *Id.* at 3945:18–3946:3. In the Gregg County scheme, Mr. Marlena Jackson was charged with "97 counts" involving "the same slate of offenses that Mr. Brown was involved in; all related to an organized vote-harvesting scheme." *Id.* at 3946:4–18. Commissioner Brown was also charged with "a violation of Chapter 84.0041, which is fraudulent use of a mail ballot application, and that's that false information was provided that this voter was disabled, when the voter was not disabled. That information was provided by the vote harvesters and not the voter." *Id.* at 3943:18–25.

300.    Commissioner Brown actually got his hands on some ballots during this scheme. Oct. 16, 2023 Tr. at 3945:5-11. All four defendants pled guilty in the Gregg County case. *Id.* at 4085:4–10.  Mr. Shannon Brown pled guilty and was convicted of election fraud under Chapter 276.013 in "an organized vote-harvesting scheme" during the 2018 Gregg County Democratic Primary in which he was a candidate. *Id.* at 3940:13–3941:3. Mr. Charlie Burns was also convicted for "the same type of vote-harvesting offenses in this same matter that was presented to the Gregg County grand jury." *Id.* at 3947:19–3948:11. Mr. DeWayne Ward was "also convicted of the same offense as Mr. Burns." *Id.* at 3948:23–3949:2. Mr. Ward was indicted on six counts of similar offenses to those already mentioned in the Gregg County scheme. *Id.* at 3949:5–11.

301.     Davonia Bradley was disenfranchised by this vote-harvesting scheme. Oct. 16, 2023 Tr. at 3944:1–7. Yolita Johnson was disenfranchised by this vote-harvesting scheme. *Id.* at 3944:5–17. Terri Thomas was disenfranchised by this vote-harvesting scheme. *Id.* at 3944:18–19. Ricky Johnson was disenfranchised by this vote-harvesting scheme. *Id.* at 3944:20–23. Eric Taylor was disenfranchised by this vote-harvesting scheme. *Id.* at 3944:24–25. Robert Harvey Jr. was disenfranchised by this vote-harvesting scheme. *Id.* at 3945:1–2. Veronica Moore was disenfranchised by this vote-harvesting scheme. *Id.* at 3945:3–4. Tamika Buchanan was disenfranchised by this vote-harvesting scheme. *Id.* at 3945:12–17. Mary Lynn Odom, Aubrey Durham, Keyannia Lister, and Roderick Smith were additional voters that were allegedly disenfranchised in this scheme. Def-State-90. Andrew Erwing, Corby Martin, Linda Carrier, Rayford Jordan, Victoria Miller-Burns, Lorine Bradley, Lorenzo Washington, Roceta Anderson, Kaylon Earl, Ricardo Pencheon, Shannon Martin, Jennifer Martin, Tiesean McCray, Otis Jones, Kenneth Pierson, Athena Johnson, Beshad Faggans, Coby Johnson, Cason Johnson, and Elizabeth Choice were additional voters that were allegedly disenfranchised in this scheme. Def-State-91. Natasha Bush was an additional voter that was allegedly disenfranchised in this scheme. Def-State-92.

302.     The Gregg County mail-in voting fraud case was cited by Senator Hughes in the signing of SB 1; it was from his district. Oct. 16, 2023 Tr. at 4083:23–4084:2. Mr. White was asked if the scheme in the Gregg County case, where the ABBMs were fraudulently filed under the name of young, able-bodied people who did not qualify to vote-by-mail, was a common scheme. *Id.* at 4113:5. Mr. White answered, "Not super common. It's certainly not at least in the numbers that we saw in this case. You know, you might see small numbers of that in other types of cases, but in this case where it was 47 percent of the mail ballots returned, that's very unusual." *Id.* at 4112:24–4113:10.

### F. Proffer (Gregg County Case)

303.     Mr. White testified that in the Gregg County case the vote harvesting affected the result of the election. *Id.* 4121:8–11. When asked how he knew that, Mr. White explained, "The

candidate who lost the race had won in-person voting by a margin of 60 percent to 40 percent, including early voting and on Election Day. There were so many mail ballots proliferated in that election, and those ballots were cast in favor of Shannon Brown, 75 percent to 25 percent, that ended up winning the election by six votes." *Id.* at 4121:8–18. Mr. White was asked to clarify his testimony about 47% percent of mail ballots in the Gregg County case. Mr. White answered

> 47 percent is the number that I recall. It was close to 50 percent of the applications for mail ballot in that commissioner precinct were for on the basis of disability, and the rest of the precincts combined, the other four precincts, I think had eight disabled voters versus almost 300 in that one precinct we're talking about.

*Id.* at 4123:8-18. At the time the Gregg County investigation and prosecution decision was made, Mr. White was in the office. *Id.* at 4123:19–22.

### B.  Evidence at Trial Shows that Vote Fraud is a Pertinent State Interest.

304.     The Elections Division also employs election security trainers, which Ms. Christina Adkins described as

> individuals that we brought on our team to provide training to election officials on specific policies and procedures with an emphasis on the security aspect, so chain of custody, documentation, and then, of course, some cybersecurity and physical security issues related to elections as well. They are primarily former election officials, so they have more practical experience, which we find to be a nice compliment to the legal support that our attorneys provide.

Oct. 18, 2023 Tr. at 4532:12–4533:3.

305.     The election security trainers also "provide some training on some more general election concepts as well." Oct. 18, 2023 Tr. at 4534:22–4535:7. The Elections Division has an obligation under the Election Code to maintain and obtain uniformity in the administration of the laws as they pertain to elections in Texas. To that end, they provide trainings on the law itself, as well as procedural issues. *Id.* at 4533:4–17.

306.     Ms. Adkins testified that elections are "quite frequently" close. Oct. 18, 2023 Tr. at 4597:14–15. When asked if elections could be within one vote, Ms. Adkins answered, "Yes, that

happens, I think, more often than people realize." *Id.* at 4597:16–8. When asked if elections could be ties, Ms. Adkins answered, "Yes. That happens very regularly as well." *Id.* at 4597:19–20. When asked if one illegal vote could change the result of an election, Ms. Adkins replied that the Elections Division just had a question "regarding a bond election that was decided by one vote, and it appears as though they may have some evidence to indicate that that voter was not eligible for that election." *Id.* at 4597:21–25. Ms. Adkins agreed that if a fraudulent vote changes the result of an election, that it could disenfranchise the legitimate votes that were cast in that election. *Id.* at 4598:1–4.

307.     The Secretary of State's Forensic Audit Division identified that Dallas County had segregated applications for ballot by mail that were received in bundles. The other three counties did not segregate applications received in this way from other applications. Oct. 17, 2023 Tr. at 4256:18–4257:7. "Through a discrete sample of the carrier envelopes review," FAD also identified instances of a person being an assister for both an application for ballot-by-mail and the mail ballot itself. That indicated that "the assistant went back to assist with the execution of the carrier envelope." *Id.* at 4258:17–25. The Forensic Audit Division's observations, recorded in its audit, with respect to these bulk/bundled ABBM applications, caused Ms. Doyer concern with respect to possible vote harvesting. *Id.* at 259:1–5.

308.     Dallas County Elections Administrator Michael Scarpello was asked whether it would be suspicious for people to receive ballots they had not requested and he replied, "I think that would be true in most states." Sept. 12, 2023 Tr. at 490:11–13. Non-profits would come to Dallas County and take copies of the Dallas County application form to distribute to voters. *Id.* at 490:18–21. After the passage of SB 1, voters do not have to use the application form created by Dallas County. *Id.* at 490:22–24.  A non-profit or individual could create their own application to vote by mail. *Id.* at 490:25–491:5.

309.     Dr. Mayer did not examine the public perception regarding the rate of voter fraud in Texas, Oct. 2, 2023 Tr. at 2030:10–12, and even if he had, not every instance of voter fraud would have been detected. *Id.* at 2030:2–4.

310.     Historically, Texas has had a problem with fraudulent elections. Oct. 4, 2023 Tr. at 2597:3–5. Indeed, there have been number of elections that involved ballot box stuffing and dead people voting, among other things. *Id.* at 2597:18-20. In these examples of fraud, minority voters are victims. *Id.* at 2597:21–2598:1. Therefore, when voter fraud has occurred, it has typically impacted minority voters as opposed to majority voters. *Id.* at 2598:14–16. Currently, fraud tends to take the form of people making false statements on voter applications or a third-party filling out a ballot for someone else. *Id.* at 2599:1–3.

311.     Slavery, Jim Crow laws, and all-white primaries have occurred during Texas and American history, Oct. 4, 2023 Tr. at 2601:15–25, as has the use of a wide range of voter fraud to disenfranchise minorities, including African Americans and Latinos. *Id.* at 2602:1–11. Political machines that used the Latino community to commit fraud would mark ballots for Latinos who could not read or who only spoke English as a second language. *Id.* at 2602:20–2603:3. In fact, some of the fraud that has been used to discriminate against minorities has lasted throughout the 1970s and 1980s. *Id.* at 2604:16–21. Tellingly, Dr. Tolson walked through some of this kind of history because she believed that it may inform modern legislative decisions. *Id.* at 2605:4–7. And in the slow and steady march towards an inclusive democracy, the historical context of SB 1 includes improvements to minority voting in Texas. *Id.* at 2606:17–22. Moreover, in 2023, Texas is not as bad as it was in 1873, 1902, 1923, or even 1964. *Id.* at 2607:23–2608:8.

312.     Even though modern legislation may remind someone of legislation from a previous time, that does not necessarily mean that modern legislation is discriminatory. Oct. 4, 2023 Tr. at 2631:1–5.

313.     Dr. Tolson was not attempting to tell the Court anything that was in the legislature's mind. Oct. 4, 2023 Tr. at 2642:11-14.

314.     While Dr. Kousser believed that "there's no evidence of systematic fraud," Oct. 5, 2023 Tr. at 2823:12, he does not deny that voter fraud does occur. *Id. a*t 2823:15–17. During his research, he has found specific instances of election fraud. *Id.* at 2823:18–20.

315.     In 2001, a scheme involving absentee ballots and mail-ballot forgeries led a state district judge to void the result of a Dallas city council race. Oct. 5, 2023 Tr. at 2873:9–14. Specifically, voters claimed that they never sought absentee ballots, but it appeared that someone had applied for those ballots using identical handwriting. *Id.* at 2873:15–18. In part, as a response to this incident, Representative Wolens sponsored HB 54, *id.* at 2874:5–8, which increased penalties for marking another person's ballot without their consent, *id.* at 2874:9–11; required those assisting voters to put their names, addresses, and signatures on carrier envelopes, *id.* at 2874:12–14; banned the practice of storing mail ballots and sending them to election departments at the last minute, *id.* at 2874:15–17; and permitted caregivers to continue to help those in their care. *Id.* at 2874:18–21.

316.     There was also a 2017 scandal that involved a pair of west Dallas city council races. Oct. 5, 2023 Tr. at 2875:5-7. In that scandal, a man applied for numerous ballots by mail on behalf of senior citizens. *Id.* Tr. at 2875:8-10.

317.     In the lead up to the 2021 Legislative Session, Lieutenant Governor Dan Patrick said, "People in America have lost faith in their elections." Oct. 5, 2023 Tr. at 2875:13–19. Senator Bryan Hughes, an SB 1 sponsor, stated, "We don't know how pervasive it is, how much fraud." *Id.* at 2875:20–23. And House Election Committee Chair Briscoe Cain noted, "We don't need to wait for bad things to happen." *Id.* at 2875:24–2876:3. Tellingly, a poll by the University of Houston's Hobby School of Public Affairs found that 83 percent of Texas Republicans believed that there had been widespread fraud in the 2020 election. *Id.* at 2877:11–16. And while Dr. Kousser alleged that the reason 46 percent of Republicans favored stricter voting laws in Texas under the University of Texas poll was because voters were "taking cues" from leadership, *id.* at 2877:22–2878:5, 2878:16–20, that study does not measure how politically active or how likely to vote the different segments of the Republican Party were. *Id.* at 2878:6–9. Instead, the poll is merely a snapshot in time that does not show whether there was already a growing trend in desiring stricter voting laws among Republicans prior to the 2021 Legislative Session. *Id.* at 2878:10–15.

318.     Former Hidalgo County Elections Administrator Ms. Yvonne Ramon was aware of allegations of voter fraud arising out of Weslaco in the 2012 elections "with the mayoral race." Oct. 3, 2023 Tr. at 2373:14–22. The Weslaco case involved "the mayor's home. And I believe there were between five and eight people registered there." *Id.* at 2378:1–5: "They were registered to vote in the mayor's home, and there were allegations that they did not reside there, that was not their homestead. *Id.* at 2377:14–21. Ms. Ramon was also aware of allegations of voter fraud arising out of a mayoral race in Edinburg in 2017 or 2019, involving "the ex-mayor and his wife." *Id.* at 2373:23–2374:4. The allegation in the Edinburg case was that people were registered to vote where they didn't live. *Id.* at 2377:7–9. Ms. Ramon was further aware "of the allegations of people assisting voters that were deemed ineligible." *Id.* at 2734:5–10.

### C.  Vote Harvesting Often Targets Voters Who Need Assistance

319.     When asked what mail ballot fraud and voter assistance fraud have in common, Mr. White testified that "The core element of both is getting between a voter and their ballot in order to influence the outcome of that vote." Oct. 16, 2023 Tr. at 4108:18–22. When asked whether it affected his opinion that mail ballot fraud and voter assistance fraud may happen outside of a polling place, Mr. White testified

> I think I would have to say, yes, because of the controls that are in place in a polling place, the number of observers that might be there, election officials that are present; versus mail ballots, which happen in a completely uncontrolled environment, and we typically have no witnesses, no video, none of that, of the harvester/voter interaction.

*Id.* at 4108:23–4109:10. Mr. White was asked whether in a case of mail ballot fraud, it was possible that some voters may never find out that their identity was used. He responded "Absolutely." *Id.* at 4109:11–14. Mr. White described the profile of voter that is disproportionately targeted for mail-ballot fraud in assistance as "Elderly, sometimes disabilities, low-income-communities are often targeted for vote harvesting." *Id.* at 4109:15–19. When asked why those communities would be targeted, Mr. White replied

> That's a tough question. One aspect that makes vote harvesting easier is when voters are not truly engaged with the process. They're not that concerned with voting. If you can get them to sign up for a ballot that they didn't want in the first place, they're very likely to turn that over to you or be susceptible to influence during the vote.

*Id.* at 4109:20–4110:2.

320.    Vote harvesters or assistance fraudsters are typically associated with a campaign. Oct. 16, 2023 Tr. at 4110:3–5. When they are associated with a campaign, Mr. White testified that they are compensated with "Typically cash, off book. Though, occasionally you may see in the campaign finance reports a paper trail showing something that says something other than vote harvesting, says something like 'canvassing, get-out-the-vote,' something like that." *Id.* at 4110:6–11. There are no geographical limitations on where vote harvesting can occur. *Id.* at 3921:21–3922:1. Mr. White testified that there are certain elections which are more vulnerable to vote harvesting; he explained "Those would be small elections, local elections, primary elections, particularly run-offs. School district elections, special district, utility district-type elections, those would be elections where the margins are close enough and the turnout is small enough that vote harvesting could have an impact." *Id.* at 3922:2–11. Another red flag of ballot harvesting would be if elections offices received

> a FedEx box that was stuffed full of ballot applications, we were asking for them to preserve the original box or envelope that those came in, if they could for us, make a copy of the original batch of ABBMs as it came to them, give us a call, or their local DA to let us know about it, and then process the ABBMs as they normally would, because under the law, those are still valid.

*Id.* at 3924:8–20.

321.    Mr. White never saw a situation while at the Election Integrity Division where they were "dealing with people just trying to provide a public service who weren′t also trying to sway the direction those votes were cast." Oct. 16, 2023 Tr. at 3995:11–17.

322.    Voter assistance can be unlawful under the Election Code. Oct. 16, 2023 Tr. at 3923:21–3924:1. This was true before SB 1. *Id.* at 3924:2–3. Assisting a voter who is not eligible for

assistance or did not ask for assistance, voting differently than the voter wished or directed, and suggesting to the voter during voting process how the voter should vote were all illegal prior to SB 1. *Id.* at 3924:4–14. Mr. White testified that an assistor voting differently than the voter wished or directed was "something that we would look at regularly" prior to SB 1. *Id.* at 3924:4–14.

323.    Mr. White described a sequence of events for organized assistance fraud as follows

it starts with a voter being identified by a campaign worker, being transported to the polling place in a van or something of that nature by a campaign worker, given some sort of literature, like, a slate of candidates on a slip of paper or a sample ballot, and then assigned to an assistant at the polling place to take them through the process from, you know, the front of the line all the way through voting, and to cast that vote or ensure that the vote is cast for the paying candidates.

Oct. 16, 2023 Tr. at 3924:16–3925:3.

324.    Prior to SB 1, it was illegal for a person who provides assistance to a voter to try to influence or coerce the voter. Oct. 16, 2023 Tr. at 3925:4–6. To "mark someone else's ballot in a direction that they did not . . . direct or approve" is as a type of illegal voting, meaning by someone who "had the requisite mens rea for the crime." *Id.* at 3925:7–15.

325.    Mr. White testified regarding the cases of Gilda Hernandez and Margarita Ozuna, who are listed on page 4 of Def-State-82. Oct. 16, 2023 Tr. at 3935:25–3936:9. "The Hernandez case was a Dallas County case, as indicated in the first column, which was tried in Rockwell County under our venue provision. It was the 2010 Primary election, and she was charged with illegal possession of a ballot, unlawful assistance, and two other of offenses." *Id.* at 3936:10–16. When asked if he had any more information on the Hernandez case, Mr. White replied that "it was associated with the Medrano prosecutions, but she was one of the vote harvesters in this Dallas County election that we tried in Rockwall County, and she pled to these vote-harvesting offenses – or at least one count." *Id.* at 4023:14–24. Margarita Ozuna "was charged with unlawfully assisting a voter" in Cameron County during the 2010 Primary election. *Id.* at 3936:17–19. When asked if he had any more information about Ms. Ozuna, Mr. White replied "I think it was suggesting the voter how to vote and not marking the ballot against the direction of the voter, so

that would be the answer on this one. Ms. Ozuna I remember quite well." *Id.* at 4024:2–11. Ms. Ozuna also appears on page 6 of Def-State-82 as a "repeat offender" in a vote fraud operation similar to the one she was charged for previously. *Id.* at 3937:25–3938:8.

326.    Tomasa Chavez, Facunda Garcia, and Bernice Garcia were charged with a number of offenses related to unlawful assistance of a voter in Cameron County during the 2012 Primary Election run-off and convicted in 2015. Oct. 16, 2023 Tr. at 3936:20–3937:9. When asked why there was a three-year gap between the election and their convictions, Mr. White testified

> This investigation, I think, took -- took quite some time, maybe 18 months or more, and then we got these cases in the system. And election cases don't tend to float to the top of the docket. They tend to go the other way. So, you know, three years for a resolution wasn't uncommon at all.

*Id.* at 3937:2–9. Mr. White confirmed that by "top of the docket," he was referring to the Court's docket. *Id.* at 3937:10–12.

327.    When asked whether he had any more information on Facunda Garcia, Mr. White replied that the voters she assisted "probably were not (entitled to assistance), which would be pretty common for this type of case." Oct. 16, 2023 Tr. at 4025:16–21. Ms. Vincenta Verino "was charged with numerous ballot-harvesting offenses and she pled guilty to unlawful assistance of a voter." *Id.* at 3938:9–16.

328.    There was an oath of assistance that preexisted SB 1. Oct. 16, 2023 Tr. at 3974:4–6. The oath of assistance was already under penalty of perjury prior to SB 1, under Texas Penal Code Chapter 37.02, Election Code Chapter 276.013 - Election Fraud, and Texas Penal Code Section 37.10 - Tampering with Governmental Record. *Id.* at 3974:7–3975:2. When asked whether he believed that having information about assistors can help distinguish between workers with no relationship to the voter versus those who assist family members or caregivers, Mr. White replied "I think that's basically true, yes." *Id.* at 3987:2–14. Mr. White testified that normal assistance would usually involve a voter being assisted by family members, caregivers, close friends, or someone trusted. *Id.* at 3987:15–20. Section 6.06 creates a carveout, codified as Section 86.0105(f)

of the Election Code, that exempts attendants or caregivers previously known to voters from the ban on compensation. No such attendant or caregiver would be in harm's way from Section 6.06. *Id.* at 4103:3–4104:11.

329.    Mr. White was asked about a hypothetical where a voter with a memory or cognitive impairment has worked with the assister prior to casting a ballot and the assister accompanies the voter in the polling place providing a reminder as to what they had discussed previously. Oct. 16, 2023 Tr. at 3988:14–19. He was asked whether he thought that presented a tough question of violating the oath of assistance. Mr. White replied, "In a technical sense of interpreting this statute to that specific set of facts, yeah, I think that's tough. In terms of prosecutorial discretion, probably not." *Id.* at 3988:14–22. When asked to elaborate on what he meant by it not being a tough question with respect to prosecutorial discretion, Mr. White explained "those are situations that could be very easily, you know, eliminated and weeded out by prosecutorial discretion. Those aren't going to get prosecuted." *Id.* at 4097:22–4098:19. Mr. White agreed that, when determining whether a crime occurred, it is a matter of taking facts as reported or investigated and seeing whether or not they fit under a particular statutory definition or not. *Id.* at 4097:15–21. When asked who would make the ultimate decision if that hypothetical situation ever went to trial, Mr. White testified "A jury would. And, of course, our burden of proof is beyond a reasonable doubt, so if there's any ambiguity, that will be doubt, and that would accrue to the favor of the defendant." *Id.* at 4098:20–4099:2. Mr. White was asked whether he would likely move forward with a case where he was concerned that a jury might not convict on a charge of violating that voter assistance oath because a voter had autism. He replied, "There's no chance of that going forward." *Id.* at 4099:3–7.

330.    When asked about the logic that an accumulation of legal actions, together with a bad act, could be a crime, Mr. White agreed that it was lawful in the State of Texas to purchase a knife and lawful to use a knife to slice, but not legal in the State of Texas to use a knife to slice another person with the intent to cause bodily harm. *Id.* at 4099:8–20. Mr. White agreed that the "under penalty of perjury" language in the oath "absolutely would" put the assistant on notice, if they were not already familiar. *Id.* at 3990:18–25. When questioned about the point at which

assistance becomes illegal, Mr. White agreed that it was where a fraudulent assister marks the ballot inconsistent with the wishes of the voter or suggests to the voter how to vote. *Id.* at 4005:14–17.

331.     When asked whether unlawful assistance had been provided in the case of Mr. Robert Gonzales of Nueces County, who was acquitted of divulging information about an election, Mr. White replied "Yes. That was the entire scheme, and the choice to go after the felony instead of the misdemeanor, unlawful assistance offenses, was probably a mistake, in retrospect." Oct. 16, 2023 Tr. at 4036:5–25. Mr. White was asked whether he testified to the Legislature in July 2021 on SB 1 and its predecessors concerning Mr. Gonzales' case. He replied, "I don't recall testifying to that. But, I mean, you know, I do feel – I do feel that that's exactly what happened, and we had video of it." *Id.* at 4037:6–13. When asked whether it bothered him to testify to the Legislature when Mr. Gonzales had been acquitted, Mr. White replied "I don't recall ever naming him. And, no, it doesn't bother me that he was acquitted of a different charge." *Id.* at 4037:14–18. Mr. White was asked to read the following testimony from the Senate Affairs transcript of July 10, 2021:

> We've seem the candidate themselves get involved in certain cases where, you know, for example, a run-off election in a county towards South Texas, but not in South Texas, we had a campaign – we had a – the candidate that was on the ballot in a run-off election literally the only race on the ballot was his race, bringing voter after voter after voter into the polling place and assisting them with their ballots.

*Id.* at 4038:1–17. Mr. White confirmed that he delivered that testimony to the Legislature in July 2021. *Id.* at 4038:20–22.

332.     The Secretary of State's Forensic Audit Division found in its audit instances of a large number of ABBMs associated with single assisters. Oct. 17, 2023 Tr. at 4257:7–11. "(W)e had three assistants that assisted on 469 ABBMs, but we had one assistant that appeared to have assisted with 393 ABBMs, or application for ballots by mail." *Id.* at 4257:14–17. The assister with 393 ABBMs had their name included on "55 applications from an assisted living facility" and 58 applications from "an affordable housing complex in Dallas." *Id.* at 4257:8–4258:14.

333.     Cameron County Elections Administrator Mr. Remi Garza at times has had concerns about the privacy of voters when utilizing curbside voting. Sept. 14, 2023 Tr. at 828:22–24. Specifically, Mr. Garza had concerns about multiple people coming together in a vehicle and remaining in the car. *Id.* at 828:25–829:2. Bexar County Elections Administrator Ms. Jacquelyn Callanen expressed concern about campaigns bringing vans of voters to vote curbside. Sept. 19, 2023 Tr. at 1102:16–19. Ms. Callanen was concerned that voting under those circumstances was not private, because the driver would not exit the van. *Id.* at 1102:20–24. The driver would hear the voter's conversation with the election worker and which party ballot the voter picked. *Id.* at 1102:25–1103:5.

334.     Ms. Callanen was concerned that the person driving the van was forcing people to vote a certain way. Sept. 19, 2023 Tr. at 1103:6–8. Ms. Callanen recalled this happening at least at three locations: Las Palmas, Shavano Park, and McCreless Library. *Id.* at 1103:9–16. One individual, Mr. Gallegos, was very familiar with an election judge. *Id.* at 1103:17–19 If Mr. Gallegos was not asking for curbside, he was taking voters to the polls. *Id.* at 1103:20–22. Ms. Callanen received complaints from voters about someone at the poll site talking to people in the voting booth. *Id.* at 1103:23–1104:2. Mr. Gallegos' actions created a huge perception. *Id.* at 1104:6–7. Ms. Callanen told the election judge that the situation could not continue. *Id.* at 1104:3–5. Because of the perception, Ms. Callanen retired the election judge in question. *Id.* at 1104:8–10. Once the election judge was no longer there, Mr. Gallegos started driving van loads to polls to vote curbside. *Id.* at 1104:11–14. Ms. Callanen believed this was because Mr. Gallegos no longer had easy access to the polling site. *Id.* at 1104:15–17. Ms. Callanen appreciated SB 1's requirement that a person who simultaneously transports seven or more voters to vote curbside must complete and sign a form, as she thought it increased protection of voters. *Id.* at 1104:18–25. Former Travis County Clerk Ms. Dana DeBeauvoir has "had complaints from other voters about potential inference with a voter." Sept. 14, 2023 Tr. at 842:14–22.

**D.  2018 clean up of voter registration polls.**

335.   The National Voter Registration Act lays out the procedure that a state is required to follow to remove a voter from the rolls. Oct. 17, 2023 Tr. at 4346:1–6. The National Voter Registration Act stipulates about the address changes "that a voter be inactive and remain active for two federal elections before they can be removed from the rolls to give them an opportunity to come back." *Id.* at 4346:7–12. Texas complies with these procedures. *Id.* at 4346:13–14.

336.   Texas removes noncitizens from the State's registration rolls. Oct. 17, 2023 Tr. at 4346:15-17. In the past, the Secretary of State has mistakenly challenged a voter registration on the genuine belief that the voter was a noncitizen. *Id.* at 4346:18–21. At the beginning of 2019, the Secretary of State

> engaged in a process that we discovered very quickly had some issues with the data and that some voters would have received a notice. We put the word out pretty quickly not to send notices to any voters but some of them might have been challenged that shouldn't have been.

*Id.* at 4346:22–4347:13. This mistake led to litigation which ended with a settlement. *Id.* at 4347:14–17. Under the settlement, the Secretary of State

> could continue this process, this proactive removal of noncitizens from the list but that we needed to do it with some changes. So if a voter under Real ID when they go to the DPS for a driver's license transaction, they have to either prove citizenship or lawful presence with documents. And so if they say they are not a citizen and they prove it with a Visa, a Green Card, or whatever else they've got that proves lawful presence, then they can get a driver's license but we will get that information that a voter came last week, a person came last week and said "I'm not a citizen," we will then match that information against our voter list, and if it's somebody that was already registered to vote before their trip to DPS, they are the ones who will be sent to the counties and sent a notice of examination for citizenship.

*Id.* at 4347:18–4348:8.

337.   The Secretary of State's office changed its procedures as a result of the settlement agreement. Oct. 17, 2023 Tr. at 4348:9–11. Section 2.05 of SB 1 amended the election code to reflect the settlement agreement. *Id.* at 4348:15–19. Subsequent to the settlement agreement and prior to the passage of SB 1, the Secretary of State and the Department of Public Safety had agreed on a process to verify the accuracy of citizenship status. *Id.* at 4350:5–17. Section 2.06 of SB 1

ensured compliance by voter registrars with the requirements imposed by Subsection A: Tex. Elec. Code 18.061 (overnight batch processing), Tex. Elec. Code 15.083 (counties sending list of suspense voters), and Tex. Elec. Code 16.032 ("the requirement to purge the voters after they haven't voted in two federal elections after being in suspense for two federal elections"). *Id.* at 4351:4–4352:3. Section 2.07 of SB 1 added a requirement that counties provide information to the Secretary of State if a person is ineligible for jury duty because they are ineligible for jury duty. *Id.* at 4353:16–22. Section 2.07 did not prompt the Secretary of State or the counties to make any changes to policies, practices, or procedures regarding noncitizens. *Id.* at 4354:5–12.

## VI. Controversies in the Immediate Lead Up to Senate Bill 1.

### A. The 2020 Presidential Election Was Both Atypical and Challenging

#### i. COVID-19 Disrupted Voting Patterns

338.    "We were at the beginning of the COVID epidemic, a terrible disease that we knew nothing about. We were all frightened and we didn't know how to defend ourselves against it." Sept. 14, 2023 Tr. at 862:15–23.

339.    The November 2020 election took place during the COVID-19 pandemic and was an unusual election. Sept. 12, 2023 Tr. at 335:1–5. The November 2020 election was a Presidential Election year, which generally has higher turnout. *Id.* at 335:9–14. That election had one of the highest turnouts on record. *Id.* at 18–20. Voting by mail was much higher for the 2020 election compared to previous elections. *Id.* at 339:4–6. November 2020 was the high watermark for ballot by mail in Travis County. Sept. 21, 2023 Tr. at 1573: 3–8. A larger percentage of voters utilized in-person early voting for the November 2020 election compared to previous elections. Sept. 12, 2023 Tr. at 339:12–15. About 85% of voters who voted in-person voted early in El Paso County, as opposed to 15% of voters who voted in-person on election day. *Id.* at 339:16–23. Whereas El Paso's in-person early voting/election day split ranged from 50/50 to 70/30. *Id.* at 339:24–340:3. Dr. Kenneth Mayer stated, "So in 2020, obviously COVID was affecting how people voted." Oct. 2, 2023 Tr. at 1978:2–5. Dr. Dan Smith testified,

People don't easily shift from one modality to another. The exception to that was probably the 2020 General Election and some in the Primary Election because of COVID, and what we're already seeing in the states that had those expansions of vote by mail, many people are coming back into the fold. They are voting early in person or on Election Day. Oct. 4, 2023 Tr. at 2736:8–20.

Dr. J. Morgan Kousser stated, "Particularly the first year of the panic, the COVID crisis, there was more of an effect on urban areas than on rural areas in small towns." Oct. 5, 2023 Tr. at 2836:13–21. Dr. Kousser also found that during the 2020 election people of color "were more likely to favor a wide distribution of votes by mail, the ability to vote by mail." *Id.* at 2838:14–22.

### B. Governor Abbot Expanded Voting Opportunities in 2020

340.    The Governor filed a proclamation with the Secretary of State's office dated July 27, 2020. Sept. 12, 2023 Tr. at 340:6–22. As a consequence of the Governor's proclamation, early voting opened for an additional week. *Id.* at 341:14–342:1. This change was only for the November 2020 election and the November 2022 election did not have an additional week of early voting. *Id.* at 342:5–9. Because of the Governor's proclamation, counties accepted in-person delivery of mail ballots during early voting and on election day, instead of just on election day. *Id.* at 344:7–18. This change was also limited to the November 2020 election. For the November 2022 election, in-person delivery of mail ballots was only accepted on election day. *Id.* at 344:22–345:6. The changes to election rules caused by the Governor's proclamation was a one-time deal. Sept. 14, 2023 Tr. at 824:22–24.

341.    The Secretary of State created the "CEO Advisory Group," a group of election officials that meet on a regular basis to discuss the needs of the election community, because of COVID-19. Sept. 22, 2023 Tr. at 1834:23–1835:4.

### C. Travis County Allegedly Sequestered Poll Watchers 20200.

342.    Travis County "rearranged their Central Counting Station" in the 2020 General Election because of COVID. Oct. 18, 2023 Tr. at 4588:9–20. Ms. Adkins of the Secretary of State's Elections Division walked through the reconfigured space with the election director for Travis

County. *Id.* at 4589:2–4590:1. After inspecting the space where poll watchers would be stationed, Ms. Adkins told the election director "That's great. I appreciate what you're doing, but where in this room are poll watchers going to be allowed to be present? Because you know you have to have them in here, as well." *Id.* at 4590:6–9. Ms. Adkins testified that the Travis County election director said

> her plan was to have them in a particular designated location. She showed me where she was planning on stationing some chairs so that they could be present in that room and rotate in and out, which is typically what we advise counties to do when they don't have sufficient space in their small central count room where the main computer is if they have more poll watchers than are permitted to be in that room, oftentimes because of things like fire safety regulations; that they allow them to rotate in and out of that room.

*Id.* at 4590:2–20. During the 2020 Election, the Secretary of State's Office received complaints about how Travis County handled poll watchers at that Central Count Station. *Id.* at 4591:2–6; ; *see* STATE Ex. 144 (picture taken of sequestered poll watchers). The Secretary of State's Office referred those complaints to the Attorney General's Office. Oct. 18, 2023 Tr. at 4591:7–9.

343.     Former Director Ingram testified that the Secretary of State's Office regularly received complaints about poll watchers being denied access to central count. Oct. 17, 2023 Tr. at 4373:21–4374:15 He explained, "In central count, some counties, the larger counties, Dallas, Travis, Bexar, they would put the poll watchers outside of the central count room and let them watch through glass the central count activities." *Id.* at 4374:13–23. These actions went against the Secretary of State's guidance. The Secretary of State took the position was that "you can't keep [poll watchers] sequestered in the corner, they need to be able to go" and "observe the activities up-close." *Id.* at 4374:20–23, 4375:12–17. "You can't keep them behind glass." *Id.* at 4374:22–23.

344.     Former Director Ingram further explained that because of the COVID-19 pandemic, disputes between poll watchers and election workers intensified in 2020. *Id.* at 4375:18–24. He pointed to the six-foot rule as a point of tension. *Id.* at 4374:24–4375:5. "That was the first time we had really heard about complaints in the polling location, but it was because of the pandemic." *Id.* Often the dispute would take the form of a phone call to the Secretary of State's

Office or an election law complaint. *Id.* at 4375:21–24. In some cases, the dispute resulted in litigation, such the allegations in Travis County. *Id.* at 4375:25–4376:2. Mr. Ingram testified that these disputes were publicized in newspapers. *Id.* at 4376:3–4, *see also* STATE Ex. 145–48.

### D. Harris County Sought to Mail Out Unsolicited ABBMs.

345.     In the summer of 2020, it came to the attention of the Elections Division that Harris County intended to send unsolicited mail ballots applications. Oct. 18, 2023 Tr. at 4436:16–21. The Secretary of State's Elections Division were notified by an email from the Harris County Clerk, Mr. Collins, that Harris County was interested in sending out applications for ballot by mail ("ABBMs") to all voters in the jurisdiction, not just those over 65. *Id.* at 4436:22–24. Harris County announced on social media that they intended to send unsolicited ABBMs to all voters. *Id.* at 4437:5–9.

346.     After the Elections Division learned about this plan, Mr. Keith Ingram of that office sent a letter to Mr. Hollins telling him that he should not send out unsolicited ABBMs. *Id.* at 4437:14–18. The Elections Division took the position that Harris County's plan to send unsolicited mail ballot application was contrary to the Election Code and its office's guidance on this issue. *Id.* at 4438:6–10. The Elections Division guidance was that at minimum "sending an unsolicited mail ballot application should be done only to those voters who are absolutely eligible. So in other words, those over 65." *Id.* at 4438:11–14.

347.     When asked why that was the Elections Division's guidance, Mr. Ingram explained that

> we didn't want voters to be confused about whether or not they were eligible to vote by mail, that voting by mail is for specific categories and, you know, in the context of COVID and the pandemic there was a lot of talk on social media about voting by mail and people were confused about whether or not fear of COVID was a disability that allowed them to vote by mail. There was a lot of confusion about that and several lawsuits that I mentioned in this letter, and so we didn't want voters to be confused by receiving an official communication inviting them to vote by mail into thinking that they qualified for it.

*Id.* at 4438:1–4439:1. In the Elections Division letter to Mr. Hollins, Mr. Ingram took the position that the unsolicited mail ballot applications were an abuse of voters rights, because "it appeared to me like an official communication from the county inviting a person to vote by mail could deceive voters into believing that they are qualified to vote by mail and thus commit a felony because they are not qualified to vote by mail." *Id.* at 4439:2–12. Mr. Ingram was concerned that this could cause voters to provide false information on the ABBMs, because "they would check the disability box where they are not disabled." *Id.* at 4439:13–19. The Elections Division's letter also threatened litigation if Harris County did not halt their plans and issue a retraction, but Harris County did not agree to a retraction. *Id.* at 4439:24–4440:3.

348.    The Secretary of State's office then filed a petition for a restraining order against Harris County. Oct. 18, 2023 Tr. at 4440:4–11. In the petition, the State argued that sending unsolicited applications was *ultra vires*, or outside the county's powers. *Id.* at 4441:7–12. Mr. Ingram testified during that case that "what (Harris County) were proposing was illegal and could confuse voters and it would clog the mail system from legitimate mail voters and prevent them from being able to successfully vote." *Id.* at 4441:15–22. The lawsuit made its way to the Texas Supreme Court. *Id.* at 4443:5–6. The Texas Supreme Court held that the Texas Election Code did not authorize an early voting clerk to send an application to vote by mail to a voter who had not requested one. *Id.* at 4443:14–17.

349.    SB 1's Section 7.04 addresses the legal controversy instigated by Harris County's decision to send unsolicited mail ballot applications to every registered voter in the county. Oct. 18, 2023 Tr. at 4444:2–7. SB 1's Section 6.04 clarifies the election code by making explicit a limitation that was recognized to already existed by the Texas Supreme Court. Oct. 18, 2023 Tr. at 4444:8–11. Section 7.04 prohibits public officials and election officials from distributing ABBMs when acting in their official capacity, but it does not prohibit political parties from doing the same. Oct. 18, 2023 Tr. at 4444:15–19.

350.    There are two interests in prohibiting public officials and election officials from distributing ABBMs when acting in their official capacity but not political parties or candidates. *Id.*

at 4444:20–4445:4. "The first one is expense, which is less important reason. The main reason is to prevent confusion of the voters and potentially walking them into committing a felony by providing a false statement on an application that they are not eligible to complete." *Id.* at 4446:16–22. Mr. Ingram thought it more likely that a voter would be confused if the form was coming from a public official or election official in their officially capacities, because "voters treat official communications from government differently than they treat campaign mail. They give it a bigger importance than they would a communication from a campaign." *Id.* at 4446:23–4447:6. The Secretary of State's office takes this into account when doing its own mailings. *Id.* at 4447:7–9. There had been an instance of this in 2020 when the Secretary of State's Office

> did the mailing that was required by the Electronic Registration Information Center to unregistered voters inviting them to register to vote and we did it as generic postcard from our office to current residents so nobody in particular was named, but we received, after sending out more than 3 million of those postcards, we received thousands of phone calls from voters who were upset because they thought we were telling them they were not registered to vote when they knew they were." *Id.* at 4447:10–25.

351.    Testimony revealed that Texas counties had different practices regarding the distribution of unsolicited ABBMs. Hidalgo County sent out unsolicited ABBMs once, during the 2020 General Election, "purely due to the pandemic." Oct. 3, 2023 Tr. at 2351:21–2352:1. Prior to the 2020 election, Hidalgo County had never sent out unsolicited ABBMs. *Id.* at 2351:16–20. Cameron County "considered it at the time but decided against it because there were so many political parties and different groups sending out those applications that we felt it would confuse the voters so we set that aside." Sept. 14, 2023 Tr. at 829:12–830:9. Bexar County, meanwhile, did not have a practice of distributing ABBMs unsolicited. Sept. 19, 2023 Tr. at 1131:15–1. The Election Administrator believed doing so would violate the Election Code and could create a risk of fraud. Sept. 19, 2023 Tr. at 1131:23–9.

### E.  Harris County Introduced the Illegal Practice of Drive-Thru Voting.

### i.  Prevalence of Drive-Thru Voting during the 2020 General Election

352.    Under Texas law, if a voter is physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health, the voter has the option of voting curbside. Sept. 14, 2023 Tr. at 827:4–7. If a voter chooses this option, an election officer will deliver a ballot to the voter at the polling place's entrance or curb. *Id.* at 827:9–12. U.S. District Court Judge Andrew Hanen wrote in an Order denying a Motion for Preliminary Injunction on the basis of standing that,

> The term 'building' is not defined in the Code. Nevertheless, Black's Law Dictionary defines 'building' as: 'A structure with walls and a roof, esp. a permanent structure.' Black's Law Dictionary (11th ed. 2019). The Court finds, after reviewing the record and arguments of counsel, that the tents used for drive-thru voting are not 'buildings' within the meaning of the Election Code. Further, they are not inside, they are clearly outside. Accordingly, if the Plaintiffs had standing, the Court would have found that the continuation of drive-thru voting on Election Day violates the Texas Election Code."

*Hotze v. Hollins*, 2020 WL 6437668, at *4 (S.D.Tex., 2020) (addressing drive-thru voting on election day). While a split Fifth Circuit panel vacated Judge Hanen's advisory on the legality of drive-thru voting without offering any opinion as to the merits of that reasoning, Judge Andew Oldham wrote in his dissent,

> Reasonable people can disagree about the wisdom or folly of drive-through voting. The place for that debate is in the Legislature. Once the dispute enters our courts, however, the only question is what the law commands. And the law could not be clearer in its prohibition of Harris County's conduct.

*Hotze v. Hudspeth*, 16 F.4th 1121, 1130 (C.A.5 (Tex.), 2021) (Oldham, J dissenting); *see also* Oct. 17, 2023 Tr. at 4357:20–4358:24.

353.    The Texas Attorney General communicated to Texas election officials that it was his belief that the election code makes no provision for drive-thru voting centers at which any voter may cast a ballot from his or her vehicle regardless of physical condition. *See* STATE Ex. 138; *see also* ECF 810.1 at 26:17–27:3. The Attorney General also told election officials that if a voter could enter the polling place on his or her own without a likelihood of injury, then it would be unlawful

to allow that voter to cast a ballot outside of the voting place. STATE Ex. 138; ECF 810.1 at 26:17–27:9. Justice Devine, at the Texas Supreme Court, echoed the Attorney General's interpretation. He "struggle[d] to see how the Election Code contemplates [Harris County's] novel concoction" given the language in Section 64.009 limiting the option of curbside voting to specific voters. *In re Hotze*, 610 S.W.3d 909, 910 (Tex. 2020) (Devine, J., dissenting).

354.    Harris County did a pilot of drive-thru voting in the July 2020 Primary Run-off, then implemented it for the November 2020 election. Sept. 19, 2023 Tr. at 1229:21–25. Harris County operated ten drive-thru voting locations for the three weeks of early voting for the November 2020 election. *Id.* at 1241:10–17. Harris County acknowledges that it was the first county to offer drive-thru voting at scale. *See* STATE Ex. 137.

355.    Hidalgo County did not utilize drive-thru voting during the 2020 election. Oct. 3, 2023 Tr. at 2342:25–2343:5. During the 2020 election, Hidalgo County had curbside voting at all physical polling locations during both early voting and on election day. *Id.* at 2343:6–16. El Paso County has never offered drive-through voting. Sept. 12, 2023 Tr. at 352:14–16. Dallas County never had drive-through voting. *Id.* at 489:13–15. Cameron County has never offered drive-thru voting. Sept. 14, 2023 Tr. at 828:11–12. SB 1 did not change Cameron County's intention on whether to introduce drive-thru voting. *Id.* at 828:16–18. Denton County has never offered drive-thru voting. Oct. 12, 2023 Tr. at 147:21–22. Denton did not have to change its drive-thru voting rules based on SB 1. *Id.* at 148:7–13.

356.    Dr. Douglas Kruse testified that voters with disabilities "are less likely to be able to drive cars." Oct. 12, 2023 Tr. at 33:2–13.

### ii.   Minority Voters Were Less Likely to Utilize Drive-Thru Voting

357.    Dr. J. Morgan Kousser cited U.S. Census data to argue that minorities are more likely to be affected by SB 1's provisions because they are less likely to own automobiles. Oct. 5, 2023 Tr. at 2897:15–23. But if minorities in Texas are less likely to own vehicles, then expanding drive-thru voting statewide may disproportionately affect minority voters. *Id.* at 2898:3–7.

358.     SB 1's drive-thru voting ban does not just apply to Harris County. Oct. 6, 2023 Tr. at 98:3–5. It also precludes the use of that procedure in other counties, such as Bee County and Calhoun County, which are predominantly white. *Id.* at 98:6–12.

359.     Mr. Ray Shackelford, an African American man, Oct. 3, 2023 Tr. at 2227:15–16, and HAUL's representative, *id.* at 2276:6–8, agreed that lack of transportation is a huge challenge among Hispanic and African Americans. *Id.* at 2271:21–24.   HAUL has distributed MetroCards and bus passes to help alleviate that challenge. *Id.* at 2271:25–2272:3. The people who receive these cards from HAUL don't have regular access to a car. *Id.* at 2272:4–8. Mr. Shackelford agreed that you cannot use a MetroCard to do drive-thru voting. *Id.* at 2272:9–11.

360.     Mr. Deion Dorsett, an African American man, *id.* at 2278:1–2, and member of HAUL, *id.* at 2281:10–15, voted by drive-thru vote in the November 2020 election. *Id.* at 2288:17–21. No other voter had told Mr. Dorsett that they would not vote due to a lack of drive-thru voting. *Id.* at 2303:11–14. Mr. Dorsett himself subsequently voted successfully in both the May 7, 2022 election and the May 24, 2022 election. *Id.* at 2306:9–12.

361.     Comparing the demographic breakdown of Harris County with the demographic breakdown of those who utilized drive-thru voting reveal that minority voters utilized drive-thru voting at rate that was less than their percentage of the population. *See* ECF 810-1 at 207:21–209:322 (Sen. Alvarado Designations); *see also* STATE Ex. 290; *c.f.* Oct. 2, 2023 Tr. at 2044:25 – 2045:6 (noting that majority of every racial group walked inside to vote). White voters, in contrast, utilized drive-thru voting at a rate that was noticeably greater than their percentage of the population. *See* ECF 810-1 at 210:16–211:5. (Sen. Alvarado Designations); *see also* STATE Ex. 290. Dr. Mayer, acknowledged that "more White votes use[d] drive-thru voting than voters of any other race." Oct. 2, 2023 Tr. at 2045:7–15.

362.     The Former Elections Administrator in Harris County also acknowledged that the majority of drive-thru voting locations in November 2020 were placed in minority-majority senate districts. Sept 20, 2023 Tr. at 1394:18–1396:16. the Harris County Election Office did not assess whether the placement of these locations in minority-majority areas had an impact on the

demographic distribution of voters who utilized the drive-thru voting option. Sept. 20, 2023 Tr. at 1396:19–1397:12.

89.

### iii. Early On, Concerns Raised about Vote Discrepancies.

363.    Just before election day, the Secretary of State's Office received a complaint from a member of Harris County Republican Party, who had reported to NRG Arena to observe a logic and accuracy test. Oct. 17, 2023 Tr. at 4362:6–4363:16; *see also* STATE Ex. 429 at 6–7. The election complaint alleged a number of irregularities, including an unresolved discrepancy between the roster produced by the Harris County Clerk's Office containing the voters who cast votes in this election and the cast vote records downloaded from the eSlates. Oct. 17, 2023 Tr. at 4362:25–4363:6; *see also* STATE Ex. 429 at 2, 6–7.

364.    Senator Bettencourt raised both the complaint and alleged discrepancy up at the August 9, 2021 State Affairs hearing, when Former Harris County Election Administrator Isabel Longoria appeared in order to testify against SB 1. STATE Ex. 42:9–45:9, 58:12–59:24. He again raised the discrepancy on the Senate floor, stating that it remained unexplained. STATE Ex. 37:5–15. When questioned, Ms. Longoria argued that the discrepancy was only alleged. STATE Ex. 58:12–59:1. However, the Secretary of State's Office reviewed Harris County's records during it forensic audit and confirmed that the reported vote for all Harris County's drive-thru voting locations totals were wrong. Oct. 17, 2023 Tr. at 4363:17–19.

### iv. The Secretary of State's 2020 Audit Identified a Number of Irregularities.

365.    Senate Bill 1 created a requirement for randomized county audits. Prior to the effective date of Senate Bill 1 an audit of four of Texas' largest counties was ordered by the Texas Secretary of State, covering Collin, Dallas, Harris and Tarrant counties, and the Secretary of State's Office created a Forensic Audit Division to conduct that audit as well as the subsequent audits. Oct. 17, 2023 Tr. at 4209:24–4210:7. Ms. Jacqueline Doyer was the attorney for the

Forensic Audit Division and later its Deputy and Legal Director. Oct. 17, 2023 Tr. at 4209:21–23, 4210:8–12.

366.   The first employees of the Forensic Audit Division were hired in February 2022. Oct. 17, 2023 Tr. at 4211:7–13. The Forensic Audit Division's first project was an investigation of voting irregularities in Brazos County in March 2022. *Id.* at 4264:17–23. The Forensic Audit Division had as many as 15 employees. *Id.* at 4211:21–25. The audit of the 2020 General Election in Texas was ordered in September 2021 by the Secretary of State and occurred in two phases. *Id.* at 4210:22–4211:13. The final audit report was issued in December 2022. *Id.* at 4213:1–5.

367.   The December 2022 report covered phase two of the audit. Oct. 17, 2023 Tr. at 4219:23–4220:4. Eight auditors participated on the December 2022 report. *Id.* at 4220:17–19. The Forensic Audit Division looked at the data received from the counties and what procedures in the election code or procedures promulgated through the administrative code or the Secretary of State and then checked for compliance with those requirements. *Id.* at 4220:20–4221:3. The four counties were selected because "They were the two largest Republican-controlled county governments and two largest Democratic-controlled county governments to give us a bipartisan look at how elections were run in those two different categories." *Id.* at 4221:4–10.

368.   The Forensic Audit Division reviewed documents from each of the four counties. *Id.* at 4221:11–13. The county documents were requested from the election administrators in each of the four counties. *Id.* at 4222:1-7. The counties were provided a detailed list of the documents and information to be provided for the audit. *Id.* at 4223:14–16. The Forensic Audit Division reviewed the documents, which largely consisted of documents the counties were required to maintain under federal or state law. *Id.* at 4223:17–24. The Forensic Audit Division received and reviewed 369 gigabytes of data from the four counties. *Id.* at 4223:25–4224:3. The audit identified "irregularities that ranged from small to large in all four counties." *Id.* at 4229:24–4230:8.

369.   When checking whether Harris County was compliant with the Election Code's requirement on chain of custody through the end of the election and up to storage, the Forensic Audit Division found that "there were many Central Count packets that were missing mobile ballot

boxes and we located several that were stored in other locations with no documentation or explanation for why that had occurred." Oct. 17, 2023 Tr. at 4239:11–4240:4. Ms. Doyer testified that "There was one polling location that Harris County did document properly and we referred to that in the report." *Id.* at 4239:11–4240:4, *see infra* State 115222 at 278.

**v.   The Audit Revealed that Every Drive-Thru Voting Location in Harris County had Voting Discrepancies**

370.    The Forensic Audit Division reviewed the canvass data provided by Harris County and "In the course of attempting to reconcile that data we learned that there were multiple locations that were not appearing in the tally or tabulation software. That included all drive-thru voting locations." Oct. 17, 2023 Tr. at 4230:10–25. While trying to find the source of the missing data, the Forensic Audit Division "discovered further issues with chain of custody and things of that nature." *Id.* at 4231:7–4232:12. Even after gathering additional information from Harris County, the Forensic Audit Division had difficulties in reconciling the number of voters who checked in to vote and the number of votes that were actually counted in Harris County in the 2020 General Election. *Id.* at 4234:21–4235:1. "Ultimately, the reconciliation showed that some locations had too many ballots according to records of how many voters should have been there and some locations had too few ballots." *Id.* at 4236:7–17.

371.    The technology and equipment used by Harris County in drive-thru voting did not operate properly and caused issues with reconciling votes cast versus records of voters checked in. Oct. 17, 2023 Tr. at 4236:18–4237:23. Because of voting equipment being destroyed or lost in Harris County "there were several polling locations that had mobile ballots boxes that (FAD) couldn't verify the origins of those cards." *Id.* at 4238:2–17. Harris County's equipment problems would "essentially make the tape internally inconsistent. . . it would not match the number of -- cast vote records on an eSlate would not necessarily match the number of access codes or ballots voted according." *Id.* at 4238:21–4239:12. The Forensic Audit Division found mobile ballot boxes from drive-thru locations in Harris County that were not ultimately tabulated. *Id.* at 4240:5–8. Ms. Doyer testified that the implication of this is "it causes questions about what was tabulated and

115

whether or not we can verify it's the same records that came from the polling location." *Id.* at 4240:9–11.

90. It is possible that some of the ballots that voters cast in their vehicles at drive-thru locations in Harris County in the 2020 General Election were never actually included in the final count, because canvass records indicated that "there were several locations that had a negative value, meaning you had more voters that were checked in than you had ballots. So there were—you know, we were negative ballots, meaning there were probably voters that didn't have their ballots cast likely given the records." Oct. 17, 2023 Tr. at 4240:14–25. The number of expected cast vote records at a polling location is determined by adding the number of poll book check-ins and the number of provisional ballots casts, which are tallied separately from check-ins. *Id.* at 4241:17–20. When Forensic Audit Division compared the number of expected cast vote records at one of Harris County's drive-thru voting locations with the actual number of cast vote records, they found a discrepancy. Ms. Doyer testified that there were "5800 expected from this drive-thru voting location, but the number of cast vote records that were actually in the tabulation software was 5,775, meaning they were 25 short." *Id.* at 4241:4–4242:1.

372. None of the ten drive-thru locations in Harris County in the 2020 General Election were able to match the number of expected cast vote records with the cast vote records. Oct. 17, 2023 Tr. at 4242:17–21. Each location had either a positive or negative difference between the expected number and the actual number. *Id.* at 4242:17–4243:2. Ms. Doyer agreed that all the drive-through voting locations in Harris County had discrepancies. *Id.* at 4306:16–18. When asked whether was possible to determine to know whether the voters associated with a negative difference ever had their ballots counted, Ms. Doyer replied "No. And that's further complicated by the absence of any audit logs to tell us, which some of these didn't have audit logs to which eSlates were backed up." *Id.* at 4243:2–9. There was a more than 800 vote discrepancy, either positive or negative, at the drive-thru locations used by Harris County in the 2020 General Election. *Id.* at 4243:10–14. Ms. Doyer considered the 800-plus vote discrepancy in the drive-thru votes an irregularity in the 2020 General Election in Harris County. *Id.* at 4245:10–13.

373.    SB 1 addresses irregularities that the Forensic Audit Division identified in "Multiple ways, but the most obvious would be by eliminating drive-thru voting." Oct. 17, 2023 Tr. at 4245:14–20. Other ways that SB 1 addresses the vote count discrepancy includes:

(1)  requiring paper-backed ballots, which creates a paper trail to verify the contents of the mobile ballot boxes;

(2)  requiring "the printing of a zero tape or an opening and closing tape that can assist with ensuring that you have the right piece of equipment at that polling location, as well as a closing tape, and so looking at that tape at the end of the day to see the ballots cast you can see that there would have been a discrepancy. That's fairly obvious on the tapes that we observed in 2020. So that would address that issue;"

(3)  requiring counties to submit a tabulation audit log to the Secretary of State within five days of an election, which incentivizes counties to provide additional oversight;

(4)  requiring "video surveillance over ballots and things that are coming back from the polling location" to prevent chain of custody issues and "assist with any questions regarding the integrity of the ballots;"

(5)  "The Secretary of State put together an open and closed polling checklist that was required by SB 1 to standardized the procedures in polling locations across the state;" and

(6)  requiring reconciliation forms that look "at number of voters and ballots cast. That's already proven useful. . .Harris County during the Primary in 2022, they discovered a 10,000 vote discrepancy -- or 10,000 ballot discrepancy and

117

that was able to be rectified before election results were certified." Oct. 17, 2023 Tr. at 4245:21–4247:9.

374.    The audit also found 14 early voting locations in Harris County where multiple mobile ballot boxes (MBB) for voting machines were created without explanation and the original mobile ballot boxes weren't tabulated. Oct. 17, 2023 Tr.. at 4243:22–4244:1. Nine of the ten drive-thru locations were on the list of 14 voting locations with unexplained, multiple mobile ballot boxes. *Id.* at 4243:15–4244:16. Harris County had over 700 voting locations for election day and over 100 locations for early voting. *Id.* at 4244:21–4245:1. When there's an unexplained discrepancy between the number of voters who checked in to vote and the number of votes actually counted in the canvass, it can undermine public confidence in the election process. *Id.* at 4245:2–8. Nine of the ten drive-thru voting sites were shut down for election day. See ECF 810.1 at 28:5–22.

### F.   Harris County Introduces 24-Hour Voting for the First Time in Texas History.

375.    Texas has had two weeks of early voting since the mid-1980s. Oct. 3, 2023 Tr. at 2210:12–17, but 24-hour voting was not widely allowed in Texas prior to 2020. *Id.* at 2210:18–20. 24-hour voting in Harris County was a "one day, one time" event that had not been done before 2020. *Id.* at 2273:21–2274:2. Harris County Elections Administrator Isabel Longoria admitted that race was a factor in the placement of drive-thru voting locations. Sept. 20, 2023 Tr. at 1394:2–1397:12. Harris County had eight polling places that offered 24-hour voting during the November 2020 election. *Id.* at 1262:25–1263:3. Harris County's turnout percentage for the November 2020 election was just below the state average of 66.73%. *Id.* at 1385:9–11.

376.    Hidalgo County has never offered 24-hour voting. Oct. 3, 2023 Tr. at 2338:8–9. Former Hidalgo County Elections Administrator Ms. Yvonne Ramon testified that prior to SB 1, counties were not required to open polls on the weekend during early voting. *Id.* at 2353:11–16. Hidalgo County added one hour for Sunday early voting because of SB 1. *Id.* at 2314:6–12. Ms. Ramon agreed that the only change SB 1 made to Hidalgo County's polling hours was requiring an

extra hour on Sundays (during early voting). *Id.* at 2534:20–23. On a question about voting hours required by SB 1: "(T)he uniformity for the voter in our county, it's great." *Id.* at 2366:5–13. Ms. Ramon agreed that having uniform voting hours makes early voting easier and more accessible and that was why she "had implemented 12-hour days." *Id.* at 2353:22–24.  SB 1 required polls to be open at least nine hours per day during early voting. *Id.* at 2353:25–2354:2. SB 1 required that polls be opened for 6 hours on Sunday during early voting. *Id.* at 2534:3–6.

377.    El Paso County has never offered 24-hour voting. Sept. 12, 2023 Tr. at 275:12–14. El Paso County Elections Administrator Wise had staffing concerns regarding opening polling locations for 24 hours. *Id.* at 351:11–15.

378.    Cameron County has never offered 24-hour voting, Sept. 14, 2023 Tr. at 825:25–826:1, and did not offer 24-hour voting in November 2020. *Id.* at 825:22–24. Cameron County's voting hours already fell within SB 1's range. *Id.* at 826:6–8. Cameron County's historical patterns show hours offered outside the range already offered wasn't a busy time. *Id.* at 826:21–24. 24-hour voting is not something they would have implemented based on their history. *Id.* at 826:25–827:3. Cameron County Elections Administrator Mr. Remi Garza admitted that Section 3.09 guarantees more hours of voting and makes voting easier. Sept. 13, 2023 Tr. at 775:21–778:1. Mr. Garza testified that Section 3.10 makes early voting more accessible for voters by requiring more counties to be open at certain times and requiring more hours at those locations. Sept. 13, 2023 Tr. at 778:2–779:22.

379.    Denton County has never organized either 24-hour polling locations or polling locations that were open after 10:00 p.m. or before 6:00 a.m. Oct. 12, 2023 Tr. at 3856:15–17. Denton County did not have to change the hours its polling locations were open in response to SB 1. *Id.* at 3857:14–17. When asked why Denton doesn't have 24-hour voting, voting after 10:00 p.m. or before 6:00 a.m., Denton County Elections Administrator Mr. Frank Phillips explained

> whenever you open, you have to staff that polling location with poll workers. So
> number one, that's going to be your first challenge is trying to find enough workers
> to fill those extra hours. And that, in turn, eats into your budget. I mean, you always
> had budget considerations to take care of. And especially on 24-hour, we just don't

feel that enough people would vote to -- you're not going to get a return on your investment. You're not getting -- I don't want to say it's not worth it. That sounds bad, but it's return on investment is the way I think about it. I just don't think you're going to get it.

*Id.* at 3856:18–147:6.

91.     When asked whether he had concerns about the safety of election workers, Mr. Phillips replied, "I do, especially late at night, of course." Oct. 12, 2023 Tr. at 3857:7–9. Mr. Phillips reviewed Def-State-161, which was a Secretary of State report that listed Denton County Voter Registration and Turnout Figures. *Id.* at 3858:14. Mr. Phillips noted that the sheet indicated turnout was 63.89% of registered voters in 2016 and 73.72% of registered voters in 2020. *Id.* at 3858:14–3859:13. Mr. Phillips agreed that this nearly 10% jump in turnout between 2016 and 2020 occurred without Denton County having either 24-hour-voting or drive-thru voting. *Id.* at 3859:14–17.

380.     Travis County has never offered 24-hour voting. Sept. 14, 2023 Tr. at 825:25–826:1.

381.     Mr. Shackelford, HAUL's representative, October 3, 2023 Tr. at 2276:6–8, was not aware of any individuals who utilized 24-hour voting during the 2020 elections. *Id.* at 2250:22–25. Ms. Sharon Watkins Jones testified that Section 3.10 helps ensure that people can vote on a Sunday. *Id.* at 2211:22–2212:1. Ms. Watkins Jones could not identify any Delta Sigma Theta member unable to vote because of 3.10. *Id.* at 2211–2212:17. Ms. Watkins Jones was not aware of any Delta Sigma Theta voter who had previously voted between 10:00 p.m. and 6:00 a.m. *Id.* at 2223:14–21.

382.     Mr. Ingram, formerly of the Secretary of State's office, when asked if voters would be confused because counties have different hours, replied,

We found it a lot where there's a large county surrounded by several rural counties that aren't covered by the same statutory requirements, so they expect 12 hours of voting the second week of early voting in their county and they are under the 55,000 population threshold so they don't have it. And it's more exacerbated, the problem is more exacerbated when a school district goes across county lines that have different voting hours.

Oct. 17, 2023 Tr. at 4367:24–4368:8.

### G. Multiple In-Person Delivery Locations

383. Harris County organized multiple in-person delivery locations during the 2020 Election located at the county clerk's branch offices. Oct. 17, 2023 Tr. at 4391:10–13. The early voting clerk in Harris County during the 2020 election was county clerk Chris Hollins. *Id.* at 4392:18–22. A county clerk may have branch offices, but an election administrator only has one office and therefore one place that a mail ballot can be delivered. *Id.* at 4392:18–4393:7. Prior to SB 1, the Secretary of State's office advised counties that election officials should record the names and signature of any voter who returned a marked mail ballot in person. *Id.* at 4391:14–23. The Secretary of State's office so advised counties in order that there would be "a record of how those ballots were delivered . . . so that if anybody wants to look at it later they can go back and satisfy themselves that everything was done correctly. You know, the whole point of having a challenge-free election is to have a transparent election." *Id.* at 4391:24–4392:6. SB 1's Section 4.12 "codified our requirement that the counties provide a roster for hand-delivery of mail ballots." *Id.* at 4392:9–11. If Section 4.12 were enjoined, counties would still not be permitted to introduce drop boxes into their elections under the Texas Election Code. *Id.* at 4392:14–17.

384. In 2020 an election administrator in Fort Bend County tried to set up multiple in-person delivery sites. Oct. 17, 2023 Tr. at 4393:8–10. The Secretary of State's office considered that a violation of the election code. *Id.* at 4393:11–13. When asked the legality of Fort Bend County having multiple in-person delivery locations, Mr. Keith Ingram, the former director of the Secretary of State's Election Division replied that "it would not be legal. And that's an important thing, because unlike drive-thru voting, if a mail ballot is improperly delivered it cannot be counted and so this would directly effect voters' rights." *Id.* at 4934:15–23.

385. El Paso had only one location for mail ballots to be delivered to the early voting clerk, a requirement which preexisted SB 1. El Paso never considered having more than one location. Sept. 12, 2023 Tr. at 353:2–11. They never considered it because of a pre-SB 1 requirement that mail ballots be delivered by the voter to the early voting clerk. *Id.* at 352:24–353:11.

386.    Bexar County allows voters to deliver their voted mail ballot to the one early voting clerk's office. Sept. 19, 2023 Tr. at 1052:21–1053:13. The voter must

> present themselves they must show their photo ID and they must sign in, just as if they were at a poll site voting in person, because at that point they are voting, and so we accept their mail ballot, we sign it in, and then we put it in a locked ballot box until we turn those over.

*Id.* at 1052:21–1053:13. The collected ballots are turned over to the early ballot board, which verifies that the carrier envelope has been filled in correctly and checks the ID number. *Id.* at 1053:20–1054:3. Bexar County would not accept a mail-in ballot on Election Day for anybody other than a voter who identifies themselves. *Id.* at 1055:4–7.

387.    Prior to SB 1, there was always an election official there to take possession of the mail ballot turned in in-person in Denton County. Oct. 12, 2023 Tr. at 3853:24–3854:8. Ballots were not dropped into an unattended box. *Id.* at 3854:9–10. Following the passage of SB 1, Denton County continues to have an election official present to take possession of a mail ballot delivered by voters. *Id.* at 3854:11–14. Denton County Elections Administrator Frank Phillips does not support drop boxes. *Id.* at 3854:21–22. When asked why not, Mr. Phillips explained

> my reasons may be different than some other reasons. I'm -- what worries me about a drop box is they are typically unattended, and that drop box has some type of slot that you can put your ballot in. Now, it may be the old cop in me, but every time I think of a ballot -- a drop box, I think of what could happen to that, what could somebody do to it to destroy it. And really, all it would take is somebody with a little bit of gasoline or something like that, squirt it in the slot, and throw a match in there, and you've torched the whole thing, so I'm adamantly opposed to drop boxes.

*Id.* at 3854:21–3855:8. Denton County did not utilize drop boxes before or after SB 1. *Id.* at 3855:9–12.

## H. Fraud in Denton County Shows Vulnerabilities of Mail-in Voting

388.    Law enforcement in Denton County filed a search warrant on October 8, 2020, requesting the time, place, and objects to be searched in connection to a suspected crime of

"Fraudulent Use of Application for Ballot by Mail, [in violation of] Texas Election Code Sec. 84.0041." *See* ECF 811-1 ¶ 2. Law enforcement affirmed that they had probable cause, noting "irregularities in about 70 applications for Ballot by Mail;" Denton County Election Administrator Frank Phillips "said they first noticed all the applications had the same address to mail the ballot to the suspect address...." and law enforcement also noted the signatures on the duplicate applications did not match, and upon contacting at least nine persons named on the duplicate ballot applications, all nine reported they were fraudulent. *Id.* at 3–4; *see also* Oct. 12, 2023 Tr. at 3824:12–3825:4.

389.    The Denton County peace officer who investigated the case met with Denton County Election Administrator Frank Phillips and discussed the suspected fraudulent ballot by mail scheme, which came to Mr. Phillips' office's attention when about 84 Ballot by Mail Applications were submitted from the same address for the November 3, 2020 election and the affidavit specifies the type of address that was used, a P.O. Box. Oct. 12, 2023 Tr. at 3829:16 – 24; *see also* ECF 811-4 (identifying 84 counts).

390.    The Denton County peace officer and his partner contacted the names of the individuals on the applications, who reported the signatures were not theirs and were in fact fraudulent. *See* ECF 811-1 at 3. Affiant further attested to the investigation and the use of an undercover officer, who posed as an employee at the Post Office, which resulted in the suspect requesting mail from the P.O. Box listed on the fraudulent applications. *See* ECF 811-2 at 5. The suspect then took the fraudulent mail in ballots to his home, where he was arrested on October 7, 2020. *See* ECF 811-2 at 6.

391.    A grand jury was impaneled and charged the defendant, Mr. Zul Mohamed, in Denton County, Texas with 25 violations Section 86.006 of the Texas Election Code. *See generally* ECF 811-3. Each count of this indictment, Warrant No. 20-596318-A, Control No.12496, filed in Denton County includes a name of a Denton County voter who was allegedly defrauded by Defendant's scheme, in which Defendant knowingly possessed an official ballot or carrier envelope intended for the named voter. *Id.*

392.    A grand jury also charged the defendant in Denton County, Texas with 84 violations of Section 84.0041 of the Election Code. *See generally* ECF 811-4. Each count of this indictment, Warrant No. 20-596318-B, Control No.12497, filed in Denton County includes a name of a Denton County voter who allegedly attempted to defraud by "intentionally or knowingly submit an application for ballot by mail without the knowledge and authorization" of the voter. *Id.*

393.    The OAG investigated Zul Mohamed and assisted with Denton County with the case in Carrollton, TX. Oct. 16, 2023 Tr. at 3951:22–3951:4, LUPE309. When asked about the OAG's involvement in the Zul Mohamed case, Mr. White testified

> we were asked in by the Denton County Sheriff's Office to assist with an election offense that they were investigating. I reviewed original election documents and evidence in this case. I assisted with the preparation of the probable cause affidavit for the search warrant -- or search warrants that were run involving this candidate, and we subsequently invested similar allegations in Dallas County, and I was privy to all of those documents as well. And the original evidence.

*Id.* at 3951:10–20. Mr. White described the conduct of which Zul Mohamed has been charged as follows "Mr. Mohamed, as it says in the press release, obtained a virtual mailbox in one of those mailbox stores using a false ID, and then he had directed mail ballot—or he submitted mail ballot applications to have mail ballots directed from at least 84 voters to that mailbox, and he was arrested in possession of 25 actual mail ballots." *Id.* at 3952:11–19.

394.    Mr. Mohamed was a candidate for Mayor of Carrollton. Oct. 16, 2023 Tr. at 3952:24–3953:3. Mr. White had phone calls with Dallas County regarding the Zul Mohamed case. *Id.* at 4015:23–4016:1. Mr. Frank Phillips was the election administrator for Denton County during the November 2020 General Election. Oct. 12, 2023 Tr. at 3823:4–6. When asked whether his office identified any allegations of election fraud in the November 2020 General Election, Mr. Phillips replied

> We did. There was a -- even though that was the General Election for state and county officers, we still had a – a special election that the City of Carrollton had placed on the ballot for mayor. And we discovered that one of the mayoral candidates was submitting multiple fraudulent applications for ballot by mail.

*Id.* at 3823:7–14. The person who is alleged to have done this is named Zul Mohamed. *Id.* at 3823:15–3823:10.

395.    When asked what first alerted his office to the possibility that mail voting fraud may have been occurring, Mr. Phillips replied

> It was actually a temporary employee who we had hired to help input applications for ballot by mail into our system, and she brought it to the attention of my absentee coordinator that she had noticed several of the applications were being asked to be mailed to an address in Lewisville, and she kept seeing that address repeatedly.

Oct. 12, 2023 Tr. at 3824:12–20. When asked why it was a red flag that multiple ballots were being sent to a single address, Mr. Phillips replied

> Well, it's not abnormal at all for three or four to go to an address, but when you start seeing that number up in the teens or more, you know, it's a red flag of potential fraud. So at that point, I asked them to collect all of those, bring them to me, and go back through the ones they had already processed to make sure that they didn't miss any before she first noticed it.

*Id.* at 3824:21–3825:4. Once his office noticed the irregularity, Mr. Phillips looked up the address on the applications for ballot mail. *Id.* at 3825:5–7. Mr. Phillips identified the address as being a commercial post box facility. *Id.* at 3826:15–17.

396.    When asked what actions he took after determining that the address on the applications for ballot by mail was a commercial post box facility, Mr. Phillips replied

> I attempted to -- well, when I was in Tarrant County, the Attorney General's Office had an investigator work with us on a case they were working, and -- just to provide information. And I tried to contact that person, but honestly, I couldn't find his contact info so called our sheriff's department.

Oct. 12, 2023 Tr. at 3826:18–24. The Denton County Sheriff's Office executed a search warrant for Mr. Mohamed. *Id.* at 3826:25–3827:2. To Mr. Phillips knowledge, the voters listed on the applications for ballot by mail did not consent to having Mr. Mohamed submit their applications for ballot by mail on their behalf. *Id.* at 3828:12–14. Mr. Mohamed allegedly submitted 84 applications for ballot by mail. *Id.* at 3829:16–24.

397.     When asked if, based on his experience and knowledge of Texas law and election procedures, incidents of voter fraud could disenfranchise voters, Mr. Phillips replied "Absolutely." Oct. 12, 2023 Tr. at 3830:2–5. When asked how voter fraud could potentially disenfranchise voters, Mr. Phillips explained

> Well, let's take an example of someone submitting a fraudulent application for ballot-by-mail that is not discovered, and they are mailed a mail ballot, they vote that mail ballot and return it. Then we're going to mark in our system that that voter has voted. Now, if that voter, the real voter turns around and does one or two things: Either submits an application for ballot-by-mail, we would reject it, in that they had already submitted a mail ballot, or if they showed up in person, our system would show that they had already voted by mail. And assuming our poll workers follow the proper procedure, they will notify us, and then that voter would be offered a provisional ballot until it could be worked -- or worked out, but it is possible that, yes, they could be denied the right to vote.

*Id.* at 3830:2–20. Mr. Phillips stated that this would have been the outcome of the alleged incident that occurred in Denton County in 2020, if one of the voters that had an ABBM submitted on their behalf had attempted to vote. *Id.* at 3830:21–25.

398.     When asked if in his experience mail-in voting was more vulnerable to fraud than in-person voting, Mr. Phillips replied "Absolutely." Oct. 12, 2023 Tr. at 3831:1–3. When asked why mail-in voting would be more vulnerable, Mr. Phillips explained "anytime that ballot leaves our office, we don't know what happens to it. We don't know whose hands it passes through or who actually, you know, voted and returned that ballot, so the potential is there." *Id.* at 3831:4–8. Mr. Phillips was asked whether Mr. Mohamed, who is accused of voter fraud in the incident in 2020, took advantage of these vulnerabilities when he submitted ABBMs. Mr. Phillips responded "Yes, in my opinion, yes." *Id.* at 3831:16–19. When asked whether the fraud would have gone undetected in 2020 if there weren't so many ABBMs routed through the same commercial address, Mr. Phillips replied "Yeah, I think it's highly likely it would have went undetected." *Id.* at 3831:20–3832:5.

399.     The City of Carrollton, TX, in addition to Denton County, is located in Dallas County and Collin County. Oct. 12, 2023 Tr. at 3837:18–25. Mr. Phillips was not aware of either Dallas County or Collin County detecting the alleged fraud being conducted in 2020. *Id.* at 3838:1–3. After he became aware of the alleged fraud, Mr. Phillips' office sequestered the flagged ABBMs and mail ballots, and turned them over to the Denton County sheriff. *Id.* at 3838:4–10. Mr. Phillips was not aware if either Dallas or Collin County were able to sequester fraudulent ABBMs or mail ballots submitted by Mr. Mohamed. *Id.* at 3838:11–14.

400.     When asked whether he was aware of any elections decided by a handful of votes, Mr. Phillips replied "Absolutely." *Id.* at 3838:15–16. When asked to provide an example, Mr. Phillips recounted the following:

> City of Pilot Point just elected their current mayor by -- well, during the regular election, they tied, and then they had to go into an run-off, and then the mayor ended up winning by, it the either one or two votes. Same person won a city council seat a few years before with one vote. And we routinely have -- especially smaller cities -- that the winner may be decided by ten or twelve votes.

*Id.* at 3838:15–24. Mr. Phillips was asked, based on his experience, whether it was more likely that voter fraud could change the outcome of a close election, and he agreed that it was. *Id.* at 3838:25–129:3.

401.     The alleged fraud perpetrated in Denton County in 2020 was covered by news outlets. Oct. 12, 2023 Tr. at 3839:4–6. When asked when news broke of the alleged fraud, Mr. Phillips replied "I don't remember the date, but they broke the day that the sheriff made an arrest." *Id.* at 3839:7–10. Mr. Phillips agreed that the news reports came out just as the 2021 legislative session was about to start. *Id.* at 3839:11–13.

402.     The Denton County Elections office provides training to members of the early voting ballot board. Oct. 12, 2023 Tr. at 3815:15–17. This training covers "signature verification, accepting mail ballots or the carrier envelopes once they come back in, and any legislative changes that may have occurred since they last served on the early voting ballot board. And we generally follow the handout that the Secretary of State provides." *Id.* at 3815:18–25. Mr. Phillips testified

that training usually takes place the first day - "That's the first thing we do with them." *Id.* at 3833:1–7

403.   When asked about establishing the identity of a mail voter prior to SB 1, Mr. Phillips testified "When that carrier envelope that contains the ballot comes into our office, we look that voter up again and just mark the record that they have voted. Now, actually confirming the identity, no." *Id.* at 3816:1–6. The early voting ballot board would analyze the voter's signature before accepting and counting the ballot. *Id.* at 3833:8–11.

404.   Pre-SB 1 the signature comparison process would work as follows:

Whenever we get an application for ballot-by-mail, we scan that into our system, we capture that signature. When the carrier envelope that contains a ballot comes in, we scan that into our system, capture that signature -- image of that signature, and then the early voting ballot board compares the signature on the application for the ballot-by-mail with that -- the signature on the carrier envelope. If they match, in their opinion, they are accepted. If they don't, then there is a procedure they can go through to try to rectify it. . .the way we literally have it is we have one Republican, one Democrat that are agreeing that these signatures match. If they don't, then the whole ballot board reviews that signature -- those signatures. And either accept or reject it.

Oct. 12, 2023 Tr. at 3833:12–3834:3.

405.   When asked what signatures they would use as the comparison with the one appearing on the carrier envelope, Mr. Phillips explained "they would use the signature on the ABBM, application for ballot-by-mail, and the carrier envelope. They also had the authority to go back -- I believe it was six years at the time -- to -- of any other signatures we may have had on file." Oct. 12, 2023 Tr. at 3834:4–10. Mr. Phillips confirmed that the signature verification committee or early ballot board would compare the ballot signature with the signature on the ABBM. *Id.* at 3834:14–17. Mr. Phillips agreed that if a fraudulent ABBM were submitted, and then afterwards the mail ballot was submitted, then the signature verification committee or early voting ballot board would compare the signature on the fraudulent ballot to the signature on the fraudulent application. *Id.* at 3834:18–23.

406.     Signature verification did not catch the 2020 fraud case where several ballots had been sent to the same commercial mailbox. Oct. 12, 2023 Tr. at 3834:24–3. When asked why the signature requirement did not flag fraud in the 2020 case, Mr. Phillips explained "in this specific case, we only had the signature on the application for ballot-by-mail. At that point, there was no other signature to compare it to." *Id.* at 3835:4–8. Mr. Phillips agreed that this was one of the vulnerabilities of voting by mail. *Id.* at 3835:9–11. When asked whether he thought SB 1's mail ballot ID requirements could have helped identify the alleged fraud in the City of Carrollton case, Mr. Phillips responded "I believe it would have been harder to commit that with the SB 1 requirements." *Id.* at 3878:12–19. When asked what had changed after SB 1 in the process of establishing the identity of applicants who have submitted an application for ballot by mail, Mr. Phillips testified "It's virtually the same process I described before with the addition of driver's license, Texas state ID or -- and/or the last four of the Social Security number. And one of those has to match what we have on file in the voter registration system." *Id.* at 3835:12–21.

407.     When asked how Denton County now determined the identity of a voter who submitted a mail ballot, Mr. Phillips replied "With that driver's license or Social." Oct. 12, 2023 Tr. at 3835:22–24. His office will remove the flap on the carrier envelope to determine whether the voter put an ID number that matches the one on file. *Id.* at 3835:25–126:3. The Denton County Election's office utilizes the ID number required under SB 1 to confirm threat the person casting the ballot is, in fact, the registered voter qualified to vote by mail. *Id.* at 3836:4–12. When asked whether he thought SB 1 addressed the vulnerabilities with mail-in voting, Mr. Phillips replied "It definitely goes a long way in addressing vulnerabilities, yes." *Id.* Tr. at 3836:13–17.  Mr. Phillips was asked why he thought SB 1 went a long way in addressing mail-in voting vulnerabilities. Mr. Phillips explained

> Well, not to use the exact example, but if we had someone that was submitting a
> fraudulent application for ballot-by-mail, before SB 1, really, all they needed was a
> list of registered voters, and they could fill out their information, the information
> that was required on the application for ballot-by-mail. . . And it would be very hard
> to do that postSB 1, because you're also going to have to have a driver's license

number or the last four of a Social or Texas ID number. To find those in large numbers would be extremely difficult.

*Id.* at 3836:18–3837:4. Mr. Phillips agreed that the lack of an ID number requirement made it easier to complete fraudulent ABBMs and receive illegitimate mail ballots in the alleged (2020) fraud. *Id.* at 3837:14–17.

## I. Proffer of Proof

408.     The following facts were solicited during Mr. White's proffer of proof following the Court's order, granting LUPE Plaintiffs' motion in limine.

409.     Mr. White's office became aware of the Zul Mohamed case when it "received a call from Denton County Sheriff's Office who was investigating at the behest of their election administrator, who had reported the – some suspicious activity." Oct. 16, 2023 Tr. at 4118:4–8. Mr. White was asked about the role of the OAG and role of county prosecutors in the Zul Mohamed case. Mr. White explained "Denton County prosecuted the Denton County piece. We conducted a separate Dallas County investigation on our own, and that was not accepted for prosecution by Dallas County." *Id.* at 4117:5–11. The OAG performed an investigation alongside Denton County. The OAG did the Dallas County on its "own, referred it, and they rejected it." *Id.* at 4117:24–4118:3. The Denton County D.A. investigatory records are not in Mr. White's possession, custody, or control. *Id.* at 4117:12–14.

410.     When asked to describe his office's communications with the Dallas County DA's office, Mr. White replied "Conversations regarding obtaining records, elections records, and conversations regarding the case itself and referring it for potential prosecution." Oct. 16, 2023 Tr. at 4118:9–4119:8. This was an OAG investigation that the Dallas County DA's office elected not to take. *Id.* at 4119:10–13. When asked his understanding of why Dallas County DA's office chose not to take the case, Mr. White answered "Our understanding is that Dallas County DA's office will accept no case for prosecution that comes from the Attorney General's Office." *Id.* at 4119:14–24.

411. When asked what role signature verification played, if any, in preventing Mr. Mohamed from completing his alleged fraud, Mr. White answered "Signature verification did not help in that case, because he was the one providing the signature on both the application and the carrier envelope, potentially, of those votes, so they would have matched ostensibly." Oct. 16, 2023 Tr. at 4119:25–4120:6. Mr. White was asked how Denton County was able to identify Mr. Mohamed's alleged fraud. Mr. White answered, "The elections office did some additional research when they saw a large number of ballots going to a single address, and they looked up what type of entity it was and found that it was a mailbox store as opposed to a group living facility or something like that." *Id.* at 4120:7–13. When asked if he knew how many votes Mr. Mohamed was alleged to have wrongfully cast, Mr. White answered "In Denton County, because he was arrested in the act and in possession of those envelopes, none of those votes in Denton County were cast, but some were in Dallas." *Id.* at 4120:14–4121:24.

412. When asked to describe what a harvesting scheme involving deceased voters would look like, Mr. White explained

> It could be as simple as a mistake by the harvesting crew not knowing that they've swept up a deceased voter, but they requested an application for a voter that is still on the rolls and shouldn't be, because they weren't removed. Or it could be purposeful like what we saw in the Mohamed Zul case where he as targeting voters that had – didn't have any recent voter history and, in doing so – and also elderly, the older voters, the oldest of the elderly voters. By doing that, he got a chunk of deceased voters.

Oct. 16, 2023 Tr. at 4115:20–4116:5. When he asked the basis for this opinion, Mr. White replied

> Based on my review of the election records themselves, the application for ballot-by-mail that were filed out for these individuals, the voter roll from that county and, where applicable, the carrier envelopes for the mail ballots themselves. The address where those applications had the ballots sent to and what that location is. Primarily, that's some of my original evidence review.

*Id.* at 4116:18–24. Mr. White's office has interacted with the families of those deceased voters whose identities were used to cast fraudulent ballots. *Id.* at 4117:15–19. When asked about

his office's experience in dealing with those families, Mr. White testified "They're often upset that their deceased relative was used for this purpose." *Id.* at 4117:20–23.

## VII.     Forensic Audit of the 2020 Election

413.     Senate Bill 1, enacted in 2021, created a requirement for randomized Texas county election audits. Oct. 17, 2023 Tr. at 4210:1–7.  Prior to the effective date of Senate Bill 1, the Texas Secretary of State created a Forensic Audit Division within the Secretary of State's Office to perform such election audits and ordered an election audit of the 2020 General Election in Collin, Dallas, Harris, and Tarrant Counties (the "Audit"). Oct. 17, 2023 Tr. at 4210:1–4211: 11. The 359-page Final Report on the Audit was issued by the Texas Secretary of State in December 2022 and pertained to Phase Two of the Audit. STATE Ex. 23, 24.

414.     The conclusions of the Forensic Audit Division were documented in that Final Report. Oct. 17, 2023 Tr. at 4212:6–13, 4229:20–23.  Dallas and Harris Counties were selected for the Audit because they were the two largest Texas county governments controlled by Democrats and Tarrant and Collin Counties were selected because they were the two largest Texas county governments controlled by Republicans. Oct. 17, 2023 Tr. at 4221:4–10.

415.     When asked if she thought the randomized county audits required by SB 1 reduced the possibility of future irregularities in Texas elections, Ms. Doyer opined,

> The randomized county audits provide counties to show their work essentially, to show all the good things that they are doing and how elections are run in the state of Texas. It varies widely across the state, you know, depending on the size of the county, but to be able to show voters in those jurisdictions that they can have confidence in the results. And moreover, because of the population that's set out in this statute, it allows small counties to learn from small counties, and also big counties to learn from big counties, so it promotes those things for election officials and election administrators, but it also has the effect of just allowing more transparency and accountability for the voters to have more confidence in those systems.

> Oct. 17, 2023 Tr. at 4260:4–20. The purpose of the audit was

> To ensure that Texans had confidence in the election systems in the state, and that if there were any irregularities that were identified that there were mechanisms by which the counties could review those, make improvements, that other counties

could learn from those and also make improvements if they saw it was applicable to their jurisdiction.

Oct. 17, 2023 Tr. at 4219:15–22.

416.     As part of the Audit, the Forensic Audit Division of the Texas Secretary of State's Office requested documents from each of the four counties to be audited. *See* STATE Ex. 320. The documents examined in the Audit were ones that the Counties were required by federal or state law to maintain. Oct. 17, 2023 Tr. at 4221:11–24, 4223:14–4224:3. They comprised 359 gigabytes of data, all of which were examined auditors. Oct. 17, 2023 Tr. at 4223:2 –4224:3.

417.     The Forensic Audit Division encountered some difficulties in the Audit because Harris County (alone among the four audited counties) failed to provide requested data as to polling locations where there was a discrepancy of more than 1 percent between the number of voters who checked in and the number of votes cast at the polling location. Oct. 17, 2023 Tr. at 4224:4–16. The Forensic Audit Division also faced difficulties because Harris County (alone among the four audited counties) declined to make its election staff personnel available to the Forensic Audit Division during the Audit. Oct. 17, 2023 Tr. at 4224:17–23.

### A.  Summarizing the Audit's Chief Findings

418.     In the course of or as a result of the Audit, the Secretary of State became aware of 138 complaints related to the 2020 election in the four counties that were audited. The Secretary of State's Office referred 18 of them to the Office of the Texas Attorney General. (Tr. 4292-94).

419.     The Audit found that, in the 2020 General Election, Harris County:

1) had serious problems in the handling of electronic media. In at least 14 polling locations, "mobile ballot boxes (MBBs) containing 184,999 cast vote records included in the tally did not have proper chain of custody."

2) "was not able to provide documentation for the creation of 17 MBBs accounting for 124,630 cast vote records."

3) "electronic pollbook records from at least 26 Early voting locations and 8 Election Day polling locations did not match the Tally Audit Log for those locations:"

4) "did not have an inventory of their warehoused records for the 2020 General Election." The "labels on the outside of boxes of warehoused records inaccurately described their contents."

5) "was the only county that did not provide a 'list of Early Voting or Election Day polling locations that had a discrepancy of one percent or more between the number of voters that checked in to the number of votes cast at that location' requested at the outset of the audit."

*See* State Defendants' Exhibit 23, at 6-7.

420.    The Audit identified the following problems in the 2020 General Election that were common across the Counties audited:

1) Varying and inconsistent data.

2) Unaccepted Applications for Ballots by Mail.

3) Counties Have Many Helpful Polling Location Forms That were Not Being Used.

4) Records Reflected Incorrect Reasons for Voting by Mail Ineligibility.

5) People Simultaneously Serving on the Signature Verification Committee (SVC) and Early Voting Ballot Board (EVBB) Created Conflicts of Interest.

*See* State Defendants' Exhibit 23, at 9-11.

421.    The Audit concluded that the Texas Legislature passed several election integrity bills in 2021, including but not limited to SB 1, that should alleviate some of the of the issues observed by the Forensic Audit Division in the Audit. *See* STATE Ex. 23 at 6.

## B. Drive-Thru Voting Irregularities

422.     The Forensic Audit Division observed irregularities in the conduct of the General Election in 2020 in Harris County and wrote a letter to Harris County shortly before the 2022

General Election to document the irregularities and ask that Harris County election administrators ensure the irregularities would not re-occur in 2022. STATE Ex. 321; Oct. 17, 2023 Tr. at 4224:24–4226:20 , 4228:14–4229:19.

423.    The Forensic Audit Division learned in the Audit that all drive-through voting locations (which were all in Harris County) did not appear in the tally or tabulation software used in Harris County to tabulate votes for final canvass reports. Oct. 17, 2023 Tr. at 4230:10–25. The Forensic Audit Division found in the Audit that many MBB's (Mobile Ballot Boxes) in Harris County, which were supposed to be in Central Count packets, were not there but were in other locations and haphazardly stored in manila envelopes, rubber banded together, so that were marked "do not read". This occurred as to both in-person voting and drive through polling locations. This was inconsistent with legal chain of custody requirements. Oct. 17, 2023 Tr. at 4235:2–4236:2.

424.    As to drive-through locations in Harris County, the Forensic Audit Division found in its Audit that some equipment used was damaged in the voting process, resulting in "stranded votes" and there were instances where electronic voting slates were connected to the wrong electronic controllers resulting in inaccurate information as to the number of ballots cast as compared to the number of voters who checked in to vote at a polling location. Oct. 17, 2023 Tr. at 4236:18–4237:16).

425.    The Forensic Audit Division found that there were MBB's in Harris County that were not ultimately tabulated. Oct. 17, 2023 Tr. at 4240:5–13. The Forensic Audit Division found that there were several polling locations in Harris County that had a "negative value", meaning that more voters checked in to vote than the number of cast votes recorded. Thus, there were probably voters at these locations whose vote were not counted. Oct. 17, 2023 Tr. at 4240:14–25, 4243:2–9.

426.    The Forensic Audit Division identified over 800 vote discrepancies (where the number of voters checked in did not match the number of cast votes recorded) at drive-through voting locations in Harris County. Oct. 17, 2023 Tr. at 4241:4–4243:14. There were discrepancies at every single drive-through location. Oct. 17, 2023 Tr. at 4242:5–4243:1. The Forensic Audit

Division also identified 14 polling locations in Harris County where multiple MBB's were created without explanation. *See* STATE Ex. 321 at 4, Appx B. Nine of those were drive-through voting locations. Some of the additional MBB's were later found in warehouses, but without evidence of a proper chain of custody. Oct. 17, 2023 Tr. at 4243:15–4245:1

427.     Vote discrepancies like those that occurred in Harris County are irregularities that tend to undermine public confidence in the election process. Oct. 17, 2023 Tr. at 445:2–13

428.     SB 1 helped address those irregularities in multiple ways, most obviously by eliminating drive-through voting. Oct. 17, 2023 Tr. at 4246:14–20. SB 1 also addressed the irregularities of vote discrepancies identified in Harris County by requiring paper-backed ballots, providing a verified paper audit trail. Oct. 17, 2023 Tr. at 4245:21–4246:3. SB 1 also requires a "zero tape" or an opening and closing tape that can assist with ensuring you have the right equipment at the polling location and identifying vote discrepancies immediately at the end of each day. Oct. 17, 2023 Tr. at 4246:4–10.

429.     In addition, as a result of SB 1, there is a requirement of video surveillance over ballots coming back from the polling locations in counties over a certain size. Oct. 20, 2023 Tr. at 4246:24–4247:5. The Texas Secretary of State created an open and closed polling checklist that was required by SB 1 to standardize procedures in polling locations across Texas Oct. 20, 2023 Tr. at. 4247:6–9.

430.     SB 1 also requires counties to submit a tabulation audit log to the Secretary of State within five days of an election, which provides an additional level of oversight and reporting. Oct. 17, 2023 Tr. at 4246:11–19. The reconciliation forms required by SB 1 reconciles the number of voters and ballots cast. This has already proven useful in Harris County, where there was a 10,000-vote discrepancy in the 2022 primary election. The reconciliation forms identified this discrepancy in time for it to be rectified before election results were certified. Oct. 17, 2023 Tr. at 4246:20–23; *see also* Sept. 20, 2023 Tr. at 1403:11–1405:3, STATE Ex. 273.

## C. Voting-by-Mail Irregularities

431.    The Forensic Audit Division in the Audit identified irregularities with ballots by mail in Dallas County. Dallas and other counties did not meaningfully track Applications for Ballots by Mail that were not accepted. Oct. 17, 2023 Tr. at 4248:16–22. In Dallas County, these unaccepted Applications were kept in a box marked "Bad Mail." Oct. 17, 2023 Tr. at 4248:23–25, 4249:8–13.

432.    "Texas has certain enumerated reasons why voters can vote by mail, one being voters would be eligible due to age." Oct. 17, 2023 Tr. at 4249:20–21. The Forensic Audit Division "looked at whether the voters who voted by mail and the reason they requested to vote by mail was for age to see whether date of birth records actually indicated they were 65 or older at the time of the election." *Id.* at 4249:22–25.

433.    The Forensic Audit Division in the Audit found instances in which voters were allowed to vote by mail on the basis of age eligibility (over 65 years of age) but who were under 65 years of age and thus ineligible to vote by mail. Oct. 17, 2023 Tr. at 4249:15–4250:15. There were other instances in which the reasons for eligibility to vote by mail were miscoded. *Id.* These instances in which voters were allowed to vote by mail without demonstrated eligibility to do so were election irregularities. Oct. 17, 2023 Tr. at 4250:21–25.

434.    The change in SB 1 that added an ID number requirement for voting by mail helped address the irregularities in voting by mail that the Forensic Audit Division observed. Oct. 17, 2023 Tr. at 4251:1–24. For example, there were instances in Collin and Tarrant County where persons under 65 and thus ineligible to vote by mail do so, because their parents had the same name and were over 65. *Id.* The ID requirement would help prevent those errors. The Forensic Audit Division also observed problems with counties attaching a record to the wrong voter. Oct. 17, 2023 Tr. at 4252:2–8.

435.    The Forensic Audit Division also observed instances where ABBMs were submitted to county officials in bulk or in "bundles". Oct. 17, 2023 Tr. at 4256:18–4257:17. For example, in one instance a single "assister" submitted 393 ABBM's. Some assisters submitted multiple ABBMs for the same voter, and sent ABBMs from multiple facilities, such as from an

assisted living center and from an affordable housing complex. Oct. 17, 2023 Tr. at 4257:22–4257:15.  In some instances, the same assister as to an ABBM also assisted with respect to the mail ballot itself. These observations caused concern with respect to possible vote harvesting. Oct. 17, 2023 Tr. at 4252:17–4259:5

436.    The Forensic Audit Division observed that Harris County had an informal cure process, but that rejected ballots marked "unresolved" were indicated on voters' history as them having voted successfully. Oct. 17, 2023 Tr. at 4255:5–4256:10. The logical deduction is that these voters had their ballot counted despite the defect not being cured. Oct. 17, 2023 Tr. at 4256:5–10. Ms. Doyer considered this an irregularity in the 2020 General Election. Oct. 17, 2023 Tr. at 4256:11–13. Texas addressed this problem through SB 1 by introducing a corrective action process, or cure process, for mail ballots. Oct. 17, 2023 Tr. at 4255:5–4256:4.

### D.  Poor Data Tracking by Counties

437.    None of the four counties audited had a system for tracking rejected Applications for Ballot by Mail (ABBMs). Oct. 17, 2023 Tr. at 4252:9–19. There were inconsistencies in the four counties in how they attempted to track some of the rejected ABBMs. Oct. 17, 2023 Tr. at 4252:20–4252:17. These problems could have affected the reported rejection rates for ABBMs. Oct. 17, 2023 Tr. at 4253:18–23.

438.    The Forensic Audit Division in the Audit observed instances where the four counties failed to report the final disposition of ballots by mail to the statewide TEAMS database. Oct. 17, 2023 Tr. at 4254:7–16. Texas's introduction after 2021 of the "Ballot Tracker" helped address this problem by requiring county officials to enter basically every step of the ABBM process, thereby improving and streamlining the numbers and promoting integrity. Oct. 17, 2023 Tr. at 4254:17–4255:4.

439.    Texas in SB 1 introduced a corrective action process, or cure process, for mail ballots. That addressed irregularities observed by the Forensic Audit Division in the Audit, where

voters were allowed to vote by mail even though defects in the ABBMs were marked "Unresolved." (Tr. 4255-56).

### E. Summarizing the Audit's Chief Findings

440.    In the course of or as a result of the Audit, the Secretary of State became aware of 138 complaints related to the 2020 election in the four counties that were audited. The Secretary of State's Office referred 18 of them to the Office of the Texas Attorney General. (Tr. 4292-94).

441.    The Audit found that, in the 2020 General Election, Harris County:

6)  had serious problems in the handling of electronic media. In at least 14 polling locations, "mobile ballot boxes (MBBs) containing 184,999 cast vote records included in the tally did not have proper chain of custody."

7)  "was not able to provide documentation for the creation of 17 MBBs accounting for 124,630 cast vote records."

8)  "electronic pollbook records from at least 26 Early voting locations and 8 Election Day polling locations did not match the Tally Audit Log for those locations:"

9)  "did not have an inventory of their warehoused records for the 2020 General Election." The "labels on the outside of boxes of warehoused records inaccurately described their contents."

10) "was the only county that did not provide a 'list of Early Voting or Election Day polling locations that had a discrepancy of one percent or more between the number of voters that checked in to the number of votes cast at that location' requested at the outset of the audit."

*See* State Defendants' Exhibit 23, at 6-7.

442.    The Audit identified the following problems in the 2020 General Election that were common across the Counties audited:

1)  Varying and inconsistent data.

2)   Unaccepted Applications for Ballots by Mail.

3)      Counties Have Many Helpful Polling Location Forms That were Not Being Used.

4)      Records Reflected Incorrect Reasons for Voting by Mail Ineligibility.

5)      People Simultaneously Serving on the Signature Verification Committee (SVC) and Early Voting Ballot Board (EVBB) Created Conflicts of Interest.

*See* State Defendants' Exhibit 23, at 9-11.

443.    The Audit concluded that the Texas Legislature passed several election integrity bills in 2021, including but not limited to SB 1, that should alleviate some of the of the issues observed by the Forensic Audit Division in the Audit. *See* STATE Ex. 23 at 6.

**VIII.     Legislative History**

**J.   Mail Ballot Tracker (HB 382)**

444.    The regular session of the 87th Texas Legislature began in January 2021. STATE Ex. 296 at 523:19. House Bill 1382 was filed on January 26. House Bill 1382 added Election Code section 86.015, which directed the secretary of state to create an online ballot tracker. Act of May 24, 2021, 87th Leg., R.S., ch. 317, Section 1, 2021 Tex. Gen. Laws 656, 656–57 (codified at TEX. ELEC. CODE Section 86.015); Oct. 17, 2023 Tr. at 4259:25-4260:1; HAUL-MFV Ex. 299, 300; STATE. Ex. 23 at 210 n.347. The ballot tracker allowed for the first time all categories of vote-by-mail voters to electronically track applications for ballot by mail and mail ballots. Oct. 17, 2023 Tr. at 4403:5-4403:10.

445.    On April 29, the house passed House Bill 1382 with 142 yeas, 3 nays, and 1 present not voting. Act of May 24, 2021, 87th Leg., R.S., ch. 317, 2021 Tex. Gen. Laws 656, 658. On May 18, the senate unanimously adopted one amendment to House Bill 1382. On May 18, the senate passed House Bill 1382 by a vote of 25 yeas to 6 nays. Act of May 24, 2021, 87th Leg., R.S., ch. 317, 2021 Tex. Gen. Laws 656, 658. On May 24, the house concurred in the senate amendments with

145 yeas, 1 nay, and 1 present but not voting. Act of May 24, 2021, 87th Leg., R.S., ch. 317, 2021 Tex. Gen. Laws 656, 658. House Bill 1382 was approved on June 7 and took effect on September 1, 2021. Act of May 24, 2021, 87th Leg., R.S., ch. 317, 2021 Tex. Gen. Laws 656, 658. House Bill 1382.

446.     The ballot tracker was first used for the March 2022 primaries. Oct. 17, 2023 Tr. at 4403:1-4403:4. The ballot tracker improved the transparency of Texas elections by allowing voters to view the status of their applications for ballot by mail and mail ballots. Oct. 17, 2023 Tr. at 4405:25-4406:11. Making this information accessible online has reduced the volume of calls local election offices must field from voters. Oct. 17, 2023 Tr. at 4406:12-4406:18. The ballot tracker promotes election integrity and reduces the possibility of election irregularities by requiring county officials to document each step of the application for ballot-by-mail process. Oct. 17, 2023 Tr. at 4254:22-4255:4; 4259:22-4260:3.

### K.  Regular Session Predecessor Bills SB 7, SB 1509, HB 6)

447.     Governor Abbott announced that election integrity was one of his office's legislative objectives for the 87th Texas Legislature. *See* State 154208 at 4:23–25. Senate Bill 7, Senate Bill 1509, and House Bill 6 were among the election integrity bills considered during the regular session. Many of the provisions included in these bills were meant to address unprecedented actions taken by Harris County during the 2020 General Election. STATE Ex. 431 at 24:6–25:10. Senator Bryan Hughes introduced Senate Bill 7 on March 11, 2021. HAUL-MFV Ex. 54 at 32 ¶ 86. Senate Bill 1509 was filed on March 11Senate Bill 1509 would have amended Election Code Section 84.001, 84.002, 84.011, 86.001, 86.002, and 87.041 to require an identification number be included on an application for ballot by mail and a carrier envelope. House Bill 6 was introduced on March 12, 2021. HAUL-MFV Ex. 54 at 33 ¶ 87.

448.     Former Director of Elections for the Office of the Secretary of State Keith Ingram testified to the Texas Legislature during its consideration of election integrity legislation in March. Oct 17, 2023 Tr. at 4334:8-4334:17. Mr. Ingram testified regarding the 2020 General Election that

"in spite of all the circumstances, Texas had an election that was smooth and secure." Oct 17, 203 Tr. at 4334:18-4334:23. Mr. Ingram's statement commended county election officials for successfully implementing measures to protect the health of voters and allow the election to move forward despite the challenges faced in relation to the COVID-19 pandemic. Oct 17, 2023 Tr. at 4334:25-4335:17. Mr. Ingram did not state or imply that there were no irregularities in the 2020 General Election, vulnerabilities in Texas elections, or room for improvement in how elections are conducted in the state. Oct 17, 2023 Tr. at 4335:18-4336:2.

449.    On March 26, the NAACP Legal Defense and Educational Fund submitted a letter to the Senate State Affairs Committee regarding Senate Bill 7 that included the group's opposition to limiting early voting hours to between 7:00 a.m. and 7:00 p.m. HAUL-MFV Ex. 124, at. 3. The final version of Senate Bill 1 that was enacted into law instead allows voting to take place between 6:00 a.m. and 10:00 p.m. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 3.09, 3.10, 2021 Tex. Gen. Laws 3873, 3879–80 (amending TEX. ELEC. CODE Section 85.005 and 85.006).

450.    Consideration of Senate Bill 7 also featured concerns that some of its provisions would prevent "souls to the polls" programs. HAUL-MFV Ex. 179, at 35:18–36:6. Some democratic members of the house praised the removal of statutory language that raised these concerns. HAUL-MFV Ex. 106 at 44:21–45:6; HAUL-MFV Ex. 180, at 8:23–9:4. This language was not included in subsequently proposed election integrity legislation. *See, e.g.*, HAUL-MFV Ex. 109 at 7:20–24. No similar language was included in the final version of Senate Bill 1 was that was enacted into law. *See generally* Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3873–903; HAUL-MFV Ex. 179 at 36:7–18.

451.    The senate considered amendments to Senate Bill 7 on March 31 and April 1. Some amendments that were offered by democratic senators were adopted. Floor amendment 1 by Senator Menendez was adopted and would have allowed voters standing in line when polls close to vote during the early voting period. The inclusion of this change in the final version of Senate Bill 1 that was enacted into law was later praised by the advocacy organization Public Citizen. HAUL-MFV Ex. 136 at 2. Floor amendment 18 by Senator West was adopted and would have

directed the secretary of state to create training for poll watchers and required poll watchers to take an oath. The poll watcher oath requirement was later added to Senate Bill 1 after democratic legislators repeatedly advocated for its inclusion. STATE Ex. 431 at182:1–183:3. Substantially similar provisions were later incorporated into the final version of Senate Bill 1 that was enacted into law. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 3.09, 4.04, 4.06, 2021 Tex. Gen. Laws 3873, 3880–84 (codified at TEX. ELEC. CODE Section 85.005, 33.008, 33.051); STATE Ex. 431 at 122:19–124:25.

452.    Some amendments offered by democratic senators were not adopted. Floor amendment 3 by Senator West was not adopted and would have struck language from the bill requiring countywide polling places to have approximately the same amount of voting machines. This language was later removed from the conference committee report due to concerns raised by Senator Alvarado, Senator Miles, and Senator Whitmire. STATE Ex. 431, at 113:24–116:17. Floor amendment 12 by Senator Zaffirini was not adopted and would have struck language from the bill that would have allowed poll watchers to record audio and video at a polling place. Floor amendment 14 by Senator West was not adopted and would have struck language from the bill that would have allowed poll watchers to record audio and video at a polling place. This language was later removed in response to criticism from democratic legislators and groups like the League of Women Voters, NAACP, MALDEF, LULAC, and ACLU. STATE Ex. 431 at 137:8–138:25. Senator Whitmire later expressed gratitude that allowing poll watchers to record at a polling place was not included in Senate Bill 1. STATE Ex. 305, at 96:8–10. The provisions these amendments sought to strike were not included in the final version of Senate Bill 1 that was enacted into law. *See generally* Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3873–903; STATE Ex. 431 at 116:18–21.

453.    Floor amendment 8 by Senator Hinojosa was not adopted and would have added a mens rea requirement to Election Code subsection 64.012(a)(1) for illegally voting. This was adopted after Representative Collier advocated for the provision and was seen by her as an improvement. STATE Ex. 433 at 200:15–201:6, 203:21–204:5. Floor amendment 9 by Senator

Hinojosa was not adopted and would have clarified that county election officials were not prohibited from notifying voters about their eligibility to vote by mail. Floor amendment 11 by Senator Hinojosa was not adopted and would have required signature verification committees and early voting ballot boards to notify voters of a ballot by mail defect and how the defect could be corrected. Substantially similar provisions were later incorporated into the final version of Bill 1 that was enacted into law. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 5.12, 5.14, 7.04, 9.03, 2021 Tex. Gen. Laws 3873, 3890–902 (codified at Tex. Elec. Code Section 87.0271, 87.0411, 276.016(e), 64.012(a)). On April 1, the senate passed Senate Bill 7 with 18 yeas and 13 nays.

454.    The definition of "vote harvesting" contained in House Bill 6 was amended in response to concerns raised by Representative Bucy that it would penalize political speech. HAUL-MFV Ex. 103, pp. 47:9–48:25; HAUL-MFV Ex. 171 at. 47:9–48:17. Representative Bucy expressed his gratitude for the change to Representative Cain during an April 1 hearing of the House Elections Committee. HAUL-MFV Ex. 103 at 49:1–2. On May 6, the house voted to consider Senate Bill 7 in lieu of House Bill 6.

455.    The house considered amendments to Senate Bill 7 on May 6 and May 7. An amendment by Representative Jarvis Johnson was adopted and removed the phrase "and preserve the purity of the ballot box" from the bill. HAUL-MFV Ex. 179 at 26:3–13. This amendment was made following Representative Anchia criticizing the historical use of the phrase while questioning Representative Cain during a May 6 floor debate. HAUL-MFV Ex. 107 at43:11–46:1. Identical phrasing exists in the Texas Constitution. *See* Tex. Const. art. VI, Section 4. This language was not included in the final version of Senate Bill 1 that was enacted into law. *See generally* Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3873–903.

456.    Some amendments that were offered by democratic house members were adopted. An amendment by Representative Gervin-Hawkins was adopted and would have provided the opportunity to correct a ballot by mail. HAUL-MFV Ex. 179 at 26:25–27:6. An amendment by Representative Vo was adopted and would have extended to the early voting period protections for workers against adverse action from employers in response to their voting. HAUL-MFV Ex. 179

at 28:15–29:9. An amendment by Representative John Turner was adopted and would have required county registrars to coordinate by canceling the voter's registration in the voter's former county of residence and processing a new registration in the new county of residence. HAUL-MFV Ex. 179 at 27:12–27:16. Amendment 20 by Representative Beckley was adopted and would have required the secretary of state to audit voting machine equipment. Many of these amendments were later used to craft Senate Bill 1 during the Second Special Session of the 87th Texas Legislature. HAUL-MFV Ex. 179 at 28:3–6. Substantially similar provisions were incorporated into the final version of Senate Bill 1 that was enacted into law. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 2.03, 3.03, 5.14, 7.02, 2021 Tex. Gen. Laws 3873, 3875–95 (codified at TEX. ELEC. CODE Section 15.021, 43.007, 87.0411, 276.004).

457.    Other amendments were also adopted. Amendment 4 by Representative Cain and Representative Schofield was adopted and added language to allow a presiding judge to request that law enforcement remove a poll watcher for a breach of the peace. This amendment came after Representative Bucy expressed concern to Representative Cain during an April 1 hearing of the House Elections Committee that election judges might be prevented from calling law enforcement to remove poll watchers under a substantially similar provision contained in House Bill 6. HAUL-MFV Ex. 103 at 36:3–38:9. Amendment 5 by Representative Cain and Representative Schofield was adopted and created an exception to Election Code section 86.0105 that would have allowed an attendant or caregiver previously known to the voter to provide assistance with voting by mail. This amendment was in response to a meeting the representatives had with an organization that advocated on behalf of disabled persons. HAUL-MFV Ex. 107 at 20:21–21:8. Amendment 6 by Representative Murr was adopted and added language that poll watchers are not allowed to interfere with the orderly conduct of an election. Clarifying that a poll watcher may not interfere with the orderly conduct of an election was important to Senator Rafael Anchia. STATE Ex. 432 at 44:20–45:11 Substantially similar provisions were later incorporated into the final version of Senate Bill 1 that was enacted into law. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section

4.01, 4.02, 6.06, 2021 Tex. Gen. Laws 3873, 3882–95 (codified at TEX. ELEC. CODE Section 32.075(h), 33.0015, 86.0105(f)).

458.    Many of the amendments proposed or supported by democratic legislators were incorporated into the initial version of Senate Bill 1 that was introduced in the Second Special Session. HAUL-MFV Ex. 179 at 25:11–15, 27:17–28:6. The house passed Senate Bill 7, as amended, on May 7 with 78 yeas, 64 nays, and 1 present but not voting. On May 30, the senate adopted the conference committee report for Senate Bill 7 with 18 yeas and 13 nays. Democratic house members left the house chamber at the end of the regular session with the intent to deprive the house of a quorum necessary to conduct business. STATE Ex. 432 at 77:7–15; STATE 433 at. 163:16–21. This was done to prevent passage of Senate Bill 7. STATE Ex. 432 at 77:16–78:2; STATE Ex. 433 at 163:24–164:5. The conference committee version of Senate Bill 7 never passed the house. STATE Ex. 433, at 163:5–9. The regular session of the 87th Texas Legislature ended on May 31 without passage of Senate Bill 7, Senate Bill 1509, or House Bill 6.

## L.  First Special Session (HB 3 and SB 1)

459.    Governor Abbott ordered the first special session of the 87th Texas Legislature in July 2021 and listed legislation strengthening the integrity of elections in Texas as a topic for consideration. HAUL-MFV Ex. 186 at 3:12–14. The first special session of the 87th Texas Legislature began on July 8. House Bill 3 and Senate Bill 1 were among the election integrity bills considered during the first special session. House Bill 3 was filed on July 7. Senate Bill 1 was filed on July 8. The House Select Committee on Constitutional Rights & Remedies considered amendments to House Bill 3 on July 11, but no amendments were adopted.

460.    Prior to final passage in the House, numerous members left the floor, breaking quorum and quorum was never reached during that special session. HAUL-MFV Ex. 54 at 34 ¶ 91; STATE Ex. 300 at 5:6–19; STATE Ex. 433 at 164:9–16. Some democratic house members left state of Texas and traveled to Washington D.C. during this period. STATE Ex. 433 at 164:19–21. Those members left the state on July 12, 2021. One motivation for some house members to leave

the state was to prevent a quorum from being established so that election integrity legislation could not be passed. Another motivation for some of those members was to provide additional time for the United States Congress to pass legislation that would preempt some of the measures included in proposed election integrity legislation in Texas. HAUL-MFV Ex. 106 at 13:5–13. The final version of Senate Bill 1 that was enacted into law during the Second Special Session contains many provisions that are substantially similar to this legislation. HAUL-MFV Ex. 179 at 16:9–14.

461.    The senate considered amendments to Senate Bill 1 on July 13. *See generally* HAUL-MFV Ex. 186 at 202:2–233:16. Floor amendment 1 by Senator Hughes and Senator Hinojosa was adopted and defined ballot harvesting as an interaction in the physical presence of the official ballot. HAUL-MFV Ex. 186 at 202:4–204:6. Floor amendment 2 by Senator Hughes and Senator Zaffirini was unanimously adopted and changed the language for accepting a ballot by mail to require that the identifying information identifies the same voter. HAUL-MFV Ex. 186 at 204:9–205:24. In response to concerns raised by Senator Lucio and Senator Zaffirini, floor amendment 3 by Senator Hughes struck from the bill language that would have prevented another person from being present in a vehicle while the voter was voting unless that person could accompany the voter to the voting station. HAUL-MFV Ex. 186 at 206:12–207:25; 211:7–212:9.

462.    These changes led Senator Hinojosa to comment that Senate Bill 1 was much better than Senate Bill 7 from the regular session. HAUL-MFV Ex. 186 at 349:11–12. Substantially similar provisions were later incorporated into the final version of Senate Bill 1 that was enacted into law. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, Section 5.13, 6.01, 7.04, 2021 Tex. Gen. Laws 3873, 3890–96 (codified at TEX. ELEC. CODE Section 87.041, 64.009, 276.015). The senate passed Senate Bill 1 with 18 yeas and 4 nays on July 13. HAUL-MFV Ex. 186 at 255:2–14. The first special session of the 87th Texas Legislature reached its 30-day limit without passage of House Bill 3 or Senate Bill 1. STATE Ex. 433, p. 165:17–22.

**M. Senate Bill 1 in the Second Special Session**

463.     Governor Abbott ordered the second special session of the 87th Texas Legislature in August 2021 and again listed legislation strengthening the integrity of elections in Texas as a topic for consideration. STATE Ex. 293 at 4:22–25. Senate Bill 1 was filed on August 6. The second special session of the 87th Texas Legislature began on August 7. The initial language in Senate Bill 1 incorporated improvements to previous proposed election integrity legislation that were suggested by legislators of both parties. STATE Ex. 293 at 11:12–17; STATE Ex. 300 at 2:24–3:3.

464.     The senate considered amendments to Senate Bill 1 on August 11. *See generally* HAUL-MFV Ex. 180 at 32:10–104:3; STATE. Ex. 192 at 1; STATE Ex. 295 at 32:6–7, 52:5–9. Many amendments proposed by democratic legislators were adopted, including those proposed by Representative Bucy, Senator West, and Senator Zaffirini. STATE Ex. 431 at 112:2–113:2. Floor amendment 5 by Senator Zaffirini was unanimously adopted and provides voters with the opportunity to correct ballot by mail defects. HAUL-MFV Ex. 180 at 62:6–63:14; STATE Ex. 192 at 1; STATE Ex. 295 at 61:18–20. Floor amendment 6 by Senator Bettencourt added the ability to cure some defects by using the online ballot tracker. HAUL-MFV Ex. 180 at 63:17–18, 64:11–14, 65:8; STATE Ex. 192 at 1; STATE Ex. 295 at 61:23–62:10. The amendment resulted from previous testimony by Chase Bearden, the Deputy Executive Director of Coalition of Texans with Disabilities. HAUL-MFV Ex. 180 at 63:23–64:5, 64:15–17, 65:1–5; HAUL-MFV Ex. 181 at 40:16–41:4.

465.     Multiple democratic legislators, including Senator Alvarado and Representative Collier, had advocated for the addition of a cure provision. STATE Ex. 431 at 125:81–29:7; STATE Ex. 433 at 192:24–193:2. These new options to cure defects were later praised by Senator Gutierrez. HAUL-MFV Ex. 180 at 9:6–14. Advocacy groups such as Public Citizen and Texas Civil Rights Project recognized this was a positive change to the legislation. HAUL-MFV Ex. 136 at 2; HAUL-MFV Ex. 226 at 6. This option to cure defects through the ballot tracker has been successfully utilized by Texas voters since its implementation. Oct. 17 2023 Tr. at 4406:19-4407:1.

466.     Floor amendment 7 by Senator Zaffirini was unanimously adopted and required the secretary of state to conduct a study on the implementation of educational programs for voters with

disabilities. HAUL-MFV Ex. 180 at 66:13–67:13; STATE Ex. 192 at 1; STATE Ex. 295 at 63:17–65:2; Joint Ex. 58 p. 1. Floor amendment 9 by Senator West was adopted unanimously and meant to ensure that the governmental entity conducting an election would be required to provide a legal defense to an election official sued in his official capacity. HAUL-MFV Ex. 180 at 70:21–71:24; STATE Ex. 192 at 1; STATE Ex. 295 at 68:1–69:1. The senate passed Senate Bill 1 with 18 yeas and 11 nays. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903; HAUL-MFV Ex. 180, p. 104:11–13.

467.     Democratic house members returned to Austin during the second special session. STATE Ex. 432 at 80:18–81:5. Specifically, following a 38-day absence from the state, the majority of democratic members of the house returned to the state of Texas on August 19. The house held a 13-hour floor debate regarding Senate Bill 1 on August 26. HAUL-MFV Ex. 106 at 4:10–15. During that floor debate, the house considered amendments to Senate Bill 1. *See generally* HAUL-MFV Ex. 179 at 79:13–322:25; STATE Ex. 192 at 1–2. Amendment 11 by Representative Bucy was adopted with 72 ayes and 47 nays and states that no provision of the Election Code may be interpreted to deny a person with a disability the opportunity to request a reasonable accommodation. HAUL-MFV Ex. 179 at 187:17–188:17, 197:20–21; STATE Ex. 192 at 1.

468.     Amendment 32 by Representative Senfronia Thompson and Representative Klick was adopted and directs the secretary of state to create training for poll watchers. STATE Ex. 300 at 4:15–23, 5:6; STATE Ex. 192 at 1. There was previously no requirement that poll watchers receive training. STATE. Ex. 305 at 53:18–23. This new training requirement addressed concerns raised by democratic legislators, both during the second special session and in previous sessions. STATE Ex. 431 at 122:6–15; STATE Ex. 433 at 147:3–4; HAUL-MFV Ex. 109 at 111:2–7, 133:1–3. The requirement was later praised by on the house floor by Representative Goodwin and Representative Dominguez. HAUL-MFV Ex. 106 at 16:16–21, 29:22–30:4.

469.     Amendment 39 by Representative Clardy passed overwhelmingly with a vote of 108 yeas, 5 nays, and 2 present not voting and allows members of signature verification committees and early voting ballot boards to take notes that are necessary to perform their official duties.

STATE Ex. 192 at 2; STATE Ex. 300 at 60:9–25, 61:1. Amendment 50 by Representative Allison added a mens rea requirement to the illegal voting offense in Election Code subsection 64.012(a)(1). Oct. 16, 2023 Tr at 3971:15–19; STATE Ex. 192 at 2; St. Defs. Ex. 300 at 130:10–14, 131:6–19.

470.     The normal house rules were observed in the passage of Senate Bill 1. STATE Ex. 432 at 91:16–21. The house passed Senate Bill 1, as amended, on August 27 with 80 yeas, 41 nays, and 1 present not voting. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903; HAUL-MFV Ex. 106 at 57:8–16; STATE Ex. 301 at 59:4–5. The senate refused to concur in the house's amendments and requested appointment of a conference committee on August 27, which the house then granted on August 29. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903. The house adopted the conference committee report for Senate Bill 1 on August 31 with 80 yeas, 41 nays, and 1 present not voting. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903; HAUL-MFV Ex. 105 at 13:12–19. The senate adopted the conference committee report for Senate Bill 1 on August 31 with 18 yeas and 13 nays. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903. The second special session of the 87th Texas Legislature ended on September 2. Senate Bill 1 was approved on September 7 and became effective on December 2, 2001. Act of August 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, 3903.

## IX.     Summary of Senate Bill 1

### N. The Legislature Enacted SB 1 to Increase Both Election Integrity and Voter Access.

471.     Texas Senate Bill 1, 87th Leg., 2d Called Session (2021) SB 1") is a commonsensical and constitutional law enacted to "to prevent fraud in the electoral process," promote "voter access," "increas[e] the stability of [] constitutional democracy," and make "the conduct of

elections . . . uniform and consistent throughout [Texas]." JOINT Ex. 1 at 1–2, 24 SB 1 Section 1.03, 1.04, 4.02)

472.    SB 1 laid out its policy in six goals that appear near the beginning of the statute. JOINT Ex. 1 at 1–2 SB 1 Section1.03). These goals were:

> 1) full, free, and fair elections are the underpinnings of a stable constitutional democracy;
>
> 2) fraud in elections threatens the stability of a constitutional democracy by undermining public confidence in the legitimacy of public officers chosen by election;
>
> 3)  reforms are needed to the election laws of this state to ensure that fraud does not undermine the public confidence in the electoral process;
>
> 4)  the reforms to the election laws of this state made by this Act are not intended to impair the right of free suffrage guaranteed to the people of Texas by the United States and Texas Constitutions, but are enacted solely to prevent fraud in the electoral process and ensure that all legally cast ballots are counted. Integral to the right to vote is the assurance of voter access and the right for all votes legally cast to be counted;
>
> 5) additionally, preventing a valid vote from being counted violates the basic constitutional rights guaranteed to each citizen by the United States Constitution; and
>
> 6) providing for voter access and increasing the stability of a constitutional democracy ensures public confidence in the legitimacy of public officers chosen by election. JOINT Ex. 1 at 1–2, SB 1 Section 1.03).

473.    Through SB 1 the legislature amended the Texas Election Code in two places to explain their intent. First, they codified Section 1.0015–Legislative Intent—to the Election Code. JOINT Ex. 1 at 2 SB 1 Section 1.04) Section 1.0015 reads:

> It is the intent of the legislature that the application of this code and the conduct of elections be uniform and consistent throughout this state to reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the ballot, promote voter access, and ensure that all legally cast ballots are counted. JOINT Ex. 1 at 2 SB 1 Section 1.04)

474.    The second amendment to the Texas Election Code regarding the legislature's intent was to clarify the role of poll watchers by adding Sec. 33.0015. JOINT Ex. 1 at 2 SB 1 Section 1.04) Sec. 33.0015 reads:

> It is the intent of the legislature that watchers duly accepted for service under this chapter be allowed to observe and report on irregularities in the conduct of any election, but may not interfere in the orderly conduct of an election. To effect that purpose, a watcher appointed under this chapter shall observe without obstructing the conduct of an election and call to the attention of an election officer any observed or suspected irregularity or violation of law in the conduct of the election. SB 1 Section 4.02.

475.    Senator Carol Alvarado stated that the election legislation that was introduced during the 87th Legislature was "partly" in response to actions taken by Harris County during the 2020 election. *See* ECF 810.1 at 8:20–9:20. Sen. Alvarado agreed that in March 2020 the United States and the world was hit by the COVID-19 pandemic, which introduced a significant number of challenges for the administration of a successful election. *Id.* at 9:21–10:3. She also stated that a lot of counties had to take innovative steps in order to conduct a successful election, including some practices that had not yet been seen in Texas. *Id.* at 10:4–10.

476.    Chris Hollins, the county clerk in Harris County during part of this time, introduced a number of innovative practices in Harris County with respect to voting. *Id.* at 10:11–11:3. That included an attempt to send an application to vote by mail to every registered voter in the county. *Id.* at 13:8–11. The Secretary of State's office sent a letter to Harris County telling them that it was not possible that every Harris County voter satisfied one of qualifying categories to vote by mail: 65 years or older, disabled, out of the county while voting is occurring or confined in jail but otherwise eligible to vote. *Id.* at 12:19–14:23. The Secretary of State's letter notified Harris County that its proposal would confuse voters, that the law remained despite challenges, and its proposal would lead many voters to believe they are allowed to vote by mail when they do not qualify. *Id.* at 15:7–16.

477.    When asked whether Mr. Hollins' attempt to send out ABBMs would confuse voters, Sen. Alvarado responded "it looks that way." STATE Ex. 431 at 31:18–22. The Texas Supreme Court stated that the Harris County Clerk did not have the authority to send out unsolicited vote-by-mail applications. ECF 810.1 at 18:13–16. The Texas Supreme Court's opinion was issued on October 7, 2020, within one month of the 2020 election. *Id.* at 18:17–25. Sen. Alvarado agreed that Senate Bill 1 "partly" addressed the concern that that was raised in the litigation over what authority the county clerk had to send unsolicited ballot-by-mail applications. *Id.* at 19:19–20:2.

478.    Senate Bill 1 clarified that drive-thru voting would not be permitted, *id.* at 30:16–21, because drive-thru voting was not specifically provided for in the election code. *Id.* at 40:24-41:21. Senator Bettencourt alleged that there was a one-and-a-half percent error rate in the vote totals trough drive-thru voting. *Id.* at 43:23-44:5. Sen. Bettencourt expressed concern that an error rate in drive-thru voting could change the totals of a close election. *Id.* at 44:11–45:5. Sen. Alvarado agreed that the State has an interest in ensuring that every vote legally cast is counted. *Id.* at 45:12–14. Sen. Alvarado also agreed that the State has an interest in advancing election integrity. *Id.* at 45:23–46:13. Sen. Alvarado agreed that the State of Texas has an interest in ensuring that voters have confidence in the election. *Id.* at 47:14–17. Sen. Alvarado stated that it "could be" that some members of the public and the Texas Senate believe that advancing election integrity is a way of advancing voters' confidence in the election. *Id.* at 47:22–48:4. Sen. Alvarado believed that it is important that the State of Texas discourage and prevent voter fraud and agreed that the State of Texas has a significant interest in preventing voter fraud from occurring. *Id.* at 48:11–16. Sen. Alvarado also agreed that the State of Texas has a legitimate interest in protecting the secrecy of the ballot and in preventing voters from being coerced into voting a specific way. *Id.* at 48:23–49:15.

479.    Senate Bill 1 standardized the hours that each county could offer in-person voting. *Id.* at 40:8–18.

480.    Senator Bryan Hughes, the author of SB 1, laid out the bill at a July 2021 State Affairs committee meeting:

153

Governor Abbott called us back for several items, but the only one before this Committee today is legislation strengthening the integrity of elections in Texas. This is important right now. It's always been important…

And we all want to work toward a better election process that's safe and accessible, and that's what SB-1 does. We're always refining and trying to improve these processes, whether we're talking about elections or transportation or education or public safety…

So voting is up in real numbers and voting is up in terms of percentages; and we want to keep it that way. High turnout is good. High turnout is always good. People need to participate and let their voices be heard.

We always want to encourage that. Yet you'll hear some folks say there's just no voter fraud and that, too, is demonstrably false. These are not subjective opinions. This is a fact. It's a matter of facts. It's a matter of record.

The attorney general's office has over 500 counts pending in court against 43 defendants. Since 2005 the office has prosecuted over a thousand counts, and that doesn't count cases being done just at the local level. We're talking here only about attorney general prosecutions. These cases are resource intensive. They are geographically diverse, all over the state, and they are becoming increasingly complicated.

And, of course, many times we cite prosecutions and convictions and folks say, well, the
current process is working. So suddenly folks give us credit for catching every bad actor with no fraud occurring outside the law. Of course, we're never going to stop every bad actor in any area, but that doesn't mean we don't try.

Several reforms were in the regular session's omnibus bill, passed in other bills. Many of the elements we've been trying for. I mentioned a moment ago paper backup for those electronic voting systems. Most folks are in favor of that. We've been trying since 2005 to get that done. That was in the omnibus selection bill in the regular session, which didn't pass, but a stand-alone bill did. So that's the law today.

Also, the ability to track your mail ballot. Many folks, folks here, don't look old enough, but if you're 65 or over, or disabled or going to be out of the county, then you can vote by mail in Texas. Many folks tell us when they apply for that ballot by mail, they are not sure if their application made it. They are not sure if their ballot is going to make it in time.

154

Well, there's no -- there will be now a system where you can track your mail ballot online. Only you can do that. Just like tracking a package. That was in our omnibus bill. But that passed in a separate bill that I had -- so we're thankful for that.

So those elements are not going to be in this bill, because they've already been passed. But they're part of this whole picture of making it easy to vote and hard to cheat. Because many reforms did not make it through. And those are included here in SB-1 before you.

The bill makes it easy to vote by expanding early voting hours and providing an opportunity to cure certain defects in mail ballots. If there is a problem with a mail ballot, and there's time, there ought to be a way for you to cure that. Senator Zaffirini had that bill, which we supported, didn't make it through the House; and so those elements are back in SB-1.

She's filed that bill again. It's important to her. It's important to all of us, that folks have a way to cure problems with the ballots. Making sure everyone who is eligible to vote can vote and making sure those votes are counted accurately. That's what this process is about.

The bill also makes it harder for bad actors to cheat. One way to do that is by adding transparency to the process.

Now, let's think about transparency in elections. The ballot, your secret ballot, that is sacrosanct. But everything else in the election process should be bathed in sunshine, that greatest of disinfectants. Poll watchers are the public's stand-in to observe the process from start to finish. Our bill allows poll watchers to see and hear the activities they are entitled to observe…

Of course, poll watchers are appointed by candidates from all parties, like political parties. This is not one party or the other. But they are the eyes and ears of the public, representing every group, every candidate.

We're also placing cameras in central counting to record and provide confidence that voted ballots are the final ballots. Protects everyone.

SB-1 standardizes a broad and consistent window of voting hours across the state so that all Texans have a fair and equal opportunity to vote and it prohibits drive-through voting.

It builds a record so that those who do cheat cannot hide as easily. We do this in part by building a record where people are assisting large numbers of voters. As we go through the elements in the bill, you'll notice that most of the security measures in Senate Bill 1 are not aimed at individual voters.

By and large individual voters are trying to vote, they are trying to do the right thing. They are trying to express their will and make their voice heard in our democracy. We want them to do that.

The security measures in this bill largely are directed at vote harvesters, the folks who are trying to steal votes, trying to influence votes unduly, trying to coerce folks. We do want to crack down on that, making it easy for folks to vote their own will.

The opportunity for a voter with a disability to receive assistance is not only fair and right; it's necessary. Voters with disabilities will have the same rights – they must have the same rights -- as those without a disability.

At the same time, we're not going to let people take advantage of those opportunities for disabled folks and cheat and coerce and steal votes.

I want to read you at this time a couple of accounts from voters who have testified in various cases across the state where their right to vote and to vote by secret ballot was  manipulated or coerced. Each of these was testifying under oath, and I want you to hear their stories.

This is sworn testimony offered, 8 pending in a matter in Texas courts from Alandra. She's asked do you know the person or the name -- she said, "Did someone call and ask you to go vote?" She says "I was picked up by Pipo. Is that the nickname for Mr. Rodriguez? Yes. Did he call and tell you he was going to come pick you up? Yes, he was calling and calling and wouldn't leave me alone. So you told him go ahead, I'll go vote? Yes. And he came and picked you up? Yes. Did he tell you what was going to happen when you got to the polling place? Whether someone was going to assist you?" And the witness says, "Yes. Who did he tell you was going to assist you? Marcella. Did he give you a little piece of paper with her name on it? I think so. I don't remember. Did he also give you have a little piece of paper with the name of the candidates he wanted you to vote for? Yes."

The witness goes on, is asked, "When you got to the polling place and you were walking towards where you actually voted, the building where you vote, did Marcella Gutierrez talk to you?" Answer, "I asked for her because I thought she was going to help me vote, because it was my first time. I didn't know how."

The witness is asked, "And she came out? Yes. What happened next? Then she took me where you vote and she was the one who told me to press for them."

So then witness is asked "So she went into the polling place where you were voting? Yes. And she told you which people to vote for?" And the witness says, "Yes, with her finger like this." The witness is asked "You indicated with your finger that she

was telling you what persons on the ballot to vote for; is that right?" The witness says, "Yes. Did these persons include Rudy Franz? Yes. Oziel Trevino? Yes. And Mr. Rodriguez? Yes. Did you do what she told you to do and vote for those persons?" The witness says "Yes."

This sworn testimony is from Angie Cavazos. It's describing her experience trying to vote. Question, "And what did he tell you?" And she says, "Before I got out of the truck, he told me tell them for Marcella to assist you. So what did you do? By that time I didn't have the intention of voting for them, so I went in, they took my information. I signed. And then what happened? Then I go to the polling place and Marcella goes up, I go to the polls and Marcella comes up behind me. I had the intention of voting and she was going to assist me how to do those things because I didn't understand that machine. So she started punching in the machine. I don't even remember the language. She was telling me you're going to press here and you're going to press over there. So I saw that she put it in favor of the team that she was on. She marked the computer for Oziel Trevino? Yes. You did not mark it?" The voter says, "No, I did not touch it at any time. And then what happened? So I had the idea that she was giving me, like, a tour of how to do those things and that she was going to leave. So by the time I told her, okay, let me, let me, let me vote on my own. And she said no, you already voted."

The testimony goes on from there. You're going to hear witnesses from the Attorney General's Office who've investigated, prosecuted these cases. We could read more and more and more sworn testimony from Texans.

That is why, that is why SB-1 addresses unlawful assistance. If folks need help in the polling place because they don't understand the language, can't read, can't mark the ballot, of course, they are going to get help; but we will not allow people to coerce, to steal votes, to intimidate voters like that and there are more cases just like that.

I remind you, each of those ladies was testifying under oath in court.

The law in Texas says if you're eligible for assistance in the voting booth and you have a physical disability that makes you unable to write or see or you can't read the language the ballot's written in, in those cases you can have someone in the voting booth with you.

But those limitations are to protect voters and to protect the secret ballot. In each of those instances that you saw the witnesses already testified they're able to vote, they're able to read, able to see; but even so these abuses are taking place.

Again, those are the types of cases being prosecuted. You're going to hear from the prosecutor doing that. So please keep those stories in top of mind. Because after

questions, I intend to talk to the AG's office about how the provisions in this bill will address those problems and hold people accountable like we just read about who are coercing, intimidating and stealing votes. I know, I know that no one here is in favor of anything like that. STATE Ex. 379 at 9–20.

481.     Many Senators and House Representatives spoke in favor or against SB 1. Representative J.M. Lozano spoke the following in support:

> This should be a bipartisan effort now, because there are documented cases of voter fraud as far back as this last 2020 election, but it's been happening year after year. I showed you yesterday how deceased people have somehow applied for a mail ballot. That's going on right now. This happened in 2020 in Houston. . . But when I read another article last night that was from the *Dallas Morning News* from May 4th, 2017, the title is "I Feel Violated." I feel violated. This senior citizen was told by the Dallas County Elections Department, your signature appears on the mail-in ballot, and a guy named Jose Rodriguez signed it saying he helped you. The victim said "I don't know Jose Rodriguez. I'm angry. How are you just going to forge my name? That's wrong. I feel violated."

> Our job here in this chamber is to fight for every single Texan. It's to make sure that we can have confidence in our election results and make sure that everyone's vote counts if it's cast legally, that everyone who votes verifies who they are before they vote, and that ultimately, Members, is that we can go back to the days when there was bipartisanship, because this is common sense. Don't let Washington get in your heart. This is Texas. Pla-HAUL-106 at 37–42.

482.     House Representative and SB 1 sponsor Andrew Murr listed on the House floor how much time had gone into debating SB 1.

> The legislation contained in Senate Bill 1 has been discussed and debated by members of this body for 14 hours in a hearing during the first called session, for 8-and-a-half hours in a hearing in the second called session, and 13 hours on the floor yesterday. That's 35 hours. That shows that this legislation is important to all of you, to your constituents, to stakeholders, to the State of Texas.

Pla-HAUL-106 at 4. A few of the amendments proposed by Texas Democrats were adopted. *See* ECF 810.1 at 51:2–52:4.

483.    Longtime Travis County Clerk Dana DeBeauvoir could not identify a single Republican who voted for SB 1 who stated they voted for it because they wanted to make people afraid to vote. Sept. 14, 2023 Tr. at 899:25–900:5. Ms. DeBeauvoir stated that she was always vigilant against voter fraud. *Id.* at 906:2–4. And every election she would report suspicious voting activity to law enforcement. Sept. 14, 2023 Tr. at 905:24–906:4. If she saw something unusual, she always referred it to the County Attorney and "followed up meetings with them." *Id.* at 913:14–914:12. Ms. DeBeauvoir had voters who accidentally voted twice, and the County Attorney was "reasonable about intent and they certainly called this person that made this mistake." *Id.* at 914:13–915:11.

484.    Dallas County Election Administrator Michael Scarpello was asked, "Even if voters believe incorrectly that an election was not impartial, you may still need to stake steps in order to demonstrate to those voters that in fact the elections are done impartially?" Mr. Scarpello answered, "Correct." Sept. 12, 2023 Tr. at 457:19–23. Cameron County Elections Administrator Remi Garza testified that election procedures were not uniform throughout the State in November 2020, Sept. 14, 2023 Tr. at 831:8–11, and that it can be more difficult to monitor elections that aren't uniform. *Id.* at 12–14.

### O.  General Description of Bill (Size, Topics, Scope)

485.    SB 1 was an omnibus bill with numerous provisions. Oct. 5, 2023 Tr. at 2805:15–2806:4. There were several iterations of SB 1 during the legislative process and the language of SB 1 was an improvement over the predecessor bills. Sept. 12, 2023 Tr. at 458:10–21 Many of the provisions of SB 1 are "highly significant." Oct. 6, 2023 Tr. at 3120:9–19.  It amended multiple versions of the Election Code, covering a plethora of different topics. Sept. 14, 2023 Tr. at 805:9–13. SB 1 caused election administrators to rethink their process. *Id.* at 805:11-13. Ms. Sharon Watkins Jones of Delta Sigma Theta sorority called SB 1 "a paradigm shift." Oct. 3, 2023 Tr. at 2206:1–7.

### P.  SB 1 Contains Numerous Helpful Provisions Not Challenged in this Action

486.    Section 1.08 of SB 1 added a section to the Election Code titled "Reasonable Accommodation or Modification. Sept. 12, 2023 Tr. at 309:21–310:4. The new Election Code Section is 1.022. Joint Exhibit 1. The new section reads:

> A provision of this code may not be interpreted to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard practice or procedure amended by law or rule that the individual is entitled to request under federal or state law.

*Id.* at 310:5–11.

487.    Section 2.03 of SB 1 amended SubSection (b) and (d) of Section 15.021 of the Texas Election Code. Subsection (b) was amended to state that it applied "(e)xcept as provided by Subsection (d)." Subsection (d) was amended to remove the qualification "who continues to reside in the county in which the voter is registered." SB 1 Section 2.03; Tex. Elec. Code Section 15.021.

488.    Section 2.03 of SB 1 also added subSection (d-1) and (d-2) to Section 15.021 of the Texas Election Code. *See* SB 1 Section 2.03

489.    Subsection (d-1) of Section 15.021 states:

> If the notice indicates that a voter no longer resides in the county in which the voter is registered, the registrar shall forward the notice and the voter's application for registration to the registrar of the county in which the voter resides. The registrars shall coordinate to ensure that the voter's existing registration is canceled immediately after the voter is registered in the county in which the voter resides in accordance with Subsection (d-2).

Tex. Elec. Code Section 15.021.

490.    Subsection (d-1) of Section 15.021 states: "A registrar who receives a voter's notice and application from another registrar under Subsection (d-1) shall treat it as an original application for registration under Section 13.002, and shall register the voter if the voter resides in the county and is otherwise eligible under Section 13.001." Tex. Elec. Code Section 15.021(d-1)

491.    Section 4.05 of SB 1 mandate a training program for poll watchers. Sept. 19, 2023 Tr. at 1061:7–12. Poll watchers must "have a certificate of completion from the State's website that

they completed training." *Id.* at 1061:13–24. When a poll watcher comes in or enters the polling place, they need to go to the presiding judge and present the certificate from the training. *Id.* at 1064:11–21.

492.     Section 4.06 of SB 1 adds a requirement that poll watchers must take an oath before being accepted into service. Sept. 12, 2023 Tr. at 289:14–15. The oath reads "I swear or affirm that I will not disrupt the voting process or harass voters in the discharge of my duties." *Id.* at 289:21–290:2.

493.     Section 4.15 of SB 1 amended Section 127.131 of the Texas Election Code to add Subsection (f), which reads as follows:

> The presiding judge of the central counting station shall provide and attest to a written reconciliation of votes and voters at the close of tabulation for election day and again after the central counting station meets for the last time to process late-arriving ballots by mail and provisional ballots. The secretary of state shall create and promulgate rules and a form to facilitate compliance with this subsection. The form shall be posted on a website maintained by the county along with election returns and results.

*See* SB 1 Section 4.15; Tex. Elec. Code Section 127.131.

494.     Section 7.03 of SB 1 amended Section 276.103(a) and (b) of the Texas Election Code. Joint Exhibit 1. "Chapter 276.013…is designed to prohibit influencing a voter during the voting process, causing a voter to register, obtain a ballot or vote under false pretenses, or intentionally making a misleading statement or false statement to election officials." Oct. 16, 2023 Tr. at 3926:15–24. Prior to SB 1, it had been unlawful to influence the independent exercise of the vote of another in the presence of a ballot or during the voting process. *Id.* at 3927:21–3928:3. Prior to SB 1, it was already a violation of 276.013 to alter the ballot of another to not reflect the intent of the voter. *Id.* at 3928:4–11. Section 7.03 reduced the penalty for attempting to violate Section 276.013 from a Class A misdemeanor to a Class B misdemeanor. *Id.* at 3928:16–3929:1. Section 7.03 however elevates the level of offense for violating Section 276.013 if the defendant is an elected official. *Id.* at 3929:2–5.

495.     Section 9.03 of SB 1 amended Section 64.012 of the Texas Election Code by amending SubSection (a) and (b) and adding SubSection (c) and (d). Joint Exhibit 1. Part of Section 9.03 was an amendment to the illegal voting offense that has occurred over the course of Texas history. Oct. 16, 2023 Tr. at 3971:5–14. Section 9.03 changed the *mens rea* requirement from "knowingly" to "knowingly or intentionally." *Id.* at 3971:15–19. Section 9.03 also clarified that it was illegal if one voted or attempted to vote in an election in the State of Texas after voting in another state in an election in which the federal office appears on the ballot and the Election Day for both states is the same day. *Id.* at 3971:20–3972:2. Section 9.03 also reduced the penalty for illegal voting from a second degree felony to a Class A misdemeanor. *Id.* at 3972:3–7. Section 9.03 also contained other protections in terms of a person not being convicted solely upon the fact that a person signed a provisional ballot affidavit. *Id.* at 3972:8–12.

### Q. The Challenged Provisions Most Clarify Ambiguities and Codify Best Practices

#### 1. Article 2 – Voter Registration

##### i. Section 2.05

496.     Section 2.05 of SB 1 amended Section 16.0332 of the Texas Election Code to require the Secretary of State to enter into an agreement with the Department of Public Safety through which the Department of Public Safety will provide information about persons who "indicate a lack of citizenship status in connection with a motor vehicle or Department of Public Safety record" each month and the Secretary of State will use this information to "verify the accuracy of citizenship status information previously provided on voter registration applications."

*See* SB 1 Section 2.05; Tex. Elec. Code Section 16.0332.

497.     Section 2.05 of SB 1 amended Section 16.0332 of the Election Code, inter alia, by adding subsection (a-1). *See* SB 1 Section 2.05; Tex. Elec. Code Section 16.0332.

498.     Subsection (a-1) of Section 16.0332 of the Election Code provides that:

The secretary of state shall enter into an agreement with the Department of Public Safety under which information in the existing statewide computerized voter registration list is compared against information in the database of the Department of Public Safety on a monthly basis to verify the accuracy of citizenship status information previously provided on voter registration applications. In comparing information under this subsection, the secretary of state shall consider only a voter's information in the database of the Department of Public Safety that was derived from documents presented by the voter to the department after the person's current voter registration became effective, and may not consider information derived from documents presented by the voter to the department before the person's current voter registration became effective. *See* Tex. Elec. Code Section 16.0332(a-1).

499.   Subsection (d) of Section 16.0332 of the Election Code provides that: "The secretary of state shall prescribe rules for the administration of this section."   Tex. Elec. Code Section 16.0332(d).

500.   Subsection (e) of Section 16.0332 of the Election Code provides that: "Not later than December 31 of each year, the secretary of state shall provide a report to the legislature of the number of voter registrations canceled under this section during the calendar year." Tex. Elec. Code Section 16.0332(e).

### ii.   Section 2.06

501.   Section 2.06 of SB 1 adds subSection (e), (f), (g), and (h) to Section 18.065 of the Election Code. *See* SB 1 Section 2.06; Tex. Elec. Code Section 18.065.

502.   Section 18.065(e) provides that "if the secretary of state determines that a voter registrar is not in substantial compliance with a requirement imposed on the registrar by a provision of rule described in Subsection (a)," the secretary will impose consequences that include mandating training for a first violation, auditing the county voter registrar list for a second violation; and for a third violation, "if the secretary of state determines that the registrar has not performed any overt actions in pursuit of compliance . . . inform the attorney general that the county which the registrar serves may be subject to a civil penalty under Subsection (f)." Tex. Elec. Code Section 18.065(e).

503.   Section 18.065(f) provides that:

163

A county is liable to this state for a civil penalty of $1,000 for each day after the 14th day following the receipt of the results of the audit conducted under Subsection (e)(2) that the county's voter registrar fails to take overt action to comply with the actions identified under that subsection as necessary for the registrar to achieve substantial compliance under Subsection (a). The attorney general may bring an action to recover a civil penalty imposed under this section.

Tex. Elec. Code Section 18.065(f).

### iii. Section 2.07

504.     Section 2.07 of SB 1 in relevant part adds subsection (a-1) to Section 18.068 of the Election Code. *See* SB 1 Section 2.07; Tex. Elec. Code Section 18.068.

505.     Subsection (a-1) of Section 18.068 provides that "The secretary of state is not required to send notice under Subsection (a) for a voter who is subject to an exemption from jury service under Section 62.106, Government Code, if that exemption is the only reason the voter is excused from jury service." Tex. Elec. Code Section 18.068(a-1).

506.     The Secretary of State has entered into an agreement with the Department of Public Safety under which information in the existing statewide computerized voter registration list is compared against information in the database of the Department of Public Safety. Oct. 17, 2023 Tr. 4350:7–17.

507.     Subsection (a-1) of Section 18.068 provides that comparisons between the statewide computerized voter registration list and the Department of Public Safety information should occur on a monthly basis. Tex. Elec. Code Section 18.068(a-1).

### 2. Article 3 – Polling Hours & Locations

### i. Section 3.04

508.     Section 3.04 of SB 1 amended Section 43.031(b) of the Texas Election Code to add that "no voter may cast a vote from inside a motor vehicle unless the voter meets the requirements of Section 64.009." *See* SB 1 Section 3.04; Tex. Elec. Code Section 43.031(b).

509.     Section 64.009 of the Texas Election Code governs curbside voting, which allows a voter who is physically unable to enter the polling place without personal assistance or likelihood

of injuring their health to vote at the polling place entrance or curb. *See* Tex. Elec. Code Section 64.009.

510.     Ms. Ramon testified that Hidalgo County did not utilize drive-thru voting during the 2020 election. Oct. 3, 2023 Tr. at 2342:25–2343:5. During the 2020 election, Hidalgo County had curbside voting at all physical polling locations during both early voting and on election day. *Id.* at 2343:6–16.

511.     Ms. Watkins Jones testified regarding a DST member, Ms. Johnson, who was not eligible to vote curbside, but who took her visually-impaired mother to do so. Ms. Watkins Jones confirmed that the mother is still able to vote curbside and was "certain" that Ms. Johnson herself had been able to vote by other means in 2022. Oct. 3, 2023 Tr. at 2221:20–2222:13.

512.     When Mr. Deion Dorsett voted by drive-thru voting in the November 2020 election, he was not provided a privacy folder by poll workers. Oct. 3, 2023 Tr. at 2300:8–21. Nor did he see poll workers handing out privacy folders to other voters. *Id.* at 2300:8–17. Mr. Dorsett said about the importance of privacy in voting: "(G)oing to vote it a private decision . . . I liken it to my faith. It's something that I believe in, and I don't have to necessarily explain it to anyone." *Id.* at 2299:3–8. Since the passage of SB 1, nobody had told Mr. Dorsett that they would not vote due to a lack of drive-thru voting. *Id.* at 2303:11–14. After the passage of SB 1, Mr. Dorsett subsequently voted successfully in both the May 7, 2022 election and the May 24, 2022 election. *Id.* at 2306:9–12.

### ii.     Section 3.09

513.     Section 3.09 of SB 1 amended Section 85.005 of the Texas Election Code to mandate that early voting last at least nine hours per weekday during the early voting period and to prohibit voting on weekdays during the early voting period earlier than 6 a.m. or later than 10 p.m. *See* SB 1 Section 3.09; Tex. Elec. Code Section 85.005.

514.     Hidalgo County has never offered 24-hour voting. Oct. 3, 2023 Tr. at 2338:8–9. Ms. Watkins Jones was not aware of any DST voter who had previously voted between 10:00 p.m. and 6:00 a.m. *Id.* at 2223:14-21. HAUL's representative, *id.* at 2276:6–8, Mr. Ray Shackelford, was not

aware of any individuals who utilized 24-hour voting during the 2020 elections. *Id.* at 2250:22–25. 24-hour voting in Harris County was a "one day, one time" event that had not been done before 2020. *Id.* at 2273:21–2274:2.

### iii.    Section 3.10

515.    Section 3.10 of SB 1 amended Section 85.006(e) of the Texas Election Code that, for counties with a population of 55,000 or more, voting by personal appearance at the main early voting polling place is to be conducted on the last Saturday of the early voting period for at least 12 hours, except that voting may not be conducted earlier than 6 a.m. or later than 10 p.m. *See* SB 1 Section 3.10; Tex. Elec. Code Section 85.006(e).

516.    SB 1 required that polls be opened for 6 hours on Sunday during early voting. Oct. 3, 2023 Tr. at 2534:3–6. Section 3.10 helps ensure that people can vote on a Sunday. *Id.* at 2211:22–2212:1.

517.    Former Hidalgo County Elections Administrator Ms. Ramon was asked about the effects of Article 3 of SB 1 on elections in Hidalgo County and she testified that prior to SB 1, counties were not required to open polls on the weekend during early voting. Oct. 3, 2023 Tr. at 2353:11–16. Ms. Ramon agreed that the only change SB 1 made to Hidalgo County's polling hours was requiring an extra hour on Sundays during early voting. *Id.* at 2534:20–23. On a question about voting hours required by SB 1: "(T)he uniformity for the voter in our county, it's great." *Id.* at 2366:5–13. Ms. Ramon agreed that having uniform voting hours makes early voting easier and more accessible and that was why she "had implemented 12-hour days." *Id.* at 2353:22–24.

518.    Ms. Sharon Watkins Jones, a member of the Delta Sigma Theta sorority ("DST") could not identify any DST member unable to vote because of 3.10. Oct. 3, 2023 Tr. at 2211:22–2212:17.

### iv.    Section 3.12

519.    Section 3.12 of SB 1 amended Section 85.061(a) of the Texas Election Code to require that an early voting polling place be located inside each branch office of the county clerk. Section 85.061(b) was added to the Texas Election Code, which provides that "(i)f a suitable room

is unavailable inside the branch office, the polling place may be located in another room inside the same building as the branch office." *See* SB 1 Section 3.12; Tex. Elec. Code Section 85.061(a).

520.    Ms. Sharon Watkins Jones could not identify any DST member unable to vote because of 3.12 or 3.13. Oct. 3, 2023 Tr. at 2212:18–2213:6.

> **v.    Section 3.13**

521.    Section 3.13 of SB 1 amended Section 85.062 of the Texas Election Code to prohibit the placement of early voting polling places in movable structures. *See* SB 1 Section 3.13; Tex. Elec. Code Section 85.062.

522.    Section 3.13 also added Subsection (f-1), which provides that:

Notwithstanding any other provision of this section concerning the location of temporary branch polling places, in an election in which countywide polling places are used, the commissioners court of a county shall employ the same methodology it uses to determine the location of countywide polling places to determine the location of temporary branch polling places.

Tex. Elec. Code Section 85.062(f-1).

523.    Section 3.04, 3.12, and 3.13 of SB 1 all potentially relate to drive-thru voting. *See* SB 1 Section 3.04, 3.12, 3.13.

> **vi.    Section 3.15**

524.    Section 3.15 of SB 1 amended Section 124.002 of the Texas Election Code to prohibit a political party's candidates to be selected in one motion or gesture. Straight-ticket voting was banned in Texas in 2017. *See* SB 1 Section 34.15; Tex. Elec. Code Section 124.002.

525.    Ms. Ramon testified that straight-ticket voting is not allowed under Texas law. Oct. 3, 2023 Tr. at 2364:25–2365:5. She also testified that straight-ticket voting was not eliminated by SB 1. *Id.* at 2365:10–13.

526.    Ms. Jacquelyn Callanen testified about Election Advisory 2020-09 and HB 25 and how these showed that straight-ticket voting was eliminated in 2017, so SB 1's provision discussing straight-ticket voting is duplicative and prompted no change. Sept. 19, 2023 Tr. at 1136:15–1139:23.

527.    Ms. Watkins Jones was aware that straight-ticket voting had been discontinued in 2017. Oct. 3, 2023 Tr. at 2213:16–21.

528.    Mr. Shackelford testified that straight-ticket voting "was not legal in 2020," "but clearly our legislators felt like something was missing so they felt the need to include it in SB 1." Oct. 3, 2023 Tr. at 2274:9–16.

### 3.    Article 4 – Poll Watchers & In-Person Delivery of Mail Ballots

#### i.    Section 4.01

529.    Section 4.01 of SB 1 prohibits election judges from having a duly accepted poll watcher removed from the polling place unless the election judge or clerk observed the poll watcher violate the law relating to the conduct of elections. *See* SB 1 Section 4.01. The election judge may call a law enforcement officer to request that a poll watcher be removed if the poll watcher commits a breach of the peace or a violation of law. *See id.*

530.    A "watcher" is "a person appointed under [Subchapter A of Chapter 33 of the Texas Election Code] to observe the conduct of an election on behalf of a candidate, a political party, or the proponents or opponents of a measure." Tex. Elec. Code Section 33.001.

531.    Section 4.02 of SB 1 adds Section 33.0015 to the Texas Election Code, which provides:

> The purpose of this chapter is to preserve the integrity of the ballot box in accordance with Section 4, Article VI, Texas Constitution, by providing for the appointment of watchers. It is the intent of the legislature that watchers duly accepted for service under this chapter be allowed to observe and report on irregularities in the conduct of any election, but may not interfere in the orderly conduct of an election. To effect that purpose, a watcher appointed under this chapter shall observe without obstructing the conduct of an election and call to the attention of an election officer any observed or suspected irregularity or violation of law in the conduct of the election.

*See* SB 1 Section 4.02; Tex. Elec. Code Section 33.0015.

532.    Former Hidalgo County Elections Administrator Ms. Yvonne Ramon testified that SB 1 still allows for a poll watcher to be removed if they cause a disruption. Oct. 3, 2023 Tr. at

2352:16–19. Ms. Ramon, however, testified that since the passage of SB 1, she was not aware of anyone being prevented from voting by a poll watcher. *Id.* at 2352:20–22. When asked about the change in poll watcher policy from preSB 1 times, Ms. Ramon agreed that prior to SB 1 poll watchers were allowed to be present everywhere in a polling location that a ballot was present; "everywhere and anywhere." *Id.* at 2352:23–2353:8. Ms. Ramon agreed that with SB 1 that policy was just written into law. *Id.* at 2353:9–10.

### ii.     Section 4.06

533.     Section 4.06 of SB 1 amended Section 33.051 of the Texas Election Code to require appointed poll watchers to present a certificate of completion from training to the presiding judge before serving. SB 1 Section 4.06. Section 4.06 also states that an election officer commits a Class A misdemeanor if the officer intentionally or knowingly refuses to accept a duly appointed and qualified watcher for service. *Id.*

534.     Section 4.06(h) of SB 1 provides that poll watchers must swear an oath not to disrupt the voting process or harass voters. Sept. 22, 2023 Tr. at 1889:24–1890:6. While the terms "disrupt" and "harass" are not defined in SB 1, *id.* at 1890:7–10, the determination of whether or not there is a disruption or harassment will be left to the presiding elections judge, as the presiding judge has the responsibility to maintain order in the polling place under section 32.075 of the Texas Election Code. *Id.* at 1891:13–17.

### iii.     Section 4.07

535.     Section 4.07 of SB 1 amended Section 33.056 of the Texas Election Code to state that a poll watcher is entitled to sit or stand near enough to see and hear the election officers conducting the observed activity, except as otherwise prohibited by Section 33.056. Section 4.07 of SB 1 also adds a provision to the Texas Election Code stating that "a watcher may not be denied free movement where election activity is occurring within the location at which the watcher is serving." *See* SB 1 Section 4.07; Tex. Elec. Code Section 33.056.

536.     While Section 4.07(f) of SB 1 provides that a poll watcher is entitled to sit or stand near enough to see and hear any election activity that the poll watcher is entitled to observe, Sept.

22, 2023 Tr. at 1882:17–23, it is important to note that this provision did not change the substance of the previous law; it merely set out what people already believed the law the be. *Id.* at 1882:17–25. Put simply, the "conveniently near" language and the "near enough to see and hear" language is the same thing. *Id.* at 1883:12–20. Thus, it did not give more abilities to poll watchers to do whatever they wanted. *Id.* at 1882:17–1883:6. Instead, this provision was still within the constraints that a poll watcher could not disrupt the voting process, such as by talking to voters. *Id.* at 1882:17–9. But because poll watchers and poll workers are both "maximalists," this language was added to the Election Code to make sure both sides understand what the roles are and what is expected of them. *Id.* at 1885:10–18.

537.    While Section 4.07(e) of SB 1 provides that a poll watcher may not be denied free movement where election activity is occurring, a person would have already been convicted of a Class B misdemeanor before SB 1 if they obstructed a poll watcher, and the Elections Division actually referred several complaints to the Attorney General's office for that same crime, such as obstructing poll watchers in central count. *Id.* at 1883:21–1884:4; 1886:16–23.

### iv.    Section 4.09

538.    Section 4.09 of SB 1 amended Section 33.061(a) of the Texas Election Code to state that it is an offense for an election official to take any action to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective. *See* SB 1 Section 4.09; Tex. Elec. Code Section 33.061(a).

539.    While Section 4.09 of SB 1 makes it a crime to knowingly distance or prevent a poll watcher from observing an activity in a manner that would make observation not reasonably effective, Sept. 22, 2023 Tr. at 1882:12–16, it was already a crime before SB 1 to relegate poll watchers to a particular area and not let them have free movement. *Id.* at 1888:1–8. Thus, even before SB 1, the Elections Division would talk to election officials and remind them that obstructing a poll watcher was a crime. *Id.* at 1888:1–8.

540.    While Mr. Espinosa is familiar with Section 4.09 of SB 1, Oct. 4, 2023 Tr. at 2463:25–2464:1, he has not personally witnessed inappropriate behavior by a poll watcher since SB

1 was enacted. *Id.* at 2464:6–8. He also has not identified a specific member of FIEL Houston that was unwilling to serve as a poll worker in 2022, *id.* at 2464:9–11, and he is not aware of any member of FIEL Houston who was threatened with prosecution under SB 1. *Id.* at 2464:12–14.

541.     Ms. Ayers is familiar with Section 4.09 of SB 1, *id.* at 2521:16–19, and she voted in both the May 2022 Primary Election and the November 2022 General Election. *Id.* at 2521:20–23. Notably, though, she has not observed any inappropriate behavior by a poll watcher while voting in 2022. *Id.* at 2521:24–2522:1. Moreover, she did not name a specific member of Friendship-West who was unwilling to vote in 2022 because of Section 4.09 of SB 1. *Id.* at 2522:11–14. She did not name a specific member of Friendship-West who was unwilling to serve as a poll worker in 2022 because of Section 4.09 of SB 1. *Id.* at 2522:15–18. And she was not aware of any member of Friendship-West who was threatened with prosecution under Section 4.09 of SB 1. *Id.* at 2522:19–22.

542.     While Ms. Ortega alleged that members of MABA in Texas are hesitant to act as poll workers following SB 1, she did not know how many MABA members acted as poll workers prior to SB 1, and she did not know how many acted as poll workers since SB 1. Oct. 4, 2023 Tr. at 2546:2–10. And while Ms. Ortega does know of a member of MABA who eventually stopped working as a poll worker following the passage of SB 1, *id.* at 2547:1–6, 12–18, that same member actually worked as a poll worker at least one time following SB 1's passage, *id.* at 2548:19–22, and that worker only stopped because she had concerns about being mistreated by election officials at the polling location and the language of Section 4.09 of SB 1. *Id.* at 2547:12–18; 2548:7–9.  Ms. Ortega is not aware of any member of MABA who refused to work as a poll watcher since the passage of SB 1. *Id.* at 2549:7–9.

           **v.     Section 4.12**

543.     Section 4.12 of SB 1 amended Section 86.006 of the Texas Election Code by requiring the election official who receives a marked early voting ballot to attest that the voter provided their name, signature, and identification when the ballot was delivered. Plaintiffs allege

that this is a prohibition on the use of ballot drop-boxes. *See* SB 1 Section 4.12; Tex. Elec. Code Section 86.006.

544.    While Dr. Tolson's concerns with SB 1's poll watcher provisions are that there may be places where a minority is discriminating against one's own race, Oct. 4, 2023 Tr. at 2634:1–3, she does not have any empirical data about the racial makeup of poll watchers in Texas, *id.* at 2634:4–8, and she is not aware of anything in Texas law that prevents minorities from working as poll watchers. *Id.* at 2634:9–12. Indeed, she does not know of anything in Texas law that would prevent any groups that are predominantly organizing among minority communities from organizing groups of people to participate as poll watchers. *Id.* at 2635:10–14.

545.    While Dr. Kousser argues that SB 1's poll watcher provisions will disproportionately affect minorities, Oct. 5, 2023 Tr. at 118:22–24, Texas is now a majority-minority state, *id.* at 2900:5–7, and there is no law preventing minorities from working as poll watchers. *Id.* at 2900:8–10.

546.    While Dr. McDaniel alleged that there was an increased number of voter intimidation incidents during the 2020 election, *id.* at 2964:18–23, he does not have any specific evidence establishing that poll watchers participate in voter intimidation in Texas. *Id.* at 2970:5–14. Indeed, he did not personally assess the alleged incidents of voter intimidation, *id.* at 2965:2–4, and he only based his conclusions on information found in secondary sources. *Id.* at 2965:5–7. Even more telling, however, none of the secondary sources he cited refers to voter intimidation having been perpetrated by poll watchers during the 2020 election in Texas. Oct. 5, 2023 Tr. at 965:20–2966:6; 2967:7–12; 2968:4–2970:4.

547.    Dr. McDaniel alleges that Texas has given more power to partisan poll watchers, Oct. 5, 2023 Tr. at 2972:14–16, thus resulting in an increased concern about attempts at voter intimidation, *id.* at 2972:17–20, but he did not contact any county official regarding SB 1's interpretation. *Id.* at 2973:4–6. He did not look to see how the relevant provisions existed prior to SB 1's enactment. *Id.* at 2973:7–9. He did not know how the relevant provisions were interpreted prior to SB 1. *Id.* at 2973:10–12. He did not know what powers partisan poll watchers had prior to

SB 1. *Id.* at 2973:13–15. He did not know what rights poll watchers had prior to SB 1 to observe election activities. *Id.* at 2973:16–18. He did not know what limitations were imposed prior to SB 1 on poll watchers' observations of election-related activities. *Id.* at 2973:19–22. And while he allegedly is "somewhat familiar" with the limitations imposed on poll watchers following the passage of SB 1, *id.* at 2973:23–25, he did not assess the exact ways in which SB 1 changed the rights and responsibilities of poll watchers, *id.* at 2974:1–4, and he did not assess the poll watchers' powers under the law. *Id.* at 2974:7–8. He also did not conduct any assessment of poll watchers in the November 2022 General Election, *id.* at 2974:19–21, and he did not assess the impact that SB 1's poll watchers provisions had on voter intimidation during the November 2022 General Election. *Id.* at 2974:24–2975:2. He never even read the parts of SB 1 addressing poll watchers before he wrote his reports in this case. *Id.* at 2976:1–3.

548.     In his expert report, Dr. Lichtman raises concerns about partisan poll watchers, Oct. 6, 2023 Tr. at 82:6–8, but he generally acknowledges that counties and elections officials work with both Republicans and Democrats to recruit poll watchers. *Id.* at 82:9–16. While Dr. Lichtman is concerned about Republican efforts to organize poll watchers in Harris County, *id.* at 82:17–20—and while Harris County is the most diverse county in Texas and is heavily Democrat, *id.* at 82:21–83:10, there is no law preventing Democrats from recruiting large numbers of diverse poll watchers in Harris County because "anyone can try to recruit poll watchers." *Id.* at 83:11–13. There is also no law in Texas preventing minorities from serving as poll watchers. *Id.* at 83:24–84:1.

### 4.     Article 5 – Mail-In Voting

#### i. Section 5.02

549.     Section 5.02 of SB 1 amended Section 84.002 of the Texas Election Code to add subsection (a)(1-a), which requires that an application for a ballot by mail include: "(A) the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety" [hereinafter collectively "DPS number"]; or "(B) if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number" [hereinafter SSN4]; or "(C) a statement by the applicant that

the applicant has not been issued a number described by Paragraph (A) or (B)." *See* SB 1 Section 5.02; Tex. Elec. Code Section 84.002.

550.    Subsection (b-1) of Section 84.002(a) allows a person to "use the number of a driver's license, election identification certificate, or personal identification card that has expired for the purpose of fulfilling the requirement under Subsection (a)(1-a) if the license or identification is otherwise valid. Tex. Elec. Code Section 84.002(a).

551.    Subsection (f-1) of Section 86.001 of the Texas Election Code requires that if a mail ballot application is rejected, the clerk must provide notice to the voter with information "regarding the ability to correct or add information required under Section 84.002(a)(1-a) through the online tool described by Section 86.015(c)." Tex. Elec. Code Section 86.001(f-1).

552.    Subsection (f-2) of Section 86.001 of the Texas Election Code provides that "[i]f an applicant corrects an application for a ballot to be voted by mail online and that application subsequently identifies the same voter identified on the applicant's application for voter registration, the clerk shall provide a ballot to the applicant as provided by this chapter." Tex. Elec. Code Section 86.001(f-2).

553.    Former Hidalgo County Elections Administrator Ms. Ramon agreed that the ID requirement language in SB 1 looks very similar to the language in the Help America Vote Act of 2002. Oct. 3, 2023 Tr. at 2358:8–15.

554.    When asked about the efficacy of signature matching for identifying voters, former Hidalgo County Elections Administrator Ms. Ramon testified that there can be issues with signature matching "with the elderly or someone who has become disabled, who signature, you know, every time they sign could be a little different." Oct. 3, 2023 Tr. at 2362:8–16. Ms. Ramon further testified that ID number matching "is more systemic." *Id.* at 2362:17–20. The Secretary of State pulls information from the Department of Public Safety to ensure that TEAM contains ID numbers for voters. *Id.* at 2362:25–2363:10. Hidalgo County has resolved issues syncing their offline system with the TEAM database. *Id.* at 2363:21–2634:3. A voter can correct a mismatched number by making a change to their voter application information or by coming into the county

elections office. *Id.* at 2364:17–24. One hundred and fifty-one voters in Hidalgo County came into the Hidalgo County elections office to confirm their ID numbers. *Id.* at 2329:8–10. Also, two voters in Hidalgo County used the Ballot Tracker during the March 2022 Primary to confirm their ID numbers. *Id.* at 2329:4–7.

555.　Mr. Louis Perales has been voting by mail for years. Oct. 3, 2023 Tr. at 2169:15-16. Prior to the March 2022 Primary Election, Mr. Perales had applied for a ballot by mail in early January. *Id.* at 2169:17–19. Tellingly, he did not have any difficulty applying for the mail ballot. *Id.* at 2169:20–22. Then, in early February, Mr. Perales received his mail ballot for the March 2022 Primary. *Id.* at 2169:23–25. Mr. Perales had his driver's license number memorized. *Id.* at 2169:16–19. But he did not include his driver's license number on his mail ballot for the March 2022 Primary Election, *id.* at 2169:16–19, and he did not include his social security number on his mail ballot for the March 2022 Primary Election. *Id.* at 2169:20–22.

556.　Nonetheless, Mr. Perales continued voting by mail in the May 2022 Constitutional Election, Oct. 3, 2023 Tr. at 2174:2–4, 7–9, and the November 2022 General Election, *id.* at 2174:5–9, and he did not have any problems voting by mail in those elections. *Id.* at 2174:10–11. Indeed, after the March 2022 Primary, he knew to look under the flap of the carrier envelope to put down the pertinent information, *id.* at 2178:7–10, and that is why he was able to vote successfully in the May 2022 Election, *id.* at 2178:11–13, the November 2022 General Election, *id.* at 2178:14–15, and the May 2023 Election. *Id.* at 2178:16–17. Even Mr. Perales's wife voted successfully during the elections following the initial March 2022 Primary. *Id.* at 2178:18–21. Interestingly, Mr. Perales is "more than happy to vote in-person" if there is no line. *Id.* at 2174:24–2175:10.

### ii. Section 5.03

557.　Section 5.03 of SB 1 amended Section 84.011(a) of the Election Code to require the officially prescribed application form for an early voting ballot to include space to enter the information required under Section 84.002(a)(1-a), which was amended by Section 5.02 of SB 1. *See* SB 1 Section 5.03; Tex. Elec. Code Section 84.011(a).

### iii.    Section 5.04

558.    Section 5.04 of SB 1 added Section 84.0111 of the Texas Election Code to prohibit an officer or employee of the state or a political subdivision of the state from: (a) distributing an application for an early voting ballot to a person who did not request the application; or (b) using public funds to facilitate third-party distribution of an application for an early voting ballot to a person who did not request the application. Section 84.0111(c) allows political parties or candidates for office to distribute an application form for an early voting ballot to a person who did not request an application. *See* SB 1 Section 5.04; Tex. Elec. Code Section 84.0111.

### iv.    Section 5.06

559.    Section 5.06 of SB 1 amended Texas Election Code Section 84.035 to provide that a voter who has already been sent a mail ballot, and who cancels their vote by mail application but fails to return their mailed ballot to the early voting clerk, may be permitted by an election judge "to vote only under a provisional ballot under Section 63.011." *See* SB 1 Section 5.06; Tex. Elec. Code Section 84.035.

### v.    Section 5.07

560.    Section 5.07 of SB 1 amended Section 86.001 of the Texas Election Code to require the clerk to reject an application for an early voting ballot if the personal identifying information included on the application as required under Section 86.001 of the Texas Election Code (amended by Section 5.02 of SB 1) does not identify the same voter identified on the applicant's application for voter registration. *See* SB 1 Section 5.07; Tex. Elec. Code Section 86.001.

561.    While Mr. Ayers is familiar with Section 5.07 and 5.13 of SB 1, Oct. 4, 2023 Tr. at 2522:23–2523:1, she did not identify a specific member of Friendship-West who tried and ultimately failed to receive a mail ballot, Oct. 4, 2023 Tr. at 2523:2–5, and she did not identify a specific member of Friendship-West who could not vote in 2022 because of the mail-ballot identification requirements. *Id.* at 2523:6–9.

### vi.    Section 5.08

562.     Section 5.08 of SB 1 amends Section 86.002 of the Election Code to add, inter alia, subSection (g) and (h). *See* SB 1 Section 5.08; Tex. Elec. Code Section 86.002.

563.     Subsection (g) of Section 86.002 provides that the carrier envelope for mail ballots include a space that is hidden from view when the envelope is sealed

> for the voter to enter the following information: (1) the number of the voter's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety; (2) if the voter has not been issued a number described by Subdivision (1), the last four digits of the voter's social security number; or (3) a statement by the applicant that the applicant has not been issued a number described by Subdivision (1) or (2).

Tex. Elec. Code Section 86.002(g).

564.     Subsection (h) of Section 86.002 allows a person to use "the number of a driver's license, election identification certificate, or personal identification card that has expired for purposes of Subsection (g) if the license or identification is otherwise valid." Tex. Elec. Code Section 86.002(h).

### vii.     Section 5.10

565.     Section 5.10 of SB 1 amended Texas Election Code Section 86.015(c) to require that the state's mandated online ballot tracker "allow a voter to add or correct" an omitted number required by SB 1 on a mail ballot application or a driver's license number, election identification certificate number, personal identification card number, or the last four digits of a Social Security Number that does not match the numbers contained in voter registration records. *See* SB 1 Section 5.10; Tex. Elec. Code Section 86.015(c).

566.     If a voter's personal identification number is missing or incorrect on the application for ballot by mail, the voter will have the opportunity to cure or correct the defect. Sept. 22, 2023 Tr. at 1841:12–15. Senate Bill 1 introduced a cure process for mail ballots. Sept. 12, 2023 Tr. at 327:14–16. One way a voter can do so is through the Ballot Tracker. Sept. 22, 2023 Tr. at 1841:16–18. And while the Elections Division received complaints about voters not being able to use the Ballot Tracker because of the residence address field in the authentication portion of it, *id.* at

1841:19–24—and while SB 1 required the residence address field, *id.* at 1842:3–5; 1860:4–7—the Texas Legislature changed that requirement in the most recent legislative session. *Id.* at 1860:8–9. Specifically, instead of their address, voters are now using their date of birth for the Ballot Tracker because it constitutes an easier field for data entry purposes. *Id.* at 1860:10–15. The cure process can be used to correct defects on a mail ballot other than just a missing or mismatched ID number. Sept. 12, 2023 Tr. at 327:17–328:1. Voters can cure four other ballot defects through the process: failure to sign the carrier envelope, a signature on the carrier envelope that cannot be certified as that of the voter, missing statement of residence, and incomplete information with respect to a witness. *Id.* at 328:8–25. Voters in El Paso also utilized the cure process. *Id.* at 329:20–25.

567.     Ms. Ramon testified that giving mail voters the opportunity to cure their ballot was a positive change by SB 1. Oct. 3, 2023 Tr. at 2314:3–5. Hidalgo County would accept an ABBM if either the voter's Driver's License or Social Security matched the voter's registration record. *Id.* at 2355:22–2356:13. Some individuals who had their ABBM rejected for ID mismatch were given an opportunity to cure their ABBM and did so. *Id.* at 2360:1–7. When asked whether those who had their application rejected and didn't cure could still vote in person, Ms. Ramon answered: "[i]f the application is canceled, yes, it does give them an opportunity to vote personal appearance." *Id.* at 2360:13–15. Ms. Ramon could not recall any individual in Hidalgo County who was ultimately unable to vote because of the ID-matching requirement. *Id.* at 2360:16–19. Ms. Ramon agreed that there were other reasons an ABBM or mail ballot could be rejected besides the ID requirement, such as failing to include a signature or failing to include the reason that the voter requested to vote by mail. *Id.* at 2360:20–2361:3. Ms. Ramon agreed that the ABBM requires a voter to include their address and left it up to the voter whether to include their phone number or email address. *Id.* at 2361:4–18. Ms. Ramon also agreed that Hidalgo County would use all information on the ABBM to contact voters as needed. *Id.* at 2361:19–2362:1.

### viii.     Section 5.11

568.     Section 5.11 amended 87.027(i) of the Texas Election Code to authorize a signature verification committee to compare the signature on each carrier envelope certificate for a mail

ballot "with any known signature of the voter on file with the county clerk or voter registrar to determine whether the signatures are those of the voter." *See* SB 1 Section 5.11; Tex. Elec. Code Section 87.027. Section 87.027(i) previously only allowed the committee to compare the signature on the carrier envelope with signatures made within the preceding six years. *See generally* SB 1 Section 5.11; Tex. Elec. Code Section 87.027.

> ix.     **Section 5.12**

569.     Section 5.12 of SB 1 adds Section 87.0271 to Texas Election Code to provide curative procedures for ballots that the signature verification committee determines are incomplete due to missing a signature on the carrier envelope certificate, statement of residence, other required information contained in Section 84.002(a)(1-a) or Section 86.002, incomplete required information regarding a witness, or "for which it cannot immediately be determined whether the signature of the carrier envelope certificate is that of the voter." SB 1 Section 5.12; Tex. Elec. Code Section 87.0271.

570.     Section 87.0271(b) of the Texas Election Code provides that, with regard to early voting ballots voted by mail,

> [n]ot later than the second business day after a signature verification committee discovers a defect . . . and before the committee decides whether to accept or reject a timely delivered ballot under Section 87.027, the committee shall: (1) determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day; and (2) return the carrier envelope to the voter by mail, if the committee determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day.

Tex. Elec. Code Section 87.0271(b).

571.     Section 87.0271(b) of the Texas Election Code provides that, if the signature verification committee determines under Subsection (b)(1) that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the committee may notify the voter of the defect by telephone or e-mail and inform the voter that the voter may request to have the voter's application to vote by mail canceled

in the manner described by Section 84.032 or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. Tex. Elec. Code Section 87.0271(b).

572.     Section 87.0271(e) of the Texas Election Code provides that "[a] poll watcher is entitled to observe an action taken under Subsection (b) or (c)." Tex. Elec. Code Section 87.0271(e).

### x.     Section 5.13

573.     Section 5.13 of SB 1 amended Section 87.041 of the Texas Election Code to provide that "A ballot may be accepted only if . . . the information required under Section 86.002(g) provided by the voter identifies the same voter identified on the voter's application for voter registration under Section 13.002(c)(8)." *See* SB 1 Section 5.13; Tex. Elec. Code Section 87.041.

574.     Section 5.13 of SB 1 also amended Section 87.041 of the Texas Election Code to provide that "the signature on the ballot application and on the carrier envelope certificate shall be rebuttably presumed to be the signatures of the voter." *See* SB 1 Section 5.13; Tex. Elec. Code Section 87.041.

575.     Subsection (e) of Section 87.041 authorizes the early voting ballot board to compare the voter's signature with any known signature of the voter on file with the county clerk or voter registrar to determine whether the signatures on the ballot application and on the carrier envelope certificate "are those of the voter." Tex. Elec. Code Section 87.041(e).

576.     Under Section 5.13 of SB 1, a mail ballot may be accepted only if contains the voter's identifying information. Sept. 22, 2023 Tr. at 1893:4–12. This means the information the voter provides only has to "identify the same voter." *Id.* at 1893:13–1894:1. This requirement is "not a memory game" for voters—it is only for voters to use a number that "identifies them as the voters," which is broader than what they submitted on their voter registration application. *Id.* at 1893:13–1894:1. That is why SB 1 created a rebuttable presumption that the signatures identify the voter, changed the weight of the signature comparison from more to less, and made the identification number provided the more objective standard. *Id.* at 1941:2–8.

### xi.     Section 5.14

577.   Section 5.14 of SB 1 adds Section 87.0411 to the Texas Election Code to provide that

> Not later than the second business day after an early voting ballot board discovers a defect described by Subsection (a) and before the board decides whether to accept or reject a timely delivered ballot under Section 87.041, the board shall: (1) determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day; and (2) return the carrier envelope to the voter by mail, if the board determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day.

*See* SB 1 Section 5.14; Tex. Elec. Code Section 87.0411.

578.   Section 87.0411(c) provides that

> [i]f the early voting ballot board determines under Subsection (b)(1) that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the board may notify the voter of the defect by telephone or e-mail and inform the voter that the voter may request to have the voter's application to vote by mail canceled in the manner described by Section 84.032 or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect.

Tex. Elec. Code Section 87.0411(c).

579.   Section 87.0411(e) of the Election Code provides that "[a] poll watcher is entitled to observe an action taken under Subsection (b) or (c)." Tex. Elec. Code Section 87.0411(e).

580.   For the November 2022 General Election, "an increase in the Black voting age population doesn't seem to have much of a bearing on [the] rejection of an application [for ballot by mail] relative to those precincts that have very low Black voting age population. The rejection rates are fairly constant across." Oct. 4, 2023 Tr. at 2735:2–13. Likewise, "those with a Spanish surname were actually a little less likely to than those with a non-Hispanic surname to have their application [for ballot by mail] rejected in the [November 2022] General Election." *Id.* at 2735:14–2736:1. Overall, Dr. Smith did not find any disparate impact with respect to the application for ballot by mail process under SB 1. *Id.* at 2743:23–25; 2772:7–22; 2774:1–24; 2780:19–22.

581.    Out all the rejected ballots cast by Hispanic voters in the 2022 General Election, 80.2 percent of them were due to SB 1. *Id.* at 2776:8–12. Tellingly, though, out of all the rejected ballots cast by non-Hispanic voters in the 2022 General Election, 84.1 percent were due to SB 1. *Id.* at 2776:13–20.

582.    As part of his analysis, Dr. Smith did not analyze the propensity of any race or ethnicity to vote by mail. *Id.* at 2779:18–20.

583.    When Dr. McDaniel assessed mail voting for the November 2022 General Election, he only utilized secondary sources. Oct. 5, 2023 Tr. at 2989:10–13. But even though he assessed mail voting, he did not analyze racial differences in mail ballot rejection rates for the November 2022 General Election, *id.* at 2989:14–16, and he did not indicate whether non-whites were more likely to have their ballot rejected in the November 2022 General Election. *Id.* at 2989:17–20.

584.    Notably, the mail ballot rejection rate dropped substantially between the March 2022 Primary and the November 2022 General elections. Oct. 5, 2023 Tr. at 2990:17–19. Part of that was due to citizens having a better understanding of the new rules in the November 2022 General Election, *id.* at 2990:20–22, and another part of that was because election administrators learned how to effectively implement SB 1's new rules. *Id.* at 2991:10–12.

### 5.    Article 6 – Voting Assistance

#### i.    Section 6.01

585.    Section 6.01 of SB 1 requires a person who "simultaneously" provides seven or more voters with curbside transportation to complete and sign a form reporting their name, address, and whether they are only providing transportation or also serving as an assistant to the voters. Section 6.01 also notes that "a poll watcher is entitled to observe any activity conducted under this section." SB 1 Section 6.01.

#### ii.    Section 6.03

586.    Section 6.03 of SB 1 added Section 64.0322 of the Texas Election Code to require a  person, other than an election officer, who assists a voter to complete a form stating:  (1) the name and address of the person assisting the voter; (2) the relationship to the voter of the person

assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee. *See* SB 1 Section 6.03; Tex. Elec. Code Section 64.0322. The form must be incorporated into the official carrier envelope if the voter is voting by mail ballot and receives assistance or must be submitted to an election officer at the time the voter casts a ballot at a polling place and receives assistance. *See* SB 1 Section 6.03; Tex. Elec. Code Section 64.0322.

587.     Mr. Espinosa is familiar with Section 6.03 of SB 1, and he is particularly familiar that this provision requires assistors to provide their name and address, their relationship to the voter, and whether they accepted any kind of compensation on a specific form. Oct. 4, 2023 Tr. at 2464:23–2465:4. Tellingly, though, he has not identified any specific member of FIEL Houston who has refused to fill out this form. *Id.* at 2465:5–7.

588.     While Ms. Ortega's concern with Section 6.03 is that the oath is under the penalty of perjury, Oct. 4, 2023 Tr. at 2549:14–22, she also explained that the penalty for perjury is the "Gold Standard for behavior." *Id.* at 2549:23–2550:1. Indeed, a witness has to be under oath because the courtroom involves a particularly important civic function, and the court does not work if people will not tell the truth. *Id.* at 2550:2–12. We thus have this "Gold Standard" to satisfy the need to have the very best from people who sit in the witness chair. *Id.* at 2550:13–15. Our elections are just as important to our democracy as our courtrooms. *Id.* at 2550:16–18. Moreover, while Ms. Ortega's concern with the oath in Section 6.03 was that the person being assisted might not give accurate information, *id.* at 2551:1–5, the oath only requires the assistor to swear that the person being assisted has represented that they are entitled to assistance; *id.* at 2551:6–8, it does not require the assistor to make an independent evaluation, and it does not require the assistor to get into the assisted voter's mind in order to swear that this information is true. *Id.* at 2551:9–12. Further, while Ms. Ortega recognizes that an assistor would also have to swear that she did not pressure or coerce the voter into choosing her as an assistor, *id.* at 2551:13–19, pressuring and coercing voters is unacceptable. *Id.* at 2551:20–22. After all, because voting is a particularly important area of public conduct to regulate, we must make sure that voters are not being

pressured—either by electioneers or assistors. *Id.* at 2553:12–17. Thus, when acting as an assistor, pressuring or coercing a voter is not something Ms. Ortega would do. *Id.* at 2551:23–25. And if Ms. Ortega was an assistor, she "would have no problem swearing under penalty of perjury . . . that [she] held [her]self up to that high standard." *Id.* at 2552:1–4.

589.    In addition, Section 37.02 of the Texas Penal Code explains that swearing to the truth of a false statement with the intent to deceive is a crime. *Id.* at 2554:4–11. Thus, prior to SB 1, a voter assistor was required to swear that they were doing things right under the law. *Id.* at 2555:9–14. And while Section 6.04 of SB 1 added the penalty-of-perjury language, *id.* at 2554:14–2555:4, all that the addition accomplished was making the penalty-of-perjury aspect explicit. *Id.* at 15–17.

### iii.    Section 6.04

590.    Section 6.04 of SB 1 amended the assistor oath required under Texas Election Code Section 64.034.  The new oath requires an assistor to swear, under penalty of perjury, that the voter "represented to [the assistor that] they are eligible to receive assistance," and that the assistor did not "pressure or coerce" the voter to choose them as the assistor. *See* SB 1 Section 6.04; Tex. Elec. Code Section 64.034.

591.    In addition to Section 6.03, Mr. Espinosa is familiar with Section 6.04 of SB 1, which revises the voter assistance oath. Oct. 4, 2023 Tr. at 2465:11–13.  Notably, he admitted on the stand to being aware that there was a voter assistance oath before SB 1, that he previously provided assistance to a voter, and that he even took that voter assistance oath. *Id.* at 16–23. Moreover, according to Mr. Espinosa, FIEL Houston and its alleged members are concerned about Section 6.04's language, including the phrase "I will not suggest by word, sign, or gesture how the voter should vote." *Id.* at 2466:13–19. But as Mr. Espinosa admitted, that particular language was already in the oath before SB 1. *Id.* at 2466:13–16. And while SB 1 did explicitly add the penalty-of-perjury language in the oath, Mr. Espinoza's and FIEL Houston's only concern was that such language "was not emphasized" previously, but even without such emphasis, Mr. Espinosa explained that

they "still took [the oath] very seriously." *Id.* at 2466:20–2467:4. He also has not identified any specific member of FIEL Houston who has refused to take the oath in Section 6.04 in 2022. *Id.* at 2467:5–7.

592.    While Mr. Cardenas recognizes that Section 6.04 of SB 1 changes the oath of assistance, Oct. 4, 2023 Tr. at 2480:3–13, he still assisted a voter in a polling place in the 2022 May Primary Run-off Election. *Id.* at 2480:14–18. Mr. Cardenas also took the oath of assistance, *id.* at 2484:2–3, even though swearing under the penalty of perjury is "not something that [he] would do lightly." *Id.* at 2484:22–24. And as part of that assistance, Mr. Cardenas has not been prosecuted, and nobody has suggested or threatened that he would be prosecuted for this act of voter assistance. *Id.* at 2496:19–20; 2497:1–4. While Mr. Cardenas alleged that he would not have assisted that voter had he "paid more attention" to the penalty-of-perjury language, *id.* at 2497:13–19, at trial, he swore under penalty of perjury to tell the truth before the Court, and he did not have any great concern about doing so because he knew that he was going to tell the truth. *Id.* at 2497:22–2498:5.

### iv.    Section 6.05

593.    Section 6.05 of SB 1 amended Texas Election Code Section 86.010 to require that a person who assists a voter in preparing a ballot to vote by mail include on the official carrier envelope: (1) the person's signature, printed name, and residence address, (2) the relationship of the person providing the assistance to the voter, and (3) whether the person received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance. *See* SB 1 Section 6.05; Tex. Elec. Code Section 86.010.

594.    Mr. Espinosa is familiar with Section 6.05 of SB 1, which requires an assistor to provide certain information on a carrier envelope when the assistor is helping a voter fill out the mail ballot. Oct. 4, 2023 Tr. at 2467:8–11. Generally, FIEL Houston does participate in the mail-in ballot process, *id.* at 2467:12–15, and Mr. Espinosa has not identified any member of FIEL Houston who has been threatened with prosecution because of SB 1. *Id.* at 2467:16–19. He also has not identified any specific person who asked for voter assistance but whom he refused. *Id.* at 2468:8–12.

v.    Section 6.06

595.    Section 6.06 of SB 1 amended Section 86.0105 of the Texas Election Code to make it a state jail felony, for a person who is not an attendant or caregiver previously known to the voter, to: (1) offer to compensate another person for assisting voters, or (2) solicit or receive compensation for assisting voters.  Under Section 6.06 of SB 1, "compensation" is an economic benefit as defined by Section 38.01, Penal Code. *See* SB 1 Section 6.06; Tex. Elec. Code Section 86.0105.

596.    While Section 6.06 makes it a state jail felony for a person to compensate or offer to compensate another person or to solicit, receive, or accept compensation for assisting voters, Sept. 22, 2023 Tr. at 1899:2–6—and while Section 6.03 requires an assistor to complete an oath form stating, among other things, that they have not received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee—it was already a crime to do so before SB 1. *Id.* at 1899:7–16. Indeed, the felony listed under Section 6.06 likely existed since 2013 when House Bill 206 created that prohibition. *Id.* at 1900:19–25. Moreover, it bears mention that a crime only occurs under Section 6.06 if money or anything of value is provided "in exchange for the assistance." *Id.* at 1901:11–17. Therefore, for example, the Secretary of State's Office believes that an assistor can have their expenses reimbursed, such as by accepting a bus fare, without violating Section 6.06 because it is not payment and only keeps the assistor from "going [in the] negative." *Id.* at 1903:23–1904:2. Likewise, if an assister receives payment to canvass for voters and then happens to assist a voter, that is not necessarily implicated by Section 6.03 because whether an assistor violated or lied under the oath depends on why the assistor was paid. *Id.* at 1902:9–22.

597.    Section 6.06(f) of SB 1 provides that the prohibition on compensating assistors does not apply if the person assisting the voter is an attendant or caregiver previously known to the voter. *Id.* at 1906:23–1907:2. Notably, it does not matter how long the voter has known the attendant or caregiver before voter assistance is provided under this provision of SB 1—as long as the assistor's job is something other than assisting a voter, then such assistance is perfectly

permissible. *Id.* at 1909:14–22. It does bear mentioning, however, that SB 1 does not define the term "attendant," *Id.* at 1907:3–4, and it does not define the term "caregiver." *Id.* at 1907:5–6. And while the Secretary of State's Office has not published any guidance or trainings on how to interpret the terms "attendant" or "caregiver," it has not received any questions about these terms, and thus, there has not been any perceived need to do any such training or education. *Id.* at 1908:3–7, 17–24.

> ### vi.    Section 6.07

598.    Section 6.07 of SB 1 amended Section 86.013(b) of the Texas Election Code to require carrier envelopes to include a space for assistors to indicate his or her relationship to the voter being assisted. *See* SB 1 Section 6.07; Tex. Elec. Code Section 86.013(b).

> ## 6.    Article 7 – Vote Harvesting & Expanded Protection for Workers

> ### i.    Section 7.02

599.    Section 7.02 of SB 1 expands the protection of voters, from only election day to now include the early voting period, from work supervisors who refuse to permit a supervisee from being absent from work for the purpose of attending the polls. SB 1 Section 7.02.

600.    SB 1 expands protections for employees by allowing them to leave work during the early voting period. Oct. 4, 2023 Tr. at 2639:25–2640:3. This is particularly important for minority voters because of the high coincidence that minority voters are in a particular income class. *Id.* at 2640:4–12.

601.    While Dr. Kousser believed that the provision expanding the rights of workers to take two hours off of work may not have gone far enough, that opportunity to leave work in order to vote during early voting did not exist prior to SB 1. Oct. 5, 2023 Tr. at 2899:16–21.

602.    Mr. Shackelford was aware that SB 1 increased the opportunity to take two hours off work during Early Voting. Oct. 3, 2023 Tr. at 2273:16–20. Former Hidalgo County Elections Administrator Ms. Ramon testified that it was a positive change of SB 1 to allow employees to take time off to vote during early voting. *Id.* at 2314:13–17.

> ### ii.    Section 7.04

603.    Section 7.04 of SB 1 adds Section 276.015 to the Texas Election Code, which makes it a felony of the third degree for a person, directly or through a third party, to knowingly: (1) provide or offer to provide vote harvesting services in exchange for compensation or other benefit; (2) provide or offer to provide compensation or other benefits to another person in exchange for vote harvesting services; or (3) collect or possess a mail ballot or official carrier envelope in connection with vote harvesting services. SB 1 Section 7.04. Section 7.04 of SB 1 defines "benefit" as "anything reasonably regarded as gain or advantage... whether to a person or another party whose welfare is of interest to the person." *Id.* The provision defines "vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *Id.*

604.    Section 7.04 of SB 1 adds Section 276.017 to the Texas Election Code, which prohibits the early voting clerk or other election officials from knowingly mailing or providing early voting by mail ballot materials to any person who the official knows did not submit an application for a ballot to be voted by mail. *See* SB 1 Section 7.04; Tex. Elec. Code Section 276.017.

605.    Section 7.04 of SB 1 adds Section 276.018 to the Texas Election Code, which makes it an offense to make a false statement or swear to the truth of a false statement on a voter registration application or in an oath, declaration, or affidavit. *See* SB 1 Section 7.04; Tex. Elec. Code Section 276.018.

606.    Section 7.04 of SB 1 adds Section 276.019 to the Texas Election Code, which prohibits election officials from creating, altering, modifying, waiving, or suspending any election standard, practice, or procedure in a manner not expressly authorized by the Texas Election Code. *See* SB 1 Section 7.04; Tex. Elec. Code Section 276.019.

607.    Generally, Section 7.04 codifies several felony offenses relating to vote harvesting. Sept. 22, 2023 Tr. at 1910:16–19. Specifically, however, Section 7.04 makes it unlawful to knowingly provide or offer to provide vote harvesting service in exchange for compensation or other benefit, *id.* at 1911:1–4, and it makes it unlawful to provide or offer to provide compensation in exchange for those vote harvesting activities. *Id.* at 1911:5–8. A "benefit" under this provision

generally means "anything reasonably regarded as a gain or advantage." *Id.* at 1911:9–11. And it defines "vote harvesting" to mean "any in-person interaction with one or more voters in the physical presence of an official ballot or a ballot voted by mail intended to deliver votes for a specific candidate or measure." *Id.* at 12–18. Thus, for vote harvesting to occur under Section 7.04, the activity must be (1) an in-person interaction with one or more voters, and (2) it must be in the physical presence of an official ballot or ballot voted by mail. *Id.* at 1911:19–24. Concerning this first requirement, the Office of the Secretary of State's view is that a telephone discussion between two individuals would not satisfy the in-person requirement. *Id.* at 1912:3–7. And concerning this second element, the whole point of this element is that harvesting occurs whenever the harvester makes sure that the voter checks a particular candidate's box as the voter and the harvester are reviewing the ballot together. *Id.* at 1915:12–16. Indeed, Section 7.04 is implicated whenever a harvester has a particular mission to deliver a particular number of votes for a particular candidate and makes sure that the voter checks a particular box, meaning that the ballot has to be in front of the voter and the harvester so that both can see the ballot—it is not a situation where someone can be caught by accident. *Id.* at 1915:17–25. According to the Secretary of State's Office, anything other than that falls within the First Amendment. *Id.* at 1914:25–1915:16. 1914:25–1915:16. That's why it does not apply, for example, when the ballot is in the kitchen, the voter and harvester are in the living room, and both people are talking about their preferred candidates. *Id.* at 1914:25–1915:11. Of course, it bears mention that a prosecutor may or may not agree with the case-by-case judgment of the Secretary of State's Office. *Id.* at 1917:10–19.

608.     Ms. Ortega is not aware of any direct effect that Section 7.04 of SB 1, a vote harvesting provision, has on MABA in Texas. Oct. 4, 2023 Tr. at 1555:18–22.

### 7.     Article 8 – Civil Penalty

609.     Section 8.01 of SB 1 adds Section 31.130 to the Texas Election Code which states that an action for violations of the Election Code, including an action for a writ of mandamus, may only be brought against an election judge in their official capacity. *See* SB 1 Section 8.01; Tex. Elec. Code Section 31.130.

610.     Section 32.075 to the Texas Election Code states that a presiding judge is to preserve order and prevent breaches of the peace and violations of the Texas Election Code in the polling place and in the area within which electioneering and loitering are prohibited from the time the judge arrives at the polling place on election day until the judge leaves the polling place after the polls close. Tex. Elec. Code Section 32.075.

611.     An election judge is considered an "election officer" under the Texas Election Code. Oct. 16, 2023 Tr. at 3978:11–18.

**X. Implementation**

### R. The Scale of Changes Required by SB 1

612.     The Texas Election Code requires the Texas Secretary of State to prescribe official election forms. Oct. 18, 2023 Tr. at 4553:17–20; Tex. Elec. Code Section 31.002. Election forms are essentially a summary of the law. *Id.* at 4554:20–23.

613.     Many forms act as a sample; many forms act as templates; and many are legally required to have their content specifically prescribed by the Texas Secretary of State's Office. Oct. 18, 2023 Tr. at 4553:17–4554:1. Indeed, election officials are required to use a number of these election forms. *Id.* at 4553:17–23.

614.     The Texas Secretary of State's Office has hundreds of forms, including around 350 identified on their website and 500 in their files. Oct. 18, 2023 Tr. at 4554:2–13. For many voters, they provide a way to interact with the law. *Id.* at 4554:20–4555:1. Thus, it is "very critical that [the Texas Secretary of State's Office] put[s] a lot of care and effort into creating a form." *Id.* at 4554:20–4555:1.

615.     Anytime that the Texas Secretary of State's Office makes changes to a form, it will send out a mass email to the counties with a template of the form. Oct. 18, 2023 Tr. at 4563:2–8. The Texas Secretary of State also has a forms manual and an index of forms on its website that it keeps updated, *id.* at 4563:2–11, and it educates on those changes through election advisories, presentations, guidance, emails, seminars, or other trainings. *Id.* at 4564:1–13.

616.     When the Texas Secretary of State's Office is updating forms, it has to be mindful of the election calendar. Oct. 18, 2023 Tr. at 4562:23–4563:1. That is because it becomes harder to change a form the closer it is to an election. *Id.* at 4562:23–4563:1. And the Texas Secretary of State's Office also does not make "major" changes to an election form without it being reviewed by a number of counties that provide feedback. *Id.* at 4556:9–10.

617.     Notably, however, SB 1 was a large bill. Sept. 14, 2023 Tr. at 805:7–8. It amended multiple provisions of the Texas Election Code. *Id.* at 805:9–10. And it covered many different topics. *Id.* at 805:11–13.

618.     Thus, when SB 1 became effective on December 1, 2021, Oct. 18, 2023 Tr. at 4548:9–11, it took time for the Texas Secretary of State's Office to distribute election advisories on SB 1. Sept. 14, 2023 Tr. at 812:4–6. That is because of the scale of changes required by SB 1. *Id.* at 812:7–9.

619.     Indeed, the Texas Secretary of State's Office had to change, among other things, every piece of guidance, every handbook, and hundreds of forms to comply with SB 1's new requirements. Oct. 18, 2023 Tr. at 4549:2–11. For example, the Texas Secretary of State's Office had to change voter registration application, the statement of residence, the request to cancel a ballot by mail, certificates of appointment of a poll watcher, and the oath of assistance and interpreter. STATE Exhibit 257 at 6. The Texas Secretary of State's Office also had to change several of its guides, including the poll watcher guide, the candidate's guide, and the handbook for qualifying a voter. STATE Exhibit 257 at 6. Overall, there were about 100 forms that the Texas Secretary of State's Office had to update or create, and on top of correcting and creating other forms, there were over 500 different variations of modifications that the Texas Secretary of State had to manually complete for voter registration applications. Oct. 18, 2023 Tr. at 4555:3–11.

620.     The Texas Secretary of State's Office also had to complete these hundreds of forms by December due to the effective date of SB 1. Oct. 18, 2023 Tr. at 4555:12–20. SB 1 thus had a short turnaround time. Sept. 14, 2023 Tr. at 805:16–17. That short turnaround time did not give time for the Texas Secretary of State's Office to complete all the forms that SB 1 required. *Id.* at

805:20–25. In fact, the Texas Secretary of State's Office continued working on tasks after SB 1's effective date because they "could not physically get everything done by that time." Oct. 18, 2023 Tr. at 4555:12–20.

### S. SB 1's Perfect Storm

621.     The late passage of SB 1 created during the perfect storm of challenges to efficient statutory implementation. Oct. 18, 2023 Tr. at 4416:6–17. To start, the first election to which SB 1 applied was the March 2022 Primary Election. Oct. 18, 2023 Tr. at 4415:24–4416:9, 4548:24–4549:1; Sept. 14, 2023 Tr. at 805:18–19. Primary elections are the most difficult election to conduct, Oct. 18, 2023 Tr. at 4417:2–3, for several reasons: (1) there are two elections occurring simultaneously that are conducted by every county party, (2) voters do not understand what a primary election is and its differences from a general election, (3) more voters make angry calls to the Secretary of State's office, and (4) an inordinate amount of part-time volunteers trying to run an election. *Id.* at 4417:4–16. Thus, these complications with primary elections contribute to higher rejection rates during primary election. *Id.* at 4417:17–21.

622.     Normally, moreover, the Texas Secretary of State's Office hosts an annual seminar the summer after the legislative session—usually in July or early August—to talk about new laws. Oct. 18, 2023 Tr. at 4416:18–22, 4549:21–4550:12. But because counties and the Texas Secretary of State had to implement SB 1 by December 1, 2021, there were two problems: (1) the Texas Secretary of State did not have a county election seminar to teach the law the summer before the election; and (2) the Texas Secretary of State did not have a November Constitutional amendment election to "trial run" the first election. *Id.* at 4416:6–17.

623.     Further, in the Fall of 2021, the Texas Legislature had a number of special sessions. Oct. 18, 2023 Tr. at 4548:15–20. And because the census data was late, *id.* at 4416:6–17, one of the big issues during those special sessions was redistricting. *Id.* at 4548:15–20. In fact, due to delays in the U.S. Census Bureau releasing 2020 Census data to the States for redistricting purposes, the timeline for undertaking redistricting in Texas was modified that year. STATE Ex. 204 at 1.

624.     As a result, the implementation of SB 1 coincided with redistricting. Sept. 14, 2023 Tr. at 808:2–3. Indeed, counties were redrawing their precinct lines while implementing SB 1. *Id.* at 808:4–10. And voter registrars had to send each voter a certificate that indicates their new precinct and voting districts. *See* Tex. Elec. Code Section 15.022, 15.024, 15.027; *see also* STATE Ex. 204.

625.     Thus, redistricting made it more difficult for counties to implement SB 1. Sept. 14, 2023 Tr. at 808:11–14. After all, the Texas Secretary of State's Office had to help with redistricting, support the November 2021 Constitutional Amendment Election, and help 500 political party chairs with candidate filings related to the March 2022 Primary Election. Oct. 18, 2023 Tr. at 4549:2–20.

626.     Moreover, voters tend to be confused whenever there is a change in election law. Sept. 14, 2023 Tr. at 810:22–24. There is always a learning curve when new voting requirements are introduced. Oct. 12, 2023 Tr. at 3843:14–16.

627.     Thus, as expected, voters were confused about the identification requirements after SB 1 took effect. Oct. 12, 2023 Tr. at 3843:4–7. The lack of SB 1's implementation time was a contributing factor to the confusion that voters had regarding SB 1's new requirements. Sept. 14, 2023 Tr. at 809:16–19. It would have been easier to implement SB 1 had the Texas Legislature given counties more time before its effective date. *Id.* at 809:13–15. And because the Texas Secretary of State's Office already was conducting an ongoing election, it had to be very cautious about beginning any of the training on SB 1, which only impacted future elections, not ongoing ones. Oct. 18, 2023 Tr. at 4551:19–8.

628.     Moreover, the news media was reporting changes in the law that did not match the Texas Secretary of State's training materials, so individuals were calling the Texas Secretary of State's office to ask about what the legal requirements were. *Id.* at 4552:21–4553:16. Specifically, the media repeated misleading, false messages in the public sphere, such as the identification number "had to match the number [the voter] original registered with" or that "voters had to 'guess' which one to provide." STATE Ex. 244 at 4. In reality, however, ninety-five percent (95%)

of all registered Texas voters had both identification numbers on record, and only four percent (4%) had one or the other identification number. STATE Ex. 244 at 1. Thus, the Texas Secretary of State's Office had to repeatedly correct the record, call the journalists, and tell them that the media was giving inaccurate information to voters. Oct. 18, 2023 Tr. at 4616:17–4617:17.

629.     In addition, because SB 1 amended multiple provisions of the Texas Election Code, covered a lot of different topics, and had a short turnaround time, counties had to rethink their processes. Sept. 14, 2023 Tr. at 805:9–15. Counties had challenges getting the forms printed in sufficient amounts because of paper shortages. *Id.* at 806:1–5. The vendors that counties used experienced delays in being able to produce the newly required forms. *Id.* at 806:6–8. And these vendors experienced delays in being able to produce the carrier envelopes. *Id.* at 806:9–11.

630.     Overall, the Texas Secretary of State's Office had to help with redistricting, support the November 2021 Constitutional Amendment Election, and help 500 political party chairs with candidate filings related to the March 2022 Primary Election. Oct. 18, 2023 Tr. at 4549:2–20. Together, all these complications contributed to a higher rejection rate during the March 2022 Primary Election. *Id.* at 4417:17–21. Indeed, counties would have had fewer voters with rejected ballots had the Texas Legislature given them more time. Sept. 14, 2023 Tr. at 809:20–23.

### T.  Actions Taken by Secretary of State

631.     As discussed above, the Texas Secretary of State's Office had to change many of its guidance documents, handbooks, and forms to comply with SB 1's new requirements. Oct. 18, 2023 Tr. at 4549:2–11; *see also* STATE Ex. 257 at 6. For example, after SB 1 was enacted, the Texas Secretary of State's Office updated their election handbooks to reflect SB 1's changes, Oct. 18, 2023 Tr. at 4568:9–11, and those updated handbooks were available prior to the March 2022 Primary. *Id.* at 4568:12–14.

632.     And with only 32 people at the time, the Elections Division of the Texas Secretary of State undertook a triage-type approach by first creating and modifying the documents that were the most time sensitive, such as ballot-by-mail envelopes and voter registration applications. Oct.

18, 2023 Tr. at 4555:15–4556:14. Another form that the Texas Secretary of State's Office had to update was the application for a ballot by mail. *Id.* at 4560:23–4561:2.

633.    The Texas Secretary of State's Office also heavily relied on the county election officials that comprised the advisory group, Oct. 18, 2023 Tr. at 4558:1–10, and it consulted with the U.S. Postal Service and local post office representatives to get their feedback on forms and other items that go through the mail. *Id.* at 4558:11-18. Further, in the redesign of the carrier envelope, for example, the Texas Secretary of State's Office also used the resources and templates of the Center for Civic Design, which is an organization that ensures the designs for elections are done in a way that is user-friendly and accessible. *Id.* at 4558:19–4559:16.

634.    The Texas Secretary of State's Office started doing web-based trainings in December of 2021. Oct. 18, 2023 Tr. at 4551:19–4552:20. Indeed, leading up to the March 2022 Primary, the Secretary of State's Office offered webinars about the interpretation and application of SB 1, Oct. 12, 2023 Tr. at 3813:25–3814:3, and the Elections Division for the Texas Secretary of State's Office conducted seminars, conferences, and trainings for election officials about SB 1. Oct. 18, 2023 Tr. at 4324:16–20.

635.    Specifically, the Texas Secretary of State's Office provided trainings on applications for ballot by mail, poll watchers, ballot cure provisions, and updates on the legislative session. Oct. 18, 2023 Tr. at 4533:18–4534:2; *see also, e.g.*, STATE Ex. 247 (presentation on the changes to in person voting practices during the early voting period); STATE Ex. 248 (presentation on frequently asked questions regarding ABBMs); October 3, 2023 Tr. at 2326:18–2327:5 (Ms. Ramon testified that the Texas Secretary of State's Office provided guidance to the counties on how to respond when a county received an ABBM with an ID number that was either missing or non-matching).

636.    Most of these trainings are available on the Texas Secretary of State's website, meaning that any individual can view them. Oct. 18, 2023 Tr. at 4534:3–18. Nonetheless, most of the trainings are targeted to the individuals that carry out the day-to-day operations related to law, such as local election officials, county election officials, county election and voter registration

offices, election officials for cities and school districts, other local political subdivisions, party officials when during Primary elections, and even candidates and members of the public. *Id.* at 4534:3–21.

637.    In addition, prior to SB 1, the Texas Secretary of State's Office had a guidance called the "Poll Watcher's Guide," which was a handout that summarizes the law as it relates to poll watchers. Oct. 18, 2023 Tr. at 4542:17–4543:10. However, SB 1 required that the Texas Secretary of State's Office create a training for poll watchers that was available on demand and specifically trained on the requirements of being a poll watcher and the proper procedure for poll watchers. *Id.* at 4542:17–4543:10. Thus, the Texas Secretary of State's Office used the Poll Watcher's Guide as the basis for creating the poll watcher training required by SB 1. *Id.* at 4542:17–4543:10. The Texas Secretary of State thus implemented this web-based poll watcher training immediately following SB 1 for the March 2022 Primary, and the training went live on the Texas Secretary of State's website in December of 2021. *Id.* at 4543:1–11.

638.    The Texas Secretary of State's Office also issued several election advisories. *See, e.g.*, STATE Ex. 14; STATE Ex. 16; STATE Ex. 17; STATE Ex. 18; STATE Ex. 19; STATE Ex. 202; STATE Ex. 203. An election advisory is a guidance that the Texas Secretary of State's Office prescribes regarding different issues under the law. Oct. 18, 2023 Tr. at 4535:24–4536:20.

639.    Relevant here, the election advisories issued after SB 1 generally summarized the election-related legislation that passed during the 87th Texas Legislature's Second and Third Special Sessions in 2021, STATE Ex. 14, advise voters of recent changes in the state law relating to early voting by personal appearance, STATE Ex. 16, detail the new requirements and new cure processes regarding applications for a ballot by mail and carrier envelopes, STATE Ex. 17, advise voters of recent changes in the state laws regarding poll watchers, STATE Ex. 18, and offer additional guidance regarding the process for voters to correct certain defects in ABBMs or carrier envelopes, STATE Ex. 19.

640.    The Texas Secretary of State's Office also engaged in voter education efforts around the ID provisions of SB 1. Oct. 18, 2023 at 4608:21–23. Specifically, the Texas Secretary of

State's Office implemented a large $3.5 million statewide campaign that educated the public on the in-person ID requirements and the voting by mail ID requirements. *Id.* at 4608:24–4609:15. This statewide voter education campaign official started in January of 2022, utilized several languages, and covered the 2022 election cycle, include the Primary, Primary run-off, and General Election. *Id.* at 4608:24–4609:15.

641.   More specifically, this statewide voter education campaign had two phases. Oct. 18, 2023 Tr. at 4620:10–12. Phase 1 sought to educate voters for purposes of the March 1, 2022 Primary Election and the May 24, 2022 Primary Run-Off Election. STATE Exhibit 227 at 7. Phase 2 sought to educate voters for purposes of the November 8, 2022 General Election. STATE Ex. at 7.

642.   For Phase 1, some $1.3 million was allotted as the budget, of which a little under $1 million was used. Oct. 18, 2023 Tr. at 4620:15–4621:10. This phase involved, among other things, paid media advertisements, radio advertisements, a grassroots tour, and digital display advertisements in English and Spanish. *Id.*

643.   Finally, in addition to educating voters about SB 1's identification requirements, the Texas Secretary of State's Office adopted the so-called HB 2512 process for the implementation of SB 1. Oct. 17, 2023 Tr. at 4400:14–17. The HB 2512 process allows the Texas Secretary of State's Office to use a person's driver's license information for voter registration, which allows them to get as many driver's licenses as possible for the implementation of SB 1. *Id.* at 440:3–13. Indeed, the Texas Secretary of State's Office adopted that process to reduce the number of voter records that only had one—or sometimes, none—of the identification numbers required under SB 1. *Id.* at 4400:22–4401:1. This attempt ultimately helped the Texas Secretary of State's Office navigate SB 1's ID number requirement and helped the voters and election officials fill out and process mail ballots. *Id.* at 4401:2–7.

### U. Actions Taken by Counties

644.    There is always a learning curve when new voting requirements are introduced. Oct. 12, 2023 Tr. at 3843:14–16. Thus, in implementing SB 1, counties had to train their staff about the new requirements under SB 1. *Id.* at 3842:15–17. Counties also had to train members of the early voting ballot board or signature verification committee about SB 1's new requirements. *Id.* at 3842:18–20.

645.    Moreover, leading up to the March 2022 Primary, counties would attend the webinars that the Texas Secretary of State's Office offered about the interpretation and application of SB 1. Oct. 12, 2023 Tr. at 3813:25–3814:5. And counties rushed to educate voters about SB 1's new requirements. Sept. 14, 2023 Tr. at 909:17–19.

646.    In light of this training and education, it took time for the members of the early voting ballot boards to understand their responsibilities pursuant to SB 1's ID number requirement. Oct. 12, 2023 Tr. at 3848:20–24. It also took time for county offices to understand their responsibilities pursuant to SB 1's ID number requirement and identify and implement best practices. *Id.* at 3848:25–3849:7. Counties now have a better sense of how to implement SB 1 today. *Id.* at 3849:8–11.

### E.    Actions Taken Post Primary

647.    After the March 2022 Primary, the Texas Secretary of State's Office continued offering webinars about the interpretation and application of SB 1. Oct. 12, 2023 Tr. at 3814:6–9. And after the primary, counties continued attending those webinars. *Id.* at 3814:10–11.

648.    The Texas Secretary of State's Office also rolled out Phase 2 of its statewide voter education campaign to continue educating voters. Oct. 18, 2023 Tr. at 4621:11–4622:5. This phase involved the same paid media advertisements as the first phase, added television advertisements, involved social media posts and graphics (such as Twitter, Facebook, Instagram, and YouTube), used another grassroots tour, involved focus groups, and conducted a lot of different community events among other things. *Id.* at 4621:11–4622:9.

649.    The voter education campaign also targeted specific groups of people, including Spanish-speaking voters with disability, minority communities (such as the African-American

198

community, Vietnamese-speaking community, and Mandarin-speaking community), voters with disabilities, students or young voters, first-time voters, elderly voters, people who were new to Texas, and people who were not yet registered but were eligible to vote. Oct. 18, 2023 Tr. at 4627:20–4628:6. For example, the Texas Secretary of State's Office used media channels that were particular to specific minority communities, such as Univision and Telemundo in Spanish and community-particular newspapers, *id.* at 4629:3–22, and the Texas Secretary of State's Office undertook research regarding voters with disabilities by working with the Coalition for Texans with Disabilities. *Id.* at 4631:12–4632:10.

650.    Notably, though, there was a learning curve for county staff and early voting ballot board members. Oct. 12, 2023 Tr. at 3842:22–24. And it took time, for example, to understand the best practices when implementing SB 1's identification requirements. *Id.* at 3842:25–3843:3.

651.    But the time following the March 2022 Primary provided counties had greater opportunity to implement the provisions of SB 1 for the March Primary Run-off and the May Local Election. *Id.* at 2349:4–7. There was also more time to implement SB 1 with respect to the November 2022 General Election and subsequent elections. *Id.* at 2349:8–11.

652.    Thus, the mail ballot rejection rate dropped substantially between the March 2022 Primary and the November 2022 General elections. Oct. 5, 2023 Tr. at 2990:17–19. Part of that was due to citizens having a better understanding of the new rules in the November 2022 General Election, *id.* at 2990:20–22, and another part of that was because election administrators learned how to effectively implement SB 1's new rules. *Id.* at 2991:10–12.

653.    For example, when the Texas Secretary of State's Office initially issued the poll watcher training, it did not include a quiz or a test because the legislature gave no statutory direction to have any kind of pass-or-fail system with the training. Oct. 18, 2023 Tr. at 4544:12–20. After the March 2022 Primary, however, the Texas Secretary of State's Office received feedback from election officials, candidates, and even poll watcher groups that the training required a mechanism to ensure people actually read the content while taking the training. Oct. 18, 2023 Tr. at 4544:12–4545:6. Thus, while the Texas Secretary of State's Office did not have statutory

authority to add a quiz, it did add questions at the end of each training module that required trainees to answer correctly before proceeding to the next module. *Id.* at 4544:12–4545:11.

654.    Moreover, after the March 2022 Primary, counties developed inserts for the ABBMs and carrier envelopes that informed voters of SB 1's ID number requirement in order to reduce the rejection rates in the following elections. Sept. 14, 2023 Tr. at 816:25–817:14; Sept. 19, 2023 Tr. at 1108:7–15; Oct. 3, 2023 Tr. at 2328:10–18; Oct. 12, 2023 Tr. at 3845:9–20; see also STATE Ex. 68 (Carrier Envelope Insert utilized by Denton County to remind voters of ID number requirement); STATE Ex. 69 (Carrier Envelope Insert utilized by Travis County to remind voters of ID number requirement); STATE Ex. 70 (Carrier Envelope Insert utilized by Travis County to remind voters of ID number requirement); STATE Ex. 71 (ABBM Insert utilized by Travis County to remind voters of ID number requirement); STATE Ex. 72 (ABBM Insert with Numbers utilized by Travis County to remind voters of ID number requirement); STATE Ex. 73 (Carrier Envelope Insert utilized by Harris County in 2022 Primaries to remind voters of ID number requirement in (English/Spanish)); STATE Ex. 74 (Carrier Envelope Insert utilized by Harris County to remind voters of ID number requirement (Chinese/English)); STATE Ex. 75 (Carrier Envelope Insert utilized by Harris County to remind voters of ID number requirement (Spanish/English); STATE Ex. 76 (Carrier Envelope Insert utilized by Harris County to remind voters of ID number requirement (Vietnamese/English)); STATE Ex. 77 (Carrier Envelope Insert utilized by Bexar County in the May 7, 2022, Local Election and May 24, 2022, Primary Runoff to remind voters of ID number requirement); STATE Ex. 78 (Carrier Envelope Insert utilized by Bexar County in the November 8, 2022, General Election to remind voters of ID number requirement); STATE Ex. 79 (Carrier Envelope Insert utilized by Hays County to remind voters of ID number requirement); STATE Ex. 80 (Carrier Envelope Insert utilized by Kleberg County to remind voters of ID number requirement); STATE Ex. 81 (ABBM Insert utilized by Kleberg County to remind voters of ID number requirement).

655.    So, while the Elections Division does not require counties to ask voters to include both personal identification numbers, Sept. 22, 2023 Tr. at 1844:19–21, the Elections Division did

review and ultimately approve county inserts that recommended to voters that they should put both their driver's license number and Social Security number on the application for ballot by mail, *id.* at 1838:24–1839:7, and the Elections Division communicated with counties to indicate that this insert was an option. *Id.* at 1839:10–12.

656.    Counties would also send voters a new registration form with any written notice of rejection so that a voter would be able to update his or her ID numbers for the voter registration file. *See, e.g.*, Sept. 19, 2023 Tr. at 1108:16–22. They would also post videos on their website regarding the same topics, Oct. 12, 2023 Tr. at 3845:9–20, and they would use voter education efforts, press conferences, social media posts, radio stations, and help from the disability community and other communities. *See, e.g.*, Sept. 19, 2023 Tr. at 1109:11–1110:5.

657.    Overall, counties succeeded in reducing the rejection rate a substantial amount. Sept. 14, 2023 Tr. at 817:15–17; *see also* Oct. 12, 2023 Tr. at 3846:2–4, 19–21 (Mr. Phillips testified that the insert and Denton County's voter educations efforts proved successful in reminding voters to put their ID number down).

## XI.    Efficacy

### V.    Voter Registration

658.    In order for a person to register to vote,

> They need their name and address. If their mailing address is different they need to supply it. Their date of birth. And then of course Help America Vote Act requires driver's license number, and if you don't have a driver's license, the last four of your social. And they've got to aver that they are a citizen, over the age of 18, and not a felon, on paper.

Oct. 17, 2023 Tr. at 4340:24–4341:8. This hierarchy is stipulated in the Help America Vote Act ("HAVA"). *Id.* at 4341:16–18.

> Live check is the identity check that's also required by the Help America Vote Act. It is a thing where we send to the DPS the person's last name, former last name, date of birth, and the number that they registered to vote with, and see if it's the same data that DPS has in their database. If they use the last four of social, then DPS transmits it on through their system to the Social Security Administration to

> do the same check on former last name, last name, date of birth, and the number
> provided to make sure they match. If they match, then the voter will be registered.

*Id.* at 4343:2–13. If the State is unable to verify the person's State ID or partial security number "(t)hen the voter will get a notice of incomplete and has ten days to either respond with different information or to say no, that's the number I have." *Id.* at 4343:14–19.

659.    "The only voters that the Secretary of State actually removes themselves are strong match deceased. Every other match, strong or weak for any other category goes to the counties for investigation." Oct. 17, 2023 Tr. at 4343:22–4344:5. The National Voter Registration Act requires the Secretary of State to

> have a general program to remove ineligible voters, including deceased, from the
> rolls. It also requires the State to undertake efforts to increase voter registration, so
> it both requires us to keep the roles as clean as we can and have programs in place
> to do so as well as to be able to register new voters.

*Id.* at 4344:6–16. The National Voter Registration Act "requires that a voter be inactive and remain inactive for two federal elections before they can be removed from the rolls to give them an opportunity to come back," with which Texas complies. *Id.* at 4346:1–14.

660.    Plaintiffs alleged that SB 1 makes it more likely that a voter will be removed from the rolls and will have to submit proof of citizenship to stay on," but elicited no testimony to support this contention. Sept. 11, 2023 Tr. at 32:11–14. Plaintiffs further alleged that Section 2.05, 2.06, and 2.07 of SB 1 "require monthly purges of the voter registration list" and "threatens sanctions on county officials who do not carry out these purges to the satisfaction of the Secretary of State." *Id.* at 23:7–23. Similarly, Plaintiffs elicited no testimony of voter registration mass purges by county officials or threats of retribution by the Secretary of State against county officials who refused to do so. *See generally id.* Plaintiffs also did not present evidence of any individual, or their race, who had been struck off a voter registration list because of SB 1. *See* October 4, 2023 Tr. at 2628:11–14 (Dr. Tolson admitting she has no evidence of SB 1 voter "purges" disenfranchising voters).

661.    Texas removes noncitizens from the State's registration rolls. Oct. 17, 2023 Tr. at 4346:15–17. In the past, the Secretary of State has mistakenly challenged a voter registration on the genuine belief that voter was a noncitizen. *Id.* at 4346:18–21. Dr. Allan Lichtman agreed that registration provisions were an effort to codify a settlement of litigation resulting from a 2019 effort to remove noncitizens from the voter rolls in Texas. Oct. 6, 2023 Tr. at 3168:12–3169:4. Under the settlement agreement, Texas could continue the proactive removal of noncitizens from the list, but

> if a voter under Real ID when they go to the DPS for a driver's license transaction, they have to either prove citizenship or lawful presence with documents. And so if they say they are not a citizen and they prove it with a Visa, a Green Card, or whatever else they've got that proves lawful presence, then they can get a driver's license but we will get that information that a voter came last week, a person came last week and said "I'm not a citizen," we will then match that information against our voter list, and if it's somebody that was already registered to vote before their trip to DPS, they are the ones who will be sent to the counties and sent a notice of examination for citizenship.

Oct. 17, 2023 Tr. at 4347:16–4348:8.

662.    Mr. Keith Ingram testified that the Secretary of State did not change any of its practices, procedures, or policies because of Section 2.05, because it "had already made those changes in response to the settlement agreement." Oct. 17, 2023 Tr. at 4348:20–23. A person indicates a lack of citizenship status in connection with a motor vehicle or Department of Public Safety record through Real ID, because the people have to "show that they are eligible to be a driver in the State of Texas, and they either do that by showing citizenship or noncitizenship but lawful presence." *Id.* at 4349:3–10. A person going through this process has to positively assert that they are a noncitizen. *Id.* at 4349:11–13. When a person does so, the Secretary of State gets that information and compares "it to the voter list to see if any of them were previously registered to vote before the transaction of DPS." *Id.* at 4350:14–19. Secretary of State sends this information to the counties and the counties "will send the voter a notice that says, you know, it appears that you're not a citizen. If you are a citizen, prove it within the next 30 days." *Id.* at 4349:20–25. If a person does not respond to their notice of examination for citizenship within 30 days, their voter registration will be cancelled; "if they do show up to vote thereafter, under 16037D they are to be

reinstated immediately if their cancellation was a mistake." *Id.* at 4345:3–21. The changes made to the Texas Election Code Section 16.033, subsection A, was a codification of the settlement agreement. *Id.* at 4350:1–4. The Secretary of State was already in agreement with the Department of Public Safety to verify the accuracy of citizenship status prior to SB 1 and the changes made to Section 16.0332(a)(1) were "a codification of the settlement agreement." *Id.* at 4350:5–22. The Secretary of State has not prescribed rules under Section 2.05(d) and does not intend to do so. *Id.* at 4350:23–4351:3.

663.     Section 2.06 is "a process for ensuring compliance by voter registrars with things that occur that are requirements imposed by subsection A." Oct. 17, 2023 Tr. at 4351:4–13. Section 2.06(h) references three Section of the Texas Election Code: Section 18.061 is the batch processing that the Secretary of State does with off-line counties overnight; Section 15.083 is the requirement that counties send the Secretary of State a list of voters that they have in suspense; and Section 16.032 is the requirement to purge the voters after they have not voted in two federal elections after being in suspense for two federal elections. *Id.* at 4351:14–25. Counties are in substantial compliance with their obligations under Section 18.061, 15.083, and 16.032 and have been so since before SB 1. *Id.* at 4352:1–24. To the best of Mr. Ingram's knowledge, the counties have not changed their policies, practices, or procedures because of Section 2.06. *Id.* at 4353:6–8. Mr. Ingram further testified that no county has been subject to civil penalty because they failed to be in substantial compliance with Section 18.061, 15.083, and 16.032, nor has the Secretary of State informed any county that it might be subject to a civil penalty under Section 2.06 since the enactment of SB 1. *Id.* at 4353:9–15.

664.     Section 2.07 requires counties to report if a person claims they are ineligible for jury duty because they have moved out of the county. Oct. 17, 2023 Tr. at 4353:16–22. Prior to SB 1, the Election Code already required the Secretary of State to compare its voter registration list with the list of Texans exempted from jury service due to a lack of citizenship. *Id.* at 4353:2–4354:4. If a voter is identified as being exempted from jury service due to residency, counties and the Secretary of State follow the procedure stipulated in the National Voter Registration Act. *Id.* at 4354:16–23.

A voter on the suspense list can still vote. *Id.* at 4355:2–4. If the Secretary of State has determined that a vote is exempted from jury service due to citizenship or residency, it refers the matter to the counties for investigation. *Id.* at 4355:9–12. The Secretary of State has not made any changes to its policies, practices, or procedures regarding noncitizens in response to Section 2.07. *Id.* at 4354:5–8. Mr. Ingram was not aware of any change that counties have made to their policies, practices, or procedures because of Section 2.07. *Id.* at 4354:9–12.

665.    When asked whether the Secretary of State had conducted any purges of the State's voter registration rolls because of Section 2.05, 2.06, or 2.07, Mr. Ingram replied "I don't know what you mean by 'purge.' We have not done any mass cancellations if that's what you mean." Oct. 17, 2023 Tr. at 4355:13–17.

666.    Ms. Angelica Razo of Mi Familia Vota, Oct. 10, 2023 Tr. at 3424:19–3425:2, testified that the 2019 purges were "very alarming to us," she however did not identify any Mi Familia Vota member who had been removed from the voter rolls because of SB 1. *See*, *e.g.*, *id.* at 3432:1–20.

667.    Former Travis County Clerk Ms. Dana DeBeauvoir testified that

> If I found any other situation that was an indication that somebody voted inappropriately, and there are lots of different kind of circumstances, but if I saw anything that was unusual or something that I couldn't justify on the voter rolls, they participated, or perhaps the election judge allowed somebody to vote without the provisional ballot and perhaps they shouldn't, I always referred it to the County Attorney.

Sept. 14, 2023 Tr. at 914:2–9.

### W. In Person Voting

#### i.    Turnout and Methods of Racial Voting

668.    Concerning the purported racial differences in voting methods, Dr. McDaniel opined that African Americans are more likely to vote absentee than their White and Hispanic counterparts. Oct. 5, 2023 Tr. at 2942:14–17. He concluded that White and Hispanic voters are significantly more likely to vote in person using early voting compared to African Americans. *Id.* at

2942:18–21. And he opined that White and Hispanic voters are marginally more likely to vote in person on Election Day compared to African Americans. *Id.* at 2942:22–24.

669.     In reaching these conclusions, Dr. McDaniel used the Cooperative Election Study for 2016 and 2020, Oct. 5, 2023 Tr. at 2942:25–2943:5, not the 2014 and 2018 reports. *Id.* at 2943:6–7. Specifically, he arrived at his conclusions regarding wait times by using the Cooperative Election Study data for 2016 and 2020, *id.* at 2951:11–15. Likewise, when he opined on the racial differences in submitting absentee ballots with respect to drop-off locations, *id.* at 2957:15–20, and concluded that Hispanics had a significantly higher probability of submitting their ballot at specified locations compared to Whites, *id.* at 2957:21–25, he relied on the Cooperative Election Study data from 2020 only. *Id.* at 2958:1–6.

670.     But while Dr. McDaniel did not look at CES data from any other election outside of 2016 and 2020 and chose those years because they were Presidential Elections, Oct. 5, 2023 Tr. at 2943:8–14, the first General Election after SB 1's enactment (i.e., the November 2022 General Election) was Midterm Election, not a Presidential Election, *id.* at 2943:15–19, and more people generally vote in a Presidential Election than a Midterm Election. *Id.* at 2943:20–22. Further, different sets of voters are interested in voting in a Presidential Election as compared to a Midterm Election. *Id.* at 2979:5–17. On top of that, the 2020 General Election was atypical. *Id.* at 2943:23–25. Thus, while Dr. McDaniel based his analysis of the drop in voter turnout on 2016 and 2020, *id.* at 2945:22–25, 2020 is not analogous to 2016, *id.* at 2945:15–17, and 2020 is not analogous to the 2022 General Election. *Id.* at 2945:18–21. And tellingly, higher turnout can have an effect on wait times. *Id.* at 2955:23–24. So, when Dr. Hoekstra performed an interval regression model, not an ordered logit model, *id.* at 2953:7–12 and included data from 2018, *id.* at 2953:13–4, he determined that White voters waited longer than African American voters in 2018. *Id.* at 2953:15–17.

671.     Moreover, Dr. McDaniel did not assess the reason why African American voters may be more likely to vote absentee, Oct. 5, 2023 Tr. at 2947:5–9, so he does not know whether those reasons remain or have changed. *Id.* at 2947:10–13. He also did not look at all the reasons why

certain demographic groups experienced wait times, *id.* at 2953:23–2954:7, so he does not know whether those same reasons have stayed the same or changed. *Id.* at 2954:8–15.

672.    Dr. McDaniel also did not specifically assess the rate at which African American voters voted absentee for the November 2022 General Election. Oct. 5, 2023 Tr. at 2950:11–13. He did not specifically assess the rate in which African American voters voted absentee compared to their White, Hispanic, or Asian counterparts for the November 2022 General Election. *Id.* at 2950:14–17. He did not specifically assess the rates in which Hispanic voters voted absentee in the November 2022 General Election. *Id.* at 2950:18–21. And he did not specifically assess the rate at which Hispanic voters voted absentee compared to their White or Asian counterparts in the November 2022 General Election. *Id.* at 2950:22–25

673.    When Dr. McDaniel assessed mail voting for the November 2022 General Election, he only utilized secondary sources. Oct. 5, 2023 Tr. at 2989:10–13. But even though he assessed mail voting, he did not analyze racial differences in mail ballot rejection rates for the November 2022 General Election, *id.* at 2989:14–16, and he did not indicate whether non-whites were more likely to have their ballot rejected in the November 2022 General Election. *Id.* at 2989:17–20.

674.    Notably, the mail ballot rejection rate dropped substantially between the March 2022 Primary and the November 2022 General Elections. Oct. 5, 2023 Tr. at 2990:17–19. Part of that was due to citizens having a better understanding of the new rules in the November 2022 General Election, *id.* at 2990:20–22, and another part of that was because election administrators learned how to effectively implement SB 1's new rules. *Id.* at 2991:10–12.

675.    Because Dr. McDaniel did not seek to determine how the provisions amended by SB 1 existed prior to the bill's passage, Oct. 5, 2023 Tr. at 2959:16–18, he does not know, for example, what effect eliminating the relevant provisions in SB 1 would have on the procedures and practices related to ballot delivery in the various Texas counties. *Id.* at 2959:19–23. Thus, he did not specifically look at what the burden would be on African American or Hispanic voters. *Id.* at 2961:8–10.

676.     Dr. McDaniel did not conduct an analysis of whether Hispanic voters were more likely to submit their ballot at a specified location as compared to Whites for the November 2022 General Election. Oct. 5, 2023 Tr. at 2961:11–15. He did not conduct an analysis of whether African Americans were more likely to submit their ballots at a specified location as compared to Whites in the November 2022 General Election. *Id.* at 2961:16–19. He did not assess whether or not Hispanics continued to exhibit the higher probability of submitting their ballot at a specified location as compared to Whites in the November 2022 General Election. *Id.* at 2961:20–24. And he did not assess whether African American voters had a higher probability of submitting their ballot at a specified location as compared to Whites in the November 2022 General Election. *Id.* at 2961:25–2962:4.

677.     While Dr. McDaniel opined that overall turnout between the 2020 and 2022 General Elections decreased more in counties with a larger portion of black residents, Oct. 5, 2023 Tr. at 2983:9–12, he could not discern the extent to which SB 1 drove any of the reduction he saw in voter turnout in the counties with large African American populations, *id.* at 1983:13–16, and he could not even discern whether SB 1 played any role in the decline of voter turnout in counties with high populations of African American voters. *Id.* at 2983:17–21. Indeed, Dr. McDaniel's report cannot itself distinguish between voting that declined among White voters and African American voters in counties with large African American populations. *Id.* at 2984:6–9. His report further fails to distinguish between counties whose early voting hours were affected and those that were not affected by SB 1. *Id.* at 2985:3–6.

678.     Dr. McDaniel did not analyze whether other provisions in SB 1 would have expanded access to voting. Oct. 5, 2023 Tr. at 2963:16–18. Therefore, he did not analyze whether other provisions in SB 1 would have expanded access to African American and Hispanic voters. *Id.* at 2963:19–22. For example, he did not consider the provision in SB 1 that expanded protections for workers being able to take off time from work to vote during the early voting period. *Id.* at 2963:23–2964:1. He did not consider the provision that ensured a voter must be allowed to vote if that voter is standing in line when polls close during the early voting period. *Id.* at 2964:2–5. And

he did not consider the addition of the cure process for mail-in ballots with defects while making his analysis. *Id.* at 2964:6–8. He didn't even assess whether these additional protections would benefit certain demographic groups compared to others. *Id.* at 2964:9–11.

679.     Dr. Morgan Kousser cited U.S. Census data to argue that minorities are more likely to be affected by SB 1's provisions because they are less likely to own automobiles. *Id.* at 2897:15–23. But if minorities in Texas are less likely to own vehicles, then expanding drive-thru voting statewide may disproportionately affect minority voters. *Id.* at 2898:3–7.

680.     According to Dr. Mayer, some voters face different costs and derive different benefits from voting. Oct. 2, 2023 Tr. at 2031:24–2032:1. Notably, Dr. Mayer did not examine whether SB 1 or any of its provisions increase a voter's satisfaction from voting. *Id.* at 2032:15–18. Indeed, the cost of voting for an individual voter can change over time. *Id.* at 2032:23–25. For example, a voter's circumstances may change, *id.* at 2033:1–2, and an individual voter may become more experienced with a particular provision over time. *Id.* at 2033:3–5. As the individual voter becomes more experienced with the provision, the cost of complying with the provision can decrease. *Id.* at 2033:6–9. According to Dr. Mayer, this kind of learning curve may exist with SB 1. *Id.* at 2033:10–12.

681.     In his initial report, Dr. Mayer analyzed voting times or the time of the day when early voters voting in Harris County in the 2020 General Election. Oct. 2, 2023 Tr. at 2040:3–8. But he did not conduct any analysis of this type for any of the other 253 counties in Texas, *id.* at 2040:9–11, and he did not conduct this type of analysis for any elections other than the 2020 General Election. *Id.* at 2040:12–14. This means that he has not done this kind of analysis for any election administered under SB 1. *Id.* at 2040:15–17.

682.     The 2020 Census shows that Harris County's population is 36.4 percent non-Hispanic White. Oct. 2, 2023 Tr. at 2042:24–2043:2 and that White voters were 652,136 out of the 1,253,278 voters, *id.* at 2043:8–10, which is a little bit more than 50 percent. *Id.* at 2043:11–12. Nonetheless, Dr. Mayer's voting time analysis did show that, out of the early voters who voted after 4:00 p.m. in Harris County, 45.8 percent were White. *Id.* at 2042:7–11. That 45.8 percent

number for White voters is larger than the number for any other racial group, *id.* at 2043:20–24, so there were more White voters who voted after 4:00 p.m. than voters of any other race. *Id.* at 2043:25–2044:2. Likewise, Dr. Mayer's analysis shows that, out of the early voters who voted after 6:30 p.m. in Harris County, 38.5 percent were White. *Id.* at 2043:13–16. Thus, there were more White voters who voted after 6:30 p.m. than voters of any other race. *Id.* at 2043:17–19.

683.    Dr. Mayer's analysis shows that the majority of early voters in Harris County voted by walking up to the polling place rather than by drive-thru, Oct. 2, 2023 Tr. at 2044:25–2045:3, and this is true for every racial group. *Id.* at 2045:4–6. According to Dr. Mayer's analysis, 38.1 percent of drive-thru voters were White, *id.* at 2045:7–10, so more White voters used drive-thru voting than voters of any other race. *Id.* at 2045:11–15.

684.    On top of that, Dr. Mayer did not examine the expense of drive-thru voting on election officials or taxpayers, Oct. 2, 2023 Tr. at 2045:21–23, did not examine the staff costs or any other costs that might be involved, *id.* at 2045:24–2046:1, was not aware of any reported irregularities in drive-thru voting, *id.* at 2046:2–4, did not examine or even look for any reports of irregularities, *id.* at 2046:5–9, and did not even control for the fact that those drive-thru voting locations were placed in predominantly minority neighborhoods. *Id.* at 2046:15–18.

685.    According to Dr. Mayer's report, the vast majority of voters in Harris County in 2020 who used early voting cast their ballots during regular hours instead of during 24-hour voting. Oct. 2, 2023 Tr. at 2046:19–25. Specifically, there were 3,462 voters who cast their ballots during the 24-hour voting period, *id.* at 2047:1–4, but there were 1,253,278 voters who voted early in Harris County. *Id.* at 2047:5–7. Thus, the percentage of voters who voted during the 24-hour voting period in Harris County was only about 0.28 percent, *id.* at 2047:8–19, and voting during regular hours was a more common or popular method of voting than voting during the 24-hour period. *Id.* at 2047:20–23. Moreover, out of those voters who used 24-hour voting, 39.3 percent were White, *id.* at 2047:24–2048:1, and that meant there were more White voters who used 24-hour voting that voters of any other race. *Id.* at 2048:2–7. And again, Dr. Mayer did not examine the expense that 24-hour voting placed on election officials or taxpayers, *id.* At 48:8–10, and he did

not control for the location of the 24-hour voting polling placed within Harris County. *Id.* at 11–13. Thus, Dr. Mayer did not control for the fact that those 24-hour voting locations were placed in predominantly minority neighborhoods. *Id.* at 2048:14–17.

### ii. Wait Times

686.     The average wait time during the early voting period in El Paso County for November 2022 General Election was around 10 to 15 minutes, which is typical for a midterm election. Sept. 12, 2023 Tr. at 285:24–286:5. Ms. Lisa Wise was not aware of any voter who was required to wait a significant amount of time because of a shortage of personnel during the November 2022 General Election. *Id.* at 286:6–9. El Paso County had teams dedicated to just curbside voting to make sure that those voters did not have to wait for an election worker to come out from inside the polling place. *Id.* at 348:1–7.

687.     The average wait time for Dallas County during the November 2022 General Election was 1.2 minutes during early voting and 3.7 minutes on Election Day. Sept. 12, 2023 Tr. at 469:3–25. Dallas County received fewer than 20 complaints about wait times following the 2022 primary election. *Id.* at 462:1–25.

688.     Ms. Rachelle Obakozuwa testified that Harris County complied with all provisions of SB 1, and she is unaware of a single voter in Harris County who could not vote in person during the November 2022 General Election because of SB 1. Sept. 19, 2023 Tr. at 1204:6–12. Mr. Toby Cole, a resident of Harris County, Sept. 13, 2023 Tr. at 695:6–7, testified that curbside voters are assisted "usually within five or ten minutes." *Id.* at 704:19–705:12.

689.     Dr. Kenneth Mayer stated that wait times in any individual polling place turn on the characteristics and processing time at that particular location. Oct. 2, 2023 Tr. at 2051:14–17. While Dr. McDaniel predicted that SB 1 may increase wait times for African American voters, he also testified that SB 1 may have "no effect on wait times" for African American voters. Oct. 5, 2023 Tr. at 2929:13–16.

690.     Notably, while Dr. McDaniel read portions of SB 1 in preparing his expert reports, Oct. 5, 2023 Tr. at 2940:6–8, he did not read any of provisions of the Election Code that were

outside of SB 1, *id.* at 2940:12–14, and he did not read any of the election advisories the Secretary of State issued, including those about SB 1. *Id.* at 2940:15–20. Moreover, when looking at the provisions of SB 1, Dr. McDaniel did not find out how the provisions existed prior to SB 1, *id.* at 2942:2–5, and he did not seek to determine how the provisions changed compared with pre-existing law. *Id.* at 2942:6–8. He also did not seek to determine how the statutes were interpreted prior to the enactment of SB 1. *Id.* at 2942:9–11.

691.    Dr. McDaniel concluded that SB 1's new policies will improve wait times for Whites and do little for African American or Hispanic voters, Oct. 5, 2023 Tr. at 2962:19–22, because counties with a population under 55,000 had significantly less wait times than counties with populations between 55,000 and 99,000, *id.* at 2962:5–13, and counties with population of 55,000 allegedly represent less than five percent of Texas's population and purportedly contain larger percentages of the state's White population compared to African Americans and Hispanics. *Id.* at 2962:14–18. But he did not assess how specific demographics within those small counties would react to the expanded hours. *Id.* at 2963:8–11. He did not assess whether African American or Hispanic voters in rural communities had different voting practices than African American or Hispanic voters in urban areas. *Id.* at 2963:12–15.

692.    Dr. McDaniel further failed to address racial differences in wait times for in-person voting for the November 2022 General Election. Oct. 5, 2023 Tr. at 2956:14–17. Specifically, he did not conduct an analysis of whether African American voters reported longer wait times than their White and Hispanic counterparts in the November 2022 General Election. *Id.* at 2956:3–9. And he did not conduct any analysis of whether Hispanic voters reported longer wait times than their White counterparts. *Id.* at 2956:10–13. Indeed, for the November 2022 General Election, Dr. McDaniel failed to address or analyze the wait times of African American voters, *id.* at 2956:18–21, Hispanic voters, *id.* at 2956:22–24, or White voters, *id.* at 2956:25–2957:2. Importantly, he also did not conduct any assessment of whether SB 1 contributed to wait times in the November 2022 General Election, *id.* at 2957:3–6, and he did not assess whether SB 1 contributed to longer wait times for African American or Hispanic voters during the November 2022 General Election. *Id.* at

2957:7–10. Thus, he makes no conclusions one way or the other about whether SB 1 contributed to wait times for African American or Hispanic voters in the November 2022 General Election. *Id.* at 2957:11–14.

### iii. Dr. Hoekstra's responses to Dr. McDaniel and Dr. Mayer

693.     Dr. Mark Hoekstra found that Dr. Eric McDaniel's expert reports and opinions as to the effects of SB 1 on absentee voting by African-Americans in Texas were not reliable or valid. Oct. 19, 2023 Tr. at 4722:5–9. Dr. McDaniel's expert reports and opinions were invalid and unreliable because they were based on data from only the 2020 and 2022 general elections. *Id.* at 4722:10–20. A review of similar data for 2018 and earlier years would lead to conclusions inconsistent with Dr. McDaniel's conclusions as to absentee voting by African-Americans in Texas. The data instead indicate that African-Americans in Texas consistently vote absentee at higher rates than white Texans in Presidential election years and at lower rates than white Texans in non-Presidential election years. *Id.* at 4725:15–23. Dr. McDaniel failed to consider this data in his expert reports and opinions. *Id.* at 4723:4–4726:7. This pattern negates any assertion that a decline in absentee voting by African-Americans in Texas from the Presidential election year of 2020 to the non-Presidential election year of 2022 was caused by any provisions of SB 1. *Id.* at 4723:4–4726:7.

694.     The data indicates that Hispanic Texans have historically (prior to 2020) been less likely to vote absentee than white Texans, but except for the outlier year of 2020, increased their absentee voting percentages in 2022, after SB 1 was passed. Oct. 19, 2023 Tr. at 4726:8–4727:8.

695.     Dr. McDaniel also expressed opinions relating to his analysis of Texas voter waiting times by race. His analysis was not reliable or valid because he compared only 2022 and the outlier year of 2020. Oct. 19, 2023 Tr. at 4727:9–47279:20.

696.     In addition, Dr. McDaniel failed to consider that the same voter turnout patterns in Texas that he attributes to the changes in SB 1 occurred nationwide. Oct. 19, 2023 Tr. at 4729:9–20. In fact, voter turnout decreased somewhat less in Texas than nationwide. *Id.* at 4732: Since SB

1 only affected Texas, this strongly indicates that the voter turnout patterns that Dr. McDaniel attributes to SB 1 were not attributable to SB 1, but to other factors. *Id.* at 4729:24–4731:17.

697.    There is no reasonable basis to conclude that SB 1 had any adverse effect on overall voting turnout in Texas. Oct. 19, 2023 Tr. at 4732:24–4733:3.

698.    There is no reasonable basis to conclude that SB 1 had any adverse effect on early in-person voting turnout in Texas. Oct. 19, 2023 Tr. at 4733:4–6.

699.    There is no reasonable basis to conclude that SB 1 had any adverse effect on absentee or mail-in voting turnout in Texas. Oct. 19, 2023 Tr. at 4733:7–10.

700.    Dr. McDaniel's opinion that Texan Black voters wait to vote longer than Texan White voters on average are not based on any valid or reliable evidence, and that opinion therefore is not reliable or valid. Oct. 19, 2023 Tr. at 4733:11–4734:3.

701.    An additional source of doubt as to the reliability and validity of the data on waiting times used by Dr. McDaniel is that it is self-reported survey data. The self-reported survey data did not match data collected in 2016 using actual smartphone data. Oct. 19, 2023 Tr. at 4736:21–4738:11.

702.    Dr. McDaniel's assertions as to possible voter intimidation in Texas were not supported by any reliable evidence. Mark Hoekstra Mar. 29, 2022 Expert Report at 14 ¶ 31. They were based on reports and opinion prior to the 2020 election, and therefore had little or nothing to do with SB 1, which was not enacted until late 2021. Oct. 19, 2023 Tr. at 4738:22–4740:25.

703.    Dr. McDaniel in his reports and opinions provided little or no reliable evidence that SB 1 resulted in any disproportionate negative impacts on Black or Hispanic Texan voters. Oct. 19, 2023 Tr. at 4741:1–7.

704.    Dr. McDaniel's 2023 report included an assertion that Texas counties with larger Black population shares experienced larger declines in voter turnout in 2022, and that this suggested SB 1 had a disproportionate negative impact on Black voters. That opinion was erroneous for the following reasons:

(a)     Like other opinions of Dr. McDaniel, it was based on comparison of only two years, 2020 and 2022, using the outlier year of 2020 as the baseline;

(b)     Dr. McDaniel mistakenly used 2022 as the base year in calculating percentage change in one instance;

(c)     Analysis shows that there was no statistically significant decrease in Black voting by mail and in early voting in the referenced counties from 2020 to 2022;

(d)     The differences in Black voter early voting turnout on which Dr. McDaniel relied were driven almost entirely by results in counties that were not affected by SB 1's changes to early voting hours.

Oct. 19, 2023 Tr. at 4742:10–4748:5.

705.     Based on the analysis of relevant data by both Dr. McDaniel and Dr. Hoekstra, there was no basis to suggest that SB 1 reduced overall turnout or early voter turnout; or caused disproportionately large reductions in overall turnout or early voting turnout among Texas counties with larger Black population shares. Oct. 19, 2023 Tr. at 4745:2–4748:5.

706.     Dr. Mayer's expert opinion and April 5, 2023 report stating that 2,949 voters in Harris, Dallas, and Hidalgo Counties were "disenfranchised" in the 2022 general election by reason of the mail-in voter identification requirements of SB 1 had significant flaws. Oct. 19, 2023 Tr. at 4749:15–4750:13. The following were significant flaws:

(a)     Dr. Mayer's report did not make clear whether the 2,949 rejections referred to were only initial rejections or final rejections and whether those rejections included ones that were due to failure to comply with requirements that pre-existed SB 1. *Id.* at 4750:14–4751:9.

(b)     Plaintiff expert Eitan Hersh made the calculation that a total of 6,355 voters statewide had their mail-in ballots rejected in the 2022 general election because of SB 1's requirements. But Dr. Hersh made clear what causes for mail-in ballot rejection he did and didn't count, and his number is more likely than Dr. Mayer's to be accurate because only Dr. Hersh had access to the Texas TEAMS database. So 6,355 out of a total of about 8.1 million votes cast is the maximum number of votes rejected in the November 2022 general election in Texas because of the SB 1 mail-in voter identification requirements. *Id.* at 4751:10–4754:4.

(c)     6,355 votes statewide is the maximum numbers, but an unknown number of those votes may have been properly rejected because they were fraudulent or otherwise illegal. So it is impossible to know if the number of legitimate votes reject was zero, 6,355, or somewhere in between *Id.* at 4752:20–4574:25.

(d)     Dr. Mayer's data indicates that in 2022 2.7 times as many mail-in ballots were rejected than in 2020 for reasons not related to SB 1. This unexplained result clearly indicates that there are flaws in Dr. Mayer's data or the design of his study. *Id.* at 4755:5–4757:19.

(e)    Dr. Mayer did not take into account in his report and opinions that any brand-new voting law requirements involve a learning curve and that mail-in ballot rejection rates will naturally diminish over time.

*Id.* at 4758:2–10.

707.    It is likely that mail-in ballot rejection rates in Texas will decline going forward as compared to the rejection rates in November 2022. Oct. 19, 2023 Tr. at 4758:11–4759:5.

708.    Dr. Mayer's report and opinions state there was no legitimate justification for SB 1's mail-in voter identification requirements because there were relatively few prosecutions and convictions for mail-in vote fraud. This is an unfounded conclusion for several reasons:

(a)    Absence of evidence is not the same as evidence of absence.

(b)    Vote fraud is a crime in which there usually is not a direct, identifiable victim. It is also a hard-to-detect crime, and successful vote frauds may never be detected, much less prosecuted. For these reasons, the number of prosecutions or convictions likely underestimates substantially the actual incidence of voter fraud.

(c)    There is evidence that in 2016 over a third of the American public believes there is a great deal of election fraud in the United States. There is also evidence that in 2020 about 15 % of registered voters believed that mail-in ballot impersonation was very common, and another 15 % believed that there was occasional mail-in ballot impersonation.

*Id.* at 4759:6–4765:5.

709.    Dr. Mayer in his opinion and report asserts that the mail-in voter identification requirements of SB 1 disproportionately affect minority voters. But Dr. Mayer's assertion was incorrect for the following reasons:

(a)    Dr. Mayer computed disparate impact incorrectly by looking only at the subset of people who voted by mail. Oct. 19, 2023 Tr. at 4765:14–4768:6.

(b)    Dr. Mayer in his analysis could not reliably determine which voters were actually of various races, because Texas does not identify voters by race or ethnicity. He had to use a statistical method or algorithm to "predict" race, and there is a substantial amount of error in those predictions, leading to sizable "false positives" (where the algorithm incorrectly predicts that a voter is of one race, for example Black, but the voter is not actually Black) and "false negatives" (where the algorithm predicts that a voter is not of one race, for example Black, but the voter actually is Black. The percentage of errors from use of the algorithm that Dr, Mayer used is particularly high for Black voters, because Black surnames are less distinguishable from those of other races or ethnicities. *Id.* at 4768:7–4771:15.

(c)     Additional shortcomings in Dr. Mayer's use of his algorithm is that it was calculated not using Texas alone, but also several other states, increasing the error rates. As a result, Dr. May produced no reliable results using the algorithm he used to predict races and ethnicities of voters using census tract data and surname data. *Id.* at 4775:24–4776:10.

(d)     Based on proper analysis of voter data for the 2022 general election in Harris County, the most populous county in Texas, there was no disparate impact of SB 1's voter identification requirements against predicted Hispanics or predicted Asian voters, and the predicted Black mail-in vote stayed about the same. *Id.* at 4768:7–4769:6.

(e)     Dr. Mayer also failed to consider substitutability in his expert report and opinions. For some mail-in voters, casting an in-person vote either early or on Election Day is equally convenient and 100% substitutable. For other mail-in voters, casting an in-person vote is difficult and therefore not an easy substitute. Dr. Mayer did not deal with this issue at all, and therefore his report gives no useful data on the level of burden any difficulty in mail-in voting places on the voter's ability to cast a valid vote in an election. *Id.* at 4476:22–4777:14.

(f)     A study based on data from Texas and Indiana indicates that the ability to vote by mail had little effect on total voter turnout. *Id.* at 4777:15–4779:1.

*Id.* at 4765:7–4779:1.

710.    Dr. Mayer also stated in his report and opinions that the elimination of drive-though voting by SB 1 had disproportional adverse effects on non-white voters. This statement was incorrect for the following reasons:

(a)     Those voters who used drive-though voting in 2020 were more likely, rather than less likely to vote in the 2022 election than those in the same county who did not vote by drive-through voting in 2022.

(b)     Dr. Mayer incorrectly calculated adverse impact. In addition to flaws discussed above, Dr. Mayer improperly used a Chi-square test statistical test. When properly calculated, the data shows there was no evidence of adverse impact from SB 1's elimination of drive-through voting on any predicted racial or ethnic group. Indeed, the same pattern Dr. Mayer demonstrated with respect to drive-through voters was also present with respect to non-drive-through voters.

Oct. 19, 2023 Tr. at 4779:2–4781:24.

711.    Examination of data from Dallas County voting in the 2022 general elections confirms that, like in Harris County, the statistical uncertainty caused by predicting races and ethnicities of voters (absent actual data on race and ethnicity) renders Dr. Mayer's conclusions unreliable and invalid. Oct. 19, 2023 Tr. at 4781:25–4782:16.

### iv. Section 3.15 had no effect on voting opportunities because counties were not considering it.

712.    The Texas Legislature eliminated straight-ticket voting in 2017, to take effect before the 2020 Election. Oct. 17, 2023 Tr. at 4370:23–4371:6. No Texas counties were offering straight-ticket voting when SB 1 took effect. *Id.* at 4371:10–12. Section 3.15

> says a voting system ballot can't be arranged in a manner that, you know, you can't do a swipe down the screen and straight-ticket vote. So it's kind of an emphasis on the fact that straight-ticket voting, one punch straight-ticket voting is not legal and you can't do the same thing in a different way I think is what this was for.

*Id.* at 4371:13–21. "(T)he ExpressVote XL is a system that is certified for use in Texas could be arranged in this way but no county uses that system." *Id.* at 4371:22-4372:2. No county is currently considering purchasing a system that would allow a political party's candidates to be selected in one motion or gesture. *Id.* at 4372:3–11.

713.    Ms. Michelle Brown was familiar with Section 3.15 of SB 1, which helps implement a prior ban on automatic straight-ticket voting. Oct. 2, 2023 Tr. at 2122:2–5. Specifically, in 2017, the legislature ended the practice of automatic straight-ticket voting via a different law, *id.* at 2122:6–9, and as part of that law, automatic straight-ticket voting was not permitted in the 2020 election. *Id.* at 2122:12–14. Ms. Brown did not know whether Democrats or Republicans are more likely to utilize straight-ticket voting. *Id.* at 2122:15–17. Ms. Brown could not identify a specific Delta Sigma Theta member who was unable to vote in 2022 because of Section 3.15 of SB 1. *Id.* at 2123:4–6.

### v.  Hidalgo County increased voting hours due to SB 1.

714.    Hidalgo County added one hour for Sunday early voting because of SB 1. Oct. 3, 2023 Tr. at 2314:6–12. SB 1 required that polls be opened for 6 hours on Sunday during early voting. *Id.* at 2534:3–6. Ms. Ramon testified that prior to SB 1, counties were not required to open polls on the weekend during early voting. *Id.* at 2353:11–16.

### X.  Voting Assistance

**i.      There is no evidence that anybody was unable to vote because of Article 6 of SB 1.**

715.     A voter can request assistance from an election worker. Oct. 12, 2023 Tr. at 149:18–20. A voter can also request assistance from a third party. *Id.* at 150:4-5. Voters do not need to specify why they need assistance. Sept. 14, 2023 Tr. at 822:8–10. The assistor's oath, promising not to influence voters, predated SB 1. Sept. 11, 2023 Tr. at 172:4–10. It was illegal prior to SB 1 for a paid assister to harass or intimidate a voter. Sept. 14, 2023 Tr. at 917:13–20.

716.     SB 1's 6.04 language removed SB7's language that voters must have a specific disability. Sept. 14, 2023 Tr. at 821:18–23. SB7's language regarding inability to read or write was not in SB 1's version. *Id.* at 821:24–822:2.

717.     Mr. Frank Phillips of Denton County was not aware of any incidents in the November 2022 General Election where an election worker refused to take the oath of assistance. Oct. 12, 2023 Tr. at 149:25–3. Mr. Phillips was not aware of any voter who was unable to obtain assistance from the person of their choice. *Id.* at 150:6–8. Mr. Phillips was not aware of any incidents in the November 2022 General Election where a third party refused to assist a voter after the voter requested their assistance. *Id.* at 150:9–12. Mr. Phillips was not aware of any incidents in the November 2022 General Election where a third party refused to take the oath of assistance. *Id.* at 150:13–16. Mr. Phillips was not aware of any instance where a voter was unable to receive voting assistance because of SB 1. *Id.* at 150:17–19.

718.     Mr. Phillips was not aware of any individual who refused to transport seven or more individuals to a polling location to vote curbside because of the requirement that they fill out the form. Oct. 12, 2023 Tr. at 150:24–151:3. Mr. Phillips was not aware of any voter who was unable to find transportation to the polls because of the requirement that a person who transports seven or more people to a polling location to vote curbside fill out the form. *Id.* at 151:4–8. Mr. Phillips was not aware of his office receiving any calls from voters expressing concern about the voting assistance provisions in SB 1. *Id.* at 151:13–16. Mr. Phillips was not aware of his office receiving any calls from voters exhibiting confusion about the voting assistance provisions in SB 1. *Id.* at 151:17–

20. When asked whether his staff would go to a voter's car to help them complete the corrective action process if that voter was unable to enter the office because of a disability, Mr. Phillips responded "Absolutely." *Id.* at 152:25–153:4. When asked whether his staff would go to a voter's home to help them complete the corrective action process if that voter was homebound and unable to come to the Denton County Elections Office because of a disability, Mr. Phillips responded "We would." *Id.* at 153:5–9.

719.    Ms. Lisa Wise believed SOS had sent out an advisory on vote assistance for mail voting. Sept. 11, 2023 Tr. at 178:24–179:4. Ms. Wise was unaware of any instance where a voter in El Paso County was unable to obtain voting assistance in the November 2022 General election. Sept. 12, 2023 Tr. at 306:18–21. Ms. Wise was not aware of any incident in the November 2022 General Election where an election worker refused to assist a voter after the voter requested assistance. *Id.* at 305:20–23. Ms. Wise was not aware of any incident in the November 2022 General Election where the election worker refused to take the oath of assistance. *Id.* at 305:24–306:2. Ms. Wise was not aware of any incident in November 2022 General Election where a third party refused to assist a voter after the voter requested their assistance. *Id.* at 306:6–9. Ms. Wise was also unaware of any third party refusing to take the oath of assistance. *Id.* at 306:10–13. Ms. Wise was unaware of any incidents in November 2022 General Election where a third party refused to provide their relationship to the voter. *Id.* at 306:14–17. Ms. Wise was unaware of any individual who refused to transport seven or more individuals to a polling location because of a requirement that they fill out the form stipulated in Section 64.0069 of the Election Code. *Id.* at 306:22–307:1. Ms. Wise was unaware of any voter who was unable to find transportation to the polls because of the requirement that a person who transports seven or more people to a polling place fill out the form stipulated in Section 64.009. *Id.* at 307:2–6. Ms. Wise further was unaware of any person who transported seven or more individuals to a polling location to vote curbside and was required to fill out a form, pursuant to Section 64.009. *Id.* at 307:15–18.

720.    Mr. Michael Scarpello was not aware of any assister providing transportation to seven or more curbside voters since the enactment of SB 1. Sept. 12, 2023 Tr. at 489:3–5. A priority

for Mr. Scarpello since he has become a Dallas County election official is to bring disability access into the 21st century for voting. *Id.* at 491:17–22. Mr. Scarpello was not aware whether his office had received requests for disability accommodation regarding the oath that assisters must provide when providing assistance. *Id.* at 492:18–21. Despite having complaint forms at every polling location, Mr. Scarpello was not aware of any complaints regarding any SB 1 voting assistance provision. *Id.* at 492:22–493:6. Mr. Scarpello was not aware of any incident in the November 2022 General Election where an election worker refused to assist a voter after the voter requested assistance. *Id.* at 493:10–13. Mr. Scarpello was not aware of any voter who was unable to obtain assistance from the person of their choice in the November 2022 election. *Id.* at 493:14–17. Mr. Scarpello was unaware of any instance where a voter was unable to receive assistance in voting. *Id.* at 493:18–20. Mr. Scarpello was unaware of any voter who was unable to find transportation to the polls because of requirements that a person who transports seven or more people to a polling location via curbside fill out the forms now required. *Id.* at 493:21–25.

721.    Ms. Jacquelyn Callanen was unaware of anyone in Bexar County who was unable to vote in person during the November 2022 General election because of Senate Bill 1—she would even consider the November 2022 General election to be a success. Sept. 19, 2023 Tr. at 1105:1–10.

722.    Ms. Rachelle Obakozuwa testified that Harris County complied with all provisions of SB 1, and she is unaware of a single voter in Harris County who could not vote in person during the November 2022 General Election because of SB 1. *Id.* at 1204:6–12.

723.    It was "not a very routine program in Travis County" for organizations to do door-to-door canvassing in support of either candidates or ballot measures. Sept. 14, 2023 Tr. at 843:3–6.

724.    LUPE usually does not assist voters at the polls who have not previously reached out for help. Sept. 11, 2023 Tr. at 77:17–24. LUPE makes sure that their staff abides by the law in providing voter assistance. *Id.* at 78:3–15. None of the LUPE staff violated the oath of assistance prior to SB 1. *Id.* at 117:11–14.

725.    Ms. Jennifer Miller is a member of Arc of Texas, Oct. 10, 2023 Tr. at 3197:14–18, who signed the oath of assistance when her daughter voted in-person. *Id.* at 3336:10–17: Ms. Miller testified that she will continue assisting her daughter with voting in the future. *Id.* at 3337:6–8.

726.    Ms. Jodi Nunez Landry was able to cast her ballot in-person in the March 2022 election. Oct. 10, 2023 Tr. at 3244:5–8. Ms. Nunez Landry did not require assistance in voting, only putting her paper ballot into the ballot box. *Id.* at 3240:13–21. She received assistance from a poll worker in putting her paper ballot into the ballot box. *Id.* at 3259:8–14. Ms. Nunez Landry agreed that nobody at a polling location has ever prevented her partner from assisting her. *Id.* at 3261:2–5. When asked whether her partner would provide her with assistance at a polling location if she requested, Ms. Nunez Landry responded, "Yes. I think so, yes." *Id.* at 3261:6–8. Ms. Nunez Landry voted in the November 2022 election. *Id.* at 3244:16–18. She requested assistance from a poll worker in that election. *Id.* at 3245:15–16. The assistance she requested was that a poll worker lift the voting machine remote control and hand it to her. *Id.* at 3244:23–3245:4. A poll worker handed her the remote control when she asked him. *Id.* at 3244:23–3245:4. Ms. Nunez Landry was able to vote in the November 2022 election. *Id.* at 3246:13–15. Ms. Nunez Landry agreed that someone could be eligible for assistance and not know it. *Id.* at 3249:4–8. In neither the March 2022 election nor the November 2022 election did Ms. Nunez Landry request a reasonable accommodation or reasonable modification. *Id.* at 3255:19–3257:4. Ms. Nunez Landry did not know whether she had made any requests for accommodation to the Secretary of State's Office. *Id.* at 3267:15–19. She was also not sure whether she had requested an accommodation from the Attorney General's Office. *Id.* at 3267:20–3268:14. Ms. Nunez Landry was asked whether she believed anybody would waive the oath requirement for her, if she requested it. She responded, "I don't know that they would know, I don't think so, but I have no idea." *Id.* at 3272:1–4.

727.    Ms. Amy Litizinger was able to prepare a mock-up ballot on the League of Women Voters' website "without having to involve my attendants or assisters in any way so I can make my own choices." Oct. 10, 2023 Tr. at 3283:23–3284:11. Ms. Litzinger testified that sometimes she will require an assistor to put her ballot into the voting machine or ballot box, but "They don't

need to provide any assistance actually choosing on the touchscreen." *Id.* at 3285:15–23. When asked to describe the emotional condition of her attendants, Ms. Litzinger testified "Nobody has outright said no, I can't help you, or I won't help you make sure that you can go vote." *Id.* at 3295:9–17. When asked whether her postSB 1 experiences would impact how or whether she would vote in the future, Ms. Litzinger responded "I'm definitely going to vote. I don't think it's possible to be as involved in politics and have all the knowledge that I have and not vote." *Id.* at 3296:6–10. Ms. Litzinger testified that she wasn't sure during the May 2022 election if taking off her chest strap counted as assistance but agreed that she never asked a poll worker whether that would count as assistance. *Id.* at 3303:16–3304:5. Ms. Litzinger agreed that she was ultimately able to cast her ballot. *Id.* at 3304:9–10. Ms. Litzinger agreed that she has not been prevented from casting a ballot since the implementation of SB 1. *Id.* at 3305:18–20.

728.    Ms. Laura Halvorson voted by mail in the March 2022 election. Oct. 10, 2023 Tr. at 3318:25–3319:2. Her attendant would not sign the oath, in part because of the language limiting assistance to reading the ballot, marking the ballot, or directing to read or mark the ballot. *Id.* at 3335:19–3336:5. Ms. Halvorson was aware that the oath no longer includes that language. *Id.* at 3336:6–9. Ms. Halvorson learned that this ballot was accepted by using the Secretary of State's ballot tracker. *Id.* at 3321:5–14. Ms. Halvorson voted in-person for the November 2022 General Election. *Id.* at 3322:5–10. Before voting, she had her father go to her polling place in Bexar County to confirm that they had remote controls for people with limited mobility. When her father went to the polling site, the poll workers "said they did" have the remote controls. *Id.* at 3322:11–3333:9. Ms. Halvorson surrendered her mail ballot in order to vote in-person. *Id.* at 3339:1–5. Due to her prior research using the website "Vote411," Ms. Halvorson "was able to figure out which candidates (she) was voting for." *Id.* at 3327:12–3328:3. Ms. Halvorson had some trouble reading the ballot on the voting machine, because the font was too large to fit on the screen. *Id.* at 3339:12–25. Ms. Halvorson was able to successfully cast her vote during the November 2022 election. *Id.* at 3340:4–6. Since the implementation of SB 1, Ms. Halvorson has never been prevented from casting a ballot in an election in the state of Texas. *Id.* at 3340:13–16. Ms. Halvorson never

requested an accommodation for her disability to modify or waive any requirement of SB 1. *Id.* at 3330:23–3331:1.

729.     Ms. Teri Saltzman voted in the May 24, 2022 primary runoff election. Oct. 10, 2023 Tr. at 3366:15–17. She decided to vote curbside in the May 2022 election. Ms. Saltzman testified that "the guy comes running out with a laptop," but that she could not see well enough to use the screen herself. *Id.* at 3359:3–14. Ms. Saltzman testified that her husband assisted her in voting by reading the ballot and that she told him to "push that" with her selections. *Id.* at 3359:20–23. Ms. Saltzman agreed that her ballot for the May 2022 primary runoff was accepted. *Id.* at 3366:15–19. Ms. Saltzman agreed that she has never requested a reasonable accommodation in Texas. *Id.* at 3367:10–22.

730.     Ms. Cathy Cranston agreed that personal care attendants were hesitant take the oath to assist voters prior to 2022. Oct. 11, 2023 Tr. at 3565:20–23. When asked what she understood the penalty of perjury to mean, Ms. Cranston replied "To me, it means that if I'm telling a lie that I will be penalized, that it's a criminal penalty." *Id.* at 3562:7–9. Ms. Cranston was aware that a voter does not need to provide proof of disability in order to secure assistance at the polls. *Id.* at 3575:1–5. Ms. Cranston testified that not all of the people she has worked with have identified as people with disabilities. *Id.* at 3565:21–23. Ms. Cranston agreed that she has never assisted an individual in filling out an application for ballot by mail. *Id.* at 3571:2-4. Ms. Cranston testified that she has only assisted a voter in dropping off a mail ballot once. *Id.* at 3572:14–19. Ms. Cranston agreed that if she knew the person she was an attendant to, that she would already be aware that they had a disability. *Id.* at 3575:6–10. Ms. Cranston agreed that no voter has been unable to vote due to a problem related to her concerns about SB 1. That "there was not an individual person that asked me directly for. . .my assistance." *Id.* at 3576:23–3577:5. Ms. Cranston agreed that each person's disability is different from another person's disability. *Id.* at 3577:6–8. Ms. Cranston agreed that accommodations need to be individualized to a person's disability and needs, with the caveat that "there are some certain commonalities that go across the board." *Id.* at 3577:14–17. Ms. Cranston did not read any guidance materials on the oath of assistance from Travis

County or any other county. *Id.* at 3579:11–22. Ms. Cranston did not contact the Travis County Clerk's office about interpreting any provision within SB 1. Oct. 11, 2023 Tr. at 3579:23–3580:1. Ms. Cranston did not contact the Travis County District Attorney's office about interpreting any provision within SB 1. *Id.* at 3580:2–5. Ms. Cranston did not contact the Secretary of State's office about interpreting any provision of SB 1. *Id.* at 3580:12–14. Ms. Cranston continues to provide personal care attendant services to people in Travis County. *Id.* at 3582:9–13.

731.    Ms. Jennifer Martinez testified that Arc of Texas was concerned that making cues to persons with IDD could violate prohibition against suggesting by word, sign, or gesture how the voter should vote. Oct. 11, 2023 Tr. at 3519:22–3520:5. Ms. Martinez agreed that Arc of Texas knows of no assister who was prevented from cuing under SB 1. *Id.* at 3549:3–6. When asked whether Arc of Texas had any evidence that a county has denied a request for reasonable accommodation to a voter with IDD, Ms. Martinez testified "We wouldn't know one way or the other." *Id.* at 3550:17–25. Ms. Martinez was asked whether Arc of Texas had any information of an instance where an assister was cuing a voter and was prevented from curing that voter. Ms. Martinez replied "that's not something we're going to have to share unfortunately," but that they had heard "that there is fear and that there is concern." *Id.* at 3537:10–21. Ms. Martinez agreed that it was "true" that a direct support professional would know from prior discussions and interactions what kind of help that person needs. *Id.* at 3538:15–19. Ms. Martinez was not aware of a voter with IDD whose vote did not count because of the oath of assistance. *Id.* at 3541:4–9. Arc of Texas could not provide an example of an assister who declined to provide assistance on account of concerns of criminal penalties of SB 1. *Id.* at 3545:2–7.

732.    Ms. Cris Rocha testified that if she was somebody's last option, she would assist them. Sept. 11, 2023 Tr. at 156:16–18.

733.    During the March 2022 primary, Ms. Marla Lopez walked with an elderly couple to a polling location, where an election worker assisted the elderly couple. Oct. 10, 2023 Tr. at 3381:22–3382:21.

734.    Ms. Sharon Watkins Jones was not aware of any member of Delta Sigma Theta who was unable to vote because of Section 6.05. Oct. 3, 2023 Tr. at 2218:18–2219:8.

735.    Dr. Douglas Kruse testified that rates of disability correlate "Very, very highly" with age. Oct. 12, 2023 Tr. at 3742:10–23. Disabilities are less prevalent among Hispanics because they are disproportionately young. *Id.* at 3741:17–3742:8. When discussing voting participation among people with disabilities, Dr. Kruse testified that "people with disabilities have lower average education and income levels, and that's associated with lower turnout." *Id.* at 3754:2–6. Dr. Kruse agreed that voters with disabilities may require assistance with voting, whether voting in person or by mail. *Id.* at 3771:6–8.

736.    Dr. Kruse has no data as to whether or to what extent any assisters in Texas have actually declined to assist any voters with disabilities because of SB 1. Oct. 12, 2023 Tr. at 3505:10–13. Dr. Kruse has no data as to whether or to what extent any Texas voters with disabilities have actually had difficulties in finding assisters because of SB 1. *Id.* at 3505:14–17. Dr. Kruse did not communicate with any Texas voters with disabilities in arriving at his predictions that Article 6 would create barriers to such voters. *Id.* at 3803:22–3804:7. Dr. Kruse has also not communicated with any Texas voters with disabilities since February 28, 2022, the date of his report, to see whether their personal experience had borne out his predictions on Section 6, *id.* at 3804:8–12, except Mr. Bob Kafka. *Id.* at 3808:5–14. Dr. Kruse however clarified that his conversation with Mr. Kafka played no role in his expert report opinions or his testimony. *Id.* at 3808:21–25. Dr. Kruse did not communicate with anybody who has assisted voters in Texas or declined to assist voters in Texas, to learn whether their personal experience has borne out his predictions on Section 6. *Id.* at 3804:13–18.

737.    Two of the six datasets that Dr. Kruse used were not limited to Texans who were United States citizens. Oct. 12, 2023 Tr. at 3738:5–11. When asked about limitations in survey data, Dr. Kruse stated "They can have limitations. The main limitation with regard to measuring disability is that it's hard to measure disability." *Id.* at 3731:16–21.

### ii.    There is no evidence of prosecutions under Article 6 of SB 1.

738.    Ms. Elaine Jones is not aware of any investigations into any alleged violations of SB 1's criminal provisions, Sept. 22, 2023 Tr. at 1781:9–11, and she is not aware of any prosecutions that have occurred under SB 1. *Id.* at 1781:12–14. Further, Ms. Jones herself has not been criminally charged with violating SB 1, *id.* at 1807:13–15, and she has not been assessed a civil penalty for violating SB 1. *Id.* at 1807:16–18.

739.    Mr. James Lewin testified that he was unaware of anyone who received a civil penalty or criminal penalty for violating section 4.09 or anyone who was subject to criminal investigation. Sept. 13, 2023 Tr. at 581:2–9; 592:3–8. Mr. Richard Ertel was not aware of any individual who was prosecuted or charged for knowingly preventing a watcher from observing an activity or procedure in violation of Section 4.09, and he is also not aware of any individual who was prosecuted or charged for knowingly refusing to accept a poll watcher. *Id.* at 633:4–19.

740.    Ms. Rachelle Obakozuwa was unaware of anyone who was prosecuted or threatened with prosecution because of anything in SB 1 in connection with the November 2022 election in Harris County. Sept. 19, 2023 Tr. at 1211:1–4.

741.    No LUPE staff or members have been prosecuted for violating SB 1's assistance provisions. Sept. 11, 2023 Tr. at 117:25–118:5. Ms. Tonia Chavez Camacho was unable to point to any LUPE member prosecuted or threatened with prosecution regarding 6.05. *Id.* at 119:20–120:25.

742.    Ms. Tonia Chavez Camacho could only identify one instance of a problem since the passage of SB 1 related to voter assistance, and that voter was still able to vote. *Id.* at 108:7-23. This instance was during the 2022 General Election. *Id.* at 109:17–20.

743.    No Texas AFT members have been investigated or prosecuted because of anything in SB 1, nor have they been threatened with such. Sept. 14, 2023 Tr. at 955:5–11.

744.    Ms. Miller has never been charged with a crime for signing the oath of assistance. Oct. 10, 2023 Tr. at 3227:4–5. Ms. Miller has not talked to anybody at Arc of Texas about how to interpret the language in the oath of assistance. *Id.* at 3223:4–8. Ms. Miller has also not sought legal advice on how to interpret the terms of the oath of assistance. *Id.* at 3222:22–3223:2. Ms. Miller

testified that she had used the Travis County Clerk's website to check on the status of her daughter's mail ballot. *Id.* at 3223:17–21. When asked whether she had also checked the Travis County Clerk's website for guidance on how to understand the oath of assistance, she first replied that she did not recall, then said "a lot of this occurred during the lockdown in 2020 and there weren't a lot of people to get assistance from I'm afraid." *Id.* at 3223:22–3224:4.

745.     While registering voters at the Houston Abilities Expo, Ms. Nunez Landry encountered people "that confused drive-thru with curbside voting. They didn't think we had that anymore. I mean, curbside, because those two terms were conflated." Oct. 10, 2023 Tr. at 3230:18–3231:9. Ms. Nunez Landry agreed that when a proposed law or constitutional amendment does not immediately make sense, she will try to educate herself. *Id.* at 3258:17–3259:1. Ms. Nunez Landry could not identify anyone who had been prosecuted for providing the type of assistance that she requires. *Id.* at 3261:20–25. Ms. Nunez Landry was asked whether she was concerned about what constitutes "pressure" and "coercion" under SB 1. *Id.* at 3262:20–22. She stated she was concerned that the definition of those terms had "not been made explicit." *Id.* at 3262:17–24. Ms. Nunez Landry called the ADA administrator at the Harris County Elections Office, Disability Rights Texas, and filed a complaint with the Department of Justice after her 2022 voting experience. *Id.* at 3254:24–3255:10. She made these calls, in part, because she witnessed "older people who couldn't stand up anymore in that election and they were leaving." *Id.* at 3255:13–18. While Ms. Nunez Landry was speaking with the Harris County ADA administrator, they told her "you're good." *Id.* at 3264:10–17. And Ms. Nunez Landry agreed that at the end of the phone call with the ADA administrator it was her understanding from Harris County that she could receive assistance as a disabled voter. *Id.* at 3264:18–3266:1. Ms. Nunez Landry could not remember whether she had called the Secretary of State's office to ask about provisions she did not understand. *Id.* at 3266:2–24. When asked whether she was concerned that SB 1 would prevent poll workers from providing assistance, Ms. Nunez Landry responded, "I'm not really concerned." *Id.* at 3269:25–3270:8.

228

746.    Mr. Bob Kafka was not aware of any threatened prosecutions under SB 1's voter assistance provisions. Oct. 11, 2023 Tr. at 3635:21–23.

747.    Ms. Martinez, on behalf of Arc of Texas, could not provide any evidence to the Court about any assister who has been investigated or prosecuted for helping someone with a disability vote in Texas. Oct. 11, 2023 Tr. at 3545:8-3546:1.

748.    Dr. Kruse testified that it was his opinion that "It could be as simple as I – maybe my neighbor is able to help me vote, and I buy that person an ice cream cone or I pay for their gas or something like that. Well, that would be – that would be criminalized, according to the wording of this – of 6.06." Oct. 12, 2023 Tr. at 3774:10–20. Dr. Kruse however admitted that he was an expert in neither Texas criminal law nor Texas criminal procedure. *Id.* at 3806:24–3807:4.

749.    When SB 1 passed, Dallas County Elections believed there could be some criminal liability, but ongoing guidance from the Secretary of State clarified for them what SB 1 does and does not allow. Sept. 12, 2023 Tr. at 463:5–11.

750.    The Attorney General's office may no longer instigate prosecutions of election crimes on its own authority. Sept. 14, 2023 Tr. at 897:5–23.

### iii. The State of Texas has an interest in ensuring that all ballots legally cast by Texas citizens with disabilities are counted.

751.    Ms. Dana DeBeauvoir agreed it was important that voters not be harassed in the polling place, while holding their ballots. Sept. 14, 2023 Tr. at 903:23–25. Ms. DeBeauvoir also agreed it was important that, wherever a voter has a ballot in hand, you don't want people telling them how to vote while they are filling out that ballot. *Id.* at 904:5–11.

752.    Ms. Cranston agreed that there are some individuals who don't understand or appreciate the proper power dynamics between a personal attendant and an individual who needs assistance. Oct. 11, 2023 Tr. at 3573:15–3574:5. Ms. Cranston agreed that there is potentially an opportunity for a personal care attendant or assister to exploit or pressure a voter with a disability while assisting them in casting their ballot. *Id.* at 3574:6–10. Ms. Cranston was asked whether she

could see her work as a personal care attendant affected by the prohibition in the oath "I will not communicate information about how the voter has voted." *Id.*at 3567:24–3568:3. Ms. Cranston gave the following example in her reply: "I could see this happening in certain families – want to know how a person voted, and in that way, because of the family dynamics, that could potentially cause an attendant to break – to break the oath." *Id.* at 3567:24–3568:12.

753.   Mr. Kafka agreed that Texas has a legitimate interest in preventing and protecting against abuse by community attendants and caretakers. Oct. 11, 2023 Tr. at 3638:1–4. Mr. Kafka stood by his deposition testimony that REV-UP had seen abuse by caretakers against their clients. *Id.* at 3637:9–25.

754.   Ms. Martinez could not say whether Arc of Texas was aware of anybody who had personally experienced cuing being misinterpreted as pressure or coercion. Oct. 11, 2023 Tr. at 3539:8–16. Ms. Martinez agreed that voters should not be pressured or coerced. *Id.* at 3540:1–4. When talking about the vulnerability of voters with IDD to pressure or coercion from direct service professionals, Ms. Martinez stated "Direct supports and services with folks that are members of the Arc of Texas are incredibly engaged in the political process. They are grass roots advocates themselves." *Id.* at 3540:5–12. Ms. Martinez agreed however that pressure or coercion by an assister would not be the correct kind of support for a voter with IDD. *Id.* at 3540:22–25. Ms. Martinez testified that when balancing between self-determination for IDD voters and ensuring IDD voters have the help they need "we're always going to side with self-determination, right? That's the cornerstone." *Id.* at 3539:3–8. The support needs of a particular person with IDD will typically be unique to that person. *Id.* at 3540:14–17. When asked whether it was dangerous to draw hard and fast rules for IDD across the board, Ms. Martinez testified "everyone is unique within the confines of some of those standard things we know are often needed." *Id.* at 3540:18–24.

755.   Ms. Rocha did not know if other assistors follow the rules. Sept. 11, 2023 Tr. at 155:21–23.

756.   The Elections Division might sometimes update a form to make it more accessible to voters. When asked to provide an example of something that makes a form more accessible, Ms.

Christina Adkins replied, "There are a couple of things. Like, the font that's used on a form. There's recommendations on the types of font that you use. You know, sans serif fonts in particular. There's recommendations on sizing of the font that's contained on a form itself. The use of graphics or boxes to delineate different parts of a form; a number of different items like that that, you know, we've taken into consideration when we redesign different forms that we have." Oct. 18, 2023 Tr. at 4560:10–22.

### iv. The Oath of Assistance Form Prescribed by Section 6.03, could theoretically increase wait times, but counties have accommodated voters with disabilities so that this did not occur.

757.  When asked about the most common barriers for people with disabilities at polling places, Dr. Kruse stated "The most common difficulty that both people with and without disabilities mentioned was difficulty in waiting in line." Oct. 12, 2023 Tr. at 3755:24–3756:6.

758.  Dr. Kenneth Mayer stated that wait times in any individual polling place turn on the characteristics and processing time of that particular location. Oct. 2, 2023 Tr. at 2051:14–17.

759.  El Paso County moves voters with mobility impairments to the front of the line at the polling place to vote. Sept. 12, 2023 Tr. at 269:15–18. El Paso County had a training with Texas Disability Rights to discuss assisting and what is required, "also with the idea to move the voter if they have lack of mobility to the front of the line." *Id.* at 278:18–25.

760.  Despite the challenges inherent in implementing SB 1, Dallas County received fewer than 20 complaints about wait times following the March 2022 primary election. Sept. 12, 2023 Tr. at 462:1–25.

### Y.  Poll Watchers

### i.  Poll watchers have been permitted under Texas law for decades.

761.  Ms. Dana DeBeauvoir agreed that poll watchers serve a valuable role. Sept. 14, 2023 Tr. at 876:25–877:2. "We always had really positive relationships with poll watchers" *Id.* at 859:16-

22. Poll watchers have an important role in making sure all the procedures and chain of custody are followed. *Id.* at 889:13–21.

762.    Mr. Jacquelyn Callanen testified that poll watchers are important in that they make sure elections are run properly and with integrity; that, per the election code, poll watchers may not engage in certain activities, such as being present at the voting station when a voter is preparing their ballot, being present at the voting station when a voter is being assisted by a person of the voter's choice, observing areas of an election office that are not being used for the designated activities, speaking with an election officer regarding the election (except to bring awareness to an irregularity or a violation of law), communicating in any manner with a voter regarding an election, or continuing to discuss an alleged irregularity with the election worker (unless the presiding officer invited the discussion); and that these limitations on poll watchers pre-existed SB 1. Sept. 19, 2023 Tr. at 1091:4–1093:16.

763.    Mr. Frank Phillips explained the purpose of a poll watcher as follows: "A poll watcher is a person appointed by a candidate, a party, or a PAC, that -- a political action committee – that is there to observe the conduct and the execution of the election at either a polling site or central count or ballot board area." Oct. 12, 2023 Tr. at 3864:10–15. A poll watcher cannot fulfill his role if he's unable to observe election activities. *Id.* at 3864:16–18. Mr. Phillips testified that SB 1 "clarified" what poll watchers could and could not do. *Id.* at 3867:8–12. When he was asked to expand on what he meant by "clarified," Mr. Phillips explained, "I've always been of the belief that a poll watcher could walk around, you know, and place themselves in a position to see what they needed to see. Now, we would occasionally get election judges that would assign them to a seat that may not have been advantageous and kind of make them stay there, but I think SB 1 spelled out that you can get up. You have freedom of movement, see whatever you need to see, hear what you need to hear, so I think it just clarified what a poll watcher could do -- can do." *Id.* at 3867:13–23.

764.    Ms. Callanen's testified that there were some problems with poll watchers during COVID-19 in the 2020 elections, because, "at that time[,] it said that the poll watchers can sit or

stand conveniently to observe the election, and so they were right behind the officials." Sept. 19, 2023 Tr. at 1060:7–24.

765.    Dallas County instituted free movement for poll watchers prior to SB 1 at its Central Counting Station to improve transparency and build confidence in poll watchers. Sept. 12, 2023 Tr. at 473:13–474:3. It was Ms. DeBeauvoir's policy to try and give poll watchers free rein at the polls to effectuate their job. Sept. 14, 2023 Tr. at 889:24–890:1. "Free movement" in Section 4.07 means poll watchers "can do anything except interrupt the work or disturb the worker who is trying to get work done." *Id.* at 876:12–16. Section 4.07 did not create a significant change in the rules governing poll watchers. *Id.* at 876:17–24.

766.    Many times and during every election, Ms. DeBeauvoir conducted investigations into misconduct and referred allegations to law enforcement. Sept. 14, 2023 Tr. at 856:20–24. One or two people every few years would accidentally vote twice but weren't charged because they did not have the requisite intent. Ms. DeBeauvoir said they can now detect double voting. *Id.* at 856:25–857:19. The 2000, 2016, and 2020 elections were watershed moments in conducting elections. The 2016 election shocked some people and created many questions. The 2020 election "really changed everything," and created a lot of suspicion and problems conducting elections. *Id.* at 858:6–20. There are generally more poll watchers during Presidential years. *Id.* at 860:25–861:2.

767.    The one negative poll watcher incident Ms. DeBeauvoir experienced occurred in the November 2020 General Election. Sept. 14, 2023 Tr. at 861:5–14. A poll watcher had been upset and complaining that she could not see or hear what people were doing in the count room. *Id.* at 865:4–22. Law enforcement was able to arrest and removed that poll watcher. *Id.* at 866:20–24. That poll watcher's name was Jennifer Fleck. *Id.* at 870:25–871:1. The Travis County sheriff's office made the arrest. *Id.* at 874:21–23. Between 3 and 4 additional poll watchers complained about the count room viewing and filed affidavits. *Id.* at 870:5–11.

768.    A complaint was filed with the Secretary of State's Office, which then forwarded the complaint to the Attorney General's office. *Id.* at 870:12–18. Jennifer Fleck filed the complaint

that went to SOS then OAG. *Id.* at 870:12–871:1. Ms. DeBeauvoir agreed that the Jennifer Fleck incident could be called a "unicorn." *Id.* at 894:3–8.

769.    Ms. Christina Adkins inspected Travis County's count room setup prior to the 2020 election. Oct. 18, 2023 Tr. at 4589:2–15. Ms. Adkins told Ms. DeBeauvoir's election director "'That's great. I appreciate what you're doing, but where in this room are poll watchers going to be allowed to be present? Because you know you have to have them in here, as well,' you know." *Id.* at 4590:2–20: The election director showed Ms. Adkins where Travis County was planning on stationing some chairs so that poll watchers could be present in that room and rotate in and out. *Id.* at 4590:2–20.

770.    Section 4.09 of SB 1 was written in response to a Travis County poll watcher incident that took place in 2020. Sept. 14, 2023 Tr. at 877:21–878:12. Travis County's actions during the 2020 Jennifer Fleck incident would not be considered obstruction of a poll watcher, under 4.09. *Id.* at 8.8:13–16. Ms. DeBeauvoir had no concerns about 4.09 while she was a clerk. *Id.* at 878:21–24. Ms. DeBeauvoir did not get any questions from poll workers about 4.09 while employed as a clerk. *Id.* at 878:25–879:2. Ms. DeBeauvoir was never concerned while she was a clerk that anybody in her office was going to be accused of poll watcher obstruction (under 4.09). *Id.* at 880:6–13. With the addition of "by taking any action to obstruct the view of the watcher" in Section 4.09, SB 1 "added some redundant language." *Id.* at 912:24–913:5. Ms. DeBeauvoir responded, "That sounds like a good guess to me" that lawmakers put something in to quiet the people who were loud and complaining. *Id.* at 913:6–10. Ms. DeBeauvoir answered, "I don't see that" when asked whether the language in 4.09 was the product of a racist conspiracy. *Id.* at 913:11–13.

771.    When asked whether he could answer a hypothetical about Section 4.09 of SB 1 on whether a particular action might obstruct a poll watcher, Mr. Jonathan White replied, "No. That's typically not how we work." Oct. 16, 2023 Tr. at 4097:4–14. When he was asked if the Election Integrity Division received complaints, before and after 2020, that poll watchers were being excluded, Mr. White replied, "pretty few and far between, but there might have been a little

bit of a surge there in 2020, yes." *Id.* at 3984:20–3985:4. Mr. White did not recall his office receiving any complaints about inappropriate conduct by poll watchers. *Id.* at 4093:5–12. Mr. White had prosecuted neither watchers nor obstruction of watchers when he left the Election Integrity Division. *Id.* at 3985:5–9.

772.     Prior to SB 1, the Secretary of State's office received complaints both from poll watchers and about poll watchers. Oct. 18, 2023 Tr. at 4545:12–15. After SB 1 and the mandatory poll watcher training, complaints to the Secretary of State about polling place activities have changed and "are a lot more specific. We rarely get complaints about polling place activities. It's typically activities that occur in the Central Counting Station, our activities that occur in the Ballot Board, and so it's more specific to that type of content." *Id.* at 4545:16–4546:4.

773.     Dallas County had an incident where a poll worker was followed home, possibly by a poll watcher, which is not allowed by SB 1. Sept. 12, 2023 Tr. at 478:6–10.

774.     Ms. Marla Lopez worked as an election judge for one election. Oct. 10, 2023 Tr. at 3416:6–10. That election was the November 2021 General Election. *Id.* at 3416:6–16. Ms. Lopez received training to be an election judge in 2021, which mentioned poll watchers. *Id.* at 3385:10–16. Ms. Lopez testified that she was concerned about the possibility of disruption from poll watchers and "(she) didn't feel like I really understood what would happen. I just knew that the laws would change and I could be sued by a poll watcher essentially." *Id.* at 3385:21–3386:9. Ms. Lopez testified that she did not know what her rights and responsibilities would have been regarding a disruptive poll watcher in the November 2021 election, the one election in which she worked. *Id.* at 3420:23–3421:2. On questioning about an incident alleged in the complaint that she had been intimidated by a poll watcher prior to SB 1, Ms. Lopez clarified that it was not a poll watcher, but an election worker. *Id.* at 3409:6–21. Ms. Lopez also testified on Election Day 2020, she witnessed "somebody outside of the polling location with some, like, certain political regalia" with whom she "didn't directly interact." *Id.* at 3409:22–3410:5. Ms. Lopez confirmed that she had already voted a week or two prior to this incident "with my dad." *Id.* at 3410:6–8. When asked whether there was anything in Texas law giving poll watcher a right that, if exercised, would cause

her to be afraid or feel intimidated as a voter, Ms. Lopez replied "Well, that they can be in the voting location." *Id.* at 3412:2–7.

775.     Despite initial doubts, Ms. DeBeauvoir now supports the SB 1 requirement in Section 3.18 of streaming a video of the counting station. Sept. 14, 2023 Tr. at 880:23–881:23. Ms. DeBeauvoir thought this might have prevented much of the grief from the November 2020 incident with Ms. Fleck. *Id.* at 902:12–16. Ms. DeBeauvoir thinks Section 3.18 will have a chilling effect on bad behavior of poll watchers. *Id.* at 902:17–22. When asked how she was able to determine people could see counting from observation room, Ms. DeBeauvoir replied that it was because she "stood there and looked at it myself." *Id.* at 892:10–13. Ms. DeBeauvoir had the same reason for thinking that people could hear the audio feed in the observation room. *Id.* at 893:1–2. Ms. DeBeauvoir agreed that the standard she applied required application of a bit of common sense. *Id.* at 893:10–25.

### ii.  Restrictions on Poll Watchers

776.     SB 1 added a requirement that the Secretary of State must provide training for poll watchers, which is in turn required for a poll watcher to be accepted for service. Ms. Wise deemed this provision helpful. Sept. 12, 2023 Tr. at 287:23–288:11. The Elections Division of the Secretary of State's office provides the training for poll watchers. Oct. 18, 2023 Tr. at 4533:22–23. When asked what content was included in the training, Ms. Adkins explained that

> after the passage of SB 1, our office was required to create a training for poll watchers. That training had to be available on demand, and it was required to specifically train on the requirements of being a poll watcher and proper procedure for poll watchers. We have had guidance that our office has issued for a number of years, we call it our 'Poll Watcher's Guide.' It's a little handbook that we put together that summarizes the law as it relates to poll watching. So we use that as the basis for our training. We took selected pieces of content from that poll watcher's guide, and we created an online training, as we were required to do. That, again, is directed toward the poll watchers on, I think, their -- the actions and the things that pertain to them, that they are allowed to do and in some cases not allowed to do, under the election code.

*Id.* at 4542:17–4543:10.

777.    When asked the use of the Elections Division's "Poll Watcher's Guide" prior to SB 1 training requirement, Ms. Adkins explained that "the original guide predated even my tenure at the Secretary of State's Office. We updated it. It was there and available on our website. We tried to provide it when questions came up, but poll watchers were not required to refer to it or use it in any way." Oct. 18, 2023 Tr. at 4543:11–19.

778.    Ms. Adkins further explained that the "requirement was from SB 1, and so it was implemented immediately following SB 1, so I believe the first election to which this would have applied broadly would have been the March 2022 Primary, so I believe this went live on our website in December of 2021." Oct. 18, 2023 Tr. at 4544:5–11. Ms. Adkins testified about the evolution of the poll watcher training since the March 2022 Primary that

> after of the Primary, we received quite a bit of feedback from election officials, from candidates, even from a number of poll watcher groups out there -- some of the ones that are a little bit more organized, that they were concerned that their needed to be something else to ensure that people were reading the content of the training itself. There was actually an interim House Elections Committee on some of these issues, and it was very clear at that committee hearing that there was a desire for us to do a little bit more to ensure that folks are, in fact, reading and taking in the content of the training itself. So while we didn't have statutory authority to add a quiz, we did add some questions at the end of each module that a person has to answer in order to get to the next module, and that's just to ensure that they are retaining and reading the content of each section.

*Id.* at 4544:12–4545:11.

779.    When asked by the Court whether poll watchers were being trained on what they can do in the Central Counting Station, Ms. Adkins testified that the Secretary of State has provided additional guidance in this area "because a lot of poll watchers have taken that provision to think it gives them free access, and so we've had to provide some additional guidance that says it does not." Oct. 18, 2023 Tr. at 4548:1–5. Ms. Adkins further testified that poll watchers could provide their credentials to the presiding judge at the Central Counting Station and observe Central Counting or the Ballot Board, but only when those were convened. Otherwise, poll watchers "have no right to be there." *Id.* at 4546:9–4548:5.

780.    Ms. Wise opined that the poll watcher training for the November 2022 General Election constituted an improvement compared to the training offered for the early elections that year. Sept. 12, 2023 Tr. at 288:25–289:3. Since SB 1, training materials are now more thorough. *Id.* at 481:10–12. The training instructs poll watchers on prohibited conduct and requires an oath. *Id.* at 289:11–14.

781.    SB 1 added a poll watchers' oath, which requires them to swear not to disrupt the voting process or harass voters. Sept. 12, 2023 Tr. at 290:3–8. SB 1 explicitly prohibits poll watchers from interfering with orderly conduct of an election and from obstructing an election. *Id.* at 291:16–24. The vast majority of poll watchers understand the rules under SB 1 and strive to follow them. *Id.* at 472:15–17.

782.    Poll watchers were not allowed to communicate with voters before SB 1 nor is communication permitted after SB 1. Sept. 12, 2023 Tr. at 292:1–10. A poll watcher may be present at the voting station if the voter is being assisted by an election worker, and this provision preexisted SB 1. But a poll watcher may not otherwise watch voters when a voter is preparing his ballot. Sept. 12, 2023 Tr. at 295:13–23. Poll watchers may not watch the voter being assisted by a person of the voter's choice. *Id.* at 295:25–296:1. And a poll watcher is not entitled to observe a ballot being prepared. *Id.* at 297:16–18.  The Court requested clarification on the definition of these terms, *Id.* at 297:19–300:21, which went as follows:

> THE COURT. What does prepare a ballot mean, as opposed to actually filling out the ballot?
>
> MISS HUNKER: Well, prepare would include multiple actions. It would include filling out the ballot, and we would argue that also includes inserting the ballot into the machine since that is part of the preparation for it to be counted.
>
> THE COURT: Let me make sure I understand what you just told me. So you are saying a loll watcher gets to watch all of that happening?
>
> MISS HUNKER: No, Your Honor. We are saying the opposite. We are saying a poll watcher, with one limited exception that preexisted SB 1, cannot watch and observe the voter prepare the ballot, fill out the ballot, or cast the ballot.

THE COURT: So what are you telling me a poll watcher can do?

MISS HUNKER: A poll watcher can obverse that process if the voter is being assisted by an election worker. They could also watch check-in.

THE COURT: So if they are being assisted, they can see every step, including the actual filling of the ballot?

MISS HUNKER: Specific context for that is if it's being assisted by an election worker.

THE COURT: the Context of my question.

MISS HUNKER: Yes.

THE COURT: If there is assistance being provided by an election worker, your position, the State's position, is that the poll watcher gets to see the voter actually exercise his vote and who he voted for or what position he voted for.

MISS HUNKER: We would argue it doesn't go that close where the person can see the lines but they would be able to see the activity to ensure that the election worker was not unduly pressuring or coercing the voter.

THE COURT: So--

MISS HUNKER: And that particular allowance would—preexisted SB 1 and is not being challenged in this case.

THE COURT: Well, what's being challenged, I thought, was the underlying red-lined language here as being vague.

MISS HUNKER: That is their challenge, your Honor. We would argue that there are explicit, within the—within the entirety of the election code relating to poll watchers, including provisions that you're not seeing in SB 1 because SB 1 only includes the language that was changed.

THE COURT: Right. So where in this red-lined language does it clearly tell a poll watcher that they can't see when being assisted the voter actually voting, his choice?

MISS HUNKER: So I would have to go back to the election code. That is a separate provision. It is – pull up – it may be 33.057. Brian, if you can please pull up the election code, Section 33.057. SO if you see, Your Honor, Section A provides the exception. " watcher is entitled to be present at the voting station when the voter is being assisted by an election officer." But if you look at Subsection B, it explicitly says, "a watcher may not be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice."

THE COURT: Well, how does the watcher know that it's being prepared in accordance with the voter's wishes, if the watcher doesn't actually see what – doesn't the watcher have to hear what the voter's preferences were, and then actually get to see whether or not the ballot's completed with whatever he heard?

MISS HUNKER: Are you talking about with respect to Subsection A?

THE COURT: Yes.

MISS HUNKER: So there would have to be some ability for the watcher to be able to observe the instructions that is given to the election worker since the transparency is designed to ensure that the person who is offering the assistance, the election worker, I not stepping across the line.

THE COURT: So they've got to be – the watcher has got to be allowed to be close enough to hear and close enough to actually see?

MISS HUNKER: For Subsection A, yes.

*Id.* at 297:19:23–300:21.

783.     It was an offense to obstruct a poll watcher preSB 1. Sept. 12, 2023 Tr. at 296:23–25. "Prior to SB 1, you could not knowingly prevent a watcher from observing." *Id.* at 480:18–481:1. Obstructing the poll watcher is only an offense if the poll watcher is entitled to observe the activity, with the exception of when an election worker is assisting a voter. Sept. 12, 2023 Tr. at 301:13–19. Moreover, "(a) poll watcher does not have the right to free movement in other areas of an election office that is not being used for the designated activities." Joint – 005. Mr. Remi Garza agreed poll watchers need to see the elections activities being conducted to perform their function. Sept. 14, 2023 Tr. at 836:22–837:1. The Court requested further explanation of these terms, Sept. 12, 2023 Tr. at 302:6–303:23, which went as follows:

THE COURT: So let me give you a hypothetical. A poll watcher only speaks English but the person casting the ballot with assistance are both speaking in Spanish, does the poll watcher now have some right to get a translator and get into this conversation?

MISS HUNKER: No, Your Honor. If the campaign or political party or candidate had wished for the individual to be able to speak Spanish, they could have appointed an individual to that location who spoke the language. The only requirement --

THE COURT: But there's rights now extended to poll watchers. So do they have a right to a translator?

MISS HUNKER: They do not. The only right that they have is to be near enough to see and hear the activity.

THE COURT: Near enough to hear and see --

MISS HUNKER: The activity.

THE COURT: -- and all that's not defined about how many feet you have to be close or away from.

MISS HUNKER: What we're about to get to, Your Honor, is that "conveniently" was also not defined.

THE COURT: Conveniently not defined by who?

MISS HUNKER: Well, that's just the point, what does conveniently mean? The language that "near enough to see and hear" is replacing a previous term, which was "conveniently near." And conveniently near was not defined as well, and so I'm about to talk to the witness --

THE COURT: So the legislature an ill-defined statute and replaced it with another ill-defined statute?

MISS HUNKER: Our argument, Your Honor, would be that see and hear is something that is more measurable and is more objective than convenient, particularly since the language in the original statute did not define convenient to who. And that's where you have a big dispute that we're going to bring out during the course of this trial, that preSB 1 there was a dispute on was it convenient to the election worker or convenient to the poll watcher, and without that clarity you had many conflicts in the 2020 election, specifically in Travis County and a few of the other counties because there was not that clear line. So this was the legislators attempt at creating what they thought and was a more measurable approach of how poll watchers would be able to observe activities at the polling place.

Sept. 12, 2023 Tr. at 302:6–303:23.

784.    Ms. Wise was not aware of any reported incident in the 2022 General Election where an election judge wished to remove a poll watcher because of the poll watcher's behavior but was unable to do so because of SB 1. Sept. 12, 2023 Tr. at 287:18–22. Ms. Callanen was unaware of any reported incident in the November 2022 election where an election judge wanted to remove

a poll watcher because of the poll watcher's behavior but was unable to do so because of SB 1. Sept. 19, 2023 Tr. at 1095:4-8. Ms. Rachelle Obakozuwa testified that there were no reports of violence or threatened violence related to poll watchers during the November 2022 election, and she was unaware of any report of an election judge wanting to remove a poll watcher who was unable to do so. *Id.* at 1208:10–20.

785.    Ms. Callanen agreed that, while a presiding judge may have a poll watcher removed from a polling place for violating the election code if the action was observed by an election judge or clerk, there is an exception to this general rule, where a presiding judge may remove a poll watcher for a violation of the Penal Code, even if the violation is not witnessed by an election judge or clerk. *Id.* at 1093:20–1094:6. Prior to SB 1, election judges could already remove poll watchers for breaching the peace. Sept. 14, 2023 Tr. at 894:9–13.

786.    In the past, disagreements with poll watchers in El Paso County could be resolved through conversation. Sept. 11, 2023 Tr. at 180:5–7. Prior to SB 1, El Paso had an issue where poll watchers would watch voters put their paper ballot into the tabulator because watchers were trying to count the votes for different candidates. *Id.* at 190:4–10. Ms. Wise testified that, even after SB 1, she would not let a poll watcher see a voter's ballot as it was fed into the machine, to protect voter's privacy. *Id.* at 190:16–191:8. It remains illegal after the passage of SB 1 for a poll watcher to remove or attempt to remove ballots from a ballot box. Sept. 19, 2023 Tr. At 1094:18–25.

### iii. Poll Watchers and the Layout of Polling Stations

787.    Polling sites are in different buildings and have different setups. Sept. 12, 2023 Tr. at 371:22–372:3. Polling sites have different requirements simply based on the shape and layout of the building. *Id.* at 372:4–6. Ms. Wise did not know how other counties set up for their different polling sites or how other counties placed their poll watchers in relation to those polling sites. *Id.* at 372:7–12.

788.    Ms. Jacquelyn Callanen described the general setup of polling locations in Bexar County, "We have six-foot tables that we provide in our cart and we put two ExpressVotes on a table, so that there's one at one end and one at the other so there's a separation between voters for

privacy." Sept. 19, 2023 Tr. at 1005:6–12. When asked whether voter privacy was protected when using ExpressVote machines, Ms. Callanen replied, "Yes, sir. The company, again, you heard me say ES&S, they have what we refer to as a bonnet because it's a plastic origami project that the judges have to put together each time that fits completely around the ExpressVote. And it sticks out, I don't know, maybe about a foot or so, so that the screen, no one can see -- if you are standing in front of it, unless someone is standing directly behind you, they won't be able to see who you are voting for." *Id.* at 1005:13–22.

789.    Dr. Kenneth Mayer stated that wait times in any individual polling place turn on the characteristics and processing time at that particular location. Oct. 2, 2023 Tr. at 2051:14–17.

790.    Mr. Richard Ertel is a member of Texas Impact. Sept. 13, 2023 Tr. at 595:15–17. He has worked "in elections in various capacities starting in 2008 or 2010 in Kerr County." *Id.* at 595:25–596:4. Mr. Ertel however has only had one instance where he personally observed a poll watcher, and in that instance poll watcher just sat in a chair for about an hour or so and then left. *Id.* at 601:9–14. Mr. Ertel agreed that the one instance he saw a poll watcher, he never saw the watcher engage in any election violations. *Id.* at 634:1–19. Mr. Ertel could not recall ever having any conversations with or questions from poll workers about what activities poll watchers could observe or when it would be appropriate to obstruct the view of a poll watcher. *Id.* at 626:13–627:7. Mr. Ertel testified that he has seen election workers engage in questionable conduct and that poll watchers are present to observe election activity. *Id.* at 636:2–637:8.

791.    Mr. Ertel testified that polling locations "are different sizes." Sept. 13, 2023 Tr. at 624:7–10. When asked whether he agreed that not every polling location is the same, Mr. Ertel replied, "That is definitely correct." *Id.* at 624:3–6. Mr. Ertel further testified that, "Given the unusual configurations we have, the distance that you are from the people is not necessarily the only way to decide whether a poll watcher is having access to what the poll workers and voters are doing." *Id.* at 624:16–625:2. Mr. Ertel continued, "I think it's true that the measurements would have to vary." *Id.* at 625:3–8.

792.     Mr. Ertel acknowledged an Election Advisory that said poll watchers do not have free movement in certain areas. *Id.* at 630:16–631:5. Mr. Ertel was aware that a poll watcher is allowed to be present when an election worker is assisting a voter, but not when the voter is being assisted by an assistor of the voter's choice. *Id.* at 628:18–629:8. Mr. Ertel was also aware that SB 1 now added an official training program for a person to be a poll watcher. *Id.* at 621:18–622:14.

### iv.  Staffing: Most Defendant Counties Had Sufficient Numbers of Election Workers Post SB 1.

793.     Travis County was able to obtain enough poll workers to staff the polls for the 2022 general election. Sept. 21, 2023 Tr. at 1539:12–15. Travis County did not have to close any polling locations due to lack of staff. *Id.* at 1539:16–18. And no voter was unable to vote due to lack of staffing. *Id.* at 1539:19–21.

794.     El Paso County was able to staff all 33 early voting locations in November of 2022 General Election. Sept. 12, 2023 Tr. at 285:5–7. El Paso County was able to staff all 118 Election Day polling locations in November 2022 General Election. *Id.* at 285:8–10. El Paso County did not close any polling locations during the early voting period for November 2022 General Election because of lack of staffing. *Id.* at 285:11–14. El Paso County did not close any polling locations on Election Day for November 2022 General Election because of lack of staffing. *Id.* at 285:15–18. Ms. Wise was not aware of any voters who are otherwise eligible to vote in November 2022 General Election but were unable to do so because of staffing shortages at polling locations. *Id.* at 285:19–23. Ms. Wise was also not aware of any voter who was required to wait a significant amount of time because of personnel shortage during November 2022 General Election. *Id.* at 286:6–9.

795.     Ms. Callanen testified that there was nothing that the poll watchers did in connection with the November 2022 election that increased wait times. Sept. 19, 2023 Tr. at 1095:9–12. Bexar County has countywide voting, which allows a voter to vote by personal appearance from any polling location in the county. *Id.* at 1085:21–1086:2. Bexar County had about 50 polling locations open during the early voting period of the 2022 General Election. *Id.* at 1086:14–16. And Bexar County had 302 polling locations open on election day. *Id.* at 1086:23–25.

796.     Ms. Obakozuwa testified that Harris County was able to train and assign election judges and alternate judges and was able to staff all 782 voting locations on Election Day for the November 2022 General Election, and she was unaware of any voters in Harris County who could not vote in the November 2022 General Election because of any staffing shortages in Harris County. She also confirmed that Harris County considered Election Day on the November 2022 a success. Sept. 19, 2023 Tr. at 1200:11–24.

797.     Dallas County was able to staff all 469 election day voting locations for the November 2022 General Election. Sept. 12, 2023 Tr. at 469:3–5. Dallas County had a surplus of 324 election workers for the November 2022 General Election. *Id.* at 469:3–7. Dallas County was able to staff all 52 early voting locations for the November 2022 General Election. *Id.* at 469:8–10.

798.     Denton County recruits election judges or clerks to work the election at polling sites. Oct. 12, 2023 Tr. at 104:21–24. Denton County has had as many as 2500 election workers during a given election. *Id.* at 104:25–105:4. Denton County had "either 48 or 50" polling location for early voting during the November 2022 General Election. *Id.* at 3867:24–3868:2. Denton County had "163 or 166" polling locations on election day for the November 2022 General Election. *Id.* at 3867:24–3868:5. Denton County was able to staff its polling locations. *Id.* at 3868:8–10. Denton County did not have to close any polling locations because of staffing shortages due to SB 1's poll watcher provisions, or for any other reason. *Id.* at 3868:8–14. Mr. Phillips anticipated that Denton County would be able to staff its polling locations for the November 2023 constitutional election. *Id.* at 3868:15–17.

####     v.  Article 4 of SB 1 places no burden on voters.

799.     Plaintiffs identified incidents of unruly poll watchers during the November 2020 general but did not identify any voter who did not vote because of Article 4 of SB 1. Sept. 11, 2023 Tr. at 12:21–13:4.

800.     Mr. Michael Scarpello was unaware of any voter who was dissuaded from casting a ballot in November 2022 General Election because of behavior of poll watchers in Dallas County. Sept. 12, 2023 Tr. at 481:15–17.

801.     Ms. Rachelle Obakozuwa was unaware of anyone who was prosecuted or threatened with prosecution because of anything in SB 1 in connection with the November 2022 election in Harris County. Sept. 19, 2023 Tr. at 1211:1–4.

802.     Mr. Ertel agreed that it was already an offense for a person to knowingly prevent a watcher from observing certain activity. Sept. 13, 2023 Tr. at 631:22–25. Mr. Ertel was not aware of any individual who was prosecuted or charged for knowingly preventing a watcher from observing an activity or procedure in violation of Section 4.09, and he was also not aware of any individual who was prosecuted or charged for knowingly refusing to accept a poll watcher. *Id.* at 633:4–19. Mr. Ertel was not aware of anyone being prosecuted under any article of SB 1 in Kerr County. *Id.* at 639:7–16.

803.     Mr. James Lewin testified that poll watchers had never been disruptive at locations where he has worked. Sept. 13, 2023 Tr. at 561:4–9. Mr. Lewin, personally, has never had an issue with a poll watcher, and he has never heard of any issues with poll watcher disruptions form his conversations with election judges or poll workers. *Id.* at 571:1–20. Mr. Lewin agreed that poll workers sometimes make mistakes that can prevent voters from having their ballot counted while also undermining public confidence in elections, and he admitted that voters have an interest in identifying and correcting those errors to make sure that every legally cast ballot is counted. *Id.* at 579:17–581:1. Mr. Lewin was unaware of anyone who had received a civil penalty or criminal penalty for violating section 4.09 or anyone who was subject to criminal investigation. *Id.* at 581:2–9; 592:3–8.

804.     A poll watcher can be appointed by "a political party. It can be a candidate, or it can be a political action committee that's for or against a measure that happens to be on the ballot." Oct. 12, 2023 Tr. at 3863:19–23. In Mr. Phillips' experience, poll watchers are appointed by both Democrats and Republicans. *Id.* at 3863:24–3864:1. When he was asked if Denton County typically had poll watchers at voting locations, Mr. Phillips replied "Yes. It's become pretty normal, yes." *Id.* at 3864:14–16. Denton County typically has poll watchers report to Central Count. *Id.* at 3864:17–19.

805.    To Mr. Phillips' knowledge, there have been poll watchers of every race. Oct. 12, 2023 Tr. at 3864:12–13. In Mr. Phillips' experience, there have been African American poll watchers. *Id.* at 3864:2–4. In Mr. Phillips' experience, there have been Hispanic poll watchers. *Id.* at 3864:5–6. Dr. Kenneth Mayer was unaware of any evidence of any Texas poll watcher raising more objections to minority voters than for white voters since SB 1 was enacted. Oct. 2, 2023 Tr. at 2049:21–25. Dr. Mayer was not aware of any evidence of any poll watcher activities increasing wait times in Texas since SB 1 was enacted. *Id.* at 2050:14–17. Specifically, he was not aware of any such evidence for the 2022 Primary Election, *Id.* at 2050:18–20, and he was not aware of any such evidence in the 2020 General Election. *Id.* at 2050:21–23. Indeed, he did not conduct any analysis on the effect of poll watcher activities on wait times for any election in Texas, *id.* at 2050:24–2051:2, and he agreed that wait times in any individual polling place turn on the characteristics and processing time at that particular location. *Id.* at 2051:14–17.

### Z.   Mail-Voting

806.    Prior to SB 1, voting by mail had been recognized as uniquely susceptible to fraud and error. *See* Jonathan White Decl. at ¶¶ 17, 31; STATE 098261 (ranking Texas house member's stating "vote by mail, that we know, is the greatest source of voter fraud in this state," before the 80th Leg.); STATE 108349 (letter by Senator Zaffirini to Chair of election reform committee noting "increasingly serious problem of mail-in ballot fraud").

807.    For example, during the 2020 elections, a mayoral candidate impersonated other voters to collect at least 100 ABBMs and cast or attempted to cast the ballots in his favor. Jonathan White Decl. at ¶ 17. This particular scheme was difficult to detect, but the elections administrator who uncovered it did testify to his belief that SB 1 voter ID requirements will make this sort of voter impersonation more difficult. *Id.*

808.    Vote harvesting occurs when a third-party "travels in person to wherever the voter is located" and "attempts to ensure the ballot is voted for the candidate of group of candidates the harvester supports" Jonathan White Decl. at ¶ 8. Typically, the goal behind vote harvesting is to

collect a large pool of ballots from vulnerable targets, often living in congregate settings, such as the elderly or disabled. *Id.* at ¶ 12. Vote harvesters then persuade their targets to sign their name once their ballot has been filled out to the harvester's liking. *Id.* at ¶¶ 24, 25.

809.    The Office of the Attorney General prosecuted more than 800 election offenses against 126 individuals between 2015 and 2022 (2022 was the last year in which the Attorney General had authority to prosecute election crimes). *Id.* at ¶ 8. Roughly two-thirds involved mail ballot fraud. *Id.*

810.    Aside from fraud, mail voting suffered from clerical errors that led to mail ballots being cast contrary to state law. E.g. STATE 115446–STATE 115449. For example, the Secretary of State's 2020 Election Audit of Collin, Dallas, Harris, and Tarrant Counties (the state's most populous counties) discovered hundreds of ballots that were incorrectly issued on account of age to voters who did not qualify for a mail ballot on that basis. STATE 115446–STATE 115449. Many of these recipients did not qualify on any basis. *Id.* at 115447.

811.    Prior to SB 1, Texas did not require government-issued proof of identity to vote by mail. *See* HAUL-MFV Ex. 384 at 1. (explaining the new ID requirements under SB 1). Texas relied exclusively on signature verification to ensure the identities of mail voters. Jonathan White Decl. at ¶ 33. PreSB 1 signature verification operated by matching the signature on the ABBM with the signature appearing on the ballot cast in their name. *Id.*

812.    Signature matching necessarily involves "a subjective determination" that two signatures are substantially similar. Id. at ¶ 36. County officials had to decide the degree of similarity they would require to approve a ballot; inevitably this led to some counties being more stringent than others.

813.    Intra-county disparities prompted a lawsuit, filed in 2020, that alleged inter alia that the "lack of training and uniform standards…guarantees that voters will be treated differently on entirely arbitrary grounds" Compl. for Declaratory and Injunctive Relief, ¶ 102, *Lewis v. Hughs*, No. 5:20-cv-00577 (W.D. Tex.).

814.     Prior to SB 1, Texas did not have a statewide process to cure defective mail ballots. *See* Oct. 17, 2023 Tr. at 4255:5–8.

### AA.     Mail Voting by Race

815.     Dr. Eric McDaniel opined that higher proportions of black voters cast mail ballots than did either white or Hispanic voters, based on a sample of Texas residents who voted in the 2020 general election. *See* Eric McDaniel Feb. 28, 2022 Expert Report at 6–7. Specifically, Dr. McDaniel found that 21.6 percent of black voters cast a mail ballot versus 13.2 and 10.5 percent of white and Hispanic voters respectively. *Id.*

816.     However, Dr. McDaniel's report exclusively relied on data from the 2020 election. *Id.*; *see also* Mark Hoekstra March 29, 2022 Expert Report at 3. Not only did Dr. McDaniel's report fail to look beyond a single election, the one election it chose to focus on was uniquely impacted by the COVID-19 pandemic. *Id.* at 6.

817.     Including data from the 2014, 2016, 2018 and 2020 elections, reveals "no statistically significant difference between the likelihood of voting absentee among Black versus White voters." *Id.* at 3. The only statistically significant racial difference is that Hispanic voters were less likely to vote by mail than non-hispanic white voters. *Id.* Dr. Hoekstra used the same type of data to conduct this research as Dr. McDaniel had used for his. *Id.* at 3, 7 (both used the Comparative Election Survey).

818.     Prof. Kenneth Mayer used 2022 election data to estimate mail ballot rejection rates by racial group for mail ballots cast in Dallas and Harris counties. *See* Kenneth Mayer March 6, 2023 Expert Report at 6–9. His research found that rejection rates were higher for black, Hispanic and Asian voters than for white voters in both counties. *Id.*

819.     However, Dr. Hoekstra opined that Prof. Mayer's racial impact analysis contained at least two major flaws. *See* Mark Hoekstra April 5, 2023 Expert Report at 5, 12–26. First, Prof. Mayer calculated rejection rates relative to mail voters rather than to all voters. This meant that his calculations did not take into account the possibility that voters of different races chose to vote

absentee at different rates. *Id.* at 12–14. When mail ballot rejection rates were computed relative to all voters, mail ballots cast by white voters were rejected at higher rates than those cast by black and Hispanic voters (this was true for Harris County; Dr. Hoekstra did not have access to requisite data for Dallas County). *Id.* at 14–16.  Second, Prof. Mayer did not use data recording actual race or ethnicity but instead inferred racial voting numbers from surname and neighborhood data. *Id.* at 16–17; Mayer at 6. Because of this, Prof. Mayer's figures for absentee ballot rejection by race are estimates that can "tell [] us little with certainty about differences by actual race." Hoekstra at 12.

### BB.      Rejection Rates

820.    Six statewide elections took place during 2022. The Democratic and Republic primaries each took place on March 1; the 2022 state constitutional amendment election was held May 7; the Democratic and Republican runoff elections on May 24; and finally, the general election was conducted November 8.

821.    According to figures collected by the Texas Secretary of State (the "SoS"), total statewide rejection rates of mail-in ballots peaked for the March 1 primary elections. The rejection rates were 12.90 percent and 11.80 percent for the Democratic and Republican primaries respectively. State 115581–115616.

822.    Rejection rates of mail ballots declined throughout subsequent elections. The rejection rate for the May 7 constitutional amendment election was down to 5.02 percent. *See id.* The rate for the partisan runoff elections declined further to 3.68 percent for the Democratic runoff and 4.27 percent for the Republican runoff. *See id.* Finally, the rejection rate for general election amounted to 2.70 percent. *See id.*

823.    These figures reveal a consistent trajectory towards lower rejection rates. Oct. 18, 2023 Tr. 4413:24–4414:14. Rejections were highest during the earliest post-SB 1 elections, sharply declined during the May elections and with the November general election declined into the range of average rates. *Id.* at 4414:12–17. Put succinctly, the SOS data shows a 'reversion to the mean.'

Rejection numbers rose immediately after SB 1 took effect but returned to historically normal rates within one year. *See id.* at 4414:12–17.

824.    Many other county election officers shared their observations that mail-in rejection rates have returned to historic levels. *E.g.,* Sept. 14, 2023 Tr. at 817:12–23.

### CC.        Rejection Rates are Likely to Continue their Decline

825.    County and state election officials commented on the adjustment frictions their elections systems experienced following implementation of SB 1. *See e.g.* Oct. 12, 2023 Tr. at 3842:5-3843:23 (Frank Phillips testifying that "short time frame" led to ineffective implementation). Keith Ingram emphasized that the timing of the new law left too short a period to properly train county election officials in time for the March primaries. Oct. 18, 2023 Tr. at 4416:5–23. He opined that adjustment to the new law contributed to higher rejection rates. *Id.* at 4417:17–21.

826.    Statutes enacted by the 88th Texas Legislature are designed to further improve the cure process. HB 315 authorizes election officials to access a wider range of contact information for voters, allowing them to contact a larger share of voters to inform them of defective ballots and to cure them. *See* Act of May 24, 2023, 88th Leg. R.S., HB 315, Section 1.

92. From the same Legislature, SB 975 amends state law to require that personal identification certificates (a form of personal ID that is an alternative to a Texas drivers license) be issued with an accompanying notification that the recipient should update their voter registration to reflect their new form of ID. Should the recipient do so, their new form of ID will be reflected in their registration, eliminating one source of defective ballots. *See* Act of May 22, 2023, 88th Leg. R.S., SB 975, Section 1.

93. HB 357, enacted by the 88th Legislature, improves voter access to the State's Ballot Tracker. These statutes change the information required to access the Ballot Tracker from a voter's registration address to their date of birth. On the premise that a larger share of voters remember their birth date than the address they used to register, this will allow more voters to

utilize the tracker to pursue corrective actions for any defects. *See* Act of May 29, 2023, 88th Leg. R.S., HB 357, Section 2.

94.     Finally, the 88th Legislature passed SB 1599 into law expanding the range of corrective actions that voters can take using the Ballot Tracker. Act of May 22, 2023, 88th Leg. R.S., SB 1599, Section 5.

827.     From the same Legislature, SB 975 amends state law to require that personal identification certificates (a form of personal ID that is an alternative to a Texas drivers license) be issued with an accompanying notification that the recipient should update their voter registration to reflect their new form of ID. Should the recipient do so, their new form of ID will be reflected in their registration, eliminating one source of defective ballots. *See* Act of May 22, 2023, 88th Leg. R.S., S.B. 975, § 1.

828.     HB 357, enacted by the 88th Legislature, improves voter access to the State's Ballot Tracker. These statutes change the information required to access the Ballot Tracker from a voter's registration address to their date of birth. On the premise that a larger share of voters remember their birth date than the address they used to register, this will allow more voters to utilize the tracker to pursue corrective actions for any defects. *See* Act of May 29, 2023, 88th Leg. R.S., H.B. 357, § 2.

829.     Finally, the 88th Legislature passed SB 1599 into law expanding the range of corrective actions that voters can take using the Ballot Tracker. Act of May 22, 2023, 88th Leg. R.S., SB 1599, § 5.

### DD.     How many Ballots were Rejected in November 2022?

830.     According to final numbers compiled by the Secretary of State in the November election Texas voters cast 336,349 mail ballots, of which 9,348 were rejected (a 2.7% rejection rate). STATE 115616.

831.     Professor Mark Hoekstra offered extensive commentary on the survey of Nov. 2022 rejection rates conducted by Prof. Eitan Hersh. *See generally*, Mark Hoekstra March 3, 2022 Expert

Report; Mark Hoekstra March 29, 2022 Expert Report. Prof. Hersh's research concluded that out of all ballots cast, including in-person and provisional ballots, in total 18,187 were rejected. Out of these, 13,638 rejections were mail ballots. Hoekstra March 3, 2023 at 12.

832.    According to Prof. Hoekstra's expert testimony, the Hersh survey distinguished mail ballots rejected for SB 1 related reasons and found that 11,430 mail ballots were rejected "due to an identification-related reason." *Id.*

833.    However, Prof. Hoekstra observed that the Hersh survey did not clearly explain that a large proportion of initially rejected mail ballots were cured in time to be counted in the November election.  Hoekstra March 29 at 12 ¶ 24. Prof. Hersh's research did note the number of cured mail ballots, but his simulation ignored the cure process, thereby failing to "assess whether the person fixes the problem using the detailed instructions provided by the county" Hoekstra March 29 at 4. 5,075 mail ballots were cured (or roughly 44% of initial rejections), meaning that Prof. Hersh's final tally of rejected mail ballots comes down to 6,355. Oct. 19, 2023 Tr. at 4752:23–4753:15.

834.    Prof. Hoekstra emphasizes that this final number must be understood as an "upper bound" for measuring the number of mail ballots rejected due only to SB 1's new ID provisions. *See Id.* at 14, 16. This is because the Hersh survey did not distinguish ballots that were submitted without any form of ID at all nor ballots that were actually fraudulent or otherwise illegal. *Id.* Thus, some of the 6,355 could have been rejected under pre-SB 1 voter ID requirements or indeed under any election law that requires voters to verify their identity. *See also* Oct. 19, 2023 Tr. at 4752:23–4754:22.

835.    In the context of the November 2022 general elections, 6,355 is a modest share of total votes cast: Texas voters cast 8,107,475 votes, of which 332,281 were mail-in ballots. This means at most 0.078 percent of total votes were uncounted mail ballots. Hoekstra March 3 at 4.

### EE.        Cause of Rejections Cannot Be Ascertained

836.    However, ballot rejections due to voter ID encompass cases where ballots were cast without any ID, with some but insufficient ID information, with ID information that does not match the individual's voter registration, and with a form of ID not permitted under SB 1. *See* Hoekstra March 3, 2023 Expert Report at 7–8. TEAM data does not differentiate these causes of rejection.

837.    Attempts to trace rejection rates back to SB 1's new ID requirements are ultimately speculative because there is no data that records the number of rejections due to failure to meet any specific requirement. *See* Oct. 19, 2023 Tr. at 4754:5–17.

838.    Thus, while the data records the number of rejected mail ballots thrown out because of incorrect ID, this data does not show the number of mail ballots that SB 1 caused to be rejected. *Id.*

839.    The Election Administration and Voting Survey ("EAVS") collects voting data from states and counties, including rejection figures for mail and in-person ballots. Christina Adkins April 11, 2023, Dep. at 70:14–21. EAVS is sponsored by the federal Election Administration Commission (the "EAC"), and responses to the survey are voluntary. Christina Adkins April 11, 2023, Dep. at 70:19–71:25. In Texas, the EAC sends EAVS to the Texas Secretary of State who in turn passes the survey forms on to individual counties. County responses are "all self-reported data." Christina Adkins April 11, 2023, Dep. at 71:20–21. County responses to EAVS are not verified nor scrutinized by either Texas SoS or the EAC. Christina Adkins April 11, 2023, Dep. at 73:13–25. As a result, election officials expressed doubts about the accuracy of these responses. *Id.* at 73:21–74:3 ("we have seen things in the past where we think counties have misreported data").

840.    Furthermore, the most recent EAVS (that had been published prior to the commencement of this action) was conducted in 2020 during the height of the COVID-19 pandemic. Several elections officials remarked on voting irregularities they observed during the 2020 election. *See, e.g.*, Oct. 18, 2023 Tr. at 4588:11–20 (Christina Adkins commenting on ad hoc changes to vote tabulation at Travis county polling stations.

841.     In addition to these worries over EAVS's accuracy, a separate set of concerns stem from improvements SB 1 made to data collection. SB 1 indirectly requires counties to collect more data in order to implement the law's cure process. *See* Tex. Elec. Code §§ 87.0271(a), 87.0411(a). Likewise, HB 1372's creation of the Ballot Tracker also places legal obligations on county election officials to collect more voter information than they had to previously. Tex. Elec. Code § 86.01. Finally, this data is collected and recorded in the TEAM database. *See* Oct. 18, 2023 Tr. at 4491:24–4492:11.

842.     Because of these new record keeping requirements, the quality of postSB 1 election data may have improved to the extent that pre- and postSB 1 data are not readily comparable. *See* Oct. 19, 2023 Tr. at 4800:4–4801:4.

843.     Given this qualitative difference, EAVS results are not readily comparable with post-SB1 figures; combining EAVS and post-SB 1 data in order to estimate a trend for rejection rates could produce inaccurate results. *See* Hoekstra April 5, 2023, Expert Report at 4, 8–9.

844.     Comparing EAVS data for the 2020 election with data collected by counties during the 2022 election, Dr. Hoekstra observed that ballot rejections for non-SB 1 reasons were 2.7 to 2.8 times higher in Dallas County and Harris County in 2022. *See* Hoekstra April 5, 2023, Expert Report at 4, 8–9. Since there is no clear reason for this increase, "something is clearly wrong with the underlying data, the comparison, or both." *Id.* at 9.

## XII.   Expert Witnesses

### A. Dr. Mark Hoekstra

845.     Dr. Mark Hoekstra is a qualified expert on statistics, methodology, and causal inferences. Oct. 19, 2023 Tr. at 4678:11–12.

846.     The expert opinion and testimony of Dr. Christian Grose in this case that the Texas legislators who voted in support of SB 1 showed intent to discriminate against Latinos and other people of color was invalid and unreliable. Oct. 19, 2023 Tr. at 4684:18–21.

847.    The "randomized audit study" on which Dr. Christian Grose based his opinion had the following design flaws:

   a.   The Texas legislators to whom emails were sent in the study may not actually have seen the emails or have been the persons who responded to the emails. Oct. 19, 2023 Tr. at 4685:4–4686:7.

   b.   The Texas legislators to whom emails were sent may not have identified the senders as their constituents, and the emails did not identify the senders as constituents of the addressees. *Id.* at 4685:20–4686:7.

   c.   Introducing multiple languages into the study (Spanish and English) was a confounder, and differential responses or non-responses by Texas legislators may have been the result of language differences rather than bias. *Id.* at 4686:8–4687:1.

   d.   Spanish language is not a valid proxy for intent to discriminate against Latinos. Just because one doesn't speak Spanish does not mean that person has any intent to discriminate against Latinos. *Id.* at 4687:7–18.

   e.   The responses or non-responses of Texas legislators in the study may have been the result of partisanship or perceived partisanship rather than bias. *Id.* at 4687–4687:1.

   f.   The study used "Jacob Smith" as a name intended to be identified by the Texas legislator email recipients as "Anglo", but "Smith" is also a common last name for African-Americans in Texas, so an unknown number of Texas legislator email recipients may have identified "Jacob Smith" as African-American or at least other than Anglo. *Id.* at 4688:3–17.

848.    Dr. Christian Grose also made errors in the mathematical interpretation of the results of his "randomized audit study", in that he incorrectly concluded that the differences in response rates for the supporters of SB 1 and the non-supporters of SB 1 were statistically significant. Oct. 19, 2023 Tr. at 4688:18–4689:2.

849.    The differences in the response rates in the "randomized audit study" for supporters of SB 1 and for non-supporters of SB 1 were not statistically significant, meaning that

no valid conclusions could be drawn about one group's "intent to discriminate" as opposed to the other group's "intent to discriminate." Oct. 19, 2023 Tr. at 4689:12–4690:16.

850.    The conclusions of the "randomized audit study" were also invalid and unreliable because it conflated correlation and causation, which are two different things. Even if there were a statistical correlation between email responses or nonresponses in the study and votes on SB 1, that would not be reliable evidence that any racial bias or animus (incorrectly) inferred from the emails was the reason for a Texas legislator's votes on SB 1. *Id*. at 4695:4–16.

851.    Differences in results by race may be, but are not necessarily, evidence of racial bias or intent to discriminate. To reach valid conclusions, one must seriously consider possible alternative reasons for the results observed that do not involve racial animus or bias. Dr. Grose failed to do this in the "randomized audit study". *Id*. at 4695:4–4698:15.

852.    The results of the "randomized audit study" by Dr. Christian Grose have no probative value for assessing the intent to discriminate (or lack thereof) of the Texas legislators who voted for SB 1. *Id*. at 4697:1–4699:3-13.

853.    Dr. Grose also expressed a view that the Texas Legislature in SB 1 "surgically and intentionally targeted" Harris County, Texas, a county with many minority voters, by mandating changes in voting hours, but his assertion was invalid, or at least not proved, for the following reasons:

      a.  Harris County was only one of three Texas counties with populations over 55,000 that were affected by SB 1's change in voting hours. Hunt and Hardin Counties were also affected by those changes. *Id*. at 4700:2–22.

      b.  Harris County includes more minority voters than other Texas counties, but both Hunt and Hardin Counties have a majority of white voters.  *Id*. at 4700:23–13.

      c.  In addition, there were also 21 Texas counties with populations of less than 55,000 that were affected by the SB 1 change in voting hours. Overall, the voters in these 21 counties are less racially diverse than Texas as a whole. *Id*. at 4700:14-4703:15.

854.    To assess whether SB 1 had an adverse effect on voting by Texas minority voters, the most important issue is total voter turnout, not turnout based on mail-in voting or any other single mode of voting, but Dr. Grose failed to examine this issue. The evidence based on overall voting in the November 2022 general election indicates that SB 1 increased Latino or nonwhite voting total turnout. Oct. 19, 2023 Tr. at 4703:16–4705:11.

855.    Dr. Christian Grose asserted in his expert opinion and report that SB 1 caused a reduction in the percentage of Latino or nonwhite voters who voted by mail, but that assertion was based on an unreliable model, failed to properly consider counties with less than 55,000 population, and is not valid or reliable. To reach a valid conclusion, one would have to determine that any observed change in mail-in voting percentages was not caused by factors other than SB 1, and Dr. Grose did not do this or attempt to do so. Oct. 19, 2023 Tr. at 4706:21–4708:3.

856.    Dr. Grose incorrectly compared only the Latino and nonwhite mail-in voting percentages in 2020 to those in 2022, using only those two data points made Dr. Grose's conclusions unreliable. Even so, the percentage differences were not statistically significant. Oct. 19, 2023 Tr. at 4708:17–4709:22, 4711:12–4713:5.

857.    The unreliability of Dr. Grose's conclusions based on comparing the 2020 and 2022 was greatly increased by the fact that the 2020 general election was an outlier election. Among the many reasons 2020 was an atypical outlier lection were the following:

    a.  2020 but not 2022 was a Presidential election year; and

    b.  Texas was in the grip in 2020 of the worst pandemic in a century, the Covid crisis, which made many votes reluctant to vote in person.

Oct. 19, 2023 Tr. at 4715:18, 4717:2-20.

858.    The Texas mail-in voting percentages in 2020 were dramatically greater than in any election before or since, strongly indicating that 2020 was an outlier and that the use of 2020 by Dr. Grose as the baseline for comparison engendered invalid results. Oct. 19, 2023 Tr. at 4718:10–4719:13.

859.    Comparing Texas mail-in voting in 2022 to Texas mail in voting in general elections previous to 2020 shows that Texas mail-in voting increased in 2022 from 2018 and prior years, indicating that SB 1 did not in fact reduce mail-in voting percentages. Oct. 19, 2023 Tr. at 4720:8–18.

860.    Dr. Grose also reached invalid and unreliable conclusion as to the effect of SB 1 on Texas mail-in voting because his analysis included the mathematically invalid process of dividing numbers by zero. Oct. 19, 2023 Tr. at 4709:24–4711:6.

861.    Dr. Grose in his opinions failed to consider or examine properly the issue of substitutability as to mail-in voting. Many voters who engaged in mail-in voting in the pandemic election of 2020 were likely to consider in-person voting a valid substitute for mail-in voting in a more normal election year like 2022. This alone would cause a reduction in mail-in voting from 2020 to 2022 entirely unrelated to SB 1. Oct. 19, 2023 Tr. at 4713:7–4714:12.

862.    The pattern of the graph of Texans voting early in person is similar to the graph of Texans voting by mail. Both have shown a steady but modest increase over many years, interrupted by a dramatic increase in 2020, and then a return to the long-term pattern of modest increases in 2022. This indicates that the decline in mail-in voting between 2020 and 2022 was not due to any provisions of SB 1 relating to mail-in voting, because a similar pattern appears as to early voting in-person. Oct. 19, 2023 Tr. at 4718:10–4719:2.

863.    Nothing in Dr. Grose's expert reports and opinions offers any reliable evidence that the Texas Legislature had any intent to discriminate against Latinos, African-Americans, or any other racial or ethnic group. Oct. 19, 2023 Tr. at 4720:19–4721:3.

864.    Dr. Grose provided no reliable evidence in his reports and opinions that SB 1's mail-in voting identification requirements had any disparate negative effects on mail-in voting in Texas in 2022 as to Latinos, or any other racial or ethnic groups. Oct. 19, 2023 Tr. at 4721:5–13.

865.    Dr. Eric McDaniel's expert reports and opinions as to the effects of SB 1 on absentee voting by African-Americans in Texas were not reliable or valid. Oct. 19, 2023 Tr. at 4722:5–9.

866.    Dr. McDaniel's expert reports and opinions were invalid and unreliable because they were based on data from only the 2020 and 2022 general elections. Oct. 19, 2023 Tr. at 4722:10–20. The 2020 general election was an outlier and an improper baseline for comparison because:

    a.    2020 but not 2022 was a Presidential election year;

    b.    Texas was in the grip in 2020 of the worst pandemic in a century, the Covid crisis, which made many votes reluctant to vote in person;

    c.    2020 was the year of the George Floyd protests and riots;

    d.    the 2020 Presidential election year was especially polarized and hotly contested, and included the first African-American Vice Presidential candidate of a major party;

    e.    Donald Trump was a unique Presidential candidate who generated high turnout in 2020 among both supporters and opponents.

*Id.* at 4723:4–10, 4741:15–4742:9.

867.    A review of similar data for 2018 and earlier years would lead to conclusions inconsistent with Dr. McDaniel's conclusions as to absentee voting by African-Americans in Texas. The data instead indicate that African-Americans in Texas consistently vote absentee at higher rates than white Texans in Presidential election years and at lower rates than white Texans in non-Presidential election years. Dr. McDaniel failed to consider this data in his expert reports and opinions. Oct. 19, 2023 Tr. at 4723:4–4726:7.

868.    This pattern undermines any assertion that a decline in absentee voting by African-Americans in Texas from the Presidential election year of 2020 to the non-Presidential election year of 2022 was caused by any provisions of SB 1. Oct. 19, 2023 Tr. at 4725:24–4726:7.

869.    The data indicate that Hispanic Texans have historically (prior to 2020) been less likely to vote absentee than white Texans, but except for the outlier year of 2020, increased their absentee voting percentages in 2022, after SB 1 was passed. Oct. 19, 2023 Tr. at 4726:8–4727:8.

870. Dr. McDaniel also expressed opinions relating to his analysis of Texas voter waiting times by race. His analysis was not reliable or valid because he compared only 2022 and the outlier year of 2020. Oct. 19, 2023 Tr. at 4727:15–4728:22.

871. In addition, Dr. McDaniel failed to consider that the same voter turnout patterns in Texas that he attributes to the changes in SB 1 occurred nationwide. In fact, voter turnout decreased somewhat less in Texas than nationwide. Since SB 1 only affected Texas, this strongly indicates that the voter turnout patterns that Dr. McDaniel attributes to SB 1 were not attributable to SB 1, but to other factors. Oct. 19, 2023 Tr. at 4728:23–4731:17.

872. There is no reasonable basis to conclude that SB 1 had any adverse effect on overall voting turnout in Texas. Oct. 19, 2023 Tr. at 4732:24–4733:3.

873. There is no reasonable basis to conclude that SB 1 had any adverse effect on early in-person voting turnout in Texas. Oct. 19, 2023 Tr. at 4733:4–6.

874. There is no reasonable basis to conclude that SB 1 had any significant effect on absentee or mail-in voting turnout in Texas. Oct. 19, 2023 Tr. at 4733:7–10.

875. Dr. McDaniel's opinion that Texan Black voters wait to vote longer than Texan White voters on average are not based on any valid or reliable evidence, and that opinion therefore is not reliable or valid. Oct. 19, 2023 Tr. at 4733:24–4734:3.

876. An additional source of doubt as to the reliability and validity of the data on waiting times used by Dr. McDaniel is that it is self-reported survey data. The self-reported survey data did not match data collected in 2016 using actual smartphone data. Oct. 19, 2023 Tr. at 4736:21–4738:11.

877. Dr. McDaniel's assertions as to possible voter intimidation in Texas were not supported by any reliable evidence.  They were based on reports and opinion prior to the 2020 election, and therefore had little or nothing to do with SB 1, which was not enacted until late 2021. Oct. 19, 2023 Tr. at 4739:12–4740:25.

878.    Dr. McDaniel in his reports and opinions provided little or no reliable evidence that SB 1 resulted in any disproportionate negative impacts on Black or Hispanic Texan voters. Oct. 19, 2023 Tr. at 4741:1–7.

879.    Dr. McDaniel's 2023 report included an assertion that Texas counties with larger Black population shares experienced larger declines in voter turnout in 2022, and that this suggested SB 1 had a disproportionate negative impact on Black voters. That opinion was erroneous for the following reasons:

  a.  Like other opinions of Dr. McDaniel, it was based on comparison of only two years, 2020 and 2022, using the outlier year of 2020 as the baseline;

  b.  Dr. McDaniel mistakenly used 2022 as the base year in calculating percentage change in one instance;

  c.  Analysis shows that there was no statistically significant decrease in Black voting by mail and in early voting in the referenced counties from 2020 to 2022;

  d.  The differences in Black voter early voting turnout on which Dr. McDaniel relied were driven almost entirely by results in counties that were not affected by SB 1's changes to early voting hours.

Oct. 19, 2023 Tr. at 4741:15–4747:22.

880.    Based on the analysis of relevant data by both Dr. McDaniel and Dr. Hoekstra, there was no basis to suggest that SB 1 reduced overall turnout or early voter turnout; or caused disproportionately large reductions in overall turnout or early voting turnout among Texas counties with larger Black population shares. Oct. 19, 2023 Tr. at 4747:23–4748:5.

881.    Dr. Mayer's expert opinion and April 5, 2023 report stating that 2,949 voters in Harris, Dallas, and Hidalgo Counties were "disenfranchised" in the 2022 general election by reason of the mail-in voter identification requirements of SB 1 had significant flaws. Oct. 19, 2023 Tr. at 4749:18–4750:1. The following were significant flaws:

882.    Dr. Mayer's report did not make clear whether the 2,949 rejections referred to were only initial rejections or final rejections and whether those rejections included ones that were due to failure to comply with requirements that pre-existed SB 1. Oct. 19, 2023 Tr. at 4750:14–4751:9.

883.     Plaintiff expert Eitan Hersh made the calculation that a total of 6,355 voters statewide had their mail-in ballots rejected in the 2022 general election because of SB 1's requirements. But Dr. Hersh made clear what causes for mail-in ballot rejection he did and didn't count, and his number is more likely than Dr. Mayer's to be accurate because only Dr. Hersh had access to the Texas TEAMS database. Therefore, 6,355 out of a total of about 8.1 million votes cast is the maximum number of votes rejected in the November 2022 general election in Texas because of the SB 1 mail-in voter identification requirements. Oct. 19, 2023 Tr. at 4751:10–4754:4.

884.     The 6,355 votes statewide is the maximum numbers, but an unknown number of those votes may have been properly rejected because they were fraudulent or otherwise illegal. So it is impossible to know if the number of legitimate votes reject was zero, 6,355, or somewhere in between. Oct. 19, 2023 Tr. at 4754:5–17.

885.     Dr. Mayer's data indicates that in 2022 2.7 times as many mail-in ballots were rejected than in 2020 for reasons not related to SB 1. This unexplained result clearly indicates that there are flaws in Dr. Mayer's data or the design of his study. Oct. 19, 2023 Tr. at 4755:5–4757:19.

886.     Dr. Mayer did not take into account in his report and opinions that any brand-new voting law requirements involve a learning curve and that mail-in ballot rejection rates will naturally diminish over time. Oct. 19, 2023 Tr. at 4758:10.

887.     It is likely that mail-in ballot rejection rates in Texas will decline going forward as compared to the rejection rates in November 2022. Oct. 19, 2023 Tr. at 4758:11–4759:5.

888.     Dr. Mayer's report and opinions state there was no legitimate justification SB 1's mail-in voter identification requirements because there were relatively few prosecutions and convictions for mail-in vote fraud. This is an unfounded conclusion for several reasons:

889.     Dr. Mayer in his opinion and report asserts that the mail-in voter identification requirements of SB 1 disproportionately affect minority voters. But Dr. Mayer's assertion was incorrect for the following reasons:

     a.   Absence of evidence is not the same as evidence of absence;

    b.  Vote fraud is a crime in which there usually is not a direct, identifiable victim. It is also a hard-to-detect crime, and successful vote frauds may never be detected, much less prosecuted. For these reasons, the number of prosecutions or convictions likely underestimates substantially the actual incidence of voter fraud.

    c.  There is evidence that in 2016 over a third of the American public believes there is a great deal of election fraud in the United States. There also is evidence that in 2020 about 15 % of registered voters believed that mail-in ballot impersonation was very common, and another 15 % believed that there was occasional mail-in ballot impersonation.

Oct. 19, 2023 Tr. at 4769:12–4765:4.

890.    Dr. Mayer in his opinion and expert report asserts that the mail-in voter identification requirements of SB 1 disproportionately affect minority voters. But Dr. Mayer's assertion was incorrect for the following reasons:

    a.  Dr. Mayer computed disparate impact incorrectly by looking only at the subset of people who voted by mail.

    b.  Dr. Mayer in his analysis could not reliably determine which voters were actually of various races, because Texas does not identify voters by race or ethnicity. He had to use a statistical method or algorithm to "predict" race, and there is a substantial amount of error in those predictions, leading to sizable "false positives" (where the algorithm incorrectly predicts that a voter is of one race, for example Black, but the voter is not actually Black) and "false negatives" (where the algorithm predicts that a voter is not of one race, for example Black, but the voter actually is Black. The percentage of errors from use of the algorithm that Dr, Mayer used is particularly high for Black voters, because Black surnames are less distinguishable from those of other races or ethnicities.

    c.  Additional shortcomings in Dr. Mayer's use of his algorithm is that it was calculated not using Texas alone, but also several other states, increasing the error rates. As a result, Dr. May produced no reliable results using the algorithm he used to predict races and ethnicities of voters using census tract data and surname data.

    d.  Based on proper analysis of voter data for the 2022 general election in Harris County, the most populous county in Texas, there was no disparate impact of SB 1's voter identification requirements against predicted Hispanics or predicted Asian voters, and the predicted Black mail-in vote stayed about the same.

    e.  Dr. Mayer also failed to consider substitutability in his expert report and opinions. For some mail-in voters, casting an in-person vote either early or on Election Day is equally convenient and 100% substitutable. For other mail-in voters, casting an

in-person vote is difficult and therefore not an easy substitute. Dr. Mayer did not deal with this issue at all, and therefore his report gives no useful data on the level of burden any difficulty in mail-in voting places on the voter's ability to cast a valid vote in an election.

    f.   A study based on data from Texas and Indiana indicates that the ability to vote by mail had little effect on total voter turnout.

Oct. 19, 2023 Tr. at 4765:7–4779:1.

891.    Dr. Mayer also stated in his report and opinions that the elimination of drive-through voting by SB 1 had disproportional adverse effects on non-white voters. This statement was incorrect for the following reasons:

    a.   Those voters who used drive-through voting in 2020 were more likely, rather than less likely to vote in the 2022 election than those in the same county who did not vote by drive-through voting in 2022.

    b.   Dr. Mayer incorrectly calculated adverse impact. In addition to flaws discussed above, Dr. Mayer improperly used a Chi-square test statistical test. When properly calculated, the data shows there was no evidence of adverse impact from SB 1's elimination of drive-through voting on any predicted racial or ethnic group. Indeed, the same pattern Dr. Mayer demonstrated with respect to drive-through voters was also present with respect to non-drive-through voters.

Oct. 19, 2023 Tr. at 4779:2–4781:19.

892.    Examination of data from Dallas County voting in the 2022 general elections confirms that, like in Harris County, the statistical uncertainty caused by predicting races and ethnicities of voters (absent actual data on race and ethnicity) renders Dr. Mayer's conclusions unreliable and invalid. Oct. 19, 2023 Tr. at 4781:25–4782:25.

## B. Plaintiffs' Experts

### 1. Dr. Christian Grose

893.    Dr. Grose used data from a "randomized audit" conducted in 2020 before SB 1 was enacted. Oct. 5th, 2023 Tr. at 3034:19–22. In fact, the study began when the legislature was not even in session. *Id.* at 3034:19–25.

894.    In the study, legislators received messages with similar content from Latino-sounding and non-Hispanic white-sounding correspondents asking for information on SB 1. Christian Grose February 28, 2022, Expert Report at 9. "Half of the emails in Spanish were also purportedly from Santiago Rodriguez and half were purported to be from Jacob Smith[.]" Oct. 5, 2023 Tr. at 3039:11–18.

895.    There was nothing in the emails that would permit the legislators to determine whether the sender lived in their district. Oct. 5, 2023 Tr. at 3046:10–14. Dr. Grose conducted no follow up to determine whether legislators—as opposed to staff or other personnel—actually read the e-mails sent as part of the study. *Id.* at 14–19. Dr. Grose did not present evidence that the legislators received the messages or that the legislators were in charge of responding to the messages. Grose February 28, 2022, Expert Report at 10–11. Nevertheless, Dr. Grose attributed any response, or lack thereof, to the legislator addressed in the e-mail. *Id.* at 3048:3–8.

896.    To measure whether there was discriminatory intent, Dr. Grose compared whether legislators who supported SB 1 were more likely to send a "discriminatory response" compared to those who did not support SB 1. Grose February 28, 2022, Expert Report at 10. Dr. Grose defined a "discriminatory response" as a response that was evasive or unhelpful. Dr. Grose labeled responses asking follow-up questions as "unhelpful." *Id.* at p. 10. A response such as "call, me, I want to help you," or, "are you a citizen," would be coded as an unhelpful discriminatory response. Oct. 5, 2023 Tr. 3049:15–3051:2. Dr. Grose did not consider the fact SB 1 was passed almost entirely on party lines. *Id.* 3057:4–9.

897.    Dr. Grose does not know whether he sent Spanish-language e-mail to many legislators who likely have relatively few Latinos in their districts. *Id.* 3061:2-7. Meanwhile, Dr. Grose admits that "[he doesn't] know how many legislators speak Spanish in Texas." *Id.* 3061:8-10. The study did not adequately take into account which legislators speak Spanish. Grose February 28, 2022, Expert Report at 10–11.

Q: "[d]id you give any consideration to whether the individual legislators to whom the emails were sent likely had different language capabilities?

266

A: I mean, we considered everything like we have talked about before, in the sense that that would be controlled for through the randomization and in Texas we didn't think that it was significant because so much in Texas is done in Spanish. People speak in Spanish. The— you know government websites are in Spanish. So we talked about it and we did consider it, but I think the way we considered it was that it's not something we would be super concerned about."

Oct. 5, 2023 Tr. at 3058:12–24.

898.    Dr. Grose concluded that ban on 24-hour early voting was intended to discriminate against voters of color. Grose February 28, 2022, Expert Report at 3.

899.    Dr. Grose looked only at the voting rules in large counties (counties with more than 55,000 people) because Harris County is a large county. *Id.* at pp. 13, 16.

900.    Because Harris County was the only large county that had 24-hour voting in 2020, Harris County had to reduce its voting hours more than the other large counties. *Id.* at p. 16; Christian Grose April 25, 2022 Rebuttal Report (HAUL-MFV Ex. 350) at 20.

901.    Additionally, Dr. Grose observed that more people voted when Harris County had 24-hour voting, than when it did not have 24-hour voting. Grose February 28, 2022, Expert Report at 16.

902.    Since Harris County has a larger minority population than other large counties, Dr. Grose found that more minorities voted when 24-hour voting was available and less voted when 24-hour voting was not available. *Id.* at pp. 16–17.

903.    Dr. Grose did not address whether other factors could have impacted the legislature's decision to ban 24-hour voting. Grose April 25, 2022 Rebuttal Report (HAUL-MFV Ex. 350) at 19–21. Dr. Grose concluded that the legislators who supported SB 1 had discriminatory intent against Latino voters. Grose February 28, 2022, Expert Report at 17. Dr. Grose concluded the requirement that early voting polls not open before 9am on Sunday was intended to discriminate against voters of color. *Id.* at 3. To come to this conclusion, Grose conducted analyzed only Texas counties with a 2020 census population greater than 55,000. *Id.* at 4.

904.    Dr. Grose observed that when counties had more early voting sites *and* had them open outside 9am to 10pm on Sundays and outside 6am to 10pm Monday through Saturday, more people voted. *Id.* at 14–16.

905.    In concluding that SB 1 "surgically and intentionally" chose the hours of 6am to 10pm on Mondays through Saturday and 9am to 10pm on Sundays to target very specific racial and ethnic geographies for voting restrictions, Dr. Grose did not consider the size of Harris County's White voter population. Oct. 5, 2023 Tr. at 3064:15–17.

### 2. Dr. Douglas Kruse

906.    Dr. Kruse finalized his report in February 2022, prior to the first election under SB 1. Oct. 12, 2023 Tr. at 3784:1–9. He agrees his report and opinions in this case reflect zero actual experience with SB 1 in any Texas elections. *Id.* at 3784:10–14. Dr. Kruse has not analyzed whether the predictions in his report have come true in practice. *Id.* at 3785:14–20. He cannot identify a single voter prevented from voting by SB 1. *Id.* at 3785:21–25. Nor can he identify a single Texas voter who has experienced an increased burden in voting because of any provision in SB 1. *Id.* at 3786:1–5. Dr. Kruse cannot identify any Texas voters who requested reasonable accommodations based on their disabilities by reason of any provision of SB 1, much less any voters who had such requests denied. *Id.* at 3786:9–19.

907.    Dr. Kruse found that the majority of voters with disabilities do not have significant difficulties voting. Oct. 12, 2023 Tr. at 3789:6–9. In fact, 82 percent of voters with disabilities reported having no difficulty in voting in a polling place. *Id.* at 3789:10-15. Moreover, the percentage of voters with disabilities who reported difficulties voting in polling places decline significantly from 2012 to 2020. *Id.* at 3789:16–24. Texas-specific data for such difficulties are not available. *Id.* at 3791:23–3792:10.

908.    Dr. Kruse identifies various barriers voters with disabilities encounter in the voting process, but all of those barriers pre-date SB 1. Oct. 12, 2023 Tr. at 3797:3–9. His finding that voters with disabilities are 5.1 or 5.2 percent less likely to vote than voters without disabilities was based

exclusively on the 2020 General Election in which the pandemic made it much more dangerous for people with disabilities to vote. *Id*. at 3797:25–3798:22, 3799:16–23.

909.     At the time Dr. Kruse's prediction about the effects of Section 5 of SB 1, he did not know SB 1 created a cure process for rejected ABBMs and mail-in ballots; he learned of the process at his deposition. Oct. 12, 2023 Tr. at 3803:11–16.

910.     Dr. Kruse has no data regarding whether, or to what extent, any assistors in Texas actually declined to assist voters with disabilities due to SB 1. Oct. 12, 2023 Tr. at 3805:10–13. Likewise, Dr. Kruse has no data on whether voters with disabilities have had difficulty locating assistors due to SB 1. *Id*. at 3805:14–17.

### 3.     Dr. Morgan Kousser

911.     According to Dr. Kousser, in 2001, mail ballot forgeries led a state district judge to void the result of a Dallas city council race. Oct. 5, 2023 Tr. at 2873:9–12. The scheme involved absentee ballot, and voters claimed they never sought absentee ballots but it appeared someone had applied for them using identical handwriting. *Id*. at 2873:13–18. The scheme was limited to a local, low-turnout election that is more susceptible to having its results altered due to manipulation of relatively few ballots. *Id*. at 2873:22–2874:4.

912.     Dr. Kousser also testified that in 2017, another absentee ballot scandal erupted in Texas. Oct. 5, 2023 Tr. at 2874:22–24. This scheme involved a pair of west Dallas city council races where a man applied for numerous ballots by mail on behalf of senior citizens. *Id*. at 2875:8–10.

913.     Dr. Kousser unabashedly testified that, in his view, correlation often implies causation. Oct. 5, 2023 Tr. at 2878:23–2879:11. He also refuses to interview legislators as part of his analysis of legislative intent. *Id*. at 2885:23–2886:5. He claims to be concerned that the legislators might be more concerned with winning ongoing litigation, than with telling the truth. *Id*. at 2885:23–2886:14. Although he acknowledges legislators have a similar incentive when making their political case to reporters and to the public, he nevertheless cites to news stories based on legislator interviews (Representatives Collier and Canales, *id*. at 2885:18–22) and to tweets by

legislators (e.g., Representative Jessica Gonzalez). *Id*. at 2884:21–2885:22, 2887:1–3. Dr. Kousser did not review the depositions of Representatives Collier or Canales in researching his report. *Id*. at 2885:21–24. Similarly, although Dr. Kousser cites to a letter sent by 36 Houston Democrats to Speaker Phelan where legislators are making their case and criticizing legislative procedure in the build-up to SB 1's passage, he spoke to none of the letter's legislator signatories. *Id*. at 2888:11–12.

914.    Dr. Kousser takes some legislators—such as Representatives Collier, Canales, and Gonzalez, as well as the 36 Democratic signatories to the letter referenced above—but not others. Dr. Kousser describes a colloquy where Democratic Senator Alvarado accuses Republican Senator and SB 1 sponsor Hughes of targeting minorities. Oct. 5, 2023 Tr. at 2889:4–13. Senator Hughes denies the accusation. *Id*. at 2889:14–15. Dr. Kousser concludes that Senator Hughes' denial of racial targeting actually reaffirms racial and partisan motives. *Id*. at 2882:16–2883:10.

915.    Dr. Kousser testified that a University of Texas poll showed that 46 percent of Republicans favored stricter voting laws in Texas immediately following the 2020 General Election. *Id*. at 2877:19-2879:5.

916.    Dr. Kousser acknowledged that SB 1 was the latest iteration of a variety of voting laws that were debated in the 2021 Texas Legislature. *Id*. at 2879:23-2880:7. Some of the provisions debated during that time evolved, while others did not make it into the final legislation of SB 1. *Id*. at 2880:8-2881:10. Dr. Kousser concedes that what he called the "most egregious provisions" did not pass. *Id*. at 2881:11-15.

917.    Dr. Kousser agrees that several members of the Texas House Democratic delegation broke quorum twice in 2021, once flying to Washington, D.C., with the express purpose of stopping the Texas legislative process. *Id*. at 2890:11-21. At least in part because of the resulting delay, SB 1 did not pass until the end of August. *Id*. at 2890:22-24. Texas legislative procedure meant that SB 1 could not take effect until 90 days after gubernatorial signature. *Id*. at 2890:25-2891:3. As a result, SB 1 did not take effect until immediately before the March 2022 primary. *Id*. at 2891:4-6 (corrected to "March" from "May").

918.    Dr. Kousser criticizes other instances of what he describes as procedural irregularities, but acknowledges, for instance, that he does not know how many times late-night legislative hearings pause for a moment to change the legislative day. *Id.* at 2891:7-17. He further acknowledges that the 2021 legislative session occurred during the pandemic. *Id.* at 2891:18-20. Although he calls Governor Abbott's use of the line-item veto to on the salaries of certain staffers an irregularity, he acknowledges Governor Abbott pledge similar action in the 2023 legislative session regarding education reform. *Id.* at 2892:7-14. He criticizes Republican Speaker Dade Phelan for banning use of the terms "racist" and "racism during the SB 1 (and related) debates, but acknowledges that Speaker Phelan works so closely with Democrats that it has brought political criticism from within his own party. *Id.* at 2892:15-2893:2.

919.    Dr. Kousser claims his analysis requires looking at the bill as a whole. *Id.* at 2893:15-17. But he admits he only focused on the challenged provisions in SB 1. *Id.* at 2894: 5-13. He concedes that expanding curbside voting to pregnant women is not discriminatory. *Id.* at 2894:15-18.

920.    Although Dr. Kousser assumes that SB 1 likely disadvantages minority voters because it was passed by a white-majority party and over opposition from ethnic or linguistic minorities, he concedes that legislators do not act solely on personal racial interest—or even, necessarily, on the putative racial interests of their constituents. *Id.* at 2896:12-2897:8. In a similar about-face, Dr. Kousser argues that SB 1 disproportionately (and negatively) affects black and Latino voters because they are less likely to have driver license numbers for absentee ballots, but concedes that—based on the same metric—expanding drive-through voting would disproportionately (and negatively) affect black and Latino voters. *Id.* at 2897:15-2898:7. In yet another reversal, Dr. Kousser criticizes SB 1's straight-ticket-voting provision for closing a putative loophole for use of certain technology that allowed straight-ticket voting; however, he concedes that he does not know whether any such loophole technology has ever been used in Texas. *Id.* at 2898:8-25.

921.    In another contradiction, Dr. Kousser criticizes SB 1's expansion of rights to workers to take two hours off work to vote during early voting as being too narrow—and thus, he argues, discriminatory due to lower work flexibility among minorities. *Id.* at 2899:3-15. Despite his criticism that SB 1 did not go far enough to address worker flexibility, Dr. Kousser was forced to concede that the opportunity to leave work to vote did not apply to early voting prior to SB 1. *Id.* at 2899:16-21.

922.    Dr. Kousser brazenly misrepresented the contents of SB 3, an education reform bill also passed in the 2021 Texas legislative session. *Id.* at 2866:4-2867:2. He alleged that bill did not require teaching such topics in public schools as the history of white supremacy and the Ku Klux Klan, Martin Luther King, Cesar Chavez, Susan B. Anthony, or Dr. King's Letter from Birmingham Jail. *Id.* In fact, SB 3 made it unlawful to remove each of these important historical topics—and many others describing both the racial sins and progress of Texas and the nation—from public school curricula in Texas. *See* Update to Instructional Requirements and Prohibitions, 87th Leg., 2d C.S., Section (6) ("the contributions of Frederick Douglass"), (7)-(10), (11) ("the history of white supremacy, including the institution of slavery, the eugenics movement, and the Ku Klux Klan, and the ways in which it is morally wrong"), (12) (esp. Section 9(12)(A), prohibiting removing, *inter alia*, Letter from Birmingham Jail from Texas public school curricula), and (13)-(16); *see also* Oct. 6, 2023 Tr. at 3155:21-3156:11 (Court taking judicial notice of SB 3).

923.    Dr. Kousser describes what he calls a "multiplicative effect" where multiple potentially discriminatory provisions pass at once, or in the same bill. *Id.* at 2893:11-14. He concedes that any multiplicative effect wanes as the number of putatively-discriminatory provisions shrink. *Id.* at 2895:7-19. As a corollary, the importance of nondiscriminatory provisions waxes as the number of putatively-discriminatory provisions reduces. *Id.* at 2894:20-2896:2.

924.    Dr. Kousser found no forthright admission of racial motives by proponents of SB 1. *Id.* at 2903:15-17. So, Dr. Kousser alleged that denials of racial animus are evidence of racial motives. *Id.* at 2903:18-24. Thus, in Dr. Kousser's analysis, both admissions and denials of racial animus evidence racial animus; Dr. Kousser sought to temper this damned-if-you-do/damned-if-

you-don't analysis by arguing that "over-the-top" denials "may be a part of the general evidence that one might consider about whether there is racial animus." *Id.* at 2905:10-16. However, he acknowledged that accusations of racism are insulting, and that silence may imply assent. *Id.* at 2905:17-2906:6.

925.    Dr. Kousser theorized that disproportionately high COVID infection rates among minorities may have incentivized them to vote via drive-through voting or via mail-in ballot but acknowledged that his data regarding infections did not show whether that putative incentive would last beyond November 2020. *Id.* at 2883:16-2884:5.

926.    Dr. Kousser did not speak to county elections officials and has no specific evidence on the cost of hiring poll workers and watchers for 24-hour voting; nevertheless, he argues that it would not be difficult to recruit poll workers or watchers for 24-hour voting. *Id.* at 2907:18-2908-11.

927.    Dr. Kousser argues that Confederate monuments "still stand tall" in Texas, suggesting those monuments somehow evidence racial animus by the Legislature. *Id.* at 2909:17-21. But he concedes that slaveowner Thomas Jefferson has a Lincoln-Memorial-sized statue in Washington, D.C., and seemed only vaguely aware that state agency The University of Texas at Austin removed several statues of Confederate figures from prominent public places. *Id.* at 2910:3-13. He also professed no knowledge as to how many public schools statewide had been renamed due to a prior affiliation with historical Confederate figures. *Id.* at 2910:14-16.

### 4.    Dr. Allan Lichtman

928.    Dr. Lichtman admits partisan motivations are easily mistakeable for racial motivations. Oct. 6, 2023 Tr. at 3149:2-6. He also largely agrees that, because immigration to the United States has not been majority non-Hispanic white for a long time, to enforce illegal entry laws at all in this country is discriminatory. *Id.* at 3160: 21-3161:2.

929.    Although Dr. Lichtman argues that Texas' felon disenfranchisement statute evidences racial animus by the Texas legislature in passing SB 1 because incarceration statistics skew towards minorities in Texas. *Id.* at 3162:3-10. But he was forced to admit that incarceration

273

statistics skew towards minorities across the country, and Texas is one of 24 states with a felon disenfranchisement statute. *Id.* at 3162:11-18.

930.    Although he argued that Texas housing policy is discriminatory because of the correlation between minorities and low income, Dr. Lichtman was completely unaware of Texas gubernatorial orders and Texas Supreme Court programs providing rent relief during the pandemic. *Id.* at 3163:1-3164:5. He also bizarrely worries about Republican efforts to recruit putatively racist poll watchers in Harris County, which is the most diverse county in the state and heavily Democratic. *Id.* at 3164:6-3165:10. He admitted there is no law preventing Democrats from recruiting large numbers of diverse poll watchers in Harris County. *Id.* at 3165:11-13.

931.    Dr. Lichtman saw no evidence to support Dean Tolson's suggestion that a minority poll watcher may discriminate against members of her own race. *Id.* at 3166:22-3167:5.

932.    Dr. Lichtman acknowledges the partisan shift on mail-in voting, citing the 2007 remarks by Democratic Representative Anchia, a Hispanic politician, vilifying mail-in voting as "a glaring weakness" at a time when it was largely used by white Republican voters. *Id.* at 3167:24-3168:11. He proved recalcitrant to considering non-racial explanations for policy positions and ultimately admitted he had not considered other influences on politics, such as religious and class affiliation among political parties. *Id.* at 3172:13-3173:19.

933.    With respect to voter registration purges, while he criticizes what he characterizes as a "flawed effort," Dr. Lichtman concedes that SB 1's voter registration provisions codify a settlement agreement stemming from 2019 litigation over a proposed voter registration purge reached between the Texas Secretary of State and private plaintiffs. *Id.* at 3168:17-3169:4.

934.    Dr. Lichtman agrees that modern Texas voting laws are not the same as they were during the Jim Crow era and acknowledged that statements to the contrary by then-Harris County Election Administrator Isabel Longoria before the Texas Legislature were political hyperbole. *Id.* at 3177:14-22.

935.    Dr. Lichtman adopts a double standard similar to Dr. Kousser's, where admissions and denials of racial animus are equally understood as evidence of racial animus. Dr. Lichtman

refers to a quote from Senator Hall during the debates leading up to SB 1's passage, where the Senator references a time in Texas history when voting laws applied only to a single race. *Id.* at 3181:20-23. Dr. Lichtman contradictorily cites the following quote from Senator Hall as evidence of racial animus:

> We had that at one time. We got rid of it. It was wrong then, when it was there. We got rid of it. And today, what we are trying to do, and I think Senator Hughes, with this bill, is make equal opportunity for all people equally. Not set it up to favor one over the other, but I thank you for your testimony.

936.    Dr. Lichtman also points to a quote from Representative Briscoe Cain, SB 1 sponsor, who referred to the "purity of the ballot box." *Id.* at 3187:11-15. Dr. Lichtman was unaware that this language is a quote from Article 6, Section 4 of the Texas Constitution, but acknowledged Texas' 1876 constitution was formulated as a requirement under Reconstruction. *Id.* at 3187:23-3188:19.

### 5.    Dr. Kenneth Mayer

937.    Dr. Mayer was asked to "analyze" four changes to election administration: the requirement that the numbers in absentee ballot return envelopes match the information in the voter files; the prohibition on drive-through voting; the prohibition on 24-hour voting; the expansion of permissible activities by poll watchers. Mayer Initial Report p. 2.

938.    Dr. Mayer agrees that not every instance of voter fraud is detected. Oct. 2, 2023 Tr. at 2030:2-4. He did not examine the public perception of voter fraud in Texas. *Id.* at 2030:10-12.

939.    Dr. Mayer's "calculus of voting" framework is not intended as a mathematical expression. Oct. 2, 2023 Tr. at 2030:15-2031:2. Its variables are measured from the perspective of the individual voter. *Id.* at 2031:9-11. According to the framework, and increase in the variable 'D,' the nonmaterial benefits of voting, could have the effect of increasing the likelihood of whether someone votes. *Id.* at 2032:2-6. Dr. Mayer does not consider SB 1, or its provisions, increased the D value for any voter. *Id.* at 2032:19-22.

940.    According to Dr. Mayer's framework, the variable 'C,' the cost of voting for an individual voter, can change over time. *Id*. at 2032:23-25. As individuals become more experienced with voting requirements, the cost of complying with those requirements can decrease. *Id*. at 2033:6-9. Dr. Mayer agrees there may be a similar learning curve for voters acclimating to SB 1. *Id*. at 2033:10-12.

941.    In Dr. Mayer's use of BISG data to estimate voters' race relied entirely on Dr. Collingwood, a designated expert whom Plaintiffs did not call as a witness. *Id*. at 2035:7-16. There are two kinds of error rates for BISG: false positives and false negatives. *Id*. at 2035:21-2036:9. Although Dr. Mayer testified that the BISG error rate was approximately 16-17 percent, he acknowledged that scholarly literature showed the error rates were closer to 22.7 percent. *Id*. 2036:14-2037:11. Dr. Mayer dismissed this error rate, saying "it doesn't matter." *Id*. at 2037:5-11.

942.    Dr. Mayer also relied on EAV data, but concedes that data—self-reported by the counties—has no mechanism to verify its rejection rates or numbers, and no penalty to the county if the numbers are incorrect. *Id*. at 2038:23-2039:10.

943.    Dr. Mayer found that "[t]here were more White voters after 6:30 p.m. than voters of any other race[.]" *Id*. at 2043:13-24. And that more White voters used drive-thru voting than any other race. *Id*. at 2045:11-15. Dr. Mayer did not examine the expense to election officials or taxpayers from offering drive-through voting. *Id*. at 2045:21-2046:1. He also did not control for the Harris County drive-through voting centers being placed in predominantly minority neighborhoods. *Id*. at 2046:15-18.

944.    Dr. Mayer concedes that voting during regular voting hours was more common that voting in the expanded 24-hour voting period. *Id*. at 2047:20-23. He further acknowledges that the 3,462 voters who voted in the expanded 24-hour voting period constituted just 0.28 percent of the Harris County voters who voted in the November 2020 General Election. *Id*. at 2047:7-22.

945.    Dr. Mayer did not conduct any analysis of the effect of poll watcher activities on wait times in any Texas election. *Id*. at 2050-51:24-2. Despite claiming a risk that poll watchers after SB 1 would raise more objections regarding minority voters than with white voters, Dr. Mayer

concedes he is not aware of any evidence of Texas poll watchers raising more objections against minority voters following the passage of SB 1. *Id.* at 2049:17-24. He is also unaware of any such evidence in the 2022 General Election. *Id.* at 2050:3-5. Indeed, Dr. Mayer has conducted no analysis of poll watcher objections or objection rates for any election in Texas. *Id.* at 2050:6-9.

946.    Similarly, despite predicting a risk of increased voter wait times due to poll watchers, Dr. Mayer admits he's unaware of any evidence of any poll watcher activities increasing wait times in Texas since SB 1 was enacted. *Id.* at 2050:10-17. In fact, his prediction notwithstanding, Dr. Mayer has conducted no analysis of the effect of poll watcher activities on wait times in any Texas election. *Id.* at 2050:24-2051:2.

947.    Dr. Mayer admits that his portion of the analysis regarding wait times at individual polling places relies upon assumptions such as a certain number of voting machines and check-in stations at each polling place. *Id.* at 2051:18-25.

948.    In his Supplemental Report (LULAC Exh. 3) Dr. Mayer evaluated the rate at which Harris County mail-in ballots were rejected due to a failure of the voter to provide required identification information in the 2022 Primary Election. *Id.* at 2056:9-11. His data showed that non-Hispanic white ballots were rejected for this reason at a rate of 17.1 percent, while African American ballots were rejected for this reason at a rate of just 22 percent—a difference of just 4.9 percent. *Id.* at 2056:19-2057:5. Nevertheless, Dr. Mayer's conclusion attempts to hide this simple, mathematical truth by presenting the data "proportionally"—where he divides the non-Hispanic white and African American rejection rates—and calculates at 28.6 percent difference. *Id.* at 2057:6-15. The raw data show that 3,967 of the 6,614 Harris County ballots rejected due to a lack of required identification information—or some 60%--were cast by white voters. *Id.* at 2057:20-2058:9. Indeed, more mail-in ballots submitted by non-Hispanic white voters were rejected for this reason in Harris County than by voters of all other races combined. *Id.* at 2058:10-14. Dr. Mayer further admits that non-Hispanic white voters are more likely to mail absentee ballots than all other races combined. *Id.*

949.     The statistics in Tarrant County were similar. There, non-Hispanic white voters submitted 466 out of 773 total mail-in ballots rejected for failing to provide required identification information; again, some 60 percent, and more than all other races combined. *Id.* at 2058:20-2059:10. Dr. Mayer further admits that non-Hispanic white voters submitted some 80 percent of mailed absentee votes in Tarrant County. *Id.*

950.     In his next (LULAC Exh. 4) Dr. Mayer also evaluated SB 1 mail ballot rejection rates in Harris County, Dallas County, and Hidalgo County; he concedes these counties are not representative of all Texas counties. *Id.* at 2060:7-17. In each of those counties, over 95 percent of mail-in ballots were accepted in the 2022 General Election. *Id.* at 2060:18-21. Dr. Mayer argues that the overall rejection rate rose from 2020 to 2022; however, importantly, the nonSB 1 rejection rate went up between 2020 and 2022. *Id.* at 2061:10-13, 2060: 22-24. Moreover, a change in Texas law changed the tracking process for absentee ballots between 2020 and 2022. *Id.* at 2060:25-2061:3. Dr. Mayer concedes that the rejection rate went down from the 2022 Primary Election to the 2022 General Election. *Id.* at 17-20.

951.     Dr. Mayer also attempted a disparate impact analysis on mail-in voters in Harris County and Dallas County in the 2022 General Election. *Id.* at 2063:18-21. That analysis showed that non-Hispanic white voters submitted 49.3 percent of SB 1 rejected mail-in ballots in Harris County—a plurality of such ballots. *Id.* at 2065:14-17, 2066:1-3. Again, the results were similar in Dallas County, where 57.5 percent of rejected mail-in ballots were submitted by non-Hispanic white voters. *Id.* at 2066:22-2067:10.

952.     Dr. Hoekstra critiqued Dr. Mayer's analysis of Calhoun County, which sought to show a disparate impact resulting from the elimination of drive-through voting. *Id.* at 2067:21-2068:7. Dr. Hoekstra ran his own analyses and concluded, "there's no evidence that the elimination of drive-through voting had any adverse effect at all on those who used drive-through voting in 2020"; and while Dr. Mayer would have run additional tests, he does not dispute either Dr. Hoekstra's methodology or conclusions. *Id.* at 2068:23-2070:8. Dr. Hoekstra's analysis also showed that predicted white, nonwhite, and Hispanic drive-through voters all turned out in higher

rates in 2022 than their non-drive-through counterparts; and while Dr. Mayer would have run additional tests, he disputes neither Dr. Hoekstra's methodology or conclusions. *Id.* at 2070:9-2071:4.

### 6. Dr. Eric McDaniel

953.    Dr. Hoekstra also re-created Dr. Mayer's Chi-squared test using a sample of voters whose 2020 method of voting; the result suggested that the elimination of drive-through voting had the same effect on non-drive-through voters as on drive-through voters. *Id.* at 2071:5-25. Dr. Mayer does not dispute Dr. Hoekstra's methodology or conclusion. *Id.* at 2072:23-2073:8. To resolve the apparent contradiction, Dr. Mayer would have liked to have performed an additional step in his analysis, but he has not done so. *Id.* at 2073:17-2074:1.

954.    In preparation for writing his report, Dr. McDaniel did not read any of SB 1's predecessor bills or the legislative record pertaining to SB 1 or the written testimony submitted for or against SB 1. Oct. 5, 2023 Tr. at 2937-37:17-1. In fact, Dr. McDaniel did not even read all of SB 1. *Id.* at 2940:6-11. He did not review any portion of the Election Code outside SB 1. *Id.* at 2940:12-14. He did not review any Secretary of State election advisories issued regarding SB 1. *Id.* at 2940:15-20. Instead, he relied on a limited reading of the bill, a memo by former Harris County Election Administrator Isabel Longoria, and articles from the Texas Tribune. *Id.* at 2940:21-24, 2941:14-19. He did not review Election Code provisions as they existed prior to SB 1 or attempt to determine how SB 1changed existing law. *Id.* at 2942:2-11. He does not know what powers partisan poll watches had prior to SB 1. *Id.* at 2973:13-15. He does not know what rights or limitations poll watchers had to observe election activities prior to SB 1. *Id.* at 2973:16-22.

955.    Dr. McDaniel used only data from the 2016 and 2020 election cycles, which were Presidential Election years, in contrast to 2022—the first election year following passage of SB 1— which was a midterm election year. McDaniel Initial Report L. 87-104; Oct. 5, 2023 Tr. at 2943:3-19. He agrees that more people vote in Presidential Elections than in midterms, and that the 2020 election was atypical. *Id.* at 2943:2-25. Because of the pandemic and county policies instituted in response, and because of the large turnout, Dr. McDaniel 2020 is not analogous to 2016, "in

certain regards." *Id.* at 2943:23-2945:17. He also agrees that 2020 is not analogous to the 2022 General Election. *Id.* at 2945:18-21.

956.    Dr. Hoekstra critiqued Dr. McDaniel and found that black voters are less likely to vote absentee than white voters in 2018 and 2014; because Dr. McDaniel did not conduct such an analysis, he could not rebut Dr. Hoekstra's calculations. *Id.* at 2946:6-2947:4. Dr. McDaniel, in reaching his own contrary conclusion, did not assess why black voters might allegedly vote absentee at higher rates. *Id.* at 2947:5-9. As a result, he did not know whether those reasons remained in 2022. *Id.* at 2947:10-13. Dr. McDaniel admitted that African-American non-Hispanics had higher COVID infection, hospitalization, and morbidity rates than non-Hispanic whites. *Id.* at 2947:17-2948:24; State Exh. 291.

957.    Dr. McDaniel did not assess who utilized drive-through voting when it was offered, or which racial demographics were more likely to use drive-through voting or the impact of drive-through voting on wait times. Oct. 5, 2023 Tr. at 2938–2939:22–7.

958.    Dr. McDaniel testified that the following data "were not available" regarding absentee voting:

    a.  The rate at which black voters voted absentee for the November 2022 General Election. *Id.* at 2950:11-13.

    b.  The rate in which black voters voted absentee compared to their white, Hispanic, or Asian counterparts in the November 2022 General Election. *Id.* at 2950:14-17.

    c.  The rates at which Hispanic voters voted absentee in the November 2022 General Election. *Id.* at 2950:18-21.

    d.  The rate at which Hispanic voters voted absentee compared to their white or Asian counterparts in the November 2022 General Election. *Id.* at 2950:22-25.

959.    The data used to calculate racial differences in wait times is based on a self-reported questionnaire. McDaniel Rebuttal Report L. 24-34. Dr. Hoekstra critiqued Dr. McDaniel's wait time analysis and performed an interval regression analysis that included 2018 data. Oct. 5, 2023 Tr. at 2953:7-14. Dr. Hoestra's analysis found that white voters waited longer than black voters in

2018, and Dr. McDaniel did not know the accuracy of that analysis because he did not assess it. *Id.* at 2953:18-22. Dr. McDaniel did not account for the prevalence of countywide voting as part of his wait-time analysis. *Id.* at 2954:16-2955:13. He agrees that 2020 and 2016 were Presidential Elections, which tend to have higher turnout than non-presidential elections, that 2020 had high turnout even for a Presidential Election, and that there are more non-presidential elections than Presidential Elections. *Id.* at 2955:14-2956.

960.    Dr. McDaniel testified that the following data "were not available" regarding wait times:

   a.  Whether black Texans reported loner wait times than their white or Hispanic counterparts. *Id.* at 2956:6-9.

   b.  Whether Hispanic Texans reported longer wait times than their white counterparts. *Id.* at 2956:10-13.

   c.  Racial differences in wait times for in-person voting. *Id.* at 2956:14-17.

   d.  Wait times for black voters in the November 2022 General Election. *Id.* at 2956:18-21.

   e.  Wait times for Hispanic voters in the 2022 General Election. *Id.* at 2956:22-24.

   f.  Wait times for white voters in the 2022 General Election. *Id.* at 2956:25-2957:2.

   g.  Whether SB 1 contributed to wait times in the November 2022 General Election. *Id.* at 2957:3-6.

   h.  Whether SB 1 contributed to longer wait times for black or Hispanic Texans during the November 2022 General Election. *Id.* at 2957:7-10.

961.    Dr. McDaniel testified the following data were "not available" for analysis regarding drop box voting:

   a.  Whether Hispanic voters were more likely to submit their ballot at a specified location as compared to whites. *Id.* at 2961:11-15.

b. Whether blacks were more likely to submit their ballots at a specified location as compared to whites. *Id.* at 2961:16-19.

c. Whether Hispanics continued to exhibit the higher probability of submitting their ballot at a specified location as compared to whites in the November 2022 General Election. *Id.* at 2961:20-24.

d. Whether black voters had a higher probability of submitting their ballot at a specified location as compared to whites in the November 2022 General Election. *Id.* at 2961:25-2962:4.

962.    Dr. Hoekstra critiqued Dr. McDaniel's assessment of the causal impact of a policy change and argued Dr. McDaniel's analysis contained implicit assumptions about how blacks and white voters will respond to the option of early voting. *Id.* at 2962:25-2963:7. Dr. McDaniel did not assess how specific demographics within small counties would react to expanded voting hours, or whether other provisions of SB 1 would have expanded access to voting. *Id.* at 2963:8-18. Dr. McDaniel did not analyze whether other provisions of SB 1 would have expanded voting for black and Hispanic voters, specifically. *Id.* at 2963:19-22.

963.    Dr. McDaniel admits that offers no specific evidence establishing poll watchers participated in voter intimidation in Texas. *Id.* at 2970:7-14. Dr. McDaniel relied entirely on secondary sources to assess voter intimidation from 2020 and did not assess alleged incidents of voter intimidation. *Id.* at 2964:21-2965:7. To determine patterns around voter intimidation, Dr. McDaniel compared each county's history of lynching and President Trump's margin of victory. McDaniel Initial Report L.255-56; Oct. 5, 2023 Tr. at 2970:15-21. Dr. McDaniel also notes that his analyses regarding the history of "racial terrorism" in a county is a correlation, not a causation. *Id.* at 2970-71:19-7. These historical instances of racial violence all occurred 1050 or before. *Id.* at 2972:5-9.

964.    Dr. McDaniel did not assess the exact ways in which SB 1 changed the rights and responsibilities of poll watchers, or poll watchers' power under the law. *Id.* at 2974:1-8. He also did not provide any specific evidence of poll watchers participating in voter intimidation in Texas. *Id.*

at 2974:9-13. Nevertheless, Dr. McDaniel asserts that Texas has given greater power to partisan poll watchers, which has increased concern about voter intimidation. *Id.* at 2974:14-18.

965.    Dr. McDaniel testified the following data "were unavailable" regarding poll watchers:

      a.  Any assessment or analysis of poll watchers in the November 2022 General Election.

      b.  The impact that poll watcher provision in SB 1 had on voter intimidation during the November 2022 General Election. *Id.* at 2974:24-2975:2.

966.    Dr. McDaniel cannot say whether the intent of the legislators who SB 1 was discriminatory or not. McDaniel Initial Report L.294-96.

**7.  Dr. Daniel Smith**

967.    Dr. Smith's reports suffered from missing data: he received no data from any county, other than possibly Bexar County. Oct. 42023 Tr. at 2751:13-2752:3. That dearth of data applies to all his reports. *Id.* at 2752:4-24. Dr. Smith knows that counties administer elections in Texas, and that voting data therefore must originate with the counties. *Id.* at 2753:3-8. He's unaware of either what data counties are required by law to collect, or what data they actually collect or report to the Secretary of State's office. *Id.* at 27:53:9-23. Dr. Smith does not suggest this dearth of data is the result the Secretary of State withholding information in discovery. *Id.* at 2753:24-2754:4.

968.    Voters in Texas do not include their race or ethnicity on their voter registration application. *Id.* at 2755:4-8. That is an historic legacy of the Voting Rights Act. *Id.* at 2755:16-19.

969.    Dr. Smith relies upon an analytical framework called the Calculus of Voting framework which predicts the potential likelihood of voting. It is based on the theory that voters will only vote in an election if the benefits they derive from voting outweigh the costs of voting. Smith Corrected Initial Report ¶ 15.

970.     The costs Dr. Smith looked at included financial, time, transportation, information, and health costs. According to Dr. Smith, SB 1 increases these costs. Smith Corrected Initial Report ¶¶ 16-20. Dr. Smith did not address the benefits of voting in an election. Smith Corrected Initial Report ¶¶ 16-20.

971.     To determine that the cost of voting rises, Dr. Smith agrees there must be a comparative baseline from which the putative increase is measured. Oct. 4, 2023 Tr. at 2762:6-15. Dr. Smith does not know whether drive-through voting existed prior to 2020. *Id.* at 2763:15-2764:2. Nor is he aware whether 24-hour voting existed anywhere in Texas prior to 2020. *Id.* at 2764:4-6. Nor is he aware whether drop box voting existed anywhere in Texas prior to 2020. *Id.* at 2764:7-11. Dr. Smith only received data from Harris County, and so his opinions regarding the impact of SB 1 on drive-through, 24-hour, or drop box voting extend to Harris County—and to no others. *Id.* at 2764:12-19. His opinions on those topics do not apply statewide. *Id.* at 2764:20-23.

972.     Dr. Smith formulated no opinions as to the security of drive-through, 24-hour, or drop box voting. *Id.* at 2771:10-14.

973.     To identify the race of each voter, Dr. Smith used U.S. Census data and Texas data of registered voters with a Spanish surname. Dr. Smith took having a "Spanish" surname as a "proxy" for the voter being Hispanic even though he admits it is not an accurate measurement. Smith Corrected Initial Report ¶¶ 23 n.6, 30.

   a.  Smith: "It's probably a pretty weak proxy" Oct. 4, 2023 Tr. at 2707:21.

   b.  Smith: "there may be some false positives of people who are identified as a Spanish surname who don't identify as Hispanic." *Id.* at 2755:1-3.

   c.  Smith: "There undoubtedly are some false positives, yes." *Id.* at 2758:20.

974.     Dr. Smith does not know what qualifies as a "Spanish surname":

   Q: Do you know how the Secretary of State determines whether someone has a Spanish surname or not?

A: No, I don't have the details on that.

*Id.* at 2757:21-23.

975.    Dr. Smith cannot name scholarly research on the false positive or false negative rate of Spanish surname analysis. *Id.* at 2759:2-5.

976.    Dr. Smith did not "even know if those individuals within that census block that are over the age of 18 are citizens of this country[.]" *Id.* at 2756-57:25-3.

977.    The only demographic analysis Dr. Smith conducted on Harris County drive-through voting locations was as to the population density, rather than racial or ethnic makeup. *Id.* at 2768:6-25.

978.    In Harris County, when 24-hour voting was permitted, 1,490 voters cast their ballots outside of times permitted under SB 1. *Id.* at 2769:14-18. That constitutes one tenth of one percent of those who voted in the Harris County General Election. *Id.* at 2769:20-25.

979.    Dr. Smith did not find a disparate impact in the percentage of ballot application rejections due to SB 1 as between those with and without Hispanic surnames. *Id.* at 2772:14-22. Indeed, Dr. Smith found that the ballot application rejection rate for people with Hispanic surnames was 67.2 percent when compared to the total SB 1-related rejections, and that the ballot application rate for people without Hispanic surnames was 67.4 percent under the same analysis. *Id.* at 2772:1-8. When compared to the total ballot application rate, non-Hispanic applications were rejected on SB 1 grounds at a higher rate (84.1 percent) than Hispanic applications (80.2 percent). *Id.* at 2776:8-20. Dr. Smith's data show that the ballot application rejection rates attributable to SB 1 was higher for non-Hispanics than for Hispanics in Dallas, Tarrant, Travis, El Paso, and Hidalgo Counties. *Id.* at 2774:13-24.

980.    Dr. Smith also found no disparate impact in the percentage of rejected ballot applications attributable to SB 1 as among the Black population. *Id.* at 2774:25-2775:11. Dr. Smith concedes that his analyses alternately find disparate impact, and no disparate impact, of SB 1 on minorities. *Id.* at 2781:15-22.

### 8.     Dr. Andres Tijerina

981.    Dr. Tijerina was not asked to and did not say "anything whatsoever" in his report about SB 1. Oct. 3, 2023 Tr. at 2419:16-19.

982.    Dr. Tijerina did not research the legislative history of SB 1 for his work on this case and has not read SB 1, or any of its predecessor bills. *Id.* at 2419:20-25. He likewise neither cited nor considered any voting or electoral legislation in Texas from the last 20 years. Dr. Tijerina does not allege that SB 1 or any of its provisions were enacted with intent to discriminate against Latinos or exclude Latinos and cannot not identify any Texas legislator who voted for SB 1 who engaged in the discriminatory practices he describes in his report. *Id.* at 2420:1-25. Dr. Tijerina did no research on how the history of discrimination described in his report had any influence at all on any legislator who voted for SB 1. *Id.* at 2421:1-9.

983.    Dr. Tijerina undermines the entire premise of his opinion when he admits that "[i]t would not be accurate to say that 2021 is contemporaneous with 1921." *Id.* at 2413:24-25. He further admitted, "[t]he 1950 to 1960 period is not contemporaneous with" 2021. *Id.* at 2414:11-12. Dr. Tijerina also acknowledged that, despite discriminatory land practices deep in Texas history, "[t]here has been no mass dispossession of Tejano lands like the ones that occurred between 1880 and 1920, since 1920," *Id.* at 2414:23-24, "I have not seen or studied any mass violence against Latino voting or Latinos since the 1960s in Texas," *Id.* at 2415:14-15, and "I have not in my report included anything about mass violence against Latino voting in the last fifty years," *Id.* at 2415:9-10. Furthermore, despite ugly and discriminatory use of state law enforcement to suppress voting in historical elections, the Texas Rangers have not been employed to suppress voting in the last 50 years. *Id.* at 2417:8-10.

984.    Finally, Tijerina does not conclude that SB 1is a continuation of past actions in Texas to discriminate against or exclude Latinos from voting. *Id.* at2420:16-20.

### Dean Franita Tolson

985.    Dean Tolson sought to contextualize historically the passage of SB 1. Oct. 4, 2023 Tr. at 2600:12-15. That context includes improvements in Texas voting among minorities, in what

she characterizes as "the slow and steady march towards an inclusive democracy." *Id.* at 2606:17-19. She acknowledges that Texas in 2023 is not as bad for minority voters as it was in 1873, 1902, 1923, or even 1964. *Id.* at 2607:23-2608:8. She further acknowledges the increasing success of minority candidates holding important—and even statewide—office in Texas. *Id.* at 2609:5-16; 2610:4-15. Dean Tolson did not study the racial makeup of the Texas Legislature in 2023. *Id.* at 2608:21-22.

986.    Dean Tolson acknowledges that her historical analogue methodology has limits. *Id.* at 2606:1-10. She further admits that historical similarity does not impute discriminatory intent:

> Q: "Do we agree that every time someone may be reminded by modern legislation of legislation from a previous time, that it does not necessarily mean the modern legislation is discriminatory?
>
> A: Yes."
>
> *Id.* at 2631:1-8.

987.    Dean Tolson acknowledges that voter fraud has occurred in Texas in the past:

> Q: Does Texas historically have a problem with conducting fraudulent elections?
>
> A: Yes.
>
> Q: Such as?
>
> A: So there were a number of elections throughout the 19th century where it involved ballot box stuffing, in addition to voter intimidation, violence, and restrictive voting laws….[S]o there are a number of elections, even in the 20th century, that involves ballot box stuffing and fraud and dead people voting and all of those things.
>
> *Id.* at 2597:3-20.

988.    She further acknowledges that Texas political machines historically disenfranchised Latinos by committing voter fraud and marking ballots for Latinos who could not read or speak English. *Id.* at 2602:9-25. Dean Tolson testified that historical political machines in Texas forced Latino voters to support machine candidates by threatening to terminate their employment—or even with violence. *Id.* at 2639:14-18.

989.    Although she argues that the U.S. Department of Justice's history of Section 5 objections in Texas under the Voting Rights Act evidences ongoing discrimination, Dean Tolson is aware that the DOJ brought suit in this case but did not challenge the restriction on drive-through voting, 24-hour voting, polling hour regulations, or poll watcher provisions. *Id.* at 2611:23-2612:1, 26:12-2613:2.

990.    Dean Tolson does not cite any support for her contention that "[b]y focusing on partisan affiliation instead of race, the State has used and can use color-blind targeting to target and subsequently disenfranchise racial minorities." *Id.* at 2617: 11-16. Though she argues minority voters tend to prefer different candidates from white voters, Dean Tolson admits her thesis can break down in Primary Elections because voting is not broadly polarized between whites and minorities—it is, in fact, multipolar. *Id.* at 2617:24-2618:8. She agrees that in 2016 there was both an "enormous uptick" in Latino electoral participation and population, and that 2016 also saw an uptick in Latino support for the Republican Party. *Id.* at 2618:9-18.

991.    Dean Tolson avers that Texas is among the most difficult states in which to vote and cites to a study reaching that conclusion one month before the largest election in Texas history by voter turnout. *Id.* at 2618:20-2619:8. For other propositions, Dean Tolson relies solely on Plaintiffs' pleadings, or articles written in The Guardian. *Id.* at 2619-2621:7, 2627:12-24, 2633:2-4. She argues that Texas ranked among the bottom 10 states for voter registration at the time of her report, but admitted that Texas had since risen to 27th in the following three years. *Id.* at 2623:15-2624:6. When asked whether this rise in voter registration was good news, Dean Tolson argued that Texas had managed to increase its voter registration by 20% and simultaneously pass the putatively discriminatory SB 1. *Id.* at 2624:7-2625:5.

992.    Despite her expressed concerns regarding putative "voter purges" SB 1, Dean Tolson's report has no statistics showing any such purges occurred or have resulted in disenfranchisement. *Id.* at 2629:11-14. She acknowledges that voter purges are mandated by federal law, and that such purges are not *per se* discriminatory. *Id.* at 2629:3-10.

993.     Dean Tolson's criticism of poll watchers includes referring to them as "overseers." *Id* at 2633:6-11. When asked why her criticism of poll watchers as racially discriminatory, Dean Tolson at first seemed genuinely surprised at her own assumption, but then bizarrely claimed that minority poll watchers "internalize the discrimination of the majority" where minorities discriminate against their own race. *Id.* at 2633:12-2634:5. She has no empirical data to support that claim. *Id.* at 2634:6-8. Neither did fellow Plaintiffs' expert, Dr. Lichtman. *Id.* at 3166:22-3167:5.

994.     Dean Tolson agrees that SB 1's provision allowing employees time off from work to vote during early voting is particularly important to minority voters due to the high coincidence of minority voters among the working class. *Id.* at 2639:25-2640:12. Her report did not discuss SB 1's expansion of early voting hours, or its provision extending curbside voting to pregnant women. *Id.* at 2640:13-25.

Date: January 21, 2024

Respectfully submitted.

KEN PAXTON
Attorney General

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Deputy Chief, Special Litigation Division
Tex. State Bar No. 24060998

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

RALPH MOLINA
Deputy Attorney General for Legal Strategy

WILLIAM D. WASSDORF
Assistant Attorney General
Tex. State Bar No. 24103022

RYAN D. WALTERS
Chief, Special Litigation Division

ZACHARY W. BERG
Special Counsel
Tex. State Bar No. 24107706

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
will.wassdorf@oag.texas.gov
zachary.berg@oag.texas.gov
ethan.szumanski@oag.texas.gov

ETHAN SZUMANSKI
Special Counsel
Tex. State Bar No. 24123966

**COUNSEL FOR STATE DEFENDANTS**

John M. Gore
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

**COUNSEL FOR INTERVENOR-DEFENDANTS**

**CERTIFICATE OF SERVICE**

    I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on January 21, 2024, and that all counsel of record were served by CM/ECF.

_/s/ Ryan G. Kercher_
RYAN G. KERCHER
