```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3
     LA UNION DEL PUEBLO ENTERO,      .
 4   ET AL,                           .
                                      .
 5              PLAINTIFFS,           .
           vs.                        . DOCKET NO. 5:21-CV-844-XR
 6                                    .
     GREGORY W. ABBOTT, ET AL,        .
 7                                    .
                DEFENDANTS.           .
 8

 9

10                 TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE XAVIER RODRIGUEZ
11               UNITED STATES DISTRICT JUDGE
                    SEPTEMBER 11, 2023
12

13

14   APPEARANCES:
     FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
15                          FATIMA L. MENENDEZ, ESQUIRE
                            JULIA RENEE LONGORIA, ESQUIRE
16                          KENNETH PARRENO, ESQUIRE
                            MALDEF
17                          110 BROADWAY
                            SUITE 300
18                          SAN ANTONIO TX 78205

19

20                          JENNIFER HOLMES, ESQUIRE
                            VICTOR GENECIN, ESQUIRE
21                          NAACP LEGAL DEFENSE & EDUCATIONAL
                            FUND INC
22                          40 RECTOR STREET, FIFTH FLOOR
                            NEW YORK NY 10006
23

24

25
```

```
 1                              LEAH J. TULIN, ESQUIRE
                                BRENNAN CENTER FOR JUSTICE AT NYU
 2                               SCHOOL OF LAW
                                1140 CONNECTICUT AVENUE NW
 3                              SUITE 1150
                                WASHINGTON DC 20036
 4

 5   FOR THE DEFENDANTS:        RYAN G. KERCHER, ESQUIRE
                                KATHLEEN HUNKER, ESQUIRE
 6                              WILLIAM D. WASSDORF, ESQUIRE
                                MONROE DAVID BRYANT, JR., ESQUIRE
 7                              TEXAS ATTORNEY GENERAL
                                P.O. BOX 12548
 8                              MC 009
                                AUSTIN TX 78711
 9

10                              ERIC J.R. NICHOLS, ESQUIRE
                                CORY REN LIU, ESQUIRE
11                              BUTLER SNOW LLP
                                1400 LAVACA STREET
12                              SUITE 1000
                                AUSTIN TX 78701
13

14                              KATHLEEN HARTNETT, ESQUIRE
                                COOLEY LLP
15                              3 EMBARCADERO CENTER
                                20TH FLOOR
16                              SAN FRANCISCO CA 94111

17

18                              JOHN M. GORE, ESQUIRE
                                LOUIS J. CAPOZZI, III
19                              JONES DAY
                                51 LOUISIANA AVENUE NW
20                              WASHINGTON DC 20001

21

22

23   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                                OFFICIAL COURT REPORTER
24                              UNITED STATES DISTRICT COURT
                                SAN ANTONIO, TEXAS
25
```

```
 1          (San Antonio, Texas; September 11, 2023, at 9:00 a.m., in
 2     open court.)
 3          THE COURT:  Let's call 21 civil 844, consolidated
 4     actions, LUPE versus Abbott.
 5          Who do we have for the plaintiffs?
 6          MISS PERALES:  Good morning, Your Honor.  Nina
 7     Perales for plaintiffs La Union Del Pueblo Entero, et al.
 8          With me today are Kenneth Parreno, Julia Longoria,
 9     Fatima Menendez, and my co-counsel from the Brennan Center,
10     Leah Tulin, Jasleen Singh, Robyn Sanders, and possibly more
11     that I can't see.
12          Thank you.
13          THE COURT:  Thank you.  I know we have a number of
14     other plaintiffs' counsel present.  In the interest of time,
15     I'll just recognize the lead counsel for opening arguments for
16     today.
17          MISS HOLMES:  Good morning, Your Honor.
18          Jennifer Holmes for the HAUL plaintiffs.  With me,
19     who will have a speaking role today, is Victor Genecin.
20          MR. GENECIN:  Good morning, Your Honor.
21          THE COURT:  Thank you.  Good morning.
22          And for the state?
23          MR. KERCHER:  Good morning, Your Honor.  On behalf of
24     the Attorney General for the State of Texas under the
25     Secretary of the State, my name is Ryan Kercher with the
```

1 | Office of the Attorney General.  I'll be giving the opening
2 | statements.  Also you'll be hearing this morning from my
3 | colleague Kathleen and my colleague Will.
4 |        THE COURT:  Thank you.
5 |        So, first of all, how many people are on the Zoom?
6 |        THE DEPUTY CLERK:  Twenty-eight.
7 |        THE COURT:  Twenty-eight.
8 |        So ladies and gentlemen, at the request of the
9 | attorneys, the request was for lawyers who were not having a
10 | participating role in any given day, if we could broadcast the
11 | proceedings by Zoom for the sake of the lawyers.
12 |        I agreed to the request, one, hoping that, well, some
13 | lawyers could do other work and it would bring down the
14 | overall cost of the attorneys fees being racked up in this
15 | case, and so I granted the request for that reason, and I also
16 | granted the request because there was rising COVID rates
17 | occurring in the county; hopefully, we've plateaued.  We'll
18 | see.
19 |        But some groups have made numerous requests to
20 | participate or at least view the proceedings by Zoom.  By
21 | judicial conference policy I am not allowed to do that.  So
22 | the only individuals who can request a Zoom link are those
23 | lawyers for any party in this case and only their lawyers.
24 |        And those lawyers and any witnesses unless they
25 | are — and so if there are witnesses on the Zoom, if someone

1  is going to invoke the rule they may not watch the Zoom

2  proceedings either, this is a formal proceeding for those who

3  are watching by Zoom.  They should behave at all times as if

4  they were present in the courtroom.

5          Photography, recording, or streaming of this

6  proceeding by any means is strictly prohibited.  That's

7  whether you are in the courtroom or in Zoom.  There is no

8  photography allowed and no recording allowed in any part of

9  this courthouse or the courtrooms.

10          Those granted approval to participate remotely in

11  these proceedings must not forward the electronic link to

12  nonparticipating colleagues or persons and must not post a

13  link on any public forum.  As with all proceedings, violations

14  of these instructions are subject to contempt proceedings.

15  Accordingly, please exercise proper courtroom decorum at all

16  times.

17          Before we move to opening statements, there are some

18  pretrial motions I want to take up.

19          So first is LUPE's motion to voluntarily dismiss

20  claims challenging Section 6.01 of SB 1.  I heard from most

21  parties but I'm not sure I heard from any — from all parties.

22  Is any party opposed to Docket Number 766?  So this is like a

23  wedding.  Anybody who does not voice any objection, okay.  So

24  766, LUPE's motion to voluntarily dismiss claims, is granted.

25          The next motion is plaintiffs' motion to substitute

1  the Harris County Elections Administrator with the Harris

2  County Clerk pursuant to the change in state law.  That's

3  Docket Number 758.  Does any party oppose that motion?  And

4  hearing no objections to that, that motion is also granted.

5          The next one was LULAC's request for judicial notice,

6  Docket Number 748.  The State has filed objections to that.

7  Here's the ruling on that.  That's granted in part, denied in

8  part.

9          Plaintiffs' motion is granted as to the population

10 data produced by the U.S. Census bureau.  The Court hereby

11 takes judicial notice of the census data set forth in

12 paragraphs 1 through 15.

13         The motion is denied as to the election data produced

14 by the Election Assistance Commission.  I can't take judicial

15 notice of that.  Although the LULAC plaintiffs may try to

16 introduce the EAC data at trial, judicial notice is not

17 warranted because the State defendants reasonably dispute the

18 accuracy of the data based on conflicting calculations.  So

19 the plaintiffs can move to enter that.  I'll hear any

20 objection at the time.  It will probably go to the weight, but

21 there's no ruling yet made on the EAC data.

22         Otherwise, we have a number of other motions in

23 limine.  So one motion deals with Dr. Smith.  Daniel Smith.

24         When can I anticipate hearing from Dr. Daniel Smith?

25         MR. GENECIN:  That, Your Honor, would be on

1    October 4th.

2           THE COURT:  Okay.  That motion in limine is held

3    until we get closer.  Do you anticipate raising his

4    supplemental report prior to that time?

5           MR. GENECIN:  Raising it?

6           THE COURT:  Or trying to introduce it, or by some

7    other witness.

8           MR. GENECIN:  We would not seek to introduce it.  We

9    may — it may come up in questioning of witnesses.  I doubt

10   that, however.

11          THE COURT:  So I'm going to hold that until we get

12   closer and I can understand what we are dealing with there.

13          Likewise, Ameer Patel, when can I expect to have to

14   hear from him?

15          MR. DODGE:  Your Honor, Christopher D. Dodge on

16   behalf of LULAC plaintiffs.  He's currently scheduled for, I

17   believe — let me check.

18          THE COURT:  Not today?

19          MR. DODGE:  Not today.  I believe —

20          THE COURT:  So we will hold off on ruling on

21   anything —

22          Yes.

23          MR. KERCHER:  Your Honor, I believe the parties have

24   reached an agreement on that issue.

25          THE COURT:  Well, thank you.

1          MR. KERCHER:  We will withdraw our motion in limine

2   regarding Patel.

3          THE COURT:  Thank you.  So that's taken care of.

4   That's mooted now.

5          Kara Ayers, are we going to expect to hear from

6   Dr. Ayers this week?

7          MISS HOLMES:  Your Honor, we do not expect to hear

8   from Dr. Ayers.

9              (Cell phone interruption)

10          MISS HOLMES:  She's a DOJ expert, so she's no longer

11   being presented in the case.

12          THE COURT:  Let me make sure I understood what you

13   just said.  I'm sorry; the phone distracted me.

14          Are you going to present her or not?

15          MISS HOLMES:  No, we are not.

16          THE COURT:  No one is presenting her from your side

17   of the aisle?

18          MISS HOLMES:  No one from plaintiffs side is

19   presenting her in the case.

20          THE COURT:  So that is now moot?

21          MR. KERCHER:  It is, Your Honor.

22          THE COURT:  That's moot.

23          MR. KERCHER:  Your Honor, if I could clarify, though.

24   Does that mean not only for live testimony, but also for

25   deposition designations?

1          MISS HOLMES:  Yes.  We can withdraw her deposition
2  designations.
3          THE COURT:  Thank you.
4          MR. KERCHER:  So long as there is no testimony, live
5  or by deposition, then it is moot, Your Honor.
6          THE COURT:  It looks like it's moot.
7          And then the declaration of Jonathan White.  Are we
8  expecting to hear about Mr. White anytime this week?
9          MISS PERALES:  September 22nd, Your Honor.
10         THE COURT:  Okay.  So we will hold off on making any
11 decisions on Jonathan White.
12         And then where are we at on Keith Ingram?  So the
13 State listed Keith Ingram as a witness and notes that he's
14 going to testify about election integrity.  I'm not sure what
15 that means.
16         He's not an expert, correct?
17         MR. KERCHER:  No, Your Honor, but for relevant
18 portions of this case he was the director of the elections
19 division for the Office of the Secretary of State.  He's been
20 deposed multiple times by the parties.  I believe the
21 plaintiffs intend to call them in their own case in chief, as
22 do defendants.
23         THE COURT:  So he'll be testifying only as a fact
24 witness as to his personal knowledge?
25         MR. KERCHER:  He will be testifying to his

1    experiences as the election director for the Secretary of

2    State, as well as the other roles that he has fulfilled in his

3    capacity as an employee of that office.

4          THE COURT:  And so as I understand it, the motion in

5    limine is to prohibit him from testifying to nonpublic

6    information?

7          MISS PERALES:  About prosecutions and investigations

8    involving voter fraud.  He's also set for September 22nd, Your

9    Honor.

10          THE COURT:  Okay.  I'll hold off on him.

11          With that then, the agreements from all the parties

12    here is 45 minutes per side.  I recognize the plaintiffs for

13    their opening.

14          MISS PERALES:  Good morning, Your Honor.

15          LUPE plaintiffs —— of course, I didn't get the frog,

16    Your Honor, until I stood up.

17          LUPE plaintiffs will divide the opening argument with

18    the HAUL plaintiffs and this opening argument is on behalf of

19    all plaintiffs, including the LULAC plaintiffs, the Mia

20    Familia Vota plaintiffs, and the OCA-Greater Houston

21    plaintiffs.

22          The face of the Texas electorate is changing.  The

23    2018 general election in Texas saw record turnout,

24    particularly by Latino voters and Black voters.

25          The 2020 election was quote, "smooth and secure,"

1  unquote, in the words of the Secretary of State, Mr. Ingram,
2  who the Court just mentioned a moment ago, even in the face of
3  a global pandemic.

4          Nevertheless, the Texas legislature entered its 2021
5  regular session by amplifying calls for restrictive voter
6  legislation based on unfounded claims of voter fraud.  The
7  legislature also immediately took up a package of measures
8  that targeted the very methods of voting that led to record
9  voter turnout across the state and particularly in
10  Harris County and targeted the minority voters who fuel
11  increased turn out in recent elections.

12          SB 1's legislative process was highly contentious and
13  the legislature ultimately enacted SB 1 in the face of
14  widespread opposition from groups advocating on behalf of
15  minority voters who explained how the law would make it harder
16  for those groups of Texans to vote.  Governor Abbott signed
17  the bill into law on September 7, 2021.

18          Texas is already one of the hardest states in the
19  country to register and vote, and now voting is even harder.
20  SB 1 adversely affects vulnerable voters, including those who
21  cannot read or write in any language, also voters who don't
22  speak English well; voters who use assistance or vote by mail
23  because of disability; voters who have challenges filling out
24  complicated forms; voters who rely on outreach by
25  community-based organizations to know when to vote and also

1  about the mechanics of voting; voters who are concerned about

2  intimidation inside the polling place; and voters who don't

3  have a lot of time to vote, such as shift workers or others

4  with nonflexible commitments during the day.

5          Plaintiffs challenge portions of SB 1 that impose

6  undue burdens on voters, prohibit political speech by

7  community-based organizations, subject election workers to

8  vaguely described crimes with significant penalties, deprive

9  voters of assistance to which they are entitled under the

10  federal Voting Rights Act, deny voters with disabilities equal

11  access to voting, target methods of voting used by Black and

12  Latino voters in Harris County, and measures that have a

13  racially disparate impact and/or are intentionally racially

14  discriminatory.

15          First, I'd like to briefly talk about the poll

16  watcher provisions.  Plaintiffs challenge SB 1 sections for

17  .06, 07, 09, and Section 8.01 which imposes the civil

18  penalties.  These provisions sanction election workers for

19  enforcing the rules like making sure that poll watchers don't

20  hover over voters and intimidate them at the polling place.

21          The Court will hear from the November 2020 general

22  election incidents of unruly poll watchers were getting more

23  serious, imposed greater challenges to elections

24  administrators, but SB 1's new poll watcher provisions which

25  authorize greater movement around the polling place by poll

1  watchers and criminalized poll workers for certain actions are
2  so vague that local elections officials and political parties
3  themselves have varied interpretations of what is allowed and
4  what is not allowed, both by watchers and poll workers.
5          Local election officials and their poll workers as a
6  result are deterred from serving because they don't understand
7  what watchers are allowed to do and what poll workers are
8  allowed to do to rein in unruly or disruptive watchers.  We
9  challenged these provisions under various statutes and
10  constitutional provisions including claims regarding void for
11  vagueness, intentional racial discrimination, and Section 2 of
12  the Voting Rights Act.
13          I'll move next to the assistance provisions in
14  Article 6.  Plaintiffs challenge Article 6, Subsection 1, 3,
15  4, 5, 6, and 7.
16          Following the Austin District Court's injunction of
17  portions of SB 1's Article 6, portions specifically of 6.04
18  and *OCA-Greater Houston v Texas*, this Court ordered that the
19  challenges to those parts of 6.04 are moot.  And that is in
20  the Court's Docket 444, but a number of plaintiffs challenge
21  remaining language in 6.04 and plaintiffs challenge other
22  portions of Article 6 in the polling place.
23          Now, as modified by the OCA injunction, SB 1 still
24  requires assisters to write down more information on the
25  assister form, take more time to fill out the form, and

1  assisters must take an expanded oath under penalty of perjury.
2  They must swear that they got a representation of eligibility
3  from the voter for assistance.  They must swear they did not
4  pressure the voter to choose them, whatever "pressure" means,
5  and they have to swear that they understand the ballot will
6  not count if the voter was not eligible for assistance without
7  providing who decides whether the voter is eligible for
8  assistance.
9         The Court will hear employees and volunteers of
10 plaintiff LUPE, La Union Del Pueblo Entero, who are deterred
11 from assisting voters in the polling place, and plaintiff
12 organization members are deterred from assisting.
13        For example, plaintiff Delta Sigma Theta Sorority,
14 Inc., many of whose members are here today, Your Honor, will
15 testify regarding its concerns about voters being
16 disenfranchised when the sorority's members declined to assist
17 voters by driving them to the polls.  SB 1 deters Delta Sigma
18 Theta members from providing transportation to voters in the
19 ways that that they have for past elections in Caravan to the
20 Polls events.  The Court will also hear about caravan events
21 by LUPE.
22        Voters with disabilities require assistance to vote
23 at significantly higher rates than voters without disabilities
24 and many Texans with disabilities have found it difficult or
25 impossible to obtain the assistance that they require under

1    the restrictions imposed by SB 1.  As a result, voters are

2    deprived of the ability to vote with the person of their

3    choice assisting them.  And that's the language from Section

4    208 of the Voting Rights Act.

5            Moving on to voter assistance but not in the polls,

6    Your Honor, voter assistance by mail, SB 1 carries forward the

7    onerous oath requirements and additional information

8    requirements but it also prohibits compensation for anybody

9    who assists a voter voting by mail.

10            The previous version of this statute, the election

11    code banned compensation on a performance based or quota basis

12    for assisters.  So under the code as it existed before SB 1,

13    one could not pay or be paid under a quota or

14    performance—based system to help voters.  So one could not say

15    I will pay you $10 a head to assist voters.  That's the way

16    the code used to read.  Now, the code prohibits across the

17    board any compensation for assisting voters who vote by mail.

18            The Court will hear that LUPE assists voters in

19    casting mail ballots at the request of those voters, many of

20    whom bring their mail ballots to LUPE's union hall for help.

21    LUPE's work assisting new voters is now prohibited.  LUPE

22    employees and volunteers, along with members of other

23    plaintiff organizations, cannot provide mail ballot assistance

24    to voters in this changed landscape of SB 1 if they are

25    compensated.

1           Voters with disabilities are now unable to receive

2    the assistance they need to vote and as a result voters,

3    again, are going without the assistance to which they are

4    legally entitled.

5           Moving on to Section 7.04, which is vote harvesting

6    and the unlawful solicitation of mail ballots.  SB 1 creates a

7    new offense of vote harvesting, the definition of which sweeps

8    in and criminalizes voter outreach, Get Out the Vote, and

9    education, even by nonpartisan nonprofit organizations.

10           The Court will hear that community organizations

11    advocate on ballot measures, including when a mail ballot is

12    present.  For example, LUPE employees advocate to voters,

13    including mail ballot voters on infrastructure measures that

14    will improve the community's access to basic services like

15    sewer and health care.

16           This speech is important to LUPE as part of its

17    efforts to engage voters on issues of importance to the Rio

18    Grande Valley residents, particularly the low-income

19    residents, but a mail ballot is present when voters have

20    chosen to bring their mail ballot with them to a meeting at

21    LUPE's union hall, or when LUPE visits with voters through its

22    organizing model of house meetings.  The mail ballot is there.

23    It is now a crime for LUPE to engage in issue-based advocacy

24    on ballot measures when the mail ballot is present.

25           Prior to SB 1 another plaintiff, Texas AFT, relied on

1 its paid employees and volunteers to engage with voters and

2 advocate on the issues.  This vote harvesting, or as we would

3 call it, voter interaction ban has forced Texas AFT to

4 completely change the way it communicates with voters and

5 members, and it restricts their political speech, just like it

6 does LUPE.

7           This is the same for the Texas Alliance for Retired

8 Americans which also relies on paid and volunteer members to

9 advocate for federal law reform and to encourage civic

10 participation.  These burdens on voters are not justified by

11 any state interest and the content-based restriction that this

12 law has imposed on political speech cannot survive strict

13 scrutiny.

14           Another part of this vote harvesting provision in

15 Article 7 bans election administrators.  There's, you know,

16 significant penalties on poll workers, but there are also

17 penalties on elections administrators or county clerks,

18 depending on who is administering the election, in Article 7,

19 for sending out applications for ballot by mail.  For example,

20 to persons over age 65.

21           This was something that Hidalgo County did routinely

22 up until SB 1.  Also El Paso County, routinely before SB 1, at

23 the beginning of the year and at other points in time would

24 send voters over age 65 an application for ballot by mail, not

25 a ballot but an application, so that those folks who were at

1  home would be able to fill it out and return it and receive a
2  mail ballot.  They could even check a box to receive mail
3  ballots for every election in the year; they check the box for
4  annual.
5          Older voters, the Court will hear, were waiting for
6  their applications for ballot by mail in El Paso County and
7  also Hidalgo County.  Now, those voters do not get the
8  application for ballot by mail in their mailbox.  They must
9  take the additional step of requesting the application for
10  ballot by mail, then, of course, taking the steps if they can
11  successfully do that also vote the ballot by mail.
12          Adding more steps to the voting process and requiring
13  more forms makes voting more difficult and it reduces the
14  number of ballots cast.  It also drains organizational
15  resources of the plaintiff organizations that are now having
16  to educate voters about the fact that they are not going to be
17  receiving their application for ballot by mail, they must
18  proactively get out there and request it.
19          Then, finally, perhaps what people talk about the
20  most with respect to SB 1 is Article 5, which is the
21  requirement of an ID number for mail voting.  The Court has
22  already ruled that these two sections of Article 5, Sections
23  5.077 and 5.13 violate the materiality provision of the Civil
24  Right Act, but the Court has also agreed to take evidence of
25  plaintiffs remaining challenges to the mail ballot ID

1    provisions.

2          Plaintiffs continue to challenge these two sections
3    on alternative theories as well as other sections of Article 5
4    that implement SB 1's mail ballot requirements.

5          The Court will hear that defendant counties reject
6    mail ballot applications and mail ballots at substantially
7    higher rates than before SB 1.  Counties rejected thousands of
8    applications for ballot by mail and mail ballots in the 2022
9    primary and general elections after SB 1 went into effect.

10          County elections administrators, the Court will hear,
11   expect to reject mail ballots in the 2024 presidential
12   election.  This is not just an issue of a learning curve by
13   voters.  El Paso County, for example, one of the largest and
14   most diverse counties estimated that about 30,000 voters in
15   their county did not have either a driver's license or a
16   social security number in the voter registration database
17   while SB 1 was moving through the legislative process.

18          Everybody knew that the counties had tens of
19   thousands of voters who had neither a social security or a
20   driver's license in the voter registration database.  The
21   counties spent scarce resources scrambling to try to assist
22   voters in curing, quote-unquote, curing the defect of not
23   having a number or putting a number that couldn't be matched.

24          Even when voters did everything right, even when they
25   found the spot on the form to put, even when they put both

1  their driver's license and their social security number on the

2  mail ballot, their mail ballots, in many cases, were rejected

3  anyway because the information could not be matched with the

4  voter registration database, which simply didn't have that

5  information in it at all.

6          The Court will hear from Dr. Eric McDaniel, an

7  associate professor in the Department of Government at UT

8  Austin, who will analyze the relationship between race and

9  methods of early voting, such as mail-in and early in-person

10  voting and show how the changes in SB 1 have negatively

11  affected voters of color.

12         Also Dr. Kenneth Mayer, a political scientist at the

13  University of Wisconsin will describe how SB 1's mail ballot

14  ID requirements arbitrarily increase mail ballot rejection

15  rates, particularly for voters of color, giving Texas now one

16  of the highest mail ballot rejection rates in the country.

17         The Court will hear that voters with disabilities are

18  four times more likely to vote by mail, more likely to have

19  difficulty accessing the requisite ID numbers and ensuring

20  that the numbers on the application and the envelope match.

21  And by that, I mean the voter registration application,

22  because the county must match the number provided by the voter

23  on the mail ballot, or ABBM, Application for Ballot by Mail,

24  with the voter's original voter registration record and

25  whatever happens to be in there.

1    This imposes significant and more obstacles for

2  disabled voters and will cause disabled voters to be

3  disenfranchised, and a further substantial number to face

4  significant difficulties in voting that they would not

5  otherwise face but for SB 1.

6    The Court will hear that plaintiff organizations

7  which work to promote civic engagement, including in the

8  minority community, have had to divert time and resources in

9  order to educate voters about the changes SB 1 created, and to

10  address their impact on voters, and that plaintiff

11  organizations expect to have more members experience rejected

12  applications and rejected mail ballots in the future.  These

13  burdens are not justified by any state interest.

14    I would like to give the rest of my time, Your Honor,

15  to Miss Holmes.

16    THE COURT:  You have 27 minutes.

17    MISS HOLMES:  Good morning, Your Honor, may it please

18  the Court.  I am Jennifer Holmes from the NAACP Legal Defense

19  Fund.  We represent the Houston Area Urban League, or HAUL,

20  Delta Sigma Theta Sorority, The Arc of Texas, and Jeffrey

21  Clemmons, but I am completing this opening on behalf of all

22  plaintiffs.

23    I would first like to discuss two additional areas of

24  SB 1 that plaintiffs challenge.  I will then touch on the

25  harms to voters with disabilities and finally speak to the

1  questions the Court should consider when synthesizing the

2  expensive evidence you will hear.

3        First, turning to Article 3 of SB 1.  Sections 3.04,

4  3.09, 310, 312, 313, 315, as well as 4.12 in a different

5  section eliminated forms of voting that promoted access to the

6  ballot box and made voting less burdensome, including

7  drive-thru voting, 24-hour voting, straight-ticket voting, and

8  multiple drop-off locations for mail ballots.

9        You will hear in the testimony that in the 2020

10  election Harris County implemented drive-thru voting with

11  great success allowing 130,000 voters to cast a ballot from

12  their vehicles during the early voting period.  Drive-thru

13  voting incorporated the same election security precautions as

14  the well-established practice of curbside voting but expanded

15  that option to all voters.

16        Harris County also allowed 24-hour voting by keeping

17  a limited number of vote centers open overnight between the

18  two final days of the early vote period.  Because of that,

19  thousands of voters were able to vote in a single night.

20        Harris County and Travis County also established

21  multiple locations where voters could return their mail-in

22  ballot.  SB 1, in response, banned all these methods of

23  voting.  Outlawing them has not only made voting more

24  inconvenient, it has erected barriers to voting that impact

25  the communities that most relied on these methods, voters of

1  color and voters with disabilities.

2         Plaintiffs challenge these provisions as an undue

3  burden on the right to vote and as adopted with the intent to

4  discriminate on the basis of race in violation of the First,

5  Fourteenth, and Fifteenth Amendments, and Section 2 of the

6  Voting Rights Act.

7         Turning now to Article 2 of SB 1.  Sections 2.05,

8  2.06, and 2.07 require monthly purges of the voter

9  registration list, ostensibly to identify noncitizens.

10 Relying on sometimes erroneous or outdated jury service and

11 DMV records, county election officials must remove registered

12 voters from the rolls, forcing them to provide proof of

13 citizenship, like a passport, a birth certificate, or a

14 certificate of naturalization within 30 days to avoid having

15 their voter registration canceled altogether.

16        SB 1 threatens sanctions on county officials who do

17 not carry out these purges to the satisfaction of the

18 Secretary of State but has no consequences for election

19 officials who erroneously remove lawful voters.  Like prior

20 flawed voter purges in Texas history, this one ensnares

21 naturalized citizens in its overreach putting the onus on them

22 to submit documentation to retain their right to vote, a

23 costly and time-consuming exercise.

24        These provisions were adopted with the intent to

25 discriminate on the basis of race and ethnicity and plaintiffs

1  challenge them under the Fourteenth and Fifteenth Amendments
2  and Section 2 of the Voting Rights Act.
3          Now that we've walked through all the challenged
4  portions of SB 1, I would like to discuss the harms that SB 1
5  imposes on a particular group, voters with disabilities.
6          The evidence will show that individually and
7  collectively the challenged provisions of SB 1 discriminate
8  against the nearly 5 million disabled voters in Texas,
9  representing as much as 30 percent of the state's
10 population — of the state's voting population.
11          SB 1 creates extra burdens in voting for many of them
12 and prevents some of them from voting altogether.  Although
13 the disabilities of plaintiffs' organizations, members and
14 their constituents may vary, the harm that SB 1 imposes on
15 them is uniform.  The denial of equal access to the votes —
16 to the state's voting programs and in many cases the denial of
17 voting assistance from a person of their choice.
18          This is true regardless of defendant's intent.
19 Plaintiffs expert Dr. Doug Kruse will testify that people with
20 disabilities face myriad barriers in voting that have only
21 been exacerbated by SB 1.
22          Many have difficulty accessing transportation to the
23 polling place.  Many require assistance with the routine steps
24 of voting, like remembering the details of the voting process,
25 writing information on a ballot and putting the ballot in the

1  mail.  Some also live in facilities where they do not have

2  ready access to identity documents needed to fill out their

3  ballots.  SB 1 poses a catch-22 for disabled voters because it

4  makes both in-person voting and voting by mail more burdensome

5  and inaccessible.

6       Consider mail voting.  Dr. Kruse will testify that

7  nationally disabled voters are three times more likely to vote

8  by mail than voters without disabilities.  Thus, restrictions

9  on voting by mail disproportionately fall on them, including

10  SB 1's onerous identification requirements.

11       These requirements as, Miss Perales said, caused mail

12  ballot rejections to sky rocket, and you will hear from county

13  officials that they have been alarmed by the high rejection

14  rates which have caused a host of problems.

15       As for in-person voting, Dr. Kruse will testify that

16  voters with disabilities require assistance to vote at more

17  than twice the rate of voters without disabilities.  And as

18  discussed earlier, SB 1's hyper-criminalized assault on voter

19  assistance has created a culture of fear and confusion making

20  it harder for disabled voters to obtain the assistance they

21  need.

22       For example, Teri Saltzman, who is blind, will

23  testify that her mail ballot was rejected multiple times

24  during the March 2022 primary because the ID numbers that she

25  provided could not be matched with the numbers in her voter

1  registration record.  She was unable to cure the problem
2  because the Secretary of State's Ballot Tracker website is
3  inaccessible to blind voters.  She called the Travis County
4  Clerk's Office four times to resolve the matter, only to
5  eventually receive a notice that her ballot was never counted.
6          Miss Saltzman's ballot was again rejected in the 2022
7  General Election.
8          Laura Halvorson, who has muscular dystrophy, will
9  testify that her personal care attendant would not assist her
10  with voting during the March 2022 Primary due to her fear of
11  criminal prosecution related to the new oath of assistance.
12  As a result, Miss Halvorson did not receive the assistance she
13  needed and it took her four attempts over two days to hold her
14  ballot to grasp a pen and to mark her choices.
15          The Court will hear that defendants have not
16  alleviated these burdens.  The Secretary of State has not
17  advised the counties how to implement the challenged
18  provisions of SB 1 while also complying with the ADA.  County
19  elections officials received extensive modification requests,
20  complaints, and grievances related to SB 1's provisions from
21  voters with disabilities, but both State and county officials
22  have stated that they would refuse to waive any part of SB 1's
23  assistance or mail ballot identification requirements as an
24  accommodation.
25          Defendants may argue that voters with disabilities

1    are not fully denied access because there are multiple options
2    available to them to vote.  Such a claim misstates the
3    standard of the ADA under which complete denial is not
4    required and it also ignores that many disabled voters find
5    all of the available options to be burdensome or inaccessible.
6         Just because these voters committed to participate in
7    the democratic process find some way to vote despite extensive
8    hardship does not make their access equal.  If a wheelchair
9    user faces an inaccessible building and can, with great
10   hardship, get herself out of the wheelchair and crawl up the
11   steps to get inside, no one would argue that this is equal
12   access under the law.  Voters with disabilities should not be
13   forced to figuratively crawl up the steps to access the
14   franchise.
15        I would like to now turn to the overarching questions
16   in this case.  Your Honor, this is a complex case.  As you
17   know, SB 1 is a complicated law.  Plaintiffs challenge
18   multiple sections and we have a lot of consolidated lawsuits
19   here, but as you sift through the evidence there are two
20   questions that plaintiffs submit provide a framework for
21   considering this evidence.  First, what was the purpose and
22   intent of SB 1?  And, second, what is SB 1's impact on voters?
23        To the first question, the evidence will show that a
24   discriminatory purpose was a motivating factor behind the law.
25   As the Court knows, the Arlington Heights test was developed

1  because legislators rarely announce their discriminatory

2  intent in the pages of the legislative record or in the text

3  of the bill.

4        So courts examine the surrounding circumstances under

5  the Arlington Heights framework supplanting the need to show

6  explicit statements of racial animus or racial motivation.  To

7  assist the Court with this analysis plaintiffs will present

8  the history of voting discrimination in Texas and the sequence

9  of events that led up to the passage of SB 1 through expert

10  testimony.

11        From its requirement of rolling voter purges, to its

12  empowerment of poll watchers who have a long history of

13  intimidating minority voters in Texas, to procedural

14  irregularities that led to its passage, SB 1 echos the

15  shameful past when Texas lawmakers employed any stratagem to

16  diminish the power of Black and Latino voters to preserve what

17  they called, quote, "the purity of the ballot box."

18        Indeed, that phrase appeared in a predecessor version

19  of SB 1 until opponents of the bill exposed the history of how

20  those words had been invoked in the past to prevent Black

21  Texans from voting.  But excising that phrase did not sanitize

22  SB 1 of its discriminatory purpose or effect.

23        The Court will hear that the proponents of SB 1 were

24  determined to ram a restrictive voting bill through the 2021

25  legislative session, which they extended by two special

1 sessions in order to do so.  They twisted parliamentary
2 procedure, they substituted bills at the last minute, and they
3 even threatened lawmakers' pay to secure the package of SB 1.
4 In the frenzy many members of the public were shut out from
5 providing testimony, including many voters with disabilities
6 who were not permitted to testify remotely.

