1      IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF TEXAS
2             SAN ANTONIO DIVISION

3
LA UNION DEL PUEBLO ENTERO,      .
4  ET AL,                        .
                                 .
5            PLAINTIFFS,         .
        vs.                      . DOCKET NO. 5:21-CV-844-XR
6                                .
GREGORY W. ABBOTT, ET AL,        .
7                                .
             DEFENDANTS.         .
8

9

10            TRANSCRIPT OF BENCH TRIAL
      BEFORE THE HONORABLE XAVIER RODRIGUEZ
11          UNITED STATES DISTRICT JUDGE
             SEPTEMBER 12, 2023
12

13

14

15  APPEARANCES:
    FOR THE PLAINTIFFS:    NINA PERALES
16                         MALDEF
                           110 BROADWAY
17                         SUITE 300
                           SAN ANTONIO TX 78205
18

19                         ELENA RODRIGUEZ ARMENTA, ESQUIRE
                           NOAH B. BARON, ESQUIRE
20                         ELIAS LAW GROUP LLP
                           250 MASSACHUSETTS AVENUE NW
21                         SUITE 400
                           WASHINGTON DC 20001
22

23

24

25

```
 1                              JAMES MICHAEL SHOWALTER, ESQUIRE
                                ARENTFOX SCHIFF LLP
 2                              2335 WACKER DRIVE
                                SUITE 7100
 3                              CHICAGO IL 60606

 4

 5                              COURTNEY M. HOSTETLER, ESQUIRE
                                FREE SPEECH FOR PEOPLE
 6                              1320 CENTRE STREET #405
                                NEWTON MA 02459
 7

 8

 9   FOR THE DEFENDANTS:        RYAN G. KERCHER, ESQUIRE
                                KATHLEEN HUNKER, ESQUIRE
10                              TEXAS ATTORNEY GENERAL
                                P.O. BOX 12548
11                              MC 009
                                AUSTIN TX 78711
12

13                              JOHN M. GORE, ESQUIRE
                                JONES DAY
14                              51 LOUISIANA AVENUE NW
                                WASHINGTON DC 20001
15

16

17   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                                OFFICIAL COURT REPORTER
18                              UNITED STATES DISTRICT COURT
                                SAN ANTONIO, TEXAS
19

20

21

22

23

24

25
```

LISA WISE — DIRECT

1       *(San Antonio, Texas; September 12, 2023, at 9:00 a.m., in*

2   *open court.)*

3           THE COURT:  And Miss Perales, your witness.

4           MISS PERALES:  LUPE plaintiffs recall Miss Lisa Wise

5   to the stand.

6                   DIRECT EXAMINATION CONT'D.

7   BY MISS PERALES:

8   Q.  Miss Wise, we were marching steadily through mail ballot

9   processing, but before we pick that up again, I just had a

10  couple of questions on an exhibit we looked at earlier.  So

11  I'm just going to show to you that exhibit again and ask you

12  my few questions.

13      This is LUPE Exhibit 185 and the description as written on

14  the report, if you wouldn't mind just refreshing yourself

15  regarding this report to you, do you see that there?

16  A.  Yes.

17  Q.  And yesterday I asked you some questions about the last

18  sentence there from the election judge, quote, "I had to stand

19  in front of the poll watcher," do you see that there?

20  A.  Yes.

21  Q.  And my follow-up questions are:  With respect to SB 1's

22  4.09 which makes it an offense to obstruct the view of the

23  poll watcher, would it concern you if the Secretary of State's

24  Office advised that standing between a poll watcher and the

25  voter could violate Section 4.09?

LISA WISE - DIRECT

1  A.  Yes.

2  Q.  And are you aware that the Secretary of State makes

3  referrals of potential criminal activity in elections to the

4  Attorney's General Office?

5  A.  Yes.

6  Q.  And so if the Secretary of State did say that a poll

7  worker positioning themselves between the watcher and the

8  voter could violate the law, would you fear that either --

9  well, would you fear that your poll worker potentially could

10  be prosecuted?

11  A.  Yes.

12  Q.  I'm going to pick up again where we left off yesterday.

13     We were talking about the Ballot Tracker and the

14  requirement in order to enter the Ballot Tracker of putting

15  your name, address, driver's license, and last four of the

16  social.

17     Would you agree with me that the way the Ballot Tracker

18  could be helpful is if a voter forgot to put an ID number on

19  the mail ballot envelope and the voter ID numbers were already

20  in your system, the voter could go into the Ballot Tracker and

21  confirm their ID numbers and you would be able to verify the

22  mail ballot?

23  A.  Yes.

24  Q.  Okay.  But you would agree with me that this situation

25  only works if the voter's ID number or numbers are already in

LISA WISE – DIRECT

1  your voter registration system?

2  A.  Yes.

3  Q.  In March of 2022 you had eleven voters use the Ballot

4  Tracker to confirm their ID numbers, is that correct?

5  A.  Yes.

6  Q.  And you believe it would be easier if voters could use the

7  Ballot Tracker to actually add their ID number information

8  into their voter registration record, correct?

9  A.  Yes.

10 Q.  You haven't experienced any problems of voter fraud

11 associated with not requiring voters to provide their driver's

12 license or last four of the social for mail ballots, is that

13 correct?

14 A.  Correct.

15 Q.  And aside from one investigation that you've been able to

16 recall, you're not aware of any incidents in El Paso County

17 where a fraudster impersonated a voter on an application for

18 ballot by mail or mail ballot, correct?

19 A.  Correct.

20 Q.  And it's fair to say, isn't it, that the ID number

21 matching requirement in SB 1 for applications for ballot by

22 mail and mail ballots has made voting more difficult for

23 by-mail voters in your county?

24 A.  Yes.

25 Q.  I want to move forward now to the 2022 General Election in

245

LISA WISE – DIRECT

1  November.  Now, in the 2022 General Election you would agree

2  that there were fewer El Paso County voters who lacked either

3  a driver's license or a social security number in your

4  database of registered voters as compared to the March

5  Primary?

6  A.  Yes.

7  Q.  And you continued to make efforts to educate voters about

8  the ID number requirement in the 2022 General Election,

9  correct?

10  A.  Yes.

11  Q.  And you even started sending out your insert to voters at

12  the point that they requested an application for ballot by

13  mail instead of your waiting for an ID problem on an

14  application for ballot by mail that you already received,

15  correct?

16  A.  Yes.

17  Q.  So, essentially, you were trying to get out ahead of any

18  potential problem?

19  A.  Yes.

20  Q.  And when you had an ID verification problem for an

21  application for ballot by mail, you would phone the voter if

22  you had a phone number, correct?

23  A.  Yes.

24  Q.  But the voter cannot give you their ID number over the

25  phone, they still have to get you that information on a new

LISA WISE – DIRECT

1  application for ballot by mail, or a new voter registration

2  form, correct?

3  A.  Yes.

4  Q.  And so when you had an ID verification problem for an

5  application for ballot by mail and you didn't have a phone

6  number, you sent the voter a notice of defect, typically

7  within about 48 hours, correct?

8  A.  Yes.

9  Q.  And in the November 2022 Election, you still heard from

10  voters who were continuing to struggle with the ID number

11  requirements, correct?

12  A.  Yes.

13  Q.  And you still had voters in the November 2022 Election who

14  called you and said they were not able to understand how to

15  use the Ballot Tracker, correct?

16  A.  Yes.

17  Q.  And the voters you heard from about the Ballot Tracker had

18  a mix of problems, including not being able to use a

19  computerized platform, not knowing what information they

20  needed to have to get into the tracker, and not knowing what

21  steps they were supposed to take once they got into the

22  tracker, correct?

23  A.  Yes.

24  Q.  I'd like to display now LUPE Exhibit 119, 119.  Do you

25  recognize this –– well, we talked about this before.  There's

LISA WISE – DIRECT

1  an updated version of this form, isn't there?

2  A.  Yes, there is.

3  Q.  But in the box where it says, "You must provide one of the

4  following numbers," that information is still the same,

5  correct?

6  A.  Correct.

7  Q.  And if we stay looking in the box there that has now been

8  highlighted in yellow, you would agree with me that the

9  portion of the form there says, quote, "You must provide one,"

10  unquote, and then it says in lower case, "of the following

11  numbers," do you see that there?

12  A.  Yes.

13  Q.  And so the first number that's requested on the form is

14  the Texas driver's license, is that right?

15  A.  Yes.

16  Q.  And then under that it says, "If you do not have a Texas

17  driver's license, personal identification number, or a Texas

18  election identification certificate number, give the last four

19  digits of your social," do you see that there?

20  A.  Yes.

21  Q.  And so you would agree that this language appears to

22  establish a hierarchy wherein you only give the last four of

23  your social, if you don't have a Texas ID number, correct?

24  A.  Yes.

25  Q.  But at the same time you are sending this form but you're

LISA WISE — DIRECT

1  trying to educate voters to put both ID numbers, correct?

2  A.  Yes.

3  Q.  Because you were seeing voters put one ID number or the

4  other and it was very frustrating for them when you told them

5  that whatever number they had put was not the number in their

6  voter registration record, correct?

7  A.  Yes.

8  Q.  And you didn't receive any money from the Texas Secretary

9  of State for SB 1 ID number implementation, correct?

10  A.  Correct.

11  Q.  Any money you spent towards implementing the SB 1

12  identification number requirement for the November 2022

13  General Election came from your office's general budget

14  allocated by the Commissioner's Court, correct?

15  A.  Yes.

16  Q.  And so now, under your current procedures, if a voter

17  calls your office and requests an application for ballot by

18  mail, you're going to send them an envelope and the envelope

19  is going to have three pieces of paper in it, the application

20  for ballot by mail, the El Paso County insert with the

21  information about SB 1 ID requirements, and a voter

22  registration application, correct?

23  A.  Yes.

24  Q.  Okay.  Can we move to LULAC Exhibit 103.

25      Miss Wise, do you recognize this as defendant Wise

LISA WISE — DIRECT

1  supplemental responses — well, defendant Wise's objections

2  and supplemental and amended responses to State defendant's

3  second set of interrogatories?

4  A.  Yes.

5  Q.  And then I understand that on Sunday there was also an

6  additional email updating some of these numbers, is that

7  right?

8  A.  Yes.

9  Q.  So I'm going to go off of the latest information that I

10  have, which is the email.  Let's see if we can get through

11  this without the — so we're going to put that exhibit away.

12      Miss Wise, can you look in the front of your binder and

13  see if it might be tucked in there?

14  A.  Yes.

15  Q.  Okay.  Thank you.  So we'll just move these — through

16  these numbers for the November 2022 General Election.

17      MISS HUNKER:  Your Honor, we're going to object to

18  the email and referencing the email.  It came on Sunday, the

19  day before the witness was scheduled to testify, and,

20  therefore, was not disclosed and gave State defendants enough

21  time to prep or to engage in some sort of discovery on the new

22  numbers.

23      THE COURT:  So what new numbers are we talking about,

24  first?

25      MISS PERALES:  In this examination it's one number

LISA WISE – DIRECT

1  and that would be the number, El Paso County's final rejection

2  rate of all timely received ballots by mail for the

3  November 2022 General Election.  And the number was updated

4  from 1.97, which was disclosed in discovery, to 2.01.  So the

5  update increased the number by .4.

6      THE COURT:  And you developed a new number how?

7      THE WITNESS:  The report is the same regardless, but

8  basically when we were going through the questions there was a

9  question on whether or not does that include things like FPCA

10 ballots, which are Federal Post Card Application, because

11 those are handled sometimes differently, are they wanting

12 timely or only untimely?

13     So the raw numbers are the same in the report but how

14 we were trying to answer the question, we would get

15 clarification and then we'd respond.

16     THE COURT:  The objection is noted and overruled.

17     Go ahead.

18     MISS PERALES:  Thank you.

19 BY MISS PERALES:

20 Q.  Is it fair to say that the mail ballot rejection rate for

21 the 2022 General Election was smaller than in the 2022

22 Primary?

23 A.  Yes.

24 Q.  And yet your mail ballot rejection rate for the 2022

25 General was still higher than it was in the 2018 General,

LISA WISE – DIRECT

1  correct?

2  A.  Yes.

3  Q.  And so El Paso County's final rejection rate of all timely

4  received ballots by mail for the November 2018 General

5  Election was .93 percent, correct?

6  A.  Yes.

7  Q.  And El Paso County's final rejection rate of all timely

8  received ballots by mail for the November 2022 General

9  Election was 2.01 percent, correct?

10  A.  Yes.

11  Q.  In fact, if we look from the 2018 General to the 2022

12  General in El Paso County, the mail ballot rejection rate more

13  than doubled, correct?

14  A.  Yes.

15  Q.  And you are aware of voters who told you that when you

16  sent them their mail ballot to be cured for SB 1 ID reasons,

17  that they threw it away because they thought it was a

18  duplicate ballot, correct?

19  A.  We did have a few voters say that, yes.

20  Q.  And to your best understanding, those people didn't end up

21  casting a ballot, correct?

22  A.  Yeah.  They told me that, so yes.

23  Q.  Let's move along to LUPE Exhibit 26.  You recognize this

24  document, don't you, as the report regarding the number of

25  voters in El Paso County with no social security and/or

LISA WISE – DIRECT

1  driver's license and their voter status, meaning whether they
2  are active or in suspense, correct?
3  A.  Yes.
4  Q.  So if we look at the status column there, A stands for
5  active, yes?
6  A.  Yes.
7       MISS HUNKER:  Your Honor, we are going to object to
8  this exhibit as lack of foundation and hearsay.
9       THE COURT:  So are you familiar with this?
10      THE WITNESS:  Yes, I am.
11      THE COURT:  That's overruled.
12 BY MISS PERALES:
13 Q.  Did your office produce this document, Miss Wise?
14 A.  Yes, we did.
15 Q.  And I should be a little clearer.  Besides producing it in
16 discovery, did your office create this document?
17 A.  Yes.
18 Q.  And you maintain it in your records at El Paso County,
19 correct?
20 A.  Yes.
21 Q.  Okay.  And this is an analysis essentially of the voters
22 on your voter role in El Paso County, correct?
23 A.  Yes.
24 Q.  And it was created sometime in the spring of 2023 after
25 the November 2022 General Election, correct?

LISA WISE - DIRECT

1   A.   Yes.

2   Q.   Although you have your voters here set out by active and

3   suspense, is it correct to say that if a suspense voter comes

4   to the polls to vote they are still allowed to vote, yes?

5   A.   Yes.  They have to generally fill out a confirmation of

6   address form and then that removes them from suspense and then

7   they are able to cast a ballot.

8   Q.   Is there a similar process if somebody wants to vote by

9   mail and they are on the suspense list?

10  A.   We would send them the confirmation of address form.

11  Q.   And if they returned that and appropriately filled out

12  with their mail ballot, their mail ballot would be counted,

13  correct?

14  A.   Yes.

15  Q.   So the top box of this exhibit which says, "No SSN, SSN4,

16  or Drivers," reflects voters on your roll in El Paso County

17  who have none of those numbers associated with their voter

18  registration record, correct?

19  A.   Yes.

20  Q.   And that number is 5,631 active voters with 314 more in

21  suspense, is that right?

22  A.   5,361 and then 314 in suspense.

23  Q.   And then there are the voters in the next box -- oh,

24  actually it's the box a little bit lower.  Where did we go?

25  Yes, With TDL Only, if we could look at that one right below

LISA WISE - DIRECT

1  it.  If we can look at the box below the one that's in yellow

2  highlight, the one that says With TDL Only.  Oh, thank you.

3  A.  Yes.

4  Q.  There are the voters with only a Texas driver's license in

5  their registration record, is that what that box represents?

6  A.  Yes.

7  Q.  And that's 9,658 voters with 824 on the suspense list,

8  correct?

9  A.  Yes.

10  Q.  And then if we move to the voters who only have a social

11  security number in their registration record, that's the box

12  just above the box that we were looking at, yes, with SSN,

13  SSN4 Only, is that what that box represents?

14  A.  Yes.

15  Q.  And that's 14,789 voters with 2,239 voters on the suspense

16  list, is that right?

17  A.  Yes.

18  Q.  And if you total those voters together, those are the

19  voters who, if they try to vote by mail in El Paso County,

20  could experience an SB 1 ID match failure and have either

21  their application for ballot by mail or ballot returned to

22  them, correct?

23  A.  Yes.

24  Q.  I would like to move to Exhibit 326, please.

25      This is a confidential document.  I'm sorry.

LISA WISE — DIRECT

1    Do you see the exhibit now?

2  A.  I do.

3  Q.  Do you recognize this document as a list of mail ballots

4  returned to voters for curing in the November 2022 Election,

5  correct?

6  A.  Yes.

7  Q.  And if we look in the upper left-hand corner of the

8  document, there is a phrase there, Return Status E7, do you

9  see that there?

10  A.  Yes.

11  Q.  And this code represents incomplete social security number

12  or Texas driver's license with the mail ballot resent to the

13  voter, correct?

14  A.  Yes.

15  Q.  And if we look at the left-hand column of this list of

16  voters, the code Y65 means that the voter is over age 65 and

17  receives an annual mail ballot, correct?

18  A.  Yes.

19  Q.  And if we could just take a moment to explain an annual

20  mail ballot is when the voter submits an application for

21  ballot by mail and checks a box that says they want to keep

22  getting mail ballots throughout that year, is that correct?

23  A.  Yes.

24  Q.  So they don't have to keep applying for a mail ballot with

25  every upcoming election, right?

LISA WISE - DIRECT

1   A.  Correct.  It's good for one calendar year.

2   Q.  Thank you.  And then also in the far left corner, and we

3   may have to go down a page or two, there's also a code YDS, is

4   that correct?

5   A.  Yes.

6   Q.  And that code means that the voter is disabled and

7   received or checked off that they were disabled on the form

8   and receives an annual mail ballot, correct?

9   A.  Yes.

10  Q.  Okay.  And it would be fair to say that if we're looking

11  at this exhibit that all of these voters that have a Y code,

12  either YDS or Y65, received their mail ballot because they had

13  made a successful application for ballot by mail previous to

14  that, yes?

15  A.  Yes.

16  Q.  And so we can assume that all of these voters listed in

17  this exhibit somehow cleared the hurdle of the application for

18  ballot by mail with respect to their ID number at some point

19  before the November General Election, yes?

20  A.  Yes.

21  Q.  And yet for these individuals listed on the exhibit, they

22  still ran into an SB 1 ID defect problem with their mail

23  ballot and were sent the mail ballot back to cure it, correct?

24  A.  Yes.

25  Q.  Thank you.

LISA WISE – DIRECT

1        I would like to look again at Joint Exhibit 1.

2            THE COURT:  Let's stop for just a second.  So the

3    chart that earlier we were talking about that had the

4    objection raised to it that was prepared by the El Paso

5    office, were you going to introduce that at any point into

6    evidence?

7            MISS PERALES:  The email, Your Honor?

8            THE COURT:  No, that document right there on the

9    screen.

10            MISS PERALES:  Yes, Your Honor.  It is marked LUPE

11   Exhibit 26.

12            THE COURT:  Okay.  Just so the record is real clear

13   about what we were referencing earlier, that was LUPE 026.

14            Now, this document here with all the voter names and

15   addresses --

16            MISS PERALES:  That is LUPE Exhibit 326.

17            THE COURT:  So are you planning to introduce that

18   into evidence?

19            MISS PERALES:  We are, Your Honor.

20            THE COURT:  Okay.  So when you do that, though,

21   let's -- unless there's a necessity for the voter name and

22   address, and what's the State's position, I think we ought to

23   be protecting third parties from having publicly -- it's okay

24   in the courtroom, but later for the published exhibits, I

25   think it's appropriate to have the voter names and addresses

LISA WISE — DIRECT

1  redacted.

2          MISS HUNKER:  State defendants agree.  We have no

3  objection to redacting personal identifying information of

4  voters.

5          THE COURT:  Thank you.

6          So, yeah, when we move 326, let's redact at least

7  those two columns.

8          MISS PERALES:  Your Honor, I think we may have a

9  procedure, and please correct me if I'm wrong, that all of the

10 exhibits that have been provided to the Court are offered for

11 admission and subject to objection, and that at some point we

12 will move them on en masse, instead of doing them one by one

13 with the witness, but we will go with what the procedure that

14 the Court prefers.

15         THE COURT:  Well, if you both have agreements worked

16 out, I'm not going to disturb that.  I'm more concerned with

17 redactions and what gets into the record.

18         MISS PERALES:  Thank you.  And with respect to the

19 previous exhibit, Exhibit 26, that exhibit, thus far, has not

20 been subject to objection, but I understand that the objection

21 that was raised just now has been overruled.

22         THE COURT:  Okay.

23 BY MISS PERALES:

24 Q.  So we can move now to Joint Exhibit 1 — well, while we

25 are putting up Joint Exhibit 1, I just want to sort of close

LISA WISE - DIRECT

1  the thought on the list of voters whose mail ballot was

2  returned to them because of an ID defect.  We were talking

3  about the fact that they had successfully submitted an

4  application for ballot by mail and had gotten on the list for

5  an annual ballot, correct?

6  A.  Yes.

7  Q.  So just to explore with you the reasons why somebody might

8  get past that stage and still have their mail ballot returned

9  to them, would it be fair to say that this group might include

10  people who didn't see where to put the ID number on the

11  carrier envelope, correct?

12  A.  That may have happened, yes.

13  Q.  But it's also possible that they used a driver's license

14  number with their application for ballot by mail and then used

15  a social security number for their carrier envelope and you

16  weren't able to match the social security number, correct?

17  A.  That's correct.

18  Q.  And also vise versa, that the voter had successfully

19  obtained or gotten on the list for an annual mail ballot using

20  their social security number but then they put their driver's

21  license on the mail ballot carrier envelope and you weren't

22  able to match that number, correct?

23  A.  Yes, that's correct.

24  Q.  And would it be fair to say then that Exhibit 26, which is

25  the chart of the number of voters who may have one number and

LISA WISE – DIRECT

1  not the other or may have no numbers in your system represent
2  a universe of people who potentially could have ID defect
3  problems when they try to vote by mail?
4  A.  Yes.
5  Q.  Going forward now to Joint Exhibit 1, page 59.  If we look
6  at this page here, are you familiar with this provision in SB
7  1 that talks about vote harvesting?
8  A.  Yes.
9  Q.  And if we look at paragraph 2, line 7, where it's yellow
10 highlighted, you would agree with me that in this part of the
11 statute vote harvesting services involve the elements of an
12 in-person interaction with one or more voters in the physical
13 presence of an official ballot or a ballot voted by mail and
14 then intended to deliver votes for a specific candidate or
15 measure, do you see that there?
16 A.  Yes.
17 Q.  And you've never heard of anybody, have you — you have
18 never heard of anyone with a nonprofit or community
19 organization trying to commit fraud with a mail voter and the
20 mail ballot, correct?
21 A.  In my county, no.
22 Q.  I'd like to scroll to page 60 now because there's another
23 section for the vote harvesting, 7.04.  And if we scroll down
24 to line 15, do you recognize that section there, line 15,
25 starting there that says, "unlawful solicitation and

LISA WISE - DIRECT

1  distribution of application to vote by mail," and it goes

2  pretty much through line 26, let's say?

3  A.  Yes.

4  Q.  Now this applies to a public official or an election

5  official, correct?

6  A.  Yes.

7  Q.  And it defines an offense which is a crime, is that

8  correct?

9  A.  Yes.

10 Q.  So stepping back for a minute, when you arrived as an El

11 Paso County Elections Administrator, it was already the

12 practice of your office that every January you would send out

13 applications for ballot by mail with a letter to voters over

14 age 65 and who had voted an annual mail ballot in the year

15 before, correct?

16 A.  Yes.

17 Q.  And that was your practice all the way up until SB 1 went

18 into effect, correct?

19 A.  Yes.

20 Q.  And in your view, it was a reasonable practice, wasn't it,

21 for your office to send, proactively, applications for ballot

22 by mail to voters over age 65 who had in the previous year

23 voted an annual ballot, correct?

24 A.  Yes, because their application had expired.  It's good for

25 one calendar year.  And sometimes, you know, we tell people,

LISA WISE - DIRECT

1  hey, once you're registered to vote, unless you change your

2  address you don't have to reregister.

3      And there's a lot of people that believe that's the same

4  for application for ballot by mail.  So we wanted to let them

5  know you do, in fact, have to re-apply every year, and you did

6  in the past, so here's a letter explaining that it's now

7  expired and if you would choose to vote that way again, here's

8  an application for you to do so.

9  Q.  And you would agree with me that a voter over age 65 is

10  categorically eligible to vote by mail, yes?

11  A.  Yes.

12  Q.  Are you aware of other states that have something called a

13  permanent early voting list or a permanent mail ballot list?

14  A.  I am.

15  Q.  And in those states, is it correct to say that once on the

16  early permanent voting list, the voter will receive ballots by

17  mail routinely?

18  A.  Yes.

19  Q.  But in Texas you have to apply every year to keep that

20  going, is that right?

21  A.  Yes.

22  Q.  Do you see around the middle of the page there, there are

23  some things that are now criminal for you to do, starting on

24  line 19.  "Solicits the submission of an application to vote

25  by mail from a person who did not request an application," do

263

LISA WISE – DIRECT

1  you see that language there?

2  A.  I do.

3  Q.  This makes it a crime, doesn't it, for you to continue

4  your practice of proactively sending applications for ballot

5  by mail to voters over age 65 who, in the past year, voted

6  with an annual ballot by mail, correct?

7  A.  Yes.

8  Q.  And so comparing January 2020 your office mailed a letter,

9  an application for ballot by mail, to this group of voters,

10 correct?

11 A.  Yes.

12 Q.  And then later in 2020 you sent a second round of

13 applications for ballot by mail to the voters as you were

14 getting closer to the Presidential Election, correct?

15 A.  Yes, we did.

16 Q.  And in January 2022, El Paso County did not send

17 applications for ballot by mail to voters over age 65 who had

18 previously voted an annual ballot, correct?

19 A.  Correct.

20 Q.  And it would be correct to say that the voters who had

21 received applications for ballot by mail from you in 2020 did

22 not receive those applications proactively from you in 2022,

23 correct?

24 A.  Correct.

25 Q.  And in 2022 your office received multiple calls from

LISA WISE - DIRECT

1  voters asking why they had not received their applications for

2  ballot by mail from you automatically, correct?

3  A.  Yes.

4  Q.  And, in fact, you were all getting calls in the office and

5  you probably took half a dozen of these calls yourself, yes?

6  A.  At least, yes.

7  Q.  And you explained to those voters that the election code

8  had changed and that now the voter has to request an

9  application for ballot by mail, yes?

10  A.  Yes.

11  Q.  You received requests where voter asked for an application

12  for ballot by mail for themselves and for another voter,

13  correct?

14  A.  Yes.

15  Q.  And generally — well, you required the second voter to

16  also make a request, yes?

17  A.  Yes.

18  Q.  So after SB 1 went into effect, your office generally

19  required, for example, if one spouse wanted to request an

20  application for ballot by mail for themselves and for their

21  spouse you required the spouse to get on the phone and make

22  that request as well?

23  A.  Yes.

24  Q.  Now, looking down below this paragraph one, which talks

25  about solicits, there's also paragraph 2 which says,

LISA WISE – DIRECT

1  "distributes an application to vote by mail to a person who
2  did not request the application unless the distribution is
3  expressly authorized by another provision of this code," do
4  you see that language?
5  A.  I do.
6  Q.  So looking at these separate paragraphs for solicit and
7  distribute, it's fair to say that in your view it's tough to
8  know for sure whether you are able to send voters over age 65
9  a letter telling them they can request an application for
10 ballot by mail, correct?
11 A.  Yes.  We did discuss sending them the application
12 basically, for an application, like a letter saying you can
13 apply to apply, and we erred on the side of caution and did
14 not do that.
15 Q.  So you decided not to even send a letter to the voters
16 reminding them that they could apply for a ballot by mail?
17 A.  Correct.
18 Q.  And it's because you're not sure if you are soliciting if
19 you tell voters they're qualified to vote by mail and they
20 have the option to contact you if they want an application for
21 ballot by mail, correct?
22 A.  We consulted with our county attorneys and discussed it
23 and decided, yes, that's correct.
24 Q.  And you are concerned, aren't you, about the state jail
25 felony provision here in 7.04, correct?

LISA WISE – DIRECT

1      We have to roll down a little bit to the next page.  Page
2  61.  There we go.
3      Page 61, line 2, can you read that there?
4  A.  "An offense under this section is a state jail felony."
5  Q.  That would apply to you, correct?
6  A.  Yes.
7  Q.  Or anybody in your office who sent out an unsolicited
8  application for ballot by mail, yes?
9  A.  Yes.
10  Q.  And you are concerned about this section, yes?
11  A.  Yes.
12  Q.  And now you, yourself, are more careful in recommending to
13  voters the option of vote by mail because you don't want to
14  seem like you are promoting mail ballots, correct?
15  A.  Correct.
16  Q.  And in the limited training from the Secretary of State
17  about what you can and cannot say to voters about requesting
18  an application for ballot by mail, you learned that you should
19  be careful about what you say and if you have questions, you
20  need to contact your county attorney, is that right?
21  A.  Yes.
22  Q.  And now, because of SB 1, you would ask your attorneys
23  first before you did voter outreach to tell voters over age 65
24  that they are eligible to vote ballot by mail, and if they
25  want to vote that way that they should ask you for an

LISA WISE – DIRECT

1  application for ballot by mail, correct?

2  A.  I'm comfortable telling people they are eligible; however,

3  I'm not comfortable telling them that, you know, here's an

4  application, or contact us.  Generally, we'll say you can find

5  applications on our website if you are interested.

6  Q.  But before SB 1 you would have been comfortable

7  encouraging voters to ask you for an application for ballot by

8  mail, correct?

9  A.  Yes.

10  Q.  And you understand, don't you, that political parties can

11  still send voters unsolicited applications for ballot by mail,

12  correct?

13  A.  Yes.

14  Q.  And I believe it's a little bit farther down on page 61,

15  we will see the exception or the language that says — hold on

16  a second.  Well, it's here somewhere.  So we'll just stick

17  with your knowledge that if somebody is an official of a

18  political party they can still send out unsolicited

19  applications for ballot by mail, correct?

20  A.  Yes, that's correct.

21  Q.  And you are aware that leading up to the March 2022

22  Primary Lieutenant Governor Patrick sent out a bunch of

23  unsolicited applications for ballot by mail to voters but the

24  return address on those were the Texas Secretary of State,

25  correct?

LISA WISE — DIRECT

1  A.  I am aware of that, yes.

2  Q.  What should the return address have been?

3  A.  It should have been coinciding with whoever their county

4  election official is.

5  Q.  So Lieutenant Governor Patrick, who is legally able to

6  send out applications for ballot by mail, sent them out to

7  voters but with the wrong return address, is that right?

8  A.  Correct.

9  Q.  Can we go to — no, I'm just going to stick with this.

10      You don't believe that political parties are more

11  qualified than you to send out unsolicited applications for

12  ballot by mail to eligible voters, do you?

13  A.  I don't believe they are more qualified.

14      And one of the side parts of that is that we would get

15  calls from voters and we would tell them that, you know, you

16  can contact the party, you can contact them to get the

17  request.

18      And we would have people that would call us, a lot of

19  people that would say we want to use the actual county form.

20  We don't want to give this Candidate So-and-so or this party

21  our information, whether that's public or not, which in our

22  office most of that is public, but they didn't want to use

23  this candidate's application, and they didn't want to use that

24  candidate's application, and they are used to using our form.

25      So we did get calls on that.

LISA WISE – DIRECT

1  Q.  Okay.  Thank you.

2     In fact, when you spoke to voters about your inability now

3  to send out applications for ballot by mail to eligible voters

4  who hadn't requested them, voters were angry that you didn't

5  send the application, correct?

6  A.  Yes.

7  Q.  And you took that to mean that voters generally favored

8  your sending applications for ballot by mail to voters who

9  hadn't requested them but who were eligible and who had voted

10 that way in the past, correct?

11 A.  Yes.

12 Q.  In El Paso County you have accommodated requests from

13 disabled voters, correct?

14 A.  Yes.

15 Q.  You have, for example, moved voters with mobility

16 impairments to the front of the line at the polling place to

17 vote, correct?

18 A.  Yes.

19 Q.  And in addition to the audio ballot, you have worked to

20 create a modification to the screen on the poll pad for

21 visually impaired voters to find the signature line and the

22 party choices with Braille so that they can sign into the

23 polling place and fill out that information independently,

24 correct?

25 A.  Yes.  We worked with our local El Paso Council for the

LISA WISE - DIRECT

1   Blind and they had come to us with a concern that although we
2   can vote independently, if we choose with an audio ballot
3   it's — we're still having a tough time with the poll pad, and
4   that she had told us about this item that she puts in her
5   checkbook where she's able to find the line and so we worked
6   with her and the local Fab Lab El Paso, which is this
7   nonprofit that uses — has a bunch of materials and does
8   things like that.
9       So we, with them, created two different screen covers, one
10  that kind of adhesive, almost like a little plastic one for
11  the Primary, so there is a box that matches with the party
12  selection, and one that's not so they still can find the
13  signature without needing assistance and vote independently.
14  Q.  Thank you.  It's your practice, isn't it, to try to make
15  accommodations when it is requested, correct?
16  A.  Yes.
17  Q.  Would it also be correct that you won't violate a
18  provision of the election code to make that accommodation?
19  A.  Correct.
20  Q.  And, in other words, if the election code has an expressed
21  requirement, like you have to match an ID number on a mail
22  ballot in order to count it, you won't violate that
23  requirement even if the voter asks you as part of an
24  accommodation to a disabled voter, correct?
25  A.  Correct.

LISA WISE – DIRECT

1  Q.  I'd like to talk to you now just a little bit more about

2  the passage of time since SB 1's implementation.  You agree,

3  don't you, that there are pieces of SB 1 that no matter how

4  long they are in effect may not reduce their impact, right?

5  A.  Yes.

6  Q.  So, for example, the prohibition on you sending out

7  unsolicited applications for ballot by mail, that prohibition

8  is still going to be there five years from now, or ten years

9  from now, correct?

10  A.  Yes.

11  Q.  And with respect to mail ballot ID provisions, is it

12  correct to say that you expect there to be mail ballot voters

13  in the 2024 Presidential Election who haven't previously voted

14  under the SB 1 ID requirements, correct?

15  A.  Yes.

16  Q.  Some people just vote in Presidential Elections, isn't

17  that right?

18  A.  Yes.

19  Q.  I'd like to display — hold on a second.  Yes.  We have

20  two exhibits that I would like to show Miss Wise, they are

21  subject currently to an objection and I would like to take a

22  moment to review them with her.  That would be LUPE Exhibit

23  15.  Do we have that?  Okay.

24      Do you recognize this as an email from Melissa Rosales to

25  Lisa Wise from May of 2017?

LISA WISE — DIRECT

1   A.   Yes.

2   Q.   Is Melissa Rosales also somebody who works in your office?

3   A.   Yes.

4        MISS HUNKER:  Your Honor, we're going to object on

5   this document regarding hearsay, relevance, and lack of

6   foundation.

7        THE COURT:  Lack of foundation is easily —— that's

8   ridiculous.  So the hearsay though, what portion of this

9   document is hearsay?

10       MISS HUNKER:  Every statement is an out-of-court

11  statement and it's the truth of the matter of what Miss —— of

12  what Melissa Rosales is saying.  She is not here in court.

13  She is not presenting that statement.  This is not an email

14  that was sent by Lisa Wise.  It's an email that was received

15  by her.

16       THE COURT:  What's the response to that?

17       MISS PERALES:  First, it's not offered for the truth

18  of the matter asserted.  Second, it is a record of a regularly

19  conducted activity which I was going to ask Miss Wise about if

20  necessary.

21       THE COURT:  I'm confused now and even though it's not

22  raised, what's the relevance of this?  We are talking about an

23  ADA physical problem.  This has nothing to do with voting.

24       MISS PERALES:  Your Honor, I was simply going to ask

25  Miss Wise if it was a routinely —— a regularly conducted

273
LISA WISE — DIRECT

1  activity that she would exchange communications with her staff

2  regarding compliance with the ADA and accommodating voters

3  with disabilities.

4       THE COURT:  I'll allow that question.

5  BY MISS PERALES:

6  Q.  So, Miss Wise, was it a regularly conducted activity that

7  you would exchange communications with people in your office

8  regarding how to accommodate disabled voters in voting?

9  A.  Yes.  As a matter of fact, last week we just had

10 Disability Rights Texas, who we work with frequently, visit

11 our office.  They do a two-day training with our judges, and

12 then they also visit locations that we have flagged or voters

13 have flagged as possible ADA violations.

