```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

LA UNION DEL PUEBLO ENTERO,      .
 4 ET AL,                         .
                                  .
 5          PLAINTIFFS,           .
       vs.                        . DOCKET NO. 5:21-CV-844-XR
 6                                .
GREGORY W. ABBOTT, ET AL,         .
 7                                .
            DEFENDANTS.           .
 8

 9

10              TRANSCRIPT OF BENCH TRIAL
        BEFORE THE HONORABLE XAVIER RODRIGUEZ
11           UNITED STATES DISTRICT JUDGE
               SEPTEMBER 13, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                        KENNETH PARRENO, ESQUIRE
                          MALDEF
18                        110 BROADWAY
                          SUITE 300
19                        SAN ANTONIO TX 78205

20

21                        JENNIFER HOLMES, ESQUIRE
                          NAACP LEGAL DEFENSE & EDUCATIONAL
22                        FUND INC
                          40 RECTOR STREET, FIFTH FLOOR
23                        NEW YORK NY 10006

24

25
```

```
 1
 2                              LEAH J. TULIN, ESQUIRE
                               BRENNAN CENTER FOR JUSTICE AT NYU
 3                               SCHOOL OF LAW
                               1140 CONNECTICUT AVENUE NW
 4                             SUITE 1150
                               WASHINGTON DC 20036
 5
 6                              AARON J. CURTIS, ESQUIRE
                               WEIL GOTSHAL & MANGES LLP
 7                             767 FIFTH AVENUE
                               NEW YORK NY 10153
 8
 9                              ROBYN SANDERS, ESQUIRE
                               BRENNAN CENTER FOR JUSTICE
10                             120 BROADWAY SUITE 1750
                               NEW YORK NY 10271
11

12

13  FOR THE DEFENDANTS:       RYAN G. KERCHER, ESQUIRE
                               WILLIAM D. WASSDORF, ESQUIRE
14                             KATHLEEN HUNKER, ESQUIRE
                               ETHAN QUINN SZUMANSKI, ESQUIRE
15                             JAMESON C. JOYCE, ESQUIRE
                               MONROE DAVID BRYANT, JR., ESQUIRE
16                             TEXAS ATTORNEY GENERAL
                               P.O. BOX 12548
17                             MC 009
                               AUSTIN TX 78711
18

19                             ZACHARY WILLIAM BERG, ESQUIRE
                               TEXAS ATTORNEY GENERAL
20                             300 WEST 15TH STREET
                               AUSTIN TX 78701
21

22                             ERIC J.R. NICHOLS, ESQUIRE
                               BUTLER SNOW LLP
23                             1400 LAVACA STREET, SUITE 1000
                               AUSTIN TX 78701
24

25
```

```
 1

 2                          BEN L. STOOL, ESQUIRE
                            CRIMINAL DISTRICT ATTORNEYS OFFICE OF
 3                           DALLAS COUNTY
                            500 ELM STREET, SUITE 6300
 4                          DALLAS TX 75202

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20  REPORTED BY:          GIGI SIMCOX, RMR, CRR
                          OFFICIAL COURT REPORTER
21                        UNITED STATES DISTRICT COURT
                          SAN ANTONIO, TEXAS
22

23

24

25
```

514

1    (San Antonio, Texas; September 13, 2023, at 9:00 a.m., in

2    open court.)

3        THE COURT:  And your next witness.

4        MISS TULIN:  Good morning, Your Honor.  Before we

5    call our next witness, we were hoping to do some exhibit work.

6        My name is Leah Tulin with the Brennan Center on

7    behalf of LUPE plaintiffs, and what I would like to do is

8    first move for the admission of exhibits that have already

9    been used over the last two days and then there are additional

10   LUPE exhibits that the defendants have indicated that they

11   have no objection to the admission of.  So it's a long list

12   and I will try and read as quickly as I can but also at a

13   speed that works for the court reporter.

14       First exhibits used on the 11th of September LUPE

15   119, LUPE 172, LUPE 185, LUPE 189, LUPE 326, LUPE 329, LUPE

16   336, LUPE 337, LUPE 339, LUPE 346.

17       Exhibits used on September 12th, LUPE 26, LUPE 350,

18   LUPE 340, LUPE -- excuse me -- LULAC 103, LUPE 33 -- sorry.

19   LUPE 340.  LUPE 172.

20       And I believe that's all that have been used so far

21   that we are moving for at this time.

22       Now the longer list.  These are exhibits that

23   defendants do not have an objection to admission at this time.

24       LUPE 4, 5, 6, 7, 8, 10, 11, 13, 14, 18, 19, 20, 21,

25   22, 23, 24, 25, 26 — oh, excuse me.  Strike that.  Not 26.

1   LUPE 27, LUPE 28, 29, 30, LUPE 33, 34, 35, 36, 37, 38, 39, 40,

2   41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55,

3   56, 57, 58, 59, 60, 61, 62, 63, 64, 65, LUPE 68, 69, 70, 71,

4   72, 73, 74, LUPE 81, LUPE 90, LUPE 91, LUPE 94, LUPE 95, LUPE

5   97, LUPE 100, 101, 102, 103, 104, 105, 106, 107, 110, 112,

6   114, 116, 117, 118, 120, 121, 122, 123, 125, 126, 127, 129,

7   130, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142,

8   143, 144, 148, 149, 155, 156, 157, 158, 159, 160, 162, 163,

9   166, 169, 170, 171, 177, 180, 11 –– excuse me –– 182, 183,

10  184, 188, 190, 193, 198, 200, 201, 202, 203, 224, 233, 234.

11          THE COURT:  You lost me.  203.

12          MISS TULIN:  Sorry.  203, 224, 233, 234, 235, 236,

13  237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248,

14  249, 250, 252, 253, 254, 255, 256, 257, 258, 259, 260, 261,

15  262, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275,

16  276, 277, 279, 289, 290, 293, 295, 296, 297, 298, 299, 300,

17  301, 302, 305, 306, 307, 308, 311, 312, 314, 315, 318, 319,

18  321, 322, 323, 324, 336, 337, 338, 339, 340, 341, 342, 346,

19  and 350.

20          I hope that that was less painful for everyone else

21  than it was for me.

22          THE COURT:  So I'm assuming you are reading off a

23  list?

24          MISS TULIN:  I am, and I will email that to ––

25          THE COURT:  Yeah.  Did you provide a list to the

1  other side?

2        MISS TULIN:  I will provide this list again but we

3  have been in contact about the list and I believe that the

4  list represents our mutual understanding.

5        THE COURT:  Okay.  If you will provide a copy over

6  there, a copy to the courtroom deputy, and a copy for me,

7  subject to later entertaining an objection from somebody on

8  the other side saying there was a mistake or there was an

9  error, all these are admitted, but that will be revisited in

10  the event that there's some mistake found.

11        MISS TULIN:  Thank you, Your Honor.

12        MR. BARON:  Good morning, Your Honor.  Noah Baron

13  with Elias Law Group for LULAC plaintiffs.  I apologize if I

14  missed it in the long list of exhibits, but I wanted to ensure

15  that LULAC Exhibit 66 will be admitted as well.

16        THE COURT:  So the only LULAC exhibit I heard was

17  103.

18        MR. BARON:  Correct.  That's what I heard as well.

19  This was an exhibit presented yesterday.

20        THE COURT:  Is 66 on your list?

21        MISS TULIN:  It was not.

22        THE COURT:  So if you will add it to your list,

23  subject to a later objection, it's admitted.

24        MISS TULIN:  Thank you.

25        THE COURT:  And anything else by housekeeping?

1           MR. NICHOLS:  Yes, Judge.  We worked very hard, as

2  you can tell, to give them a list of the exhibits to which we,

3  the defense, has no objection.  We've yet to receive a similar

4  list from the plaintiffs.

5           THE COURT:  So I expect reciprocity.  So if there's

6  exhibits from this side that need to be admitted, let's try to

7  do it at some point today.

8           Anything else by way of housekeeping?

9           Okay.  Your next witness.

10           MISS PERALES:  Thank you, Your Honor.  Plaintiffs

11  call Miss Tacoma Phillips.

12      (TACOMA PHILLIPS, having been duly sworn, testified as

13  follows:)

14           MISS PERALES:  Your Honor, I request permission to --

15           THE COURT:  I'm sorry.  One second.

16           MR. STOOL:  May my client have one of those bottles

17  of water?

18           THE DEPUTY CLERK:  I gave her one.

19           MR. STOOL:  Pardon me, Judge.

20           MISS PERALES:  Your Honor, I request permission to

21  ask leading questions under FRE 611(c)(2) because

22  Miss Phillips is with the Dallas County Elections Department,

23  which is an adverse party, a defendant.

24           MR. BRYANT:  No objection, Your Honor.

25           THE COURT:  You may proceed.

TACOMA PHILLIPS – DIRECT

1          MISS PERALES:  Thank you.

2                    DIRECT EXAMINATION

3   BY MISS PERALES:

4   Q.  Good morning.

5   A.  Good morning.

6   Q.  Can you please state your name for the record.

7   A.  Tacoma Phillips.

8   Q.  Thank you.  What is your job title?

9   A.  Elections supervisor.

10  Q.  Is it correct you work for the Dallas County Elections

11  Administrator?

12  A.  Yes.

13  Q.  And your responsibilities are to supervise the mail voting

14  department, is that correct?

15  A.  Yes.

16  Q.  And I think I did the math right on this, but as of last

17  month have you had 25 years with Dallas County elections?

18  A.  Yes.

19  Q.  You'll agree with me that SB 1 created new requirements to

20  verify ID number for the voter on both the application for

21  ballot by mail and the mail ballot carrier envelope, correct?

22  A.  Can you define ID number?

23  Q.  It would be the number that the voter has in the voter's

24  voter registration record.

25  A.  Yes.

TACOMA PHILLIPS – DIRECT

1  Q.  And that would be either a driver's license number or the
2  last four of the social security number, correct?
3  A.  Yes.
4  Q.  So now when you're — do your duties include supervising
5  the processing of applications for ballot by mail?
6  A.  Yes.
7  Q.  And you also have some duties with respect to processing
8  the mail ballot carrier envelope when it comes back, correct?
9  A.  Yes.
10  Q.  So just for application for ballot by mail is it correct
11  that now you look into the voter registration system that you
12  have for the voter not only to verify that the voter is
13  registered but also to look at the voter registration ID
14  number to see if it matches what the voter wrote on the
15  application for ballot by mail?
16  A.  Yes.
17  Q.  And if the voter, if the number that the voter put on the
18  application for ballot by mail does not match with what you
19  have in your records then you'll send the voter a notice
20  letting the voter know the requirements were not met, correct?
21  A.  Yes.
22  Q.  And now switching over to the mail ballot carrier
23  envelope.  When a carrier envelope comes into your office now
24  you remove the secrecy flap on the carrier envelope and you
25  check to see that the voter put a number for ID, either

TACOMA PHILLIPS - DIRECT

1  driver's license or last four of the social that matches in
2  your system, correct?
3  A.  Yes.
4  Q.  Now I'm going to take you back to January of 2022.  Is it
5  correct to say you started receiving applications for ballot
6  by mail for which you could not match the ID number on the
7  ABBM to the voter registration record?
8  A.  Yes.
9  Q.  And you saw that on many applications for ballot by mail
10  that were coming to your office that the voter had failed to
11  put either a driver's license or the last four of the social,
12  correct?
13  A.  Yes.
14  Q.  And you also saw applications for ballot by mail where the
15  voter forgot to put the ID number that matched what was in the
16  voter registration record even though they did put an ID
17  number?
18  A.  Yes.
19  Q.  So, for example, the voter might have written a driver's
20  license number and what you had in your records were the last
21  four of the social, correct?
22  A.  Yes.
23  Q.  And also vice versa, that the voter provided the last four
24  of the social but you had the driver's license number in your
25  records?

TACOMA PHILLIPS - DIRECT

1  A.  Yes.

2  Q.  And all of those would be considered a failure to match,

3  correct?

4  A.  Yes.

5  Q.  So if that happened with an application for ballot by mail

6  you would put that application for ballot by mail in a pile

7  and send the voter a notice saying that you had a mismatch on

8  the ID number, correct?

9  A.  Yes.

10 Q.  At a certain point you started sending voters with an ID

11 number defect on their applications for ballot by mail a new

12 voter registration application, correct?

13 A.  Say that again please.

14 Q.  So for people where you couldn't match the ID number on

15 application for ballot by mail did you begin at some point to

16 send them voter registration applications with their notice of

17 defect to try to collect the new ID number information?

18 A.  Not the application.

19 Q.  Not a voter registration application?

20 A.  No.

21 Q.  You would send them the notice of defect?

22 A.  Yes.

23 Q.  And a clean application for ballot by mail?

24 A.  Yes.

25 Q.  Okay.  Not a voter registration form?

TACOMA PHILLIPS – DIRECT

1    A.   No.

2    Q.   So when –– and it's also true that you didn't call or

3    email the voter, you just sent the notice of defect and the

4    new clean application for ballot by mail?

5    A.   That is correct.

6    Q.   All right.  Now, when the voter would receive that notice

7    of defect and the new application for ballot by mail, if they

8    had originally put, for example, a driver's license number

9    that you couldn't match, did you include any other material

10   with the letter saying try something other than your driver's

11   license?

12   A.   No.

13   Q.   Okay.  So it would be up to the voter to try a different

14   ID number?

15   A.   Yes.

16   Q.   Your office received calls, is that correct, from voters

17   who had received notice of defect?

18   A.   Yes.

19   Q.   And would it be fair to say that most of the calls that

20   you were getting from voters when they got a notice of defect

21   was calls for information about this new ID requirement?

22   A.   Yes.

23   Q.   So now I'd like to shift over to what would happen if you

24   could match the number on the application for ballot by mail,

25   if you could match the ID number and the rest of the

TACOMA PHILLIPS – DIRECT

1  application for ballot by mail was sufficient, you would send

2  that voter a mail ballot, correct?

3  A.  Yes.

4  Q.  But is it true for some of the voters that you sent the

5  mail ballot, you would get the carrier envelope back and you

6  could not match the ID number that was on the carrier

7  envelope?

8  A.  Yes.

9  Q.  Is it true that you spoke to some voters for whom there

10 wasn't enough time left, either for you to send them the

11 notice of defect and the new materials, or for them to be able

12 to get that back to you?

13 A.  Yes.

14 Q.  And in those instances you would advise the voter to go to

15 an early voting location or go to the polls on Election Day

16 and vote in person, correct?

17 A.  Yes.

18 Q.  And if it was an ID defect on the application for ballot

19 by mail there were times when you told the voter to go vote in

20 person but still fill out the application for ballot by mail

21 with the new info so that you could at least get them into the

22 system for the next mail ballot in the cycle, correct?

23 A.  Yes.

24 Q.  It's also true that you had voters tell you in response to

25 your advice that they were not physically able to get to the

TACOMA PHILLIPS – DIRECT

1  polls to vote in person, correct?

2  A.  Yes.

3  Q.  And some of the reasons that they shared with you were

4  that they could not walk, or they didn't have transportation

5  to get to the polls, correct?

6  A.  Yes.

7  Q.  And most of the people that you were talking to who were

8  in that situation were over age 65, correct?

9  A.  Yes.

10  Q.  It's also true that after SB 1 went into effect you

11  rejected more applications for ballot by mail than you had in

12  the past, yes?

13  A.  Yes.

14  Q.  And this was because of the requirement to match an ID

15  number of the voter, correct?

16  A.  Yes.

17  Q.  And you believe that there are voters in Dallas County who

18  submitted an application for ballot by mail, you couldn't

19  match their ID number, you sent them the notice of defect and

20  the new materials, but they were never able to cure the

21  application for ballot by mail and thus they did not vote?

22  A.  Yes.

23  Q.  It was also the case that sometimes you would get that

24  second application for ballot by mail that had been returned

25  by the voter and you still were not able to match the ID

1  number, correct?

2  A.  Yes.

3  Q.  And either you or someone in your office did speak with

4  voters who said they hadn't been able to vote in the election

5  as a result of the voter ID number mismatch, correct?

6  A.  Yes.

7  Q.  Based on your speaking with voters, it's also true that

8  voters, some of them, just got frustrated and they wouldn't

9  return a second application for ballot by mail, correct?

10  A.  Yes.

11  Q.  And you knew this because they told you that they gave up,

12  correct?

13  A.  Yes.

14          MR. BRYANT:  Objection.  Hearsay, Your Honor.

15          THE COURT:  Your response?

16          MISS PERALES:  My response is that it reflects her

17  understanding of the situation based on having heard this from

18  somebody she spoke to directly.

19          THE COURT:  Besides hearing it from someplace else,

20  do you have any other independent knowledge that people didn't

21  try a second time?

22          THE WITNESS:  I didn't do the research on looking at

23  any particular voter but it was over a phone conversation with

24  a voter.

25          THE COURT:  That's sustained.

TACOMA PHILLIPS – DIRECT

1  BY MISS PERALES:

2  Q.  In Dallas now, your ballot is trilingual, isn't it?

3  A.  Yes.

4  Q.  And what are the languages on your ballot?

5  A.  English, Spanish, and Vietnamese.

6  Q.  You used to work in voter registration for Dallas County,

7  is that right?

8  A.  Yes.

9  Q.  So I just have one question for you about the voter

10 registration form.  Do you recall where the voter registration

11 form asks for either a driver's license number or the last

12 four of the social that the form says to provide one or the

13 other?

14 A.  Yes.

15 Q.  Okay.  Thank you.  Is it also true that you have voters in

16 Dallas County who register to vote before the registration

17 application asked for either a driver's license or the last

18 four of the social?

19 A.  Yes.

20 Q.  Following the 2022 March Primary Election your office

21 administered a May 24, 2022 Election, is that right?

22 A.  Yes.

23 Q.  And you received applications for ballot by mail for that

24 May 24 election that you were unable to process because you

25 couldn't match the ID number, correct?

TACOMA PHILLIPS – DIRECT

1  A.  Yes.

2  Q.  And the number — okay, skipping that one.

3     And you personally were concerned by the greater number of

4  rejected applications for ballot by mail and mail ballots in

5  the March Primary, correct?

6  A.  Yes.

7  Q.  In terms of how the mismatch came about, is it true that

8  at least some individuals whose applications for ballot by

9  mail or mail ballots that were rejected were, in fact,

10  eligible voters who either made an error filling out the form,

11  maybe they missed the place where they were supposed to put

12  the number, or they did put a number but you couldn't match

13  it?

14  A.  Can you repeat that, please?

15  Q.  Yes.  That was a really long question.  I'm sorry.

16     It is your belief that at least some individuals whose

17  mail ballots or ABBMs were rejected were, in fact, eligible

18  voters but they either missed the place where they were

19  supposed to put the ID number, or they put their ID number and

20  it just didn't match your system?

21  A.  Yes.

22  Q.  I'd like to talk now about the November 2022 Election.

23     And I'm going to display some exhibits.  I'd like to ask

24  for LUPE 60, please.  I just want to confirm that this does

25  not have a Bates number on it, this is the native, is that

1  correct?  Thank you.

2      This is also personal information, if we can take the

3  precautions on displaying it.

4          THE COURT:  Let's take down the spectator area and

5  just do the well.  But now you've taken — there we go.

6          MISS PERALES:  Thank you.

7  BY MISS PERALES:

8  Q.  Miss Phillips, do you recognize this as a chart produced

9  by Dallas County?

10 A.  Yes.

11 Q.  And if we go up to the top — well, because this was

12 produced to us in native format, if we roll over to the right

13 I'd like to see — if you would just stop for a moment,

14 please.

15     If you look in Column V, as in Victor, do you see return

16 dates for these materials that are associated with the

17 November 2022 Election?

18 A.  Yes.

19 Q.  Okay.  And then a little bit to the right in Column Y

20 there is — if we could just expand that a tiny bit, like

21 widen the column — do you see the codes there in Column Y?

22 A.  Yes.

23 Q.  And is it fair to say that the code Y65 is a voter who is

24 voting at what we call an annual ballot by mail because they

25 are over 65?

TACOMA PHILLIPS - DIRECT

1   A.   Yes.

2   Q.   And then RM stands for regular mail, correct?

3   A.   Yes.

4   Q.   We need to go back there.  Thank you.  And then if we

5   scroll down.

6        Is it also true that the code YDS stands for disabled

7   voter who is voting an annual ballot?

8   A.   Yes.

9   Q.   Okay.  Thank you.  Now I wanted to try to ask you about

10  some of the codes that are on here, at least so you could

11  identify them for us and I'm hoping that if we scroll to the

12  right we might see these codes but I'll ask you about them

13  anyway.  For a return status, if you have an OK in return

14  status, that means it was returned, it was okay and you were

15  able to process it, correct?

16  A.   Yes.

17  Q.   And if it had an AV in the column, that would mean the

18  person already voted in person, correct?

19  A.   AV in the — what column?

20  Q.   For the return status column.

21  A.   T.

22  Q.   Oh, okay.  So T as in Thomas?

23  A.   Yes.

24  Q.   And so I'll go down still.  If you have RA, that would be

25  received after the deadline, correct?

TACOMA PHILLIPS – DIRECT

1  A.  Yes.

2  Q.  And if you have CL, that would be the ballot canceled by

3  the voter, correct?

4  A.  Yes.

5  Q.  If you had UN, that would mean that the ballot was

6  returned by the post office, correct?

7  A.  Yes.

8  Q.  And if you had X1, that was associated with corrected mail

9  ballots with a different judge election, is that right?

10  A.  Yes.

11  Q.  But it might be another election as well?

12  A.  Yes, it might be another election.

13  Q.  Thank you.  Now I want to talk about some other codes.  If

14  the code is E7, that is associated with an ID number either

15  missing or mismatch, correct?

16  A.  Yes.

17  Q.  And also the code IF, as in Frank, is for incorrect or

18  missing ID final, yes?

19  A.  Yes.

20  Q.  And then finally V8, like the vegetable juice, that is

21  associated with the ballot board concluding that there was

22  incomplete social security number or Texas driver's license,

23  correct?

24  A.  Yes.

25  Q.  And so if we were to take all of these codes and

TACOMA PHILLIPS – DIRECT

 1  understand them on this chart, we could add up E7, IF, and V8,
 2  and get a sense of the voters who had an ID defect, correct?
 3  A.  Yes.
 4  Q.  I'd like to go to LUPE 61, please.
 5      Also I believe it's a similar chart that has confidential
 6  information.
 7      And on the left-hand column —— first of all, do you
 8  recognize this as data that is put together by the
 9  Dallas County Elections?
10  A.  Yes.
11  Q.  And is the create date in Column E associated with the
12  November 2022 Election?
13  A.  Yes.
14  Q.  Okay.  And then in Column C are we looking now at data for
15  applications for ballot by mail?
16  A.  Yes.
17  Q.  And then in the Column D for the notice subcode, does that
18  give us some information about ID mismatch, or no?
19  A.  Yes.
20  Q.  It does.  Can you tell me what the code ISM means?
21  A.  ISM means that it's missing, that it was no ID or social
22  security information on the application.
23  Q.  And then ISI?
24  A.  ISI, I believe, means that it's either incorrect on the
25  driver license or the social security.

TACOMA PHILLIPS – DIRECT

1  Q.  Okay.  And then for the code TL, do you know what that

2  code is for?

3  A.  It's too late.

4  Q.  Too late.  Okay.  IC?

5  A.  I cannot remember the codes but I do believe on this

6  spreadsheet, if you scroll down ––

7  Q.  All the way to the bottom?

8  A.  –– all the way to the bottom, that it would have the codes

9  down –– the description.  There you go.

10 Q.  Oh, thank you.  And so if we scroll over to the right we

11 will see ––

12 A.  All the definitions.  The definitions of the codes, yes.

13 Q.  Thank you.  Come back up just a tiny bit, please.  Right

14 there.

15     So we see for ABBM IFI, that's a final incomplete social

16 or Texas driver's license, correct?

17 A.  Correct.

18 Q.  Also IFM is related to an ID failure, right?

19 A.  Yes.

20 Q.  Also ISI related to ID failure?

21 A.  Yes.

22 Q.  ISM is related to ID failure?

23 A.  Yes.

24 Q.  Okay.  And then I think if we just scroll slowly down that

25 might be –– oh, no.  There's more.

TACOMA PHILLIPS – DIRECT

1    ABBM–NT is also, that's row 2140, that's also an ID

2  defect?

3  A.  Yes.

4  Q.  Okay.  And then finally going a little bit lower down,

5  there's also a line, if you can stop, for row 2161 –– row 2160

6  instead.  It says rejected BBM–ID not associated with the

7  voter registration record, is that right?

8  A.  Yes.

9  Q.  And that's DEF ABBM–IDVR, correct?

10  A.  Yes.

11  Q.  And then the one above it is also an ID defect, rejected

12  BBM, No ID, NOSG?

13  A.  Yes.

14  Q.  And that's code DEF ABBM–IDSG, correct?

15  A.  Yes.

16  Q.  And then if we go to row 2171, is that code also

17  associated with an ID defect, that's rejected BBM, no ID/SS

18  number?

19  A.  Yes.

20  Q.  And then I see some additional codes that are similar but

21  have to do with the Spanish application for ballot by mail,

22  that would be row 2172, correct?

23  A.  Yes.

24  Q.  And then going down a little bit more –– maybe we've come

25  to the end.

TACOMA PHILLIPS – DIRECT

1    So if we were to add up the entries with those codes,
2 would we get a sense of the universe of people for the
3 November 2022 Election whose applications for ballot by mail
4 were rejected for ID defect reasons?
5 A.  Yes.
6 Q.  Okay.  Thank you.  I'm only going to make you look at one
7 more chart, and that's LUPE 59, if you could.  Can we scroll
8 over to see if there's a date here.
9    All right.  If you could look at Column W and X.  Before
10 that though, I'm going to ask you if this is also a chart that
11 is produced by Dallas County Elections?
12 A.  Yes.
13 Q.  And if you are looking at the date in Column W and X, are
14 these associated with the 2022 November General Election?
15 A.  Yes.
16 Q.  Okay.  And then if we scroll over to the left, if you look
17 in Column M and — well, if you look at Column M, it's
18 referring to the ballot style.  So does this relate to mail
19 ballots?
20 A.  I'm not understanding the question.
21 Q.  Do you know if this chart is related to ABBMs or to mail
22 ballots?  How would we tell the difference?
23 A.  It's both.
24 Q.  It's both?
25 A.  Yes.

TACOMA PHILLIPS – DIRECT

1  Q.  Could be both?

2  A.  Yes.

3  Q.  Okay.

4  A.  This chart is the applications that was submitted, and

5  then this chart is also the return of the carrier envelope.

6  Q.  So it combines the information for both?

7  A.  Yes.

8  Q.  Okay.  And would it be worth it for us to scroll to the

9  bottom, maybe there's a code list there?

10  A.  No, there would not be a code list on this chart.

11  Q.  And then if we scroll slowly to the right is there a place

12  where we find the codes entered in this chart, return status

13  codes.

14     Okay.  Column T, as in Thomas, that would give us the

15  codes.  And are those the codes similar like OK that we went

16  over a little bit earlier?

17  A.  Yes.

18  Q.  Okay.  Thank you.  We can put those away now.

19     Would it be fair to say that if we compare November of

20  2020, before SB 1 went into effect, and November 2022, that

21  you rejected for November 2022 more applications for ballot by

22  mail than you had in November of 2020?

23  A.  I don't have the numbers in front of me to say yes or no

24  to that.

25  Q.  Do you recall during November 2022 forming any conclusions

TACOMA PHILLIPS – DIRECT

1  about whether you were rejecting more applications for ballot
2  by mail than you were in the previous?
3  A.  Again, I don't have the numbers in front of me.
4  Q.  Let's go on.  I have another question for you about
5  applications for ballot by mail.  It's true, isn't it, that
6  you could get a voter whose ID you could not verify on the
7  ABBM and you would send the voter a clean ABBM, that voter
8  would get it back to you, and you could send them a mail
9  ballot for that election but then you would get a subsequent
10 ABBM from that voter and the mismatch would happen again?
11 A.  Yes.
12 Q.  And that's because even when you get a voter to send you a
13 corrected application for ballot by mail with the right ID
14 number on it, your department does not update voter
15 registration records, correct?
16 A.  Yes.
17 Q.  And this is because the voter registration department is
18 what updates voter registration records, not the mail ballot
19 department?
20 A.  Yes.
21 Q.  So you would be receiving information that, for example,
22 would be a driver's license number that might be missing from
23 the voter's registration record but you were not going into
24 the system and updating the system to add that driver's
25 license number, correct?

TACOMA PHILLIPS - DIRECT

1  A.  Correct.

2  Q.  Is it also true for the November 2022 Election that

3  voters -- that you learned through your work that voters with

4  ID mismatches could not get to vote in person, again, because

5  they were elderly or they lacked transportation to the polls?

6  A.  Repeat that, please.

7  Q.  Through your work in the November 2022 Election did you

8  come to learn that there were voters with ID defects that

9  couldn't physically get to vote in person because they were

10  either elderly or they lacked transportation?

11  A.  Yes.

12  Q.  You knew that some people were homebound, is that correct?

13  A.  Yes.

14  Q.  Did you come to learn that some voters felt that

15  Dallas County Elections was trying to stop them from voting

16  because of ID mismatch problems?

17  A.  Yes.

18  Q.  Some people thought you were trying to take their rights

19  away, is that correct?

20  A.  Yes.

21  Q.  And you would explain to them about SB 1 and the changes

22  in the law and the reason why you were asking for a number

23  that you could match to your records, correct?

24  A.  Yes.

25  Q.  But voters, some of them, were really, really angry,

TACOMA PHILLIPS – DIRECT

1 correct?

2 A.  Yes.

3 Q.  Okay.  In your view, there were quite a few voters who,

4 after you tried to explain the ID number requirements to them

5 for voting abandoned the process, is that correct?

6 A.  Yes.

7 Q.  Is that because the phone call ended before you were able

8 to sort of get all of that information out?

9 A.  Yes.

10 Q.  Okay.  Thank you.  And, again, the voters who were

11 experiencing these ID mismatch problems were primarily over

12 the age of 65, is that correct?

13 A.  Yes.

14 Q.  Was it also true that in November 2022 you saw voter

15 confusion from voters, mail voters, who had not voted in the

16 2022 March Primary and who were filling out applications for

17 ballot by mail for the first time for the November 2022

18 General Election?

19 A.  Yes.

20 Q.  Do you expect that for the upcoming Presidential Election

21 in 2024 that you are also going to have voters who are going

22 to be filling out the ABBM for the first time that calls for

23 ID information?

24 A.  Yes.

25 Q.  Isn't it also true that for November of 2022 you had

TACOMA PHILLIPS – CROSS

1  voters who had voted successfully by mail and you had counted

2  their mail ballot for November 2022 — for March 2022 — I'm

3  sorry — but then in November 2022 that same voter experienced

4  an ID number mismatch?

5  A.  Yes.

6  Q.  Now, a registered voter with a disability is not able to

7  get a modification or accommodation to the ID, specifically

8  the ID requirement for vote by mail, isn't that right?

9  A.  Yes.

10  Q.  And so to the best of your knowledge, even if a disabled

11  voter requested accommodation to not have to put an ID number

12  that you can match, you would not give them a different set of

13  rules, correct?

14  A.  Correct.

15          MISS PERALES:  I pass the witness.

16          THE COURT:  Anything else from that side?  None.

17          Any cross?

18          MR. BRYANT:  Yes, Your Honor.

19                      CROSS-EXAMINATION

20  BY MR. BRYANT:

21  Q.  Good morning, Miss Phillips.

22  A.  Good morning.

23  Q.  My name is David Bryant.  I had a chance to briefly

24  introduce myself.  I represent the State defendants, the

25  Secretary of State and the Attorney General for the State of

TACOMA PHILLIPS - CROSS

1  Texas.  It's my understanding you have worked for the
2  Dallas County Election Department for a little over 25 years
3  at this point, is that right?
4  A.  Yes.
5  Q.  And how much of that time have you worked in the area
6  of — that you currently work in, of dealing with the mail
7  ballots or mail ballot applications?
8  A.  I started helping out with mail ballot around September of
9  2020 and then I officially became the supervisor March of
10  2021.
11  Q.  Okay.  And so a great majority of your time with the
12  Dallas County Election Department has been spent in areas
13  other than the ballot-by-mail section or the mail department?
14  A.  Yes.
15  Q.  But you have had an opportunity to work in the mail voting
16  department prior to SB 1 and after SB 1, is that right?
17  A.  Yes.
18  Q.  Now, prior to SB 1, you worked in the mail department for
19  what elections in 2021?
20  A.  You said prior?  Before?
21  Q.  Before SB 1 went into effect, which was in December.
22  A.  Um-hum.  I worked in the November 2020 Election.
23  Q.  Okay.  And did you work in elections in 2021?
24  A.  Yes.
25  Q.  And were there a couple of those, although they weren't

TACOMA PHILLIPS - CROSS

1  statewide elections?

2  A.  Yes.

3  Q.  Now, you had a series of questions on direct about people

4  with disabilities seeking accommodation with respect to ID

5  requirements.  During the time that you've been in the mail

6  department of the Dallas County election operation, have you

7  ever received any request for any accommodations from disabled

8  voters with respect to voter ID requirements?

9  A.  Not that I can recall.

10 Q.  And is that true, not only for you personally, but for all

11 of the folks who worked for you?

12 A.  Not that I can recall.

13 Q.  If you did receive or your department received a request

14 for accommodation from a disabled voter, would you make any

15 effort to accommodate it?

16 A.  Yes.

17 Q.  And what would you be willing to do in order to

18 accommodate a request for accommodation from a disabled voter

19 if anyone ever made one?

20 A.  What type of request would it be?  Like how?

21 Q.  Well, I assume that you would want to know what the

22 specific problem is that the disabled voter was having and

23 would you base your response on whatever the specific problem

24 was?

25 A.  Yes.

TACOMA PHILLIPS - CROSS

1  Q.  And would you do anything that you could reasonably do to
2  accommodate the disabled voter other than violating the law?
3  A.  Yes.
4  Q.  Have you ever had any requests for accommodation from a
5  disabled voter or any other voter who said they had a
6  disability related to the process of curing either an
7  application for ballot by mail or a mail ballot?
8  A.  Yes.
9  Q.  What types of requests have you received?
10  A.  If we were able to come and assist them or come get them
11  to go to the polls to vote.
12  Q.  And would your department -- did your department make the
13  accommodation when it was requested?
14  A.  No.
15  Q.  Have there been any requests that you could respond to?
16  A.  Yes.  We assisted voters through the cure period to help
17  them to get on the Secretary of State's Ballot Tracker to help
18  them to try to cure.
19  Q.  Now, because you worked with respect to elections before
20  SB 1 was put in place, you are familiar with the process that
21  Dallas County went through to verify applications for ballot
22  by mail prior to SB 1, is that right?
23  A.  Yes.
24  Q.  And could you generally describe that?
25  A.  How we verify?

TACOMA PHILLIPS - CROSS

1  Q.  How you verified it before SB 1.

2  A.  We'll get the application in the mail, look at the

3  application, make sure that everything physically, that we see

4  on the application is acceptable, then we in turn enter the

5  information into the system by making sure we check in the

6  voter's name — make they are sure registered to vote first,

7  check in the voter's name, address, and make sure all the

8  required criterias match, even with the signature, make sure

9  there's a signature there, and accept it, and enter the

10  information in the system.

11  Q.  And prior to SB 1 did you have instances where you had to

12  do some extra work to verify an application for ballot by mail

13  because perhaps you had a very common — someone with a very

14  common name, or names that matched some other name that you

15  had in your records?

16  A.  Yes.

17  Q.  And what extra work was required when you encountered that

18  kind of situation?

19  A.  Well, the extra work was either trying to verify the voter

20  by name, trying to look at the voter's signature to see if we

21  couldn't read the information on the application that we could

22  try to match the signature closest to any other voter, any

23  other voter, or we either had to try to identify it by

24  address.

25       And sometimes in the past we would go to the Voter

TACOMA PHILLIPS - CROSS

1  Registration Department and ask them for help to see if we can

2  identify, help identify a voter.

3  Q.  Now, since SB 1 has been in effect are you able to look at

4  ID numbers, either a last four of the social, driver's license

5  number, or a state ID number to assist in that verification

6  process?

7  A.  Yes.

8  Q.  And is the process of verification easier for you in your

9  department since SB 1 has been passed?

10  A.  Easier, yes.

11  Q.  Now, prior to SB 1 you were looking at things like

12  people's name and address to do the verification, is that

13  right?

14  A.  Yes.

15  Q.  And that information was information that is publicly

16  available?

17  A.  Public information, name and address?

18  Q.  Yes.

19  A.  Yes.

20  Q.  And so would you say that if somebody wanted to attempt to

21  vote in somebody else's name it would be easier prior to SB 1

22  than after SB 1?

23  A.  I wouldn't say.

24  Q.  Okay.

25  A.  It wouldn't be my decision to make.

TACOMA PHILLIPS - CROSS

1  Q.  Prior to SB 1 you are relying on verification for items of
2  information that were publicly available, is that right?
3  A.  Yes.
4  Q.  And after SB 1 you are using ID numbers and those were not
5  publicly available, is that correct?
6  A.  That is correct.
7  Q.  And so because of that, would it be easier for someone who
8  wanted to vote in somebody else's name or use somebody else's
9  name to vote to do that prior to SB 1 than after?
10  A.  I don't know.  I'm not ballot board.  Ballot board is the
11  one who will check the signatures on a casted ballot, so —
12  Q.  Okay.  Miss Phillips, in one of the charts that
13  plaintiffs' counsel showed you, I saw an abbreviation that was
14  NOSG.  Are you familiar with that abbreviation?
15  A.  Yes, sir.
16  Q.  What does that mean?
17  A.  No signature.
18  Q.  I also saw on that list that plaintiffs' counsel had up
19  some addresses that were not in Dallas County.  I saw one that
20  was Dorchester, Massachusetts, and I think one in Memphis,
21  Tennessee.  Could you explain why those addresses would be on
22  that chart?
23  A.  That voter was out of county, and if there was requesting
24  and it's probably an RM, that voter was out of county and it
25  depends on what line it was on.  It's either — because you

TACOMA PHILLIPS - CROSS

1  would have to see a resident address in Dallas County, and if

2  there is an address that, like you said -- what was it again?

3  Q.  Dorchester, Massachusetts?

4  A.  Massachusetts, that means we sent the ballot to

5  Massachusetts, an out-of-county voter.

6  Q.  I also saw on the chart that plaintiffs' counsel put up a

7  number of those codes indicated a rejection and then some of

8  them had the word "final" at the beginning of the explanation

9  of the code.  Could you explain the difference in those two

10 designations?

11      For example, it might say "rejected, no signature" and

12 then maybe it said "final," another code was final rejected

13 because of no signature?

14 A.  NIF, which is a final code, is only used by the ballot

15 board for a final rejection of Texas ID, social security or

16 driver's license.  Any other code is just a rejection code.

17 It's not, the State hasn't find identified it as being final.

18 Q.  Miss Phillips, you described your experience with the

19 election in March of 2022 and then you described your

20 experience in November 2022, did you see a change in the

21 number of verification problems, at least relatively, I

22 understand you're going to have more voters in November 2022,

23 between March and November?

24 A.  Yes.

25 Q.  Could you describe the extent of that for the judge?

TACOMA PHILLIPS – REDIRECT

1  A.  Well, for March, for 2022, it was the first time that a

2  lot of voters did apply for a ballot by mail with the ID

3  information missing or incorrect, and in November of 2022 you

4  would not have the same voters apply because most of the

5  voters, which are Y65 or YDS or annual voters, so we would

6  just pull that information over because either they had

7  already corrected information or if they choose not to vote

8  again.  So that means in November 2022 you would have new

9  voters putting in new applications with the same issue, so...

10  Q.  So you would have some new voters with the same issue but

11  once you have taken care of the problems or that the voters

12  had taken care of the problems with respect to their annual

13  ABBMs, you didn't have those same folks having to —— often

14  having to have a problem again in November?

15  A.  No, sir, because they was already in the system.  We just

16  pulled —— because they annual voters, so they are going to

17  still to get an application in November for that same year.

18  Q.  Okay.  So did you have problems verifying those same

19  voters in November that you did in ——

20  A.  No, sir, because they were already verified.

21            MR. BRYANT:  I'll pass the witness.

22            MISS PERALES:  Just a couple questions, Your Honor.

23                    REDIRECT EXAMINATION

24  BY MISS PERALES:

25  Q.  Miss Phillips, a moment ago you had a conversation about

TACOMA PHILLIPS - REDIRECT

1  some of the codes, return status codes in the materials
2  provided by Dallas County, some of which were final and some
3  of which were not.  Would it be fair to say that even if a
4  code is not final that either ABBM or mail ballot did have an
5  ID mismatch and you would have sent a notice of defect?
6  A.  I would send a notice of defect for any defective reason.
7  Q.  And then is it true that the status codes were developed
8  in cooperation with your vendor that handles your registration
9  system or -- well, maybe I should back up.
10     Where did the status codes come from, who developed them?
11 A.  The State develops the codes, but in doing the codes we
12 didn't have the codes -- for 2022 we didn't have the codes
13 from the State right away so we had to, in turn, create some
14 codes to go into the system so we can send the voters the
15 defective letters letting them know what they had to correct
16 or cure.
17 Q.  And so is it fair to say that earlier on you were using
18 certain codes to express an ID defect that you had come up
19 with yourself, and then at a certain point after you got the
20 codes from the State you started using the codes from the
21 State?
22 A.  Yes.
23 Q.  Is that the reason why we see quite a number of different
24 codes that are expressing an ID defect?
25 A.  Yes.

TACOMA PHILLIPS - REDIRECT

1          MISS PERALES:  And then finally if I can make one

2  more run, Your Honor, at the hearsay objection, I would like

3  to ask at least one or two questions of Miss Phillips?

4          THE COURT:  Go ahead.

5  BY MISS PERALES:

6  Q.  Miss Phillips, when you spoke to voters over the phone,

7  would it be fair to say with respect to the ones that were

8  very angry that you testified, that they were agitated when

9  they spoke to you?

10  A.  Yes.

11  Q.  And when you spoke to these agitated voters, were they

12  just speaking out their feelings of agitation?

13  A.  I would say, yes, they were speaking out their feelings.

14  Q.  And in those conversations did voters tell you that they

15  were just not going to pursue this process anymore?

16  A.  Yes.

17  Q.  Okay.

18          MISS PERALES:  Excited utterance exception, Your

19  Honor.

20          THE COURT:  And I didn't hear any other objections.

21          MR. BRYANT:  Your Honor, I repeat the objection.

22          I don't have a problem with bringing out that people

23  were agitated or excited but to the extent that plaintiff is

24  asking a witness to repeat out-of-state -- out-of-court

25  statements for the truth of them, then I stand on that hearsay

JAMES LEWIN - DIRECT

1  objection.

2          THE COURT:  But excited utterance is an exception.

3          The objection is now overruled.

4          MISS PERALES:  Thank you.

5          THE COURT:  Anything else for this witness?

6          You may step down, ma'am.  Thank you.

7          Your next witness.

8          MISS PERALES:  Your Honor, we are going to switch

9  seats.  We have another set of counsel.

10         MR. CURTIS:  Good morning, Your Honor, Aaron Curtis

11 of Weil Gotshal & Manges on behalf of the LUPE plaintiffs and

12 plaintiffs would like to call plaintiff Jim — James Lewin to

13 the stand.

14    (JAMES LEWIN, having been duly sworn, testified as

15 follows:)

16         MR. CURTIS:  Your Honor, may I approach the witness?

17         THE COURT:  You may.

18         MR. CURTIS:  Your Honor, the LUPE plaintiffs offer

19 the testimony of plaintiff James Lewin.  We're offering

20 Mr. Lewin's testimony in support of our void for vagueness

21 challenges to Sections 4.09 and 8.01 of SB 1 and we are

22 challenging those provisions under the Fourteenth Amendment.

23                    DIRECT EXAMINATION

24 BY MR. CURTIS:

25 Q.  Good morning.  Please introduce yourself to court.

JAMES LEWIN – DIRECT

1  A.  My name is James Lewin.  I live in Austin, Texas, and I

2  served as an election worker and an election judge in the

3  elections in Travis County.

4  Q.  What do you do for a living, Mr. Lewin?

5  A.  I run a small music tech start-up in Austin.

6  Q.  Do you have any degrees?

7  A.  Yes, I have a bachelor of arts degree from Dartmouth

8  College.

9  Q.  Let's talk about your work as an election worker and an

10 election judge.  When did you first begin working at the

11 polls?

12 A.  I first began working in the polls during the early voting

13 leading up to the November 2020 Election.

14 Q.  How many days did you work at the polls that year?

15 A.  That year I believe the early voting was 18 days in

16 October prior to the November Election Day.

17 Q.  Why did you decide to work at the polls?

18 A.  I decided to work at the polls just to be more active in

19 my community and to participate in the Democratic process and

20 to — I felt I could contribute to facilitating fair and

21 well-run elections in Travis County.

22 Q.  Were there any events leading up to the 2020 Election that

23 prompted you to start working at the polls?

24 A.  Prior to being an election worker, when I was just voting

25 in Travis County, there were a few experiences I had when I

JAMES LEWIN – DIRECT

1  was at the polls as a voter where I witnessed other voters

2  getting incorrect or incomplete information from some of the

3  election workers and part of my motivation for becoming a poll

4  worker was just to contribute and I felt that I could help

5  ensure that people are given the correct information at the

6  polls and that anyone who is eligible to vote would be able to

7  cast their ballot.

8  Q.  What are your responsibilities as an election judge?

9  A.  As an election judge you are essentially the manager of a

10  polling location during the election and the responsibilities

11  range from informing the voters as to the process of checking

12  in and voting, answering questions and resolving any disputes

13  about check-ins and making sure that the voters know how the

14  machines operate to cast their ballot.

15      And then on the other side, managing the other election

16  workers that are working at that site so that they are up to

17  speed on how to set up and operate the machines so that they

18  can give good guidance to the voters, and then also to serve

19  as an election worker yourself while you are there on the day.

20      As a judge you spend time with the resolution table when

21  there are questions that come up that are — require a little

22  bit more time and you don't want to stop the flow of traffic,

23  people come over to the resolution table and you work there

24  but you also serve as an election worker in every capacity.

25  Q.  And I think you said you oversee the polling place.  Does

JAMES LEWIN - DIRECT

1  that include supervising polling workers who are working at

2  that polling place?

3  A.  Yes.

4  Q.  And did you work at the polls after the 2020 Election?

5  A.  I did.  I worked at the polls again in November of 2021,

6  and then for the Primaries in March of 2022, and then again

7  for the General Mid-Term Election in November of 2022.

8  Q.  Why did you decide to continue working at the polls in

9  2021 and 2022?

10  A.  I decided to continue working at the polls in 2021 and

11  2022 because I felt that I had the ability to contribute to

12  managing a well-run polling location and I thought that I

13  could contribute to those elections.

14  Q.  Did you have any concerns when you were deciding whether

15  to work at the polls in 2022?

16  A.  In 2022?

17  Q.  Correct.

18  A.  Yes.  I had concerns going in 2022.  With the passage of

19  SB 1 in 2021 and some of the provisions in the language in

20  that law that I found to be ambiguous and potentially

21  problematic, I had concerns about my ability to execute all

22  the tasks and perform in my role as an election judge

23  effectively during that election, those two elections.

24  Q.  But you decided to work at the polls nonetheless, is that

25  correct?

JAMES LEWIN — DIRECT

1  A.  Yes.

2  Q.  And why did you decide to work, despite those concerns?

3  A.  Well, again, I feel that it's important work and even

4  though I had concerns about the effects of the law and how it

5  would make the job more difficult, the job is still worth

6  doing and so I felt it was important to continue to serve in

7  that role.

8  Q.  Let's talk about your preparations to work at the polls.

9  Did you participate in any training or review any written

10  materials before you served as an election judge in

11  October 2020, the first time you worked at the polls?

12  A.  Yes.  Prior to that election all the election workers were

13  issued a poll worker's manual, which is a document that covers

14  everything from setting up the machines to checking in, and

15  it's also the manual that you use on the day if you have to

16  refer to it for any questions that you have.

17      So I was issued that document, which I reviewed, and then

18  we were also issued links to online videos where we could

19  watch the videos that had to do with physically setting up the

20  machines and what some of the, you know, elements of the

21  different machines look like so you are familiar with them

22  before getting to the site on the day.

23  Q.  And did you review those videos as well?

24  A.  I did.

25  Q.  Did you review — I'm sorry.  Did the videos or the manual

555

JAMES LEWIN − DIRECT

1  discuss poll watchers?

2  A.  They did.

3  Q.  And did you feel you had a clear understanding of what

4  poll watchers could observe in 2020, the first time you worked

5  at the polls?

6  A.  Yes, I found I did.

7  Q.  And what was your understanding of that?

8  A.  My understanding was that poll watchers were able to

9  observe all the activities at the polling location.

10  Essentially that was my understanding.

11  Q.  What was your understanding of what poll watchers could

12  not observe in 2020?

13  A.  In 2020 my understanding was that poll watchers really

14  were able to observe the entire location but for the actual

15  voting process with a voter at a voting machine.

16      In other words, they would maintain the privacy of the

17  voter at the actual voting station.  So they would observe but

18  maintain a respectful distance, as did we.  You know, one of

19  the things we needed to look out for is that voters, for

20  instance, don't have a mobile device at the actual balloting

21  machine.  So, you know, we can observe that from a distance,

22  and, you know, as election workers you monitor that throughout

23  the day.

24      But maintaining that same respectful distance was my

25  understanding of what the poll watchers could do.  So they

JAMES LEWIN - DIRECT

1  could observe everything that, you know, we could, without,

2  you know, infringing on the voter's privacy.

3  Q.  I'd like to transition to discussing 2022.  Did you

4  participate in any training or review any materials before you

5  served as an election judge in 2022?

6  A.  Yes.  In 2022 we received an updated poll worker's manual

7  and there was also an organized Zoom call where a number of

8  election workers were able to get on a zoom in realtime with

9  some of the folks from the Elections Division.

10      They took us through a presentation that included some

11  videos, training videos about setting up the machines and

12  things like that, some of the ones we watched before, but it

13  was in realtime so that we had the opportunity to ask

14  questions along the way and during the Q and A session as part

15  of that training.

16  Q.  Had SB 1 passed at that point?

17  A.  In 2022?

18  Q.  When you reviewed those training materials and attended

19  that training.

20  A.  Yes.

21  Q.  And did you have a clear understanding of what poll

22  watchers could observe based on the training and the manual

23  that you reviewed in 2022?

24  A.  No.  In light of the passing of SB 1 and some of those

25  changes, it wasn't clear how those changes were being

JAMES LEWIN - DIRECT

1  communicated in the manuals.  It seemed like the parameters

2  for the poll watchers were the same as they had been in the

3  past, the sections in the manual were the same and the

4  language was the same.

5  Q.  And when you worked at the polls did you work for the

6  elections division or who was employing you at that time?

7  A.  I believe it was the Travis County Elections Division.

8  Q.  Okay.  And are you a voter in Travis County?

9  A.  Yes.

10      MR. CURTIS:  Your Honor, in the interest of time I'm

11  not going to put the poll worker manuals up on the screen, but

12  I would respectfully refer you to Exhibits LUPE 201 and LUPE

13  202 for those poll workers.  I guess I'll pull them up just so

14  everyone can see them but we wouldn't linger on them.

15  BY MR. CURTIS:

16  Q.  Mr. Lewin, I'd like to circle back to that training a

17  little bit more.  So in 2022 when you participated in that

18  Zoom training, was it the State office that performed that

19  training or was it a local Travis County official who

20  performed that training?

21  A.  I believe it was the Travis County Elections Division.

22  Q.  Okay.  Thank you.

23  A.  The same folks who issued us the poll worker training

24  manual.  That was my understanding.

25  Q.  Did you participate in any other training relating to the

JAMES LEWIN – DIRECT

1  election in 2022?

2  A.  Yes.

3  Q.  What was that training?

4  A.  Well, with the passing of SB 1 and the fact that I was

5  confused about some of the language in the provisions as they

6  related to my job, I was first informed on information on the

7  laws relates to the poll watchers.  So I elected to do the

8  poll watcher's training and go through the process of getting

9  a poll watcher's certification which could be done on the

10  Secretary of State's website.

11    So I just downloaded the manual for the poll watcher

12  training and went through the process of getting certified as

13  a poll watcher just so that I could get some more of that

14  information and learn a little bit more so I could better

15  advise the people on my team as to how it would affect us

16  during the elections they were about to serve in.

17  Q.  Were you required to participate in that training to serve

18  as an election worker?

19  A.  No.

20  Q.  Did you have a clear understanding of what poll watchers

21  could observe based on the poll watcher training and manual

22  that you reviewed?

23  A.  No, not really.  The poll watcher training was very

24  similar to the language in the poll worker's manual.  It was

25  just reiterating the basic parts that the poll watchers were

JAMES LEWIN - DIRECT

1  allowed to observe what happened at a polling location.

2      The poll watcher's training had some references to the

3  actual law in the language, you know, citing, you know, what

4  was allowed and what wasn't allowed, but there was nothing in

5  there that provided any more specifics that gave me a better

6  practical understanding of how I would translate that

7  knowledge to guidance for the team during the day in the

8  election.

9  Q.  I'd like to talk a little bit about your interactions with

10 poll watchers.  Did you have any concerns relating to poll

11 watchers in 2020, when you worked at the polls for the first

12 time?

13 A.  I did, yes.

14 Q.  And what were those concerns?

15 A.  In 2020 it was my first time as an election worker and

16 there was a lot going on in the world at that time but some of

17 the stories in the lead up to the election in the news

18 involved poll watchers who were being -- or people who were

19 being encouraged to become poll watchers, just for the purpose

20 of, you know, potentially disrupting polling sites, and not

21 having served as an election worker I wasn't really sure how

22 that was going to affect us or how that was going to take

23 place in Travis County, but that was in the back of my mind.

24     In addition to my concerns, you know, I had friends and

25 family members reaching out and, you know, sending articles

560

JAMES LEWIN – DIRECT

1  that had to do with, you know, poll watchers, you know,

2  perhaps being encouraged to disrupt polling locations.

3      And, you know, between all those correspondence with my

4  friends and family and my daily emails from my mom about it —

5  yeah, those, you know, concerns were definitely in the back of

6  my brain going in.

7  Q.  Did you have any interactions with poll watchers in 2020?

8  A.  In 2020, yes, we had a few poll watchers through the

9  course of the early voting.

10  Q.  And did you have any — were the — I'm sorry.  Let me

11  start over.

12      Were the poll watchers ever disruptive at your polling

13  place during the 2020 early voting period?

14  A.  No, they were not.

15  Q.  Have you had any interactions with poll watchers since

16  2020?

17  A.  I have not had interactions with poll watchers except in

18  the — I think it was the November 22 Primary Election there

19  was a person who introduced themselves as a person who had

20  poll watcher credentials but at the time they had elected —

21  they just wanted to stay outside and view the line, and they

22  were actually set up in some chairs outside of the

23  hundred-foot mark from the doorway.

24      So I didn't officially check them in as a poll watcher

25  because they had chosen to stay outside and we just decided it

JAMES LEWIN — DIRECT

1  was busy at the time they arrived so we decided that if they
2  wanted to come in, we would go through the procedures then.
3      But they never did.
4  Q.  Have poll watchers ever been disruptive at the polling
5  places where you have worked?
6  A.  No.  Not poll watchers, no.
7  Q.  And did those experiences dispel your concerns about poll
8  watchers being disruptive at the polls?
9  A.  No.  They did not.
10  Q.  And why not?
11  A.  Well, there was just a few examples of interactions with
12  poll watchers and they were all very civil.  Interactions that
13  I had with poll watchers in 2020, it almost felt
14  collaborative.
15      It was in the middle of, you know, the pandemic and there
16  was a lot going on and we were processing a lot of people and
17  the poll watchers were there to observe and, you know, we were
18  there to run a smooth election and it all felt like, you know,
19  we were all being respectful and, you know, facilitating the
20  voters in their path.
21      So that was just a handful of, you know, examples, but
22  that doesn't calm my concerns about the future and whether
23  poll watchers might disrupt a future election, especially
24  based on the provisions in SB 1 that I think might increase
25  the chances of that happening.

JAMES LEWIN - DIRECT

1  Q.  Why do you think the provisions of SB 1 could increase the

2  chances of a poll worker being —— or a poll watcher being

3  disruptive at the polling place?

4  A.  I feel that just due to the ambiguous nature of the

5  language and with the confusion that I have over how I'm

6  supposed to interpret that language, you know, based on the

7  distance a poll watcher might stand from the voter and the

8  fact that I could be, you know, accused of, you know, running

9  afoul of the law if I, you know, don't adhere to some of the

10 ambiguous parameters that are in that language, I just feel

11 that that would, you know, empower people who sought to

12 disrupt the election to, you know, test the limits of, you

13 know, what is appropriate at a polling location and just, you

14 know, provide an additional, you know, amount of stress on the

15 election workers and the judge who is supposed to manage that

16 election.  So I just, I feel that there is a higher potential

17 for those incidents to occur in the future.

18 Q.  Are you aware of what the penalties could be if you

19 violate the law in your interactions with poll watchers under

20 SB 1?

21 A.  My understanding is that one of the provisions, it's a

22 criminal offense to violate the provisions and I'm not

23 entirely sure the extent, you know, to which, you know —— I

24 don't know exactly, you know, what that means, but getting

25 arrested, you know, or jailed or fined for those actions

JAMES LEWIN – DIRECT

1  criminally, and I also believe one of the provisions has to do

2  with being sued civilly for the same offenses.

3      And on top of that, my understanding is that if you are

4  prosecuted, if a judge or a poll worker were prosecuted for

5  that, they would be unable to serve in the role as a result of

6  being prosecuted.

7  Q.  So let's talk some more about SB 1.  I'd like to pull up

8  Joint Exhibit 1.  And it's in your binder and it will also be

9  up on the screen, but I'd like you to turn to page 29 of Joint

10  Exhibit 1.

11      And this is a copy of SB 1 and do you see where it says

12  Section 4.09?

13  A.  Yes, I do.

14  Q.  Is this the provision that you were discussing that makes

15  it an offense for you to obstruct a poll watcher from

16  observing activities at the polling place?

17  A.  Yes.

18  Q.  And is there any language in this provision that you find

19  confusing or unclear?

20  A.  Yes.

21  Q.  And what language specifically do you find confusing and

22  unclear in Section 4.09?

23  A.  There are a couple of areas here.  The first one, for me,

24  is the obstructing the view of a watcher or distance the

25  watcher from the activity.  The distance that is being

JAMES LEWIN - DIRECT

1 referred to here, I'm unclear on what that distance is.

2     As I mentioned before, in 2020 it was a general rule about

3 maintaining a respectful distance of the voters and there was

4 never an issue with any of the poll watchers respecting that

5 distance or any of the poll workers for that matter, but I

6 don't know what that distance is and I've never seen nor been

7 advised to what that distance is and my fear is that if anyone

8 took issue and said, well, I can stand this close to a voter,

9 and as a judge I wanted them to back off from that voter to

10 allow the voter to vote, you know, privately, that I could

11 then be accused of violating this provision.

12     And then the second part of it that gives me concern is

13 the last few words where it says, you know, making an

14 observation not reasonably effective.  That seems like a very

15 subjective phrase, and, again, I have had positive experiences

16 with poll watchers but that doesn't mean that I couldn't

17 imagine a poll watcher who is being particularly difficult

18 just saying that I was rendering their observation not

19 reasonably effective and I don't understand at that point who

20 decides what is reasonably effective.

21     So both of those elements give me pause and I'm confused

22 about both.

23 Q.  I think you touched on this a moment ago but do you know

24 how far away from an activity you can ask a poll watcher to

25 stand under SB 1?

JAMES LEWIN - DIRECT

1  A.  No, I do not.

2  Q.  And why is that?

3  A.  Because I've never seen it in any of the manuals or seen

4  it in any of the videos we've watched, nor have any of the

5  officials that we've talked to in any of the Q and A's, we,

6  being other poll watchers during those sessions, no one has

7  provided an actual distance to which we should adhere.

8  Q.  And did you ask about this provision during the Q and A in

9  2022 that you attended that was held by the Travis County

10  Elections Division?

11  A.  I'm not sure I asked about it in the Q and A.  I did ask a

12  question or two but I think someone else had asked about the

13  distance from voters that a poll watcher can stand, and that I

14  think the answer was they just referred back, you know, to the

15  manual that the poll watchers could observe the activities at

16  a polling location and never really got to a specific

17  distance.

18      But the supposition on the call was that people would

19  automatically maintain a respectful distance and the poll

20  watchers would know this, but it was never a specific answer

21  to that question.

22  Q.  And you mentioned that they referred people back to the

23  manual.  Did the manual provide clarity on how far away poll

24  watchers needed to stand?

25  A.  No.

JAMES LEWIN – DIRECT

1  Q.  Are you concerned about being criminally prosecuted for

2  violating Section 4.09?

3  A.  Yes.

4  Q.  And why is that?

5  A.  Because I'm unclear how to adjust my behavior or adjust

6  the instructions or guidance that I'm giving my team during an

7  election for how to adhere to this law.

8      And like I said, I'm concerned that without the specifics

9  of those parameters and the distance, you know, for example,

10 of how far a poll watcher can stand, that I could simply be

11 accused of, you know, not allowing a poll watcher to stand

12 close enough, if they decided that's what they wanted to levy

13 against me.

14 Q.  Please turn to page 62 of SB 1.  Do you see where it says

15 Section 8.01, Mr. Lewin?

16 A.  Yes.

17 Q.  Is this the provision you are referring to earlier when

18 you said that you could be sued or barred from working as a

19 poll worker if you violated SB 1?

20 A.  Yes.  I believe this is the provision that says I can be

21 sued civilly for violating those provisions.

22 Q.  And would this apply to, in your understanding would this

23 apply to violations of Section 4.09 that we looked at a moment

24 ago?

25 A.  Yes.  My understanding is that those same violations that

JAMES LEWIN - DIRECT

 1  apply here, only the suit would be a civil suit as opposed to
 2  being prosecuted criminally.
 3  Q.  And what's your understanding of the penalties that you
 4  could be subject to under this provision?
 5  A.  Well, again, I could -- I'm not sure if that's a monetary
 6  penalty and/or being prevented from serving in the role of an
 7  election judge or a poll worker in the future, but, yeah, the
 8  penalties of being sued, I'm not exactly sure what those
 9  penalties would be but they don't sound good.
10  Q.  And it's your understanding that a civil lawsuit could be
11  brought against you under this provision, if you violated
12  Section 4.09, is that correct?
13  A.  Correct, and -- yeah.  That sounds like a hassle.
14  Q.  Has SB 1 had any impact on how you've prepared to work at
15  the polls?
16  A.  Yes.  We talked a little bit earlier about the additional
17  training that I did, but in addition to seeking out other
18  information and trying to, you know, better prepare myself for
19  working at the polls, there's just a general stress level now
20  that I need to, you know, sort of calm down, and, you know,
21  calm down other folks who are considering, you know, working
22  at the polls just because no one is really sure exactly how
23  it's going to play out during an election, so more effort and
24  more time preparing as best I can, more, you know, questions
25  and seeking out more answers from the officials, and then

JAMES LEWIN - DIRECT

1 just, you know, more ruminating about how to handle situations

2 as they come up in advance of an election so I can manage the

3 location properly and effectively.

4 Q.  You mentioned that your stress level has increased.  Could

5 you tell us more about why it has increased and what stress

6 you are experiencing?

7 A.  It's just the fear of prosecution based on ambiguous

8 parameters that I'm not sure how I can follow.  It's just

9 nerve-wracking to consider, again, how I need to behave to be

10 effective in the role without being prosecuted for serving in

11 the role, and then also just the stress of not being able to

12 give good answers to a team of clerks and other election

13 workers who want to know how they are supposed to behave to

14 perform well in their task and to still, you know, avoid

15 prosecution.  It's just an — it's an unfortunate additional

16 thought stream that that causes stress.  You just want to

17 focus on giving people the information they need to serve well

18 in the role.

19     I remember the first time I was an election worker, there

20 was a lot of moving parts and you just want to get familiar

21 with them and get into the flow of, you know, running a smooth

22 operation at the polling location.  You don't want to have the

23 idea that you could be prosecuted for some of your actions

24 hanging over your head and — yeah, it's just an additional

25 stress on the entire experience.

JAMES LEWIN - DIRECT

1   Q.  I think you alluded to this before, but has SB 1 had any

2   impact on the guidance you give to the election workers you

3   supervise at the polls?

4   A.  Yes.

5   Q.  And how has it impacted that guidance?

6   A.  Just in the sense that I think I would always ask the poll

7   workers if they have any questions that come up or things, you

8   know, they feel they can't handle in realtime comfortably to

9   send them my way.

10      And with poll watchers, it's the judge's responsibility to

11  check them in any way, but I think that just taking more time

12  to verse the poll workers on the existence of the law and the

13  existence of that ambiguity, just try to dispel some of the

14  stress in advance so that, you know, folks can just kind of

15  concentrate on learning the skills they need to be effective

16  on the day, taking the time to do that, you know, is a

17  relatively new part of the regimen and getting people up to

18  speed.

19  Q.  And do you feel you have a clear understanding of how to

20  advise poll workers on how they can interact with poll

21  watchers now that SB 1 has passed?

22  A.  I do not.  That's part of the stress.  I can pass along

23  the information that's given to me, which is, you know,

24  everything should be fine, there should -- you know, poll

25  watchers should be on able to observe freely and there

JAMES LEWIN — DIRECT

1  shouldn't be any disruptions, and if, you know, if there is an

2  issue please refer it over to me and I'll do my best to

3  process and diffuse the situation, but — yeah.

4  Q.  But you don't have a clear sense of how to advise them on

5  obstructing poll watchers from viewing activities at the

6  polls, is that correct?

7  A.  Correct.  I don't know how to give them specifics that

8  will, you know, let them know, you know, how to — you know,

9  when to approach a poll watcher, for example, for being too

10 close to a poll worker.  I can't give them a distance because

11 I don't know a distance.  And I can't, you know, advise them

12 as to, you know, what is not going to be an infraction as, you

13 know, relates to that law.

14 Q.  Do you have any concerns about how SB 1 will impact poll

15 workers' safety?

16 A.  Yes.

17 Q.  And what are those concerns?

18 A.  I think that just in a scenario where a poll watcher feels

19 empowered to be disruptive at a location, you're never really

20 sure what form that disruption will take, but in the sense

21 that any confrontation or people are disappointed can lead,

22 you know, to other things, I feel that safety is a concern for

23 me when I think about the teams that I'm briefing in and I

24 think about how to manage a good location that is, you know,

25 well run where everybody feels safe.

JAMES LEWIN – DIRECT

1  Q.  And why are you concerned that there might be safety
2  issues with poll watchers now that SB 1 has passed?
3  A.  Well, again, going back to some of the stories that you've
4  heard about people being encouraged to become poll watchers
5  for the goal of disrupting polling locations, the fear there
6  is that people would use that position to make other people
7  uncomfortable and intimidate other people, and, you know,
8  sometimes that leads to unsafe situations for the people
9  involved.
10  Q.  Would you recommend that other people become poll workers
11  or election judges now that SB 1 has passed?
12  A.  That's not an easy question to answer.  My gut is, yes, I
13  would encourage people to become poll workers because I think
14  it's an important job and I find it very gratifying.  I'm
15  glad, you know, that I've done it and I would encourage people
16  on that level because I think it's worthwhile, but with the
17  passage of SB 1 I wouldn't comfortably be able to make that
18  recommendation without providing a caveat that there's a
19  certain degree of risk that comes with that position and that
20  it's a personal decision for that person to make.
21      So I would love to be able to recommend the position but
22  it would have to come with a warning that I'm not really sure,
23  you know, they wouldn't be safe from prosecution given these
24  ambiguous provisions and they need to consider that before
25  they decide to take it on.

JAMES LEWIN - CROSS

1  Q.  And would the risks you are referring to involve potential

2  prosecution relating to SB 1 and the poll watcher provisions

3  we discussed earlier?

4  A.  Yes, exactly.

5          MR. CURTIS:  Thank you, Mr. Lewin.

6          I'll pass the witness.

7          THE COURT:  Anything else from this side?  None.

8          Any cross?

9          MR. STOOL:  Yes, Your Honor, if I may.

10                         CROSS-EXAMINATION

11  BY MR. STOOL:

12  Q.  Mr. Lewin, my name is Ben Stool.  I represent Michael

13  Scarpello, the Elections Administrator in Dallas County,

14  Texas, and John Creuzot, the Criminal District Attorney,

15  Dallas County, Texas.  I only have a very few questions to ask

16  you and I thank you for being here today.

17      Do you recall in your deposition that you gave before this

18  case went to trial that you stipulated you did not -- with

19  regard to the claims in this case, the legal claims in this

20  case, that you did not have any connection to Dallas County,

21  Texas?

22  A.  I recall being asked about that and I believe the question

23  was in reference to some of the plaintiffs and some of the

24  defendants, rather, in Dallas County.

25  Q.  And did you stipulate that you don't -- with regard to the

JAMES LEWIN - CROSS

1  claims in this case, that you don't have any connection to

2  Dallas County, Texas, with regard to this case?

3  A.  I believe that's true, yes.

4  Q.  Okay.  So do you stand by that stipulation now that you —

5  only with regard to the claims in this case, the legal claims,

6  that you don't have a connection to Dallas County, Texas?

7  A.  Yes, I believe so.

8  Q.  Thank you very much.

9          MR. STOOL:  Nothing further, Your Honor.

10          THE COURT:  Anything else on this side?

11          MR. BERG:  Yes, Your Honor.

12                  CROSS-EXAMINATION

13  BY MR. BERG:

14  Q.  Morning, Mr. Lewin.  My name is Zachary Berg for State

15  defendants, the Attorney General and the Secretary of State.

16  Thank you for your service.

17      You are a plaintiff in this case, correct?

18  A.  Yes.

19  Q.  And as a plaintiff you are challenging the poll watcher

20  provisions of SB 1, correct?

21  A.  Yes.

22  Q.  And you're not a lawyer, correct?

23  A.  Correct.

24  Q.  As a layperson, do you know whether or not SB 1 creates a

25  criminal penalty for violating 409?

JAMES LEWIN - CROSS

1  A.  Whether the —

2  Q.  Would you like me to repeat?

3  A.  — creates a penalty.

4  Q.  Yes.

5  A.  I'm sorry.  Please rephrase the question.

6  Q.  As a layperson, do you know whether or not SB 1 created

7  the criminal penalty for violating the Section 409 of the poll

8  watcher provision?

9  A.  I'm not sure that it created the penalty, no.

10  Q.  Okay.  And you confirmed or you testified that you live in

11  Austin, right?

12  A.  Yes.

13  Q.  And that's Travis County?

14  A.  Yes.

15  Q.  And you have worked elections in 2020, 2021, and 2022, is

16  that correct?

17  A.  Yes.

18  Q.  Which elections in 2022 did you work?

19  A.  In 2022 I worked the March Primary Election and the

20  November General Election in 2022, the Mid-term Election.

21  Q.  And have you worked any elections in 2023?

22  A.  No.

23  Q.  And you testified that the 2020 General Election was the

24  first time you served as an election worker, correct?

25  A.  Yes, during the early voting.

JAMES LEWIN - CROSS

1  Q.  And you were a deputy election judge, correct?

2  A.  Yes.

3  Q.  Mr. Lewin, you've testified that when you decided to serve

4  as a deputy election judge in 2020, you were already concerned

5  about disruptions from poll watchers, is that correct?

6  A.  Yes.

7  Q.  Would you agree that even before SB 1 election judges and

8  poll watchers would sometimes disagree about the role of poll

9  watchers?

10 A.  I think that's possible, yes.

11 Q.  And you testified that you personally have never had an

12 issue with a poll watcher, is that correct?

13 A.  Yes.

14 Q.  And as an election judge you presumably talk with other

15 election judges, is that correct?

16 A.  Occasionally.

17 Q.  Have any of the election judges you've spoken with had any

18 issues with poll watcher disruptions?

19         MR. CURTIS:  Objection, Your Honor.  Hearsay.

20         THE COURT:  Only if you have personal knowledge, sir.

21         THE WITNESS:  No, not according to my personal

22 knowledge.

23 BY MR. BERG:

24 Q.  And same question for poll workers who are not election

25 judges, subject to the objection, on your personal knowledge

JAMES LEWIN - CROSS

1  have any of the poll workers that you've spoken to had any

2  personal issues with a poll watcher disrupting them?

3  A.  No.

4  Q.  You testified that pre-SB 1 poll watchers could observe

5  everything except the act of voting, is that correct?

6  A.  I think that's what I said, that the act of voting, I was

7  referring to the specific act of the voter casting their

8  ballots in the private space of that action.

9  Q.  Thank you for clarifying.

10     Pre-SB 1, are you aware of any instance when a poll

11  watcher could observe the act of voting?

12  A.  I'm sorry.  Could you restate that?

13  Q.  Prior to SB 1, are you aware of any instance in which a

14  poll watcher could observe the act of a voter filling out

15  their ballot?

16  A.  No, I wasn't aware of any instances of poll watchers being

17  allowed to watch a poll — a voter fill out their ballot.

18  Q.  And you took a — you took two trainings to try to

19  accommodate yourself to SB 1 and poll watchers, is that

20  correct?

21  A.  I took one additional training and then the training that

22  was required of all the poll workers for that election.

23  Q.  The additional training that you took, was that provided

24  by the Travis County Elections Division?

25  A.  No.  Poll watcher training was available through the

577

JAMES LEWIN – CROSS

1  Secretary of State's website, I believe, and it was the same

2  site where you could download the poll watcher training manual

3  and also go through the course or the certification which was

4  a series of modules that you completed online at that same

5  website I believe.

6  Q.  Were those the modules where you took a test between each

7  section?

8  A.  Yes, sir.

9  Q.  I would like to ask you a couple questions about the other

10 training that you took, which I believe you testified was

11 provided via Zoom by the Travis County Elections Division, is

12 that correct?

13 A.  In 2022?

14 Q.  Correct.

15 A.  Yes.

16 Q.  There were Secretary of State Elections Division staff

17 present on that call, correct?

18 A.  I'm not sure.

19 Q.  Would you like to review your deposition transcript to

20 refresh your recollection?

21 A.  Sure.

22 Q.  Okay.  Brian, would you please put on the screen for

23 Mr. Lewin the 4/27/22 deposition transcript, page 66 and 67.

24 I guess we will start with 66.  Starts on line 24.

25     And do you have the transcript in front of you, Mr. Lewin?

JAMES LEWIN – CROSS

1    A.  Yes.

2    Q.  So I'd like to ask you specifically about lines 66-24 —

3          MR. CURTIS:  Objection, Your Honor.  This doesn't

4    appear to be the actual transcript.  We don't recognize what

5    this document is.

6          THE COURT:  Can you go to the first page?

7          MR. CURTIS:  It appears to be formatted very

8    differently than anything we've seen before.

9          UNIDENTIFIED MALE SPEAKER:  It's an ASCII file.

10         THE COURT:  He's representing it's an ASCII file, so

11   it's just not been tidied up.

12         MR. CURTIS:  We withdraw that objection.  Thank you,

13   Your Honor.

14   BY MR. BERG:

15   Q.  Would you go back to page 66, line 24, please.

16       Thank you for your patience.  Okay.  From 66-24 to 67-3,

17   I'll read it and then if you could just read along in your

18   head.

19   A.  Okay.

20   Q.  "And what training did that consist of?"

21       "Answer.  That training included a video conference call

22   with folks from the Elections Division and other judges and

23   election workers who had been trained for that event."

24       Did I read that correctly?

25   A.  Yes.

JAMES LEWIN - CROSS

1  Q.  And the Elections Division, was that the Travis County

2  Elections Division?

3  A.  I believe so, yes.

4  Q.  So not the SOS folks?

5  A.  Correct.

6  Q.  Okay.  Got it.  Mr. Lewin, would you agree that election

7  judges and poll workers, as a whole, strive to administer

8  elections fairly?

9  A.  Yes.

10  Q.  And would you agree that election judges and poll workers,

11  as a whole, strive to ensure that as many voters as possible

12  vote within the confines of the law?

13  A.  Yes.

14  Q.  And would you agree that election judges and poll workers,

15  as a whole, approach their responsibilities in good faith?

16  A.  Yes.

17  Q.  Mr. Lewin, even before you became an election judge you

18  noticed poll workers sometimes make mistakes, correct?

19  A.  Yes.

20  Q.  And before you started working in elections you witnessed

21  poll workers miscommunicating information to voters, correct?

22  A.  Yes.

23  Q.  And errors made by poll workers can prevent voters from

24  having their ballot counted, correct?

25  A.  Yes.

JAMES LEWIN - CROSS

1  Q.  Even when these errors are well-intentioned and completely

2  inadvertent, errors made by poll workers can harm voters,

3  correct?

4  A.  Yes.

5  Q.  And that's one of the reasons you wanted to work in

6  elections, correct?

7  A.  Yes.

8  Q.  Would you agree that errors made by poll workers can

9  undermine the public's confidence in elections?

10  A.  Yes.

11  Q.  Would you agree that voters have an interest in

12  identifying errors made by poll workers?

13  A.  Yes.

14  Q.  And would you agree that voters have an interest in

15  correcting errors made by poll workers?

16  A.  Could you please repeat that?

17  Q.  Yeah.  Would you agree that voters have an interest in

18  errors made by poll workers being corrected?

19  A.  Yes.  I think voters have an interest in making sure that

20  any errors are corrected.

21  Q.  Do you agree that every ballot cast legally should be

22  counted?

23  A.  Yes.

24  Q.  Do you agree that the State has an interest in ensuring

25  that every ballot legally cast is counted?

JAMES LEWIN - CROSS

1  A.  Yes.

2  Q.  And, Mr. Lewin, do you know anyone who has received a

3  civil penalty for violating Section 409, the poll watcher

4  provision of SB 1?

5  A.  No, I don't think so.

6  Q.  And do you know anyone who has received a criminal penalty

7  for violating Section 409, the poll watcher provision, in SB

8  1?

9  A.  Not that I'm aware of, no.

10 Q.  And you have testified that your concern with the current

11 poll watcher training is that it is unclear, correct?

12 A.  With regard to the poll watcher provisions, yes.

13 Q.  And that makes you concerned, correct?

14 A.  Yes.

15 Q.  Can you imagine a scenario where a better training would

16 clarify that for you?

17        MR. CURTIS:  Objection, Your Honor.  Calls for

18 speculation.

19        THE COURT:  Do you know?

20        THE WITNESS:  I'm sorry?

21        THE COURT:  If you know, you can answer.  If you're

22 guessing or you don't know, just say you don't know.

23        THE WITNESS:  Could you repeat the question?

24        MR. BERG:  Yeah.

25

JAMES LEWIN – CROSS

 1  BY MR. BERG:

 2  Q.  Could you imagine a scenario where there is a training

 3  that clarified your questions?

 4          MR. CURTIS:  Objection.

 5          THE COURT:  I'm not sure I understand that.

 6          THE WITNESS:  Could I imagine?

 7          THE COURT:  We can all imagine there's better

 8  training for everything but I don't understand what you are

 9  saying.

10          MR. BERG:  Okay.  I can withdraw that.

11  BY MR. BERG:

12  Q.  I just have one further question.  Earlier your attorney

13  asked you if you were uncertain how to obstruct the view of

14  poll watchers, is that correct?

15  A.  Uncertain of how to obstruct?

16  Q.  The view of poll watchers.

17  A.  I don't recall the question being phrased that way.

18  Q.  Okay.  Do you remember using the words "obstruct the view

19  of poll watchers?"

20  A.  Do I remember using those words?  No.

21  Q.  Okay.  And you would only obstruct a poll watcher if they

22  were acting outside the bounds of law, is that correct?

23  A.  I'm not sure.  Could you please repeat that?

24  Q.  As an election judge you would only obstruct a poll

25  watcher if they were acting outside the bounds of law, is that

JAMES LEWIN - CROSS

1  correct?

2  A.  If I understood what the bounds of the law to be, I would

3  try to manage the location so that a poll watcher who was in

4  violation of those parameters was not allowed to adversely

5  affect the voting process at that location.

6          MR. BERG:  Thank you for your time.

7          I pass the witness.

8          Anything else on that side?

9          MR. NICHOLS:  Judge, just a few if I might.

10 BY MR. NICHOLS:

11 Q.  Good morning, Mr. Lewin.

12 A.  Good morning.

13 Q.  My name is Eric Nichols.  I represent the Harris County

14 District Attorney Kim Ogg, and even though I represent the

15 Harris County DA, I'm going to confuse you on the geography.

16 I live in Travis County.  My wife proudly serves as a poll

17 worker in Travis County, but I don't think you and I have met

18 before, unless I have seen you at a polling place, does that

19 seem right?

20 A.  Seems right.

21 Q.  Now, I just want to ask you a few questions about the

22 things that you were asked about earlier today, and

23 specifically I want to ask you about those training manuals

24 that were referred to you by counsel for plaintiffs, if I

25 could.

584

JAMES LEWIN – CROSS

1  A.   Um-hum.

2  Q.   Could you pull up Exhibit 201 for me, please.

3         MR. NICHOLS:  And before I do that, Judge, just to

4  make sure I'm not referring to something that's not — that's

5  in evidence, I would move for the admission of LUPE 201 and

6  202?

7         THE COURT:  That's already admitted.

8         MR. NICHOLS:  Okay.  Thank you, Judge.

9  BY MR. NICHOLS:

10  Q.   So if we look at the first page, and the judge will have

11  this for himself later, but if you look at the first page, we

12  are looking at LUPE 201, and this would be the manual that you

13  would have reviewed as part of your training to serve as an

14  election worker in the November 2020 Election, correct?

15  A.   Yes.  I served during the early voting for that election

16  in October.

17  Q.   Yes, sir, but this would be the manual that you would have

18  looked at?

19  A.   Yes, sir.

20  Q.   And then if we could turn on the PDF to page 16, if you

21  don't mind, and just for the record, this is page 12 of the

22  manual at the bottom.

23      And so, Mr. Lewin, you see here that there is — and

24  actually let's make sure he's clear on what we are talking

25  about.  Let's go to the prior page.  And the page before that.

JAMES LEWIN — CROSS

1    And you see there's a section of the training manual that

2  deals explicitly with poll watchers, correct?

3  A.  Yes.

4  Q.  And that's what you've been talking about today, correct,

5  is the poll watcher issue, right?

6  A.  Yes.

7  Q.  Okay.  So if we go back down to page 12, I just want to

8  ask you a few questions — and just to orient everybody, this

9  is the manual that was in effect to train people who were

10  working the polls before SB 1 was ever SB 1, right?

11  A.  Yes.

12  Q.  And so the first category is called Observing General

13  Activity.  Did I get that right?

14  A.  Yes.

15  Q.  And it says there that "A watcher is entitled to sit or

16  stand conveniently near the election officials conducting the

17  observed activity."

18    Did I read that correctly?

19  A.  Yes.

20  Q.  And so you had the word "conveniently" in there, correct?

21  A.  Um-hum.

22  Q.  It doesn't say they are going to be within five feet, or

23  six feet, or ten feet.  It says "conveniently," correct?

24  A.  Yes.

25  Q.  And as I understand your testimony, your overarching

JAMES LEWIN - CROSS

1 belief is that people can and should act reasonably in terms

2 of the interaction between poll workers and poll watchers,

3 correct?

4 A.  Yes.  I believe people should act reasonably.

5 Q.  Yeah.  And so even though conveniently is not defined here

6 in the manual, you would expect that people would act

7 reasonably in determining what "conveniently near the election

8 officials conducting the observed activity," would be,

9 correct?

10 A.  Yes, I would expect that, yeah.

11 Q.  Okay.  And then we can back out of that one.

12     And you have said, I think you described very accurately

13 the actual ballot casting location and you referred to it I

14 think a second ago as having kind of a — it's kind of

15 enclosed and it — it's enclosed because it has a veil of

16 privacy that the voter is entitled to when casting a ballot,

17 correct?

18 A.  Yes, the ballot marking devices have flaps that come out

19 to —

20 Q.  Yes, sir.  Are you aware, as a poll worker and an election

21 judge, that there's a provision of the election code that says

22 that no one, no one is entitled to view a voter as she or he

23 goes to that sacred private place to cast that ballot?

24 A.  Could you please ask the question again.

25 Q.  Sure.  Are you aware of another provision, you were asked

JAMES LEWIN - CROSS

1  about SB 1, but are you aware of another provision of the

2  election code that says that no one is entitled to observe the

3  voter as she or he enters that screened voting area to cast

4  that ballot?

5        MR. CURTIS:  Objection, Your Honor.  We'd ask that

6  counsel show him the provision that he's talking about instead

7  of asking him if he just knows about it.

8        THE COURT:  I'm not aware of that law either that

9  says with that explicitness that you are describing, that law

10  does not exist counsel.

11        MR. NICHOLS:  Could we pull up the provision of law

12  that was addressed yesterday?

13        We'll pull it up, Judge.

14        THE COURT:  It didn't say what you described.

15        MR. NICHOLS:  Well, I may be taking a little bit of

16  license but I believe in the sanctity of the ballot box.  I

17  think the Court does and I think everybody else does too.

18  BY MR. NICHOLS:

19  Q.  So do you see up here, it's 33057 of the election code,

20  and I'm going to refer you specifically to both sections.

21  Read the whole thing, but specifically to Sub B.

22  A.  Okay.  I've read it.

23  Q.  Were you aware of this provision of law at the time you

24  served in the early voting period for the November 2020

25  Election?

JAMES LEWIN - CROSS

1  A.  I had never read this section of the law prior to becoming

2  an election worker.

3  Q.  And so you don't recall whether or not this particular

4  provision of law was part of that election training manual

5  that the Travis County Elections Division prepared?

6  A.  I don't recall this being part of the training, no.

7  Q.  Okay.  But you do know that -- you knew in November of

8  2020 and now that poll watchers are required to comply with

9  law, with Texas law, correct?

10  A.  I'm sorry.  Are you asking me if I know that poll watchers

11  are expected to comply with Texas law?

12  Q.  Yes, sir.

13  A.  Yes.

14  Q.  And so here, and the Court correctly put me back in my

15  lane, I may have added a few words that aren't explicitly in

16  the statute, but we see here in the statute that, "A watcher

17  may not be present at the voting station when a voter is

18  preparing the voter's ballot or is being assisted by a person

19  of the voter's choice," correct?

20  A.  I see that.

21  Q.  But that's consistent, even though you didn't know about

22  this provision, that's consistent with your experience as an

23  election judge.  You don't have poll watchers going into

24  that -- the judge will push me back if I'm using too much

25  language -- that sacred private place of a voter casting her

JAMES LEWIN - CROSS

1  or his ballot, correct?

2  A.  No.  There's nothing about that phrase that says that a

3  poll watcher couldn't encroach on the voter and there's no

4  specifics as to what those parameters actually are.

5  Q.  Yes, sir.  So if I understand, just to make sure we

6  understand your testimony, you are testifying that when you

7  see this language that says, "A watcher may not be present at

8  the voting station when a voter is preparing the voter's

9  ballot or is being assisted by a person of the voter's

10  choice," there's nothing in that language that you as an

11  election judge would say would prohibit a watcher from being

12  in that space when the ballot is cast, correct?

13  A.  Please repeat that.

14  Q.  Yes, sir.  I just want to make sure that we all understand

15  your testimony.  Your testimony is that the language that

16  we're seeing on the screen, 33057(b), from your perspective as

17  an election judge there's nothing in that language that would

18  prevent a watcher from entering what I've referred to as the

19  sacred private space where a voter himself or herself is

20  casting a ballot at that ballot box, is that correct?

21  A.  I feel that this language could use some clarification.

22  Q.  Okay.  And then with respect to — going back to Exhibit

23  201, if we might, same page.  It's page 12 at the bottom.

24  It's page 16 of the PDF.  And this, again, is the manual that

25  applied pre-SB 1, correct?

JAMES LEWIN — CROSS

1  A.  Okay.

2  Q.  And if we look at —— there's another provision that says,

3  "A watcher may observe assistance of a voter by a poll

4  worker," do you see that section?

5  A.  Yes.

6  Q.  And if we could just pull that up, please.

7      So it says —— this is pre—SB 1.  "A watcher is entitled to

8  be present at the voting location when a poll worker is

9  assisting a voter.  The watcher is entitled to examine the

10 ballot before the ballot is placed in the ballot scanner to

11 determine whether it is prepared in accordance with the

12 voter's wishes."

13     Did I read that correctly?

14 A.  Yes.

15 Q.  Now, have you ever, as an election judge in 2020 or 2021

16 or 2022, have you ever come across a situation where a voter

17 was obtaining assistance in casting her or his ballot at the

18 polling place?

19 A.  Yes.

20 Q.  And have you ever been in a situation where a poll watcher

21 wanted to observe that activity of a poll worker assisting

22 that voter?

23 A.  Yes.

24 Q.  Did that happen in 2020?

25 A.  Yes.

591

JAMES LEWIN - CROSS

1  Q.  And did you understand in 2020 that a poll watcher was

2  entitled to actually examine the ballot before the ballot was

3  placed in that machine, and the judge will remember with

4  whatever the DS number is associated with it, but the one

5  where you stick your ballot in after you've been to the

6  polling place and received the ballot back?

7  A.  My understanding with regard to that part of the process,

8  we always instruct the voters once the ballot comes back out

9  of the machine to review it to make sure that everything looks

10  right before they finally cast their ballot, and my

11  understanding was that the poll watcher was allowed to be part

12  of the moment where the voter verifies that what is on the

13  paper ballot is what goes into the machine.

14      I wasn't aware that the poll watcher was allowed to look

15  at the actual selections that the voter made but I was aware

16  that the poll watcher was allowed to be there for the voter,

17  essentially verifying their own selections.

18  Q.  Yes, sir, but it's clear from the manual that applied to

19  your work in 2020 before SB 1 that the poll worker, if the

20  poll -- I'm sorry -- the poll watcher, if the poll watcher

21  wanted, would be able to examine the ballot to determine

22  whether it was prepared in accordance with the voter's wishes?

23  A.  Yes.

24  Q.  Now, just one more question for you.  You were asked about

25  prosecutions.  I obviously represent a DA who is not in

JAMES LEWIN - CROSS

1  Travis County.  Do you know who the DA is in Travis County?

2  A.  I can't recall.

3  Q.  And are you aware of any situation where anyone has been

4  subject to criminal investigation with respect to the portion

5  of the election code that was amended by Section 409 of SB 1?

6  A.  I'm not aware of anyone, no.

7  Q.  Or prosecuted under that provision?

8  A.  No.

9          MR. NICHOLS:  Thank you, Judge.

10          THE COURT:  Anybody else?

11          Any redirect?

12          MR. CURTIS:  No, Your Honor.  Thank you.

13          THE COURT:  You may step down, sir.  Thank you.

14          We haven't taken a break yet this morning.  Let's

15  take a quick ten-minute break.

16      (Recess)

17          THE COURT:  Your next witness.

18          MISS SANDERS:  Good morning, Your Honor.  My name is

19  Robyn Sanders.  I'm an attorney with the Brennan Center and I

20  represent the LUPE plaintiffs.  LUPE plaintiffs would like to

21  call Richard Ertel to the stand.

22      (RICHARD ERTEL, having been duly sworn, testified as

23  follows:)

24          MISS SANDERS:  Your Honor, LUPE plaintiffs offer

25  Mr. Ertel as a witness in support of our void for vagueness

1  claims concerning the poll watcher provisions, Section 4.09

2  and Section 8.01 of SB 1, and we are challenging these

3  provisions under the Fourteenth Amendment.

4          May I approach the witness, Your Honor.

5          THE COURT:  You may.

6                    DIRECT EXAMINATION

7  BY MISS SANDERS:

8  Q.  Good afternoon.

9  A.  Good afternoon.

10  Q.  May you please state your name for the record.

11  A.  My name is Richard Ertel.

12  Q.  Mr. Ertel, are you a party to this case?

13  A.  I am not a party to this case.

14  Q.  Thank you.  I'd like to start out by talking a little bit

15  about your background.  Are you a Texas resident?

16  A.  I am a Texas resident.

17  Q.  And how long have you resided in Texas?

18  A.  I've lived here since January of 1984.

19  Q.  And where do you currently live?

20  A.  I live in Mountain Home, Texas.

21  Q.  I'd like to talk a little bit more about Mountain Home.

22  In what county is that located?

23  A.  Mountain Home is in Kerr County, Texas.

24  Q.  And how long have you lived in Kerr County?

25  A.  We have lived in Kerr County since September of 2006.

594

RICHARD ERTEL - DIRECT

1   Q.   And what is the approximate population of Kerr County?

2   A.   I believe it is now about 53,000 people.

3   Q.   Thank you.  Are you registered to vote?

4   A.   I am registered to vote in Kerr County.

5   Q.   Thank you.  I'd like to transition now to talk a little

6   bit more about your educational background.  May you please

7   tell the Court the degrees that you've obtained beyond a high

8   school diploma.

9   A.   I graduated with a BA in economics from Williams College

10  in 1971.  I graduated from Harvard Business School with a

11  master's in business administration in 1973, and I graduated

12  from Stanford Law School with a JD in 1976.

13  Q.   Thank you.  Are you currently employed?

14  A.   No, I'm a retired lawyer.

15  Q.   Are you currently licensed to practice law?

16  A.   I'm currently licensed to practice law in Texas, my

17  license here is active, and I'm licensed to practice in

18  Illinois but that license is inactive because I don't continue

19  the legal education requirements.

20  Q.   And since you are a retiree, I'd like to now focus on any

21  sort of volunteerism work that you engage in.  Do you have any

22  civic volunteerism work that you engage in currently?

23  A.   Well, I'm involved in a lot of different civic

24  organizations where I've been a member, a volunteer, and an

25  officer and a president, but I guess what you're most

RICHARD ERTEL – DIRECT

1  interested in is probably Texas Impact.

2  Q.  Sure.  So you are engaged in voting volunteerism work?

3  A.  I am engaged in that, yes.

4  Q.  What is Texas Impact and what does the organization do?

5  A.  Texas Impact is the state's oldest and largest interfaith

6  advocacy organization.  It has as members individuals, houses

7  of worship, and judicatory bodies representing Christian,

8  Muslim, and Jewish traditions of faith, and we do a lot of

9  research and education on public policy issues and we do

10  advocacy of the State legislature, and we are, in fact, the

11  legislative office for various religious organizations.

12  Q.  And so Texas Impact stays abreast of any new legislation

13  changes with regard to voting in Texas?

14  A.  Yes.  We try to monitor all those changes.

15  Q.  How long have you been a member of Texas Impact?

16  A.  I don't remember exactly when I became a member.  It may

17  be more than a decade ago.  I became a board member in 2011.

18  Q.  Have you served in any leadership capacities?

19  A.  Well, I'm a representative on the board of Texas Impact, a

20  representative of the Evangelical Lutheran Church of America,

21  Southwestern Texas Synod.  And I've been vice president of

22  Texas Impact for thirty-four years, and then I was president

23  for four years, and now I'm finishing my first two-year term

24  as the past president.

25  Q.  I'd like to shift gears and talk a little bit more about

RICHARD ERTEL - DIRECT

1  your experience with elections.  Have you had any experience
2  with the administration of elections?
3  A.  I have worked in elections in various capacities starting
4  in 2008 or 2010 in Kerr County.
5  Q.  Can you describe those roles, please.
6  A.  Well, I have served in various elections as a judge or an
7  alternate judge or a clerk.  I've worked on the early vote
8  ballot board.  I've worked at central count.  And I have been
9  a county chair of the one of the parties for four years from
10  2014 to 2018.  So in those years I ran the election, the
11  Primary elections, as well as worked with the Election
12  Administrator to run the General Election throughout the
13  county.
14  Q.  And what is the last position that you held as an election
15  worker?
16  A.  The last position I had was in November of 2022.  I worked
17  as a clerk in Precinct 404, which is the Mountain Home -- one
18  of the Mountain Home precincts.
19  Q.  Did you have any appointment powers related to that
20  service?
21  A.  I'm not sure I understand.
22  Q.  Did you have any appointment powers as it relates to poll
23  workers and poll watchers in your capacity as an election
24  clerk?
25  A.  No, I had no such authority.

597

RICHARD ERTEL - DIRECT

1  Q.  And I heard you say earlier that you served previously as
2  Kerr County Chair?
3  A.  Yes, I did.
4  Q.  Did you have any appointment powers in that capacity?
5  A.  Well, as the Kerr County Chair you appoint the judges and
6  the alternate judges for both the Primary and General
7  Election.
8      You appoint members to the early vote ballot board and to
9  central count and send election workers for the early voting,
10 and if you provide to the Election Administrator by the
11 statutory deadline all of those people plus the clerks for all
12 of those 20 precincts that we have, then you have complete
13 authority to make changes to where people work and who
14 actually works, right up until Election Day.
15 Q.  And based on your experience serving as Kerr County Chair
16 and also as an election clerk, would you say that you are
17 familiar with the roles and responsibilities of poll watchers
18 and workers?
19 A.  I think I am because there's a lot of training that's done
20 by the Secretary of State, as well as the State party, as well
21 as the Election Administrator for the county chairs to run the
22 Primaries and General Election.
23 Q.  Let's talk a little bit more about your service as an
24 election clerk in the November 2022 General Election.  What
25 was your role at the polls on Election Day?  What did it

RICHARD ERTEL - DIRECT

1  encompass?

2  A.  I, as the clerk, sat along with a clerk — actually two

3  clerks from the other party where we had the iPad that has the

4  voter registration, list of voters registered in Precinct 404,

5  and as voters would come in, we would check their photo IDs

6  and then look them up on the iPad to see if they were

7  registered in our precinct, and if they were registered and

8  they had proper ID we would offer them three identical ballots

9  and they would get to choose which ballot, paper ballot, they

10  wanted to vote on.

11  Q.  Can you tell me a little bit more about the polling

12  location at which you served, the size of the polling place?

13  A.  There aren't a lot of buildings available in Mountain

14  Home.  Our polling place is in the Volunteer Fire Department

15  building which is primarily just a huge garage to house fire

16  trucks, but there's, at one end of the building there is a

17  modest-sized training room that's bigger than a two-car garage

18  but maybe not quite a three-car garage that's filled with some

19  fold-up, you know, rectangular tables and some really

20  overstuffed chairs that the Fire Department uses to have

21  training sessions in the room.

22  Q.  And would you say that there is adequate space for poll

23  workers and poll watchers to maneuver about the polling

24  location that you just described?

25  A.  It's actually pretty constrained because we have to set up

RICHARD ERTEL - DIRECT

1  the sign-in table right against the wall, so we're sitting

2  sort of stuck between one wall and the sign-in table, and then

3  there's only room for I think two rows of those fold-up or

4  fold-down tables where we could set up the dividers for people

5  to have privacy when they vote on their ballots, their paper

6  ballots, and there's one spot in the corner where there's the

7  electronic voting machine that no one used, and there was a

8  scanner right at the exit where people would walk out, but

9  there's really not the ability to maneuver around among those

10  areas very easily.

11  Q.  And would you describe for the Court some of the other

12  polling locations at which you served or that you have

13  observed personally?

14  A.  Okay.  Well, as county chair I would go around to the

15  early vote ballot, early voting locations as well as to the 20

16  precinct voting locations, and I have to say that there aren't

17  a lot of choices for where you can set up polling places in

18  Kerr County.

19       So I know before we were able to vote at the new

20  firehouse, we voted at a small wooden church about a mile or

21  two farther down the road.  I remember that when we were there

22  one of the parties, our party, set up our voting operation and

23  sign-in and everything in what was basically a storage closet

24  in the church.

25       Another place that we have voting is at The Rock Church

600

RICHARD ERTEL - DIRECT

1  between Center and Comfort [phonetic] where people have to set
2  up voting between the front pew of the church and the alter,
3  so it's sort of a contorted arrangement.
4      We've also had voting at a strip shopping center in
5  Kerrville, but that had to be moved because of health
6  concerns.
7      And we had one in a partially vacant shopping mall where
8  it was a very small storefront where there was really limited
9  space to have a sign-in table for people and places to set up
10 the table for the people to fill out their paper ballots.
11     There are also other locations.  KOA Campground has a
12 little room that we were having to use.
13 Q.  Thank you.  Mr. Ertel, why did you ultimately decide to
14 serve as an election worker at the polls on November in the
15 November 2022 General Election?
16 A.  Well, I really had no interest in serving because of my
17 concern about the risks poll workers have due to poll
18 watchers, but I served because Kerr County was having trouble
19 finding people to man the polls and they said they had no one
20 to be a clerk out in Precinct 404.
21     They finally came up with someone who is older than I am
22 who was going to have to make a 40-mile plus round trip from
23 Kerrville out to Mountain Home, you know, before sunrise, stay
24 all day, and then drive back after sunset, and I thought that
25 was actually a risky thing for a person like that so I

601

RICHARD ERTEL - DIRECT

```
 1  reluctantly decided to just drive the three miles and serve as
 2  a clerk.
 3  Q.  And we're going to get more into your hesitancy to serve a
 4  little bit later but focusing on your service did you have any
 5  interactions with poll watchers at the polling location in
 6  November 2022?
 7  A.  There were no poll watchers at our polling place in
 8  November of 2022.
 9  Q.  And prior to 2022 did you ever have an occasion to
10  encounter or engage with any poll watchers?
11  A.  One time when I worked at the polls someone came in as a
12  poll watcher and sat in a chair for an hour or two and just
13  sort of observed what was going on and then left and never
14  came back.
15  Q.  In your experience as an election worker is there any
16  reason why you would say that you didn't have any occasion to
17  encounter poll watchers during elections?
18  A.  Well, the way the elections have worked up until SB 1 is
19  that each polling place was staffed with both -- with election
20  workers from both major political parties so the election
21  workers themselves were monitoring what was going on at the
22  polls and there was really no interest.  I know the county
23  chair before I would always ask, does anyone want to be a poll
24  watcher and there was really no interest in doing it because
25  the polls were already being monitored.
```

602

RICHARD ERTEL – DIRECT

1  Q.  Okay.  Let's talk a little bit more about poll watchers.
2  Prior to the passage of SB 1, what was your understanding of
3  what a poll watcher was permitted to do and what he or she was
4  prohibited from doing in the polling location?
5  A.  My understanding was that the poll watcher was there to
6  act as a witness as to what was happening in the polls, they
7  have some time limits about how long they have to stay and
8  that kind of thing, and if they observed something out of the
9  ordinary they would leave the polling place and contact the
10  Secretary of State or the Election Administrator or the
11  candidate that had appointed them as a poll watcher and bring
12  that to their attention and try to remedy the problem as soon
13  as possible.
14  Q.  And before the passage of SB 1, what was your
15  understanding of what a poll worker was permitted to do,
16  vis-a-vis poll watchers?
17  A.  Well, there was really no interaction between poll
18  watchers and poll workers so my understanding was if the poll
19  watcher went beyond what they were doing that the election
20  judge would tell them what the limitations were on what they
21  should be doing.
22  Q.  Okay.  I now want to turn to some questioning regarding
23  your reluctance to serve as an election worker and some of the
24  concerns that you said you harbored to serve.
25      Could you please pull up Joint Exhibit 1.

RICHARD ERTEL - DIRECT

1  A.  Okay.

2  Q.  Okay.  I want to draw your attention to what's on the

3  screen.  Can you see it?  And I've already provided you with a

4  notebook in case you need it.

5  A.  Yes, I can see it.

6  Q.  Are you familiar with Senate Bill 1?

7  A.  I am.

8  Q.  When did you become familiar with this legislation?

9  A.  Well, I became familiar with it as the legislature was

10 considering it along with HB 3 during the process of it being

11 introduced and being heard in committee.

12 Q.  Do you recall which sections of SB 1 concerned you, and if

13 there were many you can say that, and you can specify as it

14 relates to your testimony.

15 A.  Well, I was concerned about a lot of different parts of SB

16 1, not just the poll watcher provisions.

17     I was concerned about the limitations on voter assistance.

18 I thought that it was going to reduce the number of people

19 that were offering to drive people to the polls.

20     It was also going to make it more difficult for people to

21 have voter assistance at the polls and to help disabled people

22 who needed assistance at the polls.

23     I was concerned about the vote-by-mail provisions, the

24 restrictions that they had on the ability to send out

25 vote-by-mail applications to people.

604

RICHARD ERTEL – DIRECT

1    I was concerned about the really cumbersome process that
2  they had for verifying whether you were the correct person
3  because of the mix-up on IDs that you had to use and where
4  they hid the ID under the return flap of the envelopes, so I
5  was very concerned about that.

6    I was concerned about the poll watcher provisions because
7  I thought it empowered the poll watchers to actually end up
8  being disruptive at the polls.

9    And I was concerned about the various things in the
10 statute talking about what poll watchers now were entitled to
11 do.

12 Q.  I want to focus on your concerns relative to the poll
13 watcher provision.

14    Please go to page 29.

15    Okay.  Mr. Ertel, I'm going to read Section 4.09 and I
16 would ask that you follow along with me.  It reads as follows,
17 "A person commits an offense if the person serves in an
18 official capacity at a location at which the presence of
19 watchers is authorized and knowingly prevents a watcher from
20 observing an activity or procedure the person who knows the
21 watcher is entitled to observe, including by taking any action
22 to obstruct the view of a watcher or distance the watcher from
23 the activity or procedure to be observed in a manner that
24 would make observation not reasonably effective."

25    Did I read that correctly?

RICHARD ERTEL – DIRECT

1  A.  Yes, you did.

2  Q.  And you understand –– do you understand that the

3  underlined language in this provision is what was added as a

4  result of SB 1?

5  A.  Yes, I do.

6  Q.  Mr. Ertel, could you please explain to the Court what your

7  understanding of the added language in this statute means, in

8  terms of what it prohibits or permits as it relates to poll

9  watchers?

10 A.  I don't really understand what you are supposed to do as a

11 result of this, especially given the unorthodox polling places

12 that we have out in the rural part of Texas.

13 Q.  Are there any specific words in the statute that concern

14 you and could can you elaborate on that?

15 A.  Sure.  Well, first off, the second change in there talks

16 about the person knows.  Since there was no training of poll

17 workers as to what poll watchers could or couldn't do, I don't

18 think that any of the workers actually had any direction as to

19 what they were allowed to do with respect to poll watchers.

20     And then the extensive language at the end, I'm not sure

21 how to apply the direction that you are not to obstruct the

22 view of a watcher, distance the watcher from the activity

23 given the, really, the unusual configurations in our polling

24 places.

25     I'm concerned that the polling place may not be able to be

RICHARD ERTEL - DIRECT

1  set up to the satisfaction of a poll watcher, and I'm not sure

2  that the poll workers know when they are or aren't obstructing

3  the view of the watcher given the configuration, and I have no

4  idea what it means to be not reasonably effective.

5  Q.  Thank you.  And, again, I'd like to reiterate, you said

6  that your concerns are elevated because of the set-up of some

7  of the polling locations that you've observed and/or served

8  in?

9  A.  That's correct, yes.

10 Q.  And so by reading this language, do you know whether a

11 poll worker can stand between a poll watcher and the, quote,

12 "activity," the poll watcher is trying to observe, and at what

13 distance?

14 A.  I can't figure out how to apply it.  I don't know.

15 Q.  Does your concern about this language in Section 4.09

16 interact with any other language that you are aware of as it

17 relates to poll watchers in SB 1?

18 A.  Well, I'm concerned about some of the other provisions

19 where they changed the rule or talked about how they had to be

20 conveniently located to, they had to be able to sit or stand

21 near to hear or see.

22     Again, I don't know exactly how to apply that in our

23 situation.  I think that appears two places in the statute and

24 then there's the language about free movement.  It's really

25 sort of hard for the poll workers to have a lot of free

RICHARD ERTEL - DIRECT

1  movement in the polling place.

2      When we were at the sign-in table in November of 2022, if

3  someone needed to use the restroom it was pretty much you had

4  to move the whole apparatus to be able to get out of there.

5  So it's hard to set up our polling places in a way that people

6  will not complain that we're somehow violating whatever this

7  means.

8  Q.  Thank you.  And Mr. Ertel, does the fact that you have not

9  encountered any disruptive poll watchers, much less have had

10  much interaction with poll watchers generally have any bearing

11  on your belief that this language in 4.09, as well as the

12  other language you just referenced is vague and unclear?

13  A.  I'm not sure I followed all that.

14  Q.  Okay.  I'll repeat.  So you testified earlier that you

15  haven't had much of any interaction with poll watchers and

16  much less have observed any misconduct from poll watchers, is

17  that correct?

18  A.  That's correct.

19  Q.  And so my question to you is:  Does the fact that you have

20  not had those interactions with poll watchers have anything to

21  do with your belief that this language is unclear and vague?

22      Does it impact your belief that this language is unclear,

23  the fact that you haven't engaged with poll watchers?

24  A.  I think we haven't engaged with poll watchers simply

25  because they haven't started to staff up to do this.  I'm very

1 concerned that that's —— could happen.

2          MR. SZUMANSKI:  Objection, Your Honor.  I would like

3 to object to speculation as to the witness' response.

4          THE COURT:  That's overruled.

5 BY MISS SANDERS:

6 Q.  So Mr. Ertel, and I ask then too that based on the fact

7 that you haven't interacted with poll watchers that does not

8 disturb the vagueness of this language, is that correct?

9 A.  Oh, that's correct.  I would not know what to do if a poll

10 watcher showed up.  I feel fortunate that no one showed up as

11 a poll watcher in 2022 because I would have not known how to

12 handle them.  I'm thankful that I was only a clerk, so it

13 would not be my problem.

14 Q.  Thank you.  I would like to discuss a little bit more

15 about your concerns regarding the lack of clarity that SB 1

16 provides.  Are you aware that there are any penalties

17 associated with filing the poll watcher provision?

18 A.  I am concerned that there are penalties, yes.

19 Q.  Are you also aware that the statute imposes the potential

20 for a civil suit and also bars you as a potential worker for

21 violating the poll watcher provision?

22 A.  Yeah.  I'm very concerned about that for me and for other

23 poll workers who would be out there putting themselves at

24 risk, both for fines and legal fees, just for the civic duty

25 of being a poll worker.

RICHARD ERTEL - DIRECT

1  Q.  And is there anything about this particular language that
2  leads you to believe that it requires a subjective position on
3  behalf of the poll worker and watcher, as far as where a poll
4  watcher can stand and what he or she can do?
5  A.  I think it is subjective and I don't think either one
6  would know from this language what they can or can't do.
7  Q.  Are you concerned about being subjected to criminal
8  prosecution as an election worker because of this and the
9  other provisions you mentioned?
10  A.  I am concerned about that.
11  Q.  And are you concerned about other poll workers being
12  subjected to criminal prosecution?
13  A.  I think they are at risk as well.
14  Q.  I'd like to transition now to talk a little bit about the
15  training that's delivered for poll workers and watchers.  What
16  kind of training did you undertake before your service in
17  November 2022?
18  A.  The Election Administrator for Kerr County conducts
19  training sessions for all of the poll workers so I attended
20  that complete training session.
21  Q.  And was the training given online or in person?
22  A.  That training is given in person.  It's given by someone
23  who has a PowerPoint so the training that's given to each
24  complete session is identical.
25  Q.  Did the training that you completed include any

RICHARD ERTEL - DIRECT

1  information at all about what a poll watcher is authorized to

2  do, or also what a poll worker is authorized to do as it

3  relates to poll watchers?

4  A.  There was no material in the training that dealt with poll

5  watchers or what poll workers could do with respect to poll

6  watchers.

7  Q.  Okay.  I'd like to shift gears to talk about whether you

8  harbored any concerns about the poll watcher provision before

9  you became a participant in this lawsuit.  Did you ever

10  publish any public comments about your concerns regarding this

11  provision?

12  A.  I published comments about House Bill 3.  I think that was

13  the House Committee on Constitutional Remedies and I published

14  comments about multiple provisions of the bill, including the

15  poll watcher provision back in July of 2019 —— excuse me ——

16  July of '21.

17  Q.  Thank you.  And can you testify generally as to what those

18  comments regarding the poll watcher provision said generally,

19  what you said you were concerned about?

20          MR. SZUMANSKI:  Objection, Your Honor.  Hearsay.

21          MISS SANDERS:  May I be heard, Your Honor?

22          THE COURT:  Yeah.

23          MISS SANDERS:  I'm not offering this for its truth.

24  I'm offering it to show that he discussed concerns about SB 1

25  before he became a participant, so the truth of the statements

RICHARD ERTEL − DIRECT

1  that he made are irrelevant to that.

2          MR. SZUMANSKI:  Brief response, Your Honor?

3          THE COURT:  Go ahead.

4          MR. SZUMANSKI:  It appears to me, Your Honor, that

5  they are offering these comments for what they say, and

6  testifying about what they say is offering it for the truth of

7  the matter asserted.  I didn't hear another purpose that they

8  are offering it for.

9          MISS SANDERS:  May I be heard, Your Honor?

10          So whether or not his statements were true regarding

11  what he thought the poll watcher provision permitted, as far

12  as poll watchers and workers, what I'm offering it for is to

13  show that he, in fact, expressed concerns about the provision

14  before he became a participant.

15          THE COURT:  Why don't you just ask him the second

16  part?

17          MISS SANDERS:  I'm sorry?

18          THE COURT:  Why don't you just ask him the second

19  part and avoid the hearsay.

20          MISS SANDERS:  Okay.  Sure.

21  BY MISS SANDERS:

22  Q.  Mr. Ertel, did you write any or make any public comments

23  about your concerns regarding SB 1 before you became a

24  participant in this case?

25  A.  I filed comments with the committee, the House Committee

612

RICHARD ERTEL − DIRECT

1  about HB 3 outlining my concerns that the poll watcher

2  provisions put poll workers at risk and I couldn't, in good

3  faith, encourage people to be poll workers because of their

4  risk of civil and criminal fines and penalties.

5        MR. SZUMANSKI:  Your Honor, I would like to object to

6  the extent that that does invade the hearsay because he was

7  testifying to what he testified with regard to the comments,

8  and so we would move to strike that testimony from the record.

9        MISS SANDERS:  Your Honor, I would stand on my

10  response to the objection that's been lodged, again, to say

11  that regardless of whether what he said was true, whether or

12  not SB 1, the provision that we are here at issue to talk

13  about is, in fact, vague.  It's irrelevant to just showing

14  that he expressed concerns regarding the vagueness.

15        THE COURT:  The objection is noted and overruled.

16        MISS SANDERS:  Thank you, Your Honor.

17  BY MISS SANDERS:

18  Q.  So, Mr. Ertel, based on these comments, you would say that

19  you, again, had concerns about the poll watcher provisions in

20  SB 1 before you became a participant in this lawsuit?

21  A.  Yes, I was concerned about it.  Um —

22        THE COURT:  Why don't you wait for a question, sir?

23        MISS SANDERS:  Thank you.

24  BY MISS SANDERS:

25  Q.  Was your answer yes?

1  A.  Yes.

2  Q.  Okay.  Thank you.  Let's talk a little bit more about how

3  SB 1 has affected you.  Other than the training that you

4  undertook after SB 1 was passed, did you take any additional

5  steps to try to understand your duties as an election worker

6  under SB 1 as it relates to poll watchers?

7  A.  Well, as a member of Texas Impact we had numerous events

8  where we were getting education about SB 1, what the effect of

9  it would be, so I got a lot of information from them as well

10 as from other places.

11 Q.  Are you concerned at all about your safety or the safety

12 of other poll workers as a result of the provisions we've

13 discussed today of SB 1?

14 A.  I'm actually getting more concerned about them because in

15 our county there's been a growing concern that our elections

16 are not accurately reflecting the vote, and just Monday the

17 tax assessor collector who has run elections for the last 15

18 years has transferred that power back to the County Clerk

19 because he said there was innuendo about whether or not the

20 elections were fair.  He said he was concerned about being

21 sued no matter what he did, so the County Clerk has taken back

22 those functions.

23     MR. SZUMANSKI:  Objection, Your Honor.  I don't mean

24 to interrupt the witness, but at this time it seems like they

25 are here trying to admit hearsay statements of this tax

RICHARD ERTEL - DIRECT

1  collector, and so I object to the extent of that testimony and

2  I would move to strike as hearsay.

3      MISS SANDERS:  Your Honor, I believe what I heard

4  from Mr. Ertel was that there was a transfer of power and he

5  did not discuss any statements that he heard.

6      THE COURT:  He did.  So the last part where he

7  repeated, supposedly, what the statements were attributable to

8  the other fellow are excluded as hearsay.  The rest is

9  allowable.

10     Granted in part, denied in part.

11     MISS SANDERS:  Thank you, Your Honor.

12     MR. SZUMANSKI:  Thank you.

13 BY MISS SANDERS:

14 Q.  Mr. Ertel, could you please summarize your concerns about

15 Section 4.09?

16 A.  Well, again, I'm concerned just in general that I have no

17 clear guidance as to what I can or can't do as a poll worker,

18 and I am concerned that the poll watchers now have been given

19 authority to interact with the poll workers and bring to their

20 attention their suspected irregularities in terms of what's

21 going on, so I am concerned that the poll watchers —— poll

22 workers no longer are on a level playing field, they are

23 totally at risk for being accused of doing something wrong

24 when it's not clear what they can or can't do.

25     MISS SANDERS:  Thank you.

RICHARD ERTEL — DIRECT

1          Your Honor, may I revisit the last your ruling the
2    last statement?
3          I would like to offer to the Court that the
4    statements that he relayed to the Court are offered not for
5    their truth but to show the effect on the listener, which is
6    Mr. Ertel, so regardless of whether the statements that he
7    heard were true, it would impact his continued reluctance to
8    serve as an election worker in future elections.
9          THE COURT:  I'll only allow it for that — so most of
10   the answer did not insert hearsay.  The last third of his
11   answer did.  I will allow that last third only for the sole
12   purpose of supporting his belief that he is concerned about
13   being a poll watcher — or poll worker in light of these
14   developments.
15         MISS SANDERS:  Thank you, Your Honor.
16   BY MISS SANDERS:
17   Q.  And, Mr. Ertel, lastly, could you please summarize your
18   concerns about the provisions that impose penalties on poll
19   workers for any violation of SB 1, as it relates to poll
20   watchers?
21   A.  Well, I'm concerned that the poll workers really do not
22   have training as to what they can or can't do and that the
23   statute is not clear to them as to what they can or can't do,
24   so they are in a situation where they are subject to civil and
25   criminal fines and penalties, plus attorneys fees, and I can't

RICHARD ERTEL – CROSS

1   in good faith suggest to people that they should go be a poll
2   worker and fulfill the civic duty that they have been doing
3   when in most cases they are retirees that do not have the
4   financial wherewithal to do battle with a poll watcher if they
5   are accused of some unlawful conduct.
6          MISS SANDERS:  Thank you, Mr. Ertel.  That concludes
7   my questioning and thank you for your service as an election
8   worker to protect the franchise for all.
9          Your Honor, I pass the witness.
10         THE COURT:  Anything else from this side?
11         Any cross?
12         MR. SZUMANSKI:  Yes, Your Honor, briefly.
13                    CROSS-EXAMINATION
14  BY MR. SZUMANSKI:
15  Q.  Good afternoon, Mr. Ertel.  My name is Ethan Szumanski and
16  I'm an attorney with the Office of the Attorney General.  I
17  represent the State defendants, including the Attorney
18  General's Office and the Secretary of State's office.
19         Thank you for your service as an election worker and thank
20  you for being here to testify.  I know as a retired lawyer you
21  probably have a lot better things to do.  Thank you.
22         Now, first, I just want to make sure I've learned enough
23  about you, okay.  You currently live in Kerr County?
24  A.  That's correct.
25  Q.  You have lived there for quite some time, right?

RICHARD ERTEL – CROSS

1  A.  Yes, we have, since 2006.

2  Q.  And as we just discussed, you have been a poll worker in

3  several instances and for several elections?

4  A.  That is correct.

5  Q.  And you've also been the county chair for a political

6  party in Kerr County?

7  A.  That's correct.

8  Q.  And as a county chair you had several responsibilities,

9  such as running primary elections, right?

10  A.  Yes.  The county chair is responsible for doing that.

11  Q.  And I also understand that you are still an active

12  licensed attorney in the state of Texas?

13  A.  I am.

14  Q.  And you were a corporate and securities lawyer?

15  A.  I was through my career.  I was a business lawyer, yes.

16  Q.  And as a business lawyer, you did not work on any type of

17  election cases, right?

18  A.  I have not litigated election cases.

19  Q.  And so you have not given legal advice on voting issues?

20  A.  I have not given legal advice on voting issues.

21  Q.  Now, in addition to being a retired lawyer, Mr. Ertel, you

22  are also married, right?

23  A.  I am.

24  Q.  Happily, I assume?

25  A.  I am.

RICHARD ERTEL – CROSS

1  Q.  Now, interestingly, your wife ran for House District 53 in
2  the Texas Legislature, right?
3  A.  She did run, yes.
4  Q.  She ran in 2016 and 2018?
5  A.  Yes, in both years.
6  Q.  And like a good husband, you helped her with her political
7  campaign, right?
8          MISS SANDERS:  Objection, Your Honor.  I'd like to
9  understand the relevance of where this questioning is going.
10          THE COURT:  I would like to know the relevance too.
11          MR. SZUMANSKI:  Yes, Your Honor.  I believe the
12  relevance will be made clear by the next few questions.
13          THE COURT:  Why don't you tell me what the relevance
14  is before you ask another couple questions.
15          MR. SZUMANSKI:  Yes, sir.  So the relevance is, Your
16  Honor, that his wife ran against a political opponent that was
17  a House Sponsor for Senate Bill 1, and after that if you would
18  like me to move on, I can move on.
19          THE COURT:  So what, you are saying that he's biased
20  because his wife ran against a sponsor of the legislation?
21          MISS SANDERS:  I'm sorry, Your Honor, to interrupt.
22          May I be heard?
23          THE COURT:  Well, one second.
24          I'm asking you, are you trying to establish bias?
25          MR. SZUMANSKI:  Yes, Your Honor.

RICHARD ERTEL - CROSS

1          THE COURT:  Okay.  Go ahead.

2          MISS SANDERS:  We have a joint stipulation.

3          THE COURT:  I know about that.  That goes to

4   political affiliation.  So he hasn't gone there.  I am

5   monitoring that.

6          MISS SANDERS:  Your Honor, would it indirectly touch

7   on that, though, if what he's coming out with?  I mean --

8          THE COURT:  So, you know, ask your question.

9   Frankly, the issue of bias is going to play such a minimal

10  role in my evaluation of this witness' testimony.

11         Go ahead and ask.

12         MR. SZUMANSKI:  Understood, Your Honor.  Actually,

13  given the minimal role, I will just move on so we can all save

14  time here.

15         THE COURT:  Good.

16  BY MR. SZUMANSKI:

17  Q.  Mr. Ertel, I understand that you have some concerns about

18  some of the poll watcher provisions of Senate Bill 1?

19  A.  Yes, I do.

20  Q.  Now, just to make sure I'm clear, you understand that

21  there are poll watchers and poll workers?

22  A.  Yes.  There are different kinds of roles to play at the

23  polls.

24  Q.  Correct.  And poll workers are, just so I understand, are

25  those individuals that are running, administering, and

RICHARD ERTEL – CROSS

1  otherwise working elections, right?

2  A.  I think that's a general description of what they do.

3  Q.  And generally poll watchers observe elections?

4  A.  Well, under the new law it goes beyond that.

5  Q.  But generally they observe elections?

6  A.  Traditionally what they did was observe elections and

7  report back what they had seen to the Secretary of State or

8  the Election Administrator or the head of the campaign that

9  had appointed them as a poll watcher in the first place.

10  Q.  Understood.  Thank you.  Now, you would agree with me that

11  there are some problematic poll watchers, right?

12  A.  Are you talking about poll watchers?

13  Q.  Poll watchers.

14  A.  I have not had direct experience up till now with poll

15  watchers except in one case, so I would be speculating.  I

16  have not researched that issue.

17  Q.  So you would agree that there are nonproblematic poll

18  watchers, based on your experience?

19  A.  I can tell you that I am aware of one nonproblematic poll

20  watcher in my decades of being involved in election work.

21  Q.  Understood.  Now, Mr. Ertel, you became concerned about

22  some of the provisions of SB 1, particularly the poll watcher

23  provisions because you've read through SB 1 I'm assuming,

24  right?

25  A.  I have read through it, yes.

RICHARD ERTEL — CROSS

1  Q.  And I'm assuming you've read through some of the reading

2  materials disseminated by organizations like Texas Impact in

3  coming to your opinions about SB 1?

4  A.  I have read some of their materials, yes.

5  Q.  My understanding is that you did not contact Kerr County

6  Elections Office regarding their interpretation of poll

7  watcher provisions, right?

8  A.  At the training that we had, after the training by the

9  Election Administrator someone asked a question about, well,

10  what about poll watchers, and the only response was, you can

11  go look up their training if you are interested.

12      So the Election Administrator who was conducting the

13  training basically had that response to that.  So I think

14  contacting the Election Administrator again really would not

15  have produced a different answer.

16          THE COURT:  Let's make sure we are clear about times.

17  Is that pre- or post-SB 1?

18          THE WITNESS:  This is the training before the

19  November 2022 General Election, so it was the most recent

20  training they had.  And that's when the new standards were in

21  place and that's the level or nonlevel of information that

22  poll workers were given.

23  BY MR. SZUMANSKI:

24  Q.  Understood.  Thank you, Mr. Ertel.

25      Now, you spoke of poll watcher training.  You are aware

RICHARD ERTEL - CROSS

1  that before SB 1 there was no official poll watcher training

2  course?

3  A.  That's correct.

4  Q.  And so for one to be a poll watcher, they were not

5  required to go through poll watcher training?

6  A.  That is correct.

7  Q.  Because no training existed?

8  A.  That is correct I believe.

9  Q.  But now with SB 1 there is an official training program

10 from the Texas Secretary of State's Office?

11 A.  There is an online training, yes.

12 Q.  And that training is required for a person to be a poll

13 watcher?

14 A.  That is correct.

15 Q.  Okay.  Now, earlier in your testimony today you mentioned

16 several sections of SB 1 so I'm going to show you Joint

17 Exhibit 1 at this time.

18     And it's going to be Section 4.07.

19     Okay.  Mr. Ertel, do you see Section 4.07 on your screen?

20 A.  Yes, I do.

21 Q.  Now, just to make sure you understand that, because SB 1

22 is the bill, strike-throughs mean that words are deleted,

23 right?

24 A.  I understand.

25 Q.  And underlined means that words were added?

RICHARD ERTEL — CROSS

 1  A.  I understand.

 2  Q.  So looking at Section 4.07 of SB 1, we see that it amends

 3  Section 33.056 of the Texas Election Code, right?

 4  A.  That is correct.

 5  Q.  Starting with the second sentence in Subsection A,

 6  particularly line 26, it says, "A watcher is entitled to sit

 7  or stand near enough to see and hear the officers conducting

 8  the observed activity," right?

 9  A.  That is correct.

10  Q.  And then it adds some language "except as otherwise

11  provided by this chapter?"

12  A.  That is correct.

13  Q.  And it also deletes the word "conveniently?"

14  A.  That is correct.

15  Q.  And my understanding is that this "near enough to see and

16  hear" language was particularly concerning to you?

17  A.  It is, given the configuration of our polling places.  It

18  does complicate how we figure out how to accommodate that.

19  Q.  And let's talk about the, as you described, the unorthodox

20  configuration of polling places.  You would agree with me that

21  the unusual set-up of the polling locations make it hard for

22  this law to be particularly specific, right?

23  A.  Not necessarily.  I think that previously the poll workers

24  were in a position to try to accommodate a poll watcher if

25  they had one.  Now they are coming up with a different

RICHARD ERTEL – CROSS

1  standard that may be difficult to implement and to understand

2  in our situation.

3  Q.  Well, let me try to back up a little bit, Mr. Ertel.

4      So you understand that not every polling location is the

5  same?

6  A.  That is definitely correct.

7  Q.  And because they are not the same, the space inside of a

8  polling location is measured differently, as far as the square

9  footage goes, and things like that?

10  A.  They are different sizes.

11  Q.  Different sizes.  And because they are different sizes,

12  six feet in one polling location might be different for one

13  county than it is for another, right?

14  A.  I guess this is getting more complicated in terms of how

15  you are applying that.

16  Q.  Sure.  Let me rephrase and maybe I'll make it a little bit

17  clearer for both of us.  So because one polling location might

18  be larger than another, six feet of space might not take up as

19  much room in that larger polling location than as in a smaller

20  one, right?

21  A.  That's true, but I don't think it gets to the point.

22      Given the unusual configurations we have, the distance

23  that you are from the people is not necessarily the only way

24  to decide whether a poll watcher is having access to what the

25  poll workers and voters are doing.

RICHARD ERTEL — CROSS

1      So, but again, I don't think this standard is actually
2  helpful.
3  Q.  So is it fair to say based on your testimony you just
4  provided me that exact measurements may not always be
5  feasible, given the unorthodox organization and structure of
6  polling locations?
7  A.  I think it's true that the measurements would have to
8  vary.
9  Q.  Understood, thank you.
10      Now, I also want to make sure that you've never received,
11  during your time as county chair, any questions from poll
12  workers about what activities poll watchers could observe?
13  A.  I believe during the course of my service as either an
14  election worker or a county chair that there would have been
15  discussions among us as to what can or can't be done because I
16  worked with previous county chairs.
17      So I don't think it's fair to say that I've never had any
18  information or discussion about that.
19  Q.  So are you saying today that during your time as county
20  chair you have had discussions from poll workers about what
21  activities poll watchers could observe?
22  A.  I think there probably would have been conversations
23  making reference to what poll watchers can or can't do but I
24  can't remember them specifically.
25  Q.  So is it you can't remember, or you presume that it —— you

RICHARD ERTEL – CROSS

 1  did have those conversations that generally touched on the
 2  matter?
 3          MISS SANDERS:  Objection, Your Honor.  This is asked
 4  and answered.
 5          THE COURT:  That's overruled.
 6  BY MR. SZUMANSKI:
 7  Q.  You can answer, Mr. Ertel.
 8  A.  Again, in conversations with previous chairs who were
 9  saying if anybody wants to be a poll watcher just let me know
10  and I'll sign the appointment, that there probably were
11  conversations about what you were going to do but I don't
12  recall the specifics of them.
13  Q.  So you don't recall if there was conversations or
14  questions to you about — let me restart so it's cleaner for
15  all of us.
16      So you don't recall any conversations or questions from
17  poll workers about what activities poll watchers could
18  observe?
19  A.  I don't recall any directed to me when I was county chair
20  because no one ever expressed an interest in being a poll
21  watcher and none of the poll workers had ever experienced a
22  poll watcher at the polls, as far as I knew, so it wasn't a
23  topic of concern to people.
24  Q.  Okay.  So just to make sure, you've never had those types
25  of questions?

RICHARD ERTEL – CROSS

1  A.  As far as I recall at the moment, I don't recall.

2  Q.  And during that time as county chair you've also never

3  received any questions from poll workers about when it would

4  be appropriate to obstruct the view of a poll watcher?

5  A.  I don't recall any conversations with a poll worker about

6  when it would be appropriate to obstruct the view of a poll

7  watcher.

8  Q.  Okay.  So that's a yes, right?

9  A.  I think that's what I said.  I am not answering yes or no.

10 I'm answering what I think your question was as far as I

11 understood it.

12 Q.  Understood.  Would it help if I refreshed your

13 recollection?

14 A.  I'm not sure I understand what you mean.

15 Q.  Well, I've understood several times that –– let's just

16 move on then since we –– let's just move on so we can same

17 some time here.

18     All right.  Now, I want to now show you what has been

19 marked as Joint Exhibit 5, so if we can pull that up.

20     All right.  Mr. Ertel, you see this exhibit in front of

21 you?

22 A.  I do.

23 Q.  You recognize it as an exhibit you've read before?

24 A.  I have read that exhibit.

25 Q.  We can see that it's Election Advisory Number 22-09,

RICHARD ERTEL — CROSS

1  right?

2  A.  That is correct.

3  Q.  And it's dated February 4th, 2022, right?

4  A.  That's correct.

5  Q.  After SB 1 was made effective?

6  A.  That's correct.

7  Q.  All right.  So let's look towards the bottom of page 2 and

8  you will see a heading titled Rights of Poll Watchers, do you

9  see that?

10  A.  I see that.

11  Q.  And if we move to the second full paragraph under this

12  heading, it starts with the word "while," right?  Is that

13  correct Mr. Ertel?

14  A.  What is the question?

15  Q.  Do you see the paragraph in front of you?

16  A.  I see it.

17  Q.  Okay.  Just wanted to make sure.

18      So I want to read this paragraph.  It says, "While a poll

19  watcher may be present if an election worker is assisting a

20  voter, a poll watcher may not be present at the voting station

21  when a voter is preparing the voter's ballot or is being

22  assisted by a person of the voter's choice, including by a

23  person also serving as an interpreter at the voting station."

24      Did I read that correctly?

25  A.  You read that correctly.

629
RICHARD ERTEL — CROSS

1  Q.  So let's break this down, Mr. Ertel.  You understand that
2  a poll watcher can be present when an election worker is
3  assisting a voter, right?
4  A.  That's correct.
5  Q.  But when a voter is being assisted by a person of the
6  voter's choice, such as an interpreter, a poll watcher then
7  cannot be present?
8  A.  That's correct.
9  Q.  And let's look at the next paragraph of this exhibit.
10        THE COURT:  Just so you keep track of the questions I
11  have for you-all, so this election advisory, what, if any, law
12  is that?
13        So, you know, the statute says one thing and this
14  Election Advisory provides further guidance.  That certainly
15  doesn't trump the written statute, but is this like rising to
16  the level of an Attorney General Opinion Letter?  What are
17  legal effect do these advisories have?
18        MISS HUNKER:  So the Secretary of State under Chapter
19  31.003 of the election code has the duty to promote uniformity
20  in the interpretation, application, and operation of the
21  election code, and these guidance, the advisories, are a part
22  of that process.
23        So they are to give basically guardrails and bench
24  rails for the county so that they know the best practices and
25  they get the full experience of the attorneys within the

RICHARD ERTEL – CROSS

1  election office of the Office of the Attorney General —

2  sorry — Office of the Secretary of State.

3          THE COURT:  But there are not promulgated by the

4  Federal Register or the Texas register attorney the code of

5  federal regulation it doesn't go through any of that?

6          MISS HUNKER:  I don't believe it has that comparable

7  type of process that you would have the Department of

8  Education in the United States Government but it is through

9  the Deliberation and Consensus building internally within the

10 Secretary of State's office.

11         THE COURT:  Thank you.

12 BY MR. SZUMANSKI:

13 Q.  Mr. Ertel, now looking again at the second paragraph, do

14 you see it in front of you?

15 A.  Yes, I see it.

16 Q.  This paragraph says, "A poll watcher does not have the

17 right to free movement in other areas of an election office

18 that is not being used for the designated activities."

19     Did I read that correctly?

20 A.  You read that correctly.

21 Q.  So based on this language you would at least agree with me

22 that a poll watcher cannot go to certain areas?

23 A.  The problem with that is there have never been any

24 designated areas or activities in any of our polling places so

25 it's not meaningful to the poll workers because they don't

RICHARD ERTEL — CROSS

1  understand what it seems to be describing.

2  Q.  But you do understand that a poll watcher's movement is

3  limited, at least in some part, right?

4  A.  It could be limited if they had designated areas for the

5  designated activities.

6  Q.  Okay.  Let's move on, Mr. Ertel.

7     And let's pull up Section 4.09 of Joint Exhibit 1 or SB 1.

8     Do you see that in front of you?

9  A.  I see it in front of me.

10 Q.  Now, looking at Section 4.09 we can see quite a bit of

11 language that is neither underlined nor struck through, right?

12 A.  That is correct.

13 Q.  Meaning that it was not changed by SB 1.

14    So looking at that, if we read the language that existed

15 before SB 1, it would read, "A person commits an offense if

16 the person serves in an official capacity at a location at

17 which the presence of watchers is authorized and knowingly

18 prevents a watcher from observing an activity the watcher is

19 entitled to observe."

20    Did I read that correctly?

21 A.  You read that correctly.

22 Q.  So you would agree with me that before SB 1 it was already

23 an offense for a person to knowingly prevent a watcher from

24 observing certain activity?

25 A.  Yes, it was.

1  Q.  Now, looking on line 7 in particular, you see the added

2  words "the person knows," right?

3  A.  Yeah.  That, to me, really inserted uncertainty for the

4  poll –– for the relationship between the poll watchers and the

5  poll workers because, as we've talked about already today, the

6  poll workers are not trained at all about what poll watchers

7  are entitled to observe, so I think it just further confuses

8  this situation because the poll watcher can claim you knew

9  that you weren't supposed to be able to do that and the poll

10  worker is going, nobody ever told me about that at all, I

11  don't know what you are talking about.

12      So I don't think that helped clarify anything.

13  Q.  But you would agree that it added a knowledge requirement

14  to this particular offense, right?

15  A.  Well, there was already a "knowingly" in there, so –– it's

16  not clear.  You actually have two "knowinglys" that go to two

17  different things now I think.  I'm confused by it.

18  Q.  Well, Mr. Ertel, would you agree that under this offense

19  there was "knowingly prevent," correct?

20  A.  There was a knowingly prevent.

21  Q.  But there wasn't the requirement that you have to know

22  that the activity is something the poll watcher could observe,

23  right?

24  A.  So that's why I'm saying it inserted ambiguity because now

25  people can argue about whether the poll worker knew the

RICHARD ERTEL – CROSS

1  watcher was billed to observe.

2  Q.  Mr. Ertel —

3  A.  It's just ambiguity upon uncertainty, from my perspective.

4  Q.  Understood.  So, Mr. Ertel, just to make sure I'm clear,

5  you are not aware of any individual who was prosecuted or

6  charged for knowingly preventing a watcher from observing an

7  activity or procedure in violation of Section 409 after SB 1,

8  right?

9  A.  I am not aware of any poll worker being prosecuted for

10 that in the — what? — year that this has now been in place

11 for elections, yeah.

12 Q.  And in that same year you are also not aware of any

13 individual who was prosecuted or charged for knowingly

14 refusing to accept a poll watcher?

15 A.  I am not aware of anybody being prosecuted for refusing to

16 accept a poll watcher, but, again, I haven't researched it.

17 That would just be from reading newspapers or something.

18 Q.  And because you haven't researched it, you are not aware?

19 A.  Correct.

20 Q.  Now, we've been talking about poll watcher provisions for

21 some time now and I'm just going to wrap up here shortly so we

22 can all potentially go to lunch.

23     Now, you said you've only had one instance with a poll

24 watcher in Kerr County, right?

25 A.  That I personally witnessed, that's correct.

634

RICHARD ERTEL - CROSS

1  Q.  I believe on direct examination you testified that this
2  poll watcher came into the polling location and took a chair?
3  A.  That is correct.
4  Q.  They sat there for about an hour or so and then just left?
5  A.  Yes.
6  Q.  So the only time you've observed a poll watcher in Kerr
7  County, you did not observe any election violations?
8  A.  Are you asking me if I observed election violations or the
9  poll watcher observed them?
10  Q.  Understood, Mr. Ertel.  Let me reask it to make sure we're
11  all clear.  So you never saw, during that one instance, that
12  poll watcher engage in election violations, right?
13  A.  In that case, which is pre-SB 1, that poll watcher
14  followed what the standard was at the time and sat there and
15  sort of watched and then got up after an hour or so and left.
16  Q.  And since SB 1, you have also not observed a poll watcher
17  engage in any election violations, right?
18  A.  In my one time to work after SB 1, I did not observe a
19  poll watcher at all.
20  Q.  So you did not observe any poll watcher, that means you
21  didn't observe a poll watcher --
22       THE COURT:  That's asked and answered.  He already
23  answered that part.  He hasn't seen anybody.
24       MR. SZUMANSKI:  Yes, Your Honor.
25

RICHARD ERTEL — CROSS

1  BY MR. SZUMANSKI:

2  Q.  And because you haven't seen anybody, that means you

3  haven't seen any poll watcher intimidate, be rude, or

4  otherwise be difficult in the polling place, right?

5  A.  It's getting a little surreal.  If I haven't seen a

6  person, I certainly haven't seen him do anything.

7  Q.  Understood.  Thank you, Mr. Ertel.

8          THE COURT:  Anything else from this side?

9          MR. SZUMANSKI:  I do have a few more questions.

10          THE COURT:  Sorry.  I thought you were through.

11          MR. SZUMANSKI:  That's okay.  I will speed up as

12  quickly as I can.

13  BY MR. SZUMANSKI:

14  Q.  Now, Mr. Ertel, even though you've only observed one poll

15  watcher, you have observed other election violations from poll

16  workers, right?

17  A.  I believe so.  I've seen things that I think raise a

18  question as to whether they comply with the election law and

19  those were dealt with at the time.

20  Q.  But so you did become aware of poll workers being rude to

21  voters in Kerr County, right?

22  A.  I became aware of voters being rude in Kerr County where

23  they would say things like, you are here — they would say

24  things like, the election is rigged.  They would say things

25  that, I can't believe that you would vote for So-and-so, and

RICHARD ERTEL — CROSS

1  things like that.

2      So I have seen situations of voters being rude and the

3  poll workers would bring to the attention of the judge that

4  they had to control the environment and not allow that to

5  happen.

6      They often -- the judge's, initial reaction would be, oh,

7  they are just my neighbors.  And the rebuttal had to be, you

8  still have to control them and not allow that conduct.

9      So I have seen situations where voters were rude, so...

10 Q.  Okay.  But just to make sure, so you have not seen any

11 election violations by poll workers, right?

12 A.  I have seen, as I testified in my deposition, when my wife

13 went to early vote in 2018 at the place where you could early

14 vote, that she voted a straight ticket and the poll worker

15 there standing right behind her said, ma'am, you voted

16 straight ticket, you're done.

17     And my wife responded with, I can override the straight

18 ticket and vote differently for specific people.  And she

19 said, ma'am, you're done.  And my wife said, no, I'm not, and

20 proceeded to finish her ballot.

21     And she did file a complaint with the Secretary of State's

22 Office and the Secretary of State ordered the retraining of

23 the poll workers in our county within 24 hours.

24     So there have been situations that arise where a person

25 who is a poll worker or who is trained to be a poll worker can

RICHARD ERTEL – CROSS

1 | bring that to the attention of the authorities and remedy the
2 | situation right away without the need for a poll watcher.
3 | Q.  Okay.  But just to make sure, that particular instance,
4 | there was an election violation by a poll worker?
5 | A.  That's correct.
6 | Q.  And you agree that poll watchers are there to observe
7 | election activity?
8 | A.  They would –– that would be their role, yes.
9 | Q.  Understood, Mr. Ertel.
10 |         MR. SZUMANSKI:  Thank you.
11 |         No further questions at this time.
12 |         THE COURT:  And just to be clear on the record, you
13 | were saying done, D–O–N–E, because I heard dumb, D–U–M–B.
14 |         THE WITNESS:  Oh, I'm sorry.  No.
15 |         Ma'am, you are done.  You voted straight ticket, you
16 | are done.
17 |         THE COURT:  Yeah, D–O–N–E?
18 |         THE WITNESS:  Yeah, you can't do anything else.
19 |         THE COURT:  I just want to make sure we got what you
20 | intended to say on the record correctly.
21 |         THE WITNESS:  Thank you.
22 |         THE COURT:  Yes, sir.
23 |         MR. NICHOLS:  Very briefly.
24 | BY MR. NICHOLS:
25 | Q.  Mr. Ertel?

RICHARD ERTEL — CROSS

1    A.   Yes.

2    Q.   Good afternoon, now.  Eric Nichols representing the Harris

3    County District Attorney Kim Ogg.

4         So my first question for you is, and the Court may know,

5    but there's not always a district attorney who is assigned to

6    a particular county, so who is the district attorney who has

7    jurisdiction over the area where you live in Kerr County?

8    A.   Off the top of my head, I can't tell you the name of the

9    district attorney.

10   Q.   That's fair enough.  But do you know, sitting here today,

11   whether the person who is the district attorney with authority

12   in the area where you live has been even named as a defendant

13   in this lawsuit like my client has?

14   A.   I don't think our district attorney is a defendant but I

15   don't know.  I would be speculating.

16   Q.   And, finally, you were asked about prosecutions that you

17   were aware of, of any person under Section 33061(a), as

18   amended by Section 409 of the election code, do you remember

19   the lawyer just asking you that question?

20   A.   I would have to see the text again to know what you are

21   talking about.

22   Q.   Yes, sir.  So remember you are here to testify about

23   Section 409 of SB 1?

24   A.   Correct.

25   Q.   And do you see that Section 409 amends Section 33.061(a)

RICHARD ERTEL - CROSS

1  of the election code?

2  A.  I see that now.

3  Q.  Okay.  And so you were asked questions about whether you

4  were aware of anyone being prosecuted criminally under this

5  provision as amended by SB 1, do you remember that question?

6  A.  I remember that question.

7  Q.  And you answered the question that you were not aware of

8  anyone being prosecuted under this provision as amended,

9  correct?

10  A.  Yeah.  I'm not aware -- now, are you asking about the

11  whole state, or just Kerr County, or what?

12  Q.  I am asking about your personal knowledge in Kerr County.

13  Are you aware of anyone being prosecuted in your county?

14  A.  I am not aware of anyone being prosecuted under that

15  section in Kerr County, but I have not independently

16  researched it, so I --

17  Q.  People can only testify to their personal knowledge.

18          MISS SANDERS:  Objection, Your Honor.

19          Mr. Nichols just established for the Court that his

20  client is not relevant to any of the defenses that his client

21  has raised so I'm not understanding why he would have any

22  questions for this witness.

23          THE COURT:  So why are we tag teaming here on this

24  side?

25          MR. NICHOLS:  Because, Your Honor, it's not clear to

RICHARD ERTEL — CROSS

1  me what the plaintiffs' ultimate pitch to the Court will be

2  with respect to an injunction in the matter.

3           Our respectful position is that there is no basis on

4  which to impose an injunction on any district attorney in the

5  State of Texas in this case, much less my client, Kim Ogg, and

6  I believe the record is — and maybe we can cut all my

7  questions out if the plaintiffs want to stipulate, there's not

8  going to be any evidence in this case that there have been

9  anyone that's been placed under criminal investigation for

10  this provision of law as amended, or has been prosecuted, and

11  if plaintiffs' counsel will accept that as a stipulation I

12  won't have to ask these questions.

13           MISS SANDERS:  Your Honor, Mr. Nichols doesn't have

14  standing to assert that.

15           THE COURT:  So he does have standing to the extent

16  he's concerned about a statewide injunction that I may or may

17  not issue, so he has standing to ask these questions.

18           MR. NICHOLS:  But my offer of a stipulation stands.

19           THE COURT:  Apparently rejected.

20           MR. NICHOLS:  I don't know that it was answered,

21  Judge.

22           MISS SANDERS:  It's denied.  Rejected.

23  BY MR. NICHOLS:

24  Q.  So with that clarification, let me ask my question, which

25  is:  Are you aware of anyone being under criminal

RICHARD ERTEL - REDIRECT

1  investigation for a potential violation of Section 33061(a) as

2  amended by SB 1?

3  A.  I have no way of knowing that.  I have no resources to go

4  research that to see what the answer is.

5  Q.  Sure.  But you haven't talked to anybody in Kerr County,

6  or —

7          THE COURT:  We got the answer now.

8          MR. NICHOLS:  Okay.  I've got it.  Thanks, Judge.

9          THE COURT:  Thank you.

10          Anything else from this side?

11          Any redirect?

12          MISS SANDERS:  Brief redirect, Your Honor.

13          THE COURT:  Go ahead.

14                    REDIRECT EXAMINATION

15  BY MISS SANDERS:

16  Q.  Hi, Mr. Ertel.  I just have a few questions for you.

17      You were asked by opposing counsel about various trainings

18  that may have been provided or advisories that discuss alleged

19  guidance that poll workers are given about the poll watcher

20  provision, is that correct?

21  A.  I think that's correct, yeah.

22  Q.  You don't — in your estimation, you would never be

23  prosecuted for violating any guidance or advisories that are

24  disseminated, correct?

25  A.  I'm not sure I understand your question.

RICHARD ERTEL - REDIRECT

1  Q.  You would only be subject to criminal prosecution or
2  prosecution for violating the statute, not training, correct?
3  A.  I agree with that, yes.
4  Q.  And even if there was sufficient training provided, which
5  you testified there has not been, that does not allay your
6  concerns about what's written in the statute, correct?
7  A.  That's right.  I don't think the training provides me with
8  a defense that I am not responsible for what the statute says.
9  Q.  And, similarly, your knowledge or lack of knowledge about
10 any prosecutions that have come about as a result of violating
11 the statute do not assuage your concerns about the vagueness
12 of the language in the statute, correct?
13 A.  Yeah.  I'm concerned about that the statute doesn't tell
14 me what election workers and watchers can or can't do.
15     And I'm concerned that we've only had a short amount of
16 time under SB 1.  So to say that, oh, we haven't had
17 prosecutions yet, is not an excuse for saying that there could
18 not be a wave of them when the '24 elections come around.
19 Q.  Thank you.  And whether an election worker violated the
20 election code, similarly has no bearing on the vagueness of
21 the language in Section 4.09, correct?
22 A.  I'm not sure I understood your question.
23 Q.  You were asked on cross about whether you observed any
24 election workers violating the code, correct?
25 A.  That's correct.

RICHARD ERTEL − REDIRECT

1  Q.  And whether or not that's true, that you've observed that,

2  that does not change your belief that the language in Section

3  4.09 is vague?

4  A.  Oh, I agree with that, yeah.  Just because election

5  workers in there, you know, working twelve hours a day at the

6  polls may do something that's not correct, I still am

7  concerned that the election workers have no idea what their

8  relationship is with the poll watchers and what the poll

9  watchers can do.

10 Q.  Based on the language in the statute, correct?

11 A.  Based on the statute, yeah.

12 Q.  And, finally, do you plan to serve as an election judge

13 rather than a clerk, so long as SB 1 is in effect?

14 A.  As long as it's in effect, I'll never serve again.

15         MISS SANDERS:  Thank you.

16         That concludes my questions, Your Honor.

17         THE COURT:  Anything based on those questions?

18         MR. SZUMANSKI:  No, Your Honor.

19         MR. NICHOLS:  No, sir.

20         THE COURT:  You may step down, sir.  Thank you.

21         With that, let's go ahead and take a lunch break.

22         Let's return at 1:40.

23     (Recess)

24         THE COURT:  Your next witness.

25         MISS HOLMES:  Thank you, Your Honor.

JEFFREY CLEMMONS – DIRECT

1          Jennifer Holmes, counsel for HAUL plaintiffs.  I call

2  Jeffrey Clemmons as the next witness.

3          Mr. Clemmons will provide testimony in related to

4  Sections 4.06, 4.07, and 4.09 of SB 1, which challenges under

5  the Due Process Clause of the Fourteenth Amendment as void for

6  vagueness.  Other HAUL plaintiffs challenge these sections

7  under the Fourteenth and Fifteenth Amendments as adopted with

8  discriminatory intent, and challenge Section 4.07 under

9  Section 2 of the Voting Rights Act.

10         THE COURT:  Thank you.

11        (JEFFREY CLEMMONS, having been duly sworn, testified as

12  follows:)

13         MISS HOLMES:  And I have a folder with some hard

14  copies of the exhibits.  May I approach the witness?

15         THE COURT:  Yes.

16                    DIRECT EXAMINATION

17  BY MISS HOLMES:

18  Q.  Good afternoon, Mr. Clemmons.

19  A.  Good afternoon.

20  Q.  Thank you for being here.

21      Can you please state and spell your name for the record?

22  A.  Yes.  My name is Jeffrey Clemmons.  J-E-F-F-R-E-Y.  Last

23  name is C-L-E-M-M-O-N-S.

24  Q.  Where do you live?

25  A.  Currently live in Austin, Texas.

JEFFREY CLEMMONS – DIRECT

1   Q.  In Travis County?

2   A.  Yes.

3   Q.  Are you a registered voter in Travis County?

4   A.  I sure am.

5   Q.  How long have you lived in Austin?

6   A.  About three years.

7   Q.  And how long have you lived in Texas?

8   A.  My entire life.

9   Q.  Where did you grow up?

10  A.  I grew up in the suburbs of Dallas, specifically

11  Lancaster-DeSoto, spent some time in Rockwall, but DFW Metro

12  plates.

13  Q.  What do you do for work?

14  A.  Currently work as an organizing manager for a Planned

15  Parenthood Texas Votes.

16  Q.  Where did you go to college?

17  A.  Huston-Tillotson University in Austin, Texas, our only

18  HBCU and the oldest institution of higher education in the

19  city, founded in 1875.

20  Q.  What is an HBCU, just for the record?

21  A.  That is a Historically Black College or University.

22  Q.  And why did you decide to attend an HBCU?

23  A.  It was really important for me to attend a University

24  where I felt like they would be culturally sensitive to my

25  background and still provide me with the same opportunities

646

JEFFREY CLEMMONS - DIRECT

1  that I might have received at a PWI, which is a Predominantly
2  White Institution at the University of Texas.
3      It was still in Austin and I wanted to be involved in
4  politics and so decided it was the best choice for me.
5  Q.  When did you graduate?
6  A.  I graduated in May of '22 -- '92.
7  Q.  What was your degree?
8  A.  I studied political science for a bachelor in the arts.
9  Q.  Were you involved in any civic or community organizations
10  while in college?
11  A.  Yes, as I tell people all the time in my regular life, I
12  was too involved, but to give you the specifics, I was chair
13  of the Austin College Student Commission, as well as president
14  of the Houston-Tillotson NAACP, Chapter 69AA, as well as being
15  a student leader with Texas Rising.
16  Q.  And what is Texas Rising?
17  A.  Texas Rising is a statewide advocacy organization that
18  focuses on engaging young people to vote, as well as on a
19  number of issues, including the climate crisis, voting rights,
20  immigration, and queer rights.
21  Q.  What is the Austin College Student Commission?
22  A.  So Austin has hundreds of boards and commissions, and so
23  the Austin College Student Commission is one of them that
24  represents the hundred thousand plus students who live in
25  Austin and attend one of the five major universities, has 15

JEFFREY CLEMMONS - DIRECT

1  members, and essentially our job was to advise city council on

2  quality of life issues, things pertaining to transportation,

3  housing, food, and security, things of that nature.

4  Q.  And just to round it out, what issues did you work on with

5  the Huston-Tillotson NAACP?

6  A.  So we worked on just about everything.  The core of our

7  mission was, of course, to engage young people of color in the

8  political process advocating for issues that they care about,

9  so that includes things like health, education, economic

10 empowerment, and, of course, our democracy.

11 Q.  Why did you choose to devote so much time to these

12 organizations and these issues?

13 A.  It was not natural for me to do so.  I didn't receive a

14 very robust education in the public school and like —

15         THE COURT:  Mr. Clemmons, let me stop you.

16         You better slow down just a little bit.  The court

17 reporter is trying to capture what you are saying and you are

18 going a little too fast.

19         THE WITNESS:  No problem.  I'm from Texas, but I

20 guess I talk a little bit like a northerner.

21         MISS HOLMES:  You are the second person to say that

22 in this trial.  Just try to speak a little more slowly.

23         THE WITNESS:  Absolutely.

24         So, like many people, I didn't talk about politics or

25 elections, probably except for every four years during the

648

JEFFREY CLEMMONS - DIRECT

1  Presidential Elections, but upon learning how major decisions
2  were being made in our country, how policies were being
3  crafted, where is this road going to go, where is this school
4  going to go, and understanding that those impacted me, I
5  thought it was really important that I have a seat at the
6  table.
7          And in the words of Shirley Chisolm, if they don't
8  give you a seat, then you should probably bring a folding
9  chair, and in my case I thought it was important to bring
10 others along with me who were also not engaged but were still
11 being impacted by many of the decisions being made by our
12 legislators.
13 BY MISS HOLMES:
14 Q.  So I'd like to switch gears and talk about the 2020
15 Election.  Did you play any official role in that election?
16 A.  Yes.  I was an election judge, and, of course, I was also
17 a volunteer deputy registrar.
18 Q.  In which election did you serve as an election judge?
19 A.  That would have been the 22-2 Primary Run-off.
20 Q.  So the 2020 Primary Run-off, is that right?
21 A.  That's right.
22 Q.  And that was in July of 2020?
23 A.  Yes.
24 Q.  Where did you serve as an election judge?
25 A.  So that was the Turner Roberts Recreation Center in

JEFFREY CLEMMONS - DIRECT

1  Travis County.

2  Q.  And were you the presiding judge or an alternate?

3  A.  I was the presiding judge of that location.

4  Q.  What area of Austin is the Turner Roberts Rec Center in?

5  A.  So the Turner Roberts Recreation Center, fairly new

6  recreation center, in fact, recently underwent some

7  renovations in 2022, but this is in East Austin, historically

8  black and brown community, very working class, and although

9  East Austin, because of some housing issues going on in Austin

10  is becoming quickly gentrified so the complexion and kind of

11  character of this part of Austin is changing pretty rapidly.

12  Q.  Why did you decide to serve as an election judge?

13  A.  So I, in addition to being a volunteer deputy registrar

14  and believing it just important to be involved in the

15  organizations I was, during 2020, of course, we were in the

16  midst of the pandemic, I had learned that there was a shortage

17  of poll workers in Travis County and across the State of Texas

18  because of the traditional demographic of folks who would

19  serve as poll workers were being impacted heavily by the

20  pandemic and I wanted to step up and make sure that, number

21  one, our elections could continue to run smoothly, as well as

22  taking some of the load off of those folks as a younger person

23  who wasn't going to be as heavily impacted.

24  Q.  You mentioned the traditional demographic of folks who

25  serve as poll workers.  What do you mean by that?

JEFFREY CLEMMONS - DIRECT

1  A.  Mostly elderly folks.  So these are good people who have

2  probably worked their whole lives and now they're retired and

3  have more time on their hands to kind of serve our democracy

4  in a fundamental way.  So it's those I'm talking about.

5  Q.  Did you get paid when you served as an election judge?

6  A.  I did, about $14 an hour.

7  Q.  So were you doing it for the money?

8  A.  Not at all.

9  Q.  How did you find out about the opportunity to serve as an

10  election judge?

11  A.  I found out about it from a friend with the Travis County

12  Democratic Party who let me know about the opportunity.

13  Q.  And when you served, did you view yourself as a

14  representative of the interest of the Democratic Party?

15  A.  Not at all.

16  Q.  Did you do any training to become an election judge?

17  A.  I did.  Travis County puts on a three-hour training that

18  you have to attend in person to learn all the ins and outs of

19  the election process from opening up the polling location to

20  closing it down and delivering the ballots.

21  Q.  About how many hours did you work on the day you served as

22  an election judge?

23  A.  Since I would have started at 6:00 a.m. that day and not

24  finished after dropping off the ballots until sometime after

25  7:00 p.m., I think it must have been about fourteen hours.

JEFFREY CLEMMONS - DIRECT

1  Q.  Based on your training and experience, what did you

2  understand your duties to be as an election judge generally?

3  A.  Most importantly, to ensure that the democratic process

4  was carried out officially and smoothly so that way lawyers

5  could maintain the secrecy of their ballot, not face any kind

6  of harassment, and felt comfortable in the polls, and,

7  therefore, that my role as an election judge was to ensure

8  decorum and order in the polling location.

9  Q.  Did you understand that your duties related at all to poll

10 watchers?

11 A.  Yes.

12 Q.  And what was your understanding?

13 A.  My understanding was that just as with other like poll

14 workers that I was to provide oversight to them.

15 Q.  Did you take your duties seriously when you served as an

16 election judge?

17 A.  Most seriously.

18 Q.  And did you serve as an election judge in the

19 November 2020 Election?

20 A.  I did not.

21 Q.  And why not?

22 A.  At that time I was employed with the Travis County

23 Democratic Party and so was choosing to serve in that regard.

24 Q.  Even though you didn't serve in November 2020 did you have

25 any plans to serve as an election judge -- at that time did

JEFFREY CLEMMONS - DIRECT

1  you have any plans to serve as an election judge sometime in

2  the future?

3  A.  Oh, of course.

4  Q.  Explain why you wanted to -- sorry.  Let me ask you first.

5      Did those plans include serving as an election judge even

6  after the pandemic subsided?

7  A.  Absolutely.

8  Q.  Explain why you wanted to keep serving.

9  A.  I knew that there was going to continue to be a need for

10  poll workers.  We routinely face shortages pretty much every

11  election, and so, again, believing that it was kind of my duty

12  to participant in our democracy, I thought that being an

13  election judge was going to continue to be a great way to

14  serve the community.

15  Q.  Did you take any action on these plans to serve again?

16  A.  Yes.  I remained on all the list serves.  They'll let us

17  know around election time when Travis County is looking for

18  election workers, as well as keeping in regular communication

19  with folks in the party, in and outside of the party too about

20  opportunities.

21  Q.  And have you served again as an election judge since your

22  service in July 2020?

23  A.  I have not at this time.

24  Q.  Why not?

25  A.  Well, of course, since I served as an election judge there

JEFFREY CLEMMONS - DIRECT

1  have been numerous changes in our state, new laws have been

2  put in place, and, of course, circumstances in the world have

3  changed that made our elections more contentious.

4       In addition, of course, I have some concerns about the

5  laws that the legislature implemented, particularly in 2021.

6  Q.  And what law you are you referring to?

7  A.  That would have been the Omnibus Election Bill that was

8  passed during the 87th Legislative Session, SB 1.

9  Q.  So let's talk about the passage of SB 1.  Are you familiar

10 with SB 1?

11 A.  Yes.

12 Q.  And are you familiar with any of the predecessor bills

13 from the 2021 legislative session that ultimately became SB 1?

14 A.  I certainly am.

15 Q.  And what bills are those, if you know?

16 A.  I believe that would have been HB 6; SB 7, at some point,

17 and I also think Senate Bill 3.

18 Q.  Did you have any involvement in the 2021 legislative

19 session?

20 A.  Yes, copious involvement.

21 Q.  Can you describe, maybe not copiously, but can you more

22 briefly describe your involvement in the legislative session?

23 A.  I participated in a great deal of testimony, visiting with

24 legislators, and otherwise kind of being present to support

25 others at the Capitol on both bills related to elections, but

1  also other bills that were coming down at the time regarding

2  things like queer rights, there was a trans sports ban I think

3  that got passed during that legislative session that I was

4  particularly concerned with.

5  Q.  Did you give any testimony related to SB 1 or its

6  predecessors bills?

7  A.  I did.

8  Q.  And what committee or committees was that before?

9  A.  That would have been in the House Elections Committee and

10  on the Senate side, State Affairs.

11  Q.  You also mentioned that you met with legislative staff, is

12  that right?

13  A.  Yes.

14  Q.  Who did you meet with?

15  A.  So, of course, I met with my hometown legislator in Austin

16  who would have been Sheryl Cole, House District 46, also met

17  with John Bucy from Williamson County, since he was on the

18  Elections Committee and was a really good friend of some of

19  the organizations that I was a part of.

20      In addition to also meeting with the –– or attempting to

21  meet with House Elections Committee Chair Brisco Cain in

22  addition to Bryan Hughes, Senator Hughes.

23  Q.  And in those meetings did you discuss SB 1 or its

24  predecessor bills?

25  A.  I did.  I raised some of the concerns that I had.

JEFFREY CLEMMONS - DIRECT

1  Q.  I think you mentioned Brisco Cain.  Did you try to meet

2  with Representative Cain directly?

3  A.  Of course, I was not — I was unsuccessful doing that.  I

4  met with members of his staff and left behind some materials

5  but I think he was otherwise occupied at the times I tried to

6  go speak with him.

7  Q.  And how about Senator Hughes, did you meet with Senator

8  Hughes directly?

9  A.  I did not meet with him directly.

10  Q.  Did you leave any materials or speak with his staff?

11  A.  Yes.  I visited his Senate office and I would have also

12  had contact with him during the State Affairs Committee.

13  Q.  What was your position on HB 6 and SB 7?

14  A.  I was strongly opposed to these bills.

15  Q.  And tell me why.

16  A.  I had really serious concerns about the way that these

17  bills were going to transform our elections in the state of

18  Texas, or what felt like they were being transformed.

19      These bills included a lot of new penalties that I don't

20  believe were in the code prior to that legislative session and

21  they seemed to have been in response to hearsay in many cases.

22      I was concerned that all these things were going to deter

23  young people and people of color in our state from wanting to

24  participant in our elections because of the heightened

25  scrutiny that these bills brought, and also deter people from

656

JEFFREY CLEMMONS - DIRECT

1  wanting to be poll workers also for some of the same reasons.

2  Q.  Did any of your concerns relate to how the bills changed

3  the law surrounding poll watchers?

4  A.  It did.

5  Q.  Can you tell me about those concerns about the poll

6  watcher provisions?

7  A.  Yes.  I was concerned that the bills were opening up kind

8  of a chasm of uncertainty in the relationship between poll

9  watchers and election judges and other clerks in the polling

10  location and didn't think that this was a positive change

11  because of kind of the way the relationship was going to work

12  felt very adversarial and hostile, which is not the kind of

13  environment I think I would want to vote in.

14  Q.  You mentioned that you testified before the House

15  Elections Committee.  Can you briefly tell me about your

16  experience testifying?

17  A.  Yes.  So if you've never testified in the Texas

18  Legislature, it can be a pretty arduous process.  Most

19  committee hearings are starting at 8:00 a.m. on a legislative

20  day, but, of course, to even know which committees to go to

21  you're probably doing some research on the Texas Legislative

22  online website that has all the committee hearings and all the

23  bills.

24      And after doing that kind of review, you'll probably show

25  up the following morning hoping to get in line early, if you

JEFFREY CLEMMONS - DIRECT

1  plan on testifying.  You'll go through security.  You'll have
2  to locate your room, which is usually in the Capitol extension
3  somewhere super faraway, and after you've done all of that,
4  sign up for testimony.

5      It really takes a couple seconds on the kiosk.  You will
6  register your position and then you'll be put in the queue.
7  You have no idea where you are in that queue, depending on how
8  early or late you get in the day, that you might be called at
9  any time.

10     And so on the particular day that I had been — I went to
11 the legislature to testify on HB 6, I think I arrived sometime
12 around 10:00 a.m. and didn't leave later on that day until 9
13 or 10 at night.  So I spent the whole day at the legislature.

14     When it comes time for you to give your testimony, someone
15 has probably texted you, or if you are watching it on the live
16 feed, you'll run down to the committee room and you've got two
17 minutes to kind of make your plea, unless some legislators
18 have questions for you.

19     And then, if there's nothing left, you can leave or stick
20 around and provide support to other people, which I did that
21 evening, but it's a pretty long and grueling process if it's
22 your first time.

23 Q.  When you testified before the House Elections Committee
24 about HB 6, did you bring any written materials to provide the
25 legislators?

JEFFREY CLEMMONS – DIRECT

1  A.  Yes.  So at every testimony, if you're going to provide,

2  verbal testimony, you also need to provide them with a copy of

3  it, 20 copies of it actually, to the committee for the

4  reference and so I did bring my testimony on HB 6.

5  Q.  And, Derek, I'd like to call up HAUL FMV Exhibit 260.

6      Mr. Clemmons, do you recognize this document?

7  A.  I do.

8  Q.  And what is it?

9  A.  So this is my written testimony on HB 6.

10  Q.  Did you write this testimony yourself?

11  A.  I did.

12          MR. JOYCE:  Objection, Your Honor.  This is hearsay.

13          MISS HOLMES:  I'm admitting this document not for its

14  truth, but for the fact that it was provided to the

15  legislature during the session for them to have notice of the

16  information in it.

17          THE COURT:  That's admitted.

18          The objection is overruled.

19  BY MISS HOLMES:

20  Q.  Who were you representing, when you gave testimony before

21  the House Elections Committee?

22  A.  At that time, I was representing the three primary

23  organizations I was involved with, which included the Austin

24  College Student Commission, the NAACP for Huston-Tillotson, as

25  well as Texas Rising.

JEFFREY CLEMMONS – DIRECT

1  Q.  Any of those organizations partisan organizations?

2  A.  Every single one of them is nonpartisan.

3  Q.  In your testimony, there's reference about voter turnout.

4  Why did you tell the legislators about turnout?

5  A.  Texas has, for many years, not been high-ranking in voter

6  turnout, and this election we, of course, broke 50 percent

7  turnout, got a very high turnout across all populations.

8      I was very excited about that because that meant that we

9  must have been doing something right, whether it was advocacy,

10  or from the State's perspective, that maybe people felt more

11  compelled to vote in an election than ever before, and I felt

12  that, again, that was a positive sign of progress, and so I

13  just wanted to make the legislature aware that given the

14  contents of HB 6 and other election bills that did not seem to

15  share the same celebration of that progress.

16  Q.  During the legislative session did you have concerns

17  about — did you have concerns that HB 6 echoed Jim Crow laws

18  of the past?

19  A.  Absolutely.  You know, in Texas I think part of the reason

20  why we didn't have high turnout for many years and sometimes

21  struggle with that today is because of the legacies of the

22  barriers to access to the ballot box that people of color,

23  especially Black people in our state have faced.

24      You know, throughout the 1860s and 1900s we had things

25  like poll taxes, all white Primaries, and general voter

JEFFREY CLEMMONS - DIRECT

1  harassment and intimidation.  And this bill, I felt like

2  brought back some of those things, along with creating kind of

3  new barriers and concerns that voters might have, such as

4  these poll watchers on being empowered to do things that they

5  hadn't before.

6  Q.  During the legislative session did you have any concerns

7  that HB 6 — about how HB 6 might interact with the carceral

8  state?

9  A.  Absolutely.

10          THE COURT:  Just to be clear, why don't we take —

11          MISS HOLMES:  We can take the document down.

12          THE COURT:  So he's testifying from his personal

13  knowledge rather than the document.

14          MISS HOLMES:  Do you want me to ask the question

15  again?

16          THE WITNESS:  I would appreciate it.

17  BY MISS HOLMES:

18  Q.  During the legislative session did you have any concerns

19  that HB 6, specifically the poll watcher provisions, about how

20  they interacted with the carceral state?

21  A.  Absolutely.  You know, HB 6 and a lot of the succeeding

22  bills increased penalties in the election code that weren't

23  there before, and so now it felt oftentimes more like voting,

24  participating in the elections was becoming something that

25  might get you involved criminally if you made a mistake in the

661

JEFFREY CLEMMONS – DIRECT

1   course of doing your job, or if as a voter, again, you felt —

2   or you made a mistake in the process of signing in and getting

3   registered to vote and things of that nature, and so with

4   respect to the poll watchers they are kind of empowered to be

5   the eyes and ears of the public, if there is any misconduct in

6   the polling location or in the process of the elections, and I

7   felt like that was a significant change that would have put

8   people in the line of prosecution.

9   Q.  During the legislative session, did you have any concerns

10  that HB 6 would discourage poll workers from serving?

11  A.  Absolutely.  Again, because of those heightened criminal

12  penalties that I think would give anyone pause since they

13  raise the stakes of whatever you are doing.  You are no longer

14  just doing your job but you are maybe even trying to avoid

15  making a mistake that could get you involved in law.

16  Q.  I think you also mentioned that you did advocacy during

17  the session around SB 7.  Were concerns related to SB 7

18  similar to those we've talked about related to HB 6?

19  A.  Absolutely.

20  Q.  Once had SB 7 and HB 6 evolved into the final version of

21  SB 1, did you remain — did you continue to have concerns

22  about poll watcher provisions in SB 1?

23  A.  I would even say that my concerns were heightened because

24  of the final formation of the bill, the process the

25  legislature went to get the bill passed, it seemed like it was

JEFFREY CLEMMONS - DIRECT

1  an anti-Democratic process, and with that came all these new

2  penalties that were, I felt, were to intimidate people and so

3  my concerns were heightened.

4  Q.  And are you aware that in SB 1 — under SB 1 poll watchers

5  have to now attend a training?

6  A.  I am.

7  Q.  Does that allay your concerns about the poll watcher

8  provisions in SB 1?

9  A.  They do not.

10  Q.  Why not?

11  A.  I would still be concerned about whether or not poll

12  watchers are being appointed by partisan actors and I don't

13  think there is any guarantee that the conduct is still going

14  to be with in line after having received that training.

15  Q.  Let's look at SB 1 directly.

16      Derek, can you pull up Joint Exhibit 1, please.

17      Mr. Clemmons, do you recognize this document?

18  A.  I do.

19  Q.  And what is this?

20  A.  This is Senate Bill 1.

21  Q.  Can we go to page 26, Section 4.06.

22      Looking down at line 2, that's where 4.06 begins, and then

23  Subsection A at line 5, do you see that?

24  A.  Yes.

25  Q.  And it says, "A watcher appointed to serve at a precinct

JEFFREY CLEMMONS - DIRECT

1  polling place, a meeting place for an early voting ballot

2  board, or a central counting station must deliver the

3  following materials to the presiding judge at the time the

4  watcher reports for service, a certificate of appointment and

5  a certificate of completion from training completed by the

6  watcher under Section 33.008."

7      Do you see that?

8  A.  I do.

9  Q.  Moving down to Subsection B.  Line 18.  It says, and I'm

10 going to pick up in the middle of the paragraph, actually line

11 22, "Except as provided by Subsection C, a watcher who

12 presents himself or herself at the proper time and with the

13 certificates required under Subsection A shall be accepted for

14 service unless the person is ineligible to serve or the number

15 of appointees to which the appointing authority is entitled

16 have already been accepted."

17      Do you see that?

18 A.  Yes.

19 Q.  Do you know how to follow this part of the law that I just

20 read as an election judge?

21 A.  I'm not sure that I would be able to follow it.

22 Q.  And why not?

23 A.  There are concerns that I would have as an election judge

24 attempting to do my duties, whether at the beginning of the

25 election process on that particular day, or otherwise about

JEFFREY CLEMMONS - DIRECT

1  how this interacts with my obligation to maintain decorum or
2  order within the polling location since I think I would be
3  concerned about poll watchers who may meet the requirements of
4  this law but have some other reason why I would object to
5  them.
6  Q.  And do your concerns relate to whether you can accept a
7  poll watcher for service?
8  A.  Absolutely.
9  Q.  And what are those concerns about whether you can accept a
10  poll watcher for service?
11  A.  I don't know if there are any circumstances, as the law is
12  written right now, in which I would have the authority as an
13  election judge to reject them for any reason, and as a result
14  I think that there would be situations in which I need to do
15  that, that I don't seem to have the allowance for.
16  Q.  Can you give me an example of a situation where you felt
17  you might need to not accept a poll watcher, that, as you
18  said, the law does not seem to allow for?
19  A.  You know, there are common sense measures in place, I
20  think, to ensure the sanctity of the polling location that
21  have to do with, you know, nonelection year and you're at the
22  polling location within a certain distance, or making sure
23  that you're not wearing gear of a partisan nature and
24  otherwise not, again, harassing or intimidating voters at that
25  point, but I think that there could certainly be situations

JEFFREY CLEMMONS - DIRECT

1  where, again, a poll watcher who may have received this
2  training but is still being appointed by other interests, that
3  they may come to the polling location, that are already
4  belligerent, already ready to, you know, cause trouble or
5  otherwise make other clerks at the polling location or voters
6  feel uncomfortable.
7  Q.  So if there is a poll watcher who, as you said is arriving
8  and they're belligerent, they are wearing partisan gear for
9  the election you're in, do you know whether under this
10  provision you are allowed to not accept them, if they present
11  the proper credentials?
12  A.  I wouldn't say that it's clear.  I think that, as it's
13  written here, it seems like I would have to accept them.
14  Q.  Do you know what the penalty is for violating Section
15  4.06?
16  A.  I believe it is a criminal penalty.
17  Q.  And let's go down to page 27, Subsection G, which is line
18  12.  Can you read that section for us Mr. Clemmons?
19  A.  Yes.  Subsection G says, "An election officer commits an
20  offense if the officer intentionally or knowingly refuses to
21  accept a watcher for service when acceptance of the watcher is
22  required by this section.  An offense under this subsection is
23  a Class A misdemeanor."
24  Q.  Do you know whether this section, Subsection G, was
25  something that was added to the law under SB 1?

JEFFREY CLEMMONS - DIRECT

1    A.  Yes, it was.

2    Q.  And how does the fact that Section 4.06 is backed up by

3    criminal penalties affect your willingness to be an election

4    judge?

5    A.  Certainly makes -- gives me pause and I hesitate about

6    that consideration since I think that it raises that while you

7    already have a pretty hefty responsibility on your shoulders,

8    I mean, you are running an election, you know, you want to

9    make sure that that's going to go smoothly for voters.

10        Knowing that there is a criminal offense that may come

11   with violating this provision that I'm not really sure how to

12   enforce or what to do in other circumstances, you know, I

13   would certainly be concerned about it.

14   Q.  I'm just going to remind you briefly to slow down a little

15   bit.  I think it will probably help everyone.

16        Can we look at the end of page 27, Section 4.07.  Let's

17   see.  Okay.  So Section 4.07 begins near the bottom of page

18   27.  Do you see that?

19   A.  Yes.

20   Q.  And then following on to the next page, there is

21   Subsection E at line 3.  Do you see that?

22   A.  Yes.

23   Q.  And that says, "Except as provided by Section 33.057(b), a

24   watcher may not be denied free movement where election

25   activity is occurring within the location at which the watcher

JEFFREY CLEMMONS – DIRECT

1  is serving."  Do you see that?

2  A.  Yes.

3  Q.  Do you know how to follow this part of the law as an

4  election judge?

5  A.  I would be very –– it's very unclear to me how to follow

6  this section of the law.  I'm not really sure about the

7  understanding of some parts of it.

8  Q.  And what parts of it are unclear to you?

9  A.  I think most significantly the free movement piece in this

10  subsection.

11  Q.  Do you know if free movement is defined in SB 1?

12  A.  I don't believe it is.

13  Q.  And do you know if under this section you can ask a poll

14  watcher to remain three feet away from a voter?

15  A.  I don't believe it gives me that kind of discretion.

16  Q.  Do you know if you can ask a poll watcher to remain six

17  inches away from a voter?

18  A.  I'm not sure.

19  Q.  Let's go down to Subsection F, I think right below it, at

20  line 6.  That says, "In this code a watcher who is entitled to

21  observe an election activity is entitled to sit or stand near

22  enough to see and hear the activity."

23      Do you see that?

24  A.  Yes.

25  Q.  Do you understand how to follow this part of the law as an

JEFFREY CLEMMONS - DIRECT

1  election judge?

2  A.  Not any more than the last section.

3  Q.  And why not?

4  A.  You know, being able to stand near enough to see and hear

5  is incredibly vague to me.  I'm not — you know, what's near

6  enough for someone, I can beg to know, because obviously

7  what's near enough for me, someone who may be — I have 20/20

8  vision and have pretty good hearing, that may be harder for

9  someone else and so they may decide that they need to stand

10  closer or further, but, me, as an election judge, I can't

11  really make that decision, I don't think so, through this law.

12  Q.  Do you know, can you measure at what distance another

13  person can see?

14  A.  Not at all.

15  Q.  Can you measure at what distance another person can hear?

16  A.  I don't think so.

17  Q.  Based on your experience as an election judge, can you

18  give an example of how it would be unclear to carry out your

19  duties under Subsection F that we're discussing?

20  A.  I think in situations —

21  Q.  Sorry.  Can I actually rephrase that question?

22      Can you give an example of how it would be unclear how to

23  carry out your duties and abide by Subsection F that we've

24  been discussing?

25  A.  I think that, you know, one of our responsibilities as

JEFFREY CLEMMONS - DIRECT

1  election judges is, again, to kind of, or to maintain the
2  secrecy of the ballot for voters.  You know, we take that very
3  seriously in this country and I think that this section would
4  bring that into conflict as I try to protect, you know,
5  voters, again, from feeling like their ballot is either
6  compromised because a watcher is either getting too close to
7  them, or needs to see what they are doing with one of the
8  clerks, since, you know, that some people sometimes require
9  extra help getting through their ballot, and I would be
10 concerned about whether or not I can do anything to ensure
11 that the voter feels confident that they are not having that
12 right violated, and so I think this gets to the comfortability
13 of voters as well, since I don't think the law gives me much
14 leeway to intervene there.
15 Q.  Do you know what the penalty is for violating Section
16 4.07?
17 A.  I believe this is a civil penalty.
18 Q.  And how does the fact that this is a civil penalty affect
19 your willingness to serve as an election judge?
20 A.  I think it's a penalty all the same, and so it, again,
21 would give me some cause to give more consideration to whether
22 or not I want to go forward with it.
23 Q.  Well, does it give you comfort that this has a civil
24 penalty, as opposed to a criminal penalty?
25 A.  Not at all.

670

JEFFREY CLEMMONS – DIRECT

1  Q.  Would you ever want to violate the election code?

2  A.  I wouldn't want to violate the election code or any other

3  Texas law.

4  Q.  Can we go down to page 29, Section 4.09.  Thank you,

5  Derek.

6      Looking at this section, starting at line 4, it says, "A

7  person commits an offense if the person serves in an official

8  capacity at a location at which the presence of watchers is

9  authorized and knowingly prevents a watcher from observing an

10  activity or procedure the person knows the watcher is entitled

11  to observe, including by taking any action to obstruct the

12  view of the watcher or distance the watcher from the activity

13  or procedure to be observed in a manner that would make

14  observation not reasonably effective."

15      Do you see that?

16  A.  Yes.

17  Q.  Do you know how to follow this part of the law, 4.09, as

18  an election judge?

19  A.  I think I would be completely lost as to where to begin

20  with this one.

21  Q.  Why is that?  Why would you be lost?

22  A.  You know, if we begin with "reasonably effective," again,

23  I'm not sure if I can make that determination as an election

24  judge.

25      And when I look at other parts of, you know, this

JEFFREY CLEMMONS - DIRECT

1  subsection, it feels less of like something for me as an

2  election judge and more of an instruction to the watcher to

3  again make that determination as to whether or not they are

4  being obstructed, or whether or not it's not reasonably

5  effective to them.

6      I can't tell them, you know, this is reasonably effective

7  for you.  I have to -- in fact, I wouldn't take their word for

8  it.  I wouldn't even know whether or not I had obstructed

9  their view or violated this provision until long after the

10  election probably.

11  Q.  Just so I understand, when you said that it seems like an

12  obstruction to the watcher, what do you mean by that?

13  A.  I mean that this subsection seems to elevate the watcher's

14  perspective about some of these issues or potential violations

15  above any concerns or duties of the election judge.

16  Q.  Can you, as the election judge, determine whether the

17  watcher's observation is reasonably effective?

18  A.  No.  I think that would be something they would have to

19  let other folks know about.

20  Q.  Sorry.  I just didn't hear.  They would have to what?

21  A.  Something they would have to let, you know, the proper

22  authorities know about.

23  Q.  And so who would make the determination -- do you know who

24  makes the determination whether the observation is reasonably

25  effective?

672

JEFFREY CLEMMONS - DIRECT

1  A.  It certainly feels like it's the watcher, but I think that

2  this section certainly leaves a lot up in the air for both the

3  watcher and election judge.

4  Q.  In Section 4.09 do you see that it says, "A person commits

5  an offense if the person knowingly prevents a watcher from

6  observing an activity or procedure if the person knows the

7  watcher is entitled to observe."

8     Do you see the "knowingly" and the "knows?"

9  A.  Yes.

10  Q.  Do those words resolve your concerns about whether you

11  might get in trouble for violating this provision?

12  A.  It doesn't.  It doesn't allay those concerns or give me

13  very much comfort at all, since, again, I'm not sure if I'm

14  the one making that determination or would be able to rebut

15  it.

16  Q.  You are not sure whether you would know?

17  A.  That's right.

18  Q.  Do you know what the penalty is for violating Section

19  4.09?

20  A.  I believe this is a criminal penalty.

21  Q.  And how does the fact that Section 4.09 is backed up by

22  criminal penalties affect your willingness to serve as an

23  election judge?

24  A.  It gives me great concern, since I, again, would be afraid

25  that is there is something that I have done that I was unaware

JEFFREY CLEMMONS – DIRECT

1  of and/or, again, I wouldn't know how to abide by this given

2  that reasonably effective piece, so definitely makes me

3  hesitant about it.

4  Q.  Are you aware of any election workers who have been

5  investigated, prosecuted, or faced legal consequences based on

6  their conduct towards poll watchers?

7  A.  Yes.  I think I'm aware of from that time Dana

8  DeBeauvoir's prosecution because of some of the actions she

9  took with respect to poll watchers in response to the

10 pandemic.

11         THE COURT:  Is this pre- or post-SB 1?

12         THE WITNESS:  I believe this would have been pre-SB

13 1.

14 BY MISS HOLMES:

15 Q.  Even though that episode with Dana DeBeauvoir was pre-SB

16 1, does that impact about how you feel serving post-SB 1?

17 A.  Not at all because I think that if Dana could have been

18 prosecuted before SB 1, and given some of the parts of the law

19 now, I think that she still could have been possibly facing

20 higher penalties for it.

21 Q.  I think you said —— let me ask my question again because I

22 think you sort of answered in two different ways.

23    I said even though the episode with Dana DeBeauvoir

24 happened pre-SB 1, does it impact how you feel about serving

25 post-SB 1?

1  A.  Yes.

2  Q.  Why is that?

3  A.  Because I would be concerned about these heightened

4  penalties that I know she probably would have faced as well.

5  Q.  I have just a few more questions about your activities

6  after SB 1 was passed.  Were you living in Texas during the

7  March 2022 Primary Election?

8  A.  The March 2022 Primary I was living in Texas.

9  Q.  Did you serve as an election judge in that election?

10  A.  I did not.

11  Q.  Why not?

12  A.  At that time I was making a transition from Texas to

13  Washington and I believe I missed the deadline to register for

14  that, and, of course, SB 1 had been passed by that point and I

15  was uncertain how it was going to be implemented in the state.

16  Q.  And sitting here today, what are your plans about serving

17  as an election judge in the future?

18  A.  So I'm actually signed up right now.  I haven't received

19  my date or further instructions about it to be an election

20  judge in the upcoming Constitutional Elections in November.

21  Q.  So you are signed up for the upcoming Constitutional

22  Election.  Does that mean your concerns about the poll watcher

23  provisions of SB 1 have been resolved?

24  A.  Absolutely not.

25  Q.  And tell me why not.

JEFFREY CLEMMONS — CROSS

1  A.  Well, I don't think that the concerns I have, have been

2  ameliorated by the State.  I don't think anything has changed.

3  I think that we are still dealing with the same provisions and

4  those would be the same ones that I would have to wrestle with

5  as an election judge this November.

6  Q.  So why are you still willing to serve?

7  A.  You know, I know that we continue to need poll workers.  I

8  see it as, again, a sign of my duty that we should be serving

9  in our elections and ensuring that they can be run smoothly,

10  fairly, and that there are people staffed to do that.  So I

11  want to be of service to the community in that way.

12          MISS HOLMES:  Thank you, Mr. Clemmons.

13          Well, unless anyone else on our side wants to

14  question, I will pass the witness.

15          THE COURT:  Any cross?

16          MR. JOYCE:  Yes, Your Honor.  Good afternoon.

17          THE WITNESS:  Hi.

18                      CROSS-EXAMINATION

19  BY MR. JOYCE:

20  Q.  My name is Jamison Joyce.  I'm with the Office of the

21  Attorney General and I represent the State defendants in this

22  case and I appreciate you being here.

23      You covered a lot of what I was already going to ask so

24  this hopefully will speed things up a little bit.

25      So I think as you've already covered, you are challenging

JEFFREY CLEMMONS – CROSS

1  three provisions of Senate Bill 1, which I'm going to be

2  referring to as SB 1, is that correct?

3  A.  Yes.

4  Q.  And specifically it sounds like you were saying it was

5  4.06, 4.07, and 4.09, is that right?

6  A.  Yes.

7  Q.  Okay.  And it would be fair to summarize these provisions

8  as regulating poll watchers, right?

9  A.  Yes.

10  Q.  So you are not challenging SB 1 in any other context?

11  A.  Just these provisions.

12  Q.  Okay.  So you are not here to comment or observe on any

13  other provision in SB 1?

14  A.  I'm only challenging these three provisions.

15  Q.  Okay.  And so you are a named plaintiff in this case,

16  correct?

17  A.  Yes.

18  Q.  And you were approached to file this lawsuit against SB 1

19  by the NAACP Defense Fund?

20  A.  Yes.

21  Q.  And this was sometime between March and June of 2021, is

22  that right?

23  A.  Yes.

24  Q.  And this was before SB 1 was passed, right?

25  A.  I believe some iteration of the bill may have been passed

JEFFREY CLEMMONS - CROSS

1  so it may have been.
2  Q.  Okay.  Fair enough.  And it sounds like you have had a lot
3  of experience in the political process, and one of those
4  positions I believe was a congressional aid, is that right?
5  A.  Yes, for Congressman Lloyd Doggett.
6  Q.  Okay.  And you mentioned in your conversation earlier that
7  you aspire to be involved in politics?
8  A.  Yes.
9  Q.  And would you consider this litigation as a step in that
10  direction?
11  A.  Of a kind, but not towards my ultimate aspirations.
12  Q.  And the last few things I would ask on that front was you
13  volunteered for the Andrew Yang Campaign?
14  A.  I did.
15  Q.  As well as for Beto O'Rourke's Campaign?
16  A.  I did.
17  Q.  And, let's see, you mentioned that when you served in
18  Travis County as an election judge that was in the July 14th,
19  2020 Election?
20  A.  Yes.
21  Q.  And that was during the COVID-19 pandemic?
22  A.  That's right.
23  Q.  And I think you mentioned on direct that this played a
24  role in your volunteering to become an election judge?
25  A.  Yes.

JEFFREY CLEMMONS – CROSS

1  Q.  And that, I think you also mentioned that you were looking

2  to alleviate the shortage in election judges at the time?

3  A.  Yes.

4  Q.  And you remain that there is a shortage of judges to this

5  day?

6  A.  I believe that we still face shortages across the state.

7  Q.  Now, the shortage that you were looking to alleviate that

8  had had nothing to do with SB 1, right?

9  A.  Not at the time because the bill hadn't been thought of.

10  Q.  That was kind of my thinking.

11      Your belief that there is still a shortage of election

12  judges is, in part, due to messages you have received from the

13  Democratic party and organizations like MOVE Texas?

14          MISS HOLMES:  Objection.  Lack of foundation.

15          THE COURT:  Say that question again.

16          MR. JOYCE:  Your belief that there is a shortage of

17  election judges is due in part to messages you've received

18  from the Democratic party and organizations like MOVE Texas.

19          THE COURT:  That's overruled.

20          You can answer.

21          THE WITNESS:  No, I received information about the

22  shortage from the Travis County Elections Division primarily.

23          THE COURT:  Though, why did we have this stipulation,

24  the stipulation that the party affiliation wasn't going to

25  come up here.

JEFFREY CLEMMONS - CROSS

1        MR. JOYCE:  Your Honor, I would respectfully submit

2   that receiving messages from the Democratic party and

3   organizations like MOVE Texas does not intuit one's

4   affiliation.

5        THE COURT:  You were just talking about the Beto

6   O'Rourke Campaign and everything else.  I mean, just because

7   you don't use the word "Democrat," you think that's how you

8   get around this?

9        MR. JOYCE:  Your Honor, I can volunteer for the Beto

10   O'Rourke Campaign.

11        MR. KERCHER:  And, Your Honor, to clarify our

12   understanding of that stipulation, it's really around

13   individual witness' voting records and so forth.  I don't

14   think, particularly given what the witness has testified to on

15   direct examination about his affiliation with a variety of

16   interests, that there is a real question as to what that

17   affiliation might be.

18        THE COURT:  So then we are going to be able to

19   introduce it for purposes of bias?  I just want to make sure

20   that I'm applying it fairly both ways.  So when it comes to

21   your witnesses, what do they get to question them about?

22        MR. KERCHER:  My understanding of the concern -- and

23   if I'm wrong about this, I'm happy to be corrected.  My

24   understanding of the concern is that we were going to delving

25   into the voting habits of folks who were going to be on the

JEFFREY CLEMMONS — CROSS

1  stand.  That's not what we are interested in, but voting

2  habits are different from political activities and whether or

3  not there might be a bias.

4        I will say that we have not gone particularly far

5  into this with either of the two witnesses with this issue

6  that's come up, but I will let my friend on the other side

7  speak to her understanding of our stipulation.

8        MISS HOLMES:  My understanding of the stipulation is

9  that it does also cover political activity.  I agree, we

10  haven't gone very far into this, but I do think we are heading

11  down that path.

12        THE COURT:  So what I'm hearing is that there

13  actually is no stipulation.  So, fair game for everybody.

14        You can continue.

15        MR. JOYCE:  Thank you, Your Honor.

16  BY MR. JOYCE:

17  Q.  So, just to be clear, you know, in addition to the

18  Travis County Election Board you also received messages from

19  the Democratic party and organizations like MOVE Texas

20  regarding a shortage of election judges?

21  A.  Yes, I would receive some.

22  Q.  Okay.  So regarding your experience as an election judge,

23  your shifts lasted approximately 14 hours, is that right?

24  A.  Yes.

25  Q.  And you would agree that election judges and poll workers

JEFFREY CLEMMONS – CROSS

1  as a whole strive to ensure that as many voters vote as

2  possible within the confines of the law?

3  A.  Yes.

4  Q.  And to that end, you would agree that voters should be

5  free from intimidation?

6  A.  Yes.

7  Q.  Would you agree that election judges have an interest in

8  preventing misconduct from poll workers?

9  A.  Absolutely.

10  Q.  Would you agree that the State shares that interest?

11  A.  Yes.

12  Q.  You would agree that election judges have an interest in

13  protecting voters from voter fraud?

14  A.  Yes.

15  Q.  And you would agree that the State shares that interest?

16  A.  Yes.

17  Q.  And you would agree that election judges had an interest

18  in protecting voters from instances of election misconduct?

19  A.  Certainly.

20  Q.  And, lastly, you would agree that the State also shares

21  that interest?

22  A.  Yes.

23  Q.  And so, as you stated, you did not choose to serve as an

24  election judge in the November 2021 Constitutional Election?

25  A.  Yes.

682

JEFFREY CLEMMONS – CROSS

1  Q.  And that was in part because there was not a judge, a

2  voting judge shortage during that election?

3  A.  During the November 2021 Election?

4  Q.  That's correct.

5  A.  No.  I would not say that that's the reason why.  At that

6  time, I was otherwise employed and it prevented me.  I wanted

7  to serve in that capacity over being an election judge in that

8  instance.

9  Q.  Okay.  And has that always been your belief?

10 A.  That —

11       MISS HOLMES:  Objection.  I'm sorry.  It's unclear.

12 Has what always been his belief?  He answered that that wasn't

13 his belief.

14       MR. JOYCE:  That there was not a voting judge

15 shortage during the November 2021 Constitutional Election.

16       THE WITNESS:  It is my belief that there was still a

17 shortage at that time.

18       MR. JOYCE:  Okay.

19 BY MR. JOYCE:

20 Q.  Would it assist you if I refreshed your recollection with

21 your deposition?

22 A.  Sure.

23 Q.  Brian, could we bring that up, it would be 38-16?

24       MISS HOLMES:  Your Honor, I am not sure that this is

25 proper refreshing the witness' recollection.  He hasn't

JEFFREY CLEMMONS – CROSS

1  testified that he can't remember.  He said that was not his

2  belief.

3          THE COURT:  So he said refreshing.  I thought this

4  was impeachment, but —

5          MISS HOLMES:  Oh, okay.  Well, I guess I'll ask

6  counsel what it's being used for.

7          MR. JOYCE:  I was under the impression that the

8  witness did not remember if he had given this testimony prior

9  given the voting judge shortage.

10         THE COURT:  In that case it's refreshment.

11         Go ahead.

12         MR. JOYCE:  We are having a hard time finding that,

13  so I'm going to move on.  It's not a significant point.

14  BY MR. JOYCE:

15  Q.  While you were serving, to your knowledge, there was not a

16  poll watcher who caused any disruption at your polling

17  location during the entire Primary Run-off, is that correct?

18  A.  Yes, because there was not a poll watcher there.

19  Q.  Okay.  And you didn't — I guess this probably answers my

20  next question.  So you didn't observe an election judge

21  attempt to expel or obstruct a poll watcher because of the

22  poll watcher's misconduct?

23  A.  That's right.

24  Q.  And you didn't witness an election judge or worker seek to

25  expel a poll watcher because of misconduct but were unable to

1  do so because of SB 1, correct?

2  A.  That's right.

3  Q.  Because, as you've noted, you haven't served as an

4  election judge or worker since SB 1's passage, you haven't had

5  the opportunity to observe the interactions with watchers

6  outside of the time it took you to vote, correct?

7  A.  That's right.

8  Q.  Since you have not served since July of 2020, you haven't

9  sat for any additional training since then?

10  A.  No, I don't — I have not.

11  Q.  So that means since SB 1 came into effect, so you haven't

12  received any trainings or materials?

13  A.  That's right.

14  Q.  And so you haven't read any guidance related to SB 1 that

15  was issued by the Secretary of State's office?

16  A.  Yes, I have not read any guidance.

17  Q.  So let's talk about the bill specifically.

18      Brian, could you bring up SB 1 Joint Exhibit 1.  We're

19  going to — let's see.  I'll direct you in just a minute.

20      So as you mentioned earlier, the specific injury you are

21  alleging pertains to your role as an election judge?

22  A.  Yes.

23  Q.  And I think you mentioned that SB 1 discourages you from

24  being an election judge?

25  A.  Yes.

JEFFREY CLEMMONS - CROSS

1  Q.  Would you say that SB 1 changes the relationship between

2  an election judge and poll watchers?

3  A.  Absolutely.

4  Q.  And I think you mentioned that you feel that election

5  judges are under more scrutiny?

6  A.  Yes, I think all poll workers are.

7  Q.  And would you agree that there needs to be scrutiny to

8  prevent misconduct?

9  A.  Of a certain level.

10  Q.  That's fair.  And there needs to be scrutiny to ensure

11  that election judges are not overstepping the bounds of their

12  authority?

13  A.  Yes.

14  Q.  But, ultimately, it's the legislature that has the

15  prerogative to determine what the authority is?

16  A.  Yes.

17  Q.  And you would agree that if an election judge had too much

18  discretion, it could interfere with running a safe and fair

19  election?

20  A.  No.

21  Q.  You wouldn't think that?

22  A.  I would not.

23  Q.  Okay.  Have you always believed that to be the case?

24  A.  I would say so.

25  Q.  That an election judge can have as much discretion or free

JEFFREY CLEMMONS – CROSS

1  will as they want when running, operating their polling

2  locations?

3  A.  To the extent that I thought about it, I would say that my

4  belief is that they should have discretion there.

5  Q.  But free rein?

6  A.  Well, there's the bounds of the law.

7  Q.  So they should have some rules guiding their decisions?

8  A.  Right, the law.

9  Q.  So the first section that you took issue with is 4.06,

10  correct?

11  A.  Yes.

12  Q.  Let's see.  Brian, could you turn to page 26.

13      And first I wanted to address the fact that you mentioned

14  in your previous conversation that you understand that when we

15  are looking at areas of the law that are not underlined, you

16  understand that that means that they preexisted SB 1, correct?

17  A.  Yes, the underlining is amendments — are amendments.

18  Q.  Okay.  So you understood that, at least, for example, when

19  it comes to Subsection A, that we are looking at here, there

20  was already a provision that preexisted SB 1 that instructed

21  the allowance of poll watchers?

22  A.  Yes.

23  Q.  And you mentioned that Subsection 1 and 2, I believe you

24  said it offered some vagaries in terms of what an election

25  judge would be required to admit?

JEFFREY CLEMMONS − CROSS

1  A.  Yes.  There is a period at the end of that sentence.  I

2  saw that as the extent of it.

3  Q.  So what we are looking at here, for Subsection 1 and 2,

4  the underlined portions, if we were to remove those portions,

5  would that somehow make this provision more clear?

6  A.  With the existing —— within the existing code, I wouldn't

7  say so.

8  Q.  So if we took away some of the specificity and made it

9  more vague, you would state that would be making it more clear

10 because I believe you said that the additions made this

11 difficult to understand?

12 A.  The additions make it more difficult to understand.  It

13 was already pretty vague.

14 Q.  Okay.  Fair enough.

15    Brian, can we turn to page 27, line 12 to 15.

16    Mr. Clemmons, if you could read that and let me know when

17 you've finished.

18 A.  I've read it.

19 Q.  Okay.  You believe that this section injures you because

20 it pertains to the removal of a poll watcher?

21 A.  Yes.

22 Q.  Let's see.  And before we talk about it more specifically

23 of Subsection G, you don't take issue with Subsection H which

24 requires the watcher to take an oath that "I swear or affirm

25 that I will not disrupt the voting process or harass voters in

JEFFREY CLEMMONS - CROSS

1  the discharge of my duties," you don't believe that injures

2  you, correct?

3  A.  That's not one of the provisions I'm challenging.

4  Q.  But would you consider that a positive addition to SB 1?

5  A.  Sure.

6  Q.  So in terms of Subsection G, you don't anticipate

7  knowingly refusing to accept a poll watcher for service, do

8  you?

9  A.  There could be circumstances in which I feel the need to,

10 so I think that there could be a situation where I might

11 knowingly do that.

12 Q.  But you wouldn't reject a poll watcher, if they had valid

13 credentials?

14 A.  I think the law would suggest I shouldn't.

15 Q.  Okay.  And you wouldn't reject a poll watcher, if they

16 weren't intimidating voters, for example?

17 A.  Not — if they weren't doing that, I suppose I wouldn't

18 have a reason to.

19 Q.  Okay.  Let's look at 4.07 which starts on page 27 line 21.

20 I assume you've already read this portion?

21 A.  Yes.

22 Q.  Okay.  And this is the second provision that you take

23 issue with, correct?

24 A.  Yes.

25 Q.  And would it be fair to summarize this provision as

JEFFREY CLEMMONS - CROSS

1  allowing free movement to poll watchers and how they are
2  permitted to interact in the space?
3  A.  Well, not Section A, but, yes, the provision about free
4  movement would.
5  Q.  That's fair.  So your objection is also to how this alters
6  the responsibility of the sitting election judge?
7  A.  Yes, because there would have to be some adjudication
8  about their free movement.
9  Q.  Okay.  Let's see.  Brian, could you jump back to that
10  previous spot.  I believe it was line 21.  Yeah.
11      All right.  So I believe you talked a little bit about the
12  additional words that were added here and I think you
13  understand that from what we discussed previously that with
14  the line conveniently crossed out, that demonstrates that that
15  word was removed and it was replaced with "enough to see and
16  hear?"
17  A.  Yes.
18  Q.  And you mentioned that the new language that was included
19  was vague to the point where you wouldn't know how to
20  interpret it?
21  A.  Yes.
22  Q.  And I believe you also said that you could not measure,
23  for example, how one could see and hear?
24  A.  That's right.  I'm only myself.
25  Q.  How does one measure the word "conveniently?"

JEFFREY CLEMMONS - CROSS

1  A.  I don't think you can measure that one either.

2  Q.  Understood.  So, for example, if we kept the previous law,

3  which we're not here to dispute, and you had the word

4  "conveniently" instead of "see and hear," would you have a way

5  of measuring three feet of convenience?

6  A.  I would not.

7  Q.  What about six inches of convenience?

8  A.  Certainly not.

9  Q.  Let's see.  You are familiar with the rules governing the

10  movement of poll watchers prior to SB 1?

11  A.  Yes.

12  Q.  Are you familiar with how these changed the

13  responsibilities of judges and workers?

14  A.  I would say that the changes that have been made, they

15  don't offer me more clarity —

16  Q.  Okay.

17  A.  — to do with that.

18  Q.  Let's turn to 4.09.  Brian, it's on page 29, line 2.

19     So, again, the words that were added here, the underlined

20  words, you take issue with them because you feel like they

21  would make the provision vague and difficult to interpret?

22  A.  Yes.

23  Q.  So this provision would be more clear and easier to

24  understand if these underlined words were removed?

25  A.  Not entirely.

JEFFREY CLEMMONS – CROSS

1   Q.  Okay.  And in terms of the "knowingly" part, where the
2   person knows, would it be better if that portion was removed
3   and you could be subject to prosecution whether or not you did
4   something on purpose, or you knew?
5   A.  Could you say that again?
6   Q.  Sure.  Would it be better if you knew you were violating
7   the law, or better if you did not know?
8   A.  I think that, as it's written here, I still wouldn't know
9   either way.
10  Q.  Okay.  That's fair.  Let's see.  So you took issue with
11  the timing of the implementation of SB 1, correct?
12  A.  I wouldn't say I took issue with the timing.
13  Q.  Okay.  So, really, it had nothing to do with, you know —
14  okay.
15      Let's see.  You didn't face any harassment while working
16  as an election judge, correct?
17  A.  No.
18  Q.  Nor did you witness anyone else experience any harassment.
19  A.  Not at my location.
20  Q.  Okay.
21          MR. JOYCE:  I have no further questions at this time.
22          Pass the witness.
23          THE COURT:  Anything else?
24          MR. NICHOLS:  No questions over and above what the
25  Court asked.

JEFFREY CLEMMONS – REDIRECT

1    THE COURT:  Thank you.

2    Anything by way of redirect?

3    MISS HOLMES:  Very brief redirect.

REDIRECT EXAMINATION

5  BY MISS HOLMES:

6  Q.  Derek, could we bring up Joint Exhibit 1, please, and page

7  26, Section 4.06.

8    Mr. Clemmons, I think counsel asked you about looking at

9  Subsection B.  Looking at Subsection B here, I want to orient

10  you to line 22.  I believe opposing counsel asked you about

11  whether this section pertains to the removal or acceptance of

12  watchers.  Is it your understanding that it pertains to the

13  acceptance of watchers?

14  A.  Yes.

15  Q.  And does this provision say anything, provide any

16  guidance, about when watchers cannot be accepted when they are

17  intimidating voters?

18  A.  No, that's part of my job chair.

19  Q.  Now, you were asked about whether they were any poll

20  watchers in your polling location when you served as an

21  election judge, and it's correct that you did not have

22  interactions with poll watchers, am I right?

23  A.  Yes.

24  Q.  Does the fact that you did not have those interactions

25  change your willingness to serve as an election judge under SB

JEFFREY CLEMMONS — REDIRECT

1  1?

2  A.  The fact that I didn't have watchers at that time and

3  given the changes that were made to SB 1, I would say I had

4  new fears.

5       MISS HOLMES:  Your Honor, before I ask my final few

6  questions, I would like to revisit the stipulation, if I may.

7       THE COURT:  So a stipulation is an agreement by both

8  sides as to the language that's being proposed.  What I hear

9  from you-all saying, this is what I think, and I hear from

10  this guy's thinking, no, this is what it means, there is no

11  stipulation.

12       MISS HOLMES:  I understand.  I did pull up the

13  language.

14       THE COURT:  If you want to confer afterwards and try

15  to come up with language —— and I would suggest you put it in

16  writing and get both sides to sign.  That way, we don't have

17  any disputes.

18       MISS PERALES:  Your Honor, we did put it in writing,

19  if you would allow Miss Holmes to read it to the Court,

20  perhaps we could get some further guidance.

21       THE COURT:  Okay.  So let's do this after witnesses

22  just so we can keep going.

23       MISS HOLMES:  Let me ask two questions then that

24  might be related to the stipulation.

25

JEFFREY CLEMMONS – REDIRECT

```
 1  BY MISS HOLMES:
 2  Q.  Mr. Clemmons, are you bringing this lawsuit as anyway to
 3  help the Democratic party?
 4  A.  Not at all.
 5  Q.  Do you view this lawsuit as a way to get Democrats
 6  elected.
 7  A.  No.
 8          MISS HOLMES:  No further questions.
 9          THE COURT:  Anything based on those?
10          MR. JOYCE:  Nothing further, Your Honor.
11          THE COURT:  You may step down.  Thank you.
12          Your next witness.
13          MR. PARRENO:  On behalf of the LUPE plaintiffs, may
14  we have a moment to get the next witness situated, in light of
15  his wheelchair?
16          THE COURT:  That's fine.
17          Your next witness.
18          MR. PARRENO:  Your Honor, LUPE plaintiffs call
19  Mr. Toby Cole.  Mr. Cole will be testify regarding LUPE
20  plaintiffs' challenges to the following sections, Section
21  6.03, 6.04, 6.05.
22          My name is Kenneth Parreno on behalf of LUPE
23  plaintiffs.
24      (TOBY COLE, having been duly sworn, testified as follows:)
25
```

TOBY COLE – DIRECT

1                     DIRECT EXAMINATION

2  BY MR. PARRENO:

3  Q.  Good afternoon.  Would you please state your name for the

4  record?

5  A.  Toby Cole.

6  Q.  Mr. Cole, please tell the Court where you live.

7  A.  I live in Harris County, Houston, Texas.

8  Q.  What is your current occupation?

9  A.  I'm a lawyer.

10 Q.  And how long have you been a lawyer?

11 A.  Since 1998, 25 years.

12 Q.  So I'd like to talk very briefly about your upbringing.

13 Where were you born?

14 A.  I was born in Los Angeles, California.

15 Q.  And when did you get to Texas?

16 A.  I think I was probably six or seven when my parents moved

17 to Texas.

18 Q.  And what part of Texas did y'all move to?

19 A.  Houston.

20 Q.  Any particular part?

21 A.  Alief, in particular, is where I grew up for the most part

22 of my life.

23 Q.  Can you tell me a little bit about what your childhood was

24 like?

25 A.  My mom is the oldest of ten, so I'm the oldest grandchild

TOBY COLE – DIRECT

1  of 25 or 26.  My parents are divorced, so my mom was a

2  waitress and then a manager at a restaurant.  My father worked

3  for an oil company that supported bigger oil companies, and so

4  I grew up with divorced parents, saw my dad on the weekends,

5  but, you know, happy childhood.

6  Q.  Did you graduate from high school?

7  A.  I did.  I graduated from Alief Hastings, 1990.

8  Q.  And after high school what did you do?

9  A.  So I had a little detour before I went to college.  I

10  broke my neck at my high school graduation party.  I dove into

11  the shallow end of the swimming pool at my uncle's house,

12  ended up going to a hospital and then a rehab hospital after

13  that.

14  Q.  Can you tell us a little bit more about that rehab

15  process?

16  A.  Yeah.  So I did –– I broke my neck, so I was paralyzed

17  from my shoulders down.  I was taken to an acute care hospital

18  called Ben Taub.  I spent nine days there and then I spent the

19  next three months at a hospital in Houston called Tirr,

20  T-I-R-R.  It's one of the best rehabilitation hospitals in the

21  world, so we have a lot of disabled people that come to

22  Houston for rehab there.

23      So I spent my senior summer there after I graduated and

24  then I got out of that hospital in early September.

25  Q.  And when you spent that time at the Tirr Rehab Hospital,

TOBY COLE — DIRECT

1  what were you learning?

2  A.  So I'm a quadriplegic, which means I can't move my arms or

3  my legs, and I joke that I'm a complete quadraplegic.  I'm not

4  one of these guys that can partially move their arms and legs,

5  and so a lot of my rehab was learning how to tell people how

6  to take care of me, how to get me in and out of a car, how to

7  arrange my legs, how to get me dressed, how to help me go to

8  the bathroom, how to feed me, do those type of things.

9      So what I was learning was not how to transfer myself, but

10  actually how to tell people how to take care of me.

11  Q.  Can you tell us a little bit more about the nature of your

12  disability?

13  A.  Yeah.  So like I — the joke that we have is that

14  paraplegics can't move their legs and want to walk,

15  quadraplegics want to be paraplegics.

16      So what my condition is, is I can't move my arms or my

17  legs.  So I can't get dressed in the morning.  I can't go to

18  the bathroom on my own.  I can't feed myself.  I can't brush

19  my teeth.  I can't drive.  I can't do any of those kind of

20  daily living activities that most people do on a regular

21  basis.

22  Q.  So you were 18 when the accident happened?

23  A.  Yeah.  Just a couple weeks after my 18th birthday.

24  Q.  After your accident did you pursue any further education?

25  A.  Yeah.  I didn't have a burning desire to go to college

TOBY COLE - DIRECT

1  necessarily to become a lawyer, but I joke too that that's
2  where the girls were, so I started going to college and
3  started going to the University of Houston, and after about
4  four and a half years I had a degree in finance.
5  Q.  Did you pursue any other education after that?
6  A.  Yeah.  I knew that I wasn't going to be able to work and
7  so I got a couple graduate degrees.  I got an MBA in finance
8  and a law degree.  And so, yeah, I wasn't planning on
9  practicing law either, but I ended up with a law degree.
10  Q.  Where did you go for those two graduate programs?
11  A.  University of Houston.
12  Q.  So, go Cougs.
13  A.  Yeah.
14  Q.  You didn't plan on practicing law but now you are, can you
15  tell me a little bit more about your practice as an attorney?
16  A.  So during the course when I was clerking when I was at law
17  school I realized that law firms — I had expertise that other
18  people didn't.
19        You know, because I was in a chair, because I had learned
20  how to live a different way, that people wanted to hire me.
21  And then I realized that that's something that I might want to
22  do, so I spent the first five years of my career working for
23  big companies until I was board certified, and then I started
24  a law firm with another person.
25        And then my practice kind of evolved in the last probably

TOBY COLE - DIRECT

1  six or seven years where almost exclusively what I do is

2  represent people with spinal cord injuries after they get

3  injured.

4  Q.  And you said the phrase "because I was in a chair," how

5  has your disability informed your practice of law?

6  A.  I think it's done a couple different things.  It's given

7  me an expertise on how things are differently.  I see things

8  differently, whether it's access, whether it's how people get

9  injured.  And I see the process of after people get injured.

10      You know, it's different now.  When I was injured, you

11  went to a rehab hospital for 90 days.  Now you go for maybe

12  six weeks, if you're lucky.

13      You don't get the same access as you do, and so helping

14  people through that process and knowing that I'm good at it,

15  knowing that I can inform juries if there's a bad product.  I

16  can help juries understand why it's a bad product.

17      I just, it helps me, I think, understand things better

18  than maybe other people do and I'm more sensitive to it and

19  certain things are more important to me.

20  Q.  Now, we talked a little bit about how you became disabled

21  but I'd like to talk about how your disability affects your

22  life, your daily life?

23  A.  Okay.

24  Q.  Could you tell us a little bit more about that?

25  A.  Yeah.  It's — if I want to go to court at 8:00 in the

TOBY COLE - DIRECT

1  morning, if I'm going to -- you know, you don't want to be

2  late for court.  So, you know, I get up at 4:00 in the

3  morning.  You know, my assistant comes in to start, gets me up

4  at 4.  I do a bowel program.  They arrange me so that I can

5  move my arms and legs and get in and out of a suit.

6      They put me in a chair.  I go take a shower.  They shower

7  me.  I get back in bed.  They put my clothes on me.  I get

8  back in my chair.  If I'm going to eat, I eat.

9      I meet with whatever legal assistant is helping me that

10  day to prepare for whatever I'm doing, and so a process that

11  may take 15 or 20 minutes, it takes several hours for me.

12  Q.  So say you had to get into court at 8:30, what time would

13  you wake up?

14  A.  Usually around 4:30.

15  Q.  Do you have another example of your daily activities that

16  are affected by your disability?

17  A.  Well, you know, it's kind of like something -- traveling.

18  Before the pandemic, I traveled all the time.  That was back

19  in the days where you wouldn't take a deposition remotely.

20  You felt like you had to be in the room.

21      Well, now, when I travel, you know, I don't about get to

22  the airport and just get on the airplane.  I'm the first

23  person on the airplane, so I have to get there an hour early.

24  They get me on the plane and then I sit there.

25      And then get wherever I'm arriving, I am the last person

TOBY COLE – DIRECT

1  off the plane.  So instead of, you know, grabbing my bag and
2  going someplace, I sit on the plane, I wait for them to bring
3  my chair up and then, you know, they get me on my chair and
4  then I go.
5      So things that normally take 15 or 20 minutes may an hour
6  or two hours, or sometimes longer.
7  Q.  Do you vote, Mr. Cole?
8  A.  I vote.  I vote religiously.
9  Q.  Religiously.  What do you mean by that?
10  A.  I love to vote.  I've always loved to vote.  I think
11  voting is important.  You know I think — and I sound cheesy
12  when I say it, but, you know, people have fought and died for
13  our right to vote, and for us to have a say is important.  I
14  think it's an obligation that we have and — yeah.
15  Q.  And how often would you say you vote?
16  A.  I vote in every election.  If it's a special school board
17  election, I might not vote, but I vote in every single
18  election.
19  Q.  And have you been disabled since you started voting?
20  A.  Yeah.  I broke my neck in May of my — when I turned 18,
21  so there weren't any elections before I voted.
22  Q.  And when you vote, do you vote in person or by mail?
23  A.  I always vote in person.
24  Q.  Always in person?
25  A.  Yeah.

TOBY COLE - DIRECT

1  Q.  Why is that?

2  A.  One, I love the feeling of voting.  I love going to the

3  voting booth.  I love seeing other people voting.  I love

4  getting my sticker that says you have voted.  I think it's

5  important.

6      And then, I can't sign things myself, and so, you know, I

7  don't want my vote invalidated because my signature doesn't

8  match a signature that someone else may have signed a year or

9  two years earlier.

10 Q.  So you vote pretty regularly.  Could you walk me through

11 what you go through when you cast a ballot on a given

12 election?

13 A.  Yeah.  I always start by — I'm a lawyer, so, for me,

14 politics are all local, so judges mean a lot to me, you know,

15 in my local area and so I always do research.

16     So I start the process by getting a sample ballot at my

17 office or at home and then either I'll do it or go I'll go

18 through with my legal assistant.

19     I'll figure out who I want to vote for what, what issues I

20 want to vote for, and so I either write that down, or if it's

21 people that I know, or if I know what I want to do, I might

22 just tell my assistant or whoever is going to help me, look,

23 on the 164th, we are going to vote for Brittany instead of

24 Dave, or whoever it is.

25     And so we just get an idea of what we are voting for.  So

TOBY COLE — DIRECT

1 that way when I get to the voting booth it doesn't take as

2 long.  And then after that we make a decision on where we are

3 going to go vote.

4 Q.  And you said the phrase, "write that down."  Are you

5 writing that down, or is someone else writing that down for

6 you?

7 A.  No.  It's — I use kind of the world "we," we are going to

8 write that down.  It's always somebody doing it for me.  You

9 know, we're going to go to court, or we're going to — so

10 that's always — because I can't ever do that, so it's always

11 somebody helping me do that.

12 Q.  And so who is that someone usually?

13 A.  It depends.  Carbon, who is in the back of the courtroom

14 came with me today and so it might be him.  We might discuss

15 it.  He might write it down for me.

16     Usually, it's one of my legal assistants or my paralegal

17 that does that for me, like we do with anything we prepare

18 for, for court, or lunch, we might write something down.

19     Just how we do things.

20 Q.  And how far in advance are you preparing?

21 A.  It depends.  Sometimes it's the morning of.  You know, if

22 my schedule opens up and I can vote in the afternoon, I might

23 do it the morning of.  It might be two or three days earlier.

24 It just depends.

25     It depends too how big of a ballot it is.  If it's a bunch

704

TOBY COLE — DIRECT

1  of new people, then, yes.  If it's, you know, for primaries,

2  sometimes I don't know everybody on the ballot, so I need to

3  look at see other elections that's not as big.

4  Q.  So we talked a little bit about your preparation.  Walk us

5  through a day you go to the poll.  What happens?

6  A.  So in Harris County, we can vote — we don't have to vote

7  in one particular spot, we can vote in different areas.  So I

8  always vote curbside, and so what we look for, first we want

9  to make sure that — you know, the spot I voted the election

10  before may not still be a voting area, so I look online to

11  make sure that the area is a voting area, and then we drive to

12  that location and make sure that the curbside is available.

13  Q.  And then what happens when you actually get to the

14  location?

15  A.  So there is a — in Harris County we have — the curbside

16  voting is a — it's like a button.  It's on a portable stick

17  that you pull up to.  It's a little blue handicap sign and you

18  press the button and then you wait.

19  Q.  I'm sorry.  You said "we drive" to the location.  Just to

20  be clear, who is doing the driving?

21  A.  Sorry.  Again, that's my royal "we."  Usually it's my

22  legal assistant that will drive me.  Or if it's in the

23  morning, it's one of my caregivers, they will drive me and

24  then we'll go up.

25      And the way the parking is oriented, the sign is usually

TOBY COLE — DIRECT

1  always on the driver's side, so we pull up and my assister

2  will hit the button.

3  Q.  And what happens next?

4  A.  Then you wait.  You wait and then eventually somebody will

5  come out and they will bring out usually like an iPad or some

6  type of device and they will take my license, they'll take the

7  license of whoever is going to help me, and then start the

8  process of voting.

9  Q.  How long is that wait usually?

10  A.  It's better now.  When it first started, it could be —

11  when it first started, it may not be connected, but now

12  usually within five or ten minutes.

13      It's usually not an election official that will come out,

14  it will be a high school student or somebody that is there to

15  assist and they will come out and just kind of ask what you

16  need and what you want.  And you tell him you want to vote,

17  and then that's how they start the process.

18      But I don't know, somewhere, five to ten minutes

19  hopefully.

20  Q.  And then what happens next?

21  A.  Then once they take your information and want you to vote,

22  then you are kind of in line to vote, so to speak.  They tell

23  you, well, as soon as a machine becomes available and it's

24  your turn to vote, they will bring it out.

25      And so eventually an election official will come out with

TOBY COLE - DIRECT

1  the voting machine that's actually in the booth and bring it
2  out to the car.
3  Q.  Then what do you do after that?
4  A.  Usually what happens after that is my assistant, who is in
5  the driver's seat, will get out of the car and then help
6  whoever the election official is.
7      Machines are -- they are not meant to be portable.  They
8  are pretty heavy, and so what needs to happen is the machine
9  needs to come in front of me and so my assistant will get out,
10  help the person put the machine in front of me, set it up so
11  that it's not my hands too much, not on my legs too much, and
12  then my assistant will help turn the knobs and hit the buttons
13  to help me vote.
14  Q.  And I'm sorry.  You mentioned that there was a little bit
15  of time between checking in and this voting machine coming
16  out, about how long does that usually take?
17  A.  It varies, but usually it takes about 45 minutes.  It
18  usually takes quite a bit of time.
19  Q.  And when you are actually going through the voting on the
20  voting machine, how does that process work?
21  A.  Yeah.  So that is -- the machines that we have, you kind
22  of spin a knob and it goes through the different people and
23  then you hit a select button.  So we spin the knob.  You know,
24  I tell my assistant, go to the next one, go to the next one.
25      And then if it's a situation where I need -- you know, if

TOBY COLE - DIRECT

1 we have taken a note, if I don't remember who are voting for,

2 what we're voting and I don't remember I'll as her, you know,

3 what did we say we were going to do on the 164th, do you have

4 the — you know, will you take the notes out and see what we

5 are doing on this area.

6     And then she'll help me and then we'll go through and then

7 hit the button that says cast ballot.  And then we hand the

8 machine back to whoever it is and then they start the process

9 of getting it to print out of the back or whatever they have

10 to do to finalize it.

11 Q.  And you said that phrase, "what are we doing," again, can

12 you go ahead and clarify who the "we" is?

13 A.  Yeah.  That's — you know, what are we doing.  On the

14 164th, who are we going to vote for.  Who am I going to vote

15 for.  Again, I say we for everything.  I say what are we going

16 to have for lunch.  What are we going to do.

17     I feel like I exclude myself from the people that help me

18 if it's always I do this and I do that.  So it's, who am I

19 going to vote for.  You know, who did I tell you to remind me

20 to vote for.

21 Q.  So from the time you've driven up to the time you've

22 actually cast your ballot, about how much time would you guess

23 that is, or would you estimate that is?

24 A.  If I'm lucky, about 45 minutes.

25 Q.  So you've mentioned that you use an assister to vote.  Do

TOBY COLE - DIRECT

1  you select an assister to help you or does a poll worker

2  assist you on it?

3  A.  No.  I always bring my own.  I remember once I went in to

4  vote and I was told by one of the election officials that my

5  assistant couldn't help me and I remember it just felt like a

6  violation, the thought of some stranger going into the voting

7  booth with me and me having to reveal, you know, who I was

8  going to vote for, and so, no, I always select my own, you

9  know.

10    And that's private information, and, you know, a lot of

11  husbands and wives don't share that information with each

12  other.  So, as it is, a lot of times a poll worker stands

13  close, and that's uncomfortable, but I always pick my own.  I

14  always pick my own person.

15  Q.  What does your assister have to do to be able to serve as

16  your chosen assister, when you go vote?

17  A.  Physically, they have to be able to come with me.  They

18  have to be able to take direction from me.  And now they are

19  required to sign an oath.

20  Q.  Is there anything else that they do -- that the assister

21  needs to do, when they go along with you?

22  A.  Physically be able to, you know, physically able to help

23  me move, whatever it is, and then help me go through my notes

24  or go through the information.  Drive me there.

25  Q.  And you mentioned this oath.  Can you talk a little bit

TOBY COLE – DIRECT

1    more about that oath?

2    A.   Yes.  That's one of the requirements now under SB 1, is

3    that whoever is with me has to sign an oath or swear to

4    certain information before they are allowed to help me vote.

5    Q.   And, Mr. Cole, we'll talk a little bit more about that

6    oath.

7        Derek, could you please pull up LUPE Exhibit 172.  Thank

8    you.

9        Mr. Cole, do you see the form on your screen?

10   A.   Yes.

11   Q.   Okay.  And what is this?

12   A.   That's the oath that I'm talking about, that if someone is

13   going to help me vote they have to sign this.

14   Q.   Now, I'd like, Mr. Cole, I'd like to draw your attention

15   to the sentence below the oath of assistance.  First quotation

16   mark, "I swear or affirm under penalty of perjury that the

17   voter I am assisting represented to me they are eligible to

18   receive assistance."

19       Do you see that?

20   A.   I do.

21   Q.   How do you represent to your assister that you are

22   eligible to receive assistance?

23   A.   Well, part of it is, is somewhat — it's offensive, but

24   part of it is obvious to the standpoint of I need help.  I

25   need someone to help move things, and that's — I think it's

TOBY COLE – DIRECT

1  somewhat obvious because I don't –– I can't move my arms or my
2  legs.  And so that, I do that visibly and show them.  And then
3  I tell them I need assistance.
4  Q.  And you said it's offensive.  Can you say a little more
5  about that?
6  A.  Well, you know, it says –– you know, here it is, that I
7  represented that I'm eligible to receive assistance.  So that
8  means that you have to tell somebody information.  Mine is
9  fairly obvious and I work these people all the time, but it
10  means I have to share with somebody what my private health
11  information is, if I need assistance to vote.
12      And, you know, we don't have to do that in any other part
13  of our daily lives.  If I want to go buy a ticket to go to a
14  concert, I don't have to reveal to somebody what my disability
15  is to get access or to get, you know, assistance under the
16  ADA.
17      So having this, to have to tell somebody, what my private
18  health condition is because I need assistance voting is
19  offensive to me.
20  Q.  Let me draw your attention, Mr. Cole, to where we left off
21  with that next little clause I guess.  It begins, "I will not
22  suggest by word, sign, or gesture how the voter should vote."
23      Do you see that?
24  A.  Yes.
25  Q.  How does that part of the oath make you feel?

TOBY COLE - DIRECT

1  A.  It's going to change the way I vote.  It's going to make
2  it harder for me to vote.  I'm a 51-year-old man.  I don't
3  remember things the way I did when I was younger.  I need
4  someone to help me.
5      When I come to court, when I go to the grocery store, when
6  I go to the doctor, I rely on my assistants to help me remind
7  me of things.  This is what I need to do.  This is how I need
8  to do it.  This is where I need to do it.
9      And so I specifically request the people that help me,
10  that they help remind me of what I've told them I want to do
11  and how I want to vote.
12          THE COURT:  In Harris County, how many judicial
13  elections are held?
14          THE WITNESS:  Now, you make me feel like a bad
15  lawyer.  There must be -- oh, on any given -- and we rotate
16  through different -- I mean, 30 or 40, not including --
17          THE COURT:  And that's courts, right?  So there could
18  be multiple candidates for that court?
19          THE WITNESS:  Oh, yeah, absolutely.  And I just do
20  civil work.  That's not including criminal work.  It's not
21  including, you know, other stuff down the ballot.  I mean,
22  there are dozens and dozens and dozens of people.
23  BY MR. PARRENO:
24  Q.  So, Mr. Cole, I would like to draw your attention to the
25  same line of the exhibit where we left off, but I want to move

TOBY COLE - DIRECT

1  forward to the part that begins, "I did not pressure or coerce

2  the voter into choosing me to provide assistance."

3  A.  Yeah.

4  Q.  Do you see that?

5  A.  I do.

6  Q.  What is your understanding of that meaning of that word

7  "pressure" in that part of the oath?

8  A.  I don't know.

9  Q.  You don't know?

10  A.  I don't know what that means.  I don't know what the State

11  of Texas means by that.

12  Q.  And how does not knowing that meaning make you feel?

13  A.  Well, a couple different things, because it leaves out the

14  complexity of what it's like to have caregivers.  There's

15  pressure all the time.

16      There's pressure on I might not want my mom or dad to be

17  my caregiver, but there's pressure that I have to choose them

18  because that's the only person that's available to me, or I

19  might not want -- I might not want someone -- someone may not

20  want to help me, but they are pressured -- my sister didn't

21  want to help take me to school after a certain point in

22  college because she wanted to move on, but I wanted her

23  because I was more comfortable.

24      So there's pressure back and forth, because reality is, is

25  I'm lucky.  I can afford to hire people to do the things I

TOBY COLE – DIRECT

1  need to do.  Not everybody can do that.  So there is pressure
2  but both directions, and so I don't know what this means and I
3  don't know what legal jeopardy it could mean for somebody when
4  there is pressure.
5  Q.  And how do you think that affects your ability to vote?
6  A.  Well, there is uncertain — I mean, there is such
7  uncertainty for something that is so unnecessary.
8      I'm not required to do any of this, if I want to go get
9  health care, or if I want to go get groceries, or if I want to
10  work, or if I want to come — if I want to come talk in this
11  courtroom, you know, no one makes sure that Carbon didn't put
12  do undue pressure on to come here, but when I want to go
13  exercise my right to vote, then, you know, all of a sudden I
14  need the State of Texas to put restrictions on how I do that.
15  Q.  So, Mr. Cole, I want to draw your attention now to the
16  next line towards the very right of that line where it begins,
17  "I understand that if assistance is provided to a voter who is
18  not eligible for assistance, the voter's ballot may not be
19  counted."
20      Do you see that?
21  A.  Yes.
22  Q.  How does that part of the oath make you feel?
23  A.  Scares me to death.
24  Q.  Scares you to death why?
25  A.  It means that some person later may come back and tell me

TOBY COLE - DIRECT

1 that what I did — that my vote doesn't count.  You know, some

2 player be drafted later and can come in and say, you didn't

3 what, you didn't follow our rules right, and so your vote

4 doesn't count.

5 Q.  And when you say "some person later," who are you talking

6 about?

7 A.  I don't know.  I don't know who that person is.  I don't

8 know who can come in and say, you know — it just says "I

9 understand that if assistance is provided to a voter who is

10 not eligible for assistance."

11     Who determines who is eligible and not eligible?

12     I mean, you know, it's not somebody that's going to be

13 there with me.  It's not going to be somebody that lives in my

14 daily life.  It's going to be some person later that decides

15 that maybe I didn't want vote the way they wanted me to vote,

16 so therefore my vote shouldn't count.

17 Q.  How does this make you feel about your ability to vote?

18 A.  Well, it just makes it hard.  You know, the thing that we

19 have, and I talk to a lot of people after they get disabled,

20 is as you make things harder, you just start cutting things

21 out.

22     You know, it's too hard to find someone to feed me, or

23 it's embarrassing, so I don't want to go to dinner.  It's too

24 hard to get on an airplane to go travel, so I just don't do

25 that.

TOBY COLE – DIRECT

1    And so every time you put even one little road bump or one
2    little barrier in front, it just makes it that much harder,
3    and so you don't do it.  I mean, I look at the oath and it
4    says, "I swear under the penalty of perjury."  I mean, that's
5    the oath I took to come sit here.
6        When I'm in a deposition — or I'm sure Your Honor has
7    used it and other lawyers have used it, when we think someone
8    is not telling the truth, we use that as a hammer.  We say,
9    you know, you understand, Mr. Cole, you're under the penalty
10   of perjury.  That's a big deal.  That's a scary deal.
11       So when you put those things in front of people, is that
12   — am I — if I'm undocumented, am I going to have somebody
13   that may get deported or thrown in jail come help me?  No, I'm
14   just not going to vote.  I'm just not going to exercise that
15   right.  It's not right.
16   Q.  Mr. Cole, do you know other voters with disabilities?
17   A.  Yeah, I do.
18   Q.  And do you know voters with disabilities who, though they
19   can physically get around the polling place, they may still
20   want an assister?
21   A.  Yeah.  You are talking about more of an invisible
22   disability.
23   Q.  Can you tell us what that — invisible disability, can you
24   tell us what that means?
25   A.  Yeah.  For me, I walk through the door and you can see

TOBY COLE - DIRECT

1  that there's something different.  I'm in a 450-pound chair
2  that I drive with my head.  It's clear that I have a
3  disability, that I do things differently.
4      But there are other people with brain injuries, or with
5  some other condition that makes it more difficult for them to
6  live their daily lives, but they don't want to broadcast that
7  to the world.
8      They don't want that to be what marks them, and, so, yeah,
9  they use assistants all the time.  It may be in the form of a
10 person.  It may be in the form of some assistive device, but
11 there's a huge world of that out there.
12 Q.  Could you give us an example of one of those types of
13 assistance?
14 A.  Yeah.  Andrea Johnson.  Andrea Johnson is a client and a
15 friend of mine.  She was blown up in Iraq and she has a mild
16 brain injury.  She can live every aspect of her life.  She
17 gets health care.  She makes decisions, but because she has
18 short-term memory issues, when we have conversations she
19 records them all, so that way she can remember what we said,
20 you know, a week later, or a day later, or a few hours later.
21     So when she goes out in her daily life, she has to have
22 people help her or something to assist her, but she would
23 never — she would be mortified to go into a place like a
24 voting booth where they would say, well, tell us why, where
25 they would question, you know, why she would need some help

TOBY COLE - DIRECT

1 because it's not obvious to the whole world that she's

2 disabled.

3 Q.  Is it your understanding that any of these voters with

4 inadvisable disabilities are worried that an election official

5 will decide they don't need assistance?

6           MR. WASSDORF:  Objection, Your Honor.  Hearsay.

7           MR. PARRENO:  This is for Mr. Cole's impression.

8           THE COURT:  Rephrase your question or state it again.

9 BY MR. PARRENO:

10 Q.  Is it your understanding that any voters with invisible

11 disabilities are worried an election official will decide they

12 don't need assistance?

13           THE COURT:  Yeah, that didn't call for hearsay.

14           That's overruled.

15           You can answer.

16           THE WITNESS:  Yeah, absolutely.  Yeah, voting is part

17 of it.  They deal with that in so many different parts of

18 their lives.

19           I remember I had a — when I first got a service dog

20 years ago when they were brand new, and the same organization

21 did hearing dogs.  I could go anywhere with a service dog.  I

22 could go on an airplane, but people with this invisible

23 disability couldn't because they would be questioned, why do

24 you need a dog in a hotel.

25           Well, if a fire alarm goes off, or if somebody knocks

TOBY COLE - DIRECT

1  on your door, you can't get alerted, and so the same thing

2  with Andrea or with other people with invisible disabilities.

3  They don't want to be called out, they don't want to be

4  separated, and so it's just, don't do it, just take that out

5  of your life and it's just -- it makes the world too small.

6  BY MR. PARRENO:

7  Q.  And based on your personal experience, how do you believe

8  that will affect those individual's desire to vote?

9  A.  They are just not going to do it.  They are just not going

10  to do it.  It's going to be too hard.  It's going to be too

11  embarrassing.  They are just not going to do it.

12  Q.  Mr. Cole, in your view, who should decide if a voter needs

13  assistance to vote?

14  A.  They should.  The individual should.  We -- in every other

15  aspect when someone is disabled they get to decide what help

16  they need, how they need the help.  We do that with employment

17  laws.  You know, you get to decide what you want to tell your

18  employer, what you don't want to tell your employer.

19      You get to decide if you need assistance.  You get to

20  decide all those things, when you go get health care, all

21  those things you get to decide.  And then when it comes to

22  voting, all of a sudden you don't get to decide that anymore,

23  someone else gets to decide that for you.

24  Q.  Now, taking a step back, Mr. Cole.  We talked about the

25  penalty of perjury.  How does it make you feel that your

TOBY COLE – DIRECT

1  assister has to swear under a penalty of perjury for you to

2  receive assistance?

3  A.  You know, I had that conversation with Mara, who Mara is a

4  Mexican National, and I remember asking her, you know, this is

5  a situation where you have to swear, and I'm going to ask you

6  to do things.  You can get in trouble, and she's like —

7         MR. WASSDORF:  Objection, Your Honor.  Hearsay.

8         THE COURT:  One second.  Yeah, that called for

9  hearsay.

10         That's sustained.

11  BY MR. PARRENO:

12  Q.  Mr. Cole, how does it make you feel that your assister has

13  to swear under penalty of perjury?

14  A.  Scared and proud.  Scared from the standpoint of that she

15  may be putting herself in jeopardy to help me vote, but proud

16  that she's willing to do it.

17  Q.  And what is your understanding of what your assister may

18  feel?

19  A.  She said it with a smile, she was going to help me vote no

20  matter what.

21  Q.  And to sum up, how does this oath make you think about

22  your own ability to get the assistance you need to be able to

23  vote?

24  A.  I'm looking right there.  It says, "I will not suggest by

25  word, sign, or gesture how the voter should vote."

TOBY COLE - CROSS

1    I specifically need that.  I don't know what and how I'm

2  going to do different when I have to go this next time because

3  I either have to choose to put somebody in harm's way or I've

4  got to choose that I can't have the things that I need to make

5  sure I can vote properly.

6         MR. PARRENO:  Your Honor, if I could just have a

7  moment.

8    (Off the record discussion)

9         MR. PARRENO:  Your Honor, we pass the witness.

10        THE COURT:  Anything from this side?

11        Any cross?

12                      CROSS-EXAMINATION

13  BY MR. WASSDORF:

14  Q.  Mr. Cole, it's good to see you again.  You've been waiting

15  a while to testify today and your counsel has already gotten

16  through a lot, so hopefully this will be quick and painless.

17    Your disability interacts with every portion of your day,

18  does it not?

19  A.  It does.

20  Q.  And I think you've already testified that you have an

21  assistant to help you with those activities?

22  A.  I do.

23  Q.  Including someone to assist you to vote?

24  A.  I do.

25  Q.  And you said that you try to vote in every election?

TOBY COLE - CROSS

1  A.  Yes.

2  Q.  In person?

3  A.  Yes.

4  Q.  You've never voted by mail, have you?

5  A.  I have not.

6  Q.  And you've never applied to vote by mail?

7  A.  I have not.

8  Q.  But your disability qualifies you to vote by mail, does it

9  not?

10 A.  It does.

11 Q.  And you simply choose not to utilize that option?

12 A.  I do, yes.

13 Q.  Let's talk a little about your in-person voting

14 experience.  I think you testified that you vote religiously,

15 is that correct?

16 A.  Yeah.

17 Q.  Since you were 18 years old?

18 A.  Yeah.  I mean, I'm a lot more — you know, I always vote

19 in big elections.  I don't remember 25 years ago if I was as,

20 you know, as zealous about it as I am now, but it's always

21 been a big deal to me, yeah.

22 Q.  But, suffice it to say, you voted many times prior to the

23 implementation of Senate Bill 1?

24 A.  Absolutely.

25 Q.  Including in 2020?

TOBY COLE - CROSS

1  A.  Yes.

2  Q.  And then I believe last we spoke you voted in at least two

3  elections since the implementation of SB 1?

4  A.  Yes.

5  Q.  And it's a few more than that now?

6  A.  Yeah.  Yeah.  There's at least one more after that, yeah.

7  Q.  And you always use an assistant to vote, correct?

8  A.  I do.

9  Q.  And you use your own assistant, not one of the poll

10  workers?

11  A.  Correct.

12  Q.  You utilize curbside voting, is that right?

13  A.  I do.

14  Q.  And there has never been a situation where a poll worker

15  didn't come to your car to provide curbside voting?

16  A.  That's incorrect.

17  Q.  That's incorrect?

18  A.  That's incorrect.  Well, I had to send somebody to go get

19  a poll worker.

20      I have had a situation where -- I have had one situation

21  where I hit the button and it didn't work because they were

22  too far away, so I had to send somebody to get a poll worker.

23      And then I had another situation where there was already

24  somebody -- curbside voting takes so long, there was already

25  somebody at the curbside voting and so we pulled over and my

TOBY COLE — CROSS

1  assistant went in to go find a poll worker.
2  Q.  But ultimately someone has always come out to provide
3  curbside voting?
4  A.  Oh, yeah.  I mean, ultimately, yeah.
5  Q.  And you have never been prevented from casting a ballot?
6  A.  I'm persistent.  I wouldn't let it.  You know, I mean, if
7  I had — if I didn't have the resources that I have, if I
8  didn't have the time.  I mean, if I took METROLift where you
9  have to schedule your rides, I wouldn't be able to vote.  They
10 wouldn't wait long enough for me.
11      So, yeah, I can vote because I have resources and I have
12 the ability and I have the persistence, but if I had limited
13 resources and I didn't have the ability to go to the polling
14 place and spend 45 minutes or an hour, however long it took,
15 then I wouldn't be able to vote.
16      Yeah, I can vote because I'm going to vote.
17 Q.  Okay.  So, just to be clear, you have always been able to
18 cast a ballot?
19 A.  Absolutely.
20 Q.  Brian, let's pull up LUPE 172 and look at the oath at the
21 top.  Thank you.
22      You were talking with counsel for LUPE just a moment ago
23 about that first sentence there, "I swear or affirm under
24 penalty of perjury that the voter I'm assisting represented to
25 me that they are eligible to receive assistance."

TOBY COLE – CROSS

1    Do you remember that conversation?

2  A.  Yes.

3  Q.  And your concern was with having to disclose your medical

4  details to a third party?

5  A.  Yes.

6  Q.  But doesn't this sentence just require you to represent to

7  the assister that you are eligible for assistance?

8  A.  Which how do I do that, if I don't tell them why?  Why and

9  how I'm eligible.

10  Q.  The sentence there doesn't require you to provide any

11  details, does it?

12  A.  I don't know.  I don't know any other place.  I mean, what

13  am I supposed to say?  How do I tell somebody that I'm

14  eligible to receive assistance?

15  Q.  Could you say to them, "I am eligible to receive

16  assistance?"

17  A.  I could say that, yes.  Is that what is required under

18  this bill?

19  Q.  You testified earlier that some of the requirements

20  imposed by this oath are not — do not apply when, for

21  example, I believe as you used, when you go grocery shopping?

22  A.  Yeah.

23  Q.  Do you understand that voting is different than shopping

24  for groceries?

25  A.  What do you mean?

TOBY COLE – CROSS

1  Q.  Do you understand that voting is a different act than

2  shopping for groceries?

3  A.  Yes.

4  Q.  And I believe you testified at the beginning of your

5  testimony earlier that you believe that voting is important?

6  A.  Yes.

7  Q.  Let's talk a little bit about disabilities generally.

8  Different disabilities pose different challenges to different

9  people, is that right?

10  A.  Correct.

11  Q.  And there is no one size fits all accommodation to enable

12  every person with a disability to vote?

13  A.  That's correct.

14  Q.  Your disability is not the same as some other person's

15  disability?

16  A.  Correct.

17  Q.  For example, being quadraplegic is not the same as being

18  blind?

19  A.  That's correct.

20  Q.  Or having an intellectual disability?

21  A.  Correct.

22  Q.  And even people with the same disability may cope with

23  that disability differently?

24  A.  Yes.

25  Q.  And those differences may result in the need for a

TOBY COLE - CROSS

1  different accommodation for that individual?

2  A.   Yeah.  I mean yes.

3          MR. WASSDORF:  Pass the witness, Your Honor.

4          THE COURT:  Anything further?

5          MR. PARRENO:  No further questions, Your Honor.

6          THE COURT:  You may step down, sir.  And thank you.

7          With that, let's go ahead and take our afternoon

8  break for about ten minutes.

9      (Recess)

10         THE COURT:  Your next witness.

11         MISS PERALES:  Thank you, Your Honor.  Plaintiffs

12  call Mr. Remi, R-E-M-I, Garza.  Mr. Garza is the Elections

13  Administrator for Cameron County, Texas.

14     (REMI GARZA, having been duly sworn, testified as

15  follows:)

16         MISS PERALES:  Before we get started, Your Honor, I

17  failed to do the small reciting of the claims before the

18  various witnesses who were Elections Administrators.  I did it

19  with Lisa Wise.  I may not have done it with Michael Scarpello

20  and Tacoma Phillips, and for Mr. Garza as well, if I could

21  just read into the record the sections.

22         Mr. Garza will provide testimony regarding LUPE

23  plaintiffs' claims challenging Sections 4.09, 5.07, 5.13,

24  6.03, 6.04, 6.05, 6.06, 7.04, and 8.01.

25         THE COURT:  Thank you.

REMI GARZA – DIRECT

```
 1                    DIRECT EXAMINATION
 2   BY MISS PERALES:
 3   Q.  Good afternoon.
 4   A.  Good afternoon.
 5   Q.  Can you please state your name for the record.
 6   A.  Remi Garza.
 7   Q.  And tell me your title and where you work.
 8   A.  I am the Cameron County Elections Administrator and Voter
 9   Registrar.
10   Q.  Where is your office located?
11   A.  Brownsville, Texas.
12   Q.  When did you assume your current position?
13   A.  July of 2015.
14   Q.  So you've been in that office for about eight years or so,
15   is that correct?
16   A.  Yes.
17   Q.  And do you also serve on the Texas Secretary of State
18   Elections Advisory Committee?
19   A.  Yes.  I've been participating on that since its creation.
20   Q.  How many individuals are on your staff full time?
21   A.  Thirteen full-time staff members.
22   Q.  And then is it the case that you hire additional staff for
23   around election time?
24   A.  Yes.  Depending on the size of the election we can hire,
25   you know, 10 to 15 people to help us out apart from poll
```

REMI GARZA – DIRECT

1   workers, or on large elections we have close to 30 people that
2   come out to help us out at the warehouse and within the
3   office.
4   Q.  And how many poll workers do you hire as well?
5   A.  It can range from 150 to 400 during a presidential year.
6   Q.  What type of equipment do you use in the polling place for
7   voters to mark their ballot?
8   A.  Cameron County is a paper ballot county, meaning their
9   voters will mark their own ballots with pen.  We have ADA
10  compliant equipment.  We are transitioning from the ES&S
11  AutoMARK.  We are now moving to the ES&S ExpressVote.
12  Q.  Does the ExpressVote involve a touch screen?
13  A.  Yes.
14  Q.  And then when a voter in Cameron County marks the ballot
15  using the ExpressVote, does that machine spit the ballot out
16  on a piece of paper?
17  A.  Yes.  So once the choices have been made, the voters
18  confirm that they are correct, they will press print ballot
19  and a piece of paper will come out of the machine.  Then they
20  take that the DS200, if it's Election Day, or a ballot box if
21  it's early voting.
22  Q.  Is it fair to say that a DS200 is also called the
23  tabulator?
24  A.  Yeah.  It's a precinct tabulator, yes.
25  Q.  Is Cameron County an online or off-line county?

REMI GARZA - DIRECT

1  A.  We're an off-line county.

2  Q.  What does it mean to be an off-line county?

3  A.  Essentially is that we have software, the voter

4  registration software from VoteTech and we maintain our

5  information locally.  We exchange information with the State

6  TEAM system by doing uploads, and then ultimately taking

7  things off our dashboard and downloading them into our system.

8  Q.  So would it be -- to use some of the terminology we have

9  heard, do you have a portal into the TEAM system?

10  A.  Yes.

11  Q.  And do you have a dashboard when you get into the TEAM

12  system?

13  A.  Yes.  There is a dashboard that the clerks interact with

14  that utilize.

15  Q.  And the dashboard has messages for you from the TEAM

16  system, for example, giving you information about voters who

17  are registered in Cameron County, yes?

18  A.  Yes.

19  Q.  You mentioned a moment ago that you are transitioning to

20  ballot marking machines that are new, is that right?

21  A.  Yes.

22  Q.  So would it be fair to say that voters who are coming to

23  vote at the polls in Cameron County soon will be finding

24  themselves using new machinery?

25  A.  Those that utilize the ADA compliant ballot marking

REMI GARZA — DIRECT

1  devices, yes, will see a new piece of equipment at the polling
2  place.
3  Q.  And do you think some voters will want to bring assisters
4  of choice to help them navigate the new machines?
5  A.  I think that is likely to happen.
6  Q.  Derek, if you would be so kind as to display Joint Exhibit
7  1.
8      Mr. Garza, I'd like to draw your attention to page 51
9  where it begins with Section 6.03, submission of form by an
10  assistant.  Do you see there where now voter assisters at the
11  poll must complete a form with name, address, relationship,
12  and compensation?
13  A.  Yes.
14  Q.  Now I'd like to scroll to page 52 and look at 6.04.
15      And do you see there in the underlined text SB 1 is adding
16  language to the oath of assistance starting at line 26?
17  A.  Yes.
18  Q.  That the underlined language starting at 26 is that the
19  oath is made under penalty of perjury, that the assister
20  obtained a statement of eligibility from the voter, on line
21  27.
22      And then page 53, lines 7 through 9, did not pressure the
23  voter.
24      And then, finally, lines 12 through 14, I acknowledge if
25  the assistance is provided to a voter who is not eligible.

REMI GARZA - DIRECT

1  Yes, "I understand that if the assistance is provided to a

2  voter who is not eligible for assistance, the voter's ballot

3  may not be counted."

4      Do you see that there?

5  A.  Yes.

6  Q.  All right.  Does Cameron County provide election materials

7  and information in any languages other than English?

8  A.  Spanish.  We use Spanish.

9  Q.  Do you provide ballot materials and other election

10  materials in any languages other than English or Spanish?

11  A.  No.

12  Q.  Do you have some registered voters who are predominantly

13  speakers of a language other than English or Spanish?

14  A.  That type of information isn't something that I can pull

15  from the voter registration records, but we haven't had

16  anybody contact us that was using a language that we weren't

17  able to understand.

18  Q.  I'd like to display LUPE Exhibit 189.  I would like to

19  display Exhibit 172.  Thank you.

20      I was just looking at the revision date.  Do you recognize

21  this as the oath of assistance form promulgated by the

22  Secretary of State?

23  A.  Yes, I do.

24  Q.  Is this the oath form used in Cameron County?

25  A.  Yes, it is.

REMI GARZA - DIRECT

1  Q.  And now, with respect to the little chart or the sign-in

2  sheet, do you see the three columns on the right?

3  A.  Yes.

4  Q.  Is it fair to say that the form now requests additional

5  information that an assister must provide at the time of

6  taking the oath?

7  A.  Yes.

8  Q.  So now with respect to this new information that's on the

9  form after SB 1, does it take more time for people to take the

10  oath as administered by the presiding judge?

11  A.  Yes, it does.

12  Q.  Okay.  Have you received any complaints about the length

13  of the form or the amount of information that's required by

14  the form since SB 1?

15  A.  We have had presiding judges and clerks at the early

16  voting locations tell us when we visit the sites that it takes

17  a long time to get through the oaths, and if somebody is

18  providing assistance to more than one person they have to take

19  it over and over again, adds a lot of time to the process.

20      In order -- we try to prevent lines and have to ask the

21  voters to step out of line so that they can take it.

22  Q.  So if you could explain with a little more detail, what do

23  you mean by asking the voter to step out of line?

24      So let me ask it to you this way.  If a voter arrives with

25  their chosen assister and they are going to get into line in

REMI GARZA - DIRECT

1  the polling place, what are you doing now in response to the
2  feedback you have received about the length of time it takes?
3  A.  Well, when the — when somebody is bringing in somebody
4  that's going to provide assistance to them, usually the
5  individual is asked to step over to sort of an administrative
6  table where the presiding judge is and the oath is
7  administered there and then brought back to the line to
8  actually continue the check-in process.
9      Before, pretty much the judge would do sort of a call and
10 response where they would say one part of the oath and the
11 person repeats after them.
12     After we started having concerns about the length of time
13 it was taking for the judge, because it ties up their time at
14 the polling place, we started suggesting that the judge and
15 the clerks actually ask the person who is providing assistance
16 to read the oath aloud so that they could just confirm that
17 they have taken the oath.
18 Q.  And they do that now in a separate place over at the
19 presiding judge's table?
20 A.  Exactly.
21 Q.  Look, if you would, at the language in the oath on the
22 oath form, "did not pressure."  It's the second line down, "I
23 did not pressure."
24     Do you think that somebody who is a potential assister
25 might refrain from encouraging someone to use them as an

REMI GARZA - DIRECT

1  assister out of concern that they might violate this part of

2  the oath, "I did not pressure?"

3  A.  I think that people would be hesitant to provide the

4  assistance based on the idea that if they had encouraged them.

5  The wording is vague enough where they are not going to -- you

6  know, they might be concerned that they are going to violate

7  the oath if they signed it.

8  Q.  Now I'd like to move back to the first line of the oath

9  where it says "the voter I am assisting represented to me that

10 they are eligible to receive assistance."

11      Do you see that there?

12 A.  Yes.

13 Q.  Do you think there are voters who are, perhaps, private

14 about themselves who would be uncomfortable telling their

15 assister what is their basis for needing assistance?

16 A.  Yes.  I think some people would be hesitant to sort of

17 confess to a disability.

18 Q.  Cameron County is located on the U.S.-Mexico border, is

19 that right?

20 A.  Yes, it is.

21 Q.  Are some of your voters in need of language assistance

22 with respect to some of the more complex wording of the

23 ballot?

24 A.  Yes.

25 Q.  And do you think some of those voters may be uncomfortable

REMI GARZA – DIRECT

1  expressing to an assister that they think they feel their
2  English is not good enough, or even sometimes their Spanish is
3  not good enough?
4  A.  Yes.
5  Q.  Do you have voters in Cameron County who cannot read or
6  write?
7  A.  I believe so, yes.
8  Q.  Do you think a voter who is illiterate would be reluctant
9  to tell their assister they need help because they cannot read
10 or write?
11 A.  Yes.
12 Q.  At the very end of the oath in English there is some
13 language that starts with "I understand that if assistance is
14 provided to a voter who is not eligible for assistance the
15 voter's ballot may not be counted."
16    Do you see that there?
17 A.  Yes.
18 Q.  Does this oath include the criteria for eligibility for
19 assistance in voting?
20 A.  No.
21 Q.  Do you think an assister might be reluctant to sign the
22 oath, if they weren't exactly sure what the eligibility
23 criteria is for assistance?
24 A.  Yes.
25 Q.  And then, finally, with respect to the very beginning of

REMI GARZA - DIRECT

1  the oath, "I swear or affirm under penalty of perjury," I have

2  one question for you.  Would you sign an oath under penalty of

3  perjury if you were not sure you were complying with that

4  oath?

5  A.  No.

6  Q.  I would like to shift now to poll watchers.  Have you had

7  an incident with a poll watcher kind of stepping up too close

8  to something?

9  A.  Yes.  In the past we had a gentleman who wanted to stand

10  behind the clerks as they were processing voters at the

11  check-in laptop and felt he wanted to stand behind them so

12  that he could actually see the screen of the laptop.

13      When the presiding judge called us on this, we told him

14  that, no, he could not get behind there because there was

15  personal information that we didn't feel it was appropriate

16  that a poll watcher would be that close into the process

17  because they are obviously on the administrative side.

18      We contacted the Secretary of State's Office at the time

19  and were told that we could prevent them from actually

20  stepping behind the laptop.

21      Of course, this was before the changes in Senate Bill 1,

22  because now they tell us that actually the poll watcher could

23  stand anywhere in the polling place, with the exception that

24  they couldn't interfere with the process.

25  Q.  So do you understand now that you have to let a poll

REMI GARZA - DIRECT

1  watcher stand behind your election clerk and look at the
2  screen with the information about the voters as the voters are
3  checking in?
4  A.  Yes.  That is what we would have to let them do.
5  Q.  And what kind of personal information is on that screen?
6  A.  You would have the person's full name.  You would have a
7  date of birth.  You would have the residence address.
8  Q.  And so, is it fair to say, that your guidance from the
9  Secretary of State's Office regarding whether you could
10  distance the watcher from this activity changed from when you
11  asked before SB 1 and when you asked after SB 1?
12  A.  Yes.
13  Q.  Have you ever had issues with poll watchers standing close
14  enough to the tabulator that they were able to look and see
15  what the voters marked ballot looked like before it went into
16  the tabulator?
17  A.  Yes, we have.
18  Q.  And what did you do, when you had that situation?
19  A.  When we spoke to the presiding judge, we suggested that if
20  they were going to be observing what was happening at the
21  DS200, the tabulator when people were putting in their
22  ballots, even the ballot box during early voting, that they
23  asked them to step back at least somewhere between five to six
24  feet from the polling place, and actually asked if there was
25  going to be a clerk that was going to be sort of helping

1  voters get to the right spot and make sure that their ballots

2  were processed, that the clerk would also stand that same

3  distance from the machine.

4  Q.  What is the purpose of distancing individuals from the

5  tabulator?

6  A.  Well, I think the privacy of the ballot.  The voters are

7  concerned that when there's poll watchers or even clerks are

8  observing them putting their ballots into the ballot box or

9  the DS200, they are checking to see if certain candidates are

10  being voted for, and, you know, sort of keeping a tally in

11  their minds as to what is happening.

12  Q.  Are you confident that you are doing the right thing by

13  asking the watcher to stand six feet away from the voter who

14  is putting the ballot in the tabulator?

15  A.  I haven't been challenged yet, but, you know, I don't know

16  how it would ultimately be interpreted, because a poll watcher

17  could claim that I was interfering with their ability to

18  observe what was happening at a polling place.

19  Q.  So even if you do think you are doing the right thing, are

20  you concerned that a disgruntled watcher will report you as

21  violating SB 1?

22  A.  Yes.

23  Q.  I'd like to go back to Joint Exhibit 1, please, and scroll

24  to page 27, line 24.  So if we could look at 4.07.

25      Do you see with me there at the bottom of page 27, SB 1

REMI GARZA - DIRECT

1 changed the election code to take out the word "conveniently"
2 and to insert the words "enough to see and hear?"
3 A. Yes.
4 Q. So is it the case then that the election code went from
5 saying the watcher is entitled to sit or stand conveniently
6 near, and now it's sit or stand near enough to see or hear?
7 A. Yes.
8 Q. Do you consider this language changing as either an
9 expansion, a contraction, or no change at all to the watcher's
10 abilities to observe?
11 A. Yes. I saw this as a significant change into the dynamics
12 in a polling place.
13 Q. And a change in terms of limiting what the watcher could
14 do, or expanding what the watcher could do?
15 A. Expanding what the watcher could do.
16 Q. How do you understand the difference between these
17 phrases, conveniently near, and near enough to see and hear?
18 A. Well, I think when you -- when it previously said
19 conveniently, it was that, you know, the person -- there was
20 sort of the discretion of the presiding judge to kind of make
21 that determination as to whether the person was going to
22 become inconveniently close to somebody, but then it switched
23 it to where the poll watcher now is the one that makes the
24 determination to whether they can see and hear what's
25 happening in the polling place.

REMI GARZA - DIRECT

1    So it becomes very subjective on their part.

2  Q.  Before SB 1 did you believe that the poll watcher had the

3  authority to claim that they needed to move in closer so that

4  they could see and hear?

5  A.  Yes.

6  Q.  Before SB 1?

7  A.  Before SB 1 they could ask the presiding judge.  The

8  difference would be if the presiding judge disagreed with

9  them.  Senate Bill 1 now made it that the poll watcher could

10 take action against the presiding judge.

11 Q.  I'd like to scroll to page 28, line 5, and this is the

12 language saying "a watcher may not be denied free movement

13 where election activity is occurring within the location."

14    Do you see that language there?

15 A.  Yes.

16 Q.  Do you see this as changing poll watchers' powers within

17 the polling place?

18 A.  Yes, it does.

19 Q.  In what way?

20 A.  Well, this language gives the poll watcher the ability to

21 move freely within the polling place, meaning that there's no

22 area that's off limits to them.

23    Going back to the example, somebody standing behind the

24 check-in clerk where they are, you know, wanting to see the

25 forms that the presiding judge is filling out or just taking

741

REMI GARZA - DIRECT

1  care of the business of the polling place throughout the day,
2  now there's no way the judge can tell them, could you please
3  step back, or could you give us room.  Depending on what's
4  happening in the polling place, they could be intrusive.
5  Q.  The poll watcher could be intrusive?
6  A.  Yes.
7  Q.  And do you have a concern that if the poll worker stepped
8  in to distance the watcher or move the watcher into another
9  spot that the poll worker could be exposed to criminal
10 penalties?
11 A.  Yes.
12 Q.  And do you have that same concern with other occasions
13 where you might, for example, tell a watcher to create more
14 space between them and a voter?
15 A.  Yes.
16 Q.  Have you heard complaints before by poll watchers in
17 Cameron County that they were being impeded from performing
18 their watching?
19 A.  We've had some concerns that were raised, more in our
20 central count than at a polling location.  It's kind of
21 limited in the space but we always put a piece of tape to give
22 the high-speed tabulators the space they need to sort of
23 process and to keep control of the ballots as they are being
24 transferred over to the ballot board review.  I'm sorry, it's
25 called the -- the name just escaped me.  I apologize -- the

REMI GARZA - DIRECT

1  ballot review committee, which makes the determination of the
2  voter's intent if is the machine is unable to read it if
3  there's a marking on the ballot.
4      And we have had some poll watchers complain that they
5  wanted to be much closer to the machine and kind of try to see
6  what's happening as it's going through the process.
7  Q.  So when you say you would put a piece of tape, do you mean
8  that you would actually tape out an area on the floor that you
9  would say to the watchers they have to stay within that area
10  so they don't crowd the poll workers?
11  A.  More that they couldn't cross to go closer to the
12  tabulating machines, but not to limit them to a specific area.
13  Q.  I see.  So you didn't pen them in, you just established a
14  zone around the people at the high-speed tabulators so they
15  could do their work?
16  A.  Yes.
17  Q.  Now, with respect to this piece of tape, are you concerned
18  that under SB 1 a poll watcher could make a complaint against
19  you for obstructing their watcher ability?
20  A.  Yeah.  I think that's possible.
21  Q.  Does Cameron County conduct trainings for its poll
22  workers?
23  A.  Yes, it does.
24  Q.  Who conducts those trainings?
25  A.  I do.

743

REMI GARZA – DIRECT

1  Q.  And so do you train the poll workers about the new SB 1
2  provisions regarding their possibly committing a criminal
3  offense by limiting watchers?
4  A.  Yes, we include that in the training.
5  Q.  And what reaction do you see from your poll workers when
6  you get to that part of the training?
7  A.  Well, you see a lot of eyebrows go up, and then they start
8  looking at other, and you can tell they are concerned that,
9  you know, they could inadvertently upset a poll watcher and
10  get in trouble.
11  Q.  I'd like to go now to the same exhibit to page 45, Section
12  5.13.  Do you understand now that under SB 1 in order to
13  accept a voter's application for ballot by mail or mail ballot
14  you have to match an ID number that the voter provides to the
15  voter's registration record?
16  A.  Yes.
17  Q.  So when you receive an ABBM, Application for Ballot by
18  Mail, or mail ballot, what is your procedure to ascertain or
19  to see if you can match the person's identification number?
20  A.  Well, our first source of information is going to be our
21  own voter registration system to check to see if we have the
22  number that the voter included on their application.
23       If we're not able to find anything there, sometimes we'll
24  go to the warehouse and see if we can pull their actual
25  physical documents to see if maybe from a previous filing that

REMI GARZA - DIRECT

1  just hadn't been scanned, we were able to find it.  And we

2  would then log on to TEAM to see if there was information on

3  there that would help us fulfill that requirement.

4  Q.  And so what do you do with an application for ballot by

5  mail, if you cannot match the ID number?

6  A.  We would have to reject it and send it back to the voter.

7  Q.  Do you send a clean application for ballot by mail to the

8  voter?

9  A.  Yes.  We include that with a letter indicating what the

10  difficulties were with their original application.

11  Q.  And then with respect to a mail ballot where you couldn't

12  match the ID number on the carrier envelope, what do would you

13  do with that?

14  A.  Depending at the time that it's reviewed, if it's during

15  the — before the ballot board meets, we would — my staff,

16  after notifying candidates that they were going to be doing

17  the phone calls to contact voters, we would essentially —

18  it's called peeking, where you sort of undo the little

19  perforated section of the envelope to see if the numbers are

20  there.

21      And if the numbers don't match, we would have to find a

22  way to contact the voter, whether through a phone number that

23  we had that was provided on the carrier envelope, or something

24  that was in our voter registration record.

25  Q.  Would you ultimately send the mail ballot back to the

1  voter for correction?

2  A.  Yes.  If when we reached when we contacted them sometimes

3  we inform them that we will be sending back their ballot

4  and/or their carrier envelope and tell them what they needed

5  to do to cure it and then we would mail it to them but if we

6  weren't able to get a hold of them we would just mail it back

7  with the letters instructing them as to how they needed to

8  correct their ballot.

9  Q.  In the March 2022 Primary Election were you able to

10 contact all the voters who ID number defects on their mail

11 ballot carrier envelopes?

12 A.  It's a difficult question to answer because we were able

13 to contact some of them by phone and if we weren't able to do

14 that we would have to mail them back.  The assumption is that

15 they did receive it back in the mail.

16 Q.  Were there some voters with ID number defects and no phone

17 number on file for you?

18 A.  Yes.

19 Q.  Was it possible on either an application for ballot by

20 mail or a mail ballot that a voter would put his or her ID

21 number there correctly but the voter had not remembered which

22 number they had used to register to vote and you would

23 experience a mismatch?

24 A.  Well, it would depend on — to us, it starts with a voter

25 registration record first because that's what we would have on

REMI GARZA – DIRECT

 1  file, what we would be looking at.  There were voters that did
 2  not use driver's licenses when they registered and they would
 3  use the four digits of the social, if, at the time they had
 4  registered, those were even required on the application.
 5      So if we weren't — if the number they included on their
 6  application for ballot by mail or the carrier envelope,
 7  depending on what part of the process we were in, if that
 8  number wasn't there we wouldn't — we would have to take the
 9  actions for them to try to correct it.
10  Q.  And you mentioned a moment ago that a voter might have
11  neither a driver's license nor the last four of the social on
12  their voter registration record, correct?
13  A.  Yes.
14  Q.  And was there a time where you didn't need to provide that
15  information to register to vote?
16  A.  Based on the records I've seen in my warehouse, there are
17  some old applications in there and it did not ask for that
18  information.
19  Q.  Are there times when you have an application for ballot by
20  mail or a mail ballot for which you have an ID number defect
21  but you are confident that the voter is the voter?
22  A.  Could you rephrase that, I'm sorry?
23  Q.  Are there times when you have either an application or a
24  mail ballot, you have an ID defect, cannot match the ID, but
25  it is signed?

REMI GARZA — DIRECT

1   A.   Yes.

2   Q.   And it could also be that the remaining information, such

3   as address, is correct to match to that voter?

4   A.   Yes.

5   Q.   And are there times when you are confident that you do

6   have the voter matched up with the either mail ballot or

7   application but you cannot process it because it's missing the

8   ID number?

9   A.   Yes.  We have an individual who kept transposing one of

10  the numbers on his carrier envelope when he returned it — I'm

11  sorry, the application.  And we knew it was him, but each time

12  we sent it back to him, he would transpose the same numbers

13  and we couldn't process it until he did it correctly.

14  Q.   Did he manage it correct it eventually?

15  A.   To be honest with you, I don't remember if in that

16  particular case he completed the process.

17  Q.   But even if you feel confident you've got the voter, you

18  cannot process the application or the mail ballot, correct?

19  A.   Correct.

20  Q.   So taking a moment to think about the voters who were

21  missing either a driver's license or a social in their voter

22  database, what is the likelihood that those voters would be

23  over 65 versus under 65?

24  A.   I think it's extremely likely they would be over 65.

25  Q.   Also with respect to the voters generally that you knew

REMI GARZA - DIRECT

1  you had ID defects for this group of voters that you were

2  sending back their materials and asking them to cure, are you

3  aware whether any of them had mobility issues?

4  A.  When the clerks were contacting the voters to let them

5  know that there were deficiencies in their carrier envelopes,

6  several of the voters indicated that they did not have

7  transportation, that they no longer drove, and they didn't

8  have anybody that would be able to help them come to the

9  office to cure it, or some even to go to the mailbox to get it

10 because they were in their homes, they weren't as mobile, they

11 couldn't go outside.

12 Q.  And for those voters then was it a viable alternative for

13 them to go vote in person?

14 A.  No.

15 Q.  At some point did you begin to have your staff go to

16 voter's homes to help them complete either the mail ballot or

17 the ABBM for ID information?

18 A.  I think it's fair to say the staff, on their own

19 initiative, started to go to people's houses, if somebody was

20 extremely old — older, sorry — or had expressed that they

21 were having difficulty taking care of the situation on their

22 own.

23 Q.  What is your understanding of why your staff did that?

24 A.  Well, I think, like a lot of us in the elections

25 profession, we're there to facilitate the process and you

REMI GARZA - DIRECT

1  know, disenfranchising somebody for something like that or not

2  being able to help them as fully as we could is something we

3  don't like to do.  So on their own initiative they decided

4  they were going to go -- that two of them would go and take

5  care of it.

6      And they understood that one they decided to make that

7  decision to take the ballots to voters, then they would have

8  to do that for any other voter that was in the same

9  circumstance.

10 Q.  Did your staff do these tasks at least in some part during

11 work hours?

12 A.  Yes.

13 Q.  And what vehicles did they drive when they went to the

14 voter's homes?

15 A.  They would use one of the county vehicles.

16 Q.  And when your staff would bring either applications for

17 ballot by mail or the mail ballots back to these voters, what

18 issue were they attempting to cure?

19 A.  Usually, it was going to be an ID issue, or that they had

20 failed to sign the back of the ballot.

21 Q.  Did your office receive complaints from voters whom you

22 notified had ID defects on either their application for ballot

23 by mail or mail ballot?

24 A.  Yes.

25 Q.  And what was your understanding of the nature of these

REMI GARZA - DIRECT

1 complaints?

2 A.  A lot of them had voted by mail in the past and didn't

3 understand why this was now being required from them to

4 process it.  Also they felt that it wasn't necessary in the

5 process, and so they were — they thought we were trying to

6 impede their ability to apply for ballot by mail by requiring

7 it on the application.

8 Q.  Moving forward to the November 2022 Election, did you have

9 voters who weren't able to cure their ballots?

10 A.  Yes, I believe there were some voters that hadn't cured

11 their ballots.

12 Q.  Can we display, please, LUPE 234.

13    Mr. Garza, can you identify this document?

14 A.  That appears to be a report from our voter registration

15 software, the VoteTech system, from Cameron County that is an

16 account of how many ballot-by-mail packets were sent out to

17 voters, and what was returned, what the disposition was by the

18 ballot board, actions that were taken by the office of the

19 early voting clerk, and then ultimately whether they were

20 returned at all.

21 Q.  So let's take the first line there, BR ballots received,

22 do you see that line there?

23 A.  Yes.

24 Q.  And the number 1,588, does that mean the number of ballots

25 that you received and counted?

REMI GARZA - DIRECT

1   A.  It would be the total number of ballots that were returned

2   to the office.

3   Q.  Okay.  And so if we looked down to E7 it says there —

4   well, could you read that out to me in English?

5   A.  EVC is the early voting clerk, incorrect social security

6   number or Texas driver's license, and the cure was available.

7   Q.  Does that mean that, that number there, 14, were ballots

8   that were not counted?

9   A.  At the time that this report was printed, they were still

10  pending.

11  Q.  I see.  And then next line, R1, is that also a code for

12  incorrect or missing social security number?

13  A.  Yes.

14  Q.  Is it fair to say that some of these codes were coming

15  from the Secretary of State for you to use?

16  A.  Yes.

17  Q.  And you were trying to work with your vendor to make sure

18  those codes were in your vendor's database, correct?

19  A.  Correct.  As you can see there, we have the Do Not Use.

20  Those are usually our original codes that we were using to

21  identify actions that were happening related to somebody's

22  ballot.  And they asked us to start using different codes in

23  the process, and so you will have some that it's already

24  attached to their voter history because that code was attached

25  at the time.  So they are essentially reporting out in this

REMI GARZA - DIRECT

1  report as being used, the R1 and the RJ.

2  Q.  Thank you.  And then the last line, V8, can you tell us

3  what the code is for V8?

4  A.  Yeah.  That's the ballot board incomplete social security

5  number or Texas driver's license cure available.  Those would

6  be the ones that have already been forwarded to the ballot

7  board and then when they reviewed them they found the

8  deficiencies and they were contacting the voter through the --

9  after the -- through the ballot board.

10  Q.  And then finally, E3, can you tell me what that one means?

11  A.  That's the -- that would be the early voting clerk which

12  would be me, it would be either an incomplete social security

13  number or Texas driver's license, and that one was actually

14  sent back to the voter and it hadn't come back.

15  Q.  So we could -- could we then say that of the 1,588 ballots

16  received by your office that the ballots that were coded

17  either E3, E7, R1, or V8 were flagged for ID number defects?

18  A.  Yes.

19  Q.  Oh, and I would like to ask you because I forgot at the

20  beginning, in the upper left-hand column where it says

21  election code?

22  A.  Yes.

23  Q.  Can you tell me what election that's for?

24  A.  The 0522-01 is going to be May of 2022, and 01 is the --

25  all the different entities that were we were conducting

REMI GARZA – DIRECT

1  elections for at that time.  Sort of like the total and the

2  summary, and then we would be able to break it down by each

3  individual jurisdiction.

4  Q.  So if we turn to the next page of this document, does the

5  election code tell us that this was the 2022 Primary, and then

6  in the middle we see Democratic Primary, is that right?

7  A.  Yes.

8  Q.  I notice some other codes here.  Would it be fair to say

9  that the code IS was related to ID number defect?

10  A.  Yes, I believe so.

11  Q.  And the code I see again, R1, is that also related to ID

12  number defect?

13  A.  Yes.

14  Q.  So can we understand that the total of those two are the

15  number of mail ballots that were flagged for ID number

16  defects?

17  A.  I believe so.

18  Q.  And then the next page, because we want to make sure we

19  cover both sides of this Primary.  Is the next page of the

20  document the 2022 Republican Primary?

21  A.  Yes.

22  Q.  And so do we see numbers there associated with the IS code

23  and the R1 code?

24  A.  Yes.

25  Q.  And those are also mail ballots flagged for ID number

REMI GARZA – DIRECT

1  defect, correct?

2  A.  Yes.

3  Q.  And these are all folks who had already successfully

4  navigated the application for ballot by mail, correct?

5  A.  Yes.

6  Q.  So they had already somehow provided you a number already

7  that had matched on the ABBM so that he could send them a mail

8  ballot, right?

9  A.  Yes.

10  Q.  So these folks are the universe of people who managed to

11  get through one hurdle, but whose mail ballots were now

12  flagged at this stage and they were told they had an ID number

13  defect?

14  A.  Correct.

15  Q.  Do you know if any other counties that use VoteTech as

16  their vendor for the voter registration database?

17  A.  Yes, there are other VoteTech users in Texas.

18  Q.  Do you know any of the names of those counties?

19  A.  I believe Tarrant County uses them.  I believe

20  Dallas County uses them.  Williamson County uses them.

21      And I'm not fully apprised of their client list.

22  Q.  Okay.  So now I want to ask you a couple questions about

23  the Ballot Tracker because you use VoteTech too, you said,

24  right?

25  A.  Yes.

REMI GARZA − DIRECT

1   Q.  So did you have any issues with voters using the Ballot

2   Tracker that was rolled out as part of SB 1?

3   A.  I honestly don't know if any voters in Cameron County used

4   the State Ballot Tracker.  We were providing a Ballot Tracker

5   through the VoteTech system on our website that people were

6   able to access, but the roll−out of the State's Ballot Tracker

7   was — it was — it didn't go well, I think is the best way.

8       There were a lot of problems with the codes that we were

9   using to identify the status of somebody's ballot and getting

10  that information to reflect on the actual State system.

11  Q.  And when you say the "codes" you were using, those were

12  the codes provided by VoteTech, is that right?

13  A.  Right.  They were the codes that we were told we should

14  use for specific actions.

15  Q.  All right.  And so would it be fair to say that there was

16  an issue integrating the codes from VoteTech with the

17  Secretary of State's Ballot Tracker?

18  A.  Yes.

19  Q.  Do you think that those issues integrating VoteTech's

20  codes with the Ballot Tracker were limited to Cameron County?

21  A.  No.

22  Q.  Are you aware of any other counties that were struggling

23  with the Ballot Tracker because of the issues involving

24  integrating the VoteTech codes with the Ballot Tracker codes?

25  A.  I think almost all the VoteTech clients did.  In fact, we

REMI GARZA - DIRECT

1  asked VoteTech to create a working group to try to resolve the

2  issue because it was that widespread.

3  Q.  So eventually VoteTech and the Ballot Tracker managed to

4  work out their issues, is that right?

5  A.  Yes.

6  Q.  But would you say it was an awkward roll-out?

7  A.  Awkward is being kind.  It was disastrous from the

8  perspective of the fact that they were putting out the link to

9  it and encouraging voters to access it.

10     In Cameron County, I did not do that.  I did not highlight

11  it.  I strongly suggested people contact us in order to

12  resolve those types of issues.

13     It was included in the materials that we distributed as a

14  possibility, but, to be honest, I don't believe a single voter

15  actually accessed it or used it.

16  Q.  Did you make any tests of the vote tracker in your office

17  to see if it was working?

18  A.  Yes.  One of our clerks used her mother's information

19  because she votes by mail and so we were trying to test the

20  system to see whether or not we would be able to access the

21  information for her mom.  And we weren't able to.  With her

22  mother's permission.

23  Q.  Thank you.  Is it fair to say that the off-line counties

24  who are using VoteTech are some of the largest counties in the

25  State of Texas?

1  A.  I would believe that to be a true statement.

2  Q.  Do you have any concerns about voter's ID numbers not

3  being reflected either on TEAM or in your voter registration

4  file for voters in Cameron County right now?

5  A.  In what sense?

6  Q.  Well, do you have any concerns that you've got voters in

7  Cameron County with missing either driver's licenses or social

8  security numbers in the voter registration database?

9  A.  I think I have concerns if those voters were attempting to

10 vote by mail, but, otherwise, if it was just a regular record

11 and was in the system, the lack of any identifying information

12 in the registration system doesn't cause me any concern at

13 all.

14 Q.  So you are not concerned if a voter goes to vote in

15 person, correct?

16 A.  No, not at all.

17 Q.  But if they do have missing numbers, either social or

18 driver's license and they try to vote by mail, is that where

19 the concern arises?

20 A.  Yes.

21 Q.  Do you expect your voter turnout in the Presidential

22 Election of 2024 to be higher than the turnout in the

23 November 2022 Election?

24 A.  Yes.

25 Q.  Do you have voters that you expect may be voting for the

REMI GARZA – DIRECT

1 first time in November 2024 under the new SB 1 mail ballot ID

2 rules?

3 A.  Yes.

4 Q.  I would like to display Joint Exhibit 1 at page 59, line

5 7.  Do you see on the screen, Mr. Garza, the definition in SB

6 1 of vote harvesting services?

7 A.  Yes.

8 Q.  Are you aware that in the Rio Grande Valley there are

9 organizations that are not affiliated with political campaigns

10 that assist voters who might be homebound to complete their

11 mail ballots?

12 A.  Yes.

13 Q.  And are you aware that some of those organizations pay

14 their staff or reimburse their volunteers to do this work?

15 A.  Yes.

16 Q.  Do you think that if such a community-based outreach

17 organization does pay its staff to assist mail voters that

18 they might be committing an offense under this provision?

19 A.  It could be interpreted that way.

20 Q.  And, of course, I'm in the wrong section.  I should be in

21 section 6, .06, I believe.  I don't know if I have a page

22 number but I would like to find 6.06.  Thank you.

23     It's page 54, line 20.  Here, we have the language, "A

24 person commits an offense if the person compensates or offers

25 to compensate another person for assisting voters as provided

REMI GARZA - DIRECT

1  by Section 86.010."  Do you see that language?

2  A.  Yes.

3  Q.  I don't know if you are familiar with the 86.010, but do

4  you recognize that as mail ballot provisions in the election

5  code?

6  A.  I believe so.

7  Q.  So going along with our community-based organization,

8  looking at this provision do you think that if the

9  organization pays its staff to assist voters to complete their

10  mail ballots that they might be committing an offense under

11  this provision?

12  A.  Yes.

13  Q.  And would you agree with me that if a community-based

14  organization stops helping voters to vote by mail because they

15  are concerned about this new crime that there would be less

16  assistance available to voters in Cameron County who vote by

17  mail?

18  A.  Yes.

19  Q.  Would you be concerned if there was less of this

20  nonpartisan community-based voter outreach to voters who vote

21  by mail as a result of SB 1?

22  A.  Yes.

23  Q.  I'd like to look at Joint Exhibit 1 again.  We are still

24  there, but page 60, line 15.

25       Are you aware, Mr. Garza, that there's a new provision

1  that SB 1 makes a new part of the Texas Election Code that
2  makes it a crime for you to send out unsolicited applications
3  for ballot by mail?
4  A.  Yes.
5  Q.  I'm glad that you are aware of it.
6      Before SB 1, would Cameron County mail applications for
7  ballot by mail to voters without the voter's first asking for
8  them?
9  A.  Yes.
10 Q.  And can you describe how you would do that?
11 A.  Each year at the end of the year their annual applications
12 for ballot by mail would lapse.  So in January we are required
13 to notify the FPCA voters of that particular event.
14     We also started notifying our annual application that had
15 their annual applications had lapsed as well and then attached
16 with that letter in the envelope we would include an
17 application for ballot by mail so that they could renew it.
18 Q.  So you limited the sending or distribution of unsolicited
19 application for ballot by mail to individuals whose annual
20 request was lapsing, is that right?
21 A.  As far as mailing them to individuals, yes, but we would
22 make them available every time we did a voter registration
23 drive if somebody said that, you know, their children were
24 going to college and they wanted an application, we would
25 provide them; if they said they knew some people who might be

761

REMI GARZA - DIRECT

1  interested in it, we would provide them to them as well,

2  either across our desk or at an event.

3  Q.  Do you now provide multiple applications for ballot by

4  mail to a single individual?

5  A.  No.

6  Q.  And do you now mail out applications for ballot by mail to

7  individuals who don't request them?

8  A.  No, we don't.

9  Q.  Have you ever had an individual ask for two applications

10 for ballot by mail, one for them, and one for their spouse?

11 A.  Yes.

12 Q.  And what do you do now, when a voter makes that request?

13 A.  We ask them if they could please — we ask them if the

14 other individual is present and if they could give an

15 indication so we can hear them over the phone that they are

16 requesting it, or if they walk in we ask them if the person is

17 in the vehicle with them outside and then we will go check to

18 see if there's somebody else in the car so that we can provide

19 it to them.

20 Q.  And you make these requests, is it, true because you do

21 not want to commit the crime of giving out an application for

22 ballot by mail to somebody who hasn't requested it?

23 A.  Exactly.

24 Q.  I want to shift now to a little bit of the information

25 that you give to either the Secretary of State or the

1  legislature during the process that SB 1 and its predecessor

2  bills was moving through the legislature.

3      You mentioned before that you serve on the Secretary of

4  State's Elections Advisory Committee and so I want to ask you

5  whether the members of that committee from the counties were

6  expressing concerns to Christina Adkins and Keith Ingram

7  regarding some of the provisions in the bill as it was moving?

8  A.  Yes.

9  Q.  And can you express any concerns about the mail ballot ID

10 requirements?

11 A.  Yes.

12 Q.  And what were the concerns that you were expressing about

13 your ability to carry out that type of ID requirement?

14 A.  Well, when we first heard it, we recognized that there

15 were going to be people who were registered in our counties

16 that were not going to have that information attached to the

17 records, or they would have one and not the other and wouldn't

18 understand which of the two they needed to provide, or three

19 depending if they had election ID, and so we really thought it

20 was going to be difficult for voters to be able to comply with

21 that and we felt it was going to be an obstacle to processing

22 the applications for ballot by mail.

23     In the discussions they also talked about how once the

24 number is confirmed then the signature lost its precedence in

25 how a ballot board was going to be reviewing the actual return

REMI GARZA - DIRECT

1  carrier envelope.  So we were -- there were a lot of things

2  that concerned us specifically about this new process that the

3  State was promoting.

4  Q.  So a moment ago you mentioned the signature matching

5  requirement.  What is your understanding about how SB 1

6  changed the signature matching requirement when the county was

7  able to verify the ID number?

8  A.  When an individual before Senate Bill 1 submitted an

9  application and return carrier envelope, we would compare the

10  signatures on the application to what was returned on the

11  envelope to see that it wasn't -- that we didn't believe it

12  was done by somebody else, and if the ballot board made that

13  determination or the signature verification committee made

14  that determination, the ballot would be accepted to be

15  counted.

16      If they felt that it wasn't by the same individual, then

17  you would be able to look at previous signatures to see if

18  there is something that would -- that the board would feel

19  that it was by the same person, it wasn't done by something

20  much somebody else.

21      Senate Bill 1 indicated that once the numbers had been

22  confirmed or matched, that the signature was now I think it's

23  a rebuttable presumption that it's of the voter.

24      And there were Elections Administrators who believed that

25  because of that statement that as long as the numbers matched,

REMI GARZA - DIRECT

1  you didn't even have to look at the signature anymore, that

2  once those two numbers jibed, it was going to be accepted

3  unless somebody on the board were to challenge it, somebody on

4  the ballot board.

5  Q.  And what was your concern with shifting away from matching

6  the signature and instead to matching either the driver's

7  license or the last four of the social?

8  A.  Well, I think the main issue is that somebody's signature

9  is pretty unique, and, you know, how they are signing things

10 from time to time are going to be, you know, consistent over a

11 short period of time.  It may vary as somebody ages but it's

12 pretty much going to be their signature.

13     Numbers are pretty static and they stay the same.  They

14 are, I think they are out there, used more often than

15 somebody's signature, when you think about your interaction in

16 life.  We used to put our driver's licenses on our checks.

17 We, you know, hand out all that type of information so that I

18 just felt that a number is just a number, a signature is

19 actually tied to a voter.

20 Q.  Did you have a concern that a fraudster might be able to

21 get their hands on a driver's license number or the last four

22 of the social and secure a mail ballot in a way that if there

23 was a signature match, the signature match could catch the

24 problem?

25 A.  I think it would be much easier for somebody to submit an

REMI GARZA - DIRECT

1  application for ballot by mail and ultimately carrier

2  envelope, if they were just relying on the numbers.  I think

3  those numbers are probably more readily accessible than

4  somebody's signature, what it looks like.

5  Q.  In addition to those concerns that you expressed to the

6  Elections Advisory Committee, did you express any concerns

7  regarding the criminal provisions aimed at poll workers

8  regarding poll watchers?

9  A.  Yes.

10 Q.  And what were those concerns that you shared with

11 Christina Adkins and Keith Ingram?

12 A.  We felt that it was going to make it difficult for us to

13 hire individuals to work as a presiding judge or as a clerk.

14 We thought people would be afraid that they would be

15 prosecuted for mistakes or for something that an oversight as

16 they were performing their duties.

17     You know, it's a different job when there's criminal and

18 civil penalties attached to what you are doing on a day-to-day

19 basis.

20 Q.  And is that the same concern with respect to the criminal

21 and civil exposure of Elections Administrators regarding

22 distribution of application for ballot by mail?

23 A.  Yes.

24 Q.  And you expressed those as well to Miss Adkins and

25 Mr. Ingram?

 1  A.  Yes.

 2  Q.  Can we look at LUPE 325, please.

 3      Do you recognize this, Mr. Garza, as an email from you to

 4  the elections internet at the Secretary of State?

 5  A.  Yes.

 6  Q.  And what is the date on the email?

 7  A.  June 7th, 2021.

 8  Q.  And looking at the second paragraph, which starts with

 9  also on page 27 of the conference committee report --

10  A.  Um-hum.

11  Q.  -- can you tell me what concern you are expressing here?

12  A.  And to refamiliarize myself with what I'm looking at, it

13  is expressing to the Secretary of State's Office that we were

14  concerned that we were going to be rejecting applications if

15  the numbers didn't match, and that a lot of, or some of the

16  records in Cameron County didn't have those numbers attached

17  to them.

18  Q.  And can you read the last sentence of that paragraph out

19  loud?

20  A.  "How would these issues be resolved to prevent the

21  rejection of otherwise eligible applicants?"

22  Q.  If we scroll up we'll see a few more headers.  Going all

23  the way up to the top, it looks like it finally goes from

24  Charles Pinney to Christina Adkins.  Do you see that --

25  A.  Um-hum.

REMI GARZA – DIRECT

1  Q.  — the following day.

2     Did you ever hear back from either Miss Adkins or anybody

3  else in response to your question?

4  A.  I don't believe so.

5  Q.  I'd like to go to LUPE 294.  Can we start at the bottom

6  with those signatures.

7     Mr. Garza, do you see that you are one of the people who

8  signed this letter?

9  A.  Yes.

10  Q.  And at that time you were the vice president of something

11  and we'll roll back up to the top, but this is a moment at

12  which you are a vice president signing this letter, is that

13  right?

14  A.  Yes, as one of the officers of the organization.

15  Q.  And the organization would be what?

16  A.  The Texas Association of Elections Administrators.

17  Q.  And then, what is the date on this?

18  A.  July 1st, 2021.

19  Q.  And so was there a time when you went from being the vice

20  president to the president of the Texas Association of

21  Elections Administrators?

22  A.  Yes.

23  Q.  And when was that?

24  A.  I believe it was in August of 2021.  The organization has

25  a rotation system where the officers move up to the next

REMI GARZA – DIRECT

1  office at the end of the year.
2  Q.  Okay.  And was this a letter that the Texas Association of
3  Elections Administrator sent to Dan Patrick and Dade Phelan,
4  the respective heads of the House and Senate?
5  A.  Yes.
6  Q.  If we go down to the bottom, is there a CC on this letter?
7     We have to go all the way to the bottom.
8  A.  Yes.
9  Q.  And who did you CC on this letter?
10  A.  We sent it to the members of the House of Representatives
11  and the Texas Senate.
12  Q.  Now, if we start at the top — well, not the very top of
13  the letter, but if we could go to the bottom of page 2 of the
14  letter, please, where it says 5.10.  If you could go down to
15  the last paragraph there.  5.10.
16     And with respect to 5.10, and flowing onto the next page,
17  can you tell me what concern you are expressing here?
18  A.  I think it goes to the idea that with the numbers matching
19  that it was going to eliminate the requirement of a signature
20  on the carrier envelope when it was returned to our offices.
21  Q.  Can we look at the next page at the top, so that we can
22  see the continuation of that sentence, if driver's licenses
23  or.  Are we able to get the next page.  No.  Okay.  We'll just
24  move on.
25     Could we display Joint Exhibit — well, and I will just

REMI GARZA - DIRECT

1  say that this is Exhibit 294, so we can always look it up

2  later.  Could you display Joint Exhibit 1.

3      May I approach, Your Honor?

4          THE COURT:  You may.

5  BY MISS PERALES:

6  Q.  Mr. Garza, I have a hard copy here of SB 1 and I'm going

7  to hand it to you and ask you to look at page 46, if you

8  would.  Oh, look.  It's here.  Line 4.  You can also look at

9  the screen.

10     Can you read the language starting on line 4, "If a voter

11 provides the information?"

12 A.  "If a voter provides the information required under

13 Section 86.002(g), and it identifies the same voter identified

14 on the voter's application for voter registration under

15 Section 13.002(c)(8), the signature on the ballot application

16 and on the carrier envelope certificate shall be rebuttably

17 presumed to be the signature of the voter."

18 Q.  Is this the language that you were concerned about and

19 expressing a concern about in your TAEA letter to legislators?

20 A.  Yes.

21 Q.  And was the concern then that this provision would open

22 the door to voter impersonation with someone acquiring a

23 voter's driver's license or last four of the social?

24 A.  Yes.

25 Q.  I don't know if we can get that letter back, but did

REMI GARZA - DIRECT

1  that -- I would like to ask you about another concern in the
2  letter, which is at the top of page 3 of the letter, so the
3  next page.
4      With respect to Section 7.0 -- oh, okay.  So since we got
5  that page, can we read that flow-over sentence, the driver's
6  license, and then if you could read at the top.
7  A.  "Or partial social security numbers are not already
8  confidential or protected, this may result in fraudulent voter
9  impersonation."
10 Q.  Okay.  Thank you.  And then with respect to the next
11 paragraph, is it fair to say that you were expressing concerns
12 about the provision that limited your ability to send out
13 applications for ballot by mail?
14 A.  Yes.
15 Q.  I know that you brought with you a mail packet for a vote
16 by mail for Cameron County and I wanted to know if the packet
17 that you brought with you contains a carrier envelope?
18 A.  Yes.
19 Q.  Can you take that out.  My question for you is:  Given
20 that SB 1 required the addition of more language on the
21 carrier envelope for instructions regarding identification,
22 the longer assister oath, the additional information from
23 assisters, looking at it overall, what do you believe the
24 effect of these additions has been on the carrier envelope for
25 mail voters?

REMI GARZA – DIRECT

1   A.  I think it's made it more difficult to understand.  The

2   font is getting smaller and smaller as more and more

3   information is required to be added onto these documents.

4   Q.  And with respect to Cameron County, do you have anything

5   unique for Cameron County that you put in the envelope when

6   you send a ballot by mail to a voter?

7   A.  We created a form to remind the voters to place their

8   ballots in the secrecy envelope and to make sure that they

9   include their — their numbers for the driver's license ID or

10  social security.

11  Q.  Can you hold up that form.  So it's blue and green?

12  A.  Yes.

13  Q.  Another county used pink, but you have blue and green.

14      Can you tell me, what is the purpose of this additional

15  material that Cameron County came up with?

16  A.  We wanted to be extra sure that the voter, as they were

17  preparing their carrier envelopes, remembered to put the

18  numbers in the proper places.

19  Q.  If a disabled voter asked you not to apply to them the

20  mail ballot ID requirements as an accommodation for their

21  disability, would you agree with that?

22  A.  I don't believe so.

23  Q.  And if a disabled voter asked you not to apply the oath of

24  assistance requirement to their assister as an accommodation,

25  would you do that?

REMI GARZA - DIRECT

1  A.  No.

2  Q.  Finally, I'd like to look at Joint Exhibit 1, page 62,

3  line 26.  This is Section 8.01 of SB 1.  Do you understand

4  this section to create new civil penalties, meaning money

5  penalties against you if you violate the election code?

6  A.  Yes.

7  Q.  Do you also see that you could potentially lose your job?

8  A.  Yes.

9  Q.  And also your employment benefits?

10 A.  Yes.

11 Q.  Do you have any concerns about this language?

12 A.  Yes.

13 Q.  Could you elaborate?

14 A.  Well, like I was mentioning earlier, this sort of changes

15 the dynamic of how we are doing our jobs because now we are

16 being extra careful and we've changed our behavior as to how

17 we are interacting with the voters.

18      It really is very chilling because, one, I don't look

19 forward to losing money, and certainly wouldn't want to lose

20 my job, or ultimately lose my benefits.

21           MISS PERALES:  Thank you.

22           I pass the witness.

23           THE COURT:  Anything else on this side?

24           Any cross?

25           MISS HUNKER:  Yes, Your Honor.

CROSS—EXAMINATION

1

BY MISS HUNKER:

2

Q.  Good afternoon, Mr. Garza.

3

A.  Good afternoon.

4

Q.  It's a pleasure to see you again.  I believe you and I

5

spoke late last year.  Thank you for your time and I'll do my

6

best to keep my questions as expedited as possible.

7

A.  Thank you.

8

Q.  Mr. Garza, you mentioned to Miss Perales that you are a

9

member of the Texas Association for Election Administrators,

10

correct?

11

A.  Correct.

12

Q.  And you are an officer of that organization?

13

A.  Not currently, but I was.

14

Q.  You were — in summer of 2021 you took the role of

15

president, is that right?

16

A.  Yes.

17

Q.  A position you held for a year?

18

A.  Yes.

19

Q.  Before that you were a vice president of the organization?

20

A.  Yes.

21

Q.  You were in a leadership position with the Texas

22

Association for Election Administrators during the

23

consideration of SB 1, correct?

24

A.  Yes.

25

REMI GARZA – CROSS

1  Q.  You did not testify before the Texas Legislature about SB
2  1, correct?
3  A.  I did not.
4  Q.  You did not testify before the Texas Legislature about any
5  of SB 1's predecessors bills, is that right?
6  A.  I did not.
7  Q.  In fact, you do not recall testifying for the Texas
8  Legislature at all in 2021, is that correct?
9  A.  I did not testify.
10  Q.  The Texas Association for Election Administrators,
11  however, did have someone speak to the legislature on their
12  behalf, is that right?
13  A.  Yes.
14  Q.  That individual was Chris Davis?
15  A.  Yes.
16  Q.  Chris Davis is the Election Administrator of Williamson
17  County?
18  A.  He was, yes.
19  Q.  In 2021 the Texas Association of Election Administrators
20  recommended to the legislature that they had a training
21  requirement for poll watchers, is that right?
22  A.  Yes.
23  Q.  The Texas Association for Election Administrators saw poll
24  watcher training as a way of preventing difficulties that
25  arose when poll watchers were not aware of their

REMI GARZA - CROSS

1  responsibilities, is that correct?

2  A.  Yes.

3  Q.  The training would also help inform poll watchers of what

4  practices and procedures counties follow when administering an

5  election?

6  A.  Yes.

7  Q.  The legislature was receptive to the recommendation that

8  poll watchers be required to take training, correct?

9  A.  Yes.

10 Q.  That recommendation was ultimately added to SB 1, correct?

11 A.  Yes.

12 Q.  You observed that the legislature was willing to engage in

13 a dialogue with the Texas Association of Election

14 Administrator as the sessions moved forward, correct?

15 A.  It improved with time, yes.

16 Q.  The Texas Association of Election Administrators also

17 supported the inclusion of an oath for poll watchers, correct?

18 A.  Yes.

19 Q.  We already discussed training.  I would like to discuss a

20 few other provisions in SB 1.

21     Brian, can you please put up Joint Exhibit 1, specifically

22 Section 3.09.

23     Do you see it on the screen in front of you?

24 A.  Yes.

25 Q.  And so this provision reads, "Regular Days and Hours for

REMI GARZA – CROSS

1  Voting.  Except as provided by Subsection C in an election in

2  which a county clerk is the early voting clerk under Section

3  83.002 early voting by personal appearance at the main early

4  voting polling place shall be conducted on each weekday of the

5  early voting period that is not a legal state holiday for a

6  period of at least nine hours, except that voting may not be

7  conducted earlier than 6:00 a.m. and no later than 10:00 p.m."

8      Did I read that correctly?

9  A.  Yes.

10  Q.  So if we look at the language that was added, it says that

11  early voting by personal appearance shall occur each weekday

12  of the early voting period that is not a legal state holiday,

13  correct?

14  A.  Yes.

15  Q.  And it struck out the weekdays of, correct?

16  A.  Yes.

17  Q.  And this ensures that the early voting clerk is having

18  early voting by personal appearance five days of the week,

19  correct?

20  A.  Yes.

21  Q.  Then if you go a little bit later on it says, "For a

22  period of at least nine hours," correct?

23  A.  Yes.

24  Q.  And the previous language did not have a minimum, is that

25  right?

REMI GARZA - CROSS

1  A.  That's correct.  Well, it was tied to the County Clerk's

2  Office hours.

3  Q.  Okay.  And then it gives a range that polling hours can be

4  open, correct?

5  A.  Yes.

6  Q.  From 6:00 a.m. in the morning?

7  A.  Yes.

8  Q.  To 10:00 p.m. at night?

9  A.  Yes.

10  Q.  Cameron County has never had early voting hours before

11  6:00 a.m., correct?

12  A.  No, we have not.

13  Q.  And you've never had early voting hours after 10:00 p.m.,

14  correct?

15  A.  No, we have not.

16  Q.  And you would agree with me that that guarantees more

17  hours of voting, correct?

18  A.   In counties where they weren't providing nine hours, yes,

19  it does guarantee additional hours.

20  Q.  And you would agree with me that having a minimum of nine

21  hours makes voting easier, correct?

22  A.  Yes.

23  Q.  And you would agree with me that having a minimum of nine

24  hours makes voting easier for workers?

25  A.  Depending on where the nine hours fall in between that 6

REMI GARZA — CROSS

1  and 10, yes.

2  Q.  And let's move to Section 3.10 and we're going to look at

3  Subsection E.  It reads, "In a Primary Election or General

4  Election for state and county officers in a county with a

5  population of 55,000 or more, the early voting clerk shall

6  order voting by personal appearance at the main early voting

7  polling place to be conducted on the last Saturday of the

8  early voting period for at least twelve hours, except that

9  voting may not be conducted earlier than 6:00 a.m. or later

10  than 10:00 p.m. on the last Sunday of the early voting period

11  for at least six hours, except that voting may not be

12  conducted earlier than 9:00 a.m. or later than 10:00 p.m."

13      Did I read that correctly?

14  A.  Yes.

15  Q.  And so this expanded the number of counties that would be

16  required to provide twelve hours of voting on the last week of

17  early voting, correct?

18  A.  Yes.

19  Q.  And it did so by reducing the population requirement?

20  A.  Yes.

21  Q.  And you would agree with me that extending the number of

22  counties that are required to provide at least twelve hours of

23  voting on the second week of early voting would make it more

24  accessible for voters?

25  A.  Yes.

REMI GARZA - CROSS

1  Q.  And let's continue to go down that section.  Okay.  Never

2  mind.  It also says that early voting must be conducted the

3  last Sunday of the early voting period, correct?

4  A.  Yes.

5  Q.  Before there was no requirement that early voting be

6  conducted on the last Sunday of the early voting period, is

7  that correct?

8  A.  I believe that there was a request for it to be on Sunday

9  but it wasn't required to be on Sunday.

10  Q.  And you would agree that this gives voters more hours to

11  vote by personal appearance in counties that did not already

12  provide that option?

13  A.  Yes.

14  Q.  And you would agree that this makes voting more accessible

15  to voters?

16  A.  Yes.

17  Q.  Let's look at Section 7.02, and so this provision requires

18  that an employer permit their employee to vote both on

19  Election Day and on early voting, is that right?

20  A.  Yes.

21  Q.  And prior to SB 1 that requirement for an employer to

22  allow their employee to go vote only applied on Election Day?

23  A.  Yes.

24  Q.  And so this provision expands the protection to voters to

25  include early voting, is that right?

REMI GARZA – CROSS

1  A.  Yes.

2  Q.  And you would agree with me that ensuring that employers

3  give answers to voters to vote during the early voting period

4  expands voters access to vote?

5  A.  Yes.

6  Q.  And let's look at Section 5.12.  The title for this

7  section is Opportunity to Correct Defect, correct?

8  A.  Yes.

9  Q.  The Cameron County Election Department initiated a cure

10 process for return ballots by mail whose carrier envelope

11 appears to be defective in response to this provision in SB 1,

12 correct?

13 A.  Yes.

14 Q.  And if we look at 5.14 quickly, and so the previous

15 section was for the signature verification committee, correct?

16 A.  Yes.

17 Q.  And this says, "Opportunity to Correct Defect Early Voting

18 Ballot Board," correct?

19 A.  Yes.

20 Q.  So Cameron County Election Department initiated a cure

21 process for returned ballots where the carrier envelope

22 appeared to have a defect in response to this provision as

23 well, correct?

24 A.  Yes.

25 Q.  And Cameron County did not have a cure process before

REMI GARZA - CROSS

1  these two additions in SB 1, is that right?

2  A.  The county had a way for individuals who had left their

3  signatures off the back of the carrier envelope to return it

4  to them within a period of time so that they could correct it

5  before it went to the early voting ballot board.

6  Q.  But for signatures that had a mismatch?

7  A.  On the numbers?

8  Q.  On the signatures, was there a cure process for that?

9  A.  No, there was not.

10 Q.  And was there a cure process for the voter leaving off the

11 statement of residence where one was required?

12 A.  No, there was not.

13 Q.  And was there a cure for a voter not completing the

14 witness section of the carrier envelope?

15 A.  No, there was not.

16 Q.  And Cameron County will call voters if they realize there

17 is a defect in the ballot by mail, correct?

18 A.  Yes.

19 Q.  You first look for the number on the application for

20 ballot by mail?

21 A.  When we receive the application, yeah, we try to confirm

22 that number with the voter registration record.

23 Q.  And if the number is not on the application for ballot by

24 mail, you check your voter record to see if the number is

25 otherwise in your system?

REMI GARZA - CROSS

1  A.  Yes.

2  Q.  And you would agree with me that having the ability to

3  correct a defect on a mail-in ballot makes it more likely that

4  the voter who cast the legal ballot would have that vote

5  counted?

6  A.  Yes.

7  Q.  And you would agree with me that SB 1 included provisions

8  that make it easier for people to vote?

9  A.  It provided provisions that would help people secure their

10  vote.

11  Q.  And you would agree with me that SB 1 included provisions

12  that make it more likely that a voter who legally cast a

13  ballot would have that ballot counted?

14  A.  Yes.

15  Q.  I want to talk to you now about poll watchers.  You would

16  agree that the role of poll watchers is to observe elections?

17  A.  Yes.

18  Q.  They observe the election on behalf of either a candidate,

19  a political action committee, or a party chair, is that right?

20  A.  Yes.

21  Q.  They are there to observe if there are any irregularities

22  or any infraction of the law?

23  A.  Yes.

24  Q.  You would agree that poll watchers are an important part

25  of the election?

REMI GARZA - CROSS

1   A.   Yes.

2   Q.   You would agree with me that in order for poll watchers to

3   be able to perform his or her function they would need to be

4   able to see election activities as they are being conducted?

5   A.   They would have to observe it, yes.

6   Q.   Let's look at some of the provisions in SB 1 related to

7   poll watchers.  We are going to start with Section 4.02.

8       So this provision reads, "The purpose of this chapter is

9   to preserve the integrity of the ballot box in accordance with

10  Section 4, Article 6, Texas Constitution by providing for the

11  appointment of watchers.  It is the intent of the legislature

12  that watchers duly accepted for service under this chapter be

13  allowed to observe and report any irregularities in the

14  conduct of an election but may not interfere in the orderly

15  conduct of an election."

16      Did I read that correctly?

17  A.   I don't have all that on my screen but I would trust that

18  that is what it says.

19  Q.   And let's look at the last sentence.  "To effect that

20  purpose, a watcher appointed under this chapter shall observe

21  without obstructing the conduct of an election and call to the

22  attention of an election officer any observed or suspected

23  irregularities or violation of law in the conduct of the

24  election."

25      Did I read that correctly?

REMI GARZA - CROSS

1  A.  Yes.

2  Q.  Prior to SB 1, if a poll watcher in Cameron County noticed

3  an irregularity, that poll watcher had the opportunity to ask

4  either the clerk or presiding judge, correct?

5  A.  Yes.

6  Q.  The poll watcher also had the option of contacting your

7  office directly, correct?

8  A.  Yes.

9  Q.  So this particular provision did not change how

10 Cameron County operated with respect to poll watchers

11 identifying an election irregularity?

12 A.  That's correct.

13 Q.  Let's turn to Section 4.06.  And so this is amending

14 Section 33.051 of the election code, correct?

15 A.  Yes.

16 Q.  And it says, "A watcher appointed to serve at a precinct

17 polling place, a meeting place for an early voting ballot

18 board, or a central counting station must deliver the

19 following materials to the presiding judge at the time the

20 watcher reports for service."

21     It then lists two things, "A certificate of appointment,

22 and a certificate of completion from training completed by the

23 watcher under Section 33.008."

24     Did I read that correctly?

25 A.  Yes.

REMI GARZA – CROSS

1   Q.  And let's take a look at A1.  This reads, "A watcher

2   appointed to serve at an early voting polling place must

3   deliver certificates under Section A to early voting clerk or

4   deputy clerk in charge of polling place the watcher first

5   responds."

6        Did I read that correctly?

7   A.  Yes.

8   Q.  And we're going to jump to Section G.  "An election

9   officer commits an offense if the officer intentionally or

10  knowingly refuses to accept a watcher for service when

11  acceptance of the watcher is required by this section."

12       Did I read that sentence correctly?

13  A.  Yes.

14  Q.  You're not aware of any election worker in Cameron County

15  who intentionally or knowingly refused to accept a watcher

16  when acceptance of that watcher was required by this section?

17  A.  I'm not aware of anybody rejecting a watcher.

18  Q.  And so we looked back towards before Section 4.06 and

19  specifically Section 33.051 of the election code provides the

20  criteria that a poll watcher must meet in order to qualify for

21  service underneath the code, is that correct?

22  A.  Yes.

23  Q.  And then the remaining sections list additional criteria

24  that could strike them from service, is that correct?

25  A.  I'm sorry.  Could you repeat that?

REMI GARZA - CROSS

1  Q.  Actually it might help if we go to the Texas Election Code

2  specifically.

3      Brian, can you please pull up Chapter 33.  And we're going

4  to go to 33.051.

5      And so you would agree with me that this is the section of

6  the election code we were just discussing?

7  A.  Yes.

8  Q.  Brian, if you could be remove the blow-up and then go to

9  the next page.

10     And so you can see Section 33.051 includes other specific

11  criteria that a poll watcher must meet in order to be accepted

12  for service, is that correct?

13  A.  Yes.

14  Q.  And if an election worker needed to make a determination

15  of whether or not to accept a poll watcher they could refer to

16  Section 33.051 for the specific qualifications that the poll

17  watcher must meet, is that correct?

18  A.  Yes.

19  Q.  You can put that down.

20     And let's look at Section 4.07 of the election code --

21  sorry 4.07 of SB 1.  And so this particular section said, "A

22  watcher is entitled to sit or stand near enough to see and

23  hear the election officers conducting the observed activity

24  except as otherwise prohibited by this chapter."

25     Did I read that correctly?

REMI GARZA - CROSS

1   A.  Yes.

2   Q.  And the word that was removed was "conveniently," correct?

3   A.  Yes.

4   Q.  So the previous standard was conveniently near the

5   election officers?

6   A.  Yes.

7   Q.  And the current standard is near enough to see and hear

8   the election officers, is that right?

9   A.  Yes.

10  Q.  The Secretary of State did not provide guidance on what

11  the definition of conveniently was, correct?

12  A.  No, not that I'm aware of.

13  Q.  And it sounded like earlier, so please correct me if I'm

14  wrong, that you interpreted conveniently as being what was

15  convenient to the election worker, is that correct?

16  A.  To the judge, yes.

17  Q.  And you are not aware if a poll watcher reading this

18  language would have interpreted conveniently enough to see or

19  hear to define conveniently as what was convenient for the

20  poll watcher?

21  A.  When it was just conveniently there wasn't the language

22  about to see and hear, so I'm just trying to make sure that

23  I'm answering your question.

24  Q.  No, I understand that.

25  A.  That poll watcher would challenge the presiding judge if

REMI GARZA - CROSS

1  they didn't feel that they were conveniently close enough to
2  what was happening at the polling place.
3  Q.  And so there was a conversation that occurs, is that
4  correct?
5  A.  There would be one, yes.
6  Q.  And sometimes poll watchers would disagree with what was
7  permitted under the section as opposed to what the election
8  worker or election judge stated?
9  A.  Are you asking me if there would be a disagreement?  They
10  would be upset that they weren't allowed to —
11  Q.  Well, if there was a disagreement, rather than being upset
12  just could be there disagreements?
13  A.  There could be disagreements, yes.
14  Q.  And those disagreements existed pre-SB 1, is that correct?
15  A.  They could, yes.
16  Q.  Now, I believe you mentioned earlier to Miss Perales that
17  you thought that near enough to see or hear was not
18  sufficiently clear, is that correct?
19  A.  Well, the way I interpret it, it places the — it moves it
20  to the poll watcher, that they make the determination of
21  whether or not they are close enough to see and hear; whereas
22  before, when it was conveniently, I felt the presiding judge
23  who has control over the polling place sort of had the ability
24  to say this is as close as you're going to be able to get to
25  this activity.

REMI GARZA - CROSS

1      That's why I always say that it seemed like it switched

2   that power dynamic of what was happening in the polling place

3   because the poll watcher now is the one that could say I'm not

4   seeing it, I can't hear it.

5   Q.  And so do you have a good understanding of what near

6   enough to see and hear is?

7   A.  I have my understanding it of it, yes.

8   Q.  And that's because you can hear me right now, correct?

9   A.  Yes.

10  Q.  And you can see me right now?

11  A.  Yes.

12  Q.  And you know when you can hear me?

13  A.  Yes.

14  Q.  And you know when you can see me?

15  A.  Yes.

16  Q.  And so that is something measurable, is that right?

17  A.  It would depend who — I mean, it's not measurable because

18  I don't know that you would get to a point where I could no

19  longer see you.

20      If the room was completely dark I wouldn't be able to see

21  you, but that's not — I don't mean to be argumentative, I

22  apologize.  I just — it is measurable.  I don't know how you

23  would measure that, though, of what I see and what I hear.

24  Q.  And when you are communicating with others, you have a

25  basic sense of how far you have to be away from them before

REMI GARZA – CROSS

1  you could perhaps say something to a colleague without being

2  overheard, is that right?

3  A.  I think anybody could, yes.

4  Q.  Yeah.  That's just part of the interactions we've had and

5  experiences we have gained throughout our lives by having

6  communications with individuals, is that right?

7  A.  I could say, yes.

8  Q.  Let's turn to Section 4.09, and so this reads, "A person

9  commits an offense if the person serves an official capacity

10  at a location of which the presence of watchers is authorized

11  and knowingly prevents a watcher from observing an activity or

12  a procedure the person knows the watcher is entitled to

13  observe, including by taking any action to obstruct the view

14  of the watcher or distance the watcher from activity or

15  procedure to be observed in a manner that would make the

16  observation not reasonably effective."

17      Did I read that correctly?

18  A.  Yes.

19  Q.  And so here a person doesn't commit an offense unless that

20  person knows the watcher is entitled to observe the activity,

21  is that correct?

22  A.  Yes.

23  Q.  And that person has to knowingly prevent the watcher from

24  being able to see the activity, is that right?

25  A.  Yes.

REMI GARZA - CROSS

1  Q.  And you are not aware of any election judge in

2  Cameron County who knowingly obstructed a watcher from

3  observing an activity in the election?

4  A.  I'm not aware of any of that.

5  Q.  And you are not aware of any election judge that has

6  knowingly prevented the watcher from observing activity that

7  the person knew the watcher was entitled to observe?

8  A.  No, I don't believe I'm aware of any of that.

9  Q.  Now, you've been an Election Administrator for about eight

10 years?

11 A.  Yes.

12 Q.  And in that eight years as an Election Administrator

13 you've only had one incident with a poll watcher?

14 A.  One that I — that was significant enough for me to easily

15 recall.

16 Q.  And in that incident the poll watcher, you said he was

17 going behind the laptop, is that right?

18 A.  Yes.

19 Q.  And that incident was resolved by you — or not you, but

20 an election worker informing the poll watcher that he was not

21 allowed to view that particular activity, is that correct?

22 A.  Yes.

23 Q.  And you weren't at that particular polling place during

24 the incident, is that right?

25 A.  I was not there.

REMI GARZA – CROSS

1  Q.  And so you don't have any personal information or personal
2  knowledge about this incident?
3  A.  No, I wasn't there.
4  Q.  And it's possible that the poll watcher simply didn't know
5  that he was not permitted to go behind the laptop, is that
6  correct?
7  A.  My understanding of the situation was the judge had
8  informed him that he wasn't allowed to go behind there and he
9  kept insisting to go behind.
10  Q.  And we discussed earlier that training for poll watchers
11  was to help inform them of what they could and could not do,
12  correct?
13  A.  Yes.
14  Q.  And you are not aware of any poll watcher that was
15  reported to intimidate voters, correct?
16  A.  No.
17  Q.  And you are not aware of any poll watcher that harassed
18  voters in Cameron County?
19  A.  Not that I can recall.
20  Q.  And you are not aware of any poll watchers who threatened
21  violence towards voters in Cameron County?
22  A.  No.
23  Q.  And you are not aware of any poll watchers that threatened
24  violence towards an election judge or poll worker in
25  Cameron County?

1   A.   I'm not aware of any.

2   Q.   The election code prohibits poll watchers from observing

3   certain activities, correct?

4   A.   Yes.

5   Q.   And those prohibitions have not changed by SB 1, correct?

6   A.   Correct.

7        MISS HUNKER:  Your Honor, I'm about to change topics

8   so I wanted to give you the opportunity if this was a good

9   time to take a break for the night or if you wanted me to

10  continue.

11       THE COURT:  So I was hoping you would finish.

12       MISS HUNKER:  Sorry.

13       MISS PERALES:  Your Honor, if we could push through,

14  Mr. Garza still has to drive to Brownsville.

15       THE COURT:  This evening?

16       MISS PERALES:  Yes.

17       THE COURT:  How much more do you have?

18       MISS HUNKER:  I hate saying, but I'm only about a

19  third through.

20       THE COURT:  I don't think any of us could take that.

21       Mr. Garza, can you stay the night?

22       THE WITNESS:  Yeah.

23       THE COURT:  Sorry.

24       We better call it a night.  We'll resume at 9.

25       So we resume with Mr. Garza and then what's the game

REMI GARZA — CROSS

1  plan?

2        MR. KERCHER:  I think we had — I think that would be

3  a good time for us to move any exhibits into evidence at that

4  point, a couple housekeeping things.  I believe that

5  Miss Perales has set out a few more witnesses, a couple more

6  Peraleses, in fact.

7        MISS PERALES:  Yes, but no relation.

8        THE COURT:  Mr. Garza, and then who else?

9        MISS PERALES:  In the morning it will be Louis

10  Perales, Esmeralda Perales, Dana DeBeauvoir, Stella Guerrero

11  Mata, and Zeph, Z-E-P-H, Capo, C-A-P-O.

12        THE COURT:  Yeah.  Just to help sort of move things

13  along for the future, I mean, I'm not sure there's a lot of

14  value in us just, here's the statute, read the statute.  I

15  mean, let's just ask somebody to — let's just ask a question

16  of the witness because I think we are losing a lot of time

17  just repetitively repeating.

18        I mean, we all can read the statute in front of us,

19  so let's try to avoid doing that, that will, if nothing else,

20  maybe just get to the gist of things.

21        I'll see you tomorrow at 9.

22        MR. KERCHER:  Your Honor, before we head out, very

23  briefly I want to preview something for the Court.  There were

24  a few exhibits that were trial exhibits that were disclosed

25  the day before trial.  My team has still not seen those.

1          We are working through those issues with opposing

2     counsel but it's my understanding that two of those exhibits

3     pertain to one of the witnesses who will be called tomorrow,

4     Miss Mata.  Since we have not seen those exhibits, we will

5     object to their use tomorrow.

6          THE COURT:  So how is it that they have not seen

7     these exhibits, if you're going to call the witness tomorrow?

8     Why weren't they given at least today?

9          MISS PERALES:  Your Honor, I believe we are planning

10    to —

11         Yes, I understand.

12         We have one exhibit that was disclosed for the

13    witness and we are — we were in negotiation with defendant

14    Harris County to produce the remaining documents related to

15    this witness because she's a Harris County voter and we have

16    just learned, because we received from them, that they have

17    some forms but they don't have the letters that were sent to

18    our voter.

19         THE COURT:  I'll take that up when the issue comes up

20    tomorrow.

21         MR. NICHOLS:  One more thing.  Doesn't have to be on

22    the record.

23         THE COURT:  I'm ready.

24         MR. NICHOLS:  This doesn't need to be on the record.

25         THE COURT:  Not related to this case?

1           MR. NICHOLS:  It is related to the case, but it's

2    personal housekeeping.  I just wanted to let you know I'm

3    going to go take care of some prison business tomorrow so I

4    won't be here.

5           THE COURT:  Oh, that's fine.

6           MR. NICHOLS:  I just didn't want to not tell you I

7    wasn't going to be here, but Mr. Liu will be here.

8           THE COURT:  Thank you.  See you in the morning.

9           (Recess)

10                          -o0o-

11      I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.  I

13   further certify that the transcript fees and format comply

14   with those prescribed by the Court and the Judicial Conference

15   of the United States.

16

17   Date:  09/27/2023        /s/  *Gigi Simcox*
                              United States Court Reporter
18                            262 West Nueve Street
                              San Antonio TX 78207
19                            Telephone:  (210)244-5037

20

21

22

23

24

25

*Gigi Simcox, RMR, CRR*