```
1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
2                      SAN ANTONIO DIVISION

3
   LA UNION DEL PUEBLO ENTERO,       .
4  ET AL,                            .
                                     .
5            PLAINTIFFS,             .
        vs.                          . DOCKET NO. 5:21-CV-844-XR
6                                    .
   GREGORY W. ABBOTT, ET AL,         .
7                                    .
             DEFENDANTS.             .
8

9

10               TRANSCRIPT OF BENCH TRIAL
           BEFORE THE HONORABLE XAVIER RODRIGUEZ
11             UNITED STATES DISTRICT JUDGE
                   SEPTEMBER 14, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                        MALDEF
                          110 BROADWAY
18                        SUITE 300
                          SAN ANTONIO TX 78205
19

20                        JENNIFER HOLMES, ESQUIRE
                          NAACP LEGAL DEFENSE & EDUCATIONAL
21                        FUND INC
                          40 RECTOR STREET, FIFTH FLOOR
22                        NEW YORK NY 10006

23

24

25
```

```
 1

 2                              LEAH J. TULIN, ESQUIRE
                                BRENNAN CENTER FOR JUSTICE AT NYU
 3                               SCHOOL OF LAW
                                1140 CONNECTICUT AVENUE NW
 4                              SUITE 1150
                                WASHINGTON DC 20036
 5

 6                              SEAN MORALES-DOYLE, ESQUIRE
                                BRENNAN CENTER FOR JUSTICE
 7                              120 BROADWAY, SUITE 1750
                                NEW YORK NY 10271
 8

 9                              DANIELA LORENZO, ESQUIRE
                                MARISA O'GARA, ESQUIRE
10                              ELIAS LAW GROUP LLP
                                250 MASSACHUSETTS AVENUE NW
11                              SUITE 400
                                WASHINGTON DC 20001
12

13   FOR THE DEFENDANTS:        RYAN G. KERCHER, ESQUIRE
                                KATHLEEN HUNKER, ESQUIRE
14                              MONROE DAVID BRYANT, JR., ESQUIRE
                                WILLIAM WASSDORF, ESQUIRE
15                              TEXAS ATTORNEY GENERAL
                                P.O. BOX 12548
16                              MC 009
                                AUSTIN TX 78711
17

18                              CORY REN LIU, ESQUIRE
                                BUTLER SNOW LLP
19                              1400 LAVACA STREET
                                SUITE 1000
20                              AUSTIN TX 78701

21

22                              ANTHONY J. NELSON, ESQUIRE
                                TRAVIS COUNTY ATTORNEY'S OFFICE
23                              314 WEST 11TH STREET, ROOM 590
                                AUSTIN TX 78701
24

25
```

```
1

2

3                              LOUIS J. CAPOZZI, III, ESQUIRE
                               JONES DAY
4                              51 LOUISIANA AVENUE NW
                               WASHINGTON DC 20001
5

6

7

8   REPORTED BY:               GIGI SIMCOX, RMR, CRR
                               OFFICIAL COURT REPORTER
9                              UNITED STATES DISTRICT COURT
                               SAN ANTONIO, TEXAS
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (San Antonio, Texas; September 14, 2023, at 9:00 a.m., in

2     open court.)

3              THE COURT:  Your cross.

4              MISS TULIN:  Good morning, Your Honor, a few

5     housekeeping matters.

6              THE COURT:  Oh, sorry.  I'm not awake yet.

7              MISS TULIN:  I'm sure you're not alone actually in

8     this courtroom.

9              Leah Tulin with the Brennan Center on behalf of the

10    LUPE plaintiffs.  I hope to have the opportunity to address

11    the Court at some point about something other than a long list

12    of exhibits but today is not that day.  So I have a shorter

13    list today.

14             I'm going to start with, I believe, the only two

15    exhibits that were used yesterday that were not admitted

16    already in the morning, which are LUPE 294 and LUPE 325.

17             For the sake of the record, if Your Honor is okay

18    with it I'd like to read the rest of the exhibits that were

19    used that I believe were admitted either in the morning or

20    throughout the day, and those are LUPE 60, LUPE 61, LUPE 201,

21    LUPE 202.  HAUL MFV260.

22             THE COURT:  I'm sorry, HAUL what?

23             MISS TULIN:  HAUL, so the HAUL plaintiffs 260.  LUPE

24    172 and LUPE 234.

25             THE COURT:  Any objection to LUPE 60, 61, 172, 201,

1  202, 234, 294, 325?

2       MR. KERCHER:  Other than the objections we may have

3  made on the record at the time, Your Honor, no.

4       THE COURT:  I'm not sure I understand that.

5       MR. KERCHER:  So the list that Miss Tulin read

6  included exhibits that were used yesterday.  I don't have the

7  numbers in front of me, but to the extent that we objected at

8  the time we would stand on those objections, however they've

9  been ruled upon, but other than those objections that are

10  already on the record, no.

11       THE COURT:  Thank you.

12       So those are admitted.

13       And then HAUL 260, same?

14       MR. KERCHER:  Correct.

15       THE COURT:  Yeah, and that's admitted.

16       Anything else?

17       MISS TULIN:  I just wanted to clarify for the record

18  something that came up at the end of the day yesterday about

19  LUPE's supplemental exhibits.  There are two exhibits that the

20  defendants have not received.  We are in the process of

21  correcting those exhibits and getting copies over to them this

22  morning, so we've been in touch about that.

23       I also just wanted to make clear, there was some

24  discussion about whether they had been received.  We

25  supplemented our list, the vast majority of the

1   supplementation was exhibits that had initially been

2   identified by the Department of Justice and that we adopted

3   after they had the privilege of not being with us for this

4   trial.

5          So I believe the defendants have copies of everything

6   and a lot of those were moved in yesterday, but I just wanted

7   to make clear for the record that there are only two I think

8   that are subject to further conferral and that we're working

9   on.

10          THE COURT:  I'll just wait to see what happens with

11   those two.

12          MISS TULIN:  Thank you, Your Honor.

13          I have one nonexhibit related housekeeping matter,

14   question really, and it relates to the Zoom link.  We have

15   parties — I understood that from the beginning from the first

16   day that the link is for the attorneys but we wanted to just

17   understand whether it's possible for parties to access the

18   Zoom link and watch remotely.

19          THE COURT:  So, you know, judicial conference just

20   published something I think just yesterday or the day before

21   and it's not even an effective date yet.  So in a few weeks or

22   a month, or something like that, Zoom broadcasting will be

23   allowed in civil proceedings that are nonevidentiary with no

24   witnesses, as far as I can understand what the new policy is

25   going to be.

1          That doesn't fit this situation because we have

2    witnesses being presented.  So technically under the judicial

3    conference policy, I cannot allow broadcasting.  Now, I'm

4    making an exception for the lawyers.

5          The problem with the parties is, and you know, no

6    offense against the sorority group that are here, but, I mean,

7    they asked for 7,000 links.  I mean, that, in effect, becomes

8    broadcasting that I can't do.  So I can't allow it for one

9    party and then start not allowing it for other parties so

10   we're going to keep it just to attorneys.

11         MISS TULIN:  Understood.  Thank you, Your Honor.

12         THE COURT:  So where are we on the stipulation?

13         MISS HOLMES:  Good morning, Your Honor, Jennifer

14   Holmes.  I can address the stipulation about political

15   affiliation.  I think we've come to — plaintiffs have come to

16   an agreement with State defendants, and that is that the

17   parties agree to the stipulation as worded in ECF 745 with a

18   small amendment.

19         Opening the door to the information described in ECF

20   745 on direct examination shall allow the topics to be

21   inquired into on cross; however, testimony concerning a

22   witness' basic background information that reveals party

23   affiliation, such as employment by a political party or

24   partisan organization, shall not be considered opening the

25   door.

1          THE COURT:  Thank you.

2          MISS PERALES:  Thank you.

3          MR. LIU:  Accordingly, for the Harris County District

4    Attorney, just for the record, we are not a party to that

5    stipulation.

6          THE COURT:  So what does that mean?

7          MR. LIU:  So if the issue, sort of as yesterday came

8    up, the issue of bias comes up, we can address any objections

9    at the time but there's no stipulation.

10          MR. KERCHER:  And, Your Honor, I believe that

11    intervenor defendants have a couple of exhibits they would

12    like to offer to the Court.

13          MR. CAPOZZI:  Good morning, Your Honor.  Louis

14    Capozzi, Jones Day, for the intervenor defendants.

15          We would like to move to admit Intervenor Exhibits

16    Number 1 and 3.  These are on the list of exhibits that

17    plaintiffs do not object to and provided to us yesterday.

18          THE COURT:  Any objection from this side?  None.

19          Any objection from your codefendants?

20          MR. KERCHER:  None, Your Honor.

21          THE COURT:  Intervenor Defendants Exhibits 1 and 3

22    are admitted.

23          Any other housekeeping?  None.

24          Now your cross.  Thank you.

25

REMI GARZA - CROSS

