1         IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2             SAN ANTONIO DIVISION

3

LA UNION DEL PUEBLO ENTERO,   .
4  ET AL,                   .
                              .
5          PLAINTIFFS,    .
        vs.            . DOCKET NO. 5:21-CV-844-XR
6                     .
  GREGORY W. ABBOTT, ET AL,    .
7                     .
          DEFENDANTS.    .
8

9

10           TRANSCRIPT OF BENCH TRIAL
       BEFORE THE HONORABLE XAVIER RODRIGUEZ
11        UNITED STATES DISTRICT JUDGE
          SEPTEMBER 19, 2023
12

13

14

15

16  APPEARANCES:
  FOR THE PLAINTIFFS:   NINA PERALES, ESQUIRE
17                  FATIMA MENENDEZ, ESQUIRE
                  JULIA LONGORIA, ESQUIRE
18                  KENNETH PARRENO, ESQUIRE
                  MALDEF
19                  110 BROADWAY
                  SUITE 300
20                  SAN ANTONIO TX 78205

21

22                  VICTOR GENECIN, ESQUIRE
                  JENNIFER HOLMES, ESQUIRE
23                  MOHAMMED A. BADAT, ESQUIRE
                  NAACP LEGAL DEFENSE & EDUCATIONAL
24                  FUND INC
                  40 RECTOR STREET, FIFTH FLOOR
25                  NEW YORK NY 10006

```
 1

 2

 3

 4

 5    FOR THE DEFENDANTS:        RYAN G. KERCHER, ESQUIRE
                                KATHLEEN HUNKER, ESQUIRE
 6                              WILLIAM WASSDORF, ESQUIRE
                                MONROE DAVID BRYANT, JR., ESQUIRE
 7                              TEXAS ATTORNEY GENERAL
                                P.O. BOX 12548
 8                              MC 009
                                AUSTIN TX 78711
 9

10

11

12

13

14

15

16

17

18    REPORTED BY:             GIGI SIMCOX, RMR, CRR
                               OFFICIAL COURT REPORTER
19                             UNITED STATES DISTRICT COURT
                               SAN ANTONIO, TEXAS
20

21

22

23

24

25
```

JACQUELYN CALLANEN - DIRECT

1       *(San Antonio, Texas; September 19, 2023, at 9:00 a.m., in*
2       *open court.)*

3               THE COURT:  Where do we begin?

4               MR. GENECIN:  Morning, Your Honor.  I'm Victor
5       Genecin of NAACP LDF for the HAUL plaintiffs and we are going
6       to call Jacquelyn Callanen, the Election Administrator of
7       Bexar County.

8               And, Your Honor, pursuant to Federal Rule of Evidence
9       611(c)(2), we request permission to examine with leading
10      questions, the witness is a defendant in this action.

11              THE COURT:  Any response?

12              MISS HUNKER:  No objection, Your Honor.

13              THE COURT:  You may proceed.

14              MR. GENECIN:  Your Honor, Miss Callanen is going to
15      provide testimony relevant to the following Sections 3.04, 09,
16      10, 13, and 15, 4.01, 04, 05, 06, 07, 08, 09, and 4.12,
17      Sections 5.02, 03, 04, 07, 08, 510, 512, 513, and 514,
18      Sections 6.01, and 6.04, and to Section 7.04 of SB 1.

19              THE COURT:  Thank you.

20              MR. GENECIN:  Thank you, Your Honor.

21          (JACQUELYN CALLANEN, having been duly sworn, testified as
22      follows:)

23                          DIRECT EXAMINATION

24      BY MR. GENECIN:

25      Q.  Morning, Miss Callanen.

986

JACQUELYN CALLANEN - DIRECT

1  A.  Good morning, sir.

2  Q.  Miss Callanen, could you state and spell your name for the

3  record?

4  A.  Sure.  Jacquelyn Callanen.  J-A-C-Q-U-E-L-Y-N.  Last name

5  is Callanen, C-A-L-L-A-N-E-N.

6  Q.  And where were you born, ma'am?

7  A.  In Pittsburgh, Pennsylvania.

8  Q.  Could you briefly describe for the Court your education

9  after high school?

10  A.  Sure.  This way it doesn't get complicated, but I attended

11  Mount Mercy College in Pittsburgh, and as of now they have

12  changed their name and it's Carlow College, so I went to Mount

13  Mercy College.

14  Q.  Did you finish college?

15  A.  In El Paso, yes, sir.

16  Q.  And where was that?

17  A.  In El Paso at UTS UTEP.

18  Q.  And when did you move to Texas?

19  A.  In 1965.

20  Q.  Where do you live?

21  A.  No, sir.  We —— I married and we moved to El Paso.  My

22  husband was in the service.

23  Q.  And where do you live now?

24  A.  Here in San Antonio, Texas.

25  Q.  Are you employed?

JACQUELYN CALLANEN - DIRECT

1  A.  Yes.  Yes, sir, I certainly am.

2  Q.  And by whom are you employed and in what capacity?

3  A.  I'm employed by Bexar County and I'm the Elections

4  Administrator for Bexar County.

5  Q.  And as Elections Administrator do you hold any other

6  titles?

7  A.  Underneath that title is Voter Registrar for Bexar County,

8  and also Early Voting Clerk for Bexar County.

9  Q.  And when did you start working in elections?

10  A.  I worked my first election in 1982.  I was teaching and at

11  the time there was a school board election and they didn't

12  have enough election officials, so over the PA came if anybody

13  still has days for substitute, we need you to work the

14  elections.  And that was my first foray into it.

15  Q.  Can you briefly describe your career in the elections

16  field?

17  A.  Thank you, sir.  I did work early voting in the mid-'90s,

18  and then in 1996 the Elections Administrator there asked me to

19  come into the office for a specific job to be the ballot

20  clerk.

21  Q.  And did there come a time when you became Elections

22  Administrator for the county?

23  A.  Yes, sir.  I became the Elections Administrator in 2005.

24  Q.  So you were employed in elections by the county from the

25  mid-'90s, 2005, and eventually rose to the top?

JACQUELYN CALLANEN - DIRECT

1  A.  Yes, sir.

2  Q.  Now, let's discuss how you administer elections here in

3  Bexar County.  What are the functions of your office?

4  A.  Well, as I said just a minute ago, my office is the voter

5  registration office for the county and it flows into the State

6  of Texas, and so we start with an election to register anyone

7  that's eligible.

8      It's a matter of, you know, getting them actually

9  registered.  And we do the data entry but the State of Texas

10  is the one that absolutely checks and assigns voter

11  registration number.  As the early voting clerk, that title is

12  the conduct of an election from the start of the election with

13  meeting with the entities, to what's on the ballot, to laying

14  out the ballot, programming it, hiring the election officials,

15  getting poll sites, and doing the tabulation.

16  Q.  And how many registered voters do you have in Bexar

17  County?

18  A.  This morning we have 1,226,837.

19  Q.  And how is it that you know today's number?

20  A.  It's the first thing I do when I get in the office every

21  day because our voter registration database is a living

22  document.  It basically changes day by day, depending on what

23  the workload was in the office.

24  Q.  So how many people do you have helping you do your job?

25  A.  I have a full-time staff of 20 people.

989

JACQUELYN CALLANEN - DIRECT

1  Q.  And are there additional employees who come on as needed?

2  A.  Yes, sir.  We could not survive without our temps.

3  Q.  And how many temps do you have?

4  A.  We have five, what we refer to as our full-time temps that

5  return to us for each election, and then we will hire

6  depending on the election anywhere from 10 to 50 temporary

7  employees through an employment agency.

8  Q.  And in addition to those employees for an election do you

9  have election judges and alternates and poll workers?

10  A.  Yes, sir.  The minimum number we have for those are 1286.

11  Q.  And in a Presidential Election about how many do you have?

12  A.  I think we topped out at 2,000.

13  Q.  And how are election judges appointed?

14  A.  In Texas, you know, I don't want to go over things again

15  for you but the system is set up that the political parties

16  nominate people to be election officials.  The Republican

17  party gives us a slate of people.  The Democratic party turns

18  over a slate of people.

19      Then it's our responsibility to have them trained, and in

20  Bexar County we have instituted a program where we take the

21  nominees from the parties and they come in for an eight-hour

22  training.  It's a full day, four hours are law, forms, conduct

23  of the election, and then the last four hours are the

24  technologies, the voting systems, the poll works, and all of

25  that.  Then they must take a test and they must pass the test

JACQUELYN CALLANEN - DIRECT

1   by 75.

2       So that's going on constantly.  Once they've passed a test

3   we're able to assign them to a specific poll.  And the goal is

4   always to have one Republican judge, one alternate judge, one

5   would be the Democratic judge.  And in a Democratic precinct

6   it would be a Democratic judge with a Republican so both

7   parties are always present at our poll sites.

8   Q.  And how is it determined whether a precinct should have a

9   Democratic judge and a Republican alternate, or a Republican

10  judge and a Democratic alternate?

11  A.  That's a great question.  Again, per the election code we

12  are to look at the last gubernatorial election held in the

13  state and then we go down our list of 776 precincts, and it's

14  decided that each individual precinct, whichever party won the

15  governor's race in that specific precinct, they are the lead

16  judge and then we have the alternate as that.

17      And then, likewise, we'll work through all of our,

18  literally all of our precincts based on the governor's

19  election.

20  Q.  And you mentioned the test that is given to people who are

21  going to be judges and alternates.  Are there people who fail

22  that test?

23  A.  Yes, sir.  I'm sorry to say, yes, sir.

24  Q.  And how about the election clerks, how are they chosen?

25  A.  The election clerks are chosen by the presiding judge.

JACQUELYN CALLANEN - DIRECT

1  Q.  And do they receive training as well?

2  A.  Yes, sir.  They have a minimum of two hours' training.

3  Q.  Now, in addition to the training your office provides, is

4  there additional training in advance of an election for

5  election officials?

6  A.  It's possible that they can —— the Secretary of State has

7  a training program on their website.  Some of the parties do

8  additional training, but for every election, like we certify

9  them, and then before every single election every person

10 working the polls must come in for a two-hour training.

11      And at that time we get to see them, familiarize them with

12 what's on the ballot, any new procedures, anything that's

13 changed.  So it's mandatory that they come to training for two

14 hours before an election.

15 Q.  So let's talk about some other aspects of your office.  Am

16 I correct that during fiscal years 2021 and 2022 the Office of

17 the Elections Administrator Bexar County received federal

18 funding through the Help America Vote Act and the CARES Act?

19 A.  Yes, sir.

20 Q.  And am I correct that your position as elections

21 administrator includes monitoring your office's compliance

22 with the Americans with Disabilities Act and Section 504?

23 A.  Yes, sir.

24 Q.  And is it also correct that your office doesn't have a

25 specific person who is designated the ADA coordinator?

JACQUELYN CALLANEN - DIRECT

1   A.  Correct.

2   Q.  Am I correct that your office has an obligation to ensure

3   that voting in person is accessible to persons with

4   disabilities?

5   A.  Absolutely.

6   Q.  And am I correct that your office equally has an

7   obligation to ensure that voting by mail is accessible to

8   voters with disabilities?

9   A.  Yes, sir.

10  Q.  And is it also true that your office has written policies

11  and procedures concerning the Americans with Disabilities Act

12  in Section 504?

13  A.  Yes, sir.

14  Q.  Am I correct that your office has not updated those

15  policies since the enactment of SB 1?

16  A.  Correct.

17  Q.  Now, let's talk about what you do to prepare for an

18  election.  What is it that -- what is your timeline, how do

19  you get ready to conduct an election?

20  A.  In our office we utilize the project management tool.  And

21  that phrase that I hate, "in a perfect world," we have six

22  months to prepare, and in a large county and I think in any

23  county when we know that the uniform election date is coming

24  up we reach out to our 52 -- we have 52 political subdivisions

25  here in Bexar County, and so we notify them and we have what's

JACQUELYN CALLANEN - DIRECT

1  called an entity meeting where the superintendents will come

2  in, and, you know, the city clerk, city managers, and they

3  advise us whether they are going to have an election on that

4  same date.

5      And in Bexar County, we're pleased that we always have a

6  joint election, which means that the voter gets to go to the

7  polls one time, vote for everything they are eligible for.

8  And so the entities will sign a joint agreement.  We contract

9  with them.  They pay part of the costs, but that starts that.

10      Then each of the entities are responsible for conducting

11  their own candidate filings, ballot drawings, if they have

12  bonds or whatever, and all the Spanish translations, they send

13  that to us.

14      We start programming the election.  When we have a

15  complete ballot we send it back to the entities so that

16  they -- the names are correct, ballot order is correct, so

17  they can make any changes.

18      So that in itself is a month of time, as you can imagine,

19  because most of the entities want their council members and

20  their candidates to see that their name's absolutely spelled

21  correctly.  So that goes on.

22      And at the same time the election division in our office

23  is contacting facilities.  You know, making sure that, as you

24  said, the ADA, we're compliant, they have access.  So they

25  have to make a contract with every one of the facilities we

994

JACQUELYN CALLANEN - DIRECT

1   use.  And that's over 300.  And then they start the staffing.

2        So all of that is going on at the same time as the by-mail

3   process.  So it gets a little bit busy, a little crazy, and we

4   program the election.  We test the election.  I wish everybody

5   could see how everything works and maybe we could convince

6   people that the elections are true and correct.

7   Q.  So when you say you "program and test the election," how

8   do you do that?

9   A.  I am blessed that I have a team of four technical people.

10  We have the ES&S ExpressVote system here, paper based with

11  cards.  We use a vendor, VoteTech, for our poll books, which

12  is our voter registration system.

13       So while they are doing all of that and programming it and

14  everybody signed off, then that team of five people will go

15  and test every precinct in every candidate.  So they spend

16  two, two and a half weeks of doing nothing but voting.

17       They are in our tab room and they are making sure that the

18  equipment -- everything works.  So if you go to Precinct 101,

19  if you go to 202, and if you go down to 4200, the people that

20  are supposed to be on that ballot, show up on that screen,

21  they get to vote for them, the equipment works, and we run it

22  all the way through to the tabulator.

23       Then we put everything we've collected into the main

24  computers to run it, to bring it altogether, and to make sure

25  that we're good to go.

JACQUELYN CALLANEN - DIRECT

1   Q.  And do you, within your office, conduct a mock election to

2   make sure that you have the right numbers coming out of the

3   tabulator?

4   A.  Absolutely.  Yes, sir.

5   Q.  And do you also test the ballot to see how long it takes

6   people to vote it?

7   A.  That's it.  That's a great point.  Yes, we do, because, as

8   you know, you-all, and I'm sure you-all vote, sometimes you'll

9   go in and you'll have three items on your ballot and you can

10  get in and out.  Sometimes you'll have 47 items on your ballot

11  and it will take a little longer.

12      And so what my team is doing as they are testing is

13  they'll bring the units out, because you can imagine, once

14  you've tested a thousand times you're pretty comfortable with

15  going through the ballot quickly.

16      So we put a stopwatch on them when they start to see how

17  many minutes it takes to get through the ballot.  And then the

18  staff always takes the units out to other staff members who

19  are not as convinced or they haven't made up their mind on who

20  they would like to vote for, so they are seeing it for the

21  first time and so we time them so that we get an average.

22      You know, sometimes will be at the booth for 30 seconds.

23  Sometimes they will be there for five minutes.  And that piece

24  we need to know on how we can ramp up each poll site because

25  if we have a poll site that has 500 people voted there the

JACQUELYN CALLANEN - DIRECT

1  last time and it's going to take five minutes a piece, we're
2  going to make sure that they have more ExpressVotes, and so
3  that matrix all has to be made and met before we can turn it
4  over to the operations side of the house where they start
5  building the equipment for each site.
6  Q.  And when you say "building the equipment for each site,"
7  how do they do that?  What is the equipment that they need and
8  how do they build it?
9  A.  I'm sorry.  As I said, we have ES&S ExpressVotes and what
10 it is, is it's basically a big pencil.  It's a ballot marker.
11     So in the course of the election a voter will come into
12 the facility.  They'll go to the qualifying table where our
13 election officials are sitting.  They will present their photo
14 ID.  Our election officials will look them up in the database
15 to make sure that they are registered.
16     Then at that time they print out labels so that the voter
17 can sign so we can get their signature.  And then there's
18 another printer on the other side that takes the ballot card
19 and prints the top of the ballot card, the precinct number,
20 and then we hand it to the voter.
21     The voter goes to that ExpressVote, inserts the card —
22 and think of it as an ATM machine, where you put it in, it
23 brings up the screen, and then they work their way through the
24 screen where it says next, next, next.  Then they have to
25 review it and then at the end there's a big button that says

JACQUELYN CALLANEN - DIRECT

1  print.

2      So it will print their selections on the card.  It comes

3  back out.  Now, that card, the voter themselves then take that

4  card across the room and place it in the tabulator.  And when

5  it goes in the tabulator, that's where they are actually

6  voting.

7      The tabulators are set up so that it's imaging both sides

8  of that ballot and tabulating it.  And then it drops down into

9  a secure ballot box and the screen comes up and says "Thank

10  you, you voted."  And then they get their "I Voted" sticker,

11  which is very important to everybody and they exit.

12  Q.  And the tabulator, what are the functions that it

13  performs?

14  A.  Again, at the beginning of every election, as I just said,

15  my team will vote on everything, every one of those

16  tabulators.  And when you turn the tabulator on, basically as

17  soon as you touch it, it automatically will print out what's

18  called a configuration tape and it's about the size of a cash

19  register tape.

20      And that comes out to tell them, yes, it has the correct

21  election on, yes, this is the date and time.  And it's the

22  record of the date and time that machine was opened.  So the

23  election officials take that tape and they keep it because

24  that's an important election record.

25      The first day when they open they will get what's called a

JACQUELYN CALLANEN - DIRECT

1  zero tape.  They will get a second tape that again lists the

2  name, the title of the election, and it starts and it lists

3  every single candidate that's on that ballot, and it shows

4  that there's absolutely no votes in that tabulator.

5      The zero tape is one of the most important records we

6  have.  When that's finished, the election judge, the

7  alternate, and if there's any poll watchers there, they sign

8  it, they fold it away, they put it in our secure -- we refer

9  to them as our purple bags, and now the election is ready to

10  begin.

11      At the end of the day we're doing a reverse process.  The

12  closing procedure now takes all the votes that have been

13  tabulated and inserted in there and it writes them to two USBs

14  that are in the voting system and it gives the results from

15  that site.

16      And, again, for the closing, it's going to give us two

17  tapes.  We always have two tapes printed, one that the

18  officials will turn over to us for the official record, and

19  again, per the election code, the election judges themselves

20  may have a record of what happened at their poll, so they have

21  a copy of that tape.

22  Q.  Could you describe, just so we understand what it looks

23  like, what the purple bag is?

24  A.  A purple bag is -- yeah, it's about this long.  It has

25  clear plastic on the one side so we can always see what's in

JACQUELYN CALLANEN - DIRECT

1   it.

2       When we send it out to the officials, we have two seals in

3   it in case we have to open it, if the technician has to open

4   it for any malfunction.  They open it.  They take the seal

5   off.  They make sure we have another seal to put on there,

6   which is numbered.

7       And the green seals we use if you take them off, they are

8   going to change where it says "voided," so we know if anybody

9   has touched them.

10      They have another seal that the tabulator has, and then it

11  has two little while seals in it so that when the election

12  officials are all finished at the end of the night, we have

13  our configuration tape, our zero tape, our final results tape,

14  we have the two jump drives that come out of the tabulator,

15  and we have -- again, here in Bexar County we purchased --

16  ES&S has the system that's called the Touch, T-O-U-C-H, and

17  it's basically, it's a big tablet that we use for our ADA and

18  our curbside voting because those ExpressVotes are just too

19  bulky, too hard, and it would just not do well to put that

20  weight on someone's lap and so we have this system that is

21  just a big tablet.

22      So when they vote on that, it comes back and it gets

23  docked in its unit, and so in the morning and in the evening

24  they do the exact same thing as the other.  They are running

25  their tapes.  It will give them a tape from that Touch and

JACQUELYN CALLANEN – DIRECT

1  they will get the USB out of that Touch.  That goes in the

2  purple bag too.

3      And then they lock it and they seal it.  And we have a

4  chain of custody form that the officials write the number of

5  that final white seal on the piece of paper that they bring

6  back and submit.

7  Q.  And so just to focus for a moment on the polling places

8  themselves, in the polling place the first table that a voter

9  would come to is what you call the qualifying table?

10 A.  Yes, sir.

11 Q.  And at the qualifying table there are laptops ––

12 A.  Yes, sir.

13 Q.  –– is that right?

14      And those are loaded with the information for all of the

15 approximately 1.2 million voters that you have here in Bexar

16 County?

17 A.  Yes, sir.

18 Q.  And what is the purpose of having those laptops with that

19 information?

20 A.  Again, it's a record of who voted.  And they sign in.

21 Some –– we do not –– we still have a hard copy wet signature

22 from all of our voters that go on a combination form, but our

23 vendor is trying to convince us to move to signature pads.  We

24 haven't done that yet.

25      But it's a record of the person that has actually stepped

1001
JACQUELYN CALLANEN - DIRECT

1  up, shown their photo ID, and voted.  Now, if there's any
2  change in that, if they are not registered to vote, they think
3  they are registered to vote, or when the official says to
4  every single voter, have you moved, we're checking to see that
5  if Jackie shows up and Jackie lives at 123 Main, our records
6  show Jackie lives at 123 Main.
7      But if when Jackie shows up there's an S, a bright S that
8  shows up next to that name on the poll book, we know that
9  Jackie may not live at 123 Main because we've been notified
10 that when we did our annual mail-out the card came back, that
11 they were not there.
12     And our voter registration cards are not allowed to be
13 forwarded.  It's a government document.  So if the S shows up,
14 now the officials take out — it's called a statement of
15 residence card, but in reality it's a voter registration card,
16 and before Jackie can step away and actually vote they must
17 fill out this statement of residence card because obviously we
18 want each voter to be able to vote on who represents them, who
19 they are eligible to vote for.
20     So if we have a lot of people that have Ss, it's going to
21 slow down.  We're going to get a line built.  It's just the
22 sheer necessity of following the law.  And if that voter was
23 not registered, if there's no name that comes up — and, of
24 course, now the voters are going to say, but I went to DPS and
25 I registered there.  We don't have a record of it.  It didn't

1002

JACQUELYN CALLANEN - DIRECT

1  come through to us.  So now they have to vote provisionally.

2      And that, as we all know, no one gets turned away from

3  voting.  So if they are not registered with us, we will still

4  provide the provisional ballot.  And the provisional — we use

5  green.  It's a green envelope, it has an affidavit on it

6  stating that I attempted to register at DPS, or I thought I

7  was registered with a deputy voter registrar, and there are

8  like six reasons on the back that they check.  They sign it

9  with their current address.

10      That process in itself takes 15 minutes per voter because

11 there's a lot going back and forth because if, again, just if

12 somebody steps to the table and it comes up on the screen,

13 what if Jackie put in an application for mail ballot, it's

14 going to say by mail, which means you're not going to vote

15 here, you've already voted.

16      Well, again, well, they didn't vote.  They didn't send in

17 their ballot.  They tell us they didn't send it in.  If they

18 don't have their ballot to turn in to that election official,

19 then they are going to do a provisional ballot.

20      And so then we have days after to make sure that their

21 ballot actually came in, or we count the ballot that they cast

22 at the site because once they put that ballot card in, they go

23 to the ExpressVotes, they choose, they vote.  The difference

24 is they bring their card back to the election officials which

25 put it in a security envelope and then seal it in that green

1003

JACQUELYN CALLANEN - DIRECT

1  envelope.

2      So now if the early ballot board, which I'm sure we'll get

3  to, chooses to say, look, we never got the ballot so we're

4  going to count this, then they are the ones that will open

5  that ballot and turn it back to us so that voter, in fact, did

6  vote.

7  Q.  So now focusing on the laptops that are on the qualifying

8  table does — do voters in Bexar County, must they vote in

9  their own precinct of residence, or can they vote anywhere in

10  any polling station in the county?

11  A.  They can vote anywhere.  We are blessed that we use what's

12  called Vote Centers.  We were approved to be a Vote Center

13  county in 2019.

14      And a Vote Center, for those — just what the center said

15  was that a voter on Election Day has the exact same luxury as

16  a voter voting early in Texas.  They can vote at any poll

17  that's open, which has been a blessing.

18      It's been a blessing for the voters because they get to

19  vote.  They don't have to race home at 6:00 or 6:30 and not

20  make it.  And for us, it's monumental.  It really — the

21  judges love it, the voters love it, and it's a great thing.

22  Q.  Am I correct that the laptops that are on the qualifying

23  table communicate with the entire voting system in the county

24  so that if a person goes to one polling center and votes

25  there, then the record will show they have already voted?

JACQUELYN CALLANEN - DIRECT

1  A.  Yes, sir.  Yes, sir.  But, please, just — I need to have

2  you make the distinction that the poll books, the laptops are

3  connected only to the laptops in all the other polls.  Nothing

4  is touched by the voting system.

5      We have two completely different systems.  The election

6  system that people are voting on is not shared by anyone.

7  It's not connected to anything, but the poll books, they are

8  connected so that we can ensure the integrity of the elections

9  so somebody can't vote here and then go three miles down the

10  road and vote again.

11  Q.  Now, the — what you described as the ExpressVotes, the

12  big pencils, are they connected to anything?

13  A.  No, sir.  That's the best part.  And, in fact, I don't

14  want to say it's the bane of our existence, but they can't

15  even be daisy-chained with each other.

16      So when we set up a poll site, that's a function that the

17  team is already looking at the poll site, where electrical

18  outlets are.  We send out — what do you call them?  Strips,

19  power strips, so that they have to — each one has to be

20  pushed in automatically.

21  Q.  Is the word you are looking for "surge protectors?"

22  A.  That's it, yes.

23  Q.  And how about the tabulators, are they connected to

24  anything?

25  A.  No.  Again, it has to be — it's across the room, and,

JACQUELYN CALLANEN – DIRECT

1 again, it's plugged in.

2 Q.  And it's otherwise independent, it's not going to —

3 A.  Yes, sir.

4 Q.  — be connected to the internet in any way?

5 A.  Yes, sir.

6 Q.  Now, in terms of the set-up of the polling places, the

7 ExpressVote machines, about how far apart are they on the

8 tables?

9 A.  We have six-foot tables that we provide in our cart and we

10 put two ExpressVotes on a table, so that there's one at one

11 end and one at the other so there's a separation between

12 voters for privacy.

13 Q.  Are these ExpressVotes, are they shielded from prying eyes

14 in any way?

15 A.  Yes, sir.  The company, again, you heard me say ES&S, they

16 have what we refer to as a bonnet because it's a plastic

17 origami project that the judges have to put together each time

18 that fits completely around the ExpressVote.

19       And it sticks out, I don't know, maybe about a foot or so,

20 so that the screen, no one can see — if you are standing in

21 front of it, unless someone is standing directly behind you,

22 they won't be able to see who you are voting for.

23 Q.  Am I correct that if someone is standing directly behind

24 you, they can see who you are voting for?

25 A.  Yes, sir.

1006

JACQUELYN CALLANEN - DIRECT

1  Q.  Now, is it part of the work of your office to answer calls

2  from the public?

3  A.  Yes, sir, it certainly is.

4  Q.  And who takes calls from the public?

5  A.  Again, for normal elections, it's all hands on deck, so

6  everyone will answer the phone calls.  And, as I said, when we

7  have a large election we'll bring in and fill up our temp

8  section and they will help us facilitate all the phone calls.

9  Q.  Do you answer calls yourself?

10  A.  Yes, sir, I do.

11  Q.  Do your employees bring you reports of calls they've

12  received?

13  A.  Yes, sir.

14  Q.  And based on calls from the public, do you sometimes

15  respond immediately to a polling place?

16  A.  Absolutely.

17  Q.  And based on calls from the public, do you sometimes make

18  a decision to investigate one of your offices practices or

19  procedures?

20  A.  There's a follow-up, yes.

21  Q.  Okay.  Now, in your experience as an Elections

22  Administrator, how many instances of voter fraud would you say

23  you know about?

24  A.  Maybe two.

25          THE COURT:  Over what period of time?

JACQUELYN CALLANEN - DIRECT

1    THE WITNESS:  The last 10 years.

2  BY MR. GENECIN:

3  Q.  Now, do you think it's fair to say that SB 1 was passed,

4  as if there were a fraud emergency in Texas?

5  A.  That appears to be true, sir.

6  Q.  In your opinion as a person who served as an Election

7  Administrator for the past 18 years, was there a fraud

8  emergency in Texas?

9  A.  Not to my knowledge.

10  Q.  Were you consulted either during the regular or special

11  sessions of the legislature about the matters that were to be

12  addressed in SB 1?

13  A.  I don't know if I would use the word "consulted," but we

14  were involved in the process.  We have an organization, Texas

15  Elections Administrators, TAEA, and we are very involved with

16  the legislature.  So the officers, we have a legislative

17  council, we have a lobbyist, and so we are obviously very,

18  very involved in that.

19  Q.  But you, yourself, did not provide testimony?

20  A.  Did not provide testimony, no, sir.

21  Q.  You, yourself, were not called by any legislator about

22  your views?

23  A.  Again, we do work closely with — I work closely here with

24  the delegation, some of the delegates here, Senator Menendez

25  is down in the office, Barbara Gervin-Hawkins is another one

1008

JACQUELYN CALLANEN - DIRECT

1  that stays in touch with us.  So we do have some input to
2  them.
3  Q.  At the time that SB 1 was passed, do you recall that there
4  were approximately 1.9 million voters in the State of Texas
5  who did not have either a Texas driver's license or the last
6  four digits of their social security number in the TEAM
7  system?
8  A.  I heard that.  I can't verify it, but that's what I heard.
9  Q.  And when we speak about voters who don't have those
10  numbers in the TEAM system, is it true that we don't know
11  whether the voters themselves actually had one or the other or
12  both of those numbers, what we know is that for those voters
13  the numbers in question were not in TEAM?
14  A.  Correct.
15  Q.  Do you think the legislature was concerned about the
16  roll-out problems that would be created by the late passage
17  and short effective date of SB 1?
18  A.  I can't speak to if they were concerned or not, but it was
19  a massive problem.
20  Q.  Was there any fraud problem in Bexar County that was
21  addressed by any section of SB 1?
22  A.  No, sir.
23  Q.  Could you list for the Court the unfunded mandates that
24  are set forth in SB 1?
25  A.  Where do we start?  Yes, sir.

1009

JACQUELYN CALLANEN - DIRECT

1    It was massive.  I mean, yes, we're a large county, but

2  remember when SB 1 was coming, we had such a short turn-around

3  to do it.  And I want y'all to remember, and I mean I'm

4  sure -- I don't want to offend anybody, but that's when

5  everybody was in the whole supply chain shortage, the supply

6  chain storage.  It just played havoc with us.

7    We had to have new forms.  We had to do all of our

8  testing.  I mean, all of our training again.  We had to write

9  all new training for our election officials.  We had to bring

10 them all in for additional training.

11   We had to order all new applications for ballots by mail.

12 We had to order all new mail ballot envelopes.  And there's

13 only so many approved printers in the state of Texas, and so

14 it was monumental.

15   So, I mean, we started, just in temps alone, for the

16 first, I would say, year, because when SB 1 started we were in

17 a Primary Election, and that year -- and it went in obviously

18 to the governor's.  So we had to have a lot of temps.  So our

19 temp bill alone was over $218,000 for an election, which,

20 again, was -- and we had, you know, we buy things on economy

21 of scale.

22   So we had a shelf-full of applications for ballots by mail

23 that were no longer any good, and we had to hustle to get new

24 applications.  And, remember, there's 254 counties in Texas

25 and every one of us are trying to get what we can.

1010

JACQUELYN CALLANEN - DIRECT

1   The State had redone the mail ballot carrier envelope

2   where they added a lot of -- dare I say legalese -- and I

3   don't mean to offend any of you lawyers, but it's not common

4   language that the election voters understand, but we could

5   only use that envelope and so our printing costs were out of

6   control.

7       I mean, it was just the postage going back and forth,

8   because now we were finding out -- and I don't want to ramble,

9   but like when it's time for the Primary Election we have a

10  strong core of voters -- I'm sorry.  They are by-mail ballot

11  voters, and we have these people that have been voting for

12  years with us and so it means so much to them.  I mean, it's

13  their heart.

14      So what we found is our voters sent in their applications

15  for ballot by mail January 4th, 5th.  They know that Texas has

16  a fantastic system where it's an annual by mail so they can

17  send us one application and we'll use it for the entire year

18  so they don't have to worry about missing a deadline.

19      But what we find is, bless their hearts, they saved the

20  blank applications in a safe place so that they are ready in

21  January to send it in.  They don't want to bother us, they are

22  just going to send this in.

23      Well, with SB 1, every one of those applications we

24  thought we had to reject because they weren't the new ones and

25  there was no space for the TDL or the SSN.  So that's where we

1011

JACQUELYN CALLANEN - DIRECT

1  started in a bind because now we have to start interacting

2  with our voters.

3      And the way SB 1 is written -- remember I just said we

4  have our like core of voters that vote by mail, or senior

5  citizens, well, if you think of the senior citizens who

6  registered to vote '60, in the '60s, or the '70s, even into

7  the '80s, there was no space on the voter registration card

8  for a driver's license number nor the last four of their

9  social.

10     So all of a sudden our database, we have no information

11 for these voters.  So SB 1 also told us that we can't update a

12 record as the voter registrar unless it's a voter registration

13 card.  So we couldn't just send the people a new ABBM that has

14 the space for those numbers.  We also had to put a new voter

15 registration card in there and tell them they needed to

16 register to vote so that we could pick up the numbers and put

17 it in our database.

18     And as you can imagine, we had to write this letter to

19 them and explain to them how it was all working and we're

20 sorry we had to bother them but they could get it back to us.

21     So those additional mail, all of that are unfunded

22 mandates.  Dare I say my Commissioner's Court, the budget

23 office were less than thrilled, and it continued throughout

24 the entire year.

25 Q.  Now, let me just ask you.  You've been using a couple of

1012

JACQUELYN CALLANEN – DIRECT

1  abbreviations.  When you say TDL?

2  A.  I'm sorry.

3  Q.  That's okay.  When you say "TDL," are you referring to the

4  Texas driver's license?

5  A.  Yes, sir.

6  Q.  And when you say "ABBM," you mean an application for

7  ballot by mail?

8  A.  Annual Ballot by Mail application, yes, sir.

9  Q.  And when you say "BBM," does that mean the ballot by mail

10  itself.

11  A.  Yes, sir.  Thank you.  I'm sorry people.

12  Q.  Now, in terms of the unfunded mandates, did you also —

13  was your installation of video surveillance pursuant to SB 1

14  paid for by anyone other than the county?

15  A.  No, sir, it wasn't.  The SB 1 included that from the time

16  the mail ballots have come back in and are turned over to the

17  early ballot board our entire — well, any room or area in our

18  office that possibly could handle a mail ballot must be under

19  24-7 video streaming on the website.  We had to put it on our

20  website.

21      Again, you can imagine how we scrambled to do that.  And

22  we still, here it is, you know, 2023, and as I sit here right

23  now we're still trying to contract with a professional

24  contractor to do this for us.

25      The way we did it, and the only way we did it, was, and,

JACQUELYN CALLANEN - DIRECT

1  again, I hate to even say it, but we did it by YouTube.  My

2  technical team figured out that they literally would use Go

3  Pros and put them all over the place and stream it on YouTube.

4      But one of the hiccups on YouTube was that it will only

5  allow you to stream something for twelve hours and then it

6  shuts off.  But we had to do 24 hours, so, again, we went out

7  and bought another laptop, and bless my guys, two of them were

8  in charge of this, and so, you know, they had to make sure

9  that like at 11:00 at night or whenever they were balancing

10  those twelve hours so that they could make sure -- they had to

11  shut it off.  It was off for three minutes or something and

12  then they could put it back on.

