IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,      .
ET AL,                           .
                                 .
          PLAINTIFFS,            .
     vs.                         . DOCKET NO. 5:21-CV-844-XR
                                 .
GREGORY W. ABBOTT, ET AL,        .
                                 .
          DEFENDANTS.            .

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE
SEPTEMBER 20, 2023

APPEARANCES:
FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
                         FATIMA MENENDEZ, ESQUIRE
                         JULIA LONGORIA, ESQUIRE
                         MALDEF
                         110 BROADWAY
                         SUITE 300
                         SAN ANTONIO TX 78205


                         AMIR BADAT, ESQUIRE
                         JENNIFER A. HOLMES, ESQUIRE
                         NAACP LEGAL DEFENSE & EDUCATIONAL
                         FUND INC
                         40 RECTOR STREET, FIFTH FLOOR
                         NEW YORK NY 10006

```
 1

 2

 3

 4

 5   FOR THE DEFENDANTS:      RYAN G. KERCHER, ESQUIRE
                             KATHLEEN HUNKER, ESQUIRE
 6                           WILLIAM WASSDORF, ESQUIRE
                             TEXAS ATTORNEY GENERAL
 7                           P.O. BOX 12548
                             MC 009
 8                           AUSTIN TX 78711

 9

10

11

12

13   REPORTED BY:           GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
14                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
15

16

17

18

19

20

21

22

23

24

25
```

ISABEL LONGORIA – DIRECT

1    (San Antonio, Texas; September 20, 2023, at 9:00 a.m., in

2   open court.)

3         THE COURT:  Good morning.  It's 9:00.

4         MISS PERALES:  Good morning, Your Honor.  Nina

5   Perales for the LUPE plaintiffs.

6         This morning we had discussed arguing a motion in

7   limine and the parties are prepared to do that, but because

8   there is a witness on the stand from out of town we certainly

9   wanted to offer that we would wait until following the

10  cross-examination of Miss Longoria to do that argument.

11        THE COURT:  Yeah.  Let's finish up Miss Longoria.

12        MISS PERALES:  Thank you.

13        MR. BADAT:  Your Honor, I ask Miss Longoria to take

14  the stand.

15        (Isabel Longoria resumed the stand)

16        Amir Badat on behalf of the HAUL plaintiffs.  Your

17  Honor may I proceed?

18        THE COURT:  Yes.

19                    DIRECT EXAMINATION

20  BY MR. BADAT:

21  Q.  Good morning, Miss Longoria.  Welcome back.

22      So yesterday we left off talking about drive-thru voting

23  and I believe I had asked you about how you ensured that

24  drive-thru voting was secure.  Could you, just to bring us

25  back to where we were, could you go over that one more time,

ISABEL LONGORIA - DIRECT

1  please.

2  A.  Sure.  First and foremost, we made sure to have those

3  groups meet together, the advocacy groups and parties and our

4  different departments, in the weeks, months leading up to the

5  July, and making sure we piloted into July so that we could

6  run through, you know, prospectively anything that comes up

7  ahead of the November 2020.

8      We kept the methods of voting, so how the machines were

9  hooked up together, how you have the e-poll book, and a

10  controller, and an e-slate at each station, I would say what's

11  different than walk-up voting is that each voting location

12  would have one to two controllers, so it became a chokepoint,

13  you know, people are ready, standing in line waiting to use

14  the controllers, but at drive-thru voting you had your own

15  controller there so you could really, in your own voting

16  booth, maintain connection to different machines and do that

17  check-in process, as well as you could — something called the

18  e-slate is nested in the tablet, that tablet is connected by a

19  cord in the older machines to the controller so when you vote

20  and you click cast and it accepts it that vote would get

21  transmitted into the controller.

22      There is a point where, just like with curbside voting,

23  you can unplug those e-slates and make sure that you use them,

24  plug them back in, vote gets transmitted, but for the sake of

25  keeping it clean and some, you know, concern that was raised

ISABEL LONGORIA - DIRECT

1  by one of the parties we just kept them ported in with longer
2  cables, and so for us it was incredibly important to keep
3  everything the same, kind of machine and procedure-wise, and
4  also to just be very responsive to even the perception that
5  something, you know, could be better to make sure that we were
6  responding to that from the community partners, parties, and
7  voters if they raised anything.
8  Q.  At what point did you make that change to keep the
9  machines plugged in?
10  A.  I believe it was day two or three of early voting that it
11  had just -- it seemed to be causing anxiety, even though there
12  wasn't anything that pointed to it being a technical issue,
13  and so we just, we got some longer cables, ordered them in,
14  and kept those ported.
15  Q.  Did you have any concern about multiple voters voting from
16  the same car?
17  A.  No.
18  Q.  Why not?
19  A.  It's something, you know, based on my past that we walked
20  through, right, if one of the main principals of voting is
21  that a voter -- you shouldn't be -- voters shouldn't be
22  talking to each other and definitely, you know, no one should
23  be influencing a voter, whether it's a walk-up location,
24  drive-thru, curbside, whatever it may be, and we walked
25  through some very extreme scenarios, you know, what if there

ISABEL LONGORIA – DIRECT

1  was a wife and a husband was abusive and what if the — and
2  the fact of the matter is very — no one I know would let a
3  stranger into their vehicle.  So this perception that like
4  just strangers are hoping in and out of cars and influencing
5  people and hopping to the next car seemed highly unlikely.
6      And then even if, unfortunately, a voter was in a
7  situation where they were in a domestic relationship that was
8  not healthy, at some point that is not something that the
9  office can control for, even if you are at in-person voting,
10 you know, to take it to these extreme examples, you could have
11 a voter who, you know, an abusive spouse kind of forced that
12 voter to accept them as an assistant and then stand there in
13 the booth with them, and again, these were just extreme
14 situations we had never seen and the ability to control for
15 someone's personal relationship was not something that was in
16 our purview, regardless, but even if we encountered one of
17 those situations we had one election worker per voting station
18 or booth, which was different than in-person voting where you
19 have, you know, a couple of election workers and they kind of
20 walk around, so these election workers were trained to remind
21 voters that they could not speak to each other, even if you
22 had kids in the car, right, everyone should stay quiet, should
23 not influence each other, and election workers were always,
24 you know, within a couple feet of a vehicle to be able to kind
25 of hear or see if anything was going on in between or between

ISABEL LONGORIA – DIRECT

1  people in the vehicle, so just by definition of having kind of

2  one election worker per voting booth, you had, I think, more

3  observatory power to just step in if anything looked improper.

4  Q.  In your experience did voters express discomfort with

5  voting from the same vehicle as someone who they came with to

6  the drive-thru voting site?

7  A.  No.  In reverse, we got folks — again, in July 2020 we

8  kind of took a quick poll or survey of people leaving

9  voluntarily and they loved it.  What I heard more was parents

10  who said I can pack my kids in the car and instead of having

11  to unload the kids, walk into a voting station, keep them

12  quiet while they are in a voting station, get out, load them

13  back, I can just put them in the car, you know, vote really

14  quick, be on my way.  We gave all the kids stickers too.  They

15  liked that.

16      Even if you had older parents, you know, I, instead of

17  being able to go to curbside voting, now you've got like — it

18  takes triple the amount of time for the machine to go back and

19  forth, you could load your older parents in the vehicle, have

20  them vote, have you vote, not have to worry about those

21  mobility issues and be on your way.  So, for us,

22  overwhelmingly, the voters responded very well to it.

23  Q.  If a voter were uncomfortable voting from the same car as

24  someone else, could they step out of the car to vote?

25  A.  Absolutely.  Voters had all free movement as any citizen

ISABEL LONGORIA - DIRECT

1  would so they could literally step out, just outside of the

2  car and be there with their own voting booth.  They could

3  elect, if they wanted to kind of step out and go inside to the

4  location to vote at the walk-up location, that we did not

5  limit their movement.  We just made sure they didn't walk out

6  in front of cars, but that was a rare instance.

7  Q.  Where were poll watchers positioned at the drive-thru

8  voting sites?

9  A.  Poll watchers were positioned wherever they wanted to be

10 positioned, so they would sign in with the election judge, she

11 was in charge of those kind of rows of tents, if you will, and

12 they could go in and out of any booth that they wanted.  They

13 could be right next to the voters and the machines.  We

14 reminded them that they couldn't look at the screen ever, but

15 they would be within, I would say, maybe six inches or a foot

16 of where the voting machines were.

17 Q.  And are you aware of any incidents of voter fraud related

18 to drive-thru voting?

19 A.  No.

20 Q.  Are you aware of any incidents in which a voter felt

21 coerced or pressured to vote a certain way while using

22 drive-thru voting?

23 A.  No.

24 Q.  Did you use drive-thru voting again in Harris County for

25 any elections after the November 2020 Election?

ISABEL LONGORIA - DIRECT

1  A.  I don't remember the number of locations but I believe we

2  did some in the December Run-off and then in the May 2021 I

3  think it was a local election that cycle.

4  Q.  And would you have used it again for future elections if

5  SB 1 had not banned it?

6  A.  Absolutely, hands down, one of the — for voters we got

7  constant questions afterwards of where they could drive-thru

8  vote, why not drive-thru voting, and if you live in a car

9  city, voting from your car is quite a luxury.

10 Q.  What is your understanding of the extent to which Black

11 voters in Harris County used drive-thru voting?

12 A.  As I remember, looking back at the statistics, if you look

13 at kind of Black voters who voted for the entirety of early

14 voting, drive-thru voting tended to have more people who were

15 from Black precincts voting.  So I think, as I understand it,

16 Black voters tended to use drive-thru voting more than they

17 did other methods of early voting.

18 Q.  And what's your understanding of the extent to which

19 Hispanic voters in Harris County used drive-thru voting?

20 A.  Same.  Hispanic voters tended to use drive-thru voting

21 more than they did other forms of early voting.

22 Q.  How did that factor in to your desire to use drive-thru

23 voting for future elections or for elections after

24 November 2020?

25 A.  As someone who has worked in public service for various

ISABEL LONGORIA – DIRECT

 1  forums and over a decade, that's exactly what we would hope to
 2  see, that we know historically voters who Black, Hispanic,
 3  Asian don't tend to vote as much and are not even registered
 4  at the same levels as their White peers in the same county.
 5      So to finally find a mechanism that truly made it easier,
 6  was convenient, was just as safe, was just as easy for the
 7  office to promote, and helped those minority communities vote,
 8  to me, made sure that the voting population was more
 9  demonstrative of the overall population dynamics in a county,
10  which is a little nerdy, but from a democracy perspective
11  that's exactly what you want.  You want to make sure that you
12  have a closer cross-section of the people being represented.
13  Q.  I would like to pull up what's been labeled again as HAUL
14  MFV 272.  This is behind Tab 3 in your binder.  I think you
15  still have it in front of you.  We took a look at this
16  yesterday but I'd like to look at page 15 of this document.
17      Do you remember this document, Miss Longoria?
18  A.  Yes.  This is the one with the -- we worked with
19  Rice University with.
20  Q.  Okay.  And I'd like to focus at the bottom of page 15 and
21  ask you to explain what this table shows, please.
22          MR. KERCHER:  Objection, Your Honor.
23          This is the document we talked about yesterday.  The
24  objection was improper opinion and hearsay.  I understand the
25  Court reviewed the portion we looked at yesterday as a

ISABEL LONGORIA – DIRECT

1  demonstrative.  It's not in evidence and we reurge our

2  objection.

3          THE COURT:  Yeah.  So what's your questions going to

4  be here?

5          MR. BADAT:  So Miss Longoria just testified about the

6  extent to which Black and Hispanic voters used drive-thru

7  voting and I wanted to have her look at this as the basis for

8  that understanding.

9          THE COURT:  Yeah, but she didn't write this report,

10 right?

11         MR. BADAT:  No.

12         THE COURT:  So how is she going to testify to this?

13 You're just getting the expert's testimony through her, right?

14         MR. BADAT:  The materials provided by this — to the

15 researchers were provided by Harris County, and so —

16         THE COURT:  She can testify to stuff of her personal

17 knowledge, if you want to try to ask her what the numbers were

18 from her personal knowledge, but you can't get it through the

19 report.

20         MR. BADAT:  That's fine.  We can move on.

21         THE COURT:  Sustained.

22         MR. BADAT:  Thank you, Your Honor.

23 BY MR. BADAT:

24 Q.  So, Miss Longoria, you are familiar with SB 1, correct?

25 A.  Correct.

ISABEL LONGORIA - DIRECT

1  Q.  And what was the first major election that took place

2  after SB 1 went into effect?

3  A.  The first major election that SB 1 went into effect was

4  the March 2022 Primary.

5  Q.  And what position were you in at that time?

6  A.  Elections Administrator.

7  Q.  And are you aware that SB 1, Sections 3.04, 3.12 and 3.13

8  banned Texas counties from providing drive-thru voting?

9  A.  I don't remember the specific text, but, yes, that SB 1

10  bans or reclassified buildings and structures, there would not

11  be any drive-thru voting.

12  Q.  And so did Harris County implement drive-thru voting

13  during the March 2022 Primary elections?

14  A.  No.

15  Q.  How did the unavailability of drive-thru voting impact

16  access to voting for Harris County voters in the March 2022

17  elections?

18  A.  We continued to get calls into our office asking about

19  drive-thru voting, again, from family members, caregivers.  If

20  I remember correctly, in November 2020 women were also more

21  likely to use drive-thru voting because there is, you know,

22  historically tend to be more caregivers, et cetera, and for

23  their own safety concerns they could stay in a confined area

24  of their vehicle.

25       People just didn't get it.  The calls that we usually got

ISABEL LONGORIA – DIRECT

1  and that we had to field was, you know, where is drive-thru

2  voting, why not, if they were confined along and commenting

3  that they just didn't understand why not drive-thru voting,

4  and so I don't have the numbers but I know that people wanted

5  it, didn't appreciate that they didn't have it, and I don't

6  know if that affected people who needed to vote quickly or not

7  from coming to vote.

8  Q.  So, Miss Longoria, I'd like to move on to another topic.

9  Yesterday you mentioned that Harris County implemented 24-hour

10  voting in the November 2020 elections.  What is 24-hour

11  voting?

12  A.  24-hour voting, I'll take a personal moment to say, was

13  one of my special projects.  It came about because I had

14  somebody who used to take care of me who worked two to three

15  jobs growing up.

16       She was Guatemalan descent and I remember thinking that

17  she could not get anywhere after work and I always thought

18  about her and stayed in contact and so what I really wanted

19  was the opportunity and had dreamed of it for years of

20  offering 24-hour voting for folks who had two to three jobs,

21  for parents who by the time you get up in the morning and get

22  your kids ready and get them to school and go to work and kind

23  of skip your own lunch, pick up the kids and go to an

24  after-school activity, et cetera, that 7:00 a.m. to 7:00 p.m.

25  is not built — voting from 7:00 a.m. to 7:00 p.m. is not

ISABEL LONGORIA – DIRECT

1  built for people who have kind of lives or atypical, not

2  9-to-5 single-person jobs.

3      So we did it through the night.  It's something that when

4  you saw other major cities doing as well in regards to you

5  know, H-E-B and grocery stores, opening up hours for older

6  folks so that they could be shopping around fewer people, so

7  around fewer germs, and so there's an alignment of this kind

8  of public access issue and the benefits in a global pandemic,

9  and so 24-hour voting is we would keep the voting location

10  open, essentially for 36 hours straight, but kind of 24 hours

11  in a calendar day, and 7:00 a.m. to 7:00 p.m. in that last day

12  of early voting.

13  Q.  What did Texas law in 2020 require of counties in terms of

14  how long early voting could remain open?

15  A.  I believe at that time it was you had to keep -- you had

16  to have early voting at least a week before Election Day and

17  you had to keep it -- the polls open for a minimum of 8 hours,

18  and I don't remember, I don't think it defined at that time

19  other than Sunday the hours that we had to stay open.  So as

20  long as you had eight hours in a big county like ours, you

21  were good.

22  Q.  And was November 2020 the first time Harris County

23  implemented 24-hour voting?

24  A.  I'm trying to remember.  I believe in July we piloted it

25  and then November would be the first major election that we

ISABEL LONGORIA - DIRECT

1  hosted it, yeah.

2  Q.  I think you were referencing this in one of your early

3  questions, but what days was 24-hour voting available in

4  Harris County in November of 2020?

5  A.  The second to last day of early voting.  We —

6  historically when you look at voting trends in early voting,

7  the first couple of days tends to be nerds like me who want to

8  get there right at the first day at 7:00 a.m.

9      It kind of slows down and then as people remember kind of

10 the deadline is approaching, you get a peak towards the end

11 of, I think it's the last four or five days of early voting

12 where people start rushing to the polls, and so we knew that

13 this was a service that we would offer for one day.

14     It didn't make sense to use resources to have 24-hour

15 voting for every single day of early voting, so we wanted to

16 catch them right at that peak, that second to last day,

17 because the last day of early voting you have to close down

18 the machines, do your reporting, and those judges have to

19 return certain materials to the office, so we couldn't you

20 know have that happening at midnight and bleeding into next

21 days, et cetera, so we chose the second to last day.

22     We hit that peak number of voters who would be coming to

23 early voting and still allowed the State and the county to do

24 their end of early voting activities.

25 Q.  And how many 24-hour voting centers were there in Harris

ISABEL LONGORIA – DIRECT

1  County in 2020?

2  A.  Oh, boy.  It was NRG and I think plus seven, so it ended

3  up being seven or eight total.

4  Q.  So can we pull up State 141.  It's Tab 6, in your binder,

5  Miss Longoria.  Have you seen this document before?

6  A.  Yes.

7  Q.  And what is it?

8  A.  It is a poster that we would have created to put up around

9  the community and social media that illustrates the eight

10  voting sites that would stay open 24 hours during the early

11  vote.

12  Q.  And how did you determine where to locate the 24-hour

13  voting sites?

14  A.  Similar to the drive-thru voting, we went through a couple

15  things.  What were the sites that would see — that

16  traditionally saw a lot of voters tend to be some of the

17  bigger early voting sites, that kind of if we are doing this

18  to also control an account for the massive voters coming

19  through, right, the bigger the site, the more they would need

20  to temporally space out in addition to physically space out.

21      And then with our community partners we ran through who is

22  most likely to be up or need that in the middle of the night,

23  right, your law enforcement, who have those second and third

24  shifts; at that time medical workers who were working around

25  the clock and equally have those late night shifts; parts of

1  town where you are more likely to have people who have two,

2  three jobs, et cetera, that put them into late night shifts,

3  and so when you accounted for kind of historic voting, areas

4  where people are more likely to be up in the middle of the

5  night or have those jobs, as well as which facilities, we

6  worked really hard to find facilities who innately have

7  security officers.

8      So one thing we heard after July is there was no security

9  incident but both parties would feel more comfortable if there

10 was a security officer there.  So we — the county paid for, I

11 can't remember if it was a sheriff deputy constable, one of

12 those, to be at every 24-hour voting location through the

13 night just for ease of mind if nothing else, but these sites

14 also had, you know, the JP McGovern, Number Two, the medical

15 facility had officers around the clock, so you always had kind

16 of people around the community, right, those officers kind of

17 watching.

18     And then we wanted to space it out as much as we could

19 throughout the county as well.  Again, Harris County is really

20 big and so we wanted to offer those options to folks so they

21 didn't have to drive as far to reach those locations.

22 Q.  And so I'm clear, were these sites already being used for

23 early voting during the remainder of the early voting period?

24 A.  Correct.  All of these sites were open for the entirety of

25 early voting.  Some of them were even drive-thru sites.  And

1  in addition to that, some of them stayed open for 24 hours.

2      And I will say, we also worked with those facilities.

3  There were some facilities, some churches who said, we don't

4  offer that or want to be open 24-hour and so we respected that

5  some locations didn't want to and we were still able to find

6  quite a few that were.

7  Q.  How did the voting process during 24-hour voting compare

8  to the voting process during early voting or during normal

9  hours?

10 A.  As far as for voters that walk up, you know, the walk-up,

11 check-in at the e-poll book, get your access controller, et

12 cetera, that was all the same.

13     It was more technical function per the State.  When we

14 were piloting this in July the Secretary of State shared

15 that –– well, at the end of every day of early voting, even

16 now regardless, the county has to turn into the State the

17 number of people that voted that day within the county, kind

18 of the early voter rolls, if you will, and so what the State

19 said is, you know, we don't mind you going to midnight, we

20 totally get it, but you have to kind of figure out how to

21 still do your end of day reporting.

22     And so what we did is instead of you know normally when

23 you close at 7 and do your end-of-day reporting, the judges

24 after that, we essentially paused voting at 11:30 and it gave

25 the judges time to do their end-of-day reports, right, check

ISABEL LONGORIA - DIRECT

1  all the machines, et cetera, and then continue at 12:01 the

2  next day.

3      It also let the voting machines kind of reset for a new

4  day of voting to be able to do that reporting for the next

5  day.  What that meant for voters, in effect, is they showed up

6  to the polls and they would be voting, and if they were in

7  line, similar to, you know, if you're in line at 7:00 p.m. to

8  vote, you get to vote no matter what.

9      So at 11:30 — I stayed up all 36 hours since this was my

10 baby.  I was at NRG.  I was walking the line at 11:30 talking

11 to voters myself.  We made sure that every judge walked the

12 line at 11:30 as well and we told the voters, hey, we're

13 pausing to do some administrative paperwork.  If you're in

14 line, you're good to vote.

15     We're going to come back right at 12:01, if you need to

16 grab a water, if you need to go to the restroom, we'll be

17 holding your place in line, you know, allow us a few moments

18 to get this paperwork done.

19     And anyone who was voting at 11:30 at a machine obviously

20 they got to continue voting and finish uninhibited.  So I

21 guess it's more accurate to say it was 23 and a half hours of

22 voting, 30-minute pause, and then the continuation of voting

23 at 12:01 a.m.

24 Q.  And you mentioned just a few minutes ago about having

25 security personnel there to ensure physical security.  How did

ISABEL LONGORIA – DIRECT

1  you ensure that 24-hour voting was secure from a ballot

2  security perspective?

3  A.  It was, because it was no different than voting at

4  7:00 a.m. on Monday, or voting at 3:00 p.m. on Wednesday.  The

5  process itself was no different in how voters voted, the

6  paperwork, the troubleshooting.

7       Our kind of — the main central office maintained staff as

8  well throughout the night, even for these eight locations, the

9  voter registration department to answer those questions, the

10  tech department to, you know, if there was an issue with the

11  machine to go troubleshoot, so it was because it was no

12  different than any other kind of voting we would have done.

13  Q.  And were poll watchers able to observe 24-hour voting?

14  A.  Yes.  They would check in and similarly they, you know,

15  poll watchers get to be there the entirety of the time of

16  early voting so they had access like they would any other

17  time.

18  Q.  Are you aware of any incidents of voter fraud related to

19  24-hour voting?

20  A.  No.

21  Q.  Did you use 24-hour voting again in Harris County for any

22  elections following the November 2020 Election?

23  A.  I can't remember.  We did expanded hours and I can't

24  remember if we did 24-hour in the May or December, but I

25  think — just blanking off the top of my head in which

ISABEL LONGORIA – DIRECT

1  elections we did it.

2  Q.  Would you have wanted to use it again for additional

3  future elections if SB 1 had not outlawed it?

4  A.  Absolutely.  One — again, it offered opportunities to

5  people to vote who just their life is not scheduled around the

6  9 to 5, you know, that many things have been based on.

7       In addition, I remember when we ran the data on it, we

8  know that younger folks tend not to vote as much as kind of

9  older folks, and younger folks defined as kind of people under

10  30 or 25.

11       And I remember feeling so ecstatic when we ran the stats

12  one day, and if you took a cross-section, it was Latinos,

13  Millennials, and Gen Z, so that like 18 to 30 group I believe

14  was the most likely to use 24-hour voting.  And it felt like a

15  lightning bolt.  And I'm Hispanic, my cousins who live in

16  Laredo, my friends who live in town, we had finally tapped

17  into something that would get young Latinos voting.

18       And it was, again, they had school and jobs and being able

19  to go after that, so that was a bit of a segue, but I have no

20  doubt and all the confidence in using 24-hour voting.

21  Q.  And you touched on this a little bit in your answer just

22  now, but to what extent based on your review of the internal

23  data in your office, to what extent did Black voters use — or

24  sorry — Black voters use 24-hour voting in November 2020?

25  A.  Again, I can't remember the exact number, but I remember

ISABEL LONGORIA – DIRECT

1 that Black voters were more likely to engage in 24-hour voting
2 than at least kind of walk-up voting from 7:00 a.m. to
3 7:00 p.m.
4 Q.  And what about Hispanic voters?
5 A.  Yeah.  Hispanic voters, especially young Hispanic voters,
6 were, I believe, the number one demographic user of that
7 voting.  And the way we calculated it is 7:00 p.m. to
8 7:00 a.m., so that twelve hours that would not have been
9 accessible.
10 Q.  And, Miss Longoria, are you aware that SB 1 Section 3.09
11 banned Texas counties from providing 24-hour voting?
12 A.  Yes.
13 Q.  So what were the early voting hours in Harris County
14 during the March 2022 Primary?
15 A.  I believe we went back to 7:00 a.m. to 7:00 p.m., and I
16 can't remember.  I can't remember if we were allowed to go to
17 10:00 p.m. or not, but probably just went back to 7:00 a.m. to
18 7:00 p.m.
19 Q.  And so did Harris County implement 24-hour voting during
20 the March 2022 Primary?
21 A.  No.
22 Q.  And how did the unavailability of 24-hour voting impact
23 access to voting in the March 2022 elections?
24 A.  People literally could not vote.  You know, if you have —
25 if you are a law enforcement official, a doctor — I forgot to

ISABEL LONGORIA - DIRECT

1  mention, you know, we've got the Port of Houston, and talking
2  about folks who work 24 hours, that was the number six busiest
3  coast activity location, you just can't — you know, I hear a
4  lot of, yes, there is a law on the books that says your
5  employer is supposed to allow you to go vote and you are
6  supposed to ask for that time off, et cetera, but if you're
7  working at the Port of Houston, a longshoreman, et cetera,
8  there is not a culture of being able to ask for 30 minutes
9  off.
10     Most employers don't even though about those laws, so
11  people, and I get it, don't want to risk their job and
12  livelihood to upset a manager to go vote, you know, for 30
13  minutes or an hour, so I think the lack of 24-hour means there
14  are people, again, whose lives, even just kids or parents with
15  kids who cannot physically get there, and, you know, without
16  risking their job, or their livelihood, or something else, so
17  I think the lack of this opportunity at least once per
18  election stops people from voting.
19  Q.  So I want to move on to the topic of straight-ticket
20  voting.  Miss Longoria, are you aware that Section 3.15 of SB
21  1 prohibits marking a ballot in one motion or gesture?
22  A.  Yes.
23  Q.  And in your view have you seen anything that gives you
24  concern that straight-ticket voting could present a risk of
25  voter fraud?

ISABEL LONGORIA – DIRECT

1  A.  No.  I think from — I would say from my experience as an

2  Election Administrator and also working on various political

3  campaigns, the vast majority of voters, over 90 percent, just,

4  you know, really don't pay attention, don't know much, they

5  know they are there for a party or not a party, and so they

6  appreciate just being able to mark, you know, Republican or

7  Democrat, and be on with their day, and I think if anything in

8  Harris County where we have, I think close to 100 races in

9  November, and now you have to go page by page by page, what we

10 are seeing actually is a detriment is that folks don't want to

11 go through all those pages or maybe don't know, once they get

12 to the municipal judges, who people are, and so they just give

13 up halfway, and so if anything I just, I don't understand why

14 we wouldn't make it easier for voters.

15 Q.  Do you have any reason to think that the prohibition on

16 straight-ticket voting has made Texas elections any safer from

17 fraud in any way?

18 A.  No.

19 Q.  And do you believe that the prohibition of straight-ticket

20 voting has made it more difficult for Texans to vote?

21       MR. KERCHER:  Objection, Your Honor.  Relevance.  SB

22 1 is not the provision that limited straight-ticket voting.

23 That was the 2017 bill that took effect in 2020.

24       THE COURT:  Your response.

25       MR. BADAT:  SB 1 clearly has a prohibition on

ISABEL LONGORIA – DIRECT

1  straight-ticket –– or on voting in one motion or gesture.

2  Legislatures generally don't pass language that is surplusage

3  and so we think that this is directly relevant to one of the

4  provisions of SB 1.

5        THE COURT:  I'll give it the weight it deserves.

6        You can answer.

7        THE WITNESS:  Would you mind repeating the question?

8  BY MR. BADAT:

9  Q.  Do you think that the prohibition of straight-ticket

10  voting has made it more difficult for Texans to vote?

11  A.  I think it's made it more difficult for Texans to vote an

12  entire ballot, especially in large counties, yes.

13  Q.  I'd like to move on to another topic, Miss Longoria, to

14  discuss voting by mail in Texas.  Was voting by mail an option

15  in the November 2020 Election?

16  A.  Yes.

17  Q.  And who was eligible to use voting by mail under Texas law

18  in 2020?

19  A.  The buckets of folks who can use mail ballot voting are

20  registered voters over the age of 65, those who are, I

21  believe, confined in jail but not finally convicted at that

22  moment, individuals who are out of the county or the country,

23  and individuals who have a disability of some sort.

24  Q.  In your view, was mail-in voting an important option for

25  these categories of voters?

ISABEL LONGORIA – DIRECT

1   A.  Absolutely.  If you look at folks confined in jail or
2   folks with disabilities who like literally cannot get out of
3   their caregiving situation, or jail, or whatever it may be to
4   go vote in person, this is for some voters the only option for
5   them to engage in.
6   Q.  And how many people voted by mail in the November 2020
7   Election?
8   A.  You'll have to refresh my memory.  I know it was
9   definitely above 100,000.
10  Q.  So if we could really quickly pull up HAUL MFV 273, I
11  think we looked at this briefly yesterday as well.  It's
12  behind Tab 13 in your binder, Miss Longoria.  And if we look
13  at the third sentence that starts with this turnout, "This
14  turnout was driven by innovations like drive-thru voting,
15  24-hour voting, and a robust mail ballot program (179,000)
16  voters."  Does this refresh your recollection about how many
17  people voted by mail in the November 2020 Election?
18  A.  Correct.  That sounds right to me.
19  Q.  And earlier you mentioned several changes that the Clerk's
20  Office made to mail voting in 2020.  Can you describe some of
21  the changes with regard to the distribution of applications
22  for ballots by mail, or ABBMs?
23  A.  Sure.  Again, going into voting, we knew that the mail
24  ballot voting procedure in Harris County, by design, was very
25  difficult or cumbersome, one, in Texas, you have to re-apply

1274

ISABEL LONGORIA - DIRECT

1  every year, every January 1st, to vote by mail.  There are

2  many people who believe voting by mail is only for, quote,

3  "older folks over 65," and many who don't realize that mail

4  ballot voting is available to you, whether you have kind of a

5  recognized disability, or whether you just feel that you have

6  some cognitive, physical, et cetera, impairment, that prevents

7  you health-wise from voting by mail.

8      So in the County Clerk Office we, at least attempted to

9  send mail ballot applications to all voters in Harris County,

10 with essentially some instructions that kind of helped educate

11 voters on who could opt in to vote, and especially during the

12 pandemic I believe there were some -- I can't remember the

13 judgment, whatever it was, that, you know, COVID could be

14 enough, the fear of contracting COVID, if you had -- if you

15 were pregnant or had some other underlying condition, would

16 have qualified you for a disability for the purpose of mail

17 ballot voting.

18     So we attempted to send mail ballot applications kind of

19 with that education to all voters and there was some judgments

20 later that restricted us to sending them to folks just over

21 the age of 65 because regardless of even if you have a

22 disability, right, if you are 65, you get to vote by mail no

23 matter what.  So we ended up sending applications to every

24 registered voter in Harris County over the age of 65.

25 Q.  So why did Harris County send applications to all voters

*Gigi Simcox, RMR, CRR*

ISABEL LONGORIA – DIRECT

1   over 65?

2   A.  Because all voters over 65 are eligible to vote by mail,

3   again, no matter if you have any other disability, or be out

4   of the country, and so for us we knew that they could vote by

5   mail so there would be no question, they didn't even have to

6   read extra or understand what might be a disability or an

7   underlying health condition, and in a pandemic if we could get

8   more people to vote by mail they wouldn't be appearing in

9   person, so in attempting to, one, just educate people on their

10  options — and, sort of as a sidebar, when you get your mail

11  ballot printed and sent to you, it allows people the

12  opportunity to really kind of sit with that ballot, reflect,

13  make more informed decisions, especially without

14  straight-ticket voting in Texas, it allowed you to really take

15  time and go through the entire ballot instead of feeling

16  rushed.  There's all these positives that come from it.

17      And then in a pandemic if you could get more people to

18  vote from home, which we saw successful in other states across

19  the country, then there would be fewer people voting in

20  person, and, therefore, kind of spreading their germs around,

21  and again that kind of public health need to keep crowds down

22  and separated in a pandemic.

23  Q.  Would Harris County have mailed ABBMs to eligible voters

24  in future elections, if SB 1 had not prohibited it?

25  A.  Yes.

ISABEL LONGORIA – DIRECT

1  Q.  Why?

2  A.  Well, one, in Texas, when you have to — even voters who

3  use mail ballots quite frequently in Texas elections where you

4  have to re-apply every year, you know, much like any other

5  government effort the best thing we could do from a

6  constituent service is at least send you a letter and remind

7  you, at least to folks over 65 that you had that right, should

8  you choose to engage in it, and just because we sent you an

9  application doesn't mean you couldn't just throw it away in

10  the trash and go vote in person.

11      So it didn't kind of stop anyone from doing anything.  It

12  educated voters on that ability.  And we know too that

13  partisan political campaigns often send applications out to

14  voters.

15      Sometimes you get multiple applications from one party or

16  from multiple candidates, and we get quite a number of calls

17  from voters who think like, well, I submitted my application

18  but now I got another application, does that mean my first one

19  wasn't accepted because they don't realize perhaps a political

20  campaign is sending you one and not the office, and so by a

21  government entity sending out this application we knew that it

22  was from, you know, correct information, that it could be

23  accepted as it was.

24      Unfortunately, in my time, I also saw political parties or

25  campaigns who would send applications that were incorrect,

1277

ISABEL LONGORIA - DIRECT

1  perhaps they marked boxes for the voter they shouldn't have,
2  or included incorrect information, and then the voter — we
3  would have to deny or return that application and so we knew
4  at very minimum it came from our office, it was right, it had
5  very broad educational materials, and so I always think if a
6  nonpartisan government entity can send you something, that is
7  better than a partisan entity who has motives.
8  Q.  Are you aware that Section 7.04 of SB 1, among other
9  things, makes it a criminal offense for an election official
10  to distribute an application to vote by mail to a person who
11  did not request it?
12  A.  Very intimately familiar with that, yes.
13  Q.  And SB 1, despite this prohibition still permits political
14  parties to send applications to vote by mail, correct?
15  A.  Correct.
16  Q.  Are you aware of any incidents of fraud involving the
17  distribution of ABBMs by counties to registered voters who had
18  not requested one?
19  A.  By the county?  No.
20  Q.  After SB 1, would a county be able to distribute ABBMs to
21  all registered voters who were 65 or older without violating
22  this provision?
23  A.  No.
24  Q.  And so did Harris County distribute ABBMs to anyone who
25  did not request them during the March 2022 Primary?

1278
ISABEL LONGORIA – DIRECT

1  A.  No.

2  Q.  I'd like to move on to another topic related to SB 1's ID

3  provision for vote by mail.  Miss Longoria, are you aware that

4  SB 1 imposed new requirements for voters to provide certain ID

5  information on both their ABBMs and their carrier envelopes?

6  A.  Yes.

7  Q.  And what is as your understanding of those requirements?

8  A.  The — kind of the additional was that you had to include

9  either your driver's license number or the last four digits of

10  your social security number under what we call the privacy

11  flap, which is a misleading term, but under a flap on the

12  envelope, sign it.

13      I believe there was extra information about if you were an

14  assistant, so there was an extra kind of oath and space of

15  having to add your name, your relationship to the voter, I

16  think your address even maybe, which those envelopes are

17  already so small and you were just squeezing in a bunch of

18  information, but those were, as I understand, the added

19  provisions.

20  Q.  And what would the county do with that driver's license

21  number or social security number when the county received the

22  carrier envelope?

23  A.  So the county works at the direction of the early vote

24  ballot board, so that's the Democratic and Republican

25  representatives who review all mail ballots, so at their

ISABEL LONGORIA - DIRECT

1  discretion, right?

