```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3
     LA UNION DEL PUEBLO ENTERO,    .
 4   ET AL,                         .
                                    .
 5              PLAINTIFFS,         .
           vs.                      . DOCKET NO. 5:21-CV-844-XR
 6                                  .
     GREGORY W. ABBOTT, ET AL,      .
 7                                  .
                DEFENDANTS.         .
 8

 9

10                 TRANSCRIPT OF BENCH TRIAL
           BEFORE THE HONORABLE XAVIER RODRIGUEZ
11              UNITED STATES DISTRICT JUDGE
                    SEPTEMBER 21, 2023
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                          FATIMA MENENDEZ, ESQUIRE
                            JULIA LONGORIA, ESQUIRE
18                          MALDEF
                            110 BROADWAY
19                          SUITE 300
                            SAN ANTONIO TX 78205
20

21

22                          ZACHARY DOLLING, ESQUIRE
                            TEXAS CIVIL RIGHTS PROJECT
23                          1405 MONTOPOLIS DRIVE
                            AUSTIN TX 78741
24

25
```

```
 1

 2                          SAVANNAH KUMAR, ESQUIRE
                            ACLU FOUNDATION OF TEXAS
 3                          PO BOX 8306
                            HOUSTON TX 77288
 4

 5                          CHRISTOPHER DOOLEY DODGE, ESQUIRE
                            ELENA RODRIGUEZ ARMENTA, ESQUIRE
 6                          ELIAS LAW GROUP LLP
                            250 MASSACHUSETTS AVENUE NW
 7                          SUITE 400
                            WASHINGTON DC 20001
 8

 9

10   FOR THE DEFENDANTS:    RYAN G. KERCHER, ESQUIRE
                            KATHLEEN HUNKER, ESQUIRE
11                          WILLIAM WASSDORF, ESQUIRE
                            TEXAS ATTORNEY GENERAL
12                          P.O. BOX 12548
                            MC 009
13                          AUSTIN TX 78711

14

15                          LOUIS J. CAPOZZI, III, ESQUIRE
                            JONES DAY
16                          51 LOUISIANA AVENUE NW
                            WASHINGTON DC 20001
17

18                          CORY REN LIU, ESQUIRE
                            BUTLER SNOW LLP
19                          1400 LAVACA STREET
                            SUITE 1000
20                          AUSTIN TX 78701

21

22

23   REPORTED BY:          GIGI SIMCOX, RMR, CRR
                            OFFICIAL COURT REPORTER
24                          UNITED STATES DISTRICT COURT
                            SAN ANTONIO, TEXAS
25
```

1    *(San Antonio, Texas; September 21, 2023, at 9:30 a.m., in*
2    *open court.)*
3            THE COURT:  And your next witness.
4            MR. DOLLING:  Thank you, Your Honor.  Zachary Dolling
5    for the OCA plaintiffs.
6            Before I call the next witness, I just wanted to be
7    extra save and confirm.  We have Deborah Chen, who is a
8    representative for OCA Greater Houston in the gallery and I
9    wanted to make sure that was okay, as the rule has been
10   invoked.
11           THE COURT:  Is she going to be a witness?
12           MR. DOLLING:  She will.
13           THE COURT:  And she's the party representative?
14           MR. DOLLING:  Yes.
15           THE COURT:  Any opposition?
16           MR. KERCHER:  It's our understanding she is a party
17   representative.  She's been deposed in that capacity, so no
18   objection.
19           THE COURT:  That's fine.
20           MR. DOLLING:  I'd like to call Charlie Johnson to the
21   stand.
22           Mr. Johnson's testimony will touch on OCA plaintiffs
23   claims that Sections 5.02, 5.03, 5.07, 5.10, and 5.12 violate
24   the ADA and the Rehab Act, as well as their claims that
25   Section 7.04 is — violates the First Amendment as overly

CHARLTON JOHNSON - DIRECT

1  broad, and the Fourteenth Amendment as void for vagueness.

2      (CHARLTON JOHNSON, having been duly sworn, testified as

3  follows:)

4          MR. DOLLING:  Your Honor, I request permission to ask

5  leading questions under Federal Rule of Evidence 611(c)(2)

6  because Mr. Johnson is a witness identified with an adverse

7  party, the Travis County Clerk.

8          THE COURT:  Any objections?

9          MR. WASSDORF:  No, Your Honor.

10         THE COURT:  You may continue.

11                    DIRECT EXAMINATION

12 BY MR. DOLLING:

13 Q.  Good morning, Mr. Johnson.

14 A.  Morning.

15 Q.  It's nice to see you again.  I know your time is precious.

16 I'm sorry you had to stay overnight but I think we'll get you

17 out of here today.

18 A.  San Antonio is a fine place to stay overnight.

19 Q.  Please state and spell your name for the record.

20 A.  Charlton, C-H-A-R-L-T-O-N, Johnson, J-O-H-N-S-O-N,

21 although you might see it as Charlie, C-H-A-R-L-I-E.

22 Q.  You serve as an assistant director in the Travis County

23 Elections Division, is that correct?

24 A.  That's correct.

25 Q.  And the Travis County Elections Division is a division of

CHARLTON JOHNSON - DIRECT

1  the Travis County Clerk's Office, is that correct?

2  A.  That's correct.

3  Q.  And in the Travis County Elections Division you are the

4  assistant director in charge of overseeing the ballot

5  technology department, is that correct?

6  A.  That's correct.

7  Q.  And you've been in this position since around early 2021?

8  A.  That's correct.

9  Q.  And before that you were the ballot technology manager for

10  the Travis County Elections Division, is that right?

11  A.  That's correct.

12  Q.  And as the assistant director in charge of the ballot

13  technology department you oversee the personnel in that

14  department, is that correct?

15  A.  That's correct.

16  Q.  And that includes overseeing recruiting and payroll, is

17  that right?

18  A.  That's correct.  That's a separate department outside of

19  ballot technology as the personnel division, but, yes, I do

20  oversee them.

21  Q.  And how many staff are in your department?

22  A.  About 12 permanent staff.

23  Q.  Okay.  And your department is responsible for sending and

24  reviewing applications for ballots by mail, correct?

25  A.  Correct.

CHARLTON JOHNSON – DIRECT

1  Q.  And for sending the mail ballots themselves and receiving
2  the ballots back, correct?
3  A.  Correct.
4  Q.  And for transferring the mail ballots to the signature
5  verification committee and the early voting ballot board,
6  correct?
7  A.  Correct.
8  Q.  And you also oversee the Travis County Elections
9  Division's Call Center, is that right?
10  A.  That's correct.
11  Q.  Mr. Johnson, Travis County is an off-line county, is that
12  right?
13  A.  That's correct.
14  Q.  An off-line county is one which uses its own local voter
15  registration database rather than the State's voter
16  registration system, is that right?
17  A.  That's right.
18  Q.  And the State's voter registration system is called the
19  Texas Election Administration Management System, or TEAM, for
20  short, is that right?
21  A.  That's right.
22  Q.  And Travis County maintains a voter registration file in
23  its local database for every registered voter in the county,
24  is that right?
25  A.  That's right.

CHARLTON JOHNSON - DIRECT

1  Q.  And, if needed, Travis County is also able to access the

2  voter registration files for Travis County voters contained in

3  the TEAM system, correct?

4  A.  Correct.

5  Q.  And although the two systems are separate, the county's

6  local voter registration files are synced at regular intervals

7  with TEAM's voter registration files, is that right?

8  A.  That's right.  It's done through a separate department but

9  a registration, yes, that's correct.

10 Q.  Thank you.  And can we agree that if I use the term "voter

11 file," going forward, it's just shorthand for a voter

12 registration file?

13 A.  That's fine.

14 Q.  So I'd like to turn now to the mail ballot identification

15 number provisions of Senate Bill 1, or SB 1.  Are you

16 generally familiar with those provisions?

17 A.  Yes.

18 Q.  And, Stephen, could we please pull up Joint Exhibit 1 and

19 scroll to SB 1, Section 5.02 at page 33.

20     And I realize I completely forgot to give you this binder,

21 if you'd like paper copy.

22 A.  Digital is fine; thank you.

23 Q.  So at lines — you can see at page 33, line 16, that this

24 is SB 1, Section 5.02, is that correct?

25 A.  That's right.

CHARLTON JOHNSON - DIRECT

1  Q.  And at lines 19 to 25, Section 5.02 states that, "An

2  application for a mail ballot must include the number of the

3  applicant's driver's license, election identification

4  certificate, or personal identification card issued by the

5  Department of Public Safety."  Did I read that correctly?

6  A.  Yes, you have.

7  Q.  And directly under that at line 26 and across to the next

8  page, Section 5.02 states that, if the applicant has not been

9  issued one of those DPS numbers, they must provide the last

10  four digits of their social security number, is that correct?

11  A.  That is correct.

12  Q.  And then right under that, at lines 2 to 4 of page 34,

13  Section 5.02 states that if the applicant does not have any of

14  the numbers just described, they must provide a statement to

15  that effect, is that right?

16  A.  That's right.

17  Q.  You agree that under SB 1 before Travis County may accept

18  a voter's application for a ballot by mail and send the voter

19  a mail ballot, the county must match the ID number provided by

20  the voter on the application to the ID number contained in the

21  voter's file, correct?

22  A.  Correct.

23  Q.  And in carrying out this matching process Travis County

24  first compares the ID number provided by the voter to the

25  voter's file in the county's local database, correct?

1  A.  That's right.

2  Q.  And if there is no match, the county then checks the TEAM

3  system to see if the ID number provided by the voter matches

4  in the voter's file in TEAM, is that right?

5  A.  That's right.

6  Q.  And you would agree that it is very rare for there to be a

7  discrepancy between the ID numbers in a voter's file in the

8  local database versus in TEAM, is that right?

9  A.  Relatively rare, yes.

10  Q.  And so now turning to after the application has been

11  accepted and a mail ballot has been sent to the voter, you

12  would agree that at this stage SB 1 requires voters to provide

13  one of the same sorts of ID numbers we just discussed, but

14  this time on the carrier envelope contained in their return

15  mail ballot, is that right?

16  A.  That's right.

17  Q.  And SB 1 requires that Travis County match the ID number

18  provided by the voter on the carrier envelope to the ID number

19  in their voter file before accepting the mail ballot, is that

20  right?

21  A.  That's right.

22  Q.  And Travis County follows the same sequential process we

23  just discussed with respect to the application, first looking

24  to its local database, and then to TEAM, if needed, in

25  carrying out the matching process for the carrier envelope, is

CHARLTON JOHNSON - DIRECT

1  that right?

2  A.  That is right.

3  Q.  Travis County uses the carrier envelopes prescribed by the

4  Secretary of State, correct?

5  A.  Yes.

6  Q.  And you agree that the instructions on the carrier

7  envelope reflect the language of SB 1 which instructs the

8  voter to first provide one of the three types of Department of

9  Public Safety ID numbers and only if they do not have one of

10  those numbers the last four digits of their social security

11  number, is that right?

12  A.  I'd have to take a look at the envelope to see if it

13  requires it in that order.  I know there is a place to place

14  the social security number or the DPS number on there.  I

15  don't know if the verbiage says "requires one or the other."

16  Q.  Okay.  We can return to that in a minute.  I've gotten the

17  carrier envelope but I've loss track of where it is so we'll

18  come back to it in a minute.

19  A.  Okay.

20  Q.  So in the spring of 2022 Travis County designed an insert

21  to be sent along with the mail ballot recommending that voters

22  provide both a DPS ID number and the last four of their social

23  security number, is that correct?

24  A.  That's correct.

25  Q.  And the county designed a similar insert to be sent along

CHARLTON JOHNSON - DIRECT

1  with the application, is that correct?

2  A.  That's correct.

3  Q.  And these inserts were provided in both English and

4  Spanish, is that right?

5  A.  That's right.

6  Q.  And the county began including these inserts after the

7  March 2022 Primary, is that right?

8  A.  That's correct.

9  Q.  And Travis County did this because it was concerned by the

10  rejection rates caused by SB 1 during the Primary, is that

11  right?

12  A.  That's right.

13  Q.  And the idea is that providing both types of numbers gives

14  the voter the highest chance of matching whatever ID number is

15  in their voter file, is that right?

16  A.  That's right.

17  Q.  And if we could just bring up OCA Plaintiffs 427, Stephen.

18      Do you recognize this document, Mr. Johnson?

19  A.  I do.

20  Q.  And could we just scroll down to the next page, please.

21  Next page.  This one.  And if you could blow up the red box.

22      And if you could just review that for a moment,

23  Mr. Johnson.

24  A.  I've reviewed it.

25  Q.  And I'll ask you this question again, which I asked

CHARLTON JOHNSON – DIRECT

1  previously.  Do you agree that the instructions on the carrier

2  envelope reflect the language of SB 1 which instructs the

3  voter to first provide one of the three types of DPS ID

4  numbers, and only if they do not have one of those numbers the

5  last four digits of their social security number?

6  A.  It does say that, yes.

7  Q.  Thank you.  And returning to the inserts that we were

8  discussing just a moment ago, did your office need to reach

9  out to the Secretary of State's Office for its approval before

10 including those inserts?

11 A.  Yes.

12 Q.  And did you do so?

13 A.  We did.

14 Q.  Thank you.  And so I'd like to pull up OCA Plaintiffs 34,

15 but before we do that I want to –– okay.  Got it already.

16     It is a confidential document, so I don't want it to be

17 shared on the public screen.

18     Can you see it?

19     Now it's gone.  Can we pull that back up?  Thank you.

20     Can you see that on your screen?

21 A.  I can.

22 Q.  And do you recognize this as a spreadsheet produced by

23 Travis County, the Travis County Clerk's Office during

24 discovery?

25 A.  Yes.

CHARLTON JOHNSON – DIRECT

1  Q.  And can you tell us what it is?

2  A.  This is a log of applications that have been rejected for,

3  appears to be for the Primary.  Yeah.  Spreadsheet of voters

4  that final application rejection that did not cure before the

5  final ballot-by-mail deadline.

6  Q.  Thank you.  And if we could just go to the left, the two

7  left-most columns, please.

8      And you mentioned it appeared to be for the March Primary.

9  Do these dates confirm that?

10 A.  Yes.  That would be the dates leading up to the Primary.

11 Q.  Thank you.  So this spreadsheet shows each voter who had

12 their application for a ballot by mail finally rejected during

13 the March 2022 Primary Election in Travis County, is that

14 right?

15 A.  That's right.

16 Q.  And in the column titled Rejection Reason, we can see a

17 variety of reasons listed.  One of them is No ID On App.  That

18 means that the voter did not include the required ID number on

19 their application, is that correct?

20 A.  That's right.  There was no ID on the application at all.

21 Q.  And DNM means Did Not Match, meaning the voter did provide

22 an ID number but it did not match their voter file, is that

23 right?

24 A.  That's right.

25 Q.  And NIS means Not In System, meaning the voter did provide

CHARLTON JOHNSON - DIRECT

1  an ID number but had no ID number in their voter file, is that

2  right?

3  A.  Correct.  Or — yes, either they — the one they provided

4  was not in the voter system or there were no IDs in the voter

5  system at all.

6  Q.  And would you agree with me that the data in this

7  spreadsheet, we don't need to go through every single one, but

8  it shows that hundreds of voters had their applications

9  finally rejected with a rejection code of either No ID on App,

10  Did Not Match, or Not In System?

11  A.  Yes.

12  Q.  And some of these voters had their applications rejected

13  multiple times due to SB 1, is that correct?

14  A.  Some voters did, yes.

15  Q.  And I'd like to turn now to OCA Plaintiffs 37, which is,

16  again, a confidential document, so — thank you.

17      And, Mr. Johnson, do you recognize this as a spreadsheet

18  produced by Travis County during discovery?

19  A.  Yes, I do.

20  Q.  Can you tell us what it is?

21  A.  It's a list of all ballots that were sent in the March

22  Primary and their final ballot status.

23  Q.  Thank you.  And that final status would be under the

24  column titled Ballot Status, is that correct?

25  A.  That's correct.

1  Q.  And those statuses include accepted, rejected, canceled,

2  and sent, is that right?

3  A.  That's right.

4  Q.  And we can see on this first page next to some of the

5  ballots that are marked as rejected under the column titled

6  Reject Reason is a description of the reason for the ballot's

7  rejection, is that right?

8  A.  That's correct.

9  Q.  And, for example, as I just mentioned, there are a number

10  on this first page where the reject reason says incorrect or

11  missing ID—online correction, is that right?

12  A.  That's right.

13  Q.  And the fact that it says online correction in these

14  entries does not indicate that the person cured their ballot,

15  does it?

16  A.  It does not.

17  Q.  It just is part of the standard notation for a rejected

18  ballot at that time?

19  A.  Yes, that they were eligible for an online correction.

20  Q.  Thank you.  And while we're on the topic of online

21  corrections, the State's online Ballot Tracker cannot be used

22  to change anything in a voter's file, is that right?

23  A.  That's right.

24  Q.  Instead, it can only verify information that is already in

25  the system?

CHARLTON JOHNSON - DIRECT

1  A.  That's correct.

2  Q.  And so one issue that can be fixed through the online

3  Ballot Tracker is if the voter already has an ID number that

4  matches what is in the system but left that ID number off of

5  their mail ballot materials, is that correct?

6  A.  That's correct.

7  Q.  And another issue that can be fixed through the online

8  Ballot Tracker is if the voter already has an ID number that

9  matches what is in the system but made a transcription error

10  in writing that number on their mail ballot materials, is that

11  right?

12  A.  That's right.

13  Q.  But there are no other issues that can be fixed through

14  the online Ballot Tracker, is that right, with respect to ID

15  numbers?

16  A.  Correct.

17  Q.  And the corrective action form that is sent along with the

18  notice of mail ballot rejection is only capable of remedying

19  the same issues as the online Ballot Tracker, is that correct?

20  A.  Say that one more time.

21  Q.  So Travis County would send a corrective action form along

22  with a notice of a rejected mail ballot, is that right?

23  A.  That's right.

24  Q.  And that corrective action form, what it can be used for,

25  it can only be used to correct the same sorts of errors that

CHARLTON JOHNSON - DIRECT

1  we just spoke about, completely missing number, or a

2  transcription error, but where the voter does have a matching

3  ID number?

4  A.  With respect for a rejection based off the ID issue,

5  that's right, missing ID on the carrier envelope or a

6  transcription, yes.

7  Q.  And turning back to the spreadsheet that's still on the

8  screen, you would agree with me that the data in this

9  spreadsheet shows that hundreds of mail ballots were rejected

10 during the March 2022 Primary due to SB 1 in Travis County?

11 A.  Yes.

12 Q.  Okay.  And you would agree if we were to tally up the

13 various rejection codes that mail ballot rejections due to SB

14 1 during the March 2022 Primary made up the substantial

15 majority of overall mail ballot rejections in Travis County,

16 is that correct?

17 A.  That's correct.

18 Q.  And so turning now to the November 2022 General Election,

19 you would agree that during that election Travis County again

20 finally rejected hundreds of applications for a ballot by mail

21 due to SB 1 ID issues, is that correct?

22 A.  That's correct.

23 Q.  And would you also agree that during the November 2022

24 General Election Travis County again finally rejected hundreds

25 of mail ballots due to SB 1 ID issues?

1  A.  That's correct.

2  Q.  And you would agree that mail ballot rejections due to SB

3  1 during the November 2022 General Election made up the

4  substantial majority of overall mail ballot rejections in

5  Travis County for that election, correct?

6  A.  It was a majority, yes.

7  Q.  And of the hundreds of voters in Travis County whose

8  ballots by mail were rejected due to SB 1 ID provisions during

9  that November Election only 27 voted a provisional ballot in

10  person, is that correct?

11  A.  That's correct.

12  Q.  And of those same hundreds of voters zero voted a regular

13  nonprovisional ballot in person, is that right?

14  A.  That's right.

15  Q.  And would you agree that during both the March and

16  November 2022 Elections Travis County made every reasonable

17  effort to notify voters whose applications and mail ballots

18  were rejected due to SB 1 of their opportunities to cure?

19  A.  I believe so.

20  Q.  And this included sending written notice of rejections to

21  every affected voter in Travis County during both elections,

22  is that right?

23  A.  That's right.

24  Q.  And if the voter had provided their email address

25  Travis County would additionally send these notices via email,

CHARLTON JOHNSON – DIRECT

1  is that correct?

2  A.  That's correct.

3  Q.  And Travis County used the rejection forms prescribed by

4  the Secretary of State when sending notices of both rejected

5  applications and mail ballots, is that right?

6  A.  That's right.

7  Q.  And if the voter had provided a phone number,

8  Travis County would also attempt to notify the voter of a

9  rejected application or mail ballot by phone, correct?

10  A.  For mail ballot, yes.  Application, we didn't always have

11  the staff to take care of that but they certainly got a

12  notice, the Secretary of State prescribed notice, yes.

13  Q.  And can you just give us a little detail about what you

14  mean when you say you didn't "have the staff," to did it at

15  the application stage?

16  A.  Yes.  Applications are received throughout the year.

17  There is oftentimes quite a — a large volume of them in

18  leading up to an election, we do our very, very — we

19  obviously send a rejection notice within 48 hours of getting

20  the application that's deemed to be rejected, but for a ballot

21  we have the signature verification committee and early voting

22  ballot board and we make, as a matter of policy because the

23  Secretary of State allows it, to call or email every one of

24  those voters to let them know that their ballot had been

25  rejected and there are options to cure.

CHARLTON JOHNSON - DIRECT

1  Q.  And so if I'm understanding correctly, it's primarily

2  because during the mail ballot stage there are just more

3  people available to make those phone calls?

4  A.  That's correct.

5  Q.  Thank you.  And when Travis County was able to make phone

6  calls, it would attempt to initiate those calls within 24

7  hours, if possible, is that right?

8  A.  That's right.

9  Q.  And Travis County attempted to provide notice up until the

10  final date that the ballot was not able to be received, is

11  that right?

12  A.  That's right.

13  Q.  But there were voters who had their mail ballot rejected

14  for whom you did not have phone numbers, correct?

15  A.  Oh, yes.

16  Q.  And there were voters who had their mail ballot rejected

17  for whom you did not have email addresses, is that right?

18  A.  That's right.

19  Q.  And it's fair to say that there were voters that

20  Travis County was just unable to reach despite its best

21  efforts, is that correct?

22  A.  Yes.

23  Q.  And the result for some of those voters was that they did

24  not vote, is that right?

25  A.  That's right.

CHARLTON JOHNSON – DIRECT

1  Q.  And your office would also attempt to walk voters through

2  using the online Ballot Tracker on the phone when their ballot

3  was curable through that method, is that right?

4  A.  Yes.

5  Q.  And walking through that -- sorry.  And walking a voter

6  through that process would often take 30 or 40 minutes, is

7  that right?

8  A.  Yes, it can.

9  Q.  And then sometimes took even longer, if the voter was less

10  familiar with technology like computers or the internet, is

11  that right?

12  A.  That's right.

13  Q.  Did you see that frequently?

14  A.  Our call center would report anecdotal examples to me,

15  yes.

16  Q.  And sometimes, despite these efforts to walk voters

17  through the online cure process on the phone, the voter was

18  still unable to complete the cure process online, is that

19  correct?

20  A.  That's right.

21  Q.  And you would agree that some voters both do not have

22  access to a computer and also do not have access to

23  transportation, is that right?

24  A.  Presume so, yes.

25  Q.  And during the 2022 elections some Travis County voters

CHARLTON JOHNSON - DIRECT

1  who fit that description and who had their mail ballots

2  rejected under SB 1 were unable to vote, is that correct?

3  A.  I don't know that personally.  Once again, just anecdote

4  communication from our call center for folks that have said

5  that someone has given up, they cannot — they are unable to

6  bring in a form to us physically, they don't have somebody to

7  drive them in, and they don't have internet connectivity or

8  the frustration using the tracker was too much and they would

9  no longer move forward with that.

10 Q.  Okay.  And I guess just elaborating a little bit on that

11 and based on your experience as an Elections Administrator for

12 a number of years, would that be — would the lack of

13 transportation affect the voter's ability to appear in person

14 at the early voting Clerk's Office, if they needed to do an

15 in-person cure?

16 A.  Yes.

17 Q.  And it would also affect their ability to appear in person

18 to vote a provisional or regular ballot, is that right?

19 A.  Yes.

20 Q.  And despite Travis County's best efforts, is it possible

21 that Travis County can receive a timely but defective mail

22 ballot so late that there is not enough turnaround time to

23 contact that person to have them cure before the deadline for

24 counting their ballot?

25 A.  Yes.  I mean, we would still reach out just as a matter of

CHARLTON JOHNSON - DIRECT

1  course, but ultimately it's not a reasonable amount of time

2  and it's received the day after Election Day.

3  Q.  Right.  Thank you.  And you previously mentioned that you

4  had heard that voters were confused or frustrated by SB 1's ID

5  provisions.  Is it also your understanding based on your

6  experience as an Elections Administrator that some voters have

7  privacy concerns about providing their ID numbers on mail

8  balloting materials?

9  A.  Once again, anecdotal communication from call center,

10  people were concerned about someone calling them asking them

11  to log on to the website to enter their social security

12  number.  Yes, there were some concerns.

13  Q.  And the people who are manning the call centers are

14  employees of the Travis County Clerk's Office, correct?

15  A.  Yes, they are.

16  Q.  Thank you.  Based on your experience with SB 1 so far you

17  do not believe the rejection rate for SB 1-related issues will

18  ever be zero, is that right?

19  A.  SB 1-related issues will ever be zero?  I don't think so.

20  Rejection rates have never been zero, so that would leave me

21  to believe that those would also never be zero as well.

22  Q.  Okay.  Thank you.  And just a handful of final questions.

23      Do you recall ever referring a voter whose application or

24  carrier envelope had an ID number that did not match their

25  voter file to the Secretary of State as a potential case of

1523

CHARLTON JOHNSON – DIRECT

1  voter fraud?

2  A.  No, I don't think so.

3  Q.  Do you recall ever referring a voter in that same position

4  to any other law enforcement authority as a potential case of

5  voter fraud?

6  A.  Not that I could recall, no.

7  Q.  And are you aware of any instances where fraudulent voting

8  was identified because of an ID number issue, mismatch,

9  missing ID number?

10  A.  I'm not aware of any.

11  Q.  And does the Travis County Election —— or excuse me.

12      The Travis County Elections Division does not have

13  Americans with Disabilities Act policies that specifically

14  address mail voting, is that correct?

15  A.  Specifically with respect to mail ballot voting, no.

16  Q.  Thank you.

17  A.  But then there's a provision for an assistance on there

18  that's provided by law, but other than that, no.

19  Q.  Okay.  And last couple questions.  Do you know if the

20  Travis County Elections Office receives federal funding?

21  A.  Not that I'm aware of, although that might be a better

22  question for Bridge Escobedo.

23          MR. DOLLING:  Okay.  Thank you.

24          I pass the witness.

25          THE COURT:  Anything else from this side?

1524

CHARLTON JOHNSON – DIRECT

1    MR. DODGE:  Just a few questions, Your Honor.

2    Good morning.  Christopher D Dodge on behalf of LULAC

3  plaintiffs.

4  BY MR. DODGE:

5  Q.  Good morning.  Just a few more questions about mail ballot

6  issues, beginning with applications.  What was Travis County's

7  final rejection rate of timely received mail ballot

8  applications for the November 2022 General Election?

9  A.  I don't have that number in front of me.  I'd have to — I

10 would need an exhibit or something that's been submitted to

11 the court.

12 Q.  Would it help to review your prior testimony on this

13 topic?

14 A.  Absolutely, yes.

15 Q.  Could we please call up Mr. Johnson's March 29, 2023

16 deposition at page 36, line 5 and publish it to him and

17 counsel.

18    Mr. Johnson, why don't you take a moment to review your

19 prior testimony from lines 5 to 14 and just let me know when

20 you're finished.  Actually, why don't you read on to the next

21 page through line 9.

22 A.  Thank you.  Towards the bottom there.  Looks like, yeah,

23 4.86 percent.

24 Q.  Great.  Thank you.  We can take that down.

25    And what was the rejection rate of timely received mail

CHARLTON JOHNSON - DIRECT

1  ballot applications in the November 2020 General Election?

2  A.  Once again, I'd have to --

3  Q.  Call that back up again, please.

4  A.  Thank you.  Oh, we're at the same place.  Sorry about

5  that.  1.33 percent for November 2020.

6  Q.  We can take that down again.

7      So it's correct that Travis County's rejection rate for

8  absentee ballot applications in the November 2022 General

9  Election was higher than the rejection rate in the prior

10 General Election, correct?

11 A.  Correct.

12 Q.  I'd like to ask you similar questions about mail ballots

13 themselves.  What was the mail ballot rejection rate in Travis

14 County for the November 2022 General Election?

15 A.  I'd have to see it again.

16 Q.  If we could pull up the same deposition transcript at page

17 47, line 17 through 48-17.  Just let me know when you've had a

18 moment to review.

19 A.  And pardon me, you were asking for the 2020 or 2022?

20 Q.  November 2022.

21 A.  2022, 2.16 percent.

22 Q.  What was the rejection rate of timely received mail

23 ballots in the November 2020 General Election?

24 A.  .42 percent.

25 Q.  What about the rejection rate for the November 2018

1  General Election?

2  A.  .47 percent.

3  Q.  So it's also the case that Travis County's rejection rate

4  for absentee ballots themselves in the 2022 General Election

5  was higher than a rejection rate in the two prior General

6  Elections, correct?

7  A.  Correct.

8  Q.  Are you aware of any instances where fraudulent voting was

9  identified because of an ID mismatch?

10  A.  I'm not.

11          MR. DODGE:  Pass the witness, Your Honor.

12          THE COURT:  Anything else on this side?

13          Any cross?

14          MR. WASSDORF:  Good morning, Mr. Johnson.

15          THE WITNESS:  Morning.

16                    CROSS-EXAMINATION

17  BY MR. WASSDORF:

18  Q.  So you oversee the department that handles ballot by

19  mails?

20  A.  Yes.

21  Q.  And that includes responsibility for reviewing and

22  fulfilling applications for ballot by mail?

23  A.  Yes.  But by "fulfilling," do you mean processing,

24  accepting, or rejecting, and if accepted we send a ballot?

25  Q.  Yes, sir.

CHARLTON JOHNSON - CROSS

1  A.  Yes.

2  Q.  And that includes sending the physical ballot out to the

3  voter?

4  A.  It does.

5  Q.  And then receiving the ballots back from the voter and

6  processing those initially?

7  A.  Correct.

8  Q.  And then transferring them to either the signature

9  verification committee or the early voting ballot board?

10  A.  That's right.

11  Q.  And at that point it's out of your hands?

12  A.  Yes, I would say so.  Yes.

13  Q.  Prior to SB 1 when you received an application for ballot

14  by mail you would initially verify that the voter was

15  registered to vote in Travis County, is that right?

16  A.  That's right.

17  Q.  And you would also verify on the face of the application

18  that they were qualified to receive a ballot by mail?

19  A.  That's right.

20  Q.  And to verify if someone was a registered voter in

21  Travis County you would check the Travis County voter

22  registration system?

23  A.  Yes.

24  Q.  And you would check the voter's name?

25  A.  Yes.

CHARLTON JOHNSON - CROSS

1  Q.  And their date of birth?

2  A.  Yes.

3  Q.  Mr. Johnson, is it possible to have two voters with the

4  same name?

5  A.  Sure.

6  Q.  Is it possible to have two voters with the same date of

7  birth?

8  A.  I presume so.

9  Q.  Is it possible to have two voters with the same name and

10  the same date of birth?

11  A.  It is possible, yes.

12  Q.  Once you verified that information, and that they were

13  registered and qualified for a mail-in ballot, you would send

14  them a ballot, is that correct?

15  A.  Yes.

16  Q.  And that package would contain a carrier envelope for them

17  to return the ballot to you?

18  A.  Correct.

19  Q.  And that carrier envelope, when they returned it, it had

20  to include their name?

21  A.  Yes.  That was provided on a label that was preplaced on

22  the carrier envelope, yes.

23  Q.  And it would have the reason that they requested a ballot

24  by mail?

25  A.  On the carrier envelope?  No.

CHARLTON JOHNSON - CROSS

1  Q.  No.  Let's take a look at his 2022 deposition, page 14, 15

2  through 19.

3      "And prior to SB 1, what information was the voter

4  required to include on the carrier envelope?"

5      "Answer.  They required their name, their reason for

6  requesting a ballot by mail, and a signature."

7  A.  That might have been the misunderstanding, we were talking

8  about application perhaps.  I think we go back and forth

9  between an application and a carrier envelope quite frequently

10 when discussing these matters, but when we send a carrier

11 envelope there is a label on there that has their name, ballot

12 style, and bar code, but not a reason for voting by mail.

13 Q.  Okay.  I just wanted to be clear for the record.

14 A.  Understood.

15 Q.  So what information was included on a carrier envelope,

16 did the voter did to include that voter envelope prior to SB

17 1?

18 A.  Prior to SB 1, a signature, any information with respect

19 an assistant, something like that, but most of that

20 information was already on a preprinted label, meaning their

21 name, their ballot style, that bar code that is — that links

22 that carrier envelope to the voter themselves.

23 Q.  And but it did need to include a signature?

24 A.  Absolutely, yes.

25 Q.  And there was a process for matching that signature to a

CHARLTON JOHNSON — CROSS

1  signature within the voter's registration file?

2  A.  That's right.

3  Q.  And that matching was performed by either the signature

4  verification committee or the early voting ballot board?

5  A.  Yes.

6  Q.  So after Senate Bill 1, the same process applied to

7  processing the applications or the ballots with the added

8  requirement that you now have the ID match and the voter has

9  to attest to that they meet the disability requirement, is

10  that right?

11  A.  Right.  In that case, yes.

12  Q.  Under the ID requirement a voter is required to provide a

13  driver's license number, the last four of the social, or if

14  they don't have either of those, a voter unique number?

15  A.  Yes, if one has been provided to them.

16  Q.  A moment ago Mr. Dolling was talking about, you know, the

17  order in which those numbers are provided, does Travis County

18  consider an order?

19  A.  We do not.

20  Q.  And so regardless of which number is provided, whether it

21  be the driver's license or the last four of the social, if

22  that matches the voter's registration record, then that is a

23  match?

24  A.  Yes.

25  Q.  And I believe you also were discussing the inserts that

CHARLTON JOHNSON - CROSS

1 are included in the applications for ballot by mail and the

2 ballot by mail?

3 A.  Yes.

4 Q.  Could we pull up State's Exhibit 70 and 72.

5     Okay.  And so on the left here, that is the insert that is

6 included in the ballot packet that goes to the voter, and on

7 the right, that is the insert that is included in the

8 application for ballot by mail, is that correct?

9 A.  That's correct, yes.

10 Q.  And both of these inserts indicate that Travis County

11 recommends providing both numbers?

12 A.  That's correct.

13 Q.  Let's now look at State's Exhibit 17 —— or 16.  Excuse me.

14     This is an election advisory from the Secretary of State's

15 Office.  Have you seen this election advisory before?

16 A.  Very likely, yes.

17 Q.  Let's scroll down and look at Scenario 3.  So Scenario 3,

18 "The voter provides the last four digits of their social

19 security number on the ABBM.  The voter registration records

20 contains a driver's license number and a social security

21 number.  The early voting clerk is able to validate that the

22 partial social security number on the application for ballot

23 by mail matches the number in the voter registration record,

24 the early voting clerk must accept the ABBM and send a ballot

25 to the voter."  Did I read that correctly?

CHARLTON JOHNSON - CROSS

1  A.  Yes.

2  Q.  And so this advisory from the Secretary of State informs

3  Travis County and all voting clerks that regardless of if the

4  voter has a driver's license in the voter registration record,

5  if the voter provides a social security number that is also in

6  the voter registration record, that they must accept the

7  application for ballot by mail?

