1           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION

3
LA UNION DEL PUEBLO ENTERO,      .
4  ET AL,                         .
                                  .
5            PLAINTIFFS,          .
        vs.                       . DOCKET NO. 5:21−CV−844−XR
6                                 .
GREGORY W. ABBOTT, ET AL,         .
7                                 .
            DEFENDANTS.           .
8

9

10              TRANSCRIPT OF BENCH TRIAL
       BEFORE THE HONORABLE XAVIER RODRIGUEZ
11            UNITED STATES DISTRICT JUDGE
                 SEPTEMBER 22, 2023
12

13

14

15

16  APPEARANCES:
FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                       FATIMA MENENDEZ, ESQUIRE
                         JULIA LONGORIA, ESQUIRE
18                       MALDEF
                         110 BROADWAY
19                       SUITE 300
                         SAN ANTONIO TX 78205
20

21                       LEAH TULIN, ESQUIRE
                         BRENNAN CENTER FOR JUSTICE AT NY
22                         US SCHOOL OF LAW
                         1140 CONNECTICUT AVENUE NW
23                       SUITE 1150
                         WASHINGTON DC 20036
24

25

```
 1

 2                          AMIR BADAT, ESQUIRE
                            NAACP LEGAL DEFENSE & EDUCATIONAL
 3                          FUND INC
                            40 RECTOR STREET, FIFTH FLOOR
 4                          NEW YORK NY 10006

 5

 6

 7

 8                          CHRISTOPHER DOOLEY DODGE, ESQUIRE
                            DANIELA LORENZO, ESQUIRE
 9                          UZOMA N. NKWONTA, ESQUIRE
                            MARCOS MOCINE-MCQUEEN, ESQUIRE
10                          ELIAS LAW GROUP LLP
                            250 MASSACHUSETTS AVENUE NW
11                          SUITE 400
                            WASHINGTON DC 20001
12

13

14

15

16

17   FOR THE DEFENDANTS:   RYAN G. KERCHER, ESQUIRE
                            KATHLEEN HUNKER, ESQUIRE
18                          WILLIAM WASSDORF, ESQUIRE
                            MONROE DAVID BRYANT, JR., ESQUIRE
19                          ETHAN QUINN SZUMANSKI, ESQUIRE
                            ZACHARY BERG, ESQUIRE
20                          TEXAS ATTORNEY GENERAL
                            P.O. BOX 12548
21                          MC 009
                            AUSTIN TX 78711
22

23                          LOUIS J. CAPOZZI, III, ESQUIRE
                            JONES DAY
24                          51 LOUISIANA AVENUE NW
                            WASHINGTON DC 20001
25
```

```
 1

 2

 3                        CORY REN LIU, ESQUIRE
                          BUTLER SNOW LLP
 4                        1400 LAVACA STREET
                          SUITE 1000
 5                        AUSTIN TX 78701

 6

 7

 8

 9

10

11

12

13

14

15  REPORTED BY:          GIGI SIMCOX, RMR, CRR
                          OFFICIAL COURT REPORTER
16                        UNITED STATES DISTRICT COURT
                          SAN ANTONIO, TEXAS
17

18

19

20

21

22

23

24

25
```

1    *(San Antonio, Texas; September 22, 2023, at 9:00 a.m., in*
2    *open court.)*

3    THE COURT:  And your next witness.

4    MR. CAPOZZI:  Your Honor, excuse me.  Would now be a
5    good time to deal with the evidentiary issue we talked about
6    yesterday?

7    THE COURT:  Sure.

8    MR. CAPOZZI:  Good morning.  We met and conferred
9    yesterday with the LULAC plaintiffs.  We weren't able to come
10   to an agreement so I will renew my motion.  We are not moving
11   to introduce the entire deposition, just select page numbers
12   which address SB 1, in particular pages 1 through 9, 17
13   through 18, 28 through 30, 41 through 43, 49 to 50.

14   THE COURT:  I'm sorry.  41 to 43.

15   MR. CAPOZZI:  49 to 50 and 72 to 73.

16   So let me just try to state briefly why these are
17   relevant and to answer your question from yesterday about
18   cumulative evidence.

19   So these are relevant to our organizational standing
20   argument.  The Fifth Circuit in a case called *LULAC v Elfant*,
21   I think this was in November 2022, held that LULAC did not
22   have standing to challenge SB 1111 because Mr. Garcia could
23   not cleanly distinguish between LULAC's response to SB 1 and
24   SB 1111.

25   So we think that this evidence is relevant in this

1  case for the same reason.  The evidence is admissible as the

2  statement of a party opponent.  There's also a prior

3  inconsistent statement.

4          THE COURT:  And what are these statements?

5          MR. CAPOZZI:  So, in brief, these are statements that

6  the Get Out the Vote campaigns, the voter registration

7  campaigns, and the fund raising that LULAC did in late 2021

8  and 2022 were in response to both SB 1 and SB 1111.

9          And the reason the evidence is accumulative and

10 repetitive is that the emphasis is different between the

11 testimony that Mr. Garcia gave on the stand and his testimony

12 in the deposition.

13         On the stand he de-emphasized SB 1111.  He said the

14 response was primarily because of SB 1, but in the deposition

15 he emphasized both equally and he didn't have the greater

16 emphasis on SB 1 versus SB 1111, so we would like to put that

17 testimony into the record.

18         THE COURT:  What's the objection?

19         MR. NKWONTA:  Your Honor, the objection primarily is

20 based on relevance, and I'll tell you why it's not relevant,

21 because opposing counsel has slightly mischaracterized via

22 Fifth Circuit's ruling.

23         SB 1111, that case was about voter registration and

24 all of the activities that are conducted in terms of diversion

25 of resources are related to voter registration.  Here, what

1  Mr. Garcia is talking about, voter outreach efforts for GOTV,

2  helping voters with mail ballots, helping voters get to the

3  polls, that, by definition, has nothing to do with SB 1111.

4         So that brings us back to the relevance issue under

5  Rule 403 because Rule 403 also excludes evidence that's

6  cumulative and evidence that confuses the issues.  And even as

7  we stand here, intervenors are confusing the issues already.

8         And the theory that they are trying to advance with

9  this argument is that because LULAC diverted resources in

10 response to SB 1111 and in response to SB 1, they are injured

11 by neither bill, and that is a nonsensical theory which makes

12 the evidence they are trying to submit irrelevant.

13        What's relevant is whether Mr. Garcia and whether he

14 testified and whether LULAC did, in fact, divert resources in

15 order to respond to the restrictions on voting procedures in

16 SB 1.  He has testified that they did.  SB 1111, a statute

17 about voter registration and testimony about voter

18 registration cannot have any bearing on that and sufficiently

19 relevant and avoids confusion of issues.

20        Nor has he identified any inconsistency that would

21 suggest these are admissible under the prior inconsistent

22 statement theory because Mr. Garcia did not say in the prior

23 deposition that there was an equal allocation.  He, at the

24 time, had not separated the two.  That doesn't mean he hasn't

25 done so now.

1    Finally, to the extent that the Court is inclined to

2  admit this evidence, we would request under Rule 106 an

3  opportunity to admit additional testimony in support of the

4  rule of completeness to ensure —

5    THE COURT:  By witness or by deposition testimony, or

6  what?

7    MR. NKWONTA:  No, additional deposition testimony,

8  from that same deposition, under Rule 106, because they are

9  only seeking to admit — because they are seeking to admit

10  portions, we would request an opportunity to submit our

11  portions as well to ensure that the Court has a complete and

12  accurate record of what Mr. Garcia said.

13    THE COURT:  So in that case, instead of portions,

14  should we just do the whole deposition?  It looks like we've

15  got most of it already.

16    MR. NKWONTA:  Well, we actually have not — I

17  wouldn't say an insignificant amount but there are only a few

18  small excerpts that are being submitted here and what we are

19  counter-designating, for lack of a better word, only amounts

20  to a few additional pages to the extent the Court accepts this

21  excerpt as admissible.

22    THE COURT:  So if this was a jury trial, I would be

23  much more concerned.  It's not a jury trial, it's a trial to

24  the bench.  If the plaintiffs are successful in this case, we

25  all know where this is headed, and so we might as well let the

1  Fifth Circuit clarify for us all this whole issue of standing.

2       I sort of made that gratuitous remark yesterday, but

3  in all sincerity, I really do not understand standing anymore.

4  So the Republican Party of Harris County and Republican

5  National Committee got to come in this case because, as I

6  understood the Fifth Circuit's position, just because they had

7  to offer any additional training to their folks, that gave

8  them standing.

9       So if that's all it took, I really honestly don't

10  understand the organizational standing challenges here, but

11  that's not a ruling, I'm just perplexed.  I don't know how to

12  apply anything anymore here because the standards are so

13  confused and don't seem to be logically applied.

14       With that said, I'm going to begin, withhold ruling

15  on this, you-all meet and confer yet again, find out which

16  additional pages you want to submit, or if you just want to

17  submit the entirety of the deposition and we'll admit it

18  later.

19       MR. NKWONTA:  Thank you, Your Honor.

20       MR. CAPOZZI:  Thank you, Your Honor.

21       THE COURT:  Anything else by way of housekeeping?

22       Next witness.

23       MR. MOCINE-MCQUEEN:  We call Miss Judy Bryant, Your

24  Honor.  My name is Marcos Mocine-McQueen.  I'm with the Elias

25  Law Group and we are representing the LULAC plaintiffs.

JUDY BRYANT - DIRECT

1      THE COURT:  Can someone assist moving the podium and

2  it may be locked down below.

3      (JUDY BRYANT, having been duly sworn, testified as

4  follows:)

5      THE COURT:  And this will be on what issues?

6      MR. MOCINE-MCQUEEN:  Your Honor, this will be on

7  5.02, 5.03, 5.08, and 7.04.

8      THE COURT:  Thank you.

9                    DIRECT EXAMINATION

10 BY MR. MOCINE-MCQUEEN:

11 Q.  Good morning.

12 A.  Good morning.

13 Q.  Miss Bryant, can you please state your full name for the

14 record?

15 A.  It is Judy Hawthorne Bryant.

16 Q.  And can you please tell the Court why you are here today?

17 A.  I'm here today to testify for the Texas Alliance for

18 Retired Americans.

19 Q.  And if I refer to the Alliance as TARA, will you

20 understand what I'm referring to?

21 A.  Yes, I will.

22 Q.  And Miss Bryant, where do you live?

23 A.  In Dallas.

24 Q.  And how long have you lived in Texas?

25 A.  Mostly my whole life except for probably about ten or

JUDY BRYANT – DIRECT

1  twelve years living in Louisiana and South Carolina.

2  Q.  And so roughly how many years have you lived in Texas?

3  A.  Roughly I guess about 60.

4  Q.  And before retiring, Miss Bryant, can you tell us a little

5  bit about what you did professionally?

6  A.  Yes.  I'm a retired 32-year teacher and I taught home

7  economics for the first about ten twelve years.  For the last

8  20 years I taught prenatal care and infant development to

9  pregnant and parenting teens in Dallas' school for pregnant

10  teens.

11  Q.  And, Miss Bryant, what is your role in the Texas Alliance

12  for Retired Americans?

13  A.  I am the field organizer in Texas Alliance for Retired

14  Americans.

15  Q.  When did you assume that role?

16  A.  In May of 2012, so it's been about eleven, going on about

17  eleven and a half years.

18  Q.  Are you paid for this role?

19  A.  Yes, I am.  It's a part-time position, but I'm paid.

20  Q.  And when did you first become involved with Texas Alliance

21  for Retired Americans in any capacity?

22  A.  In about 2008 I became a member in the Dallas area.

23  Q.  And why did you join TARA?

24  A.  Because I was working as the political action vice

25  president and the retiree chair for my union for Alliance AFT,

JUDY BRYANT – DIRECT

1  and I became familiar with TARA and the things that they were

2  doing to protect things like social security, Medicare, and so

3  on.

4  Q.  So I'd like to learn a little bit more about TARA then.

5  Can you tell me, what is TARA?

6  A.  TARA is a part of a four and a half million member

7  National Alliance for Retired Americans and we work on –– the

8  Alliance for Retired Americans works on issues, as I

9  mentioned, such as social security, Medicare, Medicaid,

10  pensions, those major issues that affect seniors and retirees.

11  Q.  And –– I'm sorry.

12  A.  And in Texas, in Texas, TARA has chapters all around the

13  state.

14  Q.  Can you name just a few of the areas at least that TARA

15  has chapters?

16  A.  We have chapters in Dallas, Fort Worth, White Settlement,

17  Austin, Houston, San Antonio, Corpus Christi area, and

18  Beaumont, and Port Arthur area.

19  Q.  Does TARA have a partisan affiliation?

20  A.  No, we're officially nonpartisan.

21  Q.  And who are the members of TARA?

22  A.  There are great many members of TARA who are retired union

23  members of all different unions because the National AFL–CIO

24  is our parent organization but we have anybody who wants to

25  further retirement, and so we have a lot of community members

JUDY BRYANT - DIRECT

1  also.

2  Q.  And what is TARA's mission?

3  A.  Our mission is to help our members become knowledgeable

4  about these issues that we talked about, social security,

5  Medicare, Medicaid, and then take action when those things are

6  under attack so that they can actually gain the dignified

7  retirement which they have earned.

8  Q.  Can you tell me a little bit more about the issues that

9  you just mentioned, a little more in-depth about the issues

10  that TARA works on?

11  A.  One thing, especially about social security, the — we've

12  been working for 20 years about the windfall on nation

13  provision and the GPO government pension offset because a lot

14  of our members are negatively impacted by that, myself being

15  one of them, and so we work and do things on that.

16      We've been working on Medicaid expansion in Texas since

17  that has never taken place, and currently we're working on

18  cost of living adjustment, COLA, to assist Texas AFT and

19  seeing that Proposition 9 gets passed.

20  Q.  And so what are the actual activities that TARA undertakes

21  to advance these issues?

22  A.  We have monthly chapter meetings in all of our different

23  locations, and, of course, share information about those

24  issues.  We go out and do rallies, street rallies, and things

25  like that.  We have a lot of fun doing those, and getting the

JUDY BRYANT – DIRECT

 1  word out about things and just calling people's attention to
 2  things with signs and so forth.  We use our social media
 3  accounts with Facebook and X, formerly Twitter, and also on
 4  our website to educate folks.
 5  Q.  And do you do anything to advance laws that are related to
 6  these issues?
 7  A.  Yes, by some of the same things to have our, have members
 8  and just the public be aware of things.
 9  Q.  And when you make members aware of these things, is there
10  something you hope they do with that information?
11  A.  Yes.  We always ask them to contact whether it's local,
12  state, or federal elected officials to make sure that their
13  voices are heard and our Alliance for Retired Americans gives
14  us tools to help them be aware of what they need to do when
15  making such visits.
16  Q.  And who primarily does the work of organizing these
17  efforts?
18  A.  I do.
19  Q.  And do you get support from anyone else in the
20  organization?
21  A.  Yes.  Especially our state president, and then we have
22  chapter presidents on our executive board and the executive
23  board works to assist in organizing those things.
24  Q.  Miss Bryant, are you familiar with Section 7.04, which is
25  the provision of SB 1 that limits advocacy for or against a

JUDY BRYANT - DIRECT

1  candidate or an issue in the presence of an absentee ballot?

2  A.  Yes, I am.

3  Q.  You stated that TARA does not have a partisan affiliation,

4  but does TARA ever endorse candidates?

5  A.  Yes, we do.  We can endorse local and state candidates and

6  then we work for endorsed national candidates, which our

7  national organization does.

8  Q.  And does TARA ever take positions either for or against

9  issues or questions that are appearing on the ballot?

10  A.  Yes, we do.

11  Q.  And do you ever, when you are advocating for or against

12  these candidates on these issues, do you ever conduct any kind

13  of in-person advocacy?

14  A.  Yes.  In addition to our meetings we are often asked to

15  maybe do a presentation at another meeting of another group or

16  to do what we call tabling at an event, at a convention, or at

17  a meeting where we set up a table and share information that

18  comes from our national organization about various issues.

19  Q.  And why make these in-person presentations instead of just

20  relying on tools like email or phone calls?

21  A.  Because some people don't read their emails, we found out,

22  and also phone calls, a lot of times you have wrong numbers or

23  you have to leave messages, and even if you could have a very

24  short face-to-face interaction with someone we found that's

25  more effective.

JUDY BRYANT - DIRECT

1  Q.  And when you send out emails, what is the audience you

2  reach with your emails?

3  A.  Generally we have about 6,000 folks on an action network

4  email list and that includes the members of each chapter and

5  lots of other people who have identified as being interested

6  in the Alliance for Retired Americans.

7  Q.  And when you are doing these in-person events, who are you

8  reaching?

9  A.  A lot of times it's just the general public because we're

10  asked to do things at events that are non-TARA events.

11  Q.  And who within the organization of TARA does the largest

12  share of this in-person activity?

13  A.  I would generally do that in the Dallas area where I live

14  but some of our chapter presidents, especially one in Austin

15  has done a number of tabling events.

16  Q.  Who would you say does the largest share for the

17  organization?

18  A.  I would be the one who does the largest.

19  Q.  How have SB 1's restrictions on in-person advocacy

20  impacted TARA's approach to advocating for issues such as COLA

21  in person?

22  A.  They have changed and harmed, I think, what we can do and

23  are used to be able to do for various events, various issues.

24  Q.  And how has it changed what you can do?

25  A.  Well, one way in particular is the fact of I haven't been

1  able to accept or set up any tabling invitations or events
2  just in the few weeks when mail ballots go out and I would not
3  want to take a chance of someone having a mail ballot when we
4  were tabling, talking to them about an issue, so that —
5  because that would be against the provisions in this law.
6  Q.  So when will you stop your in-person advocacy efforts?
7  A.  Probably — well, making sure — probably after the first
8  week in October because mail ballots are generally going out
9  by that time in most counties.
10 Q.  Prior to SB 1, when you engaged in this type of advocacy,
11 how late into the election cycle would you have been
12 conducting these in-person activities?
13 A.  Right up and including Election Day, right up to and
14 including Election Day.
15 Q.  So if you're able to do this work until the ballots come
16 out, why does it matter that you have to stop once the ballots
17 are in the mail?
18 A.  Because we find that especially with this particular law
19 or with anything, the closer you can do some education and
20 information sharing, the closer to the time of someone voting,
21 that's the — going to be the best thing to do because people
22 tend to forget or not be familiar with an issue and then the
23 closer to actually them voting makes a big difference.
24 Q.  So, Miss Bryant, I want to talk about some of the other
25 provisions in SB 1 that affect mail ballots and mail ballot

JUDY BRYANT – DIRECT

1  applications, and specifically I'd like to talk about Sections
2  5.02, 5.03, and 5.08.  Are you familiar with these provisions
3  of SB 1 that require voters to enter ID numbers when they are
4  requesting and when they are returning their absentee ballots?
5  A.  Yes, I am.
6  Q.  What impact did these changes have on TARA members?
7  A.  Well, first of all, we heard from members who were afraid
8  to even apply for a ballot because of it being complicated,
9  new and complicated.  And then, second, we did hear from
10  members who actually made a mistake on their application for a
11  ballot, or even making a mistake on their ballot, the ballot
12  itself when they filed it and so it got rejected.
13  Q.  So what changes did TARA have to make to respond to what
14  it was hearing from its members?
15  A.  We had to do a big education project for advocacy and
16  taking action to inform our members about the provisions of SB
17  1.
18  Q.  So what was involved in this effort to help them navigate
19  the voting process?
20  A.  To help them navigate the new voting system, we have a
21  TARA projects committee which we activated at that time.  We
22  activate for various reasons, and the projects committee is
23  made up of most of our chapter presidents and so we spent a
24  great deal of time planning our advocacy campaign for this new
25  law.

JUDY BRYANT - DIRECT

1 Q.  And what was involved, what did you actually create in

2 this effort?

3 A.  We created emails that would go out to all those —— that

4 list that I mentioned with the action network.  We also had

5 folks who created or found memes that we could use on social

6 media, which we did a great deal.

7     Obviously, we had information which chapters could share

8 at their chapter meetings or anybody could take out and share,

9 and then we planned and carried out three different webinars

10 about applying for the ballot and voting a ballot.

11 Q.  So if you were to add together the hours that yourself and

12 the volunteers spent creating these presentations, emails,

13 webinars, if you were to estimate how much time was spent on

14 those collectively, what would you estimate that amount of

15 time to be?

16 A.  I would imagine it would be around 125 to 150 hours.

17 Q.  And how does that compare to the amount of time you would

18 have normally expected to get from these volunteers?

19 A.  Well, they are all great volunteers, but it was a great

20 deal more time that they spent doing this particular work, and

21 we really appreciated that because it was necessary.

22 Q.  So before SB 1, was this sort of helping your members

23 navigate voting something that TARA had typically done?

24 A.  No.  We had encouraged everyone, of course, to go to

25 register to vote.  A lot of us are deputy voter registrars in

JUDY BRYANT – DIRECT

1 our counties and we do that, but we would just be reminding
2 them to plan to vote by mail and fill out the application and
3 not spend anywhere near this amount of time helping them
4 navigate a new system.
5 Q.  So as you built out this effort to help your members
6 navigate, are there any programs or activities that were
7 negatively impacted?
8 A.  One thing that I can think of, I mentioned the Social
9 Security Fairness Act, we didn't spend as much time getting
10 our members to go and call their Congresspersons and visit
11 them.  Another thing that we have worked on, as I said, is
12 expansion of Medicaid in Texas, and that was something that we
13 definitely had to pull back on a bit.
14 Q.  And who under normal circumstances would have been
15 spearheading these efforts?
16 A.  I would have been.
17 Q.  And would you have relied on anyone else for support in
18 that?
19 A.  Our state president and secretary.
20 Q.  And any other members outside of the executive –– the two
21 executives you just mentioned?
22 A.  Well, chapter presidents to actually carry the message of
23 various things to their members.
24 Q.  Just a couple more questions to wrap this up, ma'am.
25     Are you planning to continue this effort to help your

JUDY BRYANT — CROSS

1  members cast their ballots?

2  A.  Yes.  We will be —— we're planning now the campaign that

3  we'll be doing in January and early February when people can

4  again apply for their mail ballot for 2024.

5  Q.  Now, if I understand correctly, you've already done this

6  once with your members.  They have now cast a ballot under

7  this system.  Why is it that you will continue this

8  educational effort in the future then?

9  A.  Because we still have a great number of people turning 65

10  each year, and so we would have new people who would be

11  eligible to apply for a mail ballot, and also because the

12  process in this situation is still more complicated than

13  people have done in the past, so we want to be able to review

14  it and go over it, and since some people felt frustrated last

15  time and didn't apply for the ballot, and we want to help them

16  perhaps do that by leading them and showing them the way.

17          MR. MOCINE-MCQUEEN:  Thank you, Miss Bryant.

18          I pass the witness.

19          THE COURT:  Anything else on this side?  None.

20          Any cross?

21          MR. BRYANT:  Yes, Your Honor.

22                      CROSS-EXAMINATION

23  BY MR. BRYANT:

24  Q.  Miss Bryant, my name is David Bryant.

25  A.  Oh, okay.  Good morning.

JUDY BRYANT - CROSS

1  Q.  Good morning.  I represent the Secretary of State, the

2  Attorney General of Texas, and as far as I know we're not

3  related, is that your guess as well?

4  A.  Yes, sir.

5  Q.  Although I have lived in Dallas a lot but I don't believe

6  that there's any relationship.

7      Now, you testified first about your organization, TARA,

8  and it was founded in part by the AFL-CIO, is that right?

9  A.  Yes, sir.

10 Q.  And the national organization Alliance for Retired

11 Americans is headquartered in the AFL-CIO building in

12 Washington?

13 A.  Yes, sir.

14 Q.  Who are you actually employed by?

15 A.  The Alliance for Retired Americans.

16 Q.  You are employed by the national organization, not the

17 Texas group?

18 A.  Well, actually my position was a grant that the Texas

19 Alliance on for Retired Americans got and it stipulates, and

20 it's the same grant every year that I sign a contract for,

21 that the Alliance for Retired Americans pays three-fourths of

22 my salary and the Texas Alliance for Retired Americans pays a

23 fourth of my salary every year.  So that was a grant which we

24 received.

25 Q.  And what organization is on your paycheck?

JUDY BRYANT - CROSS

1   A.   The Alliance for Retired Americans.

2   Q.   And TARA, or the Texas Alliance for Retired Americans, has

3   some members who don't pay any dues, is that right?

4   A.   Yes, sir.

5   Q.   Who are those who don't have to pay any dues at all?

6   A.   Well, it's not that they don't have to pay any dues.  Our

7   dues are $10 a year.  It's generally the ones who actually

8   attend or are a part of chapters.  So since we have members

9   that we contact who are all over the state and not

10  necessarily, you know, in a chapter, those would be the people

11  who would not be dues paying members.

12  Q.   And is it fair to say that even the people who do pay dues

13  to TARA, they are just nominal dues?

14  A.   Yes, sir.

15  Q.   Is it correct that there are no paid employees of TARA?

16  A.   Yes, that's correct.  Except myself, but it's not

17  officially of TARA as you just pointed out.

18  Q.   Is it correct that TARA is open to members of all ages,

19  it's not an organization of retirees only?

20  A.   That's correct, sir.  In fact, our motto is "let's not be

21  the last generation to retire," so we have members that are

22  not yet retired because they want to make sure they have a

23  retirement.

24  Q.   Miss Bryant, is it correct that there are no members of

25  TARA that you know of who were unable to vote in 2022 because

JUDY BRYANT — CROSS

1  of anything in SB 1?

2  A.  I don't know of anyone who was unable to vote, but as I

3  said, know of a number of members who had problems and had

4  to — their ballots — their application or ballot was

5  initially rejected and they had to do something about it.

6  Q.  Is it correct that TARA has, for many years, promoted

7  voting by mail?

8  A.  Yes, sir.

9  Q.  That's a — you had campaigns before to encourage your

10  members and your audiences to vote by mail?

11  A.  Yes, that's true.

12  Q.  And I believe in 2020 you had a campaign that was called

13  Step Out of Line for Democracy, is that right?

14  A.  Yes, sir.

15  Q.  And is it true that you've always, as an organization,

16  conducted efforts by social media, direct contact to encourage

17  people to vote by mail in Texas?

18  A.  Yes, we have.

19  Q.  And is it also correct that in 2020 and before you

20  conducted voter education efforts to try to get people to sign

21  their mail ballots the same as they signed everything else so

22  that they would deal with the ID requirements that were in

23  effect at that time?

24  A.  We really didn't do a campaign about that, and most of the

25  time our campaigns have been just simply encouraging people by

JUDY BRYANT — CROSS

1  maybe email or in person at our chapter meetings, not to the

2  extent we did this Step Out of Line for Democracy when that

3  was starting the SB 1.

4  Q.  Okay.  And I understand that it may not have been a

5  campaign, but is it true that TARA always warned people to try

6  to sign the same way and thus comply with the ID requirements

7  for vote by mail that were in effect?

8  A.  Yes.

9  Q.  And you also made efforts in 2022 to encourage people and

10  educate people to comply with the voter ID requirements for

11  vote by mail that were in effect in 2022?

12  A.  We really have not spent that much time about the voter ID

13  requirements.  We were mainly concerned about the numbers that

14  had to be placed on the application and on the ballot flap,

15  so...

16  Q.  Do you understand that those number requirements are part

17  of voter ID requirement in Texas law?

18  A.  Yes.

19  Q.  In other words, it's identifying the voter who is voting

20  by mail?

21  A.  Yes.

22  Q.  So, to that extent, in 2022 you are doing the same kind of

23  thing that you were in 2020, namely educating and encouraging

24  your members and your audiences to comply with the applicable

25  voter ID requirements?

