```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3
   LA UNION DEL PUEBLO ENTERO,      .
 4 ET AL,                           .
                                    .
 5            PLAINTIFFS,           .
        vs.                         . DOCKET NO. 5:21-CV-844-XR
 6                                  .
   GREGORY W. ABBOTT, ET AL,        .
 7                                  .
              DEFENDANTS.           .
 8

 9

10                   TRANSCRIPT OF BENCH TRIAL
              BEFORE THE HONORABLE XAVIER RODRIGUEZ
11                 UNITED STATES DISTRICT JUDGE
                        OCTOBER 2, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                        FATIMA MENENDEZ, ESQUIRE
                          JULIA LONGORIA, ESQUIRE
18                        MALDEF
                          110 BROADWAY
19                        SUITE 300
                          SAN ANTONIO TX 78205
20

21                        CHRISTOPHER D. DODGE, ESQUIRE
                          ELIAS LAW GROUP
22                        250 MASSACHUSETTS AVENUE NW
                          SUITE 400
23                        WASHINGTON DC 20001

24

25
```

```
 1                              BREANNA DELLA WILLIAMS, ESQUIRE
                                NAACP LEGAL DEFENSE & EDUCATIONAL FUND
 2                              40 RECTOR STREET
                                FIFTH FLOOR
 3                              NEW YORK, NY 10006

 4

 5

 6   FOR THE DEFENDANTS:       RYAN G. KERCHER, ESQUIRE
                                KATHLEEN HUNKER, ESQUIRE
 7                              WILLIAM WASSDORF, ESQUIRE
                                TEXAS ATTORNEY GENERAL
 8                              P.O. BOX 12548
                                MC 009
 9                              AUSTIN TX 78711

10

11                              ZACHARY WILLIAM BERG, ESQUIRE
                                TEXAS ATTORNEY GENERAL
12                              300 WEST 15TH STREET
                                AUSTIN TX 78701

13

14                              JOHN M. GORE, ESQUIRE
                                LOUIS J. CAPOZZI, III, ESQUIRE
15                              JONES DAY
                                51 LOUISIANA AVENUE NW
16                              WASHINGTON DC 20001

17

18

19

20

21

22

23   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                                OFFICIAL COURT REPORTER
24                              UNITED STATES DISTRICT COURT
                                SAN ANTONIO, TEXAS
25
```

1      (San Antonio, Texas; October 2, 2023, at 9:00 a.m., in

2  open court.)

3          THE COURT:  Good morning.  Welcome back.  The lights

4  are on.

5          Any housekeeping?

6          MISS PERALES:  Good morning, Your Honor.  Nina

7  Perales for the LUPE plaintiffs.

8          The parties understand the schedule for this week

9  involves concluding today at 3:45 and commencing on Friday at

10  1:00 p.m.  The parties would like to go on Friday afternoon,

11  and, if necessary, to catch up with our schedule next

12  Wednesday the parties propose going late that court day if

13  needed.

14          THE COURT:  That will work.

15          MISS PERALES:  Thank you.

16          THE COURT:  Do we have a holiday on Monday?  Yeah.

17          Everybody has taken that into account too, right?

18          MISS PERALES:  We understand that there is no court

19  that day, Your Honor.

20          THE COURT:  Thank you for that, yes, and we'll go

21  long on Wednesday.  Sorry about the impediments.  So last

22  week, thank you for your courtesies in letting me get out.  I

23  got to speak for the tenth time at this major e-Discovery

24  seminar in Chicago and it's the tenth year that me and four

25  other colleagues have been able to present in consecutive

1    appearances.  We lost one of our colleagues, though, he passed

2    away this year and so it was a memorial to him.  So I was glad

3    I was able to be there.

4         MR. KERCHER:  Your Honor, I just want to clarify.  We

5    are also not scheduled for trial a week from Friday, is that

6    true?  There are three trial days scheduled for next week, is

7    that everyone's understanding?

8         THE COURT:  So my computer is on the blink.  Can you

9    draw that up for me?

10        MR. DODGE:  I believe that's right.  I believe that

11   means there will be trial on the 10th through the 12th.

12        THE COURT:  Okay.  Thank you.

13        MR. KERCHER:  And I hope this case gave you plenty of

14   things to talk about at the e-Discovery conference, Your

15   Honor.

16        THE COURT:  I did not talk about this case.

17        So the only impediment to things going on, so as I

18   let you-all know, I've got two minor little medical issues

19   going on, something on my foot and a piece of calcium has

20   grown on my shoulder.  So if you see me rubbing my shoulder,

21   that's what's going on.  The fix is easy.  They put a syringe

22   in the knee and break it up and suck it out, but it's a matter

23   of getting the doc to see me.  So we'll see when this occurs,

24   but, sorry.  This getting old business is hard.  We'll just

25   work around it.

KENNETH MAYER — DIRECT

1    With that, next witness.

2    MR. DODGE:  Morning, Your Honor, Christopher D. Dodge

3    with the Elias Law Group on behalf of LULAC plaintiffs.  We

4    call Dr. Kenneth R. Mayer to the stand.

5    THE COURT:  Is he a shoulder surgeon?

6    THE WITNESS:  No, Your Honor.  I have had that issue.

7    MR. DODGE:  Political science, I'm afraid, Your

8    Honor.

9    (KENNETH MAYER, having been duly sworn, testified as

10   follows:)

11                    DIRECT EXAMINATION

12   BY MR. DODGE:

13   Q.  Good morning, Dr. Mayer.

14   A.  Good morning.

15   Q.  Dr. Mayer, could you state your full name for the Court

16   please?

17   A.  My name is Kenneth R. Mayer, M-A-Y-E-R.

18   Q.  And you have been retained by the LULAC plaintiffs in this

19   case?

20   A.  That's correct.

21   Q.  And as part of that engagement you've prepared several

22   expert reports in this case?

23   A.  That's correct.

24   THE COURT:  And he's is speaking on what issues?

25   MR. DODGE:  He'll be speaking on the LULAC plaintiffs

KENNETH MAYER - DIRECT

1  challenges to the mail-ballot provisions, the drive-thru

2  voting, and extended-hour provisions, and I believe that's

3  everything.

4           THE COURT:  Thank you.

5           MR. DODGE:  And that's with respect both to our

6  Section 2 claim and our Anderson-Burdick claim.

7  BY MR. DODGE:

8  Q.  Dr. Mayer, the first report you prepared in this case was

9  a February 28, 2022 report?

10 A.  That's correct.

11 Q.  If we could please pull up LULAC Exhibit 2.

12     Can you identify this exhibit, Dr. Mayer?

13 A.  This is the February 2022 report I submitted in this case.

14 Q.  And you'll understand what I'm referring to if I call this

15 your February 2022 report?

16 A.  Yes.

17 Q.  You also prepared an April 29th, 2022 supplemental report

18 after the March 2022 Primary?

19 A.  That's correct.

20 Q.  If we could pull up LULAC 3.

21     And could you tell us what this exhibit is?

22 A.  Yes.  This is the April 2022 report I submitted in this

23 case.

24 Q.  And you'll understand what I'm referring to if I call this

25 your April 2022 supplemental report?

KENNETH MAYER – DIRECT

1  A.  Yes.
2  Q.  And, finally, you also prepared a March 6th, 2023 report
3  addressing the 2022 November General Election?
4  A.  That's correct.
5  Q.  If we could pull up LULAC 4, please.
6     Can you identify this exhibit, Dr. Mayer?
7  A.  This is my March 2023 report.
8  Q.  And you'll understand what I'm referring to if I call this
9  your March 2023 General Election report?
10  A.  Yes.
11     MR. DODGE:  At this time, Your Honor, I would ask to
12  move LULAC 2, 3, and 4 into evidence.
13     THE COURT:  Any objections?
14     MR. GORE:  No objections, Your Honor.
15     THE COURT:  Thank you.  LULAC 2, 3, and 4 admitted.
16  BY MR. DODGE:
17  Q.  Do you have a copy of your March 2023 General Election
18  report in front of you?
19  A.  Yes.
20  Q.  Does that include a copy of your CV?
21  A.  Yes.
22  Q.  Is this a complete and accurate summary of your background
23  and professional experience as of the time of your March 2023
24  report?
25  A.  Yes, at that time this was complete.

KENNETH MAYER — DIRECT

1  Q.  I'd like to ask you some questions about your background

2  and professional expertise.  Can you tell me about your

3  educational background.

4  A.  My undergraduate degree is from the University of

5  California, San Diego, where I majored in political science

6  and minored in applied math.  My Ph.D. is from Yale

7  University.  I received that in political science in 1988.

8  Q.  Where are you currently employed?

9  A.  At the University of Wisconsin—Madison.

10  Q.  What is your role at the University of Wisconsin?

11  A.  I am a professor of political science and affiliate

12  faculty of the La Follette School of Public Affairs.  I

13  characterize my responsibilities as teaching, research, and

14  service.

15  Q.  How long have you been a professor at Wisconsin?

16  A.  Since 1989.

17  Q.  Are you tenured?

18  A.  Yes.

19  Q.  What classes do you teach at the University of Wisconsin?

20  A.  Undergraduate classes, the introduction to American

21  government and politics, operative division courses, and the

22  presidency.  I've taught courses on Congress.  I teach a

23  seminar on election administration.

24  Q.  What are your principal areas of research?

25  A.  American politics generally.  The presidency, election

KENNETH MAYER − DIRECT

1  administration, and campaign finance.

2  Q.  Have you publishing peer−reviewed articles on these

3  subjects?

4  A.  Yes.

5  Q.  About how many?

6  A.  Probably in the 20s of peer−reviewed articles.

7  Q.  Have you ever published any books on these topics?

8  A.  Yes.

9  Q.  About how many?

10  A.  There are three either sole−authored or coauthored books

11  and probably 15 edited volumes.

12  Q.  And these peer−reviewed articles and books, have they been

13  on — have any of them been on the topic of election

14  administration?

15  A.  Yes.

16  Q.  Have any of them been on methods of voting?

17  A.  Yes.

18  Q.  Have any of them concerned the frequency of instances of

19  voter fraud?

20  A.  Yes.

21  Q.  Have you ever been accepted as an expert witness in cases

22  involving the impact of election laws on voters?

23  A.  Yes.

24  Q.  And have you been accepted as an expert witness in cases

25  where the frequency of alleged voter fraud has been at issue?

KENNETH MAYER — DIRECT

1  A.  Yes.

2  Q.  And about how many cases have you testified as an expert

3  witness?

4  A.  So cases where I have testified at a trial, probably

5  around 12.  I would say there's another dozen or so where I

6  have testified in depositions, and another probably ten where

7  I submitted a report.

8  Q.  Has a court ever declined to recognize you as an expert on

9  these subjects?

10  A.  No.

11  Q.  And have courts previously credited and relied upon your

12  testimony?

13  A.  They have.

14  Q.  The list of cases in which you have served as an expert

15  witness is included on page 16 of your March 2023 General

16  Election report, is that right?

17  A.  That's correct.

18        MR. DODGE:  Your Honor, pursuant to Federal Rule of

19  Evidence 702, the LULAC plaintiffs would like to proffer

20  Dr. Mayer as an expert in election administration, voting

21  methods, and voter fraud.

22        THE COURT:  Any response?  Any objection?

23        MR. GORE:  No objection, Your Honor.

24        THE COURT:  He's recognized as an expert on those

25  three areas.

KENNETH MAYER − DIRECT

1  BY MR. DODGE:

2  Q.  Dr. Mayer, I'd like to now go through each of the reports

3  with you, starting with your February 2022 report.  Do you

4  have a copy of that?

5  A.  Yes.

6  Q.  In this report you analyzed various changes to election

7  administration in Texas due to SB 1?

8  A.  That's correct.

9  Q.  You submitted this report just a few days before the

10  March 2022 Primary?

11  A.  That's correct.

12  Q.  Okay.  Let's discuss several of your conclusions in that

13  report.  What did you observe in your February 2022 report

14  regarding the mail ballot rejection rate in Texas in the wake

15  of SB 1?

16  A.  So there were reports that county election officials were

17  reporting dramatically higher mail ballot rejection rates,

18  orders of magnitude higher than had been observed in previous

19  general elections or previous elections.

20  Q.  And how were you able to reach this conclusion at that

21  time?

22  A.  This conclusion was based on news reports that county

23  clerks or county administrators were telling reporters and

24  publicly reporting the problems or the number of absentee

25  ballots, mail ballots that were being rejected.

KENNETH MAYER - DIRECT

1   Q.  Were you able to conclude at that time whether this

2   increase in the mail ballot rejection rate during the Primary

3   was attributable to the mail ballot identification

4   requirements in SB 1?

5   A.  There were indications that that's what county officials

6   were saying, but I did not have granular data on specifically

7   why an individual ballot was rejected.

8   Q.  But you were able to confirm that later?

9   A.  Yes.

10  Q.  Okay.  We'll get to that in a bit.  Did you conclude in

11  your February report that the mail ballot identification

12  requirements in SB 1 significantly burdened voters in Texas?

13  A.  I did.

14  Q.  I'd like to move on to another conclusion in that report.

15  What did you conclude with respect to the elimination of

16  drive-thru voting as a voting method?

17  A.  So with respect to drive-thru voting, I had

18  individual-level data from Harris County which showed that

19  voters of color relied on drive-thru voting at

20  disproportionate rates compared to non-Hispanic Whites.

21  Q.  Did you reach a similar conclusion with respect to

22  elimination of 24-hour voting?

23  A.  I did.  The conclusion was the same.  It was voters of

24  color that were disproportionately relying on 24-hour voting

25  compared to non-Hispanic Whites.

KENNETH MAYER - DIRECT

1    Q.  Is it accurate to say that each of the changes to Texas'

2    election administration rules that you looked at created or

3    risked creating significant burdens for voters in Texas?

4    A.  That's what I concluded.

5    Q.  Did you consider whether any of these burdens contributed

6    to combating any risk of voter fraud, or lack of election

7    security in Texas?

8    A.  I did.

9    Q.  What did you conclude on that from?

10   A.  My conclusion was that the provisions of SB 1 did not

11   contribute to increased election security, largely because

12   there's no evidence of any material levels of voter fraud, and

13   no evidence that the requirements of SB 1 would have prevented

14   instances of voter fraud.

15   Q.  I want to get further into each of those conclusions in

16   your February report, but first I want to discuss a little bit

17   what data you relied upon in preparing your February report.

18   Did you rely on any data from the U.S. Election Assistance

19   Commission?

20   A.  I did.  I relied on the 2020 Election Administration and

21   Voter Survey conducted by the EAC.

22   Q.  That's sometimes called the EAVS survey?

23   A.  Yes.

24   Q.  What is EAVS?

25   A.  EAVS is a survey that the EAC sends out to every election

KENNETH MAYER - DIRECT

1    jurisdiction in the country.  In Texas, it would be counties,
2    and it's a lengthy survey asking about registration and voting
3    and ballots and includes items on the number of mail ballots
4    sent, returned, counted, and rejected.  So it's a very
5    detailed survey instrument that covers a wide range of voting
6    data.
7    Q.  And you may have just mentioned it, but what data in the
8    EAV survey specifically did you use in your report?
9    A.   In this report I relied on data on the number of mail
10   absentee ballots that were returned and the number that were
11   rejected in 2020.
12   Q.  You also relied on some data produced by the Harris County
13   Election Administrator in your report.
14   A.  That's correct.
15   Q.  Can you tell us what you looked at from Harris County?
16   A.  This was a voter history file for Harris County which
17   showed for everyone who cast a ballot in Harris County the
18   method that they used to vote, whether they voted early in
19   person, mail absentee, or on Election Day.
20       It had detailed information on where people voted, which
21   early voting site or polling place they cast a ballot.  And it
22   also included data for early voters about the specific time
23   that their ballot was submitted.
24   Q.  That also gave you information, for example, about whether
25   an individual voted drive-thru or during extended hours

KENNETH MAYER – DIRECT

1  voting?

2  A.  That's correct.  The locations with drive-thru voting had

3  specific notations in the file.

4  Q.  According to the Harris County data you looked at, about

5  how many people were registered to vote in that county in the

6  2020 Election?

7  A.  It was in the range of about two and a half million

8  people.

9  Q.  And that would make it the largest voting population of

10  any county in Texas?

11  A.  That's correct.

12  Q.  Does the Harris County voter file record the self-reported

13  race or ethnicity of voters in Harris County?

14  A.  No, it does not.

15  Q.  And why is that?

16  A.  Because Texas does not ask voters information about their

17  race or ethnicity when they register.

18  Q.  There are some states that do that, though, correct?

19  A.  That's correct.

20  Q.  But not Texas?

21  A.  That's correct.

22  Q.  In your report you draw conclusions about how different

23  racial and ethnic groups use different kinds of voting

24  methods, correct?

25  A.  That's correct.

KENNETH MAYER – DIRECT

1  Q.  And how are you able to do that, if the Harris County

2  voter file does not include race and ethnicity data?

3  A.  I relied on an estimate of the probability that a voter

4  belonged or could be classified into one of five different

5  racial or ethnic categories.

6  Q.  And that data was generated by a Dr. Loren Collingwood, is

7  that right?

8  A.  That's correct.

9  Q.  Is Dr. Collingwood respected within the field of political

10  science?

11  A.  I would say yes.

12  Q.  Does much of his work focus on the issue of race and

13  ethnicity in American politics?

14  A.  It does.

15  Q.  Can you tell me what methodology Dr. Collingwood performed

16  to generate those predictions you mentioned?

17  A.  He used a method that's called bayesian improved surname

18  and geocoding.  And what the method does is it relies on the

19  voter's last name, relying on data from census, the U.S.

20  Census Bureau about the most common names that people of

21  different racial or ethnic categories had in the census, and

22  then it incorporates information on the demographics of where

23  voters live, and so it uses that to generate estimates of what

24  a voter's race or ethnicity is.

25  Q.  Bayesian improved surname and geocoding is sometimes

KENNETH MAYER – DIRECT

1  called BISG?

2  A.  Yes.

3  Q.  Is Dr. Collingwood considered an expert in the field when

4  it comes to BISG?

5  A.  Yes.  In fact, Dr. Collingwood wrote a lot of the computer

6  code that is used to generate the BISG estimates.

7  Q.  Are you, yourself, familiar with BISG?

8  A.  I am.

9  Q.  You explained a moment ago how BISG works, and so just to

10  pick a very simple example to illustrate its methodology, if a

11  person in the Harris County data file with the last name of

12  Gonzales had an address in a predominantly Hispanic census

13  block, the BISG methodology would assign a high likelihood to

14  that individual of being Hispanic?

15  A.  That's correct.

16  Q.  Is BISG recognized as a reliable methodology for

17  predicting race within your field?

18  A.  Yes.  It's widely used.

19  Q.  Are there peer-reviewed articles in your field that rely

20  upon BISG?

21  A.  Yes.

22  Q.  Do you have any reason to believe that Dr. Collingwood

23  misapplied the BISG methodology in preparing the data you

24  mentioned?

25  A.  No.

KENNETH MAYER — DIRECT

1  Q.  Just to further explain what BISG does, what sort of data

2  does it process or generate with respect to any given

3  individual voter?

4  A.  So for each individual voter there are five possible race

5  or ethnicity categories, White, Black, Hispanic, Asian, or

6  other.  Each of those categories for each voter will have a

7  probability, a number between zero and one, representing the

8  likelihood that the voter falls into that category.

9      If you sum the probability across all five categories, it

10 sums to one.  So it gives you an estimate.  It allows you to

11 determine what the most likely category is.

12 Q.  And so returning to my very simple example of an

13 individual with the last name Gonzales who lives in a heavily

14 Hispanic census block in Harris County, BISG might generate an

15 output like .85 Hispanic, .05 White, and so forth, until it

16 sums to one?

17 A.  That's likely.  I don't know what the exact probability

18 for that person would be.  It would depend, but that would be

19 the data that you had in front of you to make that assignment.

20 Q.  And BISG has certain known error rates?

21 A.  That's correct.

22 Q.  Do other probabilistic methods in the social sciences have

23 error rates?

24 A.  I would say it's ubiquitous.  All probabilistic measures

25 or methods in social science have an error rate.

KENNETH MAYER – DIRECT

1  Q.  So BISG does not purport to predict with 100 percent
2  certainty what a given person's race or ethnicity is?
3  A.  No, it doesn't.
4  Q.  It sometimes might provide a prediction that's close to
5  that number, however?
6  A.  Yes.
7  Q.  Do these known error rates with BISG give you any reason
8  not to rely upon it as a methodology in your work?
9  A.  No.
10  Q.  And why not?
11  A.  For one reason, the estimates are accurate most of the
12  time.  There are varying estimates, 15 percent, 16 percent,
13  17 percent.  In social science, that's pretty good.
14      The other reason I don't think the error rates undermine
15  any conclusions that I reach is that an error in BISG would be
16  a voter who was actually Black who we misclassified as White,
17  or vice versa.
18      And to the extent those errors are in the data, what that
19  will do is reduce the observed differences in voting behavior
20  or reliance on different groups because we're looking at
21  voters who we think are Black but it's a mix of White, Black,
22  Hispanic voters.
23  Q.  So it's the case that these error rates associated with
24  BISG would actually tend to understate differences between
25  racial groups?

KENNETH MAYER – DIRECT

1  A.  That's correct.

2  Q.  At a very simple level, if you are observing a group of

3  voters who you predict to be White but it actually includes

4  some number of Hispanic individuals, Black individuals, that's

5  going to move the average of that group towards the average of

6  everyone?

7  A.  That's correct.

8  Q.  We'll discuss BISG in greater depth later, but for now, is

9  it your opinion as an expert in the field of political science

10  that BISG analysis is an appropriate resource for reviewing

11  whether SB 1 impacts different groups of voters differently?

12  A.  It is.

13  Q.  Do you recall that we talked a moment ago about how BISG

14  generates a range of probabilities summing to one for any

15  given individual?

16  A.  That's correct.

17  Q.  How did you use that data for purposes of your

18  February 2022 report in assigning race or ethnicity to voters

19  in Harris County voter file?

20  A.  The primary method I used is I assigned a voter to the

21  category with the highest probability that was greater than

22  the other four.

23  Q.  So, for example, if someone had a predicted Black

24  probability of .7, you would assign that person to be Black?

25  A.  Correct.

1  Q.  Why did you do that?

2  A.  Because it maximized the number of voters I could include

3  in the analysis.  I replicated the analysis to see if it made

4  a difference if I used different thresholds, .5, for example,

5  making sure that there was an outright majority probability of

6  a voter being in a racial group.

7      I also used a threshold of .9 to include only those voters

8  who we were very, very confident were members of a particular

9  race or ethnic category and my substantive conclusions didn't

10 change if you used these different thresholds.

11 Q.  Great.  Thank you.

12     I'd like to get back into your conclusions in your

13 February report in more detail.  Beginning with your

14 discussion of the elimination of certain early voting methods,

15 Texas has early voting?

16 A.  That's correct.

17 Q.  What does the term "early voting" refer to in the context

18 of Texas elections?

19 A.  In this context for some time prior to Election Day voters

20 can go to an early voting center and they can cast a ballot in

21 person, usually for a week or two before Election Day.

22 Q.  Texas had early voting during the 2020 General Election?

23 A.  Yes.

24 Q.  I'd like to focus specifically on Harris County for a

25 moment.  During the 2020 General Election Harris County

KENNETH MAYER – DIRECT

1  offered voters early voting options that were not available in

2  most other counties in Texas?

3  A.  That's correct.

4  Q.  For example, Harris County offered a number of polling

5  locations where voters could complete and submit their ballots

6  while remaining in their cars?

7  A.  That's correct.

8  Q.  And in your report you refer to this as drive-thru voting?

9  A.  That's correct.

10 Q.  Did a voter in Harris County in 2020 need a reason to use

11 drive-thru voting?

12 A.  No.

13 Q.  Is it the case that about 130,000 voters in Harris County

14 during the 2020 General Election used drive-thru voting to

15 vote?

16 A.  That's the approximate total.

17 Q.  Another option Harris County offered voters was the option

18 to vote early during expanded voting hours?

19 A.  Correct.

20         MR. WASSDORF:  Objection, Your Honor.

21         THE COURT:  Yes.

22         MR. WASSDORF:  Leading.

23         THE COURT:  Sustained.

24 BY MR. WASSDORF:

25 Q.  Can you describe what these extended voting hours looked

KENNETH MAYER - DIRECT

1  like, specifically on the dates of October 29 and

2  October 30th?

3  A.  So on the last day of early voting Harris County offered

4  24-hour voting where someone could vote early between

5  7:00 p.m., which was the normal closing time of early voting

6  centers overnight until 7:00 p.m. the next day — 7:00 a.m.

7  the next day.

8  Q.  And you refer to this as 24-hour voting in your report?

9  A.  Correct.

10  Q.  Did you reach a conclusion as to whether certain groups of

11  voters were more likely to use these early voting methods in

12  Harris County in the 2020 General Election?

13  A.  I did.

14  Q.  And what was that conclusion?

15  A.  That both drive-thru and 24-hour early voting was, that

16  was relied on disproportionately by voters of color compared

17  to non-Hispanic Whites.

18  Q.  Can we please pull up table 4 on page 13 of Dr. Mayer's

19  February report, which is LULAC 2.

20      Can you explain what table 4 of your report shows?

21  A.  This shows the demographic composition of the voters who

22  relied on in-person early voting versus drive-thru early

23  voting.  So it used this table to determine what percentage of

24  White voters cast their early ballot in person versus

25  drive-thru voting, and also for other — three of the other

KENNETH MAYER – DIRECT

1  racial or ethnic classifications.

2  Q.  And what conclusions can we draw from the table?

3  A.  What this data shows is that voters of color

4  disproportionately relied on drive-thru voting compared to

5  non-Hispanic Whites.

6  Q.  And so, for example, White voters constituted about 53 and

7  a half percent of in-person early voters?

8          MR. WASSDORF:  Objection, Your Honor.  Leading again.

9          THE COURT:  Sustained.

10 BY MR. DODGE:

11 Q.  Can you tell us what percentage of early in-person voters

12 were White?

13 A.  53.5 percent of early voters were –– in-person early

14 voters were non-Hispanic White.

15 Q.  And how does that compare to their share of drive-thru

16 voters?

17 A.  Non-Hispanic Whites were 38 percent, 38.1 percent of

18 drive-thru voters.

19 Q.  About what share of early in-person voters were non-White?

20 A.  About 46.5 percent.

21 Q.  How does that compare to the share of the drive-thru

22 voting population?

23 A.  Minority voters were about 62 percent of drive-thru

24 voters.

25 Q.  Just in terms of raw numbers, can you tell us about how

1  many non-White voters cast ballots using drive-thru as

2  compared to White voters?

3  A.   There were a little over 77,000 minority voters who cast a

4  ballot using drive-thru voting.

5  Q.   Compared to how about how many White voters?

6  A.   It was about 47, 48,000 non-Hispanic White voters.

7  Q.   What data did you use to reach the conclusions in table 4?

8  A.   I used the reported data on voting method in the Harris

9  County voter histories and the BISG racial probabilities.

10  Q.   So your report concluded that non-White voters were

11  significantly more likely to use drive-thru voting than White

12  voters?

13          MR. WASSDORF:  Objection, Your Honor.  Leading again.

14          THE COURT:  Sustained.

15  BY MR. DODGE:

16  Q.   What did you conclude in table 4 about the likelihood of a

17  non-White voter to use drive-thru voting, relative to a White

18  voter?

19  A.   So what this data shows is non-White voters were more

20  likely to rely on drive-thru voting than non-Hispanic White

21  voters.

22  Q.   Were your findings in table 4 statistically significant?

23  A.   Yes.

24  Q.   What does it mean to be statistically significant in this

25  context?

KENNETH MAYER – DIRECT

1  A.  In this context statistical significance looks at the
2  likelihood that you would observe this kind of pattern or
3  these differences between different groups if all of the
4  underlying probabilities were the same.
5      So this tells us if, in truth, Black voters or Hispanic
6  voters were no more or less likely than White voters to use
7  drive-thru voting, what is the probability that you would
8  observe this kind of pattern and that test shows that the
9  probability is basically indistinguishable from zero.
10  Q.  Could we please pull up table 5 from Dr. Mayer's report
11  now, page 14.
12      Can you explain what table 5 of your report shows?
13  A.  Table 5 repeats the analysis in table 4, only this time
14  with respect to in-person votes cast during regular hours and
15  votes cast during the 24-hour vote period.
16  Q.  So can you tell us what share of 24-hour voters were
17  non-White relative to White voters?
18  A.  I'm sorry; ask that again.
19  Q.  Can you tell us what share of 24-hour voters were
20  non-White?
21  A.  About 61 percent of 24-hour voters were non-White.
22  Q.  And that's relative to what share of early in-person
23  voters?
24  A.  Minority voters were about 48 percent of in-person early
25  voters.

KENNETH MAYER – DIRECT

1  Q.  How did you reach the conclusions in table 5?

2  A.  Basically applying the same tests that I did in table 4,

3  that the likelihood of observing this kind of pattern, if all

4  of the underlying probabilities are the same, is basically

5  indistinguishable from zero.

6  Q.  What did you conclude in your report in table 5

7  specifically with respect to whether non-White voters were

8  more likely to use 24-hour voting than White voters?

9  A.  This those that non-White voters were more likely to use

10 24-hour voting than non-Hispanic White voters.

11 Q.  Was that a statistically significant finding?

12 A.  Yes.

13 Q.  Your conclusions in tables 4 and 5 both relied upon BISG

14 data?

15        MR. WASSDORF:  Objection, Your Honor.  Leading.

16        THE COURT:  Sustained.

17 BY MR. DODGE:

18 Q.  Did you rely on BISG data to reach your conclusions in

19 tables 4 and 5?

20 A.  Yes.

21 Q.  We previously discussed error rates with that data?

22 A.  Yes.

23 Q.  What impact, if any, did those error rates have on the

24 conclusions you reach in tables 4 and 5?

25 A.  To the extent there is an error in the BISG estimates,

KENNETH MAYER - DIRECT

1  that would have the effect of reducing these intergroup

2  differences, meaning that if we had -- we were able to observe

3  race without error the differences that we see in the

4  disproportionate effects would be larger than what we observe.

