1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2               SAN ANTONIO DIVISION

3
LA UNION DEL PUEBLO ENTERO,      .
4 ET AL,                          .
                                 .
5          PLAINTIFFS,            .
      vs.                         . DOCKET NO. 5:21-CV-844-XR
6                                 .
GREGORY W. ABBOTT, ET AL,         .
7                                 .
          DEFENDANTS.             .
8

9

10              TRANSCRIPT OF BENCH TRIAL
       BEFORE THE HONORABLE XAVIER RODRIGUEZ
11           UNITED STATES DISTRICT JUDGE
                 OCTOBER 3, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                        FATIMA MENENDEZ, ESQUIRE
                          JULIA LONGORIA, ESQUIRE
18                        MALDEF
                          110 BROADWAY
19                        SUITE 300
                          SAN ANTONIO TX 78205
20

21                        AMIR BADAT, ESQUIRE
                          JENNIFER A. HOLMES, ESQUIRE
22                        BREANNA DELLA WILLIAMS, ESQUIRE
                          NAACP LEGAL DEFENSE & EDUCATIONAL
23                        FUND INC
                          40 RECTOR STREET, FIFTH FLOOR
24                        NEW YORK NY 10006

25

```
 1

 2

 3

 4

 5

 6   FOR THE DEFENDANTS:     RYAN G. KERCHER, ESQUIRE
                             KATHLEEN HUNKER, ESQUIRE
 7                           WILLIAM WASSDORF, ESQUIRE
                             JAMESON JOYCE, ESQUIRE
 8                           TEXAS ATTORNEY GENERAL
                             P.O. BOX 12548
 9                           MC 009
                             AUSTIN TX 78711
10

11                           ZACHARY WILLIAM BERG, ESQUIRE
                             TEXAS ATTORNEY GENERAL
12                           300 WEST 15TH STREET
                             AUSTIN TX 78701
13

14                           LOUIS J. CAPOZZI, III. ESQUIRE
                             JONES DAY
15                           51 LOUISIANA AVENUE NW
                             WASHINGTON DC 20001
16

17                           ERIC NICHOLS, ESQUIRE
                             BUTLER SNOW LLP
18                           1400 LAVACA STREET, SUITE 1000
                             AUSTIN TX 78701
19

20

21

22   REPORTED BY:            GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
23                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
24

25
```

```
1        (San Antonio, Texas; October 3, 2023, at 8:50 a.m., in
2   open court.)
3             THE COURT:  Good morning.
4             MISS PERALES:  Good morning, Your Honor.  Nina
5   Perales for LUPE plaintiffs.
6             Plaintiffs are ready to continue with their witness
7   presentation but I have a request of the Court.  We have a
8   witness who we would like to take out of order now.
9             Mr. Perales suffers from PTSD and anxiety disorders
10  and it's important for us to be able to present him and then
11  let him leave this morning.  I know it's unusual to present a
12  witness while we have another witness who is still being
13  examined but we would ask the Court's permission to do that.
14            THE COURT:  Any objection?
15            MR. KERCHER:  No objection, Your Honor.
16            After Mr. Perales' testimony, we'd like to confer
17  with plaintiffs' counsel on the issue that we spoke about
18  yesterday regarding the provisions that the sorority
19  plaintiffs are challenging.  I think that will be helpful if
20  we can get a ten-minute break at that time and then we can
21  present whether we have an agreement or not with the Court.
22            THE COURT:  Thank you.  So let's proceed with
23  Mr. Perales first.
24            MISS PERALES:  Thank you, Your Honor.
25            MISS LONGORIA:  My name is Julia Longoria with MALDEF
```

LOUIS PERALES - DIRECT

1  and I represent LUPE plaintiffs.  My next witness or the next

2  witness that the Court will hear from is Louis Perales.

3         His testimony goes to LUPE plaintiff's challenges to

4  5.07 and 5.13, the mail ballot ID requirements, and those are

5  challenged by LUPE plaintiffs under First and

6  Fourteenth Amendments as an undue burden on the right to vote.

7         Mr. Perales will also testify in support of LUPE

8  plaintiffs claims under Section 2 of the Voting Rights Act,

9  specifically senate factors one and five, and Section 2 of the

10  voting rights claims for LUPE plaintiffs, against SB 1,

11  Section 6.03, 6.04, 6.05, 6.06, and 7.04.

12        (LOUIS PERALES, having been duly sworn, testified as

13  follows:)

                          DIRECT EXAMINATION

15  BY MISS LONGORIA:

16  Q.  Good morning, Mr. Perales.

17  A.  Good morning.

18  Q.  Could you please state your name for the record?

19  A.  Louis Anthony Perales.

20  Q.  And would you please spell your first name?

21  A.  L-O-U-I-S.

22  Q.  Thank you.  Can you please tell the Court where you live,

23  Mr. Perales?

24  A.  I live at 6820 Stonykirk Road in San Antonio, 78240, zip.

25  Q.  And what county is that in?

LOUIS PERALES - DIRECT

1  A.  Bexar County.

2  Q.  What is your current occupation?

3  A.  Retired.

4  Q.  Before you retired, where were you employed?

5  A.  I worked with the U.S. Postal Service for 24 years.

6  Q.  And we're going to briefly go over your background.  Where

7  were you born?

8  A.  I was born in Floresville, Texas.

9  Q.  And where did you grow up, Mr. Perales?

10  A.  Poth, Texas.

11  Q.  Very briefly, can you describe the neighborhood that you

12  grew up in?

13  A.  I lived on a farm.

14  Q.  And can you describe the farm that you grew up on?

15  A.  Yes, ma'am.  My dad was a sharecropper and we had

16  350 acres that he was in charge of and farming and ranching

17  was a way of life.

18  Q.  Can you tell me what schools you attended when you were

19  going to school?

20  A.  Yes, ma'am.  Grammar school, I went to Poth, Texas.

21  Junior high, Poth, Texas.  And later on we moved to West Texas

22  and I went to Rovie High School [phonetic].

23  Q.  And what was the racial composition of the schools that

24  you attended?

25  A.  80-40, I guess.  80-20.  It was mostly Angelo.

LOUIS PERALES - DIRECT

1  Q.  And what was school like for you, Mr. Perales?

2  A.  Like I said, we were sharecroppers and we had to play

3  catch-up every year in school because we had to go out in the

4  field and chop cotton, pick cotton, bail hay.

5  Q.  And how many kids were in your family?

6  A.  We came from a big family, six boys and six girls.  They

7  figured that it was cheaper by the dozen.

8  Q.  And how many months of school would you miss a year?

9  A.  At least two, sometimes three, and we definitely had to

10  play catch-up to make the grade.  I made the grade but

11  sometimes barely.

12  Q.  And you mentioned that you were a migrant worker.  Can you

13  please tell me what that work was like for you?

14  A.  Yeah.  By the time I was twelve years old, I had to go and

15  pick cotton, but prior to that, you know, slopping the hogs,

16  feed the chickens.  Doing work around the farm.  There was

17  always work to do.

18  Q.  And what were your hours of work?

19  A.  When out in the fields, early in the morning, late in the

20  evening type thing.

21  Q.  Did you get paid for that work?

22  A.  No.

23  Q.  And did your family get paid for your work?

24  A.  Yes, ma'am.  We did, and Dad would make sure that we had

25  monies for a pair of shoes and clothes for school year.

LOUIS PERALES – DIRECT

1  Q.  And did the money that you make contribute to your family
2  for the family necessities?
3  A.  Again, please.
4  Q.  Did the money, the income that you made, contribute to the
5  family necessities?
6  A.  Yes, ma'am.
7  Q.  And what is your highest level of education?
8  A.  I was a sophomore, went into — my dad signed for me and I
9  went into the Marine Corps.  I got my GED a little later,
10 couple years later in fact.
11 Q.  And what did you do in the military?
12 A.  The first year and a half I worked as a guard, guarding —
13 we call pills, they were bombs for B-52s.  They would fly
14 sorties to Vietnam.  I got top secret clearance, by the way,
15 working there.  The last year I spent in Vietnam as a GRUNT.
16 Q.  Thank you for your service.  What was the treatment of
17 Mexican-Americans when you were growing up?
18 A.  You couldn't speak Spanish, but naturally I didn't have
19 any problems there.  You know, I grew up mostly with Angelo
20 kids and stuff, but I couldn't speak — the Mexican couldn't
21 speak Spanish at all.  It's here in America they speak
22 English.
23 Q.  Did you experience any prejudice while you were — prior
24 to your service?
25 A.  Yes, ma'am.  When I was in high school I went into this

LOUIS PERALES - DIRECT

1  place across town for Texas.  It's in West Texas, and I was

2  going to go into this restaurant and this White guy came up to

3  me and says, "Can't you read, Boy?  No Mexicans or dogs

4  allowed."

5  Q.  And how did that make you feel?

6  A.  It was a setback.  It was upsetting.

7  Q.  And what was the treatment of Mexican-Americans in the

8  military and after you came home from deployment?

9  A.  Well, I was treated like an equal all through my service.

10     When I was being deployed to Guam I had an experience.  I

11  was in my uniform and I was on a Greyhound bus.  We stopped at

12  this restaurant in Merkel, Texas, near Abilene, and there was

13  usually service there and that I was fortunate that the bus

14  driver was right behind me when they refused me service and he

15  took up for me.

16  Q.  How did it make you feel to be refused service?

17  A.  I was in my uniform and it made me feel bad.  Here I am,

18  you know, fighting for my country, so to speak, and I'm

19  refused service, but that was a bad time and place.

20  Q.  I'm going to shift gears a little now and I'm going to ask

21  you a few questions about your life right now.  How old are

22  you, Mr. Perales?

23  A.  I'm 76 years old.

24  Q.  And what is your health like?

25  A.  I got a few issues.  I got cirrhosis of the liver, and

LOUIS PERALES – DIRECT

1  I've got PTSD, diabetes with neuropathy, and a few other
2  setbacks.
3  Q.  And when were you diagnosed with PTSD?
4  A.  At 2010.
5  Q.  And how were you diagnosed with PTSD?
6  A.  Through the VA.
7  Q.  And how is your eyesight, Mr. Perales?
8  A.  I've got 20/20 vision, and I got early signs of glaucoma.
9  I don't drive at night because of the headlights, they bother
10 me.  My wife does most of the driving.
11 Q.  And you wear glasses?
12 A.  Yes, ma'am.
13 Q.  Are you a voter, Mr. Perales?
14 A.  Yes.
15 Q.  And how do you vote, Mr. Perales, in person or by mail?
16 A.  For the past five years I've been voting by mail.
17 Q.  And prior to the March 2022 Primary Election, when did you
18 apply for your ballot by mail?
19 A.  Early in January, I believe.
20 Q.  And did you have any difficulty applying for the mail
21 ballot?
22 A.  No, ma'am.
23 Q.  When did you receive your mail ballot for the March 2022
24 Primary Election?
25 A.  Early February.

2170

LOUIS PERALES - DIRECT

1   Q.  And did you find the mail ballot difficult to fill out?

2   A.  Undoubtedly.

3   Q.  I'm going to ask, Derek, would you please display Exhibit

4   LUPE 277.  If you could scroll down, please.

5       Mr. Perales, is this your signature?

6   A.  Yes, ma'am.

7   Q.  And do you recognize this document as the envelope for

8   your March 2022 Primary Election mail ballot?

9   A.  Yes, ma'am.

10  Q.  And what contact information did you include on your mail

11  ballot?

12  A.  It asked for driver's license and last four of your social

13  security, or one or the other.

14  Q.  And did you include a phone number or an email address?

15  A.  No, ma'am.

16  Q.  And did you include your driver's license number on the

17  mail ballot for the March 2022 Primary Election?

18  A.  No, ma'am, and I don't know why I didn't because I got my

19  driver's license memorized.

20  Q.  And did you include your social security number on your

21  mail ballot for the March 2022 Primary Election?

22  A.  No.

23  Q.  And why didn't you include your driver's license or social

24  security number?

25  A.  I don't know.  It didn't ask for it, or it did ask for it

*Gigi Simcox, RMR, CRR*

LOUIS PERALES - DIRECT

1   but it was on a flap I guess.

2   Q.  Did you try to use the Texas Secretary of State's new

3   Ballot Tracker for your March 2022 Primary Election ballot?

4   A.  Yes.  I made a phone call.

5   Q.  You made a phone call.  And what did you ask them?

6   A.  If they received my vote.

7   Q.  And what is your understanding of what you should do after

8   that call?

9   A.  Well, they directed me to the voter registration office to

10  contact them direct.  And I did.  I called them four times

11  trying to verify.

12  Q.  And how did you find out your mail ballot had problems?

13  A.  I was contacted a couple hours prior to closing, or the

14  voter date for me to come in, which was downtown to make the

15  correction.

16      I want to specify also that my wife had the same problems

17  as I did and she voted by mail three days after I did and she

18  had the same problem that I had.  She failed to pick up the

19  flap and read the questions that were being asked, and she's

20  real meticulous about what she does and when she does it.

21      And me being a postman, I should have caught that but I

22  didn't because who puts information on the inside of a flap.

23  That's for the glue to make sure that your letter is in the

24  envelope and stays there.

25      When I open a letter, I usually have a letter opener that

LOUIS PERALES - DIRECT

1  tears it open.  The flap is never opened because it's glued on

2  there.

3  Q.  And what is your understanding of what you had to do to

4  fix the problem with your mail ballot?

5  A.  I had to go in and make the correction.

6  Q.  And you had to go in where?

7  A.  I was told that I had to go to downtown and the directions

8  were given to me but I didn't -- it was voter registration

9  office, I'm sure.

10  Q.  And was this on Election Day?

11  A.  Yes, ma'am, three hours prior.

12  Q.  Three hours prior to what?

13  A.  Election Day.  It was on Election Day that I had to go in

14  before I guess 7:00.

15  Q.  Before 7:00.  And what did you do in response to that

16  direction?

17  A.  Well, I told them that I would make an attempt to go in

18  because I wanted our vote to count.  Now, when I told her that

19  I hadn't discussed it with my wife, and when I did, we had our

20  grandbabies with us and it was during rush hour and we didn't

21  have somebody to take the babies to so we decided against

22  going.

23  Q.  And how did that phone call from Bexar County make you

24  feel?

25  A.  Well, I was upset because I had been calling and calling.

LOUIS PERALES – DIRECT

1   And, in fact, I made four calls and I was upset.

2   Q.  And why couldn't you go into the polling place to vote?

3   A.  Again, you know, it was such short notice that my wife,

4   she's the driver of the house and she said that it was –– we

5   wouldn't make it in time.  You know it was close to the rush

6   hour, so we weren't going to fight the traffic with the babies

7   in the car.

8   Q.  Did your vote get counted for the March 2022 Primary

9   Election?

10  A.  Did it count?

11  Q.  Yes, sir.  Did your vote get counted?

12  A.  No, because I didn't go in.

13  Q.  Was your mail ballot accepted for the March 2022 Primary

14  Election?

15  A.  Was it accepted?

16  Q.  Yes, sir.  Was it accepted?

17  A.  Yes, for the Proposition A, it was accepted.  For the

18  General Election, it was accepted.  But the March, I had to go

19  in and make the correction.

20  Q.  So it didn't count for the March 2022 Primary?

21  A.  No, ma'am, it didn't count for that.  And my wife's didn't

22  either because she made the same mistake as I did, but me

23  being a postman I should have known to pick up the flap and

24  look underneath it and get that information.

25  Q.  But you didn't know?

LOUIS PERALES - DIRECT

1  A.  Who does that?

2  Q.  Did you vote in any elections after the March 2022 Primary

3  Election?

4  A.  Yes, ma'am.  I voted for the Proposition A.

5  Q.  And did you vote in the November 2022 General Election?

6  A.  Yes, ma'am.

7  Q.  And how did you vote in those elections, by mail or in

8  person?

9  A.  I voted by mail.

10  Q.  And did you have any problems voting in those elections?

11  A.  No, I contacted them.

12  Q.  And when you say "them," who do you mean when you say

13  them?

14  A.  I'm sorry.  Voter registration, to verify that they

15  received it and there was no errors.

16  Q.  And why did you do that?

17  A.  Well, I was concerned over what happened in March

18  election.  I wanted to make sure that they weren't throwing

19  any monkey wrench there.

20  Q.  And do you do that after every election?

21  A.  I'm sorry?

22  Q.  Do you contact after every election?

23  A.  Yes, because I'm worried whether they are receiving it.

24  Q.  Do you feel confident voting by mail?

25  A.  Well, I'm fearful that they are not getting it, and but I

2175
LOUIS PERALES – CROSS

1  am making a point to contact voter registration and verify.

2      But to answer your question, I'm thinking of maybe going

3  back to voting by — going to the — though I have anxiety

4  attacks and stuff, you know, if that's the only way to get my

5  vote counted, I'm going to go ahead and do that.

6      But I think that by mail would be the ideal thing for me

7  and my wife both because she has anxiety also and I have

8  issues with my equilibrium.  I can't be standing for any long

9  period of time, and, you know, if I can get in a line when

10  there is no line, I'd be more than happy to vote in person.

11  Q.  Thank you, sir.

12  A.  I used to do that all the time.  And my wife also.

13  Q.  Thank you, sir.

14          MISS LONGORIA:  Pass the witness.

15          THE COURT:  Anything else from this side?

16          Any cross?

17                    CROSS-EXAMINATION

18  BY MR. KERCHER:

19  Q.  Morning, Mr. Perales.

20  A.  Good morning, sir.

21  Q.  My name is Ryan Kercher.  I work for the Attorney

22  General's Office.  Thank you for being here this morning.

23  A.  Thank you, sir.

24  Q.  I understand that you are the son of a sharecropper, is

25  that right?

LOUIS PERALES – CROSS

1    A.  Yes, sir.

2    Q.  And then you served in the Marine Corps with a top secret

3    clearance, is that right?

4    A.  Yes, sir, when I was stationed in Guam.

5    Q.  And then you are a combat veteran from your service in the

6    Marine Corps, is that right?

7    A.  Yes, sir.

8    Q.  Thank you so much for your service.

9         And then you went on to a 24-year career with the U.S.

10   Postal Service, is that right?

11   A.  Yes, sir.

12   Q.  And here you are today in federal court in a voting rights

13   lawsuit, is that right?

14   A.  Yes, sir.

15   Q.  It's a remarkable story.  Thank you for being here.

16        You talked about what sounds like a pretty rotten moment

17   when you were refused service while you were wearing your

18   Marine Corps uniform, did I hear that right?

19   A.  Yes, sir.

20   Q.  I wish that had not happened.  Did I hear you say that

21   that happened in another time and another place?

22   A.  It was in Texas.

23   Q.  Let's talk a little bit about your voting experience in

24   March 2022.  It sounds like that was pretty frustrating as

25   well.

LOUIS PERALES - CROSS

1  A.  It was frustrating because I worked with the post office

2  for 24 years.  You know, I don't know much about the postal

3  service other than anywhere in the state of Texas, or anywhere

4  in the United States, a letter gets delivered within three

5  business days, you know.

6      Here, I put in my vote early and I get notification that

7  my vote was rejected three hours prior.  That was upsetting,

8  real upsetting, because, you know, I worked all my life to

9  better myself economically, and, you know, I try to do

10  everything honestly.

11  Q.  Sure.

12  A.  And I'm fearful now whether my vote is going to count.

13  Q.  Well, let's talk about that for a minute.  We looked at

14  the envelope for your ballot a moment ago and you did not put

15  down some of the information that they asked you to put down,

16  right?

17  A.  Yes, sir.  But who puts information inside a flap?

18  Q.  And we'll talk about that in just a minute, but when you

19  didn't put that information down it's just an honest mistake,

20  right?

21  A.  I didn't see it, Mr. Kercher, and my wife didn't see it

22  and she's meticulous about everything.  She didn't see it

23  because it was like hidden.  That flap is used for glue.

24  Q.  You had never seen that before, right?

25  A.  I beg your pardon?

LOUIS PERALES - CROSS

1   Q.  You had never seen that before, where you had to lift the

2   flap and put information on it, right?

3   A.  Had I seen it, sir, I got my driver's license memorized, I

4   would have definitely put it down.

5   Q.  I've got mine memorized too.  It's pretty handy, isn't it?

6   A.  Mine's an easy one.  That's the reason I got it memorized.

7   Q.  After that March 2022 Primary that was so frustrating,

8   after that you knew to look under the flap and put down that

9   information, is that right?

10  A.  Yes, sir.

11  Q.  And that's why you were able to successfully vote in May

12  of 2022, right?

13  A.  Yes, sir.

14  Q.  And in November of 2022, is that right?

15  A.  Yes, sir.

16  Q.  And again in May of 2023, is that right?

17  A.  Yes, sir.

18  Q.  And your wife has successfully also voted in those

19  elections following that initial March 2022 Primary, is that

20  right?

21  A.  Yes, sir.

22      MR. KERCHER:  That's all I have for you today.  Thank

23  you for again for coming in this morning.  We appreciate you

24  being here.

25      THE WITNESS:  I have a question for you, Mr. Kercher.

LOUIS PERALES - CROSS

1           MR. KERCHER:  Well, I'm not sure if I can answer it
2   but I'll listen to you.
3           THE WITNESS:  I hope you can answer it.
4           Why weren't we notified?  I'm a taxpayer.  Why
5   weren't we notified that there was going to be some revisions
6   on the mail ballot?  You know, it makes me look like a fool,
7   and three hours prior I wanted to vote.
8           MR. KERCHER:  Well, what I can tell you is that this
9   trial is going to continue for several more days and I think
10  in about two weeks my side is going to have the opportunity to
11  call some witnesses.  I hope now that you're done and off the
12  rule that you'll come and sit and listen to the rest of the
13  testimony and maybe get your question answered, fair?
14          THE WITNESS:  Fair.
15          MR. KERCHER:  Thank you, Your Honor.  I pass the
16  witness.
17          THE COURT:  Any redirect?
18          MISS LONGORIA:  No redirect, Your Honor.
19          THE COURT:  Thank you, Mr. Perales.
20          THE WITNESS:  Thank you, Your Honor.
21          THE COURT:  Do you-all need to confer?
22          MR. KERCHER:  If we could confer for a few moments.
23          THE COURT:  Like five?
24          MR. KERCHER:  Can we call it ten, is that all right?
25          THE COURT:  We'll be back.

1        *(Recess)*

2            MISS HOLMES:  Your Honor, Jennifer Holmes for the

3    HAUL plaintiffs.

4            I don't believe we were able to come to a resolution

5    on the full scope of our dispute.  There are some areas that I

6    think we've agreed on and those are off the table, but I think

7    it may be helpful to be heard briefly on the matter.

8            THE COURT:  So I guess I'm curious where the problems

9    are.  I mean, the complaint, the latest complaint alleges

10   certain claims.  Then I asked you-all repeatedly a hundred

11   times in the joint pretrial order to delineate your claims,

12   and so from what was presented to me yesterday, how, if at

13   all, does it differ from what you stated in the last pretrial

14   order?

15           MISS HOLMES:  Yes, Your Honor.

16           So with respect to Delta Sigma Theta, they challenge

17   Sections 3.04, 3.09, 310, 312, 313, 315, 412, 601, 603, and

18   6.05.

19           THE COURT:  I'm sorry.  412.

20           MISS HOLMES:  Sorry.  I went kind of fast.

21           412, 6.01, 6.03, and 6.05.  However, I think the

22   issue arises is that they have information from their

23   activities that the organization conducts that are relevant to

24   other sections of SB 1 that are challenged by other plaintiffs

25   in this litigation, and so --

```
 1              THE COURT:  So let's try to be as clear as possible.
 2              Does Delta assert any claims under 4.01, 06, 07, 09,
 3    502, 604, or 607?
 4              MISS HOLMES:  They do not, but we submit they have
 5    relevant information.
 6              THE COURT:  Right.  I'm just trying to figure out who
 7    is raising what claims.  So you are not raising any claims
 8    there.  So the question becomes do you, as just fact
 9    witnesses, get to testify as to 401, 06, 07, 09, 502, 504,
10    507, just as fact witnesses in support of any challenges to
11    those provisions of SB 1 raised by other parties.
12              MISS HOLMES:  I believe that's the question.
13              THE COURT:  So what's wrong with that?
14              MR. KERCHER:  Because at the 30(b)(6) deposition of
15    DST, defense counsel, counsel for the State defendants,
16    specifically inquired into what provisions DST was
17    challenging, and in an attempt to sort of narrow that down,
18    just as the Court did, an objection was raised by DST's
19    counsel saying, you can't argue with the witness about what
20    provision she is not challenging.
21              The parties went off the record, came back on the
22    record, and said, okay, DST is challenging these ten
23    provisions.  And as a result of that colloquy, the State
24    defendants limited their questioning to provisions that DST
25    was challenging.
```

1          For DST's 30(b)(6) witness to take the stand

2    yesterday and then challenge that statute under a variety of

3    additional provisions, that we were told they were not

4    challenging it, is, I don't think intentional, but is

5    nevertheless a surprise because it means that we were

6    precluded from asking questions about other provisions because

7    we didn't understand there would be testimony on those.

8          THE COURT:  So I'm trying to recall her testimony.

9          She's clearly testified as the 30(b)(6) rep of Delta.

10   Did she say anything about that she was also testifying on her

11   individual behalf?

12         MISS HOLMES:  Are you talking about her deposition

13   testimony or yesterday's testimony?

14         THE COURT:  Miss Brown's testimony.

15         MISS HOLMES:  Yesterday in court?

16         THE COURT:  Yes.

17         MISS HOLMES:  I'm also trying to recall.  I believe

18   in the initial question she was introduced as an

19   organizational representative, but I can't recall if there

20   was —

21         THE COURT:  But, you know, I'm still stuck on, both

22   of you were in agreement, surprisingly, about what the claims

23   are and what Delta is bringing.  I think what you are arguing

24   is that you didn't have an opportunity to depose Miss Brown in

25   any individual capacity to the extent that she's testifying in

1  an individual capacity, or even a 30(b)(6) capacity, now that

2  you say that, on any of these other claims.

3        MR. KERCHER:  I disagree with that, Your Honor, and

4  here's why.  And Miss Holmes and I disagree on that too, we

5  discussed it.

6        It would be different, I think, if the 30(b)(6)

7  witness said this is the information I have about the

8  organization and that is cabined to these ten claims, but also

9  personally I have information about these other claims.

10  That's not what the testimony was yesterday.

11        The testimony was the injury to Delta Sigma Theta.

12  If the witness had other additional information that was

13  personal, I think we would have a hard time — we would have a

14  harder argument here, but because of the nature of her

15  testimony it was classic, frankly, standing testimony about

16  the injury to the organization, the way the organization had

17  experienced the bill.  That's information that we were

18  precluded from obtaining during her deposition, and the

19  information we got from the 30(b)(6) witness influenced the

20  decisions that State defendants made, as they had to, in

21  determining who else they had to depose.

22        THE COURT:  I mean, since Delta is not bringing any

23  claims under these seven other sections, isn't the question,

24  are any of the plaintiffs who are raising claims under 401,

25  06, 07, 09, 502, 504 — pardon me — 502, 604, and 607, are

2184

1  they having to rely on Miss Brown as a witness or did they

2  have other independent witnesses to support any of their

3  claims under any of those sections?

4        MISS HOLMES:  Well, I don't want to speak for all the

5  plaintiffs here.  I think, you know, on the plaintiffs' side,

6  we challenge a number of provisions of SB 1 and the testimony

7  from witnesses is complimentary, and instead of, you know, one

8  plaintiff group calling Miss Brown as a third-party witness,

9  in addition to the HAUL plaintiffs calling her as an

10 organizational representative witness, it is certainly more

11 streamlined to just present her testimony once.

12        I can't say that whether or not other plaintiffs need

13 to rely on her testimony, but typically any testimony that is

14 relevant to any of the issues in trial should be allowed to

15 come in.

16        THE COURT:  But the argument from the State is they

17 have been prejudiced by the fact that they didn't get to take

18 a deposition and examine her on these claims that she's

19 allegedly raising for the first time now on the stand, and so

20 that's their claim.  How do we get around that?

21        MISS HOLMES:  I would dispute two things.  I don't

22 think she has raised for the first time on the stand that

23 these are claims that they are bringing.

24        THE COURT:  Well, if they are not claims that she's

25 bringing, so you are telling me that they are -- she's

1  bringing testimony in support of attacks on these sections,

2  but you've already admitted that she's not bringing those

3  claims and Delta is not bringing those claims.

4      MISS HOLMES:  That's right.  And in the testimony

5  yesterday there was a portion of testimony that walked through

6  various sections of SB 1 and asked have they injured Delta

7  Sigma Theta.  That line of questioning was limited to the

8  sections that Delta challenges directly.

9      There were some more general questions about why they

10  opposed SB 1 and the predecessor bills in the legislative

11  session and the concern they had about those bills.  Those

12  touched on areas beyond just the sections that we challenged

13  officially in this lawsuit, but I would not characterize her

14  testimony as suddenly bringing new challenges to this law.

15      THE COURT:  So I'm trying to struggle with the

16  concept of prejudice to the State here by letting her testify

17  as to these seven other sections.  I mean, how are you

18  prejudiced?

19      MR. KERCHER:  If this is information that was going

20  to be elicited at trial, then we should not have been

21  precluded from discussing provisions that DST was not

22  challenging at the 30(b)(6) deposition of DST.  That's only

23  fair.

24      MISS HOLMES:  And on that point, Your Honor, my

25  understanding of the deposition is that the counsel went off

```
 1  the record to clarify which sections DST was actually
 2  challenging -- and please correct me if I'm wrong -- and then
 3  the State limited its questions to just those sections.
 4       I don't believe there was any motions practice about
 5  trying to get anything to compel testimony about other areas
 6  that they might have knowledge about, but I don't know that
 7  there was any sort of effort on the State to go beyond after
 8  that clarification as to what was being explicitly challenged
 9  by Delta Sigma Theta whether there were any efforts to go
10  beyond those sections of SB 1.
11       THE COURT:  So, I mean, this is a trial to the bench.
12  I think the easiest way for me to do is, let's just continue
13  Miss Brown's testimony here.  With regard to those seven other
14  sections, when I start going -- making my detailed findings of
15  fact and conclusions of law, the easiest way for me to do this
16  is to excise Miss Brown's testimony on those seven sections,
17  and then let's just see what else you-all have.  And if you
18  have enough to survive or get your verdict on those things, I
19  won't need Miss Brown's testimony, right?
20       MISS HOLMES:  And if I could just clarify, so we had
21  Miss Brown testify yesterday.  We are now in the midst of Miss
22  Watkins Jones' testimony.  She was not deposed, and so our
23  position is that there was no effort to preclude the State
24  from taking her deposition or inquiring into whatever they
25  wanted to from Miss Jones.
```

```
 1              THE COURT:  Wait a minute.  I'm sorry.  Who was the
 2    30(b)(6) rep at deposition?
 3              MISS HOLMES:  Michelle Brown.
 4              THE COURT:  The same person who was here yesterday?
 5              MISS HOLMES:  Yes.
 6              THE COURT:  Okay.
 7              MISS HOLMES:  But now we have a witness who we are
 8    currently in the midst of her direct, Miss Jones, Sharon
 9    Watkins Jones, who was not deposed by the State, there was
10    never any dispute about —
11              THE COURT:  I'm sorry.  I thought we were going back
12    to Miss Brown.  You are right, we are going back to Miss
13    Watkins Jones.  So, well, that's an interesting point.  I
14    mean, if Miss Watkins Jones was never deposed by you-all, how
15    are you arguing you are prejudiced by her talking without
16    these other sections?
17              MR. KERCHER:  Precisely, because as the Court knows
18    there have been many witnesses who were designated.  The State
19    defendants had to make choices about who they would depose and
20    some of those decisions were informed by information we got,
21    for example, in 30(b)(6) witness testimony.
22              So when we understood from the 30(b)(6) deposition of
23    DST that they would only be providing testimony on the
24    provisions that they challenged, we had to make executive
25    decisions about whether or not we wanted to spend another
```

1  deposition on additional DST witnesses.

2          And, to be clear, and I expressed this to Miss Holmes

3  as we were discussing, if the testimony from Miss Watkins

4  Jones is cabined as to DST, to the challenges that that

5  organization is making, and she has separate independent

6  knowledge about what happened to her under SB 1 regarding

7  other provisions, then I think that that is fair for the

8  testimony.

9          What I do not think that Miss Watkins Jones can do

10 under the current situation is testify about DST and its

11 experiences with the provisions of SB 1 that organization is

12 not challenging.

13         MISS HOLMES:  Your Honor, the State made its

14 decisions about who to depose and not to depose.  We never

15 objected to seeking any discovery as to Miss Watkins Jones.

16 No issues were raised in discovery about her and so I think it

17 would prejudice the plaintiffs to limit her testimony today in

18 any regard.

19         And, in fact, the defendants have inquired of other

20 witnesses in this case into sections of SB 1 that those

21 witnesses' organizations do not challenge.  I believe Judy

22 Bryant from TARA on cross was asked about Section 3.15, the

23 quote-unquote, straight-ticket voting ban, and TARA does not

24 challenge that part of SB 1.

25         So we have a pattern in this case already of

 1  witnesses being questioned in talking about provisions that

 2  their organization does not challenge.

 3          THE COURT:  I'm going to allow the testimony for now.

 4  And again, as I do findings of fact and conclusions of law,

 5  safest course of action for me to do is excise portions of

 6  Miss Watkins Jones' testimony, if it's supported by others,

 7  the point is supported by others, that their testimony is not

 8  challenged to, and then for purposes of appeal this makes this

 9  issue go on moot.

10          I'm going to try to go that direction to the extent I

11  can.  If I can't, then we'll all talk about it in post-trial

12  briefing.

13          MISS HOLMES:  Okay.

14          MR. KERCHER:  Understood.

15          MISS HOLMES:  May I just ask for one clarification?

16          You said you were potentially going to excise

17  portions of Miss Watkins Jones' testimony.  Is the same

18  approach being applied to Miss Brown as Miss Watkins Jones?

19          THE COURT:  Well, no one has asked me to do that yet.

20          MISS HOLMES:  I'm sorry.  I think, Your Honor, you

21  may have flipped the names.

22          THE COURT:  So with regard to Miss Watkins Jones,

23  that's who we are challenging right now.

24          MISS HOLMES:  Okay.

25          MR. KERCHER:  So I'll start at the beginning.

1              Miss Brown testified yesterday as a 30(b)(6) witness.
2  We are challenging her testimony insofar as it addressed
3  provisions not challenged by DST.
4              And with regard to Miss Watkins Jones, we would
5  challenge her testimony regarding the non-DST challenged
6  provisions to SB 1 as well.
7              So we would ask the Court to adopt that approach to
8  both witnesses, if that's the solution the Court has reached.
9              THE COURT:  Yeah.  So with regard to both Miss Brown
10 and Watkins Jones, I'm going to allow the testimony for now.
11 That is subject to me excising on those seven sections their
12 testimony and I'll see if it's supported by any other witness
13 as I evaluate those claims.
14             It could very well be that the Court won't need to
15 rely upon any testimony from Miss Brown or Miss Watkins Jones
16 on those seven challenged sections.  That will make it easy
17 and that will make this dispute moot.
18             In the event I do consider, because there's not any
19 other supporting evidence, those seven sections, we'll all
20 talk about this in post-trial briefing.
21             MISS HOLMES:  Understood, Your Honor.  Thank you.
22             MR. KERCHER:  Thank you for your time.
23             MISS HOLMES:  And with that, plaintiffs recall Miss
24 Sharon Watkins Jones to the stand to complete her direct
25 testimony.

2191
SHARON WATKINS JONES – DIRECT

1          MISS WILLIAMS:  Good morning, Your Honor.  I am

2   Breanna Williams, counsel for the HAUL plaintiffs.

3      (SHARON WATKINS JONES, having been previously sworn,

4   resumed the stand and testified as follows:)

5               DIRECT EXAMINATION CONTINUED

6   BY MISS WILLIAMS:

7   Q.  Good morning, Miss Jones.  I'd like to begin by picking up

8   on the discussion we had yesterday afternoon about the

9   experience you had with a poll watcher while voting, do you

10  remember that conversation?

11  A.  Yes.

12  Q.  Will you briefly describe what your experience was with

13  that poll watcher?

14  A.  Sure.  I entered the polling station and finished with the

15  verification process, received my ticket, and went to the

16  polling booth, a poll watcher had been walking the rows, which

17  are very narrow in this particular polling station which

18  happens to be the David Weekley Center in Northwest Houston,

19  and the rows are very small.

20      There isn't room, really, to do anything except pass in

21  close proximity to voters and the poll watcher continued to

22  walk back and forth between those aisles, squeezing in between

23  the booths, and as I voted, still at the end of the kiosk

24  because I was on the end of the row and sort of walked back

25  and forth, could glance over into my booth at any time, back

SHARON WATKINS JONES - DIRECT

1  and forth, and behind, and as I completed my voting process,

2  followed me, walked behind me as I went to distribute the

3  paper ballot into the box.

4  Q.  About how far away was the poll watcher standing from you?

5  A.  Probably a foot.

6  Q.  When you printed your ballot with your choices, what did

7  the poll watcher do?

8  A.  Stood next to the box as I — or stood next to me, and as

9  I printed it, and walked to the box to deposit it, followed

10 behind me and stood next to the box as I deposited the ballot.

11 Q.  To your knowledge were you doing anything unique that may

12 have drawn a poll watcher's attention?

13 A.  No, I wasn't doing anything other than what I normally do.

14     The only difference is that I did not, as I usually do,

15 have my League of Women Voter's guide with me.  I had nothing

16 in my hands except my ID at this particular time.

17 Q.  The transcript from trial yesterday says that you stated

18 that this incident occurred during the Presidential Election

19 of last year, but there was no Presidential Election in 2022.

20 So would you please clarify for the record when the incident

21 was?