7          The Court will hear that parts of SB 1 were a direct
8 reaction to the engagement and political power of Black and
9 Latino voters shown in recent elections.  Despite the
10 challenges presented by an election during a global pandemic,
11 Black and Latino turnout soared in November 2020.

12          In response, the legislature passed restrictions
13 aimed at these groups:  Voter purges that impact Latino and
14 naturalized citizens, limitations on voter assistance to
15 nonnative English speakers, and bans on methods of voting
16 disproportionately favored by Black voters.  SB 1 targeted
17 them with surgical precision.

18          The Court will hear from legislators and community
19 organizations that opposed SB 1 during the legislative
20 session.  They informed the legislature of the harmful effects
21 of these bills.  They backed this up with evidence, studies,
22 statistics, and accounts of their own personal.  Experiences.

23          For example, members of Delta Sigma Theta testified
24 that these bills would have a disparate impact on Black voters
25 continuing a long history of racial discrimination in Texas

1  endured by the sorority's members by returning our voting laws

2  to a Jim Crow era.

3          The Texas Civil Rights project submitted an analysis

4  that showed that voters of color were more likely in 2020 to

5  use the very methods of voting that SB 1 would ban, and it

6  presented testimony about the unique and historical harm that

7  Black voters face from intimidation from partisan poll

8  watchers.

9          Thus, the evidence will show that the harm of SB 1 to

10  minority voters was foreseeable, despite attempts by its

11  proponents to close their eyes to it by prohibiting the word

12  racism during the legislative debate, or refusing to

13  commission their own study to study the racial impact of the

14  bill.

15          I do not doubt that State defendants will proffer

16  alternative justifications for SB 1 but these find little

17  support in the evidence.  You will hear that resource

18  intensive investigations by the Attorney General failed to

19  document more than a few isolated instances of proven fraud in

20  2020.

21          County election officials will testify that they did

22  not have problems with fraud under the pre-SB 1 election code,

23  and that there were already effective measures in place to

24  safeguard voting by mail, voting with assistance, and other

25  methods that SB 1 attacked.

1          The restrictive and punitive measures adopted in SB

2     1, moreover, were not necessary to combat fraud or to

3     prophylactically guard against never-before-seen fraud,

4     because, as you will hear, those measures were not tailored to

5     achieve those proffered goals.  Instead, they imposed heavy

6     burdens on voters and election fecials.

7          You will also hear that polling before the 2021

8     legislative session showed that most Texans did not prioritize

9     an election integrity bill, so there was no need to boost

10    public confidence in elections in the state, which, as Keith

11    Ingram had said, were "smooth and secure" in 2020.

12         State defendants may also point to uniformity in

13    elections as justifications for SB 1.  You will hear that

14    opponents of the bill exposed the tenuousness of this

15    justification during the legislative session, noting that the

16    uniformity sought under SB 1 would disadvantage voters in

17    larger, more urban counties with more diverse electorates.

18         They cast doubt on the value of seeking uniformity in

19    a state where counties vary greatly by size, by density, and

20    by population, and they emphasize the importance of allowing

21    county officials flexibility in how their administer

22    elections.

23         Ultimately, SB 1 did not actually achieve uniformity

24    in many key areas, belying the claim that this was truly its

25    purpose.  While it is not plaintiffs' burden to disprove the

1  State's justifications under an intentional discrimination

2  claim, the evidence at trial will reveal them to be flimsy at

3  best.

4          This evidence also weighs in plaintiffs' favor in the

5  balancing test required under plaintiffs' undue burden claim,

6  and in the Senate factor analysis under plaintiffs' claims

7  under Section 2 of the Voting Rights Act.

8          Turning to the second overarching question, what is

9  the impact of the challenged provisions of SB 1?  I would like

10  to highlight three characteristics of this impact.

11          First, SB 1 burdens voters at every stage of voting.

12  At the outset, SB 1 makes it more likely that a voter will be

13  removed from the rolls and will have to submit proof of

14  citizenship to stay on.

15          Then, SB 1 makes it harder to apply to vote by mail,

16  harder to correctly fill out a mail ballot, harder to drop off

17  that ballot, and more likely that that ballot will be rejected

18  because of a mismatch between the ID numbers in the voter

19  registration record, which is a defect outside of the voter's

20  control.

21          SB 1 makes it harder for voters to learn about

22  political issues from community organizations and makes it

23  harder for those organizations to engage in Get Out the Vote

24  efforts due to the law's vague prohibitions on vote

25  harvesting.

1          Next, SB 1 makes it harder for voters to get to the
2    polls, particularly for shift workers and Texans with less
3    flexible work schedules, and for voters who need organized
4    group transportation.

5          At the polling place, SB 1 produces longer lines by
6    banning the -- by banning or restricting alternative methods
7    of voting.  SB 1 makes it harder for voters to receive the
8    assistance that they need to vote, and SB 1 leaves voters
9    exposed to intimidation from rogue poll watchers by empowering
10   them to operate virtually unchecked.

11         Finally, at the voting machine, SB 1 makes it harder
12   to vote for a preferred state of candidate because it outlawed
13   straight-ticket voting.  The burdens brought by SB 1 permeate
14   the entire process of voting.

15         That brings me to the second characteristic of the
16   impact of SB 1.  Because these challenged provisions impact
17   voters at every stage of voting, we submit that the Court
18   should not ignore their cumulative impact.  SB 1 provisions do
19   not operate in isolation.  Rather, they affect voters in
20   overlapping ways as part of a holistic regime.

21         Plaintiffs' expert, Dr. Dan Smith, modeled this
22   phenomenon through a cost of voting analysis which evaluated
23   how various sections of SB 1 imposed different costs or
24   hardships that voters must incur to successfully vote.  Time
25   costs, transportation costs, health costs, financial costs,

34

1  and information costs.  By piling on these costs, each

2  additional restriction in SB 1 makes it more likely that a

3  voter will be dissuaded or prevented from voting.

4         Recognition of the cumulative impact of SB 1's

5  provisions fits with the totality of circumstances analysis

6  required for our results claim under Section 2 of the Voting

7  Rights Act.  It also reflects the reality facing our clients.

8         And I'd note that impact is not limited to voters.

9  SB 1 also burdens poll workers who are chilled from carrying

10  out their duties by vague restrictions on their interactions

11  with poll watchers and the criminal penalties for violations

12  of those provisions.

13         Jeffrey Clemmons will testify that after serving as

14  an election judge in the 2020 Primary runoff he has been

15  fearful of doing so again, now that SB 1 is in effect.  He's

16  concerned that in trying to maintain order at the polling

17  place and trying to protect voters from intimidation and

18  trying to safeguard the secrecy of the ballot he might

19  inadvertently violate one of SB 1's expansive and ambiguous

20  poll watcher entitlements.

21         Voters, of course, suffer the downstream effects of

22  election judges declining to work or feeling inhibited from

23  carrying out their duties, which is yet another cumulative

24  burden.

25         Finally, the third characteristic of SB 1's impact.

These burdens are not distributed equally among voters.
Dr. Kenneth Mayer will testify that people of color
disproportionately used drive-thru voting in 2020.  Black
voters made up roughly 30 percent of drive-thru voters, versus
only 18 percent of in-person voters, so they were the most
affected when SB 1 banned this form of voting.

Regarding voting by mail, Dr. Smith found that
post-SB 1, Black voters had their mail ballots rejected at
four times the rate of white voters.  As for Latino voters, he
found that when the applications or mail ballot was rejected,
the reason was overwhelmingly due to SB 1's ID requirements.
Crucially, about half of voters who had their mail ballot
application rejected due to SB 1 did not ultimately vote by
any method.  They were shut out completely.

The Court will also hear evidence from people on the
ground about -- from the organizations that serve Black,
Latino, and Asian-American communities about how their
constituents have been impacted.

Ray Shackelford from the Houston Area Urban League
will testify that the voting methods SB 1 banned met the basic
needs of the Black and Latino communities that HAUL serves.

Twenty-four hour voting reduced the burden on shift
workers who could not get to the polls during the day,
drive-thru voting decreased the difficulty for those with
childcare obligations, or health concerns, like Deion Dorsett,

1  a member of HAUL, who will testify that drive-thru voting was
2  crucial to his ability to vote in 2020.
3        You will also hear from Deborah Chen, from
4  OCA-Greater Houston who will testify that SB 1's vote
5  harvesting provisions have forced her organization to stop
6  doing many voter outreach activities, like hosting candidate
7  meet and greets.  And SB 1's criminalization of compensation
8  for mail ballot assistance have forced OCA-Greater Houston to
9  stop providing language and other voting assistance to the
10 Asian-American and Pacific Islander community it serves.  SB 1
11 means these communities of color now bear a greater burden to
12 have their voices heard.
13       To close, I want to acknowledge that the plaintiffs,
14 many of whom have members of their organization present in the
15 gallery today, the plaintiffs brought this case for one
16 reason, voting is a fundamental right that is preservative of
17 all other rights, but SB 1 is disenfranchisement by a thousand
18 cuts.
19       No plaintiff, or member, or eligible Texas voter
20 should face these barriers to voting.  Thus, we urge the
21 Court, after hearing all the evidence to hold the challenged
22 provisions are unconstitutional and in violation of federal
23 statutes.
24       Thank you, Your Honor.
25       THE COURT:  Thank you.

37

1          Do any of the lawyers or my staff need a break?  We

2     push on then.

3          The Court recognizes the State.

4          MR. KERCHER:  If we could have the screen, Your

5     Honor.

6          Morning, Your Honor.  In light of the fact that State

7     defendants anticipate that their own case in chief won't begin

8     for several weeks, I'm not going to go into the same level of

9     detail because I'm not going to try and hold you responsible

10    for that much information over that many weeks.  Rather, we'll

11    delve in the details across the examinations coming in

12    plaintiffs' case in chief and on our own, but I would like to

13    highlight some things for the Court to be looking for as we

14    progress with the evidence.

15         This case is a dispute between two sides that are

16    concerned that Texas elections are in danger.  They disagree

17    vehemently on the specifics, but when it comes down to what

18    the primary disagreement between these parties is whom or of

19    what they are afraid.

20         In 2022 the Texas population exceeded 30 million

21    people, over half of whom were registered to vote.  Voting is

22    a fundamental right but it is also an extraordinary exercise

23    of governmental administration.

24         The parties on both sides are not fundamentally

25    dishonest.  They are not fundamentally unimportant.  And, in

1  fact, the tension between them is what we call democracy.  The

2  right to vote is fundamental to that democracy, but ensuring

3  that every vote counts and that every vote is real is just as

4  fundamental.

5       There are 254 counties in this state with thousands

6  of polling locations ensuring that the people who can vote do

7  vote by opening those polling locations, by getting ballots to

8  them in their own homes and overseas, is an exercise in

9  governmental thoroughness matched only by taxation.

10      SB 1 undertakes biannual additions to the election

11  code in the same way that the Texas legislature undertakes

12  additions and changes to the Texas Election Code every two

13  years.  The reason for that is because elections are hard.

14      Each election cycle we identify new problems.

15  Sometimes those problems are mere vulnerabilities, but it's

16  important to remember that not every fence, not every wall is

17  built after an attack.  When we identify vulnerabilities, we

18  have a responsibility to act to ensure that they are not

19  exploited.

20      Let's talk a little bit about the story of SB 1, Your

21  Honor.  The legislature undertakes the challenge of

22  identifying problems in elections.  It identifies what has

23  happened and what yet may happen.  That was particularly true

24  following the 2020 election which was unprecedented because it

25  happened during an unprecedented time and an unprecedented

1  pandemic.

2        There were experiments that different counties tried

3  in order to see how they could effectuate voting.  Some of

4  those experiments may have worked.  Some of those may have

5  exposed frailties or challenges that could not subsist while

6  ensuring voter security and that each vote counts going

7  forward.

8        The legislature, after identifying problems, what did

9  work, what did not work, then manufactured its solutions.  My

10  colleagues referred to a previous version of SB 1.  And, to be

11  sure, SB 1 is not the only version of election changes taken

12  up by the Texas legislature in 2021.

13        It was a hotly debated topic.  Despite suggestion by

14  plaintiffs' counsel that this was not prioritized by voters,

15  anyone with a computer, or television, or radio knows that

16  election integrity was a hot political topic in 2020 and in

17  2021.  Voters were concerned.

18        The next phase of any legislation is evaluating its

19  efficacy, and you're going to learn that SB 1 was passed with

20  a remarkably short time frame for the county and the State to

21  implement or understand its provisions, but that over time the

22  implementation of those provisions has gotten better and that

23  SB 1 now serves its purpose to ensure voting integrity, that

24  each vote counts and that each vote is real.

25        We've walked through many of these provisions but I'd

1   like to outline them for you just by category, Your Honor.
2   We're going to have to keep track of a bunch of them here.
3          Section 2 of SB 1 deals with voter registration, and
4   there are three provisions challenged by different plaintiffs.
5   Section 2 -- excuse me -- yeah.  Section 3 deals with polling
6   hours and locations, where people can vote, when people can
7   vote, whether their problems with voting locations being in
8   certain places or in certain kinds of places, and whether
9   there are problems with having voting access at different
10  times of day, whether because it institutes a burden on the
11  State or the county, or because it institutes dangers to the
12  voter and to the integrity of their vote.
13         Section 4 deals with poll watchers, what they can do,
14  what they cannot do, what they must be allowed to do to ensure
15  that those who are administering this important fundamental
16  right are following the rules.  Poll watchers are a part of
17  transparency and ensuring that they can do their job is an
18  important State interest.
19         Section 5 is mail-in voting.  You've already had an
20  awful lot of exposure to this in your evaluation of the
21  parties' cross-motions for summary judgment.  As my learned
22  opposing counsel points out, there are some of the same
23  provisions as well as others that are being challenged under
24  different causes of action.
25         Section 6 deals with voting assistance, particularly

1 when a voter goes into a polling place, although not

2 exclusively and what help they receive, and who can provide

3 it, and how, and whether or not we need to cabin that

4 assistance to ensure that that important assistance is not

5 taken advantage of.

6        A thing you're going to see throughout trial, Your

7 Honor, is not just whether or not something ought to happen in

8 terms of running an election and ensuring voter access, but

9 whether it could be taken advantage of.

10        What happens if we put this tool in the hands of

11 someone who is not trustworthy?  You're going to learn that

12 there are instances where that has certainly happened.  You're

13 going to learn that there are vulnerabilities where it might

14 happen and SB 1 takes steps to ensure the safety of Texas

15 elections.

16        Section 7 deals with vote harvesting and whether or

17 not we can aggregate votes in the hands of a few.  Plaintiffs

18 will tell you that they are here to help and that those vote

19 harvesting provisions prevent them from helping, but what if

20 we put these same provisions in the hands of someone we do not

21 trust?

22        Finally, Section 8, Your Honor, deals with the civil

23 penalty imposed by SB 1.

24        You have heard a variety of cautions of action that

25 have been brought by the plaintiffs.  We'll touch the high

1  points again.  They've brought Fourteenth Amendment

2  intentional discrimination claims, as well as due process

3  claims for vaguely; as well as intentional discrimination

4  claims under the Fifteenth Amendment.

5          They brought free speech claims under the First

6  Amendment, as well as vaguely and overbreadth.

7          They've they brought ADA and Rehabilitation Act

8  claims.

9          They have also brought Voting Rights Act claims under

10  Sections 2 and 208, and Anderson-Burdick, or undue burden

11  claims.

12          Let's talk a little bit about the efficacy of SB 1.

13          Its effective date was December 2nd, 2021.  You will

14  learn that the last day to register to vote for the Primary

15  Election was January 31st of 2022.  And, of course, the

16  Primary then was the beginning of March and the General

17  Election was November 8th of 2022.

18          Unfortunately, the effective date of

19  December 2nd left precious little time for county

20  administrators and the State to fully understand or implement

21  the provisions of SB 1.  Counties were learning to understand

22  it and trying to implement it as best they could, and the

23  State was working to provide what guidance it could.

24          You will learn, Your Honor, make no mistake, that in

25  it the Primary Election of 2022 there were real problems.  The

1  question the Court will be faced with is whether those real

2  problems are the results of the provisions of SB 1 itself or

3  whether they resulted from the difficulties of implementing SB

4  1 in a short frame of time.

5       The way that the Court is going to be able to sort

6  this out is that the evidence will show that the difference

7  between the problems provided for in the Primary Election of

8  2022 had largely dissipated, if not disappeared by the general

9  election of 2022, after which time the counties had had

10  sufficient time to implement the new requirements and the

11  State had had sufficient time to provide guidance as necessary

12  to those counties, and the training provisions put together by

13  SB 1 had taken root in those it sought to train and how to

14  better run Texas elections.

15       Some challenges, Your Honor, that the plaintiffs will

16  face as they put on their evidence will be demonstrating

17  standing.  Listen closely for evidence of injury, whether it's

18  because of the nature of the entity that has brought its

19  claims, or because the voter may have suffered some difficulty

20  in voting, some additional burden in voting, was ultimately

21  able to vote, or whether the additional burden may have been

22  justified by the State interest the SB 1 sought to implement.

23       Also look at causation, Your Honor.  If there was a

24  challenge, if there was a problem, if a voter was unable to

25  vote, is that because it happened in the Primary Election

 1    where there was insufficient time to implement SB 1, and did

 2    that problem subsist into the general election, after which SB

 3    1 was more fully integrated into the Texas Election System and

 4    the problems were far fewer.

 5            Also look at, Your Honor, the fact that some of the

 6    challenged provisions under SB 1 unquestionably increase voter

 7    access.  For example, Sections 5.12 and 5.14 create cure

 8    processes for a variety of ballot defects.  This is a way to

 9    solve problems.  When someone has a hard time with their

10    ballot, when their ballot is rejected, there is an opportunity

11    and a process now, thanks to SB 1, to fix it.  Nevertheless,

12    those provisions are challenged in this lawsuit.

13            Likewise, Your Honor, Section 7.02 unquestionably

14    increases voter access by requiring employers to give their

15    employees the opportunity to vote, not just on Election Day,

16    but through early voting as well.  These are not the hallmarks

17    of a statute designed to disenfranchise, particularly to

18    disenfranchise those in the working class.

19            Also, Your Honor, keep in mind some of the legal

20    challenges that the plaintiffs will face.  For example, they

21    have brought ADA and Rehab Act causes of action which require

22    seeking an accommodation.  This is an unusual way to bring an

23    ADA claim where no one has sought an accommodation and we

24    think that you will hear no evidence of them, much less that

25    there was a lack of interactive process.

1          Consider also, Your Honor, the strictures of the
2  Anderson-Burdick test.  My learned co-counsel with whom we've
3  gotten to work very closely and I respect very much talked
4  about the burden on voters.

5          Every election will encumber the right to vote.  It
6  must, because without that encumbrance we cannot organize the
7  vote.  The question is not simply whether or not there was an
8  additional burden, whether there is any burden at all.  The
9  question, as the Court knows, is a balancing test.  Is that
10 burden so great?

11         As the Court weighs that, the Court should weigh the
12 novelty of some of the provisions that plaintiffs complain are
13 shut down by SB 1.  We talked earlier about some of the novel
14 provisions that some of the counties utilized during the 2020
15 election.  For example, drive-thru voting, or 24-hour voting.

16         The Court will learn that 24-hour voting in the State
17 of Texas was literally a once-in-a-lifetime occurrence.  The
18 plaintiffs have alleged that saying that something that has
19 only ever happened once should not happen again under the law
20 constitutes a constitutional violation or other violation of
21 federal statutory right.

22         The Court will have to weigh that evidence about
23 whether a handful, a relative handful of Texas citizens who
24 had the opportunity to vote in a 24-hour period in one county
25 in Texas, in one election in the history of the State,

1  constitutes a statutory or constitutional injury.

2          Your Honor, we look forward to presenting this case

3  to you.  We've worked hard on it.  We appreciate the work of

4  our colleagues on the other side with whom we wish we agreed

5  more.

6          Thank you for your time, Your Honor, and we look

7  forward to showing you the evidence of these claims.

8          THE COURT:  Thank you.

9          Before I recognize witnesses to the stand, let's take

10 up the issue of exhibits.

11         MR. KERCHER:  Your Honor, I apologize.  I believe

12 some of my codefendants have some time left.

13         THE COURT:  Oh, I'm sorry.  I thought you were

14 speaking on behalf of everybody.  You didn't identify anybody

15 else.

16         MR. KERCHER:  My apologies.

17         THE COURT:  For Miss Ogg then.

18         MR. NICHOLS:  Good morning, Judge.  Eric Nichols.

19 I'm here representing Harris County District Attorney Kim Ogg.

20 With me is my colleague —

21         Would you please stand?

22         — Cory Liu, who you'll be seeing throughout the

23 trial.  I do appreciate just a few minutes.  I don't think

24 it's going to take very long, but I think the Court recognizes

25 that there is — there are different paths, different tracks

1  that the plaintiffs have pursued with respect to their claims

2  against different defendants, and to a significant degree the

3  claims that are made against my client, and I hazard to say

4  other district attorneys around the State who have been sued,

5  are different than those that have been brought against the

6  State, and so I do appreciate just a few minutes.

7          Judge, I know you've reviewed the joint pretrial

8  order and I know you listened carefully to the openings.  So

9  from the joint pretrial order on one of the first pages from

10 the openings you have heard today, it is fair for everyone to

11 say that there is an extensive list of provisions that were

12 enacted through SB 1 that the plaintiffs are challenging in

13 the case.

14         You're going to see as part of the evidence, you're

15 going to see something marked as Joint Exhibit 1.  It's a copy

16 of the actual bill.  It's got the red lining where things were

17 added.  It's got the strike-through where things were deleted.

18         And actually the version that I think is proposed to

19 be in evidence of that has some highlighting on it but it

20 doesn't actually highlight all of the provisions that are

21 under attack in the case, and so I've done that and I can tell

22 you that these provisions are very, very extensive in terms of

23 those who have been challenged.

24         Among these provisions, Your Honor, by my count,

25 there are nine that concern, in any form or fashion, the

1  criminal justice system in the State of Texas.  And as of

2  today, as we sit here today, you have allowed the private

3  plaintiffs to proceed with respect to claims against my client

4  and presumably against other DAs around the State with respect

5  to only those nine provisions.

6        Now, of those nine provisions, Judge, I think you're

7  going to hear that of those nine only four actually create new

8  criminal laws, as it were, in the State of Texas.  In other

9  words, only four of those actually set fourth a new criminal

10  offense that was added to the election code.

11        Others — there's one that actually limits the scope

12  of a penalty provision that already existed in law.  There are

13  a couple that amend the language of existing statutes,

14  criminal statutes that existed before SB 1, and there's one

15  that deals with a — the form of an oath that needs to be

16  given for voter assistance at the polling place that we

17  respectfully contend at the end of the day you're going to

18  find is a lot like some of the claims that the OCA plaintiffs

19  made with respect to the provisions of Section 5, which you

20  actually said could not proceed as a matter of law.

21        But, Your Honor, our participation in this trial will

22  be limited, and I know that this Court runs a tight ship, and

23  I know if I stray out of my lane outside of these nine

24  provisions that we're talking about, I know you're going to

25  get me back in my lane.

49

1          But we are here, as you well appreciate from what
2    we've filed and we've argued to you that we will be using the
3    trial to help illustrate from our perspective, number one, why
4    plaintiffs could never meet the Ex Parte Young exception to
5    sovereign immunity as to the district attorney I represent and
6    likely other district attorneys for any of the constitutional
7    claims that they make.
8          Number two, that plaintiffs have not pled and cannot
9    prove in the way that all the federal courts all the way up to
10   the Supreme Court require that they can establish standing as
11   to District Attorney Ogg, and likely any other DA as to any of
12   their statutory claims or their constitutional claims on any
13   of these nine provisions.
14         Along the way, Your Honor, we'll hopefully take some
15   opportunities to illustrate why the plaintiffs' efforts to
16   pull in the district attorneys, like my client, into this
17   dispute that has now been I think fairly illustrated by the
18   openings in terms of a political process in which the
19   plaintiff groups participated SB 1 was passed in the form that
20   it was passed, and so the DAs in effect have been pulled into
21   this discussion through federal claims kind of in the abstract
22   and not in the context of any threatened or actual enforcement
23   of any of the provisions that the private plaintiffs
24   challenge.
25         So, Your Honor, we very much appreciate the

1    opportunity to be before the Court and look forward to

2    proceeding with the evidence.

3            THE COURT:  Thank you.

4            State defendants still have 23 minutes.  Do you have

5    anyone else?

6            MR. GORE:  Good morning, Your Honor.  John Gore on

7    behalf of the intervenor defendant, Republican committees.

8            I'd just like to introduce myself for the Court, and

9    also my colleague, Louis Capozzi will be here with us

10   throughout the trial.  I just wanted to say for the record

11   that we join the State's opening statement.

12           THE COURT:  Is there anyone else?

13           MR. KERCHER:  I believe that concludes on behalf of

14   defendants, Your Honor.

15           THE COURT:  Thank you.

16           So where I was headed before is the exhibits.  Do we

17   have exhibits that can be admitted at this time that are not

18   objected to, or not?

19           MISS PERALES:  Your Honor, I believe we do, Your

20   Honor.

21           MR. NICHOLS:  And, Judge, I knew you were going to

22   ask this question, so I have provided a list to the plaintiffs

23   of all the exhibits to which DA Ogg has no objection to

24   admissibility, so they actually have a list and I can find it

25   too if they can't find it, but as to those we have no

51

 1   objection.

 2          THE COURT:  So why don't we take a break while

 3   you—all find this list.

 4          MISS PERALES:  Your Honor, I just want to clarify

 5   that is piecemeal, in the sense that is one defendant, DA Ogg.

 6          THE COURT:  That's why I'm asking.

 7          So I would like to introduce at this time exhibits

 8   that no one has any objection to.  Is there at least one

 9   exhibit out of I'm sure the thousands that we have here that

10   everyone can agree to, other than Joint Exhibit Number 1, the

11   actual legislation?

12          MISS PERALES:  Yes, Your Honor, I believe so.  Docket

13   Entry 753—9, Exhibit 6, if I might give to my friend

14   Mr. Kercher.

15          THE COURT:  So I tell you what.  While you—all look

16   at that, let's take a quick ten—minute break and hopefully I

17   can come back and at least admit something.

18          MISS PERALES:  Thank you, Your Honor.

19      (Recess)

20          MISS TULIN:  Good morning, Your Honor, Leah Tulin

21   with the LUPE plaintiffs.

22          On behalf of, I believe all of the parties, we are in

23   a position to preadmit a list of exhibits.  It is from Docket

24   Entry 753—9.  This is a list of joint exhibits that were

25   identified along with the joint pretrial order on last

1  Tuesday.

2           So I will read those into the record, and before I --

3  then I have, we also conferred and have some additional

4  thoughts about how we might move forward, but at least for now

5  this is the list that we're ready to go forward with.

6           THE COURT:  So please double-check for accuracy on

7  the other side.

8           Go ahead.

9           MISS TULIN:  Joint Exhibits 1 through 10, 12 through

10  29, 31 through 42, 46 through 52, 54 through 60, 62 through

11  66, and 68 and 69.

12           THE COURT:  Any objection to the introduction of

13  Joint Exhibits 1 through 10, 12 through 29, 31 to 42, 46 to

14  52, 54 to 60, 62 to 66, 68, 69?

15           MR. WASSDORF:  Not from State defendants, Your Honor.

16           THE COURT:  And none from anyone else?

17           Those exhibits are admitted.

18      *(Joint Exhibits 1 through 10, 12 through 29, 31 to 42, 46*

19  *to 52, 54 to 60, 62 to 66, 68 and 69 received into evidence)*

20           THE COURT:  Any other helpful suggestions?

21           MISS TULIN:  I believe that there will be additional

22  exhibits that we will be ready to come to an agreement on

23  admission of.  I think both sides of the V need some

24  additional time to confer and then to confer with each other

25  and I would recommend -- I believe that there's going to be

1  some time later in the week we have at least one witness who

2  has COVID and so I think there will be time to come back

3  hopefully by Wednesday afternoon and have additional exhibits

4  that are ready to be moved in and perhaps also to address the

5  remainder of the objections to the exhibits at that time.

6            THE COURT:  Thank you.

7            So with regard to any exhibits that have an objection

8  by anyone, let's go ahead —— rather than me slogging through

9  objections, let's make sure that the exhibits actually are

10 going to get tendered into evidence by someone.

11           So if someone intends to offer an exhibit, offer the

12 exhibit, and I'll hear the objection at that time and then

13 make a ruling or reserve a ruling, but, otherwise, yeah,

14 please engage in your efforts to try to agree to exhibits that

15 can be admitted without objection.

16           Anything else that we need to take up before we hear

17 a witness?

18           MR. KERCHER:  Your Honor, I apologize.  The State

19 defendants wish to invoke the rule.

20           THE COURT:  The rule has been invoked.

21           Are there any witnesses in the courtroom?  Any

22 witnesses in the courtroom ——

23           MISS PERALES:  Yes.

24           THE COURT:  —— need to step out to the benches there

25 in the walkway and we'll call you as soon as we can.

```
 1              MISS PERALES:  We are taking one witness out now,
 2   Your Honor.
 3              UNIDENTIFIED FEMALE SPEAKER:  Your Honor, for the
 4   record, I'm Kathleen Hartnett on behalf of El Paso Elections
 5   Administrator Lisa Wise.  She is also a witness but because
 6   she's a party, we have her in the courtroom.
 7              THE COURT:  Parties are allowed.
 8              And then, again, no witnesses should be on Zoom.
 9              Anything else we need to take up?
10              MR. KERCHER:  Your Honor, as you know, a number of
11   plaintiffs have recently in a joint filing notified the Court
12   that they intend not to move forward on some of their claims,
13   that they are dropping their claims.  I think there are two of
14   those parties who have actually moved to dismiss their claims.
15              Before we begin with the presentation of evidence, we
16   would ask for any parties who have not so moved but who intend
17   to drop their claims, move this Court to dismiss their claims,
18   have the Court rule on that on the record so that we are all
19   clear before evidence begins which claims are on and which
20   claims are off.
21              It may also be useful because there has been some
22   inconsistency even in the joint filings as between what is in
23   the body of those filings and what is in the footnotes and
24   what may have been represented otherwise.  If each of the
25   plaintiffs' groups could go through and say on the record
```

1   which of their claims continue, there are Fifteenth Amendment

2   claims against Sections XYZ, and so forth, just to make sure

3   that we are all on the same page.

4           THE COURT:  Are you—all prepared to do that right

5   now?

6           MISS PERALES:  Your Honor, we are prepared to do

7   that.  It would take me at least five minutes.  I can also

8   file an advisory with the Court and other plaintiffs can as

9   well.

10          THE COURT:  So but I do agree that we need to have

11  that on the record and we ought to be doing that at the

12  beginning of trial rather than in the middle of trial.

13          So if you're not prepared to do that at this moment,

14  we'll do it by the end of the day before we break.  So all of

15  you be prepared to enunciate on the record what claims you are

16  going forward on, and what claims you have already dismissed

17  or will be dismissing, and I will grant the dismissal by the

18  end of the day.  So everybody be prepared to do that.

19          MISS PERALES:  Your Honor, LUPE plaintiffs are going

20  to call the first witness.  We can read off a list of the

21  provisions that we challenge and the claims that we have

22  against those provisions before we call the first witness or

23  we can do it as the Court prefers.

24          THE COURT:  So what would be helpful to me, so rather

25  than hunting and pecking through the record so I know what

1 evidence is going to support what claims, it would be helpful

2 for us to be able to have anybody calling a witness announcing

3 what are the claims that are going to be presented.  So if you

4 could do that, that would be appreciated.

5 　　　　MISS PERALES:  I can do that now, Your Honor, before

6 we call the first witness —

7 　　　　THE COURT:  Go ahead.

8 　　　　MISS PERALES:  — if it's an appropriate time.

9 　　　　With the first witness, Your Honor, who will be Miss

10 Tonia Chavez Camacho, plaintiffs will elicit testimony in

11 support of their challenges against Section 5.07 and 5.13.

12 Those legal claims are First and Fourteenth Amendment undue

13 burden on the right to vote.

14 　　　　The witness will also testify with respect to the

15 challenge that we have against Section 6.03, 6.04, 6.05, and

16 6.06.  And the legal challenges against those provisions are

17 First and Fourteenth Amendment undue burden on the right to

18 vote, Fourteenth and Fifteenth Amendments intentional

19 discrimination, Title II of the ADA, Section 208 of the

20 federal Voting Rights Act, and Section 2 of the federal Voting

21 Rights Act.

22 　　　　Also the witness will testify regarding the challenge

23 against Section 7.04, and those claims are First and

24 Fourteenth Amendment undue burden on the right to vote,

25 Fourteenth Amendment void for vagueness, First and

TONIA CHAVEZ CAMACHO - DIRECT

1  Fourteenth Amendment free speech, Fourteenth and

2  Fifteenth Amendment intentional discrimination, Section 208 of

3  the VRA, Section 2 of the VRA, and Title II of the ADA.

4          THE COURT:  Thank you.

5          Your witness.

6          MISS PERALES:  Thank you, Your Honor.

7          May I have permission to examine from counsel table

8  so that I can see the witness?

9          THE COURT:  That's fine.

10          MISS PERALES:  Thank you.

11          Plaintiffs call Miss Tonia Chavez Camacho.

12      (TONIA CHAVEZ CAMACHO, having been duly sworn, testified

13  as follows:)

14                  DIRECT EXAMINATION

15  BY MISS PERALES:

16  Q.  Good morning.

17  A.  Good morning.

18  Q.  Please state your name for the record.

19  A.  My name is Tonia Chavez Camacho.

20  Q.  What is your job?

21  A.  I am currently the executive director at La Union Del

22  Pueblo Entero, also known as LUPE.

23  Q.  What is your educational background after high school?

24  A.  I hold a bachelor's degree in business administration with

25  a concentration in finance and a minor in Spanish, a master's

TONIA CHAVEZ CAMACHO – DIRECT

1  in business administration with a concentration in finance,

2  and a second master's in communication status with a

3  concentration in training and development.