14 Q.  And then I would also like to show LUPE Exhibit 17.

15      THE COURT:  Okay.  So with regard to the objections

16 to 15, though, it does contain hearsay and it's not relevant

17 to the issues I'm discussing, other than the general concept

18 that you got the question and the answer for.  So the hearsay

19 objections to 15 are sustained.  15 is going to be not

20 admitted.

21      MISS PERALES:  Thank you, Your Honor.

22 BY MISS PERALES:

23 Q.  And the other exhibit is LUPE 17.  Miss Wise, is this —

24      MISS HUNKER:  Your Honor, we're going to object for

25 hearsay, the same reasons, that this is an email from a third

LISA WISE — DIRECT

1  party not in court to Miss Wise.  We are also objecting on

2  speculation, lack of personal knowledge, and improper legal

3  conclusion.

4          THE COURT:  So what question did you want to ask?

5          MISS PERALES:  The question I was going to ask

6  Miss Wise is whether it is a regularly conducted activity that

7  she would receive communications from voters regarding

8  complaints they have about the SB 1 ID provision.

9          THE COURT:  I'll allow that question.  The document,

10  though, does contain hearsay, and so 17 is going to be not

11  admitted, but you are free to ask that question.

12  BY MISS PERALES:

13  Q.  Miss Wise, is it a regularly conducted activity of your

14  office that you would receive emails from voters complaining

15  about the ID requirements in SB 1 for mail voting?

16  A.  Yes.

17  Q.  Thank you, Miss Wise.

18          MR. WASSDORF:  I pass the witness.

19          THE COURT:  Any cross?

20          MISS HUNKER:  Yes, Your Honor.

21          MISS RODRIGUEZ ARMENTA:  Excuse me, Your Honor.

22          Sorry.

23          LULAC plaintiffs and I believe other plaintiffs'

24  groups have some additional questions for Miss Wise.

25          THE COURT:  I'm sorry, go ahead.

275

LISA WISE – DIRECT

```
 1          MISS RODRIGUEZ ARMENTA:  Thank you so much.
 2          Good morning, Your Honor.  Elena Rodriguez Armenta
 3  from Elias Law Group for LULAC plaintiffs.
 4                    DIRECT EXAMINATION
 5  BY MISS RODRIGUEZ ARMENTA:
 6  Q.  And, good morning, again, Miss Wise.  First, thank you so
 7  much for being here both today and yesterday.  We recognize
 8  it's an incredibly busy time for all the County EAs.
 9      I'll just touch briefly so on some follow-up topics,
10  basically some of the things you just discussed with
11  Miss Perales.
12      El Paso County has never offered 24-hour voting, is that
13  right?
14  A.  Correct.
15  Q.  But you did consider implementing 24-hour voting during
16  the 2020 General Election, didn't you?
17  A.  We did.
18  Q.  Why did you consider it?
19  A.  During the election we knew we were going to have record
20  turnout in a Presidential, we were in the middle of a
21  pandemic, we were trying to figure out ways that we could
22  limit lines, that the 6-foot rule was very — people were
23  talking about that, making sure you are not too close to
24  people.  We went through a bunch of different options of what
25  can we do to limit the burden on us and voters.
```

LISA WISE – DIRECT

1  Q.  Thank you.  And, in fact, you are aware of voters in El

2  Paso County who struggled to make it to the polls during

3  voting hours, right?

4  A.  I am.

5  Q.  Were you concerned that implementing 24-hour voting could

6  lead to voter fraud?

7  A.  No.

8  Q.  And why not?

9  A.  We process a voter at 1:00 a.m. the same way I would do at

10  1:00 p.m., so the time on that was not an issue with me.

11  Q.  So it's fair to say the processes for voting your office

12  would have implemented from 9 to 5:00 p.m. as opposed to say,

13  1:00 a.m., I believe you said, or midnight, are the same?

14  A.  Correct, yes.

15  Q.  You extended early voting hours to 10:00 p.m. during early

16  voting during in 2020 elections, correct?

17  A.  Yes.

18  Q.  And some early voting sites were open from 10:00 a.m. to

19  10:00 p.m., right?

20  A.  Yes.

21  Q.  Ten sites were open from 10 to 10?

22  A.  Correct.

23  Q.  And at one location you had voters who showed up even

24  after the 10:00 p.m. closing time?

25  A.  Yes, we did.

LISA WISE – DIRECT

1  Q.  And in your experience, keeping polling sites open for

2  longer periods of time makes voting more accessible?

3  A.  Yes.

4  Q.  And in your experience, shortening the amount of time the

5  polling places are open makes voting more burdensome?

6  A.  Yes.

7  Q.  Miss Wise, the majority of ballots rejected in the 2022

8  Primary were rejected because of issues related to voters' ID

9  numbers, right?

10  A.  Yes.

11  Q.  And the majority of applications rejected because of

12  application defects in the 2022 General were due to issues

13  related to voters' ID numbers, right?

14  A.  Yes.

15  Q.  The majority of ballots rejected in the 2022 General, due

16  to defects, were rejected because of voter ID issues, correct?

17  A.  Yes.

18        MISS RODRIGUEZ ARMENTA:  Those are all the questions

19  I have.  Thank you so much again for your time and I pass the

20  which, I believe, to another plaintiffs' group.

21        Thank you, Your Honor.

22        MR. SHOWALTER:  My name is James Michael Showalter of

23  the ArentFox Schiff Law Firm.  I'm here on behalf of HAUL

24  plaintiffs.

25

LISA WISE – DIRECT

1                     DIRECT EXAMINATION
2  BY MR. SHOWALTER:
3  Q.  Thank you for being here, again, Miss Wise.  I know it's a
4  long time and it takes you away from your activities.
5      Are you familiar with the Americans with Disabilities Act?
6  A.  Yes.
7  Q.  Section 208 of the Voting Rights Act?
8  A.  Yes.
9  Q.  Your county has an obligation to ensure that voting is
10  accessible to voters with disabilities?
11  A.  Yes.
12  Q.  Does your office provide any training to your staff on
13  meeting the needs of voters with disabilities in the
14  vote-by-mail process?
15  A.  I mean, we discuss making sure that the assistance is
16  signed, things like that, but as far as specific to ballot by
17  mail, not that I recall.
18  Q.  Has your county conducted any training for staff or
19  volunteers focused on the impact of SB 1 on voters with
20  disabilities?
21  A.  We, like I mentioned earlier, we just completed a training
22  with Texas Right —— or Texas Disability Rights and we do
23  discuss assisting there and we talk about what we require,
24  also with the idea to move the voter if they have lack of
25  mobility to the front of the line, those parts we cover.

LISA WISE — DIRECT

1  Q.  But voting by mail?

2  A.  I don't believe so.

3  Q.  The Secretary of State's Office has not conducted or

4  offered to conduct any training for your staff on the impact

5  of SB 1 on voters with disabilities, correct?

6  A.  I don't recall, I have to be honest.

7  Q.  Has anyone in your office been trained on how to respond

8  to request for reasonable accommodations or modifications

9  related to vote by mail?

10  A.  I don't believe so.

11  Q.  What about regarding physical access?

12  A.  Yes.

13  Q.  Can I —— I'm going to turn your attention to Joint Exhibit

14  Number 1, page 43, and we're going to look at —— I'm going to

15  ask you a couple questions about Sections 5.12 and 5.14.

16      Is your understanding that Section 5.12 involves the

17  signature verification committees?

18  A.  Yes.

19  Q.  What are those?

20  A.  The signature verification committee is a committee made

21  up generally of what we have both parties send members to sit

22  on that committee and they review the signatures on the

23  carrier envelope for accuracy.

24  Q.  Is it your understanding that a signature verification

25  committee must not later than two business days after

LISA WISE - DIRECT

1  discovering a defect on a vote-by-mail ballot determine if it

2  would be possible for the voter to correct the defect and

3  return the carrier envelope before the time the polls are

4  required to close on Election Day?

5  A.  Yes.

6  Q.  And if the committee determines that it would be possible

7  to return the carrier envelope to the voter in time for the

8  voter to correct the defect and return the carrier envelope

9  before the time the polls are required to close on Election

10 Day, is it your understanding that SB 1 would require the

11 signature verification committee to notify a voter of an

12 alleged defect in his or her vote by mail?

13 A.  Yes.

14        THE COURT:  Do you have any longer ones like that?

15 Slow down.

16        MR. SHOWALTER:  I talk with a drawl but at the speed

17 of a New Yorker.

18 BY MR. SHOWALTER:

19 Q.  If the signature verification committee determines that it

20 would not be possible for the voter to receive the defective

21 ballot by mail, correct the defect, and return the carrier

22 envelope by the time the polls close on Election Day, the

23 committee may notify the voter of the defect by telephone or

24 email, is that correct?

25 A.  Yes.

LISA WISE — DIRECT

1  Q.  But under SB 1 the committee may provide notice and such

2  circumstances, but it's not required to, is that right?

3  A.  It's not required.  Our practice is to, but yes.

4  Q.  Has the Secretary of State provided any guidance as to

5  what constitutes sufficient time for the mail, the defective

6  ballots, or the voter, have the voter correct and return the

7  carrier envelope, or you guys just relying on internal

8  policies?

9  A.  I'm sorry.  Can you ask that again?

10  Q.  I should.  Is there any guidance which relates to this

11  that you are aware or is this El Paso County sort of practice

12  that you are operating under?

13  A.  With regards to always notifying them about the ballot?

14  Q.  Yes.

15  A.  I believe how the law is written and I'm not 100 percent

16  sure but it's either notified by the signature verification

17  committee, the ballot board, or ourselves.

18      So as far as I know, every voter we have gets notified,

19  but with more specific guidance than that, there are some

20  advisories on notice of defect, how to handle that, but it's

21  pretty much the same as what the code is relating.

22      I don't know if that answered your question; I'm sorry.

23  Q.  It did.  Can we turn to Section 5.14 of Joint Exhibit 1.

24      This relates to early voting ballot boards.  I could ask

25  you a similar series of questions, but the key ones are:  If

LISA WISE - CROSS

1  there is any defects in early voting ballots, is it El Paso

2  County's policy to always provide notice to a voter?

3  A.  Yes.

4          MR. SHOWALTER:  Thank you.  Nothing further.

5          I'll pass the witness.

6          THE COURT:  Anything else on this side?

7          Any cross?

8          MISS HUNKER:  Yes, your Honor.

9                    CROSS-EXAMINATION

10  BY MISS HUNKER:

11  Q.  Good morning, Miss Wise.

12  A.  Good morning.  Good to see you again.

13  Q.  Yes.  I know you've been here for a while so I'll do my

14  best to be as expedited as possible.

15      El Paso County provides county-wide voting, correct?

16  A.  Yes.

17  Q.  County-wide voting allows a voter to vote by personal

18  appearance from any polling location in the county, correct?

19  A.  Yes.

20  Q.  This is a contrast to precinct-based voting?

21  A.  Correct, yes.

22  Q.  Where a voter could only vote at the polling location in

23  their assigned precinct, is that right?

24  A.  It is, yes.

25  Q.  But in El Paso County a voter can cast their ballot at any

LISA WISE – CROSS

1  polling location in the county?

2  A.  That is correct.

3  Q.  This is true to early voting?

4  A.  Yes.

5  Q.  This is true on Election Day?

6  A.  Yes.

7  Q.  For the 2022 General Election, El Paso County had 33

8  polling locations during the early voting period, correct?

9  A.  Yes.

10 Q.  For the entire early voting period a voter in El Paso

11 County could cast their ballot at any one of these 33

12 locations?

13 A.  Yes.

14 Q.  El Paso County had 118 polling locations on Election Day?

15 A.  Yes.

16 Q.  On Election Day a voter in El Paso County could cast their

17 ballot at any one of these 118 locations?

18 A.  Yes.

19 Q.  And for the second — for Election Day polling locations

20 were open from 7:00 a.m. to 7:00 p.m., correct?

21 A.  Yes.

22 Q.  That was twelve hours of voting, correct?

23 A.  Yes.

24 Q.  And during the early voting period you offered a range of

25 hours, is that right?

LISA WISE – CROSS

1  A.  Yes, that's correct.

2  Q.  And can you sort of — can you tell me what those hours

3  were?

4  A.  Sure.  So we usually have three different sets of hours,

5  which are 8 to 5, 9 to 6, and 10 to 7, and those are based on

6  sometimes when the entity will allow us access to the building

7  but we try to have those, at least one of each of those in

8  every district, commissioner's precinct to offer some people

9  who maybe come after work.

10      So those are the three times we generally stick with.

11  Q.  And those are the same times you stuck with in previous

12  General Elections, is that correct?

13  A.  Yes.  With the exception of the 10 to 10.  Sorry.

14  Q.  You would agree that El Paso County provided its residents

15  ample opportunities to vote in person during the 2022 General

16  Election?

17  A.  We try yes.

18  Q.  And you would agree that El Paso County provided its

19  residents ample opportunities to vote in person during the

20  2020 General Election?

21  A.  Yes.

22  Q.  And you would agree that El Paso County will provide its

23  residents ample opportunities to vote in person in November

24  2023 Constitutional Election?

25  A.  Yes.

LISA WISE – CROSS

1  Q.  And you agree that El Paso County will provide its

2  residents ample opportunities to vote in person in the 2024

3  General Election?

4  A.  Yes.

5  Q.  El Paso County was able to staff all 33 early voting

6  locations in November of 2022 General Election, correct?

7  A.  Yes.

8  Q.  And El Paso County was able to staff all 118 Election Day

9  polling locations in November 2022 General Election?

10 A.  Yes.

11 Q.  El Paso County did not close any polling locations during

12 the early voting period for November 2022 General Election

13 because of lack of staffing?

14 A.  Correct.

15 Q.  El Paso County did not close any polling locations on

16 Election Day for November 2022 General Election because of

17 lack of staffing?

18 A.  Correct.

19 Q.  And you're not aware of any voters who are otherwise

20 eligible to vote in November 2022 General Election but were

21 unable to do so because of staffing shortages at polling

22 locations?

23 A.  Correct.

24 Q.  The average wait time during the early voting period for

25 November 2022 General Election was around 10 to 15 minutes,

LISA WISE — CROSS

1  correct?

2  A.  Yes.

3  Q.  A 10- to 15-minute wait is typical for a mid-term

4  election?

5  A.  In our county, yes.

6  Q.  And you are not aware of any voter who was required to

7  wait a significant amount of time because of personnel

8  shortage during November 2022 General Election?

9  A.  Correct.

10  Q.  A location will not be selected as an early polling

11  location if the location is not ADA compliant, is that

12  correct?

13  A.  Yes, that's correct.

14  Q.  A location will not be selected as an Election Day

15  location if the location is not ADA compliant, is that

16  correct?

17  A.  Yes, that's correct.

18      Can I comment on that just briefly or no?

19  Q.  Yes.

20  A.  Okay.  So that is correct; however, we have run into a

21  couple issues at schools where their campus may have been

22  grandfathered in to the ADA, so we do work with them to try to

23  get us in a building that is ADA compliant, but we have had to

24  either we move after we've been informed by someone that this

25  no longer meets ADA compliance, and sometimes it is a voter.

LISA WISE – CROSS

1  Q.  And so you work to ensure that the Election Day polling
2  locations are ADA compliant?
3  A.  Yes.
4  Q.  And when you receive a complaint that a location is not
5  compliant, you work to correct that, is that correct?
6  A.  Yes.
7  Q.  And El Paso County works to ensure that its residents have
8  easy access to voting locations during election?
9  A.  Yes.
10  Q.  El Paso County works to ensure that its residents have
11  voting locations in close proximity to where residents live
12  and work?
13  A.  Yes.
14  Q.  And you would consider El Paso County's efforts at
15  providing voters easy access to in-person voting locations
16  successful, is that right?
17  A.  Yes, I would.
18  Q.  You are not aware of any reported incident in the 2022
19  General Election where an election judge wished to remove a
20  poll watcher because of the poll watcher's behavior but was
21  unable to do so because of SB 1, is that correct?
22  A.  Yes, that's correct.
23  Q.  The Secretary of State provides trainings for poll
24  watchers?
25  A.  Yes.

LISA WISE – CROSS

1  Q.  A poll watcher must have undergone the training before

2  being certified?

3  A.  Yes.

4  Q.  A poll watcher must have undergone the training before

5  being accepted for service?

6  A.  Yes.

7  Q.  That requirement was added by SB 1, correct?

8  A.  Yes.

9  Q.  And you thought that provision was a helpful addition,

10  correct?

11  A.  Yes, I do.

12  Q.  You took the training offered by the Secretary of State?

13  A.  Yes.

14  Q.  You took the training that the Secretary of State provided

15  poll watchers for the March 2022 Primary Election?

16  A.  Yes.

17  Q.  You also took the training the Secretary of State provided

18  poll watchers for the 2022 General Election?

19  A.  Yes.

20  Q.  You were able to compare the training that the Secretary

21  of State offered the poll watchers for the March 2022 Primary

22  with the training that the Secretary of State offered poll

23  watchers for the November 2022 General Election?

24  A.  Yes.

25  Q.  You thought that the training for the November 2022

LISA WISE - CROSS

1  General Election constituted an improvement compared to the
2  training offered for the early elections that year?
3  A.  Yes.
4  Q.  The November 2022 training required poll watchers to
5  answer questions about what they read before moving on to the
6  next module?
7  A.  That is correct.
8  Q.  The previous version of the training did not contain the
9  quiz component, correct?
10 A.  Yes, that's correct.
11 Q.  That training instructed poll watchers on what conduct
12 they could not engage in?
13 A.  Yes.
14 Q.  Poll watchers must also take an oath, is that right?
15 A.  Yes.
16 Q.  I'm going to introduce State Exhibit 1.
17     Brian, if you can please put that up.
18     And so specifically we're going to look at Section 4.06.
19 Do you see that on the screen?
20 A.  Yes.
21 Q.  And we're going to be looking at Subsection H.  This is
22 the oath that was added by Senate Bill 1, correct?
23 A.  Yes.
24 Q.  And that oath reads, "I swear or affirm that I will not
25 disrupt the voting process or harass voters in the discharge

LISA WISE – CROSS

1  of my duties," did I read that correctly?

2  A.  Yes.

3  Q.  A poll watcher must take this oath before being accepted

4  into service, is that correct?

5  A.  Yes.

6  Q.  And this oath that poll watchers take to not disrupt the

7  voting process or harass voters was added by SB 1, correct?

8  A.  Yes.

9       THE COURT:  Who decides what is disruption and

10  harassing?  How is the poll watcher informed about what's

11  harassing or disruptive conduct?

12       MISS HUNKER:  We are going to be getting into that

13  when the Secretary of State's Office comes to testify.

14  Specifically, they are going to be talking about the training

15  and how that training incorporates these lessons of what the

16  poll watcher can and cannot do.

17       THE COURT:  So just be prepared for my questions

18  about the vagueness of those instructions.

19  BY MISS HUNKER:

20  Q.  I want to go now to Section 4.02 on page 24 of SB 1.  Do

21  you see that in front of you?

22  A.  Yes, I do.

23  Q.  And this has the chapter purpose and watcher duty,

24  correct?

25  A.  Yes.

291

LISA WISE - CROSS

1  Q.  And if we look at the second sentence, it reads, "It is

2  the intent of the legislature that the watchers duly accepted

3  for service under this" — and then it goes to the next page

4  — "chapter be allowed to observe and report on irregularities

5  in the conduct of any election but may not interfere in the

6  orderly conduct of an election."

7      Did I read that correctly?

8  A.  Yes.

9  Q.  It then continues, "To effect that purpose a watcher

10  appointed under this chapter shall observe without obstructing

11  the conduct of an election and call to the attention of an

12  election officer any observed or suspected irregularity or

13  violation of the law in the conduct of the election."

14      Did I read that correctly?

15  A.  Yes.

16  Q.  And so the purpose stated in SB 1 for the poll watchers

17  provisions states expressly that a poll watcher may not

18  interfere in the orderly conduct of an election, is that

19  correct?

20  A.  That's correct.

21  Q.  And that purpose also states that the poll watcher shall

22  observe without obstructing the conduct of an election, is

23  that correct?

24  A.  Yes, that is correct.

25  Q.  It is your understanding that poll watchers are not

LISA WISE – CROSS

1  allowed to communicate with voters?

2  A.  Yes, that's correct.

3  Q.  Poll watchers were not allowed to communicate with voters

4  before the passage of SB 1, correct?

5  A.  That's correct.

6  Q.  And poll watchers are still not allowed to communicate

7  with voters, correct?

8  A.  That is correct.

9  Q.  And that is true after the passage of SB 1, correct?

10  A.  Yes.

11  Q.  Do you recall yesterday discussing the incident about a

12  poll watcher telling people to remove their masks?

13  A.  Yes.

14  Q.  That was inappropriate, correct?

15  A.  Yes.

16  Q.  And you would agree that we need rules to prevent that

17  from happening?

18  A.  Yes, I do.

19  Q.  And you would agree that the legislature in SB 1 required

20  voters to take training?

21  A.  Yes.

22          THE COURT:  Did you say "voters" needed training?

23          MISS HUNKER:  Sorry.  I did and I did not mean to say

24  that.  Thank you, Your Honor.

25

LISA WISE – CROSS

1  BY MISS HUNKER:

2  Q.  You would agree that in SB 1 the legislature required poll

3  watchers to take training?

4  A.  Yes.

5  Q.  And that training instructed poll watchers on the actions

6  they could not take?

7  A.  Yes.

8  Q.  And you would agree that SB 1, the legislature requires

9  poll watchers to take an oath, correct?

10  A.  Yes.

11  Q.  And that oath has poll watchers swear not to disrupt the

12  voting process or harass voters, correct?

13  A.  Yes.

14  Q.  And in SB 1 the legislature stated that the purpose of

15  poll watchers was to have them observe but not interfere, is

16  that correct?

17  A.  Yes.

18  Q.  And so through SB 1 the legislature enacted provisions

19  aimed at preventing poll watchers from harassing voters,

20  correct?

21  A.  Yes.

22  Q.  Do you recall discussing with counsel an incident in 2022

23  regarding a poll watcher that was standing too close to

24  voters?

25  A.  Yes.

LISA WISE – CROSS

1  Q.  And you did not conduct an investigation after the

2  incident, is that correct?

3  A.  Correct.

4  Q.  And you don't have personal knowledge of the incident, is

5  that correct?

6  A.  I do not have personal knowledge, no.

7  Q.  And you don't know whether the voters referenced in the

8  email were obtaining assistance from the election workers, is

9  that correct?

10  A.  I do not know that, no.

11  Q.  And you don't know if the activity was observable as

12  defined by the election code, is that correct?

13  A.  I do not know that, correct.

14  Q.  I want to quickly bring up Joint Exhibit Number 5.

15     Do you see the exhibit on your screen?

16  A.  I do.  Yes, I do.  I'm sorry.

17  Q.  Can you tell me what this exhibit is?

18  A.  This is an election advisory, that we receive advisories

19  from the Secretary of State's Office.  This one is specific

20  to, it looks, the poll watcher requirement changes.

21  Q.  And you received this election advisory, is that correct?

22  A.  Yes.

23  Q.  And we can see that the date is February 4th, 2022?

24  A.  Yes.

25  Q.  I want to quickly look at page 3, second paragraph, where

LISA WISE – CROSS

1  it states –– previous page.
2      Do you see where it says, "while a poll watcher may not be
3  –– "may be present?"
4  A.  Yes.
5  Q.  And so the advisory reads, "While a poll watcher may be
6  present if an election worker is assisting a voter, a poll
7  watcher may not be present at the voting station when a voter
8  is preparing the voter's ballot or is being assisted by a
9  person of the voter's choice including a person also serving
10  as an interpreter at the voting station."
11      Did I read that correctly?
12  A.  Yes.
13  Q.  And so a poll watcher may be present if an election worker
14  is assisting the voter, is that right?
15  A.  Yes.
16  Q.  And that allowance preexisted SB 1, correct?
17  A.  Yes.
18  Q.  However, outside of that one exception, a poll watcher may
19  not be present at the voting station, is that correct?
20  A.  Correct.
21  Q.  And a poll watcher may not watch the voter as that voter
22  is preparing the ballot, correct?
23  A.  Correct.
24  Q.  And the poll watcher may not watch the voter being
25  assisted by a person of their choice?

LISA WISE — CROSS

1  A.  Correct.

2  Q.  You can put away this exhibit.

3      Let's pull up SB 1 again.  Specifically, we're going to

4  look at Section 4.09.  Do you have that in front of you?

5  A.  Yes, I do.

6  Q.  And so Section 4.09 amended Section 33.061(a) of the

7  election code, is that correct?

8  A.  Yes.

9  Q.  And Subsection A begins with, "A person commits an offense

10  if the person serves an official capacity at a location at

11  which the presence of watchers is authorized and knowingly

12  prevents a watcher from observing activity or procedure the

13  person knows the watcher is entitled to observe, including by

14  taking any action to obstruct the view of a watcher, or

15  distance the watcher from the activity or procedure to be

16  observed in a manner that would make the observation not

17  reasonably effective."

18      Did I read that correctly?

19  A.  You did.

20  Q.  And do you notice where it says, "a person commits an

21  offense," is not underlined?

22  A.  Yes.

23  Q.  And you are aware that it was an offense to obstruct a

24  poll watcher pre—SB 1?

25  A.  I am.

297

LISA WISE – CROSS

1  Q.  And do you see where it has the lines that are underlined,

2  the words that are underlined?

3  A.  Yes.

4  Q.  And do you see how it adds, "the person knows the watcher

5  is entitled to observe?"

6  A.  Yes.

7  Q.  And so this adds a requirement that the person obstructing

8  the watcher know that the watcher is entitled to view that

9  activity?

10  A.  Yes.

11  Q.  A poll watcher is not entitled, as we stated, to observe

12  the voter prepare and cast their ballot, correct?

13  A.  I believe the language says "prepare," but as far as, I

14  think that's some of the question on the casting of the

15  ballot.

16  Q.  So let me rephrase the question.  A watcher is not

17  entitled to observe a voter prepare their ballot?

18  A.  Correct.

19       THE COURT:  What does prepare a ballot mean, as

20  opposed to actually filling out the ballot?

21       MISS HUNKER:  Well, prepare would include multiple

22  actions.  It would include filling out the ballot, and we

23  would argue also includes inserting the ballot into the

24  machine since that is part of the preparation for it to be

25  counted.

LISA WISE – CROSS

1    THE COURT:  Let me make sure I understand what you
2  just told me.  So you are saying a poll watcher gets to watch
3  all of that happening?

4    MISS HUNKER:  No, Your Honor.  We are saying the
5  opposite.  We are saying that a poll watcher, with one limited
6  exception that preexisted SB 1, cannot watch and observe the
7  voter prepare the ballot, fill out the ballot, or cast the
8  ballot.

9    THE COURT:  So what are you telling me that a poll
10  watcher can do?

11    MISS HUNKER:  A poll watcher can observe that process
12  if the voter is being assisted by an election worker.  They
13  could also watch check-in.

14    THE COURT:  So if they are being assisted, they can
15  see every step, including the actual filling of the ballot?

16    MISS HUNKER:  Specific context for that is if it's
17  being assisted by an election worker.

18    THE COURT:  That's the context of my question.

19    MISS HUNKER:  Yes.

20    THE COURT:  If there is assistance being provided by
21  an election worker, your position, the State's position, is
22  that the poll watcher gets to see the voter actually exercise
23  his vote and who he voted for or what position he voted for.

24    MISS HUNKER:  We would argue it doesn't go that close
25  where the person can see the lines but they would be able to

LISA WISE - CROSS

1 | see the activity to ensure that the election worker was not
2 | unduly pressuring or coercing the voter.
3 |     THE COURT:  So —
4 |     MISS HUNKER:  And that particular allowance would —
5 | preexisted SB 1 and is not being challenged in this case.
6 |     THE COURT:  Well, what's being challenged, I thought,
7 | was the underlying red-lined language here as being vague.
8 |     MISS HUNKER:  That is their challenge, Your Honor.
9 |     We would argue that there are explicit, within the —
10 | within the entirety of the election code relating to poll
11 | watchers, including provisions that you're not seeing in SB 1
12 | because SB 1 only includes the language that was changed.
13 |     THE COURT:  Right.  So where in this red-lined
14 | language does it clearly tell a poll watcher that they can't
15 | see when being assisted the voter actually voting, his choice?
16 |     MISS HUNKER:  So I would have to go back to the
17 | election code.  That is a separate provision.  It is —
18 |     Pull up — it may be 33.057.  Brian, if you can
19 | please pull up the election code, Section 33.057.
20 |     So if you see, Your Honor, Section A provides the
21 | exception.  "A watcher is entitled to be present at the voting
22 | station when the voter is being assisted by an election
23 | officer."
24 |     But if you look at Subsection B, it explicitly says,
25 | "A watcher may not be present at the voting station when a

LISA WISE − CROSS

1  voter is preparing the voter's ballot or is being assisted by

2  a person of the voter's choice."

3         THE COURT:  Well, how does the watcher know that it's

4  being prepared in accordance with the voter's wishes, if the

5  watcher doesn't actually see what — doesn't the watcher have

6  to hear what the voter's preferences were, and then actually

7  get to see whether or not the ballot's completed with whatever

8  he heard?

9         MISS HUNKER:  Are you talking about with respect to

10  Subsection A?

11         THE COURT:  Yes.

12         MISS HUNKER:  So there would have to be some ability

13  for the watcher to be able to observe the instructions that is

14  given to the election worker since the transparency is

15  designed to ensure that the person who is offering the

16  assistance, the election worker, is not stepping across the

17  line.

18         THE COURT:  So they've got to be — the watcher has

19  got to be allowed to be close enough to hear and close enough

20  to actually see?

21         MISS HUNKER:  For Subsection A, yes.

22         THE COURT:  Thank you.

23         MISS HUNKER:  And so I'm going to reask my question

24  because I don't remember if I've gotten an answer.

25         THE COURT:  That's my fault.

LISA WISE — CROSS

1  BY MISS HUNKER:

2  Q.  A poll — with the exception of when a voter is being

3  assisted by an election worker, a poll watcher is not entitled

4  to observe the voter prepare their ballot, correct?

5  A.  Correct.

6  Q.  And if we — I believe it was LUPE Exhibit 119 — no.

7  Wrong one.  Never mind.  I did not write the number down.

8      You discussed earlier today with Miss Perales that you

9  were concerned about your election worker standing between the

10 poll watcher and the voter preparing their ballot, do you

11 recall that conversation?

12 A.  Yes.

13 Q.  And we had just discussed that obstructing the poll

14 watcher is only an offense if the poll watcher is entitled to

15 observe the activity, correct?

16 A.  Correct.

17 Q.  But with the exception of when an election worker is

18 assisting a voter?

19 A.  Yes.

20 Q.  Assisting a voter, that the poll watcher is not entitled

21 to observe the voter prepare their ballot?

22 A.  The preparation of a ballot, yes, correct.

23 Q.  And so you do not know whether the poll watcher was

24 entitled to observe the activity that was described in the

25 email in your conversation with Miss Perales, is that correct?

LISA WISE – CROSS

1  A.  I do not know that; however, even if they were assisting,

2  I would still not want a poll watcher in between the assister

3  and the voter.

4          THE COURT:  I don't know why I'm still stuck on this

5  one.

6          So let me give you a hypothetical.  A poll watcher

7  only speaks English but the person casting the ballot with

8  assistance are both speaking in Spanish, does the poll watcher

9  now have some right to get a translator and get into this

10  conversation?

11          MISS HUNKER:  No, Your Honor.  If the campaign or

12  political party or candidate had wished for the individual to

13  be able to speak Spanish, they could have appointed an

14  individual to that location who spoke the language.  The only

15  requirement ––

16          THE COURT:  But there's rights now extended to poll

17  watchers.  So do they have a right to a translator?

18          MISS HUNKER:  They do not.  The only right that they

19  have is to be near enough to see and hear the activity.

20          THE COURT:  Near enough to hear and see ––

21          MISS HUNKER:  The activity.

22          THE COURT:  –– and all that's not defined about how

23  many feet you have to be close or away from.

24          MISS HUNKER:  What we're about to get to, Your Honor,

25  is that "conveniently" was also not defined.

LISA WISE - CROSS

1        THE COURT:  Conveniently not defined by who?

2        MISS HUNKER:  Well, that's just the point, what does

3   conveniently mean?  The language that "near enough to see and

4   hear" is replacing a previous term, which was "conveniently

5   near."  And conveniently near was not defined as well, and so

6   I'm about to talk to the witness —

7        THE COURT:  So the legislature an ill-defined statute

8   and replaced it with another ill-defined statute?

9        MISS HUNKER:  Our argument, Your Honor, would be that

10   see and hear is something that is more measurable and is more

11   objective than convenient, particularly since the language in

12   the original statute did not define convenient to who.

13        And that's where you have a big dispute that we're

14   going to bring out during the course of this trial, that

15   pre-SB 1 there was a dispute on was it convenient to the

16   election worker or convenient to the poll watcher, and without

17   that clarity you had many conflicts in the 2020 election,

18   specifically in Travis County and a few of the other counties

19   because there was not that clear line.

20        So this was the legislators attempt at creating what

21   they thought and was a more measurable approach of how poll

22   watchers would be able to observe activities at the polling

23   place.

24        THE COURT:  Thank you.

25

LISA WISE – CROSS

```
 1  BY MISS HUNKER:
 2  Q.  Let's look at Section 4.07.  And so in 4.07 the
 3  legislature struck out "sit or stand conveniently near the
 4  election officers," to "sit or stand near enough to see and
 5  hear," is that correct?
 6  A.  Yes.
 7  Q.  Now, you assumed that the word "conveniently" meant what
 8  was convenient to the election worker, correct?
 9  A.  Yes.  We erred on that conveniently was what is allowing
10  the poll worker to process the voter convenient to them, yes.
11  Q.  The election code, however, did not define conveniently in
12  the statute, correct?
13  A.  Correct.
14  Q.  The election code did not state whether the word
15  "conveniently" referenced the convenience of the election
16  worker versus the convenience of the poll watcher?
17  A.  Correct.
18  Q.  And the Secretary of State's Office did not advise you on
19  the definition of conveniently?
20  A.  Correct.
21  Q.  The Secretary of State's Office did not advise you whether
22  the word "conveniently" referenced the convenience of the
23  election worker versus the convenience of the poll watcher?
24  A.  That's correct; however, we would have trainings on how to
25  set up your polling sites and there would always be — I
```

LISA WISE - CROSS

1  shouldn't say always, but there were diagrams that had where a
2  watcher, and they were always at the check-in table, is where
3  they would be from SOS on some direction.
4  Q.  And you don't know if other counties in Texas interpret
5  the word "conveniently" differently, as meaning what is
6  convenient for the poll watcher?
7  A.  Correct.
8  Q.  And you don't know if poll watchers interpreted the word
9  "conveniently" differently, as meaning what is convenient for
10 the poll watcher?
11 A.  Correct.
12 Q.  And so I want to turn to a new topic.
13     You are aware that on occasion voters will ask for
14 assistance to vote?
15 A.  Yes.
16 Q.  When a voter requests assistance to vote, the voter can be
17 provided assistance by the election worker at the polling
18 location, correct?
19 A.  Yes.
20 Q.  You are not aware of any incident in the November 2022
21 General Election where an election worker refused to assist a
22 voter after the voter requested assistance?
23 A.  I'm not aware of, no.
24 Q.  And you are not aware of any incident in the November 2022
25 General Election where the election worker refused to take the

LISA WISE – CROSS

1  oath of assistance?

2  A.  No.

3  Q.  The voter can also request assistance from a third party,

4  correct?

5  A.  Yes.

6  Q.  You are not aware of any incident in November 2022 General

7  Election where a third party refused to assist a voter after

8  the voter requested their assistance?

9  A.  No.

10  Q.  You are not aware of any incident in November 2022 General

11  Election where a third party refused to take the oath of

12  assistance, correct?

13  A.  Correct.

14  Q.  And you are unaware of any incidents in November 2022

15  General Election where a third party refused to provide their

16  relationship to the voter?

17  A.  Correct.

18  Q.  You are unaware of any instance where a voter in El Paso

19  County was unable to obtain voting assistance in the

20  November 2022 General Election, correct?

21  A.  Correct.

22  Q.  And you are unaware of any individual who refused to

23  transport seven or more individuals to a polling location

24  because of a requirement that they fill out the form

25  stipulated in Section 64.0069 of the election code?

LISA WISE – CROSS

1   A.  Correct.

2   Q.  And you are unaware of any voter who was unable to find

3   transportation to the polls because of the requirement that a

4   person who transports seven or more people to a polling place

5   fill out the form stipulated in Section 64.009?

6   A.  Correct.

7   Q.  The requirement that a person who transports seven or more

8   voters fill out a form, that only applies to curbside voting,

9   correct?

10  A.  Correct.

11  Q.  It does not apply when a person transports seven or more

12  voters and those voters enter the polling place to vote,

13  correct?