```
 1                        CROSS-EXAMINATION
 2   BY MISS HUNKER:
 3   Q.  Good morning, Mr. Garza.
 4   A.  Good morning.
 5   Q.  I appreciate you staying the night and I'm hoping we'll
 6   get this through as expedited as possible.
 7       SB 1 was a large bill, correct?
 8   A.  Yes.
 9   Q.  It amended multiple versions of the election code?
10   A.  Yes.
11   Q.  And these those provisions covered a lot of different
12   topics?
13   A.  Yes.
14   Q.  Your office had to rethink your process?
15   A.  Yes.
16   Q.  The bill had a short turnaround time?
17   A.  Yes.
18   Q.  It came into effect on top of the March Primary?
19   A.  Yes.
20   Q.  It did not give you much time to get the forms that were
21   required by SB 1?
22   A.  That's correct.
23   Q.  You ran into challenges getting the forms created by the
24   Secretary of State's Office?
25   A.  Yes.
```

REMI GARZA - CROSS

1  Q.  Then once you had the forms you had challenges getting
2  them printed out in sufficient quantities?
3  A.  Yes.
4  Q.  You also ran into paper shortages?
5  A.  Yes.
6  Q.  You were informed by your vendor that there was a delay in
7  being able to produce these forms?
8  A.  Yes.
9  Q.  You were informed by your vendor there was a delay in
10 being able to produce the carrier envelopes?
11 A.  Yes.
12 Q.  I am going to bring up State Exhibit 13.  Do you see the
13 document on your screen?
14 A.  Yes.
15 Q.  And this is Election Advisory 2021-18, correct?
16 A.  Yes.
17 Q.  And this is particularly the March 1st, 2022 Primary
18 election law calendar?
19 A.  Yes.
20 Q.  And the Election Law Calendar is distributed by the
21 Secretary of State's Office, correct?
22 A.  Yes.
23 Q.  And the election law calendar specifies the dates that the
24 counties must meet for the upcoming election, is that right?
25 A.  It provides guidance on when certain events should be

REMI GARZA - CROSS

1  occurring.  Some are hard deadlines and some are more open.

2  Q.  Let's turn to page 29 of this exhibit where it says

3  February 14th.  One more up.

4      Early voting for the March 4th — sorry — the March

5  Primary in 2022 started on February 14th, correct?

6  A.  Yes.

7  Q.  And then if we turn to page 33, the last day for voters to

8  submit their ABBM was February 18th, correct?

9  A.  Yes.

10  Q.  In addition, mail-in voters can submit their ABBM any time

11  of the year, correct?

12  A.  Yes.

13  Q.  So a voter who is qualified to vote by mail in the March

14  2022 Election could have submitted an ABBM early as

15  January 1st, 2022?

16  A.  Yes.

17  Q.  You were taking steps to ensure that paper shortages do

18  not disrupt your preparation for coming elections, correct?

19  A.  Yes.

20  Q.  But during the March 2022 Primary Election you ran into

21  difficulties distributing the form?

22  A.  Yes.

23  Q.  A voter who submitted an ABBM on the old form, that would

24  have been rejected unless they added a space on their own

25  initiative for the ID number requirement, correct?

REMI GARZA – CROSS

1   A.  Yes.

2   Q.  The implementation of SB 1 coincided with redistricting?

3   A.  Yes.

4   Q.  Following redistricting the county saw –– sorry.

5   Following redistricting counties redraw their precinct lines,

6   correct?

7   A.  Yes.

8   Q.  And that was ongoing while your office was implementing SB

9   1?

10  A.  Yes.

11  Q.  You found that the coinciding of both SB 1 and

12  redistricting made it more difficult for you to implement SB

13  1?

14  A.  Yes.

15  Q.  You also said yesterday that the Ballot Tracker rollout

16  did not go well.

17  A.  From my perspective, it did not.

18  Q.  You said that "awkward" was an understatement?

19  A.  Yes.

20  Q.  The Ballot Tracker had trouble integrating codes from

21  VoteTech?

22  A.  Yes.

23  Q.  Which made it difficult for voters in off-line counties to

24  use?

25  A.  Yes.

REMI GARZA - CROSS

1  Q.  The Ballot Tracker was a new addition to Texas elections,
2  correct?
3  A.  For the Secretary of State's Office, different components
4  were.
5  Q.  The legislature only enacted in 2021?
6  A.  I believe as it exists today, yes.
7  Q.  The March 2022 Primary was the first election that the
8  Ballot Tracker in that form was available?
9  A.  Yes.
10 Q.  The Secretary of State has since managed to integrate the
11 VoteTech's codes?
12 A.  Yes.
13 Q.  You think it would have been easier to implement SB 1 had
14 the legislature given you more time before its effective date?
15 A.  To implement, yes.
16 Q.  You think some of the confusion that voters had regarding
17 the new requirements was due to the lack of implementation
18 time?
19 A.  It was a contributing factor, yes.
20 Q.  Based on your experience, you concluded that less voters
21 would have had their ballots rejected had the legislature
22 given you more time?
23 A.  Yes.
24          THE COURT:  Just to help me remember, when did the
25 governor sign SB 1?

1          MISS HUNKER:  I couldn't tell you the exact date, but
2     it would have been after the second special session.  So I
3     believe it would have been in August or early September.
4     Probably early September.
5          MISS PERALES:  I'm sorry.  September 7, 2021.
6          THE COURT:  So the legislature could have made the
7     effective date of the legislation September 1st?
8          MISS HUNKER:  No, Your Honor.  The effective date was
9     in December.
10         THE COURT:  I know that was the effective date.  I'm
11    saying the legislature could have made it effective
12    September 1, couldn't it?  That's a question; I don't know.
13         MISS HUNKER:  You mean September 1, 2021?
14         THE COURT:  Yeah.  So we are talking about the delay
15    or the rush that county election administrators had to engage
16    in.
17         MISS HUNKER:  The legislature did, had they thought
18    of it, have an option to have a longer implementation period
19    before it became effective, yes.
20         THE COURT:  Thank you.
21    BY MISS HUNKER:
22    Q.  In your experience, there tends to be voter confusion
23    whenever there is a change in election law?
24    A.  Yes.
25    Q.  I want to turn our discussion to some of the advisories

REMI GARZA – CROSS

1  your office received regarding the ID number requirement and

2  so we are going to look at Joint Exhibit 4, which is State

3  Exhibit 17.  And do you see that on the screen?

4  A.  Yes.

5  Q.  This is Election Advisory 2022-08, correct?

6  A.  Yes.

7  Q.  And this was issued by the Secretary of State's Office?

8  A.  Yes.

9  Q.  And your office would have received this election

10  advisory, correct?

11  A.  Yes.

12  Q.  And the title for this particular exhibit is Opportunity

13  to Correct Defects on Application for Ballot by Mail and

14  Carrier Envelope, correct?

15  A.  Yes.

16  Q.  And if we look at the date, it is January 28th, 2022,

17  correct?

18  A.  Yes.

19  Q.  And that is after voters could have submitted their ABBMs,

20  correct?

21  A.  Yes.

22  Q.  And during your deposition last year you had mentioned

23  that your office was only able to really start its process

24  once you received advisories from the election — from the

25  election division at the Secretary of State's Office, correct?

1  A.  Well, yeah.  It helped answer questions to make sure that

2  what we were doing was in line with the guidance the Secretary

3  of State's Office was implementing.

4  Q.  And it took time for the Secretary of State's Office to

5  distribute election advisories on SB 1, correct?

6  A.  Yes.

7  Q.  And that was partly because of the scale of changes,

8  correct?

9  A.  Most likely, yes.

10  Q.  And so I want to turn to the next page.  The advisory

11  gives you certain scenarios of when the early voting clerk

12  should accept an ABBM or reject it, correct?

13  A.  Yes.

14  Q.  And let's turn one more page to scenario three.

15      If the voter provides four digits of their social security

16  number and the voter registration record contains a driver's

17  license and a social security number but the early voting

18  clerk is able to validate the social security number, the

19  early voting clerk must accept the ABBM, correct?

20  A.  Yes.

21  Q.  And that's even though there was a driver's license in the

22  record, correct?

23  A.  Yes.

24  Q.  And your office follows this procedure, correct?

25  A.  Yes.

REMI GARZA - CROSS

1  Q.  And let's jump to scenario six.

2      Voter provides both types of personal identification

3  number on their ABBM, the registration record contains both

4  types of personal identification numbers.  One of the numbers

5  matches, the other does not.  The early voting clerk must

6  accept that, correct?

7  A.  Yes.

8  Q.  And your office follows that procedure, correct?

9  A.  Yes.

10 Q.  I also want to jump to page 16 very briefly, and the top

11 title for this is "Impact on Federal Postcard Applications

12 Voters."

13     Did I read that right?

14 A.  Yes.

15 Q.  And FPCA voter is a military voter or overseas voter,

16 correct?

17 A.  Yes.

18 Q.  And this says that an FPCA form already includes a place

19 for a voter to provide this information.  That's correct,

20 right?

21 A.  Yes.

22 Q.  And the reason for that is the FPCA acts as a voter

23 registration form, correct?

24 A.  Correct.

25 Q.  And voters are required to put their Texas ID number or

REMI GARZA - CROSS

1  social security number on voter registration forms, correct?

2  A.  If they have been issued one, yes.

3  Q.  And the voter may correct a defect on their FPCA form

4  simply by resubmitting an FPCA form with the new information,

5  correct?

6  A.  My understanding, yes.

7  Q.  Let's put that document aside.

8      I want to discuss now Joint Exhibit 6, which is State

9  Exhibit 19.  Do you have that on the screen in front of you?

10 A.  Election Advisory 22-12.

11 Q.  Yes.  And this was also issued by the Secretary of State's

12 Office, correct?

13 A.  Yes.

14 Q.  And the title for this particular election advisory is

15 "Additional Procedures Regarding Correction of Defects on an

16 Application for ballot by mail or carrier envelope."

17     Did I read that correctly?

18 A.  Yes.

19 Q.  And this election advisory was issued February 11, 2022?

20 A.  Yes.

21 Q.  And this was a follow-up to the election advisory you and

22 I had just discussed, which was 22-08, correct?

23 A.  Yes.

24 Q.  And let's go to the section that says "removing the

25 secrecy flap."  The guidance advises counties that the early

REMI GARZA – CROSS

1  voting clerk may remove the secrecy flap to check whether the
2  voter has put a matching ID number, correct?
3  A.  Correct.
4  Q.  Now, the Secretary of State's Office had previously
5  advised counties that early voting clerks could not remove the
6  flap, is that right?
7  A.  Yes.
8  Q.  You were a member of the Secretary's advisory group?
9  A.  Yes.
10  Q.  The advisory group asked the Secretary of State to
11  reconsider its guidance on this point, correct?
12  A.  Yes.
13  Q.  The Secretary of State, in response, issued its revised
14  guidance, correct?
15  A.  I believe so, yes.
16  Q.  Your office removes the secrecy flap when a carrier
17  envelope arrives, correct?
18  A.  Yes.  For review, yes.
19  Q.  This procedure gives you more time to identify defects on
20  the carrier envelope?
21  A.  Yes.
22  Q.  And this was a procedure you implemented once you received
23  the new guidance from the Secretary of State's Office,
24  correct?
25  A.  Yes.

REMI GARZA - CROSS

1  Q.  But you would have not followed that procedure in the
2  early months of SB 1's implementation, correct?
3  A.  No, we wouldn't have done it.
4  Q.  And let's jump to the next section for returning carrier
5  envelope.  According to this advisory, the early voting clerk
6  may deliver the carrier envelope to the voter in person,
7  correct?
8  A.  Yes.
9  Q.  Upon receipt of the carrier envelope, the voter may
10 correct the defect immediately, correct?
11 A.  Yes.
12 Q.  Your office has utilized this option?
13 A.  Yes.
14 Q.  In certain circumstances your office will deliver the mail
15 ballot in person?
16 A.  Yes.
17 Q.  Specifically, if a voter is over 75 and has informed you
18 that they did not have any way of coming to the office and you
19 felt that they wouldn't have a way to quickly come to the
20 office, your staff would take the ballot to the voter?
21 A.  Correct.
22 Q.  This was to help ensure that voters who were elderly could
23 correct their ballot in the deadline, correct?
24 A.  Yes.
25 Q.  Your office also designed an insert for the carrier

1   envelope that informed voters of the ID number requirement?

2   A.   Yes.

3   Q.   That insert was not included in the Primary Election?

4   A.   No, it was not.

5   Q.   But the insert was included in the May 7, 2022

6   Constitutional Election?

7   A.   Yes, I believe we started using it then.

8   Q.   It was included in the November 2022 General Election?

9   A.   Yes.

10  Q.   And it will be included in future elections?

11  A.   Yes.

12  Q.   And your office worked to reduce its rejection rate,

13  correct?

14  A.   Yes.

15  Q.   And you succeeded in reducing the rejection rate a

16  substantial amount, correct?

17  A.   Yes.

18  Q.   I believe you went from nearly a 10 percent rejection rate

19  in the March Primary — is that right?

20  A.   That's about correct, yes.

21  Q.   — to about a 1.67 percent rejection rate in the

22  November 2022 Election?

23  A.   That's correct.

24  Q.   Brian, can you please bring up LUPE Exhibit 294.

25       You discussed this particular document with Miss Perales

REMI GARZA - CROSS

1  yesterday, correct?

2  A.  Yes.

3  Q.  And this is a letter that the Texas Association of

4  Election Administrators sent Lieutenant Governor Dan Patrick

5  and House Speaker Dade Phelan?

6  A.  Yes.

7  Q.  And if you go to the last page, you are a signatory of

8  this particular document, correct?

9  A.  Yes.

10 Q.  And I want to go to the page and discuss Section 6.04.  I

11 guess before I go on, this particular letter was in response

12 to Senate Bill 7, is that right?

13 A.  It was one of the early filings of Senate Bill 1.

14 Q.  Brian, before we go over 6.04 — thank you.

15     And so if you see on the first paragraph this says, "in

16 response to SB 7 Conference Committee Report," correct?

17 A.  Yes.

18 Q.  Let's go back to Section 6.04.

19     And this says that "Section 6.04 of SB 7 would mandate

20 that a person who assists the voter in a voting process state

21 why the assistance is necessary."

22     Did I read that right?

23 A.  Yes.

24 Q.  And your office, when I say "your office," I mean the

25 Texas Association of Election Administrators, had concerns

REMI GARZA - CROSS

1  over this particular provision?

2  A.  Yes.

3  Q.  I want to look now at Section 6.07 of SB 1 Conference

4  Report.

5      And so this is Section 6.04, correct?

6  A.  Yes.

7  Q.  And if you look where it says, "I swear, the voter I'm

8  assisting represented to me that they are eligible to receive

9  assistance because of a physical disability that renders the

10 voter unable to write or see or inability to read the language

11 in which the ballot is written."

12     Do you see that language?

13 A.  Yes.

14 Q.  And does that conform with your recollection of what SB 7

15 said when you wrote that letter?

16 A.  Yes.

17 Q.  And can you David — sorry, Brian.  Please go to the first

18 page just so we can confirm what this document is.

19     And you see where it says "Conference Committee Report?"

20 A.  Yes.

21 Q.  And you see how it has SB 7 along with a date May 29,

22 2021?

23 A.  Yes.

24         MISS HUNKER:  Your Honor, I would request that the

25 Court take judicial notice of this document.  It was not used

REMI GARZA - CROSS

1   as an exhibit, but given that the fact that this is a

2   Conference Committee Report, it seems to be information that

3   cannot be disputed.

4           THE COURT:  Any response from that side?

5           MISS PERALES:  Your Honor, we haven't seen the

6   exhibit.  Can we defer our response?

7           THE COURT:  So let's give it a number.  That way we

8   know what we are talking about.

9           What's this going to be?

10          MR. WASSDORF:  One second.

11          THE COURT:  I'm assuming if I tried to look it up on

12  the online version, I would find it in there?

13          MR. KERCHER:  That's correct.

14          MR. WASSDORF:  State 316.

15          THE COURT:  I'm sorry?

16          MR. WASSDORF:  State 316.

17          THE COURT:  316.  Okay.  I'm inclined to give this

18  judicial notice because I can find it on the Texas Legislative

19  online site for bills, but I'll wait to hear from the

20  plaintiffs, but conditionally admitted.

21          MISS HUNKER:  Thank you, Your Honor.

22  BY MISS HUNKER:

23  Q.  Mr. Garza, I'm now going to —

24          MISS PERALES:  I'm sorry.  I just needed a second.

25          Your Honor, we have determined that this exhibit is

1  also HAUL 266, so we have no objection to the admission of

2  that exhibit and you won't need to do a judicial notice.

3           THE COURT:  Thank you.

4           It's admitted.

5           MISS HUNKER:  Thank you, Your Honor.

6  BY MISS HUNKER:

7  Q.  Mr. Garza, I now want to quickly look at section 6.04 of

8  SB 1 or the oath provision.  Just actually —

9           MR. KERCHER:  Kathleen, can you say that again?

10          MISS HUNKER:  Looking for the oath provision of SB 1.

11  I forgot to write it down.

12          MR. KERCHER:  6.04.

13          MISS HUNKER:  I don't think it's 6.04.  I think it's

14  4.

15          MR. KERCHER:  6.04.

16          MISS HUNKER:  6.04; thank you.

17  BY MISS HUNKER:

18  Q.  And let's look at the language in SB 1.  It says, "I swear

19  under the penalty of perjury the voter I'm assisting

20  represented to me they are eligible to receive assistance."

21      It does not have the additional language of establishing

22  that the voter had a specific disability, is that correct?

23  A.  Yes.

24  Q.  And it doesn't establish and it gets through the language

25  that requires the person taking the oath to establish that the

REMI GARZA - CROSS

1  voter has an inability to read or write, is that correct?

2  A.  Yes.

3  Q.  You can put the document down.  Thank you.

4      You said yesterday that a voter needs to tell the assister

5  why they would need assistance, is that correct?

6  A.  If I stated that, I don't recall; I'm sorry, but they

7  would have to tell them that they are eligible for assistance.

8  Q.  But they would not need to specify why they needed that

9  assistance, is that correct?

10  A.  Correct.

11  Q.  You were the election administrator during the 2020

12  November General Election, is that right?

13  A.  Yes.

14  Q.  That election occurred during the COVID-19 pandemic?

15  A.  Yes.

16  Q.  There was a lot of concern about how to ensure that voters

17  could vote safely?

18  A.  Yes.

19  Q.  It was also a Presidential Election?

20  A.  Yes.

21  Q.  Presidential Elections tend to have a larger turnout,

22  correct?

23  A.  Correct.

24  Q.  The governor also that year moved many of the elections

25  you were going to have in May to the November Election?

1   A.  He allowed for that option, yes.

2   Q.  As a consequence jurisdictions that normally would host

3   their elections in May had their races incorporated into the

4   November ballot?

5   A.  Yes.

6   Q.  That change required a lot of additional administrative

7   work, correct?

8   A.  Yes.

9   Q.  For example, it took more work to prepare the ballot,

10  correct?

11  A.  Correct.

12  Q.  And it also, in part, increased the number of voters

13  interested in the particular election, correct?

14  A.  Yes.

15  Q.  Cameron County saw a high turnout in November 2022?

16  Correct — sorry — November 2020, correct?

17  A.  Yes.

18  Q.  And that was a higher vote turnout in 2020 than previous

19  presidential elections, correct?

20  A.  Correct.

21  Q.  You also had a higher number of voters who voted by mail

22  that year, correct?

23  A.  Yes.

24  Q.  Over double the amount of mail-in voters that you normally

25  would receive, correct?

 1  A.  I think that's — yes.

 2  Q.  Mr. Garza, I covered this topic somewhat with an earlier

 3  county witness, so in order to be economical with your time,

 4  I'm going to hit the highlights rather than repeat the full

 5  history, but if at any point you want more context please let

 6  me know.

 7  A.  Okay.

 8  Q.  The governor issued proclamations in 2020 in response to

 9  the COVID-19 pandemic?

10  A.  Yes.

11  Q.  A handful of these proclamations pertain to elections,

12  correct?

13  A.  Yes.

14  Q.  One of the proclamations expanded the number of days that

15  voters could deliver their mail ballot in person to the Early

16  Voting Clerk's Office?

17  A.  Yes.

18  Q.  You would agree with me that the change prompted by the

19  governor's proclamation increased access to the franchise

20  during the pandemic?

21  A.  Yes.

22  Q.  The governor's proclamation was also a one-time deal,

23  correct?

24  A.  Correct.

25  Q.  Once the November Election passed, the provision governing

REMI GARZA - CROSS

1  the in-person delivery of mail ballots went back into place?

2  A.  Yes.

3  Q.  Accordingly, post-November 2020, voters could only drop

4  off their in-person ballots on Election Day, correct?

5  A.  Yes.

6  Q.  You are the early voting clerk for Cameron County?

7  A.  Yes.

8  Q.  You were the early voting clerk for the November 3rd, 2020

9  Election?

10  A.  Yes.

11  Q.  Accordingly, if a voter wishes to deliver their ballot in

12  person, they have to deliver it to your office?

13  A.  Yes.

14  Q.  You only had a single office?

15  A.  Yes.

16  Q.  You maintain a warehouse to store election records but you

17  only have one office location?

18  A.  That's correct.

19  Q.  Cameron County, therefore, did not have multiple in-person

20  delivery sites for mail ballots?

21  A.  True.

22  Q.  You did not offer 24-hour voting during the 2020 November

23  Election?

24  A.  No.

25  Q.  You have never offered 24-hour voting?

REMI GARZA - CROSS

1   A.  No, we have not.

2   Q.  We have already discussed Sections 3.09 and 3.10 which

3   stipulate the hours that polling locations may be open,

4   correct?

5   A.  Correct.

6   Q.  The voting hours offered by Cameron County already fell

7   within the range laid out in SB 1?

8   A.  Correct.

9   Q.  You did not have to contract hours in response to Section

10  3.09 or 3.10 of SB 1?

11  A.  I did not.

12  Q.  When you look at the hours of polling locations, you want

13  to see how many voters the location is expected to have?

14  A.  Yes.

15  Q.  You want to look at how many polling locations you have to

16  serve voters throughout the county?

17  A.  That's correct.

18  Q.  This is because you need to see whether or not you'll be

19  able to accommodate the turnout during those times?

20  A.  True.

21  Q.  When you looked, the history patterns of early voting show

22  that hours outside the ranges you already offered wasn't

23  really a busy time?

24  A.  That's correct.

25  Q.  So it wasn't something that you have considered doing?

REMI GARZA - CROSS

1  A.  Well, we consider it.  At each election we look at our

2  options, but it's not something we would have implemented

3  based on our history.

4  Q.  Under Texas law, if a voter is physically unable to enter

5  the polling place without personal assistance or likelihood of

6  injuring the voter's health, the voter has the option of

7  voting curbside, correct?

8  A.  Correct.

9  Q.  If a voter chooses this option, an election officer will

10  deliver a ballot to the voter at the polling place's entrance

11  or curb?

12  A.  Correct.

13  Q.  Cameron County offers voters this option at each polling

14  location?

15  A.  Yes.

16  Q.  And every polling location in Cameron County has a parking

17  area reserved for voters to vote curbside?

18  A.  Yes.

19  Q.  In the event a voter asks to vote curbside, you accept the

20  voter's representation that the voter is qualified to vote

21  curbside?

22  A.  Correct.

23  Q.  You understand that curbside voting and drive-thru voting

24  refer to different methods of voting?

25  A.  Yes.

REMI GARZA - CROSS

1  Q.  For curbside, a voter must meet specific criteria before
2  being eligible?
3  A.  Correct.
4  Q.  For drive-thru, voters do not need to met additional
5  eligibility standards?
6  A.  I haven't implemented drive-thru voting, so I'm not really
7  sure if there was any qualification on it.
8  Q.  Cameron County did not offer drive-thru voting during the
9  2020 Election?
10  A.  No, it did not.
11  Q.  Cameron County has never offered drive-thru voting?
12  A.  No, we have not.
13  Q.  You do not intend to introduce the practice of drive-thru
14  voting following the 2020 Election?
15  A.  No.
16  Q.  SB 1 did not change Cameron County's intention to
17  introduce drive-thru voting?
18  A.  It did not.
19  Q.  You would agree with me that it is important to ensure
20  that voters have privacy while voting?
21  A.  Yes.
22  Q.  And at times you had concerns about privacy of voters when
23  utilizing curbside voting?
24  A.  Yes.
25  Q.  Specifically, you had concerns when multiple people come

 1  together in a vehicle and remain in the car?

 2  A.   Yes.

 3  Q.   You mentioned yesterday that if a voter requested a ballot

 4  for themselves and another voter you would provide multiple

 5  ABBMs to that voter, is that correct?

 6  A.   In the past, yes.

 7  Q.   Yes.  But you did not send an ABBM without receiving a

 8  request first, is that right?

 9  A.   In the past?

10  Q.   Yes.

11  A.   We did.

12  Q.   Mr. Garza, I'm going to bring up our discussion back in

13  May 2022.  Specifically, we're going to look at page 46, lines

14  9 through 11.

15      And I asked you, "In 2020 did Cameron County send out

16  unsolicited applications to vote by mail?"

17      You responded, "No."

18          MISS PERALES:  Objection, Your Honor.  This is

19  improper impeachment because the question that counsel is

20  asking now is different from the question that counsel is

21  attempting to use to impeach.

22          THE COURT:  Yeah.  He can explain it.

23          MISS HUNKER:  So I'm going to ask him if he could

24  explain it.

25          THE COURT:  Go ahead.

REMI GARZA – CROSS

1          THE WITNESS:  Why the different responses?

2          MISS HUNKER:  Yes.

3          THE WITNESS:  The question I think that was asked in

4    the deposition, I thought it was applying directly to the

5    November 2020 Election, in which case we did not send out

6    unsolicited applications.  We considered it at the time but

7    decided against it because there were so many political

8    parties and different groups sending out those applications

9    that we felt it would confuse the voter so we set that aside.

10   BY MISS HUNKER:

11   Q.  You can pull that down.

12       The legislature prescribes law as governing how elections

13   are conducted in the State, correct?

14   A.  Yes.

15   Q.  And you would agree that the legislature has an interest

16   in maintaining confidence in Texas elections?

17   A.  Yes.

18   Q.  If people are concerned about fraud, that undermines

19   confidence in elections?

20   A.  Yes.

21   Q.  The legislature is justified in modifying election laws to

22   improve people's confidence in elections?

23   A.  Yes.

24   Q.  Reasonable people can disagree on the best way to improve

25   people's confidence in elections?

REMI GARZA - CROSS

1  A.  Yes.

2  Q.  Reasonable people can disagree about the best way to

3  address voter fraud?

4  A.  Yes.

5  Q.  Reasonable people can disagree about the best way to

6  address vulnerabilities underlying Texas elections?

7  A.  True.

8  Q.  Looking back at the November 2020 Election, you would

9  agree that the election procedures were not uniform throughout

10  the state?

11  A.  That's correct.

12  Q.  Generally speaking, it can be more difficult to monitor

13  elections when procedures are not uniform?

14  A.  I would say yes.

15  Q.  If procedures are not uniform, that can raise doubts about

16  the fairness of an election?

17  A.  It could.

18  Q.  In your opinion, the legislature has an interest in

19  prescribing laws that promote uniformity?

20  A.  Certain aspects, yes.

21  Q.  And you would agree with me that people can disagree about

22  how much uniformity is ideal in Texas elections?

23  A.  Yes.

24  Q.  You would agree that the legislature has expressed an

25  interest elsewhere in the election code for uniformity and how

REMI GARZA – CROSS

1   elections are conducted throughout the state?

2   A.   Yes.

3   Q.   Specifically, the legislature has tasked the Secretary of

4   State with obtaining and maintaining uniformity in the

5   application, operation, and interpretation of the election

6   code?

7   A.   Yes.

8   Q.   Cameron County is covered by the language requirements

9   under the federal Voting Rights Act for Spanish, correct?

10  A.   Correct.

11  Q.   Cameron County, therefore, provides assistance relating to

12  the electoral process in English and Spanish?

13  A.   Yes.

14  Q.   To that end, Cameron County has poll workers who can speak

15  Spanish, correct?

16  A.   Yes.

17  Q.   These poll workers can assist voters at polling centers?

18  A.   Yes.

19  Q.   Voters will sometimes call your office speaking Spanish?

20  A.   Yes.

21  Q.   You use staff in your office who can advise voters in

22  Spanish?

23  A.   Yes.

24  Q.   You conduct elections in compliance with what the election

25  code requires?

REMI GARZA - REDIRECT

1  A.  Yes.

2  Q.  Your office conducts elections in compliance with what the

3  election law -- election code requires?

4  A.  Yes.

5  Q.  That was true pre-SB 1?

6  A.  Yes.

7  Q.  It's true post-SB 1?

8  A.  Yes.

9  Q.  You will continue to conduct elections in Cameron County

10  within the election code, correct?

11  A.  Correct.

12        MISS HUNKER:  No more questions, Your Honor.

13        THE COURT:  Anything else?

14        MR. LIU:  No questions.

15        MISS PERALES:  Just a couple of very short questions,

16  Your Honor.

17        If we could bring up LUPE 294.

18                     REDIRECT EXAMINATION

19  BY MISS PERALES:

20  Q.  Mr. Garza, LUPE 294 is the letter that the TAEA, Texas

21  Association of Elections Administrators sent to the

22  legislature on July 1, 2021.  And I would like to show, side

23  by side, parts of the letter along with Joint Exhibit 1 which

24  is SB 1.

25       So when we were eliciting your testimony earlier we talked

1  about the letter's discussion of section 5.10 and that was the

2  version of the bill SB 7 that you were addressing, 5.10, do

3  you see that on the left?

4  A.  Yes.

5  Q.  And this has to do 5.10 and not 5.01.  There we go.  5.10

6  and that flows onto the second page and this has to do with

7  the creating a rebuttable presumption that the voter is the

8  voter based on the match of the ID number.

9      Do you see that in SB 1?

10 A.  Yes.

11 Q.  So is it fair to say that the concern you were expressing

12 in the TAEA letter about section 5.10, the language ends up in

13 the final bill?

14 A.  It appears that way, yes.

15 Q.  And then one more comparison, which is just your letter,

16 section 7.04 which talks about prohibiting county election

17 officers from soliciting a voter to apply for an absentee

18 ballot, do you see that on the left in your letter?

19 A.  Yes.

20 Q.  Do you see that provision in SB 1?  And this would be

21 starting at line 15, unlawful solicitation, and then line 19

22 and 20.

23 A.  Yes.

24 Q.  So that did make it into the final SB 1, is that correct?

25 A.  Yes.

835

REMI GARZA – REDIRECT

1  Q.  And are your concerns still, as expressed in your letter

2  of the TAEA, regarding these two provisions?

3  A.  Yes.

4          MISS PERALES:  Thank you, Derek.

5  BY MISS PERALES:

6  Q.  Now, Miss Hunker asked you some questions about the phrase

7  "see and hear.  Near enough to see and hear," and she asked

8  you whether you could see her and hear her.  Do you recall

9  that?

10  A.  Yes.

11  Q.  If I'm a poll worker –– this is the scenario that you

12  gave –– and you are a watcher, and I'm checking voters in at

13  the check-in table, and you want to watch that activity, can

14  you see me if I were the poll worker from where you are

15  sitting and what I'm doing on the screen?

16  A.  No.

17  Q.  Where would you have to go?

18  A.  Behind you.

19  Q.  Close enough to see on the screen what I was doing, is

20  that correct?

21  A.  That's correct.

22  Q.  Would you agree with me that different people have

23  different abilities to see print on a screen?

24  A.  Yes.

25  Q.  And if I were to tell you, "Stand close enough to me so

1  that you can see and hear," you would determine how close you

2  needed to stand, is that correct?

3  A.  Yes.

4           MISS PERALES:  Thank you.

5           Oh, Your Honor.  I'm so sorry.

6           Earlier in his testimony Mr. Garza showed us one

7  sheet of paper that was the unique insert that Cameron County

8  developed to put in the envelope to tell voters about the

9  defect and that they should fix their ID number, and that

10  single page we would like to move the admission of as LUPE

11  351.

12           THE COURT:  Any objection from anyone?

13           MISS PERALES:  I can show it to counsel.

14      (Off the record discussion)

15           MISS HUNKER:  No objection, Your Honor.

16           THE COURT:  And seeing no objection from anyone, 351

17  is admitted.

18           MISS PERALES:  Thank you, Your Honor.

19           THE COURT:  Any other questions from this side?

20           Any further cross based on those questions?

21  BY MISS HUNKER:

22  Q.  Only one question for you, Mr. Garza.

23      In order for a poll watcher to be able to perform his or

24  her function, they would need to be able to see the election

25  activities that are being conducted, correct?

DANA DEBEAUVOIR — DIRECT

1  A.  Yes.

2          MISS HUNKER:  Thank you.  No further questions.

3          THE COURT:  And with that, you can step down.

4          Any further need for this witness?

5          MISS PERALES:  No, Your Honor.  The plaintiffs would

6  like to thank Mr. Garza for staying an extra day.

7          THE COURT:  And he can be excused?

8          MR. KERCHER:  Yes, Your Honor.

9          THE COURT:  You are excused, sir.  Thank you.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  And your next witness.

12          MISS TULIN:  Your Honor, plaintiffs call Dana

13  DeBeauvoir.

14          MR. MORALES-DOYLE:  Good morning, Your Honor.

15          On behalf of LUPE plaintiffs, we are offering

16  Miss DeBeauvoir's testimony as to our claims regarding

17  Sections 4.09, 5.07, 5.13, 6.06, and 7.04 of SB 1, and her

18  testimony is related to all of the statutory and

19  constitutional theories of liability that we are addressing.

20          THE COURT:  Thank you.

21      (DANA DEBEAUVOIR, having been duly sworn, testified as

22  follows:)

23                      DIRECT EXAMINATION

24  BY MR. MORALES-DOYLE:

25  Q.  Good morning, Miss DeBeauvoir.

DANA DEBEAUVOIR – DIRECT

1  A.  Good morning.

2  Q.  Do you mind stating your name for the record?

3  A.  Yes.  Dana DeBeauvoir.

4  Q.  Miss DeBeauvoir, what do you do for a living?

5  A.  I used to serve as the Travis County Clerk elected for 36

6  years before I retired about a year and a half ago.

7  Q.  And as Clerk of Travis County, were you responsible for

8  administering elections?

9  A.  I was.  It was my favorite part of the job.

10  Q.  Have you held any other positions, whether paid or

11  otherwise related to election administration?

12  A.  No.

13  Q.  Did you hold any role in the clerk's association while you

14  with Travis County?

15  A.  Yes.  Several.  Probably most relevant, I was the Chair of

16  the Elections Committee for the County and District Clerks'

17  Association of the Legislative Committee.  I was the Chair for

18  elections for many years.

19  Q.  Do you have any experience outside of the United States

20  with elections?

21  A.  Yes.  A lot of experience.  I was the United Nations

22  elections observer multiple times, especially in the '90s.  I

23  was one of the UN observers for the 1994 Election to end

24  Apartheid in South Africa.  That was a violent election, and I

25  was honored to serve.  I also served in Bangladesh for their

DANA DEBEAUVOIR – DIRECT

1  violent election, also in Kosovo and in Serbia.  I also did an

2  appointment in Poland.  It was training people on budget, how

3  to do budget issues.

4  Q.  Have you received any certifications or awards related to

5  your experience as an election official?

6  A.  Yes.  I am certified with the Election Center with a

7  certificate called CERA, C-E-R-A, Certified Elections and

8  Registration Administration.

9  Q.  And can you briefly give the rest of your educational

10  background, please.

11  A.  I have an undergraduate degree, bachelor of arts, in

12  sociology social work from the University of Texas at

13  Arlington and a master's degree, 1981, from the LBJ School of

14  Public Affairs in Austin.

15  Q.  Miss DeBeauvoir, I now want to talk a little bit about

16  Senate Bill 1.  Are you familiar with what I'm referring to

17  when I refer to Senate Bill 1?

18  A.  Yes.

19  Q.  And how do you become familiar with the bill?

20  A.  Through the legislative process and the things that

21  happened in Harris County and Travis County before Senate Bill

22  1 was under consideration.

23  Q.  Have you read SB 1?

24  A.  Oh, yes.  Many times.

25  Q.  Did you read it at the time it was passed?

840

DANA DEBEAUVOIR – DIRECT

1  A.  Yes, I did.

2  Q.  Now, having run elections in Texas for about — 36 years,

3  is that right?

4  A.  Yes.

5  Q.  Did you believe that SB 1 at the time that it was passed

6  was likely to solve problems that you had witnessed over the

7  years?

8  A.  No.

9  Q.  Can you tell me why not?

10  A.  Well, the intent of SB 1 was to stop communications

11  between elections offices and voters, especially regarding by

12  mail ballots.  It was specifically designed so that we could

13  not give voters specific information regarding how to cure

14  problems with the by-mail ballots.

15  Q.  You were still in office when SB 1 went into effect in

16  December of 2021, correct?

17  A.  Yes, for the implementation — not for the implementation

18  part but for the planning part.

19  Q.  So did you ever administer any elections under SB 1?

20  A.  For the planning part I did.  So I had to develop all the

21  training programs to try to deal with it but I had left office

22  just at the point in time when we were doing the

23  implementation.

24  Q.  So there was a March Primary in 2022, is that right?

25  A.  Correct.

DANA DEBEAUVOIR – DIRECT

1  Q.  And it's my understanding under Texas law that in order to

2  vote by mail one has to apply to vote by mail, correct?

3  A.  Yes.

4  Q.  And the period for applying to vote by mail for the

5  March 2022 Election would have begun in January of 2022, is

6  that right?

7  A.  Forty-five days in advance of the election, yes.

8  Q.  So you were still in office at the time that at least some

9  of the activities regulated by SB 1 were happening for the

10 March 2022?

11 A.  Yes.  We had already started voting by mail.

12 Q.  Now, I want to talk about some specific pieces of SB 1 and

13 I'm going to refer a couple times to Joint Exhibit 1 which is

14 the law here.

15     I want to start with Section 7.04, which is at pages 58 to

16 60.  I'm just going to start by asking:  Are you familiar with

17 this provision of SB 1?

18 A.  Vote harvesting?

19 Q.  Yes.

20 A.  Yes.

21 Q.  So this provision I think creates a new criminal offense