13      And the piece that we don't know, and as I sit here, I

14  still can't tell you how much it will cost us to archive that

15  information because SB 1 also says that we must archive the

16  streaming.  I'm not good on technicalities, but we must

17  archive it for the election period, which is a 22 month for

18  any election.

19      And the vendors we're working with now are telling us that

20  that's where the real expense will come from.  So I wish I had

21  an answer for you, but I just know it's going to be expensive.

22  Q.  And am I correct that each of the 254 counties in Texas

23  had to very quickly come up with its own way of putting its

24  video streaming online?

25  A.  Yes, sir.  We were all scrambling.

JACQUELYN CALLANEN - DIRECT

1  Q.  And different counties have done it different ways?

2  A.  A couple of the smaller counties, they literally took

3  their cell phones and propped them in a hallway.

4  Q.  Now, you mentioned that you spent $218,000 for additional

5  employees.  Was that an expense directly connected to

6  verifying the ID numbers on people's applications and on their

7  ballots?

8  A.  I can't say that that was the only thing they were doing.

9      They were taking the calls and explaining to people why we

10 had sent things, or they were taking the names and addresses

11 so they could send them a new application, because they only

12 had the old one, or they were explaining to them that if they

13 had a computer they could go online and download this

14 application and put it in an envelope and send it to us.

15     So it was just sort of calming the waters.  All of those

16 people were taking calls from people.

17 Q.  So that additional expense was connected to the ID number

18 requirements of SB 1?

19 A.  Yes.  Yes, sir.

20 Q.  And do you anticipate that that additional expense will

21 recur in future elections?

22 A.  Yes, sir.

23 Q.  And will it be larger in larger elections?

24 A.  Yes.  I mean, I think it will be a lot coming in — well,

25 2024, because the whole boat floats.  I mean, that's a phrase

JACQUELYN CALLANEN - DIRECT

1  we use, that as we come into a Presidential Election every

2  function we do just floats because we're going to get

3  additional people.

4      And that means that those additional people have not

5  worked with us in 2022 or 2023 to understand the ID, and so

6  we're going to be have to do more mass media.  We'll have to

7  do a whole lot more than we've done in our unfunded mandate.

8  Q.  Am I correct that in general elections it is the entities

9  that are holding elections that pay, each of them pays a share

10 of the cost here?

11 A.  Yes, sir.

12 Q.  So does that mean that school districts, for example, are

13 paying a higher cost for elections than they did because of

14 this additional work that's imposed by SB 1?

15 A.  Yes, sir.  They were very surprised.

16 Q.  Can you give us an idea of the differential in costs?

17 A.  In the 2022 General Election — elections, by no means,

18 are — elections are unbelievably costly.  And that's for a

19 good thing.

20     So here in Bexar County — and I can — obviously I'm

21 going to speak for Bexar County, but if we have a countywide

22 election for a minimum an election in Bexar County will cost

23 $1.3 million.  That's for, you know, maybe — I mean, like I

24 said, the General Election.

25     The City of San Antonio that has a 7 or a 13 percent

1  turnout in May, their elections cost $1.2 million.  When we

2  have the general elections, and we have everyone else on it,

3  it's going to cost 1.5.  Well, all of a sudden, when we had SB

4  1, the November Election, we now were at 1.78.  It jumped

5  considerably.

6  Q.  Now, after SB 1 became effective in December of 2021, do

7  you recall the Secretary of State's Office going silent?

8  A.  Yes, sir.

9  Q.  And were you able to get responses from them to your

10 questions?

11 A.  No, sir.

12 Q.  Am I correct that your office received no guidance from

13 the Secretary of State's Office regarding how the Americans

14 with Disabilities Act in Section 504 apply to SB 1?

15 A.  No, sir.

16 Q.  Am I correct about that?

17 A.  Correct.

18 Q.  And am I correct that in January of 2022 the Secretary of

19 State provided a file to the off-line counties, including

20 Bexar County, with social security numbers and Texas driver's

21 license, but the file had the wrong format and couldn't be

22 uploaded?

23 A.  Yes, sir.

24 Q.  And when I say "off-line counties," can you just explain

25 for the record what are the off-line counties and what are the

JACQUELYN CALLANEN - DIRECT

1  online counties?

2  A.  When we go back to HAVA 2022 --

3  Q.  So HAVA is the --

4  A.  Help America Vote Act that came after the Florida hanging

5  chads.

6      So the idea at that time was that every state had to have

7  a uniform one-size database for every voter in the state.

8  Prior to that, we were all on our own.  We held our own voter

9  registration.

10      And if you were in Bexar County, we had cards.  I mean, we

11  had file cards that just -- everything.  So they said, okay,

12  we have to digitize everything and it has to be one system.

13      So the State of Texas did a wonderful job.  They got

14  vendors and they set up their system for all 254 counties.

15  They turned it on.  And boom.  It crashed.  I've learned these

16  terms.  And it was not big enough to handle 254 counties, and

17  so back to the drawing boards.

18      And, you know, we tried another iteration of it, and

19  another iteration, and finally, I guess whoever they were

20  working with said this isn't big enough and it's never going

21  to work for the bigger counties.  So if you look at the 31

22  counties, the top 31 counties, if you are talking, you know,

23  Harris County, and El Paso, and Denton, and us --

24  Q.  So it's the top 31 in population?

25  A.  In registration.  It may be population, I don't know that,

1  but definitely in registered voters.  And they say that –– I'm

2  sorry and I don't want to –– we call ourselves the "big boys."

3      So the big boys can't use the system realtime.  But that

4  means you've got another 220 some counties that that's how

5  they work every day.  When they turn it on, they are actually

6  working in the system that the Secretary of State has.

7      The big boys are out here, and we have 75 percent of the

8  total registered voters in the State of Texas, so it's large

9  counties with a lot –– you know, so we can't use the system,

10  but what we've done in the process is we export and import.

11      So, for us, when I said, you know, I have my voter

12  registration people and they are doing their work and pounding

13  it and we have this living database, we also have a

14  third-party vendor.  And all of the big boys have this vendor.

15  It may not be the same one.

16      And so the work product that my office does, we have our

17  own self-contained voter registration system like we've always

18  had.  So we keep it here.  We've got servers and our data

19  stays in our building.

20      But, at the end of the workday, I have a staff member who,

21  and again, please, I'm not technical, wraps up all of that

22  work product for the day and exports it to the State.  They

23  wrap it up, they encrypt it, and they shoot it up to them,

24  like the last thing we do.

25      Then when we come in, in the morning, the same person has

JACQUELYN CALLANEN - DIRECT

1  to, before we find out it's 1.226, that I check that number,

2  my staff member has pulled whatever has happened up at the

3  Secretary of State's Office, he pulls it back down and imports

4  it into our system.

5      Now, you know, just to be -- if we shoot up 100

6  applications, because they are not registered at this time, so

7  if we shoot up 100 at night and then we come back in the next

8  morning, we may only get like 83 of them back with a voter

9  registration number, meaning that the TDLs matched if they had

10  it, the SSNs matched, the birth dates matched, the addresses

11  matched, so the State does that.  They match those.

12      If one of those items doesn't match, if we fat-fingered

13  something, or the item was left off, then we get back, the 83

14  will go right back in, but those other 17 come back to us with

15  what's called a PSV.  They are marked as PSV, and that means

16  pending state verification.

17      So now we have to take those 17, go back and get the

18  applications and check to see, is there something we did

19  wrong, okay.  So we'll -- if we rework, it if it was our fault

20  we'll rework it, send it back up in the next day's business.

21      But if it's the voter, then we have -- there's a box to

22  check to just say, this is the information that you gave us.

23  And so we send that up to the State and then they send it back

24  to us.  And it's always marked as PSV because they -- so when

25  they show up to vote, that goes back to the provisional

JACQUELYN CALLANEN - DIRECT

1  ballots and that, that I talked about.

2  Q.  Now, is there a tool provided by the Secretary of State

3  that is called the Ballot Tracker?

4  A.  Yes, sir.

5  Q.  And does the Ballot Tracker work for Bexar County?

6  A.  No, sir.

7  Q.  Is it true that the Ballot Tracker now requires the voter

8  to enter both their Texas driver's license or their Texas ID

9  number and the last four digits of their social security

10  number, and if the voter doesn't have both the tracker doesn't

11  work?

12  A.  Correct.

13  Q.  And is it also true that as of September 8th of this year,

14  just before trial began, there were approximately 12,000

15  voters in Bexar County who had no Texas driver's license

16  listed in the TEAM system?

17  A.  Correct.

18  Q.  And is it true that there were approximately 7500 voters

19  in Bexar County who had — who did not have the last four

20  digits of a social security number listed in the TEAM system?

21  A.  Correct.

22  Q.  So there were at least 19,000 voters in Bexar County who

23  would not be able to make the Ballot Tracker work because

24  either their Texas driver's license, or their Texas ID, or

25  their social security number is just not in the tracker?

JACQUELYN CALLANEN - DIRECT

1  A.  Correct.

2  Q.  Am I right that the 31 counties that are not online on

3  TEAM use different vendors?

4  A.  Yes, sir.

5  Q.  And those vendors have different codes?

6  A.  Yes, sir.

7  Q.  And this has been true since the TEAM system was created?

8  A.  Yes, sir.

9  Q.  Now, I understand that you are opposed to 24-hour voting,

10  is that right?

11  A.  Yes, sir.

12  Q.  Is your opposition to 24-hour voting based on any risk

13  that 24-hour voting might present for voter fraud?

14  A.  No, sir.

15  Q.  In fact, is it your opinion that 24-hour voting presents

16  no danger of voting fraud?

17  A.  Correct.

18  Q.  I'd like to turn now --

19          THE COURT:  I'm curious.  Why are you opposed?

20          THE WITNESS:  To 24-hour voting, sir?

21          THE COURT:  Yes, ma'am.

22          THE WITNESS:  For -- this is going to sound silly,

23  but I respect our poll workers so much and everything they do,

24  and here in Bexar County our election officials have -- I

25  don't want to say just -- I don't know how to say this, so

JACQUELYN CALLANEN – DIRECT

1  much integrity that they won't even split a shift to help

2  themselves during early voting when they could work — when we

3  have twelve-hour days.

4          They want to make sure that everything is done

5  correctly, and if we extend their days, they are going to have

6  such discomfort.  And I know that sounds silly to say that but

7  we would be looking at security issues.  Right now, when we

8  have an early voting, we're open from 8 to 8, and we have some

9  of our officials, some of my election officials ask that we

10  send out deputies to walk them to their cars because now it's

11  dark when they go out.

12          THE COURT:  So when you talk about security issues,

13  you're talking about their personal —

14          THE WITNESS:  Their personal security, yes, sir.

15          And so I have to take that into consideration, and

16  that's my main — and then, again, logically, I tell myself we

17  have so many hours of early voting available where we do ten

18  hours each day, and then we have our whole week of twelve

19  hours, and we are open twelve hours on Saturday and Sunday,

20  and I just feel that if somebody wanted to vote, we had enough

21  hours in early voting.  And I know that's a blanket statement

22  that I shouldn't make, but that's my feeling, sir.

23          THE COURT:  Thank you, ma'am.

24  BY MR. GENECIN:

25  Q.  So I'd like to turn to Section 3.15 of SB 1, which is the

1023

JACQUELYN CALLANEN - DIRECT

1  prohibition on straight-ticket voting.  What's your view of
2  the prohibition of straight-ticket voting?
3  A.   Again, if we back up to what I had said about our process
4  and how we test, do we time everything.  Again, when we had
5  straight-ticket voting, we had less lines.  People were able
6  to get in and through the ballot faster.
7       And I will say that in Bexar County we have — our people
8  like straight-party tickets, they really do, but with the
9  systems they still could vote straight party and then they
10 could still make changes throughout the ballot, but it
11 expedited things because when we, as I said before, we have
12 ballots that have 47 different races on them and people have a
13 hard time remembering 47 different races and who they wanted
14 to vote for.
15      And the problem, then again, it's causing for us in the
16 poll site is that the people who do their homework, and we're
17 really proud of them, and they come into the polls and they
18 are all ready and they know who they want to vote for, in this
19 age of technology they put their information on their cell
20 phones.
21      So then they get to the polls and they open up their cell
22 phones to remind them who they are going to vote for, and the
23 election officials are there going, you have to put that away,
24 you have to put that away, you can't be here with a cell
25 phone, you can't have it.

1024

JACQUELYN CALLANEN - DIRECT

1    So now the election officials have to take that voter cell
2  phone, hand them a sample ballot and tell them they have to go
3  outside of the hundred feet, mark your sample ballot, come
4  back in, and we'll let you vote.  And that's what we saw a lot
5  more of, which is, again, why I'm saying that it was
6  problematic since we lost it.
7         THE COURT:  I'm curious about that part too.  So now
8  the statute prohibits a voter from using their cell phone as
9  merely just a — well, let me backtrack.  You can take a hard
10  copy of a sample ballot into the voter booth, correct?
11         THE WITNESS:  Yes, sir.
12         THE COURT:  But you can't take a PDF that's on your
13  cell phone and use it in the voter booth?
14         THE WITNESS:  Yes, sir.  Isn't that ridiculous?
15         THE COURT:  And who caused that or what caused that?
16         THE WITNESS:  It's been in effect since we've had
17  basically photo ID.  It goes back to no electronics.  They
18  will not let —
19         THE COURT:  So is it in the statute?
20         THE WITNESS:  It's in the statute, and the basis for
21  it, because I've sort of fought that one, the basis is that
22  every cell phone has a camera and no pictures are allowed in
23  the poll site, that that was the basis for it.  So then we are
24  just not going to make any — you know, we are not taking any
25  chances.  But at the same time, sir, we have younger people

JACQUELYN CALLANEN - DIRECT

1  that when they step to the —

2          THE COURT:  I totally understand what you are saying.

3          THE WITNESS:  They, you know, they have to show their

4  photo ID and we need their license, and they will turn their

5  cell phones to the judges and the judge is like, we can't take

6  that, which again, causes ill will.  And then they have to go

7  out to their car to get their license, if they have it.

8          I'll stop.  I'm sorry.

9  BY MR. GENECIN:

10 Q.  So, Miss Callanen, you've been Election Administrator in

11 Bexar County for 18 years, is that right?

12 A.  Yes, sir.

13 Q.  And during much of that time Texas had straight-ticket

14 voting, is that correct?

15 A.  Yes, sir.

16 Q.  And in your 18 years of experience as an Election

17 Administrator, have you seen anything that gives you any

18 concern that straight-ticket voting could present a risk of

19 voter fraud?

20 A.  No, sir.

21 Q.  Based on your 18 years as Election Administrator of Bexar

22 County, do you have any reason to think that the prohibition

23 of straight-ticket voting and SB 1's Section 3.15 has made

24 Texas elections safer in any way?

25 A.  No, sir.

JACQUELYN CALLANEN - DIRECT

1  Q.  And based on your 18 years of experience as Election

2  Administrator of Bexar County, do you believe that the

3  prohibition of straight-ticket voting in SB 1 Section 3.15 has

4  made it more difficult for Texans to vote?

5  A.  More timely.  It takes longer.  There's going to be longer

6  lines.  So if that translates to difficulty, then, yes.

7  Q.  Now, you mentioned just a little while ago that Bexar

8  County offered voting hours up to 10:00 p.m. in the 2020

9  Election?

10 A.  Yes, sir.

11 Q.  And you didn't offer any voting hours after 10:00 p.m.?

12 A.  Correct.

13 Q.  And that was because of your concern about your election

14 judges, is that right, and your election, and the alternates

15 and poll workers?

16 A.  Well, again, I was not a strong proponent of going to

17 10:00 at night, and so we usually closed at 8:00, but our

18 Commissioner's Court wanted extended hours and so we did it

19 for two hours and we were able to prove that very few people

20 voted from the 8 to 10 hours.

21 Q.  Did those extended hours present any problem in terms of

22 voter fraud?

23 A.  Not to my knowledge, no, sir.

24 Q.  And your opposition to extending the hours was not based

25 on any concern about voter fraud, was it?

JACQUELYN CALLANEN – DIRECT

1  A.  Correct.

2  Q.  Now, I'd like to turn to applications for ballots by mail

3  and specifically to the period before SB 1 was enacted.

4  A.  Yes, sir.

5  Q.  Back at that time, did your office send applications for

6  ballots by mail to voters?

7  A.  Absolutely.

8  Q.  And when did you send them?  When in the year.

9  A.  When someone would call and request them, you know, we

10 would drop them in the mail.  We were asked by like

11 organizations to have some.  We were asked by churches to have

12 some and we were handing them out.

13 Q.  And when you received, back at your office, an application

14 for ballot by mail, did you match the signature on that

15 application with the prior signatures by the same voter?

16 A.  No, sir.

17 Q.  And that's because the election code didn't require that,

18 is that right?

19 A.  Correct.

20 Q.  And today, with SB 1, do you match the signature on the

21 application for ballot by mail to prior signatures of the same

22 voter?

23 A.  No, sir.

24 Q.  Because SB 1 still doesn't require that, is that right?

25 A.  Correct.

JACQUELYN CALLANEN - DIRECT

1    Q.  So the focus now is on the ID numbers that a voter must

2    enter, is that right?

3    A.  Yes, sir.

4    Q.  And before SB 1 was enacted, were you aware -- well, I'll

5    withdraw that and ask this question.

6        I'd like to turn to Section 5.02 of SB 1 which requires

7    the applicant for a ballot by mail --

8        You can wait on that, Derek.

9        -- requires the applicant for a ballot by mail to set

10   forth the number of the applicant's driver's license, or the

11   number of their elections identification certificate, or their

12   personal identification card issued by the Department of

13   Public Safety, or if the applicant doesn't have one of those,

14   the last four digits of the applicant's social security

15   number?

16   A.  Yes, sir.

17   Q.  Is that the ID number requirement, did I read -- describe

18   that correctly?

19   A.  Yes, sir.

20   Q.  And I just want to focus for a minute on the election

21   identification certificate or EIC.  Is that the same as the

22   VUID that appears on a voter's registration?

23   A.  No, sir.

24   Q.  What is the election identification certificate?

25   A.  It's a DPS issued form that looks just like a driver's

JACQUELYN CALLANEN - DIRECT

1  license.  The necessity for an election ID came about when

2  photo ID, when we had to start showing photo ID at the polls,

3  and there were obviously a number of people that didn't have

4  driver's license and didn't drive and so the State of Texas

5  set up this election ID form whereby voters who didn't have a

6  driver's license would go to any DPS office and take their

7  identification.  They would take their picture.

8      They didn't charge for them, there was no charge like a

9  driver's license or a personal ID, and the card says Election

10  ID, may only be used for elections, so they can't use it for

11  other functions.  And a number of people got these election

12  cards.

13  Q.  So would it be fair to say that the Department of Public

14  Safety, or DPS, issues three different kinds of ID that a

15  voter can use?  They issue the Texas driver's license, for

16  which a driver must qualify; and then they issue a second form

17  of ID, which is called a Texas Identification Card, and that's

18  good as identification for any purpose?

19  A.  Yes, sir.

20  Q.  It's being issued now as real ID that you can use to take

21  domestic flights?

22  A.  I'm sure.

23  Q.  And you have to pay a fee, just like you pay a fee for a

24  driver's license for that, is that right?

25  A.  I think so.

JACQUELYN CALLANEN - DIRECT

1  Q.  And then there is the election certificate, which is a

2  separate document, and that's issued free by the Department --

3  A.  Yes, sir.

4  Q.  And you can only use that to vote?

5  A.  Yes, sir.

6  Q.  Now, as we've discussed, there are currently more than

7  19,000 Bexar County voters who don't have either a Texas

8  driver's license number, or a Texas ID number, or the last

9  four digits of their social security number listed in TEAM, is

10 that right?

11 A.  Correct.

12 Q.  And if the number that they provide on their application

13 for ballot by mail is not in the system, their application is

14 rejected, is that right?

15 A.  Correct.

16 Q.  And am I correct that social security numbers, for

17 example, are on file in nursing homes?

18 A.  Yes, sir.

19 Q.  And am I correct that social security numbers are on file

20 in hospitals for their patients?

21 A.  I would assume so, yes, sir.

22 Q.  So I'm going to ask you now to focus on Section 5.07 of SB

23 1, which requires the rejection of an application for ballot

24 by mail that does not contain the identification numbers.  And

25 it requires your office to give notice of the rejection,

JACQUELYN CALLANEN - DIRECT

1  including of the possibility of correcting or adding

2  information through the online tool?

3  A.  Yes, sir.

4  Q.  Okay.  And I understand that it's Section 86.015(c) that

5  provides for the online tool.

6     Could we see 86.015(c) of the election code, please.

7  A.  Yes.

8  Q.  So we've highlighted it on your screen, and just see a

9  description in 86.015(b) of the online tool.  And am I right

10  that the online tool can only be accessed by the voter if the

11  voter puts in name and date of birth, last four digits of

12  their social security number, plus the voter's driver's

13  license number, or personal identification number issued by

14  the Department of Public Safety?

15  A.  Yes, sir.  That's what it says.

16  Q.  So in order to access the online tool, you've got to put

17  in both?

18  A.  Yes, sir.

19  Q.  And let's go down now just a little way here to

20  Subdivision C that says that an online tool used on to this

21  section must —— and here's Subdivision 4 is highlighted ——

22  must allow the voter to add or correct information required

23  under Section 84.002(1)(a), or Section 86.002 Subdivision G.

24  Now, are you aware that the information required in Sections

25  84 and 86 that are cited here are those same ID numbers?

JACQUELYN CALLANEN – DIRECT

1   A.  Yes, sir.

2   Q.  So am I correct that under this statute, this statute

3   requires the tool to be — to make it possible for the voter

4   to correct, but at the same time this tool — this statute

5   forbids the voter to access the tool unless they've already

6   got the correct information?

7   A.  Yes, sir.

8   Q.  So how is the voter supposed to do that?

9   A.  Our advice to them is that they use the voter registration

10  card that we mailed to them and fill it out and send it back

11  to us.

12  Q.  So your advice is that they do something that's not

13  provided for here in the law because there's no way for the

14  voter to comply with the law?

15  A.  Correct.

16      May I say one thing more?

17  Q.  Of course.

18  A.  They are just — the Secretary of State has just, when we

19  went to our seminar in August, all the tools that we have —

20  remember, I told you we had to redo all of our ABBMs and get

21  all new stock, and the back of the carrier envelope was all

22  new stock, and all of the instructions on both the ABBM that

23  we are using and the carrier envelope that we are using has

24  the instructions of and/or.

25      So they want you to put in your Texas driver's license

1033

JACQUELYN CALLANEN – DIRECT

1  and/or, and so now they are changing everything to "and."  So,

2  again, we have information out there that we are sending, so

3  we are expecting to see some new information come down.

4      And I think I shared with you, we've already started to

5  change internally the letter that we send with the mail ballot

6  application and we've highlighted and bolded the word "and,"

7  in the instructions.

8  Q.  Certainly, the voter has to put in both in order to access

9  the system?

10 A.  Correct.

11 Q.  And am I correct that once again the system only

12 recognizes the voter, if the system has both numbers in it

13 already?

14 A.  Yes.

15 Q.  So now we've talked a little bit about the materials that

16 you send out to voters.

17 A.  Yes, sir.

18 Q.  And so I'd like to ask you to have a look at these items

19 that you brought with you.

20        MR. GENECIN:  Permission to approach, Your Honor?

21        THE COURT:  Yes.

22 BY MR. GENECIN:

23 Q.  I'm going to ask you first, there are a number of copies

24 here, so if you would be good enough to tell us what this is

25 and then we can pass one up to the Court.

JACQUELYN CALLANEN - DIRECT

1  A.  Sure.  This is the current application, the ABBM.  This
2  the ballot-by-mail application.
3  Q.  Pass that to Your Honor.  Hold on to one.
4  A.  Are you going to put this up on the screen?
5  Q.  No, we'll just have you --
6  A.  Can I say something to the judge?
7  Q.  Yes, of course.
8  A.  Judge, now that you have one, would you see at the very
9  top where they are asking for one of these numbers, it says
10 you must provide "one."  It doesn't say "both."  And again,
11 that's why we know we're going to have to get all new ones.
12 Q.  So a voter who provides one is taking his or her chances
13 that that number that they provide is actually in the
14 system --
15 A.  Correct.
16 Q.  -- is that right?
17        THE COURT:  Did you get an answer, Gigi?
18        COURT REPORTER:  I have "correct."
19        THE COURT:  You did.
20 BY MR. GENECIN:
21 Q.  I'll ask you to have a look at this letter and pass one up
22 to His Honor to have a chance to identify.
23 A.  Yes, sir.  This is the letter we're required to send and
24 you can see it's dated.  The form came to us on January of
25 2022, so this is after SB 1, this form.

JACQUELYN CALLANEN – DIRECT

1  Q.  And this advises the voter that their application for
2  ballot by mail has been rejected?
3  A.  It's been defective, yes, sir.  Been rejected.
4  Q.  And is it different from the second –– if I could ––
5  A.  Yeah.  Yes, it's different.  It's different.
6      We feel that this second one is more in plain English for
7  them, but it still says that they have to give us one or the
8  other.  This says there are two ways to add, and it's just
9  saying that this letter, the second letter that they have made
10  says that they are recommending that you give both numbers.
11  They are not requiring it, but they are recommending, to your
12  point, that they would stand a better chance.
13  Q.  I want to hand up to Your Honor the first letter and the
14  second one.
15          THE COURT:  Is 6-3 –– you may not know that, but
16  maybe one of the counsel do, 6-3, does that mean that's the
17  version number of this document?  And the next one is 6-4?
18          THE WITNESS:  Yes, sir.  That's how they put them on
19  their website for us to draw down.
20          THE COURT:  Thank you.
21  BY MR. GENECIN:
22  Q.  And now I'll ask you to have a look at this document.
23  Tell us what it is.
24  A.  Again, this is the packet that we send to the voter with
25  their ballot included.  We don't have a ballot included here.

JACQUELYN CALLANEN - DIRECT

1  This is the carrier envelope that I spoke of.

2  Q.  So a voter who succeeds in getting his or her numbers

3  right will receive this packet to vote?

4  A.  Yes, sir.

5  Q.  And could you describe for His Honor the contents of the

6  packet?  I'll hand it up.

7  A.  Again, we have the colored ballot.  And then the next item

8  in it is called the ballot envelope, which is the secrecy

9  envelope that we ask the voter to put their ballot in before

10  they place it in the other envelope, and this allows for the

11  security of their ballot.

12      The ballot board will open —— if they accept it, they will

13  open the outside envelope, and we want to take out the white

14  envelope.  And they are separating them as they go, so that

15  before anyone sees the ballot inside here, there's absolutely

16  no way to attach a name to it.  So it's for identity.  So this

17  is the secrecy envelope.

18      And then we're required to send them —— I'm sorry —— we

19  refer to it as our "Dear John Letter," that has the dates and

20  what they are supposed to do.  And again, it's a, sort of a

21  lot of legalese again that we know people don't read, and it

22  tells them about information about how to return your carrier

23  envelope, what you need to do, to do that.

24      And again, this is the one that we've been —— we are

25  trying to change it and make it much more user friendly but we

JACQUELYN CALLANEN - DIRECT

1  only have so much leeway with it.

2      And then we have, which I'm very proud of, our little

3  insert that goes in there.  And this was developed after the

4  first time we used SB 1 in the Primary of 2022 and we had a

5  horrendous number of rejects because people did not have the

6  numbers there, which was totally unacceptable, and so we had

7  to figure out how we could lower our number and assist people,

8  so we developed this insert.

9  Q.  When you say "we," who do you mean?

10 A.  I mean Bexar County people.  Your local office to take

11 care of your local office's voters.  We all complained and

12 said that these other two forms were too -- they weren't going

13 to read them, they were just too verbose and they weren't

14 going to read them.

15     So the State said, okay, well, if you're going to do one,

16 we'll do the insert for you.  So they came up with an insert

17 that was exactly the same as this other one with all the

18 little language.

19     And, again, we just know our voters don't read that.  We

20 know they don't read that.  So we came up with this little

21 piece of paper.  And we made it bright.  We made it colorful.

22 We made it just this size, so that -- and I'm not embarrassed

23 to say, but I'm sort of proud to say Evil Jackie came out and

24 we made it this size so that we were hoping when our election

25 officials -- when the voters pulled this whole packet out and

JACQUELYN CALLANEN - DIRECT

1  opened it, that this little piece of paper would fall on the
2  floor so that they had to pick this piece of paper up.
3      We had to be so different from everything that was in
4  there so that this would catch their eye.  And it worked,
5  because by the time we got to our November Election we had a
6  1.7 rejection rate.
7  Q.  So this insert, this was a Bexar County insert?
8  A.  Yes, sir.
9  Q.  Nobody, no other counties, as far as you know, are using
10 this particular form?
11 A.  No, sir.
12 Q.  And now I'd like to show you finally two letters, if you
13 would explain for the Court what these are, please.
14 A.  These are the, basically the companion reject notices.
15 The first two you gave me were for the ABBM, the application
16 itself.  These two are for the actual carrier envelope, the
17 one that has come back to us and doesn't have the numbers on
18 the back.
19     And so, again, we have two versions of this, one that as
20 the judge noticed, this is an 8-223, and this was an 8-24,
21 where they've given -- remember, I said we had to give them a
22 voter registration card to correct anything?  Well, they
23 changed the name of the form on the back and said it's a
24 corrective action defect change, but in reality, it's a voter
25 registration card.

JACQUELYN CALLANEN - DIRECT

1    So now they are allowing us to use this, but this only

2 comes back to us if the voter has applied, gotten their

3 ballot, had it rejected, that we can use this one.

4 Q.  So there are two versions of it?

5 A.  Yes, sir.

6 Q.  One for carrier envelope that you returned to the voter by

7 mail and the other for a carrier envelope when you are able to

8 notify the voter by phone or email?

9 A.  Yes, sir.

10 Q.  Hand these up as well.

11       MR. GENECIN:  Your Honor, would this be a good moment

12 to take a break?

13       THE COURT:  It would be.

14       Let's take about 10 or 15.

15  (Recess)

16       MR. GENECIN:  Your Honor, may I continue?

17       THE COURT:  Please.

18 BY MR. GENECIN:

19 Q.  So, Miss Callanen, what advice, if any, does the Secretary

20 of State give about the impossibility for a voter to correct

21 his or her record in TEAM, if he or she cannot access the

22 Ballot Tracker because TEAM does not have one or more of the

23 numbers that the voter is required to have?

24 A.  We don't — I mean, I don't know if the State puts any

25 information out on that, other than they just kept telling us

1  that the tracker works and have everybody use the tracker.

2  Q.  And in your experience does the tracker work?

3  A.  No, sir, I'm sorry to say.

4  Q.  I believe there were some voters in Bexar County who were

5  able to use the tracker successfully, is that right?

6  A.  Yes, sir.  We had 39.

7  Q.  Out of how many?

8  A.  We had 3,000 and some that were trying to use the tracker

9  and we had — and then it got down to 1300 that we had been

10 working with and calling them and emailing them, and so we did

11 get 39 through the tracker.

12 Q.  So just 39 voters were able to make successful use of the

13 tracker?

14 A.  Yes, sir.

15 Q.  Now I'd like to turn to Sections 504 and 704 of SB 1.

16     Those are the sections that forbid Elections

17 Administrators to distribute an application for ballot-by-mail

18 form to a person who didn't request one and that make it a

19 state jail felony for an Election Official to solicit

20 submission of an application for ballot by mail from a person

21 who requests an application.  Are you familiar with those

22 sections, ma'am?

23 A.  Yes, sir.

24 Q.  And what is your view of them?

25 A.  As I told the staff in the office, I'm not going to go to

1041

JACQUELYN CALLANEN - DIRECT

1   jail so we will abide by a single application.

2   Q.  And has abiding by that requirement been difficult?

3   A.  Absolutely.  I don't like it.  It goes against everything

4   we stand for.

5   Q.  What did you do before SB 1 about distribution of

6   applications for ballots by mail?

7   A.  Again, if anyone would call in, you know, we would mail

8   them.  And the one strong point we had in our office,

9   especially for large elections, and I know everybody hates

10  those phone trees where it's press one, press two, but we have

11  one of those automated phone systems in our office, so for

12  24-7 people can press three and get an application for a

13  ballot by mail, and they leave their name and their address

14  and how many applications they wanted.  So we had to change

15  that, obviously.

16      And then I have a staff member that comes in, in the

17  morning, and they will, out of that mailbox, they will take

18  50, or 75, or 100 different messages.  And what we've run into

19  with SB 1 is, you know, it will be obviously the husband,

20  would you please send two applications for myself and my wife,

21  blah, blah, blah, the address, and that's how we've always

22  done it; I need three, my son needs one.

23      And then, all of a sudden, we send one with a notice

24  saying we're only allowed to send one to you.  We must speak

25  with the other person, but by now they've lost time.  They

1042
JACQUELYN CALLANEN - DIRECT

 1  think we're incompetent, that that's the main thing because

 2  it's — we've taken a big hit on that.

 3      But, for me, personally, one of the hardest things — and,

 4  like I said, we deal with a lot of people and that's what

 5  makes this so worthwhile.  I wish you-all could have that

 6  sense of feeling of helping somebody actually vote.

 7      And as I said before, I'm on the phones like everybody

 8  else and so I've taken a phone call from a mother and she had

 9  asked, you know, could she please have two applications.  She

10  wanted one for herself and one for her son.

11      So I explained to her that I could just send her one since

12  I was speaking with her on the phone and could she please have

13  her son call, or if he was there could she put him on the

14  phone and I'd be glad to send one and she told me that was

15  impossible because her son was paralyzed and didn't speak.

16      You know, that's the stuff that hurts your heart.  That's

17  what makes it so difficult.  So for good or bad, and I — you

18  know, I recommended to her that she hang up and call back, and

19  that maybe she would have somebody else answer the phone and

20  she could put in for another application for ballot by mail.

21      Sometimes there's the right thing to do and SB 1 has

22  really tied our hands on that.

23  Q.  Now, do SB 1's limitations on distribution of applications

24  for ballots by mail prevent you from giving applications to

25  legal voters?

JACQUELYN CALLANEN - DIRECT

1   A.  Absolutely.

2   Q.  And to other civic groups?

3   A.  Absolutely.

4   Q.  And do the limitations prevent you from giving

5   applications to church groups?

6   A.  Yes, sir.

7   Q.  And, meanwhile, does the prohibition on distributing

8   ballots to people who haven't asked for them, does that apply

9   to the political parties?

10  A.  I'm sorry.  Would you ask me that again?

11  Q.  I said does the prohibition on distributing ballots to

12  people who haven't asked for them, is that a prohibition that

13  applies to the political parties?

14  A.  No.

15  Q.  So political parties or their consultants can distribute

16  as many applications for ballots by mail as they want?

17  A.  Yes, sir.

18  Q.  In your opinion, does the prohibition on election

19  administrators to distribute ballots by mail to anybody other

20  than a specific individual who is asking for it, is that a

21  prohibition that enhances the security of the ballot?

22  A.  No, sir.

23  Q.  Now, we already discussed the fact that the Texas Election

24  Code does not require any comparison between the signature on

25  an application for ballot by mail and an example of the voter

JACQUELYN CALLANEN - DIRECT

1  signature such as the signature on their registration form.

2  Do you think that having such a comparison would give more

3  protection to the application for ballot-by-mail process?