2      The county would, if we got carrier envelopes back and you

3  could see the signature was missing, you could, you know, the

4  county could call a voter and say, hey, you've got to come in,

5  you've got to figure out how to resolve this.

6      And then normally we would have sent that along to the

7  signature verification committee and they do their process of

8  checking the signature against what's on record, or if it's a

9  first time, just kind of check it against the driver's license

10  ID, whatever, and then flag it through the process.  That took

11  a matter of seconds to do.

12      Because the ID numbers are saying, you don't have an ID,

13  there's some kind of -- I didn't have this ID disclosure,

14  because the numbers were under that privacy flap those

15  envelopes had to go directly to the signature verification

16  committee.

17      The flaps, it was determined by the Secretary of State had

18  to be torn off or opened in the presence of the signature

19  verification committee.  Then, and only then, could you see if

20  a voter had included, or, you know, forgot to include one of

21  those numbers to begin with.

22      So even from flagging to say, oh, hey, you know, voter,

23  you put your signature but you forgot your driver's license

24  number, we're mailing back, or please come resolve this, that

25  was different because usually the office, or before the office

1  could work ahead of time, get a lot of work done in the

2  morning, signature verification comes in the afternoon,

3  verifies those signatures, moves on, now, we are doubling the

4  time because you can only do certain actions in front of

5  signature verification committee.

6      Then signature verification committee — oh, the staff

7  scans those envelopes, so it goes in our computer system.  The

8  signature verification committee, one Democrat, one

9  Republican, look at each screen and they have to determine if

10  it's the driver's license or social security number, they have

11  to go into the voter registration database and see if there

12  was a number for those individuals.

13      If, for whatever reason that number was not tied to a

14  voter registrar's registration, they would have do go into the

15  DPS system and so you have now, you know, 30 seconds to a

16  minute for a quick case for each one, just trying to figure

17  out what that number is, if that number is off.  It takes a

18  lot to read those eight digits as you are trying to go fast.

19      And if the numbers were similar and matched something in

20  the voter record, could be accepted.  And if not, it was put

21  in pending in this pool where the signature verification

22  committee folks would have to figure out how to contact the

23  voter, let them know that there was an issue.

24      Harris County elected to do that in the moment or daily.

25  I think before my time and most counties in Texas tend to send

ISABEL LONGORIA - DIRECT

1 those announcements of rejections later on in the process,

2 sometimes once voting is done, but we sent letters out every

3 day or we attempted to call voters.

4     If I remember correctly, only 30 percent of registered

5 voters include a phone number on their voter registration

6 rolls when voting, and so, you know, you probably don't have

7 an email, so you're desperately trying to contact these voters

8 to get them in to resolve this issue.

9     I'm jumping around a lot, but ostensibly you would check

10 that number, approve or deny, and then go to the next stage

11 from there.

12 Q.  And so the process that you just described was the process

13 to confirm identity for a voter who submitted a ballot right

14 through the carrier envelope?

15 A.  Correct.

16 Q.  Did SB 1 also require an ID number on the ABBM?

17 A.  Yes.  Yes, it was also required on the application, and

18 so, you're right, that process for the application, again, if

19 you received the application our office could send it back or

20 call the voter and say, hey, we think you forgot your driver's

21 license number, or it doesn't match what we have on file for

22 you.

23 Q.  And so you mentioned that some voters did not have their

24 driver's license number in their voter registration file, are

25 there any categories of voters who might be less likely to

ISABEL LONGORIA - DIRECT

1  have a driver's license number on file?

2  A.  Folks who are older who never wanted to drive or never got

3  a driver's license number; and additionally because maybe they

4  were born outside of what we would call a traditional hospital

5  system, you know, I don't know what access they might have had

6  to their social security number; folks who, not even a

7  disability — well, cognitive disabilities, folks with maybe

8  dementia or Alzheimer's, or otherwise who are in a caregiving

9  facility who they kind of store those documents for

10  individuals so they don't — they are not victim to identity

11  theft in other ways; and folks who maybe are in situations

12  where, again, they just never got a driver's license, they

13  don't drive, they don't want to drive, they can't drive, and,

14  yes, Texas allows for an ID number, but in our experience if

15  you're not driving then you probably don't have an ID number.

16  Q.  Are there other categories of voters, you touched on this

17  I think a little bit in this answer, but are there categories

18  of voters who are less likely to have their social security

19  number in their voter registration file?

20  A.  Yeah.  So when you sign up to vote, when you register to

21  vote, I can't remember if you have to put your ID number down

22  or not, I believe it's address, so there are folks who may not

23  have put it down when they initially registered to vote, for

24  example, or folks whose driver's license number is changed

25  because they come from out-of-state, whatever it may be.

ISABEL LONGORIA - DIRECT

1    There's also a category of folks who I believe the

2  Secretary of State at some point bought or got data from DPS

3  and imported it into voter files, and so that was not — that

4  driver's license number was not self-reported by voters, and

5  so what DPS —— sorry —— what the State had imported in did not

6  always correctly match the voter's actual information, and so

7  they might have had a number but it would not have matched

8  what was on record with the State.

9  Q.  And, to your knowledge, were there also voters who had

10  neither their driver's license number or their social security

11  number in their voter registration file?

12  A.  Yes.  I don't know the number but there would have been

13  folks who didn't have it, and those individuals could have

14  submitted —— I forget what the form was called to say I don't

15  have that, but if I remember correctly the trick with that

16  form is that you never got or selected to get a driver's

17  license, but again there's a category of individual who lives

18  in caregiving facilities, senior homes, or adult caregiving

19  facilities who got a driver's license, applied for a driver's

20  license, and I worked at AARP for four years so we dealt with

21  this quite often when we were talking about identity theft and

22  kind of abuse of caregivers, if you are caregiver abused, that

23  they had it so they couldn't fill out the form because they

24  had one but they didn't have access to it necessarily to fill

25  out their mail ballot application or mail ballot, so kind of

ISABEL LONGORIA – DIRECT

1  some tricky situations there.

2  Q.  So after SB 1 was signed into law, what efforts did your

3  office make ahead of the March 2022 Primary to educate voters

4  about the new ID requirements?

5  A.  When it doubt, fill it out.  So we engaged in, I think a

6  very — well, we attempted to engage in a very aggressive

7  education program that shared with individuals that if they

8  received a mail ballot application or — from a, you know, one

9  of these campaign mailers, or if they selected to get one from

10  our website, that we wanted to assuage people's fear of

11  identity theft, that they should put down their driver's

12  license number and the last four digits of their social

13  security number, whatever number they had, you know, put it

14  under that flap and send it to us because we didn't know or

15  couldn't know what we had on record for them versus what the

16  voter had, and so we said when in doubt fill it out.

17      This ran — there's another provision, I can't remember, I

18  think it was SB 1, that said that I, as an Elections

19  Administrator in the office could not solicit mail ballots,

20  and so there was definitely a fear at that time of what

21  counted as education around mail ballots versus did education

22  count as us trying to solicit mail ballots.

23      So there was even a vagueness in that information.  You

24  know, who could apply, if you could apply, how to apply.  We

25  thought at minimum we could share that when in doubt, fill it

ISABEL LONGORIA – DIRECT

1  out, that if people self-select again, we could at least share
2  through social media, through our community partners, at least
3  put down what you have and we'll do everything we can on our
4  end to help the voter.
5  Q.  And so how did the new ID requirements impact ABBM and
6  ballot rejection rates during the March 2022 Primary?
7  A.  More mail ballots, and I believe applications, got
8  rejected in that March 2022 Primary, one, because people just
9  didn't want to put their ID numbers, especially, again working
10  at AARP for four years, one of our main topics was identity
11  theft, and I'll tell you, a good chunk of calls we got from
12  voters desiring to apply to vote by mail was they didn't
13  understand why, kind of why the government needed this
14  information from them.
15     They did not trust maybe the post office system to protect
16  their information because all other campaigns around identity
17  theft tell us never put your social security number, never put
18  your driver's license number on anything at any time if you
19  can avoid it, and so there was — you know, you're getting
20  from, if you will, security experts one piece of advice, and
21  then from us another request, and so I think people either put
22  it on their applications and didn't put it on their mail
23  ballot because they didn't think they needed to, or people who
24  were used to voting by mail would close that flap and sign it
25  and not realize that they had to put their driver's license

ISABEL LONGORIA - DIRECT

1  number under the flap and so they would have had to open or
2  tear the flap thereby damaging their signature potentially to
3  go back and add a number, or, again, may not have realized
4  that's where they had to put their number, and so just extreme
5  confusion on how they were forced to design the envelope by
6  the State and just not wanting to add that information, why do
7  I need to add it was what we got over and over and over, and
8  so I -- it stuck in my head I think the rejection rates went
9  up to -- the ultimate rejection rates for the mail ballots,
10 I'm not even sure that included the application issues, I
11 think shot up to like 10, 15, 20 percent, something in there.
12 Q.  So let's pull up what's been marked as OCA Exhibit 36.
13 This is behind Tab 10 in your binder, Miss Longoria.  Do you
14 recognize this document?
15 A.  It looks like a press release our office would have -- the
16 elections office would have put out regarding mail ballots
17 rejection rates after the March 2022 Primary.
18 Q.  Were you involved in the preparation of this document?
19 A.  Yes.
20 Q.  And was it prepared using data that your office routinely
21 collects?
22 A.  Yes.
23 Q.  In the first paragraph it says that, "Of the 36,878 mail
24 ballots received in time for the 2022 Primary, 6,888 were
25 ultimately rejected as a direct result of SB 1."

ISABEL LONGORIA – DIRECT

1    Did I read that correctly?

2  A.  Correct.

3  Q.  And so that was specifically due to the ID provision we've

4  just been talking about, right?

5  A.  Correct.

6  Q.  And, Derek, I'm going to ask you to do a little bit of

7  math again.  If we could divide 6,888 by 36,878, what do we

8  get?  Okay.  Is that about 18.7 percent, almost 19 percent,

9  Miss Longoria?

10 A.  Yes.

11 Q.  And then it goes on to say, "In comparison for the 2018

12 Primary, only 135 out of the 48,473 ballots, mail ballots,

13 were rejected."  Did I read that correctly?

14 A.  Correct.

15 Q.  Let me ask you, why did you compare to the 2018 Primary?

16 A.  We wanted to compare apples to apples.  So 2022 was I

17 believe a Gubernatorial Primary and 2018 was also a

18 Gubernatorial Primary.  We know from elections and from other

19 experience that voting rates are different in presidential

20 years versus gubernatorial versus non — either of those

21 years, so we wanted to make sure that we were accounting

22 for — we wanted to make sure we were comparing apples to

23 apples.

24    It's a Gubernatorial Primary, so the voting rates would

25 have been similar.  The only thing that would have been

ISABEL LONGORIA - DIRECT

1  different was these new laws in effect regarding mail ballots.

2  Q.  And, Derek, if we could pull up the calculator one more

3  time and divide 135 by 48,473.

4      Miss Longoria, what is that percentage?

5  A.  .27 percent.

6  Q.  Okay.  And so in the 2018 Primary the mail ballot

7  rejection rate was .27 percent, is that right?

8  A.  Correct.

9  Q.  And in the 2022 Primary the rejection rate was nearly

10  19 percent, right?

11  A.  Correct.

12  Q.  And so let's move down to the third paragraph of this

13  document.  It says, "Confusion and frustration over the new

14  requirements caused a swell of phone calls to the Election

15  Administrations Call Center.  Since January, the Call Center

16  received 8,000 calls from people asking for help navigating

17  the voting process.  This is higher than the monthly call

18  volume in the lead-up to the November 2020 and November 2021

19  Election."  Did I read that correctly?

20  A.  Correct.

21  Q.  And so tell us what you are talking about here.

22  A.  I guess I did a lot of things.  In 2020 one of my jobs as

23  special advisor was to improve our call center, improve kind

24  of response times, being able to track types of calls that

25  came in, you know, if it was about kind of security issues or

ISABEL LONGORIA - DIRECT

1  mail ballot or early voting, whatever it may be, to better

2  track how we could be responsive in the future.

3      A long way of saying that in 2020 when we started

4  collecting call data we got, if I remember correctly, kind of

5  in the hundreds of calls, you know, per week, or per day,

6  maybe in those thousands per month, and then that was a

7  Presidential General Election where we know I think we looked

8  at over 65 percent of voters or something like that were

9  voting.

10     So that's a huge chunk of the population, and even then we

11  were in the kind of the low thousands of calls.  In the

12  several months ahead of time, things really escalated up on

13  Election Day to get something crazy like 5 or 8,000 calls.

14     Then you get to a Primary, so this is January, three

15  months from Election Day, the mail ballot application,

16  January 1st just tripped open, and to get 8,000 calls in one

17  month alone, I think people were watching the news, seeing,

18  you know, the stuff that had happened in the legislature about

19  all these voting changes and how it was affecting them, I

20  think people were specifically attuned, and just flooded our

21  office again with calls.

22     I think about, you know, 5,000 of those 8,000 calls were

23  about mail ballots alone, why do I have to provide an ID

24  number.  Do you have my ID number.  Which ID number do you

25  have.  I want to get this right.  I want to get this right.

ISABEL LONGORIA – DIRECT

1  Do I still have to put it on my mail ballot, if I put it on my
2  application.  If I put driver's license on my application, but
3  I put social security on my mail ballot, you know, am I going
4  to be in trouble, et cetera, just like — and even then they
5  hadn't even received their mail ballot so these are just
6  speculative questions and the immense amounts of fear and
7  frustration of the new laws and having to do this.
8      So I will say, in elections you have to be able to
9  anticipate six months to a year the kind of resources you'll
10 need, so that you can petition the county for those resources,
11 hire enough people in the call center, train them on all these
12 laws, get them in place at least months ahead of time in
13 anticipation of Election Day.
14     And so what happened here is we were slammed with calls.
15 We had increased our mail ballot team to some point but not
16 enough to account for 8,000 calls in one month.  So now voters
17 are frustrated that they are calling, calling, calling,
18 waiting for an answer, calling, and that kind of their fear is
19 mounting.  So it was particularly shocking to us how many
20 calls we were getting on this subject alone.
21 Q.  And did you receive a similar number of calls in February
22 related to mail ballot procedures?
23 A.  I believe so.  I believe that stayed consistent throughout
24 the March '22 Primary period.
25 Q.  So you mentioned the impact that this had on your staffing

ISABEL LONGORIA - DIRECT

1  needs, do you remember exactly how much you had to increase
2  your staff to respond to or to perform voter outreach related
3  to SB 1?
4  A.  We had the funds in 2021 to double our staff.  I would
5  have -- you know, these numbers would have dictated maybe
6  tripling or quadrupling the calls on our staff, but, we, at
7  that time, could only double our staff.
8  Q.  What impact did SB 1's new mail ballot ID requirements
9  have on your office's capacity to process mail ballots?
10 A.  I think I've gone into it a bit earlier, that pre-SB 1 we
11 had staff who in the morning would get the latest batch of
12 several hundred mail ballots, kind of look at those carrier
13 envelopes and see if a signature was missing or not missing
14 and kind of help triage those, if you will, for the signature
15 verification committee, and contacting voters to, you know,
16 come in or resolve this issue.
17     I believe we could also mail back applications, and I
18 can't remember if we could mail back ballots to the direct
19 voter if we could confirm them to resolve their signature
20 issue.  That took, you know, a matter of seconds, once it got
21 to signature verification committee.  A picture of the ballot
22 envelope would flash up with the signature, the record of
23 signatures for that voter would pop up, and in a matter of
24 seconds you can tell, okay, these meet the match test, or we
25 have to flag it for someone else to kind of dig into this and

ISABEL LONGORIA – DIRECT

1 I think the number of flags were probably around 10 or

2 15 percent of the initial pool, and then it goes down from

3 there.

4     Again, with kind of a limited mail ballot staff, that mail

5 ballot stuff in the morning is helping signature verification

6 committee, then in the afternoon, a signature verification

7 committee is working on that signature match, and this is

8 pre-SB 1, that staff in the afternoon would either be working

9 on, you know, returning or contacting voters from the previous

10 day or helping other departments were their functions,

11 preparing election materials, whatever it may be.

12     Post-SB 1, in the morning they could only flag for

13 signature, but, again, they had to wait for signature

14 verification committee, the staff had to wait for signature

15 verification committee to come in the afternoon to take those

16 flaps of paper off.

17     The way the envelopes were designed, you had to be careful

18 on tearing the flaps off.  It wasn't something you could do

19 with an automatic machine because you didn't want a machine to

20 tear off the flap, and therefore tear off the signature,

21 thereby kind of destroying the envelope for future purposes.

22     You also didn't want a machine to accidentally cut into a

23 ballot that was inside that envelope, and so you had to

24 have –– we had to hire people, extra people, to just tear off

25 thousands of pieces of paper, to tape down other things,

1  especially with signatures, so it wouldn't move around.

2      Then and only then could the staff go through and help

3  signature verification committee see and flag if there were

4  any envelopes who had those numbers missing.  So then you take

5  those and again triage, trying to contact voters to help

6  resolve their issue.

7      If there was at least one member, they had to be sent to

8  another machine to scan because signature verification

9  committee did everything on their computer system.  So you

10 would have to send it to a machine, cost us $250,000 to scan

11 it on both sides now because there was information on both

12 sides, send it back to signature, so we had to wait for a

13 couple of hours, signature verification committee then had to

14 compare numbers.

15     And, again, where comparing signatures happened in a

16 matter of seconds, it's very kind of intuitive.  Does it match

17 or not.  This time, you have to stop, read numbers, figure out

18 if it's driver's license or social security number, compare it

19 to some information in that voter's record.

20     If the Harris County or SOS system didn't have it, I think

21 they could tap into the DPS driver's license, kind of image

22 center.  That takes 30 seconds, a minute.  It's a different

23 kinds of cognitive level that is not as fast.

24     Pre-SB 1, a fair of folks, Democrats and Republicans

25 working as a pair, could resolve 1,000 mail ballot envelopes

ISABEL LONGORIA – DIRECT

1  per day.  So each pair, 1,000 per day.  You can calculate from

2  that.  If I remember correctly, post that, each pair could

3  resolve or examine I think something between 4 and 500 per

4  day, if they were lucky.

5      So it halved the processing rate of signature verification

6  committee and now took up the time of the mail ballot team

7  completely.  There was no shifting mail ballot department

8  folks to other departments, or it used to be that mail, you

9  know, department, could finish their work by 5 or 6, so in the

10  evening they could volunteer to get some overtime hours in the

11  warehouse, et cetera.  There was none of that.

12      So in addition to not having enough mail ballot staff,

13  halving the processing time of the signature verification

14  committee, so therefore doubling either the hours they had to

15  work in a day, or their teams, and how much we had to pay to

16  double their teams to just meet the same processing time,

17  there was no longer a group of workers we could shift from

18  department to department.

19      So now the warehouse team, the training team, the

20  materials team could not count on those folks we had

21  inherently built into the system.  So it started pushing

22  pressure on the entire system and we didn't even get to

23  election night in being able to like scan those ballots, all

24  those ballots now coming in, in a short amount of time with

25  the same number of people.

ISABEL LONGORIA – DIRECT

1  Q.  So, Miss Longoria, you've testified about the various

2  efforts made by your office to educate voters and respond to

3  their questions and concerns about this new ID requirement.

4  Do you think those efforts were sufficient to prevent eligible

5  voters from not being able to vote?

6  A.  Can you repeat that question?

7  Q.  Sure.  I'll try to remove the double negative.

8      Do you think that your voter education efforts and

9  outreach efforts were sufficient to prevent eligible voters

10  from being disenfranchised?

11  A.  No.  Again, coupled with the other provisions of SB 1

12  dealing with what information our office was allowed to share

13  or send out to voters and how proactive we could be about

14  that, in my ideal world we would have been able to send a

15  letter, a letter, not even an application, a letter to all

16  voters over the age of 65 reminding them of, you know, where

17  they could apply to vote, the law changes, where they could

18  ask for questions, where they could go to the Secretary of

19  State to ask those questions, so, you know, the law as it was

20  disenfranchised and scared voters from participating in mail

21  ballots, and then we were further handicapped by our inability

22  to be as proactive as we wanted to be in educating voters.

23  Q.  Do you think that additional voter education efforts would

24  be able to fully address the concerns you've expressed about

25  the ID provision?

ISABEL LONGORIA - DIRECT

1   A.  No.  I mean, no solution fully, but we could help more
2   than we hurt.
3   Q.  In your experience administering elections in Harris
4   County, are you aware of any incidents involving someone
5   fraudulently submitting a mail ballot on behalf of another
6   person?
7   A.  No.
8   Q.  Okay.  So I want to shift gears a little bit and talk
9   about SB 1's impact on voters with disabilities.  You've
10  talked a little bit about this so far in your testimony.  In
11  your capacity as Election Administrator did your job include
12  responsibilities with respect to voters with disabilities?
13  A.  Yes.
14  Q.  And what were they?
15  A.  Per federal ADA laws and other federal election laws, and,
16  ironically, in 2018, Harris County had been sued about voter
17  disability access, and so we, I believe, were the only county
18  in America under a federal preclearance settlement that
19  required every election someone from the Department of Justice
20  visiting our office to make sure we were being responsive to
21  voters with disabilities, so not just kind of laws in general
22  but our specific settlement.
23      Our duty was to make sure that methods of voting, be it
24  mail ballot, or in-person voting, early or Election Day were
25  always available and accessible to people with their wide

ISABEL LONGORIA – DIRECT

1  range of disabilities, whether those be physical, or

2  cognitive, and to, you know, the best of our ability, if the

3  provisions we put in place weren't helpful to the best of our

4  ability provide solutions to folks who reached out to us.

5  Q.  And are you familiar with Americans with Disabilities Act,

6  or the ADA?

7  A.  Can't quote everything, but, yes.

8  Q.  And is it your understanding that Harris County has, and

9  while you were in office, had an obligation under the ADA to

10 ensure that voting in person is accessible to voters with

11 disabilities?

12 A.  Yes.

13 Q.  And is it also your understanding that Harris County has

14 an obligation under the ADA to ensure that voting by mail is

15 accessible to voters with disabilities?

16 A.  Yes.

17 Q.  While you were Election Administrator did Harris County

18 have a complaint or grievance procedure for voters with

19 disabilities?

20 A.  Yes.  Specifically, again because of that DOJ settlement,

21 we had an entire section of our website where folks could

22 submit, either in writing, via email, or the specific contact

23 information of our, I think we called them ADA coordinator,

24 where folks could call or they could visit any one of our

25 offices and report a concern, or even if they called our call

1  center, maybe it wasn't classified kind of like as a, quote,

2  "formal" or legal complaint, but if they had a question, a

3  request, just a comment, it would get routed through our call

4  center and routed back to our ADA coordinator.

5  Q.  And are you familiar with the phrase reasonable

6  accommodation as it pertains to voters with disabilities?

7  A.  Yes.

8  Q.  What's your understanding of that term?

9  A.  That, you know, any government entity, but the election

10  office had to make a good faith effort to whenever a voter

11  with disabilities reached out, you know, whether it was

12  getting a mail ballot printed in Braille, or an accommodation

13  needed, some folks have things called puffers or a different

14  kind of mechanical elements to help with maybe different

15  physical or cognitive issues, to the best of our ability

16  providing machines that those could plug into, or essentially

17  just doing what we can to make sure that the tools they need

18  to survive and live and give them autonomy would also give

19  them autonomy in voting.

20  Q.  Would your office require a voter to use the words

21  "reasonable accommodation" to receive a modification of

22  procedures to make voting accessible for them?

23  A.  No.  That's a — with all due respect, a lawyer term, and

24  we took it if people just called our office and said I need

25  help, or this was a problem, they didn't even say they needed

ISABEL LONGORIA - DIRECT

1  help, if they just said this was a problem or didn't work, we

2  would have worked to at least correct that issue for voters in

3  the future.

4  Q.  So we've already talked a little bit about mail-in voting

5  and SB 1's new ID requirements.  I want to talk specifically

6  about how that new requirement impacted voters with

7  disabilities.  In your experience what are the age

8  demographics of the voters who tend to vote by mail in Harris

9  County?

10  A.  The majority tend to be folks over 65.

11  Q.  And we talked about yesterday some proportion of those

12  also are individuals with disabilities, right?

13  A.  Yeah.  In my time working at AARP for four years, I

14  learned that most older folks have either kind of permanent or

15  temporary disabilities, breaking an arm, having a stroke,

16  maybe even vision just gets blurry over time, those count as

17  different levels of disability.

18      They may not rise to the merit of someone being kind of

19  federally labeled as disabled for the purposes of receiving

20  other financial or other aid from the government, but as you

21  get older, just things happen, and those folks, it's always

22  easier on your mail ballot to put, yeah, I'm 65, then wonder

23  if your disability kind of merits the legal standard for

24  disability to request a mail ballot.

25      So I do think that there are more folks who vote who have

ISABEL LONGORIA – DIRECT

1  a disability, even if they don't mark that as their primary
2  reason on a mail ballot, for voting by mail.
3  Q.  And how did SB 1's mail ballot ID requirements impact the
4  ability of voters with disabilities to vote by mail?
5  A.  I was very vocal with the Secretary of State at the
6  Elections Administrator Conference in August of 2021 in
7  stating that I felt the way SB 1, and even throughout the
8  drafting process, I felt that the way SB 1 was drafted created
9  an inherit conflict in the ability of voters with disabilities
10  to cure their mail ballot, and what we could provide to them.
11      I seem like I should give an example here.  To cure your
12  mail ballot, so that is a mail ballot, the carrier envelope
13  maybe, you put seven digits of your driver's license number
14  and not eight because of a physical disability, your writing
15  was so illegible that it was hard for us to compare even your
16  signature or your number, at the time the Secretary of State
17  said people had to cure those matters in person or eventually
18  they came up with the online database for the Secretary of
19  State's online database.
20      On the curing in person, if you are requesting a mail
21  ballot because you have a disability, or even if, you know,
22  you request it because you're over 65, but you can't get out
23  of your home, there's still a pandemic, you are still worried
24  about meeting people, or you physically are restrained to
25  perhaps a wheelchair, a bed, or a caregiving situation because

ISABEL LONGORIA - DIRECT

1  you need, you know, ventilators, whatever it may be that are

2  not easy to move around, you request to vote by mail, and then

3  the Secretary of State said, sure, but if you need to fix it

4  you need to come in person, you cannot come in person, that's

5  why you requested a mail ballot, but now you've got to come in

6  person to make sure it's ultimately cured and counted.

7      So then there's nothing we could do, right?  We

8  couldn't -- we allow members of the military, you know, pre-SB

9  1 and now who are in active, kind of active war zones to vote

10  by mail, or by email.  So we email them their ballot.  They

11  mark and scan that ballot and email it back to the office.  So

12  we know that there's a secure way for us to email you

13  government documents and for those to come back to us.

14      I asked the Secretary of State if we could offer that to

15  folks with disabilities for curing their mail ballot, not even

16  marking the ballot.  Secretary of State said, no, they

17  interpreted the language to be very strict to say that someone

18  had to come back in person or do it on the database.  No

19  faxing.  Even if you had an assistant who helped you with your

20  mail ballot, that assistant could not return or come cure that

21  mail ballot on behalf of their person.

22      It was excruciating to know that there were tools at our

23  disposal, tools that we regularly used for other voters that

24  we were not allowed to apply, kind of in that reasonable

25  accommodation to voters with certain disabilities.

ISABEL LONGORIA – DIRECT

1    The State said that the work-around was their online

2    database.  One, you have to have a computer and internet and

3    if you have a certain disability, the ability to even use that

4    computer and internet to access the Secretary of State's

5    database.  The Secretary of State's database at that time

6    specifically, you had to have your correct driver's license

7    number to input it into the system.

8        So let me take a step back.

9        I think I mentioned earlier, for example, not everyone

10   includes a driver's license number on their voter registration

11   form, or the State at some point had purchased driver's

12   license numbers from DPS and imported them into records, so we

13   knew there were situations where the Secretary of State's

14   Office maybe had the wrong driver's license number for an

15   individual.

16       So if the Secretary of State has theirs as 123, but your

17   number is 345, you had to be — you input 345, your correct

18   number, to access the database, but because the database had

19   123, it would say that you could not access the database.  So

20   you literally could not access the database to correct the

21   information that the State had wrong using their portal.

22       Now, people would say, well, you could call.  If you have

23   a disability that prevents you from calling, right, and you're

24   not allowed to use an assistant to correct that database or

25   call the Secretary of State, there was questions to, you know,

ISABEL LONGORIA - DIRECT

1  whether or not an assistant could be used, so we were — the

2  tools provided were not accessible to voters with

3  disabilities.  The methods and solutions we could come up with

4  were not allowed for voters with disabilities.

5      Ultimately, the Secretary of State's Office shared that we

6  could just send election staff to any house, that if we really

7  cared, we would send our staff out to every house.  Well, you

8  can help maybe in a smaller county.  Again, we were under an

9  extreme crunch.  We were trying to deal with this influx of

10  mail ballots, preparing for the March Primary.  Every second

11  is valuable.

12      So in Harris County, the idea that you could just uproot

13  ten staff, have them drive, you know, miles and miles and

14  hours around Harris County, we might have been able to help in

15  March, we might have been able to help a dozen voters, but at

16  some point I knew I couldn't help 50, 100, or 200 voters, and

17  so it became kind of a sense of fairness and justice, at what

18  level could I offer that to one voter and not another voter,

19  and taking the staff away from the office I thought would

20  actually hurt the entirety of the election process more.

21      And so we had to choose.  The election office had to

22  choose between being able to help a voter with disabilities or

23  not, and we knew it just consistently put us in conflict.  And

24  whether or not I would have killed myself to like go drive

25  myself and do all those hours, that's one person.  The next EA

ISABEL LONGORIA – DIRECT

1    may not have elected to do that.  Another county may not have

2    elected to do that.

3        So the way SB 1 was structured inherently hurt the ability

4    of voters with disabilities from curing their mail ballot and

5    ultimately being counted.

6    Q.  So let me go back to one portion of your answer here.  You

7    mentioned that there were voters who could not use either of

8    the options that were provided at the time, which were going

9    to the office in person, or going through the Secretary of

10   State's online portal.  Were there voters that contacted your

11   office requesting some alternative method to cure their mail

12   ballots?

13   A.  I apologize.  I think I mentioned there were voters who

14   would call and ask if they could email, you know, scan and

15   email those documents back, or if they could send an assistant

16   in their place to resolve those issues in person.

17       Those were the methods I was sharing that the Secretary of

18   State let us know would not be allowed, that in the Secretary

19   of State's view the law did not account for that.

20       And when I — I asked this question in public at the

21   Elections Administrators Conference to the Secretary of State,

22   and I do think they knew at some level that the SB 1 did not

23   allow for these provisions, because when asked for solutions I

24   was told go back and read the law.  Okay, well, I read the law

25   and I have this question.  And they said, well, do what you

ISABEL LONGORIA - DIRECT

1  can, go back and read the law.

2     So I don't think the Secretary of State either had a

3  solution for these.

4  Q.  Do you know if the voters who requested an alternative

5  option ultimately were able to cure their ballots and vote?

6  A.  I know that some of those folks were not able to cure

7  their ballot and vote.

8  Q.  What is your understanding of whether you would be able to

9  grant an accommodation if a voter requested or needed one that

10 would require you to modify a requirement of SB 1?

11 A.  I think, as I've shared, we attempted every modification

12 that we could think of and were told by the Secretary of State

13 that that was not allowed.  So I don't know quite how to

14 answer that question, but we had — we knew we weren't

15 providing the reasonable accommodations we could provide to

16 voters with disabilities.

17 Q.  And so if a voter with a disability asked your office not

18 to comply with SB 1's ID match requirement, would you be able

19 to do that?

20 A.  Can you rephrase that, or --

21 Q.  Sure.  Let me try to ask it this way.  If a voter with a

22 disability contacted your office and said because of my

23 disability I cannot access my ID, I can't provide the ID

24 number required by the mail ballot, would you be able to

25 modify or waive the ID requirement and allow that person to

1  vote without putting their ID down?

2  A.  No.

3  Q.  So, Miss Longoria, now I'd like to ask you a few questions

4  about voter assistance.  Are you aware of Section 208 of the

5  Voting Rights Act?

6  A.  You'll have to refresh my memory what that section refers

7  to.

8  Q.  Are you aware of that federal law requires that voters

9  with –– who need assistance or have trouble reading or writing

10 must be able to choose assisters of their choice?

11 A.  Yes.

12 Q.  In your experience, why is it important for a voter to be

13 able to choose their assistant?

14 A.  I'll share my own personal experience.  My grandmother, a

15 U.S. citizen primarily speaks in Spanish.  She passed away,

16 but she primarily spoke in Spanish.  For her, she needed the

17 ability to access voting in Spanish.

18     She was 85 and didn't really trust computers or anyone

19 else, so though the ballot or the mail ballot –– or sorry ––

20 the voting machines had information in Spanish, her eyesight

21 wasn't great, she didn't trust the machines, if you will, so

22 she often employed me to be her assistant.

23     From that personal experience and from what I know just

24 from elections in general, people trust their friends and

25 their family more than they do kind of government machines, et

ISABEL LONGORIA – DIRECT

1  cetera, and so especially for something like voting, that is

2  so intimate, the ability to go vote in person and have someone

3  who can be there with you that you trust to accurately

4  translate the ballot that you trust to kind of accurately

5  interpret the process and help you through that process, you

6  want someone there that you can trust.

7      So whether that is a language access issue, or a

8  disability issue, it's important that every citizen have the

9  right to kind of employ or select who they trust most to

10  shepherd them through that very special process.

11  Q.  Are you aware of election workers in Harris County ever

12  prohibiting a voter's assistant of choice from providing any

13  kind of assistance?

14  A.  Unfortunately, yes.

15  Q.  Can you tell us about that?

16  A.  There —— the first two examples that come to mind, there

17  was —— it was at the Tomball Public Works voting location.

18  There was an individual who came in and an election worker

19  assumed that they had Down Syndrome and therefore assumed that

20  that individual did not have the autonomy to vote on their

21  own.

22      That election worker told that voter —— the voter never

23  asked for an assistant, told that voter that the election

24  worker would have to help that voter.  The voter said, listen,

25  if you're going to force me to use someone, I would rather

1  use — I think it was the mom or dad who was there, right?  I

2  would rather use them.  And the election worker said

3  absolutely not, we don't want them taking advantage of you,

4  don't worry, I know better, I know I'm here to protect you.

5      And so the election worker attempted to force themself on

6  that voter.  And I think ultimately the voter became so

7  frustrated that they just let the election worker stand there.

8      And their parents were irate that the election worker just

9  kept trying to push buttons, trying to tell this voter that

10  they didn't know what they were doing, and just kind of

11  somehow seemed suspicious that anyone with what they thought

12  was Down Syndrome, I don't know ultimately what that

13  individual did or did not have, just inherently suspicious

14  that that person could vote.

15      That, to me, is enraging, that any election judge — and

16  they were definitely not trained to do that, that any election

17  judge would assume that for a voter, impose that on a voter,

18  and then when a voter asked for a special assistant would deny

19  them that.

20      There are also the other examples that come to mind are

21  folks who were wheelchair bound or had maybe things like, I

22  think they are called puffers that they would use.  They are

23  breath to — a mechanical instrument using their breath to

24  create motion for the purposes of voting.

25      So often, at least two or three times, I can remember in

ISABEL LONGORIA – DIRECT

1  recent history a voter in a wheelchair would come into a

2  location, say, hey, I need to use the disability access unit,

3  so it was a unit where you could port or plug in paddles,

4  puffers, different assistive methods for voting, I need to use

5  that, and so often election workers would crowd around that

6  person.

7       They might help them plug the device in and then still try

8  to touch the screen or touch the paddles, or just be there

9  kind of hovering around this voter who did not ask for their

10 assistance, did not give consent to that assistance, and those

11 voters would call our office either irate or in tears and

12 would report them I believe to our ADA office, just that

13 sharing that the imposition or assumption an election worker

14 on anyone's abilities was just disgusting, disheartening, and

15 one of the key pillars I understand from democracy and voting

16 is that all voters have the right to vote as they want to vote

17 in whatever manner and in whatever language they have pure

18 autonomy over their voting process, and that autonomy is often

19 taken away willingly or unwillingly by voters who are

20 perceived as having certain disabilities.

21 Q.  Are you aware that SB 1 made certain changes to voter

22 assistance in the Texas Election Code?

23 A.  Yes.  I believe that assistants had to kind of swear.  I

24 can't remember if it was an additional or expanded oath and

25 then put down information, I believe their name, address, and

ISABEL LONGORIA – DIRECT

1   what their I think relationship was to the voter.