8  A.  That's correct.

9  Q.  You can take that down.

10     So if they fail to include an ID number, the application

11  for ballot by mail or ballot by mail is initially rejected?

12  A.  If they fail to include any number whatsoever?

13  Q.  Correct.

14  A.  Yes.

15  Q.  And if the numbers don't match, the application or the

16  ballot would be initially rejected?

17  A.  The numbers on either one do not match the voter

18  registration system?

19  Q.  Correct.

20  A.  Yes.

21  Q.  And if the application or the ballot is initially

22  rejected, you send out a notice to the voter to inform them of

23  the rejection?

24  A.  Yes.

25  Q.  And that notice includes the reason for the rejection?

CHARLTON JOHNSON — CROSS

1  A.  It does.

2  Q.  The defect that was on the application or the ballot that

3  they need to cure?

4  A.  It does.

5  Q.  And at that point it's up to the voter to correct that

6  defect that they had been informed of?

7  A.  It is.

8  Q.  Now, you can't say which occurred more often, missing or

9  mismatched ID numbers, is that right?

10  A.  Not without looking at statistics in front of me, no.

11  Q.  And you can't say why any voter was unable to cure a

12  rejected application or ballot?

13  A.  I — with all of the hundreds of people that were

14  rejected, I don't know of every reason why they were unable to

15  cure.  I don't know.

16  Q.  I mean, you're not aware of the reason any voter was

17  unable to cure, is that right?

18  A.  I'm not aware of the specific circumstances with a

19  specific voter why they ultimately did not cure.

20  Q.  Now, an ID number is not the only reason an application

21  for ballot by mail, for example, could be rejected?

22  A.  That's correct.

23  Q.  It could be rejected because it has the date that they are

24  going to be out of the county isn't included?

25  A.  Right.

CHARLTON JOHNSON - CROSS

1  Q.  It could be missing a signature?

2  A.  Right.

3  Q.  It could be missing the reason that they are requesting to

4  vote by mail?

5  A.  Correct.

6  Q.  And none of those requirements were created by SB 1?

7  A.  No.

8  Q.  And there are even other defects that could be present

9  that would result in a rejection?

10  A.  Right.

11  Q.  You're not aware of any voter with a disability whose

12  ballot was ultimately rejected, are you?

13  A.  Not specifically, no.

14  Q.  And you don't know of a disabled voter who had their

15  ballot rejected who was unable to cure?

16  A.  Not specifically, no.

17  Q.  With respect to getting the applications or the ballots

18  out to the voters, you didn't have any problem getting those

19  mailed out, did you?

20  A.  And -- can you be more specific?  The question?

21  Q.  You didn't have any problems mailing out applications or

22  ballots to the voters?

23  A.  Operationally, no.  No.

24  Q.  And of the applications and ballots that were finally

25  rejected, all of those individuals were notified of the

CHARLTON JOHNSON - CROSS

1  defect?

2  A.  Yes.

3  Q.  And they were contacted at least by mail and then I

4  believe possibly by email or phone if they provided that

5  information?

6  A.  Correct.

7  Q.  And all of those voters had the opportunity to cure the

8  defect on their application or ballot?

9  A.  I don't know if they had the resources to do it, but we

10  certainly sent them the notice to let them know that they had

11  that opportunity.

12  Q.  A mismatched ID number can be cured in a couple different

13  ways, is that right?

14  A.  Online and — yes, right.

15  Q.  So it can be cured online through the Ballot Tracker?

16  A.  Um-hum.

17  Q.  And it can be cured in person?

18  A.  Yes.

19  Q.  And that includes both at your office, correct?

20  A.  Yes.

21  Q.  And it includes going to a polling place and canceling the

22  ballot and voting in person?

23  A.  Yes.  Yes.

24  Q.  And for certain military voters it can also be cured via

25  email?

CHARLTON JOHNSON - CROSS

1  A.  That's right.

2  Q.  In fact, there are more options to cure an ID defect than

3  there are with any other defect on an application or a ballot?

4  A.  For an ID defect they do have the opportunity to cure

5  online.

6  Q.  Which is not present for other defects?

7  A.  That's correct.

8  Q.  Now, for the -- comparing the 2022 Primary to the

9  May 7th local election, there were fewer carrier envelopes

10  rejected for a missing ID number during the May 7th Election

11  than the May or March 2022 Primary, is that right?

12  A.  I don't have the specific statistics in front of me, but

13  yes.

14  Q.  And the rejection rate during the 2022 Primary was also

15  significantly higher than the rejection rate during the 2022

16  General Election?

17  A.  Yes.

18  Q.  And you would attribute that difference to voter education

19  over the course of several election cycles?

20  A.  I think so, yes.

21  Q.  Because over time voters learn, as they are educated, with

22  respect to the voting requirements?

23  A.  Presumably, yes.

24  Q.  And voters will probably continue to improve in their

25  ability to meet the voting rules?

CHARLTON JOHNSON - CROSS

1  A.  I hope so.

2  Q.  Now, Travis County didn't have any significant issues

3  performing the ID matching requirement?

4  A.  No significant issues.

5  Q.  And you were able to implement the provisions of the law

6  as they were written?

7  A.  We were.  And let me clarify one thing.

8  Q.  Yes, sir.

9  A.  With respect to being able to verify IDs, as you

10  mentioned, significant issues to verify IDs, no, we did not

11  have issues with respect to the ballots, the signature

12  verification committee, but at the beginning of the '22 cycle

13  going into the Primary there were some difficulty in being

14  able to verify IDs on applications due to the fact that our

15  local database did not have a comprehensive list of IDs for

16  voters.

17      We would get an application, have a driver's license on

18  it, it wasn't in our local system, we were ready to reject it

19  until we were able to then actually verify it against TEAM,

20  but there was a — it took a few weeks there at the beginning

21  to figure out the best method in order to verify the

22  information on the application against either our database or

23  the State database.

24  Q.  And that was during the March 2022 Primary?

25  A.  That's correct.

CHARLTON JOHNSON - CROSS

1  Q.  And that was the first election after the implementation

2  of SB 1?

3  A.  That's correct.

4  Q.  And but you figured it out, right?

5  A.  Eventually, yes.

6  Q.  And it was better during the May 7, 2022 Election?

7  A.  It did get better.

8  Q.  And it was better during the November 2022 Election?

9  A.  Yes.

10  Q.  Both before and after SB 1, there are circumstances in

11  which you are unable to match a prospective voter with their

12  voter registration file, is that right?

13  A.  On the application side?

14  Q.  Either way.

15  A.  Well, a carrier envelope has an ID that we create that

16  links it to the voter profile.  It would be quite unusual to

17  get a carrier envelope that we had no idea what voter it

18  belonged to, unless it came from another county, something

19  like that.  That does happen occasionally.

20      But on the application side, that could happen, just

21  because it's a brand new application filled out by a voter

22  that may not provide as much information as we might need to

23  indicate which voter they are, that's pretty rare, but it

24  could happen.  More on side of the application side than the

25  carrier envelope side.

CHARLTON JOHNSON - CROSS

1  Q.  And the ID requirement does make it a little easier to

2  match a prospective voter to the voter registration file?

3  A.  It may.  Before SB 1 typically the name, date of birth,

4  especially address was enough a vast majority of the time to

5  figure out who the voter was that was requesting the ballot by

6  mail.  If we couldn't find it, jump into the State system,

7  find it there, and actually registered in another county, so,

8  yeah, us having a driver's license or a social security number

9  on there could assist in the off-chance that we just don't

10  have enough information to figure out exactly who that voter

11  might be.

12  Q.  Let's talk briefly about staffing.  For the 2022 General

13  Election you were able to obtain enough poll workers to staff

14  the polls, right?

15  A.  Yes.

16  Q.  And you didn't have to close any polling locations due to

17  lack of staff?

18  A.  No.

19  Q.  And you're not aware of any voter who was unable to vote

20  due to a lack of staffing?

21  A.  No.

22  Q.  And there weren't any polling locations that had

23  significant delays opening?

24  A.  Significant delays opening?  No, not that I'm aware of.

25  Q.  And you didn't have to close any polling locations due to

CHARLTON JOHNSON - CROSS

1  lack of supplies, or anything like that?

2  A.  Oh, no.

3  Q.  Now, overall, you would consider the November 2022 General

4  Election a success?

5  A.  Yes.

6  Q.  And, in fact, I believe you called it the "best run since

7  the implementation of SB 1?"

8  A.  Yes.

9  Q.  You learned a lot of lessons in the Primary?

10  A.  We certainly did.

11  Q.  And you worked through I think seven total elections in

12  2022?

13  A.  Yes.

14  Q.  And you got your workflow cemented?

15  A.  They are always evolving, but, yes, we are always trying

16  to find our best practices.

17  Q.  And you were able to work out the kinks in your specific

18  processes?

19  A.  To the best of our ability, yes.

20  Q.  And overall you think the entire operation for the 2022

21  General Election went well?

22  A.  It certainly improved since the spring, yes.

23        MR. WASSDORF:  Pass the witness.

24        THE COURT:  Anything else on this side?  Nothing.

25        Anything by redirect?

1    MR. DOLLING:  Just a few questions.

2                REDIRECT EXAMINATION

3    BY MR. DOLLING:

4    Q.  So, Mr. Johnson, earlier you were speaking with

5    Mr. Wassdorf and you talked about how it's possible that

6    voters could have the same name and date of birth, do you

7    remember that?

8    A.  Yes.

9    Q.  And it's possible that voters with the same -- could in

10   theory have the same, name date of birth, and address?

11   A.  I suppose so.

12   Q.  Have you ever seen that?

13   A.  Same name, date of birth, and address?  I've never seen

14   that.

15   Q.  How frequently do you see voters with the same name and

16   date of birth?

17   A.  I couldn't tell you, but it's pretty infrequent.

18   Q.  And every voter registration file in your local database

19   or in TEAM should have a name, date of birth, and address, is

20   that right?

21   A.  Yes.

22   Q.  So as long as one of those data points differs between two

23   voter files, you should be able to distinguish them, is that

24   right?

25   A.  Yes.

CHARLTON JOHNSON - REDIRECT

1  Q.  And I just wanted to briefly return to what we had been

2  speaking about before about the carrier envelope reflecting

3  that order of operations of DPS number than social security

4  number, do you remember that?

5  A.  Yes.

6  Q.  And you were speaking with Mr. Wassdorf about how

7  Travis County, pursuant to the SOS's advisories, does not

8  impose that order in receiving materials, right?

9  A.  That's right.

10  Q.  But you still agree that the carrier envelope reflects the

11  order that is set out in SB 1, is that correct?

12  A.  That's the way the language reads, yes.

13  Q.  And so you would agree, notwithstanding the SOS's

14  advisory, just on its face, that the instructions on the

15  carrier envelope and the recommendation in the inserts to

16  provide both numbers are in conflict, is that right?

17  A.  Yes.

18  Q.  Okay.  Thank you.  And, to your knowledge, the legislature

19  has not made any changes to the order of numbers set out in SB

20  1?

21  A.  I don't think that was addressed.

22  Q.  And you were discussing with Mr. Wassdorf the various

23  forms of cure that are available for ID numbers, do you

24  remember that?

25  A.  Yes.

CHARLTON JOHNSON - REDIRECT

1  Q.  And, in fact, there are technically more ways to cure an
2  ID issue than other issues, right?
3  A.  Yes.
4  Q.  But despite all these cure options, it still remains true
5  that Travis County rejected the hundreds of applications and
6  mail ballots that we talked about, is that right?
7  A.  That's right.
8  Q.  And earlier in response to questions from Mr. Wassdorf,
9  you talked about how the mail ballot rejection rate had gone
10  down between the March and November Elections, is that right?
11  A.  Say that one more time.
12  Q.  Yeah.  Earlier in response to questions from Mr. Wassdorf,
13  you were talking about how the mail ballot rejection rate had
14  gone down between the March and November Election?
15  A.  Yes.
16  Q.  In 2022?
17  A.  Yes.
18  Q.  And while that may be the case, you don't know where the
19  floor is, is that correct?
20  A.  I don't.
21  Q.  And so you can't say where the average rejection rate
22  under SB 1 will settle, is that correct?
23  A.  Too early to tell.
24  Q.  And you do agree that even if the rejection rates went
25  down between March and November, the November rejection rate

CHARLTON JOHNSON - REDIRECT

1  is still higher than the rejection rate in elections prior to

2  SB 1?

3  A.  That's right.

4          MR. DOLLING:  Actually, that's it for me.

5          Pass the witness.  Thank you.

6          THE COURT:  Anything else?

7          Any further need for this witness or can he be

8  excused?

9          MR. DOLLING:  No need.

10          THE COURT:  You're excused, sir.  Thank you.

11          THE WITNESS:  Thank you.

12          THE COURT:  And your next witness.

13          MISS KUMAR:  Your Honor, Savannah Kumar for the OCA

14  Greater Houston plaintiffs.

15          Plaintiffs call Miss Bridgette Escobedo to the stand.

16          Miss Escobedo's testimony will go to all of OCA

17  Greater Houston's claims, Section 6.06, which OCA Greater

18  Houston challenges under Section 208 of the Voting Rights Act,

19  Sections 5.02, 5.03, 5.07, 5.12, and 6.04 under the Americans

20  with Disabilities Act and Rehabilitation Act and Section 7.04

21  under the First Amendment and Fourteenth Amendment due

22  process.

23          Your Honor, I request permission to ask leading

24  questions under Federal Rule of Evidence 611(c)(2) because

25  Miss Escobedo is a witness identified with an adverse party,

BRIDGETTE ESCOBEDO - DIRECT

1  the Travis County Clerk.

2          THE COURT:  Any response?

3          MR. KERCHER:  No objection, Your Honor.

4          THE COURT:  You may proceed.

5      (BRIDGETTE ESCOBEDO, having been duly sworn, testified as

6  follows:)

7                  DIRECT EXAMINATION

8  BY MISS KUMAR:

9  Q.  Good morning, Miss Escobedo.

10  A.  Good morning.

11  Q.  I so appreciate you being here today.

12      Can you please state your name for the record.

13  A.  Bridgette Escobedo.

14  Q.  Where did you grow up, Miss Escobedo?

15  A.  I was born and raised in Austin, Texas.

16  Q.  What is your educational background?

17  A.  I have some college.

18  Q.  And you are the Director of Elections in the Travis County

19  Elections Division, correct?

20  A.  Yes, ma'am.

21  Q.  And the Travis County Elections Division is a division of

22  the Travis County Clerk's Office, correct?

23  A.  Yes.

24  Q.  And you have been in that role of Director of Admissions

25  since January 2020, correct?

1546

BRIDGETTE ESCOBEDO - DIRECT

1   A.  Yes.

2   Q.  As Elections Director you oversee all elections in

3   Travis County, correct?

4   A.  Yes.

5   Q.  And you supervise staff in the Elections Division?

6   A.  Yes.

7   Q.  Approximately how many staff members do you supervise?

8   A.  We currently have 30 staff members.

9   Q.  And before you were Director of Elections for

10  Travis County, you were Assistant Director for Elections in

11  Travis County as well, starting in September 2019, is that

12  correct?

13  A.  That's correct.

14  Q.  And so you have been at the Travis County Elections

15  Division for about four years, is that right?

16  A.  Yes.

17  Q.  And before these positions in Travis County, you were the

18  Elections Administrator in Bastrop County, correct?

19  A.  Yes.

20  Q.  And you were the Assistant Elections Administrator in

21  Bastrop County before that, right?

22  A.  Yes.

23  Q.  So you have about 16 years of experience working in

24  elections in Texas, is that right?

25  A.  Yes.

BRIDGETTE ESCOBEDO - DIRECT

1  Q.  And why have you chosen to work in elections in Texas for

2  all these 16 years?

3  A.  It's my passion.

4  Q.  I'm now going to ask you about some of your experience

5  with these elections.  You are not aware of any incidents of

6  voter fraud associated with mail-in ballots in Travis County,

7  is that correct?

8  A.  That's correct.

9  Q.  And so just to be clear, that means you are not aware of

10  any incidents of voter fraud associated with mail-in ballots

11  in Travis County elections before 2022, correct?

12  A.  That's correct.

13  Q.  And the same is true for elections after the start of 2022

14  in Travis County, is that correct?

15  A.  That's correct.

16  Q.  And so that means that you are not aware of any decrease

17  in voter fraud in Travis County after SB 1 went into effect

18  because you're not aware of any incidents of voter fraud with

19  mail-in ballots to begin with, correct?

20  A.  That's correct.

21  Q.  And similarly, you are not aware of any incidents of voter

22  fraud associated with in-person assistance at a polling place,

23  is that correct?

24  A.  That's correct.

25  Q.  The last statewide election in Travis County was the

BRIDGETTE ESCOBEDO - DIRECT

1  November 2022 General Election, correct?

2  A.  Yes.

3  Q.  You are not aware of any illegal voting occurring in

4  connection with the November 2022 General Election in

5  Travis County, correct?

6  A.  Correct.

7  Q.  And you are not aware of any criminal conduct occurring in

8  connection with the November 2022 General Election in

9  Travis County, correct?

10 A.  Correct.

11 Q.  So now let's turn to Section 6.06 of SB 1, and, Stephen,

12 can you please pull up on the screen, I see you have it there,

13 Joint Exhibit 1, and then if you could highlight on page 54

14 line 20 through page 55 line 19.

15     And, Miss Escobedo, do you see the provision of SB 1

16 displayed on the screen?

17 A.  Yes.

18 Q.  You are familiar with this provision, correct?

19 A.  Yes.

20 Q.  And do you understand this provision to mean that a person

21 commits an offense if the person offers or receives

22 compensation for assisting voters, is that correct?

23 A.  Yes.

24 Q.  And you understand that a violation under this section is

25 a state jail felony, correct?

BRIDGETTE ESCOBEDO - DIRECT

1  A.  Yes.

2  Q.  You agree that under this provision somebody who is paid

3  by a nonprofit organization is prohibited from assisting

4  voters, is that correct?

5  A.  Yes.

6  Q.  And in your understanding this provision does not limit

7  compensation just to meaning monetary compensation, is that

8  correct?

9  A.  Correct, yes.

10  Q.  And you agree that buying someone's lunch could be

11  considered a type of compensation, correct?

12  A.  Yes.

13  Q.  And, similarly, you agree that giving someone a cup of tea

14  could be considered a type of compensation too, correct?

15  A.  Correct.

16  Q.  And you would you agree that paying for someone's parking

17  could be considered a type of compensation, correct?

18  A.  Correct.

19  Q.  Under this provision many other types of things could be

20  considered compensation, is that correct?

21  A.  Yes.

22  Q.  And it's your understanding that a person could be charged

23  with a felony, if they accept an offer of refreshments for

24  assisting a person with their mail-in ballot, correct?

25  A.  I believe so.

1    Q.  And, similarly, the person offering those refreshments to

2    the assistant could also be charged with a felony, in your

3    understanding, is that correct?

4    A.  Yes.

5    Q.  And it's your understanding that a person could be charged

6    with a felony if they offer to pay for someone's parking for

7    assisting with a mail-in ballot too, is that correct?

8    A.  Yes.

9    Q.  And my last couple of questions for you.  Does your office

10   receive federal funding?

11   A.  We have received federal funding.

12   Q.  And when would that have been?

13   A.  During 2020 during the pandemic.

14        MISS KUMAR:  I pass the witness.  Thank you.

15        THE COURT:  Anything else from this side?

16        MR. DODGE:  Just a few questions, Your Honor.

17   BY MR. DODGE:

18   Q.  Morning, Miss Escobedo.

19   A.  Morning.

20   Q.  You spoke a moment ago about SB 1's identification number

21   requirements for mail ballot applications.  You agree that

22   some applications were rejected in the 2022 elections due to

23   issues with SB 1's ID matching requirements?

24   A.  Yes.

25   Q.  And of those voters whose applications were rejected, some

BRIDGETTE ESCOBEDO - DIRECT

1  were unable to cure their application in time to receive a

2  mail ballot?

3  A.  Yes.

4  Q.  And some voters who were unable to cure their application

5  in time ultimately did not vote?

6  A.  Possibly, yes.

7  Q.  Do you know whether or not some voters who were not able

8  to cure their application in time ultimately did not vote?

9  A.  Some communicated to us they did not vote.

10  Q.  It's accurate to say that in Travis County the rate of

11  rejection of applications since SB 1's enactment has been

12  higher than prior to SB 1?

13  A.  That's correct.

14  Q.  And that increase in rejection rate for applications is

15  primarily due to issues with SB 1's voter identification

16  requirement?

17  A.  Yes.

18  Q.  And switching gears to actual ballots, it's the case that

19  some voters who had their ballots rejected for voter ID

20  matching issues were also unable to cure their ballot in time

21  to qualify in order to vote?

22  A.  Some, yes.

23  Q.  And in the 2022 General Election the majority of absentee

24  ballots rejected in Travis County had voter ID matching

25  issues, correct?

BRIDGETTE ESCOBEDO - DIRECT

1    A.  That's correct.

2    Q.  Just a few questions on extended-hour voting now.  What

3    are the usual weekday hours for polling sites in Travis County

4    during early voting?

5    A.  7:00 a.m. to 7:00 p.m.

6    Q.  And did Travis County ever extend these hours during the

7    2022 Election cycle?

8    A.  Yes.  We stayed open until 10:00 p.m. at some locations.

9    Q.  And were you involved in the discussions to extend early

10   voting hours in those locations?

11   A.  Yes.

12   Q.  And during those discussions did you have any concern that

13   extending voting hours would lead to voter fraud?

14   A.  No.

15   Q.  And the process for checking in a voter during extended

16   voting hours is the same as during ordinary hours, right?

17   A.  That's correct.

18   Q.  And setting aside any limitations in SB 1 or in the

19   election code, would you recommend offering extended hours

20   voting in future elections in Travis County?

21   A.  Yes.

22   Q.  Why is that?

23   A.  To expand access to voting.

24        MR. DODGE:  Pass the witness.

25        THE COURT:  Anything else?

BRIDGETTE ESCOBEDO - CROSS

1    Anything else from your side?

2    MR. KERCHER:  I do have cross-examination, Your

3  Honor.  Would you like to take the morning break first or just

4  power through?

5    THE COURT:  Anybody need a break?

6    You need a break?

7    MR. KERCHER:  I'm ready to go, Your Honor.

8    THE COURT:  Go head.

9    MR. KERCHER:  Before I approach, it looks like

10  somebody has left their work product up there and I don't want

11  to cheat.

12    CROSS-EXAMINATION

13  BY MR. KERCHER:

14  Q.  Morning, Miss Escobedo.  My name is Ryan Kercher.  I work

15  for the Attorney's General Office.

16  A.  Morning.

17  Q.  I want to first start by talking about the assister oath

18  in SB 1.  You are familiar with that, right?

19  A.  Yes.

20  Q.  And you know that folks who want to assist voters have to

21  take that oath, right?

22  A.  Yes.

23  Q.  You are not familiar with, you haven't heard about any

24  voters in Travis County who could not vote as a result of that

25  oath, right?

BRIDGETTE ESCOBEDO - CROSS

1   A.   I'm not aware.

2   Q.   You are also not aware of any person who wanted to be an

3   assister but chose not to as a result of the oath, is that

4   true?

5   A.   Right.  I'm not aware.

6   Q.   Let's talk about poll watchers next, okay?

7   A.   Okay.

8   Q.   Now, throughout the early voting period, and on Election

9   Day in the March 2022 Primary, there were probably only 20 or

10  25 poll watchers at a time, is that true?

11  A.   Not certain.

12  Q.   Okay.  Just don't recall, is that fair?

13  A.   Can't recall.

14  Q.   We heard testimony from Miss DeBeauvoir about an incident

15  with a poll watcher named Jennifer Fleck.  Are you familiar

16  with that incident?

17  A.   Yes.

18  Q.   Now, she was removed from the central counting station,

19  right?

20  A.   Yes.

21  Q.   That's the only instance, though, that you are aware of

22  where a poll watcher needed to be removed from a voting site,

23  is that true?

24  A.   Yes.

25  Q.   Now, another poll watcher actually filed a criminal

BRIDGETTE ESCOBEDO – CROSS

1  complaint against you, right?

2  A.  Yes.

3  Q.  They wanted to view the early voting tape, is that right?

4  A.  That's correct.

5  Q.  And even though you explained the situation and the poll

6  worker seemed to understand why that was not going to be

7  permitted, that watcher filed a complaint anyway, right?

8  A.  Yes.

9  Q.  And you don't have any evidence, though, that that poll

10  watcher filed that criminal complaint because of SB 1, is that

11  fair to say?

12  A.  Yes.

13  Q.  And what happened with that criminal complaint is a

14  sheriff's deputy came out and talked to you, right?

15  A.  Yes.

16  Q.  And determined that nothing criminal had actually

17  happened, right?

18  A.  Yes.

19  Q.  And so no charges were filed, you weren't indicted, there

20  wasn't an information filed against you, right?

21  A.  Yes.

22  Q.  Let's turn now to 24-hour voting, okay?

23  A.  Okay.

24  Q.  We heard from Miss DeBeauvoir that Travis County has never

25  done 24-hour voting, do you agree with that?

1   A.   Yes.

2   Q.   You're generally familiar, though, that Section 3.09 of SB

3   1 limits voting hours to no earlier than 6:00 a.m. and no

4   later than 10:00 p.m., right?

5   A.   Yes.

6   Q.   That section did not require Travis County to change its

7   voting hours, right?

8   A.   That's right.

9   Q.   Travis County had not, before SB 1, allowed voting before

10  6:00 a.m., right?

11  A.   Correct.

12  Q.   And before SB 1 Travis County had not allowed voting after

13  10:00 p.m.?

14  A.   That's correct.

15  Q.   And the reason that Travis County has not allowed voting

16  before 6:00 a.m. or after 10:00 p.m. is not out of some desire

17  to suppress the vote, fair to say?

18  A.   That's correct.

19  Q.   Travis County isn't adopting those voting hours in order

20  to ensure that people of color cannot vote, for example?

21  A.   Can you repeat the question?

22  Q.   Sure.  Travis County isn't adopting the voting hours that

23  is traditionally used between 6:00 a.m. and 10:00 p.m. in

24  order to suppress the vote of people of color, for example?

25  A.   That's correct.

BRIDGETTE ESCOBEDO - CROSS

1  Q.  Or people with disabilities?

2  A.  Correct.

3  Q.  Or the elderly?

4  A.  Correct.

5  Q.  There are plenty of other reasons to have voting hours

6  between 6:00 a.m. and 10:00 p.m., fair?

7  A.  Yes.

8  Q.  You know that in 2020 Harris County offered 24-hour

9  voting, right?

10  A.  I believe so.

11  Q.  And as a result, your office got some questions from

12  Travis County voters about whether there would be 24-hour

13  voting in Travis County, right?

14  A.  I'm not aware of those questions.

15  Q.  Would you like to refresh your recollection right quick?

16  A.  Sure.

17  Q.  Okay.  Brian, if we could pull up the 2022 deposition,

18  page 94 line 7 to 10.

19      Take a moment and look at that right quick.

20  A.  Um-hum.

21  Q.  See if that refreshes your recollection.

22  A.  It says we received a few calls.

23  Q.  And you are familiar with those calls, is that true?

24  A.  Yes.

25  Q.  And the nature of those calls was people wanted to know

BRIDGETTE ESCOBEDO - CROSS

1   whether Travis County was going to allow 24-hour voting the

2   way that Harris County had, right?

3   A.   Yes.

4   Q.   There was some confusion about whether what was happening

5   in one county for an election was going to happen in another

6   county for an election?

7   A.   Yes.

8   Q.   You're not aware of any calls to your office about

9   Travis County polling locations closing too early, is that

10  right?

11  A.   Too early for -- during regular business hours?

12  Q.   So let me see if I can ask you a better question.

13      We talked a little bit about the traditional hours that

14  Travis County has kept its polling locations open, right?

15  A.   Yes.

16  Q.   Did you ever get any -- you're not aware of any phone

17  calls from voters saying, hey, your polling locations are

18  closing so early that I can't vote?

19  A.   I'm not aware of any phone calls.

20  Q.   And, likewise, you're not aware of any phone calls

21  complaining -- by voters complaining that the polls in

22  Travis County did not open early enough?

23  A.   Correct.

24  Q.   And in all your time working with Travis County, you are

25  aware of fewer than five instances where someone was unable to

BRIDGETTE ESCOBEDO – CROSS

1  vote because they arrived too late to a polling location, is

2  that true?

3  A.  I'm not certain of the number.

4  Q.  Would you agree with me that it's less than ten?

5  A.  I'm not certain.

6  Q.  Would you like to refresh your recollection?

7  A.  Sure.

8  Q.  Brian, can we pull up the 2022 deposition, please, and

9  that's page 96, lines 3 through 18.

10     Take a moment and review that and let me know when you're

11  done.  Does that refresh your recollection?

12  A.  It does.

13  Q.  So let me ask you my question again.  In all your time at

14  Travis County, you are aware of fewer than five times when a

15  voter has arrived too late at a voting location to vote?

16  A.  Correct.

17  Q.  All right.  Let's talk a little bit about drive-thru

18  voting now, okay?

19  A.  Okay.

20  Q.  You are generally aware that Section 3.04 of SB 1 makes it

21  unlawful or prohibits a voter from passing a vote from inside

22  a motor vehicle, right?

23  A.  I believe that's the section.

24  Q.  That provision does not affect Travis County, right?

25  A.  That's correct.

BRIDGETTE ESCOBEDO - CROSS

1    Q.  Travis County never offered drive-thru voting?

2    A.  That's correct.

3    Q.  And your understanding of the election code prior to SB 1

4    is that drive-thru voting was already not permitted by the

5    election code prior to SB 1?

6    A.  Correct.

7    Q.  All right.  Let's move on to voter ID, okay?

8    A.  Okay.

9    Q.  Brian, could we please pull up State Exhibit 17, that's

10   Joint Exhibit Number 4.

11       You recognize this as an election advisory from the

12   Secretary of State's Office?

13   A.  Yes.

14   Q.  And it's dated January 28, 2022?

15   A.  Yes.

16   Q.  And it's entitled New Law Senate Bill 1 Opportunity to

17   Correct Defects on Application for a Ballot By Mail and

18   Carrier Envelope, right?

19   A.  Yes.

20   Q.  Let's go to page 2, Brian, section called Requirements for

21   Processing Applications for Ballot By Mail, do you see that

22   there?

23   A.  Yes.

24   Q.  And if we go to the second paragraph under that heading,

25   it reads, "Section 86.001 outlines the process that an early

BRIDGETTE ESCOBEDO - CROSS

1  voting clerk must follow when reviewing a voter's submitted

2  ABBM.  Among other things, the early voting clerk must verify

3  that the personal identification information provided by the

4  voter on the application, i.e., a DPS-issued driver's license,

5  EIC, or personal identification card number, the last four

6  digits of the applicant's social security number, or a

7  statement that the applicant has not been issued any of these

8  numbers identifies the same voter identified on the

9  applicant's voter registration record."

10     Did I read that correctly.

11  A.  Yes.

12  Q.  This is the standard that Travis Clerk's Office has

13  followed, is that true?

14  A.  Yes.

15  Q.  All right.  Let's go to the next paragraph, please, Brian.

16     It reads, "If the voter fails to provide any of the

17  required identification information on the ABBM, or the

18  information provided by the voter on the ABBM does not match

19  the information on the voter's registration record, the early

20  voting clerk shall reject the ABBM and provide notice of the

21  rejection."  And I'll skip the parenthetical.

22     Is that the standard that the Travis County Clerk's Office

23  has followed?

24  A.  Yes.

25  Q.  It goes on, "Similarly, if the voter provides one or both

BRIDGETTE ESCOBEDO - CROSS

1  of the required identification numbers, but the voter's voter

2  registration record does not contain either number, the early

3  voting clerk must reject the ABBM and promptly notify the

4  voter of the rejection."

5      Is that the standard that Travis County Clerk's Office has

6  followed?

7  A.  Yes.

8  Q.  So it's right to say that when Travis County Clerk's

9  Office has received this kind of guidance from the Secretary

10 of State's Office they have implemented the policy suggested

11 by the Secretary of State's Office?

12 A.  Yes.

13 Q.  All right.  Let's go to the next section, Brian, called

14 Possible Scenarios, and we'd like to go to Scenario Number 3.

15     Now, we looked at this earlier with your predecessor on

16 the stand.  I won't read it to everybody again, but this

17 generally provides for where a voter provides a social

18 security number, their registration record has a social

19 security number, and a driver license number.

20     If the clerk verifies the social security number, then the

21 clerk must accept the ABBM.  Is that the standard that the

22 Travis County Clerk's Office has followed?

23 A.  Yes.

24 Q.  Okay.  Let's go to Scenario Number 6, please.  This

25 provides that when a voter gives a social security number and

BRIDGETTE ESCOBEDO — CROSS

1  a driver's license and one matches the registration record but

2  the other does not, the clerk must accept the ABBM.  Are you

3  familiar with that guidance from the Secretary of State's

4  Office?

5  A.  Yes.

6  Q.  Is that the standard that the Travis County Clerk's Office

7  follows?

8  A.  Yes.

9  Q.  If a voter provides you with a social security number and

10  it matches your records, you don't inquire as to whether the

11  voter has a driver's license, is that right?

12  A.  That's correct.

13  Q.  And if a voter signs a statement saying they do not have

14  either number, you don't inquire into whether that statement

15  is true, that statement is good enough for your office, is

16  that true?

17  A.  That's true.

18  Q.  All right.  Between the March 2022 Primary and the

19  May 7th, 2022 Primary — or excuse me — Election,

20  Travis County saw a decline in the rate of ABBM rejections?

21  A.  I believe they stayed consistent.  The rejection rate

22  stayed consistent.

23  Q.  Would you like to refresh your recollection?

24  A.  Sure.

25  Q.  Brian, can we pull up the same deposition, page 148, lines

BRIDGETTE ESCOBEDO - CROSS

1  1 through 7.  Does that refresh your recollection,

2  Miss Escobedo?

3  A.  Yes.

4  Q.  I'll ask you my question again.  Between the March 2022

5  Primary and the May 7, 2022 Election, Travis County saw a

6  decline in the rejection rates of ABBMs, true?

7  A.  Yes.

8  Q.  Travis County also saw a decline in the rejection rate of

9  ABBMs between the March 2022 Primary and the May 24, 2022

10 Election?

11 A.  Can you please repeat the question.

12 Q.  Sure.  All these dates, right.  So a moment ago we were

13 talking about that March Primary and the May 7th Election, but

14 there's another election in May 2022, right?

15 A.  That's correct.

16 Q.  So Travis County saw a decline in the rate of ABBM

17 rejections between that March Primary in 2022 and the

18 May 24th, the later May 2022 Election, is that true?

19 A.  I believe so.

20 Q.  Travis County also saw a reduction in voter confusion

21 between the March 2022 Elections and the May -- March 22

22 Election and the May 2022 Elections regarding SB 1 provisions?

23 A.  Yes.

24 Q.  There were fewer calls to your office about how these new

25 provisions were going to work, true?

BRIDGETTE ESCOBEDO – CROSS

1   A.   I believe so, yes.

2   Q.   There were fewer conversations between your office with

3   confused voters over ABBM requirements, that's true?

4   A.   Yes.

5   Q.   And voters were becoming more familiar with the ABBM

6   requirements under SB 1, that was your experience?

7   A.   Yes.

8   Q.   Brian, let's pull up State Exhibit 17 again, please, and

9   go to page 6.  This section is entitled New Comparison

10  Requirements for Early Voting Ballot Board and Signature

11  Verification Committee.  I'm going to direct your attention to

12  the last sentence in that paragraph.  It's highlighted here.