1  A.  Yes.

2  Q.  You testified earlier about Section 7.04 of SB 1 and that

3  TARA has made a decision not to set up tabling events after

4  around the 1st of October to — because of fear of

5  inadvertently violating Section 7.04, is that right?

6  A.  Yes, that's right.

7  Q.  Did TARA consider simply asking people who came up to the

8  table whether they had mail-in ballots present, and if so, to

9  put them away?

10  A.  No, sir.  I wouldn't have considered that.

11  Q.  You testified about efforts that were made in 2022 to

12  educate people on how to comply with the number requirements

13  for voter ID on mail-in ballots.  About how many people did

14  the work on that for TARA, including not only yourself but

15  volunteers?

16  A.  When you said "2022," we actually started this in 2021

17  after SB 1 was passed.

18  Q.  Okay.  And I did not ——

19  A.  Summer of 2021, really, so...

20  Q.  I did not mean to limit it.

21  A.  Okay.

22  Q.  You gave us a number of you estimated about 125 hours.

23  Did that include all the work in 2021 and 2022?

24  A.  No.  I was only speaking of the main campaign that we

25  started out so that people when they applied —— in 2021, so

JUDY BRYANT - CROSS

1  that when they applied for a mail ballot in 2022, and then

2  voted, that they would understand and help them navigate the

3  system.  So, once again, I said between 125 and 150 hours.

4  And this was probably spread among about ten people with

5  chapter presidents and our state officers.

6  Q.  Okay.  So that if assuming it were 150 we might be talking

7  about 15 hours a person?

8  A.  Possibly, yes.

9  Q.  And that's over '20, '21, and 2022?

10  A.  No.  This campaign was — this was in about a three-month

11  period where we put this campaign together so that we could

12  carry it out.

13  Q.  What was that three-month period approximately?

14  A.  Probably June, July, August of 2021, after SB 1 was, you

15  know, passed, so that when it became law and we — in 2022

16  when people would have to follow these procedures we wanted to

17  make certain people could navigate that system.

18  Q.  I believe you testified that as a result of the efforts

19  that you made at TARA relating to the voter ID requirements

20  for the mail-in ballots under SB 1, that TARA didn't have as

21  much time to get people to call their representatives or

22  contact their representatives regarding Medicaid issues, is

23  that right?

24  A.  Yes, regarding Medicaid expansion in Texas.

25  Q.  Yes.  And I think you said that because of those

JUDY BRYANT - CROSS

1  provisions of SB 1 TARA had to pull back a bit on its efforts

2  it otherwise would have made, is that right?

3  A.  Yes, that's correct.

4  Q.  But those efforts did continue, just in a diminished

5  manner?

6  A.  Yes, they continued.  That's exactly correct.

7  Q.  Okay.  And you also, I believe, my notes indicate that you

8  said that the efforts to deal with vote-by-mail provisions of

9  SB 1 on the part of TARA also caused TARA to cut back some on

10  their efforts to have people call representatives regarding

11  social security issues, is that right?

12  A.  Yes.

13  Q.  Okay.  Were there any other identifiable effects of TARA's

14  efforts to educate its members regarding the voter ID

15  provisions of SB 1 dealing with vote by mail or any other

16  provisions of SB 1?

17  A.  So would you restate that question, please?

18  Q.  I'll be happy to.  You mentioned that TARA had to cut back

19  on its efforts a little bit on Medicaid expansion and on

20  social security.  Were there any other efforts that TARA had

21  to cut back on or eliminate because of its efforts to educate

22  and deal with the provisions of SB 1?

23  A.  One thing at that time that we did cut back on were

24  efforts about pension and COLAs, cost of living adjustment, we

25  had to cut back on those things at that time because we also

JUDY BRYANT – CROSS

1   work with other groups to get those provisions passed and
2   luckily we did in this last legislature.
3   Q.  Okay.  Can you think of anything else besides those you've
4   already mentioned?
5   A.  Oh, each chapter also has some local issues and local
6   candidates that they can support and recommend for endorsement
7   to the executive board, and I –– we didn't have as much action
8   in those areas, so each –– because each chapter is free to do
9   certain things that just apply to them locally and they work
10  with me if necessary.
11  Q.  Miss Bryant, is it correct that in 2020 TARA was a
12  plaintiff in a lawsuit to invalidate straight-ticket voting
13  prohibitions in Texas?
14  A.  Yes.
15  Q.  And in that lawsuit, ultimately the Fifth Circuit ruled
16  against TARA and other plaintiffs in that case?
17  A.  Yes, that's true.
18          MR. MOCINE-MCQUEEN:  Objection, Your Honor.
19  Relevance.
20          THE COURT:  What is the relevance?
21          MR. MOCINE-MCQUEEN:  Your Honor, there is a claim,
22  there claims in this case, not by TARA, but by other
23  plaintiffs challenging straight-ticket voting, and I just
24  wanted to make the history of, number one, the fact that that
25  prohibition was in the law prior to SB 1 and the prior

JUDY BRYANT - CROSS

1  judicial challenge and its results.

2         THE COURT:  That's overruled.

3         You can continue.

4         MR. BRYANT:  Okay.

5  BY MR. BRYANT:

6  Q.  Is it correct that in Case Number 20-40643, ultimately

7  Fifth Circuit reversed a preliminary injunction that TARA and

8  other plaintiffs had obtained regarding the prohibition of

9  straight-ticket voting in Texas?

10 A.  Yes.

11 Q.  And is it correct that the Southern District of Texas

12 dismissed the lawsuit by TARA and other plaintiffs challenging

13 the prohibition on straight-ticket voting in Texas in 2022?

14 A.  Yes.

15         MR. BRYANT:  Pass the witness.

16         THE COURT:  Anything further on this side?

17 BY MR. LIU:

18 Q.  Cory Liu with the Harris County District Attorney's

19 Office?

20 A.  I'm sorry.  I didn't hear, what district attorney?

21 Q.  Harris County.

22 A.  Okay.  Thank you.

23 Q.  Could you just state one more time, I want to make sure I

24 heard you correctly, about the in-person, the tabling and why

25 you stopped?

JUDY BRYANT - CROSS

1  A.  You mean why we would stop before?

2  Q.  After the law.

3  A.  After the law?  Because of the provision in the law that

4  if you're actually passing out information when someone has a

5  ballot, then we could have a problem, be in trouble about

6  that.

7  Q.  So is that based on your understanding that even if it was

8  an accident, you didn't know that person had a ballot, that it

9  would still be illegal under the law?

10  A.  Yes.

11         MR. MOCINE-MCQUEEN:  Objection, Your Honor.  This

12  calls for a legal conclusion.

13         THE COURT:  That's overruled.

14         Do you need the question repeated, ma'am?

15         THE WITNESS:  Yes.

16  BY MR. LIU:

17  Q.  So is your stopping the tabling, as you've described, a

18  result of your understanding that even if you were talking to

19  someone, or if you were talking to someone and they had a

20  ballot but you didn't know, that that would still be illegal?

21  A.  Yes.  That's my understanding but I'm not a legal expert.

22  Q.  In coming to that understanding, is that a result of any

23  statement by any law enforcement official that you've heard

24  of?

25  A.  No, but we have some retired attorneys that are members of

JUDY BRYANT – REDIRECT

1  TARA and they just made us aware that that would be a good

2  idea not to do that, so we would not run any risk of talking

3  with someone who might have a ballot in their backpack, or

4  purse, or whatever.  I mean probably their purse or briefcase.

5  Q.  So, to make sure I heard you correctly, that that's not

6  the result of any statement from a law enforcement official,

7  is that right?

8  A.  Correct.

9  Q.  And you're not aware of any investigations into any

10 alleged violations of SB 1's criminal provisions, are you?

11 A.  No.

12 Q.  And you are not aware of any prosecutions that have

13 occurred under SB 1, is that right?

14 A.  That's correct.

15        MR. LIU:  Thank you.  No further questions.

16        THE COURT:  Any redirect?

17        MR. BRYANT:  Yes, Your Honor, just a few quick

18 questions.

19                    REDIRECT EXAMINATION

20 BY MR. MOCINE-MCQUEEN:

21 Q.  Miss Bryant, just a few quick questions here.  First of

22 all, I just wanted to confirm, do you receive some of your

23 salary from TARA?

24 A.  Yes, a fourth of my annual salary is paid yearly by TARA.

25 Q.  And do you receive any other sort of reimbursements or any

JUDY BRYANT — REDIRECT

1  other benefits from TARA itself?

2  A.  My expenses for travel are reimbursed by TARA.

3  Q.  Okay.  And I want to clarify a few questions about the

4  campaign before SB 1 and then following SB 1.  Are there ways

5  in which the campaign you ran after SB 1 was different than

6  your communications with your members before SB 1?

7  A.  Yes.  That campaign was much more extensive than anything

8  we had done before about voting.

9  Q.  When you say "more extensive," can you tell me a little

10  bit more about that?

11  A.  Well, just like the simple things that I mentioned that we

12  did, we had never gone into such detail with having the

13  emails, the social media things like memes, we had not

14  previously done webinars.  Of course, we've just been able to

15  do that during COVID when folks learned about doing that, how

16  to do webinars and things, so, but that did take a lot more

17  time.

18  Q.  And before SB 1 how many communications might you have

19  made with your members about applying for an absentee ballot?

20  A.  Maybe one or two in January when they are eligible to

21  apply.  We would put it on our website, we would have our

22  chapters remind people to do that, and a lot of times have

23  applications for a mail ballot available at meetings for

24  people to take and complete and return.

25  Q.  And how many people would have been involved in preparing

JUDY BRYANT − REDIRECT

1  an email, that email before SB 1?

2  A.  Probably just two, the president and myself.

3  Q.  Okay.  And I want to confirm, you talked about the kind of

4  peak period of work that you put in to creating the Step Out

5  of Line campaign and your efforts to help your members

6  navigate, after that peak period, were there any additional

7  time spent between that peak period and the election?

8  A.  Yes, from reminder emails and again posting things, that

9  was the first time, and then we're planning to do that again

10  in January and early February in 2024.

11  Q.  And do you anticipate you'll have to continue this after

12  2024?

13  A.  Yes, because we had be adding new voters each year.

14  Q.  And with this being a continuing process, do you

15  anticipate that it will continue to have impact on your

16  efforts around things like COLA, Medicaid, Medicare, social

17  security, WEP, and GPO?

18  A.  Yes.

19  Q.  And what kind of impact will that have?

20  A.  Of just taking, especially since I'm the field organizer,

21  taking my time away to do those things with the president, and

22  sometimes with executive board which meets monthly, but I know

23  we'll be spending more time on those things than normal.

24  Q.  And I think I just have one last question, Miss Bryant.

25      In terms of whether you would ask someone if they had a

JUDY BRYANT — REDIRECT

1  ballot, you answered you had not considered that.  Why not?

2  A.  Because I don't think that would be appropriate to ask

3  someone if they have a ballot.  I think it's really none — I

4  would be invading their privacy, none of my business.

5      And when you're tabling you only have, you know, a minute

6  or so to actually talk with someone, and if you asked them

7  that question, that would turn them off, I would think, and

8  also take up time to give them a flyer about whatever issue

9  you are campaigning on, which this time it would be about the

10  COLA.

11      And as I was doing a presentation at a meeting or

12  whatever, same thing.  I think if I said if you have a mail

13  ballot would you please step out, and you know, I can't talk

14  anymore or whatever, I just think that is each person's

15  private business and not for me to ask a question about.

16  Q.  And what do you think would be the result, if you were to

17  ask that question at a meeting?

18          MR. BRYANT:  Objection.  Calls for speculation.

19          THE COURT:  Rephrase your question.

20  BY MR. MOCINE-MCQUEEN:

21  Q.  Why are you concerned about asking that question at a

22  meeting?

23  A.  Because I feel like if I, representing TARA, asked that,

24  that that would probably cause us to never be invited back to

25  that group and would just not be a good thing for TARA, in

ELAINE JONES — DIRECT

1  general, and that's something I'm always concerned about is

2  promoting the integrity of our organization.

3          MR. MOCINE—MCQUEEN:  No further questions, Your

4  Honor.

5          THE COURT:  Anything else?

6          Anything on this side?

7          MR. BRYANT:  No, Your Honor.

8          MR. LIU:  No, Your Honor.

9          THE COURT:  Thank you, ma'am.  You can step down.

10         THE WITNESS:  Thank you, sir.

11         THE COURT:  Your next witness.

12         MR. MOCINE—MCQUEEN:  Your Honor, we next call Miss

13  Elaine Jones.  While she's approaching the stand, Miss Jones

14  will be testifying with regards to Section 5.08.

15    (ELAINE JONES, having been duly sworn, testified as

16  follows:)

17                    DIRECT EXAMINATION

18  BY MR. MOCINE—MCQUEEN:

19  Q.  And, once again, I'm Marcos Mocine—McQueen with the Elias

20  Law Group on behalf of LULAC plaintiffs.

21     Good morning.

22  A.  Good morning.

23  Q.  Would you please state your full name for the record?

24  A.  Elaine Irene Jones.

25  Q.  And, Miss Jones, in what county do you live?

ELAINE JONES - DIRECT

1  A.  I live in San Patricio.

2  Q.  And how long have you lived in Texas?

3  A.  All my life.

4  Q.  And, pardon me for asking, Miss Jones, but how old are

5  you?

6  A.  Eighty.

7  Q.  Do you currently belong to any membership organizations?

8  A.  Yes.  I belong to two, Texas State Teachers Association,

9  the Retiree Plus group, and Texas Association for Retired

10 Americans.

11 Q.  And when you say — when you refer to the Texas Teachers

12 Association, are you referring to AFT?

13 A.  Yes.

14 Q.  Is that Texas AFT?

15 A.  Yes.

16 Q.  And how long have you been a member of Texas AFT?

17 A.  I joined Texas AFT, I do not remember the date but it

18 would be some time in the early '90s, and I remained a member

19 the rest of my life.

20 Q.  And why did you choose to join Texas AFT?

21 A.  Well, when I first started teaching at this particular

22 school I changed school districts and I started teaching at

23 this particular school, there was a representative from Texas

24 AFT that everybody went to for advice, for help, and what to

25 do about this, what to do about that, how to vote, and things

ELAINE JONES - DIRECT

1  like that, and I just sat there and watched for about a year

2  or so and I thought, I don't like depending on one person to

3  give me all this information, I want to be on the inside of it

4  finding out about the information, taking votes on decisions

5  and so on.

6      So I wanted to be more active than just somebody that

7  listened to somebody else that did all the work, so I joined

8  so I could become more active.

9  Q.  Can you describe some of the — not in terrific detail,

10 but just at a high level describe some of the issues that drew

11 your attention?

12 A.  Well, things like classroom size.  I can't pretend and

13 avoid mentioning salary, but classroom size, salary, there

14 were so many things that happened in our classroom that wasn't

15 decided and I wanted to start voting for the right people and

16 so the school board made decisions about what happened in our

17 classroom, the State legislature made decisions, and even

18 Congress made some decisions that affected us and I wanted to

19 be able to help vote in the people that were favorable for

20 public education and public teachers and other employees in

21 public schools, so I wanted to help.

22 Q.  And shifting a little bit, how long have you been a member

23 of TARA, and to make sure we're clear, when I say "TARA," I"m

24 referring to the Texas Alliance of Retired Americans?

25 A.  Yes.  I was an original founding member in 2006.

ELAINE JONES - DIRECT

1  Q.  And why did you join TARA?

2  A.  Okay.  I was already a member of one retiree group, but

3  the Texas AFT retiree group covered a number of topics, not

4  just for retired teachers, but there was something we felt

5  needed to be done in the regular classroom, we covered that

6  too.

7      For TARA, we covered just the issues of pensions across

8  the board for everybody, not just for us, but the idea of we

9  want our grandchildren to still have pensions.  We wanted

10  pensions to be around, social security and Medicare.  Those

11  three issues were the main focus of TARA at the time.

12  Q.  And can you tell us a little bit about your professional

13  career before you retired?

14  A.  Yeah.  When I started teaching, I was teaching English for

15  many years.  The -- in 1978 I taught a basic programming class

16  in little Robstown High School.  I don't know how many of you

17  are familiar with Robstown, but it's a very small town in

18  Texas.

19      And that's 1978.  We had our first computer.  It had 4K

20  memory and we had cassette tapes for recording and we were

21  just terribly excited over that.  And I got permission from

22  TEA to teach a basic programming class, so at one time

23  Robstown was the only school district in the state of Texas

24  that had a computer class and so we were a pilot program.

25      And so they later on adopted a similar program, but so

ELAINE JONES – DIRECT

1  I've been working with computers since 1978 and I've stayed

2  up-to-date as much as possible since then.

3  Q.  And outside of teaching at the high school level, have you

4  taught in any other environments?

5  A.  Yeah.  My last 11 years of teaching I taught advanced

6  academic honors computer programming and C++ programming,

7  which you may have never heard of but it was advanced at the

8  time C++ programming.

9      I was also, for the last something like ten or 11 years, I

10  was teaching night school at the local junior college and I

11  was taking computer science classes there as well.

12  Q.  Since retiring from teaching have you done any additional

13  employment work?

14  A.  Yes.  In 2018 I happened to volunteer for a campaign

15  manager.  Usually I volunteered for the Democratic party.

16  This particular time, because of some encouragement, I

17  volunteered for a particular campaign manager and we ——

18      *(Cell phone interruption)*

19      I hope that's not me.

20      —— we end up —— it is me.

21      I did not set a 10:00 a.m. alarm.  I promise.  This is

22  entirely ghost work.

23      Okay.  So I started working for him full time at the end

24  of 218.  So since 2018, during campaign seasons, I have worked

25  for —— I'm doing campaign work of various kinds.

ELAINE JONES – DIRECT

1   Q.  And, Miss Jones, are you registered to vote in Texas?

2   A.  Yes, I am.

3   Q.  And how long have you been registered to vote in Texas?

4   A.  Again, I can't give you the year but I came from a family

5   that believed in voting, so whether it was my

6   eighteenth birthday or my twenty-seventh birthday, I don't

7   remember which, but whenever it was my birthday I was there to

8   register and been voting ever sense.

9   Q.  So would you say that was more than ten years ago?

10  A.  At least.

11  Q.  Roughly how long ago would you say?

12  A.  Sixty years probably.

13  Q.  Would you say you're a regular voter?

14  A.  Yes.

15  Q.  And is it important to you to vote?

16  A.  It is very important to me because, as I alluded to a

17  while ago, as teachers we had an expression that we got to

18  elect our bosses.  Not very many people are in that position

19  but the school board members made so many decisions that

20  affect us and legislature and Congress, and I mean like I

21  believe I mentioned class size, but today we're even being

22  told what books we can teach and what topics we can teach and

23  electing what we consider to be the proper people is a

24  continuing concern of mine.

25  Q.  Okay.  I want to shift and to talk a little bit about your

ELAINE JONES - DIRECT

1   more recent voting experiences and in particular I'd like to

2   talk about the elections immediately leading up to the

3   enactment of SB 1, so we'll talk about the general elections

4   in 2016, 2018, and 2020.  Did you vote in those elections?

5   A.  I did.

6   Q.  And by what method did you cast your ballot?

7   A.  I voted by mail.

8   Q.  And what was that experience like for you?

9   A.  Very plain.  Very ordinary.  No problems.

10  Q.  And why did you choose to cast your ballot by mail?

11  A.  Well, one of the reasons that appealed to me was just

12  simply the weather in Texas.  Sometimes it's unbearably hot to

13  stand in line to — and our voting centers keep getting kicked

14  back so the lines are longer, but my main concern was starting

15  in 2018 I was working full time during the campaign, during

16  the very time that we would be voting.

17      So for several months before I would be working seven days

18  a week, ten hours a day.  So to take off time for voting I

19  would be losing time from work.

20  Q.  And would you be paid for the time that you —

21  A.  No, I would not.

22  Q.  And how far from your workplace is your polling place?

23  A.  Okay.  I mentioned that I live in San Patricio County.  My

24  campaign work is in Nueces County.  Now, from one campaign to

25  another, our office space, of course, will move around a

ELAINE JONES – DIRECT

1  little bit, but in general my house is 25 to 30 miles away

2  from where my workplace would be.

3  Q.  Okay.  I want to shift a little bit now and talk about

4  your voting experiences after –– or actually, before we do

5  that, one more question.  You said that you would work the

6  days leading up to the election.  How about Election Day?

7  A.  Election Day I was still assigned to work, all day.

8  Q.  So now I'll shift a little bit to the experience after SB

9  1 was enacted.  Are you familiar with the Section a 5.08, and

10  I'll explain, this is the provision of SB 1 which requires

11  people voting by mail to include either their driver's license

12  number ––

13  A.  I'm familiar with that, yes.

14  Q.  –– or social security under the flap of their mail ballot

15  envelope?

16  A.  Yes.

17  Q.  And why is it that you are familiar with this provision?

18  A.  During the legislative session we became aware of the fact

19  that this number regulation, knowing the number that you are

20  supposed to vote with, we became aware of that fact while it

21  was being discussed in the legislature.

22      We did a little campaigning, don't vote for this, so on

23  and so forth, but we were following it before it was ever

24  adopted.  So when it was finally adopted, when it was passed,

25  we then started campaigning with our members to educate them

1   about this situation.

2   Q.  And who is the "we" that you are referring to there?

3   A.  TARA.

4   Q.  And did you take any part in this?

5   A.  Yes.  I viewed webinars, but the webinars contained

6   PowerPoints and which we could download.  So we would use the

7   PowerPoints to send out.  So I had groups of people that I

8   sent out the PowerPoints to.  I texted links to the PowerPoint

9   to them and I even presented in person the PowerPoints to two

10  different groups.  So I communicated in every way possible.

11  Q.  And in 2022 did you submit an absentee ballot application?

12  A.  Yes, I did.

13  Q.  And when you submitted that application, did it require

14  you to include an identification number on the application?

15  A.  Yes, it did.

16  Q.  And did you do so?

17  A.  Yes.

18  Q.  After receiving your ballot did you submit your absentee

19  ballot, did you return it in that election?

20  A.  I did return it.

21  Q.  And did you run into any trouble in that process?

22  A.  I did.  Again, I'm sorry that I don't remember dates all

23  the way through, but I do remember that on a Wednesday I

24  received in the mail notification that my ballot had been

25  rejected, and to refresh memories, that means I was working

ELAINE JONES - DIRECT

1  all that day.  So I got home, you know, at 8:00 or so, and so

2  I just got the notification very late Wednesday.

3  Q.  And what did that notification tell you?

4  A.  Told me I had forgotten about the numbers.

5  Q.  And what was your reaction to learning that?

6  A.  Humiliated, angry, embarrassed, because I had -- it had

7  been such a focus of mine for weeks and months to notify and

8  for somehow for me to neglect that, it was humiliating.

9  Q.  And if you did successfully fill out the application, why

10 was it that you had this difficulty when you were completing

11 your actual ballot?

12 A.  I went down the ballot from the top to the bottom and I

13 folded it and mailed it off.  I forgot about the numbers being

14 under the flap.

15 Q.  Okay.  And do you think it's possible that you'll make

16 this mistake again in the future?

17 A.  Well, I would have said it was impossible for me to make

18 the mistake the first time, so I'm very hesitant to say that

19 it's impossible for me to make the mistake again.  I can be

20 distracted or whatever, but it's just another hurdle.

21 Q.  So when you found out your ballot was flagged for possible

22 rejection, what steps did you take?

23 A.  Well, when you receive a notification they have a listing

24 of possible ways of what they call curing or correcting your

25 ballot, and the first one on there was using the State's URL

ELAINE JONES - DIRECT

1  to correct it.  And I thought, I'm not scared of computers,

2  I'm going to use the computer system, why not?

3      Now, remember, I received it Wednesday and got home, you

4  know, 8:00, so I'm, you know, later at night that I'm doing

5  this.  So I did it.  Filled out all the forms, thought this is

6  nice.  And then I get at the end and there's a button and I

7  don't remember if it said submit or continue or what it says,

8  but, in other words, it's the final button and you click the

9  button and it says page not found.

10      So I'm willing to take the burden on myself and say, oh, I

11  did something wrong, so I tried it again.  Same thing.  Tried

12  it a third time.  Same thing.

13      So I decided, okay, they were not prepared for the number

14  of people that were using it so I'll give them a break that

15  they just weren't prepared.  And so the next day, remember I'm

16  working a full day the next day, so I get home, and I once

17  again try three times.  Three seems to be my magic number.  I

18  tried three times and I keep getting page not found.

19      So I'm left with on Friday, I'm worried about getting it

20  there on Monday.  So Friday, I don't go into work.  I stay at

21  home.  I fill out the paper form.  I go to the Post office.

22  Post office says, we can't guarantee we can get it there

23  Monday, you know.

24      Well, the second option was for me to travel personally to

25  the county seat.  That's another 30 miles.  So I'm in my town.

ELAINE JONES - DIRECT

1  The county seat is 30 miles that way.  Where I work is, you

2  know, 25, 30 miles that way, and I keep thinking of there and

3  back and there -- apologize -- going around and I'm going

4  that's a whole lot of time.

5      So I said, okay.  I'm going to go over to FedEx.  FedEx

6  could guarantee they could get it there by Monday and I

7  decided to do that and I spent $12.50 so I had that piece of

8  mind that it was going to get there in time.

9  Q.  And I just want to make sure I understand the timing of

10 this.  When you say you got it on Wednesday, what Wednesday

11 that was in relationship to Election Day?

12 A.  Okay.  It was the week before Election Day.

13 Q.  Okay.

14      MR. MOCINE-MCQUEEN:  I think that's it for me for

15 now, Miss Bryant.

16      I pass the witness.

17      THE COURT:  Anything else?

18      MR. MOCINE-MCQUEEN:  I'm sorry.  Miss Jones; I

19 apologize.

20      THE WITNESS:  Okay.

21      THE COURT:  Anything else on this side?

22      Any cross?

23      MR. BERG:  Yes, Your Honor.

24      Zachary Berg from the Office of the Attorney General

25 on behalf of the Attorney General and the Secretary of State.

ELAINE JONES — DIRECT

1  BY MR. BERG:

2  Q.  Good morning, Miss Jones.  Good to see you.

3  A.  Good morning.

4  Q.  You look well.

5  A.  So do you.

6  Q.  Thank you; that's very kind.

7      You testified that you're a member of AFT, correct?

8  A.  Yes.

9  Q.  And you're a member of TARA, correct?

10 A.  Yes.

11 Q.  And you live in and are registered to vote in Portland,

12 Texas, correct?

13 A.  Yes.

14 Q.  And you mentioned that's in San Patricio County, correct?

15 A.  Yes.

16 Q.  And if I represented to you that in July 2022 the Census

17 Bureau estimated San Patricio's population to be just under

18 70,000, would that sound about right?

19 A.  I'm not going to disagree with you.  You're looking at it;

20 I'm not.

21 Q.  You are eligible to vote by mail on the basis of being 65

22 or older, correct?

23 A.  Yes.

24 Q.  And you're not aware of any other basis on which you would

25 be eligible to vote by mail?

ELAINE JONES - DIRECT

1  A.  No.

2  Q.  And you've been voting by mail since 2016, correct?

3  A.  Yes.  To the best of my recollection, yes.

4  Q.  And we appreciate you coming up to San Antonio to see us.

5  Did you drive up?

6  A.  Yes.

7  Q.  And you have no disability that would prevent you from

8  voting in person, correct?

9  A.  No disability yet.  There's time ahead.

10 Q.  But you prefer mail ballot voting, correct?

11 A.  Yes.

12 Q.  You were involved in AFT's voter education efforts,

13 correct?