5  Q.  Are you aware of anything suggesting that voters using

6  drive-thru or 24-hour voting are more likely to commit voter

7  fraud than other kinds of voters?

8  A.  There's no evidence that that's true.

9  Q.  Do the trends reflected in tables 4 and 5 reflect a real

10  pattern or revealed preference on the part of voters?

11  A.  It does.

12  Q.  I'd like to turn to the parts of your February report that

13  discuss SB 1's impact on mail ballot rejection rates.  What

14  changes do you understand SB 1 to have imposed on absentee

15  mail ballot roles in Texas?

16  A.  So in this the context of my report that the primary

17  change that I analyzed is a requirement that voters write down

18  or include their Texas driver's license, their state ID

19  number, or the last four digits of their social security

20  number on both the absentee ballot application and the

21  absentee ballot return envelope, and if that information does

22  not match exactly into what is in the Texas voter file the

23  absentee ballot application and ballot is rejected.

24  Q.  Does Texas' voter registration database include a driver's

25  license number for all voters?

KENNETH MAYER — DIRECT

1  A.  No.

2  Q.  Does Texas' registration database have complete and

3  accurate social security number information for every

4  registered voter?

5  A.  No.

6  Q.  So could a voter accurately record the identification

7  number they used to register to vote and still have their

8  application or ballot rejected because of information missing

9  in the database?

10  A.  It's possible.

11  Q.  Could a voter, for example, transpose a digit on one of

12  their ID numbers and have their application or ballot

13  rejected?

14  A.  That's my understanding.

15  Q.  Could a voter also write a digit illegibly in a manner

16  that looks like another number and have their application or

17  ballot rejected?

18  A.  That's my understanding.

19  Q.  You address SB 1's impacts on mail voting in all three of

20  your reports?

21          MR. WASSDORF:  Objection, Your Honor.  Leading.

22          MR. DODGE:  Just trying to keep this moving, Judge.

23          THE COURT:  I know, but you are leading.

24  BY MR. DODGE:

25  Q.  Do you address SB 1's impacts on mail voting on all three

KENNETH MAYER − DIRECT

1  of your reports?

2  A.  Yes.

3  Q.  When did you file your February report relative to the

4  March Primary?

5  A.  It was just a few days before the March 2022 Statewide

6  Primary.

7  Q.  So what data sources were you relying on for information

8  related to mail ballot rejection rates in your February

9  report?

10 A.  In this report I was relying on what clerks were saying

11 about the percentage of ballots and applications they were

12 rejecting and compared that to data from the 2020 EAVS survey.

13 Q.  What did these initial reports reflect?

14 A.  So these initial reports reflected what clerks were

15 observing leading up to the election where applications and

16 ballots were coming in, and depending on the county there were

17 counties that were reporting 50 percent application

18 rejections, meaning half the absentee ballots they were

19 receiving were rejected, and absentee ballot rejection rates

20 were running 10 percent, 20 percent in Dallas County, and

21 above 30 percent in Harris County.

22 Q.  Just as a baseline for those numbers you just gave, what

23 was the absentee ballot rejection rate in Texas in the 2020

24 General Election?

25 A.  Based on the EAVS data it was 0.84 percent.

1  Q.  And that's a reliable source for that information?

2  A.  Yes.

3  Q.  Did the 2020 EAV survey say anything about the number of

4  counties in Texas that had a mail ballot rejection rate under

5  1 percent in 2020?

6  A.  Yes.  Based on the data there were 157 counties in Texas

7  that reported a rejection rate below 1 percent.

8  Q.  That's a majority of counties in Texas?

9  A.  That's correct.

10  Q.  Can you tell us what Harris County's overall mail ballot

11  rejection rate was in the 2020 General Election?

12  A.  In 2020 in Harris County the mail ballot rejection rate

13  was .3 percent.

14  Q.  Is it likely that there were first-time mail ballot voters

15  in the 2020 General Election?

16  A.  Yes.

17  Q.  Why is that?

18  A.  Texas does not have no excuse absentee.  You have to fall

19  into a number of specific categories, over the age of 65, away

20  on Election Day, ill or disabled, and so it's not –– people

21  don't get to decide they are always going to vote absentee,

22  and so in every election there will be people who did not

23  qualify for absentee ballot, mail absentee voting before who

24  do and decide they are going to apply.

25      So the inference is that there will always be first time

KENNETH MAYER − DIRECT

1  or new mail absentee voters cycling into the system.

2  Q.  Were there any additional reasons why in 2020 in

3  particular there might have been new first-time mail voters?

4  A.  So in 2020, obviously COVID was affecting how people

5  voted.  So it's certainly plausible that a number of the −−

6  unusually number −− an unusually large number of absentee

7  voters in 2020 were new, or first time, or inexperienced mail

8  absentee voters.

9  Q.  You previously mentioned these reports you were looking at

10 prior to the March Primary.  Did you conduct any analysis to

11 see if the trend in those reports, in fact, prove to be true?

12 A.  I did.  Once the primary occurred, I was able to obtain

13 data from the actual mail ballot rejection rates in some Texas

14 counties.

15 Q.  Could we please pull up what's now been admitted as LULAC

16 3.  Can you remind us what this is, Dr. Mayer?

17 A.  This is the April 29th, 2022 report that I submitted.

18 Q.  What did you do in this report?

19 A.  This report followed up and examined individual-level

20 absentee ballot data from Tarrant and Harris Counties.  I also

21 looked at election reconciliation reports, which are written

22 reports that counties have to provide showing the total number

23 of mail ballots submitted, counted, and rejected.

24 Q.  What did these data show with respect to your earlier

25 findings in your February 2022 report?

KENNETH MAYER – DIRECT

1  A.  So the actual rejection data for the 2022 Primary showed

2  that in the ten largest counties in Texas, the mail ballot

3  absentee rejection rate was 15.9 percent.

4  Q.  Did that confirm your earlier conclusion?

5  A.  It did.

6  Q.  Can you tell us what the statewide mail ballot rejection

7  rate was for the March 2022 Primary?

8  A.  I have to check here.  I think it was —

9  Q.  Take a moment to review your report.

10  A.  I know it's in there.  Sorry, I don't see — I can't find

11  the statewide rejection rate in Texas.  There it is on page 1;

12  I'm sorry.  The statewide — the reported statewide rejection

13  rate was 12.4 percent.

14  Q.  Thank you.  And how does that 12.4 percent number compare

15  to Texas' pre-SB 1 mail ballot rejection rate?

16  A.  It was more than 20 times higher than the rate in 2020.

17  Q.  Could we please pull up table 1 on page 3 of LULAC 3.

18      Can you please tell us what this table shows?

19  A.  So this table shows the number of mail ballots that were

20  returned in the 2022 Primary; the number rejected, which I

21  used to calculate the rejection rate.  The rejection rate was

22  the percentage of returned ballots that were rejected.

23      It shows the 2020 rejection rate from the EAVS survey and

24  it shows the multiple, how many times larger the 2022 Primary

25  rejection rate was compared to the 2020 General Election rate.

KENNETH MAYER — DIRECT

1  Q.  What sort of range of values do we see in that last column

2  you mentioned?

3  A.  They range from Fort Bend County, where there were —— it

4  was 11 times greater than it was in 2020, up through Harris

5  County where it was 66 times larger.

6  Q.  What was the aggregate rate of increase for these ten

7  counties?

8  A.  It was 30 times larger than it was in 2020.

9  Q.  And what specifically was the rejection rate for mail

10  ballots in Harris County in the March 2022 Primary?

11  A.  20.2 percent.

12  Q.  How did you calculate rejection rate for purposes of this

13  table in your report?

14  A.  So I calculated the rejection rate as the percentage of

15  mail ballots returned that were rejected reflecting a voter

16  like made an attempt to vote absentee by returning their

17  ballot to election offices.

18  Q.  Does table 1 reflect the rate of mail ballot application

19  rejections?

20  A.  No, I did not have specific data on the number of

21  applications and rejections.

22  Q.  What does that mean for any conclusions you draw from this

23  data?

24  A.  Well, what it means is that we would need to add to these

25  totals the number of people who applied for an absentee ballot

KENNETH MAYER - DIRECT

1  or submitted an application for an absentee ballot that was

2  rejected.  Some of them may have subsequently submitted an

3  application that was accepted, but some of them almost

4  certainly did not -- were not able to submit an application

5  that was accepted.

6  Q.  These individuals who had their mail ballots rejected as

7  reflected in table 1, had they already successfully applied

8  for an absentee ballot?

9  A.  Yes.  In order to submit an absentee ballot you already

10  would have had to overcome the barriers to applying.

11  Q.  Do we know whether the increases reflected in table 1 are

12  attributable to SB 1's mail ballot provisions?

13  A.  Here, no; although the inference is that was the major

14  change.  Subsequently I did get -- have data on the specific

15  reasons why absentee ballots were rejected.

16  Q.  Did you have any of that data at the time of this report

17  from any counties?

18  A.  No, I did not.

19  Q.  You are sure you didn't have any individual-level county

20  data at the time of your April 2022 report?

21  A.  Oh, I'm sorry.  I submitted multiple reports.  It can be

22  difficult for me to keep --

23  Q.  Understandable.

24  A.  So I did have data from Harris and Tarrant County about

25  the reasons for the absentee ballot rejections.  I apologize.

1  Q.  No worries.  It's been a long case for all of us,

2  Dr. Mayer.

3     Prior to SB 1 can you just give us a sampling of what

4  reasons existed for rejecting a mail ballot in Texas?

5  A.  So a mail ballot could be rejected because it arrives

6  late, the voter forgot to sign it, there is information on the

7  attestation that is missing.  So there are other reasons why

8  an absentee ballot would be rejected prior to SB 1.

9  Q.  Could we please pull up table 2 on page 5 of LULAC 3 and

10  zoom in on the table.  Thank you.

11     What does table 3 show, Dr. Mayer?

12  A.  This shows the ballots that are rejected specifically

13  because of SB 1 because Harris County broke out specific data

14  on which ballots or how many mail absentee ballots were

15  rejected because of the missing or nonmatching social security

16  or driver's license number, and this shows the race of -- or

17  actually the rate at which ballots were rejected because of SB

18  1 reasons for non-Hispanic Whites and other racial or ethnic

19  categories.

20  Q.  And what does this table tell us about the share of mail

21  ballots in Harris and Tarrant Counties rejected in the March

22  Primary due to SB 1?

23  A.  It shows that there were a total of 6,614 ballots

24  rejected.  Turns out this total actually is a little bit

25  different from the totals in table 2, primarily because there

1 | were some voters in the file where it was not possible to
2 | generate BISG estimates because the address didn't geocode,
3 | but ultimately it shows that there were 6614 ballots overall
4 | rejected because of SB 1 where we could classify the voter by
5 | race.
6 | Q.  I want to return to this table but actually I got ahead of
7 | myself.  Could we go back to table 2, please.
8 |     And I apologize for going slightly out of order here,
9 | Dr. Mayer.  Could you tell us what this table shows?
10 | A.  So this shows specific data reported by Harris and Tarrant
11 | County about why a mail absentee ballot was rejected.
12 | Q.  And what does this table tell us about the share of mail
13 | ballots rejected in Harris and Tarrant Counties in the March
14 | Primary due to SB 1?
15 | A.  It shows that 90 percent of the rejected ballots in Harris
16 | and Tarrant County in March 2022 were rejected because of SB
17 | 1, a missing, incomplete, or nonmatching driver's license or
18 | social security number.
19 | Q.  And how many times greater is that than the next largest
20 | reason for a mail ballot to be rejected in Harris and Tarrant
21 | Counties?
22 | A.  It's a factor of — well, it's basically nine times
23 | greater than all of the other reasons put together.
24 | Q.  Looking only at timely ballots submitted in Harris and
25 | Tarrant County, what percentage were rejected due to SB 1?

KENNETH MAYER — DIRECT

1  A.  So I redid this calculation counting only ballots that

2  arrived on time because they would have been rejected in any

3  event.  If we count only ballots that arrived in a timely way,

4  99.6 percent were rejected because of SB 1.

5  Q.  Do you have any reason to believe that SB 1 would have

6  been a less significant basis for rejections and mail ballots

7  in other Texas counties during the March 2022 Primary?

8  A.  It certainly would have varied, but there isn't any reason

9  to believe it would have been dramatically different that this

10  pattern of almost all ballots that were rejected, were

11  rejected because of SB 1.  My inference or my opinion is that

12  that the pattern would have existed in most if not every other

13  Texas county.

14  Q.  Based on the data we've discussed so far from your April

15  report, what did you conclude?

16  A.  I concluded that SB 1 resulted in dramatically higher

17  absentee ballot rejection rates and that the effect fell most

18  heavily on voters of color.

19  Q.  I want to get into that second point now.  In your

20  supplemental report did you look into whether mail ballot

21  rejections due to SB 1 disproportionately impacted certain

22  groups of voters?

23  A.  I did.

24  Q.  Could you restate your conclusion on that specific point?

25  A.  So I found that minority voters were significantly more

1  likely to have their mail ballot rejected because of SB 1 than

2  non−Hispanic White voters were.

3  Q.  Could we now pull back up table 3.  And I apologize for

4  the duplication, but could you just tell us again what table 3

5  shows?

6  A.  So table 3 shows information for every individual voter

7  who submitted a mail absentee ballot that was accepted or

8  rejected specifically because of SB 1.  So I'm not counting

9  the other reasons for rejecting an absentee ballot.

10 Q.  How are you able to estimate a person's race in the Harris

11 and Tarrant County voter files here?

12 A.  Again I relied on the BISG method.

13 Q.  What conclusions can we draw from this table with respect

14 to mail ballot rejection rates among different racial groups

15 in Harris County in the March 2022 Primary Election?

16 A.  That the SB 1 rejection rate was uniformly higher for

17 every minority group compared to non−Hispanic Whites.

18 Q.  Was that a statistically significant finding?

19 A.  Yes, it was.

20 Q.  Did you observe a similar pattern in Tarrant County?

21 A.  I did.

22 Q.  Could we please now pull up table 4 from page 6.

23     What does this table show us, Dr. Mayer?

24 A.  This replicates the analysis for Harris County showing the

25 race of voters who —— in Tarrant County who had their mail

1  absentee ballot accepted or rejected because of SB 1.

2  Q.  What does this table show us with respect to the mail

3  ballot rejection rate for different racial groups of voters in

4  Tarrant County?

5  A.  So it shows that the SB 1 rejection rate for non-Hispanic

6  White voters was 5.2 percent, meaning about one ballot in 20

7  was rejected for SB 1 reasons.  For minority groups, it was

8  between 2 and almost 4 times higher.

9      Among African-Americans, 17.4 percent that their mail

10  ballots were rejected because of SB 1.  Hispanic voters,

11  12.4 percent were rejected because of SB 1.  Asian voters,

12  15.7 percent were rejected.  And again, the rejection rate for

13  non-Hispanic Whites was 5.2 percent.

14  Q.  The pattern here in table 4, was that also statistically

15  significant?

16  A.  Yes.

17  Q.  Could we now please pull up table 6 from page 7 of

18  Dr. Mayer's report.  Can you tell us what this table does?

19  A.  This table collapses all of the different minority groups

20  into one category, so we're comparing just White, non-Hispanic

21  Whites to minority groups and it shows that combining all

22  minority groups into one category that their SB 1 rejection

23  rate for mail ballots was over three times higher than it was

24  for non-Hispanic Whites.

25  Q.  And that disparity, was it statistically significant?

KENNETH MAYER - DIRECT

1  A.  Yes.

2  Q.  What were you able to conclude from this data with respect

3  to whether SB 1's mail ballot identification requirements

4  impact certain groups of voters more than others?

5          MR. WASSDORF:  Objection, Your Honor.  Assumes facts

6  not in evidence, specifically everything after "with respect

7  to."

8          THE COURT:  Do you want to respond to that?

9          MR. DODGE:  I think it's what he just testified to.

10  It's the conclusion of his report.

11          THE COURT:  That's overruled.

12          THE WITNESS:  I'm sorry.  Can you ask the question

13  again?

14          MR. DODGE:  Sure.

15  BY MR. DODGE:

16  Q.  What were you able to conclude from this data with respect

17  to whether SB 1's mail ballot identification requirements

18  impact certain groups of voters more than others?

19  A.  I concluded that it was an onerous burden that resulted in

20  far higher rejection rates for minority voters and increased

21  rejection rates for all voters and these rejections were,

22  because we saw it and we had the data, was specifically

23  because of SB 1.

24  Q.  Were you able to look at the predicted race for Texas

25  voters who had their mail ballot applications rejected in the

KENNETH MAYER — DIRECT

1 | March 2022 Primary?

2 | A.  Again, I have to look.  I don't think I had data on —— I

3 | don't think I had data on application rates.  Let me ——

4 | Q.  Do you have any reason to believe the rejection rate for

5 | applications would have followed a different pattern than

6 | rejection rates for actual mail ballots?

7 |        MR. GORE:  Objection.  Foundation.  He just testified

8 | he didn't have any data on applications.

9 |        MR. DODGE:  I'm asking for his opinion as an expert

10 | on whether or not he believes the trend for applications,

11 | which had an identical requirement under SB 1, would follow

12 | the trends similar to mail ballot rejections which he directly

13 | looked at.

14 |        THE COURT:  I'm not sure I understood the question.

15 |        Do you understand the question?

16 |        THE WITNESS:  Yes.

17 |        MR. DODGE:  I can restate it, if it would be helpful

18 | for the Court.

19 | BY MR. DODGE:

20 | Q.  What I'm asking, Dr. Mayer, is if based on your expertise

21 | as a political scientist do you think the rejection rates we

22 | just discussed with respect to different groups mail ballot

23 | rejection rates would have been similar or dissimilar for each

24 | racial groups' mail ballot applications?

25 |        MR. GORE:  The objection ——

KENNETH MAYER - DIRECT

1    THE COURT:  Similar from when, like pre-SB 1?

2    MR. DODGE:  In the same election where he did not

3  have access to the predicted race of voters who had their

4  applications denied or accepted.

5    MR. GORE:  The objection is still foundation.

6    He's testifying he had data about rejection rates of

7  ballots, but he just testified he didn't have any data with

8  respect to the rejection rate of applications.

9    THE COURT:  How do you render an opinion, if you

10  didn't have that data?

11    THE WITNESS:  So, Your Honor, it would be an

12  expectation based on things that we bring in about these kinds

13  of requirements, how they -- how a similar requirement might

14  apply in a different context.  Even though I don't have

15  specific data I believe I could make an inference about

16  greater or lesser.

17    THE COURT:  That's sustained.

18    Next question.

19  BY MR. DODGE:

20  Q.  Is it your understanding that the -- do SB 1's rules for

21  mail ballot applications differ from its rules for mail ballot

22  return envelopes?

23  A.  In terms of the requirement to include your driver's

24  license, state ID, or last four of your social security and

25  have that match, that requirement is the same.

1990

KENNETH MAYER - DIRECT

1  Q.  Dr. Mayer, in either your February 2022 report or your
2  April 2022 supplemental report, did you make any guesses or
3  predictions at what the absentee mail ballot rejection rate
4  would be in the November 2022 General Election?
5  A.  So the forecast was that the rejection rate in
6  November 2022 because of SB 1 would be higher than it had been
7  in previous general elections, so my expectation was that the
8  mail ballot rejection rate would be higher in 2022 than it was
9  in 2020.
10 Q.  Why did you believe that?
11 A.  Because -- primarily because SB 1 created a new category
12 of reasons to reject an absentee ballot that didn't exist
13 before and this was an effect that we saw in the Primaries
14 which resulted in orders of magnitude, more rejections and
15 rates of rejections.
16 Q.  Were you eventually asked to look into the mail ballot
17 rejection rates for the 2022 General Election?
18 A.  I was.
19 Q.  Could we please pull up LULAC 4.
20    Can you remind us what this is again, Dr. Mayer?
21 A.  This is the third report I submitted in March 2023.
22 Q.  Could we pull up the top paragraph of page 6 in this
23 report, please.
24    At the time of your report, what was the reported
25 statewide rejection rate for Texas in the 2022 General

1991
KENNETH MAYER - DIRECT

1  Election based on the data available at that time?

2  A.  So there was a reported investigation or reported

3  calculations based on data that the clerks had reported that

4  showed the rejection rate for mail ballots was 2.7 percent in

5  the 2022 General Election.

6  Q.  Did that, in fact, turn out to be the actual statewide

7  rejection rate for Texas in the 2022 General Election?

8  A.  No.  The subsequent EAVS data showed that the actual mail

9  ballot rejection rate was 3.4 percent.

10  Q.  Could we pull up what's been marked as LULAC 106.

11       You may have just referred to this, Dr. Mayer, but can you

12  tell us what this document is?

13  A.  This is a summary of the EAVS data which was released I

14  recall in June of 2023 where it gives some top line results

15  from the survey.

16  Q.  And do you know whether this is the full 2020 EAV survey?

17  A.  In terms of what's in this report?

18  Q.  Can we just scroll through the document briefly.

19  A.  So this is a table from that report summarizing the mail

20  ballot data, the number requested, sent, returned, and the

21  rejection rates.

22  Q.  Could we go to page 4 of this document, please.

23       What does this table show, Dr. Mayer?

24  A.  This shows the rejection — the percentage of returned

25  mail absentee ballots that were rejected.

1  Q.  And turning to the next page, can you state again what the

2  rejection rate is for Texas?

3  A.  This shows that the mail ballot rejection rate in Texas

4  was 3.4 percent.

5        MR. DODGE:  Your Honor, at this time I move LULAC 106

6  into evidence.

7        THE COURT:  Any objection?

8        MR. GORE:  We do have an objection, Your Honor.

9        This EAV survey is based on self-reporting.  There's

10 been no verification that the data here is actually accurate.

11       THE COURT:  So that goes to the weight.  What's the

12 objection to authenticity?

13       MR. GORE:  The objection is as stated, that it's not

14 reliable and probative.

15       THE COURT:  Any other objections?  None.

16       That's overruled.  106 is admitted.

17 BY MR. DODGE:

18 Q.  What data source would the 2022 EAV survey have used for

19 this table?

20 A.  It would have used reports from counties in Texas about

21 their data.

22 Q.  Do you have any idea why the EAV survey reported a higher

23 rejection rate than the preliminary report?

24 A.  I have some reasons, in part because the data that was

25 reported to in January was not —— may not have been complete.

KENNETH MAYER - DIRECT

1  There could have been some counties excluded.  There may have

2  been some mail absentee ballots that were reported as rejected

3  later.

4  Q.  Between the preliminary number contained in your report

5  and this latter number from the EAV survey, which do you

6  believe to be more reliable?

7  A.  No question the reported EAVS data would be more reliable.

8  Q.  And why do you reach that conclusion?

9  A.  Again, this is an ongoing survey that's regarded as

10 reliable in election administration and there were another six

11 months, five months for counties to report their data.

12 Q.  I believe you testified to this earlier.  Can you remind

13 us what the mail ballot rejection rate was for Texas in the

14 2020 General Election?

15 A.  I believe it was 0.84 percent.

16 Q.  And how does that number compare to the rejection rate

17 reported in the 2020 EAV survey?

18 A.  This rejection rate was about four times higher.

19 Q.  So did your prediction at the time of the Primary Election

20 that the November 2022 rejection rate would be higher than the

21 2020 rejection rate prove correct?

22 A.  It did.

23 Q.  Where does the 3.4 percent mail ballot rejection rate put

24 Texas relative to other states in the nation?

25 A.  According to the EAVS data Texas had the third highest

1 | mail ballot rejection rate in the country.
2 |      THE COURT:  Out of curiosity, who were the other two?
3 | I see South Carolina is 3.2.
4 |      MR. DODGE:  If we can scroll back to the prior page
5 | it might help answer the Judge's question.  Further up the
6 | page, I suppose.
7 |      THE COURT:  Delaware 13.2.  How odd.  Okay, thank
8 | you.
9 | BY MR. DODGE:
10 | Q.  Dr. Mayer, does Delaware have a history of a high mail
11 | ballot rejection rate?
12 | A.  It typically does.
13 | Q.  Are you in a position to explain why today?
14 | A.  No.
15 | Q.  Did you have access to any county-level data from the 2022
16 | General Election in preparing your report?
17 | A.  Yes.
18 | Q.  Can you tell us which counties you had data from for this
19 | specific report?
20 | A.  Give me a second.
21 | Q.  Before we do that, just one more question on the EAVS.
22 | Could you tell us where Texas' 3.4 mail ballot rejection rate
23 | puts it, relative to the national average?
24 | A.  The — it's higher.  So the national average, I think —
25 | it can be hard for me to recall these off the top of my head.

KENNETH MAYER - DIRECT

1    THE COURT:  It's right there on the screen.  1.5.

2    THE WITNESS:  Okay.  There it is.  So it's more than

3  twice the national average.

4  BY MR. DODGE:

5  Q.  Returning to the county-level data you had access to for

6  your March 2023 report, can you tell us which specific

7  counties you looked at?

8  A.  For rejection rates I had data from Dallas, Harris, and

9  Hidalgo County.

10  Q.  Were you able to draw any conclusions about how the mail

11  ballot rejection rates in those counties in the 2020 General

12  Election compare to the 2020 [verbatim] General Election?

13  A.  Yes, I was able to compare them.

14  Q.  Can we now please pull up table 1 on page 4 of Dr. Mayer's

15  March report, which is LULAC 4.

16    Can you please tell us what table 1 shows?

17  A.  This shows specific data from these three counties for the

18  number of mail absentee ballots returned, the number that were

19  rejected because of SB 1, the percentage of rejections because

20  of SB 1, the total rejection rate for all reasons, and

21  comparison of the 2020 to the 2022 total mail ballot rejection

22  rate.

23  Q.  By what rate did Harris County's mail ballot rejection

24  rate increase from 2020 to 2022?

25  A.  It increased by almost 16 times.

1  Q.  And looking at the data in this table, at what rate did

2  Harris County's mail ballot rejection rate increase from 2020

3  to 2022 specifically due to SB 1?

4  A.  It increased from 2020 by a factor of about 13.

5  Q.  How are you able to distinguish between absentee mail

6  ballots rejected for reasons related to SB 1 as compared to

7  other reasons?

8  A.  Because in the voter files there was a code that indicated

9  why an absentee ballot was rejected and there were specific

10 codes that indicated the ID or social security number was

11 missing, incomplete, or nonmatching.

12 Q.  And how did you calculate the 2020 General Election

13 rejection rates in table 1?

14 A.  That's from the EAVS.

15 Q.  Do we know in this table whether the increased rejection

16 rates we see are attributable to SB 1?

17 A.  Certainly, we can, because there were no ballots rejected

18 in 2020 because of SB 1 because it hadn't gone into effect,

19 and we can directly observe how many ballots were rejected

20 because of the missing, incomplete, or nonmatching driver's

21 license or social security number that's in column 2 of the

22 data.

23 Q.  Could we pull up table 2 on the next page.

24     What does table 2 show?

25 A.  Table 2 shows the percentage of all absentee ballot

1  rejections that were due that were attributable to SB 1.

2  Q.  What does it tell us, for example, about the percentage of

3  rejections due to SB 1 in Harris County?

4  A.  It shows that 82 percent of the rejected mail ballots in

5  Harris County were rejected specifically because of SB 1.

6  Q.  And what was the average rejection rate due to SB 1 in

7  these three counties?

8  A.  It was over three quarters, it was 75.8 percent.

9  Q.  Were you able to observe the same disparate impact on

10  non-White voters in the 2020 General Election that you

11  observed in the Primary?

12  A.  I was.

13  Q.  And how were you able to observe this?

14  A.  Again, by looking at the race of voters whose ballots were

15  accepted or rejected because of SB 1.

16  Q.  Were there any changes in how you used BISG data in your

17  March 2023 report?

18  A.  No.  I did the analysis using the same method.

19  Q.  Could we please pull up table 3 on page 7.

20      What does table 3 show us, Dr. Mayer?

21  A.  This shows the demographic makeup of all voters who

22  returned an absentee ballot, voters whose ballot was accepted,

23  and voters whose ballot was rejected because of SB 1.

24  Q.  And what conclusions can we draw from table 3?

25  A.  It showed that SB 1 resulted in disproportionately high

1  rejection rates for voters of color compared to non-Hispanic

2  Whites.

3  Q.  What does this table tell us about the approximate share

4  of mail ballot voters in Harris County who were Black, for

5  example?

6  A.  It shows that returned ballots were 22 percent

7  African-American.

8  Q.  What does it tell us about the share of rejected ballots

9  that were cast by African-Americans?

10  A.  It showed that African-Americans comprise 30.8 percent of

11  SB 1 rejected mail ballots.

12  Q.  What does this tell us with respect to the share of mail

13  ballot voters in Harris County who were Hispanic?

14  A.  It shows that 9.8 percent of returned ballots were

15  returned by Hispanic voters.

16  Q.  What does it say with respect to the share of rejected

17  ballots in Harris County cast by Hispanic voters?

18  A.  It shows that Hispanic voters were 14.1 percent of SB 1

19  rejected ballots.

20  Q.  Are the data in table 3 statistically significant — or

21  let me restate that.  Are the disparities reflected in table 3

22  statistically significant?

23  A.  They are.

24  Q.  Could we please pull up table 4 on page 8 of LULAC 4.

25      Can you tell us what this table shows, Dr. Mayer?

KENNETH MAYER – DIRECT

 1  A.  Table 4 computes something called an odds ratio, which is
 2  essentially what is the rate of rejection for voters in other
 3  non-White racial groupings compared to rejection rates for
 4  non-Hispanic White voters.  And what it gives us is it allows
 5  us to determine how much more likely a ballot was to be
 6  rejected for voters of color compared to non-Hispanic Whites.
 7  Q.  Could you walk us through how much more likely voters of
 8  different racial groups were to have their mail ballots
 9  rejected, relative to White voters, as reflected in this
10  table?
11  A.  So it shows that a Black mail ballot —— someone who
12  returned a mail ballot who was Black was 82 percent more
13  likely to have their ballot rejected than a White voter.  So
14  almost twice as likely to have their ballot rejected.
15  Q.  What does it show us with respect to Hispanic voters in
16  Harris County?
17  A.  It shows that an Hispanic voter was 86 percent more likely
18  to have their ballot rejected by a non-Hispanic White.  So,
19  again, almost double.
20  Q.  And what about an Asian voter?
21  A.  It shows that an Asian voter was 71 percent more likely to
22  have their absentee ballot rejected.
23  Q.  To be clear, the rejections we're looking at in this
24  table, are they attributable only to SB 1?
25  A.  Yes.  I did not count any other reason for rejecting a

KENNETH MAYER — DIRECT

1  ballot.