22 A.  Sure.  It was the General Election.

23 Q.  The General Election in November '22?

24 A.  Yes, General Election, November '22.

25 Q.  Are you confident that this incident occurred during an

SHARON WATKINS JONES - DIRECT

 1  election in 2022 —

 2  A.  Yes.

 3  Q.  — after SB 1 had gone into effect?

 4  A.  Correct.  Yes, I am confident.

 5  Q.  How did you feel during this experience?

 6  A.  It was unsettling, especially because of the narrowness of

 7  the passageways and the freedom with which the poll watcher

 8  could loom behind voters, and particularly looming next to me

 9  as I was on the end of the row.

10      It just was a totally different feeling from voting

11  before.  I did not feel like I had privacy and I did not feel

12  as if I had safety or security either as I passed my ballot.

13  Q.  Do you recall what the poll watcher involved in this

14  incident looked like?

15  A.  He was a white male, I don't remember much about what he

16  was wearing except that he either had a T-shirt or badge or

17  something that indicated that he was a poll watcher.

18  Q.  Did the experience that you had with this poll watcher

19  bring any other experiences to mind?

20  A.  It reminded me of some of the things that I learned from

21  my parents and grandparents about feeling intimidated or

22  frightened while casting a vote.

23  Q.  Now I'd like to ask you a few questions about how some of

24  the specific provisions of SB 1 have impacted DST's work as an

25  organization and its members.

2194
SHARON WATKINS JONES - DIRECT

1       First, let's talk about Sections 3.04, 3.12, 3-13, the

2   provisions of SB 1 that eliminate drive-thru voting.  Are you

3   familiar with these provisions?

4   A.  Yes, I am.

5   Q.  Do you know if any DST members in Harris County made use

6   of drive-thru voting in November of 2022?

7   A.  Yes.  I know of two specific members who made use of

8   drive-thru voting.

9       In Harris County, a member of the Bay Area Alumnae

10  Chapter, two members actually, Kimberly Baker and Sonia Baker

11  used drive-thru voting with their two elderly parents, one of

12  whom is mobility challenged, and it made it possible for the

13  four of them to vote together without the burden of navigating

14  separately to vote or having to take their elderly parents

15  inside the voting polls.

16      Also I'm aware that from the Houston Area Chapter, Janine

17  Johnson helped her mother who is visually impaired vote using

18  the drive-thru voting mechanism.

19  Q.  Does DST have concerns now that drive-thru voting is no

20  longer available?

21  A.  Yes.  The specific examples that I just shared, the Baker

22  sisters from Bay Area Houston Alumnae Chapter, after SB 1 was

23  implemented, they were no longer to all vote the drive-thru,

24  and although their parents qualified to vote curbside, there

25  was the added burden of them parking the car, leaving their

SHARON WATKINS JONES - DIRECT

1  parents in the car to go inside and vote, and that took a

2  length of time, that was burdensome, cumbersome, and could

3  have been dangerous for their parents.

4      And the same is true for Janine Johnson, who had to

5  navigate voting separately from her mother who qualified to

6  vote curbside.

7  Q.  The next provisions of SB 1 that I'd like to ask you about

8  are Sections 3.09 and 3.10 which focus on the hours in which

9  early voting can be conducted and prohibit counties from

10 operating early voting, earlier than 6:00 a.m. or later than

11 10:00 p.m.  Are you familiar with those provisions of SB 1?

12 A.  Yes.

13 Q.  And do you know if DST members in Harris County made use

14 of early voting in November of 2020?

15 A.  Yes.  The Houston Alumnae Chapter surveyed the 240 members

16 who attended their meeting following the General Election in

17 2021, and approximately 84 percent of their members made use

18 of early voting hours, and one percent of their members voted

19 on Election Day in person.

20 Q.  What did the other 15 percent of voters do?

21 A.  Mail-in ballots.

22 Q.  Now, based on that poll, are you aware of whether the DST

23 members, who stated that they voted early used — or voted in

24 hours earlier than 6:00 a.m. or later than 10:00 p.m.?

25 A.  Those that were shift workers made use of the 24-hour

2196

SHARON WATKINS JONES - DIRECT

 1  voting, and those would be members who are medical

 2  professionals, physicians, nurses, and those who are law

 3  enforcement.

 4  Q.  And are you aware of any specific examples of how the time

 5  limitation on early voting hours in Harris County has made

 6  things more difficult for DST members and their families?

 7  A.  Certainly, while the hours may have extended one way or

 8  the other, if it doesn't coincide with your shift, then it's

 9  still not helpful to you and the 24 hours would be your best

10  option.

11  Q.  Will you please tell the Court about Lisa Newman and her

12  husband's experience?

13  A.  Yes.  A member of Delta Sigma Theta, Lisa Newman's husband

14  is a medical professional who had worked a twelve-hour shift

15  and needed to vote and went immediately from his shift to

16  vote.  The voting process took five hours.  He had not had

17  sleep or rest and was injured in a car accident due to the

18  lack of rest, and so a 24-hour voting would have helped him to

19  get the rest that he needed and vote at a time that was more

20  convenient and more -- and less burdensome to him.

21  Q.  I'd next like to ask you about the provision of SB 1 which

22  requires a person who assists voters by simultaneously

23  providing transportation to seven or more voters for curbside

24  voting to fill out a form and explicitly states that poll

25  watchers are entitled to observe this process.  Are you

SHARON WATKINS JONES – DIRECT

1  familiar with this provision?

2  A.  Yes, I am.

3  Q.  How has this provision affected DST's voting assistance

4  work as an organization?

5  A.  It has really made it difficult to recruit members to do

6  this because of the fear of legal repercussion if there are

7  mistakes made or if they inadvertently break the law.

8      And in Fort Worth, this is particularly frightening

9  because members of Fort Worth are keenly aware of how Crystal

10 Mason was sentenced to five years for voting because she

11 thought she was eligible to vote and she mistakenly cast her

12 ballot, and so that is really fresh on the minds of members of

13 Delta Sigma Theta in Fort Worth and the Fort Worth Chapter had

14 routinely assisted the seniors at Friendship Senior Center in

15 Fort Worth and none were willing in the 2021 election cycle to

16 do this because of the fears associated with penalties.

17 Q.  You mentioned the Fort Worth Chapter.  Have any other DST

18 Chapters reevaluated the types of voting assistance that they

19 provide —

20 A.  Yes.

21 Q.  — in light of the provision regarding —

22 A.  Yes.

23 Q.  — transportation?

24 A.  Yes, ma'am.  I know that Austin Alumnae has reevaluated

25 the work that they do helping seniors vote, and Bay Area

SHARON WATKINS JONES - DIRECT

1  Houston has reevaluated that as well.

2  Q.  In terms of their reevaluation, what results have they

3  come to?

4  A.  They have not been able to recruit members who are brave

5  enough to assist with senior voters because of the fears of

6  criminal penalties.

7  Q.  Has this provision regarding transporting voters for

8  curbside voting required DST to do any sort of training for

9  volunteers?

10  A.  Yes.  The Bay Area Houston Chapter, which I am a member,

11  conducted trainings in 2021 and 2022 specific to SB 1.

12  Additionally, they invited the Secretary of State to, or

13  staff, to participant in these trainings to ensure the

14  accuracy of the trainings, and in both instances the Secretary

15  of State's Office declined and directed the chapters to the

16  website for information.

17  Q.  The next provision I'd like to ask you about is SB 1

18  Section 6.01 which requires a person who assists voters by

19  simultaneously -- withdrawn.

20      Miss Jones, just to clarify the record, I believe in

21  response to one of the recent questions where you were giving

22  examples of the work that DST Chapters have done, you

23  mentioned a 2021 election.  Was that in 2022?

24  A.  2022.  My apologies.

25  Q.  My apologies.  I also have a clarification for one of my

SHARON WATKINS JONES - DIRECT

1  own questions.  At the beginning of this conversation

2  regarding the form for transporting seven or more curbside

3  voters, I believe that I stated that the relevant provision is

4  SB 1 Section 5.02.  I would like to just correct myself.

5      Do you understand that the relevant section of SB 1 is

6  actually Section 6.01?

7  A.  Yes.

8  Q.  My apologies.

9      The next provisions I would like to ask you about are SB 1

10 sections 6.03 and 6.04 which require people who assist voters

11 with in-person voting to fill out a form disclosing details

12 like whether they received compensation from certain entities

13 and to swear an oath under penalty of perjury.  Are you

14 familiar of these provisions?

15 A.  Yes, I am.

16 Q.  Have these provisions made it harder for DST members to

17 assist elderly voters?

18 A.  Yes.  In the same vein as I described earlier, the threat

19 of criminal penalties is confusing and intimidating.

20 Q.  Have any DST members reevaluated the types of voting

21 assistance that they provide in light of these provisions

22 regarding in-person voting?

23 A.  Yes.  Chapters have shied away from the actual one-to-one

24 assistance and lean more heavily toward voter education.

25 Q.  Have these provisions made any DST members concerned about

SHARON WATKINS JONES – DIRECT

1  providing in-person assistance to voters at the polls?

2  A.  Yes.  Chapters are very concerned about the risk

3  associated with the criminal penalties.

4  Q.  What has DST done to assuage this fear and still achieve

5  its mission?

6  A.  As I mentioned, at least one chapter, and I'm sure several

7  chapters but I give you the example of the Bay Area Houston

8  Chapter, has invited the Secretary of State's Office to

9  clarify and to participate in our trainings for accuracy but

10  they have declined, and so we have been burdened to try to

11  become experts ourselves, and based on the website and

12  materials and to share that information with our chapter

13  members and the constituencies in the communities that we

14  serve and we have done that with virtual webinars as well as

15  in-person education seminars in public libraries and other

16  places where we meet.

17  Q.  Can you say more about what DST has done in its effort to

18  try to become experts for yourself?

19  A.  Sure.  We have invited attorneys to speak on our webinars.

20  We have, you know, reached out to the Secretary of State's

21  Office.  We have partnered with League of Women Voters where

22  applicable.  We have held meetings to review and try to

23  analyze the bill.  We've had to do a lot of just one-on-one

24  with members and also members of the community to try to

25  assuage fears and try to, you know, encourage voters and those

SHARON WATKINS JONES - DIRECT

1  who would help voters to push forward.

2  Q.  The next provision I'd like to ask you about is SB 1,

3  Section 6.05, which requires people who assist voters with

4  mail ballots to provide information including whether they

5  received compensation from certain entities on the mail ballot

6  and subjects them to the possibility of criminal penalty if

7  they do not do so.  Are you familiar with this provision?

8          MR. JOYCE:  Objection, Your Honor.  Mischaracterizes

9  that provision of SB 1.

10          MISS WILLIAMS:  I can restate my question.

11          THE COURT:  Go ahead and restate the question.

12          MISS WILLIAMS:  Sure.

13          I will just use language directly from SB 1 for that

14  provision.

15  BY MISS WILLIAMS:

16  Q.  Miss Jones, the next provision I'd like to ask you about

17  is SB 1, Section 6.05, which requires a person who assists a

18  voter to prepare a ballot to be voted by mail -- well --

19  withdrawn.

20      The next provision I'd like to ask you about is SB 1,

21  Section 6.05, which requires a person who assists a voter with

22  a mail ballot to enter on the official carrier envelope of the

23  voter the person's signature, printed name, and residence

24  address, along with the relationship of the person providing

25  the assistance to the voter and whether the person received or

2202
SHARON WATKINS JONES - DIRECT

1  accepted any form of compensation or other benefit from a
2  candidate campaign or political committee in exchange for
3  providing assistance.
4       Section 6.05 also provides that it is an offense for a
5  person who assists a person with a mail ballot to fail to
6  include this information on the carrier envelope.  Are you
7  familiar with this provision?
8  A.  Yes.
9  Q.  Has this provision and the associated criminal penalty for
10 violating it made any DST members concerned about providing
11 in-person -- or assistance on mail ballots to voters?
12 A.  Yes.  It's the same concerns with the criminal penalties
13 and the fact that, you know, personal information is also
14 included while assisting.  Those are concerns.
15 Q.  What has DST done to assuage this fear and continue
16 working toward its mission?
17 A.  In those same webinars and in-person educational seminars
18 we address this concern and educate those who would help on
19 the rules so that they can feel more confident in helping.
20 Q.  Who develops those webinars and educational tools that --
21 A.  Our members do.  Our chapters do.
22 Q.  And those members would be DST members and volunteers or
23 are they --
24 A.  DST members and volunteers, invited guests who are experts
25 in the area, and -- yes.

SHARON WATKINS JONES − DIRECT

1  Q.  Has this provision regarding assistance for mail ballots

2  required DST to do any sort of additional training for

3  volunteers?

4  A.  Yes.  Our training normally in an election cycle would

5  center solely on how to vote or where to vote, and polling

6  locations, hours of operations, things of that nature, and the

7  training now has to be more enhanced to include information

8  about the criminal penalties and the details of how to assist

9  and not run afoul of these criminal penalties.

10 Q.  Have any DST Chapters reevaluated the types of voting

11 assistance that they provide in light of this provision?

12 A.  Yes.  And our chapters have difficulty finding members who

13 would risk the penalties and who are concerned that they may

14 not be fully knowledgeable of how to assist under the current

15 law.

16 Q.  Has this provision frustrated DST's goal of getting people

17 out to vote?

18 A.  We do our best to remain undaunted because this is what we

19 do, but this law does make it difficult because of the

20 enhanced education and enhanced assuaging of fears that we

21 have to do.

22 Q.  Now that we've discussed the impact that the provisions

23 related to assisting voters in person and assisting voters

24 with mail ballots have had on DST, I'd like to ask a summary

25 question about how these changes have affected DST.  Has it

SHARON WATKINS JONES - DIRECT

1  become more difficult to find volunteers willing to provide

2  assistance to voters?

3  A.  Yes.  In particular, our Delta DEARS, who are seniors who

4  usually form the largest cadre of assistance as Deltas, it has

5  been very difficult to help to assuage their fears and engage

6  them in ways that normally are second nature to us.

7  Q.  In terms of the people who are still willing to provide

8  assistance to voters, has DST's approach to educating them

9  changed post-SB 1?

10 A.  Yes, because we are just as concerned about our members as

11 they are for themselves, and so we really have had to, you

12 know, enhance our training, include more money in our budgets

13 to do the type of training that's necessary to mobilize our

14 members and mobilize voters.

15 Q.  Has SB 1 required DST to spend more resources on voting?

16 A.  Yes.  The Bay Area Houston Chapter normally has a budget

17 of around $700 per election cycle to spend on voter

18 registration drives and mobilization efforts, and because of

19 the added training and enhanced education needing to be done

20 around SB 1, the budget was increased to $1,000 for the

21 2022-2023 year.

22 Q.  Would you anticipate that other chapters in Texas would

23 have similarly responded to SB 1?

24 A.  I would anticipate that.

25 Q.  Has SB 1 required DST to spend more time on their voting

SHARON WATKINS JONES – DIRECT

1  efforts?

2  A.  Yes.  More time, more —— especially the one-on-one

3  conversations with members who would normally be volunteers

4  for the assistance piece of the voter projects, more time

5  analyzing the law, reassuring members that they can continue

6  to assist voters, that they can continue to transport voters

7  under the provisions, and also sort of the reeducation of

8  voters following those things that were available to them in

9  2020 that are no longer available to them.

10  Q.  Has the proportion of time that DST spends on its voter

11  mobilization efforts and its voter education efforts changed

12  in response to SB 1?

13  A.  It has decreased.  You know, we are volunteers with

14  families, with jobs, with obligations, responsibilities, and

15  that time that many members need to spend on their jobs and

16  their families and volunteering is a piece of their life.

17  That time of volunteering has been focused on education in

18  ways that draw from mobilization which would be a normal part

19  of our efforts.

20  Q.  In terms of the comparison, before SB 1 how much of DST's

21  time related to voting would you estimate was spent on voter

22  mobilization versus voter education?

23  A.  Before SB 1 we could focus 100 percent of our time on

24  registration and mobilization.  After SB 1, probably

25  50 percent of that time is spent on education.

SHARON WATKINS JONES - DIRECT

1  Q.  And if not absolutely 100 percent on mobilization, would

2  you estimate that the proportion was heavily skewed toward

3  mobilization?

4  A.  Yes.  Of course, you know, laws change frequently, but SB

5  1 was such a paradigm shift and had so many provisions that

6  were of concern that our time was skewed toward explaining SB

7  1.

8  Q.  And how has that proportion changed now after SB 1?

9  A.  We still find that members are confused as to what they

10  can and can't do and what the penalties are, and as well as

11  the general public or rather the communities that we serve

12  need a lot of explaining of SB 1.

13  Q.  Just a few more questions to close.  In general, what

14  message do you think SB 1, as a whole, gives to voters?

15  A.  The message to us is clear, there were provisions made

16  that made voting more accessible, more common sense,

17  commonsensical, that's an expression I can use, and as a

18  result of voters of color availing themselves of drive-thru

19  voting, 24-hour voting, and then having those taken away, the

20  message is that we don't want you to vote, we don't want to

21  make it an experience that is less burdensome.

22  Q.  What message do you believe SB 1 gives to election

23  workers?

24  A.  We have many members of Delta Sigma Theta who are election

25  workers who are reevaluating that work and the message is that

2207
SHARON WATKINS JONES - DIRECT

1  they aren't trusted, they are not trustworthy, and the message
2  is pretty clear that, you know, this work should be heavily
3  scrutinized to the point where you might not want to return.
4  Q.  And what message do you think SB 1 gives to poll watchers?
5  A.  Well, the message to poll watchers seems to be to run free
6  and catch people doing things that make them uncomfortable and
7  things that are intimidating so that voters would be less
8  likely to want to vote.
9  Q.  One final question, Miss Watkins Jones.  Is there anything
10  else that you would like to share about SB 1's impact on
11  various communities of interest to DST?
12  A.  I think that our members feel attacked by SB 1.
13      As I mentioned before, we have generational trauma as it
14  relates to the voting experience in Texas.  And those of us
15  like me, I'm blessed to have a 103-year-old grandmother,
16  parents in their 80s, who being share with me those stories
17  and have expressed that this is a Deja Vu in a sense and so
18  the impact on us is great.
19      This is a substantially upsetting turn of events for those
20  of us who really care about the voting process and care about
21  the ability to exercise our vote.
22          MISS WILLIAMS:  Thank you.
23          Your Honor, I pass the witness.
24          THE COURT:  Anything else from this side?  Nothing.
25          Any cross?

2208
SHARON WATKINS JONES - CROSS

1          MR. JOYCE:  Yes, Your Honor.

2                    CROSS-EXAMINATION

3     BY MR. JOYCE:

4     Q.  Good morning, Miss Jones.

5     A.  Good morning.

6     Q.  Thank you for being here and thank you for you and your

7     sorority providing us with a pop of color every single day.

8     A.  You're welcome.

9     Q.  My name is Jamison Joyce.  I'm with the Attorney General

10    and I represent the State defendants.  So you are appearing as

11    a witness on behalf of Delta Sigma Theta, is that right?

12    A.  Yes.

13    Q.  I think throughout I might refer to "you," but I'm

14    referring to your sorority which is a plaintiff here.

15         So I'd like to start with, you know -- and I apologize, I

16    might hop around a little bit, but in terms of some of what

17    you were talking about regarding 4.07 regarding the provision

18    on poll watchers, you mentioned on direct when voting during

19    the 2022 November General Election that poll watchers were

20    standing by and you were -- something along the lines of they

21    were too close and that you were uncomfortable?

22    A.  Yes.

23    Q.  And I believe I got this right, but you said that you did

24    not raise your concerns to any poll workers, is that right?

25    A.  I said that.

SHARON WATKINS JONES - CROSS

1  Q.  And you were able to successfully cast your ballot?

2  A.  I did.

3  Q.  Okay.  Let's see.  On 5.02 regarding mail ballot

4  applications that need to match, I just wanted to ask about, I

5  believe you said the woman's name was Rose Mary McGowan, she

6  had a mail-in ballot that was rejected for not including

7  information under the privacy flap?

8  A.  Yes.

9  Q.  And you mentioned that she was able to successfully vote

10  in person, is that right?

11  A.  With great risk to her health, she did.

12  Q.  So let's see.  3.04 regarding the lack of curbside voting

13  unless voters qualify.  I believe you mentioned that you had

14  several members who still managed to qualify under this

15  provision and voted curbside, is that right?

16  A.  Are you referring to the Baker family?

17  Q.  I believe so, yes.

18  A.  The Baker family was able to -- two of the members who are

19  disabled curbside voted but then had the burden of sitting in

20  their car so that their caregiver could go inside to vote.

21  Q.  Okay.  And you are aware that prior to 2020 curbside

22  voting was not widely available in the state of Texas?

23  A.  It was available, perhaps not widely.

24  Q.  In terms of 3.09, the expanded hours.  Let's see.  Under

25  SB 1 it was expanded for early voting to allow for 16 out of

SHARON WATKINS JONES - CROSS

 1  24 hours to be available for early voting, does that sound
 2  right?
 3  A.  Say that again, please.
 4  Q.  This provision expanded the early voting hours to no
 5  earlier than 6:00 a.m. and no later than 10:00 p.m., meaning
 6  that there were -- that means there were 16 out of 24 hours
 7  that are available for voting?
 8  A.  Is this in all counties?
 9  Q.  Under SB 1, that is correct.
10  A.  If you are reading the statute, I defer to you that that
11  is how the statute reads.
12  Q.  And if you want, we can bring it up, but in Texas we have
13  two weeks of early voting for an election, is that true?
14  A.  Yes.
15  Q.  And this has been -- early voting has been available in
16  Texas since the mid-'80s, correct?
17  A.  I remember when it was installed, yes.
18  Q.  And so you are aware that prior to 2020, 24-hour voting
19  was not widely allowed in Texas?
20  A.  Still allowed, but not widely.
21  Q.  So would it be fair to say that this provision reaffirms
22  the status quo from prior to the pandemic of 2020?
23  A.  I'm not understanding what you mean by "status quo."
24  Q.  Sure.  What we established, that prior to 2020, 24-hour
25  voting was not a policy that was adopted by the State of

 1  Texas?

 2  A.  Okay.

 3  Q.  So what I'm asking is that this provision reaffirms the

 4  status quo, it takes us back to how things were prior to 2020?

 5          MISS WILLIAMS:  Objection, Your Honor.

 6          THE COURT:  You have to be more specific than that.

 7          MISS WILLIAMS:  This question mischaracterizes the

 8  witness' prior testimony.

 9          THE COURT:  That's overruled.

10  BY MR. JOYCE:

11  Q.  Would you like me to ask it again?

12  A.  Please.

13  Q.  So as we've established, that prior to 2020, 24-hour

14  voting was not allowed in Texas, and so this provision simply

15  returns us to that status of 24-hour voting?

16          MISS WILLIAMS:  Objection, Your Honor.  This question

17  mischaracterizes the statute and the state of the law in

18  Texas.  It also calls for a legal conclusion.

19          THE COURT:  That second part is sustained.

20          Next question.

21  BY MR. JOYCE:

22  Q.  Regarding DST's challenge to Section 3.10, the last

23  Saturday of early voting must be open 12 hours.  So this

24  provision sets a floor on the last Sunday before voting and

25  ensures that people can vote on a Sunday, right?

2212
SHARON WATKINS JONES - CROSS

1   A.  It does.

2   Q.  And you haven't identified anyone in your organization who

3   was not able to vote because of this provision?

4   A.  I have not, but I can tell you that we do have members who

5   are shift workers who work on Sundays, hospitals are certainly

6   open on Sundays.  Those who work in the oil and gas industry

7   in the Harris County area, those plants are open on Sundays.

8   There are a lot of manufacturing positions who work on

9   Sundays.  My husband, in particular, works for a trucking

10  company and freight does not stop moving on Sundays.

11  Q.  Certainly.  I absolutely understand that and I appreciate

12  their services but this provision does not mandate they vote

13  on a Sunday.

14  A.  Okay.

15  Q.  So you didn't have any members of your organization who

16  because of this provision were not able to vote?

17  A.  I did not offer those as an example.

18  Q.  Let's talk about 3.12 and 3.13.  I believe you highlighted

19  the aspect of drive-thru voting.  You're not aware of any

20  county other than Harris County in 2020 that allowed for

21  drive-thru voting, is that right?

22  A.  I am aware that Harris County is a big target of this

23  bill.

24  Q.  I appreciate that, but going back to my question, you're

25  not aware of any county other than Harris County which allowed

SHARON WATKINS JONES - CROSS

1   for drive-thru voting, right?

2   A.  I'm not.

3   Q.  Okay.  And because of this provision, you haven't

4   identified anyone who was not able to vote at all because of

5   this provision?

6   A.  I have not offered any examples of that.

7   Q.  In terms of let's move on to Section 3.15, and I guess we

8   can also lump in 4.01 because I believe you were talking about

9   the provision regarding straight-ticket voting.  In states

10  that voting system —

11          MISS WILLIAMS:  Objection, Your Honor.  That is

12  beyond the scope of direct.  We didn't ask about

13  straight-ticket voting.

14          THE COURT:  That's overruled.

15  BY MR. JOYCE:

16  Q.  The provision 3.15 states that voting system ballots may

17  not be arranged in a manner that allows for a political

18  party's candidates to be selected in one motion or gesture.

19  Are you aware that in 2017 the legislature ended the practice

20  that allowed for straight-ticket voting?

21  A.  I'm aware of that.

22  Q.  4.12, moving on to the next provision.  Let's see.  It

23  requires that an election official receive a marked mail-in

24  ballot delivered in person and record the voter's name,

25  signature, and type of identification on a roster.  So it's a

SHARON WATKINS JONES - CROSS

1  fact that in-person delivery can't be dropped off but it must
2  be delivered to the election official, that's your concern
3  with this provision?
4  A.  Repeat your question.  You started off talking about
5  straight ticket and then you veered into the --
6  Q.  Sure.  I'm just trying to knock off those provisions one
7  at a time because we covered a lot of ground.
8      Regarding 4.12, it requires that an in-person delivery of
9  a ballot, it can't simply be dropped off but it must be
10 delivered to an election official, is that your understanding?
11 A.  Is this the provision that provides for the one ballot box
12 for returning mail-in ballots?
13 Q.  4.12.  I don't think it specifies one specific ballot box
14 but I can bring the provision up if you like.
15 A.  Yes.  Please repeat.  I'm not understanding what you are
16 asking me to comment on.
17 Q.  Sure.  I'm simply asking that you would agree that
18 dropping off a ballot to a physical election official is more
19 secure than simply dropping off at a ballot box?
20 A.  I don't know that I would agree with that.
21 Q.  Okay.  Let's talk about voting assistance.  I think you
22 addressed some of this in 6.01, 6.03, 6.04, and 6.05.
23 Starting with 6.01, it specifies that a poll watcher may
24 observe the entrance or curbside voting and it also requires
25 that a person assisting seven or more voters complete a form

SHARON WATKINS JONES - CROSS

1   provided by the election officer.  Do you recall that

2   provision?

3   A.  Yes.

4   Q.  Now, you mentioned that on direct the Austin Alumni

5   Chapter stopped providing voter assistance due to this

6   provision, is that correct?

7          MISS WILLIAMS:  Objection, Your Honor.  That

8   mischaracterizes the witness' prior testimony.

9          THE COURT:  That's overruled.

10  BY MR. JOYCE:

11  Q.  So you mentioned that the Austin Alumni Chapter stopped

12  providing voter assistance due to various SB 1 provisions?

13  A.  I mentioned that members of the Austin Alumnae Chapter

14  were reticent to participant in some of the activities that

15  they previously had participated in.

16  Q.  And as far as you know, no one in that chapter spoke to

17  the Travis County District Attorney to ask whether their

18  previous voter assistant efforts would result in prosecution,

19  was that right?

20  A.  I didn't testify as to whether they spoke to the

21  Travis County District Attorney.

22  Q.  So as far as you know, they never sought clarification

23  from the Travis County —

24  A.  I wouldn't — I would not go so far as to assume that, but

25  I would say that I do not know.

SHARON WATKINS JONES - CROSS

1  Q.  Okay.  And as far as you know, no one has been prosecuted

2  for assisting voters, is that right?

3  A.  I am not aware of anyone having been prosecuted.

4  Q.  And do you know anyone who has been threatened with

5  prosecution under SB 1?

6  A.  It is my understanding that SB 1 is the threat.

7  Q.  So, specifically, you are aware of no law enforcement

8  authority which has threatened prosecution for violation of SB

9  1?

10  A.  There have not been any opportunities for a law

11  enforcement official to threaten a member of Delta Sigma

12  Theta.

13  Q.  So over the course of one and a half years of this law on

14  the book, there have not been any opportunities for

15  prosecution?

16  A.  Members of Delta Sigma Theta who do assist voters, who do

17  provide education and assistance have followed the letter of

18  the law.

19  Q.  Okay.  Let's discuss 6.03 more specifically regarding a

20  person other than an election officer who assists a voter must

21  complete a form that specifies the relationship to a voter and

22  whether they receive compensation from a candidate, campaign,

23  or political committee.  So you are aware of this provision?

24  A.  Yes.

25  Q.  And let's see.  I think, I believe it was this provision,

SHARON WATKINS JONES – CROSS

1   but you said on direct that the San Antonio Alumni Chapter no

2   longer sends out applications for ballot by mail due to fear

3   of prosecution under SB 1, is that right?

4   A.  They no longer send applications by mail because they

5   cannot receive these applications from the election officials

6   and it is an undue burden for them to print applications to

7   distribute, as well as the applications that come from the

8   election office are on card stock and has all of the trappings

9   of an official election ballot.

10      When you print, it doesn't have that same paper, or guard

11  tops, or any of the indications that it is official, and so

12  members and committee members are reticent to use the printed

13  mail-in applications.

14  Q.  I appreciate that clarification.  So it sounds like it's

15  due to a variety of factors, including the expense, the

16  hassle, everything else, and not so much strictly due to the

17  fear of prosecution under SB 1?

18  A.  I think the fear of prosecution looms heavy over the

19  entirety of SB 1 and that many members may be concerned of —

20  for that reason.

21  Q.  And these members, as far as you know, did they seek

22  clarification from the Bexar County District Attorney to ask

23  whether this provision would cause their efforts to result in

24  prosecution?

25  A.  They consulted with Bexar County who informed them that

SHARON WATKINS JONES - CROSS

1  they could print -- individuals can print mail-in ballots but

2  that the office could not distribute the mail-in ballots in

3  bulk.

4  Q.  Understood.  So, just to be clear, they did not seek

5  information from the Bexar County District Attorney regarding

6  their fear of prosecution?

7  A.  I can't speak for what the specific conversation was with

8  the election officials.

9  Q.  And as far as you know, no one has been prosecuted for

10 sending an application for a ballot by mail to voters?

11 A.  As far as I am aware, members of Delta Sigma Theta

12 Sorority, Incorporated, and the Texas Chapters that I can

13 speak to have followed the letter of the law.

14 Q.  Okay.  And so you are not aware of anyone who has been

15 threatened with prosecution under this provision?

16 A.  There would be no reason for the threat, except that SB 1

17 itself is the threat.

18 Q.  Let's see.  Moving on to 6.05.  It requires the person

19 providing assistance to provide information on the carrier

20 envelope, including the relationship to the voter and whether

21 the person received compensation from a candidate, campaign,

22 or political committee.  Now, you haven't identified a member

23 of DST who refused to provide the information required in this

24 section, right?

25 A.  Repeat your question.

2219
SHARON WATKINS JONES — CROSS

1    Q.  Sure.  Just going to, as you've been saying, DST has been
2    following the letter of the law, so you haven't identified a
3    specific member who has refused to provide the information
4    required by this provision, right?
5    A.  We would not refuse to abide by the law.
6    Q.  And you haven't identified anyone in your organization who
7    is unable to vote because of this provision?
8    A.  I'm not aware of that.
9    Q.  Now, 6.04, which modified the oath of assistance, you are
10   aware of this provision?
11   A.  Yes.
12   Q.  Now, it was already illegal for an assister to coerce or
13   pressure a voter, is that right?
14   A.  That's my understanding.
15   Q.  And so your concern is due to the oath, is that right?
16   A.  The concern is the threat of criminal penalties for
17   assisting and the fear of inadvertent mistakes that would lead
18   to criminal prosecution.
19   Q.  So the penalty of perjury?
20   A.  That is the penalty.
21   Q.  Now, you swore an oath under penalty of perjury today, did
22   you not?
23   A.  Yes.
24   Q.  That you would testify truthfully under penalty of
25   perjury?

SHARON WATKINS JONES - CROSS

1   A.  That is correct.

2   Q.  But you are here nonetheless.

3   A.  I am here.  And as I mentioned before, the generational

4   trauma of voter intimidation is a looming fear and concern to

5   our members and to the communities that we serve.

6   Q.  Now, the last thing I wanted to ask was regarding the

7   resources that your organization uses.  Now, one of the main

8   activities that your sorority engages in is voter education,

9   is that right?

10  A.  Yes.

11  Q.  And this happens whenever provisions of the election code

12  changes?

13  A.  It happens every election cycle.

14  Q.  And you've been providing education on the election code

15  for some time, is that right?

16  A.  Yes.

17  Q.  And would this include back in 2014 when the 12th

18  Legislature passed a voter ID law?

19  A.  Yes.

20  Q.  What about with redistricting, do you provide educational

21  events whenever the legislature redistricts?

22  A.  Yes.

23  Q.  So whenever the law changes, you reeducate people?

24  A.  We do, but in this instance SB 1 had so many sweeping

25  changes that we had to enhance our training.  It took more

SHARON WATKINS JONES - CROSS

1  time and more resources.
2  Q.  So but for SB 1 you would not be providing educational —
3  A.  We would always provide educational training, but SB 1 had
4  so many new provisions and so many reasons to be fearful that
5  our training was enhanced and more resources were applied.
6  Q.  Understood.
7          MR. JOYCE:  Thank you, Your Honor.  I pass the
8  witness.
9          THE COURT:  Anything else on this side?
10          MR. CAPOZZI:  Yes, Your Honor.
11  BY MR. CAPOZZI:
12  Q.  Good morning, Miss Watkins Jones.  How are you today?
13  A.  I'm fine.  How are you?
14  Q.  I'm well.  Thank you for taking the time to be here today.
15  Just a few questions for me.
16      How long have you been in the leadership in DST?
17  A.  Less than five years.
18  Q.  So that would be 2017?
19  A.  Um-hum.
20  Q.  You talked about curbside voting and a member of DST, I
21  think Miss Johnson, who voted with her mother, is that right?
22  A.  Yes.
23  Q.  And so after SB 1 Miss Johnson has to vote — when she
24  takes her mother to vote curbside, her mother can still vote
25  curbside, right?

2222
SHARON WATKINS JONES - CROSS

1  A.  Yes.

2  Q.  And Miss Johnson has to vote in another way, right?

3  A.  Yes.

4  Q.  Do you know whether Miss Johnson voted in 2022?

5  A.  Deltas will endure the hardships that are put in front of

6  us to vote, and while burdensome we will vote but many of the

7  communities that we serve are so concerned and may not have

8  our same conviction and so it is our duty to help to educate

9  them so that they press through.

10 Q.  Thank you for that, but going back to Miss Johnson, do you

11 know whether she voted in 2022?

12 A.  If she is a Delta, I am certain that she pressed through

13 the burden of voting with her mother who is visually impaired.

14 Q.  Thank you.  You mentioned a survey conducted by the

15 Houston Chapter about the percentage of members that used

16 early voting, right?

17 A.  Yes.

18 Q.  I believe you said 84 percent of members in the survey

19 said they used early voting, right?

20 A.  That's correct.

21 Q.  The survey didn't ask what time people voted during early

22 voting, right?

23 A.  No.  This was an informal polling of the membership during

24 a membership meeting.

25 Q.  Okay.  So the survey didn't -- I'm sorry.  Strike that.

2223

SHARON WATKINS JONES – CROSS

1    So you didn't identify a specific member who previously

2 voted between 10:00 p.m. and 6:00 a.m. during early voting,

3 right?

4 A.  This particular poll of members did not include that

5 information.

6 Q.  So beyond the poll, in your testimony you didn't identify

7 a member of Delta Sigma Theta who previously voted between

8 10:00 p.m. and 6:00 a.m., right?

9 A.  That poll didn't require the answer to that question.

10 Q.  I appreciate the clarification about the poll, but just

11 let's just put the poll —

12 A.  I was speaking to the poll.  I wasn't speaking to any

13 other information that I might have.

14 Q.  That's fair.  So let me ask the question a different way.

15    Are you aware of a specific member of Delta Sigma Theta

16 who previously voted between 10:00 p.m. and 6:00 a.m.?

17 A.  Not based on that information that I shared regarding the

18 poll.

19 Q.  Based on other information, are you aware of a specific

20 voter?

21 A.  No.

22 Q.  You talked about some members of Delta Sigma Theta being

23 concerned about providing voter assistance, right?

24 A.  I did.

25 Q.  But you didn't identify a specific member of Delta Sigma

SHARON WATKINS JONES – CROSS

1   Theta unwilling to provide voter assistance in 2022, right?

2   A.  I did not speak of a specific member but I have knowledge

3   that members are concerned and that some members did not

4   assist because of their concerns.

5   Q.  Okay.  Do you know how many members of Delta Sigma Theta

6   volunteered to provide voter assistance in 2018?

7   A.  I don't know the specific number.

8   Q.  Do you know how many or roughly how many volunteered in

9   2022 to provide voter assistance?

10  A.  I don't have a number for you.

11  Q.  You talked about having to update —— strike that.

12      You talked about how chapters of Delta Sigma Theta have

13  had to update their trainings based on SB 1, correct?

14  A.  Yes.

15  Q.  And these trainings previously focused —— strike that.

16      These trainings provide the rules on how to vote and also

17  discuss the rules in SB 1, right?

18  A.  Ordinarily our trainings —— or our educational seminars

19  prior to an election cycle had more to do with voting hours,

20  voting locations, polling locations, if there is an update on

21  the law, such as the voter ID law, that they are to be done in

22  those educational settings.

23  Q.  So to hear then the training still focused on the rules

24  for voting, the hours, the candidates, but they also have to

25  focus on the rules in SB 1, right?

2225
SHARON WATKINS JONES - CROSS

1  A.  Yes.

2  Q.  I believe you testified, I think you said exactly, "of

3  course laws change," right?