4  Q.  What does La Union Del Pueblo Entero mean in English?

5  A.  La Union Del Pueblo Entero stands for a community union, a

6  union of entire community.

7  Q.  And how is LUPE a community union?

8  A.  LUPE is a membership-based organization and we stand for

9  the rights of community members.  We organize in the issues

10  that affect them the most in trying to reach quality of life

11  and making sure that the rights are heard and that they are

12  participating members of democracy.

13  Q.  Where does LUPE conduct its activities?

14  A.  We primarily serve the region of the Rio Grande Valley,

15  primarily in the four-county area of Hidalgo County, Cameron

16  County, Starr County, and Willacy County.

17  Q.  When was LUPE founded?

18  A.  In 1989.

19  Q.  And who founded LUPE?

20  A.  Legal rights leaders Delores Huerta and Cesar Chavez.

21  Q.  What is LUPE's organizing model?

22  A.  Because we were founded by both Dolores Huerta and Cesar

23  Chavez, currently the organizing model of LUPE is a housing

24  model.  We go where community is at and we identify what are

25  the issues that they are most affected by and we organize

TONIA CHAVEZ CAMACHO – DIRECT

1  around those issues.  We ensure that community members elevate
2  their own voice and we don't speak on behalf of themselves.
3  They are able to represent their own voice.
4  Q.  How many neighborhoods are you currently organizing with
5  LUPE?
6  A.  Hidalgo County has approximately a thousand colonias.
7  Cameron County, roughly 177 colonias or so.  However, at any
8  given time, we organize between 50 to 60 colonias.  And then
9  once we finish with those, we move to the next.
10  Q.  Tell the Court, what is a colonia?
11  A.  A colonia is an unincorporated community neighborhood,
12  usually substandard housing.  They lack drainage
13  infrastructure, lighting.  They have running water and
14  electricity but they do not have basic primary services.
15      If you dial 9-1-1, it could take very long for emergency
16  services to get there because often colonias don't have street
17  names.
18      And oftentimes when it rains kids need to canoe out of the
19  streets in order to get to the school buses or put bags on
20  their feet to be able to go to school without mud on their
21  feet.
22  Q.  Why is it that the school bus cannot come in to where the
23  children live?
24  A.  Because it's too flooded and so the school bus is not able
25  to drive in, or the streets are very narrow and it's unable to

TONIA CHAVEZ CAMACHO - DIRECT

1  like make a curve.

2  Q.  Did you say that colonias are incorporated or

3  unincorporated?

4  A.  Unincorporated.

5  Q.  For LUPE, the organization, what are your major areas of

6  service?

7  A.  We have two primary areas of service and multiple things

8  fall under each of those.  One of them is community organizing

9  and the other one is social services.

10  Q.  Okay.  Now, we'll take that in order.  What are the issues

11  that you conduct your community organizing around?

12  A.  Because we organize in the low-income neighborhoods, the

13  colonias, we, one of the primary issues is infrastructure.

14  And when you look at infrastructure, we have drainage,

15  lighting, paved roads, safety, emergency services, trash

16  pickup, among others.

17      And we also, because we are a multi-issue organizing

18  organization, we address issues that most affect our

19  community, and some of them are access to health care, access

20  to education, equity, so transitioning students from high

21  school to college, immigration, and a pathway to legalization.

22      We also advocate around a woman's reproductive options.

23  And these are just some of the issues that we advocate around.

24      The primary one has been civil engagement over the past

25  few years and being able to educate voters about their right

TONIA CHAVEZ CAMACHO – DIRECT

 1  to vote and their ability of their civic engagement on

 2  options.

 3  Q.  And, now, as to the second main activity of LUPE, what do

 4  you do for social services?

 5  A.  We are accredited by the Department of Justice to provide

 6  family needs and immigration services, so anywhere between

 7  DACA approvals, legal permanent residency, family petition,

 8  citizenships, adjustments of status.

 9      We're also accredited by the IRS to be able to provide

10  income tax services.  We do all kinds of income tax services,

11  1040, 1040X, 1040EZ, 1040A, all of them.

12      In addition to that, we provide notary services,

13  interpretation services, postal services.  We make sure that

14  community members' needs are addressed and oftentimes serve as

15  a one-stop hub for community members.  When they don't know

16  where to go, they come to LUPE, and then we refer them out to

17  the services they might need if we don't offer them.

18  Q.  You mentioned the apostille services, is that when

19  somebody has a foreign government document, like a birth

20  certificate, and they need help getting it sort of certified

21  or authorized in English?

22  A.  The other way around.  So it's usually when you're going

23  to use a U.S. document in a foreign country.  So oftentimes

24  U.S. citizen children, they are taken by their parents to

25  Mexico and registered in school so they need to get their

TONIA CHAVEZ CAMACHO – DIRECT

 1  birth certificate certified by the state, or any other legal
 2  document.  If they are going to get married in Mexico, they
 3  need to get the official interpretation translation of the
 4  document and certified by the state.
 5  Q.  Thank you.
 6      What are LUPE's broad goals?
 7  A.  So in terms of LUPE's broad goals, the primary one that we
 8  have at the moment is being able to build electrode power in
 9  the Rio Grande Valley, this having communities that have been
10  disenfranchised for many, many decades.
11      Colonias still exist, so it's a testament of how
12  low-income families have been taken advantage of and how
13  low-income families are not being given the primary services
14  that they deserve because they are also taxpayers.
15      So we want to make sure that the community members are
16  able to understand their own political powers so that they are
17  better serviced by their government.
18      Another one of our primary goals at the moment because the
19  federal government has disclosed a large amount of OPR legal
20  permanent residence in the Rio Grande Valley area, we want to
21  make sure that through our immigration services we help them
22  become U.S. citizens and eventually walk them through the
23  continuum to offer them the opportunity to register to vote
24  and help them turn out to vote and aid with the ability for
25  them to cast their vote.

TONIA CHAVEZ CAMACHO – DIRECT

1        Those are some of the major areas of work.

2        The other area of work is leadership development.  We work

3   with community members in all parts of the county who are in

4   different levels of education, but we truly believe that no

5   matter what the level of education that you have, that you

6   have the ability to raise your own voice, you have the ability

7   to channel your own asks to improve your quality of life, and

8   so leadership development, it's part of that, being able to

9   speak in public, being able to learn how government works,

10  among other things.

11  Q.  How long have you worked for LUPE?

12  A.  I have worked for La Union Del Pueblo Entero for over 11

13  years in multiple capacities.

14  Q.  How many members does LUPE have today?

15  A.  LUPE approximately has 8,000 members at the moment.

16  Q.  What proportion of your members are over age 65?

17  A.  Approximately 30 percent of the LUPE membership is our

18  elderly community members over the age of 65.

19  Q.  Are any LUPE members registered voters?

20  A.  Oh, yes, many of them are registered voters.

21  Q.  Are any of your LUPE member registered voters also limited

22  English proficient?

23  A.  Yes.  Many of them are mono-lingual Spanish speakers.

24  Q.  Are any of your LUPE registered voters –– LUPE member

25  registered voters also disabled?

64

TONIA CHAVEZ CAMACHO – DIRECT

1  A.  Yes, many of them are.

2  Q.  Are any of your LUPE registered voter members limited in

3  their literacy?

4  A.  Yes, many of them.  For both the disabled and literacy,

5  many of them are elderly community members and so they have —

6  that's part of the reason why we work with an aging community.

7  Q.  Now, with respect to the low-literacy members, are some of

8  them immigrants to the United States?

9  A.  Yes.  A large portion of the community members that we

10  currently work with who are able to become citizens are

11  elderly.  You know, misinformation.  They didn't get to apply

12  for their citizenship early enough and they waited until they

13  were illegible [verbatim] to take the citizenship exam in

14  Spanish, and so now they are becoming citizens.

15      But the reality of it is that we serve not just immigrant

16  community members, we also serve a lot of U.S. citizens who

17  grew up in the United States and who unfortunately were never

18  able to speak the English language.

19      Many of them were migrant workers so they used to travel

20  to other states, and being able to finish school continuously

21  was a problem.  And so we do have multiple community members

22  who are elderly, who are not Spanish — English literate, and

23  who are immigrant and U.S. born citizens.

24  Q.  And to draw a little bit of a distinction between

25  English-speaking ability and literacy, do you have LUPE

TONIA CHAVEZ CAMACHO — DIRECT

1  members who are registered voters who are not literate in any

2  language?

3  A.  Yes.  Many of the community members that we work with,

4  they are able to speak Spanish.  Unfortunately, they are not

5  able to write or read, and this goes for both English and

6  Spanish.

7  Q.  Thank you.

8     Do you have registered voters who are LUPE members who use

9  assistance to vote?

10 A.  Multiple.  Part of them is because they are disabled, and

11 others because they are elderly.  Some because they just are

12 not computer literate, and so even to know what to push is

13 difficult for them.

14 Q.  What are the dues that LUPE members pay?

15 A.  LUPE is a membership-based organization and our community

16 members pay individual dues of an annual membership of $40 for

17 individuals, 60 for couples or marriages, 20 for minors and

18 our elderly community members.

19 Q.  And in what counties do your members live?

20 A.  The four-area region of the Rio Grande Valley, Starr,

21 Cameron, Hidalgo, and Willacy County.

22 Q.  Where are your offices located?

23 A.  We have seven offices in the same region.  We have four of

24 them that are open to the public in San Juan, Texas; Alton,

25 Texas; Rio Grande City, Texas; and San Benito, Texas.  We also

TONIA CHAVEZ CAMACHO - DIRECT

1  have staff in the Mercedes, and in the four office, and a

2  satellite office in Edcouch.

3  Q.  What is your annual budget?

4  A.  $4.1 million.

5  Q.  And generally, by percentage, what are the sources of your

6  funding?

7  A.  We are funded by family foundations approximately at

8  sixty percent.  The membership fees revenue that comes in is

9  somewhere around six to eight percent, give or take.

10      Part of the work that we also do includes the fee for

11  services, and that's approximately 30 percent of our revenue.

12  And less than one percent are individual donations.

13  Q.  What is your direct experience with the neighborhoods in

14  which LUPE members live?

15  A.  Well, I've worked for LUPE for over 11 years, so I have

16  visited with multiple community members there, you know,

17  created a relationship with them, but the primary experience

18  is that I actually live in a colonia.  So I have learned

19  firsthand some of those struggles of living in those

20  neighborhoods.

21  Q.  And what are the services or lack of services in your

22  colonia?

23  A.  We don't have trash pickup, so our landlady has multiple

24  family members living in the same colonia and she goes around

25  the neighborhood, picks up the trash once a week and takes it

TONIA CHAVEZ CAMACHO − DIRECT

1  to the dumpster.

2       We don't have natural gas lines, so we have to have the

3  propane tank.  So, God forbid you are cooking something and it

4  runs out on Christmas night.

5       Part of the lack of services that we have is, you know,

6  obviously the trash pickup, the gas, but also we have service

7  by the sheriff, and we are in the south part of the county.

8  The sheriff's office is in the north side of the county, like

9  approximately an hour away from where I live, so getting

10 emergency services there is very difficult.

11 Q.  Are you connected to a sewer line?

12 A.  No, I have a septic tank.  That's part of the challenge.

13 There's no drainage infrastructure.  There's no sewage

14 infrastructure.  It doesn't flood, it is paved, and so part of

15 the challenge is if you do implement the sewage, the drainage,

16 then you have to destroy the roads and then being able to do

17 that again, and oftentimes, we are not a priority for the

18 county.

19 Q.  Are there LUPE members who live in your colonia besides

20 you?

21 A.  Yes, multiple LUPE members live in that colonia.

22 Q.  What have you observed about the neighborhoods where LUPE

23 members live in terms of race and ethnicity?

24 A.  Many of the neighborhoods that LUPE serves are mostly

25 either Mexican-American decent, Mexican, first generation

TONIA CHAVEZ CAMACHO – DIRECT

1  immigrants, second, third generation immigrants.

2      Many of the people that we work with, the belief is that

3  they are not U.S. citizens, but that is not necessarily true.

4  Many of the children that we — the families — the children

5  of the families we serve are U.S. citizens.

6      And oftentimes multiple families that we work with are

7  mixed status families, so we do have a lot of U.S. citizens

8  who are part of the community that we serve.

9  Q.  And with respect to the income levels, same question.

10 What have you observed for the neighborhoods where LUPE

11 members live?

12 A.  Many of them are very low-income neighborhoods.

13 Q.  With respect to educational level, what have you observed?

14 A.  Most of the families that we work with have not finished

15 grade school, as it relates to the parents.  Some of them

16 might have finished high school but the rates are not very

17 high.  The children, they are either in college or in grade

18 school.

19 Q.  And what have you observed with respect to access to the

20 internet for neighborhoods where LUPE members live?

21 A.  Whew.  Hot topic area right there.

22      If you ask the FAC, it will tell you that it is

23 100 percent covered, but that's not the reality that we see in

24 the neighborhoods.

25      Oftentimes, the internet goes out.  There's no optic,

TONIA CHAVEZ CAMACHO – DIRECT

1  fiber optic that is implemented in the low-income

2  neighborhoods and so we have satellite internet and the speed

3  is very, very tiny, not even enough to send a text, picture

4  over text message.

5      And it's a challenge for children who are in school but

6  also for families who may need to work from home.  It's, you

7  know, as information is available online, on social media,

8  it's hard for them to be able to get that information.

9  Q.  And my last question about the neighborhoods in which LUPE

10 members live, what is the rate of voting?

11 A.  It's high in terms of people being able to register to

12 vote; however, it's also low in actual turnout because

13 oftentimes information doesn't get to the individual

14 neighborhoods, so when you actually look at where polling

15 locations are located they are located within the boundaries

16 of city limits not necessarily on the unincorporated

17 communities where colonias are at.

18     There are some, but not as many, and so in the -- not too

19 long ago we were working on a bill to push trash pickup and

20 the county judge, through our face, he said, well, you know,

21 actually, the people who vote for me are not people who live

22 in the colonias, are people who live in the city.  Yet, he

23 actually work with people who live in the colonias in the

24 unincorporated neighborhoods.

25     So we are actively working on registering voters in the

TONIA CHAVEZ CAMACHO – DIRECT

1  colonias door by door to make sure that they turn out to vote

2  in elections and make sure that we are reminding them and

3  providing rights it's needed to take.  So it is a great need

4  on being able to do outreach in the low-income neighborhoods.

5  Q.  Where are the main type of voter engagement activities

6  that LUPE engages in?

7  A.  We do voter education, voter registration, and Get Out the

8  Vote efforts.

9  Q.  You mentioned a moment ago voter registration.  I have a

10 couple more specific questions for you.  When does LUPE engage

11 in voter registration?

12 A.  Year-round.

13 Q.  And is voter registration associated or in tandem with any

14 other LUPE services?

15 A.  We do have –– all of our LUPE staff are able to, if they

16 are illegible to, become deputy registrars, and so those are

17 illegible to become deputy registrar.  They are encouraged to

18 do so.

19      In other levels of our LUPE offices and in organizing

20 work, we do have the ability to provide the opportunity for

21 community members who step into the office to register to

22 vote, but also one of the primary ways that we are engaging

23 community members is when they become U.S. citizens we offer

24 them the opportunity to become –– to register to vote and then

25 become active voters.

TONIA CHAVEZ CAMACHO – DIRECT

1  Q.  The next category that you named for your voter engagement

2  activities is voter education.  Can you tell me what you are

3  communicating to voters when you are doing voter education?

4  A.  Voter education happens year-round and it sort of happens

5  in two ways.  One of them is during nonelection time and

6  during election time.

7      Part of the work that we do during nonelection time is

8  making sure that we are talking to community members about

9  when to register to vote, where to register to vote, who is

10 illegible to register to vote, what are the deadlines they

11 need to be looking out for.  That's part of the work that we

12 do.

13     And then as we lead up to actual election season then we

14 talk about what are the races that are going to be in the

15 ballot.  We also, if there's constitutional elections, then we

16 go over the different proposals.  If there's a ballot measure

17 then we address what those may be and ask them to support or

18 against a specific ballot measure that we might be working on.

19     So it depends where in the continuum we are doing voter

20 education, but it's actively year-round the work that we are

21 doing.

22 Q.  And where do you conduct voter education?

23 A.  We conduct voter education where the community are at, and

24 that may be in the low-income neighborhoods.  As I mentioned

25 earlier, we utilize the house main model.  So we have

TONIA CHAVEZ CAMACHO — DIRECT

1  approximately ten organizers on staff who host house meetings
2  out in the neighborhoods, an average three a week or so, and
3  so we are doing this education out in the neighborhoods but we
4  also do it in our multiple LUPE offices.
5      We have a meeting hall, probably around the size of this
6  room that holds — you know, we make the space work.  So it
7  does hold a lot more people than there are here.
8  Approximately 100 to 200 people, we are able to fit there.
9  And we do is a lot of voter education because community
10  members are in need of ensuring that their questions are
11  answered.  The questions that they may have, that somebody is
12  there to aid them or help them.
13      So we do it both in their LUPE offices and out in the
14  field.  And sometimes we go to community events.  We go to
15  health fairs and we have a LUPE table and people approach us.
16  Q.  So does a community member find themselves interacting
17  with LUPE for just one thing, for one service or one matter?
18  A.  No.  LUPE has built a reputation in Hidalgo County and
19  oftentimes it's not a service that we offer, but they will
20  still come to us because of the credibility that the
21  organization has built over time.
22      LUPE is a membership organization and part of the
23  membership organization is that we provide members with
24  membership ID.  And oftentimes that is recognized in the
25  county whenever community members apply for TANF, whenever

TONIA CHAVEZ CAMACHO – DIRECT

1  community members need to get married.  And that's the

2  credibility of the organization.

3      And oftentimes they come us to because they don't have

4  funding to pay for utility bills, or we refer them to Texas

5  Rio Grande Legal Aid because they are being evicted out of

6  their home.  And while that's a service that we might not

7  provide, we still aid in guiding them in getting them to the

8  right location.

9  Q.  Why do members come to LUPE for information about

10 elections and voting?

11 A.  Because we have built a relationship with community

12 members throughout the year and because you are working with

13 the organizers.  So the way that we work is that out in the

14 field we are dividing the organizers by precincts and that

15 organizer is working on five, ten different neighborhoods, so

16 they have built a relationship with those community members.

17     They are meeting with them week by week.  When they go to

18 the office, we bring in community members from across

19 neighborhoods to do leadership development sessions and so

20 they have built the confidence and the reputation, but also

21 the rapport with our community organizers to be able to have

22 the confidence or the trust to ask for help, not only are we

23 community organizers and need to them, but oftentimes, you

24 know, they invite us to their family parties.

25     They invite us to break bread with them, and that's just

TONIA CHAVEZ CAMACHO — DIRECT

1  the level of relationship that we have built with our
2  community members.
3  Q.  The last category you named is Get Out the Vote, or GOTV.
4  When does LUPE engage in Get Out the Vote activities?
5  A.  It will depend on the election season but typically we
6  start doing Get Out the Vote efforts somewhere between 10 to
7  12 weeks before election, if it's going to be a long campaign,
8  or six to eight weeks before election if it's going to be a
9  small campaign.  It will depend on the timing.
10      And that entails identifying high concentration of voters
11  in the neighborhoods that we are working in, knocking on
12  doors.  We break our universe in different ways.  We have our
13  entire universe of voters we're going to be reaching out to,
14  in membership and more, but we do want to concentrate in
15  neighborhoods that we directly know the people and knock on
16  those doors.
17      In addition to that, we engage the broader sect of the
18  universe digitally by texting them, by calling, making sure
19  that we are running adds on the radio, making sure that we are
20  running billboards on the — near the neighborhoods they live.
21  Q.  One point of clarification.  When you use the word
22  "campaign," do you mean a campaign to elect a candidate?
23  A.  No, I mean a Get Out the Vote campaign, making sure that
24  we run nonpartisan Get Out the Vote efforts to educate
25  community members about when election season is going to be

TONIA CHAVEZ CAMACHO - DIRECT

1  at, and we are a multi-issue organizing organization and part
2  of the work that we do is advocate for community members to go
3  out and cast their vote on issues that matter the most to the
4  community we serve, making sure that they are electing
5  officials who represent their values on immigration, on access
6  to health care, on access to education, on increasing the
7  minimum wage.
8      And so all of our efforts are nonpartisan, though we do
9  ask community members that they do stand with the values and
10 issues that LUPE is advocating for.
11 Q.  And who conducts the canvassing from door to door in the
12 colonias, who for LUPE conducts this activity?
13 A.  We have our staff and we hire temporary canvassers to be
14 able to do these activities and we have a few volunteers but
15 most of the community, most of the people that we engage on
16 door knocking and activities are paid staff or paid temporary
17 canvassers.
18 Q.  You mentioned voter -- GOTV in the community.  Do you also
19 do GOTV at the LUPE offices where the union hall is?
20 A.  We do.  So earlier I mentioned a little bit of the voter
21 education work that we do.  That also happens in the LUPE
22 offices.  A very significant event that we do in the LUPE
23 offices are voter caravans.  We -- people are coming in for
24 multiple reasons to our LUPE offices.  One of them may be
25 because they need assistance with voting, right?  They have

TONIA CHAVEZ CAMACHO - DIRECT

1  the ballot, the mail-in ballot that they need help with.

2      Oftentimes they are just lost.  They don't know where to

3  go vote.  There was a period of time that we were changing

4  whether you are supposed to go in the individual polling

5  location, or you can vote at any polling location, and they go

6  back and forth, and it depends on the county.  So community

7  members have questions around that and we help them when they

8  have those questions, but the caravans is a very significant

9  event that we host in our LUPE offices.

10      Part of the work that we do with the voter caravans is by

11  communities.  We host multiple ones in our different offices,

12  but when we do host them we invite community members to come

13  in around lunchtime, everybody gathers around, we get in a

14  circle, we celebrate those that are going to be voting for the

15  very first time, those who either became citizens, or those

16  who just turned 18 and are able to cast their vote for that

17  first time.

18      We also identify community members who got to LUPE because

19  maybe they need assistance with voting.  They might be

20  elderly, they might not speak English, they might be disabled,

21  and so at the community center that we have in the union hall

22  and the multiple offices we ask them, is anybody going to need

23  assistance with voting.

24      And when they do request that assistance, we make sure

25  that somebody is available to help them and they choose an

TONIA CHAVEZ CAMACHO - DIRECT

1  assister who is able to help them and that's part of the work

2  that we do.  You know, community members go to the polls, they

3  get off the cars, and their go in and walk together with their

4  assister to go vote.

5  Q.  What happens after the community members vote, when you

6  are doing a caravan?

7  A.  Part of the work that we do is, of course, make sure that

8  there was no issues with voting, right, and making identifying

9  any flacks that they might have had.  If anything goes without

10  any challenges, we then proceed to come back and celebrate

11  those that have voted.

12     We break bread together and celebrate the fact that they

13  were able to cast and be part of the democratic process, but

14  also we give them homework and make sure that they are

15  inviting their family members that haven't yet voted to do so,

16  their friends to do so, their neighbors.

17  Q.  Okay.  Aside from the caravans are there other occasions

18  when LUPE employees find themselves assisting voters in the

19  polling place?

20  A.  We usually don't assist voters in the polling place, like

21  we don't start at the polling place.  Part of the work that we

22  do is we get calls from community members, or we get specific

23  requests in the neighborhoods that community members are going

24  to need help with voting.

25     And so then we either pick them up or they meet us in the

TONIA CHAVEZ CAMACHO – DIRECT

1   LUPE offices and then we assist them with voting.  That's part

2   of the work that our community organizers do.

3   Q.  Okay.  How do you train your staff to provide assistance

4   in the polling place?

5   A.  We make sure that they abide by the statutes of the law in

6   making sure that they only aid voters with their requests that

7   they may have, whether that is helping them understand how the

8   machine works, maybe interpreting something for –– oftentimes

9   we don't have election workers who are bilingual so being able

10  to interpret for them is part of the work that we do.

11      At other times, part of the training that we do with them

12  is often, it's making sure that they exercise the will of the

13  voter in whatever choice the voter wants to make to be able to

14  vote.  We're only there to assist in whatever the voter needs

15  us to assist with.

16  Q.  I would like to now display Joint Exhibit 1.  That will be

17  displayed by Derek, who is here, but I can't see him.

18      And there you are.

19      So Miss Chavez, I'm going to review with you a few

20  provisions here and I'd like to go first to page 51 and

21  section 6.03.

22      *(Off the record discussion)*

23  BY MISS PERALES:

24  Q.  Tell me if you can't see the screen and I will provide you

25  a hard copy.

TONIA CHAVEZ CAMACHO – DIRECT

1    A.  I can, the last line on the page.

2    Q.  Thank you.  This is — I'd like to — okay.  With respect

3    to 6.03 — are we doing the yellow?  I think we can do the

4    Joint Exhibit 1, if that's okay.

5            MISS PERALES:  Your Honor, may I approach the

6    witness?

7            THE COURT:  You may.

8            MISS PERALES:  Thank you.

9            Your, Honor, we made two versions of SB 1 in an

10   attempt to try to make the reading of it a little more

11   accessible.  We have a version that's highlighted in yellow,

12   and that's a demonstrative, but we also have a clean version

13   of the bill which our technology person can highlight as we

14   go, if the Court wants to express a preference.

15           THE COURT:  It is fine.

16           MISS PERALES:  Okay.

17   BY MISS PERALES:

18   Q.  So we are looking at a clean version now of Joint Exhibit

19   1, Section 6.03 at page 51.  And do you see there where it

20   talks about the voter assister filling out a new form with

21   name, address, relationship, and compensation?

22   A.  Um-hum.

23   Q.  And that is on line 2, what we are looking at now,

24   submission of a form by an assistant.  Do you see that

25   language there?

TONIA CHAVEZ CAMACHO – DIRECT

1  A.  I do.

2  Q.  Okay.  Now I'd like to scroll to 6.04, which is on page

3  52.  This is where there are changes to the oath of

4  assistance, and if you will look on line 26, do you see there

5  where the statute adds in underlined language that the oath of

6  assistance is taken under penalty of perjury?

7  A.  I do.

8  Q.  And then where on line 27 where it says, "The assister

9  obtained a statement of eligibility from the voter," do you

10  see that language there?

11  A.  Yes.

12  Q.  On page 53, lines 7 through 9, do you see the new language

13  where the assister has to swear they did not pressure or

14  coerce the voter?

15  A.  I have.

16  Q.  And then, finally, the last part is on page 53, lines 12

17  through 14, where the assister acknowledges that if assistance

18  is provided to an ineligible voter the ballot may not count,

19  or may not be counted, do you see that there?

20  A.  Yes.

21  Q.  Okay.  Thank you.  How has this new language affected

22  LUPE's staff or volunteers who assist voters?

23  A.  It has frightened them.  It has made it more difficult for

24  community members to have their assister of choice help them

25  at the polls.  Even staff have resorted to be the last option

81

TONIA CHAVEZ CAMACHO – DIRECT

1  when assisting voters.

2      We do also have community members who used to volunteer to

3  assist voters at the polls, like Miss Maria Gomez, who has

4  chosen to no longer do so because she's frightened that she

5  will make a mistake and the way that the oath is now written,

6  it also gives the opportunity to the poll worker to decide

7  whether or not somebody is abiding by the oath, and the fact

8  that somebody could be prosecuted for that, it is inhibiting

9  the ability for community members to have an assister of

10  choice, and also for LUPE staff to be willing to help

11  community members in need of assistance.

12  Q.  Do you know if the expanded information that's now

13  required on the new oath has any affect on the lines in the

14  polling place?

15  A.  Yes.  So now you have a form that has additional

16  information that you have to fill out and so this has created

17  additional lines at the polling place.

18      It used to be that you would get in line with your

19  assister of choice, go take the oath, go vote.  But now we

20  have found that those who are choosing to assist voters at

21  their request, now they are having to do a separate line to be

22  able to go through the oath, to be able to fill out all the

23  information that is requested of them, and that has delayed

24  the process in doing —— in assisting voters and created larger

25  lines at the polls.

TONIA CHAVEZ CAMACHO - DIRECT

1  Q.  What is the impact on LUPE members of the effects that you

2  are talking about with assisters being afraid, and so forth?

3  A.  Well, unfortunately, we have less community members, staff

4  members able to assist at the polls, and it has created a lot

5  of confusion as well for community members.

6      They used to come to LUPE all the time to request an

7  assister of choice, and when our own staff says, well, you

8  should ask a family member or a friend, somebody else before

9  you ask us, it sort of creates confusion that we are no longer

10 wanting to provide a service.

11     And we do, but how are we going to be helping voters when

12 now we could be criminalized for doing so?

13 Q.  And in terms of whether or not the voter votes or how the

14 voter votes, what is the impact on LUPE members who are

15 voters?

16 A.  We, unfortunately, especially for disabled voters,

17 oftentimes they don't have anybody who take them to the polls,

18 and so not having an assister of choice helping them can

19 hinder their ability to go out and cast their vote.

20 Q.  I'd like to go now to page 54, line 23.  This is Section

21 6.06, and the language is mostly on page 54.

22     Do you see the language there, where a person commits an

23 offense if the person compensates or offers to compensate

24 another person for assisting voters as provided by Section

25 86.010, do you see that language?

TONIA CHAVEZ CAMACHO – DIRECT

1  A.  I do.

2  Q.  And do you understand that this Section 86.010 is related

3  to vote by mail?

4  A.  I do.

5  Q.  I think you very — you may have referenced this before,

6  but does LUPE provide assistance to voters who vote by mail?

7  A.  We used to.  We used to be able to do that.

8  Unfortunately, today, with SB 1, we are unable to do that.

9      Being able to assist voters under the provisions of the

10  law at the moment will mean that our staff could be jailed,

11  that I could be put in prison, that any volunteer that

12  receives any kind of compensation could be then prosecuted,

13  and so we have refrained from doing so.

14  Q.  Okay.  Did LUPE use to assist mail ballot voters before?

15  A.  Absolutely.  So part of the work that we do is being able

16  to do voter education, voter registration, and Get Out the

17  Vote efforts, right?  So that meant that community members

18  used to come to our LUPE offices with their ballot by mail and

19  they used to request assistance.

20      Unfortunately, today, we have to turn them away, right?

21  We were able to resort to presentations where we would not

22  assist community members directly on how to help fill out

23  their ballot.  We simply projected on the screen and walked

24  them through how a ballot can be filled without providing

25  direct assistance to any one individual, and they would have

TONIA CHAVEZ CAMACHO – DIRECT

1  to do it on their own.

2      Unfortunately, that's what we have had to resort to.  And

3  this is problematic.  Very problematic.

4  Q.  Did you have paid staff performing this assistance back

5  when you used to do it?

6  A.  Oh, yes, most definitely.  All of our LUPE staff are able

7  to — were at the time able to help community members to fill

8  out their ballot by mail, our community organizers, or service

9  providers, anybody.

10      And so we do have house meetings out in the neighborhoods

11  and oftentimes that meant somebody having a ballot by mail in

12  their purse, or showing up to the union hall with their ballot

13  in their purse, or maybe they just went directly to the LUPE

14  office to seek assistance with that one ballot and that was

15  the only purpose of them being there.

16  Q.  What type of help would LUPE give the mail ballot voter

17  with the mail ballot?

18  A.  So the reason why I mentioned earlier that the fact that

19  we are not able to do it is so problematic is because many of

20  the community members that we work with, they are elderly,

21  they have vision challenges.  They are unable to read or

22  write, and so we would read aloud the ballot for them, or many

23  of the times because they can't see very well, we would have

24  to help them fill out the ballot and verbally ask them what

25  their choice was, and today we are unable to do that.

TONIA CHAVEZ CAMACHO - DIRECT

1  Q.  And so in the past did LUPE employees provide this
2  assistance to mail ballot voters as part of the LUPE employees
3  job?
4  A.  Yes.
5  Q.  And did LUPE employees ever tell members how to vote or
6  who do vote for?
7  A.  Absolutely not.
8  Q.  Okay.  How has LUPE responded to SB 1's prohibition on
9  employees or other compensated individuals assisting voters
10 with their mail ballots?
11 A.  We have asked them to stop helping community members on
12 assisting voters with their ballot by mail.  And,
13 unfortunately, this has created confusion to the point where
14 other community members, other staff members were afraid and
15 create a confusion and they stopped even registering voters.
16     For them, it was too confusing, anything related with
17 elections, and so they just stopped doing it all around.  So
18 now we have had to resort to different options of only put in
19 the work of a few people and redirecting all those efforts to
20 only a few people that will know how to differentiate between
21 the ballot by mail or registering people to vote because it
22 has created so much confusion.
23 Q.  And have you spent resources training that staff?
24 A.  Yes.  So part of the work that we do is training
25 canvassers, training staff, not just during Get Out the Vote

TONIA CHAVEZ CAMACHO – DIRECT

1  efforts, we're year-round.  We just hosted deputy register

2  training less than two weeks ago, and part of those efforts is

3  being able to talk to staff on the effects of SB 1 and what

4  are some of the limitations that we have to face as we aim to

5  help voters.

6       But not only that, we are also having to resort to other

7  measures as it relates to helping members apply for the ballot

8  by mail.

9  Q.  And what do you tell a LUPE member now when they come to

10  the offices to with their mail ballot and they ask for

11  assistance?

12  A.  We tell them we cannot help and that they should find help

13  with their family or friends.

14  Q.  What do you expect to happen with mail ballot voters who

15  come to LUPE for help in the upcoming November 2023 election?

16  A.  Well, we are going to do a lot of work, a lot more work in

17  terms of helping them apply for their ballot by mail, because,

18  unfortunately, they will not be getting the applications

19  immediately.  So that's going to create a lot more work for us

20  in being able to educate them, to apply for the ballot by

21  mail, but, unfortunately, we will not be able to help them to

22  fill out the actual ballot.