14  A.  Correct.

15  Q.  And you are unaware of any person who transported seven or

16  more individuals to a polling location to vote curbside and

17  was required to fill out a form, pursuant to Section 64.009?

18  A.  Correct.

19  Q.  And you did not transmit to the Secretary of State any of

20  the affidavits that were required under Section 65.009 of the

21  election code because that person transported seven or more

22  individuals to vote curbside?

23  A.  Correct.

24  Q.  And you would consider El Paso County's in-person voting

25  program a success, correct?

LISA WISE – CROSS

1   A.   Yes.  I believe we do the best with what we have.

2   Q.   I think you guys do a great job.

3   A.   Thank you.

4   Q.   To the best of your knowledge, you are not aware of any

5   voters who were unable to vote in person in El Paso County

6   during the November 2022 General Election because of SB 1?

7   A.   I'm sorry.  Could you repeat?

8   Q.   Sure.  To the best of your knowledge, you are not aware of

9   any voter who was unable to vote in person in El Paso County

10  during November 2022 General Election because of SB 1?

11  A.   Correct.

12  Q.   Your office did not receive any ADA complaints with

13  respect to the November 2022 General Election, is that right?

14  A.   I don't –– yes, I believe that's correct.

15  Q.   And you would agree that the El Paso County Election

16  Administrator's Office works to ensure that its voting program

17  is accessible to voters with disabilities?

18  A.   Yes.

19  Q.   You would agree that the El Paso County Election

20  Administrator's Office takes its responsibilities under the

21  ADA seriously?

22  A.   Very, yes.

23  Q.   And you are aware that voters with disabilities have the

24  option of requesting an accommodation or change in the voting

25  procedure?

LISA WISE – CROSS

1  A.  Yes.

2  Q.  And to your knowledge, your office did not receive a

3  request for accommodation regarding any of SB 1's provisions,

4  is that correct?

5  A.  Correct.

6  Q.  To your knowledge, your office did not receive a request

7  for accommodation regarding the requirement that assisters

8  take the oath before assisting the voter, correct?

9  A.  Correct.

10  Q.  And to your knowledge, your office did not receive a

11  request for accommodation regarding the requirement that

12  mail-in voters put the social security number or Texas ID

13  number on the mail ballot, correct?

14  A.  You mean a disability accommodation?

15  Q.  That's correct.

16  A.  Correct.

17  Q.  To your knowledge, your office did not receive any

18  disability request for accommodation regarding the cure

19  process for ballots by mail?

20  A.  Correct.

21  Q.  Let's turn back to SB 1.  Specifically, we're going to be

22  looking at Section 1.08.  And do you see Section 1.08 in front

23  of you?

24  A.  I do now, yes.  I do now.  Thank you.

25  Q.  And this adds a section to the election code, correct?

310

LISA WISE — CROSS

1  A.  Yes.

2  Q.  And the title of this section is called Reasonable

3  Accommodation or Modification, correct?

4  A.  Yes.

5  Q.  And it reads, "A provision of this code may not be

6  interpreted to prohibit or limit the right of a qualified

7  individual with a disability from requesting a reasonable

8  accommodation or modification to any election standard

9  practice or procedure amended by law or rule that the

10  individual is entitled to request under federal or state law?"

11  A.  Yes.

12  Q.  For mail voting, a voter can submit their ABBM anytime of

13  the year, correct?

14  A.  After January — yes.

15  Q.  And just to clarify, when I say "ABBM," you understand I

16  mean Application for Ballot by Mail?

17  A.  I do.

18  Q.  In other words, a voter who qualified to vote by mail in

19  November 2022 Election could have submitted an ABBM as early

20  as January 1st, 2022?

21  A.  Yes.

22  Q.  Similarly, a voter who qualifies to vote by mail for the

23  November 2024 Election will be able to submit an application

24  for ballot by mail as early as January 1st, 2024?

25  A.  Yes.

LISA WISE – CROSS

1  Q.  For some voters, Texas law permits them to submit an

2  annual application for ballot by mail?

3  A.  Yes.

4  Q.  For these voters the voter can check a box on the

5  application for ballot by mail for an annual application,

6  correct?

7  A.  Yes.

8  Q.  Then, once their application is accepted, they will

9  receive a ballot for every election that their jurisdiction is

10  participating in that year?

11  A.  Yes.

12  Q.  They will not need to submit an additional application for

13  ballot by mail until the next calendar year?

14  A.  Yes.

15  Q.  By way of example, if a voter successfully submitted an

16  annual application for ballot by mail in January 2022, they

17  would not need to submit a second application for ballot by

18  mail to receive a ballot for November 2022 General Election?

19  A.  Correct.

20  Q.  Likewise, if a voter has their annual application for

21  ballot by mail accepted in January 2024, they would not need

22  to submit a second application for ballot by mail to receive a

23  ballot for November 2024 General Election, correct?

24  A.  Correct.

25  Q.  The General Election is usually held on the first Tuesday

LISA WISE – CROSS

1  in November, correct?

2  A.  Yes.

3  Q.  That means a voter has eleven months in which to submit an

4  application for ballot by mail — correct? — for

5  November 2022 — for —

6  A.  November election?

7  Q.  Yes.

8  A.  Yes.

9  Q.  There are two grounds of eligibility for an annual

10  application for ballot by mail, correct?

11  A.  Yes.

12  Q.  One ground of eligibility is age?

13  A.  Yes.

14  Q.  The other ground of eligibility is disability?

15  A.  Yes.

16  Q.  And I want to turn to LUPE Exhibit 326.

17      So you had mentioned earlier with Miss Perales that where

18  it says Y65 means that a voter has an annual application by

19  reason of age?

20  A.  Yes.

21          MISS HARTNETT:  Excuse me.  I'm sorry.  This document

22  has the personal information.

23          THE COURT:  It's okay for now.

24          MISS HARTNETT:  It's in the gallery.

25          THE COURT:  I understand, but that's just — we're

LISA WISE — CROSS

1  going to have to work through this.  I'm more concerned about
2  what takes place publicly once these documents get filed, but
3  thank you for that.
4  BY MISS HUNKER:
5  Q.  Whereas the initials RM means regular mail?
6  A.  Yes.
7  Q.  And a regular mail voter is somebody who just has the
8  ballot for that particular election?
9  A.  That is correct, yes.
10 Q.  And there was another code type for disability, is that
11 correct?
12 A.  Yes.
13 Q.  And I notice that for the annual voters the majority are
14 over 65, is that correct?
15 A.  Yes, that is correct.
16 Q.  And so is it fair to say that the most common reason for
17 securing an annual ballot by mail application is age over 65?
18 A.  Yes.
19 Q.  You can put that down.
20    You testified yesterday that SB 1 necessitated a change in
21 the ABBM form, is that correct?
22 A.  Yes.
23 Q.  Specifically, the Secretary of State added a place on the
24 application for ballot by mail for the voter to enter their ID
25 number, is that right?

LISA WISE — CROSS

1  A.  Yes.

2  Q.  The previous form did not have a place on the ABBM for the

3  voter's ID number, correct?

4  A.  Yes.

5  Q.  You testified yesterday that the revised ABBM form came

6  late, just before January, is that correct?

7  A.  I believe so.

8  Q.  You also — I believe you also testified that in early

9  2022 some voters submitted the wrong version of the form?

10  A.  Correct.

11  Q.  The example you gave was a voter who downloaded the ABBM

12  earlier in December before the revised form was posted on your

13  website?

14  A.  Correct.

15  Q.  If a voter submitted a — the old version of the form and

16  did not add their ID number, that ABBM would be rejected,

17  correct?

18  A.  Yes.

19  Q.  And the use of old ABBM forms was one reason why the

20  rejection rate for application for ballot by mail was high in

21  the beginning of 2022?

22  A.  It was one of the reasons, yes.

23  Q.  Prior to 2021 your office did not have a mechanism to

24  track the acceptance and rejection rates of applications for

25  ballot by mail?

LISA WISE — CROSS

1   A.  Correct.

2   Q.  Someone in your office did not have the mechanism to track

3   the reason and application for ballot by mail would have been

4   rejected, correct?

5   A.  Correct.

6   Q.  Your office only began tracking that information in 2021,

7   correct?

8   A.  Correct.

9   Q.  It's fair to say that if an application for ballot by mail

10  arrives in your office, a notice of defect will go out within

11  24 to 48 hours in the event that the application for ballot by

12  mail did not satisfy the ID number requirements?

13  A.  That's what we've been able to do so far, yes.

14  Q.  It's fair to say you try to get the notice of defect out

15  as fast as possible to inform the voter of a need to cure?

16  A.  Yes.

17  Q.  And you are an off-line county, correct?

18  A.  We are.

19  Q.  So when an application for ballot by mail comes in, your

20  office first checks your off-line county database to determine

21  whether the ID number is in the system, is that right?

22  A.  Yes.

23  Q.  And in the event that the number is not in your system,

24  you check the TEAM's database, correct?

25  A.  That is correct.

316

LISA WISE — CROSS

1   Q.  And just for clarity of the record, the TEAM's database is

2   the voter registration database maintained by the Secretary of

3   State's Office, correct?

4   A.  Yes.

5   Q.  Federal law requires that ballots go out 45 days to

6   military and overseas voters before a federal election,

7   correct?

8   A.  Yes.

9   Q.  And your office met that deadline in the November 2022

10  General Election, correct?

11  A.  Yes.

12  Q.  And ballots tend to go out a few days later for

13  nonmilitary voters, is that right?

14  A.  Yes, within the next week for sure.

15  Q.  And so within the next week you are able to send out the

16  ballots for nonmilitary and overseas?

17  A.  For the requests that we have up to that point, yes.

18  Q.  And when a mail ballot comes in, your office removes the

19  flap to check whether or not the ID number was included on the

20  carrier envelope, correct?

21  A.  Yes.

22  Q.  And then your office checks the ID number on the carrier

23  envelope to the voter's registration file, correct?

24  A.  Yes.

25  Q.  If the voter put a phone number on the ballot, you call

LISA WISE - CROSS

1  the voter and let them know what their options are, is that

2  correct?

3      I think I asked that question wrong.

4  A.  Okay.

5  Q.  If you have a phone number, you will call the voter and

6  let them know what their options are, correct?

7  A.  If there is a defect?

8  Q.  Yes.

9  A.  Yes.

10  Q.  And your office recommends to voters that they put their

11  phone number and email on their application for ballot by

12  mail, correct?

13  A.  Yes.  We do, and that, in fact, is the new change on the

14  ABBM.  It used to say "optional."  With some legislation that

15  came through this year, it now kind of gives a little blurb of

16  why it's important to do that.

17  Q.  And so through the new legislation, the legislature is

18  informing the voter why it's important for them to put their

19  phone number and email address, is that right?

20  A.  They have added that to the application, yes.

21          THE COURT:  Is that from the legislator or from the

22  Secretary of State's Office?

23          THE WITNESS:  That's from the legislation that was

24  passed this most recent session.  So that's why the form has

25  been updated that I spoke earlier about.

LISA WISE - CROSS

1          MISS HUNKER:  And Your Honor, we will be at various

2    points introducing evidence regarding the new legislation,

3    since many of those bills came into effect September 1st.

4          THE COURT:  And to complicate things further then, so

5    the September 1st amendments, are any of those affecting any

6    of the challenges?  Did they amend any of these challenged

7    provisions?

8          MISS HUNKER:  They did, Your Honor.

9          THE COURT:  On that happy note, let's take a

10    15-minute break.

11      (Recess)

12    BY MISS HUNKER:

13    Q.  Miss Wise, in the event the application for ballot by mail

14    does not have a phone number or email, your office checks

15    their voter registration file to determine whether there is a

16    phone number or email in the system?

17    A.  Yes.

18    Q.  And typically your office will issue the notice of defect

19    within 24 to 48 hours of receiving the ballot, is that

20    correct?

21    A.  Yes.

22    Q.  And your office will typically communicate to the voter or

23    attempt to communicate to the voter about the defect within 24

24    to 48 hours of receiving the ballot, is that correct?

25    A.  Yes.

LISA WISE - CROSS

1  Q.  So military and overseas voters have the option of
2  submitting an FPCA, is that correct?
3  A.  Yes.
4  Q.  And can you just please tell the Court what an FPCA is?
5  A.  It's the Federal Post Card Application for a ballot by
6  mail for military and overseas.
7  Q.  And an FPCA voter can cure an identification number defect
8  by resubmitting their signature sheet with the numbers, is
9  that correct?
10 A.  Yes.
11 Q.  And your office emailed FPCA voters notification of the
12 defect, is that correct?
13 A.  Yes.
14 Q.  And these FPCA voters are able to email you that signature
15 sheet, correct?
16 A.  Yes.
17 Q.  And that email signature sheet can have the corrected
18 identification number information, correct?
19 A.  Yes.
20 Q.  And so an FPCA voter would be notified by a defect via
21 email and cured via email, is that correct?
22 A.  Yes.
23 Q.  Your office was able to reduce mail ballot rejection rates
24 in November 2022 Election compared to the March 2022 Primary,
25 correct?

320

LISA WISE – CROSS

1   A.  Yes.

2   Q.  For the March 2022 Primary, the mail ballot rejection rate

3   was approximately 14 percent, correct?

4   A.  Yes.

5   Q.  For the November 2022 General Election, the mail ballot

6   rejection rate was initially reported at 1.97 percent,

7   correct?

8   A.  Yes.

9   Q.  And your office recently communicated that the rejection

10  rate is 2.01 percent, correct?

11  A.  Yes.

12  Q.  Your office worked to reduce the mail ballot rejection

13  rates, correct?

14  A.  Yes.

15  Q.  Your office included an insert with the application for

16  ballot by mail, correct?

17  A.  Yes.

18  Q.  That insert informed voters of the ID number requirement?

19  A.  Yes.

20  Q.  Your office created a Spanish version of that insert?

21  A.  Yes, that's correct.

22  Q.  In the event a voter's application for ballot by mail was

23  rejected because their number did not appear in your system,

24  your office sent out a voter registration form along with the

25  notice of defect?

LISA WISE — CROSS

1   A.   Initially we sent the registration form with the

2   application for the November election, but we did that in

3   response for the March election.

4   Q.   So after the primary but in the lead up to the

5   November 2022 Election your office amended your practices to

6   include a voter registration form with the application for

7   ballot by mail?

8   A.   With the initial one, yes.

9   Q.   And that's because a voter can update the ID numbers for

10  the voter registration file by submitting a voter registration

11  form with those numbers?

12  A.   Yes.

13  Q.   Voters, in fact, must provide either a Texas ID number or

14  social security number to register to vote, correct?

15  A.   That is the — yes, now that is the law.

16  Q.   And let's take a look at that.  If you can pull up Texas

17  Election Code Chapter 13, specifically 13.002(c).

18      And so this is the section that has to do with what is

19  required on the application for register to vote, correct?

20  A.   Yes.

21  Q.   And it says the following information, "The applicant's

22  Texas driver's license number, or number of a personal

23  identification card issued by the Department of Public Safety,

24  B, if the applicant has not been issued a number described by

25  paragraph A, the last four digits of the applicant's social

322

LISA WISE - CROSS

1  security number, or C, a statement by the applicant that the
2  applicant has not been issued a number described by paragraph
3  A or B."
4      Did I read that correctly?
5  A.  Yes.
6  Q.  And so this appears to include a hierarchy, correct?
7  A.  Yes.
8  Q.  And let's take a look at the Help America Vote Act, which
9  is 52 U.S.C., Section 21083(A).  Do you see where it says
10 verification of a voter's registration information?
11 A.  Yes, I do.
12 Q.  And then let's look at AI, "Acceptance provided in clause
13 I2, notwithstanding any other provision of law, an application
14 for voter registration for an election for federal office may
15 not be accepted or processed by a state unless the application
16 includes, one, in a case the applicant who has been issued a
17 current and valid driver's license, the applicant's driver's
18 license number; or, two, in the case of any other applicant,
19 the last four digits of the applicant's social security
20 number," is that right?
21 A.  Yes.
22 Q.  And that appears to include a hierarchy, correct?
23 A.  Yes.
24 Q.  And so under the Help America Vote Act a voter is required
25 to provide their driver's license if it has been issued,

LISA WISE — CROSS

1  correct?

2  A.  Correct.

3  Q.  And in the event it was not issued, they can present their

4  last four digits of their social security number, correct?

5  A.  Correct.

6  Q.  Thank you, Brian.  You can put that aside.

7      Your office also included an insert in the balloting

8  materials, correct?

9  A.  Yes, correct.

10 Q.  That insert informed voters of the ID number requirement,

11 correct?

12 A.  Correct.

13 Q.  Your office also engaged in voter education?

14 A.  Yes.

15 Q.  You conducted interviews?

16 A.  Yes.

17 Q.  You had social media reminders?

18 A.  Yes.

19 Q.  You filled out the ID number requirement when speaking

20 with community groups?

21 A.  Yes.

22 Q.  You utilized material from the Secretary of State's

23 Office?

24 A.  Yes.

25 Q.  Your office conducted interviews in both English and

LISA WISE – CROSS

1  Spanish, correct?

2  A.  Yes.

3  Q.  The social media posts were available in both English and

4  Spanish, correct?

5  A.  Yes.

6  Q.  And the materials you got from the Secretary of State's

7  Office was available in both English and Spanish, correct?

8  A.  Yes.

9  Q.  And it's fair to say that you incorporated voter education

10  about the ID number requirement into your normal voter

11  education practices?

12  A.  Yes.

13  Q.  You are aware that the Secretary of State's Office

14  harvested social security numbers and driver's licenses from

15  the Department of Public Safety's database, correct?

16  A.  Yes.

17  Q.  And after the Secretary harvested numbers from DPS, you

18  observed having less voters with neither a social security

19  number nor Texas ID number?

20  A.  We had less, yes.

21  Q.  After the Secretary of State harvested numbers from DPS

22  you observed that there were fewer voters that had only one

23  number, either a social security number or a Texas ID number

24  in your system, as opposed to both?

25  A.  Yes.

LISA WISE – CROSS

1  Q.  Having the Secretary of State update the numbers in the

2  voter registration database helped reduce the number of ABBMs

3  rejected, correct?

4  A.  Yes.

5  Q.  Having the Secretary of State update the numbers in the

6  voter registration database helped reduce the number of

7  ballots rejected, correct?

8  A.  Yes, I believe so.

9  Q.  And you were aware that the harvesting process is

10  conducted annually, correct?

11  A.  Yes.

12  Q.  There were fewer voters with neither a social security

13  number nor Texas ID number in their voter record in the

14  November 2022 General Election as compared to the primaries?

15  A.  Yes.

16  Q.  There were fewer voters with either a social security

17  number or a Texas ID number, but not both, in the voter

18  registration file in the November 2022 General Election as

19  compared to the primaries?

20  A.  Yes.

21  Q.  But November 2022, some voters had already navigated the

22  mail voting ID requirement, correct?

23  A.  That is correct.

24  Q.  Familiarity with the ID number requirement also helped

25  reduce the rejection rate, correct?

LISA WISE – CROSS

1  A.  I believe so, yes.

2  Q.  And you observed voters having less confusion in the

3  November 2022 General Election regarding ID number requirement

4  as compared to the primaries?

5  A.  Yes.

6  Q.  There were multiple type of defects that can result in an

7  application for ballot by mail being rejected, correct?

8  A.  Yes.

9  Q.  And there are multiple types of defects that can result in

10  a mail ballot being rejected, correct?

11  A.  Yes.

12  Q.  Mail ballots were rejected in El Paso County in 2022 for

13  defects other than the ID number requirement, correct?

14  A.  Yes.

15  Q.  The mail ballot rejection rate includes mail ballots that

16  were rejected for reasons other than the ID number requirement

17  introduced by SB 1, correct?

18  A.  Yes.

19  Q.  Let's look once again at SB 1, specifically Section 5.13.

20  Do you have that in front of you?

21  A.  I do, yes.

22  Q.  And if you see Subsection B, it says, "A ballot may only

23  be accepted if," do you have that part in front of you on the

24  screen?

25  A.  I do, yes.

LISA WISE – CROSS

1  Q.  It then lists a number of requirements that a ballot must
2  meet before being accepted, correct?
3  A.  Yes.
4  Q.  For example, a carrier envelope must be properly executed,
5  correct?
6  A.  Correct.
7  Q.  The voter signature cannot have been determined to be
8  executed by someone other than the voter?
9  A.  Correct.
10 Q.  And if we scroll down, you'll see a statement of residence
11 must be returned in the carrier envelope for voters required
12 to provide it, correct?
13 A.  Yes.
14 Q.  Senate Bill 1 introduced a cure process for mail ballots,
15 correct?
16 A.  Yes.
17 Q.  That cure process allows voters to correct certain defects
18 so that their vote may count, correct?
19 A.  Yes, correct.
20 Q.  That option did not exist pre-SB 1, correct?
21 A.  Correct.
22 Q.  A missing or mismatched ID number is one of the defects
23 that can be corrected through this process, correct?
24 A.  Correct.
25 Q.  However, it is not the only defect that can be corrected?

LISA WISE - CROSS

1  A.  Correct.

2  Q.  Let's take a look at Section 5.14 of SB 1.  And this

3  amended Section 87.0411 of the election code, correct?

4  A.  Yes.

5  Q.  And it says, "Opportunity to correct defect early voting

6  ballot board," is that right?

7  A.  Yes.

8  Q.  It then lists five separate ballot defects that a voter

9  can cure through this process?

10 A.  Yes.

11 Q.  Those defects include a ballot for which the voter did not

12 sign the carrier envelope, is that right?

13 A.  Yes.

14 Q.  A ballot for which it cannot immediately be determined

15 whether the signature on the carrier envelope certificate is

16 that of the voter?

17 A.  Correct.

18 Q.  A ballot that is missing a statement of residence?

19 A.  Correct.

20 Q.  A ballot that is missing or containing incorrect ID

21 numbers?

22 A.  Correct.

23 Q.  A ballot that contains incomplete information with respect

24 to a witness?

25 A.  Correct.

LISA WISE – CROSS

1  Q.  In prior elections before SB 1 if you received a ballot by

2  mail and the signature was missing, there was not a method for

3  the voter to correct the issue, correct?

4  A.  Correct.

5  Q.  In prior elections before SB 1 if you received a ballot by

6  mail and the early voting ballot board determined that the

7  signature was not that of the voter, there was not a method

8  for the voter to correct the issue, correct?

9  A.  Correct.

10  Q.  So SB 1 made it possible for voters to correct signature

11  defects?

12  A.  It did.

13  Q.  And SB 1 made it possible for voters to correct a missing

14  statement of residence, correct?

15  A.  Correct.

16  Q.  And SB 1 permits a voter to — let me rephrase that.

17     SB 1 made it possible for a voter to cure a ballot that

18  had incomplete information with respect to a witness?

19  A.  Yes.

20  Q.  Voters utilized the cure process in El Paso County,

21  correct?

22  A.  They did, yes.

23  Q.  You found the cure process to be a careful addition by SB

24  1, is that right?

25  A.  Yes.

LISA WISE – CROSS

1  Q.  And you've never had a zero percent mail ballot rejection

2  rate, correct?

3  A.  Not that I can remember.

4  Q.  Let's take a look at State Exhibit 197.  Do you have it in

5  front of you?

6  A.  Yes, I do.

7  Q.  And so this is a bill, correct?

8  A.  Yes.

9  Q.  And on top it says "SB 1599," is that right?

10  A.  Yes.

11  Q.  And you are aware that SB 1599 was passed in the last

12  legislative session?

13  A.  I am.

14  Q.  And you are aware that this made changes to the corrective

15  action process for mail ballots?

16  A.  Yes.

17  Q.  And let's scroll down to Section 8.  I believe it is page

18  7.  And so this reads, "Not later than the second day after

19  signature verification committees discovered a defect

20  described by Subsection A, and before the committee decides

21  whether to accept or reject a timely delivered ballot under

22  Section 87.027, the committee shall send a voter a notice of

23  defect and a corrective action form developed by the Secretary

24  of State under Subsection C1 by mail, or by common or contract

25  carrier."

LISA WISE – CROSS

1      Did I read that correctly?

2  A.  Yes.

3  Q.  The option of sending a voter a corrective action form is

4  a new addition through SB 1599, is that correct?

5  A.  To send only that, yes.

6  Q.  And so this is in place of sending the voter their mail

7  ballot, is that right?

8  A.  Correct.

9  Q.  And so the early voting ballot board no longer has to send

10  out the mail ballot back to the voter in order to receive the

11  corrected information?

12  A.  Correct.

13  Q.  And that is true of the signature verification committee,

14  correct?

15  A.  Correct.

16  Q.  Now I'm going to do something dangerous, that is ask a

17  question that I don't know the answer to, but I genuinely want

18  to know.  So for LUPE Exhibit 349, this was the corrective

19  action form required.  This was for November 2022, correct?

20  A.  Correct.

21  Q.  This would not be the same materials that would be

22  provided following the passage of SB 1599?

23  A.  That is correct.

24  Q.  I want to talk briefly about the changes SB 1 made to the

25  signature verification process.  Let's turn back to Senate

LISA WISE – CROSS

1  Bill 1, specifically Section 511, which is on page 42.

2      And so if you look at Subsection I —

3  A.  Yes.

4  Q.  — it says that, "the committee may compare the signature

5  with any known signature of the voter on file with the County

6  Clerk or voter registrar to determine whether the signatures

7  are those of the voter."

8      Did I read that correctly?

9  A.  Yes.

10  Q.  And this was a change from only allowing a signature

11  within the last six preceding years, is that correct?

12  A.  Yes.  It expanded the universe of signatures we could

13  compare to.

14  Q.  And that made it easiest for the signature verification

15  committee or early voting ballot board to accurately match or

16  to successfully match the signatures, correct?

17  A.  Yes.

18  Q.  And SB 1 also changed the presumption, did it not?

19  A.  Yes.

20  Q.  And so the signatures are now presumed to be the voter, is

21  that right?

22  A.  Under SB 1, if the identifier matches?

23  Q.  Yes.

24  A.  Yes.

25  Q.  And so SB 1 eased the standard for signature matching, is

LISA WISE — CROSS

1   that correct?

2   A.  Yes, it did.

3   Q.  You can put that down.

4       Voters are required to show ID when they vote in person,

5   correct?

6   A.  There are exceptions, but yes.

7   Q.  In El Paso County you post the application for ballot by

8   mail on your website, is that right?

9   A.  Yes.

10  Q.  And I believe you mentioned that political parties can

11  still distribute applications for ballot by mail?

12  A.  Yes.

13  Q.  And nonprofit organizations can distribute applications

14  for ballot by mail?

15  A.  I believe so, yes.

16  Q.  In your opinion, you would have preferred to have a year

17  to 18 months to implement SB 1, correct?

18  A.  Yes.

19  Q.  You were not given 12 to 18 months to implement SB 1?

20  A.  No.

21  Q.  And we had just discussed SB 1599.  The effective date for

22  that law was September 1st, correct?

23  A.  Yes.

24  Q.  When legislation is enacted by the legislature during a

25  regular session, those bills typically take effect on

LISA WISE – CROSS

1  September 1st, is that right?

2  A.  Yes.

3  Q.  SB 1 was not passed in regular session, correct?

4  A.  Correct.

5  Q.  So its effective date was later, is that right?

6  A.  December, I believe.

7  Q.  And so for SB 1599 you are going to have the opportunity

8  to implement the new law with the Constitutional Election,

9  correct?

10  A.  That would be our first election under that, yes.

11  Q.  And typically when an election law is passed in regular

12  session, you have a chance to implement it in the

13  Constitutional Election, correct?

14  A.  Yes.

15  Q.  And you have the chance to implement it in the

16  Constitutional Election before you have to implement it for

17  the primary, is that right?

18  A.  Generally, yes.

19  Q.  But for SB 1, the first statewide election that was held

20  post its effective date was the primary, is that right?

21  A.  That's correct.

22  Q.  I want to change gears now and talk about 2020.  You were

23  the Election Administrator during the 2020 November General

24  Election, is that right?

25  A.  I was, yes.

LISA WISE – CROSS

1  Q.  The November 2020 election was an unusual election,

2  correct?

3  A.  Yes.

4  Q.  That election took place during the COVID-19 pandemic?

5  A.  Yes.

6  Q.  El Paso was even called a "hotspot," for COVID in

7  November 2020?

8  A.  We were, yes.

9  Q.  The November 2020 election was also a Presidential

10  Election year, correct?

11  A.  Yes.

12  Q.  And voter turnout is generally higher in presidential

13  elections?

14  A.  Yes.

15  Q.  The November 2020 election had higher voter turnout

16  compared to other elections, correct?

17  A.  Yes.

18  Q.  The election, in fact, had one of the highest turnouts

19  that your office has on record, correct?

20  A.  Yes.

21  Q.  And I want to take a look at that.  Let's bring up State

22  Exhibit 163.  Do you have that in front of you?

23  A.  Yes, I do.

24  Q.  And do you see that the title reads El Paso County voter

25  registration figures?

LISA WISE — CROSS

1   A.  Yes, I do.

2   Q.  And you see on the banner, on the top, it says, "Texas

3   Secretary of State, John B. Scott?"

4   A.  Yes, I do.

5   Q.  And John Scott was the former Secretary of State, correct?

6   A.  Yes.

7   Q.  And you see on the bottom where it has the URL website

8   address?

9   A.  Yes, I do.

10  Q.  And that address begins with

11  www.sos.state.texas.us\elections?

12  A.  Yes, it does.

13  Q.  And would you agree with me that this is captured picture

14  of a Texas Secretary of State website?

15  A.  Yes, I would.

16  Q.  And you had mentioned earlier that the Secretary of State

17  has the official voter registration database, correct?

18  A.  Yes.

19  Q.  And that means they have the official voter registration

20  list?

21  A.  Yes.

22  Q.  And your office updates that TEAM's database on an

23  expedited basis?

24  A.  Yes.

25  Q.  And that's whenever a voter makes a change to their voter

LISA WISE – CROSS

1  registration file, correct?

2  A.  A change –– yes, a new voter, anything like that.

3  Q.  And you also report to the Secretary of State turnout

4  numbers from specific races?

5  A.  Yes.

6  Q.  And you also provide voter history files, is that correct?

7  A.  You have those, yes.

8  Q.  So your office submits to the Secretary of State data on

9  each voter participating in the election, correct?

10  A.  I'm sorry, could you repeat?

11  Q.  Your office submits to the Secretary of State data on each

12  voter participating in the election?

13  A.  Correct.

14  Q.  If we look at the chart, the columns are labeled Year,

15  Registered Voters, Voted Percentage, Early Vote, and Early

16  Vote Percent, correct?

17  A.  Yes.

18  Q.  And then the rows meanwhile list even years, is that

19  right?

20  A.  Yes, they do.

21  Q.  And they list from 1988 through 2020?

22  A.  Yes.

23  Q.  And on this chart the Secretary of State reports that the

24  percentage of voter turnout in 2020 was 52.01 percent,

25  correct?

338

LISA WISE – CROSS

1   A.   Yes.

2   Q.   And that is higher than the percentage of voter turnout

3   reported in 2016, correct?

4   A.   Yes, it is.

5   Q.   That is higher than the percentage of voter turnout

6   reported in 2012?

7   A.   Yes.

8   Q.   It's higher than the percentage of voter turnout reported

9   in 2008?

10  A.   Yes.

11  Q.   And it's higher than the percentage of voter turnout

12  reported in 2004 and 2000?

13  A.   Yes.

14  Q.   2016, and 2012, 2008, 2004, and 2000 were also

15  Presidential Election years, correct?

16  A.   Yes.

17  Q.   And so the percentage of turnout in 2020 was higher than

18  any Presidential Election held this century, correct?

19  A.   Yes.

20  Q.   Percentage of voter turnout in 2020 was also higher than

21  2018, correct?

22  A.   Yes.

23  Q.   And 2018 was a mid-term election year, correct?

24  A.   Yes.

25  Q.   And according to the chart, voter turnout in 2020 was

LISA WISE - CROSS

1  higher than every mid-term election since at least 1990, is

2  that right?

3  A.  Yes.

4  Q.  Voting by mail was much higher for the 2020 election

5  compared to previous elections, correct?

6  A.  Yes.

7  Q.  Before 2020 your highest number of ballot by mail was

8  12,000, correct?

9  A.  Yes.

10  Q.  From November 2020 election, you had 36,000, correct?

11  A.  Yes.

12  Q.  A larger percentage of voters utilized in-person early

13  voting for the November 2020 election compared to previous

14  elections, correct?

15  A.  Yes.

16  Q.  About 85 percent of voters who voted in person -- I'm

17  sorry.  Let me rephrase that.  I misstated it.

18     About 85 percent of voters who voted in person voted early

19  that election, correct?

20  A.  Yes.

21  Q.  Only 15 percent of voters who voted in person voted on

22  Election Day, correct?

23  A.  Yes.

24  Q.  Oftentimes, the breakdown of voters who vote early as

25  opposed to those who on vote on Election Day is 50/50,

LISA WISE - CROSS

1  correct?

2  A.  Yeah.  So it ranges, 50/50 to 70/30, it creeps in that

3  somewhat.

4  Q.  The November 2020 was higher than them all, correct?

5  A.  Yes.

6  Q.  I'm going to bring up our next exhibit.  That is State

7  Exhibit 128.  Do you have that in front of you?

8  A.  Yes, I do.

9  Q.  And so if you look on the header on the second page it

10 reads, "Proclamation by the Governor of the State of Texas."

11     Did I read that correctly?

12 A.  Yes, you did.

13 Q.  And if you flip back to the first page, you'll see a stamp

14 from the Secretary of State, correct?

15 A.  Yes.

16 Q.  The stamp says, "Filed in the office of the Secretary of

17 State, 2:00 p.m. o'clock, July 27th, 2020," correct?

18 A.  Yes.

19 Q.  You recognize this exhibit, correct?

20 A.  Yes, I do.

21 Q.  This is proclamation that the Governor issued, correct?

22 A.  Yes.

23 Q.  Components of this proclamation affected the election?

24 A.  Yes.

25 Q.  Turn to page 3 of the document.  I ask that you please

LISA WISE – CROSS

1  direct your attention to the paragraph that begins, "Now

2  therefore, I, Gregg Abbott."

3  A.  Yes.

4  Q.  Okay.  And this reads, "Now, therefore, I, Gregg Abbott,

5  Governor of Texas, under the authority vested in me by the

6  Constitution and laws of the State of Texas, do hereby suspend

7  Section 85.001(a) of the election code to the extent necessary

8  to require that for any election ordered or authorized to

9  occur on November 3rd, 2020, early voting by personal

10  appearance shall begin on Tuesday, October 13th, 2020, and

11  shall continue to the fourth day before Election Day."

12      Did I read that correctly?

13  A.  Yes.

14  Q.  In response to the Governor's proclamation, El Paso County

15  changed its election procedures for the November 2020

16  election, correct?

17  A.  Yes.

18  Q.  Specifically, you changed the date that early voting would

19  begin?

20  A.  Yes.

21  Q.  Early voting by personal appearance typically begins on

22  the seventeenth day before Election Day?

23  A.  In November even — yes.

24  Q.  But as a consequence of the Governor's proclamation you

25  opened early voting for an additional week?

LISA WISE − CROSS

1  A.  We did.

2  Q.  Voters, therefore, had an additional week of early voting

3  to cast their ballot, correct?

4  A.  Yes.

5  Q.  This change was limited to the November 2020 Election?

6  A.  Yes.

7  Q.  You did not have the additional week of early voting in

8  the November 2022 Election?

9  A.  Correct.

10  Q.  So the in−person early voting period was shorter for the

11  November 2022 Election than the November 2020 Election?

12  A.  Yes.

13  Q.  Turning back to State Exhibit 128, I ask that you

14  please −− I'm going to read the second sentence of that

15  paragraph.

16      It reads, "I further suspend Section 86.006(a)(1) of the

17  election code for any election ordered or authorized to occur

18  on November 3rd, 2020, to the extent necessary to allow a

19  voter to deliver a marked mail ballot in person to the Early

20  Voting Clerk's Office prior to and including on Election Day."

21      Did I read that correctly?

22  A.  Yes.

23  Q.  Brian, please bring up Section 86.006 of the election

24  code.

25      And so this reads, "Method of returning a marked ballot.

LISA WISE − CROSS

1  A marked ballot voted under this chapter must be returned to

2  the early voting clerk in the official carrier envelope.  The

3  carrier envelope may be delivered in another envelope and must

4  be transported and delivered by, one, mail; two, common or

5  contract carrier; three, subject to Subsections(a)(1)

6  and(a)(2) in-person delivery by the voter who voted."