22 for compensating or receiving compensation for so-called vote

23 harvesting and defines vote harvesting services to mean,

24 quote, "In-person interaction with one or more voters in the

25 physical presence of an official ballot or a ballot voted by

DANA DEBEAUVOIR - DIRECT

1  mail intended to deliver votes for a specific candidate or
2  measure."  That's at page 59, lines 7 through 10.
3     Does that — did I read that provision of the law
4  correctly?
5  A.  Yes, you did.  I see that.
6  Q.  Now, is that, as someone who has administered many, many
7  elections, is that definition clear to you?
8  A.  Well, it doesn't make the distinction between legal
9  assistance to a person who is qualified to receive it.
10 Q.  In your time as clerk do you recall there ever being an
11 issue with people interacting with voters in the presence of
12 their ballots?
13 A.  An issue about?
14 Q.  Let me be more specific.  Do you recall any instances of
15 misconduct stemming from the kinds of interactions that are
16 described in this section that we just read?
17 A.  Not the way you are referring to it.  I have had
18 complaints from other voters about potential interference with
19 a voter.  I have had questions about a child assisting a
20 voter, but I wouldn't say there were any issues about it.  It
21 was all just routine assistance with a voter, usually for very
22 obvious reasons.
23 Q.  And in your experience was it common — so I want to focus
24 on the mail ballot part of this.
25 A.  All right.

DANA DEBEAUVOIR — DIRECT

1  Q.  Or actually strike that.  Let's not limit ourselves to
2  that.
3      In your experience, was it common for organizations in
4  Travis County to do door-to-door canvassing in support of
5  either candidates or ballot measures?
6  A.  It was not a very routine program in Travis County.  It
7  was done somewhat, but for the most part, no, it was not, but
8  we didn't have politiqueros [phonetic] in Travis County.
9  Q.  The organizations that did do this on the occasions that
10 it was done, did they include both partisan organizations and
11 nonpartisan organizations to be advocating in support of
12 ballot measures?
13 A.  It was all done on ballot measures.  I couldn't tell you
14 about the party affiliation.
15 Q.  I want to focus on that language at the end of that
16 section we just read, "intended to deliver votes for a
17 specific candidate or measure."  So under your reading of this
18 section, could a nonpartisan organization still have paid
19 staff, do that kind of voter engagement we just talked about,
20 going door to door to advocate for a ballot measure?
21 A.  Probably not, because anybody who was, I guess you would
22 refer to it as deputized or appointed to serve in that
23 capacity is going to be appointed by a party or a measure, so
24 that automatically disqualifies anyone who is appointed to try
25 to help voters.

DANA DEBEAUVOIR - DIRECT

1  Q.  And looking at that language there "intended to deliver

2  votes for a specific candidate or measure," under your reading

3  could an organization pay staff to campaign against a ballot

4  measure?

5  A.  Hmmm, that's interesting.  Yes, I think because it says

6  "for" a specific candidate or measure.  I assume if it was

7  against they could do that.

8  Q.  So does that mean that you would read this to criminalize

9  paying someone to encourage people to vote for a measure but

10  to make it legal for someone to discourage someone from

11  voting?

12  A.  I believe I agree with your point.

13  Q.  I want to turn now to — oh, you know what?  Actually, do

14  you recall when SB 1 passed when you were clerk did you have

15  concerns about the effect of this section?

16  A.  Yes.

17  Q.  Can you explain what your concerns were?

18  A.  Yes.  I thought it criminalized a very innocent process

19  that helped often our most vulnerable voters, voters who were

20  shut in who really relied on vote by mail to be able to

21  participate in democracy, and I thought that was a real shame

22  they would take away people who, in places that used

23  assistants for vote by mail, somebody who is probably very

24  well-known to them, who came to their house all the time to

25  help them complete their ballot by mail.

DANA DEBEAUVOIR − DIRECT

1  Q.  Do you recall whether you sought any guidance or had any

2  discussions with the Secretary of State's Office about this

3  provision specifically when you were clerk?

4  A.  I tried to, to no avail.

5  Q.  What do you mean by that?

6  A.  At that time, just before I left office and right when we

7  should have been getting assistance and advice from the

8  Secretary of State about SB 1, the Secretary of State's Office

9  went silent on us.

10     All of us in Texas were trying our best to call in

11  multiple times and we never got answers back from our

12  telephone calls to ask questions about Senate Bill 1.  It was

13  a very difficult time.

14          THE COURT:  What time period are we talking about?

15          THE WITNESS:  This would have been December and

16  January, so December of 2021 and January of 2022.

17  BY MR. MORALES−DOYLE:

18  Q.  Just to help for the rest of the testimony, what date was

19  your last day in office?

20  A.  January 31st, 2022.

21  Q.  Thank you.  Now I want to turn to another provision of SB

22  1, section 6.06, which is at pages 54 and 55 of this exhibit.

23     And this section concerns compensated assistance of mail

24  voters.  I want you to take a second to look at these changes

25  you can.  Are you familiar with that section?

DANA DEBEAUVOIR – DIRECT

1  A.  Let's see.  I am familiar with it.

2  Q.  What is your understanding of what this section does?

3  A.  It makes it illegal to pay people to go out and help other

4  voters complete casting their by-mail ballots.

5  Q.  Did you in the time before you retired have any

6  involvement in the implementation or enforcement of this

7  section?

8  A.  I did not.

9  Q.  Now, I want to — I guess I don't want to completely

10  repeat the conversation we just had, but were you aware prior

11  to the enactment of SB 1 of organizations in Travis County

12  offering assistance to mail voters?

13  A.  I am somewhat aware that there was assistance available.

14  I didn't participant in it and I'm not specifically aware of

15  the groups that were doing it.

16  Q.  Okay.  Do you recall any instance in your 36 years in

17  office when a paid assister was alleged to have coerced or

18  intimidated a voter?

19  A.  No.

20  Q.  Were you aware of any instance of a paid assister engaging

21  in any kind of fraud?

22  A.  No.

23  Q.  Were you aware of any instance of a paid assister engaging

24  in any kind of misconduct?

25  A.  No.

847

DANA DEBEAUVOIR – DIRECT

1   Q.  Were you aware of any allegations at all of misconduct by
2   a paid assister?
3   A.  No.
4   Q.  Based on your experience, is there any reason to think
5   that an assister paid to provide assistance by a nonpartisan
6   nonprofit organization is more likely to engage in misbehavior
7   than one that is not paid?
8   A.  No.
9   Q.  When SB 1 was passed, did you have any concerns about the
10  effect of this section as clerk?
11  A.  Yes.
12  Q.  Can you share what those were?
13  A.  Well, yes.  It means that campaigns who are always
14  strapped for volunteers can't make use of usually minimum wage
15  people that can hire to do outreach for voters.  It limits
16  campaigns.
17  Q.  When you say campaigns ——
18  A.  All kinds of campaigns.
19  Q.  I was going to ask.  When you say "campaigns," do you just
20  mean partisan campaigns, or ——
21  A.  All Democrats, Republicans, Independents, candidate and
22  social measures, all of them.  It hurts their ability to do
23  outreach.
24  Q.  I assume the answer is the same here with regard to any
25  attempt at communication with the Secretary of State about

DANA DEBEAUVOIR – DIRECT

1  implementation of this provision?

2  A.  I'm sorry?

3  Q.  Let me ask that differently.  Did you attempt to talk to

4  the Secretary of State's Office about this provision before

5  you left office?

6  A.  Yes.  This was not top of my list to communicate with them

7  about, but, yes, I did try to talk to them about this

8  compensation matter.

9  Q.  Were you able to have any communication?

10  A.  We had a hard time talking with them about any of the

11  provisions of Senate Bill 1, certainly not this one.

12  Q.  All right.  Let's move on to sections 5.07 and 5.13.  So

13  we can start at page 38 with 5.07.  I'll just give you a

14  second to read what's on the screen here.  See if you are

15  familiar with this provision.

16  A.  Okay, yes.

17  Q.  Do you recall these provisions that required people to put

18  an ID number on their mail ballot application and their mail

19  ballot envelope?

20  A.  I do.

21  Q.  Were you involved in implementing these provisions prior

22  to your retirement?

23  A.  I was.

24  Q.  And, again, that's because people had already begun to

25  apply to vote by mail for the March 2022 Primary, correct?

DANA DEBEAUVOIR – DIRECT

1  A.  Correct.  And if I may clarify, this provision was added
2  by the courts.  Senate Bill 1 did not have any kind of cure
3  provision when it was originally written and it also created a
4  problem with everybody in the state, all of the election
5  offices, in that we were gagged.  We could not have a
6  conversation with any of our constituents about specific
7  information about how to cure the problems with their ballots.
8      And the number one problem that voters had with their
9  ballots was trying to guess the magic number for what was in
10 the database and how they could try to match it with the
11 number that they were writing on their application for ballot
12 by mail.
13 Q.  I think I know what you're talking about.  Let's turn to
14 that in a second.  I wanted to clarify two things.  One is not
15 a clarification.  I don't know if you are bumping something or
16 if the court reporter — something is hitting the mike and I
17 just want to make sure — maybe you're too close to the mike.
18 A.  Sorry.
19 Q.  The second thing is I want to be clear that the provision
20 we are looking at here actually was in SB 1, but I think I
21 know what you are referring to, and so I want to talk about
22 the provisions that are actually in SB 1 here, and I want to
23 ask you in, you know, your last months in office when this
24 went into effect how did the implementation of this provision
25 go, this requirement that people put numbers on their mail

1  ballot application?

2  A.  How did it go?  You mean -- well, it was complicated to

3  implement.  For my piece of it, which was, you know, up until

4  I left, we had to implement training programs for people in

5  the office and to try to get past our problems of how to do

6  the communication to tell people how to add information, how

7  to correct information because we weren't really allowed to do

8  that at the time when I was still there.

9  Q.  Let me ask a more specific question.  Do you recall there

10  being many ballot applications that were rejected in early

11  2022 as a result of this provision?

12  A.  Many.  Travis County, like a lot of other counties, had an

13  extremely high rejection, unusual rejection rate for

14  ballot-by-mail applications.  It was around 50 percent

15  rejection rate for applications for ballot by mail.

16  Q.  So in January 2022 you recall that Travis County was

17  rejecting one out of every two mail ballot applications that

18  were submitted?

19  A.  Yes, it was scary.

20  Q.  Can you give me a sense of what a typical mail ballot

21  application rejection rate might have been before 2022?

22  A.  One to one and a half percent.

23  Q.  Do you recall, were you rejecting these ballots because

24  the number given was incorrect, or -- meaning that they

25  actually didn't give the correct social security number, or

DANA DEBEAUVOIR – DIRECT

1  because it didn't match with the number that was in the

2  registration record?

3  A.  There were both categories.  Either they were missing a

4  number because of the design of the form or they gave the

5  wrong number.  They guessed the wrong number.

6  Q.  And were there times when you were rejecting ballots or

7  applications because they gave a driver's license number, for

8  instance, but the number in the registration record was the

9  last four of their social?

10  A.  That's correct.

11  Q.  And you mentioned that it was difficult to try to help

12  voters.  Can you explain what your limitations were in trying

13  to help voters that were having their applications submerged?

14  A.  Yes.  The threat of Senate Bill 1 was that if we were of

15  giving any information that was specific to the vote-by-mail

16  application, then we were promoting by-mail voting.  It was a

17  real catch-22 that all of us county clerks and elections

18  administrators were trying to deal with during that time.

19      We wanted to be able to give specific information to our

20  voters about how to cure their ballots but we couldn't do that

21  because Senate Bill 1 only allowed general information to be

22  communicated, so we were, the whole state, all the elections

23  administrators were gagged.

24  Q.  Are you referring to a different provision of SB 1 that

25  said that it was a crime for an election official to solicit

DANA DEBEAUVOIR - DIRECT

1  mail ballot applications?

2  A.  Well, there's that one too, yes.  Yeah.

3  Q.  And that there was an exception to that offense, if I

4  recall correctly, for providing general information about —

5  A.  Correct, but general information didn't cure the problem

6  for voters or assist them in curing their problem.

7  Q.  So you were concerned that if you gave specific

8  information to voters about how to fill out their mail ballot,

9  you might be convicted of a criminal offense?

10  A.  Yes.

11          MR. KERCHER:  Objection, Your Honor.  Leading.

12          THE COURT:  Sustained.

13          And slow down.

14          MR. MORALES-DOYLE:  Sure.

15          MR. KERCHER:  Request the question and answer be

16  stricken.

17          THE COURT:  Granted.

18  BY MR. MORALES-DOYLE:

19  Q.  Miss DeBeauvoir, at the time, given these limitations that

20  you described, did you try reaching out to the Secretary of

21  State's Office about how to implement this provision?

22  A.  Multiple times.

23  Q.  And was that successful?

24  A.  No.  We kept a record of how many times we tried to call

25  the office and got no answer and no return call.

DANA DEBEAUVOIR - DIRECT

1  Q.  Were you able to use the information you had in the voter

2  file or the State's records to try to remedy the problems you

3  were seeing in these mail ballot applications?

4  A.  No, and I can explain if you would like.

5  Q.  Please do.

6  A.  In Texas, the smaller counties have a database that's

7  called team, T-E-A-M.  The larger counties have their own

8  databases and we connect to those databases to the Secretary

9  of State's Office through a portal.

10      Our normal portal had been closed down in favor of a new

11  portal; however, by the time we needed to use that portal for

12  the opening of processing ballot by mails, it was inoperative.

13  It didn't exist.  It was blank.  So we had nothing to check

14  by-mail ballots, the application for by-mail ballots once we

15  started receiving them.

16      And we couldn't, the larger counties really couldn't tag

17  onto the TEAM system because if the larger counties tried to

18  use it, it would crash it.  It was not made for big counties.

19  So we had nothing to help.  We had no way especially to look

20  up driver's license numbers.

21  Q.  Did you attempt to contact the Secretary of State's Office

22  about that problem?

23  A.  That problem specifically multiple times without success.

24  Q.  Did your office receive questions from voters about these

25  provisions in January of 2021?

DANA DEBEAUVOIR - DIRECT

1  A.  Our office made multiple phone calls.

2  Q.  How did you respond to those questions?

3  A.  Not very well in the beginning.  We didn't know what to

4  tell voters.  Later, we were able to give them a better answer

5  and then the court stepped in, thankfully, and gave us an

6  answer.

7  Q.  When you say the court stepped in, what are you referring

8  to?

9  A.  The Supreme Court stepped in and said that we could give

10  specific information to a voter about how to cure their

11  ballot.

12  Q.  Did you speak out publicly about the problems that you

13  experienced with these provisions in early 2022?

14  A.  Yes, I did.

15  Q.  Can you explain what you mean?

16  A.  I held a press conference in January about ten days before

17  I left to do two things.  One of them was to try to correct

18  the misinformation that was out there about how to apply for a

19  ballot by mail and what you needed to do, to do that

20  successfully.

21      And the second reason I did it was to try to create a

22  one-stop shopping place for reporters, activists, anybody who

23  needed one place to have to go for correct information and I

24  was trying to create success in doing that with a press

25  conference.

855

DANA DEBEAUVOIR - DIRECT

1  Q.  In your experience, prior to 2022 was there ever an issue

2  that you recall with a voter fraudulently returning someone

3  else's ballot by mail?

4  A.  Fraudulently?

5  Q.  I can rephrase.  Do you ever recall a time when someone

6  returned — voted somebody else's mail ballot and returned it

7  as if they were that person?

8  A.  No, I don't.

9  Q.  Did you have other methods in place prior to SB 1 for

10 confirming the identity of the person who mailed in their

11 ballot application for mail?

12 A.  Yes, and there are several methods for confirming the

13 identity of who is voting by mail.

14 Q.  Can you explain maybe one or two of those.

15 A.  Yes.  One of them we've already talked about, and that is

16 the identification number that they provide.  And I think

17 everybody is probably familiar with that.  There's always been

18 some kind of identification number.  SB 1 just added more

19 information to that.

20     And then the one that's always been used is signature

21 verification.  So let me be clear.  When you are dealing with

22 a missing number or perhaps some mistake with a number, that's

23 a staff-level correction that can be made.  The other is

24 signature verification, and if it's a signature question, then

25 that's something that the ballot board can cure.

DANA DEBEAUVOIR – DIRECT

1    So the first one can come early in the process and give

2  the voter more time to cure the problem.  The second is going

3  to be happening later in the process when the voter has

4  submitted their voting by mail ballot and the signature board,

5  the ballot board, can cure that problem for the voter.

6  Q.  So in your view and your experience in administering

7  elections, was this new requirement that voters provide a

8  number that would match the voter registration record helpful

9  in preventing fraud or misconduct?

10 A.  Not particularly.

11 Q.  Now, moving away from that provision specifically, as a

12 general matter in your 36 years' experience, how frequent was

13 fraud of any kind in elections in Travis County?

14 A.  I've described it as a unicorn, that it's so very rare you

15 really don't know what it looks like.  I have seen people, I

16 have seen voters make mistakes, and I have seen them own up to

17 their mistakes, but voter fraud, especially since we have seen

18 them in the ones and twos out of millions of votes is

19 extremely rare and in most cases unintentional.

20 Q.  Were there times when you conducted investigations into

21 misconduct or referred allegations to law enforcement?

22 A.  Many times.  If I saw anything that looked unusual, I

23 always referred it to the county attorney as required by law.

24 Every election.

25 Q.  Do you recall, and you may not, but do you recall in your

DANA DEBEAUVOIR - DIRECT

1  36 years how many times those allegations resulted in

2  prosecutions or convictions?

3  A.  I don't think ever.  We had a couple of instances where

4  perhaps — and this would have been early on before we had the

5  capability to stop people from voting twice.  We would have

6  situations between early voting and Election Day where perhaps

7  someone with a memory issue would forget that they had voted

8  early and then show up again on Election Day.

9      That would be turned in and they were caught, you know,

10 every time.  That would be turned into the county attorney,

11 but it didn't meet the level of intent.  So they weren't

12 prosecuted.  They just were caught voting twice and we are

13 talking one or two people —

14 Q.  One or two people?

15 A.  — every election.

16 Q.  Sorry.  I didn't mean to interrupt you.  One or two people

17 a year, or one or two people since 1987?

18 A.  Yeah, right.  It was very few people.  One or two maybe

19 every few years.

20 Q.  Okay.  Another broad question.  Over the course of your

21 career, do you have the sense that the environment for

22 election officials, including yourself, has changed in any

23 way?

24 A.  Yes.  There have been two watershed moments in elections

25 where we had a paradigm shift where everything completely

DANA DEBEAUVOIR – DIRECT

1  changed.

2      When I started conducting elections in Texas in 1987, we

3  had this, the beginning of early voting.  I didn't know any

4  difference from it.  It seemed like a great idea to me, so I

5  embraced it and welcomed it and it was wonderful.

6      But the big watershed moment came in the year 2000, Bush v

7  Gore, when I think a lot of the public woke up and said, oh,

8  you means elections doesn't just magically happen, and there's

9  a ballot waiting for me at my polling place.  They suddenly

10  realized there was a lot of things going on behind the scenes.

11  And that was a good thing.  People actually understood what it

12  took to conduct an election.

13      The second time we had a watershed moment was the 2016

14  election when President Trump was elected and there were some

15  people who were shocked at the outcome and that created so

16  many, you know, questions.

17      And then again in 2020 with the, you know, questions about

18  that election.  That really changed everything.  It created a

19  lot of suspicion and a lot of problems with conducting

20  elections.

21      And it especially created a problem for those of us who

22  work in elections because suddenly our jobs became much more

23  criticized and much more, quite frankly, dangerous.

24  Q.  Can you explain what you mean by "dangerous?"

25  A.  We encountered a lot of threats, personal serious threats,

DANA DEBEAUVOIR - DIRECT

1  and people started protesting and attacking the county

2  stations and creating disturbances in the polling places and

3  early voting locations and counting stations.  It was a

4  complete shift in the way things had been going.

5  Q.  Was it scary?

6  A.  Very.

7  Q.  Do you recall, I guess when I ask you, was it scary, was

8  it scary for you personally?

9  A.  Personally, yes.

10 Q.  And were you scared for the folks that work for you?

11 A.  Mostly I was frightened for the election workers because

12 they were the ones who were the most vulnerable.

13 Q.  Now let's focus on the provisions of SB 1 that concern

14 partisan poll watchers.

15 A.  Okay.

16 Q.  As clerk, what were your responsibilities with regard to

17 partisan poll watchers?

18 A.  To welcome them, to train them, to see that they had

19 everything they needed, that they could get to everybody they

20 needed.  It was a normal part of our job.  We always had

21 really positive relationships with poll watchers and answered

22 their questions and we were always happy to have them.

23     There was a distinct difference between the early years of

24 poll watchers because poll watchers were always the eyes and

25 ears of the public.  They were there to make sure that the

DANA DEBEAUVOIR – DIRECT

1  procedures were being followed and everybody was all on the up

2  and up and everything was being followed correctly.

3      In more recent years, these poll watchers were no longer

4  the eyes and ears of the general public.  They became partisan

5  and they became much more intent on supporting their

6  particular party, their particular candidate, or their

7  particular measure, and they were aggressive.  Sometimes

8  overly aggressive about making sure that their candidate and

9  their particular person was attended to.

10 Q.  During the course of your time as clerk, was it common for

11 there to be partisan poll watchers in the polls in every

12 election?

13 A.  It was common for there always to be poll watchers.  In

14 the old days, you didn't necessarily know who was who.  It was

15 just everybody was there and they were all entitled to watch

16 everything.  It was only in more recent years that you became

17 aware of which poll watcher was with which party or which

18 measure.

19 Q.  And did the frequency with which you saw poll watchers

20 vary from election to election?

21 A.  Sometimes.  It really depended on what was hot.  Sometimes

22 a school board election had a lot of poll watchers.  Sometimes

23 the gubernatorial election really didn't have any at all.

24      So it depended on the election.

25 Q.  In your experience as a general matter, were there more

DANA DEBEAUVOIR – DIRECT

1  poll watchers during presidential election years?

2  A.  Yes, that's true.

3  Q.  Prior to the enactment of –– you've touched on that.  I'm

4  going to skip on.

5     Do you recall you've mentioned poll watchers being more

6  aggressive.  Were there ever instances where, in your view,

7  poll watchers behaved inappropriately?

8  A.  Yes.  I had one incident that I had a very bad situation

9  where one poll watcher behaved so badly, screaming and

10 yelling, and pounding her hands on the glass windows, that her

11 fellow poll watchers turned her in to the police.

12 Q.  Okay.  Let's talk about that.  What year did that take

13 place?

14 A.  That was November 2021 I think.  The November election.

15 Q.  Would it have been –– was there an election in November of

16 2021?  I just want to make sure.

17 A.  I'm so sorry.  I documented it in my deposition and I

18 apologize if my memory is a little –– it was a November

19 election.

20 Q.  Well, maybe I can refresh your recollection.

21 A.  Thank you.

22 Q.  Could we show Miss DeBeauvoir Defendant's Exhibit 146.

23    Have you seen this document before?

24    Well, you know what?  I think I grabbed the wrong exhibit.

25 My apologies.  Give me one second here.  Might be off by one

DANA DEBEAUVOIR - DIRECT

1  number.  Defendant's Exhibit 147.  Excuse me.  I hope it won't
2  be hard to pull up.
3      Have you seen this document before?
4  A.  Rule 11 agreement.  Yes, I know this document.
5  Q.  Was this document related to the incidents with poll
6  watchers that you were just mentioning?
7  A.  Yes.  One of the incidences.  This had to do with the
8  COVID set of incidences where we were in the middle -- if you
9  want me to explain.
10  Q.  Well, so let me, before you explain, ask:  Does this
11  refresh your recollection as to what when the incident you
12  were just referencing took place?
13  A.  Let's see.  November '20.  So I'm corrected.  It's the
14  November '20 Election.
15  Q.  Okay.  Great.  So let's take that down.  We'll get back to
16  that in a minute.
17      So the incident that you were just referring to before
18  with this poll watcher, was a November 2020 Election.  Can you
19  explain in detail what happened?
20  A.  Yes.  We were at the beginning of the COVID epidemic, a
21  terrible disease that we knew nothing about.  We were all
22  frightened and we didn't know how to defend ourselves against
23  it.
24      I was trying to protect both the poll watchers and the
25  poll workers in an environment with not very much information.

DANA DEBEAUVOIR - DIRECT

1  I was trying to keep them wearing masks and kept six feet
2  apart, which was the basic defense that we had at the time.
3  There was very little else that we had.  We had no vaccine.
4  No other protections.
5      The poll watchers objected to those basic defenses and
6  basic protections for each other and the poll watchers were
7  breathing on and coughing on the poll workers in the counting
8  station.
9      It got so bad that I was seriously afraid that we were
10 going to have a serious infection outbreak and I was left to
11 the only thing -- I tried putting up clear plastic sneeze
12 guards between the people who were the workers who were trying
13 to get things done, especially at the processing stations and
14 the poll watchers who were allowed to get right close, right
15 next to the sneeze guard and watch what they were doing.
16     And the poll watchers objected that they could not see
17 through a clear plastic sneeze guard and said that I was
18 obstructing their view.  And so they objected and I had to
19 remove the sneeze guard and I was finally left with the only
20 way to protect the poll workers was to dress them in full
21 hazard suits.
22 Q.  Did you-all — do you recall whether any of your poll
23 workers in that election were infected by COVID?
24 A.  Yes.  I lost — one died.
25 Q.  I think you mentioned the counting facility as you were

DANA DEBEAUVOIR – DIRECT

1  describing that.  So was this, this incident you were

2  describing, did it take place in a polling place, or did it

3  take place elsewhere?

4  A.  This incident took place at the counting station.

5  Q.  And the counting station, is that only operable

6  post-Election Day, or is that running during the course of the

7  election?

8  A.  No, it runs during the course of the election during

9  certain times when we are doing the public counting or public

10  testing.

11  Q.  So this is actually a place where the election workers are

12  counting voted ballots, if it was pre-Election Day, I assume

13  these are early voting or mail ballots, is that right?

14  A.  Yes, sometimes.  It is both.  You do it the prep work

15  prior to Election Day and then you don't count any ballots

16  until after 7:00 p.m. on Election Night.

17  Q.  So the prep work, can you explain what the prep work

18  details?

19  A.  Well, you need to know how many ballots you have.  So

20  you're going to count the number of pieces of paper ahead of

21  time.

22  Q.  Are ballots removed from envelopes, that kind of thing at

23  this point, or does that all happen after the election?

24  A.  The ballot board has a specific time when they are going

25  to be opening ballots and doing the preparation work, but none

865

DANA DEBEAUVOIR - DIRECT

1  of the actual tallying happens until a specified time period

2  for by-mail balloting and for in-person early voting and

3  Election Day.  They are all specific time periods.

4  Q.  So you mentioned that some of the poll watchers were upset

5  with this arrangement; I think you mentioned earlier that one

6  of them had to be removed by law enforcement, is that right?

7  A.  Correct.

8  Q.  Can you explain what happened with that one poll watcher.

9  A.  Yes.  I don't -- I was not there.  I was back in my office

10  working and I did not know about it at first, but she had been

11  yelling and complaining that she couldn't see and couldn't

12  hear what was going on in a set of large rooms that had been

13  designed about approximately three or four years earlier,

14  specifically designed for observation, built so people could

15  see and hear what was going on.

16      At her complaint we put in a little audio -- I'm not sure

17  what you call them.  It's kind of like a little Echo Dot so

18  that she could hear what was being said in the other room.

19      They were also allowed to go in and out of that room, but

20  because it was so filled with people trying to get the data

21  entry work done, we couldn't overload it because of the fire

22  marshal.  So only a few people could get in at a time.

23      So we put in one of these Echo Dots that you could still

24  hear when you were in the room with the big, clear window,

25  what was being said.

DANA DEBEAUVOIR – DIRECT

1    So we did everything we could think of to accommodate her

2  and she was still loudly and violently objecting to all of our

3  efforts to give them whatever access we could think of.

4    And finally, she was using her cell phone inside the

5  counting station, which is illegal in the state of Texas, and

6  finally her fellow poll watchers objected to her offensive and

7  loud and aggressive behavior and they called the police.

8    And at that point, that's when I was advised that we had a

9  problem in the counting station, and my staff advised me that

10  we had been having a problem with her for several hours.

11    And so I went over to try to talk to her and she was

12  pretty loud, pretty –– I couldn't visit with her.  I couldn't

13  make heads or tail out of what she was talking because she was

14  just basically yelling, but I did try to speak to her that if

15  she stood here she could hear every that's being said.  If she

16  stood here, she could see everything that's going on.

17    She could actually see better behind the window than she

18  could if she was in the room, but she couldn't move around as

19  easily.

20    She would have none of it.  And, finally, the officer who

21  was there, great big guy, said, you know, you need to stop

22  this.  Will you stop this haranguing.  And she said, no, I'm

23  not, and took a picture of him.  And at that point he said,

24  well, put your hands behind your back, you're going to go.

25    That was my involvement with her.

DANA DEBEAUVOIR – DIRECT

1  Q.  Okay.  I want to put another exhibit up.  This is

2  Defendant's Exhibit 144, please.  I hope I got the number

3  right this time.

4  A.  Um-hum.  Um-hum.

5  Q.  Is this room that's pictured here familiar to you?

6  A.  Yes.  These are the sets of the rooms that were designed

7  for observation.  You can see all of the large windows.  Most

8  of the people were trying to be —

9  Q.  I'm sorry.  I'm just going to —

10  A.  I'm sorry.

11  Q.  I want to ask — we'll get back to the follow-up.  I'm

12  sorry to interrupt you.  But is this approximately how this

13  room looked in November 2020?

14  A.  Yes.

15  Q.  So can you — I'm going to ask you to walk me through what

16  we are looking at here a little bit.  You mentioned a window

17  earlier.  So is this room, is there actual processing of

18  ballots happening in this room that we are looking at right

19  now?

20  A.  If you are looking through that window into the next room,

21  yes, there is processing of ballots going on.  That's data

22  entry.  To your left, there's processing going on in that

23  room.  That's the ballots that are going through the scanners.

24  Q.  And how are these rooms that we're seeing here connected

25  to one another?  Are they connected to one another?

DANA DEBEAUVOIR – DIRECT

1  A.  Yes.  Doorways that go around both ways, and people could
2  go both directions.
3  Q.  So the poll watchers were not limited to being in this
4  room?
5  A.  No, they were not.
6  Q.  They were allowed to go through the doors to the other
7  rooms we see through the windows?
8  A.  Yes.
9  Q.  And when you described this Echo Dot, and I've never heard
10  of it, but essentially are you saying that the audio from
11  these other rooms was being broadcast into the media room?
12  A.  Specifically they had asked for any conversations that
13  were going on in the room directly in front of them, which was
14  the data entry room.
15  Q.  And I'm sorry.  I think I used the term you hadn't there.
16  What did you refer to this room that we are looking at here?
17  A.  The one straight ahead is the data entry room.  The one to
18  the left is the scanner room with the ballots going through
19  the machines.
20  Q.  And what about the room where we are seeing people
21  standing and sitting?
22  A.  That's a general information room, press, media, watchers.
23  Anybody can be in there.
24  Q.  Was it sometimes referred to as the media room?
25  A.  Sometimes, yes.

DANA DEBEAUVOIR - DIRECT

1  Q.  Okay.  And when you talked about putting up a sneeze
2  guard, was that in this room, or was that in these rooms
3  through the windows?
4  A.  The sneeze guard would have been put up in the room to the
5  left.
6  Q.  Okay.  I see computer screens in these other rooms that
7  we're looking at here.
8  A.  Yes.
9  Q.  Were folks able to see what was on those — were the poll
10  watchers able to see what was on those computer screens?
11  A.  Yes, in very large screens.
12  Q.  Very large screens in those rooms or in —
13  A.  Yes.  You can't see it because it's on this wall that's to
14  the right, but, yes, big screens so they could read any of
15  the — any results they were trying to put up.
16  Q.  So the information on the small screen is being mirrored
17  up on the big screen?
18  A.  Yes.  And then there's a big screen in the other room to
19  the left that you could see.  It also had information on it in
20  large print.
21  Q.  Okay.  So this poll watcher that you referred to, I think
22  you said that she was acting violent and I'm curious if you
23  can explain more.
24  A.  Well, if you can see the gentleman who's got the
25  binoculars that's standing up at the front of the window, she

DANA DEBEAUVOIR - DIRECT

1  was using her palms to pound on that glass.  So it was

2  disruptive not only for the people that were inside that room

3  but also in the next room we were trying not to make any

4  mistakes on data entry.

5  Q.  And did anybody else besides this woman complain to you

6  about this poll watcher set up in 2020?

7  A.  Yes.  Three, maybe four other fellow poll watchers.  And

8  they filled out affidavits.

9  Q.  Did they fill out -- they filled out affidavits.  Was

10  there litigation about this issue?

11  A.  Yes.

12  Q.  Do you recall who filed the lawsuit?

13  A.  It was -- perhaps litigation isn't the correct term.

14  Perhaps complaint is the better term.

15      A complaint was filed with first with the Sheriff's

16  Office, then with the Secretary of State's Office.  And then

17  the Secretary of State's Office forwarded those complaints to

18  the Attorney General.

19      Complaints were also sent over to the County Attorney's

20  Office.  County Attorney's Office forwarded those complaints

21  to the District Attorney's Office.  The District Attorney's

22  Office followed up with charges against general -- excuse

23  me -- Jennifer Fleck based on the individuals who had filled

24  out affidavits that day.

25  Q.  Jennifer Fleck is who?

DANA DEBEAUVOIR - DIRECT

1  A.  Is the person who was arrested.

2  Q.  Okay.  Now let's turn back to that exhibit we were looking

3  at earlier, which I believe was 147.  I believe you said you

4  had seen this document before and were familiar with it, is

5  that right?

6  A.  Um-hum.

7  Q.  Do you recall, this says it's a Rule 11 Agreement, do you

8  recall what this agreement was about?

9  A.  Yes, I do.

10  Q.  Can you explain?

11  A.  This was an agreement that my attorney Leslie Dippel

12  worked very hard on to try to get the best protections she

13  could in our coded environment so that the poll watchers and

14  the poll workers could try to avoid being infected in a

15  working environment.

16     I did not consider this Rule 11 Agreement successful, but

17  it allowed the work to continue.  I had to dress my people in

18  full hazard suits because there was no protection in this Rule

19  11 Agreement for workers in the county session.  There still

20  isn't today.

21  Q.  And it says at the top of this document, "In Re: Honorable

22  Matt Mackowiak and Travis County Republican Party and Martin

23  Harry, Relators," do you recall what involvement those parties

24  had in this agreement?

25  A.  Well, they were the complainers.  They didn't believe in