4  A.  Yes.

5  Q.  But that's not required by SB 1?

6  A.  Correct.

7  Q.  What is required is the entry of the ID numbers?

8  A.  Correct.

9  Q.  And is it correct that your office received significantly

10  more complaints and requests for assistance than usual

11  regarding the mail voting ID requirements of SB 1?

12  A.  Yes, sir.

13  Q.  Do you know of voters who were dissuaded for voting by

14  mail because of the ID provisions in SB 1?

15  A.  Yes.

16  Q.  Is it correct that your office was aware of voters who had

17  more than one mail ballot application rejected because of SB

18  1's ID requirements?

19  A.  Yes, sir.

20  Q.  And is it correct that your office tries to make

21  modifications or accommodations for voters with disabilities

22  who need accommodations or applications?

23  A.  Absolutely.

24  Q.  And is it correct that your office received requests for

25  assistance from voters with disabilities in the 2022

JACQUELYN CALLANEN - DIRECT

1  elections?

2  A.  Yes, sir.

3  Q.  And is it your understanding that if a voter with a

4  disability requests a change to a specific requirement in the

5  election code put in place by SB 1 to put in mail ballot

6  identification numbers, is it your understanding that you

7  can't make such a change for them?

8  A.  Correct.

9  Q.  Is it correct that your office does not track the request

10 that it receives for reasonable modifications or request from

11 assistance for voters with disabilities?

12 A.  Correct.

13 Q.  Now, in your 18 years of experience as an Election

14 Administrator, have you seen anything that gives you any

15 concern that there's a risk of voter fraud when an Election

16 Administrator gives out multiple applications for ballot by

17 mail?

18 A.  No, sir.

19 Q.  And based on your 18 years as Election Administrator here

20 in Bexar County, do you have any reason to think that the

21 prohibition in SB 1, Section 5.04, and the felony that SB 1

22 imposes on giving an application for ballot by mail to anyone

23 other than an individual voter who asks for one has made Texas

24 any safer from fraud in any way?

25 A.  No, sir.

1046

JACQUELYN CALLANEN - DIRECT

1  Q.  And based on your 18 years of experience as Election

2  Administrator in Bexar County, do you believe that the

3  prohibition in 5.04 of SB 1 and the state jail felony imposed

4  by SB 1 on giving an application for ballot by mail to anyone

5  other than an individual voter who asked for one has made it

6  more difficult for Texans to vote?

7  A.  Yes.

8  Q.  Now I'd like to turn to Section 5.08 of SB 1, which

9  requires the entry on the carrier envelope of the Texas

10  driver's license number, election identification certificate,

11  or personal identification card number issued by the

12  Department of Public Safety, and I think you have the envelope

13  there, if you would --

14  A.  Yes, sir.

15  Q.  -- just hold up the carrier envelope and show it.

16     Is there a flap on that?

17  A.  Yes, sir.

18  Q.  And it's under the flap that the voter must enter that

19  information?

20  A.  Absolutely.

21  Q.  Okay.  And do voters miss the information that's supposed

22  to add because the flap hides it from them?

23  A.  Yes.

24  Q.  And we'll also focus on Section 5.13 which requires

25  rejection of a ballot by mail, if the carrier envelope is not

*Gigi Simcox, RMR, CRR*

JACQUELYN CALLANEN - DIRECT

 1  properly filled out.  Am I correct that if the — well,

 2  withdrawn.

 3      Am I correct that your office has voter signatures on

 4  file?

 5  A.  Yes, sir.

 6  Q.  And that each time a voter signs, whether they are

 7  registering or voting in person, or applying for ballot by

 8  mail, or voting by mail if they succeed in doing it, you get a

 9  voter signature?

10  A.  Correct.

11  Q.  And that's an original signature?

12  A.  Correct.

13  Q.  And, of course, if they are voting in person, they are

14  coming up to the qualification table and identifying themself

15  with their ID before they sign their name?

16  A.  Yes, sir.

17  Q.  So those signatures are known signatures of the person who

18  is the voter, is that right?

19  A.  Yes, sir.

20  Q.  Am I correct that you have a computer system that collects

21  all those signatures?

22  A.  Yes, sir.

23  Q.  It clips them out?

24  A.  Correct.

25  Q.  Makes it possible for somebody who wants to compare them

1  to superimpose them?

2  A.  Correct.

3  Q.  So that you can see whether a person is signing the same

4  way as they have before?

5  A.  Yes, sir.

6  Q.  Am I correct that a signature comparison on either an

7  application for ballot by mail or a ballot by mail would take

8  less time than verifying the ID numbers?

9  A.  Yes.

10  Q.  And with regard to the —— and the ID numbers themselves,

11  of course, are not personal the way a signature is, are they?

12  A.  Right.

13  Q.  Have members of the public expressed concerns to you about

14  identity theft because of the requirement to putting their ID

15  numbers on the envelope?

16  A.  Yes, sir.  More so on the applications than the actual

17  carrier envelope.

18  Q.  Is it your view that the ID matching requirement has made

19  voting by mail more difficult for voters?

20  A.  Absolutely.

21  Q.  And has it also made elections more difficult for

22  Elections Administrators?

23  A.  Absolutely.

24  Q.  And is it true that the majority of ballots that were

25  rejected in Bexar County in the 2022 General Election were

1  rejected because of the ID number requirements?

2  A.  Yes, sir.

3  Q.  Did the State provide any funds for implementation of the

4  ID number requirement?

5  A.  No, sir, they didn't.

6  Q.  Are the voters who aren't using mail in because they are

7  concerned about identity theft?

8  A.  We heard a lot of that yes, sir.

9  Q.  And it's also the case, am I correct, that there remain

10  thousands of registered voters in Bexar County who do not have

11  either a driver's license or last four of their social

12  security number in their registration record?

13  A.  Correct.

14  Q.  And so even if such voters included both numbers on an

15  application or on a ballot, it couldn't be accepted because

16  those numbers aren't in the system?

17  A.  Correct.

18  Q.  And in the 2022 Primary in March, most of the mail ballots

19  that your office rejected were rejected because of reasons

20  related to SB 1's ID number requirements, is that right?

21  A.  Yes.

22  Q.  And, again, the same is true in November of 2022?

23  A.  Yes, sir.

24  Q.  When a person has his or her mail ballot rejected due to

25  lack of an ID match, does that give you any reason to believe

JACQUELYN CALLANEN - DIRECT

1  that the person was not actually qualified to vote?

2  A.  No, sir.

3  Q.  So, in other words, when a person has an application or

4  ballot rejected for lack of an ID match, that does not leave

5  you to believe that the person was trying to commit fraud?

6  A.  Correct.

7  Q.  Indeed, you believe that the people in Bexar County who

8  had their mail ballots rejected since SB 1 came in were

9  actually eligible voters, is that right?

10 A.  Correct.

11 Q.  Has your office ever referred a voter whose application or

12 ballot was rejected because of an ID problem to the Bexar

13 County District Attorney's Office?

14 A.  No, I wouldn't know that.

15 Q.  Okay.  Well, it's your office.  Has your office ever made

16 a referral?

17 A.  Right, we have not sent anyone there.

18 Q.  Has your office made a referral to the Attorney General

19 because of an ID number that didn't match?

20 A.  No, sir.

21 Q.  And since SB 1 was enacted, are you aware of voters in

22 Bexar County who were ultimately not able to vote, despite the

23 fact that they provided both their driver's license and their

24 social security number on the application or on ballot?

25 A.  Yes, sir.

JACQUELYN CALLANEN - DIRECT

1  Q.  And is it your view that eligible voters will continue to
2  have their ballots rejected because of SB 1's voter
3  identification requirements?
4  A.  Yes.  I think, as I said before, we expect an uptick in
5  2024, and they would not have been aware of what they had to
6  do.
7  Q.  Right.  In fact, there always will be new voters becoming
8  eligible to vote by mail, is that right?
9  A.  Yes, sir.
10  Q.  And with each election those voters will be confronting SB
11  1's mail identification requirements for the first time, is
12  that right?
13  A.  Correct.
14  Q.  And that includes people who are turning 65 and newly
15  eligible to vote?
16  A.  Correct.  As we've heard, the baby boomers are joining
17  those ranks.
18  Q.  So people I think of as the youngsters, they are turning
19  65?
20  A.  Yes, sir.
21  Q.  And it also includes people who become disabled and are
22  newly eligible to vote by mail because of their disability,
23  correct?
24  A.  Correct.
25  Q.  And some of these groups of voters are going to have their

JACQUELYN CALLANEN - DIRECT

1  applications or ballots rejected as a result of SB 1, is that

2  correct?

3  A.  Correct.

4  Q.  And specifically because of the ID requirements of SB 1?

5  A.  Yes, sir.

6  Q.  And as we sit here today, SB 1 has not yet been in place

7  during a Presidential Election, is that right?

8  A.  Correct.

9  Q.  And in your experience, is turnout significantly higher in

10  a Presidential Election than it is in a Mid-term Election

11  year?

12  A.  Yes, sir, it is.

13  Q.  So there are going to be many voters in Bexar County who

14  will be encountering SB 1's mail ballot ID requirements for

15  the very first time next year, is that right?

16  A.  That's what we think, yes, sir.

17  Q.  So there will be potential for confusion among those

18  voters who are trying to vote for the first time during the

19  2024 elections?

20  A.  Correct.

21  Q.  Let's turn now to Section 4.12 of SB 1 which restricts

22  in-person delivery of ballots by mail to one that's voted by

23  the voter and the voter must identify himself or herself to an

24  election official.  So can you explain how a voter brings

25  their ballot to an election official here in Bexar County?

JACQUELYN CALLANEN - DIRECT

1  A.  On Election Day only a voter may bring their voted mail

2  ballot down to the early voting clerk's office, and we only

3  have one office here in Bexar County, over on Frio Street, and

4  when they bring their voted ballot sealed in a carrier

5  envelope, when they present themselves they must show their

6  photo ID and they must sign in, just as if they were at a poll

7  site voting in person, because at that point they are voting,

8  and so we accept their mail ballot, we sign it in, and then we

9  put it in a locked ballot box until we turn those over,

10 however many there may be.

11     But they bring them in and we can only accept it from that

12 voter because as I just said, in reality, they are going to

13 show their photo ID and they are going to sign it in.

14 Q.  So when a voter comes in to your office and presents their

15 mail-in ballot on Election Day, that ballot is enclosed in the

16 carrier envelope, is that right?

17 A.  Yes, sir.

18 Q.  And that carrier envelope has to be filled out completely?

19 A.  Yes, sir.

20 Q.  So when you say you keep the ballots in a ballot box until

21 they are turned over, who do you turn them over to?

22 A.  The early ballot board.

23 Q.  Is it the early ballot board's job to verify that the

24 carrier envelope has been filled in correctly?

25 A.  Correct.

JACQUELYN CALLANEN - DIRECT

1  Q.  And so they are going to be checking the ID numbers on it,

2  is that right?

3  A.  Correct.

4  Q.  They do that with every single one they receive?

5  A.  Yes.

6  Q.  And that's true whether they are receiving it by mail, or

7  whether a voter came in, in person, and delivered it, is that

8  right?

9  A.  Correct.

10  Q.  So a voter who comes in, in person, and identifies himself

11  satisfactorily to an employee in your office, will then have

12  his ballot taken in, in its carrier envelope, for the early

13  ballot board, is that right?

14  A.  Yes, sir.

15  Q.  And if it should happen that one of the numbers is

16  missing, or the voter failed to fill in the carrier envelope

17  in a totally satisfactory way, that ballot would be rejected,

18  is that right?

19  A.  Correct.

20  Q.  So the voter coming in and identifying himself or herself

21  to an election official doesn't change the fact that they've

22  got to meet the carrier envelope requirements?

23  A.  Exactly.

24  Q.  Now, at the same time such a voter can't bring in an

25  identically completed ballot of carrier envelope, identically

JACQUELYN CALLANEN - DIRECT

1  in terms of the details that must be filled in, for the
2  voter's spouse or the voter's child, is that right?
3  A.  That's right.
4  Q.  So you are not going to accept a mail-in ballot on
5  Election Day for anybody other than a voter who identifies
6  himself?
7  A.  That's right.
8  Q.  So if a voter comes in and presents his mail-in ballot and
9  the carrier envelope is incomplete, the early voting ballot
10 board will reject it?
11 A.  Yes.
12 Q.  Meanwhile, if the voter's spouse mails in their ballot by
13 mail and the information is incomplete, that ballot will be
14 rejected the same way?
15 A.  Correct.
16 Q.  So it doesn't matter which one you do?
17 A.  Right.
18 Q.  So I'd like to turn for just a moment to the cure
19 provisions of SB 1 in Section 5.10, 5.14, 5.12.  Am I correct
20 that those cure provisions are not acted on by your office,
21 they are acted on by the early voting ballot board?
22 A.  Correct.
23 Q.  So the early ballots are handed in to the early voting
24 ballot board and they process them?
25 A.  Correct.

JACQUELYN CALLANEN - DIRECT

1  Q.  Now, Section 5.12 requires a notice of defect to go out by

2  the second business day from when the defect is noted,

3  correct?

4  A.  Correct.

5  Q.  So first the defect has to be noted and that may take some

6  time?

7  A.  Sure.

8  Q.  And then within two business days a notice has to go out?

9  A.  Yes, sir.

10  Q.  Do you think it's going to be possible for the early

11  voting ballot board here in Bexar County to meet that deadline

12  in 2024?

13  A.  I certainly hope so.  It just depends on, it's an economy

14  of scale, depending on how many they get in to work on

15  Election Day.

16  Q.  The early voting ballot board is going to need a large

17  number of people to do that work?

18  A.  Yes, sir.

19  Q.  And I take it that those individuals are paid?

20  A.  Yes, sir.

21  Q.  And it's your office that will be charged for that?

22  A.  Yes, sir.

23  Q.  Is there any funding from the State for it?

24  A.  No, sir.

25  Q.  So, again, the cost of that will be passed through to all

JACQUELYN CALLANEN – DIRECT

1  the entities that are holding elections?

2  A.  Yes, sir.

3  Q.  And the early voting ballot board members themselves are

4  all political appointees, is that right?

5  A.  Yes, sir.

6  Q.  Now I'd like to turn to Article 6 of the SB 1 and its

7  assister provisions.  Section 604 requires an oath to be

8  administered to each person who assists a voter, and am I

9  correct that that oath is delivered and must be sworn to for

10 each person that an assister helps?

11 A.  Correct.

12 Q.  And how is the oath administered?

13 A.  The in-person at the poll site.  The election official

14 will have the person who is going to assist raise their hand

15 and fill out the paperwork that we have there that's the oath

16 of assister.

17 Q.  And does the election judge read the oath to the assister

18 and have them repeat it back?

19 A.  Sometimes.  So sometimes they will do that.  Sometimes

20 they will just hand it to the person and say, you know, read

21 this, you know, do you swear this is correct.

22 Q.  Okay.  Does the requirement of this oath make lines longer

23 at polling places?

24 A.  Absolutely.

25 Q.  And I take it that for poll workers themselves, the poll

JACQUELYN CALLANEN - DIRECT

1  workers themselves sign an oath at the beginning of their day,
2  is that right?
3  A.  Correct.
4  Q.  And they don't need to for every voter they assist?
5  A.  Very good, correct.
6  Q.  Because they are assisting voters all day long?
7  A.  Yes, sir.
8  Q.  And about how much of the time do poll workers provide
9  assistance to disabled voters?
10 A.  I think in the course of the day probably 60 percent,
11 70 percent of the time the election officials are the
12 assisters.
13 Q.  Now, am I correct that under SB 1 a poll watcher is able
14 to get very involved in the assistance that's provided when
15 it's being provided by a poll worker?
16 A.  Correct.
17 Q.  On the other hand, when the assistance is provided by an
18 assister of the voter's choice, the poll watcher is not
19 supposed to be involved in that interaction?
20 A.  Correct.
21 Q.  And is it your understanding that if a voter with a
22 disability requests a change to the requirement in the
23 election code put in place by SB 1 of the assister oath, you
24 can't make that change?
25 A.  Correct.

JACQUELYN CALLANEN - DIRECT

1  Q.  And is it correct that you know of no instances where a

2  voter was forced to vote a certain way by an assister in the

3  2022 Election?

4  A.  Correct.

5  Q.  Now, do you have poll workers, either a judge, an

6  alternate, a clerk at each polling site who speaks Spanish?

7  A.  Absolutely.

8  Q.  And have poll watchers insisted when poll workers are

9  helping Spanish-speaking voters on having the poll worker

10 translate for them?

11 A.  Absolutely.

12 Q.  So that translation is not needed for the assistance to

13 the voter, right?

14 A.  Right.

15 Q.  That's only because the poll watcher wants to hear what's

16 being said?

17 A.  Yes, sir.

18 Q.  Now, before SB 1, during the November of 2020 General

19 Election, did poll watchers complain that the election judge's

20 signature on the ballots voided the ballots?

21 A.  Yes, sir, they did.

22 Q.  Now, I see that you are laughing about that.  Why are you

23 laughing?

24 A.  It's the law that their signature must be on the back of

25 the ballot.

JACQUELYN CALLANEN - DIRECT

1  Q.  So am I correct that every ballot that is voted in Texas

2  has an election judge's signature on the back of it?

3  A.  Yes, sir.

4  Q.  And, in fact, the ballot cards that you described earlier

5  in your testimony are each signed by an election judge?

6  A.  Correct.

7  Q.  And back in 2020, did you and the Bexar County

8  Administration of Elections have problems with poll watchers

9  who did not respect the COVID masking and distancing

10 requirements?

11 A.  That was very difficult.  Yes, sir, we did.

12 Q.  And what happened?

13 A.  Again, our officials literally kept reaching out to us for

14 help, was there some way we could stop the poll watchers from

15 literally standing behind them at the qualifying table.  And

16 some of our poll watchers were not abiding by the rules we had

17 set up for our officials.

18      If you all remember that, we had PPE and our election

19 officials were wearing masks and they had asked us to get them

20 those shields, and they were quite concerned about this and we

21 had nothing that we could do to have the poll watcher back,

22 because at that time it said that the poll watchers can sit or

23 stand conveniently to observe the election, and so they were

24 right behind the officials.  And we had some officials that

25 actually contracted COVID after they worked the election.

JACQUELYN CALLANEN - DIRECT

1  Q.  Were there any that were hospitalized?

2  A.  We had one that died, so, yes.  We had a couple that were

3  hospitalized.

4  Q.  Am I correct that in the 2020 Election in Bexar County

5  poll watchers did not expose any fraud?

6  A.  Not to my knowledge.

7  Q.  Now, the poll watchers are required to take — well, let

8  me withdraw that and ask it differently.

9      Sections 4.04 and 4.05 of SB 1 now mandate a training

10 program for poll watchers.  Are you familiar with that

11 training program?

12 A.  Yes, sir.

13 Q.  How do you know about it?

14 A.  Obviously we were told and we needed to know what we were

15 going to — how we were going to train our officials.  And so

16 part of SB 1 requires the poll watchers to have a certificate

17 of completion from the State's website that they completed

18 training, and so for our purposes here I took the training and

19 I printed off my own certificate and we used that as a model

20 to hand to each of our election officials because there's a

21 date that it's only good for.  It's about like six months I

22 think.  One was in August and the next one was in December.

23     So I took that first training so that we could have a

24 model to give to our election officials.

25 Q.  And have you now taken the training more than once?

1062

JACQUELYN CALLANEN - DIRECT

1  A.  Yes, sir.  I got the next generation, yes.

2  Q.  And when you took the next generation, can you describe

3  the training that was provided?

4  A.  It was insufficient in my opinion.  It was very

5  insufficient.

6  Q.  About how long did it take to do the training?

7  A.  About 15 minutes.

8  Q.  Was there any kind of test to see if you had learned the

9  material?

10  A.  The first one we had I referred to it as it was a joke.

11  What it was, is it was a PowerPoint that they went through,

12  with no requirements for answering any questions or anything.

13  They could just click through it and print their certificate.

14      So, boy, a lot of us made complaints about that and so the

15  Secretary of State said that, you know, they had improved it.

16  So when we went through the next one, it was two slides,

17  PowerPoint, and then they would ask a question after it, and

18  two more and they'd ask another question, so there was no

19  comprehensive test where they had to remember something or do

20  anything.

21      This time, they just had to highlight the answer.  So from

22  this standpoint we knew that somebody had to be there to put

23  in an answer, whereas before on the first one they could just

24  turn it on and walk away and then print their certificate.

25  Q.  So when a would-be poll watcher goes through this course

JACQUELYN CALLANEN - DIRECT

1   now, they look at two PowerPoint slides and then they have

2   questions about them?

3   A.  Yes, sir.

4   Q.  Are they able to look back at the slides?

5   A.  Of course, yes, sir.

6   Q.  And how long does to take to do the whole course?

7   A.  Maybe twenty minutes.

8   Q.  So if you're a slow reader, it might take half an hour?

9   A.  Yes, sir.

10  Q.  And can you compare that to the training that your

11  election judge has taken?

12  A.  As you heard me say, eight hours to start with.  But the

13  training for the secretary -- on the Secretary of State's site

14  for the election judges is more of a review where they can

15  begin and they sign in, based on the election system they

16  have, whether it's ES&S or Hart, and so it's a good 45 minutes

17  to an hour.

18  Q.  And that's in addition to your eight-hour course?

19  A.  Yes.

20  Q.  With an exam at the end?

21  A.  Yes, sir.

22  Q.  That you have to pass?

23  A.  Absolutely.

24  Q.  So the poll watchers essentially come in with their

25  certificate --

1  A.  Certificate.

2  Q.  —— but they don't really know how an election is run?

3  A.  That's the impression we've all gotten from a lot of our

4  officials.

5  Q.  They don't have the law training that you give your

6  officials, is that correct?

7  A.  Correct.

8  Q.  And they don't have the training on the equipment that you

9  give your officials?

10  A.  Correct.

11  Q.  Now, when a poll watcher arrives at the polls, am I

12  correct that the watcher must be qualified immediately?

13  A.  Yes.

14  Q.  So how does that happen?

15  A.  When a poll watcher comes in or enters the building, of

16  course, they need to go to the presiding judge, and it's the

17  presiding judge of that team and they present a certificate.

18      There is a certificate of appointment.  They are going to

19  give them two pieces of paper, a certificate of appointment,

20  and the certificate that they printed off from the Secretary

21  of State's training.

22      The appointment is the one where a candidate has chosen

23  them to be a poll watcher.  So the candidate fills out the top

24  and says, you know, Jackie Callanen is going to be at

25  Timberwilde Elementary, they have to tell where they are going

1065

JACQUELYN CALLANEN - DIRECT

1  to be, their name, the candidate says who they are, what
2  position they are running for, and then the candidate signs
3  that application, that they are appointing Jackie to this
4  site.
5      And in the presence of the candidate, the poll watcher is
6  supposed to sign.  There's a space where, you know, you have
7  been appointed, okay, you have to sign.  Now, when a person
8  walks into the poll site, they present this certificate to the
9  judge and the judge asks for photo ID first.
10     And then they check to see if that poll watcher resides in
11 the same district that the candidate is.  So if it's
12 statewide, they don't have to check, but if it's a school
13 board election, they need to see that they are in District 1.
14     Then the poll watcher will countersign the poll, the
15 appointment letter, and then it's the judge's responsibility
16 then to have them just look it over and see that that
17 certificate meant — the signatures match, and then they give
18 them the oath, and then they give them their badge and they
19 are good to go.
20 Q.  And so is that qualification of a poll watcher a
21 time-consuming process?
22 A.  It can be, if the judge has interrupt the flow of voters
23 to look on the laptop to make sure that that person resides in
24 the district they are appointed to.
25 Q.  Am I correct that SB 1 is inconsistent in that it requires

1066

JACQUELYN CALLANEN - DIRECT

1  voters to put down their original signature, but it does not
2  require original signatures on the poll watcher appointment?
3  A.  Correct.
4  Q.  And what has been your experience with that?
5  A.  We've been very frustrated with that because we have seen
6  numerous campaigns have one state candidate fill out his
7  portion, sign it, and then hand it off to, whether it's
8  campaigns or whatever, so they just hand it out, sort of like
9  candy.  And if you're going to be a poll watcher, here, take
10 this one and sign it, but the right hand side of the form
11 that's the candidates to fill out is all a copy.  We don't
12 have an original signature there.
13 Q.  So you've got a photocopied form with the candidate's name
14 on it but not the poll watcher's name?
15 A.  But the poll watcher will fill it in themselves.
16 Q.  So the poll watcher will fill in their name and the place
17 where they are going to watch?
18 A.  Yes, sir.
19 Q.  And do poll watchers have multiple copies that they can
20 fill in and go to different places?
21 A.  Absolutely.
22 Q.  And what is the five-hour rule?
23 A.  Until this legislative session ended, prior to that —
24 Q.  When you say "this one," you mean the one in 2023?
25 A.  2023, the one that just ended, because they changed it.

1067

JACQUELYN CALLANEN - DIRECT

1    Prior to that, if a poll watcher came in and a judge
2  accepted them, our policy was to train the judges to write the
3  time that the poll watcher appeared before them.
4    It wasn't necessary for them to be there at opening.  You
5  know, they didn't have a specific time, but what happened is
6  they had to stay in that poll site for five hours, and if they
7  stayed for five hours, then they could leave and come back.
8    So that's — you know, the judge didn't like to have a lot
9  of attention if they were going to stay there for the five
10 hours, they — but, again, that's why we had them mark the
11 time on that slip so that they can see that they actually
12 stayed there for five hours.
13   But what this last legislative session did is took away
14 the five-hour rule and said the poll watchers can come and go
15 at any time.  They don't have to stay.  They can come in and
16 check for five minutes, ten minutes, and then walk away and go
17 to another poll site.
18       THE COURT:  I'm missing this.  What's your complaint
19 about that?
20       No, I'm talking about from the plaintiffs'
21 perspective.
22       THE WITNESS:  I'm sorry.
23       MR. GENECIN:  Well, it's yet another way that the
24 poll watchers are licensed to interfere in the election, as
25 Miss Callanen I believe is going to testify.

JACQUELYN CALLANEN - DIRECT

1    THE COURT:  By just coming and going?

2    MR. GENECIN:  By coming and going and requiring that

3 they be qualified, which is a time-consuming process, each

4 time.

5    THE COURT:  Maybe what I missed, Miss Callanen, when

6 they come and go, under the new regime, when they come and go

7 what needs to take place?

8    THE WITNESS:  They still have to do that whole

9 process of coming in and swearing them and finding out that

10 they are, you know, in the same spot, and as we just heard

11 that's time-consuming.

12    THE COURT:  Is that required by the statute, or is

13 that just the protocol you have implemented?

14    THE WITNESS:  No, the time, you don't have to --

15 that's not by statute, but everything else is by statute, that

16 they have to appear before the judge, they have to swear

17 before the judge.

18    THE COURT:  That they have to do it all over again?

19    THE WITNESS:  They have to countersign it, and, yes,

20 what we are saying is this new rule that they just put in will

21 be problematic because they could send in four or five people,

22 which is going to stop the flow of whatever that team is doing

23 holding the elections, you know, if they have to bump off

24 somebody from the computer because they have to check whoever

25 lives in this district, it has the possibility of just

JACQUELYN CALLANEN - DIRECT

1   interrupting the smooth running of the poll.

2           THE COURT:  And I'm sorry, you said four or five,

3   four or five poll watchers?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  So there's no limitation on how many —

6           THE WITNESS:  The only limitation is that at no time

7   can a candidate have more than two physical bodies in that

8   same poll site.  So you can have — they could all of a sudden

9   have ten people there that are poll watchers, if five

10  candidates send in two from each one.

11  BY MR. GENECIN:

12  Q.  And, in fact, you could have 45 candidates on a ballot, is

13  that right?

14  A.  Correct.

15  Q.  So, in theory, you could have 90 poll watchers trying to

16  crowd in?

17  A.  In theory.

18  Q.  There wouldn't be room for them?

19  A.  No, sir.

20  Q.  Now, when this practice of having photocopied

21  appointments, to your knowledge, when did that begin?

22  A.  In 2020.

23  Q.  Did you raise a question about that with the Secretary of

24  State?

25  A.  Yes.  Yes, sir.

JACQUELYN CALLANEN - DIRECT

1  Q.  And what response did you get?

2  A.  We were told we had to accept that.

3  Q.  Am I correct that SB 1 forbids election officials to

4  remove a poll watcher, other than for a violation of the penal

5  code, unless the election judge or clerk has personally

6  observed the conduct, is that right?

7  A.  Yes, sir.

8  Q.  So that means that no action can be taken on the basis of

9  a voter complaint?

10  A.  Correct.

11  Q.  And does the requirement that watchers are entitled to sit

12  or stand near enough to see and hear and may not be denied

13  free movement throughout the polling site create difficulties

14  for your election judges?

15  A.  Yes.

16  Q.  And can you describe that?

17  A.  Again, we've gone from where they would sit or stand, and

18  like we talked about in 2020, they would be standing behind

19  the officials as they were qualifying people and they very

20  rarely went out on — we referred to it as the floor, so they

21  didn't go out on the floor.

22      But with the advent of the new rule where they had free

23  moment, all of a sudden they were intrusive.  We had tons of

24  complaints that the poll watchers were intrusive and the

25  voters felt intimidated because the poll watcher now would

JACQUELYN CALLANEN - DIRECT

1 come and stand behind them as they are voting.

2     You know, we like to think that they have all the privacy

3 in the world, but depending on, you know, how close that

4 voter — the poll watcher was, it was disturbing.

5     And at one poll we had a very aggressive poll watcher and

6 he was able to convince some of the voters that after they had

7 voted, and their ExpressCard, came back out with their

8 candidate selections, he had inserted himself before the

9 tabulator and was telling people that they had to show him

10 their ballot before they put it in, which caused all kinds of

11 trouble and we ended up having to send the sheriff out there

12 to quell that.

13 Q.  Am I correct that poll watchers now, under Section 4.08,

14 are entitled to observe the closing of the polling place, the

15 sealing and transfer of the memory card or flash drive or UBS

16 [verbatim] stick and to follow the transfer of the election

17 materials from the polling place to the counting office?

18 A.  Yes.

19 Q.  And has that been a problem?

20 A.  It has been with the new wave of poll watchers.  They've

21 always been there, and please understand from my standpoint, I

22 totally believe that the poll watchers serve a purpose, I

23 really do, it's a checks and balances, but now they've

24 become — I keep thinking of the word "intrusive," but what

25 they are doing is slowing down the process of opening or

1072

JACQUELYN CALLANEN - DIRECT

1 closing because it's within their right to ask for the serial
2 numbers that are on different, as we've talked about, what we
3 have different seals on specific pieces of equipment, and if
4 the judge is there, and we pray they have our manual in front
5 of them so they have walked through their steps, it's throwing
6 them off because now the poll watcher is talking to them and
7 demanding that they can't do the next step until the poll
8 watcher on their clipboard has said, this is the seal that
9 they broke, and they put down the number.

10     And at the end of the night, likewise, the same, they are
11 right there.  And again, we pray they've got our manual in
12 front of them so it closes smoothly, but just they are slowing
13 down the process and making the officials very, very nervous,
14 where they didn't happen before.

15     And now they are following them in their car.  While we
16 have had that occasionally maybe one or two, now it's almost
17 all of our election officials.  And, again, it's making them
18 very, very uncomfortable.

19     And I just had one of my officials tell us that if
20 something didn't change that she wasn't going to continue
21 because she wasn't going to be run off the road into a ditch
22 coming in.  And, again, that statement never should have been
23 made.

24 Q.  What have you been able to do to limit watchers who make
25 your election officials anxious?

JACQUELYN CALLANEN - DIRECT

1  A.  Nothing.

2  Q.  And in the past did poll watchers bring election

3  irregularities to your attention?

4  A.  Very rarely.

5  Q.  Since the enactment of SB 1, have poll watchers brought

6  any irregularities to your attention?

7  A.  Very rarely.  The poll watchers are taking their

8  information back to the parties or back to the candidate that

9  has signed them there.

10  Q.  So if there are any irregularities that they've observed,

11  you're not being notified of them?

12  A.  Correct.

13  Q.  Is there any restriction on a poll watcher leaving the

14  polling place and going out past the hundred-foot line and

15  acting as an electioneer?

16  A.  No, sir.

17  Q.  And the poll watcher can then stop acting as an

18  electioneer and come back to the polling place?

19  A.  Yes, sir.

20  Q.  Have poll watchers stood over election workers in your

21  central count office?

22  A.  Yes, sir.

23  Q.  Have they stood over your workers at the qualifying table?

24  A.  Yes, sir.

25  Q.  Have they stood behind voters as the voters were preparing

1  their ballot balance?

2  A.  Yes, sir.

3  Q.  I believe you had — well, withdrawn.

4      At your office is a person permitted to come in with a

5  firearm?

6  A.  Peace officers.

7  Q.  Anybody else?

8  A.  No.

9  Q.  Poll watchers?

10  A.  No.

11  Q.  I believe you had an incident involving a poll watcher who

12  did have a firearm?

13  A.  Yes, sir.

14  Q.  Could you describe that for us, please?

15  A.  It's with me personally.  It happened at the end of early

16  voting.  I just said how the, you know, the poll watchers are

17  there and they watch the officials close everything down and

18  then they drive down and the judges bring everything to us.

19      Now, the statute said that they return everything to the

20  early voting clerk, and as I said a long time ago, that's one

21  of the hats that I personally wear as the Elections

22  Administrator, so my duty is to be there.

23      And we use a part of our building like a warehouse and the

24  officials drive up in their car and give us that infamous

25  purple bag, and they give us back their laptop, and they give

1075

JACQUELYN CALLANEN - DIRECT

1    us the signature rosters, and we capture a lot of information

2    there.

3        And then the team, my team will bring me the purple bag

4    and our chain of custody form where I'll take that little seal

5    that's on it to prove that -- and I write it on the form and I

6    sign it and we give the time that that person -- so they have

7    a copy, so the judge has proof that, yes, they came down, and,

8    yes, they turned it in; all's good.

9        Well, that's occurring inside our building, not outside.

10   So, again, had some really aggressive poll watchers and they

11   were demanding to come into the building to watch what was

12   going on.  Well, you heard me say a little bit ago that the

13   only way a poll watcher form works is to be signed by the

14   presiding judge.  Well, there's no presiding judge in my

15   office as we're harvesting these, so there's no legal way for

16   them to come in.

17       So this caused quite a bit of friction because it was

18   like, you can't be here.  Well, the astute party poll watchers

19   had Christina Adkins' phone number and so they called

20   Christina.

21   Q.  And, just for the record, who is Miss Adkins?

22   A.  Oh, I'm sorry.  Christina Adkins is the Director of the

23   Elections for the Secretary of State's Office.

24       So they called Christina and were like, Jackie won't let

25   us in the building, and it's like -- so she put me on the

JACQUELYN CALLANEN - DIRECT

1  phone and she said you have to let them be in there.

2          THE COURT:  Was she aware they had guns?

3          THE WITNESS:  No, not at that time, but she sure did

4  the next day.

5          THE COURT:  And I'm curious, how did they have her

6  personal cell phone number?

7          THE WITNESS:  Oh, she — I mean, to certain parties

8  and people she gives her cell phone number to them.  I mean, I

9  can give you the names of the —

10         THE COURT:  What do you mean, is it applicable to

11 both parties or just one party?

12         THE WITNESS:  That I can't speak to.  I can speak to

13 the names of the people that I have had contact with, with

14 their handing the phone to me and saying, here, it's Christina

15 on the phone.

16         THE COURT:  And when someone comes in with a weapon,

17 either holstered or carried, let's talk about voting

18 locations, can they go into the voting location armed?

19         THE WITNESS:  No, sir.

20         THE COURT:  That's prohibited by law?

21         THE WITNESS:  Absolutely.  We have signs posted all

22 over.