2   Q.  We can take a look at some of these provisions.

3       So can we pull up SB 1, Section 6.03.

4       Miss Longoria, this is behind Tab 12 in your binder.

5   A.  6. ─

6   Q.  So Section 6.03 of SB 1 on the screen also requires that

7   "A person providing assistance, other than an election worker,

8   must provide" ── "must complete a form disclosing the person's

9   name, address, relationship to the voter, and whether the

10  assister received or accepted any form of compensation or

11  benefit from a candidate, campaign, or political committee."

12      Are you aware of this provision?

13  A.  Yes.

14  Q.  Did this provision concern you?

15  A.  Yes.  First, there are individuals, again, and I can share

16  from my personal experience, that there are folks who are

17  eligible to vote but their preferred assistant might be

18  undocumented, or, you know, unable to register to vote, right,

19  and might be concerned that swearing this oath, putting down

20  certain kinds of information on a government document that

21  could run them afoul in the future of kind of applying for a

22  different immigration status or whatever it may be.

23      So just kind of inherently, right, why am I having to fill

24  out all of these documents, sensitive government documents,

25  when I'm just trying to help my grandmother, or whoever it may

ISABEL LONGORIA – DIRECT

1  be, to vote.

2      In addition to which that point number three, it says

3  "whether the person assisting the voter received or accepted

4  any form of compensation or other benefit from a candidate,

5  campaign, or political committee."

6      Very key is what is missing after.  There's another part

7  of the code when talking about mail ballots that says that

8  received this compensation in order to help someone with a

9  mail ballot, but this part doesn't say that.

10      And so, for example, you know, there's been many times

11  where I've worked on political campaigns, so I'm working on a

12  political campaign, I am being paid by a candidate to work on

13  a political campaign, but I go to help my grandmother to vote.

14      You know, I can help my grandmother, I'm not trying to

15  influence her vote, just trying to read the ballot, but I

16  would interpret this section as saying that anyone who worked

17  on a political campaign could provide no assistance even to a

18  family member because this section doesn't say you are being

19  paid in order to help that person.  It just says that you are

20  being paid by a political campaign.

21      So I think there's, at least for me, some ambiguity in

22  what it means for a whole subset of people for one to engage

23  in a political campaign.

24  Q.  During the March 2022 Primary Election did you learn of

25  concerns from voters about this provision?

1312

ISABEL LONGORIA – DIRECT

1  A.  More on folks, again, wanting to assist folks with

2  disabilities or with language access who again went to go,

3  wanted to help their person, and ultimately maybe got scared

4  away from being the assistant because they just — they did

5  not want to or did not understand all these extra, from their

6  lay perspective, legal documents they had to fill out, and

7  what, if anything, this could mean for them, could they go to

8  jail because they didn't know the election laws, you know,

9  they were afraid that even kind of an innocent attempt to

10 assist a family member could put them in jail because that's

11 what they were hearing in the media and on the news.

12 Q.  And would you be able to grant an accommodation to waive

13 completion of this form, if it were clear that a voter with a

14 disability was not able to receive the assistance they needed?

15 A.  No.

16 Q.  So let's look at Section 6.04 of SB 1 which requires that

17 a person with an — excuse me — "which requires that a person

18 who assists a voter must take an oath under the penalty of

19 perjury stating that the voter they are assisting represented

20 that they were eligible to receive assistance and that the

21 assister did not pressure or coerce the voter into choosing

22 them to provide assistance."

23     Are you familiar with this provision, Miss Longoria?

24 A.  Yes.

25 Q.  And did this provision concern you?

ISABEL LONGORIA - DIRECT

1  A.   Yes.   I'm reading the ballot.

2       The law is meant to say, you know, you are not going to

3  sit there and say you better vote for person X instead of

4  person Z.   The way I read this was so strict that, you know,

5  like my grandmother, we would go vote, and you'd get to

6  railroad commissioner, and she would say, mija, what is this.

7       And so the law would say all I could do was continue

8  reading the words, you know, please select your candidate for

9  railroad commissioner, person A or person B.   The law would

10 not let me say, oh, well, railroad commissioner covers oil and

11 gas pipelines in Texas, so you should consider that is the

12 scope of the job, you know, make your selection as you will.

13      There are things like that that when you have an

14 assistant, especially a trusted family member, you're not

15 having them there just to be your reader necessarily.   You

16 might want to engage with them in an innocent conversation

17 about, oh, what's this, or, oh, who is that person, or is that

18 the person we saw in the news, whatever it may be, that again

19 it's not attempted to influence a vote but is meant to just

20 kind of talk through options innocently.

21      I think that what a layperson would see just as an

22 innocent attempt to help their family member in this would be

23 considered illegal, and, you know, when you get this oath and

24 you say "under penalty of perjury," for, again, the layperson,

25 that seems like a very intimidating threshold.   What does

1  perjury mean.  Would I go to jail for that.  Would I lose my

2  family.

3      And then especially in Texas, when you include that there

4  are poll watchers around, what are poll watchers going to

5  assume, what are election workers going to assume, especially

6  if I'm speaking in a different language than what they

7  understand, it creates this whole element again of instilling

8  kind of this atmosphere of fear for just trying to help your

9  family.

10 Q.  And did you, during the March 2022 Primary Elections,

11 learn of any concerns about this provision from voters or

12 other groups?

13 A.  Again, I remember kind of a handful of calls that trickled

14 up from the call center regarding folks who went, intended to

15 assist a family member, and maybe left because they wanted to

16 call the office and get more clarity on what these new

17 provisions and oaths were.

18     Also, the community groups I mentioned earlier, we

19 frequently met with community groups who would share with us,

20 you know, that voters, especially voters needing language

21 assistance or disability assistance were intimidated, were

22 calling their offices, were very confused by these new

23 provisions.

24 Q.  So let's move on to Section 6.05 of SB 1, which requires

25 that a voter -- "that a person assisting a voter with

ISABEL LONGORIA – DIRECT

1  preparing a mail ballot shall enter on the carrier envelope
2  their relationship to the voter and whether the assister
3  received any compensation or benefit from a candidate,
4  campaign, or political committee for their assistance."
5      Are you familiar with this provision, Miss Longoria?
6  A.  That's at the bottom of page 53.  Sorry.  Can you put me
7  on the map again?
8  Q.  It is looking at Section 6.05 and Subsection E, which
9  states that, "A person who assists a voter to prepare a ballot
10  to be voted by mail shall enter on the official carrier
11  envelope of the voter."
12      And then looking at Subsection 2 and 3, states that "The
13  information to be provided on the carrier envelope must
14  include the relationship of the person providing the
15  assistance to the voter and whether the person received or
16  accepted any form of compensation or other benefit from a
17  candidate, campaign, or political committee in exchange for
18  providing assistance."
19  A.  Correct.  I see that now.  Thank you.
20  Q.  And let's take a quick look also at Section 6.07, which
21  creates a space on the carrier envelope to indicate the
22  assister's relationship to the voter.  Subsection 3 right
23  there.  Are you familiar with this provision as well,
24  Miss Longoria?
25  A.  Yes.

ISABEL LONGORIA - DIRECT

1  Q.  And so did these two provisions raise any concerns for

2  you?

3  A.  Yes.  That Subsection 3 is when I mentioned before, that

4  part specifically, "in exchange for providing assistance,"

5  this is where there was a mismatch in the disclosure, right,

6  of someone who had to provide assistance in person versus

7  someone who was providing assistance on a mail ballot.

8      So, again, that disclosure in person just said "paid by a

9  political, committee, or campaign," whereas on the mail ballot

10  assistance section said, "In exchange for providing

11  assistance" –– you know –– "for the purposes of this mail

12  ballot."

13      So there was kind of that ambiguity, what does it mean.

14  Why are there different standards for assistants.  That part

15  about the relationship, that is very intimate and personal

16  information, that there are many voters who have complicated

17  family histories, you know, people who have adopted children,

18  versus, you know, who is married, who is not married, who is a

19  friend, who is not a friend, that it might deter a voter from

20  asking someone who they would have otherwise asked for

21  assistance from asking for that assistance because they didn't

22  want to deal with the very personal awkward conversation of

23  what, you know, what is our official relationship, and so that

24  relationship status, to me, we did get questions about that,

25  or often it was left off because people just didn't see why

ISABEL LONGORIA – DIRECT

1  they should have to disclose that, and, again, at least for

2  the office, the ambiguity of what it meant for someone to be

3  paid or compensated in exchange for providing assistance.

4  Q.  And for these two provisions as well as the other

5  provisions that we just looked at related to assistance, would

6  your office have been able to waive the requirements, the

7  disclosure requirements, the oath requirement for a voter with

8  a disability who would not be able to receive assistance due

9  to these provisions?

10  A.  Our office would not have been able to, no.

11  Q.  Are you aware of any incidents of voter fraud involving

12  voter assistance that took place in Harris County during the

13  2020 Presidential Election?

14  A.  No.

15  Q.  Are you with aware of any incidents of voter intimidation

16  or harassment involving assistance by an assister of the

17  voter's choice that took place in the Harris County

18  Election — or in Harris County during the 2020 Election?

19  A.  No.

20      THE COURT:  Are you at a transition point?

21      MR. BADAT:  Yes.  If we want to take a break, now

22  would be a good time.

23      THE COURT:  Let's take a break.

24   (Recess)

25

ISABEL LONGORIA – DIRECT

1    BY MR. BADAT:

2    Q.  Miss Longoria, I would like to move on to the topic of

3    poll watchers.  As part of your role as special advisor during

4    the 2022 Election, what were your responsibilities related to

5    poll watchers?

6    A.  That was one of my project areas, so it was my

7    responsibility to be the point person for questions raised by

8    poll watchers.  At NRG, specifically the main voting location,

9    I was their point person for the mail ballot drop-off

10   location, kind of anything inside the building related to

11   central count, signature verification, early vote ballot

12   board, and then for the rest of the county as questions came

13   up from either poll watchers that were escalated past that

14   location, or again questions from election judges about poll

15   watchers, I was the point person that got escalated to.

16   Q.  Can you tell us a little bit about the history of poll

17   watchers in Texas?

18   A.  After the Jim Crow Era and the 1965 Civil Rights Era, as

19   kind of Black, Hispanic, and Asian individuals were provided

20   the right to vote, there was the creation of this poll watcher

21   position, which was meant to allow kind of citizens on behalf

22   of — I don't know who they were appointed by on that behalf

23   at that time to go and monitor polls.

24       And monitoring at that time really showed up as going into

25   neighborhoods of black and brown communities to kind of

ISABEL LONGORIA – DIRECT

1  intimidate voters to really ask them questions and otherwise

2  deter them from voting, either through direct violence, or

3  kind of insinuation as they were voting and going through the

4  process.

5      So that poll watcher position has carried on, and,

6  unfortunately, has a very deep and troubled history of being

7  not just folks who are kind of observing the process for

8  accountability but abusing their access in a voting location

9  to monitor and interfere with voters.

10  Q.  And so when you were in the Clerk's Office what type of

11  training was provided to election workers about how to

12  interact with poll watchers ahead of the November 2020

13  Election?

14  A.  As part of their training modules, so every kind of

15  election worker had to go through a multiple-hour training

16  module, part of that dealt with poll watchers, and the

17  Secretary of State had some excellent one-page on kind of the

18  dos and don'ts.

19      Poll watchers are allowed to, as long as they have the

20  right paperwork, be there, generally observe the process.  The

21  don'ts, these are very bright lines, poll watchers were never

22  allowed to talk directly to a voter, touch a voter, touch the

23  voting machines, touch any kind of voting equipment.

24      If they had issues, it was more appropriate that they

25  raised them either to an election worker or directly with the

ISABEL LONGORIA – DIRECT

1  election judge, and, you know, if they felt that location

2  wasn't responding correctly to escalate that either to our

3  central office or to the Secretary of State.

4      But when I worked with poll watchers at the NRG location I

5  introduced myself every morning.  We did a huddle-up.  Anyone

6  who was new, I would sign them in.  Anyone who had been there

7  before, I gave them my personal cell phone number so they

8  could reach out to me directly.

9      If either the poll watcher or election worker had a

10  question, I would go rotate every couple of hours to just kind

11  of show face and make sure that I was accessible to folks as I

12  was doing my duties inside and going outside.

13      And just –– sorry, that extended past that the judges were

14  doing, but we created, by example, an atmosphere where you

15  work with poll watchers, you educate, you provide warnings,

16  you provide ample opportunity for them to do what they feel

17  they are there to do within reason.

18  Q.  And during the November 2020 Election, did you respond to

19  any complaints involving poll watchers who thought they were

20  not able to properly observe the election?

21  A.  Yes.

22  Q.  Can you tell us a little bit about those situations?

23  A.  So the ones I had direct knowledge or interaction with

24  were specifically around the mail ballot drop-off location.

25  So there was one location for the county where folks could

ISABEL LONGORIA – DIRECT

1  drive up and return their completed mail ballot directly to
2  the election staff.
3      Poll watchers were there and every morning we would meet
4  and every morning we would talk about the fact that a voter
5  would drove up, a poll watcher could not stand in front of the
6  vehicle for their own safety, and otherwise direct voters to
7  go in a lane or go into a certain position, they had to let
8  voters drive up to an election worker.
9      The election worker was allowed to be the first person to
10 approach the car, and, you know, they would speak to the
11 voter, they would have their clipboard and form within view,
12 but I had particularly I think one or two irate poll watchers
13 who would try to kind of like wedge themself in between the
14 election worker and the vehicle, or the voter, or would touch
15 the election worker to try and move them over, or would
16 frequently pick up the clipboards of voter information to copy
17 that information.
18     I had to walk out there continuously and share that a poll
19 watcher had every right to be, you know, there, six inches
20 away, a foot away.  They could be there close enough to see
21 what was going on.  We could all play well together, but some
22 key poll watchers specifically, and kind of the lead poll
23 watcher out there for the Republican Party shared with me
24 multiple times that they had been instructed to write down the
25 name and driver's license numbers of voters and that they felt

ISABEL LONGORIA - DIRECT

1  they needed to be close enough to be able to see those names

2  and driver's license numbers.

3      And I, in writing and verbally warned them multiple times

4  that whatever their intent may be, they could not stop the

5  election workers, they could not touch their clipboards, they

6  could not ask voters to speak louder, and especially if voters

7  did not want them near, if a voter asked them to step back,

8  the proper thing to do for a poll watcher would be to give the

9  voter the space that the voter requested to feel safe in that

10 voting process.

11     So there were two individuals I remember that I warned

12 verbally, I warned in writing multiple times, and ultimately I

13 decided to remove because they started shouting, they started

14 becoming aggressive with our election workers and being more

15 aggressive in trying to insert themself between the election

16 workers and the voters.

17 Q.  So this was specifically at the NRG Arena, is that right?

18 A.  Correct.

19 Q.  And within the NRG Arena, this was at the mail ballot

20 drop-off location?

21 A.  Correct.

22 Q.  Were there any other situations that you had to respond to

23 related to poll watchers at other locations?

24 A.  I believe it was yesterday I mentioned that at the

25 drive-thru voting location, to be clear there were election

ISABEL LONGORIA - DIRECT

1    judges there, but as I would drive by, do my rounds, that poll

2    watchers would respond either at the mail ballot drop-off or

3    at the drive-thru location that basically they felt the

4    locations were too big, so not that they had any complaint,

5    but they felt the locations were too big and that they

6    resented having to walk in the heat to be able to monitor what

7    they wanted to monitor, and so I don't — that was not

8    necessarily an actionable item, more the poll watchers just

9    wanted to walk faster, or have air conditioning, or have

10   bottles of water, have access to stuff that is not the purview

11   of our office to provide.

12   Q.  Apart from the poll watchers at the drive-thru voting

13   locations did you receive any other complaints by poll

14   watchers that they weren't able to properly observe the voting

15   process?

16   A.  Sorry.  Outside of NRG, is that what you asked?

17   Q.  Outside of NRG and I think you just described one of the

18   drive-thru voting locations, right?

19   A.  Can you repeat the question?

20   Q.  Sure.  Outside of what we've already talked about —

21   A.  Gotcha.

22   Q.  — were there any other complaints about poll watchers

23   that they weren't able to properly observe the voting process?

24   A.  Yes.  Those would have happened at individual locations.

25        I know that there were questions of poll watchers at

ISABEL LONGORIA – DIRECT

1    individual locations, didn't always trickle up for me to take
2    action on, but more notice at some of our larger locations
3    again that poll watchers felt that, you know, they did not
4    appreciate the fact that they would have to walk multiple rows
5    of voting machines at our bigger locations, or when asked
6    multiple times not to talk to voters, or not to at the
7    check-in station at the voting machines, that they felt that
8    their rights were being impeded because they were asked to
9    stop talking to voters.
10   Q.  And were any of the complaints that you received from poll
11   watchers, in your mind, valid complaints?
12   A.  The -- I'm trying to think.  I mean, no.  Usually poll
13   watchers and election judges, you know, for the most part
14   would play along and get along very well.  What escalated to
15   my attention was often where poll watchers had been repeatedly
16   notified that whatever they wanted to do was not within their
17   right and that they were escalating for the purpose of kind of
18   feeling disgruntled about it.
19   Q.  Now, we talked about how you handled complaints from poll
20   watchers during the 2020 November Election.  Did you also
21   receive complaints about poll watchers?
22   A.  Yes.  Voters -- I myself observed when I would go to the
23   mail ballot drop-off location, voters would pull off
24   towards -- you know, after dropping off, pull off towards the
25   end and say, hey, you know, that person, referring to the poll

ISABEL LONGORIA - DIRECT

1  watcher, that person, who are they, why are they being so

2  aggressive, why are they being rude to the election worker,

3  because they could see that had like a poll watcher sticker

4  on, why is that person allowed to be near me, and complaints

5  from voters at other locations that trickled up through our

6  call center of voters very wary of why this individual poll

7  watcher was like reading over their shoulder, standing too

8  close to them at a voting location, when they asked them to

9  move back the poll watchers wouldn't move back, so kind of

10 just generally wary, especially in black and brown communities

11 because of that history of who are these people, what are they

12 doing, and how can I get them to just leave me alone when

13 voting.

14 Q.  So let's pull up SB 1, Section 4.01.

15      I want to ask you a few questions about this provision,

16 Miss Longoria.  It states that "A presiding judge cannot have

17 a poll watcher removed from the polling place for violating a

18 provision of this code or any other provision of law relating

19 to the conduct of elections other than a violation of the

20 Penal Code unless the violation was observed by an election

21 judge or a clerk."  Do you see that?

22 A.  Yes.

23 Q.  What is your understanding of this provision?

24 A.  That even in those instances — sorry — that a clerk or

25 judge had to see with their own eyes, really kind of be

ISABEL LONGORIA - DIRECT

 1  present at the needed instance of the poll watcher action or
 2  alleged action in order to take a responsive action to it, and
 3  so other than violation of the Penal Code, which I don't know
 4  the definition, but as I understand it's like unless a poll
 5  watcher was like kicking, spitting, shouting, punching, kind
 6  of something very violent and aggressive and outlandish, that
 7  other than that an election worker had to see it with their
 8  own eyes, which, in my experience, is a little bit ludicrous,
 9  even in the smallest of voting locations with six, eight, ten
10  machines, and especially with our new voting machines in
11  Harris County where you have people over by the ballot
12  drop-off section, or you have the judge, an assistant judge
13  trying to help check people in and do provisional ballot
14  paperwork, or whatever it may be, that their eyes are not
15  always on the exact movement of the poll watchers.
16      The job of the election worker is to serve the voter, and
17  so though it's the voter experiencing, you know, the potential
18  harassment or the potential discomfort, the law does not allow
19  us to actually believe voters when they are reporting a crime,
20  the ones who are the victims of this, it would have to be only
21  in an instance where an election worker is watching.
22  Q.  And so, in your mind, would the exception for a violation
23  of the Penal Code be sufficient for an election judge or clerk
24  to maintain order at the polling place?
25  A.  No.  In my ten elections working, there was only one

1 instance of shoving that I can remember.  So the vast majority

2 of what was raised by poll watchers was never kind of a

3 physical altercation.  It was always something more nuanced,

4 right, about this intimidation factor.

5 Q.  So going back to some of the experiences you described in

6 the November 2020 Election, you mentioned that you removed a

7 couple of poll watchers from the voting location.  If this

8 provision were in effect at that time, would you have been

9 able to do that?

10 A.  No.  It depends, right.  I wouldn't have observed those

11 activities.  I was in the office.  I was doing other duties.

12 I was circulating around the NRG complex, you know, checking

13 on different areas.

14     Poll watchers who were talking to voters or rushing up to

15 cars before election workers could even get to them, or after

16 their instances, or even the election workers would not have

17 seen it.

18     Like I said, more likely kind of inside and voting that

19 just there are so many responsibilities for election workers

20 they can't keep their eyes on every poll watcher.

21 Q.  In the lead-up to the March 2022 Primary, how did you

22 train election judges on this provision?

23 A.  Similarly, in the election judge and worker training there

24 is I believe a module where we cover poll watchers

25 specifically.  We would have updated election workers on the

1  updates in the law and we just would have let them know that

2  they needed to be much more vigilant, that in kind of

3  determining what their duties should be at a voting location

4  that they had to just try and watch poll watchers more, and

5  the election workers were -- raised what I raised, you know,

6  what if I'm helping a -- what if I'm helping check in people,

7  you know, what if we have a particularly big lunch rush come

8  through, or evening rush, and now we need to pull four or five

9  election workers to do check-in, we've got one at the ballot

10  box at the end, there's one circulating, but there's two or

11  three poll watchers, by sheer number alone, you cannot be

12  there watching every poll watcher.

13      So all we can do is educate them that they could only

14  remove people if they saw it themselves, and that if a voter

15  reported an issue, we still asked that those election sites

16  and voters still report that to our office, that we couldn't

17  remove a poll watcher, at least it gave us an idea of which

18  poll watcher was starting to test those lines more, you know,

19  not that we could send staff to every location that was

20  happening, but at least being aware of kind of the environment

21  and how the power dynamics were very much shifting toward poll

22  watchers at that time.

23  Q.  So let's take a look at Section 4.06 of SB 1 which deals

24  with accepting poll watchers for service.  In Subsection G it

25  states that, "An election officer commits an offense if the

ISABEL LONGORIA – DIRECT

1  officer intentionally or knowingly refuses to accept a watcher

2  for service when acceptance of the watcher is required by this

3  section."

4      And the offense under the subsection is a Class A

5  misdemeanor.  Did I read that correctly?

6  A.  Correct.

7  Q.  What does it mean to knowingly or intentionally reject a

8  poll watcher in the context of this provision?

9  A.  Your guess is as good as mine.  This is very ambiguous on

10  what knowingly or intentionally.

11      I know of instances in which, for example, a poll watcher

12  submitted their form and an election judge had a question

13  about it, you know, let me go check your VUID number, or let

14  me make sure that there's rules on how many people a campaign

15  can assign in a county at any given time to be a poll watcher

16  so they might want to just pause and call our office real

17  quick to check on those upper limits, and a poll watcher could

18  walk away, or had walked away, and could allege, well, the

19  election judge is just trying to intimidate me, and so it's

20  this kind of knowingly or unknowingly, election judges have to

21  check paperwork, election judges might innocently believe, oh,

22  you didn't check a box, or maybe your VUID number was wrong,

23  and maybe it was right, maybe it was a judge who committed a

24  mistake, and so this kind of knowingly for the purpose of —

25  you can see that I'm even strongly explaining what it would

ISABEL LONGORIA - DIRECT

1  mean to knowingly or intentionally reject someone.

2  Q.  Have election judges expressed concerns related to this

3  provision?

4  A.  There were election judges that with these provisions and

5  others that put penalties on election judges, who mostly are

6  older folks, volunteers, just trying to do their civic duty,

7  that they felt this raised now a level for them of fear,

8  right?

9       I'm volunteering my own time, but now I'm in a situation

10 where because those power dynamics are shifting towards a poll

11 watcher, if they allege that I kicked them out, am I going to

12 jail, and this job just isn't worth it, and so I know

13 personally at least two individuals who had been long-standing

14 judges who decided no longer to work in elections because of

15 this provision and others that added criminal penalties for

16 subjective standards.

17 Q.  So let's look at another section of SB 1, Section 4.07.

18 I'm not going to read through the entire section, although I'm

19 happy to if it's helpful for you, Miss Longoria, but let me

20 ask, are you familiar with this section of SB 1?

21 A.  Yes.  Regarding kind of poll watcher standards and where

22 they can be and what they can do in a location.

23 Q.  So did you have concerns with this provision?

24 A.  Yes.  First, there's that standard on line 27, "A watcher

25 is entitled to sit or stand near enough to see and hear."

1 This is ambiguous to us for election purposes.  As I've

2 shared, you know, I worked with poll watchers to make sure

3 that they could absolutely observe the process that they were

4 allowed to be there to do, but one person's ability to see and

5 hear is different from another person's ability to see and

6 hear.

7      I would say this was quite often an item of tension

8 between poll watchers and election judges.  Again, the

9 election judge, they, themself, could see and hear the

10 activity, they felt they were providing poll watchers a

11 reasonable distance to do so and access to do so, but the poll

12 watcher didn't feel that they could reasonably see or hear, or

13 what's that they alleged, and so it doesn't share who gets to

14 decide who gets to see and hear or what that standard is, and

15 so this becomes a basis for a lot of controversy at the polls,

16 even for well-meaning election judges and poll watchers.

17      I think, further, the free movement -- let me see if I

18 can -- I think E says, "A watcher may not be denied free

19 movement where election activity is occurring within the

20 location at which the watcher is serving."

21      This is particularly problematic at the Harris County

22 Election Technology Center.  So the Election Technology Center

23 is basically a big warehouse.  It's where the voting machines

24 are kept, it's where voting materials are prepared, and it's

25 where the logic and accuracy tests are conducted and some mail

ISABEL LONGORIA - DIRECT

1  ballot functions.

2      The question of what counts as election activity.  So if a

3  poll watcher is there and they have signed in to observe the

4  logic and accuracy test which is happening on the floor of the

5  warehouse, no problem, right.  We understand that they are

6  there to see that function.  They would get free movement

7  around to kind of see and hear what was going on.  We would

8  caution them, don't stand in front of election workers who are

9  moving around, and kind of impeding their movement as well,

10 but what we had those instances of people who would start

11 wandering, right?

12     Well, isn't the preparation of like packing materials for

13 election, is that election activity?  Do I now have to let an

14 election — a poll watcher just move freely about the entire

15 warehouse, which is a huge warehouse, and I don't have staff

16 to dedicate to follow a poll watcher around the entire

17 warehouse, and make sure that they are not touching equipment,

18 or talking to other election workers, et cetera.

19     And so the ambiguity of what counts as election activity,

20 what is the envelope, if you will, that separates one election

21 activity from another, I believe technically poll watchers are

22 supposed to submit an affidavit for each different area that

23 they want to observe, but, again, a warehouse, there is

24 machinery, there is equipment, right, there is movement

25 happening very quickly and safety standards that, and again,

1  if I can't follow a watcher around they could absolutely touch

2  election equipment, election documents, what prevents someone

3  from seeing and signing up as a poll watcher and then moving

4  into another part of a warehouse and acting in a nefarious

5  manner.  So that has caused great concern for me in what it

6  means to have free movement in kind of an envelope of space.

7  Q.  So let's go to the next section, Section 4.09 of SB 1.

8  And we've looked at this section in the context of this trial

9  already, so I won't read through the entire thing, but let me

10  ask you, Miss Longoria, are you familiar with this section?

11  A.  If you'll give me a second to review it.

12  Q.  Sure.

13  A.  Gotcha.  Yep.

14  Q.  And did you have concerns with this provision?

15  A.  Yes.  This one came up.  I think an example of that is at

16  the mail ballot drop-off location pre-SB 1 where again, and

17  most frequently this would come up at voting locations at

18  post-SB 1, even the check-in station, so you have the e-poll

19  book, the tablet, you have an election worker there, maybe

20  filling out documents or helping the voter on the e-poll book,

21  and just their physical body, they might be, for example, a

22  very large or tall election worker.

23      You might have a poll watcher who is shorter, and so this

24  election worker is doing nothing but their job and the poll

25  watcher would allege that that election worker was obstructing

ISABEL LONGORIA – DIRECT

1  their view because they weren't moving their body out of the

2  way or providing -- how do I put it?  Just by moving the

3  election worker was accused of obstructing a view, where the

4  election worker was, you know, the poll watcher was there, the

5  poll watcher was allowed to observe activity, this idea of

6  what counts as blocking a view.

7      And I think poll watchers took this to mean that somehow

8  election workers had to actively move out of the way or give

9  deference to poll watchers, and so kind of the culmination of

10  these laws shifts power to poll watchers again, right?

11      If you take this in the context of other situations of,

12  well, if the poll watcher is alleging that they can't see or

13  hear, if the poll watcher is alleging that your shoulder is in

14  the way, they can't look over your shoulder at a form, and now

15  you are too scared to maybe -- you don't know if they counts

16  enough to throw a poll watcher out, you don't want to get

17  accused of taking action that could then incur a criminal

18  penalty against you, it's shifting, again, those power

19  dynamics to poll watchers where even knowing the poll watchers

20  don't have the right to write down voter information, that it

21  just created this whole confusion of how poll watchers could

22  be, you know, allowed there, and their rights within a voting

23  system while also being held accountable.

24  Q.  And do you know what the penalty associated with the

25  violation of Section 4.09 is?

ISABEL LONGORIA – DIRECT

1  A.  Not off the top of my head, no.

2  Q.  Could we go back to just the full section on the screen.

3  We can come back to that.

4      So taken together, Miss Longoria, the provisions that we

5  just reviewed related to poll watchers, how did these

6  provisions impact election judge's ability to deal with

7  disruptive poll watchers during the March 2022 Primary?

8  A.  Again, taken in totality, it shifted the power dynamic to

9  poll watchers.  And in elections, judges and workers tend to

10 be older, tend to be volunteers, tend to be people that are

11 nerds like me who want to do their civic duty, all of a sudden

12 it added an increased threshold and fear that innocent

13 mistakes, right, attempts to protect voters would somehow run

14 afoul of poll watchers, at the very least perception, of how

15 they were being managed, and that the laws were geared more

16 towards protecting poll watchers than that were to protecting

17 voters.

18 Q.  And taken together, the provisions that we just reviewed

19 related to poll watchers, how did your office as Election

20 Administrator train election judges on implementing these

21 provisions?

22 A.  We shared the Secretary of State's information, you know,

23 exactly what the law was, as it was written.  We would try and

24 take them through maybe a couple of examples of in the morning

25 meeting with poll watchers, discussing where they could, kind

ISABEL LONGORIA – DIRECT

1  of, you know, here's where you can sit and stand right here,
2  you know, here's where you can move, please check in with me,
3  always trying to create a friendly environment at least of
4  working with poll watchers to meet their goals, but, you know,
5  ultimately the law is the law and if they had any questions,
6  if they had observed that activity directly to please call our
7  office so that we could, to the best of ability, counsel them
8  on what to do next.
9  Q.  And, sorry, was this training for poll watchers?
10  A.  Oh, sorry.  Did you ask for poll watcher?
11  Q.  I meant the election judges, but I think that's what you
12  were talking about, is that right?
13  A.  If you wouldn't mind, let's start over just to make sure I
14  got it right.
15  Q.  Sorry.  I made things confusing.
16      Taken together the provisions that we just reviewed
17  related to poll watchers, how did that impact your training of
18  election judges in implementing these provisions?
19  A.  Correct, that we asked election judges, or counseled
20  election judges to work to the best of their ability with poll
21  watchers, log what they could, call our office, even with
22  questions, but ultimately to just be cautions in removing poll
23  watchers because of how subjective the laws were.
24  Q.  Now, Miss Longoria, I'd like to turn our attention to the
25  2021 legislative sessions during which SB 1 was debated and

1337
ISABEL LONGORIA - DIRECT

1  ultimately enacted.  What position were you in during the 2021

2  legislative sessions?

3  A.  Elections Administrator.

4  Q.  As EA, would legislators reach out to you for your

5  professional opinion about issues related to elections?

6  A.  Yes.  Within and external to Harris County, just how the

7  law obviously it affects measures we had put in place in

8  Harris County and also how other laws would prevent or hinder

9  voting rights and access.

10 Q.  Now, if I say SB 1 in the context of these legislative

11 sessions, would you understand that to mean SB 1 as well as

12 the bills that preceded SB 1 related to voting during those

13 sessions?

14 A.  As a former Senate staffer, I'll give a pass and say I

15 understand it's an omnibus collection of election bills.

16        MR. KERCHER:  Your Honor, we'd object under Rule 403

17 that that's unnecessarily confusing.  I understand that

18 ordinarily only applies in jury trials, but here there are

19 important differences, as the Court will learn particularly

20 later.

21        In the earlier bills, for example, Senate Bill 7 and

22 HB 6 -- thank you, everyone -- that where other election code

23 provision changes were considered, and conflating these is

24 confusing, not only for the Court, but there will be other

25 folks who will be looking at this record down the line, as the

ISABEL LONGORIA – DIRECT

1  Court knows.

2          THE COURT:  Well, to the extent the Fifth Circuit is

3  confused, that's their problem.  I will not be.

4          That's overruled.

5          MR. KERCHER:  Okay.

6  BY MR. BADAT:

7  Q.  So, Miss Longoria, were you involved in the 2021

8  legislative sessions as they pertained to SB 1?

9  A.  Yes.

10 Q.  What specifically did you do in the context of SB 1 during

11 those legislative sessions?

12 A.  Formerly, I have served in the Texas House and the Texas

13 Senate in the capitol in writing and advocating for

14 legislation, so I felt very comfortable in that environment,

15 and I went to testify multiple times in front of the Texas

16 House and Senate.

17     I shared — my office created and shared a letter with

18 members of the Texas House and Senate who had any overlapping

19 jurisdiction with Harris County, and I believe the members of

20 the committee related to elections, and I met with absolutely

21 anyone who would meet with me on how I believed the various

22 election bills would impact voter access in Texas.

23 Q.  So let's pull up HAUL MFV 273.  I'm showing you what has

24 been marked as HAUL MFV 273.  It's a collection of several

25 documents but I'm only going to be asking you about the one at

ISABEL LONGORIA - DIRECT

1  the front of the collection.  Do you recognize this document?

2  A.  Yes.  So this is an example of the letter or memo we

3  provided to Texas Senators who overlapped with Harris County

4  about — to the gentleman's point — the collection of

5  election bills at that time that dealt with these election

6  provisions.

7  Q.  And who prepared this document?

8  A.  Myself and my staff.

9  Q.  Where did you get the information to prepare this letter?

10  A.  Either from just kind of internally, right, the voting

11  information we had as part of the voter rolls, as well as

12  census data, and I believe a collection of other studies and

13  articles pertaining to the election, the elections at that

14  time.

15  Q.  And why did your office prepare this letter?

16  A.  From my experience working at the Texas Legislature I knew

17  how important it was for local officials, experts on the topic

18  to provide background and facts in writing, that legislators

19  and their staff could use to educate themselves on these

20  issues, so it was important to provide first-person resources

21  as an advocacy tool, and also for each Senator and House

22  Representative, for them to understand exactly how many

23  people, not just esoterically, but from their districts use

24  these voting methods, so that they could see this was not —

25  these were not voting methods concentrated in one part of the

ISABEL LONGORIA - DIRECT

1  world, that this was voters from across the county who used
2  the different measures in question.
3  Q.  I'm sorry.  Who did you submit this letter to?
4  A.  This specific letter was submitted to State Senator
5  Alvarado.
6  Q.  Did you also submit letters to other senators?
7  A.  Yes.  Again, the different senators who any portion of the
8  district they represented, if any portion of it overlapped
9  with Harris County, but we restricted our data and numbers to
10  Harris County since we were the Harris County representatives.
11  Q.  So I want to go over a few different parts of this letter
12  and we can start with the first paragraph.
13      It reads, "Senate Bill 7 and House Bill 6 would hurt
14  voters and voting in Harris County in November 2020.  Despite
15  a global pandemic, Harris County had a historic 1.68 million
16  voters participate in the elections in a safe, accessible,
17  transparent, and equitable manner.  This turnout was driven by
18  innovations like drive-thru voting, 128,000 voters, 24-hour
19  voting, 16,000 voters, and a robust mail ballot program
20  179,000 voters.  These were part of the 28 SAFE initiatives
21  planned and executed by a bi-partisan coalition of political
22  parties and community partners in the July 2020,
23  November 2020, December 2020, and May 2021 elections.  In
24  addition, these methods helped promote voting in minority
25  communities, which helped create a more accurate

1 representation of communities in the county."