13      It reads, "If the voter includes an identification number

14  on the carrier envelope, the number on that, on the carrier

15  envelope does not match" –– excuse me –– "does not have to

16  match the type of number on the voter's ABBM, as long as they

17  are both associated with the voter's registration record."

18      Is that the standard that Travis County Clerk's Office has

19  followed?

20  A.   Yes.

21  Q.   Brian, let's scroll down the page to Scenario Number 2.

22      This scenario reads, "Voter provides a personal

23  identification number on the carrier envelope that matches the

24  number in the voter's voter registration record but is a

25  different type of number than what the voter listed on the

BRIDGETTE ESCOBEDO - CROSS

1  ABBM.  So, for example, a voter provided last four digits of
2  the social security number on the ABBM, and a driver's license
3  number on the carrier envelope, because the voter's voter
4  registration record contains both identification numbers, the
5  SVC or EVBB is able to verify the voter's identity.  The SVC
6  or EVBB should perform its remaining duties in the ballot
7  review process.  If the SVC or EVBB does not identify any
8  other ground for rejection, the ballot would be accepted."
9      Is that the standard that the Travis County Clerk's Office
10 has followed?
11 A.  Yes.
12 Q.  Travis County also saw ballot rejections based on lacking
13 voter ID numbers dropped between the March and May 2022
14 elections, right?
15 A.  I believe so.
16 Q.  And Travis County saw ballot rejections based on
17 mismatched voter ID number drop between the March and May 22
18 Elections, right?
19 A.  I believe so.
20 Q.  Likewise, Travis County saw voter confusion regarding ID
21 numbers on ballots dropped between the March and May 22
22 Elections, true?
23 A.  I believe so.
24 Q.  We've been talking about ballots being rejected for having
25 no ID number or mismatch ID number.  SB 1 provides ways to

BRIDGETTE ESCOBEDO - CROSS

1  cure those ballots, right?

2  A.  Yes.

3  Q.  They can be cured in person, right?

4  A.  I'm not certain.

5  Q.  I'm not trying to quiz you.  Let me ask you.  Do you

6  remember whether SB 1 allows those ballots to be cured in

7  person?

8  A.  I'm not certain.

9  Q.  What about online?

10  A.  They can cure online.

11  Q.  And a person can also submit a new voter registration

12  form, is that true?

13  A.  I believe so, yes.

14  Q.  Brian, can we please pull up State Exhibit 19 and go to

15  page 1.  This is another election advisory from the Secretary

16  of State's Office, right?

17  A.  Yes.

18  Q.  And it's dated February 11th, 2022, is that true?

19  A.  Yes.

20  Q.  And it is entitled Additional Procedurals Regarding

21  Correction of Defects on Application for Ballot By Mail or

22  Carrier Envelope, right?

23  A.  Yes.

24  Q.  Brian, can we go to page 3, please.  The section entitled

25  Removing the Secrecy Flap on Carrier Envelope, do you see

1  that?

2  A.  Yes.

3  Q.  The first paragraph under that heading reads, "The early

4  voting clerk is authorized to remove the secrecy flap on a

5  return carrier envelope to facilitate the processing and

6  review of voted mail ballots.  If, when removing the secrecy

7  flap, the early voting clerk discovers that the voter did not

8  fully seal the carrier envelope, the clerk may take action

9  such as taping or sealing the flap to ensure that the envelope

10 containing the ballot is not separated from the carrier

11 envelope."

12     Your office follows that procedure, is that true?

13 A.  That's true.

14 Q.  We can go gown to the next section Returning the Carrier

15 Envelope to the Voter.  The first sentence under this

16 provision says, "If an early voting clerk delivers the carrier

17 envelope to the voter in person, the clerk should document

18 this delivery.  This hand-delivery option must be applied

19 uniformly to all voters in similar circumstances."

20     Did I read that correctly?

21 A.  Yes.

22 Q.  Travis County did not deliver carrier envelopes to voters

23 in person, true?

24 A.  True.

25 Q.  All right.  Let's turn now to vote harvesting.  You are

1  generally aware that Section 7.04 creates a criminal offense
2  for vote harvesting, right?
3  A.  Yes.
4  Q.  Your office does not enforce that provision, right?
5  A.  Our office does not.
6  Q.  And you have not spoken to DA Jose Garza or someone at his
7  office about how he intends to enforce that provision, right?
8  A.  Correct.
9  Q.  And, likewise, you have not spoken to County Attorney
10 Delia Garza or someone in her office about how she intends to
11 enforce that provision, fair?
12 A.  That's correct.
13 Q.  You are also not aware of anyone having been prosecuted
14 under this provision, is that right?
15 A.  That's correct.
16 Q.  You were asked on direct examination about what
17 compensation might mean, about whether somebody could be —
18 could understand compensation to mean getting a glass of
19 lemonade, right?
20 A.  That's right.
21 Q.  You are not aware of anyone having been prosecuted for
22 getting a glass of lemonade under SB 1, fair to say?
23 A.  I'm not aware.
24 Q.  You are not aware of anyone having been prosecuted under
25 SB 1 for getting parking validation, right?

1   A.   I'm not aware.

2   Q.   And you are not aware of anyone being prosecuted under

3   this provision of SB 1 at all, is that true?

4   A.   That's correct.

5   Q.   We've been talking about some of the changes that SB 1 has

6   made to voting practices that have been challenged in this

7   lawsuit.   I want to talk about some of the other things SB 1

8   also did, like expanding voter access, okay?

9   A.   Okay.

10  Q.   SB 1 expanded the minimum number of hours the county is

11  required to have polling locations open, do I have that right?

12  A.   I believe so.

13  Q.   Prior to SB 1 a county simply had to have polling places

14  open on weekdays during early voting, right?

15  A.   Yes.

16  Q.   SB 1 changed that and required that counties have polling

17  locations be open on each weekday during early voting, right?

18  A.   Yes.

19  Q.   Under SB 1 a voter who is in line at the time a polling

20  location closes is still entitled to vote, right?

21  A.   Yes.

22  Q.   That was not true under the election code prior to SB 1?

23  A.   Can you repeat that, please.

24  Q.   Sure.   Prior to SB 1 it was not the case that just because

25  a voter had made it into the voting line at a polling location

BRIDGETTE ESCOBEDO - CROSS

1  that -- let me try and ask that question again.

2      It was not true before SB 1 that the law required allowing

3  a voter to vote if they were in line to vote at the time the

4  polling location closed.

5      There's no way to ask that question without being too

6  long.

7  A.  I believe it's always been the case if you were in line by

8  the time the polls closed you would be allowed to vote.

9  Q.  But SB 1 made this true for early voting, isn't that

10 right?  If you don't know, you don't know.

11 A.  I'm not certain.

12 Q.  That's fine.  Let's talk a little bit about Travis County,

13 my home county.  Austin is the biggest city there, right?

14 A.  Yes.

15 Q.  Austin, though, is not completely contained within the

16 confines of Travis County, right?

17 A.  That's correct.

18 Q.  And, likewise, Travis County shares some smaller cities

19 with surrounding counties, right?

20 A.  That's correct.

21 Q.  So, for example, Cedar Park and Leander stretch across

22 both Travis and Williamson County, right?

23 A.  That's correct.

24 Q.  And you know that when those different Austin area

25 counties have different polling hours, sometimes voters get

BRIDGETTE ESCOBEDO - CROSS

1  confused?

2  A.  That's correct.

3  Q.  Voters also get confused when voting hours change, is that

4  fair to say?

5  A.  That's fair.

6  Q.  And having uniform polling hours across counties reduces

7  that confusion, right?

8  A.  Yes.

9  Q.  Travis County conducted an analysis of whether extended

10  voting hours led to more voters being able to vote after the

11  passage of SB 1, right?

12  A.  Can you repeat that, please.

13  Q.  Sure.  After SB 1 passed, Travis County looked at whether

14  the extended voting hours increased voter participation,

15  right?

16  A.  Yes, we did look at that.

17  Q.  And you figured out that the expanded hours under SB 1

18  increased voter participation, is that true?

19  A.  Yes.

20  Q.  We -- I don't know how many witnesses have been sitting in

21  that chair and have been asked now, 2020 was a different kind

22  of election, right?  It certainly was because of COVID, right?

23  A.  That's right.

24  Q.  It was also a Presidential Election, right?

25  A.  Yes.

BRIDGETTE ESCOBEDO - CROSS

1  Q.  But it also had unprecedented turnout, true?

2  A.  Yes.

3  Q.  More people voted by mail in that election than had voted

4  by mail in Travis County before, right?

5  A.  Yes.

6  Q.  In fact, it was the high watermark for ballot by mail, in

7  your experience, in Travis County, true?

8  A.  That's correct.

9  Q.  Travis County did not use drive-thru voting?

10 A.  No.

11 Q.  Did not use 24-hour voting?

12 A.  No.

13 Q.  Finally, I want to talk to you about implementing SB 1;

14 that was really hard, wasn't it?

15 A.  Yes.

16 Q.  It would have been easier if you had had more time to do

17 it, right?

18 A.  Yes.

19 Q.  And over time, though, your communications with the

20 Secretary of State's Office about SB 1 have improved, right?

21 A.  Yes.

22 Q.  The Secretary of State's guidance has improved on SB 1

23 over time?

24 A.  Yes.

25 Q.  And they are better able to answer questions that you have

BRIDGETTE ESCOBEDO – REDIRECT

1  about how to implement SB 1, is that fair?

2  A.  That's fair.

3       MR. KERCHER:  Thank you for your time this morning,

4  Miss Escobedo.

5       I pass the witness.

6       THE COURT:  Anything else this side?

7       Anything else?

8       MISS KUMAR:  Yes.

9                    REDIRECT EXAMINATION

10  BY MISS KUMAR:

11  Q.  Just a few more questions for you, Miss Escobedo.

12      You were just speaking with the attorney on the other side

13  about voter frustration and confusion, is that right?

14  A.  Yes.

15  Q.  With respect to the Ballot Tracker, you received

16  complaints that it was difficult to navigate, correct?

17  A.  Correct.

18  Q.  And you understand that some voters were never able to

19  successfully use the Ballot Tracker, right?

20  A.  Yes.

21  Q.  And between the March 2022 Primary and the May 2022

22  Election, you did not observe voter frustration with the

23  Ballot Tracker to dissipate, correct?

24  A.  That's correct.

25  Q.  And you're not aware of the Travis County District

1  Attorney disavowing prosecution for the vote harvesting

2  provision that you were just discussing, is that correct?

3  A.  Not aware.

4  Q.  And you don't recall a time when Travis County declined to

5  follow the Secretary of State advisories, correct?

6  A.  That's correct.

7        MISS KUMAR:  Thank you.

8        I pass the witness.

9  BY MR. DODGE:

10  Q.  A moment ago you were talking with Mr. Kercher about hours

11  of voting in neighboring counties, do you recall that?

12  A.  Yes.

13  Q.  Does SB 1 require counties to offer identical early voting

14  hours?

15  A.  SB 1, I do not believe it requires it.

16  Q.  So under SB 1 counties would still be allowed to offer

17  different early voting hours, correct?

18  A.  That's correct.

19        MR. DODGE:  Pass the witness.

20        THE COURT:  Anything based on those?

21        MR. KERCHER:  No further cross-examination, Your

22  Honor.  When we get a moment I have a housekeeping matter.

23  I'm cleaning up some exhibit numbers.

24        THE COURT:  Any further need for this witness?

25        You are excused, ma'am.  Thank you.

BRIDGETTE ESCOBEDO - REDIRECT

1        While you are doing that, let's go ahead and take our

2   ten-minute break.

3      *(Recess)*

4        MR. KERCHER:  Couple of housekeeping matters, Your

5   Honor.  The last couple of cross-examinations from the State,

6   we have referred to some exhibits as State Exhibits.  To

7   clarify for the record, State Exhibit 16 is Joint Exhibit 3,

8   which is in evidence.  State Exhibit 17 is Joint Exhibit 4,

9   which is in evidence.  And State exhibit 19 is Joint

10  Exhibit 6, which is also in evidence.

11        Additionally, Your Honor, State moves State's

12  Exhibits 294, 141, and 36 into evidence.

13        THE COURT:  Any objection to 294, 141, or 36?

14        MISS KUMAR:  No, Your Honor.

15        THE COURT:  294, 141, and 36 are all admitted.

16        MR. KERCHER:  Thank you, Your Honor.

17        THE COURT:  Your next witness.

18        MISS KUMAR:  Your Honor, Savannah Kumar for the OCA

19  Greater Houston plaintiffs again.

20        I'd like to call to the stand Grace Chimene.

21  Miss Chimene is here to testify as a plaintiff representative

22  for the League of Women Voters of Texas.  Miss Chimene will

23  provide support for the OCA Greater Houston plaintiffs

24  challenges to SB 1, Section 6.06, which OCA plaintiffs

25  challenge under Section 208 of the Voting Rights Act, and

GRACE CHIMENE — DIRECT

```
 1  Section 7.04, which OCA plaintiffs challenge under the First
 2  Amendment and Fourteenth Amendment due process.
 3        THE COURT:  Thank you.
 4      (GRACE CHIMENE, having been duly sworn, testified as
 5  follows:)
 6                     DIRECT EXAMINATION
 7  BY MISS KUMAR:
 8  Q.  Good morning.  Can you please state your name for the
 9  record.
10  A.  Grace Chimene.
11  Q.  Who are you testifying on behalf of today?
12  A.  I'm testifying on behalf of the League of Women Voters of
13  Texas.
14  Q.  Is the League of Women Voters of Texas a plaintiff in this
15  case?
16  A.  Yes, we are.
17  Q.  Approximately how long ago was the League of Women Voters
18  of Texas founded?
19  A.  The League of Women Voters of Texas was founded
20  October 19th, 1919, here in San Antonio at the St. Anthony
21  Hotel.
22  Q.  If I refer to the League of Women Voters of Texas going
23  forward as the league or the state league, will you understand
24  it to refer to the League of Women Voters of Texas?
25  A.  Yes.
```

GRACE CHIMENE - DIRECT

1  Q.  What is the highest leadership position you have held at

2  the league?

3  A.  I was president of the League of Women Voters of Texas for

4  four years.

5  Q.  Are you currently a member of the league?

6  A.  Yes, I am.

7  Q.  How long have you been a member of the league?

8  A.  I joined in 2012.

9  Q.  Where did you grow up?

10  A.  I grew up in Austin, Texas.

11  Q.  Can you tell us about your professional background?

12  A.  I was -- I became -- I graduated from UT Nursing School

13  and was a nurse, and then a pediatric nurse practitioner for

14  more than 30 years.

15  Q.  And what type of work did you do as a nurse?

16  A.  As a pediatric nurse practitioner I saw children, infants

17  and children up to age 18 at clinics and pediatrician offices,

18  mostly in the Austin and Houston areas.

19  Q.  When did you first start voting?

20  A.  I voted for the first time when I was 18.

21  Q.  Was voting already important to you at that age?

22  A.  Yes, it was.

23  Q.  Why was voting already important to you at that age?

24  A.  Voting was important to me at that age because it was a

25  part of what we did as a family, and I specifically remember

1  my mother registering voters when the Civil Rights Act was

2  passed and we were in North Carolina.  I remember her

3  registering first-time Black voters.

4  Q.  And what specifically made you decide to join the League

5  of Women Voters of Texas?

6  A.  I joined the League of Women Voters of Texas because

7  during the 2012 Presidential Election, my husband and I were

8  walking down the street in our neighborhood and one of the —

9  one of my neighbors had hung an effigy of the president from

10 our — from a tree, an oak tree in their front yard and we

11 were appalled by it and thought that people shouldn't use

12 symbols of violence and lynching during a campaign to try to

13 influence voters in the neighborhood.

14     And I took a photo of it and didn't know anything about

15 social media and I just posted it and then it went viral and

16 it was a very difficult time for me and my family.

17     It reminded me of the time when my mother, who was

18 registering voters in North Carolina for the League of Women

19 Voters and she was registering Black voters and somebody had

20 put a burning cross in our yard and I remember seeing that as

21 a child and thinking that and being overwhelmed with that and

22 it brought back those memories.

23     That's why I decided I wanted to join a nonpartisan

24 organization like the League of Women Voters that supported

25 everyone being able to vote.

GRACE CHIMENE - DIRECT

1  Q.  What is the mission of the league?

2  A.  The League of Women Voters mission is empowering voters

3  and defending democracy, and I always say, yay, after that

4  because it means so much to me.

5  Q.  What does empowering voters mean to you?

6  A.  Empowering voters means to me making sure that everyone

7  has the knowledge and the right and the ability and the access

8  to vote in every election.

9  Q.  When you first joined the league did you serve in any

10  leadership roles?

11  A.  When I first joined the league in 2012 I became what's

12  called an issue chair.  And I was an issue chair in support of

13  our child health position, so I would follow the bills that

14  had to do with child health, and — at the Texas legislature

15  and I'd write testimony and provide testimony on child health.

16  Q.  Did you have any other leadership positions after that?

17  A.  Yes.  After that I was legislative director on the state

18  board and then I became advocacy chair on the state board

19  before I became president.

20  Q.  And you testified that you served as president for the

21  league, is that right?

22  A.  Yes.

23  Q.  How long was your term as president of the league?

24  A.  It was four years.

25  Q.  And when did that term occur?

GRACE CHIMENE - DIRECT

1  A.  It was from 2018 to 2022, June of both years.

2  Q.  What was the process that you went through to become

3  president of the league?

4  A.  In the league what happens is the members vote on who are

5  going to be their leaders, because it's a membership driven

6  organization.  And the leagues come together every two years

7  to vote on the leaders for the League of Women Voters of

8  Texas.  We come together at a convention.

9  Q.  What were your duties as president of the league?

10  A.  As president of the league, I was the — something called

11  the speaker for the league, which means that I was the one who

12  spoke to the press or represented the league anytime I was

13  talking to other organizations or talking to press or talking

14  to other folks, that I was the representative of the league.

15      The other things we did is helped support everybody else's

16  job, like voter education and advocacy, and helped guide and

17  organize what we did, empowering voters and defending

18  democracy.

19  Q.  And in that role were you responsible for collaborating

20  with other organizations?

21  A.  Oh, yes.  We collaborated with lots of organizations,

22  mostly nonpartisan organizations that supported voting and

23  elections.

24  Q.  And in that role did you talk to members of the league?

25  A.  Yes, we did.

1  Q.  Is being president of the league a paid position?

2  A.  No.  Most everybody who is a member of the league are

3  volunteers, so we're just members of the community.  People

4  join because empowering voters and defending democracy is

5  really important to them and they want to belong to a

6  nonpartisan organization that does this work.

7  Q.  Approximately how much time did you spend working on

8  behalf of the league, when you were president?

9  A.  When I was president, it was depending on if there was an

10 election going on, or if there was a legislative session going

11 on, and so it would go from 20 hours a week to 40 hours a

12 week, or a little bit more.

13 Q.  What motivated you to spend all this time working in a

14 volunteer capacity for the league?

15 A.  I love our mission.  I love empowering voters.  I love

16 defending democracy.  I love making sure that everybody who

17 wants to vote is able and understands the process and is able

18 to vote in every election.  I think that the work we do is

19 vital and I'd love to see more and more leagues across Texas.

20 Q.  Are you familiar with SB 1, the law at issue in this case?

21 A.  Yes.

22 Q.  Were you president of the league when SB 1 was being

23 considered by the Texas Legislature?

24 A.  Yes.

25 Q.  And were you president when SB 1 went into effect?

GRACE CHIMENE – DIRECT

1  A.  Yes, I was.

2  Q.  As president, did you communicate with league members

3  about SB 1 when it passed?

4  A.  Yes, we did.  What I did was we really looked at SB 1 and

5  the changes that were created and we wanted to share it with

6  members but also with other organizations, and so we created

7  PowerPoints, we created videos, we created social media, we

8  created write-ups, and we did whatever we could to make sure

9  that this huge change to the election law was –– that the

10  barriers created were something that we could help voters

11  with.

12  Q.  Now that you have completed your term as president of the

13  league, do you hold any other leadership positions at the

14  league?

15  A.  Yes.  Right now I am the chair of communications for the

16  League of Women Voters of Austin, and I'm also on the

17  committee –– the voter education committee for the League of

18  Women Voters of Texas, and I'm also the nominations chair for

19  the League of Women Voters of Texas.

20  Q.  So let's start with the voter education committee.

21  A.  Okay.

22  Q.  And what is the voter education committee?

23  A.  The voter education committee is –– it's a committee on

24  the League of Women Voters of Texas board and what we do is we

25  put out the voter's guide, we do voter education, we talk to

GRACE CHIMENE – DIRECT

 1  all the other voter education folks from around, from the

 2  other leagues in Texas, and we share information, we do social

 3  media, we promote, and Get Out the Vote in all those different

 4  areas for elections.

 5  Q.  And do you generally need to know about voting laws as

 6  part of this role?

 7  A.  Yes, we try.

 8  Q.  And you also mentioned the communications committee for

 9  the League of Women Voters of the Austin area.  Can you tell

10  me about that?

11  A.  The League of Women Voters of Austin area communications

12  committee that I'm in charge of, what we try to do is Get Out

13  the Vote, we try to encourage participation in elections and

14  voting on using social media and on our website and create

15  videos, everything we can to try to promote every election and

16  to promote voting in every election.

17  Q.  For your continued involvement with the state league, have

18  you stayed up-to-date on how SB 1 is affecting the league and

19  its members?

20  A.  Yes, I do.  Because I was a past president, I still get

21  all the emails and all the newsletters and I go to some of the

22  meetings where other leaders from — of leagues from around

23  the state get together and share information.

24  Q.  And from your leadership experience with the League of

25  Women Voters of Texas would you say that you have a good

GRACE CHIMENE - DIRECT

1 understanding of the issues currently affecting the league?

2 A.  Yes.

3 Q.  And would you say this is true because of the continued

4 work that you do with the communications committee and with

5 the other positions that you hold?

6 A.  Yes, especially with the voter education committee.  I'm

7 very much aware of what is going on around Texas and the

8 issues impacting our members and voters across Texas.

9 Q.  Now, I'm going to ask you some more questions about the

10 structure of the league.

11 A.  Okay.

12 Q.  Miss Chimene, can you describe the basic structure of the

13 league?

14 A.  So the structure of the league, people join as a member at

15 the local level.  So there is a local league, a Texas league,

16 you know, for every state really, and then the national

17 league.

18     And you join a local level but you are a member of the

19 local level, the state level, and the national level when you

20 join and when you pay dues also, the dues are shared with

21 those three organizations.  I call it a three-tiered or a

22 level organization.  I've heard other folks call it federated

23 but I'm not as familiar with that word.

24 Q.  Approximately how many local leagues are there in Texas?

25 A.  In Texas there are about, and I say that because leagues

GRACE CHIMENE - DIRECT

1    form, new leagues come up and are forming all the time, and so
2    there are about 34 leagues in Texas.
3    Q.  And where are these leagues located in Texas?
4    A.  Most of the larger cities have one or more league in them,
5    and then we also are really proud to say that we have leagues
6    serving more rural districts in Texas also.
7    Q.  Is there a local league in Harris County?
8    A.  Yes, there is.  There is multiple leagues in Harris
9    County.  I think there are about five.
10   Q.  And so does the league have members in Harris County?
11   A.  Yes, we do.
12   Q.  And is there a local league in Travis County?
13   A.  Yes, there is.
14   Q.  Are you personally a member of a local league?
15   A.  I'm a member of the league in Travis County called the
16   League of Women Voters of Austin area.
17   Q.  And how long have you been a member of that particular
18   local league?
19   A.  When I joined in 2012 that is the league that I joined.
20   Q.  You stated earlier that you were elected president of the
21   league -- of the state league.  Do league members elect league
22   leadership?
23   A.  Yes, they do.
24   Q.  And can you explain the process for how members elect
25   league leadership?

GRACE CHIMENE - DIRECT

1   A.  So in local leagues and in the state league there is a
2   meeting, some local leagues have it every year.  At the state
3   and national they have it every two years and delegates come
4   from each league to the state convention and they vote on a
5   slate of leaders, so they vote directly for their leaders.
6   Q.  And you testified that league members pay money to be
7   members, is that right?
8       What is the money from these members used for?
9   A.  So the monies from members are used to support our
10  mission, empowering voters and defending democracy.  We mostly
11  use the money for putting out our voter's guide for every
12  election.
13  Q.  Can you describe the league's membership?
14  A.  The league's membership, so in order to be able to join
15  you have to be 16 and over and you can be — you don't have to
16  just be a woman to be able to join, so we're open to anyone to
17  be able to join.  So like my husband is a member of the League
18  of Women Voters.
19  Q.  And approximately how many members does the league have
20  across Texas?
21  A.  Across Texas we have about 3,050.
22  Q.  Does the league have members who are above the age of 65?
23  A.  Yes, we do.  We have a lot of members who are 65 and over
24  because a lot of our work is done by people who have retired.
25  Q.  Does the league have members that have disabilities?

GRACE CHIMENE - DIRECT

1  A.   Yes.  We have members who have disabilities.

2  Q.   Does the league have members who are more comfortable

3  speaking in languages other than English, based on your

4  experience?

5  A.   Yes, we do.  We have members who speak — who feel more

6  comfortable speaking in another language than English.

7  Q.   And do any of the members of the league have — vote by

8  mail?

9  A.   Say it one more time.  I'm sorry.

10  Q.   Do any league members vote by mail?

11  A.   Yes, we do have members who vote by mail.

12  Q.   What is your understanding of why some league members vote

13  by mail?

14  A.   Some league members vote by mail because they are 65 and

15  over.  Some league members vote by mail because they are

16  disabled.  Some members vote by mail because they are going to

17  be out of the county where they are registered to vote.

18  Q.   Now you've testified that you are familiar with SB 1, is

19  that right?

20  A.   Yes.

21  Q.   What was the league's position on SB 1 when it was being

22  considered by the legislature?

23  A.   We opposed SB 1.

24  Q.   And why was the league opposed to SB 1?

25  A.   We were opposed to the major changes to the election law.

GRACE CHIMENE - DIRECT

1  We were very concerned that it would impact and make it harder

2  for voters to be able to vote here in Texas.

3  Q.  So now I'm going to ask you some questions about Section

4  6.06 of SB 1 which prohibits offering or receiving

5  compensation for assisting with a mail-in ballot.  Are you

6  familiar with this provision generally?

7  A.  Yes.

8  Q.  And if I refer to this position — to this provision —

9  sorry — as the assistance provision, will you understand what

10 I'm talking about?

11 A.  Yes.  Thank you.

12 Q.  Based on your experience, does the league have members who

13 use assistants in order to vote by mail?

14 A.  Yes.  We have — we do have members who use assistants

15 when they vote by mail.

16 Q.  What is your understanding of why they use assistants?

17 A.  Some of our members may use assistants because — oh.

18 Q.  You don't have to worry about this on the screen.

19     Take it down, Stephen.

20 A.  Yeah.  Thank you.

21     Some of the members use assistants when they vote by mail

22 because although they have voted many, many years, they either

23 have developed a disability that means that they need to have

24 help with their vote-by-mail ballot.

25 Q.  And based on your experience, does the league have members

GRACE CHIMENE - DIRECT

1  who have assisted voters with their ballots by mail?

2  A.  Yes.  We do have members who assist voters with their

3  ballot by mail.

4  Q.  Now, what do you understand the word "compensation," in

5  the assistant provision to mean?

6  A.  I am not sure exactly what compensation means in this

7  section of the law.  I am concerned that it may mean something

8  like you get something for assisting a voter.  So if it —

9  does it mean you get a gift?  Does it mean you get some tea?

10 Some coffee?  Does it mean you get free parking?  Does it

11 mean — it is very concerning to me what compensation means in

12 that section.

13 Q.  Do you know if there is a criminal penalty associated with

14 this provision?

15 A.  Yes, I do know that there is a criminal penalty.

16 Q.  Prior to SB 1 going into effect, can you give an example

17 of a place that league members went to provide assistance, if

18 any?

19 A.  So league members could be providing assistance at

20 somebody — you know, they are helping somebody who is a

21 member of their family.  They may go to a nursing home.

22 Sometimes they go to assisted living centers.  Sometimes they

23 go to places where people or voters with disabilities live.

24 Sometimes they go to friend's houses who need assistance where

25 they vote by mail.

GRACE CHIMENE - DIRECT

1  Q.  Are you concerned about league members who vote by mail

2  providing things that could be considered to be compensation

3  to those who service their assistants?

4  A.  My concern is that Texas and Texans, Texas voters, they

5  are just really generous people.  So if you've come to need to

6  have assistance, they want to be able to provide you with

7  something so they will often try to make you feel as

8  comfortable as possible and offer you tea, or coffee, or

9  water, or help you with your — perhaps where available they

10 will help you with your parking, or provide something for you

11 because they are just — this is Texas and that's how Texas

12 people are.  They are very grateful.

13 Q.  So based on your understanding of this assistance

14 provision, could an assistant receiving tea, when assisting a

15 voter with their mail ballot be considered to be committing a

16 crime?

17 A.  That is our concern, is that we don't have, you know, what

18 is — the change in the law made it so that we are very

19 concerned that we now may fall underneath — you know, by

20 getting — receiving tea or receiving some type of whatever

21 compensation means, that we might be doing something that is

22 illegal or criminal, and that would not be good.

23 Q.  And based on your understanding of this provision could a

24 voter who offers coffee to their assistant when receiving

25 assistance to vote by mail be committing a crime?

GRACE CHIMENE - DIRECT

1  A.   That is my concern.  It's not just my concern for the
2  league members, but it's also a concern if just a voter that
3  were helping provides compensation, or the place that they
4  live provides compensation of some type that they may be
5  committing a crime.
6  Q.   Based on your experience, has this provision affected
7  where league members have been able to go to provide
8  assistance to voters who need it?
9  A.   Yes, it has.  I have –– I am aware of some assisted care
10 centers that said that we shouldn't come out to provide
11 assistance at this time because and –– that's it.
12 Q.   And how has not being able to go to these places affected
13 the league's ability to carry out its mission?
14 A.   Our mission is really important to our members and it's
15 really important to the community we serve, the community of
16 voters, especially the older voters, the voters with
17 disabilities, the voters who need assistance.
18     They have been voting for all these years and now they are
19 unable to get the assistance of their choice because of their
20 concern with this change to the law, so it's very important to
21 us and our members to empower voters and we're not able to
22 provide this service.
23 Q.   Did the league have to create any materials about this
24 assistance related provision that we've been discussing?
25 A.   Yes.  We created PowerPoints.  We created handouts.  We

GRACE CHIMENE - DIRECT

1  had discussions with leaders of the leagues and shared this
2  out to other organizations also.
3  Q.  Did the league educate its members about the limitations
4  on compensating assistants?
5  A.  Yes.  We -- our hope was that this was getting out to all
6  the members, the information about assisting voters with their
7  vote-by-mail ballot.
8  Q.  In creating these materials that you discussed, did the
9  league have to devote time to addressing this assistance
10 provision?
11 A.  Yes.  It took time.  It took finances.  It took time away
12 from other activities that we would normally be doing, trying
13 to make sure that we protected our members and the voters in
14 our communities that we serve.
15 Q.  Did the league have to turn away from doing any other work
16 as a result of the resources spent on addressing this
17 assistance related provision?
18 A.  So because of this change in law we did have to turn away
19 from doing the normal activities that we did, and also planned
20 activities.  Normally we are trying to help young members who
21 are new to voting and explain the voting process to them and
22 trying to encourage them to get out and vote and be a part of
23 our democracy, but instead we had to turn our attention from
24 those new and young voters and pay attention to these voters
25 who have been voting for years, many of them, or voters who

1  needed assistance, or voters with disabilities, or voters

2  who — you know, and it just made it so that our normal

3  activities were changed.

4  Q.  Do you have concerns about how the criminal penalty

5  associated with this provision will impact assistants?

6  A.  I have concerns that the criminal penalties are — will

7  make it so that we don't provide that assistance; and that

8  places where voters with disabilities or older voters who live

9  won't allow assistance to occur in those places; and my other

10  concern is that voters who need assistance will not be able to

11  find that in their community.

12  Q.  And does the criminal penalty associated with this

13  provision have an impact on league members?

14  A.  Yes, it does, because they think that this is really

15  important.  It's very important for our members to be able

16  to — to work towards getting everybody who wants to

17  participate in the election to be able to vote.

18  Q.  Now let's turn to a different provision of SB 1.  I'd like

19  to ask you about Section 7.04 which prohibits compensated

20  in-person interactions with voters in the presence of a mail

21  ballot intended to deliver votes for a particular candidate or

22  measure.  Are you generally familiar with this provision?

23  A.  Yes, generally.

24  Q.  If I refer to this provision is the in-person interaction

25  provision, will you know what I'm talking about?

1   A.   Yes.

2   Q.   Prior to the passage of SB 1 did the league ever support

3   ballot measures?

4   A.   Yes.

5   Q.   And prior to the passage of SB 1 did the league ever

6   organize any in-person events?

7   A.   The league is well-known for organizing in-person events

8   surrounding elections.  They are commonly known as candidate

9   forums or we have forums on whatever is on the ballot.

10  Q.   Is it important for the league to host in-person events?

11  A.   It's very important.  Many voters, not only some voters

12  like to read the voter's guide, some voters like to hear from

13  the candidates directly at a candidate forum.  Some voters

14  like to hear about any ballot measures that are on the ballot,

15  also hear about it from people in their community.

16  Q.   Let's talk more about candidate forums.  Can you tell me

17  more about what happens at candidate forums?

18  A.   At candidate forums with the league, because we are

19  nonpartisan, we never support or oppose political parties or

20  political candidates, we would invite every candidate that's

21  running for an office to come to a candidate forum, and then

22  we would have somebody on stage who would ask those candidates

23  questions and those candidates would have a certain amount of

24  time to be able to answer each of those questions.

25       We generally ask -- I mean, we always ask every candidate

GRACE CHIMENE - DIRECT

1  that is running for office to come to those, for that

2  particular office to come to those candidate forums.

3  Q.  In your view why is it important for the league to host

4  candidate forums?

5  A.  Members of the community in the communities where there is

6  a League of Women Voters, they expect candidate forums from

7  the league, and the leagues love providing this service

8  because voters can come in person.

9      And oftentimes we get questions from the audience, and we

10  ask that question, or we review those questions and it becomes

11  a real important part for voters who are really interested in

12  democracy hear directly from candidates.

13  Q.  Does the league invite every candidate running in a race

14  to join a candidate forum?

15  A.  We invite every candidate running for a race to join us on

16  the candidate, on the panel, or whatever it's called.

17  Q.  Are there ever instances where only one invited candidate

18  running for a position appears on a candidate forum?

19  A.  Occasionally that happens.  So if they — and — so at a

20  candidate forum we invite everyone to show up.  Even if they

21  say yes, sometimes a candidate will not show up and so then we

22  would have one candidate up there, and we have some sentence

23  that we say to try to let people know that there is — to let

24  people know that just because there's only one candidate, we

25  are not saying that we support that specific candidate but we

GRACE CHIMENE - DIRECT

1   are going to continue and allow all these people that came to

2   hear them talk to let them answer the questions.

3   Q.  Are you aware of instances where the league has been

4   accused of only supporting one particular candidate in those

5   instances?

6   A.  Yes.

7   Q.  And now that SB 1 is in effect, do you have any concerns

8   about those instances where not every invited candidate

9   participates in the candidate forum?

10  A.  Yes.

11  Q.  What are those concerns?

12  A.  We are concerned that if the perception sometimes happens

13  where we are supporting one candidate or one party over

14  another, that if a person in the audience had their

15  vote-by-mail ballot with them that they -- then we would be

16  accused of supporting of a criminal penalty brought about by

17  the new SB 1.

18  Q.  Do people ever volunteer at candidate forums?

19  A.  Yes, we have many -- everybody in the league is a

20  volunteer in general.  We have just a very few staff.