14 A.  Yes.

15 Q.  And one of those things you educated voters on was how to

16 fill out an application for ballot by mail, correct?

17 A.  Definitely.

18 Q.  And during those trainings you emphasized the part of the

19 application that people forget to fill out, correct?

20 A.  Yes, I did.

21 Q.  You would agree that you understand mail ballots fairly

22 well?

23 A.  I would agree at this moment, yes.

24 Q.  You also did voter education for TARA, correct?

25 A.  Yes.

ELAINE JONES – DIRECT

1  Q.  And that voter education was similar to the education you

2  did for AFT, correct?

3  A.  Yes.

4  Q.  And that would also include doing voter education for TARA

5  on SB 1, right?

6  A.  Yes.

7  Q.  And that voter education also dealt with mail ballot

8  voting, correct?

9  A.  Yes, sir.

10 Q.  And areas a voter might get confused, right?

11 A.  Yes.

12 Q.  Your chapter of TARA also put on webinars on voting,

13 correct?

14 A.  Yes.

15 Q.  And you weren't the main speaker but you prepared those

16 speaking on SB 1 and voting?

17 A.  Well, there were two instances in which I was the speaker

18 making the presentation, but all the rest of the times the

19 ones online I was just a participant.

20 Q.  And sometimes when you were just a participant you would

21 help prepare those speaking on SB 1 and mail ballot voting?

22 A.  To some extent, yes.

23 Q.  You also met with other women's organizations you were a

24 part of and discussed SB 1, correct?

25 A.  Women's organizations?  Like what?

ELAINE JONES - DIRECT

1  Q.  League of Women Voters.

2  A.  I wasn't a member but I certainly would read their

3  publications.  I joined League of Women Voters just a few

4  weeks ago.

5  Q.  Okay.  But did you meet with them and discuss SB 1?

6  A.  I cannot honestly say that I met with them.  Like I said,

7  I read their publications, but I don't remember meeting with

8  them, no.

9  Q.  Would it be helpful to look over your deposition testimony

10 to refresh your recollection?

11 A.  If you have some sort of written documentation, I'm not

12 going to disagree with you.  But what do you have?  A sign in

13 sheet or something?

14         THE COURT:  Is this important?

15         MR. BERG:  No, I'll move on, Your Honor.

16 BY MR. BERG:

17 Q.  And you also testified that you worked for Campaign

18 Services, LLC, correct?

19 A.  Yes.

20 Q.  And as part of that job you emailed out information on how

21 to vote by mail under SB 1, correct?

22 A.  Yes, sir.

23 Q.  So you would agree with me that at the time you filled out

24 your ballot, mail ballot for the March 2022 Primary, you were

25 aware of the ID requirement?

ELAINE JONES - DIRECT

1  A.  Oh, certainly.

2  Q.  And, in fact, you educated others on the ID requirement,

3  correct?

4  A.  Certainly.

5  Q.  I believe when you were speaking with counsel you

6  testified that when you filled out your application for ballot

7  by mail in 2022, you did put down your ID numbers, correct?

8  A.  Yes.

9  Q.  But your application was initially rejected anyway,

10  correct?

11  A.  Yes, it was.

12  Q.  And when you were filling out the application, you were

13  particularly focused on making sure you didn't forget your

14  signature, right?

15  A.  Yes.

16  Q.  And because you were so focused on that, you forgot to

17  indicate that you were eligible to vote by mail on the basis

18  of being 65 or older?

19  A.  Yes.  I didn't consider that had anything to do with our

20  process here since it's not number oriented, but, yes, you're

21  right.

22  Q.  And after you found out your application had been

23  rejected, you drove a replacement application to the elections

24  office, correct?

25  A.  For that particular one, I honestly don't remember how I

ELAINE JONES — DIRECT

1  corrected.  I think I probably drove it, but that was earlier
2  in the campaign and I didn't feel like I was being neglectful
3  of my job at the time.
4  Q.  If you don't remember driving, would you like me to bring
5  up the deposition to refresh your recollection?
6  A.  I do not remember how I corrected that particular problem,
7  don't remember at all, but —
8  Q.  Brian, would you please bring up Miss Jones' deposition.
9  Thank you.
10 A.  Oh, okay.
11 Q.  Would you just review?
12 A.  Okay.  I see it.  Yeah; I'm refreshed.
13 Q.  Let me ask that question again.  So after you found out
14 your application had been rejected, you drove a replacement
15 application to the elections office, correct?
16 A.  Yes.  Drove it to the window so they would approve.  I do
17 remember that now.
18 Q.  And they accepted your application?
19 A.  Yes.
20 Q.  And I believe you also testified that they were very fine
21 people, right?
22 A.  Yes.  At the time.
23 Q.  Now, the signature requirement was not created by SB 1,
24 correct?
25 A.  Say again.

ELAINE JONES - DIRECT

1  Q.  The signature requirements for the application by ballot

2  by mail that you were focused on wasn't created by SB 1,

3  correct?

4  A.  Right.

5  Q.  And the box on the application to indicate your reason for

6  voting by mail, that you inadvertently forgot --

7  A.  Right.  I was concentrating on the numbers.

8  Q.  So the box to indicate your reason, that wasn't

9  implemented by SB 1, correct?

10  A.  I don't believe it was.  I think it's always been there.

11  Q.  Would you agree that sometimes people just forget to fill

12  out part of the ballot?

13  A.  Obviously.  I'm a case in point.

14  Q.  Let's talk about the March 2022 ballot, primary ballot.

15  You testified that you did not put the ID numbers on your

16  ballot, correct?

17  A.  Yes.

18  Q.  And I believe you also testified that you were aware that

19  the ID numbers had to go under the flap of the carrier

20  envelope, correct?

21  A.  I was aware of it moments before I needed to do it.

22  Q.  And you've already testified today that you were upset

23  when you found out why it had been rejected, correct?

24  A.  Right.

25  Q.  And when we met previously I believe you said you pounded

1  yourself on the head, correct, and you did the motion, right?

2  A.  Quite likely, yes.

3  Q.  And the reason you were upset was because you were aware

4  of the ID requirement?

5  A.  Of course.

6  Q.  And you were aware of the ID requirement because of all

7  the trainings you had done for AFT and TARA, right?

8  A.  Yes.

9  Q.  And the county sent you a replacement ballot that you

10  could have filed and mailed in, correct?

11  A.  Yes, if I felt safe with the amount of time.

12  Q.  But you instead tried to use the Ballot Tracker and were

13  unsuccessful?

14  A.  Yes.  Not the Ballot Tracker, the ballot correction.

15  Q.  Ballot correction.  And when your application for ballot

16  by mail was rejected, you drove the replacement to the

17  elections office, correct?

18  A.  Which one are you talking about now?

19  Q.  The application.

20  A.  Yeah, the application, yes.  Yes, because that was earlier

21  in the campaign.

22  Q.  So, theoretically, you could have gone to either carry

23  your ballot in person or vote in person, correct?

24  A.  Theoretically, yes, but my duties at my job had changed

25  from that moment to, you know, the original time to the time

1805

ELAINE JONES - DIRECT

1  of the actual ballot, the amount of jobs I had to perform and

2  people I was responsible for had changed so I was feeling a

3  little more duty-bound to my office.

4  Q.  So you testified that you received the notice of rejection

5  on the Wednesday and you had to have your replacement ballot

6  in by the next Monday, is that right?

7  A.  Yes, it was my imposed deadline.

8  Q.  And I believe you testified that you were working some of

9  the days in between that Wednesday and that Monday, right?

10 A.  Yeah, I was working seven days a week by that point.

11 Q.  Are you aware that the election code guarantees voters two

12 hours off work, either on Election Day, or while early voting

13 is in progress?

14 A.  I was aware of that, but that was something that we took

15 advantage of in situations like being teachers and so on, and

16 not so much with myself as a contract laborer.  It never

17 crossed my mind at that time.  I felt like I was in a

18 different employment world than as was in at other times.

19 Q.  So would it be fair to say that you were aware of that in

20 the election code but you didn't feel comfortable doing it?

21 A.  It was not in my mind at all during that time.  I knew

22 historically, yes, but it was not in my mind at that time so

23 it's not something I chose to ignore.  Just never thought of

24 it.

25 Q.  Your ballot for the March 2022 Primary arrived on time to

ELAINE JONES — DIRECT

1  be counted, correct?

2  A.  Yes.

3  Q.  And you know that because you tracked it on the Secretary

4  of State's Ballot Tracker, correct?

5  A.  Yes.  And I did have a little trouble with that but it

6  took a little longer and I did found out that, yes, my ballot

7  had been counted.  Wasn't as quick an acknowledgment as I

8  would have wished for.

9  Q.  But you were able to figure out —

10  A.  Yes.

11  Q.  — because of your experience with computers?

12  A.  Yes.  Yes.  I learned to be patient.

13  Q.  So your Primary vote was counted, right, and then you

14  voted by mail in the May 7th, 2022 Constitutional Election,

15  right?

16  A.  Yes.

17  Q.  And that ballot was accepted, correct?

18  A.  Yes.

19  Q.  You also voted by mail ballot for the May 24th, 2022

20  Run-off Election, correct?

21  A.  Yes.

22  Q.  And that ballot was also accepted?

23  A.  Yes.  I only trip up once in a while, but I can trip up

24  again.

25  Q.  You voted by mail ballot in the November 2022 General?

ELAINE JONES — DIRECT

1  A.  I did.

2  Q.  And that ballot was accepted, right?

3  A.  It was.

4  Q.  You also have voted by mail ballot in 2023, right?

5  A.  2023?  What, March, or —

6  Q.  Let me clarify.

7  A.  Yeah; let's clarify.

8  Q.  You voted by mail ballot in the May 6, 2023 city council

9  and school board bond election, correct?

10  A.  Yes.

11  Q.  And that ballot was accepted, right?

12  A.  Yes.

13  Q.  Miss Jones, you have not been criminally charged with

14  violating SB 1, correct?

15  A.  No.

16  Q.  And you have not been assessed a civil penalty for

17  violating SB 1, correct?

18  A.  I have not.

19          MR. BERG:  Thank you for your time.

20          Pass the witness.

21          THE COURT:  Anything else on this side?

22          MR. LIU:  No questions.

23          THE COURT:  Any further redirect?

24          MR. MOCINE-MCQUEEN:  No, Your Honor.  Thank you.

25          THE COURT:  Miss Jones, you may step down.  Thank

ALICE PENROD – DIRECT

1    you, ma'am.

2            Let's take a 10- or 15-minute break.

3        *(Recess)*

4            THE COURT:  Your next witness.

5            MISS LORENZO:  LULAC plaintiffs call Alice Penrod to

6    the stand.  Miss Penrod is here testifying as an injured

7    member and a voter of AFT.  She will provide support for the

8    LULAC plaintiffs challenges to SB 1 Section 5.08.

9        (ALICE PENROD, having been duly sworn, testified as

10    follows:)

11                        DIRECT EXAMINATION

12    BY MISS LORENZO:

13    Q.  Good morning, Miss Penrod.  Could you please state your

14    full name for the record.

15    A.  Alice Lee Penrod.

16    Q.  And where do you live?

17    A.  I live in San Antonio.

18    Q.  San Antonio, in Bexar County?

19    A.  Yes, ma'am.

20    Q.  How long have you lived in San Antonio?

21    A.  Since -- well, over 20 years but recently moved back

22    April 2018.

23    Q.  Have you lived in Texas your whole life?

24    A.  Yes.

25    Q.  And how old are you, Miss Penrod?

ALICE PENROD – DIRECT

1   A.   Sixty-seven.

2   Q.   Who do you live with in San Antonio?

3   A.   I live with my husband and my mother.

4   Q.   How old is your mom?

5   A.   She's 92.

6   Q.   How long has she lived with you?

7   A.   Since July of 2019.

8   Q.   Are you then her primary caretaker?

9   A.   Yes.

10  Q.   What does that look like?

11  A.   Well, she doesn't drive anymore so I take her to all of

12  her appointments, and, you know, do anything she needs me to

13  do for her.

14  Q.   Does she have any issues moving around, or anything like

15  that?

16  A.   Yes.  She is unable to stand for long periods of time so

17  our outings are pretty short but she still likes to go.

18  Q.   And you also said you live with your husband.  How old is

19  he?

20  A.   He's 70.

21  Q.   How long have you two been married?

22  A.   Almost 27 years November.

23  Q.   Congratulations on that.  Are you retired, Miss Penrod?

24  A.   Yes.

25  Q.   When did you retire?

ALICE PENROD — DIRECT

1  A.  Retired in June of 2011.

2  Q.  What did you do before you retired?

3  A.  I was a public school teacher.

4  Q.  What did you teach?

5  A.  I have taught kinder, first, fourth, and sixth grade.

6  Q.  What is the reason that you became a teacher?

7  A.  Well, I've always enjoyed working with children from an

8  early age and in high school I taught Sunday school, I was a

9  camp counselor, those types of things, so it was just a

10  natural desire to be a teacher.

11  Q.  You mentioned that you are retired, but are you a member

12  of any organizations?

13  A.  Yes, I'm a member of AFT.

14  Q.  AFT stands for the Texas chapter of the American

15  Federation for Teachers, correct?

16  A.  Yes.

17  Q.  How long have you been a member of AFT?

18  A.  Since 2005.

19  Q.  What made you get involved with AFT?

20  A.  Well, when I first started teaching I taught here in San

21  Antonio and I was a member of NEA National Education

22  Association.  We moved to the Rio Grande Valley and when I

23  started teaching there they did not have NEA so I joined AFT

24  there.

25  Q.  And NEA and AFT are both — are they unions?

ALICE PENROD - DIRECT

1  A.  Yes.

2  Q.  Why did you feel it was important to join both of those

3  unions?

4  A.  I feel that they are good advocates for teachers.  You

5  know, we, as teachers, are pretty busy teaching and don't have

6  a lot of time to advocate for things like, you know, classroom

7  size, duty-free lunch, things like that, and so it's very

8  helpful to have a union that can advocate for those types was

9  things.

10  Q.  Thank you.  I'd like to talk to you now a bit more about

11  your experiences with voting.  Are you registered to vote in

12  Texas?

13  A.  Yes.

14  Q.  How long have you been voting in Texas?

15  A.  Since 1974.

16  Q.  Is that when you turned 18?

17  A.  Yes.

18  Q.  Do you vote regularly?

19  A.  I do.

20  Q.  Would you say that voting is important to you?

21  A.  Yes.  I think it's my civic duty, so I've always voted as

22  soon as I was able.

23  Q.  Did you vote during the March 2022 Primary?

24  A.  I did.

25  Q.  How did you vote during that Primary?

ALICE PENROD - DIRECT

1   A.  I voted by mail.

2   Q.  Was that your first time voting by mail, or —

3   A.  Yes.  It was my first time because I was finally eligible

4   by age to vote by mail.

5   Q.  So is that the only reason that you decided to vote by

6   mail that election?

7   A.  No.  We were just coming out of the pandemic.  My mother

8   was 90 at the time.  We tried to limit exposure outside the

9   home for her as much as possible so we all discussed it and we

10  were all eligible as a family.  We thought it would just be

11  the better part of valor to easily vote by mail, we thought.

12  Q.  I was going to ask.  As someone who had never voted by

13  mail before, what did you expect that experience to be like?

14  A.  I thought it would be very straightforward and easy.  You

15  know, we applied for the mail-in ballots and we received them,

16  filled them out, I took them to the post office, stamped,

17  mailed, but turned out to not be that straightforward.

18  Q.  And why not?

19  A.  A couple of weeks later I received a letter, form letter,

20  stating that my ballot had not been accepted.  It told me I

21  could go online to a website, state website, and fix the

22  problem on the ballot.  So that's what I did.

23  Q.  Now, do you know why your ballot was rejected?

24  A.  Yes.  I failed to put my driver's license or my social

25  security number on the carrier envelope under the flap.

ALICE PENROD - DIRECT

1  Q.  And you alluded to this, but in order to receive your mail
2  ballot you had to apply to vote by mail, is that correct?
3  A.  Yes.
4  Q.  Do you remember when you applied to vote by mail?
5  A.  I'm sure -- I don't remember exactly, but I think it was
6  probably at least a month before the election.
7  Q.  And did you have any issues with your application?
8  A.  No.
9  Q.  And turning back to your 2022 Primary ballot, when did you
10 learn that your ballot had been rejected?
11 A.  About two weeks after I mailed it.
12 Q.  And you said you were notified with a letter, is that
13 correct?
14 A.  Yes.
15 Q.  How did you feel when you learned that your ballot had
16 been rejected?
17 A.  I was pretty mad.  I was horrified that my vote had not
18 counted, and, you know, this was supposed to be a very secure,
19 easy way to vote.  And it was not.
20 Q.  What did you do once you learned that your ballot had been
21 rejected?
22 A.  I went online to hopefully make the corrections that
23 needed to happen.
24 Q.  Were you ultimately able to cure your ballot?
25 A.  Yes.  I had to keep checking back.  I would say about two

ALICE PENROD - DIRECT

1 weeks before it was finally noted on the screen that it was

2 finally accepted.

3 Q.  How did you feel about the whole process of updating your

4 ballot online?

5 A.  I was a little frustrated.  I wasn't sure -- you know,

6 after I actually went online and made the corrections, it

7 didn't immediately tell me that my ballot was accepted so I

8 had to wait some more and I didn't know if it was ever going

9 to be accepted.  So that was a little frustrating.

10 Q.  Was your ballot the only ballot in your household that was

11 rejected?

12 A.  No.  My husband's was rejected as well.

13 Q.  Was that also your husband's first time voting by mail?

14 A.  Yes.

15 Q.  Did he have any issues with his application to vote by

16 mail?

17 A.  No.

18 Q.  Now, Miss Penrod, did you vote again after your experience

19 in the March 2022 Primary?

20 A.  I did.

21 Q.  In which election?

22 A.  I think there was a Run-off in May.

23 Q.  Did you vote in the November 2022 —

24 A.  I voted in the November General Election as well.

25 Q.  For the November General Election did you vote by mail?

ALICE PENROD - DIRECT

1   A.   No.

2   Q.   Why not?

3   A.   I just didn't trust it.  I made sure that I got to the

4   polling place.

5   Q.   Did your mom go with you to the polling place?

6   A.   Yes.  We had discussed it as a family.  We were all pretty

7   taken aback as to, you know, being — ballot not being

8   automatically accepted and obviously we had made mistakes so

9   we decided as a family to go to the polling place.

10  Q.   And what was that experience like?

11  A.   Well, it was in November.  It was raining.  We decided to

12  go to early voting because our polling place is usually pretty

13  crowded.  It's a very popular polling place.  So we didn't

14  want my mom to have to stand in line very long, if possible.

15       We got up early.  Went as early as we could.  You know,

16  right before it opened.  As I said, it was raining, so we took

17  our umbrellas.  The line wasn't too long.  We took a folding

18  chair in the car just in case my mom needed to sit down, you

19  know, if the line was long.

20       So we were fortunate, while standing in line, that a poll

21  worker did come out, walked the line, and saw my mother with

22  her cane and took her on in so she didn't have to stand in

23  line very long.

24  Q.   Did you and your husband wait in line then?

25  A.   Yes, we waited in line.

ALICE PENROD - CROSS

1  Q.  Did you have any delays in casting your ballot?

2  A.  Yes.  We didn't realize that because we had voted in the

3  Primary by mail they automatically send us a ballot in the

4  mail for the General Election, and we didn't realize we needed

5  to take that with us to the polling place.

6      So we were pulled aside and one of the poll workers called

7  the Clerk's Office to make sure that it was negated or

8  whatever they needed to do to make sure we could go ahead and

9  vote while we were there.

10 Q.  Understood.  Miss Penrod, would it have been overall less

11 burdensome for you and your family if you had voted by mail?

12 A.  Definitely, yes.

13 Q.  But given the current requirements to vote by mail, do you

14 think you'll ever feel comfortable voting by mail again?

15 A.  I don't think so.  As long as I'm able, I think I'm going

16 to go to the polls.

17          MISS LORENZO:  Thank you, Miss Penrod.

18          I pass the witness.

19          THE COURT:  Anything else on this side?

20          Any cross?

21          MR. SZUMANSKI:  Yes, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. SZUMANSKI:

24 Q.  Good morning, Miss Penrod.

25 A.  Good morning.

ALICE PENROD – CROSS

1  Q.  Good to see you.  My name is Ethan Szumanski and I'm an

2  attorney with the Office of Attorney General in Texas.  I

3  represent the State of Texas, the Secretary of State's Office

4  and the Attorney General's Office.

5      Before I start, I do want to thank you for your service as

6  a teacher.  My brother is an elementary teacher, so I thank

7  you for your service to those kids.

8      Now, I do want to talk about a few topics, okay?

9  A.  Okay.

10  Q.  So as you mentioned on direct, you believe that voting is

11  important, right?

12  A.  Yes.

13  Q.  Now, you don't disagree with all voting requirements,

14  right?

15  A.  No, I don't disagree with all voting requirements.

16  Q.  Right.  And you believe that a voter should be able to

17  show that they are otherwise eligible to vote in order to

18  engage in that voting process, right?

19  A.  Yes.

20  Q.  Such as through presenting some form of identification,

21  right?

22  A.  Yes.

23  Q.  Now, you talked about two different elections, the

24  March 2022 Primary — actually, you talked about several, I

25  believe, some elections in 2022, right?

ALICE PENROD - CROSS

1  A.  Yes.

2  Q.  Well, let's go through some of those.  We'll take them one

3  by one.  So the March 2022 Primary.  You decided to vote by

4  mail for the first time in March 2022?

5  A.  That's correct.

6  Q.  And to do that you went online and you got an application

7  for ballot by mail?

8  A.  Yes.

9  Q.  You printed it out, you filled it out, and you sent it

10  back in?

11  A.  I did.

12  Q.  And after you did that, you got your mail ballot?

13  A.  Yes.

14  Q.  And just like you did with the application, you filled out

15  your mail ballot and sent that back in?

16  A.  Yes.

17  Q.  And then you got a letter notifying you that it was

18  initially rejected?

19  A.  Yes.

20  Q.  Now, you don't actually know why your mail ballot was

21  initially rejected, right?

22  A.  I do.  I do know.

23  Q.  Has that always been your testimony?

24  A.  No.  I didn't know at the time but I have found out since

25  that I failed to put either my driver's license or my social

ALICE PENROD - CROSS

1  security number on the carrier envelope.

2  Q.  So you just recently found out why your mail ballot was

3  rejected?

4  A.  Yes.

5  Q.  Okay.  Well, you would agree with me that when you found

6  out your mail ballot was initially rejected you got a letter

7  notifying you about how to cure that mail ballot, right?

8  A.  That's correct.

9  Q.  And you are aware that SB 1 created a provision that

10  allowed this texasvote.org or Ballot Tracker, where you could

11  go online and cure your ballot, right?

12  A.  I didn't know that that law created that but I was able to

13  use it.

14  Q.  And so you were able to go to texasvote.org and cure your

15  mail ballot?

16  A.  Yes.

17  Q.  So you would agree with me that you were ultimately able

18  to vote successfully by mail during the March 2022 Primary?

19  A.  Yes, eventually.

20  Q.  Now, you also voted in subsequent elections in 2022, such

21  as the May Primary Run-off?

22  A.  Yes.

23  Q.  Okay.  Let's talk about those.  You voted in person for

24  those elections?

25  A.  Yes.

ALICE PENROD - CROSS

1  Q.  And you didn't have any issues voting in person for those
2  May 2022 elections?
3  A.  No.
4  Q.  Okay.  Then you voted in person for the November 2022
5  General Election?
6  A.  Yes.
7  Q.  And, as you mentioned on direct, you took your mom and
8  your husband with you to the polls for the November 2022
9  Election?
10  A.  Right.
11  Q.  Now, when you got to the polls, you were notified that you
12  did not bring your mail-in ballot to the polls?
13  A.  Yes, that's correct.
14  Q.  So what happened after that was they had to make a few
15  calls and see if you could vote in person at the polling
16  location, right?
17  A.  Yes.
18  Q.  After they made those calls, they handed you a physical
19  ballot, right?
20  A.  That's correct.
21  Q.  And then you voted in person?
22  A.  Yes.
23  Q.  So it's fair to say that you were ultimately able to vote
24  successfully during the November 2022 General Election?
25  A.  Yes.  Eventually, yes.

ALICE PENROD – CROSS

1    MR. SZUMANSKI:  Thank you, Miss Penrod, for your

2  time.  I appreciate it.  And again, thank you for your

3  service.

4    No further questions at this time.

5    THE COURT:  Anything else on this side?

6    MR. LIU:  No questions.

7    THE COURT:  Anything else?

8    MISS LORENZO:  No further questions, Your Honor.

9    THE COURT:  Thank you, ma'am.  You may step down.

10    And your next witness.

11    MISS TULIN:  Your Honor, the plaintiffs call

12  Christina Adkins.

13    THE COURT:  This will be on what issues?

14    MISS TULIN:  Your Honor, the LUPE plaintiffs will

15  be — will elicit testimony from Miss Adkins that will support

16  all of the claims in this case.  I also expect that some of my

17  friends on this side will have additional questions after I

18  pass the witness.

19    THE COURT:  Miss Adkins.

20    MISS TULIN:  Your Honor, I request permission to ask

21  leading questions under Federal Rule of Evidence 611(c)(2)

22  because Miss Adkins is a witness identified with an adverse

23  party.

24    THE COURT:  Any response?

25    MISS HUNKER:  No objection.

1    THE COURT:  You may proceed.

2    (CHRISTINA ADKINS, having been duly sworn, testified as

3  follows:)

4                    DIRECT EXAMINATION

5  BY MISS TULIN:

6  Q.  Good morning, Miss Adkins.

7  A.  Good morning.

8  Q.  Can you please state your full name for the record?

9  A.  Yes.  My name is Christina Worrell Adkins.

10  Q.  Thank you.  Let's start with some background information.

11  You earned an undergraduate degree from the University of

12  Texas at Austin, right?

13  A.  That's correct.

14  Q.  And then you went to SMU, Southern Methodist University,

15  for law school?

16  A.  That's correct.

17  Q.  My grandmother wanted me to go there for law school.

18    After law school, you did some contract work and then you

19  worked at the Texas Workforce Commission?

20  A.  I did.

21  Q.  And then you began working for the Elections Division in

22  the Texas Secretary of State's Office in June of 2012, is that

23  right?

24  A.  That's correct.

25  Q.  At first you ran the certification program for voting

CHRISTINA ADKINS – DIRECT

1  systems?

2  A.  When I first started with the Secretary of State's Office,

3  I was an attorney in the Elections Division, a staff attorney,

4  and one of the duties that I did there, or one of my duties at

5  the time was to oversee the certification program for

6  electronic voting system equipment.

7  Q.  Thank you for clarifying that.  And in December of 2017

8  you became the legal director of the Elections Division, is

9  that correct?

10  A.  That's correct.

11  Q.  As the legal director for the Elections Division, you

12  oversaw the division's legal staff?

13  A.  Yes.

14  Q.  And in early March of 2023 you became the Acting Director

15  of Elections?

16  A.  That's correct.

17  Q.  And on April 26, 2023 you were officially named Director

18  of Elections?

19  A.  I was.

20  Q.  Congratulations.  The Director of Elections oversees the

21  entire Elections Division for the Secretary of State's Office,

22  is that right?

23  A.  That's correct.

24  Q.  And in your role of Director of Elections, you report to

25  the Deputy Secretary of State?

CHRISTINA ADKINS – DIRECT

1  A.  That's correct.

2  Q.  And then beyond that you report directly to the Secretary

3  of State, Jane Nelson?