2  Q.  Did you perform a similar analysis for Dallas County for

3  the 2022 General Election?

4  A.  I did.

5  Q.  Can we please pull up table 5.

6      Can you tell us what table 5 shows, Dr. Mayer?

7  A.  Again, this shows the demographic makeup of voters in

8  Dallas County in 2022 in the General Election who returned an

9  absentee ballot, and also the demographics of those who had

10  their ballot accepted or rejected because of SB 1.

11  Q.  What conclusions can we draw from table 5?

12  A.  The conclusion is that voters of color were significantly

13  more likely to have their mail ballot rejected than were

14  non-Hispanic White voters.

15  Q.  Based on table 5, can you tell us what share of voters who

16  voted by mail in Dallas County in 2022 were Black?

17  A.  So data indicates that of the mail ballots that were

18  returned 20.2 percent were from Black voters.

19  Q.  And what share of the rejected ballots in Dallas County

20  were cast by Black voters, according to table 5?

21  A.  31.6 percent.

22  Q.  Are the disparity rates reflected in table 5 statistically

23  significant?

24  A.  Yes.

25  Q.  Can we now bring up table 6.

2001

KENNETH MAYER - DIRECT

1      Can you tell us what table 6 shows?

2  A.   Table 6 shows a calculation of odds ratios about the

3  relative odds that a ballot cast by a minority voter was

4  rejected compared to non-Hispanic White.

5  Q.   Can you tell us, based on the data in table 6, how much

6  more likely a Black voter in Dallas County in 2022 was to have

7  their mail ballot rejected relative to a non-Hispanic White

8  voter?

9  A.   This computation shows that a Black voter was 87 percent

10  more likely to have their mail ballot rejected compared to a

11  non-Hispanic White voter.

12  Q.   Can you tell us what table 6 says with respect to how much

13  more likely an Hispanic voter in Dallas County in 2022 was to

14  have their mail ballot rejected relative to a non-Hispanic

15  White voter?

16  A.   This computation shows that a Hispanic voter was

17  36 percent more likely to have their mail ballot rejected

18  because of SB 1.

19  Q.   Did you look at mail ballot rejection rates in Hidalgo

20  County in this report?

21  A.   I did.

22  Q.   Can we please pull up table 7.  Can you tell us what table

23  7 shows?

24  A.   Table 7 shows the aggregate rejection rate in Hidalgo

25  County for elections between the 2018 Primary and the 2022

KENNETH MAYER – DIRECT

1   General.

2   Q.   What conclusions can we draw from table 7?

3   A.   Table 7 shows that the aggregate rejection rate in the

4   2022 General was almost twice what it was in 2020, and higher

5   than it was in any other election since 2018, other than the

6   2022 Primary where it was almost 20 percent.

7   Q.   Dr. Mayer, what conclusions did you draw with respect to

8   SB 1's mail ballot provisions in your March 2023 report?

9   A.   The data confirmed my conclusions in my earlier reports

10  that SB 1 imposes a significant burden on voters in ways that

11  disproportionately affect voters of color.

12  Q.   Dr. Mayer, did you draw any conclusion as to whether this

13  burden was justified by any concern about fraudulent mail

14  voting in Texas?

15  A.   I concluded that it was not related to or would have no

16  effect on rates of voter fraud and wouldn't reduce the rate of

17  voter fraud which was already vanishingly close to zero.

18  Q.   Dr. Mayer, we've now discussed how SB 1 impacts multiple

19  different modes of voting in Texas, is that fair to say?

20  A.   Yes.

21  Q.   Do the impacts of those changes to methods of voting in

22  Texas operate in isolation?

23  A.   No, they don't, not in my view.

24  Q.   What can we say about the cumulative impact of SB 1's

25  changes to voting rules in Texas?

2003
KENNETH MAYER - DIRECT

1  A.  There are multiple changes to voting, all of which show

2  that they disproportionately affect voters of color, had the

3  effect of either cutting off altogether voting methods that

4  were disproportionately used by minority voters in the case of

5  24-hour voting or drive-thru voting, created an entirely new

6  category of reasons -- a reason to reject a mail absentee

7  ballot that disproportionately affects voters of color.

8      And in the aggregate we're talking about hundreds of

9  thousands of voters who have their -- who run a greater risk

10 of having their ballot rejected or face more difficulty voting

11 because the method they had used in the past is cut off.  So

12 these changes work together to make it more difficult to vote.

13         MR. DODGE:  Your Honor, now might be a good time to

14 take our midmorning break, unless you would like us to keep

15 pushing through.

16         THE COURT:  How much more do you have?

17         MR. DODGE:  I would guess I'm about three quarters of

18 the way through.

19         THE COURT:  Let's take a break.

20     (Recess)

21 BY MR. DODGE:

22 Q.  Welcome back, Dr. Mayer.  After you submitted your

23 March 2023 report on the 2020 General Election, an expert for

24 the State defendants submitted a rebuttal report.

25 A.  That's correct.

KENNETH MAYER - DIRECT

1   Q.   Which of your reports does that report respond to?
2   A.   It responds to my 2023 report, the third report that I
3   submitted.
4   Q.   Does it respond to your February 2022 report or your
5   April 2022 report?
6   A.   No.
7   Q.   Can you tell us the name of the individual who submitted
8   that report?
9   A.   It's Dr. Mark Hoekstra.
10  Q.   And prior to this litigation, were you familiar with
11  Dr. Hoekstra?
12  A.   No, I wasn't.
13  Q.   To your knowledge is Dr. Hoekstra a political scientist?
14  A.   He is not.  He's an economist.
15  Q.   In his report Dr. Hoekstra suggests that pre-SB 1 election
16  data you relied upon is unreliable.  What data source did you
17  rely upon in your report for pre-SB 1 election data?
18  A.   I relied on the previous versions of the EAVS.
19  Q.   And has EAVS been relied upon by political scientists?
20  A.   Yes.
21  Q.   Is EAVS considered reliable enough for peer-reviewed work?
22  A.   Yes.
23  Q.   Have you ever relied upon EAVS data in your own academic
24  work?
25  A.   Yes.

KENNETH MAYER - DIRECT

1  Q.  Dr. Hoekstra in his report notes that the mail ballot
2  rejection rate for non-SB 1 reasons went up between 2020 and
3  2022, do you recall that?
4  A.  Yes.
5  Q.  Does that fact give you any reason to doubt the data you
6  relied upon in your report?
7  A.  No, it doesn't.
8  Q.  Why not?
9  A.  Several reasons.  One is that we can observe directly the
10 ballots that are rejected because of SB 1.  So in that sense
11 what counties did before SB 1, it's not necessary to know
12 anything about that.  The second is that it is possible for
13 absentee ballot rejection rates to have gone up that were not
14 attributable to SB 1 that might have been indirectly related
15 to SB 1.
16 Q.  Can you explain to us how mail ballot rejection rates, not
17 directly attributable to SB 1, may have been indirectly caused
18 by SB 1?
19 A.  So one possibility is other than SB 1 the most common
20 reason for rejecting a mail absentee ballot is it arrives
21 late.  And it is possible that some absentee voters might have
22 had their application rejected and had to go through that
23 process multiple times, they might have had their absentee
24 ballot rejected and had to go through the process a second
25 time which resulted in a ballot arriving late and being

2006

KENNETH MAYER - DIRECT

1  rejected for that reason, but irrespective of the indirect

2  effects it's irrelevant to my conclusions about the effects of

3  SB 1 because we can observe that directly.

4  Q.  Are you aware of any reason why prior to 2021 county

5  officials in Texas would have had difficulty accurately

6  counting the number of rejected mail ballots in their county?

7  A.  I'm not aware of any reason why they would have difficulty

8  doing that.  The decision about whether a ballot is rejected

9  or not, that's a binary decision.  A ballot meets the

10  requirements, arrives on time, and is counted or it's not.

11      There's not necessarily a complicated process that that

12  requires, so it strikes me as unlikely that there would have

13  been significant changes and/or difficulties in county

14  officials making a determination about whether an absentee

15  ballot was counted and rejected prior to SB 1.

16  Q.  Were county officials in Texas asked to count and record

17  mail ballot rejections in election cycles prior to SB 1?

18  A.  Yes.  That was data that was collected and part of the

19  election returns and reported to the EAC.

20  Q.  Do you believe there is any reason to think that Texas'

21  introduction of a Ballot Tracker might have increased its

22  rejection rate artificially?

23  A.  No.  In fact, there's reason to think that the

24  introduction of a Ballot Tracker, other things being equal,

25  should have driven down the rejection rate.

KENNETH MAYER – DIRECT

1  Q.  Is that what happened in Texas?

2  A.  No.

3  Q.  Dr. Hoekstra's report talks about how a learning curve

4  might impact future mail ballot rejection rates in Texas, do

5  you recall that?

6  A.  Yes.

7  Q.  Did you account for any learning curve in your report?

8  A.  Yes, I did, in noting that the rejection rate in November

9  of 2022 was lower than it was in March of 2022 but remained

10  significantly higher than it had been in previous general

11  elections.

12  Q.  Do we know what the specific mail ballot rejection rate

13  will be in any future election in Texas?

14  A.  No.

15  Q.  What can we say for certain about the future impact of SB

16  1's mail ballot provisions?

17  A.  So what I can say with certainty or near certainty is

18  there will always be ballots rejected because of SB 1., a

19  nonzero number of ballots rejected, because in creating a new

20  category of reasons to reject an absentee ballot there will

21  always be voters who are affected by that.

22      It is true that as voters get more familiar with a voting

23  method, the election administration literature shows that

24  people who are experienced in voting a particular way, they

25  tend to have an easier time with that.

KENNETH MAYER - DIRECT

1      But, again, Texas does not have no excuse absentee voting,

2  so therefore my expectation is that there will always be new

3  absentee or first-time absentee voters cycling in who weren't

4  eligible before but become eligible.

5      So the key inference here is that the mail absentee ballot

6  rejection rate might go up a little bit compared to 2022.  It

7  might go down a little bit compared to 2022, but my

8  expectation is that rate will always be higher than it was

9  before SB 1 went into effect.

10 Q.  I'd like to now turn to the issue of voter fraud.  You've

11 published work on the prevalence of voter fraud, is that

12 right?

13      MR. WASSDORF:  Objection.  Leading.

14 BY MR. DODGE:

15 Q.  Have you ever published work on the prevalence of voter

16 fraud?

17 A.  I have.

18 Q.  Dr. Hoekstra quotes you as saying in an article that,

19 quote, "The prevalence of fraudulent voting, as with any

20 illegal or largely private matter, is difficult to measure."

21      Do you recall that?

22 A.  Yes.

23 Q.  Is there any important context missing from that quote?

24 A.  Yes.  In my view Dr. Hoekstra is taking that sentence

25 fragment entirely out of context because the entire article in

KENNETH MAYER — DIRECT

1  which that —— in which I wrote that, or my and my coauthors

2  wrote that goes on to use a method that is known to capture

3  private, stigmatized, or illegal activity.

4      So Dr. Hoekstra seems to be arguing here or quoting that

5  to say that I concede that you can't measure rates of voter

6  fraud, even though in that article we went on to actually

7  create a method that does capture rates of voter fraud, and

8  it's been shown in other contexts to accurately measure not

9  just voter fraud in other context but other forms of

10  stigmatized activity, such as texting while driving.

11  Q.  What conclusions did you and your coauthor reach in that

12  article, with respect to the prevalence of voter fraud?

13  A.  We found no evidence of any voter fraud that was

14  indistinguishable from zero.  And it didn't matter what state

15  you were looking at, whether it was a state that was

16  competitive or not competitive, whether a state had a voter ID

17  law or not, the rate of voter fraud was essentially

18  indistinguishable but was basically zero.

19  Q.  What conclusions did you and your coauthors reach in that

20  article with respect to the prevalence of voter fraud relative

21  to other social phenomenon?

22  A.  Well, we repeated the study several times, but ultimately

23  we found evidence that the rate of voter fraud was essentially

24  equal to the rate at which people report being abducted by

25  aliens.

KENNETH MAYER − DIRECT

1  Q.  Dr. Hoekstra's report discusses several polls showing that

2  some percentage of Americans are concerned about the

3  prevalence of voter fraud, do you recall that?

4  A.  Yes.

5  Q.  In your capacity as a political scientist, are you aware

6  of any evidence that laws such as SB 1 do anything to impact

7  the public's perceived prevalence of voter fraud?

8  A.  So, in fact, almost all research concludes that there's no

9  relationship between measures like voter ID, or other things

10 that states do purportedly to reduce election fraud, and that

11 a key reason voters have inaccurate beliefs about the measure

12 of the frequency of voter fraud is because they are being

13 misled by false claims of voter fraud.

14 Q.  So in your view as a political scientist, what would, in

15 fact, make an impact in reducing the public's perception of

16 the prevalence of voter fraud?

17 A.  Well, one of the things is to — for people to stop making

18 unwarranted allegations of voter fraud.

19 Q.  I'd like to next ask you some questions about

20 Dr. Hoekstra's criticism of your disparate impact analysis.

21 In his report Dr. Hoekstra suggests that your disparate impact

22 analysis should have looked at the mail ballot rejection rates

23 relative to all voters in a racial group, rather than those

24 who voted by mail, do you recall that?

25 A.  Yes.

2011

KENNETH MAYER - DIRECT

1  Q.  Do you agree with Dr. Hoekstra?

2  A.  Not at all.  In my view, that's completely wrong.

3  Q.  Why is that?

4  A.  Because if we're looking at the effect of SB 1, we need to

5  look at the effect on voters who are voting by mail.  It makes

6  no sense to look at the effect of SB 1 by looking at people

7  who aren't effected by SB 1, people who vote in person, or

8  people who vote early during the regular times for voting.

9      We're comparing a group that we know is affected to a

10  group that we know is not affected.  So in my view

11  Dr. Hoekstra's argument is equivalent to saying we need to

12  evaluate the effect of SB 1 in Texas by looking at how people

13  in Oklahoma vote.  It just — it is not — it makes no sense.

14  Q.  And, to be clear, what do you consider to be the relevant

15  empirical question here, with respect to SB 1's mail ballot

16  provisions?

17  A.  So the relevant empirical question is:  How many people

18  are affected, not just how many people have their ballots

19  rejected.  But conditional voting mail absentee, what are the

20  rates at which people had their ballots rejected.  That's the

21  quantity of interest.

22  Q.  Do you recall that in his report Dr. Hoekstra suggests

23  that when properly calculated SB 1, in fact, has a disparate

24  impact against individuals predicted to be White, relative to

25  people predicted to be Hispanic?

KENNETH MAYER - DIRECT

1  A.  That's the conclusion that he draws.

2  Q.  What do you make of that conclusion?

3  A.  Again, the fundamental method is just simply wrong.

4      He's comparing people who are affected by SB 1 who are

5  not — it's not possible that they are affected by SB 1.  So

6  the way that he's doing this calculation is simply incorrect,

7  and by including people in the denominators who don't vote

8  absentee.

9  Q.  So in your view does SB 1 discriminate against White

10  voters?

11  A.  There is no evidence that remotely suggests that compared

12  to voters of color.

13  Q.  I'd like to discuss another issue Dr. Hoekstra raises

14  about disparate impact analysis and specifically about BISG.

15  Do you recall that Dr. Hoekstra notes in his report the

16  existence of certain known classification error rates

17  associated with BISG?

18  A.  He does.

19  Q.  What did you previously testify to with respect to the

20  impact those error rates had on whether or not you were

21  inclined to rely upon BISG for your analysis?

22  A.  My conclusion is that the existence of those error rates

23  does not mean that BISG is not reliable for these, for the

24  purposes I use it for, and to the extent that those errors

25  exist, that they will drive all of the between group

KENNETH MAYER - DIRECT

1  percentages to be smaller or to be larger than what we

2  observed, if we were able to correct for them.

3  Q.  And have you prepared a demonstrative to help further

4  illustrate this last point you just made?

5  A.  Yes.

6  Q.  Could we please pull up LULAC Demonstrative 1.

7      Can you just tell us a high level what this demonstrative

8  is intended to show?

9  A.  So at the highest level what it shows is that when we are

10  misclassifying people, we have people who our method predicts

11  are Black who are not always Black but some of them might be

12  White or vice-versa, the existence of those misclassifications

13  will take any percentage we calculate based on our estimates

14  of race and will move those percentages towards the overall

15  population mean because when we are combining Black, White, in

16  this case together, we're going to get a mix of rates, the

17  Black rate and the White rate, and that will make it more like

18  the overall percentage that we measure.

19  Q.  Can you tell us about what the group of voters look like

20  in this hypothetical?

21  A.  So I created a hypothetical to demonstrate that there is a

22  movement towards the population mean.  And each jar is ——

23  consists of voters who, when we do the estimates, voters who

24  we conclude are Black or White, but for these purposes I'm

25  taking this hypothetical as the ground truth.

2014
KENNETH MAYER – DIRECT

1    So we're creating a scenario where we know that there are
2    50 Black voters.  We know that there are 50 White voters.  We
3    know as the ground truth that 60 percent of voters who are
4    Black will vote early, and that 20 percent of White voters
5    vote early.
6        And this is for illustrative purposes.  You can change
7    these percentages or the number of voters and the overall
8    conclusion is the same.
9        So this shows that in our example we take as the ground
10   truth that 60 percent of our 50 Black voters vote early,
11   20 percent of our White voters vote early, and that we
12   actually don't observe race directly, we have to estimate it.
13       So this example shows what happens when there is an error
14   rate in this process.
15   Q.  So I want to unpack some of what you've just told us.  Can
16   you tell us how many voters are in this hypothetical?
17   A.  There are 100 voters in this hypothetical.
18   Q.  And in this hypothetical, what do we directly observe
19   about the behavior of those voters?
20   A.  We directly observe how many voters there are and how they
21   voted.
22   Q.  And what percentage of these voters in the hypothetical
23   vote on Election Day?
24   A.  We directly observed that overall we have 40 percent of
25   voters who vote early and 60 percent of voters voting on

KENNETH MAYER - DIRECT

 1  Election Day.

 2  Q.  Is that sort of method of voting information something

 3  that might be available in a county voter file?

 4  A.  Yes.  We would be able to directly observe this without

 5  error.

 6  Q.  And were you able to observe that kind of voting behavior

 7  when you looked at, for example, the Harris County voter

 8  history file?

 9  A.  Yes.  There is information about how each individual voter

10  voted in 2022.

11  Q.  So returning to the hypothetical, what do we not directly

12  see about these 100 voters?

13  A.  We don't directly observe their race.  We have to estimate

14  that.

15  Q.  But I think you explained this, for purposes of this

16  hypothetical we are assuming certain things to be what you

17  call the ground truth?

18  A.  Correct.  We are creating an example that we are assuming

19  that this is the ground truth and what happens when there is

20  an error when we start estimating race compared to that ground

21  truth.

22  Q.  Okay.  So if we wanted to know in this hypothetical what

23  percentage of Black voters voted early without being able to

24  directly observe race, what would we have to do?

25  A.  Well, you would have to find a way of estimating the race

KENNETH MAYER - DIRECT

1  of individual voters, which is what BISG does.

2  Q.  So what do we assume in this hypothetical about an error

3  rate of a predictive method?

4  A.  So in this hypothetical, I'm assuming that when we do our

5  estimates of the race of voters that we get it wrong

6  20 percent of the time, that 20 percent of voters we think are

7  Black are actually White, and 20 percent of voters that we

8  think are White are actually Black, comparing these estimates

9  to the ground truth.

10  Q.  And how does that 20 percent hypothetical error rate

11  compare to what you understand to be the overall known error

12  rate for BISG?

13  A.  Well, it's actually a little bit larger than the BISG

14  error rate which has, according to the recent estimates I've

15  seen, has an error rate of about 16 or 17 percent.

16  Q.  So what impact does this error rate have in trying to

17  predict the race of our group of 100 voters?

18  A.  So it means that in the group of voters that we estimate

19  are Black, 40 of them are Black but actually 10 of them are

20  White, 20 percent.  And the same is true for voters that we

21  think are White, ten of them that we estimate are White are

22  actually Black because we've misclassified them.

23  Q.  And so if we take that group of voters who we think are

24  Black, but ten of whom are actually not, and try to discern

25  what share of them voted on Election Day, what impact would

2017
KENNETH MAYER - DIRECT

1  that have?

2  A.  So, again, we're comparing this error to the ground truth

3  and what this shows is that compared to the ground truth that

4  40 percent of Black voters voted early because White and Black

5  voters vote early at different rates, we actually predict or

6  we actually observe that 24 voters that we think are Black

7  voted on Election Day, or 48 percent compared to the ground

8  truth of 40 percent.

9  Q.  And now you just said Election Day and early.  For

10  purposes of this slide, what voting method are we looking at?

11  A.  I'm sorry.  For this slide, it's just Election Day.

12  Q.  And for purposes of this hypothetical, what do we assume

13  the total of all voters to be with respect to the rate of

14  Election Day voting?

15  A.  So we have established that -- or as part of this

16  hypothetical that 60 percent of voters, White and Black

17  combined, vote on Election Day.

18  Q.  What ground truth do we have here about how Black voters

19  actually vote in the hypothetical on Election Day?

20  A.  We have 40 percent of Black voters voting on Election Day.

21  Q.  And what does our predictive method do as a result, due to

22  its error rate?

23  A.  Because we have misclassified some voters, what it does is

24  it takes the observed Black voting rate on Election Day and

25  makes it closer to the overall rate.  It moves it from

1  40 percent to 48 percent.  48 percent is closer to the overall

2  Election Day voting rate of 60 percent.

3  Q.  And that's because we have some non-Black voters who

4  actually ended up in our predicted group of Black voters?

5  A.  That's correct.

6  Q.  Dr. Mayer, can you tell us what this slide shows?

7  A.  This shows what happens to our observed rate of early

8  voting among what we think are Black voters, again, with this

9  group that we think is Black but it's 40 Black and ten White

10  because we've misclassified some voters.

11  Q.  And the effect is the same?

12  A.  The effect is the same.  We observe, because there is an

13  error, that 52 percent of Black voters we observe voting on --

14  voting early, and that's closer to the overall population

15  early voting rate than the actual Black early voting rate.

16  Q.  What does this slide show?

17  A.  So this summarizes that.  And it shows that when we

18  introduce an error rate, and we're basically combining some

19  Black, mostly Black voters, but some White voters, and vice

20  versa, it drives the observed rates that we see toward the

21  population mean, and so it has the effect of moving all of the

22  percentages towards the overall mean and reducing the

23  differences that we observe between groups.

24  Q.  Do the hypothetical numbers that we assumed in this

25  demonstrative reflect any of the data in your reports?

2019

KENNETH MAYER - DIRECT

1  A.  No.  No, it doesn't.  This is a hypothetical.

2  Q.  Would the statistical effect they show differ if you

3  changed the variables in our hypothetical?

4  A.  No, it does not.  The math is inevitable.  When you

5  introduce an error rate and you misclassify people, you will

6  drive every calculation for a particular group towards the

7  population mean and move them closer together compared to

8  other groups.

9  Q.  Would that continue to be true if the error rate for

10 misidentifying different groups with one another was

11 different?

12 A.  Yes.  As the error rate grows larger, this effect would be

13 larger because there are basically in the group that we think

14 is one race is a mix of different races, White and Black in

15 this example.

16 Q.  We can take down Demonstrative 1.

17     I'd like to move on to a different topic but staying on

18 the issue of disparate impact.  Can you tell us what a

19 bounding exercise is?

20 A.  A bounding exercise is an effort to try to establish a

21 range of plausible values for a quantity or parameter, what's

22 the larger or smallest that it be reasonably be.

23 Q.  Did you perform a bounding exercise in your disparate

24 impact analysis in your March 2023 report?

25 A.  No.

2020

KENNETH MAYER - DIRECT

1  Q.  Why not?

2  A.  Because it wasn't necessary.  The BISG method is accurate

3  most of the time, 85 percent of the time, 80 percent of the

4  time.  I also knew that to the extent that there wasn't any

5  errors in the method, that it would drive all of the

6  percentages of different groups towards each other.

7      So, essentially, if I was able to observe race without

8  error, the differences that I see in the disproportionate

9  effects would be even larger than what I observed.

10 Q.  And the disparate impacts you observed with respect to

11 mail ballot voting in your March 2023 report, were they

12 statistically significant?

13 A.  Yes.

14 Q.  Do you know whether Dr. Hoekstra purported to perform a

15 bounding exercise in his rebuttal report?

16 A.  He did.

17 Q.  Could we now pull up LULAC Demonstrative 3, Slide 1.

18     Can you tell us what we're looking at, Dr. Mayer?

19 A.  This is Dr. Hoekstra's bounding analysis of mail ballot

20 rejected rates in Harris County.

21 Q.  If we could look at the bottom right corner — well,

22 actually, I'm not asking the tech to zoom in, but, Dr. Mayer,

23 if you could look at the bottom right corner, could you tell

24 us what those numbers 0.00 and 3.71 represent in

25 Dr. Hoekstra's bounding exercise?

1  A.  So here Dr. Hoekstra is arguing that the difference

2  between mail ballot rejection rate odds could be anywhere from

3  zero to 3.71.

4  Q.  He's looking specifically at Black voters in this table?

5  A.  In this table for Black voters.

6  Q.  So what does it mean for Dr. Hoekstra to say the lower

7  bound of his bounding excise is 0.00 for Black rejection rates

8  for mail ballot voters in Harris County?

9  A.  He's asserting that the error rate is that the true

10  rejection rate could be zero.

11  Q.  Does Dr. Hoekstra say anywhere in this table what the

12  likelihood of any given outcome within that range is?

13  A.  No, he does not.

14  Q.  Does he say that anywhere in his report, to your

15  recollection?

16  A.  He does not.  And he, in my view, he implicitly is

17  presenting this as any value in this range is equally

18  plausible.

19  Q.  Do you believe that's an appropriate way to perform a

20  bounding exercise in these circumstances?

21  A.  No.  In my view, it is not.

22  Q.  Can you tell us why not?

23  A.  Because in any process that has an error, there will be a

24  distribution where the true value is more likely to take some

25  values rather than others and it's just incorrect to say that

2022

KENNETH MAYER - DIRECT

1  it could be anywhere in this range.

2  Q.  What do you consider to be the likelihood that zero mail

3  ballots rejected in Harris County were cast by Black voters?

4  A.  I would say that the likelihood of that is essentially

5  zero.

6  Q.  Turning back to table 5, do you see a column in

7  Dr. Hoekstra's table labeled Total Votes?

8  A.  Yes.

9  Q.  And at the bottom of that column what does he describe as

10  the actual Black voters for Harris County?

11  A.  So this is how we know that this exercise is just wrong,

12  because Dr. Hoekstra is making a claim that the actual number

13  of Black voters in Harris County is more than 342,000 voters.

14  Q.  Dr. Mayer, the Court has taken judicial notice of the fact

15  that according to the 2020 United States Census, Harris County

16  has a population of about 4.7 million, and a non-Hispanic

17  Black population of about 900,000.  Do those figures sound

18  about right to you?

19  A.  Yes.

20  Q.  Is the U.S. Census an authoritative source for such

21  information?

22  A.  It would be.

23  Q.  Would you accept my math that based on those census

24  figures, that means that Harris County's population is about

25  19 percent non-Hispanic Black?

2023
KENNETH MAYER — DIRECT

1  A.  Yes.

2          THE COURT:  So what do you think this 342 number

3  should be?

4          MR. DODGE:  We'll get there in a few questions,

5  Judge, unless you would like him to answer now.

6          THE COURT:  Go ahead.

7  BY MR. DODGE:

8  Q.  According to the Harris County voter file, there were

9  about how many voters in Harris County in the 2022 General

10  Election?

11  A.  It was about 1.1 million.

12  Q.  And so in view of the census data we just discussed and

13  those vote totals from Harris County, does it seem plausible

14  to you that 342,076 of the 1.1 million voters in Harris County

15  were Black?

16  A.  It's not remotely plausible.

17  Q.  And why not?

18  A.  Because one of the things that we observe almost

19  invariably is that turnout among African-Americans is

20  disproportionately low.  It might, depending on the election,

21  there might be something that drives it a little bit higher,

22  but based on everything that we have learned about elections

23  and turnout, it is — I don't regard it as remotely plausible

24  that 31 percent or 32 percent of voters in Harris County are

25  African-American compared to their representation in the

KENNETH MAYER − DIRECT

1  population of about 18, 19 percent.

2  Q.  What did your report conclude to be the estimated number

3  of Black voters in the 2022 General Election in Harris County?

4  A.  The number I reported is at the top, or this is the

5  results of the BISG.  It's about 187,000.

6  Q.  In your view, is that estimate consistent with the U.S.

7  Census data we just discussed?

8  A.  Yes, it's close to the census data.

9  Q.  Could we pull up LULAC demonstrative 2 slide 1.

10     Can you tell us what this table shows, Dr. Mayer?

11  A.  This just shows how Dr. Hoekstra's claim about the true

12  number of Black voters in Harris County in 2022 is wildly

13  disproportionate to the African-American share of the

14  population.

15  Q.  How does Dr. Hoekstra's deviation in terms of predicted

16  number of Black voters from the actual Black population share

17  of Harris County compare to the deviation in your report?

18  A.  So the absolute deviation for Dr. Hoekstra's claim is off

19  by 12 percentage points.  My estimate is less than 2

20  percentage points off.

21  Q.  And —

22  A.  Actually, one other way to think about this is that

23  Dr. Hoekstra's estimate of the number of African-American

24  voters is probably off by two-thirds.