4  A.  They do.

5  Q.  And so when the laws change, Delta Sigma Theta will have

6  to update its trainings for the public and the members on how

7  to vote, right?

8  A.  That is true, and in this instance SB 1 fundamentally

9  altered that training.

10  Q.  So if the Court got rid of all the provisions in SB 1,

11  just hypothetically, you would have to retrain and you

12  would — strike that.

13      If the Court got rid of all the provisions in SB 1, you

14  would have to update your trainings to account for those

15  changes as well, right?

16  A.  I believe the previous attorney spoke about a status quo,

17  and if SB 1 was stricken, we would use previous trainings that

18  would reflect what we were previously doing.

19  Q.  So you would update your current trainings and they would

20  be more like the old trainings, right?

21  A.  They would be whatever they needed to be to get voters to

22  the polls.

23          MR. CAPOZZI:  That's all I have.  Thank you for your

24  time.

25          THE COURT:  Anything else over here?

SHARON WATKINS JONES - CROSS

1          MR. NICHOLS:  Just very, very briefly.

2    BY MR. NICHOLS:

3    Q.  Good morning, Miss Watkins Jones.  I'm Eric Nichols.  Just

4    a few very few questions for you.  Appreciate your service.

5          Among your service, have you ever served as a poll worker,

6    in other words, somebody working at a polling location?

7    A.  I have not served as a poll worker.

8    Q.  And, accordingly, any information that you would have

9    about DST members wanting to serve or deciding not to serve as

10   poll workers, that would be based on what they — what these

11   individuals would tell you?

12   A.  Yes.

13          MR. NICHOLS:  That's all I have, Judge.

14          THE COURT:  Anything by way of redirect?

15          MISS WILLIAMS:  No redirect, Your Honor.

16          THE COURT:  Thank you, ma'am.  You are excused.

17          THE WITNESS:  Thank you.

18          THE COURT:  And your next witness.

19          MR. BADAT:  Your Honor, we would like to call Ray

20   Shackelford of the Houston Area Urban League as our next

21   witness.

22          Your Honor, Amir Badat for the HAUL plaintiffs.

23          Mr. Shackelford's testimony will be relevant to SB 1,

24   sections 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.12, 5.02, 6.01,

25   6.03, 6.04, 6.05, and 6.07.

RAY SHACKELFORD – DIRECT

1    (RAY SHACKELFORD, having been duly sworn, testified as

2  follows:)

3            MR. BADAT:  May I proceed, Your Honor?

4            THE COURT:  Yes.

5                    DIRECT EXAMINATION

6  BY MR. BADAT:

7  Q.  Good morning.

8  A.  Good morning.

9  Q.  Could you please state your name for the record?

10  A.  Ray Shackelford.

11  Q.  Where do you live, Mr. Shackelford?

12  A.  Houston, Texas.

13  Q.  How long have you lived in Houston?

14  A.  About thirty-three years.

15  Q.  And what do you identify as your race?

16  A.  African-American or Black.

17  Q.  What is your educational background?

18  A.  I got my bachelor of arts in undergrad from Morehouse

19  College in business administration and finance.  My economics,

20  my MBA, from the University of Houston.  Most recently a

21  masters in public policy from Georgetown University.

22  Q.  Is Morehouse an historically black college?

23  A.  Yes, it is.

24  Q.  Why did you decide to go to an historically black college?

25  A.  Well, a few different reasons.  My grandmother lovingly

2228

RAY SHACKELFORD - DIRECT

1  wanted my father to go to Morehouse, but in order for him to

2  get a car he had to stay home so he didn't go.

3      So as a result, from a young age she was always talking to

4  me about Morehouse before I even knew what it was.  I feel

5  like she probably prayed it into existence.

6      And then when it came that time for high school, you know,

7  before I even had a conversation, you know, about the

8  different universities because I had a lot of different

9  options and things, and his thing was that I had the rest of

10 my life to be a minority, and the culture emerging that I

11 experienced in.

12     So we went on a college tour.  The first school was

13 Fleming U [phonetic].  We went to Morehouse.  They offered me

14 a full ride and then some, and so I didn't make it to Hampton.

15 Q.  What was your experience like at Morehouse?

16 A.  It honestly was probably one of the biggest blessings in

17 terms of the friendships, the family that I gained, two of my

18 best friends, brothers, in life I got from Morehouse.

19     Same thing with my Spelman sisters.  My daughter, as a

20 result of her mother being a Spelmanite.  She's what we call a

21 Spel-House baby.  So, yeah, my life has been forever changed

22 as a result of that, but also just the history of our school,

23 the way they develop leaders, and the responsibility that they

24 give us in terms of once we graduate and transition from Men

25 of Morehouse to Morehouse Men, the responsibility that we have

1  to fight for those that don't have a voice.

2  Q.  Mr. Shackelford, are you a registered voter?

3  A.  Yes, I am.  I've been voting since 2004, when I turned 18.

4  Q.  What is your current occupation?

5  A.  I'm a social impact consultant.  I have a firm called

6  Ozark Street Consulting.  I work with nonprofit government

7  entities to educate the community, come up with programs

8  initiatives to transform the community for the better.

9  Q.  Who are your current clients?

10  A.  Currently I have HAUL as my longest-standing client.

11  Q.  And when you say "HAUL," do you mean the Houston Area

12  Urban League?

13  A.  Yes, I do.

14  Q.  What is the Houston Area Urban League?

15  A.  The Houston Area Urban League is one of more than 91

16  affiliates of the National Urban League, which was established

17  in 1910.  We just celebrated 113 years this past Friday.

18      Originally, it was borne out of the need and the desire to

19  create better social and economic conditions for negroes, for

20  black people.  Then in June 19th of 1968 the Houston Area

21  Urban League was founded.

22      Now, originally, as you can imagine, during that time

23  period it was almost exclusively focused on black people

24  around housing jobs and education, and then you fast-forward

25  to when HAUL was founded, it was formed by both white and

RAY SHACKELFORD - DIRECT

 1  black business owners because they saw the need to do the same

 2  thing there in Houston, as things started to transition during

 3  the Civil Rights Era.

 4      Now, you fast-forward to today, we have expanded beyond

 5  housing, jobs, and education.  We still have our Housing

 6  Department.  Workforce Development, Workforce Training.  The

 7  Education Department, Entrepreneurship Center, Health, and

 8  then the work that I do, the Center for Social Justice

 9  Education and Advocacy.

10  Q.  Congratulations on 113 years.

11  A.  Thank you.  It's a major accomplishment.

12  Q.  How does civic engagement factor into HAUL's work?

13  A.  It is one of the cornerstone elements of our organization.

14  Again, when you think about when we were founded, black people

15  did not have the right to vote.

16      And then even when you look at HAUL, we were founded right

17  after we received the right to vote in the heart of the Civil

18  Rights Movement, and it still wasn't welcomed at that time,

19  and so as we seek to create social and economic parity for the

20  underserved, the people that we serve in the community, voting

21  is one of the key tools that allows us to do that and allows

22  community members to make sure that their voice is heard.

23  Q.  What are some of the activities that HAUL engages in

24  related to civic engagement?

25  A.  So we do voter registration drives.  We partner with the

2231
RAY SHACKELFORD - DIRECT

1  County Clerk or the Election Administrator's Office to do
2  voter deputy trainings.  We do our Advocacy U training that I
3  facilitate.  We bring in community members over the course of
4  12 weeks to teach them about different topics, whether it be
5  policing, voting, city government, state government, federal
6  government.
7      I also go into a couple of the schools, Yates and Worthing
8  High School that fall in the field that we serve through our
9  education department to teach the youth about civic engagement
10 advocacy.
11     Just this past spring I scheduled a trip for them to come
12 up to the Legislature to tour Austin to actually get to engage
13 with some of the State Senators and State Reps.  We also do
14 review policy, produce letters of support, or opposition.  We
15 train our volunteers also to do canvassing for Get Out the
16 Vote.  We help prep them for testimony.
17     I feel like that's a pretty good overview of the some of
18 the civic engagement activities.
19 Q.  So you mentioned that you are a social impact consultant
20 for HAUL.  Can you describe your responsibilities as a
21 consultant?
22 A.  Yes.  So I'm responsible for facilitating our Advocacy U
23 cohort, also the youth cohort.  I'm responsible for advising
24 our CEO, Judson Robinson, III, our senior leadership team,
25 both of our auxiliaries, when it comes to anything that's a

RAY SHACKELFORD - DIRECT

1   civic engagement, advocacy, policy.

2       I'm responsible for helping to prep them, when it comes to

3   providing testimony, canvassing.  Also working with our

4   different departments when it comes to potential policy areas

5   related to problematic arms.  So if there's something from an

6   education standpoint that we are looking at, discuss that with

7   our CEO, as well as the head of education department to figure

8   out what those talking points or focus areas should be related

9   to that.

10  Q.  Has addressing SB 1 been a part of your role as a

11  consultant at HAUL?

12  A.  It was not intended to be a part of my role, but, yes, it

13  has consumed a great deal of my time, and as a result taken

14  away from other activities that I would have been able --

15  would have been expected to perform normally.

16  Q.  How long have you been in your role as consultant?

17  A.  It is a little over four years.  I started in August of

18  2019.

19  Q.  I think just a moment ago you mentioned the Center for

20  Social Justice Education and Advocacy, can you tell us what

21  that is?

22  A.  Yes.  So the center was actually borne out of,

23  unfortunately, and still a blessing, the murder of George

24  Floyd.  Like a lot of organizations, we received funding,

25  different commitments.  One of them was to create the Center

RAY SHACKELFORD – DIRECT

1  for Social Justice and Education and Advocacy, and in that
2  it's intended to be a source of knowledge for the community to
3  make sure they understand what it means to vote, the
4  importance of it, how they advocate for themselves, also to
5  look at different policies that could be harmful for the
6  community, and to hopefully train a better generation of
7  leaders than ourselves.
8      That's why we focus on the youth, to make sure they
9  understand things that we probably didn't at such a young age.
10     So those are some of the activities that are, I guess, the
11 goal of the center and its creation.
12 Q.  How long have you been involved with HAUL in any capacity?
13 A.  About 20 years.  I was first introduced to HAUL around 15
14 or 16 years old.  As a result of our previous CEO, Sylvia
15 Brooks and my mother wanted me to get involved in high school.
16 Q.  And what are some of the different roles you've held over
17 the past 20 years?
18 A.  So I've been a client.  Initially, like I said, I was part
19 of the new lights when I was in high school, which is a
20 program centered around mentoring and also college
21 preparation.
22     I've also received services when I was unemployed briefly
23 when it came to my resume and job finding tips.  Also before I
24 started my business I went through the Small Business
25 University in the Entrepreneurship Center.

1    Then from a volunteer perspective, I first joined the
2  Young Professionals in 2009.  I went on to become the local
3  president, also a board member for the Houston Area Urban
4  League, then going on to become the national president in
5  2019.  Currently, I am the immediate past national president.
6    I was also a trustee for the National Urban League.
7    I worked for HAUL from 2010 to 2013 when I was in graduate
8  school, basically working in and/or supporting every
9  department, with the exception of accounting, finance, and
10  fund development, even doing special projects for our CEO.
11    I was also the liaison between HAUL and our auxiliaries.
12    I worked for the National Urban League doing logistics
13  during the national conferences.  I've gone through two of the
14  development programs, the Emerging Leaders, as well as one of
15  their civic engagement programs.
16    So it's safe to say that I am proud of the Urban League.
17  Q.  So I want to ask you a few questions specifically about
18  HAUL as an organization.  How many employees does HAUL have?
19  A.  About 20 full-time employees.
20  Q.  And who does HAUL serve?
21  A.  HAUL serves anyone who needs our services.  From an income
22  perspective, about 39 percent of our clients fall between zero
23  and $10,000; about 35 percent fall between 10 and 40,000.
24    53 percent identify as Hispanic.  57 percent identify as
25  African-American.  About 67 percent identify as women.  One

RAY SHACKELFORD – DIRECT

1  percent actually identifies as LGBTQ+.

2      We also have a segment of our clientele, about 4 percent,

3  that identify as un-housed.  76 percent have some type of

4  employment.  When it comes to seniors, there is about 8 to

5  9 percent that identify as that.

6      So we don't turn away anyone, whether it's, you know,

7  veterans, we also have individuals that have disabilities and

8  different impairments, individuals from immigrant community.

9      Anyone who needs our services, we don't turn them away.

10  There are certain programs that has certain criteria they have

11  to meet, but outside of that we serve anyone who needs our

12  help.

13  Q.  And you've mentioned a couple of times HAUL's clients or

14  HAUL's; clientele.  Is that what you refer to as the people

15  that HAUL serves?

16  A.  Yes.  So anyone who comes in to receive direct services,

17  they have to go through an intake, complete a form.

18      So, for example, with the workforce orientation, they

19  would have to come in and sit through orientation, fill out

20  some paperwork, hear about the services of HAUL.

21      Specifically, or more in detail, those I work for's

22  department will offer, and that's what they would ultimately

23  be designated or how they would be designated as a client.

24  Q.  How many clients has HAUL served over the past year?

25  A.  About 16,681, give or take.

RAY SHACKELFORD – DIRECT

1  Q.  Give or take.  Is HAUL a membership organization?

2  A.  Both of our volunteer auxiliaries are membership-based

3  organizations.

4  Q.  Can you tell us what are HAUL's volunteer auxiliaries?

5  A.  Yes.  We have the Houston Area Urban League Young

6  Professionals, and the HAUL Guild.  The Young Professionals is

7  aged 21 to 40.  The Guild is 41 and up.  These two auxiliaries

8  are intended to support the Houston Area Urban League through

9  volunteerism, fund raising, advocacy, and developing

10  membership, not just within the Urban League, within a broader

11  community.  We also have responsibility for the Dallas/Fort

12  Worth Urban League Young Professionals because there currently

13  is not an affiliate in Dallas.

14      So as the 501(c)(3) or the fiscal entity, we have a

15  responsibility for those three volunteer organizations.

16  Q.  How does someone become a member of one of HAUL's

17  auxiliaries?

18  A.  So you can go to our website, haulyp -- H-A-U-L-Y-P --

19  dot.org.  You fill out the membership application.  There's an

20  annual fee of $75.  So if you join today, on October 3rd, it

21  would expire next year on October 3rd.  So that's how you

22  become a member.

23      And in terms of how you engage, it's up to that

24  individual.  You have some individuals that just pay and

25  become a member.  You have individuals like myself who maybe

1  want to get more active, take on leadership, but we leave that

2  up to each person on how they want to get engaged.

3  Q.  And does that process apply to both HAUL Young

4  Professionals and HAUL Guild?

5  A.  Yes, that is correct.

6  Q.  Approximately how many members are a part of HAUL Young

7  Professionals and HAUL Guild?

8  A.  We have 414 members for HAUL YP.  For the Guild, it's 175.

9  Q.  What is the demographic breakdown of HAUL's members?

10  A.  The majority of all of our volunteer auxiliaries is going

11  to be African-American, in excess of 95 percent.  It's also

12  going to be a majority of women, in excess of probably

13  60 percent.

14  Q.  Now, Mr. Shackelford, I'd like to shift gears a little bit

15  to talk about the legislative debate and enactment of SB 1 in

16  2021.  Are you familiar with SB 1?

17  A.  Yes, I am.

18  Q.  What is it, to your understanding?

19  A.  Senate Bill 1 was passed during the 87th Legislative

20  Session.  It was framed as an election integrity bill.  HAUL

21  views it as a voter suppression bill, specifically because it

22  removed many of the provisions that allowed us to have

23  historic voter turnout in Harris County, around 1.6 million

24  people, almost 70 percent of the registered voters, and a huge

25  turnout when it came to the black and brown community.

1  Q.  Are you familiar with SB 1's predecessor bills from that

2  legislative session, HB 6, HB 3, and SB 7?

3  A.  Yes.

4  Q.  If I refer to SB 1 and these predecessor bills

5  collectively as SB 1, would you understand what I mean?

6  A.  Yes, sir.

7  Q.  Did HAUL do any advocacy related to SB 1?

8  A.  Yes, we did.

9  Q.  What type of advocacy to the legislature did HAUL engage

10  in?

11  A.  So we actually had our CEO, as well as many of our

12  volunteers went up to Austin in an effort to provide testimony

13  in opposition of SB 1.  Unfortunately, they used some

14  different stalling tactics where many of them were not able to

15  give testimony.  The session ended up running well into the

16  evening, so some of them decided to submit written testimony,

17  and others just were not able to give testimony at all.

18  Q.  About how many members or clients of HAUL traveled to

19  Austin to provide testimony?

20  A.  It was about 15.

21  Q.  And I think you just mentioned that some people, because

22  of how long it took, were not able to ultimately provide oral

23  testimony, is that right?

24  A.  That's correct.

25  Q.  What was the purpose of HAUL's advocacy to the

RAY SHACKELFORD – DIRECT

1  legislature?

2  A.  The purpose was to stop SB 1 from being passed.  You know,

3  you look at some provisions that were removed, drive-thru

4  voting, 24-hour voting, again, it allowed many of the

5  communities that HAUL serves to have historic turnout, just

6  because of the ease of access, comfort.

7       You know, voting, again, people getting out to vote in

8  itself is very difficult, so from the purview of HAUL it

9  should be about making it easier and more accessible versus

10  placing more obstacles in the places of voters.

11  Q.  And so what was HAUL's message to the members of the

12  legislature that were in support of SB 1?

13  A.  The message was to not pass SB 1 because it was going to

14  do a great deal of harm to us, our members, our clients, and

15  broader community, and that they should probably focus on,

16  again, expanding access, doing things like automatic voter

17  registration, online voter registration, versus, again, making

18  it more difficult.

19  Q.  Did HAUL attempt to get in touch with any legislators

20  directly?

21  A.  Yes.

22  Q.  Who did HAUL attempt to get in touch with?

23  A.  So we reached out to Representative Cain, as well as

24  Senator Hughes, because they both either wrote, sponsored, or

25  cosponsored Senate Bill 1 or one of the underlying bills.

RAY SHACKELFORD - DIRECT

1        We also reached out to both of our U.S. Senators here in
2   Texas, Senator Cornyn and Senator Cruz.  We reached out to
3   Congresswoman Sheila Jackson Lee, Congressman Al Green,
4   reached out to State Senator Borris Miles, State Senator
5   Royce West.  At the time, Representative Jasmine Crockett, she
6   is now a member of Congress.  Also Senator Carol Alvarado, and
7   Representative Ron Reynolds.
8        I feel like that's everybody.
9   Q.  Did you ultimately make contact with any of these
10  legislators?
11  A.  We were able to get in touch with everyone except for
12  Senator Hughes and Representative Cain.
13  Q.  And do you know why you weren't able to get in touch with
14  Representative Cain and Senator Hughes?
15  A.  No, I do not.
16  Q.  You mentioned a few moments ago that the individuals who
17  traveled to Austin to provide testimony weren't able to
18  provide oral testimony so they provided written testimony, is
19  that right?
20  A.  That's correct.
21  Q.  Do you know if any of the legislators who supported SB 1
22  read that testimony?
23  A.  I do not.
24  Q.  Ultimately SB 1 was enacted, right?
25  A.  Yes.

RAY SHACKELFORD - DIRECT

1  Q.  And do you believe that the legislators who voted for SB 1
2  listened to what HAUL had to say about it?
3  A.  I don't.  There was a point where not just HAUL but a lot
4  of the community spoke out against SB 7, specifically because
5  of Hughes' language both from the Texas Constitution and this
6  manifesto with the period of ballot box which contained a lot
7  of racist language, and so ultimately they removed it.
8      It was directly tied to what they used to call All White
9  Primaries.  Black people were not allowed to vote, so they did
10 remove that language, but outside of that they ignored many of
11 the things we expressed to them.
12 Q.  Now I'd like to discuss some of the provisions of SB 1 in
13 this litigation.  HAUL is challenging several of the
14 provisions of SB 1, right?
15 A.  That's right.
16 Q.  Why is HAUL challenging SB 1?
17 A.  We are challenging SB 1 because it has created harm to us
18 as an organization in terms of diversion of financial
19 resources, as well as human capital.  Also it's been impactful
20 to our members, some of our clients, and also even from the
21 community, the outpour of frustration, anger, confusion.  All
22 of these different elements played a role into ultimately
23 pursuing the action in why we are here today.
24 Q.  So turning to some of the specific provisions of SB 1, are
25 you familiar with the provisions of SB 1 that concern

RAY SHACKELFORD - DIRECT

1  drive-thru voting?

2  A.  Yes, I am.

3  Q.  And to your understanding, what is drive-thru voting?

4  A.  Drive-thru voting, they had multiple locations.  The one

5  that stands out the most is the one that was at NRG, or

6  Reliant.  They would have different tents.  You could drive

7  up.  They would hand you a device.  Once they verified your

8  identity, you would submit the information that they required

9  before you could access the ballot.  Go through the ballot.

10  You know, select individuals you wanted to vote for.  Submit

11  it.  And then return the device to one of the workers from the

12  County Clerk's Office and then drive off.

13  Q.  Was the availability of drive-thru voting important to the

14  communities that HAUL serves?

15  A.  Yes, it was.

16  Q.  Can you tell us why?

17  A.  Because when you look at, you know, some of the

18  individuals we serve, and they have limitations in terms of

19  their availability based on their employers, and even though

20  SB 1 didn't mandate the employers would have to give them time

21  off, we also, you know, live in the real world and so it's not

22  theoretical.  All employers are not necessarily going to give

23  them their time off.

24       And even if they do, they may not compensate them for that

25  time, and when you think about some of the individuals that we

1  serve they need every hour they can get to make sure that they
2  keep their lights on and feed their families.
3  Q.  How has SB 1's elimination of drive-thru voting impacted
4  the communities that HAUL serves?
5  A.  It has either completely suppressed the vote to where some
6  individuals will no longer be able to vote because of
7  obstacles that's placed in front of them.  For other
8  individuals, it's made it much more challenging and just
9  created a lot of confusion honestly.
10  Q.  Turning to another provision, are you familiar with the
11  provision of SB 1 that eliminates 24-hour voting?
12  A.  Yes, I am.
13  Q.  To your understanding, what is 24-hour voting?
14  A.  24-hour voting, again, there was multiple locations, but
15  they chose one day where from 7:00 a.m. to the following
16  morning people had the ability to vote.
17  Q.  And you are referring to the General Election in 2020 in
18  Harris County?
19  A.  Yes, sir.
20  Q.  Was the availability of 24-hour voting important to the
21  communities that HAUL serves?
22  A.  Yes, it was.
23  Q.  Why?
24  A.  Because when you look at the portion of the community that
25  we serve that have shift related roles, they don't always have

2244

RAY SHACKELFORD - DIRECT

1  a shift that aligns with them being able to go vote during the

2  normal voting hours.  You know, sometimes they may have to bid

3  for a shift ahead of time and then by the time election time

4  comes around they can't necessarily move or get off.

5      And so the availability for those that are part of the

6  labor unions and that work in that capacity, being able to get

7  off and go vote without having to impact to their salary or

8  compensation was definitely very beneficial.

9  Q.  How has the elimination of 24-hour voting impacted the

10 communities that HAUL serves?

11 A.  It has, again, created confusion with a lot of individuals

12 because they simply cannot understand why it was taken away.

13 It has created some obstacles for some individuals.  For

14 others, again, just based on the types of jobs that they have,

15 they will not be able to vote going forward.

16 Q.  So now I want to ask you a few questions about mail

17 ballots in Texas.  Are you familiar with the provision of SB 1

18 that requires a mail ballot voter to provide either their

19 driver's license or the last four digits of their social

20 security number on their mail ballot applications and carrier

21 envelopes?

22 A.  Yes, I am.

23 Q.  Now, let me ask you.  Is the option to vote by mail

24 important to the communities that HAUL serves?

25 A.  Yes.  Specifically, that would apply primarily to our

RAY SHACKELFORD – DIRECT

1  clients that identify as senior citizens, or those that may

2  have disabilities.

3  Q.  And why is it important for those categories of

4  individuals to be able to vote by mail?

5  A.  Because it allows them to do so safely.  It allows them to

6  cut down confusion and not feel rushed.  Being, you know, at a

7  polling location sometimes can be an intimidating process,

8  especially with some of the new provisions of SB 1 and the

9  poll watchers, and so it just allows them, you know, a

10  different level of comfort to be able to do so.

11  Q.  How has SB 1's mail ballot ID provisions, how have they

12  impacted the communities that HAUL serves?

13  A.  It has, you know, similar to the removal of drive-thru

14  voting and 24-hour voting, again, created confusion with those

15  populations that we serve, and in some cases made it to where

16  they won't be able to vote going forward as a result of some

17  of those changes.

18  Q.  Sticking on the topic of mail ballots, are you familiar

19  with the provision of SB 1 that adds certain requirements to

20  the process for in-person dropoff of mail ballots?

21  A.  Yes, I am.

22  Q.  Is the ability to drop off a mail ballot in person

23  important for the communities that HAUL serves?

24  A.  Yes, it is.

25  Q.  And tell us why.

2246
RAY SHACKELFORD - DIRECT

1    A.  So when we look at, actually it applies to those same two
2    previously mentioned populations.  Primarily we are looking at
3    seniors and those with disabilities.
4        For some where they have issues with the mail ballot, the
5    drop box is the next best option, and so it was a process that
6    when you add a step there's already a lot for those
7    individuals to do so it just further complicates the process
8    and creates more confusion about with those two demographics.
9    Q.  Now, with the mail ballot ID provisions we were talking
10   about earlier, are you aware of voters whose ballots were
11   rejected due to those provisions?
12   A.  Yes, I am.
13   Q.  Can you tell us a little bit about that?
14   A.  Yes, an individual named Donna Clay actually had her
15   ballot rejected.  She is a retired attorney, and, you know,
16   she basically expressed the confusion with all the different
17   places that you need to place your signature.
18       There's even a story in the chronical about Pamela Gaskin
19   where she's been a registered voter for almost 40 years and
20   because she couldn't remember the ID that she originally used
21   when she registered, her ballot was rejected.
22   Q.  So for a voter whose ballot is rejected, like the voters
23   you just mentioned, how does the ability to drop off a mail
24   ballot factor into their ability to ultimately cast their
25   vote?

2247
RAY SHACKELFORD - DIRECT

1   A.   It's critical for them to be able to cast their vote.  You

2   know, again, where we are talking about seniors and

3   individuals with disabilities, probably more so than any other

4   group that votes you should be trying to making it as easy and

5   as secure as possible and the changes that were made did the

6   opposite.

7       It made it more complex, more confusing, and, again, in

8   some cases it's going to make it to where those individuals

9   won't be able to vote going forward.

10  Q.   Mr. Shackelford, I'd like to ask you about another

11  provision of SB 1 that outlaws straight-ticket voting.  Are

12  you familiar with that?

13  A.   Yes, I am.

14  Q.   What is —

15          MR. BERG:  Objection.  Mischaracterizes the

16  legislation.

17          THE COURT:  That's overruled.

18  BY MR. BADAT:

19  Q.   What is straight-ticket voting?

20  A.   Straight-ticket voting is what allowed an individual,

21  whether they were a Democrat or Republican, to go in and

22  select their party and it would automatically select all the

23  candidates that identified with that party, then they could

24  submit their ballot.

25      And this is something that was especially critical for

RAY SHACKELFORD - DIRECT

1  Harris County because we have one of the longest ballots in

2  the country and so it is something that historically has

3  created very long lines.

4      And when we don't have that option in one of the largest

5  counties in the country, it just makes the process much more

6  complex, much more confusing, frustrating, and creates a lot

7  of challenges.

8  Q.  Was the availability of straight-ticket voting important

9  to the communities that HAUL serves?

10 A.  Yes, it was.

11 Q.  And how has the elimination of straight-ticket voting

12 impacted those communities?

13 A.  It definitely has made it to where some people don't want

14 to vote anymore.  You know, even for myself, someone who is

15 highly civically engaged, it's a lot to go through, you know,

16 a voter's guide from the League of Women Voters and, you know,

17 look at 100 different races or candidates to figure out who I

18 want to vote for.

19     Now, I take the time to do it, but, again, when we are

20 talking about your average everyday person that has different

21 responsibilities and just trying to keep the lights on, it's

22 kind of difficult to come up with, you know, very convincing

23 reasons where they should put those responsibilities to the

24 side and spend what can be hours to figure out who you are

25 going to vote for.

RAY SHACKELFORD – DIRECT

1  Q.  Finally, I'd like to talk about the provisions of SB 1
2  that require those providing voter assistance, including
3  transportation to curbside voters, and assistance with mail
4  ballots, to disclose certain personal information and sign an
5  oath under penalty of perjury.  Are you familiar with those
6  provisions?
7  A.  Yes, I am.
8  Q.  Is voter assistance important to the communities that HAUL
9  serves?
10  A.  It absolutely is.
11  Q.  Why?
12  A.  We have individuals that, again, whether senior citizens
13  or have some different types of impairments, and I even
14  remember back in 2020 specifically myself, Mr. Robinson, a
15  group of our volunteers, were out doing a canvass in the Cuney
16  Homes and there was an elderly woman who needed assistance.
17      This was the last day of early voting.  Mr. Robinson took
18  it upon himself to take her to the poll and to assist her.
19  She had a visual impairment, so she had needed help
20  determining, you know, what was actually on the ballot.  And
21  so that's a realtime example of someone needing assistance.
22      And also, when you look at just the history of the black
23  community, minority communities, and government entities,
24  there's a lot of mistrust.  And for good reason.  And so
25  historically when you look at programs like Souls to the

2250

RAY SHACKELFORD – DIRECT

1  Polls, our churches are historically trusted civil rights
2  organizations.  Fraternities, sororities have always been
3  there to provide the necessary support, even members of agency
4  youths, so now when you put something like this in place it
5  has a significant impact in our ability to Get Out the Vote.
6  Q.   You mentioned the Cuney Homes, what are those?
7  A.   The Cuney Homes is an affordable housing project that is
8  in Third Ward Texas, which is where I'm from, but it's also
9  where George Floyd grew up, specifically at the Cuney Homes.
10 Q.   How has the — how have these provisions related to voter
11 assistance impacted communities that HAUL serves?
12 A.   It has, again, made people fearful, confused.  We actually
13 have individuals from Sunnyside, South Park, Third Ward Cuney
14 Homes express basically fear.  They don't know what's going to
15 happen, if they do try to help someone, and ultimately similar
16 to a lot of these provisions they don't understand why these
17 things are being put in place because it wasn't an issue
18 previously.
19 Q.   The neighborhoods that you mentioned Third Ward,
20 Sunnyside, are those predominantly black neighborhoods?
21 A.   Yes, they are.
22 Q.   Going back really quickly to the topic of 24-hour voting,
23 are you aware of individuals who voted 24-hour in the 2020
24 elections?
25 A.   I am not.

RAY SHACKELFORD - DIRECT

1  Q.  Now, Mr. Shackelford, we've talked about a bunch of these

2  provisions of SB 1 and the impact that they have had on the

3  communities that HAUL serves.  Can you tell us what the

4  cumulative impact of these provisions has been on those

5  communities?

6  A.  Cumulative impact has been very harmful, even now there's

7  still confusion about the voting process.  You know, everyone

8  doesn't vote every election, and so when you have all these

9  different tools available to make it easier for people to vote

10  and then you take them away and then now maybe somebody is

11  trying to go vote in the current municipal election cycle

12  because that's where we are in Houston, they don't know what

13  to do because of all these different changes they don't

14  understand and ultimately in some cases it's going to suppress

15  the vote.  People will not vote.  For others, it's going to

16  make it that much more challenging.

17  Q.  So now I'd like to turn to HAUL's response to SB 1 after

18  it was enacted.  And I'd like to focus on your role first.

19  How did SB 1 impact your role at HAUL?

20  A.  Well, one, you know, obviously it has been here today, but

21  immediately after its passage on September 7th of 2021 we

22  actually had a virtual activation where -- which we do those

23  periodically, but what made this unique is we actually had our

24  National President CEO come in for National Voter Registration

25  Day, and that is not a normal thing for us to have him come

2252
RAY SHACKELFORD - DIRECT

1   in.

2       And even after the election, typically we do, you know,

3   the routine post-election conversation recap, next steps going

4   forward, but because of the confusion and fear that was being

5   expressed by the community, we actually partnered with Radio

6   One to do a livestream with then Rep Jasmine Crockett to talk

7   about the future of voting because, again, people just didn't

8   understand what was happening.  They had concerns about what

9   it was going to look like going forward.

10       And, for me, personally, many of the things that

11  originally I was intended to do when it comes to building out

12  the center, working with Mr. Robinson and senior leadership

13  team around strategy, I haven't been able to do because I have

14  to spend some time with SB 1, whether it was getting trained

15  myself by the county clerk, the Election Administrator's

16  Office, scheduling those trainings for our staff, for the

17  auxiliaries, then for myself going in to provide recurring or

18  supportive training to those same individuals, and for all of

19  us spending time having to go out into the community and

20  educate and continue to do so, because, again, everyone

21  interacts with elections differently and so just because we

22  started doing it in 2021 immediately after, it still hasn't

23  made it to everybody.

24       Some people only vote in presidential elections, which we

25  have one obviously coming up, so for those individuals that

1  used those options in 2020, we are going to have to make a

2  significant investment to ensure that had they understand

3  these options are not available in 2024.

4  Q.  So you talked a little bit about the livestream that HAUL

5  had to do after the enactment of SB 1.  Was the subject matter

6  of that livestream SB 1 and the provisions that we've talked

7  about today?

8  A.  Yes, it was.  We were also joined by Senator Carol

9  Alvarado who did the 24-hour testimony opposition of SB 1

10  specifically.

11  Q.  And you personally participated in that livestream?

12  A.  Yes, I did.

13  Q.  You also talked about the work that you've had to or —

14  let me rephrase.

15      You talked about getting pulled away from the work of the

16  Center for Social Justice Advocacy and Education, how has the

17  time that you've had to take away from the work of the center

18  impacted the center?

19  A.  Well, one, we've had to bring on additional support

20  because I haven't been able to dedicate the time to all the

21  intended activities.  So initially it was just some, Cornell

22  Walker, who works for our United Way Thrive program under our

23  Workforce Department, she was initially just providing some

24  support, but fast-forward to now, she is completely housed as

25  a full-time employee at the Center for Social Justice, so it

RAY SHACKELFORD – DIRECT

1   had a trickle-down effect because we had to replace her with

2   two FTEs to manage the United Way Thrive program, but

3   unfortunately they don't have the same experience as she does

4   when you are talking about interacting with clients, and so we

5   have suffered in our ability to service as many clients

6   through that program.

7   Q.   And which program was this?

8   A.   United Way Thrive is under our Workforce Department.

9   Q.   Now, in order for you to do your SB 1 related work, what

10  did you have to do in terms of learning about SB 1?

11  A.   There was a lot of training that I had to undergo when it

12  came to the Election Administrator, the County Clerk's Office,

13  a lot of just self-education, connecting with different state

14  reps, state senators, elected officials to make sure that I

15  was abreast of what was going on, and then also taking time to

16  then follow up and meet with all of our community partners

17  because everybody had questions, everybody had concerns, and

18  so, again, it was very time-consuming and directly impacted my

19  ability to perform other functions.

20  Q.   And you mentioned the training that you had to do with the

21  Election Administrator.  Can you tell us a little bit more

22  about that?

23  A.   Yes.  So essentially the Election Administrator was doing

24  these presentations where they would come in and talk about

25  the provisions of SB 1, the things that would no longer be —

RAY SHACKELFORD - DIRECT

1  that we would no longer be able to use in an effort to vote
2  and it talked about, you know, what elections would look like
3  as a result of SB 1.
4      And then, you know, traditionally there's a Q and A
5  portion, and then I, outside of the larger community training
6  I had a one-on-one with some of the members of the office,
7  just to make sure that I was clear on all of the details.
8  Q.  Was this type of training both the group training and the
9  one-on-one training something that was part of the normal
10 civic engagement work of HAUL?
11 A.  No.  So typically the only trainings we undergo with the
12 County Clerk, Election Administrator's Office is the VDVR, or
13 Voter Deputy, Voter Registrar training so that we can go out
14 and register people to vote.  So that's the only standard
15 training that we would engage.
16     I can't recall any other time where we've had to do some
17 type of specialized training like this, so, no, it was very
18 unique and outside of the normal scope of what we do from a
19 civic engagement perspective.
20 Q.  You also mentioned that you have to spend time with staff
21 internally to talk about SB 1.  Can you tell us more about
22 that?
23 A.  Yes.  So they had to give me time and take away from our
24 staff meetings for me to actually come in and talk to them
25 about what was going on with SB 1.  In some cases actually

1  help schedule the training for them with the Election

2  Administrator's Office.

3  Q.  And so how did that impact the work of staff that normally

4  wouldn't be doing trainings with you?

5  A.  The best example would actually be probably in our

6  education department.  So John Robinson does what we call face

7  presentations or family community engagement where he spends

8  about two hours going to different schools in multiple

9  districts to talk about the importance of literacy, how

10  parents can work with their kids to improve how they read,

11  especially because we know if they can't read by third grade,

12  it results in prisons being built, and so that's our effort to

13  regularly attack the school-prison pipeline, so he had to

14  shorten and amend some of those presentations to give me 30

15  minutes to come and talk about SB 1 as well as answer any

16  questions, and so on both sides, for me and him, that's not a

17  normal part of our engagement because while I may accompany

18  him on some of those visits I typically -- I don't ever take

19  up that much time so he doesn't have to alter his presentation

20  to that degree.

21  Q.  And the time that you had to devote to talking about SB 1

22  in that presentation, that took away time to talk about what

23  you would normally talk about during these face presentations?

24  A.  Correct.

25  Q.  And did that impair HAUL's ability to provide family and

2257
RAY SHACKELFORD — DIRECT

1  community education during those presentations?

2  A.  Yes.  It would impair the quality of it, because, again,

3  he had to present the same information but more succinctly and

4  so it wasn't as robust, if you will.