23       So we'll only be doing the work halfway, and that is so

24  unfortunately, especially for the elderly community members we

25  work with, for the disabled community members that we work

87

TONIA CHAVEZ CAMACHO – DIRECT

1    with, for community members who need assistance and who prefer
2    to vote by mail.
3    Q.  You mentioned before voter meetings where you would have
4    the mail ballot projected up on the wall and you mentioned
5    that you would talk generally about how to fill out the mail
6    ballot, what would you have been doing with the voters and the
7    mail ballots before SB 1?
8    A.  We would be helping community members one-on-one and
9    that's what we would have done.  The needs of every community
10   members are so different.  Like I mentioned, some of them
11   don't know how to read or write.  Some of them are vision
12   impaired.  Some of them are disabled.  Some of them have
13   ability issues.
14       So we would either help them fill out the ballot by mail,
15   could be at the offices, it could be in the house meetings, at
16   the union hall events that we have, multiple events in the
17   offices, but also in their homes.
18       If they will call us and ask that we will go home and help
19   them fill out their ballot by mail, we will do that.  And
20   today, we cannot do that.  Staff members would be persecuted
21   if we ask them to do that.
22   Q.  Do you mean persecuted?
23   A.  Yes.
24   Q.  Or prosecuted?
25   A.  Prosecuted.

1   Q.  Okay.  Thank you.

2       Okay.  Now I'm going to shift now to the next part of SB 1

3   and I'm going to start by asking, does LUPE staff ever do

4   outreach to voters to urge support for a ballot maybe?

5   A.  We do.  We have.

6   Q.  And is this partisan or nonpartisan?

7   A.  Nonpartisan.

8   Q.  Can you give me an example of when LUPE was reaching out

9   to voters to urge support for a ballot measure?

10  A.  I have two.  One of them is a drainage bond and I want to

11  say somewhere around 2011-2012 to be able to implement

12  drainage in the colonias.

13      And the second one is around health care district.

14  Hidalgo County does not have any public hospitals.  All of

15  them are privately owned.  So implementing a health care

16  district would allow us to implement the public hospital in

17  the county.

18  Q.  And was the drainage bond that LUPE advocated with voters

19  for successful or unsuccessful?

20  A.  It was successful.

21  Q.  And then with respect to the creation of a health care

22  district were your efforts to urge voters to vote for that

23  successful or unsuccessful?

24  A.  Unsuccessful.

25  Q.  Okay.  Do you plan to try again in the future to get a

TONIA CHAVEZ CAMACHO – DIRECT

1  health care district created in Hidalgo County?

2  A.  Most definitely.  It's one of the poorest areas in the

3  country and the ones with the highest rates of obesity and

4  diabetes, and so being able to improve the quality of health

5  care and availability of health care in our county, it's in

6  dire need.

7  Q.  And what settings does LUPE advocate on ballot issues,

8  actually physically where do you advocate?

9  A.  As I mentioned, we do Get Out the Vote efforts and when we

10  do have a ballot measure, it's part of the efforts to be

11  knocking on doors, out in the neighborhoods, at the house

12  meetings, at the LUPE events, and the union halls, at the

13  tabling events, in the LUPE offices, we want to make sure that

14  everybody is educated about the ballot measure we are

15  supporting and we want to make sure that the community members

16  know specifically how to vote for that ballot measure.

17  Q.  And who carries out this work for LUPE?

18  A.  LUPE staff and paid canvassers, temporary canvassers.

19  Q.  Why is it — why are you trying to convince voters to

20  support these ballot measures?

21  A.  Because we want to make sure that they advocate for — to

22  improve their own quality of life.  And so when we support —

23  LUPE is a membership-based organization and we advocated for

24  issues that are most in need to our community members.  Every

25  two years we host a colonias event with community members for

TONIA CHAVEZ CAMACHO – DIRECT

 1  solutions on the issues they want to advocate for, and if a
 2  ballot measure is part of those issues, that's how we validate
 3  us standing for and against a specific ballot measure.
 4  Q.  You mentioned before that LUPE members bring their mail
 5  ballots to meetings at LUPE?
 6  A.  That's correct.
 7  Q.  Do you expect then that if you're having a big meeting at
 8  LUPE to urge support for a ballot measure that people are
 9  going to have their mail ballots, at least some of them, with
10  them?
11  A.  Absolutely.  And this is part of the reason why SB 1 is so
12  worrisome for us, because it would inhibit our ability to be
13  able to advocate for a ballot measure in the presence of a
14  ballot by mail, and there's really no way for us, if a
15  community member is walking in with a ballot to our office
16  while we have posters where we are talking about the specific
17  measure at a public event in our offices, or we are hosting a
18  house meeting where the major topic is a ballot measure and
19  community members brought in their ballot by mail to be helped
20  on how to fill them out.
21      And so all around it's problematic, one, because we can't
22  help them fill out the ballot, and two, because it's against,
23  now against the law for us to speak on the ballot measure in
24  the presence of the actual ballot.
25  Q.  I would like to display, if you would be so kind, Derek,

91

TONIA CHAVEZ CAMACHO – DIRECT

1 | the Joint Exhibit SB 1, page 59, line 7.  This is section

2 | 7.04, page 59, line 7.

3 |     Okay.  Miss Chavez, can you read from line 7 to 10,

4 | please.

5 | A.  "Vote harvesting services means in-person interaction with

6 | one or more voters in the physical presence of an official

7 | ballot, or a ballot voted by mail intended to deliver votes

8 | for a specific candidate or measure."

9 | Q.  And do you interact in person with one or more voters in

10 | your work on ballot measures?

11 | A.  Most definitely we do.

12 | Q.  And is your interaction urging people to vote for the

13 | drainage bond or the health care district?

14 | A.  Yes, it is.

15 | Q.  And is it true that you expect that at least in some

16 | occasions there is going to be a mail ballot there?

17 | A.  Most definitely.

18 | Q.  So let us look forward to the future.  You mentioned that

19 | you were going to try again to get a ballot measure passed to

20 | create a health care district.

21 |     How is this provision, Section 7.04, going to affect

22 | LUPE's activities with respect to urging the voters and mail

23 | voters to support — mail ballot voters to support the health

24 | care district?

25 | A.  It would prohibit our ability to be able to do so.  We

TONIA CHAVEZ CAMACHO - DIRECT

1  want to make sure that community members are aware of the

2  ballot measures that we are supporting, but not only that, we

3  want to make sure that community members are standing for and

4  voting for ballot measures that are going to improve their

5  quality of life.

6       And whenever we cannot do advocacy in the presence of the

7  ballot by mail, it will prohibit the ability to freely do Get

8  Out the Vote efforts in the presence of the ballot by mail.

9  How are we going to know, when we are knocking on doors,

10  specifically we are knocking on doors of somebody who is

11  disabled, somebody who is elderly, how are we going to know

12  that their mail-in ballot is sitting in their living room?

13       So we can't to make sure that our staff members do not

14  feel that they will end up in jail because now we are

15  advocating for a ballot measure in the presence of a ballot by

16  mail.

17  Q.  Is LUPE currently being investigated or prosecuted for any

18  SB 1 offenses?

19  A.  Not that I am aware of, because we have done so much work

20  to make sure that our LUPE staff are trained to ensure that we

21  are not violating the current statutes of the law.

22  Q.  But does this mean now that you are not worried?

23  A.  Oh, I'm most definitely worried, which is the reason we

24  are doing so much training to make sure we prevent such.

25  Q.  I'd like to go now to Joint Exhibit 1, page 38, lines 22

93

TONIA CHAVEZ CAMACHO – DIRECT

 1  through 26, Section 5.07.  This is the last thing I'm going to

 2  ask you to read, Miss Chavez.

 3  A.  Can you repeat the pages again?

 4  Q.  Yes.  Page 38, and you can also look at the computer

 5  monitor that is there.  Derek is very helpful in doing his

 6  highlighting.

 7      If you look at lines 22 through 26 — actually, I'll have

 8  you read the next one.  Do you see here that this provision

 9  requires an identification number on the application for

10  ballot by mail?

11  A.  I do.

12  Q.  Okay.  Now let's go forward to page 45, line 4, and then

13  the text down below.  If you could read on page 45, line 4 for

14  me.

15  A.  "Return to carry envelope to the voter by mail."

16  Q.  If you could read line 4.

17  A.  Page 34?

18  Q.  No.  I'm sorry.  Page 45.

19  A.  "A ballot may be accepted only if."

20  Q.  Now, if you can go down to line 27, and then onto 28, if

21  you could read through line 27 and then through line 3 on the

22  next page.

23  A.  "The information required under Section 86.002(g)" — line

24  3?

25  Q.  And then go all the way from 1 through 3.

TONIA CHAVEZ CAMACHO – DIRECT

1  A.  "Provided by the voter identifies the same voter

2  identified on the voter's application for voter registration

3  under Section 13.002(c)(8).  D1, if a voter provides the

4  information required under the Section 86.002(g) and it

5  identifies the same voter identified on the voter's

6  application for voter registration under Section

7  13.002(c)(8) —

8  Q.  That's okay.  We don't need you to read the next section.

9  A.  Okay.

10  Q.  I know you practiced reading from the statute and I

11  appreciate that very much.  I would like to ask you now

12  whether you recognize through line 3 as a requirement to put

13  an ID number on the mail ballot envelope?

14  A.  I have.

15  Q.  Okay.  And now I want to take you back to February of

16  2022.  This is the early voting period and the lead-up to

17  voting in the March 2022 party Primary.  What was the first

18  effect of SB 1 that LUPE felt?

19  A.  The first effect was community members coming in and being

20  superconfused because they were referring to, oh, my ballot

21  didn't arrive in the mail.  What they meant to say is their

22  voter registration didn't arrive.

23  Q.  Their voter application?

24  A.  Their vote application to register for ballot by mail did

25  not arrive in the mail.

TONIA CHAVEZ CAMACHO - DIRECT

1  Q.  Okay.

2  A.  And that was shocking for us.  We were not aware that they

3  would stop sending applications for community members to apply

4  for the ballot by mail and part of that created a lot of

5  confusion.

6      Community members were coming in to our office wondering

7  why they never received the ballot.  We then learned quickly

8  that we needed to help them apply for the ballot by mail, and

9  so this were some of the first gatherings we were hosting as a

10 result of SB 1.

11     We hosted multiple community gatherings tailored

12 specifically to elderly community members to help them apply

13 for their ballot by mail.  As we did that and as things

14 progressed and the continuum, some of them working their

15 ballot by mail.

16     And then chaos happened because as we were trying to turn

17 in their ballot to cast their vote, then the confusion was

18 about which number they needed to put on the inside of the

19 flap of the envelope, was it their social security, was it

20 their voter registration number, was it their driver's license

21 number, how were they supposed to remember which number they

22 put on the voter registration card they had failed months or

23 years ago, and so this created a lot of confusion as to

24 whether or not the ballots would actually be counted, and some

25 of them did not even trust that turning in the ballot will

TONIA CHAVEZ CAMACHO – DIRECT

1  make their vote valid.

2  Q.  Now, with respect to the ballot by mail, moving past the

3  application for ballot by mail, you mentioned meetings to

4  educate voters about the ID number requirement.  Were those

5  the meetings where you were projecting the picture of the

6  ballot by mail up on the screen?

7  A.  Yes.  And part of the reason why we were doing that is

8  because the statutes of SB 1 prohibits us from actually

9  helping or aiding any community member from filling out a

10  ballot by mail, so we resorted to doing public gatherings

11  where we were showing a sample ballot by mail instead of

12  walking community members as to how they were supposed to fill

13  out an application.  But at the end of the day, they have they

14  had to do it on their own.

15  Q.  Why didn't you just tell these voters to go vote in person

16  at the polling place?

17  A.  These community members are elderly and many of them, you

18  know, LUPE has built a relationship with them.  They feel more

19  comfortable going to us than they would feel going to an

20  election worker that they never met.  And that's part of the

21  reason why they were in our building.

22      We built up a reputation with them for several weeks, many

23  of them for decades.  So coming into LUPE and seeing a

24  familiar face, having an assister of choice, is something they

25  wanted and it's something that we were unable to give.

TONIA CHAVEZ CAMACHO - DIRECT

1        So the only thing we could do for them is project on the

2   screen and so walk them through the process of what they

3   needed to do in order to cast that ballot.

4        Again, even in us doing that, it didn't fulfill their

5   needs because projecting on the screen for somebody that is

6   visually impaired, projecting on the screen for somebody who

7   has a challenge with reading, it's also difficult, and so we

8   were able to help some but even in us doing that presentation

9   we weren't able to help all the needs and accommodate all the

10  needs of the disabled community members that we serve.

11  Q.  Is that the same for people who are not literate?

12  A.  Yes, absolutely.  We, again, because part of the challenge

13  with community members is that some of them are unable to read

14  or write, and if you are unable to read or write how are you

15  supposed to fill out the ballot, if you don't know how to

16  write.  And so that's part of the obstacles that SB 1 imposes

17  to us.

18  Q.  Do you think that the challenges that you are describing

19  that voters have with the ID requirement will get better over

20  time?

21  A.  Most definitely not.

22  Q.  Why not?

23  A.  Because we have an aging community population.  There will

24  always be voters over the age of 65 in our neighborhoods in

25  our communities and so as time progresses there will be an

TONIA CHAVEZ CAMACHO – DIRECT

1  aging community that we need to cater to.

2      Right now, we don't have as much information available,

3  other than that community organizations are doing but that

4  becomes obsolete over time.  So we need to make sure that we

5  are doing outreach years after years to make sure that we are

6  informing community members.  So, yes, this issue will

7  continue.

8  Q.  Has LUPE been financially affected by changes made to

9  voting by SB 1?

10  A.  We have.

11  Q.  In what way?

12  A.  When we looked at the campaigns that we used to run, Get

13  Out the Vote efforts, we were spending somewhere around 50,000

14  or so overall, on the GOTV efforts.  Today, we are spending

15  somewhere around 100,000 to 150,000, depending on the season

16  and the campaign.

17      And part of those efforts really has been that we've added

18  additional LUPE staff.  Alexis and Vaughn [phonetic], who our

19  civic engagement organizers, and Michael Andes [phonetic], who

20  runs our civic engagement teams, we have added a specific

21  department to be available to voters at all time and do the

22  education that is needed.

23      And so now we have identified that we have to help people

24  apply for the ballot by mail early in the year and so now you

25  are looking at January helping voters apply for those ballots

TONIA CHAVEZ CAMACHO - DIRECT

1  by mail.  We can no longer wait into election season.  So we

2  have to be a lot more proactive in helping voters being able

3  to cast their vote.

4  Q.  Has LUPE ever accepted money from elected officials to

5  help them get elected?

6  A.  No, we never have done that.

7  Q.  What percent of funding potentially comes from elected

8  officials?

9  A.  Less than .001 percent.  Their donations are minimal, 200

10 to a thousand dollars.  Most recently the former director

11 retired and they donated for that.

12 Q.  For some kind of event?

13 A.  Yes, the retirement party gala that we hosted.

14 Q.  Does LUPE perform favors for services for elected

15 officials?

16 A.  Most definitely not.

17 Q.  Does the membership of LUPE include individuals who are

18 migrant farmworkers and who are registered to vote?

19 A.  Yes, it does include migrant farmworkers and voters who

20 are registered to vote.

21 Q.  My last question.  Is Maria Gomez a member of LUPE?

22 A.  Yes, she is.

23 Q.  I actually have another question.  Are you a member of

24 LUPE?

25 A.  I am.  Very proud to be.

TONIA CHAVEZ CAMACHO – DIRECT

1  Q.  Thank you, Miss Chavez.

2        MISS PERALES:  I pass the witness.

3        THE COURT:  Will there be any questions?

4        MR. BRYANT:  Yes, Your Honor.

5        THE COURT:  Let's go ahead and take a break.

6        Let's resume right at 1:00.

7    *(Recess)*

8    *(Change in Reporter)*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *(1:02 p.m.)*

2          COURT SECURITY OFFICER:  All rise.

3          THE COURT:  Thank you.  Please be seated.  Your cross,

4    and the witness.

5          MR. BRYANT:  Your Honor, I'm David Bryant from the

6    Attorney General's Office on behalf of the Attorney General,

7    the Secretary of State.

8                         CROSS-EXAMINATION

9    BY MR. BRYANT:

10   Q.  Ms. Chavez, we met about 90 days ago when I had the

11   opportunity to take your deposition down in San Juan.  And

12   since January 2023 early this year, you've been the executive

13   director of LUPE, is that correct?

14   A.  That is correct.

15   Q.  And you're the top employee at LUPE?

16   A.  At the moment, yes, I am.

17   Q.  And LUPE has its headquarters and all of its offices in

18   Cameron, Hidalgo and Starr Counties of Texas, is that right?

19   A.  Our offices are, the headquarters are in San Juan.

20   Q.  All of your employees at LUPE are in those three counties

21   as well?

22   A.  Employees, yes, we do have additional contractors in

23   different parts of the U.S.

24   Q.  And over 95 percent of all of LUPE's members are in those

25   three counties Hidalgo, Cameron and Starr County?

1    A.   That is correct.  And it's four counties including Willacy.

2    Q.   LUPE has about 48 full-time employees currently?

3    A.   That is correct.

4    Q.   And LUPE's budget for the current year of 2023 is about

5    $4.1 million?

6    A.   That is correct.

7    Q.   Now, I believe you told me at your deposition that LUPE's

8    revenues in 2020 were only about 2.5 to 3 million; is that

9    correct?

10   A.   Yes.

11   Q.   So LUPE's revenues have grown at least 30 percent since

12   2020?

13   A.   Uh-huh.

14   Q.   And have LUPE's revenues continued to grow since it filed

15   this lawsuit about this time in 2021?

16   A.   No, it's been about the same from 2022 to 2023 our budget

17   went from around 3.6 to 4.1, so it has grown, but it has not

18   grown as a result of the lawsuit.

19   Q.   Now, let's talk about the events that led up to the passage

20   of SB 1 in the Texas legislature in 2021.  You weren't involved

21   in any of the discussions related to voting rights in the 2021

22   legislature yourself, were you?

23   A.   That is correct.  At the time, my father had passed away

24   and I was not engaged with the legislative session at that

25   time.

1   Q.  And you didn't communicate with any members of the Texas
2   legislature regarding SB 1 or its predecessor bills before it
3   was passed in 2021?
4   A.  No, as I mentioned, I was grieving my father, so I was not
5   actively engaged in the legislative session.
6   Q.  And you haven't communicated with any members of the Texas
7   legislature about the law that SB 1 became since it was passed
8   by the Texas legislature in 2021, is that right?
9   A.  That is correct.
10  Q.  And you haven't let anybody in the legislature know of any
11  of the problems that LUPE is having that you have described in
12  your testimony?
13  A.  Since we're in litigation, no, we have not.
14  Q.  You're not in litigation with members of the Texas
15  legislature, are you?
16  A.  No, we're in litigation with the State of Texas about the
17  legislation.
18  Q.  So you have no knowledge based on any communications you've
19  had about what the intention of the legislature was in passing
20  SB 1 as a whole or any of the particular provisions of it?
21  A.  At the time, no, but I have plenty of knowledge about the
22  effects of how it has affected our community.
23  Q.  And have you ever had any communications with any state
24  officials about SB 1 or any provisions of SB 1?
25  A.  Not to my recollection.

1  Q.  You ever had any communications with any members of the

2  staff of the Texas legislature regarding SB 1 or any of its

3  provisions?

4  A.  Multiple conversations with legislative staff, but not to

5  my recollection in regards to SB 1.

6  Q.  Have you ever had any communications with any Texas county

7  or local officials regarding SB 1 or any of its provisions?

8  A.  We've had conversations around the challenges that

9  community members were having in regards to filing their ballot

10  by mail and also trying to understand why they weren't getting

11  the applications in the mail, that was the extent of the

12  conversation that we've had with the elections office.

13  Q.  I want to be clear about that.  I had asked you about you

14  having conversations?

15  A.  Not directly, no.

16  Q.  When you say "we", who are you referring to?

17  A.  Our LUPE staff.  Particularly our former executor director,

18  Juanita Valdez Cox.

19  Q.  Did you observe that the vote to pass SB 1 in 2021 was

20  there was a lot of -- there was very much by party?

21  A.  As I mentioned, I was grieving my father, so I was not

22  engaged with anything that led to the passage of SB 1.

23  Q.  Do you know today whether it was SB 1 was primarily passed

24  on a party vote?

25  A.  It's irrelevant to the work that we do, what we are

1  currently engaged with is the effects of the SB 1 as it

2  currently stands in the law.

3  Q.  I'm just asking what you know, not how it bears on your

4  work today.  Do you know?

5  A.  I'm answering what I know and what I am aware of is how

6  it's currently affecting our community membership.

7  Q.  I'll tell you unless you tell me otherwise that you don't

8  know that it was passed on primarily a party vote?

9  A.  As I mentioned, I am not -- I already shared with you I am

10  not aware of anything that led to the passage of SB 1 as I was

11  not actively engaged in the legislative session of 2021.

12  Q.  Now, LUPE today is in this action suing various county

13  officials, you're aware of that?

14  A.  Uh-huh.

15  Q.  And one of the officials that LUPE is suing is a district

16  attorney of Dallas County.  Why is LUPE suing the district

17  attorney of Dallas County?

18  A.  We are suing on the provisions on how it is affecting our

19  membership and we were also joined in a lawsuit, and we, as

20  LUPE, currently do not serve Dallas County.  We do serve Texas

21  residents.  I'm sure our attorney may answer the question in

22  regards as to why Dallas, since different lawsuits were joined.

23  Q.  I understand and I'm sure that your counsel will explain

24  that, but I just want to see if you as the top employee in the

25  organization had any idea why you're suing Dallas County's

1  district attorney?

2          MS. PERALES:  Objection, asked and answered.

3          THE COURT:  She doesn't know, next question.

4  BY MR. BRYANT:

5  Q.  And is that the same for all of the other district

6  attorneys that LUPE has sued?

7  A.  That is the case.

8  Q.  And none of those district attorneys have done anything to

9  injure LUPE that you're aware of?

10 A.  What I am aware of is how is the legislature currently

11 injuring our membership and the provisions that are directly

12 affecting the opportunity for people to cast their vote and the

13 inability for us to be able to have assisters of choice and

14 also being able to allocate for valid provisions, so that is

15 where I'm testifying on and currently aware of.

16 Q.  All right.  Has the Secretary of the State of Texas done

17 anything that you're aware of that injures LUPE by reason of SB

18 1?

19 A.  The Secretary of State in enacting SB 1 is directly

20 responsible for not having mailed the ballots, the application

21 for ballots by mail to community residents in our county areas

22 and the way that they are exercising the -- the way that the

23 bill is currently enacted, and so yes, it is directly affecting

24 our constituency when they're not given the opportunity to

25 register to apply for a ballot by mail.

1    Q.   Is it your understanding that the Secretary of State of

2    Texas enacted SB 1?

3    A.   It is my understanding that they are the ones entitled with

4    carrying out the provisions of SB 1 as it relates to elections.

5    Q.   And has the Attorney General of Texas done anything to

6    injure LUPE by reason of SB 1?

7    A.   The way that the Attorney General of Texas is responsible

8    for potentially criminally prosecuting the members of LUPE by

9    which the SB 1 mandates, it's in a way affecting the way that

10    our membership is currently observing SB 1 in the way that our

11    LUPE staff is currently observing SB 1.

12    Q.   Is there anything else that the Attorney General of Texas

13    has done to injure LUPE by reason of SB 1?

14    A.   The way that currently the law is written, it allows for

15    staff members to potentially be prosecuted and in a way as top

16    attorney of the State of Texas ultimately responsible for such,

17    so to us it represents directly being affected by the

18    provisions of SB 1 and his authority.

19    Q.   Has the Attorney General of Texas either prosecuted or

20    threatened to prosecute anyone under SB 1 that you're aware of?

21    A.   Has the ability to do so under the SB 1 provisions.

22    Q.   Has the Attorney General of Texas communicated in any way

23    to LUPE that it will be or might be prosecuted under SB 1 in

24    any way?

25    A.   Not to my knowledge at the moment, but as I mentioned, as a

1    top attorney in the state, it's ultimate responsible for any of
2    those incidents if they may such occur.
3    Q.  You understand that in Texas the actual election workers
4    are hired by county election authorities rather than by anybody
5    up in Austin?
6    A.  Yes, I am.
7    Q.  And has LUPE had some problems with, since SB 1 was passed,
8    with some of the actions of local elections workers dealing
9    with its members?
10   A.  Yes.  We in particular had an incident with one of our
11   members who has a child with cerebral palsy, and in assisting
12   her adult child to the polls, an election worker did not
13   believe that her child could make a choice on his own and
14   believed that the assister would actually put a vote on his
15   behalf, and so hovered over the entire time making it a lot
16   more stressful for her child to be able to cast the vote.  And
17   so the way that -- the way that they were harassing our LUPE
18   member was overstretching and it was in a way affecting the way
19   that our community member was able to cast his vote.
20   Q.  And was that community member Mr. Aaron Garcia?
21   A.  Omar Garcia.
22   Q.  Omar Garcia, thank you.  And was Mr. Garcia able to vote?
23   A.  Yes, after much harassment, he was able to cast a vote.
24   Q.  Had there been any LUPE members who were unable to vote by
25   reason of any actions taken under SB 1?

A.  I am aware that multiple community members have plenty of challenges in being able to cast their vote.  Even our former executive director had a lot of trouble trying to figure out whether or not she successfully filled out her ballot by mail. We had multiple community members who we were unable to help to fill out their ballot by mail.  Unfortunately, I wouldn't be able to tell you exactly whether or not they voted because we weren't directly able to help them and that is a direct result of SB 1.

Q.  And so my question was whether you know of any LUPE members who are unable to cast the vote because of any provisions of SB 1?

A.  As I mentioned, I wouldn't be able to answer the question directly, so the short answer will be no, I don't because SB 1 doesn't allow us to directly help members, so we wouldn't be able to actually tell whether or not they voted.

Q.  Now, going back to Mr. Garcia and the additional stress that you described he had in voting, was that in the general election in 2022?

A.  Yes, I believe it was.

Q.  And you testified about the poll worker who questioned his capability of voting, as I understand it.  Was that a poll worker who worked for the election administrator in Hidalgo County?

A.  That is correct.

1  Q.  And did you understand that that action by the poll worker

2  was not mandated by SB 1?

3  A.  I do understand that the provisions of SB 1 now force

4  community members to take an oath that they will be under

5  perjury of law or something or other, that if they -- that they

6  have to assist community members and if the election workers

7  believes that they are not abiding by the statutes of the law,

8  they could be prosecuted.  And so the challenge here is that

9  the mother of our community member was afraid of having taken

10  that oath and that election worker actually believing that she

11  was not abiding by the oath that she had taken, and so to me

12  that's a very direct relationship on SB 1 and its effects.

13  Q.  Now, you weren't present for that instance?

14  A.  That is correct.

15  Q.  And how did you get your information about that incident?

16  A.  Directly from the assister of choice, the mother of our

17  LUPE member.

18  Q.  Now, you didn't choose to sue, and I say "you," I'm saying

19  LUPE, LUPE didn't choose to sue the election administrator of

20  Hidalgo County or anybody in Hidalgo County; is that right?

21  A.  That is correct.

22  Q.  And there are county and local officials in Hidalgo County

23  that donate to LUPE; is that correct?

24  A.  As I testified before, that is correct.

25  Q.  And it's the local administrators who decide whether to

1  accept or reject mail-in ballots or applications for mail-in

2  ballots?

3  A.  What is your question?

4  Q.  Isn't it the local administrators who decide whether to

5  accept or reject mail-in ballots?

6  A.  Yes, that is correct.  However, they have to do that by

7  mandate of the legislature and in this case SB 1.  And SB 1

8  does state that if the ID is not matched, that that ballot will

9  be rejected.

10 Q.  Is it correct that neither LUPE nor any LUPE members, to

11 your knowledge, have ever been investigated or prosecuted or

12 threatened with prosecution by reason of anything in SB 1?

13 A.  That is correct.  We've done a lot of extensive work in

14 being able to train our staff and our volunteers on the

15 provisions of SB 1.  And so to my knowledge, we have not --

16 we're not aware of any investigations, but that is because of

17 the extra work that we have done in training and capacity to

18 ensure that we're not violating any of the statutes of SB 1.

19 Even as such, turning membership away from being able to help

20 them and assist them in casting their vote.

21 Q.  You definitely answered my question as to LUPE and its

22 staff.  Is it also true you're not aware of LUPE members who

23 have ever been prosecuted or investigated or threatened with

24 prosecution by reason of anything in SB 1?

25 A.  That I am aware, no, we've done our best to train the LUPE

1  memberships, the LUPE members that we're in contact with, and I
2  believe that is a direct result of the extra work that we've
3  done in training.
4  Q.  And I believe you testified that you have no fear that LUPE
5  will be investigated or prosecuted for any of its activities
6  related to voting or elections, is that right?
7  A.  Oh, there is a lot of fear and such is the reason why --
8  such is the reason why we are doing extra training.  I am
9  confident that our training it is yielding results and that we
10  will prevent any criminalization that may result as a result of
11  SB 1.  However, this is directly hindering our ability to fully
12  service our membership.
13  Q.  And you personally, you have not had any fear that LUPE
14  would be investigated or prosecuted for any of its activities
15  relating to SB 1?
16  A.  As I mentioned and that is a direct result of the extra
17  training that we're doing for our members.  I wish we didn't
18  have to do that, but at this point, that's the best thing that
19  we can do to prevent any of this happening.
20  Q.  Now, you testified I believe that voter education is one of
21  the main activities of LUPE, is that right?
22  A.  That is correct.
23  Q.  Happens all year round, every year?
24  A.  It happens all year round, it used to not happen every
25  year, it has happened every year after 2021.

1  Q.  And so having to do voter education to educate your members

2  about new changes in the voting law is something that LUPE has

3  done before 2021 and SB 1 was passed, right?

4  A.  Can you repeat your question again?

5  Q.  Do you recall that SB 1 had to do voter education to

6  explain to people the voting laws after passed changes in the

7  voting laws in Texas?

8  A.  I just want to make sure I understand your question

9  correctly.  You're saying if I am aware that SB 1 did any

10  education?

11  Q.  No.  Do you recall that there have been changes in Texas's

12  voting laws numerous times before SB 1 was ever thought of?

13  A.  Yes, and every time close to election season we do training

14  around those changes.

15  Q.  And so it's nothing new for LUPE to have to deal with

16  something that the legislature has passed about voting laws and

17  to educate its members about it?

18  A.  Well, this time around was extremely harsh on the way that

19  this particular legislation affected our community membership

20  which is the reason why since we've added additional staff and

21  educated an entire department to do civic engagement year

22  round.

23  Q.  And when SB 1 was passed around two years ago, did LUPE

24  immediately sue by bringing this lawsuit?

25  A.  I was not the executive director at the time and I wasn't

1    particularly engaged with the decision that it took to file the

2    lawsuit, so I wouldn't be able to directly answer your

3    question.  I do know LUPE did file a lawsuit before the end of

4    2021, approximately, but I didn't directly became engaged with

5    the lawsuit until later.

6    Q.  Did LUPE begin to educate its members about the provisions

7    of SB 1 before the end of 2021?

8    A.  Not that I am aware.  The first trainings that we started

9    to do were around February of 2022 when we started seeing the

10   effects of SB 1.  That's part of the challenge that we --

11   that's when I shared earlier we started seeing community

12   members showing up to our offices confused as to why we're not

13   getting their application to file a ballot by mail and they

14   were asking for their ballots and they meant their application

15   to receive it and so that was our first initiative to start

16   mobilizing and helping community members.  We needed to see how

17   the effects of SB 1 will take effect for us to be able to

18   determine what were they needed and added trainings that we

19   needed to incur.

20   Q.  But you didn't need to find out how SB 1 was going to be

21   put into effect to sue over SB 1, did you?

22   A.  Well, we foresaw some of the challenges.

23   Q.  And I believe you testified in your direct testimony that

24   you were shocked when you learned that the counties weren't

25   automatically sending out the applications for mail ballots?

1    A.   That is correct.

2    Q.   But wouldn't anybody who read SB 1 when it was passed back

3    in September of 2021 have known that that was going to happen?

4    A.   But as I shared, I wasn't part of the 2021 legislative

5    session, so I didn't become actively engaged in the lawsuit

6    until 2022, and I did testify to that.

7    Q.   Yes, you did.  But there were people at LUPE who knew that

8    that practice of sending out applications for mail-in ballots

9    without a request had ended when SB 1 was passed or would end

10   when the law became effective?

11   A.   And so what is your question?

12   Q.   Were there people at LUPE who knew that your members would

13   need to be educated that they weren't going to get their

14   automatic mail-in ballots as soon as the law was passed?

15   A.   And I believe that is the reason why they filed the lawsuit

16   and also we do have community organizers that were continuously

17   registering community members to vote.  Unfortunately, we

18   didn't think that effects of SB 1 at the time were going to be

19   as astronomical as they were and they became more apparent the

20   moment community members started coming into our offices.

21   Unfortunately, I cannot speak to what people thought or didn't

22   think because I was not actively engaged in that at the time,

23   but I can speak to my personal interaction with the legislation

24   and how it has affected community membership since I've been

25   engaged with SB 1, working the electoral work.

1  Q.  So do you know of any reason why LUPE could not have

2  educated its members about the new changes with SB 1 September,

3  October, November, December of 2021 or January of 2022?

4  A.  Well, I believe that if the State implemented something

5  different, that perhaps the State was going to take care of

6  that, right?  As this is something initiated by the State.  Us

7  at LUPE, at the time we didn't had a full-time civic engagement

8  team and we've been able to add that since to build high

9  capacity to have educated civic engagement organizers respond

10  to the community need.

11  Q.  If I understood your testimony correctly, it is that the

12  dues of the members only provided about 8 percent of the

13  revenues of LUPE; is that right?

14  A.  That is correct.

15  Q.  And approximately 60 percent comes from donations from

16  foundations?

17  A.  Uh-huh.  That is correct.

18  Q.  And about 30 percent comes from fees for services provided

19  like income tax service, translation services, immigration

20  related services; is that right?

21  A.  That is correct.

22  Q.  If my notes are correct, and please correct me if they're

23  not, I understood you to testify that even prior to SB 1, LUPE

24  usually didn't assist voters at polling places; is that right?