7      Did I read that correctly?

8  A.  I'm still waiting on if they can finish scrolling down a

9  little just —

10      Yes.

11 Q.  And if you look at Section(a)(1), it says, "The voter may

12 deliver a marked ballot in person to the Early Voting Clerk's

13 Office while the polls are open on Election Day.  A voter who

14 deliveries a marked ballot in person must present an

15 acceptable form of identification described by Section

16 63.0101."

17      Did I read that correctly?

18 A.  Yes.

19 Q.  Voters in El Paso County may return their marked ballot by

20 mail, correct?

21 A.  Yes.

22 Q.  Voters in El Paso County may return their marked ballot by

23 common or contract carrier, correct?

24 A.  Yes.

25 Q.  Voters in El Paso County may return their marked ballot by

LISA WISE – CROSS

1   in-person delivery, correct?

2   A.  Yes.

3   Q.  If a voter in El Paso County returns their marked ballot

4   by in-person delivery, the voter must deliver the marked

5   ballot to the Early Voting Clerk's Office, correct?

6   A.  Yes.

7   Q.  In a typical election if a voter in El Paso County returns

8   their marked ballot by in-person delivery, the voter must

9   deliver the marked ballot only while polls are open during

10  Election Day, correct?

11  A.  Yes.

12  Q.  However, in response to the Governor's proclamation, your

13  office changed its procedures regarding the in-person

14  delivery?

15  A.  Correct.

16  Q.  You accepted in-person delivery of mail ballots during the

17  early voting period, correct?

18  A.  Correct.

19  Q.  This was not — so you accepted delivery of in-person mail

20  ballots, not just on Election Day?

21  A.  Correct.

22  Q.  This change was limited to the November 2020 Election?

23  A.  Yes.

24  Q.  So you only accepted in-person delivery of mail ballots on

25  Election Day during the March 2022 Primary?

LISA WISE — CROSS

1   A.  Yes.

2   Q.  You only accepted in-person delivery of mail ballots on

3   election during the November 2022 Election?

4   A.  On Election Day?

5   Q.  Yes.

6   A.  Yes, on Election Day only.

7   Q.  Voters, therefore, had a shorter period of time in which

8   they could deliver mail ballots November 2022 compared to

9   November 2020, correct?

10  A.  Yes.

11  Q.  In response to the pandemic, your office did what it could

12  to make sure that voters could vote safely?

13  A.  Yes.

14  Q.  Let's take a look at Texas Election Code 64.009.  Do you

15  have that in front of you?

16  A.  I do.

17  Q.  And this reads, "Voter unable to enter polling place,

18  Subsection A?"

19  A.  Yes.

20  Q.  "If a voter is physically unable to enter the polling

21  place without personal assistance or likelihood of injuring

22  the voter's health, on the voter's request, an election

23  officer shall deliver a ballot to the voter at the polling

24  place entrance or curb?"

25  A.  Yes.

LISA WISE — CROSS

1    Q.  And let's take a look at Subsection(a)(1).

2         This reads, "At each polling place an area for parking,

3    not smaller than the size of one parking space, shall be

4    reserved for voting under this section.  The area may not be

5    designated specifically for persons with disabilities.  The

6    area must be clearly marked with a sign, one, indicating the

7    space reserved for use by a voter who is unable to enter the

8    polling place; and, two, displaying in large font that is

9    clearly readable from the vehicle a telephone number that a

10   voter may call or text to request assistance from an election

11   officer at the polling place."

12        Did I read that correctly?

13   A.  Yes.

14   Q.  If a voter who is physically unable to enter the polling

15   place without personable assistance or likelihood of injuring

16   the voter's health requested, election workers in El Paso

17   County will deliver a ballot to the voter at the polling

18   entrance or curb?

19   A.  Yes.

20   Q.  Election workers at every polling location in El Paso

21   County will deliver a ballot to the voter at the polling place

22   entrance or curb if requested by a voter who is physically

23   unable to enter the polling place without personal assistance

24   or likelihood of injuring the voter's health?

25   A.  Yes.

LISA WISE – CROSS

1  Q.  Every polling location in El Paso County has a parking

2  area reserved for voting under this section, correct?

3  A.  Yes.

4  Q.  The voting described in Section 64.009, the voting we just

5  discussed, that's often referred to as curbside voting,

6  correct?

7  A.  Yes, it is.

8  Q.  El Paso County offered curbside voting during the 2020

9  elections, correct?

10  A.  Yes.

11  Q.  At every polling location?

12  A.  Yes.

13  Q.  El Paso County offered curbside voting during the 2022

14  elections, correct?

15  A.  Yes.

16  Q.  At every polling location?

17  A.  Yes.

18  Q.  And El Paso County, absent changing the law, will offer

19  curbside voting during the 2024 elections?

20  A.  Yes.

21  Q.  At every polling location?

22  A.  Yes.

23  Q.  In 2020 your office introduced what you called Express

24  Curbside Voting?

25  A.  Yes.

LISA WISE – CROSS

1  Q.  That entailed having teams dedicated to just assisting

2  with curbside voting?

3  A.  That's correct, yes.

4  Q.  The dedicated teams made it so that voters didn't have to

5  wait for an election worker to come out from inside the

6  polling place?

7  A.  Correct.

8  Q.  Express Curbside Voting was offered at seven polling

9  locations in the 2020 General Election?

10 A.  Yes.

11 Q.  Anyone eligible for curbside voting could take advantage

12 of express curbside, correct?

13 A.  Yes.

14 Q.  Your office, however, did not expand curbside to anyone

15 not previously authorized on the election code, correct?

16 A.  Correct.

17 Q.  And you maintain the option of having express curbside in

18 future elections, correct?

19 A.  I believe so.

20 Q.  You offered extended hours during the 2020 General

21 Election?

22 A.  Yes.

23 Q.  In the second week of early voting, you offered what you

24 called 10 till 10?

25 A.  In the final week.

LISA WISE – CROSS

1  Q.  Yes.  Thank you.  There was an extra week.

2      So let me ask that again.  In the final week of early

3  voting, you offered what you called 10 to 10?

4  A.  We did, yes.

5  Q.  Polling locations opened at 10:00 a.m.?

6  A.  Some opened at 10.  Some — for early voting.  Some opened

7  at 8.  Some opened at 9.  We had a couple variances in that.

8  Q.  But for the most part, you offered twelve hours of voting,

9  correct?

10  A.  We had some locations during — are you talking about

11  early voting?

12  Q.  Yes, for that final week.

13  A.  That final week we had ten locations that were open till

14  10, and they may have been open for twelve hours.  They may

15  have been open for thirteen hours.

16      The 10 to 10 was the ten sites till 10, not 10:00 a.m. to

17  10.

18  Q.  And 10:00 p.m. was the latest that the polls closed?

19  A.  Yes.

20  Q.  And the earliest they opened was?

21  A.  8:00 a.m.  Well, actually, with the exception of the

22  William [phonetic] location, which was 7 to 7, I believe,

23  which was required by law.

24  Q.  Let's take a quick look at SB 1 one more time, Section

25  3.09.  Do you have it in front of you?

LISA WISE – CROSS

1  A.  Yes, I do.

2  Q.  And so this amended Section 85.005 of the election code,

3  correct?

4  A.  Yes.

5  Q.  And it says "regular days and hours for voting?"

6  A.  Yes.

7  Q.  And then it says, "Except as provided by Subsection C in

8  the election with the county clerk," is the early voting clerk

9  under Section 83.002, "early voting by personal appearance at

10 the main early voting polling place shall be conducted each

11 week of the early voting period that is not a legal state

12 holiday for a period of at least nine hours, except where

13 voting may not be conducted earlier than 6:00 a.m. and later

14 than 10:00 p.m."

15      Did I read that correctly?

16 A.  Yes.

17 Q.  And if we go to Section 3.10 on page 18, we're going to be

18 looking at Subsection E.  It says, "In a Primary Election or

19 the General Election for state and county officers in a county

20 with a population of 55,000 or more, the early voting clerk

21 shall order voting by personal appearance at the main early

22 voting place to be conducted on the last Saturday of the early

23 voting period for at least twelve hours, except that voting

24 may not be conducted earlier than 6:00 a.m. or later than

25 10:00 p.m.  And on the last of — Sunday of the early voting

LISA WISE - CROSS

1  period for at least six hours, except that voting may not be
2  conducted earlier than 9:00 a.m. or later than 10:00 p.m."
3      Did I read that correctly?
4  A.  Yes.
5  Q.  And so the hours you offered in 2020 fall within the
6  ranges stated in Section 3.09 and 3.10?
7  A.  Yes.
8  Q.  And you would not be prohibited of SB 1 of offering those
9  hours in future are elections?
10 A.  I don't believe so.
11 Q.  And you never implemented 24-hour voting, correct?
12 A.  Correct.
13 Q.  And you had staffing concerns regarding opening polling
14 locations for 24 hours, correct?
15 A.  Yes, that was our main concern.
16 Q.  Election workers, they put in long days, correct?
17 A.  They do.
18 Q.  And for 24-hour voting, you would need to have at least
19 two groups of election workers?
20 A.  For early voting, we could — it's conducted as a joint
21 election so we still would be able to have just one check-in
22 area, they would work together but we would need to have three
23 to four people at least that would be willing to work
24 overnight.  And, yes, from both parties, but one group.
25 Q.  All voting locations in November 2020 Election were

LISA WISE — CROSS

1  located inside a building, correct?

2  A.  Yes.

3  Q.  None of the elections you were involved with in El Paso

4  County had polling locations outside of a building, correct?

5  A.  Correct.

6  Q.  If I use the phrase "drive-thru voting," do you know what

7  that means?

8  A.  I believe so.

9  Q.  And you know it is different than curbside voting?

10  A.  Yes.

11  Q.  El Paso County did not implement drive-thru voting in

12  November 2020 Election, correct?

13  A.  Correct.

14  Q.  And you have not offered drive-thru voting in any previous

15  election, correct?

16  A.  Correct.

17  Q.  You were the early voting clerk in El Paso County?

18  A.  Yes.

19  Q.  You only have one office?

20  A.  We do.

21  Q.  In November 2020 you only had one location for a voter to

22  deliver their mail ballot in person, correct?

23  A.  Yes.

24  Q.  El Paso County did not consider having more than one

25  in-person delivery location that election, correct?

LISA WISE – CROSS

1  A.  Correct.

2  Q.  And that is because it is your understanding that mail

3  ballots must be delivered by the voter to the early voting

4  clerk?

5  A.  Yes.

6  Q.  And you only had one office?

7  A.  Correct.

8  Q.  And that requirement preexisted SB 1?

9  A.  I'm sorry?

10  Q.  That requirement preexisted SB 1?

11  A.  Yes.

12  Q.  In November 2020 Election when your office accepted a mail

13  ballot by in-person delivery, an election worker checked the

14  voter's ID when they dropped off their ballot, correct?

15  A.  Yes.  We had a team of three, basically what we would

16  consider as poll workers monitor that site, check the ID, fill

17  out the roster, and there was a secure ballot box on site and

18  they would then put the ballot in there.

19  Q.  Likewise, when your office accepted a mail ballot by

20  in-person delivery, you would have the voter sign the roster?

21  A.  Correct.

22  Q.  I'm going to bring up State Exhibit 208.  Do you have that

23  on the screen?

24  A.  Yes, I do.

25  Q.  And this is Election Advisory 2020-27?

354

LISA WISE — CROSS

1   A.  Yes.

2   Q.  And you would have received this election advisory,

3   correct?

4   A.  Yes.

5   Q.  And the subject of this advisory reads, "Minority Language

6   Requirements."  Did I read that correctly?

7   A.  Yes.

8   Q.  And let's take a look at the top-most paragraph.  It says,

9   "This advisory is to remind you of the minority language

10  requirements that apply to elections in Texas.  State and

11  federal laws require all voters [verbatim] to be translated

12  into Spanish statewide, and require the appointment of

13  bilingual clerks in certain election precincts."

14      Did I read that correctly?

15  A.  Yes.

16  Q.  Now let's took at the next two sentences.  Is says, "The

17  U.S. Department of Justice has advised this office that they

18  will continue to closely monitor compliance in each county

19  with these bilingual election requirements.  Texas election

20  law has required bilingual election materials and bilingual

21  clerks since 1975."

22      Did I read that correctly?

23  A.  Yes.

24  Q.  This advisory informs county clerks, election

25  administrators, and county chairs that state and federal law

LISA WISE – CROSS

1  requires all voting materials to be translated into Spanish

2  statewide?

3  A.  Yes.

4  Q.  The advisory also informs county clerks, election

5  administrators, and county chairs that Texas election law has

6  required by bilingual election materials and bilingual clerks

7  since 19575, correct?

8  A.  Yes.

9  Q.  El Paso County complies with the federal and state

10  minority language requirements, correct?

11  A.  Yes.

12  Q.  The El Paso County Election Administrator Office translate

13  all its materials into Spanish?

14  A.  Yes.  I'm the only one that's not bilingual in my office.

15  Q.  Let's move to the next section where it says, "Appointment

16  of bilingual election clerks."  This states, "State law

17  requires the presiding judge of an election precinct to make

18  reasonable efforts to appoint a sufficient number of election

19  clerks who are trained and fluent in both English and Spanish

20  to serve the needs of the Spanish-speaking voters of the

21  precinct.  If five percent or more of the inhabitants are of

22  Spanish origin or decent.  Federal law requires that all

23  assistance relating to electoral process be provided in

24  English and Spanish."

25      Did I read that correctly?

LISA WISE — CROSS

1  A.  Yes.

2  Q.  I believe you mentioned this with opposing counsel, but El

3  Paso County is covered by language requirements under the

4  federal Voting Rights Act for Spanish, correct?

5  A.  Yes.

6  Q.  El Paso County, therefore, provides assistance relating to

7  electoral process in English and Spanish?

8  A.  Yes.

9  Q.  To that end, El Paso County has poll workers who can speak

10 Spanish, correct?

11 A.  Yes.

12 Q.  You, in fact, have poll workers who can speak Spanish at

13 every single polling place in El Paso County?

14 A.  Correct.

15 Q.  And these Spanish-speaking election workers can offer

16 assistance to voters at every single polling location in El

17 Paso County?

18 A.  They can, yes.

19 Q.  Voters will often call your office speaking Spanish,

20 correct?

21 A.  Yes.

22 Q.  You have staff in your office who can advise voters in

23 Spanish?

24 A.  Yes.

25 Q.  Let's jump to page 2 where it says, "Translation of

LISA WISE – CROSS

1  bilingual election materials."  It says, "Pursuant to state
2  and federal law, all election materials prepared for voters in
3  English must also be provided in Spanish and any other
4  required minority languages.  The bilingual requirement
5  applies to instruction posters, ballots, official affidavits,
6  and other forms requiring a voter's signature, early voting
7  materials, and all other election information provided to
8  voters in English."
9       Did I read that correctly?
10 A.  Yes.
11 Q.  When you stated that El Paso County translates all its
12 materials into Spanish, that includes instruction posters,
13 correct?
14 A.  Yes.
15 Q.  It includes ballots?
16 A.  Yes.
17 Q.  It includes official affidavits?
18 A.  Yes.
19 Q.  It includes forms requiring a voter's signature?
20 A.  Yes.
21 Q.  It includes early voting materials?
22 A.  Yes.
23 Q.  And it includes all other election information provided to
24 voters in English?
25 A.  Yes.  I just want to be clear, though, that some of those

LISA WISE – CROSS

1  items are translated by the Secretary of State's Office or

2  entities who provide us ballot language.  We don't do all the

3  translations.

4  Q.  Thank you for the clarification.

5      The Texas legislature writes and amends the election code,

6  correct?

7  A.  Yes.

8  Q.  You do not believe that you have the authority to ignore

9  these changes, correct?

10  A.  Correct.

11  Q.  You've never refused to implement a change to the election

12  code?

13  A.  Correct.

14  Q.  You conduct elections in compliance with what the election

15  code requires?

16  A.  Yes.

17  Q.  Your office conducts elections in compliance with what the

18  election code requires?

19  A.  Yes.

20  Q.  That was true pre-SB 1?

21  A.  Yes.

22  Q.  And that was true post-SB 1?

23  A.  Correct.

24  Q.  And your office has complied with Senate Bill 1 since its

25  effective date, correct?

LISA WISE – REDIRECT

1  A.  Yes, I believe so.

2        MISS HUNKER:  That is all the questions I have, Your

3  Honor, in case other defendants want to ask questions of the

4  witness.

5        THE COURT:  Thank you.

6        Anyone else?  No one else on that side.

7        Anybody here for redirect?

8  MISS PERALES:  Yes, Your Honor.

9        THE COURT:  I said that without looking at the clock.

10 How much, do you think?  Can we get through this witness in

11 the next 15, 30 minutes?

12       MISS PERALES:  I will certainly be done within 15 to

13 30, but I know there are possibly one or two questions from

14 the other plaintiffs.

15       THE COURT:  Well, push through yours at least.

16       MISS PERALES:  Thank you, Your Honor.

17                    REDIRECT EXAMINATION

18 BY MISS PERALES:

19 Q.  Good afternoon, Miss Wise.

20 A.  Good afternoon.

21 Q.  I know that I'm now standing between you and lunch so I

22 will try to move along as best I can and I want to give a

23 heads-up to Derek that in a few minutes I'm going to call for

24 two exhibits, 339 and 340.

25       Miss Wise, when you were talking to my friend Miss Hunker,

LISA WISE — REDIRECT

1  you mentioned with respect to poll watchers that the Secretary

2  of State used to provide you a diagram as guidance with

3  respect to where to position poll workers.  Do you remember

4  that testimony a little bit earlier?

5  A.  I do.  It was provided at these trainings we would go to,

6  the election law seminar.  And I don't want to say for sure

7  that this SOS created those presentations.  They did hold the

8  trainings, but it may have been another EA or somebody that

9  they said is going to present on how to do set up on site.  So

10  it wasn't SOS training, but I'm not — you know, I'm not to

11  say that they created that.  They did, I assume, review it

12  before we had the training, but not necessarily create.

13  Q.  Thank you for that clarification.

14      So the election law conferences were hosted by the

15  Secretary of State, is that right?

16  A.  Yes.

17  Q.  And the speakers were chosen by the Secretary of State?

18  A.  Yes.

19  Q.  And it was at one of these election law conferences or

20  seminars where you saw the diagram being presented in a

21  presentation, is that right?

22  A.  Yeah.  We would have presentations on how best to set up a

23  polling site and they would talk about for ADA compliance,

24  things like that, make sure you have room for a chair to turn

25  around, make sure you have plenty of privacy for the voter,

361

LISA WISE — REDIRECT

1  and that was just one component, the poll watcher part of it.

2  Q.  So focusing in on the poll watcher component, I think you

3  mentioned this but where on the diagram were the poll watchers

4  positioned?

5  A.  At the check-in station.

6  Q.  And were they then behind the poll workers who were

7  checking in the voters, to the side?

8  A.  I believe to the side, if I remember.

9  Q.  Okay.

10  A.  They were kind of at the long table, if I recall

11  correctly.

12  Q.  And the diagram would show that they would be offered a

13  chair to sit in that spot, is that right?

14  A.  Correct.

15  Q.  And in your experience, watchers sat on either a chair or

16  a stool, I believe you mentioned earlier in your testimony?

17  A.  Yes.

18  Q.  Okay.  And Miss Hunker reviewed with you some language

19  that used to be in the statute about the positioning of

20  watchers and she referenced the old statutory language of

21  "conveniently near," is that correct?

22  A.  Yes, I believe so.  Conveniently.  I don't know if near

23  was in there, I forget, but yes.

24  Q.  Conveniently.  And so conveniently, as the statute used to

25  read, is it correct to say was paired with this practice of

362

LISA WISE – REDIRECT

1  putting watchers behind the poll workers on chairs or stools?

2  A.  Behind or beside.

3  Q.  Behind or beside.  Thank you.

4      Now, the new statutory language uses the phrase, "free

5  movement," is that right?

6  A.  Yes.

7  Q.  And the new statutory language also uses the phrase, "see

8  and hear, close enough to see and hear," is that right?

9  A.  Yes.

10 Q.  And so the term "see and hear" is now paired with "free

11 movement," is that correct, for watchers?

12 A.  Yes.

13 Q.  With respect to your poll worker training now, do you

14 instruct your poll workers to position watchers on stools or

15 chairs behind or besides the check-in desk?

16 A.  We still instruct them to offer them a place to sit at the

17 check-in desk, yes.

18 Q.  But do you also train your poll workers that now watchers

19 have free movement and can position themselves where they

20 believe they need to see and hear?

21 A.  Yes.

22 Q.  Miss Hunker walked you through some changes that the 2023

23 Texas legislature made to the Texas Election Code, do you

24 recall that?

25 A.  Yes, I do.

LISA WISE — REDIRECT

1  Q.  And she specifically mentioned a bill called SB 1599, do
2  you recall that?
3  A.  I think it's HB 1599, but I'm not 100 percent sure, but
4  1599 is correct.
5  Q.  1599, we'll call it.
6  A.  Yes.
7  Q.  Have you received guidance yet from the Secretary of State
8  on the changes that were made by that bill?
9  A.  I believe the forms are being rolled out as we speak,
10 piece by piece.  So we received the, like I said, the new
11 ballot—by—mail application was up on our website last week, I
12 believe.  I have to be honest, I'm not sure what's happened
13 this week, I'm here, but piece by piece.
14 Q.  And so one part of this bill says that now the signature
15 verification committee, I believe, if they receive an — if
16 they receive a mail ballot that has an ID defect that the
17 signature verification committee should send to the voter a
18 notice of corrective action notice or a corrective action
19 form.  Are you aware of that?
20 A.  Yes.
21 Q.  And the corrective action form is intended to be completed
22 by the voter and returned, is that right?
23 A.  Yes.
24 Q.  And so you have been sending out voter registration forms
25 in that instance, correct?

LISA WISE — REDIRECT

1  A.  We've been sending voter registration forms on the initial

2  side, but then we have been sending the corrective action

3  forms with the corrective action required and notice of

4  defect.

5  Q.  And so this is essentially catching up with what at least

6  what you were doing, which is sending the voter notification,

7  some kind of letter to tell them to have an ID defect, and

8  then send them a form on which to gather the information so

9  you can cure the defect, is that right?

10  A.  Right.  I believe the corrective action form was already

11  included in the packet.  It's on the reverse of the notice of

12  defect, if I remember.  There's a lot of forms.  The

13  difference is that now the carrier envelope does not have to

14  be included in that return package.  It's the notice of defect

15  I'm guessing with the action form on the back.

16  Q.  Okay.  Thank you.  Thank you for that.

17     So in terms of how the mail ballot packet for corrective

18  action is going to change, I know Miss Hunker covered with you

19  that it's not going to have exactly the same things in it as

20  before, would you explain how the packet is going to be

21  different?

22  A.  I believe that it will have the — still obviously the

23  notice of defect letting them know why their ballot wasn't

24  accepted, what their — and their choices for curing with the

25  corrective action on the back side.  We may include something

LISA WISE — REDIRECT

1  else with English and Spanish on it if we see fit, but I think

2  that's the complete –– maybe an envelope.  It's hard for me to

3  know for sure until I really get into it.

4  Q.  And you say those forms are being promulgated now?

5  A.  Um-hum.

6  Q.  Okay.  Thank you.  Now, there's another aspect of 1599,

7  the bill, that has to do with the Ballot Tracker.  Are you

8  familiar with how 1599 makes adjustments to the Ballot

9  Tracker?

10 A.  I believe so.

11 Q.  Okay.  So do you know whether those changes made changes

12 to the language of SB 1, or whether those changes made changes

13 to preexisting statutory language around the Ballot Tracker?

14 A.  I don't believe there was preexisting language on the

15 Ballot Tracker prior to SB 1 because we did not have that

16 prior to SB 1 that I recall.

17 Q.  Okay.  Thank you.  And so is it your understanding that

18 the Ballot Tracker, in order for the voter to get into it,

19 still requires a driver's license and the last four of the

20 social that the Ballot Tracker already has on file?

21 A.  That is my understanding.

22 Q.  Okay.  Miss Hunker walked you through some statistics

23 involving voter turnout in El Paso County, do you recall that?

24 A.  I do.

25 Q.  And one of them was a rather dramatic 85 percent voter

LISA WISE – REDIRECT

1  turnout in the –– I believe it was the 2020 ––

2  A.  The turnout of the –– percent of the total turnout

3  85 percent early voting in 2020.

4  Q.  Yes.  So, first of all, I wanted to clarify that that was

5  a proportion of early votes cast that were –– the proportion

6  of all votes cast that were cast early, is that right?

7  A.  Yes.  I wish it was the total, but it's of those

8  in–person, yes.

9  Q.  And so early vote, that phrase on that chart, includes

10  early voting by personal appearance as well as mail voting,

11  correct?

12  A.  Yes.

13  Q.  Mail voting is reported as early voting, correct?

14  A.  Correct.

15  Q.  So when we saw that dramatic number in November of 2020 in

16  the middle of the pandemic, that of all votes cast in that

17  election, 85 percent were early, that included mail voting as

18  well, yes?

19  A.  Yes.

20  Q.  I'd like to put on the display, please, LUPE 339.

21     Can you identify this document?

22  A.  This is a document we post on our website with daily

23  statistics for each location and in–person voting, with at the

24  bottom I believe there's a by–mail statistic, if I –– you

25  would have to roll down.

LISA WISE – REDIRECT

1  Q.  If there's a second page.

2      Okay.  So looking at the totals down along the bottom we

3  see mail ballots returned and then is the total for vote by

4  mail, that's at the very, very bottom?

5  A.  I'm sorry, yes.

6  Q.  Yes?

7  A.  The 5779, is that what you are asking me for?

8  Q.  Yes.

9  A.  Yes.  That would be the 500 mail ballots returned plus the

10  5729 of in-person on that sheet so far.

11  Q.  So, again, when you are doing your reporting of statistics

12  back up at the top and you are talking about --

13      If we could go all the way to the top of the document

14  again.

15      -- you are talking about, and here's the title of the

16  document, Early Voting Statistics, that will report, again,

17  mail ballot and early voting by personal appearance, correct?

18  A.  Correct.

19          MR. WASSDORF:  Thank you.

20          THE COURT:  Does anyone else from that side have

21  questions?

22          MISS HOSTETLER:  Just a few, Your Honor.

23          THE COURT:  Go ahead.

24          MISS HOSTETLER:  Good afternoon, Miss Wise.  My name

25  is Courtney Hostetler and I represent the Mia Familia Vota

1  plaintiffs.  I just have a couple of questions.

2                    REDIRECT EXAMINATION

3  BY MISS HOSTETLER:

4  Q.  I wonder if we could pull up Joint Exhibit 1.  My first

5  question will be about Section 511.

6      Looking at page 42, line 23, I just had questions about

7  the changes to the signature comparison.  So the signature

8  verification committee may now compare a voter's signature

9  with any known signature of the voter on file, correct?

10 A.  Correct.

11 Q.  And before SB 1, that period was limited to six years?

12 A.  Correct.

13 Q.  So under SB 1 a signature verification committee may now

14 reject a ballot based on a comparison to a signature that is

15 more than six years old, 20 years old, 30 years old?

16 A.  I'm sorry.  Can you ask that again?

17 Q.  Sure.  Under SB 1, a signature verification committee may

18 now reject a ballot, they may find a signature mismatch based

19 on comparison with a signature that is older than six years?

20 A.  By law, possibly, but how our process is, is we review

21 everything we can on site to err on the side of accepting the

22 ballot, but by law, yes.

23 Q.  Okay.  And looking at 513, that's page 46, lines 10

24 through 14, I believe it's the same language just looking now

25 at the early voting ballot board as opposed to the signature

LISA WISE - REDIRECT

1  verification committee, but that same expansion of the period

2  of comparison, is that true?

3  A.  Yes.

4  Q.  I don't want to repeat all my questions, but I just want

5  to make sure that that's —

6  A.  Okay.  Yes.

7  Q.  And then in terms of notice, looking also, I think still

8  at 114, so the opportunity to cure an alleged mismatched

9  signature would be the same as that opportunity to cure a

10  missing voter ID number, it would only be guaranteed if the

11  signature verification committee or the early ballot board

12  determines that the defective ballot could be returned by

13  mail, cured by the voter, and returned by the end of polling

14  on Election Day, is that correct?

15  A.  Yes, in this part of the — in this law, yes, it is.

16  Q.  And my understanding is El Paso has made the decision to

17  notify all voters regardless of that determination of timing,

18  is that correct?

19  A.  Correct.

20  Q.  But SB 1 does not require that?

21  A.  Correct.

22  Q.  Notice becomes voluntary on the part of the county, if

23  they think there's not enough time to go through this process

24  of returning the ballot by mail and having the voter then

25  return it, is that correct?

LISA WISE — RECROSS

1    A.  Correct.

2           MISS HOSTETLER:  Thank you very much for your time.

3           MISS PERALES:  Your Honor, with respect to exhibits,

4    we learned yesterday that State defendants had additional

5    objections to exhibits related to El Paso County, but we are

6    talking with State defendants and we believe that we can

7    resolve their objections over the exhibits with El Paso

8    County, and based on that understanding we would not seek to

9    hold Miss Wise here further.

10          There are about 20 plus exhibits at issue.

11          MR. KERCHER:  I think that's right, Your Honor.  I

12   think we've reached an agreement so Miss Perales doesn't have

13   to go through another 28 exhibits with this witness.

14          THE COURT:  Thank you for that.

15          So I'm not trying to deprive you of lunch, I'm trying

16   to let you get to El Paso as soon as you can.

17          THE WITNESS:  I appreciate that.

18          THE COURT:  Are there any other questions for the

19   witness based on the last set of questions?

20          MISS HUNKER:  Yes, Your Honor, but very, very short.

21                     RECROSS-EXAMINATION

22   BY MISS HUNKER:

23   Q.  Miss Wise, I just want to make sure that we are talking

24   about the same thing, when you've mentioned 85 percent of

25   voters voted early.  So I'm going to pull up a deposition

LISA WISE - RECROSS

1  transcript that my colleague Jeff White had with you.

2       So if you look, it's -- my colleague Mr. white says, "In

3  the data you track on the early voting methods used in 2020

4  election, did you see increases in any particular type of

5  voting?"

6       You responded, "a ballot by mail was much higher, I

7  believe prior to that election.  Our highest had been 12,000.

8  The ballot by mail that year we had 36,000."

9       And this is the point I want to discuss with you.  It

10  says, "Our early voting at that point, and a lot of times we

11  would go 50/50.  Our early voting during 2020 was 85/15."

12       When you were using that number in that instance, were you

13  talking about early voting that is combined with in-person and

14  mail, or were you talking about just early voting in person?

15  And I know this was a year ago and so I apologize.

16  A.  I'd honestly have to refer to the statistics before I -- I

17  don't want to give the wrong answer and I'd hate to say.  I do

18  not remember 100 percent on that.

19  Q.  You had spoke with my friend Miss Perales about the

20  diagram regarding poll watchers, correct?

21  A.  Yes.

22  Q.  And would you agree with me that polling sites are at

23  different buildings?

24  A.  Yes, definitely.

25  Q.  And that buildings have different set-ups?

LISA WISE - RECROSS

1  A.  I'm sorry.  Have different what?

2  Q.  Set-ups?

3  A.  Yes.

4  Q.  And that polling sites have different requirements simply

5  based on the shape and layout of the building?

6  A.  Yes.

7  Q.  And you don't know what other counties, how they have set

8  it up for those different polling sites?

9  A.  Correct.

10 Q.  And so you don't know where other counties placed poll

11 watchers in relation to those polling sites, is that correct?

12 A.  Correct.

13 Q.  And you don't recall the context of that particular

14 diagram, is that right?

15 A.  Not 100 percent, no, I don't.

16 Q.  So you don't know if the Secretary of State was presenting

17 it as an optional set-up versus as a recommended set-up?

18 A.  Correct.

19 Q.  And you don't know if they were using the diagram as an

20 optional set-up as compared to one that would be required by

21 law, is that correct?

22 A.  Correct.

23       MISS HUNKER:  That's all the questions I have, Your

24 Honor.

25       THE COURT:  Anything else from this side?  And

*Gigi Simcox, RMR, CRR*

LISA WISE - RECROSS

1   nothing.

2          You are excused, ma'am.

3          Is there any further need for this witness or can she

4   be excused?

5          MISS PERALES:  No.  Based on the understanding

6   regarding exhibits, plaintiffs have no further need for the

7   witness.

8          MR. WASSDORF:  Nina, Eric may have some issue with

9   the exhibits.

10         MR. NICHOLS:  We are just verifying, Judge.  I don't

11  think it's a problem, Judge.  I think the witness can go.

12         THE COURT:  You are excused, ma'am.  I suggest you

13  leave as quickly as possible.

14         With that, we'll return at 1:30.

15     *(Recess)*

16     *(Change in reporter)*

17

18

19

20

21

22

23

24

25

Michael Scarpello - Examination                374

```
 1            (1:32 p.m.)
 2            COURT SECURITY OFFICER:  All rise.
 3            THE COURT:  Thank you.  Please be seated. And your
 4   next witness.
 5            MS. PERALES:  Thank you, Your Honor.  Plaintiffs call
 6   Michael Scarpello, the Dallas County Elections Administrator.
 7            COURTROOM DEPUTY CLERK:  Raise your right hand.
 8                           *  *  *
 9            (Oath administered and MICHAEL SCARPELLO, witness,
10   sworn.)
11                           *  *  *
12            MS. PERALES:  May I approach the witness and give him
13   a physical binder?  Thank you.
14            Mr. Scarpello, that's only if you prefer to look at
15   the exhibits on paper in front of you, but the exhibits will
16   also be shown on the monitor.  Your Honor, I request permission
17   to ask leading questions under FRA 611(c)(2) because the Dallas
18   County Elections Administrator is a defendant of the LUPE
19   plaintiffs and thus an adverse party.
20            THE COURT:  Any response?
21            MR. KERCHER:  No objection, Your Honor.
22            THE COURT:  You may.
23                       DIRECT EXAMINATION
24   BY MS. PERALES:
25   Q.  Good afternoon.
```

Michael Scarpello - Examination                 375

```
 1   A.   Good afternoon.

 2   Q.   Please state your name for the record?

 3   A.   Michael J. Scarpello.

 4   Q.   Now, you serve as the Dallas County elections

 5   administrator; is that correct?

 6   A.   That's correct.

 7   Q.   And you grew up in Omaha, Nebraska; is that right?

 8   A.   Correct.

 9   Q.   You received your undergraduate degree from the University

10   of Nebraska at Omaha, correct?

11   A.   Correct.

12   Q.   And you received a law degree from the University of

13   Nebraska College of Law; is that correct?

14   A.   Correct.

15   Q.   The judge may be wondering, but we do know that Omaha

16   Nebraska is the birthplace of all great elections

17   administrators.  Just don't say that to Mr. Garza when he comes

18   tomorrow.

19        So before December of 2020, you had hands-on experience

20   administering both voter registration and voting, correct?

21   A.   That's correct.

22   Q.   And I'd like to walk quickly through some of the jobs that

23   you've held in elections.  You worked for Run-Back Election

24   Services, correct?

25   A.   That's correct.
```

Michael Scarpello - Examination                    376

1  Q.  And you were the registrar of voters in San Bernadino,

2  California, correct?

3  A.  Yes, from 2011 to 2018.

4         MR. KERCHER:  Sorry to interrupt.  I'm having a hard

5  time hearing the witness.  If you could be a little bit closer

6  to the microphone please.

7  BY MS. PERALES:

8  Q.  Before San Bernadino, California, you were director of

9  elections for the City and County of Denver Colorado; is that

10 correct?

11 A.  That is correct.

12 Q.  Before that job, you were the elections manager for Douglas

13 County, Nebraska; is that right?

14 A.  That's correct.

15 Q.  And so if we are to add up all the years that you've been

16 involved in administration of either elections or voter

17 registration, that would be over 23 years, yes?

18 A.  That's correct.

19 Q.  Thank you.  Now, you came to Dallas County as the elections

20 administrator in December 2020; is that right?

21 A.  Yes.

22 Q.  In addition to your duties with Dallas County Elections

23 Administrator, it's also true that you're a member of the

24 Election Advisory Committee for the Secretary of State; is that

25 right?

Michael Scarpello - Examination                377

1    A.  That is correct.

2    Q.  And that is a committee that is an advisory group of

3    election officials to advise officials from the Office of the

4    Secretary of State, correct?

5    A.  That's correct.

6    Q.  And that committee has bi-weekly meetings; is that right?

7    A.  Yes, every two weeks.

8    Q.  And you personally participate in these meetings, don't

9    you?

10   A.  Yes, I do.

11   Q.  Now, you've expressed concerns about SB1 during meetings of

12   the Election Advisory Committee, yes?

13   A.  Yes.

14   Q.  And those concerns included concerns about criminal

15   penalties for election officials, penalties for poll workers

16   for their interactions with watchers and SB1's effect on the

17   recruitment and retention of poll workers and election

18   officials, correct?