```
 1  science.  They didn't believe in masks.  They didn't believe
 2  in COVID.  They didn't think that there was any —
 3            MR. CAPOZZI:  Objection.  Lack of personal knowledge.
 4            THE COURT:  That's overruled.
 5            THE WITNESS:  They objected to any of my suggestions
 6  that we try to protect each other from getting COVID.
 7            THE COURT:  Oh, by the way.  You are representing
 8  who?
 9            MR. CAPOZZI:  Intervenor defendants.
10            THE COURT:  That's what I thought.
11  BY MR. MORALES-DOYLE:
12  Q.  So was this agreement the result of complaints made by
13  those parties at the time?
14  A.  Yes.
15  Q.  Now, you mentioned that this incident with Jennifer Fleck
16  ended up being referred to any number of different law
17  enforcement offices.  At the time prior to SB 1's enactment
18  was it a crime to obstruct a poll watcher?
19  A.  Yes.
20  Q.  And were you concerned during these various disputes over
21  the arrangement of the counting facility that you might be
22  accused of running afoul of that rule?
23  A.  Never.
24  Q.  Did anyone accuse you of running afoul of that rule?
25  A.  Never.
```

DANA DEBEAUVOIR - DIRECT

1  Q.  Were you investigated for running afoul of that rule?

2  A.  Never.

3  Q.  Did the incidents with Miss Fleck or the incidents under

4  this agreement lead to any law enforcement action against you?

5  A.  The Attorney General pursued an indictment against me

6  based on the false charges.

7  Q.  How did you come to learn of the fact that the Attorney

8  General was pursuing an indictment against you?

9  A.  By accident.

10  Q.  Can you explain?

11  A.  Yes.  The Attorney General secretly pursued an indictment

12  against me, not going through any normal channels.  It was not

13  filed with the District Attorney or the District Clerk or

14  anything.  It was shopped around to an adjacent county and I

15  was not notified that there was any proceeding against me at

16  all.

17      Once I found out about it, I was required to hire private

18  counsel at my personal expense to defend myself.  I hired two

19  attorneys and I ultimately found out that — I ultimately

20  found out in July of 2022 that I had been No Billed in April.

21  Q.  When you say "No Billed," what do you mean?

22  A.  No Billed.  I mean I had been found innocent of the

23  charges, that there was no — I had not committed any crime, I

24  had not obstructed poll watchers.

25  Q.  So you found out that the grand jury did not indict you?

DANA DEBEAUVOIR – DIRECT

1  A.  Correct, months after it had happened, since there was no

2  official record.

3  Q.  And so you said it was shopped around to an adjacent

4  county.  So these proceedings were not in Travis County?

5  A.  No.

6  Q.  What county were they in?

7  A.  Williamson County, without the benefit of the District

8  Clerk's record.

9  Q.  So the Attorney General pursued an indictment against you

10  in Williamson County?

11  A.  Yes.

12  Q.  And do you know whether that indictment was related to the

13  incident with Jennifer Fleck or some other incident?

14  A.  Yes.

15  Q.  I'm sorry, which was it?

16  A.  It was Jennifer Fleck.

17  Q.  So as a result of your having removed Jennifer Fleck from

18  the central counting or the counting facility in 2020, the

19  Attorney General's Office attempted to indict you for poll

20  watcher obstruction?

21  A.  No, I did not remove her.  Her fellow poll watchers

22  objected to her behavior and they had her arrested and the

23  sheriff of Travis County removed her.

24  Q.  Did this investigation by the Attorney General's Office

25  hamper your ability to carry out your duties as clerk?

DANA DEBEAUVOIR – DIRECT

1  A.  Yes.

2  Q.  How so?

3  A.  Oh, she caused a work stoppage.  She caused errors.  She

4  was very successful at disrupting the counting station.

5  Q.  When you say "she," you mean Miss Fleck?

6  A.  Correct.

7      Was that your question?

8  Q.  No, I'm sorry.  Perhaps I wasn't clear.

9      The investigation that was pursued against you in

10  Williamson County, did that hamper your ability to do your

11  duties as the clerk in any way?

12  A.  It was very upsetting personally and it was intended to be

13  disruptive to me personally and professionally, so, yes.

14  Q.  And you mentioned you had to hire lawyers to represent

15  you.  Did you pay their fees personally?

16  A.  Yes, I did.

17  Q.  And how much were their fees, if you recall?

18  A.  Ultimately it was $75,000.  And I did not have to write

19  the check for the whole amount until later and then I was

20  successful at getting reimbursement before that bill came due.

21  Q.  So ultimately you were reimbursed for these fees?

22  A.  Yes, I was, through insurance.

23  Q.  Oh, through insurance.  Was it your insurance or the

24  Clerk's Office?

25  A.  County's insurance.

DANA DEBEAUVOIR - DIRECT

1  Q.  So did you know at the time that you were hiring them that

2  you would be reimbursed by the County?

3  A.  Absolutely not.  I assumed it was my bill.

4  Q.  Now, I want to talk about SB 1.  So let's look at section

5  4.07 of SB 1.  That's Joint Exhibit 1, pages 27 to 28.

6      And you'll see here in subsection E, it says, "A watcher

7  may not be denied free movement where election activity is

8  occurring within the location at which the watcher is

9  serving."

10     Did I read that correctly?

11  A.  Correct.

12  Q.  What do you understand free movement to mean?

13  A.  They can walk anywhere they want to go.  They can see

14  anything they want to see.  They cannot -- it means they can

15  do anything except interrupt the work or disturb the worker

16  who is trying to get work done.

17  Q.  Did you see this provision providing a watcher the right

18  to free movement to be a significant change in the rules

19  governing poll watchers?

20  A.  No.  We had always welcomed them in.  They just couldn't

21  touch ballots or interrupt the workers.  I enjoyed having poll

22  watchers around because they were fun to teach.  Usually they

23  didn't know about the procedures and chain of custody and it

24  was always a good thing to teach them about the procedures.

25  Q.  Did you see poll watchers serve a valuable role?

DANA DEBEAUVOIR — DIRECT

1  A.  Absolutely.  Absolutely.  They usually walked away with

2  new information to tell the next group of poll watchers.

3  Q.  Now let's turn to section 4.09, which is on page 29, and

4  you'll see here that — and you, as former legislative Chair I

5  think you said for the County Clerks, I assume you understand

6  that the language that's underlined here is language that was

7  added by SB 1 to the laws that previously existed, is that

8  right?

9  A.  That's correct.  That's Travis County language.

10  Q.  So in section 4.09 here we see at the bottom this

11  highlighted language was added that says that a poll watcher

12  commits — "A poll worker commits obstruction of a poll

13  watcher if they take any action to obstruct the view of a

14  watcher or distance the watcher from the activity or procedure

15  to be observed in a manner that would make observation not

16  reasonably effective."

17      Do you understand what it means to take any action that

18  would make observation not reasonably effective?

19  A.  I don't think I do because I never took any action that

20  was not reasonably effective.

21  Q.  Do you think that this new language, which was enacted

22  after your — well, let me ask you.  What do you mean when you

23  say this is the "Travis County language?"

24  A.  This is specifically written because of the clear plastic

25  sneeze guards that were — that the Relators claimed they

DANA DEBEAUVOIR - DIRECT

1  couldn't see through.

2  Q.  Is that -- do you come to that conclusion based on just --

3  is that just your assumption based on the language, or do you

4  have any personal knowledge that you base that conclusion on?

5  A.  No, that's what they told me.  Sometimes loudly.

6  Q.  Who is "they?"

7  A.  The Matt Mackowiak, and the observers who were in the room

8  at the time.

9  Q.  They told you that they viewed this language in Senate

10 Bill 1 to be responsive to the situation in 2020?

11 A.  Yes.  And that they viewed the sneeze guard, clear plastic

12 sneeze guards as obstructions.

13 Q.  Do you think -- now that this language has been added, do

14 you think that the actions that you took to protect your

15 employees in 2020 might be considered obstruction under SB 1?

16 A.  Absolutely not.

17 Q.  Okay.  Would you have been concerned, given this new

18 language, that you might have faced the kind of

19 investigation -- well, let me ask you this.  Strike that

20 question.

21      In the couple of months when you were clerk after SB 1

22 went into effect, did you have concern about this change to

23 the poll watcher obstruction statute?

24 A.  None.

25 Q.  No.  Did you get any questions from poll workers about

DANA DEBEAUVOIR – DIRECT

1  this change to this section?

2  A.  No.

3  Q.  Did you develop any training or guidance for poll workers

4  in the months before you left office concerning how to

5  interact with poll watchers?

6  A.  Yes.

7  Q.  And was that a response to these new rules concerning poll

8  watchers?

9  A.  Yes.  We made a lot of changes in training.

10  Q.  Do you recall the kinds of — well, actually, let's back

11  up.  Before SB 1, did you provide training or guidance to poll

12  workers on how to interact with poll watchers?

13  A.  Yes.  We assumed more of a teaching role, explained to

14  them what's going on.

15  Q.  And after SB 1 and after what happened in 2020, do you

16  recall how your training changed?

17  A.  Yes.  We kept the same educational approach to poll

18  watchers but we added, and I think the short answer is we

19  added a deescalation portion to our training so that when

20  somebody was upset, behaving loudly, that we could try to

21  reach out to them or somebody else in the room who could

22  connect with them, could reach out to them, calm them down and

23  see if we could get to the base of the problem, what were they

24  worried about.

25  Q.  Now, after your investigation in Williamson County and

DANA DEBEAUVOIR – DIRECT

1  everything that happened and after SB 1 was enacted, were you
2  concerned that your employees might face similar accusations
3  of having obstructive poll watchers?
4  A.  I was no longer the elected official afterwards so I can't
5  speak to what the new county clerk —
6  Q.  Sure.  I guess I mean during those couple of months when
7  you were, in December and January, December 2021,
8  January 2022, after this bill went into effect and you passed
9  this deescalation — or you implemented this deescalation
10  training, were you concerned that the folks that worked in
11  your office might be accused of poll watcher obstruction?
12  A.  I was not concerned that they were going to be accused of
13  obstruction, no.  That's not what I was worried about.
14  Q.  What were you worried about?
15  A.  I was worried about them coming under attack, the way they
16  had already been attacked.  I was more worried about worker
17  safety in their workplace.
18  Q.  Did you think that they had the tools available to them
19  and the ability to respond, if they did come under that kind
20  of attack?
21  A.  Giving them all that we had, I still felt that as an
22  employer I was insufficient.
23  Q.  Let me ask you this.  Do you recall whether there were any
24  provisions of SB 1 about poll watchers that you liked?
25  A.  Yes.

DANA DEBEAUVOIR – DIRECT

1  Q.  Can you explain?

2  A.  Yes.  Well, at first I thought it was sort of a big

3  brother provision, but one of the things that SB 1 called for

4  was to install streaming, video streaming in the counting

5  station.

6      And I thought it was a little strange maybe.  For one

7  thing, polling –– excuse me –– counting sessions are usually

8  very boring.  It's a lot of high-volume processing.

9      But I ultimately wished I had had that kind of streaming

10  when I had had the bad actor incident at our counting station

11  because then it would have been obvious what was going on.

12      So I actually supported adding the streaming to the

13  counting station and I began the process, the purchasing and

14  implementation of doing streaming and it was implemented after

15  I left.

16  Q.  Can we put up section 3.18, which is on pages 22 to 23

17  please.

18      Is this the provision that you are referring to here, "The

19  general custodian of election records in a county with a

20  population of 100,000 or more shall implement a video

21  surveillance system that retains a record of all areas

22  containing voted ballots?"

23  A.  This is such.

24  Q.  Now, I think you said you weren't concerned that your

25  workers were going to obstruct poll watchers but you were

1  concerned that they were going to face harassment, is that

2  right?

3  A.  Yes.

4  Q.  And you were concerned that you couldn't provide them with

5  the protection that they needed, is that right?

6  A.  That's correct.  To this day, I don't think they have that

7  protection.

8  Q.  And did you worry that if they took action to protect

9  themselves that they would face the kind of investigation that

10  you faced?

11  A.  Maybe, yes.

12  Q.  Did the positive provisions of SB 1 that you've just

13  mentioned, the things that you did like, did they resolve that

14  concern for you?

15  A.  I don't know, and I'm not there to see the benefit of it.

16  I hope so.

17  Q.  When you were a clerk do you recall about how many

18  registered voters there were in Travis County?

19  A.  Oh, yes.  Approximately 973,000 registered voters.

20  Travis County is getting close to a million.

21  Q.  Do you remember how many polling places there were in

22  Travis County?

23  A.  172 county-wide polling places open for Election Day, and

24  approximately — it's 36 or 38 early voting locations.

25  Q.  And do you remember how many people you would employ

DANA DEBEAUVOIR - DIRECT

1 during a typical Presidential Election?

2 A.  Oh, gosh.  Let me think.  I think the payroll would have

3 been about 4,000 people total, considering Election Day, early

4 voting, and the in-house staff.

5 Q.  So would you say that running elections in a county the

6 size of Travis County is a stressful job?

7 A.  It's a big job.

8 Q.  Did having the specter of criminal indictment hanging over

9 your head add to that stress?

10 A.  Yes.

11 Q.  How are you enjoying retirement?

12 A.  Well, I ended up with shingles on my face the last

13 election, so I'm doing a lot better now.  It took a while to

14 learn to slow down.

15 Q.  Understood.

16         MR. MORALES-DOYLE:  I think I might be done.  Give me

17 one second.

18     (Off the record discussion)

19         MR. MORALES-DOYLE:  I'll pass the witness, Your

20 Honor.

21         THE COURT:  Anything else from this side?

22         MISS LORENZO:  Yes, Your Honor.

23                     DIRECT EXAMINATION

24 BY MISS LORENZO:

25 Q.  Good morning, Miss DeBeauvoir.

DANA DEBEAUVOIR – DIRECT

1  A.  Morning.

2  Q.  My name is Daniela Lorenzo with LULAC plaintiffs.  Thank

3  you for your time.  I justs have a few more questions for you.

4  A.  Okay.

5  Q.  Just to talk about election administration generally, does

6  Travis County have the exact same election administration

7  needs as every other county in Texas?

8  A.  I wouldn't put it that way.  The bigger counties have

9  bigger needs, if you will, and it depends on what the county

10 clerk is willing to take on.  I was always willing to conduct

11 elections for all the jurisdictions in Travis County.  Not all

12 county clerks are willing to do that.

13     So it depends.  For the most part, though, election

14 counties are conducted according to state law and that's

15 pretty much the same for every county, given local

16 preferences.

17 Q.  But would you say that the needs of the different counties

18 are the same or vary with, like you said, population size?

19 A.  Pretty much the same, given size and the kinds of job you

20 are doing.

21 Q.  And you testified earlier about mail ballots, do you

22 remember that?

23 A.  Yes.

24 Q.  So just a few more questions on that.  If a voter includes

25 their driver's license number in their vote-by-mail

885

DANA DEBEAUVOIR -- DIRECT

1  application or their ballot but your office only has, let's

2  say, their social security number on record, would your office

3  have to reject that application or mail ballot?

4  A.  I'm going to have to make a distinction here between when

5  SB 1 first came out and when the court's clarified.

6      So when SB 1 first came out the answer was automatic

7  rejection.  And that's why we ended up with a really high

8  rejection rate because if you didn't guess the correct number

9  then your ballot was automatically rejected.

10      Now, when the courts stepped in, what they said was, they

11  gave elections administrators and county clerks permission to

12  contact the voter and say, do you have another number, can we

13  get your driver's license number, or when the Secretary of

14  State's Office finally, very late in the game, opened up their

15  portal, we were able to check driver's license numbers.

16      So eventually we were able to set up a roomful of people

17  who could make phone calls and check different databases and

18  we were able to cure those, but in the beginning, no, if you

19  didn't guess the correct number, automatic rejection.

20  Q.  I understand.  Even now, let's say you can't find the

21  voter's driver's license number or you're not able to get in

22  touch with a voter, you would still have to reject that

23  application if you have the social security number on file but

24  not the driver's license number?

25  A.  Although I'm not the elected official, that is my

DANA DEBEAUVOIR - DIRECT

1  understanding.

2  Q.  And let's say that the voter puts both their social

3  security number and their driver's license number on either

4  their application or their ballot but your office does not

5  have a record of either, what is your understanding of what

6  would happen with that ballot or application?

7  A.  They're still pretty bulletproof.  And there would be a

8  group of people that had perhaps registered before 1964 before

9  numbers were required that might fall into that category, but

10  giving a social security number or a driver's license number

11  would qualify you.

12  Q.  Understood.  But let's say your office does not have a

13  record of that social security number or that driver's license

14  number, you would have to reject the application because you

15  wouldn't have —

16          THE COURT:  One second, ma'am.

17          MR. NELSON:  Your Honor, Tony Nelson for

18  Travis County.  The question is "your office."

19  Miss DeBeauvoir is not a county clerk.  It's not her office.

20          THE COURT:  Why don't you rephrase your question.

21          MISS LORENZO:  I will.  Thank you, Your Honor.

22  BY MISS LORENZO:

23  Q.  Under your understanding of SB 1 while you were still the

24  Elections Administrator and just your understanding of the

25  bill, do you understand that you have to match the mail ballot

DANA DEBEAUVOIR – CROSS

1  application number to whatever information of the voter you

2  have in your system?

3  A.  It is my understanding that you have to match the numbers.

4  If you have a situation where you have neither number, I don't

5  know what that situation would be, other than the 1964 subset

6  because you have to provide a number.

7      So I'm sorry.  I'm not getting the —

8  Q.  No; that's perfect.  Thank you very much.

9          MISS LORENZO:  I don't have any other questions.

10         THE COURT:  Anything else from this side?

11         Will there be cross?

12         MR. KERCHER:  There will be, Your Honor.  Seems like

13  a good time to take our morning break.

14         THE COURT:  Yeah.  Let's take our morning break.

15     (Recess)

16         THE COURT:  Your cross.

17                  CROSS-EXAMINATION

18  BY MR. KERCHER:

19  Q.  Morning, Miss DeBeauvoir.

20  A.  Morning.

21  Q.  My name is Ryan Kercher.  I work for the Office of the

22  Attorney General.  I want to start by thanking you for your 36

23  years of service to my home county, Travis County.  I voted in

24  many elections that you administered, so thank you.

25      I always want to thank you for your service overseas as an

DANA DEBEAUVOIR – CROSS

1  election observer.  I was fascinated to hear a little bit

2  about that, and that certainly puts this case in context.

3      So let's start talking about the time frame in which you

4  were involved with SB 1.  After serving for 36 years, your

5  last day in office was January 31st of 2022, is that right?

6  A.  Correct.

7  Q.  So that's maybe 60 days after SB 1 became effective and it

8  was maybe another 60 days or so — not even that, 30 days

9  before the first election after SB 1, right?

10 A.  That's correct.

11 Q.  And now you are retired, happily, I hope?

12 A.  I hope — yes.

13 Q.  You did have involvement, though, in the early

14 implementation of SB 1, right?

15 A.  I did.

16 Q.  Just because voting day is March 1st doesn't mean there is

17 not a lot of work getting ready for early voting and just

18 getting all the ducks in a row to administer the election?

19 A.  That's right.

20 Q.  But you were not the Travis County Clerk for the actual

21 March 2022 Election?

22 A.  I had already left.

23 Q.  You would agree with me, wouldn't you, that after your

24 many years of service that administering elections requires

25 thinking ahead, right?

DANA DEBEAUVOIR - CROSS

1  A.  Yes.

2  Q.  It requires solving problems before they arise sometimes?

3  A.  Yes.

4  Q.  Let's talk a little bit about poll watchers and your

5  experience with them, okay?

6  A.  Um-hum.

7  Q.  We heard some testimony yesterday from a witness who said

8  that poll workers are the eyes and ears of the people at the

9  polls, but that's not your experience, right?

10    I'm sorry.  I need for you to answer out loud.

11  A.  No, it's not my experience that poll workers serve as the

12  eyes and ears.

13  Q.  Your experience is that poll watchers are the eyes and

14  ears of people watching the election to make sure procedures

15  are followed, right?

16  A.  I believe that's their assigned role.

17  Q.  And they are supposed to make sure all the procedures and

18  chain of custody are followed, right?

19  A.  Yes.

20  Q.  And that's an important role in your view?

21  A.  Yes.

22  Q.  And as a clerk you always welcomed poll watchers, right?

23  A.  I did.

24  Q.  And it was your policy to try and give them free rein at

25  the polls in order to effectuate that job?

DANA DEBEAUVOIR – CROSS

1   A.  Yes, I did.

2   Q.  Now, in terms of how SB 1 provisions related to poll

3   watchers in the March 2022 Election, you were not involved in

4   that piece because you had already left, right?

5   A.  Correct.

6   Q.  Let's talk a little bit about some of the poll watcher

7   controversy that we talked about you did experience in the

8   November 2020 Election, okay?

9   A.  All right.

10  Q.  And I understand this may be something of a sore subject

11  and I hope that you understand how my questions are intended.

12  A.  Okay.

13  Q.  November 2020 Election was in the middle of the pandemic,

14  right?

15  A.  Yes.

16  Q.  Everybody was trying to be flexible and figure out how to

17  run an election officially and carefully during unprecedented

18  times, true?

19  A.  Everybody?

20  Q.  Well, you certainly were.

21  A.  I was.

22  Q.  Okay.  We talked a little bit about the observation room

23  that you had set up at the ballot counting station, is that

24  right?

25  A.  Several rooms, yes.

DANA DEBEAUVOIR - CROSS

1  Q.  Brian, could we please pull up State's Exhibit 144.  Thank
2  you.
3      You looked at this earlier, right?
4  A.  Yes.
5  Q.  And this is a true and accurate depiction of one of the
6  observation rooms at the Travis County ballot counting station
7  in November 2020, right?
8  A.  Yes.
9  Q.  And I understand that you had a bad experience with one
10 poll watcher in this room during that election, right?
11 A.  Yes.
12 Q.  Did you have any conversations with the Secretary of State
13 about whether or not or — the Secretary of State's Office
14 about whether or not these observation rooms complied with the
15 Texas Elections Code, that you can recall?
16 A.  My staff had conversations with the Secretary of State's
17 Office a few years ago, when — I think it was four years ago
18 when this was designed, we got their input.  I don't recall
19 specifically what it was, but we visited with them at the
20 time.
21 Q.  These rooms, as I understood your testimony earlier, were
22 specifically designed to house poll watchers, is that right?
23 A.  Yes.
24 Q.  And the idea was that you would put these windows in that
25 would allow the poll watchers to see what they needed to see

1  in order to evaluate what they needed to evaluate, is that

2  right?

3  A.  Yes.

4  Q.  In addition to putting the windows in, you also installed

5  some kind of audio feed so that the poll watchers in the room

6  could hear what was going on, is that right?

7  A.  Correct.

8  Q.  Were you involved personally in the design of these rooms?

9  A.  Yes.

10  Q.  As you were designing these rooms, how did you know that

11  the people in the room would be able to see what they needed

12  to see?

13  A.  Because I stood there and looked at it myself.

14  Q.  And that was good enough for you to determine whether

15  someone could see what they needed to see, is that right?

16  A.  Yes.

17  Q.  As you were designing these rooms, how did you know that

18  the poll watchers would be able to hear what they needed to

19  hear?

20  A.  Because they could go in and out of the rooms if they

21  wanted to.  The only reason there was a limit for the

22  Presidential Election was because of the fire marshals

23  limitation on the number of people, so we made an extra

24  accommodation if the room was already filled so the people in

25  the adjacent room could also hear.

DANA DEBEAUVOIR - CROSS

1  Q.  And you installed the audio feed, is that right?

2  A.  Correct.

3  Q.  And the audio feed was so that an election — a poll

4  watcher would not have to leave the room but could hear what

5  they needed to hear while still in the room, is that right?

6  A.  Correct.

7  Q.  Was that something that was introduced and then tested to

8  make sure that it worked?

9  A.  Yes.

10 Q.  When you were testing the audio feed, how did you know

11 that the audio feed was sufficient to show poll watchers to

12 allow them to hear what they needed to hear?

13 A.  The other observers were using it.

14 Q.  So you were able to use your own ears to figure out

15 whether or not one could hear what needed to be heard, is that

16 right?

17 A.  Yes.

18 Q.  And you were able to speak to others who were also trying

19 to figure out whether they could hear what they needed to hear

20 to figure out whether or not this was a sufficient way for a

21 poll watcher to do what they needed to do, is that right?

22 A.  Yes.

23 Q.  Required application of a little bit of common sense,

24 true?

25 A.  Yes.

DANA DEBEAUVOIR – CROSS

1  Q.  And it also required working together a little bit, right?

2  A.  Yes.

3  Q.  Did I understand your testimony correctly earlier that in

4  your experience Miss Fleck's behavior that you described as

5  violent was very unusual?

6  A.  I've never seen anything like that.

7  Q.  Could we call that a unicorn too?

8  A.  Yes, we could.

9  Q.  Even though that behavior by a poll watcher was, in your

10  experience, a unicorn, there are election code provisions that

11  allow election judges to have a poll watcher removed for

12  beaching the peace, right?

13  A.  There were.

14  Q.  So even though this kind of behavior by a poll watcher is

15  exceedingly rare, the code provides us a way to deal with that

16  problem, whatever it may be, is that fair?

17  A.  That is correct.

18  Q.  You also talked about being investigated by the Attorney

19  General's Office following that incident, right?

20  A.  Yes.

21  Q.  And you talked I think about a couple actually different

22  investigations, there was one where you were the subject of an

23  investigation and then also Travis County initiated an

24  investigation of their own, is that right?

25  A.  Um ––

1  Q.  That was a long question.  Let me try again.  I'm sorry

2  about that; that's fair.

3      So we talked a little bit about two investigations that

4  sprang out of that incident in the November 2020 Election,

5  right?

6  A.  Yes.

7  Q.  One involved you as the subject, right?

8  A.  Yes.

9  Q.  And the other involved Miss Fleck as the subject, right?

10 A.  Yes.

11 Q.  And, of course, Miss Fleck was, in fact, removed by a

12 Travis County law enforcement, right?