23         THE COURT:  The reason I'm making a distinction is

24 you were just talking about the Frio building, right?

25         THE WITNESS:  Yes, sir.

1077

JACQUELYN CALLANEN – DIRECT

1  THE COURT:  So the Frio building as opposed to like

2  just a general election area which may or may not be a public

3  building, the Frio building is a public building, and so

4  weapons are prohibited in there?

5  THE WITNESS:  Yes, sir, and especially when we are a

6  voting site.

7  THE COURT:  Was it posted as no weapons?

8  THE WITNESS:  It was not posted because we were like

9  at our warehouse, but anytime we are transporting election

10  results, we have a deputy sheriff with us, and so about

11  halfway through the deputy sheriff came up to me and asked me

12  did I have any of the signs in the warehouse, the No Weapons,

13  and I said sure, and he said get me three of them and get me

14  some tape.

15  So I had one of the staff members give –– and I

16  watched him and he went and he put –– he put one on the wall

17  and then he put one on the door going outside.  And he went

18  outside and put one in.  And then he went over and stood where

19  he was.

20  And we completed the harvesting.  Everybody brought

21  their things in, and then these people followed myself and one

22  of my staff members and the deputy back to our vault where we

23  lock everything up, you know, we put all these purple bags in

24  a box that has a seal on it.  We write down the seal number

25  and put everything in the vault.

JACQUELYN CALLANEN – DIRECT

1    So now we're finished.  So the poll watchers left.
2   And — pardon me — I looked at the deputy and I said, what
3   the hell was that all about.  And he said he had seen it and
4   he said he — right behind you, the whole time, he had a gun.
5        And so my reaction was, why didn't you make him
6   leave, why did you let him be there.  And he said because
7   their training says you don't escalate it.  He said he knew
8   when I put the posters up that I knew that he had a gun.
9   BY MR. GENECIN:
10  Q.  Now, before SB 1 was enacted, am I correct that Bexar
11  County already had safeguards in place under the election code
12  to make sure that voters are who they say they are?
13  A.  Yes, absolutely.
14  Q.  And those safeguards were in place regardless of when a
15  voter chose to cast their ballot?
16  A.  Correct.
17  Q.  And I think you've said that based on your experience as
18  the Bexar County Elections Administrator there was no problem
19  of fraud that was addressed by any provision of SB 1, is that
20  correct?
21  A.  Correct.
22  Q.  And would it be fair to say that you agree that different
23  counties in Texas should be free, subject to the election law
24  to adopt different voting options that work best for them?
25  A.  Yes.

JACQUELYN CALLANEN - DIRECT

1   Q.  So, Miss Callanen, what message do you think SB 1 gives to
2   Election Administrators and county clerks?
3   A.  That basically with all the new instituted that we have to
4   do is that we need to be more uniform in what we're doing, all
5   the counties since there's 254 of us, and we need to get a
6   handle on that, but basically, you know, SB 1 just opened the
7   door to tell people that we hadn't been doing our jobs prior
8   to.
9   Q.  And do you believe that you were doing your job?
10  A.  Absolutely.
11  Q.  I think you said once that SB 1 put a target on your back?
12  A.  It certainly has.
13  Q.  What message do you think SB 1 gives to election judges
14  and poll workers?
15  A.  It's made them very uncomfortable.
16  Q.  And why is that?
17  A.  Again, because they feel that they have the target on
18  their back.  I mean, where somebody is watching them and they
19  are already presumed guilty, that they are doing something,
20  and that they have — this person has the opportunity to
21  interject themselves, you know.  And that, dare I say it, like
22  throws them off their game.
23  Q.  So do you think the message to election officials in this
24  state from SB 1 is that they are not to be trusted?
25  A.  Yes, sir.

JACQUELYN CALLANEN - DIRECT

1  Q.  And what message do you think SB 1 gives to minority
2  voters?
3  A.  I think, likewise, the same.  I mean, it's pervasive.
4  It's pervasive across all of our voters.
5  Q.  And what message do you think SB 1 gives to poll watchers?
6  A.  It empowers them.
7  Q.  Would it be fair to say that it empowers them although
8  they don't really understand the process?
9  A.  Yes.  If they had had better training, you know, maybe
10 they would understand more.
11 Q.  Does SB 1 reassure voters that elections are fair, or does
12 it fan the flames of suspicion?
13 A.  I can't speak to that.  I don't know how they feel.
14 Q.  How do you feel about it?
15     MISS HUNKER:  We would object, Your Honor, based on
16 lack of personal knowledge.
17     THE COURT:  It's asking her how she feels about it.
18 How could that be lacking in personal knowledge?
19     MISS HUNKER:  It seems to assume that she was —— it
20 was based on her conversations with other individuals.
21     THE COURT:  No, listen to the last question.  He
22 asked her how she felt.  That can't be asked for something
23 outside her knowledge.
24     MISS HUNKER:  I might have misheard, Your Honor.
25     THE COURT:  You can answer.

1          THE WITNESS:  Oh, thank you.

2          Yes.  I mean, again, it is basically thrown a pall

3   over everything, from our interaction with the voters, to

4   definitely the interaction with our election officials where

5   we have to, you know, adjust, you know, training, and have

6   these discussions of, you know, how we can protect them and

7   what we can do when we're actually in the throws of an

8   election.

9          MR. GENECIN:  Miss Callanen, thanks very much.  I

10  think my colleagues may have some questions and then the State

11  and the other defendants may have some as well.

12         THE COURT:  Anything else from this side?

13  BY MISS LONGORIA:

14  Q.  Good morning, Miss Callanen.

15  A.  Good morning.

16  Q.  My name is Julia Longoria and I represent LUPE plaintiffs.

17      I'm going to ask Derek to display LUPE 278.

18      Have you seen this document before, Miss Callanen?

19  A.  Yes, I certainly have.

20  Q.  Do you recognize these handwritten notes as notes drafted

21  by an agent or employee of Bexar County Election

22  Administrator?

23  A.  Yes.

24  Q.  And do you recognize this document as a record of the

25  communication between your office and Miss Esmeralda Perales

JACQUELYN CALLANEN - DIRECT

1  in regards to her March 2022 Primary mail ballot?

2  A.  Yes.

3  Q.  Do you recognize this document as a record of a

4  communication between your office and Mr. Louis Perales?

5  A.  Yes.

6  Q.  In regard to his March 2022 Primary Election mail ballot?

7  A.  Yes, ma'am.

8  Q.  This record was made during the normal course of business,

9  correct?

10  A.  Correct.

11  Q.  Okay.

12       MISS LONGORIA:  No more questions, Your Honor.

13       I pass the witness.

14       THE COURT:  Anything else from that side?

15       Why don't we give Miss Callanen and the rest of us a

16  lunch break.

17       What are we doing about all of these documents that

18  we have just talked about?  Are they going to be admitted?

19       MR. GENECIN:  Yes, Your Honor.  We'll mark them.  If

20  you'd like, I'll take your set and mark them, or I will

21  take —

22       THE COURT:  It doesn't matter to me which set, but

23  let's figure out how you want to use these things.

24       And then this last LUPE document, what are you doing

25  with it?

1083

JACQUELYN CALLANEN — DIRECT

1    MISS LONGORIA:  Your Honor, we would like to move to

2 admit LUPE 278, Your Honor.

3    THE COURT:  Any objections?

4    MISS HUNKER:  No, Your Honor.

5    THE COURT:  278 is admitted.

6    Okay.  Let's be back at 1.

7    MISS LONGORIA:  Thank you, Your Honor.

8    *(Recess)*

9    *(Change in reporter)*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (Change of reporter; 1:03 p.m.)
2                   COURTROOM OFFICER:  All rise.
3                   THE COURT:  Thank you.  Please be seated.
4          Your cross.
5                      DIRECT EXAMINATION
6   BY MS. HUNKER:
7   Q.    Kathlyn Hunker from the Attorney General's Office for the
8   State defendants.
9          Good afternoon, Ms. Callanen.
10  A.    Good afternoon.
11  Q.    In Texas, a voter can vote by personal appearance on
12  election day, correct?
13  A.    Correct.
14  Q.    Additionally, a voter can vote by personal appearance
15  during early voter period?
16  A.    Yes.
17  Q.    Texas has an open early voting period?
18  A.    Isn't that wonderful, yes.
19  Q.    That means anyone can vote during the early voting period?
20  A.    Yes.
21  Q.    No excuse required?
22  A.    Correct.
23  Q.    Early voting by personal appearance typically begins on
24  the 17th day before election day?
25  A.    Yes.
```

1    Q.    And continues through the fourth day before election day?

2    A.    Yes.

3    Q.    The exceptions being run-off elections?

4    A.    Correct.

5    Q.    And the elections held on a uniform date in May?

6    A.    Yes, that's Saturday.

7    Q.    In the case of run-off elections, the early voting period

8    begins on the tenth day before election day?

9    A.    Yes.

10   Q.    In the case of the May uniform date, early voting begins

11   on the 12th day before election day?

12   A.    Yes.

13   Q.    That means for November general election, Texas has nearly

14   two weeks of early voting?

15   A.    Yes, ma'am.

16   Q.    The same is true on the primaries?

17   A.    Yes, ma'am.  Uh-huh.

18   Q.    Voters in Bexar County have embraced early voting,

19   correct?

20   A.    Yes, ma'am.

21   Q.    And Bexar County operates under a vote center model?

22   A.    Correct.

23   Q.    This is otherwise known as countywide voting?

24   A.    Yes, ma'am.

25   Q.    Countywide voting allows a voter to vote by personal

1    appearance from any polling location in the county?

2    A.    Yes, ma'am.

3    Q.    This is in contrast to precinct-base voting, correct?

4    A.    Correct.

5    Q.    Where a voter can only vote at their home precinct?

6    A.    Yes, ma'am.

7    Q.    But in Bexar County, a voter can cast their ballot at any

8    point location in the county?

9    A.    Correct.

10   Q.    This is true during the early voting period?

11   A.    Yes.

12   Q.    This is true on election day?

13   A.    Yes.

14   Q.    The 2022 general election, Bexar County had about 50

15   polling locations during the early voting period, correct?

16   A.    Yes, ma'am.

17   Q.    For the entire early voting period, a voter in El Paso

18   County could cast their ballot at any one of these 50 or so

19   locations?

20   A.    In Bexar County.

21   Q.    That's right.

22   A.    Yes, ma'am.

23   Q.    Bexar County had 302 polling locations on election day,

24   correct?

25   A.    Yes, ma'am.

1    Q.    And on election day, a voter in Bexar County could cast

2    their ballot at any one of those 302 locations?

3    A.    Yes, ma'am.

4    Q.    For the first week of early voting, Bexar County had their

5    polling locations open from 8 a.m. to 6 p.m. for the

6    November 2022 general election?

7    A.    Yes, ma'am, ten hours.  Uh-huh.

8    Q.    Now, the Saturday of early voting, Bexar County had their

9    polling locations open from 8 a.m. to 8 p.m.

10   A.    Yes, ma'am.  Twelve hours.

11   Q.    Bexar County opened their polling locations for six hours

12   on Sunday?

13   A.    Yes, ma'am.

14   Q.    Specifically, the polls were open between 12 p.m. and

15   6 p.m.?

16   A.    Yes, ma'am.

17   Q.    Then for the last week of early voting, polls were opened

18   for 12 hours each day?

19   A.    Yes, ma'am.

20   Q.    Specifically from 8 a.m. to 12 p.m. -- I'm sorry, 8 a.m.

21   to 12 p.m.?

22   A.    Yes, ma'am.

23   Q.    Finally, on election day, Bexar County's 300 plus

24   locations were open for 12 hours?

25   A.    Yes, ma'am.

1    Q.    From 7 a.m. to 7 p.m.?

2    A.    Yes, ma'am.

3    Q.    And for all those hours, in early voting and on election

4    day, Bexar County voters could cast their ballot at any

5    location in the county?

6    A.    Correct.

7    Q.    You'd agree that the hours of Bexar County offers makes it

8    pretty easy for someone to vote if they want to vote during the

9    early voting period?

10   A.    Yes, ma'am.

11   Q.    And you'd agreed that the hours at Bexar County offers

12   makes it pretty easy for someone to vote if they want vote on

13   election day?

14   A.    Yes, ma'am.

15   Q.    You'd agree that Bexar County provides its residence ample

16   opportunities to vote in person?

17   A.    Yes, ma'am.

18   Q.    Bexar County started using countywide voting in 2019,

19   correct?

20   A.    Yes, ma'am.

21   Q.    You were the election administrator at the time?

22   A.    Yes, ma'am.

23   Q.    When Bexar County first implemented countywide voting,

24   there was a learning curve for voters, correct?

25   A.    Yes, a very short one.

```
1    Q.    There was also a learning curve for your office?

2    A.    Yes, ma'am.

3    Q.    But by the second time around, you had gotten a lot

4    savior, correct?

5    A.    Correct.

6    Q.    Since Bexar County introduced countywide voting, about

7    40 percent of Bexar County's election day voters vote outside

8    their home precinct, correct?

9    A.    Yes, that's pretty instead.

10   Q.    And countywide voting makes voting easier in Texas?

11   A.    Yes, ma'am.

12   Q.    Bexar County was able to staff all its early voting

13   locations for November 2022 general election, correct?

14   A.    Yes, ma'am.

15   Q.    Bexar County was able to staff all 302 election day

16   polling locations for November 2022 general election?

17   A.    Yes, ma'am.

18   Q.    You're not aware of any voters on election day who were

19   otherwise eligible to vote in the November 2022 general

20   election but were unable to do so because of personnel

21   shortages?

22   A.    I'm sorry.  I don't understand.

23   Q.    You're unaware of any voters on election day who were

24   otherwise eligible to vote but were unable to do so for the

25   November 2022 general election because of personnel or staff
```

1    shortages?

2    A.    Oh.    Thank you.    No.

3    Q.    And you're not aware of any voters required to wait

4    significant additional wait time on election day because of

5    personnel shortages?

6    A.    No.    We did have one site that they did have to wait at.

7    But it was more of an issue of the type of voter that they were

8    getting.

9    Q.    It is typical to see some level of attrition among

10   election judges and poll workers; is that correct?

11   A.    Yes, ma'am.

12   Q.    So if one exception in Bexar County did not have any

13   significant problems with wait time, correct?

14   A.    Correct.

15   Q.    The only exception was The University of Texas,

16   San Antonio?

17   A.    There you go.    Yes, ma'am.

18   Q.    And that instance many of the students that came to vote

19   were not registered to vote in Bexar County; is that right?

20   A.    Correct.

21   Q.    It took more time to process these voters?

22   A.    Yes, ma'am.

23   Q.    Which led to longer than normal wait times?

24   A.    Yes, ma'am.

25   Q.    But outside of UTSA, you're not aware of any polling

1    location in Bexar County that had longer than normal wait times

2    for the November 2022 general election?

3    A.    Correct.

4    Q.    I want to shift gears for a minute and discuss poll

5    watchers.  Poll watchers have been part of Texas elections

6    since before you started with the Bexar County election's

7    office, correct?

8    A.    Yes, ma'am.

9    Q.    They're an important piece of the puzzle?

10   A.    I believe that.

11   Q.    The role of poll watchers is to make sure that elections

12   are run as they should?

13   A.    Yes, ma'am.

14   Q.    The role of poll watchers is to make sure that elections

15   are with integrity?

16   A.    Yes, ma'am.

17   Q.    The role of poll watchers is to make sure that everyone

18   gets to vote?

19   A.    Yes, ma'am.

20   Q.    In your experience, poll watchers generally concentrate

21   more at polling locations with the highest amount of voters,

22   correct?

23   A.    Yes, ma'am.

24   Q.    And the election codes specifies certain activities that

25   poll watchers may not observe, correct?

1  A.    Correct.

2  Q.    For example, a poll watcher may not be present at the

3  voting station when a voter is preparing their ballot?

4  A.    Correct.

5  Q.    A poll watcher may not be present at the voting station

6  when a voter is being assisted by a person of the voter's

7  choice?

8  A.    Correct.

9  Q.    A poll watcher does not have the right to observe areas of

10 election office that is not being used for the designated

11 activities?

12 A.    Correct.  I wish they paid attention to that; but, yes.

13 Q.    The election code also specifies certain actions that a

14 poll watcher cannot take, correct?

15 A.    Yes.

16 Q.    I want to take a quick look at them.  If we can pull up

17 Section 33 -- Chapter 33 of the Texas Election Code,

18 specifically Section 33.058.

19         MS. HUNKER:  If you could go to 33.058.

20 Q    (By Ms. Hunker) While on duty, a poll watcher may not

21 speak with an election officer regarding the election except to

22 call attention to a regularity or a violation of law; is that

23 correct?

24 A.    Correct.

25 Q.    A poll watcher may not speak with a voter?

1    A.    Correct.

2    Q.    And yet according to the election code, a poll watcher may

3    not communicate in any manner with a voter regarding an

4    election?

5    A.    Correct.

6    Q.    In addition, a watcher may call to the attention of an

7    election worker a suspected irregularity or a violation of the

8    law?

9    A.    Correct.

10   Q.    But if the election worker referred the poll watcher to

11   the presiding officer, the watcher can no longer discuss the

12   alleged irregularity with the election worker unless the

13   presiding officer invited the discussion?

14   A.    Correct.

15   Q.    And these rules pre-existed Senate Bill 1, correct?

16   A.    Yes, ma'am.

17   Q.    And let's take a quick look at Chapter 32 of the election

18   code.  We're going to specifically look at Section 32.075,

19   Subsection G.

20         Under the election code, a presiding judge may have a poll

21   watcher removed from the polling place for violating the

22   election code if the action was observed by an election judge

23   or clerk, correct?

24   A.    Correct.

25   Q.    There is an exception, however, for violations of Penal

1    Code, correct?

2    A.    Correct.

3    Q.    A presiding judge may remove a poll watcher for a

4    violation of the Penal Code, even if the violation is not

5    witnessed by an election judge or clerk?

6    A.    Correct.

7    Q.    Let's take a quick look at some of the violations

8    specified in the Election Code.

9           MS. HUNKER:  Brian, if you can please pull up

10   Chapter 276 of the Election Code, specifically Section 276.001.

11   Q.    (By Ms. Hunker) So a person commits an offense if he harms

12   or threatens the voter because of how the voter voted; is that

13   correct?

14   A.    Correct.

15   Q.    A person also commits an offense if a person knowingly

16   removes or attempts to remove ballots from the ballot box?

17   A.    Correct.

18   Q.    It remains illegal for a poll watcher to harm or threaten

19   a voter?

20   A.    Yes.

21   Q.    It remains illegal for a poll watcher to remove or attempt

22   to remove ballots from a ballot box?

23   A.    Correct.

24   Q.    SB 1 did not change that?

25   A.    Correct.

```
 1              THE COURT:  Can a poll watcher train the Secretary of
 2   State's office facility, do they go over all that?
 3              THE WITNESS:  No.
 4   Q    (By Ms. Hunker) You're not aware of any reported incident
 5   in the November 2022 election where an election judge whisked
 6   to remove a poll watcher because of the poll watcher's behavior
 7   but was unable to do because of Senate Bill 1?
 8   A.   Yes.
 9   Q.   Likewise, to your knowledge, nothing that the poll
10   watchers did in connection with the November 2022 election
11   increased wait times?
12   A.   Correct.
13   Q.   And do you recall our conversation back in April of 2022?
14   A.   Probably, if you remind me.
15   Q.   There was a lot of hypes surrounding poll watcher
16   provisions in SB 1.
17   A.   Yes, ma'am.
18   Q.   SB 1 predecessor bills had provisions that raised concern
19   for your election workers?
20   A.   Absolutely.
21   Q.   Such as the provision that would allow poll watchers to
22   use video cameras?
23   A.   Yes.
24   Q.   In reality, the final version of SB 1 was taken out?
25   A.   Correct.
```

1096

1    Q.    Those provisions were taken out?

2    A.    Yes, modified to just our office.

3    Q.    But the media had reported about the earlier provisions,

4    correct?

5    A.    Correct.

6    Q.    And you believe that the loss of poll watcher -- let me

7    repeat that.  You believe the loss of poll workers was at

8    least, in part, a result of the hypes surrounding SB 1?

9    A.    Yes.

10   Q.    Under Texas law, if a voter is physically unable to enter

11   the polling place without personal assistance or likelihood of

12   injuring the voter's health, the voter has an option of voting

13   curbside, correct?

14   A.    Correct.

15   Q.    If a voter chooses this option, an election officer will

16   deliver a ballot to the voter at the polling place's entrance

17   or curb?

18   A.    At the curb, yes, ma'am.

19   Q.    Bexar County offers this option at each polling location,

20   correct?

21   A.    Correct.

22   Q.    And every polling location in Bexar County has a parking

23   area reserved for voters who vote curbside?

24   A.    Correct.

25   Q.    Bexar County plans on offering curbside voting in future

```
 1   elections?

 2   A.    Absolutely.

 3   Q.    I'm going to turn now to State Exhibit 236.  Do you see

 4   the exhibit on your screen?

 5   A.    Yes, ma'am.

 6   Q.    Do you see on top where it says Vote TxDOTgov?

 7   A.    Yes, ma'am.

 8   Q.    You see it says powered by the Texas Secretary of State?

 9   A.    Yes, ma'am.

10   Q.    And Vote TxDOTGov is a website hosted by the Secretary of

11   State's Office, correct?

12   A.    Correct.

13   Q.    And the title of this particular web page is services

14   available to voters with disabilities in Texas.  Did I read

15   that correctly?

16   A.    Yes, ma'am.

17   Q.    I want to jump to the section that reads accessible voting

18   systems.

19   A.    Okay.

20   Q.    It reads, "In every federal election, and most nonfederal

21   elections, each polling place will offer at least one type of

22   accessible voting equipment."  Correct?

23   A.    Correct.

24   Q.    Bexar County goes beyond that requirement, correct?

25   A.    Yes, ma'am.
```

```
 1   Q.    Every one of your election units in Bexar County is ADA

 2   accessible?

 3   A.    Absolutely.

 4   Q.    Let's jump to the next section of the web page called "All

 5   Polling Places Must Be Accessible."  Do you see that?

 6   A.    Yes, ma'am.

 7   Q.    This section lists the accessibility standard polling

 8   places must meet, correct?

 9   A.    Correct.

10   Q.    To your knowledge, Bexar County does its best to have its

11   polling location satisfy this criteria, correct?

12   A.    Correct.

13   Q.    And you'd agree with me that the Bexar County Election

14   Administrator's Office works to ensure that its voting program

15   is accessible for voters with disabilities?

16   A.    Yes, ma'am.

17   Q.    You'd agree that the -- that the Bexar County Election

18   Administrator's Office take its responsibilities under the ADA

19   seriously?

20   A.    Absolutely.

21   Q.    You're aware that voters with disabilities have the option

22   of requesting accommodation or change in the voting procedure,

23   correct?

24   A.    I'm not sure I understand.

25   Q.    Let me rephrase.
```

1          You're aware that voters with disabilities have an option
2     of requesting an ADA accommodation or change to a voting
3     procedure or practice?
4     A.    Yes.
5     Q.    And it's your experience that when a voter requesting ADA
6     accommodation your office does its best to provide one?
7     A.    Yes, ma'am.
8     Q.    To your knowledge, your office did not receive a request
9     during the November 2022 election for an ADA accommodation
10    regarding any one of SB 1's revisions?
11    A.    Not SB 1 revisions.
12    Q.    And you're aware on occasion that voters will ask for
13    assistance to vote, correct?
14    A.    Yes, ma'am.
15    Q.    When a voter requests assistance to vote, the voter can be
16    provided assistance by the election worker at the polling
17    location, correct?
18    A.    Yes, ma'am, two.  Two are required.
19    Q.    And the voter can also request assistance from a third
20    party?
21    A.    Yes.
22    Q.    Bexar County leaves it up to the voter to decide whether
23    he or she is eligible to receive assistance, correct?
24    A.    Correct.
25    Q.    Prior to SB a, a person who assisted a voter was required

1500

1  to take the oath of assistance, correct?

2  A.    Yes, ma'am.

3  Q.    In addition, pre-SB 1, a person who assisted the voter

4  provided their name and signature?

5  A.    Yes, ma'am.

6  Q.    But they did not provide their address, relationship or

7  whether they received compensation from a candidate, campaign

8  or political committee?

9  A.    Exactly.

10  Q.    Under the old system pre-SB 1, the assister's signature

11  was not tide to a person, correct?

12  A.    Right.  That was a problem, yes, ma'am.

13  Q.    It did not have an address?

14  A.    Right.

15  Q.    It did not identify who the assistor was assisting?

16  A.    Correct.

17  Q.    And so it wasn't very helpful?

18  A.    No, you're absolutely right.

19  Q.    You consider the change form with the additional

20  information an improvement from what came before?

21  A.    Yes, ma'am.

22  Q.    You also supported the open assistance?

23  A.    Absolutely.

24  Q.    SB 1 changed the open assistance, correct?

25  A.    Yes, ma'am.

1    Q.    And based on your experience, you would characterize the

2    changes made to the open assistance to be minor, correct?

3    A.    No.  No, I can't say that.

4    Q.    Based on your experience, you would characterize changes

5    made to the form to be minor?

6    A.    No, I can't say that either.

7    Q.    You viewed SB 1 changes to the open assistance to be an

8    improvement, correct?

9    A.    Yes, ma'am.

10   Q.    Your office has a contract with the company called Deaf

11   Link?

12   A.    Certainly.

13   Q.    In the event a voter needs to communicate using American

14   Sign Language, you have lap tops?

15   A.    Yes, ma'am.

16   Q.    You push a button and there is someone that communicates

17   with the voter?

18   A.    In American Sign Language, yes, ma'am.

19   Q.    Your office worked with the deaf community during the

20   November 2022 election?

21   A.    Yes, ma'am.

22   Q.    Members of the deaf community would make appointments to

23   vote?

24   A.    Yes, ma'am.

25   Q.    You then had staff members who would take the laptop out

1    to meet the voter at the assigned time?

2    A.    Correct.

3    Q.    You do not know if -- how Deaf Link and the other

4    organizations notified members within the deaf community about

5    this accommodation, correct?

6    A.    On all of our publications, we specified that we have Deaf

7    Link.

8    Q.    But you cannot be certain that everyone was able to take

9    advantage of the accommodation, correct?

10    A.    Right, I wouldn't know.   Right.

11    Q.    But outside of that possible exception, you were not aware

12    of any individual who was not able to get assistance that they

13    wanted or needed in connection with the November 2022 general

14    election in Bexar County?

15    A.    Not to my knowledge.

16    Q.    During your tenure as an election administrator, you

17    expressed concern about campaigns bringing vans of voters to

18    vote curbside?

19    A.    Yes, ma'am.

20    Q.    To be specific, you were concerned that voting under those

21    circumstances wasn't private.

22    A.    Correct.

23    Q.    This is because the driver would not exit the van?

24    A.    Absolutely.

25    Q.    The driver would hear the voter's conversation with the

1    election worker?

2    A.    Correct.

3    Q.    In the case of a primary, the voter would hear -- sorry --

4    the driver would hear which party ballot the voter would pick?

5    A.    Yes, ma'am.

6    Q.    In addition, you were concerned that the person driving

7    the van was forcing people to vote a certain way?

8    A.    Yes, ma'am.

9    Q.    You recall this happening at least three locations?

10   A.    Yes, ma'am.

11   Q.    Las Palmas?

12   A.    Uh-huh.

13   Q.    Shavano Park?

14   A.    Shavano, yes.

15   Q.    McCreless Library?

16   A.    Yes, ma'am.

17   Q.    There was one individual, Mr. Gallagos, who was very

18   familiar with an election judge, correct?

19   A.    Correct.

20   Q.    If he was not asking for curbside, he was taking voters to

21   the polls?

22   A.    Correct.

23   Q.    You received complaints that there was someone at the poll

24   site talking to people in the voting booth?

25   A.    Correct.

1    Q.    These complaints came from voters?

2    A.    Yes, ma'am.

3    Q.    You told the election judge that the situation could not

4    continue?

5    A.    Yes, ma'am.

6    Q.    Mr. Gallagos actions created a huge perception?

7    A.    It certainly did.

8    Q.    Because of the perception, you retired that election

9    judge, correct?

10    A.    Yes, ma'am.

11    Q.    Then once the election judge wasn't there, Mr. Gallagos

12    started driving van loads to the polls to vote curbside,

13    correct?

14    A.    Correct.

15    Q.    You believe this was because he no loner had easy access

16    to the polling site?

17    A.    Yes.

18    Q.    Senate Bill 1 requires that a person who simultaneously

19    transports seven or more voters to vote curbside complete and

20    sign a form?

21    A.    Yes, ma'am.

22    Q.    You appreciated that provision?

23    A.    I did.  It needs to be modified, but I did.

24    Q.    You thought it increased the protection of voters?

25    A.    Yes, ma'am.

1  Q.   To the best of your knowledge, you're not aware of anyone

2  in Bexar County who was unable to vote in person during the

3  November 2022 election because of Senate Bill 1, correct?

4  A.   Correct.

5  Q.   Overall, you would consider the November 2022 election of

6  Bexar County to be a success?

7  A.   Yes, ma'am.

8  Q.   You would categorize as more successful than the

9  March 2022 primary?

10 A.   Absolutely.

11 Q.   Organizations are not supposed to compensate people for

12 the number of registration applications they submit, correct?

13 A.   Correct.

14 Q.   But if organizations get around this by paying people per

15 hour?

16 A.   Yes, ma'am.

17 Q.   You observed that the deputy registrars paid by these

18 organizations would submit incomplete or duplicate registration

19 forms?

20 A.   Absolutely.

21 Q.   A number of people would bring multiple cards that they

22 had signed themselves?

23 A.   Yes, ma'am.

24 Q.   You know this because you had the forms in hand and they

25 were signed by the same person?

1106

```
1   A.   Yes, ma'am.

2   Q.   The paid deputy registrars would have an incentive to

3   bring more registration forms to impress the organization they

4   were working for?

5   A.   Yes.

6   Q.   And the registration forms, the paid registers handled,

7   they have the voter's social security number or Texas Driver's

8   License number, correct?

9   A.   They do now, yes, ma'am.

10  Q.   Your office was able to reduce mail ballot rejection rates

11  in the November 2022 election as compared to the March 2022

12  primary?

13  A.   Absolutely.  Very proud of that fact.

14  Q.   For the March 2022 primary, the mail ballot rejection rate

15  was over 20 percent, correct?

16  A.   Yes, ma'am.

17  Q.   That is unacceptable?

18  A.   Unacceptable.

19  Q.   In contrast, the mail ballot rejection rate in Bexar

20  County for the November 2022 general election was approximately

21  1.7 percent, correct?

22  A.   Yes.

23  Q.   In a normal election, Bexar County will have a mail ballot

24  rejection rate of 3 to 4 percent, correct?

25  A.   Yes, ma'am.
```

1507

Q.   But in November 2022, the mail ballot rejection rate was

only about 1.7 percent, correct?

A.   Yes, ma'am.

Q.   The mail ballot rejection rate for the November 2022

election was less than the rejection rate Bexar County

typically has had in past elections?

A.   Correct.

Q.   And to your recollection, the mail ballot rejection rate

from November 2022 was less than the rejection rate in

November 2020?

A.   Correct.

Q.   That 1.7 rejection rate for the November 2022 election,

that included all mail ballot defects, correct?

A.   Correct.

Q.   And so it would have included ballots that left off the

signature?

A.   Yes.

Q.   It would have included ballots that has a signature

mismatch?

A.   Correct.

Q.   And it would have included ballots that did not contain a

required statement of residence?

A.   Correct.

Q.   A mail ballot also may sometimes be rejected for multiple

reasons?

```
 1   A.    Yes, ma'am.

 2   Q.    In that case, even if the ID number mismatched had not

 3   occurred, the ballot still would have been rejected?

 4   A.    Correct.

 5   Q.    You take satisfaction reducing rejection rate, correct?

 6   A.    Absolutely.

 7   Q.    And you should, your office worked to reduce the mail

 8   ballot rejection rate, did it not?

 9   A.    Yes, ma'am.

10   Q.    Your office included an insert with the application for

11   ballot by mail, correct?

12   A.    Yes, ma'am.

13   Q.    And that insert informed voters of the ID number

14   requirement?

15   A.    Correct.

16   Q.    You would send voters a new registration form with any

17   written notice of rejection?

18   A.    Yes.  With the application, yes, ma'am.

19   Q.    And that's because a voter can update the ID numbers for

20   the voter registration filed by submitting a voter registration

21   form with those numbers?

22   A.    Correct.

23   Q.    Voters, in fact, must provide a Texas ID number or social

24   security number now to register to vote?

25   A.    Yes.  I would only correct you to say a Texas Driver's
```

1    license number.  I mean, I don't want to mix it up with an ID

2    number.

3    Q.    Thank you for the clarification.

4          So voters, in fact, must provide a Texas driver's license

5    number or social security number to register to vote?

6    A.    Yes, ma'am.

7    Q.    The Secretary of State will then verify that Texas

8    driver's license number or social security number when signing

9    the voter or registration number?

10   A.    Correct.

11   Q.    Your office also engaged in voter education?

12   A.    Yes, ma'am.

13   Q.    You held press conferences?

14   A.    Yes, ma'am.

15   Q.    Twice a week?

16   A.    Yes, ma'am.

17   Q.    You conducted media blitzes?

18   A.    Yes, ma'am.

19   Q.    You worked with radio stations?

20   A.    Absolutely.

21   Q.    TV stations?

22   A.    Absolutely.

23   Q.    You utilized social media?

24   A.    Yes, ma'am.

25   Q.    You worked with the AARP?

```
 1   A.    Yes, ma'am.

 2   Q.    And you worked with the disability community?

 3   A.    Yes, ma'am.

 4   Q.    Your commissioners court did their own outreach as well?

 5   A.    Correct.

 6   Q.    And that was separate and apart from what your elections

 7   office did?

 8   A.    Correct.

 9   Q.    You anticipate duplicating your efforts in 2024, correct?

10   A.    Absolutely.

11   Q.    But you haven't planned out beyond 2024, correct?

12   A.    Correct.

13   Q.    When a carrier envelope arrives, your office removed the

14   perforated flap to check whether the voter has entered an ID

15   number?

16   A.    Yes.  We're permitted now.

17   Q.    You did not have this option during the March 2022

18   primary?

19   A.    Correct.

20   Q.    But you did remove the perforated flap in November 2022

21   general election?