2     Did I read that correctly?

3 A.  I believe so.

4 Q.  And then the next sentence in the second paragraph says,

5 "However, SB 7 and HB 6 will prohibit most of the innovative

6 measures Harris County has enacted in the last four elections

7 to make voting a success, increase turnout, maintain health

8 standards in a pandemic, and overall host secure and fair

9 elections."  Did I read that correctly?

10 A.  Correct.

11 Q.  So what were you trying to tell legislators in the parts

12 of this letter that I just read?

13 A.  That the election bills proposed in those measures would

14 hurt voters in voting in Harris County, that -- and to show

15 that these methods were used, used quite robustly, and we saw

16 had positive effects both in voter access and in maintaining

17 health standards in a pandemic.

18 Q.  Let's go to the vote-by-mail heading on the first page.

19     Could you please summarize for the Court what you are

20 saying here?

21 A.  So you can see in that first sentence, for District 6, so

22 Senator Alvarado was the Senator of District 6, we looked at

23 specifically the number of voters in District 6 who voted by

24 mail, which was 17,800 voters.

25     We, in comparison, provided the number of mail ballot

1342
ISABEL LONGORIA – DIRECT

1  voters who voted in 2016, which was 11,273 people who voted by
2  mail.  So there was at least 6,000 more people who voted by
3  mail in 2020 than in 2016, and we used 2016 as a comparison,
4  again, apples to apples.

5      It was the last Presidential Election, so it would have
6  been equally, you know, a large percentage of voters who were
7  motivated by presidential voting, or kind of that to motivate
8  them to go turn out to vote, and so — and, too, it would have
9  been from the same district, so they would have been bound
10 largely by the same geographic cultural, et cetera,
11 representations.

12     And so, holding all things constant, you had 6,000 people
13 vote more by mail ballots in 2020 than in 2016, which we
14 attribute later to those innovations, both in mail ballot
15 design and in increasing our customer service and just making
16 sure that people knew that they could apply by sending out
17 those applications.

18 Q.  And so you say, "Both SB 7 and HB 6 will prohibit an
19 Elections Administrator from sending senior voters or any
20 voters an application to vote by mail."

21     Is it your understanding that SB 1 incorporated this ban
22 on sending any voters an application to vote by mail?
23 A.  Correct.
24 Q.  Let's look at the next heading entitled Expanded Hours on
25 the second page.  Could you tell us what you are saying in

1  this paragraph?

2  A.  So expanded hours, for many years up to that point Harris

3  County had held voting locations open from 7:00 a.m. to

4  7:00 p.m. with the exception of Sunday, and so we took kind of

5  expanded hours as those voters who voted in what we — new

6  hours, if you will, for the county, 7:00 p.m. to 7:00 a.m.

7      So there you can see that in November 2020 2,527 voters in

8  District 6 voted from 7:00 p.m. to 7:00 a.m.  And, clearly, we

9  couldn't provide that number for 2016, since in 2016 those

10  expanded hours were not provided.

11  Q.  And then you say, "However, SB 7 will prohibit the

12  Elections Administrator from opening polls for longer than

13  twelve hours during the weekdays of early voting.  Even though

14  the bill would allow polls to be open between 6:00 a.m. and

15  9:00 p.m., the twelve-hour daily limitation prohibits the

16  county from actually offering extended hours without cutting

17  voting in either the morning or the evening."

18      Now, is it your understanding that the law was ultimately

19  enacted and SB 1 allowed the polls to be open from 6:00 a.m.

20  and 10:00 p.m.?

21  A.  Correct.  I believe ultimately it was 6:00 a.m. to

22  10:00 p.m. for a minimum of twelve hours.  So though it added

23  a prohibition for the first time on what hours they could be

24  open, and then twelve hours is definitely less than 24 hours,

25  so we could not enact those expanded hours as we had been in

1344

ISABEL LONGORIA – DIRECT

1  those previous elections.

2  Q.  And so the concern that you are expressing here with SB 7,

3  did it apply equally to your concerns with SB 1?

4  A.  Correct.  Yes, that anything less than the ability to

5  provide voting for 24 hours, whether it was — you know, even

6  trying to open up those times, would not allow Harris County

7  or any county the flexibility to adapt to future situations

8  and to our voters.

9      And I will point out, District 6, I know is primarily

10  Hispanic district, so this district more than others would be

11  impacted by preventing 24-hour voting, since I shared earlier

12  that we know those who voted using 24 hours tended to be

13  younger and Latino.

14  Q.  Let's look at the next section, In-person Drive-thru

15  Voting.  Could you summarize for us, please, what you are

16  saying here?

17  A.  Similarly, you know, we showed that in District 6 in

18  November 2020 15,617 of their voters opted to use drive-thru

19  voting, and that, you know, we felt that those 15,000 plus

20  voters might not otherwise vote, if they didn't feel they

21  could do so from the comfort and security of their vehicles,

22  especially caregivers and folks with maybe not disability but

23  at least certain mobility issues, or even kind of social

24  mental health issues that would provide [verbatim] them from

25  going into a — walking into a voting location.

ISABEL LONGORIA - DIRECT

1  Q.  Was this ban on drive-thru voting incorporated into the

2  enacted version of SB 1?

3  A.  Correct.

4  Q.  Now let's jump down to the third page, the heading labeled

5  as Criminalizing Election Workers.  Now, can you tell the

6  Court what you are saying in this paragraph, please?

7  A.  At the time HB 6, I believe had added provisions regarding

8  election judges and workers and I think kind of restrictions

9  and penalties, but, ultimately, SB 1 provided similar

10 penalties or restrictions that election workers who are

11 volunteers civil servants just trying to do the right thing

12 would otherwise be deterred from serving, or feel that they

13 could not act, you know, to protect voters in certain

14 instances because the election bills collectively shifted

15 those power dynamics from protecting poll watchers instead of

16 election workers and voters.

17 Q.  And you mentioned that SB 1 incorporated some of the

18 criminalization provisions of election workers that were in HB

19 6, right?

20 A.  Correct.

21 Q.  And then let's take a look at the last heading --

22 actually, sorry, before that, let's look at Poll Watchers and

23 Video Recording.  So at the bottom of that page.

24 A.  Correct.

25 Q.  Tell us what you are saying here.

1  A.  I believe at the time there was an instant that would have

2  allowed poll watchers to use electronic recording in a voting

3  location.  That ultimately didn't make it, but it included

4  those — it did include the movements regarding destruction —

5  I'm sorry — regarding distance or obstructing the view and

6  free movement.

7      So, again, by shifting those power dynamics to poll

8  watchers, there was, not for election workers, a clear mind on

9  where poll watchers could be held accountable and how to even

10  in the best of intentions allow poll watchers to conduct their

11  activity while also protecting voters, or for us as an

12  election office protecting the election equipment from

13  potentially nefarious or wandering poll watchers.

14  Q.  And I think you already mentioned the provisions relating

15  to distance or obstructing the view to free movement for poll

16  watchers.  Those were incorporated into SB 1, right?

17  A.  Correct.

18  Q.  And then, lastly, let's look at Assistance and Caregivers.

19  It's on the last page.  Yeah.  Could you tell the Court what

20  you are saying here, please?

21  A.  That individuals who needed either language assistance or

22  disability assistance for either physical, cognitive, mental

23  health issue, whatever it may be, that these restrictions —

24  or these new laws would impose more restrictions in creating

25  more penalties, in creating a sense of fear around assistance,

ISABEL LONGORIA – DIRECT

1  and in many ways kind of –– I don't know if setting a higher

2  threshold, but making it difficult for well-meaning laypeople

3  to want to or feel that they could help their families or

4  their caregivees.

5  Q.  And in the last sentence you say, "will likely discourage

6  assistants and caregivers from providing the help necessary

7  for voters to cast their ballot, ultimately leading to fewer

8  people with disabilities and limited English-proficient voters

9  actually voting."

10     Is that concern that you expressed there equally

11  applicable to what ultimately was enacted in SB 1?

12  A.  Yeah.  If you showed up to vote in March 2020 and you saw

13  that you had to add more oaths, that your assistants had to

14  add or disclose government documents, even though they didn't

15  have to be a registered voter, all that paperwork, even for

16  folks who might be driving you, that I think next time people

17  would rather not vote, or not engage in what became just much

18  more of an onerous and scary process for them.

19  Q.  So let's look at the appendix that's attached to this

20  letter.  All right.  And so, Miss Longoria, attached to the

21  letter is an appendix and several exhibits that I want to talk

22  about.  Let's look at Exhibit 1.  What does this show us?

23  A.  We –– after the elections, we wanted to, you know,

24  investigate for ourselves and share and illustrate with

25  lawmakers the positive impact that these voting methods had on

ISABEL LONGORIA – DIRECT

1  helping traditionally disenfranchised communities,

2  specifically Black, Hispanic, Latino, and Asian voters.

3      So the State of Texas, I would say probably by design,

4  does not allow information about race or ethnicity to be

5  collected at the voter level.  So while you can provide your

6  gender, your address, and other markers when you register to

7  vote, you cannot provide your race or ethnicity.

8      What we knew from working with Rice University and other

9  experts is that the best way then to understand the impact of

10 voting methods on race is to look at precinct level or higher.

11     So, for example, if you are a voter in Precinct 28 and we

12 know from census data that 100 percent of the voters from

13 Precinct 28 have identified as Black, then we can very likely

14 assume that any given voter from Precinct 28 is also Black.

15          MR. KERCHER:  Objection, Your Honor.

16          I apologize for interrupting.  I don't object to the

17 exhibit, but to the extent that the witness is parroting the

18 expert report that we discussed earlier, we would object to

19 that as an improper expert opinion.

20          THE COURT:  I assumed she was testifying from her own

21 personal knowledge.

22          THE WITNESS:  Yes, sir.

23          MR. KERCHER:  What I heard her say was that she knows

24 this only because of the work that was done by

25 Rice University, Your Honor.

ISABEL LONGORIA – DIRECT

1    THE WITNESS:  If I might clarify.

2    THE COURT:  Yeah.

3    THE WITNESS:  We are the ones who advised

4  Rice University on how to conduct this research in the manner

5  of examining racial implications when voting.

6    THE COURT:  So limit your testimony just to what you

7  personally know without going back.

8    THE WITNESS:  Yes, sir.

9    THE COURT:  I understand her to be giving information

10  from her personal knowledge.

11    That's overruled.

12  BY MR. BADAT:

13  Q.  Go ahead and continue, Miss Longoria.

14  A.  So to extrapolate further, when trying to provide this

15  data to the Senators, again, in my experience working at the

16  Texas Legislature we thought they would find it helpful to get

17  an examination of kind of the racial or ethnic breakdown of

18  their districts.

19    So here you can see a chart where we took each district in

20  the portions that overlapped with Harris County specifically

21  and examined as an entire Senate District what percent of

22  those voters in the Texas Census reported — the U.S. Census,

23  I apologize — reported they were White, Black, Hispanic, or

24  Asian.

25    And from there if, obviously, any one of those groups was

ISABEL LONGORIA – DIRECT

1  over, I believe 40 or 50 percent, then we would classify them

2  as a, you know, Hispanic majority or Black majority district.

3      If any one of those groups — I'm sorry.  If any

4  combination of those groups, other than White, was still more

5  than the White population, you can see, for example, in Senate

6  District 15, we considered that a mixed-race district.

7      So this was our way of sharing kind of the racial ethnic

8  breakdown, and therefore the voters who used these methods per

9  district, the likely majority race or ethnic breakdown in that

10  area.

11  Q.  Okay.  Thank you.  And so, just for purposes of clarity of

12  the record, could we take a look at Footnote 33, please.

13  A.  Footnote 33, yeah.

14  Q.  Yes.  And so this I think — tell us what this says,

15  Miss Longoria.

16          THE COURT:  It says what she just said.

17          MR. BADAT:  I wanted to make sure it was clear.

18  Thank you.

19  BY MR. BADAT:

20  Q.  All right.  So going back to the chart in Exhibit 1, it

21  looks like Senate Districts 6, 13, and 15 are majority

22  non-White districts, is that right?

23  A.  Correct.

24  Q.  So let's look at Exhibit 2.  What does this tell us?

25  A.  It's, if you will, a summary of Exhibit 1.  So this is how

ISABEL LONGORIA – DIRECT

1  our office categorized each Senate District, either as White

2  majority, Hispanic majority, Black majority, or mixed race.

3  Q.  Okay.  And if we can look now at Exhibit 6, can you

4  describe what Exhibit 6 is showing, please?

5  A.  It says that when looking at the Senate Districts that

6  were Black majority, Hispanic majority, or mixed race and

7  cross-referencing it against the number of voters, you can see

8  that 56 percent of the voters in Harris County overall, the

9  predominant race was expected to be kind of White majority

10  based on precincts, and, you know, 13 percent Black majority,

11  11 percent Hispanic majority, and 20 percent mixed race.

12  Q.  And so this shows that 56 percent of voters in Harris

13  County lived in White majority districts, is that right?

14  A.  Correct.

15  Q.  And that means that 44 percent of Harris County voters

16  lived in non-White majority districts?

17  A.  Correct.

18  Q.  Let's go down to Exhibit 8, please.

19      So what is this showing us?

20  A.  Exhibit 8.  If you — we are looking at the number of

21  voters who used voting from 7:00 p.m. to 7:00 a.m., so again

22  those expanded hours.  We took per district the number of

23  voters who used those expanded hours and then calculated the

24  percentage of voters.

25      So all voters who voted in that 24-hour period versus the

ISABEL LONGORIA – DIRECT

1  number of voters who voted strictly from 7:00 p.m. to

2  7:00 a.m., so right there you can see percentages of voters by

3  extended hour period.

4  Q.  Okay.  And then looking at Exhibit 10.

5  A.  Yep.

6  Q.  Could you tell us what this shows?

7  A.  If you looked at just voters who used extended hours that

8  there were more voters came from Senate Districts that were

9  Black majority, Hispanic majority, or mixed race.  So as

10 compared to the voting population, more of those voters who

11 used extended hours came from areas that were, yeah, minority

12 serving districts.

13 Q.  So it might be helpful if we compare Exhibit 10 to another

14 exhibit, Exhibit 6 that we looked at just a second ago, if we

15 can do it side by side that would be awesome.

16     And so, Miss Longoria, let me see if I understand

17 correctly, is what you are saying that if you compare Exhibit

18 10 to Exhibit 6 that tells you –– what does that tell you

19 about the extent to which voters of different races used

20 extended hour voting?

21 A.  In reference to tying a voter back to their Senate

22 District as compared to in Exhibit 6 all voters during that

23 election more –– the people who voted tended to be more likely

24 from districts that were Black, Hispanic, or majority serving.

25 Q.  And then let's move down to Exhibit 13.  Actually, if we

1  could put Exhibit 13 and keep Exhibit 6 up there as well.

2      While we're getting that sorted, Miss Longoria, what does

3  Exhibit 13 show us?

4  A.  Exhibit 13 shows similar information but for drive-thru

5  voters.  So when looking at only voters who use drive-thru

6  voting, you can see in Exhibit 13 the majority of voters who

7  used drive-thru voting were likely to be from districts that

8  were Black majority or mixed-race serving, and when compared

9  to overall voters in that election period voters who were —

10 who used drive-thru voting were more likely to come from

11 districts that were Black, Hispanic, or mixed-race serving.

12 Q.  And so — all right.  Got it.  Thank you.

13     Now, in addition to providing written testimony,

14 Miss Longoria, I think you mentioned you also provided oral

15 testimony to the legislature —

16 A.  Correct.

17 Q.  — regarding SB 1?

18     Or actually, before I go there, let's pull up really

19 quickly HAUL MFV 274.  Do you recognize this document,

20 Miss Longoria?

21 A.  This was a similar letter that was provided to State

22 Representatives.  So as the document we were just referring to

23 broke down information by Senate District, this one broke down

24 information by House District and returned that information to

25 each member of the Texas House who had a portion at least of

1354
ISABEL LONGORIA – DIRECT

1  their district serve Harris County.

2  Q.  And the concerns that we went through that you mentioned

3  in that Senate letter in the findings related to use of

4  drive-thru and 24-hour voting by race, were those equally

5  applicable to this letter?

6  A.  Yes.  As I remember, the only thing that would have been

7  different is, again, the district specific numbers showing

8  exactly how many members or how many people in each district

9  voted in that certain method.  The rest of the information, my

10  concerns remain the same.

11  Q.  So let's pull up State Exhibit 94, which is behind Tab 15.

12      So this is a transcript of the Senate Committee Hearing on

13  State Affairs, on August 9, 2021.  It's Volume 2 of the

14  transcript.  There was a morning transcript and an evening or

15  afternoon transcript.  And, Miss Longoria, you see here it

16  says "In Re: SB 1?"

17  A.  Yes.

18  Q.  And so do you remember testifying before the Senate

19  Committee on State Affairs?

20  A.  Multiple times, yes.

21  Q.  And August 9, was that — do you remember which

22  legislative session that was?

23  A.  I believe at that point it would have been the second

24  special legislative session.

25  Q.  So by this point SB 1 was being considered by the

ISABEL LONGORIA – DIRECT

1  legislature?

2  A.  I believe so, yes.

3  Q.  I just want to talk through a few portions of your

4  testimony here.  We can start on page 29.  So this is, I

5  think, when you begin your testimony, and starting on line 20

6  you state, "And I can tell you that Senate Bill 1 by design

7  harms marginalized voters and severely limits my office's

8  ability to provide fair elections."

9      Did I read that correctly?

10  A.  Yes.

11  Q.  So what did you mean when you said, "SB 1 harms

12  marginalized voters by design?"

13  A.  At this point in the process we had showed each Senator

14  and Representative in the letters we just covered how it would

15  have affected their districts specifically, how there was an

16  impact where voters who came from likely Hispanic majority,

17  Black majority, mixed-race districts were more likely to use

18  those measures, and, therefore, eliminating those measures

19  would have affected –– would have had more of an effect on

20  districts on voters in those districts.

21      In addition to which there was other information you

22  showed overall for all of Harris County, when running kind of

23  race against voters that Black, Hispanic, young voters, women,

24  folks who were more likely to use these methods, it was very

25  clearly demonstrated and it had been shared up to that point

1  by SB 1 second special that it was clear the legislators and

2  Senators in their multiple iterations of this bill were not

3  interested in considering that racial impact anymore, and so

4  at that point even making other changes regarding poll

5  watchers, whatever it may be, they did not materially make any

6  changes to these provisions in an attempt to protect minority

7  voters.

8  Q.  Were you the only person telling the legislature about the

9  racial impact of these provisions?

10  A.  No, I believe other community groups and advocacy groups

11  testified to that effect.

12  Q.  If we go down to page 31, starting on line 4, I think this

13  is the conclusion of your kind of prepared remarks, you say,

14  "Therefore, I implore you, please, to stop giving in to the

15  conspiracy theories and work with us election officials to

16  craft a bill that Texans can be proud of, because this ain't

17  it."

18      So when you say, "stop giving in to conspiracy theories,"

19  what are you referring to?

20  A.  As I was watching the testimony, as I was watching

21  testimony that the legislators had invited, so had given more

22  precedence or credence to it, it tended to be a lot of, you

23  know, well, there could be fraud, or there could have been

24  fraud, or there could have been massive fraud that we don't

25  even know about, and so a lot of not able to provide evidence

ISABEL LONGORIA - DIRECT

1  that we had, or at least demonstrating that there was a

2  pattern in some way that we had, there was a lot more

3  subjective could have, would have, should haves, so I at that

4  point was very desperate to take a last stand and implore that

5  the legislators, through our testimony, through other expert

6  testimony, through other advocacy groups, had the cover to do

7  the right thing, had the data in front of them, and I was

8  imploring them to please use what was demonstrating at least

9  patterns, instead of giving credence to a lot of hearsay.

10 Q.  And so you said here, you asked the legislature to "work

11 with us election officials."  Had legislators up until then

12 been working with election officials on these bills?

13 A.  I believe a handful.  I believe some legislators maybe had

14 spoken to members of the Texas Elections Administrators

15 Association, but were largely locked out of negotiations.

16     I know I reached out to members, the authors of these

17 bills, and though a lot was said about Harris County, they

18 never entertained my meetings directly and were not interested

19 in meeting with me directly to hear our side, and it just

20 became very clear that the Elections Administrators and I

21 believe the association had submitted letters and concerns,

22 that those were not materially addressed in the bill.

23 Q.  So we can go down to page 45 of the transcript, starting

24 at line 11.  You had a question from Senator Bettencourt.

25 Senator Bettencourt was one of the coauthors of SB 1, correct?

ISABEL LONGORIA - DIRECT

1  A.  Correct.

2  Q.  And he says, "Okay.  There's a front page story in the

3  Houston Chronicle where I believe you are quoted as saying

4  this bill is racist.  Could you point to specific sections of

5  this that are racist?"

6      And then you respond, "Yes.  The provisions getting rid of

7  drive-thru voting, which we know that drive-thru voting is

8  used most often by Black, Asian, and Latino voters, whether

9  you intended or not has a racial intent or racial

10 discrimination, and the application of removing it.  Same with

11 24-hour voting."

12     So, here, you are speaking directly with one of the

13 coauthors of the bill, is that right?

14 A.  Correct.

15 Q.  And you are telling him that the bill has a discriminatory

16 impact, right?

17 A.  Correct.

18 Q.  Do you know how Senator Bettencourt voted for the bill?

19 A.  I believe he voted to pass or approve the bill.

20 Q.  And ultimately the legislature enacted SB 1, right?

21 A.  Correct.

22 Q.  So, Miss Longoria, taking a step back, we've talked about

23 the various methods of voting that SB 1 eliminated, the way it

24 sort of altered the process to vote by mail, the way that it

25 changes poll watcher rules, assister provisions, taken

1   together, what is the cumulative impact of all these

2   provisions of SB 1 on voters?

3   A.  I believe SB 1 cumulatively has a discriminatory impact on

4   voters with disabilities, voters with limited English

5   proficiency, and voters who are Black, Hispanic, Latino,

6   Asian, and otherwise not White.

7   Q.  Taken together, do these provisions of SB 1 address any

8   problems related to fraud that you have experienced in your

9   time administering elections in Harris County?

10  A.  No.

11  Q.  In your view, were the concerns you raised and others

12  raised to the legislature about the discriminatory impact of

13  SB 1 listened to?

14  A.  No.

15          MR. BADAT:  That's all I have for this witness.

16          THE COURT:  With that, let's take a lunch break.

17          We'll return at 1:00.

18      (Recess)

19      (Change in reporter)

20

21

22

23

24

25

```
 1                 COURT SECURITY OFFICER:  All rise.
 2                 THE COURT:  Thank you.  Please be seated.  Yes, sir.
 3                          CROSS-EXAMINATION
 4    BY MR. KERCHER:
 5    Q.  Good afternoon, Ms. Longoria.  You've been on the stand a
 6    long time.  I appreciate you being here.  My name is Ryan
 7    Kercher.  I work for Attorney General's Office.
 8        Before we really dive into things, I have a bone to pick
 9    with you for your time at the AARP.  On my 40th birthday, I
10    began receiving mail from them.  If you listen carefully, you
11    can still hear my wife laughing, because she restarts every
12    time we get another piece.  So if you have friends over there,
13    if you could ask them to knock it off, I'd appreciate it.
14    A.  They would say AARP is for people of all ages to plan ahead
15    for aging gracefully and at your leisure.
16    Q.  And there's my wife.
17        Let's start, Ms. Longoria, by talking about requesting
18    accommodations.  While you were the Harris County election
19    administrator, Harris County had a process by which a voter
20    with a disability could request the accommodation for voting,
21    right?
22    A.  In that we had a site on our website where you could submit
23    an ADA complaint.
24    Q.  Well, somebody could call the elections administrator and
25    ask for an accommodation, right?
```

Isabel Longoria - Examination                    1361

1   A.  Yes.

2   Q.  Somebody could e-mail the election administrator's office

3   and ask for an accommodation as well, right?

4   A.  Correct.

5   Q.  Or they could show up at the office itself; is that true?

6   A.  Correct.

7   Q.  Your office had an ADA team while you were the election

8   administrator?

9   A.  Correct.

10  Q.  And that was four full-time employees?

11  A.  I don't remember exactly but, yes, a team about that size.

12  Q.  Several full-time employees on the ADA team?

13  A.  Correct.

14  Q.  Part of their responsibility was to address accommodation

15  requests by voters with disabilities?

16  A.  Yes.

17  Q.  And you're not aware of a single incident during your term

18  as elections administrator where a voter's request for a

19  disability accommodation was denied?

20  A.  I am aware of an accommodation or accommodations that were

21  denied.

22  Q.  Has that always been your testimony?

23  A.  I believe so, yeah.

24  Q.  You've been deposed a couple of times in this case, right?

25  A.  Yes.

1  Q.  You remember -- you may not remember the date exactly, but

2  you remember one of those depositions was on April the 20th of

3  2022?

4  A.  Sounds fair.

5          MR. KERCHER:  Brian, can we bring up 4/20/22

6  individual, page 25, lines nine and ten.

7          Ms. Fernandez, can we get access to the feed?

8          COURTROOM DEPUTY CLERK:  Left gallery, my fault.

9  BY MR. KERCHER:

10 Q.  All right.  Ms. Longoria, this is from your April 20, 2022

11 deposition it reads, *"Question:  "Do you always grant*

12 *accommodations that are requested?"*

13     *"Answer:  I cannot think of a moment where we have not."*

14     Did I read that correctly?

15 A.  Yes, sir.

16 Q.  Brian, can you look at page 25, lines 16 through 19.

17     This is a few lines down, Ms. Longoria.  It reads,

18 *"Question:  And so far as you're aware, the ADA team has never*

19 *decided to deny a request for an accommodation from a voter*

20 *requesting an accommodation related to a disability to vote?"*

21     *"Answer:  Not that I'm aware of."*

22     Did I read that correctly?

23 A.  The ADA team was tasked largely with physical

24 accommodations in regards to the DOJ lawsuit, and a request for

25 accommodation is a strict legal thing, so there are situations

1    where people called our office asking about options and asking

2    about what could or could not be done that may not have been

3    kind of a strict legal request for accommodation.

4    Q.   But part of the responsibility of the ADA team, though, was

5    to address accommodations requests -- by voters, right?

6    A.   To request -- to address requests is different from a

7    request for accommodation, in the legal sense.

8        Let me clarify.  In the deposition, I understood in the

9    conversations leading up to this that "request for

10   accommodation" referred to a very specific process under the

11   ADA procedure.  And what I am sharing is that there are things

12   that come through the call center and through other means that

13   may not meet the legal merits of a specific request for

14   accommodation or that the ADA had to fulfill through the DOJ

15   lawsuit, but were otherwise individuals seeking help in ways

16   that we could not help them.

17   Q.   Let me ask you this question, see if it clears it up.

18   You're not aware of a single instance where a voter's request

19   for accommodation under the ADA was denied.  Does that clear it

20   up?

21   A.   I just don't have a memory of what those ADA accommodations

22   would have been.

23   Q.   Let's talk about a different kind of accommodation.

24   Accommodations for the applications for ballot by mail or

25   ABBMs, okay?

Isabel Longoria - Examination                    1364

1      Your office received some accommodation requests pertaining

2   to the ABBM cure process, right?

3   A.  Correct.

4   Q.  Roughly a dozen?

5   A.  Sounds fair.

6   Q.  Your understanding was, at least initially, that there were

7   two options available for seeking the ABBM process, right -- or

8   cure process, right?

9   A.  What were those two for?

10  Q.  Sure.  Let's go into detail.  You understand one way to get

11  that ABBM cure process was online, right?

12  A.  If I -- if you are referring to the state -- the Secretary

13  of the State's online portal, yes.

14  Q.  All right.  And then the other way to use that ABBM cure

15  process was in-person, right?

16  A.  Correct.

17  Q.  Now, subsequently, though, you became aware from the

18  Secretary of State's guidance that there was a third way for

19  someone to avail themselves of the ABBM cure process, right?

20  A.  If you'll share that third way.

21  Q.  Sure.  Brian, can we bring up Joint Exhibit Number 6.

22      You have Joint Exhibit Number 6 on the screen in front of

23  you, Ms. Longoria?

24  A.  Yes, sir.

25  Q.  You can see this is Election Advisory Number 2022 - 12,

Isabel Longoria - Examination                    1365

1   right?

2   A.  Correct.

3   Q.  And it's dated -- Brian, can you scroll down.  Thank you.

4       It's dated February 11, 2022, correct?

5   A.  Correct.

6   Q.  If we go to page two, to the paragraph beginning,

7   *"Returning the carrier envelope to voter,"* it reads, *"If the*

8   *early voting clerk discovers that the carrier envelope is*

9   *missing"* -- it reads, *"If the early voting clerk discovers that*

10  *the carrier envelope is missing -- is missing the voter's*

11  *signature, has an incomplete signature, has missing or*

12  *incomplete witness or assistant information, or has missing or*

13  *incorrect personal identification information, the early voting*

14  *clerk may deliver the carrier envelope in-person or by mail so*

15  *that the voter may correct the defect."*

16      Did I read that correctly?

17  A.  Correct.

18  Q.  So if we go to the next paragraph, first sentence.  It

19  reads, *"If an early voting clerk delivers the carrier envelope*

20  *to the voter in-person, the clerk should document this*

21  *delivery.  The hand delivery option must be applied uniformly*

22  *to all voters in similar circumstances."*

23      Did I read that correctly?

24  A.  Correct.

25  Q.  And if we skip a sentence, then next one begins, *"Upon*

1    *receipt of."*

2        *"Upon receipt of the carrier envelope, the voter may*

3    *correct the defect immediately and surrender the carrier*

4    *envelope to the early voting clerk personnel, who would return*

5    *the clerk's office -- to the clerk's office with the corrected*

6    *carrier envelope."*

7        Did I read that correctly?

8    A.  Correct.

9    Q.  Now, you talked on direct examination a little bit about

10   this sort of limited resources that Harris County and its

11   elections administration office is going to have, right?

12   A.  Correct.

13   Q.  And you said that you're just not going to be able to, you

14   think, help all the folks who will need ABBM cure process by

15   going out to the homes of the people who may need that process,

16   right?

17   A.  Yes.  It would be difficult to make staff available to

18   visit all homes in Harris County who would -- who might

19   potentially need it.

20   Q.  And on direct you said, at most, you could probably only

21   help about a dozen voters that way, right?

22   A.  Potentially, yes.

23   Q.  And that's about as many ABBM cure requests as you got,

24   right?

25   A.  No.  The dozen I referred to or so is the ones that I could

Isabel Longoria - Examination                1367

1  remember that had requested perhaps a -- what's it -- a

2  modification because of a disability.  There were many others

3  who requested help or an ability to cure their ABBM in another

4  way that wasn't provided.

5      So, for example, a voter over 65 who may not have shared

6  that because of a disability was the initial reason that they

7  needed a different cure process, but otherwise asked our office

8  for different cure processes.

9  Q.  So is it right to say that you received a dozen or so ABBM

10  cure process requests from voters with disabilities?

11  A.  That I can remember.

12  Q.  And those are the dozen or so who your office could have

13  helped by sending someone to their residence, true?

14  A.  It was a prospective option available.

15  Q.  One, in fairness, your office chose not to take?

16  A.  Correct.

17  Q.  Let's talk about the ballot cure process now.  You know

18  that some voters did cure their mail ballots and, of course,

19  some did not, right?

20  A.  Correct.

21  Q.  You do not know how many cured their mail ballots; is that

22  fair?

23  A.  Not off the top of my head, no.

24  Q.  Do not have an estimate even, right?

25  A.  I would be guessing at a ballpark.

Isabel Longoria - Examination                    1368

1   Q.  And your office did not keep records of what would -- that

2   would allow us to make that determination; is that true?

3   A.  Of who -- if you could repeat the question on what data

4   point.

5   Q.  Sure.  Your office did not keep records that would allow us

6   to determine how many voters successfully cured their ballots

7   and how many voters were unsuccessful in curing their ballots?

8   A.  In that strict sense, you would have to get about it in

9   different ways.

10  Q.  So there's not just like a list for example?

11  A.  No.  The cure process in that sense goes through the

12  signature verification committee, who maintains those records

13  and flag people as either pending, which means that their mail

14  ballot is on hold until they resolve an issue.  So you would

15  have to run a report of how many individuals at any moment had

16  their mail ballot in a pending category for a certain category

17  to then determine who ultimately met that cure standard or not.

18  Q.  So you'd have to maybe pull data from a couple of different

19  places and reconcile that data; is that right?

20  A.  Sure.

21  Q.  And that's just not something a practice that Harris County

22  elections administrator office had while you were there, fair?

23  A.  We did not create a regular report of that.

24  Q.  Now, there are some other kinds of accommodation I want to

25  talk to you about.  You're not aware of people providing

Isabel Longoria - Examination                    1369

```
 1   assistance to voters -- sorry, as I'm reading my question, I'm
 2   realizing it doesn't make sense.  Let me ask you a different
 3   question.
 4       You're not aware of a poll watcher requesting disability
 5   assistance, are you?
 6   A.  A poll watcher requesting disability assistance?  No.
 7   Q.  And Harris County was able to grant all requested
 8   accommodations by poll workers; is that true?
 9   A.  I believe so, yes.
10   Q.  And you're not aware of any situations in which your office
11   denied a request for accommodation by a voter with a disability
12   that led to in-person voting?
13   A.  Can you repeat that one, please.
14   Q.  Sure.  So somebody may -- a voter might -- with a
15   disability might request an accommodation so that they do not
16   have to vote in-person, right?
17   A.  So that they do not have to vote in-person?  Let's try that
18   one again.  So there -- if you could give me an example of --
19   Q.  Well, so a voter with a physical disability may be entitled
20   to vote by mail, for example, right?
21   A.  Correct.
22   Q.  May be entitled to curbside voting, right?
23   A.  Correct.
24   Q.  And here, I'm distinguishing between curbside and
25   in-person.  Okay?
```

Isabel Longoria - Examination                    1370

1   A.  Understood.

2   Q.  So you're not aware of a voter requesting one of those

3   accommodations and having that request denied such that they

4   were forced to vote in-person?

5   A.  Not to my recollection.

6   Q.  Let's take a look at SB1 for a moment, Brian.  If you bring

7   up Joint Exhibit 1.  We've been through a lot of provisions in

8   this bill over this trial, and I want to draw your attention to

9   one in particular.

10      We're on page 4, line 20, through page 5, line 1 of SB1.

11  This is Section 1.08.  Are you familiar with this section?

12  A.  Yes.

13  Q.  It's called *"Reasonable Accommodation or Modification,"*

14  right?

15  A.  Correct.

16  Q.  It reads, *"A provision of this code may not be interpreted*

17  *to prohibit or limit the right of a qualified individual with a*

18  *disability from requesting a reasonable accommodation or*

19  *modification to any election standard, practice, or procedure*

20  *mandated by law or rule that the individual is entitled to*

21  *request under federal or state law."*

22      Did I read that correctly?

23  A.  Yes.

24  Q.  Let's talk now a little bit about voter assistance.

25  Sometimes voters need assistance at the polls, as you've

1    described on direct examination, right?

2    A.   Correct.

3    Q.   And they have some options in who can assist them, right?

4    A.   Insomuch as they are allowed to choose who they think is

5    best to assist them.

6    Q.   They can have a third-party assister of their choice or

7    poll workers can help them if the voter so chooses?

8    A.   Yes.  They can choose for assistance anyone to help them

9    who is not their employer, union boss, or anyone otherwise

10   trying to influence their vote.

11   Q.   The assisters, though, have to take an oath, right?

12   A.   Correct.

13   Q.   No one complained to your office about having to take the

14   oath; is that true?

15   A.   Incorrect.  I believe I testified earlier that there were

16   prospective assistants who left the polling location or came

17   back and communicated to our office or to community groups that

18   they were -- that they didn't want to provide assistance

19   because of that oath and the implications of perjury and other.

20   Q.   And I remember that part of your direct testimony, which is

21   why I'm asking.  Has that always been your testimony?

22   A.   As I remember it now.

23   Q.   Brian, can you bring up that same deposition, please.  This

24   is page 63, lines 11 through 14.

25        "*Has anyone ever complained to your office, to the best of*

1  *your knowledge, about the oath relate today providing*

2  *assistance?"*

3      *"Answer:  No."*

4  A.  I see that now.

5  Q.  No one objected to the content of the oath before taking

6  it, true?

7  A.  To the content of the -- as in, are there any voters or

8  assistants who once objected to the content of the oath but

9  still took the oath?