21  Q.  What types of volunteers do you get at candidate forums?

22  A.  So we have members, and then we have members of the

23  community, and then we have student volunteers, all doing

24  different activities that are needed at every candidate forum.

25  Q.  What role do volunteers play when they volunteer at

1  candidate forums?

2  A.  Somebody is up at the front who asks the candidate

3  questions.  There are timers who time the candidate answers.

4  And then there's greeters who greet everybody who shows up and

5  probably provides everybody with a voter's guide.

6  Q.  So are volunteers interacting with attendees at these

7  candidate forums?

8  A.  Yes, they are.  All the volunteers would be interacting

9  with members -- or no -- the community who shows up.

10 Q.  And what do they get in return for volunteering, if

11 anything?

12 A.  So volunteer members often get little pens, or stickers,

13 or oftentimes there's cookies provided, or doughnuts, or

14 pizza, whatever that you provide normally we provide for

15 people who are volunteering at one of these activities.

16 Q.  And for student volunteers, do they ever get letters of

17 recommendation, for example, from the league?

18 A.  Yes.  We often -- sometimes they are volunteering in order

19 to get a credit or something, and so we'll give them a

20 certificate of participation.  Sometimes if they have been

21 volunteering over time, we'll give them a letter of

22 recommendation.

23 Q.  Based on your understanding could these things that people

24 get in return for volunteering at these in-person events be

25 considered to be compensation?

GRACE CHIMENE — DIRECT

1   A.  I — it would, it could be considered as compensation.

2   Q.  Now, where do these candidate forums typically take place?

3   A.  The candidate forums take place in the communities we

4   serve across Texas.  Generally, they are at government

5   buildings, or schools, or churches, or community centers,

6   anyplace that has a place big enough where people who show up

7   are able to see the people who are speaking.

8   Q.  And are these events open to the general public?

9   A.  Yes.  Events are always open to the general public.

10  Q.  And are these events well attended generally?

11  A.  Oh, they are very well attended.

12  Q.  Approximately how many people would you say attend these

13  events?

14  A.  Well, it depends on the community, because we serve some

15  small communities and we serve some larger urban areas, so it

16  could be anywhere from 50, to 150, to 200 people show up.

17  Q.  Do these candidate forums ever occur during the voting

18  period when mail-in ballots would have already been sent out?

19  A.  They almost always occur during the voting periods because

20  that's when people are most interested in learning about

21  candidates and learning about what's on the ballot.

22  Q.  Do you have any concerns about conducting candidate forums

23  during early voting going forward because of the in-person

24  interaction related provision of SB 1?

25  A.  We're concerned about providing the service going forward

GRACE CHIMENE - DIRECT

1  because of the possibility that people who attend may have a

2  vote-by-mail ballot in their possession while we're providing

3  this service, that candidate forum or a forum that would be

4  about what is on the ballot, a forum about propositions, or a

5  form about constitutional amendments.

6  Q.  Does the league ever check to see whether attendees have

7  their mail-in ballots with them at in-person events that it

8  hosts?

9  A.  No, we have never checked that.

10 Q.  Would the league have any way to verify that attendees do

11 not have their mail-in ballots with them?

12 A.  No, we would not have any way to verify whether they had

13 their ballot-by-mail ballot with them.

14 Q.  So could attendees at league events have their mail-in

15 ballots on them without the league knowing?

16 A.  Yes.

17 Q.  And you testified that the league has supported ballot

18 measures, right?

19 A.  Right.

20 Q.  What is an example of this?

21 A.  There was, I know in 2018 there was a ballot measure, a

22 school bond from the League of Women Voters of Austin area

23 where we were supporting that school bond.

24 Q.  Prior to the passage of SB 1 could the league host

25 in-person events about any ballot measures that it supported?

GRACE CHIMENE - DIRECT

1  A.  Yes.

2  Q.  And now that SB 1 is in effect do you have concerns about

3  the league hosting in-person events supporting ballot

4  measures?

5  A.  I am concerned about not only in-person events supporting

6  ballot measures, but also events where we might be providing

7  information like on the constitutional amendment election

8  that's coming up.

9     If there's -- just providing information about it may be

10 skewed by the people who are listening to think that we're

11 supporting or opposing one particular amendment or not.

12 Q.  And for in-person events about ballot measures could a

13 person have their mail-in ballot with them?

14 A.  Yes, they could.

15 Q.  And would there be volunteers at these in-person events

16 involving ballot measures?

17 A.  Yes, absolutely.

18 Q.  And would those volunteers receive some of the same things

19 that you testified volunteers receiving when they volunteer at

20 candidate forums?

21 A.  Yes.  They would be receiving -- they would probably all

22 receive a voter's guide, they would all receive stickers and

23 pens and pencils, and sometimes we have food for the

24 volunteers or special -- sometimes we do even pay for their

25 parking because some of these events are held in downtown

GRACE CHIMENE – DIRECT

1  areas where you had to pay for parking.

2  Q.  Now, let me ask you more generally, does the league try to

3  comply with voting related laws?

4  A.  Yes, we do.

5  Q.  What are some of the ways that it takes care to comply

6  with voting related laws?

7  A.  We try to understand the laws as much as we can and then

8  we try to share that understanding out either to our members,

9  to the other voters in the communities that we serve.

10  Q.  Based on your experience did the league spend time trying

11  to understand how to comply with the two provisions that we

12  have discussed today, the assistance provision and the

13  in-person interaction provision?

14  A.  Please repeat the question.  I was not paying attention

15  like I should.

16  Q.  Of course.  Based on your experience did the league spend

17  time trying to understand how to comply with the two

18  provisions that we have discussed today?

19  A.  Yes.

20  Q.  And did the league spend time educating members about how

21  to comply with the two provisions?

22  A.  Yes, we did.

23  Q.  Why does the league try to ensure that its members comply

24  with these provisions?

25  A.  We try to enter -- we want to protect our members because

GRACE CHIMENE - DIRECT

1   it's very important and people are not going to want to join

2   and provide the services that we do if there is a chance that

3   they're going to be criminally prosecuted.

4      Also we want to protect the voters.  So we don't want to

5   do anything that's going to put a voter at risk from criminal

6   penalties or another organization so we also help share the

7   information out with other organizations so that their members

8   or their, you know, church members or whatever are not put at

9   risk from providing these services.

10   Q.  Are there any projects that the league has had to postpone

11   because of the time spent on the two provisions that we have

12   discussed?

13   A.  Yes.  We were going to do a study on election security and

14   we had to put that particular study off, and because we were

15   just too overwhelmed with everything that was going on with

16   the new laws from SB 1.

17   Q.  And I know you mentioned that the league is primarily

18   volunteers, but did the league have to expand its staff as a

19   result of these two provisions?

20   A.  Yes.  So this was just a very huge amount of effort put

21   out by our volunteers, and so we went from having one staff

22   member to getting a communications chair so she would — not a

23   chair, a communication staff person who can help with doing

24   all the social media and getting out the newsletters, so it

25   was really important that we had some extra staff so that I

1604

GRACE CHIMENE - DIRECT

1  and other leaders in our organization would be able to take a
2  breath and have a paid person do this.
3  Q.  Now, overall, how have the two provisions of SB 1 that we
4  have discussed affected the league's work as a whole?
5  A.  It made it more difficult for us to be able to provide —
6  to support our mission of empowering voters in Texas.  It made
7  it more difficult for us to be able to support voters and
8  voters who have maybe voted all their lives and now wouldn't
9  be able to participate in an election because they needed
10 assistance.
11      We, just, we are concerned about providing the services
12 that we do that communities are — look forward to at every
13 election.  They want to be able to come to candidate forums.
14 They want to be able to hear us have some speakers on
15 constitutional amendments.  They want us to be able to provide
16 information about propositions and they want us to be able to
17 provide candidate forums, and this changes to the election law
18 will make it much more difficult for us to continue providing
19 these services.
20          MISS KUMAR:  Thank you.
21          I pass the witness.
22          THE COURT:  Thank you.
23          Anything else on this side?
24          With that, let's go ahead and take our lunch —
25          Well, how long do you expect this will last?

1     MR. WASSDORF:  I would estimate 20, 30 minutes.

2     THE COURT:  Let's go ahead and take a lunch break

3  now.

4     Let's return right about 1:00.

5     *(Recess)*

6     *(Change in reporter)*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (1:04 p.m.)

2          COURT SECURITY OFFICER:  All rise.

3          THE COURT:  Thank you.  Please be seated.  Your cross,

4    I believe.

5                        CROSS EXAMINATION

6    BY MR. WASSDORF:

7    Q.  Good afternoon, Ms. Jones.

8          COURTROOM DEPUTY CLERK:  Not Jones.

9    BY MR. WASSDORF:

10   Q.  Excuse me, Ms. Chimene.  We were just talking about someone

11   else.

12       I think we've already established that you have been

13   associated with the League of Women Voters for some time?

14   A.  Yes.

15   Q.  And in the course of that association, you further their

16   mission of providing voting education for the voters of Texas;

17   is that right?

18   A.  I supported the mission of empowering voters in defending

19   democracy here in Texas.

20   Q.  The voting process, by its nature, is a little complicated

21   sometimes; isn't that right?

22   A.  Yes, it is complicated.

23   Q.  But to enable the people to be able to vote, the League of

24   Women Voters, it does engage in voter education?

25   A.  We engage in voter education, and there is a fine line

1   between providing people with the information they need to vote

2   and providing them with information that they need to vote and

3   making it so that they don't feel uncomfortable voting.

4   Q.  So the League of Women Voters tries to educate voters on

5   how to vote?

6   A.  Yes.

7   Q.  And in addition to informing them about the candidates and

8   measures that are before them?

9   A.  We provide -- we try to provide information about how to

10  participate in every election and also information with what is

11  on the ballot, who is on the ballot, so that voters can make an

12  informed decision; so we take whatever is on the ballot and try

13  to provide them with information perhaps in plainer language

14  than it is written.

15  Q.  And to do that, for example, the League publishes a voter

16  guide every year?

17  A.  Yes, we provide a voter's guide.  No, not every year.  We

18  provide a voter's guide for every election that we're serving

19  that community.

20  Q.  And it published voter guides in 2020?

21  A.  Yes.

22  Q.  And it published voter guides in 2022?

23  A.  Yes.

24  Q.  And these guides can be found on the League's website

25  vote411.org; is that right?

Grace Chimene - Examination                    1608

1    A.  The PDF can be found on our website, lwvtexas.org or

2    whatever the local league's website is and also online at

3    vote411.org, thank you.

4    Q.  And the League also prints hard copies of these guides?

5    A.  We do.  We print -- you're giving me all the great ones.

6    We print hard copies, and then we provide those copies to the

7    local leagues to share in their communities, and also we send

8    them out to public libraries and other organizations across

9    Texas trying to reach as many people as we can.  We print them

10   in English and Spanish and sometimes in other languages.

11   Q.  And even before Senate Bill 1, when a new voting law was

12   passed, the League of Women Voters would typically try to

13   educate the voter about the change in the law.

14   A.  If -- we tried to educate the voters about the changes in

15   the law that impact them, so we try to reach them in many

16   different ways.  But, yes, we try to educate the voters about

17   the laws.

18   Q.  So before SB1 passed the legislature, the League was trying

19   to convince voters to oppose SB1; is that right?

20   A.  So could you say it one more time, just so I understand?

21   Q.  Before SB1 passed the legislature or became law, the League

22   asked voters to oppose the bill?

23   A.  We weren't specifically reaching out to voters, but what we

24   were doing was trying to explain -- during the legislative

25   session, we, as the League of Women Voters, opposed it, and we

Grace Chimene - Examination                    1609

1    tried to put out as much information we could that we

2    understood about it so that -- to encourage folks in Texas -- I

3    wouldn't say just voters, but folks in Texas to let their

4    legislators know that we didn't agree with this law.

5    Q.  And some of you -- some of the things you did in

6    furtherance of that effort was you asked people or encouraged

7    people to write op-eds in the newspaper.

8    A.  I believe we did.  We encouraged people to write op-eds.

9    We encouraged people to take action with our action site that

10   would send e-mails to their legislators, and we encouraged them

11   to also call or contact their representatives.

12   Q.  And you expended resources during the session trying to

13   educate people about SB1 while it was being considered.

14   A.  Yes.  We spent money on the -- the different ways we get

15   out the information to other organizations, members, and other

16   folks who support what we're doing.

17   Q.  And just like you testified a moment ago, when there's a

18   change in the law, the League educates the voters on that

19   change.  When SB1 passed, you worked to educate the voters on

20   the changes that SB1 implemented; is that right?

21   A.  We try -- it was a huge -- what I consider a huge change to

22   the election law, and it had many aspects to it, and we tried

23   to share information about those changes to voters, and

24   especially -- but not only to voters, because it doesn't only

25   impact voters.  It also impacted our members, and it also

1    impacted other organizations who do help and assist voters.

2    Q.  And in trying to educate voters or others about the changes

3    made by SB1, would it be fair to say that the League tried to

4    explain SB1 in plain language?

5    A.  Yes.  That is our main goal is to make the complicated

6    election law and complicated changes to election law, to write

7    it in plain language, because there -- as I was saying, there's

8    a fine line between explaining it and -- because the way the

9    law is written, if you make -- if you share too much

10   information, sometimes that can suppress the vote, so it's a

11   fine line.  We don't want to make people too afraid to vote.

12   Q.  And you did the same thing when the voter ID law passed in

13   Texas some years ago.

14   A.  Yes, we spent a great deal of time educating voters in many

15   ways on the voter ID law.  We still spent time on the voter ID

16   law, because we -- it's an important aspect.

17   Q.  Let's talk a little bit about the League's revenue and

18   expenses.  Every year around December the League puts together

19   an annual report; is that right?

20   A.  Yes, uh-huh.

21   Q.  And that kind of summarizes where the money is coming in

22   and how the money is going out.

23   A.  Yes.  It is a simplified summary of what we were able to

24   accomplish in the past year.

25   Q.  Let's pull up the 2020 impact report, and let's take a look

1  at page four.  So is this one of those reports for the year

2  2020?

3  A.  It appears to be, yes.

4  Q.  And in 2020, this shows that the League of Women Voters of

5  Texas had an income of $275,811; is that right?

6  A.  Income, yes.

7  Q.  It also shows expenditure of $210,246?

8  A.  Yes.

9  Q.  So that means that there's a surplus that year of about

10  $65,000 roughly?

11  A.  It appears to be, yes.

12  Q.  Let's take a look at the 2022 impact report.  Is this the

13  same report for 2022?

14  A.  Yes.

15  Q.  So let's go to the same chart.  Okay.  So this year in

16  2022, it shows an income of $432,057.

17  A.  Scroll it up so I can see the income.  Where is that?

18  Q.  Income is at the top.

19  A.  At the top.  Excellent.  Thank you.  Yes.

20  Q.  And it shows expenditures in 2022 of $310,616; is that

21  right?

22  A.  Yes.

23  Q.  And so that would mean there's a surplus of $120,000 that

24  year?

25  A.  I would have to get a calculator, but I'm sure you're

1  close.

2  Q.  So between 2020 and 2022, the League of Women Voters made

3  more money?

4  A.  I don't know if making money -- I think it would probably

5  had more donations is probably what it was, but I would have to

6  look to really scan this.

7  Q.  But you brought in more --

8  A.  Brought in more money, yes.

9  Q.  And between 2020 and 2022, your expenditures also went up?

10  A.  Yes, uh-huh.

11  Q.  And despite your expenditures going up, you still had more

12  surplus in 2020 than you did -- or in 2022, excuse me, than you

13  did in 2020?

14  A.  Yes.

15  Q.  Now, in both of these years -- and can we put them side by

16  side, Brian.

17     So in both of these years, the majority of the League's

18  funding came from sources other than membership payments; is

19  that right?

20  A.  Let me look.  Just a second.  Yes.

21  Q.  All right.  You can take those down.

22     So the League is challenging a couple different provisions

23  of SB1; is that right?

24  A.  Yes.

25  Q.  The vote-by-mail provision?

Grace Chimene - Examination                    1613

1    A.    Yes.

2    Q.    And the voting assistance provisions?

3    A.    Yes.

4    Q.    And the ban on vote harvesting; is that right?

5    A.    The --

6    Q.    The in-person interaction.

7    A.    Thank you, yes.  When you say "vote harvesting," it feels

8    derogatory to what we're trying to accomplish.

9    Q.    With respect to the vote-by-mail provisions in

10   Senate Bill 1, the League contends that those provisions will

11   prevent voters from participating in elections; is that right?

12   A.    With the vote-by-mail, the one about -- say it one more

13   time.  I just want to make sure I'm --

14   Q.    With respect to the vote-by-mail provisions, there are a

15   couple of them that have to do with vote-by-mail.

16   A.    Uh-huh.

17              MS. KUMAR:  Objection.  This is beyond the scope.

18              THE COURT:  That's overruled.

19   BY MR. WASSDORF:

20   Q.    With respect to the vote-by-mail provisions of

21   Senate Bill 1, the League contends that those provisions will

22   prevent voters from participating in elections.

23   A.    That is our concern.

24   Q.    And in an effort to address this perceived problem, the

25   League has shifted some of its resources from activities that

Grace Chimene - Examination                    1614

 1   otherwise would have engaged in to educate voters about the

 2   vote-by-mail provisions; is that right?

 3   A.  Say it again.  I'm sorry.  I want to make sure I get it

 4   right.

 5           MS. KUMAR:  Your Honor, if I may, after this Court's

 6   notification of its summary judgment ruling, we specifically

 7   paired our claims and specifically for the League of Women

 8   Voters, as well to not cover Section 5 consistent with the

 9   Court's order, and so allowing cross-examination on this

10   subject would be contrary to that and not part of what this

11   witness testified on direct exam.

12           THE COURT:  So where are you going with this?  What's

13   the relevance?  Is it to show bias?  Is it to show

14   organizational standing is lacking because of money resources

15   not being tapped?  What are you doing here?

16           MR. WASSDORF:  It was to go towards standing for the

17   vote-by-mail provisions, but if they're representing that they

18   are not challenging the vote-by-mail provisions, I can move on

19   to another provision.

20           THE COURT:  Thank you.

21           MR. CLANCY:  Your Honor, just to be clear, we are

22   challenging them in the summary judgment ruling, which you said

23   you already ruled on, and so we paired -- the League is not

24   challenging Section 5 through the ADA Rehab Act.  That is only

25   for our client, REVUP.

1    THE COURT:  You all need to speak with one voice.  Is

2    any plaintiff here still challenging Section 5?

3    MS. PERALES:  Yes, Your Honor.

4    THE COURT:  You may continue.

5    BY MR. WASSDORF:

6    Q.  Let's just start over there.  So in an effort to address

7    the perceived issue with SB -- the vote-by-mail provisions of

8    SB1 that you have, the League has shifted some of its resources

9    from activities that it would have engaged in to educate voters

10   about the vote-by-mail provisions; is that correct?

11   A.  Yes.  Many of our resources -- and when I say "resources,"

12   I mean multiple resources.  It's not just financial.  For an

13   organization like ours, it's financial, but it's also our

14   services and our members' time and the leaders' time.  All of

15   those services were reallocated.

16   Q.  But despite those efforts, the expenditure funds and the

17   time of the volunteers, you still believe that the vote-by-mail

18   provisions will stop some voters from participating in

19   elections?

20   A.  Absolutely.

21   Q.  The League also contends that the oath and the prohibition

22   on compensation for assisting in SB1 will prevent some voters

23   from participating in elections; is that right?

24   A.  Say that again, because that is not what I thought we were

25   talking about today, so just say it one more time so I can try

1   to remember back.  Go for it.

2   Q.  We're talking about the voter assistance provisions.

3   A.  Okay.

4   Q.  So this is the voter assistant oath and the compensation to

5   assist voters, so those two provisions.

6   A.  Right.

7   Q.  You believe that those provisions will prevent some voters

8   from participating in elections?

9   A.  Yes.

10  Q.  Now, Senate Bill 1 has been in effect for about a year and

11  a half now; is that right?

12  A.  Yes, since December, after it passed.

13  Q.  And since December of 2021, you're not aware of a single

14  prosecution that has been brought under either the oath

15  provision or the compensation for assistance provision of

16  Senate Bill 1, are you?

17  A.  I am not aware.

18  Q.  So if a year and a half has passed and there have been no

19  prosecutions, how much time has to pass before you stop being

20  afraid of being prosecuted under those provisions?

21          THE COURT:  Does the State of Texas usually pass laws

22  that they have no intent that there's going to be any

23  enforcement?

24          MR. WASSDORF:  No, Your Honor.  This goes to the

25  subjective understanding of the law.  You know, we believe that

Grace Chimene - Examination                    1617

1    they have misinterpreted it and that it is not read in the way

2    that they believe, and therefore no prosecution will come in

3    the method or in the situations that they have stated so far.

4              THE COURT:  Go ahead.  Do you need that repeated?

5              THE WITNESS:  I don't remember the question.  I'm

6    sorry.

7    BY MR. WASSDORF:

8    Q.  How much time must pass, without a prosecution, for you to

9    stop being afraid of being prosecuted under those provisions?

10             MS. KUMAR:  Objection.  This calls for speculation.

11             THE COURT:  He's asking for her personal opinion.

12             Go ahead.

13             THE WITNESS:  You have to say it one more time.

14   BY MR. WASSDORF:

15   Q.  How much time must pass, without a prosecution, under these

16   provisions, for you to stop being afraid that you will be

17   prosecuted and -- for the activities that you wish to engage

18   in?

19   A.  As long as the law is in effect, because previously my

20   understanding of the law, we did not fall under -- with the

21   compensation section, we did not fall under the way it was

22   written, so I was not worried about it.  But the way it's

23   written now, I am worried -- am worried for our members, our

24   voters, and other organizations that help assist voters and

25   also the places where they live.

1  Q.  And I think you testified earlier --

2  A.  I'm sorry.  You said how long, and so I think the answer

3  would be as long as it's in effect.

4  Q.  I believe you testified earlier that one of the things you

5  were afraid of is if you assisted a voter and they gave you a

6  cup of tea; is that right?

7  A.  I think that Texas voters, especially older voters, if you

8  come into their home or you come into the place that they live

9  and you're assisting them, that they would provide you with

10  something like tea or cookie or whatever.  And the place that

11  they are staying at may provide you with parking or other

12  things, and the way it is written right now, it is concerning

13  to me for our members and for those voters and for those places

14  where they live.

15  Q.  I believe you live in Austin; is that correct?

16  A.  I do live in Austin.

17  Q.  Has José Garza, the District Attorney in Travis County,

18  ever threatened anyone with prosecution for drinking a cup of

19  tea provided by a voter?

20  A.  I am not aware of anyone being threatened at this time, but

21  what I am aware of is that there have been some places that

22  have stopped having league members come into, because-- and

23  understanding is because of the change in the law, because it

24  didn't happen until after SB1 passed.

25  Q.  And that was their choice, not because they were threatened

```
 1    with prosecution; is that right?
 2    A.  I would be -- I think it was their choice, but their
 3    concern may be similar to mine, and their concern would be that
 4    they're going to be prosecuted for allowing people to come in
 5    and assist the people who live in their nursing home or
 6    assisted living center.
 7    Q.  Let's talk about vote harvesting now or the in-person
 8    interaction --
 9    A.  Thank you.
10    Q.  -- provision.  Since at least 2015, the League of Women
11    Voters of Texas has never taken an action intended to deliver a
12    vote for a specific candidate in an election.
13    A.  I believe that it wasn't 2015.  I think it was 2018, but I
14    could be wrong.  In that year, the League of Women Voters of
15    the Austin area supported a bond, and I'm sorry if I got the --
16    a school bond, and I'm sorry if I got the year wrong.
17    Q.  I believe you testified 2017 earlier, but I was speaking
18    specifically with respect to a candidate.
19    A.  Because we never support or oppose a political party or
20    political candidate, so tell me again.  Ask the question again.
21    Q.  That's the question I was asking.
22    A.  Okay.  Ask me again.  I'm sorry.  Start again.
23    Q.  So you don't support or oppose a specific candidate or
24    political party?
25    A.  We never support or oppose a political party, a political
```

Grace Chimene - Examination                    1620

1    candidate.  That's just one of our basic provisions.

2    Q.  The League tries to address these problems by, again,

3    shifting some resources from other activities to educate people

4    about the in-person interaction provision of Senate Bill 1; is

5    that right?

6    A.  The in-person interaction with a vote-by-mail ballot, yes.

7    Q.  I think you testified earlier that at your candidate forums

8    that you would have no idea whether a voter brought a

9    vote-by-mail ballot with them; is that right?

10   A.  Candidate forums are held during -- most of the time

11   they're held during early voting, and so the vote-by-mail

12   ballots would already have been sent out to the people, to the

13   voters who vote by mail, so they may have a vote-by-mail ballot

14   with them when they attend a candidate forum.

15   Q.  And you testified that you would have no way to know

16   whether they had their ballot with them; is that right?

17   A.  That is correct.

18   Q.  You could ask them, though, couldn't you?

19   A.  We could ask, and whether they -- I think that that would

20   be a form -- that would be somewhat intimidating for people,

21   for us to stand up there and ask them, because what are they

22   going to do?  They can't hand you the -- they can't -- the

23   ballot, the vote-by-mail ballot.  That again, would be, I

24   think, illegal.  And they would have to be asked to leave with

25   their vote-by-mail ballot, and they wouldn't be able to

1  participate in the candidate forum.

2  Q.  You could ask them to leave their ballot in the car?

3  A.  I wouldn't ask anybody to do anything with their ballot.  I

4  just wouldn't.

5  Q.  You mentioned earlier a study on election security.

6  A.  Yes.

7  Q.  Now, so the League of Women Voters is concerned with

8  election security; is that right?

9  A.  Yes, we are concerned with election security.  The specific

10  study was about election administration and how the election

11  administrations are run in all the 254 counties here in Texas.

12  Q.  And that's because free, fair, and secure elections are

13  important for the trust of the people and the results; is that

14  right?

15  A.  That is true.

16  Q.  The League actually likes some of the provisions of

17  Senate Bill 1, don't they?

18  A.  It is a huge bill, and I would have to review it again to

19  be able to see which aspect we supported or which ones we

20  opposed.

21  Q.  We're going to talk about that right now.

22  A.  Oh, boy.

23  Q.  For example, the League likes the fact that Senate Bill 1

24  required smaller counties to provide longer hours for early

25  voting?

1   A.  Yes.  We were trying to find aspects that we supported, and

2   that was one of them.

3   Q.  You're aware that before Senate Bill 1, there was no cure

4   process that was required; is that right?

5   A.  Yes.  And we were excited to have a form of cure process.

6   Q.  And it was SB1 that created that cure process?

7   A.  Yes, it was.

8   Q.  So you like that part of it?

9   A.  Yeah.  I wish it was a separate bill.

10  Q.  Before Senate Bill 1, pregnant voters would have had to

11  consider themselves disabled in order to vote by mail; is that

12  right?

13  A.  Yes.  And there's a certain time frame where they're able

14  to vote by mail after SB1.  We also supported that, I think.

15  Q.  Right.  So a pregnant voter who is expecting to give birth

16  during the three weeks before or after Election Day is allowed

17  to vote by mail now?

18  A.  Yes.

19  Q.  And that was because of Senate Bill 1?

20  A.  Yes.

21  Q.  The League also liked the fact that Senate Bill 1 now

22  requires poll watchers to complete a training course conducted

23  by the Secretary of State?

24  A.  Yes, that was very helpful.

25  Q.  And the League considers that a win for voters?

Grace Chimene - Examination                1623

1    A.  That one particular aspect of the bill, yes, we consider

2    that a move that would be helpful.

3    Q.  And the League has also recommended that Texas introduce a

4    vote-by-mail tracking system that we now have?

5    A.  Yup, that was exciting.

6           MR. WASSDORF:  Pass the witness, Your Honor.

7           THE COURT:  Anything else from this side?

8           (1:35 p.m.)

9                          EXAMINATION

10   BY MR. LIU:

11   Q.  Cory Liu with the Harris County District Attorney's office.

12       Do you know the Harris County District Attorney by chance?

13   A.  No.

14   Q.  Are you aware of any statements -- whether she's made any

15   statements regarding SB1?

16   A.  No.

17   Q.  The interpretations that you were talking about on your

18   direct examination and your concerns, are those based on any

19   statements that were made by any government officials?

20   A.  No.  The concerns were based on the bill.

21   Q.  And to your knowledge, the Harris County District

22   Attorney's office has not investigated anyone for an alleged

23   violation of SB1; is that right?

24   A.  Not to my knowledge, but we do have, I believe, up to five

25   leagues in Harris County, I think.

1    Q.  And to your knowledge, the Harris County District

2    Attorney's office has not brought any criminal proceedings

3    against anyone under SB1, correct?

4    A.  Not to my knowledge.

5                MR. LIU:  Thank you.

6                THE COURT:  Anyone else from this side?

7                MS. KUMAR:  Yes, Your Honor.

8            (1:36 p.m.)

9                        REDIRECT EXAMINATION

10   BY MS. KUMAR:

11   Q.  Ms. Chimene, the lawyers on the other side asked you about

12   prosecutions under SB1, right?

13   A.  Yes.

14   Q.  To your knowledge, has any prosecutor in Texas promised

15   that they will not prosecute people for violating SB1?

16   A.  Not to my knowledge.

17   Q.  And so to your knowledge, has the Harris County District

18   Attorney promised that she will not prosecute people for

19   violating SB1?

20   A.  Not to my knowledge.

21   Q.  And to your knowledge, has the Travis County District

22   Attorney promised that he will not prosecute anyone for

23   violating SB1?

24   A.  Not to my knowledge.

25   Q.  And to your knowledge, has the State Attorney General's

Grace Chimene - Examination                    1625

```
 1   Office promised that it will not prosecute people for violating
 2   SB1?
 3   A.  Not to my knowledge.
 4   Q.  And are you concerned that these prosecutions could happen
 5   in the future?
 6   A.  I am concerned.  The League of Women Voters has been around
 7   for a hundred -- more than a hundred years, and we will be
 8   around for another hundred years trying to do our job of
 9   empowering voters and defending democracy here in Texas.  If
10   this continues on, I cannot say if it's going to impact our
11   members, our voters, and our organizations, and what we do in
12   those communities.
13   Q.  Do you remember that you were asked by the lawyer for the
14   other side that even before SB1 went into effect that the
15   League educated voters about changes in the law?
16   A.  Say it again.  Sorry.
17   Q.  Yes.  Do you remember that the lawyer on the other side
18   asked you that even before SB1, whether the League he had
19   educated voters about changes in the law?
20   A.  Yes, we have.  That's -- we try to write them and share
21   changes in plain language, and we try to share changes so as --
22   voters understand what the law is.
23   Q.  Now, in your view, was SB1 different from other laws that
24   you needed to provide educational materials about?
25   A.  It was huge.  It was very big bill that changed many
```

1  aspects to the law.  But in particular, we are concerned with

2  the two aspects to the law that we were talking about earlier.

3  Q.  So let's talk about those for a moment.  So how is the

4  provision criminalizing certain forms of assistance different

5  from other changes to the Election Code?

6  A.  The laws that criminalize assistance, to me and to the

7  League, makes it harder for our voters, our members, who need

8  assistance to be able to get that assistance.  But it makes it

9  harder for the general voters to get that assistance.  They may

10  not want to reach out to whoever they like to have assist them.

11  And the places where they live also, we've seen that sometimes

12  they don't want the League members there to assist the people

13  who live in their communities.  It is not only affecting our

14  members, other organizations, but it's affecting these people

15  who have been voters for a very long time, and it makes them --

16  it may make them not be able to vote in elections.

17  Q.  So when the League educates about this provision concerning

18  criminalizing certain forms of assistance, does that lead to

19  fear in voters about exercising their right to vote?

20  A.  I think it may, if they knew about it, which I'm concerned

21  they might not know or understand this aspect of the law.  Then

22  they should be concerned.  Our members would be concerned --

23  organizations that support or provide assistance to voters who

24  are trying to -- need help with their vote-by-mail ballot may

25  not be able to provide that assistance because they'll be

 1    concerned for their members and their assisters and the voters

 2    in their community.

 3    Q.  And then how is the provision criminalizing certain forms

 4    of in-person interactions different from other changes in -- to

 5    the Election Code?

 6    A.  Could you be more specific about the in-person

 7    interactions?  Are we talking about having the vote-by-mail

 8    ballot with the voter while discussing what's on the ballot?

 9    Q.  Yes.  So I'll ask the question again.

10    A.  Okay.

11    Q.  So how is the provision criminalizing certain in-person

12    interactions with voters in the presence of a ballot and in

13    support of a particular candidate or a measure different from

14    other changes to the Election Code?

15    A.  This particular aspect change to the Election Code is

16    concerning to me because it makes it so that we would not be

17    able -- we don't know who has that ballot with them, but of

18    course it's going to be close enough to the -- you know, to the

19    election that they have received one, but people who vote by

20    mail often will have their ballot with them in their purse or

21    in their whatever they're carrying, so that -- especially if

22    they're going to interact at a candidate forum, if they're

23    going to interact at a forum that talks about propositions or

24    constitutional amendments, or they may have it when they just

25    walk up to a table where there happens to be League members

1    talking.

2    Q.  And beyond educating voters about changes in the law after

3    SB1, did you also provide trainings to help voters and

4    organizations avoid violating the law?

5    A.  Ask me again.  I'll try to concentrate.

6    Q.  Beyond educating voters about the changes in the law, after

7    SB1, did you provide trainings to help voters and organizations

8    avoid violating the law?

9    A.  So, yes, we provided PowerPoints.  We provided Zoom

10   meetings with other organizations.  With organizations for --

11   that serve voters with disabilities.  With other organizations

12   that serve voters who are in -- members of churches, because

13   those organizations either have voters who are members or

14   voters -- or people who assist voters who may need assistance

15   with their vote-by-mail ballot.

16   Q.  And you were asked about the income for the League of Women

17   Voters of Texas, right?

18   A.  Yes.

19   Q.  Is the League of Women Voters of Texas a nonprofit

20   organization?

21   A.  We are a nonprofit.

22   Q.  And you testified that the League relies primarily on

23   volunteers; is that right?

24   A.  That's right.

25   Q.  And regardless of how much income the League has, is

```
 1   volunteer time still limited?
 2   A.  It is certainly limited.  I know it is for me, and it
 3   should be for other members.  We can't do this 24 hours a day.
 4   Q.  So if the League expends volunteer hours working on the
 5   provisions discussed today, does that limit the time that the
 6   League is able to spend working on other projects?
 7   A.  Yes, it does.  There's only so much time in the day that
 8   all our members can do the work we do, and we have to put the
 9   voter's needs first.
10   Q.  And each year since SB1 passed, has the League allocated
11   resources in response to the provisions in SB1 that we have
12   discussed today?
13   A.  Yes, we have.
14   Q.  And so that includes putting resources towards the
15   assistance provision?
16   A.  Towards the assistance provision, so that our members and
17   other organizations will understand -- will try to
18   understand -- so that we keep them as safe as we can as
19   possible.
20   Q.  And that also includes putting resources towards the
21   in-person interaction provision?
22   A.  Right, yes.
23            MS. KUMAR:  Thank you.
24            THE COURT:  Anything else?  Anything based on those?
25            MR. WASSDORF:  Yes, Your Honor.
```

```
 1            (1:45 p.m.)
 2                      RECROSS-EXAMINATION
 3   BY MR. WASSDORF:
 4   Q.  As it stands today, does the League of Women Voters still
 5   produce its voters guide?
 6   A.  Yes.
 7   Q.  Does it still educate voters about changes in the law?
 8   A.  Yes.
 9   Q.  Does it still do everything it used to do before the
10   implementation of SB1?
11   A.  No, it doesn't.  One of the things that we didn't do, as I
12   explained earlier, was we didn't have a study after the
13   convention that was voted on about cyber security.  We did not
14   do that study because of all the time we had to spend on
15   educating voters about this law.
16   Q.  So you just don't do studies any more?
17   A.  No, we didn't do that study, and we can't vote on having
18   another study until the next convention.
19            MR. WASSDORF:  Pass the witness, Your Honor.
20            THE WITNESS:  Thank you.
21            THE COURT:  Anything?
22            MS. KUMAR:  No, Your Honor.
23            THE COURT:  You're excused, ma'am.  Thank you.
24            And your next witness.
25            MS. ARMENTA:  Your Honor, LULAC plaintiffs will be
```

 1  calling Domingo Garcia.