4  A.  Yes.

5  Q.  And during the period of time that you served as the

6  acting Director of Elections, the Legal Director position

7  remained unfilled, is that right?

8  A.  That's correct.

9  Q.  And so during that time you were fulfilling the roles of

10 both the Director of Elections and the Legal Director?

11 A.  Yes, I was.

12 Q.  Before you took over as Acting Director, the Director of

13 Elections was Keith Ingram?

14 A.  That's correct.

15 Q.  And you took over as Acting Director after Mr. Ingram was

16 relieved of his duties?

17 A.  That's correct.

18 Q.  When you were legal director Keith Ingram was your direct

19 supervisor, is that right?

20 A.  That's right.

21 Q.  And Mr. Ingram still works for the Secretary of State's

22 Office doing special projects?

23 A.  He does not.

24 Q.  When did he leave the Secretary of State's Office?

25 A.  His — the end of his employment was, I believe, the end

CHRISTINA ADKINS – DIRECT

1  of August, August 31st I think was his last day officially

2  with the State.

3  Q.  Okay.  For a period of time after he was relieved of his

4  duties and you took over as the Director of Elections, though,

5  he did work for the Secretary of State's Office?

6  A.  That's correct, yes.

7  Q.  And during that time he was doing special projects?

8  A.  That's correct.

9  Q.  Okay.  And for that period of time he reported directly to

10 you?

11 A.  Yes.

12 Q.  Okay.  Thank you.  Let's zoom out for a moment and talk

13 about the Office of the Texas Secretary of State.  The Texas

14 Secretary of State is one of six officials named in the Texas

15 Constitution forming the executive department of the State, is

16 that right?

17 A.  Yes, ma'am.

18 Q.  And the Secretary of State is appointed by the governor of

19 Texas and confirmed by the Texas Senate?

20 A.  Correct.

21 Q.  Among other things, the Secretary of State is the Chief

22 Election Officer for the State of Texas?

23 A.  That's correct.

24 Q.  And the Elections Division is responsible for

25 administering the Texas Election Code, correct?

1  A.  Among other things, yes.

2  Q.  And the Texas Election Code is the law of the land for

3  Texas voters, elections, voting systems, candidates, and

4  political parties?

5  A.  I would say the election code in conjunction with a number

6  of other laws that also address election-related issues, may

7  not be found in the election code but do speak to elections.

8  Q.  Okay.  And will you believe me if I say that I took that

9  language from the Texas Secretary of State's website?

10 A.  Sure, yes.

11 Q.  The Elections Division maintains more than 16 million

12 voter registration records on behalf of the State?

13 A.  That's correct.

14 Q.  And the division also provides election-related calendars?

15 A.  Yes.

16 Q.  And that entails explaining all the relevant dates and

17 deadlines and requirements leading up to uniform election

18 dates, right?

19 A.  Yes, and the Primary Election.

20 Q.  And the division also handles Primary Election funding?

21 A.  Yes.

22 Q.  You agree that the Elections Division provides general

23 support to the election community in Texas?

24 A.  Absolutely.

25 Q.  And that includes providing assistance and advice to

CHRISTINA ADKINS – DIRECT

1  election officials on the proper conduct of elections?

2  A.  As much as we can, yes.

3  Q.  But elections in Texas are run by the counties, not the

4  State, correct?

5  A.  That's correct.

6  Q.  Okay.  The Elections Division, though, is charged with

7  maintaining and obtaining uniformity in the administration of

8  elections and the laws relating to elections in Texas, right?

9  A.  Correct, and that's straight from the Texas Election Code.

10  Q.  And conducting elections uniformly across the state is

11  meant to protect voters?

12  A.  Yes.

13  Q.  But it's also important for counties to retain local

14  control of elections?

15  A.  Yes, that's the way our system is set up.

16  Q.  Because what works in Harris County may not work in Loving

17  County?

18  A.  Absolutely.

19  Q.  The Elections Division, though, does provide guidance to

20  counties on best practices?

21  A.  Yes.

22  Q.  Okay.  Let's focus a little bit more on the advice and

23  assistance that you provide to election officials.  The

24  division provides legal interpretations of election laws to

25  election officials, right?

CHRISTINA ADKINS – DIRECT

1  A.  Yes, when appropriate.

2  Q.  And sometimes the division issues formal legal opinions?

3  A.  Rarely do we issue legal opinions.  It's been a practice

4  that's done in the past.  Not so much today.

5  Q.  It used to happen more frequently?

6  A.  Correct.

7  Q.  But it's only happened once or twice since you've been at

8  the Secretary of State's Office, right?

9  A.  That's correct.

10  Q.  The Elections Division also sometimes issues election

11  advisories?

12  A.  Yes.  We do that much more frequently.

13  Q.  And your advisories are disseminated in emails to county

14  officials through an email distribution list?

15  A.  Yes, and posted on our website.

16  Q.  You anticipated my next question.

17      For example, your office issued an election advisory about

18  the changes to the poll watcher provisions contained in SB 1,

19  do you recall that?

20  A.  Yes.

21  Q.  Okay.  Let's take a look at what has been admitted as LUPE

22  232.  And this will appear on your screen but I do have a

23  binder, if you would like to have hard copies.  Just let me

24  know.

25  A.  The screen is fine.

CHRISTINA ADKINS - DIRECT

1  Q.  Okay.  And so this is an advisory that was issued by your

2  office in February of 2022, correct?

3  A.  It appears to be, yes.

4  Q.  And do you know, is this the version that would be posted

5  on your website?

6  A.  It should be.

7  Q.  And this was also disseminated to county officials via

8  email, correct?

9  A.  That's correct.

10  Q.  And you decided to issue an advisory about this in

11  particular because of the number of questions that your office

12  was receiving about the new poll watcher provisions, do you

13  agree with that?

14  A.  I would agree that that's part of why we decided to issue

15  it.

16  Q.  Okay.  The division also offers more informal advice and

17  assistance to election officials?

18  A.  That's correct.

19  Q.  Sometimes that happens through email?

20  A.  Yes.

21  Q.  And sometimes through phone calls?

22  A.  Correct.

23  Q.  Okay.  Let's now — Derek, you can pull that one down and

24  let's pull up what has been marked as State 143, please.

25      And I'll give you a minute, Miss Adkins, to look at this

CHRISTINA ADKINS - DIRECT

1  email.  It's two pages.

2  A.  May I see the second page.  And can we scroll back up to

3  on the top again, please.  Okay.

4  Q.  Thank you, Derek.

5     So this is an email chain between Charles Pinney and

6  Daniel Hayes, correct?

7  A.  That's correct.

8  Q.  And Mr. Pinney was an attorney in the Elections Division,

9  is that correct?

10 A.  Yes.  He's currently an attorney with the Elections

11 Division.

12 Q.  And he was also an attorney at the time of this email in

13 September of 2020?

14 A.  Yes.

15 Q.  And you supervised Mr. Pinney at this time, correct?

16 A.  Yes.

17 Q.  And at the time of this email exchange, Dan Hayes was the

18 Assistant Director of the Travis County Clerk's Office?

19 A.  Assistant Director for Elections, yes.

20 Q.  Thank you.  And at the bottom of the first page, if you

21 can take a look, Mr. Hayes references a phone conversation

22 between himself and Mr. Pinney, do you see that?

23 A.  I do.

24 Q.  And then the top of this email is a response from

25 Mr. Pinney?

CHRISTINA ADKINS - DIRECT

1   A.  I see that.

2   Q.  And so this is an example of the Elections Division

3   providing advice and assistance to a county election official,

4   correct?

5   A.  I would agree with that.

6   Q.  Okay.  Great.  We can take that down.

7       So shifting gears away from your office's work with

8   election officials for a moment, the Elections Division also

9   offers advice and assistance to political candidates?

10  A.  Yes, among others.

11  Q.  You also provide advice and assistance to voters?

12  A.  We do.

13  Q.  Or anyone else who reaches out to the division?

14  A.  That's correct.

15  Q.  The Elections Division has no set policy for determining

16  how to respond to fact-specific questions from voters, is that

17  fair?

18  A.  That's correct.

19  Q.  And the Elections Division has no set policy for

20  determining how to respond to questions regarding how to

21  interpret or apply specific provisions of law?

22  A.  I think it depends on the specific issue.  There may be

23  times where we have particular issues that are arising and we

24  may want to make sure we have a more uniform response, and so

25  depending on the particular issue we may request that certain

CHRISTINA ADKINS – DIRECT

1  inquiries be presented to us in writing, or that they, you

2  know, provide us some additional facts before we can issue a

3  response.

4  Q.  Can we agree that there's not a formal process?

5  A.  I think I can agree with that.

6  Q.  So sometimes an attorney from your division will just

7  answer the question directly?

8  A.  Yes.

9  Q.  And sometimes you convene and discuss as a group?

10 A.  That's correct.

11 Q.  And sometimes administrative staff reviews in response to

12 voter inquiries?

13 A.  Yes, when they are routine inquiries where we typically

14 discussed a response or just are providing information that's

15 available on our website or publicly available information.

16 Q.  And the Elections Division also reviews and responds to

17 election complaints, right?

18 A.  That's correct.

19 Q.  And that means anytime someone doesn't like something with

20 an election they can email or fill out a complaint form?

21 A.  That's correct.

22 Q.  And whenever you get a complaint, you take a look at it

23 and you respond?

24 A.  Yes.  There is a process within the division by which we

25 review complaints and determine how we respond to them.

1833

CHRISTINA ADKINS - DIRECT

1  Q.  And at least when Mr. Ingram was the Director of Elections

2  that process was the complaints would go to him and he would

3  indicate what the disposition should be?

4  A.  That's correct.

5  Q.  And the election code criminalizes certain acts, right?

6  A.  Yes.  There are some criminal — there are provisions that

7  have criminal elements to them, yes.

8  Q.  And the code also addresses what the Elections Division

9  calls irregularities, which are deviations from the law but

10 not criminal?

11 A.  That's correct.

12 Q.  And you would agree that most of the complaints that the

13 office receives are about irregularities, as opposed to

14 criminal conduct?

15 A.  Absolutely, yes.

16 Q.  But your office doesn't track or log complaints, is that

17 right?

18 A.  If it's a formal complaint submitted to us in one of our

19 complaint forms, then we do track and monitor and log our

20 responses to that.  We may get general inquiries, phone calls,

21 where people are making allegations, emails, if it's an email

22 and there is a response, we will retain that response.

23      It depends on how formalized that complaint is.

24 Q.  But if you just get a call, you're not logging calls?

25 A.  That's correct.  Our call volume in general is just too

CHRISTINA ADKINS - DIRECT

1  high in order to log calls.

2  Q.  Okay.  Let's talk briefly about forms.

3  A.  Wonderful.

4  Q.  I thought you might be excited about that.

5      Chapter 31 in the election code says that the Secretary of

6  State is responsible for prescribing official forms, correct?

7  A.  It definitely says that.

8  Q.  And SB 1 includes specific requirements about what

9  language must be on some of those forms, would you agree with

10 that?

11 A.  I believe so.  There's other provisions in the election

12 code that speak to that as well.

13 Q.  And you agree that some of those provisions require a lot

14 of information to be included on forms, right?

15 A.  Absolutely.

16 Q.  And sometimes you solicit feedback from county election

17 officials about forms, is that right?

18 A.  Fairly regularly, yes.

19 Q.  Okay.  And one of the ways that historically you have

20 gotten that type of feedback is through the CEO Advisory

21 Group, is that right?

22 A.  That's correct.

23 Q.  And the CEO Advisory Group is a group of election

24 officials that meets on a regular basis to discuss the needs

25 of the election community?

1  A.  That's correct.  Specifically county election officials.

2  Q.  And the group was formed in response to the COVID-19

3  pandemic?

4  A.  Yes, it was.

5  Q.  And it was your idea to form that group, right?

6  A.  It was.

7  Q.  And you were also the person who initially decided which

8  county should participate in that group, right?

9  A.  Yes, in conjunction with, you know, other folks in my

10 office with, you know, discussions we had with other people.

11 Q.  Okay.  Let's take a look at what has been marked as LUPE

12 292.  And, again, if you would like a hard copy to flip

13 through, this one is a sort of lengthy email.

14 A.  Um-hum.

15 Q.  So actually maybe I will —

16         MISS TULIN:  Your Honor, may I approach the witness?

17         THE COURT:  You may.

18 BY MISS TULIN:

19 Q.  Just for ease of reference I'm going to show you this.

20 A.  I'm familiar with the email.

21 Q.  So I know you said you are familiar with it, but I'll just

22 give you a moment to take a look at it.

23 A.  Okay.

24 Q.  And then if I can focus your attention on the fifth page

25 of the document.  And I apologize, it doesn't have page

CHRISTINA ADKINS – DIRECT

1   numbers included on it.

2   A.  I see.

3   Q.  Okay.  And so this is an email from you to the CEO

4   Advisory Group summarizing what was discussed on a phone call

5   on June 23rd, 2021, correct?

6   A.  That's correct.

7   Q.  And the second item on that list mentions a draft ABBM

8   form, right?

9   A.  That's correct.

10  Q.  And you and I both understand that ABBM stands for

11  Application for Ballot By Mail, right?

12  A.  It does, yes.

13  Q.  And so this is an example of you soliciting feedback from

14  county election officials about a form?

15  A.  That's correct, yes.

16  Q.  Okay.  And, specifically, you ask the CEO Advisory Group

17  for questions, concerns, or suggested edits?

18  A.  That is correct, yes.

19  Q.  And then if you look back on page 4 at the next email in

20  the chain, there's a response from Frank Phillips, do you see

21  that?

22  A.  I see that.

23  Q.  Okay.  And Mr. Phillips is the Denton County Elections

24  Administrator, right?

25  A.  He is the Denton County Elections Administrator, yes.

CHRISTINA ADKINS - DIRECT

1  Q.  And his office suggested some changes to this form, is
2  that right?
3  A.  They did.
4  Q.  And then the next email in time is from Christopher Davis,
5  is that right --
6  A.  Correct.
7  Q.  -- that would be on the first page?
8      And Mr. Davis was of Elections Administrator for
9  Williamson County, is that right?
10 A.  That's correct.
11 Q.  And Mr. Davis said, "Agree with Frank?"
12 A.  Yes.
13 Q.  And you agree that Mr. Davis was expressing agreement with
14 the suggestions that had been made in that previous email by
15 Mr. Phillips?
16 A.  Yeah, suggestions that we actually implemented too.
17 Q.  And turning to the second page, he wrote, "Did y'all
18 misplace your copies of these?"
19 A.  Yes, he did.
20 Q.  And then he pasted below -- pasted below that message are
21 photographs or screenshots of a field guide to ensuring voter
22 intent, is that right?
23 A.  Yes.  I think he got those from me.
24 Q.  Okay.  The Elections Division doesn't have a process to
25 validate that every county is using the most updated version

CHRISTINA ADKINS - DIRECT

1  of its forms, does it?

2  A.  That's correct.  You know, we post our forms on our

3  website with dates indicating when their last revisions

4  occurred.  We work with vendors to make sure, you know, any

5  new vendors have the most version of the form, but we can't

6  personally validate that all 254 counties are using that,

7  those most recent versions.

8  Q.  And you are aware that at least some counties use outdated

9  forms in the March 2022 Primary, is that right?

10  A.  That's correct, from what I recall.

11  Q.  Okay.  Let's focus a little bit more specifically on the

12  ballot-by-mail process.  You are familiar, I assume, with the

13  changes to the ballot-by-mail requirements included in SB 1?

14  A.  Yes, ma'am, very familiar.

15  Q.  Probably more familiar than me at this point.

16  A.  That's possible.

17  Q.  Neither the ABBM nor the carrier envelope instructs voters

18  to list multiple numbers, is that correct?

19  A.  That's correct.

20  Q.  Okay.  The forms generally instruct the voters to list

21  their driver's license number, and if they do not have one to

22  put down the last four digits of their social security number?

23  A.  That's correct, as consistent with what the law says.

24  Q.  And your office reviewed county inserts recommending that

25  voters put both their driver's license number and social

CHRISTINA ADKINS - DIRECT

1  security number on the ABBM, is that right?

2  A.  Yes.

3  Q.  Okay.  And your office approved inserts for application

4  materials recommending that both types of ID numbers be

5  listed?

6  A.  Yes.  And I don't believe that was a form we had to

7  approve, but many of the counties asked us to review them.

8  Q.  And that included Bexar County's insert?

9  A.  That's correct.

10  Q.  And you, your office, communicated with counties to

11  indicate that an insert was an option, correct?

12  A.  Absolutely.

13  Q.  And the Elections Division considered designing a standard

14  insert to recommend providing both numbers, is that right?

15  A.  That's correct.

16  Q.  And if we can take a look at what is in evidence as LUPE

17  170, and that's behind the next tab in your binder, Miss

18  Adkins.  And Miss Adkins, this is an email exchange between

19  you and Miss Callanen from April of 2022, do you agree?

20  A.  I agree.

21  Q.  And Miss Callanen is the Elections Administrator for Bexar

22  County?

23  A.  That's correct.

24  Q.  And so as early as April 2022 you, your office, was

25  working on a separate insert to provide as part of the ABBM,

CHRISTINA ADKINS – DIRECT

1  is that right?

2  A.  Correct.

3  Q.  And that was never finalized, is that right?

4  A.  To my knowledge, no, it was not finalized.

5  Q.  Okay.  And your office doesn't have any plans currently to

6  change any official forms or include any inserts to include

7  advice or suggest that both application -- both -- excuse

8  me -- both identification numbers are included, is that right?

9  A.  At this point we don't have any plans to revise some of

10  the official documentation and some of that is by request of

11  our county election officials that didn't want us changing

12  anything this close to a big election.

13      As far as creating some additional forms, you know, I

14  wouldn't say that that's never -- that's completely off the

15  table, we just, we kind of have to see how things play out the

16  next few weeks.

17  Q.  Well, do you remember that you were deposed in April 2023

18  of this year?

19  A.  Yes.

20  Q.  And at that point your office didn't have any plans to

21  change any of the official forms either, is that right?

22  A.  Well, that's because we were in the middle of a

23  legislative session and I wasn't going to commit to making any

24  changes until we had some resolution on potential statutory

25  required changes.

CHRISTINA ADKINS – DIRECT

1  Q.  And so you didn't have plans then and now you don't have

2  plans because it's close to the election, is that right?

3  A.  That's correct.

4  Q.  And you have also not spoken to any counties about their

5  future plans with regard to inserts that advise voters to list

6  more than one ID number, do you agree?

7  A.  I would agree with that.

8  Q.  And you don't have any way of knowing how many counties

9  provided inserts regarding the ID requirement for ABBMs, do

10 you agree with that?

11 A.  That's correct.

12 Q.  Okay.  And if the personal identification number is

13 missing or incorrect on the ABBM, then the voter will have the

14 opportunity to cure the defect or correct it, do you agree?

15 A.  Correct the defect, correct, yes.

16 Q.  And one way that a voter can do that is through the Ballot

17 Tracker?

18 A.  Yes.

19 Q.  Your office received a lot of complaints about voters not

20 being able to use the Ballot Tracker, do you agree with that?

21 A.  Yes, regarding the authentication portion of it.

22 Q.  And that was at least in part because of the residence

23 address field in the Ballot Tracker?

24 A.  Yes.

25 Q.  And, in fact, you tried using your own residence address

CHRISTINA ADKINS - DIRECT

1  and the Ballot Tracker wasn't able to validate it, correct?

2  A.  That's correct.

3  Q.  And the residence address field was required by SB 1,

4  would you agree with that?

5  A.  Correct.

6  Q.  Okay.  You also agree that a voter may not remember what

7  information they provided on a defective application form once

8  it's been sent in, do you agree with that?

9  A.  Yes.

10 Q.  And the ABBM rejection form does not provide any

11 information about which number was originally sent in, agreed?

12 A.  Correct.  We discussed that with a number of counties on

13 including that field but generally the consensus was not to

14 include that.

15 Q.  And you agree that some voters whose mail ballots have

16 been rejected because of the ID requirements under SB 1 would

17 not be able to cure in time due to the timing of when they are

18 notified or when they find out about how to cure their ballot?

19 A.  That's correct.  If there's a deadline and they receive

20 notification towards the end of that deadline, it might limit

21 their opportunities.

22      MISS TULIN:  Thank you, Miss Adkins.

23      I pass the witness.

24      THE COURT:  Anything else on this side?

25      MR. DODGE:  Just a few questions, Your Honor.

CHRISTINA ADKINS – DIRECT

1  BY MR. DODGE:

2  Q.  Morning, Miss Adkins.

3  A.  Morning.

4  Q.  Miss Tulin was quite thorough so I have just a few

5  questions.  You were discussing a moment ago the application

6  and carrier envelope that your office publishes, correct?

7  A.  That's correct.

8  Q.  And your office cannot amend the application or the

9  carrier envelope to advise voters to include both a driver's

10  license number and a social security number, right?

11  A.  When we put our forms together we try to track the law as

12  much as we can and the law I think limits us in what we can

13  say in that area.

14  Q.  So you can't amend the forms because it would not be

15  consistent with the provisions in SB 1?

16  A.  That's a concern that we've had about changing that

17  language, yes.

18  Q.  You also discussed with Miss Tulin certain inserts that

19  counties put in their materials, do you recall that?

20  A.  I do.

21  Q.  Those counties can't require voters to include both a

22  driver's license and social security number on their

23  applications or carrier envelopes?

24  A.  They cannot require folks to include both numbers, that's

25  correct.

CHRISTINA ADKINS – DIRECT

1  Q.  And your office can't require or even encourage counties

2  to recommend providing both numbers?

3  A.  We cannot require them –– I'm sorry.  Say that again.

4  Q.  Or encourage.

5  A.  I don't know if I can say that we can't encourage.  I

6  mean, when voters called us asking about what to do with the

7  forms or when they had questions about it we would oftentimes

8  tell voters if you are unsure list both numbers on your

9  documentation.

10  Q.  My question was about whether or not you could encourage

11  counties to ask voters to include both numbers.

12  A.  Oh, I see what you're asking.  We would be very cautious

13  in that area because we don't want them to being making

14  suggestions to a voter that would make them think that they

15  had to include both, that I mean if somebody didn't know both

16  numbers and they were being told that they should put both, it

17  might prevent somebody from completing the process if they

18  don't have both numbers on hand.

19  Q.  Just so it's clear for the record then, your office does

20  not require counties to ask voters to include both numbers?

21  A.  That's correct.

22  Q.  And you would be hesitant to encourage them to do that,

23  correct?

24  A.  Correct, depending on how exactly they are trying to say

25  that or provide that encouragement.

CHRISTINA ADKINS - DIRECT

1  Q.  Your office doesn't keep track of which counties advise

2  voters to include both forms of ID, right?

3  A.  That's correct.

4  Q.  So you don't know which counties intend to advise voters

5  to include both kinds of ID numbers in future elections,

6  correct?

7  A.  Correct.  It gets back to the local control issue.

8  Q.  At the time SB 1 went into effect there were about 700,000

9  registered voters in Texas who had only either a driver's

10 license or social security number but not both associated with

11 their voter registration?

12 A.  That sounds right.

13 Q.  And at that time there were also approximately 100,000

14 registered voters in Texas who had no ID number at all

15 associated with their voter registration?

16 A.  That's correct.

17 Q.  To your knowledge there continue to be voters on TEAM who

18 only have one ID number associated with their registration?

19 A.  To my knowledge -- I'm sorry.  Repeat the question.

20 Q.  To your knowledge there continue to be registered voters

21 on TEAM who only have one ID number associated with their

22 registration?

23 A.  Yes, but much smaller numbers than they were at that time.

24 Q.  And there continue to be voters on TEAM who do not have

25 any ID numbers associated with their registration?

1846

CHRISTINA ADKINS – DIRECT

1  A.  I would agree with that, but, again, in much smaller

2  numbers than previously.

3  Q.  Voters in Texas can have multiple ID numbers issued by the

4  Department of Public Safety, right?

5  A.  Yes, but they are not necessarily all valid.  They may

6  have a driver's license, surrender that driver's license and

7  received a personal identification card, so it may change the

8  validity of those numbers.

9  Q.  But it's possible that they could have multiple valid

10  DPS-issued ID numbers, right?

11  A.  I don't know that.  That's a question for DPS.

12  Q.  The TEAM system only reflects a single DPS-issued ID

13  number for each voter?

14  A.  Correct.  The most current one, the one that I believe

15  would be valid.

16  Q.  Does your office have any plans to update TEAM so that a

17  voter registration record can hold multiple DPS-issued ID

18  numbers?

19  A.  No.

20  Q.  And if a person has a DPS-issued ID number that is valid

21  and not reflected in TEAM, they cannot use that number on a

22  ballot application or carrier envelope, correct?

23  A.  Correct, but, again, I'm not sure how many instances there

24  would be where somebody has a valid number because of the way

25  the DPS process works, where you have to surrender one in

CHRISTINA ADKINS – DIRECT

1   order to obtain a new one.

2   Q.   Shifting gears a little bit, are you familiar with the

3   Election Administration and Voting Survey?

4   A.   The EAV Survey, yes, I am.

5   Q.   Your office is responsible for collecting data for the EAV

6   Survey from county officials, correct?

7   A.   Yes.  I mean, it passes through our office.

8   Q.   And then you report it to the United States Elections

9   Assistance Commission, right?

10  A.   Correct.  We don't go through and validate the data

11  reported because it's meant to be a survey directly from those

12  officials, so it's self-reported data.

13  Q.   Your office has been responsible for collecting that data

14  since at least 2018, right?

15  A.   That sounds right.  Maybe even before then.

16  Q.   And you are aware that the EAV Survey asks the State's

17  Chief Election Officer to certify in writing that the

18  information being presented to the U.S. Election Assistance

19  Commission is true and accurate to the best of their

20  knowledge?

21  A.   Correct, to the best of our knowledge.

22  Q.   Are you aware of any other source of election data like

23  the EAV Survey that you've considered to be superior?

24  A.   I think it depends on the subject or the type of data we

25  are looking at.

CHRISTINA ADKINS – DIRECT

1  Q.  Can you give me an example of what other source of data

2  that might be?

3  A.  I mean, if you're looking for things like rejection rates,

4  you may want to look to what we have in our State system

5  versus what was reported by counties.

6  Q.  And where does the information in the State system come

7  from?

8  A.  It has to do with the information that the counties would

9  put in our system, you know, how they would track and log the

10  individual applications, where they are in the process, all

11  things related to ballot-by-mail tracker, actually.

12  Q.  So the source in the State system is the counties?

13  A.  Correct.

14  Q.  And the counties are also the jurisdictions who report

15  data to the EAV Survey, correct?

16  A.  Correct.

17  Q.  You spoke with Miss Tulin a little bit about the issue of

18  uniformity, do you recall that?

19  A.  Yes.

20  Q.  And she talked about your office's statutory duty to

21  obtain and maintain uniformity in the application of Texas

22  election law, right?

23  A.  Yes.

24  Q.  You would agree also that Texas has a highly decentralized

25  election system?

CHRISTINA ADKINS - DIRECT

1  A.  Absolutely.

2  Q.  There's a lot of local control over elections in Texas?

3  A.  Definitely.

4  Q.  And that's a purposeful way that the election process is

5  set up in Texas?

6  A.  I believe so.

7  Q.  So by necessity elections are going to be different on a

8  county-by-county basis in Texas due to different county needs

9  and that element of local control over election

10 administration?

11 A.  Yes.

12       MR. DODGE:  Pass the witness.

13       THE COURT:  Anything else on this side?

14       MR. BADAT:  Few questions, Your Honor.

15 BY MR. BADAT:

16 Q.  Morning, Miss Adkins.  My name is Amir Badat.  I represent

17 the HAUL plaintiffs in this litigation.  Thank you for being

18 here.  A few minutes ago you were talking about the numbers

19 that need to be provided on an ABBM for a person's mail

20 ballot -- or mail ballot application to be accepted, right?