25  Q.  Is the deviation associated with the number in your report

KENNETH MAYER – DIRECT

1  consistent with what you described earlier about
2  African-American voting patterns?
3  A.  Yes.  Other things being equal, we would expect the
4  percentage of voters who are African-American to be slightly
5  smaller than their proportion of the population.
6  Q.  Did Dr. Hoekstra perform a similar bounding exercise for
7  any other part of your disparate impact analysis?
8  A.  He also did the analysis —— bounding analysis for
9  Dallas County.
10 Q.  Could we go back to LULAC demonstrative 3 and go to slide
11 2, please.  And what is this, Dr. Mayer?
12 A.  This is ——
13 Q.  Oh, if we could go to slide 2, please.  There we go.
14     Can you tell us what we are looking at here, Dr. Mayer?
15 A.  This is Dr. Hoekstra's bounding analysis for
16 Dallas County.
17 Q.  And what does Dr. Hoekstra identify here as the actual
18 Black voter total amongst mail ballot voters in Dallas County
19 in 2022?
20 A.  He claims that the actual Black voters were a little over
21 7,000.
22 Q.  And what was the number estimated in your report?
23 A.  It was about 4,200.
24 Q.  Glad to pull your report back up, but do you recall how
25 many mail-in ballots were cast in the Dallas County General

1  Election in 2022?

2  A.  I can look.

3  Q.  I would direct your attention to table 5 of your report.

4  A.  So the data that I had showed about -- actually, 20,914

5  mail ballots were returned in Dallas County.

6  Q.  And that number, where does it come from?

7  A.  That comes from the data that Dallas County provided about

8  the General Election.

9  Q.  Dr. Mayer --

10 A.  Mail absentee voting in the General Election.

11 Q.  Dr. Mayer, the Court has also taken judicial notice of the

12 fact that according to the 2020 U.S. Census, Dallas County has

13 a population of about 2.6 million, and a non-Hispanic Black

14 population of about 565,000.  Do those numbers sound right to

15 you?

16 A.  Yes.

17 Q.  Would you again accept my math that accordingly about

18 22 percent of Dallas County's population identifies as

19 non-Hispanic Black?

20 A.  Yes.

21 Q.  Could we please go back to LULAC demonstrative 2 and go to

22 slide 2.  What does this chart show, Dr. Mayer?

23 A.  So this chart shows again how Dr. Hoekstra's claims about

24 the actual number of Black voters in Dallas County is wildly

25 disproportionate to the share of Black voters in the actual

1  population.

2  Q.  And what does it show with respect to the deviation of

3  Black mail ballot voters in Dallas County in your report

4  relative to the Black population shown of Dallas County?

5  A.  So it shows that the percentage of mail ballots

6  submitted —— the share of mail ballots submitted by

7  African-American voters was about 1.4 percentage points lower

8  than their share in the population.

9  Q.  Would that be consistent with the phenomenon you described

10  earlier with respect to rates of African-American voting?

11  A.  Yes.

12  Q.  You can take down the demonstrative.

13  Dr. Mayer, do any of the critiques that Dr. Hoekstra's

14  bounding exercise make undercut your confidence in the

15  disparate impact findings in your reports?

16  A.  No.

17  Q.  Can you tell us why not?

18  A.  Two reasons.  One is that we know from the math that

19  errors will have the effect of driving these within group

20  differences or between group differences towards each other.

21  The other problem is that Dr. Hoekstra is claiming that we

22  have no information about the true number of ballots that are

23  rejected cast by African-American voters.  And that's wrong.

24  We may not have information with absolute certainty, but

25  we do have good information and estimates of race and

1   Dr. Hoekstra is conflating the existence of an error rate and
2   essentially a random assignment where we don't know anything.
3   And that's simply wrong.
4   Q.  Is there anything in the literature on the BISG method to
5   suggest it produces random results?
6   A.  No.
7           MR. DODGE:  Pass the witness.
8           THE COURT:  Anything else from this side?
9           Any cross?
10                      CROSS-EXAMINATION
11  BY MR. GORE:
12  Q.  Good morning.  John Gore for intervenor defendants.
13      Good morning, Dr. Mayer.
14  A.  Good morning.  It's good to see you again.
15  Q.  It's good to see you again.  I believe the last time I saw
16  you in person it was a cool day in Madison and today is
17  something other than a cool day in San Antonio, so good to see
18  you.
19      I would like to start by understanding your methodology a
20  little bit better, if that's okay.  In your reports you did
21  not conduct any interviews of voters, correct?
22  A.  That's correct.
23  Q.  And you didn't conduct any surveys of any voters, correct?
24  A.  That's correct.
25  Q.  And you, likewise, have not identified any individual who

1  is unable to vote because of SB 1, correct?

2  A.  I would say that's actually incorrect because the data do

3  provide individual-level data on which individuals did not

4  vote because their ballot was rejected.

5  Q.  You didn't provide any data about whether voters cured

6  their ballots, correct?

7  A.  I believe the data provided by the counties was the final

8  rejection figures.

9  Q.  You didn't interview or survey any election officials,

10  correct?

11  A.  That's correct.

12  Q.  And you also didn't interview or survey any legislators,

13  correct?

14  A.  That's correct.

15  Q.  Or any other elected officials, correct?

16  A.  That's correct.

17  Q.  You also did not analyze whether SB 1 increases public

18  confidence in elections in Texas, correct?

19  A.  That's correct.

20  Q.  And you didn't analyze whether SB 1 increases uniformity

21  statewide in Texas' election practices, correct?

22  A.  That's correct.

23  Q.  And you concluded that SB 1 cannot be justified on the

24  basis of combating fraud, correct?

25  A.  That's correct, that there's no relationship between the

1  measures in SB 1 and actual voter fraud.

2  Q.  But you agree that not every instance of voter fraud is

3  detected, correct?

4  A.  That's correct.

5  Q.  And you also agree that the legislature may have reached a

6  different judgment than you did about whether a certain level

7  of voter fraud should be addressed, correct?

8  A.  I'm not offering an opinion on the intent of the

9  legislature.  My analysis was on the effects.

10  Q.  And you also didn't examine the public perception

11  regarding the rate of voter fraud in Texas, correct?

12  A.  That's correct.

13  Q.  If we can get Dr. Mayer's first report up on the screen,

14  it's LULAC Exhibit 2.  And if we can go to page 4.

15     I would like to understand this calculus of voting

16  framework that you used in this report.  A couple lines down

17  from there, there's a utility of voting equals BP minus C plus

18  D.  Do you see that?

19  A.  Yes.

20  Q.  And this is a framework for understanding the cost and

21  benefits of voting, correct?

22  A.  Not exactly.  It's a framework that incorporates the cost

23  and benefits of voting into a prediction about the effects of

24  different costs and benefits.

25  Q.  Thank you for that clarification.  This is not intended as

1   a mathematical expression, correct?

2   A.  That's correct.

3   Q.  And so it's not a formula where someone can simply plug in

4   numbers and generate some kind of output, is that right?

5   A.  That's correct.

6   Q.  And, in fact, these variables B, P, C, and D, are not

7   intended to be objective, correct?

8   A.  I guess I don't understand what you mean by "objective."

9   Q.  They are measured from the perspective of the individual

10  voter, is that right?

11  A.  Yes.

12  Q.  And —

13  A.  Well, actually, most of them are.  The probability of a

14  vote being decisive would be something that you would

15  determine by the total number of votes cast, not whether a

16  voter perceives something.

17  Q.  Thank you for that.  So, in other words, B, C, and D, are

18  measured from the perspective of the individual voter,

19  correct?

20  A.  That's correct.

21  Q.  And those values are not identical for every voter,

22  correct?

23  A.  That's correct.

24  Q.  Because some voters may face different costs and derive

25  different benefits from voting, correct?

2032

KENNETH MAYER – CROSS

1   A.  That's correct.

2   Q.  Now, according to this framework, an increase in D

3   variable, the nonmaterial benefits of voting, would result in

4   higher turnout, correct?

5   A.  Yes, it would — it could have the effect of increasing

6   the likelihood of whether someone votes.

7   Q.  And according to the framework, a single change in voting

8   laws can increase both the cost of voting, the C variable, and

9   an individual's nonmaterial satisfaction from voting, the D

10  variable, correct?

11  A.  It's possible.

12  Q.  And in that scenario if a change increases D more than C,

13  the framework would still expect increased turnout, correct?

14  A.  It could.

15  Q.  And in your reports you didn't examine whether SB 1 or any

16  of its provisions increase any voter's nonmaterial

17  satisfaction from voting, correct?

18  A.  That's correct.

19  Q.  So, in other words, you did not consider whether SB 1 or

20  its provisions increased the D value in this framework for any

21  voter, correct?

22  A.  That's correct.

23  Q.  Now, the value of C, the cost of voting for an individual

24  voter, can change over time, correct?

25  A.  Yes.

KENNETH MAYER – CROSS

1  Q.  For example, a voter's circumstances may change, right?

2  A.  Yes.

3  Q.  And an individual voter may become more experienced with a

4  particular provision over time, right?

5  A.  Yes.

6  Q.  And as the individual becomes more experienced with the

7  provision, the cost of complying with the provision can

8  decrease, right?

9  A.  It can.

10  Q.  And you have acknowledged that there may be that kind of

11  learning curve for SB 1 provisions too, right?

12  A.  Yes.

13  Q.  Now, I believe you testified on direct that you can't say

14  for certain what will happen in future elections with respect

15  to rejection rates under SB 1, is that right?

16  A.  Well, I want to be precise here.  I can't tell you whether

17  the rate will be 3.25 or 3.6 percent, but I am very confident,

18  in fact, I can say with a degree of certainty that the

19  rejection rates in future elections will be higher than they

20  were before SB 1.

21  Q.  And so you're not aware that in some Texas counties the

22  rejection rates actually went down from 2020 to 2022?

23  A.  Well, the only way that could happen, and Texas has some

24  very small counties, the median county is actually pretty

25  small, so it is possible that there is a county where the

1  number of absentee ballots submitted is small enough that the
2  SB 1 rejection rate, there are actually no ballots, but my
3  conclusion is that will never be true statewide.
4  Q.  And in your reports you didn't examine our host county,
5  Bexar County, here in San Antonio, correct?
6  A.  I think I did in my second report.
7  Q.  Did you do any comparative analysis in rejection rate in
8  Bexar County from 2020 to 2022?
9  A.  I did.
10  Q.  Where is that?
11  A.  It's on page 3 of my second report.
12  Q.  Let's return to your initial report.  Now, you concluded
13  that the burdens and costs of SB 1 fall most heavily on
14  minority voters, correct?
15  A.  That's correct.
16  Q.  And you've discussed today using the BISG method, correct?
17  A.  Correct.
18  Q.  And you assigned each individual race based on the highest
19  percentage estimate yielded from BISG, correct?
20  A.  That's correct.
21  Q.  And that was true, even in scenarios where the highest
22  percentage estimate was less than 50 percent, correct?
23  A.  Yes.  I testified in my deposition there weren't a lot of
24  those voters, but there were some.
25  Q.  And so, for example, if a BISG generated an estimate,

1  40 percent estimate that an individual was African-American,

2  30 percent that she was Hispanic, and 20 percent that she was

3  White, you assigned that voter African-American?

4  A.  I would have, but I don't think there was anybody in the

5  file that had that distribution of values.  They tended to be

6  much closer to .5, like .7, .48.

7  Q.  And Dr. Collingwood's estimates are the only source you

8  used to estimate the race of voters, correct?

9  A.  That's correct.

10 Q.  And you did not do anything to verify that

11 Dr. Collingwood's estimates are accurate, correct?

12 A.  No, I didn't do any independent analysis, although we see

13 that the estimates of the percentage of African-American

14 voters who cast a ballot was very close to the census

15 population.  So I would take that as evidence that the -- as

16 an independent verification of the accuracy of that method.

17 Q.  And you didn't go to individual voters or individuals to

18 verify that Dr. Collingwood's estimates corresponded to those

19 individual's actual race, correct?

20 A.  That's correct.

21 Q.  Now, we talked a little bit, or you've talked today about

22 error rates in BISG.  The BISG estimates actually carry two

23 different kinds of error rates, correct?

24 A.  That's correct.

25 Q.  So one of those is a false positive error rate, or a type

1  one error, correct?

2  A.  Correct.

3  Q.  And that's an error that occurs when it identifies a voter

4  as a race, when, in fact, the voter is some other race,

5  correct?

6  A.  Correct.

7  Q.  And it also carries false negative, or type two errors,

8  correct?

9  A.  That's correct.

10  Q.  And that happens when it estimates that a voter is one

11  race, when, in fact, they are another race as well, in the

12  other direction, correct?

13  A.  That's correct.

14  Q.  And as you sit here today, do you know what the BISG type

15  one and type two error rates are?

16  A.  I know what the reported error rates in a —— I think it

17  was a 2022 study that compared BISG to self-reported data on

18  individuals.

19  Q.  And what were those rates?

20  A.  The overall error rate was about 16 percent, 17 percent.

21  And I believe the —— for African Americans the false negative

22  was about 17 percent.  And the false positive was about 4 or

23  5 percent.

24  Q.  And for which racial category were those?

25  A.  That was for African-Americans.

KENNETH MAYER - CROSS

1  Q.  And you are aware that there are other error rates that
2  have been calculated for African-Americans in our literature
3  as well, correct?
4  A.  That's correct.
5  Q.  So, for example, the authors of at least one study have
6  concluded the error rate is closer to 22.7 percent, is that
7  correct?
8  A.  That's true, but again, it doesn't matter.  An error rate
9  like that would not affect the between group calculations
10  because it would have the effect of driving all of those
11  calculations towards the population averages.
12  Q.  Now, earlier you had a demonstrative -- let me.
13      Earlier you had a demonstrative, Demonstrative Number 1,
14  do you recall that, with the jars, that I think you had maybe
15  marbles in them, or something like that?
16  A.  Yes, I recall that.
17  Q.  And that was just a hypothetical, correct?
18  A.  Yes.  It demonstrated the general phenomenon that errors
19  would drive all of the group percentages towards the
20  population percentages.
21  Q.  And that was not something you observed necessarily
22  anywhere in Texas, correct?
23  A.  I'm sorry.  I don't understand the question.
24  Q.  So the hypothetical is based on a variety of assumptions,
25  correct?

KENNETH MAYER — CROSS

1  A.  Correct.  The hypothetical was designed to demonstrate the
2  phenomenon of errors driving the group calculations towards
3  the population mean.
4  Q.  And so there were assumptions about the total number of
5  voters and the demographics, is that right?
6  A.  True, although it doesn't matter.  I chose those values
7  because they were easy to keep track of, but the overall
8  phenomenon doesn't change if you have a different distribution
9  of number of voters or even error rate.
10  Q.  And you also were asked some questions about
11  Dr. Hoekstra's analysis, do you recall that?
12  A.  Yes.
13  Q.  And you were shown a couple tables from Dr. Hoekstra's
14  report, do you recall that?
15  A.  Yes.
16  Q.  You don't dispute any of the arithmetic in those tables,
17  correct?
18  A.  Well, I mean, the problem is that the underlying numbers
19  are incorrect and the assumptions that Dr. Hoekstra makes
20  about how many voters fall into each category, but if you take
21  the, you know, the actual arithmetic, as I testified before,
22  the arithmetic itself appears to be correct.
23  Q.  Now, you've also testified today about the EAV survey, and
24  EAVS data, do you recall that?
25  A.  Yes.

KENNETH MAYER – CROSS

1  Q.  And that data is self-reported by counties and states,

2  correct?

3  A.  That's correct.

4  Q.  And there's no penalty for them getting it wrong, correct?

5  A.  That's correct.

6  Q.  And there's no verification of how they track those

7  rejection rates, correct?

8  A.  That's correct.

9  Q.  And there's also no verification of the numbers, correct?

10 A.  That's correct.

11 Q.  Now, Dr. Hoekstra, [verbatim] a second ago I asked you if

12 you had done an analysis of rejection rates in Bexar County,

13 do you recall that?

14 A.  Yes.

15 Q.  And you pointed me helpfully to page 3 of your supplement,

16 do you recall that?

17 A.  Yes.

18 Q.  And the 2022 rejection rates reported in this table are

19 for the 2022 Primary Election, correct?

20 A.  That's correct.

21 Q.  This table does not record rates for the 2022 General

22 Election, correct?

23 A.  That's correct.

24 Q.  And you've not looked at what happened in Bexar County in

25 the 2022 General Election, correct?

KENNETH MAYER — CROSS

1  A.  I did not analyze that in my third report with the

2  information from 2022.

3  Q.  Okay.  If we can go back to what's — if we can turn pages

4  on what is on the screen and go to page 6.  You offered in

5  this initial report analysis of voting times, an analysis of

6  the time of day when early voters voted in Harris County in

7  the 2020 General Elections, do you recall that?

8  A.  That's correct.

9  Q.  And you did not conduct any analysis of this type for any

10  of Texas' other 253 counties, correct?

11  A.  That's correct.

12  Q.  And you also did not conduct this analysis for any

13  election, other than the 2020 General Election, correct?

14  A.  That's correct.

15  Q.  So you've not done this kind of analysis for any election

16  administered under SB 1, correct?

17  A.  That's correct.

18  Q.  Or for any other election in 2022, correct?

19  A.  That's correct.

20  Q.  Now, when conducting this analysis you didn't control for

21  turnout rates by racial group, correct?

22  A.  In which analysis?

23  Q.  In this wave times analysis.

24  A.  Well, no, I was looking at absolute numbers and this

25  was — this reflected overall early voting numbers for each

1  demographic group.

2      So, in that sense, it would take into account turnout

3  because the number of people who voted early would be in these

4  charts, and for the purposes of these charts, in terms of what

5  time of day people voted, turnout is not something that would

6  make a difference to this analysis.

7  Q.  And you also didn't mention or control for the underlying

8  racial demographics in Harris County, correct?

9          MR. DODGE:  Your Honor, I object to this as beyond

10  the scope of direct examination.

11          THE COURT:  That's overruled.

12          THE WITNESS:  I'm sorry.  Can you ask the question

13  again?

14          MR. GORE:  Certainly.

15  BY MR. GORE:

16  Q.  You also didn't control for the underlying racial

17  demographics in Harris County, correct?

18  A.  No, because I was looking at actual numbers and looking at

19  differences between racial groups in terms of their

20  demographic makeup of different slices of the people who voted

21  early.

22  Q.  Let's go to page 10 of this report, table 1, if we can get

23  that on the screen.  I'd like to understand the percentages in

24  this chart.  If we look at the column, for example, for

25  African-American, you report vote totals for before 4:00 p.m.

1  and after 4:00 p.m., is that right?

2  A.  That's correct.

3  Q.  And you also calculate percentages, correct?

4  A.  Well, the percentages read across, so it tells you what

5  percentage of voters before 4:00 p.m. or after 4:00 p.m. were

6  White, African-American, Hispanic, or Asian.

7  Q.  That was my next question, so thank you.

8      If we look at that column down below under White, we see

9  that —— first of all, White voters were approximately

10 45.8 percent of post-4:00 p.m. voters, correct?

11 A.  That's correct.

12 Q.  And do you know, according to the 2020 Census what

13 percentage of Harris County's population is non-Hispanic

14 White?

15 A.  Well, for the purposes of this table, that's not relevant

16 because I'm comparing the people who voted before 4:00 p.m.

17 and after 4:00 p.m., so it's that difference that makes ——

18 that is the quantity of interest.

19     I'm not saying that X percent of the electorate voted

20 after 4:00 p.m.  This shows you of the people who voted early

21 the demographics of people who voted before 4:00 p.m. or after

22 4:00 p.m., and so those differences in those disparities are

23 the quantities of interest here.

24 Q.  If I were to represent to you that, according to the 2020

25 Census, Harris County's population is 36.4 percent

KENNETH MAYER - CROSS

1  non-Hispanic White, would you have any basis to dispute that?

2  A.  No.

3  Q.  If we look at the bottom line where it says total, it says

4  that "White voters were 652,136 of the total of 1,253,278

5  early voters in Harris County in 2020."

6      Did I read had that correctly?

7  A.  I'm sorry.  Say that again.

8  Q.  According to the bottom line of this chart, White voters

9  were 652,136 out of the 1,253,278 voters, is that correct?

10 A.  That's correct.

11 Q.  And that's a little bit more than 50 percent, correct?

12 A.  That's correct.

13 Q.  And if we could go down to table 2, we observe here that

14 White voters were 38.5 percent of the after-6:30 p.m. voters,

15 correct?

16 A.  That's correct.

17 Q.  So, again, there were more White voters after 6:30 p.m.

18 than voters of any other race, correct?

19 A.  That's correct.

20 Q.  If we were to go back to table 1 — my apologies for

21 backtracking — we see that 45.8 percent number for White

22 voters is also larger than the number for any other racial

23 group, correct?

24 A.  That's correct.

25 Q.  So there were more White voters after 4:00 p.m. voters of

1  any other race, correct?

2  A.  That's correct.

3  Q.  Let's move ahead to page 12 of this report which discusses

4  drive-thru voting and 24-hour voting in Harris County in the

5  2020 Election, and no other county offered 24-hour voting in

6  Texas in the 2020 General Election, correct?

7  A.  That's my understanding.

8  Q.  And let's go to page 13 of this report and pull up table

9  4, and again, this table provides numbers and percentages

10  about usage of drive-thru and in-person voting, is that right?

11  A.  That's correct.

12  Q.  And, again, the percentages here should be read

13  horizontally, is that correct?

14  A.  That's correct.

15  Q.  And these percentages examine only voters who voted early,

16  correct?

17  A.  That's correct.

18  Q.  So it's not all voters in Harris County, right?

19  A.  Correct.

20  Q.  And, again, you didn't control for differences in turnout

21  rates by race, correct?

22  A.  Again, I didn't, but the relevant comparison here is the

23  demographics of early voters who voted in person than early

24  voters who voted by drive-thru.

25  Q.  And since you mentioned it, we see from this chart that

KENNETH MAYER – CROSS

1    the majority of early voters in Harris County voted by walking

2    up to the polling place rather than by drive-thru, correct?

3    A.   That's correct.

4    Q.   And that's true for every racial group in this chart,

5    correct?

6    A.   Correct.

7    Q.   And, according to this chart, White voters were

8    38.1 percent of drive-thru voters, according to these

9    estimates, correct?

10   A.   Correct.

11   Q.   And that's more White voters use drive-thru voting than

12   voters of any other race, correct?

13   A.   That's correct, although the share of White voters voting

14   drive-thru was significantly smaller than it was for White

15   voters who voted in person.

16   Q.   And, Dr. Mayer, have you reviewed the Secretary of State's

17   final report on the audit of the 2020 Election in Texas?

18   A.   The audit of the 2020 Election?

19   Q.   Yes.

20   A.   No.

21   Q.   Have you examined the expense to election officials or

22   taxpayers from offering drive-thru voting?

23   A.   In terms of the monetary cost?  No, I did not.

24   Q.   Or the staff cost or any other cost that might be

25   involved?

1  A.  I did not.

2  Q.  And so you are not aware of any reported irregularities in

3  drive-thru voting in 2020, correct?

4  A.  That's correct.

5  Q.  And you did not examine or look for reports of those

6  irregularities, correct?

7  A.  I didn't examine the reports.  I was paying attention to

8  whether there were credible reports of problems with

9  drive-thru voting.

10  Q.  And did you control for the — you did not control for the

11  location of drive-thru voting standards in Harris County,

12  correct?

13  A.  No, I knew where the drive-thru centers were and

14  identified voters who relied on that method of voting.

15  Q.  And you did not control for whether those drive-thru

16  voting standards were placed in predominantly minority

17  neighborhoods, correct?

18  A.  That's correct.

19  Q.  All right.  Let's go to the next page of this report, page

20  14, table 5.  It's 24-hour voting.  And according to this

21  chart, if we look at the far right column first, the vast

22  majority of voters in Harris County in 2020 who use early

23  voting cast their ballots during regular hours instead of

24  during 24-hour voting, correct?

25  A.  That's correct.

KENNETH MAYER — CROSS

1  Q.  And so according to this chart there were 3,462 voters who

2  cast their votes, cast their ballots during the 24-hour voting

3  period, is that right?

4  A.  That's correct.

5  Q.  And there were 1,253,278 voters who voted early in Harris

6  County, is that right?

7  A.  That's correct.

8  Q.  So the percentage who voted during that 24-hour voting

9  period was about 0.28 percent, does that sound about right?

10  A.  Well, that's correct, but I would respond this way, that

11  if given that this mode of voting was cut off, if before an

12  election I went into the Harris County voter file and I

13  randomly selected 3400 people and cut off their avenue of

14  voting, the fact that it was .28 percent would not mean that

15  there were voters who were affected by that cutoff, so the

16  relevant number here is the absolute number of voters who did

17  this, and the fact that it's only .3 percent of voters I think

18  is not relevant to the question of the burdens that these

19  voters could face by having that voter modality cut off.

20  Q.  But certainly you would agree that voting during regular

21  hours was a more common or popular method of voting than

22  voting during the 24-hour period, correct?

23  A.  That's correct.

24  Q.  And table 5, again, shows that White voters were

25  39.3 percent of the 24-hour voters, correct?

KENNETH MAYER – CROSS

1   A.  That's correct.

2   Q.  And, again, that's more White voters used 24-hour voting

3   than voters of any other race, correct?

4   A.  That's correct, but, again, the relevant quantity here is

5   the disparity, that the number of the percentage of White

6   voters went down between regular and early, 24-hour voting,

7   where for all minority groups the percentage went up.

8   Q.  And, once again, you did not examine expense to election

9   officials or taxpayers of 24-hour voting, correct?

10  A.  That's correct.

11  Q.  And you did not control for the location within Harris

12  County of the 24-hour voting polling places, correct?

13  A.  That's correct.

14  Q.  And you did not control for whether those 24-hour voting

15  locations were placed in predominantly minority neighborhoods,

16  correct?

17  A.  That's correct.

18  Q.  Let's turn now to the next page of your report.  You have

19  a brief section here called Section D, Loosened Restrictions

20  on Partisan Poll Watchers, do you recall this section?

21  A.  Yes.

22  Q.  And in this section you suggested there were two potential

23  risks from SB 1's poll watcher provisions, correct?

24  A.  That's correct.

25  Q.  And the first is that poll watchers may raise more

KENNETH MAYER – CROSS

1  objections with respect to minority voters than they do for

2  White voters, correct?

3          MR. DODGE:  Your Honor, I would again object to this

4  as beyond the scope of direct-examination.

5          THE COURT:  Do you intend to bring him back up in

6  your case?

7          MR. GORE:  I don't, Your Honor, but here's the issue.

8  I think we can agree that the reports can come in without a

9  hearsay objection, if we could cross.  If they would prefer to

10  just withdraw these portions of the report, then we can live

11  with that.

12          THE COURT:  That's not going to happen, so go ahead.

13          MR. GORE:  Okay.

14  BY MR. GORE:

15  Q.  Do you want me to repeat the question?

16  A.  Please.

17  Q.  The first potential risk you identified is that poll

18  watchers may raise more objections with respect to minority

19  voters than they do for White voters, correct?

20  A.  That's correct.

21  Q.  But you're not aware of any evidence of any Texas poll

22  watcher raising more objections with respect to minority

23  voters than for White voters since SB 1 was enacted, correct?

24  A.  That's correct.

25  Q.  You're not aware of any such evidence in the 2022 Primary

KENNETH MAYER – CROSS

1  Election, right?

2  A.  That's correct.

3  Q.  And you're also not aware of any such evidence in the 2022

4  General Election, right?

5  A.  That's correct.

6  Q.  And, in fact, you've not conducted any analysis of poll

7  watcher objections or objection rates than any election in

8  Texas, right?

9  A.  That's correct.  I didn't have access to data on that.

10  Q.  The second potential risk you identify is that poll

11  watchers could have the effect of increasing wait times, do

12  you recall that?

13  A.  Yes.

14  Q.  But you're not aware of any evidence of any poll watcher

15  activities increasing wait times in Texas since SB 1 was

16  enacted, correct?

17  A.  That's correct.

18  Q.  So you're not aware of any such evidence in the 2022

19  Primary Election, correct?

20  A.  That's correct.

21  Q.  And you're also not aware of any such evidence in the 2022

22  General Election, correct?

23  A.  That's correct.

24  Q.  And, in fact, you've not conducted any analysis of the

25  effect of poll watcher activities on wait times in any

KENNETH MAYER — CROSS

1  election in Texas, correct?

2  A.  That's correct.  I phrased this in terms of a risk.

3  Q.  Let's move now to page 17 in this report.  It starts on

4  page 17 — starts on 16 and carries out through the rest of

5  your report.  You've conducted what you've described as a

6  notional example of wait time increases, do you recall that?

7  A.  That's correct.

8  Q.  And you did not offer this as an example of what you had

9  actually observed in any Texas election, correct?

10 A.  Correct.

11 Q.  And you also did not offer this as a prediction of what

12 necessarily will happen in any future Texas election, correct?

13 A.  Correct.

14 Q.  And, in fact, you agree that wait times in any individual

15 polling place turn on the characteristics and processing time

16 at that that particular location, correct?

17 A.  I believe that's what I wrote.

18 Q.  And you relied on a number of assumptions to construct

19 this notional example, correct?

20 A.  Yes.  I made that part of the analysis very clear, that it

21 was dependent on the assumptions.

22 Q.  So you, for example, stated in here that you assumed a

23 certain number of voting machines and check-in stations at the

24 polling place, correct?

25 A.  Correct.

KENNETH MAYER – CROSS

1  Q.  And you also used the wait time simulator from MIT,

2  correct?

3  A.  Correct.

4  Q.  And you used that simulator as default value of 90 seconds

5  for a voter to check in, is that right?

6  A.  That's correct.

7  Q.  And you also used the simulator's default five minutes for

8  a voter to vote, correct?

9  A.  Correct.

10  Q.  But you did not verify that those default values

11  approximate average check in and voting times anywhere in

12  Texas, right?

13  A.  Correct.  Again, the purpose of this analysis was to show

14  how even small increases in processing times could result in

15  long wait times and all of the analysis is dependent on the

16  assumptions.

17  Q.  And you also assumed the polling place would have 1500

18  in-person walk-up voters, is that right?

19  A.  I believe that's the value that I used.

20  Q.  And you're aware that the State's expert, Dr. Stephen

21  Graves, has provided a report critiquing this notional

22  example, correct?

23  A.  Yes.

24  Q.  And Dr. Graves actually developed one of the MIT wait time

25  simulators, although I believe a different one than the one

1  you used, is that right?