5  Q.  Now, at some point this morning you also mentioned

6  Advocacy U.  Can you tell us what Advocacy U is?

7  A.  Yes.  Advocacy U is our core style training for the

8  community that we do in the spring and fall.  It's a 12-week

9  program where we cover different issues to educate the

10  community so they can go out and be better advocates.

11      Part of this was in response to a lot of people wanting to

12  serve or run for office but we noticed that, you know, they

13  weren't always as well-informed as they should have been even

14  though they will have met the base criteria.

15      So in addition to our volunteer auxiliaries, this is

16  another effort to make sure that we train individuals to be

17  better advocates, better understand the civic process, not

18  just when it comes to the issues that are important to HAUL,

19  but the issues that are important to those individuals and

20  their families.

21  Q.  Did SB 1 require you to change your Advocacy U curriculum?

22  A.  Yes.  So immediately after its passage, originally we were

23  going to focus on DEI that particular fall in 2021, and

24  because of the passage of SB 1 we had to shift it again based

25  on the confusion and what we were hearing from the community

RAY SHACKELFORD – DIRECT

1  because we try to shape those modules based on the feedback
2  that we're getting from the community, and, so yes, it was a
3  direct impact to that program specifically.
4  Q.  And for clarity of the record, what do you mean when you
5  say DEI?
6  A.  Diversity Equity Inclusion.
7  Q.  How did SB 1 impact the work of HAUL's auxiliaries?
8  A.  So for auxiliaries, we depend on them a lot because we
9  are, you know, smaller nonprofit in terms of our overall
10  staff, so our volunteers are definitely a valued resource, but
11  it's also a limited resource, and so because they had to take
12  time out to get trained on SB 1, we lose volunteers in some
13  cases completely or we lose some of their capacity because all
14  these individuals have full-time jobs or their own businesses
15  that they run so they are giving their time freely and so when
16  they have to take away to now do this work related to SB 1,
17  there's an impact to them and ultimately to HAUL as a result.
18  Q.  And the time that volunteers had to take away to devote to
19  SB 1, what work did that of the auxiliary did that take away
20  from?
21  A.  So specifically it did impact our ability to do some of
22  our voter registration and deputization activities.  We still
23  did facilitate them but we were not able to reach the numbers
24  that we would have liked, if we did not have to focus as much
25  on SB 1.

2259

RAY SHACKELFORD - DIRECT

1  Q.  You mean the number of people you were able to register to
2  vote?
3  A.  That's correct.
4  Q.  Did SB 1 take away from voter registration work that you
5  personally would have done?
6  A.  Yes, it definitely did.  I've had to focus a lot as it
7  relates to SB 1, and so as a result, no, I was not able to
8  engage as much of the voter registration activities as I would
9  typically.
10  Q.  Now, you mentioned that SB 1 caused a lot of confusion,
11  how many times do you have to train a particular voter to be
12  able to convey the impact that SB 1 had on how voting occurs
13  in Texas?
14  A.  It's going to vary.  You know, I think even when you look
15  at things like sales, for example, you know, I think it says
16  something like seven nos before you get a yes.  And so you
17  have to continue to do these trainings over and over,
18  sometimes two to three times, sometimes more than that, just
19  because there are so many different provisions that were
20  stripped and the changes.
21      And, again, just overall people not understanding or
22  having a clear reason as to why these things were taken away,
23  but it is going to vary depending on the individual.
24  Q.  Is that different from the normal civic engagement work or
25  voter educational work that HAUL would do?

2260

RAY SHACKELFORD – DIRECT

1  A.  Yes.  Typically, even like when we partnered with, again,

2  the County Clerk or the Voter Election Administrator's Office,

3  those trainings are one hour, and — they are around one hour,

4  there may be one follow-up afterwards because they may not be

5  clear on something, but it's typically not this much time and

6  effort that's dedicated to making sure they have an

7  understanding.

8  Q.  Will HAUL have to continue investing resources into

9  addressing SB 1?

10  A.  Yes, we will.

11  Q.  Why?

12  A.  Because with the Presidential Election coming up and with

13  the, you know, varied engagement of voters, and even, you

14  know, what we were just talking about, the fact that you

15  communicate something one time and people still won't receive

16  it so you have to do so over and over again to make sure it

17  will be clearly communicated so we definitely will have to

18  invest resources as it relates to making sure people

19  understand what options are available when it comes to SB 1 on

20  how that's going to impact their ability to vote.

21  Q.  How did SB 1 impact the work of HAUL's leadership such as

22  you mentioned Judson Robinson, the CEO?

23  A.  So it impacted his ability to focus on fundraising.  You

24  know, as our CEO, two of the main things that he does is, you

25  know, outside of being the face of our organization, he has to

2261
RAY SHACKELFORD - DIRECT

1 raise money for us to do the work that we do.

2     So him having to dedicate all this time to SB 1 and its

3 response and the confusion, because he's one of the main

4 people that's getting phone calls, text messages, because

5 people are upset, they don't understand what's going on, and

6 that's time that he could be spending on raising more funds

7 for us to do, you know, first-time home buyers, foreclosure

8 litigation, literacy training, but he's, again, spending time

9 focusing on SB 1.

10 Q. So, Mr. Shackelford, you've testified about all of the

11 time that you personally have had to devote to addressing the

12 provisions of SB 1 that we've talked about today.  Apart from

13 the fact that it's part of your job, why have you put so much

14 time and energy into addressing the impact of SB 1?

15 A.  It's a few different reasons.  One, you know, we do this

16 work because of the people that, you know, don't have the

17 opportunities or the blessings that, you know, I've been able

18 to receive.

19     I've been very fortunate in terms of, you know, how I've

20 gotten to where I am, but I also understand that everybody

21 doesn't have those same opportunities, and so that's, you

22 know, why organizations like Urban League exist, to be a voice

23 for those that ultimately wouldn't have a voice, and even when

24 I think about, you know, my father and how he raised me to

25 make sure that when I leave a space it's better for those that

RAY SHACKELFORD — CROSS

1  come after me, and it's ironic that in 1991 my father and

2  other members of the Houston Lawyer's Association were a part

3  of a lawsuit because of a lack of black judges in Harris

4  County, and you know now I'm here today.

5      So it's definitely something that obviously makes me

6  emotional, because that's over 30 years ago, and we're still

7  fighting the same fights to make sure our voting rights are

8  protected.

9  Q.  Thank you for your work, Mr. Shackelford, the work of your

10 father.

11         MR. BADAT:  I pass the witness, Your Honor.

12         THE COURT:  Any other questions on this side?

13         Any cross?

14         MR. BERG:  Yes, Your Honor.

15                    CROSS-EXAMINATION

16 BY MR. BERG:

17 Q.  Morning, Mr. Shackelford.

18 A.  Morning.

19 Q.  You've consulted with HAUL since August 2019, correct?

20 A.  That's correct.

21 Q.  And they are your only client, correct?

22 A.  Currently, yes, that's correct.

23 Q.  But you've been associated with HAUL for longer than

24 you've been in your current position, correct?

25 A.  That's correct.

1  Q.  And you originally brought to your current position to

2  help with the census project, is that correct?

3  A.  That's correct.

4  Q.  And since the census was over in 2021, the plan was for

5  you to transition to focusing on redistricting, correct?

6  A.  Correct.

7  Q.  And you would agree with me that sometimes the same people

8  work on both voting and redistricting, correct?

9  A.  That is correct.

10 Q.  And I believe, as you've testified, your duties have

11 expanded way past redistricting, correct?

12 A.  Yes.

13 Q.  And not just SB 1, just generally, correct?

14 A.  Generally, yes, but SB 1 — because when you say that, I

15 feel like it kind of mischaracterizes things, because, yes,

16 there was an expectation for me to work on voting things

17 broadly, but there's never been a specialized issue like SB 1,

18 and in the four years there's been nothing else that has

19 consumed this much time or been that much of a diversion of my

20 time and resources.

21 Q.  And the position with the Center for Social Justice and

22 Education that you filled in 2021, that was a new position,

23 correct?

24 A.  Yes, that's correct.

25 Q.  So there wasn't any past history that you could rely upon

RAY SHACKELFORD - CROSS

1   about what the job would necessarily entail, correct?

2   A.  No.

3   Q.  I believe you testified that HAUL has two volunteer

4   auxiliary groups, correct?

5   A.  Yes, we do.

6   Q.  And you've served as a liaison between HAUL and those

7   auxiliary groups, correct?

8   A.  I did at some point in 2010 and 2013.

9   Q.  But not anymore?

10  A.  Now, it's not as a liaison.  I actually advise them when

11  it comes to civic engagement, advocacy, and policy.

12  Q.  So the auxiliary organizations, they have members,

13  correct?

14  A.  Yes, they do.

15  Q.  But HAUL does not have members, correct?

16  A.  No.  HAUL has clients.

17  Q.  So HAUL is challenging SB 1 on an organizational basis,

18  correct?

19  A.  Yes, as a nonprofit, correct.

20  Q.  Let's talk about the passage of SB 1.  You went to Austin

21  on behalf of HAUL when SB 1 was being considered, right?

22  A.  I went to Austin for a voter rally.  It was separate from

23  when Mr. Robinson and our auxiliary members went to go provide

24  testimony.

25  Q.  You prepped volunteers who went to Austin and provided

RAY SHACKELFORD - CROSS

1  testimony themselves about SB 1, correct?

2  A.  Correct.

3  Q.  Would you agree with me that many Texans wished to testify

4  on SB 1?

5  A.  I don't know.

6  Q.  And when you went up, that was during one of the special

7  sessions, correct?

8  A.  Yes, it was.

9  Q.  And the regular -- strike that.

10      The regular legislative session ended because the

11  Democratic House Reps got up and walked out, correct?

12  A.  Correct.

13  Q.  One of your responsibilities with HAUL is working on their

14  Get Out the Vote campaign, correct?

15  A.  Correct.

16  Q.  And that consists of radio adds encouraging people to

17  vote, right?

18  A.  Depending on funding, yes.

19  Q.  HAUL typically runs radio adds every year?

20  A.  Depending on funding, correct.

21  Q.  And you would agree with me that the funding for the Get

22  Out the Vote always comes from donors, correct?

23  A.  If by "donors," you mean different corporate entities or

24  private business owners, yes.

25  Q.  In its regular course of business as a nonprofit HAUL

RAY SHACKELFORD — CROSS

1  files an IRS Form 990 every year, right?

2  A.  Correct.

3  Q.  Brian, would you please pull up the first form, and if we

4  could zoom in on the top left corner.

5      Mr. Shackelford, do you see on the top left where it

6  says ——

7          MR. BADAT:  Your Honor, real quick, we don't have a

8  copy of this.  I don't believe it was on the defendant's

9  exhibit list.

10         THE COURT:  So is this a demonstrative, or what is

11  this?

12         MR. BERG:  We intend to, after laying foundation,

13  intend to submit it as an exhibit.

14         THE COURT:  Was it previously supplied to any of the

15  defendants?

16         MR. BERG:  No, Your Honor.

17         THE COURT:  That don't be allowed.

18         MR. BERG:  May I use it as a demonstrative?

19         THE COURT:  You may.

20         MR. BERG:  Thank you.

21         MR. BADAT:  Can we get a copy of this?

22         THE COURT:  Well, you'll be seeing it as he's showing

23  it.

24         Just come on.  Let's go.  Move on.

25

RAY SHACKELFORD - CROSS

1  BY MR. BERG:

2  Q.  So, Mr. Shackelford, do you see where it says Form 990,

3  Department of the Treasury, Internal Revenue Service?

4  A.  I do.

5  Q.  And then if we go to the top right of this same page, what

6  year does it say?

7  A.  2019.

8  Q.  And if we go to box C on page one, name of organization,

9  what organization is listed?

10  A.  Houston Area Urban League.

11  Q.  And then if we could look at letter G, gross receipts.

12     Now, Mr. Shackelford, gross receipts, would that be total

13  revenue HAUL took in for 2019?

14  A.  It looks like it's defined as gross receipts.

15         THE COURT:  Now, I'm confused.  What's the relevance

16  to this?

17         MR. BERG:  It goes to standing.

18         THE COURT:  Go ahead.  Continue.

19  BY MR. BERG:

20  Q.  Mr. Shackelford, what were HAUL's gross receipts in 2019?

21  A.  It looks like 3,382,295.

22  Q.  Thank you.  Brian, if we could pull up the second form.

23         MR. BERG:  So I also intend to use this as a

24  demonstrative, Your Honor.

25         THE COURT:  I'm still confused by standing here.  So,

RAY SHACKELFORD – CROSS

1   yeah, it made money.  I mean, isn't it — isn't standing how

2   they spent the money and what they spent it on?  What does

3   receipts do for us?

4        MR. BERG:  I think that all goes to it.  I think what

5   you would take in and also goes out would both go into

6   standing.

7        THE COURT:  I'll give you some leeway.

8        MR. BERG:  Okay.

9   BY MR. BERG:

10  Q.  So this is another 990 form, correct?

11  A.  Correct.

12  Q.  And it's a 990 from 2021, correct?

13  A.  Correct.

14  Q.  And could we see the name of the organization.

15      It's still from HAUL, correct?

16  A.  Correct.

17  Q.  And if we go to gross receipts, what would be the total

18  for the 2021 gross receipts?

19  A.  5,294,124.

20  Q.  So would you agree with me that between 2019 and 2021

21  HAUL's gross receipts increased about $1.9 million?

22  A.  I don't have a calculator, but it definitely went up.

23  Q.  Okay.  You testified about HAUL auxiliary volunteers

24  providing applications for ballot by mail to voters, correct?

25  A.  Correct.

RAY SHACKELFORD – CROSS

1  Q.  And this has continued post-SB 1, correct?

2  A.  Correct.

3  Q.  You testified that in 2021 HAUL held an activation

4  regarding SB 1, correct?

5  A.  Correct.

6  Q.  And this was a virtual streaming panel in conjunction with

7  Radio One, correct?

8  A.  Correct.

9  Q.  And you mentioned that there are many individuals involved

10  in this activation, correct?

11  A.  Correct.

12  Q.  And this activation with Radio One occurred in May 2021,

13  right?

14  A.  Correct.

15  Q.  And you would agree with me that May 2021 was before SB 1

16  was passed?

17  A.  That was the first one.  The second one was in November,

18  after the election.

19  Q.  So let's talk about the Center for Social Justice and

20  Education.  That's where HAUL houses work on advocacy, civil

21  engagement, and voting, correct?

22  A.  Civic engagement, yes.

23  Q.  And you would agree with me that SB 1 has to do with

24  voting, correct?

25  A.  Yes, it does.

RAY SHACKELFORD - CROSS

1  Q.  And HAUL educates the community on voting through many

2  means, right?

3  A.  That's correct.

4  Q.  Voting, in person — sorry.

5      Meetings in person and on Zoom?

6  A.  Correct.

7  Q.  Through social media, YouTube, and on its website?

8  A.  Correct.

9  Q.  And HAUL and Mr. Robinson have been posting videos on

10 YouTube for a decade, right?

11 A.  Correct.

12 Q.  You testified about the program Advocacy Youth, right?

13 A.  Advocacy U, yes.

14 Q.  And that's where you go to schools and educate them on

15 certain subjects, right?

16 A.  So Advocacy U is the community program, but I also do a

17 similar version of that program at two of the high schools.

18 Q.  Got it.  So you testified that as — because of SB 1

19 programming for this had to change to include more on voting

20 rights, correct?

21 A.  Yes.  That would not be the youth one.  That would be the

22 one with the broader community.

23 Q.  Okay.  Did you also make changes to the — strike that.

24     Within the education department of HAUL exists the family

25 and community engagements program, correct?

RAY SHACKELFORD - CROSS

1  A.  Correct.

2  Q.  And there is SB 1 outreach through this, correct?

3  A.  Correct.

4  Q.  And through this program HAUL reached out to families and

5  people in the community to let them know how they would be

6  harmed by SB 1, correct?

7  A.  It was to let them know the changes as a result of SB 1

8  and how that would impact their ability to vote based on what

9  options they used.

10 Q.  You testified that in response to an increase in your

11 duties, a person was transferred to help you and two full-time

12 employees were hired by HAUL, is that correct?

13 A.  Correct.

14 Q.  If SB 1 is overturned, do you plan to fire those two

15 people?

16 A.  That's not my decision to make, but I doubt it.

17 Q.  You doubt it.  So would you agree with me that whether or

18 not SB 1 is overturned, HAUL will continue to employ those two

19 people?

20 A.  In all likelihood, yes, we will.

21 Q.  Let's talk a little bit about drive-thru voting.  You

22 would agree with me that lack of transportation is a huge

23 challenge in the black and brown community?

24 A.  Yes.

25 Q.  And one of the things that HAUL has done to alleviate that

RAY SHACKELFORD - CROSS

1  challenge in the black and brown community is to distribute

2  MetroCards and bus passes, correct?

3  A.  Correct.

4  Q.  And one of the reasons that HAUL gives people MetroCards

5  or bus passes would be that those people don't have regular

6  access to a car, correct?

7  A.  Correct, and it's also typically tied to Workforce

8  Development specifically.

9  Q.  And you can't use a MetroCard to do drive-thru voting,

10  correct?

11  A.  Not to my knowledge.

12  Q.  You testified about a time in 2020 when you were doing

13  canvassing with Mr. Robinson, correct?

14  A.  I did.

15  Q.  And that was in conjunction with the musician Common

16  right?

17  A.  That's correct.

18  Q.  And while you were canvassing, Mr. Robinson helped a

19  visually impaired woman, correct?

20  A.  Correct.

21  Q.  And he helped her by reading her ballot to her, correct?

22  A.  Making sure she had clarity on what was printed there,

23  yes.

24  Q.  You are aware that even in 2020 a person assisting a voter

25  with a mail ballot was required to provide their name,

RAY SHACKELFORD - CROSS

1  signature, and residence address, correct?

2  A.  I'm not aware of that.

3  Q.  With what you know about Mr. Robinson, even after post-SB

4  1, would he still have helped that woman?

5  A.  He would, but he also is someone similar to me that has

6  access to different opportunities and things that many of the

7  people we serve do not and so I don't think looking at myself

8  and Mr. Robinson and how we will or will not be impacted by SB

9  1 is a good comparison to the community that we serve,

10  especially when I mentioned that some of those individuals,

11  about 39 percent of our clients, make only $10,000.

12  Q.  Earlier you spoke about workers being able to get two

13  hours off of work but sometimes they are not always allowed or

14  able to take those two hours, is that right?

15  A.  That's correct.

16  Q.  Are you aware that SB 1 increased the opportunity to take

17  those two hours to the early voting period as well as to the

18  Election Day period?

19  A.  I am aware, but that also doesn't change the fact that

20  some employers still won't actually apply it.

21  Q.  And you testified that 24-hour voting in Harris County was

22  a one-day event, right?

23  A.  That's correct.

24  Q.  And it was a one-time event, correct?

25  A.  It was one day, one time.

RAY SHACKELFORD – CROSS

1  Q.  And that that hadn't been done before 2020, right?

2  A.  That's correct.

3  Q.  You would agree with me that straight-ticket voting was --

4  sorry.

5      You would agree with me that straight-ticket voting was

6  prohibited by the Texas Legislature in 2017, correct?

7  A.  I don't remember the exact year.  I do know it was a part

8  of SB 1.

9  Q.  So your understanding is that straight-ticket voting was

10  legal in, say, 2020?

11  A.  It was not legal in 2020.

12  Q.  It was not legal in 2020?

13  A.  Not to my knowledge.

14  Q.  And 2020 was before the passage of SB 1, correct?

15  A.  Correct, but clearly our legislators felt like something

16  was missing so they felt the need to include it in SB 1.

17  Q.  You are not aware of anyone who has been charged with a

18  crime because of SB 1, correct?

19  A.  Personally, no.

20  Q.  And you're not aware of anyone who's been assessed a civil

21  penalty because of SB 1, correct?

22  A.  No.

23          MR. BERG:  Thank you for your time.

24          Pass the witness.

25          THE COURT:  Anything else on this side?  Nothing

RAY SHACKELFORD – REDIRECT

1   further.

2          Any redirect?

3          MR. BADAT:  Just a couple of questions on redirect,

4   Your Honor.

5                    REDIRECT EXAMINATION

6   BY MR. BADAT:

7   Q.  Mr. Shackelford, counsel asked you a couple of questions

8   on cross-examination about the center and I just want to

9   clarify a couple of things, and that's the Center for Social

10  Justice Education and Advocacy.  When was the center created?

11  A.  In May of 2021.

12  Q.  And that was before the passage of SB 1?

13  A.  That's correct.

14  Q.  Was addressing SB 1 part of what the center's work was

15  supposed to do?

16  A.  No.

17  Q.  And then opposing counsel also showed you a demonstrative

18  of the Form 990s that HAUL submitted for a couple of years, do

19  you remember that?

20  A.  Yes, for 2019 and 2021.

21  Q.  Were you involved in the preparation of those Form 990s?

22  A.  No, I was not.

23  Q.  And independent of the reading the screen, do you have any

24  knowledge of the numbers that opposing counsel showed you?

25  A.  No, I do not.

RAY SHACKELFORD — RECROSS

1            MR. BADAT:  That's all, Your Honor.

2            THE COURT:  Anything based on those?

3            MR. BERG:  One question.

4                    RECROSS-EXAMINATION

5    BY MR. BERG:

6    Q.  Mr. Shackelford, do you understand yourself to be

7    testifying on behalf of HAUL?

8    A.  I do.

9            MR. BERG:  Thank you.

10           Nothing further.

11           THE COURT:  With that, you can step down.

12           We'll take an hour for lunch.  Be back at 1.

13       (Recess)

14       (Change in reporter)

15

16

17

18

19

20

21

22

23

24

25

Deion Dorsett - Direct

```
 1      (Change in reporter)
 2      (1:02 p.m.)
 3          THE COURT:  Thank you.  Please be seated.
 4          MR. BADAT:  Your Honor, I'd like to -- we'd like to
 5   call Deion Dorsett as our next witness.
 6      (Witness enters courtroom)
 7      (The oath was administered)
 8          MR. BADAT:  Your Honor, Mr. Dorsett's testimony will
 9   relate to Sections 3.04, 3.12 and 3.13 of SB1.
10          THE COURT:  Thank you.
11          MR. BADAT:  May I proceed?
12          THE COURT:  Yes.
13           DEION DORSETT, PLAINTIFFS' WITNESS, SWORN
14                    DIRECT EXAMINATION
15   BY MR. BADAT:
16   Q.  Good afternoon.
17   A.  Good afternoon.
18   Q.  Would you please state your name for the record.
19   A.  Yes, Deion Dorsett.
20   Q.  Where do you live, Mr. Dorsett?
21   A.  Houston, Texas.
22   Q.  How long have you lived there?
23   A.  About 13 and a half years now.
24   Q.  And where did you live prior to moving to Houston?
25   A.  Baton Rouge, Louisiana.
```

Deion Dorsett - Direct

1  Q.  What do you identify as your race?

2  A.  African-American.

3  Q.  And what is your current occupation?

4  A.  So I am an equal opportunity specialist for the

5  United States Department of Labor, an agency called the Office

6  of Federal Contract Compliance Programs.

7  Q.  And what does that role entail?

8  A.  So I investigate companies that have federal contracts with

9  the government.  They have to abide by affirmative action, EEO

10  obligations, so I audit that, and if I find indicators of

11  discrimination, I open a discrimination investigation.

12  Q.  What are your work -- excuse me.

13      What are your work hours like?

14  A.  So it can vary.  Typically I may work 6:00 a.m. to about

15  3:30, 4:00 p.m. depending on the business demands.  I can be at

16  work at 5:00 a.m.  I've had days I work 5:00 a.m. to 10:00 p.m.

17  at night.

18  Q.  And how far away is your office from your home?

19  A.  My current home, the office is maybe about ten miles.

20  Where I previously lived, a few years ago, I was about two

21  miles away from my office.

22  Q.  And how -- how much time does it take for you to get to

23  your office?

24  A.  From where my current residence, 25 minutes, without

25  traffic; 40 minutes with it.

Deion Dorsett - Direct

1  Q.  Can you tell us a little bit about your educational

2  background?

3  A.  Yes.  So I have a -- I have dual bachelor degrees in

4  economics and finance, and I have a master's in business

5  administration.

6  Q.  And where did you get your degrees from?

7  A.  From Southern University Agriculture and Mechanical

8  College.

9  Q.  And is that a historically black college?

10  A.  Yes, it is.

11  Q.  Why did you choose to go to a historically black college?

12  A.  A few reasons.  So I had a guidance counselor who was a

13  graduate of Southern University, and she encouraged me to take

14  that opportunity.  She also offered me the $500 scholarship,

15  which was a lot of money back in those days.

16      But also because typically I'd been in Gifted and Talented

17  programs where I was usually either the only or maybe there was

18  one other black student in those classrooms.  And the

19  educational system in Louisiana didn't touch on

20  African-American history.  And I saw going to a historically

21  black college and university as an opportunity to learn more

22  about my ancestry, the contributions of our people to this

23  country and to the world.

24  Q.  And what was your experience like going to a historically

25  black college?

Deion Dorsett - Direct

1   A.  It was a great experience.  I know that might not seem that

2   serious to a lot of other people.  But it was the first time

3   that I ever addressed anyone as "professor" that looked like

4   me.  It was the first time that I'd ever seen anyone I

5   addressed them as "doctor" and they weren't a medical doctor

6   and they looked like me.  First time I'd met a black lawyer

7   before in my life.

8       So it was life-changing for me.  It showed me that there

9   really was no ceiling to what I could accomplish.  It was my

10  first opportunity to be a student leader because then I would

11  be elected by predominantly black people.  It just was a really

12  great opportunity.

13      I pledged a historical black fraternity, the first one to

14  ever be founded on an African-American campus.  And so it was

15  life-changing for me, definitely was something that taught me

16  about who I was and what my potential was.

17  Q.  And apart from college and graduate school, what other

18  training have you received?

19  A.  So I also served in the United States Army.  I joined the

20  National Guard as my initial service where I trained at Fort

21  Sill, Oklahoma.  And then from there, here to San Antonio,

22  Fort Sam.

23      I then, in the wake of 9/11, I was deployed twice, and so I

24  ended my military career in about 2005 so I could focus on

25  graduating from college.

Deion Dorsett - Direct

1  Q.  Why did you decide to serve in the military?

2  A.  Yeah.  So we are -- we are a military family by trade, I

3  would say.  My grandfather was in the United States Army.  My

4  father was a Marine.  His next youngest brother was a Marine.

5  The rest of the brothers were in the Army.  We have one person

6  that's in the Air Force.  And so every generation of my family

7  that has been in this country have served this country.

8  Q.  Thank you to you and your family for your service.

9  A.  Thank you.

10  Q.  Mr. Dorsett, are you involved in any civic or community

11  organizations?

12  A.  Yes, I am.  I belong to the Houston Area Urban League.

13  Q.  And is the Houston Area Urban League sometimes known as

14  HAUL?

15  A.  Correct.

16  Q.  How did you become involved with HAUL?

17  A.  So I became involved in HAUL when I got here.  I wasn't

18  sure that I was still going to be living in the City of

19  Houston.  I didn't know how long.  I was a career federal

20  employee.  That was my track.  I figured that I would be headed

21  to DC at some point in time.

22      But I started to decide to make Houston home because my

23  daughter was here.  Her mother had moved here, and I wanted to

24  be a part of her life.  And so in 2014, I realized I needed to

25  be engaged.  My history back in Baton Rouge, Louisiana was one

Deion Dorsett - Direct

1  of civic engagement.  It was one of community outreach.

2      And so I decided, if Houston was going to be home, then

3  this was going to be the place where I needed to get connected.

4  I needed to get involved.

5      And I had a good friend from college who had joined the

6  Urban League in New York, and I saw, you know, following him on

7  social media, the great things that they were doing in the

8  community.  I connected with him.  He told me, hey, there's an

9  operation out here for you as well in Houston.

10      And so I joined.  I wanted to give back.  I wanted to -- I

11  wanted to belong to the community, and I wanted to have some

12  responsibility for my community.

13  Q.  And what issues have you worked on during your time with

14  HAUL?

15  A.  Man, I feel like I want to say everything.  But, primarily,

16  I think the -- one of the highlights that we have worked on for

17  me has been voter get-out-the-vote actions.

18      We were always hyper -- in this hyper mode of making sure,

19  getting people registered to vote, even to the point where we

20  had a target goal of having 50 percent of our membership voter

21  deputy/voter registrar trained so that, you know, our group

22  would be ready to deploy to underserved communities to register

23  individuals to vote.

24  Q.  Now, I'd like to shift gears a little bit and talk about

25  your experiences voting in Texas.

Deion Dorsett - Direct

1  A.  Okay.

2  Q.  When did you first register to vote in Texas?

3  A.  I would say it had to be probably maybe 2014, 2015 time

4  frame.  I'm not exactly certain, but I know that I had a Texas

5  driver's license.  And because of my involvement in the Houston

6  Area Urban League, I started to become more aware of the

7  different systems, the difference between the county and the

8  city, which we really didn't have coming from Baton Rouge.  It

9  was the city.

10  Q.  And how frequently have you voted since you registered in

11  Texas?

12  A.  I rarely miss an election.  I would probably say that I

13  have not missed an election.  There's only been one

14  opportunity, one time, where I've gone to vote and I was not

15  able to vote.

16  Q.  Is voting important to you?

17  A.  Absolutely.  Voting is something that's a core, I guess,

18  tenet of our family.  My father -- my father, when he would go

19  to vote, he would take me.  So in November when there was an

20  election, I would be right there standing next to him at the

21  ballot.

22      So that was something that was engrained into us, that this

23  is our opportunity to lend our voice to the process.  And it's

24  a responsibility that we have.

25  Q.  And have you developed any special traditions around voting

Deion Dorsett - Direct

1  with your family?

2  A.  Oh, absolutely.  So my now wife, we met in the Houston Area

3  Urban League.  We served on the young professionals board

4  together.  And as we started to become more serious about each

5  other, we created a tradition that we would go and vote

6  together.

7      And so going to vote on election day is very important to

8  me because it always reminds me of -- it always lets me know

9  that it's the least that I could do, given the history of my

10  people in the United States where people were killed, people

11  were made to jump through all kind of ridiculous hoops in order

12  to exercise this right that belonged to everyone.

13      And so my wife and I take it seriously, so we do it as a

14  thing to also remind us of our responsibility to the community

15  and our responsibility together.  So we go and vote together.

16  Sometimes we early vote together, but most of the time we go on

17  election day.

18  Q.  And so I'd like to turn our focus to some specific

19  elections.

20      Do you recall voting in the March 2020 Primary Election?

21  A.  The March -- I'm sorry.  Can you say that date one more

22  time?

23  Q.  The March 2020 Primary Election.

24  A.  2020, yes, I did.

25  Q.  Can you tell us about that experience?

Deion Dorsett - Direct

1  A.   Yes.  It probably was the worst voting experience of my

2  life.

3      I went to Texas Southern University, me and my wife, we

4  hopped in the car.  We made it a point that we wanted to go

5  over and vote on election day this time.  Typically the Urban

6  League really promoted early voting.  But we wanted to go on

7  election day.

8      So we went to Texas Southern, and just it was very

9  unfortunate that it was the primaries, and there were

10 Democratic machines, there were Republican machines.  And those

11 are the first time I had ever become aware that there were

12 actually different machines.

13     But we were in line for about an hour, standing outside.

14 Then, when we got inside, we were in line for maybe about

15 another three hours.  And when we got inside, we found out that

16 only two of the Democratic machines were working.  And we

17 couldn't use the Republican, I guess, primary machines.

18     So we were in line and just waiting to exercise the right

19 to vote for almost four hours.

20 Q.  What was the temperature like when you were waiting

21 outside?

22 A.  It was hot, very unpleasant.  While we were standing

23 outside and watching people who are elderly, individuals who

24 had disabilities, clearly having to stand in that line.  Some

25 of them left the line.  A good bit of them stayed, but

Deion Dorsett - Direct

 1  definitely under duress.

 2      I had my 14-year-old daughter with me at that time, and it

 3  was an opportunity for me to also bring her to the polls with

 4  me and my wife together as a family unit.  And she had to

 5  endure that as well.

 6  Q.  And so what did your daughter do while you were waiting to

 7  vote?

 8  A.  Yes.  So a little background with my daughter.  She has

 9  ADHD.  She suffers from panic attacks.  So for the most part,

10  our expectations was that we wouldn't be there too long.  But

11  as it -- you know, the time continued to progress, we realized

12  that, okay, this could probably be a problem, especially for

13  her.  She doesn't like being around a lot of unfamiliar people.

14      So for the most part, we were able to distract her, you

15  know, because she could play on her phone, and then her phone

16  dies, you know, before we even make it in the door.

17      So now she has my phone, and then she plays -- my phone has

18  died.  My wife's phone has died.  And so that's when now I

19  could start to see that she was kind of dealing with some

20  things at that point.  And so we tried to communicate, talk

21  with her to kind of keep her calm.

22      Eventually, the election workers started bringing out some

23  chairs, which was mainly to kind of focus on the individuals

24  who did have a disability.

25      And I was able to get a chair for my daughter, put her in a

Deion Dorsett - Direct

1  corner where we could watch her.  And she slept.  She would
2  wake up, fall back asleep.  So she -- needless to say, she was
3  not excited about voting.
4  Q.  So let me ask you, how did this experience impact her --
5  impact your daughter's view of voting after that?
6  A.  Oh, every time I bring up that I'm going to go vote or
7  talking about the elections, she's like, oh, I'm so glad I
8  don't have to go with you.  That's kind of her perspective.
9      But I also tried to keep hammering at her -- into her that,
10  you know, this is our responsibility, you know.  It's not
11  always going to be pleasant, but this is what we're supposed to
12  do.
13  Q.  And so what time did you say you arrived at the polling
14  site that day?
15  A.  I want to say that we probably arrived at the poll maybe
16  around 5:00.
17  Q.  And what time did you ultimately leave?
18  A.  It was close to 9:00.  Yeah.  It was close to four hours
19  that we were there.  I recall when we walked out, we saw --
20  there were people still in line.  And there were election
21  workers outside, you know, to kind of make sure, I guess, no
22  one else would get in line.  That's what I assumed that I was
23  witnessing.
24      But my heart really went out to those individuals that were
25  still there.  I mean, I saw throughout the entire process

Deion Dorsett - Direct

1  people walking and leaving the line, you know, being
2  discouraged from voting at that point.
3  Q.  And what motivated you to stay in line for more than four
4  hours to vote?
5  A.  Again, like I touched on before, the history of voting in
6  this country, people have literally died, they have literally
7  given their lives, black, white, across all demographics for
8  the right to vote.  And the least that I could do to honor that
9  is to stay in line.
10 Q.  Do you think that people should be expected to stay in line
11 for that long to be able to vote?
12 A.  No, absolutely not.  I don't think that we should engage in
13 any type of process or, I guess, even any type of situation
14 where people are forced to show endurance in order to exercise
15 what is a right for everyone.  It should be an opportunity for
16 everybody.
17 Q.  So now I'd like to turn to the November 2020 election.  Did
18 you vote in that election?
19 A.  Yes, I did.
20 Q.  And what method of voting did you use during that election?
21 A.  We, my wife and I, decided to do drive-through voting.  I
22 think this was at the height of the pandemic.  The hospitals,
23 all the news reports across the country were indicating that
24 hospitals were over capacity.  And it was just this real fear
25 of getting COVID, maybe potentially passing that on to our

Deion Dorsett - Direct

1   parents.  We had some loved ones that had passed away during

2   the pandemic.

3       And so we were not sure at first whether or not we were

4   actually going to go vote this time, you know, whether it was

5   worth us, you know, potentially putting ourselves at harm or at

6   risk.  We were also trying to actively get pregnant.  So there

7   was just a lot of concerns there.

8       But we kind of did a little research, and we kind of locked

9   in on drive-through voting as being the best option for us.

10  Q.  Apart from concerns related to the pandemic, what motivated

11  you to use drive-through voting?

12  A.  Besides the pandemic, also, it's just -- you know, after a

13  while, the rhetoric in politics in this country has just gotten

14  so polarizing, that there were other voting opportunities where

15  we just didn't feel comfortable going to the poll, right?  We

16  didn't know who was yelling at us, who was trying to put

17  something in our hands, and we just kind of figured that what

18  we wanted to do was put ourselves in a position that was going

19  to allow us to be safest.

20      The other thing about drive-through voting that we kind of

21  was able to lock in on was that the drive-through voting

22  location that we used, which was the Toyota Center, was very

23  centrally located to where we were.  We were also trying to

24  engage family members to also go out and vote.  And so that

25  provided us a central location for everybody.

Deion Dorsett - Direct

1  Q.  Can you tell us a little bit about your experience using
2  drive-through voting during that election?
3  A.  So it was a pretty great experience.  It was seamless.  I
4  think "seamless" is the best term that I can use to describe
5  it.  I had some, you know, concerns because I wasn't familiar
6  with, you know, how it would necessarily be set up.
7      But when we got there, you know, there were election
8  workers.  Everybody was wearing vests.  So it was easy to
9  identify who was a part of the process and who was not supposed
10 to be there.
11     And because it was in a parking garage, which was really
12 great, at each corner, each turn, there was an election worker
13 to say, hey, turn here, to direct us to the next spot.
14 Everyone was wearing masks.
15     When we finally got up to the level to where we needed to
16 park, we were directed into our parking spot.  We were told to
17 cut the car off.  And we could see that there were, you know,
18 other cars pretty much down the row, but we were sitting maybe
19 about two or three empty spots in between these -- each
20 vehicle.
21     The election workers all had masks on.  I watched them
22 sanitize the machine.  They gave us very clear directions about
23 what this process was like, what we were supposed to do,
24 indicating things like we are not to communicate with each
25 other while voting.  They even told us that one person -- while

Deion Dorsett - Direct

1  one person is voting, the other person look away.  They stood

2  there and pretty much watched us vote.  They sanitized the

3  machines for us.  And then they went on to the other side of

4  the car, did the same thing for my wife.  And I want to say we

5  might have been out of there five to ten minutes.  We were --

6  we were on the way home.