25  A.  Assisted voters at polling places?

1  Q.  Unless there was a specific request for it?

2  A.  That is correct.  We do not have community members or staff

3  members standing outside polling locations.  We only assist

4  voters when they call us and they either come to our office to

5  make the request.  We do not have the capacity to have staff

6  members outside every single polling location, so we do it at

7  the request of our membership.

8  Q.  And you testified also about the oath that is the forms and

9  the oath that are required of assisters; do you recall that?

10  A.  Uh-huh, I do.

11  Q.  And if I understand you correctly, none of your assisters

12  violated that oath when they gave assistance even prior to SB

13  1; is that right?

14  A.  That is correct, and the oath was different.  The oath has

15  changed since.  And now it adds language that shares that they

16  might be criminalized for not acting up to par with the

17  provision, it's hindering people's willingness.  Some of our

18  staff members have actually told community members that she

19  will prefer to be the last action, to talk to friends or family

20  members before they request her assistance because she's afraid

21  that she will make a mistake or she's afraid that the elections

22  workers who are there deem her acting otherwise and not in

23  compliance with the oath.  So it has created greater fear in

24  addition to also extending the lines at the polls.

25  Q.  So you've had I guess two years now since SB 1 was passed

1  and are you aware of anyone who's been prosecuted anywhere in

2  the state for violating an assister's oath?

3  A.  I cannot speak to the rest of the state.  I can speak to

4  our staff and the community that we work with and we have done

5  extensive training to ensure that that is not the case.

6  Q.  My question is whether -- is about anybody trying to

7  prosecute somebody for violating an assister's oath.  Are you

8  aware that that has happened anywhere in your three counties or

9  anywhere else in the state?

10  A.  As I mentioned, we do not service the rest of the state, so

11  I cannot speak to the rest of the state.  I am not aware of

12  that happening in our county area, but we have made sure that

13  that does not happen within our membership or LUPE staff since

14  we have increased training for our staff to ensure that does

15  not take place.

16  Q.  If I understand you correctly, no one connected with LUPE

17  was violating that oath even before SB 1, nobody's violating it

18  since then, but it's just an irrational fear of some people

19  that they might be prosecuted for just making a mistake that is

20  causing them not to be willing to assist?

21  A.  I do not believe to be an irrational fear.  Whenever you

22  put different statutes of the law, I think that's a very real

23  fear, and so the language as it currently stands, it's a very

24  real fear, and that is something that was not before.  So while

25  before they were not violating the oath of office, the oath

1    they were taking to assist community members, it did not have

2    under the perjury of law.  Now, it does, and so that is a real

3    fear.  The words are very real, so I don't think it's an

4    irrational fear.

5    Q.  Ms. Chavez, when you came to testify today, did you have to

6    take an oath?

7    A.  Yes, I did.

8    Q.  Were you frightened to take it because you thought you

9    might make a mistake and get prosecuted?

10   A.  I am very honest about my choices today and very careful to

11   make sure that I am answering truthfully to the questions that

12   you and my attorney ask and so I am trying to do my very best

13   to answer very truthfully to every single question that you

14   have.  And was I nervous?  Absolutely, I was.

15   Q.  But you overcame any nervousness to take the oath; is that

16   right?

17            MS. PERALES:  Objection, asked and answered.

18            THE COURT:  Yes.  Move on.

19   BY MR. BRYANT:

20   Q.  And you also talked about the concern that there might be

21   some prosecution if any of the LUPE staff assisted a voter

22   regarding a mail-in vote if the mail-in ballot was somewhere in

23   their house?

24   A.  That is correct, and part of the challenge is the way that

25   the statutes of the law currently stand, it will prohibit us as

1    an entity paying staff members to help community members fill

2    out a ballot.  That's the number one challenge.  And so when we

3    talk to our staff members about this, overall they stop helping

4    community members even register to vote because the fear was

5    such of making a mistake.  That's one.

6         And two, it's the ballot measures.  This is something that

7    we currently don't have a ballot measure, but it is something

8    that we anticipate given the way that our work takes place,

9    being able to knock on doors, community members invite us to

10   their homes.  We have house meetings in their homes and us not

11   being able to determine whether a ballot is in the presence

12   when we're doing advocacy work, it has happened in the past

13   where we are doing advocacy work and the ballot is there and

14   they pull out the ballot because they need assistance to help

15   fill it out.  Because it happened before, we do anticipate this

16   happening in the future again, it is the nature of our work.

17   We meet people where they're at, that might be at their home or

18   they might come to our offices.

19   Q.  At any of those instances where someone showed you that

20   they had a mail-in ballot, since SB 1 has passed, has anyone

21   threatened to prosecute somebody over that?

22   A.  Well, we have rejected community members.  How do we help

23   them fill out that ballot?  Then maybe I will be sharing a

24   different story, but at the time we are rejecting community

25   members from being able to help them fill out those ballots.

1  Q.  Is there any reason why LUPE could not accomplish the

2  assistance objective through volunteers?

3  A.  We have staff members that should be able to help them.

4  There's no reason why we should be asking volunteers to do

5  that.  If they're coming to LUPE for us to offer our service,

6  there's no reason why we should be recruiting volunteers to be

7  able to do that.  We should be able to have our own staff be

8  able to do that.  That's what we intended to hire them for, to

9  help community members be able to cast their vote.

10  Q.  I understand that's your view, but is there any reason you

11  couldn't accomplish the assistance of these members regarding

12  mail-in ballots through a volunteer effort?

13  A.  I don't think what's in question here is whether or not we

14  could have recruited volunteers.  I think the question is why

15  wouldn't the State allow us to have our own staff do that?  Is

16  there any reason why the State wouldn't allow us to do that?

17  Q.  You would have to ask the legislature about that.  That's

18  not what we're here about.  It's about whether it's legal or

19  not.

20          THE COURT:  Let's ask a question and get an answer.

21          MR. BRYANT:  Would you like me to move on to the next

22  question?

23          THE COURT:  Are you satisfied you got an answer?

24          MR. BRYANT:  I did not get an answer.

25          THE COURT:  Why don't you repeat your question.

1          MR. BRYANT:  Thank you, Your Honor.

2   BY MR. BRYANT:

3   Q.  So is there any reason why LUPE could not have accomplished

4   its goal of assisting members with their mail-in ballots one on

5   one through a volunteer effort?

6   A.  The way the legislation currently stands, any kind of

7   compensation will unfortunately lead to potential prosecution,

8   so even us giving them a gift card, us giving them a T-shirt

9   could be considered a type of compensation.  And so it is also

10  hindering our ability to be able to recruit volunteers that we

11  will provide any kind of compensation for.  And if volunteers

12  are taking their time to be there outside of work hours, we

13  should at the very least be able to compensate them with gift

14  cards to pay for the gas.  I don't know if you're familiar with

15  the Rio Grande Valley, but there's no public transportation, so

16  people do have to drive everywhere there, and so if we could at

17  least provide gift cards to them, but unfortunately, the way

18  the law stands at the moment, we could not even do that.  Does

19  that answer your question?

20  Q.  Not quite.  Is there any reason why you couldn't get

21  volunteers to provide some assistance with mail-in ballots?

22  A.  Because if we provide compensation to them, they will also

23  be prosecuted.

24  Q.  Ms. Chavez, you testified that you expect that the efforts

25  to educate elderly voters about the SB 1 mail-in ballot rules

1    is only going to go up and up and up indefinitely into the

2    future; is that right?

3    A.   That is correct.

4    Q.   And as I understand, that's because another group of people

5    go from age 64 to 65 every year?

6    A.   That is correct.

7    Q.   But wouldn't it be true also that if you educate somebody

8    when they're 65 or 66 on the requirements of the rule, you

9    won't have to educate them again when they're 67?

10   A.   But we will have to educate the ones that are currently 62

11   and they will eventually become 65, and so I'm talking directly

12   about the aging population, the ones that are currently not 65

13   yet that will age in into becoming legible to apply for a

14   ballot by mail.  And so unless you have found a secret formula

15   for youth, I believe this is something that is going to

16   continue to happen year after year as more people age.

17   Q.   I definitely haven't found that formula.  But you don't

18   have to keep re-educating elderly voters every year once you've

19   educated them about the requirements of SB 1 on mail-in

20   ballots, do you?

21   A.   We do because there will always be new elderly voters.  So

22   we will not be getting attention of community members who are

23   currently not eligible to register for ballot by mail for them

24   to learn that knowledge now and expect for them to act on it

25   two, three years down the line.  That's not going to happen.

1   We need to get them at the age that they actually need the

2   service.  And every single year we will have new people turn

3   65, every single year.

4   Q.  Ms. Chavez, thank you very much.

5          MR. BRYANT:  I pass the witness.

6          THE COURT:  Any redirect?

7          MS. PERALES:  Very short redirect, Your Honor.

8                     REDIRECT EXAMINATION

9   BY MS. PERALES:

10  Q.  Ms. Chavez, a moment ago my friend asked you about using

11  volunteers to assist voters to fill out or complete their mail

12  ballots, do you recall that conversation?

13  A.  Yes.

14  Q.  So I'm going to ask you, how carefully do you train your

15  civic engagement staff to assist with ballots by mail?

16  A.  Very careful.

17  Q.  Can you explain that?

18  A.  We do presentations, we prepare Power Point and we also

19  have our senior staff, our directors in charge of civic

20  engagement work conduct the training with the help of attorneys

21  that we-- with MALDEF, TCRP, others that help in ensuring that

22  the information we're providing is accurate.  That usually

23  takes place before every Get Out The Vote effort for sure for

24  new canvasers, and once a year for staff that works with us

25  year round.

1    Q.  And you mentioned that you have dedicated civic engagement

2    staff; is that correct?

3    A.  That is correct.

4    Q.  And does that dedicated staff then just see one or two

5    voters to help them or more?

6    A.  Oh, no, they see multiple voters.  The civic engagement

7    personnel works directly with the other ten organizers, so we

8    have every county has designated organizers or multiple

9    organizers and they're tag teamed with the specific engagement

10   organizers which is two of them tag team with those two

11   organizers to attend multiple house meetings, to be able to

12   host events during actual election season, each of these

13   organizers run a field plan and so they are directly working

14   with the canvasers who are knocking on thousands of doors,

15   hundreds of doors, and then we have a senior civic engagement

16   staff member who is overseeing operations and ultimately

17   responsible for conducting these trainings.

18   Q.  Do you train your civic engagement staff with respect to

19   avoiding influencing the voter's choice?

20   A.  Oh, most definitely.

21   Q.  Okay.  Can you explain that?

22   A.  Yes, we want to make sure that we run a nonpartisan effort

23   in all of our LUPE operations, in all of our La Union Del

24   Pueblo Entero operations, so part of them is if they're going

25   to be assisting voters at the polls, making sure that the will

1    of the voter is always respected, that if we're going to be
2    knocking on doors, as many times as community members ask us
3    who to vote for, to always ask community members to stand with
4    the values and issues that LUPE supports and for them to do
5    research as to who are the elected people running for office
6    who stand with those values.  And whenever we do send text
7    messages, whenever we do make phone calls, we are making the
8    same requests and always asking them to cast their vote.  We
9    want to make sure we increase voter turnout regardless of who
10   they're actually voting for.
11   Q.  And would it be also that same type of training for your
12   civic engagement staff for helping voters by mail?
13   A.  That is correct.
14   Q.  Do you consider your training of your dedicated civic
15   engagement staff to make them professional in their approach to
16   assisting mail ballot voters?
17   A.  As professional as we can be.  I mean, we're not attorneys,
18   right, we try to provide the best information that we can.  We
19   have staff members from all paths of life, college educated,
20   not college educated community members who have been organizers
21   with us for multiple years so they are professionals in being
22   able to care for the community.  They're not professionals in
23   fully understanding the law, so we try to do the best that we
24   can with providing them with parameters to follow the laws with
25   the confinements of such.

1  Q.  Do you have the same confidence that if you try to recruit

2  volunteers to assist mail ballot voters that they would have

3  the same level of knowledge of the voting procedures and the

4  rules?

5  A.  Absolutely not.  Whenever somebody is dedicating their life

6  to this work, you take a certain level of responsibility.  We

7  do have very committed members like Maria Gomez who has made

8  this her life mission, she retired and she's still very

9  dedicated, but unfortunately not every single volunteer that we

10  engage has the same level of commitment.  Oftentimes we get

11  college students, they're there because they need the credit

12  hours, so we cannot put the same level of responsibility on a

13  volunteer that we will put on a staff member.

14          MS. PERALES:  Thank you.  I have no more questions.

15          THE COURT:  Anything based on those questions?

16          MS. PERALES:  Hold on a second, Your Honor.  I appear

17  to have several more questions.  I'm so sorry, Your Honor.

18  BY MS. PERALES:

19  Q.  Ms. Chavez, have you received any promises from the

20  Attorney General that he will not prosecute you or your staff?

21  A.  Absolutely not.  I wish.

22  Q.  Have you received any promises from the local prosecutor or

23  the Secretary of State that you will not be prosecuted for

24  violating SB 1?

25  A.  Nope.

```
 1              MS. PERALES:  Thank you, Your Honor.  Now I have no
 2    more questions.
 3              THE COURT:  Anything based on all of those questions?
 4              MR. BRYANT:  No, Your Honor.
 5              THE COURT:  You may step down, ma'am, thank you.  Your
 6    next witness.
 7              MS. PERALES:  Your Honor, with respect to the next
 8    witness, I will explain to the Court the claims that the
 9    witness will testify to and I am now at the podium because I
10    have figured out that I can see the witness from here and I
11    will no longer use the table.
12              The next witness that the Court will hear from is
13    Juanita Valdez Cox.  Her testimony goes to the LUPE plaintiffs'
14    challenges to 5.07 and 5.13, the mail ballot ID requirements,
15    and those are challenged by LUPE plaintiffs under the First and
16    14th Amendments as an undue burden on the right to vote.
17    Ms. Valdez Cox will also testify in support of LUPE plaintiffs'
18    claims under Section Two of the Voting Rights Act, specifically
19    the senate factors one and five.  And the Section Two VRA
20    claims for LUPE plaintiffs are against SB 1, Section 6.03,
21    6.04, 6.05, 6.06, and 7.04.
22              COURT CLERK:  Raise your right hand please.
23                             *   *   *
24              (Oath administered and JUANITA VALDEZ COX, witness,
25    sworn.)
```

1                          *   *   *

2            THE WITNESS:  I do.

3                    DIRECT EXAMINATION

4    BY MS. PERALES:

5    Q.  Good afternoon, Mrs. Valdez Cox.

6    A.  Good afternoon.

7    Q.  If you need to scoot up a little closer to the microphone,

8    make yourself comfortable.  Please state your name for the

9    record?

10   A.  My name is Juanita Valdez Cox.

11   Q.  And where were you born?

12   A.  I was born in Mercedes, Texas, in the Rio Grande Valley.

13   Q.  And what year were you born?

14   A.  The year I was born, March 22nd, 1947.

15   Q.  What did your parents do for a living?

16   A.  We were all migrant farm workers.

17   Q.  What did your dad do and his work?

18   A.  He was a tractor driver in the fields and would also

19   irrigate the crops.

20   Q.  What did your mom do for work?

21   A.  She would work in the fields.

22   Q.  And where did your parents do their work?

23   A.  In the Valley, in South Texas, and then we followed the

24   crops that needed harvesting to the different states.

25   Q.  You used the word "we" and I would like to ask how old were

1  you when you began to join your parents for the migrant farm

2  working work?

3  A.  I was ten, yes, I was ten years old.

4  Q.  Can you describe for me the route that you would take

5  starting in Texas?  As you mentioned, you would move with the

6  fields and starting in Texas, can you describe the route that

7  you worked with your family?

8  A.  We started in West Texas, in a city called Hereford and we

9  would do the thinning of the lettuce.

10  Q.  What tool would you use to thin the lettuce?

11  A.  The shorthanded hoe, which now has been outlawed.

12  Q.  What position does a person have to work in when they use

13  the shorthanded hoe?

14  A.  You have to be stooped over because it's not a long handle,

15  it's really short, and so bend over working.

16  Q.  And after Texas, where would you go?

17  A.  We would go to -- from Texas, we would go to I think it was

18  Ohio.

19  Q.  What would you cultivate there or pick there?

20  A.  It was tomatoes for Olinitis *(ph)* and the Campbell's

21  companies.

22  Q.  And then after Ohio where?

23  A.  Michigan for the cherries.

24  Q.  After that?

25  A.  Illinois for the asparagus.

1  Q.  How did being a migrant farm worker affect your schooling

2  in terms of time that you spent in school?

3  A.  Well, we had to leave early before school was out, so it

4  was around towards the end of April and school was usually out

5  in May.  And then we would -- when we came back, we came back

6  and it was already started, classes had begun.

7  Q.  When you were traveling in the north and working, was there

8  school for migrant children?

9  A.  Not at that time.

10  Q.  Where did you spend your summers?

11  A.  In the fields.

12  Q.  Where did you live when you were attending elementary

13  school?

14  A.  We lived in a colonia, called Colonia Seca.

15  Q.  What county is that in?

16  A.  It's in Hidalgo.

17  Q.  What does Colonia Seca mean?

18  A.  That means dry, no running water.

19  Q.  And can you explain what you mean by no running water?

20  A.  There was no -- we only had -- that colonia only had an

21  irrigation ditch that ran by the houses on the first street and

22  that was the only water that we had, there was no water, we had

23  to go get water in big jugs from town from the church or a gas

24  station or something like that.

25  Q.  How did you bathe?

1    A.  The canal, the irrigation canal had water and we used to --

2    well, my mom used to connect a hose.  There's a way where you

3    can connect it and get water from there and she would fill the

4    tubs and we could bathe there, as long as the canal rider

5    didn't see you.  We weren't supposed to take it, I guess.

6    Q.  And what else was the infrastructure like in your

7    neighborhood besides the water?

8    A.  At that time that colonia didn't have -- the streets were

9    not paved, so at that time the buses couldn't make the routes

10   inside the colonia so we had to walk out because he would get

11   stuck in the mud if the bus came in.  And also we didn't have

12   the numbers to our house.  The houses weren't numbered and the

13   streets didn't have street signs.  And I know that the

14   community in there fought to have those, our homes numbered and

15   the street signs because there were incidents where an incident

16   or something would happen and the ambulance couldn't find the

17   place or the Fire Department, so they worked to get those

18   installed.

19   Q.  Did you have public sewer in the neighborhood, the colonia

20   where you grew up?

21   A.  No, it was the outhouses, outside, yes.

22   Q.  Did you have gas lines that brought gas for you to cook on

23   the stove?

24   A.  No, it was petroleum.  It was big, like big tanks where --

25   a truck would come and fill it up, you would buy it, right, and

1   my dad would buy it and they fill up the tanks with petroleum

2   gas.

3   Q.  Growing up, what was the racial composition of your

4   neighborhood?

5   A.  We were all -- all Latinos, all Mexican, all Latinos,

6   migrant workers.

7   Q.  What elementary school did you attend?

8   A.  Runn, R-U-N-N.

9   Q.  I know you took a deep breath when you said that?

10  A.  Yes.

11  Q.  Can you tell me the nickname that peopled used for that

12  school?

13  A.  They said it was called escuela de los burros.

14  Q.  What does that mean?

15  A.  It was like derogatory for people that -- because it was

16  mainly -- it was almost all Latinos and all migrant workers and

17  all students from colonias, that's who went to that school, so

18  we were busted at school.

19  Q.  What would happen if you spoke Spanish at school?

20  A.  Later when I went to the school in the city, that's where

21  the -- we spoke Spanish, that's where you got into trouble.

22  Well, I got into trouble.  The people that spoke Spanish got

23  into trouble so our mouth was washed with soap.

24  Q.  For speaking Spanish?

25  A.  For speaking Spanish, yes.

1    Q.   How far did you progress as a young person in school?

2    A.   I dropped out at the tenth grade.

3    Q.   Why did you drop out?

4    A.   At that time, one was because we were always late in school

5    and the other one was because my parents needed help for the

6    younger siblings in our house, so I helped them in the fields.

7    Q.   Did you ultimately end up getting more education?

8    A.   Yes.

9    Q.   Did you get your GED?

10   A.   I did.

11   Q.   And did you then attend some college?

12   A.   Yes, I did.

13   Q.   And when you were attending college, were you attending

14   college during the day?

15   A.   No, it was -- actually it was after I got married and I had

16   my first child and then I started -- I was working full-time

17   and attending school.  At that time it wasn't the university,

18   it was college there in Edinburg at night.

19   Q.   And when you worked during the day, where did you work?

20   A.   I was the director of two Head Start centers.

21   Q.   And what does a Head Start center do?

22   A.   The Head Start center is at that time it was welfare moms

23   that we needed to help catch up a little bit more on their

24   education so that when they went to school they would be better

25   prepared.

1    Q.   Was there a childcare aspect as well?

2    A.   Yes, for the moms that had to work, that was part of it

3    too.

4    Q.   What is your highest level of degree completed?

5    A.   The highest level I have is an Associate degree.

6    Q.   What is your occupation today?

7    A.   I am retired.

8    Q.   And what was the position that you retired from, what was

9    the job you had right before you retired?

10   A.   Yes, I was executive director of La Union Del Pueblo Entero

11   for many years.

12   Q.   Now, we've already heard about LUPE, so I'm going to turn

13   to your personal experience in the March 2022 primary election.

14   Are you registered to vote?

15   A.   Oh, yes.

16   Q.   Where are you registered to vote?

17   A.   Precinct three in Hidalgo County.

18   Q.   And in the past what was typically the way that you voted?

19   A.   By person, always.

20   Q.   And was there a point that came that you decided that you

21   would vote by mail?

22   A.   Yes, we retired I think it was at the end of February,

23   early March, and so my husband and I decided, well, let's vote

24   by mail.

25   Q.   And is it correct that you were age 75 at that time?

1    A.   Yes.

2    Q.   And you chose to vote by mail in the March 2022 primary,

3    yes?

4    A.   Yes.

5    Q.   How did you submit your application for ballot by mail?

6    A.   I told my husband to get online for both of us to get -- to

7    fill out the application and we filled it out, we signed it and

8    we mailed it.

9    Q.   And did you then receive a mail ballot packet?

10   A.   Yes and you're correct to call it a packet because it was a

11   packet.

12   Q.   So what did you do with the mail ballot packet?

13   A.   The first day that we got it of course I was very

14   interested because it was my first time to vote by mail, so we

15   opened it, I opened it.  I looked at it and I found it hard to

16   understand, so I left it alone for a few days.

17   Q.   Did a time come when you picked it back up?

18   A.   Yes, after a few days I wanted to look at it again and to

19   see if I could, you know, understand it better.  And both my

20   husband and I talked about it and I said, well, did you

21   understand this question or that one and we talked about it and

22   finally filled it out.

23   Q.   And when you were talking it over with your husband, did

24   that discussion include how you were supposed to follow the

25   instructions for voting by mail?

1    A.  Yes, apparently he had looked at it a little bit more

2    carefully than me and he said that there was -- he told me did

3    you look under the flap because there was some more

4    information.  And I said I didn't and I already sealed it.  And

5    you can't open those once they're sealed.  So I said I already

6    sealed it and so I kept it.

7    Q.  Did you expect to have to fill out anything under the flap?

8    A.  No, I didn't know that there was -- I had heard on the news

9    a lot about this, but I didn't ever remember saying that there

10   was going to be something new under the flap, so I didn't look

11   there.

12   Q.  You've said a moment ago that you kept it?

13   A.  Right.

14   Q.  So what did you do after you kept it, what was the next

15   step that you took?

16   A.  I just kept it and then I don't remember how long

17   afterwards.  I went to the elections office in Edinburg and I

18   talked to a young lady and I said I have my mail-in ballot, but

19   I have some questions and so she said that she couldn't take

20   it, I had to go to the precinct where I vote to turn it in.

21   Q.  So what did you do with your ballot next?

22   A.  I kept it again.  So I just kept it with me because I

23   wasn't sure and I wanted to make sure that my vote was going to

24   count.  I wanted to be very careful, I also wanted to be very

25   careful because this is the first time I had done that.

1  Q.  Was there a time that you returned again to the county

2  office?

3  A.  Yes, I returned again, but this time I went around the

4  building because when I went around the building a saw a phone

5  number that said if you need assistance call, that way you can

6  wait in your car.  So there's a number there and I called it

7  and they sent a young man to the car and I said I am here to

8  turn in the ballot.  But also he also told me I needed to go to

9  my -- I needed to go to my precinct.

10  Q.  So would he take the ballot from you?

11  A.  Actually he didn't say to my precinct because it was to

12  early vote, so he told me I could go to any precinct, which I

13  knew, but I had forgotten I guess because I heard on TV that I

14  had to go to -- I could go to any precinct.

15  Q.  So when you tried to give him your ballot at the county

16  elections, did he accept it from you?

17  A.  No.

18  Q.  So then what did you do then with your ballot?

19  A.  We had a caravan of people to go vote for the early vote,

20  and again I lived in Donna, but I could vote anywhere, so I

21  went to the Pharr, members of the organization and we went to

22  vote in Pharr.

23  Q.  What did you do when you arrived at the polling place?

24  A.  At the Pharr, I asked to speak to the election judge

25  because I was so concerned about the flap, the information, and

1    so I asked to talk to the election judge and she said I -- she

2    could take it there and then I said but what's going to happen

3    to it, and then she just did a long explanation about where it

4    was going to go and some people that were going to see it.  And

5    I didn't understand who those people were or anything.  I'm

6    saying I am asking you because I want to make sure it counts.

7    And she said yes, just give it to me and I will send it to

8    wherever the ballots go.

9    Q.  And what were you worried about?

10   A.  I was worried about my vote.  You know, and my history I

11   don't miss elections, never, it's perfect record.

12   Q.  And so did you give your envelope to the polling place

13   worker?

14   A.  Yes, she took it.

15   Q.  What did you say to her when you left the poll?

16   A.  When I was where?

17   Q.  When you were leaving the polling place, what did you say?

18   A.  I just told her, *"Ma'am, I hope that my vote counts."*  And

19   she says she was going to send it off.

20   Q.  And did you find out eventually whether your vote was

21   counted?

22   A.  I didn't find out until -- yeah, I didn't know ever because

23   I didn't know how to follow up on it to see.

24   Q.  And did you ultimately contact that county and ask them if

25   your vote counted?

1  A.  Yes, I called twice because I wanted to know.  Actually I

2  wanted to know about the three that I said, the primary and the

3  run-off, and the election, and I said I'm really worried about

4  my ballot and I still don't know if I voted and they checked

5  and they said that it did.

6  Q.  And did you vote by mail or in person after this

7  experience?

8  A.  Oh, after the first time, yeah, I wasn't going to go

9  through -- it took a lot of time, but also I voted, I've always

10  voted in person.  I just wanted to try this one, right?  But it

11  didn't work well, so from then on I voted in person, in the

12  run-off and also in the general election.

13  Q.  And how old are you today?

14  A.  Seventy-six.

15      MS. PERALES:  Thank you.  I pass the witness.

16      THE WITNESS:  Thank you.

17      THE COURT:  Any cross?

18      MR. BRYANT:  Yes, Your Honor, just a little bit.

19                    CROSS-EXAMINATION

20  BY MR. BRYANT:

21  Q.  Ms. Valdez Cox, were you the person who authorized the

22  filing of this lawsuit on behalf of LUPE?

23      MS. PERALES:  Objection, Your Honor.  We have a

24  stipulation with State defendants that Ms. Valdez Cox would be

25  questioned limited to the scope of her direct examination which

1    would be her personal background and her experience voting by

2    mail in the 2022 election.

3            MR. BRYANT:  If that is our stipulation, then I'll

4    certainly abide by it.  I have no questions.  Thank you, Your

5    Honor.

6            THE COURT:  You may step down, ma'am, thank you.  Your

7    next witness.

8            PLF. COUNSEL:  Your Honor, Ms. Rocha will be examined

9    by my colleague, Fatima Menendez.  And Ms. Rocha will be

10   testifying as to LUPE plaintiffs' claims against 6.03, 6.04,

11   6.05, and 6.06, and those provisions of SB 1 are challenged

12   under the First and 14th Amendment as an undue burden on the

13   right to vote, the 15th and 14th Amendment regarding

14   intentional discrimination, Title Two of the ADA, Section 208

15   of the VRA and Section Two of the VRA.

16           COURTROOM DEPUTY CLERK:  Raise your right hand.

17                        *   *   *

18           *(Oath administered, Cristela Rocha, witness, sworn,*

19   *and testified through a Spanish Interpreter.)*

20                        *   *   *

21                   DIRECT EXAMINATION

22   BY MS. MENENDEZ:

23   Q.  Ms. Rocha, good afternoon.

24   A.  Good afternoon.

25   Q.  Could you please state your full name for the record?

```
1    A.   My name is Maria Cristela Gonzalez Tobias.

2    Q.   You prefer to go by Cris Rocha, correct?

3    A.   Yes.

4    Q.   Can you please tell the Court where you live?

5    A.   3533 Cesar Avenue in Edinburg, Texas.

6    Q.   What county is that in?

7    A.   Hidalgo.

8    Q.   How long have you lived at that address?

9    A.   Since 2002.

10   Q.   Since when have you lived in Hidalgo County?

11   A.   Since 1975.

12   Q.   Are you a member of LUPE?

13   A.   Yes.

14   Q.   What is your current occupation?

15   A.   Community organizer.

16   Q.   Who is your employer?

17   A.   LUPE.

18   Q.   Are you a paid employee of LUPE?

19   A.   Yes.

20   Q.   When did you begin working as a LUPE employee?

21   A.   In 2008.

22   Q.   Where did you grow up?

23   A.   In San Juan, Texas.

24   Q.   Very briefly can you describe the geographic area that you

25   grew up in?
```

1    A.   Yeah, well, it's an area where there's a lot of agriculture

2    and people who work very hard in agriculture.

3    Q.   What did your parents do for work?

4    A.   They worked in agriculture, in stores and in the fields and

5    I did too, I would help them.

6    Q.   What is your highest level of education?

7    A.   Sixth grade.

8    Q.   What was school like for you?

9    A.   Well, it was very difficult because I had to go to school

10   at night.  We had to work during the day time in agriculture

11   and so I stopped going to school because we would get home very

12   tired from work and my mother wasn't able to take us to school,

13   and I had to help my mother to work and my siblings, help my

14   siblings.

15   Q.   After you left school, what did you do?

16   A.   Well, I was working in the fields and I would also clean

17   houses, I would work the fields whenever there was work, I

18   would clean houses, I would take care of children, and then

19   when I was a little older I was working for Pro Air taking care

20   of people who were elderly, and I worked for the County, but

21   just for a very short time.

22   Q.   I am going to ask you a few questions about your work with

23   LUPE now.  When did you first learn about LUPE?

24   A.   Like when I was, like, 12 years old.  At the time it was

25   the Farm Workers Union.

1    Q.   What services of LUPE did your family rely on?

2    A.   Well, with the union we got a piece of land so that we

3    could cultivate it, and then we would sell that in the

4    colonias, in the outskirts neighborhoods and they would help us

5    out with clothing.

6    Q.   What is a colonia?

7    A.   A colonia is a place where there is no public lighting,

8    doesn't have any streets, it's on the outside of -- the

9    outskirts of the city and I live in a colonia like that.

10   Q.   What do you do as a community organizer with LUPE?

11   A.   I promote the services that LUPE provides, I provide

12   information about the voting calls if it's possible and I

13   encourage people to go out and vote.

14   Q.   What types of neighborhoods do you visit when you are doing

15   your organizing?

16   A.   The colonias.

17   Q.   You mentioned that part of your job is to encourage people

18   to vote, what people do you encourage to vote?

19   A.   I do that over the phone or I visit them in their houses.

20   Q.   And when you call somebody on the phone or you visit their

21   house, what do you say or do to encourage them to vote?

22   A.   I tell them -- can you repeat the question?

23   Q.   When you call someone on the phone or knock on their door

24   at home to encourage them to vote, what do you say?

25   A.   Well, for them to go out and vote that is very important in

1    every election.  And I give them information about when and

2    where the voting is going to take place.

3    Q.  How do you know which doors to knock on?

4    A.  Because I have a list of people who have voted.

5    Q.  As part of your job, do you ever encourage people to vote

6    for a certain candidate?

7    A.  No.

8    Q.  What do you say if someone asks you which candidate to vote

9    for?

10   A.  We tell them that we cannot tell them who to vote for, they

11   are the ones who have to decide and the most important thing is

12   for them to go out and vote.

13   Q.  What do people say to you when you encourage them to vote?

14   A.  Some of them say they need help, some of them say they need

15   transportation, and some of them say they don't need anything.

16   Q.  What kinds of people have asked you to help them to vote?

17   A.  Well, it's the, um, elderly, yes, the elderly and the

18   disabled persons.

19   Q.  How do they ask you for help?

20   A.  Over the phone.

21   Q.  What do you say when someone asks you for help to vote?

22   A.  I tell them to find either a relative or a friend who can

23   take them to vote and if they can't find anyone, then they can

24   call us.

25   Q.  How do you assist voters?

1    A.  Well, to read the ballot at the voting booth or in their

2    cars.

3    Q.  How many voters have you driven at the same time to vote?

4    A.  Two.

5    Q.  As an organizer with LUPE, what is your involvement in the

6    caravans, the caravanas, conducted by LUPE?

7    A.  Well, we invite them to come with us so that they can go

8    vote, they can either join the caravan driving their own cars

9    or they can join us in one of our cars.

10   Q.  Can you describe the voters that select you to be their

11   assister?

12   A.  What was that?

13   Q.  Can you describe the voters that select you to assist them

14   with voting?

15   A.  People who are elderly and they can't walk, they either

16   have to use a cane or walker.

17   Q.  When do voters choose you as their assister?

18   A.  When we're in the voting polling places.

19   Q.  How do you arrive at the polling place, with a voter or

20   separately?

21   A.  Sometimes we're together, sometimes we're separate.

22   Q.  What do you have to do to assist a voter at the polling

23   place?

24   A.  Well, I have to give an oath and I have to fill out a form,

25   and put in my information.