19   A.  Correct.

20   Q.  And you've expressed those concerns with that group on more

21   than one occasion, correct?

22   A.  Yes.

23   Q.  You most likely expressed these concerns about SB1 when

24   Christina Adkins was on one of these calls, correct?

25   A.  Yes.

Michael Scarpello - Examination              378

 1   Q.  And similarly, you would have expressed -- well, not you

 2   necessarily, but is it true that elections administrators from

 3   other counties who also serve on that committee express similar

 4   concerns to Ms. Adkins?

 5   A.  Yes.

 6   Q.  And did those other election officials express similar

 7   concerns about SB1 to Keith Ingram to the extent that he was

 8   there?

 9   A.  Yes, but I don't recall if he was in those calls or not.

10   Q.  But definitely Ms. Adkins?

11   A.  Yes.

12   Q.  I'm going to ask you a couple of questions about

13   demographics in Dallas.  Is it true that Dallas County has a

14   large enough population of Spanish speakers that under the

15   Justice Department's 5 percent rule, the county must provide

16   alternate language services to Spanish speakers?

17   A.  That is correct.

18   Q.  And is it also the case that Dallas County has a large

19   enough population of Vietnamese speakers that under the DOJ

20   5 percent rule, the county must provide alternate language

21   services to Vietnamese speakers?

22   A.  As of December 2021, that is correct.

23   Q.  I'm going to ask you a little bit about some things related

24   to your office, the elections office, and I want to start with

25   the March 2022 primary, to bring you in time.  During the

Michael Scarpello - Examination            379

1    March 2022 primary, Dallas County experienced a very

2    significant shortage of poll workers at polling sites; is that

3    correct?

4    A.  That is correct.

5    Q.  And there were about 71 no-shows of poll workers on the

6    Sunday before Election Day, correct?

7    A.  Yes.

8    Q.  And is the Sunday before Election Day a day when you expect

9    to see poll workers?

10   A.  The Sunday before the Election Day is when they pick up

11   their supplies, their judge supplies, so yes, that's the kind

12   of the final confirmation whether they're working or not.

13   Q.  And in addition to the 71 no-shows that you had on the

14   Sunday before Election Day, there were some more judges that

15   didn't show up on Election Day; is that correct?

16   A.  That is correct.

17   Q.  And you had to close eight polling sites as a result of the

18   shortage of poll workers; is that right?

19   A.  Yes, after the 71 no-shows, we filled those vacancies, but

20   then there was even more no-shows.

21   Q.  And in anticipation of the May 2022 election, you went to

22   the Dallas County Commissioners Court and talked about the

23   issues with the poll workers; is that correct?

24   A.  Yes.

25   Q.  And you secured funding from Dallas County Commissioners

Michael Scarpello - Examination                    380

1   Court to increase financial incentives for county workers to
2   work as poll workers; is that right?
3   A.   That is correct.
4   Q.   Now, this funding is only local funding; is that right?
5   A.   Yes.
6   Q.   The funding is not from the Secretary of State, correct?
7   A.   Correct.
8   Q.   And during this time, SB1 had a big impact on your office's
9   ability to recruit and retain poll workers; is that right?
10  A.   I believe so.
11  Q.   And in response to the impact of SB1 for the November 2022
12  general election, your office and the political parties had big
13  recruiting efforts, yes?
14  A.   That is correct.
15  Q.   And so as a result in the November 2022 general election,
16  you had no shortages of poll workers?
17  A.   We had an excess of 324 poll workers.
18  Q.   Is it true that interest in serving as poll workers
19  increases with those federal elections in the even years?
20  A.   Typically interest in working in an election mirrors the
21  interest in voting in an election.
22  Q.   I'm going to ask you some questions about how people vote
23  in Dallas County.  In a Dallas County polling station, would it
24  be fair to say that there are four distinct stations as part of
25  the voting process in the polling place?

Michael Scarpello - Examination                381

1    A.   Yes, that would be fair.

2    Q.   And one station is the check-in table, correct?

3    A.   Correct.

4    Q.   And another station is potentially dealing with exceptions

5    to the standard voting procedures and that's at the election

6    judge's table, correct?

7    A.   That is correct.

8    Q.   And then another station is where the voter is marking his

9    or her ballot, correct?

10   A.   Yes.

11   Q.   And then finally the fourth station is where the voter

12   deposits their ballot; is that correct?

13   A.   That is correct.

14   Q.   Now, in Dallas County, a voter casts a ballot on a touch

15   screen machine; is that right?

16   A.   They mark their ballot on a touch screen machine.

17   Q.   They mark their ballot on the touch screen and that machine

18   in Dallas is the express vote ballot marking device, correct?

19   A.   Correct.

20   Q.   And then after the voter marks their ballot using the touch

21   screen, is it correct to say the machine spits out a piece of

22   paper that the voter takes?

23   A.   It prints out a ballot and then that ballot is taken to

24   another station where it's cast.

25   Q.   And that's the fourth station?

Michael Scarpello - Examination                    382

1    A.    Yes.

2    Q.    Where the voter feeds the ballot into the machine?

3    A.    Correct.

4    Q.    And that is a DS200 vote tabulator; is that correct?

5    A.    Correct.

6    Q.    I'd like to shift now to voting with assistance and I'd

7    like to take first in-person voting.  The Elections Department

8    has a goal to have a Spanish speaking poll worker at every

9    single polling place in Dallas County; is that right?

10   A.    That is correct.

11   Q.    But not every polling place in Dallas County yet has a

12   Spanish speaking poll worker in an election, yes?

13   A.    I believe we may have in 2022.

14   Q.    And that's very possible because I asked you that question

15   before the November election.  So does the Department also have

16   the goal of having a Vietnamese speaking poll worker in every

17   polling place?

18   A.    That's our ultimate goal, but we're a ways away from that

19   goal.

20   Q.    So in the 2022 general election, there were some polling

21   places in Dallas County where you did not have a Vietnamese

22   speaking poll worker, correct?

23   A.    Correct.

24   Q.    I would like to display LUPE 172 please.  Do you recognize

25   this form as the oath of assistance form promulgated by the

1    Secretary of State in July of 2022?

2    A.  Yes.

3    Q.  And is it fair to say that in Dallas County an assister

4    fills out this form and signs the oath of assistance at the

5    check-in table?

6    A.  Yes.

7    Q.  So with respect to the form, I would like to ask Derek to

8    highlight the last three columns of that chart-looking thing,

9    so starting with "relationship" and then through the "Yes/Nos".

10       Do you understand this information, Mr. Scarpello, as

11   information that is newly required of assisters as a result of

12   SB1?

13   A.  I believe so.

14   Q.  And if we can go back to the form overall.  You would agree

15   with me that filling out that -- those additional columns will

16   take additional time compared to the time period when those

17   questions on the form were not required, correct?

18   A.  Correct.

19   Q.  And it's also true that this form has to be completed by

20   the assister for each separate instance of providing

21   assistance, yes?

22   A.  Yes.

23   Q.  So for example, if I go to the polls and I help my mother

24   and my aunt, I fill out the information on the form twice; is

25   that correct?

```
1    A.  Yes.
2    Q.  And also in that example I would take the oath of
3    assistance twice; is that right?
4    A.  That's right.
5    Q.  And at a polling place where there are more voters who are
6    voting with assisters, this new requirement of the form will
7    take more time for each instance when an assister has to fill
8    out this additional information, correct?
9    A.  Marginally more time, yes.
10   Q.  And then that marginal increase would occur with every
11   assister who happens to come at that time, yes?
12   A.  Yes.
13   Q.  I'd like to zoom in on the oath of assistance.  That's very
14   nice.  Thank you.
15       Would you agree with me, Mr. Scarpello, that an assister,
16   because they are signing the oath under penalty of perjury,
17   would want to make sure that they follow the commands of the
18   oath very closely?
19   A.  I would think so.
20   Q.  And you're aware that SB1 says that a ballot may not be
21   counted if the voter is not eligible for assistance, correct?
22   A.  Yes.
23   Q.  It's fair to say, isn't it, that the Elections Department
24   would not be aware of what a voter and an assister would say to
25   each other prior to coming to vote about whether the assister
```

1  is willing to help?

2  A.  That would be accurate.

3  Q.  I'd like to move now to Joint Exhibit One, Section 4.09,

4  the poll watcher provisions.  This is at page 28, lines three

5  through five.

6     Mr. Scarpello, do you understand that under this provision,

7  a poll watcher cannot be limited in their activities as a

8  watcher?

9  A.  Yes.

10  Q.  And your understanding is that under that provision a poll

11  watcher can follow a voter through a polling place, correct?

12  A.  Yes.

13  Q.  And you did conduct trainings for your poll workers in

14  2022, yes?

15  A.  Correct.

16  Q.  And during one of those trainings, you warned poll workers

17  not to interfere with the movement of poll watchers because

18  otherwise they might face legal jeopardy, correct?

19  A.  That's correct.

20  Q.  And around the March 2022 primary, you were aware that

21  several election judges were afraid of being prosecuted under

22  Section 4.09, correct?

23  A.  That's what I had heard from my training staff.

24  Q.  So I'm going to take you forward now to the March 2022

25  primary.  In the March 2022 primary at an early voting site,

Michael Scarpello - Examination                    386

1   you had a conflict between a poll watcher and an election

2   judge, correct?

3   A.  Yes.

4   Q.  I should probably make clear for the Court, is an election

5   judge the person who serves as the chief poll worker at that

6   polling place?

7   A.  At an Election Day polling place, they're called an

8   election judge.  At a early voting location, they are not

9   considered a presiding judge.  They're an assistant clerk to

10  me.

11  Q.  Got it.  Thank you for that.  Sometimes when we say "judge"

12  here in this examination, we understand it's election judge,

13  yes?

14  A.  Yes.

15  Q.  And so in this conflict that I was just asking you about

16  between a poll watcher and a judge, there were co-judges,

17  meaning there was a Republican co-judge and a Democratic

18  co-judge; is that right?

19  A.  That's correct.

20          THE COURT:  When did this take place?

21          MS. PERALES:  March 2022.  Yes?

22          THE WITNESS:  Yes.

23          THE COURT:  So is this after the poll watcher

24  supposedly took his oath?

25          MS. PERALES:  Well, I will ask the witness.

Michael Scarpello - Examination                387

1   BY MS. PERALES:

2   Q.  So if a poll watcher in March 2022 presented with

3   credentials and was accepted, you would agree with me that that

4   poll watcher had to have taken the training to serve, yes?

5   A.  That's correct.

6   Q.  And so in that instance, one of the election judges let the

7   poll watcher have access to things that she should not have

8   had, correct?

9   A.  Yes.

10  Q.  And specifically the poll watcher was attempting to open up

11  the ballot box of the vote tabulator, yes?

12  A.  I believe it was the election judge in concert with the

13  poll watcher that were doing it together.

14  Q.  And the other election judge called your office about this;

15  is that correct?

16  A.  Yes.

17  Q.  And your office sent a technician to try to mediate the

18  disagreement, correct?

19  A.  I believe we sent an inspector.

20  Q.  And that person was going to attempt to mediate the

21  disagreement; is that right?

22  A.  Yes.

23  Q.  And then the conflict kept going even after that, correct?

24  A.  Yes.

25  Q.  And in fact, one of the two parties ended up calling the

Michael Scarpello - Examination                388

1    Sheriff's Office; is that right?

2    A.   Yes.

3    Q.   And the sheriff's deputies went to that location, correct?

4    A.   That's correct.

5    Q.   And when the sheriff's deputies arrived at that location,

6    they worked with the election judge to make sure she felt safe

7    and that there weren't any more problems; is that right?

8    A.   That's my understanding.

9    Q.   Now, I'm going to ask you some questions about poll

10   watchers and the 2022 November general election.  So since May

11   of 2022, poll watchers have identified things that they

12   believed to be irregularities, but those things were not

13   necessarily irregularities, correct?

14   A.   Correct.

15   Q.   And you can't recall an instance where a poll watcher

16   reported an actual legal irregularity that needed to be

17   addressed, correct?

18   A.   Not that I can recall.

19   Q.   And so for the November 2022 general election, you did,

20   however, receive complaints from the public and poll workers

21   that watchers were making them feel uncomfortable?

22   A.   I'm not sure about the public, but certainly our poll

23   workers.

24   Q.   And you kept records of complaints that were coming in

25   about watchers, correct?

Michael Scarpello - Examination                    389

1   A.  We log every complaint into our system.

2   Q.  And I'd like to display now LUPE 330.  Can we go to the

3   next page of the exhibit?

4       Mr. Scarpello, do you recognize this as at least part of

5   the log that is kept by Dallas County and was kept by Dallas

6   County in the November 2022 election?

7   A.  Yes.

8   Q.  And I will represent for the Court that the Court has in

9   its binder some selected pages of the log, but the log itself

10  is very long.  And it's because it also contains other issues

11  that were being dealt with on that day, yes?

12  A.  Yes, operational issues as well as complaints.  Any call,

13  any communication we have on Election Day we put into the log.

14  Q.  Thank you.  I would like to point your attention to entry

15  number 122857, which is highlighted in the yellow?

16          MR. KERCHER:  Objection, Your Honor, to hearsay.

17          THE COURT:  For what purposes are you bringing this?

18          MS. PERALES:  I want to question the witness about his

19  awareness of these incidents.

20          THE COURT:  So not for the truth of the matter

21  asserted.

22          MS. PERALES:  Yes, Your Honor.

23          THE COURT:  Go ahead.

24          MS. PERALES:  Thank you.

25          MR. KERCHER:  Respectfully, Your Honor, may I have a

 1    ruling on my objection.

 2             THE COURT:  You're overruled.

 3    BY MS. PERALES:

 4    Q.  Do you notice that for this entry 122857 it has a date and

 5    timestamp of November 1, 2022 at 17:54?

 6    A.  Yes.

 7    Q.  Do you have a recollection of learning about this incident?

 8    A.  I do.

 9    Q.  Can you tell me a little bit more about it?

10    A.  I don't remember the exact dates and times, but I know that

11    during the early voting period at this Lancaster location, the

12    judge, the assistant clerk was having issues with poll

13    watchers.  She called not only our hotline, but she, in fact,

14    talked to me and explained what was going on.  I was well

15    aware, in fact, I went down there myself to observe and so you

16    know --

17             THE COURT:  Sorry to interrupt.  Just so we can make

18    the record clear then, why don't we disregard what's on the

19    screen, so that way we overcome any hearsay objection and why

20    don't you just testify as to your personal knowledge of the

21    event.

22             THE WITNESS:  Sure.  Like I said, I had received phone

23    calls from Ms. Grogan and we knew that there was trouble

24    brewing, and so I went down to that location and looked,

25    inspected the site, tried to figure out what the issues were,

Michael Scarpello - Examination                    391

1    tried to prevent the issue from escalating, tried to

2    de-escalate, if you will.

3    BY MS. PERALES:

4    Q.  Did you come to learn that one voter had closed her touch

5    screen machine because the watcher was hovering so close to

6    her?

7    A.  I don't recall that particular.

8    Q.  Do you recall hearing that a voter said, *"Who is she, the*

9    *police?"*

10    A.  Not from my firsthand knowledge, no.

11    Q.  Did you come to understand that the poll watcher was

12    hovering over voters?

13    A.  Only through the written records.

14    Q.  But you did speak to the election judge?

15    A.  Yes.

16    Q.  Did she tell you the poll watcher was hovering?

17    A.  Yes.  She was -- the judge --

18        MR. KERCHER:  Your Honor, objection.  This is hearsay.

19        THE COURT:  Yeah, so I'm not entertaining it for the

20    truth of the matter asserted, I'm hearing it for the purposes

21    of the alleged issues involved with the poll watcher provision

22    at issue in this case.  Go ahead.

23        THE WITNESS:  The judge was explaining to me the

24    limitations of the space and where she was trying to position

25    the poll watchers in such a manner that they were not

```
 1   interfering with voters.
 2           MS. PERALES:  I'd like to scroll -- well, I'm going to
 3   go to another log entry, Your Honor, and I don't know if this
 4   is a situation -- this is all one exhibit, but it's pages
 5   within the exhibit and so I can go without the exhibit.  This
 6   is log entry 122303, or we can try to do it without the
 7   exhibit.
 8           THE COURT:  Do you have any personal knowledge of this
 9   one?
10           THE WITNESS:  No, I do not.
11   BY MS. PERALES:
12   Q.  University Park United Methodist Church?
13   A.  No firsthand knowledge, no.
14   Q.  Did you come to know during early voting leading up to the
15   election that there was an incident where an election judge
16   opened a tabulator saying it was too full and started moving
17   ballots.  Does that sound familiar?
18   A.  Yes, that's not uncommon.  If I can elaborate, those
19   ballots they drop into a box and sometimes they need to be
20   shifted around and redistributed so that they can sit better in
21   the box.
22           THE COURT:  So you had poll watchers complain that
23   that's alleged tampering or something?
24           THE WITNESS:  I think that poll watchers are
25   uncomfortable with that.  I don't recall any particular
```

 1   complaint from a poll watcher about that practice.

 2           MS. PERALES:  Your Honor, I've received a helpful note

 3   to try to establish that this is a business record and thus is

 4   an exception to the hearsay rule.

 5           THE COURT:  You may continue.

 6           MS. PERALES:  Thank you, Your Honor.

 7   BY MS. PERALES:

 8   Q.  And just to be clear, I did ask you, Mr. Scarpello, if you

 9   recognized this document and you said this document is created

10   as part of your election administrator, is that right?

11   A.  That is correct.

12   Q.  And this document is maintained in your office as a

13   business record?

14   A.  Yes, it is.

15   Q.  Thank you.  Moving along to page three.  I'd like to draw

16   your attention to 122967.  Do you recall an incident at this

17   polling place where the watcher was sort of inserting herself

18   into a situation where a poll worker was assisting a voter?

19   A.  Yes.

20   Q.  Can you tell me a little more about that?

21   A.  I'd have to refresh my memory by reading the record here,

22   but it was the -- this is the same location we talked about

23   earlier.  I believe it was the next day and where the judge

24   continued to have issues with the poll watchers where this

25   debates, if you will, were continuing about what poll watchers

Michael Scarpello - Examination                    394

1    were and were not allowed to do.

2    Q.  And do you recall this as the incident in which the poll

3    worker was followed home in her car?

4    A.  I don't believe so.  I think that was a different location,

5    different -- it was not this location, I believe.

6              THE COURT:  Before we leave this, so the middle

7    paragraph there, can a poll watcher act in the role of a poll

8    watcher and then unilaterally just choose to step outside and

9    then start acting as an electioneer?

10             THE WITNESS:  I don't believe there's any -- off the

11   top of my head, I don't believe there's any restrictions from

12   that happening.

13             THE COURT:  And then they can go back into the poll

14   area, and as long as they don't electioneer, they can be a poll

15   watcher?

16             THE WITNESS:  I believe so, as long as they have the

17   credentials, as far as electioneering as long as it's outside

18   the hundred-foot limit.

19   BY MS. PERALES:

20   Q.  So before we leave this entry, did you receive any

21   information about voters being uncomfortable with the poll

22   watcher in their space and asking questions about why she was

23   in their space?

24   A.  I don't recall.

25   Q.  You mentioned a moment ago that you thought there was a

Michael Scarpello - Examination                395

1  different incident where a poll worker was followed home, can
2  you describe that incident please?
3  A.  Yes.  That was the one where -- I believe that was during
4  the primary, and that's where the poll watcher and the
5  alternate judge or the co-judge got into the ballot box and
6  then those continued to be fights after that between the poll
7  workers and -- between the two judges as well as the watcher.
8  And it got to the point where that watcher was accused of
9  following one of those judges home.
10  Q.  And what was done with that report of being followed home?
11  A.  I'd have to look at the sheriff's records, but I believe
12  the sheriffs discussed that issue with that poll watcher.
13  Q.  Did you speak to the poll worker?
14  A.  I don't recall.  I believe so.
15  Q.  Do you recall anything about your conversation with her?
16  A.  Only that she was very upset and she had contemplated
17  quitting and I believe between myself, and more importantly,
18  the other staff that manages our poll workers, they talked her
19  out of that and said that we would give her the support, to not
20  worry about that watcher anymore.
21  Q.  I'd like to go now to page four of the exhibit log entry
22  123958.  Do you recall -- it should be 123958.  So the next one
23  down maybe, next page maybe.  There we go.
24      Do you recall an incident on November 4, 2022 where an
25  election judge reported that poll watchers were hovering over

Michael Scarpello - Examination                396

1    the voters?

2    A.   Yes.

3    Q.   Can you tell me a little bit more about what you know about

4    this?

5    A.   This is a continuation of that same location.  I think the

6    first was recorded on the first, another on the second, this is

7    on the fourth.  The same judge, Carla Reynolds Grogan, not only

8    one watcher, but multiple watchers.  My understanding is that

9    the poll watchers were -- because of the initial interaction

10   between the poll watcher and the judge, that there was then

11   some suspicion by the watchers, so more and more watchers were

12   going there.  And the more watchers were going there, the more

13   they were each of them getting in different scruffs with the

14   judge.

15   Q.   And were there also complaints of these watchers hovering

16   over voters?

17   A.   Yes, because that's the location where it's very tight

18   space and very limited space for watchers as well as voters.

19   Q.   Is there anything else that you recall about that incident?

20   A.   No.  Like I said, I'd have to refresh my memory by reading

21   through these documents.  If you want me to do that.

22   Q.   Well, we can move on.  There's only one more that I'd like

23   to refer your attention to.  It's not in yellow on the exhibit,

24   but it's entry 124093.

25            MR. KERCHER:  Your Honor, before we continue to use

Michael Scarpello - Examination                397

1  this exhibit, just a piece of clarification, I understand that

2  you said that you're accepting the portions that have been

3  highlighted of this document not for the truth of the matter

4  asserted.  Can I understand that the Court will continue to

5  accept this highlighted evidence from this document in the same

6  way?  If not, I would reurge my objection.

7          THE COURT:  So once it gets proposed to be admitted,

8  it appears to be a business record, that's been established.

9  That being a business record, there's always hearsay within a

10  business record, so not all business records in their entirety

11  get admitted, but nevertheless, if I excise the hearsay

12  statements and in this case it's not for the truth of the

13  matter asserted, but just for a general discussion of alleged

14  voter interference by the poll watchers as it affects the

15  Court's consideration of the poll watcher and harassment and

16  intimidation allegations, I'm accepting it for that purpose and

17  that purpose only.

18          MR. KERCHER:  And for clarity of the record, my

19  objection is to hearsay within hearsay in as much as I

20  understand the business record, but thank you for your

21  clarification, Your Honor.

22  BY MS. PERALES:

23  Q.  Mr. Scarpello, do you have a recollection of this log entry

24  124093 or the events associated with it?

25  A.  Yes.

Michael Scarpello - Examination                398

1   Q.  Can you describe it please?

2   A.  My understanding is this was a complaint about the same

3   location and I think this was a complaint from the poll watcher

4   saying that the PEO or judge was not allowing her to do her --

5   didn't have the space to do her watching under the law.

6   Q.  And is it your recollection, then, that the watcher was

7   complaining she was being denied free movement around the

8   polling location?

9   A.  That's correct.

10  Q.  And that she was obstructing, the watcher was complaining

11  about being obstructed from doing her watching?

12  A.  Yes.

13  Q.  Did you have a communication with the election judge about

14  the interaction with the watchers?

15  A.  I don't recall which day I went to that location or the

16  several conversations I had with her over the phone, but

17  generally speaking, what I was communicating to her was poll

18  watchers have certain rights and that if she interfered with

19  those rights, that she could be subjecting herself to

20  prosecution.

21  Q.  And did the election judge communicate to you that she was

22  trying to help the poll workers be able to do their job without

23  interference?

24  A.  Yes, and to help maintain the privacy of voters.

25  Q.  So also to protect the voters in their voting process?

Michael Scarpello - Examination                399

1    A.   Yes.

2    Q.   In addition to the incidents that we've covered in the log,

3    it's also true, isn't it, that there were a series of more

4    minor incidents related to poll watchers in the early voting

5    period of November 2022, yes?

6    A.   That's correct.

7    Q.   And in many of those instances, poll workers were very

8    nervous about the presence of poll watchers; isn't that right?

9    A.   I think during the last three or four days of early voting,

10   these incidents kept happening more and more and I think we

11   were all very nervous going into Election Day, thinking that it

12   could be a very messy Election Day.  Fortunately, it didn't --

13   it didn't turn out as bad as we thought on Election Day.

14   Q.   And you were hearing from poll workers that they were

15   concerned that poll watchers were going to get out of hand,

16   correct?

17   A.   That's correct.

18   Q.   And when poll workers raised those concerns in the smaller

19   polling places, their concerns were mostly related to poll

20   watchers getting too close to voters; is that correct?

21   A.   I think too close to voters and too close to workers

22   themselves.

23   Q.   And so for example, you heard concerns that watchers were

24   looking over voters' shoulders; is that correct?

25   A.   Over voters' shoulders and over workers' shoulders, yes.

Michael Scarpello - Examination          400

1   Q.  And making voters nervous, correct?

2   A.  Yes, that's correct as well as workers being nervous.

3   Q.  And creating a feeling of confinement for voters and poll

4   workers, correct?

5   A.  Correct.

6   Q.  And this information was mainly coming from the poll

7   workers themselves, correct?

8   A.  Yes.

9   Q.  When you reminded poll workers, as you just described, that

10  watchers under the law were allowed certain freedoms, you told

11  poll workers that watchers have the freedom to roam around and

12  observe under SB1, correct?

13  A.  Correct.

14  Q.  And you advised the poll workers not to obstruct the poll

15  watchers, correct?

16  A.  Yes.

17  Q.  And you basically repeated the requirements of SB1 and

18  warned the poll workers that they could be cited if they

19  obstructed poll watchers, correct?

20  A.  Correct.

21  Q.  You reminded poll workers that they could potentially face

22  penalties for interfering with poll watchers, correct?

23  A.  Correct.

24  Q.  And you provided this advice in response to poll workers

25  contacting you with concerns about poll watchers getting too

Michael Scarpello - Examination                401

 1  close and making voters and poll workers feel uncomfortable?

 2  A.  We provided that information during training as well as in

 3  response to complaints.

 4  Q.  And you believe that based on the advice that you were

 5  giving, there were poll workers who felt they could not

 6  intervene on behalf of an uncomfortable voter or could not

 7  advocate on behalf of an uncomfortable voter, correct?

 8  A.  I can only assume that.

 9  Q.  You believe SB1 is not specific enough to allow you to

10  advise poll workers about how close a watcher can stand to a

11  voter, correct?

12  A.  Yeah, it's fairly vague.

13  Q.  And with respect to how close a watcher can get to a voter,

14  yes?

15  A.  That's correct.

16  Q.  And for the 2022 general election, Dallas County poll

17  workers who were being trained asked questions about the new

18  freedom of movement for poll watchers under SB1; is that right?

19  A.  That's correct.

20  Q.  And there was confusion by poll workers about how to allow

21  watchers their new freedoms under SB1 and still make sure that

22  voters were comfortable voting, correct?

23  A.  Correct.

24  Q.  And you think SB1 is vague and that it makes it difficult

25  for your Department to provide guidance to poll workers in

Michael Scarpello - Examination                402

1    sufficient enough fashion for the poll workers to be

2    comfortable with knowing what to do, correct?

3    A.  I think that's a fair statement.

4    Q.  And given the penalties faced by poll workers under SB1 for

5    interfering with watchers, you think that poll watchers are

6    likely -- sorry, poll workers are likely to err on the side of

7    not intervening on behalf of a voter who might be

8    uncomfortable, correct?

9    A.  Yes, and that's the advice that we give them.

10   Q.  Is to refrain from intervening?

11   A.  Yes.

12   Q.  And this might be even when they know that the voter is

13   uncomfortable?

14   A.  Yes.

15   Q.  You believe that poll workers are probably hesitant to

16   confront poll watchers regarding misconduct because there is a

17   possibility of criminal liability, correct?

18   A.  Yes.

19   Q.  And that hesitation by poll workers is not about what a

20   watcher is allowed to do or not to do, but it's about the

21   restriction on the poll worker who could be charged with a

22   misdemeanor; is that right?

23   A.  That's correct.

24   Q.  You're aware of reported incidents, aren't you, where a

25   Dallas County election judge wished to remove a poll watcher

Michael Scarpello - Examination                403

1  because of the poll watcher's behavior, but was unable to do so
2  because of SB1, correct?
3  A.  I don't have -- I don't recall a particular instance, but
4  I'm pretty confident that that happened quite frequently
5  throughout the county.
6  Q.  Let me see if I can refresh your recollection.  Could we
7  call up the deposition of Mr. Scarpello from April 13, 2023.
8  And if we could go to page 121, line 23.
9      Do you recall in your deposition being asked, *"Are you*
10  *aware of any reported incident where an election judge wished*
11  *to remove a poll watcher because of the poll watcher's*
12  *behavior, but was unable to do so because of SB1?"*  And what
13  was your answer there?
14  A.  *"Yes."*
15  Q.  Do you still have confidence in that answer?
16  A.  Yes.
17  Q.  Thank you.  It's part of the mission of Dallas County
18  elections to maintain public confidence in honest and impartial
19  elections, yes?
20  A.  Correct.
21  Q.  And poll watchers who have expressed concerns about
22  election integrity have also expressed that they are gratified
23  that the Department has responded by being very transparent and
24  changing its procedures in the Central Count in response to
25  watchers' concerns, yes?

Michael Scarpello - Examination                    404

 1   A.   That's correct.  We rebuilt our Central Counting Station to
 2   make it poll watcher friendly.
 3   Q.   And sometimes, sometimes poll watchers make a complaint
 4   that is based on a misunderstanding, correct?
 5   A.   Yes.
 6   Q.   And in those cases, in addition to being transparent, you
 7   educate the watchers on the correct procedures when there are
 8   misunderstandings?
 9   A.   In the case of Central Count, not only do we do it, my
10   staff, but also the presiding judge of the Central Counting
11   Station and the alternate presiding judge, they are kind of the
12   liaisons to the poll watchers.
13   Q.   And with respect to poll watchers in the Central Count
14   Station, you've taken steps to increase their confidence in the
15   process, yes?
16   A.   Yes, we've documented every single step of the process
17   through our Central Counting Station plan, provided that to
18   those poll watchers, explained both of the procedures.  We've
19   provided large television screens on the walls to let them
20   witness the entire process, we have streaming, live streaming
21   of the location where people from home can watch the entire
22   process, so a variety of things to try to increase
23   transparency.
24   Q.   And you also allow poll watchers in Central Count to go
25   where they want and ask questions of anybody who's there; is

Michael Scarpello - Examination                405

1   that right?

2   A.  We prefer to have them direct their questions to the

3   presiding judge because we don't want them to interfere with

4   the workers who are trying to count ballots.

5   Q.  But you do allow them to move around freely and observe?

6   A.  That's correct.

7   Q.  And just for the sake of the record, there are no voters

8   casting ballots in the Central Count Station, correct?

9   A.  No, no.  Tabulation of previously cast votes.

10  Q.  So let's talk about the Central Count Station where you

11  have made all of these changes for the poll watchers and what

12  happened in November of 2022.  During the November 2022 general

13  election, it's fair to say that you had a lot of poll watchers

14  in the Central Counting facility, yes?

15  A.  Yes, we had quite a few.

16  Q.  And in the November '22 general election, your office went

17  to extraordinary measures to try to be accommodating to poll

18  watchers, yes?

19  A.  Yes, we did.

20  Q.  And still there were poll watchers leaning over the

21  shoulders of poll workers, correct?

22  A.  Yes, like I mentioned before, we have a counting station

23  where they're taking a USB stick and they're feeding the

24  results and they have a small screen in front of them, but

25  above them there's a large, it's a 60-inch TV so that poll

Michael Scarpello - Examination                    406

 1  watchers can stand back and watch the big screens.  But instead
 2  of doing that, many times they were over the shoulder of those
 3  workers making our workers very uncomfortable and
 4  claustrophobic, if you will.
 5  Q.  In fact, some poll workers felt harassed, didn't they?
 6  A.  Yes, they did, couple of our staff did.
 7  Q.  You would also say that some of the poll watchers were
 8  being difficult, correct?
 9  A.  Yes.
10  Q.  And some of the poll watchers interfered with the poll
11  workers, correct?
12  A.  Yes.
13  Q.  Now, there was an incident in that same November 2022
14  election where a poll watcher tampered with some election
15  records in the post election canvas; is that right?
16  A.  During the canvas period, yes.
17  Q.  And you discovered the tampering in the post election
18  canvas, didn't you?
19  A.  Yes.
20        THE COURT:  What timeframe are we talking about?
21        THE WITNESS:  I'm going to guess, I'm guessing five
22  days post election.
23        THE COURT:  And this is November or March?
24        THE WITNESS:  November.
25  BY MS. PERALES:

Michael Scarpello - Examination          407

1  Q.  And so where is the canvas taking place?

2  A.  In the Central Counting Station.

3  Q.  And the tampering was captured on video tape; is that

4  correct?

5  A.  That's correct.

6  Q.  But at the time, that watcher was not removed from Central

7  Count, is that right, because you didn't know about the

8  tampering at that time?

9  A.  One of our staff members witnessed it, she informed the

10  Central Counting Station manager of the issue.  The Central

11  Counting Station manager went to that person and obtained the

12  records back -- grabbed the records back from the person and

13  instructed her not to touch any records from that point on,

14  otherwise she'd be removed.

15  Q.  And she was a watcher?

16  A.  Yes.

17  Q.  And then later you confirmed what the watcher had done by

18  looking at the video tape?

19  A.  That's correct.

20  Q.  And this is my last question in this series because I don't

21  want to get into what may or may not happen as a result, but

22  after the incident, you did contact legal authorities about the

23  incident; is that right?

24  A.  That's correct.

25  Q.  Based on what we've been talking about today, it's fair to

Michael Scarpello - Examination                    408

1   say that you believe SB1 emboldened a certain percentage of

2   poll watchers to go beyond their authority in the 2022

3   election, correct?

4   A.   That's my belief.

5   Q.   I'd like to shift now to mail ballot provisions.  If we

6   could look at Joint Exhibit One, page 45, Section 5.13.  And

7   we've covered this and we're going to cover it in shorter and

8   shorter ways as we move through the different counties, but do

9   you -- just to ask you in a broad sense, do you understand this

10  section to require your office to match the ID number provided

11  on the returned mail ballot envelope to the voter's voter

12  registration record ID number?

13  A.   Yes.

14  Q.   After SB1 was enacted, your office advised mail ballot

15  voters to provide both their Social Security number and

16  driver's license number on the mail ballot; is that correct?

17  A.   That is correct.

18  Q.   And your office began making that recommendation around

19  February of 2022, correct?

20  A.   Yes.

21  Q.   And that's in part because around February of 2022, you had

22  high rejection rates for mail ballots; is that correct?

23  A.   That's correct.

24  Q.   And your office started using the tag line, *When in doubt,*

25  *fill them both out;*" is that correct?

Michael Scarpello - Examination                409

1    A.  That's correct.

2    Q.  And you advised voters to put both identification numbers

3    to be as safe as possible with the idea that someone is likely

4    to have one of those two numbers in their voter registration

5    record, correct?

6    A.  That's correct.  And I just want to say we stole that tag

7    line from Harris County.

8    Q.  Credit to Harris County.  We had testimony earlier that El

9    Paso County also adopted that slogan.

10       And then a couple of quick questions about your voter

11   registration database.  Is it fair to say that Dallas County is

12   an offline county?

13   A.  That's correct.

14   Q.  And that means that Dallas County maintains its voter

15   registration database through a vendor, separate from Teams,

16   correct?

17   A.  It's separate, but tied to Teams, it's near realtime

18   integration.

19   Q.  You have a realtime integration.  Thank you for that.  So

20   there's a way for you to get information from Teams, correct?

21   A.  Yes.

22   Q.  But Teams does not host your voter registration database;

23   is that right?

24   A.  Teams is the system of record, it holds the official record

25   and our system is what we interact with.

Michael Scarpello - Examination                410

1    Q.   And you use VoTech as your vendor, correct?

2    A.   Yes.

3    Q.   And the product you use is called VMax, correct?

4    A.   That's correct.

5    Q.   Now, with respect to applications for ballot by mail, I do

6    have more questions for Ms. Phillips, so I promise I won't ask

7    you anything I haven't already asked you before, but when

8    you're processing an application for ballot by mail or a mail

9    ballot and you can't make the ID number, Dallas County sends a

10   form prescribed by the Secretary of State to the voter that

11   informs the voter of the ID defect and recommends how the voter

12   can cure the ballot or the application for ballot; is that

13   right?

14   A.   I believe that's correct.

15   Q.   And these forms I believe in your opinion are highly

16   complex, are they not?