13 A.  Correct.

14 Q.  What happened then is Miss Fleck said, I cannot see and I

15 cannot hear, law enforcement was called, right?

16 A.  Yes.

17 Q.  And after explaining the situation and viewing Miss

18 Fleck's behavior, law enforcement said Miss Fleck, you are at

19 fault, right?

20 A.  Yes.

21 Q.  Removed her, right?

22 A.  Yes.

23 Q.  And then charges made their way up through the

24 Travis County Attorney's Office and District Attorney's

25 Office, correct?

DANA DEBEAUVOIR — CROSS

1  A.  Correct.

2  Q.  And the Travis County District Attorney's Office decided

3  to pursue charges against Miss Fleck?

4  A.  Yes.

5  Q.  Now, separately, the Attorney general Office investigated

6  you, correct?

7  A.  Correct.

8  Q.  And you were No Billed?

9  A.  Yes.

10  Q.  Much to your relief?

11  A.  Yes.

12        THE COURT:  Where was she presented to the grand

13  jury, in Williamson County?

14        MR. KERCHER:  That was her testimony, yes, Your

15  Honor.

16        THE COURT:  What jurisdiction did the Attorney

17  General have?  I mean, so in a federal system you have to

18  raise it in the division where the misconduct during the

19  alleged illegal activity occurred, so how was it — this

20  occurred in Travis County, what authority did the Attorney

21  General have to raise this in Williamson County?

22        MR. KERCHER:  I am not familiar with that decision,

23  Your Honor.

24        THE WITNESS:  I can answer.

25        THE COURT:  No, ma'am; that's all right.  Thank you.

DANA DEBEAUVOIR - CROSS

1          MR. KERCHER:  The short answer is, Your Honor, I'm

2   not familiar with that decision at all.

3          THE COURT:  Go ahead.

4   BY MR. KERCHER:

5   Q.  You are perhaps aware that following a Texas court

6   decision the Attorney General's Office may no longer instigate

7   prosecutions on its own authority, are you familiar with that?

8   A.  I am familiar you can no longer do that.

9   Q.  So following that decision, the only prosecutorial

10  decisions to be made arising out of an incident like the one

11  you described with Miss Fleck would be the Travis County

12  Attorney's office or District Attorney's Office, right?

13  A.  Correct.

14  Q.  So that would now be under Miss Delia Garza or Mr. Jose

15  Garza, correct?

16  A.  Correct.

17         MR. MORALES-DOYLE:  Objection, Your Honor.  I'm not

18  sure Miss DeBeauvoir is qualified to answer these questions

19  about the way the prosecutorial authority works.

20         THE COURT:  Yeah and I don't think anybody on

21  counsel's side of the tables even agree with that decision.

22         MR. KERCHER:  I'll let the witness' testimony stand,

23  Your Honor.

24  BY MR. KERCHER:

25  Q.  Let's talk a little bit about applications for ballot by

DANA DEBEAUVOIR - CROSS

1  mail and the rejection rates that you saw during your time

2  trying to get ready to implement SB 1, okay?

3  A.  Okay.

4  Q.  Now, during that time there were an extraordinary number

5  of rejections of those, let's call them ABBMs, is that right?

6  A.  There was an extraordinary rejection rate at the

7  beginning.

8  Q.  Initially something like 50 percent?

9  A.  Yes.

10  Q.  You and I agree that's way too high?

11  A.  Way too high.

12  Q.  You were able to resolve those during your time in office

13  to about half that rejection rate, is that true?

14  A.  Yes.

15  Q.  And I understand that you left office, but your best

16  understanding is that they were ultimately resolved down to

17  something like 8 percent, right?

18          MR. MORALES-DOYLE:  Objection.  Foundation.

19          THE COURT:  If you know, ma'am.

20          THE WITNESS:  When I left, we had gotten it down to

21  27 percent.  After I left, I understood later it had been

22  reduced to 8 percent.

23  BY MR. KERCHER:

24  Q.  You and I agree that 8 percent is still too high?

25  A.  Way too high.

DANA DEBEAUVOIR - CROSS

1    Q.  You don't have information about whether or not

2    Travis County was able to reduce that number further in

3    subsequent elections, is that fair?

4    A.  The next elected official would have that information; I

5    don't.

6    Q.  Let's talk a little bit about the legislative intent of SB

7    1.  And the reason I want to talk to you about that, even

8    though you're not a legislator is one of the things you said

9    early on in your testimony this morning is that it was your

10   belief that SB 1 was designed to make people afraid to vote,

11   is that right?

12   A.  That is correct.

13   Q.  Now, of course, SB 1, there was a partisan dispute about

14   the bill while it was being considered by the legislature, is

15   that fair to say?

16   A.  There was a dispute.

17   Q.  It passed largely along partisan lines, is that right?

18   A.  That's right.

19   Q.  And it was the case that the party who did not vote for it

20   was suggesting in the public, you recall, that, as you said,

21   the purpose of SB 1 was to intimidate voters, make people

22   afraid to vote, or otherwise participant in the electoral

23   process, is that right?

24   A.  I believe that to be true.

25   Q.  In fairness, and I'm not trying to pick on you, but I do

DANA DEBEAUVOIR - CROSS

1  want to drill down on the information that you have.  You

2  cannot name a single Republican who voted for SB 1 who stated

3  that they voted because they wanted to make people afraid to

4  vote?

5  A.  That's not possible.

6  Q.  Now, there are parts of SB 1, as I think counsel alluded

7  to, that you do approve of?

8  A.  Yes.

9  Q.  SB 1 extended early voting hours, is that true?

10 A.  Yes.

11       MR. MORALES-DOYLE:  Objection, Your Honor.  Outside

12 the scope of direct.

13       THE COURT:  I'll allow it.

14       Go ahead.

15       MR. MORALES-DOYLE:  Your Honor, if we're going to go

16 outside the scope of direct, I would just ask that the counsel

17 not be allowed to lead the witness, if this is part of the

18 State's direct examination.

19       THE COURT:  You can continue.

20 BY MR. KERCHER:

21 Q.  SB 1 increased the number of hours an early voting place

22 had to be open from eight to nine hours, is that right?

23 A.  That's my understanding, yes.  It was after I left.

24 Q.  That's a good thing, the expansion of those hours, right?

25 A.  It's always a good idea to give people more opportunity to

DANA DEBEAUVOIR – CROSS

1  vote.

2  Q.  And that is not something that's going to, in your view,

3  make someone afraid to vote, fair?

4  A.  No, it's not.

5  Q.  SB 1 also extended early voting in a couple of other ways,

6  right?  Early voting usually lasts for two weeks, true?

7  A.  That's correct.

8  Q.  And before SB 1, those were just ten business days, those

9  two weeks of early voting, right?

10  A.  No, because you have to count the weekend in between.

11  Q.  SB 1 expanded early voting to that weekend, right?

12  A.  No, it was always the weekend in between.

13  Q.  But it did expand early voting on that weekend?

14  A.  Expanded, yes.

15  Q.  And I appreciate your precision; that's helpful.

16  A.  Okay.

17  Q.  SB 1 also added an important category of people to those

18  who can vote by mail, right?

19  A.  Yes.

20  Q.  If you are pregnant now, thanks to SB 1, you can vote by

21  mail, true?

22  A.  True.

23  Q.  Could not do that before SB 1?

24  A.  That's true, you could not.

25  Q.  That's not a provision that will make people afraid to

DANA DEBEAUVOIR - CROSS

1  vote, fair?

2  A.  No, it's not.

3  Q.  Something that I think you discussed on direct examination

4  was another provision of SB 1 that you became to be a big fan

5  of, which is the live stream of the ballot counting station,

6  right?

7  A.  That's true.

8  Q.  Now, initially you looked at that as an unfunded mandate

9  from the State and you were not particularly excited about

10  that aspect of it, right?

11  A.  That's true.

12  Q.  But we agreed, I think I heard you say this on direct,

13  that that live stream requirement would have prevented much of

14  the grief that you got from that November 2020 dispute with

15  Miss Fleck, right?

16  A.  I think it might have.

17  Q.  Even though it was expensive to implement, in your view,

18  it had a chilling effect on the bad behavior of poll watchers

19  in the counting station, right?

20  A.  I wasn't there to see it implemented so I don't know, but

21  that's my speculation, is that it would have a chilling

22  effect.

23  Q.  In all events, that provision could have directly

24  addressed the problem you had experienced in 2020?

25  A.  I don't know that it would have directly affected it, but

DANA DEBEAUVOIR — CROSS

1  it might have.

2  Q.  Let's talk a little bit about rules about whether or how

3  voters might be influenced when they've got a ballot in their

4  hands, okay?

5  A.  Okay.

6  Q.  I learned in 2020, when I was putting campaign signs in

7  the ground for my wife, that there are rules about how close a

8  campaign sign can be to a poll location, right?

9  A.  Yes.

10 Q.  It's like 100 feet or something, right?

11 A.  Correct.

12 Q.  And there are also rules about other kinds of election

13 year you cannot do within a certain space of a polling

14 location, right?

15 A.  There are rules, yes.

16 Q.  And Travis County enforces those rules?

17 A.  Yes, we do.

18 Q.  Do we agree those rules are important?

19 A.  Oh, yes.

20 Q.  And it's important voters not be harassed as they are

21 walking into the polling place, right?

22 A.  I agree with you.

23 Q.  Even more important they not be harassed when they were in

24 the polling place, ballot in hand, right?

25 A.  Correct.

904
DANA DEBEAUVOIR - CROSS

1  Q.  We don't want for people in the polling place, while a

2  voter has a ballot in hand, saying, this is how you should

3  vote, right?

4  A.  That's right.

5  Q.  It is also fair to say that the polling place is not the

6  only place where a voter may have a ballot in hand, right?

7  A.  That's right.

8  Q.  And wherever a voter has that ballot in hand, we don't

9  want people harassing them and saying, this is how you should

10 vote, while they are filling out that ballot, fair?

11 A.  Fair enough, yeah.

12 Q.  I think you testified on direct, and I don't want to put

13 words in your mouth, if I misheard this, let me know, but I

14 thought I heard you say that you've got no experiences with

15 paid assisters behaving improperly, is that right?

16 A.  That's correct.

17 Q.  We have heard from other witnesses in this case about the

18 concerns they have about what will happen in the future under

19 SB 1.  You haven't heard that, but I'll represent that to you,

20 okay.

21     It doesn't surprise you, I'll bet, that some of the

22 witnesses who have testified in this case have expressed

23 anxiety about what might happen under SB 1.  Does that

24 surprise you at all?

25 A.  No, it doesn't.  I indicated that I'm worried about what

DANA DEBEAUVOIR - CROSS

1  it will do to some campaigns.

2  Q.  And in a similar way, just because there have been no

3  instances that you know of, of vote assisters behaving

4  improperly, it doesn't mean that a vote assister won't behave

5  improperly in the future, right?

6  A.  Well, it's sort of like, and the corollary is true too,

7  just because they have behaved badly doesn't mean that they

8  will continue to behave badly.  I can't answer the question.

9  Q.  That's true.  Just because you can't say, hey, just

10  because you can't point to a specific incident where a bad

11  thing happened doesn't mean it doesn't make sense to ask for

12  some protection from that thing happening in the future, fair?

13  A.  It's not quid pro quo.  I don't think I can agree with

14  you.  I understand what you are saying, but you're trying to

15  protect against something bad happening.  I don't think it's

16  automatic quid pro quo though.

17  Q.  It would depend on the particular policy and the people

18  making those policy choices, fair?

19  A.  Yes.

20  Q.  Maybe we can talk about a specific example.  We talked

21  about unicorns a little bit and I love the way you described

22  that in your experience voter fraud is a unicorn, right?

23  A.  I think so.

24  Q.  And, nevertheless, every election you will report

25  suspicious voting activity to law enforcement, right?

DANA DEBEAUVOIR - CROSS

1   A.  I always did.

2   Q.  Even though voter fraud is a unicorn, we still have to be

3   vigilant against it, is that fair?

4   A.  I always was.

5   Q.  Let's talk a little bit about what SB 1 kind of does and

6   does not do and the information that you had about the way it

7   was going to work while you were still in office, okay.

8   A.  All right.

9   Q.  You talked a little bit about a Supreme Court of Texas'

10  ruling about whether SB 1 permitted election officials to

11  provide specific information to voters, right?

12  A.  Yes.

13  Q.  I'm going to ask you some specifics, and if you don't know

14  the answer, I understand that you're not a lawyer, but I'm

15  just going to see how much we can agree on here, okay?

16  A.  All right.

17  Q.  You were referring to a case called *Paxton v Longoria*, do

18  you recall that?

19  A.  Some of it, yes.

20  Q.  And do you recall that that case went up to the Federal

21  Court of Appeals at the Fifth Circuit and the Fifth Circuit

22  asked the Supreme Court of Texas for an opinion about the way

23  this bill worked, right?

24  A.  I'm a little vague on the litigation.

25  Q.  Do you know whether or not the Supreme Court of Texas has

DANA DEBEAUVOIR - CROSS

1  ever enjoined the enforcement of any piece of SB 1?

2  A.  I don't think I can answer your question.

3  Q.  Brian, can we pull up section 5.07 of SB 1 and Joint

4  Exhibit Number 1.

5      Miss DeBeauvoir, on direct examination, my friend on the

6  other side showed you section 5.07, do you remember that?

7  A.  Let's see.  Yes, someone else submitting a by-mail

8  application.

9  Q.  Right.  This is something that we've been talking about as

10 a cure process, right?

11 A.  A cure process.  Okay; I'll go with you for a moment.

12 Q.  Well, what I heard you say on direct was that SB 1 did not

13 originally contain a cure process but that the courts got

14 involved and created a cure process, is that right?

15 A.  That's my understanding.

16 Q.  Okay.  Are you — I'm not sure that I understand what you

17 mean by that.  Are you suggesting that the courts wrote a

18 provision into SB 1?

19 A.  I don't know that the courts actually drafted it but they

20 caused a cure process to be added to the Senate Bill 1 that

21 allowed Elections Administrators to speak directly to voters

22 about specific guidance on how to cure the problems of their

23 ballots and the specific guidance had to do with the most

24 common problem which had to do with the numbers.

25 Q.  At least part of the problem here, Miss DeBeauvoir, is I

DANA DEBEAUVOIR - CROSS

1  had you looking at the wrong section and I apologize for that.

2  A.  Okay.  Maybe that was why I was a little confused.

3  Q.  I heard some snickering over here and I figured I messed

4  up and I just couldn't figure it out.  Fortunately, I have

5  friends at my table.  Section 5.12.

6  A.  Okay.

7  Q.  That makes way more sense, doesn't it?

8  A.  Yes, it does.

9  Q.  But somehow you understand we are talking about a cure

10 process.  It's your understanding that something happened in a

11 court somewhere and subsequently the legislature then adopted

12 a cure process, is that right?

13 A.  That's correct.

14 Q.  And that happens sometimes in legislation, doesn't it,

15 that something -- there is a practice or an understanding of

16 the law and a new piece of legislation will clarify that

17 practice that's already been undertaken by Elections

18 Administrators, is that true?

19 A.  It happens.

20 Q.  You spoke on direct about the automatic rejection of

21 someone who sent in an ABBM, Application for Ballot by Mail,

22 with both their driver's license and the last four of their

23 social security, is that right?

24 A.  That's correct.

25 Q.  And if I understood you correctly, initially when your

DANA DEBEAUVOIR - CROSS

1  office would receive an ABBM with both pieces of information,
2  your office would automatically reject it, is that right?
3  A.  Received —— I'm sorry.  I don't think so.  If I
4  received —— when I was clerk, if I received both numbers, then
5  it would be a ballot that would qualify, assuming that it was
6  a registered voter with all the other complete information.
7  Q.  Okay.  Then I must have misunderstood your testimony.
8  Thank you for clarifying.
9      In your view, asking voters to provide an identification
10  number is not much of a problem, is that true?
11  A.  I don't think asking people for an ID number is a problem,
12  no.
13  Q.  The problem for you about SB 1 was regarding the period,
14  the insufficient time to implement that new requirement, is
15  that right?
16  A.  That is it.
17  Q.  There was insufficient time to educate voters about this
18  requirement, is that fair?
19  A.  It was rushed, yes.
20  Q.  And, in fact, your primary criticism of SB 1 was a lack of
21  time that Elections Administrators like you and the Secretary
22  of State's Office had to implement it, is that true?
23  A.  The lack of time and the lack of resources, for example,
24  the portal that was supposed to be ready.
25  Q.  And in your view the Secretary of State's Office had

DANA DEBEAUVOIR - CROSS

1  insufficient time to do their job to implement it, fair?

2  A.  Did not have time.

3  Q.  You hold the Secretary of State's Office in very high

4  regard?

5  A.  I do.

6  Q.  And you believe that Keith Ingram at the Secretary of

7  State's Office is an excellent public servant?

8  A.  I do.

9  Q.  And you, in fact, thanked him for the work he was doing to

10  implement the poll worker training?

11  A.  Yes, I did, publicly.

12  Q.  And you, likewise, believe that Christina Adkins at the

13  Secretary of State's Office is an incredible public servant?

14  A.  I think she's excellent.

15          MR. KERCHER:  Pass the witness.

16          THE COURT:  Anything else from this side?

17          MR. LIU:  Yes, Your Honor, briefly.

18  BY MR. LIU:

19  Q.  Good morning, Miss DeBeauvoir.  I'm Cory Liu from the

20  Harris County District Attorney's Office.  I was born and

21  raised in Austin, so it's an honor to meet you as well, after

22  voting so many time and seeing your name.

23  A.  Nice to meet you too.

24  Q.  Did I hear you correctly on direct examination, you

25  described section 4.09 of the SB 1 law as the "sneeze guard"

DANA DEBEAUVOIR - CROSS

1  provision?

2  A.  Yes.  I'm not sure that's exactly my quote, but, yes.

3  Q.  And I think it was mentioned that you had kind of become

4  aware that it was almost like basically targeted at you and

5  the incident that happened there.  Can you say a little bit

6  more about how you became aware of that?

7  A.  Yes.  Let me think just a minute.

8      We were holding a meeting -- "we," meaning the large

9  counties -- let me back up.

10     Before I resigned -- retired as Travis County Clerk, I

11  started holding weekly meetings with the large counties

12  through Zoom.  As a part of those meetings, we were talking

13  about the progress of Senate Bill 1 and could we get any

14  clarification, could we move this.

15     When new language started coming down that provided us

16  clarification on especially the issue regarding general

17  information versus specific information, the new language that

18  came out with direction from the court made it clear that we

19  could talk to our voters.

20     The additional language that said that we couldn't

21  obstruct poll watchers was mentioned in one of the

22  conversations in this group that not only did Harris County

23  have a marker in Senate Bill 1 for the 24-hour voting period

24  that you could not vote from -- I apologize for not

25  remembering exactly the hours, but you couldn't vote from

DANA DEBEAUVOIR - CROSS

1  sometime in the evening until sometime in the morning, that

2  that was rare, a little rosebud.

3      But Travis County had one that was for the sneeze guards,

4  and it was the one about that you couldn't erect any barriers

5  between the two.  So all of the counties were mentioning this

6  in our meeting.  So that's when it was a light-hearted comment

7  but it was certainly accurate.

8  Q.  Did you hear anything from lawmakers or Mr. Mackowiak, or

9  any of those people?

10  A.  You know, it seems like Matt made a comment, but I think

11  I'm going to have to defer that one because my memory is too

12  vague on it.

13  Q.  And I think you mentioned that --

14  A.  I really thought -- I'm so sorry.

15      I really think I remember Matt making a comment about it

16  but -- I'm going to have to say my memory is too vague.

17  Sorry.

18  Q.  But you remember that kind of first came -- was put on

19  your radar in the conference call?

20  A.  Oh, yes.  Oh, yes.

21  Q.  Now, I think you mentioned that under the law before SB 1

22  it was already a crime to obstruct a poll watcher, right?

23  A.  Yes.

24  Q.  And then I guess what SB 1 added was this kind of took

25  that same provision just added that it includes "by taking any

DANA DEBEAUVOIR - CROSS

1  action to obstruct the view of the watcher," so it kind of

2  just, I guess in some sense kind of takes what already existed

3  and adds a reiteration or something more specific, is that how

4  you read it?

5  A.  It added some redundant language.

6  Q.  And I suppose, just kind of looking at that, does it seem

7  like some people were loud and complaining and so lawmakers,

8  just to quiet them, put something in there that probably was

9  still was kind of redundant with what was there before?

10  A.  That sound like a good guess to me.

11  Q.  So it wouldn't be a product of a racist conspiracy, would

12  it?

13  A.  I don't see that.

14  Q.  You mentioned that you've referred complaints or kind of

15  incidents or topics to law enforcement.  Can you say a little

16  bit more about that?

17  A.  Well, every election we went through an audit to make sure

18  that we didn't have a situation where basically did we have a

19  situation where a voter voted twice.  And in the early days,

20  we didn't have a way to prevent somebody from doing that.  We

21  only had away to catch them after the fact.

22      Once we had a way to prevent them then all of those

23  referrals really went away, but in the early days we had some

24  incidences of people, usually it was a forgetful kind of

25  situation, and every single time that happened I referred

DANA DEBEAUVOIR - CROSS

1   those over to the County Attorney.

2       If I found any other situation that was an indication that

3   somebody voted inappropriately, and there are lots of

4   different kind of circumstances, but if I saw anything that

5   was unusual or something that I couldn't justify on the voter

6   rolls, they participated, or perhaps the election judge

7   allowed somebody to vote without the provisional ballot and

8   perhaps they shouldn't, I always referred it to the County

9   Attorney.

10      And I always followed up with meetings with them, did we

11  have intent, some mistake on our end that accounted for it,

12  what was the story behind it.

13  Q.  And I think you said there really weren't any prosecutions

14  or hardly any, but can you say a little bit more about kind of

15  how the prosecutors or the County Attorney or DA would react?

16  A.  We found situations where voters did make mistakes.  We

17  had voters that voted twice.

18      What we rarely, if ever, found was a situation where a

19  voter had deliberately done it.  I'm straining my memory to

20  remember one time that a voter deliberately did it.  There

21  might have been one in my 36 years, but it was very, very

22  rare.  It was usually somebody made a mistake.

23  Q.  So —

24  A.  I do remember one.  I remember one.  Yes, where one person

25  voted, she voted for her mom because she thought her mom was

DANA DEBEAUVOIR – REDIRECT

1 sick and when her mom came to vote she voted provisional.  It

2 was one situation.  Yeah, well —

3 Q.  Do you do find District Attorneys are generally

4 understanding of those concerns and trying to be sensitive to

5 that?

6 A.   In my case, it would have been the County Attorney.

7      I found them to be reasonable about intent and they

8 certainly called this person that made this mistake, that did

9 this, and questioned them and followed through with their —

10 they were very careful about making sure this person

11 understood what they had done.

12              MR. LIU:  Thank you.

13              No further questions.

14              THE COURT:  Anything behaved anything on redirect?

15              MR. MORALES-DOYLE:  Just a little, Your Honor.

16                      REDIRECT EXAMINATION

17 BY MR. MORALES-DOYLE:

18 Q.  Miss DeBeauvoir, you were asked a few questions by counsel

19 about how when you stood in that media room you could tell

20 whether or not poll watchers were able to see and hear what

21 was happening in the counting facility, do you remember that?

22 A.  I do.

23 Q.  And you said that you knew that they could see what was

24 happening because you stood there and you could see what was

25 happening, is that right?

916

DANA DEBEAUVOIR – REDIRECT

1  A.  Well, in addition to that, the photographic evidence shows

2  that you can see between the two rooms, so it's more than just

3  me.

4  Q.  And you also stood there and heard what was happening in

5  the room and you could effectively hear what was happening in

6  the room, is that your testimony?

7  A.  That's correct, and I would represent that I have normal

8  hearing.

9  Q.  Miss Fleck said she could not see and hear effectively, is

10 that right?

11 A.  Perhaps she couldn't hear over her own screaming.

12 Q.  And in your view, Miss Fleck should have been able to see

13 and hear effectively, right?

14 A.  That's correct.

15 Q.  But she said that she could not?

16 A.  She did say that.

17 Q.  And the Attorney General's Office attempted to prosecute

18 you for obstructing her, based on those claims, is that right?

19 A.  That's right.

20 Q.  You were No Billed?

21 A.  I was.

22 Q.  But section 4.09 now says that a poll worker commits a

23 poll watcher obstruction if they take any action that makes

24 that poll watcher's observation not reasonably effective, is

25 that right?

DANA DEBEAUVOIR – REDIRECT

1  A.  That's what the bill says.

2  Q.  And that language wasn't in there at the time when you

3  were No Billed?

4  A.  That is correct.

5  Q.  You were also asked about this idea of preventing a bad

6  thing before it even happens, do you remember that

7  conversation?

8  A.  Yes.

9  Q.  In your experience, you've never been made aware of any

10  situation in which a paid assister harassed or intimidated a

11  voter in any way, is that correct?

12  A.  I'm not aware of one in Travis County when I was clerk.

13  Q.  Now, prior to SB 1, was it illegal in Texas to harass and

14  intimidate voters?

15  A.  Yes.

16  Q.  So if there had ever been a single occasion in your 36

17  years as a clerk where a paid assister did harass or

18  intimidate a voter, that would have been illegal prior to SB

19  1?

20  A.  It would have been illegal.

21        MR. MORALES-DOYLE:  That's it.  Thank you.

22        THE COURT:  Anything based on those?

23        MR. KERCHER:  No, Your Honor.

24        THE COURT:  You may step down.

25        Any further need for this witness, or can she be

DANA DEBEAUVOIR – REDIRECT

1  excused?

2          MR. MORALES-DOYLE:  She can be excused, as far as the

3  plaintiffs are concerned.

4          THE COURT:  You are excused, ma'am.  Thank you.

5          With that, let's go ahead and just break for lunch

6  now.  We'll resume at 1:00.

7      *(Recess)*

8      *(Change in reporter)*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (1:04 p.m.)
2              COURT SECURITY OFFICER:  All rise.
3              THE COURT:  Thank you.  Please be seated.
4              Your next witness.
5              MS. O'GARA:  Your Honor, Marisa O'Gara for LULAC
6    plaintiffs, from Elias Law Group.  LULAC plaintiffs calls Zeph
7    Capo to the stand.
8              Your Honor, Mr. Capo is here to testify as a plaintiff
9    representative for AFT, as restructured.  Mr. Capo's testimony
10   will provide support for the LULAC plaintiffs' challenges to
11   SB1 Sections 304, 309, 310, 312, 313, 502, 503, 507, 508 and
12   704.
13                           *   *   *
14              (Oath administered and ZEPH CAPO, witness,
15              Sworn.)
16                           *   *   *
17                       DIRECT EXAMINATION
18   BY MS. O'GARA:
19   Q.  Good afternoon, Mr. Capo.  Can you please state your full
20   name for the record?
21   A.  Zeph Capo.
22   Q.  And where do you live?
23   A.  Bastrop, Texas.
24   Q.  Is that Bastrop County?
25   A.  Yes.
```