22   A.    Correct.  I don't want to say removed, but we were able to

23   go across, push and fold it down to check the numbers.  And

24   then we had to put it back up so that we could scan it for the

25   signature without anyone seeing their numbers.
```

1    Q.    But this allowed your office to identify the ballot defect

2    earlier, correct?

3    A.    Yes.

4    Q.    And you hired additional temporary workers to remove or to

5    check the perforated flap?

6    A.    Yes.

7    Q.    Your office included an insert in the balloting materials?

8    A.    Yes, ma'am.

9    Q.    That insert informed voters of the ID number requirement?

10    A.    Yes, ma'am.

11    Q.    Your office developed that insert?

12    A.    Yes, ma'am.

13    Q.    You went through multiple iterations of the carrier

14    envelope insert?

15    A.    Yes, ma'am.

16    Q.    You started with the black and white insert?

17    A.    It had a lot of legalese on it.  Yes, ma'am.

18    Q.    But that didn't jump out voters, correct?

19    A.    No.

20    Q.    So you had one with duller colors?

21    A.    Yes.

22    Q.    But you didn't think that jumped out enough at them

23    either?

24    A.    Right.  We did better in the mail election, but, still, we

25    needed some more.

1  Q.   So you designed a new insert for the November 2022

2  election?

3  A.   Yes, ma'am.

4  Q.   It had bright colors?

5  A.   Yes, ma'am.

6  Q.   You made it a quarter sheet?

7  A.   Yes, ma'am.

8  Q.   I think you said this was Evil Jackie?

9  A.   Yes, ma'am.

10 Q.   But this way it would fall out of the carrier envelope

11 when the voter removed their materials?

12 A.   Correct.

13 Q.   And I just want to quickly introduce State's Exhibit 77

14 and 78.  State Exhibit 77 is also joint Exhibit 41.

15     And so this was the insert you used for the May election,

16 correct?

17 A.   Correct.

18 Q.   And let's take a quick look at 78.  And so this one is the

19 one you would have used for the November election?

20 A.   Correct.

21 Q.   Bright colors, easy to read?

22 A.   Yes, ma'am, we think so.

23 Q.   You designed the insert to be attention grabbing as

24 possible?

25 A.   Absolutely.

1    Q.    And it worked?  Bexar County reduced its rejection rate to

2    1.7 percent in the general election.

3    A.    Correct.  And Secretary of State John Scott had a press

4    conference and praised the insert from Bexar County.

5    Q.    There are other circumstances your office has relied on

6    inserts, correct?

7    A.    Yes.

8    Q.    In particular, the election code states that voters need

9    to use more than one stamp to return a mail ballot.  You have

10   to put a notice that the ballot alerted the voter?

11   A.    Correct.

12   Q.    Accordingly, your office includes an insert, a carrier

13   envelope, when you have a two-page 17 inch ballot that weighs

14   more than 1 ounce?

15   A.    Correct.

16   Q.    The insert pertaining to postage has proven effective?

17   A.    Correct.

18   Q.    In your experience, voters read the insert?

19   A.    Correct.  Again, we put it on bright colored paper.

20   Q.    They understand the insert?

21   A.    Yes.

22   Q.    And the insert helps them avoid confusion that they may

23   have otherwise experienced?

24   A.    Correct.

25   Q.    I want to quickly refer to the carrier envelope that

1    opposing counsel had brought up this morning.

2    A.    Yes, ma'am.

3    Q.    And so when you open the flap, the ID numbers are here,

4    correct?

5    A.    Right here, yes.

6    Q.    And you have to -- sorry, I didn't mean to interrupt.

7    A.    It would be hidden, yes, ma'am.

8    Q.    And so when you open the flap and to put your materials

9    in, you have to have the flap open, correct?

10   A.    Correct.

11   Q.    And so you have to have the place for the ID numbers

12   exposed, correct?

13   A.    Is visible, yes, ma'am.

14   Q.    You discussed this morning voters who didn't have a

15   carrier envelope with them when they went to vote in person

16   and, therefore, voted provisionally, correct?

17   A.    Correct.

18   Q.    That happens every election, correct?

19   A.    Yes, ma'am.

20   Q.    Some voters even use a mail ballot as a sample ballot?

21   A.    Yes.

22   Q.    The requirement that they vote provisionally, that's to

23   ensure that someone doesn't vote twice, correct?

24   A.    Correct.

25   Q.    Even if it's inferred?

1    A.    Yes.

2    Q.    Likewise, you take precautions to ensure that someone

3    doesn't vote at one location only to vote at a different

4    location later on?

5    A.    Correct.

6    Q.    Prior to SB 1, for a registered voter to submit an

7    application to ballot by mail, they need a name, address, check

8    a reason, and then sign the application, correct?

9    A.    Correct.

10    Q.    The name of registered voters is publically available

11    information, correct?

12    A.    Absolutely.

13    Q.    The address for registered voters is publically available

14    information, correct?

15    A.    Correct.

16    Q.    So somebody could look at the publically available

17    information and identify name and address, and then all they

18    would have to do is check the box and sign prior to SB 1

19    correct?

20    A.    Correct.

21    Q.    Information on registered voters who vote in certain

22    election is publically available as well, correct?

23    A.    Yes, ma'am.

24    Q.    So from that publicly information, somebody could figure

25    out who's registered but who hasn't voted in a long time?

1    A.    Absolutely.

2    Q.    And you'd agree that the signature matching is set up to

3    match the signature on the ballot with the signature on the

4    application for ballot by mail?

5    A.    Correct.

6    Q.    So pre-SB 1 it would have been possible for someone to

7    send in an application for a person they know does not vote

8    regularly, get the ballot, sign the ballot and no one would be

9    the wiser?

10   A.    Correct.

11   Q.    Now that SB 1 is in effect, when a voter wants to request

12   an application for ballot by mail, they must provide either a

13   Texas ID number or social security number, correct?

14   A.    Correct.

15   Q.    A voter's Texas ID number and social security number,

16   they're not publically available, correct?

17   A.    Correct.

18   Q.    In fact, let's take a quick look at Chapter 13 of the

19   Election Code.  Do you see where it has 13.004?

20   A.    Yes, ma'am.

21   Q.    And let's look at subsection C.  It specifies a voter's

22   social security number and Texas ID number are confidential and

23   do not constitute public information, correct?

24   A.    Correct.

25   Q.    I want to quickly refer to Chapter 65 of the Election

1    Code, specifically Section 65.060.  Do you have it in front of

2    you?

3    A.    Yes, ma'am.

4    Q.    This too specifies that a voter's social security number

5    and Texas ID number are confidential and do not constitute

6    public information?

7    A.    Unprovisional, yes, ma'am.

8    Q.    So before SB 1, it was possible to get the information for

9    an application for ballot by mail from publically available

10   information on registered voters, correct?

11   A.    Correct.

12   Q.    But after SB 1, it's no longer possible to get all the

13   information needed for application for ballot by mail or public

14   information on registered voters?

15   A.    From us, yes.

16   Q.    And it's fair to say that you are aware of Texas citizens

17   who think that fraud is going on, correct?

18   A.    Yes, ma'am.

19   Q.    Now, earlier, you mentioned that the legislature passed

20   SB 1 to address what they thought was a flawed emergency.  Do

21   you recall that testimony?

22   A.    Yes, ma'am.

23   Q.    I want to take a quick look at SB 1, specifically

24   Section 1.04.  Do you have it on your screen?

25   A.    Yes, ma'am, thank you.

1   Q.   And so it identifies one of the intent of the legislature

2   to reduce the likelihood of fraud in the conduct of elections,

3   correct?

4   A.   Absolutely.

5   Q.   It does not reference a fraud emergency, correct?

6   A.   Correct.

7   Q.   It also says that the intent of SB 1 is to protect the

8   secrecy of the ballot, correct?

9   A.   Correct.

10  Q.   It also identifies promoting voter access?

11  A.   Yes.

12  Q.   But it also says that to ensure all legally cast ballots

13  are counted, correct?

14  A.   Absolutely.

15  Q.   And there are provisions in SB 1 that expand a minimum

16  number of hours a polling location must be open during the

17  early voting period, correct?

18  A.   Yes, ma'am.

19  Q.   And there's provisions in SB 1 that increase protection

20  for workers, requiring their employees to let them out to vote

21  during early voting period, correct?

22  A.   Yes, an extended --

23  Q.   And SB 1 introduced a peer process, correct?

24  A.   Correct.

25  Q.   And we had spoken earlier about some of your privacy

1   concerns in certain situations that were addressed by SB 1

2   correct?

3   A.    Yes.

4   Q.    And so there are provisions in SB 1 that promote voter

5   access, correct?

6   A.    Yes.

7   Q.    And there are provisions in SB 1 that protects you to see

8   the ballot?

9   A.    Yes.

10  Q.    Based on your observations in elections, you have found

11  that voters tend to react negatively when there are changes to

12  election laws, correct?

13  A.    Absolutely.  I think it's human nature.

14  Q.    And so voters being frustrated or irate about a change is

15  not too unusual when it comes to changes in the election code?

16  A.    True.

17  Q.    The majority of people tend to calm down once they know

18  the rules, correct?

19  A.    Yes, ma'am.

20  Q.    And you believe that one of the reasons people were upset

21  about Senate Bill 1 was the hype surrounding it, correct?

22  A.    It was quite a bit, yes, ma'am.

23  Q.    And you believe that for some voters they were upset about

24  the hype surrounding SB 1 and not necessarily the actual

25  provisions themselves?

```
 1    A.    That's fair.
 2    Q.    You'd agree that conducting an election involves a lot of
 3    project management?
 4    A.    Yes, ma'am.
 5    Q.    There are a lot of details that go into conducting a
 6    successful election?
 7    A.    Yes, ma'am.
 8    Q.    In Bexar County, you start preparing for an election six
 9    months in advance?
10    A.    Yes, ma'am.
11    Q.    There might be small exceptions, such as one -- when a
12    special election is called?
13    A.    Yes, ma'am.  Put one on in two weeks.
14    Q.    But a normal election takes six months of preparation
15    time?
16    A.    Correct.
17    Q.    For this reason you prefer having six months lead time to
18    implement changes in Texas election law?
19    A.    On anything, yes, ma'am.
20    Q.    However, for Senate Bill 1 you think you needed at least a
21    year to implement?
22    A.    Absolutely.
23    Q.    And this is because of the number of changes SB 1
24    introduced?
25    A.    Correct.
```

```
 1    Q.   As well as because some of SB 1 changes were significant?
 2    A.   Yes.
 3    Q.   The implementation time is one of your biggest criticisms
 4    of the bill?
 5    A.   Absolutely.
 6    Q.   In fact, had you had more time to implement the changes
 7    you would have been more comfortable with the change in SB 1?
 8    A.   Yes.  I mean, again, it fell, and for all of us here, I
 9    mean, because of the way it was implemented as quickly, all the
10    unfunded mandates rolled out and like we didn't even have time
11    to put in our budgets for the next year and that obviously for
12    many reasons caused, you know, stress, all of that.
13    Q.   The timing of SB 1 did not give you much time to get
14    revised forms in the Secretary of State's Office?
15    A.   Correct.
16    Q.   You ran into challenges getting the new forms from the
17    Secretary of State's office?
18    A.   Yes, ma'am.
19    Q.   Then once you had the forms, you had challenges getting
20    them printed out in sufficient quantities?
21    A.   Correct.
22    Q.   And you ran into big charges.
23    A.   Yes, ma'am.
24    Q.   In addition, mail-in voters can submit their ABBM any time
25    of year, correct?
```

1   A.    Yes.

2   Q.    So a voter who is qualified to vote in the March 2022

3   election could have submitted ABBMs as early as January 1st,

4   2022?

5   A.    Yes.

6   Q.    For some voters Texas law permits them to submit an annual

7   application for ballot by mail?

8   A.    Absolutely.

9   Q.    These voters can check a box on the ABBM that says annual

10  application?

11  A.    Which is wonderful.

12  Q.    Then once their application is accepted they receive the

13  ballot for every election in their jurisdiction?

14  A.    Yes.

15  Q.    Many of these annual voters submit their ABBM at the

16  beginning of the year?

17  A.    Yes, ma'am.

18  Q.    They voted by mail in the past?

19  A.    Wonderful.

20  Q.    They were used to the old rules governing mail voting?

21  A.    Yes, ma'am.

22  Q.    And SB 1 necessitied the change in the ABBM Form, correct?

23  A.    Yes, ma'am.

24  Q.    Specifically, the Secretary of State added a place on the

25  ABBM for the voter to enter their ID number?

1    A.    Yes, ma'am.

2    Q.    The previous form did not have a place on the ABBM for the

3    voter's ID number?

4    A.    Correct.

5    Q.    Unless the voter add the ID numbers on the old form your

6    office would have to reject the ABBM?

7    A.    We did, yes, ma'am.

8    Q.    And in the beginning many voters submitted they're wrong

9    version of the ABBM form?

10   A.    Yes, ma'am.

11   Q.    You had high rejection rates of ABBM in early 2022 because

12   voters were using the old application?

13   A.    Yes, ma'am.

14   Q.    In addition, a regular session of the Texas legislature

15   ends by June 1st, correct?

16   A.    Yes, ma'am.

17   Q.    As such an election bill is passed during the regular

18   session, the counties have several months over the summer to

19   implement any changes?

20   A.    Correct.

21   Q.    The Secretary of State, likewise, has several months over

22   the summer to amend forms or issue guidance before the next

23   election gears up?

24   A.    Correct.

25   Q.    In that scenario the first election where you try out new

```
 1   legislation will be the November constitutional election?
 2   A.    Yes.
 3   Q.    The November constitutional election is an easier election
 4   to administer than the primary?
 5   A.    It's a much smaller -- smaller turn out.
 6   Q.    SB 1 is not enacted during a regular session?
 7   A.    Correct.
 8   Q.    It was enacted during the second special session, correct?
 9   A.    Correct.
10   Q.    And that made it harder for you to implement the changes
11   in SB 1?
12   A.    Absolutely.
13   Q.    Many of the problems you experienced with SB 1 did not
14   stem from the content of the law itself but with the time you
15   had in which to implement it?
16   A.    That's fair.
17   Q.    It was a perfect storm?
18   A.    That's one way to put it, yes, ma'am.  We're still in it.
19   Q.    SB 1 isn't the first time you implemented a change to the
20   election code, correct?
21   A.    Correct.  I mean, we had gone to vote centers that was
22   quite a process for us.
23   Q.    It isn't the first time you implemented a change in how
24   Bexar County conducts its elections?
25   A.    Correct.
```

1    Q.    It's not even the first time you implemented a major

2    change in Texas election law?

3    A.    Right.

4    Q.    As an example, you worked elections when Texas introduced

5    the ID number requirement to vote in person?

6    A.    Yes, ma'am.

7    Q.    In that instance, you had about six to nine months to

8    implement the legislation, correct?

9    A.    Correct.

10   Q.    But there was still issues that first election that had to

11   be worked through?

12   A.    Absolutely.

13   Q.    It took you about two years to get through the growing

14   pains, correct?

15   A.    Yes, the forms kept changing and the number of items that

16   we were able to accept for photo ID changed constantly.  Yes.

17   Q.    You updated many of your processes after the March 2022

18   primary, correct?

19   A.    Would you ask me that again, please.

20   Q.    Sure.  You updated many of your offices processes and

21   policies after the March 2022 primary, correct?

22   A.    Yes, ma'am.

23   Q.    I believe the line you used was lessons learned?

24   A.    Absolutely.

25   Q.    You will continue to make changes based on lessons learned

1    in upcoming elections?

2    A.    Correct.

3    Q.    You mentioned earlier that your office needed to spend

4    more money and resources and response to SB 1, correct?

5    A.    Yes, ma'am.

6    Q.    Senate Bill 1 is not the first unfunded change to the

7    Texas legislature has imposed on your elections office,

8    correct?

9    A.    I'm sorry.  Repeat that.

10   Q.    Senate Bill 1 is not the first unfunded change of the

11   Texas legislature has imposed on your elections office?

12   A.    Correct.

13   Q.    And you talked a little bit about the surveillance

14   provision in SB 1, correct?

15   A.    Yes, ma'am.

16   Q.    Let's quickly pull that up, Section 3.18 of SB 1.

17         This provision is separate and apart from the ID number

18   requirement, correct?

19   A.    Correct.

20   Q.    And so even if the ID number requirement would go away,

21   you would still be required to provide a video surveillance

22   system, correct?

23   A.    Correct.

24         MS. HUNKER:  You can put that down, Brian.

25   Q    (By Ms. Hunker) This brings us to our next topic, 2020

```
 1    general election.  You were election administrator in 2020?
 2    A.    Yes, ma'am.
 3    Q.    And so you oversaw the November 2020 election in Bexar
 4    County?
 5    A.    Yes, ma'am.
 6    Q.    The November 2020 general election was not a normal
 7    election in Bexar County, correct?
 8    A.    Correct.
 9    Q.    The election took place while we were all in the throwes
10    of the COVID-19 pandemic?
11    A.    Yes, ma'am.
12    Q.    So there are many things that were different about how the
13    November 2020 elections was conducted compared to other
14    elections?
15    A.    Yes, ma'am.
16    Q.    You had to purchase personal protective equipment or PPE?
17    A.    We sure did.
18    Q.    You had to change how you trained your election officials?
19    A.    Yes, ma'am.
20    Q.    All 1200 of them?
21    A.    Yes, ma'am.
22    Q.    There was a large influx of voting by mail?
23    A.    Correct.
24    Q.    Normally in a big election you will process 40 to 50,000
25    mail ballots, correct?
```

```
1    A.    Correct.
2    Q.    But in November of 2020, you had 121,000?
3    A.    Yes, ma'am.
4    Q.    To top it off, the Government issued proclamations that
5    suspended certain provisions of the election code?
6    A.    Correct.
7    Q.    The proclamation extended the number of days a voter can
8    hand delivery their mail ballot?
9    A.    Yes, ma'am.
10   Q.    They extended the early voting period?
11   A.    Yes, ma'am.
12   Q.    They allowed Bexar County's 52 taxing entities to move
13   their election to November so that their races could be on the
14   November ballot?
15   A.    Yes, ma'am.
16   Q.    Bexar County did not offer 24-hour voting during the
17   November 2020 election?
18   A.    Correct.
19   Q.    You did not consider hosting a 24-hour polling site for
20   the November 2020 election?
21   A.    Correct.
22   Q.    You would concerns about staffing, correct?
23   A.    Correct.
24   Q.    Election workers already worked long hours, correct?
25   A.    Right.
```

1   Q.   You also had safety concerns?

2   A.   Yes, ma'am.

3   Q.   You also thought it was unnecessary?

4   A.   Yes, ma'am.

5   Q.   That said, Bexar County offered extended hours for the

6   November 2020 election?

7   A.   Yes.

8   Q.   You kept polling places open until 10 p.m.?

9   A.   Yes, ma'am.

10  Q.   That was for two days?

11  A.   Two days.

12  Q.   However, all your polling locations open at the usual

13  time?

14  A.   Yes.

15  Q.   Or on Sundays the usual time for opening the polls is

16  8 a.m.?

17  A.   Correct.

18  Q.   You have never conducted an election where voters could

19  start voting before 6 a.m.?

20  A.   No.

21  Q.   And you've never conducted an election where polls stayed

22  opened past 10 p.m.?

23  A.   Correct.

24  Q.   You were aware that SP 1 states that early voting cannot

25  be conducted earlier than 6 a.m. and later than 10 p.m.?

1  A.    Correct.

2  Q.    That part of SB 1 had no impact on Bexar County?

3  A.    Correct.

4  Q.    SB 1 permits a window for voting that is larger than what

5  you implemented in Bexar County?

6  A.    Correct.

7  Q.    Now, there are political subdivisions in Bexar County that

8  extended into neighboring counties, correct?

9  A.    Yes, ma'am.

10  Q.    And you witnessed confusion when neighboring counties have

11  different polling hours?

12  A.    Yes, ma'am.

13  Q.    And that confused is particularly acute when those

14  counties have subdivisions where some voters may be located in

15  one county and some voters maybe located in another?

16  A.    Correct.

17  Q.    In your experience, having uniform polling hours across

18  neighboring counties, lessons voter confusion?

19  A.    Yes, ma'am.

20  Q.    Earlier, you and I discussed curbside voting, correct?

21  A.    Yes, ma'am.

22  Q.    You understand that curbside voting and drive-through

23  voting referred to two different methods of voting?

24  A.    Absolutely.

25  Q.    Curbside voting is initiated at voters request?

1   A.    Yes, ma'am.

2   Q.    Curbside voting is conducted on one-by-one basis?

3   A.    Yes, ma'am.

4   Q.    A voter must meet specific criteria before being eligible

5   for curbside?

6   A.    Yes, ma'am.

7   Q.    In the November 2020 election, Bexar County offered normal

8   curbside voting?

9   A.    Yes, ma'am.

10  Q.    You believe based on your understanding of the election

11  code, that allowing voters to vote from a motor vehicle in

12  2020, when they were not disabled, would have been contrary to

13  the election code?

14  A.    Correct.

15  Q.    In years past pre-SB 1, your office did not send out

16  unsolicited applications for ballot by mail, correct?

17  A.    Correct.

18  Q.    You would distribute the ABBM, if requested?

19  A.    Yes.

20  Q.    But you would not send out an application if no one asked

21  for it?

22  A.    Correct.

23  Q.    At that point, you believed it would violate the election

24  code to mail out an application for ballot by mail when they

25  weren't requested?

1    A.    Correct.

2    Q.    Furthermore, you agree that there is a risk of fraud

3    associated with sending out an application for ballot by mail

4    when it hasn't been requested?

5    A.    Yes.

6    Q.    Just like your voter registration cards, if you send out

7    an application for ballot by mail to everyone in your database

8    some of those voters may not be there?

9    A.    Correct.

10   Q.    They may have moved, for example?

11   A.    Yes.

12   Q.    Or simply not been there to receive it?

13   A.    Correct.

14   Q.    As such, sending out unsolicited applications for ballot

15   by mail could put the application in the hands of people who

16   live in the home but aren't the person qualified to vote by

17   mail?

18   A.    Correct.

19   Q.    You were the early voting clerk in Bexar County?

20   A.    Yes, ma'am.

21   Q.    You were the early voting clerk for Bexar County during

22   the November 3rd, 2020, election?

23   A.    Yes, ma'am.

24   Q.    Accordingly, if a voter wished to deliver their ballot in

25   person, they have to deliver it to your office?

```
1   A.    Correct.

2   Q.    You only have a single office?

3   A.    Correct.

4   Q.    Bexar County, therefore, cannot have multiple in-person

5   delivery sites for mail ballots?

6   A.    Correct.

7   Q.    That said, some of the commissioners in Bexar County

8   wanted you to have multiple in-person delivery sites in 2020?

9   A.    Correct.

10  Q.    You had to inform them because you are an election

11  administrator with one office, Bexar County could not have

12  multiple drop-off locations?

13  A.    Correct.

14  Q.    It caused confusion that certain counties, like Harris

15  County, who operated under a county clerk model, proposed

16  having multiple in-person delivery locations?

17  A.    Correct.

18  Q.    In any event, even if counties could provide multiple

19  in-person delivery sites, the site would still be located at

20  the physical office of the early voting clerk, correct?

21  A.    Yes, ma'am.

22  Q.    In November of 2020, when a voter delivered their mail

23  ballot in person to your office, there was always an election

24  official taking possession of the ballot?

25  A.    Correct.
```

1  Q.    The ballots were not being dropped into an unattended box?

2  A.    Correct.

3  Q.    And you agreed that SB 1 did not alter how SB -- how Bexar

4  County operated with respect to ballot delivery locations?

5  A.    Correct.

6  Q.    You'd agree that the election process in November of 2022

7  was more successful than November 2020?

8  A.    Yes.

9  Q.    The election ran smoother in 2022 than in 2020?

10  A.    Absolutely.

11  Q.    There were fewer problems?

12  A.    Yes, ma'am.

13  Q.    When you compare election turn out, you look for the last

14  like election, correct?

15  A.    Correct.

16  Q.    And you can just quickly explain to the Court what is a

17  like election?

18  A.    It's -- we prepare an election we -- that phrase last like

19  election is we'll use the data, like, right now, we're using --

20  we're in an amendment election so we will go back two years to

21  the last amendment election and we'll base the turn out on that

22  and we'll see where areas of town, wherever in the county we're

23  going to have a higher vote than not and it works its way

24  through the entire process.  Thereby, like for this election,

25  we will have fewer precincts in early vote centers than we had

1    in general election because we're going to have a 7 to

2    10 percent turn out.  And so you always go back and, like, for

3    presidential election, you're going to go back and you're going

4    to look at, you know, what happened back in 2020 and that will

5    take precedence over any other planning.

6    Q.    The general election in 2022 was a midterm election,

7    correct?

8    A.    Correct.

9    Q.    And so to conduct a proper comparison, you would look at

10   last midterm election?

11   A.    2018, yes, ma'am.

12   Q.    Elections run on four-year cycles?

13   A.    Yes, ma'am.

14   Q.    And the last midterm election before 2022 was 2018?

15   A.    Yes, ma'am.

16   Q.    And so the last like election for November 2022 is

17   November 2018?

18   A.    Yes, ma'am.

19   Q.    And that would be the proper point of comparison?

20   A.    Yes, ma'am.

21   Q.    Bexar County is covered by the language requirements under

22   the federal voting rights for Spanish, correct?

23   A.    Correct.

24   Q.    Bexar County therefore provides assistance to -- provides

25   assistance relating to like oral process in English and

1    Spanish?

2    A.    Yes, ma'am.

3    Q.    To that end, Bexar County has poll workers who can speak

4    Spanish?

5    A.    Yes, ma'am.

6    Q.    At every polling location?

7    A.    Yes, ma'am.

8    Q.    These poll workers can assist voters at the polling

9    center?

10   A.    Correct.

11   Q.    Voters will sometimes call your office speaking Spanish?

12   A.    Correct.

13   Q.    You have sat in your office and advised voters in Spanish?

14   A.    Absolutely.

15   Q.    The Texas legislature eliminated straight ticket voting in

16   2017, correct?

17   A.    That's when they voted on it, yes, ma'am.

18   Q.    And the elimination of straight ticket voting took effect

19   September 2020?

20   A.    2020, yes.

21   Q.    I'm going to pull up a couple of quick exhibits.  First is

22   going to be election advisory of 2020-29.  Do you have it on

23   your screen?

24   A.    Yes, ma'am.

25   Q.    And you see on the top how it says the Texas Secretary of

1    State?

2    A.    Yes, ma'am.

3    Q.    And you see the title of the election advisory number

4    2020-29?

5    A.    Yes, ma'am.

6    Q.    And this was sent by the elections office of the Secretary

7    of State?

8    A.    Correct.

9    Q.    And your office would have received this election

10   advisory, correct?

11   A.    Correct.

12   Q.    And the title of this is New Law HB 25, in parenthesis,

13   2017 elimination of straight party voting.  Did I read that

14   correctly?

15   A.    Yes, ma'am.

16   Q.    Let's just take a quick look at the first paragraph.  It

17   says that "The Texas legislature enacted the House Bill 25 in

18   2017."  Correct?

19   A.    Correct.

20   Q.    And that amended certain provisions of the election code

21   to eliminate straight party voting, correct?

22   A.    Correct.

23   Q.    And that effective date was September 1st, 2020?

24   A.    Yes, ma'am.

25   Q.    And let's quickly bring up HB 25.  You see where it says,

1    on top, HB number 25?

2    A.    I do.

3    Q.    We're going to scroll to page 3.  The part that's crossed

4    out, and you see crossed out is "capable of admitting straight

5    party voting."  Correct?

6    A.    Correct.  May I ask, can we go back to the advisory?

7    Q.    Of course.

8    A.    Okay.  I just want to make a point on this.  Would you

9    look at the date that the advisory was sent to us?  It's

10   September 17th of 2020.  Well, that comes down to about five

11   days before we're required to send out all of our ballots to

12   the military, which means we would have had to have had

13   everything programmed, removed the straight party ticket from

14   even the mail ballots that were ready to put in the mail in

15   five days.

16        So I just want to make a point of how we're getting so

17   very, very late.  They knew this was passed in 2017, but we

18   never got the details until September 17th of 2020.

19   Q.    But you would have had a three-year implementation time;

20   is that correct?

21   A.    We knew it was coming, but to get the actual advisory.

22   Q.    You can put that down.

23   A.    Thank you.

24   Q.    So November 2020 was the first election in which straight

25   ticket voting was not an option for Texas?

```
 1   A.    Correct.
 2   Q.    Now, you're aware there's a provision in SB 1,
 3   Section 3.15, that states voting systems may not be arranged in
 4   a manner that allows a political party's candidates to be
 5   selected in one motion or gesture?
 6   A.    Correct.
 7   Q.    You did not stop offering straight ticket voting in
 8   response to that provision?
 9   A.    Would you repeat that, please?
10   Q.    Sure.  You did not offer -- stop offering straight ticket
11   voting in Bexar County in response to SB 1's provision 3.15?
12   A.    Correct.
13   Q.    That language is duplicative of what already had been
14   enacted by the legislature, correct?
15   A.    Correct.
16   Q.    The provision prompted no change to the ballots in Bexar
17   County in 2022?
18   A.    Correct.
19   Q.    You spoke earlier about voters not being able to use a
20   cell phone at a polling place?
21   A.    I know, yes.
22   Q.    That provision pre-existed SB 1?
23   A.    Yes, it did.
24   Q.    You also spoke with opposing counsel about Section 5.10,
25   the ballot tracker?
```

```
 1   A.    Yes.
 2   Q.    And you had mentioned that if a voter did not have the
 3   numbers in the system, they wouldn't be able to use the ballot
 4   tracker?
 5   A.    Correct.
 6   Q.    The ballot tracker would allow somebody who forgot to put
 7   their ID number on the carrier envelope, correct?
 8   A.    Correct.
 9   Q.    The Texas Association of Election administrators
10   particularly legislature concerns about the different
11   provisions being considered in 2021?
12   A.    Yes, ma'am.
13   Q.    The legislature was responsive to at least some of those
14   concerns, correct?
15   A.    A few, yes.
16   Q.    You won some, you lost some?
17   A.    That's the way we walked out, yes, ma'am.
18   Q.    I want to quickly discuss poll watcher training.  Poll
19   watcher training is only good for a certain period of time,
20   correct?
21   A.    I think it's around six months on that certificate, yes,
22   ma'am.
23   Q.    And at which point a poll watcher must retake the
24   training --
25   A.    Correct.
```

1    Q.    -- in order to certified.

2         And you have not seen the training for the 2024 elections,

3    correct?

4    A.    No.  In fact, they don't have the handbooks out for us

5    yet.  They've -- all of the bills that came out of SB 1, we

6    don't have the new judge's handbooks.  We don't have the poll

7    watcher, we don't have the early ballot board to finish

8    verification.

9    Q.    You're talking about in response to the bills passed this

10   last legislative cycle?

11   A.    Right.  They have not been updated yet.  So, again, we're

12   waiting patiently for those.

13   Q.    As an election administrator, it is your duty to operate

14   in accordance with the Texas Election Code, correct?

15   A.    Absolutely.

16   Q.    You therefore conduct elections in compliance with what

17   the election code requires?

18   A.    Yes, ma'am.

19   Q.    The same is true of your office?

20   A.    Correct.

21   Q.    You conducted elections in compliance with the elections

22   code pre-SB 1?

23   A.    Yes, ma'am.

24   Q.    And you intend to conduct elections in compliance with the

25   election code for the SB 1?

1   A.    Absolutely.

2              MS. HUNKER:  I have no further questions, Your Honor.

3              THE COURT:  Anything else on this side?

4              MR. NICHOLS:  Nothing from us.  Thank you, ma'am.

5              THE COURT:  Anything else by redirect?

6              MR. GENECIN:  No.

7              THE COURT:  You may step down, ma'am.  And your next

8   witness?

9              MR. GENECIN:  Before, actually, we call our next

10  witness, if I may, I'd just like to take care a piece of

11  business we have left over from the morning.

12       We have marked as Plaintiff's Exhibit for the HAUL MFV,

13  Plaintiff's 395.  That is the application for ballot by mail.

14  396A is the notice of rejected application for ballot by mail,

15  the form that Your Honor noted is marked at the top 6-3.  And

16  396B for the HAUL plaintiffs is the notice of rejected

17  application for ballot by mail, which Your Honor noted is

18  Form 6-4.

19       We've marked all of the items in the ballot by mail

20  package as Plaintiff's Exhibit 397.  397A is the carrier

21  envelope.  397B is the ballot envelope or privacy envelope.

22  397C is information about returning your carrier envelope.

23  That's the white closely printed document.

24       And 397D is the dear voter letter, the yellow document

25  sent with the materials sent to voter ballot by mail

1    And, finally, 397E for the HAUL MFV plaintiffs is the tiny

2    insert intended to fall to the floor.

3    Then we have Plaintiff's Exhibit 398A, that's the notice

4    of carrier defect for a carrier envelope returned to the voter

5    by mail.  And 398B is the notice of carrier defect where the

6    voter is notified of the carrier envelop defect by phone or

7    e-mail.

8    And I will hand all of the marked exhibits to

9    Ms. Fernandez.  Thank you very much

10    THE COURT:  Any objection to any of those from any on

11    this side?

12    MS. HUNKER:  No, Your Honor.

13    THE COURT:  395 -- HAUL 395, 396A, 396B, the entire

14    397 series, which is A, B, C, D, E, 398A and 398B are all

15    admitted.

16    MS. LONGORIA:  Your Honor, Claudia Longoria for the

17    plaintiffs, LUPE plaintiffs move into evidence LUPE

18    Exhibits 225 through 231.

19    THE COURT:  Any objection to LUPE 225 to 231?

20    MS. HUNKER:  Not from State.

21    THE COURT:  Anyone else?  225 to 231 are admitted.

22    MS. LONGORIA:  Thank you, Your Honor.

23    MS. HUNKER:  Your Honor, I would like to move into

24    evidence exhibits I used during my cross-examination of

25    Ms. Callanen.  They are State Exhibits 77, 78, 236, and that we

 1  would be adding State Exhibits 317 and 318.

 2          THE COURT:  Any objections to State 77, 78, 236, 317

 3  or 318?

 4          MS. HOLMES:  No objection, Your Honor.

 5          THE COURT:  77, 78, 236, 317, 318 are all admitted.

 6          MS. HUNKER:  And just to clarify for the record, 317

 7  is the election advisory 2020-29, and 318 is HB25 the old

 8  version.

 9          THE COURT:  Thank you.  And your next witness.

10          MS. HOLMES:  The plaintiffs call Rachelle Obakozuwa

11  as our next witness.

12      Ms. Obakozuwa's testimony is relevant to HAUL challenges

13  to SB1 Sections 3.04, 3.09, 310, 312, 313, 4.01, 4.06, 4.07,

14  4.09, 5.02, 5.03, 5.06, 5.07, 510, 6.03, 6.04, 6.05, and 6.07

15  which span all of our claims.

16          THE COURT:  Thank you.

17      *(The oath was administered)*.

18          MS. HOLMES:  Your Honor, pursuant to Federal Rules of

19  Evidence 611, I request the permission to ask leading questions

20  because Ms. Obakozuwa is identified with defendant Harris

21  County?

22          THE COURT:  Any --

23          MR. BRYANT:  No objection, Your Honor.

24          THE COURT:  You may proceed.

25                          DIRECT EXAMINATION

```
 1   BY MS. HOLMES:
 2   Q.   Ms. Obakozuwa, please state and spell your name for the
 3   record.
 4   A.   Rachelle Obakozuwa, R-A-C-H-E-L-L-E, O-B-A-K-O-Z-U-W-A.
 5   Q.   Where do you live?
 6   A.   Houston, Texas.
 7   Q.   How long have you lived in Houston?
 8   A.   Thirty plus years.
 9   Q.   And how long have you lived in Texas?
10   A.   Same amount of time.
11   Q.   Where do you work?
12   A.   At the Harris County elections office.
13   Q.   And what's your title?
14   A.   Director of logistics.
15   Q.   How long have you been the director of logistics?
16   A.   Since 2021 January.
17   Q.   And have you held any other roles related to Harris County
18   elections?
19   A.   Yes.
20   Q.   What are those?
21   A.   Manager of training, manager of recruitment, manager of
22   voter center, ADA coordinator, and ballot proofer.
23   Q.   In total, how long have you worked on elections in Harris
24   County in some capacity?
25   A.   For 11 years.
```

```
 1   Q.    And during that time, the authority to conduct elections
 2   in Harris County has shifted back and forth between the Harris
 3   County clerk and the election administrator, correct?
 4   A.    Correct.
 5   Q.    In your time working on elections in Harris County, did
 6   you always work for whichever entity had authority to conduct
 7   elections at any given time?
 8   A.    Yes.
 9   Q.    So as of September of this year, you're now working in the
10   Harris County clerks office?
11   A.    Correct.
12   Q.    And prior to September, were you at the Harris County
13   election administrators office?
14   A.    Yes.
15   Q.    That was under Clifford Tatum?
16   A.    Yes.
17   Q.    And prior to that Isabel Longoria?
18   A.    Yes.
19   Q.    And -- but during the 2020 election, you were at the
20   Harris County clerks office; is that correct?
21   A.    Correct.
22   Q.    Under Chris Hollands?
23   A.    Yes.
24   Q.    And why did you choose to devote more than a decade
25   working on elections in Harris County?
```

1    A.    I love having a purpose doing something that is impactful.

2    So I really wanted to work in an environment where what I did

3    was making a difference.

4    Q.    Let's turn to your duties as the director of logistics.

5    You're responsible for directing the recruitment and training

6    teams within the office, correct?

7    A.    Yes.

8    Q.    And you also played some role in assisting in kind of

9    every other part of the election?

10   A.    Yes.

11   Q.    Your responsibilities included overseeing the recruitment

12   of poll workers, including election judges and election clerks;

13   is that right?

14   A.    Yes.

15   Q.    And your responsibilities also include the training of

16   poll workers on how to administer elections; is that right?

17   A.    Correct.

18   Q.    Your responsibilities also include overseeing the training

19   of internal office staff on how to administer elections; is

20   that correct?

21   A.    Yes.

22   Q.    And in your prior role as manager of training and

23   recruitment, were you also involved in the training and

24   recruitment of election workers and internal staff?

25   A.    Yes.

1    Q.    So in terms of the recruitment of poll workers, tell me

2    how election judges are recruited to work in elections.

3    A.    It varies by election.  However, generally, the political

4    parties submit nominees to our office and Harris County, our

5    office, works to place them in vote centers.

6    Q.    So the political parties submit nominees, and then what is

7    the role that your office plays in making sure you have enough

8    of election judges?

9    A.    So we put the persons that are nominated into position, we

10    place them, we support them, we help them get them the

11    training, make sure that they are accepting the role.  And then

12    in emergency periods, we also do the staffing for any judges

13    that do not accept the position.

14    Q.    And how about election clerks?  How do they get recruited

15    and placed at polling locations?

16    A.    For early voting our office places the clerks from the

17    party nominations, and for election day the presiding judge

18    selects the clerks.

19    Q.    And so on election day, the presiding judge has the

20    responsibility to recruit a team of clerks to work with them in

21    the polling place?

22    A.    Correct.

23    Q.    Traditionally, prior to SB1 where a large portion of

24    election judges in Harris County, people who have previously

25    served in that role in prior elections?