10  Q.  Correct.

11  A.  I don't know.

12  Q.  No one refused to take the oath to your knowledge?

13  A.  As I've said since reflecting further, there are calls that

14  our office received about assistants who are now wary of

15  helping those voters.

16  Q.  Brian, will you bring that up on the same deposition,

17  please.

18      This is page 63, line 18 through 19.  *"Are you aware of*

19  *anyone ever refusing to take the oath?"*

20      *"Answer:  No."*

21      If your office became aware of someone's request for

22  assistance being denied, you would take some kind of corrective

23  action if you could, right?

24  A.  Can you repeat that one?

25  Q.  Sure.  If your office became aware of someone's request for

1    assistance being denied, you would take some kind of corrective

2    action if you could?

3    A.  If the office became aware of some assistance?  Yes,

4    when -- I think -- I believe I shared two examples that I could

5    remember where we called those election judges back and

6    re-educated them on those laws.  And whether or not those

7    voters went back to vote, I cannot remember.

8    Q.  Right.  First things first.  If you found out about a

9    request for assistance being denied, you'd go collect some

10   information about that, right?

11   A.  Yes.

12   Q.  And if necessary, you would counsel the election judges or

13   other election workers to ensure that if they made a mistake,

14   they didn't repeat it, right?

15   A.  Correct.

16   Q.  And those actions are to ensure that future requests would

17   not be improperly denied, right?

18   A.  Correct.

19   Q.  You talked a little bit about the vote assister oath and

20   being concerned about whether it might impact interactions like

21   you used to have helping your abuela, right?

22   A.  Yeah.

23   Q.  And I think the example you gave is by the time she got

24   fair enough down to the ballot, maybe the railroad

25   commissioner, she would turn to you and say, *"Miha, what is*

1  *this*," right?

2  A.  Sure.

3  Q.  So you're worried, as I understand it, about how these SB1

4  provisions will be enforced and whether they'll be enforced in

5  a way that would somehow criminalize interactions like you had

6  with your abuela, right?

7  A.  Correct, in that I understand SB1 to say that an assister

8  is just to read the words on the screen and to assist at the

9  explicit direction of the voter, kind of if they need help and

10  pushing buttons or what may be, but that conversations about

11  what is on the ballot could be interpreted as trying to

12  influence a voter.

13  Q.  And when you say "could be interpreted," we're putting that

14  in the passive voice probably not on purpose, but that's

15  because we're not saying who is going to be doing the

16  interpreting, right?

17  A.  Whether it's the election worker or poll watcher.  I mean,

18  there is an instance of a poll watcher who, because a voter and

19  their assistant were interacting in Spanish, the poll watcher

20  called our office alleging that the voter had to be -- or the

21  assistant had to explain items in English so the poll watcher

22  felt that they could monitor the actions of the voter better.

23  So there are instances -- and again, that is the example that

24  triggered for our office the concern that interpretation --

25  because a poll watcher didn't understand the language or didn't

1    understand the intent of a voter -- could, by poll watcher, be

2    interpreted as a nefarious action.

3    Q.  But when your office was notified by the poll watcher of

4    that interaction, you did not refer that instance to law

5    enforcement, right?

6    A.  We did not refer that instance -- what instance, the poll

7    watcher?

8    Q.  The poll worker, the assister.  Once the poll -- let me

9    start -- let me ask a better question.

10        Poll watcher calls you up and says, *Hey, I can't understand

11   what they're saying.  I think this is Election Code violation,*

12   right?

13   A.  Sorry.  To be clear, the poll watcher called and said,

14   "They are speaking Spanish, and I don't like that."

15   Q.  And your response to that was not to call the Sheriff's

16   Department on the voter assister, right?

17   A.  No, because speaking Spanish is not illegal.

18   Q.  That's right.  So that's an instance where you have this

19   SB1 provision pertaining to a voter assister, but when you had

20   the opportunity to make a decision about how it would be

21   enforced, you made the rational choice not to call law

22   enforcement in that instance, right?

23   A.  I did not?  That does not prevent, from my understanding, a

24   poll watcher from reporting that instance to other authorities.

25   Q.  That's right.  SB1 has been in effect now for about a year

Isabel Longoria – Examination                1376

1   and a half, right?

2   A.   Sounds about right.

3   Q.   And you're not aware of anyone being prosecuted for voter

4   assistance violations in that time?

5   A.   In all fairness, I haven't been working in elections in all

6   that time, so I can't speak to what has or has not been

7   reported.

8   Q.   My question is just about what you know, and you don't know

9   about any prosecutions under SB1 voter assistance provisions,

10  true?

11  A.   I don't know anything about that.

12  Q.   You talked a little bit on direct about the history of

13  elections, particularly in Texas, right?

14  A.   I believe in regard to the history of poll watchers.

15  Q.   And you also talked specifically about history of

16  discrimination in this state, true?

17  A.   I believe so, yeah.

18  Q.   You're familiar that in that same history, there have been

19  political machines that have been used by people in power to

20  gather up groups of voters and pressure them to vote in a

21  particular way, right?

22  A.   You'd have to be more specific about which machines you're

23  referring to.

24  Q.   Well, how about the South Texas democratic machine in the

25  1880s and 1890s.  Are you familiar with that?

1    A.  I am not.

2    Q.  Are you familiar with the fact that in Texas history,

3    immigrants to this country have been particularly victimized by

4    political machines putting people under pressure to vote in a

5    particular way?

6    A.  Again, very broad.  If you can take me through specific

7    examples of which machines, I might be able to speak to those.

8          MS. PERALES:  Objection, Your Honor.  Counsel is

9    testifying.

10         THE COURT:  I'm taking note of that, and so I will not

11   be using any of his words as evidence.  I guess I'm more

12   curious about in light of past comments by the Supreme Court

13   especially about staleness of -- if you're talking about the

14   Tammany machine and all that, I mean, when the Supreme Courts

15   say that this is so remote and tenuous not to be applicable to

16   this current situation.

17         MR. KERCHER:  I think that's probably right, Your

18   Honor, but I also think that it is true that there are

19   political machines that come after 1880.  That's just sort of a

20   big one that would perhaps be common knowledge.  Since we are

21   speaking in very broad swaths about Texas election history on

22   direct examination, I thought it would be fit under cross to

23   talk about that history in fuller context.  If the witness

24   doesn't know, though, I understand.

25         THE COURT:  So if you haven't studied that history,

1    just say "I don't know."

2           THE WITNESS:  Understood.

3    BY MR. KERCHER:

4    Q.  You talked on direct examination also about poll watchers,

5    right?

6    A.  Yes, sir.

7    Q.  And I think in one circumstance you were talking about the

8    difficulty of having free movement for poll watchers that made

9    it difficult for poll workers to be able to keep an eye on the

10   poll watchers; is that right?

11   A.  In the election warehouse, yes.

12   Q.  And I think that you said you know if the poll watchers had

13   that kind of freedom of movement, it can be difficult to keep

14   an eye on them and keep an eye out for their possible nefarious

15   behavior, right?

16   A.  Yes, in a warehouse setting.

17   Q.  So there are some legitimate concerns about nefarious

18   behavior by poll watchers, true?

19   A.  Based on my experience, poll watchers touching equipment

20   and otherwise acting in such manners, yes.

21   Q.  You understand that poll watchers, by their nature, have

22   concerns about nefarious behavior by poll workers and other

23   people at polling locations, right?

24   A.  Yes.

25   Q.  There is inherently attention between the workers and the

1   watchers, right?

2   A.  I can accept that, yeah.

3   Q.  You talked a little about the power swinging towards the

4   watchers under SB1; is that right?

5   A.  Correct.

6   Q.  Over time, where there is tension between groups like that

7   that are supposed to keep each other in check, we will see that

8   pendulum swing back and forth, true?

9   A.  Insomuch as laws are created over time that create

10  pressures, yes.

11  Q.  Let's talk a little bit about the 2020 election, okay?  In

12  Harris County, it made some changes to its voting practices

13  during the pandemic.  Fair to say, right?

14  A.  Yes.

15  Q.  And one of those changes was drive-through voting, right?

16  A.  Correct.

17  Q.  Harris County had not previously allowed drive-through

18  voting?

19  A.  Not to my knowledge, no.

20  Q.  Another change, of course, was 24-hour voting, right?

21  A.  Correct.

22  Q.  And Harris County had not previously allowed 24-hour

23  voting?

24  A.  Correct.

25  Q.  You're not aware of any other counties that allowed 24-hour

1    voting in the November 2020 election, right?

2    A.  Not in Texas.

3    Q.  And regarding the drive-through voting, you are aware of

4    only one other county that did that, right?

5    A.  From my understanding, Tom Green County only allowed early

6    voting by means of drive-through voting.

7    Q.  That's out there in San Angelo, right?

8    A.  I honestly don't know.  I just know it was Tom Green

9    County.

10   Q.  Let's focus for a minute on drive-through voting.

11       Well, let's go a different direction first.  You talked on

12   direct about the unprecedented election numbers that Harris

13   County got in 2020, right?

14   A.  Correct.

15   Q.  And you credited at least some of that growth in vote

16   participation in 2020 to the election experiments that the

17   county conducted in that election, right?

18   A.  The election innovations that we implemented, yes.

19   Q.  Governor Abbott expanded early voting in 2020 by executive

20   order, right?

21   A.  If you are referring to -- I believe he allowed for three

22   weeks of early voting, yes.

23   Q.  He also expanded the number of days a person could

24   hand-deliver their mail ballot, right?

25   A.  Correct.

1   Q.   Brian, can you bring up State Exhibit 128.

2        You can see the governor's seal at the top of this

3   document, right?

4   A.   Yes.

5   Q.   Brian, can you go to the next page, please.

6        You can see this is a proclamation by the governor, right?

7   A.   Yes.

8   Q.   All right.  Let's go to page three.  Paragraph that begins

9   *"Now therefore."*

10       I've been reading at you a lot this afternoon.  I'm not

11  going to read this whole thing to you, but you're generally

12  familiar that this is the place where Governor Abbott expanded

13  early voting, right?

14  A.   Yes.

15  Q.   And, in fact, your boss at the time in 2020, Chris Hollins

16  wrote a letter to the governor asking him to do just this,

17  right, expand early voting?

18  A.   I'll take your word for it.  I don't remember.

19  Q.   Brian, can we pull up State Exhibit Number 127, please.

20       You can see Exhibit Number 127 is a letter from Chris

21  Hollins, right?

22  A.   Correct.

23  Q.   Dated July 22, 2020, right?

24  A.   Correct.

25  Q.   If we go down to paragraph three, Mr. Hollins wrote, *"I*

1   *write today to ask two things of you.  Please provide by the*
2   *end of July the new start date of early voting for the November*
3   *election; and two, please increase early voting by at least one*
4   *week to begin no later than Tuesday, October 13, 2020."*
5        Right?
6   A.   That is what's written.
7   Q.   So Harris County asked for more early voting in 2020, and
8   the governor's office supplied more early voting in 2020, true?
9   A.   Insofar as expanding the number of days of early voting
10  available, yes.
11  Q.   Brian, can you please pull up the demonstrative chart.
12       MR. KERCHER:  Your Honor, this is a demonstrative
13  chart, it's pulling data from a number of exhibits that are
14  already in evidence.  If the Court wants, I'm happy to provide
15  those exhibit numbers to you now or at a later time.
16       THE COURT:  So is it a demonstrative chart or are you
17  going to try to use it as a chart that's a summary of other
18  documents?
19       MR. KERCHER:  Right now, we're just using it as
20  demonstrative, so we can pull this information and have it
21  side-by-side and have it for you.
22       THE COURT:  So as a demonstrative, it's okay to
23  proceed.
24  BY MR. KERCHER:
25  Q.   Ms. Longoria, you see the chart that's up in front of you,

Isabel Longoria - Examination                    1383

 1  right?

 2  A.  Yes.

 3  Q.  I'll represent to you that these are numbers pulled from

 4  the same kinds of documents you were looking at with opposing

 5  counsel during your direct examination.  You remember he showed

 6  you the voting numbers and totals and percentages from Harris

 7  County in November 2022, right?

 8  A.  I believe from the Secretary of State's office, yes.

 9  Q.  Excuse me, November 2020.

10      Yes, ma'am, from the Secretary of State's office; that's

11  right?

12  A.  Is this from the Secretary of State's office?

13  Q.  All this data is from the Secretary of State's office.

14      THE COURT:  So I was getting confused too.  So this is

15  not the Rice material that you were complaining about?

16      MR. KERCHER:  That's exactly right, Your Honor.

17      THE COURT:  Okay.

18  BY MR. KERCHER:

19  Q.  So for example, Ms. Longoria, if we just look at the top

20  line of this chart, it says "Harris," and if we go across that

21  line, you can see "Early Voting Percentages, 87.79 percent."

22      You see that?

23  A.  Correct.

24  Q.  You remember going over those same figures from the

25  Secretary of State's documents on direct examination, right?

Isabel Longoria - Examination                1384

1    A.   Yes.

2    Q.   Now, 87.79 percent voting in early voting is a very high

3    percentage, right?

4    A.   It absolutely is.

5    Q.   I imagine Harris County is very proud of the 65.86 percent

6    turnout that it had in the November 2020 election, right?

7    A.   Yes.

8    Q.   And on direct, you credited that high percentage, at least

9    in part, to the voting -- I think I called it "experiment."  I

10   think you called it "innovations" used in the November 2020

11   election by Harris County, right?

12   A.   Correct.

13   Q.   If we look down at the same data for other major counties

14   across Texas, we can see that Bexar County had almost the same

15   percent turnout in 2020, right?

16   A.   In Bexar County had 2020 turnout of 63.57 percent.

17   Q.   And you can see that Denton County beat Harris County by

18   eight percentage points, right?

19   A.   On which part, sir?

20   Q.   Denton County is two below Bexar County.

21   A.   On the 2020 turnout?

22   Q.   Yes.

23   A.   Which -- sorry, 73.72 percent.

24   Q.   That's right.  Denton County got 73.72 percent turnout in

25   the November 2020 election despite not having 24-hour voting or

Isabel Longoria - Examination                    1385

1   drive-through voting, right?

2   A.  I don't know what Denton employed or did not employ as far

3   as their voting methods, but I don't believe they had

4   drive-through or 24-hour voting.

5   Q.  If we go to the bottom of this chart, we can compare Harris

6   County to the state average.  You can see Harris County 2020

7   turnout was at 65.86 percent again, right?

8   A.  Correct.

9   Q.  And that's just below the state average of 66.73 percent,

10  right?

11  A.  Yes.

12  Q.  All right.  Now let's focus on drive-through voting.  For

13  drive-through voting, Harris County used electronic voting

14  machines called an eSlate system; is that right?

15  A.  Correct.

16  Q.  These are the same machines that Harris County would have

17  used for nondrive-through voting?

18  A.  Correct.

19  Q.  So if Harris County had not made those machines available

20  during drive-through voting, it could have used them at a

21  polling location, right?

22  A.  In that they were -- those machines could be allocated as

23  needed for any voting resource at that time.

24  Q.  And likewise, with the poll workers who were working at the

25  drive-through voting locations, if they had not been working at

1  a drive-through location, they could have been working at a

2  polling location, right?

3  A.  I don't think I can necessarily agree with that.

4  Q.  Has that always been your testimony?

5  A.  Trust me, I don't remember what my deposition says, but

6  insomuch as if you think about it in absolute terms, let's say

7  we hired -- and I don't remember, but if you allow me to use a

8  demonstration -- a thousand folks to work at drive-through

9  voting.  There's only so many other places you could have put

10  those folks, so I don't know that we would have employed

11  exactly all 1,000 folks that we employed for drive-through

12  voting at those other sites, but a portion of them could have

13  been allocated to other locations.

14  Q.  Brian, please pull up page 85, line 16 through 19.

15      *"Question, And election workers can be deployed to*

16  *nondrive-through voting sites if you don't have drive-through*

17  *voting, correct?"*

18      *"Answer, Yes."*

19  A.  I took that question -- perhaps I'm adding a little more

20  color now -- that a portion, but not necessarily all of them.

21  Q.  The voter would take the eSlate system into his car and

22  cast the ballot in the vehicle; is that right?

23  A.  His or her vehicle.  They could if they elected to kind of

24  angle it through the window or otherwise have it in their lap.

25  Q.  And if the -- in that scenario, if they've got the eSlate

1    in the vehicle with them, it's not going to have the privacy

2    screens that a voter would have if they were voting inside the

3    polling place, right?

4    A.   In that there were privacy screens attached to voting

5    booths for other eSlates were at the walk-up voting.  In the

6    in-car situation, they would have had to angle or use -- I

7    think we had folders and cardboard partitions that they could

8    use if they wanted to kind of protect the view of the screen.

9    Q.   On direct you were talking about drive-through voting and

10   going through different scenarios about concerns that someone

11   in the vehicle might pressure the voter.  You talked about

12   thinking through different kinds of relationships where that

13   might happen, right?

14   A.   Yes.

15   Q.   And ultimately, I think you said you decided that as

16   election workers, as elections administrators, you were not

17   going to have control over peoples' individual relationships;

18   is that right?

19   A.   Correct.

20   Q.   But in a polling place, you have control over the space,

21   don't you?

22   A.   In what sense?

23   Q.   Well, in the sense that if need be, someone could be

24   removed from the polling place, right, if they were

25   misbehaving?

Isabel Longoria - Examination                1388

1   A.   Someone could also be removed from a vehicle if need be.

2   Q.   Well, is it your testimony that you understand that law --

3   that you could have called law enforcement if you thought that

4   somebody was exerting pressure on a drive-through voter?

5   A.   Let me make sure I got this right.   In the scenario where

6   an election worker observes perhaps that a passenger in a

7   vehicle is speaking to a voter and after multiple times of

8   being asked to stop, they still kind of engage in that activity

9   and is seen as perhaps abusive or coercive, I do believe an

10  election worker could call over law enforcement or obviously us

11  in the election office, to remove that person from the vehicle

12  or otherwise get the voter to a safer location.

13  Q.   Do you believe that election workers exert the same control

14  over the interior of a private vehicle that they do over a

15  public polling location?

16  A.   Yes, because I think in that scenario we define them as

17  having kind of appeared in their vehicle, but similar to

18  curbside voting, that becomes a voting space, and so there is

19  the ability to protect the voter in those instances.

20  Q.   The way that you analogize those on direct examination was,

21  for example, you couldn't hope to interfere in some kind of an

22  abusive relationship, because if that were really what was

23  going on, then the abuser could sign up to be the voter's

24  assister and put pressure on them that way, right?

25  A.   Correct, that I wouldn't know if there was an abusive

Isabel Longoria - Examination                    1389

1    situation necessarily.

2    Q.  But the fear or pressure that a voter may feel in his or

3    her own vehicle sitting right next to that person could be very

4    different than what they feel in a public place with privacy

5    screens, poll workers and poll watchers, true?

6    A.  I don't agree with that statement, sir.

7    Q.  You talked about, you know, you just don't see a spouse

8    exerting that kind of pressure on somebody in a drive-through

9    voting situation where the spouse is in the car.  What if it's

10   not a spouse, though?  What if it's a faith leader?

11   A.  Can you rephrase that question?

12   Q.  Sure.  What if a faith leader says, *"Come on, Ms. Longoria.*

13   *I'll drive you to the poll.  We'll go through drive-through,"*

14   and as you're driving there, the faith leader says, *"Now you*

15   *remember when you vote, you're doing the Lord's will, and you*

16   *need to know that he's watching you when you vote."*  And then

17   eSlate gets put into your lap to vote, and there's your faith

18   leader.

19          MR. BADAT:  Objection, Your Honor.  He's asking the

20   witness to speculate about how a hypothetical voter will feel

21   in a hypothetical situation with a hypothetical faith leader in

22   the car.

23          THE COURT:  That's sustained.

24          MR. KERCHER:  Your Honor, if I may, we talked about

25   what might happen in an abusive relationship.  The witness has

1    already testified on direct that they went through a variety of

2    these scenarios.  I'm entitled, respectfully, to cross-examine

3    on whether there are other scenarios they did not consider.

4              THE COURT:  Go ahead.

5    BY MR. KERCHER:

6    Q.  What if it's not a faith leader.  What if it's just a

7    community leader who offers to take a voter to the poll and

8    says "*Remember, our community is counting on you*"?

9    A.  I'll say regardless of that -- whatever that personal

10   relationship may be, whether it's a spouse, community leader,

11   the reference in the law is union worker or boss, etc., for us

12   whether or not if -- I'll take faith leader -- drove you to the

13   polls and you elected to walk inside, that pressure would have

14   been exerted.  Whether you were in drive-through voting and

15   they were in the vehicle with you, that pressure was exerted.

16   Whether you engaged in curbside voting, that pressure could

17   speculatively, so in having to weigh the risks, the risks of

18   pressure in any of those situations to us were no different --

19   or were not impacted by the method of voting.  Pressure exerted

20   on a voter existed in all of those situations.

21   Q.  We agree, though, don't we, that assisters are not supposed

22   to pressure voters?

23   A.  Correct, yes.

24   Q.  But as your example of the abusive spouse points out, that

25   can still happen, true?

Isabel Longoria - Examination                1391

1    A.   Insomuch as people who sign up to be assisters could act in
2    ways that are not legal.
3    Q.   So there's no -- there's not going to be any foolproof way
4    to stop all voter assister pressure.  We agree on that?
5    A.   Correct.  There's no foolproof way of anything.
6    Q.   We have a responsibility to limit improper assister
7    behavior if we can; is that fair?
8    A.   I can -- I can buy that.
9    Q.   Let's talk about 24-hour voting now.  Twenty-four hour
10   voting requires poll workers to be at polling locations at
11   atypical times; fair to say?
12   A.   Atypical, in that voting up to that point had happened 7:00
13   a.m. to 7:00 p.m.
14   Q.   Well, and if we were talking about having availability of
15   services 24 hours in the private sector, we'd call that
16   "graveyard shift," wouldn't we?
17   A.   I'll take your word for it.
18   Q.   You'd need staff at 3:00 a.m., for example?
19   A.   Yes.
20   Q.   And you and I agree that voting patterns vary by hour,
21   right?
22   A.   Correct.
23   Q.   Of course, a lot of people try to vote before the workday
24   starts, right?
25   A.   I think you and I -- or perhaps I would.  The reason that

1    24-hour voting was created was that the start of everyone's

2    workday is not the same.

3    Q.  That's fair.  Not every workday is the same, but there is

4    such a thing as a 9-to-5 job, right?

5    A.  In certain jobs, 9-to-5 people, yes, would try and vote

6    before their job started at 9:00 a.m.

7    Q.  That's why we have rush-hour traffic, because so many

8    people have those kinds of jobs, true?

9    A.  Sure.

10   Q.  Now, when you instituted 24-hour voting, there was a drop

11   off between midnight and 5:00 a.m., is that true, in the number

12   of voters?

13   A.  More or less, yeah.  Sorry.  More or less, I can't remember

14   if it was exactly midnight to 5:00, but those early morning

15   hours, if you will.

16   Q.  Yesterday, Ms. Obakozuwa -- you know Ms. Obakozuwa?

17   A.  Rachelle, yes.

18   Q.  She testified that not every polling location was open

19   24 hours.  Do you agree with that?

20   A.  Correct.

21   Q.  Were you a part of the decision to not have every polling

22   location open 24 hours?

23   A.  Yes.

24   Q.  Why have some open 24 hours and not others?

25   A.  We anticipated that fewer people would vote in those hours,

1    that there is a portion of the population that, while they

2    do -- may work from those seven -- may be free in those

3    7:00 p.m. to 7:00 a.m. hours, that would not be everyone's

4    experience.  And so based on the historic voting trends, we

5    felt that we would be acting in a responsible way to kind of

6    cull down our resources through those hours to meet the

7    demands, prospective demands that we could of those hours.

8    Q.  When you say cull down resources, that's because keeping

9    polling locations open has a cost by hour, right?

10   A.  Correct.

11   Q.  Allocating scarce resources in order to keep these polling

12   places open, true?

13   A.  True.

14   Q.  So the choice of whether to -- to make voting available

15   24 hours a day has to be weighed against its costs, right?

16   A.  One of the issues, yes, is cost.

17   Q.  And whoever is deciding whether to keep a given polling

18   place open 24 hours has to -- part of that decision has to be

19   weighing costs versus benefits, right?

20   A.  Costs versus benefiting.  The same way that not everyone

21   uses mail ballot voting.  Only a certain percentage.  We still

22   make sure to offer voting to folks whether or not they end up

23   being the majority of the voting block.

24   Q.  Right.  You want to make sure there are a number of ways to

25   reach different kinds of voters; that's true?

Isabel Longoria - Examination                1394

1    A.   True.

2    Q.   And when you were making that choice about which voting

3    locations to keep open for 24 hours, that choice had nothing to

4    do with race, true?

5    A.   Nothing to do with race -- well, I know from my previous

6    work that individuals who tended to have later working hours,

7    those overnight or graveyard shifts as you called them, tended

8    to be individuals who were lower income and therefore tended to

9    be individuals who were Black, brown, Hispanic, Latino, etc.,

10   and so while race was not the primary motivator, we knew that

11   it would have a positive effect in folks who are not

12   structured -- not historically had those what we called

13   traditional 9-to-5 jobs.

14   Q.   Would it be fair to call that a race-based decision by your

15   office?

16   A.   A race-based decision?  It was historical and race-informed

17   decision.

18   Q.   Brian, can we please pull up State Exhibit 15 and our

19   demonstrative map, please.

20        I'm sorry.  If you could bring up State Exhibit 151 and our

21   demonstrative map.  My apologies.

22        Ms. Longoria, you recognize State Exhibit 151, which is

23   that map of the polling locations you were looking at earlier,

24   right?

25   A.   It's slightly cut off, but I suspect it says *"2020 General*

1  *Special Election Voting.*"

2  Q.  The other map that's in color here is a demonstrative map.

3  I'll represent to you that this is from the district viewer on

4  the state legislative website that shows the senate districts

5  as they were in 2020.  Do you see that map that's in color

6  there on your right-hand side?

7  A.  Yes.

8  Q.  Brian, could you highlight for us the drive-through voting

9  locations.

10      Those are the ones that are in a square, right,

11  Ms. Longoria?

12  A.  In a square?  Again, it's -- I see it there on the side,

13  yes.  The ones that are squares were drive-through voting, in

14  addition to being walk-up voting locations.

15  Q.  Now, you know from the information that you put together

16  for the Texas legislators in the letter that you sent them that

17  Senate District 6 at the time was majority Hispanic, right?

18  A.  Correct.

19  Q.  Senate District 13 was majority African-American, right?

20  A.  Correct.

21  Q.  And Senate District 15 was mixed; is that right?

22  A.  Correct.

23  Q.  If we line up the locations of your drive-through voting

24  with the locations of those senate districts, we see that the

25  majority of your drive-through voting locations were in

1  majority/minority senate districts.  Do you agree with that?

2  A.  Minority senate districts.  I'll have to take your word for

3  it on where they're being placed.

4  Q.  Well, if you look at the two maps here, we've highlighted

5  for you where they are on State Exhibit 151 and where they are

6  using the road map on the demonstrative exhibit.  Do you see

7  those yellow squares highlighted for you?

8  A.  Trying to calculate majorities just to be specific, but I

9  take your point, and we can move.

10  Q.  Do we agree on that, though -- let me restate the question

11  to make sure we're --

12  A.  That they are placed in districts that -- based on this

13  map, they were in senate districts that were in other documents

14  labeled as majority/minority districts.

15  Q.  We agree on that?

16  A.  We can go with that point, yeah.

17  Q.  Was that intentional?

18  A.  No.

19  Q.  Has your office done any analysis of whether the placement

20  of its drive-through voting centers had any effect on the

21  number of minority voters who utilized them?

22  A.  In selecting voting locations, we contend with several

23  factors past what we may want to, that there are certain

24  neighborhoods, usually historically Black, Latino, and Asian

25  neighborhoods, that because of underinvestment in the past in

```
 1    urban development, they don't have large spaces, community
 2    centers, places with sufficient parking lots for drive-through
 3    voting, for example.  And also private facilities have the
 4    right to refuse service or to refuse to be an election site,
 5    and so in kind of so much you may have intentions to serve
 6    different communities, at the end of the day, those communities
 7    may not have the structures that allow for certain types of
 8    voting and may not have the community -- you know, in more,
 9    say, conservative districts may not be willing to accept
10    certain voting sites.  And so we never did a geographic impact
11    since all voting locations are open to all voters in Harris
12    County as part of countywide voting.
13    Q.  Let's talk about implementing SB1.  The first election for
14    which SB1 was in effect was March 2022 primary, right?
15    A.  Correct.
16    Q.  And most voting laws passed by the legislature pass in the
17    regular session, true?
18    A.  Most laws by the legislature pass in a regular session.  I
19    think that's true.
20    Q.  Ordinarily, we're used to seeing effective dates of
21    September 1 for new legislation, right?
22    A.  Correct.
23    Q.  SB1 passed in a special session, true?
24    A.  Correct.
25    Q.  Do you know why that was?
```

Isabel Longoria - Examination                    1398

1    A.  I believe that certain members of the House decided to

2    break quorum as a way to exert pressure on the bill writers to

3    kind of answer into more negotiations on those bills, so it

4    dictated, then, several special sessions being called to take

5    up that issue.

6    Q.  And so SB1 was not in effect for the November 2021

7    election.  We agree on that?

8    A.  November 2021, correct, it was not in effect.

9    Q.  And one of the challenges that you had with SB1 was the

10   limited time frame for implementing it into that March 2022

11   election, true?

12   A.  Correct.

13   Q.  Another challenge you had was that because it was a

14   brand-new law, you did not have any experience implementing

15   those new provisions.  You were learning the law as you were

16   implementing it, true?

17   A.  I would say it's more accurate that by the time the laws

18   were passed, there's a difference in the budgeting cycle of the

19   county and being able to account for and request resources in

20   the lead up to that election, kind of the timing of all of

21   that.

22   Q.  And, of course, voters are not familiar with the new law,

23   right?

24   A.  Correct.

25   Q.  And your office provided information and education to

1  voters about SB1 as well as it could, right?

2  A.  Yes, as well as it could, contending with other provisions

3  of SB1.

4  Q.  Regarding how to provide ID numbers when attempting to vote

5  by mail, for example?

6  A.  As in were those some of the education efforts we -- yes.

7  Q.  In fact, there were some specific voters who had their

8  applications rejected as part of the March 22 election, and

9  your office directly contacted those voters about the problems

10  with their applications, right?

11  A.  As far as attempting to call voters for whose phone numbers

12  we had, I can't remember if we sent letters or not.

13  Q.  Of course, the purposes of those communications was to help

14  the voters understand the process better; is that fair to say?

15  A.  Yes.

16  Q.  This is a little out of order, and I apologize for jumping

17  around on you a little bit.

18      But in 2020, Harris County decided that it would send out

19  ballot applications to everyone over the age of 65?

20  A.  Correct.

21  Q.  And that's one of those voting innovations you talked

22  about, right?

23  A.  Yes.

24  Q.  Subsequently, Harris County announced that it would send

25  ballot applications out to all voters in the county, right?

Isabel Longoria - Examination                    1400

1    A.  I believe for timeline purposes, for November 2020, Clerk

2    Hollins announced that he desired to send applications to all

3    voters, and then through subsequent -- some legal something or

4    other that was then restricted to voters over the age of 65.

5    Q.  Harris County got sued in order to prevent Mr. Collins from

6    sending out -- or Mr. Hollins from sending out ballots to all

7    the voters, right?

8    A.  I'm not sure -- I don't know what all the legal mechanisms

9    are but, yes, something happened in that sense.

10   Q.  You showed us some statistics on direct about the rate of

11   ballot rejection following SB1, right?

12   A.  Correct.

13   Q.  And I think that you -- I think you did some quick math and

14   figured out that those ballot rejection rates at one point were

15   as high as something like 19 percent, right?

16   A.  I believe that's what the press release we showed said.

17   Q.  That's too high.  We agree, right?

18   A.  I prefer that no mail ballots are rejected.

19   Q.  You don't know what the rejection rate was in November of

20   2022; is that true?

21   A.  I believe the rejection rate was under or close to

22   one percent, because one of the initiatives I was working on

23   was redesigning the mail ballot envelopes.  They were up to

24   that point three white envelopes that differed in one-fourth of

25   an inch from each other, all with black text.  And one

1    innovation we brought forth in the November 2020 election was

2    coloring the envelopes blue, green, and purple.  And we got

3    permission from the Secretary of State's office to add blue,

4    green, and purple on there so that it would make it more

5    intuitive for voters and kind of easier to figure out which

6    envelope was the ballot verses the carrier versus mail-in

7    envelope.

8        In addition to which we added some another innovations of

9    increasing our call center to respond to mail ballot voters'

10   concerns or questions.  And additionally, I led training for

11   the signature verification committee to make sure they were

12   aware of their processes.  Had a couple test times going

13   through, so by the time we reached the November 2020 period,

14   those mail ballot innovations, in addition to the mail ballot

15   drive-through drop-off for mail ballots, I believe were key in

16   driving those rejection rates, I believe, much closer to

17   1 percent.

18   Q.  So there's a lot of information there.  Let me pull you

19   back around to my question and let me see if I understood the

20   answer as it pertained to my question.

21       So in the March 2022 election, which was the first one

22   under SB1, the ballot rejection rate was approximately

23   19 percent; is that part true?

24   A.  Yes.

25   Q.  And by the November 2022 election, Harris County had

1    managed to drop that 20 percent -- 19 percent rate to below

2    1 percent.  Do I have that part correct?

3    A.  I apologize.  I misunderstood.  I was referencing the

4    November 2020, which we had been speaking about up to this

5    point.  So in November 2020, we had introduced several design

6    and customer service innovations that had driven down the

7    rejection rate closer to 1 percent.  I don't remember the exact

8    number.

9    Q.  Let me pull you back over to November 2022.

10   A.  Sincere apologies.

11   Q.  Appreciate your patience.  So now that we have our time

12   frames clear -- and this is my fault.

13   A.  We're good.

14   Q.  We talked about that rejection rate under the first SB1

15   election in March 2022, right?

16   A.  Correct.

17   Q.  You were not in office for the November 2022 election,

18   right?

19   A.  Correct.

20   Q.  You do not know the numbers, I presume, of what the ballot

21   rejection rate was in November 2022?

22   A.  No, sir.

23   Q.  There were some controversies in Harris County following

24   the March 2022 election; is that true?

25   A.  Yes, sir.

Isabel Longoria - Examination                1403

1    Q.  The County had a hard time meeting some of its deadlines?

2    A.  Yes.

3    Q.  There were some lawsuits that got filed?

4    A.  Several.

5    Q.  An initial report suggested that there were 10,000 more

6    voters who checked in to vote than actual votes counted, right?

7    A.  That checked in to vote -- if you are referring to the

8    unofficial election night reports submitted to the Secretary of

9    State's office, yes.

10   Q.  Brian, can we pull up State Exhibit 273, please.

11       This is that preliminary election reconciliation report,

12   its unofficial totals, right?

13   A.  Correct, dated March 3rd*(sic)* there at the bottom.

14   Q.  This is a reconciliation report that is actually required

15   by SB1?

16   A.  Yes.  I can't remember if it was required by SB1, but it is

17   now required, yes.

18   Q.  We agree that this document sets out your office's

19   activities for the March 2022 election, right?

20   A.  I would say not activities, but the checkpoint at the end

21   of the election night period and what had been kind of gathered

22   by that point.

23   Q.  And these are matters observed by your office pursuant to

24   that legal duty that we just talked about, right?

25   A.  Correct.

Isabel Longoria - Examination                1404

1    Q.  If we scroll down to part four of this preliminary

2    reconciliation report, it says that the difference between

3    voters and ballots was initially counted as little over 10,000

4    people, right?

5    A.  Correct.

6    Q.  Now, subsequent reports brought these numbers down

7    considerably, true?

8    A.  Correct.

9    Q.  Subsequent reports divided it up by party; is that right?

10   A.  Yes.

11   Q.  And each of those parties was, I think, less than a

12   thousand people different, or a thousand ballots different,

13   right?

14   A.  I don't remember off the top of my head, but it sounds

15   about right in the ballpark.

16   Q.  But when this 10,000 number came out, it caused a lot of

17   problems for your office; fair to say?

18   A.  I wouldn't say problems for our office, but it definitely

19   flagged for us that through the cure period, we had to see --

20   you know, go back and examine what had happened.

21   Q.  I mean, there were news stories about it, right?

22   A.  Oh, if you're referring to public heartaches or headaches,

23   sure, there were news stories about this.

24   Q.  And Harris County Judge Lina Hidalgo requested your

25   resignation, true?