 2          COURTROOM DEPUTY CLERK:  Raise your right hand.

 3                          *   *   *

 4          *(Oath administered and Domingo Garcia, witness,*

 5  *Sworn.)*

 6                          *   *   *

 7          MS. ARMENTA:  Your Honor, Elena Rodriguez Armenta from

 8  Elias Law Group for the LULAC plaintiffs.

 9          Mr. Garcia, is here testifying today as a plaintiff

10  representative for LULAC Texas.  Mr. Garcia will provide

11  support for LULAC to make the challenges to SB1 Sections 3.04,

12  3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08 and 7.04.

13      And for the court reporter, this witness and I speak

14  particularly fast.  I invite you to slow us down.  We're going

15  to do our best to speak at a reasonable rate.

16          *(1:49 p.m.)*

17                      DIRECT EXAMINATION

18  BY MS. ARMENTA:

19  Q.  Mr. Garcia, thank you for being here.  Could you please

20  state your full name for the court, please?

21  A.  My name is Domingo Alberto Garcia.

22  Q.  Where do you live, Mr. Garcia?

23  A.  I live 640 Caster Springs, Dallas, Texas.

24  Q.  How long have you lived in Texas?

25  A.  Sixty-five years.

Domingo Garcia - Examination                    1632

1    Q.   Are you from Texas?

2    A.   I am.  I was born in Midland, Texas.

3    Q.   And why are you here today?

4    A.   I am here as the national president of LULAC, the nation's

5    largest Latino civil rights organization.

6    Q.   What is LULAC?

7    A.   LULAC stands for --

8                 *(Court reporter clarification.)*

9         THE WITNESS:  LULAC stands for the League of United

10   Latin American Citizens.  It is a Latino civil rights

11   organization founded in 1929 in Corpus Christi, Texas.

12   BY MS. ARMENTA

13   Q.   And what is your role within LULAC?

14   A.   I am the national president of LULAC.

15   Q.   How long have you been in that role?

16   A.   Six years.

17   Q.   And what are your duties as national president?

18   A.   To represent the organization in all matters involving the

19   Latino community, whether it's education, health, immigration,

20   civil rights; anything that impacts the Latino communities and

21   their families.

22   Q.   Does LULAC have a partisan affiliation?

23   A.   A what?

24   Q.   A partisan affiliation?

25   A.   No.  LULAC is a nonpartisan organization.  We do not

Domingo Garcia - Examination                     1633

1  support candidates of either party.

2  Q.  So though LULAC doesn't endorse candidates, does LULAC

3  support and advocate for specific policies or legislation?

4  A.  Yes, we do.  We have -- we take positions, like for

5  example, school bond programs or city municipal bond programs

6  or issues such as state amendments to the Constitution or

7  propositions of the state ballot that affect public education

8  or taxes or anything like that would impact our communities; we

9  do take positions on issues, but not on candidates.

10 Q.  Thank you.  I know you've touched on this already a little

11 bit, but does LULAC have an official organizational mission?

12 A.  Yes.

13 Q.  Can you share that with me?

14 A.  Our mission is to improve the lives of Latino families

15 throughout the United States and Puerto Rico and to protect

16 their civil rights in all aspects and to ensure that when we

17 say *With liberty and justice for all"* that "all" includes all

18 Latinos and Latino citizens in the United States.

19 Q.  So LULAC is focused on protecting the civil rights of all

20 Latinos?

21 A.  Yes.

22 Q.  Before you were in the role of national president, did you

23 have any other leadership roles within LULAC?

24 A.  Yes.  I was a LULAC council president in Dallas, Texas, and

25 then I was also general counsel for LULAC back in the 1990s.

Domingo Garcia - Examination                    1634

1    Q.   What is LULAC in Texas?

2    A.   LULAC in Texas represents the largest group of -- it

3    started in Texas, and most of our members of LULAC are actually

4    based in Texas.  And LULAC Texas is the organization that

5    represents all our LULAC members in the state.

6    Q.   Can you share with me a little bit about how LULAC Texas is

7    structured?

8    A.   We have councils.  For example, here in San Antonio, we

9    have probably 30 or 40 different LULAC councils, and LULAC

10   councils exist in Corpus, Dallas, San Antonio, Houston, El

11   Paso, and they represent different entities.  We have other

12   LULAC councils that might just be focused on education and

13   getting scholarships.  We might have a LULAC council that just

14   represents veterans.  A LULAC council that just focuses on

15   higher ed, making sure that students are able to go to college

16   and we get professors and studies and things like that.

17       So the whole spectrum of the community is represented in

18   LULAC.  We have high school LULAC councils, and then we have

19   collegiate LULAC councils at major universities like UT and

20   A&M, UNT.

21   Q.   Did LULAC Texas bring this lawsuit on behalf of particular

22   members?

23   A.   It brings it on behalf of all thousands of LULAC members

24   here in Texas.

25   Q.   Mr. Garcia, would it be all right for you going forward

1  during your testimony if I refer to plaintiff LULAC Texas as

2  "LULAC"?

3  A.  That's -- that's fine with me.

4  Q.  Okay.  Thank you.

5     Separate from your work with LULAC, I'd like to ask you

6  some questions about your personal background.  So what do you

7  do for work, Mr. Garcia?

8  A.  I'm an attorney.

9  Q.  And how long have you been an attorney?

10 A.  Thirty-seven years.

11 Q.  And where did you go to law school?

12 A.  I went to school at Thurgood Marshall School of Law in

13 Houston, Texas.

14 Q.  Do you have any other higher education?

15 A.  Yes.  I have a Bachelor's of political science from

16 University of North Texas.  I have a Master's in international

17 relations from El Colegio de Mexico in Mexico City.  I have a

18 Master's in corporate governance from Harvard, and then I have

19 my JD from Thurgood Marshall School of Law.

20 Q.  Apart from your work as lawyer and with LULAC, have you

21 held any other positions?

22 A.  Yes.  I was Dallas City Council member for six years.  I

23 was mayor pro tem for the City of Dallas, and I was a state

24 representative for six years in the Texas legislature.

25 Q.  So you ran for office.  How many times have you run for

Domingo Garcia - Examination                    1636

1  office?

2  A.  Seven.

3  Q.  And that includes campaigns for federal and state office?

4  A.  Yes.

5  Q.  I know you touched on this a little bit.  Which offices did

6  you run for?

7  A.  I ran for city council, for state representative, and for

8  Congress.

9  Q.  Have you ever --

10  A.  And actually, also mayor of Dallas.

11  Q.  Thank you.  Have you ever worked in elections yourself in

12  any capacity?

13  A.  I have.  I have been a precinct judge and a poll watcher.

14  Q.  How long were you a judge, a precinct judge?

15  A.  Four years.

16  Q.  How long were you a poll watcher?

17  A.  I worked on two different campaigns in Copper Hill*(ph)*,

18  Texas, and Dallas, Texas.

19  Q.  In addition to being national president, are you also LULAC

20  member yourself?

21  A.  I am.

22  Q.  Why did you join LULAC?

23  A.  I wanted to make a difference.  I come from a very humble

24  background, and I thought that LULAC was the organization that

25  when I graduated from law school, that would allow me to make

Domingo Garcia - Examination          1637

1    an impact in the lives of our community and try to improve

2    their situation here in the State of Texas.

3    Q.  How many members does LULAC have in Texas?

4    A.  I haven't checked, but probably actual members, somewhere

5    in the neighborhood in the thousands, probably four to 5,000,

6    and eMembers -- there's a lot set up online, probably closer to

7    80- or 90,000.

8    Q.  Can you describe the typical LULAC member for me?

9    A.  There is no such thing as a "typical LULAC member."  It

10   could be everything from a veteran who just got back from Iraq

11   or Afghanistan and joins LULAC.  It could be a police officer

12   who works part-time as a volunteer helping kids in the

13   community.  It could be a high school student who is -- wants

14   to move on to college, and they're a member of the local high

15   school LULAC or a collegiate member at UT Austin.  And it could

16   be a construction worker who wants to make a difference, or a

17   homemaker who gives and volunteers her time for LULAC

18   activities.

19   Q.  And as national president, do you personally have much

20   involvement with LULAC Texas -- LULAC in Texas, rather?

21   A.  Yes.  LULAC has the largest portion of our membership.  It

22   was founded -- LULAC was founded in Texas and continues to be

23   our main site of organizing and moving -- mobilizing our

24   communities here in Texas, and I live in Texas, and I work in

25   Texas.

Domingo Garcia - Examination                    1638

1    Q.  How do you generally receive communications about LULAC

2    activity taking place in Texas?

3    A.  It runs the gamut.  We get e-mails.  We get texts.  We get

4    social media, direct messaging.  We get phone calls, and we

5    actually still get mail.  We get letters all the time from

6    LULAC members wanting help or support in one issue or another.

7    Q.  And just to clarify, when you say "we," do you mean you

8    directly?

9    A.  Me, yeah.  Me, at my office.

10   Q.  Thank you.  And are you personally involved in any of those

11   activities taking place in Texas?

12   A.  Yes, I am.  I get called to different issues that are

13   happening throughout the state.  I was in Uvalde the day after

14   the shooting talking to the families and the victims there.  We

15   raised over $2 million from LULAC members to support the

16   families.  We're the first organization to help them directly

17   with mental health and other issues that occurred after the

18   shooting.

19       I was in Humble, Texas, when 29 students were denied

20   graduation because of wearing a sash, and the teacher, Spanish

21   language teacher was terminated.  And we went there to help

22   them get -- to graduate, which they did, and to try to get the

23   teacher reinstated.  So those are just some of the issues we

24   get involved in, but there's multiple.

25   Q.  And as you mentioned, LULAC's mission involves protecting

Domingo Garcia - Examination                1639

1    civil rights of all Latinos, so what kinds of issues does LULAC
2    focus on as part of its mission?
3    A.   A big part of our mission is education.  We have learning
4    centers throughout the state.  Many people don't know, but the
5    School of 400 started in Houston, it's a -- if a student
6    learned 400 words in English, he would be -- he or she would be
7    able to start first grade better.  It was the genesis of Head
8    Start that Lady Bird Johnson implemented nationwide.  And now
9    we prepare students in high school to go to college at our
10   learning centers, to take the SAT, to apply for college, to get
11   scholarships.  84 percent of the students who go through our
12   programs graduate with a four-year college degree.
13       We also participate in health care, providing and making
14   sure that families have access to Medicaid, Medicare and other
15   resources.  We are active in civil rights legislation and
16   advocacy at the state capitol and also at the city and school
17   board level, and we work on individual issues for people who
18   may be the victims of some type of injustice.
19   Q.   And how does LULAC support its interests in immigration?
20   A.   We have been involved in immigration since the '80s.
21   Personally, I was -- my family is from Eagle Pass, Texas, and I
22   was down there, and we had been active helping some of the
23   refugees coming across the border.  We filed a lawsuit on the
24   buoys that were made there that were resulting in bodies
25   floating down the Rio Grande, talking to landowners who were

1    seeing the bodies pile up on the Eagle Pass side, and working

2    with them.

3       I -- we helped several immigrants from Eagle Pass that

4    literally -- talking about mother and baby.  I think it was a

5    four-month-old baby with just clothes on the back, and others

6    get -- that are already been legally processed to get

7    transportation from Eagle Pass to San Antonio to bring them to

8    a migrant center where they can get help.

9    Q.  Does LULAC conduct any programming related to strengthening

10   the organization, like recruitment?

11   A.  Yes, we are always -- we have programs.  Primarily, it's

12   word-of-mouth.  It's a LULAC member talking to a family or a

13   neighbor and getting them involved.

14      One of the fathers in Uvalde who lost his nine-year-old

15   daughter in the shooting created the first LULAC council in

16   Uvalde.  Another mother who got shot in El Paso during the

17   Walmart shootings when a guy went to kill Mexicans in El Paso

18   created a LULAC council in El Paso.

19      So those are the type of people.  They run the gauntlet

20   from everywhere to join, and then we also have outreach

21   programs through our social media and through our events that

22   we have throughout the state.

23   Q.  Thank you.  And apart from what you mentioned, does LULAC

24   participate in any community outreach or community response

25   initiatives?

Domingo Garcia - Examination                1641

```
 1          THE COURT:  Mr. Garcia, slow down.
 2          THE WITNESS:  Okay.  If you repeat the question,
 3    please.
 4    BY MS. ARMENTA:
 5    Q.  Does LULAC participate in any community outreach or
 6    community response initiatives?
 7    A.  Yes, we do.  I mentioned earlier Uvalde is a good example
 8    of that where we provided help and assistance to the children.
 9    I was looking at 9 and 10-year-old kids who were shot, and
10    helping them get, you know, support and help for treatment.
11    And that was before any of the other organizations arrived, to
12    programs such as -- I got a call from the FBI in February that
13    21 immigrants had been found naked in a house at Fort Worth,
14    Texas, and the traffickers, the human traffickers, had been
15    arrested, but they didn't know what to do with these
16    immigrants.  And within 72 hours, we were able to mobilize a
17    team to provide clothing, shelter, and bus ticket to get those
18    victims to families around the state.  And that's just one of
19    the many items that we do routinely.
20    Q.  And does LULAC have a working relationship with law
21    enforcement?
22    A.  Yes, we do.  We work closely with the FBI, with local
23    police departments, whether it's in Dallas, Houston, the
24    sheriffs departments here in Bexar County, down in Eagle Pass
25    and in El Paso -- especially after the shootings in El Paso.
```

Domingo Garcia - Examination                1642

1    And with the district attorneys around the state to deal with

2    issues regarding specifically hate crimes or unjust crimes that

3    occur throughout the state to Mexican Americans.

4    Q.  Thank you.  And why are all these efforts that you've just

5    described so important to LULAC's mission?

6    A.  Because at the core of what we want is for Mexican

7    Americans to be treated just like all Americans, to have

8    fairness, equity before the law, and in politics and economics

9    and in education.  And that's our mission and our goal, and

10   that's what we try to do.  We're all volunteers, by the way.

11   Q.  Has LULAC been involved in lawsuits against voting and

12   election-related legislation before in Texas?

13   A.  Since 1929.  Still going.

14   Q.  Can you give me some examples?

15   A.  LULAC has been -- has filed lawsuits challenging the poll

16   tax where people had to pay to vote.  LULAC has challenged the

17   whites only primary that only allowed whites to vote in

18   Democratic primary when that was really the only party, to

19   allow African Americans and Latinos to vote in the election.

20       In Hernandez versus Texas that went to the Supreme Court in

21   1957, we challenged the fact that Mexican Americans were not

22   allowed to serve as grand jurors in Texas, and we won that

23   lawsuit and allowed Mexican Americans to serve on grand juries

24   in the State of Texas.  We filed suit to get the Voting Rights

25   Act to include Texas and Spanish language minorities.  Before

Domingo Garcia - Examination                    1643

1    it only covered African Americans in the South, and because of

2    our litigation and the proof showing that Mexican Americans

3    were subject to voter suppression and illegal gerrymandering,

4    that the Voting Rights Act was extended to the Southwest, and

5    specifically Texas and those areas where we had

6    Spanish-speaking Mexican American minorities.

7    Q.  So a lot of lawsuits then?

8    A.  Yeah.  And every ten years we sue the State of Texas on

9    redistricting, and we always win, since 1970 and again in 2020.

10   Q.  Are you familiar with SB1?

11   A.  I am.

12   Q.  Can you tell me at a high level your understanding of what

13   SB1 is?

14   A.  It's a voter suppression bill.  It has racism written all

15   over it.

16   Q.  Were you following the events in the legislature

17   surrounding SB1's passage?

18   A.  Yes, we were.

19   Q.  And why was LULAC focused on SB1?

20   A.  Because we knew that it was targeting minority voters,

21   primarily in Harris County but throughout the state, and its

22   intent, it was trying to suppress the ability of people to

23   vote.  You know, you would think in a democracy that you would

24   make it easier for people to vote, not harder.  And the

25   provisions we saw in SB1, it would make it -- limit the hours

Domingo Garcia - Examination                    1644

1   of voting, limit how you could vote -- the ability to vote

2   easier by, like, say, driving through a voting location and

3   voting.  And especially for Mexican Americans, we're

4   working-class people.  Many of us work ten, 12 hours a day.  My

5   dad did.  He was a concrete construction worker.  My mother

6   worked as a maid.  You have people that worked two jobs to make

7   ends meet, and so they have limited space and time to vote.  So

8   when you make it difficult for them to do so, then you are, in

9   essence, suppressing their vote, and it's politicians choosing

10  the voters, not the voters choosing the politicians.

11  Q.  So you mentioned drive-through voting.  Did LULAC's

12  experience in the 2020 election during the pandemic impact the

13  organization's response to SB1?

14  A.  Yes, it had a major impact.  We tried to stop it while it

15  was in the legislature.  We spoke against it.  Most of the

16  Mexican American state representatives actually left the State

17  of Texas to stop SB1 from passing -- I think it was called SB7

18  at the time -- because they knew about it discriminatory impact

19  on Mexican Americans and African Americans in Texas.  And I

20  think it finally passed in a special session, and we still

21  fought it there.  Unfortunately, we were not successful.

22  Q.  So you touched on this a bit earlier, but can you briefly

23  explain why LULAC publicly opposed SB1?

24  A.  Because it limited -- you want us to go through each

25  provision?

Domingo Garcia - Examination                    1645

1  Q.  No.

2  A.  Okay.  It limited the rights of Latinos and African

3  Americans to vote.

4  Q.  And you mentioned some of the other important initiatives

5  that LULAC focuses on as part of its mission.  Is voting

6  important to those initiatives?

7  A.  It's crucial to our mission, because we know that when

8  Mexican Americans are allowed to vote, they are able to choose

9  candidates of their choice.  Candidates who reflect their --

10  the diversity of Texas.  Candidates that will stand and work on

11  issues that are important to them, whether it's fixing potholes

12  or getting a new school or whether it's passing bills that

13  label them to start mom-and-pop businesses or to deal with

14  issues that are impacting them at an employment level or school

15  level or whatever it may be.

16  Q.  Mr. Garcia, now I'd like to ask you about some of the

17  specific provisions of SB1, starting with the provisions of SB1

18  that eliminate drive-through voting, which are Sections 3.04,

19  3.12, and 3.13.  Are you familiar with those provisions?

20  A.  I am.

21  Q.  Has LULAC been impacted by those provisions?

22  A.  It has.

23  Q.  How so?

24  A.  We've had to deal with the possibility that -- we -- every

25  year, LULAC has volunteers that engage in voter registration

Domingo Garcia - Examination                1646

1  and get-out-the vote efforts.  That provision, in essence,

2  would hamper our ability to get our vote out and get as many

3  voters as possible to vote, especially medium or low propensity

4  voters, voters who have difficulty getting to the polls in the

5  first place.  And that impacted our organization because we had

6  to divert resources that we were using for educational

7  programs; for instance, scholarships, or dealing with the

8  issues I talked to you about like Uvalde or El Paso or Humble,

9  Texas, and try to deal with SB1, because we didn't want

10  anybody -- I have not seen the weaponization and

11  criminalization of voting since probably the Jim Crow and Juan

12  Crow laws of Texas back in the '40s and '50s, and this would

13  have made people criminals for helping their grandpa or grandma

14  go vote.  It could make people criminals for providing

15  breakfast tacos or pan dulce to volunteers who are going to go

16  out and try to get the vote out.  It was sort of a step

17  backwards for Texas and Texans.

18  Q.  Thank you.  Coming back to specific provisions of SB1, I'd

19  like to ask you next about the provisions involving 24-hour and

20  extended-hour voting, Sections 3.09 and 3.10.  These provisions

21  prohibited counties from operating early voting before

22  6:00 a.m. --

23                    *(Court reporter clarification.)*

24  BY MS. ARMENTA:

25  Q.  I'd like to ask you about the provisions of SB1, involving

Domingo Garcia - Examination                    1647

1    24-hour and extended-hour voting, which are Sections 3.09 and

2    3.10.  These provisions prohibit counties from operating early

3    voting before 6:00 a.m. or later than 10:00 p.m. daily except

4    Sundays, which are also otherwise limited.

5        Are you familiar with these provisions?

6    A.  I am.

7    Q.  Has LULAC been impacted by those provisions?

8    A.  Yes, it has.

9    Q.  How so?

10   A.  One of our largest LULAC concentration of members is in

11   Harris County.  Harris County has the largest Latino population

12   in the State of Texas, and we have many councils and members in

13   Harris County, and when they had 24-hour voting, it increased

14   the number of Latinos who were able to vote in the 2020

15   elections.

16       Again, as I mentioned to you, we have a lot of

17   working-class Latinos, people who are bricklayers and

18   construction workers who work from sunrise to sunset.  We have

19   people that work double shifts, and so the ability to be able

20   to go vote when their shift was over or before their shift was

21   out during 24-hour voting was a great plus in increasing

22   turnout and helping those individuals vote.  And by putting a

23   limitation on the hours, that impacted our ability to get our

24   vote out.

25   Q.  And does LULAC have many members in Harris County?

Domingo Garcia - Examination                  1648

1    A.  Yes, we do.

2    Q.  Does LULAC have many councils in Harris County?

3    A.  Yes.  We have actually two districts in Harris County

4    because it's so big, and I don't remember the number of

5    councils we have, but at least 14 or 15.  I was just at the

6    Astros game Monday night giving an award to José Altuve from

7    the Astros, and we must have had over one or 2000 LULAC fans at

8    the ballpark that night.

9    Q.  And do you know if LULAC members made use of drive-through

10   voting or 24-hour voting?

11   A.  Yes, we do.

12   Q.  How do you know that?

13   A.  Because many of our members that were there in Harris

14   County during the 2020 election were making a concentrated

15   effort to get many of our members -- Hey, you can't go vote

16   because you're working 7:00 to 7:00.  You know, why don't you

17   go vote at 11:00 or go vote at, you know, 5:00 in the morning

18   because that will be easier for you.  And many did take

19   advantage.  I believe 130,000 people voted during that time

20   period or something like that.  I forgot the exact number,

21   somewhere between a hundred and 130.

22   Q.  I'd like to ask you next about the provisions of SB1

23   imposing new voter identification requirements.  So that's

24   Sections 5.02, 5.03, 5.07 and 5.08.  These provisions require

25   that, among other things, voters eligible to vote by mail must

Domingo Garcia - Examination                1649

```
 1   now either include their drivers license number or the last
 2   four digits of their Social Security number.
 3       Are you familiar with these provisions?
 4   A.  I am.
 5   Q.  Have LULAC members been impacted by these provisions?
 6   A.  Yes, they have.
 7   Q.  How so?
 8   A.  We always have a get-out-the-vote effort, and we work a lot
 9   on getting our seniors to vote, because many people don't
10   realize, but if you were born in the '40s, '50s, '60s time
11   period, most Latinos only got to sixth or eighth grade,
12   therefore many of them are illiterate.  They don't know how to
13   read or write.  Many are Spanish-language only speakers or
14   Spanish dominant and, therefore, they don't -- are not fluent
15   in English and cannot read English.  And many of them, because
16   they're now in their 70s or 80s, they don't have a driver's
17   license because they don't drive.  They don't have a car.  Many
18   of them don't have Social Security number any more because
19   they're not working and their Social Security card got lost or
20   is missing or expired, and they didn't get a new one;
21   therefore, there is no Social Security card.  There is no
22   driver's license, and it disproportionately impacts low-income
23   Latino seniors throughout the State of Texas, and especially
24   those that are wanting to vote by mail.
25   Q.  And does a rejection of absentee ballots or ballot
```

Domingo Garcia - Examination                    1650

1  applications affect LULAC's ability to accomplish its mission?

2  A.  It does, because if we are not able to get our vote out,

3  we're not able to get what candidates the community wants and

4  that represents their interests and is responsible --

5  responsive to their concerns.

6  Q.  So focusing specifically on the voter identification

7  provisions, has LULAC done anything to mitigate the impact of

8  these SB1 requirements?

9  A.  Yes, we have.  We have -- for example, we rented a bus and

10  went around the State of Texas and had town hall meetings.  I

11  had public events to educate our members and our volunteers

12  about if you're going to go do registration, if you're going to

13  do -- especially in terms of working with seniors, if we're

14  trying to get our seniors to go vote, they're going to have to

15  fill in these -- this information in terms of, if you don't

16  include the driver's license or Social Security number, then

17  that ballot could be rejected.  And we saw large numbers of

18  ballots rejected in the very beginning, including some that I

19  personally had to deal with.

20  Q.  So this bus tour you mentioned provided voter education?

21  A.  Yes, ma'am.

22  Q.  Has putting on these voter education programs required

23  staff and volunteer time?

24  A.  Yes.  We had to -- for example, just the bus tour, it cost

25  us gasoline money, driver, food for the volunteers, housing for

1   the volunteers.  And we went from Brownsville to Laredo to San

2   Antonio to Houston to Dallas.  We were all over the state,

3   because we were concerned we wouldn't want any of our members

4   to get arrested and persecuted for helping somebody go vote.

5   Q.  You mentioned funds.  Did the bus also require staff and

6   volunteer time?

7   A.  It did.

8   Q.  Are these the same staff and volunteers that work on other

9   LULAC's critical initiatives?

10  A.  Yes.  We had to divert members working on other issues to

11  make sure during that election cycle that they knew the

12  consequences and the provisions of SB1.

13  Q.  Can you give me an example of what other projects or

14  initiatives important to LULAC these staff and volunteers would

15  have been working on?

16  A.  Well, like right now, we're doing a voter registration

17  drive and get-out-the-vote drive in Uvalde.  One of the mothers

18  of -- whose daughter got killed is running for mayor in Uvalde.

19  And even though we don't support candidates --

20              *(Court reporter clarification.)*

21          THE WITNESS:  For example, in Uvalde, Texas, we are

22  doing a voter registration and get-out-the-vote effort.  One of

23  the mothers who lost her nine-year-old daughter actually is

24  running for mayor, and while we don't endorse candidates, we do

25  want to get the vote out, and we have to divert resources from,

 1    let's say, that voter registration effort to make sure anybody

 2    involved there now has to be educated about what happens when

 3    you're visiting the seniors home, so that they don't get in

 4    trouble.  There's a provision that says if you get

 5    compensation, that you might commit a criminal act.

 6            Well, again, the analogy I use, we normally give

 7    breakfast tacos or pan dulce and coffee.  And, you know, it's a

 8    hundred degrees in Texas right now, and water and Gatorade.  Is

 9    that compensation?  If we give gasoline to volunteers to drop

10    off the door knockers, is that compensation?  Can those people

11    be arrested?  If you have a district attorney who is

12    overzealous or if you've got a crooked Attorney General who's

13    been impeached and indicted who might try to divert attention

14    to himself to prosecute innocent people who are just trying to

15    get the vote out.

16    Q.  Thank you.  And just back to your voter education efforts

17    for a moment.  You mentioned funds being spent on this bus

18    tour, for example.  Can you give me an example of where those

19    funds would have otherwise been spent?

20    A.  Our education programs, scholarship programs, programs

21    regarding voter registration, programs regarding town halls

22    that we put on for naturalization and citizenship events.  It

23    runs the gamut of all the activities that we do and, you know,

24    it costs us thousands of dollars.

25    Q.  And is that reallocation of funds temporary?

Domingo Garcia - Examination          1653

1    A.   No.  We have to do it every year, because every year --

2    like I said, there might be a veteran who just arrived from

3    Iraq or Afghanistan who joined LULAC, and he wants to volunteer

4    and get out the vote.  There might be a teacher who just

5    retired and has more time and wants to help students or seniors

6    go vote.  We have new members arriving all the time from out of

7    state, and we have to educate them that, you know, Texas is not

8    California; and therefore, you can register to vote same day in

9    California.  Everybody can vote by mail if they get excused in

10   California.  You can't do that in Texas.  And in fact, it might

11   be a crime if you do it in this state.

12   Q.   Are you aware of any individual LULAC members who are

13   harmed as a result of SB1's voter identification provisions?

14   A.   I am.

15   Q.   How do you know about this?

16   A.   During the '22 election, I got a call from a member in

17   McAllen, Texas, who told me that she applied twice for an

18   application to vote by mail and had been turned down twice.

19   She was disabled and needed assistance, and I had to personally

20   call the elections officials in Hidalgo to get her an

21   application to vote by mail because the election councils of

22   Hidalgo County told me that.  They were confused, and they

23   didn't know the processes, and they were going to try to help

24   her to get her ballot on the third attempt.

25   Q.   Who was this LULAC member?

1    A.   Her name was Roslyn Wisefeld*(ph)*.

2    Q.   Has LULAC -- sorry.  I know you touched on this a little

3    bit earlier.  I'd like to ask you next about Section 7.04,

4    which prohibits compensated in-person interactions with voters

5    in the presence of a ballot or mail ballot and imposes criminal

6    penalties for violaters of this provision, which is referenced

7    in LULAC plaintiffs complaint as the voter interaction ban.

8         Are you familiar with that provision?

9    A.   I am.

10   Q.   Has LULAC been impacted by that provision?

11   A.   Yes.

12   Q.   How so?

13   A.   For example, in Tarrant County, our LULAC councils in

14   Tarrant County are no longer doing get-out-the-vote efforts

15   with seniors.  They stopped doing that because they're afraid

16   that they could be persecuted for helping a senior.  And if

17   they got compensated again through helping people volunteer to

18   pay for gas or food, their drinks, that they could be possibly

19   be subject to criminal indictments.

20   Q.   As part of these volunteer programs you described, does

21   LULAC provide any voter assistance?

22   A.   Yes, we do.  We help -- like I said, we have -- our seniors

23   are not literate.  Many of our seniors have physical

24   disabilities, have glaucoma, other issues.  They have -- some

25   of them have Parkinson's.  They can't write, and they need

Domingo Garcia - Examination                    1655

1    assistance, and it used to be perfectly legal to assist as long

2    as you listed your position.  And now, you know, we're

3    concerned that compensation can be used, because it's so vague,

4    to persecute somebody by an overzealous district attorney or

5    Attorney General.

6    Q.  And as part of the programs you described for volunteers,

7    does LULAC provide advocacy?

8    A.  Yes, we do.  We provide voter advocacy and education to our

9    seniors as well as the entire public.

10   Q.  So how has the voter interaction ban, Section 7.04,

11   affected LULAC's advocacy and assistance programs?

12   A.  It stopped it totally in Tarrant County.  I was with

13   members in Houston on Monday, and they're trying to get a

14   get-out-the-vote effort for their elections for mayor and city

15   council on November 7, and they said they scaled that down.

16   They're not going to touch any seniors.  They're only going to

17   be working with those under 65 for fear that they could be

18   subject to prosecution if they help seniors vote by mail.

19   Q.  So, fundamentally, why has Section 7.04, the voter

20   interaction ban, in particular, caused these voters assistance

21   to voter advocacy programs to end?

22   A.  Because the vagueness of the law says that if we help

23   somebody with gasoline, we give them 50 bucks to fill up the

24   tank and take the volunteers who work on our precinct, that

25   that is compensation, and they could be subject to criminal

1    indictments.  If you provide food or drinks, is that

2    compensation?  If you pay a high school senior ten or $15 an

3    hour to go do a voter registration drive and they knock on a

4    senior's home, and they get invited by the abuelita to come in

5    and have cookies and chocolate, could they be subject to

6    criminal charges?

7        And that's a heavy burden for volunteers, especially

8    volunteers with LULAC, that could be facing that.  You know, I

9    don't want some college kid or some high school kid to go to

10   jail because they helped a senior vote.

11   Q.  And apart from, I think, the food you mentioned and gas you

12   mentioned, does LULAC ever provide volunteers with anything of

13   value like a token of appreciation?

14   A.  Yes.  Like I said, we -- sometimes we raffle off tickets to

15   a Cowboys game or the Rangers game or, you know, Astros in

16   Houston, the Spurs in San Antonio.  And that might be

17   considered compensation.  Sometimes we give them tickets to the

18   Six Flags or something like that to help them out.  So, yeah.

19   Q.  Does LULAC still operate any voter advocacy or assistance

20   program in Texas?

21   A.  Yes, we do, but on a much limited scale.

22   Q.  You mentioned it was limited.  How do these new versions of

23   LULAC's voter assistance/voter advocacy programs compare to

24   their prior versions before SB1?

25   A.  It's much less from us.  We used to have a program to --

1    I'm just going to use Tarrant County, Fort Worth, where we

2    would help seniors get out, fill out their applications.  Help

3    them make and sure that they -- remind them to go and mail

4    their ballots.  We -- our LULAC councils in Fort Worth totally

5    stopped doing that, because they're afraid that they might be

6    persecuted because Fort Worth has a Republican District

7    Attorney and one who works with the Attorney General.  And

8    there was a case a couple years ago where two women were

9    arrested for supposedly voter fraud.  The term they use is

10   "voter harvesting."  It was fake.  It was a lie.  The charges

11   were dismissed, but those ladies lives were ruined and their

12   careers, reputations were destroyed.

13   Q.  Does this fear you described impact LULAC's broader mission

14   in any way?

15   A.  Of course.  It has a chilling effect on our members.  It

16   has a chilling effect on our ability to just get seniors to go

17   vote, because of the danger that somebody could wind up

18   indicted and arrested and have their career and lives destroyed

19   because they helped a senior vote.

20   Q.  Thank you, Mr. Garcia.

21            MS. ARMENTA:  I pass the witness.

22            THE COURT:  Anything further on this side?  Any cross?

23            MR. CAPOZZI:  Yes, Your Honor.

24            (2:24 p.m.)

25                        CROSS-EXAMINATION

1   BY MR. CAPOZZI:

2   Q.  Good afternoon, Mr. Garcia.  How are you today?

3   A.  I'm good.

4   Q.  My name is Louis Capozzi.  I am from Jones Day with the

5   intervener defendants, which includes the Harris County

6   Republican Party.  I just want to start with a preliminary

7   question.

8       You talked about individuals potentially getting punished

9   for assisting voters if they received compensation for

10  assisting voters, but just to clarify, LULAC isn't challenging

11  any of the voter assistance provisions in Section 6, correct?

12  A.  Elaborate on what you're talking about.

13  Q.  Well, SB1 includes various sections.  Section 6 are the new

14  provisions on voter assistance.  In particular, Section 6.06 of

15  SB1 talks about receiving compensation to assist voters.

16  A.  That's the one that concerns us and has created a lot of

17  tension in our community, anxiety, regarding what that means.

18  Again, like I mentioned, is giving food, drinks, raffling off

19  tickets to volunteers, is that compensation?

20  Q.  But just to be clear, you're aware that LULAC is no longer

21  challenging that provision, correct?

22  A.  I know that there are separations, but I'm not -- I'll

23  leave that up to the attorneys.  I don't know about that one.

24  Q.  Okay.  You talked about a specific member of LULAC that you

25  said was injured by the voter ID provisions, Rosa Lee

Domingo Garcia - Examination                    1659

1  Wisfield*(ph)*, correct?

2  A.  Yes.

3  Q.  And you testified that during the March 2022 primary, she

4  ultimately did receive a mail ballot, correct?

5  A.  On the third attempt after defended by LULAC, and myself.

6  Q.  Do you know whether she was able to vote in the March 2022

7  primary?