21 A.  Yes.

22 Q.  And you mentioned that there are a number of people still

23 on TEAM that only have either their driver's license number or

24 their social security number, but not both, right?

25 A.  That's correct.

CHRISTINA ADKINS – DIRECT

1    Q.  And there are still a number of people in TEAM who have

2    neither a driver's license number or a social security number,

3    right?

4    A.  Yes, but the number is much, much smaller than it was

5    initially.

6    Q.  Now, if a voter's ABBM is rejected for a missing ID or an

7    ID mismatch, SB 1 requires a county to provide notice of the

8    rejection and include information in that notice about the

9    ability to cure the defect through the Secretary of State's

10   online Ballot Tracker, is that right?

11   A.  Yes.  I would say that what you are talking about, that

12   you said the county would provide notice, it could be the

13   county early voting ballot board, signature verification

14   committee, I mean, I think I need to point that out because

15   that's relevant.  It's those individual bodies that are

16   charged with that.  And, yes, they would be providing notice

17   of all of that options for instituting corrective action.

18   Q.  And one of those options is the Secretary of State's

19   online Ballot Tracker, right?

20   A.  That's correct.

21   Q.  Can we pull up Section 86.015(b) of the Texas Election

22   Code.  I'd like to take a look at the provision that covers

23   the Ballot Tracker.  Can we look at 86.015.

24        Okay.  Miss Adkins, are you familiar with this provision?

25   A.  I am, yes.

1851
CHRISTINA ADKINS – DIRECT

 1  Q.  And Section 86.015(b) says, "The online tool developed or
 2  provided under Subsection A must require the voter to provide
 3  before permitting the voter to access information described by
 4  that subsection, one, the voter's name and date of birth and
 5  the last four digits of the voter's social security number;
 6  and, two, the voter's -- a driver's license number, or, B,
 7  personal identification card number issued by the Department
 8  of Public Safety."  Did I read that correctly?
 9  A.  Yes.
10  Q.  So by statute a voter is only able to access the Secretary
11  of State's online Ballot Tracker if they have in their voter
12  registration file both their social security number and either
13  their driver's license number or personal ID card number, is
14  that right?
15  A.  That's correct.
16  Q.  So someone whose ABBM was rejected because they put down
17  their driver's license number but their voter registration
18  file only has their social security number would not be able
19  to access the online Ballot Tracker, right?
20  A.  Correct.  They couldn't use the tracker but they would
21  still be able to use the other methods that the law
22  prescribes.
23  Q.  And, vice versa, someone whose ABBM was rejected because
24  they put down their social security number but their voter
25  registration file only has their driver's license number, they

CHRISTINA ADKINS - DIRECT

1 would not be able to access the Ballot Tracker either, right?

2 A.  Correct.  Again, they could use the other options that are

3 there.

4 Q.  And someone who only has an election identification

5 certificate is also out of luck, right?

6 A.  Same problem, yes.

7 Q.  Because, by definition, they don't have a driver's license

8 or a personal ID card number so they wouldn't be able to

9 access the Ballot Tracker either, right?

10 A.  Correct, but, again, they have the other options available

11 to them under the law.

12 Q.  And voters who don't have both their social security

13 number and their driver's license or personal ID number in

14 their voter registration file would also be shut out of the

15 Ballot Tracker for purposes of curing their carrier envelopes

16 for an ID defect, right?

17 A.  Correct.  They wouldn't be able to utilize the tracker.

18 They would have to rely on alternative methods.

19 Q.  And because these requirements are set by statute, your

20 office cannot modify authentication requirements for the

21 Ballot Tracker, right?

22 A.  That's correct.

23 Q.  I'd like to stay on the topic of mail ballots.  It's true

24 that mail ballot voters are permitted to drop off their own

25 mail ballots in person at the Early Voting Clerk's Office on

CHRISTINA ADKINS - DIRECT

1  Election Day while the polls are open, right?

2  A.  Yes.  You got it all in, yes.

3  Q.  Got it.  And when a voter does that, they must present an

4  acceptable form of photo ID?

5  A.  Correct, yes, sir.

6  Q.  And that's the same photo ID that a voter must present

7  when they are voting in person at a polling location, right?

8  A.  That's correct.

9  Q.  And that photo ID is intended to confirm the identity of

10  the voter, right?

11  A.  Yes.

12  Q.  And when the election worker is looking at the ID to

13  confirm the voter's identity, they are comparing the photo on

14  the ID to the person who is in front of them, right?

15  A.  Correct.

16  Q.  A person is not permitted to drop off someone else's mail

17  ballot, correct?

18  A.  That's what the law says.

19  Q.  And, now, as we discussed, all mail ballots post-SB 1 must

20  include an ID number that matches with an ID number in the

21  voter file in order to be accepted, correct?

22  A.  Correct.

23  Q.  And that requirement also applies to mail ballots that are

24  dropped off in person, correct?

25  A.  The identity requirements are still the same, that's

1  correct.

2  Q.  So even though the voter provides photo ID at drop-off and

3  the election worker confirms the voter's identity, a person's

4  ballot could still be rejected if they don't have a matching

5  ID number on their carrier envelope, correct?

6  A.  That's correct.

7  Q.  Or if they forgot to put their ID on their carrier

8  envelope, correct?

9  A.  That's correct.

10 Q.  I'd like to ask you a couple of questions about voter

11 registrations.  Texas has seen significant growth in the

12 number of people registering to vote over the past several

13 years, correct?

14 A.  Yes, we have.

15 Q.  Hundreds of newly registered voters every day?

16 A.  That sounds right, yes.

17 Q.  Can we take a look at OCA Plaintiffs Exhibit 283, please.

18     This is a Texas voter registration application, right?

19 A.  Yes.

20 Q.  You've seen this before?

21 A.  Many times.

22 Q.  If we could go to the second page of the exhibit, I'd like

23 to turn your attention to the section at the bottom underneath

24 filling out the application, and actually it's on the

25 right-hand side, the seconds bullet.  It states that, "All

1855

CHRISTINA ADKINS - DIRECT

 1  voters who register to vote in Texas must provide a Texas
 2  driver's license number or personal identification number
 3  issued by the Texas Department of Public Safety.  If you don't
 4  have such a number, simply provide the last four digits of
 5  your social security number, and if you don't have a social
 6  security number you need to state that fact."
 7      Did I read that correctly?
 8  A.  You did.
 9  Q.  If we can go back up to the first page and take a look at
10  row nine.  It has a space for the person who is registering to
11  enter their Texas driver's license number or Texas personal ID
12  number, correct?
13  A.  That's correct.
14  Q.  And then next to it, it says, "If no Texas driver's
15  license number or personal identification number, give the
16  last four digits of your social security number," correct?
17  A.  Correct.
18  Q.  So a voter is not -- or a person registering to vote is
19  not required to provide both numbers on this application,
20  correct?
21  A.  Correct.
22  Q.  And a reasonable reading of this is that if I put down my
23  driver's license number I don't have to put down my social
24  security number, correct?
25  A.  Yes.

CHRISTINA ADKINS – DIRECT

1  Q.  Or if I put down my social security number I don't have to

2  put down my driver's license number, right?

3  A.  That's correct.

4  Q.  And so for someone who is filling out this application to

5  register in Texas for the first time the ID number they are

6  providing here is the ID number that will populate in TEAM,

7  correct?

8  A.  Initially that will be the one that populates in TEAM, but

9  we do work with DPS to try to obtain missing information.  So

10 we try to get — if you put the last four digits of your

11 social security number, we work to get the full line.  We also

12 work to get driver's license numbers, you know, and vice

13 versa.

14 Q.  And so for people who you can't get that additional

15 information for and they register to vote with just one of

16 these numbers in TEAM, they will only have one of these

17 numbers?

18 A.  That's correct.

19 Q.  Which means that they are at risk of having their ABBMs or

20 carrier envelopes rejected, if they don't use the right ID

21 number, correct?

22 A.  Right.  If they are applying within that time period

23 before we've been able to obtain additional information, if

24 it's available through DPS.

25 Q.  And they will also be shut out of the Secretary of State's

CHRISTINA ADKINS – CROSS

1  online Ballot Tracker because they don't have both numbers in

2  their file, correct?

3  A.  Correct.  If both are not in the file then they would not

4  be able to utilize the tracker.

5  Q.  Generally speaking, Miss Adkins, your office can't waive,

6  modify, or suspend state law, correct?

7  A.  Or alter or create, I think it says after that, yes,

8  that's correct.

9  Q.  You know the election code much better than I do.

10      And last question.  The Secretary of State's Office

11  receives federal funding, is that right?

12  A.  Yes, we do receive some federal funds through HAVA, Help

13  America Vote Act.  There are things that have come through our

14  office.  Most of that is passed on to the counties, but, yes.

15          MR. BADAT:  Thank you, Miss Adkins.

16          I pass the witness.

17          THE COURT:  Anything else on this side?

18          Any cross?

19          MISS HUNKER:  Very short cleanup, Your Honor.

20                    CROSS-EXAMINATION

21  BY MISS HUNKER:

22  Q.  Miss Adkins, what is the Secretary of State's role

23  regarding the EAV Survey?

24  A.  We help collect that data and then pass it on to the

25  Election Assistance Commission.  It's just a point of — we're

CHRISTINA ADKINS - CROSS

1  just a point of collection of the data.

2  Q.  During your examination with counsel you had used the word

3  "pass-through" what did you mean about that?

4  A.  The counties report that data, it says self-reported from

5  the county since they are the practitioners we are gathering

6  this data from.  They submit it through whatever mechanism the

7  EAC is using that year for collection of data.  Once that data

8  has been collected, we submit that data on to the Election

9  Assistance Commission but we don't review it for accuracy.

10  Q.  Were the counties required to collect data related to mail

11  ballot rejection rates prior to 2021?

12  A.  I think there were questions related to that in the EAV

13  Survey, but with respect to the data that our system held

14  there were not as many requirements at the time for them to

15  report, I think all of the things that occur with a

16  ballot-by-mail process directly into the TEAM system.

17  Q.  Were there any state requirements that they collect that

18  data?

19  A.  No.  There were no state requirements that they collect

20  that data.

21  Q.  Were there requirements that the State collect data

22  regarding ABBM rejection rates, specifically State

23  requirements?

24  A.  No, there were no State requirements to collect that

25  information.

CHRISTINA ADKINS - CROSS

1  Q.  Were counties required to follow specific standard when
2  tracking data related to mail ballot rejection rates?
3  A.  No.
4  Q.  Were counties required to follow specific standard when
5  recording EAVS data?
6  A.  No.
7  Q.  When did Texas introduce the Ballot Tracker?
8  A.  It was the result of legislation I believe in 2021.
9  Q.  And in response to the Ballot Tracker have counties
10 started collecting more data related to mail ballots?
11 A.  I would say yes, as a requirement they have to submit
12 information in order to populate that tracker.  In the past
13 counties were not always entering in all the final outcomes
14 related to their ballot-by-mail applications.  They weren't
15 always reporting things that were rejected into the tracker.
16    Because of the tracker, we now have more reporting
17 requirements about where things are along in the process and
18 so now they do have to do that.
19 Q.  And when did Texas introduce a cure process for ballots by
20 mail?
21 A.  That process came about as a result of Senate Bill 1, so
22 as a result of that 2021 legislation.
23 Q.  In response to the cure process are counties collecting
24 more data related to mail ballot rejections?
25 A.  Oh, yes, definitely.

CHRISTINA ADKINS - CROSS

1    Q.  During your conversation with counsel you had mentioned a

2    Ballot Tracker and authentication?

3    A.  Yes.

4    Q.  When SB 1 was enacted, was a voter required to put in

5    their residence address?

6    A.  Yes.  When SB 1 was enacted, residence address was a

7    required field to authenticate.

8    Q.  Has the Texas legislature changed that requirement?

9    A.  They have, yes.

10   Q.  Are Texas voters required to provide their address to

11   enter the Ballot Tracker today?

12   A.  No.  That was a change from the most recent legislative

13   session, in lieu of residence address voters are now using

14   date of birth, which is an easier field for data entry

15   purposes.

16          MISS HUNKER:  Thank you, Miss Adkins.  We'll reserve

17   the rest of the questions for our case in chief.

18          THE COURT:  Any further from this side?

19          MR. LIU:  No questions.

20          THE COURT:  I've got a question.  So these advisories

21   that your office issues and in the past used to issue legal

22   opinions, what's the difference between the two?

23          THE WITNESS:  That's an excellent question, Your

24   Honor.

25          In the past I think our office would wade into the

1861

CHRISTINA ADKINS – CROSS

1  area of issuing opinions similar in a way to the way the

2  Attorney General's Office would issue an opinion.

3      We don't go that route because we really don't have

4  the authority to issue binding opinions like that.  So when we

5  issue an advisory, that's our attempt to provide guidance and

6  instruction, either in areas of law that need clarification,

7  or because there may be something in the law that says SOS may

8  prescribe additional procedures.  And so it's our way of

9  providing those addition procedures and guidance.

10      THE COURT:  So like in a legal precedent statute, the

11  Constitution statutes, and down lower in the list is the

12  federal system regulatory agencies like the wage and hour

13  issue, an opinion letter, the Attorney General for the State

14  of Texas would issue a letter, and so courts are supposed to

15  give some deference.  It's a matter of question about how much

16  deference, but it's got some legal effect.  The advisory

17  opinions have no legal effect, is that correct?

18      THE WITNESS:  Well, I don't know if I would say no

19  legal effect, sir.  I think what I would say is they are very

20  procedure driven.

21      It's more about explaining procedures, kind of in

22  that quest that we have in Chapter 31 of the election code to

23  maintain and obtain uniformity in the way the laws are applied

24  those advisories are the way in which we do that.  We provide

25  detail and procedure to help with the application of the laws,

CHRISTINA ADKINS - CROSS

1  and we do that through the advisory process.

2         You know, it's a little bit different than like an

3  administrative rule because it's more about process and

4  procedure and helping to explain what the law means so that

5  the counties, when they are the ones that are applying the law

6  have a little bit more guidance.

7         It's more to help create some uniformity in our

8  system and to give those additional guidelines when the

9  legislature has indicated there may be a need for additional

10 guidelines.

11        THE COURT:  Are you aware of any Texas state court or

12 any federal court for that matter that has given the advisory

13 opinions the same effect as a letter opinion?

14        THE WITNESS:  No, sir.  I'm not aware.  I'm not

15 aware.

16        THE COURT:  Is it fair to say that — so you talked

17 earlier about getting informal advice on a one-off by email,

18 is this just a better way to give advice on a larger scale, is

19 that a better way of phrasing this?

20        THE WITNESS:  I would say advice and procedures

21 because there are advisories that we have — I'll give you an

22 example, if you don't mind, sir.

23        We have an advisory on our electronic voter systems

24 and procedures.  We have specific statutory authority to

25 prescribe some additional procedures related to the use of

CHRISTINA ADKINS - CROSS

1   electronic voting systems.  We do that in an advisory format
2   that we typically issue every few years because we need to
3   update it with respect to changing technology, and so the
4   guidance in that document is based on statutory authority we
5   have to prescribe procedures, but it's not really an opinion.
6   It's more providing the details on how to do something or to
7   provide some additional standards, you know, in this example
8   security standards and security procedures, but, again,
9   different than the law.  It's filling in the gaps is the way I
10  like to think about it.
11          THE COURT:  And you are not pre-publishing any of
12  this in the Texas Register for comment, or anything like that?
13          THE WITNESS:  That's correct, yes, sir.  It's
14  different than the administrative role-making process.  I
15  agree with you there, Your Honor.
16          THE COURT:  Any questions based on my questions?
17          MR. DODGE:  I have one follow-up question on a topic
18  that counsel touched on.
19          THE COURT:  Do you have an objection to that, or are
20  you going to allow his question out of order or not?
21          MR. KERCHER:  If it's responsive to the questions
22  Your Honor that we raised, we don't have a problem with it.
23          THE COURT:  Go ahead.
24
25

1864

CHRISTINA ADKINS — REDIRECT

1    REDIRECT EXAMINATION

2    BY MR. DODGE:

3    Q.   You were discussing with counsel a moment ago the new

4    tracking and cure process implemented by SB 1, correct?

5    A.   Yes.

6    Q.   That was in place for the 2022 elections, correct?

7    A.   Yes.

8            MR. DODGE:  Nothing further.

9            THE COURT:  Any other questions based either on the

10   cross or my questions?  None on this side.

11           Anything on this side?  None.

12           You may step down, ma'am.  Thank you.

13           Oh, you are still under the rule, as I think they

14   intend to bring you back.  So you can of course consult with

15   lawyers but no other witnesses.

16           THE WITNESS:  Yes, your Honor.

17           THE COURT:  With that, let's go ahead and take a

18   lunch break.

19           *(Recess)*

20           *(Change in reporter)*

21

22

23

24

25

1          *(12:59 p.m.)*

2          COURT SECURITY OFFICER:  All rise.

3          THE COURT:  Thank you.  Please be seated.

4          MR. KANTERMAN:  Thank you, Your Honor.  Jason

5     Kanterman from Fried, Frank, Harris, Shriver & Jacobson on

6     behalf of the LUPE plaintiffs.  And Your Honor, we're going to

7     call Keith Ingram to the stand.

8          COURTROOM DEPUTY CLERK:  Raise your right hand.

9                         *   *   *

10         *(Oath administered and, KEITH INGRAM, witness, Sworn.)*

11                        *   *   *

12         MR. KANTERMAN:  Your Honor, before we begin the

13    examination, for the record, the LUPE plaintiffs will elicit

14    testimony from Mr. Ingram in support of all of their claims

15    across all of the sections that have been challenged in this

16    case.

17         THE COURT:  Thank you.

18         MR. KANTERMAN:  And Your Honor, as the Court will

19    hear, Mr. Ingram was formerly employed by the Secretary of

20    State's Office, previously served in the Elections Division,

21    and testified on numerous occasions in this case as the

22    30(b)(6) witness; so therefore, pursuant to Federal Rule of

23    Evidence 611(c)(2), I'd request leave to ask leading questions

24    of Mr. Ingram, because he's a witness identified with an

25    adverse party.

1          MR. KERCHER:  No objection.

2          THE COURT:  You may proceed.

3          MR. KANTERMAN:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5   BY MR. KANTERMAN:

6   Q.  Mr. Ingram, good afternoon.

7   A.  Howdy.

8   Q.  Good to see you again.  Please state your full name for the

9   record.

10  A.  Brian Keith Ingram.

11  Q.  Mr. Ingram, you previously worked for the Secretary of

12  State's Office?

13  A.  I did.

14  Q.  In the Elections Division?

15  A.  I did.

16  Q.  Before going into details about your job with the Secretary

17  of State's role, I'd like to talk a little bit about your

18  personal educational background and employment history.

19      After graduating from college, you went on to law school?

20  A.  I did.

21  Q.  At the University of Texas School of Law?

22  A.  Yes.

23  Q.  You graduated from University of Texas School of Law in

24  1993?

25  A.  1993, yes, sir.

Keith Ingram – Examination                    1867

1   Q.  With a Juris Doctorate degree?

2   A.  Yes.

3   Q.  After graduating from law school, you proceeded into

4   private practice?

5   A.  I did.

6   Q.  Worked for a number of firms?

7   A.  Three, I guess.

8   Q.  And after your time in private practice in the late 2000s,

9   you went on to work for Governor Perry's office?

10  A.  That's true.

11  Q.  You worked for the Governor's Office for approximately

12  four years?

13  A.  I did.

14  Q.  And after that, you transitioned over to the Secretary of

15  State's Office?

16  A.  I agree.

17  Q.  And that was generally in January of 2012?

18  A.  Yes, it was January 5, 2012.

19  Q.  Thank you for the clarification.

20      When you first joined the Secretary of State's Office, you

21  were given the title of director of the Elections Division; is

22  that right?

23  A.  I agree.

24  Q.  Director is the most senior title in the Elections

25  Division?

Keith Ingram – Examination                    1868

1    A.   It is.

2    Q.   And you held that role for more than ten years?

3    A.   Eleven years, two months, five days.

4    Q.   And that was up until March of 2023?

5    A.   Yes, sir.

6    Q.   At which point you transitioned out of the director role

7    into more of a special projects role?

8    A.   I agree.

9    Q.   And in that new role, you reported to the new director of

10   the Elections Division?

11   A.   I agree.

12   Q.   And that was Ms. Christina Adkins?

13   A.   Yes.

14   Q.   Now that we've had an opportunity to discuss your

15   background, I'd like to talk more about your time at the

16   Secretary of State's Office and your role in the Elections

17   Division.

18       During your time as director, you managed and oversaw the

19   Elections Division?

20   A.   Agree.

21   Q.   And during that time, there were approximately 30 employees

22   in that division?

23   A.   That's right.

24   Q.   All of those individuals ultimately reported to you?

25   A.   They did.

Keith Ingram – Examination                    1869

1    Q.  And you ultimately reported to the executive leadership

2    team at the Secretary of State's Office?

3    A.  I agree with that.  Specifically, the deputy secretary.

4    Q.  And the Secretary of State as well; is that right?

5    A.  Of course.

6    Q.  And generally, your job as director was to help the

7    secretary fulfill their responsibility as chief elections

8    officer of the State of Texas?

9    A.  Agreed.

10   Q.  And as part of that role, you helped the secretary prepare

11   for and ultimately implement SB1?

12   A.  That's true.

13   Q.  Let's discuss some of the things that you and your office

14   did prior to SB1's enactment.  Among other things, you and your

15   office met with legislative staff to discuss impending voting

16   legislation, including SB1?

17   A.  Well, in the regular session, it was SB7 and HB6, but, yes,

18   sir.

19   Q.  And you also met with individual legislators before the

20   bill became SB1?

21   A.  Agreed.

22   Q.  And you also met with legislative committees before the

23   bill became SB1?

24   A.  I did.  I testified before several committees.

25   Q.  During some of those meetings, setting aside just for the

Keith Ingram - Examination                1870

1    moment the testimony that you provided, you would -- you and

2    your office would advise legislators, their staff, or

3    legislative committees about the bill language?

4    A.  Our role in the Secretary of State's Office is to be a

5    resource for the legislature, and so if they had a question

6    about how certain language would be implemented or what we

7    thought it meant or if they thought -- if we thought there

8    would be a problem in the implementation, those are the kind of

9    questions we would get.  We didn't usually get asked about

10   language unless the legislature had a question about it.

11   Q.  But, for example, if an individual legislator approached

12   you or your office and asked for your advice about whether some

13   language that they were considering proposing would work in the

14   real world, your office would provide them with that advice?

15   A.  Sort of.  I mean, it's our goal to help the legislature get

16   where it wants to go without doing any damage along the way, so

17   sometimes we might suggest alternative ways to achieve the same

18   goal without some side effects.

19   Q.  And, in fact, it's part of the Secretary of State's role to

20   advise on the technical implementation process of

21   voting-related legislation or future voting-related

22   legislation?

23   A.  When they ask.  It's not our job to volunteer or try to

24   somehow change legislation outside of the resource witness

25   role.

Keith Ingram – Examination                    1871

1  Q.  Let's talk a little bit about some of the things you did

2  and your office did to help implement SB1.  We'll start first

3  with discussing drafting of forms.

4      In addition to the legislative interactions we discussed,

5  the Elections Division changed a number of forms that it

6  publishes following the enactment of SB1?

7  A.  I agree.

8  Q.  And, for example, the Secretary of State's Office revised

9  the application for a ballot-by-mail form that it promulgated?

10 A.  We did.

11 Q.  And the Secretary of State's Office also changed the voter

12 assistance oath form?

13 A.  Yes.

14 Q.  And it did so to accommodate new changes in the law brought

15 about by SB1?

16 A.  Agreed.

17 Q.  For example, SB1 changed the language of the assister oath.

18 A.  It did.

19 Q.  And the Secretary of State's Office changed the voter

20 assistance oath form to conform with this new language.

21 A.  Agreed.

22 Q.  As director of the Elections Division, no form or policy

23 could be published without your approval when you were the

24 director?

25 A.  I can't envision a circumstance where it would have.  I

Keith Ingram - Examination                    1872

1    don't know if it was possible.  I guess it's possible, but I

2    don't think it ever happened.

3    Q.  You would agree, though, that no form could be published if

4    the deputy Secretary of State disagreed with it?

5    A.  Agreed.

6    Q.  And the same for the Secretary of State.  No form could be

7    published by the Elections Division if the Secretary of State

8    ultimately disagreed with it?

9    A.  Agreed.

10   Q.  You would agree that any form provided to voters should be

11   designed so that a voter who follows the instructions on that

12   form will ultimately have the form accepted?

13   A.  I agree with that.  The most important thing for a form to

14   do is to follow the law.  A good form is a guide to the law

15   and, of course, if it guides through the law successfully, then

16   the voter will be successful.

17   Q.  And so we could agree, then, that any form put out by the

18   Secretary of State's Office, the goal of that form would be

19   that if a voter followed it to the T, it would ultimately get

20   accepted?

21   A.  Agreed.  For whatever purpose the form is supposed to be

22   used for, you bet.

23   Q.  In addition to changing forms and having meetings with the

24   legislature, the Elections Division also issues documents known

25   as "advisories"; is that right?

Keith Ingram - Examination                    1873

1    A.  We do.

2    Q.  Advisories are something the division would send out,

3    something more formal than a mass e-mail, but generally a mass

4    communication relating to voted-related topics?

5    A.  Agreed.  We would do advisories on discrete topics of law.

6    Usually the advisory was a combination of legal stuff as well

7    as practical implementation stuff, steps to take.

8    Q.  And so let's talk just a little bit more about that.  These

9    advisories that you would send out may go to county elections

10   officials?

11   A.  That's true.

12   Q.  It might go to cities?

13   A.  Sometimes, yes.

14   Q.  They might go to other political subdivisions throughout

15   the state?

16   A.  Agreed.

17   Q.  These advisories might, as you've already mentioned,

18   provide official instructions to these elections officials from

19   the Secretary of State's Office?

20   A.  Agreed.

21   Q.  Those advisories might, for example, offer interpretation

22   from the Secretary of State's Office of certain provisions of

23   SB1?

24   A.  Yes.  I mean, but usually our role is to follow the law as

25   it's written, so there's not a lot of interpreting to be done.

1    However, sometimes to make a statute work, it has to be

2    interpreted around the edges a little bit, and so that's our

3    job under 31.003 of the Election Code is to obtain and maintain

4    uniformity in the interpretation of the Election Code if the

5    election falls outside of the Code, so sometimes to harmonize

6    existing law with a new statute, some interpretation has to be

7    done, but our goal always was to begin and end with the text.

8    Q.   But it is true that sometimes when you are offering those

9    interpretations in furtherance of your office's goals, those

10   would appear in advisories that your office would send out?

11   A.   I don't know if we put it in the advisory as an

12   interpretation, but that's what ended up in the advisory was

13   our interpretation, if interpretation was needed.

14   Q.   As the director of the Elections Division, you were

15   ultimately the person authorized to make interpretations of law

16   for the division?

17   A.   Well, as I said in my deposition, we've got a whole lot of

18   folks who review our work, and so there's not anything that we

19   do that is not vetted.  So, you know, sure, it's my name that

20   it goes out under, and it's my authority that it goes out

21   under, but it's not only my work.

22   Q.   No advisory would be sent out from the Elections Division

23   under your name if you disagreed with it?