2  A.  I'm actually not sure, but it's possible.

3  Q.  And Dr. Graves concluded that Harris County early voting

4  center had 1500 or more in-person walk-up voters only about

5  3 percent of the time, is that right?

6  A.  I believe that's what was in his report.

7  Q.  And you criticized other of your assumptions as

8  unrealistic or unfounded, is that right?

9  A.  Well, he did.  Again, the purpose of this was to show how

10  even small increases in processing times could have nonlinear

11  effects.

12  Q.  Thank you, Doctor.  Let's move on and talk a little bit

13  about your analysis of absentee ballot rejection rates.  And

14  you did not quantify the cost to any voter of complying with

15  SB 1's rules for mail-in ballots, correct?

16  A.  Well, I think that's incorrect because I was able to

17  directly observe voters whose mail ballots were rejected,

18  which is — that certainly is a high cost of compliance that

19  resulted in a vote not being counted.  So I would say it's

20  incorrect that I didn't consider the costs to voters of

21  complying with SB 1's requirements.

22  Q.  So I understand that's the consequence of noncompliance,

23  is that the ballot is not counted, but what about the cost of

24  actually filling out the line on the form, you didn't quantify

25  what the cost is to the voter of writing the correct number,

KENNETH MAYER – CROSS

1  correct?

2  A.  No, but, again, the relevant question here is whether a

3  ballot was rejected or not because of failure to or inability

4  or nonmatching of the number that the voter wrote down.

5  Q.  And you did not –– nothing to determine whether any of

6  these rejected ballots otherwise would not have been counted

7  in Texas, correct?

8  A.  No.  I relied on ballots that were rejected because of SB

9  1 and there were other reported reasons why ballots were

10  rejected.

11  Q.  But you also didn't do anything to determine whether any

12  of these ballots was fraudulent, correct?

13  A.  No.

14  Q.  Or otherwise invalid, right?

15  A.  Again, as I testified before, absent evidence that that

16  was not the case you would have to presume that these were

17  legitimate ballots.

18  Q.  Let's go in your supplemental report, which I believe is

19  LULAC Exhibit 3, if we could first go to page 3, table 1.  I

20  think you testified about this table briefly on your direct.

21  And this table captures both non-SB 1 rejections and SB 1

22  rejections for the 2022 data, is that correct?

23  A.  Yes.  This is based on the election reconciliation reports

24  or other data that showed all rejections didn't break out the

25  reasons in counties other than Harris or Tarrant, which I went

KENNETH MAYER – CROSS

1  on to analyze.

2  Q.  So in order to receive an absentee ballot in Texas, the

3  voters first has to complete the application accurately,

4  correct?

5  A.  That's correct.

6  Q.  So any individual here whose ballot was rejected had

7  supplied the correct number on their ballot application,

8  correct?

9  A.  That would be the implication, yes.

10  Q.  So they supplied the number that SB 1 requires on the

11  application and didn't do so on the ballot, is that right?

12  A.  That's correct.

13  Q.  And as you mentioned, if we flip over to the next page of

14  this report, you analyze rejection rates in Harris and Tarrant

15  counties, correct?

16  A.  That's correct.

17  Q.  And you were attempting to determine whether — let me

18  back that up.  You didn't conduct this analysis for any of

19  Texas' other counties, correct?

20  A.  That's correct.

21  Q.  And let's go now to page 5, table 3.  You looked for a

22  disparate impact in Harris County and Tarrant County, correct?

23  A.  Well, I didn't look for a disparate impact.  I did some

24  tests to determine if that was, in fact, what happened.

25  Q.  So you analyzed whether a disparate impact was present,

KENNETH MAYER – CROSS

1  correct?

2  A.  That's correct.

3  Q.  And you did not conduct this kind of analysis for any

4  other county in Texas, correct?

5  A.  No, I also conducted the analysis for Tarrant County.

6  Q.  Other than Tarrant and Harris County, you didn't look at

7  any of the other 252 counties, correct?

8  A.  That's correct, I didn't have data from other counties.

9  Q.  So let's go and look here at table 3.  And this records

10  rejection rates by race in Harris County, is that right?

11  A.  That's right.

12  Q.  And you provide both numbers and percentages here, is that

13  correct?

14  A.  That's correct.

15  Q.  The percentages here are different than they were in the

16  other chart, correct?

17  A.  Right.  These read down because I have a binary looking at

18  whether a ballot was rejected or not.

19  Q.  So, for example, 17.1 percent, if we look at non-Hispanic

20  White rejected SB 1, that's a percentage of non-Hispanic White

21  individuals who submitted a mail ballot that was rejected for

22  an SB 1 reason, correct?

23  A.  That's correct.

24  Q.  And, similarly, if we go over one column, 22.0 percent is

25  the percentage of African-American individuals who submitted a

KENNETH MAYER — CROSS

1  mail-in ballot that was rejected for an SB 1 reason, correct?

2  A.  Correct.

3  Q.  And that's a difference of 4.9 percentage points, is that

4  correct?

5  A.  That's correct.

6  Q.  And I believe in this report you concluded that

7  proportionally an absentee ballot cast by an African-American

8  voter was 28.6 percent more likely to be rejected than one by

9  a White voter?

10 A.  That's correct, when you look at the percentage — the

11 percentage — relative percentage of the percentages of

12 denominator.

13 Q.  So you calculated that 28.6 percent by dividing these two

14 percentages, is that right?

15 A.  Yes.

16 Q.  Now, we could also calculate other percentages based on

17 this table.  We could calculate the horizontal percentage, if

18 we wanted to, correct?

19 A.  Yes.

20 Q.  So we could calculate each racial group's percentage of

21 the total mail-in ballots that were rejected under SB 1,

22 correct?

23 A.  That's correct.

24 Q.  And if we look at the rejected SB 1 row, we see that 3,967

25 ballots submitted by non-Hispanic White voters were rejected

KENNETH MAYER – CROSS

1   out of a total of 6,614 such ballots, is that right?

2   A.  That's correct.

3   Q.  And that's approximately 60 percent, correct?

4   A.  I don't want to try to do the math in my head, but that

5   looks about right.

6   Q.  Okay.  And so more than a majority of the SB 1 rejected

7   mail-in ballots in Harris County were submitted by

8   non-Hispanic White voters, correct?

9   A.  That's correct.

10  Q.  And, in fact, more mail-in ballots submitted by

11  non-Hispanic White voters were rejected under SB 1 than by

12  voters of all other races combined, correct?

13  A.  That's correct, but there are also more mail absentee

14  ballots submitted than all other races combined.

15  Q.  Let's go now to page 6, table 4, Tarrant County.  As I

16  understand, the numbers and the percentages are oriented in

17  the same direction in this table as they were in the last

18  table, is that correct?

19  A.  That's correct.

20  Q.  So if we again look at the rejected SB 1 row, we observe

21  that 466 rejected ballots were submitted by non-Hispanic White

22  voters out of a total of 773 such ballots, is that correct?

23  A.  That's correct.

24  Q.  And, again, will you trust my math that that's

25  approximately 60 percent?

KENNETH MAYER – CROSS

1  A.  Yes.

2  Q.  And so, once again, more than a majority of SB 1 rejected

3  mail-in ballots in Tarrant County were submitted by

4  non-Hispanic White voters, correct?

5  A.  That's true, but non-Hispanic White voters submitted over

6  80 percent of mail absentee ballots in Tarrant County.

7  Q.  So more mail-in ballots were cast by -- or submitted by

8  non-Hispanic White voters were rejected under SB 1 in Tarrant

9  County than by voters of all other races combined, correct?

10  A.  That's correct.  That also applies to ballots submitted.

11  Q.  Let's move now to your General Election report, Dr. Mayer,

12  which is, I believe, LULAC Exhibit 4.

13      If we can get that up on the screen.  Thank you.

14      I'd like to understand a little bit of the scope of this

15  report compared to your prior reports.  So unlike in your

16  first report, in your supplemental report, you didn't make any

17  predictions on wait times in this report, correct?

18  A.  That's correct.

19  Q.  And you offered no analysis of wait times in the 2022

20  General Election, correct?

21  A.  Correct.

22  Q.  And you offered no analysis of voting times on early

23  voting days in any 2022 Election, correct?

24  A.  Correct.

25  Q.  And you offered no analysis of poll watcher activities in

KENNETH MAYER – CROSS

1   this report, correct?

2   A.   Correct.

3   Q.   And also no analysis of drive-thru voting, correct?

4   A.   I mean, drive-thru voting in 2022?

5   Q.   Yeah.

6   A.   I don't think drive-thru voting was allowed in 2022.

7   Q.   Let's turn to page 4 of your report, table 1.  Now, you

8   observed here, you examined SB 1 mail ballot rejection rates

9   in Harris County, Dallas County, and Hidalgo County, correct?

10  A.   That's correct.

11  Q.   And you didn't present data on any of the 251 other

12  counties, correct?

13  A.   That's correct.

14  Q.   And you don't claim that Dallas, Harris, and Hidalgo

15  Counties are statistically representative of all Texas

16  counties, correct?

17  A.   No, I don't make that claim.

18  Q.   According to table 1, in each of the three counties you

19  examined, more than 95 percent of mail-in ballots were

20  accepted in the 2022 General Election, correct?

21  A.   That's correct.

22  Q.   And table 1 also shows that the non-SB 1 rejection rate

23  went up between 2020 and 2022, correct?

24  A.   That's correct.

25  Q.   And you are aware that a change in Texas law changed the

KENNETH MAYER – CROSS

1  tracking process for absentee ballots between 2020 and 2022,

2  correct?

3  A.  That's correct.

4  Q.  So the 2020 rejection rate reflected the old process and

5  the 2022 rejection rate reflects the new process, correct?

6  A.  That's correct.

7  Q.  And you haven't examined or analyzed those tracking

8  processes for purposes of this report, correct?

9  A.  That's correct.

10 Q.  And the far right column provides what you call an

11 increase in total rejection rate from 2020 to 2022, is that

12 right?

13 A.  Correct.

14 Q.  And, again, you calculated this number by dividing these

15 percentages in the row, is that correct?

16 A.  Correct.

17 Q.  And you agree that between the 2022 Primary and the 2022

18 General Election the rejection rate went down, including for

19 SB 1 related reasons?

20 A.  That's correct.

21 Q.  And it's possible that that decrease will continue into

22 the future, correct?

23 A.  Well, I don't know if that decrease will — the rate of

24 decrease will be the same, but it's — my expectation is that

25 the SB 1 rejection rate going forward will be lower than it

KENNETH MAYER — CROSS

1  was in the 2022 Primary, but it will always be higher than the

2  pre-SB 1 rejection rate.

3  Q.  Let's turn now to —

4           THE COURT:  If this is a good stopping point, let's

5  go ahead and stop.

6           MR. GORE:  Okay.

7           THE COURT:  Let's return right at 1:00.

8      (Recess)

9      (Change in reporter)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *(Change in reporter)*

2    *(Open court)*

3          THE COURT:  Thank you.  Please be seated.

4    Mr. Gore.

5          MR. GORE:  Thank you.

6                      CROSS-EXAMINATION

7    BY MR. GORE:

8    Q.  Dr. Mayer, before we get back into the details of your

9    report, I have one more question about the scope of what you

10   looked at in this case.

11       You did not examine whether any voters would change their

12   method of voting in response to SB1, correct?

13   A.  I did not do any individual tracking to see if that -- see

14   how voters would respond.

15   Q.  Okay.  We were, before the lunch break, talking about the

16   General Election report.  I'd like to turn to Page 6 of that

17   report, if we can.

18       So in this report you examine whether there was a disparate

19   impact from SB1 on mail-in voters in Harris County and Dallas

20   County in the 2022 General Election; is that right?

21   A.  That's correct.

22   Q.  And those are the only two counties you looked at, correct?

23   A.  Correct.  Those are the only counties for which I had data.

24   Q.  And so even though you conducted the analysis for Tarrant

25   County in the 2022 Primary Election, you didn't do that for

1  Tarrant County in the 2022 General Election, correct?

2  A.  Correct.  I did not have data for Tarrant County in the

3  2022 General.

4  Q.  Can we go to Dr. Hoekstra's General Election report which I

5  believe is Exhibit 4, is that LULAC Exhibit 4.  I'm sorry.

6  Dr. Mayer.  And Page 6 of this report.

7      And, Dr. Mayer, you also didn't present any disparate

8  impact analysis for Hidalgo County, correct?

9  A.  That's correct.

10  Q.  And the disparate impact analysis you did here looked only

11  at SB1 rejections, correct?

12  A.  That's correct.

13  Q.  You did not analyze whether non-SB1 rejections also have a

14  disparate impact based on race, correct?

15  A.  That's correct.

16  Q.  And you did not analyze whether there was any disparate

17  impact in mail-in ballot rejections prior to SB1, correct?

18  A.  That's correct.

19  Q.  And in your analysis of the 2022 elections, you also didn't

20  address whether rejections for all reasons, the combination of

21  both SB1 rejections and non-SB1 rejections, have a disparate

22  impact, correct?

23  A.  That's correct.

24  Q.  If we can go to Page 7 of this report, Table 3.  And this

25  table shows returned, accepted and SB1 rejected columns,

Dr. Kenneth Mayer – Cross

1  correct?

2  A.  That's correct.

3  Q.  And there's no column for non-SB1 rejections, correct?

4  A.  That's correct.  Although you could calculate that just by

5  subtracting the accepted from the returned, and you'd be able

6  to derive the total rejection rate.

7  Q.  And this table shows that for every racial group, the

8  percentage of mail absentee ballots returned and the percentage

9  accepted is similar, correct?

10  A.  That's correct.

11  Q.  And in terms of the SB1 rejections, those are in the far

12  right column.  You see that?

13  A.  Yes.

14  Q.  And it shows that 49.3 percent, or nearly half, of SB1

15  rejected mail-in ballots in Harris County were submitted by

16  non-Hispanic white voters, correct?

17  A.  That's correct.

18  Q.  And so, again, there were more mail-in ballots submitted by

19  non-Hispanic white voters that were rejected under SB1 in

20  Harris County than by voters of any other race, correct?

21  A.  Actually, I don't think that's true.  I think the total

22  number of SB1 rejections was, yeah, a little over half of all

23  rejected ballots.

24  Q.  So I'm not sure I follow.  Maybe my question wasn't as

25  precise as it should be.

Dr. Kenneth Mayer - Cross

```
 1       Non-Hispanic white voters are the plurality of the SB1
 2   rejected?
 3   A.  That's correct.
 4   Q.  That is correct?
 5       And so there were more non-Hispanic white voters whose
 6   ballots were rejected than voters of any other single racial
 7   category, correct?
 8   A.  That's correct.
 9   Q.  Okay.  Let's go -- if we can pull up Table 4 from Page 8 of
10   this report.  This is the -- what you have on the right column
11   here is an odds ratio.  Do you see that?
12   A.  Yes.
13   Q.  And you discussed this with Mr. Dodge earlier.  Just want
14   to confirm that these ratios are calculated by dividing
15   percentages; is that right?
16   A.  Basically.  It's the likelihood compared to non-Hispanic
17   whites.
18   Q.  So for -- just to take one example, for black, you have
19   1.82.  Is that the 5.5 percent for black divided by 3.0 percent
20   for white?
21   A.  Yes.
22   Q.  And if we go to the next table, which is Table 5 on Page 9,
23   this is a similar table but for Dallas County, correct?
24   A.  Correct.
25   Q.  And if we go to the far right-hand column, we see that 57.5
```

Dr. Kenneth Mayer - Cross

1  percent, or more than a majority, of SB1 rejected mail-in

2  ballots in Dallas County were submitted by non-Hispanic white

3  voters, correct?

4  A.  I'm sorry.  I think I lost you at the very end.  Are we

5  talking about SB1 rejected or returned?

6  Q.  SB1 rejected.

7  A.  Yeah.  So it was 57 and a half percent of SB1 rejections

8  were non-Hispanic white.

9  Q.  And that's more than a majority, correct?

10  A.  That's a majority.

11  Q.  So, in other words, more mail-in ballots submitted by

12  non-Hispanic white voters were rejected under SB1 than voters

13  of all other races combined, correct?

14  A.  That's correct.

15  Q.  If we go to the next table, Table 6, this, again, is

16  calculating the odds ratio for Dallas County?

17  A.  That's correct.

18  Q.  And, again, you used the same method on this table, the

19  dividing of the percentages; is that right?

20  A.  Yes.

21  Q.  So, Dr. Mayer, in your General Election report, you also

22  conducted an analysis of voters who use drive-through voting in

23  Calhoun County in 2020.  Do you recall that?

24  A.  Yes.

25  Q.  And that starts on Page 10 of that report.  And you were

1  attempting to determine whether elimination of drive-through

2  voting had a disparate impact on drive-through voters based on

3  race in the 2022 elections, correct?

4  A.  That's correct.

5  Q.  Okay.  And after you issued this report, Dr. Hoekstra

6  pointed out some flaws in this analysis, correct?

7  A.  Well, he argued that the analysis was incorrect.

8  Q.  When you conducted this analysis, you did not control for

9  differences in turnout between 2020 and 2022, correct?

10 A.  That's correct.  I started with a file that listed only

11 voters who had voted drive-through in Calhoun County.

12 Q.  And you did not control for any differences in turnout

13 rates by race as part of this analysis, correct?

14 A.  That's correct.

15 Q.  And you also did not control for differences in utilization

16 rates of various forms of voting by race, correct?

17 A.  That's correct.  This was limited to voters who used

18 drive-through voting in 2020.

19 Q.  If we can get Dr. Hoekstra's report up on the screen.

20     Do you recognize this report, Dr. Mayer?

21 A.  Yes.  This is Dr. Hoekstra's report.

22 Q.  Let's go to Page 28 of this report, if we can.

23     And in Table 8, Dr. Hoekstra conducts on analysis of voting

24 in 2022 by Calhoun County early voters from 2020.

25     Do you recall this table?

Dr. Kenneth Mayer - Cross

1  A.  Yes.

2  Q.  And Dr. Hoekstra concluded based on this table that in 2022

3  drive-through voters voted at a higher rate than their

4  counterparts who voted early in person in 2020, correct?

5  A.  That is his argument, yes.

6  Q.  And you don't dispute his methodology, correct?

7  A.  No.  I argued -- I said in my deposition that there are

8  some other statistical steps -- tests that I would have done

9  with data, with additional data on total turnout.

10  Q.  But you did not do those steps, correct?

11  A.  That's correct.

12  Q.  And if we go to Page 27 of Dr. Hoekstra's report, in

13  paragraph 65, starting with the sentence, "It shows."

14      "It shows that in the 2022 Primary Election and the 2022

15  General Election, drive-through voters from 2020 voted at

16  higher rates than their counterparts who voted early and in

17  in-person during the 2020 election."

18      Now, did I read that correctly?

19  A.  Yes.

20  Q.  And you don't dispute that conclusion, correct?

21  A.  No, although I -- my analysis was limited to examining the

22  demographics of the differences between the people of different

23  races and their composition and representation in the

24  drive-through voting, the Primary and the General electorates.

25  Q.  And Dr. Hoekstra continues here, "Put differently, there's

Dr. Kenneth Mayer - Cross

1  no evidence that the elimination of drive-through voting had

2  any adverse effect at all on those who used drive-through

3  voting in 2020."

4      Did I read that correctly?

5  A.  Yes.

6  Q.  And you don't dispute that conclusion either?

7  A.  As I said, there were some other tests that I would do to

8  test for that.

9  Q.  And let's go to Page 30 of Dr. Hoekstra's report and pull

10  up Table 9, if we can.

11      And you're familiar with this table as well, right,

12  Dr. Mayer?

13  A.  Yes.

14  Q.  And you don't dispute any of the math or arithmetic in this

15  table, correct?

16  A.  That's correct.

17  Q.  And you don't dispute Dr. Hoekstra's methodology, correct?

18  A.  Not with respect to what he did in this table.

19  Q.  And Dr. Hoekstra concludes, based on this table, that

20  predicted white, predicted nonwhite and predicted Hispanic

21  drive-through voters all turned out in higher rates in 2022

22  than their non-drive-through counterparts; is that correct?

23  A.  That is his conclusion.

24  Q.  And you don't dispute that conclusion, correct?

25  A.  Not as that is expressed.  Again, but there are other tests

Dr. Kenneth Mayer - Cross

1  that one could do.

2  Q.  And you don't dispute the methodology that Dr. Hoekstra

3  used in this table, correct?

4  A.  That's correct.

5  Q.  And if we can go to Page 31 of Dr. Hoekstra's report.

6      And I believe in your report you used what's called the

7  Chi-square or Chi-square test.

8      Can you help me with the pronunciation?

9  A.  Chi-squared.

10 Q.  Chi-squared.  C-H-I, right?

11 A.  Correct.

12 Q.  And you used that test in your report, correct?

13 A.  Yes.

14 Q.  Okay.  And if we pull up paragraph 72 of Dr. Hoekstra's

15 report, it reads, "The problem is that when I performed this

16 exact same statistical test as Professor Mayer, except on a

17 sample of voters whose 2020 method of voting was completely

18 unaffected by SB1, I get the same result as Professor Mayer

19 reported.  In both cases, the test rejects the null

20 hypothesis."

21      Did I read that correctly?

22 A.  Yes.

23 Q.  And so Dr. Hoekstra concluded that the Chi-square test also

24 showed an impact on non-drive-through voters; isn't that right?

25 A.  That's correct.

Dr. Kenneth Mayer - Cross

1  Q.  And, of course, that's impossible, correct?

2  A.  I'm sorry.  It's impossible?

3  Q.  Well, the elimination of drive-through voting, it would

4  have had no effect on voters who didn't use drive-through

5  voting in 2020, correct?

6  A.  Well, possibly, although it's possible that people would

7  have voted drive-through in 2022 had it been available.  So

8  it's not necessarily true that the elimination of drive-through

9  voting couldn't have had an effect on people who voted in

10  person in 2022, based on whether they would have taken

11  advantage of drive-through voting had it been available.

12  Q.  But it didn't require them to change their method of voting

13  from 2020 to 2022, correct?

14  A.  That's correct.

15  Q.  And you don't dispute Dr. Hoekstra's methodology here,

16  correct?

17  A.  No.

18  Q.  And you don't dispute his conclusion here either, correct?

19  A.  Well, his conclusion about the -- what the Chi-squared

20  shows.

21  Q.  That conclusion, you don't dispute, correct?

22  A.  Correct.

23  Q.  Okay.  And so in light of all of this, you no longer stand

24  by this analysis of the Calhoun County drive-through voters,

25  correct?

Dr. Kenneth Mayer - Cross

1  A.  Well, to the extent that, as I phrased it in the

2  deposition, the way that I did the analysis was to examine the

3  demographics of people who voted in the Primary and in the

4  General.

5      To that degree, I stand by the conclusion that the

6  demographics shifted in terms of the electorate.  But in terms

7  of what Dr. Hoekstra did here, the results of his Chi-squared

8  analysis, I don't dispute.

9  Q.  And so you no longer stand by the conclusion that the

10  elimination of drive-through voting had a disparate impact

11  based on race on Calhoun County voters?

12  A.  Well, based on what I found here, as I phrased it in the

13  report, it was suggestive and consistent with what we saw in

14  Harris County, though in my report, I did not make a causal

15  argument.

16  Q.  Right.

17      But as you sit here today, are you offering the opinion

18  that there was a disparate impact on Calhoun County voters

19  based on race from the elimination of drive-through voting?

20  A.  Based on what I found here, yes.  But I -- Dr. Hoekstra did

21  a different set of tests which reached a different conclusion.

22  Q.  And you testified in your deposition that you would have

23  liked to do an additional step, correct?

24  A.  Yes.

25  Q.  And you have not conducted that step, correct?

Dr. Kenneth Mayer - Redirect

1    A.  That's correct.

2            MR. GORE:  No further questions.  I pass the witness.

3            THE COURT:  Anything else on this side?

4            MR. NICHOLS:  No, Your Honor.

5            THE COURT:  Any redirect?

6            MR. DODGE:  Just a few questions, Judge.

7                        REDIRECT EXAMINATION

8    BY MR. DODGE:

9    Q.  Dr. Mayer, do you recall that in his examination, Mr. Gore

10   asked you about whether you investigated if voters who had

11   their mail ballots rejected ultimately cast votes?

12   A.  Yes.  I believe the way that he phrased it was about

13   curing.

14   Q.  In your March 2023 General Election report, did you do

15   anything to investigate that question?

16   A.  Yes, I did.  It's something that's -- I did examine voters

17   in Harris County whose absentee ballots were rejected because

18   of SB1 and subsequently re-sent to the voter.

19   Q.  And what did you find when you looked into that with

20   respect to how many of those voters were ultimately able to

21   cast a ballot?

22   A.  So let me see if I can find the footnote.  There were --

23   there were 423 voters in Harris County whose mail absentee

24   ballots were rejected because of SB1, re-sent to the voter and

25   not returned.  And of those voters, 98.4 percent did not cast a

Dr. Kenneth Mayer - Redirect

 1  ballot in the 2022 election either by mail absentee or early or
 2  on election day.
 3  Q.  Do you recall that Mr. Gore asked you a question about how
 4  you took data generated by BISG analysis and used it in your
 5  report?
 6  A.  Yes.
 7  Q.  Specifically, he asked if you relied upon data points where
 8  the predictive -- the largest predictive value was under .5.
 9      Do you recall that?
10  A.  Yes.
11  Q.  Were many of the data points in any of the voter files you
12  looked at under .5?
13  A.  It was a small percentage.
14  Q.  Did you do anything in your analysis to check whether or
15  not relying upon those data points impacted the outcomes you
16  observed?
17  A.  Yes.  I redid the analysis using the .5 threshold, so
18  basically not including anybody whose largest probability was
19  below .5.  And I did it again only those voters whose
20  probability was above .9.
21      And my conclusions did not change even though the
22  population of people who were included did change.  .9 -- there
23  were -- it was not all of the voters.  It excluded those with
24  probabilities below .9.
25  Q.  Do you recall some questions from Mr. Gore about the impact

Dr. Kenneth Mayer - Redirect

1  of SB1 on mail ballot rejection rates in future elections?

2  A.  Yes.

3  Q.  Do you know how many counties there are in Texas?

4  A.  254.

5  Q.  Good.

6      Do you think it's possible there will be outlier counties

7  with respect to whether or not -- I was going a little quickly.

8  I apologize.  Let me start again.

9      Do you dispute whether there will be outlier counties in

10 future elections with respect to whether their mail ballot

11 rejection rate is higher or lower than in pre-SB1 elections?

12 A.  It's certainly possible that there could be some outliers.

13 Q.  Do those outliers impact the conclusion you testified

14 earlier to, that SB1 will always result in some number of mail

15 ballots being rejected in the future?

16 A.  No.  Because I was expressing that in terms of statewide

17 results.

18 Q.  And, finally, you had some questions from Mr. Gore about

19 which counties you looked at in your various reports and why.

20     Do you recall that?

21 A.  Yes.

22 Q.  Can you tell us why you looked at specific counties in any

23 of your specific reports?

24 A.  In the first and third reports I examined counties for

25 which I was provided data, granular data.

Dr. Kenneth Mayer - Redirect

1    And for my second report, I relied on counties that were

2  the larger counties for which I was able to find the election

3  conciliation reports or had data provided by the counties.

4  Q.  Were you ever provided county-level data that you then

5  didn't include in your report?

6  A.  No.

7         MR. DODGE:  No further questions.

8         THE COURT:  Anything based on those?

9         MR. GORE:  No, Your Honor.

10        THE COURT:  Any further need for this witness?  Can he

11  be excused?

12    You're excused, Doctor.  Thank you.

13        THE WITNESS:  Thank you, Your Honor.

14        THE COURT:  And your next witness.

15        MS. HOLMES:  Your Honor, the plaintiffs call Michelle

16  Brown.  And if you just give us a moment to reorient, we'll

17  have her up to the witness stand immediately.

18    *(Witness enters courtroom)*

19    *(The oath was administered)*

20        MS. WILLIAMS:  Good afternoon, Your Honor.  I am

21  Breanna Williams, counsel for the HAUL plaintiffs.  I call

22  Michelle Brown to the stand as our next witness.

23    Ms. Brown is testifying as an organizational witness for

24  HAUL plaintiff, Delta Sigma Theta Sorority, Incorporated.  And

25  her testimony is relevant to plaintiffs' claims challenging the

Michelle Brown - Direct

1  following sections of SB1:  Sections 3.04, 3.09, 3.10, 3.12,

2  3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.02, 6.01, 6.03,

3  6.04, 6.05 and 6.07.

4          THE COURT:  Thank you.

5          MICHELLE BROWN, PLAINTIFFS' WITNESS, SWORN

6                  DIRECT EXAMINATION

7  BY MS. WILLIAMS:

8  Q.  Good afternoon.  Please state your name for the record.

9  A.  Michelle Brown.

10  Q.  Where do you live?

11  A.  I reside in Fort Worth, Texas, which is in Tarrant County.

12  Q.  And how long have you lived in Texas?

13  A.  I have lived in Texas all of my life.

14  Q.  What is your educational background?

15  A.  I have a bachelor's degree in criminal justice -- criminal

16  justice and criminology, and I have a master's degree in

17  criminal justice management.

18  Q.  And are you retired?

19  A.  I am retired, yes.

20  Q.  What did you do for work before you retired?

21  A.  Just prior to retiring, I had spent 32 years with the

22  Tarrant County Pretrial Services.  I started out as a pretrial

23  officer, then supervisor, and for the last 26 years of my

24  career, I was the director of Tarrant County Pretrial Services

25  Department.

Michelle Brown - Direct

1  Q.  Will you briefly describe your professional career for the
2  Court?
3  A.  Sure.  Started out, you know, like I said, with pretrial
4  services, worked my way up to director.
5      I developed a passion for pretrial services.  So I became a
6  member of the National Association of Pretrial Services
7  Agencies.  I served with that -- with that professional
8  organization as the at-large director, as a central regional
9  director, and then I served four years as president of the
10  National Association of Pretrial Services Agencies.
11     After that, came back to Texas, and several of the
12  directors with several of the programs in Texas, we got
13  together and we formed the Texas Association of Pretrial
14  Service Agencies in 2014.
15  Q.  What did your work as director of pretrial services entail?
16  A.  Pretrial services, we facilitated personal bonds for
17  individuals who couldn't afford to bond out on their own, those
18  with minor offenses, mostly, and then we monitored them, made
19  sure that they made it to court when they were supposed to go
20  to court.
21  Q.  Are you a registered voter?
22  A.  I am.
23  Q.  When did you register to vote?
24  A.  When I was 18.
25  Q.  Do you vote regularly?