7  Q.  Were you able to use your phone during the voting process?

8  A.  Absolutely not.  They indicated that no phones could be

9  out.  The only thing that you could have visibly in your hand

10 was if you had a copy of your -- a paper copy of your ballot,

11 you could have that.

12 Q.  At any point during this experience, did you have concerns

13 regarding the secrecy of your ballot?

14 A.  No, I didn't.

15 Q.  And I think you mentioned you shared your experience with

16 other people.  Who did you share your experience with?

17 A.  So while we were leaving out, me and my wife were both, you

18 know, extremely impressed about the process.  So we got on the

19 phone with her sister.  We got on the phone with her cousin,

20 both -- who are both younger than us but also had some serious

21 COVID concerns.  One of them is a health researcher at MD

22 Anderson.  So she was directly exposed to this all the time.

23 So we shared with them the process.  They went out and voted

24 and used drive-through voting.  To our knowledge, they went and

25 used drive-through voting.

Deion Dorsett - Direct

1    We also shared it with our parents.  My mother-in-law is
2   a -- is a nurse, and she worked on the COVID ward, on the COVID
3   wards at the height of the pandemic.  She was convinced, you
4   know, by what we shared with her, to, you know, go out and vote
5   as well.
6   Q.  And you mentioned your wife voted drive-through voting with
7   you.  Is your wife also a member of HAUL?
8   A.  Yes.  We met -- we met, I was the vice president of the
9   young professionals.  She moved to Houston.  She joined the
10  organization.  We eventually started dating.  We served on the
11  board together.
12    We're happily married.  So it worked out really well for
13  me.
14  Q.  So, Mr. Dorsett, are you aware of SB1?
15  A.  Yes.  I have some knowledge of it.
16  Q.  And are you aware that SB1 eliminated drive-through voting?
17  A.  Yes, I do.
18  Q.  What was your reaction when you learned that SB1 eliminated
19  drive-through voting?
20  A.  I was disappointed, I think kind of sums it up.  I think if
21  I -- from recollection of the news articles that I read
22  commentary on, you know, favorite shows on NPR and things like
23  that, that the consistent message was that we had overwhelming,
24  you know, voter turnout.  Like, there were records that were
25  broken in the county, I believe.

Deion Dorsett - Direct

```
1       And so to hear that an opportunity to access was removed
2  didn't sound like it was trying to protect the rights of the
3  people.
4  Q.  Do you think that SB1's elimination of drive-through voting
5  enhances the integrity of elections?
6  A.  I don't see how.  I think this claim -- I think everything
7  that I've seen or that I've heard about election integrity has
8  been unproven, has been unfounded.
9       I try to pay attention to what actually the facts are of
10 things.  And so that argument hasn't been convincing to me.
11 What I -- what I would kind of relate that to is creating a
12 problem so you can create a solution.  That's what I see that
13 as.  We're fighting an imaginary monster.  Doesn't exist.  It
14 has not impacted the integrity of our elections, not one bit.
15 Q.  Do you think that SB1's elimination of drive-through voting
16 increases the public's confidence in elections?
17 A.  No.  I think what increases the confidence of -- in
18 elections is our leaders having confidence in our elections,
19 you know, and if there's a problem, being able to identify
20 problems with facts and being able to show that and demonstrate
21 that to the people so the people can make a decision on
22 what's -- on what's going to be in their best interest.
23 Q.  If SB1 had not been enacted, would you have used
24 drive-through voting in future elections?
25 A.  Yeah.  I think I mentioned before, we -- you know, it's the
```

Deion Dorsett - Direct

1  safest option.  You know, just given the climate in this
2  country right now, it's the safest option.  Two places that I
3  feel the safest for me and my family is in our home and in our
4  vehicle.
5      I've had other experiences going to the polls where, you
6  know, the feeling is intimidating, right?  While I'm still
7  going to go, I mean, do I still get the same opportunity, or do
8  I put my daughter at risk in bringing her just for the sake of
9  showing her this process and so that she can vote, not knowing
10 what could potentially happen?
11     And so it's made me a little uneasy.  And so, yeah,
12 definitely, if it was still available, I would utilize it.
13 Q.  So I'd like to ask just a few more questions about some
14 other voting experiences that you had, Mr. Dorsett.
15     Let's talk about the March 2022 Primary Election.  Did you
16 vote in that election?
17 A.  No, I did not, no.  That was -- again, that election, I
18 believe, was -- that polling location was at Texas Southern
19 University as well.  It was one of those times where my wife
20 and I were both -- had to go -- we both had to go into work,
21 and we both got off extremely late.  And so I was waiting for
22 her to come home, so then we could make our way to the polling
23 location and vote.
24     We rushed over there.  We barely got there in time.  And
25 once we were able to get up to the desk -- or before we got up

Deion Dorsett - Direct

1  to the desk, I was told that identification that I had, because

2  it was a government identification, that it would be -- I would

3  be able to use that because I didn't have my license.

4      And so when I finally -- when we finally did get up to the

5  table where they verify information and identification, I was

6  then told that it was not an acceptable form of ID because it

7  did not have my birthday on it.

8  Q.  And so, ultimately, were you able to cast a ballot in

9  that --

10 A.  I was not able to cast a ballot.

11 Q.  How did that experience make you feel?

12 A.  It's frustrating because this is an important, you know,

13 part of our family tradition.  It's something that is important

14 to me.  Being able to lend my voice to the process is something

15 that I take seriously.

16     You know, I think from a military standpoint, you learn a

17 sense of duty.  And that's something that I see as a part of my

18 duty.  I think that is something that's part of my leadership,

19 you know.  If I demonstrate that I'm going to go vote, you

20 know, people may see what I'm doing and then follow suit and,

21 you know, be a part of the process as well.

22 Q.  If drive-through voting had been an option in the 2022

23 Primary Election, would you have used it?

24 A.  Yeah.  We would have been in the drive-through, for sure.

25 Q.  Now, I'd like to turn your attention to the 2022 General

Deion Dorsett - Direct

 1   Election in November.

 2       Did you vote in that election?

 3   A.  Yes, I did.

 4   Q.  Can you tell us a little bit about that experience?

 5   A.  So that was one of those experiences where we felt a little

 6   bit uncomfortable going to the polls.  There was just so

 7   much -- I mean, there was just so much discord that was just

 8   being communicated through every media, that we were really

 9   concerned about it from a safety standpoint.  But we decided

10   that, hey, we're going to go ahead and do it.  We weren't going

11   to bring my daughter.

12       So the two of us, my wife and I, we went to one of the

13   polling locations that we figured was kind of least used, kind

14   of out the way.  Of course, as soon as we get there, there are

15   people just kind of all over the place, yelling, shouting at

16   us, and we just kind of put our heads down, got in there,

17   voted, and then got back to our car.

18       And we didn't even stop to -- typically, we would do the --

19   we would get our "we voted" sticker, and we would stop to take

20   pictures and post on social media that we voted, you know, to

21   encourage other people to go vote.

22       But at that particular experience, we were like, nah, we

23   can get out of here.  We can -- we can do pictures later.  We

24   can do that at home.

25   Q.  If drive-through voting had been an option during this

Deion Dorsett - Direct

1   election, would you have used it?

2   A.  Yes, I would have.

3   Q.  And do you think it would have helped to avoid the

4   difficulties that you experienced during that election?

5   A.  Yes.  I think -- well, as I mentioned before, when we did

6   drive-through voting, everybody was identifiable.  It wasn't a

7   question about who was supposed to be there, who was in

8   authority there.

9       But going through this -- that election cycle, I didn't

10  know -- you didn't know who was who or who was in charge until

11  you got there, and you made an assumption that whoever was

12  behind the desk, giving directions was the person in charge.

13      And so going from that situation, going from drive-through

14  voting back to this situation, just lent confusion to me.

15  Q.  Well, Mr. Dorsett, you've testified about the elimination

16  of drive-through voting by SB1.

17      What message do you think SB1's elimination of

18  drive-through voting sends to voters in Texas?

19  A.  Well, I think it sends that we don't want everyone to be a

20  part of the process.  I can only conclude that, when you create

21  greater access, you create more opportunities.  And the more

22  opportunities there are, the likelihood of people engaging in

23  the process, the easier it is for them to engage in the

24  process, the most likely they will be a part of that process.

25      And when you start taking things off the table after it has

Deion Dorsett - Cross

1    been proven to work and to be effective and to be done

2    correctly, after you do that, then you can only say -- the only

3    thing that someone can conclude is that you just didn't want to

4    provide more opportunities.  You wanted to restrict

5    opportunities.  You wanted to restrict participation.

6              MR. BADAT:  Thank you, Mr. Dorsett.

7        No further questions for me, Your Honor.

8              THE COURT:  Anything else on this side?  Any cross?

9                    CROSS-EXAMINATION

10   BY MR. KERCHER:

11   Q.  Good afternoon, Mr. Dorsett.

12   A.  Good afternoon.

13   Q.  My name is Ryan Kercher.  I work for the Attorney General's

14   office.

15       I want to start by thanking you for your service.  With so

16   many members of the Army and the Marine Corps in one house, I

17   would imagine that family get-togethers are a lot of fun; is

18   that right?

19   A.  Very competitive.

20   Q.  I imagine.

21       Let's start by talking about your approach to voting

22   generally.

23       You spoke very eloquently about its importance to you on

24   direct examination, and I wanted to follow up on some of that.

25   A.  Okay.

Deion Dorsett - Cross

 1    Q.  When you vote, you appreciate having some privacy, right?

 2    A.  Yes, I do.

 3    Q.  For you, voting is an inherently private decision?

 4    A.  Yes.  I think I've said before that, you know, going to

 5    vote is a private decision.  It's something between me.  I

 6    liken it to my faith.  It's something that I believe in, and I

 7    don't have to necessarily explain it to anyone.  And so, yeah,

 8    so that is important to me.

 9    Q.  Right.  When you use that faith metaphor, your faith is

10    between you and your creator, and the vote is between you and

11    the ballot, right?

12    A.  That's correct.

13    Q.  And you don't want somebody looking over your shoulder

14    while you vote or while you pray to admonish you for how you're

15    doing that?

16    A.  Well, I don't want anyone to -- I don't want anyone to

17    engage in a process where my information is readily available

18    to someone who should not be able to see it.  But I think that

19    I've experienced -- in all my voting opportunities I've

20    experienced the privacy -- a level of privacy that I feel is

21    appropriate.

22    Q.  So I appreciate that additional explanation.  To bring you

23    back to my question --

24    A.  Okay.

25    Q.  -- it's important to you to not have somebody looking over

Deion Dorsett - Cross

1  your shoulder and admonishing you for your choices when you
2  vote?
3  A.  That's correct.  Yes.
4  Q.  Let's turn now then to your experience voting in that
5  November 2020 election when you used drive-through voting,
6  right?
7  A.  Correct.
8  Q.  Now, there was -- there was a Harris County election -- or
9  a former Harris County election official who testified earlier
10  during trial that at the -- at the drive-through voting
11  locations, they were handing out folders inside the cars for
12  privacy.
13      You didn't experience that.  Is that true?
14  A.  I can't recall that.
15  Q.  You didn't see anybody handing out any folders at the
16  drive-through location?
17  A.  I do not recall that.
18  Q.  And that's not a part of your description of the
19  drive-through voting experience that you had when you were
20  talking to --
21  A.  It's not something that I remember.
22  Q.  And I appreciate your enthusiasm to answer my questions.
23  Sometimes my questions --
24  A.  I'm sorry.
25  Q.  The court reporter has to take down what we both say.  And

Deion Dorsett - Cross

 1    so if we do it one at a time, that's going to make his job a
 2    lot easier.
 3    A.  Fair enough.
 4    Q.  So if I remind you, I'm not picking on you.  It's a weird
 5    situation.  I get it.
 6             THE COURT:  You need to slow down.
 7             MR. KERCHER:  And I'm doing something wrong, too.  So
 8    thank you, Your Honor.
 9    BY MR. KERCHER:
10    Q.  Now, when you voted in the drive-through voting, you went
11    with your wife, right?
12    A.  That is correct.
13    Q.  She was in the car with you?
14    A.  Yes, she was.
15    Q.  And the two of you both scrupulously followed the rules for
16    drive-through voting, right?
17    A.  Yes, we followed the directions as given.
18    Q.  Right.  You could not use your phone, I think you said,
19    right?
20    A.  Correct.
21    Q.  You could not speak to each other while each of you was
22    filling out the ballot, right?
23    A.  Correct.
24    Q.  And that's to -- that's to ensure that kind of privacy that
25    we talked about, right?

Deion Dorsett - Cross

1  A.  That is correct.

2  Q.  And, of course, you're in the car with your wife.  You

3  trust her to follow those rules, right?

4  A.  Correct.

5  Q.  And she trusted you to follow those rules?

6  A.  Absolutely.

7  Q.  Not every time that we trust somebody to do something and

8  to follow the rules do they follow those rules.  Is that true?

9  A.  That is true.  But that's also why you have individuals who

10  are there to ensure the compliance in the process.  And that's

11  what the election worker was doing.

12     Directions were given, and we trust each other to follow

13  through on those directions.  But you're also going to have

14  someone that's going to be there to ensure compliance from that

15  standpoint.

16  Q.  Well, and I appreciate that additional answer about your

17  personal experience with drive-through voting.

18     To your point, though, a lot of people used drive-through

19  voting, right?

20  A.  That's correct.

21  Q.  It's possible that not everybody had the same experience

22  with it that you did.  Fair?

23  A.  I mean, it's possible.  A lot of things are, yes.

24  Q.  And so when you -- you have described your personal

25  experience with drive-through voting, you also said it is

Deion Dorsett - Cross

1  important to you to keep up with the facts, right?

2  A.  That is correct.

3  Q.  So I'm going to ask you kind of an odd question, but I hope

4  you'll bear with me.

5     You have not reviewed the Secretary of State's Final Report

6  on Audit of the 2020 General Election, have you?

7  A.  No, I have not.

8  Q.  I told you it was going to be a weird question.  I

9  appreciate you --

10  A.  Sure.

11  Q.  -- working with me on that.

12     It's right to say that no one has ever told you that they

13  would not vote due to a lack of drive-through voting?

14  A.  Yes.  No one has told me that.

15  Q.  Let's shift gears now to that March of 2022 Primary

16  Election.

17  A.  Okay.

18  Q.  So on that election, you and your wife were trying to get

19  to the polling location in time on election day, right?

20  A.  That is correct.

21  Q.  And you thought that you had the right kind of

22  identification with you, right?

23  A.  Yes.

24  Q.  Now, this was a deal where you had a driver's license and

25  also a temporary form; is that right?

Deion Dorsett - Cross

```
 1  A.  That is correct.

 2  Q.  And you thought that you had both of them with you.  But as

 3  it turned out, you had left the picture ID in another vehicle?

 4  Do I have that right?

 5  A.  That is correct.

 6  Q.  Honest mistake, right?

 7  A.  Yeah.

 8  Q.  And when you got in the car to go to the polling location,

 9  you thought you had both of them, right?

10  A.  That is correct.

11  Q.  When you got there, you were disappointed to have learned

12  that you had left one in the other car, right?

13  A.  Yes.

14  Q.  And you were told that you were not going to be able to

15  vote with just that paper temporary ID, right?

16  A.  Not just that, but I would not be able to utilize my

17  federal government ID as a valid form of identification.

18  Q.  And when you were -- you say you were told that.  Were you

19  told that by poll watchers or poll workers?  Or do you know?

20  A.  So the only thing -- I'm making the assumption that they

21  were election workers because they were behind -- they were

22  behind the table, and it was the table where it listed out all

23  the forms of potential ID.  I think there was a table where we

24  had to sign at some point in time.  So my -- the best that I

25  conclude, that they were election workers.
```

Deion Dorsett - Cross

1  Q.  Did any of those election workers talk to you about using a

2  provisional ballot?

3  A.  No, they did not.

4  Q.  Do you know what that is?

5  A.  I do not.

6  Q.  Since you had trouble voting in that March 2022 election,

7  have you done any research to see what a provisional ballot is

8  or other measures you might take in the event you leave your ID

9  at home sometime in the future?

10  A.  I have not done any research regarding the provisional

11  ballot.  But I did become aware, much later on, that they --

12  that I should have been given an opportunity to vote, and I --

13  I should have been given an opportunity to vote if I made -- if

14  I essentially had other forms of identifications that I could

15  have displayed at that point in time.  But I wasn't given that

16  option.

17  Q.  And at any time did you -- did you report the election

18  workers to on up the chain, either to the county or to the

19  local parties?

20  A.  No, I did not, not at the time.  At that time I thought it

21  was my error in that situation.  So for a while I was -- the

22  frustration was with myself not having -- to a certain extent,

23  being prepared.

24  Q.  And since then, you've not made a report to the Attorney

25  General's office or the Secretary of State's office about

Deion Dorsett - Cross

1  having been denied the right to vote; is that correct?

2  A.  I have not.  That's correct.

3  Q.  That experience in March of 2022, fortunately, did not

4  discourage you from going back to the polls on May 7th, 2022,

5  right?

6  A.  Yes.  I believe that was maybe constitutional amendments,

7  something like that.

8  Q.  That's my memory, too.

9      You voted successfully on that May 7th election, right?

10  A.  Correct.

11  Q.  And again on the May 24th, 2022 elections?

12  A.  I believe so, yes.

13  Q.  Thank you again for your time today.

14          MR. KERCHER:  Your Honor, I pass the witness.

15          THE COURT:  Anything else from this side?

16      Any redirect?

17          MR. BADAT:  No redirect, Your Honor.

18          THE COURT:  You're excused, sir.  Thank you.

19          THE WITNESS:  Thank you.

20          THE COURT:  Your next witness.

21          MS. PERALES:  Good afternoon, Your Honor.  Nina

22  Perales for the LUPE plaintiffs.

23      LUPE plaintiffs call Ms. Yvonne Ramon.

24      I request permission to ask leading questions under Federal

25  Rule of Evidence 611(c)(2) because Ms. Ramon, she's actually

Deion Dorsett - Cross

 1   the retired elections administrator for Hidalgo County.  But at

 2   the time of her examination, she was the elections

 3   administrator.

 4          THE COURT:  Any response?

 5          MR. WASSDORF:  No objection.

 6          THE COURT:  You may proceed.

 7          MS. PERALES:  Thank you.

 8          THE COURT:  She'll be testifying on what subjects?

 9          MS. PERALES:  Yes.  For the record, Ms. Ramon's

10   testimony will support plaintiffs' challenges to SB1

11   Sections 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, 7.04, 4.09 and

12   8.01.

13      *(The oath was administered)*

14          MS. PERALES:  Your Honor, if we might approach.

15          THE COURT:  Yes.

16          MS. PERALES:  Thank you.

17          THE WITNESS:  I'm going to need my glasses, if I have

18   to read something.

19          MS. PERALES:  Yes.  Please feel like you can take a

20   moment to have your glasses handy or put them on.

21          THE WITNESS:  May I -- may I --

22          THE COURT:  Sure.

23          THE WITNESS:  I'm sorry.

24          MS. PERALES:  Testifying is hard enough.  We're not

25   going to take make you do it without your glasses.

```
 1              YVONNE RAMON, PLAINTIFFS' WITNESS, SWORN
 2                        DIRECT EXAMINATION
 3   BY MS. PERALES:
 4   Q.  Good afternoon.  Can you please state your name for the
 5   record.
 6   A.  Yvonne Ramon.
 7   Q.  You are retired; is that correct?
 8   A.  I am.
 9   Q.  What job did you hold before you retired?
10   A.  I was the elections administrator for the County of
11   Hidalgo.
12   Q.  How long did you hold that job before you retired?
13   A.  14 years.
14   Q.  And tell us the date that you retired.
15   A.  September 11th, 2022.
16   Q.  As the elections administrator in Hidalgo County, you
17   oversaw the voter registration department and the elections
18   operations in Hidalgo County; is that right?
19   A.  That's correct.
20   Q.  And you administered federal and state elections, county
21   elections, 18 school districts' elections and 21 city
22   elections; is that right?
23   A.  That's correct.
24   Q.  And in your time, your 14 years with Hidalgo County
25   elections, you administered well over 200 elections; is that
```

Yvonne Ramon - Direct

 1  correct?

 2  A.  Yes.

 3  Q.  And I understand you retired on September 11, 2022.  But

 4  does that mean that you did conduct elections in Hidalgo County

 5  and its subdivisions through the 2022 March primary, the

 6  primary runoff and local elections?

 7  A.  Yes.

 8  Q.  Okay.  You had a leadership role, didn't you, in the Texas

 9  Association of Elections Administrators; is that right?

10  A.  Yes.

11  Q.  What was the highest position that you served in?

12  A.  I was -- I did serve as President of the Texas Association

13  of Elections Administrators.

14  Q.  Do you recall the year that you were president?

15  A.  At the moment, I don't.

16  Q.  Was it some time around 2019?

17  A.  You start off as secretary and then treasurer and then

18  president.  So I was with the board for a few years.

19  Q.  And then after you served as president of the TAEA, you

20  then transitioned, as was customary, on to the legislative

21  committee; is that right?

22  A.  Yes.

23  Q.  And were you a cochair of the legislative committee?

24  A.  I was.

25  Q.  And just with respect to the Texas Association of Elections

Yvonne Ramon - Direct

1  Administrators, there are roughly 137 counties represented in
2  that association; is that right?
3  A.  That's about right.  When I left, that was around the
4  number.
5  Q.  And Texas' largest counties are all represented in the
6  TAEA; is that right?
7  A.  At the time that I was there, yes.
8  Q.  How long have you lived in the Rio Grande Valley?
9  A.  All my life.
10 Q.  And Hidalgo County is located on the U.S./Mexico border, is
11 it not?
12 A.  Yes.
13 Q.  How many people roughly live in Hidalgo County?
14 A.  The last time I checked was -- which was about a year ago,
15 we were right under 900,000.  It was 800 and something thousand
16 in population, according to the census.
17 Q.  And is it fair to say that the strong majority of the
18 population in Hidalgo County is Hispanic?
19 A.  Yes.
20 Q.  About how many poll workers would you hire for a General
21 Election?
22 A.  Well, we would have between 29 to 35 early vote locations,
23 and each required a judge and an alternate judge, plus a
24 minimum of three clerks.  And during election day, at that time
25 we had 75 election days.  So can't do the math right now, been

Yvonne Ramon - Direct

1  ill, but that roughly -- and we really didn't have but a few

2  with three clerks.  Most had between five and eight and some

3  had as many as ten clerks.

4  Q.  Those would be for the bigger locations?

5  A.  That's correct.

6  Q.  Okay.  And I should thank you now for allowing us to

7  reschedule you so that you could come and testify a little bit

8  after some of the other administrators.  So thank you for that.

9  A.  Well, thank you for having me and for waiting for me to get

10 better.  I was quite ill.

11 Q.  Would it be fair to say that the type of equipment you used

12 in the polling place was -- actually, I should ask you.

13     Was it ExpressVote or another type of machine?

14 A.  I'm trying to think.

15 Q.  Okay.  We'll come back to that one.

16 A.  Why isn't it coming to me?

17     We started with ES&S.  We did have ES&S when I first

18 started in 2008, and then we went with Hart.  Hart.  It was

19 Hart voter equipment.

20 Q.  Yeah.  We will come up with a suggestion for later in the

21 examination for that.

22     Here's an easier question.  Was Hidalgo County an online or

23 an offline county?

24 A.  We were offline.

25 Q.  Okay.  And was VoteTech your vendor for your voter

Yvonne Ramon - Direct

1   registration?

2   A.   Yes.

3   Q.   Okay.  Now, in your view and while you were elections

4   administrator, the elections division of the Secretary of State

5   set the voting procedures for state elections; is that correct?

6   A.   Would you repeat the question?

7   Q.   The elections division of the Secretary of State set the

8   voting procedures for state elections, correct?

9   A.   Yes.

10  Q.   Okay.  And, in fact, in your view, the Texas Secretary of

11  State's office was your number one support system, correct?

12  A.   Yes.

13  Q.   And you looked to them for guidance, yes?

14  A.   Yes.

15  Q.   And you looked to them for instructions when something

16  changed or when something was new, yes?

17  A.   Yes.

18  Q.   And the Secretary of State interpreted the Election Code,

19  correct?

20  A.   That's correct.

21  Q.   And so if you had a question about what the Election Code

22  said, you would call the Secretary of State, correct?

23  A.   Correct.

24  Q.   Did you serve on the Secretary of State's County Election

25  Advisory Committee?

Yvonne Ramon - Direct

```
 1  A.  I did.
 2  Q.  And that advisory committee was created around 2020 by
 3  Christina Adkins and Keith Ingram; is that right?
 4  A.  That's correct.
 5  Q.  And it's your understanding that they invited 27 elections
 6  administrators to join them for monthly meetings to discuss
 7  changes and topics for election administration, yes?
 8  A.  Yes.
 9  Q.  You served on this committee from the time that it was
10  created by the Secretary of State until you retired; is that
11  right?
12  A.  That's correct.
13  Q.  And it was your understanding that although the Secretary
14  of State made a final decision about things like carrier
15  envelope design, for example, the Secretary of State would
16  solicit your input as the people who were administering the
17  elections; is that right?
18  A.  Yes.
19  Q.  And as part of your work on the elections advisory
20  committee, you usually dealt with Keith Ingram and Christina
21  Adkins; is that correct?
22  A.  That's correct.
23  Q.  I'd like to shift now to some things that you believe are
24  positive about SB1.
25      You believe it is positive that SB1 requires poll workers
```

Yvonne Ramon - Direct

1  to be trained; is that right?

2  A.  Yes.

3  Q.  And you believe it is positive that SB1 gives mail voters

4  the opportunity to cure their ballot, correct?

5  A.  Yes.

6  Q.  And you believe it is positive that SB1 regularized some of

7  the hours or made more uniform some of the hours of operation

8  of polling places, correct?

9  A.  Yes.

10  Q.  And as a result, in fact, Hidalgo County added an hour for

11  Sunday voting; is that right?

12  A.  That's correct.

13  Q.  And then, finally, you also believe it is positive that SB1

14  talks about employees who would like to vote during early

15  voting having the opportunity to take time from work; is that

16  right?

17  A.  Yes.

18  Q.  I'm going to shift now to voter assistance.

19      You have assisted a voter in the past; is that right?

20  A.  Yes.

21  Q.  And that voter was your mother; is that right?

22  A.  That's correct.

23          MS. PERALES:  Derek, would you be so kind as to

24  display SB1 at Page 51, Section 6.03.

25

Yvonne Ramon - Direct

```
1   BY MS. PERALES:
2   Q.  And this is the provision, Ms. Ramon, that talks about the
3   voter assistant submitting an additional form.
4            MS. PERALES:  And then, if you could, Derek, scroll to
5   Page 52, Section 6.04 where we see the requirements of the
6   assister oath.
7   BY MS. PERALES:
8   Q.  Ms. Ramon, does Hidalgo County provide election materials
9   and information in a language other than English?
10  A.  Yes.
11  Q.  And what language is that?
12  A.  Spanish.
13  Q.  Do you provide election materials and information in any
14  Asian languages?
15  A.  No.
16  Q.  You do have some voters who are in Hidalgo County who are
17  monolingual in an Asian language; is that correct?
18  A.  I would assume so.
19  Q.  You also are aware that in Hidalgo County there are some
20  voters who can't read or write, and they use assistance at the
21  polls; is that correct?
22  A.  Yes.
23  Q.  If we could turn now to LUPE Exhibit 172.
24       You'll notice the revision date in the upper left-hand
25  corner is July 2022.  Do you see that there?
```

Yvonne Ramon - Direct

1  A.  Yes.

2  Q.  Would that have -- would you have then begun to use this

3  oath of assistance form when it was released to you in July

4  2022?

5  A.  Yes.

6  Q.  And you'll notice on the right-hand column of the sign-in

7  sheet, it now asks for the relationship between the assistant

8  and the voter and also information about whether -- in the far

9  right, whether the assistant is being paid.

10    Do you see that there?

11 A.  Yes.

12 Q.  You would agree with me that this is new information,

13 additional information that is asked from assisters; is that

14 right?

15 A.  That's correct.

16 Q.  And when you were training your poll workers on these new

17 requirements, you did train your poll workers with the

18 expectation that it would take more time to get the assisters

19 through the oath process at the polling place, correct?

20 A.  Yes.

21 Q.  Now, in the oath itself, on the second line, around the

22 middle, it says, "I did not pressure or coerce the voter into

23 choosing me to provide assistance."

24    Do you see that there?

25 A.  I do.

Yvonne Ramon - Direct

1   Q.  Would you agree with me that you did not receive any

2   guidance from the Secretary of State's office about what

3   "pressure" means in the context of this oath?

4   A.  No.

5   Q.  Meaning, you did not get --

6   A.  We did not receive any structure, guidance or explanation,

7   no.

8   Q.  Thank you.

9       I'm shifting now to poll watchers.

10      Hidalgo County saw some incidents in the 2020 General

11  Election with poll watchers; is that correct?

12  A.  Yes.

13  Q.  And in one incident in 2020, a poll watcher demanded to see

14  the identification of a voter because the poll watcher claimed

15  the voter did not look like a U.S. citizen; is that correct?

16  A.  That's correct.

17  Q.  And this happened at the main early voting polling site,

18  also called the Annex; is that right?

19  A.  That's correct.

20  Q.  And the election judge at the annex contacted you to talk

21  about the poll watcher who had accused the voter of not being a

22  U.S. citizen; is that right?

23  A.  That's correct.

24  Q.  And you told the judge to tell the watcher, "Not only is it

25  not allowed, but it's disrespectful," correct?

Yvonne Ramon - Direct

1    A.  I did.

2    Q.  Now, as far as you know, the voter voted; is that right?

3    A.  Yes.

4    Q.  But you thought to yourself, "How do you take the sting

5    away from being told that," didn't you?

6    A.  I did.

7    Q.  Now, also, in 2020 at the main early voting polling site,

8    there were poll watchers gathered outside for curbside voting;

9    is that correct?

10   A.  Yes.

11   Q.  And some of those poll watchers were walking up to the

12   vehicles, peering inside the cars, taking pictures of the

13   people in the cars and also taking pictures of the license

14   plate; is that right?

15   A.  That's correct.

16   Q.  And these poll watchers were also writing things down,

17   according to election judge, and making the voters feel

18   uncomfortable; is that right?

19   A.  Yes.

20   Q.  And you believe this happened more than once; is that

21   right?

22   A.  Yes.

23   Q.  And it was very difficult to monitor this activity because

24   the election judge, who was Mrs. Rosales, was supposed to be

25   inside the polling place, doing her tasks inside, not outside,

Yvonne Ramon - Direct

1  trying to deal with the poll watchers who were taking pictures
2  of the inside of the car; is that right?
3  A.  Yes.
4  Q.  And you told Ms. Rosales that the watchers could observe
5  the process without taking pictures; is that right?
6  A.  Yes.
7  Q.  And the election judge did handle the incident; is that
8  right?
9  A.  Yes, she did.
10 Q.  Now, these poll watchers didn't report any irregularities
11 to you, did they?
12 A.  No, they didn't.
13 Q.  And you don't know what the poll watchers did with the
14 photographs that they took of the voters and their drivers; is
15 that right?
16 A.  I do not know.
17 Q.  Now, as far as you know, the voters in the cars voted; is
18 that right?
19 A.  They did.
20 Q.  But you also don't know what experience they took from
21 having watchers peer into the car and take photos of them; is
22 that right?
23 A.  That's correct.
24 Q.  Okay.  Now, then finally, also in 2020, you had an incident
25 involving an aggressive poll watcher; is that right?

Yvonne Ramon - Direct

```
 1  A.  At what location?
 2  Q.  In Mission.
 3  A.  Yes.
 4  Q.  Okay.  And there, the poll watcher was yelling and being
 5  very aggressive; is that right?
 6  A.  That's correct.
 7  Q.  And the judge felt uncomfortable and felt that this
 8  behavior could lead to something else because of the yelling
 9  and the aggressive behavior; is that right?
10  A.  That's correct.
11  Q.  You believe the election judge removed that poll watcher;
12  is that right?
13  A.  Yes.
14  Q.  But you're not sure if the poll watcher came back the next
15  day because the removal might have just been for that day; is
16  that right?
17  A.  That's correct.  I do not know.
18  Q.  Now, to the best of your understanding, voters were able to
19  vote at that polling place; is that right?
20  A.  Yes.
21  Q.  But you also don't know what impression the voters might
22  have taken away from that incident; is that right?
23  A.  That's correct.
24  Q.  And so looking into the 2022 Primary Election, was it your
25  sense that there was a group of poll watchers that had
```

Yvonne Ramon - Direct

1  organized for spring 2022 as well?

2  A.  No.  I believe it was November of 20 -- the prior year, the

3  2020 -- it wasn't that way in the Primary of 2022.

4  Q.  So in the General Election of 2020, you felt that the poll

5  watchers had some type of organization to them; is that right?

6  A.  That's correct.

7  Q.  And that when some poll watchers left, others would then

8  appear to take their place; is that right?

9  A.  Yes.  With the same approach.

10  Q.  Thank you.  I apologize for getting the date wrong on that.

11        MS. PERALES:  I'd like to go now to SB1 again, Derek,

12  if you'd be so kind, to Page 25, line 5.  And this is

13  Section 4.0.  Let's see if -- yes.  I think this is where it

14  is.

15  BY MS. PERALES:

16  Q.  There's a line here that says, at lines 4 and 5, with the

17  number on the left, that:  The watcher shall observe without

18  obstructing and call to the attention of an election officer

19  any observed or suspected irregularity or violation of the law.

20      Do you understand SB1 to allow a poll watcher now to

21  address more than just the election judge at the polling place?

22  A.  I understand.

23  Q.  Okay.  And this is a change, because previously the poll

24  watcher could only address themselves to the election judge; is

25  that right?

Yvonne Ramon - Direct

1  A.  Yes.

2  Q.  And so instead of being limited to talking to the election

3  judge, a poll watcher can talk to an election clerk while the

4  clerk is working with a voter; is that right?

5  A.  That's correct.

6  Q.  And so now, under SB1, a watcher can go to an election

7  clerk and possibly interrupt the process that is happening in

8  that moment with the voter; is that right?

9  A.  Yes.

10  Q.  So previously, when the watcher would go to the election

11  judge, in your view the judge could then address whatever the

12  problem might be after listening to the watcher and make a

13  correction if necessary; is that right?

14  A.  Yes.

15  Q.  But now that the poll watcher has the ability to go

16  directly to the election clerk, they can be interrupting, for

17  example, the check-in of a voter or the assistance of a voter;

18  is that right?

19  A.  Yes.

20  Q.  And you have a concern that now a poll watcher will come

21  and say to a poll worker, while the poll worker is interacting

22  with the voter, "Tell me what you're doing," or, "How is it

23  that you're doing this," or complaining something is not being

24  done right sort of while the voting is happening; is that

25  right?

Yvonne Ramon - Direct

1   A.   That's correct.

2   Q.   I'd like to scroll now to Page 27, lines 12 through 15.

3   There's language here in SB1 that an election officer commits

4   an offense if the officer intentionally or knowingly refuses to

5   accept a watcher.

6        Do you see that there?

7   A.   Yes.

8   Q.   And the offense is a Class A misdemeanor; is that right?

9   A.   Yes.

10  Q.   Now, you trained poll workers for the 2022 Primary

11  Election; is that right?

12  A.   I did.

13  Q.   And your poll workers expressed a concern about this

14  penalty for the Class A misdemeanor; is that right?

15  A.   Yes.

16         MS. PERALES:  Okay.  We can -- I'm actually going to

17  go forward to Page 27, bottom of the page, where Section 4.09

18  is, starting line 24 to the bottom.  Perfect.  Thank you.

19  BY MS. PERALES:

20  Q.   Now, with respect to how close a watcher can stand, you've

21  read this statute before, and you would agree with me that SB1

22  doesn't provide an exact distance; is that right?

23  A.   That's correct.

24  Q.   And you believe that the distance would have to be

25  determined by the individual watcher; is that right?

Yvonne Ramon - Direct

1   A.  That's right.

2   Q.  So you yourself said you might need to get a little bit

3   closer to the action if you couldn't hear or maybe if you

4   needed to get a little closer for your eyes; is that right?

5   A.  That's correct.

6   Q.  Okay.  And you would also agree with me that you didn't

7   receive any guidance from the Secretary of State about how

8   close a watcher can stand; is that right?

9   A.  We did not receive guidance on that.

10  Q.  You also didn't receive guidance from the Secretary of

11  State, did you, about the different ways in which a poll worker

12  might obstruct a poll watcher; is that right?

13  A.  That's correct.

14  Q.  And you agree that there can be tension between a poll

15  worker trying to, for example, protect a voter who's concerned

16  about COVID and a watcher who believes they need to be close

17  enough to see and hear; is that right?

18  A.  That's right.

19  Q.  And you personally don't know if a poll worker distancing a

20  watcher out of COVID concerns would be deemed obstruction; is

21  that right?

22  A.  I wouldn't be able to speculate, no.

23  Q.  Now, when you trained your poll workers for March 2022

24  Primary, that was in an auditorium; is that correct?

25  A.  It was, I believe, at the Bert Ogden Arena.  Is that what

Yvonne Ramon - Direct

1    I -- for the Primary 2022.  It was a huge arena.

2    Q.  And you did your training there for your poll workers?

3    A.  Yes.

4    Q.  Okay.  And in your training, you had a poll worker say,

5    about these criminal provisions, something along the lines of,

6    "It's kind of scary.  Will we get in trouble?"  Is that right?

7    A.  They were apprehensive, yes.

8    Q.  And you did have a discussion, and the way that you put it

9    for your poll workers was, "Once you start to feel the hair on

10   the back of your neck standing up, excuse yourself."  Is that

11   right?

12   A.  I was known to say that, yes.

13   Q.  All right.  And that was generally that if the poll worker

14   felt like they might be getting into trouble, that their hairs

15   were standing up, that they needed to back away a little bit

16   from the poll watcher; is that right?