1   Q.  When you take a voter to the polling place, you transport a

2   voter to the polling place, does that voter always ask you to

3   be their assister?

4   A.  Yes.

5   Q.  And when do you know that they have selected you to assist

6   them with voting?

7   A.  Well, because they tell me that they need my help either

8   because they don't know how to read or they can't see too well.

9   I don't know that's enough.

10  Q.  I would like to pull up Exhibit LUPE 189.  I would like to

11  review the oath of assistance on this form.  Do you recognize

12  this oath?

13  A.  Yes.

14  Q.  Is this the oath that you now have to take in order to

15  assist a voter?

16  A.  Yes.

17  Q.  I would like to review certain language in the oath.  The

18  first part of this oath that I would like to review with you is

19  the penalty of perjury language.

20  A.  Uh-huh.

21  Q.  Do you see that language in the Spanish oath?

22  A.  Yes.

23  Q.  It's highlighted in yellow?

24  A.  Yes.

25  Q.  What do you understand these words to mean, swear under

 1  penalty of perjury?

 2  A.  What I understand is that if I do something wrong, I'm

 3  going to end up in jail.

 4  Q.  How does swearing under penalty of perjury in this assister

 5  oath affect your actions as an assister?

 6  A.  Well, now I don't want to do that anymore to give

 7  assistance because I'm afraid that if I do something wrong,

 8  it's either going to hurt me or hurt the voter.

 9  Q.  I would like to ask you a question about different language

10  in the oath.  The next language that I would like to ask you

11  about is this language highlighted in green that is being

12  underlined.  What do you understand these words to mean, *"The*

13  *voter I am assisting represented to me they are eligible to*

14  *receive assistance"*?

15  A.  Well, I don't know because I mean I don't know because if

16  he tells me that he needs help, to me that's enough.

17  Q.  How does swearing that the voter you are assisting

18  represented to you that they are eligible to receive assistance

19  affect your actions as an assister?

20          SPANISH INTERPRETER:  Interpreter requests repetition.

21  BY MS. MENENDEZ:

22  Q.  How does swearing that the voter you are assisting

23  represented to you that they are eligible to receive assistance

24  affect your actions?

25  A.  Well, now I don't want to do it anymore, I get more

1    nervous.  And also when they talk to me, I tell them I don't

2    want to help them, they should try to find somebody else and I

3    should be their last option.

4    Q.  Before the law SB 1 was passed, did you tell voters who

5    asked you for assistance to ask other people for assistance?

6    A.  Oh, no.

7    Q.  I'd like to look at other language in the oath of

8    assistance.  The next language I would like to focus on is

9    right here in blue.  What do you understand these words to

10    mean, *"I did not pressure the voter into choosing me to provide*

11    *assistance"*?

12    A.  Well, I don't know, that word is very confusing.  It's very

13    confusing because the word to pressure is very broad and it all

14    depends on how you understand it.

15    Q.  How do you know if you have pressured a voter into choosing

16    you to assist them?

17    A.  I don't know, like, if I call someone to tell them to go

18    out and vote, I don't know if that would be pressuring because

19    I don't do that.  I don't know.

20    Q.  Do you know who decides if a voter is ineligible to receive

21    assistance?

22    A.  No.

23    Q.  In your view, who should decide if a voter needs assistance

24    to vote?

25    A.  Well, the voter.

1  Q.  In general, how has this new oath language affected you as

2  a voter assister?

3  A.  Well, I don't want to do it anymore and, well, there's

4  other people who have told me that they don't want to do it

5  anymore either.

6  Q.  What impact, if any, has SB 1 had with respect to voter

7  assistance?

8  A.  Well, it now takes longer and it wasn't like that before.

9  Q.  You mentioned that you don't want to provide assistance

10  now.  Have you had any problems providing assistance since SB 1

11  passed?

12  A.  Yes, there have been some problems.

13  Q.  Could you give me some examples of a problem?

14  A.  Well, I took somebody, a LUPE member, Mr. Cabello and the

15  line was very long and I got in line and I filled out the

16  information and took the oath and then when I turned to look,

17  he was no longer there with me, somebody else was helping him,

18  so I was not the one that he chose to assist him.

19      The other one is Mr. Garcia who is also a LUPE member and I

20  was assisting him in the car.  Again, I was told to go inside

21  to fill out all the information and it took me a while and when

22  I came back, there was somebody else, a poll worker who was

23  helping him.  So I asked the young lady while she was helping

24  him if I was supposed to be the one to do that, and she said

25  no, she said that she could help, that she was going to be

1    there, and then the police was called, and then the police

2    officer was the one who helped him.

3    Q.  I would like to ask you a question about the example you

4    provided with Mr. Cabello.

5    A.  Uh-huh.

6    Q.  You mentioned that while you were in line to complete the

7    requirements to serve as an assister, somebody took him and

8    assisted him.  When you say they took him, where did they take

9    him?

10   A.  Well, he was supposedly going to take a seat inside, but by

11   the time I got back he was already voting.

12   Q.  And Mr. Cabello voted with someone else and not with you,

13   the person he had taken with him to help him vote?

14   A.  Yes, uh-huh, that's how it happened.

15   Q.  I have a couple of questions that I would like to ask about

16   the incident with Mr. Cabello.  I'd like to clarify something

17   with the interpreter.  Earlier when Ms. Rocha mentioned that

18   she was assisted by someone else, she was discussing this

19   incident with Mr. Cabello, she said she was assisted by a poll

20   worker; is that correct?

21            THE COURT:  So the questions don't go to the

22   interpreter.  So why don't you just --

23            MS. MENENDEZ:  I think the interpretation by the

24   interpreter was incorrect.

25            THE COURT:  Your remedy there is to ask a new question

1   or rephrase question to the witness and let's see what the

2   response is, but the interpreter is not a witness.

3            MS. PERALES:  If I could have a moment, Your Honor.

4   This is a new situation for us.

5   BY MS. MENENDEZ:

6   Q.  I have a couple of questions I would like to ask Ms. Rocha

7   about the incident with Mr. Cabello.  Who was the assister that

8   Mr. Cabello wanted to assist him with voting?

9            MR. KERCHER:  Objection, Your Honor.  The answer calls

10  for hearsay and requires speculation as to what the voter

11  himself wanted.

12           THE COURT:  So, ma'am, in answering the question, only

13  answer the question based on your personal knowledge.  For

14  example, is it Mr. Botello?

15           MS. MENENDEZ:  Cabello.

16           THE COURT:  Did Mr. Cabello tell you he wanted you to

17  assist him?  But you need to answer from your personal

18  knowledge, don't guess or speculate what Mr. Cabello wanted.

19           THE WITNESS:  Because he told the young ladies there

20  that are taking down the information that he wanted me to be

21  the one.

22  BY MS. MENENDEZ:

23  Q.  The young ladies that you mentioned that wrote down the

24  information, are those ladies that worked at the polling

25  location?

A.  Yes, yes.

Q.  Did Mr. Cabello vote with his assister of choice?

A.  No.

Q.  Earlier you mentioned when you were at the polling location with Mr. Cabello, that you were in a line.  What was that line for?

A.  Well, I was in line so the gentleman could go vote and there was another line and there were two people in front of me and that was for the oath.  For that reason and because this was an elder man he was told that he could have a seat while I finished.  And I think what happened was because it took me a longer time.

Q.  When you say longer time, a longer time for what?

A.  Well, to complete the process of filling out all the information and all that because there were two people in front of me and that may be the reason why it took me longer, I don't know how long, because it's been a while.

Q.  Okay.  I'd like to now look at a different part of this exhibit.  I would like to look at the form, this area right here with these blank spaces.  And I would like to look at these two right columns?

A.  Uh-huh.

Q.  How long do you spend filling in these boxes compared to 2020 and before?

A.  Could you repeat it?

1  Q.  How long do you spend filling in these boxes compared to

2  2020 and before?

3  A.  Well, longer.

4  Q.  What have you seen when you arrive at the poll to assist a

5  voter and there are also other voters with assisters in line?

6  A.  It's just that the lines now are longer.

7  Q.  I would like to switch gears a little bit and ask about

8  mail ballots.  In 2022, did you help anyone fill out their

9  application for a mail ballot?

10  A.  No, just the information.

11  Q.  The information for what?

12  A.  About where they can get their application.

13  Q.  In 2022, did you help anyone fill out their mail ballot?

14  A.  No.

15          MS. MENENDEZ:  I pass the witness, Your Honor.

16          THE COURT:  Any cross?

17          MR. KERCHER:  Yes, Your Honor, Mr. Kercher.

18                    CROSS-EXAMINATION

19  BY MR. KERCHER:

20  Q.  Good afternoon, Ms. Rocha.  My name is Ryan Kercher.

21  A.  Good afternoon.

22  Q.  Thank you for being here and thank you for testifying under

23  oath today.

24  A.  Thank you.

25  Q.  You encourage people to vote; is that right?

```
 1   A.   Yes.
 2   Q.   Voting is important, we agree?
 3   A.   Of course it is.
 4   Q.   If someone asks you who to vote for, you tell them that you
 5   cannot answer that question; is that right?
 6   A.   That is correct.
 7   Q.   Why do you tell them that?
 8   A.   Because we are not partisan to any party, what we care
 9   about is for people to go out and vote.
10   Q.   You want for voters to make their own choice; is that
11   right?
12   A.   Yes.
13   Q.   And you want to follow the rules about helping voters,
14   right?
15   A.   Correct.
16   Q.   That is how LUPE helps voters, right?
17   A.   Yes.
18   Q.   And you don't know if others who talk to voters want to
19   follow the rules, right?
20   A.   What was the question again?
21   Q.   Sure.  You don't know if other people who also talk to
22   voters want to follow the rules that you follow?
23   A.   Well, no.
24   Q.   You talked about the oath that you looked at with my
25   friend, right?
```

1  A.  Yes.

2  Q.  And you said that the oath made you nervous; is that true?

3  A.  Yes, for --

4  Q.  Have you received training from LUPE about the new oath?

5  A.  Yeah, well, yes.

6  Q.  You talked with my friend about the perjury part of the new

7  oath, right?

8  A.  Yes, that, yes.

9  Q.  And the training that you've received from LUPE, has that

10  discussed whether that perjury part is a new part of the oath?

11  A.  Well, it's something -- well, yes, it is something new.

12  Q.  You said that with the oath if someone asks for you to be

13  an assister, you tell them that you will only be their assister

14  if you are their last choice; is that right?

15  A.  Yes.

16  Q.  But if you are someone's last choice, you will be an

17  assister; is that right?

18  A.  Well, yes, if there's no other choice.

19  Q.  You talked about two people who you had tried to assist,

20  but had trouble assisting?

21  A.  Yes.

22  Q.  One was Mr. Cabello, right?

23  A.  Uh-huh.

24  Q.  And who was the other -- what was the name of the other

25  person?

1    A.  Garcia.

2    Q.  Garcia.  When Mr. Cabello had difficulty voting with his

3    assister, the assister you say he wanted, did you report that

4    incident to the County?

5    A.  No.

6    Q.  Did you tell anyone at LUPE about that incident?

7    A.  Yes, yes.

8    Q.  Do you know whether anyone at LUPE reported that incident

9    to the County?

10   A.  Yes, we did report it, yes, it was reported.

11   Q.  Do you know if anything came of that report to the County?

12   A.  No, we don't know they're going to do anything or not, but

13   I did report it.

14   Q.  So we talked about Mr. Cabello.  Let's talk about

15   Mr. Garcia.  After you say Mr. Garcia was not able to use the

16   assister of his choice, did you report that incident to the

17   County?

18   A.  Yes, there was a line where we could report everything that

19   happened and I reported it there.

20   Q.  Do you know the result of that report?

21   A.  So far, so far they haven't said anything to us.

22   Q.  With Mr. Cabello, do you remember whether that took place

23   in the primary of 2022 or the general election of 2022?

24   A.  It was 2022, I don't remember too well, but it was 2022.

25   Q.  That's fair.  I want to ask one more question to see if I

1    can help you remember.  Do you remember whether the incident

2    with Mr. Cabello was in March of 2022 or in November of 2022?

3    A.  I think it was November, but I'm not very sure, I'm not.

4    Q.  Do you remember when the incident with Mr. Garcia was?

5    A.  Yes, I think it was during early voting.  That one I

6    remember.

7    Q.  Do you remember whether it was an early voting in March or

8    early voting around November?

9    A.  November.

10   Q.  Thank you for your time, Ms. Rocha.

11   A.  Thank you.

12            MR. KERCHER:  Pass the witness, Your Honor.

13                    REDIRECT EXAMINATION

14   BY MS. MENENDEZ:

15   Q.  I have a few questions for you.  You said that before the

16   law, SB 1, you would help a voter if they asked you, correct?

17   A.  Of course I did.

18   Q.  And now if the voter asks you to assist them, you tell the

19   voter to ask other people first, right?

20   A.  Yes, correct, yes.

21   Q.  But in this situation, the voter chose you and you tell

22   them to choose someone else, correct?

23            SPANISH INTERPRETER:  Interpreter asks for repetition.

24   BY SPANISH INTERPRETER:

25   Q.  In this situation, the voter chose you and you tell them to

1    choose someone else, correct?

2    A.  Yes.

3              MS. MENENDEZ:  Thank you.  That's all I have.

4              MR. KERCHER:  No additional questions, Your Honor.

5              THE COURT:  Let's take about a 15-minute break.

6              COURT SECURITY OFFICER:  All rise.

7         (3:04 p.m.)

8                        *   *   *

9         (3:26 p.m.)

10             COURT SECURITY OFFICER:  All rise.

11             THE COURT:  Thank you.  Please be seated.  Ladies and

12   gentlemen, so from time to time you might see the Marshals

13   popping in here, they're also able to see us all through

14   cameras, so even if they're not in here, they can see you and

15   see what you're doing, and they're expressing some concern that

16   too many of you are using your phones and they're not quite

17   sure what you're doing with your phones.  Now, as long as the

18   phones are off, I'm fine with that and I'm fine with you using

19   your phones if they're in a silent mode, but there is no video

20   or recording allowed, no picture taking allowed.  So just fair

21   warning if they either see you here in the courtroom or they

22   see you on the cameras doing anything that looks like

23   recording, you'll be escorted out and questions will be asked

24   and your phone might be confiscated.  So hopefully that's the

25   last warning on that.

1          Your next witness.

2          MS. PERALES:  Your Honor, plaintiffs will call El Paso

3     County Elections Administrator, Ms. Lisa Wise.  This will be

4     our longest examination because it is the first of the

5     elections administrators, just to prepare the Court.  And the

6     testimony of Ms. Wise will go to all of LUPE plaintiffs' claims

7     in the case.

8          COURTROOM DEPUTY CLERK:  Raise your right hand.

9                        *   *   *

10         *(Oath administered and LISA WISE, witness, sworn.)*

11                        *   *   *

12         THE WITNESS:  I do.

13         MS. PERALES:  Ms. Wise, before we start, in case you

14    prefer paper over a monitor, I'm going to hand you a binder

15    that has the same exhibits that we're going to be discussing

16    today, but in a hard copy format.

17         Do I have permission to approach the witness, Your

18    Honor?

19         THE COURT:  Yes.

20         MS. PERALES:  Your Honor, I request permission to ask

21    leading questions under Federal Rule of Evidence 611(c)(2)

22    because the El Paso County Elections Administrator is a

23    defendant of the LUPE plaintiffs and is thus an adverse party.

24         THE COURT:  In response.

25         MS. HUNKER:  No, Your Honor, there's no objection.

1          THE COURT:  You may proceed that way.

2          MS. PERALES:  Thank you.

3                      EXAMINATION

4   BY MS. PERALES:

5   Q.  Good afternoon.

6   A.  Good afternoon.

7   Q.  Will you please state your name for the record?

8   A.  Lisa Wise.

9   Q.  And you serve as the El Paso County Elections

10  Administrator; is that correct?

11  A.  Yes.

12  Q.  You grew up in Omaha, Nebraska, correct?

13  A.  Yes.

14  Q.  And you earned your undergraduate degree at Park University

15  just outside Kansas City, correct?

16  A.  Yes.

17  Q.  And you earned Master's in public administration from the

18  University of Nebraska, in Omaha, correct?

19  A.  Yes.

20  Q.  Before you came to El Paso County, you worked as the Deputy

21  Election Commissioner in Douglas County, Nebraska, correct?

22  A.  Yes.

23  Q.  And you held that position for a little over eight years;

24  is that right?

25  A.  Yes.

1    Q.  And so in total you've worked in election administration

2    for about 15 years; is that right?

3    A.  About 17.

4    Q.  Well, it was a bit ago that we took your deposition, yes.

5    I would like to put on the monitor, if Derrick would be so

6    kind, LUPE Exhibit 336.  And I'd like to begin, Ms. Wise, with

7    some questions about the demographics of the voters in your

8    county, in El Paso County.  Do you recognize this as the El

9    Paso County Hispanic Voter Statistics Report?

10   A.  Yes.

11   Q.  And this report was prepared by your office, correct?

12   A.  Yes.

13   Q.  This is for the 2020 March primary, correct?

14   A.  Yes.

15   Q.  How many registered voters did you have all together for

16   that election?

17   A.  About 470,000, 470,006, it looks like.

18   Q.  Thank you so much.  Do you know about how many registered

19   voters you have now in El Paso County?

20   A.  I think about 492,000.

21   Q.  I would like to look with you, if we could zoom out a

22   little bit, for the percent of voters age 18 to 30 who are

23   Hispanic.  So can you tell me if it's correct to say that ages

24   18 to 30 about 30.7 percent of your voters are Hispanic?

25   A.  Yes.

1  Q.  And then if we move to the next age group down, age 31 to

2  45, does it show there that Hispanic voters are 55.95 percent

3  of your registered voters?

4  A.  Yes.

5  Q.  And then if we follow along to the next page, page two and

6  we look at that oldest group, 61 to 110, skipping forward, is

7  it fair to say that Hispanic voters have risen to 63.37 percent

8  of your voters in that age group?

9  A.  Yes.

10  Q.  So then looking at this chart as a whole, it's fair to say

11  then that the proportion of registered voters who are Hispanic

12  in El Paso County increases with the age group of the

13  registered voters?

14  A.  Yes.

15  Q.  And then if we look at the column for total Hispanics who

16  voted, that's after total voters, the sixth column across, you

17  would agree that the proportion of Hispanics among all voters

18  who voted increases with the age of the voters, correct?

19  A.  I think that's highlighted, that's the next column so I

20  just want to make sure.  You're talking about the total, yes,

21  thank you.

22  Q.  Yes, there we go.

23  A.  Sorry, could you repeat it?

24  Q.  Since we're on the age 61 to 110, the Hispanics who voted

25  as a percent of total who voted is 63.85; is that correct?

1    A.   Yes.

2    Q.   So at this age, age 61 and over, the Hispanic voters are

3    63.85 percent of those who voted, yes?

4    A.   Yes.

5    Q.   And if we go all the way back to the 18 to 30, our youthful

6    voters on page one if we look at that same column, we see that

7    they are 60 percent which is less than the first number; is

8    that correct?

9    A.   Are you asking -- I'm sorry?

10   Q.   The percent in total who voted, Hispanic?

11   A.   That is correct, I'm sorry, I thought you asked about just

12   18 to 30.

13   Q.   You're right, we should be looking at the next one down?

14   A.   I just want to make sure I'm answering --

15   Q.   I apologize.  So the third group, instead of being in the

16   60s, it's in the 40s percent range; is that correct?

17   A.   Correct.

18   Q.   I would like to go to LUPE 337.  And do you recognize this

19   as the Hispanic Voter Statistics Report for the 2020 November

20   general?

21   A.   Yes.

22   Q.   And if we look just at all votes cast, so that number that

23   we were just discussing for age 18 to 30, so the next group

24   down, yes, for ages 18 to 30, the percent of total who voted

25   who were Hispanic, it's 36.5; is that right?

1    A.   Yes.

2    Q.   And then if we go to the oldest age group on the next page,

3    the age 61 to 110, if we look at the percentage of those voters

4    who are Hispanic it's 63.64; is that right?

5    A.   Yes.

6    Q.   And so just to explain in more plain English, it's fair to

7    say that according to El Paso County's records, as a percent of

8    those voting, the Hispanic share goes up as the age goes up,

9    correct?

10   A.   Yes.

11   Q.   El Paso County is a covered jurisdiction for the Spanish

12   language under the Federal Voting Rights Act; is that correct?

13   A.   Yes.

14   Q.   How many full-time employees do you have in your office?

15   A.   Eighteen including myself.

16   Q.   And for the 2022 November general election, how many people

17   did you employ all together?

18   A.   Counting poll workers?

19   Q.   Just inside the office.

20   A.   Temporary workers or just full-time?

21   Q.   I know that it can be broken down that way, so if you can

22   tell me how many full-time and how many temporary?

23   A.   I believe we hired from the beginning of our voter

24   registration surge to probably to canvas anywhere between 20 to

25   25 total, but we had usually eight to ten in our office at a

1    time and then along with our staff.

2    Q.   How many poll workers did you employ for the November 2022

3    general election?

4    A.   Somewhere between 800 and a thousand.

5    Q.   Now, your voting machines in El Paso County are the kind

6    where the voter votes on a touch screen machine; is that

7    correct?

8    A.   Yes.

9    Q.   And then the voter receives a piece of paper that comes out

10   of the machine; is that correct?

11   A.   Yes.

12   Q.   And then the voter takes that piece of paper over to a

13   separate machine and feeds the paper in; is that correct?

14   A.   Yes.

15   Q.   And what do we call the machine that you feed the paper

16   into?

17   A.   We call it the DS200, some people call it the ballot box,

18   it's called both of those generally.

19   Q.   Thank you.  Is it called the tabulator sometimes?

20   A.   It can be.

21   Q.   And the machine where the people press the touch screen,

22   what is that called?

23   A.   Could be called express vote, that's the name of the actual

24   machine that we would call in our office, the people call it

25   the touch screen, people call it the voting machine.  I mean,

1    it's called several things depending on I think who you speak

2    with.

3    Q.  Thank you.  I'd like to display Exhibit State 128.  When we

4    prepared this, I don't believe we had State 128, so this is

5    based on the description.  We think this is State 128, but it

6    was definitely an exhibit in your deposition.  The

7    proclamation.

8        While we're looking for it, I can still ask you some

9    questions about it.  You may also have it in your binder.  Do

10   you recall that in the summer of 2020, the governor made a

11   proclamation that changed some of the rules around voting?

12   A.  Yes.

13   Q.  And the proclamation was related to COVID, do you recall

14   that?

15   A.  Yes.

16   Q.  And the proclamation extended early voting for the upcoming

17   2020 general election by a week; is that correct?

18   A.  Yes.

19   Q.  And under that authority of that proclamation, there it is,

20   you used that authority that you had to extend early voting by

21   a week for the 2020 general election in El Paso County,

22   correct?

23   A.  Yes.

24   Q.  And also under that proclamation, you used your authority

25   to collect ballots by mail during the early voting period; is

1    that correct?

2    A.  Yes.

3    Q.  Whereas typically if someone wanted to drop off a ballot by

4    mail, they would only be able to do that on election day,

5    right?

6    A.  Correct, yes.

7    Q.  And you believe that those measures were helpful to the

8    voters, correct?

9    A.  Yes.

10   Q.  But they were temporary, correct?

11   A.  That's correct, yes.

12   Q.  So for the 2022 election cycle, you went back to the

13   regular period of early voting and the dropping of mail ballots

14   only on election day, correct?

15   A.  Yes.

16   Q.  I'm going to ask you some questions now about voter

17   assistance.  And I would like to take first the topic of voter

18   assistance at the polling place.

19       Based on your familiarity with the conduct of elections in

20   El Paso, it's correct to say that there are voters who will

21   come to vote in person and they will bring someone with them to

22   help them with the voting process, correct?

23   A.  Yes.

24   Q.  And examples of El Paso voters who bring assisters with

25   them include people who are visually impaired and don't want to

1    use the audio ballot, correct?

2    A.   Yes.

3    Q.   And so they bring someone with them to help them read the

4    ballot, yes?

5    A.   Yes.

6    Q.   And then you also have people who speak a language that

7    isn't English or Spanish and they would like their spouse or

8    their child to come with them to interpret; is that right?

9    A.   Yes.

10   Q.   And for example, somebody who speaks Vietnamese, correct?

11   A.   Correct, yes.

12   Q.   Thank you.  And sometimes curbside voters bring their

13   assisters with them as well, yes?

14   A.   Yes.

15   Q.   And your main groups of voters who bring assisters use that

16   help for reading or language translation, correct?

17   A.   Yes.

18   Q.   And you have some voters who speak Spanish and are limited

19   English proficient and they come with their own trusted person

20   to vote at the polling place, correct?

21   A.   Yes.

22   Q.   And a voter who doesn't hear or who communicates in sign

23   language, they might want to bring their own person to assist

24   and help them with the voting process, correct?

25   A.   Yes.

1    Q.  And you agree that a voter assister can be anybody as long

2    as they're not an employer, a representative of an employer, a

3    union representative or an agent of the union, correct?

4    A.  Yes.

5    Q.  You're familiar with the term "souls to the polls",

6    correct?

7    A.  I am, yes.

8    Q.  And it's your understanding generally that it is an action

9    by a church or synagogue or religious body that encourages and

10   may even assist voters who need to vote, correct?

11   A.  Yes.

12   Q.  And with souls to the polls, encouragement or assistance

13   might be rides to the polls or the help of an assister, yes?

14   A.  Yes.

15   Q.  And the voters go in kind of a community church activity

16   often after Sunday to do souls to the polls, yes?

17   A.  Yes.

18   Q.  And you're aware that nonprofit Get Out The Vote

19   organizations also offer rides sometimes to voters to the

20   polls, yes?

21   A.  Yes.

22   Q.  And some of your voters in El Paso County are Chinese

23   speaking; is that right?

24   A.  We do have some, yes.

25   Q.  And you've seen them bring their chosen assisters to help

1  them vote at the polls, yes?

2  A.  Yes.

3  Q.  And El Paso County contains the Ysleta del Sur Puebla; is

4  that right?

5  A.  It does, yes.

6  Q.  And Tiqua speakers who live in El Paso County typically

7  choose to take their own assisters to the polls to help them,

8  correct?

9  A.  Correct.  We actually fall under the requirement to have

10 our documents in the Tiqua language, however, it's an oral

11 language so it's a little different.  And the actual governor

12 of the tribe had to give us a letter for the State, stating we

13 don't want that in written language, it is not written

14 language, it needs to be oral.  So they generally bring other

15 people that can speak Tiqua with them.  We don't have it at

16 every site.

17 Q.  And those folks that Tiqua speakers bring with them then

18 assist them in the voting; is that right?

19 A.  Yes.

20 Q.  And you would agree with me that a voter could be both

21 limited English proficient and physically disabled, correct?

22 A.  Yes.

23 Q.  So example, for example, an elderly Spanish speaking voter

24 might bring an assister both to help the voter physically

25 navigate the polling place, but also to help understand, for

1    example, the instructions on how to use the machine; is that

2    right?

3    A.   Yes.

4    Q.   Now, before SB 1, you would agree with me that voter

5    assisters who were not poll workers were required to take an

6    oath before assisting a voter; is that correct?

7    A.   Yes.

8    Q.   And that previous oath pre SB 1, included swearing that the

9    assister would not suggest to the voter how to vote, yes?

10   A.   Yes.

11   Q.   Can we display LUPE 172 please?  Ms. Wise, do you recognize

12   this as the assistance oath prescribed by the Secretary of

13   State in July 2022?

14   A.   Yes.

15   Q.   And is this the form El Paso County will use in the

16   upcoming election of the fall of 2023?

17   A.   Yes.

18   Q.   Can we go back to joint exhibit one please?  And if we can

19   go to page 54, section 6.04, towards the bottom on page 52.  Do

20   you see where SB 1, Section 6.04 adds some new language to the

21   oath of assistance where it starts with "I swear"?

22   A.   Yes, I do.

23   Q.   And so for example, where the person swears under penalty

24   of perjury, that language means to you that if you are not

25   honest on this form, that you can be charged with perjury,

1  correct?

2  A.  Yes.

3  Q.  And perjury is a crime, yes?

4  A.  Yes.

5  Q.  And so if we continue on, do you see in lines 26 and 27

6  that SB 1 has added to the oath *"The voter I am assisting*

7  *represented to me that they are eligible to receive*

8  *assistance"*?

9          THE COURT:  It's the wrong line.

10         MS. PERALES:  Sorry.

11  BY MS. PERALES:

12  Q.  Actually the bottom of 52 and onto 53 that *"The voter I am*

13  *assisting represented to me that they are eligible to receive*

14  *assistance."*  Do you see that language there?

15  A.  I do, yes.

16  Q.  And so you would agree with me that in order to sign this

17  form and avoid being charged with perjury, an assister will now

18  have to secure from the voter a representation that the voter

19  is eligible to receive assistance, yes?

20  A.  Yes.

21  Q.  Now, following down on page 53 to line seven through nine,

22  do you see the new language there that the assister has to

23  swear, *quote, I did not pressure or coerce the voter into*

24  *choosing me to provide assistance.*

25      Do you see that there?

1    A.   I do.

2    Q.   And it's true that you would not be able to say based on

3    the election code whether it's pressuring or not if a neighbor

4    tells a voter three days in a row, early voting is happening, I

5    can give you a ride to the polls and help you.  Is that

6    correct?

7    A.   That's correct.

8    Q.   And finally if we go around lines 12 through 14, do you see

9    that the assister now has to swear, quote, I understand that if

10   assistance is not provided to a voter who is not -- *"I*

11   *understand that if assistance is provided to a voter who is not*

12   *eligible for assistance, the voter's ballot may not be*

13   *counted."*

14        Do you see that there?

15   A.   Yes, I do.

16   Q.   Would you agree with me that the oath does not contain the

17   criteria for eligibility for assistance for a voter?

18   A.   Yes.

19   Q.   And it's also true that you don't regularly post in polling

20   places a sign that announces the eligibility criteria for

21   assistance to a voter, do you?

22   A.   No.

23   Q.   And you would agree with me that it might be less than

24   completely clear to an assister who shows up to help a voter

25   what the exact criteria is for eligibility for assistance, yes?

1   A.   Yes.

2   Q.   And you agree that a potential assister might have some

3   concerns about securing a representation from the voter that

4   the voter needs assistance, correct?

5   A.   They may, yes.

6   Q.   And you would agree with me that a potential assister might

7   be concerned that if they make a mistake in giving either the

8   wrong kind of assistance or assistance to an ineligible voter,

9   that the ballot of that voter might not get counted, correct?

10  A.   Yes.

11  Q.   And you would agree with me that it's possible that a

12  potential assister who is aware of SB 1 might think that if

13  they make a mistake in either giving the assistance or giving

14  the assistance to the wrong type of voter, that they might be

15  accused of perjury for having signed the oath before delivering

16  the assistance, yes?

17        MS. HUNKER:  Objection, Your Honor, hearsay and

18  speculation.  She is not actually speaking about her own

19  personal experience.

20        THE COURT:  I'm assuming this is coming from

21  deposition testimony.

22        MS. PERALES:  It is, Your Honor.

23        THE COURT:  Go ahead.

24  BY MS. PERALES:

25  Q.   Would you like the question again?

1    A.  Please.

2    Q.  Would you agree with me that it's possible that a potential

3    assister who is aware of SB 1 might think that if they make a

4    mistake in either giving the assistance or giving the

5    assistance to the wrong type of voter, that they might be

6    accused of perjury for having assigned the oath for delivering

7    the assistance?

8    A.  It is possible.

9    Q.  Based on your experience, if there is more information

10   required on a form or the talk of some sort of penalty under

11   law, that people can be intimidated by that?

12   A.  Can you repeat one more time?

13   Q.  And based on your experience, if there's more information

14   required or the talk of some sort of penalty by law, people can

15   be intimidated by that?

16   A.  Yes, they can.

17   Q.  Can you display LUPE 172 please?

18       With respect to this document that we're looking at right

19   here, this form, you would agree with me that when an assister

20   arrives at the polling place to give assistance to the voter,

21   that the assister would sign this document that we see here

22   that has the oath written out on top; is that correct?

23   A.  Yes.

24   Q.  And unless someone told you, you wouldn't necessarily know

25   if a potential assister had made a decision not to serve as an

1  assister because of the new requirements under SB 1, correct?

2  A.  Unless they brought it to my attention, correct.

3  Q.  And you're not aware of any instances in El Paso County of

4  voter fraud during the delivery of assistance to a voter in the

5  polling place, correct?

6  A.  Correct.

7  Q.  Okay.  Moving on to joint exhibit one, if you can go to

8  page 52, and specifically Section 6.03.  Do you see there for

9  lines eight through 12 that there's now additional information

10  being required of the voter assister?

11  A.  Yes.

12  Q.  And the requirements on the form now include in addition to

13  name and address of the person providing the assistance, the

14  assister now has to provide their relationship to the voter and

15  also indicate whether they received or accepted any form of

16  compensation or other benefit from a candidate campaign or

17  political action committee; is that right?

18  A.  Yes.

19  Q.  And then in Section 6.05, if we go down to page 53, do you

20  see that there's new language added regarding the carrier

21  envelope for a mail voter, so in 6.05 if we roll down, 6.05

22  that on the carrier envelope the assister also has to provide

23  this additional information about their relationship to the

24  voter and whether they are receiving the compensation; is that

25  correct?

1   A.   Yes.

2   Q.   And then if we go down to page 54, you will see the

3   language Section 86 0105 is amended by adding, and you

4   recognize that section as applying to mail voting, correct?

5   A.   Yes.

6   Q.   And you agree with me on this language that the language

7   that's coming out has to do with performance based

8   compensation.  We may need to roll down a little bit.

9        Yes, there we go.  In Section 6.06, you see the language

10  that's being struck which was previously in the statute had to

11  do with the performance based compensation scheme, correct?

12  A.   Yes.

13  Q.   And the language that is coming in is simply now a person

14  commits an offense if that person compensates or offers to

15  compensate another person for assisting voters as provided by

16  86.010, solicits, receives or accepts compensation for an

17  activity described by subdivision one.  Do you see that there?