17   A.   In my opinion, yes.

18   Q.   And they are long, in your opinion?

19   A.   Yes.

20   Q.   And they are verbiage rich, in your opinion?

21   A.   Yes, they are.

22   Q.   And in your opinion, these forms are very difficult for a

23   voter to use, correct?

24   A.   That's my belief, based on my experience, yes.

25   Q.   I have asked you to bring with you today a mail ballot

Michael Scarpello - Examination                    411

```
 1    packet and also a corrective action packet.  Did you bring
 2    those two things with you?
 3    A.  Yes, I did.
 4    Q.  Would you be willing to show us anything in that packet
 5    that is special to Dallas County?  I think I recall learning
 6    about maybe a pink piece of paper that you have in your mail
 7    ballot packet?
 8    A.  Yes.
 9    Q.  Can you tell me about that?
10    A.  Sure.  The mail ballot packet in the State of Texas is --
11    what I say, it's not very user friendly.  We have the ballot
12    itself that comes in the outgoing envelope as well as
13    instructions from the Secretary of State here.  And then
14    another letter from the Secretary of State, what they call Dear
15    Voter letter that kind of provides more instructions.  This is
16    the list of declared write-in candidates.  In some cases, a
17    statement of residence form.  A ballot secrecy envelope, more
18    words on it with more instructions where the ballot goes back
19    into the secrecy envelope.  And then the carrier envelope with
20    lots more instructions, really tiny verbiage on it.  We found
21    based on what I have seen in other states, this is highly
22    complex and very unuser friendly.  And so what we've done is --
23    we created our own sheet.  Well, we did one separate for the
24    primary, a short one that addressed only the issues with the ID
25    issues.  And then for the November election, we created what we
```

Michael Scarpello - Examination                412

1  call the abbreviated instructions which is written like most

2  good-quality instructions should be and that's down to like the

3  fifth grade level and made it step by step and very easy for a

4  voter to follow.  And that's what we call the abbreviated

5  instruction.  So we still -- the State-provided instructions,

6  we still reference them, but we do provide this to make it a

7  shortcut, if you will.

8  Q.  Thank you.  And in the corrective action envelope, could

9  you open that and tell us if there's anything unique to Dallas

10  County in there?

11  A.  You might to have ask Ms. Phillips, but I don't believe

12  there's anything unique to Dallas, though we plan on making it

13  unique because this is the very long corrective form that they

14  kind of package everything all in once.  It's a lot of

15  "if/thens."  If your problem was A, then do B.  If it was C,

16  then do D, where really it should be customized to what the

17  problem is instead of one size fits all.  We're still in the

18  process of redoing a lot of our internal process, but whatever

19  we do we have to get it approved by the Secretary of State.  So

20  it's a rather long process.

21  Q.  Thank you.  After the March 2022 primary, in the phone

22  calls that you had with the Secretary of State's staff as part

23  of the Advisory Committee, you recall raising issues with the

24  carrier envelope design; is that right?

25  A.  That's correct.

Michael Scarpello - Examination              413

1   Q.  And you raised concerns about the ability of the voter to

2   fill out the carrier envelope properly and for elections

3   administrators to be able to access it, correct?

4   A.  Yes.

5   Q.  And in the Elections Advisory Committee to the Secretary of

6   State, elections administrators, not just you, have expressed

7   concerns about the design of the carrier envelope, correct?

8   A.  Yes.  And I would say the design concerns are not so much

9   what the Secretary of State did to design the envelope, but the

10  rather large quantity of requirements that the legislature has

11  imposed on Secretary of State to put on the envelope.

12  Q.  We don't want to throw the Secretary of State under the bus

13  if the Election Code requires that all of these things be put

14  on the envelope.

15  A.  Correct.

16  Q.  But in order to fit all of these things on the envelope,

17  there's quite a bit there, isn't there?

18  A.  There's quite a bit, yes.

19  Q.  And what size font would you observe for that?

20  A.  I'm going to say this is probably number eight, number

21  seven, if I had to guess.

22       THE COURT:  So for purposes of the record, just to be

23  clear, it looked like it was more than a letter size.  Is that

24  legal size or what is that?  The paper that you're looking at.

25       THE WITNESS:  Depends on -- I think they're all letter

Michael Scarpello - Examination                414

 1  size.  The corrective action form was legal size.

 2  BY MS. PERALES:

 3  Q.  Can you hold up the carrier envelope please and show where

 4  the voter puts their ID number that has to be matched as a

 5  result of SB1?

 6  A.  It's underneath the flap because it has to be protected

 7  when it's in the mail system.

 8  Q.  Inside the -- yes, inside the mail system.  Understood.

 9  A.  And I forgot, I should mention that one other thing we did.

10  You talked about things that we did to try to help.  So we

11  provided the pink instruction sheet, abbreviated instructions,

12  and we also on the envelopes we tried to highlight those spaces

13  that needed to be filled -- that we recommended to be filled

14  out.

15  Q.  So you took a yellow highlighter to the carrier envelope?

16  A.  The printer had a yellow highlighter, yes.

17  Q.  That's one less thing for Ms. Phillips and her staff to do.

18  You expressed concerns to the Election Advisory Committee,

19  didn't you, about the design of the form in terms of how it

20  guides the voter to make sure that the voter sees to provide

21  the identification number under the flap, correct?

22  A.  Can you repeat that question?

23  Q.  One concern you had and expressed in the Advisory Committee

24  is about the design of the carrier envelope and how it guides

25  the voter to make sure that the voter puts the ID number under

Michael Scarpello - Examination          415

1  the flap, correct?

2  A.  Yes.

3  Q.  And when you say the vendor highlighted some of this in

4  yellow, was that Dallas County vendor?

5  A.  Yes.

6  Q.  So you asked for that additionally?

7  A.  Yes.

8  Q.  And in Dallas County, a certain percentage of people don't

9  fill out the carrier envelope properly; is that right?

10  A.  Yes.

11  Q.  And that people are missing the place where they're

12  supposed to provide the ID number on the carrier envelope,

13  correct?

14  A.  Yes.

15  Q.  And that's resulting in the voter not providing an ID

16  number on the carrier envelope, correct?

17  A.  Yes.

18  Q.  And other elections administrators have also expressed

19  concerns about this aspect of the carrier envelope, correct?

20  A.  Yes.

21  Q.  You suggested to the Secretary of State that the carrier

22  envelope form should be thrown away and a new one should be

23  created from scratch, yes?

24  A.  Yes.

25  Q.  I'm going to shift now to Dallas County rejecting

Michael Scarpello - Examination                416

1   applications for ballot by mail and mail ballots for ID defect

2   reasons.  Back in April of 2022, you believed that there were

3   voters who would attempt to vote by mail in November 2022

4   general election who had not yet encountered the ID matching

5   requirements because they hadn't voted in the March primary,

6   correct?

7   A.  Yes.

8   Q.  And at that time, you anticipated that for at least some of

9   those voters they were going to have either their application

10  for ballot by mail rejected or their mail ballot rejected

11  because they didn't have a matching ID number in your records,

12  correct?

13  A.  Yes.

14          MS. PERALES:  I need a moment to get my exhibit.

15          (Pause.)

16          THE WITNESS:  If I could correct the record for the

17  judge, one of the instructions --

18          THE COURT:  That's what I saw.  That's what I thought.

19  So what form is that?

20          THE WITNESS:  This is Texas Secretary of State form

21  6-17.

22          THE COURT:  What I saw was something that was well

23  beyond letter, more looking like legal, and what I'm seeing is

24  just a whole body of text with limited white space.  And it's

25  front and back, right?  Is that right?

Michael Scarpello - Examination                417

```
1          THE WITNESS:  Yes.
2          MS. PERALES:  Thank you for giving me that moment.
3    BY MS. PERALES:
4    Q.  I know it's never a good idea to try to talk through
5    numbers, but I would like to talk through a few numbers with
6    you, Mr. Scarpello.  It's never a good idea for the lawyer
7    here.  I think the lawyer over there is doing just fine.
8          I'd like to look at LUPE 236 please.  Mr. Scarpello, you'll
9    see in the upper left-hand corner where it says Summary RPT
10   Group Detail?
11   A.  Yes.
12   Q.  And then across the top, 2018 Republican Primary March 6,
13   2018.  Do you recognize this as a record of unofficial results
14   from the March 6, 2018 Republican primary in Dallas County?
15   A.  I wasn't here in 2018, but I would recognize this as one of
16   our reports.
17   Q.  Now, there is a number, let's see if I can help guide
18   Derek, left-hand column ballots cast total 82,854; is that
19   right?
20   A.  Yes.
21   Q.  Just to the right and slightly below -- just to the right
22   of the 82,854 and below is a 6.44.  Do you recognize that as a
23   turnout percentage?
24   A.  Yes.
25   Q.  And then if we go slowly to the right, there is EV_mail and
```

Michael Scarpello - Examination                418

1  8911; is that right?

2  A.  Yes.

3  Q.  And is it correct that in Texas elections, the early vote

4  includes both early vote by personal appearance at the polling

5  place and mail ballots, correct?

6  A.  Yes.

7  Q.  And mail ballots are just generally considered part of the

8  early vote?

9  A.  They're a subset of it, yes.

10  Q.  Thank you.  I would like to hopefully have that available

11  if we have to go back to it, but I'd like to go to LUPE 238 if

12  we could.  I would like to look at LUPE 240 please.  So a

13  moment ago we were in 2018.

14      Will you observe with me that this is the summary results

15  report from the 2022 March primary?

16  A.  Yes.

17  Q.  And this is -- no, that's wrong.  I'm sorry.  I was right

18  the first time.  Exhibit 238 please.

19      Mr. Scarpello, hopefully you recognize this as a document

20  from Dallas County, over on the right-hand side it says,

21  Unofficial final for Dallas County?

22  A.  Yes.

23  Q.  And on the left, Summary Results Report 2022 March Primary;

24  is that right?

25  A.  Yes.

Michael Scarpello - Examination                419

1  Q.  Now, do we see that the total ballots cast in the
2  Republican primary is 88,210, yes?
3  A.  Yes.
4  Q.  And then if we just follow that line across to EV mail, the
5  number there is 2,765; is that right?
6  A.  Yes.
7  Q.  Would you observe with me that comparing those two, and I
8  don't know if it's possible to go back to the previous one, in
9  terms of the total votes cast?
10  A.  8,900.
11  Q.  Oh, wow, they can go side by side, this is miraculous.
12  It's about 6,000 more votes cast in 2022 in the Republican
13  primary, yes?
14  A.  Yes.
15  Q.  But what has happened to the number of mail ballots cast in
16  the Republican primary?
17  A.  It's shrunk considerably.
18  Q.  It went from 8,911 all the way down to 2,765; is that
19  right?
20  A.  Correct.
21  Q.  And so you would agree with me that the Republican mail
22  voter by mail voter turnout dropped substantially between the
23  2018 primary and the 2022 primary in Dallas County?
24  A.  Yes.
25  Q.  While the total number of votes cast in the Republican

Michael Scarpello - Examination                    420

1   primary went up overall?

2   A.   Correct.

3   Q.   Now, before my friend, Ms. Hunker, gets up and points out,

4   I will walk you through.  We don't know just from looking at

5   these papers why there were fewer mail ballots cast in 2022

6   than there were in 2018, just from the face of these reports,

7   correct?

8   A.   No, we don't.

9   Q.   And it could be that some people simply chose to vote in

10  person instead of by mail, correct?

11  A.   That's correct.

12  Q.   It's also possible that some of these voters experienced an

13  ID number defect and decided to vote in person, correct?

14  A.   That could be.

15  Q.   It's also possible that that in-person turnout went up by

16  in-person voters and that there were people with ID defects

17  that were never cured; isn't that right?

18  A.   Can you repeat that?

19  Q.   It's also possible that the drop from 8,911 to 2,765 is due

20  in part from people experiencing ID number defects on their

21  mail ballots and then not voting in that election?

22  A.   It could be one of many possibilities.

23  Q.   But the one thing we do know is that there are

24  substantially fewer mail ballots cast in the Republican primary

25  from 2018 to 2022 while overall turnout in that race went up?

Michael Scarpello - Examination                421

1    A.  Correct.

2    Q.  Moving on.  You went to extraordinary measures to try to

3    educate the public about the identification requirements,

4    correct?

5    A.  Yes.

6    Q.  And you received an allotment of $89,000 from the Dallas

7    County Commissioners Court to reach out to voters who had

8    rejected mail ballot applications, correct?

9    A.  Yes, that was in the primary of 2022.

10   Q.  Thank you.  And these measures to educate the public

11   included some radio ads, correct?

12   A.  I believe so.

13   Q.  Some Facebook educational efforts also?

14   A.  Yes.

15   Q.  And these measures were not only to help people who had

16   already experienced a rejected mail ballot or ballot

17   application, but also to try to prevent those problems from

18   happening to people who were going to try for the first time,

19   correct?

20   A.  Yes.

21   Q.  Now that we're on the other side of the November 2022

22   election, is it fair to say that based on your direct

23   experience with November 2022, that you foresee a need to

24   engage in continued voter education efforts around the ID

25   number requirement?

Michael Scarpello - Examination                  422

1   A.  Yes, because there's always going to be new people turning

2   65 and people that are less experienced and what you find in

3   presidential election, for instance, is a lot more

4   participants, so people who have not voted in the previous

5   couple years.

6   Q.  So new people turn 65, people will experience these ID

7   requirements for the first time in 2024 because they haven't

8   voted since SB1 went into effect?

9   A.  Correct.

10  Q.  I'm skipping questions, Mr. Scarpello.  You've walked us

11  through the contents of the mail ballot packet and the

12  corrective action packet.  Now, despite your efforts including

13  the pink piece of paper which is meant to be reader friendly

14  and very accessible, in the 2022 general election it continued

15  to be the case that certain voters ultimately were unable to

16  vote by mail because they either provided an ID number that

17  could not be matched to their registration or they did not

18  provide an ID number at all, correct?

19  A.  Correct.

20  Q.  And the turnout rate for mail voting as compared to overall

21  voting in the November general in 2022 was down compared to

22  previous elections, correct?

23  A.  I believe so, we only pointed out the Republican side, I

24  don't know about --

25  Q.  So do you recall discussing in your deposition your opinion

Michael Scarpello - Examination                423

1    whether or not the overall turnout for mail vote in
2    November 2022 was lower than in past elections?
3    A.   I believe so, yes.
4    Q.   Thank you.  And you know this because prior to going into
5    an election, you look at similar types of elections and the
6    turnout in past years, so you can plan for your resources,
7    correct?
8    A.   Prior to an election, we do a very extensive evaluation --
9    we project how many people are going to vote early, how many
10   people are going to vote by mail, how many are going to vote on
11   Election Day as well as where they're going to vote, what time
12   they're going to vote, that sort of thing, so that we can
13   properly distribute our resources.
14   Q.   And so your observation that overall in the November 2022
15   general, that the turnout rate for mail voting was lower than
16   you expected was because you had done an analysis and you had
17   some expectations about vote by mail, correct?
18   A.   Yes, yes.
19   Q.   And the actual numbers for mail voting in November 2022
20   were not as high as you had projected, based on historic
21   turnout, correct?
22   A.   Correct.
23   Q.   I'd like to look at Joint Exhibit One, page 60, starting at
24   line -- it's actually the previous page, page 59.  Starting at
25   line seven, Vote Harvesting Services.  This is the provision

Michael Scarpello - Examination                424

1  before the provision that makes it a crime for election

2  officials to send out applications for ballot by mail.  But

3  this is just the earlier part of the vote harvesting part of

4  SB1.  And I'd just like to talk with you for a brief moment

5  about this.

6     You would agree with me that if someone is going door to

7  door to canvas voters to encourage them to vote for school

8  bond, that person is having a face-to-face interaction with a

9  voter?

10 A.  Yes.

11 Q.  And if the person is urging voters to vote for school bond,

12 that that person's intent is to convince the voter to vote a

13 certain way?

14 A.  Yes.

15 Q.  And if that individual who is canvassing, talking to the

16 voter in the doorway, and the voter says, *Oh, I have my mail*

17 *ballot right here on the mail table,* and they continue the

18 conversation, that that would be in the presence of the mail

19 ballot, correct?

20 A.  Yes.

21        MR. KERCHER:  Objection, seeks an improper legal

22 conclusion.

23        THE COURT:  Yeah, I will not accept it as a legal

24 conclusion, but I will accept the witness's answer based upon

25 his experience with his staff and polling -- or entities that

Michael Scarpello - Examination                425

1   engage in advocacy as to his experience with them and what they

2   may perceive as proper or improper.

3              MS. PERALES:  That was my last question in the series,

4   Your Honor.

5              MR. KERCHER:  Sorry to interrupt.  Your Honor, is my

6   objection overruled.

7              THE COURT:  It's overruled.

8   BY MS. PERALES:

9   Q.  I'd like to move to page 62 now, line 26.  Starting at line

10  26, Civil Penalty, and if we could see the rest of it, if it's

11  possible?

12             THE COURT:  Actually, that was granted in part and

13  denied in part.  I granted it in part to the extent that I'm

14  not accepting it as a legal conclusion.

15             MR. KERCHER:  Thank you for clarifying, Your Honor.

16  BY MS. PERALES:

17  Q.  Are you familiar, Mr. Scarpello, with Section 8.01 of SB1

18  which in part imposes civil penalties on election officials?

19  A.  Yes.

20  Q.  Are you employed by a political subdivision of Texas?

21  A.  I'm employed by Dallas County.

22  Q.  Do you consider yourself an election official?

23  A.  Yes.

24  Q.  Do you understand this to impose a civil penalty on you

25  including the loss of your employment and your employment

1    benefits if you violate a provision of the Texas Election Code?

2    A.  Yes.

3    Q.  And will you observe with me all of this language is

4    underlined, meaning it's being added to the Election Code?

5    A.  Yes.

6    Q.  You also understand that this provision subjects you to

7    money penalties as well, yes?

8    A.  Yes.

9    Q.  And you are concerned about liability for civil penalties

10   for mistakenly violating the Texas Election Code, correct?

11   A.  Correct.

12   Q.  And every election official you know is concerned about the

13   civil penalty provision of 8.01, correct?

14   A.  I think there are election officials all around the state

15   who are very concerned about these provisions and are touching

16   up their resumes.

17   Q.  Now, let's scroll down -- well, actually we're going back

18   up to page 60, but we're going to start at line 15.  So in this

19   provision which is the part that I referenced earlier, 7.04 of

20   SB1 has a section that applies to elections officials, correct?

21   A.  Yes.

22   Q.  And one part of it, sub one, talks about soliciting the

23   submission of an application to vote by mail, but then the

24   second part criminalizes distributes an application to vote by

25   mail; is that right?

Michael Scarpello - Examination                    427

1   A.   Correct.

2   Q.   And then the third part is criminalizes any authorizing or

3   approving of the expenditure of public funds to facilitate

4   third party distribution; is that right?

5   A.   Yes.

6   Q.   You understand this section to prohibit your Department

7   from sending out applications for ballot by mail to voters who

8   have not already requested those applications, correct?

9   A.   Correct.

10  Q.   And when the provision says "commits an offense," you

11  understand that phrase to be a criminal act, correct?

12  A.   Correct.

13  Q.   Now, Dallas County has not previously sent out unsolicited

14  applications for ballot by mail; is that correct?

15  A.   They did not do that when I first came here, that was part

16  of our plan to do it until SB1 came along.

17  Q.   And what was the purpose of doing it -- let me back up.

18  Were you part of the plan to decide to do it?

19  A.   That was part of my plan, yes, because that is what we've

20  done in other states.

21  Q.   And what is the purpose of sending out an unsolicited

22  application for ballot by mail?

23  A.   To make it easier on the voter.

24  Q.   And was the plan to send application for ballot by mail to

25  all the voters or some subset of the voters?

Michael Scarpello - Examination                428

1    A.  I think my original plan was to send to those who had

2    previously been a voter, if they were a mail ballot voter last

3    year, send them an application for this year, not the more

4    aggressive send to everyone over age 65.

5    Q.  Okay, so somebody who had used it in the year before?

6    A.  Yes.

7    Q.  Historically, though, Dallas County provided mail ballot

8    applications if an individual came to you and said something

9    like *I want to distribute applications for ballot by mail,*

10   that's correct?

11   A.  Yes.

12   Q.  So somebody might come from a church and say, *I would like*

13   *a certain number of applications for ballot by mail so I can go*

14   *and distribute them to my friends who are eligible to do that,*

15   yes?

16   A.  Yes.

17   Q.  Does your Department do that now?

18   A.  No.

19   Q.  Why?

20   A.  I believe there was an interpretation by the Secretary of

21   State that said that they believe that would be a violation.

22   Q.  And now you require a voter to request from you the

23   application for ballot by mail before you send it out; is that

24   right?

25   A.  That's correct.

Michael Scarpello - Examination                    429

1    Q.  Now, you participated in an exchange of e-mails in Dallas

2    County about whether or not you could put return postage on an

3    application for ballot by mail.  Do you recall that?

4    A.  I vaguely recall that, yes.

5    Q.  Do you recall expressing a concern that putting postage for

6    the return of the application for ballot by mail could get you

7    too close to the prohibited practice under SB1?

8    A.  Yes.

9    Q.  And would it be fair to say that when you engage in that

10   communication, you are expressing a concern that paying return

11   postage on an application for ballot by mail is prohibited --

12   was potentially prohibited?

13   A.  Yes, yes.

14   Q.  Now, later on your office made a determination that it was

15   okay under SB1 to provide the voter the return postage,

16   correct?

17   A.  Yes, I believe so.

18   Q.  But the criminal offenses and heavy penalties associated

19   with SB1 caused the Department to question its practices, did

20   it not?

21   A.  Yes.

22   Q.  And because when it comes to State jail penalties, you need

23   to try to do as much as you can to protect the Department's

24   staff, correct?

25   A.  That's correct.

Michael Scarpello - Examination                430

1    Q.  And you were very concerned about any practice having to do

2    with the vote by mail applications, correct?

3    A.  Yes.

4    Q.  So for example, when a candidate asked you to review their

5    own application for ballot by mail after SB1 was enacted, you

6    said something like, well, even something as simple as that,

7    does it put us in legal jeopardy?

8    A.  Yes, that's a best practice, we would normally offer that

9    service to candidates to make sure their stuff they send is

10   accurate, but even that, we were wondering whether or not that

11   would violate one of these provisions.

12   Q.  I'm going to shift a little bit now to voters with

13   disabilities.

14          THE COURT:  Before you do that, let's take our

15   afternoon break.  Let's break for 15 minutes.

16          COURT SECURITY OFFICER:  All rise.

17          *(2:59 p.m.)*

18                              *   *   *

19          *(3:16 p.m.)*

20          COURT SECURITY OFFICER:  All rise.

21          THE COURT:  Thank you.  Please be seated.

22   BY MS. PERALES:

23   Q.  Mr. Scarpello, do you need any water or anything?

24   A.  I'm good.  Thank you.

25   Q.  Mr. Scarpello, sometimes people ask the Dallas County

Michael Scarpello - Examination                431

1   Elections Department for an accommodation based on disability,

2   correct?

3   A.   Yes.

4   Q.   And sometimes an election judge will push a person in a

5   wheelchair to the front of the line at a polling place because

6   that person is disabled, correct?

7   A.   Correct.

8   Q.   And sometimes an election judge will help a person to the

9   front of the line at a polling place because of advanced age,

10  correct?

11  A.   I believe so.  The law gave -- gives the judge the

12  discretion to do that previously, the current law says they

13  shall do it, the new law.

14  Q.   Now, based on your experience, you think that at least some

15  voters showed up to vote curbside during the 2022 primary and

16  general election because of SB1's identification requirements

17  for mail-in ballots, correct?

18  A.   I believe I speculated that could be a reason.

19  Q.   And you thought, for example, that a disabled voter who

20  can't access a polling place would look for an alternative to

21  vote, correct?

22  A.   Yes.

23  Q.   And this is also because the provisions of SB1 make mail

24  ballots much more difficult to vote, correct?

25  A.   Yes.

Michael Scarpello - Examination                    432

1    Q.  After SB1 was enacted, the Secretary of State sent out

2    election advisories including to your Department, correct?

3    A.  Yes.

4    Q.  And those advisories attempted to explain how to implement

5    SB1, correct?

6    A.  Yes.

7    Q.  And you believed that the rules under SB1 were vague,

8    correct?

9    A.  I believe that the law as stated on its face could be

10   interpreted various ways and that's true of any law and that's

11   why the Secretary of State typically puts out election

12   advisories trying to provide more guidance.

13   Q.  You have personal knowledge that voters misunderstood the

14   new rules under SB1, correct?

15   A.  Yes.

16   Q.  For example, you knew of voters or know of voters who did

17   not fill out their applications for ballot by mail correctly,

18   yes?

19   A.  Yes.

20   Q.  And you also know of voters -- when you did find voters who

21   misunderstood the new rules under SB1, you tried to explain

22   those new rules, correct?

23   A.  Yes.

24   Q.  You would agree with me that for both the 2022 primary and

25   general elections, there were voters whose mail ballots were

Michael Scarpello - Examination                    433

1   received and who would -- who sent you mail ballots that you

2   couldn't verify and who received their rejection notice too

3   late to cure, correct?

4   A.  I believe that was the case.

5   Q.  And do you also think that this category of voters who

6   receive their corrective action packets so close to Election

7   Day that they can't cure, you think there's always going to be

8   that category of voters, correct?

9   A.  Yes.

10  Q.  I'm going to shift a little bit now to voter fraud.  You're

11  not familiar with any instances in which someone in Dallas

12  County has tried to improperly influence a voter's decision

13  while providing assistance, correct?

14  A.  No, I'm not familiar with any cases like that.

15  Q.  And for the 2022 primary election, you're not aware of any

16  incidents of voter fraud associated with in-person assistance

17  of voters at the polling place, correct?

18  A.  Correct.

19  Q.  And for the 2022 general election, reports by poll watchers

20  did not provide information to conclude that there was voter

21  fraud occurring at any polling site in Dallas, correct?

22  A.  Correct.

23  Q.  And for the November 2022 general election, you did not

24  experience any problems of voter fraud associated with

25  individuals providing assistance to voters in the polling

Michael Scarpello - Examination                434

1   place, correct?

2   A.  Correct.

3   Q.  It would have concerned you to know that the Attorney

4   General's Office sought to bring criminal charges against the

5   Travis County Elections Administrator in the past, correct?

6   A.  Correct.

7   Q.  And you communicated with members of the Texas legislature

8   regarding SB1 or its predecessors during the legislative

9   process of the 87th Texas legislature, that's 2021, including

10  during the regular and the special sessions, correct?

11  A.  Yes.  And I'm not sure if I communicated directly or if it

12  was through our lobbyists.

13  Q.  And you shared concerns about SB1 with the legislators that

14  represent the Dallas County area, correct?

15  A.  Yes.

16  Q.  You shared concerns with them about the criminal penalties

17  for election officials under SB1, correct?

18  A.  Correct.

19  Q.  And you shared concerns with them about the penalties under

20  SB1 for poll workers for their interactions with poll watchers,

21  correct?

22  A.  Correct.

23  Q.  You were very concerned that those penalties would have a

24  chilling effect on being able to recruit and retain poll

25  workers, correct?

Michael Scarpello - Examination                    435

1   A.  Correct.

2   Q.  You also expressed concerns to legislators about not being

3   able to process mail ballots or applications for ballot by mail

4   because of the new ID requirements of SB1, correct?

5   A.  Correct.

6   Q.  And you advised legislators on what you think the effects

7   of the legislation might be, correct?

8   A.  Correct.

9   Q.  I have a number of exhibits.  I have concluded my

10  examination and I have a number of exhibits that I believe

11  there are three of them.  There are defendant Ogg's objections

12  who is not a defendant in our case, but we do have objections

13  to these three exhibits, so I'd like to call them up please.

14  LUPE 78, and I believe the objection here is hearsay.

15      Mr. Scarpello, perhaps I can just ask you do you recognize

16  this document?

17          THE COURT:  Let me stop you here, so is Ogg the only

18  defendant objecting?

19          MS. PERALES:  Well, as to these three that's my

20  understanding unless the new objections that we received are --

21          THE COURT:  So how does Ogg have standing, since we're

22  so focused on this side of the fence, how does Ogg have

23  standing to challenge this?

24          MR. NICHOLS:  If that is the ruling of the Court--

25          THE COURT:  That's a question of the Court.

1      MR. NICHOLS:  But if that reflects the understanding

2  of the Court, that nothing concerning Dallas County relates in

3  any form or fashion to claims against DA Ogg, I agree with the

4  Court and I will withdraw whatever objections have been made by

5  us.

6      THE COURT:  What are the claims against Ogg again?

7      MR. NICHOLS:  The claims against Ogg as I understand

8  and appreciate them, Judge, include claims over those roughly

9  nine provisions of SB1 that relate in some form or fashion to

10  the criminal justice system.  And that would include the claims

11  relating to the four new provisions of the -- criminal

12  provisions of the Election Code as well as some of the

13  provisions that amend penalty ranges, and the provision that

14  deals with the assister oath, which of course, you know our

15  legal position, Judge, is that has nothing to do with a DA

16  anyways, but those are the only claims that are being made.

17  But if the Court --

18      THE COURT:  Let me find out.  These three exhibits

19  deal with what subject matter?

20      MS. PERALES:  They deal with Dallas County elections,

21  as far as I know.

22      THE COURT:  They're just data on voting numbers and

23  turnout.

24      MS. PERALES:  The first exhibit is, Your Honor.  The

25  three of them are communications by Mr. Scarpello, the Dallas

1  County Elections Administrator, regarding various issues that

2  arose during the lead-up to the March primary, as far as I

3  know.

4            THE COURT:  What kind of issues?

5            MS. PERALES:  Well, some having to do with poll

6  watchers, some having to do with rejected ballots by mail, so

7  the first one, LUPE 78, is communication from Mr. Scarpello in

8  which he said that --

9            THE COURT:  So 78 is not a problem.  What are the

10 other two?

11           MS. PERALES:  Okay, 79.  This is also similarly an

12 e-mail from Mr. Scarpello to Dallas County officials as well as

13 officials from the parties.  There's a description there by

14 Mr. Scarpello about a poll watcher issue, so these are in his

15 words --

16           THE COURT:  It was a poll watcher issue just in

17 Dallas, but not in Houston, okay, that's not a problem, next

18 one.

19           MS. PERALES:  80 please.  Again a communication by

20 Mr. Scarpello to the party leaders regarding -- acknowledging

21 there's been a lot of questions.

22           THE COURT:  Can you go down on the document?  Keep

23 going.

24           MS. PERALES:  Is that the bottom?  And then there were

25 two attachments there.  There's an attachment from the

Michael Scarpello - Examination                    438

```
 1   Secretary of State regarding ballot security and then I believe
 2   the next one has to do with poll watchers.
 3            THE COURT:  Nothing affecting Ogg.  Any objections
 4   noted are overruled.  Those 78 -- give me the other two
 5   numbers.
 6            MS. PERALES:  79 and 80.
 7            THE COURT:  What's the other one?
 8            MS. PERALES:  78, 79 and 80.
 9            THE COURT:  All three admitted.
10            MS. PERALES:  Thank you, Your Honor.  I pass the
11   witness.
12            THE COURT:  Anybody else on this side?
13            MR. BARON:  Yes, Your Honor.  This is Noah Baron on
14   behalf of LULAC plaintiffs.
15                          EXAMINATION
16   BY MR. BARON:
17   Q.  Good afternoon, Mr. Scarpello.  How are you holding up?
18   A.  Good.
19   Q.  Earlier you were discussing that voters in Dallas County
20   have had their mail ballots rejected due to issues with
21   identification numbers; is that right?
22   A.  Can you repeat the question?
23   Q.  Yes, sorry.  With my colleague, Ms. Perales, you were
24   discussing that voters in Dallas County have had their ballots
25   rejected due to issues with identification numbers; is that
```

Michael Scarpello - Examination                    439

1   right?

2   A.   That is correct.

3   Q.   She referred to it as identification defect?

4   A.   Yes.

5   Q.   And would you agree with me that in Dallas County the rate

6   of rejection of mail ballots since SB1's enactment has been

7   higher than in years prior to SB1?

8   A.   Yes.

9   Q.   And --

10  A.   As far as I know.  I haven't done an extensive study.

11  Q.   Understood.  Don't worry I'm not going to be getting into

12  the specific numbers, I went to law school because I can't do

13  math.

14       Would you also agree with me that a high percentage of the

15  rejections are due to defects that are caused by issues with

16  identification numbers?

17  A.   Yes.

18  Q.   Would you say that those constitute more than half of the

19  defect rejections?

20  A.   I don't recall, I'd have to look at the numbers.

21  Q.   Would you say it's a significant percentage?

22  A.   Yes.

23  Q.   And is it fair that you today still have concerns about the

24  high rate of rejections?

25  A.   Yes.

Michael Scarpello - Examination          440

1  Q.  And at this point, I'd like to pull up what's been

2  premarked as LULAC Exhibit 66.  This is a one-page document

3  titled ID statistics that your office produced.  Have you seen

4  this document before, Mr. Scarpello?

5  A.  I'm sure I have.

6  Q.  This is a chart created by your office and attached to your

7  interrogatory responses in this case; is that right?

8  A.  I believe so, yes.

9  Q.  And could you briefly explain to the Court what this chart

10  shows?

11  A.  Can you give me a moment?

12  Q.  Of course.

13  A.  So it looks like a summary of how many people have either a

14  driver's license number attached to their voter registration or

15  a SSN on their voter registration.

16  Q.  Can we please expand the far left column of this chart?

17  Mr. Scarpello, I'd like to direct your attention to where the

18  chart says, quote, *No DL#-No full SS#-no SS4.*  That means the

19  entry below reflects the number of registered voters in Dallas

20  County who had no driver license number or full Social Security

21  number listed with their voter file; is that right?

22  A.  Or in addition, it looks like not even the last four of

23  their Social Security number.

24  Q.  Right.  And according to the chart, the number of such

25  individuals is 7,335; is that right?

Michael Scarpello - Examination                441

1    A.  That's correct.

2    Q.  So if one of those people were to submit a mail ballot

3    application, that application would be denied even if they

4    concluded both their driver's license number and their Social

5    Security number?

6    A.  I don't recall the exact procedures, what happens in that

7    case, but my memory is that they would be denied, but

8    Ms. Phillips can answer that question better than I.

9    Q.  It would not be accepted?

10   A.  Correct.

11   Q.  And please expand the column to the right of the column we

12   just discussed.

13       So Mr. Scarpello, I'd like to direct your attention to

14   where it says, *Full SS# only - No DL#.*  That entry below that

15   reflects the number of registered voters in Dallas County who

16   have only their Social Security number associated with their

17   file and no driver's license number; is that correct?

18   A.  Correct.

19   Q.  And according to this chart, the number of those

20   individuals is 7,879; is that right?

21   A.  Yes.

22   Q.  And we're going to move to the column one more over to the

23   right.  Directing your attention to where the chart says, *SS4*

24   *only-No full SS#-No DL#.*  The number below there, you would

25   agree, shows the number of registered voters in Dallas County

Michael Scarpello - Examination                    442

1    who have only the last four digits of their Social Security

2    number associated with their file; is that right?

3    A.   Correct.

4    Q.   According to this chart, there are 24,328 such individuals

5    in Dallas County; is that right?

6    A.   Yes.

7    Q.   So in total, about 32,207 registered voters in Dallas

8    County do not have a driver's license associated with their

9    file.  Does that sound accurate?

10   A.   I'm not sure if that's cumulative or not as far as -- I

11   don't know if you would add those all together or not.

12   Q.   I'm sorry.  That do not have a driver's license associated

13   with their file, but do have a Social Security number

14   associated with their file of some kind.  So those would be the

15   column that states full SS number only - No DL number and the

16   column that states SS4 only - No full SS number, No DL number?

17   A.   You have to repeat the question.

18   Q.   Sure putting those columns together, that would reflect the

19   number of registered voters in Dallas County who have some part

20   of their Social Security number, the last four digits at least,

21   but no driver's license number associated with their voter

22   file; is that accurate?

23   A.   Yes, but keep in mind that I went to law school too because

24   the numbers.

25   Q.   Fair enough.  Fair enough.  So if one of those individuals

Michael Scarpello - Examination                443

1    were to submit an application for a ballot by mail and they
2    included only their driver's license, that application would
3    not be accepted, right?
4    A.  That's correct.
5    Q.  And likewise, if they submitted a mail ballot that only
6    included their driver's license number on their mail ballot,
7    that ballot would also be rejected, wouldn't it, or would not
8    be accepted?
9    A.  I believe so, yes.
10          MR. BARON:  That, I believe, is all my questions for
11   you.  No further questions.  I'll pass the witness.
12          MR. SHOWALTER:  My name is Mike Showalter, I'm with
13   Arent Fox Schiff Law Firm, counsel for Haul plaintiffs.
14                       EXAMINATION
15   BY MR. SHOWALTER:
16   Q.  Good afternoon, Mr. Scarpello.
17   A.  Good afternoon.
18   Q.  In your capacity is Dallas County Election Administrator,
19   you're generally familiar with your office's obligations under
20   the Americans with Disabilities Act, correct?
21   A.  Correct.
22   Q.  You're aware that your county has an obligation to ensure
23   that voting in person is accessible to voters with
24   disabilities, correct?
25   A.  Correct.