Zeph Capo – Examination                    920

1   Q.  Which city do you live in?

2   A.  Texas.

3   Q.  Sorry, which city do you live in?

4   A.  Outside the City of Bastrop.

5   Q.  Thank you.  How long have you lived in Texas?

6   A.  Twenty-six years.

7   Q.  And do you know why you're here today, Mr. Capo?

8   A.  Yes.

9   Q.  And why is that?

10  A.  I'm here representing our organization and our challenge to

11  Senate Bill 1.

12  Q.  Which organization is that?

13  A.  Texas AFT.

14  Q.  And what is your role at Texas AFT?

15  A.  Currently, I'm the president.

16  Q.  What is Texas AFT exactly?  How would you describe the

17  organization?

18  A.  Texas AFT is a (c)(5) designated labor union.  We represent

19  K-12 public school employees and higher education employees in

20  the State of Texas.

21  Q.  And have you held positions beside the position of

22  president at Texas AFT?

23  A.  I was formerly the president of Houston Federation of

24  Teachers.

25  Q.  And what are your job responsibilities as president of

Zeph Capo – Examination                    921

1  Texas AFT?

2  A.  First and foremost, to oversee the mission of the

3  organization, to develop and implement the budget, to oversee

4  the staff, to support our locals across the State of Texas and

5  their mission, and to preside over the executive counsel and

6  carry out their will.

7  Q.  And apart from your role as president of Texas AFT, can you

8  tell us a little bit about your professional background?

9  A.  Sure.  I came into education, oh, 30 some-odd years ago

10  now.  I was going to school back home in Miami.  We had a

11  hurricane, Hurricane Andrew.  My aunt was an office manager.

12  They couldn't keep staff because staff's houses were destroyed,

13  I started substitute teaching to help fill that staffing need

14  there.  I fell in love with what I was doing.  I went on to be

15  a middle school science teacher, social studies teacher.

16      I moved to Texas with the intent of going to law school,

17  but I ended up working -- coming out of the classroom after

18  teaching high school biology here in Texas and working for the

19  Union.

20  Q.  And you began to touch on this, but can you tell us why you

21  became a teacher?

22  A.  Sure.  I became a teacher because I wanted to make a

23  difference in my community.  I wanted to make a difference for

24  the students that I saw each and every day to ensure that they

25  had at least the same opportunities that I did, if not more,

1    and better opportunities.

2    Q.  Now, shifting back to Texas AFT, can you tell the Court a

3    little bit about the work that you do there?

4    A.  Sure.  Our main mission is to advocate for good working

5    conditions for our members and good learning conditions for the

6    students and the families that we serve.  We focus on policies

7    that -- focus on policies such as controlling class loads so

8    that teachers have class rooms that they can manage and

9    students have spaces that -- where they can get attention from

10   their teacher.  We focus on improving funding, because Texas is

11   one of the lowest paid states in the country, certainly one of

12   the lower funding states in the country, so we're consistently

13   advocating and fighting for improved funding for our public

14   schools.

15       We fight for programs like community schools that actually

16   treat children like holistic individuals, that focus on making

17   sure that barriers to them receiving a good academic foundation

18   are addressed as part of the needs that may need to be met

19   throughout their career.  We focus on building partnerships

20   with parents and community members that want to be active in

21   their public schools and have a say in the voice and direction

22   of their children's education.

23   Q.  And if I refer to Texas AFT as "AFT" throughout the

24   remainder of our conversation, will you understand that I'm

25   referring to the Texas chapter of AFT?

Zeph Capo - Examination                    923

1    A.    Yes.

2    Q.    Great.  And can you tell us a bit more about how AFT

3    accomplishes the work that you just described?

4    A.    We make sure that our members are well abreast of what's

5    going on in their state.  We educate our members and educate

6    our community members.  We interact and advocate for them

7    before regulatory boards such as the State Board of Education.

8    We work to make connections within the community around policy

9    issues, whether that's at the school board level or whether

10   that's at the community level.  We represent them with, you

11   know, elected officials that have power over their lives and

12   the lives of the students that they teach.  We do engage in the

13   political process, as well, as part of that work.

14   Q.    Do you endorse candidates?

15   A.    We do, yes.

16   Q.    Does AFT have a partisan affiliation?

17   A.    We do not.  We have a policy platform.

18   Q.    Do you have members?

19   A.    We have approximately 66,000 members in the State of Texas.

20   Q.    Can you tell us more about who your members are?

21   A.    Our members are a very diverse group of individuals from

22   varying racial and ethnic backgrounds.  They come from across

23   the State of Texas.  They could be newly graduated high school

24   or college students.  They could be teachers with decades of

25   experience, varied slice of Texas.

1  Q.  Are any AFT members Texas voters?

2  A.  Probably about 90 percent of our members are voters.

3  Q.  Do you have any AFT members who are registered voters and

4  are also Black or Latino?

5  A.  I would say across the state, approximately two-thirds of

6  our members are Black and Latino that are registered voters.

7  Q.  Now let's talk about SB1 a bit.  I'd like to ask you about

8  Section 704, which prohibits compensated in-person interactions

9  with voters in the presence of a mail ballot and imposes

10 criminal penalties for violaters of this provision.

11     Are you familiar with that provision?

12 A.  Yes, I am.

13 Q.  And does that restriction impact AFT's advocacy work?

14 A.  That restriction has impacted us tremendously.  Previously,

15 and through many of the years as I was moving through the

16 profession, we primarily relied upon canvassing, or

17 door-knocking, as the main motive for communicating with our

18 members, particularly around advocacy issues and endorsed

19 candidates, to some extent phone banks, but mainly

20 door-knocking.

21     Since Senate Bill 1 has come into place, we have had to

22 shift our main methods of communication with our members.  It's

23 my responsibility to look out for the best interest of our

24 members, and I can't in a good conscience put them in a

25 particular place where they could be in harm's way.  I am

1  concerned about the potential criminal activity -- or criminal

2  penalties that could come across this law if they happen to

3  knock on the door where somebody who had a live ballot, an

4  absentee ballot.  That was a -- that was a -- in our past work,

5  we would often canvass.  That would be part of the questions

6  that we would ask, if our members were 65 and above or

7  otherwise eligible to vote by mail.

8      Of course, those questions would happen throughout the

9  period.  And there were occasions where people may have already

10 received their ballot, and they would show their ballot.

11 That's happened to me before, as I've been block-walking.

12     So with that in mind, we made a decision to shift primarily

13 away from that method of communication in order to not have

14 instances where our members could be put in harm's way.

15 Q.  Now, you've mentioned door-to-door canvassing and

16 block-walking.  Can you describe what those terms mean?

17 A.  Sure.  In the past, we may on evenings or the weekends,

18 have our staff and our members come to a location.  Usually it

19 was one of our union halls, could be somewhere in the

20 community.  We may have 15, 20 people in a weekday or a weekday

21 evening or 80 or 90 people on any given Saturday.  Those

22 individuals would receive training.

23     They would receive training on -- regarding what we are

24 advocating on.  They would receive training on what the

25 messages were.  They would receive training on how to use their

1    block-walk packet, which would be their either paper electronic

2    reports about the questions that they'd be asking voters, who

3    the voters were, how they were able to find them on the doors.

4        They would be trained in how to have a conversation.  And

5    most of the time, this was member-to-member conversations where

6    they would knock on the door of a fellow union member, announce

7    themselves, let them know that they're a fellow union member,

8    and then go into a conversation about whatever the issues were

9    what we were advocating for or the candidates that we were

10   endorsing.

11       They would complete their conversations, mark that on the

12   paperwork, finish their packet and their turf, which was

13   usually several streets within a particular neighborhood, and

14   return back to the launching location, wherever that would be,

15   and debrief with our staff or with our other individuals that

16   were collecting materials as they returned.

17   Q.  And you alluded to this, but prior to SB1, would these

18   conversations that your canvassers or your block-walkers were

19   having, would they ever occur in the physical presence of a

20   mail ballot?

21   A.  Yes.  Canvassing usually would happen very early, up

22   through the day of election.  And when you have -- particularly

23   individuals that would qualify that used to be part of the

24   practice, to ask them, ask them prior to if they -- how they

25   were going to vote, whether they were going to vote by mail,

1    whether they were going to vote early or vote on Election Day,

2    if they had applications, to do so.  When the process had

3    taken -- there's usually a date within the cycle where the

4    county or whomever would release the ballots.  They would send

5    them in the mail.  Some people would receive them earlier than

6    others.  And there would be occasions when they're asking those

7    questions, they may have received it in the mail.  It could

8    have been right there next to the door with their mail stack,

9    and say, Yes, I've already gotten my ballot, which would

10   sometimes lead to other questions.

11        That's happened to me before whenever I've been out

12   block-walking in the past.

13   Q.  And is block-walking or door-to-door canvassing the only

14   situation in which an AFT staff member or volunteer might

15   interact with a voter in the physical presence of a mail

16   ballot?

17   A.  No.  We have several retiree chapters both within our

18   locals and statewide.  Those individuals, the majority of them

19   would be 65 and over.  Voting would be a big -- huge part of

20   what they do.  They would often do those things together.

21   There were times that they would potentially bring their

22   ballots together and mark those ballots and turn them in as a

23   group as part of what they were doing in their retiree chapter.

24   They're very excited about that, for example, because they're

25   hoping to get a cost-of-living adjustment passed this November

Zeph Capo – Examination                    928

 1    in the elections.

 2        We've had to tell them or remind them as they're having

 3    their meetings to please don't do anything like that, because

 4    when they come into those buildings, whereas they may not

 5    necessarily be thinking about it.  We may not necessarily be

 6    thinking about it.  They could inadvertently trigger the

 7    potential, under the law, for having problems, because,

 8    obviously, our staff are in the buildings.  We're paying for

 9    the buildings with our resources, etc.

10    Q.  Now, you gave us a lot of detail about what your

11    block-walking program used to look like prior to SB1.  You've

12    mentioned that it changed.  Can you tell us more about what it

13    looks like now?

14    A.  If we do any block-walking at all it is generally with a

15    local and a much smaller group or smaller detail that can be

16    more controlled.  More time spent in training, more time making

17    sure there's proper oversight.  We don't do large block-walk

18    programs any more unless, you know, there's special

19    circumstances, but we just really haven't done it.  We've

20    mainly shifted most of the volunteer work or the volunteers

21    that we would have doing canvassing and door-knocking to other

22    motives.  For example, they may spend time in texting parties

23    where we do virtual trainings, and they come in to do

24    peer-to-peer texting.  They may spend time doing letter

25    campaigns or postcard campaigns to get out the message.

Zeph Capo - Examination                    929

1       So we've had to identify new and different ways to

2   compensate for the reduction in the amount of canvassing or

3   door-to-door block-walking that we do.

4   Q.  Do they also call voters on the phone?

5   A.  Yes.

6   Q.  Are your block walker -- or some of your block walkers paid

7   staff members?

8   A.  Yes.

9   Q.  But not all of them?

10  A.  There would always be paid staff with our block walkers

11  because the paid staff have to be the ones that really

12  coordinate the work for our volunteers, for our rank-and-file

13  members that would come out and help assist and do this work.

14  Q.  Do your unpaid block walkers receive any kind of

15  compensation or other benefits?

16  A.  Generally, they often would be provided some type of

17  benefits.  These are teachers, food service workers, bus

18  drivers.  We certainly don't want them to have to, you know,

19  expend their own money to be able to do this volunteer work.

20  So if they showed up and were volunteering a shift, we would

21  often provide gas cards so that they could get to the turf and

22  back.  We would certainly always feed our volunteers breakfast

23  in the morning when we're doing training, lunch during the day

24  or whenever they got back.  We would often, in order to

25  maintain volunteers and increase volunteer recruitment, we

Zeph Capo - Examination                    930

1    would do raffles of those that participated.  A hundred dollar

2    gift certificate to the teacher store or a hundred dollar gift

3    certificate to Kroger's, things like that; swag from the

4    organization, to make them feel like they were part of a

5    network that was actually doing work together.

6    Q.  And why did you alter your block walker program?

7    A.  Frankly, I don't want to put any of our members,

8    particularly our rank-and-file members that we have fiduciary

9    responsibility to, in harm's way.

10   Q.  How has altering the program affected its efficacy?

11   A.  The quality of the conversations that we have, even if

12   we're able to have the same amount of conversations, they will

13   never be the same quality that they are when you are standing

14   in front of a union member's door and sending a message about

15   the fact that you're there knocking on their door, that you

16   care enough about them to come see them in their space where

17   they're comfortable.

18       The types of conversations that either our union leader or

19   a member would have with fellow rank-and-file members at the

20   door were the types that you would never get the same level of

21   persuasion pretty much in any other venue.  You are able to

22   relate on a eye-to-eye level and around the shared and common

23   values that we both have.  And you're able to engage in a level

24   of conversation where they can understand that we've done our

25   work.  We vetted through the processes.  This is why we're

Zeph Capo - Examination                    931

1    endorsing somebody.

2        And when you're able to have that type of face-to-face,

3    eye-to-eye conversation, and they can see themselves in you as

4    a person that's talking about these issues and they know that

5    you share common bonds and common interest, then the likelihood

6    that they're able to -- they're not only going to go out and

7    vote, but vote in a manner that is in their own interest,

8    dramatically improves.  It is very difficult to have those same

9    types of conversations over the phone.  It's very easy to hang

10   up the phone when you don't see somebody that is actually

11   taking time to come knock on your door.  It's very hard to have

12   those type of substantive conversations through a texting

13   party.

14       Texts can be deleted or ignored at any given moment.  So

15   you have to work harder, do more, consistently push in

16   different ways to even try to come close, but there is no other

17   communication system that I am aware of in the 30 some-odd

18   years I've been doing this that will ever have the efficacy of

19   meeting somebody in the space where they are comfortable, which

20   is their home, and speaking to them face-to-face.

21   Q.  And since SB1 was enacted, have you joined your block

22   walkers on the phones?

23   A.  Yes.

24   Q.  Can you tell us a bit more about the questions and concerns

25   that you've gotten?

Zeph Capo - Examination                    932

1   A.  Since many of these changes, we try to focus most of our
2   conversation at the time on our advocacy issues, our
3   persuasion, and our endorsed candidates.  But there has been --
4   and at least in my anecdotal experience, an increase in the
5   number of administrative questions that are being asked.  How
6   do I vote?  Where do I vote?  When can I vote?  What are these
7   pieces that we need to do now?  What are the changes?  What do
8   I have to put on my ballot again?
9       These were not the types of questions and the time that we
10  generally spent on these issues prior to Senate Bill 1.
11  Q.  Has the need to address these concerns and questions
12  prevented you from discussing any specific advocacy work with
13  voters?
14  A.  Well, any time that we are taking away and additionally
15  spending on these types of mobilization efforts are taking away
16  from opportunities we have to advocate on issues that make a
17  difference in peoples lives.  So any additional time that we
18  spend going over administrative questions and issues is time we
19  could have been spent talking about what our teachers need in
20  their classroom to be successful.  Talking about how we can
21  work together to make sure that they're not spending out of
22  their own pocket for resources that schools should be providing
23  for them and their students.
24  Q.  Have you been able to reach the same number of voters as
25  you did previously?

1   A.  Not in the same -- not in the same way to the same level of

2   efficacy that we have been able to in the past.  We may be able

3   to get to volume increases through text message blasting, but

4   that doesn't mean that they're necessarily going to respond or

5   connect or engage in a conversation with you.

6   Q.  You mentioned that the conversations that you're having on

7   the phones and digitally are less effective.  Are you finding

8   that that causes an impact on member engagement?

9   A.  Yes.  There's -- beyond just the direct conversation about

10  the issue that we're advocating on or the candidate that we're

11  supporting, there is a tremendous amount of organizational

12  building that happens when individuals are canvassing or

13  door-knocking or block-walking.  They actually are able to see

14  and clearly understand and articulate in a way why they're

15  doing what they're doing, why we're actually doing the work

16  that we're doing.

17      For example, I've had debrief conversations with members

18  that have left neighborhoods, and they started being able to

19  guess which house was going to be the Union member's house in

20  the neighborhood, because it's oftentimes the house that could

21  afford to be painted or fixed or what have you, and that would

22  lead to conversations in debrief.  Well, if people were in a

23  union where they were getting a decent union wage, where they

24  were probably getting their health care covered, the expenses

25  that would have to be paid going to the doctor, they could

1    actually take care of their home and do these other things.

2        So it not only impacted the conversations we were having

3    with individuals.  It impacted the experiences that are

4    sometimes fundamentally necessary to move our members, the

5    activists, and our activists and leaders within the

6    organization.

7    Q.  And what about on volunteer recruitment?  Are you seeing an

8    impact there?

9    A.  To an extent, yes.  We can get people to come in and do

10   text messaging because they can do that from their home, and

11   it's rather easy, but they're not really learning the types of

12   skills that are necessary to be proficient at one-on-one

13   conversations and help build the organization in the manner

14   that the mission requires.

15       Additionally, I think that the unknown issues around some

16   of the provisions of SB1 have had a chilling effect on people

17   being willing to go out and volunteer to do that level of

18   block-walking.  Our members are school employees, teachers

19   primarily, and by nature, they're rule followers.  And when

20   there's a level of uncertainty about these things, they tend to

21   shy away.

22   Q.  And do you anticipate that this impact on your volunteer

23   recruitment and retention efforts will continue throughout

24   future election cycles?

25   A.  If the current conditions stay in place, yes.

Zeph Capo – Examination                    935

1    Q.  Now, before SB1, were your block walkers the only Texas AFT
2    employees that interacted with voters?
3    A.  No.  Our temporary political organizers, they were
4    generally the individuals that met our volunteers or our block
5    walkers.  They're the ones that would coordinate the work.
6    Previously, prior to SB1, they were generally the individuals
7    that would prepare packets, prepare the training.  In
8    campaigning lingo, "cut the turf," which meant that they would
9    divide up the spaces for each of the walkers, the canvassers or
10   the volunteers, that would delineate who they were going to
11   have conversations with and where those conversations were
12   going to take place.
13       They would be the individuals that would be charged with
14   either printing out packets or loading it into a mobile device.
15   They would be the individuals that would make sure that
16   canvassers had maps to get where they needed to be.  They may
17   be going out on the doors with them to be able to supervise or
18   oversee or provide support and assistance to people that may
19   have not done the work before.
20       And then, of course, they would be the individuals helping
21   to coordinate the data, to make sure that it returned and got
22   back into the system in an appropriate manner.
23   Q.  And just so it's clear, how are temporary political
24   organizers different than block walkers?
25   A.  They're the individuals that coordinate the work.  They're

Zeph Capo - Examination                936

1    the individuals that meet those block walkers.  And for lack of

2    a better term, probably serve as their supervisors or their

3    point of contact.

4    Q.  And has their work changed at all post-SB1?

5    A.  Tremendously.  Without having canvassers, block walkers or

6    volunteer members to oversee, we have had to shift up how they

7    do their work and how they get their messages out.  So now

8    they're the individuals that are generally going out trying to

9    either get volunteers to our virtual events or identifying our

10   building leaders that are willing to do happy hour parties

11   after school, to do letter-writing campaigns or postcard

12   campaigns.  They're educating our leaders and attending union

13   meetings or attending community meetings to provide information

14   and make sure people understand what they need to do to be able

15   to engage in the process.

16       Ultimately, they're the ones that are now trying to be

17   innovative to find other ways to get the message out.

18   Q.  Has the efficacy of your temporary political organizers'

19   work been impacted by SB1?

20   A.  Yes, it's -- if you think about having a -- your temporary

21   political organizers having a group of 70 or 80 volunteers on

22   any given Saturday to be able to reach 30 to 50 households in a

23   particular day, they're able to get a fairly decent number of

24   communication knocks done.