```
 1   A.    Yes.
 2   Q.    And did those election judges tend to have a group of
 3   election clerks who had served with them on election day,
 4   election after election?
 5   A.    Yes.
 6   Q.    In the 2020 election, did you have any difficulties
 7   recruiting or staffing or recruiting enough poll workers to
 8   staff all your polling locations?
 9   A.    No, not at all.
10   Q.    Was there a lot of interest in serving as a poll worker in
11   the 2020 election?
12   A.    Yes.  There were over 65,000 applicants that we received
13   within a month period of time, so many that we had to turn off
14   the system to accept applications.
15   Q.    So you were oversubscribed?
16   A.    Yes.
17   Q.    How about in the 2018 election or any prior midterm
18   elections, did you have challenges in recruiting enough poll
19   workers to work those elections?
20   A.    No.
21   Q.    You mentioned that your role entails overseeing training
22   of office staff and poll workers, correct?
23   A.    Yes.
24   Q.    And you actually trained -- you trained the trainers; is
25   that right?
```

1150

```
 1    A.    Correct.
 2    Q.    You trained the people in your office who conduct these
 3    trainings?
 4    A.    Yes.
 5    Q.    And you developed the training curriculum and review it
 6    for accuracy?
 7    A.    Correct.
 8    Q.    So you're familiar with the content of the training your
 9    office gives to poll workers?
10    A.    Yes.
11    Q.    And you're familiar with the content that your office
12    gives of the training that your office gives to internal staff?
13    A.    Yes.
14    Q.    Are you sometimes personally present during these
15    trainings?
16    A.    Yes.
17    Q.    And could you describe the topics contained in Harris
18    County's poll worker training program?
19    A.    Yes.  We talk about what roles there are in the vote
20    center, who is allowed in the vote center, the -- how to set up
21    the equipment, how to open a vote center, how to run the tapes
22    and reconcile the vote center, how to -- what is allowable for
23    voter assistance and a lot of other legal aspects of running a
24    vote center.
25    Q.    Does your training for poll workers include how to
```

1  facilitate voter assistance to people with disabilities or

2  language barriers?

3  A.    Yes.

4  Q.    And does the training include how to interact, how poll

5  watchers should interact -- withdrawn.

6      Does the training include how a poll worker should

7  interact with a poll watcher?

8  A.    Yes.

9  Q.    Does the training of poll workers explain the consequences

10  poll workers might face if they violate provisions of the

11  election code?

12  A.    Yes.

13  Q.    And that includes civil and criminal penalties?

14  A.    Yes.

15  Q.    And your office does everything it can, of course, to make

16  sure poll workers don't actually face these penalties?

17  A.    Yes.

18  Q.    I'd like to talk about drive-through voting.  In the

19  November 2020 election, Harris County offered drive-through

20  voting, correct?

21  A.    Correct.

22  Q.    Did Harris County also offer curbside voting in that

23  election?

24  A.    Yes.

25  Q.    And can you explain what curbside voting is?

1    A.    Curbside voting is for voters who are unable to physically

2    enter the vote center without likelihood of injury or without

3    an assistant.  And it's done at the curb or near the facility

4    outside.

5    Q.    So curbside voting under the laws is not available to

6    everyone?

7    A.    Correct.

8    Q.    But curbside voting is a voting method that all counties

9    across Texas offer, correct?

10   A.    Yes.

11   Q.    And curbside voting is available in every polling

12   location?

13   A.    Yes.

14   Q.    Since every polling place offers curbside voting, are all

15   election workers in Harris County trained on curbside voting?

16   A.    Yes.

17   Q.    And how long has Harris County offered curbside voting?

18   A.    At least prior to 2015.

19   Q.    Can you explain the difference between curbside voting and

20   drive-through voting in terms of the process?

21   A.    Sure.  For curbside voting, when a person approaches to

22   vote that method, they have to push a buzzer to get an election

23   workers attention.  The election worker will come out and work

24   the process that voter, their identification, and then will

25   grab the equipment and bring it out to the voter, the voter

1  will then cast or mark their ballot.  It will be printed and

2  then the election worker will take the ballot into the vote

3  center and insert it into the scan for the voter.

4  Q.    And then I think you just walked through how it works in

5  curbside voting, can you explain how it works in drive-through

6  voting?

7  A.    Yes.  For drive-through voting, a vehicle will pull up and

8  would be able to cast their ballot from their vehicle at the

9  machine, the machine was outside.  And so when they voted their

10  ballot, it would print and then the voter would drive forward

11  to the scan and then would deposit their ballot into the scan.

12  And so, basically, they would conduct the whole process on

13  their own instead of having an election worker take the items

14  in and out the building.

15  Q.    Is there any difference between curbside voting and

16  drive-through voting in terms of how the voter marks their

17  ballot?

18  A.    No.

19  Q.    Is there any difference between curbside voting and

20  drive-through voting in terms of how the ballots are processed

21  by your office?

22  A.    No.

23  Q.    Is there any difference between curbside voting and

24  drive-through voting in terms of the election security

25  precautions that your office takes?

```
 1   A.    No.
 2   Q.    And you mentioned that in curbside voting, the poll worker
 3   takes the voters ballot and brings it back inside to cast it in
 4   the tabulator?
 5   A.    In the scanner, yes.
 6   Q.    The scanner.  But with drive-through voting, the voter
 7   themselves inserts the ballot into the scanner because the
 8   machine is already outside; is that correct?
 9   A.    Correct.
10   Q.    And so curbside voting, the ballot never leaves the
11   voter's sight?
12   A.    It will leave the voter's sight when the end curbside
13   voting, when the poll worker takes it into the vote center.
14   Q.    I'm sorry.  I think you caught me.  I said the wrong
15   thing.  In drive-through voting, does the ballot ever leave the
16   voter sight?
17   A.    No.
18   Q.    In November 2020, how many drive-through polling places
19   did Harris County offer?
20   A.    Approximately ten.
21   Q.    Were they open during both early voting and on election
22   day?
23   A.    Yes.
24   Q.    And why did your office decide to offer drive-through
25   voting?
```

1    A.    To provide more accessibility, more opportunities for

2    people to be able to get to vote.

3    Q.    Was drive-through voting implemented specifically in

4    response to the pandemic?

5    A.    No.

6    Q.    What was your understanding of voters reactions to the

7    option to vote using drive-through voting?

8    A.    There was a lot of excitement, people were very pleased

9    with it.

10   Q.    And do you know of any fraud steming from drive-through

11   voting?

12   A.    No.

13   Q.    What is your assessment of how drive-through voting went

14   in November 2020?

15   A.    It was a great success.

16   Q.    And why do you consider it a success?

17   A.    We had a lot of people turn out to vote, about 17,000

18   people voted there.  We had multiple reports of people just

19   really excited to be able to do it.  Some people who advised

20   they would not have voted had it not been for the drive-through

21   option.

22   Q.    Did Harris County offer drive-through voting again after

23   November 2020?

24   A.    Yes.

25   Q.    And which elections, if you recall?

```
1    A.    In every election until SB 1.

2    Q.    And were there any reports of fraud associated with

3    drive-through voting in any of those subsequent options?

4    A.    No.

5    Q.    Based on Harris County's experience with drive-through

6    voting, would you recommend that your office offer it again if

7    you were able to do so under the law?

8    A.    Yes.

9    Q.    I'd like to discuss 24-hour voting.  In the November 2020

10   election, Harris County implemented 24-hour voting; is that

11   correct?

12   A.    Yes.

13   Q.    And can you explain how 24-hour voting worked?

14   A.    Twenty-four hour voting was just regular voting instead of

15   ending at 7 p.m., it would go over night into the next morning,

16   through the next day.

17   Q.    And 24-hour voting was only offered between, I believe,

18   the last two days of the early voting period; is that correct?

19   A.    Correct.  From the Thursday into the end of Friday.

20   Q.    So essentially, the polls were kept open overnight between

21   those two days?

22   A.    Yes.

23   Q.    And do you know approximately how many vote centers were

24   kept open during this 24-hour period?

25   A.    It was a fewer than ten.
```

```
 1   Q.   Is there any difference in how ballots were processed
 2   during the overnight period of 24-hour voting?
 3   A.   No.
 4   Q.   Is there any difference in terms of the election security
 5   precautions your office takes for 24-hour voting?
 6   A.   No.
 7   Q.   The voting process was the same at 2 p.m. as it was at
 8   2 a.m.; is that correct?
 9   A.   Correct.
10   Q.   And is there any difference in how you train poll workers
11   to work in a 24-hour voting vote center?
12   A.   No.
13   Q.   Why did your office decide to offer 24-hour voting?
14   A.   To provide more access to voters who would not normally be
15   able to vote during regular hours.
16   Q.   And was 24-hour voting implemented specifically in
17   response to the pandemic?
18   A.   No.
19   Q.   Are you aware of how many voters approximately voted
20   between 10 p.m. and 6 a.m. on that night when -- on that
21   overnight period of 24-hour voting?
22   A.   Yes.  There were about 17,000.
23   Q.   And what was your understanding of who voted using 24-hour
24   voting?
25   A.   We know that we received reports from nurses, ambulance
```

1    drivers, doctors, warehouse workers, performers, a wide variety

2    of people who usually sleep during the day and work at night.

3    Q.    Are you aware of any fraud stemming from 24-hour voting?

4    A.    No.

5    Q.    And what was your assessment of how 24-hour voting went?

6    A.    It was successful.

7    Q.    Why did -- why do you consider it a success?

8    A.    To be able to have more voters to be able to vote who

9    normally wouldn't be able to.

10   Q.    Based on Harris County's experience with 24-hour voting,

11   would your office consider offering it again if it could do so

12   under the law?

13   A.    Yes.

14   Q.    And did SB 1 make 24-hour voting illegal?

15   A.    Yes.

16   Q.    I'd like to discuss mail-in voting.  Does your office

17   train internal staff on voting by mail?

18   A.    Yes.

19   Q.    And would you agree that the two major groups of voters

20   are eligible to vote by mail in Texas are voters 65 and older

21   and voters who indicate a disability on the application?

22   A.    Yes.

23   Q.    Would you agree that in-person voting may be more

24   difficult or even impossible for some disabled or older voters?

25   A.    Yes.

1    Q.    Are you familiar with SB 1's requirements to put a Texas

2    driver's license number or the last four digits of a social

3    security number on an application for ballot by mail?

4    A.    Yes.

5    Q.    And if I use the acronym ABBM, will you know I mean

6    application for ballot by mail?

7    A.    Yes.

8    Q.    Are you familiar with SB1's requirement to put a Texas

9    driver's license number or the last four digits of a social

10   security number on the carrier envelope of a mail-in ballot?

11   A.    Yes.

12   Q.    And did these two requirements cause any problems during

13   the March 2022 primary or November 2022 general election?

14   A.    Yes.

15   Q.    Can you explain?

16   A.    Just a lot of the people who didn't put it on and didn't

17   get their ballot counted, or were confused about how to add it

18   if they had put it within the time frame.

19   Q.    And did any voters express concerns about having to put

20   these numbers on their ABBM for carrier envelope?

21   A.    Yes.

22   Q.    And what were those concerns?

23   A.    Specifically, they didn't want to put private information

24   on the document.

25   Q.    Were high number of ABBMs or mail-in ballots rejected due

1   to not having ID numbers that matched to the ID numbers in your

2   system?

3   A.    Yes.

4   Q.    And how did the rate of rejections of ABBMs for mail

5   ballots in the 2022 election compare with prior elections?

6   A.    They were higher -- yes, they were higher.

7   Q.    Did your office do anything to attempt to mitigate the

8   higher rates of ABBM and mail-in ballot rejections?

9   A.    Yes, we did a lot of marketing and voter education.

10  Q.    Can you describe some of those efforts?

11  A.    Yes.  We did community meetings, hundreds of community

12  meetings to try to show people the proper way to submit one.

13  We did TV ads and billboards and radio, social media, all kinds

14  of advertisements, videos on text, any kind of advertisement

15  that we could think of to try to get the word out.

16  Q.    And did your office do any internal staffing changes to

17  try to mitigate the problems with rejected ABBMs and mail-in

18  ballots?

19  A.    Yes.

20  Q.    And what was that?

21  A.    We had to increase staffing to accommodate the level of

22  phone calls and the processing of the applications and notice

23  of improper delivery.

24  Q.    And despite the efforts that you just described, the voter

25  outreach and education, the rejection rates of ABBMs and mailed

1  ballots were still higher in November of 2022 than in pre-SB 1

2  elections; is that correct?

3  A.    Yes.

4  Q.    Why do you believe this was?

5  A.    There were still a lot of voters who don't know to put

6  that information is required or don't want to put that

7  information on it.

8  Q.    Do you expect the problem of ABBM and mail ballot

9  rejections to continue in future elections?

10  A.    Yes.

11  Q.    A couple more questions about voting by mail.

12  Specifically about the -- the database system that your office

13  uses.  Are you an offline county?

14  A.    Yes.

15  Q.    What does that mean when I say "offline county"?

16  A.    It means that we are not live connected with the State's

17  database.

18  Q.    And the State's database is Team?

19  A.    Yes.

20  Q.    And what is the name of the database that Harris County

21  uses?

22  A.    Vmax.

23  Q.    Vmax.  Before SB 1, community organizations could

24  distribute ABBMs to their members; is that correct?

25  A.    Yes.

1    Q.    And your office made those applications available to these

2    organizations so they could do this?

3    A.    Correct.

4    Q.    Under SB 1, your office no longer does this, correct?

5    A.    Right.

6    Q.    And why not?

7    A.    It's no longer legal.

8    Q.    Do you still receive requests from organizations who want

9    to distribute ABBMs to their members?

10   A.    Yes.

11   Q.    And what do you tell the organizations making those

12   requests?

13   A.    That we're no longer able to supply them.

14   Q.    Let's talk about dropping off a mail ballot.  A voter can

15   only drop off their mail ballot on election day; is that

16   correct?

17   A.    Yes.

18   Q.    And there is only a single location in Harris County where

19   they can drop off this mail ballot in person?

20   A.    Correct.

21   Q.    And when a voter comes -- where is that location?

22   A.    Downtown.

23   Q.    Can you describe the area downtown?

24   A.    Yes.  We are in a busy downtown area that has one-way

25   streets surrounding us with no free parking, very active roads.

1    Q.    And has the fact that -- that downtown location is the
2    only place where a voter can drop off their mail ballot in
3    person presented any problems?
4    A.    Yes.
5    Q.    Can you describe those problems?
6    A.    A lot of the voters don't drive downtown, they don't want
7    to drive downtown.  They're concerned about the safety or the
8    streets or, you know, not having parking.  And then, also, if
9    they were to find parking, there's a great distance to walk
10   from the parking to our building.
11   Q.    And once the person makes it to your building, they hand
12   over their mail ballot to a staff member in your office; is
13   that correct?
14   A.    Yes.
15   Q.    Can they deliver someone else's mail ballot, like a
16   spouse's ballot?
17   A.    No.
18   Q.    What happens if a voter shows up and they have their
19   spouse's ballot?
20   A.    We advise them that we can't accept it and let them know
21   there are other options.
22   Q.    And when the voter hands over their own ballot, what does
23   your office do?
24   A.    We have to get their identification and prove their
25   identity and then log their ballot and receive the ballot.

1    Q.    After SB 1, did your office receive more calls, questions

2    or complaints about elections than before SB 1?

3    A.    Yes.

4    Q.    And your office operates a call center where members of

5    the public can contact you related to election issues; is that

6    right?

7    A.    Yes.

8    Q.    Can you explain how the call center works?

9    A.    Yes.  All of our office is on a phone line, we have a

10   specific line dedicated to voters, and then lines dedicated to

11   election workers.

12   Q.    And who staffs the call center?

13   A.    They are staffed by different teams.  The recruitment line

14   is staffed by me, the voter services which processes ballot by

15   mail, staffed by the valid by mail director.  So each director

16   staffs their own line.

17   Q.    Can members of the public also contact your office by

18   e-mail?

19   A.    Yes.

20   Q.    And who tends to call the call center or e-mail you about

21   elections?

22   A.    Voters, election workers, state holders, media, anyone

23   interested in the elections in Harris County.

24   Q.    What are some of the reasons that voters call your office?

25   A.    To find out where their center is, to get assistance with

1155

1    answering questions on their ballot by mail, to request a

2    ballot by mail, to make a complaint, to know what's on a

3    standard ballot, those type of things.

4    Q.    Do voters with disabilities ever contact your office

5    asking for accommodations?

6    A.    Yes.

7    Q.    How would you describe the volume of calls that your call

8    center received related to the March 2022 primary?

9    A.    They were high.

10   Q.    And how would you describe the volume of calls your call

11   center received to the November 2022 general election?

12   A.    They were also high.

13   Q.    And how would you compare that volume to prior midterm

14   elections?

15   A.    Much higher.  I couldn't say a number, but higher.

16   Q.    Did many of the calls from voters that you received in the

17   2022 election cycle relate to SB 1's mail voting ID

18   requirements?

19   A.    Yes.

20   Q.    And can you describe what it was like for your office to

21   handle this higher volume of calls?

22   A.    Yes.  It was -- it took a lot of effort and a lot of work,

23   just a lot more activity from the voter calls.

24   Q.    Did your office do anything internally to handle the

25   larger volume of calls?

```
 1   A.    Yes.
 2   Q.    What was that?
 3   A.    We increased the staffing.  We also -- the voter services
 4   call line used to handle a lot of other call lines, but we
 5   reduced it so that they only handled voter calls.
 6   Q.    And how did -- can you quantify how you increased
 7   staffing?
 8   A.    Yes.  I would say we almost doubled the quantity of staff
 9   in our call center.
10   Q.    Do you expect to maintain that increased call center
11   staffing in future elections?
12   A.    Yes.
13   Q.    Is it the regular practice of the employees who staff the
14   call center to make a record of the call either during or
15   immediately after the call?
16   A.    Yes.
17   Q.    Why is that information collected?
18   A.    So that we can review the kinds of calls that are coming
19   in and analyze the -- when we're getting more calls, where we
20   might need more support in the future.
21   Q.    And you have a system where each call is assigned a
22   ticket; is that right?
23   A.    Yes.
24   Q.    And you -- you want to track each ticket to make sure they
25   get addressed?
```

```
 1   A.    Yes.
 2   Q.    And is the information that you collect from the callers
 3   used to determine the proper response from your office?
 4   A.    Yes.
 5   Q.    The -- the document that collects the record of all of
 6   these calls, did you refer to it as a call log?
 7   A.    Yes.
 8   Q.    Is that call log maintained as part of the regular
 9   activity of your office?
10   A.    Yes.
11           MS. HOMES:  Derek, I'd like to pull up what's been
12   marked as HAUL NFB 91, but for ease of preference, I'm using
13   the native Excel version of this document.
14   Q    (By Ms. Homes) Do you recognize this document?
15   A.    Yes.
16   Q.    And what is this?
17   A.    This is our call log.
18   Q.    And is this a record of the calls that came in during
19   various elections in 2022?
20   A.    Yes.
21           MS. HOMES:  Derek, could we scroll down to the bottom
22   of the document, please.
23   Q    (By Ms. Homes) Ms. Obakozuwa, this call log has 32,015
24   rows; is that correct?
25   A.    Correct.
```

1    Q.    And does each row represent a separate contact to your

2    offices call center?

3    A.    Yes.

4    Q.    And if we go back up to the top, column A is labeled

5    election period.  Do you see that?

6    A.    Yes.

7    Q.    That code indicates which election the call was in

8    reference to; is that correct?

9    A.    Correct.

10    Q.    So at the -- near the bottom of the documenter, I believe

11    there are some codes that are 1122.  Do you see those?

12    A.    Yes.

13    Q.    And that includes it's a call related to the November 2022

14    election?

15    A.    Yes.

16    Q.    Looking at the tab at the very bottom of the spreadsheet,

17    at the bottom of the page that says 4/20/2022 through 12/31/22.

18    Do you see that?

19    A.    Yes.

20    Q.    Does that -- does that tab indicate that this call log

21    includes contacts to your office between April 20th, 2022, and

22    December 31st, 2022?

23    A.    Yes.

24    Q.    And column C, sorry, at the top, again, column C is

25    labeled call date.  Do you see that?

```
1    A.    Yes.
2    Q.    And does that column provide the date of each contact to
3    your office?
4    A.    Yes.
5    Q.    Okay.  We can take that down for the moment.  We'll come
6    back to it.
7          Your position includes responsibilities related to voters
8    with disabilities; is that correct?
9    A.    Yes.
10   Q.    And Harris County has an obligation to ensure that voting
11   in person is accessible to voters with disabilities; is that
12   correct?
13   A.    Yes.
14   Q.    And Harris County also has an obligation to ensure that
15   voting by mail is accessible to voters with disabilities,
16   correct?
17   A.    Yes.
18   Q.    Are you familiar with the Americans with Disabilities Act?
19   A.    Yes.
20   Q.    And are you familiar with Section 208 of the Voters Right
21   Act?
22   A.    Yes.
23   Q.    And you oversee training of international staff of how to
24   ensure that these laws are followed in administering elections?
25   A.    Yes.
```

Q.   Does this training include a general overview of how to provide reasonable modifications to voters with disabilities?

A.   Yes.

Q.   During this training do you provide any guidance to your staff on how the requirements of the ADA specifically provide to the provisions of SB 1?

A.   Yes.

Q.   And does that include how the ADA applies to SB 1 provisions related to mail voting?

A.   The training that my team provides is related to anything that occurs in the vote center.  So it can be handled by all kinds of cancelations, but our office does provide training internally about voter assistance by mail.

Q.   But your office has received no guidance from the Secretary of State's Office about how the ADA applies to SB 1; is that right?

A.   Correct.

Q.   Does your training of your office staff include how the ADA applies to SB 1's provisions related to voter assistance?

A.   Yes.

Q.   Is it the practice of your office to try to make a modification or accommodation for a voter with a disability who needs it?

A.   Yes.

Q.   And has your office received requests for reasonable

1    modifications from voters with disabilities in recent

2    elections?

3    A.    Yes.

4    Q.    Is it your understanding that you can't change a provision

5    of SB 1 as a modification or accommodation for a voter with a

6    disability?

7    A.    Correct.

8    Q.    So if -- as an accommodation, a disabled voter asks your

9    office to waive SB 1's ABBM or mail-in ballot ID requirements,

10   would you grand that accommodation?

11   A.    No.

12   Q.    Are you familiar with SB 1's requirement for people who

13   assist voters to take an oath under penalty of perjury?

14   A.    Yes.

15   Q.    And if, as an accommodation, a disabled voter asked your

16   office to waive the assistance oath requirement for the

17   assistor, would you grant that accommodation?

18   A.    No.

19   Q.    You testified earlier that many of the questions and

20   complaints to your office during the 2022 election cycle

21   concerned SB 1's mail voting ID requirements; is that right?

22   A.    Yes.

23   Q.    Do you believe those complaints largely came from voters

24   over 65 or with a disability?

25   A.    Yes.

1    Q.    And has your office also received complaints from voters

2    with disabilities who are not able to receive the assistance

3    they needed to vote?

4    A.    Yes.

5            MS. HOLMES:    And I'd like to pull up HAUL NFB 91

6    again, please, Derek.

7        Now, I'd like to look at one complaint here.  Can we look

8    at line 28223, and then it's going to be over in column -- I

9    think we have the wrong column number.  Can you scroll over to

10   the right, please, Derek.  Column N.

11   Q     (By Ms. Homes) Do you see that on the screen?

12   A.    Yes.

13   Q.    Is it your understanding that this complaint was from a

14   voter who had are an, quote-unquote, awful experience trying to

15   assist someone to vote?

16   A.    Yes.

17   Q.    And the voter says here that they had a negative

18   experience filled with anxiety and frustration that they did

19   not experience in the past; is that right?

20   A.    Yes.

21   Q.    And one thing the voter complained about was that they had

22   to fill out a form and read a tiny printed very long oath; is

23   that correct?

24   A.    Yes.

25            MR. BRYANT:    Your Honor, I object to going into the

1    specifics of this on the basis of hearsay.  I understand that

2    the record itself is not hearsay, but it contains hearsay

3    within hearsay.

4              MS. HOMES:  Your Honor, this entry in the record

5    describes the assistors state of mind and emotional state in

6    trying to abide by the oath requirements that SB 1 put in

7    place.

8              THE COURT:  It is hearsay.  That's sustained.

9    Q.   (By Ms. Holmes) Your office received no reports of

10   suspected voter fraud related to people assisting voters in the

11   March or November 2022 election; is that right?

12   A.   Correct.

13   Q.   And your office receives federal funding; is that correct?

14   A.   Yes.

15   Q.   For example, your office receives federal funds related to

16   cyber security?

17   A.   Yes.

18   Q.   And in the past, your office has received funding through

19   the Help American Vote Act?

20   A.   Yes.

21   Q.   Let's discuss poll watchers.  Are you familiar with SB 1'

22   changes to the election code related to poll watchers?

23   A.   Yes.

24   Q.   And how would you describe those changes?

25   A.   They gave the poll watchers more free movement and created

1    a greater penalty to the election worker for not allowing free

2    movement.

3    Q.    And I'm going to go through a couple of these sections of

4    SB 1, and I'll be happy to bring up the text if you would like

5    me to reference it, so please let me know.

6          Are you familiar with, under SB 1 that a presiding judge

7    may not have a watcher removed for a violation of the election

8    code unless the violation was observed by an election judge or

9    clerk?

10   A.    Yes.

11   Q.    And SB 1 makes it a criminal violation for an election

12   judge to refuse to accept a poll watcher who presents with the

13   proper credentials.  Are you familiar with that change?

14   A.    Yes.

15   Q.    Under SB 1, a poll worker cannot deny a poll watcher free

16   movement in a place where election activity is occurring.  Are

17   you familiar with that change?

18   A.    Yes.

19   Q.    And under SB 1, a poll watcher is entitled to sit or stand

20   near enough to see or hear the activity they're observing.  Are

21   you familiar with that change?

22   A.    Yes.

23   Q.    Finally, under SB 1, a person commits a crime if they

24   knowingly prevent a poll watcher from observing, including by

25   obstructing the poll watcher's view or distancing the watcher

1    from the activity and manner that would make observation not

2    reasonably effective.  Are you familiar with that change?

3    A.    Yes.

4    Q.    When you train your poll workers, do you train them on the

5    rules governing poll watchers?

6    A.    Yes.

7    Q.    And you train them on how they should interact with poll

8    watchers?

9    A.    Yes.

10   Q.    As part of that training, what do you tell your poll

11   workers about how they should interact with poll watchers?

12   A.    That they should allow them free access to anything that's

13   occurring in the vote center.

14   Q.    In the training, do you give instructions about how close

15   a poll watcher can be to a voter?

16   A.    No.

17   Q.    Why not?  Why don't you give that instruction?

18   A.    We specifically state what's in the code that they can be

19   near enough to see or hear, but we can't give them a distance.

20   Q.    And do you have an understanding of how close a poll

21   watcher can be to a voter in terms of distance?

22   A.    No.

23   Q.    During the 2020 election, did your office receive any

24   guidance or recommendation from the Secretary of State about

25   how close poll watchers could be to voters?

1   A.    Yes.

2   Q.    And what was that guidance from the Secretary of State in

3   2020?

4   A.    They gave some guidance about poll watchers not needing to

5   wear masks, but that it's reasonable to request that they give

6   them an opportunity.

7   Q.    Post SB 1, have you received any guidance or

8   recommendation from the Secretary of State with a distance that

9   they recommend poll watchers maintain from a voter?

10  A.    No.

11  Q.    Is it true that during an election your office tries to

12  assist poll workers in real-time to troubleshoot problems they

13  encounter?

14  A.    Yes.

15  Q.    And that includes assisting poll workers with problems

16  they encounter related to poll watchers?

17  A.    Yes.

18  Q.    And to assist poll workers with a problem they encounter

19  with a poll watcher, you tell them what the law is; is that

20  right?

21  A.    Correct.

22  Q.    Were there any parts of SB 1 related to poll watchers that

23  poll workers had difficulty applying in the 2022 election

24  cycle?

25  A.    Yes.

1    Q.    What parts of the law?

2    A.    How close a poll watcher could be.  What documents they

3    could access, like, from previous days or maybe closed up,

4    sealed in envelopes, whether they could -- how close they could

5    be to a voter who's voting that doesn't have a poll worker

6    assisting.

7    Q.    And if you get post-SB 1, if you get a question from a

8    poll worker who is concerned that a poll watcher is too close

9    to a voter who is marking their ballot, what do you tell that

10    poll worker to do?

11    A.    That they need to be allowed free movement but that they

12    can communicate with the poll watcher to remind them that

13    they're not supposed to be inspecting the voter's ballot, and

14    then potentially ask if that's what they're doing.

15    Q.    So you recommend to the poll worker to ask the poll

16    watcher whether the poll watcher is inspecting the voter's

17    ballot?

18    A.    Yes.

19    Q.    And so does the poll worker need to rely on the word of

20    the poll watcher to determine that?

21    A.    Yes, or use their discretion.

22    Q.    In Harris County, the voting machine at the polling place

23    is called the Duo; is that right?

24    A.    Yes.

25    Q.    And the Duo sits on a stand and has privacy flaps on each

1  side; is that correct?

2  A.    Yes.

3  Q.    How big are the privacy flaps?

4  A.    About almost 2 inches -- 2 feet tall by maybe a foot wide.

5  Q.    And so if a poll watcher is standing behind the person who

6  is voting at the Duo, is it possible that the poll watcher can

7  see what the voter is marking on their ballot?

8  A.    Yes.

9  Q.    And post SB 1, have you ever seen complaints from poll

10  workers or voters who found poll watchers were standing too

11  close to them?

12  A.    Yes.

13  Q.    And let's say it's a poll worker who makes that complaint,

14  what do you tell the poll worker?

15  A.    We ask the poll watcher -- poll worker or remind the poll

16  watcher that they are not allowed to inspect the voter's

17  ballot.

18  Q.    There's no ballot nearby that the poll worker feels like

19  the poll watcher is just too close to them, what do you tell

20  the poll worker to do?

21  A.    We just remind them that they are allowed to have free

22  movement in the vote center and they're allowed to inspect

23  anything in the vote center.

24  Q.    And so is there anything the poll worker can do to

25  intervene in that scenario?

```
 1   A.   No.
 2   Q.   Let's say it's a voter who calls in and complains that the
 3   poll watcher is too close to them, what you do tell that voter?
 4   A.   That by law the poll worker -- poll watcher is entitled to
 5   see anything that's going on in the vote center, except for
 6   when they're voting.
 7   Q.   And have you received any complaints from voters that
 8   something that the poll watcher was doing was making them
 9   uncomfortable in the vote center?
10   A.   Yes.
11   Q.   And can you give my an example?
12   A.   So we had a call from a voter that felt that the poll
13   watcher was close -- too close to them and could possibly see
14   their ballot.  We had calls from poll workers who were
15   complaining that poll watchers were getting very close to
16   voters who were voting.
17   Q.   Are you aware of any instances in the 2022 election cycle,
18   when a poll worker confronted a poll watcher about something
19   that the poll worker considered a violation but the poll
20   watcher did not comply?
21   A.   Yes.
22   Q.   And in that kind of scenario, what would you advise the
23   poll worker to do?
24   A.   We would generally ask them to remind the poll watcher
25   about the rule, and then if they still don't comply, then to --
```

1    that they could be removed.

2    Q.    And can you give me an example of when this happened?

3    A.    It happened in the November 2022 election during early

4    voting.  We got several phone calls from different judges, one

5    particular one said that he asked the poll watcher to stop

6    talking to voters.  The poll watcher would not stop talking to

7    voters.  The poll worker called our office to seek guidance so

8    he could remove that poll watcher and was authorized to do

9    that.

10   Q.    And did the poll worker express any concerns about

11   actually removing the poll watcher?

12   A.    Not in that situation.

13   Q.    Okay.  If a poll worker does express concerns about, you

14   know, exercising their authority to remove a watcher, what do

15   you tell the poll worker to do?

16   A.    We ask them to speak with our legal line, with our county

17   lines to identify if there is an actual legal issue and whether

18   they have the authority to remove them.

19   Q.    So are there instances where poll workers had to get legal

20   advice before engaging poll watchers?

21   A.    Yes.

22              THE COURT:  Are you on a different topic?

23              MS. HOLMES:  Not quite yet, but --

24              THE COURT:  Why don't you finish --

25              MS. HOLMES:  In a couple more minutes, and then if

```
 1   would you like to break, Your Honor.

 2           THE COURT:  Yes.

 3   Q.    (By Ms. Holmes) If you got a question from a poll worker

 4   about what they can do in relation to a poll watcher and the

 5   answer is not clear, does your office tell the poll worker to

 6   err on the side of being more permissive of the poll watcher?

 7   A.    Yes.

 8   Q.    And why is that the approach your office takes?

 9   A.    So that the election worker doesn't get in trouble.

10   Q.    And your office does not train poll watchers, correct?

11   A.    Correct.

12   Q.    But they go through a training with the Secretary of

13   State?

14   A.    Yes.

15   Q.    Did your office notice that despite this training, there

16   were poll watchers in the 2022 election cycle that they did not

17   know what they could or could not do?

18   A.    Yes.

19           MS. HOLMES:  I can stop there, Your Honor, if you

20   want.