Isabel Longoria - Examination                1405

1   A.  Yes.

2   Q.  And you did submit that, and it was effective July 1, 2022?

3   A.  Correct.

4            MR. KERCHER:  Pass the witness, Your Honor.

5            THE COURT:  Anything else from this side?

6            MR. NICHOLS:  Nothing from us.  Thank you.

7            MR. GORE:  John Gore for intervener defendants

8   including the Harris County Republican Party.

9        (2:07 p.m.)

10                   CROSS-EXAMINATION

11  BY MR. GORE:

12  Q.  I don't think we've met before today, but it's nice to meet

13  you, and I'm very impressed by your stamina on the stand.

14  Thank you for being here.

15  A.  That's kind of you to say.

16  Q.  I have a few questions about a couple of topics you touched

17  on in your testimony today.  First is drive-through voting.  Am

18  I correct to understand that the eSlate is the device on which

19  the voter actually inputs their vote when they're in

20  drive-through voting?

21  A.  I hope I got that right the tablet machine, yes.

22  Q.  And does drive-through voting also may use of a device

23  called a "Judge Booth Controller" or a "JBC"?

24  A.  All voting does, but yes.

25  Q.  What does that device do?

1   A.  When you check in, when a voter checks in using the iPad
2   ePoll book to verify -- I can't remember the specific
3   mechanism, but the controller then gives the access code.  That
4   access code, those four digits, tie kind of the programming of
5   the computer to then when the voter goes to their station, or
6   eSlate; allows them to -- allows the computer, for lack of a
7   better term, to pull up the correct ballot.  And then the
8   completed vote on the eSlate is stored both on each eSlate
9   machine and then transmitted back into the controller, so the
10  controller, for lack of a better term, kind of collected the
11  votes from all of the eSlates that were tied to that
12  controller.
13  Q.  So there's some syncing between the eSlate and the
14  controller; is that right?
15  A.  Correct.
16  Q.  And I believe you testified that the political parties in
17  Harris County try to work with you on drive-through voting and
18  make it successful; is that right?
19  A.  Correct.
20  Q.  And at some point, did the Harris County Republican Party
21  also raise concerns about the syncing between the eSlate and
22  the controller and whether that was happening properly?
23  A.  If you are referring to when the eSlate, either in curbside
24  voting or drive-through voting, if an eSlate has to be removed
25  from its tablet, that's when the eSlate is kind of reattached

1  to that tablet, if that data cord is removed, the Republican

2  party had, I think, consistently always speculated in every

3  election that somehow that that was -- that there would be

4  syncing issues.

5  Q.  And at some point your office discovered some discrepancies

6  between the eSlate numbers and the controller numbers, correct?

7  A.  In what sense?

8  Q.  Well, at one point the Harris County Republican Party

9  requested that you rerun that syncing, correct, in your office?

10  A.  If you could be -- if you're referring -- if you could be

11  more specific on what time period you're referring to.

12  Q.  Certainly.  So we're talking about at the end of the early

13  voting period, that syncing was rerun, is that correct, or

14  verified in some way?

15  A.  At the end of election night when votes are tabulated, you

16  would -- in the tabulations, similar to the reconciliation

17  sheet, Harris County, before the reconciliation sheet was

18  mandated by the state would, at the end of the election night

19  period and throughout, tally kind of how many check-ins there

20  were versus how many votes had been tallied or counted up to

21  that point, and you're always running -- you know, one of the

22  core functions of elections is always trying to match those

23  numbers up.

24      One of the ways, you know, if the controller, we felt that

25  maybe there was some -- the controller numbers was off, you

Isabel Longoria - Examination                 1408

1    could go to each eSlate machine and pull directly from each

2    eSlate machine those records as well to give you a double-check

3    so that you could reconcile those numbers across the board.

4    Q.   And at one point at the end of the early voting period,

5    that comparison was run, and there was a discrepancy about

6    18,000 votes, correct?

7    A.   I don't remember the exact number, sir.

8    Q.   But there was a discrepancy when that was run?

9    A.   There's always a discrepancy.

10   Q.   And there was, again, a discrepancy on Election Day when

11   that comparison was done, correct?

12   A.   I don't remember off the top of my head what those -- what

13   the numbers were when they happened, but there -- point taken,

14   there was something that we had to reconcile during the cure

15   and canvass period.

16   Q.   And your office also received other expressions of concern

17   or other complaints about drive-through voting, correct?

18   A.   From the Republican Party?

19   Q.   From anybody.

20   A.   In this context, I remember -- the two I remember from the

21   Republican Party were this issue of providing cords so that

22   those eSlates didn't have to be unnested, and then in kind of

23   advocating for their poll watchers to have what they felt, you

24   know, more freedoms or more access to certain locations.

25   Q.   Your office also received some feedback from an early

1   voting clerk about drive-through voting, correct?

2   A.   You'll have to jog my memory, sir.

3   Q.   Did you receive any comments from early voting clerks about

4   voters recording the drive-through voting process on a cell

5   phone, for example?

6   A.   Voters recording the drive-through voting?  Insomuch as

7   voters themselves who were in their car kind of for social

8   media saying that, *"Oh, here I am drive-through voting,"* I

9   vaguely remember.  I don't know if I -- I don't know if those

10  came through early voting -- I cannot remember distinctly where

11  those came, but I remember the claims or concerns that voters

12  were taking social media videos from their cars as they were

13  going through the drive-through lanes.

14  Q.   And you agree that that kind of video-recording is not

15  permitted in a polling place, correct?

16  A.   Correct.

17  Q.   And did you also receive any complaints that it was

18  difficult for election workers or poll watchers to see into

19  high profile SUVs or trucks as voting was happening at

20  drive-through voting?

21  A.   You'll have to jog my memory.  Were cars of different

22  sizes, and does that present, you know, folks who are shorter,

23  taller, could they see into vehicles differently if they were

24  shorter or taller?  Sure, but I don't remember the specific

25  conversations.

1  Q.  I'd like to ask you a few questions about the racial impact

2  analysis you provided to legislature if that would be okay.

3  A.  Sure.

4  Q.  I believe it's your testimony that you don't know the race

5  of any voter in Harris County, correct?

6  A.  Probably more accurate to say the State of Texas does not

7  collect the race or ethnicity of voter per voter within the

8  voter rolls.

9  Q.  Thank you for that clarification.  So you also can't check

10  the voter rolls to check the race of any voter who used

11  drive-through voting or 24-hour voting, correct?

12  A.  Insomuch that I cannot go to any one voter record, and in

13  their voter record there is no display of race or ethnicity for

14  any single voter.

15  Q.  And instead what you presented to the legislature was the

16  number of voters from each senate district or house district

17  and then the racial composition of that district, correct?

18  A.  I believe we also presented, because there was -- I believe

19  TCRP, Texas Civil Rights Project, at that time also came out

20  with information on Harris County overall, so while we were

21  trying to provide illustrative documents for any given senate

22  or house district, I believe I did also reference information

23  about voting patterns, if you will, by race across the county.

24  Q.  And not every senate or house district had a drive-through

25  voting or 24-hour voting location within its boundaries,

Isabel Longoria - Examination                1411

1   correct?

2   A.  Correct.

3   Q.  So voters in any such district would have had to travel

4   outside of their district to participate in drive-through

5   voting or 24-hour voting, right?

6   A.  Correct.  Per countywide voting, voters are allowed to

7   engage in any voting -- in any voting location, whether it's

8   in-person, drive-through, or 24-hour voting.

9   Q.  And you included in your analysis every senate or house

10  district that contained a portion of Harris County, correct?

11  A.  Correct.

12  Q.  And a number of those districts also encompassed areas

13  outside of Harris County; is that right?

14  A.  Correct.

15  Q.  And voters outside Harris County could not vote in Harris

16  County, correct?

17  A.  Not true.  For the November 2020, there's something called

18  the "limited ballot," so if you were voting for president but

19  you were in Montgomery County but you found yourself in Harris

20  County or vice versa, you could vote for a limited series of

21  those.  But if you were from Montgomery County, you could not

22  vote for a state representative in Harris County.

23  Q.  So other than the limited ballot, a voter from outside of

24  Harris County could not have used drive-through voting or

25  24-hour voting in Harris County, correct?

1    A.   Correct.

2    Q.   You've also testified a little bit about poll watchers; is

3    that right?

4    A.   Yes, sir.

5    Q.   And you testified about the new -- I think you used the

6    phrase "power dynamics" under SB1; is that correct?

7    A.   Yes, the shifting power dynamics between poll watchers,

8    election workers, and voters.

9    Q.   And you haven't identified any alleged misconduct by a poll

10   watcher in the March 2022 primary election, correct?

11   A.   In the March -- I don't remember off the top of my head.

12   It's been a couple years, so trying to place, yeah, stories

13   with elections.

14   Q.   And you also haven't testified today about the 2022 general

15   election, correct?

16   A.   I was not in the election office at that time, so I cannot

17   comment to that election.

18          MR. GORE:   Thank you for your attentiveness and time.

19   I pass the witness.

20          THE COURT:   Any redirect?

21          MR. BADAT:   Yes, Your Honor.

22        (2:17 p.m.)

23                     REDIRECT EXAMINATION

24   BY MR. BADAT:

25   Q.   Ms. Longoria, on cross-examination, you remember

1   Mr. Kercher asked you questions about whether or not your

2   office always granted accommodations to voters who requested

3   them?

4   A.  Right.  The difference between an official accommodation

5   request under the ADA act versus a request through other means.

6   Q.  And he showed you deposition testimony that said you --

7   your office would always grant accommodations, right?

8   A.  I don't remember the sentence, but, yes, alluded to a

9   deposition.

10          MR. BADAT:  Could we go to Ms. Longoria's April 20

11  deposition from the morning, line 37, please.

12          MR. KERCHER:  Objection, Your Honor.  This is an

13  improper impeachment.

14          MR. BADAT:  This is showing the complete testimony of

15  the witness.

16          THE COURT:  That's overruled.

17  BY MR. BADAT:

18  Q.  Could we go to line 8, please.

19      And the questioner here asked you, *"Now, I want to go back*

20  *to where we were talking about the cure process for mail*

21  *ballots.  At one point in your testimony, it seemed like you*

22  *were saying that your office has never denied a request for an*

23  *accommodation for a voter with disability.  Do you remember*

24  *that?"*

25      And your answer was, *"I believe I said when voting*

1  *in-person.*"

2      So does this refresh your recollection in terms of your

3  deposition testimony about what you were answering when you

4  said your office always granted requests for accommodation?

5  A.  I believe with the other gentleman, I shared the same, that

6  there is, as I understand it, a difference between an official

7  request for accommodation under the ADA act that would have had

8  to go through our complaint process, which we were particularly

9  sensitive about because of Harris County's unique status of

10 having to go through pre-clearance for DOJ issues versus -- and

11 those were largely geared towards the in-person situations.

12 You know, the wheelchair ramping, one-fourth of an inch off, or

13 a bar having to be removed from an entryway of a door so that a

14 voter could access the location of their choice.

15      So, you know, kind of in that in-person sense.  And then

16 again, as I shared with mail ballots, that there may not have

17 been official ADA complaints as logged through our website, but

18 calls, questions, concerns, comments that came from voters over

19 the phone and through our call center; that they wanted to know

20 what their options were.  Even if they weren't requested, they

21 were at least wanting to know what their options were, which I

22 took to mean as someone who was asking for a way to vote.

23 Q.  Thank you.  And then do you remember Mr. Kercher asked you

24 a few questions about complaints from voters who -- about not

25 being able to receive assistance?

1   A.  As in, being able to select their assister at a voting

2   location?

3   Q.  Right.

4   A.  Yes, the questions on assistance.

5   Q.  Is it correct that you received requests for assistance

6   from voters with disabilities regarding provisions of SB1 such

7   as the mail voting ID requirements?

8   A.  Again, they may not have said, *"I am requesting*

9   *assistance,"* but they asked if they could e-mail or fax certain

10  provisions or send in assistants on their behalf to help with

11  these issues.

12  Q.  Were these requests always treated as formal complaints or

13  were they -- sorry.  Let me ask you that.

14      Were these requests treated as formal complaints on all

15  occasions?

16  A.  Again, because our office is under that DOJ pre-clearance

17  settlement regarding ADA accessibility, we are -- or were

18  particularly sensitive to a formal complaint log through the

19  website with an ADA coordinator that had to be logged and

20  preserved in a certain process for that DOJ -- and they came

21  for every election and requested reports -- versus they may not

22  have used -- and this is maybe where I got stuck.  They never

23  perhaps used a specific word "request for accommodation," but

24  folks who called the call center either through the mail ballot

25  department, through voter registration department, or other

1    area, who were asking what their options were if they couldn't

2    show up in-person, of what their options were for curing or

3    other processes.

4    Q.   Thank you.

5         And let me go back to the -- a couple of the demonstratives

6    that Mr. Kercher showed you.

7         First, can we bring up the demonstrative showing

8    drive-through voting locations.  We don't have that.  We never

9    received that demonstrative, but if the --

10            COURTROOM DEPUTY CLERK:  You want the State to show

11   it?

12            MR. BADAT:  Could the State help me out here?

13   BY MR. BADAT:

14   Q.   Thank you.  You remember Mr. Kercher asked you questions

15   about the -- where drive-through voting locations were

16   established in relation to where certain populations were in

17   the map on the right?

18   A.   Yes.

19   Q.   Now, you testified on direct about how you selected

20   drive-through voting locations.  Do you remember that?

21   A.   Yes.

22   Q.   And is it right -- I think I remember your testimony as

23   saying, correct me if I'm wrong, that you tried to select where

24   there was significant concentrations of population?

25   A.   Correct.  When selecting drive-through voting locations,

Isabel Longoria - Examination                    1417

1    there are a couple metrics.  First, where there would be a

2    space with a parking lot large enough to allow for the movement

3    of vehicles, to allow for enough voting booths and machines,

4    and also to allow for tented stake -- or staked tents --

5    sorry -- to meet the legal definition of a "structure" for the

6    purposes of early voting.

7        So you can imagine there were some locations who had a

8    beautiful parking lot who may have had a lot of voters

9    historically but did not want us to stake tents into their

10   parking lot, for example.  And so in addition to trying to

11   figure out where the -- historically, there were large voting

12   sites where people would go, where we thought people might

13   drive more often or, you know, find accessible, we were limited

14   by the physical kind of nature of the desire for those sites,

15   in addition to -- especially for private sites like churches or

16   stadiums -- we ran up against individuals or entities, I

17   apologize, who just did not want to participate in their civic

18   duty by offering those locations to us.

19       So, you know, I'm sure -- I would have to remember the

20   specifics -- that we tried to expand further into that western

21   area or others and were denied the ability to host

22   drive-through voting at sites, which is the right of any

23   private entity.

24   Q.  We can take this down.

25       Sticking on the topic of drive-through voting, Mr. Gore

Isabel Longoria - Examination                    1418

1  asked you a question about the letter that you sent to

2  legislators that had statistics about the use of drive-through

3  voting by race, right?

4  A.  Correct.

5  Q.  And he asked you about whether or not there were senate or

6  representative districts that included a portion of Harris

7  County and a portion not in Harris County.

8  A.  Correct.

9  Q.  Were the portions that were not in Harris County of any of

10  those districts included -- the voters from those portions

11  included in your analysis?

12  A.  No.  So, for example, I think Senate District 17 or one of

13  those.  Let's say for Senate District 17 -- please don't take

14  this as fact.  More on demonstration.  Let's say 10 percent of

15  Senate District's 17 voters lived in Harris County.  When we

16  presented that information to the Senate District 17's senator,

17  we only presented information about those 10 percent voters who

18  resided within Harris County.  So we did not offer statistics

19  for anyone who lived outside of Harris County to keep it --

20  we're Harris County, so we didn't want to speak on behalf of

21  any other county in that situation.

22  Q.  So the voters that were included in your analysis would

23  have had the option to vote a full ballot in the 2020 election?

24  A.  Correct, yes.  Those were only Harris County voters, so all

25  methods of voting would have been open to them in Harris

BENCH TRIAL PROCEEDINGS                 1419

 1   County.

 2          MR. BADAR:  That's all for me, Your Honor.  Thank you.

 3          THE COURT:  Anything else from that side.

 4   Mr. Kercher?

 5          MR. KERCHER:  Nothing further, Your Honor.

 6          MR. NICHOLS:  No, your Honor.

 7          THE COURT:  You may step down, ma'am.  You're welcome

 8   to stay or you can get on 10 as fast as you can.

 9          THE WITNESS:  Thank you, Judge.

10          THE COURT:  Let's take a break.

11          COURT SECURITY OFFICER:  All rise.

12          *(2:26 p.m.)*

13                              *   *   *

14          *(2:38 p.m.)*

15          COURT SECURITY OFFICER:  All rise.

16          MS. PERALES:  Your Honor, the motion in limine.

17          Your Honor, with the Court's indulgence, we believe

18   the most efficient way to move through the sequence of events

19   is by using a PowerPoint demonstrative, if that is acceptable

20   to the Court.  And if I might approach the bench, there is a

21   copy.

22          Your Honor, the motion in limine regarding Jonathan

23   White seeks to strike portions of the declaration of Mr. White

24   which were filed at 645-5 at 14 and 646-3 at 29, but also to

25   exclude testimony of Mr. White or any similar witness on

1    nonpublic information regarding investigations or prosecutions

2    of alleged voter fraud.

3           The reasons why:  This testimony is barred by the

4    sword-and-shield doctrine.  It's based on documents never

5    disclosed in discovery.  It is inadmissible summary evidence.

6    It is improper lay opinion testimony, and it doesn't satisfy

7    the disclosure and reliability requirements of expert

8    testimony.

9           Plaintiffs asked state defendants for information

10   related to investigation and prosecution of voter fraud in

11   their first request for production to the Attorney General on

12   November 29, 2021, including documents discussing actual or

13   alleged illegal voting and election fraud, as well as election

14   fraud in connection with voter assistance in particular, and

15   that's the second bullet there, Your Honor.

16          The Attorney General responded, asserted the

17   investigative privilege, along with other privileges, and

18   stated the release of nonpublic information could have severe

19   consequences, and then offered to produce a chart, or a

20   spreadsheet, as they refer to it, which they did.

21          In Mr. White's first deposition of April 27, 2022, OAG

22   counsel, who was defending Mr. White, objected and asserted the

23   investigative privilege 27 times, and that includes having a

24   running objection on that.  And to summarize how all of that

25   went in that deposition, we include an excerpt showing the

 1    Judge -- showing the Court that OAG counsel instructed

 2    Mr. White not to provide any answers that would encroach on his

 3    variously asserted privileges or that could conceivably be

 4    implicated by those questions, and the witness accepted that

 5    instruction.

 6            That meant that Mr. White would not discuss any

 7    investigations that were not public.  Also with respect to

 8    resolved cases that didn't result in a conviction or a deferred

 9    adjudication, the witness also declined to answer.  He declined

10    to answer any questions that would reveal internal thought

11    processes about how they might charge a case, and also declined

12    to answer anything having to do with mental impressions or

13    investigative practices.

14            Mr. White -- everybody is very clear on this.  In his

15    August deposition, Mr. White, reflecting on his previous

16    testimony, did say that he talked about closed cases only to

17    the extent that they were on his spreadsheet and only public

18    information, or publicly available information, as he described

19    it.  As a result, Mr. White limited his testimony on a number

20    of topics which touch on what he later put in his declaration

21    of this summer.

22            So, for example, Mr. White limited his testimony on

23    the efficacy of SB1.  He would not talk about the different

24    types of vote-harvesting crimes that could be deterred by SB1's

25    new mail ballot ID requirement.  He wouldn't talk about whether

1    his office would have other means of detecting vote-harvesting

2    without the mail ballot ID requirements.  He also limited his

3    testimony on voter assistance fraud.  He would not talk about

4    what kind of illegal behavior portions of SB1 voter assistance

5    oath would be aimed at preventing.  He limited his testimony on

6    whether there's any activity that was previously permitted by

7    the assistance oath that is now prohibited, and also whether

8    specific activities by an assister would fall outside of the

9    permissible activities under SB1.

10          Mr. White was -- that was his April 2022 deposition

11   was in his personal capacity.

12          He sat a week or so later in his official capacity as

13   the 30(b)(6) representative of the Attorney General's Office.

14   At that deposition his counsel lodged a total of 87 various

15   privilege objections.  OAG counsel instructed Mr. White not to

16   provide information about specific investigations and nonpublic

17   information regarding investigations and prosecutions, which

18   led to Mr. White either not answering or answering in a limited

19   fashion.  So he wouldn't go into details.  He would give

20   sometimes general answers.

21          Here is an example from that deposition in which

22   Mr. White was asked what kinds of evidence typically did he

23   look for or does he find in an assistance fraud case.  There

24   was an objection from OAG counsel.  Mr. White said he wouldn't

25   discuss it.  It involved investigative methods.  And Mr. White

 1    did subsequently answer after counsel agreed to limit the

 2    question to public information, and he gave a general answer

 3    following that.

 4            Plaintiffs made another request for production of

 5    documents in February of 2023 asking again for documents

 6    related to suspected or alleged election fraud, and -- with

 7    respect to certain counties, and then also communications

 8    between the OAG, the Office of the Attorney General, and other

 9    entities like counties or the Secretary of State.

10            Again, the Attorney General's Office objected or,

11    rather, Defendant Kenneth Paxton objected and stated that they

12    considered any documents related to investigative and

13    prosecution case files to be privileged, as well as unduly

14    burdensome and not proportional to the needs of the case.

15            We did get some production.  We got about -- a little

16    bit less than 450 documents.  They were primarily or almost

17    exclusively public materials, news clippings, legislative

18    transcripts, screenshots from Web pages.  We did get charging

19    documents or plea agreements that had been filed in Court for

20    some, but probably not all, of what was listed on the

21    spreadsheet.  And we received two investigation files, both

22    involving poll watcher obstruction complaints in 2022.

23            And we've received these spreadsheets from the

24    Attorney General's Office, which just lists prosecutions or --

25    pending or resolved prosecutions.  We understood the universe

 1    of what we were going to receive at that point.  It was going

 2    to be public information from the Attorney General's Office.

 3            And then on June 22, 2023, Mr. White's declaration was

 4    filed in response to motions for summary judgment, and it went

 5    into a great deal of detail from Mr. White about what he

 6    thought were the types of voter fraud, the prevalence, the

 7    techniques, the behavior of voters when being caught up in this

 8    type of behavior, the effectiveness of investigation

 9    techniques, and finally how SB1 combats mail ballot fraud.

10            At the Court's suggestion, we deposed Mr. White one

11    final time about four weeks before trial started.  The Attorney

12    General's Office only offered Mr. White for three hours.  We

13    questioned for the three hours.  That meant that the Department

14    of Justice asked questions for an hour and a half, LUPE

15    Plaintiffs asked questions for an hour and a half.  The

16    Attorney General's Office did not supplement its document

17    production or privilege logs prior to this deposition.

18            At the deposition, Mr. White did testify that the

19    statements in his declaration were based at least in part on

20    the investigative and prosecution files that he reviewed as

21    part of his work and that we never received.  He did not recall

22    producing any of these documents in discovery, and he

23    frequently said that what he would learn about an investigation

24    either would be these documents or would be based on

25    conversations with investigators.

1          We went statement by statement through Mr. White's

2    declaration of June 2023, which was, we believe, consistent

3    with what the Court was contemplating in the July 2023 hearing.

4    We asked him, for example, about his very specific statements

5    about illegal voter assistance in the polling place, in-person.

6    Mr. White just looking at the spreadsheets that had been

7    produced, could only point at a case that ended in acquittal

8    and dropped charges.  He could not identify from the public

9    material successful prosecutions or any documents that had been

10   produced in discovery and ultimately fell back on, quote, *"My*

11   *recollection is based on generally anecdotes that I might have*

12   *spoken with an investigator about or just general memories of*

13   *an investigation and wouldn't be tied to any document."*

14          THE COURT:  So why wouldn't you want to keep those

15   parts of the declaration intact?  Are you trying to strike it

16   all?

17          MS. PERALES:  We filed with our motion in limine a

18   redacted version of the declaration and does remove most of it,

19   because Mr. White would not testify in his depositions about

20   nonpublic information.  When we asked him repeatedly, he would

21   always constrain his answers to the public record.  So between

22   what we have in the public record and the two investigation

23   reports involving poll watcher obstruction, that is all we've

24   ever been allowed to see.  And Mr. White does say that he's

25   essentially testifying based on things that we never were able

1    to access because of claims of investigative privilege.

2         He talks about how the knowledge that he's expressing

3    is based on his past exposure to documents, and he says, *"Yes,*

4    *it's an amalgamation of 50 years of cases in prosecutions,*

5    *reviewing lots of election records, things like that, things*

6    *we've talked about today."*

7         So with respect to another example.  In his

8    deposition, we asked him about a statement in his declaration

9    regarding an individual named Zul Mohammed.  Mr. White talks

10   extensively about Mr. Mohammed in his declaration saying this

11   is why SB1's requirement of an ID number is helpful and

12   efficacious, but the Attorney General's Office didn't produce

13   any investigation of prosecution documents.  Mr. White said

14   that he -- his information was secondhand, and the only

15   document we do have is a press release from the Attorney

16   General's Office saying that Mr. Mohammed forged voter

17   registration applications, which, if he did, would mean that

18   SB1's ID requirements would not be helpful in that situation

19   because Mr. Mohammed would have already had the matching ID

20   numbers for these voters.

21        Mr. White said, *"I did not go to Dallas County.  I*

22   *didn't talk with the families and the voters.  I may have*

23   *reviewed some election records.  I don't have a specific*

24   *memory."*

25        And thus, we are completely deprived of any

1    information that we would need to be able to assess this claim

2    or talk about it.

3         Under the sword-and-shield doctrine, a party may not

4    use privileged information offensively and defensively, and

5    allowing a party to use a privilege such as the investigative

6    privilege as a sword and a shield would be manifestly unfair.

7    And fairness is the touchstone here.

8         Judge Pitman, in 2017, when ruling on the case

9    involving Baylor University found that Baylor University's

10   attempt to invoke the attorney/client privilege over an

11   investigation report but then also selectively reveal portions

12   of that report was a sword-and-shield violation.  That is what

13   we are contending is happening here.

14        The four factors that courts typically weigh in these

15   types of situations weigh in favor of plaintiffs here.  With

16   respect to number four, the availability of a continuance, even

17   the state agrees, we're in the middle of trial.  It's not

18   really possible to reopen discovery to receive the information

19   that was withheld under these claims of investigative

20   privilege.  There isn't really an explanation for the failure

21   to disclose this material.

22        Mr. White testifies extensively that lots and lots of

23   information that he relied on and that people in his office

24   rely on are in investigation reports, but we only received two,

25   and they have nothing to do with anything in Mr. White's

 1    declaration.  They have to do with poll watcher obstruction

 2    post SB1.  The only explanation we've ever received for the

 3    State's failure to disclose is the investigative privilege, and

 4    the stand, the very firm stand, that they took throughout the

 5    litigation, that we would be entitled to receive public

 6    information, but not anything that wasn't public information.

 7    The information is important to both sides.  The extent,

 8    prevalence, and the degree to which the legislature was

 9    attempting to address voter fraud with SB1 is very much in

10    contention for both of us.

11            And so we believe that our inability to explore this

12    evidence is very prejudicial to the plaintiffs.  And thus, as

13    to number three, at least, it tips heavily in favor of the

14    plaintiffs.

15            I'd just like to end my portion, Your Honor, because I

16    am dividing this with Mr. Parreno -- that, you know, under the

17    rules, if a party fails to provide information, the party is

18    not allowed to use that information to supply evidence.  And so

19    this is, besides the sword-and-shield doctrine, another reason

20    why we believe that Mr. White's testimony as to nonpublic

21    information should be excluded.

22            Finally, I'd like to point out, Your Honor, that the

23    State failed to even identify these materials.  We have very

24    little on privilege logs from the OAG.  And because the State

25    didn't just not produce these materials, but also failed to

1    identify them on a privilege log, we weren't able to do what we

2    might have done normally, and which we have done in this case.

3    When we thought a privilege was improperly asserted or was

4    being asserted too broadly, we did file motions to compel,

5    particularly on the legislative privilege and other topics.

6    But here, we didn't see anything on the privilege logs.  We had

7    to rely on the State's assertion that there was a valid

8    investigative privilege and, you know, we understood that to be

9    the situation.  Now, it appears that Mr. White is going to

10   testify as to things that were withheld or not identified in

11   this litigation.

12            THE COURT:  Thank you.

13            MR. PARRENO:  Good afternoon, Your Honor.  Kenneth

14   Parreno on behalf of LUPE plaintiffs.  I will continue talking

15   about the remainder of the motion in limine and motion to

16   strike, specifically the sections regarding improper summary

17   evidence, improper lay testimony, improper expert testimony,

18   and inadmissible legal opinions.

19            First, improper summary evidence.  Mr. White's

20   testimony made similar testimony by a State witness similar to

21   what was presented in Mr. White's declaration constitutes

22   improper summary evidence in accordance or pursuant to Federal

23   Rule of Evidence 1006.  That evidence -- that rule specifies

24   that --

25            *(Court reporter clarification.)*

1          MR. PARRENO:  That rule of evidence provides that a

2    proponent using summary evidence must make originals or

3    duplicates available for examination to the opposing party at a

4    reasonable time and place.

5          A Fifth Circuit case, *United States v. Nguyen* that's

6    at 504 F.3d 561 in 2007 is instructive here.  And that case,

7    the Fifth Circuit examined whether testimony by an FBI analyst

8    was improper summary evidence.  In that case, the analyst

9    provided summary under investigation and authenticated a

10   summary chart that described an investigation and operation.

11   The Fifth Circuit held that in that case, in *Nguyen*, that that

12   was improper summary evidence for a few reasons.

13         First, that evidence was -- that summary evidence was

14   based in part on out-of-court statements by unspecified

15   witnesses made to FBI agents during the investigation.  And

16   second, any underlying documents or other evidence was not

17   previously provided to the opposing party or to the

18   fact-finder.  Based on these conditions, under Federal Rule of

19   Evidence 1006, that evidence was improper summary evidence.

20         It's very similar to what we see here.  Mr. White's

21   testimony is summary evidence just by its nature.  Based on the

22   declaration, for example, Mr. White provides a breakdown of a

23   portion of the investigations and prosecutions in his office

24   purportedly dealing with various types of alleged fraud.  He

25   also summarizes what in his estimation are common features of

1  these alleged forms of fraud.  In addition, Mr. White's

2  testimony explicitly describes what he has seen as "common

3  features, what is often happening, what normally happens, what

4  usually happens, and what typically happens.

5       This is very similar.  In fact, squarely on point

6  aligned with *United States v Nguyen,* that Fifth Circuit case

7  that I just described.  And so as Ms. Perales has already

8  detailed more thoroughly, the State has withheld privileged

9  underlying information that is nonpublic, or that it purports

10  is nonpublic, and has failed to identify identification or

11  prosecution files relating to these investigations that are

12  informing Mr. White's testimony in his declaration and other

13  testimony that we have seen by the State here.

14       Mr. White, in fact, acknowledged in his August 11,

15  2023 deposition that statements in his declaration are informed

16  by those case files that he has reviewed through his work at

17  the Election Integrity Division and over his 15 years at the

18  Office of the Attorney General.  In other words, Mr. White's

19  testimony is premised on a number of out-of-court statements

20  not presented to the fact-finder as well, because in that same

21  deposition, he acknowledged that a number of the investigations

22  that he actually did learn about, he learned through

23  conversations with investigators and prosecutors, not through

24  actual participation in those actual investigations.

25       The problem here is that we've never received any of

BENCH TRIAL PROCEEDINGS                    1432

 1    that information, any of those documents, as Ms. Perales

 2    detailed more thoroughly.

 3          And the limited information that we were provided; for

 4    example, spreadsheets, detailing some of the listings and

 5    active prosecutions and providing limited information.  Even

 6    those forms of summary charts plaintiffs were not provided with

 7    any documents underlying -- with underlying information about

 8    that information.  And Mr. White declined to testify about

 9    anything that was nonpublic in nature.

10          Second, improper lay opinion testimony.  The State

11    seeks to elicit improper lay opinion testimony from Jonathan

12    White and other witnesses.  This has to do more with the nature

13    of what Mr. White is testifying about.  Under Rule 701, a lay

14    opinion must be based on personal perception, and that is the

15    key here.  It must be one that a normal person would form from

16    those perceptions and must be helpful to the fact-finder.  The

17    key problem here is the "personal perception" part.

18          The witness must have personalized knowledge, under

19    Rule 701, of the facts underlying the opinion.  That personal

20    knowledge must be direct and particularized.  And helpful here

21    in the context of an investigation, a witness must have made

22    first-hand observations regarding the specific investigation to

23    offer lay opinion testimony.

24          So, for example, in the context of law enforcement

25    officials testifying, the Fifth Circuit has provided some

1    instructive examples.  For example, *United States v. El Mezain,*

2    664 F.3d at 514.

3              FBI agents were able to testify about an investigation

4    because they had been extensively involved in that

5    investigation, and their testimony was based on their

6    participation of those events.

7              Similarly, in *United States versus Ebron,* 683 F.3d

8    105, the Bureau of Prison officials were able to testify about

9    aspects of penitentiary life and prison behavior based on their

10   own past experiences formed from their own firsthand

11   observations.

12             And particularly instructive here is United States v

13   Keys 2018 -- 2018 Fifth Circuit case in which case police

14   detectives were able to testify based on their own personal

15   perceptions.  The Fifth Circuit emphasized that police

16   detectives were one of the agents that actually were present

17   during the investigation and interview, participated actively

18   in questioning, and were able to observe over time the

19   defendant's demeanor and inconsistencies in his story, and

20   therefore only in those instances was the -- rather, because of

21   that, the police detective was allowed to testify about the

22   veracity of the defendant's statements.

23             Contrast that with the examples of inadmissible lay

24   opinion testimony.  For example, any testimony rendering an

25   opinion formed as a result of facts or circumstances about

1    which an officer lacks personal knowledge constitutes expert

2    testimony under Rule 702.  And for example, testimony that

3    certain conduct or methods of distribution are consistent with,

4    for example, drug trafficking, constitutes expert testimony.

5           The courts in the circuit have emphasized the obvious

6    parallel here is, for example, conduct or methods of alleged

7    voter fraud constituting voter fraud.

8           And notable as well is that in a Seventh Circuit case,

9    cited by one of the cases that the State points us to in their

10   response brief, testimony by a law enforcement officer about

11   how drugs are packaged for distribution was not permitted or

12   testimony was not limited to what that officer observed.  And

13   critically, where the officer brought the wealth of his

14   experience as a narcotics officer to bear on the investigation

15   that he was testifying about and was making connections based

16   on his prior experiences elsewhere for the fact-finder based on

17   that specialized knowledge.

18          All that is to say like lined up here, is that

19   Mr. White's testimony is improper lay opinion testimony and

20   falls in the latter category of what I just described.  As

21   Mr. White acknowledges, he lacks first-hand, personalized

22   knowledge about investigations and prosecutions in forming his

23   testimony.  He did not merely draw straightforward conclusions

24   from observations informed by his own experience.  He did not,

25   for example, in the side of the Criminal Investigations

1    Division, Mr. White did not participate in investigations

2    performed by that division of the Office of the Attorney

3    General.  He admitted that, quote, unlikely, end quote, that

4    any complaint that didn't merit investigation was brought to

5    his attention, and of the investigations that actually did come

6    to his attention, Mr. White relied almost exclusively on

7    investigators and prosecutors who, in turn, provided him that

8    information second or thirdhand.

9           On the Election Integrity Division side, Mr. White

10   acknowledged in his August 11, 2023 deposition that he

11   frequently did not even review portions of investigative

12   reports or files for matters referred to the Election Integrity

13   Division and that he relied almost exclusively on conversations

14   with investigators and prosecutors about the investigations and

15   prosecutions on his side of the division.

16          And so all that is to say, Mr. White has had little to

17   no personal involvement in the vast majority of investigations

18   and prosecutions by the Office of the Attorney General.  And

19   some of those examples from his declaration include his

20   testimony about methods, frequency, and prevalence of alleged

21   voter fraud, efficacy of pre-SB1 investigative techniques, and

22   the extent to which SB1 aids in combating voter fraud.

23          So the State has emphasized in its response that

24   Mr. White has some personal familiarity with some election

25   fraud cases, but that's not enough.  It does not allow him --

1    that knowledge, personal knowledge about other investigations

2    and prosecutions, does not allow him to opine about alleged

3    election fraud generally or alleged election fraud in other

4    cases to which he did not have personal knowledge.  That is a

5    form of expert testimony that is not permitted under Rule 701.