8  A.  Yes.

9  Q.  And she was able to vote?

10  A.  After the third attempt.  She was very persistent.

11  Q.  And you didn't testify whether she was able to vote in the

12  fall 2022 elections, correct?

13  A.  I did not hear a complaint at that time.

14  Q.  Okay.  And you didn't testify that Ms. Wisfield*(ph)* was

15  injured by any provisions in SB1 other than the voter ID

16  provisions, correct?

17  A.  Correct.

18  Q.  You talked about Sections 3.04, 3.12, and 3.13 of SB1,

19  which deal with drive-through voting, correct?

20  A.  Yes, sir.

21  Q.  And you're familiar with those provisions?

22  A.  I am.

23  Q.  Those provisions left intact curbside voting for voters

24  with disabilities, correct?

25  A.  Yes, sir.

Domingo Garcia - Examination                    1660

1    Q.  And you didn't identify a specific member of LULAC who was
2    unable to vote in 2022 because of the drive-through provisions,
3    correct?
4    A.  Not specifically.  We just know the numbers went down.
5    Q.  But not a specific number?
6    A.  Not a specific number.  Just overall the numbers went down.
7    I'm talking about the number of people voting, especially
8    Latinos in Harris County.
9    Q.  Sections 3.12 and 3.13 also require polling places to be
10   located inside buildings as opposed to structures like tents,
11   right?
12   A.  Yes, sir.
13   Q.  And you haven't identified a LULAC member who was unable to
14   vote because of those requirements, right?
15   A.  Counties like Harris and Dallas had mobile voting sites
16   like in shopping centers, different community centers in 2020.
17   And what we saw was after those mobile sites were removed that
18   voting, specifically Mexican Americans and African Americans,
19   reduced in 2022.
20   Q.  But you haven't identified a specific person who couldn't
21   vote in 2022?
22   A.  Not an individual, no.  That's difficult to get that
23   information.
24   Q.  And you're familiar with Sections 3.09 and 3.10 which deal
25   with early voting hours, correct?

Domingo Garcia - Examination                    1661

1    A.  Yes, sir.

2    Q.  Under those provisions, for ordinary primary and general

3    elections, SB1 permits two weeks of early voting, correct?

4    A.  Yes, sir.

5    Q.  That includes early voting on two weekends, right?

6    A.  I thought it was one weekend, but it could be two.  I

7    haven't read it.  I remember it was one Saturday and one

8    Sunday.

9    Q.  Okay.  So you're not sure either way how many weekends it

10   is?

11   A.  It used to be one weekend.  It could be two weekends.  I

12   don't remember that specific provision.  I just don't know.

13   Q.  That's fair enough.

14       So each day, SB1 permits up to 16 hours per early voting

15   day at any early voting location in the state, right?

16   A.  Yes, sir.

17   Q.  And you're aware that Harris County is the only county that

18   allowed 24-hour voting during the 2022 general election, right?

19   A.  I believe so.

20   Q.  And you haven't identified a member of LULAC who was unable

21   to vote in 2022 because of SB1's regulation of early voting

22   hours, correct?

23   A.  Again, I can only tell you what our members told us, that a

24   lot of people were not able to vote because they weren't --

25   they're essential workers.  They're working on refineries.  Are

1   you from Houston?

2   Q.  I am not from Texas.

3   A.  Okay.  Well, I mean, if you're working in Houston, you're

4   working refineries, construction.  You're working in the hotel,

5   restaurant industries, and those people don't get out of work

6   until 2:00, 3:00 in the morning, so they could not go vote.

7   Q.  But you haven't identified a specific person?

8   A.  Not a specific individual, no.

9   Q.  And I understand some people have long shifts in Houston,

10  but you're not aware of a specific worker who works for the two

11  full weeks every day from 6:00 a.m. to 10:00 p.m. and on the

12  weekends?

13  A.  I know that a lot of people work more than that actually,

14  because they're working double shifts.  They're working in a

15  lot of areas.  So that 24-hour voting was a great plus.  You

16  saw the numbers just dramatically increase in Harris County.

17  That's why I think it's a targeted bill.  It's targeting the

18  largest minority county in Texas with the largest number of

19  minority voters.  I mean, what's the intent except to

20  disenfranchise those voters?

21  Q.  But you haven't identified a specific member of LULAC who

22  works a shift during all those hours?

23  A.  Not an individual, no.

24  Q.  Let's talk about Section 4.12, which deals with drop boxes.

25  You're familiar with that provision, right?

Domingo Garcia - Examination                    1663

1    A.   Yes, sir.

2    Q.   And you would agree that there's never been an election in

3    Texas where every Texas county permitted drop boxes, correct?

4    A.   No, that was because of COVID.  We had a situation with

5    COVID.  A lot of people didn't want to vote in-person because

6    they were in fear of getting COVID, so that's why we had drop

7    boxes.

8    Q.   So are you saying in 2020, every single county in Texas

9    allowed drop boxes?

10   A.   Normally at the elections office.

11   Q.   Okay.  So the counties in 2020 allowed you to drop your

12   ballot off at the elections office to an election official?

13   A.   And some counties created drop sites.  Like, Harris County

14   created, I believe, eight drop sites.

15   Q.   So let me clarify my question, then.  In 2020, not every

16   county allowed voters to drop off their ballot at a drop box

17   without an election official present, correct?

18   A.   I think 2020 is when they did allow it.  It was before that

19   that they did not.

20   Q.   So in 2020 --

21   A.   Well, it was never prohibited, first of all, but

22   everybody --

23                   *(Court reporter clarification.)*

24        THE WITNESS:  That prior to 2020, every county allowed

25   you to drop your absentee mail ballot at the elections office.

1    During 2020, they created drop boxes.  Like Harris County

2    created eight sites, because there was a larger number of mail

3    ballots because people didn't want to vote in-person because of

4    the COVID illness going around at the time.

5    BY MR. CAPOZZI:

6    Q.  Yeah, so let's just be clear about this.  So in 2020, some

7    counties allowed you to do that, to drop off your ballot at a

8    drop box without an election official present, right?

9    A.  Correct.

10   Q.  And some counties did not allow that in 2020?

11   A.  Yes.  I mean, depends.  You know, Lubbock County has 400

12   people.  Harris County has, you know, 8 million people,

13   whatever the number is.  You're talking huge difference.

14   Q.  You talked a little bit about the voter ID requirement for

15   mail ballots, right?

16   A.  Yes, sir.

17   Q.  But you didn't identify a specific member of LULAC who was

18   unable to vote because of those provisions, correct?

19   A.  All I can tell you is that another LULAC member of Grand

20   Prairie, Texas, contacted me, Gracie Cortez.  She was going to

21   help her mother vote by mail, and she was concerned about the

22   new provisions around the Social Security number and the

23   driver's license, and the probability for theft that would she

24   be committing a crime if she helped her mother.

25   Q.  You're not saying that Gracie Cortez didn't vote, correct?

1    A.  No, they did vote.  I told -- they sought legal advice

2    before filling out the application.

3    Q.  So just to summarize, then, for all the challenges that we

4    just talked about, you haven't identified a specific member of

5    LULAC who was unable to vote in 2022 because of any provision

6    in SB1, right?

7    A.  Well, they did vote, but they were denied.  Rosalee

8    Wisfield(ph), and again, Gracie Cortez's mother.  I don't

9    remember her name, but she did vote eventually.

10   Q.  Okay.  Let's change the subject a little bit and talk about

11   what LULAC does.  You would agree that when the legislature

12   changes the election laws, educating voters about those changes

13   is important, right?

14   A.  Yes, sir.

15   Q.  And LULAC has been doing that for a long time, right?

16   A.  Yes, we have.

17   Q.  You talked about efforts going back to the 1930s, I

18   believe?

19   A.  Yes, sir.

20   Q.  And so educating voters about election law changes is a

21   regular part of LULAC's work, right?

22   A.  It is.

23   Q.  For example, LULAC would communicate changed early voting

24   hours to its members and the public, right?

25   A.  Yes, sir.

Domingo Garcia - Examination                1666

1  Q.  You testified that LULAC had to divert resources because of

2  SB1, correct?

3  A.  Yes, sir.

4  Q.  And you testified that LULAC spent its resources on trying

5  to register voters in response to SB1, right?

6  A.  And educating our volunteers about the provisions of SB1.

7  Specifically the criminal parts of it.

8  Q.  That was my next question.  So you also spent money on

9  voter education in response to SB1, right?

10  A.  Yes, sir.

11  Q.  And you also spent money organizing a big voter

12  registration drive in response to SB1, correct?

13  A.  We always do voter registration, but more voter education

14  in 2022.

15  Q.  And also a big get-out-the-vote campaign in response to

16  SB1, right?

17  A.  Correct, except for the seniors.

18  Q.  And I think you mentioned there was a bus tour?

19  A.  Yes, sir.

20  Q.  So the bus tour was to get out the vote, right?

21  A.  Get out the vote and to educate people about SB1 and the

22  impact; especially our volunteers and our members throughout

23  the state.

24  Q.  And LULAC has long engaged in get-out-the-vote efforts,

25  right?

Domingo Garcia - Examination                    1667

1    A.  Yes, we have.

2    Q.  And LULAC has long engaged in voter registration efforts,

3    right?

4    A.  Yes, we have.

5    Q.  Now, let's talk about the bus tour, voter registration

6    efforts to get-out-the-vote efforts.  You testified that those

7    efforts were in response to SB1, but they were also in response

8    to other changes in Texas election law, right?

9    A.  No.  SB1 was the one that was at the forefront.  The other

10   ones have been pretty much the same or there were minor

11   changes.

12   Q.  You are familiar with Senate Bill 1111, correct?

13   A.  Yes, sir.

14   Q.  And just briefly, can you tell us what Senate Bill 1111

15   did?

16   A.  It was another voter suppression bill.

17   Q.  Would it be fair to say that Senate Bill 1111 made several

18   changes to Texas's laws on registering voters?

19   A.  Yes, sir.

20   Q.  So LULAC's voter registration campaign in 2020 was also in

21   response to Senate Bill 1111, correct?

22   A.  There was provisions that we had to comply with during

23   registration drive, but they were more of a technical nature.

24   Q.  And LULAC's get-out-the-vote campaign in 2022 was also

25   partly in response to Senate Bill 1111, correct?

1  A.  Partially, but mainly SB1.

2  Q.  And so LULAC's decision to redeploy resources resulted from

3  multiple changes in Texas voting law changes since late 2021,

4  including SB1 and SB1111, correct?

5  A.  Correct, but mainly SB1.

6  Q.  But you can't tease out how many resources you've diverted

7  as a result of SB1 and SB1111, correct?

8  A.  I can give you an approximation.  90 percent SB1,

9  10 percent SB1111.

10  Q.  I'd like to show you a deposition you gave in a prior case.

11      Brian, can you bring up the SB1111 deposition page 42, line

12  11 through 14.

13          MR. CAPOZZI:  Your Honor, may I give a copy of this to

14  the witness?

15          THE COURT:  You may.  Thank you.

16          THE WITNESS:  Are you on page 42?

17  BY MR. CAPOZZI:

18  Q.  Well, let's just start with a couple preliminary questions.

19      So this is a deposition that you gave in a case called

20  *Texas State LULAC V Elfant,* correct?

21  A.  Yes, sir.

22  Q.  And so on page 42, the question is, *"Are you able to tease*

23  *out how much you're spending on account of SB1111 versus how*

24  *much you're spending in addition on account of SB1?"*  And the

25  answer is, *"I don't think I could be able to do that."*

1       Did I read that correctly?

2   A.   Yeah.  I couldn't give you an exact dollar number; that's

3   correct.

4   Q.   And LULAC also ramped up its fundraising efforts after the

5   passage of SB1, correct?

6   A.   Yes, sir.

7   Q.   And LULAC also ramped up its fundraising efforts after the

8   passage of SB1111, correct?

9   A.   Yes, they were together.

10  Q.   So fundraising efforts from late 2021 onward are in

11  response to both SB1 and SB1111, correct?

12  A.   Yes, sir.

13  Q.   You talked about LULAC having to forego specific efforts

14  because of SB1.  You talked about having to forego certain

15  registration and get-out-the-vote efforts, correct?

16  A.   Yeah, diverting some of the resources, yes, sir.

17  Q.   And that was partly in response to SB1111 too, correct?

18  A.   Some of it was, but SB1 was the major one.

19  Q.   And you're not testifying that LULAC was unable to do

20  get-out-the-vote efforts or voter registration solely because

21  of the changes to drive-through voting, correct?

22  A.   No, but it impacted the number of Latinos who were able to

23  vote because it wasn't so easy.  Drive-through voting allowed a

24  lot of Latinos who are, again, working two jobs, long shifts,

25  to vote.  And these are-- many of them just are not going to be

Domingo Garcia - Examination                    1670

1    able to get there.  That's what the numbers showed in 2022.

2    Q.  And you also haven't identified how much LULAC has

3    specifically spent in response to the changes to the

4    drive-through voting provisions, correct?

5    A.  No.

6    Q.  And you also didn't testify that LULAC was unable to do

7    voter registration and get-out-the-vote solely because of the

8    standardization of the early voting hours, right?

9    A.  It doesn't affect our registration.  It just affects our

10   turnout.

11   Q.  And you haven't identified how much LULAC has spent in

12   response to the drive-through voting provisions specifically,

13   correct?

14   A.  Not -- I couldn't give you specific dollar, but it's in the

15   thousands of dollars.  I just can't give you exact number.  And

16   a lot of volunteer time.

17   Q.  You didn't testify that LULAC was unable to do voter

18   registration or get-out-the-vote solely because of SB1 Section

19   4.12's elimination of drop boxes, right?

20   A.  No.  I just -- I didn't -- I don't have an opinion on that

21   one right now.

22   Q.  And you haven't identified how many LULAC has spent in

23   response to Section 4.12's elimination of drop boxes, right?

24   A.  No.

25   Q.  Let's change subjects again and talk a little bit about

Domingo Garcia - Examination                    1671

1    your views of SB1.

2        During the consideration of SB1 and its predecessor bills,

3    several members of LULAC testified about the legislation,

4    right?

5    A.    Yes, sir.

6    Q.    And while SB1 was being considered, you spoke to some

7    Democratic members of the legislature about it, correct?

8    A.    Actually, minority members, African-American and Latino

9    members, about the impact.  They might have been Democrats,

10   too, though.

11   Q.    Okay.  But you didn't speak to any Republican legislatures

12   in the Senate about SB1, right?

13   A.    I tried to contact Senator Hughes, I believe, the sponsor,

14   but he never responded.

15   Q.    So you didn't ultimately talk to Senator Hughes?

16   A.    I did not.

17   Q.    And you didn't speak to any Republican legislators in the

18   House about SB1, right?

19   A.    No, sir.

20   Q.    And you didn't talk to the governor while SB1 was being

21   considered, right?

22   A.    Unfortunately, I had a good relationship with Governor Bush

23   and Governor Perry, but not Governor Abbott.

24   Q.    And you didn't talk to anyone in the governor's office

25   about SB1, right?

Domingo Garcia - Examination                    1672

1   A.  No, sir.

2   Q.  And you didn't talk to the Speaker of the House while SB1

3   was being considered, right?

4   A.  No, sir.

5   Q.  And you didn't talk to any member of the Speaker's staff

6   about the bill, right?

7   A.  No, sir.

8   Q.  And you didn't talk to the Lieutenant Governor about SB1,

9   right?

10  A.  No, sir.

11  Q.  Or anyone in the Lieutenant Governor's office about the

12  bill?

13  A.  No.

14  Q.  So in summary, you spoke only to SB1 opponents and not to

15  any SB1 supporters about the bill, right?

16  A.  Well, we did at the hearings.  They were there at the

17  hearings, both Republican and Democrats were at the Senate

18  hearings and the House hearings.

19  Q.  But you personally.  You only talked --

20  A.  Oh, not me personally.  We sent our members and our general

21  counsel there.

22  Q.  So you personally, you spoke to some opponents of the bill

23  but not to any supporters?

24  A.  It's a voter suppression bill.  Why would I support -- I

25  mean, we did try during the first -- if I remember correctly,

Domingo Garcia - Examination                    1673

1  all the minority representatives walked out in the first

2  session, and we reached out to some of the Republican members,

3  but their hands were tied.  They couldn't move.

4  Q.  So you didn't ultimately speak to any supporters of the

5  bill while it was being considered?

6  A.  No.

7  Q.  So you clearly disagree with at least some of what's in

8  SB1, but you would agree that there are some good things in the

9  bill as well, right?

10 A.  If I have to point out something, some lipstick on the pig,

11 the lipstick would be that the hours are from 6:00 to 10:00,

12 they extended voting hours during early voting.

13 Q.  So Section 3.09 mandates that large counties offer at least

14 nine hours of early voting each day up from eight in preSB1

15 law, and you agree that's a good thing, right?

16 A.  Yes, sir.  Any time you make it easier to vote, yes.

17 Q.  And Section 3.09 mandates that smaller counties offer at

18 least four hours of early voting each day, up from three hours.

19 You also agree that's a good thing, right?

20 A.  Yes, sir.

21 Q.  And you're aware that SB1 for the first time mandated

22 trainings for poll watchers, right?

23 A.  Yes, sir.

24 Q.  And that's a good thing?

25 A.  Yes.

Domingo Garcia - Examination                    1674

1  Q.  And you're aware that SB1 provides that poll watchers must

2  swear or affirm that they will not disrupt the voting process

3  or harass voters in the discharge of their duties, right?

4  A.  Yeah.  I've been a poll watcher, and I've seen some

5  pretty -- let me put it this way -- some very belligerent poll

6  watchers and belligerent actions taken by poll watchers where

7  they have to be removed by the election judge, and I've been an

8  election judge.  They could be fined with criminal charges, I

9  believe.

10  Q.  But the oath, by itself, the obligation for a poll watcher

11  to take the oath not to disrupt, that by itself is a good

12  thing, right?

13  A.  The oath by itself, if it's enforced, yes.

14  Q.  Now, Mr. Garcia, you were a member of the State House of

15  Representatives for six years, right?

16  A.  Yes, sir.

17  Q.  And you also ran for U.S. Congress?

18  A.  Yes, sir.

19  Q.  And as a candidate, you deployed poll watchers, correct?

20  A.  I have.

21  Q.  And as a candidate, you wanted to make sure you had eyes

22  and ears in the polling place to make sure you were getting a

23  fair shake, right?

24  A.  Yes, sir.

25  Q.  And you said you previously served as an election judge

Domingo Garcia - Examination                1675

1    too, right?

2    A.  Yes, sir.

3    Q.  In your time as an election judge, you never witnessed a

4    poll watcher violating the law, correct?

5    A.  Not while I was election judge.

6    Q.  I have a couple of closing questions about Hispanic voting

7    in Texas.  You would agree that Hispanics in different parts of

8    the state vote in different ways, right?

9    A.  Slightly different; in rural areas to urban areas.

10   Q.  To take an example that you gave in your deposition,

11   Starr County, which is in the Rio Grande Valley, it's about

12   90 percent Hispanic, they voted for -- it voted 80 percent for

13   Hillary Clinton in 2016, but then Trump won the County with

14   about 47 percent in 2020, correct?

15          MS. ARMENTA:  Excuse me.  I'm sorry to interrupt.

16   Could you clarify which deposition you're talking about?  He's

17   had multiple.

18          MR. CAPOZZI:  It was the deposition in this case.

19          MS. ARMENTA:  Okay.

20   BY MR. CAPOZZI:

21   Q.  Let me repeat my question.  It is correct that

22   Starr County, which is in the Rio Grande Valley and is about

23   90 percent Hispanic, voted 80 percent for Hillary Clinton in

24   2016, but then Trump almost won the county in 2020, correct?

25          MS. ARMENTA:  Objection.  Relevance and beyond the

Domingo Garcia - Examination                    1676

 1   scope.

 2          THE COURT:  That's overruled.

 3          THE WITNESS:  Whatever the numbers show, but I know he

 4   did better in 2020 than he did in 2016.

 5   BY MR. CAPOZZI:

 6   Q.  And you would agree that Hispanic voting patterns in Texas

 7   are somewhat different between the cities and the rural areas,

 8   right?

 9   A.  That is correct.

10          THE COURT:  He just said that.

11          MR. CAPOZZI:  Okay.  That's all, Your Honor.  Thank

12   you.

13          THE COURT:  Anything further on this side?

14          MR. BRYANT:  No questions, Your Honor.

15          THE COURT:  Thank you.

16          MR. CAPOZZI:  While I'm up here, I'll move to admit

17   Intervener Defendant Exhibit 6, which is the SB1111 deposition

18   that we went through.

19          MS. PERALES:  I'm sorry.  We have something here that

20   doesn't have an exhibit sticker on it.  Is this what you're

21   referring to?

22          MR. CAPOZZI:  Yes.

23          MS. PERALES:  All right.  We just received this.

24   Might we postpone this discussion until the end of today?

25          THE COURT:  We will, since I'm also questioning the

1    relevancy.

2              MS. PERALES:  Thank you, Your Honor.

3              THE COURT:  Yes, sir.

4         *(2:48 p.m.)*

5                      CROSS-EXAMINATION

6    BY MR. LIU:

7    Q.  Cory Liu with the Harris County District Attorney's Office.

8    I think I heard you mention on direct examination that you were

9    concerned about overzealous district attorneys.  Could you say

10   a little bit more about what you mean by that?

11   A.  Well, when I used to work with Harris County District

12   Attorney's Office, we had some overzealous -- a D.A. back then,

13   Mr. Holmes, who would prosecute people that I thought was

14   innocent, and I just don't know -- the current district

15   attorney, I don't know her personally.

16   Q.  Are there some district attorneys who you say wouldn't fall

17   under the category of overzealous?

18   A.  I've seen some overzealous prosecutors in the Attorney

19   General's Office, in the Tarrant County District Attorney's

20   office, and other areas in the State of Texas during my legal

21   career.

22   Q.  Sorry, my question was any that weren't overzealous.  Was

23   your answer just a moment ago about the ones you thought were

24   overzealous?

25   A.  Yes, sir.

1    Q.   Okay.  Were there any other more particular names that you

2    had that you thought would count as overzealous?

3    A.   Again, I'm talking -- we're talking about voting, those are

4    the ones that I know.

5    Q.   So I think you mentioned you don't know the Harris

6    County -- the current one, current Harris County District

7    Attorney in particular, but are you aware of whether she's made

8    any statements about SB1?

9    A.   I am not.

10   Q.   Are you aware of whether the Harris County District

11   Attorney's office has investigated any alleged violations of

12   SB1?

13   A.   I don't know that.

14   Q.   And are you aware of whether the Harris County District

15   Attorney's office has initiated any criminal proceedings

16   against anyone for alleged violations of SB1?

17   A.   My concern is she's -- the district attorney in Harris

18   County would be pressured by the Attorney General to bring

19   charges against people if they believed they would -- in fact,

20   the Attorney General could bring charges in an adjoining

21   county, in Montgomery County, for something that happens in

22   Harris County.

23   Q.   So back to my question.  You're not aware of any current --

24   or any criminal proceedings that have been filed by the Harris

25   County District Attorney in connection with SB1?

Domingo Garcia - Examination                    1679

1    A.  Not right now I am not aware of that.

2    Q.  Thank you.

3             MR. LIU:  No further questions.

4             THE COURT:  Anything further?

5             MS. ARMENTA:  Yes.

6         (2:50 p.m.)

7                    REDIRECT EXAMINATION

8    BY MS. ARMENTA:

9    Q.  Hello again.  Mr. Garcia, are the lawsuits over SB1111 and

10   SB1 about the same legislation?

11   A.  No.

12   Q.  So back to SB1, Mr. Garcia, just to clarify, Section 7.04

13   of SB1 prohibits in-person interactions with voters in the

14   presence of a mail ballot and imposes criminal liability for

15   violations of that provision.

16       And is this provision being challenged by LULAC?

17   A.  It is.

18   Q.  And I believe you testified that this provision of SB1

19   impacts LULAC's voter advocacy efforts?

20   A.  Yes, ma'am.

21   Q.  Are LULAC's voter education and advocacy efforts geared

22   towards SB1 different in any way than prior LULAC voter

23   engagement education advocacy efforts?

24   A.  Yes, they are.  We have to really educate our members and

25   our volunteers that there are criminal penalties that could be

Domingo Garcia - Examination                    1680

1  enforced against them for, like I said, helping seniors vote,

2  helping seniors with a ballot, providing food, drinks,

3  transportation to volunteers that are going door-to-door to get

4  out the vote.

5  Q.  Just to confirm, the diversion of staff and volunteer time

6  that you talked about, were those specific to SB1-related

7  provisions?

8  A.  The majority, yes.

9  Q.  So the bus tour, for example?

10  A.  The bus was SB1.

11  Q.  And you testified that you can't give an exact number of

12  resources spent on SB1?

13  A.  I can't give you dollar amount.

14  Q.  Thank you.  But are the majority of resources, would you

15  say, that were raised or allocated during that SB1111 and SB1

16  period of time geared towards SB1?

17  A.  Yes.

18  Q.  Thank you.  One second, please.

19       So Mr. Garcia, you just clarified for us that SB1111 and

20  SB1 are not about the same legislation.  Was SB1111 about voter

21  registration?

22  A.  Yes, ma'am.

23  Q.  And SB1 is what, in your understanding?  What is it about?

24  A.  It's a voter suppression bill trying to limit the hours

25  people can vote, how they can vote, and really affecting

1    seniors in how -- in getting assistance to be able to vote.

2    Q.  So diversions of resources that LULAC made towards voter

3    education, voter assistance, voter advocacy would be about SB1?

4    A.  Yes, ma'am.

5            MS. ARMENTA:  Thank you so much.  I pass the witness.

6            MR. LIU:  Just a moment, Your Honor.

7            MR. CAPOZZI:  Your Honor, just a couple more.

8            *(2:53 p.m.)*

9                    FURTHER CROSS-EXAMINATION

10   BY MR. CAPOZZI:

11   Q.  Mr. Garcia, I'd like to draw your attention back to the

12   SB1111 deposition.

13       Brian, can you pull up page 4124 through 4204.

14       So the question is, *"Now, let me ask you this.  If SB1111*

15   *hadn't passed, would you spend less money than you're currently*

16   *spending"* --

17           MS. ARMENTA:  Objection.  Sorry.  This is outside the

18   scope.

19           THE COURT:  Yeah, how --

20           MS. ARMENTA:  Oh, I'm so sorry, Your Honor.

21   Objection.  This is not a prior inconsistent statement.

22           MR. CAPOZZI:  I believe it is an inconsistent

23   statement.  The point that we're trying to make is that the

24   get-out-the-vote effort in 2022 was in response to two laws,

25   SB1 and SB1111.

1              MS. ARMENTA:  I object.  The foundation hasn't been

2    laid for this question.

3              THE COURT:  Let me go back to what's the purpose of

4    your question?

5              MR. CAPOZZI:  The purpose of the question, Your Honor,

6    is to show that LULAC's spending in 2022 was in response to

7    both SB1 and SB1111 together.

8              THE COURT:  So is this again trying to challenge the

9    organizational standing?  Is that the purpose of all this?

10             MR. CAPOZZI:  Yes, Your Honor.

11             THE COURT:  That's fine.  But another question for the

12   laundry list for you all, so the intervener defenders get to

13   come in here so they have enough standing.  303, the Supreme

14   Court says the possibility that you might be asked to do some

15   website has standing.  How are we now imposing such a different

16   standard for standing in this case?

17             So I don't expect you to give me an answer now, but

18   expect that to come up later.

19             MR. CAPOZZI:  Yes, Your Honor.  Understood.

20             THE COURT:  You may proceed.  Any further objections

21   are overruled.

22             MS. ARMENTA:  Your Honor, I have a separate objection.

23             THE COURT:  What's the new objection?

24             MS. ARMENTA:  It's not clear to us what this

25   deposition transcript is being raised for.  If it's for

1    impeachment, he hasn't laid the foundation.
2            THE COURT:  He said it's not for impeachment.  Well, I
3    guess it is for an inconsistent statement.  It's more for
4    clarification.  I'll let the question in.
5            MS. ARMENTA:  Thank you, Your Honor.
6            MR. CAPOZZI:  Thank you, Your Honor.  It's also the
7    statement of a party opponent.
8    BY MR. CAPOZZI:
9    Q.  So the question is, *"Now, let me ask you this.  If SB1111*
10   *hadn't passed, would you spend less money than you're currently*
11   *spending on voter registration?"*
12       The answer, *"We had no plans to spend a million or*
13   *2 million in Texas on voter registration and get-out-the-vote*
14   *until SB1111 and SB1 passed."*
15       Did I read that correctly?
16   A.  Yes, sir.
17           MR. CAPOZZI:  That's all, your Honor.
18           THE COURT:  Anything else?
19           MS. ARMENTA:  Nothing further, Your Honor.  Thank you
20   so much.
21           THE COURT:  You may step down, sir.
22           THE WITNESS:  Thank you.
23           THE COURT:  Let's take an afternoon break.
24           COURT SECURITY OFFICER:  All rise.
25           *(2:56 p.m.)*

Deborah Chen - Examination                         1684

```
 1                        *   *   *
 2           (3:12 p.m.)
 3           COURT SECURITY OFFICER:  All rise.
 4           THE COURT:  Thank you.  Please be seated.  Your next
 5   witness.
 6           MR. DOLLING:  Zachary Dolling for OCA plaintiffs.  I'd
 7   like to call Deborah Chen to the stand.
 8           Ms. Chen's testimony will go to OCA plaintiff's claims
 9   that SB1 Section 6.06 violates Section 208 of the Voting Rights
10   Act and that SB1 Section 7.04 is overbroad in violation of the
11   First Amendment and void for vagueness in violation of the
12   14th Amendment.
13           COURTROOM DEPUTY CLERK:  Raise your right hand.
14                        *   *   *
15           (Oath administered and DEBORAH CHEN, witness, Sworn.)
16                        *   *   *
17                      DIRECT EXAMINATION
18   BY MR. DOLLING:
19   Q.  Good afternoon, Ms. Chen.
20   A.  Good afternoon.
21   Q.  Please state and spell your name for the record.
22   A.  My name is Deborah Chen, D-E-B-O-R-A-H, C-H-E-N.
23   Q.  What is your title at OCA-Greater Houston?
24   A.  I am the civic engagement programs director.
25   Q.  And what is OCA-Greater Houston?
```

Deborah Chen - Examination                    1685

1  A.  OCA-Greater Houston is an organization of community

2  advocates.  We work to advance the social, economic, and

3  political well-being of Asian Pacific Americans.

4  Q.  Is there a national OCA organization?

5  A.  Yes, there is a national organization.

6  Q.  And is OCA-Greater Houston affiliated with it in anyway?

7  A.  Yes, we are a chapter in it, and we have a hold of vote on

8  their national board -- or our president does.

9  Q.  Does the OCA and OCA-Greater Houston stand for anything?

10  A.  Well, we were formed initially as the Organization of

11  Chinese Americans, originally back in 1973, and then the

12  Greater Houston Chapter was founded in 1979.

13  Q.  Does it still stand for Organization of Chinese Americans?

14  A.  No.  We changed our name to reflect the change in our

15  demographics of our community.  We changed in 2013, and we now

16  simply go by OCA Asian Pacific American Advocates, or our

17  chapter chose to go by OCA-Greater Houston.

18  Q.  Can you elaborate by what you mean by "changes in

19  demographics"?

20  A.  Well, when we were first formed in the 1970s, the largest

21  community in the Asian American community was primarily the

22  Chinese American community.  There just simply weren't as many

23  other AAPIs, but over the time, our demographics, our

24  membership has changed to have more people who are of mixed

25  ethnic heritage and other AAPI groups where people of that

Deborah Chen - Examination                    1686

1  ethnicity have chosen to join OCA.

2  Q.  I think it's probably fairly apparent, but just for clarity

3  sake when you're saying "AAPI," is that shorthand for "Asian

4  American and Pacific Islanders"?

5  A.  Yes.

6  Q.  Thank you.  Does OCA-Greater Houston have a Board of

7  Directors?

8  A.  Yes, we have a volunteer Board of Directors.

9  Q.  How many people are on the Board?

10  A.  We currently have 19 members.

11  Q.  Are all Board members also members of -- well, I'll ask

12  that in a moment.

13      Does OCA-Greater Houston have executive officers?

14  A.  We do.  We have an immediate past chapter president,

15  chapter president, vice president, treasurer, and secretary.

16  Q.  Is OCA-Greater Houston a membership organization?

17  A.  Yes, we are a membership-based organization.

18  Q.  How many members do you have?

19  A.  On average, around 160 or so paid members, depending on the

20  time of year.  Sometimes it goes up to 200 paid members.

21  Q.  When you say "paid members," are you referring to members

22  who pay dues?

23  A.  Yes.  We have a number of volunteer members as well.

24  Q.  Do dues-paying members elect the board?

25  A.  They are the -- that is the only distinction; that

Deborah Chen - Examination                    1687

1   dues-paying members are able to vote to elect our Board.

2   Q.  And you mentioned that you also have nondues-paying

3   members?

4   A.  Correct.

5   Q.  Approximately how many of those do you have?

6   A.  That goes in the hundreds, especially once you start

7   counting all the high school students that we work with.

8   Q.  Please describe your members.

9   A.  Our members range in a very diverse ethnic background as

10  well as age and socioeconomic background.  We work with members

11  as young as middle school or high school, and then we have

12  members who are in their 80s that participate in our senior

13  programs.

14  Q.  Do you have limited English proficiency members?

15  A.  Yes.  The Greater Houston area is a majority of

16  first-generation AAPI community, and so a large number of our

17  members are also limited English proficient or first-generation

18  immigrants.

19  Q.  And that was -- do you have a large proportion of immigrant

20  members or new immigrant members?

21  A.  Yes.

22  Q.  And does OCA-Greater Houston have paid staff?

23  A.  Yes.

24  Q.  How many?

25  A.  We have eight paid as employees and two as independent

Deborah Chen - Examination                    1688

1    contractors.

2    Q.   Are you one of those paid staff members?

3    A.   Yes.  I am an independent contractor.

4    Q.   And are all staff, including yourself, also members of

5    OCA-Greater Houston?

6    A.   Yes.

7    Q.   And are all the board members of OCA-Greater Houston also

8    members of the organization?

9    A.   Yes.

10   Q.   Geographically speaking, where is OCA-Greater Houston

11   active?

12   A.   We are primarily active in the Greater Houston, Southwest

13   area covering counties primarily in Harris, Fort Bend, and

14   Brazoria.

15   Q.   Thank you.  How long have you been the civic engagement

16   programs director for OCA-Greater Houston?

17   A.   Since the end of 2015.

18   Q.   How many hours a week do you spend working as the civic

19   engagement programs director?

20   A.   Depending on the time of year, anywhere between 60 to 80

21   hours on average.