24   A.   I agree with that.

25   Q.   And no advisory would be sent out from the Elections

Keith Ingram - Examination                    1875

1    Division if the deputy Secretary of State disagreed with it?

2    A.   Probably not.

3    Q.   And the same is true for the Secretary of State?

4    A.   That's right.

5    Q.   The Division also provided or published trainings relating

6    to SB1's changes to voting laws in Texas; is that right?

7    A.   That's right.

8    Q.   For example, the Division has provided seminars for county

9    election officials to teach them about changes to the election

10   law requirements?

11   A.   Agreed.

12   Q.   And on how to implement those changes in their counties?

13   A.   Yes.  The seminar for county election officials is usually

14   in July of an even-numbered year or an odd-numbered year, and

15   so the SB1 was not completed until September of that year, so

16   we missed our chance with the seminar to teach the counties

17   about it.

18   Q.   Your office has also provided trainings and webinars to

19   ballot boards; is that right?

20   A.   Agreed.  More recently.  That's only a more recent

21   phenomena.

22   Q.   Those webinars or trainings to the ballot boards may have

23   included topics relating to mail ballots following enactment of

24   SB1?

25   A.   Agreed.

Keith Ingram - Examination                    1876

1    Q.  You'd also provide trainings on how certain forms
2    promulgated by the Secretary of State's Office could and should
3    be used?
4    A.  I don't know -- I mean, sort of.  The forms that are
5    designed to be used by the voters -- we obviously don't train
6    voters on our forms.  The forms that are supposed to be used by
7    candidates, we do talk to the political parties in every
8    odd-numbered year about the candidate applications.  We also
9    talk to city schools and other political subdivisions and
10   county election officials about the application process in
11   accepting applications, because they do independent
12   applications for office.
13   Q.  And so while you don't necessarily provide training to
14   individual voters about forms, fair to say that you have in the
15   past provided training to entities who receive or accept those
16   ballots on how to use those forms?
17   A.  Right.
18   Q.  The Secretary of State's Office also creates training for
19   poll watchers, right?
20   A.  We do.  It's a part of SB1 for the first time.
21   Q.  And poll watchers may not serve unless they've completed
22   this training?
23   A.  Agreed.
24   Q.  Secretary of State's Office also reports complaints that it
25   receives relating to various election crimes to the Attorney

Keith Ingram – Examination                    1877

1    General's Office?

2    A.  One of the functions of our office is to review complaints

3    from the public or from election officials and determine

4    whether or not there's reasonable cause to suspect a crime has

5    occurred.  And if we believe that, you know, on the face of the

6    document that it looks like the elements of a crime have been

7    met, we will refer that to the Attorney General for further

8    action.

9    Q.  And I'm going to unpack that with you in just a moment, so

10   thank you.  But before I get there, as the director of the

11   Elections Division of the Secretary of State's Office, it was

12   ultimately up to you to decide whether to refer a complaint to

13   the Attorney General's Office or not?

14   A.  Yes, most of the complaints.  I'm the one that would review

15   them and decide what the disposition was going to be.  There

16   were a few that were pretty close calls that I would, you know,

17   bring before the rest of the attorneys and have our general

18   counsel to see what they thought, you know, if it was a close

19   call.  Usually, if it's a close call, we'd refer it anyway,

20   because it's better to err on the side of making sure that

21   crimes are prosecuted.

22   Q.  And so you've given me a good amount already about the

23   process that you used in deciding whether to refer something,

24   but let's just run through it a little bit more to make sure I

25   have it.

1        As a general matter, a complaint would come into your

2    office and would ultimately be scanned in and sent to you for

3    review; is that fair?

4    A.   Agreed.

5    Q.   And you personally reviewed every complaint that came in?

6    A.   I did.

7    Q.   And then you personally would decide what to do next?

8    A.   I agree.

9    Q.   You would, for example, as you've mentioned, consider

10   sending a disposition letter?

11   A.   To the person who sent the complaint, sure.

12   Q.   Thank you for clarifying.

13       And if you chose to send a disposition letter to the

14   complainant, you might ask your support staff to draft that

15   letter for you and send it back to the complainant; is that

16   right?

17   A.   Agreed.

18   Q.   Another option that you had at your disposal was to refer

19   internally to Secretary of State's Office the complaint you

20   received to a Secretary of State lawyer for further review?

21   A.   Right.  And usually with instructions to refer or not

22   refer, but to write a specific kind of letter in response to

23   the complaint.

24           THE COURT:  Let me backtrack.  I'm assuming

25   "disposition letter" meant no merit?  Why don't you explain

Keith Ingram - Examination                    1879

 1   what that means.
 2           MR. KANTERMAN:  I think that's a very fair point, Your
 3   Honor.
 4   BY MR. KANTERMAN:
 5   Q.  Mr. Ingram, when you and I refer to the term "disposition
 6   letter," is it fair to say that a disposition letter would be
 7   sent to a complainant if you determined that there was no merit
 8   and the complaint was not worth investigating further?
 9   A.  Well, it's kind of both things.  If we write a letter in
10   response to a complaint, sometimes it's a referral to the
11   Attorney General and we do cc the complainant, so they get a
12   response either way.  But if we decide that there's not any
13   merit or if it needs more factual information in order to
14   justify referring it, then we will send that letter to the
15   complainant and ask them for more information or tell them, you
16   know, *We're sorry this happened to you, but it's not a crime*
17   *under any set of circumstances.*  Or we sometimes say, *We're*
18   *sending a copy of this complaint to the local election*
19   *officials so that they can address this in training, so it*
20   *won't happen with their workers again.*  You know, those are
21   kind of the three normal answers to a complainant.
22   Q.  Thank you.
23           MR. KANTERMAN:  Your Honor, I'm happy to explore
24   further unless -- thank you.
25   BY MR. KANTERMAN:

1  Q.  When making a determination about how to proceed with a

2  particular complaint, there was a standard or a process that

3  you would apply.  I think you've already alluded to that as the

4  reasonable cause to suspect that a crime has occurred, right?

5  A.  Agreed.  That's in 31.006 of the Code.

6  Q.  And in applying that standard, you would review the

7  elements of any particular election crime, compare that with

8  the allegations in the complaint you received, and ultimately

9  see if there was a match?

10  A.  Agreed.

11  Q.  And so long as a complaint alleged facts that your office

12  believed constituted criminal activity, you would send the

13  complaint on to the Attorney General's Office for review?

14  A.  I am a sorry, I lost that question.

15  Q.  I'm happy to repeat it.  As long as a complaint alleges

16  sufficient facts that your office believes constitutes criminal

17  activity, you would send that complaint on to the Attorney

18  General's Office for review?

19  A.  Right.  If it created a reasonable cause to suspect that a

20  crime has occurred.

21  Q.  And I think you mentioned earlier that even if it was a

22  close call in your mind about whether the complaint satisfied

23  that standard, you would err on the side of forwarding those,

24  too, to the Attorney General's Office?

25  A.  Absolutely.

Keith Ingram - Examination                    1881

1  Q.  Now, you'd agree that the reasonable cause to suspect

2  standard is subjective?

3  A.  It is.  Well, I mean a reasonable person would they have

4  cause to suspect.  That's always been an objective standard,

5  but I don't know how objectively you can measure it.

6  Q.  In fact, it's probably fair to say it was a judgment call

7  on your part on whether you thought there was enough of an

8  allegation in a complaint to forward along or not?

9  A.  Agreed.

10  Q.  Now, to be clear, while the Secretary of State's Office

11  refers election complaints to the Attorney General's Office, it

12  is not the only referring agency or referring source in the

13  state.

14  A.  Agree with that.

15  Q.  And that means anybody can go to any county attorney or any

16  district attorney and complain about something that they think

17  is criminal activity, including election-related criminal

18  activity and lodge a complaint.

19  A.  Sure.  There's a part of the Election Code that says if two

20  or more voters swear in writing to the facts, then the D.A. has

21  to investigate.  So, I mean, it's both voluntarily as well as

22  mandatory if they do it right.

23  Q.  Mr. Ingram, let's transition now to talk about SB1, and

24  I'll ask Derek, please, to publish the statute, which is

25  already in evidence as Joint Exhibit 1.

1        Mr. Ingram, you've got the statute in front of you on the

2   screen, but if it's helpful, I've got a paper copy.  Happy to

3   provide that to you too.

4   A.  This is fine.

5   Q.  Thank you.  Before we dig into the substance of my

6   questions on SB1, is it fair to say that you're familiar with

7   the statute?

8   A.  Yes.

9   Q.  In fact, you've engaged with this statute regularly since

10  its enactment?

11  A.  Not so much recently, but very much in 2022.

12  Q.  I want to first begin by discussing Section 4.09.

13  Generally, sir, 4.09 makes it a crime to knowingly distance or

14  prevent a poll watcher from observing an activity in a manner

15  that would make observation not reasonably effective.

16  A.  Right.

17  Q.  And Section 4.07(f) -- which I'll give Derek a moment to

18  pull up on the screen for you -- provides that where a poll

19  watcher is entitled to observe an election activity under SB1,

20  they are entitled to sit or stand near enough to see and hear

21  the activity.

22       Is that right?

23  A.  That's what it says.  It's important to note that this law

24  doesn't change anything substantively.  It just set out in

25  words what we already believed the law to be.  So conveniently

Keith Ingram – Examination          1883

1   near or close enough to see and hear the observed activity;

2   that they're entitled to observe any election activity in the

3   polling place, all of these things were already known and put

4   in place by poll workers.  So this didn't change the law

5   substantively.  It did not give more abilities to poll watchers

6   to do whatever they wanted to do.  It was still within the same

7   constraints that you couldn't disrupt the voting process.  You

8   couldn't talk to voters.  I mean, all of those things are still

9   the same.  It just made very clear what an observer was

10  entitled to observe.  You know, it didn't change the

11  relationship between the observer and the poll workers.

12  Q.  And I appreciate that explanation, Mr. Ingram, but just for

13  purposes of the question I asked, you would agree that 4.07(f)

14  provides that where a poll watcher is entitled to observe,

15  they're entitled to sit or stand near enough to see and hear

16  the activity?

17  A.  Right.  You can see up there in (a) that a watcher was

18  entitled to sit or stand conveniently near the observed

19  activity before.  And now it's near enough to see and hear.

20  That's the same thing.

21  Q.  Section 4.07(e), provides that a poll watcher may not be

22  denied free movement where election activity is occurring; is

23  that right?

24  A.  Agreed.  And that was the case before.  If you got in their

25  way and you obstructed them, you were going to be convicted of

Keith Ingram – Examination                    1884

1    a crime, Class B misdemeanor, for obstructing a poll watcher.

2    And we had several complaints that were referred to the

3    Attorney General for exactly that crime, and we would still

4    refer them today.

5    Q.  The phrase "reasonably effective" as used in Section 4.09

6    is not defined anywhere in SB1, right?

7    A.  Well, I think everybody knows that the whole point of

8    observing election activity is to be able to effectively

9    observe it so that if something is going on, you can make

10   notes, you can bring it to the attention of your principal, and

11   it might be the basis for an election contest.  That's the

12   whole reason to have observers in the polling places, so that

13   they can effectively observe election activities.

14   Q.  And I appreciate that explanation, but my question was a

15   little bit more narrow.  The phrase "reasonably effective" as

16   used in Section 4.09 is not defined anywhere in SB1, right?

17   A.  I don't believe it is, no.

18   Q.  And the Secretary of State's Office does not have any

19   opinion as to the meaning or definition of the term "reasonably

20   effective" as that phrase is used in this section?

21   A.  If you're asking if we've got anything in our materials, we

22   refer to the statutory language.

23   Q.  The determination of whether some action makes observation

24   not reasonably effective requires a subjective assessment,

25   fair?

Keith Ingram – Examination                    1885

1   A.   Yeah.  And the one making that assessment in the first

2   instance is the election judge.

3   Q.   And we'll get to that, and so I appreciate that.

4       Fair to say, though, that differing parties have differing

5   views about what makes observation reasonably effective?

6   A.   I would agree with that.  I think that it's probably on a

7   spectrum from more effective to less effective, and at some

8   point it gets to be so much less effective that it's not

9   effective at all.

10  Q.   You would agree with me that poll watchers, in your

11  experience, tend to be maximalists in their view of how close

12  they're entitled to be to any activity?

13  A.   In my experience, poll watchers are definitely maximalists

14  and so are poll workers, so what we've got is a situation where

15  two people are very much with their feet in concrete, and

16  that's why this language was added to the Code, to make both

17  sides understand, with more words, what the roles are and

18  what's expected of them.

19  Q.   Now, because the Secretary of State's Office does not have

20  an opinion or definition beyond what SB1 says, it would just

21  tell the presiding judge, who you said is responsible for

22  making the determination in the first instance, to use their

23  best judgment when deciding who's right?

24  A.   Agree with that.  And, you know, we encourage them to call

25  back to their election official in the county and make sure

Keith Ingram - Examination                    1886

1    that everybody is on the same page with regard to their

2    proposed actions.  Sometimes they call us from the polling

3    place.  Sometimes the election official will call us, and we're

4    happy to give our best guess about what to do, but every time

5    that we talk to somebody about potentially taking action

6    against a poll watcher, we remind them that it's a crime if

7    you're not justified in your action.  So you need to be

8    careful.  But that was our advice before SB1.  That's our

9    advice since SB1.

10   Q.  And so I want to unpack that just a little bit.  The

11   Secretary of State's Office would tell the elections judge to

12   be careful about rejecting a poll watcher's complaint about not

13   having a reasonably effective ability to observe because it's a

14   crime to obstruct a poll watcher?

15   A.  Exactly.

16   Q.  And the Secretary of State's Office would also tell the

17   elections judge to think carefully about what they're doing?

18   A.  Absolutely.  And when we've had conversations with election

19   officials because of poll watchers in Central Count or the

20   ballot board, we've told them the same thing.  And we've had

21   complaints against election officials for obstructing poll

22   watchers in Central Count, and we've referred those over to the

23   Attorney General.

24   Q.  The Secretary of State's Office would also recommend the

25   elections judge consider calling the county attorney before

Keith Ingram - Examination                    1887

1    making a final choice on any dispute?

2    A.  If they've got that luxury, yes, sir, that's the best

3    advice, because the county attorney is the one that's going to

4    be representing them.

5    Q.  But in the end, the Secretary of State's Office would tell

6    the elections judge it's ultimately their call?

7    A.  Absolutely.

8    Q.  While the Secretary of State's Office doesn't have an

9    official opinion as to the meaning of the phrase "reasonably

10   effective," it does have a view as to what types of activities

11   might render observation not reasonably effective, right?

12   A.  Right.  Like I said, we've got a spectrum from more

13   effective to less effective, and the further you get toward

14   less effective, that's when you get into not reasonably

15   effective.

16   Q.  So let's try to discuss a little bit about that spectrum.

17   The Secretary of State's Office's view is that even so much as

18   just standing between the watcher and the activity being viewed

19   could violate Section 4.09.

20   A.  Yes.  If you're obstructing their view of the activity,

21   then yes.

22   Q.  And the Secretary of State's Office would also say that

23   making the watcher stay in the designated area could also

24   violate section 4.09.

25   A.  Absolutely.

Keith Ingram - Examination                    1888

1    Q.  And the Secretary of State's Office would say watchers

2    can't be put into some sort of a pen.

3    A.  Agree with that.  And that was the law before SB1, and

4    that's the law after SB1.  That hasn't changed at all.

5    Whenever an election official tries to relegate watchers to a

6    particular area of Central Count and doesn't let them have free

7    movement, we would talk to those election officials before SB1

8    and remind them that obstructing a poll watcher is a crime.

9        So, you know, every single Election Day that I've been --

10   that I was in that job, we started the day with poll watchers,

11   usually from Dallas, sometimes from Houston, sometimes from

12   Austin or Bexar County, but every day we would start with poll

13   watchers demanding to be let into Central Count and not kept in

14   a pen.  And every single Election Day we would tell the

15   election officials *"You can't keep them in a pen."*

16   Q.  And so similarly, the Secretary of State's Office would

17   say, *"Watchers can't be held behind a wall."*

18   A.  That's right.  Or between a glass partition in the

19   activity.

20   Q.  Now, the Secretary of State's Office has no position about

21   what distance is close enough to see or hear under

22   Section 4.09, right?

23   A.  Well, it's -- yeah, it's just as subjective as conveniently

24   near.  They're both subjective distance requirements, and it's

25   going to depend on how well their eyesight is and how well

1  their hearing works before they're close enough to see and
2  hear.  Or before they're conveniently near, whichever standard
3  you're dealing with.
4  Q.  And in your view, and the view you applied when you were
5  director of the Elections Division, is that asking a poll
6  watcher to stand ten feet back from voting booths could
7  constitute a violation of Section 4.09?
8  A.  Yes, absolutely.  And all of that became much more
9  litigated, more of a real problem in 2020 with COVID.
10  Q.  The Secretary of State's Office can't say whether a poll
11  official violates 4.09 by demanding that a poll watcher stand
12  one foot away from a voter?
13  A.  Yeah, I don't know.  It could be unreasonable.  It could
14  render their service unusable, but in most cases I don't think
15  it would, so that's a very difficult question to answer in the
16  abstract.
17  Q.  As a general matter, the Secretary of State's Office
18  doesn't really get into those details?
19  A.  Well, we get into it when we're called about it, so
20  sometimes, you know, you get a call, and you're on speakerphone
21  and both teams are stressing their position and trying to get a
22  ruling from you on the spot, so we get involved in those
23  situations sometimes.
24  Q.  Mr. Ingram, I want to turn our discussion now to another
25  provision of SB1, and that's going to be Section 4.06(h).  You

1  would agree that 4.06(h), which for the record, I'll note is on

2  the screen in front of you, provides that poll watchers must

3  swear an oath not to disrupt the voting process or harass

4  voters.

5      Right?

6  A.  Agree with that.

7  Q.  The term "disrupt" is not defined in SB1.

8  A.  I agree with that.

9  Q.  And the term "harass" is also not defined in SB1.

10 A.  Yes.

11 Q.  Despite the lack of definition for these terms in the

12 statute, the Secretary of State's Office would agree that there

13 are lots of ways you could harass a voter?

14 A.  I never have stopped to think about the ways that you could

15 harass a voter.  So I don't have an opinion on that at all.

16 You know, obviously, if you're getting in their personal space

17 when they're trying to cast their ballot, that's illegal and

18 should not be done, and that's what I would think would be the

19 harassment.

20     I heard about one situation in Williamson County where a

21 poll watcher wanted to review a voter's ballot before it went

22 into the scanner, and they yanked it out of the voter's hand.

23 That was harassing that voter and should not be done.

24 Q.  And so it sounds like, sir, we agree one way you could

25 harass a voter is trying to see what they're marking on their

Keith Ingram - Examination                    1891

1    ballot?

2    A.  Agreed.

3    Q.  And one way you could harass a voter is to get in their

4    personal space?

5    A.  Right.  I mean, sometimes at the check-in table you can't

6    avoid being in their personal space if you're going to

7    adequately observe the check-in process, so I wouldn't say that

8    the personal space invasion is always harassment.  It could be.

9    Q.  And another way you could harass a voter is by standing too

10   close to them?

11   A.  Again, it could be or it could be just doing what you have

12   to do to have a reasonable observation of the check-in process.

13   Q.  And the determination of whether or not there is harassment

14   is going to be left up in the first instance to the presiding

15   elections judge?

16   A.  The presiding judge under 32.075 has the responsibility to

17   maintain order in the polling place, so yes.

18   Q.  And in every election since you've been with the Secretary

19   of State's Office, there has been some tension between poll

20   watchers who want to observe the activity and poll workers who

21   feel like they're being crowded?

22   A.  I agree with that.  And I'd also agree that every election

23   there's tension between poll watchers and election officials in

24   Central Count about the observation process.

25   Q.  Sir, I'll direct the conversation now to Section 8.01 of

1    SB1.  And separate from Section 4.09's creation of a criminal

2    penalty, Section 8.01 creates a civil penalty for anyone

3    convicted of a criminal offense arising under SB1.  Is that

4    right?

5    A.  Yeah, I can't see all of the Section 31.129, so I don't

6    know, is that it?

7    Q.  Sure.  We'll make that available to you.  Please bear with

8    us just one moment.

9    A.  Okay.  That's what I thought.  Yeah, it's not the violation

10   of a provision of SB1 that triggers this.  It's a violation of

11   the Election Code.

12   Q.  So a violation of the Election Code could subject an

13   offender to civil penalty under 8.01?

14   A.  Right.  It could subject an election official as that term

15   is defined up in 31.128 to a civil action.

16   Q.  And that civil action or civil penalty that we're

17   discussing would provide that anyone convicted of a crime may

18   no longer serve as an elections official?

19   A.  I don't agree with that.  Go back up so I can see the rest

20   of 31.129 -- back down, I mean.  Yeah, I don't agree with that.

21   31.128 says if you're convicted of a crime under this code,

22   you're disqualified.  It doesn't say anything about having a

23   civil penalty and that qualifying you or not qualifying you in

24   the future.

25   Q.  So maybe if we change my question just a bit.  If you're

Keith Ingram - Examination                    1893

1  convicted of a crime, you'd agree that you'd be disqualified

2  under this section; is that fair?

3  A.   Under 31.128.

4  Q.   Let's turn our attention now if we could to Section 5.13,

5  please.  Section 5.13(b) provides that a mail ballot may be

6  accepted only if certain identifying information is provided on

7  the carrier envelope or signature sheet; is that right?

8  A.   I didn't get to read all of it.

9  Q.   Please take your time.  Just let me know when you're ready.

10      (Pause.)

11 A.   Okay.  Yeah, the identifying information has to be on there

12 before it's accepted.

13 Q.   And Section 5.13 also requires an early voting clerk to

14 reject a mail-in ballot if the required identification

15 information on the carrier envelope is either missing or does

16 not match the information that the voter previously provided on

17 their voter registration application.

18 A.   What it says is if a voter provides information required

19 and it identifies the same voter.  Well, "identifies the same

20 voter" is broader than what they submitted on their voter

21 registration application.  That means anything that's in that

22 voter's record that matches what they put on the carrier is

23 sufficient to justify acceptance.  This is not a memory game

24 for voters to have to remember what they put on their

25 application and get it right.  This is for them to use a number

Keith Ingram - Examination                1894

1   that identifies them as the voter.

2   Q.  Mr. Ingram, I'd like to ask you some questions about what

3   is sometimes referred to as the "HB2512 process."  Are you

4   familiar with that?

5   A.  I am.

6   Q.  You'd agree that when I use the term "HB2512 process," this

7   refers to a bill in the 2013 legislative session called HB2512

8   that amended the Transportation Code to provide for the

9   Secretary of State's Office to have access to information in

10  the driver's license file to assist with voter registration?

11  A.  Agreed.

12  Q.  And pursuant to HB2512, Secretary of State's Office created

13  an annual process where it would try to maximize the number of

14  full Social Security numbers that you had in your database?

15  A.  Agreed.

16  Q.  And the HB2512 process, as it's known, allows the Secretary

17  of State to get information from the driver's license record to

18  supplement voter registration records and use it for voter

19  registration purposes?

20  A.  Right.

21  Q.  I'm going to show you what's already in evidence as

22  LUPE 289.

23      Mr. Ingram, you've got that on the screen in front of you?

24  A.  I do.

25  Q.  And you recognize LUPE 289 as an e-mail from Kristi Hart to

1    you and Mr. Adam Bitter dated December 20, 2021?

2    A.   Agreed.

3    Q.   Ms. Hart is the team manager; is that right?

4    A.   She is.

5    Q.   And this communication says, *"As you know, we ran a*

6    *comparative process over the weekend.  We did run queries prior*

7    *to and following the process.  That information is listed*

8    *below."*

9         Do you see that?

10   A.   I do.

11   Q.   And here, the word "query" means a search run across a

12   database; is that right?

13   A.   Right, this query is with regard to the voter registration

14   database.

15   Q.   And "before," as that term is used, means before you did

16   the HB2512 matching process, right?

17   A.   Agreed.

18   Q.   And so before the HB2512 matching process, on December 20,

19   2021, in the team database, the number of active and suspense

20   voting records with no Texas driver's license number was

21   1.3 million plus a little?

22   A.   Agreed.

23   Q.   And then after the process it was 493,823, right?

24   A.   Agreed.

25   Q.   The number went down by approximately 800,000?

Keith Ingram - Examination                    1896

1    A.   It did.

2    Q.   And if we go back down to the fourth row of LUPE 289, it

3    says *"Number of active and suspense voting records with neither*

4    *TDL or SSN in the record."*  The after number is 106,911, right?

5    A.   Agreed.

6    Q.   And that box gives us the number of voters with neither

7    Texas driver's license nor Social Security numbers, right?

8    A.   That's right.

9    Q.   And so it's fair to say that on December 20, 2021, there

10   were that many active and suspense voters who did not have

11   either of the numbers required by SB1 in the team database?

12   A.   Agreed.  But they're only required by SB1 if you are voting

13   by mail.

14   Q.   We can take down what's been marked as LUPE 289, and I'd

15   ask, Derek, to please put up what's been marked as LULAC 75.

16        Mr. Ingram, you have LULAC 75 in front of you?

17   A.   I do.

18   Q.   Again, you'll acknowledge this is an e-mail sent from

19   Kristi Hart to you, Ms. Adkins, and Mr. Bitter on December 23,

20   2022, right?

21   A.   Correct.

22   Q.   After the HB2512 process in December 2022, it's fair to say

23   that 463,393 voters had no Texas driver's license number on

24   their record?

25   A.   I agree with that.

Keith Ingram - Examination                1897

1    Q.  And after the HB2512 process in December of 2022, it's fair

2    to say that 392,084 voters had no Social Security number on

3    their voter record?

4    A.  I agree with that.

5    Q.  Together, that's over 850,000 voters who may put an ID

6    number on a mail ballot that does not match their registration

7    record.

8    A.  I wouldn't agree with that, no.  I would look at the bottom

9    two fields, the bottom two where it talks about they have a TDL

10   but a null value for SSN, and where they've got at least a four

11   of SSN but null for TDL, that's the universe of people that

12   we're talking about, or the people in the middle column that

13   have neither one.  Those are the ones, not the top two, the

14   bottom three.

15       And this is precisely why we emphasize in our education

16   materials to put both numbers.  That's why Secretary Scott

17   emphasized it.  I'm sure Secretary Nelson is doing the same,

18   because it increases the voter's chance of success if they put

19   both numbers.  If either one is identifying the same voter,

20   then that carrier envelope or application for ballot-by-mail

21   gets accepted.

22   Q.  So it sounds like you would at least agree with me that

23   there are 93,867 voters have neither Texas driver's license nor

24   Social Security numbers in the team database as of December 22,

25   2022?

1   A.   Right, I agree with that, December 23rd.

2   Q.   The report that we're looking at is only run once a year,

3   right?

4   A.   Yes.

5   Q.   And December 2022 is the last time this report has been

6   run?

7   A.   It's the last time as of the time that I knew anything

8   about it.  Whether they've run it again this summer for some

9   reason, I don't know.  Haven't heard.  I'm not part of that

10  process anymore.

11  Q.   You'd agree that this report was run after voters and

12  counties work to get ID numbers into the voter registration

13  databases in the 2022 primary and general elections, right?

14  A.   I agree with that.  And you can see the result of that work

15  in that middle number here, because in the other dataset from

16  '21, it was 106,000.  Well, 11,000 have already been knocked

17  off before we did the process, and now that it's down 13,000

18  after the process.  So that diminution in that number with zero

19  values for either one is evidence of the work that was done in

20  '21 to get people to supply those numbers.

21       The only way these numbers are ever going to go is down.

22  Q.   Let's turn our attention to Section 6.06 of SB1, and I'll

23  give Derek just a moment to pull it up for you.