Michelle Brown - Direct

```
 1  A.  I do.
 2  Q.  Is voting important to you?
 3  A.  Yes.  It's always been important to me.  My mother started
 4  voting when she was 18, and she insisted that me and my
 5  brothers and sisters also register when we were 18.  So that's
 6  just been a part of what we do as a family, and it's important.
 7  Q.  For the rest of my questions today, if I refer to Delta
 8  Sigma Theta Sorority, Incorporated as "DST" or "Delta," will
 9  you understand what I mean?
10  A.  Yes.
11  Q.  What is DST?
12  A.  Delta Sigma Theta is a national nonprofit, nonpartisan
13  national service sorority.  We were founded in 1913 at Howard
14  University by 22 collegiate women who had a focus on doing
15  better for our people.  They wanted to -- they wanted to focus
16  on social injustices.
17      And, actually, one of the first things that they did, the
18  first public act was to participate in the Woman Suffrage March
19  of 1913.  They weren't wanted, but they did anyway.  And what
20  that did was to really set the foundation and the tone for what
21  Delta Sigma Theta was to do and participating in going forward.
22  Q.  You mentioned that they weren't wanted.  What did you mean
23  by that?
24  A.  Well, as black women, they weren't -- the white suffrages
25  didn't want them in the parade, so -- but they marched anyway.
```

Michelle Brown - Direct

1   Q.  What is the mission of DST?

2   A.  The mission of DST, Delta Sigma Theta is an organization of

3   black college-educated women, dedicated to the constructive

4   development of our members and focusing primarily on the black

5   community, public service focusing primarily on the black

6   community.

7   Q.  What are the key tenets of DST's work?

8   A.  Delta Sigma Theta, our work is centered around what we call

9   our Five Point Programmatic Thrust, which includes educational

10  development, economic development, international awareness and

11  involvement, physical and mental health and political awareness

12  and involvement, which is actually realized through social

13  action through our chapters and our regions and nationally.

14  Q.  You mentioned social action.  How does DST define "social

15  action"?

16  A.  Social action for Delta Sigma Theta, Delta Sigma Theta,

17  it's taking any -- an issue, perennial issue, that affects the

18  black community, and Delta Sigma Theta develops a action plan

19  and then directs the action of our members and our chapters as

20  we move forward to combat that issue.

21  Q.  What is the importance of social action to DST?

22  A.  Social action is very important.  As I said, that was one

23  of the first actions of our founders, and they set the tone for

24  what we would do.  And through the years, for 110 years, Delta

25  Sigma Theta has been on the forefront of social action.

Michelle Brown - Direct

1    We have fought against any type of racism, sexism.  Back in

2    1917, we had the vigilance committee, which fought

3    anti-lynching -- which fought lynching, and we lobbied

4    Washington at that time for the anti-lynching legislature.

5        So any time through the years that there are, you know,

6    legislature or activity that is going to affect the black

7    community or black women, Delta Sigma Theta is on the

8    forefront.

9        When it comes to things like also housing, you know,

10   discriminatory housing practices, anything like that,

11   employment, discriminatory employment practices, Delta has been

12   on the forefront, and we have lobbied Congress, we've lobbied

13   within our states, and we are constantly fighting against

14   injustices for black people.

15   Q.  You mentioned a Five Point Programmatic Thrust for DST.

16   Does DST pursue each of those goals equally, or do some

17   interests predominate?

18   A.  Social action is what we do, but we also have programs

19   under the Five Point Programmatic Thrust.  But I would say our

20   major focus is in social action because it encompasses -- it

21   can actually encompass our Five Point Programmatic Thrust as

22   well, different aspects of it.

23   Q.  Why did DST decide to become a plaintiff in this lawsuit?

24   A.  Again, it's what we do.  And from the beginning, from

25   inception, we have been fighting to protect the right to vote.

Michelle Brown - Direct

1    The women who participated, our founders who participated

2    in the Woman Suffrage March in 1913, had the women gained the

3    right to vote at that time, it would not have included our

4    founders because they were black.

5    So we have fought and fought and fought.  And anytime

6    something comes up that's going to suppress our right to vote,

7    our fundamental right to vote, Delta is going to be on the

8    front lines.

9    And SB1 in the State of Texas is just another effort to

10   discriminate against black voters.  And so Delta Sigma Theta

11   could not stand silent.  We had to speak out on this, and that

12   is why we are a part of this lawsuit.

13   Q.  Approximately how many members does DST have?

14   A.  Delta Sigma Theta, we have initiated approximately 300,000

15   members since inception.

16   Q.  Are all of those members located within the United States?

17   A.  We have 300,000 members worldwide.  We have chapters in --

18   of course, throughout the United States, and we also have

19   chapters internationally, which include chapters in Japan --

20   chapters in Japan, Canada, the Virgin Islands, the Bahamas,

21   Jamaica, West Africa, East Africa and, most recently, the

22   United Kingdom.

23   Q.  How many of those members that you mentioned are in Texas?

24   A.  We have 75 chapters in Texas, representing about 21,450

25   registered voters.

Michelle Brown - Direct

1    Q.  Does DST have chapters in Harris County?

2    A.  Yes.

3    Q.  And does DST have chapters in Travis County?

4    A.  Yes.

5    Q.  What chapter of DST are you a part of?

6    A.  I am a member of the Fort Worth Alumnae Chapter.

7    Q.  And how long have you been a member of that chapter?

8    A.  How long I been a member of that particular chapter?

9    Since -- wow.  Since 2001.

10   Q.  Have you been a member of another chapter of DST?

11   A.  Prior to that, I was a member of -- of course, of a

12   collegiate chapter, and then I was out for a while.  And then I

13   joined the Fort Worth Alumnae Chapter in 2001.

14   Q.  What roles have you held in DST?

15   A.  I have held several roles of leadership since 2004.  I have

16   been chapter president.  I have served on the state level,

17   state coordinator, Texas and New Mexico state coordinator.  I

18   have served as a regional journalist.  And most recently, I

19   served as southwest regional director from -- from 2018 to

20   2022.

21   Q.  I'd like to talk a little bit more about your position as

22   southwest regional director.

23       What responsibilities did your role entail?

24   A.  It entailed working with the chapters in the southwest

25   region.  Delta Sigma Theta is broken into seven regions,

Michelle Brown - Direct

 1    southwest region being one of them.  It was established in

 2    1932.

 3        And so we have chapters representing chapters in Texas, of

 4    course, Arkansas, Louisiana, New Mexico and the Island of

 5    Jamaica.  And so my role as regional director was to represent

 6    the members of the chapters on the national board and to also

 7    direct those chapters with programs and things like that, just

 8    to kind of manage the chapters to assure that we were doing

 9    what we need to do in our communities.

10    Q.  In your role as southwest regional director, did chapters

11    in your region report to you regarding their social action

12    activity?

13    A.  Yes.

14    Q.  What types of information would chapters report regarding

15    their social action?

16    A.  Social -- well, what they would do was, when it comes to

17    social action and the work that we do in social action, we have

18    a Social Action Commission that directs the activities that we

19    do, even on the local basis.

20        And we have a social action liaison.  And as regional

21    director, all of the information was sent -- would go up to

22    the -- to our social action liaison, and I would be copied on

23    all of that.  So I was able to pretty much keep up with all of

24    the activities.  And at the end of each year, of course, they

25    had to -- had to document the different activities that they

Michelle Brown - Direct

 1  participated in throughout the year.

 2  Q.  So you were aware of much of the social action activity

 3  taking place within your region?

 4  A.  Yes.

 5  Q.  In your role as southwest regional director, did you report

 6  on your region's social action activity to national DST

 7  officers?

 8  A.  During board meetings, we would report on all of the

 9  activities of the chapters.

10  Q.  How long did you serve as the southwest regional director

11  for DST?

12  A.  Four years.

13  Q.  Which four years were those?

14  A.  Oh, I'm sorry.  2018 to 2022.

15  Q.  As the immediate past southwest regional director for DST,

16  are you familiar with the work that DST chapters and their

17  members engaged in related to voting in Texas?

18  A.  Yes.

19  Q.  Could you describe the work that DST members do in Texas

20  related to voting?

21  A.  All of our chapters and members participate in voter

22  registration.  Our members are constantly registering voters,

23  set up tables in the community to register voters, new voters.

24  We set up activities and tables at different sporting events to

25  capture brand new voters that are graduating high school.

Michelle Brown - Direct

1        We also -- voter registration, we do voter education.  So a
2   lot of our chapters do voter education as it relates to how
3   to -- how to vote, what to expect when you get to the voting
4   polls, how to register to vote, how to vote absentee.
5        Especially coming up to an election, we're making sure that
6   our community are aware of the -- of the issues at hand, what's
7   going to be on the ballot, if candidates are running, local
8   candidates are running.
9        We partner sometimes with the League of Women Voters,
10  NAACP, other Divine Nine organizations, and we put -- do
11  candidate forums.  We always invite -- as a nonpartisan
12  organization, we invite all candidates that are running for the
13  specific -- the specific office, and we allow them to present
14  their -- what they plan to do in the role, if elected, so that
15  our communities are knowledgeable when they go to the polls.
16  Q.  You mentioned some of DST's voter registration efforts.
17       Do you have a sense of how many voters DST registers in
18  Texas per year?
19  A.  No.  Not at this -- no.
20  Q.  You also mentioned candidate forums that DST might
21  facilitate with other organizations.
22       Do these candidate forums include candidates from multiple
23  parties?
24  A.  Yes, all candidates running for any particular office is
25  invited to participate in our forums.

Michelle Brown - Direct

1  Q.  Do any DST chapters in Texas provide voter assistance?

2  A.  Yes.  I know that our Austin chapter provided voter

3  assistance to, I believe, a nursing home or a senior citizen

4  facility.  They would provide them with applications for

5  mail-in voting, so help them to fill out address changes.

6      Also, the Dallas Alumnae Chapter has provided assistance in

7  that regard as well.

8  Q.  Do any DST chapters in Texas provide transportation to the

9  polls?

10  A.  Many of our chapters have participated in caravans to the

11  poll, Souls to the Poll, yes, mostly in combination with

12  churches, in providing transportation.  Probably not as Delta

13  chapter specifically, but our members -- as members of the

14  churches that do it, and they provide actual physical

15  transportation.

16  Q.  Do any DST chapters in Texas assist voters with filling out

17  applications for voting by mail?

18  A.  Yes.

19  Q.  Why does DST work to get people out to vote if it is a

20  nonpartisan organization?

21  A.  We get people out to vote because it's -- voting is

22  important.  It gives you a voice, and it's just important that

23  your voice be noted in every election, not only the

24  presidential elections, but local elections.  You know, it's

25  important to vote.  And that's what we feel like.

Michelle Brown - Direct

1    So we work very hard to make sure that individuals,

2  especially in the black community, know that they have a right

3  to vote and that they should exercise that right to vote.

4  Our -- those that came before us fought hard.  Our founders

5  fought hard.  Those that came before us have fought hard to get

6  us the right to vote, and we should exercise that right to

7  vote.

8  Q.  Does DST do any legislative advocacy?

9  A.  Yes, we do.

10  Q.  What does that legislative advocacy look like?

11  A.  Well, we have annual Delta Days at the nation's capitol,

12  where our members come to Washington, D.C.  We hear from some

13  of our legislators, experts in the political arena, and then we

14  go to the capitol to speak with our legislators in Congress.

15  Delta develops -- develops our priorities and the different

16  things that we want to talk to them about, what we're

17  supporting, what we're not supporting, that would impact our

18  community.

19    Also, many of our chapters do what's called Red and White

20  Days at our state capitols, where we go and talk to our state

21  leadership, our state legislators, talk about what our

22  priorities are in terms of state.

23    And then locally, we do Red and White Days at the -- at the

24  school board, Red and White Days at city council.  So we're

25  constantly making sure that in -- at every level that Delta

Michelle Brown - Direct

1  Sigma Theta's voice is heard.

2  Q.  Do Red and White Days at the state level happen during

3  every legislative session?

4  A.  Yes.

5  Q.  During Delta Days and Red and White Days, does DST attempt

6  to speak with legislators from all parties?

7  A.  Yes.  We -- regardless of who represents us, whether it's a

8  Democrat or a Republican, we make appointments to meet with

9  them and discuss our priorities.

10 Q.  Are you familiar with SB1, the subject of this lawsuit and

11 the election bill that passed during the second special session

12 of the Texas Legislature in 2021?

13 A.  Yes.

14 Q.  And are you familiar with the predecessor bills to SB1 from

15 2021, including HB3, HB6 and SB7?

16 A.  Yes.

17 Q.  What was DST's position on SB1 and its predecessor bills?

18 A.  We opposed those bills.

19 Q.  Did the Texas chapters of DST engage in any activities to

20 oppose SB1 and its predecessor bills before SB1 was passed into

21 law?

22 A.  Yes, we did.  We did a letter-writing campaign.  We asked

23 all of our members in Texas, all of our chapter members in

24 Texas to contact their legislatures and the committees that was

25 proposing the bills to let them know how those bills that they

1  passed would impact our communities and black people in general

2  and those with disabilities.  And we asked them to send those

3  letters to each and every one of them.

4      We also -- during the first session, we were in the midst

5  of a pandemic, COVID.  So we had one of our members, our state

6  coordinator, to testify on Delta's behalf, opposing the passage

7  of that bill.  And also, during the special sessions, we

8  testified as well.

9  Q.  You mentioned a letter-writing campaign.

10     To your knowledge, did any legislators respond to those

11  letters from DST?

12  A.  Yes.  We had some of the democratic legislators to respond

13  that they were with us.  We have three -- at that time we had

14  three members, Texas representatives who were members of our

15  organization, Toni Rose, Rhetta Bowers and Jasmine Crockett,

16  who is now a member of Congress, and they also spoke out.  From

17  Dallas, we had Royce West.

18     So, yeah.  We did receive information back from some of

19  those democratic legislators that opposed it as well.

20  Q.  To your knowledge, did any Republican legislators respond

21  to those letters?

22  A.  Not personally.  We did have some automatic responses that

23  they received the email, but they did not reach out to us.

24  Q.  Did DST -- you mentioned that DST offered testimony in the

25  Texas Legislature while SB1 and its predecessor bills were

Michelle Brown - Direct

 1  under consideration; is that correct?

 2  A.  Yes.

 3  Q.  Did you offer any testimony on behalf of DST in opposition

 4  to SB1 or its predecessor bills at any time?

 5  A.  Yes, I did, on July the 10th, during the first special

 6  session.

 7  Q.  In which house of the state legislature did you testify?

 8  A.  House of Representatives.

 9  Q.  Did other members of DST attend that committee meeting with

10  you?

11  A.  Yes.

12  Q.  Did other members of DST testify during that committee

13  meeting?

14  A.  Yes.  There were other members who testified on their own

15  behalf.

16  Q.  About how many people would you estimate attended that

17  meeting?

18  A.  We had about 50 to 60 to actually attend and about maybe 20

19  to 24 that testified.

20  Q.  What was the process of testifying before the house

21  committee like?

22  A.  Well, we arrived at 6:00 in the morning.  We were first in

23  line, and we were told that we needed to sign up through the

24  kiosk if we wanted to provide verbal testimony, which many of

25  us did.  If we wanted to just do written testimony, we could do

 1  that as well.  But we needed to sign up through the kiosk to do

 2  that as well.

 3      And then we just waited.  Went in, had a seat and waited

 4  for them to call us to testify.

 5  Q.  How long did DST members have to wait to testify?

 6  A.  About 16, 17 hours.

 7  Q.  So at about what time did you get to testify?

 8  A.  Our members started testifying at about 1:00 in the

 9  morning, the next morning.

10  Q.  And do you recall how long you were allowed to speak for?

11  A.  Three minutes, I believe.

12  Q.  During the legislative committee meeting that you attended

13  to testify, do you remember Representative Neave questioning

14  Representative Murr, the bill's author, about the purpose of

15  SB1?

16  A.  Yes.  I do.

17  Q.  Do you recall how Representative Murr described election

18  integrity?

19  A.  Not exactly.  No.  I don't recall exactly how he --

20  Q.  Would it be helpful to watch a recording of that portion of

21  the legislative hearing to refresh your memory of that

22  discussion?

23  A.  Yes.

24          MS. WILLIAMS:  Derek, will you please play the video

25  clip to refresh the witness' memory?

Michelle Brown - Direct

1     *(Discussion off the record)*

2          MR. CAPOZZI:  I have a question about the purpose for

3     which this testimony is being offered.  If it's being offered

4     for the truth of what Representative Murr said, it's hearsay.

5          MS. WILLIAMS:  I'm not offering it for the truth of

6     the matter asserted.

7          THE COURT:  So I believe she was offering it initially

8     to refresh the witness' testimony.  And I'm assuming

9     Representative Murr is adverse?  Is that correct or not?

10         MS. WILLIAMS:  Yes.

11         MR. CAPOZZI:  But, Your Honor, I don't believe

12     Representative Murr is a defendant in this case.

13         THE COURT:  He was one of the legislators who voted

14     for the bill, was he not?

15         MR. CAPOZZI:  That's true.  But it still wouldn't be

16     the statement of a party opponent.

17         THE COURT:  All objections are overruled.

18      You can proceed.

19      *(Playing video)*

20   BY MS. WILLIAMS:

21   Q.  Ms. Brown, do you recall seeing that exchange between

22   Representative Neave and Representative Murr take place?

23   A.  Yes, I do.

24   Q.  Does the video accurately represent what you remember of

25   that discussion?

Michelle Brown - Direct

1  A.  Yes.

2  Q.  When you heard Representative Murr's comments about the

3  purpose of SB1, did anything stand out to you?

4  A.  It did.  We were a little taken aback by the fact that he

5  said basically that they wanted valid votes counted only.  And

6  then he went on to say that they wanted the right people to

7  vote.

8      So we kind of looked at each other, wondering, well, who

9  are the "right people," and came to a conclusion that obviously

10  black people and Latino voters are not the right people because

11  all of SB1 -- all of the provisions in SB1 will

12  disproportionately impact people of color.

13  Q.  What was the tenor in the room like when Representative

14  Murr made those comments about the right people voting?

15  A.  A little quiet.

16  Q.  During that same legislative committee meeting, do you

17  recall a discussion about whether Representative Murr had

18  requested a study to determine the racial impact of SB1?

19  A.  Yes.

20  Q.  Do you recall a discussion between Representative Neave and

21  Representative Murr about the importance of understanding the

22  racial impact of SB1?

23  A.  Yes.  Bits and pieces, yes.

24  Q.  Would it be helpful to watch a video of that discussion to

25  refresh your memory?

Michelle Brown - Direct

1   A.  Yes.

2           MS. WILLIAMS:  Derek, will you please play the second

3   video clip in the order.

4       *(Playing video)*

5           THE COURT:  So just -- can you pause?  Thank you.

6       So I just notice that the court reporter was not taking

7   down the statements being made on the audio.  Did you want that

8   part of the record or not?

9           MS. WILLIAMS:  We actually have the transcripts from

10  the video listed on our exhibit list, and we'll be looking to

11  move those into evidence, definitely, so it should be fine.

12          THE COURT:  Thank you.  Do you need to play this more,

13  or do you have a question --

14          MS. WILLIAMS:  No, I think that was a natural stopping

15  point.

16  BY MS. WILLIAMS:

17  Q.  Ms. Brown, do you remember watching this discussion between

18  Representative Neave and Representative Murr taking place?

19  A.  Yes, I do.

20  Q.  Does the video fairly and accurately represent what you

21  remember?

22  A.  Yes.

23  Q.  How did you feel when you heard Representative Murr say

24  that he respected the fact that people in the gallery had

25  traveled great distances and sat for many hours to be able to

Michelle Brown - Direct

1  share?

2  A.  Well, felt like perhaps he was going to listen to what we

3  had to say since he said that he had not conducted a study and

4  did not know anything about the bill being disproportionately

5  impacting people of color, although he is definitely one of --

6  since he was the coauthor of the bill or the author of that

7  particular bill, that his office did receive letters from Delta

8  Sigma Theta outlining the impact.

9      So we were hopeful that he would be there to listen to us

10  testify and hear some of what we had to say.

11  Q.  How did you feel when you heard Representative Murr say

12  that he looked forward to listening to every witness' testimony

13  and that he was going to give that testimony the importance it

14  deserves?

15  A.  Well, he said that he had listened to his peers in writing

16  it but had not heard from people of color or had not done a

17  study.

18      So, again, we kind of felt that, hopefully, he would listen

19  to what we had to -- had to say, but we were not convinced that

20  he would change anything, because in our minds he did not -- it

21  didn't seem that he felt like we were the right people to vote.

22  Q.  When the time came for you to testify, was Representative

23  Murr present to hear your comments?

24  A.  No, he wasn't.

25  Q.  Was Representative Murr present to hear the testimony of

Michelle Brown - Direct

1  any of the speakers from DST during that committee meeting?

2  A.  No, he wasn't.

3  Q.  How did that make you feel?

4  A.  Just like we thought, that we're not the right people to

5  vote, and he didn't want to hear what we had to say.  It was

6  his opportunity to hear from us about the impact of that bill

7  on people of color.

8  Q.  How did you describe the impact that SB7 would have on DST

9  members and the communities DST serves in your testimony before

10  the house select committee?

11  A.  Basically outlined what the impact would be, the different

12  provisions, and that's pretty much -- how it would impact our

13  communities and our people.

14  Q.  Do you remember what you said the impact of SB1 would be?

15  A.  Not completely, no.

16  Q.  Would it be helpful to watch a video of your recorded

17  testimony to refresh your recollection?

18  A.  Yes.

19          MS. WILLIAMS:  Derek, will you please play the last

20  video clip.

21      *(Playing video)*

22  BY MS. WILLIAMS:

23  Q.  Ms. Brown, does the video fairly and accurately represent

24  what you remember your testimony to have been?

25  A.  Yes.

Michelle Brown - Direct

1    Q.  Why was it important for you to speak on behalf of DST to
2    tell the legislature these things?
3    A.  It was important because, again, Delta Sigma Theta has been
4    fighting to protect the right to vote since inception.  And as
5    a Texan, we have gone through many, many tactics of our
6    legislators to stop blacks from voting, from the time after the
7    Civil War, that Texas has implemented poll tax, Texas has
8    implemented white primaries, many tactics to keep black people
9    from voting.
10       And even after the Civil Rights Act of 1965, Texas was
11   placed under a preclearance order, and the only way that states
12   were placed under a preclearance order was because they had a
13   documented history of voter suppression of blacks.
14       And so, once again, here we go again, SB1.  You know, the
15   preclearance was lifted in 2013.  And even during preclearance,
16   Texas came up with this voter ID law that was -- did not clear.
17   But as soon as preclearance was lifted, Texas implemented it
18   the next day.  And that voter ID bill impacted people of color,
19   people with disabilities, people with language barriers in
20   Texas.
21       So it's just a long history that Texans have had to endure
22   as black Texans, African-Americans and Latinos -- have had to
23   endure because the legislators do not want African-Americans
24   and Latinos to vote because we are not the right people.
25   Q.  Was the substance of the testimony from the other DST

Michelle Brown - Direct

1   members who testified similar to your comments?

2   A.   Yes.  They laid out how it would impact them and their

3   families and their chapters.  So yes.

4   Q.   How did the legislators who were still in attendance at the

5   house committee meeting respond to your testimony?

6   A.   They appeared to be attentive.  Several of them did ask

7   questions of those who testified.

8   Q.   Focusing now specifically on the version of SB1 that was

9   passed into law in 2021, what is DST's view of that law?

10  A.   We oppose SB1.  We oppose the passage of it.

11  Q.   Since it went into effect in December of 2021, has SB1

12  affected DST members in Texas?

13  A.   Yes, it has.

14  Q.   How?

15  A.   They've had to -- we have had -- well, as members of Delta

16  Sigma Theta and chapters of Delta Sigma Theta, we have had to

17  reorganize how we -- how we -- how we educate our community --

18  I'm sorry -- how we educate the community.  SB1 has a lot of

19  different provisions that are totally new.

20      It also -- some of the provisions discourage our

21  communities and our members from participating in the political

22  process.  And it just makes it harder.

23      One of the things that we do is register voters and get

24  them out to vote.  And something like SB1 is going to

25  discourage people to vote.  So all the work that we have done

1  up to this point to get people out to vote has been impacted.

2  Q.  Has SB1 -- withdrawn.

3      Is the additional education that DST implemented in

4  response to SB1 different than the activities that DST

5  routinely engages in?

6  A.  It was different in the -- in that we had new information

7  that we had to make sure -- urgent information basically that

8  we had to get to our members and our community on the impact of

9  SB1.

10     But we still participated in education.  We just had to do

11 more of it.

12 Q.  It was different in the subject matter, but was it --

13 A.  Yes.

14 Q.  -- also different in kind?

15 A.  In what?

16 Q.  In kind?

17 A.  "In kind"?  I'm sorry.  What's that?

18 Q.  Withdrawn.

19     You mentioned that you had to -- that DST had to do more

20 training.  Has DST devoted any additional resources to its

21 voting activities because of SB1?

22 A.  Yes.  We've had to put more effort into the number of

23 trainings that we provide.  We've had to have more volunteers

24 in terms of what we're -- what we're doing in our communities.

25 So we've had to devote more time and resources to the work that

Michelle Brown - Direct

1  we're doing to educate our communities on SB1.

2  Q.  Where did those additional resources come from?

3  A.  From our chapter budgets.

4  Q.  Did DST divert any resources away from its other voting

5  activities because of SB1?

6  A.  We just added to those budgets.  Everything that we do is

7  important to our communities.  We have programs under the Five

8  Point Programmatic Thrust, as well as our social action

9  activities.  And so we just had to devote more time, more

10 resources to make sure that everything that we do gets done.

11 Q.  Did DST divert any resources away from its nonvoting

12 activities because of SB1?

13 A.  Yes.  Some chapters had to reallocate the funds and do a

14 little less on some and much more on social action activities.

15 Q.  Has SB1 required DST to spend more time on voting?

16 A.  Absolutely.

17 Q.  How is that time spent?

18 A.  On getting the vote out, registering new voters, doing the

19 same things and making sure that they, like I said, are aware

20 of what the impact is on SB1 and how it impacts them as voters.

21 Q.  You mentioned DST spending more time on getting the vote

22 out and external outreach.

23     Has DST also spent -- or has -- how does the time that DST

24 has spent on internal training compare?

25 A.  Well, we need to -- well, more training, because of the

Michelle Brown - Direct

 1  impact of SB1.  We want to make sure that our members are aware
 2  because a lot of our members, like we said, participate not
 3  necessarily just in social action activities with the -- with
 4  the sorority, but also in other organizations that they're a
 5  part of, making sure that their churches get out to vote,
 6  giving information to their churches and working with other
 7  organizations.
 8      So we need to make sure that our membership is aware and
 9  they understand what SB1, how it impacts them.  And especially
10  since there are criminal penalties attached to some of the work
11  that they have done in the past, we need to make sure that
12  they're aware of that.
13  Q.  Now I'd like to talk a bit about the specific provisions of
14  SB1 that are challenged in this lawsuit.
15      First, I'd like to ask you about some of the specific
16  provisions, starting with Section 3.04, 3.12 and 3.13, the
17  provisions of SB1 that eliminate drive-through voting.
18      Are you familiar with those provisions?
19  A.  Yes, I am.
20  Q.  Has DST been impacted by these drive-through voting
21  provisions?
22  A.  Yes.
23  Q.  How?
24  A.  Our members have utilized -- there's members who live in
25  Houston that have reported that they utilize drive-through

Michelle Brown - Direct

1  voting.  And reducing it or eliminating drive-through voting

2  will impact them, as well as other members of our community.

3       People who work irregular hours.  We have members within

4  our organization who are healthcare workers.  And many -- a

5  couple of them even testified that being a healthcare worker

6  and having the opportunity to drive-through voting after they

7  get off of work was helpful for them.  They were able to vote.

8       So single mothers who -- single dads even, it just gives

9  them an opportunity to vote.  It was another method to get out

10  and vote.

11  Q.  Does DST have concerns now that drive-through voting is no

12  longer available?

13  A.  Yes, we do.

14  Q.  What are those concerns?

15  A.  Well, we're concerned, again, because those are the

16  methods -- that is one of the methods that people of color

17  utilized overwhelmingly in Harris County when it was offered.

18  And, obviously, if people took part in that, then it was a

19  method that was necessary to get people out to vote.

20  Q.  Has DST devoted any of its resources to alleviating the

21  burden of this provision?

22  A.  Alleviating the burden of drive-through voting?

23  Q.  Alleviating the burden of the fact that drive-through

24  voting no longer is permissible.

25  A.  It's a part of our training programs and the information

1  that we provide to the communities, if that is no longer an

2  option.

3  Q.  The next provisions of SB1 that I'd like to ask you about

4  are Sections 3.09 and 3.10, which focus on the hours in which

5  early voting can be conducted.

6      These provisions prohibit counties from operating early

7  voting earlier than 6:00 a.m. or later than 10:00 p.m.

8      Are you familiar with those provisions of SB1?

9  A.  Yes, I am.

10  Q.  And is it also your understanding that this provision

11  eliminates 24-hour voting?

12  A.  Yes.

13  Q.  Why does DST oppose these provisions?

14  A.  Because, yet again, that was a method that overwhelmingly

15  was utilized by people of color, Latino voters and black

16  voters.  And there's just no indication that those who voted by

17  that method -- there was no fraud involved in it.  So we can't

18  understand why 24-hour voting was eliminated.

19      We had many, again, people with irregular hours, healthcare

20  workers, you know, people who work at the different plants and

21  chemical facilities who utilized drive-through voting and --

22  I'm sorry.  24-hour voting.

23      And so it's just a tactic to minimize the number of people

24  who vote or limit the number of people who vote.