17   A.  Step away and let someone else take over or take a moment

18   to compose themselves.

19   Q.  Okay.  I'd like to shift now to the mail ballot ID

20   requirement.  If we could look at Page 45 of the bill,

21   Section 5.13.

22       You recognize this language as providing that a mail ballot

23   may only be accepted if -- and there is going to be, down a

24   little bit where -- line 27, actually, all the way down, where

25   it says "the information required," which is the number

Yvonne Ramon - Direct

1  matching.

2     And you understand this to be that on a returned mail

3  ballot, your office would have to match the ID number provided

4  on the carrier envelope to the voter's voter registration

5  record; is that right?

6  A.  That's correct.

7  Q.  And there's also similar requirement for the application

8  for ballot by mail, yes?

9  A.  That's correct.

10  Q.  And you agree that it's possible that a voter could write

11  one of their ID numbers on the carrier envelope, or the ABBM,

12  but they hadn't remembered correctly which ID number they

13  originally put on their registration application, right?

14  A.  Yes.

15  Q.  But your office would have to reject it if you couldn't

16  match the number; is that right?

17  A.  If there was not a match, yes.

18  Q.  And you did -- your office did reach out to applications

19  for ballot by mail for an ID number either missing or

20  non-matching; is that right?

21  A.  That's correct.

22  Q.  And in those situations, if you didn't have contact

23  information for the voter, you would mail those things back to

24  the voter and ask for a correction; is that right?

25  A.  Yes.  The Secretary of State had guidance on that, and I

Yvonne Ramon - Direct

1   believe a form would be sent to the voter.

2   Q.  And it's your understanding that some people were able to

3   fix and send you, for example, an ABBM that you could match,

4   but some people did not return a second ABBM; is that right?

5   A.  That's correct.

6   Q.  Now, your mom learned to drive a little later in life,

7   didn't she?

8   A.  Yes.

9   Q.  And so her driver's license number was not something she

10  had when she originally registered to vote; is that right?

11  A.  That's correct.

12  Q.  And so it was her Social Security number that was on file

13  with her voter registration record; is that right?

14  A.  Yes.

15        MS. PERALES:  I'd like to go to Page 39, line 16.

16  There it is.  Now, that's for the -- oh, yes.  And can you also

17  highlight the second paragraph there, paragraph 1 and 2.  Yes.

18  If 2 could also be in yellow.

19  BY MS. PERALES:

20  Q.  So you would agree with me, looking at the language of SB1,

21  that if a voter has been issued a driver's license number, that

22  you don't see where SB1 allows them instead to provide the last

23  four of the Social on their carrier envelope; is that right?

24  A.  That's right.

25  Q.  So just the way the statute is written, it says if you have

Yvonne Ramon - Direct

1  a driver's license number, that's what you should use, correct?

2  A.  That's right.

3  Q.  So someone like your mom, who did -- who did have a

4  driver's license, but her voter registration record had her

5  Social Security number, somebody like her might follow this

6  language and put her driver's license number, and either her

7  application for ballot by mail or her carrier envelope would

8  fail to match; is that right?

9  A.  That's correct.

10  Q.  Now, also, to remind voters of the need to put the ID

11  number, is it correct to say that your office developed an

12  insert based on what the other counties were doing to draw the

13  voter's attention to that requirement; is that right?

14  A.  We did.

15  Q.  And you kind of evaluated what the other counties were

16  doing, and you picked the most kind of easy-to-read and even a

17  little colorful; is that right?

18  A.  That's correct.

19  Q.  Okay.  And you developed one for the ABBM and one for the

20  carrier envelope; is that right?

21  A.  Yes.

22  Q.  I'd like to move on for a minute to talk about the ballot

23  tracker.

24      Is it fair to say that in Hidalgo County, the rollout of

25  the ballot tracker was -- it was late to start working?

Yvonne Ramon - Direct

```
 1  A.  It was.
 2  Q.  And also that the ballot tracker was not user-friendly?
 3  A.  That's correct.
 4  Q.  And for the March 2022 Primary in Hidalgo County, you had
 5  two people use the ballot tracker to confirm their ID numbers;
 6  is that right?
 7  A.  Yes.
 8  Q.  And then I believe you had about 151 who came into the
 9  office to do it in person; is that right?
10  A.  I don't recall that number, but I think it is.
11  Q.  Thank you.
12      And one factor that you might think would affect people's
13  ability to use the ballot tracker, besides the
14  user-friendliness of it, might be because there are people in
15  the community who don't have access to computers; is that
16  right?
17  A.  That's correct.
18  Q.  Now, you tried to use the ballot tracker to track your
19  mother's mail ballot; is that right?
20  A.  I did.
21  Q.  And because she had a Social Security number in her
22  registration record but she didn't have a driver's license in
23  her registration record, the ballot tracker would not let you
24  continue to log in; is that right?
25  A.  That's correct.
```

Yvonne Ramon - Direct

1  Q.  The registration database needed to already have both the

2  Social Security number and the driver's license number in order

3  for her to use the ballot tracker; is that right?

4  A.  I would imagine so, because the application had not been

5  rejected.  And so the carrier itself had already been returned

6  by my mother or, as her assistant, I put it in the mail for

7  her.  So we were tracking it that way.  So it was the actual

8  tracking of it, using her Social Security number, and it

9  wouldn't let us continue.

10 Q.  Okay.  And so, ultimately, in order to update your mom's

11 voter registration record, you had to fill out a special

12 additional form to update her record; is that right?

13 A.  That's correct.

14 Q.  And she had the best helper in the world because it was the

15 Hidalgo County elections administrator who was helping her; is

16 that right?

17 A.  Thank you.  I was helping her.

18        MS. PERALES:  Okay.  Now, I'm going to move on to

19 Section 7.04 of SB1.  That's on Page 59, line 7.  And this has

20 to do with -- actually, am I telling you to go to 59, line 7?

21 I meant Page 60, line 15.

22 BY MS. PERALES:

23 Q.  And this is the section that says, "Unlawful solicitation

24 and distribution of application for vote by mail."

25        And you understand this to be a prohibition on election

Yvonne Ramon - Direct

1  officials sending out application for ballot by mail to people
2  who haven't requested it; is that right?
3  A.  That's right.
4  Q.  Now, for one election, the 2020 General Election, Hidalgo
5  County did mail out application for ballot by mail to
6  registered voters over age 65; is that right?
7  A.  Yes.
8  Q.  And this was -- would it be possible that Hidalgo County
9  uses -- used or uses the Hart InterCivic Verity Voting
10 machines?
11 A.  The Hart InterCivic -- they're listening.  They're going to
12 be so mad at me.  Hart InterCivic, yes.
13 Q.  Thank you.  Thank you.
14     Now back to the applications for ballot by mail.
15     In the 2020 general, you did send out unsolicited
16 applications for ballot by mail, yes?
17 A.  Yes.
18 Q.  And that was authorized by the Hidalgo County Commissioners
19 Court; is that right?
20 A.  Yes.
21 Q.  And the elections commission board in Hidalgo County had
22 met and asked you to take that item to the commissioners court
23 to ask for that because Hidalgo County was hit very hard with
24 COVID; is that right?
25 A.  That's correct.

Yvonne Ramon - Direct

1  Q.  And so for that election, November 2020, you did send out
2  applications for ballot by mail along with a letter explaining
3  that the voter could use the application for ballot by mail to
4  request a mail ballot; is that right?
5  A.  Yes.
6  Q.  And you mentioned that the letter of explanation was
7  approved by the Secretary of State; is that right?
8  A.  I know that I must have spoken to them because that was
9  my -- the norm, you know, because I didn't want voters to be
10 confused the following year with thinking they were going to
11 automatically get a mail ballot, when it's not automatically
12 renewable.
13     So I do recall discussing it with Christina and asking if
14 this was possible, and absolutely, it was mailed to each voter
15 that received the application.
16 Q.  And now, under SB1, you cannot send an application for
17 ballot by mail to a voter who has not asked for it; is that
18 right?
19 A.  That's correct.
20 Q.  And you felt that after you had uploaded the new ABBM on
21 your website, that you had to be very cautious about how you
22 distributed applications for ballot by mail; is that right?
23 A.  After Senate Bill 1?  Yes.
24 Q.  And you had to make sure that as you were talking to the
25 voters, that it was the voter for him or herself who was the

Yvonne Ramon - Direct

1  person who was asking for the application; is that right?

2  A.  That's correct.

3  Q.  Because the community was used to asking for multiple

4  applications for ballot by mail, for example, one spouse might

5  request for themselves and for the other spouse; is that right?

6  A.  That's right.

7  Q.  And, previously, people would come to your office and pick

8  up several applications for ballot by mail and take them back

9  to their neighbors; is that right?

10  A.  Yes.

11  Q.  And you believe that when Senate Bill made that -- when

12  Senate Bill 1 made that change, it was dramatic because the

13  individual now can only pick up for themselves; is that right?

14  A.  Yes.

15  Q.  And I believe this might be the last appearance of mom, but

16  as an election official, you could no longer take applications

17  to your mother and her friends; is that right?

18  A.  That's correct.

19  Q.  And that was something that you used to do?

20  A.  Including my homebound brother, who's a Vietnam vet.

21  Q.  And you would also bring one for him?

22  A.  I would.

23  Q.  And now, especially with respect to your mom's friends,

24  they're not computer savvy, they can't download and print

25  applications.  So now each of them individually has to call the

1  elections office and request the application for ballot by

2  mail; is that right?

3  A.  That's correct.

4  Q.  I'm going to shift now to the legislative process.

5     You watched the legislative hearings for SB1 remotely; is

6  that right?

7  A.  I did.

8  Q.  And because you served on the Secretary of State's

9  Elections Advisory Committee, you spoke about the bill to the

10 people at the Secretary of State's office; is that right?

11 A.  I would.

12 Q.  And both Christina Adkins and Keith Ingram heard from local

13 elections administrators with respect to their concerns about

14 SB1 as it was moving through the process; is that right?

15 A.  There were discussions, yes.

16 Q.  For example, counties expressed that they didn't have all

17 of the ID numbers for voters that they would need to implement

18 ID number matching; is that right?

19 A.  That's correct.

20 Q.  And counties expressed concerns about the criminal

21 provisions aimed at poll workers regarding poll watchers; is

22 that right?

23 A.  That's correct.

24 Q.  And counties also expressed concerns about the criminal

25 provisions for elections administrators distributing

Yvonne Ramon - Direct

1  applications for ballot by mail to people who hadn't requested
2  them; is that right?
3  A.  Yes.
4  Q.  Other members of the Elections Advisory Committee for the
5  Secretary of State included Ms. Jacque Callanen from Bexar
6  County; is that right?
7  A.  Yes.
8  Q.  Lisa Wise from El Paso County?
9  A.  Yes.
10 Q.  Michael Scarpello from Dallas County; is that right?
11 A.  Yes.
12 Q.  Ms. Anderson from Hays County?
13 A.  Yes.
14 Q.  And Chris Davis from Williamson County; is that right?
15 A.  Yes.
16 Q.  Also Tarrant County, right?
17 A.  Heider Garcia, yes.
18 Q.  Can we display briefly LUPE Exhibit 294.
19     This is a letter from the Texas Association of Elections
20 Administrators; is that right?
21 A.  Yes.
22 Q.  It's from the summer of 2021?  Upper left-hand corner
23 there, "July 1, 2021"?
24 A.  Yes.
25 Q.  Is that right?

Yvonne Ramon - Direct

 1  A.  Uh-huh.

 2  Q.  The only question I'll ask about this is that I believe

 3  you're one of the folks who signed the letter.  If we could

 4  just look at the bottom.

 5      You see your name there?

 6  A.  Yes.  And this will tell you when I was president, in 2020,

 7  because the letter is dated 2021.  So my term, I was immediate

 8  past president.

 9  Q.  Okay.  Thank you.

10      At this point you would have been on the legislative

11  committee, though; is that right?

12  A.  That's correct.

13  Q.  Now, I have a few questions for you regarding

14  accommodations of disabled voters.

15      In general, you work to accommodate the requests for

16  accommodation of disabled voters; is that right?

17  A.  Yes.

18  Q.  Sometimes you cannot accommodate those requests, such as, I

19  believe you recall an instance where a voter asked for a

20  braille ballot, and you were unable to provide a braille

21  ballot; is that right?

22  A.  That's correct.

23  Q.  So if a disabled voter asked you not to apply the mail

24  ballot ID requirement to them, would you still apply the law to

25  them?

Yvonne Ramon - Direct

```
 1  A.  Yes.
 2  Q.  And if a disabled voter asked you not apply the oath of
 3  assistance requirement as an accommodation, would you still
 4  apply the law to them?
 5  A.  Yes.  Yes.
 6  Q.  Finally, the last part of the bill that I'd like to look
 7  at, if we can switch back to SB1, is at Page 62, line 26.
 8      In Section 8.01 there is a provision there for civil
 9  penalty, and it flows on to the next page for election
10  officials who violate the Texas Election Code.  And it starts
11  on 62 and flows on to 63.  Liable to the state for a civil
12  penalty and also could lose their employment.
13      Do you see that there?
14  A.  Yes.
15  Q.  And you were worried, weren't you, as an elections
16  administrator, about these penalties because you were in charge
17  of a department of 27 permanent employees and hundreds of poll
18  workers.  And your concern was that you might be fined or
19  punished for a mistake that you might make or that one of your
20  employees might make; is that right?
21  A.  That's correct.
22          MS. PERALES:  I pass the witness.
23          THE COURT:  Anything else on this side?
24          MS. ARMENTA:  Good afternoon, Ms. Ramon.
25      I'm Elena Rodriguez Armenta from the Elias Law Group for
```

1  the LULAC plaintiffs.  I just have a few questions for you.

2      Sorry.  I should add, Your Honor, I'll be asking Ms. Ramon

3  questions related to LULAC plaintiffs' challenges to SB1

4  Sections 3.04, 3.09, 3.10, 3.12, 3.13, 5.03, 5.07, and 5.08.

5          THE COURT:  Thank you.

6                    CROSS-EXAMINATION

7  BY MS. ARMENTA:

8  Q.  Ms. Ramon, Hidalgo County has never offered 24-hour voting?

9  A.  That's correct.

10 Q.  And since leaving office, can you see a need for 24-hour

11 voting in Hidalgo County?

12 A.  Since leaving office, I've had an experience of having to

13 be with my elderly mother in a hospital 24 hours for seven

14 days.  And my observation now as a community member is looking

15 at all the medical people that are there day in and day out and

16 thinking to myself that definitely longer hours, more

17 accessible would have been convenient for them.

18     I didn't think in that respect when I was the elections

19 administrator.  But it was my concern.

20 Q.  Thank you.  And I'm sorry about your mom.  I hope she's

21 doing okay.

22 A.  She's better.

23 Q.  So 24-hour voting, in your opinion, would make voting more

24 accessible in Hidalgo County?

25 A.  It would.

Yvonne Ramon - Cross

1  Q.  And, in fact, a couple of Hidalgo polling places regularly

2  have lines that go past the close of polls, right?

3  A.  Yes.

4  Q.  So typically, some voters, at least, are waiting in lines

5  after polls close in Hidalgo County?

6  A.  Yes.

7  Q.  And options like 24-hour voting would give voters like this

8  more opportunities to vote?

9  A.  Absolutely.

10  Q.  I'd like to move on next to SB1's voter identification

11  requirements that you touched on with Ms. Perales.

12      After SB1 was enacted, the rejection for applications for

13  ballots by mail -- ballots to vote by mail markedly increased,

14  right?

15  A.  Yes.

16  Q.  The majority of applications rejected in Hidalgo County

17  because of application defects in the 2022 Primary Election

18  were due to issues related to voters' ID numbers?

19  A.  That's correct.

20  Q.  And the majority of ballots rejected in the 2022 Primary

21  Election due to defects were rejected because of voter ID

22  issues?

23  A.  That's correct.

24  Q.  You agree that Texas has many counties, each with unique

25  election needs?

Yvonne Ramon - Cross

```
 1  A.  Excuse me?
 2  Q.  You agree that Texas has many counties, each with unique
 3  election needs?
 4  A.  Yes, each unique, all 254.
 5  Q.  And Hidalgo County has election needs that are unique and
 6  specific to Hidalgo County?
 7  A.  Yes.
 8  Q.  And certain voting procedures that work well in Harris
 9  County may not be --
10      (Court reporter clarification)
11          MS. ARMENTA:  Sorry.
12  BY MS. ARMENTA:
13  Q.  Certain voting procedures that work well in Harris County
14  may not be necessary in Hidalgo County, is the question.
15      And she answered?
16  A.  Yes.
17  Q.  And vice versa?
18  A.  That's correct.
19  Q.  You did not implement, like you mentioned, 24-hour voting,
20  for instance.  But you had the discretion and freedom to adopt
21  it if you needed it?
22  A.  That's correct.
23  Q.  You chose not to?
24  A.  That's right.
25  Q.  But an entirely different county adopting 24-hour voting
```

Yvonne Ramon - Cross

1  did not impact you in any way?

2  A.  No.

3       MS. ARMENTA:  Thank you.  That's all I have.  I pass

4  the witness.

5       THE COURT:  Any cross?

6                    CROSS-EXAMINATION

7  BY MR. WASSDORF:

8  Q.  Good afternoon, Ms. Ramon.

9       Well, my colleagues have covered a lot of what I was going

10  to talk about.  So I apologize if we skip around a little bit.

11      But to start out, I'd like to talk about -- a bit about the

12  2020 election.

13      The 2020 was a Presidential Election year; is that right?

14  A.  Yes.

15  Q.  And voter turnout is normally higher during a Presidential

16  Election year?

17  A.  That's correct.

18  Q.  But the 2020 election was also at the height of the COVID

19  pandemic?

20  A.  That's correct.

21  Q.  And so things were working a little differently that year,

22  suffice it to say.  With respect to the elections, the governor

23  issued a proclamation extending the early voting period?

24  A.  Yes.

25  Q.  And one of the things that that caused was that increased

Yvonne Ramon - Cross

1  the cost of the election?

2  A.  Absolutely.

3  Q.  Because of the ongoing COVID pandemic at the time, you also

4  implemented some safety measures?

5  A.  Yes.

6  Q.  You held voting at perhaps different locations than you

7  ordinarily would have?

8  A.  In different rooms.  The locations weren't necessarily

9  different, but when we were perhaps put into a conference room,

10  we were then asked if they could put us into the gymnasium,

11  like, it was a school building, for example, or into a larger

12  office.  When they would put us in a hall, we would ask for

13  larger accommodations.

14  Q.  So you sought out larger places where people could social

15  distance?

16  A.  So that people could have more space between them and not

17  be so crowded.

18  Q.  And, in fact, you also in one instance used a sports and

19  concert arena?

20  A.  Yes, that's where we used the sports -- Berg Ogden Arena

21  for training, and as a poll location, too, on election day.

22  Q.  So would it be accurate to say that the 2020 election was

23  very different from the 2022 elections?

24  A.  Absolutely.  No comparison.

25  Q.  Now, during the 2020 election, you didn't use drop box

Yvonne Ramon - Cross

 1  voting, did you?

 2  A.  Just the one at the main -- the main office.  We only

 3  utilized one.

 4  Q.  And you didn't use drive-through voting?

 5  A.  No, we did not.

 6  Q.  But you did allow qualified individuals to use curbside

 7  voting?

 8  A.  We did set up curbside voting at our main office for the

 9  elderly and disabled that would not be able to walk inside the

10  main office.

11  Q.  And did you have curbside voting at the other physical

12  polling locations?

13  A.  All our locations have always had curbside voting, and so

14  we implemented that for the drop of the ballot on election day.

15      Actually, the governor also extended to the entire period

16  of voting.  So we had it every day.

17  Q.  And you also didn't utilize 24-hour voting during the

18  2020 --

19  A.  No.

20  Q.  And so after the 2020 election, there was the 87th

21  legislative session during 2021, and that is when SB1 was put

22  under consideration; is that right?

23  A.  That's correct.

24  Q.  And you never testified at the legislature about Senate

25  Bill 1, did you?

Yvonne Ramon - Cross

1   A.  I did not.

2   Q.  You -- and I believe the only person, the only legislator

3   that you personally spoke with about SB1 was Representative

4   Guerra?

5   A.  Yes.  He called.

6   Q.  Ms. Perales spoke about the Texas Association of Election

7   Administrators; is that right?

8   A.  Yes.

9   Q.  And you were, I guess, the immediate past president at the

10  time SB1 was under consideration?

11  A.  Yes.  The letter had the date.

12  Q.  In addition to the letter that TAEA sent to, I believe it

13  was the Lieutenant Governor and Speaker Phelan, TAEA also had a

14  lobbyist; is that right?

15  A.  Yes.

16  Q.  And he was responsible for representing TAEA's interests

17  before the legislature?

18  A.  Yes.  And we also had a TAEA member as our co-liaisons that

19  lived in the area and would attend with our lobbyist.

20  Q.  And you feel that the lobbyist -- I think his name was

21  Mr. Roberts?

22  A.  Cary Roberts.

23  Q.  You believe that he adequately represented your interests

24  before the legislature that session?

25  A.  Yes, sir.

Yvonne Ramon - Cross

1  Q.  Now, TAEA didn't take a position on Senate Bill 1 itself,

2  did it?

3  A.  That's correct.

4  Q.  But you did watch some of the hearings and floor debate on

5  the senate?

6  A.  I did.

7  Q.  And was it your understanding that voter fraud was one of

8  the reasons that the legislature passed SB1?

9  A.  That was their reason for passing the bill.  That was what

10  they commented and stated.

11  Q.  And you also understand that the uniformity of elections

12  was another reason the legislature passed the bill?

13  A.  That's correct.

14  Q.  And then, finally, I believe that ensuring public

15  confidence in the elections was another reason the legislature

16  passed the --

17  A.  That was what they stated.

18  Q.  Would you agree with me that we don't want fraud in Texas

19  elections?

20  A.  Nobody does.

21  Q.  And you would also agree that it's best if the elections

22  are uniform for everyone in the vote -- state to be able to

23  vote the same?

24  A.  That would be fine.

25  Q.  And you also think it's a good thing if the public is

1  confident in the outcome of those elections?

2  A.  Would you repeat the question?

3  Q.  Do you also believe that it is best if the public is

4  confident in the outcome of the elections?

5  A.  Absolutely.

6  Q.  You believe that all legally cast ballots should be

7  counted?

8  A.  That all illegally cast ballots should be counted?

9  Q.  No.  That all legally cast ballots.

10  A.  Legally.  I'm sorry.  If you could just get closer to the

11  microphone, that would really help me.

12  Q.  Yes, ma'am.

13      You believe that all legally cast ballots should be

14  counted?

15  A.  Yes.

16  Q.  And you believe that all illegally cast ballots should not

17  be counted?

18  A.  That's correct.

19  Q.  I believe you spoke with Ms. Perales about some instances

20  of voter fraud in Weslaco and Edinburg; is that correct?

21          MS. PERALES:  Objection, mischaracterizes the

22  testimony.

23          THE COURT:  She can clear it up.  Go ahead.  That's

24  overruled.

25

Yvonne Ramon - Cross

1  BY MR. WASSDORF:

2  Q.  You are aware of allegations of voter fraud in Weslaco and

3  Edinburg, aren't you?

4  A.  I was aware, yes.

5  Q.  Specifically people registering at addresses they didn't

6  live at?

7  A.  That's correct.

8  Q.  Specifically involving, I think, the former mayor in one

9  instance?

10  A.  That's correct.

11  Q.  And you are also aware of instances of people assisting

12  voters who did not qualify for assistance; is that correct?

13  A.  I wouldn't be able to speculate on that because I would not

14  be there, and the assistant is with the voter.  I'm not

15  present.

16  Q.  But --

17        THE COURT:  Is this the subject of all this that I

18  heard earlier about the documentation you didn't provide to the

19  plaintiffs?

20    So this is mere allegations of an investigation.  It's not

21  any -- it's not any testimony that there was any actual

22  findings of voter fraud, correct?

23        MR. WASSDORF:  I don't recall specifically.  We can

24  take a look at her deposition testimony if you'd like.

25        THE COURT:  No.  That's not answering my question.

Yvonne Ramon - Cross

1    You're not going to skirt that.

2        I made a previous ruling about, we're not going to go into

3    areas where you didn't provide the plaintiffs documentation.

4            MR. WASSDORF:  I believe that ruling --

5            THE COURT:  It seems like you're skirting that.

6            MR. WASSDORF:  I believe that ruling was with respect

7    to the testimony of Jonathan White, Your Honor.

8            THE COURT:  You're not going to get it through this

9    sidetrack here.

10       Next question.

11           MR. WASSDORF:  Yes, Your Honor.

12   BY MR. WASSDORF:

13   Q.  So the legislature passed Senate Bill 1 in September of

14   2021; is that correct?

15   A.  Yes.

16   Q.  And it took effect in December of 2021?

17   A.  December.

18   Q.  The first election after the implementation of Senate Bill

19   1 was in March of 2022?

20   A.  With early voting starting in February.

21   Q.  And so that's essentially three months or less to implement

22   an omnibus election bill?

23   A.  Weeks.

24   Q.  That's not much time?

25   A.  Not at all.

Yvonne Ramon - Cross

1  Q.  But since the March primary, additional time has passed; is

2  that right?

3  A.  Yes.

4  Q.  And Hidalgo County had more time to implement the

5  provisions of SB1 for the March primary runoff and the May

6  local election that I believe you also participated in?

7  A.  When I was still there in 2022, yes.

8  Q.  And since you left, there has been more time to implement

9  SB1 with respect to the November 2022 election and subsequent

10 elections?

11 A.  That's correct.

12 Q.  But you did not participate in those elections?

13 A.  I did not.

14 Q.  You spoke with Ms. Perales about the Secretary of State's

15 Advisory Committee that you sat on.

16     When you were on that committee, did you provide input to

17 the Secretary of State on the implementation of Texas election

18 laws?

19 A.  We were an advisory committee, and there were discussions

20 ongoing anytime we met, yes.

21 Q.  And do you believe that the Secretary of State took your

22 positions seriously?

23 A.  Yes.

24 Q.  As the elections administrator, one of your jobs was to

25 make sure that voting in Hidalgo County complied with federal

Yvonne Ramon - Cross

1  and state disability laws; is that right?

2  A.  That's correct.

3  Q.  And you are not aware of any individual who ever requested

4  a reasonable accommodation for a disability for any provision

5  of SB1, are you?

6  A.  I'm not aware.

7  Q.  And you've never denied a disabled individual a reasonable

8  accommodation if they requested one?

9  A.  I would not deny.  If we were not able to comply, then we

10  would definitely work with the voter to make sure the voter

11  could vote.

12  Q.  And I believe you spoke about an instance earlier with a

13  blind voter requesting a braille ballot.  And were you able to

14  assist that voter?

15  A.  We were able to assist but not provide the braille ballot,

16  which we didn't have.

17  Q.  And you are not aware of any voter in Hidalgo County who

18  has ever been able -- unable to vote due to their disability,

19  are you?

20  A.  Unable to vote?  I am not aware.

21  Q.  Before SB1 was implemented, it was illegal for an assister

22  to be paid to assist a voter.  Isn't that true?

23  A.  Before Senate Bill 1?  And are you talking about personal

24  appearance, or are you talking about mail ballot?

25  Q.  Either.

Yvonne Ramon - Cross

1    A.  Because --

2    Q.  To be -- to be paid to assist a voter.

3    A.  I am not aware.

4    Q.  Now, Senate Bill 1 did include a provision that

5    specifically excluded personal attendance or caregivers

6    previously known to the voter from the prohibition on payment

7    to assist a voter; is that correct?

8    A.  Previously, yes.

9    Q.  And that provision didn't exist prior to Senate Bill 1?

10   A.  No, not that I'm aware of.

11   Q.  And you're familiar with the provision of Senate Bill 1

12   that prohibits counties from sending out unsolicited mail-in

13   ballot applications?

14   A.  From sending out unsolicited?  That's correct.  In Senate

15   Bill 1.

16   Q.  Prior to 2020, though, Hidalgo County had never sent out

17   unsolicited applications for ballot by mail?

18   A.  One time, for the COVID 2020 November election.

19   Q.  My question was, prior to 2020.

20   A.  No.

21   Q.  And so the only time that Hidalgo County has sent out

22   unsolicited applications is during the COVID-19 pandemic for

23   the 2020 General Election?

24   A.  Correct.

25   Q.  But that was purely due to the pandemic?

Yvonne Ramon - Cross

1  A.  Purely due to the pandemic.

2  Q.  Prior to SB1, you occasionally had problems with poll

3  watchers; is that right?

4  A.  Occasionally.

5  Q.  Mainly complaints about intimidation?

6  A.  Could be intimidation.

7  Q.  And I believe you spoke earlier about one instance in which

8  a poll watcher was removed from the polling place?

9  A.  During what election?

10  Q.  I do not recall what election it was.  I believe they were

11  just being disruptive at the polling place.

12      Do you recall a poll watcher being removed?

13  A.  The one we just discussed initially?

14  Q.  Yes.

15  A.  That's correct.

16  Q.  And Senate Bill 1 still allows for a poll watcher to be

17  removed if they cause a disruption, doesn't it?

18  A.  Yes.  It's stricter now, but it still will allow eventually

19  a poll watcher to be removed.

20  Q.  You're not aware of anyone who has ever been prevented from

21  voting by a poll watcher?

22  A.  No.

23  Q.  Under Senate Bill 1, a poll watcher is able to be present

24  at the polling locations?

25  A.  That's correct.

Yvonne Ramon - Cross

1   Q.  And at central count?

2   A.  That's correct.

3   Q.  Basically everywhere a ballot is present?

4   A.  Everywhere and anywhere.

5   Q.  And poll watchers in Hidalgo County could be present at

6   that location -- at those locations prior to SB1.  Isn't that

7   true?

8   A.  Yes.  But the hours were different.

9   Q.  But now it's just written into law?

10  A.  Yes, sir.

11  Q.  Prior to Senate Bill 1, the counties had more discretion as

12  to when the polls were going to be open during early voting; is

13  that right?

14  A.  There was more discretion.

15  Q.  Counties weren't required to open polls on the weekends?

16  A.  They weren't.

17  Q.  And counties weren't required to open the polls for any

18  particular length of hours during the day?

19  A.  That's correct.  Now, keep in mind that on the weekend, the

20  office could be petitioned by voters to open.  So there was

21  that possibility.

22  Q.  And you believe that having uniform voting hours makes

23  early voting easier and more accessible, don't you?

24  A.  That's why we already had implemented 12-hour days.

25  Q.  So Senate Bill 1 required polls to be open at least nine

Yvonne Ramon - Cross

 1  hours a day during early voting; is that right?

 2  A.  That's right.

 3  Q.  And they required that they be opened on the weekends?

 4  A.  That's right.

 5  Q.  And including six hours on Sunday?

 6  A.  That's correct.

 7  Q.  And Senate Bill 1 also required that the polls couldn't be

 8  opened before 6:00 a.m. or after 10:00 p.m.?

 9  A.  That's correct.

10  Q.  But Hidalgo County already had the polls open for 12 hours

11  a day during early voting?

12  A.  We did.

13  Q.  And you already had the polls open on the weekend during

14  early voting?

15  A.  Yes.

16  Q.  And Hidalgo County didn't open the polls before 6:00 a.m.?

17  A.  No, sir.

18  Q.  And you didn't close the polls after 10:00 p.m.?

19  A.  No, sir.

20  Q.  And so, really, the only change with respect to polling

21  hours that Senate Bill 1 made for Hidalgo County was requiring

22  one extra hour on Sundays?

23  A.  That's correct.

24  Q.  And now, after SB1, other counties are required to do --

25  use similar hours to what Hidalgo County already used?

Yvonne Ramon - Cross

 1  A.  That's correct.

 2  Q.  Prior to SB1, the legislature has passed other election

 3  laws; is that right?

 4  A.  Yes.

 5  Q.  And you have implemented changes in voting rules prior to

 6  SB1?

 7  A.  Yes.

 8  Q.  And it's your experience that voters take time to learn new

 9  voting processes?

10  A.  It takes time.

11  Q.  But sooner or later, they do learn those new processes,

12  right?

13  A.  They don't have a choice.  So yes.

14  Q.  And you would expect that to hold true for Senate Bill 1?

15  A.  We would work hard at it, yes.

16  Q.  And you took efforts to educate your staff about the

17  changes implemented by Senate Bill 1?

18  A.  Yes.

19  Q.  And you took efforts to educate the voters about the

20  changes implemented by --

21  A.  We did our very best.

22  Q.  So you're familiar with Senate Bill 1's ID number matching

23  requirement?

24  A.  Yes.

25  Q.  And Hidalgo County accepted applications for ballot by mail

Yvonne Ramon - Cross

1    or ballot by mail that had a matching driver's license number,
2    correct?
3    A.   If that was the ID that the voter --
4    Q.   If there was a driver's license number listed on the
5    application on the ballot that matched the voter registration
6    record, you would accept that?
7    A.   Yes.
8    Q.   And if it had a Social Security number that matched the
9    voter's registration record, you would accept that?
10   A.   Yes.
11   Q.   If it had both numbers and one of them matched, you would
12   accept that?
13   A.   Yes.
14   Q.   And this approach was informed by guidance from the
15   Secretary of State's office?
16   A.   It took a while because implementing it was late, as you've
17   already stated, and so have I.  And so as the process continued
18   and we tried to understand the law as best we could, with weeks
19   in between of implementing it, it did take on different shapes
20   and forms.  And so eventually we were instructed to take the
21   application if it had both, to take the application if one or
22   the other matched.
23   Q.   Earlier Ms. Perales showed you some language of Senate Bill
24   1 that said, you know, if you have a driver's license, use your
25   driver's license.  If you have a Social Security number, use

Yvonne Ramon - Cross

```
 1  your Social Security number.
 2       Do you remember that?
 3  A.  Yes.
 4  Q.  Do you know where the legislature got that language?
 5  A.  I don't.
 6  Q.  Do you know if, when voters register to vote, they are
 7  required to include either their driver's license or Social
 8  Security number?
 9  A.  In today's law, yes, but not always.
10  Q.  Do you know what law implemented that requirement?
11  A.  I don't recall.
12  Q.  Do you know what the Help America Vote Act is?
13  A.  Yes, I do.
14          MR. WASSDORF:  Brian, could you pull up this
15  comparison.
16  BY MR. WASSDORF:
17  Q.  So on the left here we have the provision that Ms. Perales
18  was showing you earlier.  And on the right we have the
19  requirements of the Help America Vote Act for voter
20  registration.
21       And so it reads here, "Except as provided in clause (ii),
22  notwithstanding any other provision of law, an application for
23  voter registration for an election for Federal office may not
24  be accepted or processed by a state unless the application
25  includes --
```

Yvonne Ramon - Cross

1        "(I) in the case of an applicant who has been issued a
2   current and valid driver's license, the applicant's driver's
3   license number; or
4        "(II), in the case of any other applicant (other than an
5   applicant to whom clause (ii) applies), the last 4 digits of
6   the applicant's Social Security number."
7   A.   Do you have the date on this?
8   Q.   This is the Help America Vote Act of 2002.
9   A.   The year?
10  Q.   2002 was the year it was passed.
11       Did I read you that correctly?
12  A.   Yes.
13  Q.   And does that requirement look very similar to the
14  requirement in Senate Bill 1?
15  A.   Yes.
16          MR. WASSDORF:  Your Honor, I would ask that the Court
17  take judicial notice of that provision of the Help America Vote
18  Act.
19          THE COURT:  Any response?
20          MS. PERALES:  No objection, Your Honor.  It's a
21  federal statute.
22          THE COURT:  Yeah.  I'll take not only that provision,
23  I'll take judicial notice of the entire statute.
24          MR. WASSDORF:  Thank you.
25

Yvonne Ramon – Cross

1  BY MR. WASSDORF:

2  Q.  So in Hidalgo County in the March 2022 Primary, I believe

3  approximately 400 voters had their application for ballot by

4  mail rejected for an ID mismatch.

5     Does that sound right?

6  A.  If that's in my deposition.  I don't recall at this moment

7  exact numbers.

8  Q.  Would you like to take a look at the deposition?

9  A.  I could.  If it's in my deposition, I would accept it.  I

10  just --

11        MR. WASSDORF:  Brian, can we pull up her April 2022

12  deposition, Page 138, lines 3 through 9.

13  BY MR. WASSDORF:

14  Q.  "Question:  Can you tell the judge how many applications

15  for ballot by mail were rejected on account of a mismatched

16  identification number as part of the March 2022 primaries?

17     "Answer:  Let's see if I can remember.  I believe for March

18  there were approximately over 400 applications that showed the

19  reason to be no ID."

20     Did I read that correctly?

21  A.  Yes.

22  Q.  Do you have any reason to dispute that testimony?

23  A.  I'm sorry?

24  Q.  Do you have any reason to dispute that testimony?

25  A.  Not at all, no.

Yvonne Ramon - Cross

1  Q.  And in rejecting those 400 approximately applications for

2  ballot by mail, Hidalgo County gave those individuals the

3  opportunity to cure that application, didn't they?

4  A.  Yes.

5  Q.  And some or all of those individuals did cure their

6  applications?

7  A.  Some.

8  Q.  Even if they didn't cure the defect on the application,

9  they still could have voted in person?

10  A.  Once the ballot by mail is received in the office, it can

11  no longer be -- and processed, it can no longer be canceled and

12  have them vote in person.  No, sir.

13  Q.  I believe I'm talking about applications.

14  A.  Applications.  If the application is canceled, yes, it does

15  give them an opportunity to then vote personal appearance.

16  Q.  And you're not aware of any individual who was ultimately

17  unable to vote because of the ID-matching requirement?

18  A.  I don't -- I don't recall.  No, I don't have that

19  information.

20  Q.  Besides the ID-matching requirement, there are other

21  reasons that an application for ballot by mail or ballot by

22  mail could be rejected?

23  A.  That's correct.

24  Q.  Such as failing to include a signature?

25  A.  That's correct.

Yvonne Ramon – Cross

1   Q.  Or on an application, failing to include the reason that

2   you're requesting to vote by mail?