18  A.   Yes.

19  Q.   And then finally in (e) right below that, it says for

20  purposes of this section, compensation means, and the new

21  language is *an economic benefit as defined by 38.01."*  Do you

22  see that?

23  A.   I do, yes.

24  Q.   You haven't received any guidance from the Secretary of

25  State, have you, about this new language related to assistance

1  for mail ballots, correct?

2  A.  There may be an advisory recently on the -- before 2022 of

3  November where we did alter the oath a little bit with the --

4  on the carrier envelope, but that's all that I remember.

5  Q.  And you would tell a nonpartisan nonprofit organization to

6  consult an attorney if they wanted to send paid canvasers door

7  to door to promote a ballot measure and they wanted to tell

8  their canvasers to assist voters with their mail ballots,

9  correct?

10  A.  Yes.

11  Q.  And you would agree with me that Section 6.06 is not

12  limited to payment by a campaign or a candidate, correct?

13  A.  Correct.

14  Q.  And from reading the text of 6.06, it's your opinion that

15  anything that talks about being punished can make people timid,

16  correct?

17  A.  It can, yes.

18  Q.  I'd like to turn now to the poll watcher provisions.  You

19  welcome poll watchers in El Paso County, don't you?

20  A.  Yes.

21  Q.  And who appoints poll watchers?

22  A.  There's a couple different options on who can appoint a

23  poll watcher, a candidate, a committee on a measure, parties I

24  believe in the primary.

25  Q.  Is it correct to say that in the past poll watchers have

1    complained that they weren't able to observe an election

2    activity and you've had to explain that that was not an

3    observable election activity for poll watchers?

4    A.   Yes.

5    Q.   But a conversation with the poll watchers was generally how

6    it got handled, correct?

7    A.   Usually, yes.

8    Q.   And also in the past a poll worker might call you and let

9    you know, for example, that a poll watcher was not doing what

10   they were supposed to do like maybe the poll watcher was

11   talking to voters, correct?

12   A.   Yes.

13   Q.   And again you would talk to the watcher and it would

14   generally be remedied, right?

15   A.   Yes.

16   Q.   But if there's any sort of interference or obstruction by

17   the poll watcher, you have to step in, correct?

18   A.   Yes.

19   Q.   And it's correct to say, isn't it, that in the

20   November 2020 election, you had more poll watchers than you did

21   in November of 2016?

22   A.   Yes.

23   Q.   And you found the November 2020 poll watcher behavior to be

24   noticeably different than in November 2016, correct?

25   A.   Yes.

1  Q.  And you can recall instances of more serious problems with

2  poll watchers in the November 2020 general election, yes?

3  A.  Yes.

4  Q.  I'm going to ask you some questions about an incident

5  involving a man who came to the polling place.  Is it fair to

6  say that a poll watcher went into the polling place and was

7  telling voters, *Take off your mask, you don't need to wear*

8  *masks, this is a hoax;* correct?

9  A.  Yes.

10  Q.  And this was in November 2020, right?

11  A.  Correct.

12  Q.  And that same poll watcher was harassing an election worker

13  who was in charge of disinfecting things, correct?

14  A.  Correct.

15  Q.  And can you explain what he was doing exactly with this

16  polling place worker?

17  A.  She was tasked with basically when a voter would complete

18  voting to disinfect all of the touch points, the poll pad, the

19  actual touch screen, the DS200 ballot box, anything that was

20  touched.  We also had some air purifiers that they had given

21  us.  So just at this location it happened to be a female and

22  she was in charge of all of those things throughout early

23  voting and Election Day.

24  Q.  And what was the poll watcher doing?

25  A.  Initially when he showed up he was telling people to take

1  off their masks, kind of how you stated, that it was a hoax,

2  this is not an actual issue, pandemic.  Then he would follow

3  along and touch every place that the person had just

4  disinfected and tell people they can't make you wear masks,

5  they don't have that right over you and basically just caused

6  some ruckus in there.

7  Q.  And when he would follow the disinfecting person around and

8  touch everything, what would she have to do?

9  A.  Re-disinfect everything.  She was upset.

10  Q.  And that same poll watcher went to other polling places and

11  demanded that poll workers give him their voter identification

12  numbers which they didn't have to give him, correct?

13  A.  Correct.

14  Q.  And did that same poll watcher then go to the county office

15  after that?

16  A.  Yes, he did.

17  Q.  And what did he do there?

18  A.  I believe when he first arrived, he tried to interfere with

19  the ballot opening boards and signature verification

20  committees.  I was made aware of that and I actually was I

21  think on the phone or something at that moment and said I'm

22  going to come out there in just a second.  And by the time I

23  got out there, he had left.

24  Q.  And you were told that while he was observing he was being

25  very loud and rude; is that correct?

1  A.  Yes, correct.

2  Q.  And several staff people talked to him to try to get him to

3  correct his behavior, didn't they?

4  A.  Correct, yes.

5  Q.  And he left, I guess, you mentioned just as you were coming

6  out to talk with him, right?

7  A.  Correct.

8  Q.  He subsequently sued you, didn't he?

9  A.  Yes, he did.

10  Q.  He filed a writ of mandamus which was then denied; is that

11  correct?

12  A.  Yes, it was.

13  Q.  Now, there was a second poll watcher with that man that

14  we've been discussing who also went into polling places and

15  demanded that poll workers provide him their voter

16  identification numbers, correct?

17  A.  Yes.

18  Q.  And you had to call a law enforcement officer on him; is

19  that right?

20  A.  Yes, we did eventually.

21  Q.  And you eventually had him removed from a polling place; is

22  that right?

23  A.  Yes, he was.

24  Q.  And you've also had a few instances, haven't you, of poll

25  watchers making voters feel uncomfortable in the polling place;

1   isn't that right?

2   A.  We do have that occasionally, yes.

3   Q.  And generally you would learn about that when the election

4   judge would call you and say, for example, there is a poll

5   watcher here who is talking to the voters which is prohibited,

6   right?

7   A.  Yes.

8   Q.  And you're also aware of instances where poll workers felt

9   uncomfortable by poll watcher behavior, correct?

10  A.  Yes.

11  Q.  And in general, you're going to get information about an

12  intrusive poll watcher from that poll worker, correct?

13  A.  Yes.

14  Q.  And in March of 2022, this is now after the 2020 election

15  cycle, in March 2022, in your view, there were El Paso County

16  poll workers who were concerned, not just about poll watchers

17  following them around because of the events of November 2020,

18  but also because the poll workers were unsure what they could

19  do in response, correct?

20  A.  Yes.

21  Q.  And this was because they knew that in November 2020 in El

22  Paso County, the problems with poll watchers had escalated all

23  the way to a lawsuit and law enforcement having to remove

24  someone, correct?

25  A.  Yes.

1  Q.  You've also sometimes had poll watchers who complained of

2  irregularities that were not, in fact, irregularities, right?

3  A.  Yes.

4          THE COURT:  Just so the record is clear, you sort of

5  transitioned from pre SB 1 now to post SB 1, so if you can make

6  your questions clear about what you're complaining of.

7          MS. PERALES:  Yes, Your Honor.

8  BY MS. PERALES:

9  Q.  We're going back to November 2020.  Can you explain to the

10  Court this incident in which a poll watcher in November 2020

11  was accusing poll workers of trying to void ballots by writing

12  on them?

13  A.  Yes, there was this some sort of national coverage that

14  started in 2020 that talked about if anyone at the polling site

15  marks on the ballot, it's going to be invalid, so don't let

16  anybody do that.  And we would get -- we started to get all

17  these mass e-mails.  I was at the polling site and the judge

18  wrote on the ballot and so we tried to as quickly as we could,

19  as best we could we kind of did a little social media outreach,

20  but again we were already in the middle of it that by election

21  code we are required the judges on Election Day to sign,

22  initial the back of the ballot in order to basically make it a

23  live ballot, then the paper is given to the voter and they go

24  to the machine.  So we had poll watchers who had heard of this

25  idea that marking at all on a ballot invalidated the ballots

 1   and that they were going to make sure your vote didn't count.

 2   And so they were bringing this up to voters inside the polling

 3   site as well as poll workers mentioning it to both of them that

 4   you need to ask for a different ballot because they put their

 5   initials on that.  Well, the next ballot would have the

 6   initials as well.  That's a requirement in Texas Election Code.

 7   Q.  And you can't recall an instance in El Paso County in which

 8   a poll watcher alerted election officials to an irregularity

 9   that turned out to be substantiated, correct?

10   A.  Not that I can remember, no.

11   Q.  You've also had poll watchers complain incorrectly that

12   they are being impeded in their duties, correct?

13   A.  Yes, we have.

14   Q.  Can you explain to the Court an incident in which a poll

15   watcher had a clipboard, this may be the same instance, where a

16   poll watcher had a clipboard and was trying to get poll workers

17   to give him their voter identification numbers?

18   A.  It happened at different locations in November 2020.  Just

19   a little quick background.  One of our local parties factioned

20   off into two factions, so one that was not the I guess

21   recognized party, the actual official party, was going to these

22   locations and asking for every poll worker on site to produce

23   their VUID immediately, fill out this clipboard, name,

24   signature, your VUID.  And so, yes, they went to a couple

25   places before we got word of it and had to deal with it.

1  Q.  When you say VUID, for the Court, a capital V, capital U,

2  capital I, capital D.  Can you explain what that number is?

3  A.  Sure.  The VUID is the -- it's the unique identification --

4  voter unique identification.  And so every voter is, once your

5  voter registration application is approved and you are in fact

6  qualified to vote, they do give you, each voter, a VUID.

7  Q.  And so this poll watcher was going around asking poll

8  workers to fill out his clipboard paper and provide personal

9  information including their voter unique identification number;

10  is that right?

11  A.  Correct.  And most of that is public information and that's

12  where there was the disconnect is that they believed because it

13  was public information it was on demand information and that's

14  where the difference was.  Although they could request that, it

15  wasn't something that needed to be created on demand at the

16  site.

17  Q.  Poll workers in El Paso County get paid $12.50 an hour; is

18  that right?

19  A.  They did.  We've brought it up to about 14 now.

20  Q.  Excellent.  And how much do your rovers get paid?

21  A.  Prior to this election, I believe they were in the

22  16-dollar range.  They may go up to 18 in this next fiscal

23  year.

24  Q.  And rovers are election workers who roam or are sent around

25  to the different polling places to assist the election workers;

1  is that right?

2  A.  Right.  So our rovers are generally past judges from both

3  parties who have been excellent and we ask if they would want

4  to take on almost a little more responsibility and maybe visit

5  five or six sites throughout the day or maybe even early voting

6  with extra supplies and a higher knowledge of election law.

7  Q.  And in terms of the hours worked by poll workers on

8  Election Day, you instruct them to arrive at 6:00 a.m. and if

9  they're on the drop-off team, that could be a 14 or 15-hour day

10  of work; is that correct?

11  A.  Easily, yes.

12  Q.  And so in addition to being paid, poll workers serve

13  because they enjoy the experience of doing it, correct?

14  A.  Some do.

15  Q.  Based on your conversations with poll workers about why

16  they serve, you understand that some have an interest in

17  community service, correct?

18  A.  Yes.

19  Q.  I'd like to go back to joint exhibit one.  And go to page

20  27, Section 4.07.  And those last lines on page 27 that strike

21  the word "conveniently" and adds the words "enough to see and

22  hear."  Do you see that language there?

23  A.  Yes, I do.

24  Q.  And then that's followed up with language at the top of

25  page 28 with a requirement that a watcher may not be denied

1    free movement where election activity is occurring within the

2    location at which the watcher is serving.  Correct?

3    A.  Yes.

4    Q.  And then underneath that in paragraph (f) it's correct to

5    say that SB 1 adds that a watcher who is entitled to, quote,

6    observe, unquote, an election activity is entitled to sit or

7    stand near enough to see and hear the activity.  Yes?

8    A.  Yes.

9    Q.  If we can go to page 29 now to Section 4.09.  You would

10   agree with me that SB 1 adds language to this paragraph about a

11   person commits an offense.  Do you see that there?

12   A.  Yes, I do.

13   Q.  And it's now under the new language added by SB 1, "an

14   offense for a poll worker to take any action to obstruct the

15   view of a watcher or distance the watcher from the activity or

16   procedure to be observed in a manner that would make

17   observation not reasonably effective."

18       Is that right?

19   A.  Yes.

20   Q.  Now, in your opinion, you don't have adequate guidance from

21   the Secretary of State's office on how poll workers should

22   behave towards poll watchers to make sure they comply with SB

23   1, correct?

24   A.  I believe it is still vague.

25   Q.  And you and your poll workers have a concern about not

1    knowing what watchers can do, for example, can watchers stand

2    next to the vote tabulator and watch people.  Right?

3    A.  Correct.

4    Q.  And El Paso County has had this issue before where watchers

5    would watch voters put their paper ballot into the tabulator

6    because the watchers are trying to count the votes for

7    different candidates; is that correct?

8    A.  They would try to, they would attempt to, yes.

9    Q.  And that was in the past before SB 1?

10   A.  Correct.

11   Q.  And you also don't have sufficient guidance in your view

12   from the Secretary of State to know how close poll watchers can

13   get to the voter at the voting station; is that correct?

14   A.  Correct.

15   Q.  And --

16        THE COURT:  Let me ask you a question on that last

17   point.  So when they're putting the ballot into the tabulator

18   and these poll watchers attempted to see what was going on,

19   were they able to see the voter and connect who the voter was

20   voting for or what proposition they were voting for?

21        THE WITNESS:  They would have been able to if they

22   were able to put the stool where they wanted.  However, we

23   stopped them from doing that because of the voter's right to

24   privacy on their ballot.

25        THE COURT:  And that was pre SB 1?

```
 1              THE WITNESS:  Yes, it was pre SB 1.
 2              THE COURT:  Now with SB 1, would you let them do that
 3    or not?
 4              THE WITNESS:  Personally, no, I still would not allow
 5    them to do that, but again there is the question I think in the
 6    code on what is free moment.  I don't believe that free moment
 7    supersedes the voter's right to privacy.  I still would not
 8    allow that.
 9    BY MS. PERALES:
10    Q.  Do you have a concern that you might violate the new
11    provisions here in Section 4.09 if you distanced a watcher from
12    the voter putting the paper into the tabulator?
13    A.  I have a concern that it could be brought up in a lawsuit.
14    Our poll watchers obviously have sued us before, they may
15    challenge that.  Again we haven't had a large election under
16    this, but I do have a concern that now they may say you
17    wouldn't let us sit here in 2020, but now free movement we
18    should be able to.
19    Q.  You mentioned a stool a moment ago.  Can you help the Court
20    understand how you would put the watchers when -- this is
21    before SB 1, is it fair to say that you would tell the watchers
22    there's a place where they could sit where they could watch
23    what was going on and that's why you mentioned a stool?
24    A.  Yes, so I think pre SB 1, I think the language is like
25    conveniently located.  I believe we always operated under the
```

1  belief that convenient to the poll worker, so basically where

2  can I put the watcher where I can address their concerns

3  because again they're only allowed to talk with the workers.

4  They are not allowed to speak with the voters.  And to me that

5  deferred to them what's convenient and they would have a chair

6  or a stool, whatever they may have at the check-in table where

7  they would be operating so that they could answer any questions

8  they were able to watch the check in, they were able to watch

9  the provisional process if someone needed a provisional ballot.

10  That's how I took it previously, that it was at the poll

11  worker's convenience.  Now it's different as far as where is

12  the free movement, where will they put a chair, where do they

13  want to set a stool, where do they want to stand, where do they

14  want to walk around.  That's the vagueness that's a little

15  concerning for election, for myself as an elections

16  administrator.

17  Q.  And poll workers want to protect themselves, they don't

18  want to do anything wrong, correct?

19  A.  Correct.

20  Q.  In the past -- I think you just covered this one, I'll skip

21  that question.

22      Is it fair to say that poll workers now are not sure what

23  poll watchers can do because SB 1 has changed the language

24  around what poll watchers can do?

25  A.  Yeah, I think the free movement is the biggest concern

1    because again I think they felt like because the law was clear

2    that they only can talk to us, frankly, it's even the judge

3    only, they can mention it to the clerk, but the clerk can refer

4    it to the judge, and basically always be within earshot of the

5    judge so that they can bring those things to their attention.

6    I do believe that was a little bit more comfort for them.

7    Q.  And you haven't received any guidance, have you, from the

8    Secretary of State as to the definition of free movement,

9    correct?

10   A.  Correct.

11   Q.  You haven't received any instructions, have you, from the

12   Secretary of State about how close a poll watcher may stand to

13   the DS200 tabulator, correct?

14   A.  Correct.

15   Q.  And you haven't received any instructions from the

16   Secretary of State about how close a poll watcher can stand to

17   the voter while the voter is marking the ballot on the touch

18   screen, correct?

19   A.  Marking the ballot without an assister I believe is an

20   unobservable act, so they're not allowed to be close enough to

21   see that, but as far as is that 2 feet, is that 5 feet, no,

22   there's not been any designation on that.

23   Q.  And you also haven't received any guidance from Secretary

24   of State about how close a watcher can stand to a voter who is

25   being assisted, correct?

1  A.  Correct.

2  Q.  And you haven't received any guidance from the Secretary of

3  State about whether a poll worker, how close a poll watcher can

4  stand to election workers as they are carrying out their duties

5  at the voter sign-in table, correct?

6  A.  Correct.

7  Q.  And you haven't received any guidance from the Secretary of

8  State about what behavior by a poll watcher might constitute a

9  breach of the peace, correct?

10  A.  Correct.

11  Q.  And you haven't received any guidance, have you, from the

12  Secretary of State's office about the difference between poll

13  watcher activity that must be observed by two election workers

14  before the watcher can be removed versus activity that only

15  needs to be observed by one election worker before the watcher

16  can be removed, correct?

17  A.  Correct.

18  Q.  And you haven't received any guidance from the Secretary of

19  State about when a presiding election judge must call law

20  enforcement officer to remove a poll watcher versus when a

21  presiding judge may remove the poll watcher without calling law

22  enforcement, correct?

23  A.  Correct.  I believe the law specifically states something

24  between the Election Code and Penal Code, if I am remembering

25  correctly, but again that's still pretty general.  Yeah, we

1  haven't gotten anything more specific on that.

2  Q.  Okay.  And with respect to Section 4.09 which we're talking

3  about now, where SB 1 makes it a crime for a poll worker to

4  obstruct the view of a watcher, you haven't received any

5  guidance from the Secretary of State about what it means for a

6  poll worker to obstruct the view of a watcher, correct?

7  A.  Correct.

8  Q.  And you also haven't received any guidance from the Texas

9  Secretary of State about what it means for a poll worker to

10  commit the crime of distancing the watcher from the activity,

11  correct?

12  A.  Correct.

13  Q.  And you haven't received any guidance from the Secretary of

14  State about what action by a poll worker would, quote, make

15  observation not reasonably effective, unquote, correct?

16  A.  Correct.

17  Q.  And so you are required to fill in the gaps in terms of

18  poll worker training with respect to activity that is allowed

19  or not allowed by SB 1 related to poll watchers, correct?

20  A.  Correct.

21  Q.  And you don't personally know, do you, whether it's an

22  offense under the Election Code if a poll worker inserts

23  themselves between a voter and a watcher who was standing too

24  close to the voter in the opinion of the poll worker, correct?

25  A.  Correct.

Q.  And if you received a report about that, a worker inserting themselves between a watcher and a voter, you would talk to the county attorney, correct?

A.  First I would gather some more information from the site and then I would, depending on what that information gave me, I would then consult our county attorney's office, yes.

Q.  With these new provisions with SB 1 about poll watchers, you're concerned, aren't you, that some poll watchers are going to be obstructive or loud and claim that these new provisions mean the poll watcher can do that, correct?

A.  Yes.

Q.  And you're concerned that your poll workers don't have coverage to be able to say no, that's not what free movement means, correct?

A.  Correct.

Q.  And you're concerned that a poll worker is going to tell an unruly poll watcher, that's not free movement and the watcher will say, well, show me in the law where it says that, correct?

A.  Correct.

Q.  And you're concerned that your poll workers will feel like they can't have an unruly poll watcher removed, correct?

A.  They'll definitely be hesitant for sure, yes.

Q.  And you're concerned that these SB 1 provisions regarding poll watchers are vague, correct?

A.  Yes.

1  Q.  And you believe that even after a few election cycles, the

2  types of concerns that you have regarding SB 1's poll watcher

3  provisions could still be a problem, correct?

4  A.  Yes.

5  Q.  I'd like to go to joint exhibit one, page 24.  Section

6  4.01, subsection (g).  Do you see on line 15 to 16 where it

7  says, *"unless the violation was observed by an election judge*

8  *or clerk"*?

9  A.  Yes.

10  Q.  And this has to do with being able to remove a poll

11  watcher; is that right?

12  A.  Yes.

13  Q.  And when you had the incident where the poll watcher was

14  harassing your disinfection person, that election worker was

15  not a judge or a clerk, were they?

16  A.  No, they were not.

17  Q.  And so just based on that, you would say that what happened

18  to her was not observed by a judge or a clerk, was it?

19  A.  Well, eventually, yes it was, because it was so boisterous

20  that it was observed by a judge and the clerk and voters all

21  there.  So initially, I don't know, but I can say that yeah,

22  eventually it was, but this person was not a judge or clerk

23  themselves.

24  Q.  And then finally, isn't it true that one of your roving

25  poll workers, one of your rovers who was sued in November 2020

1    expressed that she needed to take a year off from working as a

2    poll worker because of the poll watchers?

3    A.   Yes.

4    Q.   I'd like to now shift forward to the 2022 general election.

5    You had poll watchers in El Paso County in the 2022 general

6    election, correct?

7    A.   Yes.

8    Q.   And you had an incident with a poll watcher, correct?

9    A.   Yes.

10   Q.   It involved a poll watcher standing incredibly close to the

11   voter, correct?

12   A.   Yes.

13   Q.   Can we display LUPE 185 please?  And can we highlight --

14   first of all, do you recognize this as an e-mail from Melissa

15   Rosales to you on Thursday, November 10, 2022?

16   A.   I do.

17   Q.   And can we highlight the description as written on the

18   report.  Can you read the new highlighted language there,

19   starting with *"had two poll watchers"*?

20   A.   *"Had two poll watchers, these two poll watchers were*

21   *targeting voters who needed assistance and would stand right*

22   *behind our voters.  I had to stand right in front of the poll*

23   *watcher, but have been told if a voter feels uncomfortable to*

24   *ask poll watcher to stand back 6 feet."*

25   Q.   Now 6 feet is not part of any guidance you have in a

1  statute, is it?

2  A.  No, I believe that actually comes from guidance I asked our

3  own county attorney's office as far as what can I tell them.

4  Q.  So that had to come from a lawyer?

5  A.  Correct.

6  Q.  You don't have any guidance either from the Secretary of

7  State about that distance, do you?

8  A.  No.

9  Q.  And do you know who Florine Villela is?

10  A.  Yes, I do.

11  Q.  Has she been an election judge for 20 years?

12  A.  Yes, she has.

13  Q.  And do you find her credible?

14  A.  I do.

15  Q.  Do you know Noemi Fragaso as an experienced election judge

16  who is also credible?

17  A.  Yes, I do.

18  Q.  And would it be fair to say that with respect to this

19  report, that the poll watcher that's being described as

20  standing right behind the voters would have been a poll watcher

21  who completed the new training required by SB 1?

22  A.  Yes, they should have been.

23  Q.  I have a question for you about this.  I understand you

24  mentioned a moment ago that if a voter is being assisted, that

25  a watcher can watch the ballot being marked; is that correct?

A.  They're able to observe the assistance if the assistance is
given by an election worker.

Q.  And in this case, do you know why your election judge said
*"I had to stand in front of the poll watcher"*?

A.  I don't know exactly.  This report was delivered post
election and so I did not get that information.  I don't know.

Q.  Would you have a concern if one of your poll workers was
standing in between a watcher and the voter, that the watcher
might say that their view is being obstructed?

A.  Yes.

Q.  But if an election worker is assisting a voter, then the
election worker has to fit in there somewhere at the voting
station; is that right?

A.  Yes, I would still state that if the election worker is
giving assistance, the watcher should still be behind the
worker observing them giving the assistance.

Q.  Thank you.  If we could go back to joint exhibit one and
section 5.07 which is on page 38.  The Court has already looked
at this and has considered this provision with his summary
judgment ruling, so I will simply ask, do you understand this
provision 5.07 to require you to match an ID number that's on
the application for ballot by mail to the voter's voter
registration record ID number?

A.  Yes.

Q.  And then if we go to LUPE 119, do you recognize this as an

1    application for ballot by mail?

2    A.  Yes, I do.

3    Q.  And if you look on the right-hand side there's a box there

4    that says you must provide one of the following numbers.  Do

5    you see that?

6    A.  Yes, I do.

7    Q.  So you understand this to be the application for ballot by

8    mail promulgated by the Secretary of State after SB 1 became

9    effective, correct?

10   A.  Yes, I do.  There's actually a little bit of an update for

11   this next election, but it doesn't have to do with that

12   necessarily, so this is now considered an old form.

13   Q.  Oh, okay.

14   A.  Just went into effect September 1.

15   Q.  Do you know if any of the information in the yellow area

16   has changed?

17   A.  That's the same.

18   Q.  Okay.  Thank you.  If we could go back to joint exhibit one

19   and page 45, Section 5.13, you'll see 5.13 paragraph (b) says a

20   ballot may only be accepted if -- and then if we roll down

21   you'll see there towards the bottom of the page it says, quote,

22   *The information required under Section 86.002(g) provided by*

23   *the voter identifies the same voter, identified on the voter's*

24   *application for voter registration under section 13.002 (C)*

25   *eight.*  Do you see that there?

1  A.  Yes, I do.

2  Q.  Do you understand this to be a requirement that on a

3  returned -- that on a mail ballot that has been returned to

4  you, your office has to match the ID number provided on the

5  returned mail ballot envelope to the voter's voter registration

6  record ID number?

7  A.  Yes, yes, I do.

8  Q.  I'm going to shift to just a few questions about your voter

9  registration database.  Can you tell the Court who maintains

10 the statewide database of registered voters?

11 A.  The Texas Secretary of State's Office.

12 Q.  And the name of the voter database or the system is called

13 Team; is that right?

14 A.  Team, yes.

15 Q.  And the smaller counties in Texas use Team to administer

16 their voter registration; is that correct?

17 A.  Yes, that's correct.

18 Q.  And El Paso is -- the smaller counties are called online

19 counties for Team; is that right?

20 A.  Yes, that's correct.

21 Q.  Is El Paso County an online county?

22 A.  No, we are not.

23 Q.  You are an offline county; is that right?

24 A.  We are an offline county.

25 Q.  And so what does it mean to be an offline county?

A.  Basically the offline counties use an outside vendor to maintain their voter registration databases, voter registration database, and they're generally the larger counties that pay some sort of company that runs that.

Q.  And your understanding about why the certain counties are offline for Team is that the Team system, which is operated by the Texas Secretary of State, cannot handle the size of the voter registration databases of the larger counties; is that right?

A.  That's what I have been told by other larger counties, yes.

Q.  And now El Paso and the other offline counties, they have a portal to access Team; is that right?

A.  Correct.

Q.  And so when El Paso County uses its portal into Team, you can check for information about an individual voter, but you can also get batch information as well; is that right?

A.  That's correct.

Q.  And you, I think as you mentioned, maintain your voter registration database in El Paso County with the assistance of a vendor, right?

A.  Correct.

Q.  And when the statewide registered voter database system like Team makes changes or updates, you have access to those updates right away because every day or so you go into your back portal in Team and you retrieve information in order to

1  perform your list maintenance on your rolls, correct?

2  A.  Yes, we do go into Teams every day.

3  Q.  So if something is happening, something is getting updated

4  in Teams, you're going to encounter that information within a

5  day or two; is that right?

6  A.  Generally, yes.

7  Q.  Now we're going to go back to applications for ballot by

8  mail and mail ballots after SB 1.  I'd like to walk you through

9  the steps from when you receive an application for ballot by

10  mail or a mail ballot.  Is it correct to say that your office

11  would receive an application for ballot by mail and if there's

12  an ID number written on there, a worker would look up that

13  voter; is that right?

14  A.  Correct.

15  Q.  And then the worker in your office would first be looking

16  up the voter in the El Paso County voter registration system,

17  correct?

18  A.  Correct.

19  Q.  And the worker would try to match the ID numbers on the

20  application for ballot by mail, for example, to the voter

21  registration record that you have for that voter, yes?

22  A.  Yes.

23  Q.  All right.  If after using your offline system, your voter

24  registration database to try to verify the ID, you would then

25  if you needed to, if you couldn't verify the ID, you would then

1  look in Team for any updates and add that information to your

2  database, correct?

3  A.  Yes.

4  Q.  And if you can verify the ID number on an application for

5  ballot by mail or a mail ballot and the form is otherwise

6  sufficient, you would proceed with processing it, correct?

7  A.  Correct.

8  Q.  And if you had an application for ballot by mail or a mail

9  ballot that you could not verify the ID number either in your

10  system or in Teams, you would notify the voter that the

11  information could not be verified, correct?

12  A.  Yes.

13  Q.  And if it was an application for ballot by mail, you would

14  send the voter a clean application for ballot by mail along

15  with a notice saying that you needed ID information; is that

16  correct?

17  A.  Yes, we would also send -- eventually we also included a

18  voter registration form as well as an insert explaining the new

19  requirement for the identifier, highlighting the area that it

20  was required, asking them to fill both out so that we wouldn't

21  receive something that we again couldn't process, so we did add

22  to that in about -- for the run-off of 2022.

23  Q.  And if it was a mail ballot and you couldn't identify the

24  ID number, you would also return that mail ballot to the voter

25  with a notice and information about how to cure the mail

1    ballot, correct?

2    A.  We would first try to call them if we did have a number to

3    reach them at, and if we did not get in tough with them by

4    phone, then yes, we would put it back in the mail for them with

5    the notice to cure -- sorry, notice of defect and a couple

6    other items in there.

7    Q.  And with respect to an ID number that you couldn't verify,

8    in addition to notifying the voter, isn't it also true that you

9    would continue to check every day or every couple of days in

10   Team to see if you could get another ID number that you could

11   verify for that voter, yes?

12   A.  Yeah, we would check every day once we got into the ballot

13   by mail phase, we would be on Team every day.

14   Q.  Now, the exhibits in this case include a lot of flat copies

15   of a lot of forms, but it is true that I asked you to bring

16   some packets; is that right?

17   A.  Yes.

18   Q.  And would you mind making available to the Court a packet

19   of what you would send for a mail ballot and also what you

20   would send if you couldn't verify the ID number?

21   A.  By making available to the Court, you mean --

22       MS. PERALES:  I'm not sure how the Court wants to

23   handle this.

24       THE WITNESS:  Well, I for sure would not then.

25   BY MS. PERALES:

1    Q.  Do you have your own packet, Ms. Wise?

2    A.  Yes, I do.

3    Q.  Now, can you explain for the Court, let's take a regular

4    mail ballot packet.  I don't know which one of those is the

5    right one or if the Court knows which one is which, but can you

6    tell me what goes in a normal mail ballot packet?

7    A.  So there's one that says corrective action, it's not that

8    one, it's the other one.  So this would be the original let's

9    say we -- the application has been approved, now we're going to

10   send the ballot.  This is actually from 2022, November.  So

11   inside the green envelope would be what we call the carrier

12   envelope.  And that's got the oath on the back.  There's

13   language on both sides including the identifier requirement.

14   There's the secrecy or ballot envelope included with some

15   instructions written on that.  There's obviously a sample

16   ballot.  This is again from November 2022, in both English and

17   Spanish for the voter.  Then there's a stapled packet with

18   information that is some required by State, some that we added

19   as a county.  The Dear Voter is a state requirement, talks

20   about your information on how to return your carrier envelope.

21   That's this second page.  And these are just this English and

22   Spanish on the back side.  Instructions for voting by mail in

23   English and Spanish, again a requirement.  A notice that each

24   ballot must be returned in its own carrier envelope so that you

25   can't -- we have households sometimes that will put husband's

1    and wife in each envelope.  The write-ins that we normally

2    would post on site by each voting machine, but if you're voting

3    by mail obviously you need them in your ballot.  Again that's

4    required by law.  And then finally the insert that we created

5    as approved by Secretary of State's Office and our attorneys

6    instructing them to not forget the identifier, to please put

7    the identifier.  Again it's both English and Spanish with the

8    back showing where those are highlighted.  We have two

9    different types of envelopes, so there's an example of each one

10   that shows that.

11   Q.  And on the carrier envelope and is it correct to say the

12   carrier envelope is the envelope that the voter is going to put

13   back in the mail to send back to El Paso County Elections?

14   A.  Correct.

15   Q.  So where on the carrier envelope does the voter put their

16   ID number?

17   A.  The voter puts the ID number under this flap, if you see

18   that, and that's for reasons so we can review that without ever

19   having to open the envelope to see if they have, in fact,

20   qualified for us to then put the envelope in the ballot by

21   wards and signature verification vault boxes.

22   Q.  And then with respect to the second packet?

23   A.  The correction?

24   Q.  Yes.  This would be the packet then that you would send to

25   the voter if the voter had sent you a mail ballot that you

1  could not verify the ID number on; is that correct?

2  A.   Correct.   So we started to hear in 2022, in March I

3  believe, from voters who said I thought this was just a second

4  ballot, so I threw it away, I didn't open it, I already mailed

5  in my ballot, I thought you made a mistake.   So we added, first

6  of all, just something that we could at least have on there

7  with corrective action required and highlighted it so hopefully

8  it would stand out a little and the voter would not toss it.

9  This is a little thicker.   I apologize.

10      So inside this is the carrier envelope which already would

11  have been filled out by the voter and hopefully signed,

12  whatever they needed to do on the back.   We would not open

13  this, but inside would be the privacy envelope again with the

14  instructions.   And inside the privacy envelope would be the

15  ballot, so we would send that back to them.   The envelope would

16  be sealed as one piece.   Along with that would be the papers

17  which are the notice of carrier defect which explains to the

18  voter what they were missing, why we are returning it and how

19  they can cure it.   One of the options is to use the defect form

20  itself and return with the ballot and that's here.   It's the

21  same document in Spanish.   And then we again put in our insert

22  telling them, you know, this is why you have to do this now as

23  much as we could concisely in English and Spanish, and again

24  showing them on the back where to do that.