Michael Scarpello - Examination                444

1  Q.  What about voting by mail, does that have to be accessible

2  to individuals with disabilities?

3  A.  Under the current law, I don't know what we could do to

4  make it, quote, accessible.

5  Q.  Does your office have any written ADA policies or

6  procedures?

7  A.  Regarding vote by mail?

8  Q.  Yes.

9  A.  No.

10  Q.  What about physical voting?

11  A.  We have this year we did an extensive survey, resurveyed

12  all of our over 550 locations for ADA access to make sure that

13  we were in compliance at the polling places.

14  Q.  So physical compliance at the polling places.  Does your

15  office have a full-time ADA coordinator?

16  A.  No.

17  Q.  Does the department head at voting sites serve in that role

18  for in-person voting?

19  A.  The department head in combination with the lead in that

20  group we have a voting sites facilities coordinator that

21  coordinates those surveys and is the subject matter expert when

22  it comes to ADA compliance.

23  Q.  I'd like to show the witness a document which has been

24  pre-tagged as Haul MFV-17.  Can you show the next page of this?

25  Can you flip through this document and tell me if you've seen

Michael Scarpello - Examination                445

```
 1  this before?  I'll represent that this is a website, so it's
 2  reduced to a PDF.  It's somewhat awkward.
 3  A.  This looks like various pages from our website.
 4  Q.  This website has a section focused on ADA voting systems,
 5  correct?
 6  A.  Are you pointing that out?
 7  Q.  No, I'm asking you.  Do you know if it does?
 8  A.  I believe so.  Probably talking about our machinery, you
 9  know, the ADA accessible machinery that we use.
10  Q.  Does it have any section where individual voters can ask
11  you for particular accommodations?
12  A.  Not that I can recall.
13  Q.  Since May 2022, has your office made any efforts to make
14  voting registration or voting more accessible to voters with
15  disabilities?
16  A.  Did you say voting and voting registration?
17  Q.  Both, either.
18  A.  Yes, like I just mentioned, we just resurveyed all 550
19  potential sites to make sure that they were ADA accessible.
20  Q.  Have you communicated with community groups about the
21  impact of SB1 on disabled voters?
22  A.  I know that we have ADA activists involved on our what we
23  call the Vote Center Advisory Committee and that's the
24  committee that helps advise which locations we should or should
25  not use.  As far as specifics on SB1, I don't think we've
```

Michael Scarpello - Examination                446

1  discussed that.

2  Q.  So nobody has expressed concerns about voters having a

3  harder time voting now than before SB1's passage?

4  A.  Regarding voters with disabilities, I don't recall any such

5  conversation.

6  Q.  Generally speaking, voters with disabilities may ask for

7  reasonable modifications or accommodations so they can vote,

8  correct?

9  A.  Yes.

10 Q.  Do they have to use accommodations as a magic word or could

11 they say anything else?

12 A.  I think at the polling place in particular, you know, we

13 provide that instruction to our judges where people with ADA

14 issues can either curbside vote or be put to the front of a

15 line and so that's all part of the training process.

16 Q.  And the presiding judge at those locations would have the

17 authority, generally speaking, to grant a request for

18 accommodation or modification?

19 A.  Yes.

20 Q.  Are the presiding judges trained on what constitutes a

21 reasonable accommodation or modification under the Texas

22 Election Code?

23 A.  I think that the training consists of putting them to the

24 front of the line or to provide them with curbside voting.

25 Q.  What if somebody asks for something else?

Michael Scarpello - Examination                447

1    A.  You'd have to be more specific in what that something else

2    is.

3    Q.  Are you aware of the provision of SB1 which is Section

4    1.022 regarding reasonable accommodations or modifications for

5    voters with disabilities?

6    A.  Do you have a document that I can reference?

7    Q.  Can we point -- show him Section 1.022 on the first -- the

8    exhibit which has been marked Joint Exhibit One?

9    A.  And your question was?

10   Q.  Are you aware of this provision, have you reviewed it

11   before?

12   A.  Yes.

13   Q.  Are you aware if the Secretary of State of Texas has issued

14   any guidance about this provision?

15   A.  I don't know.

16   Q.  In your experience, are disabled voters more likely to opt

17   for voting by mail than nondisabled voters?

18   A.  I couldn't say, I don't know.

19   Q.  Could curing rejected mail ballots or ballot applications

20   be more difficult for individuals with disabilities?

21   A.  Could be, yes.

22   Q.  You've testified that the ballot as opposed to application

23   cure process is done by the ballot board, not by your office,

24   correct?

25   A.  Correct.

Michael Scarpello - Examination                448

1   Q.  And the way they do that is by sending one of two
2   prescribed forms explaining the cure process?
3   A.  Yes.
4   Q.  And you've described this form as a highly complex, long,
5   verbiage rich form that's difficult to use, correct?
6   A.  Correct.
7   Q.  Could a form such as that be more difficult for a person
8   with disabilities to ascertain the meaning of?
9   A.  I suppose it depends on what their disability is, but
10  generally, yes.
11  Q.  You agree that voters who use assistance often include
12  voters with disabilities?
13  A.  Yes.
14  Q.  And people who provide assistance could include friends,
15  family or neighbors?
16  A.  Or poll workers.
17  Q.  Could they include people from volunteers from other
18  groups?
19  A.  Yes.
20  Q.  Who are paid staff from other groups?
21  A.  Yes -- well, I can't recall what the restrictions are on
22  that.
23  Q.  But people who take assistance or provide assistance like
24  this need to take an oath, correct?
25  A.  Yes.

Michael Scarpello - Examination                    449

1    Q.  And some people who would take that oath might not want to

2    sign the oath for any of the various reasons including criminal

3    penalties?

4    A.  I can't say.  I can't put myself in their heads.

5    Q.  If a voter assister or poll worker was not clear if the

6    oath was required, would the presiding judge make that

7    determination?

8    A.  Can you repeat the question?

9    Q.  If a voter, assister or poll worker wasn't clear about who

10   had to take an oath for an assister, would the presiding judge

11   at that polling location make that determination?

12   A.  I'm not understanding your question.

13   Q.  If there was uncertainty about whether an oath was required

14   for some assistance to be provided, who would make the

15   determination?

16   A.  The presiding judge.

17   Q.  Your office has not promulgated any guidance as to when an

18   oath would be required if there's uncertainty?

19   A.  I believe it's part of our training.

20          MR. SHOWALTER:  Thank you.  Nothing further.

21          THE COURT:  Anything else on this side?

22                        EXAMINATION

23   BY MS. HOSTETLER:

24   Q.  Good afternoon, Mr. Scarpello.  Courtney Hostetler here for

25   Mi Familia Vota plaintiffs.  I will take only a few more

Michael Scarpello - Examination                    450

1   minutes of your time.  Thank you for your patience.

2       I'm going to look at Joint Exhibit One, so pull that back

3   up.  Thank you.  Would you mind going to page 42, line 23.

4       I want to ask a few questions about Section 5, starting

5   with Section 5.11, and looking at the known signature change.

6   Is it your understanding that the Signature Verification

7   Committee may now compare a voter's signature with any known

8   signature of the voter, correct?

9   A.  Yes.

10  Q.  Before SB1, that period was limited to six years?

11  A.  Correct.

12  Q.  So under SB1, a Signature Verification Committee might

13  reject a ballot based on a comparison to a signature that's

14  more than six years old, right?

15  A.  I don't know how other counties interpret that

16  particular -- this particular law, but I know that in Dallas

17  County it would not be interpreted that way.  It wouldn't be

18  used -- those additional signatures would not be used to

19  disqualify voters, it would be used to qualify voters.

20  Q.  And what happens, then, if there's a signature that is more

21  than six years old that looks different from a signature that

22  they're using now?

23  A.  I believe that the approach of the Signature Verification

24  Committee or Early Voting Ballot Board or any body that has

25  done this sort of work in my past, they're looking -- it's not

Michael Scarpello - Examination                451

1  like they're approaching this where they're looking to

2  disqualify people.  They're looking for those -- for a

3  signature that matches.  So if there's five signatures on file

4  and one of those five matches, they're going to allow it.

5  Q.  Thank you.  And is that the policy that would be across all

6  the committees in Dallas County?

7  A.  Yes.

8  Q.  And to avoid just being duplicative, the same language

9  appears in 5.13 Early Voting Ballot Board, it would be the same

10  policy for them as well?

11  A.  Yes.

12  Q.  And then turning to section 5.12, and that would be

13  page 43, line 24, and I have just questions here about the

14  notification to voters.  So if a voter, if either -- if the

15  Signature Verification Committee believes they have discovered

16  a defect, whether it be lack of signature or a mismatched ID,

17  is it your understanding that they have two business days to

18  determine if it would be possible for the voter to correct

19  that -- if it would be possible for the voter to receive the

20  ballot back in the mail, correct the defect and return the

21  carrier envelope before the time that the polls are required to

22  close on Election Day?

23  A.  That's my understanding.

24  Q.  And if the determination is that yes, there would be enough

25  time to accomplish all of this, notification would have to be

Michael Scarpello - Examination                452

1   given to the voter?

2   A.  Yes.

3   Q.  If the Signature Verification Committee determines there's

4   not enough time to do this, the Committee may notify the voter

5   of the defect?

6   A.  I believe they notify the voter of the defect no matter

7   what the timeframe is.

8   Q.  Is that Dallas County's policy?

9   A.  I believe that's the Early Voting Ballot Board's policy,

10  yes.

11  Q.  Looking at SB1, if we can look to page 44, lines eight

12  through 16, looking specifically at line 13, it says, "The

13  voter --" sorry.  Sorry, line 12, *The committee may notify the*

14  *voter of the defect."*

15      To you is that the same as being an obligation to inform

16  the voter or an option to inform the voter?

17  A.  My understanding is the Early Voting Ballot Board who is in

18  charge of the Signature Verification Committee, the head of the

19  Early Voting Ballot Board and the alternate presiding judge of

20  that group, that they have a very liberal approach and they do

21  everything they can to assist the voter in getting their votes

22  to be counted.

23  Q.  Is that true for Dallas County or is that your

24  understanding of every board across the state?

25  A.  That's true of Dallas County.  I don't know about the other

1    253 counties.

2    Q.  Is your understanding of this that although Dallas County

3    does choose to notify voters, that they're not obligated to

4    under SB1 as it is now written?

5    A.  Because of the "may" language, I would say they are not

6    obligated.

7    Q.  I don't want to be duplicative.  I will mention that the

8    same language appears in Section 5.14 related to that Early

9    Voting Ballot Board.  Is your understanding the same for all

10   these questions?

11   A.  Yes.

12   Q.  Great.  Thank you so much.

13            THE COURT:  Anyone else on that side?

14            *(No response.)*

15            Any cross?

16            MR. KERCHER:  Yes, Your Honor.

17                         CROSS-EXAMINATION

18   BY MR. KERCHER:

19   Q.  Good afternoon, Mr. Scarpello.  Ryan Kercher, I work for

20   the Attorney General's Office.  I'm the latest in a cavalcade

21   of attorneys who have harangued you with questions about this

22   lawsuit over the course of the last year and a half.  Very much

23   appreciate you being here and your patience.  I will try to be

24   efficient with your time.

25        You became the Dallas County Election Administrator on

1  December 7, 2020; is that right?

2  A.  That's correct.

3  Q.  And your first statewide general election as Election

4  Administrator in Dallas County was the November 2022 general

5  election; is that right?

6  A.  Yes.

7  Q.  Now, the Dallas County Elections Department has procedures

8  for administering elections, right?

9  A.  Well, since I've been here, we've developed procedures, we

10  didn't really have too many before, frankly.

11  Q.  And you've tried to implement those procedures proactively

12  so that you can prevent problems before they arise; is that

13  fair?

14  A.  Correct.

15  Q.  You agree, for example, that the privacy of the ballot

16  booth helps protect voters from manipulation?

17  A.  Yes.

18  Q.  And there should not be someone standing over your shoulder

19  telling you how to vote?

20  A.  Correct.

21  Q.  Dallas County Elections Department takes any potential

22  voter fraud seriously; is that a fair statement?

23  A.  Yes.

24  Q.  I want to talk to you a little bit about election workers.

25  Now, the political parties recruit the poll watchers and

Michael Scarpello - Examination                455

1    judges -- excuse me.  The poll workers and judges; is that

2    true?

3    A.  The political parties nominate the judges and the

4    Commissioners Court appoints those that are nominated.  The

5    judges in turn select a lot of their clerks.  Now, having said

6    that, there's always a shortage of judges and clerks and we

7    recruit the balance of those where we run short.

8    Q.  Is it right to say that there is an element of partisanship

9    built into the recruiting of judges and clerks inasmuch as it

10   is the political parties who nominate judges and the judges who

11   then go and recruit clerks?

12   A.  That's a fair statement.

13   Q.  Election judges and clerks have Election Day

14   responsibilities; is that true?

15   A.  Yes.

16   Q.  Among those responsibilities are handling exceptions to

17   standard of voting; is that right?

18   A.  That's correct.

19   Q.  And clerks handle the 80 percent that are easy and judges

20   handle the 20 percent that are hard; is that right?

21   A.  That's correct.

22   Q.  Many judges -- back up.  Judges are recruited for a

23   two-year term typically; is that right?

24   A.  By law they can be appointed to a one or two-year term and

25   in Dallas County we choose a two-year term.

Michael Scarpello - Examination                456

1   Q.  Is it right, though, that many judges do not complete their

2   two-year term?

3   A.  That's correct.

4   Q.  And if those judges don't show up, then the Elections

5   Office has to fill those spots, sometimes with last-minute

6   volunteers?

7   A.  Correct.

8   Q.  I think you alluded to that a moment ago?

9   A.  Yes.

10  Q.  In order to alleviate that problem, your office obtained

11  some pay raises for judges and clerks in Dallas County; is that

12  right?

13  A.  That's correct.

14  Q.  Let's talk a little bit about election integrity.  Of

15  course, making sure that elections are secure is a part of

16  maintaining public confidence in the election system; is that

17  true?

18  A.  Yes.

19  Q.  If people are going to trust the results of an election,

20  they have to have confidence in their government, you agree?

21  A.  Yes.

22  Q.  And they have to understand that the process to elect their

23  leaders is safe and accurate?

24  A.  Yes.

25  Q.  And in the courtroom sometimes we talk about judges needing

Michael Scarpello - Examination                457

1   to be not just impartial, but also to appear impartial.

2   Elections need that same kind of appearance of impartiality,

3   right?

4   A.  I would agree with that.

5   Q.  Even if an election is run completely impartially, if there

6   is a belief among voters that it was not run impartially or

7   fairly, that's a problem, true?

8   A.  That would be my opinion.

9   Q.  Cesar's wife must be beyond reproach, as one of my

10  colleagues once asked you, correct?

11  A.  Correct.

12  Q.  So sometimes you have to take steps to make sure the

13  elections appear above reproach even when the belief that they

14  were not is incorrect?

15  A.  Which party are you talking about?  For me, personally?  Or

16  for the judges?  For who?

17  Q.  Sure.  Let me see if I can ask you a better question.  I

18  got in trouble because that one was three lines long.

19      Even if voters believe incorrectly that an election was not

20  impartial, you may still need to take steps in order to

21  demonstrate to those voters that in fact the elections are done

22  impartially?

23  A.  Correct.

24  Q.  Let's turn now to talk a little bit about the passage of

25  SB1.  While Ms. Perales was talking to you about whether you

Michael Scarpello - Examination                458

1   had had conversations with legislators, I thought I heard your

2   answer this way and I want you to let me know if I misheard.  I

3   thought I heard you say that you had not directly spoken with

4   legislators but that your office had done so through lobbyists;

5   is that right?

6   A.  I think I made that correction because I can't recall the

7   firsthand -- I very well may have talked to legislators, in

8   fact, now that I'm thinking more about it, I'm sure I did, but

9   I couldn't tell you who and when.

10  Q.  You know that there were several iterations of SB1 during

11  the legislative process, right?

12  A.  That's correct, there were several bills that were then

13  merged into SB1.

14  Q.  That's right, SB1 is not even the only sort of omnibus

15  election change that was considered during the 2021 legislative

16  sessions, right?

17  A.  Correct.

18  Q.  You view the language in SB1 although you disagree with

19  parts of it as being an improvement over the predecessor bills,

20  true?

21  A.  I would agree with that, yes.

22  Q.  So we've talked a little bit about the passage of SB1,

23  let's turn now to talk about its implementation, okay.  SB1

24  took effect on December 2nd, 2021; is that right?

25  A.  That's correct.

Michael Scarpello - Examination                    459

1   Q.  The first election in which you were charged with

2   implementing these new provisions in SB1 was the March 2022

3   primary; is that right?

4   A.  That's correct.

5   Q.  It's an awfully short period of time between the passage or

6   the effectuation of an omnibus Election Code bill and the first

7   election in which you have to implement it, fair?

8   A.  Fair.

9   Q.  Your counterpart from El Paso testified earlier today, I

10  know you didn't hear her, that she would have liked to have 12

11  to 18 months to implement it.  Do you share that sentiment?

12  A.  I think having more time to implement is always better.  I

13  will say, though, that December 2nd is really not a fair

14  timeframe because, as I mentioned earlier, when the law is

15  written it's not plain on its face how to implement it.  So the

16  election advisories from the Secretary of State are critical.

17  There was various election advisories that came out that were

18  not released on December 2nd, they were released -- I think

19  between election advisories, etc., etc., communications from

20  the Secretary of State, I think we had 46 different

21  communications in the last 80 days.  And in fact, the last one

22  that was received was the day before the election.  So it's

23  very difficult to effectively implement a law when you get late

24  notices like that.  And that's not the Secretary of State's

25  fault, it's just that it was a highly complex law.

Michael Scarpello - Examination                    460

1   Q.  The Secretary of State was stuck, like elections

2   administrators, trying to figure out the ins and outs of a very

3   complicated bill in a very short period of time, true?

4   A.  True.

5   Q.  It's always going to be more difficult to implement a

6   complicated statute or set of provisions like SB1 the first

7   time you have to implement them; is that fair?

8   A.  That's fair.

9        THE COURT:  Couldn't that have been addressed by

10  including the Secretary of State's Office in the legislative

11  process to make sure you were drafting something that was

12  workable?

13       MR. KERCHER:  Well, it is undoubtedly true that the

14  legislature would have sought input from the Secretary of

15  State's Office through that process, but they are not endemic

16  to it in the same way that the individual legislators are.

17       THE COURT:  Did they do so in this instance?

18       MR. KERCHER:  Yes, I believe the record is replete

19  with testimony from resource witnesses and others from the

20  Secretary of State's Office.

21  BY MR. KERCHER:

22  Q.  You mentioned that in 80 days you got something like 46

23  advisories from the Secretary of State's Office, right?

24  A.  Forty-six various forms of communication including

25  advisories.

Michael Scarpello - Examination                461

1   Q.  And that's an unusual number, right?

2   A.  Yes.

3   Q.  You know that as voters were going through their first

4   election that included these SB1 provisions that some of them

5   misunderstood the new rules, right?

6   A.  I'm assuming that, yes.

7   Q.  Some of the voters, for example, filled their applications

8   for vote by mail incorrectly, right?

9   A.  Correct.

10  Q.  And you tried to help those voters understand those

11  mistakes, true?

12  A.  Yes.

13  Q.  You used a public outreach campaign during the March

14  primary of 2022, right?

15  A.  Yes.

16  Q.  You had also reached out individually to voters to alert

17  them to their mistakes and try to help them understand so that

18  they could fix it?

19  A.  Yes.

20  Q.  You designed those kinds of communications to be as

21  understandable as you could to voters?

22  A.  Yes, and we had the -- we also had a firm that helped us

23  with some of those communications.

24  Q.  We have heard some discussion in this trial about wait

25  times and how they might have been extended by the provisions

Michael Scarpello - Examination                 462

1   of SB1.  Despite the challenges that your office had in

2   implementing SB1 in the March 2022 primary election, you had

3   fewer than 20 complaints about wait times following that

4   election, true?

5   A.  If that's what the records say.  I don't know off the top

6   of my head.

7   Q.  If you'd like, I can refresh your recollection.  Would you

8   like to take a look at your deposition testimony?

9   A.  Sure.

10        MR. KERCHER:  Brian, can we pull up Mr. Scarpello's

11  April 29, 2022 deposition?  Page 269, line 19.

12  BY MR. KERCHER:

13  Q.  Mr. Scarpello, I'll represent to you if you want to see the

14  whole document, I'll represent to you that this is your

15  testimony from your April 29, 2022 deposition, page 269 line 19

16  through page 270 line three.  Take a moment to review that and

17  let me know if it refreshes your recollection.

18  A.  Yes.

19  Q.  Do you stand by the testimony that you got fewer than 20

20  complaints about wait times in the March 2022 primary election?

21  A.  I think I couldn't quantify it, I believe I said.  And he

22  said, *More than five?*  I said, *Probably.*

23      *More than 20?*  I said, *Probably not.*  So I don't know

24  what the number is, frankly.  Go ahead.

25  Q.  Didn't mean to interrupt you.  Go ahead.

Michael Scarpello - Examination                463

1    A.   That concludes my answer.

2    Q.   Do you stand by the testimony as you have read it from your

3    deposition?

4    A.   Yes.

5    Q.   When SB1 passed and I think you alluded to this on direct

6    examination, you began to question whether your office's

7    practices might result in some criminal liability, right?

8    A.   Correct.

9    Q.   But ongoing guidance from the Secretary of State has helped

10   you better understand what SB1 allows and does not allow?

11   A.   Yes.

12   Q.   Let's talk a little bit about rejection rates in November

13   of 2022.  You believe that the rejection rate in November of

14   2022, that general election was too high, right?

15   A.   Yes.

16   Q.   But like all good elections administrators, you believe

17   that any rejection rate higher than zero is too high?

18   A.   That's correct.

19   Q.   You've never seen an election rate that is -- a rejection

20   rate at zero, right?

21   A.   That's correct.

22   Q.   But you strive for it anyway?

23   A.   Yes.

24   Q.   And in fact, Dallas County was able to reduce its rejection

25   rate in the November 2022 general election from the rejection

1    rate in the March 2022 primary election, right?

2    A.  That's correct.

3    Q.  In fact, the rejection rate in that November 2022 general

4    election was also a reduction from the rate in the May 2022

5    primary run-off?

6    A.  Yes.

7    Q.  For as long as there is a signature requirement, you don't

8    believe that the rejection rate will ever be zero; is that

9    true?

10   A.  That's fair.

11   Q.  And for as long as there is a statement of residence

12   requirement, you don't believe the rejection rate will ever be

13   zero?

14   A.  That's fair.

15   Q.  SB1 did not create those requirements?

16   A.  No, it didn't create the requirements.

17   Q.  And you would not advocate for eliminating the signature or

18   statement of residence requirements on applications?

19   A.  No.

20   Q.  Just like EAs like yourself from the Secretary of State

21   have a learning curve with this complicated bill, there is a

22   learning curve for voters when there is complex change to the

23   election code; is that right?

24   A.  Correct.

25   Q.  With SB1 you have seen an improvement in voter

Michael Scarpello - Examination                465

1   understanding of the new provisions?

2   A.  The numbers would indicate that there is probably better

3   understanding.

4   Q.  You've also seen improvement of election officials

5   understanding of the new provisions?

6   A.  Yes.

7   Q.  Ms. Perales asked you whether you believed that SB1 had

8   emboldened the actions of poll watchers, do you remember that?

9   A.  Yes.

10  Q.  You said that you believed it was your personal belief that

11  it had, right?

12  A.  Yes.

13  Q.  But only in a very small percentage of poll watchers?

14  A.  Yes.

15  Q.  And you have no objective evidence that that emboldening is

16  true?

17  A.  I have anecdotal evidence.  Including my own knowledge of

18  watching poll watchers in the Central Counting Station.

19  Q.  I appreciate that answer.  Is it right to say that you have

20  not gone and collected or run numbers to evaluate whether there

21  has been a rise in incidents of disturbing poll watchers,

22  rather you are relying on stories that stand out in your own

23  memory?

24  A.  Time will tell.  The reason we don't have good numbers is

25  that prior to my being there, we didn't keep good statistics as

1   far as complaints and logging calls.  Since I've been there, we

2   keep -- we log every single call and every single complaint.

3   So as time goes on, we will have better statistics.

4   Q.  So it's not that you haven't gone and tried to pull those

5   statistics, it's that you don't have statistics at all about

6   what poll watcher behavior used to look like versus what it

7   looks like after SB1?

8   A.  Correct.

9   Q.  You discussed briefly a poll worker shortage in the

10  March 2022 primary; is that right?

11  A.  Yes.

12  Q.  Large hours -- excuse me, long hours had an effect on that

13  shortage, true?

14  A.  I think there's a variety of factors that affect poll

15  workers being unwilling to work.

16  Q.  Another one that particular March was the weather, right?

17  A.  Yeah, we did have some weather in that election.

18  Q.  And the weather, and I don't want to put words in your

19  mouth, my memory is there was something like several snow days

20  or winter storm days; is that right?

21  A.  During the early voting period.

22  Q.  And you believe that was one of the factors that had an

23  effect on the poll worker shortage in the March 2022 primary

24  election?

25  A.  Possibly.

Michael Scarpello - Examination                467

1   Q.  Let's move forward then to the May 2022 election.  That was

2   a primary run-off, right?

3   A.  There were two elections in May.  There was a joint

4   election in early May and then there was a -- there was a

5   run-off primary election in late May.

6   Q.  You had some trouble recruiting poll workers for that

7   election as well?

8   A.  For both of those elections, yes.

9   Q.  For both of those elections.  This is still when SB1 was

10  fairly new, this is the second and third election respectively

11  when provisions had been implemented, right?

12  A.  Correct.

13  Q.  When poll workers or judges declined to work in those

14  May 2022 elections, you did not reach out to them and ask why

15  they did so; is that true?

16  A.  We didn't do it in a formal fashion.  I know that some of

17  our trainers would interact with people during the training and

18  during those interactions a lot of people were very nervous

19  about SB1.

20  Q.  So I want to make sure I understand your testimony.  You

21  did not personally have any interactions with poll workers or

22  potential poll workers who expressed that they would not work

23  in those May elections due to SB1?

24  A.  Not that I can recall.

25  Q.  Instead, you are relying on your memory of conversations

Michael Scarpello - Examination                    468

1    you had with others in your office, right?

2    A.   Yes.

3    Q.   And then in turn they are relying on their memories of

4    interactions with other people not in your office, right?

5    A.   Correct.  As well as conversations with party officials who

6    were doing the recruiting.

7    Q.   And when you say that, do you mean you had conversations

8    with party officials or others in your office had

9    conversations?

10   A.   I had conversations with party officials.

11   Q.   The reason I'm pausing is my question is a little bit out

12   of date.  When you last spoke with attorneys in this case at

13   your April 2023 deposition, you did not anticipate having

14   trouble staffing your poll worker needs for the May 2023

15   election; is that right?

16   A.   I don't think so because we had taken other measures to

17   reduce the number of polling places that would be open.  Dallas

18   County has an extraordinarily high number of polling places

19   compared to other counties and so we reduced that number

20   somewhat from 469 down to like 407 or something like that for

21   that May election.

22   Q.   So is it right to say that you were able to fully staff the

23   May 2023 election?

24   A.   I believe we still might have had some shortages.

25   Q.   Do you know a number or are you just operating off of

Michael Scarpello - Examination          469

1    memory?

2    A.  Going off memory.

3    Q.  In the November 2022 general election, Dallas County was

4    able to staff all 469 Election Day voting locations?

5    A.  Correct.

6    Q.  In fact, you had a surplus of 324 workers in that election?

7    A.  That's correct.

8    Q.  Dallas County was able to staff all 52 early voting

9    locations for the November 2022 general election, right?

10   A.  Correct.

11   Q.  In that election, Dallas County provided its residents

12   ample opportunities to vote in person in the 2022 general

13   election, right?

14   A.  Yes.

15   Q.  The efforts of your office of providing voters easy access

16   to in-person voting was a success in that election, true?

17   A.  Yes.

18   Q.  You had wait time monitoring that allowed you to figure out

19   the average wait time at polling locations across the county,

20   right?

21   A.  Yes, we did.  In anticipating your next question, the wait

22   time for early voting was 1.2 minutes and the wait time for

23   Election Day was 3.7 minutes.

24   Q.  And that's an average wait time; is that right?

25   A.  Correct.

Michael Scarpello - Examination                    470

1    Q.  Let's talk a little bit about poll watchers now.  Poll

2    watchers have to take an oath, right?

3    A.  Yes.

4    Q.  And they have to swear not to harass voters or to disrupt

5    the voting process?

6    A.  I believe that language is accurate.

7    Q.  Earlier today before you arrived, the Court asked a

8    question about who gives instructions to poll watchers about

9    what is harassing and disruptive and I want to talk to you a

10   little bit about that.

11       Your office advises poll watchers on the law, right?

12   A.  Poll watchers, no.

13   Q.  Let me go at it this way.  Every election judge in Dallas

14   County has a county issued cell phone, right?

15   A.  Yes.

16   Q.  Your office can also communicate with those election judges

17   using a messaging system, right?

18   A.  Correct.

19   Q.  And you have a hotline set up where judges can call in and

20   create tickets about questions they have about voting

21   irregularities, right?

22   A.  Yes.

23   Q.  That hotline is staffed by 30 people or the tickets are

24   handled by 30 people, right?

25   A.  Correct.

Michael Scarpello - Examination                471

1    Q.  You also have a series of response teams that respond to

2    the tickets; is that true?

3    A.  That's true.

4    Q.  At least one of them is an eight-person team full of

5    election procedure experts, right?

6    A.  Correct.

7    Q.  So your office is in constant or can be in constant contact

8    with election judges who have questions about how to handle

9    irregularities in an election, right?

10   A.  Correct.

11   Q.  And so if a poll watcher wants to know whether or not he or

12   she can engage in a particular kind of behavior and goes and

13   asks the judge, the judge has a variety of ways of contacting

14   your office and getting that answer?

15   A.  Yes, and the reason I answered the way I did previously is

16   the poll watchers don't interact with that hotline or to those

17   response teams.  The judges do, not the poll watchers.

18   Q.  And understanding that poll watcher questions may not be

19   the only reason that election judges might have questions that

20   they present to your office, certainly if poll watchers present

21   their questions to election judges, election judges can get

22   those answers for them from your office; is that fair?

23   A.  That's fair.

24   Q.  You also have 45 inspectors, right?

25   A.  Correct.

Michael Scarpello - Examination                472

1  Q.  Each of them has a ten location group that they go through

2  and inspect during the election?

3  A.  That's correct.

4  Q.  If a poll worker is making voters uncomfortable, you have a

5  number of options to investigate the incident, right?

6  A.  Sorry.  Did you say poll worker or poll watcher.

7  Q.  I probably messed it up, so let me ask you again.  If a

8  poll watcher is making a voter feel uncomfortable, your office

9  has a number of ways to investigate what is happening at that

10 polling location?

11 A.  Yes.

12 Q.  And there were only three or four such incidents after the

13 May 2022 primary -- or the May 2022 elections?

14 A.  That's probably accurate.

15 Q.  It's your belief, isn't it, that the vast majority of poll

16 watchers understood the rules under SB1 and abided by them?

17 A.  That's probably fair.

18 Q.  There was a small percentage who either ignored the rules

19 or did not understand them, that's fair too?

20 A.  Yes.

21 Q.  Now let's talk about poll watchers.  Brian, if you would

22 bring up Joint Exhibit One, page 27, line 21 is where we are.

23      So you can see we're looking at Section 4.07.  Do you see

24 that, Mr. Scarpello?

25 A.  Yes.

Michael Scarpello - Examination                    473

1    Q.  Brian, can we scroll down to page 28, line three.  This

2    reads, *"Except as provided by Section 33.057 (b) a watcher may*

3    *not be denied free movement where election activity is*

4    *occurring within the location at which the watcher is serving."*

5         Did I read that correctly?

6    A.  Yes.

7    Q.  Your office implemented a similar policy shortly after you

8    took office or took that position, right?

9    A.  In our Central Counting Station, we did, you know, there

10   was tape on the floor saying where people could go, could not

11   go.  We pulled up the tape and we allowed more access to those

12   poll watchers, yes.

13   Q.  Your office before the institution of SB1 made the decision

14   to grant free movement to poll watchers in your Central

15   Counting Station; is that true?

16   A.  I think free movement would be a liberal interpretation of

17   what we actually did.

18           THE COURT:  I just want to make sure I understand.  So

19   this is where your office is doing counting or do people also

20   vote at the same time in that location?

21           THE WITNESS:  Just where we're doing counting.

22           THE COURT:  So that wasn't a voting location.

23           THE WITNESS:  That's correct.

24   BY MR. KERCHER:

25   Q.  That policy change that you instituted that allowed poll

Michael Scarpello - Examination                474

1   watchers more freedom of moment in that Central Counting

2   Station was a move that you instituted for transparency, right?

3   A.  Yes.

4   Q.  You thought it would help build confidence in the poll

5   watchers, right?

6   A.  That's correct.

7   Q.  That's part of the benefit of in your mind of granting them

8   access in that context?

9   A.  Correct.

10  Q.  The policy did not make everyone happy; is that true?

11  A.  That's true.

12  Q.  It's hard to please everybody?

13  A.  That's right.

14  Q.  Earlier in the trial, it may have been with your

15  predecessor on the stand, I can't recall, the Court was asking

16  about poll watchers and whether they can -- it was while you

17  were on the stand -- a poll watcher can flip/flop back and

18  forth between being a poll watcher and doing electioneering,

19  right?

20  A.  Yes.

21  Q.  Brian, please put up Joint Exhibit five.

22      You have Joint Exhibit Five in front of you, Mr. Scarpello?

23  A.  Yes.

24  Q.  This is an election advisory from the Secretary of State,

25  right?

Michael Scarpello - Examination                475

1    A.  Yes.

2    Q.  And you can see the date on it is February 4th, 2022?

3    A.  Yes.

4    Q.  If we could scroll down to page three, Brian -- sorry this

5    is not what I'm looking for.  Can you show me page two please?

6    Brian, bring up the paragraph that begins second from the

7    bottom, *"A poll watcher duly accepted."*

8        Mr. Scarpello this reads, *"A poll watcher duly accepted for*

9    *service at a polling location is entitled to follow the*

10   *transfer of election materials from the --"* am I reading the

11   right spot?  I'm not?  Show me.

12       *(Pause.)*

13           MS. HUNKER:  Your Honor, may I point it out on the

14   screen?

15           THE COURT:  Sure.

16           MR. KERCHER:  Thank you.

17   BY MR. KERCHER:

18   Q.  All right.  Apologies for the delay.  Brian, under rights

19   of, begins *"A poll watcher does not."*  Thank you.

20       Mr. Scarpello, thanks for your patience.  This reads, *"A*

21   *poll watcher does not have the right to free movement in other*

22   *areas of an election office that is not being used for the*

23   *designated activities.  Because election offices often possess*

24   *confidential voter information that may not be subject to*

25   *inspection by poll watchers, this information must be closely*

Michael Scarpello - Examination                476

1    *guarded and election officials should clearly designate what*
2    *rooms and locations are needed for specified election*
3    *activities."*
4        Did I read that correctly?
5    A.    Yes.
6    Q.    You spoke with Ms. Perales about a case where a poll
7    watcher and poll worker had opened a ballot box together.
8        Brian, you can take this down.  Thank you.
9        You remember that?
10   A.    Yes.
11   Q.    In that case, the sheriff was called?
12   A.    Yes.
13   Q.    Do you recall who called the sheriff there?
14   A.    I don't recall.
15   Q.    You do remember that the sheriff came to the polling place?
16   A.    Yes.
17   Q.    And the sheriff may have, memory was little fuzzy, but the
18   sheriff may have visited that poll watcher at his home?
19   A.    I don't know.
20   Q.    It's right to say, though, that poll watchers can be
21   removed for breaching the peace from a polling location, right?
22   A.    Yes.
23   Q.    It's also right to say that if a poll watcher breaks the
24   law while at a voting location, he may be subject to criminal
25   penalties?

Michael Scarpello - Examination                477

1   A.  I believe there's some language that says it has to be

2   witnessed in order for that to happen.