25       Now, without that, more of the work is on their shoulders,

Zeph Capo - Examination                    937

1    because they're then trying to get people in twos or threes or

2    fours or fives or sixes in different meetings at one time.  So

3    they're having to duplicate and replicate their message to

4    different audiences in different places across the state in a

5    much different way than they did before.

6    Q.  And how have your temporary political organizers managed

7    this increased demand on their workloads?

8    A.  "Manage," is the word.  I'm not quite sure that it's -- if

9    we've all figured out together how to completely manage it just

10   yet.  We're working through it.  We're certainly attempting to

11   do the best that we can under the circumstances that we find

12   ourselves, but I would say that we've still got work to do if

13   we're going to either continue to maintain or get to the place

14   that we were before.

15   Q.  Have you had to hire any additional temporary political

16   organizers to keep up with this increased demand?

17   A.  Yes.  When you have more of a central location, when your

18   methods of communication are more focused on canvassing and

19   block-walking or phone-banking, you could do both of those

20   types of events out of one space, and you could have a common,

21   central location that your canvassers or volunteer members

22   could locate to.  When you're able to do that and they know

23   where to go each evening or on Saturdays, you're able to staff

24   up with maybe two or three people to be able to do that work as

25   they come through.

Zeph Capo – Examination                    938

```
 1        If we're now depending on the temporary political
 2   organizers to go out and do much more frequent smaller meetings
 3   where individuals are, because we don't have kind of this
 4   central gathering point in the same way any more, then we need
 5   more of those organizers to actually be able to do the work and
 6   be in those geographic spaces.
 7   Q.  Can you estimate about how many more temporary political
 8   organizers you've had to hire post-SB1?
 9   A.  Roughly double.
10   Q.  And do you anticipate that you'll have to continue to hire
11   additional temporary political organizers in future election
12   cycles if SB1 is still law?
13   A.  If the conditions stay the same, yes.
14   Q.  And why is that?
15   A.  The work location spots are not decreasing.  We have
16   thousands of work location spots across the State of Texas.
17   Each and every day our members are aging into absentee ballot
18   voting.  Each and every day our members are aging into turning
19   18 and becoming voters.  Our student members become voters when
20   they're 18.  There's always going to be a new section of work
21   there.
22        We're in a profession where we have a tremendous staffing
23   crisis where people are coming in not only from multiple states
24   across the country, but oftentimes from multiple countries.
25   And they're becoming citizens at different rates of time, as
```

Zeph Capo – Examination                    939

 1   well too.  So there's always new people that we're having to

 2   work through, identify, and help ensure that they can exercise

 3   their Democratic rights.

 4   Q.  Has hiring these additional temporary political organizers

 5   required more funding?

 6   A.  It's required funding that we've had to take from other

 7   programs or activities to make sure that we can ultimately get

 8   the job done.

 9   Q.  And what would that money have otherwise been spent on?

10   A.  For example, in this last year, we ran a statewide campaign

11   The Respect Us Expect Us campaign that was focused on the

12   staffing crisis and why -- you know, why teachers were leaving

13   the classroom and why we couldn't maintain them and retain them

14   in our school districts.

15       We allocated funding and partnershipped with a nonprofit to

16   do focus groups of educators across the state so that we could

17   actually hear what would make a difference to them and how we

18   could improve conditions within their schools so that we could

19   retain them.  Part of what we had to do is make a decision in

20   which cities we would cut out of the program in order to make

21   our budget work for what we needed to do over the '22 year.

22   Q.  Are there any other advocacy efforts that you've had to

23   scale down or delay because of SB1?

24   A.  Sure.  I mean, every dollar that we have to transfer to

25   doing any of the additional mobilization work are dollars we

Zeph Capo - Examination                    940

1   could have spent on powerful partnership institutes, which are

2   partnerships to help engage parents and community members with

3   educators at the school level to be engaged in the public

4   education process.  Those are dollars that take away from

5   supporting our locals and districts that are implementing

6   community schools, which provide outside-of-school support for

7   students and families so that they can be successful.

8       It takes away from our general organizing, which is the

9   funding we need to actually be able to reach out to new

10  individuals through the system and recruit them to the union.

11  There are multiple programs that the funding could pull from,

12  because there is a finite number of dollars that we have for

13  everything.

14  Q.  Now, shifting gears.  We spoke briefly about some of the

15  questions and concerns that you and your fellow AFT staff and

16  volunteers were getting about post-SB1.  I want to talk about

17  that now in a little bit more detail.  I want to ask you about

18  the provisions of SB1 which eliminate drive-through voting

19  Sections 304, 312 and 313.

20      Are you familiar with those restrictions?

21  A.  Yes.

22  Q.  And have those restrictions impacted AFT's advocacy work?

23  A.  We definitively use them in Harris County for drive-through

24  voting both as part of our mobilization advocacy work and as

25  part of our attempts to make sure that our members could engage

1    in the process.  Particularly in 2020, we were in the middle of

2    COVID.  We were very focused on school safety and maintaining

3    safety for our members, so one of the organizing methods that

4    we would use were car caravans.  We did car caravans around the

5    state capital.  We did car caravans around the school district

6    offices in support of teachers being able to get access to

7    vaccines, etc., and other policy issues.

8        One of the things that we did particularly during that year

9    in Harris County was the car caravan where members were able to

10   put up posters and share their voice and concerns about policy

11   issues and safety matters particularly --

12          THE COURT:  Sorry.  Maybe I'm confused.  I thought you

13   asked him about drive-through voting.

14          MS. O'GARA:  I did.

15          THE WITNESS:  And as we finished these events, they

16   would finish at the drive-through voting location where they

17   would finish the activity, and everybody would use the

18   drive-through voting location to cast their ballots, because

19   this happened to be during early voting periods.

20   BY MS. O'GARA:

21   Q.  And did you attend that caravan event that you just

22   described?

23   A.  Yes.

24   Q.  Has drive-through voting impacted AFT's members?

25   A.  Yeah, I think so.  Part of the debrief that came out of

Zeph Capo - Examination                    942

1    that was, you know, like, our teachers that had their kids with

2    them, for example.  What they realized was using drive-through

3    voting allowed them to maintain their kids in their car and

4    have them occupied as opposed to trying to keep them in line

5    through a long in-person line at a voting booth.  That was

6    particularly helpful to those individuals.  We had

7    conversations with teachers that talked about where they live

8    and how far they drive.  Some of them have up to a 90-minute

9    commute each way.  And having access to a drive-through voting

10   location on their way home was particularly helpful for them to

11   be able to make things work within their day.

12   Q.  And did drive-through -- did the restrictions on

13   drive-through voting create any unique challenges for AFT

14   members?

15   A.  I think any time that we take away an opportunity to be

16   able to fit the voting process into a schedule, it does take --

17   it does create a difficulty.

18   Q.  Do you know about how many of your members used

19   drive-through voting in the 2020 election?

20   A.  We estimated we thought it was around 2000, based on the

21   statistical numbers of how many people in the county were using

22   drive-through voting and the number of members we have in

23   Harris County.

24   Q.  You mentioned earlier that your membership is very diverse.

25   Is that also true in Harris County?

Zeph Capo - Examination                943

1    A.   Probably more diverse in Harris County.

2    Q.   How so?

3    A.   There's probably a high preponderance of Black and Latino

4    members in Harris County as opposed to the general number

5    across the state.

6    Q.   And do you know about how many?

7    A.   In Harris County?

8    Q.   Yes.

9    A.   Somewhere between two-thirds and three-fourths.  The number

10   fluctuates depending on the number, but the last time I ran the

11   numbers was approximately 36 percent African-American and

12   32/33 percent Hispanic, but I do have a feeling that that's

13   probably increased since the last time I ran those numbers.

14   Q.   And was that diversity reflected in the group of members

15   involved in your caravan events for drive-through voting?

16   A.   Yes, definitely.

17   Q.   I'd like to ask you next about the provisions of SB1

18   involving 24-hour and extended-hour voting, Sections 309 and

19   310.  These provisions prohibit counties from operating early

20   voting before 6:00 a.m. or later than 10:00 p.m.  Are you

21   familiar with those provisions?

22   A.   Yes.

23   Q.   And do those provisions impact AFT members?

24   A.   Yes.

25   Q.   How do they impact AFT members?

1    A.  AFT members, depending on who they are and what type of

2    work they do -- for example, our bus drivers, could be up at

3    work at 4:00, 5:00 in the morning.  They could be working until

4    late, late in the evening.  Our teachers sometimes are getting

5    there to school before the sun rises and are not leaving before

6    the sun sets.  Most of our school employees, our teachers in

7    particular, they are not like most professions where they can

8    leave during their lunch and go cast a vote or take care of

9    other business.  They actually have 30 students that they're

10   responsible for.

11       We fight to make sure that they actually have 30 minutes of

12   lunch during the day just to take care of their own personal

13   needs.  Having extended hours, in particular, is something that

14   helps them engage in the process in a much more efficient way.

15       For example, in October, when we usually have early voting,

16   that particular time of the year for teachers, that's usually

17   when fall festivals are going on.  So in addition to their

18   regular duties, they may be staying after school for the fall

19   carnival.  That's usually when Meet The Teacher nights are

20   going on or math night during the fall.  So having those

21   extended hours really help a group of individuals that have

22   much more restrictions on them than most other professions to

23   leave and take care of these things during the day.

24   Q.  Finally, I'd like to ask you about the provisions of SB1

25   imposing new voter identification requirements, Sections 502,

1    503, 507 and 508.  These provisions require that, among other

2    things, voters eligible to vote by mail must now include either

3    their driver's license or Social Security number, the last four

4    digits.

5         Are you familiar with those provisions?

6    A.  Yes, I am.

7    Q.  And do those provisions impact AFT members?

8    A.  They do.  They certainly have.

9    Q.  How do they do that?

10   A.  We've had our members have their ballots rejected because

11   of these provisions.

12   Q.  Do any specific members come to mind?

13   A.  Elaine Jones from Corpus Christi.  She had her ballot

14   rejected because the flap that's supposed to contain the ID

15   information was separated away from her ballot and the county

16   rejected her.

17   Q.  Do any other members come to mind?

18   A.  Alice -- trying to think of her last name, Pinrod.  She

19   actually just aged into absentee voting.  She was a member who

20   was caretaker for an elderly parent, and it was always a burden

21   for them because she had to leave the parent or the parent had

22   to stand in line with them.

23        MR. BRYANT:  Object.  Lack of personal knowledge, and

24   he's just relating hearsay.

25        THE COURT:  So the first part is overruled.  The

Zeph Capo - Examination                    946

1    second part, what's the exception to hearsay?

2           MS. O'GARA:  The question is not soliciting an

3    out-of-court statement, Your Honor, and Mr. Capo should be able

4    to answer based on his personal knowledge.  He knows these

5    women.

6           THE COURT:  Right.  That's why I overruled the first

7    part, but the second part is the hearsay.  So how is he not

8    offering this for the truth of the matter asserted?

9           MS. O'GARA:  I think it could come in under the

10   exception for present sense impression.

11          THE COURT:  That's sustained.

12   BY MS. O'GARA:

13   Q.  Moving on.

14      Now that Harris County can't offer these voting options,

15   does that require more mobilization from AFT?

16   A.  It does.

17   Q.  And how does it require that?

18   A.  You have to -- we have to spend more time making sure that

19   they have plans with less opportunities to be able to cast a

20   vote.  It's even more important that our members are very

21   thoughtful about how they're going to cast their vote, what

22   their plans are going to be to cast their vote.  So some of the

23   things we would do is help them by putting together templates

24   so that they could develop their voting plans.  Were they going

25   to cast their vote early?  Were they going to cast on Election

Zeph Capo – Examination                947

1    Day?  Where was the location they needed to be?  How do they

2    make sure they get the information ahead of time?

3        Those are things that we have to expend costs on printing

4    as well as providing training to staff and members to be able

5    to share out to try to get done.

6    Q.  And can you tell us a bit more about some of the resources

7    and staff time that's required?

8    A.  Printed costs, development costs, working with staff to

9    make sure they understand what they need to do with

10   individuals, how they're going to have conversations about

11   getting -- walking through with them their plan to vote.  How

12   we're actually tracking that information or trying to keep up

13   with it so that we know that our members are prepared with the

14   information, ready to engage in the process.

15   Q.  And how does this impact AFT's other programs and efforts?

16   A.  The more time we spend on any of these mobilization efforts

17   are less time that we can spend on our advocacy work.

18   Q.  Do you think these impacts that you've described on AFT and

19   its members affect your mission?

20   A.  Yes, I think they do.

21   Q.  How so?

22   A.  If we're spending more time with the administrative

23   processes of how to vote, then we're spending less time having

24   the persuasive conversations around why they need to vote and

25   what we're trying to accomplish.

1  Q.  And do you think that it will continue to do that?

2  A.  If the conditions stay the same, yes.

3          MS. O'GARA:  No further questions.  Thank you.

4          THE COURT:  Anybody else on this side?  Before I

5  recognize the other side, let me ask a question, because I'm

6  sure you-all want to follow up on this.

7          So the past testimony, you-all have been making a

8  distinction between curbside voting and drive-through voting,

9  and in light of this testimony, I'm not sure I understand what

10  distinction exists.

11          Let me ask it this way.  Can you -- in Harris County,

12  because that's where you have experience, Harris, right?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  -- what is drive-through voting from your

15  perception?

16          THE WITNESS:  The location that we were at that we saw

17  was -- I don't know if the county had rented either a bank spot

18  or -- but it looked like a drive-through teller bank spot.

19  There were multiple lines of cars.  And then I am assuming it

20  was the county staff who were doing the administration were up

21  in the front and people were moving through kind of like as if

22  they were, you know, waiting to enter/exit someplace, so that

23  they were literally driving through the process to go through

24  the voting pieces.

25          THE COURT:  It's a bad analogy, but it's like going

1    through the Six Flags amusement park to the parking lot.

2    You're going through some station?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  And how did you actually vote?  Did you do

5    drive-through voting?

6              THE WITNESS:  I did not.  We --

7              THE COURT:  So then what's your understanding of how

8    the mechanics worked?

9              THE WITNESS:  It looked like -- I was on the other

10   side.  We actually were having a press conference with this

11   particular group behind us, and it looked as if they were

12   either handing them -- whoever the staff were -- were actually

13   handing them materials.  Like, they were voting with what I

14   assume to be was something similar to an absentee ballot, and

15   they were collecting that information or going through whatever

16   the process was.  I don't really have knowledge of the process.

17   I can only speak to what I kind of saw from 500 yards away.

18             THE COURT:  Thank you.

19             Any questions on this side?

20             MR. BRYANT:  Yes, Your Honor.

21                        CROSS-EXAMINATION

22   BY MR. BRYANT:

23   Q.  My name is David Bryant.  I represent the State of Texas

24   and the Attorney General and Secretary of State of Texas.

25        With respect to this issue of curbside voting, are you

1    familiar with that term?

2    A.  If it relates to the drive-through voting, that's what I'm

3    familiar with, is the drive-through voting.

4    Q.  Okay.  Are you familiar with the curbside voting that is

5    only available to voters who are physically unable to enter a

6    polling place without personal assistance or the likelihood of

7    injury to the voter's health?  Have you heard that referred to

8    as "curbside voting"?

9    A.  Perhaps.  I'm not really sure.  I'm not an expert in those

10   pieces.

11   Q.  All right.  Sir, you testified earlier about the demands on

12   teachers and -- to attend Meet The Teacher nights and fall

13   carnivals and other after-school activities, especially in the

14   fall.  Do you recall that testimony?

15   A.  Yes, sir.

16   Q.  Now, the 24-hour voting provision of SB1 refers to the

17   prohibition against the polls operating, I believe, from

18   10:00 p.m. to 6:00 a.m.  Are any of those events taking place

19   or did they take place during those hours?

20   A.  I would say probably not, but the opportunity for teachers

21   to go vote before they go to school is where the extended hours

22   on that end would come into play with most of our members.

23   Most of our members get up very early.

24   Q.  Were you personally active in efforts to shape the

25   legislation that ultimately became SB1?

Zeph Capo - Examination                    951

1   A.  I personally was not.  I'm not a registered lobbyist.  I

2   have staff for that.

3   Q.  Did the Texas branch of AFT have staff lobbyists, other

4   folks who attempted to have input into the legislation that

5   ultimately became SB1 in 2021?

6   A.  We certainly do have a lobbying team.  I'm unaware of what

7   the extent of their participation in SB1 was.  It's not really

8   our focus.

9   Q.  As that legislation ultimately came together and was

10  passed, did the Texas branch of AFT oppose it?

11  A.  I'm unsure about that officially.

12  Q.  Are you sure that the Texas branch of AFT promptly

13  supported a lawsuit against SB1?

14  A.  Yes.  We would generally not be in favor of undue

15  restrictions on voting for anyone.

16  Q.  And is it fair to say that in putting together a piece of

17  legislation like SB1, there are a lot of competing interests

18  that the legislators have to consider, some of which you would

19  support, and others you might not support?

20  A.  I'm not sure I could speak to that.  I'm not a lobbyist,

21  and it's not my area of expertise.

22  Q.  But you're the president of the Texas branch of AFT?

23  A.  Yes.

24  Q.  And do you understand that ultimately the legislators have

25  to make some policy choices and some value choices in --

Zeph Capo - Examination                952

```
 1            MS. O'GARA:  Objection, Your Honor.  Calls for
 2   speculation.
 3            THE COURT:  Let him finish the question.
 4   BY MR. BRYANT:
 5   Q.  Do you understand that in a democracy like we have in
 6   Texas, that the legislators have to make some policy choices in
 7   enacting a complex piece of legislation like SB1?
 8            MS. O'GARA:  Objection, Your Honor.  Calls for
 9   speculation and seeks improper opinion.
10            THE COURT:  That's overruled.
11            With that general proposition, do you agree with that,
12   sir, or disagree?
13            THE WITNESS:  Do I agree with his question that people
14   have to -- that the legislature has to make compromise?
15   BY MR. BRYANT:
16   Q.  May have to consider competing interests and values.
17   A.  For whom, I guess?  It's hard for me to answer the
18   question.  I guess I would ask for whom, whose values?  Are
19   they --
20   Q.  The people of Texas.  Their constituents.
21   A.  Which constituents, I guess?
22   Q.  I guess that's up to the legislators.
23   A.  Yeah.
24   Q.  But I'm not here to answer questions.  I'm here to ask them
25   of you.
```

1       Do you understand that they have to make value choices and

2   that you may not agree with the results that they come to?

3   A.  I understand that they're elected and they cast votes.

4   Q.  And do you understand that in a democracy you have to

5   accept the results of those value choices sometimes even if you

6   really disagree with them?

7   A.  I don't necessarily believe that, because when any citizen

8   feels that their values or rights may be -- that are given to

9   them through the Constitution and are abridged, they should

10  have the right to at least question them.

11          THE COURT:  Why don't you move on to another subject.

12          MR. BRYANT:  I will.

13  BY MR. BRYANT:

14  Q.  You were talking about the situations in which the Texas

15  branch of AFT had block walkers going to peoples' houses

16  identifying themselves as fellow union members and making a

17  pitch for sometimes endorsed political candidates.  Do you

18  recall that testimony?

19  A.  Yes, sir.

20  Q.  Do you see how someone might view that as undue influence

21  on a voter?

22  A.  No.

23  Q.  Do you see that if a caravan is used to rally voters and

24  then take them directly to the polls, that they might be under

25  some influence or pressure to vote for the candidates endorsed

Zeph Capo - Examination                          954

1  by the Union?

2  A.  I'm unsure of the question, because I don't recall

3  testifying to taking anybody to the polls.

4  Q.  Well, when you go to drive-through voting, isn't that

5  effectively taking them to the polls?

6  A.  I am not sure I understand your question.  I didn't drive

7  anybody.

8  Q.  Did you go in a caravan with union members to do

9  drive-through voting?  I thought you had testified to that.

10  A.  True.

11  Q.  Okay.  And would you understand that in that instance, it

12  might be viewed as having some influence on the votes of those

13  voters?

14  A.  I would probably disagree with that statement.  None of

15  them had to follow us to the drive-through voting location, and

16  they were all free to vote of their own accord when they met

17  with the staffer who handed them their ballot.  As I testified,

18  we were several yards away.

19  Q.  I believe you testified that you have about 66,000 members

20  in the Texas branch of the AFT; is that right?

21  A.  Yes, sir.

22  Q.  Approximately how many of those members are eligible for

23  early voting in Texas -- I'm sorry, for mail-in voting in

24  Texas?

25  A.  I don't recall that number off the top of my head.  I would

1  have to do the numbers to see how many of our members are 65

2  and above.

3  Q.  Do you have any estimate?

4  A.  I would just be guessing at this particular point.

5  Q.  And to your knowledge, has the Texas branch of the American

6  Federation of Teachers or any of its members been investigated

7  or prosecuted by reason of anything in SB1?

8  A.  Not yet.

9  Q.  Has there been any threat of any such action to your

10  knowledge?

11  A.  Not yet.

12  Q.  Did I understand correctly that as a result of the

13  communications changes that you have made since SB1, the volume

14  of your organization's interactions with potential voters has

15  increased?

16  A.  Not necessarily.

17  Q.  Do you know?

18  A.  I would say that the interactions have not increased,

19  because "interactions" means that there's two-way conversation

20  and a relational conversation happening.

21          MR. BRYANT:  I pass the witness.

22          THE COURT:  Anything else on this side?

23          MR. CAPOZZI:  Yes, Your Honor.

24          THE COURT:  Go ahead.

25          MR. CAPOZZI:  Good afternoon.  Louis Capozzi, Jones

1    Day, for the Intervener defendants, which includes the

2    Republican National Committee and Republican Party.

3                         CROSS-EXAMINATION

4    BY MR. CAPOZZI:

5    Q.  Thank you for being here.  Thank you for taking the time.

6    Just a few questions.

7        So you are familiar with Sections 3.09 and 310, which

8    standardize early voting hours, correct?

9    A.  Yes.

10   Q.  And you acknowledge that in Texas, you have two weeks of

11   early voting, correct?

12   A.  Not necessarily in all elections.

13   Q.  Which elections in Texas do you not have two weeks of early

14   voting for?

15   A.  I don't know -- I'd have to look back at the calendar.

16   Seems like it was shortened for the primary runoffs.

17   Q.  But generally, for general elections like the fall, the

18   general election of 2022, you had two weeks of early voting?

19   A.  I think that's right.

20   Q.  And you can vote early on weekends in early voting?

21   A.  Sometimes.  I don't want to answer inappropriately here,

22   but we have locals and members across the state, and individual

23   places set different schedules.  They don't necessarily always

24   get to vote every weekend during an early voting period.

25   Q.  Well, it's good to be specific.

Zeph Capo - Examination                    957

1      So in the general election, in 2022, would you agree that

2 because of SB1, every county in Texas had to offer early voting

3 on the weekend?

4 A.  I would have to review the policies.  I don't know if it

5 was "a" weekend or "every" weekend.  Was it both weekends?  I'm

6 not sure of that.

7 Q.  Okay.  You would agree that teachers' shifts usually end

8 before 10:00 p.m., right?

9 A.  Teacher shifts maybe would.  Custodial shifts, probably

10 not.

11 Q.  Are you aware of any members of your union that work from

12 before 6:00 a.m. until after 10:00 p.m. on a given day?

13 A.  There are members that definitively work before 6:00 p.m.

14 They may or may not --

15          THE COURT:  You meant 6:00 a.m?

16          THE WITNESS:  Excuse me, 6:00 a.m.  They may or may

17 not be working after 10:00 p.m., depending on the day of

18 schedule.

19 BY MR. CAPOZZI:

20 Q.  So it's at least possible that they could vote somewhere

21 between 6:00 a.m. and 10:00 p.m. on a weekday?

22 A.  Anything is possible.

23 Q.  Teachers usually don't have shifts on weekends, correct?

24 A.  That's hard to say.  Schedules have changed in the State of

25 Texas quite a bit.  There are significant Saturdays that

Zeph Capo – Examination                           958

1    teachers do have to work.

2    Q.  But at least some of your members, then, can also vote

3    early on weekends, right?

4    A.  I would assume that some of them could.

5    Q.  In your testimony today, you didn't identify a specific

6    member of your union that couldn't vote in 2022 because of

7    these provisions, right?

8    A.  We identified members that had their ballots rejected.

9    Q.  Because of these provisions?

10   A.  Yes.

11   Q.  So which members have you identified whose ballots were

12   rejected because of early voting hour rules?

13   A.  Well, we were in those discussions, but the judge overruled

14   us continuing having those discussions.

15          THE COURT:  So he's opening up the door.  Since he's

16   opening up the door, you can talk about hearsay.

17          THE WITNESS:  So yeah, there was, as we stated, Elaine

18   Jones from Corpus Christi who had her ballot rejected because

19   the flap that was supposed to contain the ID information was

20   separated from the ballot.

21          There was another individual that I'm aware of, Alice

22   Pinrod.  As I stated earlier, she was the member who had newly

23   aged into absentee balloting and was actually looking forward

24   to it because she took care of her -- she was caretaker for her

25   elderly parent.  Her ballot was rejected because of a name/ID

1    match, and then she didn't trust the system after that.  So she

2    bundled her herself up to stand in line for a tremendous amount

3    of time to be able to vote, and was therefore injured by the

4    provisions of SB1.

5    BY MR. CAPOZZI:

6    Q.  So Elaine Jones, she was not able to vote because of SB1's

7    mail ballot provisions, correct?

8    A.  That's correct.

9    Q.  So, really, SB1's rules for early voting, they didn't

10   injure her?

11   A.  In that particular case, they may not have injured her.

12   Q.  And Alice Pinrod, she was also injured by SB1's mail voting

13   provisions, correct?