21           THE COURT:  Let's take 15.

22           COURTROOM OFIFCER:  All rise.

23      (Recess taken from 3:01 to 3:24)

24           COURTROOM SECURITY:  All rise.

25           THE COURT:  Thank you.  Please be seated.
```

```
 1    Q.   (By Ms. Holmes) Ms. Obakozuwa, earlier in your testimony
 2    when we were talking about drive-through voting, I believe I
 3    asked you approximately how many voters used drive-through
 4    voting in November of 2020.  Do you recall that?
 5    A.   Yes.
 6    Q.   And you said 17,000.
 7    A.   Yes.  That's the incorrect number.  17,000 in the 24-hour
 8    voting period, 130,000, approximately, voted during
 9    driving-through.
10    Q.   Thank you for that correction.
11         Returning to our discussion about poll watchers, did your
12    office receive a complaint form a person providing language
13    assistance in the November 2022 election that incorrectly
14    identified a poll watcher as a poll worker?
15    A.   Yes.
16    Q.   And did your office investigate this complaint?
17    A.   Yes.
18    Q.   And tell me what you found.
19    A.   We found a video from the assister showing the -- the
20    person who was telling her to leave the property that was
21    inside the vote center.  And the -- upon inspection of the
22    person's badge, we identified it was not a poll worker as the
23    assister had thought but was a poll watcher badge.
24    Q.   So according to this video, a person asked the assister to
25    leave the vote center?
```

```
 1   A.   Yes.
 2   Q.   And the person who did that was a poll watcher.
 3   A.   Correct.
 4   Q.   Would a poll watcher have the authority to remove an
 5   assister from a vote center?
 6   A.   No.
 7   Q.   And do you know what organization the person providing
 8   language assistance was affiliated with?
 9   A.   The Asian-American, Latin Defense -- Legal Defense Fund,
10   I'm sorry.
11   Q.   Are you aware of any incidents of harassment or
12   intimidation of voters by poll watchers during the
13   November 2022 election?
14   A.   Yes.
15   Q.   And what are those?
16   A.   There were voters who believed that a poll watcher was
17   very close to them may have been reading their ballot.
18   Q.   And that's something that your office classified as
19   harassment?
20   A.   Yes.
21   Q.   In the November 2022 election, did you receive complaints
22   about voters feeling -- I'm sorry.  I've asked you this
23   question already.  Withdrawn.
24        Derek, can we look at the call log again HAUL MFE 91.
25        And when we get that document up, I'd like to look at the
```

1   header in Column G.

2       Do you see Column G there, the header that says "issue

3   question"?

4   A.    Yes.

5   Q.    And do you see that one of the notations in Column G is

6   legal and coercion?  For example, if you scroll down to row

7   711 -- I'm sorry.  Take some time to navigate the large

8   document.

9   A.    Yes.

10  Q.    And what does legal and coercion -- what does that

11  notation mean?

12  A.    It is a call that requires a legal response or maybe a

13  report of coercion.

14  Q.    And by coercion, do you understand that to mean harassment

15  or intimidation or some sort of issue where the voter's rights

16  are inhibited?

17  A.    Yes.

18          MS. HOLMES:  Thank you, Derek.  We can take that

19  document down.

20  Q.    (By Ms. Holmes) I'd like to ask you a couple of questions

21  about central count.  What is central count?

22  A.    Central count is the -- the station that accepts the

23  ballots, the returns, and tabulates them at the end on an

24  election.

25  Q.    And where is that central count located in Harris County?

1185

1  A.    In November of 2022, it was at NRG.

2  Q.    Can you describe -- this is the NRG Arena?

3  A.    Yes.

4  Q.    Can you describe what the set up looks like outside of the

5  NRG Arena when you do central count?

6  A.    Yes.  NRG is a very large facility that has multiple

7  parking lots.  One of the parking lots was transformed to a

8  drive-through area where election workers would drive through

9  and return their election supplies.

10  Q.    And so at the end of the day, election judges drive over

11  the ballots and the equipment, they pull into one of these

12  drive-through lanes in the parking lot of NRG Arena; is that

13  correct?

14  A.    Yes.

15  Q.    And what is the process, then, for getting the equipment

16  and the ballots actually inside the arena?

17  A.    Our office goes through every item, checks the seals,

18  marks them off into our poll book, and then puts them on a

19  large cart and transports them inside to the central count

20  area.

21  Q.    And in November of 2022, did poll watchers disrupt this

22  process at all?

23  A.    Yes.

24  Q.    And how so?

25  A.    They were attempting to stop the carts so that they could

1    inspect different seals or look to see which items were in

2    there.  They attempted to take photos of the vehicles that were

3    coming and going.  And there's a lot of movement, so they

4    basically just were in front of a lot of activities or stopping

5    a lot of activities.

6    Q.    And this -- you mentioned taking photos of the vehicles.

7    Would those have been election judges' cars?

8    A.    Yes.

9    Q.    Their personal vehicles?

10   A.    Yes.

11   Q.    And what did your office do in response to this

12   disruption?

13   A.    We tried to continue processing as much as we could, as

14   fast as we could.  Tried to remind poll watchers where they

15   were supposed to be in the central count area.

16   Q.    And did the poll watchers comply with those reminders?

17   A.    No.

18   Q.    You testified earlier that in 2020, there was no problem

19   recruiting poll workers to staff vote centers; is that right?

20   A.    Right.

21   Q.    And in the 2022 midterm election, did you have any

22   challenges recruiting poll workers?

23   A.    Yes.

24   Q.    And in that election, you had many election judges who had

25   served before but they declined to work in the 2022 election

```
 1  cycle; is that right?
 2  A.    Yes.
 3  Q.    Did that happen -- did that happen in both the primary and
 4  the general election?
 5  A.    Yes.
 6  Q.    How many election judges declined to worker in November of
 7  2022?
 8  A.    Approximately 600.
 9  Q.    So losing 600 election judges, is that -- would you
10  consider that to be a lot?
11  A.    Yes, that's a lot.
12  Q.    And is it typical to lose 600 election judges just from
13  attrition from election to election?
14  A.    No.
15  Q.    And what was the impact of having so many election judges
16  decline to work during the 2022 election cycle?
17  A.    It created a lot of extra work internally.  When someone
18  declines to work, you have to find someone else to fill their
19  position.  It kind of created a lot of effort during the
20  emergency period to try to find new people who would be willing
21  to do it.  It causes to need more recruiters to be able to do
22  this activity.
23  Q.    And did you end up hiring more recruiters to do this?
24  A.    Yes.
25  Q.    How many more?
```

1   A.    We -- in 2020, we had 20.  And then in 2022, November, we

2   had approximately 40.

3   Q.    So you doubled your recruitment staff for this.

4         The election judges who declined to serve were ones who

5   had experience administering elections; is that correct?

6   A.    Yes.

7   Q.    So was there any impact in losing this experience core of

8   election judges?

9   A.    Yes.  When you have an election experienced judge, they

10  have a group of clerks who normally work with them.  And so we

11  had a lot of judges who needed help finding clerks, and then

12  election workers who just needed a lot more support during the

13  voting period because they haven't done the activities before.

14  Q.    Were there any polling places that could not be staffed in

15  either the 2022 primary or general election due to the loss of

16  election judges?

17  A.    There was in March 2022.

18  Q.    And it's your understanding that there are some

19  relationship between SB 1 and the difficulties recruiting and

20  retaining election judges; is that correct?

21  A.    Yes.

22  Q.    And what's your understanding of that relationship?

23  A.    We've had conversations with the election workers who told

24  us that because of the -- the fear they have over the legal

25  consequence of what occurs with the poll watcher, that they

1    just didn't feel that they wanted to participate or subject
2    themselves to that.
3    Q.    Was there anything else that shaped your understanding
4    that the decline in election judges was related to SB 1?
5    A.    Typically, when people are declining they tell you things,
6    like, I'm sick, I have to work that day.  But what we've found
7    is that there are a lot more unknown reasons that those.  So
8    people just saying "I never want to work elections again,
9    "Don't call me again," "I don't want to work."  So it's -- they
10   may not specifically say, but just generally not interested in
11   working again.
12   Q.    And you suspect that the change in the law is what leading
13   them to decline?
14   A.    Yes.
15   Q.    Do you believe election judge recruitment and retention
16   will continue to be a challenge in future elections?
17   A.    Yes.
18            MS. HOLMES:  No further questions.  I pass the
19   witness.
20            THE COURT:  Anybody else on this side?  Any cross?
21            MR. BRYANT:  Yes, Your Honor.
22                        CROSS-EXAMINATION
23   BY MR. BRYANT:
24   Q.    Ms. Obakozuwa, my name is David Bryant.  I represent State
25   of Texas, Secretary of State, and the Attorney General and I

```
 1    would like to ask you a few questions related to your
 2    testimony.
 3         Some of your testimony was about drive-through voting in
 4    Harris County in the connection with the November 2020
 5    election.
 6         Approximately how many drive-through locations did Harris
 7    County have during that election?
 8    A.   I believe it was under ten.
 9    Q.   And were some or all of those set up so that voters didn't
10    have to either go into a building or deal with somebody who was
11    in a building?
12    A.   Correct.
13    Q.   Was that true for all of them?
14    A.   Yes.
15    Q.   I want to understand better the procedures that was
16    followed with respect to those drive-through voting operations.
17         The voter could come up with as many people in their
18    vehicle as they chose to?
19    A.   Yes.
20    Q.   And did they present ID to an election worker at the
21    beginning of the drive-through voting process?
22    A.   Yes, sir.
23    Q.   And what did the election worker do once proper ID had
24    been presented?
25    A.   They would issue an access code and then allow the voter
```

1591

1    to access the booth and cast a ballot.

2    Q.    And so when you say "access the booth," did that require

3    the voter to physically get out of their vehicle?

4    A.    No.

5    Q.    So could you explain what you -- did they then drive up to

6    some type of booth with a dual, like in the polling places?

7    A.    Yes, sir.

8    Q.    And if there were multiple people in the vehicle who were

9    voting, how was that handled?  Did they have to shift around

10   within the vehicle?

11   A.    The dual booth was mobile and could be moved to different

12   windows.

13   Q.    And who would do that?

14   A.    The election worker.

15   Q.    Okay.  And after the various occupants of the vehicle

16   marked their ballot on the dual, did they get a paper product

17   that reflected their choices?

18   A.    In 2020, they did not.  In the next elections they did.

19   Q.    Those are the elections in 2021, prior to the passage of

20   SB 1?

21   A.    Correct.

22   Q.    Okay.  How was it done in November of 2020?

23   A.    It was on an eSlate different machine which recorded the

24   ballot without paper.

25   Q.    Okay.  Now, in connection with the drive-through voting in

1    November of 2020, was there any prohibition on communication
2    among the occupants of a vehicle that were in the process of
3    doing the drive-through voting?
4    A.    There really isn't any prohibition against communication
5    other than electioneering is not allowable.
6    Q.    So was the poll worker in a position to observe all of the
7    interactions among the various persons in the -- in the vehicle
8    at the time of the drive-through voting?
9    A.    Yes.
10   Q.    And were all of the people in the vehicle required to be
11   participating in drive-through voting?
12   A.    No.
13   Q.    So there could be people in there who might be union
14   bosses, might be employers, might be others with influence over
15   a voter at the time that they marked their ballot?
16   A.    Potentially.
17   Q.    Now, are you aware of whether or not Harris County
18   received a notice from the Attorney General of Texas regarding
19   the illegality of drive-through voting at some point?
20   A.    I'm vaguely familiar with communication received by our
21   office with concerns over drive-through.
22   Q.    Okay.
23            MR. BRYANT:  Frank, could you put up State
24   Exhibit 138.
25   Q.    (By Mr. Bryant) This appears to be a letter from the

1   Attorney General of Texas, dated October 16th, 2020, addressed

2   to "Dear Texas Election Officials."

3       Did you ever see or hear of this letter?

4   A.   Yes.

5   Q.   And did you hear or see -- hear of or see this letter in

6   approximately October of 2020?

7   A.   No.

8   Q.   When did you first become aware of the letter that is

9   State's Exhibit 138?

10  A.   In November.

11  Q.   Did you become aware of it in November prior to the date

12  of the general election?

13  A.   I became aware of its existence.

14  Q.   And what, if any, conversations did you have with other

15  Harris County election officials regarding State's Exhibit 138,

16  prior to the actual completion of the November 2020 election,

17  if any?

18  A.   It was very minor.  It was communication that we had

19  received a concern, but that we were still moving forward with

20  the drive-through because there wasn't believed to be any legal

21  issue.

22  Q.   Okay.  In State Exhibit 138, the Attorney General of Texas

23  cites a provision of the Texas Election Code, Section 43.031 B,

24  that was said to provide that, quote, "each polling place shall

25  be located inside a billing," unquote.

1    Did you or anybody else with the Harris County elections

2   offices, to your knowledge, determine whether or not that was

3   actually a provision of the Texas Election Code?

4   A.   Yes, sir.

5   Q.   And what did you do?

6   A.   We found multiple locations in the code that referred to

7   voting being able to occur in a structure, and we did have a

8   structure where the drive-through voting was occurring.

9   Q.   Okay.  And was that structure a building?

10  A.   It was -- it had a roof and walls.

11  Q.   Could you describe for the Court what those structures

12  consisted of?

13  A.   Yes, sir.  It was a very large tent, with walled-off areas

14  around the tent, other than in the through-drive lane.

15  Q.   Okay.  And so Harris County concluded that a tent with the

16  walls that you described constituted a building?

17  A.   Constituted a structure.

18  Q.   It never concluded it constituted a building?

19  A.   I'm not certain.

20  Q.   Okay.

21       THE COURT:  What does that mean?  So would the

22  Attorney General's Office be fine if they had all just run

23  through a beer barn?  Is that a building?

24       MR. BRYANT:  Your Honor, I am unqualified to answer

25  that, I'll state very frankly.  I've never --

1          THE COURT:  I'm just serious.

2          MR. BRYANT:  -- considered running an election in a

3    beer barn.

4          THE COURT:  You're asking me --

5          MR. BRYANT:  That might run afoul in some other

6    provisions of the voting law.

7          THE COURT:  You're asking me to find that Houston did

8    something improper.  I'm just wondering where's the line

9    between proper and improper?

10          MR. BRYANT:  Your Honor, I think that's --

11          THE COURT:  We have a beer barn answer.

12          MS. HUNKER:  Your Honor, we would agree that it's a

13    closer question.  But the Secretary of State's Office will be

14    testifying later in this trial, that they do not believe that a

15    structure applied in the same way as the witness is currently

16    defining it.

17          THE COURT:  No, I agree there's a difference between

18    a tent and a structure or building.  But I'm just wondering,

19    okay, could they have remedied the situation by just having

20    something like a beer barn drive-through.  Is that the

21    workaround?  We can hold that thought.

22          MR. BRYANT:  And, Your Honor, I don't believe we're

23    asking the Court to make a finding in this case that what was

24    used in November of 2020 was unlawful under the Texas Election

25    Code.  But I certainly would assert that this issue of what is

1    a structure and what is a building was eliminated as an issue

2    in a source of controversy in SB 1.

3            THE COURT:  Okay.  Thank you.

4    Q.   (By Mr. Bryant) I'd like to pull up State's Exhibit 150.

5    Can you identify State's Exhibit 150?

6    A.   Yes, sir.  It's the early voting poster with a schedule

7    and locations of our early voting locations for November 2018.

8    Q.   Okay.  Did those early voting locations multiply between

9    early voting in 2018 and early voting in 2020?

10   A.   Yes.

11   Q.   Could we have State's Exhibit 151.

12        Can you identify State's Exhibit 151?

13   A.   Yes, sir.  It's the same document but for November 2022,

14   that gives the dates and the locations for the voting.

15   Q.   And if I understand this correctly, it includes, on

16   State's Exhibit 151, kind of a legend or code, up near the map,

17   that indicates what each marking represents.  It looks like a

18   square represented a drive-through voting location; is that

19   correct?

20   A.   Correct.

21   Q.   And so if you look down at the -- at the list of early

22   voting places, you can see which ones were early voting

23   locations that offered drive-through voting?

24   A.   Correct.

25   Q.   For example, the first one is the NRG Arena that we talked

1  about.

2  A.    Yes.

3  Q.    And those that have a dot next to them represent new

4  drive-through locations that had not been used prior to

5  November 2020 for early voting?

6  A.    I'm not seeing the legend, and I don't recall.

7  Q.    Okay.  What I'm trying to interpret is the legend just

8  below the one we looked at, that referred to drive-through

9  voting.

10  A.    Yes, sir.  I'm uncertain about which items were new or if

11  the asterisks items were new.

12  Q.    Okay.  And then to the right of that is another legend

13  that, as I read it, says open 24 hour on October 29th.  Do you

14  see that?

15  A.    Yes.

16  Q.    And so can you -- can you pick out from the list of public

17  places the specific locations where 24-hour voting was

18  available in Harris County for the November 2020 election?

19  A.    Yes, sir.

20  Q.    And how many of those were there?

21  A.    For the drive-through locations?

22  Q.    Yes, ma'am.

23  A.    Seven.  Now, if I may, I would like to correct something I

24  said.

25  Q.    Okay.  Please do so.

1598

1    A.    In regards to Mr. Paxton's letter, I remember the -- we

2    were asked not to do drive-through on election day.  So we did

3    continue -- we were instructed to continue through early

4    voting, but for election day we did not conduct drive-through

5    voting.

6    Q.    Based on Exhibit 151, how many early voting locations did

7    Harris County have in November 2020?

8    A.    This does not show the full list, but there were, I

9    believe, including the drive-through, approximately 120.  There

10   is the list of -- it's saying 112.

11   Q.    Okay.

12   A.    It would have counted as, technically, 119 because the

13   locations that had drive-through voting were also an internal

14   voting location.

15   Q.    Okay.  And if we can go back to State's Exhibit 150.  How

16   many early voting locations were there in Harris County for the

17   November 2018 general election?

18   A.    Fifty-eight.

19   Q.    So Harris County went from 58 to 119 in two years?

20   A.    And, I'm sorry, I read the wrong number.  I apologize.  I

21   thought it was high.  It was 46.

22   Q.    It went from 46 to 119 between 2018 and 2020?

23   A.    Yes.

24            MR. BRYANT:  Your Honor, I move admission of State's

25   Exhibits 138, 150 and 151.

1          THE COURT:  Any objections?

2          MS. HOLMES:  No objection, Your Honor.

3          THE COURT:  State 138, 150 and 151 are admitted.

4      (State's Exhibit 138, 150 and 151 admitted)

5    Q.   (By Mr. Bryant) All right.  Can we pull up State's

6    Exhibit 25.

7          Can you identify what State's Exhibit 25 is?

8    A.   It is a post-election report from the November 2022

9    election.

10   Q.   And who issued that report?

11   A.   The election's administrator.

12   Q.   And did you personally have a part in either gathering

13   information for State's Exhibit 25, writing a portion of

14   State's Exhibit 25, or both?

15   A.   Yes, sir, I had a role in writing portions of it.

16   Q.   Did you also have a role in gathering information for it?

17   A.   Yes, sir.

18   Q.   And when was that post-election assessment that is State's

19   Exhibit 25 actually issued by Harris County election

20   administration?

21   A.   December 2022.

22   Q.   Now, that November 2022 election was the first election --

23   first general election that Harris County conducted under SB 1

24   or after SB 1; is that right?

25   A.   Correct.

1    Q.    And, in general, did that election go significantly better

2    than the March 2022 primaries in Harris County?

3    A.    I couldn't say.

4    Q.    You described earlier in your direct testimony a public

5    awareness campaign that Harris County elects their

6    administration, executed between the primaries in 2022 and the

7    general election.  Do you recall that?

8    A.    Yes, sir.

9    Q.    Did you consider that public awareness campaign a success?

10   A.    Yes.

11   Q.    And was Harris County able to train and assign election

12   judges and alternate judges for all 782 voting centers on

13   election day in November of 2022?

14   A.    Yes.

15   Q.    And was Harris County able to staff all 782 voting centers

16   on election day in November of 2022?

17   A.    Yes.

18   Q.    Are you aware of any voters in Harris County who could not

19   vote in the November 2022 general election because of any

20   staffing shortages in Harris County?

21   A.    No.

22   Q.    And did Harris County consider election day of November

23   2022 a success?

24   A.    Yes.

25   Q.    Is it fair to say, however, that there were problems that

1   Harris County experienced that are discussed in State's

2   Exhibit 25?

3   A.   Yes, sir.

4   Q.   Would you please pull up page 16 of State's Exhibit 25.

5        State's Exhibit 25, at page 16, toward the bottom,

6   discusses some problems that were encountered with respect to

7   mail ballots in the November 2022 election.  Do you recall

8   those problems?

9   A.   Yes, to a degree.

10  Q.   And do you recall that, first, there was a problem that

11  the ballot insertion would not fit in the envelopes that were

12  provided?

13  A.   Yes.

14  Q.   And so what did Harris County do to try to cope with that

15  problem?

16  A.   I'm unaware of most of the details, but I am aware that we

17  had to look at different vendors.

18  Q.   And, in fact, experts says that the initial contractor and

19  the election administration office agreed to subcontract the

20  mail ballot work out to a second vendor to prepare and mail the

21  ballots, but then there were other problems that were

22  encountered with the mail ballots.  Do you recall that?

23  A.   No, sir.

24  Q.   Okay.  This states that the Election Administration Office

25  received reports that voters were not receiving mail ballots,

1    and that voters were being charged extra postage because of the

2    size of the carrier envelope.

3         Do you recall any discussion about that in connection with

4    the November 2022 election?

5    A.   I do remember a conversation about the excess postage.

6    Q.   And do you or does Harris County Elections Administration,

7    to your knowledge, have any idea how that affected the number

8    of people who actually were able to complete and mail in their

9    ballots for the November 2022 election?

10   A.   I am not aware.

11   Q.   Now, in November of 2022, is it correct that all early

12   voting centers opened on time in Harris County?

13   A.   Yes.

14   Q.   But is it also correct that -- that Harris County had some

15   problems with respect to getting all of its voting centers open

16   on time on election day in November of 2022?

17   A.   There were some judges that did not open on time.

18   Q.   And could we pull up pages 17 and 18?

19        Do you recall why Harris County had some problems in

20   getting its voting centers opened on election day in November

21   of 2022?

22   A.   Some, yes.

23   Q.   What do you recall?

24   A.   There were some judges who arrived late.  There was a

25   judge that had a -- and I'm vague on the details, but there was

1    some confusion about items that were supposed to be -- the

2    judge thought were supposed to delivered by the elections

3    office.

4    Q.    Do you recall also that Houston had a very positive event

5    that occurred the day before the election, which was that it

6    held a parade to celebrate the Astros winning the World Series?

7    A.    Yes.

8    Q.    And do you recall that because of that parade, many of the

9    Houston schools were not available to allow set up for the

10   election the next day?

11   A.    Yes.

12   Q.    And what effect did that have on all of those voting

13   centers that were located in schools in Harris County?

14   A.    Any of the HISD schools, the majority of those judges had

15   to open and set up on election morning.

16   Q.    And did that result in delays in opening the voting

17   centers in Harris County on election morning to say they were

18   affected by -- anywhere from five minutes to two and a half

19   hours?

20   A.    Yes.

21   Q.    Did that result in quite a few calls and complaints to

22   Harris County Election Administration?

23   A.    Yes.

24   Q.    Did it result in significant numbers of voters appearing

25   with a desire to vote on election day and being turned away for

1    a while?

2    A.    Yes.

3    Q.    Do you have any idea how many voters were turned away and

4    never came back that day?

5    A.    No.

6    Q.    To the best of your knowledge, did Harris County comply

7    with all provocations of SB 1 in the November 2022 elections?

8    A.    Yes.

9    Q.    And is it correct that you're unaware of a single voter in

10   Harris County who could not vote in person at the November 2022

11   election because of SB 1 or any of its provisions?

12   A.    Correct.

13   Q.    Are you aware of a single instance in Harris County in

14   connection with that November 2022 election in which a voter

15   requested assistance and was unable to get it?

16   A.    Yes.

17   Q.    You aware of such instances or not aware?

18   A.    I'm aware of an instance.

19   Q.    Okay.  Tell us about that instance.

20   A.    There was a voter that requested assistance and the -- the

21   assister was having trouble with the oath and couldn't read the

22   oath, and so refused to take the oath.  And because they

23   couldn't read it, and then was not able to assist the voter.

24   Q.    Was the person who was asking -- being asked to take the

25   oath, someone who had a vision impairment?

A.    I'm unaware.

Q.    Do you know why the assister was not able to read the oath?

A.    It was just reported that they couldn't read it.

Q.    Okay.  Aside from that instance, are you aware of any instances in which a voter requested assistance and was unable to get it in connection with the November 2022 election?

A.    I am not aware of another situation right now.

Q.    Okay.  Now, another problem that Harris County had in connection with the November 2022 election day operations was ballot shortages.  Do you recall that?

A.    I recall reports.

Q.    And do you recall it was reported by the media that there were 20 or 24 voting centers in Harris County that, at one point or another during the election day hours, ran out of ballots?

A.    Not the specific number, but I recall media reports about it.

Q.    And did any criminal investigations, to your knowledge, result from anything that occurred or was alleged of have occurred during election day November 2022 in Harris County?

A.    Yes.

Q.    Could you describe, not the specifics, but the general topic of the investigation?

A.    Whether ballot paper was appropriately allocated.

```
1   Q.    Are you aware of any complaints of violence or threatened
2   violence by election workers while on duty in Harris County in
3   connection with that November 22 election?
4   A.    No.
5   Q.    Are you aware of any racial or other discrimination by an
6   election judge, clerk, election worker or other official in
7   connection with the November 2022 election in Harris County?
8   A.    Could you repeat the question?
9   Q.    Yes.  Are you aware of any racial or other discrimination
10  by an election judge, clerk, election worker, or other official
11  in Harris County in connection with the November 22 election?
12        THE COURT:  Does this include poll workers?
13  Q.    (By Mr. Bryant) Yes.  I include a poll worker within the
14  description, election worker.
15  A.    I am aware there was a statement from a poll worker
16  believing that their judge was being racist, but we couldn't
17  find evidence to it.
18  Q.    Okay.  Anything besides that?
19  A.    No, sir.
20  Q.    Okay.  Are you aware of any harassment or intimidation by
21  an election judge, clerk, election worker, or other official in
22  Harris County in connection with that November 2022 election?
23  A.    Could you list the people again?
24  Q.    Election judge, clerk, election worker, including poll
25  workers, or other officials?
```

```
 1   A.    Yes.
 2   Q.    In Harris County?
 3   A.    Yes.
 4   Q.    And what do you recall in that regard?
 5   A.    There were reports that poll watchers were intimidating or
 6   harassing voters by being very close to them in the vote --
 7   voting booth.
 8   Q.    And do you consider a poll watcher to be within that list
 9   that I gave you of election workers?
10   A.    I thought you said including poll watchers.
11   Q.    I'm sorry.  I meant to say including poll workers.
12   A.    Okay.
13         THE COURT:  I was confused by the question, that's
14   why I was asking you whether poll watchers were included, and
15   then I think you said it was included within election officials
16   is what I thought.
17         MR. BRYANT:  Well, I'm sorry that I confused
18   everybody.
19         THE COURT:  You need to be asking questions or --
20         MR. BRYANT:  I would be happy to.
21         THE COURT:  It's up to you.
22   Q.    (By Mr. Bryant) Clarify my terms very briefly and then
23   we'll move on.
24         What I meant to ask was about election judges, clerks,
25   election workers, including poll workers, but not poll
```

1    watchers, or other officials.  So the question was, were you

2    aware of any harassment or intimidation by those groups of

3    people?

4    A.    No.

5    Q.    Is it correct that, aside from the problem of getting the

6    voting centers open on time, that there were calls regarding

7    wait times in Harris County in connection with the

8    November 2022 election, but the number was low?

9    A.    Yes.

10   Q.    We talked to, in your testimony, about poll watchers.  And

11   you described some problems that occurred during that

12   November 2022 election in Harris County with respect to some

13   poll watchers.

14        Is it correct that there were no reports of violence or

15   threatened of violence related to poll watchers in that

16   election?

17   A.    Correct.

18   Q.    Is it correct that there was no report of an election

19   judge wanting to remove a poll watcher who was unable to do so?

20   A.    Correct.

21   Q.    Is it correct that the biggest problem with poll watchers

22   in Harris County in that election was that they wouldn't put

23   away their digital devices or phones and/or that they were

24   taking photos in the polling places?

25   A.    The other large complaints were that they were close to

1  voters, and that they were very close to election workers or

2  trying to access information from past states.

3  Q.    And in all of these 782 voting centers in Harris County,

4  on election day, November 2022 is it correct that less than

5  five poll watchers were removed?

6  A.    I just -- the number that I'm aware.

7  Q.    Now, you already testified you're familiar with the

8  provisions of the SB 1 regarding poll watchers.

9  A.    Yes.

10  Q.    And you found them clear enough to administer and to use

11  as training; is that right?

12  A.    I would say the application is not very clear.

13  Q.    Would you say that the provisions are clear?

14  A.    The wording is clear, but how to apply that wording.  For

15  example, proximity or being near enough, it is a challenge to

16  know what that space is.

17  Q.    Harris County has an election manual, does did not?

18  A.    Yes.

19  Q.    And does it contain provisions regarding what poll

20  watchers can and can't do?

21  A.    Yes.

22  Q.    Does Harris County election manual prohibit a poll watcher

23  from observing a voter as he or she votes?

24  A.    Yes.

25  Q.    And does that election manual prohibit poll watchers from

1  communicating with voters?

2  A.    Yes.

3  Q.    And does the Harris County election manual prohibit poll

4  watchers from recording images or sound inside of a voting

5  center.

6  A.    Yes.

7  Q.    And does the Harris County voting manual or election

8  manual allow an election judge to call the police to have a

9  poll watcher removed if he breaches the peace or commits a

10  violation of law?

11  A.    I don't believe breach of peace is in there.  After SP 1,

12  it requires the election worker to have witnessed a violation

13  of Penal Code or Election Code.

14  Q.    In Harris County, is it correct that poll watchers can be

15  turned away if they either lack required credentials or they

16  refuse to turn off and put away their digital devices?

17  A.    Yes.

18  Q.    And does Harris County, as far as you know, enforce those

19  provisions fully?

20  A.    Yes.

21  Q.    I believe you -- I believe that there were instances where

22  election workers had questions in the November 2022 election

23  about poll watchers.  Is it correct that Harris County was able

24  to answer them satisfactorily?

25  A.    No.

1    Q.    Was anyone, to your knowledge, prosecuted or threatened

2    with prosecution because of anything in SB 1, in connection

3    with the November 2022 election in Harris County?

4    A.    No.

5    Q.    I think you were asked a question or two about assistors

6    also, people who assist voters.  If an assisted voter, or

7    assister, can't read the print on any of the election

8    materials, will Harris County supply a large print version of

9    those materials?

10   A.    Yes.

11   Q.    And if they still can't read the large print version, is

12   it correct that a Harris County election worker will read aloud

13   those materials to the voter and the assister?

14   A.    They may.

15   Q.    It's correct that Harris County trains election workers on

16   the ADA and how to comply with it?

17   A.    Yes.

18   Q.    And prior to the November 2022 general election, when was

19   the last time that Harris County trained its election workers

20   on ADA compliance?

21   A.    Every election.  So prior to November would have been the

22   May elections.

23   Q.    Could you please pull up page 2 of State's Exhibit 25.

24        Now, this is a portion of the post-election assessment

25   that Harris County Elections Administration did, right?

1    A.    Yes.

2    Q.    Okay.  And Harris County is the, by far, the most populous

3    County in Texas?

4    A.    Yes.

5    Q.    And, in fact, it's the third most populous county in the

6    United States.

7    A.    Yes.

8    Q.    Now, what were the total number of votes -- ballots that

9    were counted in the November 2022 election in Harris County?

10   A.    According to this report, it's 1,107,390.

11   Q.    And that's -- you have no reason to believe that's

12   inaccurate, do you?

13   A.    Correct.

14   Q.    Now, if we look at the mail ballot data, it indicates that

15   there were 64,259 mail ballots that were returned by voters.

16   And then the next line says mail ballots surrendered.

17         Can you explain what that means, what the term "mail

18   ballots surrendered" means?

19   A.    Yes, sir.  They are mail ballots returned to the votes

20   center to be canceled so that they can vote in person.

21   Q.    And there's -- the next line says "mail ballots not

22   returned."  And what does that term mean?

23   A.    Those are mail ballots that the voter never returned.

24   They requested it, but they didn't return.

25   Q.    Okay.  With respect to those instances, does Harris County

1    Election Administration know whether the person -- the voters

2    to whom those mail ballots were issued, voted in some other

3    manner?

4    A.    They would not have been able to vote without canceling

5    the mail ballot.

6    Q.    Okay.  So your belief is that that line or people who did

7    not vote for whatever reason.

8    A.    Yes.

9    Q.    And then the next line is "mail ballots not countable,

10    $3,176.  What does that refer to?

11    A.    Those are mail ballots returned to our office that did not

12    have the required identification or information for it to be

13    counted.

14    Q.    Would it include ballots that were returned without

15    signatures?

16    A.    Yes.

17    Q.    Would it include ballots that were returned, but were not

18    properly filled out?

19    A.    Yes.

20          MR. BRYANT:  Your Honor, I'll move the admission of

21    State's Exhibit 25.

22          MS. HOLMES:  No objection.

23          THE COURT:  25 is admitted.

24      (State's Exhibit 25 admitted)

25          MR. BRYANT:  Pass the witness.

```
 1                THE COURT:  Anything else on this side?

 2                MR. NICHOLS:  Nothing further.  Thank you, ma'am.

 3                THE COURT:  Any redirect?

 4                MS. HOLMES:  No redirect.

 5                THE COURT:  You may step down.  Thank you.

 6           Do you have another witness for today?

 7                MR. BADAT:  Your Honor, I'm Amir Badat on behalf of

 8   NAACP Legal Defense Fund, we'd like to call Isabel Longoria as

 9   our next witness, please.

10                THE COURT:  Go ahead.

11            (The oath was administered)

12                MS. BADAT:  Your Honor, Ms. Longoria's testimony is

13   relevant to HAUL challenges to SB 1 Sections 3.04, 3.09, 3.10,

14   3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 5.02, 5.03, 5.06,

15   5.07, 5.10, 6.03, 6.04, 6.05, and 6.07, which span all of our

16   claims.