6            Other state witnesses like White cannot provide

7    similar improper lay opinion testimony about alleged voter

8    fraud.

9            Moving a little more quickly into improper expert

10   testimony.  The State has provided properly construed

11   Mr. White's testimony as expert in nature.  And the State has

12   not satisfied its disclosure or the reliability requirements

13   for expert testimony regarding alleged voter fraud.

14           First, under Rule 26(a)(2), state must have done,

15   among other things, two of the things that it failed to do

16   here.  It should have designated Mr. White, or any other

17   similar witness as an expert, and it should have produced all

18   matters relied on for his opinions, but the State did neither.

19           And on the reliability side, Rule 702 provides that an

20   expert may testify only if, among other things, the testimony

21   is based on sufficient facts or data and the testimony is the

22   product of reliable principles and methods.

23           The problem here is Mr. White's testimony is not

24   reliable, for the reasons we described in the motion in limine.

25   But to briefly summarize two big points.  First, Mr. White's

1    testimony is based on an incomplete and skewed data set.  As

2    described previously, Mr. White has not seen all the

3    investigations or prosecutions or have personal knowledge about

4    those investigations or prosecutions, so to make broad

5    statements about alleged voter fraud is based on a skewed data

6    set.

7         And second, Mr. White's testimony is based on improper

8    methodology.  The most troubling part about this is, for

9    example, that Mr. White classifies as voter fraud instances in

10   which an individual has not been convicted, and in some cases

11   actually has been acquitted, as detailed further in our motion

12   in limine.  That, and for example, what Ms. Perales pointed out

13   about Zul Mohammed and the ID requirement about mail ballot

14   voting, are just examples of the improper methodology

15   underlying Mr. White's testimony.

16        And so because the Secretary of State is similarly

17   providing testimony that will be expert in nature or other

18   individuals proffered by the State, we seek to limit that

19   testimony as well.

20        And then finally, inadmissible legal opinions.

21   Briefly, neither lay opinion nor expert testimony can contain

22   legal opinions.  And in Mr. White's declaration, there are a

23   few examples of that inadmissible legal opinion testimony.  And

24   those are further elaborated in the actual brief itself.

25        Mr. White's statement, for example, that SB1's ID

BENCH TRIAL PROCEEDINGS                1438

1   requirement is reasonably calculated and necessary to eliminate

2   voter fraud is just one of those examples.  As is his

3   assessment that SB1 provides -- or SB1's measures provide an

4   appropriate balance between election integrity and

5   accommodation to voters.

6           THE COURT:  So if you all prevail, Mr. White's

7   declaration gets struck from the summary judgment evidence.

8   And so what, if anything, does Mr. White get to say in this

9   courtroom?

10          MS. PERALES:  Mr. White can talk about public

11  information, about the matters that he is planning to testify

12  about; that that is the information that the State defendants

13  made available to us.  As to nonpublic information, they

14  asserted the investigative privilege and said that he could not

15  testify to those things.  They also did not share any of the

16  internal materials of the unit because of an investigative

17  privilege assertion.

18          So as to public information, Lady X from Hidalgo

19  County took a diversion agreement.  She was charged with this.

20  She pled guilty to this.  That is the information that was made

21  available to us in the spreadsheets and that we were told was

22  what we were going to get.

23          THE COURT:  And what of Keith Ingram?

24          MS. PERALES:  Well, Mr. Ingram has been disclosed as

25  somebody who is going to talk about election integrity and

1    similar topics.  We do not know what his planned testimony is,

2    but to the extent that he would be used as some kind of

3    replacement for Mr. White, we would want similar testimony to

4    be limited to public information, which was made -- you know,

5    referred to in depositions and summarized on the spreadsheet.

6         THE COURT:  Thank you.  Anybody else on this side?

7    Your response?

8         MR. WASSDORF:  Your Honor, we can probably shortcut

9    this argument quite a bit.  On page two of their demonstrative

10   that they just submitted, they identify three areas that this

11   motion seeks to address.

12        First, striking portions of the declaration of

13   Jonathan White.  In that regard, Your Honor, the declaration is

14   moot at this point.  The Court has already ruled on the only

15   motion for summary judgment that it has been submitted in

16   response to.  We do not plan to admit that declaration into

17   evidence in this trial.  There is really nothing additional to

18   consider with respect to that declaration.  Additionally, the

19   declaration was not used against the LUPE plaintiffs who have

20   brought this motion.  It was only used against the United

21   States and the OCA plaintiffs in the narrow circumstance of

22   those motions for summary judgment, so I don't even believe

23   that they have a standing to raise the issue with the

24   declaration, if the declaration were even still at issue in

25   this case, which it is not.

1             Let's talk a little about the background here.

2             THE COURT:  So let me make sure I understand the

3    background.  So is it true that neither Mr. White nor

4    Mr. Ingram have ever been designated as an expert?

5             MR. WASSDORF:  That is true, Your Honor.

6             They have not been designated as experts, but their

7    testimony is exactly what we have been treating as personal

8    knowledge and lay opinion testimony throughout the course of

9    this trial.

10            THE COURT:  But you've had the benefit of the

11   documents or discovery -- or at least you never challenged the

12   lack of any documents or discovery before me.  They're arguing

13   you want to present them as witnesses, but you wouldn't provide

14   us responses to requests for production and invoke the

15   investigative privilege and other privileges.

16            MR. WASSDORF:  We have provided information in

17   response to their requests for production, Your Honor.

18            THE COURT:  450 documents?

19            MR. WASSDORF:  450ish.  I don't remember the exact

20   number.

21            THE COURT:  And so only a few charging documents and

22   two investigative files regarding poll watchers.  So why

23   shouldn't I limit your testimony to just that 450 documents

24   that they have the benefit of getting during discovery?

25            MR. WASSDORF:  Because they have failed to pursue that

1  in discovery.  They never filed a motion to compel over this

2  request for production.  Could you bring up --

3          THE COURT:  Well, you made it very clear, though, that

4  you weren't going to respond, and I even offered a chance at

5  the second deposition of Mr. White, and it looked like it's the

6  same objections being lodged during that second, so I tried to

7  give you the benefit of trying to cure this without the Court

8  intervention.

9          MR. WASSDORF:  And I believe we have cured it, Your

10  Honor.

11          THE COURT:  Did you provide more than 450 documents?

12          MR. WASSDORF:  We didn't provide any additional

13  documents.  They didn't request any additional documents.

14          THE COURT:  Well, if you were going to tender the

15  witness here at trial, though, you still have an ongoing duty

16  to supplement your production request.  Even absent a party

17  asking you to supplement, that duty is upon a party themselves

18  in each and every case.

19          MR. WASSDORF:  And we have supplemented.  As cases

20  have become closed and the privilege no longer applied, we have

21  supplemented that production with the documents related to

22  those cases.

23          THE COURT:  So then let me make sure I understand what

24  you've given up then.  I was told just moments ago it was only

25  450 documents including charging documents and including two

BENCH TRIAL PROCEEDINGS                    1442

1    investigative files regarding poll watchers.

2              MR. WASSDORF:  450 documents from OAG.  Many

3    additional documents from the Secretary of State's office.

4              THE COURT:  So then what you believe -- correct me if

5    I'm wrong -- is the equitable argument here is that whatever

6    documents you have already produced in discovery, whether it's

7    the OAG or the Secretary of State's office, just your side

8    collectively, Mr. White and Mr. Ingram should be able to talk

9    about it.

10             MR. WASSDORF:  They should be able to talk about

11   certainly those documents, but whatever information they have

12   that is relevant to this case that is not based on some

13   document that has not been produced.  Mr. White did not go and

14   review documents and then parrot that information in his

15   deposition or in his declaration.  This is information that he

16   has gained in the ordinary course of his employment with the

17   Office of the Attorney General conducting election integrity

18   work.

19             THE COURT:  So you're basically saying that the

20   entirety of his verbal testimony is, in essence, a summary

21   chart, even though it hasn't been reduced to summary chart

22   written format, and he should be able to be able to do that?

23             MR. WASSDORF:  No, Your Honor.  That's not what I'm

24   saying.  Just as all -- if somebody were to ask me about

25   litigation, it would be based on my experience working at the

1    Attorney General's Office.  That does not mean that my

2    knowledge is a summary of all of the case files that I have

3    worked on.

4            THE COURT:  Are you testifying in your hypothetical as

5    an expert or a layperson?

6            MR. WASSDORF:  As a layperson, Your Honor, because

7    that is personal knowledge.  That is not knowledge that I have

8    gone and obtained for the purposes of rendering an expert

9    opinion.

10           THE COURT:  And another question that's troubling me

11   in this here is, I'm trying to figure out why is this relevant

12   here.  So isn't the question whether or not the information

13   that Mr. White and Mr. Ingram want to bring at this trial,

14   isn't the real big question whether the legislative body had

15   the benefit of that information at the time it enacted SB1?

16           MR. WASSDORF:  Could you rephrase the question, Your

17   Honor.

18           THE COURT:  Yes.  SB1's enacted, you gave the

19   legislative purpose for SB1.  And my question is, did the

20   legislative body have the benefit of the testimony Mr. White

21   and Mr. Ingram want to bring here as they deliberated as to

22   enacting SB1?  Because if they didn't, then what's the

23   relevance here?

24           MR. WASSDORF:  Well, Your Honor, I would point out

25   that this Friday that plaintiffs plan to call Mr. Ingram and

 1    Mr. White to the stand and ask them questions, so they
 2    obviously believe that their testimony is relevant.  But as we
 3    have heard from all of these county witnesses, every single one
 4    of them has talked about election integrity and the
 5    implementation of SB1, the problems caused by SB1.
 6           THE COURT:  So let me -- let me ask you a question
 7    here.  I see where Mr. Ingram might be able to talk about that,
 8    but Jonathan White, refresh me exactly on what his role is in
 9    that office.
10           MR. WASSDORF:  He was the director of the Election
11    Integrity Division.
12           THE COURT:  And what did that mean?  What did he do?
13    Because plaintiffs just presented a picture of -- I don't
14    understand in the big picture where he fit in.
15           MR. WASSDORF:  So he was responsible for the division
16    that prosecuted election fraud cases.
17           THE COURT:  So that was before the Court of Criminal
18    Appeals took that away?
19           MR. WASSDORF:  Yes, Your Honor.
20           THE COURT:  Okay.  Go ahead.
21           MR. WASSDORF:  So that's what he did.  He was
22    responsible for the prosecution of these cases.  There was also
23    the Criminal Investigation Division that conducted the
24    investigation, similar to the police conducting an
25    investigation and the D.A. prosecuting.  And I would say, Your

 1  Honor, that both Jonathan White and Keith Ingram have testified

 2  before the legislature during the consideration of SB1 and its

 3  predecessor bills.

 4          THE COURT:  And did they provide the legislative body

 5  or individual legislators materials that you all now have

 6  failed to produce to the plaintiffs in this case?

 7          MR. WASSDORF:  I don't believe so, Your Honor.  We

 8  have taken the consistent position that what is covered by the

 9  privilege is nonpublic information related to open cases.  So

10  that means information related to closed cases and information

11  that is public related to open cases is not covered by the

12  privilege.

13          THE COURT:  But you say it's a consistent position,

14  but you're telling me -- but why didn't Ingram get to talk

15  about more than that and they get to say on the stand about

16  documents that you have failed to produce?

17          MR. WASSDORF:  He does not intend to testify about

18  documents that we did not produce in this trial.

19          THE COURT:  What is he going to say?

20          MR. WASSDORF:  He's going to talk about the

21  implementation of Senate Bill 1.  He's going to talk about the

22  administration of the elections, their work with the counties

23  to ensure that the elections are run fairly and uniformly

24  across the state.

25          THE COURT:  That's all good.  And so -- but then if he

BENCH TRIAL PROCEEDINGS                     1446

1    starts talking about why SB1 is proper because of all this

2    stuff that I wouldn't give to the plaintiffs, doesn't that

3    cross the line?

4              MR. WASSDORF:  I don't believe it's the last part of

5    that statement, that because of all the stuff that was not

6    turned over to the plaintiffs.  It's not because of that.  It's

7    because of his experience directing elections across the

8    state --

9              THE COURT:  But he gained that experience by reviewing

10   files that you won't provide now to the other side.

11             MR. WASSDORF:  I don't believe he gained that

12   experience by reviewing files.  He gained that experience by

13   doing the work, Your Honor.

14             THE COURT:  But you didn't provide them even anything

15   to challenge whether the work was good, bad.  You've given them

16   nothing to be able to challenge that assertion.

17             MR. WASSDORF:  And Your Honor, we, in our -- could we

18   pull up the response to requests for production?

19             In our response to their requests for production, we

20   objected to the extent that it called for the production of

21   complete case files.

22             THE COURT:  Under the Rules of Civil Procedure, if

23   you're going to object to some, you still had an affirmative

24   obligation to produce what you could produce.

25             MR. WASSDORF:  Yes, Your Honor, and that's what we

1    did.

2            THE COURT:  And that is the 450 documents?

3            MR. WASSDORF:  Yes, Your Honor.

4            THE COURT:  Boy, seems like we're going in circles

5    here.  So help me understand, why didn't Ingram get to go

6    beyond those 450 documents?

7            MR. WASSDORF:  Because, Your Honor, no one's testimony

8    is limited to documents that that party produced.

9            THE COURT:  But that's what the whole sword-and-shield

10   doctrine is about.

11           MR. WASSDORF:  Actually, Your Honor, I believe the

12   sword-and-shield doctrine is about specific information.  You

13   cannot withhold specific information and then attempt to use

14   that same specific information affirmatively in court.  What

15   plaintiffs are trying to do is saying, okay, you withheld

16   documents based on the investigative privilege, and now you

17   cannot discuss investigations.

18           That goes too far, Your Honor.  And we're not just

19   talking about the 450 documents that OAG produced.  You know,

20   there were over 22,000 documents produced by the Secretary of

21   State's office, whom Mr. Ingram works for.

22           THE COURT:  But what would those documents have to do

23   with election integrity?

24           MR. WASSDORF:  You know, the Secretary of State is the

25   chief election officer of the state responsible for overseeing,

1    you know, the elections across the state.  He also has a

2    responsibility of reporting suspected voting fraud when it is

3    identified by that office.  And the Secretary of State's office

4    advises the counties on the implementation of Senate Bill 1.

5              THE COURT:  No doubt there's a whole bunch of other

6    topics that he can talk about that don't start talking about

7    these investigations that you won't provide the materials to

8    the plaintiffs.  So all these other topics, you know, either

9    White or Ingram, can talk about, but you're just -- what I hear

10   you saying is, because we provided a whole bunch of documents

11   regarding voting generally, we now get to have two witnesses

12   talk about investigations and prosecutions for which we've

13   intentionally, deliberately, knowingly have decided not to give

14   to the other side.

15             MR. WASSDORF:  No, Your Honor.

16             THE COURT:  So where am I wrong on that?

17             MR. WASSDORF:  Because the information that we have

18   turned over is with respect to closed investigations.

19             THE COURT:  I'm going to let you talk about those.

20             MR. WASSDORF:  Okay.

21             THE COURT:  And I'm going to let you talk about the

22   public information.  So to be very clear, I'm going to let you

23   talk about the public information documents that you have given

24   to the plaintiffs, so that's okay.  My question is, why do you

25   get to go beyond that?

1    MR. WASSDORF:  Well, see, I think that's where the

2  confusion is, Your Honor, because we don't intend to go beyond

3  that.  We do not intend --

4    THE COURT:  But you're going to be providing verbal

5  testimony that had to rely on all that, and you didn't give the

6  opportunity to the other side to get any fodder for potential

7  cross-examination on those subjects.

8    MR. WASSDORF:  We do not intend to offer verbal

9  testimony about specific closed investigations, about nonpublic

10  information regarding those closed investigations.

11    THE COURT:  But what about -- let's assume -- I don't

12  know what these two gentlemen are going to say, but let's

13  assume somebody says, *Based upon my 15 years of experience from*

14  *what I see in terms of voter fraud, SB1 is the most magical*

15  *thing that the legislature could have ever approved.*

16    Why should I allow him to state that when you didn't

17  provide the other side any documents to support that

18  contention?

19    MR. WASSDORF:  Because yesterday you allowed

20  Mr. Jennison --

21    THE COURT:  I didn't hear any objections.  I take

22  things one at a time.

23    MR. WASSDORF:  -- to ask Ms. Callanen, *"Based on your*

24  *18 years of experience as an election"* --

25    THE COURT:  Did you object?

BENCH TRIAL PROCEEDINGS                    1450

1          MR. WASSDORF:  I don't recall.

2          MR. KERCHER:  We have objected to precisely that kind

3     of testimony, both as hearsay and improper opinion.  We have

4     understood the Court's position to be that that was their

5     personal knowledge.

6          THE COURT:  And so how does this now -- so going to

7     the other counsel's argument.  How does White and Ingram have

8     any personal knowledge of this?  She's in the trenches.

9     Neither one of them are in the trenches.

10         MR. WASSDORF:  I beg to differ, Your Honor.

11         THE COURT:  Mr. White is getting his information based

12    upon investigative files that are given to him.  He doesn't do

13    any independent investigation, does he?

14         MR. WASSDORF:  I do not know if he does any

15    independent investigation.  He was the lead prosecutor for the

16    Election Integrity Unit of the Office of the Attorney General.

17         THE COURT:  So just like any prosecutor, no prosecutor

18    has personal knowledge of events.  The prosecutor is

19    prosecuting a case which the law enforcement officers has given

20    him all the details.  So if you want to use that analogy,

21    there's no way that they have personal knowledge.

22         What about Mr. Ingram?

23         MR. WASSDORF:  Mr. Ingram is the head of the Elections

24    Division for the chief election officer of the State of Texas,

25    Your Honor.

1              THE COURT:  Anything else?

2              MR. KERCHER:  Your Honor, if I could ask to clarify

3    your comment a moment ago --

4              THE COURT:  Yes, sir.

5              MR. KERCHER:  -- about what information is personal

6    knowledge or not personal knowledge for a prosecutor.

7              So if a prosecutor were to interview witnesses, would

8    that be, in the Court's view, within the purview of personal

9    knowledge?  The reason I ask --

10             THE COURT:  The prosecutor is not going to take the

11   witness stand and testify, though.

12             MR. KERCHER:  Well, the reason I'm asking, Judge --

13   and this is not meant by way of criticism --

14             THE COURT:  Yes, it is, but go ahead.

15             MR. KERCHER:  Well, I just want -- what's good for the

16   goose is good for the gander.  We have objected to hearsay to a

17   number of witnesses called by the plaintiffs to testify what

18   people told them, and you have said, *Well, you can't tell me*

19   *their words, but you can tell me your personal knowledge.*  And

20   then the witness testified as if it was personal knowledge what

21   they only could have gained from that hearsay.  I understand

22   why the Court would rule like that in that context, but what

23   the Court is saying now about Mr. White and his capacity as a

24   prosecutor seems to be inconsistent with that.

25             THE COURT:  Anything else?

 1          MR. WASSDORF:  No, Your Honor.

 2          THE COURT:  Anybody else?

 3          So why don't you respond to that last point.  I'm

 4   getting criticized that I let in certain small designations

 5   of -- specifically, Ms. Callanen.  The argument is, good for

 6   the goose, good for the gander.  What's the response to that?

 7          MS. PERALES:  Your Honor, we asked for this

 8   information in discovery.  We had two rounds of requests for

 9   production of documents exactly on this issue.  State

10   defendants asserted the investigative privilege and other

11   privileges.  That's why we have a sword-and-shield problem

12   here.

13          My -- we are on -- if I could move, Your Honor, to

14   just a couple points in rebuttal.  Then my main point is, why

15   is this not like Ms. Callanen getting up and saying, This is my

16   work experience, is because we have been seeking this

17   information from the very beginning of this case.  And we have

18   been met with a wall of a privilege assertion.  We tried in

19   three depositions to get this information, and we were met with

20   a wall of a privilege assertion.  Because of that, we believe

21   that there is now a bar to State defendants using that

22   nonpublic information in testimony and also in this

23   declaration, which is part of the record and not at all moot,

24   because all of this is going up to the Fifth Circuit and is

25   certainly something that they can reach in and look at.

BENCH TRIAL PROCEEDINGS                    1453

1              I have a couple of other points in rebuttal, Your

2    Honor.  My friends on the other side have said that as cases

3    were closed, that information was provided.  That is not true.

4    Mr. White did not testify as to nonpublic information regarding

5    closed matters.  And I will point the Court to Mr. White's

6    testimony on August 11 under questioning from OAG counsel at

7    transcript 121, four through nine.

8              *"To the extent you were asked, did you provide all*

9    *information about close cases?"*

10             Answer, *"To the extent that they existed on the*

11   *spreadsheet and the publicly available information, I did."*

12             So I just want to be clear as a matter of fact that

13   nonpublic information about closed cases was not provided in

14   Mr. White's testimony.  This was not a trick question.  This

15   came from his own lawyer on redirect.

16             And then also if I can go forward a couple of more

17   slides, there is also Mr. White's testimony.  You know, my

18   friend Mr. Wassdorf says that sword-and-shield operates with

19   respect to specific information, and I want to give an example

20   of specific information.

21             Mr. White makes a number of very detailed statements

22   about fraud in assistance, in-person, in the polling place.

23   Mr. White says that fraudsters intercept voters, assign them

24   assisters, coerce them at the voting station.

25             Mr. White says that assisters latch on to voters.

1    It's vivid and extremely detailed language, and it goes to the

2    heart of one of the most important claims in this case, and it

3    also touches on voter assistance provided by LUPE plaintiffs,

4    specifically if the Court will recall the testimony of Tanya

5    Chavez.

6            So we asked Mr. White about those very specific

7    statements, "latching on to voters, assigning voters to

8    assisters."  And he could not come up with public information

9    for this.  And then resorts to *"general anecdotes, I might have*

10   *spoken with an investigator.  General memories."*  He then later

11   points to investigation files.  This is where his knowledge

12   comes from, and this is the material that we've been asking for

13   all along.

14           He has been a supervising -- he was a supervising

15   prosecuting attorney from 2018 to the end of 2022, so about

16   four and a half years, and so he was getting his information

17   from these case files and from his conversations with his law

18   enforcement investigators, right, the law enforcement officers.

19           If we can't see the case files and we have no idea

20   what conversation he had with his law enforcement officers,

21   it's not firsthand knowledge on his part.  He didn't interview

22   these witnesses.  We have absolutely no way to probe the

23   statements about the voter assisters, and that's just one

24   highlighted example.

25           My friends may have misspoken when they said that as

1    cases were closed, the investigation files were provided to us.

2    That's not the case.  We only received two investigation files.

3    They both had to do with poll watcher obstruction.  They were

4    both post-SB1.  We did not receive any other investigation

5    files; although we did receive public material about charging

6    documents and pleas or convictions.

7            I would just like to point out, Your Honor, I was

8    passed a note regarding Federal Rule of Civil Procedure 26(e).

9    Plaintiffs agree there is an ongoing duty to supplement.  And

10   as I mentioned earlier, it is not our burden to move to compel

11   when we have what we believe is a legitimate assertion of a

12   privilege like the investigative privilege and nothing on the

13   privilege log, or very few entries on the privilege log from

14   OAG custodians.  We are not psychic, and we don't know what's

15   being withheld or not identified.  And it was only in June with

16   the declaration of Mr. White that the sword-and-shield problem

17   emerged.

18           Finally, the Court asked -- or perhaps my friends on

19   the other side asked -- what do the plaintiffs plan to question

20   these witnesses about?  We have public information, and we have

21   the spreadsheet.  We plan to question the witnesses about the

22   public information that we were given as well as the

23   information on the face of the spreadsheet, just to answer any

24   question that happens to be floating out there.

25           Thank you, Your Honor.

BENCH TRIAL PROCEEDINGS                    1456

1          THE COURT:  So the "What's good for the goose is good
2   for the gander," I mean the problem with that analogy as far as
3   I can see is you weren't prohibited from getting any
4   information that Ms. Callanen rendered any kind of testimony
5   on.  Here, I have a real problem that you're using
6   sword-and-shield.  You keep asserting all these various
7   privileges, and at the same time then you want to present
8   witnesses who will talk about documents that you deliberately
9   will not provide.
10          MR. KERCHER:  I'm going to allow my colleague,
11   Mr. Wassdorf, to address what documents were withheld and why
12   it's not exclusively privilege, and if you give him just a
13   moment to clear that up.  It may make a difference to you or
14   not, but it's information you should have.
15          THE COURT:  Thank you.
16          MR. WASSDORF:  Your Honor, the -- Ms. Perales is
17   talking about the lack of information regarding the privileged
18   documents, the fact that they weren't included on the privilege
19   log.  But the fact is, as I was trying to show earlier, that
20   our response to the requests for production specifically
21   objected and stated that it was not including, within the scope
22   of responsive documents, the case files.  So that's the reason
23   that the case files were not logged on the privilege log,
24   because they were not included in the scope of responsive
25   documents to that request for production.

 1          THE COURT:  They weren't included in the scope?  They

 2   weren't included in the scope as you defined the scope.

 3          MR. WASSDORF:  Yes, Your Honor.

 4          THE COURT:  So didn't you have a responsibility to

 5   file a motion for protective order?

 6          MR. WASSDORF:  No, Your Honor, I don't believe so.

 7   That's a pretty standard practice to object and define the

 8   scope of what is being produced --

 9          THE COURT:  Not define the scope, redefine.  So the

10   scope is determined by the request.  And so you're saying,

11   then, you object to the request.  You have to provide with

12   specificity why you're objecting.  You did that, and then

13   you've got to say what documents you're willing to provide.

14   You apparently did that.  But if you weren't going to identify

15   any other documents in a privilege log, how is a requesting

16   party ever supposed to figure out what else you're not giving

17   up?

18          MR. WASSDORF:  Well, because in an ordinary

19   circumstance -- we've got two levels of things here.  We've got

20   the objection for which we define the scope of responsive

21   documents, and then we've got the privilege.  Because the case

22   files were never defined within the scope of responsive

23   documents to that request, they were never included on the

24   privilege log.  Plaintiffs had an opportunity to confer or file

25   a motion to compel with respect to the case files, at which

1    point they would have been subject to the privilege

2    requirements.  That never happened here, which was why they

3    were never disclosed.

4         THE COURT:  And I'm still left with -- I believe it's

5    Mr. White, but maybe it's also Mr. Ingram.  They're going to

6    take the stand and say, *Hey, well, I did all these*

7    *investigations in the past.  It could very well be that some of*

8    *these investigations never turned into a successful*

9    *prosecution, and so -- but because I investigated, there must*

10   *be rampant voter fraud, and so SB1 is good.*

11        Why isn't that just rank speculation?

12        MR. WASSDORF:  I don't think it's speculation, Your

13   Honor.  I think it is proper lay opinion, that based on his

14   experiences --

15        THE COURT:  How can it be proper -- what I just gave

16   you, how could that be proper lay testimony, that a mere

17   investigation is de facto evidence of voter fraud?

18        MR. WASSDORF:  I don't think it's the evidence of

19   voter fraud.  I think it is evidence that voter fraud could

20   exist, and that to ensure --

21        THE COURT:  So why isn't that speculation?

22        MR. WASSDORF:  The --

23        THE COURT:  So let's use it in an employment case as a

24   hypothetical.  If a plaintiff came up here and came up and

25   said, *I was discriminated on the basis of my race, sex,*

1    *national origin*, whatever, and then we've got a whole bunch

2    MeToo people come up and says, *I guess I also was discriminated*

3    *against on the basis of my race, sex, or national origin,* if

4    they all did all that and they all just conclusory state that

5    with no evidence to support that, that's not evidence at all.

6              And so why is that not the case here with Mr. White?

7              MR. WASSDORF:  He intends to testify based on his

8    experience in prosecuting election fraud cases the, you know,

9    potential gaps in the law that SB1 intended to fill, which is

10   generalized information, not specific to any one investigation,

11   but is just based on his years of experience.

12             THE COURT:  Thank you.

13             MR. WASSDORF:  Your Honor, one other issue.  I just

14   want to be clear on the record to the extent that you are going

15   to grant any motion, is it a motion in limine?  Is it a motion

16   to exclude?  If it is a motion to exclude, we would like to

17   reserve the right to make an offer of proof during our

18   case-in-chief.

19             THE COURT:  Thank you.  So here is the ruling with

20   regard to the unopposed motion to strike the declaration of

21   Mr. White.  It's the contention of all sides, correct me if I'm

22   wrong, that this is now moot, because the defendant's side does

23   not intend to rely on the declaration of Mr. White at all, so

24   that's now moot.

25             With regard to the remaining parts of the motion, I

1    consider this a motion in limine, and so Mr. White --

2    Messrs. White and Ingram, will be restricted to trial testimony

3    as to any documents that were previously provided to the other

4    side and any public information that was provided to the other

5    side.  They will not be provided to render any testimony on

6    nonpublic information related to voter fraud investigations.

7    They will not be allowed to testify because they were not --

8    it's uncontested they were not provided and designated as

9    experts, so they will not be able to provide any expert

10   testimony.  They will not be able to opine on any testimony

11   outside their personal knowledge, and they will not be able to,

12   like any other witness, render legal conclusions which are for

13   the Court and Court only.

14             MR. KERCHER:  May I ask a piece of clarification, Your

15   Honor?

16             THE COURT:  Yes, sir.

17             MR. KERCHER:  I understand the Court has limited the

18   testimony of these two witness to at least part of the

19   documents they have been provided regarding case files.  Both

20   of these gentlemen have been deposed -- in Mr. White's case

21   twice; in Mr. Ingram's case three times?

22             *(No response.)*

23             At any rate, they've been deposed numerous times.  May

24   we assume the topics about which they were questioned in their

25   depositions and received answers; that is, answers other than

1    the assertion of privilege where they refused to answer, that

2    they may provide courtroom testimony regarding testimony that

3    they have already provided in depositions subject to ordinary

4    evidentiary objections in the moment?

5         MS. PERALES:  Your Honor, plaintiffs object to that.

6    Much of the questioning that we did in deposition was, *So you*

7    *say this,* and then the answer, *Well, yes, I think this is*

8    *what's happening.*  And then all the subsequent questions.  *Did*

9    *you disclose documents?  No.  Did you search for these types of*

10   *documents?  I don't remember.  Where did you get this*

11   *information from?  I got it from a conversation with my*

12   *investigator*, and so forth.

13        And so whether or not the witness tried to shoehorn

14   some of his thoughts or ideas into his testimony does not make

15   it admissible now under the Court's ruling.

16        THE COURT:  So I'm only going to entertain their trial

17   testimony, Mr. White's and Mr. Ingram's trial testimony, and

18   not rely on the depo testimony.

19        With regard to your other request, though, that is

20   granted.  So once the testimony of Mr. White and Mr. Ingram are

21   completed, then we'll continue with them for the purposes of

22   providing a record for the questions that the State side would

23   have liked to have asked and which I precluded.

24        MR. KERCHER:  Understood, Your Honor.  And just as a

25   matter of housekeeping and for clarity, give the Court a sense

1   of what to expect -- we communicated this with some of

2   plaintiff's counsel -- they intend to call three state

3   witnesses on Friday.  It is has been the State's intention to

4   call those -- as part of their case-in-chief.  It's been the

5   state's intention to recall them as part of our case-in-chief,

6   so any questions we anticipate doing with the witnesses on

7   Friday will be perfunctory and just cleaned up.  We will

8   reserve the bulk of our questions for those witnesses for our

9   case-in-chief.  Thank you.

10          THE COURT:  So do we have any more witnesses for

11   today?

12          MS. PERALES:  Your Honor, I believe that we do.  If

13   the Court would give us a moment to switch chairs.

14          MS. HARRIS:  Your Honor, Ashley Harris for OCA

15   plaintiffs.  Plaintiffs call Daniel Hayes, the assistant

16   division director for Travis County, to the stand.

17          Mr. Hayes' testimony will go to several of OCA's

18   claims.  The Americans with Disabilities Act and Rehabilitation

19   Act claims against Section 5.02, 5.03, 5.07, 512, and 6.04.

20   And the Section 208 of the Voting Rights Act claim against

21   Section 6.06.

22          Your Honor, I request permission to ask leading

23   questions under Rule 611, because Mr. Hayes is a witness

24   identified with an adverse party, Travis County Clerk.

25          THE COURT:  Any response?

```
1              MR. KERCHER:  No objection.

2              MR. WASSDORF:  No objection.

3              THE COURT:  You may.

4              COURTROOM DEPUTY CLERK:  Raise your right hand.

5                          *   *   *

6         (Oath administered and DAN HAYES, witness,

7         Sworn.)

8                          *   *   *

9                      DIRECT EXAMINATION

10   BY MS. HARRIS:

11   Q.  Good morning, Mr. Hayes.  How are you?

12   A.  Doing well.  Thank you.

13   Q.  Can you please state your name for the record?

14   A.  Dan Hayes.

15   Q.  What is your educational background?

16   A.  I have a Master's degree in English and biology from Steven

17   F. Austin University and I was working on my Master's in

18   education at Texas State.

19   Q.  You previously worked at the Bastrop County Elections

20   Division, correct?

21   A.  Yes.

22   Q.  How long did you work for Bastrop County?

23   A.  I started working as an election clerk in 2009.  And I

24   worked in the office from 2017 to '19.

25   Q.  And you currently work at the Travis County Clerk's Office,
```

1   correct?

2   A.   I do.

3   Q.   When did you start working at the Travis County Clerk's

4   Office?

5   A.   March or April of 2020.

6   Q.   And your current job title is assistant division director,

7   correct?

8   A.   Correct.

9   Q.   You work in the ADA section at the Travis County Clerk's

10  Office, correct?

11  A.   I manage, yes, that section.

12  Q.   And as a manager, you supervise the division?

13  A.   Correct.

14  Q.   That section is also referred to as the ADA Division,

15  correct?

16  A.   Yes.

17  Q.   If I continue to refer to the ADA, will you know that I'm

18  referring to the Americans With Disabilities Act?

19  A.   I will.

20  Q.   The ADA Division was established in 2022, correct?

21  A.   Correct.

22  Q.   And as part of your job, you're familiar with the ADA?

23  A.   Somewhat, yes.  I manage the people that are more intimate

24  with it, using it on a daily basis then I am.

25  Q.   And you manage them in that work with the ADA?

Dan Hayes - Examination                    1465

1    A.   Yes.

2    Q.   Are you familiar with the Rehabilitation Act?

3    A.   Not by the name.

4    Q.   More specifically, are you familiar with the Rehabilitation

5    Act in the context of prohibiting discrimination on the basis

6    of disabilities in programs that receive federal funding?

7    A.   Yes.

8    Q.   And the Travis County Elections Office receives federal

9    funding, correct?

10   A.   That's not something I can speak to.  I'm not in charge of

11   distributing funds, asking for funds, or anything like that.

12   Q.   Is there someone in your office; namely, Bridgette Escobedo

13   or Charlie Johnson who can speak more specifically to that

14   federal funding to the elections office?

15   A.   I would refer you to Bridgette.

16   Q.   And you're familiar with Section -- are you familiar with

17   Section 208 of the Voting Rights Act?

18   A.   Would you refresh my memory?

19   Q.   I can.  Are you familiar with Section 208 of the Voting

20   Rights Act which requires that voters who need assistance for

21   disabilities or for an inability to read or write may be given

22   assistance by a person of the voter's choice?

23   A.   I am.

24   Q.   Are you aware, generally, that your county has legal

25   obligations regarding voters with disabilities?

1    A.   Yes.

2    Q.   And your county has an obligation to ensure that voting by

3    mail is accessible to voters with disabilities, correct?

4    A.   Correct.

5    Q.   You are familiar with the right of a voter with a

6    disability to ask for reasonable accommodation under the ADA,

7    correct?

8    A.   Correct.

9    Q.   Your office has written ADA policies, correct?

10   A.   We have some, yes.

11   Q.   And those ADA policies are based only on federal ADA

12   guidelines, correct?

13   A.   They are based on both -- what I deal with is mostly what

14   our ADA division deals with mostly, is physical access to

15   polling locations.  So those guidelines are federal.  And then

16   the state has some as well that follow those, so we have to

17   meet state code, election code, essentially, but it is

18   influenced, obviously, guided by the Americans with

19   Disabilities Act.

20   Q.   And when you say "state guidelines," you're referring to

21   the Texas Election Code?

22   A.   Yes, I am.

23   Q.   Your office's written ADA policies don't explain how your

24   office should provide accommodations in specific situations,

25   correct?