22   Q.   And can you give us a brief history of your involvement in

23   OCA-Greater Houston prior to holding your current position?

24   A.   I joined officially as a member in the end of 1998.  I have

25   served on the Board of Directors.  I joined in 1999 as a Board

Deborah Chen - Examination                    1689

1   member.  I was a past treasurer, I think in year 2000.  I've
2   been a past chapter president.
3   Q.  And you mentioned this a little bit earlier, but I'd like
4   to ask it to put it into these terms.  In your words, what is
5   OCA-Greater Houston's mission?
6   A.  Our mission is to embrace the hopes and aspirations of
7   Asian Pacific Americans.  We primarily work in advancing four
8   main goals.  One is to advocate for social justice, equal
9   opportunity, fair treatment.  We work to advance Coalition
10  building and advancing community building.  We also work to
11  advance -- I should say promote civic engagement -- civic
12  participation, education, leadership, as well as working on
13  cultural heritage.
14  Q.  What are your duties as civic engagement programs director
15  for OCA-Greater Houston?
16  A.  My primary job is to plan, to execute, manage and report on
17  all of our civic engagement-related work.
18  Q.  And you generally have final say over what civic engagement
19  programs OCA-Greater Houston takes on?
20  A.  Yes.
21  Q.  Can you give us a high level, broad overview of the civic
22  engagement work that OCA-Greater Houston engages in to advance
23  its mission?
24  A.  It's very broad.  We work starting with helping limited
25  English proficient as well as people who are English proficient

1    Green Card holders -- I'm sorry -- legal permanent residents to
2    be able to acquire their citizenship, and then once they
3    receive their citizenship, we work to make sure that they are
4    educated and understand the importance of voting.  We help them
5    to get registered and to pledge to vote.  We also do community
6    education around voter education.  We do a variety of community
7    outreach around civic engagement, and then we also do the
8    things that people traditionally consider to be civic
9    engagement, and that would be texting, phone banking, sending
10   mailers, doing lit-drop canvassing, traditional door-knock
11   canvassing.  We also hold events, educational events.  We hold
12   candidate forums, AAPI candidate meet-and-greets, a variety of
13   different types of culturally-based programming.
14   Q.  Were you involved personally in building any of these
15   programs?
16   A.  Yes.  I was personally involved with building all of them.
17   I'd say the only one that I'm a little less involved with would
18   be taking seniors to go vote, because I would usually be the
19   person driving the seniors.
20   Q.  Okay.  Tell us about the AAPI community that
21   OCA-Greater Houston serves.
22   A.  We primarily serve the AAPI community in the Southwest
23   region of town.  Depending on any particular years' funding
24   availability, our capacity in that particular year, we might go
25   beyond the traditional areas we're in.  We've gone as far as

Deborah Chen - Examination                    1691

1   going to Pearland, Clear Lake.  We've gone north to Jersey

2   Village, but mostly we're in the Sugar Land area.

3   Q.  Are there many new immigrants within that AAPI community?

4   A.  Yes.  It's a large base of new immigrants, especially want

5   to come around the Asia town area.

6   Q.  Are there many limited English proficiency voters within

7   that community?

8   A.  Yes.

9   Q.  Does OCA-Greater Houston maintain offices?

10  A.  Yes.

11  Q.  Where are they?

12  A.  We maintain offices in Chinatown and Asia Town.

13  Q.  Are these offices open to the community?

14  A.  They are.  We hold office hours, but if the lights are on,

15  people will still come in, even though we don't have posted

16  office hours for that particular day.

17  Q.  What kind of things are community members stopping by to

18  ask for?

19  A.  People come by to register to vote or typically ask for

20  assistance related to voting or about our programs.  They come

21  to ask about citizenship assistance.  We actually have signs on

22  our door promoting "If you want to register to vote, come

23  here."  We promote citizenship assistance.

24  Q.  How does -- how do people know that they can stop by

25  OCA-Greater Houston's offices for this sort of service?

Deborah Chen - Examination                    1692

1   A.  We have advertising in the two different Chinese Yellow

2   Book pages, one published by World Journal, one published by

3   Southern Chinese News.  Over the years we've been on ethnic

4   radio, Chinese radio.  We're generally known in the community

5   for doing this kind of work.  We've been doing it for a couple

6   decades or more.

7   Q.  Are OCA-Greater Houston's members registered voters?

8   A.  Yes, a large number of our members are.

9   Q.  Are you a registered voter?

10  A.  Yes.

11  Q.  Where are you registered to vote?

12  A.  Harris County.

13  Q.  Do you vote often?

14  A.  Almost every election.

15  Q.  Is voting important to you?

16  A.  Extremely.

17  Q.  Can you explain why?

18  A.  I believe that voting is a responsibility of every U.S.

19  citizen.  It is a fundamental part of our civic duty and

20  responsibility as a citizen.

21  Q.  Thank you.  And we were earlier talking in very broad

22  levels about your civic engagement work.  I'd like to talk now

23  about OCA-Greater Houston's voting-related work.  Is voting

24  advocacy important to advancing OCA-Greater Houston's mission?

25  A.  Yes.  It is a fundamental core part of civic participation.

Deborah Chen - Examination                    1693

1   Q.  And I'd like to discuss some specification about

2   OCA-Greater Houston's voting-related activities prior to SB1.

3   When I say "SB1," do you understand that I am referring to

4   Senate Bill 1?

5   A.  Yes.

6   Q.  And do you know when SB1 became law?

7   A.  Yes.  I believe it came into effect towards the end of

8   2021.

9   Q.  And so these questions will be prior, prior to SB1 coming

10  into effect.

11      So what were the main types of voting-related activities

12  that OCA-Greater Houston engaged in before SB1 became law?  And

13  I know you mentioned a few of them earlier.

14  A.  We do texting, phone banking.  We would take seniors -- we

15  would literally go and pick them up, drive them, take them to

16  the polls to vote.  We may table at poll site to be able to be

17  there to assist anyone who needed, you know, help with voting.

18  We did candidate forums, AAPI meet-and-greets, and these were

19  all in addition to our lit-drop canvassing or door-knock

20  canvassing efforts.

21  Q.  And who carries out OCA-Greater Houston's voting-related

22  activities?

23  A.  Our staff, our volunteers and members.

24  Q.  And are you involved in carrying out these activities?

25  A.  I'm intimately involved in every activity.

Deborah Chen - Examination                    1694

1    Q.  And is carrying out OCA-Greater Houston's voting-related

2    activities part of paid staff members' duties?

3    A.  Yes.

4    Q.  Other than paid staff, how did you recruit members to carry

5    out these voting-related activities?

6    A.  We would put out a call in our social media, our

7    eNewsletter.  Depending on the event, sometimes the Chinese

8    language reporters may even write an article about an event

9    that's coming up, and they would usually say something about

10   how we're looking for volunteers.

11   Q.  And does OCA-Greater Houston provide members and volunteers

12   with any sort of refreshments or other benefits when carrying

13   out these voting-related activities?

14   A.  Yes.  It is standard practice.  It's almost culturally

15   expected.  You pretty much don't go to an Asian American event

16   in the community and not have food or beverages.  It would just

17   be strange.

18   Q.  And would these refreshments be extended to attendees as

19   well?

20   A.  Yes.

21   Q.  So you mentioned that as part of its voting-related

22   activities prior to SB1, OCA-Greater Houston hosted in-person

23   candidate forums; is that right?

24   A.  Correct.

25   Q.  Can you briefly describe what an OCA-Greater Houston

Deborah Chen - Examination                    1695

1   candidate forum is?

2   A.  A candidate forum usually is something that we have

3   organized in partnership with other community partner

4   organizations in the AAPI community where we would then

5   invite -- depending on the particular election, we would invite

6   candidates from both parties to be able to come and talk about

7   why they're running, what particular -- things they want to

8   accomplish if they were to be elected.

9   Q.  Was it important to OCA-Greater Houston to host these

10  candidate forums?

11  A.  Very much so, because they were also educational

12  opportunities.  They were a fairly standard way where community

13  members would know this is where you could come to ask

14  questions and to ask for help.

15  Q.  Did you advertise these candidate forums to the community?

16  A.  Yes.  We would put out flyers, post it on our social media.

17  It would go out in our eNewsletters.  We would let the ethnic

18  media know about.  You know, sometimes we would -- if we had

19  the funding, we would take out ads to promote the different

20  candidate forums.

21  Q.  And was it a regular practice for OCA-Greater Houston to

22  hold candidate forums?  How frequently did you hold them?

23  A.  Typically almost every election cycle.  It was a fairly

24  regular thing that people had come to expect and know, that if

25  there's an election, there's most likely going to be a

Deborah Chen - Examination                    1696

1    candidate forum.

2    Q.  And were you personally present at these candidate forums?

3    A.  Almost every one.

4    Q.  And how many people on average would you see attend these

5    candidate forums?

6    A.  Depending on the particular election year and the location,

7    on average, it would be anywhere between a hundred to 300 or

8    more people; just depending on the year and the venue.

9    Q.  And what was OCA-Greater Houston doing while a candidate

10   forum was on going?

11   A.  Typically, a candidate forum -- especially when we're doing

12   it in partnership with other organizations, we would have

13   potentially one of our members or board members would be a

14   co-MC.  We would have people at the check-in registration area,

15   and then we would have tables at the back of the room where we

16   would have members or volunteers there ready to be able to give

17   assistance.  And so if anyone came to a candidate forum, if

18   they were seeking help, then the people at the registration

19   desk would know to direct them to the tables at the back of the

20   room.

21   Q.  Did community members bring their mail ballots to these

22   candidate forums seeking assistance with preparing the ballot?

23   A.  Yes.

24   Q.  Would that include -- I'm sorry.  What sort of assistance?

25   A.  Everything from helping to read it to help to translate or

Deborah Chen - Examination                    1697

1    to explain it.  We'd get questions of, like, Do I have to use

2    it?  Can I still go in-person?  What's the process?  So full

3    range.

4    Q.  And I think you alluded to it when you said translation,

5    but would that assistance include providing Chinese language

6    assistance with preparing the ballot to limited English

7    proficiency voters?

8    A.  Yes.

9    Q.  If I use the term "LEP voter," going forward, will you

10   understand me to be referring to "limited English proficiency

11   voters"?

12   A.  Yes.

13   Q.  Do you speak Chinese?

14   A.  I do.

15   Q.  Have you personally provided Chinese language assistance to

16   LEP voters who have brought their mail ballots to a candidate

17   forum?

18   A.  Yes.

19   Q.  Have you seen other OCA-Greater Houston members provide

20   that same sort of assistance to those same voters?

21   A.  Yes.

22   Q.  And did you specifically recruit bilingual OCA-Greater

23   Houston members to operate the tables at candidate forums for

24   this reason?

25   A.  Yes.

Deborah Chen - Examination                1698

1    Q.  And did you train OCA-Greater Houston members on how to

2    provide that sort of assistance if requested?

3    A.  Yes.

4    Q.  What did that training look like?

5    A.  In the years that Chinese wasn't, you know, a designated,

6    required language for -- on the ballots by the county, then we

7    would literally have the sample English ballots to be able to

8    explain and translate.  And in the years later -- I want to say

9    it was post-2011 that -- the Chinese language ballots were made

10   available by the county, then we would have these sample

11   ballots there to be able to explain.

12   Q.  And so you just mentioned that at a certain point in time,

13   Harris County began providing Chinese language ballots; is that

14   right?

15   A.  Yes.

16   Q.  And after Harris County began providing Chinese ballots,

17   did you still see LEP voters bring ballots in English to

18   candidate forums seeking Chinese language assistance in

19   preparing the ballot?

20   A.  Yes.

21   Q.  And did OCA-Greater Houston provide that assistance?

22   A.  Yes.

23   Q.  And have you seen Chinese speakers who have a Chinese

24   ballot request assistance in preparing their ballot?

25   A.  Yes.

Deborah Chen - Examination                    1699

1   Q.  And has OCA-Greater Houston provided that assistance?

2   A.  Yes, we have.

3   Q.  And have you seen Chinese speakers who cannot read or write

4   in Chinese request assistance with their Chinese ballot?

5   A.  Yes.

6   Q.  And has OCA-Greater Houston provided that assistance?

7   A.  Yes, we have.

8   Q.  And did OCA-Greater Houston engage with the community in

9   ways other than providing mail ballot assistance while tabling

10  at candidate forums?

11  A.  I'm sorry.  Could you repeat that?

12  Q.  Sure.  Other than assisting community members with mail

13  ballots, what else was OCA-Greater Houston doing while tabling

14  at a candidate forum?

15  A.  Typically, we would also be providing information about

16  other services that we did, such as citizenship assistance.  We

17  may be promoting different programs that were coming up or

18  other educational opportunities for people.

19  Q.  Would there also be things like pledge-to-vote flyers?

20  A.  Yes, those would be pretty standard.  At any event, we

21  would h voter registration forms.  We would have pledge-to-vote

22  forms, and we would ask people if they would pledge to vote

23  fairly regularly.

24  Q.  Thank you.  And you also mentioned that as part of its

25  voting-related activities prior to SB1, OCA-Greater Houston

Deborah Chen - Examination                    1700

1  hosted AAPI candidate meet-and-greets; is that right?

2  A.  Yes.

3  Q.  What is an AAPI candidate meet-and-greet?

4  A.  An AAPI meet-and-greet is where we would invite the AAPI

5  candidates from both parties to come to a meet-and-greet event

6  where community members would have the opportunity to meet

7  them, get to know the candidates.

8  Q.  What was the purpose of hosting meet-and-greets that

9  featured exclusively AAPI candidates?

10  A.  In large parts, one, we wanted to raise awareness that

11  there are even AAPI's who consider being a candidate.  And we

12  wanted to show that, you know, they're regular people.  You

13  don't have to have a special background.  You don't have to be

14  an attorney to be able to be a candidate, and so they served as

15  role models.  And especially for our young members, our

16  students, we really wanted them to see and think and be able to

17  picture themselves as, hey, this is something that I could

18  consider doing someday too.

19  Q.  Did you advertise these meet-and-greets to the community

20  similarly to how you did so with candidate forums?

21  A.  Yes.

22  Q.  Were you personally present at these meet-and-greets?

23  A.  Almost all.

24  Q.  How many people on average would attend?

25  A.  Usually maybe around a hundred to 200 or so.

Deborah Chen - Examination                    1701

1    Q.  And was the role that OCA-Greater Houston played during

2    meet-and-greets similar to the role it played during candidate

3    forums?

4    A.  Yes.

5    Q.  And did community members bring their mail ballots to these

6    meet-and-greets seeking assistance with preparing the ballot?

7    A.  Yes.

8    Q.  And did OCA-Greater Houston help these voters?

9    A.  Yes.

10   Q.  And did that include providing Chinese language assistance

11   to LEP voters?

12   A.  Yes.

13   Q.  And have you personally provided Chinese language

14   assistance with preparing the ballot to LEP voters who brought

15   their mail ballot to a meet-and-greet?

16   A.  Yes.

17   Q.  And have you seen other OCA-Greater Houston members do the

18   same?

19   A.  Yes.

20   Q.  And did you specifically recruit bilingual

21   OCA-Greater Houston members to operate the tables at

22   meet-and-greets in expectation of this?

23   A.  Yes.

24   Q.  And was OCA-Greater Houston engaging with the community in

25   ways other than mail ballot assistance similar to what we

Deborah Chen - Examination                    1702

1    talked about with respect to candidate forums?

2    A.  Yes.

3    Q.  You also mentioned that as part of its voting-related

4    activities prior to SB1, OCA-Greater Houston engaged in voter

5    canvassing; is that right?

6    A.  Correct.

7    Q.  Can you give us a high level overview of what

8    OCA-Greater Houston's canvassing looked like?

9    A.  Canvassing, you know, the size of the universe would be

10   subject to how much funding and capacity we had in any given

11   year, but essentially it would be us a recruiting members and

12   volunteers to go with us to go knock on doors of individual

13   households that were -- we targeted AAPI households, whether

14   they were apartments or houses.  We would recruit, train, and

15   equip our volunteers with the supplies needed to go and

16   essentially ask people to go and vote, to remind them that, you

17   know, it's early voting time.

18   Q.  When canvassing, did OCA-Greater Houston provide any sort

19   of literature to people?

20   A.  Yes, we did.

21   Q.  Can you tell us a little bit about that?

22   A.  It would generally be information on, you know, how to go

23   vote, where to go vote, how to go -- how to look up information

24   on different candidates, for example.  In the years that we had

25   the resources, we were very fortunate to have the League of

Deborah Chen - Examination                    1703

1   Women Voters provide us with voter guides that we would include

2   in our door bags.

3       We would also include information about other community

4   services that may be happening such as citizenship assistance,

5   and typically we would usually try to include, like, a mail

6   ballot application or information about the different ballots.

7   Q.  And when you refer to the League of Women Voters voter

8   guide, are you referring to a voter guide in English?

9   A.  Yes.  But there was a year where we were able to work with

10  the League of Women Voters to develop the Chinese language

11  guide in English -- I'm sorry, in traditional and simplified

12  Chinese.  It was printed that year, but then in subsequent

13  years, it's still being created, but it's a PDF version online.

14  Q.  And did you train your canvassers to answer questions from

15  voters who answered the door?

16  A.  Yes, we did.

17  Q.  Did you train your canvassers to provide assistance to a

18  voter in the event a voter were to bring their mail ballot to

19  the door to request assistance?

20  A.  Yes, for those canvassers that were bilingual.

21  Q.  Thank you.

22      Prior to SB1, as part of its voting-related activities, did

23  OCA-Greater Houston provide in-person assistance at the polls?

24  A.  Yes, we did.

25  Q.  And what kind of assistance would that be?

Deborah Chen - Examination                    1704

1   A.  It would literally be helping people with either a mail-in

2   ballot, if they brought it or to help them actually, you know,

3   go in as their assister or translator.

4   Q.  And so like you just alluded to, that would include Chinese

5   language assistance for LEP voters; is that right?

6   A.  Correct.

7   Q.  You mentioned that as part of its voting-related activities

8   prior to SB1, OCA-Greater Houston would also set up tables at

9   polling places; is that right?

10  A.  Yes.

11  Q.  What was the purpose of setting up these tables?

12  A.  So that it was very clear that this was a place that people

13  could go and ask for help.  Especially when we were picking up

14  and driving seniors there to go vote, then we would be able to

15  tell them, "Okay, once you go inside, look for the table where

16  our volunteers are, and there will be someone who can help you

17  to go and vote."

18  Q.  And are you referring to LEP voters who need Chinese

19  language assistance?

20  A.  Yes.

21  Q.  And so these tables that you would set up would often

22  result in the provision of in-person Chinese language

23  assistance to AAPI community members?

24  A.  Correct.

25  Q.  Prior to SB1, as part of its voting-related activities, did

Deborah Chen - Examination                    1705

1   OCA-Greater Houston set up exit polling tables to conduct exit

2   polling surveys?

3   A.   Yes, we do.

4   Q.   Can you briefly tell us what this -- doing so would entail?

5   A.   We have participated since the 1990s in partnership with

6   the Asian American Legal Defense and Education Fund, AALDEF.

7   They organize a national exit survey, and our chapter would run

8   all of the Houston sites.  We would organize them, recruit all

9   the volunteers to participate in that.  We would be at

10  particular polling locations that -- usually anywhere between

11  six to ten at most, and we would be there with volunteers

12  essentially asking voters as they come out from voting to fill

13  out an anonymous one-page survey.

14  Q.   Did voters ever approach OCA-Greater Houston at one of

15  these exit survey tables for assistance with voting?

16  A.   Yes.

17  Q.   And are we -- are you referring to in-person voting

18  assistance?

19  A.   Yes, because we would usually have extra volunteers there,

20  because we know that sometimes if people see us standing

21  outside and they see an AAPI there, and our organization name

22  is there, then they would know that if they needed help, they

23  could go to our table, and we would have a volunteer who could

24  help them.

25  Q.   And specifically you would have a bilingual member who was

Deborah Chen - Examination                    1706

1   available to provide Chinese language assistance to LEP voters;
2   is that right?
3   A.   Yes, as much as possible.
4   Q.   Have you ever seen an LEP voter bring a mail ballot to one
5   of OCA-Greater Houston's exit polling tables?
6   A.   Yes.
7   Q.   What sort of circumstances would that occur in?
8   A.   It could be where they were coming with their mail-in
9   ballot, seeing whether or not they could still vote in-person,
10  because they've changed their mind for whatever reason, or
11  simply they had a question about it.
12  Q.   Prior to SB1, as part of its voting-related activities, did
13  OCA-Greater Houston arrange voting machine demonstrations for
14  the community?
15  A.   Yes.   Sometimes we did those in conjunction with the
16  candidate forum.
17  Q.   Can you elaborate on what a voting machine demonstration
18  event would look like?
19  A.   It would be very similar to a candidate forum in the sense
20  that we would have -- depending on the timing, the County
21  Clerk's office would actually allow us to have a machine there.
22  They would have somebody bring it and demonstrate and show how
23  it worked.   People would have the opportunity to actually go
24  and touch the machine and see how the dial would work on the
25  voting machine.

Deborah Chen - Examination                1707

1    Q.  Have you seen people bring their mail ballots to these

2    demonstrations?

3    A.  Yes.

4    Q.  And you mentioned that great -- OCA-Greater Houston used to

5    drive seniors to the polls; is that right?

6    A.  Correct.

7    Q.  On average, how many seniors would you say

8    OCA-Greater Houston would drive to the polls in a given year?

9    A.  Depending on the election, anywhere from a hundred to 300

10   or more.

11   Q.  Thank you.

12       Is it your experience that OCA-Greater Houston is known to

13   the AAPI community as an organization that provides Chinese

14   language assistance with voting?

15   A.  Yes.

16   Q.  Why?

17   A.  We're the only ones that do this type of work to that

18   degree.

19   Q.  And you testified earlier that you have been doing this

20   work and involved with OCA-Greater Houston for over two

21   decades; is that correct?

22   A.  Correct.

23   Q.  And you briefly touched on this just now, but after working

24   in this space for two decades, are you familiar with other

25   civic advocacy organizations that serve the AAPI community in

Deborah Chen - Examination                    1708

1    the Greater Houston area?

2    A.   Yes.

3    Q.   And to your knowledge, are there any community

4    organizations other than OCA-Greater Houston that provide

5    Chinese language assistance with voting in the Greater Houston

6    area?

7    A.   No one does it to the degree and extent that we do.

8    Q.   To your knowledge, is there any community organization

9    other than OCA-Greater Houston that provides the same level of

10   voter education to the AAPI community in the Greater Houston

11   area?

12   A.   No.

13   Q.   And prior to SB1, when a voter would approach

14   OCA-Greater Houston for Chinese language voter assistance, how

15   would you know that you were their assister of choice?

16   A.   Mainly because there's no one else there.  They didn't have

17   an option.  If they came to a polling location, for example,

18   typically, the County, who may have one or two bilingual

19   clerks, they're more likely to have one who's a Spanish

20   speaker, and the other one would be an Asian who maybe speaks

21   Vietnamese or Cantonese or Mandarin or Taiwanese, but very

22   rarely are you going to have someone who can speak all of those

23   languages, so our services that we provided was really

24   important because they wouldn't necessarily be able to get help

25   in the language that they needed.

Deborah Chen - Examination                    1709

1    Q.  And I think you've mostly answered this, but I'll ask it

2    anyway.  Ms. Chen, in your experience, is language assistance

3    important to the AAPI community?

4    A.  It's extremely important.

5    Q.  Can you elaborate a little?

6    A.  You know, Houston is a majority first-generation immigrant

7    community, and the ability to vote, right, you have people who

8    are coming from different countries where they wouldn't

9    necessarily be able to vote safely, and it is the fundamental

10   part of their being a U.S. citizen, their duty, and literally

11   their right and their privilege to vote, so it's very important

12   to our community.

13   Q.  Have you experienced any instances in your own life that

14   have highlighted the importance of language assistance?

15   A.  Yes.  I am as passionate about doing this type of work and

16   has committed this to being a lifelong volunteer for this,

17   because, you know, I've witnessed it within my own family.  My

18   mother is a very highly educated person.  She has a chemistry

19   Ph.D.  She was a dentist, and she worked at the City of Houston

20   Public Health Department at a dental clinic, right?  So Monday

21   through Friday, she spoke English.  She actually got to where

22   she was the chief dentist of her clinic.

23       But in her own private practice on weekends and

24   weeknights -- I started working with her when I was eleven --

25   and all of her clients -- or I should say patients, I'd say,

Deborah Chen - Examination                    1710

1    like, maybe 98 percent, 99 percent of our patients were all

2    Chinese speakers, and she spoke Chinese with them.  I spoke

3    Chinese with all of our patients.

4        But what really struck me was that there was this one year

5    where our -- her clinic was next door to a laundromat, and

6    there was some kind of malfunction or something.  There was,

7    you know, flooding, and our supply closet of all of our

8    supplies was just -- everything in it was just ruined.  And I

9    was the one who was -- told by Mom, *You deal with the*

10   *insurance company,* because she had such a difficult time

11   understanding what they were trying to explain about the

12   replacement of the inventory.  And I had to explain.  *They're*

13   *going to replace everything.  We just need to take an*

14   *inventory,* right?  They're not going to somehow only replace

15   the partial value of whatever, because it was opened already.

16   And for -- she just could not grasp that, even though she's

17   highly educated, literate in English.  But I think she was just

18   really intimidated and scared and really ashamed, you know, in

19   hindsight.

20       I look back as an adult now, that she didn't want to deal

21   with the insurance company.  She made me, as the teenager, deal

22   with the insurance adjustor, right?  And so this struck me

23   that, you know, if somebody who is as accomplished as my mom

24   was, could speak English normally, right?  But even her, with

25   English as a second language, could be intimidated by that

Deborah Chen - Examination                    1711

1    process and prefer to speak in Chinese and do things in

2    Chinese, then you can only imagine someone who is a new

3    immigrant who isn't as -- is limited English proficient, who

4    may or may not have the same education level, would be

5    completely intimidated by the process.  So that's why it's so

6    personally important to me.

7    Q.  Thank you for sharing that story.

8        Prior to SB1, did OCA-Greater Houston ever urge the AAPI

9    community to support a ballot measure?

10   A.  Yes, we have.

11   Q.  Can you give an example?

12   A.  I want to say it was in 2015, and Houston had a HERO

13   ordinance.  I think it was the Houston Equal Rights Ordinance,

14   and it was about fair and equal treatment in public

15   accommodations, like restaurants and clubs.

16   Q.  Did OCA-Greater Houston take a public stance on that

17   ordinance?

18   A.  We did.  We took a public stance that we were for this.  We

19   want to encourage people to vote for that measure.

20   Q.  Why was the Houston Equal Rights Ordinance important to

21   OCA-Greater Houston?

22   A.  We knew that this was something that definitely would

23   impact our community.  I know specifically in the Asian

24   American community in the late '90s, 1997, there was a very,

25   you know, highly publicized case.  It was a Denny's Restaurant,

Deborah Chen - Examination                1712

1   and there were Asian American students who were refused -- they

2   weren't being seated at this restaurant.  They were letting

3   people go by them, and when they raised a complaint, they were,

4   you know, told to leave, and then people from within the

5   restaurant --

6            MR. KERCHER:  Objection.  Hearsay, and outside the

7   knowledge of the personal knowledge of the witness.  I would

8   also object to relevance, Your Honor.

9            THE COURT:  Yeah, let's go tackle that one.  So how is

10  it relevant?

11           MR. DOLLING:  Just trying to show what sorts of

12  measures would motivate OCA-Greater Houston to support a

13  measure.

14           THE COURT:  The relevance is minimal.  That's

15  sustained.

16  BY MR. DOLLING:

17  Q.  Did OCA-Greater Houston advocate in support of the Houston

18  Equal Rights Ordinance during any of its voting-related

19  activities?

20  A.  Yes.

21  Q.  Can you give us an example?

22  A.  We would have talked about that at our candidate forum.  We

23  would have brought up examples of people asking, you know, why

24  is this an important ballot measure, and we would have talked

25  about that case because everyone in our community knows about

1   the Asian Americans who were attacked in the restaurant, did

2   nothing, and the child had to suffer permanent brain damage as

3   a result of it.

4   Q.  Would OCA-Greater Houston want to engage in similar

5   advocacy in the future if another measure of importance to the

6   AAPI community were on the ballot?

7   A.  I'm sorry.  Could you repeat that?

8   Q.  Sure.  Would OCA-Greater Houston want to engage in similar

9   advocacy in the future if another measure of importance to the

10  AAPI community were on the ballot?

11  A.  Yes.

12  Q.  And so now I'd like to turn to the text of Senate Bill 1.

13      Steven, can you please bring up Joint Exhibit 1.  And this

14  is a signed copy of SB1, and if we could go to page 54.

15      And Ms. Chen, do you see the language starting on line 20

16  of page 54 that says *"Section 6.06"*?

17  A.  Yes.

18  Q.  And under that, on line 23 of page 54 and continuing to

19  line 9 of page 55, reading the language that has not been

20  struck, it says that *"A person commits an offense if the*

21  *person, one, compensates or offers to compensate another person*

22  *for assisting voters, as provided by section 86.010; or two,*

23  *solicits, receives, or accepts compensation for an activity*

24  *described by Subdivision 1."*

25      Did I read that correctly?

Deborah Chen - Examination                    1714

1   A.  Yes.

2   Q.  And do you understand that assisting voters, as provided by

3   Section 86.010, is referring to assisting voters with their

4   mail ballots?

5   A.  Yes.

6   Q.  And then on page 55, lines 13 to 14, do you see the

7   language that says *"For purposes of this section,*

8   *'compensation' means an economic benefit as defined by Section*

9   *38.01, Penal Code"*?

10  A.  Yes.

11  Q.  Do you know how the penal code defines "economic benefit"?

12  A.  I think it means anything of value.

13  Q.  Does Section 6.06 of SB1 concern OCA-Greater Houston?

14  A.  Yes.

15  Q.  Can you tell us why?

16  A.  We compensate people to help people.

17  Q.  And by "compensate," what are you referring to?

18  A.  It's very broad, right?  We have volunteers who come --

19  aside from our staff, who are paid.  We have members and

20  volunteers who we give bottles of water.  We, you know, have

21  T-shirts to volunteers.  That would technically be

22  compensation.

23  Q.  And returning to Joint Exhibit 1, Steven, could you please

24  scroll to page 58.

25      And Ms. Chen, do you see on line 26 of page 58 it says

Deborah Chen - Examination                    1715

1   *"Section 7.04"*?

2   A.  Yes.

3   Q.  And right under it starting on line 2 of page 59, it says

4   *"Vote-harvesting"*?

5   A.  Yes.

6   Q.  And on line 7 to 10, it says *"Vote-harvesting services*

7   *means in-person interaction with one or more voters in the*

8   *physical presence of an official ballot or a ballot voted by*

9   *mail, intended to deliver votes for a specific candidate or*

10  *measure."*

11      Did I read that correctly?

12  A.  Yes.

13  Q.  And on lines 11 to 13, it says that *"A person commits an*

14  *offense if the person directly or through a third party*

15  *knowingly provides or offers to provide vote-harvesting*

16  *services in exchange for compensation or other benefit."*

17      Did I read that correctly?

18  A.  Yes.

19  Q.  And then finally, lines 14 to 17, it says that *"A person*

20  *commits an offense if the person directly or through a third*

21  *party, knowingly provides or offers to provide compensation or*

22  *other benefit to another person in exchange for vote-harvesting*

23  *services."*

24      Did I read that correctly?

25  A.  Yes.

Deborah Chen - Examination                  1716

1  Q.  Do you know if under this law OCA-Greater Houston provides

2  compensation or other benefit to its staff and members for

3  carrying out its voting-related activity?

4          MR. KERCHER:  Objection.  Speculation, and improper

5  legal opinion.

6          THE COURT:  So that's overruled.

7          Do you have personal knowledge for the first part of

8  the question?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  You can answer.  That's overruled.

11  BY MR. DOLLING:

12  Q.  Do you need me to repeat it?

13  A.  Please.  Thank you.

14  Q.  Do you know if under this law, OCA-Greater Houston provides

15  compensation or other benefit to its staff and members for

16  carrying out its voting-related activities?

17  A.  Yes, we do.

18  Q.  And during its voting-related act -- sorry.  And

19  specifically, you're referring to what we just spoke about with

20  respect to Section 6.06; is that right?

21  A.  Yes, but also this section 7-point something.  I'm sorry.

22  I'm blanking out on the number.

23  Q.  Thank you.  And during its voting-related activities prior

24  to SB1, did OCA-Greater Houston ever have in-person

25  interactions with one or more voters?

Deborah Chen - Examination                    1717

1    A.  Yes.

2    Q.  And did those interactions ever occur in the physical

3    presence of an official ballot or a ballot voted by mail?

4    A.  Yes.

5    Q.  Does Section 7.04, which is this one, concern -- of SB1

6    concern OCA-Greater Houston?

7    A.  A great deal.

8    Q.  Can you explain a little?

9    A.  Well, we -- it concerns us because we hold events where

10   people can bring a ballot.  We compensate people.  We help

11   people.  They're in-person.  And we're afraid of the perception

12   that we could be perceived as trying to help one particular

13   candidate or another, and then we would suddenly be criminals.

14   Q.  And you mentioned this, but I'd like to just break it down

15   a little bit.  Since SB1 became law, has OCA-Greater Houston

16   stopped paying its staff?

17   A.  That would be illegal and unconscionable.

18   Q.  Okay.  Since SB1 became law, has OCA-Greater Houston

19   stopped paying its members for canvassing?

20   A.  That would also be illegal and unconscionable to steal

21   peoples' time and labor.

22   Q.  So the answer is "no"?

23   A.  Sorry, no.

24   Q.  Okay.  Thank you.

25       Since SB1 became law, has OCA-Greater Houston stopped

Deborah Chen - Examination                    1718

1    providing food and drink to staff and members?

2    A.   No.   If we're going to send someone out to canvass in the

3    Texas heat of hundred degrees or more, you can't, in good

4    conscience, send them out without water or Gatorade.  We would

5    run the risk of somebody dying from heatstroke.

6    Q.   Thank you.  And I'd like to turn now to some of the

7    specifics of how SB1 has affected OCA-Greater Houston's

8    voting-related activities.

9         We spoke earlier about candidate forums.  In what way does

10   SB1 pose a problem for OCA-Greater Houston's hosting of

11   candidate forums?

12   A.   Well, you know, when we host a candidate forum -- we're a

13   nonpartisan organization, and so we make a concerted effort to

14   invite candidates of both parties, but we don't really have

15   control over who will actually end up showing up, so if a

16   candidate were to not show up from either party, then when

17   we're there providing services or assistance, we could have

18   this perception and be accused of trying to promote one

19   candidate over the other, and that's a very real fear for us.

20   Q.   Did OCA-Greater Houston organize a candidate forum for the

21   March 2022 primary election?

22   A.   No.

23   Q.   And was that because of SB1?

24   A.   Correct.

25   Q.   Did OCA-Greater Houston organize a candidate forum for the

Deborah Chen - Examination                    1719

1   November 2022 general election?

2   A.  We partnered with others to organize, to co-sponsor.

3   Q.  Did OCA-Greater Houston set up a table at this November

4   candidate forum to provide mail ballot assistance?

5   A.  No, we did not.

6   Q.  Did OCA-Greater Houston have any interaction with community

7   members at this forum?

8   A.  No.  SB1 prevented us from being able to do that.

9   Q.  So your role in this November candidate forum was limited

10  solely to co-sponsoring it; is that right?

11  A.  Correct.

12  Q.  Does OCA-Greater Houston plan to organize any candidate

13  forums in the future?

14  A.  We are considering it.

15  Q.  And how will OCA-Greater Houston's practices at any future

16  candidate forum differ from its practices prior to SB1?

17  A.  If we were to do it, right, to be able to provide, you

18  know, that basic information, opportunity for our community, we

19  would still be prohibited from being able to actually offer

20  assistance, and -- like we normally would.  We wouldn't be able

21  to have tables in the back with volunteers there, able to help

22  people, you know, with their ballots.

23  Q.  And would you also not provide the various other sorts of

24  community services that we spoke about previously?

25  A.  Correct.

Deborah Chen - Examination                    1720

1    Q.  In what way does OCA's practice -- or OCA-Greater Houston's
2    practice of holding AAPI candidate meet-and-greets pose a
3    problem under SB1?
4    A.  It also, you know, potentially could be perceived by
5    people, and we could be accused of trying to promote an AAPI
6    candidate over others.
7    Q.  Have you held an AAPI candidate meet-and-greet since SB1
8    passed?
9    A.  We did in the spring of 2022, but we did it virtually.
10   Q.  Why virtually?
11   A.  To avoid any potential of people bringing their ballots and
12   asking for help.
13   Q.  How did attendance at the virtual meet-and-greet compare to
14   attendance at in-person meet-and-greets before SB1?
15   A.  It was fairly abysmal.
16   Q.  And even though it was held virtually, did
17   OCA-Greater Houston attempt to provide assistance with mail
18   ballots virtually?
19   A.  No.
20   Q.  And do you expect to hold any other -- additional AAPI
21   meet-and-greets in the future?
22   A.  Possibly, but it really depends if there are actually any
23   AAPI candidates, you know, to be able to hold up as role
24   models.
25   Q.  But these forums would be limited to virtual?