24       Mr. Ingram, do you have that on your screen in front of

25  you?

Keith Ingram - Examination                    1899

1    A.  I do.

2    Q.  You'd agree that Section 6.06 makes it a state jail felony

3    for a person to compensate or offer to compensate another

4    person or to solicit, receive, or accept compensation for

5    assisting voters?

6    A.  I agree with that.

7    Q.  And relatedly, Section 6.03, which we'll pull up for you,

8    requires an assister to complete an oath form stating, among

9    other things, they have not received or accepted any form of

10   compensation or other benefit from a candidate, campaign, or

11   political committee?

12   A.  I agree with that.  It was a crime before SB1, and it was a

13   more specific crime after SB1.

14   Q.  You'd agree that the oath we're talking about in Section

15   6.03 is sworn to under penalty of perjury, correct?

16   A.  Agree.

17   Q.  Returning to 6.06(e), that section defines "compensation"

18   as an economic benefit as defined by Section 38.01 of the Penal

19   Code?

20   A.  I know it incorporates by reference the Penal Code.  I'm

21   not seeing that on this screen.

22              THE COURT:  Yes, you're in the wrong section.

23              MR. KANTERMAN:  6.06(e).  Do I have the wrong section?

24              THE COURT:  No, he -- displayer has -- you correctly

25   named it.  It's just not what's showing up on the screen.

1          THE WITNESS:  There it is.

2    BY MR. KANTERMAN:

3    Q.  Mr. Ingram, do you now have 6.06(e) in front of you?

4    A.  I do.

5    Q.  And would you agree that it references Section 38.01 of the

6    Penal Code?

7    A.  I agree with that.

8    Q.  Section 38.013 of the Texas Penal Code describes "economic

9    benefit" as *anything reasonably regarded as an economic gain*

10   *or advantage, including money or anything of value.*"

11   A.  Okay.

12   Q.  And so you would agree with that?

13   A.  I'll take your word for it.  I haven't looked at the Penal

14   Code, but I don't have any reason to doubt that you read it

15   correctly.

16   Q.  In your view, there's no difference between the terms

17   "paying" and "compensating," right?

18   A.  Agreed.

19   Q.  And so you understand under Section 6.06, the section

20   creates a felony where a person offers or, in fact, provides

21   money or anything of value in exchange for assisting voters?

22   A.  It didn't create the felony.  The felony already existed

23   since, I believe, 2013.  It was, I believe, House Bill 206 that

24   created the compensation prohibition, so that's not a new

25   creation.

Keith Ingram - Examination                    1901

1  Q.  You would agree that it contains reference to the fact that

2  a felony would occur if a person offers or, in fact, provides

3  money or anything of value in exchange for assisting voters?

4  A.  Agree with that, that the difference is it used to be that

5  you had to be paid for piecework, and this made it a little

6  broader to say if you assist voters at all and get paid for it,

7  then you're committing a crime.  This doesn't mean that people

8  who are otherwise paid to assist a voter in their regular life,

9  they also can help them with their ballot.  It's not -- this is

10 not covering that activity.

11 Q.  And so the answer to my question was, yes, you understand

12 Section 6.06 references a felony which occurs if a person

13 offers or, in effect, provides money or anything of value in

14 exchange for assisting voters?

15 A.  In exchange for the assistance.  I agree with that.  And

16 also it creates a crime for -- or changes the crime so that

17 it's clear if you solicit payment for assisting voters.

18 Q.  And you understand also that an assister who, in fact,

19 accepts money or anything of value from a candidate, campaign,

20 or political committee, and swears under oath pursuant to

21 Section 6.03 that they did not accept anything of value,

22 violates that oath and commits perjury?

23 A.  So, obviously, campaigns hire people to canvass for votes

24 in neighborhoods.  I mean, there's -- door-knocking and shoe

25 leather is part of the election experience in America.

1    That's -- nothing in this prohibits that, affects that, changes

2    that in any way.  Campaigns can pay people to canvass

3    door-to-door.  No question about it.  This is not that.

4        What we're talking about is paying somebody specifically to

5    assist a voter with their ballot.  "Assistance" is a term of

6    art.  "Assistance" is not general information.  It's not

7    education.  "Assistance" is a thing that's defined in the

8    Election Code.

9    Q.  Sir, my question, I think, was different, and that was

10   whether you understand that an assister who, in fact, accepts

11   money or anything of value from a candidate, campaign, or

12   political committee and swears under oath that they haven't,

13   violates the oath set forward in Section 6.03?

14   A.  I can't answer the question the way you ask it, because the

15   way you ask it is, if I'm paid by a campaign and then I go

16   assist a voter and swear I didn't get paid, am I lying?  No,

17   maybe not.  I don't know.  It depends on why you got paid.  If

18   you got paid to canvass for votes, and you happen to assist a

19   voter, that's not implicated by this section at all.  So you

20   wouldn't be lying on your oath.  You didn't get paid a $20

21   bonus for assisting that voter.  You didn't get paid extra.

22   You know what I mean?

23       So you're trying to lump in something that's perfectly

24   legal in the First Amendment with something that's not legal,

25   and that's what I'm trying to make sure we've got very

Keith Ingram - Examination                    1903

1    distinctly separated.

2    Q.  And so I understand that you cannot answer the question the

3    way I posed it to you.

4    A.  I agree with that, because I don't know the answer.

5    Depends on what's happening.  I need more facts.

6    Q.  Let's discuss a few hypotheticals that may help us supply

7    some of the facts and further understand the Secretary of

8    State's Office's understanding of these provisions and

9    application.

10       Mr. Ingram, assume, please, for the moment, that an elderly

11   voter calls the local senior center and asks for assistance

12   with completing a mail ballot.  Follow me so far?

13   A.  Absolutely.

14   Q.  Assume further that the senior center volunteer agrees to

15   help the voter and, in fact, offers to do so.  Still good?

16   A.  Offers to use them?

17   Q.  Offers to do so.  Offers to assist.

18   A.  Okay, sure.

19   Q.  And assume further that the voter offers to pay the

20   volunteer's bus fare to visit her at her home to get the

21   assistance that's been requested.  Do you have all of that?

22   A.  I do.

23   Q.  Under that hypothetical, the Secretary of State's Office

24   believes the assister can accept the bus fare without violating

25   Section 6.06?

1   A.  Absolutely.  They can get their expenses reimbursed.

2   That's not payment.  That's keeping from going negative.

3   Q.  Another hypothetical -- and you can ignore facts that we

4   just set up.  New facts.

5       Assume for the moment that a community member hires a local

6   teenager and asks them to assist with completing the ballot and

7   offers to pay the teenager $20 to do so.  Understood?

8   A.  Okay.

9   Q.  Under that scenario, the Secretary of State's Office would

10  say Section 6.06 has been violated?

11  A.  We would strongly discourage somebody from taking $20 to

12  assist a voter, yes.

13  Q.  And if they did, it would be the Secretary of State's

14  Office's position that 6.06 has been violated?

15  A.  If I received a complaint with that set of facts in it,

16  yes, I would refer that to the Attorney General.

17  Q.  For example, if a voter says, *Hey, Jimmy, come by.  I'll*

18  *pay you 20 bucks to help me with this ballot,* that violates the

19  statute?

20  A.  I'm sorry.  I missed it.

21  Q.  Sure.  Happy to give it again.

22      If a voter says, *Hey, Jimmy, come by, and I'll pay you 20*

23  *bucks to help me with this ballot,* in the Secretary of State's

24  Office's view, they violated Section 6.06?

25  A.  Agreed.

Keith Ingram - Examination                    1905

1    Q.  Another hypothetical.  Assume a blind voter needs

2    assistance with completing a mail ballot.  Good so far?

3    A.  Okay.

4    Q.  Assume that this blind voter calls an old college friend

5    and asks for assistance with the ballot and offers further to

6    meet the friend at a local restaurant at which they will fill

7    out the ballot together.  Still following me?

8    A.  Sure.

9    Q.  Assume that the blind voter offers to and does, in fact,

10   buy lunch for the friend in exchange for his assistance.  Still

11   good?

12   A.  Yeah, I don't know if that's the way that would normally go

13   down.  The way that normally would go down is --

14        THE COURT:  That's not the question, sir.

15        THE WITNESS:  Well, I'm just --

16        THE COURT:  Sir, stop.  You're not going to argue with

17   me.

18        THE WITNESS:  No, sir.

19        THE COURT:  Finish your question.

20        MR. KANTERMAN:  Thank you, Your Honor.

21   BY MR. KANTERMAN:

22   Q.  The most previous hypothetical.  Assume that the blind

23   voter offers to and does, in fact, buy lunch for the friend in

24   exchange for his assistance.

25   A.  If it's definitely for the exchange -- in exchange for the

1    assistance, then, yes, that would be referable, but normally

2    that's going to be something that you do for your friend

3    because he's helping you out.  It's not for the assistance;

4    it's just because you got the opportunity to see your friend

5    and you're happy to see him.

6    Q.  It's your testimony that if a blind voter offers to and

7    does, in fact, buy lunch for the friend in exchange for his

8    assistance, that there has been a violation of SB1?

9    A.  There's definitely a potential violation.  It would depend

10   on the facts of the exchange, but on that hypothetical, with

11   those facts, I would agree that we've got a facial violation.

12       Now, whether or not anybody would ever complain about it

13   and whether it would ever get prosecuted, highly doubt it.

14   Q.  Mr. Ingram, you would agree that there are certain

15   exceptions to 6.06's application, right?

16   A.  I don't know.  I'd have to look at the Code.

17   Q.  Derek, if you wouldn't mind, please, let's pull up

18   Section 6.06(f).

19       Mr. Ingram, on the screen in front of you should be a copy

20   of Joint Exhibit 1, which is already in evidence displaying

21   6.06(f.)  Do you have that?

22   A.  I do.

23   Q.  Section 6.06(f) provides that 6.06's prohibition on

24   compensating assisters does not apply if the person assisting

25   the voter is an attendant or caregiver previously known to the

Keith Ingram – Examination                    1907

1   voter.

2   A.   Agree with that.

3   Q.   SB1 does not define the term "attendant."

4   A.   I agree.

5   Q.   And it also doesn't define the term "caregiver."

6   A.   Agree.

7   Q.   The Secretary of State's Office does not have a definition

8   of the term "caregiver" as that's used in this section.

9   A.   Other than Webster's, we don't have any special definition,

10  no, sir.

11  Q.   And same for the term "attendant"?

12  A.   Agreed.

13  Q.   And despite the words "attendant" and "caregiver," each

14  appearing separately in the statute, the Secretary of State's

15  Office understands the terms to mean generally the same thing?

16  A.   I mean, it can have slightly different job functions.

17  "Attendant" might be somebody that, you know, is more like

18  running errands.  "Caregiver" is somebody that has to make sure

19  that somebody is taken care of and able to do their activities

20  of daily life, so they're a little different, but the point is

21  that they're previously being paid for something besides

22  assisting a voter.

23  Q.   So you would generally agree, at least despite minor

24  differences in their functions, the roles and titles, the words

25  mean the same thing?

1    A.  It means somebody that's previously engaged by the voter to

2    take care of them.

3    Q.  Now, the Secretary of State's Office has not published any

4    guidance on how to interpret the term "attendant" as that term

5    is used in this section, right?

6    A.  I agree with that, but we've not had any questions about it

7    either.

8    Q.  But you agree you hadn't published any guidance on it?

9    A.  Usually we publish guidance in order to cut off questions.

10   There haven't been any questions.

11   Q.  And so you would agree that you have not published any

12   guidance on it?

13          MR. KERCHER:  Objection, Your Honor.  Asked and

14   answered.  He responded yes at the very beginning.

15          THE COURT:  That's asked and answered.

16   BY MR. KANTERMAN:

17   Q.  The Secretary of State's Office has not published any

18   trainings on the term "attendant."

19   A.  No.

20   Q.  And the Secretary of State's Office has not published any

21   guidance on how to interpret the term "caregiver"?

22   A.  Agreed.  Again, we haven't had any questions about it, so

23   there hasn't been any perceived need to do any such training or

24   education.

25   Q.  As we discussed, 6.06(f)'s exception requires the caregiver

1   or attendant to have been previously known to the voter, right?

2   A.   Agreed.

3   Q.   SB1 does not define the phrase "previously known to the

4   voter"?

5   A.   It does not.

6   Q.   And the Secretary of State's Office has not published any

7   guidance on how the phrase "previously known to the voter"

8   should be interpreted?

9   A.   Agreed.

10  Q.   And the Secretary of State's Office has not published any

11  trainings on how the phrase "previously known to the voter"

12  should be interpreted?

13  A.   Agree with that.

14  Q.   Setting aside the fact the Secretary of State's Office has

15  not provided guidance on this matter, in your view, it doesn't

16  matter how long the voter has known the attendant or caregiver

17  before voter assistance is provided under this section?

18  A.   Well, I agree with that.

19  Q.   Could be 15 years?

20  A.   Could be 15 years.  Could be 15 minutes, if they're fresh

21  on the job.  But their job is something other than assisting a

22  voter, then it's fine.

23  Q.   But you would agree the explanation you just provided to me

24  cannot be found anywhere in SB1?

25  A.   Sure, it's right here.  I mean, the whole point of

Keith Ingram - Examination                    1910

1    attendant or caregiver is that their job is to do more than

2    just assisting the voter with voting.

3    Q.  You can't say with certainty whether prosecutors would

4    agree with your interpretation of the length of relationship

5    that we just discussed, right?

6    A.  I have no ability to control what prosecutors do.  I know

7    that most of them, if they have a question about an election

8    law statute, will call the Secretary of State's Office and ask

9    us what we think.  We get that question a lot.

10   Q.  But ultimately, as you said, you don't have any control

11   over the prosecutorial decision-making in the end?

12   A.  Absolutely not.

13   Q.  Mr. Ingram, let's turn now to Section 7.04.  Confirming,

14   sir, you've got that on the screen in front of you?

15   A.  I do.

16   Q.  You would agree that Section 7.04 codifies several new

17   felony offenses relating to vote harvesting?

18   A.  I mean, I agree it does what it does, yes.  Doesn't

19   specifically define "vote harvesting."

20   Q.  Let's work towards that.  So Section 286.015(b) makes it

21   unlawful to directly or through a third party -- I'll pause for

22   a moment while this populates on your screen.

23       *(Pause.)*

24       Sir, do you have that in front of you?

25   A.  Okay.

1  Q.  Generally agree that 7.04 makes it unlawful to knowingly

2  provide or offer to provide vote-harvesting services in

3  exchange for compensation or other benefit?

4  A.  Agreed.

5  Q.  And it also makes it unlawful to provide or offer to

6  provide compensation in exchange for those vote-harvesting

7  activities?

8  A.  Agreed.

9  Q.  For purposes of these sections, a "benefit" is *"anything*

10 *reasonably regarded as a gain or advantage"*?

11 A.  That's what it says.

12 Q.  And you mentioned a moment ago that this section also

13 defines "vote harvesting," and it defines vote-harvesting

14 services to mean *"any in-person interaction with one or more*

15 *voters in the physical presence of an official ballot or a*

16 *ballot voted by mail intended to deliver votes for a specific*

17 *candidate or measure."*

18 A.  Uh-huh, I agree with that.

19 Q.  So for an activity to be considered vote harvesting under

20 this provision, the activity must include, one, in-person

21 interaction with one or more voters; and two, be in the

22 physical presence of an official ballot or ballot voted by

23 mail?

24 A.  Agreed.

25 Q.  I want to --

Keith Ingram - Examination                    1912

1   A.  And intended to produce a vote for a particular candidate

2   or measure.

3   Q.  I want to begin by discussing the in-person interaction

4   requirement.  In the Secretary of State's Office's view, a

5   telephonic discussion between two individuals would not satisfy

6   the in-person requirement, right?

7   A.  Agree with that.

8   Q.  Sitting across the table from an individual would satisfy

9   the in-person requirement, right?

10  A.  Sure.

11  Q.  And in the Secretary of State's Office's view, in order for

12  the in-person interaction requirement to be met, the

13  interacting individuals must be close enough to see or hear

14  each other; is that right?

15  A.  They have to be in the physical presence of each other,

16  yes.

17  Q.  And so you would agree that they would have to be close

18  enough to see or hear each other?

19  A.  They've got to be with each other, yes.

20  Q.  If I asked you to put a number on how close that would be,

21  you couldn't do that, right?

22  A.  No, no, I couldn't.  The point of vote harvesting is that

23  you are both present, across a table, catty-corner from each

24  other, whatever, in the presence of the ballot.  And

25  politiqueras, when they get hired by a candidate, they don't

Keith Ingram - Examination                1913

1    care who you vote for president, they don't care about U.S.

2    Senate, they don't care about anything except the race that

3    they got hired on.  So when they get down to that school

4    district race, then they want to make sure that the voter

5    checks the box for their preferred candidate.  That's vote

6    harvesting.  That's the whole point of it.

7        So if you've got an interaction with two people that is

8    15 feet apart or close, it doesn't really matter.  The point is

9    that the vote-harvester is trying to do is to make sure that on

10   that particular candidate or measure, the voter goes a

11   particular way.  And that can be done from 15 feet, it can be

12   done from 5 feet.  I'm not going to put a number on it.  If

13   that's what's happening, that's vote harvesting.

14   Q.  Based upon that description you just gave us, I assume it

15   would be the Secretary of State's Office's view it doesn't need

16   to give a precise measurement or distance of closeness, because

17   everybody would know it if they saw it.  Everybody sees it when

18   it happens, everybody would understand what's going on; is that

19   right?

20   A.  Whether everybody would know, I don't know, but if I get a

21   complaint with a set of facts in it that is like what I

22   described -- like what (a)2 here describes, then I would refer

23   that to the Attorney General.  What everybody knows, I don't

24   know what they know.  I have zero insight into what everybody

25   knows.

1       What I do know is if I get a complaint, and it talks about

2   physical presence, intimidation, making sure that a voter

3   marked one box one way, I would consider that vote harvesting,

4   and I would get it over to the Attorney General for

5   investigation.  And I have, in fact, done so, before SB1 and

6   since SB1.

7   Q.  You would agree, though, that the Secretary of State's

8   Office has not published any guidance specifying how close two

9   individuals must be for an interaction to be considered

10  in-person under 7.04?

11  A.  I agree with that.  We have not published any such

12  guidance.

13  Q.  And you have not published any such trainings?

14  A.  I agree with that.

15  Q.  And we alluded to it earlier.  We can squarely address it

16  now.  Let's discuss the requirement that a ballot be physically

17  present under 7.04.

18      You'd agree that SB1 does not define what it means for a

19  ballot to be physically present, right?

20  A.  I agree with that.

21  Q.  For example, SB1 does not designate the proximity within

22  which a ballot must be to a conversation for it to be deemed

23  physically present.

24  A.  I agree that the statute doesn't say anything about that.

25  Q.  The Secretary of State's Office has no official opinion

Keith Ingram - Examination                    1915

1  about whether a ballot being within ten feet of a discussion is
2  close enough to constitute physical presence for this section?
3  A.  I don't know how else to say this.  If the ballot is in the
4  kitchen, and we're in the living room, and we're talking about
5  our preferred candidates, that's First Amendment.  That's not
6  implicated by this section at all.  So whether that's ten feet
7  or 8 feet, it doesn't matter.  That's not what's going on.
8  What's going on is a perfectly normal -- I'm trying to persuade
9  you to vote for my candidate.  I can get paid for that.  I can
10  go do it all day long, and it will never, ever, ever implicate
11  this section.

12      The whole point of this section is whenever the voter and
13  the harvester get together and they're reviewing the ballot
14  together, and then they get down to that candidate, and the
15  harvester makes sure they check the right box, that's
16  harvesting.  So anything other than that is First Amendment.

17      I mean, we've got the right to pay canvassers to go solicit
18  votes for our preferred candidate.  That's not implicated by
19  this.  This is whenever you've got a particular mission to
20  deliver a particular number of votes for a particular candidate
21  and you make sure that the voter checks that box.  That means
22  that the ballot has to be in front of both of you and you both
23  have to know it's there and you both have to be looking at it.
24  This is not a situation where you can be caught by accident.
25  Vote-harvesters know exactly what they're doing.

1  Q.  So I think you agreed with me that the Secretary of State's

2  Office has no official opinion about whether a ballot being

3  within ten feet of a discussion is close enough to constitute

4  physical presence for this section.

5  A.  Almost never would that be.  I can imagine, I guess, a

6  very --

7          THE COURT:  Sir, that's not the question.

8          THE WITNESS:  I'm sorry.

9          THE COURT:  It will go a whole lot easier if you just

10  answer the question.  The question is, does the Secretary of

11  State's Office have a position?

12          THE WITNESS:  Not really, no, sir.

13  BY MR. KANTERMAN:

14  Q.  As a general matter, if a discussion is proceeding and a

15  ballot is 5 feet away, generally, the Secretary of State's

16  Office doesn't think that the ballot is sufficiently nearby to

17  constitute physical presence for this section, right?

18  A.  I agree with that.

19  Q.  Yet, in the Secretary of State's Office's view, there are

20  circumstances that might render a ballot which is 5 feet away

21  from a conversation sufficiently nearby to deem it physically

22  present.

23  A.  It's hard to envision.

24  Q.  I'll give you an example.  If a conversation is occurring

25  at a large conference room table and the ballot is 5 feet away

Keith Ingram - Examination                  1917

1   from the two speakers but still on the table that, in the

2   Secretary of State's Office's view, might be enough to

3   constitute physical presence under this section.

4   A.  Doubtful, but maybe.  It just depends.

5   Q.  But the Secretary of State's Office can't give a blanket

6   opinion or blanket guidance about how close in proximity a

7   ballot must be to a conversation for it to be deemed physically

8   present for this section.

9   A.  I agree with that.

10  Q.  You'd agree that any decision would have to be made on a

11  case-by-case basis?

12  A.  Well, whether or not voter-harvesting is going on is always

13  going to be decided on a case-by-case basis, yes.  Proximity to

14  the ballot is one of the factors.

15  Q.  And if I pressed for a more specific set of guidance about

16  proximity, you'd tell me it's just you or the director

17  reviewing a complaint and applying their judgment?

18  A.  As far as what we do.  Now, whether or not a prosecutor

19  agrees with us is a different story entirely.

20  Q.  But while you were director, a decision as to whether

21  someone violated this section, for purposes of assessing a

22  complaint, you'd simply just have to know it when you saw it?

23  A.  If the allegation in the complaint is that Ms. Rodriguez or

24  Mr. Smith paid me $50 if I would go vote for commissioner

25  so-and-so for the school board, then that gets it referred to

 1  the Attorney General.  That's either 3602 or vote harvesting,

 2  but either way, that gets referred.  It's not Keith Ingram

 3  deciding, does it fit in the statute or doesn't it?

 4          MR. KANTERMAN:  Your Honor, I don't know if now would

 5  be a good time for a short break?

 6          THE COURT:  Yes.

 7          COURT SECURITY OFFICER:  All rise.

 8      *(2:22 p.m.)*

 9                                *   *   *

10      *(2:39 p.m.)*

11          COURT SECURITY OFFICER:  All rise.

12          THE COURT:  Thank you.  Please be seated.

13          MR. KANTERMAN:  Thank you, Your Honor.

14  BY MR. KANTERMAN:

15  Q.  Mr. Ingram, I've been handed a number of questions from my

16  colleagues, and I'd like to just circle back on some of them to

17  make sure I've closed some gaps, so I appreciate your patience.

18      I don't think I asked you earlier, but when we discussed

19  some of the legislative meetings that your office was having, I

20  wanted to ask two additional questions.  The first is whether

21  on some occasions your office would propose language to achieve

22  what a particular legislator or committee member might want to

23  accomplish?

24  A.  In general or with regard to SB7/SB1?

25  Q.  In general.

1  A.  In general, that is one of the functions of our office,

2  sure.  We will propose language if a legislator tells us what

3  they want to do, and they want us to draft something, it always

4  goes to a "leg." council after we submit it.  That didn't

5  happen on SB1 or SB7.

6  Q.  I'll ask Derek to please pull back up LULAC 75.

7      Mr. Ingram, we looked at this document earlier, right?

8  A.  We did.

9  Q.  And you highlighted row four as being relevant, the row

10  where the post number says 298,217, correct?

11  A.  Yes, and as well as the bottom and the middle.

12  Q.  And I'll stay with row four just for a moment, please.

13  A.  Okay.

14  Q.  These are the voters who, if they put their Social Security

15  number on the mail ballot, will not match to their voter

16  registration record?

17  A.  That's right.

18  Q.  And row five, I believe, is the row that you had just

19  indicated you also identified?

20  A.  That's right.

21  Q.  Row five, which you'll note has been highlighted in green,

22  these are the voters who, if they put their Texas driver's

23  license number on the mail ballot, will not match to their

24  voter registration record?

25  A.  Right.  And I just want to make clear that when we talk

Keith Ingram - Examination                    1920

1    about "matching," we mean identify the same voter.  That's what
2    the statutory language is.
3    Q.  And taken together, there are 667,685 voters who could put
4    a valid driver's license or Social Security, the last four, on
5    a mail ballot and not match to their voter registration record?
6    A.  Agree with that.  That's the number that we want to get
7    down, and it's going to continue to decrease.
8    Q.  And so I want to talk a bit about that assertion.  You
9    would also agree, though, that each year a new group of Texas
10   voters turns 65 years old?
11   A.  I agree with that, but these numbers reflect all active and
12   suspense voters.  These are not limited to people over 65.  So
13   out of the almost 18 million voters that we have, this is the
14   total number with one or the other number but not the other
15   one.
16   Q.  But you would agree that there are a new set of voters who
17   would turn 65 every year?
18   A.  I agree with that, yes.
19   Q.  And some Texas voters who turn 65 may choose to vote by
20   mail?
21   A.  Agreed.
22   Q.  We could take LULAC 75 down.  Thank you very much.
23       Mr. Ingram, since implementing SB1, the Secretary of
24   State's Office has not done any analysis of the impact SB1 has
25   had on minority groups?

Keith Ingram - Examination                    1921

1   A.  I agree with that.

2   Q.  Secretary of State's Office has not done any analysis, for

3   example, the impact of SB1 on Black voters?

4   A.  I agree with that.

5   Q.  Secretary of State's Office has not done any analysis of

6   the impact of SB1 on Latino voters?

7   A.  Agreed.

8   Q.  Secretary of State's Office has not done an analysis, the

9   impact of SB1 on Asian voters?

10  A.  Agree with that.

11  Q.  Same true for Pacific Islander voters?

12  A.  Agreed.

13  Q.  And the Secretary of State's Office has not done any

14  analysis on the impact of SB1 on voters with disabilities?

15  A.  Agreed.

16  Q.  We spoke earlier about the fact that in March of 2023, your

17  role at the Secretary of State's Office changed.

18  A.  Yes, sir.

19  Q.  And your role changed shortly after an interaction you had

20  with Representative Swanson during testimony that you provided

21  at a March 9, 2023 Texas House Committee Meeting.

22  A.  Agreed.

23  Q.  Generally, that meeting, you were explaining that

24  notwithstanding the challenges that the Harris County election

25  had had in 2022, the November general election was the best one

1    Harris County had had since they implemented an election

2    administrator.

3    A.   I agree with that.

4    Q.   When you provided that testimony at the Texas House

5    Committee, you thought you were making accurate statements

6    regarding that election?

7    A.   I did.  It was accurate.

8    Q.   And Representative Swanson took issue with the views you

9    were expressing.

10   A.   She did.  She misunderstood what I said.  She thought that

11   I was saying they had a good election.  I was not saying that.

12   I was saying they had the best election they had had since they

13   had an EA.  That was a fairly low bar.