25  Q.  Has DST devoted any resources to informing the community

Michelle Brown - Direct

1  about the lack of an extended early voting option since the

2  passage of SB1?

3  A.  Yes.  Some of our chapters have done social media videos to

4  let people know how they can vote now in terms of the hours,

5  the days that early voting takes place.  We have done Zoom

6  meetings, in-person meetings with our communities to let them

7  know.  It's something that's pretty much ongoing leading up to

8  an election.

9  Q.  You mentioned videos and Zoom trainings.

10      Are those materials that would have been developed or

11  produced by DST volunteers?

12  A.  Yes.

13  Q.  And presumably, if those volunteers were not working on

14  this, they could have devoted that time to other DST efforts;

15  is that correct?

16  A.  Yes.  Of course.

17  Q.  Now I'd like to discuss SB1 Section 3.15, which prohibits

18  straight-ticket voting.

19      Are you familiar with this provision?

20  A.  Yes, I am.

21  Q.  Has DST been impacted by this provision?

22  A.  Yes.  Those who would like the choice to vote straight

23  ticket, whether it's democratic or -- a democratic straight

24  ticket or Republican straight ticket, the choice has been

25  eliminated.  We believe in choice.  And not only does that take

Michelle Brown - Direct

1  away the choice.  It also creates longer lines at the -- at the

2  polls.  Because if I can go in, if I have looked at my ballot

3  and I studied my ballot before I go to the polls, which we do

4  encourage people in our communities and our members to do, know

5  what you -- know what's already on the ballot before you get

6  there.

7      And if we are voting on candidates, and if I -- whichever

8  party, I align with that entire party, I align with what they

9  have to offer, then why shouldn't I be able to just vote a

10 straight ticket?  I could get in and out in a matter of minutes

11 versus marking each individual candidate.

12 Q.  Has DST developed additional trainings to inform the

13 community of this provision?

14 A.  Yes.  It's part of the training of SB1 and how to vote and

15 what to expect and -- yes.

16 Q.  The next provision I'd like to ask you about is SB1 Section

17 4.12, which adds requirements for when voters drop off mail

18 ballots.

19     Are you familiar with this provision?

20 A.  Yes.

21 Q.  Did some -- did some DST members drop off mail ballots in

22 2020?

23 A.  Yes.

24 Q.  Do you know why DST members dropped off mail ballots?

25 A.  Just to assist voters who could not get to the ballot box,

1  and they were asked.

2  Q.  Has DST developed any new trainings or voter education

3  efforts in response to this provision?

4  A.  It's part of the training of SB1.  All provisions are

5  discussed in the trainings that we do for our community and for

6  our members.

7  Q.  The next provision I'd like to ask you about is SB1 Section

8  6.01, which requires a person who assists voters by

9  simultaneously providing transportation to seven or more voters

10  for curbside voting to fill out a form that explicitly

11  states -- oh, and explicitly states that poll watchers are

12  entitled to observe this process.

13      Are you familiar with this provision?

14  A.  Yes.

15  Q.  Does this provision make your members afraid?

16  A.  Yes, it does.  First of all, there's a history of

17  intimidation by poll watchers.  Our members or even community

18  members who provide transportation are afraid to fill out those

19  forms.  They don't know what's going to happen to the

20  information that they put on those forms.  And these are

21  legitimate people taking legitimate and eligible voters to the

22  polls.

23      So, you know, they're afraid to do that.  And those people

24  who need -- who truly need these rides could be impacted by

25  that.  Maybe they won't have an opportunity to get to the polls

Michelle Brown - Direct

1  to vote without the assistance.  But those who do the
2  assisting, bills like this are meant to discourage people from
3  assisting others to get to the polls.
4  Q.  Has DST conducted any internal training or external
5  outreach to the community in order to alleviate the burden of
6  this new provision?
7  A.  Again, that's part of the education that we provide when we
8  discuss SB1.
9  Q.  The next provision I'd like to ask you about is SB1 Section
10  6.03, which requires people who assist voters with in-person
11  voting to fill out a form and disclose details like whether
12  they received compensation from certain entities.
13      Are you familiar with this provision?
14  A.  Yes, I am.
15  Q.  Has this provision frustrated DST's goal of getting people
16  out to vote?
17  A.  Yes.  Yes, it has, in that, again, people are leary of
18  providing their personal information because they don't know
19  what will happen with it, what it's going to do.  And, you
20  know, they don't understand.  If it's a -- you know, it's
21  difficult to understand what is compensation and what is not
22  because it's not clearly set out.
23      If I assist someone at the poll and they give me five --
24  assist someone to get to the poll and they give me $5 for gas,
25  is that -- is that compensation?  It's not clear enough to --

Michelle Brown - Direct

 1  so people are afraid to assist in that manner or put their name

 2  and address and information on a form.

 3  Q.  Does DST have members aged 65 and older?

 4  A.  Yes.

 5  Q.  Does this provision make it harder to assist your elderly

 6  voters?

 7  A.  It does because those -- that's usually the group who need

 8  the assistance, you know, to get to the polls, rides to the

 9  poll maybe or assist them, you know, with -- might have hearing

10  disabilities and may need someone to be with them at the polls

11  while they vote.

12  Q.  The next provision I'd like to ask you about is SB1 Section

13  6.05, which requires people who assist voters with mail ballots

14  to provide information, including whether they received

15  compensation from certain entities on the mail ballot and also

16  subjects them to the possibility of criminal penalty if they do

17  not do so.

18      Are you familiar with this provision?

19  A.  Yes, I am.

20  Q.  Has this provision frustrated DST's goal of getting people

21  out to vote?

22  A.  Yes, it has.  Again, you know, just having to swear to an

23  oath and, you know, under the penalty of perjury is frightening

24  and intimidating and discouraging.  So people are not going to

25  want to do that.  And I've heard the members say they don't

Michelle Brown - Direct

1   want to do that.

2   Q.  Has DST used its resources to conduct training or outreach

3   to alleviate the burden of this provision?

4   A.  It's a part of our training as we talk about SB1 and the

5   impact.

6   Q.  You have mentioned how several of the provisions of SB1

7   have been included in DST's training.

8       Is the cumulative effect of all these changes that DST is

9   now producing more training?

10  A.  Yes.  It's not just one or two provisions that we have to

11  reeducate our members through, but it's a whole myriad of

12  provisions.  So yes.

13  Q.  You mentioned reeducating voters.

14      Is that different than the work that DST generally does

15  with registering new voters?

16  A.  Well, we -- we do programming for voters about ballot --

17  what's going to be on the ballot, how to vote, where to vote,

18  how to find out where you need to vote.  Every election, there

19  are brand new voters that we are providing that information to.

20  In this instance, for brand-new voters, this may be brand new.

21  They have not voted prior to that.

22      But for our community and members who have been voting for

23  years, this is -- a lot of this is new, and it's frightening

24  and it's intimidating.  And as -- there was a lot of press, you

25  know, as these different bills were coming through the

Michelle Brown - Direct

1  legislative session, and people heard a lot of things that have
2  just basically frightened them about voting at this point.
3      So it's reeducating them to let them know what passed, what
4  didn't and how it impacts them when they go to the polls to
5  vote.
6  Q.  So now, in addition to educating new voters, DST is also
7  focusing and investing resources into reeducating regular
8  voters?
9  A.  Yes.
10 Q.  One final question, Ms. Brown.
11     Is there anything else that you'd like to share about DST's
12 opposition to SB1?
13 A.  Well, one of the things that we want to talk about and what
14 I would like to talk about in terms of SB1 is that, you know --
15 talked about the history of Texas as it relates to suppressing
16 the votes of black people.
17     And we're always going to be out on the front lines to
18 speak against it.  But we need them to hear us.  And it's
19 obvious to us that in 2020, even though these methods were put
20 out there because of COVID, to make it a safe election, people
21 got out and voted.
22     And in my opinion, the goal of any election is to increase
23 voter turnout.  Texas is at the bottom of all states when it
24 comes to voter turnout.  It is documented that Texas is the
25 hardest state to vote in because of all of their restrictions

 1  and rules.

 2      And there was high voter turnout in Harris County in 2020

 3  because of these methods, these new methods to vote.  So,

 4  obviously, they were methods that were able to encourage those

 5  who had not been voting prior to this, gave them an opportunity

 6  to vote.

 7      So why are we not applauding that effort and encouraging

 8  other counties to utilize some of those methods so that Texas

 9  can come off of the bottom of voter turnout.  Why do we have so

10  few people making decisions for all Texans by suppressing the

11  vote of those -- of black people?  We deserve the right to vote

12  as well.

13      And this SB1, all these provisions were overwhelmingly --

14  all of these methods, rather, were overwhelmingly used by black

15  people.  So the only conclusion that we can come to is they

16  needed to stop the black people from voting because we were not

17  the right people, as Representative Murr said.

18          MS. WILLIAMS:  Thank you, Your Honor.  I pass the

19  witness.

20          THE COURT:  Anything else from this side?  None.

21      Any cross?

22          MR. CAPOZZI:  Yes, Your Honor.

23                   CROSS-EXAMINATION

24  BY MR. CAPOZZI:

25  Q.  Good afternoon, Ms. Brown.  How are you today?

Michelle Brown - Cross

1  A.  I'm good.  Thank you.

2  Q.  My name is Louis Capozzi.  I'm with the intervenor

3  defendants.

4     I just want to start by clarifying which provisions of SB1

5  that Delta Sigma Theta is challenging.  Is it accurate to say

6  that you are challenging Section 3.04, 3.09, 3.10, 3.12, 3.13,

7  3.15, 4.12, 6.01, 6.03 and 6.05?

8  A.  I believe that's correct.

9        MS. WILLIAMS:  Objection, calls for a legal

10  conclusion.

11        THE COURT:  Well, we left out some sections.  Was that

12  deliberately or not?

13        MR. CAPOZZI:  Your Honor, the reason I bring this up

14  is because in the deposition there was a discussion about which

15  provisions Delta Sigma Theta was challenging.  And both counsel

16  and the witness agreed in the deposition that the provisions I

17  just listed were the only ones being challenged.

18        THE COURT:  Well, I'll --

19        MR. CAPOZZI:  So we can bring it up in the deposition

20  if that would be helpful.

21        THE COURT:  Well, and so this is going to take a

22  fight.  So let's just ask questions of this witness.  And then

23  with regard to 4.01, .06, .07, .09 -- there may be others that

24  I missed -- I'll hear your arguments on why that is or is not

25  before us.

Michelle Brown - Cross

1        Go ahead.

2   BY MR. CAPOZZI:

3   Q.  Well, I'll limit my discussion then to the challenges

4   talked about in the deposition.  You're familiar with SB1

5   Sections 3.04, 3.12 and 3.13 which prohibit drive-through

6   voting and also curbside voting unless you have a disability,

7   correct?

8   A.  Correct.

9   Q.  Those provisions left intact curbside voting for voters

10  with disabilities, correct?

11  A.  Yes.

12  Q.  And you would agree that, before 2020, curbside voting was

13  not widely allowed in Texas?

14  A.  Yes.

15  Q.  And you don't know of any county other than Harris County

16  in 2020 that let nondisabled voters vote curbside, correct?

17  A.  Not that I'm aware of.

18  Q.  And you agree that people have different views on whether

19  curbside voting is secure, right?

20  A.  Yes.

21  Q.  And you didn't identify a specific member of Delta Sigma

22  Theta who was unable to vote in 2022 because of SB1 limiting

23  curbside voting to voters with disabilities, right?

24  A.  Say that again, please.  I'm sorry.

25  Q.  Of course.

Michelle Brown - Cross

1      You didn't identify a specific member of Delta Sigma Theta

2   who was unable to vote in 2022 because of SB1 limiting curbside

3   voting to voters with disabilities, right?

4   A.  Right.

5   Q.  You testified that Delta Sigma Theta had to educate voters

6   about this provision, right?

7   A.  Right.

8   Q.  And you talked about a training that Delta Sigma Theta

9   conducts for members of the community on how to vote, right?

10  A.  Right.

11  Q.  And this training covers the rules of voting, who's on the

12  ballot, where to vote, when to vote, stuff like that, right?

13  A.  Yes.

14  Q.  And that training is meant for both new voters and old

15  voters, right?

16  A.  Yes.

17  Q.  And that training includes discussion of some of the rules

18  in SB1, right?

19  A.  Right.

20  Q.  And it also includes discussion of rules in Texas that are

21  not in SB1, right?

22  A.  I'm sorry?  Rules of law that are not in SB1?

23  Q.  Yeah.  The training talks about election rules that aren't

24  in SB1 as well.  So that voters know all the rules they have to

25  follow, right?

Michelle Brown - Cross

1  A.  Right.  It's a broad view.  But with SB1, we're making sure

2  that they know what's in SB1 that's new.

3  Q.  So the training makes sure that voters know both the new

4  rules in SB1 and also the old rules that preexisted SB1, right?

5  A.  I don't -- I need clarity on the question.

6      When you say the "old rules," it's still how to vote,

7  what's on the ballot.

8  Q.  Right.

9  A.  Yeah.  All of that is still included, yes.

10 Q.  Right.  And so you want to make sure that voters know all

11 the rules that govern voting, right?

12 A.  Well, I'm sure we can't go through everything, but what the

13 basic rules are to voting and what to expect when they get to

14 the polls, ballots.

15 Q.  Right.

16     Let's talk about drive-through voting.  You're not aware of

17 any county other than Harris County in 2020 that allowed

18 drive-through voting, right?

19 A.  Right.

20 Q.  And you didn't identify a specific member of Delta Sigma

21 Theta who was unable to vote in 2022 because of SB1's

22 drive-through voting provisions, correct?

23 A.  Correct.

24 Q.  Sections 3.12 and 3.13 also require polling places to be

25 located inside buildings as opposed to structures like tents,

Michelle Brown - Cross

1  right?

2  A.  Right.

3  Q.  And you haven't identified a Delta Sigma Theta member who

4  was unable to vote in 2022 because of SB1 Sections 3.12 and

5  3.13, correct?

6  A.  Correct.

7  Q.  Section 3.13 also requires the commissioner's court of a

8  county to employ the same methodology it uses to determine the

9  location of countywide polling places to determine the location

10  of temporary branch polling places.

11    You're familiar with that part of Section 3.13, right?

12  A.  Right.

13  Q.  And Delta Sigma Theta doesn't have any issue with that

14  specific part of Section 3.13, right?

15  A.  Could you repeat the portion you're talking about?

16  Q.  The question about the provision?

17  A.  Right.

18  Q.  So Section 3.13 requires the commissioner's court of a

19  county to employ the same methodology it uses to determine the

20  location of countywide polling places to determine the location

21  of temporary branch polling places.

22    And you're familiar with that part of 3.13, right?

23    And Delta Sigma --

24    *(Reporter clarification.)*

25        THE WITNESS:  Yes.

```
 1          MR. CAPOZZI:  Sorry.
 2   BY MR. CAPOZZI:
 3   Q.  And Delta Sigma Theta doesn't have any issue with that
 4   specific part of Section 3.13, right?
 5   A.  It was not individual parts.  It's the SB1 in its totality
 6   that we are opposed to.
 7   Q.  Maybe it would be helpful to refresh your recollection on
 8   this.
 9          MR. CAPOZZI:  Brian, can you pull up Page 117, line
10   12, to 118, line 2 from the deposition.
11   BY MR. CAPOZZI:
12   Q.  You were previously deposed in this case, right?
13   A.  Yes.
14   Q.  Okay.  And so I'll read from the deposition transcript.
15      "There's another provision that was added, and I just want
16   to understand if -- what your concerns would be about this
17   provision.  There was a section added, 'Notwithstanding any
18   other provision of this section concerning the location of a
19   temporary branch polling place, in an election in which
20   countywide polling places are used, the commissioner's court of
21   a county shall employ the same methodology it uses to determine
22   the location of countywide polling places to determine the
23   location of temporary branch polling places.'
24      "Do you have any concerns about that provision?  Does --
25   does Delta Sigma Theta have any concerns about that provision?
```

1    "Answer:  On its own, no."

2    Did I read that correctly?

3  A.  Yes.

4  Q.  And do you stand by that prior answer?

5  A.  On its own, no.

6    But in totality, with all the other provisions is what we

7  look at.

8  Q.  Okay.  Let's talk about Sections 3.09 and 3.10.  You're

9  familiar with those sections which standardize early voting

10  hours, correct?

11  A.  Correct.

12  Q.  And under those provisions, SB1 for Ordinary, Primary and

13  General Elections permits two weeks of early voting, correct?

14  A.  Correct.

15  Q.  And that includes early voting on two weekends, correct?

16  A.  Correct.

17  Q.  And that includes up to 16 hours per early voting day at

18  any early voting location in the state, correct?

19  A.  Correct.

20  Q.  And you're aware that Harris County is the only county that

21  allowed 24-hour voting during the 2020 General Election,

22  correct?

23  A.  Yes.

24  Q.  And you haven't identified a member of Delta Sigma Theta

25  who was unable to vote in 2022 because of SB1's regulation of

1  early voting hours, correct?

2  A.  That's correct.

3  Q.  And by themselves, in isolation, SB1's early voting

4  provisions didn't injure Delta Sigma Theta as an organization,

5  right?

6  A.  Repeat that question.

7  Q.  By themselves, in isolation, SB1's early voting provisions

8  didn't injure Delta Sigma Theta as an organization, right?

9  A.  It harmed the work that we do as an organization in letting

10  our members and our community know what's available, what

11  methods are available.

12        MR. CAPOZZI:  Brian, can you pull up Page 97, lines 1

13  through 12 of the deposition, please.

14  BY MR. CAPOZZI:

15  Q.  So let me try to read this then.

16      "Okay.  And so with respect to this one, is there

17  anything -- is there -- because 24-hour voting has been

18  addressed in this bill, is there any expense or any impact on

19  Delta Sigma Theta?"

20      There was an objection by counsel.

21      And the question continues, "So, first, has the

22  organization experienced any -- have they suffered any sort of

23  injury by that provision?

24      "Answer:  No.  The organization as a whole, no."

25      Did I read that correctly?

 1  A.  Yes.

 2  Q.  Okay.  Let's move on to Section 3.15.

 3      You're familiar with that section, which helps implement a

 4  prior ban on automatic straight-ticket voting, right?

 5  A.  Right.

 6  Q.  And you're aware that in 2017, in a different law, the

 7  legislature ended the practice of automatic straight-ticket

 8  voting?

 9  A.  Yes.

10  Q.  And the automatic straight-ticket voting -- so -- sorry.

11  Let me strike that.

12      An automatic straight-ticket voting was not permitted in

13  the 2020 election, right?

14  A.  Right.

15  Q.  And you don't know whether Democrats or Republicans are

16  more likely to utilize straight-ticket voting, right?

17  A.  I'm not.

18  Q.  You mentioned that Delta Sigma Theta had to discuss the

19  adjustment to straight-ticket voting in the training that you

20  do for voters; is that correct?

21  A.  Well, it's just a line, and some of this says there's no

22  straight-ticket voting.

23  Q.  So it's part -- it's part of this general training?

24  A.  It could be for some of -- yes.

25  Q.  And you haven't identified a specific Delta Sigma Theta

Michelle Brown - Cross

1  member unable to vote because of Section 3.15, right?

2  A.  What we said about straight-ticket voting is that it

3  creates longer lines and takes away choice.

4  Q.  But you haven't identified a specific Delta Sigma Theta

5  member unable to vote in 2022 because of Section 3.15, right?

6  A.  No.

7  Q.  Let's talk about Section 4.12, which prohibits dropoff

8  voting when no election official is present; is that right?

9  A.  Yes.

10 Q.  And you haven't identified a specific member of Delta Sigma

11 Theta that was unable to vote because of Section 4.12, right?

12 A.  Right.

13 Q.  Okay.  Let's talk about the voter assistance provisions.

14     You're familiar with SB1 Section 6.01, which requires a

15 person who simultaneously assists seven or more voters by

16 providing transportation to the polling place to complete a

17 form, right?

18 A.  Right.

19 Q.  And you're aware that a transporter of seven or more voters

20 only has to fill out the form if the seven or more voters vote

21 curbside, right?

22 A.  Right.

23 Q.  And you haven't identified a specific member of Delta Sigma

24 Theta who has simultaneously assisted seven or more voters by

25 providing transportation to a polling place, right?

1  A.  Right.

2  Q.  And you're familiar with Section 6.03, which requires those

3  who assist voters to fill out a form providing their name and

4  address, their relationship to the assisted voter and whether

5  they accepted any form of compensation from a candidate,

6  campaign or political committee, right?

7  A.  Right.

8  Q.  And you haven't identified a specific member of Delta Sigma

9  Theta who has refused to fill out this form, right?

10  A.  Right.

11  Q.  And you haven't identified a specific member of Delta Sigma

12  Theta who has stopped providing voter assistance because they

13  have to provide the information required by Section 6.03,

14  right?

15  A.  There are members who have said they're not going to

16  participate in that any longer.

17  Q.  But have you identified a specific member of Delta Sigma

18  Theta --

19  A.  I can't provide you with a specific name at this point.

20  Q.  Okay.  And you're familiar with SB1 Section 6.05, which

21  requires someone assisting a voter filling out their ballot by

22  mail to provide certain information on the carrier envelope,

23  right?

24  A.  Right.

25  Q.  And you haven't identified a specific member of Delta Sigma

Michelle Brown - Cross

1  Theta who refused to provide the information required by

2  Section 6.05, right?

3  A.  Right.

4  Q.  And you haven't identified a specific member of Delta Sigma

5  Theta who refused to provide assistance because of Section

6  6.05, right?

7  A.  Right.

8  Q.  Let's zoom out for a second.

9      You haven't identified a specific member of Delta Sigma

10  Theta who has refused to provide voter assistance because of

11  any provision in SB1, right?

12  A.  Right.

13  Q.  And you haven't identified a specific member of Delta Sigma

14  Theta who was unable to vote in 2022 because of SB1, right?

15  A.  Right.

16  Q.  I want to talk a little bit about the voting-related work

17  that Delta Sigma Theta does.

18      You would agree that when the legislature changes the

19  election laws, educating voters about those changes is

20  important, right?

21  A.  Right.

22  Q.  And Delta Sigma Theta has been doing voter education for a

23  long time, right?

24  A.  Yes.

25  Q.  And so educating voters about election law changes is a

Michelle Brown - Cross

1  regular core part of the work that Delta Sigma Theta does,
2  right?
3  A.  Right.
4  Q.  For example, whenever Texas or a county in Texas changes
5  the voting hours, Delta Sigma Theta would communicate that
6  change to its members and the public, right?
7  A.  Right.
8  Q.  You testified that Delta Sigma Theta's members volunteer to
9  do things like provide voter assistance, right?
10 A.  Right.
11 Q.  And Delta Sigma Theta conducts trainings for those
12 volunteers about applicable election rules before they
13 volunteer, right?
14 A.  Right.
15 Q.  And Delta Sigma Theta has been conducting such volunteer
16 trainings for a long time, right?
17 A.  Right.
18 Q.  So, for example, Delta Sigma Theta conducted such volunteer
19 trainings in 2020, right?
20 A.  Yes.
21 Q.  You also testified that voter registration is a core part
22 of Delta Sigma Theta's work, right?
23 A.  Right.
24 Q.  And Delta Sigma Theta engaged in voter registration efforts
25 in 2020, right?

Michelle Brown - Cross

1  A.  Yes.

2  Q.  And Delta Sigma Theta has engaged in voter registration

3  efforts in elections before 2020, right?

4  A.  Yes.

5  Q.  You also testified that Delta Sigma Theta engages in

6  get-out-the-vote efforts, right?

7  A.  Yes.

8  Q.  And you do phone banking as part of such efforts?

9  A.  I'm sorry?

10  Q.  You do phone banking as a part of such efforts?

11  A.  Some do phone banking with -- in conjunction with other

12  organizations.

13  Q.  And you talked about setting up tables to talk about -- to

14  talk to voters in various locations, right?

15  A.  Setting up tables for voter registration.

16  Q.  Thank you for the correction.

17     Delta Sigma Theta has engaged in get-out-the-vote efforts

18  in prior elections, right?

19  A.  Right.

20  Q.  So it did these efforts in 2020, right?

21  A.  Yes.  Well, in 2020, not so much outside because we were in

22  the midst of COVID.

23  Q.  Because of COVID?

24  A.  Yes.

25  Q.  So perhaps then in the 2018 election, Delta Sigma Theta

1  engaged in these efforts?

2  A.  Yes.

3  Q.  Okay.  That's right?

4  A.  Yes.

5  Q.  So it's fair to say that Delta Sigma Theta -- I'm sorry.

6  Strike that.

7      You testified that Delta Sigma Theta had to divert

8  resources to educating voters because of SB1, correct?

9  A.  Yes.

10  Q.  But you don't know how much Delta Sigma Theta has spent on

11  voter education due to SB1, right?

12  A.  I don't know personally how each chapter has reallocated

13  their funds, no.

14  Q.  You testified that Delta Sigma Theta has had to expend

15  resources to training its volunteers and staff members after

16  SB1, right?

17  A.  Yes.

18  Q.  You think your trainings in response to SB1 have been

19  effective, right?

20  A.  We hope so.

21  Q.  And anytime the legislature changes the election laws,

22  Delta Sigma Theta will have to train its volunteers and staff

23  members on the election law changes, right?

24  A.  Yes.

25  Q.  Several elections have now taken place under the rules in

Michelle Brown - Cross

 1   SB1, right?

 2   A.  Yes.

 3   Q.  And if a court rules against SB1 and reverts the rules back

 4   to the rules that preexisted SB1, Delta Sigma Theta will need

 5   to educate its volunteers and members about those changes, too,

 6   right?

 7   A.  Correct.

 8   Q.  You testified that Delta Sigma Theta spends money on

 9   training members to provide voter assistance, right?

10   A.  Yes.

11   Q.  But you don't know how much money has been spent on such

12   trainings, right?

13   A.  I do not.

14   Q.  In your testimony, you didn't identify a specific part of

15   Delta Sigma Theta's normal programming that Delta Sigma Theta

16   had to forgo solely because of SB1, right?

17   A.  Right.

18   Q.  You clearly disagree with much of what's in SB1, right?

19   A.  "Clearly" --

20   Q.  -- disagree with much of what's in SB1, right?

21   A.  Yes.

22   Q.  But you would agree there are some things that are good for

23   voters in SB1, too, right?

24   A.  I'm not sure.

25   Q.  Let me provide an example.

Michelle Brown - Cross

1    Section 3.09 mandates that large counties in Texas offer at

2  least nine hours of early voting each day.  And that's up from

3  eight hours in pre-SB1 law.

4    You would agree that's a good thing, right?

5  A.  It's good that they added an hour, but it's not enough for

6  counties like Harris County, Dallas County because there are

7  still long lines at the polls.

8  Q.  But the fact that SB1 mandates that all the large counties

9  offer an extra hour, that by itself is good, right?

10 A.  By itself.

11 Q.  Okay.  And Section 3.09 mandates that smaller counties

12 offer at least four hours of early voting each day, up from

13 three hours in pre-SB1 law.

14    By itself, you would agree that's a good thing, too, right?

15 A.  Yes.

16 Q.  And, finally, black voter turnout in Texas was higher in

17 the 2022 elections than the 2018 elections, right?

18 A.  I'm not familiar with that statistic.

19 Q.  In the 2022 Primary Election, are you aware that black

20 voter turnout in Texas was higher than the 2018 Primary

21 Election?

22 A.  Would I agree with that?  If it's been reported, then I --

23 I don't know for sure.

24    MR. CAPOZZI:  Brian, can you just pull up Page 182,

25 lines 1 through 7 of the deposition.

Michelle Brown - Cross

```
 1  BY MR. CAPOZZI:
 2  Q.  Okay.  So let me read this.
 3      "Do you know if -- do you know if African-American turnout
 4  has -- between March of 2018 and March 2022 has increased or
 5  decreased?
 6      "Answer:  According to things I have read, I believe so.
 7      "Question:  It has increased or decreased?
 8      "Answer:  Increased."
 9  A.  That was in reference to the 2020 election, though.  You
10  said between -- this says between March of 2018 and March of
11  2022.  So turnout did increase in 2020 election.
12  Q.  So the question is, did turnout -- did black voter turnout
13  in Texas increase when you compare 2018 to 2022?
14  A.  That's not what this says.  This says African-American
15  turnout has -- between March of 2018 and March 2022.  It's not
16  comparing.
17  Q.  So you don't understand the question to be comparing 2018
18  and 2022?
19  A.  It's not comparing.
20  Q.  Okay.
21  A.  It's saying African-American turnout between March of 2018
22  and March of 2022 has increased or decreased, between those
23  two.
24  Q.  So between those --
25  A.  That span.
```

Michelle Brown - Cross

 1  Q.  So between those two dates, you would agree that black

 2  voter turnout in Texas has increased?

 3  A.  Yes.

 4          MR. CAPOZZI:  Okay.  That's all, Your Honor.  Thank

 5  you.

 6          THE COURT:  Anything else on this side?

 7          MR. NICHOLS:  No.  Thank you, ma'am.

 8          MR. BERG:  Shortly, Your Honor.

 9          THE REPORTER:  What's your name?

10          MR. BERG:  Zachary Berg from the Office of the

11  Attorney General.

12                      CROSS-EXAMINATION

13  BY MR. BERG:

14  Q.  Ms. Brown, voting is important to you, correct?

15  A.  Yes, it is.

16  Q.  You waited all day, into the wee hours of the morning,

17  because voting is a meaningful part of your life, correct?

18  A.  Correct.

19  Q.  And when counsel played the video for your recollection

20  about you testifying, you remember that Representative Trent

21  Ashby was there when you spoke, correct?

22  A.  Yes.

23  Q.  And Representative Ashby is the chairman of the committee

24  to which you testified, correct?

25  A.  Yes.

Michelle Brown - Cross

1  Q.  And he was there with you in the early morning, correct?

2  A.  Yes, he was.

3  Q.  And he listened attentively, correct?

4  A.  He did.

5  Q.  He was a cosponsor of SB1, correct?

6  A.  Correct.

7  Q.  And even after your testimony to which he listened

8  attentively, he still voted for SB1, correct?