3   A.  Yes, sir.

4   Q.  And the application for ballot by mail includes a place for

5   the voter to include their phone number?

6   A.  That's correct.

7   Q.  And their email address?

8   A.  Yes.

9   Q.  As well as their home address?

10  A.  Yes.

11  Q.  And so that's three ways that the county can contact the

12  voter to let them know about the defective application?

13  A.  The only difference is the address is mandatory to complete

14  the application, but the email and the phone number are

15  optional.

16  Q.  But it's up to the voter to decide whether they want to

17  include that information?

18  A.  It's up to the voter.

19  Q.  And as much of that information was present on the

20  application, Hidalgo County would use that to try to contact

21  the voter, correct?

22  A.  That's correct.

23  Q.  So if it had all three, you know, you'd call them, you'd

24  email them, and you'd mail them the form, I think you discussed

25  about from the Secretary of State; is that right?

Yvonne Ramon - Cross

 1   A.  Yes, sir.

 2   Q.  Prior to Senate Bill 1, the signature on a ballot was

 3   matched to the signature on the application; is that right?

 4   A.  Yes.

 5   Q.  To match up the application to the ballot that was sent as

 6   a result of that application?

 7   A.  The carrier envelope, yes.

 8   Q.  And you don't believe that the signature match is the best

 9   way to match a ballot to that application, do you?

10   A.  I don't -- I have an opinion in the age and the year of the

11   signature with the elderly or someone who has become disabled,

12   whose signature, you know, every time they sign could be a

13   little different.

14       That's when there are issues in my opinion because -- it's

15   just my opinion -- where perhaps a signature may not match

16   because of circumstances.

17   Q.  And you believe that an ID match is a more effective way to

18   match ballots to applications?

19   A.  It is more systemic, correct, unless, of course, there's a

20   transposition of a number or somebody doesn't remember.

21   Q.  Now, initially, you had some difficulties implementing the

22   ID-matching requirement, I believe because Hidalgo is an

23   offline county, as you discussed previously?

24   A.  That's correct.

25   Q.  And so when we say "offline county" -- actually, let me

Yvonne Ramon - Cross

1    back up.

2        The Secretary of State's statewide voter registration

3    system is called the Texas Election Administration Management

4    System?

5    A.   TEAM.

6    Q.   TEAMs for short.  And that database, Secretary of State

7    works to pull information from the Department of Public Safety

8    to ensure that it contains the ID numbers for the voters; is

9    that right?

10   A.   Now it does, yes.

11   Q.   But Hidalgo County doesn't directly use the TEAMs system?

12   A.   Not directly, correct.  We don't put the information into

13   TEAM.  We are an offline county, so we have our own vendor.

14   And every month information is uploaded to the Secretary of

15   State's database.

16   Q.   And so Hidalgo County has their own database that they

17   maintain?

18   A.   Yes, sir.

19   Q.   And initially, when Senate Bill 1 was getting implemented,

20   that upload, that sync between your database and the TEAM

21   database, you were having some problems with that?

22   A.   Yes, sir.

23   Q.   But since those initial problems occurred, you were able to

24   eventually successfully sync those systems and establish a

25   process for getting information from the TEAMs database into

Yvonne Ramon - Cross

 1  your database to ensure that you had as much data as possible

 2  to match to; is that right?

 3  A.  Eventually, yes.

 4  Q.  There are a couple of ways to correct a missing or

 5  mismatched ID number; is that right?

 6  A.  For example?  Explain --

 7  Q.  So I think you discussed the ballot tracker earlier.

 8  A.  Oh, yes.

 9  Q.  So somebody can go into the Secretary of State's ballot

10  tracker to correct an ID number?

11  A.  I don't know that answer.  I believed the ballot tracker

12  was simply to track your ballot as to where the ballot's

13  position was, what had been done to the ballot thus far.

14      I am not aware that it is possible to edit.  Things may

15  have changed.  I don't know.  So I wouldn't be able to answer

16  that.

17  Q.  You could -- a voter could also submit a new voter

18  registration application with a correct ID number on it,

19  couldn't they?

20  A.  They could make a change, not a new, but a change to their

21  voter application information.

22  Q.  And they could also come into your office in person, I

23  believe?

24  A.  That's correct.

25  Q.  Let's talk briefly about straight-ticket voting.

Yvonne Ramon - Cross

1      Now, straight-ticket voting is the ability to select all of

2  a parties' candidates on a ballot at once, correct?

3  A.  That's correct.

4  Q.  And straight-ticket voting is not allowed under Texas law?

5  A.  No, sir.

6  Q.  In fact, it was eliminated from the election procedures in

7  2017?

8  A.  And implemented in 2019, right?  It wasn't implemented

9  right away.

10  Q.  Somewhere around there.

11      So -- but that means that straight-ticket voting was not

12  eliminated by Senate Bill 1?

13  A.  That's correct.

14  Q.  There are some provisions of Senate Bill 1 that you do

15  like.  And I think you've already talked about a few of them,

16  but I want to make sure we get them all down.

17      So you like that mail-in voters now have the opportunity to

18  cure their ballot under Senate Bill 1?

19  A.  To cure their ballot, yes, sir.

20  Q.  And you also like the uniformity created by Senate Bill 1,

21  specifically the voting hours?

22  A.  I like the uniformity, but I also recognize that every

23  county is different.  And so my heart goes out to a small

24  county that may not need to open for 12 hours because they have

25  such a small voter registration database.  And to be required

1    to open for 12 hours is quite costly.

2        So I don't like to speculate.  When I was with TAEA, I was

3    charged for the small underdog because not everything fits

4    everyone the same way.  For Hidalgo County it worked.

5    Q.  Now, under Senate Bill 1, for small counties, the

6    requirements for voting hours is different, isn't it?

7    A.  It's nine hours, I believe, for the --

8    Q.  It's different --

9    A.  Yeah.

10   Q.  -- let's say.

11   A.  So I believe in there having to be some differences

12   depending on the needs of each county.  But the uniformity for

13   the voter in our county, it's great.

14   Q.  Now, I believe that Section 1.08 of Senate Bill 1 or

15   Section 1.022 of the Election Code, that ensures that state and

16   federal protections for disability accommodations are not

17   overridden by SB1.

18       Are you familiar with that provision?

19   A.  Yes.

20   Q.  And you think that's a good provision as well?

21   A.  That's a good provision.

22   Q.  And the provision that guarantees that voters can't be

23   turned away if they get in line before the polls close, that's

24   a good provision?

25   A.  Yes.

Yvonne Ramon - Cross

1  Q.  And the provision that guarantees that employees get time

2  off to vote during early voting, that's also a good provision?

3  A.  That's good.

4  Q.  And so Senate Bill 1 does do some good things, doesn't it?

5  A.  Yes.

6        MR. WASSDORF:  Your Honor, Mr. Kercher would like to

7  address the Court before we pass the witness.

8        THE COURT:  Go ahead.

9        MR. KERCHER:  Your Honor, regarding your ruling about

10 talking to this witness about allegations of voter fraud, our

11 understanding that -- I think folks on this side of the room

12 are genuinely surprised by the Court's interjection for a few

13 reasons.

14     First, we understood that dispute to be cabined to a

15 particular witness.

16     We also understood the Court's ruling to be that if we were

17 going to go into examination with that witness about

18 allegations of voter fraud or other voter integrity issues,

19 that that -- that that questioning would have to be based on

20 documentation that had been provided to the plaintiffs.

21     So on the first point, it perhaps makes itself, this

22 witness is not Jonathan White.

23     Secondly, the questions that were being asked of this

24 witness first go to her personal knowledge and, second, were

25 inquired into at her deposition based on exhibits that were

 1  made exhibits to her deposition and documents that have been

 2  produced by the State.

 3      Am I going too fast again?  Tells you how much I want this,

 4  Judge.

 5          THE COURT:  Okay.  To your first one, I'll give you

 6  that it was -- there was ambiguity about what this applied and

 7  did not apply to.

 8      Let me just go straight to the chase.  Relevancy.  So --

 9  and then also whether the document -- the questioning by the

10  lawyer -- and I'm sorry.  I forgot your name.

11          MR. WASSDORF:  Mr. Wassdorf.

12          THE COURT:  Thank you.  Your question was directed to

13  an allegation about a former mayor, I believe, right?

14          MR. KERCHER:  That's correct, Your Honor.

15          THE COURT:  And so it was only an allegation with

16  regard to the former mayor.  Were any of those documents

17  provided to the plaintiffs?

18          MR. KERCHER:  The documents from which the question

19  derives were -- many of them were public articles.  Some of

20  them included --

21          THE COURT:  No, no, no.  Was it -- and so the heart of

22  the -- or the relevance is, people can be accused of improper

23  voting practices all the time.  Was this gentleman ever

24  actually prosecuted and found guilty of voter fraud?

25          MS. PERALES:  Your Honor, he was acquitted.

Yvonne Ramon - Cross

 1          THE COURT:  That answers all that.  So there was no --
 2  there's no relevance to that line of question.
 3          MR. KERCHER:  Respectfully, there is relevance for two
 4  reasons.
 5      First, the fact that there were very public allegations
 6  about voter fraud go to voter concern and whether or not the
 7  legislature has an obligation or a state interest in addressing
 8  those concerns.
 9      Second, that was one of several items that the witness
10  would have been inquired into, including indictments and a plea
11  agreement.  But we were foreclosed from asking those questions
12  because of the Court's interjection.
13          THE COURT:  Okay.  So if you were asked those
14  questions, ma'am, are you aware of any of this?  Do you have
15  any personal knowledge of any of this?
16          THE WITNESS:  Personal knowledge, outside the doors of
17  my office.
18          THE COURT:  So what do you mean by that?  Reading in
19  the paper?
20          THE WITNESS:  We were talking about fraud.
21          THE COURT:  Let me ask the question again.  Do you
22  have any personal knowledge of any of these allegations made
23  against the former mayor?
24          THE WITNESS:  Personal knowledge, no.
25          THE COURT:  And how are you going to ask this witness

Yvonne Ramon - Cross

```
 1   any questions where she says she doesn't have personal
 2   knowledge?
 3              MR. KERCHER:  Well, if we were to ask the witness, for
 4   example, if she were aware that someone had been indicted or
 5   that there had been a plea agreement.
 6              THE COURT:  Are you going now beyond the mayor?
 7              MR. KERCHER:  The questions, Your Honor, that we were
 8   asking -- and Mr. Wassdorf can correct me if I'm wrong.  He's
 9   got the outline in front of him -- were not solely about the
10   mayor, but about multiple different allegations of voter fraud
11   that came about during a similar time frame.  All of that is
12   relevant to the state interest in addressing voter concern
13   about voter fraud.
14              THE COURT:  Okay.  Let me stop you here.
15       Ma'am, in your jurisdiction, was anybody ever convicted of
16   voter fraud?
17              THE WITNESS:  I don't know the legal term, but they
18   did go to court, and they were -- Mr. Molina was acquitted.
19       The other people that had charges brought against them, I
20   believe the charge -- they were dropped.  The charges were
21   dropped.  They didn't go to court.
22              THE COURT:  So, now, from your -- the State's
23   perspective, where is the evidence before the legislative
24   record that the legislative body had any of this before it when
25   it enacted SB1?
```

Yvonne Ramon - Cross

1    MR. KERCHER:  At the time, Your Honor, that SB1 was

2  under consideration, my understanding is that the Molina trial

3  was -- and the Molina trial and charges were ongoing.

4    THE COURT:  But was that -- was that evidence before

5  the legislative body?  Because you're saying that it's an

6  articulated reason for why the State passed this act.  And so

7  I'm asking, is there any evidence to support that that was

8  before the legislature?

9    MR. KERCHER:  I don't know whether that particular

10  case is in the legislative record, if that's the Court's

11  question.

12    THE COURT:  It is.  And so what's the relevance then?

13    MR. KERCHER:  Well, the relevance would still go, Your

14  Honor, to whether or not these issues were being covered in the

15  media and causing voter concern and whether or not this --

16    THE COURT:  But it's your burden -- it's your burden

17  to prove that the legislative body was considering all that

18  when it passed legislation.  And you're telling me, to your

19  knowledge, none of that is before the legislative record.

20    MR. KERCHER:  Well, when we say "none of that," I'm

21  not sure that's quite right.

22    THE COURT:  Well, is any of it?

23    MR. KERCHER:  If I may, it is certainly the case that

24  there is a legislative record and that there was testimony

25  taken about concerns about voter integrity -- about voting

Yvonne Ramon - Cross

 1  integrity and about voter fraud.

 2      I mean, Your Honor, we all know that that was true and in

 3  the media and a concern following 2020.

 4          THE COURT:  Again, that goes to my point, though.

 5  There's always allegations.  Is there any proof that there was

 6  voter fraud?  Because there had to be proof of voter fraud

 7  before the legislature -- legislative body to enact legislation

 8  that would unduly restrict or be unduly burdensome on voters.

 9          MR. KERCHER:  And I think that's where we are -- where

10  we are missing each other.

11      You and I agree, Your Honor, that in order for there to be

12  public allegations of voter fraud, it's important to follow up

13  and figure out whether or not there's proof.  On that, we

14  agree.

15      However, whether or not particular allegations are proven

16  is a separate issue from whether or not widespread allegations

17  cause voter concern, which may give the State a reasonable

18  interest to respond to that concern.

19          THE COURT:  Okay.  So the question for you, ma'am, is,

20  these allegations of what were going on allegedly in your

21  jurisdiction, did that have voter concern from your perspective

22  as the chief election officer of Hidalgo County?

23          THE WITNESS:  So for clarification, did voters come to

24  me with concern?

25          THE COURT:  Yes, ma'am.

Yvonne Ramon - Cross

```
 1          THE WITNESS:  No, sir.
 2          THE COURT:  You know, go ahead and ask all your
 3   questions.  But there is just no relevance here whatsoever.
 4   But ask your questions.
 5          MS. PERALES:  Your Honor --
 6          THE COURT:  Yeah.
 7          MS. PERALES:  -- if I could request that the
 8   transcript be segregated, essentially that --
 9          THE COURT:  No.  I'm going to let them ask their
10   questions, and I'm going to give it whatever little weight it
11   deserves.
12          MS. PERALES:  Thank you, Your Honor.
13   BY MR. WASSDORF:
14   Q.  So, Ms. Ramon, were you familiar with some allegations of
15   voter fraud arising out of Weslaco and Edinburg?
16   A.  Yes.  And if you could be more clear, in Weslaco, the
17   specific election, are you talking about the Primary, or are
18   you talking about past elections?
19   Q.  One moment.  Past elections, 2012 specifically.
20   A.  Yes, sir.  I am aware.
21   Q.  And so you were aware of that event in Weslaco in 2012?
22   A.  With the mayoral race.
23   Q.  And were you aware of some voter fraud allegations arising
24   out of Edinburg?
25   A.  And this was for the city mayoral race in 2019, was it?
```

Yvonne Ramon - Cross

```
 1   2017?
 2   Q.  I do not have that information here.  This is the one with
 3   the ex-mayor and his wife.
 4   A.  I am aware.
 5   Q.  You're aware of that.
 6       Are you also aware of some allegations of people assisting
 7   voters who did not qualify for assistance?
 8   A.  I wouldn't speculate on that.  Again, those were the
 9   allegations.  And so I am aware of the allegations of people
10   assisting voters that were deemed ineligible.
11           MR. WASSDORF:  Okay.  Thank you.
12           THE COURT:  Anything else?
13       Oh, now, on this side, anything else?
14           MR. NICHOLS:  No, sir.
15           THE COURT:  Anything by redirect?
16           MS. PERALES:  Yes, Your Honor.  I have two short lines
17   of question on redirect, and I need a moment to confer with
18   aligned counsel regarding the questions that were just asked --
19           THE COURT:  That's fine.
20           MS. PERALES:  -- by Mr. Wassdorf.
21           THE COURT:  If anybody needs to stand and stretch,
22   feel free.
23           MS. PERALES:  So shall I do my short -- two short
24   lines and then we break?  Or we break now?
25           THE COURT:  Oh, well, I was going to suggest you
```

Yvonne Ramon - Redirect

1  confer right now so you get all your questions out.  And

2  everybody else can stand and stretch if they want.

3        MS. PERALES:  Thank you.

4     (Discussion of the record)

5        THE COURT:  Ready?

6        MS. PERALES:  Yes, Your Honor.

7                    REDIRECT EXAMINATION

8  BY MS. PERALES:

9  Q.  Just a few additional questions, Ms. Ramon.

10 A.  Yes.

11 Q.  I wanted to give you an opportunity to finish your answer

12 to Mr. Wassdorf when he asked you about the language in the

13 Help America Vote Act of 2002.

14    You said something along the lines of, "That's the law

15 now."

16    Could you expand on what that point is that you're making?

17 A.  Becoming the elections administrator in 2008, I realized

18 that the laws have changed throughout history.  And so as I was

19 reviewing the voter registration applications, I noticed that

20 there were so many without ID, the forms were different.  And

21 so I spoke to the Secretary of State at length back then and

22 realized that the laws have changed and there have been years

23 where no ID has been required.

24    And so those applications -- to even have space on the

25 application itself for IDs.  And so that's why in 2002, when

Yvonne Ramon - Redirect

1   the law did change, from then forth, again, laws have changed,
2   and not everything is uniform in that respect.
3   Q.  So might we understand that people who registered after
4   2002 might put that information, but maybe the over-40 set is
5   less likely to put that information?
6   A.  That's absolutely correct.
7   Q.  A few moments ago with Mr. Wassdorf you were shown a
8   snippet of one of your depositions with the number of 400
9   associated with rejections.  I don't know if it's possible to
10  bring that snippet back or if counsel is willing to do it.
11       But I believe you were asked in that question -- yeah.  It
12  was there a second ago.
13       But were asked in that question, on line 5, about
14  mismatched ID.  And your answer on line 9 was, "No ID."
15       Do you see that there?
16  A.  Yes.
17  Q.  Is it true that at a certain point post-SB1, that Hidalgo
18  County was keeping track of no-ID rejections, but you were not
19  keeping track of mismatched-ID rejections?
20  A.  That's correct.
21  Q.  All right.  So if you gave the number 400 here, that might
22  have been, as your answer states, for no ID, but it wouldn't
23  have encompassed the rejections for mismatched ID; is that
24  right?
25  A.  Correct.

Yvonne Ramon - Redirect

1  Q.  Thank you very much.

2      Finally, you spoke a moment ago to Mr. Wassdorf regarding

3  allegations of voter fraud in an Edinburg election against the

4  mayor, for which he was acquitted.

5      Do you remember that conversation?

6  A.  Yes.

7  Q.  And the allegation there was that people were registered to

8  vote where they didn't live; is that right?

9  A.  That's correct.

10 Q.  Do you have any sense that SB1 has provisions addressing

11 the problem of someone registering to vote where they don't

12 live?

13 A.  No, ma'am.

14 Q.  And then, finally, you spoke to Mr. Wassdorf about

15 something that may have happened in Weslaco in 2012; is that

16 right?

17 A.  That's correct.

18 Q.  And how many individuals were involved in the accusation?

19 A.  Not too many.  It was the mayor's home.  And I believe

20 there were between five and eight people registered there

21 that --

22 Q.  Well, that's in Edinburg; is that right?

23 A.  No.  That was in Weslaco, in 2012.

24 Q.  Was that also --

25 A.  That was also a mayor race.

Yvonne Ramon - Recross

1  Q.  And was it also people registered to vote where they didn't

2  live?

3  A.  In the mayor's home.  They were registered to vote in the

4  mayor's home, and there were allegations that they did not

5  reside there, that was not their homestead.

6  Q.  I see.

7      And so, again, would there be anything in SB1 that would

8  address that issue from Weslaco from 2012?

9  A.  No.

10          MS. PERALES:  Thank you.  I pass the witness.

11          THE COURT:  Anything else here?

12          MS. ARMENTA:  Yes.

13                    RECROSS-EXAMINATION

14  BY MS. ARMENTA:

15  Q.  Hello again, Ms. Ramon.

16  A.  Hello.

17  Q.  I'd like to briefly follow up on some of your personal

18  experiences regarding some of the topics you touched on.  You

19  believe that extended-hour voting makes voting more accessible,

20  right?

21  A.  Yes.

22  Q.  Hidalgo County did not offer drive-through voting, right?

23  A.  No, they didn't.

24  Q.  But you did not have any reason to believe that

25  drive-through voting would lead to voter fraud, right?

Yvonne Ramon - Recross

1  A.  I have no reason to believe.

2  Q.  And Hidalgo County offered curbside voting, including

3  during your time as elections administrator?

4  A.  Yes.

5  Q.  You are not aware of any instances in Hidalgo County of

6  somebody committing voter fraud using curbside voting?

7  A.  I am not aware, no.

8  Q.  And that is because the voter would clearly be qualified to

9  vote before voting curbside?

10  A.  That's correct.

11  Q.  And you mentioned that Hidalgo County has never offered

12  24-hour voting, right?

13  A.  We have not.

14  Q.  And you did not implement 24-hour voting mainly because you

15  thought there would be staffing concerns for your workers?

16  A.  That's correct.

17  Q.  But you did not believe that implementing 24-hour voting

18  would lead to voter fraud, did you?

19  A.  I did not.

20        MS. ARMENTA:  Thank you so much, Ms. Ramon.

21    Pass the witness.

22        THE COURT:  Any cross?

23        MR. WASSDORF:  No, Your Honor.

24        THE COURT:  You may step down, ma'am.

25        THE WITNESS:  Thank you.  Thank you.

1    Thank you, Your Honor.

2        THE COURT:  And your next witness --

3    *(At the bench off the record)*

4        THE COURT:  Court reporter needs to break.  So let's

5    take five -- or ten.

6    *(Recess at 3:25 p.m. until 3:36 p.m.)*

7        THE COURT:  Thank you.  Please be seated.

8    Your next witness.

9        MS. MARTIN:  Good afternoon, Your Honor.  Rebecca

10   Martin for the LUPE plaintiffs.  The LUPE plaintiffs call

11   Dr. Andres Tijerina.

12   For the record, the LUPE plaintiffs will elicit testimony

13   from Dr. Tijerina in support of their claims in connection with

14   SB1 Sections 5.07, 5.13, 6.03, 6.04, 6.05, 6.06 and 7.04.

15       THE COURT:  Thank you.

16   *(The oath was administered)*

17       ANDRES TIJERINA, PLAINTIFFS' WITNESS, SWORN

18                    DIRECT EXAMINATION

19   BY MS. MARTIN:

20   Q.  Good afternoon, Dr. Tijerina.  Would you please state your

21   name for the record.

22   A.  Andres Tijerina.

23   Q.  And, Dr. Tijerina, when did you get your doctorate?

24   A.  I received my Ph.D. at the University of Texas at Austin.

25   Q.  And in which year?

Andres Tijerina - Direct

1  A.  1977.

2  Q.  What field is your Ph.D. in?

3  A.  United States history.

4  Q.  And within the field of United States history, do you have

5  a particular specialty?

6  A.  Yes.

7  Q.  What is your specialty?

8  A.  Texas history, Latino history.

9  Q.  Are you currently employed?

10  A.  I'm employed part time as a retired emeritus professor at

11  Austin Community College.

12  Q.  Have you conducted any research in Latino history in Texas?

13  A.  Yes.

14  Q.  Have you published any of that research?

15  A.  Yes.

16  Q.  Would you briefly summarize your major published and

17  forthcoming works for us?

18  A.  Excuse me.  Repeat that, please.

19  Q.  Would you please briefly summarize your major published and

20  forthcoming works?

21  A.  Major published, a book called Tejanos & Texas Under The

22  Mexican Flag, which traces the Texas laws and culture from

23  Spain through Mexico to modern Texas.

24      Tejano Empire:  Life on the South Texas Ranchos, published

25  by Texas A&M University Press, recording the largest cattle

Andres Tijerina - Direct

1   industry in the world, which is south Texas, and became a North
2   American cattle industry, beef industry.
3       Most recently, Beasley's Vaqueros, which is the art of a
4   Vaquero artist in south Texas that drew drawings of probably
5   the largest portfolio of Texas vaqueros today, published
6   also -- now, that's published by the Texas State Historical
7   Association, recently exhibited at the Whitte Museum.
8   Q.  Do you have any textbooks coming out soon?
9   A.  I recently published the two-volume History of the
10  United States, which is in use in colleges and universities
11  across Texas and the United States.
12      I just finished this week the first history ever of
13  Mexican-Americans in Texas, which is a tenth-grade social
14  studies textbook that is expected to be in the Texas classrooms
15  by the next spring.
16      And, finally, a book on the art of Texas through the years,
17  published by Texas A&M University Press.
18  Q.  Thank you, Dr. Tijerina.
19      Are you a member of any societies or associations relating
20  to history?
21  A.  Yes.
22  Q.  Would you please name those for us?
23  A.  I'm a member of the American Historical Association, and
24  have been for decades, where I've served on national committees
25  and which presented me the National Equity Award in 1991.

Andres Tijerina - Direct

1      I'm also a member of the Texas State Historical

2  Association, and have been for decades.  And I've served on

3  numerous committees.  I'm serving now on numerous committees

4  for the TSHA, and I was inducted as a fellow.

5      I'm also a member of the Organization of American

6  Historians.

7  Q.  Have you been appointed to any state commissions relating

8  to history?

9  A.  I was appointed by Governor Perry to the State Historical

10  Commission -- or Historical Representation Commission on

11  History.

12      I also served for several years for the Texas Historical

13  Commission on their Committee for National Registration of

14  Historic Places in Texas.

15  Q.  I want to very briefly go over your work outside of

16  academia.

17      Would you tell me what your first job was out of college?

18  A.  I was commissioned upon graduation at Texas A&M University

19  in 1963.  Two weeks later, I was on duty in the Air Force where

20  I trained and I went into the United States Air Force.

21  Q.  And that was during the Vietnam War?

22  A.  It was.  One year later, after my commissioning, I went

23  into combat, flying a hundred combat missions in Vietnam over a

24  period of 18 months.

25  Q.  Thank you so much for your service.

Andres Tijerina - Direct

1    When you left the military, is that when you went to get
2  your Ph.D.?
3  A.  I left the military, actually got what they called an
4  "early out" after five years of service, active service.  I
5  remained on reserve until I finally retired as a major in the
6  U.S. Air Force, site of the Air Force Academy.
7    But my career then was to enter Texas Tech University
8  immediately after getting out of the Air Force in 1972, and I
9  received my master's at Texas Tech.
10  Q.  Did you also work in the corporate sector?
11  A.  After I received my doctorate at the University of Texas, I
12  worked for a few years on the faculty at UT and the University
13  of Houston.
14    But in 1981, I began work in the State of Texas.  I was
15  hired as the -- and commissioned as the executive director of a
16  state agency called the Texas Good Neighbor Commission and
17  confirmed by the Texas Senate in that position.
18  Q.  Dr. Tijerina, have you previously offered expert testimony
19  in voting rights cases?
20  A.  Yes.
21  Q.  Do you recall how many times?
22  A.  In voting rights, I think only once in voting rights.
23    MS. MARTIN:  Okay.  Your Honor, unless there is any
24  further inquiry, we would offer Dr. Tijerina as an expert in
25  Latino history in Texas, including the history of

 1  discrimination against Latinos in Texas.

 2          THE COURT:  Any response?

 3          MR. BRYANT:  Your Honor, we certainly don't dispute

 4  Dr. Tijerina's expertise.

 5      We will have some objections to his testimony on some of

 6  the subjects.  But no problem with him being accepted as an

 7  expert.

 8          THE COURT:  He's qualified as an expert in Latino

 9  history in Texas.

10          MS. MARTIN:  Thank you.

11  BY MS. MARTIN:

12  Q.  Dr. Tijerina, did you offer a report in this case?

13  A.  Yes.

14  Q.  Very briefly, what were you asked to address in your

15  report?

16  A.  I was asked to review the history of Latinos in Texas and

17  discrimination or any kind of resistance to their voting

18  participation in Texas, historically.

19  Q.  What methods of analysis did you use in forming the

20  conclusions that are contained in your report?

21  A.  My standard research methods, is that what you're asking?

22  Q.  Yes.

23  A.  I used the standard scholarly research methods that I

24  was -- that I learned at Texas Tech in my master's and

25  University of Texas in my doctorate.

Andres Tijerina - Direct

1  Q.  And at a high level, what conclusions did you draw in your

2  assessment of historical discrimination against Latinos in

3  Texas?

4  A.  In general, that Latinos in Texas have an experience of

5  being exploited or abused by Anglo-Americans who are able to

6  take advantage of government, economic or other advantages to

7  exploit Latino labor, to appropriate their lands on a mass

8  scale, to dominate their participation, if not restrict their

9  participation, in the electoral process.

10  Q.  Did you review or rely on the text of the statute that's at

11  issue in this litigation that we've been calling SB1?

12  A.  I have not reviewed it, I have not studied it --

13  Q.  Did you --

14  A.  -- and I certainly did not rely on it.

15  Q.  Did you review or rely on the legislative history of that

16  statute?

17  A.  No.

18  Q.  Would that have changed your -- any of the opinions about

19  historical discrimination against Latinos that are contained in

20  your report?

21  A.  No.

22  Q.  Are you a statistician, Dr. Tijerina?

23  A.  No.

24  Q.  In your experience, can historians form conclusions about

25  historical events, trends, groups without performing any

Andres Tijerina - Direct

1  statistical or multivariate analysis?

2  A.  Yes.

3  Q.  You mentioned dispossession of lands.  So let's start

4  there.

5      What did you find with regard to the dispossession of land

6  from Latinos in Texas?

7          MR. BRYANT:  Your Honor, I'd like to interpose an

8  objection.

9      Based on Federal Rules of Evidence 402 and 403,

10  Dr. Tijerina's about to testify, I believe, about events in the

11  19th century, back to 1836, early part of the 20th century.

12  And those events are not relevant to this case and/or under

13  Federal Rule 403, any possible relevance is substantially

14  outweighed by the danger of a confusion of issues or the waste

15  of time.

16      The Supreme Court in *McCleskey v. Kemp* in 1987 stated that

17  "Unless historical evidence is reasonably contemporaneous with

18  the challenged decision, it has little probative value."  And

19  the Court, I think, raised this issue with respect to some

20  questions about the 1880s this week.

21      Here to challenge the decision is the decision of the Texas

22  Legislature in August of 2021 to pass SB1.  Evidences to events

23  going back to 1836 or the Mexican War in 1848 or any other time

24  in the 19th century or the 20th century up to, we believe,

25  approximately 1971 are -- that testimony would not be

Andres Tijerina - Direct

 1 reasonably contemporaneous with the passage of SB1 in 2021 and
 2 should be excluded from evidence.
 3     Fifth Circuit has also stated that, quote, the most
 4 relevant historical evidence is relevant -- is relatively
 5 recent history, not long past history.
 6     And the problem of relevance is exacerbated by the fact
 7 that, as has already been presented, Dr. Tijerina's expert
 8 report and his testimony, although scholarly, is not in any way
 9 connected to SB1 or his -- he has no opinion, I believe, based
10 on his deposition, on there being any relationship between the
11 events of the 19th century and early 20th century in which he
12 is a special -- has a specialty, and the passage of SB1 or the
13 intentions of any legislators or the legislators all with
14 respect to SB1.
15         THE COURT:  You know, the problem with higher courts
16 is, oftentimes, they want to engage in historical analysis when
17 they're not historians and then cherrypick history.  And in
18 other times they want to whitewash history and say it has no
19 relevance to today.  So they get to have it both ways.
20     I understand your point, however, and it goes to, I think,
21 staleness.  And so the argument from the higher courts is that
22 there's got to be recency in terms of discrimination that's
23 being attempted to be cured.
24     I'll take all of it into account.  This is a bench trial,
25 not a jury trial.  The objections are noted, overruled.

Andres Tijerina - Direct

```
 1        Don't go long at length on this.
 2             MS. MARTIN:  Your Honor, may I make it --
 3        Would you like to address?
 4             MS. PERALES:  Your Honor, only to note for the record
 5   that our friends on the other side have made their argument
 6   with respect to an argument of intentional discrimination in
 7   enactment of a statute.  Dr. Tijerina's testimony goes to
 8   Senate Factors 1 and 5 under Section 2 of the Voting Rights
 9   Act.
10             THE COURT:  Yeah.  No.  I'm going to allow it in.
11   I'll give it what weight it deserves.  I'll look at the recency
12   of the events.  I'll take into account the Supreme Court and
13   Fifth Circuit's guidance on staleness of events in making my
14   determinations.  I made my ruling.
15             MS. MARTIN:  Thank you.
16             MR. BRYANT:  Your Honor, our objection goes to all of
17   the plaintiffs' claims.  And I would like, if the Court would
18   allow us to, of course, have a running objection to the
19   testimony regarding matters that are not reasonably
20   contemporaneous so I don't have to jump up and down.
21             THE COURT:  Yeah.  No.  You can have a running
22   objection.
23        Now, I'm curious, how do you -- so you say you don't want
24   old history because it's ancient history, even though I was
25   born in 1961, and so it's not all that ancient to me.
```

Andres Tijerina - Direct

```
 1      And so how do you arbitrarily pick 1971?  Why does the date
 2  1971 all of the sudden become relevant and everything before
 3  1971 is not relevant?  How do we cherrypick dates?
 4          MR. BRYANT:  And, Your Honor, I'm even older than you.
 5  So I have history that goes even back farther.
 6      However, I have not found any cases that provide a very
 7  specific cutoff date as to --
 8          THE COURT:  Because we all make it up.
 9          MR. BRYANT:  -- what is reasonably contemporaneous or
10  what is not reasonably contemporaneous.
11      I suggested 1971 because I read Chief Justice Roberts'
12  opinion in Shelby County v. Holder in 2013 in which Chief
13  Justice Roberts for the Supreme Court discussed the dramatic
14  changes in voting practices and in issues related to voting
15  discrimination since the passage of the Voting Rights Act of
16  1965.  That was an opinion that was written 48 years after the
17  Voting Rights Act.
18      So I certainly don't mean to suggest that I've got the
19  magic number.  But that was my suggestion as to what may be
20  appropriate based on that guidance from the Supreme Court.
21          THE COURT:  So this is a completely inappropriate
22  analogy.  But the problem with discounting history is so, like
23  in world events, everybody, oh, well, why do we care about
24  Byzantine history?  It's because Turkey is trying to
25  re-establish its former Ottoman Empire.
```

1    And so history doesn't stop.  History is continuous.

2    You have your running objection.

3         MR. BRYANT:  Thank you, Your Honor.

4         MS. MARTIN:  Thank you, Your Honor.

5  BY MS. MARTIN:

6  Q.  Let's go back to the dispossession of land.

7    What did you find with regard to the dispossession of land

8  from Latinos in Texas?

9         THE COURT:  Dates?  What date -- what are you talking

10  about?  What dates?

11  BY MS. MARTIN:

12  Q.  Beginning in the 1800s.

13  A.  What I found is that, beginning in the 1800s, land has

14  been, in general, dispossessed, has been taken, in what

15  historians have called a one-way transfer of land that began in

16  the 1830s and 1840s, accelerated in the 1880s, reached its

17  peak in the 1915 to 1920 period and has been a continuous,

18  one-way exchange of land from Latino hands into Anglo hands,

19  and it has never been reversed.  It has never gone in the other

20  direction.

21    It is consistent throughout the history of Texas.  Much of

22  the land dispossession or exchange was done violently.  Much of

23  it was done illicitly, and much of it was done illegally.  Much

24  of it was done legally.

25    But there has been what historians have called that one-way

Andres Tijerina - Direct

1  irreversible transfer of lands.  The history of Texas is the

2  history of land, and the history of land in Texas is a history

3  of Latinos being the largest landowners at one time and

4  becoming a landless population within 50 years, two or three

5  generations, in general.

6  Q.  What role, if any, did the government play in the

7  dispossession of land from Latinos?

8  A.  The government either initiated or it was complicit or it

9  directed much of the transfer of lands, either through

10  government commissions, government programs or through the

11  actions of government officials, from the governor on down to

12  county governors, county officials, county judges, sheriffs,

13  justices of the peace, down to city, municipal, mayors, chief

14  of police or through militia, through the Texas Army, in which

15  many of those, such as the Texas Rangers, involved brutal, mass

16  atrocities against hundreds, if not thousands, of legitimate

17  landowning Latino citizens.

18  Q.  Has your research revealed any rationale or justification

19  that was used by Anglos for the raids against Latinos?

20  A.  One of the most consistent reasons and statements given by

21  the Anglo-Americans who either took the land legally or

22  illegally or illicitly or who murdered and assassinated Latino

23  landowners and their entire extended families was that they

24  were "Mexicans," that they were disloyal to Texas or that they

25  were suspect of colluding with Mexico.

Andres Tijerina - Direct

1  Q.  What ended the violent dispossession of land from Latinos
2  in Texas?
3  A.  The mass transfer of lands, which took place between 1880
4  and 1920, was the most violent in which brutal atrocities were
5  committed to thousands of Latinos, U.S. citizens, ended
6  primarily because they had already taken all of the most
7  fertile soils, the largest ranches and the ranches with the
8  most mineral deposits, specifically oil.  Also, because the
9  very few Latino large landowners who still owned the land were
10  able finally to use their American citizenship rights to defend
11  themselves.
12  Q.  So is it your understanding that the Latinos and Anglos
13  eventually found peace?
14  A.  By the 1920s, historians generally have agreed in
15  publications in their interpretations that the
16  Anglo-American -- Anglo-Americans who were taking the land,
17  either squatters, vigilante raids, land lawyers or corrupt
18  county and state officials, as well as land developers, finally
19  were able to -- and political bosses, I should say, political
20  bosses and political machines, finally were able to achieve a
21  modicum of a lack of violence that they called the "peace
22  structure."
23      And that is the -- that is the term that came to be used
24  and is used by modern historians by which Anglo-Americans, in
25  an asset agreement with the last landowning Latinos and the

Andres Tijerina - Direct

1  last Latinos who had any importance in society or the economy

2  or in politics in Texas, they all agreed that the Latinos would

3  then be subservient to a dominant Anglo-American economic and

4  political power structure.