25      Finally, we did also include another envelope so that they

1    didn't have to pay to send the ballot in twice.

2    Q.  Have you received complaints from voters over the years

3    saying that the application for ballot by mail and the mail

4    ballot carrier envelope are not user friendly; is that correct?

5    A.  We have, yes.

6    Q.  And you believe there's not enough attention drawn to the

7    ID requirements on the form, so it's easy to miss; is that

8    right?

9    A.  Yeah, there's a lot of information on there so we do hear

10   from people that they have missed it.

11   Q.  So I'm going to move now to the rejection of mail ballots

12   and ABBM, applications for ballot by mail because of the ID

13   number being -- you were unable to verify it.  So during the

14   spring of 2021 when SB 1's predecessor bills were moving

15   through the legislature, you checked to see how many voters in

16   El Paso County did not have a driver's license and or a Social

17   Security number associated with their voter registration

18   record; is that correct?

19   A.  Yes.

20   Q.  And you determined that around 50,000 some odd voters did

21   not have a driver's license number in their voter record; is

22   that right?

23   A.  Yes, I believe so.

24   Q.  And you determined that 30-some thousand didn't have either

25   a driver's license number or a Social Security number in their

1  voter record, correct?

2  A.  Correct.

3  Q.  And when you started receiving applications for ballot by

4  mail in early 2022, you noticed that on some of the forms the

5  voter had not completed the ID box; is that right?

6  A.  Correct.  We actually had people who hadn't used the one

7  even from December that was online.  When you have that March

8  election and they have such a tight timeline, they may pull

9  something off before the holidays and use that form.  So we had

10  a lot that didn't even have that on there and then we did have

11  people that left that blank or put in their VUID, there was a

12  definite -- definite learning curve on that.

13  Q.  So what you're talking about is that there were still forms

14  for application for ballot by mail that did not request an ID

15  number that were still floating around either online or the

16  community or the voter had downloaded that in December, and

17  then when the new year occurred, the voter just sent in the old

18  form?

19  A.  Correct.

20  Q.  And then you mentioned that voters had put their voter

21  unique identifier number for their ID number, some folks did

22  that as well?

23  A.  Yes.

24  Q.  And then did you also find it to be the case that a voter

25  would put a driver's license number, but you would only have

1  the Social Security, last four of the Social in the voter's

2  voter registration record?

3  A.  Correct.

4  Q.  And vice versa, the voter would put the Social and the

5  voter's record would have a driver's license in it?

6  A.  Correct.

7  Q.  And then sometimes a voter would potentially put both, but

8  you had neither in your record?

9  A.  Correct.

10  Q.  And some voters were able to make a successful application

11  for ballot by mail and provide an ID number that you could

12  match, but then later you would reject their mail ballot

13  because they had put a different number?

14  A.  Yes, correct.

15  Q.  Or they just missed where they were supposed to put the ID

16  numbers under the flap; is that right?

17  A.  Yes, sometimes they call and tell us I already gave it to

18  you on the application.

19  Q.  Now, during this period of the first two weeks of February,

20  2022, your workers were spending more than 50 percent of their

21  time trying to address the issue of failure to match ID numbers

22  on either applications for ballot by mail or mail ballots as

23  they were starting to come in, correct?

24  A.  It was a combination -- that was the majority of that time,

25  but that was also when we -- because we were not able to

1    initially send out applications like we had in January previous

2    years, we were also dealing with that part of the ballot by

3    mail request which was getting massive numbers out, explaining

4    why we hadn't sent them.  Voters were missing deadlines and

5    things like that.  So it was a ballot by mail combination of

6    both of those things really.

7    Q.  And your workers were making phone calls on Saturdays and

8    Sundays into the evening, four or five people spending the

9    majority of their day working on those issues, correct?

10   A.  Yes.

11   Q.  And the failure to match ID numbers made it more difficult

12   for you to meet your timing goals for processing applications

13   for ballot by mail and mailing a ballot to the voter, correct?

14   A.  It was very tight.

15   Q.  And it's fair to say that you spoke to many voters during

16   and prior to March 2022 about curing either the mail ballot or

17   the application for ballot by mail because you weren't able to

18   match the ID number?

19   A.  Correct.

20   Q.  And your staff talked to even more voters than you did,

21   correct?

22   A.  Yes.

23   Q.  I'm going to go through a scenario with you now, it's

24   possible, isn't it, that a person who is elderly would not have

25   any ID number associated with their voter registration,

1  correct?

2  A.  Correct.

3  Q.  And this is because when that elderly person registered to

4  vote, putting an ID number was not required, correct?

5  A.  Correct.

6  Q.  And as a result you would not be able to match an

7  application for ballot by mail or a mail ballot ID number and

8  you would reject it, correct?

9  A.  Correct.

10  Q.  And in fact, you know of a voter to whom this happened,

11  yes?

12  A.  Yes.

13  Q.  And that voter put one of her ID numbers on either the

14  application or the mail ballot, but your office rejected it,

15  correct?

16  A.  Yes.

17  Q.  So she tried again.  This time she put both her driver's

18  license number and her Social Security number, and your office

19  rejected it again, correct?

20  A.  Yes.

21  Q.  And in that voter's case, your office sent her a new voter

22  registration form, but she did not fill it out because she was

23  already registered to vote, correct?

24  A.  Yes.

25  Q.  And she ended up not voting in the March 2022 primary

1    election, correct?

2    A.  Correct.

3    Q.  And you advised her to re-register to vote in order to

4    provide her ID numbers and you could get them into the system,

5    correct?

6    A.  Yes, she stopped me at a restaurant to let me know.  She

7    was not happy.

8    Q.  And are you aware of a time when legally in order to

9    register to vote you did not have to provide either a driver's

10   license number or the last four of your social?

11   A.  Yes.

12          THE COURT:  How far back was that?

13          THE WITNESS:  This woman was probably in her 80s.  I

14   don't know exactly the timing, but it's in our lifetime.  I

15   mean, it's in -- this is not ages ago, but it's old.

16          THE COURT:  Thank you.

17   BY MS. PERALES:

18   Q.  And this might have varied state by state; is that right?

19   A.  Correct, that is correct.

20   Q.  Have you ever heard of the Help America Vote Act?

21   A.  I have.

22   Q.  Did you hear that it was enacted by Congress after the

23   debacle of the 2000 presidential election?

24   A.  Yes, I did.

25   Q.  And are you aware that the Help America Vote Act makes --

1    it's a federal requirement that individuals provide either

2    driver's license or last four of the social?

3    A.    Yes.

4    Q.    And it's possible that even a middle-aged person who

5    registered and then didn't re-register, basically they stayed

6    in the same place could also lack ID numbers in their voter

7    registration record, yes?

8    A.    Yes.

9    Q.    So we're in this period of time February, March 2022, you

10   heard from voters who were confused about why you couldn't

11   match the number that they gave you when you had another number

12   attached to their voter registration record, correct?

13   A.    Yes.

14   Q.    And at some point you started telling voters to put both

15   the driver's license and the Social Security number on the form

16   when they resent it to you to maximize the chances that you

17   could match a number to the voter registration's record,

18   correct?

19   A.    Correct.

20   Q.    And you had a slogan, when in doubt fill both out, correct?

21   A.    Yes.

22   Q.    And eventually about a week into receiving applications for

23   ballot by mail, you started highlighting that box on the form

24   when you resent it back to the voter to let the voter know that

25   that's where the voters have to put their ID number, correct?

1  A.  Yes.

2  Q.  And then you started adding your own notice in addition to

3  the Secretary of State letter to provide more information about

4  what the voter could do, correct?

5  A.  Yes.

6  Q.  And at some point a couple of weeks into the process

7  counties asked the Secretary of State if you could start

8  sending voters new voter registration forms with a clean

9  application for ballot by mail, correct?

10 A.  Yes.

11 Q.  And then you started doing that, correct?

12 A.  Yes.

13 Q.  And you received multiple phone calls, didn't you, from

14 voters expressing confusion about why they were being sent a

15 new voter registration form with their rejected mail ballot or

16 rejected application for ballot by mail because they were

17 already registered?

18 A.  Yes, we did include that information in the notice that

19 this is a new part, we'd like you just to update, but there was

20 still that, the calls from people that didn't understand why or

21 didn't think it was right they had to.

22 Q.  And on more than one occasion you had voters who attempted

23 to correct their mail ballot or application for ballot by mail

24 by submitting it a second time with different ID information

25 and you then rejected them a second time because you could not

1  match the new number they provided, correct?

2  A.  Yes.

3  Q.  And you had voters who were rejected for ID reasons and

4  tried again to submit either an application or ballot by mail,

5  but it was too late and they missed the deadline, correct?

6  A.  Yes.

7  Q.  There were voters that you advised could cancel their mail

8  ballot and vote in person at the polling place who informed you

9  that they were unable physically to get out and vote at the

10  polls, correct?

11  A.  Yes.

12  Q.  And then there were voters that you advised could drop off

13  their mail ballot carrier envelope with you in person on

14  Election Day who said that they could not come to the County

15  Courthouse and do that on that day, correct?

16  A.  Yes.

17  Q.  And you believe the voters in those instances did not vote

18  in the election, correct?

19  A.  I believe they didn't, especially if it was a late call on

20  Election Day, a couple of them would have told me, well, that's

21  why I wanted to vote by mail, so yes.

22  Q.  And you would agree with me that it's possible for a voter

23  who votes by mail to make an error, for example, transposing

24  the numbers of their ID or failing to provide an ID number

25  altogether that would require them to have to cure their mail

1  ballot and then in a subsequent election they could be required
2  to cure again because of a different ID number problem, yes?
3  A.  Yes.
4  Q.  And you would agree that somebody who votes from home
5  because they have a physical disability that affects their
6  mobility might have some difficulty getting to your office to
7  correct the mail ballot carrier envelope, yes?
8  A.  Yes.
9  Q.  And it's also fair to say that you are aware of voters over
10 65 who have some kind of mobility challenges that would make it
11 difficult for them to physically get to your office, correct?
12 A.  Yes.
13 Q.  In fact, in the November 2020 -- that may be a typo -- if
14 you can recall that only eight voters came to your office to
15 correct their mail ballots.  Does that sound familiar?
16 A.  Yes, it's I believe 2022, though, that they chose when we
17 offered them their options of how to cure, like I said,
18 99 percent of the people would say put it back in the mail or
19 it wouldn't get through to them.  And then some said that's
20 fine, just we'll come in and do it in person, and I believe
21 that number was eight.
22 Q.  Eight people.  Now, a mail voter to whom you had returned
23 the carrier envelope for ID defect could also try to take that
24 mail ballot to a polling place, cancel the ballot and vote in
25 person, correct?

1   A.   Yes.

2   Q.   But you would agree with me that if a voter has a physical

3   mobility challenge as a result of disability or advanced age,

4   voting in person at the polls could present challenges, yes?

5   A.   Yes.

6   Q.   And your staff does not personally deliver carrier

7   envelopes with SB 1 ID problems back to the voters so the

8   voters can cure them, do they?

9   A.   No.

10   Q.   You consider that a safety issue, don't you?

11   A.   That's one reason.  Logistically I think it would be

12   impossible, and safety issues.

13   Q.   Would it be fair to say, then, that you're not personally

14   aware of every instance in which a voter might decide that, for

15   example, going through this process of curing the ID number is

16   simply more than they can handle and they choose not to vote?

17   A.   I would not know every instance, no.

18   Q.   Would it be fair to say that you wouldn't necessarily

19   become personally aware if an individual who relies on an

20   assister to help them vote in person wouldn't be able to vote

21   because their assister was deterred by a new oath requirement

22   in SB 1?

23   A.   I wouldn't know, no.

24   Q.   And unless someone contacts your office and tells you, you

25   wouldn't personally be aware, would you, if with respect to the

1   two incidents involving the unruly poll watchers in
2   November 2020, whether any voters upon learning of those events
3   decided that they didn't want to go and vote, you wouldn't know
4   that, would you?
5   A.  No, I would not.
6   Q.  You heard from multiple voters who were concerned about
7   identity theft as a result of their putting down either a
8   driver's license number or the last four of their Social on
9   either the mail ballot or the application for ballot by mail,
10  correct?
11  A.  Yeah, more on the Social than the driver's license, but
12  yes.
13  Q.  And you had calls from voters who said that ID number
14  information is private, yes?
15  A.  Yes.
16  Q.  And I'm going to return now back to the Team system.  It's
17  true, isn't it, that the smaller online counties received
18  updates on information about ID numbers through Team
19  automatically into their voter registration because Team is
20  their voter registration system, correct?
21  A.  I believe so.
22  Q.  But because you were a larger county, you did take the
23  extra step of checking twice for ID matches, first in your own
24  system and then in Team to see if there had been any updates
25  for that voter, correct?

1   A.   Yes.

2   Q.   Your office would hear from voters who said they didn't

3   have Internet; is that right?

4   A.   Yes.

5   Q.   And you would hear about this from a voter in response to

6   your telling them the option that they could use a computer to

7   print an application for ballot by mail; is that right?

8   A.   That's one of the instances, yes.

9   Q.   It's also possible, isn't it, that after having an

10  application for ballot by mail rejected for ID reasons, that

11  the voter gave up and just didn't vote?

12  A.   It's possible.

13  Q.   It's also possible, isn't it, that a voter could

14  successfully secure a ballot by mail after having managed to

15  get through the application for ballot process, but when they

16  return the mail ballot, they use a different number that you

17  can't match and you end up rejecting the mail ballot after

18  accepting the application for ballot by mail?

19  A.   It's possible, yes.

20  Q.   It's correct to say, isn't it, that in January of 2022,

21  Team received an update from the Secretary of State that

22  contained some ID numbers for voters, January of 2022?

23  A.   I don't remember the exact date, but I do remember the

24  action.

25  Q.   And your understanding from what the Secretary of State's

1   Office told you is that the Secretary of State got ID numbers

2   for voters from the Department of Public Safety, DPS, correct?

3   A.   Yes.

4   Q.   And so the Secretary of State put additional information

5   into Teams related to voter ID numbers and provided you a

6   notice that there was additional information there, correct?

7   A.   Yes.

8   Q.   And after you received the notice from the Secretary of

9   State, you imported that information into your voter

10  registration database, correct?

11  A.   Yes.

12  Q.   And the import from Team allowed you to get some driver's

13  license numbers and Social Security numbers for registered

14  voters that you didn't have before, correct?

15  A.   Yes.

16  Q.   And it's correct to say, then, that the team update

17  included the information that came from the DPS sync, correct?

18  A.   Yes.

19  Q.   So when you're checking in Team, that would also mean that

20  you were checking and had available to you this information

21  that had come from DPS, yes?

22  A.   Yes.

23  Q.   And during that time period, you, El Paso County, were also

24  asking for reports from the Secretary of State of voters whose

25  ID numbers were being updated in the Teams system, correct?

1    A.  Yes.

2    Q.  And you were also working with your vendor to see if the

3    vendor could work with the Teams system to create an alert

4    that, for example, Lisa Wise's information is updated, correct?

5    A.  Yes.

6    Q.  But that alert never came to fruition in your voter

7    registration system, so you continued to look and check

8    manually each time to see if voter ID numbers were updating,

9    correct?

10   A.  Yes.

11   Q.  It's also fair to say that after the update of ID numbers

12   from the Secretary of State, you still had many voters for whom

13   you were unable to match information that they provided on

14   their application for ballot by mail or mail ballot related to

15   ID, correct?

16   A.  Yes.

17   Q.  I'm going to ask you a few questions about the ballot

18   tracker.  If we could display LUPE 346.  This should be a

19   notice of rejected ballot.  And it's not right, so we'll just

20   move on.

21       You mentioned when you were going through the packet that

22   there was a notice of rejected ballot; is that right?

23   A.  Yes.

24   Q.  And that came from the Secretary of State and that's why

25   you said it was state required, is that right?

1    A.    Yes.

2    Q.    Now, does that piece of paper which you have with you

3    mention the ballot tracker at the bottom of the letter?

4    A.    Yes, it does.

5    Q.    And so the letter is telling the voter that they can use

6    this ballot tracker to help resolve issues with ID numbers,

7    correct?

8    A.    Yes.

9    Q.    It also says in that letter that you have to enter your

10    driver's license and last four of your Social to get into the

11    ballot tracker; is that right?

12    A.    Yes.

13    Q.    And so for a voter to get into the ballot tracker, the

14    voter has to have access to a computer with Internet, correct?

15    A.    Yes.

16    Q.    And in order to get into the ballot tracker, the voter not

17    only has to provide the driver's license and last four of the

18    Social, but the voter's registration record also has to have

19    both of those numbers, correct?

20    A.    Yes.

21    Q.    And so in total in El Paso County, for March 2022, eleven

22    voters used the ballot tracker, correct?

23    A.    Yes.

24    Q.    And let me go to LUPE 329, if we could have that.  Do you

25    recognize this as an e-mail from Melissa Soto to you?

1    A.    Yes.

2    Q.    And the subject is Ballot By Mail Webinar Link; is that

3    right?

4    A.    Yes.

5    Q.    And down below or attached it says -- and this is from

6    February 3, 2022; is that right?

7    A.    It is, yes.

8    Q.    Now, it looks like what Melissa Soto is sending to herself

9    is some kind of screen shot of a chat; is that right?

10   A.    Right, so yes, it's from the actual webinar that we had

11   with the Secretary of State's Office.  We had discussed prior

12   to the webinar this issue, and before we were able to even ask

13   in the webinar, another county did, this Kyle Rush, I'm not a

14   hundred percent sure where they're from, and asked in the chat

15   the same question, and the SOS responded in the chat and so she

16   sent me the screen shots to let me know that this is basically

17   the answer to the question we had discussed earlier that day.

18   Q.    And Christina Adkins works for the Texas Secretary of

19   State's Elections Division; is that right?

20   A.    Yes.

21   Q.    And Ms. Adkins is providing information about the ballot

22   tracker in response to the question from Mr. Rush; is that

23   right?

24   A.    Yes.

25   Q.    And so Mr. Rush is asking if the voter only has a Social

1  Security number in their record, do they have to submit

2  additional information to get into the tracker.  And then

3  Ms. Adkins responds, *"To access the tracker, the voter must*

4  *submit DL and SSN and residence address.  This authentication*

5  *requirements were set by statute in SB 1.  If the voter does*

6  *not have both DL and SSN in their record, they will not be able*

7  *to access the tracker until they update their VR record with*

8  *that information."*

9      Is that right?

10 A.  Yes, that's correct.

11 Q.  And is VR record voter registration record?

12 A.  Yes.

13 Q.  And DL is driver's license?

14 A.  It is.

15 Q.  You would agree with me, then, that if a voter is trying to

16 use the ballot tracker to add a missing driver's license or

17 Social Security number from their voter record, that they

18 cannot get into the ballot tracker because both the driver's

19 license and the Social Security number are not already in their

20 record?

21 A.  Correct.

22 Q.  So this is essentially a catch 22 where you cannot get into

23 the system to update your record because you don't have an

24 updated record?

25 A.  Yes.

1    Q.  So on the second page there seems to be a question from

2    Amanda McClure.  Do you see that question down below, *quote, So*

3    *from the ballot tracker they can modify things, question mark,*

4    *question mark.*  Is that right?

5    A.  Yes.

6    Q.  And Ms. Adkins response, "No."  Do you see that?

7    A.  Yes, I do.

8    Q.  Read me the rest of the answer?

9    A.  *"They can't modify anything.  They can only check a box*

10   *that validates their personal identification numbers -- we'll*

11   *show it what it looks like in just a minute."*

12   Q.  So essentially the ballot tracker was a mechanism that a

13   voter could use if the voter already had a Social and a

14   driver's license number in their voter registration record?

15   A.  Yes.

16   Q.  And they could verify that through the ballot tracker?

17   A.  Yes.

18   Q.  But they couldn't add information through the ballot

19   tracker; is that right?

20   A.  Yes.

21   Q.  And you didn't raise this catch 22 with the Secretary of

22   State because you were too busy trying to get reports from the

23   Secretary of State of ID numbers from voters; is that correct?

24   A.  I mean, the answer was here already, so that was part of

25   why I didn't raise it.  We had to move on, frankly.

1          THE COURT:  Are you at a transition point?

2          MS. PERALES:  At any time, Your Honor.

3          THE COURT:  I assume you have more time with this

4   witness?

5          MS. PERALES:  Yes, Your Honor.

6          THE COURT:  It's 5:15.  The only reason I'm quitting

7   at this time is I hope none of you run into this problem, but

8   some employees here at the courthouse have noticed that there's

9   an unusual activity of tow trucks.  The parking lots across the

10  street are paid parking lots, so I hope everybody did pay and I

11  hope no one is going to encounter walking out of here and you

12  can't find your car.  So in the event that that may happen to

13  one of you, I figured I better let you out now so you can

14  figure out if your car is there or not.  And anyway I also want

15  to take up with the lawyers what's the plan for tomorrow and

16  then the causes of action.  So why don't we resume with this

17  witness tomorrow morning at 9:00.  Spectators, you're free to

18  stay here if you'd like, but I'm just doing housekeeping with

19  the lawyers.  So with that housekeeping, are we in a position

20  to announce which causes of action are going forward or not or

21  do you all need more time on that?

22         MS. PERALES:  Your Honor, the LUPE plaintiffs are

23  prepared to inform the Court of their causes of action going

24  forward.

25         THE COURT:  Let me ask the question this way.  Is

1    there any plaintiff who needs more time?

2           MS. HOLMES:  I believe we're all prepared.

3           THE COURT:  Okay.  Well, let's get this done.

4           MS. PERALES:  Perales.  So I should just read this to

5    the Court.  LUPE plaintiffs challenge SB 1 Section 4.09 under

6    the 14th Amendment, void for vagueness.  We challenge Section

7    5.07, First and 14th Amendments, undue burden on the right to

8    vote.  Section 5.13, First and 14th Amendments, undue burden on

9    the right to vote, 6.03 First and 14th Amendments, undue burden

10   on the right to vote, 14th and 15th Amendment, intentional

11   discrimination, Title Two of the Americans with Disabilities

12   Act, Section 208 of the VRA, Section Two of the VRA.  Those

13   causes of action are the same for Section 6.04, 6.05, 6.06.

14   With respect to Section 7.04, LUPE plaintiffs' claims are First

15   and 14th Amendment, undue burden on the right to vote, 14th

16   Amendment, void for vagueness, First and 14th Amendment, free

17   speech, 14th and 15th Amendment, intentional discrimination,

18   Section 208 of the VRA, Section Two of the VRA, Title Two of

19   the ADA.  And then finally, LUPE plaintiffs challenge Section

20   8.01 under the 14th Amendment, void for vagueness.

21          MS. HOLMES:  The Haul plaintiffs, Your Honor, I'm

22   going to attempt to do this by categories.  The Haul plaintiffs

23   challenge Section 3.04, 3.09, 3.10, 3.12, 3.13.  We challenge

24   all of those under the First and 14th Amendment as an undue

25   burden, under the 14th Amendment as our intentional

1    discrimination claims, under the 15th Amendment as our

2    intentional discrimination claim, under Section Two of the

3    Voting Rights Act.  We challenge Section 3.15 under the 14th

4    Amendment as an intentional discrimination claim, under the

5    15th Amendment as intentional discrimination claim and under

6    Section Two of Voting Rights Act.  We challenge Section 4.01 as

7    under the 14th Amendment as intentional discrimination, under

8    the 15th Amendment as intentional discrimination, and under

9    Section Two of the Voting Rights Act.  We challenge Section

10    4.06 under the 14th Amendment as intentional discrimination,

11    under 15th Amendment as intentional discrimination, and under

12    the 14th Amendment due process clause as void for vagueness.

13    We challenge Section 4.07 under the 14th Amendment as

14    intentional discrimination, under the 15th Amendment as

15    intentional discrimination, under Section Two of the Voting

16    Rights Act, and under the 14th Amendment due process clause

17    as void for vagueness.  We challenges Section 4.09 under the

18    14th Amendment as intentional discrimination, under the 15th

19    Amendment as intentional discrimination and under the 14th

20    Amendment due process clause as void for vagueness.  We

21    challenge 4.12 under the First and 14th Amendments as an undue

22    burden, and under the 14th Amendment as intentional

23    discrimination and the 15th Amendment as intentional

24    discrimination.  We challenge Section 5.02 under the 14th

25    Amendment as intentional discrimination, under the 15th

 1   Amendment as intentional discrimination, and under Title Two of

 2   the ADA and Section 504 of the Rehab Act.  We challenge

 3   Sections 5.03, 5.06, 5.07 and 5.10 under Title Two of the ADA

 4   and under Section 504 of the Rehab Act.  We challenge Section

 5   6.01 under 14th Amendment as intentional discrimination,

 6   under the 15th Amendment as intentional discrimination, under

 7   Section Two of the Voting Rights Act and under Section 208 of

 8   the Voting Rights Act.  We challenge Sections 6.03, 6.04, 6.05,

 9   and 6.07 under the 14th Amendment as intentional

10   discrimination, under the 15th Amendment as intentional

11   discrimination, under Section Two of the Voting Rights Act,

12   under Section 208 of the Voting Rights Act, under Title Two of

13   the ADA and under Section 504 of the Rehab Act.  I note that in

14   the joint pretrial order, we voluntarily dismissed our claims

15   under -- sorry, against sections 5.04 and 7.04.  Thank you.

16           THE COURT:  Thank you.

17           MS. ARMENTA:  Good afternoon, Your Honor.  Elena

18   Rodriguez Armenta from the Alias Law Group for the LULAC

19   plaintiffs.  LULAC plaintiffs challenge under count one

20   violation of Section Two of the Voting Rights Act, Sections

21   3.04, 3.09, 3.10, 3.12, 3.13, 5.02, 5.03, 5.07, 5.08 and 7.04.

22   Under count two, undue burden on the right to vote under the

23   First and 14th Amendments, we challenge Sections 4.12, 5.02,

24   5.03, 5.07, 5.08, and as to count three, restriction on free

25   speech and expression under the First and 14th Amendments, we

1    challenge section 7.04.  As to count four, violation of Section
2    208 of the Voting Rights Act, we challenge Section 7.04.  And
3    I'll just note that pursuant to the Court's instructions at the
4    August 22nd status conference in the joint pretrial order,
5    LULAC plaintiffs noted that we are no longer intending to
6    challenge the following provisions of SB 1, 4.01, 4.02, 4.07,
7    and 4.09, previously challenged under LULAC plaintiffs VRA
8    Section Two and Anderson verdict claims.  Section 5.01
9    previously challenged under our VRA Section Two claim, and
10   Section 6.03 and 6.04, previously challenged under VRA Section
11   Two claim and Anderson verdict claims.  Thank you, Your Honor.
12           THE COURT:  Thank you.
13           MS. ROSENBAUM:  Good afternoon, Your Honor.  Laura
14   Rosenbaum of Stoel Rives on behalf of Mi Familia plaintiffs.
15   We were actually prepared to review the claims we had dismissed
16   as opposed to all the claims we were keeping, and we did file a
17   motion this morning with the claims that we are dismissing
18   which were also identified in the pretrial order.  And the
19   claims we are dismissing are all claims under 5.01, and the
20   First and 14th Amendment claims with respect to 2.04 to 2.06,
21   5.11, 5.12, and 5.14.  We did list all the claims that we're
22   pursuing in the joint pretrial order and I can --
23           THE COURT:  Why don't we go through the list.
24           MS. ROSENBAUM:  Okay.
25           THE COURT:  Previously that's what you're no longer

1    pursuing.  So now what are you pursuing?

2            MS. ROSENBAUM:  The challenged provisions include

3    3.04, 3.12, 3.13, 3.09, 3.10 of SB 1, provisions 4.12, 4.01,

4    4.07, and 6.01, provisions 5.04 and 7.04.  And I apologize

5    these are not all in numeric order, 5.02 and 5.03, 5.07 and

6    5.08, 5.13, 6.01, 6.03, 6.05, and 6.07, as well as 7.02 all

7    with respect to undue burden.

8            The provisions I just referred to are also challenged

9    as violating equal protection clause of the 14th Amendment

10   and violating the 15th Amendment as well as violating Section

11   Two of the Voting Rights Act, and specifically with respect to

12   Sections 6.01, 6.03, 6.04, 6.05 and 6.07 violating Section 208

13   of the Voting Rights Act.

14           THE COURT:  Thank you.

15           MR. DOLLING:  Good afternoon, Your Honor.  Zachary

16   Dolling on behalf of the OCA Greater Houston plaintiffs.  The

17   OCA Greater Houston plaintiffs consist of Rev Up Texas OCA

18   Greater Houston and the League of Women Voters of Texas and our

19   claims are a little bit divided between the groups, so I'm

20   going to go through them one by one.  Plaintiff Rev Up Texas

21   brings claims on behalf of itself and its members that SB 1

22   Sections 5.02, 5.03, 5.07, 5.10, 5.12 and 6.04 violate Title

23   Two of the ADA and Section 504 of the Rehab Act.  Plaintiffs

24   OCA Greater Houston and League of Women Voters of Texas

25   bringing claims on behalf of themselves and their member that

1    SB 1 Section 6.06 violates Section 208 of the VRA and that SB 1

2    Section 7.04 is both overbroad in violation of the First

3    Amendment and void for vagueness in violation of the 14th

4    Amendment.

5           Then as reflected in the joint pretrial order, each of

6    these plaintiffs has dropped certain parts of their claims.

7    Plaintiff Rev Up Texas has voluntarily dismissed its claims

8    that SB 1 Section 5.06 violates the ADA and Rehab Act, claims

9    that SB 1 Section 6.06 violates the ADA and Rehab Act and

10   claims that SB 1 Section 6.04 and 6.06 violates Section 208 of

11   the Voting Rights Act.  Plaintiffs OCA Greater Houston and

12   plaintiffs League of Women Voters of Texas voluntarily

13   dismissed the following claims, claims that SB 1 Sections 5.02,

14   5.03, 5.06, 5.07, 5.10 and 5.12 violate the ADA and Rehab

15   acts -- Rehab Act, claims that SB 1 Section 6.04 and 6.06

16   violate the ADA and Rehab Act and claims that SB 1 Section 6.04

17   violate Section 208 of the VRA.  Thank you.

18           THE COURT:  We got everybody.

19           MS. PERALES:  Yes, Your Honor.  I did have one quick

20   question for the Court.  Which is that if the Court would find

21   it convenient to move into evidence the two sample packets from

22   El Paso County.  We did provide those to the state this morning

23   and told them we plan to use them as demonstrative exhibits.

24   We're happy to move those into evidence at this time.

25           THE COURT:  What numbers would you call them?

1          PLF. COUNSEL:  LUPE 348 and LUPE 349 with the

2    corrective action envelope being 349.

3          THE COURT:  Any objections?

4          MR. KERCHER:  If I could have a moment, Your Honor.

5    No objection, Your Honor.

6          THE COURT:  348 and 349 are admitted.  Where do we

7    land for tomorrow?  So we resume this witness and then who is

8    up?

9          MS. PERALES:  It will be Michael Scarpello, the Dallas

10   County Elections Administrator and Tacoma Phillips, the Dallas

11   County mail ballot supervisor and then we have three poll

12   workers, Jim Luin, Rick Urtle and Jeffrey Clemons.  After

13   having memorized the order, it just went right out of my head,

14   I should have been able to rattle that off faster.

15         THE COURT:  So five new witnesses and continuation of

16   this one.

17         MS. PERALES:  Yes.

18         THE COURT:  Yes, sir.

19         SPEAKER:  My name is Ben Stoel, I'm with Dallas

20   County.  The first two names she mentioned are my clients.

21         THE COURT:  Your clients are up tomorrow.

22         SPEAKER:  I want to be sure I heard clearly that's

23   all.

24         THE COURT:  Not at all.  We made good progress today,

25   looks like we'll make good progress tomorrow.

1          MR. KERCHER:  Two points of clarification.  First, I

2     heard you say that we'll begin tomorrow at 9:00.  We received

3     an e-mail saying Tuesday and Thursday would start at 9:30, I

4     don't want to correct anybody, I just want to know what time to

5     be here.

6          THE COURT:  I didn't see any criminal defendants so

7     that will start next week.  Sentencings go on around here.  So

8     I will give you advance notice on days, that way you can clear

9     your tables and when we'll need room for any sentencing

10    procedures before we resume with you all, but tomorrow is 9:00.

11         MR. KERCHER:  Thank you.  Second thing is I appreciate

12    the Court going through and getting witnesses for tomorrow.

13    Plaintiffs counsel has been trying to give us three days notice

14    I think we are a little bit behind, but no harm done, it

15    appears to me based on comments made by plaintiffs that they

16    have their case planned out much farther in advance.  It would

17    probably be useful to share that information to all parties if

18    they have it.  When defendants put together their pretrial

19    disclosures we gave the order and how long it would take so

20    they have that information.  They may not have -- if they have

21    it out more than three days, that would be very useful for us

22    in order to make sure we don't wind up being a couple of cross

23    examinations short and have to cut a day short.

24         THE COURT:  If you all have a draft order of witness

25    list, let's share it.  Anything else?

1          MR. KERCHER:  Nothing from state defendants, Your

2    Honor.  Thank you.

3          THE COURT:  Anything from this side?  See you tomorrow

4    at nine.

5          COURT SECURITY OFFICER:  All rise.

6          *(5:29 p.m.)*

7                              *   *   *

–o0o–

    I certify that the foregoing is a correct transcript from the record of proceedings in the above–entitled matter.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.


Date:  09/11/23                    /s/ *Gigi Simcox*
                                   United States Court Reporter
                                   262 West Nueve Street
                                   San Antonio TX 78207



                                   /s/ *Angela Hailey*
                                   United States Court Reporter
                                   262 West Nueve Street
                                   San Antonio TX 78207