3   Q.  You also spoke with Ms. Perales about a case where you

4   found ballot tampering that was on video tape, right?

5   A.  It wasn't ballot tampering it was election record

6   tampering.

7   Q.  Election record tampering.  SB1 does not allow election

8   record tampering, do we agree on that?

9   A.  Yes.

10  Q.  You spoke about some anxiety among poll workers about the

11  Election Day and the November 2022 general election.  Do you

12  remember that?

13  A.  Yes.

14  Q.  And the anxiety, as I understood your testimony earlier, is

15  that you had a variety of poll workers who perhaps had had a

16  hard time with poll watchers and were worried that they would

17  have a hard time with them again on Election Day, right?

18  A.  Yes.

19  Q.  Those concerns turned out not to be as big a deal as some

20  people thought they might be, fair?

21  A.  I think that the concern wasn't necessarily with those

22  individual poll workers, it was with me and my staff and thus

23  we, you know, had Sheriff's Office on notice ready to go to,

24  you know, intercede if necessary.

25  Q.  And so there is this -- sounds like there's this sort of

Michael Scarpello - Examination                478

1   ongoing theme of sometimes there being tension between poll

2   watchers and poll workers, is that your experience?

3   A.   Yes.

4   Q.   The watchers and the watched don't always get along, fair?

5   A.   Fair.

6   Q.   You talked also about a poll worker who was followed home

7   possibly by a poll watcher; is that right?

8   A.   Correct.

9   Q.   SB1 does not allow that, right?

10   A.   No.

11   Q.   Your office contacted the poll worker who had been

12   followed, right?

13   A.   I'm sorry.  Repeat?

14   Q.   Sure.  Your office reached out to the poll worker who had

15   been followed?

16   A.   Yes.  She reached out to us.

17   Q.   She was pretty upset, understandably?

18   A.   Correct.

19   Q.   But you don't recall that poll worker connecting that

20   experience to something that SB1 had caused?

21   A.   No.

22   Q.   And it's right to say, isn't it, that you don't recall

23   whether that incident occurred in the 2022 primary or general

24   election?

25   A.   I believe it was the -- I think it was the primary.  I will

Michael Scarpello - Examination                479

1   say, though, that the preceding -- I think of it as an ongoing

2   incident, it started within the polling place under what would

3   be, you know, SB1 freedoms and then proceeded outside of the

4   hundred-foot marker and continued with him following her home.

5   Q.  In fairness, as you sit here, you don't know whether had

6   the old poll watcher movement restrictions been in place

7   whether this particular poll watcher who had the temerity to

8   follow a stranger to her home would have felt constrained by

9   the old Election Code provision restraining election poll

10  watcher movement?

11  A.  I can't say.

12  Q.  Let's talk about poll worker obstruction in Section 4.09 of

13  SB1.  Brian, if you'll pull up Joint Exhibit One, page 29 line

14  two.

15      You have that in front of you, Mr. Scarpello?

16  A.  Yes.

17  Q.  If you look down at line eight, the underlined portion

18  reads *"including by taking any action to obstruct the view of a*

19  *watcher or distance the watcher from the activity or procedure*

20  *to be observed in a manner that would make observation not*

21  *reasonably effective."*

22      Did I read that correctly?

23  A.  Yes.

24  Q.  It's right to say that it was illegal to obstruct poll

25  watchers prior to SB1?

Michael Scarpello - Examination                480

1   A.  This is add language, what you just quoted.  That's part of

2   SB1, correct?

3   Q.  Are you saying it was not previously unlawful to obstruct

4   the view of poll watchers?

5   A.  I don't know that the previous language -- the previous

6   language would be in lines four, five, six, partial seven.  The

7   new language is in eight, nine, ten, eleven, right, so you were

8   quoting eight, nine, ten, eleven.

9   Q.  That is the portion that I read and it's true that that is

10  language that's added to SB1.  My question is a little bit

11  different, because you're right that is new language to SB1.

12  That is language that SB1 adds.

13      My question is whether it was unlawful under any other

14  provision of the Election Code to obstruct the view of poll

15  workers?

16  A.  I think the language says knowingly prevents a watcher from

17  observing, not -- doesn't say anything about obstructing.

18  Q.  My question remains the same, the difference in language

19  notwithstanding.  Prior to SB1, you could not obstruct the poll

20  worker, right?

21  A.  Prior to SB1, you could not knowingly prevent a watcher

22  from observing.

23  Q.  You agree with that prior to SB1 you could not knowingly

24  prevent a poll watcher from observing?

25  A.  I agree with that line six would prevent that.  The

Michael Scarpello - Examination                481

1   language speaks for itself.

2   Q.  You agree with me that after SB1, election workers are more

3   keenly aware of the fact that obstructing poll watchers is

4   illegal?

5   A.  Sorry.  Can you repeat?

6   Q.  Sure.  You agree with me that after SB1, election workers

7   are more keenly aware of the fact that obstructing poll

8   watchers is illegal?

9   A.  Yes.

10  Q.  Would you also agree with me that training materials

11  following SB1 on that issue are now more thorough?

12  A.  Yes.

13  Q.  For all of our discussion about poll watchers today --

14  Brian, you can take that down.

15      You are not aware of any voter who is dissuaded from

16  casting their ballot in the November 2022 general election

17  because of the behavior of poll watchers?

18  A.  Not that I am aware.

19  Q.  Let's talk about the ID requirement for vote by mail

20  application.  Dallas County keeps publicly available voter

21  files that do not contain the voter's driver license, right?

22  A.  Yes.

23  Q.  As I read that question, I realize maybe I shouldn't have

24  read it.  Dallas County keeps voter files that are publicly

25  available, you can request them or purchase them, right?

Michael Scarpello - Examination                482

1   A.  Yes.

2   Q.  Sometimes campaigns will do that, true?

3   A.  Correct.

4   Q.  And that allows campaigns or other requesters to put

5   somebody's name with their address, right?

6   A.  Yes.

7   Q.  But as a part of that publicly available file, Dallas

8   County does not include driver license information, right?

9   A.  Correct.

10  Q.  It is the case, however, that Dallas County may have that

11  driver license information in a non-publicly available file?

12  A.  Correct.

13  Q.  Prior to SB1, an application to vote by mail, in terms of

14  information that it required, only required the voter's name

15  and address, right?

16  A.  Yes.

17  Q.  So if somebody wanted to vote under somebody else's name or

18  to request a vote by mail application -- strike that.  Let me

19  start over.

20      If somebody wanted to request a vote by mail ballot under

21  someone else's name, all they would need to do is request from

22  your office that publicly available information before SB1 and

23  they would have all of the information necessary, the name and

24  address to request that vote by mail under someone else's name?

25  A.  They could request the ballot, but it would be worthless

Michael Scarpello - Examination                483

1    because the signature wouldn't match, so it wouldn't be counted

2    anyway.

3    Q.  Assuming that there was somebody who could accurately

4    determine whether the signatures matched, true?

5    A.  Yes.

6    Q.  Now that --

7    A.  Which is the point of why we have signature verification.

8    Q.  Now that SB1 is in place, someone could not get all of the

9    identifying information they need from publicly available

10   information from your office to fill out that application to

11   vote by mail?

12   A.  I'm sorry.  You got to repeat it again.

13   Q.  It was an awfully long question, and you've been on the

14   stand an awfully long time.  I appreciate your patience.

15       Now that SB1 has this ID requirement, that ID information

16   is not publicly available from your office?

17   A.  Correct.

18   Q.  So the application to vote by mail requires information

19   that someone could not get, a counterfeiter could not get from

20   your office, right?

21   A.  Not from my office.

22   Q.  When you said that it would be useless for a counterfeiter

23   to fill out an application to vote by mail, but it would be

24   useless because the signatures would not match, right?

25   A.  Yes.

1   Q.  The signatures that would be compared would be the one on

2   the application to vote by mail and on the ballot?

3   A.  Yes.

4   Q.  And I don't mean to pick on you, but I do think it's

5   important to clarify, it's not the case then if you had a

6   counterfeiter prior to SB1 who wanted to request a ballot by

7   mail under somebody else's name, that that signature matching

8   process would prevent that counterfeit, right?

9   A.  So you're opening the door, to me, with my full criticism

10  of just another section of Texas law.  This is how bad it is.

11  In other states you don't compare the signature on a ballot to

12  the application.  That's stupid.  You compare the signature on

13  the ballot to what's on the voter registration.  And that's how

14  all the other states do it.  This is the only state that I know

15  of that has this ineffective system.  And so this new system of

16  requiring all these numbers is confusing to voters and, in my

17  opinion, unnecessary.

18          THE COURT:  So if I understand you correctly, and I'm

19  hearing the State's position, they can -- someone nefarious can

20  request from your office name and address and they could go to

21  the dark web and get Social Security numbers or driver's

22  licenses and so they can still accomplish the nefarious deed?

23          THE WITNESS:  Yes.

24          THE COURT:  So the State hasn't done anything.

25          THE WITNESS:  They've done something to make life a

Michael Scarpello - Examination                485

 1  little tougher for some of the voters and for administrators.
 2  BY MR. KERCHER:
 3  Q.  Mr. Scarpello, do you know how to request that public
 4  facing voter file from your office?
 5  A.  Yes.
 6  Q.  Is there information on your public facing website about
 7  how to do that?
 8  A.  I believe so, I don't know for sure.
 9  Q.  If somebody wanted to do that, they would not have to be
10  skilled in the ways of the dark web to figure it out, right?
11  A.  Anybody can buy a voter file of all voters in Dallas
12  County.
13  Q.  You agree with me the number of people who can figure out
14  who can buy that voter file would be larger than people who
15  know how to navigate the dark web?
16  A.  Most likely.
17  Q.  Let's talk about that cure process for the application to
18  vote by mail, that Section 5.12 of SB1.  Under that section, a
19  voter can do a few things to cure an application to vote by
20  mail that would otherwise be rejected, right?
21  A.  Right.
22  Q.  If the voter failed to sign the application, the voter can
23  cure that defect by providing the signature?
24  A.  Yes.
25  Q.  If the voter failed to provide a driver's license, or last

Michael Scarpello - Examination                    486

1    four digits of Social Security number, they can cure that

2    defect by providing either of those numbers?

3    A.   Yes.

4    Q.   There are other options and some of those will include

5    actually going in to the Elections Office; is that right?

6    A.   Yes, which is part of the problem.  You have a voter that

7    can't get to the polls, so they're voting by mail, but yet when

8    there's a defect they have to come not only to their polling

9    place, but all the way to our -- the one location in our

10   Elections Office.

11   Q.   I want to make sure I understand that answer and I

12   appreciate the color that you added there.  Prior to SB1, there

13   was no cure provision, true?

14   A.   I don't believe so, I don't know.

15   Q.   And your critique here is not that the State has tried to

16   create a cure provision, it's that perhaps that cure provision

17   does not go as far as you would like for it to?

18   A.   Correct.

19   Q.   Would you rather have some cure process or none?

20   A.   Some.

21   Q.   There are, in fact, some voters in Dallas County who have

22   come to the Election Office in order to cure their application

23   to vote by mail, true?

24   A.   True.

25   Q.   Not ideal, but it has happened, right?

Michael Scarpello - Examination                487

1    A.  Yes.

2    Q.  Those people have been helped by the cure process?

3    A.  Yes, though they were hurt by the fact that they had to do

4    a cure to begin with, right?  If they didn't have to do a cure

5    to begin with, they wouldn't have to worry about doing the

6    cure.

7    Q.  You don't believe, though, do you, that prior to the

8    enactment of SB1, there was never an application to vote by

9    mail that didn't need to be fixed some way, right?

10   A.  That's correct.

11   Q.  Because you're right, that cure process does apply to that

12   ID requirement which is new, right?

13   A.  Yes.

14   Q.  But it also applies to the signature requirement, right?

15   A.  Yes.

16   Q.  Sometimes people would just forget to sign it, right?

17   A.  True.

18   Q.  If that happens today, thanks to SB1, somebody doesn't even

19   have to drive to your office to fix that, they can fix that

20   problem remotely, right?

21   A.  Because of the poor design of the forms and the carrier

22   envelope, there are a lot of mistakes that need to be cured.

23   Q.  So the answer to my question was yes?

24   A.  Yes.

25   Q.  There's also a cure process related to ballots, right?

Michael Scarpello - Examination                488

1   A.  Yes.

2   Q.  We've been talking about the application to vote by mail.

3   There's a cure process for ballots themselves.  It's the Ballot

4   Board that runs that process, true?

5   A.  Yes.

6   Q.  That process allows voters to cure their ballot if the

7   voter does not provide driver's license or Social Security

8   digits matching their voter registration?

9   A.  Yes.

10  Q.  That process allows voters to cure their ballot if the

11  voter fails to provide a signature as well?

12  A.  Yes.

13  Q.  And voters had to provide a signature prior to SB1, we just

14  talked about that, right?

15  A.  Right.

16  Q.  And prior to SB1, if they had failed to do that, they would

17  not have had a way to fix their ballot, true?

18  A.  True.

19  Q.  Let's talk briefly about curbside voting.  You were not

20  aware of anyone providing transportation to seven or more

21  curbside voters at a time prior to SB1, true?

22  A.  I don't know.

23  Q.  You don't know that there were any; is that fair?

24  A.  I only participated in one election prior to SB1 and I

25  don't recall that -- I don't know if there was voters or if

Michael Scarpello - Examination                489

1  there was people who provided transportation to more than seven

2  people.

3  Q.  You're not aware of any assister providing transportation

4  to seven or more curbside voters since the enactment of SB1?

5  A.  That's correct.

6  Q.  Let's talk about drive-through voting.  Dallas County does

7  not have drive-through voting?

8  A.  Correct.

9  Q.  It has never had drive-through voting?

10  A.  Once again, that was something we were going to contemplate

11  that was in the plans until SB1 came along.

12  Q.  And I appreciate that.  I'm going to bring you back to my

13  original question.  Dallas County has never had drive-through

14  voting?

15  A.  That's correct.

16  Q.  You mentioned that you considered implementing it, but you

17  did not get very far in your analysis of that implementation?

18  A.  That's correct.

19  Q.  You hadn't looked into the logistics of it?

20  A.  Correct.

21  Q.  You did not inquire into any irregularities that Harris

22  County encountered in the one election where it used

23  drive-through voting?

24  A.  We didn't get that far into the planning.

25  Q.  And you would not know about any voting discrepancies that

Michael Scarpello - Examination                    490

1   occur in Harris County in relation to drive-through voting?

2   A.  Correct.

3   Q.  Let's talk about Section 7.04 of SB1.  This is Joint

4   Exhibit One, page 58 line 26.  You can see we're looking at

5   Section 7.04.  Do you see that, sir?

6   A.  Yes.

7   Q.  If we scroll down to page 60, at line 15, it says,

8   *"unlawful solicitation and distribution of application to vote*

9   *by mail."*  Right?

10  A.  Yes.

11  Q.  In Texas we agree it would be suspicious for people to

12  receive ballots they had not requested, right?

13  A.  I think that would be true in most states.

14  Q.  You've got to apply for the ballot, right?

15  A.  In most states.

16  Q.  And in Texas, right?

17  A.  Yes.

18  Q.  Now, it used to be the case that nonprofits would come to

19  Dallas County and take copies of the Dallas County application

20  form to distribute to voters, right?

21  A.  Yes.

22  Q.  But today after the passage of SB1, voters do not have to

23  use the application form created by Dallas County?

24  A.  No.

25  Q.  A nonprofit could create its own application to vote by

1    mail?

2    A.  Yes.

3    Q.  In fact, it doesn't have to be a nonprofit.  An individual

4    could create their own application to vote by mail?

5    A.  Yes.

6    Q.  Let's switch gears now --

7           THE COURT:  So when we get to closing arguments, I

8    keep asking myself, if that's the case, then why do you

9    prohibit the election officials from doing that?  Just hang

10   that thought and we can get back to it.

11          MR. KERCHER:  Write that down.

12   BY MR. KERCHER:

13   Q.  Let's talk about disability voting.  Dallas County works to

14   make its voting program as accessible to voters with

15   disabilities as it can, right?

16   A.  Yes.

17   Q.  And I think I've heard throughout your testimony and I've

18   read an awful lot of it too, that's been a priority for you

19   since you have taken the job at Dallas County is to bring

20   disability access into the 21st century for Dallas County in

21   its voting; is that right?

22   A.  Yes.

23   Q.  There had not been procedures before and you're trying to

24   institute those now, right?

25   A.  Yeah, we still have a long way to go, but yes.

Michael Scarpello - Examination                492

1   Q.  And that's why you instituted that sort of census of your

2   voting locations where you went out 500 locations and people

3   had iPads and you put together questionnaires to figure out

4   what was right and what was wrong with each of these locations,

5   right?

6   A.  Right.

7   Q.  This is something that matters to you?

8   A.  Yes.

9   Q.  Your office has received no requests for disability

10  accommodation regarding the requirement that mail-in voters put

11  their Social Security number or ID number on their application

12  for ballot by mail?

13  A.  No.

14  Q.  Your office received no request for disability

15  accommodation regarding the requirement that mail-in voters put

16  their Social Security or ID numbers on their ballot by mail?

17  A.  No, not that I'm aware of.

18  Q.  Your office received no request for disability

19  accommodation regarding the oath that assisters must provide

20  with providing assistance?

21  A.  Not that I am aware of.

22  Q.  There are complaints, excuse me, there are complaint forms

23  at every Dallas County polling location, right?

24  A.  Right.

25  Q.  That would be a place where somebody could ask for an

Michael Scarpello - Examination                493

1  accommodation; is that right?

2  A.  Yes.

3  Q.  Despite having complaint forms at every polling location,

4  none of the complaints you received addressed any SB1 voting

5  assistance provision?

6  A.  Not that I am aware of.

7  Q.  No poll worker contacted you, said SB1 made it more

8  difficult for voters with disabilities to vote?

9  A.  Not that I am aware of.

10 Q.  You are unaware of any incidents in November 2022 general

11 election where an election worker refused to assist a voter

12 after the voter requested assistance?

13 A.  Not that I am aware of.

14 Q.  You're not aware of any voter who was unable to obtain

15 assistance from the person of their choice in the November 2022

16 election?

17 A.  Not that I am aware.

18 Q.  You are unaware of any instance where a voter was unable to

19 receive assistance voting?

20 A.  Not that I am aware.

21 Q.  And you're unaware of any voter who was unable to find

22 transportation to the polls because of requirements that a

23 person who transports seven or more polling people to a polling

24 location via curbside fill out the forms now required?

25 A.  Not that I am aware.

Michael Scarpello - Examination                    494

1   Q.  Ms. Perales talked to you a little bit on direct

2   examination, although she kind of crossed you about turnout

3   following SB1, right?

4   A.  Yes.

5   Q.  We agree that there are a lot of factors that affect

6   turnout, right?

7   A.  Yes.

8   Q.  What kind of election it is will effect turnout?

9   A.  Yes.

10  Q.  And that is true between primaries in general, right?

11  A.  Yes.

12  Q.  As well as run-off or special ballot initiatives, right?

13  A.  Yes.

14  Q.  It's also true depending upon whether it is presidential

15  election year or not, right?

16  A.  Correct.  There's factors external to election

17  administration and then there's factors internal to election

18  administration.  So keep in mind that we completely revised all

19  of our processes at the polling place, signage, the way we

20  operate within that location, the way we process voters, the

21  speed, etc.  So all those factors, there's dozens of factors

22  that could change turnout.  And that's why projecting for an

23  election is as much an art as it is a science.

24  Q.  That was my next question.  You said that before.  That's

25  exactly right.  Trying to figure out what turnout is going to

Michael Scarpello - Examination                495

1    be for the next election because of all these externalities

2    including like we talked about earlier, weather, it's an art

3    not a science, right?

4    A.  Yes.

5    Q.  We agree, don't we, that correlation does not imply

6    causation?

7    A.  Not necessarily, but it could.

8    Q.  Ms. Perales gave you a sort of a hypothetical where

9    somebody is going door to door talking to people about an

10   election -- excuse me, an education bond, right?

11   A.  Yes.

12   Q.  And she asked whether somebody could be prosecuted if while

13   that person is making their pitch at someone's door, the person

14   suddenly reveals that they had a ballot on them the whole time.

15   Right?

16   A.  I don't think she asked that.  I think -- I don't think she

17   was -- I don't think she asked whether or not someone could be

18   prosecuted.  I think she was asking more narrow questions than

19   that.

20   Q.  Well, that's fair.  Let me ask you a more narrow question.

21   Your office would not be in charge of making charging decisions

22   in the hypothetical Ms. Perales laid out for you, right?

23   A.  We are not a law enforcement agency.

24   Q.  That would be some prosecutor, the DA, the county attorney,

25   right?

Michael Scarpello - Examination                496

1   A.   Right.

2   Q.   You don't know anyone who has been charged with a crime for

3   the kind of activity Ms. Perales described in her hypothetical?

4   A.   My memory is that she was pointing out the vagueness of the

5   ballot harvesting definition and I would agree with that, I

6   don't know what ballot harvesting means and that it could be

7   interpreted a lot of different ways based on the definition

8   that they put into the law.

9   Q.   And my question was a little narrower than that.  You don't

10  know of anyone who has been charged for the activities she

11  described?

12  A.   No.

13  Q.   Brian, can you pull up State Exhibit 136 please?

14       Mr. Scarpello, you said that SB1 prevented you from sending

15  applications to vote by mail to voters who have not requested

16  them, right?

17  A.   Correct.

18  Q.   I'm showing you State Exhibit 136 which is a copy of a

19  Texas Supreme Court case called State of Texas v. Hollins, are

20  you familiar with this case?

21  A.   No.

22  Q.   You can see, Brian, if you would take us down to the last

23  page of this exhibit please.  You can see the opinion was

24  delivered on October 7, 2020, right?

25  A.   Yes.

Michael Scarpello - Examination                497

1   Q.  That is before the enactment or the effectuation of SB1,
2   right?
3   A.  You have to give me a chance to read it.
4   Q.  I'm just asking about the date right now.  October 7, 2020
5   is before SB1 became effective, right?
6   A.  Correct.
7   Q.  This last paragraph of the opinion, Texas Supreme Court
8   said, *We hold that the Election Code does not authorize an*
9   *early voting clerk to send an application to vote by mail to a*
10  *voter who has not requested one and that a clerk's doing so*
11  *results in irreparable injury to the State."*  Did I read that
12  correctly?
13  A.  Yes.
14          MR. KERCHER:  Pass the witness.
15          THE COURT:  Anything else from this side?
16          MR. GORE:  Yes, Your Honor.  Few questions.  John Gore
17  for intervening defendants.
18                    CROSS-EXAMINATION
19  BY MR. GORE:
20  Q.  Mr. Scarpello, I don't believe we've met before.  My name
21  is John Gore, I represent the intervening defendants in this
22  case, including the Dallas County Republican party.  I just
23  want to thank you for being here today.
24      As I understand it, the parties nominate the poll workers
25  and election judges in Texas; is that correct?

1  A.  They nominate the presiding and alternate presiding judges.

2  Q.  And then those individuals select clerks to assist them at

3  the polling places, correct?

4  A.  Correct.

5  Q.  And the presiding judge comes from the party that received

6  the highest number of votes in that precinct in the prior

7  election; is that correct?

8  A.  It's partially correct.  That's in a precinct-based

9  election.  In a countywide model, it's a somewhat different

10 formula.

11 Q.  And the assistant judge in a precinct-based election will

12 come from the party that received the second highest number of

13 votes in the prior election; is that correct?

14 A.  Correct.

15 Q.  And the parties generally work with you to recruit poll

16 workers or people to fill these positions as presiding judges

17 and assistant judges, correct?

18 A.  Yes.

19 Q.  They generally work with each other to try to make sure

20 those people get along; is that right?

21 A.  I think that we've had a great -- had great leaders on the

22 Republican and Democratic side where they work together very

23 well and they're trying to make things run smoothly.

24 Q.  In fact, they recorded a video that you were able to use at

25 poll worker training encouraging poll workers to get along and

Michael Scarpello - Examination                499

1   work cooperatively; is that correct?

2   A.  Correct.

3   Q.  The parties communicate with you about concerns they might

4   have about presiding judges and alternate judges; is that

5   right?

6   A.  Yes.

7   Q.  And they respond to you as well when you raised concerns

8   that you may have heard from somebody in the field; is that

9   right?

10  A.  Yes.

11  Q.  And they also work cooperatively with you when you raise

12  concern raised by the other political party; is that right?

13  A.  Yes.

14  Q.  And the parties also work cooperatively with you in your

15  office when concerns are raised about poll watchers, correct?

16  A.  Yes.

17  Q.  And in fact, one of the instances we heard about today

18  occurred in the March 2022 primary; is that right?

19  A.  I believe so, yes.

20  Q.  We've heard about it in bits and pieces, but as I

21  understand it, it was an incident where a poll watcher and

22  assistant judge improperly opened a ballot box which led to a

23  series of events that culminated in that poll watcher following

24  the presiding judge home; is that all one incident, am I right?

25  A.  Yes.

Michael Scarpello - Examination                    500

1  Q.  And the appointing authority of that poll watcher revoked

2  that poll watcher's credentials after that incident; is that

3  correct?

4  A.  That is correct.

5  Q.  We also heard today about some incidents at the Lancaster

6  library.  Do you recall that?

7  A.  Yes.

8  Q.  And who was the presiding judge at the Lancaster Library?

9  A.  Carla Reynolds Grogan.

10  Q.  And Ms. Grogan has been a judge there for a while; is that

11  correct?

12  A.  I believe so.

13  Q.  I believe that you and Ms. Perales discussed a complaint

14  that was made by a poll watcher against Ms. Grogan earlier

15  today; is that right?

16  A.  Yes.

17  Q.  And even though the parties try really hard to work

18  together, sometimes there can be tension between the presiding

19  judge or assistant judge from one party, maybe a poll watcher

20  from another party; is that fair?

21  A.  Certainly.

22  Q.  And the watchers and the watched don't always get along; is

23  that right?

24  A.  That's correct.

25  Q.  And has your office received other complaints about Ms.

Michael Scarpello - Examination                501

1  Grogan?

2  A.  Yes.

3  Q.  And have you received numerous complaints about Ms. Grogan?

4  A.  I would say so, yes.

5  Q.  And have those complaints been complaints about Ms.

6  Grogan's behavior in the polling place?

7  A.  Probably more about her temperament.

8  Q.  And what have those complaints been about her temperament?

9  A.  She's a little surly.

10 Q.  Have there been complaints that she has perhaps berated an

11 assistant judge in the past?

12 A.  I don't recall the specifics.

13 Q.  Have you discussed replacing Ms. Grogan with her appointing

14 authority?

15 A.  It's been under discussion before, but ultimately decided

16 not to.

17 Q.  And has her appointing authority agreed that Ms. Grogan is

18 problematic?

19 A.  I don't think problematic is the right word.  That she's

20 maybe a project that needed -- she needed some coaching.

21 Q.  And part of how you address the situation at the Lancaster

22 Library was to try to de-escalate tension between Ms. Grogan

23 and poll watchers; is that right?

24 A.  Correct.

25 Q.  And that tension can sometimes be inherit in that

```
 1   relationship between the presiding judge and the poll watcher;
 2   is that right?
 3   A.  Correct.
 4   Q.  Mr. Scarpello, do you use e-mail in the regular course of
 5   your business?
 6   A.  Yes.
 7   Q.  And do you use your official e-mail to communicate with the
 8   political party leaders about poll watcher issues?
 9   A.  Yes.
10   Q.  Do you also use e-mail to communicate with them about poll
11   worker or presiding judge issues?
12   A.  I use e-mail to communicate about every aspect of my job,
13   yes.
14   Q.  Can we get document one up on the screen?  I'd like to ask
15   you about this e-mail that was produced in discovery.  Can we
16   focus on the top part of page one here.  This is an e-mail from
17   Ms. Susan Fountain to three individuals, one of whom is you,
18   dated May 18, 2022, 2:54 p.m.  Do you recall receiving this
19   particular e-mail?
20   A.  Yes.
21   Q.  And this is an e-mail titled Lancaster Veterans Memorial
22   Library?
23          MS. PERALES:  Sorry, Mr. Gore, I don't mean to stop
24   your flow, but you referred to it as "document one" and I'm not
25   sure whether this is an exhibit, it doesn't have a stamp on it.
```

1    We're not sure if we've seen it.

2         MR. GORE:  This is a document that was produced in

3    discovery.  We did not list it as an exhibit because we weren't

4    planning to introduce it until we heard this witness's

5    testimony today.

6         MS. PERALES:  Thank you.

7         MR. GORE:  We're bringing it up on cross-examination.

8         THE COURT:  So what are you going to call this now?

9         MR. GORE:  We'd like to call it Intervener Defendant's

10   Number Five.

11        THE COURT:  Go ahead.

12   BY MR. GORE:

13   Q.   And who is Ms. Fountain?

14   A.   Susan Fountain is an employee of the Republican party.

15   Q.   And this e-mail here, she says in this e-mail to you, *I

16   have a 93-year-old co-judge at this location and Ms. Carla is

17   yelling and berating her in front of everyone.  She's already

18   run off Shelly Evans from this location.  What can we do to

19   rectify this?*

20        Did I read that correctly?

21   A.   Yes.

22   Q.   Who do you understand Ms. Carla to be in this e-mail?

23   A.   That's Carla Reynolds Grogan, the assistant clerk, the

24   judge at that particular location.

25        THE COURT:  I don't mean to interrupt you either,

1    maybe it's just late.  What's the relevance of this?

2            MR. GORE:  It just goes to the point, Your Honor, I

3    was discussing with the witness which is if we go to the second

4    page of this e-mail, Mr. Scarpello writes an e-mail where he

5    conveys that even the appointing authority for Ms. Grogan

6    agreed that she's, quote, highly problematic.

7            THE COURT:  Assume all that is correct, what issue am

8    I supposed to tie this into?

9            MR. GORE:  I believe there's just been testimony today

10   about issues with poll workers at the Lancaster Library and

11   we're bringing out the fact that there have been issues with

12   the judge as well and that's created an environment with those

13   particular poll watchers.

14           MS. PERALES:  Your Honor, if I could make a hearsay

15   objection.  What is good for the goose is good for the gander.

16   If it's a statement by Mr. Scarpello, we don't have an

17   objection, but we do have an objection to the other statements

18   in the document.

19           THE COURT:  So I'll take this in account for whatever

20   it's worth that not only are there issues with poll watchers,

21   there's issues with election judges, and that's based on this

22   witness's own verbal statement, but I still -- maybe I'm wrong,

23   and maybe you'll correct me in post trial briefings, but the

24   relevance is minimal if at all, but go ahead.

25           MR. GORE:  I take Your Honor's point.

Michael Scarpello - Examination                505

1            MR. SHOWALTER:  Counsel, do you have copies of this

2    agreement that we could see or use?

3            THE COURT:  Agreement?  You mean the exhibit?

4            MR. SHOWALTER:  This document.  Because we're looking

5    at it on the fly.  We don't have full productions with us right

6    now.

7            THE COURT:  I think we're making too much of this

8    issue.  The issue is poll watchers are sometimes problematic,

9    election judges are sometimes problematic.  That's, I think,

10   the entirety of the issue, right?

11           MR. GORE:  That's what we were trying to show, Your

12   Honor.  Thank you.

13           THE COURT:  Anything else?

14           MR. GORE:  No.

15           THE COURT:  Thank you.  Anything else from that side?

16   Anything more from this side?

17           MS. PERALES:  Very short, Your Honor, very, very

18   short.

19                   REDIRECT EXAMINATION

20   BY MS. PERALES:

21   Q.  Mr. Scarpello, if I was a Dallas County voter and I said to

22   you, *I am disabled and I would like an accommodation, I would*

23   *like you to not implement the mail voter ID provision with*

24   *respect to me,* would you grant that as an accommodation?

25   A.  I wouldn't provide an answer, I would consult with the

 1  Secretary of State's Office and I would consult with the DA's

 2  Office to determine whether I can accommodate that request.

 3            MS. PERALES:  Thank you.

 4            THE COURT:  Anything else?

 5            MR. SHOWALTER:  I have two quick questions.

 6                       REDIRECT EXAMINATION

 7  BY MR. SHOWALTER:

 8  Q.  Mike Showalter, counsel for Haul plaintiffs.  Is it correct

 9  that at your deposition you stated you spoke to voters who

10  stated they had not been able to vote because of the new voter

11  ID requirements in SB1?

12  A.  If it is --

13            MR. KERCHER:  Objection, Your Honor, I believe this is

14  improper impeachment.  If he's going to impeach him, impeach

15  him.

16            THE COURT:  What are you trying to do?

17            MR. SHOWALTER:  I think I asked the wrong question.

18            THE COURT:  I was confused by the question.  Ask a new

19  question.

20            MR. SHOWALTER:  I will happily ask a new question.

21  BY MR. SHOWALTER:

22  Q.  Do complaint forms available at polling places indicate

23  that there are methods to request reasonable accommodations for

24  persons with disabilities?

25  A.  I still don't understand the question.

Michael Scarpello - Examination                    507

1  Q.  You testified that there are complaint forms at every

2  polling place.  And counsel for the State asked if a person

3  could complain or ask for accommodation with those complaint

4  forms.  Is there any place on these complaint forms for people

5  to ask for disability accommodations?

6  A.  I think the complaint form is generic that you can say

7  virtually anything on that.  There's no leading them through

8  what they're complaining about, it's a pretty wide open.

9  Q.  And one other question.  Would a voter who needs to vote by

10 mail because they cannot access a polling place have access to

11 these complaint forms at polling places?

12 A.  I believe -- I can't be sure, but I believe we have a

13 complaint form on our website where they could submit any sort

14 of complaint or contact us through e-mail.

15 Q.  But you don't have any place on your website where people

16 can ask for specific disability accommodations?

17 A.  No.

18 Q.  Thank you.

19         MR. SHOWALTER:  Nothing further.

20         THE COURT:  Anything else?  Any further need for this

21 witness or can he be excused?

22         MR. KERCHER:  Nothing further from the State, Your

23 Honor.

24         THE COURT:  Thank you, sir.  You're excused.  So we

25 got through one of the five witnesses for today.  I'm assuming

 1    then tomorrow we pick up with Phillips, Clemmons and the other

 2    two?  And are we going to add witnesses to that list or is it

 3    going to take us all day to get to the four?

 4            MS. PERALES:  Your Honor, we're also planning to call

 5    Remmi Garza, the elections administrator for Cameron County,

 6    but we will start with Phillips and then we will do the three

 7    together, the poll workers together, and then Mr. Remmi Garza

 8    after that.

 9            THE COURT:  So that's the plan for tomorrow.  We'll

10    start promptly at nine.  I have criminal sentencings at 8:30,

11    they're going to be very short, they're simple cases, so I

12    imagine we'll be through by 15 minutes, 20 minutes at the

13    moment.  I would ask that you also clean off at least the front

14    row of desk and then don't enter the well until after we finish

15    the sentencings because the Marshals will ask that you be in

16    the back spectator area until we're through.  And lastly, I was

17    asking my courtroom deputy why do we have the 18th open here?

18    And she reminded me that I think it was at the request of U.S.

19    Department of Justice lawyers for religious accommodation, they

20    wanted 18th off.  I just propose to you, unless someone here

21    also requires religious accommodation, I'm of course willing to

22    grant it to you, but do you want to pick up the 18th or do you

23    still want to set it aside?

24            MS. PERALES:  We would still like to set it aside,

25    Your Honor.

Michael Scarpello - Examination                 509

1          MR. KERCHER:  No objection from State defendants, Your

2    Honor.

3          THE COURT:  So we're not working the 18th.

4          MS. PERALES:  For religious accommodation, Your Honor.

5          THE COURT:  That's fine.  I just raise it out there.

6    Okay.  We'll see you tomorrow morning at nine.

7          MR. KERCHER:  Before we head out, a couple of

8    housekeeping matters.  First, we are also not working the 15th,

9    is that still everybody's understanding?

10         THE COURT:  Yes.

11         MR. KERCHER:  Finally, I believe the parties have

12   reached an agreement about offering exhibits into evidence.  We

13   had tinkered with doing this at the end of the trial we decided

14   we're not going to do it that way.  At the end of each day when

15   there's some housekeeping moments, we would like to move the

16   exhibits that have been offered and to which objections have

17   not been sustained into evidence.

18         THE COURT:  So if you don't mind, Tuesdays and

19   Thursdays I teach, so I'm getting close to when I have to run.

20   Let's do that first thing tomorrow morning.

21         MS. PERALES:  Thank you, Your Honor.

22         COURT SECURITY OFFICER:  All rise.

23

24

25

1                    *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  September 12, 2023

12   /s/ Gigi Simcox

13   /s/ Angela M. Hailey

14   United States District Court
     Official Court Reporters, CSRs, CRRs, RPRs, RMRs
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25