14   A.  Correct.

15   Q.  So she was not injured by SB1's early voting provisions?

16   A.  That's information I can't testify to because I understand

17   that she needed to -- she chose to use early voting and not

18   continue through with the absentee balloting because of the

19   onerous provisions of Senate Bill 1.

20   Q.  Was Ms. Pinrod unable to vote in a 2022 election in-person?

21   A.  At this point, I'm not sure that I can answer that

22   question.

23   Q.  Fair enough.

24       Just a couple of questions about Sections 3.04, 3.12 and

25   3.13.  These are the drive-through provisions.  You're familiar

Zeph Capo - Examination                    960

1   with those, correct?

2   A.  Yes, sir.

3   Q.  And so you didn't identify in your testimony a specific

4   member who was unable to vote in 2022 because of the

5   restriction on drive-through voting, correct?

6   A.  I didn't, but I didn't necessarily ask that question.  We

7   were focused on how the ability to have drive-through voting

8   improved the voting ease and conditions for our members.

9           MR. CAPOZZI:  That's all, Your Honor.  Thank you.

10          THE COURT:  Anything by way of redirect -- sorry.  Go

11  ahead.

12                  CROSS-EXAMINATION

13  BY MR. LIU:

14  Q.  My questions really aren't so much about the text of the

15  law and how to carve out who is who and term locations --

16  A.  I'm sorry.  Who are you?

17  Q.  I'm Cory Liu with the Harris County District Attorney.

18  A.  Thank you.

19  Q.  Do you know who the Harris County District Attorney is?

20  A.  Very well.

21  Q.  And are you aware of any statements she's made, if she's

22  made any statements, about SB1?

23  A.  I am not aware.  I haven't done that research.

24  Q.  I think we've talked about two members that you have named,

25  Alice Pinrod and Elaine Jones.  Were there any more that you

1    had named in your testimony?

2    A.  Not at this point.

3    Q.  Are you aware of whether either of them or anyone has ever

4    been investigated by the government for alleged violations of

5    SB1?

6    A.  Not yet.

7    Q.  Are you aware of whether either of them or anyone have been

8    prosecuted for an alleged violation of SB1?

9    A.  Not yet.

10            MR. LIU:  I have no further questions.

11            THE COURT:  Any redirect?

12            MR. BRYANT:  No, Your Honor.

13            THE COURT:  Any further need for this witness?

14            MS. O'GARA:  No.

15            MR. BRYANT:  No, Your Honor.

16            THE COURT:  You're excused, sir.

17            THE WITNESS:  Thank you.

18            THE COURT:  And your next witness.

19            MS. LONGORIA:  My name is Julia Longoria with MALDEF.

20    I represent LUPE plaintiffs, and we're calling Stella Guerrero

21    Mata.

22            The next witness that the Court will hear is Stella

23    Guerrero Mata.  Her testimony goes to support LUPE plaintiffs'

24    challenges to 5.07 and 5.13, the mail ballot ID requirements.

25    And those are challenged by LUPE plaintiffs under the 1st and

1   14th Amendments as an undue burden on the right to vote.

2          Ms. Mata will also testify in support of LUPE

3   plaintiffs' claims under Section 2 of the Voting Rights Act,

4   specifically Senate Factors 1 and 5 and the Section 2 VRA

5   claims for LUPE plaintiffs are against SB1 Section 6.03, 6.04,

6   6.05, 6.06 and 7.04.

7          COURTROOM DEPUTY CLERK:  Raise your right hand.

8                         *   *   *

9          *(Oath administered and STELLA GUERRERO MATA, witness,*

10         *Sworn.)*

11                        *   *   *

12         THE WITNESS:  I do.

13         MS. MENENDEZ:  Fatima Menendez on behalf of LUPE

14   plaintiffs, Your Honor.

15                    DIRECT EXAMINATION

16   BY MS. MENENDEZ:

17   Q.  Good afternoon.  Please state your full name.

18   A.  Stella Guerrero Mata.

19   Q.  Can you please tell me where you live, Ms. Mata?

20   A.  In Tomball, Texas.

21   Q.  What county is that in?

22   A.  Harris County.

23   Q.  What is your current occupation?

24   A.  I'm retired.

25   Q.  Before you retired, what did you do for work?

Stella Guerrero Mata - Examination          963

1    A.   I was a school bus driver for Aldine ISD.

2    Q.   How long were you a school bus driver?

3    A.   Seventeen years.

4    Q.   Before that, what did you do for work?

5    A.   It was at a factory, Hughes Tools.

6    Q.   Where were you born?

7    A.   In Houston.

8    Q.   Where did you grow up?

9    A.   In Houston.

10   Q.   What area of Houston did you grow up in?

11   A.   I grew up -- it was mainly low and middle-income

12   neighborhood.

13   Q.   What was the name of your neighborhood?

14   A.   It was called La Bonita Gardens.

15   Q.   Very briefly, can you please describe La Bonita Gardens,

16   the area that you grew up in?

17   A.   It was basically Hispanic, a few Blacks.  And whites, not

18   that I remember, if any.

19   Q.   Can you tell me what schools you attended when you were

20   growing up?

21   A.   I went to James Bowie Elementary, John Marshall Middle

22   School, and Jefferson Davis High School.

23   Q.   What was the racial composition of the schools that you

24   attended?

25   A.   It was whites, Hispanics, and a few Blacks.

Stella Guerrero Mata - Examination          964

1  Q.  What was your experience like as a Mexican-American in

2  school?

3  A.  Well, when I first started elementary, like in the first

4  grade, I basically talked Spanish.  So I'll never forget.  I

5  mean, the teacher would ask us what we had for breakfast, so

6  one morning I made up my mind -- my courage -- I'm going to

7  answer it.  So when she came to ask what we had for breakfast,

8  it was my turn, and I answered her.  Apparently, I answered her

9  in Spanish, which I didn't know, and all I heard was a scream

10  and a yelling at me, and that gave me to where I'm not supposed

11  to talk any more.  So, I mean, it gave me a low esteem to

12  myself.

13  Q.  What is your highest level of education?

14  A.  I graduated, and I did some college and some community

15  college.

16  Q.  You graduated high school?

17  A.  Yes, I graduated high school.

18  Q.  Where did you go to college?

19  A.  University of St. Thomas.  And community college, Lone Star

20  College.

21  Q.  Did you complete any college degree?

22  A.  No.

23  Q.  What did your parents do for a living?

24  A.  My dad, his basic job was working in the laundry.  He

25  looked over to washing clothes, and my mom was working at a

Stella Guerrero Mata - Examination                965

1  factory attaching labels to the bottles of Hawaiian Punch.  And

2  then after that, then she went to work for this lady looking

3  after her children.

4  Q.  I'm going to shift gears a little bit.

5  A.  Okay.

6  Q.  And ask you a few questions about your life now.

7  A.  Okay.

8  Q.  How old are you, Ms. Mata?

9  A.  Seventy-three.

10  Q.  What is your health like?

11  A.  It's fair, considering I got -- I'm a diabetic Type II,

12  high blood pressure, COPD.  I've had knee replacements on both

13  my knees.  Back problems.  Of course, I've had injections for

14  that.  Then my neck, neck problems, I've had injections for

15  that.  Migraine headaches, and my thyroid.

16  Q.  How is your eyesight?

17  A.  My eyesight, it's fair.

18  Q.  Do you wear glasses?

19  A.  Yes, I wear glasses, and I also need them for driving.

20  Q.  You just said that you drive?

21  A.  Well, it's kind of getting basically hard for me to see.

22  Oh, especially at night.  I don't do no night driving or when

23  it's raining.  It has to be clear outside.  It has to be clear.

24  Q.  Are you a registered voter, Ms. Mata?

25  A.  Yes.

Stella Guerrero Mata - Examination                966

1    Q.  And you are registered to vote in Harris County, correct?

2    A.  Yes.

3    Q.  Do you vote in every election?

4    A.  Not every election.

5    Q.  When you vote, do you vote in-person or by mail?

6    A.  By mail.

7    Q.  When did you apply for your mail ballot in 2022?

8    A.  In January.

9    Q.  Did you have any difficulty applying for the mail ballot?

10   A.  No.

11   Q.  Did you vote in the March 2022 primary election?

12   A.  No.

13   Q.  Did you vote in the May 2022 constitutional amendment

14   election?

15   A.  No.

16   Q.  Did you vote in the November 2022 general election?

17   A.  I thought I had, but my vote got rejected.

18   Q.  Did you find the mail ballot difficult to fill out?

19   A.  I thought I had, but basically it was difficult to fill

20   out.

21   Q.  I would like to pull up LUPE Exhibit 273, please.

22       Do you see your signature on this document, Ms. Mata?

23   A.  Yes.

24   Q.  Do you recognize this document as a copy of the carrier

25   envelope for your November 2022 general election mail ballot?

Stella Guerrero Mata - Examination          967

1    A.   Yes.

2    Q.   What information did you include on this document?

3    A.   My signature.

4    Q.   Did you include any contact information?

5    A.   No.

6    Q.   Did you include your driver's license number on the carrier

7    envelope for your November 2022 mail ballot?

8    A.   No.

9    Q.   Did you include your Social Security number on the carrier

10   envelope for your November 2022 mail ballot?

11   A.   No.

12   Q.   Do you have a computer at home?

13   A.   Yes, which I haven't used ever since last year in, like,

14   June.

15   Q.   Did you try to use the Texas Secretary of State's new

16   ballot tracker for your November 2022 general election ballot?

17   A.   No.

18   Q.   How did you find out your mail ballot had problems?

19   A.   I got a letter in the mail.

20   Q.   What is your understanding of what that letter said?

21   A.   That my vote was rejected.  It wasn't accepted.

22   Q.   How did that make you feel?

23   A.   Made me feel angry.

24   Q.   Why did it make you feel angry?

25   A.   Because my voice wasn't being heard again.

1  Q.  What is your understanding of what you had to do to fix

2  your mail ballot?

3  A.  Apparently that I had to include my ID.

4  Q.  Did you do that to fix your ballot, your mail ballot?

5  A.  No.  Basically, it was too late, too late for me to fix it.

6  Q.  And when you say "too late," what does that mean?

7  A.  I got the letter in the mail, and that day that I got the

8  letter in the mail, it was due on that date.  And I live in

9  Tomball.  I was going to have to go all the way to downtown

10 Houston to deliver that letter, because there was no option for

11 me to mail it or fax it.  I had to take it to downtown.

12 Q.  How long would it take you for you to drive from your house

13 in Tomball, Texas, to downtown Houston, Texas?

14 A.  Taking the back roads, which I do, about an hour.  Over an

15 hour, hour and a half.

16 Q.  Was your mail ballot accepted for the November 2022 general

17 election?

18 A.  No.  It was rejected.

19 Q.  And how did you find out that your mail ballot was

20 rejected?

21 A.  By the letter I received.

22 Q.  I would like to display exhibit -- LUPE Exhibit 274.

23     Do you recognize this document as the rejection letter you

24 received from Harris County regarding your November 2022

25 general election mail ballot?

Stella Guerrero Mata - Examination          969

```
 1   A.  Yes.

 2   Q.  What was your understanding of what this letter said?

 3   A.  That my vote was not counted at all.  I had no voice.  And

 4   again, it brought me to my childhood to where when I was

 5   elementary, and I got screamed and yelled at.  I mean, you

 6   don't have no voice.

 7   Q.  Is there an election that you plan to vote in in the

 8   future?

 9   A.  I'm not sure.  Which I would like to, but I'm not sure.

10   Q.  How do you feel about the likelihood that your mail ballot

11   will be counted in a future election?

12   A.  It puts me to -- it will not be counted at all.

13           MS. O'GARA:  I pass the witness, Your Honor.

14           THE COURT:  Anything else on this side?

15            (No response.)

16           Any cross?

17           MR. WASSDORF:  Will Wassdorf for the State defendants.

18                     CROSS-EXAMINATION

19   BY MR. WASSDORF:

20   Q.  Ms. Mata, thank you for driving all the way over here this

21   afternoon.  How are you today?

22   A.  I'm holding in there so far.

23   Q.  I'll try to be quick.  You testified that a moment ago that

24   you submitted an application for a mail-in ballot; is that

25   correct?
```

1   A.  Correct.

2   Q.  Let's pull up LUPE 275.  Let's look at the upper left-hand

3   corner.

4       And so you filled out an application.  This is your name

5   and contact information here; is that right, ma'am?

6   A.  Yes.

7   Q.  And let's look at the signature block down at the bottom.

8   And that's your signature there?

9   A.  Yes.

10  Q.  And it's dated January 30, 2022; is that correct?

11  A.  Yes.

12  Q.  Now let's look at the upper right-hand corner.  I see here

13  that you put your driver's license number and the last four of

14  your Social Security number on your application; is that right?

15  A.  Yes.

16  Q.  And you submitted your ballot for the November 2022 general

17  election by mail, correct?

18  A.  Yes.

19  Q.  Let's pull up LUPE 273.

20      Ma'am, is this your -- the carrier envelope for your

21  November 2022 ballot?

22  A.  Yes.

23  Q.  Let's look at the signature block there.  And is that your

24  signature where you signed the envelope?

25  A.  Yes.

Stella Guerrero Mata - Examination                971

1   Q.  Let's zoom it back out and look up at the top.

2       Do you see that this is an area for you to put your

3   driver's license number and your Social Security number?

4   A.  Yes.

5   Q.  But you didn't put any information there?

6   A.  No.

7   Q.  Do you understand now that you were required to put your

8   identification number on your carrier envelope?

9   A.  Right now that I'm looking on it on the computer screen,

10  which is still kind of very hard for me to see, even though I'm

11  wearing my bifocals.  I would need a magnifying glass.  I mean,

12  I'm not trying to be funny or anything.

13  Q.  Do you understand that you needed to have put your ID on

14  there?

15  A.  Now I do.  After I've been shown all this, but not --

16  Q.  And do you understand that that's why your ballot was

17  rejected, because you didn't include your identification number

18  on there?

19  A.  Now I do, at this time, yes.

20  Q.  All right.  Thank you, ma'am.  I hope you vote in the

21  future.

22  A.  Thank you.

23              THE COURT:  Anything else here?

24              Nothing on this side.

25              Any redirect?

1          MS. MENENDEZ:  Yes, Your Honor.  One question.

2                    CROSS-EXAMINATION

3    BY MS. MENENDEZ

4    Q.  Hi, Ms. Mata.  I just have one question for you.

5        My friend on the other side just showed you your carrier

6    envelope for your mail ballot.  We looked at it earlier.  Did

7    you see that you were supposed to put an ID number on that

8    carrier envelope when you filled it out?

9    A.  When I filled it out, no.

10   Q.  Thank you, Ms. Mata.

11         MS. MENENDEZ:  That's all I have, Your Honor.

12         THE COURT:  Anything based on that?

13         MR. WASSDORF:  No, Your Honor.

14         THE COURT:  Thank you, ma'am.  You can step down and

15   leave.

16         Any further need for her?  Can she be excused?

17         MS. MENENDEZ:  She's excused.

18         THE COURT:  You're excused, ma'am, thank you.

19         And your next witness.

20         MS. PERALES:  Your Honor, I believe we've come to the

21   end of our witnesses today.  And we would like to move two

22   exhibits into evidence, State 144 and State 147.

23         THE COURT:  Anybody on this side objections to 144 and

24   147?  No one on this side.

25         Does anybody from the other side object to those

1  exhibits?

2          MR. KERCHER:  We are going to forego the opportunity

3  to object on our own exhibits at this time, Your Honor.

4          THE COURT:  It's happened before.  144 and 147 are

5  admitted.  State 144 and 147.  What else do we have?

6          MS. PERALES:  We have additional housekeeping matters,

7  Your Honor.

8          MS. HOLMES:  Good afternoon.  I believe the Haul

9  plaintiffs forgot to move an exhibit into evidence on Tuesday,

10  and that was Haul MFV17, which was used during the Scarpello

11  examination.  So we move to admit that now.

12          THE COURT:  Any objection to Haul 17 on this side?

13  Any objection to Haul 17 over here?

14          MR. KERCHER:  One moment to check, Your Honor.  Other

15  than any objections we may have made on the record, Your Honor,

16  no.

17          THE COURT:  Haul 17 is admitted.

18          MS. HOLMES:  Thank you.

19          THE COURT:  What else do we have?

20          MR. WASSDORF:  We'd like to move State 13 into

21  evidence.

22          THE COURT:  Any objection to State 13?  I hear none.

23  State 13 is admitted.

24          MR. WASSDORF:  And then Ms. Hunker this morning used

25  State 17 and State 19.  They are also Joint 4 and Joint 6.  She

1  used the State exhibit numbers in her examination, and so we

2  need to move those into evidence as well, whether we use the

3  Joint or the State.

4         THE COURT:  State 17 and State 19 are admitted, but

5  when we do final cleanup at the end -- and let's hold this off

6  too -- just so I don't have duplicate exhibits, you know, then

7  at the end, let's call anything that may be duplicative.

8         Anything else?

9         MR. KERCHER:  Briefly, your Honor.  I've had some

10 introductory conversations with at least some of my friends on

11 the other side about this fact, but on the Joint Pretrial Order

12 in footnote two, the plaintiff's disclosed that they had

13 arrived at the conclusion that they would be trying all of

14 their claims rather than waiting to try the intent claims for a

15 later date.  But we haven't had fulsome discussions about what

16 that means for the rest of this trial, whether or not there

17 will be -- a second portion of the trial, if any would be

18 necessary following a ruling on the legislative privilege

19 issues.

20        When the state defendants put together their witness

21 and exhibit list, they were operating under the assumption it

22 would be bifurcated as to intent and non-intent claims.  We

23 will, I think by September 30, which is the end of our rest

24 week, if you will, have amended our witness disclosures.  I

25 think there will probably only be two or three additional ones,

 1    as well as maybe a couple dozen exhibits which would pertain to

 2    the legislative record.  These are the kinds of things that

 3    would probably be judicial and noticeable in any event.

 4              Finally, with regards to those witnesses, at least two

 5    of them would probably be legislative witnesses.  In light of

 6    the fact that those witnesses are otherwise engaged at the

 7    moment and may likewise be otherwise engaged in a special

 8    session later, we may need to have -- I will talk with my

 9    counterparts on the other side about what scheduling of those

10    witnesses looks like, but I wanted to flag that issue for the

11    Court.  If we wind up having a second portion of trial so that

12    we can talk about whatever may or may not come in under the

13    legislative privilege ruling, we're all anticipating it might

14    be the case that we would leave those witnesses for that time.

15              I understand LUPE plaintiffs may want to call one of

16    their experts during that portion of trial.  I just kind of

17    want to preview some of these issues for the Court.  I don't

18    know that we have a resolution yet, but just to let you know

19    what's going on.

20              THE COURT:  Thank you for that.  So I was confused

21    because I was thinking we're still going to do bifurcated.

22    Then I saw a hundred plus witnesses, and I thought, Well, there

23    went bifurcation.  So I'm, frankly, not certain what's going to

24    be left here.  So you have me confused.  These legislators who

25    were otherwise busy at the impeachment proceedings?  Or were

1    they busy?

2        MR. KERCHER:  Yeah.  At this point, Your Honor -- and

3    I don't think we've finalized the list, but I think we would

4    anticipate -- at this point we anticipate calling two

5    legislators who are engaged in the impeachment trial.

6        THE COURT:  Well, that should be over, shouldn't it?

7        MR. KERCHER:  It should be.  I think that we are

8    anticipating another special session later on the other side of

9    that impeachment trial.  And since we don't know exactly what

10   that looks like yet, we are trying to make plans and figure out

11   the best way to navigate that scheduling issue.

12       THE COURT:  That's news to me.  I haven't read or seen

13   anything about that, so it's expected there's going to be

14   another special session?

15       MR. KERCHER:  That's my understanding.  That's a

16   little bit outside my wheelhouse, but that is my understanding.

17       THE COURT:  But the governor hasn't called one?

18       MR. KERCHER:  I don't believe so, Your Honor.

19       THE COURT:  Okay.  Well, in this case, we'll just take

20   things one step at a time.

21       Now, speaking of one step at a time, so tomorrow we're

22   off.  Monday we're off.  So we resume Tuesday at 9:00.  I have

23   just a few criminal sentencings beforehand, so same thing.

24   Please stay in the back until we're ready for you to come

25   forward.  We last left off -- now I'm just thinking out loud --

 1  with the State wanting to introduce exhibits, and I asked for

 2  reciprocity.  Where are we at on that?  Have you entered all

 3  the exhibits you want to enter at this point in time or not?

 4          MR. WASSDORF:  Your Honor, the reciprocity that we

 5  were speaking of is which ones we could --

 6          THE COURT:  Which exhibits you want to enter into that

 7  you think are unobjected.

 8          MR. WASSDORF:  Yes.  And they have provided a list of

 9  that.  And if Your Honor wishes, I can read that into the

10  record.

11          THE COURT:  Well, you can do it today if you're ready

12  or you can do it Tuesday.  I'm just trying to do clean-up while

13  we have an early break.

14          MR. WASSDORF:  I'm happy to do it now.

15          THE COURT:  Let's go ahead and do it now.

16          MR. WASSDORF:  That will be State Exhibit 1, 28, 30,

17  31, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49,

18  50, 52, 53, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 68,

19  69, 70, 137, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159,

20  160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171,

21  172, 173, 193, 195, 196, 197, 199, 200, 201, 211, 213, 216,

22  217, 238, 239, 293, 295, 296, 297, 298, 299, 300, 301, 302,

23  303, 304, 305.

24          And then I believe there's also GOP Interveners 1 and

25  3.  There may be some additional that we can come to an

 1   agreement on, but that's the list as of now.

 2          THE COURT:  Any objections on this side to any of

 3   these exhibits?

 4          MS. HOSTETLER:  Courtney Hostetler.  We have no

 5   objections.  This smashes the list.  We worked very hard, but

 6   as I was the one to do it, I would like to ask that if I made

 7   any mistakes, that we be allowed to correct early next week to

 8   make sure everyone has a chance.  But I believe that matches

 9   what I gave you and should be correct.  Thank you.

10          THE COURT:  Anybody over here objecting to anything?

11   So 128, 30, 31, 34, 35, 37 to 50, 52, 53, 55, 56 through 70,

12   137, 150 through 173, 193, 195 through 197, 199, 200, 201, 211,

13   213, 216, 217, 238, 239, 293, 295, 296, 297, 298 through 305

14   and Defendant Interveners 1 and 3 are all admitted subject to

15   revisitation at a later date, but for now they're admitted.

16          Anything else that we can do?

17          MR. WASSDORF:  One more thing, Your Honor.  Ms. Hunker

18   informs me that there were two exhibits that were used during

19   the cross-examination of Ms. Wise, the El Paso County Election

20   Administrator, that were not on the joint list that you just

21   read into the record.  That would be State's Exhibit 128 and

22   208.  And we would also move to admit them.

23          THE COURT:  Who is the objector over here?

24          MS. HOSTETLER:  State 128, I believe there's no

25   objection.

1          THE COURT:  128?

2          MS. PERALES:  No objection?

3          THE COURT:  1-2-8.

4          MS. PERALES:  Your Honor, I believe the objector will

5     be the first attorney who can pull up that exhibit on their

6     computer.

7          (Pause.)

8          We believe it's the governor's proclamation and an

9     election advisory from the Secretary of State.  We have no

10    objection, Your Honor.

11         THE COURT:  To both of those?

12         MS. PERALES:  To both of them.  That's right.

13         THE COURT:  State 128 and 208 are admitted.

14         Anything else, housekeeping we have to do?

15         MR. KERCHER:  No, Your Honor.  Thank you.

16         MS. PERALES:  Just one brief matter, Your Honor.  So

17    that I can give a heads up to my co-counsel, Mr. Parreno, who

18    is going to be arguing with me the motion in limine regarding

19    the exclusion of testimony of Jonathan White and similar

20    witnesses.

21         Mr. White is scheduled to testify on the 22nd of

22    September, which is next Friday.  If the Court would find

23    convenient a time during next week, I can let Mr. Parreno know

24    when to be here in person.

25         THE COURT:  So let's figure -- what are we doing

1      Tuesday then?  Who is up on the witness list?

2              MR. KERCHER:  Your Honor, I believe next up it may be

3      either the two Perales witnesses, as well as Jacqueline

4      Callanen and Jennifer Colvin, Rachelle -- oh, no.

5              MS. PERALES:  So, Your Honor, we are going to work to

6      slot the Peraleses in -- no relation -- next week if we can,

7      but we don't have a time certain.  So for sure Tuesday,

8      September 19, is Jacqueline Callanen, the Bexar County

9      elections administrator; Jennifer Colvin, Harris County

10     elections administrator staff; Rachelle Obakozuwa, Harris

11     County elections administrator staff; and Isabel Longoria,

12     former Harris County elections administrator.

13             THE COURT:  Tuesday sounds like a full day.

14             MS. HOLMES:  Can I add one thing?  Just to add one

15     thing to that list -- I've already told Ms. Menendez -- but

16     Jennifer Colvin will be testifying remotely.  Just to give a

17     heads up to the other side.

18             THE COURT:  So we've got a full day on Tuesday.  I

19     doubt we'll be able to have any motion hearing.  Let's try to

20     plan that on Wednesday if we can, but ...

21             MS. PERALES:  I will have Mr. Parreno appear on

22     Wednesday.  Thank you, Your Honor.

23             THE COURT:  What else do we need to talk about?  Okay.

24     I will see you all back on Tuesday.

25             COURT SECURITY OFFICER:  All rise.

1          *(2:41 p.m.)*

2                              *    *    *

1                              *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  September 14, 2023

12   /s/ Gigi Simcox

13   /s/ Angela M. Hailey

14   United States District Court Reporters
     CSRs, CRRs, RPRs, RMRs
15   Official Court Reporter
     262 West Nueva Street
16   San Antonio, Texas  78207
     (210)244-5048

17

18

19

20

21

22

23

24

25