17                THE COURT:  Thank you.

18                MR. BADAT:  May I proceed?

19                THE COURT:  Yes.

20                          DIRECT EXAMINATION

21   BY MR. BADAT:

22   Q.   Good afternoon, Ms. Longoria.

23   A.   Good afternoon.

24   Q.   Could you please state your name for the record?

25   A.   Isabel Longoria.
```

1    Q.    Where do you live, Ms. Longoria?

2    A.    Houston, Texas.

3    Q.    How long have you lived there?

4    A.    Thirty-five years on and off, born and raised.

5    Q.    And what is your educational background?

6    A.    Undergrad here at Trinity University in San Antonio, and

7    then a graduate degree at the University of Texas Public

8    Affairs School.

9    Q.    And what is your current occupation?

10   A.    I am a deputy director at the Annie's List Training and

11   Engagement Fund.

12   Q.    And what did you do before that?

13   A.    I took a short break, but before that I was the elections

14   administrator of Harris County, Texas.

15   Q.    And what were your responsibilities as an elections

16   administrator.

17   A.    To administer elections and voting voter registration in

18   Texas, including election day, early vote, mail ballot and

19   everything encompassed by that.

20   Q.    How were you selected for that position?

21   A.    The county created the EA position and there was an

22   election commission that interviewed several candidates and I

23   believe they appointed me or voted to appoint me in November of

24   2020.

25   Q.    And during what time were you in this position?

1   A.     From that November 2020 -- the end of 2022 to July 1st,
2   2022.
3   Q.     What did you do before you were elections administrator?
4   A.     I was a special advisor for then County Court Chris
5   Hollins for voting rights and access at the Harris County
6   clerks office.
7   Q.     And during what time were up in this position?
8   A.     I believe the official start was June 1st, 2020, and then
9   I went from there to being the EA.
10  Q.     And what were your responsibilities as special advisor?
11  A.     Clerk Hollins created something called the safety
12  initiative, to promote safe accessible, fair, and equitable
13  elections, and he hired a group of us to manage various
14  projects related to elections in the 2020 election.  So my jobs
15  were 24-hour voting, mail ballot improvements, poll watchers,
16  supervised and helping build the drive-through voting program,
17  collaborating with community groups and partners and then other
18  duties as assigned.
19  Q.     And how were you selected for the special advisor role?
20  A.     Chris and I spoke into lead up to and enter a county clerk
21  being selected.  We were both passionate about voting rights,
22  and I've grown up in Houston my whole life and I couldn't
23  imagine doing anything better than dedicating my service to
24  elections in a pandemic.
25         So he knew I had experience running campaigns and public

1    service and he picked me to be a part of the team.

2    Q.   And so why did you start working in elections?

3    A.   I've always been drawn to public service, to helping in

4    some way.  But for elections specifically, nothing in a

5    democracy happens without free and fair elections.  We don't

6    have, respectfully, judges, we don't have representatives, we

7    don't have departments of transportation unless people are

8    elected or appointed.  And what holds us up as a democracy

9    versus others is the peaceful transition of power.  So being

10   able to hold elections that people can be a part of, can feel

11   good about and ultimately select those folks to run our

12   country.  And so it's -- I know it's a little -- but it all

13   starts with elections.

14   Q.   And was it particularly meaningful for you to be able to

15   work in elections in Harris County?

16   A.   I'm a big Houston nerd.  I used to get called a Houston

17   ambassador here at Trinity.  It's my hometown.  You know, to be

18   in public service is great, to be in service to your family,

19   your friends, the people you've grown up with, the people you

20   hope to serve for the rest of your life, there are fewer eyes

21   than that.

22   Q.   And so as a Harris County native, can you tell us a little

23   bit about your own county?

24   A.   Harris County is big, quite large.  You can drive an hour

25   from one side to the other and still be in the county.  It's

1     one of the most diverse places in America.  Sometimes I think

2     of it as New York on a bigger footprint, and that's what I

3     love.  You can drive from one end to the other and be in 15

4     different worlds and still be in Harris County.

5     Q.   So I want to ask you a few more questions about Harris

6     County and I'd like to ask Derek to pull up State Exhibit 290.

7     Actually, I have a binder with some exhibits that I'm hoping to

8     show you today's, Ms. Longoria.

9                MR. BADAT:  Your Honor, may I approach the witness?

10                THE COURT:  You may.

11     Q.   (By Mr. Badat) So, Ms. Longoria, I'm showing you what has

12     been labeled as State Exhibit 290.  This is a printout of the

13     U.S. Census Bureau's quick fax page for Harris County.  If I

14     could direct your attention to the header population, and

15     taking a look at the fourth row.  Do you see it says population

16     census, April 1, 2020?

17     A.   Yes.

18     Q.   What's the number there that's next to that?

19     A.   4,731,145.

20     Q.   Do you understand that to be the population of Harris

21     County according to the U.S. Census of 2020?

22     A.   It sounds fair to me.

23     Q.   If you go down to the heading race and Hispanic origin,

24     what is the percentage of black population of Harris County?

25     A.   Black or African-American alone, it looks like

1  20.3 percent.

2  Q.    Now, I don't want to ask you to do math, so I'm hoping

3  Derek can help us out here.  But, Derek, could you pull up a

4  calculator to see what the percentage black population is in

5  Harris County.  So that would be 4,731,146 multiplied by .203.

6      What's that number, Ms. Longoria?

7  A.    960,422 and change.

8  Q.    Now, a couple of rows below that, can you tell me what the

9  percentage of Asian population is in Harris County?

10 A.    Asian alone is 7.4 percent.

11 Q.    And a few rows below that, what is the percentage Hispanic

12 or Latino population in Harris County?

13 A.    44.4 percent.

14 Q.    And, Derek, could you help us out again with the quick

15 calculation.

16      If you took the total population of Harris County of

17 4,731,145 and multiply that by .444.   Ms. Longoria, can you

18 read that number, please?

19 A.    2.1 million.

20 Q.    And do you understand that to be the number of Hispanic or

21 Latino people living in Harris County?

22 A.    It seems fair to me.

23 Q.    Do you know what a majority/minor county is?

24 A.    Yes.  Majority/minor refers to the fact that no one

25 minority group, black, Asian, Hispanic is above 50 percent or

1    simple majority of the whole population.  But if you add all of

2    those minority groups together, combined they comprise over

3    50 percent of the population.

4    Q.    And based on this U.S. Census data, is it your

5    understanding that Harris County would be considered a

6    majority/minor county?

7    A.    Yes.

8    Q.    A couple of more questions about this document.  If we go

9    back up to the Asian sex heading, can you tell me the

10    percentage of Harris County's population that is aged 65 and

11    over?

12    A.    Sixty-five and over, looks to be 11.4 percent.

13    Q.    Okay.  And then if we go down to the health section, what

14    percentage of Harris County residence have a disability and are

15    under the age of 65?

16    A.    6.6 percent.

17    Q.    In your experience, does a large proportion of the 65 and

18    over population have disabilities?

19    A.    Yeah.  I worked for AARP for four years, doing aging

20    advocacy.  And in my experience, I can't remember the exact

21    number, but as folks get older either through stroke or aging

22    or cognitive impairment, there's quite a chunk of them who have

23    that age overlap and disability overlap of some sort.

24    Q.    So would it be reasonable to expect that the percentage of

25    people with disabilities in Harris County would be larger than

1  the 6.6 percent that we just looked at?

2  A.    Yes.  When adding folks under 65 with disability with

3  folks over 65 with the disability, it would be over

4  6.6 percent.

5  Q.    So the demographic data that we just looked at, is that

6  consistent with your experience living and growing up in Harris

7  County, with regard to the diversity of the county that you

8  mentioned?

9  A.    Yes, it's a huge melting pot.

10  Q.    And then, finally, last thing on this document, if we got

11  all the way to the bottom under geography -- this might be on

12  the second page.  There it is.

13       What is Harris County's land area in square miles as of

14  2020?

15  A.    As of 2020, 1. -- I'm sorry -- 1,706 square miles.

16  Q.    So that's a pretty big county?

17  A.    Yes.

18  Q.    Okay.  Thank you.  We can put this document away.

19       Ms. Longoria, now I'd like to talk a little bit about the

20  November 2020 Election.  You were in your special advisory role

21  at the Harris County Clerk's Office during this election,

22  right?

23  A.    Correct.

24  Q.    And so you mentioned the Harris County Clerk's Office and

25  then after that you were the election administrator in Harris

1    County.  Can you tell us the difference between a county clerk

2    and an election administrator?

3    A.    At least in Harris County, the County Clerk was in charge

4    of election matters and the tax office was in charge of voter

5    registration matters.

6         And then, kind of the simplified version, an elections

7    administrator is in charge of elections and voter registration,

8    and is appointed by the election commission, whereas the other

9    two are elected.

10   Q.    So what was the function of the Harris County Clerk's

11   Office for the November 2020 Election?

12   A.    Harris County Clerk in November 2020 was the election

13   function.  So not voter registration, but mail ballot,

14   drive-through voting, early voting, voter issues, et cetera.

15   Q.    How did the November 2020 Election compare to previous

16   elections in Harris County?

17   A.    It was a big election.  I believe up to that point, the

18   largest, both in percentage and people participating, raw

19   number of voters in Harris County, as well as happening during

20   a pandemic and then again kind of the County Clerk position.

21   Q.    So were there adjustments made by the County Clerk's

22   Office in response to these two things that you just mentioned?

23   A.    Yeah.  Of course, with the pandemic all industries were

24   looking to how to keep people safe in a pandemic, how to create

25   more physical space, not temporal space, and how if we are

1    doing drive-through banking and drive-through vaccines, you can

2    do drive-through voting.  If grocery stores are staying open

3    earlier or later, can we do that with voting.  And just

4    generally, you know, not just that, but under Clerk Hollins

5    with safe initiatives, asking ourselves how can we keep people

6    safe and how can we use this as an opportunity to get people

7    more engaged in the voting process.

8    Q.   So you mentioned drive-through voting, you mentioned

9    staying open later, opening up earlier.  Were you referring

10   there to 24-hour voting?

11   A.   Yes.

12   Q.   Were there any changes related to mail ballot procedures

13   in Harris County for the 2020 Election?

14   A.   Yeah.  The mail ballot voting in the design, in the

15   training of signature verification committee, and early vote

16   ballot board.  Kind of we retrained folks too on how to deal

17   with voters in a pandemic, poll watcher opportunities and

18   opening up again that kind of voter access within the office.

19   Q.   And so you mentioned in addition to the pandemic that

20   Harris County had more voters than ever in 2020.  What role did

21   that play in the decision to make some of the adjustments that

22   you just mentioned?

23   A.   We had to -- the challenge was how to offer voting

24   opportunities to kind of more voting opportunities and

25   opportunities that would move people through the voting system

1    faster, while still maintaining, you know, kind of all safety

2    and legal procedures, et cetera, and the added addition of

3    trying to keep enough space so that they wouldn't share COVID,

4    you know, prospective COVID germs.  So dealing both from how to

5    deal with such an influx of people in the resource restrictive

6    environment, as well as dealing with the health crisis.

7    Q.   Tell us a little bit about the process that the County

8    Clerk's Office used to develop these changes.

9    A.   Almost from day one in June, like I said, we came in,

10   Clerk Hollins directed us to interview every department,

11   interview the every nonpolitical parties, Democratic and

12   Republican, interview advocacy and community groups and just

13   collect from them, what did they see needed to be done to

14   expand elections, especially in a pandemic, you know, how could

15   we help folks who spoke different languages, had disabilities,

16   were just scared for their health, and then how could we use

17   this also as a moment to create more efficiency within the

18   office that would ultimately serve voters.

19        So we met with those community groups, pretty much in 30

20   days, collected those ideas.  And in July of 2020, I think it

21   was the Primary Run-off Election that had been pushed back a

22   bit, we used that as an opportunity for what we called pilot

23   those initiatives, so drive-through voting, 24-hour, some mail

24   ballot improvements and other training improvements to kind of

25   work with our community partners, to put those in place, see

1  how those initiatives worked in real life and then, again, work
2  to kind of scale or improve them going into what we anticipated
3  would be a huge November election.
4  Q.    So as part of this process, would you hold regular
5  meetings with the groups that you just mentioned?
6  A.    Yes.  I think we had something like 28 initiatives, we had
7  a leader for each initiative.  We would hold weekly or biweekly
8  meetings, depending on kind of what those groups decided.  We
9  always had presentations, we followed up with notes, before and
10 after meetings we solicited input on what should be part of
11 that meeting, notes after that meeting, and it was always what
12 we called consensus driven.
13       Those scripts had to agree and feel comfortable with
14 initiatives we would put in place.  And in July we invited
15 those groups, for example, with the drive-through voting, for
16 all of those groups to come, observe the process so they could
17 see firsthand from a safe distance and see how that was
18 working.  So it was a very hands-on process.
19 Q.    And in addition to the community groups that you
20 mentioned, were there other groups involved in this process as
21 well?
22 A.    In that the Democratic and Republican parties were --
23 because that July Run-off was Primary were, you know, centered
24 in that process as having initiative of those elections, and
25 obviously, you know, getting bind from two major political

1    parties going into November.

2    Q.   Ms. Longoria, do you recall what the overall turnout was

3    for the November 2020 Election?

4    A.   I think it was 1.68 million, something around there.

5    Q.   We can pull up State Exhibit 167.  This is behind Tab 2 in

6    your binder, Ms. Longoria.

7         I'm showing you what's been labeled as State Exhibit 167.

8    Do you recognize this document?

9    A.   By the title, it looks like a printout from the Secretary

10   of State's Office on voter registration turnout in Harris

11   County.

12   Q.   If we go down to I believe it's the second page, can you

13   please tell us the overall turnout in Harris County in the 2020

14   General Election?

15   A.   It was very close.  It looks like 1.63 million for total

16   turnout.

17   Q.   Not bad.  And how did this compare to the turnout in prior

18   elections listed in this table?

19   A.   1.63 million is bigger than any other number listed, that

20   I can see there, as far as raw number of people voting.

21   Q.   So the 2020 General Election in Harris County had the

22   highest voter turnout of any election since, I think the

23   earliest is 1992 here, is that fair to say?

24   A.   By raw numbers?

25   Q.   1988.  Sorry.  I spoke over you.  What was your answer?

1    A.    I'm sorry.  By raw number, 2020 was the largest turnout

2    election since 1988.

3    Q.    If we go back down to the row for 2020, what percent of

4    registered voters voted in 2020?

5    A.    It looks like 65.86 percent of registered voters voted

6    since 2020 -- or in 2020.

7    Q.    And how did this compare to turnout rates in prior

8    elections listed here?

9    A.    It looks like, with the exception of 1992, or the highest

10    turnout percentage-wise since 1992.

11    Q.    And if you go back to the row for 2020, all the way to the

12    right, what percentage of voters voted early here?

13    A.    87.79 percent.

14    Q.    And how does that compare to previous elections?

15    A.    Looks like since '88, almost double, double what previous

16    highs of early voting percentage.

17    Q.    Ms. Longoria, you mentioned some of the changes that the

18    County Clerk's Office made for 2020, like drive-through voting

19    and 24-hour voting, what impact do you think those changes had

20    on turnout in Harris County in 2020?

21    A.    I think a couple of things.  I think that ease of voting,

22    that kind of creativeness in meeting people where they were in

23    different points of their lives, got more people voting, you

24    know, more minority folks voted as compared to the percentage

25    of registered voters, more women voted, as compared to the

1    registered voters.  And, you know, from these numbers, you can

2    see too it shifted voters to early voting, which was very much

3    intentional in our effort to, again, when we're speaking about

4    how to keep people safe in a pandemic, making sure that you

5    could shift them to opportunities early so that you're not

6    crowded on Election Day jamming more people into spaces where

7    they prospectively are spreading germs.  So I think it really

8    shifted that dynamic and offered opportunities that people felt

9    they could vote early and engage in voting.

10   Q.    So I'd like to talk a bit more, in more detail about some

11   of the methods of voting that you mentioned.  You mentioned

12   drive-through voting.  Can you explain to us, what is

13   drive-through voting?

14   A.    Drive-through voting is where someone can engage in

15   in-person voting from the safety and convenience of their

16   vehicle.  So we called it the Sonic method.  A voter could

17   drive up, and you would have your own kind of check-in and

18   ballot station, you could select to stay in your car or step

19   just outside of it, check in, vote, be on your way.

20   Q.    By sign-up you're referring to the drive-up pass through?

21   A.    I apologize.  When we were discussing how to set up

22   drive-through voting, we had discussed whether it should be set

23   up from McDonald's style and so we decided on Sonic style, so

24   people had the security and safety at their own booth.

25   Q.    And why did Harris County provide drive-through voting in

1    2020?

2    A.    One, we were looking at other folks, again, banks,

3    vaccination sites, grocery stores who were public health

4    officials who were saying, you know, if you can keep physically

5    in that vehicle, it reduces your likelihood of interacting with

6    other individuals.  And so we took that model and we wanted to

7    apply that for health and safety reasons to drive-through

8    voting, how can we give people the option to stay safe, where

9    curbside voting was really designated to folks just with maybe

10   kind of specific health issue, drive-through voting was

11   available like all in-person voting to everyone who was

12   eligible to vote.

13        In addition to which, you know, it also provided the

14   opportunity to do something that we thought -- let me put it

15   this way.  Harris County, Houston is car city.  People do

16   everything in their cars.  And so why not extend what people

17   are used to, to voting as well, to those government services,

18   and so it was an opportunity both to keep people safe and to

19   give people what that want in Harris County, and that's the

20   convenience of voting from your car.

21   Q.    Earlier you mentioned that Harris County did a pilot of

22   drive-through voting in the July 2020 Primary Run-off.  So was

23   the November 2020 Election the second time Harris County

24   implemented drive-through voting?

25   A.    Correct.

1    Q.    And was Harris County the only county in Texas to

2    implement drive-through in November 2020.

3    A.    From my understanding in 2020, Tom Green County, you could

4    only early vote using drive-through voting.  And I don't

5    remember the specifics on the number of voters.

6    Q.    I'd like to pull up HAUL in 275.  This is behind Tab 3 in

7    your binder, Ms. Longoria.  Do you recognize this document?

8    A.    Yes.  It was a memo or a report that was created by folks

9    at Rice University.  Our office worked with Rice University,

10   kind of run the statistics and see how effective our different

11   methods of voting were after the 2020 Election.

12   Q.    And in preparing this report, did your office provide any

13   materials or data to Rice University?

14   A.    Yeah.  I was the head of this project.  There's a guy,

15   Benjamin Chow, who worked with the students at Rice.  I believe

16   he walked them through, how the set up was, and did share with

17   them how to look up voter data and how to run statistics.  And

18   then they worked with their professor to do so in a

19   statistically significant way so they can be sure this was good

20   and helpful data for our purposes.

21   Q.    So I want to take a look at the bottom of page 4 of this

22   document.  What is this?

23          MR. KERCHER:  Your Honor, I'm sorry.  We have some

24   objections.  It's hearsay and it's improper expert opinion.

25          THE COURT:  Are you admitting the report right now?

1          MR. BADAT:  I'm not admitting the report right now.

2     For purposes of the witness's testimony right now.

3          THE COURT:  This is an illustrated diagram of just

4     how this process worked?

5          MR. BADAT:  Exactly.

6          THE COURT:  And so this is a demonstrative aid only?

7          MR. KERCHER:  So it's not in evidence.  The Court is

8     only looking at it as a demonstrative; is that correct?

9          THE COURT:  Correct.

10          MR. KERCHER:  Thank you for the clarification.

11     Q.    (By Mr. Badat) So, Ms. Longoria, looking at this photo --

12     let me ask you first.  If you read the caption underneath the

13     photo, it says photos of the layout of HCC West Loop, location

14     provided by Elections Administrators Office 2020.  And so did

15     your office provide this photo?

16     A.    Yes.  This comes from the -- the working group of

17     drive-through voting.  So this was the map that Democrats and

18     Republicans and community groups put together for planning

19     drafting zoning and ultimately were provided the specs, if you

20     will, for setting up voting and drive-through voting at this

21     location.

22     Q.    Okay.  And so HCC West Loop, that a drive-through voting

23     site during which elections?

24     A.    This was the first pilot of drive-through voting for the

25     July 2020 Election, so it was the only drive-through voting

1  site for the July 2020 Election, and I believe it was also used

2  in the November 2020 and in jurisdictions or elections where

3  the voting area overlapped we would have used this site for

4  drive-through voting for future elections.

5  Q.    So looking at this photo, can you walk us through how

6  drive-through voting worked in Harris County?

7  A.    Uh-huh.  Bear with me while I get a little technical here.

8  Black dots are vehicles and a couple of things we want to

9  account for is when you are voting from your vehicle, once

10  general safety and circulation right, making sure that the path

11  of the vehicle wouldn't overlap with the path of pedestrians,

12  keeping them safe, wouldn't -- those blue lines there showed

13  generators, extension cords, et cetera, that would have plugged

14  into machines.  So we never wanted vehicles to cross over those

15  extension cords and put those machines at risk, et cetera.  And

16  so they showed that you enter there on the left.  You have kind

17  of two check-in stations where people -- election workers would

18  have been there just to, you know, kind of welcome people to

19  the site, let them know how this works and hold them until

20  voting booths was open.  They would direct them to those voting

21  booths which, I think, are reds, that each voting booth had an

22  election worker and had a controller, and different machines

23  you need to check people in and get them voting.  And, again,

24  it was Sonic style.  So each slot had its own machine so you

25  could vote there, you weren't taking machines from other

1    voters, et cetera.  You vote, you check in, you vote as you
2    wanted to.  You could, again, step out of your vehicle, just
3    there.  It was just one person; or if you got there, you didn't
4    look it, all drive-through voting locations were poll located
5    with walk-up locations.  So the individual could pull out of
6    that parking lot, and you see the great building down the left
7    was the indoor voting location as well.
8           So you vote, you back out, and you go about your way.  We
9    also asked people at the end of that how they liked it, what
10   they liked, what they didn't like so that we could capture that
11   voter experience at some level to improve if it for November
12   202.
13   Q.   Thank you.
14   A.   That was a short version.
15   Q.   Let me ask you a few questions about that.  So am I right
16   that the black ovals here represent cars?
17   A.   Correct.
18   Q.   And so I think that you mentioned that the red circles are
19   voting stations; is that right?
20   A.   Correct.
21   Q.   Okay.  So a car would pull into one of these parking
22   spaces and there would be a poll worker there to meet them; is
23   that correct?
24   A.   Correct.  Oh.  I'd also like to point out that this
25   diagram -- this is the roof of the garage, but they were not on

1    the roof of the garage, they were on the first floor of that
2    garage.  So they also had kind of the roof that protected from
3    the elements otherwise.
4    Q.    Thank you.  And so when a car pulls up and the poll worker
5    greets the person in the car, what happens after that?
6    A.    The pole -- the election worker would ask who in the
7    vehicle was there to vote.  You know, it might be driver or
8    driver and passenger, and one by one you would ask for their
9    ID, you know, check them in, make sure they're registered to
10   vote on the poll book.  You would then administer their ballot
11   access code, at least with the old machines in Harris County so
12   you go to the controller, get your ballot access code, which is
13   a foreign number on a piece of paper, and then eSlate, which is
14   voting machine, the tablet, was on, I believe, I think there
15   were on dollies at that point or on tables so you would push
16   the dolly that the eSlate was on right next to the door of the
17   vehicle.  And, again, voters could kind of reach out and vote
18   on that machine.  They could also -- the eSlate -- it's like a
19   tablet next to the machines so you could take the tablet out
20   and angle it so voters would feel comfortable if they have a
21   heavy truck, they can kind of pull it a little closer so they
22   could vote; or, again, they could open their car door, sit in
23   their car and still use that eSltae.  So it's very adaptable to
24   the different sizes of cars and needs of the voters.
25   Q.    And after the voter made their selections on the eSlate

1    machine, what would happen after that?

2    A.    They would hit cast ballot.  And if you're lucky the

3    American flag waves, you're done voting, you pull out.  If

4    there was another voter, say, passenger, we roll the machines

5    to the other side of the vehicle and start that process over

6    and checking in that voter, giving him the ballot access code,

7    you know, letting them continue their functions and otherwise

8    voting.  And it's important to note if there was more than one

9    individual in a vehicle who wanted to vote or even if there

10   was, you know, a mom and kids, for example, you could not

11   speak.  Just like any other in-person voting, you can't speak

12   to any other voters in the car, you can't kind of motion.  And

13   so there is -- the election workers were always there, you

14   know, obviously making sure that things were running smoothly

15   with the machine, but also to make sure that was no undue

16   chatter, if you will, inside the voting booth.

17   Q.    So where exactly would the election worker be positioned

18   relative to the car while the voter was making their choices on

19   the ballot?

20   A.    Like a foot or two away.  You know, so they rolled up the

21   dolly and they would stay kind of one side of that car with the

22   dolly, and the voters making their selections.

23        We even had like cardboard privacy screen things, same

24   cardboard privacy screens you would have used in the disability

25   access, but it's in the walk-up voting.  And so voters could

1    kind of petition those -- or position those cardboard

2    partitions if they didn't want election workers, you know, they

3    were worried they didn't want anyone looking or they didn't

4    want anyone else in the vehicle looking, they could kind angle

5    those cardboard pieces so the that you could still see the

6    machine, just to make sure it's all plugged up and nothing is

7    happening.  But you couldn't see any -- any given selection of

8    that voter.  So you can't see how they're voting, but I can see

9    the machines are also there and working.

10   Q.    And you mentioned the machines were called the eSlate

11   machines, right?

12   A.    Yes.

13   Q.    And were those the same machines used at normal early

14   voting locations?

15   A.    All voting, all early voting whether it was curbside,

16   walk-up or drive-up, used the same machines.

17   Q.    And were those also the same machines used at election day

18   at polling locations?

19   A.    Correct.

20   Q.    How was drive-through voting -- let me ask you a question

21   before this.

22         Are you familiar with curbside voting?

23   A.    Yes.

24   Q.    What is curbside voting?

25   A.    Curbside voting, I believe, I think it's federal law that

1    dictates it, for disability access.  Every single voting

2    location for early vote and on election day must offer an

3    option where voters who feel they cannot walk into a voting

4    location or whose health might be, you know, otherwise severely

5    impacted by walking into a voting location, they can pull up to

6    the curb of a voting location.  In Harris County, you have

7    buttons that they can push and some places they have phone

8    numbers that you call.  And, basically, an election worker

9    would come out to the vehicle, ask who in the vehicle needs

10   this curbside option.

11        They would take the voter's ID, so their driver's license,

12   walk with it inside, do the whole epoll book check-in process.

13   Sometimes they bring the epoll book outside.  Come back outside

14   with a ballot access code, and they would have to remove an

15   eSlate from the tablet to make it mobile.  They would bring the

16   tablet and the access code outside, and they would either hold

17   it against the vehicle or if the vehicle was large enough, the

18   voter could bring it in the vehicle and make their selection,

19   and then that tablet would be returned and kind of plugged back

20   in to the eSlate.

21        To make a final point, I apologize, the main differences

22   are there's only certain folks who can be eligible for curbside

23   voting.  Those who, I believe the standard is you can't --

24   don't feel that they can walk inside or stand up long enough to

25   walk inside and vote.  It's also not protected because it's so

1  many voting sites, they have to have at least one option.  You

2  have to unplug those machines, bring them out, so rain -- sun,

3  rain hurricane, you've got to bring out those machines to those

4  vehicles.  Whereas drive-through voting was always sheltered.

5  There's all kinds of, for lack of a better term, kind of a roof

6  and ceiling, et cetera or roof and wall stretches.

7        And then for curbside, you know, a voter has to give up

8  their ID and there's a certain walking back and forth, where

9  drive-through voting always pull up to the booth and those

10 machines are right there.  So the voter maintains visual access

11 of everything happening in that process.

12       So both eligibility and kind of some slight mechanic and

13 majestical differences.

14 Q.   In your opinion, is curbside voting a secure method of

15 voting?

16 A.   It's secure in that -- yeah, the process is the same.  I

17 think that the voter has to have a little more faith in

18 watching those things go back and forth.

19 Q.   How many drive-through voting centers were there in Harris

20 County in 2020?

21 A.   In November of 2020?

22 Q.   I'm sorry.  November 2020?

23 A.   In November of 2020, I think it was -- I think it was ten

24 overall.  Right around the county.

25 Q.   So can we pull up State Exhibit 142, which is 4 in your

1    binder, Ms. Longoria.

2    A.    Got it.

3    Q.    Do you recognize this document?

4    A.    Yes.  This is a flier that was created by the election

5    office, County Clerk office.  We have posted it on social media

6    and shared it around the community group and such.  That

7    illustrates the locations of the ten voting sites for early

8    voting in the November 2020 Election.

9    Q.    And I think that it's -- the screen might be cut off at

10   the bottom, so we're only seeing a few.  There we go.

11        There are the ten sites.  So is this an accurate

12   reflection of where the drive-through voting locations for

13   early voting were established in Harris County for the November

14   of 2020 Election?

15   A.    Yes.

16   Q.    How did the Clerk's Office determine where to locate

17   drive-through voting centers?

18   A.    A couple of mentions.  One, we knew from July 2020, that

19   you needed a good amount of space.  So first a voting location

20   that had a nice size parking lot so that, again, you could have

21   that safe movement of vehicles and keep them separated from

22   other pedestrian and traffic.  That every drive-through voting

23   site had to be co-located.  So not just a nice big parking lot,

24   but co-located with a walk-up voting site, just, you know, a

25   couple of feet away, whatever it might be, so that people

1    always had that option of doing the drive-up or the walk-up

2    voting.

3        We also staked some out geographically.  Like in Harris

4    County, it's huge, so we wanted to make sure that people around

5    the county could get to it, you know, in a reasonable amount of

6    time.

7        We also looked at sites that had a lot of traffic, that

8    they were popular sites, that we knew historically always had

9    several hundred voters per day.  And that was trying to, again,

10   get at kind of the geographic needs to space people out.  We

11   were providing machines, 6-foot space indoors, but if you had

12   people waiting in line or a lot of people, that's a lot of

13   germs to spread, so we wanted to kind of give another option at

14   what we called mega voting sites.

15       And then, finally, people had to agree to that.  So every

16   voting site -- because we had to use a special kind of tent

17   that was staked into the ground that had a tinted roof and

18   could also have partitions, kind of, walls that could withstood

19   weather conditions, people had to agree to have that in their

20   parking lot.  So there was all of those together we landed on

21   these top ten sites.

22   Q.   And were -- you mentioned that each of these sites were

23   co-located with what you called walk-up sites.  Can you explain

24   what a walk-up site is?

25   A.   A walk-up site is where -- what we have in voting now

```
1    Harris County is where you park your car and if you are not
2    eligible for curbside voting, you have, you know, the mobility
3    to go inside, you literally walk inside to the voting location,
4    and it's all the same check-in process, machines, et cetera.
5    So you're walking around doing that versus doing it from your
6    vehicle.
7    Q.    So what most lawyers would know to be just a normal early
8    voting location?
9    A.    Correct.  Yeah, voting location.
10   Q.    And so were each of the ten sites listed here also early
11   voting locations for the duration of early voting in 2020 --
12   I'm sorry -- walk-up early voting locations?
13   A.    Yes.  All of these sites would have been early -- open for
14   the entirety of early voting.
15   Q.    And what days was drive-through voting available?
16   A.    Drive-through voting was available all three weeks of
17   early voting for the November 2020 Election.
18   Q.    And what were the hours of drive-through voting?
19   A.    I believe, in general, early voting was open from 7 a.m.
20   to 7 p.m. with the exception of our expanded hours, nights,
21   which I think went to 10 p.m. for all sites and then a couple
22   of sites had 24-hour voting through the night.
23   Q.    How many voters in Harris County used drive-through voting
24   in the November 2020 Election?
25   A.    You'll have to refresh my memory on the exact number.
```

```
1   Q.   Why don't we take a look at HAULD V273, which is behind
2   Tab 13 in your binder, Ms. Longoria.
3   A.   Go it.
4   Q.   So do you know what this document is?
5   A.   Yes.  This is, I believe, an example of a memo we prepared
6   for the State legislature going into the legislative season
7   2021 with, kind of, data about the different methods of voting.
8   Q.   And in the second sentence in the first paragraph --
9   sorry, the third sentence in the first paragraph, it says:
10  This turn out was driven by issues like drive-through voting
11  from the season of 128,000 voters.  Does that refresh your
12  memory about how many voters in Harris County used
13  drive-through voting in 2020?
14  A.   Yes.  It always makes up percentages; but, yes.
15  Drive-through voting was about 128,000 voters.
16  Q.   And do you know what percentage of overall voters that
17  was?
18  A.   I can't do the math right now.  It's around 10 percent, if
19  I'm not mistaken.
20  Q.   So let me ask you -- we can take this down.
21       How did you ensure the drive-through voting was secure?
22  A.   When we looked at walk-up voting or kind of the other
23  in-person voting methods and we made sure that the machines
24  were the same, that check-in process was the same, the -- the
25  ability to access the eSlate to conduct your voting was the
```

1   same, again, we spent weeks and weeks talking with community

2   groups and political parties to walk through.  We even did a

3   pilot set up of a drive-through voting site that all the

4   parties attended and community parters just to see how it

5   worked in person.  And we consistently thought about what was

6   the voter perception using it as well.

7        And so when you look at the safety, making sure that those

8   voting booths were spaced out from each other, so, you know,

9   when you're outside and talking in your own car, you couldn't

10  see or hear what another voter was doing specifically.  Making

11  sure we had those privacy screens again, those cardboard

12  privacy screens that were used in the walk-up station for those

13  facility voters, same materials.  So we wanted to keep

14  everything as much as possible consistently the same.  So I

15  feel confident in saying that drive-through voting had the same

16  security and privacy as walk-up voting.

17           THE COURT:  When you did demo, were representatives

18  from the Democratic and Republican party there the demo?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Did either one of them object at that

21  point in time to doing voting by that manner?

22           THE WITNESS:  I don't remember objections.  There

23  were, you know, the Republican party brought up, hey, we want

24  to make sure these machines are plugged in, for example, they

25  didn't like similar to curbside voting when we had to remove an

1    eSlate from the tablet and then plug it back in.

2         A lot of concerns about making sure there was enough air

3    circulation and making sure that vehicles wouldn't run

4    pedestrians over.  And so that's why we did the mock up and the

5    trials.  And also why we -- every meeting we ended with written

6    notes back to these groups so that they could correct the

7    record, if you will, or return any comments in writing.  Kind

8    of as they reflected on these measures.  So anything that was

9    brought up, we wanted to correct to make sure that everyone

10   felt comfortable with this process.

11        THE COURT:  And when this process was used in

12   November 2020, at any point did you get any kind of writing,

13   communication from either the Democratic or Republican party of

14   Houston or Harris County to object to the process?

15        THE WITNESS:  I believe the Republican party, towards

16   the end, objected to the process.  And, again, what they

17   returned to me in the beginning was they wanted the eSlates to

18   remain connected to the tablets.  And so after the first the

19   few days of early voting, we got them longer cords at

20   drive-through voting.  So even if the eSlate had to be removed

21   from the tablet, it could still stay plugged into the

22   controller.

23        And then I think there was broadly some other concerns

24   about poll watchers being able to look and see everything, and

25   poll watchers had free reign at drive-through voting sites

1  together in single voting booths and what they wanted.  What I

2  would categorize is the Republican party and poll watchers is

3  they stated that at some point walk-up polling location the

4  poll watcher could stand in the middle of the room and kind of

5  rotate and see more voting booths at all once.  But at larger

6  voting locations, equally, you can't see every voting booth all

7  the time, and so I considered that a kind of null or neutral

8  tradeoff to what was equivalent to a large walk-up, in-person

9  location.

10            THE COURT:  Thank you.  I apologize for the -- I

11  teach Tuesdays and Thursdays, so we're going to have to call it

12  quits today.

13        We'll resume with Ms. Longoria tomorrow morning.

14        Anything else we need to take up though before we quit for

15  the day?

16            MS. HOLMES:  No, Your Honor.  We can -- we have an

17  exhibit to enter into evidence but we can do it in the morning.

18            THE COURT:  Anything else?

19            MR. KERCHER:  I'll take up anything else in the

20  morning.

21            THE COURT:  Thank you.  Things change by the hour

22  around here, but right now I have two criminal sentencing

23  tomorrow morning.

24        So don't take seats until we find out whether those go or

25  not.

1          Thank you.  Good night.

2              MR. BADAT:  Thank you, Your Honor.

3              COURTROOM OFFICER:  All rise.

4          (Court adjourned at 5:06 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1247

```
1                              —o0o—

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above—entitled matter.  I

4    further certify that the transcript fees and format comply

5    with those prescribed by the Court and the Judicial Conference

6    of the United States.

7

8    Date:  09/19/23              /s/  Gigi Simcox
                                  United States Court Reporter
9                                 262 West Nueve Street
                                  San Antonio TX 78207
10

11

12                               /s/  Tish Moncivais
                                  United States Court Reporter
13                                262 West Nueve Street
                                  San Antonio TX 78207
14

15

16

17

18

19

20

21

22

23

24

25
```