Dan Hayes - Examination                    1467

1    A.  That is not correct.

2    Q.  Okay.  Can you expand on that?

3    A.  Accommodations, as we understand it, do deal with

4    assistance.  Our voters' request for assistance, witnesses,

5    access to the polling location, moving to the front of the

6    line, if they have mobility issues.  We have guidelines for

7    that as well, yes.

8    Q.  And so your office's ADA guidelines deal only with physical

9    accommodations, correct?

10   A.  For the part that I manage, yes.

11   Q.  And the Texas Election Code does not deal with

12   accommodations for mail-in voting, correct?

13   A.  I'm not sure what you're asking, to be honest.  If you

14   could expand on that a little bit what you're asking.

15   Q.  Sure.  I can back up a little bit.  Your office's written

16   ADA guidelines, do they address accommodations for voters

17   voting by mail?

18   A.  I'm hesitating simply because the Ballot-by-Mail

19   Department, which falls under Charlie Johnson, but part of the

20   code addresses what we would consider accommodations:  The use

21   of a witness, the use of hand delivery, different methods of

22   accomplishing the ballot-by-mail, the application and the

23   ballot-by-mail process, and that's addressed by election code,

24   and we do follow the Texas Election Code in that regard, those

25   requirements.

Dan Hayes - Examination                    1468

1   Q.  So what you're thinking of is when someone uses their own

2   assistant to help them vote by mail?

3   A.  Correct.

4   Q.  But there are no other accommodations that your office can

5   grant specific to vote by mail?

6   A.  I have never had a request for specific accommodation

7   regarding ballot-by-mail in that regard.

8   Q.  If you were to receive an accommodation about voting by

9   mail, your office couldn't violate a provision of the election

10  code to make that accommodation, correct?

11  A.  That's our understanding, yes.

12  Q.  And more specifically, if the election code had an express

13  requirement like matching an ID number on a mail ballot in

14  order to count it, you wouldn't violate that requirement even

15  if a voter with a disability asks you as part of an

16  accommodation, correct?

17  A.  There is a provision on both the application for

18  ballot-by-mail and the carrier envelope where if a person has

19  not been issued an ID that is a process, so that I don't --

20  that would be an accommodation to some degree, but if they have

21  an ID, and it's on record with their voter registration record,

22  they would have to provide, according to code, and we would

23  have to follow that under our understanding of the law.

24  Q.  So other than those situations where someone can mark a

25  space that says they don't have either ID number, your office

Dan Hayes - Examination                    1469

1   couldn't grant an accommodation for someone about their ID

2   number and mail-in voting, correct?

3   A.  Could you restate that again?

4   Q.  Sure.  So the same question.  Setting aside that issue

5   where folks might not have either ID number.  For anyone else,

6   your office could not grant an accommodation request about ID

7   numbers and mail-in voting, correct?

8   A.  If they have one of the ID numbers required in code and it

9   is associated with their VR record, and they do not provide it

10  on the two -- either the application or the ballot by carrier,

11  we cannot provide an accommodation that grants them an

12  exception to that policy, correct.

13  Q.  And have you ever known someone to be able to mark that

14  spot that says they don't have either ID number?

15  A.  I don't see those on the daily, so I have not seen those

16  personally.

17  Q.  If you were to be presented with a request for reasonable

18  accommodation that you thought conflicted with the election

19  code, you would consult the Secretary of State's office about

20  that request?

21  A.  If it's -- if it is a question that we don't have the

22  answer to, yes, we would consult with the SOS.

23  Q.  And if you consulted with them, based on your experience,

24  it could be difficult to get a timely response from the

25  Secretary of State about an accommodation request near an

Dan Hayes – Examination                            1470

1    election, correct?

2    A.   During election time, they are very busy, and they may not

3    answer in a timely, immediate fashion, yes.

4    Q.   And revisiting accommodations, generally.  You can't grant

5    them, if they violate the Texas Election Code, correct?

6    A.   That's our understanding of the code, yes.

7    Q.   Your office does not provide ADA training to election

8    workers about ID requirements in mail voting, correct?

9    A.   I'm hesitant, simply because the election clerks that we

10   provide ADA training to deal with the physical aspect,

11   generally, of the polling location, those accommodations mostly

12   for mobility; some other impairments.  ID requirements for

13   ballot-by-mail in that regard, they don't deal with that, what

14   I'm calling our poll workers.

15   Q.   And to clarify, they don't deal with those ID requirements

16   in mail voting?

17   A.   In mail voting, no.

18   Q.   The Department of Justice, or DOJ, provides ADA training to

19   your office, correct?

20   A.   They have, yes.

21   Q.   And those DOJ trainings are also limited to in-person,

22   physical accommodations, correct?

23   A.   Correct.

24   Q.   And more specifically, those DOJ trainings do not cover

25   anything related to ID numbers when voting by mail, correct?

Dan Hayes - Examination                         1471

1   A.  Correct.

2   Q.  The Secretary of State's office has not provided any

3   guidance to Travis County about how SB1 affects voters with

4   disabilities, correct?

5   A.  Specifically, I can't think of anything.

6   Q.  And the Secretary of State's office has not provided any

7   training to Travis County about how SB1 affects voters with

8   disabilities, correct?

9   A.  Other than I would say -- I would answer with the provision

10  that if they've not been issued an ID, they have that option.

11  If they require a witness or assistance, that's been trained as

12  well.  That could fall under the purview of an ADA voter or

13  ballot-by-mail.

14  Q.  And none of that guidance covers the ID numbers on mail

15  ballot or mail applications, correct?

16  A.  The training for -- BBM, ballot-by-mail, it does outline

17  the requirements for the numbers and what to do, what the

18  voters should provide in regard to the application of the

19  ballot-by-mail.

20          (Court reporter clarification.)

21          THE WITNESS:  The ADA -- the SOS, ADA, the ID numbers.

22  Back up.  The ID numbers and the training that the SOS has

23  provided, they do provide the requirements for the driver's

24  license, ID numbers, Social Security, and the conditions for

25  them not having them, and the exception with saying -- checking

Dan Hayes - Examination                    1472

1    the box saying they've not been provided, as well as the use of

2    assistance and witnesses in that process.

3    BY MS. HARRIS:

4    Q.  And that information from the Secretary of State's Office

5    is not specific to voters with disabilities, correct?

6    A.  Not to my recollection.

7    Q.  Your office has not provided any voter education pertaining

8    to the effects of SB1 specifically on voters with disabilities,

9    correct?

10   A.  Specifically, no.

11   Q.  When there are mail ballot rejections because of ID errors,

12   your office does not physically take those ballots to voters

13   with disabilities for correction, correct?

14   A.  No, we do not.

15   Q.  Is it correct that you don't take those ballots to voters

16   with disabilities in-person because the Secretary of State's

17   office advised you it would then have to be done for all voters

18   in need of ID corrections?

19   A.  That is correct.

20   Q.  With the number of voters in Travis County, that would not

21   have been feasible, correct?

22   A.  That is correct.

23   Q.  In your experience working in elections, is it your

24   understanding that certain voters with disabilities choose to

25   vote by mail because they face challenges with voting

1   in-person?

2   A.   Those are assumptions that I'm not willing to make.   One

3   assumes that voters vote by mail because they can't or choose

4   not to go to a physical polling location.

5   Q.   In your experience working in elections, is it your

6   understanding that a voter with memory problems could have

7   difficulty remembering which ID numbers they used on their

8   voter registration form?

9   A.   Yes.

10  Q.   And if that voter requested an accommodation that they not

11  be required to input their ID numbers on their vote-by-mail

12  application, it would be denied, correct?

13  A.   It would be flagged for curing, and they could cure it in a

14  multiple -- in multiple ways, they could fix it.   If they have

15  the number associated with their VR record, they would be

16  required to provide it in some manner.

17  Q.   And no other accommodation could be provided to them that's

18  not provided to all voters, including those without

19  disabilities?

20  A.   Correct.

21  Q.   And that is because that would violate the Texas Election

22  Code?

23  A.   Yes.   That's the policies, procedures, and code, yes.

24  Q.   And that same voter with memory issues could have the same

25  issue on their carrier envelope, correct?

Dan Hayes - Examination                    1474

1    A.  Correct.

2    Q.  And if that voter requested a similar accommodation for

3    their mail-in ballot and carrier envelope, that would be

4    denied, correct?

5    A.  You're talking about the accommodation to not having to

6    provide the ID number?

7    Q.  Yes.

8    A.  Yes, they would not be allowed to be accepted.

9    Q.  In your experience working in elections, is it your

10   understanding that a voter with certain physical disabilities

11   could have difficulty writing an ID number legibly on an

12   application to vote by mail?

13   A.  I've seen something similar, yes.

14   Q.  And if that voter requested an accommodation that they not

15   be required to input their ID number on their vote-by-mail

16   application, it would be denied, correct?

17   A.  They would have to cure that, yes.

18   Q.  And they wouldn't be provided with another accommodation

19   because that would violate the Texas Election Code, correct?

20   A.  There's no provision in the code that I know of, that our

21   office knows of, that would allow them not to provide the ID

22   numbers as required by election code, if they have those ID

23   numbers associated with their voter registration record.

24   Q.  And that would be the same if that voter with physical

25   disabilities requested an accommodation for their mail ballot

Dan Hayes - Examination                    1475

1  carrier envelope, correct?

2  A.  Correct.

3  Q.  In your experience working in elections, is it your

4  understanding that a voter with a learning disability could

5  incorrectly copy their ID number on to a vote-by-mail

6  application?

7  A.  I wouldn't limit that to learning disabilities.  Other

8  people have done the same thing.  So, yes, anyone can do it.

9  Q.  And many voters with disabilities, like learning

10  disabilities, could have that happen to them because of their

11  disability, correct?

12  A.  Yes.

13  Q.  And if a voter with a learning disability in that situation

14  requested an accommodation that they not be required to input

15  their ID numbers on their vote-by-mail application, it would be

16  denied, correct?

17  A.  Same answer as before, yes.  They would have to cure it in

18  some manner.

19  Q.  And that same voter would have an accommodation request

20  denied for their mail ballot carrier envelope, correct?

21  A.  Correct.

22  Q.  In your experience working in elections, is it your

23  understanding that a voter in an out-of-home placement such as

24  a nursing home may not have ready access to documents with

25  their ID numbers which they would need for a vote-by-mail

1    application?

2            MR. WASSDORF:  Objection, Your Honor, calls for

3    speculation.

4            THE COURT:  Can you repeat that?

5            MS. HARRIS:  Your Honor -- and just up front, this is

6    based on the witness's experience in elections.

7            THE COURT:  Repeat your question.

8    BY MS. HARRIS:

9    Q.  In your experience working elections, could a voter in an

10   out-of-home placement such as a nursing home not have ready

11   access to documents with their ID numbers?

12           THE COURT:  Can you answer that without speculating?

13           THE WITNESS:  No.

14           THE COURT:  Next question.  Sustained.

15   BY MS. HARRIS:

16   Q.  I want to briefly switch gears away from ADA and talk about

17   voter education generally.  Leading up to the November 2022

18   election, your office created social media posts educating

19   voters about SB1's vote-by-mail ID requirements, correct?

20   A.  Correct.

21   Q.  And these social media posts advised voters to include both

22   ID numbers on their vote-by-mail forms, correct?

23   A.  Correct.

24   Q.  And your office's goals with those social media posts was

25   to reduce the numbers of vote-by-mail reductions, correct?

Dan Hayes – Examination                    1477

1    A.  Correct.

2            MS. HARRIS:  I pass the witness.

3            THE COURT:  Anything else on this side?  Anything else

4    over here?

5        (4:09 p.m.)

6                    CROSS-EXAMINATION

7    BY MR. WASSDORF:

8    Q.  Good afternoon.  Let's just jump right into it and start

9    talking about accommodations.  A voter with a disability can

10   request an accommodation with respect to voting, correct?

11   A.  As I understand the Code, yes.

12   Q.  And there are a number of ways that a voter can request an

13   accommodation from Travis County?

14   A.  Correct.

15   Q.  You can request an accommodation in-person at your office?

16   A.  True, yes.

17   Q.  Somebody could request an accommodation in-person at a

18   voting site?

19   A.  Correct.

20   Q.  You could request an accommodation by phone?

21   A.  For informational purposes, yes, I could see that.

22   Q.  Or by e-mail?

23   A.  Yes.

24   Q.  During early voting, I believe Bridgette Escobedo is the

25   final determiner of whether an accommodation is going to be

Dan Hayes - Examination                    1478

1    granted; is that correct?

2    A.  The -- during early voting, the Travis County Clerk is the

3    early voting clerk.  She is -- it happens to be female.  She is

4    the final -- she's in charge of running the elections.  It

5    would fall to her.

6    Q.  And on Election Day, at in-person voting at a polling site,

7    the election judge is the final decision as to whether an

8    accommodation is granted?

9    A.  The presiding judge has the authority to run it, yes.  They

10   run the polling location.

11   Q.  Now, poll workers are trained not to question someone's

12   representation of a disability; is that right?

13   A.  For the purposes of curbside voting or moving voters to the

14   front of the line upon request, that's true, yes.

15   Q.  And that is just out of respect for the voter?

16   A.  And as training from the SOS as well, yes.

17   Q.  And you believe that that is at least based in part on the

18   fact that not all disabilities are immediately perceivable by

19   visual observation?

20   A.  Yes.

21   Q.  And because the election code just doesn't require a

22   disabled voter to prove their disability?

23   A.  Correct.

24   Q.  Now, whether someone needs an accommodation can vary

25   depending on someone's disability; is that right?

Dan Hayes – Examination                    1479

1    A.  I imagine so, yes.

2    Q.  And depending on an individual's specific needs, what

3    specific accommodation they require could also vary?

4    A.  Correct.

5    Q.  Now, you are not aware of receiving any accommodation

6    requests with respect to mail-in voting; is that correct?

7    A.  That's correct.

8    Q.  And you know of no formal or informal requests for

9    reasonable modification to voting procedures during the

10   March 2022 primary, for example?

11   A.  I don't -- regarding ballot-by-mail or?

12   Q.  Any requests for modification of a voting procedure.

13   A.  Other than curbside, they're utilizing current procedures

14   to affect the accommodation or to achieve the accommodation, if

15   that answers.  So I don't know of any -- outside of that.

16   Q.  Let me ask a better question.

17       So outside of the ordinary accommodation procedures; for

18   example, curbside voting, you're not aware of any additional

19   accommodation requests that any voter made during the

20   March 2022 primary?

21   A.  That's correct.

22            (Court reporter clarification.)

23            THE WITNESS:  That's correct.

24   BY MR. WASSDORF:

25   Q.  And you have not received any complaints regarding the ADA;

Dan Hayes - Examination                    1480

1    is that right?

2    A.  We have received complaints in our office about some

3    signage concerns, about it not being visible.  Parking spaces,

4    things like that, so we have received some concerns.  I would

5    call them complaints.  They call our office, and then we

6    adjust -- we survey the issue and adjust as necessary.

7    Q.  So those are complaints regarding requirements of the ADA

8    itself?

9    A.  Yes.

10   Q.  You are not aware of any voter who has made a request for

11   an accommodation to not be required to provide an ID number on

12   a mail-in ballot?

13   A.  Not personally, no.

14   Q.  And you're not aware of any voter who has requested an

15   accommodation or modification due to any provision of Senate

16   Bill 1?

17   A.  Not personally, no.

18   Q.  You have never had to deny an accommodation request that

19   you didn't receive?

20   A.  If I don't receive it, I can't deny it or accept it; so,

21   no.

22   Q.  If a voter doesn't have a driver's license or Social

23   Security number, they have another option that they can use to

24   still utilize mail-in voting; is that right?

25   A.  Correct.  Well, if they have been issued one and the number

1    is associated with their voter registration record, they must

2    provide it.  If they've not been issued the required ID's, then

3    there is a method for them to state that -- sign and attest to

4    that on the application and the carrier.

5    Q.  And so someone either has a driver's license or Social

6    Security number or doesn't, and either way they have a way to

7    cast a mail-in ballot?

8    A.  Yes.

9    Q.  Now, the Secretary of State has never advised you not to

10   issue an accommodation because it conflicts with the election

11   code, have they?

12   A.  If someone requested an accommodation -- the SOS has

13   advised us that the ID requirements in this regard, in this

14   scenario we're talking about, that the ID's must be presented

15   on the pertinent application or carrier envelope if they've

16   been issued.  Now, if someone were to say they don't want to or

17   they don't have it, they lost it, that's an accommodation that

18   the SOS -- we've been told explicitly, trained by the SOS, that

19   if the number has been associated with the VR record, it must

20   be provided on the requisite form.

21   Q.  But you haven't been told that in respect to a request for

22   accommodation, have you?

23   A.  In so many words, no.

24   Q.  Let's pull up Joint Exhibit 1, Section 1.08.  So Section

25   1.08 of Senate Bill 1 here adds Section 1.022 of the Texas

 1   Election Code and reads, *"Reasonable accommodation or*
 2   *modification.  A provision of this code may not be interpreted*
 3   *to prohibit or limit the right of a qualified individual with a*
 4   *disability from requesting a reasonable accommodation or*
 5   *modification to any election standard, practice, or procedure*
 6   *mandated by law or rule that the individual is entitled to*
 7   *request under federal or state law."*
 8        Did I read that correctly?
 9   A.  As far as I can tell, yes.
10   Q.  Are reasonable accommodations mandated by federal or state
11   law?
12   A.  I believe the ADA.  Reasonable accommodations are
13   requested.
14   Q.  So would this provision not accept from the requirement,
15   the ID requirement, somebody who requested and needed an
16   accommodation to not be able -- to not be required to submit an
17   ID number?
18   A.  I'm no attorney.  If that question arose, I would
19   request -- our office would request the advice and input from
20   the Secretary of State's office.
21   Q.  I asked you this question during your deposition last year.
22   Did you go ask the Secretary of State's office about this issue
23   after I raised this provision with you?
24   A.  I did not.
25   Q.  You can take that down.

1      Let's talk about cure for a moment.  There are multiple

2  ways a person can cure a defective application for

3  ballot-by-mail or a ballot-by-mail; is that right?

4  A.  Yes, that is true.  That's -- that's a division within

5  our -- that's a department within our division that I don't

6  manage, and it has changed.  There would be other people that

7  would be able to speak to that more closely and intimately, but

8  I can answer some questions about that.

9  Q.  We're just going to cover a couple of general questions.

10 They can cure in-person?

11 A.  They can.

12 Q.  And they can use an online ballot tracker to cure some

13 defects?

14 A.  Yes.

15 Q.  And they can submit a new voter registration form to get

16 their ID number in the voter registration system?

17 A.  That's correct.

18 Q.  And counties can also take the ballot to the voter

19 in-person to allow them to cure?

20 A.  As mentioned earlier, we have that authority, but we must

21 do it to every voter equally across the board in the county, to

22 all the voters that request it.

23 Q.  Let's pull up Joint Exhibit 6, page 4.  Let's look at the

24 section entitled *"Uniform treatment of voters."*

25      So this is an advisory from the Secretary of State's

Dan Hayes – Examination                    1484

1   office, and this section reads, *"If an early voting clerk*
2   *chooses to notify voters of defects in their carrier envelope*
3   *under Section 86.011 (D) The clerk must apply these procedures*
4   *uniformly to all voters in similar circumstances.  The*
5   *Secretary of State recommends keeping a log to track the*
6   *ballots mailed to voters and the ballots in the possession of*
7   *the early voting clerk before the ballots are delivered to the*
8   *SVC or EVBB."*
9       Did I read that correctly?
10  A.  I believe so, yes.
11  Q.  Does this not mean that you could apply your own criteria
12  for determining which voters to utilize that procedure with;
13  for example, with homebound voters, as long as you applied that
14  to all homebound voters?
15  A.  I'm sure it could be read that way.  We would seek guidance
16  on that selective categorization.
17  Q.  Have you sought guidance?
18  A.  We have not.
19  Q.  Now, Travis County also seeks to educate voters on the
20  requirements of SB1; is that correct?
21  A.  Correct.
22  Q.  Including the ID requirement?
23  A.  Yes.
24  Q.  Your office included an insert with the applications for
25  ballot-by-mail and the ballot-by-mail's carrier envelopes that

Dan Hayes - Examination                    1485

1  pointed out the ID requirement; is that correct?

2  A.  That is correct.

3  Q.  Could we look at State's 71 and 72?

4     And so this is the insert for the application for

5  ballot-by-mail that says, "Don't forget your ID numbers" and

6  instructs that Travis County recommends providing both the

7  driver's license and the last four of the Social Security

8  number; is that correct?

9  A.  That's correct.

10 Q.  And do you know -- well, one of these has the numbers

11 filled out, and one doesn't.  Are both included in the

12 envelope?

13 A.  No.  The first on my left, I'm assuming it's -- the first

14 one that does not have the numbers, was the initial format that

15 we developed.  And then with feedback and consultation within

16 our office, we decided to go ahead and use an example, fill

17 them out as an example for the voters, just so it's as explicit

18 as we could possibly make it.

19 Q.  I believe both of these have already been admitted.  Let's

20 take a look at State 69 and 70 now.

21    And are these the same inserts, but this time for the

22 ballot itself as opposed to the application?

23 A.  It goes in the ballot package, correct, yes.

24 Q.  And same circumstance:  The ones with the numbers is the

25 more updated version?

Dan Hayes – Examination                    1486

1    A.  Correct.

2            MR. WASSDORF:  Your Honor, these documents are not in

3    evidence.  I move to admit State 69 and 70.

4            THE COURT:  Any objection?

5            MS. HARRIS:  No objection.

6            THE COURT:  Sixty-nine and 70 State are admitted.

7            MR. WASSDORF:  I need to do that the other way around,

8    Your Honor.  69 and 70 are already admitted.  I need to move

9    into evidence 70 and 71, excuse me.

10           THE COURT:  You just said 69 and 70.  So what are the

11   numbers?

12           MR. WASSDORF:  I got it backwards, Your Honor.

13   Sixty-nine and 70 are already in evidence.  Seventy and 71 need

14   to be moved into evidence.  That's the insert for the

15   application for ballot-by-mail.

16           THE COURT:  I'm confused.  You said 69 and 70 have

17   already been admitted, and you want 70 and 71?

18           MR. WASSDORF:  I just flopped them, Your Honor.

19           THE COURT:  Am I missing something?  You're saying 70

20   twice, aren't you?

21           MR. WASSDORF:  Seventy-one and 72.  Excuse me.

22           THE COURT:  Thank you.  I want to make sure I got the

23   right numbers.  State 71 and 72, any objections?

24           MS. HARRIS:  No objection.

25           THE COURT:  Seventy-one and 72 are admitted.

1        MR. WASSDORF:  It's right on my paper.  I swear it.

2        MS. PERALES:  Your Honor, no objection to whatever

3   those numbers were.  Thank you.

4        THE COURT:  Thank you.

5   BY MR. WASSDORF:

6   Q.  You are also responsible for training poll workers; is that

7   right?

8   A.  I manage the department that trains poll workers, yes.

9   Q.  And you have a poll worker manual that you use to train

10  them or give them as informational resource?

11  A.  Yes.

12  Q.  Let's pull up State 240.  Is this that manual?

13  A.  It is one, yes.

14       MS. HARRIS:  Objection, Your Honor.  This is beyond

15  the scope of the direct testimony which didn't include

16  discussion of poll workers.

17       THE COURT:  So I'm not going to make them bring it

18  again.  Let's just take care of this witness so he can get on

19  with his life.  So overruled.

20       MR. WASSDORF:  Thank you, Your Honor.

21  BY MR. WASSDORF:

22  Q.  Could we scroll down to the table of contents.  Looking at

23  this table of contents, it appears that this manual applies

24  specifically to poll workers at physical polling locations; is

25  that right?

1    A.   That's correct.

2    Q.   And it looks like in the last section under -- section on

3    page 54, Serving Voters with Disabilities and Voter Assistance

4    are there.  So this manual advises poll workers on how to deal

5    with voter assistance and voters with disability?

6    A.   That's correct.

7              MR. WASSDORF:  Your Honor, I'd move to admit state

8    240.

9              THE COURT:  Any objection?

10             MR. SALDIVAR:  No objection.

11             THE COURT:   240 is admitted.

12   BY MR. WASSDORF:

13   Q.   You also deal with voting locations, both during early

14   voting period and on Election Day; is that right?

15   A.   Yes.

16   Q.   Let's look at State 265.

17        And so these are a list of all the voting locations for the

18   early voting period during the November 2020 general election;

19   is that right?

20   A.   That looks correct.

21   Q.   Do you know how many voting locations there were during

22   that early voting period?

23   A.   I don't remember.

24   Q.   I won't make us go and count them.  Don't worry.

25        Let's pull up State 266.

1      So this is the list of vote centers for Election Day during
2  the November 2020 general election; is that right?
3  A.  This particular page doesn't have all of them.  There we
4  go.  Yes.
5  Q.  And there are more voting locations on Election Day than
6  there are during early voting; is that right?
7  A.  That's correct.
8  Q.  Now let's look at State 267.  And so this is a list of the
9  early voting locations for the March 2022 primary; is that
10 right?
11 A.  Looks correct, yes.
12 Q.  And it looks like it's roughly the same number of locations
13 as there were during the 2020 general election; is that right?
14 A.  Approximately, yes.
15 Q.  Now let's look at State 268.
16     And so this is for Election Day during the March 2022
17 primary; and, likewise, it appears that there are the same
18 number, approximately, as there were during the March 2020
19 primary?
20 A.  That's correct.
21 Q.  Now let's look at State 269.  Is this a list of the early
22 voting locations for the May 7, 2022 local election?
23 A.  Yes, it looks like it.
24 Q.  And likewise, the early voting locations, it looks like it
25 was about the same number?

1   A.  Yes.

2   Q.  Let's go to State 270.  This is Election Day voting

3   locations for the May 2022 local election.  And again, it looks

4   like there's approximately the same number of locations during

5   the May 2022 local election as there was during the

6   November 2020 and March 2022 elections for Election Day?

7   A.  On Election Day, the May elections have probably 20 to 30

8   less Election Day voting locations than the general elections

9   in November and even-numbered years; so an approximation,

10  within 20 or 30.

11          MR. WASSDORF:  Your Honor, I would move to admit State

12  265 through 270.

13          MS. HARRIS:  No objection.

14          THE COURT:  State 265 through 270 are admitted.

15  BY MR. WASSDORF:

16  Q.  Let's talk a little bit about the 2022 general election.

17  In 2022, Travis County had both in-person and mail-in voting

18  options; is that right?

19  A.  That's correct.

20  Q.  And Travis County gave ample opportunity for voters to vote

21  in-person?

22  A.  We followed what's prescribed in the Texas Election Code as

23  far as dates and hours.  Whether it's ample or not, we follow

24  the Code.

25  Q.  And in the 2022 general election, you would consider the

1    in-person voting to have been a success?

2    A.   I would define -- I would say that we provided a fair

3    election, a clean election, and an accurate election, yes.

4    Q.   And that would apply to both in-person and mail-in voting

5    options?

6    A.   I would think that we -- we accomplished our

7    responsibilities and our duties very well.

8    Q.   And you are not aware of any person during the 2022 general

9    election who desired to vote but who was not able to because of

10   any provision of Senate Bill 1?

11   A.   I can't remember -- I wouldn't be able -- I cannot remember

12   anything specifically right now.

13            MR. WASSDORF:  Pass the witness, Your Honor.

14            THE COURT:  Anything else from this side?

15            MR. NICHOLS:  No.  Thank you for your work, sir.

16            MS. HARRIS:  We have a couple more questions.

17            (4:33 p.m.)

18                        REDIRECT EXAMINATION

19   BY MS. HARRIS:

20   Q.   Just a couple more questions, Mr. Hayes.

21        First, you testified that the Secretary of State provided

22   training that hadn't, quote, in so many words, instructed you

23   not to deny an accommodation request to not include ID numbers

24   on vote-by-mail forms.  But is it your general understanding

25   that the Secretary of State's instruction is that you cannot

1    grant an accommodation request not to include those ID numbers?

2    A.  That's my understanding, correct.

3    Q.  And you also discussed an option for voters who don't have

4    an ID, a checkmark box.  There are people who have been issued

5    a driver's license or Social Security number but no longer

6    possess them, correct?

7    A.  I could imagine that being the case.

8    Q.  And those people can't check that box, correct?

9    A.  I don't believe they could check it and be honest about it.

10   Q.  The Texas Election Code doesn't allow for that?

11   A.  Right.

12   Q.  And with respect to whether you could go to the homes of

13   voters with disabilities to help cure their ballots -- to have

14   them cure their ballots, your testimony is that the Secretary

15   of State told you you could not do that unless you went to all

16   of the voters' homes that needed to cure their ballots,

17   correct?

18   A.  That's my understanding, yes.

19            MS. HARRIS:  That's all.  Thank you.

20            THE COURT:  Anything based on those?

21            MR. WASSDORF:  One question, Your Honor.

22                        RECROSS-EXAMINATION

23   BY MR. WASSDORF:

24   Q.  A moment ago you testified in response to my question that

25   Secretary of State's office had not advised you that to not

Dan Hayes - Examination                        1493

1   provide an accommodation with respect to the ID requirement; is

2   that right?

3   A.  Would you restate that for me, please?

4   Q.  I apologize.  In your prior testimony, you stated that the

5   Secretary of State's office had not advised you with respect to

6   providing an accommodation to a voter to not have an ID on

7   their mail-in ballot or application; is that right?

8   A.  If I understand your question correctly, they have not used

9   that express language, that explicit language with us.

10  Q.  Just a moment ago you testified that it was your general

11  understanding that that was their position, so if they have not

12  told you that, I'm trying to figure out where you're getting

13  that general understanding.

14  A.  The Texas Election Code mandates that on an application for

15  ballot-by-mail as well as the carrier envelope returned by the

16  voter that if the voter has an ID number associated with their

17  voter registration record, those numbers must be included on

18  the application or the carrier envelope.  They have not

19  expressly said -- SOS being "they" -- have not expressly told

20  us that these certain accommodations are an exception or an

21  exemption from that requirement in the Code except what I've

22  already stated before, as if they've not been issued, there is

23  an avenue for the voter to check that boss and attest that they

24  have not been issued.  And then that avenue -- that requirement

25  will have been met.

1    But it is our understanding that if there is -- it is the

2    office's and my understanding, that if there is an ID

3    associated with the voter's voter registration record, that it

4    must be included with that application or carrier envelope.

5    And we've not -- I have not personally heard of any request for

6    an accommodation regarding that.  So we would never -- it's

7    never come up, in my experience, to question or gain guidance

8    from the SOS.  So that's where I come up with that.

9        The SOS, as you said, has not told us that explicitly in

10   those words that you said.  It would be an incredibly verbose

11   advisory ethic, if it were worded that way, but our

12   understanding, like I said, if there is a number associated

13   with the VR record, it must be applied.

14   Q.  I think we both agree that the Texas Election Code contains

15   the ID requirement.  But as we looked earlier, Texas Election

16   Code also contains Section 1.022 of the Texas Election Code

17   which prohibits you from limiting or -- from limiting an

18   accommodation based on any provision of the Election Code.

19   That is also true, correct?

20            MR. SALDIVAR:  Your Honor --

21            THE COURT:  One second.  I didn't hear your objection.

22            MR. SALDIVAR:  This has been asked and answered.

23            THE COURT:  That's overruled.

24   BY MR. WASSDORF:

25   Q.  That is also true that that provision also exists in the

1  Texas Election Code?

2  A.  1.088 of --

3  Q.  1.022.

4  A.  Yes.

5  Q.  It was 1.08 of the Senate Bill 1.

6  A.  Yes.

7            MR. WASSDORF:  Thank you.  Pass the witness.

8            THE COURT:  Anything else?

9            MS. HARRIS:  None from us, Your Honor.

10           THE COURT:  You may step down.  Can he be excused?

11           MR. WASSDORF:  Yes, Your Honor.

12           THE COURT:  Let's call it a day.  There is no criminal

13  sentencings tomorrow.  But I have to take a phone call, so

14  let's plan on resuming at 9:30.  Instead of 9:00, 9:30.

15  Anything else that we need to wrap up today by way of

16  housekeeping?

17           MR. KERCHER:  Your Honor, there were a couple of

18  exhibits used in the direct and cross of Ms. Longoria.  State

19  Exhibit 142 and State Exhibit 273, which we offer for

20  admission.

21           THE COURT:  Any objection to 142 and 273?

22           MS. HOLMES:  No objection, Your Honor.

23           THE COURT:  142 and 273 are admitted.  Anything else?

24           MS. HOLMES:  Your Honor, we also have some exhibits

25  that were used with Ms. Longoria as well as Ms. Obakozuwa

 1   yesterday that we'd like to move to admit, and that is Haul
 2   MFV91.
 3           THE COURT:  I'm sorry, Haul what?
 4           MS. HOLMES:  Haul 91.  And we've provided the native
 5   version of that exhibit to Ms. Fernandez.
 6           As well as Haul MFV273, 274, OCA PX36, OCA PX290, OCA
 7   PX354, and State Exhibit 141, State Exhibit 167, State Exhibit
 8   290, State Exhibit 294.  And then in addition, during
 9   Ms. Longoria's direct we used a demonstrative with her that
10   came from an exhibit, and I understand that State defendants
11   objected to that report, the exhibit in full, but we're
12   wondering if we can offer it as an exhibit, just the
13   demonstrative portion of this?
14           MR. KERCHER:  No objection, Your Honor.
15           MS. HOLMES:  This is the photograph.
16           THE COURT:  So what are you going to call that?
17           MS. HOLMES:  We will need to call it -- can someone
18   from my illustrious team tell me the next number?  399.  Haul
19   399.
20           THE COURT:  Haul 399 is the demonstrative, and it now
21   is going to be an exhibit.  No objection to that one.  That is
22   admitted.
23           Any objections to State 141, 167, 290 and 294?
24           MR. WASSDORF:  No, Your Honor.
25           THE COURT:  Those are admitted.  Any objection to OCA

1    36, 290 or 354?

2            MR. KERCHER:  We're checking on those, Your Honor.

3            *(Pause.)*

4            None, Your Honor.

5            THE COURT:  OCA 36, 290 and 354 are admitted.  Any

6    objections to Haul 91, 273 and 274?

7            MR. NICHOLS:  Your Honor, just -- I can help with the

8    housekeeping.  I think 91 was the complaint log that you had

9    already ruled.  There is a section of that that you will not be

10   considering as part of the evidence.  There's a column on there

11   that -- let me see if I can pull up --

12           MR. WASSDORF:  I believe it was Column H.

13           MR. NICHOLS:  -- Column H that contained the hearsay

14   that you already indicated you wouldn't --

15           THE COURT:  Can you all pull up Haul 91 for me?

16           So while we're waiting on that, any objection to Haul

17   273 and 274?

18           MR. WASSDORF:  No, Your Honor.

19           THE COURT:  273 and 274 are admitted.

20           There we go.  So you want to admit the entire thing?

21           MS. HOLMES:  We move to admit the document.  I think

22   you accepted it as a business record, but there was a concern.

23           MR. WASSDORF:  Column N that contains the description

24   of the complaints.

25           THE COURT:  Can you scroll?

 1            (Pause.)

 2            So I'll admit it, but exclude Column N, as in "Nancy."

 3     Anything else by way of house keeping?

 4            MR. KERCHER:  One last thing just to put on your

 5     radar, Your Honor, the parties had previously agreed that

 6     County witnesses would sort of get preference in order so that

 7     they can be done well in advance of the upcoming election.

 8            State defendants do plan to call one County witness,

 9     Frank Phillips.  We are working with plaintiffs to find a place

10     to fit him in.  I think the agreement is that the County

11     witnesses need to be done by October 6 or 9th.  That may

12     require a lot of movement on their side.  I don't have anything

13     new to report, but I wanted to alert you that that is a

14     scheduling issues the parties are working on.

15            THE COURT:  I have no problem with taking him out of

16     order, putting him in the plaintiff's case-in-chief portion to

17     accommodate his schedule.  So you all work that out.

18            MR. KERCHER:  That's what we're working on at the

19     moment, Your Honor.

20            MS. PERALES:  Yes, Your Honor, we are working on it.

21     Thank you.

22            THE COURT:  Anything else for tonight?  See you

23     tomorrow morning at 9:30.  Thank you.

24            COURT SECURITY OFFICER:  All rise.

25            (4:45 p.m.)

1                       *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  September 20, 2023

12   /s/ Gigi Simcox

13   /s/ Angela M. Hailey

14   United States District Court
     Official Court Reporters
15   CSRs, CRRs, RPRs, RMRs
     262 West Nueva Street
16   San Antonio, Texas  78207
     (210)244-5048

17

18

19

20

21

22

23

24

25