Deborah Chen - Examination                    1721

1    A.  Most likely.

2    Q.  How has SB1 affected OCA-Greater Houston's practice of

3    providing in-person assistance at the polls?

4    A.  It has decimated our ability to do it.  We simply don't.

5    We are deeply afraid of running any kind of program that

6    provides that kind of assistance and putting our students --

7    many of our volunteers are young people, and that's a

8    fundamental part of our mission is to educate and develop a

9    poll of future leaders, and we are afraid that they would get a

10   black mark on their record as a criminal.

11   Q.  And why exactly is it that you believe that providing

12   in-person assistance at the polls could pose a problem under

13   SB1?

14   A.  SB1 is written so broadly, it could, in theory, cover

15   almost everything that we do.  Because we are known for

16   providing so much assistance, we are the go-to organization if

17   you have questions related to civic participation, and we have

18   so many young people who work with us, and in today's, you

19   know, automated, you know, employment systems now, any young

20   person who -- or I shouldn't even just limit it -- I shouldn't

21   limit it to just young people, but really any person who has a

22   criminal black mark on their record, no computer system is

23   going to get them past the first gate to get a job interview,

24   right?  Like, they wouldn't even be considered.  You wouldn't

25   even be able to get a job at McDonald's if you had this type of

Deborah Chen - Examination                    1722

1    black mark on your record.  It would destroy peoples' economic
2    futures.
3    Q.  How has SB1 affected the way OCA-Greater Houston canvasses?
4    A.  It's completely changed how we approach canvassing.  We're
5    not able to train our people to be able to provide assistance.
6    We're not able to ask questions of, like, you know, do you need
7    a ride?  Do you know who someone who needs a ride to the polls?
8    We're not able to literally direct people to, you know, our
9    next event where they could come and get assistance or come to
10   our office to get assistance.  Now, all we can say is "*Here is*
11   *the website.  Go to the county clerk.*"  Like, we've cut out all
12   other information about how and where to get help.
13   Q.  And has this -- is this decision related to what you were
14   saying earlier about the possibility of being perceived to be
15   trying to deliver votes for a specific candidate or measure?
16   A.  Yes.
17   Q.  How has SB1 affected OCA-Greater Houston's pre-SB1 practice
18   of tabling at early voting centers or community centers to
19   provide voting assistance?
20   A.  It has prevented us from doing it at all.  We simply do not
21   do it.  We did not provide rides for seniors.  We have not
22   tabled with volunteers.  We have not recruited volunteers.
23   Q.  In what way does driving seniors to the polls pose a
24   problem under SB1?
25   A.  Literally, if you're picking up a senior to go vote, they

Deborah Chen - Examination                    1723

1   are typically going to have a sample ballot or they'll have

2   their mail-in ballot, because they may have changed their mind

3   that they want to vote in-person, or they are there -- they

4   just want to ask questions, regardless of whether or not they

5   actually get in the car to go vote.

6   Q.  And how has SB1 affected OCA-Greater Houston's practice of

7   setting up tables to conduct exit polling surveys?

8   A.  We are still doing the exit survey, but we are limiting and

9   training our volunteers to not provide help.  We're not

10  recruiting the extra volunteers who are bilingual to be there,

11  to be able to provide assistance or to help -- to literally go

12  in and help people.  We can only just say, *I'm sorry.  You*

13  *must go inside."*

14  Q.  And you sort have mentioned this offhand, but has

15  OCA-Greater Houston had to train its staff and members

16  differently as a result of SB1?

17  A.  Yes.  We're having to train them in the opposite manner.

18  Instead of training people, like, this is how you can help, now

19  we're having to train people be very careful to say nothing.

20  Q.  And how often do you have to provide that sort of training?

21  A.  For canvassing, which we're in the process of gearing up

22  for right now or, you know, for last year, we had to say it at

23  our general training, our weekly training, and reminders

24  literally every morning, because you may have different people

25  going out, so you have to reiterate and make sure people are

Deborah Chen - Examination                    1724

 1    very, very aware to not say anything; to only direct people to
 2    the County Clerk's website.
 3    Q.  Has SB1 caused OCA-Greater Houston to expend resources in
 4    any other ways?
 5    A.  It is a complete and utter time suck.  It is an
 6    energy-draining time suck to have to spend the amount of time
 7    and energy to try and think through all the different scenarios
 8    of how -- first it was how can we get around this, then it was
 9    well, what are all the possible scenarios of how this could
10    impact our people, our members, our volunteers?  The time it
11    takes to replan and redesign our programs, our trainings, of
12    how to approach this in a way that we don't put anybody at risk
13    of being a criminal.  And the time it's taken to just bouncing
14    it off with different people, different members, different
15    staff.
16    Q.  Has OCA-Greater Houston stopped recruiting voter assisters
17    as a result of SB1?
18    A.  Yes.
19    Q.  How has SB1 affected OCA-Greater Houston's membership
20    participation in its voter -- voting-related activities?
21    A.  It's really impacted us because we are not actively
22    recruiting volunteers to do that type of voter assistance work.
23    You know, volunteerism is such a unique American cultural
24    thing, right?  Like, it's unique to our democracy, and it's an
25    integral part of our mission, to develop more civic

Deborah Chen - Examination                    1725

1    participation and to have volunteers.  And volunteering is a

2    very personal thing for people.  It is where -- most people

3    come to volunteer, they want to have that feel-good feeling of

4    having helped somebody, and SB1 makes it impossible for us to

5    be able to do that.  It's very different to come and just,

6    like, stuff some envelopes or stuff some bags versus you're

7    actually able to talk with somebody in-person and have that

8    feel-good immediate gratification of, like, I helped this

9    person.

10       And so by not having that opportunity -- right -- you're

11   depriving that volunteer, that potential volunteer, of that

12   meaningful, purposeful experience.  And so then you're not able

13   to retain volunteers, because they no longer have that

14   opportunity to have that kind of experience.  So it's really

15   going to impact our members and, you know, especially our

16   volunteers, who we need to do this type of work.

17   Q.  Based on your decades of experience working in the AAPI

18   community, what do you think would happen to

19   OCA-Greater Houston's ability to recruit members and volunteers

20   who carry out its programs if an OCA-Greater Houston member was

21   prosecuted under SB1?

22   A.  If we had just one, one student who gets charged -- and I

23   could guarantee you every Asian paper would write about that --

24   there is no Asian parent in their right mind who would ever let

25   their child come and volunteer with us for anything.  It would

Deborah Chen - Examination                    1726

1   decimate, you know, literally the -- half of our mission of
2   trying to build for our future community, because people would
3   be so scared about ruining, you know, their kid's future.
4   Q.  Today, if a measure of importance to the AAPI community
5   were on the ballot, would OCA-Greater Houston engage in
6   advocacy around that measure?
7   A.  I'm sorry.  Could you repeat that?
8   Q.  Today, post-SB1, if a measure of importance to the AAPI
9   community were on the ballot, would OCA-Greater Houston engage
10  in advocacy around the measure?
11  A.  We would want to.  We would really have to think hard of
12  how we could do that.
13  Q.  And that's because of SB1?
14  A.  Yes.
15  Q.  And I'd like to pull all of this together.  You sort of
16  mentioned it in a variety of answers, but how has SB1 affected
17  OCA-Greater Houston's ability to carry out its organizational
18  mission?
19  A.  It has made it nearly impossible.  It's impacting almost
20  every program area of our work.
21  Q.  Since SB1 came into effect, has OCA-Greater Houston
22  provided any voter assistance to any person, whether at the
23  polls or with mail ballots?
24  A.  None.
25  Q.  And does that include not providing any sort of language

Deborah Chen - Examination                    1727

1    assistance to LEP Chinese-speaking voters?

2    A.  Correct.

3    Q.  Have you yourself provided any voter assistance, including

4    Chinese language assistance, to any voter since SB1 came into

5    effect?

6    A.  I have not.

7    Q.  If not for SB1, would OCA-Greater Houston return to the

8    voting-related activities it engaged in prior to SB1?

9    A.  Absolutely, yes.

10   Q.  If not for SB1, would you, yourself, return to providing

11   Chinese language assistance to voters?

12   A.  Yes.

13           MR. DOLLING:  I pass the witness.

14           THE COURT:  Before we do that, I noticed -- I believe

15   it's the League of Women Voter representative that's walking

16   the hallways.  Is she excused?  Do you need her any further?

17           MR. SALDIVAR:  She's excused.

18           THE COURT:  Someone might let her know that she can

19   come in here if she'd like.

20           Any other direct questions on this side?  None.  Any

21   cross?

22           MR. KERCHER:  Yes, Your Honor.

23           *(4:16 p.m.)*

24                   CROSS-EXAMINATION

25   BY MR. KERCHER:

Deborah Chen - Examination                    1728

1   Q.  Good afternoon, Ms. Chen.  My name is Ryan Kercher.  We met

2   in summer of 2022.  I tool your deposition in the redistricting

3   case.  It's good to see you again.

4   A.  Likewise.

5   Q.  OCA-Greater Houston is a membership organization we talked

6   about on direct examination, right?

7   A.  Yes.

8   Q.  About 160 dues-paying members at any one time, right?

9   A.  Correct.

10  Q.  I heard you say something on direct, and I think I

11  understood you, but I need to make sure that I did.  I heard

12  you say that the board members are volunteers; is that right?

13  A.  Yes.  They're unpaid.

14  Q.  The reason I want to follow up on that with you is

15  sometimes also when we have discussed OCA-Greater Houston, you

16  have distinguished between dues-paying members and

17  nondues-paying volunteers, right?

18  A.  Yes.

19  Q.  And so when you say that the folks on the Board are

20  volunteer, they are the dues-paying members; is that right?

21  A.  Correct.

22  Q.  Part of what OCA-Greater Houston does is voter education,

23  right?

24  A.  Yes.

25  Q.  You update your voter education materials almost every

Deborah Chen - Examination                    1729

1  year?

2  A.  Depending on whether or not there is major changes.

3  Q.  And although it may support ballot provisions sometimes, it

4  is a nonpartisan organization; is that right?

5  A.  We are always a nonpartisan organization.

6  Q.  And I guess what I mean is, you may -- you may support

7  particular ballot measures, but you don't endorse candidates,

8  right?

9  A.  Correct.  We've never endorsed a candidate.

10  Q.  Traditionally, OCA-Greater Houston has hosted some

11  candidate forums, right?

12  A.  Yes.

13  Q.  It has engaged in door-to-door canvassing, right?

14  A.  Yes.

15  Q.  And when engaging in canvassing, of course,

16  OCA-Greater Houston does not press people to vote for specific

17  candidates.  That's fair to say?

18  A.  Correct.

19  Q.  Let's talk a little bit about Section 6.06, which you

20  looked at with Mr. Dolling during your direct, okay?

21      Now, you're familiar, generally, that SB1 Section 6.06

22  prohibits offering or accepting compensation to someone for

23  assisting voters with mail ballots, right?

24  A.  Correct.

25  Q.  And when you were talking about some of the activities that

Deborah Chen - Examination                    1730

1  OCA-Greater Houston has stopped doing because of Section 6.06,
2  I want to walk through some of the things you described that
3  OCA-Greater Houston does, okay?
4      You talked about tabling at polling locations, right?
5  A.  Yes.
6  Q.  And you -- your testimony is that you that
7  OCA-Greater Houston has stopped tabling at polling locations
8  because of Section 6.06?
9  A.  Partially, yes.
10 Q.  We agree that if you're helping voters at a polling
11 location, that you're not helping them vote by mail, right?
12 A.  The issue is that some people still bring their mail
13 ballots.
14 Q.  So -- and I want to make sure I'm understanding your
15 concern.  Is your concern, then, with the tabling that if you
16 are talking to -- if you are talking to voters while you're
17 tabling at a polling location, you may get in trouble because
18 they have their ballot with them; is that right?
19 A.  It's two parts.  Under 6.06, right, our fear is that the
20 person who is there is being compensated, whether they are a
21 staff person being paid or a volunteer getting a bottle of
22 water or lunch or T-shirt; that they would be compensated and
23 helping someone.
24     But then if you were to go to the other section of
25 7-point -- sorry, don't remember the number.

Deborah Chen - Examination                    1731

1  Q.  7.04.  That's okay.

2  A.  7.04.  Then, you know, they're quote/unquote being, you

3  know, compensated.  They're -- you know, it's in-person.

4  They're potentially, you know, helping someone in the presence

5  of a ballot, and it could be perceived that they're, you know,

6  helping them in a particular way or encouraging them in some

7  particular way, and we could be accused of it.  And so it's --

8  the language is so broad, it's really just unclear.

9  Q.  That's helpful.  Let me take you back to Section 6.06.  In

10 that circumstance where you talked about tabling at a polling

11 location, right?  You said the concern is, well, they may have

12 their ballot with them, right?

13 A.  Yes.

14 Q.  So when you looked at Section 6.06 on the screen a moment

15 ago -- and we can pull it back up if you'd like -- you're

16 generally aware that Section 6.06 refers to assisting voters in

17 the context of Election Code Section 86.010.  Did you know

18 that?

19 A.  I believe so.

20 Q.  And maybe you don't know this off the top of your head, but

21 did you know that that 86.010 in the Texas Election Code is

22 entitled *"Unlawful Assisting Voter Voting Ballot By Mail."*

23 Were you aware of that?

24 A.  I'm going to trust you that you have just read it.

25 Q.  All right.  I appreciate your trust, Ms. Chen.

Deborah Chen - Examination                1732

1    When -- so this kind of takes me back to a question I asked
2  you earlier, and I'm not sure if I understood your answer or
3  whether I got one maybe.
4    When you are polling -- or, excuse me, when you're tabling
5  at a polling location, you're helping voters who are going into
6  the polling location, right?
7  A.   Ideally, yes.
8  Q.   When you are tabling at a polling location, you are not
9  helping voters vote by mail, fair?
10  A.   So when you're tabling at a location and a senior has
11  brought their mail-in ballot, they may have not changed their
12  mind.  They may be bringing it and wanting help right then and
13  there, and then saying, Okay, well, if I got the help that I
14  need, then I don't need to go in and go through the whole
15  process.  Because we would explain to them.  You can vote,
16  okay, but if you want to vote in-person, then you're going to
17  have to talk with them.
18    You know, the -- I think it's usually the assistant
19  precinct judge.  Somebody has to cancel out that mail-in
20  ballot.  Like, there's a whole process, and sometimes a senior
21  may not want to go through that process, and so we may be
22  literally helping them, right, answering any questions with
23  their mail-in ballot, and then they decide, you know what, I'm
24  just going to use the mail-in ballot.  I'm not going to go in
25  and vote today in-person, because I don't want to go through

Deborah Chen - Examination                    1733

1   that process.

2   Q.  So it would be possible, wouldn't it, if someone walked up

3   to your table while you're tabling at a polling location for

4   you to begin the conversation by saying, *"Welcome.  We're here*

5   *to help, but we can't help you vote by mail,"* and then see

6   where the conversation goes from there, right?

7   A.  Well --

8   Q.  Right?

9   A.  Technically, are you asking pre-SB1 or with SB1 in effect?

10  Q.  Well, I mean, whether SB1 is in effect or not, you could

11  ask someone who comes to your table that clarifying question

12  first, right?

13  A.  I'm sorry.  I'm confused by the question, because if SB1 is

14  in effect, we simply wouldn't table to run any risk.

15  Q.  And that's what I'm getting at.  I'm getting at the risk

16  that you're describing for the Court and whether or not it's

17  actually there.  I understand you're afraid of it, but I want

18  to drill down on that with you a little bit.

19      So you're worried about getting in trouble when you're

20  tabling for helping somebody who is voting by mail, right?

21  A.  Correct.

22  Q.  My question is, can't you alleviate that concern by asking

23  that voter, *"Are you trying to vote by mail or vote at the*

24  *poll?"*  And once you know the answer to that question, you can

25  either assist them in voting at the polling location or not

Deborah Chen - Examination                    1734

```
 1   help them with their ballot, if that's your concern.  With
 2   their ballot-by-mail if that's your concern, right?
 3   A.  Yes.  But, unfortunately, SB1 as a whole wouldn't -- that
 4   one provision wouldn't necessarily negate the other.  The
 5   language itself is so broad that, yeah, that's possible, but it
 6   still leaves the possibility for the other part to happen,
 7   right, where somebody could be coming.  And what if -- what if
 8   we had a volunteer who didn't ask the question and
 9   inadvertently made a mistake, and then they could be prosecuted
10   for a crime.  It could be a 16-year-old standing there who, you
11   know, we can train them as much as you want, but whether or not
12   that 16-year-old right then and there is going to remember to
13   ask, why would we run that risk?  And that's what SB1 does.  It
14   creates that risk of somebody becoming a criminal, and we have
15   a genuine fear for that happening.  We don't want to have the
16   responsibility of having ruined someone's life potentially.
17   Q.  Well -- and I understand that there is fear, but I want to
18   push back on that and ask you a little bit about the basis of
19   that fear.  I don't want to suggest for a moment that there's
20   somebody -- that there is a law enforcement agency that's not
21   going to enforce the provisions of SB1, but I do want to ask
22   you about what you anticipate a district attorney, for example,
23   might do, might -- the decisions they might make when deciding
24   whether or not to bring charges under, for example, Section
25   6.06, okay?  Okay?
```

Deborah Chen - Examination                1735

1   A.  What I think --

2   Q.  Well, but I'm just saying --

3   A.  -- a district attorney might do?

4   Q.  Yeah.  I'm just saying do you understand where I'm taking

5   you next?

6   A.  I'm sorry.  Could you repeat that?

7   Q.  Probably not.  Let me just go on to the next question.

8       It's right to say that OCA-Greater Houston has not had any

9   conversations with the Harris County District Attorney's office

10  about how Kim Ogg, District Attorney, intends to enforce

11  Section 6.06 of SB1, right?

12  A.  Correct.

13  Q.  OCA-Greater Houston has not spoken to the Secretary of

14  State's office to figure out how prosecutors might make choices

15  on how to enforce Section 6.06 of SB1, right?

16  A.  Right.

17  Q.  And so the only basis that you have for being concerned

18  that somebody might be charged because a 16-year-old

19  accidentally forgot to ask a single question is your own,

20  right?

21  A.  Well, it's based on the letter of the law.

22  Q.  It's not based on experience; is that fair?

23  A.  It is a combination of -- well, I take that back.  It's not

24  experience in the sense that I haven't seen anybody being

25  charged yet, but the law exists, and the way it's written

Deborah Chen - Examination                    1736

1  basically means the possibility is out there.  It's just a
2  matter of hasn't happened yet.
3  Q.  Well, and I appreciate that, but when you say *"It hasn't*
4  *happened yet"* in fairness, the law has been on the books for a
5  year and a half, right?
6  A.  There are many of laws on the books.
7  Q.  Well, my question is whether this law has been on the books
8  for a year and a half, right?
9  A.  Approximately.
10  Q.  And in that time, you are aware of no one being prosecuted
11  under Section 6.06 in OCA-Greater Houston, true?
12  A.  True.
13  Q.  You're also not aware of any member of OCA-Greater Houston
14  who has been prevented from voting by the provision of 6.06 in
15  SB1?
16  A.  True.
17  Q.  You cannot specifically identify an OCA-Greater Houston
18  member who is unable to get assistance because of Section 6.06?
19  A.  Correct.
20  Q.  You cannot specifically identify an OCA-Greater Houston
21  member who is unable to select an assister of their choice
22  because of Section 6.06?
23  A.  Correct.
24  Q.  You're not aware of any member of OCA-Greater Houston who
25  has been injured by Section 6.06?

Deborah Chen - Examination                    1737

1   A.  That depends on how you define injury.  I think it's an

2   injury if people can't get help.

3   Q.  In 2022, OCA-Greater Houston brought in additional staff,

4   right?

5   A.  I'm sorry, could you repeat that?

6   Q.  Sure.  Maybe I need to be closer to the mike.

7       In 2022, OCA-Greater Houston brought in additional staff,

8   right?

9   A.  Correct.

10  Q.  And you brought in additional staff because you were doing

11  more voter outreach in 2022, right?

12  A.  We brought in additional staff because we run youth

13  programs, so we hired on some people specifically for our youth

14  program.  We brought on more people for some of our canvassing

15  work, yes.

16  Q.  And that canvassing work is increased voter outreach, fair?

17  A.  I wouldn't call it increased, because our actual numbers in

18  2022 were significantly less than 2021 and 2020, but we

19  definitely brought on more people.

20  Q.  Brian, can you bring up the deposition page 89, lines 22

21  through 25.

22      *"Question:  And you brought on additional staff because you*

23  *are doing more work?  You're doing more voter outreach?"*

24      *"Answer:  Partially, yes."*

25      Did I read that correctly?

Deborah Chen - Examination                    1738

1    A.  Yes.

2    Q.  OCA-Greater Houston's staff time grew in 2022 related to

3    the organization's expanded capacity in that time, right?

4    A.  Correct.

5    Q.  And this is immediately following the passage of SB1, fair?

6    A.  Yes.

7    Q.  2022 was the first year OCA-Greater Houston was able to do

8    primary election work, right?

9    A.  For the first time, yes.

10   Q.  And the opportunity to do primary election work in 2022

11   after the passage of SB1 was partially the result of increased

12   staff capacity, right?

13   A.  Increased staff capacity and reallocation of resources.  We

14   reallocated resources that we would have used for just the

15   November election and were able to do some more in the primary

16   for the first time.

17   Q.  Well, it's not just reallocation of resources.

18   OCA-Greater Houston had increased funding in 2022; isn't that

19   right?

20   A.  We did get some increased funding.

21   Q.  We talked a little bit about Section 7.04, the

22   vote-harvesting provision in SB1, right?

23   A.  Yes.

24   Q.  I want to talk to you a little bit more about that.  You

25   cannot identify a specific member of OCA-Greater Houston who

Deborah Chen - Examination                    1739

1    was unable to vote in 2022 because of Section 7.04, true?

2    A.  True.

3    Q.  You testified on direct a little bit about

4    OCA-Greater Houston's work with volunteers since SB1, right?

5    A.  Correct.

6    Q.  And I think that you said that SB1 had decimated your

7    ability to recruit volunteers; is that right?

8    A.  Decimated the need for recruiting bilingual volunteers.

9    Q.  So to make sure I understand what you mean by that, we

10   agree, don't we, that since SB1, OCA-Greater Houston has not

11   tried to recruit volunteers like it did prior to SB1; is that

12   right?

13   A.  We have not tried recruiting volunteers to do that specific

14   type of work, correct.

15   Q.  When we're talking about "that specific type of work," I

16   want to talk to you about some of the canvassing work that

17   OCA-Greater Houston has done, okay?

18       Has OCA-Greater Houston ever done canvassing work where

19   they're going door-to-door and encouraging voters to vote in

20   favor of or against a ballot provision, a new law or provision

21   that's going to be on the ballot?

22   A.  Only in 2015.  And I don't remember, honestly, if we

23   included that in our canvassing, because in 2015 we didn't

24   actually have a lot of funding to do door-knock canvassing.

25   Q.  And other circumstances where you were concerned about

Deborah Chen - Examination                    1740

1  talking to voters to try and persuade them either on a ballot

2  measure or because you were concerned at one of your candidate

3  forums you might be accused of pushing one candidate over

4  another, the concern there is that while you're engaging those

5  activities, a voter might bring in a ballot unbeknownst to you,

6  right?

7  A.  It's multiple parts, right?  That it's in-person.  Somebody

8  could bring in their ballot seeking assistance, and there could

9  be a perception that we are promoting one candidate over

10  another.

11  Q.  So let's break that out into a couple of pieces here.  We

12  talked about when you were tabling at polling location you

13  could ask this initial question that would be helpful in

14  figuring out whether or not you would be violating Section

15  6.06.

16           *(Court reporter clarification.)*

17        MR. KERCHER:  Am I going too fast?  You've had a long

18  day.

19  BY MR. KERCHER:

20  Q.  If the concern under Section 7.04 is that you might

21  accidentally be talking to somebody and pushing a ballot

22  measure or be perceived to be pushing a candidate while that

23  person has their ballot in hand, couldn't you solve that

24  problem by asking people or putting up a sign at your candidate

25  forum that says *"Please don't bring your ballot here"*?

Deborah Chen - Examination                    1741

1    A.  Are you done with the question?

2    Q.  Yes, ma'am.

3    A.  No, because the issue with perception is that we don't have

4    any control over which candidates show up.  So it's not as

5    simple as, oh, somebody just came with their ballot.  It's the

6    fact that we're having a candidate forum, for example, and it

7    could be where only the candidates of one party showed up.  And

8    so then there's this perception, you know, someone brought in a

9    ballot, but it's the event itself that has that perception.  So

10   just putting up a sign and saying, *"Please don't bring your*

11   *ballot.  Go put it in your car"* or whatever, that doesn't solve

12   that perception problem.

13   Q.  Well -- and I want to talk to you about that perception,

14   what implications it might have in a minute, but that

15   perception is really only a problem if, in your view, somebody

16   has a ballot with them in that candidate forum, because then

17   that would be in the presence of the ballot, right?

18   A.  If I'm remembering 7.04 correctly, there's four different

19   parts.  We're talking about perception and the ballot, but it

20   doesn't take out the fact that this is something that's

21   happening in-person.  I believe the other part is that

22   someone's getting a benefit or -- yeah, that potentially

23   somebody is getting a benefit, I believe.

24   Q.  So let me ask you about your understanding of 7.04, okay?

25   A.  Yes.

Deborah Chen - Examination                    1742

1   Q.  Is it your understanding that if you had the kind of

2   candidate forum that you described where maybe only one

3   candidate from either side of the spectrum shows up, that that

4   could result in prosecution under 7.04, whether a member of

5   audience brings a ballot with them or not?

6   A.  Potentially.  They would need to have all four elements

7   line up.

8   Q.  We agree on that.

9       Do we also agree that it is important that only people who

10  are eligible to vote should vote?

11  A.  Yes.

12  Q.  And do we agree that we need to have laws that make sure

13  that only those who are eligible to vote do get to vote?

14  A.  Yes, in spirit, yes.

15  Q.  Thank you, Ms. Chen.

16         MR. KERCHER:  Your Honor, I pass the witness.

17         THE COURT:  Anything else on this side?

18         (4:36 p.m.)

19                   CROSS-EXAMINATION

20  BY MR. LIU:

21  Q.  Cory Liu with Harris County District Attorney's Office.  So

22  I just want to clarify.  You were saying that if you had a

23  candidate forum and you invited different candidates, but some

24  of them didn't show up, some people might perceive you as

25  supporting one candidate, but that -- that wouldn't be

Deborah Chen - Examination                    1743

1    accurate, right?

2    A.  Why would that not be accurate?

3    Q.  Do you believe that when that happens that you are

4    supporting the candidate -- so I'm trying to understand your

5    testimony.  I thought I had understood you to say that you

6    weren't trying to favor one candidate, but some people might

7    perceive it that way; so what -- from your -- from your

8    perspective, would you be supporting that person or would you

9    not be trying to support that person?

10   A.  We're not, but that's not the issue.  The problem is the

11   public would perceive it that way potentially.

12   Q.  Well, I suppose -- you've mentioned the concerns of law

13   enforcement.  Have you heard any government officials say

14   anything that would say that even though you are not trying to

15   support someone, that you would still be subject to criminal

16   prosecution?

17   A.  I can't say for every government official.  I can say that

18   if the law exists, and we currently have a very interesting,

19   you know, Attorney General who is unethical --

20   Q.  Well, I don't represent the Attorney General, so I

21   suppose --

22   A.  Right, but I'm just saying --

23        *(Court reporter clarification, simultaneous speakers.)*

24            THE COURT:  One second.  One at a time.  And your

25   question again?

```
 1   BY MR. LIU:
 2   Q.  Well, my question -- let's talk about the Harris County
 3   District Attorney.  You haven't heard any statement from the
 4   Harris County District attorney's office that when you invite
 5   multiple candidates and some don't show up, that means you're
 6   intending to favor the candidate that does show up?
 7   A.  No, I have not heard anything like that.
 8   Q.  And I think you mentioned the concern about the possibility
 9   that a snack or a drink on a hot day could be considered
10   compensation.  To be clear, you haven't heard anyone -- any
11   government official say that that's the interpretation of the
12   law?
13   A.  Correct, I haven't heard anything.
14   Q.  And you're not aware of any investigations at all that have
15   ever been opened into possible criminal violations of SB1,
16   correct?
17   A.  Correct.
18   Q.  Thank you.
19           MR. LIU:  No further questions.
20           THE COURT:  Anything else on this side?  Any redirect?
21           MR. DOLLING:  Just a few questions, Your Honor.  Thank
22   you.
23           (4:39 p.m.)
24                     REDIRECT EXAMINATION
25   BY MR. DOLLING:
```

1    Q.  Ms. Chen, you testified earlier -- or Mr. Kercher was

2    asking you whether you could identify specific people who had

3    been denied the right to vote earlier.  Do you remember that?

4    A.  Yes.

5    Q.  Or denied assistance.

6        And you testified earlier that after SB1,

7    OCA-Greater Houston has not been able to engage in many of the

8    voting-related activities it did prior to SB1; is that right?

9    A.  Correct.

10   Q.  Does that mean there would have been far fewer

11   opportunities for voters to approach OCA-Greater Houston to

12   request assistance?

13   A.  That is correct.

14   Q.  Based on your decades of experience doing this work, having

15   done it for many years, is it your belief that had you been

16   able to engage in those voting-related activities, LEP voters

17   seeking Chinese language assistance would have requested

18   OCA-Greater Houston's help with their mail ballots?

19           MR. KERCHER:  Objection.  Leading, Your Honor.

20           THE COURT:  Sustained.

21   BY MR. DOLLING:

22   Q.  You have seen many LEP voters seek assistance with their

23   mail ballots at your various voting-related activities prior to

24   SB1, correct?

25           MR. KERCHER:  Objection, Your Honor, leading.

```
 1            THE COURT:  You're still leading.
 2            MR. DOLLING:  Sorry.
 3   BY MR. DOLLING:
 4   Q.  Have you seen many LEP voters come to your voting-related
 5   activities seeking Chinese language assistance with their mail
 6   ballots?
 7   A.  Yes.  Over the years, we have.
 8   Q.  And would you expect to have seen that, after SB1, if you
 9   had been able to hold those events?
10   A.  Yes.
11   Q.  Are you aware of any disavowal from District Attorney Kim
12   Ogg of an attempt to enforce the provisions of SB1?
13   A.  No.
14   Q.  Are you aware of any disavowal from the Attorney General to
15   not enforce the -- I guess that's double negative.
16       Are you aware of the Attorney General ever saying that he
17   would not enforce the provisions of SB1?
18   A.  No.
19   Q.  Do you obey the law even if you have not heard -- even if
20   you do not have knowledge of someone having been prosecuted
21   under that law?
22   A.  Yes.
23   Q.  You -- Mr. Kercher was asking you about whether you could
24   simply put a sign up at a candidate forum telling people
25   *"Please don't bring your mail ballots here,"* and, in doing so,
```

Deborah Chen - Examination                    1747

1    avoid violating SB1.  Do you remember that?

2    A.  Yes.

3    Q.  If you were to put up a sign like that, would you expect

4    fewer people to attend a candidate forum?

5    A.  Possibly, yes.

6    Q.  Is that an outcome that OCA-Greater Houston would want?

7    A.  No.

8    Q.  And I just want to -- I think, you know, we've been talking

9    about this law.  It's got a lot of different elements in it.

10   You're not expected to necessarily understand it all, but I

11   just want to clear up that you do understand that for SB1

12   Section 7.04 to be implicated, there need to be ballots -- as

13   the statute defines it, you need to be in the physical presence

14   of a ballot; is that correct?  Or do you understand that?

15   A.  Yes.

16              MR. DOLLING:  No further questions.

17              THE COURT:  Anything else on this side?  Anything

18   else?

19              MR. KERCHER:  Nothing additional from State

20   Defendants, Your Honor.

21              THE COURT:  Is there any need for this witness or can

22   she be excused?

23              MR. KERCHER:  Excused, Your Honor.

24              THE COURT:  You're excused, ma'am.  Thank you.

25              THE WITNESS:  Thank you, sir.

```
 1            THE COURT:  And with that, let's call it a day.  Where
 2   are we at for tomorrow?
 3        (4:43 p.m.)
 4            MS. ARMENTA:  LULAC plaintiffs will be starting with a
 5   few witnesses, Your Honor, and then I believe --
 6            LULAC plaintiffs will be starting with, I believe,
 7   Ms. Bryant.
 8            THE COURT:  How many witnesses can we expect for
 9   tomorrow?
10            MS. ARMENTA:  At least three from LULAC plaintiffs.
11            MS. PERALES:  And then following the three LULAC lay
12   witnesses, LUPE plaintiffs will be calling Ms. Christina Adkins
13   from the Secretary of State and Mr. Keith Ingram from the
14   Secretary of State.
15            THE COURT:  Full day.  Okay.  With that, we'll start
16   at 9:00.
17            MR. CAPOZZI:  Your Honor, excuse me.  We still have
18   issue of the intervener defendant exhibit, which we could do
19   now or tomorrow.
20            THE COURT:  Have you-all had time to review that
21   document?
22            MR. NKWONTA:  Not fully, Your Honor, but we will do it
23   tomorrow.
24            THE COURT:  Why don't you-all confer on that.  I'm
25   questioning the relevance, so this deposition was in relation
```

 1    to another bill, from what I gather.  I mean, I haven't had a

 2    chance to see it, so I'm wondering what the relevance between

 3    the two parts are.  And then why does the whole deposition

 4    transcript need to be entered if you think you got the evidence

 5    in verbally from the witness?  That's my second question.  But

 6    those are questions I have, because I haven't been able to

 7    review the document.

 8              MR. CAPOZZI:  Just briefly, Your Honor -- and I'm

 9    happy to confer with Plaintiffs -- we're only going to move

10    specific parts of the deposition, not the entire part.

11              THE COURT:  But are they redundant to the testimony?

12              MR. CAPOZZI:  I don't believe so, Your Honor, and I'm

13    happy to explain why we think these are relevant either now or

14    tomorrow.

15              THE COURT:  Why don't you kind of confer first, and

16    let's try to avoid redundancy, because you've already fed me

17    enough paper, so I don't need more paper.  So if we've already

18    got -- if you already got it through the transcript, the trial

19    transcript, the testimony, don't need to see it again in

20    another format.  But you-all confer.

21              MR. CAPOZZI:  Understood, Your Honor.

22              THE COURT:  Anything else, sir?

23              MR. NKWONTA:  Nothing further, Your Honor.

24              COURT SECURITY OFFICER:  All rise.

25              *(4:45 p.m.)*

1                              *    *    *

2                         *    *    *    *    *

3    UNITED STATES DISTRICT COURT

4    WESTERN DISTRICT OF TEXAS

5

6         I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.  I

8    further certify that the transcript fees and format comply with

9    those prescribed by the Court and the Judicial Conference of

10   the United States.

11

12   Date signed:  September 21, 2023

13   /s/ Gigi Simcox

14   /s/ Angela M. Hailey
     _____
15   United States District Court
     Official Court Reporters
16   CSRs, CRRs, RPRs, RMRs
     262 West Nueva Street
17   San Antonio, Texas  78207
     (210)244-5048

18

19

20

21

22

23

24

25