14   Q.   And that disagreement was in part because Representative

15   Swanson was expressing there to be, in her view, vast problems

16   in Harris County relating to ballot paper shortages and

17   Republican-heavy areas; isn't that right?

18   A.   I agree with that.  There was a litany of things she listed

19   in that hearing.

20   Q.   And during the exchange that you had with Representative

21   Swanson, you became frustrated with the representative.

22   A.   I did.  I don't like to have my testimony misunderstood or

23   mischaracterized.  I speak plainly, because I want to be

24   understood.

25   Q.   And that frustration that you had with Representative

1   Swanson was because you believed she was, in fact,

2   mischaracterizing your testimony?

3   A.   I agree with that.

4   Q.   After that hearing, the Secretary of State was not pleased

5   with your exchange with the Representative.

6   A.   That's right.

7   Q.   And following that exchange, your role at the Secretary of

8   State's Office changed?

9   A.   It did.

10  Q.   Simply put, as you understand it, the Secretary of State

11  thought that it was best for her and for you to change your

12  role.

13  A.   I agree with that.

14          MR. KANTERMAN:  Just a moment, Your Honor, if I could.

15          Mr. Ingram, thank you for your time.

16          Your Honor, I have no further questions.  I do pass to

17  my colleagues, who I understand have some additional questions.

18          MR. GENECIN:  Good afternoon, Your Honor.  I'm Victor

19  Genecin for the Haul plaintiffs.

20          (2:47 p.m.)

21                          EXAMINATION

22  BY MR. GENECIN:

23  Q.   Good afternoon, Mr. Ingram.

24  A.   Howdy.

25  Q.   A little while ago when you were testifying, you described

Keith Ingram - Examination                    1924

1   your view of vote harvesting.  Do you recall doing that?

2   A.  I agree we were talking about the new statute in SB1 and

3   its definition.

4   Q.  You explained what you understood the concept of vote

5   harvesting to mean; is that right?

6   A.  That's right.

7   Q.  Now, has the Secretary of State's Office put out any

8   written guidance to set forth the definition of vote harvesting

9   that you provided to the Court this afternoon?

10  A.  No, sir.  We go with the statute.  The criminal enforcement

11  is not something that we generally do, so we don't educate on

12  it.  The only role that the criminal pieces have for us is

13  whether or not something is a crime on the face of a complaint.

14  You know what I mean?  Our office doesn't implement the

15  criminal section, so that -- all those criminal laws and

16  things, you know, we sort of scan them, we know exactly -- we

17  know generally what they say, but it's not our job to educate

18  on those.

19  Q.  So that definition that you provided is not set down in

20  writing anywhere?

21  A.  The definition that I provided came straight out of the

22  statute, so you can look at 27.601, what was it 016(a)(2), and

23  you'll get the definition.

24  Q.  Has your understanding of the vote-harvesting law been

25  adopted by the Attorney General in an opinion of the Attorney

1   General, as far as you know?

2   A.  I don't think they've issued any opinions with regard to

3   vote harvesting.

4   Q.  Now, with regard to your testimony a little bit earlier, do

5   you remember you testified about the concept that the old poll

6   watcher provision that spoke of poll watchers being permitted

7   to be conveniently near meant the same thing as in the new law

8   which says that they have a right to be near enough to see and

9   hear?

10  A.  Agree with that.

11  Q.  You remember that testimony?

12  A.  No substantive difference.

13  Q.  Okay.  And has your view that there's no substantive

14  difference between those two phrases found its way into any

15  written guidance by the Secretary of State's Office?

16  A.  I don't know if we've gotten written guidance on it.  I

17  know that I've presented several legislative updates regarding

18  SB1, and that was my consistent position in front of several

19  different county audiences, including county judges, county

20  commissioners, and county election officials.

21  Q.  I'm asking, though, has there been anything in writing from

22  the Secretary of State's Office to that effect?

23  A.  Well, I don't know what the particular slide said.  You

24  know, I don't know if there's something in writing to accompany

25  what I was saying, but I know that whenever I teach that

Keith Ingram - Examination                    1926

1    provision of SB1, that I taught it to be the same as the

2    pre-existing standard.

3    Q.  Do you know if the Attorney General has issued any opinion

4    about the meaning of "near enough to see and hear"?

5    A.  As far as I know, they haven't issued any opinion on that,

6    no, sir.

7    Q.  And you also spoke about the question of what paid

8    canvassers would be allowed to do under SB1, remember that?

9    A.  Okay, uh-huh.

10   Q.  Has the Secretary of State's Office issued any written

11   guidance about what paid canvassers are or are not permitted to

12   do?

13   A.  No, sir.  That's, again, something that's beyond our scope.

14   Q.  Now, during your time as director of elections for the

15   Secretary of State's Office through the month of March of 2023,

16   were you familiar with the Secretary's obligations to voters

17   with disabilities under the Americans With Disabilities Act?

18   A.  Well, the Americans With Disabilities Act is not a voting

19   statute.  It has incidental implications with regard to

20   accessibility of polling locations, but HAVA is the more direct

21   law governing elections with regard to the disabled.

22   Q.  Let's start with Americans With Disabilities Act.  To the

23   extent the Americans With Disabilities Act applied to

24   elections, were you familiar with its requirements?

25   A.  Well, not in detail, no, sir.  There's I don't know how

Keith Ingram - Examination                    1927

1    many hundreds of pages in the Code of Federal Regulations about

2    ADA's requirements for accessibility.  We depended upon the

3    Coalition for Texans with Disabilities as well as Texans for

4    Disability Rights.  We depended on them.  They do surveys at

5    polling locations, they do audits in counties, and then they

6    send us those results, and we make sure that the County takes

7    those results seriously and makes changes sometimes to the

8    location, sometimes to a different location, so that they can

9    be accessible to all voters.

10   Q.  Were you familiar with the Secretary's obligations under

11   HAVA?

12   A.  Yes.

13   Q.  Were you familiar with the Secretary's obligations to

14   voters with disabilities under Section 504 of the

15   Rehabilitation Act?

16   A.  I don't know what that is.

17   Q.  Were you familiar with the Secretary's obligations to

18   voters with disabilities under Section 208 of the Voting Rights

19   Act?

20   A.  I do know that, yes, sir.

21   Q.  And during your tenure as director of elections, is it

22   correct that your office did not have written policies

23   regarding the State's obligations under the Americans with

24   Disabilities Act with regard to the administration of

25   elections?

Keith Ingram - Examination                    1928

1  A.  As I said before, we depend upon the Coalition for Texans

2  with Disabilities and Texans --

3           THE COURT:  It goes a lot easier if you would just

4  listen to the question and answer the question.

5           THE WITNESS:  The point is that we had them present

6  our seminars with written material --

7           THE COURT:  No, sir, that's not the question.  The

8  question is did you have written policies.

9           THE WITNESS:  Our office did not.  Our office

10 outsourced that to the experts, and we used their materials in

11 our seminars.

12 BY MR. GENECIN:

13 Q.  And to your knowledge, does the Secretary of State's Office

14 now have written policies regarding the State's obligations

15 under the Americans with Disabilities Act?

16 A.  No, sir.

17 Q.  No.  You don't know or the office still does not have such

18 written policies?

19 A.  I haven't looked on the website lately.  I would be

20 surprised if they had policies there.  They did not in March,

21 and there was no plans for such.

22 Q.  Is it correct that no one at the Secretary of State's

23 Office is assigned responsibility of monitoring the Division of

24 Elections compliance with the ADA?

25 A.  That's not true.  We've had a staff attorney assigned to

Keith Ingram – Examination                    1929

1    that role throughout my time at the office.  Christine Ramon

2    was the last one who was assigned that role, and she has not

3    been replaced yet, and I don't know if Christine has got

4    somebody else assigned that responsibility now.

5    Q.  Could we, Derek, have Mr. Ingram's deposition of March 29th

6    of 2023, please.  And if you'd go to page eight, please, at the

7    bottom, lines 24 and 25.

8        Yes.  If you would have a look at the testimony there.

9    A.  I think that's exactly what I just said.

10   Q.  Well, I think at that time we asked the question, *"Is there*

11   *someone in your office who is assigned the responsibility for*

12   *monitoring compliance with the Americans with Disabilities*

13   *Act?"*  And you answered, *"No, sir."*

14   A.  I agree with that, and that's exactly what I said.  I said

15   Christine Ramon was responsible for it, and she had left a year

16   and a half ago, and we were farming those questions out to all

17   the lawyers.  And then I said that we didn't have anybody

18   assigned.  As far as I know, that remains the case.  Christina

19   could have assigned somebody since March.  This was March of

20   '23.  I don't think I've said anything inconsistent in this

21   room.

22   Q.  Could we take that down.  And thank you, sir.

23       Secretary of State's Office employs trainers who provide

24   peer-to-peer support to county election officials on issues

25   related to elections; is that right?

1    A.   Agreed.

2    Q.   And is it correct that the Secretary of State's Office does

3    not provide internal training about the Americans with

4    Disabilities Act to those peer-to-peer trainers?

5    A.   Agree with that.

6    Q.   Is the correct --

7    A.   I take that back.  We have had presentations in the office

8    to our lawyers and the trainers about ADA and accessibility.

9    That is not something that we do regularly, but it has

10   occurred.  And again, we rely on Coalition for Texans With

11   Disabilities and Texas for Voters with Disability Rights.

12   Q.   You think you didn't remember that when you were deposed on

13   March 29th?

14   A.   Probably not.

15   Q.   I could show you your deposition where you said that

16   Secretary of State's Office did not provide internal training

17   about the ADA to its peer-to-peer trainers.

18   A.   No, I agree with that.  That's what I said.  I think I was

19   mistaken.

20   Q.   So you corrected your deposition testimony here today?

21   A.   I have now.

22   Q.   Okay.  Is it correct that the peer-to-peer trainers

23   employed by the Secretary of State's Office have not conducted

24   any trainings to county officials on their obligations under

25   the ADA outside of consulting with them on the physical

Keith Ingram - Examination                    1931

1   accessibility of polling places?

2   A.  That's probably right.

3   Q.  And is it correct that the Secretary of State's Office has

4   not done anything to educate voters with disabilities about

5   their rights under Section 108 of SB1 to request reasonable

6   modifications to SB1 under the law?

7   A.  I don't know.  We have a voter-facing website

8   votetexas.gov, and I don't know if we updated the disability

9   page or not.

10  Q.  As of your deposition in 2022, would it be fair to say that

11  you had not yet done anything to educate voters with

12  disabilities about their rights under Section 108?

13  A.  Agree with that.

14  Q.  And you don't know if any such efforts have been made since

15  then?

16  A.  I agree with that.

17  Q.  So I'd like to turn now to recordkeeping required by SB1.

18  Do the counties maintain records of each request for an

19  absentee ballot that they receive?

20  A.  They should.

21  Q.  And the counties are legally mandated, are they not, to

22  enter that information into TEAM?

23  A.  They are.

24  Q.  When I say "TEAM," we mean the -- it's the Texas Election

25  Administration Management system?

1    A.   It is.

2    Q.   But even though the counties are required to enter records

3    of each request for an absentee ballot that they receive into

4    TEAM, they don't always do so, do they?

5    A.   It didn't really matter until we had a requirement for a

6    ballot tracker, and so since that's occurred in '21, we have

7    had much higher compliance.

8    Q.   But you still don't have anywhere close to a hundred

9    percent compliance, do you?

10   A.   I don't know.  I would say it's pretty high.  I don't know

11   if it's close to a hundred percent.  I don't know what you

12   consider close to a hundred percent, but it's definitely a good

13   80, 85 percent.

14   Q.   Are you able to tell me which counties do not provide

15   information concerning the requests for absentee ballots that

16   they receive?

17   A.   I can't off the top of my head.  I could get Kristi to

18   print something out of TEAM.  There would be a report.

19   Q.   Okay.  Do the counties maintain records of the date on

20   which they receive each application for a ballot by mail?

21   A.   They're supposed to.

22   Q.   And they're supposed to enter that information into TEAM,

23   aren't they?

24   A.   They are.

25   Q.   And are you able to tell the Court which counties don't

Keith Ingram - Examination                    1933

1    provide that information for TEAM?

2    A.   No, sir.  Most do.

3    Q.   Okay.  Do the counties maintain records of whether each

4    application for ballot-by-mail was accepted or rejected?

5    A.   Yes.  I don't know if you mean final acceptance or

6    rejection or interim, but we now have a cure period, so it

7    matters.

8    Q.   Well, we're not talking here -- just to be clear, we're

9    talking ABBM's.  Talking about the applications for

10   ballots-by-mail and not by the ballots-by-mail themselves?

11   A.   I understand that, but still, there's an interim phase

12   where it could be incomplete and need more information that is

13   a status of rejected, but it gets cured, and then it's accepted

14   and the ballot is sent.

15   Q.   Well, do the counties maintain records of those initial

16   rejections?

17   A.   They're supposed to, but what we would have recorded in our

18   TEAM system is the final status, which could be the initial

19   status, and they could have just filled in another application

20   for ballot-by-mail that did get accepted, and so that would be

21   a separate transaction in the database.

22   Q.   Can you tell me which counties are not providing

23   information about their rejections?

24   A.   Not off the top of my head.  We can run a report, but most

25   counties are doing their job with regard to mail ballot

Keith Ingram – Examination                    1934

1  recording since SB1.

2  Q.  And it's your testimony they've been doing that since SB1

3  was enacted?

4  A.  No.  We had a rough patch there in the first primary

5  election where we had less than stellar compliance, but since

6  then, it's been getting better and better and better.

7  Q.  And do the counties keep information regarding each ballot

8  that they send to a voter?

9  A.  They should, yes, sir.

10  Q.  And is a record of each ballot that had to be sent to a

11  voter information that the counties are required to enter into

12  TEAM?

13  A.  What they're required to do is put into TEAM the date that

14  a ballot was mailed.

15  Q.  And is it true that there are counties that don't put that

16  information into TEAM?

17  A.  Some don't.

18  Q.  And turning now to the rejection.  Do counties keep records

19  of their final rejections of applications for ballot-by-mail?

20  A.  Yes.

21  Q.  And they're required to enter that information into TEAM?

22  A.  They are.

23  Q.  They don't always do that, do they?

24  A.  Some don't.

25  Q.  Again, do you know which counties don't?

Keith Ingram - Examination                    1935

1    A.  We can run a report.

2    Q.  Okay.  Any particular problem children occur to you?

3    A.  No.

4    Q.  And do the counties --

5    A.  That's a hard question to answer because some counties are

6    problematic on some things and not on others.

7    Q.  Do counties maintain records of each ballot-by-mail that is

8    filed with them?

9    A.  Yes.

10   Q.  And is that information required to be enter into TEAM?

11   A.  When they receive back a ballot, yes, sir, that's supposed

12   to be recorded in TEAM.

13   Q.  And do all the counties comply with their obligation to

14   enter that information?

15   A.  Not all of them.

16   Q.  And are they required to enter the date on which they

17   received each ballot-by-mail?

18   A.  Yes, sir.

19   Q.  And do they -- do all the counties enter that information

20   into TEAM?

21   A.  Not all of them.

22   Q.  And are the counties required to maintain information about

23   whether each ballot-by-mail is accepted or rejected?

24   A.  The final disposition will be recorded in TEAM.

25   Q.  And well, they're required to enter the final

Keith Ingram - Examination                    1936

1    information -- final disposition into TEAM; is that right?

2    A.  They're also required to enter the interim dispositions.

3    Q.  Do you have a hundred percent compliance with either the

4    interim dispositions or the final dispositions from the

5    counties?

6    A.  More on the final than the interims.

7    Q.  Are the counties required to maintain records of the

8    notification that they send to each voter of the rejection of

9    his or her ballot by mail when a voter's ballot-by-mail is

10   rejected?

11   A.  I can't answer that.  You talking about an interim

12   rejection or the final rejection?  The answer is both, but I

13   want to make sure that we know what we're talking about.

14   Q.  Let's talk about interim first.  Are the counties required

15   to maintain record of their notification to a voter of their

16   interim --

17                  *(Court reporter clarification.)*

18   BY MR. GENECIN:

19   Q.  Are the counties required, under SB1, to maintain records

20   of the interim rejection of a voter's ballot-by-mail?

21   A.  Of their notice to the voter, yes.

22   Q.  And are they required to record that notice to the voter in

23   TEAM?  Or to record information concerning the notice to the

24   voter?

25   A.  I don't think so.  I'd have to go back and look at House

1  Bill 1382 again.  But I don't think that information is

2  required.  You know, maybe some do, some don't, but the

3  important thing is the final acceptance or rejection.

4  Q.  So with regard to the final, are the counties required to

5  maintain records of the final rejection?

6  A.  Yes.

7  Q.  And are they required to enter that information into TEAM?

8  A.  They are.

9  Q.  And do all the counties enter the information concerning

10  their final rejections into TEAM?

11  A.  Not all.

12  Q.  Are you able to tell us which counties don't?

13  A.  It's easier to run a report, but I don't have the

14  information in front of me.

15          MR. GENECIN:  Thank you.  Your Honor, I'll pass the

16  witness.

17          THE COURT:  Anything further on this side?

18          MR. DODGE:  Just a handful more, Your Honor.  If we

19  could pull up Joint Exhibit 1 and go to page 33.

20          (3:07 p.m.)

21                          EXAMINATION

22  BY MR. DODGE:

23  Q.  Good afternoon, Mr. Ingram.  My name is Chris Dodge.  I

24  represent the LULAC plaintiffs in this case.

25      I'd like to return to -- with some questions about the mail

1    ballot provisions in SB1 that you were discussing earlier.  You

2    see Section 5.02 on the screen now right?

3    A.  I see the first part of it, yes.

4    Q.  Section 5.02 states that *"an applicant seeking a mail*

5    *ballot should include the number of the applicant's driver's*

6    *license, election identification certificate or personal*

7    *identification card issued by the Department of Public Safety*

8    *on the application,"* correct?

9    A.  Agreed.

10   Q.  And Section 5.08 contains an identical statement regarding

11   the mail ballot carrier envelope?

12   A.  I believe so, yes.

13   Q.  And you agree that for a voter who has been issued a Texas

14   driver's license, Sections 5.02 and 5.08 require that driver to

15   list their driver's license?

16   A.  I agree that the statute has this hierarchy.  I believe

17   that they copied this from the Help America Vote Act, which has

18   a very similar hierarchy.

19   Q.  And under Section 5.02 and 5.08, Secretary's Office cannot

20   amend the application or carrier envelope to require any

21   additional identification number; is that right?

22   A.  Agreed.

23   Q.  And county officials cannot require mail ballot applicants

24   or voters to include additional ID information on their

25   applications or carrier envelopes?

1   A.  They cannot say that such is required.  They can put a

2   notice in the carrier envelope information, the mail ballot

3   information, that says you increase your odds of success if you

4   put both, but it's not a requirement to put both.  But they

5   definitely can communicate to voters, extraneous from the form,

6   that if you've got two numbers, use two numbers.

7   Q.  But you agree counties aren't required to do that?

8   A.  They are not.

9   Q.  And you agree the Secretary's Office cannot require

10  counties to do that?

11  A.  Agreed.  We can encourage them to.  We can tell them that

12  other counties do it, and we can advise them that it's a great

13  idea.

14  Q.  You agree the application in carrier envelope instructions

15  published by the Secretary's Office after SB1 went into effect

16  track the statutory language of Section 5.02 and Section 5.08,

17  right?

18  A.  I agree.

19  Q.  Switching gears, I have some questions about election

20  security.  At the time of the 2020 general election, it was

21  your view that Texans could have a great deal of confidence in

22  the mail ballot system?

23  A.  Agreed.

24  Q.  As of the 2020 general election, it was your view that

25  Texans could have a great deal of confidence in the electoral

Keith Ingram - Examination                    1940

1  process generally?

2  A.  Agreed.

3  Q.  At the time of the 2020 election, Texas mail ballot system

4  and electoral process had robust built-in security checks?

5  A.  Agree with that.

6  Q.  Prior to SB1, election officials in Texas confirmed that

7  each person who applied to vote-by-mail was, in fact,

8  registered to vote before issuing them a ballot?

9  A.  Absolutely.

10  Q.  And also prior to SB1, officials in Texas would make sure

11  that the address listed on the application was the same as the

12  address in the voter's registration file?

13  A.  Agreed.  Or else they would send the statement of residence

14  that had to be returned before the ballot was counted.

15  Q.  Prior to SB1, officials in Texas would verify that the

16  signature on the voter's application to vote by mail matched

17  the signature in the voter's file, on the voter's application?

18  A.  Agreed.  But again, when we talk about "matching," what we

19  really mean is does the signature on the application, signature

20  on the carrier envelope identify the same voter.  "Identify the

21  same voter" is operative language.  That sort of devolves

22  colloquially into "matching," but it's not really matching.

23  It's does it identify the voter?

24  Q.  But you agree that process was in place prior to SB1?

25  A.  Yes.

1    Q.  I appreciate that clarification.

2    A.  SB1 said that if somebody provides a number, it creates a

3    rebuttable presumption that the signatures identify the voter,

4    so it changed the weight of the signature comparison from more

5    to less.  It made the number the more objective standard, the

6    most important, and then shifted the burden of proof to anybody

7    that wants to prove it's not the same voter, that they're going

8    to have to do it.

9    Q.  Prior to SB1, each mail ballot contained a unique serial

10   number so you could identify which ballot went to which voter?

11   A.  Agreed.

12   Q.  Mr. Ingram, do you agree there are people who seek to cast

13   doubt on the--

14                   *(Court reporter clarification.)*

15   BY MR. DODGE:

16   Q.  I said, Mr. Ingram, do you agree that there are people who

17   seek to cast doubt on the legitimacy of Texas's electoral

18   system?

19   A.  There are such people, yes.

20           MR. DODGE:  Pass the witness.

21           THE COURT:  Anything else from this side?  Any cross?

22           MR. KERCHER:  Not at this time, Your Honor.  We

23   reserve the right to call this witness during our

24   case-in-chief.

25           THE COURT:  You may step down, sir.

1                THE WITNESS:  Yes, sir.

2                THE COURT:  You're remaining under the rule, so only

3      discussions with the lawyers.  No discussions with any other

4      witnesses.

5                THE WITNESS:  Yes, sir.

6                THE COURT:  Where do we --

7                MS. TULIN:  Leah Tulin with the Brennan Center on

8      behalf the LUPE plaintiffs.  Your Honor, at this time, LUPE

9      plaintiffs would seek to move into evidence LUPE 232, State

10     143, LUPE 292 and LULAC 75.  I believe I misspoke during my

11     examination of Ms. Adkins, and said that LUPE 232 had already

12     been admitted, but I do not believe that is the case.

13               THE COURT:  Any objection from anybody on this side on

14     LUPE 232 or 292?

15               MR. WASSDORF:  No, Your Honor.

16               THE COURT:  No objections over here?

17               MR. LIU:  No objection.

18               THE COURT:  And LUPE 232 and 292 were admitted.  Any

19     objection to State 143?  Hearing none, 143 State is admitted.

20               Any objection to LULAC 75?

21               MR. WASSDORF:  No, Your Honor.

22               THE COURT:  No objection to LULAC 75.  That's

23     admitted.

24               MS. TULIN:  Thank you, Your Honor.  There are two

25     exhibits that were not used today that I would also like to

 1   move into evidence at this time.  That would be LUPE 109 and

 2   LUPE 194.

 3            THE COURT:  Any objections over here to LUPE 109 or

 4   194?  Hearing none, any objections here to LUPE 109 or 194?

 5            MR. WASSDORF:  No, Your Honor.

 6            THE COURT:  None, none.  Those two are admitted.

 7            MS. TULIN:  Thank you, Your Honor.

 8            THE COURT:  Any other housekeeping?

 9            MR. DOLLING:  Thank you, Your Honor.  Zachary Dolling

10   for the OCA plaintiffs.  I would also like to move into

11   evidence a handful of exhibits that were used yesterday during

12   our examinations.  Those would be OCA Plaintiffs 34 and 37,

13   which were the two spreadsheets produced by Travis County, and

14   OCA 427, which was the carrier envelope.

15            THE COURT:  Any objections to OCA 34, 37 or 427?

16            MR. WASSDORF:  No objection, Your Honor.

17            THE COURT:  No objections over here.  Those three are

18   admitted.

19            MR. DOLLING:  Thank you, Your Honor.

20            THE COURT:  Any other housekeeping?

21            MR. BADAT:  Just one more exhibit, Your Honor.  We

22   used with Ms. Adkins today OCA Plaintiff's Exhibit 283, voter

23   registration application.  We'd like to move that into

24   evidence.

25            THE COURT:  Any objection to 283 over here?  Hearing

1    none.  Any objection to OCA 283?

2          MR. WASSDORF:  No objection.

3          THE COURT:  None.  283 is admitted.  Any other

4    housekeeping we need to do?

5          MR. CAPOZZI:  Yes, Your Honor, just to close the book

6    on Intervener Defendant Exhibit Six, I conferred with the LULAC

7    plaintiffs and we have no objection to the additional pages

8    that they want to offer in the SB11 deposition.  Conditional on

9    admitting our exhibit, they would like to also admit pages 31

10   through 33, page 42 lines nine through 21, page 70, line 13

11   through 71, line 18; page 73 line one through page 74 line two.

12         THE COURT:  Are those the additions you want?

13         MS. ARMENTA:  Yes, could you just confirm the last one

14   for me please?

15         MR. CAPOZZI:  Line 73 -- page 73, line one through

16   page 74, line two.

17         MS. ARMENTA:  Yes, thank you.  And again, that is in

18   the event the Court decides to admit the proposed exhibit.

19         THE COURT:  Any objections to the initial introduction

20   of Intervener's Defendant Six is overruled.  The now

21   substituted exhibit is going to be admitted.  I would suggest

22   that you all clean it up and have as Intervener Defendant Six a

23   redacted format with redactions so we know or at least upstairs

24   knows what exactly has been admitted.

25         MS. ARMENTA:  Thank you, Your Honor.

BENCH TRIAL PROCEEDINGS                1945

1          THE COURT:  Anything else by housekeeping?

2          MR. KERCHER:  Your Honor, I'd just like to say how

3    much State defendants appreciate the plaintiffs' efficient use

4    of time today.  I never thought we would get through this many

5    witnesses today.  I appreciate their efforts.

6          THE COURT:  I'm surprised we got through all this.

7          MS. PERALES:  Your Honor, we collectively hope that

8    the Court enjoys this afternoon's musical performance.  We were

9    aiming to avoid mariachi music during the examination of

10   Mr. Ingram and I think we may have been successful.  Thank you

11   to the defendants.

12         THE COURT:  We are off next week.  We will resume on

13   Monday, October 2 at 9:00.  In the interim at some point next

14   week, I would suggest to you all that you all coordinate with

15   Ms. Fernandez about what -- at least this point, we probably

16   ought to do interim check-ins, so use this as an interim

17   check-in on what exhibits everybody agrees has been admitted

18   to.  So you might want to check in at some point during this

19   off week and make sure we are all understanding what's been

20   admitted.  That way we can cure any problems as we go along.

21         Anything else we need to take up before we break?

22   Let's make sure that the other side knows which witnesses

23   you'll be calling on the 2nd.  We'll see you back.

24         COURT SECURITY OFFICER:  All rise.

25         (3:18 p.m.)

1                          *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  September 22, 2023

12   /s/ Gigi Simcox

13   /s/ Angela M. Hailey
     _____
14   United States District Court
     Official Court Reporters
15   CSRs, CRRs, RPRs, RMRs
     Official Court Reporter
16   262 West Nueva Street
     San Antonio, Texas  78207

17

18

19

20

21

22

23

24

25