9  A.  Correct.

10         MR. BERG:  Nothing further, Your Honor.

11         THE COURT:  Anything further?

12         MS. WILLIAMS:  Nothing from us, Your Honor.

13         THE COURT:  You may step down, ma'am.  Thank you so

14  much.

15     And your next witness.

16         MS. HOLMES:  Your Honor, the plaintiffs call Sharon

17  Watkins Jones as our next witness.

18     (Witness enters courtroom)

19     (The oath was administered)

20         THE COURT:  And she'll be testifying on what subjects?

21         MS. WILLIAMS:  Ms. Watkins Jones is testifying as an

22  organizational witness for HAUL plaintiff Delta Sigma Theta

23  Sorority, Incorporated.  And her testimony is relevant to

24  plaintiffs' claims challenging Sections 3.04, 3.09, 3.10, 3.12,

25  3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.02, 6.01, 6.03,

Sharon Watkins Jones - Direct

1    6.04, 6.05 and 6.07.

2        THE COURT:  Thank you.

3        SHARON WATKINS JONES, PLAINTIFFS' WITNESS, SWORN

4                    DIRECT EXAMINATION

5    BY MS. WILLIAMS:

6    Q.  Good afternoon.  Please state your name for the record.

7    A.  Good afternoon.  I'm Sharon Watkins Jones.

8    Q.  Where do you live?

9    A.  I live in Houston, Texas.

10   Q.  And what county is that in?

11   A.  Harris County.

12   Q.  And how long have you lived in Texas?

13   A.  I have lived in Texas my entire life, so 56 and some years.

14   Q.  What is your educational background?

15   A.  I have a bachelor's degree in sociology from the University

16   of Texas at Austin.

17   Q.  I'd like to briefly go through your professional history.

18       What jobs have you held in the legislative sphere, starting

19   with your first one after college?

20   A.  Sure.  My first job after college was a continuation of

21   work that I did in college at the Texas Legislature.  I worked

22   for a State Representative Karyne Jones Conley.  I started in

23   her office as an intern and, after college, remained with her

24   in various roles, including legislative director, until around

25   1992.

Sharon Watkins Jones - Direct

1      And then a few years after that, I worked in various state

2  legislative -- state agencies as legislative liaisons,

3  including Texas Workforce Commission, Texas Sunset Commission

4  and Texas Railroad Commission.

5  Q.  Okay.  Just taking your experience as a legislative

6  director in a state representative's office, how long did you

7  work in the legislator's office?

8  A.  So probably a total of six years.  And within those six

9  years, I did everything from answering the phones, to taking

10  meetings with constituents.  The responsibilities increased to

11  the point that I was legislative director, which meant that I

12  was responsible for helping the state representative to develop

13  her bills that she filed, as well as to write analysis for

14  those, to work with committees on which she served, including

15  appropriations committee, met with constituents and lobbyists

16  and anyone who visited her office that had questions about her

17  positions on bills or bills that she herself filed and moved

18  through the legislative process.

19  Q.  What were your responsibilities as a legislative director?

20  A.  Including those that I just stated, I also attended various

21  hearings on her behalf.  If she were on the house floor and

22  hearings had started, I would go to those hearings and take

23  notes.  I would create for her files that had legislative bill

24  analyses in there, any information collected from visitors to

25  her office, including lobbyists, including organizations and

Sharon Watkins Jones - Direct

1  associations, I would compile those files for her.  And also

2  would manage staff, including interns and other legislative

3  aides in the office.

4  Q.  About how often would you observe public testimony during

5  your time as a legislative director?

6  A.  Quite frequently.  During the legislative session, which is

7  from January to May and any subsequent special sessions

8  thereafter, I would attend hearings weekly, two to three times

9  a week, during those five months of legislative sessions.  So

10 quite frequently.

11 Q.  And what was your next job in the legislative sphere after

12 your work as a legislative director?

13 A.  So working as liaison for state agencies, my

14 responsibilities were to monitor legislation pertaining to that

15 state agency.

16    And in the case of the Sunset Advisory Commission, I was an

17 analyst.  And during those times when state agencies would come

18 up for review, I was responsible for interviewing staff at

19 those state agencies and helping to provide a report and

20 recommendations for the legislature as related to keeping that

21 agency afloat or re-establishing that agency.

22 Q.  In order to provide those reports to the state legislature,

23 did you testify before the legislature?

24 A.  Yes.

25 Q.  About how many times?

Sharon Watkins Jones - Direct

1  A.  I think twice I personally testified for the Sunset

2  Commission.  But I was also responsible for writing reports and

3  testimony for other staff to present.

4  Q.  Did you observe public testimony during your time as the

5  policy director?

6  A.  Yes.

7  Q.  How regularly?

8  A.  During the legislative session, I would, you know, attend

9  hearings either as a witness or as an observer, at least once

10  weekly during the legislative session after committees got

11  going about February or March.  So between February and May,

12  two to three times a week.

13  Q.  And how long did you work collectively for those state

14  agencies?

15  A.  Between 1997 and 2000.

16  Q.  And what was your next job in the legislative sphere after

17  your work as a liaison for those multiple state agencies?

18  A.  I moved to Houston.  I got married.  I was a public

19  schoolteacher for a number of years while my children were

20  small.

21      And then I returned to legislative work as a director of

22  policy -- or as director of political strategies for ACLU of

23  Texas.

24  Q.  And what issues did you focus on at the ACLU of Texas?

25  A.  Immigration rights, women's rights, criminal justice reform

Sharon Watkins Jones - Direct

1    and civil rights.

2    Q.   And how long did you work as a director?

3    A.   From 2016 to 2019.

4    Q.   And what were your responsibilities as a policy director?

5    A.   As policy director, my responsibilities were to draft and

6    monitor bills to Texas Legislature pertaining to the subjects

7    aforementioned, as well as to work with community groups and

8    constituencies to build coalitions to forward those issues.

9    Q.   Did you observe public testimony during your time at the

10   ACLU?

11   A.   I did, quite frequently.  My work during those years, those

12   were sort of the dawn of virtual attendance during those

13   legislative sessions.  So I was able to observe daily during

14   the legislative session public testimony to committees as well

15   as to travel to Austin frequently for those same committees.

16   Q.   What was your next job after your work with the ACLU?

17   A.   After working with ACLU, I worked as chief equity officer

18   for Children at Risk, an advocacy group for children and

19   families in Texas.

20       And in that role I also observed legislative testimony,

21   committee testimony, committee hearings, public testimony,

22   working on issues pertaining to children and family and the

23   welfare of children in Texas.

24   Q.   About how often would you say you observed public

25   testimony?

Sharon Watkins Jones - Direct

1  A.  Daily, during the legislative session, in particular
2  because of virtual -- the ability to attend virtually, as well
3  as submit testimony digitally.
4  Q.  Did you testify before the legislature during your time as
5  CEO of Children at Risk?
6  A.  Yes, I did.
7  Q.  About how many times?
8  A.  Twice.  And in particular, this last legislative session
9  three times relating to the Texas CROWN Act.
10  Q.  And how long did you work as the CEO for Children at Risk?
11  A.  Three years.
12  Q.  What was your next job after your work at Children at Risk?
13  A.  I am currently director of civic engagement for Public
14  Private Strategies.
15  Q.  And what is Public Private Strategies?
16  A.  It is also an advocacy and education group.
17  Q.  And what are your responsibilities in that position?
18  A.  My responsibilities are to help build coalitions of
19  like-minded organizations for democracy work.
20  Q.  Through your experience testifying at the legislature and
21  observing testimony, have you become familiar with the process
22  through which a bill moves through the legislature?
23  A.  Yes, very familiar.
24  Q.  Are you a registered voter?
25  A.  I am.

Sharon Watkins Jones - Direct

1   Q.  When did you register to vote?

2   A.  At the age of 18, while in college, I registered to vote.

3   Q.  Do you vote regularly?

4   A.  Yes.

5   Q.  Is voting important to you?

6   A.  Extremely.

7   Q.  Why?

8   A.  Voting is extremely important to me because it's the way

9   that I am able to express my wishes on how the community that I

10  live in is governed.

11  Q.  Is voting important to your family?

12  A.  It has been very important to my family.

13  Q.  How long has your family been in Texas?

14  A.  So according to ancestry.com and my 103-year-old

15  grandmother's Bible, we have at least five generations of

16  Texans in our family.  We can trace that to -- well into

17  slavery.

18  Q.  You mentioned that your family has been in Texas for

19  generations.

20  A.  Yes.

21  Q.  Are you -- are you aware of difficulties that your parents

22  or grandparents had while attempting to exercise their right to

23  vote?

24  A.  I am extremely aware of the generational trauma that voting

25  difficulties have caused my family.

Sharon Watkins Jones - Direct

1    My grandmother is living.  She is 103 years old, and she

2    can still very vividly tell stories of having to pay poll taxes

3    and how her family, as farmers, it was a great sacrifice and a

4    great burden to pay poll taxes in order to vote.

5    It was a great sacrifice and a great burden to vote when

6    there were intimidation tactics at the polls.  She can recall

7    times when there were members of Ku Klux Klan waiting outside

8    the polls and being very menacing when voters would go --

9    especially voters of color would approach the polls.

10    She can also recall that in some counties there were

11    challenges and burdens to vote that included things like having

12    to count the number of jelly beans in a jar or recite the

13    Preamble to the Constitution before being able to get

14    registered to vote or to cast a ballot.

15    My family -- my parents came along and met each other in

16    college in the '60s, and they can recall that when you would go

17    to register to vote, sometimes mysteriously there wouldn't be

18    any registration applications available, and that they would

19    have to return repeatedly in order to register to vote.

20    And that's just a sampling of some of the things that I

21    have heard from my family.

22    Q.  Were you aware of Delta Sigma Theta Sorority,

23    Incorporated's commitment to voting before you joined the

24    organization?

25    A.  Yes.  My mother was a member of -- is a member of Delta

Sharon Watkins Jones - Direct

1  Sigma Theta, and I'm keenly aware of Delta Sigma Theta's
2  commitment to the importance of voting, since I was a child,
3  attending voter registrations with her as a member of Delta.
4  Q.  For the -- for the rest of my questions today, if I refer
5  to Delta Sigma Theta Sorority, Incorporated as "DST" or
6  "Delta," will you understand what I mean?
7  A.  Yes.
8  Q.  When did you join DST?
9  A.  In the fall of 1986 while a student at the University of
10 Texas at Austin.
11 Q.  What chapter of DST are you currently a member of?
12 A.  I am currently a member of the Bay Area Houston Alumnae
13 Chapter.
14 Q.  Have you been a member of any other DST chapters in Texas?
15 A.  I have.  Epsilon Beta is the collegiate chapter at the
16 University of Texas.  I've been a member of the Austin Alumnae
17 Chapter, and I've been a member of the North Harris County
18 Alumnae Chapter in Houston.
19 Q.  What is your current role in DST?
20 A.  I'm currently the state social action lead.
21 Q.  What duties does your role as state social action lead
22 entail?
23 A.  It's my responsibility to help Texas chapters fulfill
24 social action initiatives, maintaining integrity with Delta
25 Sigma Theta's Five Point Programmatic Thrust and with our

Sharon Watkins Jones - Direct

 1  social action priorities.

 2      I am in communication constantly with our liaison to the

 3  National Social Action Commission of Delta Sigma Theta.

 4  Chapters submit for review their activities, and our liaison to

 5  the Social Action Commission provides guidance and includes me

 6  in that guidance so that I can be a resource to those chapters.

 7  Q.  In your role as state social action lead, do the chapters

 8  in your state report to you regarding their social action

 9  activity?

10  A.  I get an opportunity to see their activities because they

11  submit them on a form that the Social Action Commission reviews

12  and that I am privy to when those activities are approved.  So

13  I have an opportunity to see and know what the chapters are

14  doing in the areas of social action.

15  Q.  Do you then communicate those activities up the chain to

16  national DST officers?

17  A.  Through our -- through our Social Action Commission, yes.

18  Q.  What types of information would chapters report regarding

19  their social action activity?

20  A.  Sure.  The process is very streamlined, and each chapter

21  submits a form that has a name of their activity, a description

22  of that activity, names of persons who are invited to that

23  activity, the place where that activity is occurring.  If there

24  are fliers, if there are partners, those things are also listed

25  on that form for review by the National Social Action

Sharon Watkins Jones - Direct

1  Commission.

2  Q.  If you received a report about a challenge that a chapter

3  was facing with a social action activity, what would you do?

4  A.  I would -- I would talk with that chapter as well as talk

5  with our liaison to the Social Action Commission and work

6  through those challenges to help them have the most impactful

7  activity that they can have.

8  Q.  How long have you served as state social action lead for

9  DST?

10 A.  So this is my second two-year term serving in this

11 capacity.  I was colead beginning in 2020.  So 2020, 2021 and

12 now 2022, '23.

13 Q.  As state social action lead, are you familiar with the work

14 that DST chapters and their members engage in related to

15 voting?

16 A.  Yes, very familiar.

17 Q.  To your knowledge, are there members of DST who, in

18 addition to their work with the organization, also serve their

19 community as voter registrars?

20 A.  Yes.  Most chapters, and I would say every chapter in Texas

21 has deputy voter registrars.

22 Q.  To your knowledge, are there members of DST who, in

23 addition to their work with the organization, also serve their

24 community as voting assisters for people with qualifying

25 disabilities?

Sharon Watkins Jones - Direct

1  A.  Yes.

2  Q.  To your knowledge, are there members of DST who, in

3  addition to their work with the organization, also serve their

4  community as poll workers?

5  A.  Yes.  We have very many members who -- especially our

6  DEARS, which are our senior members, members who are older than

7  65, do a lot of work as poll workers.

8  Q.  Will you please tell the Court what a Delta DEAR is?

9  A.  Yes.  A Delta DEAR is a member of Delta Sigma Theta who is

10  65 or older.

11  Q.  And does Delta have many DEARS?

12  A.  We have our DEARS.  We are a very intergenerational

13  organization, from collegiate level through retirement and

14  beyond.

15  Q.  In addition to individual DST members participating in the

16  building process in the ways that you just described, can you

17  provide any examples of voting-related work that DST chapters

18  in Texas engage in?

19  A.  Absolutely.  In addition to voter registration, we have

20  voter forms where candidates, all parties are invited to share

21  their platform with members of the community.

22       We also have voter forums that are explanations of what's

23  on the ballot and very much in the same vein as those done by

24  the League of Women Voters, where people can see a sample

25  ballot and understand before they get to the polling location

Sharon Watkins Jones - Direct

1  what to expect.

2      We have voter education forums to talk about issues of

3  importance to members of the sorority, members of the

4  community, to learn about those issues, to learn about what --

5  how to vote, where to vote.

6      We have several members of the chapter who are -- of the

7  chapters who are deputy voter registrants, who work as poll

8  workers and in all capacities.

9  Q.  You mentioned that some of DST's voting-related efforts

10  involve voter registration.

11      Do you have a sense of how many voters DST registers in

12  Texas annually?

13  A.  It really depends on the location of the chapter.  We have

14  chapters in urban and rural areas across the state.  I have

15  seen reports of chapters registering as many as 500 people at

16  a -- at a particular gathering, especially gatherings that are

17  in public places such as churches or universities.

18      So it varies.  I've seen activities where as many as five

19  people are registered to vote if they are in a small venue.

20  Q.  Do you have a sense of how many hours DST members spend on

21  voter registration?

22  A.  Yes.  I would say in an election cycle a chapter,

23  particularly a large chapter, could spend anywhere from 20 to

24  40 hours on registering voters in an election cycle.

25  Q.  You mentioned voter education efforts, including candidate

Sharon Watkins Jones - Direct

1  forums.

2      Do you have a sense of how many voters in Texas participate

3  in DST voter education events?

4  A.  It varies.  If they are in-person events, there can be

5  anywhere from 10 to 150 people, depending on the venue.  And

6  with the ability now to hold education webinars and the use of

7  Zoom and other similar technology, could be as many as 3- to

8  400, depending on the capacity of that chapter's technology.

9  Q.  Do any DST chapters in Texas provide voter assistance?

10  A.  Some do, yes.

11  Q.  Which ones?

12  A.  In the past, chapters such as Austin Alumnae in Austin,

13  Texas have helped voters with disabilities by helping voters in

14  nursing homes.  In particular with -- when Souls to the Polls

15  was a regular activity, there would be chapters that would

16  assist elderly with transportation to the polls, especially

17  those who were disabled.

18  Q.  You mentioned that the Austin Alumnae chapter engaged in

19  these efforts in the past.

20      Why did they stop?

21  A.  Well, in particular, with Senate Bill 1 and so many of the

22  measures of Senate Bill 1 having confusing criminal penalties

23  and confusing measures that require an oath if there's a

24  certain number of people in a vehicle, there have been many

25  initiatives such as -- such as helping elderly and disabled

Sharon Watkins Jones - Direct

1  voters cast their ballot, that some members aren't willing to
2  assume that liability because it is so confusing as to what is
3  at risk.
4  Q.  Do any DST chapters in Texas assist voters with obtaining
5  applications for ballots by mail?
6  A.  Yes.  That has happened in the past.  San Antonio Alumnae
7  Chapter, prior to SB1, was able to distribute mail-in ballot
8  applications that were obtained from their county officials,
9  election officials.
10      That doesn't take place anymore because of the burden on
11  organizations to not receive official type ballots from the
12  county or from the elections office, but the burden would be
13  upon them to print on their own and distribute.  And so that
14  is -- that is something that is not taking place.
15  Q.  You mentioned that the San Antonio Alumnae Chapter no
16  longer engages in the activity -- the activity of distributing
17  at locations for ballots by mail.
18      Is that because of the new requirement in SB1?
19  A.  Yes, it is.  The chapters would have to print ballots.  I
20  think there is an element of trepidation of those who would
21  receive those printed ballots, that they may look at that and
22  feel like that's not official.
23      There's also the burden of having to pay for the printing
24  of those ballots by a volunteer organization.
25  Q.  Do any DST chapters in Texas assist voters with filling out

Sharon Watkins Jones - Direct

1  applications for voting by mail?

2  A.  In the past that has happened, yes.

3  Q.  You mentioned that that has happened in the past.

4      Why is that not continuing?

5  A.  There are criminal penalties assigned to those who would

6  make inadvertent mistakes in helping someone to fill out their

7  applications.  And the risk of those penalties is off-putting

8  and intimidating and is not a risk that, at this time, we

9  are -- chapters are not assuming that risk.

10 Q.  Do you have a sense of how many voters in Texas DST members

11 assisted with voting before SB1?

12 A.  I don't have a specific number of voters that were

13 assisted.  No.

14 Q.  You've mentioned it already a few times, but to clarify for

15 the record, are you familiar with SB1, the voting bill that

16 passed during the second special session of the Texas

17 Legislature in 2021?

18 A.  Yes.

19 Q.  And are you familiar with the predecessor bills of SB1 from

20 earlier sessions of the legislature in 2021, including HB3, HB6

21 and SB7?

22 A.  Yes, I am.

23 Q.  Did the Texas chapters of DST engage in any activities --

24 withdrawn.

25      Did you testify in the legislature on behalf of DST

Sharon Watkins Jones - Direct

1   regarding SB1 or its predecessor bills in 2021?

2   A.  I testified -- I submitted letters of testimony for SB1,

3   but I testified in person for its predecessor, SB7.

4   Q.  Do you recall approximately when you testified regarding

5   SB7?

6   A.  It was on my birthday, March 26 of 2021.

7   Q.  Did other members of DST attend that committee meeting with

8   you?

9   A.  Yes.

10  Q.  About how many?

11  A.  We started at 6:30 in the morning.  There were probably 30

12  members of Delta Sigma Theta in the hearing room.  And by the

13  time we were heard, well after midnight, there were probably

14  ten to twelve members.

15  Q.  Did other members of DST testify during that committee

16  meeting?

17  A.  Yes.

18  Q.  About how many?

19  A.  I think five.

20  Q.  Was the process of testifying regarding SB7 similar to the

21  other times that you have testified in the legislature?

22  A.  Similar in process and similar in -- similar in process.

23      Unsimilar in the fact that we were there over 18 hours

24  waiting to testify.  That is not always my experience.

25  Q.  Do you have a sense of why that occurred during the

Sharon Watkins Jones - Direct

1   hearings for SB7?

2   A.  We felt, and I felt, that the bill, which was the first

3   bill on the agenda, was pushed back repeatedly and other bills

4   were heard, other testimonies were heard for other bills.  The

5   members left to go to session, they returned, they had their

6   lunch.  And still, SB1, which was the first bill on the -- on

7   the agenda, was not -- public testimony was not called for

8   until after midnight.

9       And I felt, we felt, those of us who were there felt as if

10  we were being worn down so that many of us would leave.  And a

11  few of us did leave for various reasons, including, you know,

12  health and wellness and having to go to return to loved ones

13  and to take care of children and other family members.  People

14  had to go to work.

15      And so, you know, we were left with a handful into the

16  night, as well as very few members of the committee were left

17  to hear our testimony.

18  Q.  When you testified, how did you describe the impact that

19  SB7 would have on DST members and the communities DST serves?

20  A.  We talked about the ways in which this bill would

21  disproportionately affect our members and the communities that

22  we serve by eliminating a lot of the ways that have been used

23  by and large by members of the community, such as the 24-hour

24  voting, such as the drive-through polling.

25      We also talked about the intimidation that giving poll

Sharon Watkins Jones - Direct

1  watchers freedom of movement throughout the polling location
2  would cause to our members given our generational trauma of
3  voting suppression and voting intimidation in Texas, that
4  giving poll watchers that sort of free rein to hover around and
5  hover over members and our community groups -- community
6  constituents as they vote, that that would be extremely
7  burdensome.
8  Q.  Focusing now specifically on the version of SB1 that was
9  passed into law in 2021, do you believe that legislators knew
10  what impact SB1 would have on black registered voters in Texas?
11  A.  I don't see how they didn't know.  We not only testified
12  publicly.  We visited offices.  We emailed.  We texted.  We
13  faxed.
14      We repeatedly gave members of the legislature, and in
15  particular those -- the senate and house committees that heard
16  the bill, an opportunity to read what we were -- to see and to
17  read and to hear what we were expressing to them.  So I think
18  they knew -- they knew what they were passing.
19  Q.  Has SB1 affected DST members in Texas?
20  A.  Yes.
21  Q.  How?
22  A.  In particular, the cumbersome way that especially our DEARS
23  apply for mail-in ballots, especially the way that the envelope
24  is situated so that you have to put your personal information
25  on the application, as well as on the envelope, under the flap.

Sharon Watkins Jones - Direct

1   And if those who apply for those mail-in ballots aren't aware
2   of that information needed under the flap, then they send their
3   application in and it is rejected.
4        I can speak specifically of one such member who had her
5   mail-in ballot rejected, and that is Rose Mary McGowan of the
6   Houston Alumnae Chapter, who happens to be in her 90s and is
7   the sister of the late Honorable Congresswoman Barbara Jordan.
8        She made the mistake of returning her ballot without that
9   information under the flap.  And when it was returned to her,
10  she did try to make those corrections but did not receive that
11  ballot in time to cast her ballot by mail and, as a 90-year-old
12  woman, made the decision to go in person and vote, at risk to
13  her own health and safety.
14  Q.  Has SB1 affected DST's activities in Texas?
15  A.  Yes.  We have had to really focus on educating our members
16  and our communities on SB1 and all the provisions that affect
17  the ways that they vote, the ways that we're able to help
18  others to be registered to vote, help others to vote.
19       We've had to -- many of our efforts would have been toward
20  mobilization.  But because SB1 was intimidating and scary and
21  different, we had to focus more of those efforts on just
22  educating people on what they could and could not do and the
23  ways that they could and could not register or vote.
24  Q.  In terms of educating people on what they could and could
25  not do, does that sort of training differ from the training

Sharon Watkins Jones - Direct

1  that DST routinely offers?

2  A.  Yes.  It was -- it was -- it was new to us.  It was new to

3  the community.  Many of our chapters, including Houston Alumnae

4  Chapter, had virtual webinars to talk through SB1, to talk

5  through what voters and potential voters could expect and what

6  we, as members who advocate for them, could expect.

7      And I saw that, you know, throughout Texas, with chapters,

8  both collegiate and alumnae.

9  Q.  You've talked about this generally, but I want to ask a

10  specific question.

11      Has DST had to change its approach to voter education post

12  SB1?

13  A.  Yes.  We've had to enhance the way that we educate the

14  community and each other.  And that enhancement has been in the

15  form of webinars, meetings, community forums, both virtually

16  and in person.

17      Chapters have collaborated with partners such as League of

18  Women Voters to make -- to try to make sure and to ensure that

19  voters have the information that they need and to try to

20  instill in them the importance of voting and pushing past some

21  of the fears associated with this bill.

22  Q.  Just to talk about the voter education trainings that DST

23  has developed in response to SB1, are those trainings -- do

24  those trainings differ from trainings that DST developed prior

25  to SB1?

Sharon Watkins Jones - Direct

1  A.  The trainings -- the trainings differ in the sense that

2  while there were poll watchers, there was poll watching prior

3  to SB1, it was a significant concern given the free range of

4  movement that was allowed to this bill.

5      And so our trainings had to be enhanced to allow -- or to

6  educate voters on what our rights are and what poll watchers

7  can and can't do and how to navigate that if they felt

8  intimidated at the polls.

9  Q.  You mentioned trainings specifically related to the poll

10  watcher provisions in SB1.  Have those poll watcher provisions

11  made DST members afraid or apprehensive?

12  A.  Yes.  And in particular, our Delta DEARS, our senior

13  members, who have been poll workers, many of them have not

14  returned to working the polls because of the fears of

15  intimidation as it relates to poll watching.

16      We have members who are election precinct judges whose

17  family members have asked them not to return to their positions

18  because of fears of being watched, being followed in a vehicle

19  if they were completing their duties.  And so that intimidation

20  has been very real to our members.

21  Q.  Have DST members had issues with the poll watchers?

22  A.  I'm not aware of specific issues other than the fear,

23  intimidation associated with poll watchers being able to roam

24  through polling locations.

25  Q.  Have you had any issues with a poll watcher?

Sharon Watkins Jones - Direct

1   A.  I have -- I have voted since SB1, and I have personally

2   seen poll watchers standing throughout the polling locations,

3   feeling as if they are, you know, watching voters to catch

4   voters doing something wrong.  I have felt that poll watchers

5   have been too close to me as I have been voting, with no reason

6   that I could discern at that time.

7   Q.  And how did that experience make you feel?

8   A.  It's very uncomfortable.  It is -- it's intimidating,

9   especially when there seems to be no reason given, you know,

10  for someone standing so close to where you're casting your

11  vote.

12  Q.  As that incident was occurring, given your knowledge of

13  SB1, did you feel comfortable reaching out to an election

14  worker?

15  A.  I knew that if an election worker, specifically the judge,

16  had not witnessed something him or herself, that there would be

17  nothing that they could do, really.  And so in my particular

18  case, I did not.  I cast my vote, as uncomfortable as it may

19  have been.

20  Q.  Do you recall what election this was in?

21  A.  This would have been the Presidential Election of last

22  year, of --

23  Q.  Could you describe how SB1 has caused Texas chapters of DST

24  to divert resources?

25  A.  Yes.  Because we've had to enhance the trainings to cover

Sharon Watkins Jones - Direct

 1  the topics related to SB1, resources that may have been spent
 2  in mobilizing voters to the polls are now spent allaying fears
 3  and informing voters of their rights.
 4  Q.  Where did those additional resources that are now being
 5  spent with regard to SB1 come from?
 6  A.  They came from chapters' existing capacity.  So, for
 7  example, chapters would have budgets for their registration
 8  activities, for education activities, for, you know, anything
 9  related to social action chapters would have budgets for that
10  and allotted resources for that.
11      And whatever those resources were, they would, after SB1,
12  be spent primarily on educating voters about SB1.
13  Q.  So did DST divert resources away from its nonvoting
14  activities also because of SB1?
15  A.  Primarily, when the -- when the bill was up for
16  consideration, we go -- we go to the capitol.  We have what we
17  call a Red and White Day every legislative session, and we have
18  a full slate of bills that we support or oppose.
19      Voting is crucial to all of our issues.  And with voting
20  rights being in the balance as a result of SB1, we asked our
21  members to travel to Austin to testify and to be in opposition
22  of SB1 so frequently during that legislative session, that --
23  in ways that we did not ask them to come for the other bills
24  that were being considered because it was such a looming
25  disturbance to us.

Sharon Watkins Jones - Direct

 1     You know, for example, if we are -- if we are advocating

 2  for health, women's rights, we're advocating for educational

 3  equity, those things -- if we don't have our right to vote,

 4  those things are also affected.

 5     And so SB1 pretty much sucked up the oxygen from most of

 6  what we were advocating for because of its importance to

 7  everything that we advocate for.

 8  Q.  Has SB1 required DST to spend more time on its voting

 9  efforts?

10  A.  Yes.

11  Q.  How?

12  A.  Because of the fears associated with it, the criminal

13  penalties associated with some of the assistance that

14  traditionally we've given to voters, as well as some of the

15  prohibitions of the different ways that members have before

16  been able to exercise their right to vote, we've had to spend a

17  lot of time, an inordinate amount of time reviewing the

18  provisions of SB1 so that our members and the people that we

19  serve feel as if they can be safe and secure when they vote.

20          MS. WILLIAMS:  And, Your Honor, I want to honor your

21  time.

22          THE COURT:  Thank you so much.  Sorry for the early

23  stop today.

24     We'll resume tomorrow morning at 9:00.  I've got one small

25  criminal matter beforehand.  So you'll reserve at least the

1    first two desks.  And we'll see you back in the morning.

2        *(Overnight recess at 3:43 p.m.)*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              -o0o-

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.  I

4   further certify that the transcript fees and format comply with

5   those prescribed by the Court and the Judicial Conference of

6   the United States.

7

8   Date:  10/2/2023            /s/  *Gigi Simcox*
                                United States Court Reporter
9                               262 West Nueva Street
                                San Antonio, TX 78207
10

11

12                              /s/  *Chris Poage*
                                United States Court Reporter
13                              262 West Nueva Street
                                San Antonio, TX 78207
14

15

16

17

18

19

20

21

22

23

24

25