5      Thus, Latinos would be expected to concede.  They would be

6  expected to support the Anglo-American -- racially

7  Anglo-American power structure in giving them their political

8  support and not challenging or opposing their economic and

9  political domination over Latinos.

10     And one of the other examples that's always given is

11 allowing their daughters to marry Anglo-Americans because the

12 daughters were the landowners, and a landless Anglo-American

13 could take the land by simply marrying a wealthy Latino woman,

14 and in exchange for protection from violent law enforcement,

15 brutal law enforcement, or continued Texas Ranger atrocities

16 against the largest Latino landowners.

17          THE COURT:  Dr. Tijerina, can you provide me bookends,

18 from what date to what date, or what decade to what decade

19 you're describing?

20          THE WITNESS:  Yes, Your Honor.

21     1880 to 1920.

22          THE COURT:  Next question.

23 BY MS. MARTIN:

24 Q.  You mentioned political subservience to the political

25 bosses.

Andres Tijerina - Direct

1    Would you explain what you mean by "political

2  subservience"?

3          THE COURT:  So at this rate, we're going to be a long

4  time with the doctor.  You're going to really need to move this

5  along --

6          MS. MARTIN:  Okay.  All right.

7          THE COURT:  -- because, let's be honest here, you do

8  have a recency issue here that you're going to have to tackle.

9          MS. MARTIN:  Thank you, Your Honor.

10  BY MS. MARTIN:

11  Q.  Your report mentions a Jim Wells.  Who is Jim Wells?

12  A.  Jim Wells was a political operative, was the chairman of

13  the Democratic Party in one county, but he controlled a lot of

14  other counties.  And he colluded with county judges, sheriffs

15  to facilitate the transfer of lands and political power from

16  Latino hands into Anglo-American hands.

17  Q.  Is that the same Jim Wells as in Jim Wells County, Texas

18  that we have today?

19  A.  Yes, it is.  He was one of the most powerful political

20  bosses in the United States.

21  Q.  And have you drawn any conclusions about why Jim Wells

22  County was created?

23  A.  Jim Wells County and the surrounding counties throughout

24  south Texas were created specifically by the political bosses

25  working with not only the county but state level officials, as

Andres Tijerina - Direct

1  well as federal officials, until the 20th century, until the
2  1930s, to specifically delineate the boundaries of the
3  counties, the districts, precincts of south Texas, specifically
4  to, as they said, kill the Mexican vote by dividing the major
5  demographic concentrations of Latinos in south Texas and
6  concentrating Anglo-Americans into other counties, specifically
7  and explicitly stated to give the Anglo-American, or the "white
8  man," as they call them, the Anglo-Saxon, the power in those
9  counties, like Brooks and Jim Wells and Cameron, Starr, Webb
10 and all those other counties.
11 Q.  Let's move on to labor.  You mentioned appropriation of
12 labor.
13     What kinds of controls were used to appropriate labor from
14 Latinos in the 20th century?
15 A.  Until the 20th century, Anglo-American farmers, ranchers
16 and formed corporations combined with county and state
17 officials to enact or implement controls such as vagrancy laws,
18 county passes, control of the movement of Latino labor forces,
19 labor -- labor groups in order to create labor surpluses, in
20 order to specifically drive wages down, to recruit thousands of
21 Mexican workers in Texas, again, to create a labor surplus, and
22 to be able to control the wages and the labor of Latinos in
23 some of the largest corporate farms in North America, near
24 Corpus Christi and south Texas.
25 Q.  Moving on to housing, with respect to housing at a high

Andres Tijerina - Direct

1  level, what conclusions did you draw about discrimination

2  against Latinos in the area of housing?

3  A.  In general, it was in the urbanization period of Texas,

4  again, between 1880 and 1920, when Texas was urbanizing, that

5  Latinos also urbanized.

6      So the Latinos came into the cities of Texas when the

7  cities were forming, and the general pattern of the Texas city

8  was to segregate Latinos into an area of the town on the edge

9  of town, but almost customarily systematically beyond a

10  geographic barrier, that would separate them from the larger

11  town or city, barriers like railroad tracks, a creek, a river,

12  a draw, or some other kind of, usually, a physical barrier that

13  restricted Latinos who lived in the town or came into the town

14  to living only in that town, either by ordinance, state

15  ordinance or city ordinance, that said there will be segregated

16  neighborhoods, or using other devices such as restrictive

17  covenants that prohibited Latinos buying property or homes in

18  the Anglo-American part of town or Anglo-American

19  neighborhoods, literally stating on the -- on the title, only

20  an Anglo-Saxon may live in this home or own this home, with the

21  exception of domestic workers, maids, butlers, gardeners or,

22  conversely, to say Latinos may not -- or Mexicans may not own

23  this property in this neighborhood.

24      Those, of course, were common in Harris County, in Bexar

25  County, San Antonio.  Restrictive covenants or posted signs, no

Andres Tijerina - Direct

1    Mexicans, no dogs, or violence, whenever Latinos entered an
2    Anglo-American neighborhood, also working informally with
3    insurance agents, real estate agents, and bankers to prevent
4    Latinos owning homes and properties in the nicer neighborhoods
5    of San Antonio, Houston, Dallas, or other Texas cities.
6            THE COURT:  And again, same question, Doctor.  Can you
7    give me bookends, from what decade to what decade you're
8    describing?
9            THE WITNESS:  The segregation of Texas cities was most
10   pronounced -- it began most pronounced in the 1910, 1915
11   period, Your Honor, and it continued until the 1980s -- 1970s
12   and 1980s.
13           THE COURT:  Thank you.
14   BY MS. MARTIN:
15   Q.  And how did this kind of geographic racial segregation
16   affect Latinos in Texas?
17   A.  Primarily because it, on one hand, made them -- it
18   restricted them only to the part of town that was the less
19   desirable part of town.
20      It did not have -- for example, the barrio, as it was
21   called, never had the courthouse, the city hall, the hospital,
22   the high school or any schools, any of the county services or
23   the city services, the health services, even law enforcement.
24      It did not have the utilities, telephone, electric, water,
25   gas, paved streets, storm sewers.  Conversely, then, it almost

Andres Tijerina - Direct

1    necessarily meant that they would have flooding in the

2    neighborhood.  They would have lack of sanitation.  They would

3    have no police protection, no health services.

4        They would have only the smokestack industries.  Always

5    almost systematically the city's power plant would be in the

6    barrio, that leading them to not only poor sanitation, high

7    crime rate, some of the worst, even San Antonio in the 1970s

8    and '80s, disease rates, tuberculosis, infant mortality in

9    the United States.  And then the social statistics as well, the

10   lack of education, sanitation, so access to education and

11   higher-paying jobs.

12   Q.  Let's move on and talk about education.  Earlier today we

13   had someone testify about, as a child, missing school because

14   they were picking cotton.

15       Have you had it -- do you -- could you give us some context

16   around what that practice is, if you have an understanding?

17   A.  Are you asking for a description of how a child could be

18   working in a cotton field?  Is what you're asking?

19   Q.  When we're talking about racial discrimination in education

20   and how that affects educational opportunities for Latinos, do

21   you have an understanding of what that practice -- what the

22   educational opportunities looked like, let's say, in the '30s

23   and '40s and '50s for children in rural areas?

24   A.  Yes.  Texas had one of the largest migrant workforces in

25   the nation.  Around 450,000 Latinos lived as a massive migrant

Andres Tijerina - Direct

1  force throughout the 1920s until the 1970s, migrating in the

2  spring from the Rio Grande Valley, through the Brazos County,

3  by summer, ending up in November in the Great Plains area,

4  Lubbock and around that area.

5      This massive transient workforce included whole families.

6  It was whole families.  The whole families worked primarily in

7  the cotton fields in that -- what was called "the big swing"

8  because it swung across the Blackland Prairie of Texas.  A big

9  percentage of the -- of the people in that 450,000 were

10  children who also had the highest disease rates and the highest

11  infant mortality in the United States.

12      Also, the lowest education, the highest illiteracy, largely

13  because not only were they moving from county to county

14  throughout the year, but also because school districts were

15  prohibited by farmers in many of these counties from allowing

16  or from admitting or enrolling Latino children in schools until

17  after the harvest was picked.

18  Q.  Focusing now on children, Latino children, who were born in

19  the 1940s and '50s who would be in their 60s and 70s today,

20  how did racial discrimination affect the educational

21  opportunities available to those Latino children born in the

22  '40s and '50s?

23  A.  Latinos in Texas in the '40s and '50s were either not

24  allowed in any schools or generally restricted to a school on

25  the edge of town, in the barrio, that was underfunded, that was

1  dilapidated physically, that had underpaid teachers, perhaps

2  not even credentialed, with much worse resources that would be

3  in the Anglo-American part of town.

4      Those schools generally in Texas called "the Mexican

5  school," in which many grades were all in one classroom or many

6  grades in only that one school.  Many of those Mexican schools

7  across the state of Texas enrolled students only until the

8  sixth grade, after which Latinos were no longer allowed to go

9  to school in many cities.

10     And those where they were allowed to go, it's not until the

11 1950s that Latinos were able to get into the high schools in

12 appreciable numbers.  Although by the late 1970s and '80s,

13 federal studies of different types, either congressional

14 reports or other federal agencies, reported that Latinos

15 maintained, retained much lower statistics in literacy,

16 education or even the numbers of Latino teachers and school

17 administrators.

18 Q.  Thinking about integrated schools, was there still racial

19 discrimination present against Latino children in integrated

20 schools?

21 A.  The segregation of Latinos was not only, as I mentioned,

22 that they were required to attend only in the barrio, but even

23 when, after 1954, *Brown v. Board of Education*, and the *Delgado*

24 case of 1948, which prohibited segregation of Latino students

25 in Texas, most school districts in Texas circumvented *Brown v.*

Andres Tijerina - Direct

1  *Board of Education* or *Delgado* by -- with a rationale that the
2  Latinos needed developmental education, that they needed --
3  that they were not proficient enough in English to attend the
4  regular classrooms.
5      And so school districts, ISDs, then drew lines to delineate
6  the Mexican schools separate from the Anglo-American schools in
7  the ISDs, or even within a school or within a district, they
8  would have -- when they started having Mexican-American junior
9  high schools and Mexican-American high schools, those were
10 exclusively Mexican-American schools and separate from the
11 exclusively Anglo-American high schools, which from the 1930s
12 until the 1980s, Hispanic or Latino lawyers were able to, for
13 example, here in San Antonio, draw the stark difference between
14 the funding of the Anglo schools in San Antonio and the funding
15 of the Latino schools, the teacher-student ratio, the
16 conditions of the school buildings, and the -- literally, the
17 budget of the schools.
18     So until the 1970s and 1980s, even where the students were
19 integrated, they were segregated either by schools or even
20 within a school, even within a building, until the 1970s,
21 1980s, 1990s.  And schools around Dallas, Plano, cities like
22 that, they segregated the Latino schools on one side of the
23 hallway in the classroom building and Anglo-American students
24 on the other side.
25     So segregation is the story of Latinos in Texas schools.

Andres Tijerina - Direct

1  Q.  And, in your opinion, does this discrimination against

2  Latinos in education have continuing effects on people who are

3  of voting age today?

4  A.  Are you asking only in education?

5  Q.  Thinking about the discrimination against Latinos in the

6  context of education, are there continuing effects on voters

7  today?

8  A.  The continuing effects today are that many of the school

9  districts are still *de facto* segregated.  Many of the schools

10  are still majority minority, majority Latino or majority

11  Anglo-American.

12      So even though we've had *Brown v. Board of Education*, even

13  though there's been integration, the segregation persists at

14  the elementary, middle school and the high school levels

15  throughout Texas today.  It started way back in the 1850s and

16  was officially -- by ordinance in 1820s to 1880s to the

17  1920s.  But the buildings, the districts and the differences

18  in funding persist and are the direct result today of that

19  long-term discrimination.

20  Q.  I want to move on to talk about racial discrimination in

21  the context of political participation in the democratic

22  process.

23      You've mentioned political bosses.  So setting aside the

24  political bosses, and focusing again on sort of the lifetime of

25  Latino children that were born in the '30s, '40s, '50s and

Andres Tijerina - Direct

1  '60s, what kinds of discriminatory practices have you

2  observed that affect political participation of Latinos in

3  Texas?

4  A.  The discouragement, the alienation, the prevention of

5  Latino-equitable voting and participation in the political and

6  electoral process in Texas is and has been found and declared

7  by educators, historians and congressional reports, as late as

8  the 1970s, 1980s, to be insidious and pervasive, establishing a

9  system that has alienated Latino voters who distrust the state

10  or county officials, who distrust the system, who even fear, as

11  a result of violence from the 1880s to the 1920s, violence

12  not only by government officials, county officials, sheriffs,

13  law enforcement, Texas Rangers, in the 1900 and 1920 period,

14  Texas Rangers making it and being appointed specifically by the

15  governor, not only Texas Rangers, but a special quasi-Texas

16  Ranger force called "The Loyalty," a thousand Loyalty Texas

17  Rangers that were specifically appointed by the governor to

18  enforce and to give power to the Democratic Party by going and

19  what they called "selectively interviewing" Latino voters or in

20  some cases literally assassinating political leaders, Latino

21  political leaders, the lynching of Latino political leaders,

22  mass Anglo-American riots in Weslaco and San Benito, at the

23  Latino polling stations, where 3- or 4,000 Anglo-Americans

24  would riot, kill the Mexican vote, "Don't let the Mexicans

25  vote," chanting, others lynching or killing several Latino --

Andres Tijerina - Direct

1   Latinos who attempted to vote at the Latino voting stations.

2           THE COURT:  Again, Doctor, if you can give me

3   bookmarks.

4           THE WITNESS:  The violence going until the 1940s,

5   the last of which was a Latino baked alive, cooked alive and

6   lynched in Rock Springs, Texas.

7       The violence ending after that, it was primarily the

8   political machines like the Callaghan in San Antonio, the

9   George Parr and other political machines that would slate

10  Latino -- or, rather, slate the candidates for city or county

11  or even school board elections, intimidation or just

12  difficulties placed on Latino voting, no Spanish ballots or the

13  ballot -- polling stations not being in the areas accessible to

14  Latinos.

15      So a variety of different methods that were used that would

16  make the -- in 1970s, 1980s, the U.S. Congressional reports

17  state that Texas and other states had engaged in what they

18  called "extraordinary devices" to -- specifically aimed at

19  perpetuating discrimination against Latino voters, making Texas

20  and the voter registration in Texas the most difficult and

21  restrictive in the United States.

22      So, again, going until about the 1970s, 1980s that I can

23  document.  And beyond that, historians generally like to see a

24  lot more history written.  But I would say all of these

25  practices, going till the 1970s and 1980s that made the Supreme

Andres Tijerina - Direct

 1  Court and congressional records state that Texas has been one
 2  of the most restrictive in voter registration or intimidation
 3  in the United States, and that it has left a legacy of
 4  alienation and intimidation of Latino voters in the electoral
 5  process.
 6  BY MS. MARTIN:
 7  Q.  Thank you, Dr. Tijerina.
 8      And just so we have a clear record on it, you mentioned
 9  that the brutal lynching in the 1940s and then, after that,
10  it went back to the political machines, am I -- am I to
11  understand your testimony that the political bosses and the
12  political machines were still in effect after 1940s?
13  A.  Yes.  The political machines were powerful until the 1970s,
14  1980s in Dallas, San Antonio, Houston.  They all had names.
15  The Parr machine in Duval County, the Callaghan, the Lasater.
16  They all had names or they had -- they had -- they retained
17  some of them, like in Dallas, it was not named a political
18  machine.  They used innocuous or benevolent-sounding names,
19  like the "ballot purification," the good -- the Good Voter
20  Council in Dallas.  They called it the citizens -- "citizens
21  council."  They all had very innocuous and benevolent names
22  and, supposedly, purposes.
23      But all of them were the ones that were engaged in the
24  voter slating, the intimidation and all of the other practices,
25  too, that the Supreme Court -- the Supreme Court and the

Andres Tijerina - Direct

1   Congress have reported were intentionally to discourage -- or

2   to dilute Latino voting in Texas.

3   Q.   Thank you, Dr. Tijerina.

4        Thinking about Latinos today, how do Latinos in Texas bear

5   the effects of the historical discrimination that we've been

6   discussing?

7   A.   Latinos still live in the segregated neighborhoods to a

8   great extent.  The schools still have the segregated character

9   that they had in the 1950s.  Someone born, for example, in

10  1950, 1960 would have been born in segregated cities, very

11  commonly across Texas.

12       The neighborhoods are still the same neighborhoods.  And

13  it's not just the schools and the neighborhoods and the

14  employment and the access to better education or the access to

15  better jobs.  It's, as has been stated in more than one

16  official government report, the people that the Latino voters

17  have to go and face today, many times today are the same ones

18  who legally could have prevented them from voting when they

19  were younger, legally the same people.  The mere fact that the

20  laws have changed, the mere fact that they can no longer

21  legally intimidate them, many reports have indicated that it's

22  still the same people.

23       And so the Latinos then are facing not only the same city

24  physical structure, the same educational structure, the same

25  access to employment and better jobs and wages.  It's the

Andres Tijerina - Direct

1  people that they still have to face, whether they were born in

2  the 1930s, 1940s, or the 1960s.  They still are having to

3  deal with the same people who legally could have and may have

4  excluded them from access to the American electoral process.

5      *(Discussion off the record)*

6  BY MS. MARTIN:

7  Q.  With respect to political participation, would a Latino

8  Texan born in 1958, for example, have been born to parents who

9  were subjected to a white primary, a white man's primary?

10  A.  The white man's primary was used by the Democratic Party to

11  prevent Latinos from participating when Texas was a one-party

12  state, in the primary, which then would preclude their having

13  any effect in the General Election.

14      And it required that a voter state, "I am a Democrat and I

15  am a white man."  That white man's primary and the poll tax

16  were found and stated by U.S. Congressional reports in the

17  1970s and the 1980s to have lingering, direct effect on Latinos

18  in those time periods, the 1970s and 1980s.

19      So the answer is yes, because not only the parents had to

20  live under those systems, but they're the ones who brought up a

21  child who was born in the 1940s or the 1950s.  And so that

22  alienation, that social alienation, the fear and the distrust

23  of the American political system, combined with the fact that

24  Latinos, even a child born in the 1960s and '70s, would still

25  have little vested interest in wanting to vote if they felt

1  that both candidates were apathetical, racist, or opposed

2  Latino equal rights.

3      So it's not just the distrust and the fear.  It's the fact

4  that they felt they had little vested interest in any political

5  measure, any law or any candidate.  So it's only logical that

6  the answer to your question would be yes, a person born in the

7  1950s, '60s, would probably still have the same alienation

8  that's been found in local, educational and federal government

9  reports in Texas.

10  Q.  And would those Latino children born in the 1950s have

11  been alive during the time of the poll tax?

12  A.  A person born in 1950s was born right about the time the

13  poll tax was no longer effective, if I understand your

14  question.

15  Q.  When was the poll tax no longer effective?

16  A.  I believe it was a federal law.  They just quit enforcing

17  it.  They couldn't enforce it around, I think it was, like,

18  1950s.  I don't know the exact law -- exact year.

19  Q.  If we had further questions about that, would we look to

20  your report?

21  A.  Excuse me?

22  Q.  If we had questions about -- further questions about the

23  poll tax, would we look to your expert report?

24  A.  Yes.  Because I cite statistics that as soon as the poll

25  tax was no longer enforceable, within a year, Latinos began to

Andres Tijerina - Cross

 1  run for local office and began to vote in appreciable --
 2  appreciably higher numbers.
 3  Q.  And has your research revealed how the amount of the poll
 4  tax was set?
 5  A.  My research indicates that the legislators who developed
 6  the poll tax developed it specifically to fall upon the poorer
 7  people, by first measuring what a -- at the time they were
 8  looking at the weekly wages of an African-American, and by
 9  using the weekly wages of an African-American, able to
10  determine that that would be the poll tax because a poll tax
11  would then fall upon a person who could not afford to pay it,
12  but it would not be a restriction to people who made a higher
13  wage than an African-American weekly wage.
14          MS. MARTIN:  Nothing further from me.
15          THE COURT:  Anything else on this side?  Nothing?
16      Any cross?
17          MR. BRYANT:  Yes, Your Honor.
18                      CROSS-EXAMINATION
19  BY MR. BRYANT:
20  Q.  Dr. Tijerina, my name is David Bryant.  I represent the
21  state defendants.  I'm from the Attorney General's office.
22  Thank you for your testimony.
23      I believe that you stated in your report that
24  discrimination against Latinos in Texas has been a pervasive
25  and constant phenomenon since 1836.

Andres Tijerina - Cross

1      Do you recall that?

2 A.  Yes.

3 Q.  Would you say that discrimination against Latinos in Texas

4 was as pervasive in 2021 when SB1 was passed as it was in 1836?

5 A.  I could not say, sir.

6 Q.  Would you say that it's not?

7 A.  I have not even -- I've not studied it.  I was not asked to

8 report on anything like that, sir.  So I really couldn't say.

9 Q.  You just don't have a -- have any knowledge or opinion on

10 that?

11 A.  That's correct.

12 Q.  Would you say that discrimination against Latinos in Texas

13 in 2021 was as pervasive as it was in 1951?

14 A.  I have not studied that, sir.

15 Q.  So is that also something that you don't have any -- enough

16 knowledge or information to state?

17 A.  I do not have any information on that.

18 Q.  You described in your report at paragraph 2 that your

19 specialty historical period is the 19th century and the early

20 20th century.

21      Would you agree that you have lesser depth of knowledge

22 about the mid to late 20th century and the 21st century?

23 A.  I conducted research in the late 20th century and in the

24 early 21st century.

25 Q.  It's not my question.

Andres Tijerina - Cross

1    My question is, would you agree that you have a lesser

2  depth of knowledge about the late 20th century and the 21st

3  century than you do about your specialty, historical period of

4  the 19th century and the 20th century, up to around 1933?

5  A.  I can say that I've published less in the 21st and the late

6  20th century than I have in the early -- the mid-19th century

7  and mid-20th century.

8  Q.  And my question is, would you agree that you have a lesser

9  depth of knowledge about the periods in the late 20th century

10  and the early 21st century than you do about the earlier

11  periods that are your specialty?

12  A.  No, sir.

13  Q.  Dr. Tijerina, am I correct that you retired after teaching

14  at Austin Community College for about 21 years?

15  A.  Yes.

16  Q.  And you retired in about 2018?

17  A.  That's correct.

18  Q.  You describe in your report many practices in parts of

19  Texas in the past that adversely affected the voting and

20  electoral power of Latinos.  You described the use of violence

21  and intimidation against Latinos to minimize Latino voting in

22  the 19th century.

23    Would you agree that the events described in your report

24  that occurred in the 19th century are not reasonably

25  contemporaneous with the passage of SB1 in 2021?

Andres Tijerina - Cross

1          MS. MARTIN:  Objection, calls for a legal conclusion.

2          THE COURT:  That's overruled.

3          THE WITNESS:  Could you repeat the question, please?

4          MR. BRYANT:  Sure.

5   BY MR. BRYANT:

6   Q.  Would you agree that the events that you described in your

7   report that occurred in the 19th century were not reasonably

8   contemporaneous with the passage of SB1 in 2021?

9   A.  Well, I can say that the violence that I reported in 1921,

10  1919 specifically, is very, very different.  And if you're

11  asking if it doesn't exist in 2021, I would say no.  You don't

12  have the same kind of violence in 2021 that I -- that I found

13  and reported on in 1920, '21.

14  Q.  Okay.  And when I -- when I use the term "reasonably

15  contemporaneous," I'm not trying to ask a legal question.

16  "Contemporaneous" means at the same time, right?

17  A.  Yes.

18  Q.  And "reasonably contemporaneous," I would view as meaning

19  about the same time.  Now, that's just my view.  I want you to

20  apply your own understanding of the term.

21       Would you agree that anything that happened in the 19th

22  century is not reasonably contemporaneous with an event in

23  2021?

24  A.  It would not be accurate to say that 2021 is

25  contemporaneous with 1921.

Andres Tijerina - Cross

1  Q.  Would you agree that events described in your report that

2  occurred in the period from 1900 to 1933 were not reasonably

3  contemporaneous with events that occurred in 2021, two years

4  ago?

5  A.  There is no way that 2021 could be considered

6  contemporaneous with events between 1900 and 1930.

7  Q.  And would you agree that the events described in your

8  report that occurred in the 1940s and the 1950s and up to

9  the passage of the civil rights laws in the 1960s were not

10  reasonably contemporaneous with events in 2021?

11  A.  The 1950 to 1960 period is not contemporaneous with 1921 --

12  with 2021.

13  Q.  Dr. Tijerina, you describe in your testimony the

14  dispossession of Tejano lands by Anglos, and I think you

15  referred to that as occurring throughout history.

16      To your knowledge, has that -- any of that occurred in the

17  last fifty years?

18  A.  The mass dispossession of Tejano lands, as I explained to

19  the Court, I framed it the mass dispossession, 1880 to 1920.

20  Q.  Okay.  So would you agree that that has not occurred in

21  Texas within the last fifty years?

22  A.  There has been no -- there has been no mass dispossession

23  of Tejano lands like the one that occurred between 1880 and

24  1920, since 1920.

25  Q.  Has there been any mass dispossession of Tejano lands in

Andres Tijerina - Cross

1  Texas in the last fifty years, to your knowledge?

2  A.  To my knowledge, there has been no mass dispossession of

3  Tejano lands, especially compared to the period between 1880

4  and 1920.

5  Q.  Dr. Tijerina, you testified that there was pervasive

6  violence used in Texas to minimize Latino voting.

7      Has any of that occurred since the passage of the Civil

8  Rights Acts in the 1960s in Texas, to your knowledge?

9  A.  I have not seen or studied any mass violence against Latino

10  voting or Latinos since the 1960s in Texas.

11  Q.  Is it correct that you didn't include in your expert report

12  any incidents of violence in Texas with the purpose of

13  minimizing Latino voting in the last fifty years?

14  A.  I have not in my report included anything about mass

15  violence against Latino voting in the last fifty years.

16  Q.  Okay.  And I want to be sure we're -- that you're answering

17  the question I asked.  I'm going beyond mass violence in that

18  question.

19      Has there been any -- is there anything in your report

20  about any incidents of violence in Texas in the last fifty

21  years with the purpose of minimizing Latino voting?

22  A.  I have to think about my report.  If you'll give me a

23  second just to think about it.

24  Q.  Certainly.  Take all the time you need.

25  A.  Violence in Texas to suppress voting, is that what you

Andres Tijerina - Cross

1  asked?

2  Q.  By Latinos, yes, sir.

3  A.  There's nothing like that in my report.

4  Q.  Did you include in your expert report any incidents of

5  intimidation with the purpose of minimizing Latino voting or

6  campaigning in the last fifty years?

7  A.  In the last fifty years, my report does quote Vilma

8  Martinez testifying before the U.S. Congress.  And my report

9  does end by stating that there were comments of cases in which

10  employers -- in one case I specifically cite a banker that

11  threatened his clients, even dictated to them the way they

12  should vote and then threatened them in a report in which the

13  Congress stated that it was intimidation in the last fifty

14  years.

15  Q.  You're saying that the report was in the last fifty years?

16  A.  It was within that time period that you framed.

17  Q.  Yes.  Yes, sir.  My question is, when did that incident

18  involving the banker occur?

19  A.  The Congressional report did not cite the year, but the

20  Congressional report was -- I believe it was 1978.

21  Q.  And you referred to Vilma Martinez.

22       When did she report the information that you described in

23  your testimony?

24  A.  The testimony that she was quoted in my report was taken

25  from a Congressional report of 1975.  So I cannot tell you when

Andres Tijerina - Cross

```
 1  she -- I cannot answer your question because I do not know the
 2  date that she actually testified.  I can only tell you that the
 3  date that the U.S. Congress published her testimony in their
 4  report.
 5  Q.  You described in your testimony the use of Texas Rangers to
 6  intimidate and explicitly discourage voting by Latinos in Texas
 7  in the early 20th century.
 8      Have the Texas Rangers been used to discourage voting by
 9  Latinos in Texas anytime in the last fifty years?
10  A.  Not voting.
11  Q.  You described in your report incidents of public statements
12  that were threatening towards Latinos who exercised their right
13  to vote in Texas with the purpose of minimizing Latino voting
14  in Texas.
15      Were there any of those incidents that occurred in the last
16  fifty years?
17  A.  Could you repeat that question, please?
18  Q.  I'll try.
19      You included in your report incidents of public statements
20  that were threatening towards Latino voters for having voted
21  with the purpose of discouraging them from voting in the
22  future.
23      Do you recall that discussion in your report?
24  A.  I don't.  If you could remind me -- tell me where in the
25  report that I stated that.
```

Andres Tijerina - Cross

1  Q.  I would have to take time, and we're running a little short

2  on time.  So I'm not going to do that.

3      Do you know of any such incidents in the last fifty years

4  in Texas?

5  A.  In which public statements were made by officials or Texas

6  Rangers?

7  Q.  Anybody to threaten somebody -- a Latino who had voted to

8  try to persuade them not to vote again in the future.

9  A.  I don't remember anywhere in my report that I cite -- and

10 I'm kind of trying to respond to your comment about running out

11 of time.  I don't want to delay you.  So I won't try to

12 remember anymore, but --

13 Q.  I'm sorry.  I do not mean to cut you off or give you

14 anything other than all the time that you want to answer the

15 question.  So please take the time you need.

16 A.  I think -- I think I would rather look at my report if I

17 were going to answer that question, and do it accurately for

18 the Court.

19 Q.  Do you know if it's correct that there were only five

20 Tejanos in the Texas Legislature, both house and senate, in the

21 58th legislative session that occurred in 1963 to '64?

22 A.  Please repeat that question.

23 Q.  Is it correct that there were only five Tejanos in the

24 Texas Legislature in the 58th legislative session that took

25 place in 1963 and '64?

Andres Tijerina - Cross

1  A.  Did I -- may I ask if I -- if I stated that in my report?

2  Q.  No.  I'm just asking for your information or your

3  knowledge, if you have any.

4          THE COURT:  If you know, sir.  You can say, "I don't

5  know," or "I" --

6          THE WITNESS:  No.  I simply did not study that.  I

7  wasn't asked to report on the number of Latino legislators in

8  any time period or specifically in that time period.

9  BY MR. BRYANT:

10  Q.  And do you know that in the 87th Texas Legislature, that

11  enacted SB1, there were 38 Latino representatives and 7 Tejano

12  senators, for a total of 45 Latinos, in the Texas Legislature

13  in 2021?

14  A.  I did not know that.  I did not have any information on

15  that.

16  Q.  Okay.  This case is about SB1.  It's correct that you were

17  not asked to and you do not say anything whatsoever in your

18  expert report about SB1; is that right?

19  A.  That is correct.

20  Q.  And you didn't do any research on the legislative history

21  of SB1 in connection with your work in this case?

22  A.  That is correct.

23  Q.  And you've never even read SB1 or any of its predecessors;

24  is that correct?

25  A.  That is correct.

Andres Tijerina - Cross

1  Q.  And you did not cite or consider any other voting or

2  electoral legislation in Texas in the last 20 years in your

3  expert report?

4  A.  Not in this report, no.

5  Q.  And you do not allege in your report that SB1 or any of its

6  provisions were enacted with the intent to discriminate against

7  Latinos?

8  A.  I do not anywhere in my report make that statement.

9  Q.  And you do not assert in your report that SB1 or any of its

10 provisions is a continuation of any past actions in Texas to

11 discriminate against or exclude Latinos from voting or from any

12 other aspect of the electoral process?

13 A.  I would ask if you could repeat the first part of that

14 question.

15 Q.  Be happy to.

16     You do not assert in your expert report that SB1 or any of

17 its provisions is a continuation of any past actions in Texas

18 to discriminate against or exclude Latinos from voting or any

19 other aspect of the electoral process?

20 A.  I do not state that in my report.

21 Q.  Can you identify any Texas legislator who voted for SB1

22 who, ever in his or her life, engaged in any of the

23 discriminatory actions or practices against Latino voters that

24 you describe in your report?

25 A.  I cannot.

Andres Tijerina - Cross

 1  Q.  Can you identify any Texas legislator who voted for SB1 who

 2  did so because of any aspect of the history of discrimination

 3  against Latinos in Texas that you describe in your report in

 4  this case?

 5  A.  I've never done research on that.

 6  Q.  Can you explain how any of that history of discrimination

 7  against Latino voters in Texas had any influence at all on a

 8  single legislator who voted for SB1?

 9  A.  I have not done any research on the legislators.

10  Q.  Dr. Tijerina, do you have any information as to the

11  approximate average age of the Texas legislators in the 2021

12  Texas Legislature?

13  A.  No.

14  Q.  Would it surprise you that they're younger than you and me?

15          THE COURT:  What's the average age of the leadership

16  who drafted the bill?  That's the more relevant context.

17          MR. BRYANT:  I'll be happy to ask him that question

18  also, Your Honor.

19          THE COURT:  That's for you all.

20          MR. BRYANT:  Okay.

21          THE WITNESS:  Could you repeat the question, please?

22  BY MR. BRYANT:

23  Q.  Sure.

24     Do you have any information as to the -- as to whether the

25  average age of the members of the Texas Legislature in 2021 was

Andres Tijerina - Redirect

1  less than 65?

2  A.  No.

3  Q.  Just based on age alone, are there any members of the Texas

4  Legislature that you're aware of who came of age any time

5  before 1971, fifty years before 2021?

6  A.  I have no knowledge about that.

7          MR. BRYANT:  Pass the witness.

8          THE COURT:  Anything else on this side?

9          MR. KERCHER:  Your Honor, a quick Google search says

10 that Senator Bryan Hughes is 54 years old and Representative

11 Murr is 46.

12         THE COURT:  Thank you.

13    Anything else from this side?

14         MR. NICHOLS:  Nothing further.

15         THE COURT:  Any redirect?

16         MS. MARTIN:  Yes, Your Honor.

17                    REDIRECT EXAMINATION

18 BY MS. MARTIN:

19 Q.  So the defense side asked you about what was reasonably

20 contemporaneous.  Setting that aside, and I want to refocus on

21 relevance.

22    Are the discriminatory practices and events that we

23 discussed earlier on the direct examination relevant to events

24 that occurred later and that are occurring today?

25 A.  The U.S. Congress and the Supreme Court have gone on

Andres Tijerina - Redirect

1    record, and I've included them -- included them in my report,

2    to have stated that there is that legacy, a strong legacy after

3    decades of that type of discrimination in Texas.  And I, in my

4    own personal and professional opinion, agree with those

5    statements.

6    Q.  The Texas Legislature's not writing on a blank slate,

7    correct?

8    A.  Can you repeat that?

9    Q.  The Texas Legislature was not writing on a blank slate when

10   it comes to Latinos in Texas?

11          MR. BRYANT:  Objection, leading, Your Honor.

12          THE COURT:  That's sustained.

13   BY MS. MARTIN:

14   Q.  In your opinion, in your experience as a historian, is it

15   important to consider history when you're evaluating current

16   events?

17   A.  What I would say as a historian is that historians study

18   and write history and interpret and write history on the basis

19   of the historical facts, not with regard to current events.

20   And so they discipline themselves, historians -- historical

21   process is to -- is to discipline that study to an objective

22   study and interpretation of the past.

23       However, this is not to say that the present is not

24   affected by the past or that historians are ignorant of the

25   impact and the legacy that the -- that the past may have on the

 1  present.

 2  Q.  Taking an extreme example, can the current socioeconomic

 3  and political situation of Latinos in Texas today be understood

 4  without thinking about the violent state-sanctioned

 5  dispossession of land beginning in the 1800s?

 6          MR. BRYANT:  Objection, Your Honor.

 7          THE COURT:  That started off with "can."  That was a

 8  question.  That's overruled.

 9  BY MS. MARTIN:

10  Q.  Do the events in your report, the racial discrimination

11  described in your report, have continuing effects today?

12  A.  Yes.

13  Q.  Are they relevant to current events today?

14  A.  I would say that they leave a legacy and that Latinos in

15  modern Texas bear the effects of that invidious and pervasive

16  discrimination that has been found and reported in educational,

17  historical and government records in Texas for decades, much of

18  which was, as reported by the Congress or had the sole purpose

19  of perpetuating not only that discrimination but the

20  discouragement of Latino participation in the electoral

21  process.

22          MS. MARTIN:  Thank you, Dr. Tijerina.

23      Nothing further from me.

24          THE COURT:  Anything else from this side?

25      Anything else based on those questions?

 1          MR. BRYANT:  No, Your Honor.

 2          THE COURT:  May the witness be excused?

 3          MS. PERALES:  Yes, Your Honor.

 4          THE COURT:  You're excused, Doctor.  Thank you so

 5  much.

 6       And we will resume tomorrow.  And I have another short

 7  sentencing at 8:30.  I don't think it's going to take very

 8  long.  So if that sentencing does finish up quickly, we can

 9  start at 8:45 or whenever you all are prepared.

10       Otherwise, requests have been made that we push on tomorrow

11  late.  So plan to 6:30 or 7:00.  I'm okay with snacks.  I'm not

12  sure about eating or drinking in the courtroom.  But you can do

13  it in the hallway in case anybody needs to bring some food.

14       We'll see you tomorrow.

15       *(Overnight recess at 5:02 p.m.)*

16

17

18

19

20

21

22

23

24

25

1                              -o0o-

2      I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.  I

4   further certify that the transcript fees and format comply with

5   those prescribed by the Court and the Judicial Conference of

6   the United States.

7

8   Date:  10/3/2023              /s/  *Gigi Simcox*
                                  United States Court Reporter
9                                 262 West Nueva Street
                                  San Antonio, TX 78207
10

11

12                                /s/  *Chris Poage*
                                  United States Court Reporter
13                                262 West Nueva Street
                                  San Antonio, TX 78207
14

15

16

17

18

19

20

21

22

23

24

25