1               IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3

LA UNION DEL PUEBLO ENTERO,   .
4  ET AL,                   .
                           .
5           PLAINTIFFS,   .
        vs.             . DOCKET NO. 5:21-CV-844-XR
6

GREGORY W. ABBOTT, ET AL,   .
7                         .
           DEFENDANTS.   .
8

9

10              TRANSCRIPT OF BENCH TRIAL
        BEFORE THE HONORABLE XAVIER RODRIGUEZ
11          UNITED STATES DISTRICT JUDGE
              OCTOBER 4, 2023

12

13

14

15

16  APPEARANCES:
    FOR THE PLAINTIFFS:     NINA PERALES, ESQUIRE
17                     FATIMA MENENDEZ, ESQUIRE
                     JULIA LONGORIA, ESQUIRE
18                     MALDEF
                     110 BROADWAY
19                     SUITE 300
                     SAN ANTONIO TX 78205
20

21                     VICTOR GENECIN, ESQUIRE
                     NAACP LEGAL DEFENSE & EDUCATIONAL
22                     FUND INC
                     40 RECTOR STREET, FIFTH FLOOR
23                     NEW YORK NY 10006

24

25

```
 1
 2
 3
 4   FOR THE DEFENDANTS:      RYAN G. KERCHER, ESQUIRE
                              KATHLEEN HUNKER, ESQUIRE
 5                            WILLIAM WASSDORF, ESQUIRE
                              DAVID BRYANT, JR., ESQUIRE
 6                            TEXAS ATTORNEY GENERAL
                              P.O. BOX 12548
 7                            MC 009
                              AUSTIN TX 78711
 8
 9                            LOUIS J. CAPOZZI, III, ESQUIRE
                              JONES DAY
10                            51 LOUISIANA AVENUE NW
                              WASHINGTON DC 20001
11
12
13
14
15   REPORTED BY:            GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
16                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
17
18
19
20
21
22
23
24
25
```

CESAR ESPINOSA – DIRECT

1    *(San Antonio, Texas; October 4, 2023, at 8:45 a.m., in*
2    *open court.)*

3              THE COURT:  Good morning.

4              MR. PARRENO:  Good morning, Your Honor.  LUPE
5    plaintiffs will call Cesar Espinosa.

6        (CESAR ESPINOSA, having been duly sworn, testified as
7    follows:)

8              MR. PARRENO:  Good morning.  My name is Kenneth
9    Parreno and I'm an attorney on behalf of the LUPE plaintiffs.

10             Mr. Espinosa will testify in support of LUPE
11   plaintiffs' challenge to Section 4.09, Section 6.03, and
12   Section 6.04.

13             THE COURT:  Thank you.

14                       DIRECT EXAMINATION

15   BY MR. PARRENO:

16   Q.  Mr. Espinosa, would you please state your name for the
17   record?

18   A.  Cesar Espinosa.

19   Q.  And would you mind just first spelling your first and last
20   name for us?

21   A.  First name is C-E-S-A-R.  The last name is
22   E-P-S-I-N-O-S-A.

23   Q.  And, Mr. Espinosa, where do you live?

24   A.  I live in Houston, Texas.

25   Q.  What do you do for a living?

CESAR ESPINOSA – DIRECT

1   A.  I am currently the executive director of FIEL Houston.

2   Q.  How long have you had that position?

3   A.  I am the founding executive director, so I've been there

4   since May of 2007.

5   Q.  Let's get to know a little bit more about FIEL.  Can you

6   give us a brief description of what FIEL is?

7   A.  FIEL is the largest immigrant-led civil rights

8   organization in Harris County.

9   Q.  And what sort of activities do you-all do?

10  A.  We have different programs aimed at empowering and

11  educating the community.

12  Q.  And FIEL, do you mind spelling that for us actually,

13  please?

14  A.  Yes.  It's F-I-E-L.

15  Q.  Is that an acronym for something?

16  A.  Yes.

17  Q.  What is that an acronym for?

18  A.  It's *Familias Inmigrantes Estudiantes Luchar*, or which is

19  an acronym for Immigrant Families and Students in the Fight.

20  Q.  And where in Houston is FIEL located?

21  A.  We are based in Southwest Houston but we have members

22  across the Greater Houston Area.

23  Q.  Could you tell us a little bit about why FIEL was created?

24  A.  FIEL was created in order to help — in 2007 help students

25  attain higher education.

CESAR ESPINOSA - DIRECT

1  Q.  Could you say a little more about that.

2  A.  So in 2007 there was not really a group that would help

3  young people access scholarships or financial aid so we began

4  what we thought was going to be a small group of students and

5  eventually it grew to what it is today.

6  Q.  And you said you've been the executive director since its

7  founding.  What are your responsibilities as the executive

8  director of FIEL?

9  A.  Well, I am -- my responsibilities are to oversee

10 day-to-day operations, to manage staff, and to make sure that

11 programs are running as the way they are intended, but I am a

12 very hands-on executive director, so I do everything from

13 answering phones to be out in the community constantly.

14 Q.  You said "hands-on," could you give us a little bit

15 more -- could you elaborate a little bit more on what you mean

16 by "hands on?"

17 A.  Yes.  So I'm not afraid or opposed to, you know, doing

18 other tasks that require -- that are required of me and I love

19 being out in the community doing presentations and things like

20 that.

21 Q.  Is FIEL a membership organization?

22 A.  Yes.

23 Q.  How many members does FIEL have?

24 A.  At the last count we have 16,000 members in the Greater

25 Houston Area.

CESAR ESPINOSA - DIRECT

1   Q.  Could you tell me a little bit more about this membership?

2   A.  So members pay a membership due a year and they basically

3   have access to our services and what we do.

4   Q.  So why don't you tell me a little more about who these

5   members are.

6   A.  These members are community members, anybody who wants to

7   be involved or engaged or who needs a service from the

8   organization.

9   Q.  Could you tell us a little bit more about them, like who

10  these individuals are?

11  A.  They are just community people, people who have families,

12  folks who require services.

13  Q.  You said one of the — the I in FIEL stands for

14  *immigrantes*.  Do you all serve — are there a lot of

15  individuals who are related to immigrants in this

16  organization?

17  A.  Yes.  So we have — a large part of our membership are

18  immigrants, either newly arrived or folks who have been here

19  for a long time, and we have many members in our membership

20  who are mixed-status families.

21  Q.  What do you mean by that?  Could you explain what mixed

22  status means?

23  A.  Mixed status is families who may have members in their

24  family members who are first generation, or newly arrived

25  immigrants, who may have family members who are naturalized

CESAR ESPINOSA — DIRECT

1  citizens, or natural born citizens.

2  Q.  And you alluded to this already, but where do FIEL members

3  reside?

4  A.  FIEL members reside in the Greater Houston Area, but we

5  have a large concentration of membership in Southwest Houston,

6  which is close to our offices, or where our office is.

7  Q.  And you mentioned this before, that FIEL members pay dues,

8  but how much are those dues?

9  A.  Individual membership dues for FIEL are $60 a year; $120

10 for families; and children are $20 additional.

11 Q.  I'm sorry.  Just to clear up, $60 a year, is that for one

12 person or multiple people?

13 A.  For — $60 a year would be for one person; $120 per

14 couple; and if they want to add kids onto that, it's $20 extra

15 additional.

16 Q.  And is there any leadership structure to FIEL?

17 A.  Yes, there is.

18 Q.  Could you tell us a little bit about what that leadership

19 structure looks like?

20 A.  So we have a staff of eight which are, you know, paid

21 staff from the organization, but we also are managed by our

22 board and by our members.

23 Q.  Could you describe that board a little bit more?

24 A.  So our board consists of five people, five community

25 people who get elected by our membership.

CESAR ESPINOSA – DIRECT

1    Q.  What does that board do?

2    A.  The board oversees more of the direction of our mission,

3    make sure that we are fulfilling our mission, that we are in

4    good standing.

5    Q.  How does the election of that board work?

6    A.  It works on staggered terms, one year off, one year on,

7    and then they are elected by their peers, who are members who

8    are in good standing.

9    Q.  You mentioned that there are eight paid staffers at FIEL.

10   Can you tell us a little bit more, still broadly, about what

11   those staffers' responsibilities are?

12   A.  There are some folks who are paralegals in our office and

13   some folks who do management and we have two organizers.

14   Q.  And what do the organizers do?

15   A.  The organizers go out and talk to the community, educate

16   them on rights, on different things, and basically try to

17   empower people to do what they need to do.

18   Q.  And as the executive director, are you among paid staff of

19   FIEL?

20   A.  Yes, I am.

21   Q.  You talked a little bit about the ins and outs of FIEL as

22   an organization, but zooming back a little bit, could you tell

23   us about FIEL's mission as an organization?

24   A.  So our mission is to organize and empower people, to make

25   sure that people know their rights, and that they exercise

CESAR ESPINOSA — DIRECT

1  their rights in the community.

2  Q.  Are there any substantive areas that relate to your

3  mission?

4  A.  Yes.  We are particularly focused in access to higher

5  education, and community organizing, and civic engagement.

6  Q.  Can you say a little more about civic engagement, what do

7  you mean by that?

8  A.  In civic engagement, we want people to participate fully

9  in the —— in either local politics, or whatever governance

10  that they are in, but we also encourage them to be active

11  participants by voting.

12  Q.  So is it fair to say that voter outreach in civic

13  engagement is part of FIEL's mission?

14  A.  Yes.

15  Q.  Broadly, what activities does FIEL undertake to further

16  its mission?

17  A.  Well, we have community forums.  We do house visits.  We

18  talk to people one-on-one, whether it's out on the street or

19  in person, and I personally talk to anybody who will listen to

20  me, whether it's at the supermarket or wherever, so we try to

21  be constant about recruiting people and letting people know

22  about their rights.

23  Q.  Can you talk a little bit more about those conversations

24  with people and what spaces do those take place?

25  A.  Well, they can take place really anywhere, but we host

CESAR ESPINOSA – DIRECT

1  specific forums dealing on specific topics, like we host
2  special events when we're at a venue, or something like that,
3  but folks can also come to our office, or like I said we go to
4  people's houses to meet them where they are the most
5  comfortable.
6  Q.  Let's talk a little bit more about FIEL's members.  Are
7  some FIEL members registered voters?
8  A.  Yes.  Some members are registered voters.
9  Q.  Among FIEL members who are registered voters, are there
10 any individuals who have limited English proficiency and
11 require assistance when voting?
12 A.  Yes.  Many members have limited English proficiency and
13 require assistance while voting.
14 Q.  And among FIEL members who are registered voters, are
15 there any individuals who are disabled and require assistance
16 when voting?
17 A.  There are members who are disabled and require assistance
18 while voting.
19 Q.  Are there any FIEL members who assist voters who vote in
20 person?
21 A.  Yes.  We do have members that assist people while voting.
22 Q.  And for any given election are there any FIEL members who
23 are first-time voters?
24 A.  Yes.  So we, through one of our programs, one of the
25 outcomes is that we help guide people through a legal process

CESAR ESPINOSA – DIRECT

1  and we have many folks who are naturalized citizens.

2  Q.  Whose first time it is to vote?

3  A.  And whose first time it is to vote.

4  Q.  I know you're the executive director of FIEL, but just to

5  be clear, are you also a member of the organization?

6  A.  Yes.

7  Q.  Mr. Espinosa, you mentioned that part of FIEL's mission is

8  voter outreach and civic engagement.  Prior to the enactment

9  of SB 1, what had FIEL done to further that part of its

10  mission?

11  A.  We had helped guide members at the polls by accompanying

12  them.  We had helped with translation services mostly, and

13  also like voter outreach forums or education forums.

14  Q.  Can you talk a little bit more about those voter outreach

15  forums?

16  A.  So what we would do during a lot of these forums is a lot

17  more complex than just explaining to people like the

18  technicalities of voting, but rather almost like a small

19  civics lesson on how it works and what they need to do, and

20  how their vote will be counted, and things like that.  So we

21  take the time to be able to teach a lot of first-generation

22  voters or first-time voters the importance of their vote.

23  Q.  Are there any other places where these conversations

24  happen?

25  A.  Yes.  They happen everywhere really, whether it is a, you

*Gigi Simcox, RMR, CRR*

 1 know, that we are going to somebody's home and doing this, or

 2 whether they are coming to us, or whether it's on the phone,

 3 or even sometimes through like social media or electronic

 4 channels.

 5 Q.  Are there any resources y'all provide to voters?

 6 A.  We provide — we used to provide the assisters and we

 7 provide like voter guides or — yeah, voter guides so they can

 8 know what voting is going to be like for them.

 9 Q.  And you talked about assistance at the polls, am I

10 remembering that correctly?

11 A.  Correct.

12 Q.  Can you talk a little bit about what that is like?

13 A.  So we would — usually we would partner up with an

14 organization who is already doing like an activity at the

15 polls, take people to vote, and we would be there to provide

16 translation services or assister services.

17 Q.  Derek, could you please pull up LUPE Exhibit 172.  Thank

18 you, Derek.

19     Mr. Espinosa, do you see the document on your screen?

20 A.  Yes.

21 Q.  Are you familiar with this document?

22 A.  Yes.

23 Q.  Can you describe what this document is in your own words?

24 A.  This is the oath of assistance, which is a new document

25 under SB 1 which now requires people to swear, affirm by this

CESAR ESPINOSA — DIRECT

1   in order to be able to be assisters to a voter.

2   Q.   Have you ever assisted any voters at the polling place?

3   A.   Yes.

4   Q.   Did you ever assist voters before the enactment of SB 1?

5   A.   Yes.

6   Q.   Did you ever assist voters after the enactment of SB 1?

7   A.   No.

8   Q.   When you assisted voters before the enactment of SB 1,

9   what did that assistance look like?

10  A.   So oftentimes it would be kind of like a companionship for

11  voters, or for people who felt uneasy about entering the

12  voting space by themselves, but a lot of times it was for

13  people who had limited English proficiency.  We would — even

14  something as simple like, this is where to turn, and things

15  like that, we would go with them and translate or help them --

16  guide them in that process.

17  Q.   And you are saying the phrase or using the word "we would

18  go," but did that include you?

19  A.   Yes.  So when I talk about we, it's me and the FIEL

20  members, but I would go.

21  Q.   Do you have any concerns about the oath that you see on

22  the screen?

23  A.   Yes, there is many concerns.

24  Q.   So, Mr. Espinosa, let's start with drawing your attention

25  to the following phrase, "I swear or affirm under penalty of

CESAR ESPINOSA — DIRECT

1  perjury that the voter I am assisting represented to me that

2  they are eligible to receive assistance," do you see that?

3  A.  Yes.

4  Q.  How does that part make you feel?

5  A.  It makes me feel uneasy because there's words in there

6  that are very daunting, like the "penalty of perjury," and

7  then there's questions that — or there's words in there that

8  raise more questions to me, like who, how would somebody know

9  they may be eligible if they are not familiar with the

10  process, et cetera, et cetera.

11  Q.  Now, let me draw your attention to that same line of the

12  exhibit where we left off after the word "assistance."  And

13  that part begins, "I will not suggest by word, sign, or

14  gesture how the voter should vote," do you see that?

15  A.  Yes.

16  Q.  How does that part make you feel?

17  A.  It, once again, makes me feel very uneasy because now I

18  feel like I should have to very much police myself as to what

19  I say, what I do, how I move, so it adds an extra layer of —

20  it adds an extra layer of complexity to an already complex

21  exercise.

22  Q.  You said you have to "police" yourself, can you talk a

23  little bit more about that?

24  A.  So where it says "sign or gesture" on how one should vote,

25  I — like what can be considered a sign or a gesture?

2441

CESAR ESPINOSA — DIRECT

1  Q.  So I'd like to draw your attention to the same line where
2  we left off, but I want to move forward a little bit to the
3  part that begins "I did not pressure or coerce the voter into
4  choosing me to provide assistance," do you see that?
5  A.  Correct.
6  Q.  How does that part of the oath make you feel?
7  A.  It makes me feel, once again, uneasy because we usually
8  encourage people that if they need assistance that they should
9  seek assistance, and we wouldn't want that to be
10 miscategorized as pressuring people to choosing us to provide,
11 or choosing me to provide assistance.
12 Q.  How does it make you personally feel about assisting
13 individuals to vote?
14 A.  It just makes me feel very uneasy and very uncomfortable
15 because there are all these added rules or stipulations.
16 Q.  Can you say more about that, with respect to this specific
17 phrase?
18 A.  Well, I mean, if I'm going to volunteer to do something
19 thinking I'm doing the right thing, but then I'm going to get
20 in trouble for it, or — yeah, in trouble for it, then I may
21 be less likely or less inclined to do it, just in order to
22 avoid issues.
23 Q.  And what is an example of one of those things you would
24 volunteer to do that you are concerned about getting in
25 trouble with?

CESAR ESPINOSA - DIRECT

1  A.  Just even translating, I would be concerned that if I'm

2  saying something in Spanish but I am being monitored by a

3  monolingual person that they may be interpreting that as me

4  trying to influence anything, if they are unable to understand

5  what I'm saying.

6  Q.  I'd like to draw your attention to the table in the middle

7  of the document.  Do you see that table?

8  A.  Yes.

9  Q.  Is there anything about that table that concerns you?

10  A.  Most of it.

11  Q.  Could you elaborate?

12  A.  I mean, the number one question that -- or the number one

13  thing that pops into my head is why is this table even

14  necessary?  Or what is my information that I provided here

15  going to be used for?  How is it going to be stored?  Who is

16  going to be able to handle it or see it?  Who is going to be

17  able to see my signature?  So there are a lot more questions

18  than answers, when it relates to this form.

19  Q.  How do you feel about the part that asks for the address

20  of resident and the relationship of assistant to voter?

21  A.  Well, so the address of the assistant, once again, I would

22  want to know who is going to have access to this?  What is it?

23  How is my data going to be stored?

24       And the part of the relationship of the assistant to voter

25  really confuses me because most of the time when we are

CESAR ESPINOSA — DIRECT

1  volunteering, we are making new friends at the polls and we
2  don't necessarily have a direct relationship to them, but
3  rather we are volunteering to help somebody in need.
4  Q.  And how does — how do these feelings you just described
5  affect your likelihood that you will volunteer to assist
6  people at the polls?
7  A.  They make me very uneasy, so the likelihood that I will
8  assist voters greatly declines or is almost not existent at
9  this point.
10  Q.  And you said earlier that you have not volunteered to
11  assist at the polls since the enactment of SB 1, is that
12  correct?
13  A.  That is correct.
14  Q.  Can you tell us a little bit more about that decision?
15  A.  So because all these other issues are tacked onto this
16  activity, or almost — almost threats of penalty of perjury,
17  things like that, then it just makes us — it makes me feel
18  very uneasy about going into that space and potentially making
19  a mistake that could affect me in the future.
20  Q.  Are you aware of any concerns by FIEL members — by other
21  FIEL members about this document?
22  A.  Yes.  FIEL members have expressed concern about this
23  document.
24  Q.  So what is your understanding of those concerns?
25  A.  My understanding is that there is a shared sense of

1  uneasiness about this document in particular.

2  Q.  Could you elaborate?

3  A.  People — our members have expressed concern when it

4  relates to the language of this document.

5  Q.  And what language are you referring to?

6  A.  The part where it says "penalty of perjury," the question

7  of who is eligible to receive assistance, the sign or gesture,

8  and feeling like they may be interpreting it as pressuring

9  people to vote or to be able to ask for assistance.

10 Q.  And what is your understanding of how those concerns

11 affect the likelihood of FIEL members to volunteer to assist

12 individuals at the polls?

13 A.  My understanding is that it makes FIEL members less likely

14 to volunteer to assist people at the polls.

15 Q.  Do you know of any FIEL members who before the enactment

16 of SB 1 assisted voters in the polls but who have stopped

17 doing so after SB 1 was enacted?

18 A.  Yes.

19 Q.  Can you give us an example besides yourself?

20 A.  There was a member by the name of Debany Gonzales, who,

21 she prior to SB 1, she would be very active in helping people

22 and assisting people at the polls, and after the enactment of

23 SB 1 she is no longer a participant in that program.

24 Q.  So taking a step back, back to your prior assistance at

25 the polls, that is your assistance before the enactment of SB

CESAR ESPINOSA — DIRECT

1  1, are the voters that you assisted in the past FIEL members?

2  A.  Yes, the voters that we have assisted have been FIEL

3  members.

4  Q.  And now since SB 1 there have been FIEL members who must

5  vote without you, even though you may be their assister of

6  choice?

7  A.  Yes, there has been FIEL members who have done that.

8  Q.  Going back to the example of Miss Gonzales, did Miss

9  Gonzales previously, before SB 1, volunteer to assist voters

10  who were FIEL members?

11  A.  Yes.

12  Q.  And now are there FIEL members who must vote without her?

13  A.  Yes.

14  Q.  Still sticking with Miss Gonzales, what is your

15  understanding of why that — why Miss Gonzales no longer

16  volunteers to assist voters at the polls?

17  A.  My understanding is that she's wary or concerned about the

18  language on this oath of assistance.

19  Q.  And what language?

20  A.  The "under penalty of perjury," the "who is eligible to

21  receive assistance," and then the part where she would have to

22  police herself to not suggest by word, sign, or gesture.

23  Q.  Do you know of any FIEL members who before SB 1 voted in

24  person with an assister, but who after SB 1 voted in person

25  but without an assister?

2446

CESAR ESPINOSA – DIRECT

1  A.  Yes.

2  Q.  Can you give us an example?

3  A.  We have a member by the name of Tonya Rodriguez, who

4  before SB 1 she requested — because of her limited English

5  proficiency had requested — she felt more comfortable having

6  an assister, and then after SB 1 she voted without an assister

7  but she found the process very cumbersome and very

8  overwhelming.

9  Q.  So before SB 1 she had requested an assister and voted

10  with that assister, is that right?

11  A.  That is correct.

12  Q.  And was that assister a FIEL member?

13  A.  That is correct, yes.

14  Q.  Can you talk a little bit more about the assistance that

15  she was seeking?

16  A.  She is a first time — or she is a naturalized citizen so

17  she had requested translation services as she would feel more

18  comfortable in her native tongue.

19  Q.  And so after SB 1 is your understanding that she was not

20  able to vote with the assister of her choice who was a FIEL

21  member, is that correct?

22  A.  That is correct.

23  Q.  And you said your understanding is that it was more

24  difficult, can you explain what that means?

25  A.  So a process that should be available or easy for anybody

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA - DIRECT

1  to cast their — I mean, to take part in for some of our
2  community members it gets very complicated if they don't have
3  assistance and translation services, or even have somebody
4  accompany them to make them feel more welcomed or more
5  comfortable.
6  Q.  And, specifically, with respect to Miss Rodriguez, can you
7  describe how that was more difficult, your understanding of
8  how that was more difficult for her?
9  A.  My understanding of how that was more difficult is she had
10  a more difficult time entering the polling place, finding her
11  way around, and she felt very anxious about was she going to
12  fill in the right thing, was she interpreting what she was
13  reading correctly, things of that nature.
14  Q.  Earlier you identified a number of pre-SB 1 activities
15  FIEL has engaged in to further its mission of voter outreach
16  and civic engagement.  For example, you talked about forums
17  with voters, and individual conversations with voters.  Has SB
18  1's requirements regarding the oath and the assister form made
19  it more difficult for FIEL to conduct those activities?
20  A.  Yes.
21  Q.  So we are going to talk a little bit more about that.  Why
22  do you say that SB 1's changes to this document have affected,
23  for example, those forums with individuals?
24  A.  In all the time that I have been executive director of
25  FIEL, we have never seen what we perceive to be such an

CESAR ESPINOSA – DIRECT

1  intrusive or complex law or change, so it doubles or triples

2  our time to have conversations with people to be able to

3  explain to them the complexity of this and what can and cannot

4  be done.

5  Q.  Let's talk specifically about those forums, how did those

6  forums look differently after the enactment of SB 1?

7  A.  So there was an –– after the forums, or once we explained

8  these things, the oath of office, or other parts of this new

9  law, there was a lot of uncertainty and a lot more questions

10  in terms of what can happen or what can be done.

11  Q.  And you said the oath of office, but just to be clear, did

12  you mean the oath of assistance?

13  A.  Yes, the oath of assistance.

14  Q.  And how did FIEL respond to those questions?

15  A.  Well, we generally –– when something –– when we are

16  dealing with stuff like this we usually try to explain it to

17  the best of our ability and we explain it as many times as

18  needed so our community feels comfortable.

19  Q.  And how did that affect the timing or the pace of these

20  forums?

21  A.  Well, it made the forums go by a lot slower.  It doubled

22  the time.  It increased the time that we were having to do Q

23  and A, so it extended these forums.

24  Q.  And how did SB 1's effect on these forums impact FIEL's

25  ability to achieve its mission?

CESAR ESPINOSA – DIRECT

1    A.  Well, it hindered our ability to achieve our mission

2    because if we are having to spend more time on this, then we

3    are having to spend less time on other activities.

4    Q.  And how did it affect your mission as it relates to civic

5    engagement and voter outreach?

6    A.  Well, it hindered our ability to fully reach out to as

7    many people as we had in the past because we were currently

8    having to spend more time with people that needed the extra

9    guidance or extra explanations.

10   Q.  And so how did this change as a result —— how did these

11   changes as a result of SB 1 differ from what FIEL ordinarily

12   did with respect to forums?

13   A.  So we had to just invest a little more time and resources

14   into these forums where we haven't in the past.

15   Q.  You also mentioned that before SB 1, FIEL would do ——

16   well, before SB 1 would FIEL do a sort of ride or caravan to

17   the polls?

18   A.  Yes.

19   Q.  Did FIEL staff and members still do this type of caravan

20   to the polls ——

21   A.  No.

22   Q.  Sorry.  Let me just finish.

23       Did FIEL staff and members still do this type of caravan

24   to the polls after the enactment of SB 1?

25   A.  No.  After the enactment of SB 1, we no longer do these

CESAR ESPINOSA - DIRECT

1  caravans.

2  Q.  And why not?

3  A.  We don't do them because we are uneasy or feel uneasy

4  about what actions we could take that would be — could be

5  misconstrued and we could get in trouble for it.

6  Q.  When you say "we can get in trouble for it," who are you

7  referring to?

8  A.  I'm referring to myself and FIEL members.

9  Q.  And why do you say it's SB 1's changes to the oath in the

10  assister form that led to this effect?

11  A.  Well, as I had explained before, it's just that level of

12  complexity.  It creates uneasiness among myself and our

13  members and we don't want to do something that we think we are

14  doing right but then end up getting in trouble for it in the

15  future.

16  Q.  And were you responding to any concerns from FIEL members?

17  A.  Yes.  We had — FIEL members had expressed concerns about

18  either caravaning, whether we were able to do so, or about

19  assisting people who were able to do that still, and so as a

20  response we decided to make changes to our program.

21  Q.  And how did SB 1's effect on FIEL's caravan efforts impact

22  the organization's ability to achieve its mission?

23  A.  Well, we feel that it definitely undermines it because we

24  are no longer able to empower people and move people to do

25  what they need to.

2451

CESAR ESPINOSA - DIRECT

1   Q.  Can you explain a little bit more about that.

2   A.  We want people to be -- once again our mission is to

3   engage people and have them actively participate, and if we

4   are no longer able to do these activities then we don't feel

5   as we are fulfilling our mission.

6   Q.  Do you anticipate FIEL organizing this type of caravan

7   effort for the 2024 General Election?

8   A.  No.

9   Q.  Why not?

10  A.  We still feel very uneasy.  We're still, there's more

11  questions than answers at this moment in regards to this law

12  so we would just feel uncomfortable in putting anybody,

13  including ourselves, in jeopardy.

14  Q.  You also mentioned that before SB 1, FIEL staff members --

15  staff and members would provide voter assistance at the polls,

16  like translation assistance, did that type of assistance still

17  happen after SB 1 was enacted?

18  A.  No.

19  Q.  How did SB 1's requirements around the oath and assister

20  form affect FIEL's efforts around this type of in-person

21  assistance?

22  A.  It greatly undercut or undermined them because now people

23  feel less inclined to volunteer, so we have seen a significant

24  number in drop-offs for people volunteering to help out with

25  these tasks.

2452

CESAR ESPINOSA – DIRECT

1  Q.  You said a significant drop-off, can you explain that a

2  little more?

3  A.  I mean, we are talking about where before we would have

4  teams of 24 dwindled down to like people of six, or teams of

5  six, so we have seen a significant drop-off in people stepping

6  up and wanting to provide this type of assistance.

7  Q.  And what is your concern — I'm sorry.  What is your

8  understanding of why that drop-off resulted?

9  A.  My understanding is that people are concerned about the

10  language under SB 1, and, therefore, they just would rather

11  not enter into that space.

12  Q.  And how did SB 1's effect —— I'm sorry.  Let me take a

13  step back.

14      And you said concern about SB 1's language.  What language

15  are you referring to?

16  A.  The oath of assistance where it talks about like penalty

17  of perjury, the question of gesturing, or influencing

18  somebody's vote, are all concerns that FIEL members have

19  brought up to our attention — to my attention.

20  Q.  How did SB 1's effect on FIEL's in-person assistance

21  effort impact FIEL's ability to achieve its mission?

22  A.  Well, if we are able to assist less people then we know

23  that less people may be more inclined to participate.

24  Q.  And do you anticipate FIEL organizing these types of

25  efforts for the 2024 General Election?

CESAR ESPINOSA - DIRECT

1    A.  No.

2    Q.  Why not?

3    A.  At this time we find ourselves with dwindling numbers of

4    people who are willing to volunteer for these types of

5    efforts, so it may just not be feasible to do them.

6    Q.  You also mentioned that before SB 1, FIEL would create

7    resources that were handed out to voters, like flyers, that

8    address some of the requirements around voting.  Did FIEL

9    still makes these types of flyers after the enactment of SB 1?

10   A.  Yes, we did.

11   Q.  How did SB 1's requirements around the oath and assister

12   form affect those flyers?

13   A.  They have doubled or tripled the amount of information we

14   have to print out.

15   Q.  Doubled or tripled the information you have to print out?

16   A.  Correct.

17   Q.  What has that done to these flyers or handouts?

18   A.  They have become more complex, they have -- we've been

19   able -- we have to fit a lot more information into a limited

20   scope, and for a smaller organization like ours that is a big

21   deal.

22   Q.  Has that had any affect on the size of these flyers or

23   handouts?

24   A.  Yes.  They have doubled or tripled in size, because before

25   we would do a one-pager, or we would try to minimize

CESAR ESPINOSA — DIRECT

1  information into one page.  We are now having to find — we

2  are now finding that we are having to print out a lot more

3  material to explain all the contents.

4  Q.  And you said before, that means before the enactment of SB

5  1, is that right?

6  A.  Correct.

7  Q.  And how does having to print out more pages affect the

8  costs incurred by FIEL?

9  A.  Well, it has increased the cost of printing for this

10  particular program.

11  Q.  By how much, would you say?

12  A.  It's doubled or tripled in size.

13  Q.  And why do you say that it's SB 1's changes — why do you

14  say that it's SB 1's changes that have led to this effect?

15  A.  Well, following the guide of people having more questions

16  at forums, we also want to make sure that people get their

17  questions answered, whether or not they want to attend a forum

18  or after they attend a forum that they have something to take

19  away so that they can revisit at a later time and get their

20  questions answered before they call us or come back.

21  Q.  And, just to be clear, what are some examples of the types

22  of questions you are receiving that were addressed in these

23  extra pages?

24  A.  So a lot of the questions that were addressed were can

25  people still receive assistance, what type of assistance can

CESAR ESPINOSA – DIRECT

1  people receive, things of that nature.

2  Q.  And how did SB 1's affect on these handouts or flyers

3  impact the organization's ability to achieve its mission?

4  A.  Well, the more resources we have to allocate to this then

5  other programs suffer or we have to undermine other programs,

6  and, therefore, we are not able to complete our mission as an

7  organization.

8  Q.  Thank you for walking me through all of that,

9  Mr. Espinosa.

10     Derek, could you please pull up Joint Exhibit 1, and

11  specifically Section 4.09, which begins I believe on page 29,

12  line 2 of the exhibit.

13     Mr. Espinosa, on your screen is Section 4.09 of SB 1 which

14  defines an offense committed by a poll worker with respect to

15  poll watchers.  Are you familiar with this part of SB 1.

16  A.  Yes.

17  Q.  Do you have any concerns about Section 4.09 of SB 1?

18  A.  Yes.

19  Q.  I'd like to draw your attention to the phrase on line 8

20  which states that a poll worker commits an offense by, quote,

21  "taking any action to obstruct the view of a watcher or

22  distance the watcher from the activity or procedure to be

23  observed in a manner that would make observation not

24  reasonably effective," and that ends on line 11.

25     Do you see that?

CESAR ESPINOSA — DIRECT

1   A.   Yes.

2   Q.   How does that part of Section 4.09 make you feel?

3   A.   It makes me feel very uneasy.

4   Q.   Why is that the case?

5   A.   In my opinion, it's very open to interpretation, what can

6   be any action, what can be misconstrued as an action to

7   obstruct, and then the part where it says "reasonably

8   effective," is very open to interpretation.  So what may be

9   reasonably effective to me may not mean the same thing to the

10  person standing next to me or in between us, or things of that

11  nature.

12  Q.   Are you aware of any concerns from other FIEL members

13  about Section 4.09?

14  A.   Yes.  FIEL members have expressed concerns about this

15  particular section.

16  Q.   What is your understanding?

17  A.   My understanding is that, once again, it leads people to

18  feel uneasy because now not only do they have to focus on the

19  task at hand but also in the back of their mind be thinking

20  about these other things that could potentially go wrong.

21  Q.   And how does what you just described, in your

22  understanding, affect the likelihood that members would

23  volunteer to be poll workers?

24  A.   In my understanding it has greatly decreased the

25  likelihood that people will volunteer to do these types of

CESAR ESPINOSA – DIRECT

1  things.

2  Q.  Before SB 1 did FIEL encourage members to work as poll

3  workers?

4  A.  Yes.

5  Q.  What did those efforts look like?

6  A.  We would encourage people, let people know what that

7  entailed, and really encourage them to take part in those

8  activities.

9  Q.  How would you — would there be any organizing around

10 these type of efforts?

11 A.  Yes.  We would recruit people and train them to, you know,

12 do what they needed to do.

13 Q.  As poll workers?

14 A.  As poll workers.

15 Q.  Since the enactment of SB 1, how has Section 4.09 affected

16 those efforts?

17 A.  They have really hindered those efforts.  We, once again,

18 find ourselves at a lack of people interested in taking part

19 in these things, so it makes our work, our organizing work, a

20 lot more difficult.

21 Q.  Why do you believe it's Section 4.09 that's having those

22 effects?

23 A.  We have heard it from members ourselves who feel that

24 these procedures are a lot more restrictive.

25 Q.  All right.  Mr. Espinosa, you walked us through a lot of

CESAR ESPINOSA − DIRECT

1  change —— well, strike that.

2      Mr. Espinosa, you walked us through changes in FIEL's

3  operations that resulted from SB 1's requirements around the

4  oath of assistance and assister form and on poll workers.  As

5  a result of those changes has FIEL had to shift resources away

6  from other organizational efforts?

7  A.  Yes.

8  Q.  What efforts did FIEL have to shift resources away from?

9  A.  We've had to take resources away from other programs to be

10  able to fulfill the new needs of the voter assistance program.

11  Q.  Could you give us a little more examples.

12  A.  So we have an access to higher education program where we

13  help students apply for college or apply for financial aid for

14  college and universities, and that's one of the programs that

15  has taken a major hit because of these —— of SB 1.

16  Q.  Let's talk about those higher education efforts.  Tell us

17  what those meetings looked like before SB 1.

18  A.  So, generally, we would have four meetings leading up or

19  starting around financial aid season or beginning of financial

20  aid season which starts in October, so we would have four

21  meetings, one in October, one in November, one in December,

22  and then one in January to be able to help and assist, guide

23  people to obtaining financial aid.

24  Q.  And what was the purpose of these meetings in the first

25  place?

CESAR ESPINOSA — DIRECT

1  A.  So the first meeting would, just like anything, would be

2  an explanation meeting and introductory meeting to how

3  students could get access to financial aid.

4      The second meeting would be an introduction to their

5  parents.  Many of these students are first-generation

6  students, meaning that their parents may be immigrants and may

7  have never gone through this process before.

8      And then the third meeting would be an actual meeting to

9  gather documents and things like that.

10      And then the final, fourth meeting, would be aimed at

11  actually sitting down with our members and helping them fill

12  their financial aid forms.

13  Q.  And why was this structure four meetings over the course

14  of the cycle important?

15  A.  It's much like everything else, our community requires

16  more assistance when it comes to understanding the systems and

17  it's almost like having to explain to them step by step on

18  what needs to be done to make them feel comfortable and help

19  them understand these systems, which can be very complex.

20  Q.  Prior to SB 1, how many students would you serve?

21  A.  Prior to SB 1 we would serve about — every year we had

22  about 4,000 students that we served.

23  Q.  And what changed after SB 1 was enacted?

24  A.  So after SB 1 was enacted, because we have to spend more

25  time explaining, or we have to allocate more time to

CESAR ESPINOSA — DIRECT

1  explaining voter — the SB 1, or voting, we had to cut these

2  forums by half because we have to allocate two more forums to

3  the voting rather than start off with the two forms that we

4  usually do for financial aid.

5  Q.  So you said cut them in half, what do you mean by that,

6  like cut the number, cut the timing?

7  A.  So in 2022 we had four forums related to voting under SB 1

8  or voting in general, and, therefore, we had to only — we

9  were only left a capacity to hold two forums under access to

10  higher education.

11  Q.  How did that affect the number of students that FIEL

12  reached?

13  A.  The number went down significantly, by 1500.  It went down

14  significantly, by about 1500, so we were only able to reach

15  about 2500 students.

16  Q.  Do you believe that SB 1 resulted in that change?

17  A.  Yes, because we were left with limited time and resources

18  to be able to do the outreach on this particular program.

19  Q.  And how did this affect FIEL's ability to achieve its

20  mission?

21  A.  Well, if we're not able to talk to people and explain to

22  people, we're left with limited time and resources, then it

23  undermines our ability to empower people.

24  Q.  In the fall semester of 2023 how many meetings do you

25  expect to have?

2461
CESAR ESPINOSA - DIRECT

1  A.  We unfortunately expect to only have two meetings again.

2  Q.  Why only two and not the four that you used to have?

3  A.  Because we are, number one, we — our funding.  We haven't

4  been able to raise enough funds because we didn't hit our

5  target number last year.  And, number two, we are still

6  spending time on explaining — or spending more time on

7  explaining voter guides than we can allot to be able to have

8  more on our higher education board.

9  Q.  And how do you think that will affect FIEL's mission?

10 A.  Unfortunately, it will, once again, hinder our ability to

11 outreach as many students as we have in the past, and,

12 therefore, can potentially hurt our ability to, once again,

13 get funding next year to be able to expense this.

14 Q.  You mentioned that FIEL also cut back — well, you

15 mentioned that FIEL had to double or triple the size of the

16 handouts, meaning the page numbers of handouts that you've

17 given to voters.  Did that have an affect on the operations of

18 the organization?

19 A.  Yes.

20 Q.  How so?

21 A.  We were forced to find different or alternative means to

22 give clients copies of their documents or things like that

23 under our legal department.

24 Q.  Were there other departments that were effected by this

25 step back?

2462
CESAR ESPINOSA – DIRECT

1  A.  Well, every department really was.  We were trying to

2  figure out a way to cut costs on everything, so for a lot of

3  them — a lot of other programs or most other programs at FIEL

4  we were forced to go digital.

5  Q.  And so as a general matter for those programs were hard

6  copies given to FIEL members after the enactment of SB 1?

7  A.  No.

8  Q.  Why do you say — well, do you believe that these were —

9  this cutback was a result of SB 1 requirements?

10  A.  Yes.

11  Q.  Why do you say that?

12  A.  Because our printing costs increased and we were trying

13  to — we're a small organization and we were trying to figure

14  out what we could do away with to be able to provide

15  information to people that requested it.

16  Q.  How did eliminating hard copies in these other programs

17  that you've described affect FIEL's ability to achieve its

18  mission?

19  A.  It made it more complicated and it left us with less —

20  made people feel uneasy, because oftentimes people want to —

21  in our community, they don't think something is real unless

22  they get it on paper, so it was a burden to be able to

23  transfer some of these other programs digitally.

24  Q.  Can you say a little bit more about this burden?

25  A.  So people are — a lot of our members, not only are they

1   limited English proficiency but also have a hard time

2   accessing a computer or internet, and, therefore, for

3   something that may be easy for us to handle, they are unable

4   to do so.

5        In fact, in the year 2021 we did a study in a separate

6   city in the Houston area called Pasadena, which was unrelated

7   to SB 1, but going and asking questions in this area we found

8   out that 76 percent of people in the Pasadena area do not have

9   access to internet or — to internet or laptop at home.

10  Q.  So how does this affect FIEL's mission generally?

11  A.  Well, if people can't access the information, then they

12  are not going to be as — we would like them to participate,

13  or they may feel more wary about the services that we are

14  providing to them.

15      *(Off the record discussion)*

16          MR. PARRENO:  No further questions at this time.

17          THE COURT:  Anything else on this side?

18          Any cross?

19          MR. CAPOZZI:  Yes, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. CAPOZZI:

22  Q.  Good morning, Mr. Espinosa.  How are you today?

23  A.  Good.  And yourself, how are you?

24  Q.  I'm great.  Thank you for asking.

25      You are familiar with SB 1, Section 4.09, right?

CESAR ESPINOSA — CROSS

1  A.  Correct.

2  Q.  Have you served as a poll worker before?

3  A.  I have, yes.

4  Q.  And you voted in 2022, right?

5  A.  I did not vote, no.

6  Q.  Have you ever personally witnessed inappropriate behavior

7  by a poll watcher since SB 1 was enacted?

8  A.  No, not at this time.

9  Q.  You didn't identify a specific number of FIEL Houston that

10  was unwilling to serve as a poll worker in 2022, right?

11  A.  Correct.

12  Q.  And you're not aware of any member of FIEL Houston being

13  threatened with prosecution under SB 1, right?

14  A.  That I am aware of, no.

15  Q.  Do you know how many poll workers feel — I'm sorry.

16  Strike that.

17     Do you know how many members of FIEL Houston served as

18  poll workers in 2018?

19  A.  No.  At this time, no.

20  Q.  Do you know how many FIEL Houston members served as poll

21  workers in 2022?

22  A.  No.  At this time, no.

23  Q.  Let's talk about voter assistance a little bit.  You are

24  familiar with SB 1, Section 6.03, which requires those who

25  assist voters to fill out a form providing their name and

CESAR ESPINOSA — CROSS

1  address, their relationship to the assisted voter, and whether

2  they accepted any form of compensation from a candidate,

3  campaign, or political committee, right?

4  A.  Correct.

5  Q.  And you haven't identified a specific member of FIEL

6  Houston who has refused to fill out this form, right?

7  A.  Correct.

8  Q.  You are familiar with SB 1, Section 6.04, which revises

9  the voter assistance oath, right?

10  A.  Can you repeat the question for me?

11  Q.  Of course.  You are familiar with SB 1, Section 6.04,

12  which revises the voter assistance oath, right?

13  A.  Yes.

14  Q.  Brian, can we pull up Joint Exhibit 1, Section 6.04.

15      You said you previously served — I'm sorry.  Strike that.

16      You said you have previously provided voter assistance,

17  right?

18  A.  Correct.

19  Q.  And you are aware that there was a voter assistance oath

20  before SB 1, right?

21  A.  Yes.

22  Q.  And so you have taken that oath before, right?

23  A.  Yes.

24  Q.  Brian, can we zoom out just to see the entire section.

25      So you can see the oath on the screen in front of you,

CESAR ESPINOSA - CROSS

1  right?

2  A.  Yes.

3  Q.  Okay.  I'll just let this settle.

4      So you see where the oath starts on line 26, where it says

5  "I swear or affirm," right?

6  A.  Correct.

7  Q.  And you understand that the underlined text is text added

8  by SB 1, right?

9  A.  Correct.

10 Q.  And so text that is not underlined was in the law before

11 SB 1, right?

12 A.  Correct.

13 Q.  So the language, "I will not suggest by word, sign, or

14 gesture how the voter should vote," was in the oath before SB

15 1, right?

16 A.  Correct.

17 Q.  You said that you and members of FIEL Houston are

18 concerned by this language, right?

19 A.  Correct.

20 Q.  But that concern is not caused by SB 1, right?

21 A.  In my opinion, it is directly tied to under penalty of

22 perjury, which is underlined and was added under SB 1, so it

23 emphasizes that people, if they do any gesture or anything,

24 can be charged with perjury.

25 Q.  Is it your impression that before SB 1 the voter

CESAR ESPINOSA – CROSS

1  assistance oath was not under penalty of perjury?

2  A.  It was —— it's under our prerogative that that was not

3  added on there, so it was not emphasized, but it still took it

4  very seriously.

5  Q.  Okay.  You haven't identified a specific member of FIEL

6  Houston who refused to take this oath in 2022, right?

7  A.  Correct.

8  Q.  You are familiar with SB 1, Section 6.05, which requires

9  someone assisting a voter filling out their mail ballot to

10  provide certain information on the carrier envelope, right?

11  A.  Correct.

12  Q.  And you haven't identified a specific member of FIEL

13  Houston who refused to provide the information required by

14  Section 6.05, right?

15  A.  We don't generally participant in mail-in ballots, so...

16  Q.  Okay.  Stepping back a little bit, you haven't identified

17  any member of FIEL Houston who has been threatened with

18  prosecution because of SB 1, right?

19  A.  Not at this time, no.

20  Q.  You said that you feel uneasy about providing voter

21  assistance, right?

22  A.  Correct.

23  Q.  Can you identify a specific person who asked you to

24  provide voter assistance in 2022 where you refused to provide

25  voter assistance?

CESAR ESPINOSA - CROSS

1  A.  We just haven't been approached as we have before because

2  we're not at the capacity that we were in the past, so out of

3  caution or overcaution we just, even when it comes to people

4  who may be uneasy to take the oath or may not be interested in

5  taking an oath, part of that has been because we have seen a

6  significant number of drop-off and people even willing to step

7  into these spaces.

8  Q.  I understand, but you are not able to identify now a

9  specific person who asked you for voter assistance in 2022

10 where you said no?

11 A.  No, just because I'm not participating in these types of

12 efforts anymore.

13 Q.  You mentioned Miss Gonzales who is also worried about

14 providing voter assistance, right?

15 A.  Correct.

16 Q.  Can you identify a specific person who asked Miss Gonzales

17 for voter assistance in 2022 where Miss Gonzales said no?

18 A.  I cannot at this time because she is no longer willing to

19 participate in this activity.

20 Q.  You mentioned Tonya Rodriguez, a member of FIEL Houston,

21 correct?

22 A.  Correct.

23 Q.  And you said she was able to vote in 2022, right?

24 A.  She was able to vote but she found it a lot more

25 cumbersome to be able to do so.

CESAR ESPINOSA – CROSS

1  Q.  Okay.  And you haven't identified a specific number of

2  FIEL Houston who was unable to vote in 2022 because of SB 1,

3  right?

4  A.  We have not identified, but that doesn't mean that they

5  don't exist.

6  Q.  Okay.  I want to talk a little bit about the voting

7  related work that FIEL Houston does.  You would agree that

8  when the legislature changes the election laws educating

9  voters about those changes is important, right?

10  A.  Very important, yes.

11  Q.  FIEL Houston has been educating its members and the public

12  about voting rules for a long time now, right?

13  A.  Correct, yes.

14  Q.  How many years have you been with the organization?

15  A.  I've been with the organization 16 years now, but I have

16  been part of the spaces for the last 22 years, or 23 years.

17  I'm 38 now.

18  Q.  And so you've been educating voters for a long time?

19  A.  Yes.

20  Q.  You testified that FIEL Houston had to divert resources to

21  educating voters because of SB 1, correct?

22  A.  Correct.

23  Q.  Can you say how much FIEL Houston has spent on voter

24  education because of SB 1?

25  A.  We cannot quantify that at this time.

CESAR ESPINOSA – CROSS

1  Q.  If the legislature repealed SB 1, FIEL Houston would

2  educate its members and the public about those rule changes,

3  right?

4  A.  We would have to, yes.

5  Q.  You talked about forums, voter education forums, right?

6  A.  Correct.

7  Q.  I think you described them as civics lessons on how voting

8  works, right?

9  A.  Um-hum.

10  Q.  That's a yes?

11  A.  Yes.

12  Q.  Thank you.  So in those forums you discussed some of the

13  roles that are in SB 1, right?

14  A.  Correct.

15  Q.  And you also discussed rules that preexisted SB 1, right?

16  A.  Correct, yes.

17  Q.  And you did these forums before SB 1 was enacted, right?

18  A.  We did, yes.

19  Q.  Let's just talk about volunteers for a moment.  Do you

20  know how many volunteers FIEL Houston had for elections in

21  2018?

22  A.  In 2018, I believe we had about 24 teams.  Each team made

23  up of maybe four people, so maybe about 100 people.

24  Q.  And in 2022 how many volunteers?

25  A.  Maybe about 20 at the very most.

CESAR ESPINOSA - CROSS

1   Q.  You talked about how FIEL Houston used to provide

2   transportation caravans to the polls, right?

3   A.  Correct.

4   Q.  And you said that FIEL Houston no longer does this because

5   of concern about SB 1's voter assistance provisions, right?

6   A.  Correct.

7   Q.  Is it your understanding that transporting voters to polls

8   is voter assistance regulated by SB 1?

9   A.  It is my understanding that our members feel uneasy

10  because they don't fully understand the complexity of SB 1.

11  Q.  But you personally, do you understand transporting voters

12  to the polls to be voter assistance regulated by SB 1?

13  A.  I understand that it can be policed by it, and, therefore,

14  I feel uneasy about doing it now.

15  Q.  Can you say which part of the law —— I'm sorry.  Let me

16  start that again.

17      Can you say which part of SB 1 limits FIEL Houston's

18  ability to transport voters to the polls?

19  A.  There's no particular language that we feel that would

20  limit us, but anything that can be taken as us and —— what's

21  the word I'm looking for?  Anything that can be taken as us

22  course or telling people who to vote for or how to do it, is

23  something that makes us generally uneasy.

24  Q.  Okay.  Can you identify FIEL Houston's budget for the 2020

25  year?

CESAR ESPINOSA - CROSS

1  A.  For the 2020 year, it was about $250,000.  We're a small

2  organization.

3  Q.  Can you identify FIEL Houston's budget for 2022?

4  A.  For 2022, about $300,000.

5  Q.  So FIEL Houston's budget has increased in recent years?

6  A.  It has, yes.

7  Q.  You talked about meetings to help students apply for

8  financial aid at college, right?

9  A.  Correct.

10  Q.  And you said that post-SB 1 you host two meetings instead

11  of four, right?

12  A.  Correct.

13  Q.  So at these meetings, post-SB 1, you still introduced

14  students to the rules about financial aid, right?

15  A.  Yes.

16  Q.  Do parents still come to the meetings?

17  A.  Sometimes they don't.  We try to have as much -- so in

18  order to understand some of the programs, you really have to

19  understand our community, and sometimes people are unable to

20  attend every meeting because they may have three or four jobs

21  and we try to have as much time with them so that we can try

22  to outreach to as many of them as possible and make it

23  comfortable and make it accessible to them so they can get the

24  information that they need.

25  Q.  So sometimes the parents come to the meetings and

CESAR ESPINOSA - REDIRECT

1  sometimes they don't, right?

2  A.  Correct.

3  Q.  At these meetings do you still help students gather the

4  documents they need to apply for financial aid?

5  A.  We do, but it's an uphill battle because we're working

6  with high school age kids.

7  Q.  Yes, I understand.  And do you still help students fill

8  out the forms they need to apply for financial aid at these

9  meetings?

10  A.  We have, yes, but at a less number, less capacity than we

11  have in the past years.

12  Q.  In your testimony you didn't identify a specific part of

13  FIEL Houston's normal programming that you had to forego

14  altogether because of SB 1, right?

15  A.  No, but we had to forego the touches that we have with

16  people and that can have a detrimental effect to us, and as an

17  overall organization.

18          MR. CAPOZZI:  Thank you for your time today.

19          THE COURT:  Anything else on this side?

20          Any redirect?

21          MR. PARRENO:  Yes, Your Honor.

22                  REDIRECT EXAMINATION

23  BY MR. PARRENO:

24  Q.  Hi, again, Mr. Espinosa.  Mr. Espinosa, you have served as

25  a voter assister in the past but you have not worked as a poll

JOE CARDENAS - DIRECT

1  worker, correct?

2  A.  Correct.

3        MR. PARRENO:  No further questions, Your Honor.

4        THE COURT:  With that, you can step down, sir.  Thank

5  you.

6        THE WITNESS:  Thank you.

7        THE COURT:  And your next witness.

8        MISS PERALES:  Nina Perales for the LUPE plaintiffs.

9        LUPE plaintiffs call Mr. Joe Cardenas, III.

10    (JOE CARDENAS, having been duly sworn, testified as

11  follows:)

12        THE WITNESS:  Good morning, Judge.

13        MISS PERALES:  Your Honor, Mr. Cardenas will testify

14  in support of LUPE plaintiffs' challenges to Article 6 of SB

15  1, as well as Sections 4.09 and 8.01.

16                    DIRECT EXAMINATION

17  BY MISS PERALES:

18  Q.  Good morning.

19  A.  Good morning.

20  Q.  Please state your name for the record.

21  A.  Joe Cardenas, III.

22  Q.  What do you do for a living?

23  A.  I am a teacher.

24  Q.  And where do you teach?

25  A.  I teach Louise, which is in Wharton County.

JOE CARDENAS – DIRECT

1   Q.  And what school do you teach at?

2   A.  Louise ISD.

3   Q.  And —

4   A.  The high school.

5   Q.  Thank you.  Beyond your employment as a high school

6   teacher, do you have any community leadership positions?

7   A.  Yes, ma'am.  I am an appointee by Commissioner's Court to

8   the Wharton County Historical Commission and I'm also involved

9   in Texas HOPE.

10  Q.  What is your position in Texas HOPE?

11  A.  I am currently its chair.

12  Q.  And what is Texas HOPE, when it's spelled out?

13  A.  Hispanics Organized for Political Education.

14  Q.  Are you also a member of Texas HOPE?

15  A.  I am.

16  Q.  Can you give the Court a brief description of Texas HOPE?

17  A.  Sure.  Texas HOPE is a 501(c)(3) nonpartisan nonprofit

18  organization whose primary goals are civic engagement, civic

19  education, and outreach.

20  Q.  And is that mission focused on any particular community in

21  Texas?

22  A.  Hispanics.

23  Q.  Is Texas HOPE a membership organization?

24  A.  It is.

25  Q.  And approximately how many members are in Texas HOPE?

JOE CARDENAS – DIRECT

1  A.  About 50.

2  Q.  Now, who are these 50 people?

3  A.  You want me to name them all?

4  Q.  No.  Can you describe generally?

5  A.  Oh, they are community leaders.

6  Q.  Okay.  And when you say "community leaders," can you

7  explain —

8  A.  Sure.  So Texas HOPE is made up of leaders from their own

9  communities back home, from various counties, all are urban

10  areas but also rural counties, like Wharton County, Bell

11  County, Goliad County, Fort Bend County.

12  Q.  Do they hold leadership positions in other organizations?

13  A.  Yes.  They hold leadership positions in other

14  organizations as well.

15  Q.  What is the purpose of gathering these community leaders

16  as Texas HOPE?

17  A.  Primarily to get together and to come up with a list of

18  best practices, what works in North Texas may not be working

19  in South Texas, and vice versa, if we get all these community

20  leaders together, and this is an easier way to disseminate

21  those best practices out back to the community.

22  Q.  And then what is the hope of — no pun intended — what is

23  the purpose of gathering these leaders to share the best

24  practices and then send them back into their communities, what

25  is the overall goal of doing that?

2477
JOE CARDENAS — DIRECT

1  A.  Well, the overall goal then is going to be civic

2  engagement, can we get —— or the goal is to get more

3  individuals to participate in civic engagement by educating

4  them and also by doing the outreach to bring them together.

5     We definitely want people to become voter registrars.  We

6  definitely want people to do Geo TV strategies.  We also want

7  people to explain vague bills like this one, to be able to

8  explain vague bills as well.

9  Q.  And so when you say "people," do you mean beyond the

10  50—member group of hope ——

11  A.  Yes.

12  Q.  —— that the purpose of engagement is broader?

13  A.  That's correct.  We see Texas HOPE as an organization made

14  of not just of members but of leaders, the leaders of those

15  other organizations so we know that they are going to go out

16  and then disseminate to their own memberships.

17  Q.  What is the leadership structure of Texas HOPE?

18  A.  There is a chair, officers, and then there's a board.

19  Q.  Do members of Texas HOPE pay dues?

20  A.  Yes, they do.

21  Q.  Does Texas HOPE have paid staff?

22  A.  It does not.

23  Q.  And what is roughly the budget of Texas HOPE?

24  A.  It ranges from 5 to $10,000, depending if it's a session

25  year or an interim session year.

JOE CARDENAS - DIRECT

1  Q.  Where does your funding come from?

2  A.  Individuals and from dues, but not candidates because

3  we're nonpartisan.

4  Q.  I think you've covered some of the goals of Texas HOPE

5  with respect to civic engagement, can you describe some of the

6  specific activities of Texas HOPE?

7  A.  Sure.  So if we are in an interim year, we do legislative

8  summits throughout the state of Texas.  Normally we do about

9  five legislative summits, and what we do is we compile

10  legislative agenda, and so we gather the community in these

11  areas and encourage the surrounding areas to also attend so we

12  can disseminate the information.

13      This is where we want people to know, look, this is the

14  type of training you need to have in order to be a poll

15  worker, for example, and these are the rules to become a voter

16  registrar.  This is what you can and this is what you can't

17  do, who can — if you're going to take people out to vote, you

18  know, again, this is who you need to get in contact with.

19  Q.  Okay.  So I think I'm hearing two separate things.  First

20  is legislative work, but putting aside that, I'd like to focus

21  a little bit on what you mentioned in the second half of your

22  answer.  Do you encourage members of the public to work in

23  elections?

24  A.  Yes, we encourage members of the public to work in

25  elections.

JOE CARDENAS - DIRECT

1   Q.   Okay.  And that can include what sorts of activities
2   working in elections?
3   A.   Poll workers, to run the elections themselves, take people
4   to go vote, to assist them to vote.
5   Q.   Do you encourage people to become volunteer deputy
6   registrars?
7   A.   Yes, we do.
8   Q.   Are HOPE members themselves registered voters?
9   A.   It's in our bylaws.  They have to be.
10  Q.   Where do your members reside?
11  A.   Throughout the state of Texas, Bell County, Wharton
12  County, Dallas County, Tarrant County, El Paso County, Bexar
13  County, Harris County.  You know, it just depends on who is on
14  the board at the time.
15  Q.   And do you have any members in Travis County?
16  A.   Yes.
17  Q.   Williamson County?
18  A.   Williamson County.  Taylor County, if that's Abilene.  I
19  think it is.
20  Q.   Derek, if you would be so kind as to display SB 1 and go
21  to page 51, and if we could scroll down to page 51, please,
22  and towards the bottom of the page where it starts with
23  Section 6.03.  Can we then go to page 52.  Thank you.  And on
24  page 52, where it mentions starting at line 8 through 12.
25       Mr. Cardenas, do you recognize this language as related to

JOE CARDENAS – DIRECT

 1  new requirements for the assister form to be filled out?

 2  A.  Yes, ma'am.

 3  Q.  And then if we could go then to 6.04 towards the bottom of

 4  that page, line 26, I swear or affirm, and then going over on

 5  to page 53.

 6      Do you recognize this language starting at line 26 and

 7  then going over through line 14, do you recognize this

 8  language —— we're just going to catch up for a second with the

 9  yellow highlight.  If you can go down to line 14 of page 53.

10  Thank you.

11      Do you recognize this as changes to the oath of

12  assistance?

13  A.  Yes, ma'am.

14  Q.  Have you ever assisted a voter in the polling place?

15  A.  I have.

16  Q.  When was the most recent election in which you assisted a

17  voter in the polling place?

18  A.  I believe it was the 2022 May Primary Run—off Election.

19  Q.  Okay.  Do you remember the name of the voter that you

20  assisted?

21  A.  I do.

22  Q.  And what was her name, that person's name?

23  A.  Arlinda Ureste.

24  Q.  And why did Miss Ureste need your assistance?

25  A.  She was visually impaired.

JOE CARDENAS - DIRECT

1  Q.  How do you know that she is visually impaired?

2  A.  She uses dark glasses, and every once in a while she uses

3  a cane also.

4  Q.  Where did you assist her in voting?

5  A.  At the polling place in Wharton, the civic center.

6  Q.  And Wharton is both a city and a county, is that right?

7  A.  Yes, ma'am, it is.

8  Q.  Did Miss Ureste have anybody at home, or a relative to

9  help her instead of you?

10 A.  Normally she would have.  She has a sister who was out of

11 town unfortunately and her parents are deceased.

12 Q.  But in this particular instance was her sister available?

13 A.  No, her sister was not available.  She was not in the

14 immediate area.

15 Q.  How did Miss Ureste get to the polling place on the day

16 you assisted her with voting?

17 A.  I picked her up and took her to the polls.

18 Q.  Then once you entered the polling place to begin the

19 process of voting, what did you do to assist Miss Ureste?

20 A.  I helped her sign in.

21 Q.  Okay.  And did Miss Ureste have to take any extra steps

22 before she went to the voting machine?

23 A.  She did.

24 Q.  What were those extra steps?

25 A.  She had to redo a voter registration card, I believe it

JOE CARDENAS - DIRECT

1  was.  She had to fill out another card.

2  Q.  And did you assist her with filling out that card?

3  A.  I did.

4  Q.  And what did you do?

5  A.  Well, basically the guy told her that — yeah, the

6  election judge told her she needed to fill out another card,

7  and so she couldn't see the numbers on there, I am assuming

8  it's her Texas ID, her driver's license, and so I had to read

9  her the numbers.  And he came over and told her don't forget

10 to sign and date it.  And, of course, I had to point out, you

11 know, where to sign and also to date it.

12 Q.  And how did you do that exactly?  How did you show her

13 where to sign and date —

14 A.  I pointed.  I pointed on the card.

15 Q.  And why did she need help seeing those parts of the card?

16 A.  Because the print is very small, even for someone who can

17 see.

18 Q.  After that was Miss Ureste then shown to a voting station?

19 A.  Yes.

20 Q.  And when you got to the voting station could Miss Ureste

21 see the ballot?

22 A.  She could not.

23 Q.  Okay.  And what happened after that, after she couldn't

24 see the ballot?

25 A.  She told me that there was an icon that would help that

2483

JOE CARDENAS - DIRECT

1  would make the screen bigger and so I looked for it -- or

2  actually we looked for it and I found it but it wasn't -- you

3  could click on it, it was active but it wasn't working.

4      I don't know how to explain that.

5  Q.  So did the screen become bigger?

6  A.  It did not.

7  Q.  And so what did you do when the two of you realized that

8  the screen was not getting any bigger?

9  A.  I read the selections to her.

10 Q.  All right.  And then once you read the selections to her

11 then what did she say back to you?

12 A.  I indicated what was the order of the candidates to her,

13 you know, and she said which candidate she wanted to vote for.

14 Q.  And then what happened?

15 A.  I would tell her whether it was the first box, second box,

16 or the third box.

17 Q.  Did you mark the ballot for her?

18 A.  No.

19 Q.  And why is that?

20 A.  Well, I certainly didn't want to get taken to jail or

21 wanting to do anything wrong, and, you know, I was sort of

22 afraid, you know, that I could be implicated of doing

23 something wrong.

24 Q.  And so did Miss Ureste then touch the boxes where she

25 believed that her preferred candidates were on the ballot?

*Gigi Simcox, RMR, CRR*

2484

JOE CARDENAS - DIRECT

1   A.  Yes, ma'am.

2   Q.  Did you take the oath of assistance?

3   A.  Yes, I did.

4   Q.  All right.  Do you remember if before you took the oath

5   Miss Ureste represented to you that she was eligible for

6   assistance?

7   A.  I don't remember.

8   Q.  Do you remember if you asked her if she was eligible for

9   assistance?

10  A.  I did not.

11  Q.  Did she otherwise represent to you that she was eligible

12  for assistance?

13  A.  I don't remember that she did.

14  Q.  Can we go now to LUPE Exhibit 172, and if we could

15  highlight at the beginning of the oath of assistance, the

16  language I swear or affirm under penalty of perjury.

17      Mr. Cardenas, what do you understand these words to mean

18  swearing "under penalty of perjury?"

19  A.  That I would be liable under law for lying.

20  Q.  Under civil law or under criminal law?

21  A.  Under criminal law.

22  Q.  And how does swearing under penalty of perjury in the

23  assister oath affect your actions?

24  A.  Well, it's not something I would do lightly.

25  Q.  And why?

JOE CARDENAS – DIRECT

1  A.  I certainly wouldn't want to in any way damage my

2  reputation or that of the voter because I know that their vote

3  can actually be disallowed.

4  Q.  Do you have a concern that swearing under penalty of

5  perjury would somehow either affect the voter or affect you?

6  A.  Yes.

7  Q.  And what is that concern?

8  A.  Well, that concern is that I can be accused of doing

9  something wrong, that, in my opinion, I didn't do anything

10  wrong for inadvertently might have done that I didn't intend

11  to do.

12  Q.  I'd like to highlight now the language on the same line,

13  "The voter I am assisting represented to me that they are

14  eligible to receive assistance."  Do you see that language

15  there?

16  A.  I do.

17  Q.  How do you feel about having to secure representation of

18  eligibility from a voter, such as Miss Ureste?

19  A.  Well, I think it would be embarrassing both to me and to

20  her.

21  Q.  Do you want to have to secure this representation?

22  A.  Of course not.

23  Q.  What do you think will happen, though, if you sign the

24  form under penalty of perjury and you don't secure a

25  representation of eligibility from the voter?

JOE CARDENAS – DIRECT

1   A.  Well, that can be construed as perjury.

2   Q.  If we could highlight the language "I did not pressure."

3   How do you represent this language, Mr. Cardenas?

4   A.  Well, that's — it's a very subjective statement, and, of

5   course, that pressure is just very subjective.  You know, what

6   I wouldn't see as pressure someone else may see as pressure,

7   pressuring the voter.

8   Q.  And so does this cause any concerns for you regarding your

9   own behavior towards voters?

10  A.  Of course it does.

11  Q.  If we could go on to highlight the language "I understand

12  that if assistance is provided to a voter who is not eligible

13  for assistance the voter's ballot may not be counted," do you

14  see that language there?

15  A.  Yes, ma'am.

16  Q.  Does the oath say who decides if a voter is eligible or

17  not to receive assistance?

18  A.  It does not.

19  Q.  Do you see the criteria for being eligible for assistance

20  in this oath?

21  A.  I do not.

22  Q.  In your view, who should decide if a voter needs

23  assistance to vote?

24  A.  The voter.

25  Q.  So, in general, how has this new oath language affected

1  you as a voter assister?

2  A.  I won't do it again unless I know the person very well.

3  Q.  And why is that?

4  A.  I'd be more comfortable that someone isn't going to accuse

5  me of doing anything wrong.

6  Q.  Do you know of any other members of Texas HOPE who are

7  affected by the new voter assistance provisions?

8  A.  Yes, ma'am.

9  Q.  And what is that person's name?

10  A.  Dr. Jennifer Cantu.

11  Q.  And what county does Dr. Cantu assist voters in?

12  A.  I think she is in Fort Bend County.

13  Q.  And do you know if she has assisted voters in recent

14  elections?

15  A.  I believe she did, yes, ma'am, in the 2022 Primary and

16  General Election.

17  Q.  And what, to the best of your understanding, is her

18  reaction to the new provisions in SB 1?

19        MR. BRYANT:  Objection.  Calls for hearsay.

20        MISS PERALES:  It does not, Your Honor.

21        THE COURT:  Overruled.

22  BY MISS PERALES:

23  Q.  To the best of your understanding, what is Miss Cantu's —

24  Dr. Cantu's reaction to the new assistance provisions in SB 1?

25  A.  She has communicated to me that she will not be signing

JOE CARDENAS – DIRECT

1  the assister form under penalty of perjury.

2  Q.  And does that mean then she won't be assisting?

3  A.  Yes, ma'am, that's how I interpret that.

4  Q.  Now, aside from the effects of SB 1 on your members, how

5  has SB 1 affected Texas HOPE as an organization in the

6  achievement of its goals?

7  A.  Well, it's made outreach a lot harder.  We rely — the

8  various organizations that sit on the board, we rely on

9  volunteers to help to take people to vote and also to assist

10  them in the process of voting and that stream has dwindled

11  significantly.

12  Q.  And so are you still encouraging people to engage and work

13  in elections?

14  A.  Absolutely, we are.

15  Q.  And what is the response post-SB 1?

16  A.  Well, the response is that because of the vagueness of the

17  bill, even when we attempt to give an interpretation, or to

18  explain to people that it doesn't deal with a specific -- or

19  it doesn't make something specifically criminal, they have a

20  hard time I guess believing what we're saying.

21      You know, there's always that shadow of a doubt there

22  because of the vagueness of the language in the bill and also

23  because of the perjury part of it.

24  Q.  What is the impact on Texas HOPE if fewer people in the

25  community are willing to work in elections or assist voters?

2489

JOE CARDENAS - CROSS

1  A.  Well, obviously it undermines our goal for sure, which is
2  to get more people to participate in the election process and
3  to volunteer.
4          MISS PERALES:  Thank you.  I pass the witness.
5          THE COURT:  Anything else from that side?
6          Any cross?
7          MR. BRYANT:  Yes, Your Honor.
8                    CROSS-EXAMINATION
9  BY MR. BRYANT:
10  Q.  Mr. Cardenas, my name is David Bryant.  I'm with the
11  Attorney General's Office.  Good to meet you, sir.
12      When I was trying to learn about you, I saw a photograph
13  of you in your high school football uniform, looked like you
14  might have played end for -- were you from Louise?
15  A.  Yes, it's my grandfather's hometown.
16  Q.  And Louise is a town of about roughly a thousand people?
17  A.  If you count some of the chickens, I think so.
18  Q.  And Wharton County is, according to 2020 census, about
19  42,000 people?
20  A.  About 45,000.
21  Q.  Very good.  Now, as I understand it, Texas HOPE is a
22  nonpartisan organization?
23  A.  That is correct.
24  Q.  And it has about 50 members.  Has that membership been
25  fairly constant over the period that you've been a member?

JOE CARDENAS – CROSS

1    A.  No, it's grown some.  What happens is as people come on

2    the board and as they go off the board they retain their

3    membership.

4    Q.  And as I understand it, Texas HOPE is kind of an

5    organization of leaders who then go out and act within their

6    own organizations to achieve similar goals?

7    A.  Yes.

8    Q.  Now, you are also I believe a chairman of a statewide

9    partisan political organization, aren't you?

10    A.  No, sir.

11    Q.  Have you been a chairman or a leader in partisan political

12    organizations?

13    A.  Yes, sir.

14    Q.  And what would that be?

15    A.  Tejano Democrats.

16    Q.  How long — are you still a leader in that organization?

17    A.  No, sir.

18    Q.  Okay.  When did you stop being?

19    A.  Somewhere around 2020 maybe.

20    Q.  Okay.

21    A.  No, it had to have been before 2020.  I'd be comfortable

22    saying in 2019 or before.

23    Q.  Thank you.  And have you been a candidate for the Texas

24    State Legislature yourself?

25    A.  Yes, sir.

JOE CARDENAS - CROSS

1  Q.  And what year did you run for the Texas State Legislature?
2  A.  In 2020, that's why I revised it.
3  Q.  And have you been a county chairman of a political party?
4  A.  Yes, sir.  I filled the unexpired term of a county chair
5  who passed away.
6  Q.  And are you a past state director of LULAC?
7  A.  Yes, sir.  I served for three years.
8  Q.  Would you describe yourself as a Hispanic political
9  activist?
10 A.  More, I would say, just an activist, not necessarily a
11 political activist.
12 Q.  Now, you ran for the legislature in 2020.  You did not
13 serve in the legislature in 2021, is that right?
14 A.  That is correct.
15 Q.  Were you active, in any event, in the discussions in the
16 legislature in 2021 regarding SB 1?
17 A.  In so far that we had members that offered input only.
18 Q.  Were you one of them?
19 A.  No, sir.
20 Q.  Okay.  Were you a named plaintiff in the redistricting
21 lawsuit that was filed in 2011?
22 A.  Yes, sir.
23 Q.  And are you a named plaintiff in the redistricting lawsuit
24 filed in 2021?
25 A.  Yes, sir.

2492

JOE CARDENAS - CROSS

1   Q.  And are you a named plaintiff in this lawsuit?

2   A.  I don't know.

3   Q.  Okay.  Now, in trying to learn about your --

4   A.  As an individual, no.  As for the organization, yes.

5   Q.  Okay.  In trying to learn about your organization, Texas

6   HOPE, I ran across a number of organizations with similar

7   names.  Does Texas HOPE have a website?

8   A.  It does not.

9   Q.  There's an organization apparently called Hispanics

10  Offering People Education?

11  A.  Um-hum.

12  Q.  Is that affiliated in any way with Texas HOPE?

13  A.  It is not.

14  Q.  There's an organization called Hispanics Organized for

15  Political Equality, is that in any way affiliated with Texas

16  HOPE?

17  A.  It is not.

18  Q.  There's an organization called Hispanic Organization for

19  Public Employees, I assume that's not affiliated with Texas

20  HOPE, is that right?

21  A.  That is correct.

22  Q.  And there's an organization called Hispanic Organization

23  Promoting Education, is that in any way affiliated with Texas

24  HOPE?

25  A.  It is not.

JOE CARDENAS - CROSS

1  Q.  What percentage of the revenues of Texas HOPE come from

2  member dues?

3  A.  Well, a significant part of them.  If I had to break it

4  down, I mean, at least 70 percent are member dues.

5  Q.  And what are the dues for a membership in Texas HOPE

6  currently?

7  A.  One hundred dollars.

8  Q.  Per year?

9  A.  Per year.

10  Q.  Does Texas HOPE have any employees?

11  A.  It does not.

12  Q.  Does Texas HOPE have any offices?

13  A.  It does not.

14  Q.  If I understand correctly, you said that the budget for

15  Texas HOPE is about 5 to $10,000 a year?

16  A.  Yes, sir.  No, not per year.  So 5,000, usually it runs

17  about 5,000 during a legislative year and 10,000 during an

18  interim year.  The difference being the legislative summits

19  that we do doing the interim years.

20  Q.  To your knowledge, have any members of Texas HOPE been

21  unable to vote because of any provisions of SB 1?

22  A.  Not to my knowledge.

23  Q.  Has the organization Texas HOPE — strike that.

24      Does — you described some outreach efforts by members of

25  Texas HOPE and their organizations, does Texas HOPE itself

JOE CARDENAS - CROSS

1  engage in any voter outreach efforts?

2  A.  Yes, sir.  When we do the legislative summits in the

3  interim period, that is part of the activities that are going

4  on as well.  Usually what we do is depending on the county

5  that we're at, we'll call in the County Elections

6  Administrator and they will usually do that for us.

7  Q.  Other than the differences in the budget during

8  legislative session years and interim years, has the budget of

9  Texas HOPE gone up or down significantly in recent years?

10  A.  Well, we didn't do the legislative summits in 2021, you

11  know, and as of right now for 2023 we haven't done them —— I'm

12  sorry.  I got my years confused.

13      In 2022, we didn't do a legislative summit.  In 2022, in

14  part because we didn't have clear answers how to go forward

15  with regards to Senate Bill 1 and so we're kind of waiting on

16  what happens here to determine how we're going to move

17  forward.  So we didn't fundraise is what I'm trying to say.

18  Q.  Thank you.  Now, you testified on direct about your

19  experience assisting a voter who was visually impaired in

20  Wharton County.  Was that in —— that was in the 2022 May

21  Primary?

22  A.  Run-off.

23  Q.  Run-off?

24  A.  Yes, sir.

25  Q.  And from what I understood of your testimony, the voter

JOE CARDENAS - CROSS

1  you assisted clearly needed assistance and would be eligible

2  for assistance under anybody's reasonable assessment, would

3  you agree with that?

4          MISS PERALES:  Objection.  Calls for speculation.

5          THE COURT:  You are talking about from a visual

6  observation of her physical condition, or what are you talking

7  about?

8          MR. BRYANT:  I'm asking whether there was any

9  question in his mind that this voter needed assistance in

10 order to vote.

11         THE COURT:  You can answer.

12         THE WITNESS:  Well, I mean, I can tell you I didn't

13 know to what degree of blindness.

14 BY MR. BRYANT:

15 Q.  The voter asked you for assistance?

16 A.  Well, I walked her in.  What happened was I took her there

17 because there was no one to take her, her sister was out.  It

18 was on Election Day.  So I took her and we got off, went into

19 the polling place, and she needed help filling out that card,

20 you know, and so that just led from one to the other.

21 Q.  And so there's no question in your mind that that voter

22 needed your assistance in order to vote?

23 A.  I wouldn't think so.

24 Q.  If I understand your testimony correctly, technically, you

25 didn't ask her to represent to you that she needed assistance,

JOE CARDENAS – CROSS

1  is that right?

2  A.  One more time.  I want to make sure I answer this right.

3  Q.  Okay.  She didn't represent to you that she needed

4  assistance, in so many words, right?

5  A.  Correct.  But are we talking to prior to getting to the

6  polling place or after?

7  Q.  Either prior to or when you arrived.  I'm not trying to be

8  specific about the location.

9  A.  Well, I mean, I guess the problem I'm having with is if

10  because she did, if she tells me I can't see the numbers on my

11  ID, you know, I mean, obviously, I have a better idea of what

12  she can and cannot see.

13      I don't know if that helps.

14  Q.  So now that counsel focused you on the specific words of

15  the assister oath, do you believe that technically someone

16  could say that you violated that oath because she did not

17  represent to you that she was eligible for assistance?

18  A.  Yeah.  That is a fear, yes.

19  Q.  And have you been prosecuted for that?

20  A.  I have not.

21  Q.  Has anybody threatened you or suggested to you that they

22  may prosecute you for helping a voter who obviously needed

23  assistance?

24  A.  I don't want to interpret your statement as meaning that.

25  Q.  I don't think you should.  I'm just asking a question.

JOE CARDENAS – CROSS

1    Has anybody suggested to you that you are going to be
2  prosecuted, or threatened you with prosecution for this, I
3  would say fine act of assisting a voter who needed it?
4  A.  No.  And I hope I won't be in the future either.
5  Q.  And would it be contrary to commonsense for you to think
6  that you would be prosecuted for doing what you did?
7         THE COURT:  Commonsense and the law have no
8  relationship.  Next question.
9         MR. BRYANT:  Your Honor, I disagree with that but
10  I'll move on to the next question.
11         THE COURT:  Thank you.
12  BY MR. BRYANT:
13  Q.  You stated that swearing under penalty of perjury is not
14  something that you would do lightly?
15  A.  That is correct.
16  Q.  But you would do it when you think it's an appropriate
17  thing to do?
18  A.  If I had paid more attention to that language I would not
19  have done it.
20  Q.  Did you do it today when you came here to testify?
21  A.  Would I do it today?
22  Q.  Did you do it today.  Did you swear that you would tell
23  the truth before the Court?
24  A.  Yes.
25  Q.  Under penalty of perjury?

JOE CARDENAS - CROSS

1   A.  Yes.

2   Q.  And did you have any great concern about that?

3   A.  No.

4   Q.  Because you knew you were going to tell the truth, right?

5   A.  Correct.

6   Q.  And if you knew that you were going to do the right thing

7   under the oath, as you, in my opinion you did, is there any

8   reason why you should have concern about stating under penalty

9   of perjury that you had done the right thing under the voter

10  assister's oath?

11          MISS PERALES:  I apologize, Counsel for stepping on

12  your question.

13          Objection to the extent that it's asking the witness

14  to agree with counsel's opinion regarding whether or not he

15  did the right thing.

16          THE COURT:  It's asking for a conclusion of law.

17  That's sustained.

18          Next question.

19          MR. BRYANT:  Your Honor, I'll ask another question,

20  but this is essentially the same question I asked.

21  BY MR. BRYANT:

22  Q.  Is there any reason in your mind why you should have

23  concern taking the voter assister oath when everything that is

24  in that oath is something that you're going to comply with?

25  A.  I do have concerns, because I don't know what may change.

JOE CARDENAS - CROSS

1  I don't know the subjective nature of the election judge or

2  even the poll workers that may later at some future time say

3  we witnessed pressuring.

4  Q.  So your concern about taking the oath is that you could be

5  accused falsely —

6  A.  Yes.

7  Q.  — of committing a crime?

8  A.  Yes, sir.

9  Q.  Do you have a concern testifying today that you'll be

10  accused falsely of perjuring yourself?

11  A.  I don't know how to answer that because in my mind I want

12  to say I don't know how capricious, you know, a person may or

13  may not be here in this room.

14  Q.  If SB 1 were repealed or amended, would it change the

15  nature of the activities of Texas HOPE at all?

16  A.  Well, it would remove a barrier and would make our goal

17  easier.

18  Q.  Anything else?

19  A.  No, sir.

20          MR. BRYANT:  Pass the witness.

21          THE COURT:  Anything else from this side?  Nothing.

22          Any further redirect?

23          MISS PERALES:  No further questions from here, Your

24  Honor, and we would like to request a short recess if now is a

25  good time for the Court to break.

2500
DANIELLE AYERS — DIRECT

1        THE COURT:  Yes.  Thank you.

2        Thank you, Mr. Cardenas.  You can step down.

3        Let's take a 10- or 15-minute break.

4    *(Recess)*

5        MISS SINGH:  Good morning, Your Honor.  Jasleen Singh

6    on behalf of LUPE plaintiffs.  LUPE plaintiffs call Danielle

7    Ayers to the witness stand.

8        (DANIELLE AYERS, having been duly sworn, testified as

9    follows:)

10       MISS SINGH:  And for the record, we are offering

11   pastor Danielle Ayers testimony primarily to establish

12   standing on all of friend west claims including those

13   challenging 4.09, 5.07 and 5.13 of Section (inaudible) and

14   the?

15       THE COURT:  I'm sorry 507, 19 and what was the first

16   one.

17       MISS SINGH:  409.

18       THE COURT:  Thank you.

19                   DIRECT EXAMINATION

20   BY MISS SINGH:

21   Q.  Good morning.

22   A.  Good morning.

23   Q.  Can you please state your full fame for the record.

24   A.  Danielle Ayers.

25   Q.  What do you do for a living?

*Gigi Simcox, RMR, CRR*

DANIELLE AYERS – DIRECT

1  A.   I currently serve as a licensed ordained clergy at a

2  church in Dallas, Texas.

3  Q.   What is your full title?

4  A.   Pastor of Justice.

5  Q.   What church in Dallas, Texas?

6  A.   Friendship West Baptist Church.

7  Q.   What is Friendship West?

8  A.   Friendship West is a faith community.

9  Q.   When was Friendship West founded?

10  A.   In 1976.

11  Q.   What is the mission of Friendship West?

12  A.   So our primary mission is to be a game-changing Christian

13  movement connecting to people to Christ, fighting for justice,

14  while creating a beloved community.

15  Q.   What are the essential activities of Friendship West?

16  A.   So spiritual formation of our members as well as

17  self-empowerment and spiritual awareness.

18  Q.   And you said you're the Pastor of Justice?

19  A.   Correct.

20  Q.   Can you talk about what the justice ministry does?

21  A.   The justice ministry is primarily responsible for voter

22  education, election protection, and really making sure we have

23  opportunities for members to engage in training around

24  advocacy training, organizing training, as well as developing

25  legislative agendas for issues that impact our community

DANIELLE AYERS — DIRECT

1  directly.

2  Q.  What are your responsibilities as Pastor of Justice?

3  A.  I have several responsibilities because I am a licensed

4  and ordained clergy, one of my responsibilities is to offer

5  pastoral care to our members and community members by

6  extension.

7      It is also my responsibility to assist with the spiritual

8  formation of the congregation through teaching, preaching, et

9  cetera.

10      I'm also responsible for developing and creating

11  strategies for us to engage with political systems as well as

12  government organizations and community organizations to deal

13  with issues again that impact our church members and our

14  community.

15  Q.  How long have you held this position?

16  A.  For 18 years.

17  Q.  Does Friendship West have a partisan affiliation?

18  A.  No.

19  Q.  Does Friendship West have members?

20  A.  Yes.

21  Q.  What are the demographics of your membership?

22  A.  We are predominantly probably 90 percent a Black church,

23  but we are very diverse when it comes to social, economic

24  backgrounds, and educational backgrounds, and ages, we are

25  transgenerational.

DANIELLE AYERS - DIRECT

1  Q.  And how many members do you have?

2  A.  Approximately 9700.

3  Q.  Where in Texas do your members live?

4  A.  Throughout the Dallas/Fort Worth area.

5  Q.  And are any of your members registered to vote in Texas?

6  A.  Yes.

7  Q.  Do you have members who vote by mail because of a

8  disability?

9  A.  Yes.

10 Q.  Do you have members who vote by mail because of their age?

11 A.  Yes.

12 Q.  Do you have members who require assistance with voting

13 because of their age?

14 A.  Yes.

15 Q.  Do you have members who require assistance with voting

16 because of their disability?

17 A.  Yes.

18 Q.  Do you have members who have assisted others with voting?

19 A.  Yes.

20 Q.  Do you have members who have served as poll workers?

21 A.  Yes.

22 Q.  Do you have members who have served as election judges?

23 A.  Yes.

24 Q.  Does Friendship West have paid staff?

25 A.  Yes.

DANIELLE AYERS - DIRECT

1  Q.  About how many?

2  A.  Thirty-two full time.

3  Q.  And how many people are full-time employed in the justice

4  ministry?

5  A.  One.

6  Q.  Is that you?

7  A.  Correct.

8  Q.  Are you a member of Friendship West?

9  A.  Yes.

10  Q.  Do your members pay dues?

11  A.  Our members do not pay dues.  They do give contributions

12  and those contributions are used to carry out the ministry and

13  mission of the church.

14  Q.  So now I'd like to discuss some specifics about Friendship

15  West's civic engagement work.  Can you tell us more about the

16  types of civic engagement work Friendship West does?

17  A.  So voter engagement, education would be one, as well as

18  election protection, and also turnout.

19  Q.  And when do you conduct these activities?

20  A.  Well, turnout would be around election season but voter

21  education is throughout the year.

22  Q.  And where do you conduct these activities?

23  A.  Primarily at the church.

24  Q.  Are you personally involved in any of these activities?

25  A.  Yes.

DANIELLE AYERS — DIRECT

```
 1   Q.  What is your role?
 2   A.  My role is to develop the overall strategy of how we will
 3   engage in all of our voter activities, engagement activities,
 4   and then to train and prepare our ministry members as well as
 5   community members who assist us on how we'll carry that out.
 6   Q.  And so does anyone else conduct these activities on
 7   Friendship West's behalf?
 8   A.  We have others who assist us on that behalf, support
 9   staff.
10   Q.  Any volunteers?
11   A.  Yes.
12   Q.  Why does Friendship West engage in these activities?
13   A.  Well, we engage in these activities pretty much because it
14   is just a trajectory of who we are and carrying out that
15   tradition of the Black church that's always seen faith in
16   public life as an intersection, so we feel that it's important
17   to not only care about the spiritual well-being of our members
18   but also the social well-being, and we can't do that without
19   engaging in politics, particularly voter engagement.
20   Q.  And is this work important to advancing Friendship West's
21   mission?
22   A.  Yes.
23   Q.  How so?
24   A.  Well, because we want to fight for justice, which means we
25   want to make sure that systems or institutions are equitable
```

DANIELLE AYERS - DIRECT

1  and that our members are not harmed by those systems and
2  institutions and we can only do that if we are engaged and are
3  registered to vote and we turn out to vote, as well as
4  creating this beloved community where everybody has what they
5  need to flourish.
6  Q.  So now I'd like to shift gears a bit to talk about SB 1
7  before and at the time of enactment.  Are you familiar with
8  Senate Bill 1 passed during the second special session of
9  2021, or what we've all been calling SB 1?
10  A.  Yes.
11  Q.  How did you become familiar with SB 1?
12  A.  Through our elected officials who represent us as well as
13  we're just civically engaged and we try to make sure we stay
14  abreast of what's happening at the state, at the local state
15  level, both levels, as well as organizations that we partner
16  with quite often.  We're just trying to always be keen and
17  aware of what's happening in our legislator.
18  Q.  Did you read SB 1 at the time it was passed?
19  A.  Yes.
20  Q.  Did Friendship West take a position on SB 1?
21  A.  Yes.
22  Q.  And what was your position?
23  A.  We opposed it.
24  Q.  And why did Friendship West oppose —
25  A.  Well, we —

DANIELLE AYERS – DIRECT

1  Q.  — SB 1?

2  A.  I'm so sorry.  You can ask me again.  I'm sorry.

3  Q.  Why did Friendship West oppose SB 1?

4  A.  Well, we felt it was more restrictions and we felt the

5  restrictions in particular around the poll watchers and the

6  mail-in ballot and ID requirements would significantly impact

7  the folks that we serve, both in the church and outside of the

8  church.

9  Q.  And did you make the legislature aware of your concerns?

10  A.  Yes.

11  Q.  Did you raise these concerns with members of both

12  political parties?

13  A.  Yes.

14  Q.  How so?

15  A.  By doing legislative visits during the session as well as

16  staying in conduct with legislators during the special

17  sessions every summer.

18  Q.  Did you take any other actions to oppose SB 1?

19  A.  Well, we did several marches and rallies.  We did — made

20  sure we doubled up on voter education to make sure we kept

21  people engaged and informed along the way.

22  Q.  Thank you.  So now I'd like to talk about SB 1 after it

23  was passed by the legislature.  Let's start with Section 4.09,

24  which makes it an offense for poll workers to take any action

25  that would make a poll watcher's observation not reasonably

DANIELLE AYERS — DIRECT

1  effective.  Are you familiar with this provision?

2  A.  Yes.

3  Q.  And based on your experience has this provision prompted

4  concerns amongst your members?

5  A.  Yes.

6  Q.  What concerns have your members expressed?

7  A.  Primarily —

8          MR. CAPOZZI:  Objection.  Calls for hearsay.

9          THE COURT:  Your response.

10          MISS SINGH:  I'm asking for her personal knowledge of

11  what her members have shared with her.

12          THE COURT:  Don't repeat anything that was told to

13  you, ma'am.

14          THE WITNESS:  I'm sorry?

15          THE COURT:  Don't repeat anything that was told to

16  you, just your personal observations.

17  BY MS. NIELSEN:

18  Q.  Go ahead.  You can answer.  I can reask the question.

19  A.  Please.

20  Q.  Yeah.  So based on your experience has this provision

21  prompted concerns amongst your members?

22  A.  Yes.

23  Q.  And what were those concerns that your members have

24  expressed?

25  A.  So one specific person approached me and emailed me their

DANIELLE AYERS – DIRECT

1  concerns with that provision —

2        MR. CAPOZZI:  Your Honor, I'm just going to repeat

3  the objection.  It calls for hearsay.

4        THE COURT:  At this point she hasn't said it yet.

5  She said she received an approach and she received an email.

6  I'll take this one step at a time.

7  BY MISS SINGH:

8  Q.  Go ahead.

9  A.  Okay.  So, yes, I was approached and received an email by

10  a member who previously served as an election judge.

11  Q.  Okay.  And expressed to you that you were not — that she

12  would not serve as an election judge?

13  A.  Correct.

14        MR. CAPOZZI:  Objection.  Leading and calls for

15  hearsay.

16        THE COURT:  Both sustained.

17        So, you know, now the problem with this whole line

18  though is, I mean, do the defendants really expect us to hear

19  testimony from each and every person?  You know, I mean is

20  that the tact we are going to have to take in this case?

21        MR. KERCHER:  I don't think that's the tact we've

22  taken, and the Court has made clear from the outset that it's

23  going to allow what it calls personal knowledge even when that

24  personal knowledge could only have been gained through

25  hearsay.  We understand that there is some expediency involved

DANIELLE AYERS — DIRECT

 1  in a bench trial but there is a line that we are trying to
 2  walk between not just allowing what would otherwise be
 3  inadmissible evidence into the record and expediency.
 4          THE COURT:  Yeah, and I'm trying to walk that line
 5  too.  That's the problem you face.  You know, so I've
 6  sustained both objections so I'm not going to consider that
 7  last remark.
 8          Next question.
 9  BY MISS SINGH:
10  Q.  Can I ask what your understanding of the person's concern
11  was?
12          THE COURT:  You can answer that one.  What is your
13  understanding of the person's concern?
14          THE WITNESS:  Yes.  Okay.  That any action that could
15  be taken was subjective to that poll watcher in terms of that
16  her actions were inappropriate and that was totally subjective
17  and she was nervous about what did that mean by way of a
18  reaction to that.
19  BY MISS SINGH:
20  Q.  Thank you.  Do you expect this concern from potential poll
21  workers will go away as your members adjust to SB 1?
22  A.  I do not.
23  Q.  Why not?
24  A.  Well, I think the concern will always be there because of
25  how they interpret SB 1, and that it's always a possibility.

DANIELLE AYERS - DIRECT

1  Even though they understand the law, it's still a possibility

2  an action still just, it could be subjective.

3  Q.  Has Friendship West changed its practices for recruiting

4  poll workers in response to Section 4.09?

5  A.  We have not changed our practices, how we go about

6  recruiting people to work at the polls, but we have had to

7  make adjustments and change the process and the frequency that

8  we tried to recruit and to train people to be prepared to

9  serve as election workers.

10 Q.  Next I want to ask you about Sections 5.07 and 5.13 of SB

11 1 concerning ID numbers on mail ballot applications and

12 carrier envelopes.  Are you familiar with those revisions?

13 A.  Yes.

14 Q.  And in your experience are you aware of how these

15 provisions have affected Friendship West's membership?

16 A.  Yes.

17 Q.  And what is your understanding of how these provisions

18 have affected Friendship West's membership?

19 A.  From members who have approached me and I've talked to

20 directly.  It has just been making sure -- they were more

21 confused about where does that identification, the state ID

22 number go, or the last four of their social where on the

23 envelope to make sure that's not missed because of its

24 location.  It was often missed and they were just calling me

25 to walk them through the process to make sure it was filled

2512

DANIELLE AYERS — DIRECT

 1  out correctly and that it wouldn't get rejected but I think
 2  the concern is just they feel it's just another extra step.
 3  For them, it just makes it a little more difficult to request,
 4  receive, send back, et cetera, and to make sure everything is
 5  properly filled out.
 6  Q.  Did congregants have these questions for the March '22
 7  Primary?
 8  A.  Yes.
 9  Q.  Did congregants have these questions for the November '22
10  General?
11  A.  Yes.
12  Q.  And do you expect this harm will go away as your members
13  adjust to SB 1?
14  A.  Again, I think as long as the bill is intact that concern
15  will be there even while we continue to do the voter education
16  to make sure we stress what you need to do to make sure your
17  mail-in ballot is requested properly, filled out properly, and
18  returned.
19  Q.  And has Friendship West changed its practices for
20  educating members about voting by mail because of these new
21  requirements?
22  A.  So our practices have not changed much.  The process and
23  perhaps other things we've done has taken place.
24  Q.  Okay.  And so I'd like to talk a little bit about that.
25  So you've testified today that Friendship West did a variety

DANIELLE AYERS - DIRECT

1  of things in response to SB 1.  Could you provide examples of

2  those activities?

3  A.  So one of the things that we did differently was to create

4  a landing page on our main website during the election season

5  and that was just more of a robust site to make sure that any

6  and everything people needed to know and had concerns about

7  was at their fingerprints.

8      Usually we would pass out like a paper, know your rights,

9  et cetera, and we figured a website was something more

10 transportable they could share with family and friends.

11     So if they were at the polling location they don't have to

12 worry about carrying a paper with them, they could immediately

13 go to the website if there were any concerns they may have or

14 information they needed to know, it was readily available and

15 it was there for them to share with others.

16 Q.  Was that a dedicated website?

17 A.  It was a dedicated landing page.

18 Q.  Has Friendship West previously had a dedicated web page to

19 the topics that you just mentioned?

20 A.  No.

21 Q.  And why did Friendship West create this web page?

22 A.  Again, we just felt it was important to be as thorough as

23 possible and to have that information readily accessible to

24 more than just our members but also to the community at large.

25 Q.  Okay.  What other activities did Friendship West engage

DANIELLE AYERS — DIRECT

1  in, in response to SB 1?

2  A.  So one of the things we did a little differently this time

3  around that we hadn't done before was more of a text message

4  campaign to eligible voters who did not vote in the Primary to

5  make sure they voted in the General Election and vice versa.

6      If they did vote in the Primary to make sure that they

7  went back out again to vote in the General Election.

8      And just to continue to remind people that they do have

9  the right to vote and just understand, you know, what the

10  rules are and to be clear about what you need to do before you

11  go to the polling location.

12  Q.  Did Friendship West ever use a text message campaign prior

13  to SB 1?

14  A.  No.

15  Q.  Why did Friendship West launch this text message campaign?

16  A.  So, again, it was just to ensure that people would go out

17  and vote.  It was just another turnout, tactic, that we used

18  that we had just not used before, just out of concern that the

19  numbers were low, we wanted to make sure that people went to

20  vote for whomever, right?  Just the main thing was exercise

21  your right to vote.

22  Q.  Did the campaign require funding?

23  A.  Yes.

24  Q.  Was the funding diverted from another program area?

25  A.  Yes.

DANIELLE AYERS - DIRECT

1  Q.  What would that funding have been used for?

2  A.  For training.

3  Q.  Can you explain what training?

4  A.  So we offer advocacy training and organizing training.

5  Q.  Did Friendship West create any videos?

6  A.  We created three videos.

7  Q.  And can you tell me about those videos and the topics of

8  those videos?

9  A.  So they were around what to expect when you arrive at your

10  polling location.  Then the other two were really around the

11  voter ID requirements and the mail-in ballot.

12  Q.  Has Friendship West previously created videos like this?

13  A.  Not around these specific topics.

14  Q.  What have the previous topics been?

15  A.  General, make sure you are registered to vote, here's the

16  deadline to register to vote, here's the election dates, here

17  are the election hours, just making sure people are aware

18  where to go vote, the hours, the date, and to make sure

19  they're registered, and to check your status to make sure

20  everything is lined up and you are ready to go.

21  Q.  So in comparison to those previous videos, the three

22  videos you just mentioned earlier were more specific?

23  A.  Well, yeah.  They were just in response to the changes

24  that were made because of SB 1.

25  Q.  Did Friendship West create a podcast?

2516
DANIELLE AYERS – DIRECT

1  A.  Yes.

2  Q.  Could you tell us more about that podcast?

3  A.  So it was designed essentially to just have us another

4  platform to have conversations, various conversations around

5  the intersection of faith, politics, and race.  It was just

6  another platform to have a conversation that we launched and

7  had, you know, designated episodes to talk about issues that

8  were important to people in the church and in the communities

9  that we serve.

10  Q.  And so you said the original intention was to have the

11  podcast focus on faith, politics, and race?

12  A.  Right.

13  Q.  And when did that podcast debut?

14  A.  Well, it was 2022.

15  Q.  Okay.  And did that — did the first season of the podcast

16  or episodes of the podcast, what were the topics covered?

17  A.  We switched it.  We initially were going to talk about

18  things like hunger, healthcare, you know, but we switched and

19  decided to dedicate the first season to really make sure

20  people really understood what this passage in SB 1 becoming

21  law what that means, so we really spent time really unpacking

22  that, and in addition to talking about issues as well to make

23  sure members and community members understood that the issues

24  that we're talking about, you can only change that when you're

25  actively engaged in the electoral process.

DANIELLE AYERS — DIRECT

1  Q.  So you changed your original plans for that podcast?

2  A.  Right.

3  Q.  Did Friendship West do anything else in response to SB 1?

4  A.  Not that — checking my memory at the moment.

5  Q.  Did Friendship West conduct a survey?

6  A.  Yes, we did.

7  Q.  Can you tell us about that survey?

8  A.  Yeah, sure.  So we just, again, it's easy — so many

9  members and it's so large it's hard to really talk to people

10  one-on-one a lot of times and we don't know what people are

11  thinking and how SB 1 maybe did or did not impact how they

12  view politics, in particular electoral politics, so we just

13  launched a preelection survey just to get a sense of how

14  people were thinking and what they were feeling, and a

15  post-survey to see if those behaviors and attitudes changed

16  from the Primary Election to the General Election.

17  Q.  And when did you administer these surveys?

18  A.  So the first survey would have been prior to the Primary,

19  so before the Primary started.

20  Q.  In 2022?

21  A.  Yes.  In 2022.  Sorry.  In 2022.  And then again after the

22  General Election, like a post-election survey in 2022.

23  Q.  Okay.  And why did Friendship West administer these

24  surveys last year?

25  A.  Yeah.  Again, to really gain how people were thinking and

DANIELLE AYERS — DIRECT

1  feeling in the moment because that was '22, so SB 1 was signed

2  into law in September '21, so we're just trying to get a sense

3  of are people feeling any particular kind of way, and will

4  this impact their engagement, and even though voter engagement

5  activities that we offered, just getting a pulse on the

6  congregation, we felt that was important to do.

7  Q.  Had Friendship West ever conducted such a survey prior to

8  SB 1?

9  A.  No.

10  Q.  Did administering the survey require funding?

11  A.  Yes.

12  Q.  Was the funding diverted from another program area?

13  A.  Yes.

14  Q.  And what would that funding have been used for?

15  A.  Again, some of that would have been used for training.

16  Another part that would have been used for travel because some

17  of the work we do requires us to travel, and which also

18  includes going to Austin to meet with some of our partners,

19  because we usually use our interim years, right, to plan our

20  legislative agenda for the legislative session, so that

21  requires travel, that requires time, et cetera, so that's

22  typically what we use the money for.

23  Q.  So you've testified that Friendship West has had to divert

24  resources because of SB 1.  Are there any specific projects or

25  issues that were affected by this diversion?

DANIELLE AYERS - DIRECT

1   A.  Well, I think because it was so important to do that, it
2   was always a balance, because at the heart of it, we are a
3   church, and so our primary responsibility is to see and attend
4   to the spiritual care of our congregation, while also dealing
5   with the social care.  We don't divorce the two, and so, you
6   know, it's a struggle to go between we have to make sure we
7   serve people with the needs they have, but also we know it's
8   so important to make sure that we maintain a level of
9   engagement to do both things.
10      And so, you know, it's a push-pull so one suffers
11  sometimes because of the other one because they are both
12  important and you have to make decisions sometimes because we
13  are a church and the money comes in, it goes back out to
14  ministry so we have to make decisions.
15  Q.  And you mentioned that you engage in legislative advocacy?
16  A.  Correct.
17  Q.  Was that at all affected by the diversion of resources
18  because of SB 1?
19  A.  Yeah.  So, again, in '22 we used most of our resources and
20  time to gear up for the 88th session for '23.
21  Q.  Were you not able to do so in the same manner?
22  A.  Not at much.
23  Q.  Can you describe what you would have done?
24  A.  Again, meeting with partners, whether they are local or
25  they're in other parts of the state, because we try to do

2520

DANIELLE AYERS – DIRECT

1  statewide connections and organizations that we work with, so

2  travel and just the time that it takes to read that, to read

3  reports in order to construct a real robust legislative agenda

4  for our church.

5  Q.  Have your efforts to recruit more poll workers required

6  staff and volunteer time?

7  A.  Yes.

8  Q.  Has putting on these voter education programs required

9  staff and volunteer time?

10  A.  Yes.

11  Q.  Are these the same staff and volunteers that work on

12  Friendship West's other critical activities?

13  A.  Yes.

14  Q.  And did the efforts to respond to SB 1 make it more

15  difficult for Friendship West to conduct its operations?

16  A.  Yes.

17  Q.  How so?

18  A.  Well, again, this diversion of resource, not just money

19  but time, as well as staff that's required to move over to

20  help out to make sure the videos get recorded, get edited, to

21  get put up, while other ministries still have their needs that

22  need to be met as well, it's just an added burden, if you

23  will, to those who are on staff, who we are already a little

24  bit understaffed, and so it's just adds more work for

25  everyone.  And then volunteers, we try to make sure we don't

DANIELLE AYERS – CROSS

1  burn them out, so it's also sometimes we take more of that

2  work because they are volunteering so you really can't expect

3  the same amount of time to be put into some of the activities

4  that we have to do.

5          MISS SINGH:  Thank you.

6          I pass the witness.

7          THE COURT:  Anything else here?

8          Any cross.

9          MR. CAPOZZI:  Yes, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. CAPOZZI:

12  Q.  Good morning, Pastor Ayers.  How are you?

13  A.  I'm good.  How are you?

14  Q.  I'm good.  Thank you for taking the time to be here.

15      My name is Louis Capozzi.  I'm with Jones Day and the

16  intervenor defendants.  Let's talk a little bit about Section

17  4.09 and poll watchers.

18      You are familiar with this provision, right?

19  A.  Correct.

20  Q.  And you voted in 2022, right?

21  A.  Correct.

22  Q.  Both the Primary and the General Election?

23  A.  Correct.

24  Q.  Did you observe any inappropriate behavior by a poll

25  watcher while voting in 2022?

DANIELLE AYERS — CROSS

1  A.  No.

2  Q.  You didn't name a specific member of Friendship West

3  Baptist Church who served as an election worker since SB 1,

4  right?

5  A.  Did I name someone?  I did not.

6  Q.  Can you say how many members of the church served as poll

7  workers in 2018?

8  A.  In 2018?  I probably could not give you exact number.

9  Q.  What about 2022?

10  A.  I know personally four who served as election judges.

11  Q.  You didn't name a specific member of Friendship West

12  Baptist Church that was unwilling to vote in 2022 because of

13  Section 4.09, right?

14  A.  Right.

15  Q.  And you didn't name a specific member of Friendship West

16  Baptist Church that was unwilling to serve as a poll worker in

17  2022 because of Section 4.09, right?

18  A.  Right.

19  Q.  And you are not aware of any member of Friendship West

20  Baptist Church being threatened with prosecution under Section

21  4.09, right?

22  A.  No.

23  Q.  Let's talk a little bit about the mail ballot ID

24  provisions.  You are familiar with SB 1 Sections 5.07 and 5.13

25  which requires voters to provide the ID number, right?

2523
DANIELLE AYERS – CROSS

1  A.  Yes.

2  Q.  And you didn't identify a specific member of Friendship

3  West Baptist Church who tried and ultimately failed to receive

4  a mail ballot, right?

5  A.  Right.

6  Q.  And you didn't identify a specific member of Friendship

7  West Baptist Church who couldn't vote in 2022 because of the

8  mail ballot ID requirements, right?

9  A.  Right.

10  Q.  Let's talk a little bit about the voting related work that

11  the church does.  You would agree that when the legislature

12  changes the laws governing elections it's important to educate

13  voters and your members about those changes, right?

14  A.  Correct.

15  Q.  The church has been educating its members and the public

16  about voting rules for a long time now, right?

17  A.  Correct.

18  Q.  You've been with the church for a long time?

19  A.  Yes.

20  Q.  And so you've been educating voters for a long time?

21  A.  Yes.

22  Q.  And you would say that educating voters about election law

23  changes is a regular and important part of the church's work,

24  right?

25  A.  Correct.

DANIELLE AYERS - CROSS

1  Q.  Friendship West Baptist Church members volunteer in

2  elections to do things like provide voter assistance, right?

3  A.  When you say "voter assistance."

4  Q.  To help voters vote.

5  A.  No.  Do our volunteers?  I don't have any knowledge of

6  volunteers specifically who have helped people to register to

7  vote.

8  Q.  I appreciate that.  Can you clarify that in what church

9  members volunteer to do in elections?

10  A.  Yeah.  So the volunteers I'm speaking of who help with

11  voter — they help with voter education activities, so that's

12  registering people to vote, checking their status, giving them

13  information on knowing their rights as a voter, et cetera, but

14  we do not train them to help people to assist in the vote.

15  They may do that on their own as a private citizen but not as

16  a volunteer of the church.

17  Q.  Appreciate that.  Thank you.  Does the church conduct

18  training for its volunteers before they provide information to

19  the voters?

20  A.  Yes.

21  Q.  And you conducted those trainings for the elections in

22  2022, right?

23  A.  Correct.

24  Q.  And you conducted those trainings for the elections in

25  2020, right?

DANIELLE AYERS – CROSS

1  A.  Yes.

2  Q.  And so as a regular matter before elections you try to

3  train your volunteers, right?

4  A.  Correct.

5  Q.  Okay.  You said that Friendship West Baptist Church

6  regularly engages in Get Out the Vote efforts, right?

7  A.  Correct.

8  Q.  You engaged in those Get Out the Vote efforts in 2020,

9  right?

10  A.  Yes.

11  Q.  And in elections before 2020, right?

12  A.  Yes.

13  Q.  You mentioned a text message campaign to Get Out the Vote,

14  right?

15  A.  Right.

16  Q.  And so you said this was a new tactic in your Get Out the

17  Vote efforts campaign, right?

18  A.  Correct.

19  Q.  I believe you testified that Friendship West Baptist

20  Church had to expend resources to training its volunteers

21  after SB 1, right?

22  A.  Can I clarify that?

23  Q.  Yes.

24  A.  The money — the question was asked of me, was money

25  diverted to some of the new activities that we did.  When we

DANIELLE AYERS – CROSS

1  talk about training our volunteers and I was saying money used
2  to train an advocacy training and organizing training which is
3  separate from what we do to prepare folks who engage in voting
4  engagement activities.
5  Q.  So the new trainings, can you just state one more time,
6  what were the new trainings for?
7  A.  So I had mentioned new trainings.  I think the question
8  was asked were resources diverted and what would those
9  resources be used for.
10    I said they were typically used for our advocacy and
11  organizing training.  So the training for voter engagement is
12  just what we do with it, because to refresh everyone to know
13  if you're using this particular voting card, make sure you put
14  your deputy registration number on there and you can clearly
15  read it.  It's more of that, refresh and training before we go
16  out into the public.
17  Q.  So you still conduct trainings for the volunteers, right?
18  A.  Right.
19  Q.  Okay.  Can you say how much Friendship West Baptist Church
20  spent on training its volunteers in 2018?
21  A.  No, I wouldn't remember that number.
22  Q.  What about 2020?
23  A.  No, I would have to estimate.  I wouldn't have an exact
24  number.
25  Q.  Or 2022?

2527
DANIELLE AYERS - CROSS

1   A.  So in 2022 for training, again, the training we did in '22
2   we did not do advocacy and organizing training, that's what we
3   would have done.  We did more just the regular before we go
4   through our voter education engagement, make sure you come to
5   the training to make sure we're all on the same page.
6       And that training just consists of also where are you
7   going to be placed that day, where to turn your things in.  So
8   that, the training I'm referring to, it cost money.  It's
9   organizing in the advocacy training, because we bring in
10  organizations to do that.
11  Q.  So you did engage in training your volunteers in 2022 but
12  you didn't bring in outside organizations as part of that
13  training?
14  A.  Right.  We never do it for the voter education training.
15  We don't need that.  We can do that as staff.
16  Q.  You mentioned the website.  Let's talk about that for a
17  second.
18  A.  Okay.
19  Q.  So Friendship West now has a web page on the website for
20  election information, right?
21  A.  So we have a landing page that we bring up when it's time
22  for election season.  So it will probably go up in the next
23  couple of weeks because we're getting ready to approach early
24  voting.
25  Q.  So for elections before SB 1 would Friendship West ever

2528
DANIELLE AYERS - CROSS

1  provide information on voting on the website?

2  A.  No, primarily it would be passed out in voting guides.

3  Q.  And were those guides made available on the website or

4  handed out by paper?

5  A.  By paper.

6  Q.  Okay.  You mentioned you've made videos about SB 1, right?

7  A.  Correct.

8  Q.  To give information to church members about the law,

9  right?

10  A.  Right.

11  Q.  Have you created videos on voting rules before SB 1?

12  A.  I don't recall voting rules.  I do recall us doing voter

13  kind of general information around make sure you registered,

14  here's your deadline to register to vote, and we may have did

15  a one-on-one voter ID a few years back just to make sure

16  people understood what ID was acceptable in order to register

17  to vote.

18  Q.  Thank you for that clarification.  And you mentioned a

19  podcast that the church has been doing.  So you — let me make

20  sure I understand this correctly.

21  A.  Okay.

22  Q.  You were going to do the podcast regardless of SB 1,

23  right?

24  A.  Correct.

25  Q.  But on a different topic?

DANIELLE AYERS – CROSS

1  A.  Correct.

2  Q.  And so because of SB 1 you changed the topic of this

3  podcast you were going to do anyway?

4  A.  Correct.

5  Q.  You also mentioned a survey that Friendship West conducted

6  before the 2022 Election, right?

7  A.  Correct.

8  Q.  And I think you said it's important to get a pulse on the

9  feeling of your congregation, right?

10  A.  Correct.

11  Q.  And so in the past you've felt it's important to

12  understand where your members are coming from on voting,

13  right?

14  A.  Correct.

15  Q.  And so you've made efforts in the past in your job to

16  understand how your members are feeling about the election

17  rules, right?

18  A.  Elections in general.

19  Q.  Yeah.

20  A.  Yes.

21  Q.  A couple questions about the church's budget.  Do you know

22  what Friendship West Baptist Church's budget for voting

23  related activities in 2020 was?

24  A.  No.  I don't recall the exact number.

25  Q.  Do you know what the budget in 2022 was?

2530

DANIELLE AYERS – CROSS

1  A.  No.

2  Q.  Okay.  And, finally, you talked about legislative

3  advocacy.  The church regularly engages with the legislature,

4  right?

5  A.  Correct.

6  Q.  You mentioned that the church engaged with the legislature

7  on SB 1 before it was passed, right?

8  A.  Correct.

9  Q.  Is it fair to say that the church makes greater efforts to

10  engage in certain legislative sessions than others?

11  A.  No, I don't think we make an attempt to be deeply engaged

12  in every session because issues we care about are always on

13  the agenda.

14  Q.  Are there some sessions where the issues being discussed

15  are more important than others?

16  A.  Yes.

17  Q.  And so for the sessions where the really important issues

18  are, is it fair to say the church would give more efforts in

19  those sessions?

20  A.  Correct.

21  Q.  And you said that you have engaged in some legislative

22  advocacy in 2023, right?

23  A.  Yes.

24  Q.  Can you say how much the church has spent on legislative

25  advocacy in 2023?

DANIELLE AYERS — REDIRECT

1   A.  I wouldn't know the exact number.

2   Q.  What about 2022?

3   A.  I wouldn't know the exact number.

4   Q.  What about 2021.

5   A.  I still wouldn't know the exact number that we spent.

6   Q.  Or 2020?

7   A.  No.

8           MR. CAPOZZI:  That's all the questions I have.

9           Thank you.  Appreciate your time.

10          THE COURT:  Any other questions on this side?

11          MR. LIU:  No, Your Honor.

12          THE COURT:  Any redirect?

13          MISS SINGH:  Yes.

14                    REDIRECT EXAMINATION

15  BY MISS SINGH:

16  Q.  Pastor Ayers, you testified that you have worked on voter

17  education with Friendship West for many years.  Was there

18  anything different about that work following the enactment of

19  SB 1?

20  A.  Well, I think the difference was we felt that —— we

21  already felt that some of the voting laws were quite

22  restrictive and we felt SB 1 just kind of upped being more

23  restrictive.  We just felt we needed to do more to respond and

24  to make sure people were clear about what the bill, what the

25  new law means for them personally as a voter.

2532
DANIELLE AYERS - REDIRECT

1  Q.  Are there issues in 2021 or 2022 that you weren't able to

2  devote attention to during the legislative sessions?

3  A.  Any issues?

4  Q.  Yeah.

5  A.  Well, I think, again, it's probably just more around we

6  probably would give more attention to our agenda justice scope

7  that was getting off the ground, just not able to give

8  attention to that to make that a more robust initiative that

9  we wanted to engage in.  That would be an example.

10  Q.  For which year?

11  A.  For 2021, '22, and we started in 2023.  So we did some in

12  '23.

13  Q.  Okay.

14          MISS SINGH:  Thank you.

15          No further questions.

16          THE COURT:  Thank you, Pastor.  You may step down.

17          THE WITNESS:  Thank you.

18          THE COURT:  Your next witness.

19          UNIDENTIFIED FEMALE SPEAKER:  Julia Longoria for LUPE

20  plaintiffs.  Our next witness is Miss Jana Ortega.

21     (JANA ORTEGA, having been duly sworn, testified as

22  follows:)

23          MISS LONGORIA:  Miss Ortega will testify to

24  challenges to SB 1 provisions 4.09, 6.03, 6.04, and 7.04.

25          THE COURT:  Thank you.

2533

JANA ORTEGA – DIRECT

```
 1                        DIRECT EXAMINATION
 2   BY MISS LONGORIA:
 3   Q.  Good morning.
 4   A.  Good morning.
 5   Q.  Miss Ortega, will you please state your name for the
 6   record?
 7   A.  Jana Ortega, O-R-T-E-G-A.
 8   Q.  What do you do for a living?
 9   A.  I'm an attorney, specifically criminal defense.
10   Q.  Beyond your employment are you involved in any other
11   activities?
12   A.  Yes.  I am active with the Mexican-American Bar
13   Association of Texas and several other local organizations,
14   nonprofits, through Travis County and Austin.
15   Q.  If I say MABA Texas, will you know that to be the
16   Mexican-American Bar Association of Texas?
17   A.  Yes.
18   Q.  What is your position with MABA Texas?
19   A.  I am president and chair of the board of directors.
20   Q.  Can you give the Court a brief description of MABA Texas?
21   A.  MABA Texas is a group of Latino lawyers.  We have chapters
22   throughout the state of Texas and we serve as a network for
23   our attorneys.
24       We encourage our attorneys to provide pro bono services in
25   their local communities.  We educate our networks as well on
```

JANA ORTEGA – DIRECT

1    any issues that may be of interest to our community.  We

2    encourage our attorneys to help their local communities with

3    voting, with any issues that may be important locally and

4    statewide.

5        We have CLEs, continuing legal education seminars, at

6    least yearly that serve to educate our members as well and

7    basically just, again, serve as a network for each other

8    throughout the state.

9    Q.  Is MABA Texas a membership organization?

10   A.  Yes.

11   Q.  And approximately how many members does MABA Texas have?

12   A.  We have approximately 500.

13   Q.  And do members pay dues?

14   A.  Yes.

15   Q.  Are you also a member of MABA Texas?

16   A.  I am.

17   Q.  And what is the leadership structure of MABA Texas?

18   A.  We have a statewide board of directors and then we also

19   have local chapters.

20   Q.  And how are the board of directors elected?

21   A.  They are elected generally at one of our statewide

22   meetings which is either in the spring or the summer and they

23   are basically nominated at one of those meetings and voted on

24   bar general membership.

25   Q.  And what is MABA Texas' annual budget?

2535

JANA ORTEGA – DIRECT

1  A.  Statewide, as far as our statewide operations are
2  concerned we have a very small budget.  We try not to spend a
3  lot of money at the state level so that more resources are
4  available to our local chapters.  So I'd say probably like a
5  thousand dollars or so, just for management of our annual
6  meetings.
7  Q.  And where does your budget come from?
8  A.  It comes from dues from our local chapters.
9  Q.  Does MABA Texas have paid staff?
10  A.  No.  No, ma'am.
11  Q.  And what are the activities of MABA Texas?
12  A.  Again, to serve as a network and communication outlet for
13  our local attorneys on issues.  We regularly have posts on
14  social media about things that we'd like our community to be
15  aware of, and we like to filter through our attorneys things
16  that are important to the Latino community.
17      We encourage our members to help when they can to Get Out
18  the Vote in their local communities, to encourage people to
19  vote, to educate voters as well.  We are non-partisan and we
20  just want to encourage people to exercise their rights.
21  Q.  Does MABA Texas work in any Geo TV activities?
22  A.  Yes.
23  Q.  And what types of activities?
24  A.  Those can be anything from tabling events at local
25  community events, candidate forums, those are a big part of

*Gigi Simcox, RMR, CRR*

JANA ORTEGA - DIRECT

1  what our local chapters do.  Let's see.  Again, it might be

2  just education, as far as knowing what our voter rights are,

3  as well as where polling locations are, resources available to

4  get people to and from polling, and the hours, things like

5  that, logistics.

6  Q.  Does MABA Texas engage in any free legal clinics to the

7  Latino community?

8  A.  We do.

9  Q.  What types of clinics does MABA Texas provide to the

10  Latino community?

11  A.  We offer a lot of immigration type — basic immigration

12  type question and answer and guidance, again, basic family

13  law, basic probate, basic employment law related issues.

14  Q.  Are your members registered voters?

15  A.  Yes.

16  Q.  And where do your members reside?

17  A.  Our members reside throughout the state.  Our main

18  chapters, however, are in Houston, San Antonio, Austin,

19  Dallas/Fort Worth.  I believe we now have a chapter in Lubbock

20  and a chapter in El Paso as well.

21  Q.  Derek, would you please display Joint Exhibit 1 and please

22  highlight Section 4.09.

23      Does MABA Texas have members who are poll workers?

24  A.  Yes.

25  Q.  And does MABA Texas have members who no longer act as poll

JANA ORTEGA – DIRECT

1  workers since the enactment of SB 1?

2  A.  From my understanding of discussions at our last general

3  meeting, our membership meeting back in March, our members

4  have expressed reluctance to do so, so my understanding is no.

5  Q.  And based on your — I'm sorry.  Just to clarify, your

6  understanding is that they no longer act as poll workers, or

7  that they — I was a little confused by your response.  Could

8  you —

9  A.  They are hesitant to do that work any longer.

10  Q.  Okay.  Thank you for that clarification.  And based on

11  your conversations with MABA Texas voters, what do you

12  understand to be their concerns?

13  A.  Their concerns are that they don't want to run afoul of

14  any of the provisions of SB 1.  You know, our members have

15  licenses through the State and they certainly don't want to do

16  anything to jeopardize their licenses by, again, running afoul

17  of any of the provisions.

18  Q.  And, Derek, would you please display Exhibit LUPE 172.

19      Miss Ortega, I would like to shift your attention to

20  provision 6.03 of SB 1 which requires an assister to fill out

21  a form explaining their relationship to the voter and whether

22  they received or accepted any form of compensation or other

23  benefit from a candidate, campaign, or political committee.

24  Are you familiar with this provision?

25  A.  Yes.

JANA ORTEGA – DIRECT

1  Q.  Does 6.03 of SB 1 impact MABA Texas' members?

2  A.  Yes.

3  Q.  In what ways have –– excuse me.  Retract that.

4      Have members of MABA Texas expressed any concerns to you

5  about the impact of 6.03 on –– have members of MABA Texas

6  expressed any concerns about SB 1 6.03?

7  A.  Yes.

8  Q.  And what are –– to your understanding, what are those

9  concerns?

10  A.  Based on our discussions, again, at our last meeting,

11  certainly the word "perjury" is very concerning and alarming

12  to our members.  They, of course, know what perjury is and do

13  not want to subject themselves to any of the consequences of

14  being accused of that.

15  Q.  And under 6.03 assisters are required to fill out their ––

16  the columns to the right here.

17      Would you highlight that, please, and also the

18  relationship.

19      Have the members of MABA Texas expressed any concerns

20  about this particular portion of SB 1?

21  A.  Yes.

22  Q.  And what concerns, to your understanding, have MABA Texas'

23  members expressed?

24  A.  They feel as though these questions are –– can be an

25  invasion of privacy.  They don't want to have to fill these

JANA ORTEGA – DIRECT

1  questions out and feel like they are overstepping their bounds
2  by knowing this information.
3  Q.  Have you ever assisted any voters at the polling place?
4  A.  I have.
5  Q.  And have you assisted anyone since SB 1 was enacted?
6  A.  I have not.
7  Q.  And what do you understand these words to mean, "swear
8  under penalty of perjury?"
9  A.  Well, that's — certainly, as being an attorney, that's
10  the Gold Standard of being responsible and being liable for
11  whatever information that you are swearing or affirming to.
12  Q.  And how does swearing under penalty of perjury in the
13  assister oath affect your actions or willingness to assist a
14  voter?
15  A.  It certainly is something that I don't want to subject
16  myself to.  As much as I would love to help someone, I'm not
17  going to put my reputation and my license on the line or
18  possibly be subject to criminal penalties, so that's not
19  something that I'll be doing.
20  Q.  How do you feel about having to secure a representation of
21  eligibility from a voter that you assist?
22  A.  It makes me nervous.  I don't know — there is no way to
23  know whether or not the information that they are giving you
24  is true and correct, and then you have to swear to that, and
25  so, again, it just goes to putting yourself to be more in a

JANA ORTEGA - DIRECT

1  more responsible position than you, I guess you would in the

2  past.

3  Q.  Do you feel it's something you should have to do?

4  A.  No.

5  Q.  What would happen if you provide assistance without

6  securing a representation of eligibility from a voter?

7  A.  Apparently I would be running afoul of the bill and the

8  law.

9  Q.  In what way?

10  A.  I would be -- I would be committing perjury.

11  Q.  Let's highlight the language "I did not pressure."

12      How do you interpret this language?

13  A.  As an attorney, I would need to see the actual definition

14  or the context of pressure or coerce.  That could be very

15  subjective and is certainly -- you know, one person might have

16  a different definition than another.

17  Q.  Would it be pressuring, for instance, to call a voter

18  multiple times and ask them if they plan to vote and then

19  later act as that voter's assister?

20  A.  It could be.

21  Q.  So do you feel comfortable with this language "swearing

22  under penalty of perjury?"

23  A.  No.

24  Q.  Derek, will you highlight the language saying "that I

25  understand if assistance is provided to a voter who is not

 1  eligible for his assistance, the voter's ballot may not be
 2  counted."
 3     Miss Ortega, who decides if a voter is ineligible to
 4  receive assistance?
 5  A.  I'm going to repeat your question.  I'm sorry.
 6     Who decides if a voter is eligible for assistance?
 7  Q.  Correct.
 8  A.  I don't know.
 9  Q.  In your view, who should decide if a voter needs
10  assistance to vote?
11  A.  The voter.
12  Q.  In general, how has this new oath language affected you as
13  a voter assister?
14  A.  There are so many subjective provisions in this oath that
15  I don't –– I, for one, do not want to subject myself to,
16  again, running afoul of any of this language so I won't be
17  assisting anyone.
18  Q.  What does this mean for the community that you live in?
19  A.  That means there are fewer of us, and "us" meaning people
20  that feel the same as myself that may be able to assist, and
21  even if a person wants us to, and as attorneys we do have, we
22  have clients, we have neighbors, we have co-workers, we have
23  family members that trust us, and even if they –– we would be
24  the assister of their choice, we still may not feel
25  comfortable doing that.

2542

JANA ORTEGA - DIRECT

1  Q.  And why have you decided not to assist voters anymore?

2  A.  I believe that there's -- there is too much to

3  misinterpret, and in the language of the oath, and I would not

4  want any of my actions to be viewed as running afoul of this

5  oath.

6  Q.  Do MABA Texas members routinely encourage support for a

7  candidate or measure?

8  A.  Yes.

9  Q.  And based on your understanding, are MABA Texas members

10  concerned that they may inadvertently be in the presence of a

11  mail ballot without their knowledge?

12  A.  Yes.  We had a discussion about that exact situation at

13  our last meeting.  You never know what a person is carrying

14  with them and you certainly are not going to check their

15  pockets or check their bag, or whatever the situation may be,

16  so it's just a situation that you really can't control.

17  Q.  And based on your understanding have these members

18  expressed concern that they are committing a crime, if they

19  accept meals, gas cards, swag, or other forms of compensation?

20  A.  Yes.

21  Q.  Do MABA Texas members include Latino registered voters?

22  A.  Yes.

23  Q.  Do MABA Texas members include voters who are limited

24  English proficient?

25  A.  Yes.

JANA ORTEGA - DIRECT

1    Q.  Do MABA Texas members include voters who are disabled?

2    A.  Yes.

3    Q.  Do MABA Texas members include voters who vote by mail?

4    A.  Yes.

5    Q.  Do MABA Texas members include voters who require

6    assistance at the polls?

7    A.  Yes.

8    Q.  Do MABA Texas members include voters who require voter

9    assistance with mail ballots?

10   A.  Yes.

11   Q.  Do MABA Texas members include voters who have relied on

12   paid assisters for assistance with their mail ballots?

13   A.  Yes, I believe so.

14   Q.  Aside from the effect of SB 1 on your members, how has SB

15   1 affected MABA Texas as an organization?

16   A.  As an organization we are finding it harder and harder to

17   find members that are willing to educate voters, to reach out

18   to voters, to be more involved in our Get Out the Vote

19   efforts.  They certainly have taken a big step back from

20   advocating for those things in our local communities.

21   Q.  In what way do you see less engagement?

22   A.  I put out a call for volunteers or a call for assistance,

23   and it's crickets.

24   Q.  And based on your conversations with MABA Texas members,

25   what do you understand to be their concerns?

2544

JANA ORTEGA – DIRECT

1  A.  Their concerns are, again, running afoul of any of the
2  provisions of SB 1.
3  Q.  And in what way — retract that.
4     In what way are MABA Texas members, according to your
5  understanding, impacted by SB 1, and therefore unwilling to
6  engage?
7  A.  My understanding is that their concerns are they don't
8  want anything that they do or may say to be interpreted as
9  pressuring a voter or anyone else for that matter.  They don't
10  want to necessarily attest to someone's disability or
11  someone's need for assistance, if — you know, they don't feel
12  like they can really guarantee that or they don't have the
13  knowledge to be able to attest to that, you know, they don't
14  want — literally our discussions were if you take a bottle of
15  water is that something that could be considered, you know,
16  accepting any form of compensation.
17     Sorry, I'm trying to see this little bitty print to get my
18  words right.
19     And, of course, as lawyers, and, you know, we are going to
20  nitpick every word, and the way we are trying to think, we
21  just don't want to put ourselves in a position to have to
22  defend our actions necessarily, if a third party, you know,
23  questions what we've done or what we've attested to.
24  Q.  Are there any activities that MABA Texas members are no
25  longer doing?

JANA ORTEGA - CROSS

1  A.  We're trying to stay the same course and maintain the same

2  level of activities, but, again, it is harder and harder to

3  find volunteers.

4          MISS LONGORIA:  Pass the witness.

5          THE COURT:  Anything else on this side?  Nothing.

6          Any cross?

7                      CROSS-EXAMINATION

8  BY MR. KERCHER:

9  Q.  Morning, Miss Ortega.

10  A.  Morning, Mr. Kercher.

11  Q.  You and I know each other a little bit, don't we?

12  A.  We do.

13  Q.  You run in the same circles as my wife, don't ya?

14  A.  Your beautiful wife, yes, I do.

15  Q.  She is lovely.  I'll tell her you said that.  You are both

16  criminal defense attorneys or have been criminal defense

17  attorneys in Travis County, right?

18  A.  Yes.

19  Q.  And at one point, though not at the same time, you both

20  ran for the same judicial seat in Travis County, right?

21  A.  We did.

22  Q.  Well, it's good to see you again.  Next maybe time we'll

23  be under different circumstances.

24  A.  Thank you, sir.

25  Q.  Let's talk about talking of Section 4.09 of SB 1, which is

JANA ORTEGA - CROSS

1  the poll watcher obstruction provision that you looked at with

2  plaintiffs' counsel.  You said that MABA Texas members are

3  hesitant to act as poll workers following SB 1, is that right?

4  A.  Yes.

5  Q.  Do you know how many MABA Texas members acted as poll

6  workers prior to SB 1?

7  A.  I don't.

8  Q.  Do you know how many have acted as poll workers since SB

9  1?

10  A.  I don't.

11  Q.  And when you said on direct examination that you

12  understood MABA Texas members to be hesitant to work as poll

13  workers following SB 1, does that mean that you don't know of

14  anyone who has refused to work as a poll worker from MABA

15  Texas since SB 1?

16  A.  I do not know anyone who has refused.  I know that in

17  March of this year there were many members that were hesitant

18  to perform those roles.

19  Q.  And I appreciate that nuance, but I want to hone in on the

20  use of the word of "nuance" -- I said nuance.  I mean use of

21  the word "hesitant," because hesitant may mean you don't want

22  to do it but that you may do it, nevertheless, right?

23  A.  Um-hum.

24  Q.  Is that a yes?

25  A.  Yes.  That's yes.

2547

JANA ORTEGA - CROSS

1  Q.  And so when you say you know that MABA Texas members were
2  hesitant, you are not testifying that there is a MABA Texas
3  member of whom you know who has refused to work as a poll
4  worker because of SB 1, is that right?
5  A.  Actually, I do know a member who has refused to work as a
6  poll worker.
7  Q.  And who is that?
8  A.  Her name is Miss Ponce and she is an attorney in Austin.
9  Q.  How many times prior to SB 1 had she worked as a poll
10  worker, if you know?
11  A.  I believe two or three but I do not know the exact number.
12  Q.  How did you come to learn that Miss Ponce has stopped
13  being a poll worker?
14  A.  Because she expressed to me concerns over the way that she
15  was treated by either election officials that were at her
16  polling location, and as well her difficulty in understanding
17  some of the training materials and her disagreement with some
18  of the training materials that she was given.
19  Q.  So I want to make sure that I understand you correctly
20  because, and it's probably my fault, my question wasn't
21  specific enough, but we have been talking about the poll —
22  the obstruction of poll worker provisions — or excuse me —
23  poll watcher provision in Section 4.09, right?
24  A.  Yes.
25  Q.  So when you say that you know a MABA Texas member who had

1  worked as a poll worker before SB 1 but doesn't do that

2  anymore, let me ask you a more specific question.  Is it your

3  understanding that Miss Ponce, the MABA Texas member, has

4  stopped working as a poll worker because of Section 4.09 of SB

5  1?

6  A.  That is my understanding.

7  Q.  And you are saying that she did that because she was

8  mistreated or because she was afraid of the provision in 4.09?

9  A.  Both.

10  Q.  What was it about 4.09 that made her afraid?

11  A.  Can you put the language back up for me?

12      Can I answer?

13  Q.  Yes, please.

14  A.  Okay.  I didn't know if you had a follow-up question.

15      She did not want to — she was not sure what some of the

16  phrases in the section actually mean and can be interpreted

17  as, and she did not want to — my understanding is she did not

18  want to subject herself to that.

19  Q.  When you say that she felt like she had been mistreated as

20  a poll worker following SB 1, does that mean that after SB 1

21  she went ahead and worked as a poll worker at least one time?

22  A.  I believe she did, one time.

23  Q.  Does MABA Texas encourage its members to work as poll

24  watchers?

25  A.  I would say not — we encourage our members to be involved

JANA ORTEGA – CROSS

1  and active in voting, the whole process of voting, whether
2  that is as a watcher, a worker, a judge, an election judge,
3  any of those roles.  I don't think that we — well, to my
4  knowledge, we don't say, you should go out and do this
5  specific role.  We just want our members to be involved in the
6  process.
7  Q.  Are you aware of any MABA Texas members who have refused
8  to work as poll watchers since the passage of SB 1?
9  A.  No.
10 Q.  Are you aware of any MABA Texas members who have served as
11 poll watchers for the first time following the passage of SB
12 1?
13 A.  No.
14 Q.  Let's talk about Section 6.03.  This has to do — this is
15 the voter assistance form.
16     Brian, could you pull that up, please.
17     You talked a little bit about your concern of the oath of
18 assistance, right?
19 A.  Yes.
20 Q.  And your concern is that this oath is under penalty of
21 perjury, right?
22 A.  Yes.
23 Q.  And I heard you say something like perjury, or the penalty
24 of perjury is sort of the Gold Standard for behavior, is that
25 right?

JANA ORTEGA – CROSS

1  A.  In my mind and to most of the attorneys that I know.

2  Q.  I'm not disagreeing with you.  I think that's exactly

3  right.  When we walk into a courtroom and we put a witness on

4  the stand, that witness has to be under oath, right?

5  A.  Yes.

6  Q.  And as attorneys we understand that because when we are in

7  the courtroom we are doing a particularly important civic

8  function, right?

9  A.  Yes.

10  Q.  The Court does not work if people will not tell the truth

11  on the stand, right?

12  A.  Agreed.

13  Q.  Which is why we have that Gold Standard, we need the very

14  best from the people who sit in that chair, right?

15  A.  Agreed.

16  Q.  Our elections are just as important to our democracy as

17  our courtrooms are, isn't that right?

18  A.  I would agree.

19  Q.  Let's talk about what someone would have to swear that

20  they would and would not do on this oath of assistance form.

21      The first line says, "I swear or affirm under penalty of

22  perjury that the voter I am assisting represented to me that

23  they are eligible to receive assistance."  Have I read that

24  correctly so far?

25  A.  Yes.

JANA ORTEGA - CROSS

1  Q.  I heard you say on direct examination that one of the

2  things that made this oath so concerning to you is that you

3  were concerned that the person you were assisting might not

4  give you accurate information, is that right?

5  A.  Correct.

6  Q.  But the oath only swears that the person has represented

7  to you that they are entitled to assistance, right?

8  A.  Yes.

9  Q.  Which means you don't have to make an independent

10 evaluation, you don't have to give in to the assisted voters

11 mind in order to swear that this is true, right?

12 A.  That's right.

13 Q.  If we go down to the next line, in the middle of the line

14 it says, "I did not pressure," do you see that?

15 A.  Yes.

16 Q.  So another thing that you would have to swear to under

17 penalty of perjury is that you did not pressure or coerce the

18 voter into choosing you to provide assistance, right?

19 A.  Yes.

20 Q.  Now, you and I agree, I know, that pressuring and coercing

21 voters is unacceptable, right?

22 A.  I agree.

23 Q.  And when you acted as an assister, that's not something

24 that you would do, right?

25 A.  Yes.

JANA ORTEGA - CROSS

1  Q.  And so you would have no problem swearing under penalty of
2  perjury, if you acted as an assister, that you held yourself
3  up to that high standard, right?
4  A.  Yes.
5  Q.  What I heard you testify to on direct is that you were
6  concerned that even if you held yourself up to that high
7  standard you could be wrongfully accused, right?
8  A.  That is my concern, yes.
9  Q.  Your concern is not that the law itself is wrong, your
10 concerned that somebody might misuse the law, is that right?
11 A.  I don't know that I would agree with the word "misuse" the
12 law.  They just may -- to me, this gives them an outlet or a
13 way to maybe make an accusation because they think something
14 is pressuring someone whereas over here I had no idea that it
15 could be interpreted that way.  It's too subjective.
16 Q.  Well, but as a criminal defense attorney, you deal with
17 that kind of dynamic all of the time, right --
18 A.  Yes.
19 Q.  -- where somebody makes an allegation and somebody
20 disagrees with that allegation, right?
21 A.  Yes.  Yes.
22 Q.  That is the nature of how we regulate public conduct,
23 isn't it?
24 A.  It is.  And as attorneys, I -- as an attorney, speaking
25 for myself, I don't want to put myself in that situation so I

JANA ORTEGA – CROSS

1  am reluctant to assist anyone.

2  Q.  Well, but even though we may be afraid that someone will

3  make an incorrect allegation of stealing, we may nevertheless

4  go into a store, right?

5  A.  Yes, maybe not with a big purse or a big bag because you

6  don't want to put yourself in a position where something can

7  be misinterpreted.

8  Q.  And even though somebody may misinterpret your actions as

9  being thievery, when, in fact, they are not, that doesn't mean

10  that we should roll back restrictions on thievery, right?

11  A.  Perhaps, if your law license is on the line.

12  Q.  And as you say, voting is a particularly important area of

13  public conduct to regulate, right?

14  A.  Yes.

15  Q.  We have to make sure that voters are not being pressured,

16  either by electioneers or by assisters, right?

17  A.  Agreed.

18  Q.  Let's look at Section 7.04, Brian, in Joint Exhibit 1,

19  please.

20      You are familiar with 7.04, right?

21  A.  Could you put it back up, please.

22  Q.  Sorry.  We may not have the actual section number there.

23  Yes, Section 7.04, the vote harvesting section.  Are you

24  familiar with this section?

25  A.  Yes, I have seen this section.

2554
JANA ORTEGA - CROSS

1  Q.  And you are familiar that this creates a -- well, sorry.
2  Strike that.
3      I need to back up for a moment, when we were talking about
4  the penalty of perjury.  As a criminal defense attorney, you
5  are familiar with Penal Code Section 37.02?
6  A.  Can you put that up for me as well?
7  Q.  I'm not sure that I've got that section for you.  I'll
8  represent to you that it says anytime you swear to the truth
9  of a false statement in Texas with the intent to deceive, that
10  it is a crime.  Are you generally familiar with that?
11  A.  Yes.
12  Q.  So, Brian, I'm sorry, can you go back to 6.04.  I'm sorry,
13  Section 6.04 of Joint Exhibit 1.
14      So we're looking at Section 6.04 of SB 1.  If we look down
15  at lines 26 and 27, you can see "I swear or affirm," right?
16  A.  26 and 27, um-hum.
17  Q.  Where did it go.  There it is.
18      Do you see it there?
19  A.  Yes.
20  Q.  Okay.  And you see that the first underlined section in
21  line 26 says "under penalty of perjury," right?
22  A.  Yes.
23  Q.  So previously the law had read "I swear or affirm that,"
24  right?
25  A.  Um-hum.

JANA ORTEGA - CROSS

1  Q.  Is that a yes?

2  A.  Yes.  Yes.

3  Q.  SB 1 added the "under penalty of perjury," right?

4  A.  Um-hum.  Yes.

5  Q.  It's okay.

6  A.  Sorry.

7  Q.  It's hard up there, isn't it?

8  A.  It is very difficult.

9  Q.  So previously a voter assister had to swear that they were

10  doing things right under the law, right?

11  A.  Yes.

12  Q.  And you understand that under Penal Code Section 37.02,

13  swearing that that was true?

14  A.  Yes.

15  Q.  Put you under penalty of perjury, right, and so all SB 1

16  did is make that explicit, right?

17  A.  That appears to be true.

18  Q.  All right.  Has Section 7.04, which is the vote harvesting

19  provision we looked at a moment ago, has that had an affect on

20  MABA Texas?  That's it in front of you.

21  A.  I'm not aware of any direct effect.  I don't recall much

22  discussion with our members on this particular provision.

23  Q.  All right.

24          MR. KERCHER:  Thank you very much for your time,

25  Miss Ortega.

JANA ORTEGA – CROSS

1          THE WITNESS:  Thank you.

2          THE COURT:  Anything else from this side?

3          Any redirect?

4          MISS LONGORIA:  None, Your Honor.

5          THE COURT:  None.

6          You may step down.  Thank you.

7          THE WITNESS:  Thank you.

8          THE COURT:  With that, let's take our lunch break and

9    we'll resume at 1:00.

10       *(Recess)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      *(Change in reporter)*

2      *(1:00 p.m.)*

3              THE COURT:  Thank you.  Please be seated.

4      Your next witness.

5              MR. WATKINS:  Thank you, Your Honor.

6      Mi Familia Vota calls Dean Franita Tolson to the stand.

7              Before we begin, though, Your Honor, we've spoken to the

8      state defendants about this.  In light of the passage of

9      SB1599, MFV is voluntarily dismissing all remaining claims

10     related to SB1 Sections 5.11, 5.12 and 5.14.  And we're also

11     voluntarily dismissing related claims to Section 6.01.

12             To make it easier on the Court, the sections that we're

13     still proceeding on in which Dean Tolson is going to be

14     speaking on are claims under the 14th and 15th Amendment and

15     Section 2 of the Voting Rights Act with respect to

16     Sections 2.05, 2.06 and 2.07, and we're also bringing

17     intentional discrimination claims under the 1st and 14th

18     Amendments, with SB1 challenges to Sections 3.04, 3.09, 3.10,

19     3.12, 3.13, 4.01, 4.07, 4.12, 5.02, 5.03, 5.04, 5.07, 5.08,

20     5.13, 6.03 --

21             THE COURT:  Hold on, going too fast for me.  5.07 to

22     5.08, what was after that?

23             MR. WATKINS:  5.13, Your Honor, 6.03, 6.05, 6.07,

24     7.02, 7.04.  And we're also challenging Sections 6.03, 6.04,

25     6.05, and 6.07 under Section 2.08 of the VAR -- or the VRA,

 1  sorry.

 2      *(The oath was administered)*

 3          THE COURT:  So I'm just going back over my notes.  So

 4  then all your claims under any cause of action for 5.11, 5.12,

 5  5.14 and 6.01, you are not pursuing anymore?

 6          MR. WATKINS:  That is correct, Your Honor.

 7          THE COURT:  Got it.  Okay.

 8          MR. KERCHER:  Your Honor, could we have a ruling that

 9  those claims are, in fact, dismissed?

10          THE COURT:  They are dismissed.

11          FRANITA TOLSON, PLAINTIFFS' WITNESS, SWORN

12                    DIRECT EXAMINATION

13  BY MR. WATKINS:

14  Q.  Dean Tolson, welcome.

15  A.  Thank you.

16  Q.  Could you please state and spell your name for the record.

17  A.  Franita Tolson, F-R-A-N-I-T-A, T-O-L-S-O-N.

18  Q.  Now, the title should give it away, but I'll ask

19  nonetheless.

20      Dean Tolson, what is it that you do for a living?

21  A.  I am interim dean in George E. and Harriet T. -- I always

22  get Harry and George's name mixed up -- Pfleger Chair in Law at

23  USC Gould School of Law.

24  Q.  How long have you been the dean at USC?

25  A.  I've been the interim dean since July, but I was co-dean

Franita Tolson - Direct

1  from April until July of this year.

2  Q.  And do you teach?

3  A.  I do.

4  Q.  And did you teach before you were dean?

5  A.  Yes.

6  Q.  What do you teach?

7  A.  I teach election law; constitutional law, structure;

8  constitutional law of rights, and I also teach an undergraduate

9  course in law and politics.

10  Q.  And where have you taught?

11  A.  I've taught at Northwestern University School of Law,

12  Florida State University College of Law and USC Gould School of

13  Law.

14  Q.  Have you ever been a guest lecturer at any other schools?

15  A.  I've guest lectured at dozens of schools and have

16  workshops, conferences and so on.  So yes.

17  Q.  Any in Texas?

18  A.  Yes.  So I've spoken at Texas A&M.  I've spoken in

19  University of Texas.

20  Q.  Have you ever guest lectured at Harvard?

21  A.  I have.  I've participated in workshops there.

22  Q.  Did you do a clerkship?

23  A.  Yes.

24  Q.  Where did you do your clerkship at?

25  A.  I clerked for Judge Ruben Castillo in the Northern District

Franita Tolson - Direct

 1  of Illinois and Judge Ann Claire Williams on the Seventh

 2  Circuit Court of Appeals.

 3  Q.  And then did you go into academia directly after your

 4  clerkships?

 5  A.  Yes.

 6      *(Court reporter clarification.)*

 7  Q.  You went into academia directly from your clerkships?

 8  A.  Yes.

 9  Q.  And what is the focus of your scholarship?

10  A.  The focus of my scholarship is I look at historical

11  discrimination in the area of voting rights from the founding

12  to the present.

13  Q.  Has any of your scholarship ever focused on the southern

14  United States?

15  A.  Yes, it has.

16  Q.  And why there?

17  A.  The southern United States is differently positioned from

18  the rest of the country because of the history of enslavement.

19  So it's a political system where they had to figure out how to

20  incorporate four million African Americans into their political

21  system.  So things transpired in the South a bit differently

22  from the rest of the country.

23  Q.  In academia, is Texas considered part of the southern

24  United States?

25  A.  Yes, it is.

Franita Tolson - Direct

1  Q.  As a result of this scholarship, how familiar are you with

2  the history of Texas voting laws in the state of Texas?

3  A.  Very familiar.

4  Q.  Have you ever been published?

5  A.  Yes.

6  Q.  We'll get into your report in a little bit, but is there a

7  bibliography included with your report at Page 51?

8  A.  Yes.

9  Q.  Have you ever been published in academic journals or law

10  reviews?

11  A.  Yes.

12  Q.  What are some of those?

13  A.  I've been published in Harvard, Yale, Stanford, Cal --

14  California Law Review, University of Pennsylvania, Notre Dame,

15  Vanderbilt, Florida State.  It runs the gamut.

16  Q.  In the articles that were being published, did they all

17  deal with voter rights or voter discrimination policies?

18  A.  Yes.

19  Q.  Have you published any books?

20  A.  I have a book forthcoming next year on congressional power

21  over voting, and I also am an editor on the Case Book, The Law

22  of Democracy, which is the best-selling election law case book.

23  Q.  Have you ever drafted any legislation or constitutional

24  amendments that deal with voter rights?

25  A.  Yes.  Senator Warren and Senator Durbin asked me to draft a

Franita Tolson - Direct

1  constitutional amendment that would incorporate the right to

2  vote.

3  Q.  Have any of your writings ever been published in mass media

4  outlets or newspapers of national circulation?

5  A.  Yes.  I've written a number of op-eds.  One has been

6  published in the *New York Times*, another in the *L.A. Times* and

7  other outlets as well.

8  Q.  Have you ever been published in the *Wall Street Journal*?

9  A.  I don't think so.

10  Q.  Have you received any awards, chairs or commendations as a

11  result of your scholarship?

12  A.  Yes.  So my chair, the Harriet E. and George T. Pfleger

13  Chair in Law is a recognition of my scholarly productivity.

14  Q.  Have you ever spoken in national media outlets?

15  A.  Yes.

16  Q.  Have you ever gained employment through that, been paid to

17  do that?

18  A.  Yes.  I was a commentator for CNN during the 2020

19  elections.

20  Q.  Have you ever worked with social media outlets in their

21  voting efforts?

22  A.  Yes.  I was a voting rights expert for Facebook for two

23  years.

24  Q.  And what did you do in that role?

25  A.  I helped the platform develop the Voter Information Center.

1  So voters who were looking for information about where their
2  precinct is located, any of the state laws and rules and
3  regulations that applied to them as they tried to vote, they
4  could go to Facebook and find that information.
5      So, for example, if a voter was wondering what types of ID
6  they needed to vote, the Voter Information Center would provide
7  that information.
8  Q.  Did your work on the Facebook voter ID center involve any
9  work with respect to Texas?
10  A.  Texas was one of the states included as a part of the Voter
11  Information Center because it was -- it was every state.
12  Q.  Have you ever testified before under oath?
13  A.  No.
14  Q.  Have you ever testified under oath in Congress before?
15  A.  Oh, yes.  I'm sorry.
16  Q.  It's something you could forget.  I get it.
17      How many times have you testified in Congress?
18  A.  So I testified three times in the House and once in the
19  Senate.
20  Q.  And did your testimony in those settings all involve voter
21  rights and voter discrimination issues?
22  A.  Yes.
23  Q.  Have you ever been retained in other litigations besides
24  this litigation?
25  A.  Yes.

Franita Tolson - Direct

1   Q.   In which -- in which states?

2   A.   So Arizona and Illinois.

3   Q.   In any of the litigations which you've served or any times

4   that you testified before Congress, I understand that people

5   might disagree with your opinions or conclusions, but has

6   anyone ever challenged your qualifications as an expert to

7   speak on the topics you did?

8   A.   No.

9   Q.   Has anyone ever, a judge or a congressional member, ever

10  said that you were not qualified or ruled you as not being

11  qualified to speak --

12  A.   No.

13  Q.   -- as an expert?

14  A.   Sorry.

15  Q.   Does your scholarship ever focus on the reasons or the

16  intent behind a particular voting law?

17  A.   Yes.

18  Q.   How so?

19  A.   So a large part of my scholarship tries to contextualize

20  current voting restrictions by drawing on lessons that we've

21  learned from history.

22       And so oftentimes that requires drawing parallels between

23  the actual text of the law, the impact of the law, but also how

24  the law is presented in the media, things that legislators

25  might say about the law, and sort of drawing -- trying to draw

1  a straight line between sort of things that the state

2  legislatures have done in the past and things that the state

3  legislatures are doing now.  So you look at all of it in order

4  to make that broader conclusion about the context.

5  Q.  And are you being compensated for your work in this case?

6  A.  I am.

7  Q.  Is your compensation contingent or based upon the outcome

8  of this case or your testimony today?

9  A.  No.

10      MR. WATKINS:  Your Honor, at this time we would

11 proffer Dean Tolson as an expert in the areas of election law

12 and the historical and contemporary discrimination of voting

13 practices of Texas and its legislature.

14      THE COURT:  Any response?

15      MR. KERCHER:  Your Honor, we don't object to

16 proffering Dean Tolson as an expert generally in election law.

17 But her testimony is that she has only touched on Texas law as

18 part of her broader scholarship, and we do not accept her as an

19 expert in Texas law.

20      THE COURT:  So you're being tendered as an expert,

21 Dean, in election law and voting practices in Texas.  Your

22 scholarship was generally in the South, but you've interpreted

23 that to include Texas?  Is that what I understood?

24      THE WITNESS:  Yes.  Yes.

25      THE COURT:  She's recognized as an election law expert

 1  and an expert in voting practices in Texas.

 2  BY MR. WATKINS:

 3  Q.  Dean, did you draft a report as part of your work on this

 4  case?

 5  A.  Yes.

 6  Q.  Does your report fairly contain all of your opinions and

 7  analysis in this matter?

 8  A.  Yes.

 9          MR. WATKINS:  Derek, can we show Exhibit HAUL MFV

10  Exhibit 59.

11          MR. KERCHER:  And, Your Honor, I'm sorry.  Before we

12  move forward with this --

13          THE COURT:  One second.

14          MR. WATKINS:  Exhibit 59.

15          MR. KERCHER:  Before we move forward with Dean

16  Tolson's report, I would like to put on the record the same

17  objection that we put on the record with Dr. Tijerina yesterday

18  regarding the relevance of voting history in Texas and in the

19  country prior to the previous fifty years.

20      I won't belabor the point, but on the same basis, we'd make

21  the same objection to the relevance of her report.

22          THE COURT:  Noted and overruled.

23  BY MR. WATKINS:

24  Q.  Dean Tolson, is Exhibit 59, which you see on the screen

25  before you, does this appear to be the report that you

1   submitted as a result of your work on this case?

2   A.  Yes.

3   Q.  And, again, it fairly and accurately contains your opinions

4   and analysis?

5   A.  Yes.

6           MR. WATKINS:  Move to admit Exhibit 59, Your Honor.

7           MR. KERCHER:  Subject to that previous objection, Your

8   Honor, no additional objections.

9           THE COURT:  Objections are noted, overruled.

10      59's admitted.

11      *(Plaintiffs' Exhibit No. 59 admitted)*

12  BY MR. WATKINS:

13  Q.  What were you asked to do, Dean Tolson, with respect to

14  this case?

15  A.  I was asked to put SB1 in historical context by looking at

16  the manner in which Texas has historically discriminated

17  against minority voters and sort of showing how that bears on

18  how SB1 operates today against minority communities.

19  Q.  What steps did you take in order to fulfill that task?

20  A.  So I looked at primary and secondary sources.  Primary

21  sources included newspapers, speeches from lawmakers who were

22  involved in passing restrictive voting laws in the past.

23      I looked at sources from the Texas Historical Society, a

24  number of secondary sources, a lot of case law.  Some of the

25  legislative history of the Voting Rights Act was helpful, too,

Franita Tolson - Direct

1  because it talked about some of the laws that Texas has passed

2  in the past.

3      So just a variety of sources that are common for people who

4  do work in this area.

5  Q.  And so you anticipated my next question.

6      Is the materials that you looked at and the research you

7  conducted, is that consistent with the principles and methods

8  that others in your field might engage in if tasked with a

9  similar job?

10  A.  Yes.

11  Q.  As a result of your research, did you come to any opinions?

12  A.  Yes.

13  Q.  And what were those?

14  A.  So first, I concluded that SB1 is consistent with Texas'

15  history of engaging in discrimination against minority voters.

16      The second conclusion I came to is that SB1 is an example

17  of something I referred to in my report as color-blind

18  targeting, which is the use of facially race-neutral practices

19  to -- laws to single out minority voters based on their voting

20  method.

21      And then the third conclusion I came to was that SB1 was

22  inconsistent with this idea that there was -- that it was

23  passed in order to remedy voter fraud.

24  Q.  Let's walk through each one of those opinions.

25      So your first opinion being that SB1 is consistent with

Franita Tolson - Direct

1   Texas' history of discriminatory voting practices.

2       I first -- before we get into that opinion, I want to ask

3   you, Dean, how is -- how does what happened a hundred years ago

4   have any bearing or impact on your analysis today to conclude

5   the discriminatory intent of the Texas Legislature that was

6   passing SB1?

7   A.  So the reason that the history is important is because it

8   shows a practice or pattern.  And so by showing the pattern, we

9   have a better understanding of how SB1 actually operates

10  because the state legislature often draws on lessons of the

11  past and looks for techniques that were useful in

12  disenfranchising individuals historically, and they use that as

13  a basis to determine what laws they can pass now.

14      So the law might evolve, but the idea is to mimic the

15  effect of prior practices.  So if you look at the pattern, it

16  really does put a new regulation in historical context.

17  Q.  Now, to be clear, Dean, are you imputing the intent of

18  Texas Legislature that was sitting in 1910 on the Texas

19  Legislature that was sitting when SB1 was passed?

20  A.  No.

21  Q.  So what are you doing?

22  A.  I'm trying to show that SB1 was not passed in a vacuum.

23  Q.  Do you know what "reconstruction" is?

24  A.  Yes.

25  Q.  What's "reconstruction"?

Franita Tolson - Direct

1  A.  So reconstruction is the period after the Civil War in

2  which the federal government was very aggressive about passing

3  a number of laws and reconstruction amendments, constitutional

4  amendments, that -- the 15th Amendment in particular

5  enfranchised African-American men.

6      And so reconstruction was a period in which the political

7  systems in the South were fundamentally remade in order to

8  incorporate African-Americans into these systems as voters and

9  officeholders.

10 Q.  In academia is reconstruction generally bookmarked around

11 the end of the Civil War to around 1876?

12 A.  Usually.  1876, 1877.

13 Q.  What was the landscape like for minority voters -- and it

14 sounds like it would be black men specifically -- in or around

15 that period from the Civil War to around 1876, 1877?

16 A.  Very high political participation.  They had -- in some

17 areas, they had over 80 percent registration -- I'm sorry --

18 turnout because they were incredibly politically active.

19     But it was also in the face of massive resistance across

20 the South.  And Texas was really no different during this

21 period.  So African-American men, they were politically active,

22 but they faced resistance from white Democrats.

23     And because of this, reconstruction was relatively

24 short-lived.  In fact, in Texas in 1873 the Democrats were able

25 to come back into power, and they almost immediately started

1  passing laws to restrict black voting rights.

2  Q.  What were some of the -- do you have any examples of laws

3  that the Texas Legislature began passing right around the

4  reconstruction period?

5  A.  Sure.

6      *(Emergency broadcast notification on multiple phones)*

7          THE COURT:  That's all right.  Let's take a break for

8  a moment and just let this -- I thought this was going to

9  happen at 2:00, but it's evidently happening earlier.

10     *(Discussion off the record)*

11         THE COURT:  Okay.

12         MR. WATKINS:  May I continue, Your Honor?

13 BY MR. WATKINS:

14 Q.  Professor, let me ask the question again.

15     Can you give us some examples of laws that were passed by

16 the Texas Legislature in or around the post-reconstruction era?

17 A.  Okay.  So first, let me say, I think it's important to

18 understand that what you get during this time is a mix of

19 centralized and decentralized voting restrictions.  So -- and

20 part of this is a reflection of the fact that there wasn't a

21 consensus among white voters who leaned Democratic or were

22 Democratic about the best way to disenfranchise.  So statewide,

23 when Texas amended its state Constitution in 1876 --

24 Q.  Go ahead.

25 A.  -- they added a felon disenfranchisement provision.

Franita Tolson - Direct

```
 1  Q.  And what's that felon disenfranchisement provision?
 2  A.  So it disenfranchises anyone who commits any felony.
 3  That's the language of the Texas disenfranchisement provision,
 4  felony disenfranchisement provision.
 5      But the state legislature retained for itself the power to
 6  remove certain felonies from that list, and the understanding
 7  was that enforcement discretion on the ground meant that, you
 8  know, certain laws that they thought African-Americans were
 9  more likely to commit, they would keep on the list.  But then
10  laws that they thought that white people were more likely to
11  commit, they would take off the list.
12      And then African-Americans were subsequently arrested for
13  things like vagrancy and, you know, and this led to huge
14  numbers being disenfranchised.  Also, during this time poll --
15  Q.  Can you -- can you give me another example of a law that
16  was around that time?
17  A.  Sure.  Sure.  So the poll tax was common in south and east
18  Texas.  So Latinos, in particular, were especially harmed by
19  the poll tax because their employers would pay the poll tax for
20  them but demanded they vote for the Democratic candidate.  And
21  if they didn't, they faced the risk of bodily harm or they
22  could lose their jobs or their housing.
23      So the poll tax was -- it wasn't a statewide law, but it
24  was common in those areas and used to control the voting power
25  of the Latino population.
```

Franita Tolson - Direct

 1  Q.  Is there any other examples of laws in the Civil War to
 2  1876 period that was prevalent in Texas?
 3  A.  So leading into, like, immediately, like, post-1877, going
 4  into the early 1880s, you start to see more localized
 5  restrictions.
 6      So, for example, towards the tail end of the 1870s, the
 7  state legislature passed a law -- well, passed charters for
 8  Dallas and Houston that required them to have a mayor or
 9  alderman who were property owners.  So that essentially limited
10  the field of potential officeholders to white men.
11      Then --
12  Q.  Why is that?
13  A.  Well, most of the property owners in Texas at the time were
14  white people.
15      So leading into the 1880s, the restrictions became even
16  more numerous.
17  Q.  So let's do that.  Let's move into, say, 1880 to the 1890s.
18  A.  Okay.
19  Q.  What did the political landscape look like for minority
20  voters then, so past reconstruction?
21  A.  Okay.  So you have a number of restrictions that were
22  passed, really in response to the increase in political
23  competition.
24      As the Republicans became less active in the 1870s and
25  1880s, there was a growing populous movement, and this populous

Franita Tolson - Direct

1  movement was willing to build coalitions with black voters.  So

2  even though the Republican Party was waning in strength, black

3  voters were basically building coalitions with third-party

4  movements in order to exercise their political power.  The

5  response was more restrictions.

6      So a lot of the restrictions in the 1880s and 1890s were

7  targeted towards big urban areas, and part of it was just this

8  understanding that it was easier to capture the black people

9  who lived in those urban areas.  And also, there were white

10 people who lived in those areas that were less beholden to the

11 Democratic Party, right?

12     So the idea was to prevent the types of coalitions that

13 could threaten the Democratic Party between -- coalitions

14 between black voters and poor white voters.

15     So some of these restrictions included voter registration

16 provisions.  They included the Australian ballot, which is a

17 requirement that a voter cast their ballot in private and only

18 by themselves.  And then you have another restriction on voter

19 assistance.  All right.  So --

20 Q.  Let me -- let me break that up a little bit.

21 A.  Yes.

22 Q.  How was voter registration provisions from the 1880s to

23 1890s, how is that indicative of discriminatory actions in that

24 time frame?

25 A.  Right.  We take voter registration for granted today

Franita Tolson - Direct

 1  because everybody's used to some form of voter registration

 2  system.  But even to use contemporaneous terms, there's a big

 3  difference between same-day voter registration and having to

 4  register 30 days out, right?

 5      The idea is that you craft a registration regime that

 6  almost ensures that people will either forget to register or

 7  maybe you'll ask for information that they don't necessarily

 8  have.

 9      In some instances, black men lived in houses with no

10  numbers, on streets with no names, in many places across the

11  South.  And so if you asked them for their address in order to

12  register to vote, that information literally doesn't exist.

13      So you can have a voter registration regime that is

14  actually quite effective that suppresses a vote, and that's

15  what we saw across Texas in the 1880s and 1890s.

16  Q.  What about voter challenges?  What do you mean by that?

17  A.  So you can challenge voters at the polls.  And the reason

18  that that is effective is because it's -- you know, it was

19  mostly targeted at African-American and Latino voters.  It

20  wasn't -- voter challenges have historically been used in a

21  racially disproportionate manner.

22      A lot of times these laws are written in somewhat facially

23  neutral ways, the ability to challenge a voter.  But in

24  practice, they were applied in a richly disparate way.  So they

25  were quite effective in the 1880s and 1890s, particularly in

Franita Tolson - Direct

1  big cities, in keeping people away from the polls.
2  Q.  To the extent you know, Dean, what would be the challenges
3  that someone would allege against a voter in that time frame,
4  and who is the person doing the challenging?
5  A.  So it can vary, of course.  But oftentimes, you may have a
6  white voter who challenges someone on the basis of citizenship.
7  That person is a noncitizen and, therefore, unable to vote.
8      They may challenge an African-American, and oftentimes they
9  didn't give a reason, right?  So this is why the regime was
10 particularly discriminatory, the ability to challenge voters.
11 Q.  And they would -- they would challenge a black man from
12 voting without a justification, and that'd be accepted?
13 A.  From time to time, yes.
14 Q.  And then you talked about the Australian ballot.
15     Could you explain that a little bit in the 1880s to 1890s
16 context?
17 A.  So the Australian ballot is the requirement that a voter
18 mark their ballot themselves in private.  And they do it on a
19 ballot -- on a ballot that is provided by the state.
20     So prior to this system, oftentimes, political parties
21 would provide ballots, they might be colorful to identify who a
22 person is supporting, that type of thing.  Things became more
23 standardized after the Australian ballot was adopted.
24     But the problem is that there were high illiteracy rates at
25 the time.  So in many instances, voters had difficulty actually

Franita Tolson - Direct

 1  being able to read the ballot, especially if they were
 2  non-English speakers.
 3      And so the Australian ballot really has to be understood in
 4  the context of also the ban on voter assistance, right?  If you
 5  can't -- if no one can assist you in filling out the ballot,
 6  then you have a very difficult time actually filling out the
 7  ballot.  And really that was the point.
 8  Q.  So from the 1880s to 1890s, was it more typical that a
 9  white man might know how to read, whereas a Hispanic man or a
10  black man may not know how to read?
11  A.  The -- I'll put it this way.  It is more typical that a
12  white male would get help and a black man or a Latino man would
13  not get help.  A lot of these regimes depended on enforcement
14  discretion.
15  Q.  At the local level?
16  A.  At the local level.
17  Q.  Fast-forwarding to the early 20th century to around, say,
18  the 1950s or so, so about a fifty-year spread there, Dean,
19  what did the political landscape look like for minority voters
20  at that time in Texas?
21  A.  Okay.  So coming into the 1950s, we're essentially living
22  in a world where statewide voter restrictions, passed in 1902,
23  1903, 1905, dictate the political structure, so the all-white
24  Democratic primary.  The poll tax is now statewide.  Prior to
25  the turn of the 20th century, it was not statewide.  The

Franita Tolson - Direct

1    prohibitions on voter assistance and the Australian ballot are
2    now statewide, right?

3         So these are all restrictions that, at the turn of the
4    century, the state legislature has now applied statewide.

5         And part of the reason is that in the 30 years leading up
6    to the adoption of these statewide restrictions, it really was
7    a battle where they were trying to figure out how to
8    disenfranchise people of color but not capture too many white
9    voters, right?

10        They didn't want to harm their constituency.  They wanted
11   to kind of isolate minorities.  And so they did that piecemeal.
12   This is why you have restrictions that targeted cities of
13   10,000 people or more and targeted more urban areas.  So you
14   saw a lot of restrictions in Dallas, Houston, Galveston, cities
15   like that.

16        Rural areas, you tended to see more violence, more
17   intimidation, a lot of fraud.  But by the turn of the century,
18   you have a situation where they have essentially purged the
19   electorate of most of the minority voters.  So passing these
20   restrictions statewide freezes in place the status quo.  And
21   this is what we have leading into later into the 20th century.

22        So there are some challenges, right?  So the all-white
23   Democratic primary was challenged over the course of three
24   decades, so 1920s, '30s and '40s.  By the time we get to
25   1953, the Supreme Court has finally invalidated the all-white

1    primary in its final form.

2    Q.  Now, Dean Tolson, I can guess by the name --

3    A.  Yes.

4    Q.  -- but just for clarity of the record, what is the

5    all-white primary?

6    A.  So the all-white primary is -- so the Democratic primary

7    barred African-Americans from being able to vote in the

8    primary.

9        The problem is that it was the only primary that mattered

10   in the South.  The Republicans were not competitive.  And so

11   being able to participate in the Democratic primary was the way

12   in which political power was exercised.  If African-Americans

13   cannot participate in that primary, then they have no political

14   power.

15   Q.  And just so I'm clear, that is the Democratic Party doing

16   something which would be discriminatory?

17   A.  Yes.  So the Democratic Party had an all-white primary.

18   Keep in mind, whoever won the primary went on to win the

19   General Election.  This is why the primary was dispositive of

20   whoever will hold that office.

21   Q.  And it sounded like, as we've talked now from the Civil War

22   up to about the 1950s, there's been times that the Republican

23   Party has done things that, in your estimation, would be

24   discriminatory.  Is that fair?

25   A.  Yes.

Franita Tolson - Direct

1  Q.  How do we know that voting legislation, like SB1, is not a

2  partisan issue but a race issue?

3  A.  Because it's not necessary -- the focus on party is a bit

4  of a -- it's a bit misguided.

5      The core issue is the fact that people of color tend to

6  prefer different candidates than white voters.  You can attach

7  a party label to it, but fundamentally, that's what's going on,

8  right?  Minorities tend to overwhelmingly vote Democratic.

9  Latinos are a bit more mixed, but still a majority of them tend

10 to support the Democratic Party.  White voters tend to support

11 the Republican Party.

12     Are there people from those demographics that support, you

13 know, either/or?  Yes.

14     But fundamentally, the issue is that because they prefer

15 different candidates, it's not really about party.  It's about

16 the fact that white people and people of color tend to have

17 different political preferences.  And in the competition for

18 scarce resources, the people in the majority have every

19 incentive to try to keep down the people in the minority so

20 that they don't have to share those resources.

21 Q.  I want to pull on that thread a little bit.

22     So you've got the majority trying to stay in power, putting

23 in rules that keep the minority from not coming into power.

24 How does the majority, which is majority white, pass laws and

25 legislation in Texas that will disenfranchise minority voters

Franita Tolson - Direct

1  while at the same time not losing out on desirable white

2  voters, say, the poor white voter that might side with minority

3  voters?

4  A.  So in my report, I framed this in terms of color-blind

5  targeting because post-1900, you start to see facially

6  race-neutral laws that target minority populations based on

7  their voting method, right?  So -- and there were, of course,

8  instances of this prior to the 20th century.

9      But for me, it's a framework for thinking through when the

10 government can discriminate without being facially

11 discriminatory about it.  And I find it a very effective way of

12 thinking about this for a couple reasons.

13     Because if you look at over the course of Texas history,

14 there are a few times where there are certain factors that,

15 when they are present, you can comfortably say the state is

16 probably trying to be discriminatory.

17 Q.  And what are those factors?

18 A.  So timing, geography and voting method.

19 Q.  What do you mean by "timing"?

20 A.  So timing is a reference to the fact that if you have an

21 election cycle in which minorities have been especially

22 politically active or if the minority population has grown or

23 if the majority feels that the minority is some sort of threat

24 to their power after a particularly contentious election cycle,

25 after that, what tends to follow are more voting restrictions.

Franita Tolson - Direct

1  Q.  And so, Professor, I think we've gotten up to about the
2  1950s or '60s here.
3      Looking, say, the 1960s to 1970s, that sort of time frame,
4  are there any examples that you could give historically to show
5  what the landscape was like for minority voters during that
6  timeframe?
7  A.  Uh-huh.  So in the 1960s and 1970s, this is middle of the
8  Civil Rights Act.  And so Texas, as in many southern states,
9  has -- they have to pivot and try to figure out how to deal
10 with federal intervention, how to deal with a different
11 constitutional landscape.
12     So you have the 24th Amendment, for example, which barred
13 the poll tax for federal elections.  1966, the Supreme Court
14 comes in and invalidates the poll tax as it applies to state
15 elections.
16     Texas is one of the few states that still had a poll tax
17 for state elections.  Right?  So -- and it was a way in which
18 they were able to effectively keep a lot of minorities out of
19 the electorate.
20     Interestingly enough, in the early 1970s, Texas passes a
21 law that requires everyone to reregister by the 1976 election.
22 So essentially it's a purge, right?  They purge everybody from
23 the voter rolls.  You have to reregister by 1976.
24     The federal court that struck that down noted that they
25 were trying to mimic the effects of the poll tax, right?  It

Franita Tolson - Direct

 1  was just a way of -- it was an evolution of sorts.  It was just

 2  a way of trying to be discriminatory in a new way, but mimic

 3  the effects of the old practice.

 4  Q.  Is that an --

 5          THE COURT:  I'm sorry.  Dean, is that court order

 6  referenced in your report?

 7          THE WITNESS:  Yes, it is.

 8          THE COURT:  Thank you.

 9  BY MR. WATKINS:

10  Q.  Dean, is that an example of history of one legislature in

11  Texas informing the actions of a next -- of the next or a

12  future legislature in Texas?

13  A.  No.  It's just showing a pattern.

14  Q.  So speaking of timing, is there anything about SB1, in your

15  analysis of SB1, that goes to the timing element of color-blind

16  targeting, in your estimation?

17  A.  So the 2020 election was a time in which you had high

18  minority registration and participation.  So SB1 is not

19  surprising in the sense that it follows on this pattern, right?

20  Anytime you have an election cycle in which minorities are

21  highly active, then restrictions tend to follow.

22      And, in fact, in Texas, you have a decade of minority

23  population growth, right?  So that in itself could be a trigger

24  because most of the population growth, I think only five

25  percent of it was among white people, and the rest of it was

Franita Tolson - Direct

```
 1  minority communities, Latinos, African-American and Asian.
 2  Q.  So you, Dean, see a connection or an analogous situation
 3  from timing issues historically where voter restriction laws
 4  were getting put in place in Texas and SB1.  Is that fair?
 5  A.  Yes.
 6          MR. KERCHER:  Objection, leading.
 7          THE COURT:  Sustained.
 8          MR. KERCHER:  Move to strike, Your Honor.
 9          THE COURT:  Sustained.
10  BY MR. WATKINS:
11  Q.  Professor, do you draw any conclusions between the timing
12  issues in SB1 and historical timing elements that you've seen
13  in Texas?
14  A.  Yes.
15  Q.  And what is that?
16  A.  So, you know, the voter reregistration and -- purge and
17  reregistration was a response to increased activism following
18  the adoption of the 1965 Voting Rights Act among minority
19  voters.  And so it created more competition and, therefore,
20  more voting restrictions.
21      But even if you go back further, you see a similar pattern.
22  So in 1891, the State of --
23          THE COURT:  If we just slow down a little bit.
24          THE WITNESS:  Oh, I'm sorry.
25          THE COURT:  The court reporter's being, I think,
```

Franita Tolson - Direct

1    really kind, but you're going too fast for him.

2         THE WITNESS:  Sorry.

3      So if we go back a little bit further, 1891, the state

4    legislature passed a law that required cities of 10,000 people

5    or more to adopt the voter registration system.  But 1891

6    wasn't the first time that it was proposed.  It was first

7    proposed in 1887 in a kind of language the voters didn't really

8    go for.  The state legislature kind of let it go.

9      But in 1891, you had a very contentious mayoral election in

10   Dallas.  And so after the Democratic candidate lost that

11   election, the Democratic leaders in Dallas advocated before the

12   state legislature that they dig that law up and get it passed,

13   and they did.

14     So it's an example of a very contentious election cycle.

15   The incumbent in that race was able to stay into office -- stay

16   in office because of the support of African-Americans.  And so

17   it's another example of not only a contentious election, but

18   one in which minorities were very active.

19   BY MR. WATKINS:

20   Q.  And do you see a similar example in SB1?

21   A.  So SB1 is very similar in terms of having that timing

22   issue, right?  Minorities very active in the 2020 election.  In

23   fact, Latinos, their turnout increased by ten percent over

24   2016, right?

25       So incredibly active, incredible minority population growth

Franita Tolson - Direct

1  in terms of voters, and more restrictions followed.

2  Q.  Just so we can finish this off, I think we got up to the

3  1970s, Professor.

4      Can you help us understand what the voting landscape looks

5  like for minorities in Texas from, say, 1980 to present, up

6  until the passage of SB1?

7  A.  Okay.  So one last thing about the 1970s, though.

8  Q.  Please.

9  A.  Because, I mean -- so the Supreme Court, there's a case

10  called *White v. Regester* that the Supreme Court resolved.

11      And one of the reasons why it's notable is because the

12  Supreme Court rarely -- you know, it's rare to see a decision

13  like this.  But *White v. Regester* involved multimember

14  districts in Dallas and Bexar County, and the Supreme Court

15  found that they actually violated the 14th Amendment, and this

16  was in the mid-1970s.

17      So it wasn't just, you know, the rules around voter

18  registration and voter qualifications.  It was also the

19  redistricting plans.  And, in fact, there have been numerous

20  challenges to Texas' redistricting plans over the decades.

21      From 1982 -- now we're in the 1980s -- to 2006, Texas had

22  more Section 2 and Section 5 violations than any state in the

23  country.  Right?

24      So everything we're seeing up to the 1980s is just -- it's

25  just carrying over, right?  It's unbroken.

Franita Tolson - Direct

 1  BY MR. WATKINS:
 2  Q.  Dean, let me ask you a question here.
 3      Based off of that time frame that you said Texas had more
 4  Section 2 and Section --
 5  A.  5.
 6  Q.  -- 5 violations than any other state, would a Texas
 7  legislator in their 30s or 40s have been around for the
 8  time that Texas was having more Section 2 and Section 5
 9  violations than any other state?
10  A.  Yes.
11  Q.  So we've talked about the timing issues with respect to
12  color-blind targeting.
13      What are the other two areas that you look at in your
14  color-blind targeting analysis to see if a state is being
15  discriminatory in its legislative practices?
16  A.  Geography and voting method.
17  Q.  And what is "geography," and what is "voting method"?
18  A.  So one of the ways in which color-blind targeting and the
19  use of facially race-neutral restrictions, the reason why it's
20  so effective is because you can single out minority populations
21  based on where they live.
22      So historically, it's not a coincidence that they singled
23  out cities of 10,000 or more people for some of these
24  restrictions.
25  Q.  And why is that?

Franita Tolson - Direct

1  A.  Because they had large minority populations in those urban

2  centers, and you see it -- and, really, that technique carries

3  into modern day as well.

4  Q.  And you've talked about geography.

5     What about in terms of voting method?  What does that mean?

6  A.  So voting method, so either the legislature isolates those

7  voting practices that were disproportionately used by minority

8  populations to cast a ballot, and they'll isolate that for

9  regulation, or they'll use tried-and-true methods in order to

10 suppress the vote.  So voter registration, poll taxes,

11 reregistration laws, things of that nature have been commonly

12 used.

13    Now, it has evolved to really focusing on, you know, which

14 voting method has a minority disproportionately used in the

15 last election?

16    2020, it was fairly easy, right?  In some areas, minority

17 voters started to use vote-by-mail at a higher rate than white

18 voters.  So that made that an easy target for some

19 legislatures.

20    Another example is the driveby -- the drive-through vote

21 and the 24-hour voting at issue in this case, right?  These

22 were -- these were methods that were adopted by

23 majority-minority counties and disproportionately used by

24 people of color.

25 Q.  So to be clear, Dean, you're saying that -- well, strike

Franita Tolson - Direct

 1  that.

 2      How does drive-through voting and early voting factor into

 3  your geography and voting method analysis?

 4  A.  So as I mentioned, Texas experienced explosive population

 5  growth.  And that's going to put tension on any voting system,

 6  right?  So -- because you have to figure out how to get

 7  these -- incorporate these new voters into the system and make

 8  sure that they can turn out and vote.

 9      So some counties adopted measures that would make voting

10  easier.  Harris County, in particular, adopted a number of

11  measures to try to make voting easier, including drop-boxes,

12  24-hour voting and drive-through voting.  And the idea was that

13  by making voting more accessible, then they can ease some of

14  the tension on the system that might come from people using

15  traditional early voting or in-person election day voting.

16  Q.  So, Dean, do you see any analogue between SB1's prohibition

17  of drive-through voting, early voting, drop-boxes, with

18  historical precedent in the state of Texas?

19  A.  Yes.  So as I've mentioned, the tactics in the 1890s about

20  using certain voting methods to suppress the vote and targeting

21  it to particular geographic areas is a historical analogue to

22  what the legislature did in the SB1.

23  Q.  Have you read SB1 and reviewed SB1?

24  A.  Yes.

25  Q.  Are there any provisions of the SB1 -- this is my term --

Franita Tolson - Direct

1  that are good or not offensive?

2  A.  Yes.

3  Q.  Is it, in your historical study, typical that a voting

4  regime might have some provisions that aren't per se

5  discriminatory and others that are?

6  A.  Absolutely.

7  Q.  Does the fact that SB1 may or may not have non-offensive

8  provisions change your analysis at all as to whether or not SB1

9  itself is discriminatory?

10 A.  No.

11 Q.  And why is that?

12 A.  Well, it's not uncommon for a legislature to include

13 provisions that fix some things.  You actually see that across

14 a number of laws that one would consider suppressive of the

15 vote.

16      But I do think that if one thinks about -- and this is why

17 the context is important.  If one thinks about what was

18 happening in the 2020 election, right, so you had long lines,

19 you had broken machines, you had not enough polling places,

20 particularly in minority communities, SB1 doesn't really

21 address any of the problems that we saw crop up in the 2020

22 election.

23      It's very unusual, to say the least, to pass a law that

24 doesn't address any actual problems.

25 Q.  Dean Tolson, what about the argument that there's SB1 or

Franita Tolson - Direct

1  any law for that matter that an enforcement arm of the

2  government may or may not actually be enforcing?  If a state

3  decides not to enforce a law that it passed, does that impact

4  your analysis of whether the law itself is constitutional or

5  discriminatory?

6  A.  No.

7  Q.  Why is that?

8  A.  Because that's just strange.  Why pass a law if you're not

9  going to enforce it, first of all.  But even more poignantly,

10  if I'm being sued over a law, I probably wouldn't enforce it

11  until the litigation ends.

12  Q.  So you've talked about drive-through voting, early voting,

13  drop-boxes.

14     Are you familiar with the voter purge provisions of SB1?

15  A.  Yes.

16  Q.  Do you see a historical analogue at all to the voter purges

17  in SB1 with anything that's happened in Texas' past?

18  A.  So let's just -- as a general matter, voter purges tend to

19  be very, like, not precise, right?  So it's always going to

20  capture some lawful voters.  It's going to mess up names.  It's

21  going to purge people with, you know, some assumption that they

22  are not citizens, but they're actually naturalized citizens.

23     And so they already are problematic to some extent.  We

24  recognize that.  We recognize also a need to keep the voter

25  rolls current, right?

1    But because they are imprecise, that means that they are a
2  great tool that can be used to disenfranchise people,
3  particularly if you do them often.
4    And so, historically, this is why, in the 1970s, the purge
5  of the voters and the reregistration regime raised so many red
6  flags, because, first of all, you're going to -- you're purging
7  everybody, but the reregistration, a lot of -- a lot of voters
8  won't remember, won't know that they've been purged, right?
9    So anytime you have a system where people are being purged,
10  you always run the risk of capturing too many people.  And if
11  you do it often, that's going repeat itself.  So historically,
12  in Texas, as well as most states in the South, purges have been
13  used because they're effective in doing that.
14    And, in fact, to give you a recent example, the Attorney
15  General threatened to purge 98,000 noncitizens from the rolls
16  in 2019.  Now --
17  Q.  The Attorney General of Texas?
18  A.  The Attorney General of Texas.
19    And this followed the 2018 election in which you had
20  historic Latino turnout.  So the federal court kept them from
21  doing that, but it is important to know that most of the voters
22  on that list were naturalized citizens.
23    So just an example of how problematic voter purges are and
24  have been in the state.
25  Q.  Do you take any issue with the voter assistance provisions

Franita Tolson - Direct

 1  of SB1, the requirement of a voter assistant to take an oath?

 2  A.  I do.  Because I think the context is important, right?

 3  Bans on voter assistants have often come with, you know -- they

 4  went hand-in-hand with Australian ballot provision, right?  So

 5  the Australian ballot provision was very effective in

 6  suppressing the vote, in part, because there were high

 7  illiteracy rates, and so people had a difficult time filling

 8  out the ballot.  And then you have a ban on being able to

 9  assist those voters.  Effectively, those voters cannot vote.

10      And so here, not only is, you know, this history important,

11  but it also raises the question of who will take the risk of

12  assisting somebody if they face a risk of criminal penalties.

13  And, you know, it's really in the context, too, of a fairly

14  complex system in which someone might not understand fully

15  their exposure, and so they may just decline to do it.  And so

16  a voter who needs help won't actually get the help that they

17  need.

18  Q.  Do you take any issue with the absentee ballot provisions

19  in SB1 on rejecting an absentee ballot or only accepting it

20  under certain circumstances?

21  A.  I do.  So the problem I have with the absentee ballot

22  provisions is that it requests information that a voter may or

23  may not have, right?

24      So if a voter registered to vote one cycle ago, two cycles

25  ago, three cycles ago, they may not remember if they used their

Franita Tolson - Direct

1    Social Security number or their driver's license number, and so
2    I think it generates a lot of confusion.  And it's very
3    reminiscent of efforts in the past to generate similar
4    confusion.
5        For example, one of the instances I pointed to was voter
6    registration, they often requested information that voters did
7    not necessarily have.  It reminds me of that, right?
8    Requesting information that voters may not have, may not
9    remember, is not easily accessible, is a way of generating
10   confusion and discouraging people from participating at all.
11   Q.  Dean, something that your testimony has struck me on, we've
12   talked a lot about the legislature making laws, but then giving
13   it -- local control to election officials at the local level.
14       Is it fair to say that SB1 continues that or changes it
15   such that it's taken away some of that control from local
16   election officials?
17   A.  SB1 takes away control from local officials, in part, I
18   think because local officials are creating a more inclusive
19   electorate than the state would like.
20       And if you look historically, the mix of centralized and
21   decentralized restrictions, it has kind of worked like that,
22   right?  So you'll have decentralized restrictions when people
23   at the state level can't agree on how to pass a state law that
24   can achieve enough suppression.  And then once a certain level
25   is reached, you'll have a state law that kind of freezes in

Franita Tolson - Direct

 1  place the status quo.

 2      So because there's a disagreement between people at the

 3  state level and local officials, it's not weird that you have

 4  the state imposing its will on these local officials.  Whereas,

 5  before, I think the reverse was true, right?  Local discretion

 6  was key to ensuring that there were exceptions made for poor

 7  white voters who supported the Democratic Party and, for

 8  example, couldn't pay a poll tax, even though it was a

 9  statewide regulation.  So there was more cooperation, and it's

10  easier to have that when you have a one-party state.

11      So we're really talking about Democrats at the state level

12  having a disagreement how to best suppress the minority vote

13  but in agreement with the overall goal of suppressing the

14  minority vote, delegating discretion to local enforcement so

15  that they can use their judgment to facilitate that goal.

16      Whereas, now, you have a competitive two-party system where

17  there isn't that agreement, and so the state is imposing its

18  will on these local jurisdictions.

19  Q.  Dean, I think that's a nice segue into poll watchers.

20      Are you familiar with SB1's restrictions or, I should say,

21  non-restrictions on poll watchers and election officials?

22  A.  Yes.

23  Q.  Is there a historical analogue to that?

24  A.  Yes.  So poll watchers have -- the historical context for

25  poll watchers is also one that involves intimidation.

Franita Tolson - Direct

1    Sometimes it leads to violence.  And so I think that context is
2    important for understanding SB1 because I think if you read it,
3    one might assume that the poll watcher is kind of like a benign
4    overseer.  But historically, that just hasn't been the case.

5        So, for example, in the 2020 election, there were a number
6    of reports from black and Latino voters complaining about
7    intimidation at the polls.  But even if you go further back,
8    poll watchers are responsible for intimidating voters in a
9    number of critical elections throughout Texas history.

10        So in the 1880s in Harrison County, which is -- was a
11    majority black county at the time, black voters were
12    intimidated from voting, and this led to federal oversight in
13    the county.  1899, Grimes County, black voters were intimidated
14    by people watching the polls and turning them away.

15        So there's just this history of poll watchers not being
16    neutral overseers of election practices in a way that raises
17    concerns about this provision in SB1, especially in light of
18    what happened in the 2020 election.
19    Q.  So, Professor, we've talked about historical examples in
20    Texas.  We've talked about color-blind targeting and how
21    there's an analogue between historical precedent and what we
22    see in SB1.

23        I want to talk a little bit now about your third opinion,
24    which is the voter fraud issue.  Okay?

25        Does the Texas Legislature have a legitimate interest in

1  curbing voter fraud?

2  A.  Yes.

3  Q.  Does Texas historically have a problem with conducting

4  fraudulent elections?

5  A.  Yes.

6  Q.  Such as?

7  A.  So there were a number of elections throughout the 19th

8  century where it involved ballot box stuffing, in addition to

9  voter intimidation, violence and restrictive voting laws.

10     The 1880 election in Harrison County is an example.

11  Probably a famous example from that time period was the 1896

12  election because you had a populous candidate for governor, and

13  that person went against a Democratic candidate.  So the

14  populous party and the black Republican voters were able to

15  form a coalition.  But the Democratic candidate won by

16  significant margins, and the fraud was quite widespread in that

17  election.

18     So there are a number of elections, even in the 20th

19  century, that involves ballot box stuffing and fraud and dead

20  people voting and all of those things.

21  Q.  In those examples -- and, again, forgive me for imprecise

22  language here -- who is the victim?  Or who is the -- whose

23  vote is being fraudulently tampered with?  Is it majority

24  voters or minority voters?

25  A.  It's minority voters, particularly African-Americans, but

1  also Latinos.

2      So anytime an employer pays the poll tax of a Latino voter

3  and tells them who to vote for, they're disenfranchised, right?

4  So they're casting a ballot.  They're going through the

5  motions.  But they're not actually exercising their judgment

6  about who to vote for, right?  So it's always black and brown

7  voters who tend to be harmed by these fraudulent measures.

8  Q.  Is the argument that Texas needs to pass certain laws in

9  order to stop voter fraud, is that a new argument?

10 A.  No.

11 Q.  Has the Texas Legislature made that argument before, as far

12 as you're aware?

13 A.  Many times.

14 Q.  So to the extent voter fraud has occurred, it's impacted

15 minority, not majority voters.  Is that your testimony?

16 A.  Yes.

17 Q.  Does the provisions in SB1 that we've discussed,

18 drive-through voting, ballot boxes, et cetera, do those address

19 or remedy the historical examples of actual voter fraud that

20 you've seen?

21 A.  No.

22 Q.  How come?

23 A.  Well, so the provisions in SB1 aren't designed to get at

24 the kind of in-person voter fraud that was pervasive in --

25 historically.

Franita Tolson - Direct

1      Fraud now tends to be, you know, people making false

2  statements on voter applications or a third party filling out a

3  ballot for someone.  Not assisting.  That's different, right?

4  Like, perhaps there's, you know, a child helping their

5  grandmother or something like that, right?

6      So this isn't -- and SB1 isn't really designed to get at

7  those things per se.  Like, it's -- it's taking away 24-hour

8  voting, taking away drive-through voting.  That's not designed

9  to get at any particular concerns about fraud, or actual fraud.

10 Q.  So then, Dean, are you able to draw any conclusions if the

11 actual fraud that has historically been seen is not addressed

12 by SB1, but the Texas Legislature is saying that it's passing

13 legislation to address fraud, are you able to draw any

14 conclusions as to why the Texas Legislature might have passed

15 SB1?

16 A.  So if you look at the full context, right, if you look at

17 the 2020 election, if you look at the problems that actually

18 came up in the context of that election, if you look at the

19 voting patterns of minority voters, if you look at -- if you

20 look at the voting methods that they prefer, it looks like SB1

21 was passed in order to curb minority voting because it targets

22 the methods that they were more likely to use, and it targets

23 the geographic areas that they were a majority in.

24     So it looks tailored towards harming that demographic.

25         MR. WATKINS:  Thank you, Dean.

Franita Tolson - Cross

```
 1        I'll pass the witness.
 2             THE COURT:  Anything else from this side?
 3        Any cross?
 4                      CROSS-EXAMINATION
 5   BY MR. KERCHER:
 6   Q.  Good afternoon, Dean Tolson.
 7   A.  Good afternoon.
 8   Q.  Thanks for bearing with us through our federal phone check.
 9   You're a champion for doing that.
10        My name is Ryan Kercher.  I work with the Texas Attorney
11   General's office.
12        You started your testimony today and, indeed, your expert
13   report by saying that you were retained in this case in order
14   to help contextualize historically SB1; is that right?
15   A.  Yes.
16   Q.  Let's start, I hope, with some things that you and I agree
17   on.  It may get touchier later on, but let's start with the
18   easy stuff.  Okay?
19        Now, you have studied the history of voting rights in the
20   United States, fair?
21   A.  Yes.
22   Q.  And some of that study has included Texas, that's your
23   testimony, right?
24   A.  Yes.
25   Q.  Some of what you have studied in Texas electoral history is
```

1  awful, isn't it?

2  A.  Yes.

3  Q.  And that's a -- that is a truth from which we cannot run,

4  right?

5  A.  Yes.

6  Q.  And that history may, in fact, inform decisions that we

7  make today, I think is at least part of your point, right?

8  A.  Yes.

9  Q.  And we have to acknowledge what that history is, regardless

10 of what we think we ought to do with it, fair?

11 A.  Fair.

12 Q.  Let's start with some easy points of agreement.  Let's do

13 this today, you and I, in federal court and at a voting rights

14 case, let's acknowledge some of the easy ones anyway.

15     Slavery is a stain on American history and on Texas

16 history, isn't it?

17 A.  Yes.

18 Q.  Jim Crow is a stain on American history and on Texas

19 history, right?

20 A.  Yes.

21 Q.  We should be ashamed of it but never forget it?

22 A.  Yes.

23 Q.  All-white primaries are a stain on Texas and American

24 history, right?

25 A.  Yes.

Franita Tolson - Cross

1  Q.  So is the use of a wide range of voter fraud like you

2  discussed to disenfranchise minorities, right?

3  A.  Yes.

4  Q.  Up until now, you and I have been talking predominantly

5  about African-American history in the United States, but that

6  kind of fraudulent discrimination also affected the Latino

7  community in Texas, right?

8  A.  Yes.

9  Q.  There were the various political machines that operated to

10 defraud Latinos out of their votes, right?

11 A.  Yes.

12 Q.  We've heard some of them named in this courtroom, the

13 Callaghan machine, right?

14 A.  Yes.

15 Q.  George Parr, Jim Wells?

16 A.  Uh-huh.

17 Q.  Is that a "yes"?

18 A.  Yes.  I'm sorry.  Yes.

19 Q.  That's all right.  I'm not picking on you.

20     These political machines used voter fraud -- committed

21 voter fraud using the Latino community, right?

22 A.  Yes.

23 Q.  Sometimes they would mark ballots for Latinos who could not

24 read or who only spoke English as a second language, right?

25 A.  Yes.

Franita Tolson - Cross

1  Q.  That is a history in Texas that is real and that we must

2  acknowledge, true?

3  A.  Yes.

4  Q.  We talk about some of the ways that that kind of history

5  can influence the decisions we make today.  I'll tell you that

6  earlier in this trial, we saw testimony provided by

7  Representative Murr in support of SB1, where he said that it

8  was about protecting election integrity and ensuring that the

9  right people are able to vote.

10      Following that testimony, a witness on the stand, an

11  African-American woman, said that she was suspicious -- those

12  are my words, but said she was suspicious of Representative

13  Murr's comments about the right kind of voter.

14      Does that surprise you?

15          THE COURT:  Was that his statement?  "The right kind

16  of voter"?  Or was it "the right type of person"?  What was his

17  quote?  What was his -- what was his statement?

18          MR. KERCHER:  It could be "right kind of voter" or

19  "right type of person."  I --

20          THE COURT:  I don't recall.  So that's a -- generally

21  a question.

22          MR. KERCHER:  No.  And I'm -- and for the record, I'm

23  paraphrasing.

24          THE COURT:  Because the context of that matters.

25

Franita Tolson - Cross

1    BY MR. KERCHER:

2    Q.  Well, let me ask you, Dean.

3       When a white representative in support of SB1 testifies in

4    a legislative committee that he wants to ensure that the right

5    kind of person/the right type of person is able to vote, are

6    you surprised that an African-American woman found that

7    statement concerning?

8    A.  I don't know her.

9    Q.  Okay.  Do you find it concerning?

10   A.  Yes, I do.

11   Q.  You don't trust the statement.  Is that fair?

12   A.  I would need to know what he meant by that.

13   Q.  And even though the statement does not itself implicate

14   race, it causes you concern that it might.  Is that fair?

15   A.  It could, yes.

16   Q.  In talking and learning about some of the kinds of voter

17   fraud that have been used to discriminate against minorities in

18   this trial, we have heard that some of that fraud lasted

19   throughout the 1970s and '80s.

20       Do you agree with that?

21   A.  Yes.

22   Q.  You have included this kind of information in your report

23   because you believe that those past crimes inform modern voting

24   decisions; is that right?

25   A.  Modern voting decisions by the state in terms of what laws

Franita Tolson - Cross

```
 1  to pass or --
 2  Q.  Let me see if I can ask you a better question.
 3  A.  Okay.
 4  Q.  Part of the reason you walked through that kind of history
 5  is because you believe that it may inform modern legislative
 6  decisions; is that right?
 7  A.  Yes.
 8  Q.  You talked extensively about the Democratic white primary
 9  in Texas, right?
10  A.  Yes.
11  Q.  And I think that you said that that was particularly
12  important because at the time there was a sort of one-party
13  rule in the state, and if you won the primary, then you were as
14  good as in office, right?
15  A.  Yes.
16  Q.  I can tell you that in my home county of Travis County it
17  is still the case that if you win the Democratic primary, then
18  you are as good as in office.
19      I want to understand, though, how an example like that fits
20  into your analysis of historical analogues, okay?
21  A.  Uh-huh.
22  Q.  Is that a "yes"?
23  A.  Yes.  I'm sorry.
24  Q.  I'm not picking on you.  I'm just trying to make the
25  record.
```

Franita Tolson - Cross

1      When, in a state like Texas, there is a county that is more
2  white than most of the other counties in Texas and it has
3  effectively one-party rule, not just one party, but the
4  Democratic Party, and if in this overwhelmingly white county
5  you win that Democratic primary, is that an analogue under your
6  analysis to the all-white Democratic primary in Texas history?
7  A.  No, because black people can still vote in Travis County.
8  Q.  Okay.  So the historical analogue has limits.  Is that
9  fair?
10 A.  Yes.
11 Q.  The historical context of SB1 also includes improvement in
12 minority voting rights across the centuries of our history,
13 right?
14 A.  I'm sorry.  Can you ask the question again?
15 Q.  It wound up being a ponderous question.  That's not what I
16 wanted it to be.  Let me try.  I can do a better one.
17      The historical context of SB1 also includes improvements in
18 minority voting in Texas?
19 A.  Yes.
20 Q.  What I think you called the slow and steady march towards
21 an inclusive democracy, right?
22 A.  Yes.
23 Q.  So when my mother was 16 years old, Dr. Martin Luther King
24 wrote his letter from Birmingham jail, and it didn't strike me
25 until I was an adult that she had never read that because it

Franita Tolson - Cross

1  happened contemporaneously with her education, right?

2  A.  Uh-huh.

3  Q.  When I was her age, 16, I read that as a part of my high

4  school curriculum as an example of how to write persuasively.

5      Did you study that in high school, too?

6  A.  I don't remember.  I might be older than you.

7  Q.  You look younger, Dean.

8      Does it -- that's progress, though, right?  Where we go

9  from a time when Dr. King has to write that letter, to a place

10  where it is engrained in our public school curriculum as an

11  example of how to do things well, that's progress, isn't it?

12  A.  Can they teach that in Texas now?

13  Q.  As far as I know, yes, ma'am.

14  A.  Okay.  Just --

15  Q.  Do you know otherwise?

16  A.  Well, I know that there's a movement towards getting some

17  of that education out of the school system.  So I --

18  Q.  And I appreciate that.  My question's a little more

19  targeted.

20  A.  Okay.

21  Q.  Do you know otherwise?

22  A.  No.  I was just asking you.

23  Q.  Your testimony, in short, is not that Texas in 2023 is as

24  bad as it was in 1873, right?

25  A.  It's not as bad as -- in 2023 as it was in 1873?

Franita Tolson - Cross

```
 1   Q.  Yes.
 2   A.  No.  That's not my testimony.
 3   Q.  And it's not as bad as it was in 1902?
 4   A.  No.
 5   Q.  1923?
 6   A.  No.
 7   Q.  Or even 1964?
 8   A.  No.
 9   Q.  In fact, I think you said on direct examination, "At this
10   point we are able to take voter registration for granted,"
11   right?
12   A.  No.  I said that people take it for granted because they're
13   used to it.
14   Q.  And the Texas Legislature is also more diverse than it's
15   ever been, right?
16   A.  I can't confirm or deny that.
17   Q.  You didn't study the racial makeup of the Texas Legislature
18   as it sits today?
19   A.  "Today," as in today?  No.
20   Q.  2023.  Yes, ma'am.
21   A.  No.  I did not study the racial makeup of the Texas
22   Legislature.
23   Q.  And do you know that the number of minority Republicans in
24   the Texas House has doubled since the last legislative session?
25   A.  Is it still majority white?
```

Franita Tolson - Cross

1  Q.  My question is, did you know whether the number of minority
2  Republicans in the Texas House more than doubled since the last
3  legislative session?
4  A.  No.  I just know it's still a majority white.
5  Q.  You know that one of Texas' two senators is the son of
6  Cuban immigrants?
7  A.  Okay.
8  Q.  Did you?
9  A.  Did I know that?
10  Q.  Yes, ma'am.
11  A.  Yes, I did know that.  I assume you're referring to Ted
12  Cruz.
13  Q.  Yes, ma'am.
14  A.  Okay.
15  Q.  First name Rafael, right?
16  A.  Yes.
17  Q.  Your research, you did not come across the recent survey
18  showing African-Americans in Texas are among the most
19  politically engaged in the country?
20  A.  You said I didn't come across that?
21  Q.  Yes, ma'am.  I'm asking.  I didn't see it cited in your
22  report.
23  A.  That they are the most politically engaged in the country?
24  Q.  Yes, ma'am.
25  A.  What is the metric for that?

Franita Tolson - Cross

1  Q.  I don't have the study in front of me.  I'm asking you
2  whether you came across that study.
3  A.  No.
4  Q.  You know that the Harris County Commissioners Court is
5  three-quarters minority, right?
6  A.  Harris County?  Yes.
7  Q.  And that the Harris County judge is Lina Hidalgo, who is
8  minority, right?
9  A.  Okay.  Yes.
10 Q.  And the Dallas County Commissioners Court is 50 percent
11 minority, right?
12 A.  Yes.
13 Q.  And that the Travis County district and county attorneys
14 are both minorities, right?
15 A.  Okay.  Yes.
16 Q.  All right.  Let's take a look at your report, Professor --
17 excuse me, Dean.
18     Let's -- do you recognize your report as HAUL MFV 59?  You
19 see that in front of you?
20 A.  Yes.
21 Q.  Let's go to Page 2.  Now, here is your table of contents,
22 right?
23 A.  Yes.
24 Q.  I appreciate that.  Thank you.
25     So starting at Section 5 is where you begin sort of your

Franita Tolson - Cross

1  march through Texas history, the discriminatory voting
2  practices of Texas, right?
3  A.  Yes.
4  Q.  And then up at Page 28 of your report, you have made it to
5  1965; is that right?
6  A.  Yes.
7  Q.  And that section ends about five pages later.  Is that
8  true?
9        MR. KERCHER:  Brian, if we could have the table of
10  contents, please.  Thank you.
11  BY MR. KERCHER:
12  Q.  So the section between 1965 and the present of your report
13  is five, maybe six pages long; is that right?
14  A.  Yes.
15        MR. KERCHER:  Okay.  All right.  Now, Brian, can we go
16  to Page 29, paragraph 77.
17  BY MR. KERCHER:
18  Q.  So here, you begin undertaking your analysis from about
19  1975 of Texas voting history, right?
20  A.  Yes.
21  Q.  And you focus on the DOJ's Section 5 objections, right?
22  A.  Yes.
23  Q.  And at least part of your point here is that the DOJ's
24  objection evidenced ongoing discrimination throughout this
25  time, right?

Franita Tolson - Cross

1  A.  Yes.

2  Q.  And you talk about objections.  In fairness, you don't list

3  the outcome of all these objections, right?

4  A.  Right.

5  Q.  But your point is that -- excuse me -- the federal

6  government had to step in in order to address discrimination in

7  Texas during this time, right?

8      I'm sorry.  I couldn't hear.

9  A.  I'm sorry.  Yes.  I'm sorry.  I can't see --

10  Q.  That's okay.  Somebody coughed over my shoulder.  You're

11  fine.

12     You are aware that the DOJ brought claims in this case,

13  right?

14  A.  Yes.

15  Q.  They challenged two provisions under the Voting Rights Act

16  materiality framework?

17  A.  Uh-huh.  Yes.  I'm sorry.  Yes.

18  Q.  They did not challenge, though, for example, SB1's

19  restriction on drive-through voting.  Are you aware of that?

20  A.  Yes.

21  Q.  They did not challenge, for another example, SB1's

22  restriction on 24-hour voting.  Are you aware of that?

23  A.  Yes.

24  Q.  Or any of SB1's polling hour regulations, right?

25  A.  Yes.

1  Q.  Or its poll watcher provisions?

2  A.  Yes.

3  Q.  Let's go to Page 34, paragraph 86, please.  Thank you.

4      The first sentence reads, "Texas has a pattern of engaging

5  in partisan and racial gerrymandering that undermines the

6  political power of minority groups seeking to insulate its

7  actions on the grounds that they were undertaken for partisan,

8  rather than racial reasons."

9      Now, the footnote at the end of that sentence is 177,

10 right?

11 A.  Yes.

12 Q.  And that cites to *Abbott v. Perez*.

13     Brian, can we see that?

14 A.  Yes.

15 Q.  And you've read this case, right?

16 A.  Yes.

17 Q.  You are familiar with its holding, right?

18 A.  Yes.

19 Q.  You know the Supreme Court held in that case that Texas

20 House District 90, in 2013, redistricting effort was a racial

21 gerrymander because it was too solicitous of changes demanded

22 by minority groups, right?

23          MR. WATKINS:  Objection, Your Honor, misstates the

24 opinion, and the opinion speaks for itself.

25          MR. KERCHER:  Brian, can we go to the opinion?

Franita Tolson - Cross

```
 1              THE COURT:  I'll ask -- I'll let the questions go.
 2       Go ahead.
 3    BY MR. KERCHER:
 4    Q.  Dean, you recognize Abbott v. Perez in front of you?
 5    A.  Yes.
 6    Q.  Brian, let's go to Page 30, footnote 24, please.
 7         Footnote 24 says, "The dissent tries to minimize the
 8    relevance of this amendment by arguing that it turns HD90 into
 9    a racial gerrymander.  But again this is misleading.  The
10    legislature adopted changes to HD90 at the behest of minority
11    groups, not out of a desire to discriminate.  That is, Darby
12    was too solicitous of changes with respect to HD90."
13         Did I read that correctly?
14    A.  Yes.
15    Q.  Brian, let's go to Page 39, first full paragraph.
16         "In drawing HD90, the legislature was pulled in opposite
17    directions by competing groups.  In 2011, the legislature,
18    responding to pressure from MALDEF, increased the Latino
19    population of the district in an effort to make it a Latino
20    opportunity district.  In the process of doing so, the
21    legislature moved the community of Como, which is predominantly
22    African-American, out of the district.  But Como residents and
23    the member of the Texas House who represented the district, Lon
24    Burnam, objected, and, in 2013, the legislature moved Como back
25    into the district.  That change was opposed by MALC because it
```

1    decreased the Latino population below 50 percent.  So the

2    legislature moved Latinos into the district to bring the Latino

3    population back above 50 percent."

4        Did I read that correctly?

5    A.  Yes.

6    Q.  Brian, Page 41, please.

7        First full paragraph, "Perhaps Texas could have made a

8    stronger showing, but it is the State's burden to prove narrow

9    tailoring.  And it did not do so on the record before us.  We

10   hold that HD90 is an impermissible racial gerrymander.  On

11   remand, the district court will have to further consider what

12   if any remedy is appropriate at this time."

13       Did I read that correctly?

14   A.  Yes.

15   Q.  All right.  Let's go to your report on Page 34, at

16   paragraph 87.

17       Here, you're arguing that part -- that the partisan

18   affiliation is just a proxy for race; is that right?

19   A.  That it can be, yes.

20   Q.  You do not cite *Rucho v. Common Cause* from the Supreme

21   Court in this paragraph, true?

22   A.  I can't see the footnote, I'm sorry.

23   Q.  Brian, can you take us down to the footnotes.

24   A.  I see it.  No, I don't.

25   Q.  In fact, if we go back up to paragraph 87, we can see that

Franita Tolson - Cross

1  it has just two -- it has just two cites in it, right?  180 and
2  181?
3  A.  Yes.
4  Q.  And then going back down to those footnotes, we can see
5  that 180 refers back to previous sections in your report,
6  right?
7  A.  Yes.
8  Q.  And 181 sends us to an Associated Press article on
9  KSAT.com, right?
10  A.  Yes.
11  Q.  In paragraph 87, you say, "By focusing on partisan
12  affiliation instead of race, the State has used and can use
13  color-blind targeting to target and subsequently disenfranchise
14  racial minorities."
15      But that statement has no citation at all, does it?
16  A.  No, it doesn't.
17  Q.  And it lumps together the increasingly complex vote of the
18  Latino community, doesn't it?
19  A.  The statement lumps together?  What is -- what's being
20  lumped and where?  Which words?
21  Q.  Well, you say, "By focusing on partisan affiliation instead
22  of race, the State has used and can use color-blind targeting."
23      So if you are using race as a -- if you are using
24  partisanship as a proxy for race, that's lumping together
25  Latinos in a particular partisanship, right?

Franita Tolson - Cross

```
 1  A.  I see.  Yes.  Yes.  I think.  Honestly, I'm not totally
 2  clear on your question.  So am I allowed to --
 3  Q.  Well, let me see if I can ask you a better question.
 4  A.  Okay.
 5  Q.  I think you said on direct that you say, "Partisanship
 6  misses the point because minorities prefer different candidates
 7  from whites."
 8  A.  Right.  So a better citation would be *LULAC v. Perry*, if
 9  you're looking for a citation.  That's a 2003 case in which the
10  State tried to use partisanship as a justification for
11  dismantling a majority-minority district, and the Supreme Court
12  found that they violated Section 2 of the Voting Rights Act.
13  Q.  Well, it's not that I'm looking for a better cite.
14      First, I was looking for any cite, and there's not one
15  there.
16  A.  There you go.
17  Q.  Second, you didn't cite to *Rucho*, which is a more recent
18  Supreme Court opinion that determined that redistricting for
19  partisan reasons is beyond the reach of federal courts.
20  A.  That's not the point I'm trying to make.
21  Q.  Partisanship may be justiciable -- may not be justiciable,
22  whereas, race is, fair?
23  A.  Fair.
24  Q.  When you were talking about minority candidates
25  preferring -- minority voters preferring different candidates
```

 1  from whites, that breaks down in Primary Elections, doesn't it?

 2  A.  It can, yes.

 3  Q.  Because in Primary Elections, we tend to see that the

 4  voting is not polarized as among minorities generally and

 5  whites, but is, in fact, multipolar, right?

 6  A.  Right.

 7  Q.  And they may form different coalitions, right?

 8  A.  Yes.

 9  Q.  And, in fact, you were also talking about on direct how,

10  around 2016, there was an enormous upsurge in Latino electoral

11  participation and in population, right?

12  A.  Uh-huh.  Yes.

13  Q.  And during that same period there was an uptick in Latino

14  support for the Republican Party, right?

15  A.  They're still mostly Democratic.

16  Q.  My question is, during that same time, there was an uptick

17  in Latino support for the Republican Party?

18  A.  Yes.

19  Q.  Let's go to Page 36 of your report, paragraph 91.

20      You argue in the first sentence that Texas is the hardest

21  state in which to cast a ballot, right?

22  A.  Yes.

23  Q.  And in footnote 187, you are citing a *Texas Tribune* article

24  for that study; is that right?

25  A.  Yes.

Franita Tolson - Cross

1  Q.  You did not conduct the study yourself, fair?

2  A.  Fair.

3  Q.  And the *Tribune* article was written in October of 2020,

4  right?

5  A.  Yes.

6  Q.  One month before the largest election in Texas history by

7  voter turnout?

8  A.  Yes.

9  Q.  If we go to paragraph 92, we see in the middle of the

10  paragraph a cite to footnote 192.  Do you see that?

11  A.  Yes.

12  Q.  Let's read the fine print there.

13      You cite to LUPE Plaintiffs' Amended Complaint in

14  21-CV-844; is that right?

15  A.  Yes.

16  Q.  That's this case?

17  A.  Indeed.

18  Q.  You're basing your expert report on plaintiffs' complaint?

19  A.  This -- all 50 pages?

20          MR. WATKINS:  Objection.

21          THE WITNESS:  Based on this one footnote?

22          THE COURT:  She can handle herself.

23          MR. WATKINS:  Okay.  You're doing great.

24          THE WITNESS:  No.

25

1  BY MR. KERCHER:

2  Q.  Have you read any of the State defendant's pleadings in

3  this case?

4  A.  Yes.

5  Q.  Underneath paragraph 29 is a block quote.  At the bottom of

6  the block quote, there is no citation, right?

7  A.  No.

8  Q.  If we go back up in the block quote, though, we see that

9  there is a citation to footnote 193, right?

10  A.  Yes.

11  Q.  Let's take a look at that.

12      It says "Id.," which means you are again referring back to

13  the plaintiffs' complaint; is that right?

14  A.  What does the paren say?

15  Q.  It says "citing another article."

16  A.  Yes.

17          MR. KERCHER:  Brian, can we see 192 and 193, the

18  footnotes.  Asking you to do something on the fly.  Sorry about

19  that, Brian.

20  BY MR. KERCHER:

21  Q.  So 192 is Plaintiffs' Amended Complaint; 193 is Id., also

22  referring to the amended complaint, right?

23  A.  Okay.  Yes.

24  Q.  Does that mean that the block quote that we just looked at

25  is cut and pasted from the plaintiffs' complaint?

 1  A.  I'm not sure.  It could be an error.  It could be a missing

 2  footnote.  I can't tell from -- I don't have any report in

 3  front of me.  I can't verify that.

 4  Q.  And it looks like in 193, if this is a block quote from the

 5  plaintiffs' complaint, they are citing an article from the

 6  *Guardian*; is that right?

 7  A.  Yes.

 8  Q.  Let's go to report Page 38, the top paragraph.

 9      You say, "However, Texas still lagged in voter registration

10  and voter turnout relative to other states in 2020; only 53.86

11  percent of its residents were registered to vote in 2020,

12  trailing every state except Idaho and Wyoming.  After the 2020

13  election, Texas retained its position in the tier of states

14  with the lowest voter turnout, ranking ahead of only eight

15  states that had lower numbers."

16      Did I read that correctly?

17  A.  Yes.

18  Q.  Let's talk first about your framing there, your comparison

19  between those two time periods.

20      In 2020, Texas was above only two states in percentage of

21  registered voter population, right?

22  A.  Uh-huh.

23  Q.  Is that a "yes"?

24  A.  Yes.

25  Q.  After the 2020 election, Texas' position had actually

Franita Tolson - Cross

```
 1  improved, right?
 2  A.  Yes.
 3  Q.  You don't say that it had improved.  You said that it
 4  retained its position in the tier of states with the lower
 5  voter turnout, right?
 6  A.  Yes.
 7  Q.  Now, if we go down to footnote --
 8         THE COURT:  Improve much beyond that tier that you
 9  were comparing?
10         THE WITNESS:  It improved in terms of percentage.  So
11  the turnout in 2020 was the strongest showing since, I think,
12  1992.  So it definitely improved.
13         THE COURT:  I was wanting -- I thought he was
14  saying -- he was criticizing you for failing to recognize that
15  voter registration and voter turnout, relative to other states,
16  in Texas improved.  And I was trying to ask, how much did it
17  really improve?
18         THE WITNESS:  Oh, I don't know.
19  BY MR. KERCHER:
20  Q.  Well, let's look at footnote 202.  For the proposition of
21  how many -- what percentage of its registered voters Texas
22  has -- excuse me -- what percentage of its voters Texas has
23  registered, you cite to a website called
24  worldpopulationreview.com, right?
25  A.  Yes.
```

Franita Tolson - Cross

1  Q.  Brian, can we pull up worldpopulationreview.com.

2      If you look at the top of this demonstrative that I'm

3  showing you, you can see --

4      Actually, Brian, before you pull that out, let's go to the

5  very top.

6      And you can see, Dean, that the website is

7  worldpopulationreview.com, right?

8  A.  Yes.

9  Q.  And you can see the top of this chart says, "Registered

10  voter by state, updated May 2023," right?

11  A.  Yes.

12  Q.  So this is after you submitted your report?

13  A.  It is.

14  Q.  Right?

15     And at the time that you submitted your report, Texas was

16  at about number 41 compared to other states in what percentage

17  of its voters it had registered, right?

18  A.  If I remember correctly.

19  Q.  It was ahead of eight other states, right?

20  A.  Yes.

21  Q.  So if we look at what those numbers in 2023 -- let's scroll

22  down, Brian -- we can see that Texas is way down there.  It has

23  actually moved way up compared to other states, right?

24  A.  Yes.

25  Q.  Let's count.  One, two, three, four, five, six, seven,

Franita Tolson - Cross

1  eight, nine, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21,
2  22, 23, making Texas the 27th ranked state in terms of
3  registration of its voting population, right?
4  A.  Yes.
5  Q.  In just the three years since you had looked at it, true?
6  A.  Okay.  Yes.
7  Q.  Dean, that's great news, isn't it?
8  A.  Am I allowed to say "yes" and then follow?  Or do I just
9  say "yes"?
10           THE COURT:  You're allowed to give an answer.
11           THE WITNESS:  Okay.  So that is terrific news that
12  Texas is -- has registered a large percentage of its residents.
13  But that's why SB1 is so concerning, because what it does is it
14  makes the actual act of voting harder.
15      So the bans on drive-through voting, the bans on mobile
16  voting, the limits on drop-boxes, these are things that come
17  after registration, right?
18      So you can look at registration and say this is excellent,
19  but then, you know, you kind of worry about the impact on
20  voters who are actually turning out to vote.  And even if
21  turnout is high, it's very hard to count people who never
22  turned out because they are concerned about their ability to
23  vote.
24  BY MR. KERCHER:
25  Q.  So where Texas has made something like a 20-percent jump in

Franita Tolson - Cross

1  the percentage of its voter population that it has registered,

2  your belief is that a bill has suppressed the vote; meanwhile,

3  the percentage of people who were excited enough to vote during

4  that same period has gone up tremendously; is that right?

5  A.  Registration.  We're not looking at turnout.  Right.

6  Q.  Well, I understand registration and turnout are different,

7  but if people think they're not going to get the opportunity to

8  vote, they're not going to go to the trouble to register,

9  right?

10          MR. WATKINS:  Objection, speculation.

11          MR. KERCHER:  The witness can --

12          THE COURT:  That's sustained.  You're asking what

13  people will do.  You can rephrase your question.  Ask her her

14  opinion, but that's not how you phrased it.

15  BY MR. KERCHER:

16  Q.  In your study of Texas -- of Texas election history, is it

17  your professional opinion that when the vote is suppressed,

18  enthusiasm for registering as a voter goes up?

19  A.  We don't live in a system where people have to register,

20  reregister every year anymore, so a lot of people are already

21  registered and won't turn out if the actual act of voting is

22  hard.

23      And then there are new people who will register and don't

24  vote.  And then there are people who register and do vote.  It

25  just varies, depending on the person.

Franita Tolson - Cross

1        But registration and turnout is never going to match.

2   Q.  Well, I understand that registration and turnout is not

3   going to match.  That's not my question.

4        My question is whether, in your professional opinion, you

5   have observed in all of your study a period of time where voter

6   registration has jumped so dramatically amidst concerns that

7   people would be unable to vote?  Is there a historical

8   precedent for that?

9   A.  After the adoption of the Voting Rights Act, registration

10  jumped across the South, and black people still experienced

11  barriers actually casting a ballot, which is why the Voting

12  Rights Act was reauthorized in 1970, 1975, 1982 and 2006.

13  Q.  So in that case you had a landmark piece of legislation

14  that caused people to be enthusiastic about voting, right?

15  A.  Yes.

16  Q.  Here, though, you're saying there's a landmark piece of

17  legislation that should cause people to be unenthusiastic about

18  voting, and we have, nevertheless, seen a jump in voter

19  registration, right?

20  A.  That's like apples and oranges.

21  Q.  Brian, let's look at the other World Population Review.

22       Dean, you can see across the top of this chart, you've got

23  two options:  Registered voters, which we just looked at -- or,

24  excuse me.

25       We've got percentage of voting age population registered,

Franita Tolson - Cross

1  and the other is registered voters, right?

2  A.  Okay.

3  Q.  And a moment ago, we looked at the percentage of voting age

4  population.  I took the trouble of pulling up the registered

5  voters as well.

6       Brian, can we zoom out on that?

7       And you can see that, in raw numbers, Texas has the second

8  most numbered of registered voters in the country, right?

9  A.  Yes.

10  Q.  Well over 13 million registered voters.

11  A.  Yes.

12  Q.  Brian, let's go back to report, Page 40, paragraph 102.

13       You've got another block quote here, and it is footnoted to

14  211.

15       Brian, can we look at that footnote, please.

16       And that block quote is, again, footnoted to Plaintiffs'

17  Amended Complaint in this case, right?

18  A.  Yes.

19  Q.  Is this another instance of your block quote being cut and

20  pasted from the plaintiffs' pleadings?

21  A.  Another instance?  I didn't confirm the last instance.  But

22  this one came from the plaintiffs' pleadings.

23  Q.  This one is definitely cut and pasted, right?

24  A.  The last one was a missing footnote possibly.

25  Q.  On direct, you talked a little bit about voting purges,

1  right?

2  A.  Yes.

3  Q.  We agree, don't we, that vote purges are mandated by

4  federal law?

5  A.  Yes.

6  Q.  There's the National Voter Registration Act at 52 USC

7  Section 20507, right?

8  A.  Yes.

9  Q.  Do we agree that not all vote purges are discriminatory?

10  A.  Yes.

11  Q.  It's fair to say that your report doesn't have, for

12  example, statistics showing that vote purges provided for in

13  SB1 have resulted in disenfranchisement?

14  A.  Yes.  I believe that's correct.

15  Q.  But it reminds you of problems with previous vote purges.

16  Is that fair to say?

17  A.  Yes.  Because of the frequency.

18  Q.  So that sort of -- it's been referred to as "generational

19  trauma" in this trial in terms of the -- what the effect that

20  Texas voting history may have on modern decision making.

21      Are you familiar with the idea of generational trauma?

22  A.  I am.

23  Q.  Is it right to say that that sort of generational trauma

24  which may cause some people to remember things that have

25  happened in history or to be reminded by things that have

Franita Tolson - Cross

1  happened in history, even when history is not repeating itself?

2  A.  I don't know if I'm qualified to opine on that.

3  Q.  Well, I guess I'm not -- I'm not trying to trick you on

4  this one, Dean.

5  A.  Yeah, because I don't know if it's -- it's very subjective,

6  right, when people talk about generational trauma.  They may

7  feel like it's repeating itself even if it is or is not, right?

8  Like, I don't -- that's why I'm -- like, I don't -- I don't

9  know how to think about that in this context.

10 Q.  Well, one of the reasons I'm asking is because the idea of

11 generational trauma, as it has been expressed in this trial,

12 reminds me of this sort of historical analogue model that

13 you're using as part of your methodology, right?

14 A.  Yes.

15 Q.  Where we look at something in a voting provision that has

16 passed here in the late -- in the middle -- I don't know, the

17 early 21st century, and it may remind us of something from an

18 uglier part of history, right?

19 A.  I don't know if it's best to think about it in terms of

20 generational trauma as opposed to thinking about it in terms of

21 a form of path dependence.

22 Q.  I'm sorry?

23 A.  As a form of path dependence.

24 Q.  What is that?

25 A.  So it's the idea that you have behavioral path dependence,

Franita Tolson - Cross

1  where people who weren't necessarily alive at the time that the

2  trauma occurred, they still internalize it.  It's passed down

3  from person to person, from generation to generation.

4      We see this quite often in studies of southern slavery,

5  right?  In areas where they had high cotton production and a

6  lot of slaves, they tend to be more politically conservative

7  than other areas in the South where there wasn't high slave --

8  high cotton production and a lot of slaves.  And in part, it

9  has a lot to do with the culture and how things are passed down

10 from generation to generation.

11     So I don't know if that's necessarily generational trauma

12 you're passing -- you're referring to, as opposed to a type of

13 behavioral path dependence where the actions of prior

14 generations actually affects present generations because of the

15 way things are passed down.

16 Q.  So it's a sort of cultural memory; is that right?

17 A.  Yeah.  Yeah.  That's a good way to think about it.

18 Q.  And it's that cultural memory that may cause us to draw

19 some of these analogies between modern voting practices or

20 modern legislation and legislation from an earlier time; is

21 that right?

22 A.  Yes.

23 Q.  Do we agree -- I genuinely don't mean this as criticism,

24 but I am trying to understand sort of the limits of your

25 methodology.

Franita Tolson - Cross

```
 1      Do we agree that every time someone may be reminded by
 2  modern legislation of legislation from a previous time, that
 3  that does not necessarily mean the modern legislation is
 4  discriminatory?
 5  A.  Yes.
 6  Q.  All right.  Let's go back to your report, Dean, on Page 42,
 7  please.
 8          THE COURT:  Do we have a way to go?
 9          MR. KERCHER:  We do.  Would you like to take a break,
10  Your Honor?
11          THE COURT:  Let's go ahead and take a break.
12      (Recess at 2:34 p.m. until 2:50 p.m.)
13          THE COURT:  Thank you.  Please be seated.
14  BY MR. KERCHER:
15  Q.  All right.  Welcome back, Dean.
16      We're going to look at Page 42 of your report now.  You can
17  see on Page 42, you take up the section The Absence of Fraud in
18  2020 Elections, right?
19  A.  Yes.
20  Q.  And you're arguing that there was no voter fraud to justify
21  the anti-fraud provisions in SB1?
22  A.  No widespread voter fraud, correct.
23  Q.  You're familiar with *Brnovich v. Democratic National*
24  *Committee*, right?
25  A.  Yes.
```

Franita Tolson - Cross

1  Q.  And this is a Supreme Court case from 2021?

2  A.  Yes.

3  Q.  Where the majority opinion says that, "It should go without

4  saying that a state can take action to prevent election fraud

5  without waiting for it to occur and be detected within its

6  borders"?

7  A.  Yes.

8  Q.  And it goes on to quote *Munro v. Socialist Workers Party*

9  and say, "The state's political system need not sustain some

10  level of damage before the legislature can take corrective

11  action."

12      We agree on that?

13  A.  Yes.

14  Q.  I love it when we agree, Dean.

15      Let's go to Page 49 of your report, paragraph 129.

16      You can take a moment to read through this.  I'm sure you

17  don't have your report memorized.

18      But here, generally, you are criticizing SB1's poll

19  watching provisions, right?

20  A.  Yes.

21  Q.  And as evidence for that criticism, you say, in part,

22  "During the 2020 Presidential Election, for example, black and

23  Latino voters faced a record number of threats and harassment

24  while trying to exercise their fundamental right to vote."

25  Right?

1  A.  Yes.
2  Q.  And if we look at the source cited there in footnote 620 --
3  260, I'm sorry, it is, again, plaintiffs' complaint, true?
4  A.  Yes.
5  Q.  Let's go to paragraph 130.
6      Here, you're using, I think, some racially-coded language.
7  Is that true?  You call --
8  A.  What language are you referring to?
9  Q.  Well, you are calling poll watchers "overseers," right?
10 A.  Yes.  I am calling them "overseers."  I wasn't trying to be
11 racially coded.
12 Q.  To the extent that you talk about the dangers to minorities
13 from poll watchers, doesn't that assume that poll watchers are
14 predominantly white?
15     It looks like it hasn't occurred to you.
16 A.  No.  It's not that it hasn't occurred to me, but the
17 question assumes that people of color cannot internalize the
18 discrimination of the majority.  And that's what I'm objecting
19 to, right?  So absent some empirical evidence, I don't want to
20 assume.
21 Q.  When you say "people of color cannot internalize" --
22 A.  Can internalize --
23 Q.  "Can"?
24 A.  -- racial attitudes about their own people, yes.
25 Q.  Thank you.

Franita Tolson - Cross

1       So your concern may include places where a minority is
2   discriminating against one's own race.  Is that true?
3   A.  Yes.
4   Q.  And I think you mentioned a moment ago a reference to
5   empirical data.
6       You don't have empirical data about the racial makeup of
7   poll watchers in Texas; is that correct?
8   A.  I don't.
9   Q.  There's nothing in Texas law, to your knowledge, that
10  prevents minorities from working as poll watchers.
11      Do we agree on that?
12  A.  Yes.
13  Q.  We have heard from many of the plaintiffs' groups in this
14  trial who organize minority communities, and I'm sure you're
15  familiar with some of them, for example, the Houston area --
16  Houston Urban Area League?
17  A.  Uh-huh.
18  Q.  "Yes"?
19  A.  Yes.
20  Q.  And I think NAACP LDF has counsel here.  You're familiar
21  with organizations that organize racial communities around
22  voting and electoral participation, true?
23  A.  Yes.
24  Q.  From Get Out the Vote efforts to voter registration
25  efforts, right?

Franita Tolson - Cross

1  A.  Yes, although, I mean, just a slight quibble.  I wouldn't

2  say -- they focus on minority communities, but it's not with

3  the active intent to exclude white voters or something.  It's

4  with the goal of making sure that everyone can vote.

5  Q.  And I didn't mean to suggest they're being discriminatory.

6  A.  Yeah.

7  Q.  But their focus may be around a particular community,

8  correct?

9  A.  Yes.

10  Q.  And there's nothing, to your knowledge, in Texas law that

11  would prevent any of those groups who are predominantly

12  organizing among minority communities from organizing groups of

13  people to participate as poll watchers, right?

14  A.  No.

15  Q.  I want to turn again to understanding the historical

16  analogue methodology that you've described in trial today.

17       You are familiar, I imagine, that in Philadelphia,

18  following the 2008 Presidential Election, the DOJ sued two

19  members of the New Black Panther Party for voter intimidation,

20  right?

21  A.  Yes.

22  Q.  That made news at the time.  I recalled that, right?

23  A.  Yes.

24  Q.  If Pennsylvania were to now pass legislation about poll

25  watchers or about electioneering, would we be more likely to

Franita Tolson - Cross

1  impute some discriminatory intent to that legislation based on
2  the DOJ's actions against the New Black Panther Party in 2008?
3  A.  Not necessarily.  Because it looks like they would pass
4  that law in response to an actual problem, right?
5      So you had an instance of intimidation at the polls, and
6  then you have a law that addresses intimidation at the polls.
7  It seems like there's more of a connection.
8      So I wouldn't necessarily impute anything to the
9  legislature just based off of that one incident.
10  Q.  And I think I understand your answer, but I want to make
11  sure.
12      In the sort of hypothetical that I've given you about
13  Pennsylvania passing a law in 2023 about electioneering or
14  voter intimidation, you're saying that if they could tie it to
15  that --
16  A.  Oh, I see.  I think I misunderstood the type of law.
17      So you're saying that they pass a law to -- what would the
18  law do exactly?  I think that's where the confusion is coming
19  in.
20  Q.  Well, I'm intentionally, actually, keeping it a little bit
21  broader.
22  A.  Because I assume that it would prevent what happened in
23  2008.  That was my assumption in answering the question.
24  Q.  So that's helpful, I think, in helping me understand why
25  you're answering.  But let me see if I can track that down.

Franita Tolson - Cross

1    A.  Okay.

2    Q.  In terms of evaluating the strength of this sort of

3    historical analogue, part of that is determined by one's

4    opinion about whether or not the law that's passed effectively

5    addresses a problem.  Is that true?

6    A.  Yes.  That is true.

7    Q.  And so people who have different opinions about the

8    efficacy of the new law may have different opinions about

9    whether or not it is historically analogous to previously

10   discriminatory laws?

11   A.  Not necessarily.  And let me explain why.

12       So one could say -- I'm trying to think of a good example.

13   One can recognize that some of the things that we do now in our

14   system of elections, some of the rules we have, some of the

15   restrictions that we have, have a historical analogue.  And I

16   would think that that would make us be more careful, and this

17   is why context matters.

18       So when I talked about SB1 and I talked about the history,

19   I tried to paint a broad picture of the history so that we

20   understand the parallel that I was trying to draw because there

21   are certain voting practices that we have now that have

22   discriminatory historical analogues that are not necessarily

23   discriminatory now.

24       So the broader context matters in thinking through,

25   including the legislature's justification for passing the law,

1  in trying to figure out whether or not it's discriminatory.

2     Because voter registration was my example of that now.

3  It's more widely accepted now, but historically it has been

4  discriminatory.  So context matters.

5  Q.  I appreciate that additional detail.  That's helpful.

6     Let's talk for a moment about drive-through voting.  Now,

7  in your opinion, this is a facially race-neutral provision in

8  SB1, right?

9  A.  Yes.

10  Q.  Because it does not mention race, right?

11  A.  Right.

12  Q.  You have not run a regression analysis to determine whether

13  this facially race-neutral practice resulted in a

14  discriminatory effect, fair?

15  A.  Fair.

16  Q.  You've also not done an analysis of the location of the

17  drive-through voting polls used by Harris County in the 2020

18  election, true?

19  A.  True.

20  Q.  You understand that 2020 was the first time that

21  drive-through voting was offered in Texas, right?

22  A.  Yes.

23  Q.  And that anybody who used it and used it legally only used

24  it once?

25  A.  Yes.

Franita Tolson - Cross

1  Q.  Similarly, 24-hour voting, we've heard testimony that fewer

2  than 3500 voters utilized 24-hour voting in Texas in 2020.

3      Do you have any reason to dispute that?

4  A.  No.

5  Q.  We agree that 24-hour voting happened in one 24-hour period

6  in Texas history, true?

7  A.  Yes.

8  Q.  I want to talk now about a few other sections of SB1.  And

9  I promise you, I'm winding down.  You've been very patient.

10     You believe that the overlap between race, class and

11 political affiliation is endemic to Texas politics and endures

12 to modern time, true?

13 A.  True.

14 Q.  You point out that Democratic political machines forced

15 Latino voters to support their candidates by threatening to

16 terminate their employment or with the threat of violence,

17 right?

18 A.  True.

19 Q.  Like we talked about before, that history is real, isn't

20 it?

21 A.  Yes.

22 Q.  And you believe that that history remains relevant today,

23 true?

24 A.  Yes.

25 Q.  SB1 expands protections for employees to allow them to

 1  leave work during the early voting period.  You know that,
 2  right?
 3  A.  Yes.
 4  Q.  This provision is particularly important for minority
 5  voters due to the high coincidence of minority voters with low
 6  income and wage-earning voters, true?
 7  A.  That is important only for minority voters, or it's
 8  important for all voters who are of a certain class?
 9  Q.  My point is that it is particularly important for minority
10  voters due to the high coincidence of minority voters in a
11  particular class.
12  A.  Okay.  Yes.
13  Q.  Your report did not address the expansion of early voting
14  hours from eight hours to nine hours, true?
15  A.  True.
16  Q.  And from four hours of early voting in small counties --
17  I'm sorry.
18      From three hours of early voting to four hours of early
19  voting in smaller counties, true?
20  A.  True.
21  Q.  Report did not address extending curbside voting to
22  pregnant women, right?
23  A.  True.
24  Q.  Or expanding -- otherwise expanding early voting, fair?
25  A.  Fair.

Franita Tolson - Cross

1  Q.  On direct examination, you made a reference to the

2  electorate growing more diverse than the state would like.  You

3  remember saying that?

4  A.  Yes.

5  Q.  How is that not imputing discriminatory intent to the

6  state?

7  A.  Because it's not follow -- I didn't follow it by an action.

8  It was just an observation, right?  I can -- I can not like

9  something and observe that I don't like it, right?

10     But more generally, I do think -- I'll put it this way.  I

11  do think it's important to understand that SB1 is an attempt to

12  beat back the tide of demographic change.  I believe that.

13     And so to the extent that that statement imputes a certain

14  view on the state, that's consistent with that observation,

15  then yes.

16  Q.  I think I get that answer.  I'm not sure.  This is your

17  field.

18     Is it right to say that your belief is that the State of

19  Texas is fundamentally inclined to discriminate against

20  minorities?

21  A.  I don't think it's -- it doesn't have to be inherent,

22  right?  Because that suggests that the State of Texas just

23  discriminates.  And that's not what I'm saying.

24     I'm saying that if you look at the circumstances

25  surrounding the adoption of SB1, it suggests that the State of

1  Texas -- if you look at the circumstances surrounding the

2  adoption of SB1, it suggests that the State of Texas was acting

3  for reasons other than addressing voter fraud.

4  Q.  You have no opinions about the intent of the legislature in

5  passing SB1, true?

6  A.  I have opinions about factors that might bear on the

7  legislature's intent, but that's for the judge to decide.

8  Q.  You conducted no interviews with any Texas state

9  legislators, true?

10  A.  I did not.

11  Q.  And you are not attempting to tell the judge or anyone else

12  what any legislator intended by voting for or against SB1?

13  A.  I am not attempting to tell the judge anything that's in

14  the legislator's mind, no.

15          MR. KERCHER:  We pass the witness.

16      Thank you, Dean.

17          THE WITNESS:  Thank you.

18          THE COURT:  Anything else from this side?

19          MR. LIU:  A few questions.

20                      CROSS-EXAMINATION

21  BY MR. LIU:

22  Q.  Hi, I'm Cory Liu, representing the Harris County District

23  Attorney's Office.

24      I think I heard you say that the urban areas were trying to

25  make voting more inclusive.  Could you say a little bit more

Franita Tolson - Cross

1   about what you mean?

2   A.   The urban areas in the 2020 election?

3   Q.   Yes.

4   A.   So in the 2020 election, many of the urban areas

5   experienced great population growth over the course of the

6   2010s.  And so in the 2020 election, they tried to adopt

7   measures to make voting more accessible.

8       So the drive-through voting, the 24-hour voting, the

9   drop-boxes, were all an attempt to ease the tension on the

10  voting system because of the increase in participation.

11  Q.   And I think you mentioned that Harris County was at the

12  forefront of that; is that right?

13  A.   Yes.

14  Q.   And that would include those measures that you just

15  mentioned?

16  A.   Yes.

17  Q.   So you're not saying then that any government officials for

18  the Harris County government have made it harder for people to

19  vote, right?

20  A.   No, I'm not.

21          MR. LIU:  Thank you.

22      No further questions.

23          THE COURT:  Anything by redirect?

24

25

Franita Tolson - Redirect

```
1                      REDIRECT EXAMINATION
2    BY MR. WATKINS:
3    Q.  Dean Tolson, tough question.  Do you not like white people?
4    A.  I like white people.
5    Q.  Do you distrust all white men?
6    A.  No.
7    Q.  Do you hate the state of Texas?
8    A.  No.
9    Q.  Did you come to this report with any sort of biases or
10   preconceived notions about how Texas does or does not treat
11   minorities in its state?
12   A.  No.
13   Q.  Did you bring to bear your decades of experience as an
14   academic in this field who's testified in front of Congress
15   multiple times and is the dean of a law school?
16   A.  Yes.
17   Q.  Do you believe that in the year 2023 discrimination still
18   exists in the United States?
19   A.  Yes.
20   Q.  Do you believe that in the year 2023 racism still exists in
21   the United States?
22   A.  Yes.
23   Q.  How is that possible if Barack Obama was the President?
24   A.  I don't even know how to answer that.  I will try.
25       So I think it's important to understand that the success of
```

Franita Tolson - Redirect

1   some members of a historically disadvantaged group or
2   disenfranchised group does not necessarily mean that the group
3   as a whole has overcome the barriers that stand in the way of
4   their full participation in society.
5       So the election of Barack Obama does not necessarily
6   signify that all white people are, therefore, now better off.
7   And, honestly, Barack Obama could not have been elected without
8   white people, right?
9       So we don't -- we don't draw any judgments about the status
10  of white people because of the election of Barack Obama.  It
11  seems weird to draw judgments about the election of -- I mean,
12  the status of black people based on Barack Obama, given that
13  he's just one black person.  And, in fact, he's biracial,
14  right?  But we don't -- we don't draw judgments about white
15  people from his election.  We shouldn't do that about black
16  people either.
17  Q.  What about the fact that Ted Cruz, his first name is
18  Rafael?  Does the fact that Ted Cruz's first name is Rafael and
19  he is a representative here in Texas, does that impact your
20  analysis as to whether or not SB1 had any sort of
21  discriminatory backing or reasoning?
22  A.  It does not.
23  Q.  And why is that?
24  A.  Well, I made the point during the cross that, you know, it
25  is -- it's possible for members of a minority to internalize

Franita Tolson - Redirect

1  the discriminatory attitudes of the majority.

2      So I pointed out that someone is of a particular race or

3  background doesn't really have any bearing on their views

4  necessarily, right?  Every person has their own views about the

5  world regardless of their background or as informed by their

6  background.

7      So I wasn't quite sure of the significance of pointing out

8  that they had a senator named Ted Cruz, whose real name was

9  Rafael.  I don't understand the significance of that because

10  that has nothing to do with whether or not SB1 was passed in

11  order to hurt the political power of African-Americans and

12  Latinos in the state of Texas.

13  Q.  And would you have the same answer if I asked you about the

14  district attorney of a given county or an elected official in

15  some other county in Texas?

16  A.  Yes.

17  Q.  Doesn't matter what their racial background is?

18  A.  Doesn't matter.  I think it's important to understand that

19  progress comes in fits and starts, right?  Like, you can have

20  elected officials who are people of color, and you can still

21  have an oppressed minority in this country.  Those two things

22  have coexisted.

23      Reconstruction was a time where it was the most elected

24  black officials ever, but it was a time of great oppression, of

25  great violence, of great disenfranchisement.  So it's not weird

Franita Tolson - Redirect

1  for those two things to coexist.

2  Q.  So is it fair to say, Dean, that your analysis wasn't

3  focused on the racial makeup of the Texas Legislature, but the

4  overall system which the Texas legislature put in place?

5  A.  Yes.

6  Q.  So you're examining whether or not the system put in place

7  by the Texas Legislature is or is not discriminatory?

8  A.  Yes.

9  Q.  There was some questioning about whether or not the DOJ

10  challenged drive-through voting and various other measures.

11      Do you generally remember those questions?

12  A.  Yes.

13  Q.  Was your opinion based in any way or dependent upon what

14  the DOJ chose to or not to challenge with respect to SB1?

15  A.  No.  And I also want to make the point that you can't

16  compare what the DOJ challenged in the context of Section 5

17  with what the DOJ sued over in the context of Section 2.

18  Q.  And why is that?

19  A.  Because the Department of Justice is going to make totally

20  different considerations in those contexts.

21      Section 5 was something that applied automatically.  If you

22  were a covered jurisdiction, you had to seek preclearance.

23  It's easy to object.

24      Whereas, making a decision about what to litigate and what

25  case you can make against a particular voting law is a much

Franita Tolson - Redirect

1  more difficult decision because it uses way more resources.

2  Q.  Is Texas still a covered jurisdiction?

3  A.  The city of Pasadena, Texas, is still covered.

4  Q.  How is the city of Pasadena still covered even though

5  there's no more covered jurisdictions?

6  A.  Because a federal court found that they committed

7  intentional discrimination against Latinos in 2018 with respect

8  to their redistricting plan.  So they were put under

9  preclearance.  They're only one of a handful of jurisdictions

10  still covered.

11  Q.  And that's in Texas?

12  A.  Not all of them, no.  But Pasadena is, yes.

13  Q.  There was some conversation about *U.S. Perez* and the

14  holding in *U.S. Perez*?

15  A.  *Abbott v. Perez*.

16  Q.  I'm sorry.  *Abbott v. Perez*.  My apologies.

17     And you're familiar with *Abbott v. Perez*?

18  A.  Yes.

19  Q.  And are you aware that *Abbott v. Perez* relies on the

20  *Arlington Heights* opinion by the U.S. Supreme Court?

21  A.  Yes.

22  Q.  Are you familiar with what the *Arlington Heights* factors

23  are to determine the intent behind a given piece of legislation

24  as whether or not it was discriminatory?

25  A.  Yes.  So the Supreme Court looks at a host of factors in

Franita Tolson - Redirect

1    determining whether or not discriminatory intent is present,

2    including the legislative history.  So any smoking gun

3    statements, the discriminatory impact, the historical

4    background, if there are any departures from normal procedures,

5    for example, these are a list of things that the Court looks at

6    because the question of intent is a fairly holistic one, and it

7    doesn't just rise and fall over whether or not a legislature

8    says something bad.

9    Q.  And so I want to key in on that.

10        So if one legislator from the state of Texas sent an email

11   that said, "I'm voting for SB1 because I don't like

12   minorities," does that answer the question as to whether or not

13   SB1 was passed with an ill intent?

14   A.  Not necessarily.  It would just be one piece of evidence.

15   Q.  Okay.  And so under the *Arlington* factors, courts are to

16   look at the history as well, the history of legislation?

17   A.  Yes.  Yes.  And also events that happened contemporaneous

18   to the legislation being passed.

19        So the things that happened in the 2020 election in terms

20   of the increase in turnout, the methods that people of color

21   used to cast a ballot, the actions taken by Governor Abbott in

22   limiting each county to one drop-box prior to the enactment of

23   SB1, these are all things that a court will consider in

24   thinking through whether or not SB1 is -- was passed with

25   discriminatory intent.

Franita Tolson - Redirect

1  Q.  So does your report provide guidance to a court in looking

2  at the historical context of SB1 which is required under the

3  *Arlington* factors?

4  A.  Yes.

5  Q.  There was also some talk about whether or not SB1 did or

6  did not disenfranchise particular minorities or not majority

7  voters.

8       Are voting suppression laws scalpels or clubs?

9  A.  No, they're not scalpels.

10      So it is inevitable that anytime you pass a suppressive

11  law, that some majority voters will be captured in that law.

12  This is why there was such difficulty after the Civil War and

13  really post-reconstruction, of trying to pass statewide laws.

14  And you had a mix of statewide and local laws to disenfranchise

15  because the -- because white voters could not agree on the best

16  way to disenfranchise people of color without unduly affecting

17  white voters.

18  Q.  There was a screenshot of a website that was shown to you

19  about the number of registered voters in Texas.

20      Do you remember that?

21  A.  Yes.

22  Q.  And there -- there was some counting, that it's 23 down and

23  all that.

24      Did that chart -- first off, do you know where that chart

25  came from?

Franita Tolson - Redirect

```
 1  A.  Yes.
 2  Q.  Where did it come from?
 3  A.  World Population Review, I believe is the name of the
 4  website.
 5  Q.  Do you know what the underlying data is that supports that?
 6  Is it census data?  Or where is that information?
 7  A.  I'm not sure.
 8  Q.  Okay.  You talked about timing in terms of color-blind
 9  targeting --
10  A.  Uh-huh.
11  Q.  -- in your --
12  A.  Yes.
13  Q.  -- initial testimony.
14      Did I understand you correctly that the point of timing is
15  that legislation, discriminatory legislation occurs on the
16  heels of some big uptick or some change?
17  A.  So discriminatory legislation tends to happen when minority
18  groups are especially active in a prior election cycle or if
19  there's a huge growth in the minority population or if the
20  majority perceives that there's some threat to their governing
21  coalition.  It's very reactionary, so you tend to see new
22  legislation on the heels of some event.
23      And so in this case the event was 2020, right, because you
24  had historic turnout among minority communities.
25  Q.  So the website screen-grab about the number of registered
```

Franita Tolson - Redirect

1  voters in the state of Texas, does that speak at all to the
2  timing issue as to why SB1 might be massed?
3  A.  It doesn't speak to the timing issue, and it also doesn't
4  speak to the voters who just didn't turn out because they
5  thought that voting would be too hard.  It just spoke to
6  registration.
7  Q.  Does it -- does it speak to how many eligible registered
8  voters there are, whether or not they did or did not register?
9  A.  No.
10  Q.  So could there be a situation where the number, the raw
11  number of registered voters goes up, but the percentage of
12  eligible registered voters has gone down?
13  A.  Yes.
14  Q.  And that's not evident from that screen-grab?
15  A.  No.
16  Q.  There was some back and forth about the Voter Rights Act
17  being landmark legislation and it increasing the desire for
18  people to vote, and SB1, in the State's terms, was also
19  landmark legislation, but people don't want to vote as a
20  result.
21     And you said it's an apples-to-oranges comparison?
22  A.  You can't really compare the two.
23  Q.  Why do you call it an apples-to-oranges comparison?
24  A.  Well, the Voting Rights Act fundamentally reshaped the
25  South, right?  So it did what the 14th and 15th Amendment

Franita Tolson - Redirect

1  should have initially did after the Civil War.  It brought

2  African-Americans into the political community of the South.

3  It made them voters, both African-American men and women this

4  time.

5      This particular law has provisions that actually turn -- it

6  turns back the clock, right?  So to the extent that these

7  counties were trying to adopt measures in order to make it

8  easier for people to vote, to push us more towards an inclusive

9  democracy, it's harder to do that after this law.

10      And so I don't quite understand how you can compare that to

11  the Voting Rights Act, which actually encouraged participation,

12  encouraged turnout, to the extent that the federal government

13  was willing to police the South for almost fifty years to

14  ensure that this would be the case.

15  Q.  And that is different than SB1, which, in your estimation,

16  makes it more difficult to vote?

17  A.  Yes.

18  Q.  There was some conversation about generational trauma.

19      Do you remember that?  Or generational memory?

20  A.  Yes.  Yes.

21  Q.  Is all -- is all generational memory based on actual

22  historical events?

23  A.  No, not necessarily.

24  Q.  Is SB1 and what we're seeing on SB1 and the provisions

25  we've talked about, are those historically analogous?

Franita Tolson - Redirect

```
 1   A.  Yes.
 2   Q.  Does generational trauma cause people to be removed from
 3   voting lists?
 4   A.  No.
 5   Q.  Does generational trauma cause mail-in ballots to be
 6   rejected?
 7   A.  No.
 8   Q.  Does generational trauma cause someone to not show up
 9   because they're concerned they'll be prosecuted?
10   A.  No.
11   Q.  Does generational trauma cause poll watchers to commit
12   violence or illegal acts at a polling place?
13   A.  No.
14   Q.  Regardless of the age of a given legislator, are
15   legislation -- are legislatures able to see or recognize what
16   may or may not have been effective ways to police a vote
17   historically?
18   A.  Yes.
19   Q.  They have that knowledge?
20   A.  Yes.
21   Q.  There was some case law cited that state legislatures do
22   not need to wait for voter fraud to occur in order to enact the
23   legislation.  Do you remember that?
24   A.  Brnovich, yes.
25   Q.  I'm sorry?
```

Franita Tolson - Redirect

1  A.  It's the *Brnovich* case.

2  Q.  The *Brnovich* case.

3      If that is so, why is it then, Dean, that you take issue

4  with SB1, even if there wasn't any voter fraud?

5  A.  Because I don't think that *Brnovich* stands for the

6  proposition that you can create a fraud justification out of

7  whole cloth either, right?

8      So one of the things the Supreme Court did in that case is

9  they pointed to election fraud in North Carolina, and they

10  said, you know, Arizona could have been concerned about what

11  was going on there and responded.

12      Here, my sense is that Texas is not necessarily pointing to

13  anything that's happening in other states, at least not from

14  what I can tell from what I -- what I've read.  But even more

15  so, it -- what's striking to me is the disconnect between the

16  justification and what SB1 actually does.  And so it's almost,

17  like, illogical, right?

18      So to the extent that the State is actually concerned about

19  fraud, why isn't there any provisions of SB1 that actually

20  addresses the fraud that they are concerned about?

21      And that's my question.  So it's not that states can't be

22  concerned about fraud.  It's not that states have to wait for

23  fraud to happen.  My question is, how does the provisions of

24  SB1 actually prevent fraud?

25  Q.  Now, there -- you recall there was some back and forth

Franita Tolson - Redirect

1  between you and my friend on the other side about whether or

2  not SB1 depended on the opinion of someone thinking that it

3  would or would not address fraud.

4      Is it just your opinion that SB1 will not address the fraud

5  that was actually complained of, or will that -- is it actually

6  they're pointing over here for a problem that's on the other

7  side?

8  A.  So when I'm in these positions, I like to think about

9  things from a rationality standpoint because that's the lowest

10 standard of review that courts use in assessing laws, right?

11 Is it a rational exercise of the state legislature's power to

12 pass this law, right?  And they try to draw a connection

13 between the means and the ends.

14     So one of the reasons why I think that's useful -- and

15 that's not the standard here.  But it does just ask a basic

16 logic question:  Does this law make sense?

17     When I asked that question about SB1, I had a very

18 difficult time connecting the dots.

19 Q.  And why is that?

20 A.  Because the means and the ends don't fit.  It's not a good

21 way of addressing voter fraud, if that's what you are concerned

22 about.  What it does do is make it harder to vote.

23          MR. WATKINS:  Can we see Exhibit 59 again.

24     Dean, this is your report.  Can we go to Page 48, please.

25 And can you blow up the footnotes at the bottom, notes 251 to

Franita Tolson - Redirect

 1  257.  Just the whole block there.

 2  BY MR. WATKINS:

 3  Q.  Dean, take your time just to look through this if you like.

 4  But do you see any reference in footnotes 251 to 257 to Mi

 5  Familia Vota's complaint?  It's coming back.

 6  A.  Okay.  I don't read that fast.

 7          THE TECHNOLOGIST:  What page?

 8          MR. WATKINS:  Page 48.

 9  BY MR. WATKINS:

10  Q.  And look at notes 251 to 257.

11  A.  Okay.

12  Q.  Is there any reference there to the Mi Familia Vota

13  complaint?

14  A.  No.

15  Q.  Jump over to Page 16, please.  And can you blow up 63 to

16  69.

17      Do you see any reference there to the Mi Familia Vota

18  complaint?

19  A.  No, I don't.

20  Q.  Can we look at Page 34, please, and then 177 to 181.

21      Any reference there to the Mi Familia Vota complaint?

22  A.  No.

23  Q.  Is it fair to say that out of the 265 different footnotes

24  in your 50-page expert report, the majority of those are not

25  citing to the Mi Familia Vota complaint?

Franita Tolson - Redirect

1   A.  Yes.  That's true.

2   Q.  Your report is not based -- or your opinions are not based

3   on what was or was not in the Mi Familia Vota complaint?

4   A.  No, it's not.

5   Q.  There was some discussion about a provision in SB1 that

6   allows people to leave work to vote, and that was characterized

7   as a good thing.

8   A.  Yes, it was.

9   Q.  Do you remember that?

10  A.  Yes.

11  Q.  Are you aware that that same provision also allows

12  employers to deny employees to leave work so long as the

13  employee has a -- has two hours off between shifts?

14  A.  Yes.

15  Q.  Do you see any historical analogue to that being

16  discriminatory?

17  A.  It sounds very familiar to when employers would control the

18  vote of Latinos with respect to the poll tax.

19  Q.  What do you mean?

20  A.  Right, so the employers dictated to that demographic how to

21  exercise their right to vote, right?  So not only telling them,

22  you know, who to vote for, but often, you know, directing them

23  in terms of filling out the ballot and so on.

24      So it got really granular.  And so giving employers control

25  in this context reminds me of that because it's giving

Franita Tolson - Recross

```
 1  employers essentially veto authority over somebody's ability to
 2  leave and go vote.
 3      And so that's why it doesn't sit very comfortably with me,
 4  because I do see that historical analogue.
 5  Q.  Last question, Dean.  Based off of all of your review of
 6  the primary and secondary sources, your understanding -- your
 7  understanding of the law in this area and your decades' worth
 8  of work in this specific space, do you have an opinion as to
 9  the reasoning behind SB1?
10  A.  My view is that SB1 was passed in order to make voting
11  harder for minorities in the state of Texas.
12          MR. WATKINS:  Thank you, Dean.
13          THE COURT:  Anything else from this side?
14      Any other cross?
15                   RECROSS-EXAMINATION
16  BY MR. KERCHER:
17  Q.  Dean, that last question asked you if you had an opinion as
18  to the reason why SB1 was passed, true?
19  A.  Yes.
20          MR. KERCHER:  Brian, can we pull up Dean Tolson's
21  deposition, Page 85, line 25, Page 86, line 6.  Sure.  It's 85,
22  line 25, 86, line 6.
23  BY MR. KERCHER:
24  Q.  "Question:  Are there any provisions of SB1 that, in your
25  opinion, were enacted by the Texas Legislature for a purpose
```

1  other than to discriminate or to disenfranchise minority

2  voters?

3      "Answer:  So questions about the intent of the legislature

4  I think are outside the scope of my report."

5      Did I read that correctly, Dean?

6  A.  Yes.

7          MR. KERCHER:  Pass the witness, Your Honor.

8                  FURTHER REDIRECT EXAMINATION

9  BY MR. WATKINS:

10  Q.  Dean, how do you square that last question?

11  A.  So I took that question to mean, were there any smoking gun

12  evidence, could I speak to any of the intentions of the

13  legislature as it pertains to any statements made.

14      But just by definition, the nature of my report is going to

15  bear on the question of discriminatory intent because of how

16  the Supreme Court has articulated the *Arlington Heights*

17  factors.  But it is providing background and context for SB1,

18  which is relevant, but it's not traditional direct intent

19  evidence as if when someone is saying, I passed this law in

20  order to disenfranchise black and brown people.

21          MR. WATKINS:  Thank you, Dean.

22          THE COURT:  You may step down.  Thank you.

23          THE WITNESS:  Thank you.

24          THE COURT:  Your next witness?

25          MS. HOLMES:  Good afternoon, Your Honor.  The HAUL

Daniel Smith - Direct

 1  plaintiffs call Dan Smith as our next witness.
 2      *(Witness enters courtroom)*
 3      *(The oath was administered)*
 4          MR. GENECIN:  If I may approach the witness, Your
 5  Honor?
 6          THE COURT:  You may.
 7          MR. GENECIN:  Thank you.
 8          THE WITNESS:  Thank you.
 9          MR. GENECIN:  Good afternoon, Your Honor.  I'm Victor
10  Genecin of -- an employee of NAACP Legal Defense Fund
11  representing the HAUL plaintiffs.  And our next witness is
12  Professor Daniel Smith who will testify about the following
13  sections of SB1:  3.04, 3.09, 3.10, 3.13, 4.12, 5.02, 5.03,
14  5.06, 5.07, 5.08 and 5.13.
15          THE COURT:  5.13?
16          MR. GENECIN:  Yes.  Sorry.
17          THE COURT:  Thank you.
18          DANIEL SMITH, PLAINTIFFS' WITNESS, SWORN
19                  DIRECT EXAMINATION
20  BY MR. GENECIN:
21  Q.  Good afternoon.  Could you state your name for the record,
22  please.
23  A.  Yes.  Daniel A. Smith.
24  Q.  And are you a professor, sir?
25  A.  I am.

Daniel Smith - Direct

1  Q.  Were you retained by the Houston Area Urban League

2  plaintiffs in this case?

3  A.  Yes.  That's correct.

4  Q.  And as part of that engagement, am I correct that you've

5  prepared several expert reports?

6  A.  Yes, five.

7  Q.  And am I correct that the corrected version of the first

8  report that you prepared in this case was dated May 13th of

9  2022?

10  A.  Yes.

11        MR. GENECIN:  And, Derek, if you could pull up HAUL

12  MFV 310.

13  BY MR. GENECIN:

14  Q.  And, Dr. Smith, that's at tab 1 of your binder.  Are you

15  able to identify this report?

16  A.  Yes.

17  Q.  What is it, sir?

18  A.  This is the first report I wrote in this case.  It deals

19  with issues in Harris County.

20  Q.  All right.  And does it discuss the subjects of

21  drive-through voting and 24-hour voting in Harris County in the

22  November 2020 election?

23  A.  That's correct.

24  Q.  And it does that using data provided by Harris County; is

25  that right?

Daniel Smith - Direct

1    A.  By Harris County, and I also use a statewide voter file.

2    Q.  And you'll understand going forward here that it's this

3    report that I'm referring to if I call this your May 2022

4    report?

5    A.  Yes.

6    Q.  Now, am I correct that you also prepared a report dated

7    April 29th of 2022?

8    A.  April 29th, yes.

9    Q.  Yes.

10        And, Derek, if you would pull up HAUL MFV 60, please.

11        Dr. Smith, that's at tab 2 of your binder.

12   A.  Yes.

13   Q.  Can you tell us what this exhibit is?

14   A.  Yes.  This is analysis I did --

15   Q.  No, no.  Wrong number here.  That's HAUL MFV 060, not 006.

16   A.  Yes.  This is my second report.  It relies on data provided

17   by five counties and it looks at absentee ballot rejection

18   rates in the March 2022 Primary Election.

19   Q.  And which were the counties that provided the data for this

20   report?

21   A.  Harris, Tarrant, Dallas, Hidalgo and El Paso counties.

22   Q.  And am I correct you also prepared a report, dated April

23   22nd of 2023, addressing the March 2022 primary and that that

24   report used data provided by the Secretary of State in the

25   state of Texas?

Daniel Smith - Direct

 1  A.  That is correct, almost nine months later.

 2  Q.  Yes.  All right.

 3      Derek, if you would pull up Exhibit OCAPX 255, please.

 4      And, Dr. Smith, if you would have a look at tab 3 of your

 5  binder.

 6  A.  Yes.  Yes.  This report relied on data that I received from

 7  the Secretary of State's office, and that allowed me to analyze

 8  both applications by mail as well as ballots by mail and

 9  looking at the rejection rates in the March 2022 Primary across

10  many counties; not all counties, but many counties.

11  Q.  And if I refer to this as your April 2023 report, you'll

12  understand that I'm referring to this exhibit that's at tab 3

13  of your binder?

14  A.  Yes.

15  Q.  Am I correct that you also prepared a report dated March

16  20th of 2023, and that report addressed the November 2022

17  General Election using data provided by Harris and Travis

18  counties?

19  A.  That is correct.

20  Q.  Derek, if you would pull up Exhibit HAUL MFV 313.

21      And, Dr. Smith, you can also look at tab 4 of your binder.

22  A.  Yes.

23  Q.  Are you able to identify this exhibit, sir?

24  A.  Yes.  It is as you described.

25  Q.  And am I correct that this report focuses on the effect of

Daniel Smith - Direct

1  the ID match requirements, all minority voters' applications

2  for ballots by mail and ballots by mail in Harris and Travis

3  counties in the November 2022 election?

4  A.  Not applications, just ballots, if I recall correctly.

5  Q.  All right.

6  A.  Those are the data I received from those two counties.

7  Q.  All right.  And you'll understand what I'm referring to if

8  I call this your March 2023 report, sir?

9  A.  Yes.

10  Q.  And now if you'd have a look -- Derek, if you would pull up

11  HAUL MFV 311, please.

12      And, Dr. Smith, you can find that at tab 5 as well.

13  A.  Yes.

14  Q.  Are you able to identify this document, sir?

15  A.  Yes.  This is that report as you described.

16  Q.  All right.  Is that a report dated June 7th of 2023?

17  A.  Correct.

18  Q.  Does it concern the effect of the ID match requirements on

19  minority voters' applications and ballots by mail in the

20  November 2022 election based on Secretary of State data?

21  A.  That is correct.

22  Q.  So the difference between this June 7th of 2023 report and

23  your March 20th of 2023 report is that the March report uses

24  Harris County and Travis County data, while the June report

25  uses Secretary of State data; is that right?

1  A.  That is correct.

2  Q.  Okay.  Now, if you would have a look, please, at tab 6.

3  A.  Yes.

4  Q.  And, Derek, if you would pull up HAUL MFV 394.

5      Are you able to identify this document, sir?

6  A.  Yes.

7  Q.  And what is it?

8  A.  This is an addendum to that June report, where I simply

9  used the same underlying data and divided a table based on

10  surname, Hispanic or Spanish surname.

11      MR. WASSDORF:  Your Honor, I'm going to object to the

12  use of this exhibit, whether or not it is introduced into

13  evidence.

14      This report was produced long after the extended expert

15  report deadline and less than 30 days before trial.

16      THE COURT:  Are you planning to introduce 394?

17      MR. GENECIN:  We certainly are, Your Honor.

18      This addendum was, in fact, the subject of a motion in

19  limine by the State defendants.  That motion in limine was

20  briefed.  It was not argued.  The State defendants have not

21  sought up till today to argue it.

22      On the other hand, when we discussed this -- the

23  possibility of the State defendants moving in limine against

24  this addendum, I offered them the opportunity to depose

25  Professor Smith.

Daniel Smith - Direct

1    I will tell you that with regard to his lengthy third

2  supplemental report of June 7th, the State defendants took

3  approximately two hours to depose Dr. Smith.  This addendum,

4  which is three pages and one table, they certainly would have

5  been able to depose him about in that time or perhaps even

6  less.

7    Between the time that we offered that deposition and the

8  start of trial, 26 days elapsed.  Between the start of trial

9  and today, a further 15 business days have gone by.

10    I repeatedly, during that time, on September 11th and again

11  on September 18th, offered the opportunity to the State

12  defendants to examine Dr. Smith.  The only discovery that they

13  could possibly need about that addendum has to do with the

14  addendum itself and Dr. Smith's preparation of it.

15    It is entirely based on data produced by the State of Texas

16  that has always been in the hands of the State of Texas.  So

17  our view is, they could have had the discovery they wanted.  As

18  a practical matter, what they've done is wait until we are here

19  before you to bring this motion in limine to your attention.

20        THE COURT:  What was the purpose behind 394 compared

21  to 311?  What was -- was the data corrected?  What was the

22  intent behind the producing of 394?

23        MR. GENECIN:  394 produces for the General Election an

24  analysis of the impact on voters with Hispanic surnames of

25  having their application for ballot by mail rejected.

Daniel Smith - Direct

1      That analysis was performed by Dr. Smith in Exhibit OCAPX

2  255 in connection with the March primary.

3          THE COURT:  Well, and my point -- my point is, did you

4  make the point in OCA 255 or HAUL 311?  What's the necessity of

5  HAUL 394?

6          MR. GENECIN:  Well, the point is made more clearly

7  because the actual numbers are broken out so that the Court can

8  see the --

9          MR. WASSDORF:  Your Honor --

10          MR. GENECIN:  -- the effect of the --

11          THE COURT:  Let him finish.

12          MR. GENECIN:  Yeah -- so that the Court can see the

13  effect on voters of having their ballot by mail rejected, their

14  application rejected.

15          MR. WASSDORF:  To simplify things, it corrected an

16  oversight in HAUL 311 after we deposed Dr. Smith on HAUL 311.

17  The data was not broken down by race in HAUL 311, and in 394

18  they broke it down by race.

19          THE COURT:  And so why didn't you take up the offer to

20  redepose him on these, I'm told, four pages or whatever?

21          MR. WASSDORF:  Because we were in the middle of trial,

22  Your Honor.

23          THE COURT:  So let's just take this one at a time.

24  Work through the four.  We'll see if we get to number five.

25  I'll see whether he can cure any prejudice by any questions

Daniel Smith - Direct

```
 1  here on the fly.  And I reserve judgment on 394.
 2          MR. GENECIN:  Okay.
 3  BY MR. GENECIN:
 4  Q.  Now, could you turn to tab number 5, your June 2023 report,
 5  sir.
 6  A.  Yes.
 7  Q.  And specifically to Page 48.
 8  A.  Yes.
 9  Q.  Does your curriculum vitae appear starting at Page 48 of
10  that report?
11  A.  That's correct.
12  Q.  And is the curriculum vitae that's there contain a complete
13  and accurate summary of your background and professional
14  experience as of the time of your June 2023 report?
15  A.  No.  There have been updates.
16  Q.  All right.  Well, as of --
17  A.  As of the June, yes, that was the current one, correct.
18  Q.  And since then, you've updated your curriculum?
19  A.  Yes.  I keep living.
20  Q.  All right.  And so if you would have a look at tab 7, and
21  if we could have HAUL MFV 401 on the screen, please.
22      Are you able to identify this document?
23  A.  Yes.  That's my current CV.
24  Q.  And does that show your background and professional
25  experience up to today?
```

Daniel Smith - Direct

```
 1   A.  Yes.  None of those things have changed.
 2   Q.  Okay.  And so I'd like to ask you about your background and
 3   professional expertise.
 4       Can you tell us first about your education, please?
 5   A.  Sure.  I received my Ph.D. almost 30 years ago at the
 6   University of was Wisconsin Madison in political science.
 7       Prior to that, I earned a master's degree there in
 8   political science.  And I earned my bachelor's degrees in
 9   political science and history at Penn State University.
10   Q.  And are you currently employed, sir?
11   A.  Yes.  I am a professor and the chair of the political
12   science department at the University of Florida.
13   Q.  And how long have you been a professor at the University of
14   Florida?
15   A.  Since 2003, I came in with tenure as an associate
16   professor.  I was promoted in 2010 to full professor, and I've
17   been chair since 2017.
18   Q.  And what classes do you teach at the University of Florida?
19   A.  Currently I'm not teaching much because of my
20   administrative duties.  But when I do teach, I teach graduate
21   and undergraduate courses.  I teach a big survey class on state
22   politics, usually with 300 students, undergrads, and six or
23   eight TAs.
24       I teach state politics graduate seminar, political parties,
25   undergraduate and graduate, courses on election administration
```

1  reform.  And my earlier career focused largely on direct

2  democracy, ballot measures.  I've taught classes on that as

3  well.

4  Q.  And are those also your principal areas of interest and

5  your scholarly research?

6  A.  Yes.  That is exactly correct.

7  Q.  And have you published peer-reviewed articles on these

8  subjects?

9  A.  Yes.  I have published quite a few peer-reviewed articles

10 over my career on state-level politics.  Sometimes I deviate

11 and focus on Ghanan politics, when I was Fulbright scholar in

12 Ghana at the University of Ghana Legon.  But most of the

13 articles are focusing on state-level election administration

14 and voting rights and various types of behavior of individuals

15 across the states.

16 Q.  And approximately how many peer-review articles have you

17 published on election administration and voting practices?

18 A.  Yes.  I published roughly 80 peer-reviewed journal

19 articles, another close to 30 peer-reviewed book chapters, and

20 I've authored three books, all having to do with state

21 politics.

22 Q.  And of these articles, have any of them been on the topic

23 of mail-in voting?

24 A.  Yes.

25 Q.  And on various modalities of voting and their use by

Daniel Smith - Direct

```
 1  different ethnic or racial groups?
 2  A.  Yes.
 3  Q.  All right.  Have you written on the subject of voting
 4  hours?
 5  A.  Yes.
 6  Q.  And the impact of voting hours on different racial and
 7  ethnic groups?
 8  A.  Yes.
 9  Q.  Have you taught courses in which different voting
10  modalities have been the subject matter of the course?
11  A.  Yes, I have.
12  Q.  Now, in your expert reports in this case, you apply various
13  statistical methods to voting data.
14      Have you published scholarly work using the same methods
15  that you use in your expert reports in this case?
16  A.  Yes, I have.
17  Q.  And what kinds of quantitative analysis do you use in your
18  reports in this case?
19  A.  So I use several.  I draw on regression analysis, which
20  I'll talk about, I hope, later.
21      I use a method of bounds analysis that's an accounting
22  process to calculate likelihood of an individual engaging in
23  some type of activity.
24      I used descriptive analysis that's using administrative
25  data.  So there's no statistics per se.  It's just looking at
```

Daniel Smith - Direct

1  the raw data coming from the election administrator or the
2  state.
3      I use all those, as well as other techniques, statistical
4  techniques in my scholarly work.  I'm very much driven by
5  questions.  And so I approach both my scholarly work with
6  interesting questions, interesting problems, and I try to
7  answer them with appropriate and very commonly used statistical
8  methods.  And I do the same thing when it comes to my work as
9  an expert.
10 Q.  Have you taught courses on these quantitative analysis
11 methods?
12 A.  Yes, in all my classes, including my undergraduate classes,
13 including all the honors students and graduate students, my
14 approach is applying statistics to questions.  So I'm not out
15 there teaching pure statistics.  I have a lot smarter junior
16 faculty who are very well trained who come in and teach those
17 core courses and can connect with the students better than an
18 old codger like me.  But in all my classes we are going over
19 the statistical methods and criticizing them as well as having
20 students apply them in their own research.
21 Q.  Has your work been cited by other scholars?
22 A.  Yes, it has.  I think I'm up to 4,000 or -- not that I
23 count.
24 Q.  But I think Google does, doesn't it?
25 A.  Google does, yes.  I think I'm over 4,000 citations, which

Daniel Smith - Direct

1   is probably the top one or two out of my faculty of 40 at the
2   University of Florida.
3   Q.  Have you served as peer reviewer for an academic journal?
4   A.  Yes.  That's an obligation that I have as a senior scholar.
5   Q.  All right.  And when you -- okay.  So in the past, have you
6   been retained as an expert on election and voting cases?
7   A.  Yes, I have.
8   Q.  Approximately how many times have you served as an expert
9   witness?
10  A.  Dozens.
11  Q.  All right.  Have you done expert work in Texas in the past?
12  A.  Yes.  I have authored three different reports on three
13  different cases in Texas.
14  Q.  And in how many cases have you conducted expert analysis on
15  the question whether an election law has a racially
16  discriminatory impact?
17  A.  Well over a dozen, probably close to 20 at this point.  And
18  not only in Florida, but in places like Georgia and Alabama and
19  other states around the country.
20  Q.  And in the cases in which you've been retained as an
21  expert, have you always found that there was discriminatory
22  impact?
23  A.  No.  I follow the data.
24  Q.  And when you're retained as an expert, do you employ the
25  same quantitative analysis methods that you use in your own

Daniel Smith - Direct

```
 1  research?
 2  A.  Yes.  I'm very conservative in that I rely on the same ones
 3  that I'm familiar with as a scholar and apply them to my work
 4  as an expert.
 5  Q.  Have you been accepted as an expert witness by courts in
 6  cases involving the impact of election laws on voters?
 7  A.  Yes.
 8  Q.  And has a court ever declined to recognize you as an expert
 9  on that subject?
10  A.  No.
11  Q.  Have courts previously credited and relied upon your
12  testimony?
13  A.  Yes.  I've been credited at the Federal District Court, of
14  course, as well as in appellate courts, the 11th Circuit, the
15  6th Circuit come to mind, in cases that went all the way up to
16  the U.S. Supreme Court, in fact.
17  Q.  And the cases in which you've served as an expert appear,
18  if you'd look at your curriculum vitae tab 7, HAUL MFV Exhibit
19  401 --
20  A.  Yes.
21  Q.  -- starting at Page 9, going through Page 11.
22      Do those pages reflect the cases in which you have appeared
23  as an expert witness or served as an expert witness?
24  A.  Yes.  Those are all included, as well as other things that
25  I've done that are not before a court.
```

Daniel Smith - Direct

1          MR. GENECIN:  So, Your Honor, pursuant to Federal Rule

2    of Evidence 702, the HAUL plaintiffs proffer Professor Smith as

3    an expert in voting and elections in the American states.

4          MR. WASSDORF:  No objection, Your Honor.

5          THE COURT:  He's recognized as such.

6          MR. GENECIN:  All right.  And then, Your Honor, at

7    this time, I move HAUL MFV 310, HAUL MFV 60, OCAPX 255, HAUL

8    MFV 313, HAUL MFV 311 and HAUL MFV 401 into evidence.

9      And that means we are holding in abeyance, as Your Honor

10   just directed, our application to accept HAUL MFV 394 into

11   evidence.

12         THE COURT:  Any objections to 310, 60, OCA 255, 313,

13   311, or 401?

14         MR. WASSDORF:  No objection, Your Honor.

15         THE COURT:  All those exhibits are admitted.

16   BY MR. GENECIN:

17   Q.  Now, Professor Smith, I understand that you brought some

18   slides with you to give an overview of your empirical

19   investigations into the effects of SB1; is that right?

20   A.  Yes.  I thought it was prudent to do so since I have these

21   five reports over a year and a half, yes.

22         MR. GENECIN:  All right.  So, Derek, could you move

23   through the slides as Dr. Smith is ready, starting with slide 1

24   of the PowerPoint.  Okay.

25

Daniel Smith - Direct

1   BY MR. GENECIN:

2   Q.  And if you'd go to slide 2, Professor Smith, could you

3   describe the tasks that you were asked to carry out in this

4   case?

5   A.  Yes.  The plaintiffs asked me to look both at the effects

6   of SB1 on types of voting that were in place in the 2020

7   General Election that were then eliminated, as well as look at

8   the effects of SB1 in the elections since the passage of and

9   implementation of SB1.

10       And so I have on this first slide some of those that I

11   focused on at county-level data where I received it, primarily

12   in Harris County and looking at their use of drive-through,

13   early voting in the 2020 General Election, their use of

14   extended hours, 24-hour voting in the 2020 General Election.

15       But then I also looked as data came in, and we've already

16   kind of talked about some of that, of the effects of SB1's new

17   identification requirements on both the applications for ballot

18   by mail as well as ballot by mail in both the Primary 2022 and

19   General 2022 Elections, using both county-level data when I

20   received it or data from the Secretary of State, which included

21   more counties.

22       And I've also tried to estimate, using those data, the

23   effects on people's turnout, especially with respect to the

24   applications that were rejected and whether or not individuals

25   would substitute and somehow turn out to vote after their

Daniel Smith - Direct

1  applications were rejected in those elections.

2  Q.  And could you describe for the Court just briefly what

3  conclusions you reached?

4  A.  Sure.  Persistently, across these different elections,

5  across both the methods that were eliminated as well as now the

6  requirements put in place, black and Hispanic voters are

7  disproportionately impacted by SB1.

8      And I will go through these in detail, I hope, today in

9  terms of the usage of drive-through voting and extended-hour

10 voting by black and Hispanic voters in Harris County, but also

11 looking at the disparate impact of these identification

12 requirements in the applications and -- the applications and

13 whether or not people who have their applications rejected were

14 more or less likely to turn out to vote, broken down by race

15 and ethnicity, as well as absentee ballots themselves being

16 rejected and these ballot by mails, as I'm calling them, in

17 both the Primary and General Elections in 2022.

18 Q.  So let's talk about how you reached those conclusions.  I'd

19 like you first to help us understand what data you had and what

20 data you didn't have or that was missing and walk us through

21 that issue.

22 A.  Sure.  I put together a slide, if we could go to the next

23 one, that kind of summarizes, for the Harris County 2020

24 General Election, the data I relied on.  I received data from

25 Harris County, what are known as cumulative EV, or early

Daniel Smith - Direct

 1  voting, files.

 2     These include all the voters who voted before election day.

 3  There are flags in there, columns that I can identify whether

 4  they voted at a drive-through voting location or if they voted

 5  after hours, if Harris County, which it did, had extended

 6  hours.  I can eliminate people who voted by mail if those were

 7  included.  I know the time and place where they are.

 8     And I have, in this case, the voter unique identifier, what

 9  I'm going to refer to, Your Honor, as VUID, that when I have

10  that, I can link it to data from the State and, in this case,

11  able to link it to a statewide voter file from January of 2022.

12     I would have liked to have had a voter file that was closer

13  to the 2020 General Election.  But that's what I had and didn't

14  get any other data that I -- would have been closer in time.

15     But those are kind of broadly understood as the data that

16  I'm going to be using and use in other analysis as well.

17     I also rely on census data, and Texas has a great portal,

18  the Texas Capitol Data Portal that provides census data.  And

19  that's really important because we don't have race and

20  ethnicity as we do in, say, Florida or North Carolina or

21  Georgia or other states at the individual level.

22     In Florida, I'm identified as a white male, and my age, my

23  birthday is there.  It's all publicly available.  In Texas, we

24  don't have the race or ethnicity available to the public, and I

25  didn't get it in any discovery.  Although I know that the State

Daniel Smith - Direct

1  of Texas has the ability to provide that data.

2      But as a result, I have to use census data to be able to

3  create individuals within various types of census blocks.

4  That's the smallest unit of analysis that the U.S. Census

5  provides.  It's an actual count of individuals broken down by

6  their race or ethnicity.

7      The VTD is the abbreviation for a voting tabulation

8  district.  That's a generic term that the census uses for what

9  we would call in Texas a "precinct."  We call that the same

10  thing in Florida.  The VTD is effectively a precinct.

11      And the census aggregates data up or it's data that's --

12  ability to aggregate up from smaller census blocks to generally

13  larger precincts.  And again, these are exact counts of the

14  number of black individuals and the number of people who are

15  white or who are -- identify as Hispanic with respect to their

16  ethnicity.

17      I draw on some data from the Harris County department

18  website as you'll see in this -- in this presentation.

19  Sometimes media accounts.  Again, I used media accounts here

20  because I was surprised that Harris County was the only county

21  in Texas that was using drive-through voting.  And, in fact, I

22  found out that Bee County, according to media reports, was

23  using drive-through voting, but I didn't receive any data from

24  Bee County to analyze.

25      And then, of course, throughout my reports, I rely on

Daniel Smith - Direct

1   scholarly literature, not only my own, but others in the field,

2   peer-reviewed literature that puts some of my analysis into

3   context.

4   Q.  And how about your subsequent reports?  You've told us now

5   about your first report, the May of 2022 report.  How about the

6   subsequent ones in April of 2022, April of '23, March of '23

7   and June?

8   A.  We can flip to the next slide.  I won't belabor this.  It's

9   similar.

10      These are looking at the applications, ballot by mail,

11  BBMs, and ballot by mail across these four reports.  Some of

12  the reports rely on data that I received directly through

13  discovery from counties.  For instance, the April 29th, 2022

14  relies on data from Harris, Tarrant, Dallas, Hidalgo and

15  El Paso counties.  I received data from a couple counties in

16  2022 November election.  Harris and Travis were two counties

17  that I could actually process and analyze.

18      But then I also have data from the Secretary of State's

19  office.  I was able to acquire through public records requests

20  more snapshots of the voter file.  The voter file, Your Honor,

21  is continuously being updated, this TEAMs, and so you get

22  snapshots whenever you request them.

23      And the snapshots are going to be accurate at that moment

24  but not necessarily precise over time, and so there's always

25  what we call scholar slippage.  There's never an ability to

Daniel Smith - Direct

 1  match exactly an election to a voter file because there are

 2  voters who are -- may be on a suspense list that are brought in

 3  and are eligible or who thought they weren't eligible and then,

 4  through a process, are able to be validated and be able to vote

 5  a provisional ballot, for instance.

 6      So these are snapshots in time.  The idea here is to be

 7  able to link the administrative data from counties, or in the

 8  case from the State, when they provided me with coverage that

 9  was not all 254 counties, but more than half in most cases, not

10  all, and link using the unique VUID data to the administrative

11  data.

12      So administrative data linked to the voter file, that's

13  really important in terms of being able to geocode, meaning

14  taking an address and placing these individuals into a census

15  block or into a VUID -- I'm sorry -- into a VTD, voting

16  tabulation district, and being able to then get the

17  characteristics of the individuals in those jurisdictions.

18      So I rely on data that the State provided through discovery

19  for the March 2022 Primary, rejection vote-by-mail

20  applications, rejected and accepted ballot by mail in that

21  election and, similarly, rejected and received.  And you'll

22  notice from that slide that I don't have received absentee

23  ballots by mail, for instance, in the March 2022 primary from

24  the State.  They didn't provide a file with that information.

25  So I had to figure out how to create a denominator, to figure

Daniel Smith - Direct

1  out the rejection rates.

2      These files need to have a reason for rejection, not just

3  that the ballot was rejected, in order for me to be able to

4  determine what the impact was SB1 -- of SB1, and to determine

5  the impact for different racial or ethnic groups of the SB1

6  requirements.

7      And as we'll talk about, some of the data included it, some

8  did not.  I try to be very conservative in all of my analysis

9  with respect to treating the data as authentic and

10  representative of what is the base truth and not to cherrypick

11  and/or substitute data.

12      I also, just briefly, rely again on census data that's

13  necessary with respect to the geocoding at the census block or

14  at the voting tabulation district, media accounts, to get some

15  context as well as the scholarly literature more broadly on

16  rejected ballots by mail.

17  Q.  And when you use the term "geocoding," what are you

18  referring to?

19  A.  So this is a process in which you're taking the physical

20  address in a voter file of an individual voter and geocoding

21  that through an application and then using the census data to

22  be able to place that individual into a census block, the

23  smallest unit, so we know exactly that this individual is

24  living in this block and we know from the census data what the

25  characteristics of that census block is.

Daniel Smith - Direct

1    And so the census is doing a real count from the 2020

2   census.  They use that same data for redistricting purposes.

3   And we've seen all this litigation based on that, with one

4   person, one vote, and having federal, congressional districts

5   having to have balanced out to zero or one voter at most.

6    That's the same data that I'm relying on here with respect

7   to the address and being able to place people then into these

8   addresses to get a sense of who they are.  We don't know,

9   because we don't have the data from the State of Texas, the

10  individual characteristics of whether or not an individual

11  identifies as black or Hispanic or white or Asian or some other

12  category.  But we know generally what those small units, those

13  census blocks are with respect to their racial or ethnic

14  composition.

15    As I said, it's something that we might be able to know

16  but -- I think we could know, but I don't have the data.

17  Q.  So could you tell us now what data you are missing in order

18  to conduct the studies that you conducted in this case?

19  A.  So the next slide looks first at these ballot by mail and

20  applications by mail.

21    And as I noted in that previous slide, in the March -- if

22  we look across this row, from March 2022 Primary Election, I

23  received data in a couple different slices, and in this case it

24  came from the Secretary of State's office.  I received data

25  which I was hopeful was going to be all 254 counties in terms

Daniel Smith - Direct

 1  of the number of rejected absentee ballots by mail,

 2  applications -- sorry, the applications by mail.  But there

 3  were 88 of the 254 counties that were missing.  And I received

 4  no data from the State on the total number of applications

 5  received in that election.

 6      So I didn't have a denominator, which is tough to do any

 7  type of analysis on the effects of SB1 when you don't know how

 8  many total ballots.

 9      If we can stay on that same slide and look at the last two

10  columns on that first row, the rejected ballot by mail and the

11  accepted ballot by mail.  Here again, the State provided me

12  with data of 252 counties in terms of the accepted, so I had a

13  good denominator, and this is individual-level data across the

14  252 counties, so hundreds of thousands of accepted ballot by

15  mail, but 73 of the counties didn't have any information.

16      I don't know whether that's the counties didn't collect the

17  information on the rejected ballot by mails.  I don't know

18  whether it's they didn't provide it to the Secretary of State.

19  I don't know if the Secretary of State didn't provide it to

20  counsel or counsel didn't provide it to me.  But I can tell you

21  by running the numbers, 73 of the counties don't have any

22  information there.

23      And I tried to treat those individuals in those counties

24  that have a denominator that I know that they -- they had an

25  absentee ballot by mail accepted, that I'm assuming then if

Daniel Smith - Direct

 1  they gave me the accepted and they didn't provide any data to

 2  the State that any were rejected, I actually count those as

 3  zero.  I don't eliminate everyone.  It's incredibly

 4  conservative.

 5      So we have data on the denominator.  Here are all the

 6  absentee ballots that were received.  I have no data on the

 7  numerator.  Instead of just eliminating all those individuals

 8  in those counties, I actually assumed that they didn't provide

 9  any data because they didn't have any restrictions.  And they

10  didn't have any rejections due to SB1.

11      That's as conservative as I possibly can be.  I am not

12  eliminating them.

13      Now, what's interesting is on the 2022 November, going

14  across that row, the State did a much better job or the

15  counties did a much better job or someone did a much better job

16  of providing me with the applications for ballot by mail that

17  all the counties and the individuals who applied.  Only one

18  county, I can't remember off the top of my head, which didn't

19  provide that data.  And they did a better job in providing the

20  applications ballot by mail that were -- had rejected

21  applications.  Only 74 out of the 254.

22      That's still, you know, approaching one-third didn't

23  provide me with any data.  But, you know, it's better than the

24  March election.

25      What's interesting is if you look at the November election,

Daniel Smith - Direct

 1  I had even fewer data points.  So I've now gone from 73

 2  counties that didn't provide any information on the ballot by

 3  mails that were rejected to now 89.  So there were another 16

 4  counties that are unaccounted for in terms of whether or not

 5  any of their voters had ballots rejected.

 6      Now, again, it could be that they didn't reject any mail

 7  ballots in the November election.  And, in fact, I actually

 8  privileged that.  I keep them in the denominator.  There are

 9  only nine counties but, again, seven more than the previous

10  election.  But I privileged them being in the denominator, and

11  I assumed that if they didn't provide any data, they're zero in

12  the numerator.

13      And that is going to deflate any type of rate of rejection

14  because I have them in the denominator.  But I have no

15  knowledge of whether or not there were rejections and they just

16  didn't provide the data.

17      So I use the word "conservative" quite a bit for my report

18  because I'm trying to be as unbiased with respect to any

19  findings by keeping the data and letting the data speak for

20  what I receive, but assuming the opposite of what findings I

21  might find, which is in this case not eliminating the

22  denominator but including in the numerator as zero.

23  Q.  What other problems, if any, did you have with data that

24  was produced to you?

25  A.  Yeah.  So the next slide is just a snapshot, screenshot of

Daniel Smith - Direct

 1   one of these files that I received from the Secretary of State.
 2   And I could have taken a snapshot anywhere.  What I've done
 3   here is I've collapsed column C, D, E, F and G to protect the
 4   privacy of these individuals that are named by name and their
 5   VUID for the purposes of the Court here, that all -- all those
 6   data are known.
 7       And I just took a snapshot.  You can see it starts on row
 8   152.  I didn't want to highlight, you know, all the problems
 9   with the Mills County data.  Duval kind of gets highlighted
10   here just because of the ordering.
11       But what I'm really focusing on here is the fact that the
12   top two rows for Mills County, and there are a lot of other
13   rows in this database, that have nothing for "reject reason."
14   This makes my analysis really difficult, actually impossible,
15   to determine whether or not an absentee ballot that was cast in
16   the November 2022 General Election was rejected because of SB1
17   or because of a non-SB1 reason.
18       Again, I leave these in the denominator, but I have nothing
19   in the numerator.  So it could be they were all SB1.  I suppose
20   it could be they were not SB1.  But I have to code up all of
21   these other reasons to determine whether it was SB1 or not
22   related from other type of things.  So it could have been an
23   envelope not meeting a deadline for delivery to EVC, and that's
24   line 181 in Brewster County.  That voter would be counted as a
25   non-SB1 violation that doesn't allow the absentee ballot to

Daniel Smith - Direct

 1  count.

 2      What you'll also notice, however, is that the column right

 3  next to that is the DT ballot rejection -- rejected, which I

 4  take, because I didn't get a key, this is the date the ballot

 5  was rejected by the local authority.  And you'll notice that

 6  going down the column, there are a lot of impossible dates.

 7  These are probably data entry errors.

 8      But I assume that the ballot was not rejected in Mills

 9  County, for whatever reason, on the 1st of January in 1900.  I

10  similarly don't think that in Victoria County -- or I'm

11  sorry -- Montgomery County that a ballot was rejected on

12  December 31st, 2021.  This is nearly a year before the election

13  happened.  And we're talking about ballots cast, not

14  applications.  And so forth.

15      And so, unfortunately, the defective data, you know, it

16  doesn't prohibit my analysis, but it's a data point that I

17  would have thought the state or the local officials would have

18  been pretty careful about collecting in order to make sure that

19  there weren't some problems with the implementation of SB1.

20      And clearly, they were not rejecting these ballots prior to

21  the election.  That's impossible.  I can still do my analysis,

22  but it's taking yet another way to kind of triangulate and

23  think about the data in a way that we would do as a political

24  scientist and that scientific peer review would probably expect

25  of me.

Daniel Smith - Direct

1    The next page, if we want to move forward, are some

2    information that I've been referring to.  So this is a -- the

3    Texas driver license application and ID identification.  I just

4    pulled this off a website.  And, you know, we can see here that

5    this application that the Department of Public Safety, I think

6    it's called now, requires individuals who want to get a

7    driver's license or an ID card, they have to provide not only

8    the Social Security number, but also, if you look down, race

9    and ethnicity.  Those are required categories that people

10   self-identify.

11        In Florida, that information is available in the -- in the

12   voter file.  I know the race and ethnicity of people in Florida

13   because that's part of the publicly available data in the -- in

14   the Florida voter file.  The Florida Secretary of State can

15   match up data to the DMV in Florida.  Department of State here

16   in Texas can do the same thing with respect to the DMV data.

17        And they do do that, presumably, when people are

18   registering to vote after they have a driver's license or an

19   ID.  They want to make sure that they are a citizen under the

20   provisions since REAL ID went into play.

21        And what would be nice is if the State had provided me with

22   these data because then I could have easily linked up

23   individuals who are registered to vote in Texas by either their

24   Social Security number or their driver's license or voter ID

25   number to actually precisely know at the individual level what

Daniel Smith - Direct

1   their race and what their ethnicity is.

2       And as an expert in other states, I have gotten that data.

3   I've gotten it under a protective order.  But I had all the

4   racial and ethnic data in Alabama on a felon voting rights

5   case, which I could then link up to the statewide voter file to

6   know precisely the race and ethnicity of individuals.

7       This is something that, again, I wouldn't get as a scholar

8   because I don't have that ability, but certainly as an expert

9   and one who is happy to sign off on whatever the Court or the

10  State would like in terms of non-disclosure, I would be happy

11  to do.

12      So this is a piece of data that would make my job a lot

13  easier in terms of being able to look at any disparate impact

14  of SB1 on either the types of voting procedures that were

15  eliminated or now the requirements with the ballot by mail and

16  applications by mail.

17          THE COURT:  I'm going to assume we're going through

18  all this data problems because the State or the State's experts

19  have criticized his reports as being defective?  Is that why

20  we're doing this?

21          MR. GENECIN:  No.  We're doing this to establish the

22  need for the statistical methods that he uses.

23          THE COURT:  Okay.

24          THE WITNESS:  So maybe we can go quickly through this

25  last bit on missing data.

Daniel Smith - Direct

1       So I got dropoff ballot by mail location usage data from no

2  counties.  You would have thought they would be providing that

3  data since, if I'm dropping off my ballot by mail in person,

4  I'm having my information recorded.  I think actually Bexar

5  County provided me with some data on -- you know, on this.  But

6  no other county did.  And so it was really not anything I

7  could -- I could really use to determine the impact of reducing

8  to one location the ballot by mail dropoff locations.

9       I received virtually no early voting data besides what I

10 was talking about with respect to Harris County.  I'm able to

11 use the drive-through data from the Harris County data but none

12 of the other 253 counties.

13      As I've already talked about, I had five counties provide

14 me with ballot by mail rejection rates, no counties with the

15 application rejection rates, even though that was all requested

16 in discovery.  And in the November election, again, no county

17 provided this information, and I was able to use Harris and

18 Travis County.  I think a couple other counties provided some

19 data, but they really weren't useable in any way to do

20 analysis.

21      And the last thing, just quickly, going through, if I

22 could, is the next slide, where I just want to impress that I'm

23 trying to be as conservative as possible in all of my analyses.

24      Here's a good example.  Hidalgo County, in one of those

25 early data provisions, provided me data on the March 2022

Daniel Smith - Direct

1  Primary Election, and I was able to do an analysis using
2  Hispanic surnames.  I'll talk about that in a second.  And I
3  found that it was over 21 percent of voters with Hispanic
4  surnames had their ballot by mail ballots rejected in that
5  Primary Election.  It was less than 13 percent of those
6  individuals with non-Hispanic surnames.
7      When I received the data from the Secretary of State's
8  office that was for the exact same election that was presumably
9  data that the counties provided to the State and the State then
10 processed and provided in discovery, there was no data on
11 Hidalgo County voters who had their ballot by mail ballots
12 rejected due to SB1.
13     That was data that was actually in Hidalgo County's
14 provision to me.  I did not take that data from Hidalgo County
15 and supplant the missing data in the State's data because,
16 quite honestly, I don't know what is definitive.  I don't know
17 which I should be using.
18     But had I done so, I can tell you that it would affect the
19 overall results because most of the people in Hidalgo County
20 are Hispanic, and the rejection rates were higher than
21 non-Hispanics with respect to ballot by mail in that March
22 Primary.  But I did not do that.
23     So, again, here's an example where I have zero for SB1
24 rejections in Hidalgo County for the statewide analysis, but
25 I'm including all of their ballots in the denominator.

Daniel Smith - Direct

1    So I think I've spent plenty of time on this, and maybe we

2  can move forward but --

3  BY MR. GENECIN:

4  Q.  Yes, absolutely.  Why don't we turn to your first report

5  and drive-through voting.

6  A.  Yes.  So let's skip a couple slides here and get to slide

7  11, I believe it is.

8    So drive-through voting was a success in Harris County.

9  About 127,000, at least -- there might have been more, about

10  130,000 perhaps.  I'll talk about why my numbers are a little

11  lower -- used the ten different locations over this 18-day

12  period.  I received nice, clean data from Harris County.  And

13  you can see that most of the votes were cast at the NRG Arena

14  in kind of downtown Houston.  Humble Civic Center, I believe is

15  in the northeast part of the county, Fallbrook Church in the

16  northwest, and so forth.

17    That's about one out of ten voters who voted early in

18  person.  I think there were about 1.27 million or so votes cast

19  early in-person in the 2020 November election.

20    That's a lot of folks who are moving through the

21  drive-through voting, who were not otherwise congesting the

22  polls on election day or in the early in-person centers.

23    The next two slides we can go very quickly through.  This

24  is something that the State introduced in terms of where those

25  locations are.

Daniel Smith - Direct

1    The next slide, in fact, is another State production on the

2    left.  On the right is data that I just grabbed from the U.S.

3    Census Bureau that's at census block level that gets a sense of

4    the density of where these locations are.  And you can compare

5    where the blue boxes are on the left-hand side from the -- from

6    the State's exhibit with the density in terms of persons per

7    square kilometer which is, unfortunately, the default for the

8    Census Bureau, for those of us who are not metrically numerate.

9    But it gives still the same sense of where the density

10   population is.

11   And you can see that, you know, the Falls Church, which I

12   think is number 80 here, is up in the northwest part.  It was

13   maybe the second highest vote total, close to 20,000.  And it's

14   not very heavily densely populated.

15   You can look on the east -- northeast side, 75, which is

16   the Humble Civic Center.  Again, this is not a heavily dense

17   place.  And I assume that the elections officials looked

18   around, not where heavily dense populations are, where there

19   are big facilities that were willing to have drive-through

20   early voting.  You need to have certain capacity to do that.

21   The next slide, just quickly, looks at the density of black

22   voting age population in the county.  Yeah.  We'll stick with

23   that one.  And, again, you can see where the locations are.

24   That's not where African-Americans predominantly live in the

25   city.  There may have been one exception to that.  A food bank,

Daniel Smith - Direct

 1  I think, was number 19 here, which overlays with a heavily
 2  African-American in terms of, you know, 60 to 100 percent black
 3  voting age population in these blocks.
 4      This is just demonstrative to talk about where these are in
 5  the city.  Drive-through voting is to be convenient to people
 6  who are coming or going from work, generally.  It allows them
 7  to vote conveniently in their vehicles.
 8      If we can go to the next slide, I'll talk about my
 9  analysis.
10      So, Your Honor, I've already mentioned that we really don't
11  have -- I do not have individual-level data on a person's race
12  or ethnicity.  There are methods that you could use.  They are
13  not ones that I use in my own academic world.  You can use
14  Bayesian statistics to use surnames and estimate the likelihood
15  that an individual is white or black or Hispanic.  In fact, a
16  lot of my former students do that work because they're
17  political consultants, and they actually want to know this.
18      I tend not to do -- I don't do that in my academic work,
19  and I'm reluctant to do it.  Happy to talk about why.  But it's
20  an established method of doing this.  What I'm doing is trying
21  to get at a sense of in what geographic units, a census block,
22  was the likelihood of, in this case, casting a drive-through
23  ballot out of all the early voting casts.
24      Again, one out of ten is about basically the rate.  That's
25  probably not one out of ten across the 51,000 census blocks in

Daniel Smith - Direct

 1    Harris County.  Harris County has the bulk of census blocks out
 2    of the 900-some thousand census blocks in Texas.
 3        But they're very small units.  And because the census knows
 4    how many black and Hispanic and white individuals and others,
 5    it's possible to try to get a sense of, on average, what does
 6    this pattern across these ten different locations look like
 7    when we geocode individuals into a census block using the voter
 8    file, knowing precisely at the individual level who cast a
 9    drive-through vote and who voted early in person, so we can
10    create a fraction or a percent of all the drive-through votes
11    out of all early in-person votes, and we can create a fraction
12    or a percent of what is the share of, say, black or white or
13    Hispanic voting-age population.
14        So the next slide, I think, just to do this so we
15    understand each other on what I'm showing here, there are close
16    to 50,000 circles on this plot.  You can't see them all because
17    many of them are overlaid one another, especially in the lower
18    left-hand corner.  But these are all census blocks, and these
19    census blocks range from zero to 100 percent in black
20    voting-age population.
21        I know that because that's from the U.S. Census.  So each
22    of these little areas, we know how many black and white and
23    Hispanic and others are in there, and I can figure out and
24    calculate what is the percentage in this case of black
25    voting-age population, 18 or over.

Daniel Smith - Direct

1    There are a lot of census blocks that have very few black
2   individuals in Harris County.  And there are some that have
3   quite a lot.  So we can understand that by going left to right
4   of the black voting-age population.
5    On the y-axis, this is where I'm taking the data from
6   Harris County on who voted early in-person and, of those, who
7   voted drive-through voting.  And I can create a percentage from
8   zero percent, where no one who voted early in-person, up to 100
9   percent, who voted early in-person did so through a
10   drive-through voting.
11    And you can see, actually, if you look all the way up at
12   the top, it looks like it's a hundred degrees.  And that's not,
13   you know, just San Antonio weather in October.  That's actually
14   a census block up over the zero.  And there's another one.  It
15   looks like almost an umlaut.  Those are two census blocks that
16   had a hundred percent of early in-person voting that was done
17   through drive-through.
18    So it may have been five people, ten people.  Whatever it
19   was, all those people voted drive-through.  And if you go
20   straight down and draw a line down, you realize that it's
21   around 60 percent black voting-age population.  So these are
22   predominantly blacks.  Now, those are outliers, and that's why
23   we can see it easily.  But it just gives you a sense of what
24   these are.
25    The circles, the size of circles, are based on the overall

Daniel Smith - Direct

 1   size of the voting-age population.  And so it's important not
 2   to treat every census block the same because some census blocks
 3   only have a couple people in them, and others can have
 4   literally tens of thousands, depending on how dense they are.

 5       That's the general pattern that's out there.  And to be
 6   able to identify what that pattern is, political scientists
 7   will use a technique called "regression analysis" which
 8   basically tries to draw a line that best fits all of these
 9   different circles to minimize their distance to the circle
10   based on their respective weights.

11       And so, you know, we use this to basically figure out for
12   what increase in black voting-age population do we see an
13   increase or perhaps a decrease in the use of drive-through
14   voting.  In this case, the slope of the line is positive.  It
15   goes from around six percent of all ballots cast early
16   in-person being drive-through, so six out of a hundred, at a
17   census block that has, on average, zero -- it has zero percent
18   white voting-age population.

19       There's a lot of variation, right?  We can definitely see
20   some white census blocks that had close to 80 percent, but
21   those are outliers.  The line is being pulled down or pulled up
22   depending on the weight of each of those census blocks, and
23   this is the best approximation that you can use calculus to
24   calculate a line that minimizes.  There's all possibilities of
25   lines.  This is the one that best fits the data in terms of

Daniel Smith - Direct

 1  thinking about this relationship.

 2      If you follow that line all the way up to the extreme, in a

 3  census block that has close to a hundred percent black

 4  voting-age population, you're looking at one in four, 25

 5  percent, use drive-through voting, right?

 6      So it's somewhere between four and five times more likely

 7  that densely populated black voting-age population census

 8  blocks, those who voted early in-person did so in a vehicle,

 9  through drive-through as opposed to those that don't have any.

10      All right.  I've gone on quite a bit of time.  I need a

11  drink of water.

12  Q.  Are you able to show us an example of a regression line

13  with a negative slope?

14  A.  Sure.  I let the data speak for themselves.  And I can use

15  the exact same data and show that.

16      So this next slide actually shows the percent of white

17  voting-age population drawn from the U.S. Census.  It's not an

18  exact image that's reverse because there are a lot of people

19  who identify as white Hispanic, and these are white

20  non-Hispanics all the way over to the extreme of 100 percent.

21      But you can see here that if you look at the hundred

22  percent census blocks of white non-Hispanic, you are looking at

23  close to zero percent of people use drive-through voting out of

24  those who voted early in-person.

25      There are some exceptions.

Daniel Smith - Direct

```
 1   Q.  Just so we're clear --
 2   A.  Yeah.
 3   Q.  -- is this graph taken -- made using the same data as the
 4   graph you showed us?
 5   A.  It's not a mirror image.  But you know how you can know
 6   that it's the exact same?  I just realized, you can look at
 7   those two little umlauts over the L and the D of "includes."
 8   Those are the exact same two census blocks that were over
 9   around the 60 percent black voting-age population.  We know
10   that they're around 60 percent black voting-age population.  We
11   also know that they're around 12 and a half percent, 13 percent
12   white non-Hispanic.
13        There are some other characteristics of those census blocks
14   that we're not accounting for, obviously.  But those are the
15   same two precincts -- census blocks that had a hundred percent
16   use of drive-through voting.  They are outliers, but they're
17   really good to identify that this is the same data.
18        What we can see here is this line goes down very
19   convincingly.  So precincts that have zero percent white
20   voting-age population in terms of white non-Hispanic were much
21   more likely to use drive-through voting around -- it's probably
22   around 16 percent, one out of eight or so individuals who voted
23   early in-person in that election.
24        I have one more slide that looks at Hispanic.  And the line
25   here on the next slide is very similar to the first one.  The
```

Daniel Smith - Direct

1    slope is not as strong, and that's largely because Hispanics in
2    Harris County are dispersed across the county.  And so you're
3    not going to necessarily see as dramatic of an effect with
4    respect to census blocks and the rate in which people are using
5    drive-through voting out of all early in-person voting.  But
6    the trend line -- the trend line is also positive, as we would
7    expect.
8        I'll try to slow down a little.
9        The umlauts now shift a little, as I've been calling them,
10   and we can see that these are largely black, very little
11   nonwhite Hispanic, but about a quarter of the population
12   identifies as Hispanic, according to the census data.  And so I
13   think that's actually a really nice visual cue to understand
14   how these data work.
15   Q.  So from this use of regression analysis, what conclusion do
16   you come to about use of drive-through voting in Harris County
17   by minority groups and by white voters?
18   A.  A, it was a very successful use of -- creative use of
19   getting people processed through the election, not having to
20   get out of their car and being able to vote.  I have found no
21   evidence that there was any fraud, anyone impersonating anyone
22   in those instances in which people used them.
23       One out of ten people in Harris County who voted early
24   in-person used drive-through voting.  So, obviously, it was
25   popular for voters.  I would imagine if they were able to keep

Daniel Smith - Direct

1   it, it would have kept on going up.

2       This is an efficient way of processing voters.  They don't

3   have to get out of their car.  You know, imagine that if you're

4   dropping someone off to -- well, if you're dropping off an

5   absentee ballot for someone who needs assistance -- and, of

6   course, you have to attest to that under SB1 -- you can't

7   necessarily, if you don't have drive-through voting, stay in

8   your car.

9       So you'd have to leave your elderly mother, who you've just

10  helped deliver her absentee ballot, in the car when you go

11  inside to vote an absentee -- to vote in person.  That seems

12  ridiculous, as opposed to being able to have the absentee

13  ballot dropped off and also stay in the car and vote early

14  in-person during that early voting period.

15      So I think it's very clear that not only it was convenient,

16  but that black and Hispanic voters in Harris County were much

17  more likely to have been using this than white non-Hispanic

18  voters, and that the elimination of that has disparately

19  impacted those minority groups.

20  Q.  Now, did you use another method as well to analyze

21  drive-through voting in Harris County?

22  A.  Yes.  The next slide talks briefly about a method that's

23  been around for a long time, that tries to get around this

24  ecological inference problem, this problem where I want to be

25  able to explain and talk about individual-level data, but I

Daniel Smith - Direct

 1  don't have all the individual-level data that I need.  In this
 2  case, individual race or ethnicity of a voter.

 3      So a method of bounds is used to look at extreme cases.  So
 4  in this case, we're going to look at extreme racial or ethnic
 5  areas with respect to census data, where we know that, say,
 6  nine out of ten individuals are black in a census block.

 7      And we're going to figure out, of those census blocks, how
 8  many people voted drive-through voting out of all the people
 9  who voted early in-person in the 2020 General Election in
10  Harris County.

11      Exact same data, a different way of approaching it that
12  social scientists will use.  It relies also on the geocoding.
13  I have to be able to put the people who voted early in-person
14  and who voted drive-through into a census block.  I have to
15  then be able to use that census block to understand the
16  characteristics.  And in doing so, I'm not using statistics
17  here.  I'm just using some simple addition, subtraction and
18  division.  I can figure out what share of ballots cast in those
19  areas had to logically be cast by black or Hispanic voters or
20  white voters even.

21      So the next slide, I think, may help us kind of visualize
22  this.  And this comes directly from my report.

23      If we look at the bottom row, what I've done here is I've
24  taken all of Harris County census blocks, and I have identified
25  all those that have at least 90 percent black voting-age

Daniel Smith - Direct

1  population.  Again, that data comes from the census.  It's real

2  numbers, real people.

3      And of those 90 percent voting-age population that's black,

4  I can -- I know how many -- because of the geocoding, absent --

5  how many drive-through ballots and how many overall early

6  in-person ballots were cast.  And I can calculate then what is

7  the likelihood, logically, that these are all cast by black

8  individuals or cast by nonblack individuals living in that

9  census block.

10      A good example, before getting into details, I think might

11  help.

12          MR. WASSDORF:  Your Honor, can I make a narrative

13  response objection here?

14          THE COURT:  Yeah.

15          MR. WASSDORF:  We can get some questions.

16          THE COURT:  We do have a lot of narrative.  We need to

17  go to Q&A.

18  BY MR. GENECIN:

19  Q.  All right.  Let me just ask you to give an example

20  arithmetically that perhaps everyone will understand.

21  A.  Sure.  So just quickly, if you think about a census block

22  that has 90 percent black voting-age population, and let's say

23  there are a hundred people in there.  90 people are black; the

24  rest are some other racial category.

25      If you think also that, of those hundred people, all of

Daniel Smith - Direct

1  them voted -- vote an early in-person ballot, and of those, 20
2  voted a drive-through ballot.  We know just from simple
3  arithmetic that if there are 20 people who voted drive-through,
4  ten of them had to have been black because 90 of them, 90
5  percent are black.  And there are only 10 nonblack individuals.
6      So that's a bound.  That's a bound where we know that at
7  least ten percent -- ten of these ballots had to have been --
8  had to have been cast by a black individual.
9      Now, it's possible that black individuals cast all 20 of
10  those.  But we don't know, logically.  And so that's what this
11  table is doing.  And if we just go up from the bottom to the
12  top of each of these categories, we know that, at a minimum,
13  black individuals cast at least 2.7 -- 2.6 percent of all the
14  drive-through ballots in these 90 percent black voting-age
15  population census blocks.  But it could have been up to ten
16  percent of them.
17      If we go up to 97 percent of black voting-age population --
18  again, there are not that many people living in 97 percent
19  black voting-age populations in Harris County, there are 1,235
20  individuals -- the rates go up.  And we know that it's almost
21  six percent at a minimum but up to nine percent.
22      We can do the same thing for Hispanics, using census data,
23  and we can see that the bounds actually get even higher and
24  tighter when it gets to 97 percent Hispanic voting-age
25  population.  We know in those census blocks that of the -- of

Daniel Smith - Direct

1  the vote-by-mail ballots that were -- sorry -- of the early
2  in-person ballots that were cast, 17 percent had to have been
3  cast by Hispanic voters up to 19.2 percent.
4      We don't see that in the predominantly white, partly
5  because there are very few census blocks that are heavily white
6  only in Harris County.  But, effectively, they're almost all
7  zero, where we can't rule out at the minimum that any early
8  in-person ballots were cast through drive-through.
9      That's what those zeros on the minimum are.  We cannot rule
10 out the possibility that they didn't cast any of those ballots.
11 Q.  So did you use another method to analyze drive-through
12 voting in Harris County?
13 A.  I did.  And this is as close as I can get to what I would
14 really like to be doing in my analysis, since I know the data
15 exists.  And that's using individual-level data for
16 understanding, in this case, ethnicity.
17     If we can go to the next slide.
18     The State of Texas in their statewide voter file provides a
19 Spanish surname flag.  It's a column that says, "Is this
20 individual Spanish surname or not?"  I'm using that as a proxy
21 for Hispanic.  It's probably a pretty weak proxy because there
22 are a lot of what we would call false negatives, people who
23 identify as Hispanic but don't have a surname like Smith that
24 the U.S. Census doesn't consider to be Hispanic.
25     So it's going to be under-inclusive, but it's an

Daniel Smith - Direct

1    individual-level data.  And so there are no statistics that are
2    even needed here with respect to being able to do Hispanic,
3    non-Hispanic using Spanish surname analysis.
4        It's very conservative because I know that I'm missing
5    individuals who would otherwise identify as Hispanic, say, you
6    know, a Martinez who identifies as Hispanic who now marries a
7    Smith and is not then going to be identified by the U.S. Census
8    as Hispanic by surname alone.
9        So what I do here is I join the Harris County individual
10   data that we've already talked about, join it to a voter file
11   that I use to draw the Spanish, link up using VUID at the
12   individual level, and look then at the rates.  Again, very
13   conservative method.
14       So the next slide provides data from my report, this first
15   report.  Sorry about the quality of this snapshot that I took.
16       But you can see that those who identified as Hispanic,
17   26,168, used drive-through voting out of the 26,168, plus
18   22,000 -- 222,029 who did not use drive-through voting, who
19   voted early in-person.  That's a rate of about 10.5 percent.
20   The non-Hispanic results in a less than ten percent, one in ten
21   drive-through rate.
22       Again, what we're seeing here is very conservative because
23   "not Hispanic" does not mean white.  It also includes a lot of
24   black and probably Asian and other mixed-race identifying
25   individuals.  We know from the previous regression analysis

Daniel Smith - Direct

 1   that certainly black voting-age population area's much more
 2   likely to use drive-through voting.
 3       So this is probably inflating the non-Hispanic use of
 4   drive-through voting.  But it's another way of trying to tackle
 5   this issue.  Again, if I had individual-level data from the DMV
 6   on race and ethnicity, I am convinced, knowing from data that
 7   I've used in other states, that these rates would widen, as we
 8   would expect.
 9           MR. GENECIN:  Your Honor, would this be an opportune
10   moment for a break?
11           THE COURT:  Sure.  Let's go ahead and take about 15.
12   And when we come back, let's go to Q&A, though, okay?
13           MR. GENECIN:  Okay.
14       *(Recess at 4:43 p.m.)*
15       *(Change in reporter)*
16
17
18
19
20
21
22
23
24
25

DAN SMITH – DIRECT

1  *(Change in Reporter)*

2              DIRECT EXAMINATION CONTINUED

3  BY MR. GENECIN:

4  Q.  Professor Smith, turning now to the question of 24-hour

5  voting in Harris County, did you analyze the usage of 24-hour

6  voting --

7  A.  Yes, I did.

8  Q.  -- in that county?

9       And you can start with your slide 24.

10  A.  Yes.

11  Q.  So could you tell us how many people used 24-hour voting

12  in Harris County?

13  A.  Yes.  So Harris County in the 2022 -- I'm sorry -- 2020

14  General Election offered eight sites that ran overnight on

15  October 29th through the morning of October 30th.  1490 voters

16  that I could identify had cast ballots during these early

17  voting locations and I've put down table 4 where they were

18  located.  Most of them are at the NRG Arena but also these

19  other areas that are identified on that table.

20  Q.  And were you able to study the question of use of 24-hour

21  voting by Black voters in Harris County?

22  A.  Yes.  The next slide is a slide that looks familiar to

23  what we've gone through and so I won't spend as much time

24  detailing the methodology.  The main difference here is rather

25  than census blocks I used voting tabulation districts, which

2711
DAN SMITH - DIRECT

1  are precincts, largely because we just don't have as many

2  individuals here, you know, 1200 -- sorry -- 1490 individuals.

3      The denominator, again, is all voters who voted early in

4  person as that 1.27 million.  I can make a very different

5  plot --

6              THE COURT:  Say that again.  I think you misstated.

7              THE WITNESS:  Yeah.  So the numerator here is the

8  people who voted early in person overnight in these eight

9  locations.  The denominator is actually all the people who

10  voted early in person, not just the people who voted in those

11  eight locations, or on those two days.

12              One could do that.  As a social scientist, I wouldn't

13  do that, though, because this is a much more conservative, and

14  as a result the effects don't look as great because the

15  denominator has 1.27 million individuals who could have voted

16  anywhere during the early voting time, including that 24-hour

17  period.

18              Again, I don't think the correct way of doing it, you

19  could do it, but you would have to have that argument, would

20  be to say let's limit it just to the eight locations on that

21  two-day period.  If I did, obviously, the denominator would be

22  much smaller.  It would be in the thousands as opposed to the

23  millions.

24  BY MR. GENECIN:

25  Q.  So comparing the 1.3 million approximately voters who

DAN SMITH – DIRECT

1  voted early with the voters who voted overnight, on the night
2  of October 29th to 30th, what does that show about Black
3  voters usage of 24-hour voting?
4  A.  Well, we see a positive slope.  Again, this is a
5  regression line, us finding the best fit across these voting
6  tabulation districts, these precincts that have Black voting
7  age population from zero to 100 percent.  It's a positive
8  line.  Those individuals who live in predominantly black
9  precincts were more likely to use the overnight voting out of
10  all the people who used early in-person voting as opposed to
11  those living in predominantly non-black voting age population
12  areas.
13  Q.  Were you able to conduct the same study with regard to
14  Hispanic voters?
15  A.  Yeah.  The next slide does the exact same analysis, again,
16  putting people by geocoding them from the Harris County data
17  into, in this case, precincts, voting tabulation districts,
18  and again, we see a positive slope here.
19      You know, the overall rate is very small, just because the
20  denominator is so huge, close to 1.3 million as you said.
21  I've been seeing 1.27 million that I'm being able to identify,
22  but a positive slope again, predominantly Hispanic voting age
23  population precincts, more likely those who used early
24  in-person voting to do so over the 24-hour period in Harris
25  County.

DAN SMITH - DIRECT

1  Q.  So what this graph shows is that as the Hispanic

2  population increases in a voting tabulation district, so too

3  did the usage of 24-hour voting?

4  A.  That's right.  It's a positive relationship.

5  Q.  And how about for white voters, were you able to study

6  that?

7  A.  Yes.  The next slide shows the exact same data.  We could

8  identify that by those outliers again, as we did in the

9  previous exercise.  Here, we see as the share of the White

10 non-Hispanic population goes up, according to the census data,

11 aggregated to the voting tabulation district precinct, the

12 share of drive-thru -- I'm sorry -- of 24-7, or extended hours

13 voting during early voting period in Harris County in the 2020

14 General Election goes down.

15 Q.  So turning now to the new question, let's look at the

16 issue of applications for ballots by mail, and the ballots by

17 mail themselves, and the requirement of SB 1 that a voter put

18 in identification numbers on their application and on the

19 carrier envelope of their ballot by mail.  Is that -- are

20 those topics that you studied?

21 A.  Yes, they are.

22 Q.  And turning now to your April report.

23     And if we could skip to slide 30.

24     In your April report, am I correct that you studied data

25 provided by five counties?

2714
DAN SMITH – DIRECT

1  A.  Yes, this would be the April 2022 report.

2  Q.  And in terms of the population of those counties, how does

3  that population relate to the overall population of the State?

4  A.  Yeah.  I will say that I was disappointed to get data only

5  from these five counties, but when I looked at the voting age

6  population of Harris, Dallas, Tarrant, El Paso, and Hidalgo,

7  it's 8.3 million voting age population.  If you look across

8  the bottom row that's highlighted in yellow, that accounts for

9  38 percent of the voting age population according to the U.S.

10  Census.

11  Q.  And 38.5 percent of the voting age population of the

12  entire state of Texas?

13  A.  Correct, just from those five counties.

14  Q.  And what does it show with regard to voting age Hispanic

15  population?

16  A.  Yes.  So these five counties account for almost 46 percent

17  of the voting age population in the entire state of Texas.

18  Q.  And for Black voting age population?

19  A.  The five counties, and I was very surprised at this,

20  account for over half, 52 percent of all the Black population

21  in the state of Texas.

22  Q.  And can you just explain to us what table 11 on this slide

23  illustrates?

24  A.  Yes.  This is simply a descriptive data on the coverage of

25  these five counties that were provided to me in discovery that

2715
DAN SMITH — DIRECT

1  I used in that April report.
2  Q.  And so using this county data, did you study the question
3  of rejected ballots by mail for voters of different groups?
4  A.  Yes, I did.
5  Q.  So — and what did you learn with regard to Black voters
6  in the March 2022 Primary Election?
7  A.  Yes.  I found certainly in Harris County but also evidence
8  in the other counties that as the rate of Black voting age
9  population increased the rejection rate of the ballots by mail
10  in that March 2022 Election decreased.  We're talking here
11  just about the ballots cast, not the applications.
12  Q.  And can you illustrate that for us?
13  A.  Sure.  The next slide does the same type of analysis we've
14  been talking about, regression analysis.  In this case these
15  are also census blocks but there are not as many census blocks
16  on this slide because we have to think about what are the
17  units.
18      It means that many of the census blocks in Harris County
19  didn't have any individuals of any race or ethnicity who cast
20  a ballot by mail, not just whether they were rejected or not,
21  but whether or not they actually cast them.  And this is
22  actually looking at SB 1 rejections of ballot by mail.
23      So think about the Y axis, the vertical axis here, as the
24  percentage of rejected ballots out of all absentee ballots
25  cast in the March Primary Election by all voters that were

DAN SMITH − DIRECT

1  rejected because of SB 1.

2      And, again, this data comes from Harris County.  I linked

3  the data up to the voter file to identify the census blocks

4  with respect to their racial composition and then the scatter

5  plot shows these various census blocks.  They are apportioned

6  in the size by the overall voting age population, so some of

7  the dots, circles, are larger than others, and the regression

8  line is the best fit across all these dots with respect to

9  trying to minimize the difference across all those circles.

10 Q.  So when you say not every census block had absentee

11 ballots, I take it that a census block is a very small unit of

12 a county?

13 A.  Yes.  And it makes sense because there are lots of

14 restrictions in place in terms of who can cast an absentee

15 ballot in Texas, both before and after SB 1.

16     So if you have an area that is largely individuals who are

17 under the age of 65 who are not disabled and fit the criteria

18 of being able to request an absentee ballot who are not

19 traveling outside of their jurisdiction or the county for

20 work, you are going to circumscribe the population's ability

21 to even request an absentee ballot, much less cast that

22 absentee ballot.

23     So it makes perfect sense that you have lots of census

24 blocks that even outside of SB 1 people are not going to be

25 able to cast an absentee ballot.

2717

DAN SMITH – DIRECT

1  Q.  But looking here, am I correct that as the percentage of

2  Black voters goes up in a census block, so too the percentage

3  of rejected applications -- I'm sorry -- of rejected ballots

4  by mail goes up?

5  A.  Absolutely, it does.  And you can see there are some

6  outliers where close to 80 percent Black voting age

7  population, you have over three-quarters of the absentee

8  ballots were rejected in that Primary Election.

9  Q.  Were you able to do the same sort of study for Tarrant

10  County?

11  A.  I did, for both Tarrant and the other four counties.  I've

12  included a couple of those slides here.

13  Q.  So --

14  A.  The next slide does look at Tarrant County.  Now, this is

15  the exact same plot.  It has, again, census blocks.  It puts

16  the voting age population of those census blocks along the X

17  axis.

18      It's interesting that the regression line only goes up to

19  about 30 percent, that's because there are no census blocks in

20  Tarrant County that had absentee ballots cast that have

21  greater than 30 percent Black voting age population.

22      So the universe here is much smaller, largely because

23  there is not as much Black voting age population, but more

24  importantly, because there are many census blocks in which no

25  one, Black or otherwise, cast a vote by mail ballot in the

DAN SMITH – DIRECT

1  March 2022 Primary.

2  Q.  It is true that in Tarrant County as the percentage of

3  Black people in the census block goes up, so too does the rate

4  of rejection goes up?

5  A.  Yes.  It's a positive slope.  It's not a dramatic positive

6  slope, but it's definitely a positive slope.

7  Q.  And how about Dallas County?

8  A.  Yes.  I put Dallas County in here as well.

9     Again, we have now some census blocks that did have people

10  voting by mail that were largely Black voting age population.

11  The line is a positive slope.  It's not a tremendously great

12  increase but the data do show that those individuals living in

13  higher Black voting age population were more likely to have

14  their ballot by mail ballot rejected in the March 2022

15  Election due to SB 1.

16  Q.  Now, did you also study the question of absentee ballot

17  rejection by ethnicity?

18  A.  Yes, I did.  I used that same flag that we talked about

19  before, the Spanish surname, and if we turn to the next slide

20  I'll show you some of the analysis that I did using this

21  descriptive data from the Harris County data that I was

22  provided for that March election, but Harris County actually

23  provided many other elections prior to that time and I decided

24  to include them here to show what did rejection rates look

25  like prior to SB 1 of vote–by–mail ballots in other elections.

DAN SMITH − DIRECT

1  Q.  So am I correct that the first election that is shown here

2  that was conducted under SB 1 was in March of 2022, and that's

3  the last line on each of these two tables?

4  A.  That is correct.

5  Q.  So, of course, ballots are rejected due to SB 1 on the

6  right−hand side of each of these tables.  There are zero

7  ballots due to SB 1 in all these elections before because SB 1

8  wasn't in effect?

9  A.  That's correct.

10  Q.  And so what you've got under the percentage sign, the

11  third column from the right in each of the tables, is the

12  percentage of ballots that were rejected for reasons not

13  related to SB 1?

14          MR. WASSDORF:  Objection.  Leading, Your Honor.

15          THE COURT:  Sustained.

16          THE WITNESS:  I'm happy to —

17  BY MR. GENECIN:

18  Q.  The objection has been sustained, so I'll ask the

19  question.

20     If we look at the percentage sign that is in the third

21  column to the left on each of these, on each of these tables,

22  what do the numbers in those columns show?

23  A.  Sure.  These are rejections for any reasons, including SB

24  1 in the 2022 March election.  All the other elections

25  obviously didn't have SB 1, and so this is a nice

DAN SMITH − DIRECT

1  apples−to−apples comparison.

2      In the March 2022 Election on the left−hand side, we see

3  people who have that Spanish surname flag which I've

4  identified here as Hispanic identifiers.  Over one in five

5  ballots in that election were rejected in the March 2022 that

6  were cast by individuals with Spanish surnames.

7      If you go to the next column over, it's 20.61 that were

8  rejected due to — percent that were rejected due to SB 1.  So

9  624 out of the 679 ballots were rejected due to SB 1.

10     And so if you want to then think about the March 2022

11 against, say, a comparable March election, like four years

12 earlier with March 2018 at the top of that column, you will

13 see that the rejection rate for those Hispanic voters that

14 cast ballots in the March 2018 was about a tenth of the rate

15 of what it was in March 2022 and we have to realize that most

16 of those ballots in March 2022 were rejected due to SB 1.

17 Q.  So turning to Tarrant County, were you able to analyze

18 rejected ballots by mail for Hispanic voters in that county?

19 A.  Yes.  They didn't provide as many elections but it's the

20 same logic here of looking at Hispanic−non−Hispanic using the

21 Spanish surname and what I find in the Primary of 2022 is that

22 Spanish surname, Hispanic voters, were more likely to have

23 their ballots rejected due to SB 1, almost 10 percent,

24 9.71 percent, compared to those voters without Hispanic

25 surnames, only 5.56 percent.

2721
DAN SMITH − DIRECT

1        THE COURT:  Can we go back a slide?

2        So what am I to make of −− let's look at those

3   March 2022.  20.61 of Hispanic ballots get rejected because of

4   SB 1, but non−Hispanic gets rejected at a rate of 17.45.  Is

5   non−Hispanic including Black in that category?

6        THE WITNESS:  It is, and you are absolutely right.

7        One way that we can think about this is if you look

8   at the left−hand side −− I had to divide this table into two

9   for visual, it's actually one combined table in my report −−

10  but if you look at that March 2022 for the Hispanic side we

11  can calculate what 624 into 679 is to figure out what

12  percentage of rejected mail ballots were due to SB 1, and

13  that's going to be over 90 percent.

14       You can do the same thing on the other side.

15  Obviously there are more non−Hispanics who voted in the

16  March 2022 Primary in Harris County, but it would be 5916 into

17  the 6520, and I suspect just looking at it, it's going to be

18  around the same or maybe a little less.

19       But your point is that if you just look at the

20  overall ballots and the rejection rate due to SB 1, it's

21  higher, it's almost −− it's over 3 percentage points higher

22  for those with Hispanic surnames, 26.1 due to SB 1, as opposed

23  to 17.45.

24       And as we know from the other analysis, we know that

25  individuals living in heavily black areas compared to heavily

2722
DAN SMITH - DIRECT

1  white areas are more likely to have their ballots rejected due

2  to SB 1, and those are included in the non-Hispanic surname

3  name obviously.

4         THE COURT:  Go ahead.

5  BY MR. GENECIN:

6  Q.  So the total for non-Hispanic is driven up by the fact

7  that it contains all groups other than Hispanic voters, is

8  that right?

9  A.  I think that's absolutely correct and we can see that from

10 the other types of analyses that I do that look at voting age

11 population broken down by the voting age population and race.

12 Q.  So turning to Tarrant County, am I correct that the data

13 here also divide voters between Hispanic and non-Hispanic

14 voters and that those who are listed as non-Hispanic include

15 all groups other than those who have the Spanish surname

16 flagged?

17        MR. WASSDORF:  Objection.  Leading again, Your Honor.

18        THE COURT:  Sustained.

19 BY MR. GENECIN:

20 Q.  How are the voters divided in the table that appears on

21 your slide 35?

22 A.  It's the exact same type of -- it's the exact same

23 analysis I did for Harris County, this time using Tarrant

24 County, and again we can see quite clearly that the rejection

25 rate for Hispanic voters due to SB 1 in the 2022 March Primary

DAN SMITH - DIRECT

1  was higher, you know, a good — more than 50 percent higher

2  than non-Hispanics in the election.

3  Q.  And is there a comparison that you can draw between the

4  2022 Primary, which is the first election held under SB 1 and

5  the other elections for which you have data?

6  A.  Yes.  They provided several other elections, which, again,

7  I tied to the voter file to identify people's Hispanic surname

8  or Spanish surname to identify their ethnicity, and we can see

9  that in the 2022 Primary Election it was about a five times

10 higher rate of rejections for those who voted compared to a

11 comparable election which would be the Primary Election in

12 2018 for Hispanic voters.

13 Q.  Were you able to conduct a similar analysis for

14 Dallas County?

15 A.  Yes, I did.

16 Q.  And what does that analysis show, sir?

17 A.  Very similar, although not quite as dramatic, and again,

18 we didn't see as dramatic results in Dallas County with the

19 Black voting age population that I've already shown you, but

20 again, higher rates of rejections for those with Spanish

21 surnames versus those without.

22      Hispanic voters, over 6.6 percent of those who cast

23 ballots in the March 2022 Primary had their ballots rejected

24 due to SB 1.  It was under 6 percent for non-Hispanics, but

25 not as dramatic as the other counties.

DAN SMITH — DIRECT

1  Q.  And how about the comparison between the Primary of 2022,

2  the first one conducted under SB 1 and the earlier elections

3  for which you have data?

4  A.  Yes.  So, again, you can see looking across prior to SB 1

5  versus SB 1 whether you use the overall rejection rate or the

6  SB 1 rejection rate, it's a much higher rate of rejection

7  overall, as well as SB 1.

8      So it's interesting why the overall rate would be going

9  up, when in this case about 6 percent — sorry — 60 percent

10  of the rejections were due to SB 1 for Hispanics we still see

11  this dramatic increase in rejection.  And that might be

12  because there are other, you know, coding issues with respect

13  to how Dallas County was accounting for people having their

14  ballots rejected.

15  Q.  So turning now to the requirement of identification

16  numbers on applications for ballots by mail, is that something

17  that you studied?

18  A.  Yes.  This is where I relied on the data that the State

19  provided, and with the caveats with respect to the missing

20  data in terms of the counties that either didn't report or the

21  State didn't provide — I assume it's the counties that were

22  not providing that but I don't know obviously for sure.

23      I was able to analyze the applications of ballots by mail

24  across those counties that did provide data, both in the

25  numerator that I could calculate the SB 1 reason, as well as

2725

DAN SMITH – DIRECT

1  the denominator which would be all of the absentee ballots

2  cast.

3     If you recall back to that analysis, I didn't have that

4  data so I had to use the absentee ballots that were actually

5  cast to determine the denominator for the applications since

6  the State didn't turn over any data on the applications across

7  those counties.

8  Q.  So turning now to your results for application rejection

9  by Black voter age population, can you tell us what the

10  results are of that study?

11  A.  Yes.  Here is, again, a regression analysis using the same

12  type of analysis.  These are census blocks that had absentee

13  applications prior to the 2022 Primary Election.  There are a

14  lot down there that have very few, and the ones that didn't

15  have any are not included in this analysis, because there's no

16  denominator.

17     Going up the vertical axis would be the rejection rate of

18  all applications due to SB 1, and you can see here that the

19  line is actually a negative slope line.  And so this would

20  indicate that, you know, full transparency, this is not

21  necessarily showing –– this is not showing a disparate impact

22  for Black voting age population.  There are obviously some

23  census blocks where that was the case, but the overall trend

24  line, which I've been using for all the other analysis, shows

25  a negative slope here.

2726

DAN SMITH — DIRECT

1    So in this case individuals living in these Black voting

2 age population census blocks that had applied for a

3 vote—by—mail ballot we're seeing not as high of a rejection

4 rate due to SB 1 than overall from the data that was provided

5 by the State.

6 Q.  Now, when you turn to the question, statewide rejection

7 and applications by ethnicity, what do the results show?

8 A.  Again, I found something that the plaintiffs probably were

9 not excited for me to find that I found the rejection rate for

10 non—Hispanic voters with respect to applications from the

11 statewide data that I received.

12    Again, incomplete data where I had to calculate a new

13 denominator based on absentee ballots cast to figure out what

14 the real denominator was for absentee ballot applications,

15 since they didn't provide that, I find that the SB 1 rejection

16 rate out of all absentee applications was actually higher for

17 individuals with a Spanish surname —— I'm sorry —— without a

18 Spanish surname, non—Hispanic individuals, 3.11 percent all

19 the way over, as opposed to 2.42 percent.

20    So, again, I let the data speak for themselves.  I did not

21 in this case, for instance, take any data that I might have

22 received and put it into the numerator.  The data speak for

23 themselves coming from the counties that provided to the State

24 that provided to me.

25 Q.  Did you study the impact of having one's application for

2727

DAN SMITH – DIRECT

1  ballot by mail rejected on voters?

2  A.  Yes, I did.  If we could go to two more slides ahead to

3  41.  I was really interested in thinking about what happened

4  to these individuals who are obviously highly motivated.  They

5  have requested a vote-by-mail ballot.  They've probably voted

6  by mail in the past.  They now are facing these new rules that

7  are being put into place by the counties prior to the

8  March 2022 Election in which SB 1 is now put into effect and

9  they are facing these new requirements.

10      And as, you know, I showed, it's not necessarily that

11  Black and Hispanic individuals who are applying for a ballot

12  by mail or having their applications rejected at a higher

13  rate, in this case I'm interested in whether or not they were

14  able to substitute and vote in that election some other way.

15      Again, we know these are motivated voters.  They have

16  actively tried to request a ballot by mail.  When they were

17  rejected, were they able to cure their ballot?  Did they

18  figure out to be able to vote by mail anyway, or did they turn

19  out and vote early in person somewhere?  Did they use

20  drive-thru voting in Harris County perhaps, or did they wait

21  and vote on Election Day?

22      Now, I think probably if you've met the requirements to

23  apply for a ballot by mail in Texas, you are pretty much said

24  I'm not going to be voting any other way.  This is a highly

25  restrictive state with respect to barriers to using vote by

2728
DAN SMITH - DIRECT

1  mail compared to any other state, most any other state.  It's
2  a very small percentage compared to a state like Florida where
3  we have between 30 and almost 50 percent use vote by mail.  So
4  these are people, what happened to them?
5      And so in this case I used the ethnicity based on Spanish
6  surname to figure out what happened to these folks and I was
7  actually very surprised.  There's clearly not a substitution
8  going on where people who had their absentee ballot
9  application rejected easily moved over and voted by a
10 different modality.
11     In fact, three-fifths of Hispanic surname voters did not
12 vote at all.  These are people who applied for a ballot by
13 mail, didn't get approved, had it rejected due to SB 1, not
14 all the other reasons, SB 1 reason, they did not turn out to
15 vote.  And again, I can't really think of another group of
16 voters who are more motivated to turn out than people who are
17 actively going through those steps to try to get their ballots
18 sent to them.
19     That rate is higher, but clearly non-Hispanic individuals,
20 which includes other races besides non-Hispanic ethnicity also
21 had a higher barrier and didn't vote, but it is clearly higher
22 among those with a Hispanic surname, and it's probably
23 underestimating.
24 Q.  Now, turning to ballots by mail and the statewide
25 March 2022 Election, did you study the ID matching requirement

2729

DAN SMITH – DIRECT

1  and its effect on rejection of ballots by mail by ethnicity?

2  A.  Yes, I did.  And if we can turn to the next slide, I can

3  walk you through the analysis.

4      Again, this is relied upon from the data I received from

5  the Secretary of State's Office for that election across, you

6  know, most of the counties but certainly not all of the

7  counties.

8  Q.  So does the graph that you are presenting here on your

9  slide 43, does that use the same type of analysis that you've

10  used in the previous graphs of similar appearance?

11  A.  It's exactly the same analysis.  I'm taking census data,

12  putting individuals that I know from the data received from

13  the State, using those data, tying it to the voter file to get

14  addresses, putting the addresses through geocoding into a

15  census block, and looking, in this case, the percentage Black

16  voting age population that goes from zero to 100 percent.

17      And in the Y axis, the up and down, vertical axis, it's

18  the percentage of ballots by mail that were rejected due to SB

19  1, so not the other reasons, just SB 1, out of all absentee

20  ballots casts in that March 2022 Primary Election.

21  Q.  What does this graph show?

22  A.  It shows a clear positive relationship again with a

23  regression line that's best fitting the data.  It may not look

24  dramatic but it's certainly several percentage points more

25  likely.  If I was abetting person, I would much rather be

DAN SMITH — DIRECT

1  living in a census block that is zero percent Black voting age

2  population if I wanted to make sure that my ballot was going

3  to not get rejected due to SB 1.

4  Q.  And did you study the same question, rejection of ballots

5  by mail in the March 2022 Primary Election with regard to

6  voters who have Hispanic surnames?

7  A.  Yes.  The next slide will show that.

8      Again, this is already a dwindling process.  These are

9  people who got through the application, right?  So they've

10  already shown the identification number, had it match on the

11  database.  These are people who have clearly cleared the bar

12  in the application, who, then, a few weeks later when they

13  send their ballot back in, they have it rejected.

14      And again, I'm using the Hispanic surname flag from the

15  April 2022 voter file to identify these individuals from the

16  data I received from the State to determine their ethnicity

17  and I can show quite clearly that it's a two-percentage point,

18  two-and-a-half percentage point difference in terms of the

19  rejection rate due to SB 1, which is, again, a proxy for the

20  ethnicity, Hispanic-non-Hispanic, the surname.

21  Q.  And so this particular table is from your April 22nd of

22  2023 report at page 28, is that right?

23  A.  That's correct.

24  Q.  And when you put in this table that these, that certain

25  ballots were rejected due to SB 1, how do you know that?

2731

DAN SMITH – DIRECT

1   A.  I know that because of the data that was provided to me by
2   the State.  So this is a very conservative analysis.  I know
3   the reasons, as we've shown already, some of the data is
4   comparable to the data I showed early that tells me a
5   rejection reason and I'm able to code that up and determine
6   which ones are an SB 1 reason and which ones are not.
7       I am very conservative in the analysis, again, because if
8   there is no reason I don't count it as an SB 1 rejection
9   reason, and so there very well could have been rejected by SB
10  1 but the clerk didn't enter any reason.  I am not assuming
11  one way or the other.  I just accept that I am not including
12  that in the numerator of rejection.
13      So this is a very conservative analysis.  I'm using,
14  again, a conservative analysis with respect to ethnicity based
15  on surname.  I would much rather have individual-level data on
16  the ethnicity or the race of an individual, as we've already
17  talked about, that the State has, but I don't have that data,
18  so conservative analysis.  And, lastly, that non-Hispanic
19  category is including people who are obviously not White in
20  there as well.
21  Q.  So the percentage and the number are driven up for the
22  non-Hispanic group because there are minorities that are
23  included there?
24  A.  That's absolutely right, and these numbers may be looking
25  lower than what media reports were doing, that also is

DAN SMITH – DIRECT

1  indicative of my conservative analysis.  I'm not including

2  ballots that didn't come in on time.  That has nothing to do

3  with SB 1 or any other, you know, part of the reason a voter

4  would be rejected, is that it wasn't received on time.  So

5  these rates look perhaps a little lower than what might have

6  been reported in some of the press.

7  Q.  And ultimately what does this table tell you or tell us

8  about rejection of absentee ballots by ethnicity in the 2022

9  Primary?

10 A.  That Hispanic voters, those with Spanish surnames, were

11 more likely to have their ballots rejected, even after they

12 have passed through the standards to request an absentee

13 ballot than individuals who are without a Spanish surname who

14 I would categorize as non-Hispanic.

15 Q.  Did you also have ballot-by-mail data for the top ten

16 counties in Texas by population?

17 A.  Yes.  So this next slide actually comes from the exact

18 same data.  I've just separated out, subset it to counties.

19 And so we can get a sense here of some of the comparable

20 rates, Harris County on the top here, with that 21.5 percent

21 rejection rate.  That's very similar to what I showed earlier

22 from the Harris County data.

23     Again, I did not substitute any data in here.  When Harris

24 County gave me data from the Primary 2022 Election, I used

25 that and did my analysis.  When the State provided me data

DAN SMITH — DIRECT

1  from Harris County, I used those data, coding them up the
2  exact same way with respect to whether it was an SB 1
3  rejection, so there might be slight differences but that's on
4  the data that I received and the snapshots of the voter file.
5      What I want to point out here is, again, across the board,
6  those with Hispanic surnames were more likely to have their
7  ballot by mail rejected in that 2022 Primary Election.
8      Highlighted is that missing data that I referred to
9  earlier from Hidalgo County where, again, I saw the data that
10 Hidalgo County provided to me in discovery for the March 2022
11 Primary Election, but the reasons for rejection for SB 1 were
12 not included in the State data.  And so, again, they are
13 included in the denominator of ballots that were cast but I
14 have zero in the numerator for that Hidalgo County in terms of
15 why SB 1 may have been the reason that it was rejected.
16 Q.  So — and am I correct that this table that we're looking
17 at here on slide 45 comes from Exhibit OCA PX 255, your
18 April 22nd report?
19 A.  Yes.
20 Q.  Am I also correct that when testifying a little while ago
21 about the information provided by Hidalgo County, that appears
22 in your April 29th of 2022 report, that's HAUL MFV Exhibit 60
23 at table 8?
24 A.  Yes, that's correct.
25 Q.  And that table shows that Hidalgo County's own data report

DAN SMITH – DIRECT

1  that 21 percent of voters with Hispanic surnames had —

2         THE COURT:  And the objection is going to be leading

3  and that's sustained already.

4         MR. WASSDORF:  Thank you.

5  BY MR. GENECIN:

6  Q.  Well, then, why don't we have a look just for a moment at

7  slide 9, and if you would tell us what the data showed that

8  Hidalgo County provided.

9  A.  Right.  Thank you for allowing me to look back at slide 9

10  which I provided from my report.

11         That, in that April 29, 2022 report where I received data

12  from Hidalgo County, I was able to calculate a 21-percent

13  rejection rate for voters with Hispanic surnames and surnames

14  compared to less than 13 percent with non-Hispanic surnames.

15  Hidalgo County provided that data in discovery.  That data —

16  those data were not provided in the spreadsheet that I

17  received from the State.

18  Q.  So now if we could turn to slide 46, did you study the

19  requirement of identification numbers on applications for

20  ballots by mail in connection with the November 2022 General

21  Election?

22  A.  Yes, I did, and I provided a couple of slides to look at

23  that.

24  Q.  And what did you find concerning rejection of applications

25  for ballot by mail for Black voters in the November 2022

DAN SMITH – DIRECT

1  General Election?

2  A.  Same analysis.  2022 General Election, using data provided

3  by the Secretary of State.  So this is looking across most of

4  the counties with respect to the applications that I received,

5  caveats from that earlier table of the counties that didn't

6  provide data, and then I'm able to calculate from the

7  rejection reasons those that were due to SB 1.

8     Very conservative analysis, very similar results to what

9  we saw in the March Primary where an increase in the Black

10  voting age population doesn't seem to have much of a bearing

11  on rejection of an application relative to those precincts

12  that have very low Black voting age population.  The rejection

13  rates are fairly constant across.

14  Q.  And did you also study rejection of applications for

15  ballots by mail by Hispanic voters in the November 2022

16  General Election?

17  A.  I did.  Same exact analysis, different data.  This time

18  data again coming from the State but that had the 2022

19  November Election applications missing data issues that we've

20  already talked about early on, both in terms of the counties

21  as well as some of the reasons that a ballot-by-mail

22  application may have been rejected, but we're seeing the same

23  kind of results here where I'm finding that those with a

24  Spanish surname were actually a little less likely than those

25  with a non-Hispanic surname to have their application rejected

DAN SMITH - DIRECT

1  in the General Election.

2  Q.  Did you also study the effect on Hispanic voters in the

3  statewide November 2022 General Election of having their

4  application for ballot by mail rejected?

5  A.  Yes, I did.  So same exact analysis as the March 2022

6  Primary, the next slide shows the results that were reported

7  in my June report of this year.

8  Q.  Just for the record, I'll say that's HAUL MFV 311.

9  A.  And here, again, I'm looking, what happened to the

10  individuals who had their applications rejected in the

11  November Election, did they turn out to vote somehow?

12      We know from a scholarly literature that that's probably

13  very unlikely.  I mean, I've written quite a few studies that

14  show that voting is sticky.  People don't easily shift from

15  one modality to another.

16      The exception to that was probably the 2020 General

17  Election and some in the Primary Election because of COVID,

18  and what we're already seeing in the states that had those

19  expansions of vote by mail, many people are coming back into

20  the fold.  They are voting early in person or on Election Day.

21      The same thing is true for people who vote by mail.  If

22  you have your application denied, it's very, very unlikely,

23  maybe it's a flip of a coin of whether or not you're going to

24  be able to turn out to vote in that election by another

25  method, and that's exactly what I find here, that this

DAN SMITH - DIRECT

1  comports with the literature that says that if you make
2  administrative changes, such as changing a precinct's
3  location, or where you vote on Election Day, or changing the
4  days of early in-person voting, or the hours that are
5  available, if you put restrictions on the possibilities to
6  vote, it's going to affect people differentially and my
7  studies have shown quite clearly across the states that Black
8  and Hispanic voters are more subjected to those changes with
9  respect to the possibility of them voting and not being able
10  to overcome those changes.

11      We see the exact same thing here.  This chart just shows
12  the overall rate where about 50 percent, little less than
13  50 percent of the people who had their application in the
14  November Election were — did not turn out to vote in that
15  election.

16      And as a political scientist, that's exactly what I would
17  expect.  These are people who are opting in to voting by mail
18  because they are over the age of 65, because they have a
19  disability that's recognized, because they are going to be out
20  of the county for Election Day.  It's not surprising that very
21  few of them, about half of these super-engaged voters who have
22  gone through the exercise to try to get their ballot but have
23  their ballot application rejected, don't turn out to vote.

24      And I think that's something that we really have to take
25  away from this, is that the substitution effect, as it's

DAN SMITH - DIRECT

1   sometimes known, is not easily transferable for all groups.

2   There are some groups where it's highly unlikely that someone

3   who is disabled, for instance, is going to be able to turn out

4   to vote on Election Day, when she has always relied on having

5   her mail ballot mailed to her and be able to return it.

6   Q.  So focusing now on registered voters with Spanish

7   surnames, whose absentee ballot applications were rejected

8   because of SB 1, what was the impact of those rejections on

9   those voters in the November of 2022 General Election?

10  A.  It was higher.  It was higher when I just divide all the

11  voters who had their applications, all the eligible voters who

12  had their applications rejected in that November General

13  Election, it was over 50 percent, 50.1 percent of those with

14  Hispanic surnames did not turn out to vote.  The non-Hispanic,

15  which again, is probably inflated with non-Whites who are also

16  non-Hispanic, was 47.6 percent.

17      So there is a disparate impact where we see that

18  individuals who had their applications rejected in the General

19  Election who are Hispanic were even less likely to turn out to

20  vote by a different means or to have their ballots somehow

21  corrected -- applications somehow corrected than non-Hispanic

22  voters.

23  Q.  And, just for the record, Your Honor, the table here at

24  slide 51 is taken from HAUL MFV Exhibit 394.  And so turning

25  now to the requirement of identification numbers on ballots by

2739

DAN SMITH – DIRECT

1  mail as reflected in the statewide data for the November of

2  2022 General Election, did you study the rejection rate of

3  ballots by mail by Black voting age population?

4  A.  Yes, I did.

5  Q.  And what did you find?

6  A.  So the next slide shows something that we're all, I think

7  by now, very familiar with, these are data that come from the

8  Secretary of State's Office that include almost all the

9  counties' data on individuals who voted a mail ballot.  We're

10  missing some counties with respect to vote-by-mail ballots

11  that may have been rejected, and, therefore, I can't determine

12  the reason, and therefore, it's a zero in the numerator, but

13  it's included in the denominator.

14      I, again, am putting individuals by linking the data from

15  the State with the VUID to a statewide voter file to identify

16  an individual's address to then geolocate them and put them

17  into a census block that ranges in this case from zero percent

18  Black voting age population to 100.  We see a positive line

19  here.

20      These are people who have made that through the first

21  phase of having to prove their identity through SB 1 in

22  obtaining an application for a ballot by mail for the November

23  Election but we see here those individuals living in heavily

24  Black voting age population are more likely than those living

25  in predominantly non-Black areas to have their vote-by-mail

DAN SMITH – DIRECT

1  ballot from the November 2022 General Election rejected due to
2  SB 1 reasons.
3  Q.  And did you study the statewide rejection data for ballots
4  by mail for Hispanic voters?
5  A.  I did.
6  Q.  And what did you find there?
7  A.  Yes.  So, again, looking at similar type of data here,
8  Hispanic–non-Hispanic using the voter file data, linking the
9  data that I received from the State on both absentee ballots
10 that were cast, as well as those that were rejected due to SB
11 1, I see about a one-percentage point difference between
12 Hispanic versus non-Hispanic in terms of a 2.94 versus a 1.98
13 rejection rate.
14      Again, Hispanic is probably undercounted with respect to
15 Spanish surnames.  Non-Hispanic is probably inflated because
16 it's including a lot of non-Anglo, such as Black voters as
17 we've seen are more and more likely to have their ballots
18 rejected.
19      So the overall rate is higher for those with Spanish
20 surnames, Hispanic voters, and most of the ballots again have
21 been rejected due to SB 1 out of all the rejected ballots.
22 Q.  And I see here that you show a total of absentee ballots
23 filed statewide of approximately 350,000, a little over
24 350,000, is that right?
25 A.  Yes.  Yes.

2741

DAN SMITH - DIRECT

1  Q.  How does that compare, if you know, to the 2018 Election?

2  A.  So that's an interesting question.  So if I recall, and I

3  did do some expert work in some other litigation prior to the

4  2020 Election, I want to say there were close to 550 total

5  vote-by-mail ballots cast.  It may have been a little shy of

6  550,000 absentee ballots that were cast in the 2018 General

7  Election, which is a comparable election.

8      So it's actually surprising that you would have 350,000

9  absentee ballots cast.  Again, I've done some processing here

10 to link to the surname using a subsequent voter file but it's

11 probably in that range.

12     200,000 almost fewer vote by-mail ballots cast in an

13 election in which the overall voter registration list has

14 increased in those four years of time.  They were competitive

15 elections, not exactly perfect elections, but competitive

16 elections, that the rules with respect to 65 and older and

17 disability and being out of the county didn't change, so why

18 would there be 200,000 fewer?

19     It's not that we've had less people who are disabled, less

20 people who are 65, people turn 65 every day, including some of

21 us here, and, you know, the Hispanic-non-Hispanic hasn't

22 changed that much.  So it is quite shocking now that I think

23 about the fact that we would have almost 50 percent less

24 vote-by-mail ballots cast in an election.

25     The rejection rate obviously is higher too because of SB

2742

DAN SMITH — DIRECT

1  1, but that could talk about some of the spillover effects of

2  having this law in place that is dissuading people from

3  applying.  The ones that do, we know that there's rejection

4  rates.  Those that get through are a few and proud here in

5  Texas to be able to vote a vote-by-mail ballot.

6      So I don't know if that's the Texas slogan, the few and

7  the proud, I don't think so, I think that's more the Marines,

8  but I'm sure you have a similar slogan here.

9  Q.  So looking, finally, at the top ten counties in Texas by

10  population, did you study rejection of ballots by mail cast by

11  Hispanic voters in those counties?

12  A.  Yes, I did.  And I apologize for the ordering of these

13  counties.  It makes it very difficult to look and compare,

14  it's because I did it by total ballots cast as opposed to the

15  voting age population which I did in the previous one, but

16  it's itself same idea here.

17      And, by and large, if you compare those with Hispanic

18  surnames versus non-Hispanic surnames the rejection rate due

19  to SB 1 out of all absentee ballots cast in the November 2022

20  General Election is higher.  There may be a couple exceptions

21  to that.

22      I see, you know, Denton County, zero ballots were rejected

23  due to SB 1 out of the 394 cast by those with Spanish

24  surnames.  That's the data I received from the Secretary of

25  State.  It's higher in Denton for non-Hispanics but generally

*Gigi Simcox, RMR, CRR*

DAN SMITH − DIRECT

1  the pattern is consistent here.

2  Q.  And based on your work in this case, Professor, what are

3  your overall conclusions?

4  A.  Well, it's been five reports, a lot of data coming in

5  through, you know, different means and kind of surprisingly

6  slow and surprisingly noncomplete, but I think my reports all

7  suggest very similar findings, and that is SB 1 has had a

8  negative impact on Black and Hispanic registered voters here

9  in Texas.  We've seen it at the county level.  We've seen it

10  at the statewide level.

11      It has affected counties' ability to offer modalities of

12  voting, such as Harris County with drive−thru voting and even

13  overnight voting, things where I have seen no evidence of any

14  type of fraud, people misidentifying themselves while voting

15  in their car or overnight.  Maybe I'm missing it but I have

16  not seen any evidence of that, and, yet, we can see that Black

17  and Hispanic voters were more likely to use those methods in

18  Harris County.

19      I have no idea what happened in Bee County where

20  presumably they had drive−thru voting as well.  I didn't

21  receive any data from Bee County, but I wouldn't be surprised

22  to see similar types of rates of usage.

23      With respect to the ballot by mail, the applications as

24  well as the ballots themselves, I did not find disparate

25  impact with respect to the application process.  That might

DAN SMITH — DIRECT

1  have something to do with advocacy groups on the ground

2  perhaps that are helping individuals with respect to making

3  sure that they are filling out their absentee ballot

4  applications correctly.  These are probably people that have

5  been doing it for a while and may be more aware of SB 1.  I

6  don't know.  I'm completely speculating there.

7      But I don't see rejection rates of the applications that

8  are higher.  What I do see, however, is that those people who

9  failed to have their application accepted because of SB 1

10 specifically are less likely to turn out to vote in the

11 General Election or in the March Primary Election both in

12 2022.

13     And then, finally, I find a positive relationship, again,

14 to those who actually do get their applications and do cast a

15 vote-by-mail ballot in both the March and November General

16 Elections that as the Black voting age population increases in

17 the census block, the likelihood of having your ballot

18 rejected goes up, and I find that the same for both those

19 elections, by and large, individuals who are identified by me

20 as being Hispanic through their surname are more likely to

21 have their absentee ballots rejected due to SB 1.

22     So I think it's a pretty clear and stark picture that SB 1

23 has had a disparate impact on Black and Hispanic voters in the

24 state of Texas.

25         MR. GENECIN:  Thank you very much, Professor.

DAN SMITH - DIRECT

```
 1              Your Honor, I'll pass the witness.
 2              THE COURT:  Anything else from this side?
 3              MISS PERALES:  Yes.
 4  BY MISS PERALES:
 5  Q.  Nina Perales for LUPE plaintiffs.
 6       Dr. Smith, if I understood you correctly, you testified
 7  with respect to your analysis of Hispanic rate of rejected
 8  application for ballot by mail, that the universe of rejected
 9  applications for ballot by mail that you identified as
10  Hispanic was 608, is that correct?
11  A.  I would have to go back and look at one of my specific
12  charts.  Which election?
13  Q.  March 2022.
14  A.  And for statewide?
15  Q.  Yes.
16  A.  For the applications?
17  Q.  Yes.
18  A.  And if someone has that page of my demonstrative --
19  Q.  I would have it but I don't believe we have the slide deck
20  for this examination.
21  A.  So I think we are looking at slide 39.
22              MR. GENECIN:  Yeah.
23              THE WITNESS:  These are the data that I received from
24  the State of Texas.  I have processed the data with respect to
25  eliminating any applications that were not received on time so
```

2746
DAN SMITH – DIRECT

1  that could very well — but I'm eliminating for all voters and

2  I'm using the — not the date because we obviously have

3  problems with respect to missing data in the date field but

4  I'm using the clerk's own reason for why a ballot was

5  rejected.  So that could lead to fewer overall rejections than

6  perhaps other data.

7  BY MISS PERALES:

8  Q.  I understand the limitations with respect to data for

9  which there was a reason given.  So then Hidalgo County, which

10 did not keep a reason for rejecting applications for ballot by

11 mail, your analysis then would not have included the 412

12 rejected applications for ballot by mail in Hidalgo County, is

13 that right?

14 A.  That's correct.

15 Q.  And so depending on what you found, if you had that data

16 with the 412 from Hidalgo County, would that potentially alter

17 the numbers that you have in your final column with respect to

18 Hispanic and non-Hispanic rates of rejection under SB 1?

19 A.  I would have to know all the applications, but very likely

20 that would inflate appropriately so rejection readings due to

21 SB 1.

22 Q.  For Hispanics?

23 A.  For Hispanics.

24 Q.  Do you know what percent of registered voters in Hidalgo

25 County are Spanish surname?

2747

DAN SMITH - CROSS

1   A.   I would imagine it's close to 90 percent.

2   Q.   Are there any other counties where you believe the data is

3   missing that might be from the U.S.-Mexico border?

4   A.   Quite a few.  When I looked at that are missing in terms

5   of reporting the data or that was provided to me either

6   individual counties or through the State, Secretary of State's

7   data that I was provided.

8   Q.   Thank you.  And then with respect to application for mail

9   ballots with respect to your finding regarding their rejection

10   rates between Hispanic and non-Hispanic voters, is it also the

11   case that inclusion of more complete data might have changed

12   your findings with respect to those relative rates?

13   A.   I am always in favor of more data and I suspect that that

14   probably would have been there.  I'm just speculating that at

15   the point since I haven't seen those data.

16          MISS PERALES:  Thank you.

17          THE COURT:  Anything else from this side?

18          Any cross?

19                    CROSS-EXAMINATION

20   BY MR. WASSDORF:

21   Q.   Hello again, Dr. Smith.

22   A.   Hello.

23   Q.   I just wanted to clear one thing up real quick.  You know,

24   there has been some discussion about your various reports in

25   this case.  I believe that Mr. Genecin, when he asked you

DAN SMITH − CROSS

1  about your May 13th report, he called that your first report,

2  is that right?

3  A.  I would have to at this point go back and take a look at

4  what the order is.  I did provide a corrected version of two

5  reports and I want to say both of those cases, the corrections

6  came after my visits with you through depositions.

7       I wanted to be as clear and transparent as possible.  You

8  asked some good questions.  I provided a revision to those two

9  reports, and the dates there for — may be out of sequence in

10  terms of the calendar, so I would have to look at each report

11  and the sequence that Mr. Genecin has presented.

12  Q.  I just want to walk through that real quick to make sure

13  the report is clear because I think you've also mentioned that

14  there were five reports and I think by my count there were

15  actually a total of eight that were issued?

16  A.  If you are including the initial versions that are

17  corrected, that's probably correct.  I don't know if you are

18  including the addendum that I did for the last one as a

19  report.  I didn't see it as that way, but, yeah.

20  Q.  So did you issue an initial report with respect to

21  drive−thru, 24−hour voting, and drop boxes on February 28th,

22  2022?

23  A.  I will take your representations.  I do not have that

24  information in front of me and I would not know that date.

25  Q.  Did you, to your knowledge, issue what you've described as

DAN SMITH - CROSS

1  a supplemental report, but this would have been the first

2  report about the applications for ballot by mail and ballot by

3  mail on April 29th, 2022?

4  A.  I believe that's included here.

5  Q.  That one should be —

6  A.  That's the HAUL MFV 060.

7  Q.  Yes, sir.  So then on May 13, 2022 I believe you issued

8  what was described as a final report that dealt with the

9  drive-thru voting, 24-hour voting, and drop boxes?

10 A.  I don't recall calling it a final report.  It may have

11 been a corrected report, but I have that in front of me as —

12 correct me if I'm wrong — the HAUL MFV 310.

13 Q.  Correct.

14 A.  Yeah.

15 Q.  Now, the, what I believe was called the initial report on

16 February of 2022 and May 13th of 2022, those were the only two

17 reports that talked about drive-thru voting, 24-hour voting,

18 and drop boxes, is that right?

19 A.  My recollection is that is correct.  It was looking at

20 obviously pre-SB 1 opportunities which the counties were not

21 allowed after SB 1, so that makes logical sense.

22 Q.  Then on February 9th, 2023 you issued what was described

23 as a second report that likewise dealt with the applications

24 for ballot by mail and ballot by mail, does that sound right?

25 A.  Is that one of the exhibits here?

DAN SMITH - CROSS

1  Q.  It's not one of the exhibits there.

2  A.  I don't have recollection of the specifics on that, but,

3  clearly, it sounds like I corrected it after one of my

4  depositions with you.

5  Q.  I actually don't believe this was one of the corrections.

6  I believe this was — this was the — was this the first

7  effort at the statewide — it doesn't matter.  I'll represent

8  to you that you issued a report on February 9th, 2023.

9  A.  Yes.  I think that was corrected and that is now Exhibit

10  OCA PX 255.

11  Q.  That is correct.  So between those two, the

12  February 9th report and the April 22nd report of 2023 that you

13  just described as OCA 255, there was also a March 20th, 2023

14  that was described as a second supplemental report that I

15  believe dealt with just Harris and Travis County?

16  A.  Yes, that's correct.  That's the HAUL MFV 313 that I've

17  spoken about today.

18  Q.  Yes, sir.  So then we just talked about the April 22nd,

19  2023 report, and that's after our first deposition together

20  where we identified some issues with the prior report and you

21  corrected those, is that right?

22  A.  That's correct.

23  Q.  And so then in June 7th of 2023 there was a third

24  supplemental report, and I believe that's where we got you

25  some statewide data for the 2022 General Election and you

2751

DAN SMITH – CROSS

1  issued that report, is that correct?

2  A.  It was sometime in May when I received that and I had a

3  very tight deadline to do this June 7th, and as a result I

4  left out one of the tables that I had generated that you

5  identified for me in my subsequent deposition, yes.

6  Q.  And that's when you issued the August 16th, 2023 report

7  that was described as a third supplemental addendum, that is

8  HAUL MFV 394, is that right?

9  A.  That's right, and it's basically a page of analysis with

10  a —

11  Q.  I just wanted to get that straightened out and on the

12  record.

13      We've talked some about missing data today, and before I

14  go into that, from what I heard the missing data issue was

15  mainly in regards to the reports regarding the applications

16  for ballot by mail and ballot by mail.  Did you similarly have

17  missing data issue with the reports that addressed drive-thru,

18  24-hour, and drop box voting?

19  A.  Well, yes.  I received no data from any county, perhaps

20  Bexar County was the only one, but when I looked into it, it

21  was not really terribly useful for any type of analysis on

22  what voters dropped off their ballot by mail at a location in

23  either of the two general elections or in the previous

24  elections, the 2020 General Election for instance.

25      That would be useful to be able to identify who uses that

DAN SMITH - CROSS

1  convenience of driving up and identifying oneself with a
2  ballot and turning it over, but I didn't receive those data
3  and as a result I have no empirical analysis for that.
4  Q.  Okay.  I just wanted to know whether I needed to address
5  the missing data issue with respect to all of the reports or
6  just the others and I think that answers my questions.
7  A.  I think you do, on the use of these, you know, drop off
8  sites.  I don't have the data to analyze, and certainly with
9  respect to the drive-thru voting you can read in media reports
10 that Bee County evidently used drive-thru voting.  I received
11 no data from Bee County.
12       There could be other counties that utilized it, I don't
13 know.  And with respect to extended hours, whether it was
14 something like Harris County did, which the county did provide
15 me with the individual-level data of who voted after hours,
16 and I think it was a Wednesday or a Thursday night, or
17 something like that, I don't know if other counties also
18 engaged in.  I just received no data.
19       So I would characterize that all as missing data, just
20 like I've categorized some of the counties, most of the
21 counties that I didn't receive any data from them besides the
22 five that I mentioned individually or the missing counties in
23 the statewide data that I received from the Secretary of
24 State's Office.
25 Q.  So let me ask you this.  Do you know what data the

DAN SMITH - CROSS

1   counties are supposed to collect?

2   A.  With regard to what type of election administration?

3   Q.  Well, I mean, you understand that in Texas anyways it's

4   the counties that administer the elections, right?

5   A.  Correct.

6   Q.  And so all of the voting data has to originate with the

7   counties?

8   A.  That's my understanding.

9   Q.  And so are you aware with respect to the voting data that

10  you have used to do your analysis, what data the counties are

11  required by law to collect?

12  A.  I don't have that information on the top of my head, no.

13  Q.  Are you aware of what data the counties actually collect,

14  regardless of whether they are required to?

15  A.  I have some indication of what's been provided in

16  discovery and what's not been provided in discovery.

17  Q.  Are you aware of what data the counties are required to

18  report to the Secretary of State's Office?

19  A.  No, I don't have that off the top of my head either.

20  Q.  To the extent it differs, are you aware of what data the

21  counties actually do report to the Secretary of State's

22  Office?

23  A.  I have no knowledge of that.

24  Q.  Do you have any reason to believe that the Secretary of

25  State has not provided you with all of the information -- the

2754

DAN SMITH − CROSS

1  voter record information that it has?

2  A.  No, I don't have any −− and if I implied that, I didn't

3  mean to.  I'm assuming that you've turned over what you have

4  that you've received from the counties, yes.

5  Q.  So let's talk some about your −− the analysis that you did

6  generally speaking.  Now, I think we established earlier that

7  you aren't directly looking at race or ethnicity, right?

8  A.  I am but not at the individual level for Black voting age

9  population or White voting age population or the individual

10 characteristics of a voter −− I'm sorry.  Let me rephrase

11 that.

12     I'm not doing that at the individual level for a Black or

13 a White voter based on the data that I have from counties or

14 the State.  I am relying on an indicator of ethnicity based on

15 surname that we've talked about for Hispanic−non−Hispanic

16 voters at the individual level.

17 Q.  But at the individual level you're not directing measuring

18 or −− is the proper word "measuring," here?  Measuring an

19 individual's race or ethnicity?

20 A.  Again, I would pushback a little in terms of using Spanish

21 surname as a proxy for an individual's identity as Hispanic.

22 It's not perfect.  There's probably a lot of false negatives

23 or people who identify individually as Hispanic do not have a

24 surname, that is classified by the U.S. Census as being highly

25 likely to be Hispanic.

DAN SMITH – CROSS

1      There may be some false positives of people who are

2  identified as a Spanish surname who don't identify as

3  Hispanic.

4  Q.  And we're going to talk about Spanish surnames in just a

5  second, but I want to get to this point first.  In the State

6  of Texas people don't include their race or ethnicity on their

7  voter registration application, is that right?

8  A.  Correct.

9  Q.  And so that data does not directly exist in the voter

10  registration file?

11  A.  That's correct, my understanding, yes.

12  Q.  And I think you mentioned that other states do require

13  that information on a voter registration application, is that

14  right?

15  A.  Yes, they require it or they capture it, yes.

16  Q.  Would it surprise you that 37 out of the 50 states do not

17  require race or ethnicity on a voter registration application?

18  A.  It's a historic legacy largely of the Voting Rights Act

19  and requirements of Congress, so, no, it wouldn't surprise me.

20  Q.  So Texas does not stand alone in the fact that it doesn't

21  require race or ethnicity to be included on a voter

22  registration application?

23  A.  That's correct.

24  Q.  Texas also doesn't require voters to include their race or

25  ethnicity on an application for ballot by mail, is that right?

DAN SMITH – CROSS

1  A.  That's correct.

2  Q.  Nor on the ballot itself?

3  A.  I would hope there's no personal identification

4  information on the ballot itself.

5  Q.  Whether that's a mail-in ballot or an in-person ballot?

6  A.  Correct.

7  Q.  So when –– we've been looking at these charts with the

8  little circles and we are talking about the voting age

9  population, and I think you mentioned that depending on which

10  specific analysis we're doing we're either looking at the

11  census blocks or voting tabulation districts, is that right?

12  A.  Most of what I presented today are the voting age

13  population within a census block.

14  Q.  And when we're talking about voting age population we're

15  talking about people over the age of 18 of a particular race

16  or ethnicity?

17  A.  That's correct.

18  Q.  Now, when we're talking about just people over the age of

19  18 we're not talking about eligible voters over the age of 18,

20  correct?

21  A.  That's correct.

22  Q.  And we're not talking about registered voters over the age

23  of 18?

24  A.  That's also correct.

25  Q.  And you don't even know if those individuals within that

2757
DAN SMITH - CROSS

1  census block that are over the age of 18 are citizens of this

2  country?

3  A.  That's correct too.

4  Q.  And in Texas you have to be a citizen to vote, is that

5  right?

6  A.  Yes.

7  Q.  And you have to be registered to vote?

8  A.  That's correct.

9  Q.  Let's switch over to Hispanic surnames now.  What is an

10  Hispanic surname?

11  A.  I am leaving it up to the State of Texas to define that

12  since I'm drawing on your data.

13  Q.  And so you are exclusively using the Spanish surname flag,

14  I think you called it, in the voter registration data?

15  A.  That's correct.  There are a couple exceptions where I do

16  look at percent Hispanic voting age population in my analyses

17  when I'm doing the scatter plots and the regression analysis

18  so there is that exception but largely with those tables --

19  exclusively with those tables it is using that Hispanic

20  surname flag.

21  Q.  Do you know how the Secretary of State determines whether

22  someone has a Spanish surname or not?

23  A.  No, I don't have the details on that.

24  Q.  Do you know if they ever changed that at the request of an

25  individual?

DAN SMITH - CROSS

1  A.  I do not know that.

2  Q.  I'm not speaking about the Secretary of State's Spanish

3  surname flag, but there is a list of Spanish surnames that is

4  used in these types of analyses, is that right?

5  A.  Is that a question for me?

6  Q.  Yes, sir.

7  A.  I don't understand what the question is relative to my

8  analysis.

9  Q.  Their exists a list of Spanish surnames that people use to

10  identify what a Spanish surname is, that, I believe, was

11  developed from census data, are you not familiar with that?

12  A.  It's pretty vague of what you're asking me, honestly.

13  Q.  Okay.  I think you talked about the false positive rate on

14  the Spanish surname and you would expect that there would be

15  some false positives, is that right?

16  A.  Well, I was actually talking more about false negatives,

17  that there are likely more individuals who identify as

18  Hispanic who are not being captured by the flag of Spanish

19  surname in the Texas voter file.

20  Q.  But there would also be a false positive rate?

21  A.  There undoubtedly are some false positives, yes.

22  Q.  And that would be an individual who is not Hispanic but

23  has a Hispanic surname?

24  A.  An individual who we've not identified as being Hispanic

25  who has a surname that has been flagged by the State of Texas

DAN SMITH — CROSS

1  as being Hispanic.

2  Q.  Are you aware of any scholarly research on what either the

3  false positive or false negative rate is of a Spanish surname

4  analysis?

5  A.  In general but I don't have any specifics in mind.

6  Q.  The false positive and false negative rates can't be

7  determined from the data that you had or the analysis that you

8  did, is that right?

9  A.  I've seen studies that have looked at, say, voter file

10  data that has an individual's identity self-reported when

11  registering as Hispanic or Black or White or some other thing

12  and estimating what the likelihood would be of using Spanish

13  surnames and some algorithm with that, but not — I don't have

14  any information with respect to Texas.

15  Q.  And you don't have that information here to do that

16  analysis?

17  A.  Well, I've requested having the DMV data that clearly

18  requests and requires race and ethnicity, which clearly the

19  Secretary of State uses that database when they are

20  registering people to vote to make sure they are citizens and

21  that they live in Texas.  Those data do exist.  I don't have

22  access to them.  I haven't been provided them, you're correct.

23  Q.  Are you aware of if the Texas Secretary of State has

24  control over the DMV or the Department of Public Safety?

25  A.  Well, it's interesting, Texas was an active participant in

DAN SMITH — CROSS

1  the ERIC System, that's the Electronic Registration

2  Information Center.  I assume, because I've looked at lots of

3  compacts and the agreements that Texas was providing

4  information from the DMV as well as from the voter

5  registration roles so that ERIC could do some matching to make

6  sure that you didn't have voters who were registered in

7  Florida and Texas or who were more importantly voting in both

8  of those states, so I assume that someone can access both of

9  those databases because they were providing information to

10  ERIC as part of this interstate compact.

11     I don't know whether the Secretary of State has direct

12  access to all the information, but, clearly they have some

13  information because they are using that database when they are

14  registering people to vote or when taking people off the

15  roles.  If they are not, then that's a bigger problem that you

16  have.

17  Q.  Okay.  Let's talk a little about your — we'll go ahead

18  and keep calling it the first report, the May 13th final

19  report with respect to the drive-thru voting, 24-hour voting,

20  and drop box voting.

21  A.  I don't think I ever referred to it as the "final report,"

22  but you can present it how you wish.  It's the

23  May 13th report.

24  Q.  The May 13th report.  Your report ultimately concludes

25  that Senate Bill 1's prohibition on drive-thru voting, 24-hour

DAN SMITH - CROSS

1  voting, or drop box voting increased the cost of voting for

2  Black and Hispanic voters, is that right?

3  A.  Well, certainly for the drive-thru and 24-7 or after

4  hours, it's harder to determine from lack of data with respect

5  to Harris County for the drop box sites.  That's more from the

6  scholarly literature that looks at drop box placement and who

7  it's going to be affecting.

8  Q.  Now, that conclusion that the cost of voting was

9  increased, that depends on those methods of voting having been

10  allowed prior to SB 1, is that right?

11  A.  I'm not sure if I understand exactly what you're asking.

12  Q.  I believe you described it as an increased cost.

13  A.  Oh, okay.  That's an interesting way.

14      Cost can occur both with things —— you know, added

15  opportunities as well as ones that are replaced.  It's not

16  necessarily true that if you expand certain types of

17  opportunities that it's going to lower costs for everyone.

18      I mean, I think we could all come up with some examples,

19  right?  If I'm working 16-hour shifts all through early

20  in-person voting, all through Election Day, it doesn't matter

21  if you open up extra facilities during those same hours,

22  right?

23      So you can be expanding the opportunities but that doesn't

24  necessarily lower my costs, if I can't get off work to go and

25  vote in one of these places.  So I'm not sure if I agree with

DAN SMITH - CROSS

1  the premise of the question, if I'm understanding it correctly
2  but I think it's a more complex way of thinking about barriers
3  and barriers are not necessarily lowered when you allow for
4  other opportunities.
5  Q.  I actually wasn't talking about lowered barriers.
6      In your report you described these -- the SB 1's
7  provisions prohibiting drive-thru voting, 24-hour voting, and
8  drop box voting as increasing the cost of voting to minority
9  voters?
10 A.  Yes.
11 Q.  And for something to increase it has to increase with
12 respect to something else, is that right, there has to be a
13 baseline?
14 A.  Correct.  And this would be the baseline was, here are
15 these opportunities, and now they have been eliminated.
16 Q.  Okay.  And that's my point, is that that conclusion
17 depends on those opportunities existing in the first place?
18      THE COURT:  He just said that.  They existed and then
19 SB 1 took them away.  So what's your point?
20      MR. WASSDORF:  Well, Your Honor.  My point is that
21 those opportunities did not exist.
22      THE COURT:  It did exist at one point.  It existed
23 prior to SB 1.  They existed.  Your point is they didn't exist
24 prior to the 2020 elections, so just ask him that.
25      MR. WASSDORF:  I would disagree with --

DAN SMITH — CROSS

1          THE COURT:  Just ask a question.  You are just going

2    at a snail's pace here.

3          MR. WASSDORF:  Yes, Your Honor.

4          THE COURT:  You have to admit, this is the slowest

5    examination I have ever seen in my life.

6          MR. KERCHER:  I disagree with that.  I understand

7    it's been a long day.  We are all tired.  It is not the

8    slowest examination that's gone on in this trial.

9          THE COURT:  He needs to move on.

10          Ask your questions.

11          This is supposed to be cross-examination of a witness

12    at a trial.  You're making it seem like it's a deposition.

13          MR. WASSDORF:  I'll try to move on, Your Honor.

14    BY MR. WASSDORF:

15    Q.  So are you aware that drive-thru voting existed only in

16    Harris County, only in 2020, only in the General Election?

17    A.  No, I'm not aware of that.

18    Q.  Where else did it occur?

19    A.  Well, as I've already said, I think you can do an easy

20    Google search and find that people were doing drive-thru

21    voting in Bee County in the 2020 General Election.  I just did

22    not receive any data from that county or from the State.

23          THE COURT:  That wasn't his question.  His question

24    was did it exist prior to 2020, do you know or do you not

25    know?

DAN SMITH – CROSS

1              THE WITNESS:  I do not know.  I'm sorry.  I misheard

2   that.

3   BY MR. WASSDORF:

4   Q.  Are you aware if 24-hour voting existed anywhere in Texas

5   prior to 2020?

6   A.  No, I'm not aware of that.

7   Q.  Are you aware if drop box voting existed anywhere in Texas

8   prior to 2020?

9   A.  The ability to drop off your ballot?

10  Q.  Drop box voting.

11  A.  No, I don't know that.

12  Q.  And when you were doing this analysis you were only

13  provided data for Harris County, is that right?

14  A.  My recollection is the data came from Harris County for

15  this type of analysis, yes.

16  Q.  And so you have not formed any opinion on the impact of

17  Senate Bill 1's prohibitions on drive-thru, 24-hour voting, or

18  drop box voting on any other county but Harris County?

19  A.  Yes, that's correct.

20  Q.  And you can't form an opinion on a statewide basis either?

21  A.  Just in terms of what the share of Harris County is

22  overall but I wouldn't rely on that.  It's specific to Harris

23  County.

24  Q.  Let's just go over a couple of facts with respect to the

25  2020 General Election.  There were 2.43 million registered

DAN SMITH - CROSS

1  voters in Harris County for that election, is that right?

2  A.  I don't know that number off the top of my head.

3  Q.  Could we pull up the May 13th report at paragraph 8.

4      Does this refresh your memory?

5  A.  Yes.

6  Q.  And so were there 2.43 million registered voters in Harris

7  County during the 2020 General Election?

8  A.  That's what I've written here.

9  Q.  And there were 1.65 million people who actually voted in

10 Harris County in the 2020 General Election, is that right?

11 A.  Again, that's what I've represented here.

12 Q.  And then there were 1.27 million early in-person ballots,

13 is that correct?

14 A.  Again, that's what I've reported here.

15 Q.  And then approximately 179,000 mail ballots?

16 A.  Yes, again.

17 Q.  Could we pull up State 155.

18     Now, this is turnout and voter registration figures from

19 the Texas Secretary of State's Office and let's scroll down to

20 the November 2020 Election.  And so does this indicate that

21 there were approximately 11.3 million voters in the

22 November 2020 General Election?

23 A.  Yes.

24 Q.  In your May 13, 2022 report you concluded that Black and

25 Hispanic voters were more likely to use drive-thru voting, is

DAN SMITH — CROSS

1  that right?

2  A.  Yes.

3  Q.  And you looked at that using three different methods of

4  analysis?

5  A.  Yes.

6  Q.  Specifically, you did a regression analysis, and then a

7  method of bounds analysis, and then what was the third type of

8  analysis that you used?

9  A.  The descriptive using the Spanish surname flag.

10  Q.  So the regression analysis you did of census block voting

11  age population by race and ethnicity, is that correct?

12  A.  Yes, correct.

13  Q.  Let's look at the May 13th report on page 23, figure 2,

14  and so this is one of these charts that we've been looking at

15  all evening, and it indicates that the greater percentage of

16  voting age population — Black voting age population were more

17  likely to use drive-thru voting?

18  A.  I think I described it slightly better than that, but,

19  yes, that's generally the point.

20  Q.  And let's look at figure 3 on page 25.  And this shows a

21  weaker correlation.  I believe you've testified previously

22  that that's because Hispanics, unlike Blacks, are more evenly

23  distributed throughout the county?

24  A.  Yes.

25  Q.  And so you also did this method of bounds analysis based

DAN SMITH — CROSS

1  on near racially homogenous precincts, is that correct?

2  A.  Yes, that's correct.

3  Q.  And you determined through that analysis, that through

4  that analysis that Hispanics were more likely to use

5  drive-thru voting which would match up with this regression

6  analysis that you did?

7  A.  Yes, that's correct.

8  Q.  Now, your report does not express any opinion as to why

9  Black or Hispanic voters used drive-thru voting more than

10 other voters, is that right?

11 A.  Correct.

12 Q.  And you state in your final report that drive-thru voting

13 was offered at ten locations, quote-unquote, across the

14 county?

15 A.  Yes.

16 Q.  Is your conclusion that SB 1's drive-thru voting provision

17 increased the cost of Black and Hispanic voters, that depends

18 on drive-thru voting being equally available to all races or

19 ethnicities, is that right?

20 A.  No, I don't think that's a fair assumption.

21 Q.  The demographics of the area surrounding a polling place

22 would impact the demographics of the people who voted at that

23 location, wouldn't it?

24 A.  There's very little scholarly evidence that would suggest

25 that.  People vote early where it's convenient.  It may be

2768
DAN SMITH – CROSS

1  near where they live.  It may be on their way or from work,

2  dropping off schools, going to church, all different types of

3  things, and we can see that from the patterns in which early

4  in-person voting is allowed at any location, not only in

5  Texas, but in other states that that's the trend.

6  Q.  Did you analyze the demographics of the drive-thru polling

7  locations?

8  A.  In terms of where they were cited?

9  Q.  Yes, sir.

10  A.  I provided some data today that showed quite clearly that

11  they were spread around in places that were densely and not so

12  densely populated, including ones that were used quite heavily

13  in very nondense areas, Falls Church –– I think Fall Church

14  and the Humble Civic Center, areas that were not heavily

15  densely populated, and certainly don't have high

16  concentrations of Black voting age population living in there.

17  Q.  Would it surprise you that we have heard testimony in this

18  case that the drive-thru voting locations were located in

19  areas that were minority-majority?

20  A.  I have no knowledge on that.

21  Q.  Would it surprise you Isabel Longoria, the Former

22  Elections Administrator for Harris County testified that the

23  location of the drive-thru voting locations was a race-based

24  decision?

25  A.  I have no knowledge on that.

2769

DAN SMITH - CROSS

1   Q.   Let's move over to 24-hour voting real quick.  So 24-hour
2   voting, to your knowledge, only occurred in the 2020 General
3   Election?
4   A.   The data I have is from the 2020 General Election.
5   Q.   And only in Harris County?
6   A.   Those are the data that I received.
7   Q.   And it only occurred on two days in Harris County?
8   A.   Again, I analyzed the data and that's what I found and it
9   comported to what they were advertising on the website, yes.
10  Q.   And there were only eight locations within Harris County
11  that offered 24-hour voting?
12  A.   I find that both in the sites that were advertised as well
13  as the raw data that I processed and analyzed.
14  Q.   And there were only 1490 voters that you were able to
15  identify that used 24-hour voting outside of normal voting
16  hours?
17  A.   Yeah.  That 1490 doesn't sound like a lot, but, you know,
18  you can put it in perspective, right?
19  Q.   Let's put it in perspective real quick.
20       Brian, could you pull up a calculator, and let's divide
21  1490 by -- let's do this on the fly.  Brian, let's divide 1490
22  by 1.27 million.  1,270,000.
23       And so out of the people who voted early in Harris County
24  in 2020, this would represent one-tenth of one percent?
25  A.   I trust Brian's calculation.

DAN SMITH – CROSS

1      I wonder if Brian can do a calculation for me to put it in

2  perspective.

3  Q.  Let's do that same calculation, 1490 divided by

4  11,300,000, which was the number of people who voted in the

5  state of Texas in 2020.  And so, you know, help me with my

6  math here, this would be one–100th of one percent of the

7  people who voted in Texas in 2020 voted using 24–hour voting?

8  A.  When I do math, I usually like to make sure that those who

9  are in the numerator are also in the denominator, and your

10  example here is really quite ridiculous in that Texas doesn't

11  allow everyone in the state to vote in Harris County, so I

12  have no idea why you would use that as your denominator except

13  to make this look ridiculous.

14      If you want to use a numerator and a denominator that's a

15  similar numerator, why not use the Heritage Foundation's cases

16  of vote fraud that they have publicized on the website, which

17  is 1200, and if Brian wants to calculate 1235, or whatever it

18  is, of convictions of vote fraud going back to 1980–something,

19  we can give a denominator of several billion and come up with

20  a number that's even smaller, but I don't see anything about

21  this exercise of giving any light on the ability to vote when

22  you can't even vote there if you're not in Harris County.

23          THE COURT:  This is my frustration of the questions.

24          So when you have an expert on the stand, you never

25  ask open–ended questions.  You need to be cross–examining him

2771
DAN SMITH — CROSS

1  on subject matter you've already going to get him to say

2  inconsistencies with.

3         MR. WASSDORF:  I don't believe I asked an open-ended

4  question, Your Honor.

5         THE COURT:  You are.

6         Your next question.

7  BY MR. WASSDORF:

8  Q.  Let's move on to the applications for ballot by mail and

9  ballot by mail reports — or actually, no, I have one last

10 question.  You formed no opinion as to the safety or security

11 of drive-thru voting, 24-hour voting, or drop box voting,

12 correct?

13 A.  No, I did not include that in my reports, except maybe

14 anecdotally.

15 Q.  Now, as we've already discussed, you did several different

16 reports that looked at applications for ballot by mail and

17 ballot by mail?

18 A.  More ballot by mail than applications because I didn't

19 have as much data for applications.

20 Q.  Let's look at the March 20th, 2023 report, Brian, on page

21 28, table 4.  Table 4.  Wait, is this the March 20th, 2023

22 report?  Well, let me go ahead and ask the question about this

23 while it's here.

24      So this chart here shows the percent of SB 1 rejections of

25 absentee ballots by percent Black voting age population, is

DAN SMITH - CROSS

1  that right?

2  A.  In Travis County, in the November 2022 November Election,

3  yes.

4  Q.  And that line is either flat or very slightly sloped in

5  one direction or the other?

6  A.  Correct.

7  Q.  And this chart would indicate that there was no racial

8  disparity with respect to SB 1 rejections for absentee ballots

9  in Travis County during the November 2022 Election, correct?

10  A.  I don't think there is anything different in my report

11  where I say precincts in Travis County with lower and higher

12  levels of Black voting age population had, on average, roughly

13  the same rate of rejected absentee ballots due to SB 1.

14  Q.  Let's look at the June 7th, 2023 report on page 23, table

15  3.  So I think we've already looked at this table and

16  established that on the face of this table it shows that the

17  percentage of rejections due to SB 1 was higher for

18  non-Hispanic individuals than it was for Hispanic individuals,

19  is that right?

20  A.  Yes.  These are the applications, and I've already talked

21  about how I do not find a disparate impact for those with

22  Hispanic surnames due to SB 1.

23  Q.  Now, in addition to looking at the direct percentage of

24  rejections due to SB 1, you also do a second analysis which is

25  looking at the percent of rejections due to SB 1 as compared

DAN SMITH – CROSS

1  to the rejections, all rejections, is that right?

2  A.  I don't recall.

3  Q.  Brian, let's look at paragraph 48 on page 24.  24,

4  paragraph 28 — or, yeah, paragraph 48.

5      So this is the analysis that I'm talking here.  In

6  addition to looking at the number of ballots rejected due to

7  SB 1 compared to all ballots you also look at a number of

8  ballots rejected due to SB 1 compared to all rejections, is

9  that right?

10 A.  Yes.

11 Q.  And here we see —

12     MR. GENECIN:  Object on this.  It's not ballots

13 rejected on this analysis.  It's applications for ballots.

14     MR. WASSDORF:  Apologies.  Applications.

15     THE WITNESS:  Thank you for that correction.  It is,

16 as I mentioned earlier, applications.

17 BY MR. WASSDORF:

18 Q.  And here we show that the rejected applications, I guess

19 67.2 percent, were rejected due to SB 1 requirements for those

20 with Hispanic surnames, is that right?

21 A.  Again, I'm using the data that was provided to me by the

22 State, and as I've already discussed, there are some issues

23 with nonreporting and missing data with respect to rejection

24 reasons, so these are the calculations based on the data I was

25 able to process and as I presented in my report.

2774
DAN SMITH - CROSS

1  Q.  So doing this second analysis, which is the number of

2  rejections due to SB 1 divided by all rejections, we come up

3  with 67.2 percent for those individuals with Hispanic

4  surnames?

5  A.  Correct.

6  Q.  And doing that same analysis we come up with 67.4 percent

7  for those individuals with non-Hispanic surnames?

8  A.  That is correct.

9  Q.  And you conclude here that the application rejection rates

10  are nearly identical, is that correct?

11  A.  Yes.  I'm very transparent in my reports, including this

12  one.

13  Q.  Let's look at page 26, table 4.  So now this is one of the

14  top ten county tables that we talked about earlier, but this

15  is a different one.  This is with respect to applications, and

16  if I'm looking at this correctly, it appears to show that the

17  percentage of applications rejected due to SB 1 for Dallas,

18  Tarrant, Travis, El Paso, and Hidalgo Counties was higher for

19  non-Hispanics than it was for Hispanics?

20  A.  Again, I think this is reflected in what I testified

21  earlier on direct.  There are issues with some of the missing

22  data.  I included this in my report and your presentation is

23  accurate, just as I was accurate in discussing it in my

24  report.

25  Q.  Now, let's look at page 30, figure 1.  Actually, let's go

DAN SMITH - CROSS

1  ahead and look at figure 2 on page 32.  And so this looks at

2  the percent of rejected applications due to SB 1 compared to

3  the Black voting age population, and, likewise, this line is

4  very flat, indicating that there was not a disparate impact on

5  Blacks in this analysis?

6  A.  Well, again, as I discussed in direct with both this as

7  well as the Hispanic-non-Hispanic-Spanish surname, there's not

8  much difference with respect to the rejection rates due to SB

9  1 in the applications, but as I showed during direct the

10 individuals were disparately impacted with respect to whether

11 they were able to vote and vote a ballot that counted.

12     And so I think that's an important consideration in terms

13 of thinking about any substitution effects that might be

14 available to voters.  Clearly Black and Hispanic voters in the

15 2022 General Election who had their applications rejected were

16 less likely to turn out to vote.  And, frankly, I think that's

17 what's really at stake here is whether people have their votes

18 count as opposed to the application.

19     This is important.  I think it's a concern for all voters,

20 but my analysis clearly shows that Black and Hispanic voters

21 who tried to apply for a ballot by mail were rejected due to

22 SB 1 were less likely to vote in an election, and that's

23 ultimately what, for me, is important and why I study voting

24 in elections.

25 Q.  Let's take a look at page 35, table 6, Brian.  And so this

1  table now shows that Hispanic voters had their ballots

2  rejected for SB 1 more frequently than non-Hispanic voters, is

3  that right?

4  A.  Yes.

5  Q.  But you did that second analysis for this data as well you

6  talked about earlier?

7  A.  I don't recall.

8  Q.  Let's look at paragraphs 67 and 68.  So in paragraph 67,

9  here, we see that for Hispanic voters whose ballots were

10  rejected due to SB 1 as compared to all rejected ballots, we

11  show a number of 80.2 percent, is that right?

12  A.  Yes, that's correct.

13  Q.  And for non-Hispanic voters whose ballots were rejected

14  due to SB 1 as compared to all rejected ballots, we have a

15  number of 84.1 percent?

16  A.  That's correct, as a share of the overall rejections that

17  were due to SB 1.  And as I've mentioned many times,

18  non-Hispanic surnames obviously include non-Anglos as well,

19  and the General Election, I'm not surprised that these rates

20  are fairly similar.

21  Q.  But the rate here for non-Hispanic surnames is higher than

22  the rate for Hispanic surnames.

23  A.  Again, given the data issues that I went over earlier

24  today where I don't have rejection rates, there could be

25  variation across the counties with respect to those that are

DAN SMITH - CROSS

1  more heavily Hispanic or not, but these are very high

2  rejection rates due to SB 1, is how I would phrase it, that

3  most people who had their ballots rejected, who got through

4  the application process, mind you, so successfully applied for

5  a ballot, the local official said, yep, you're clear to get an

6  absentee ballot, when they returned their absentee ballot —

7  and again, I'm eliminating all those that were late, I'm

8  eliminating other categories, I'm just looking at the ones

9  that were SB 1 versus non-SB 1 that were otherwise returned

10  timely — you know, the way I would look at this is that, you

11  know, four out of five voters had their ballots rejected, and

12  slightly more who are Hispanic and slightly more than four out

13  of five had them rejected who are non-Hispanic surnames.

14      Again, these are people who have already cleared the bar

15  and are getting tripped up a second time due to SB 1.  And we

16  look at the ones who got tripped up on the first application

17  and they are disparately more likely to be Black and Hispanic,

18  as I've shown multiple times.

19      So, again, is this cheering that the glass is, you know,

20  half empty?  This isn't even half empty.  You are somehow

21  cheering us on that the glass is a quarter, a fourth empty.

22  Q.  Brian, could you pull up a comparison of the April 2023

23  report, page 31, table 5 to the June 2023 report that we're

24  already on, page 38, table 7.  It's the — this report that

25  we're already in on page 38, table 7 and I want to compare

2778

DAN SMITH - CROSS

1  that to the April 2023 report on page or 31 at table 5.

2      Now, both of these tables look at rejection rates of the

3  top ten counties.  One is — the one on the right is for the

4  2022 Primary, and the one on the left is for the 2022 General,

5  is that right?

6  A.  Yes, not intuitively well laid out, but, yes, that's

7  correct.

8  Q.  Now, the one on the right has a total at the bottom, the

9  one on the left doesn't?

10  A.  Yes, that's true.  This is the product of many reports

11  over time.

12  Q.  I understand, but looking at the one on the right from the

13  2022 Primary, would you agree with me that the rejection

14  percentages due to SB 1 are significantly higher than the

15  rejection percentages due to SB 1 during the 2022 General

16  Election?

17  A.  Again, I would put these numbers into context.

18      You are comparing a Primary Election against a General

19  Election.  I would do, as I did with the Harris County data

20  and some of the other counties, compare apples-to-apples

21  elections, and, yes, while the overall rates are lower in the

22  General Election due to SB 1, they are still considerably

23  higher than rejection rates of vote-by-mail ballots in

24  previous elections such as the 2020 General Election, the 2018

25  General Election.

DAN SMITH - CROSS

1    We can look at your own state data to determine those
2  rejection rates, and these are all higher than what we would
3  see statewide in those elections.  And so I think you really
4  need to be thinking apples to apples here and not comparing
5  two elections with very different electorates, you know,
6  different experience of trying to get through the process.
7  Q.  But for the purposes of your report these were the only
8  two elections that we had data for after SB 1 went into
9  effect?
10 A.  I am sure that I asked for lots of data.  These are the
11 data that I received.
12 Q.  And from these tables, the rejection rates due to SB 1
13 dropped between the Primary and the General Election?
14 A.  That is true, and if you're happy with those rates, you
15 know, ask the people who were rejected compared to those that
16 somehow got through the process no problem with no fraud in
17 previous elections.
18 Q.  Now, you did not, in your analysis, analyze the propensity
19 of any race or ethnicity to vote by mail, generally speaking?
20 A.  No, I did not.
21 Q.  And it is possible for one race or ethnicity to have a
22 greater propensity to vote by mail than another race?
23 A.  Well, particularly in a state like Texas where you've
24 restricted the use of vote by mail, and if you look at –– I
25 mean, this is something that I, you know, have been thinking

DAN SMITH — CROSS

1 about.  If you look at actuarial tables, if you look —

2         THE COURT:  You are looking at me.  He's not

3 objecting.

4         MR. KERCHER:  Nobody had to object for you to

5 interrupt Keith Ingram four times.

6         THE COURT:  You're going to be polite to me.  You

7 will sit down.

8         And you need to learn how to do examination and you

9 need to learn how to control witnesses.  If he's not answering

10 your question, object to it.  He'll have the opportunity to

11 expand on the answers he wants to give when he goes back on

12 redirect.  You're letting this witness walk all over you.

13         MR. WASSDORF:  Yes, Your Honor.  I apologize.

14 BY MR. WASSDORF:

15 Q.  Just one last question, Dr. Smith.  Some of the analyses

16 that we've walked through today showed that SB 1 had a

17 disparate impact on racial minorities, correct?

18 A.  Yes.

19 Q.  And some of the analyses that we walked through showed

20 that SB 1 did not have a disparate impact on minorities,

21 correct?

22 A.  Yes, that's correct.

23         MR. WASSDORF:  Pass the witness.

24         THE COURT:  Any other questions from this side?  No

25 questions.

2781

DAN SMITH - CROSS

1          Any redirect?

2          MR. GENECIN:  Your Honor, thank you.  No redirect.

3          THE COURT:  You may step down.  Thank you, sir.

4          We'll resume at 9:00.

5                          -o0o-

6     I certify that the foregoing is a correct transcript from

7  the record of proceedings in the above-entitled matter.  I

8  further certify that the transcript fees and format comply

9  with those prescribed by the Court and the Judicial Conference

10 of the United States.

11

12 Date:  10/04/23          /s/ *Gigi Simcox*
                             United States Court Reporter
13                           262 West Nueve Street
                             San Antonio TX 78207
14

15

16                          /s/ *Chris Poage*
                             United States Court Reporter
17                           262 West Nueve Street
                             San Antonio TX 78207
18

19

20

21

22

23

24

25

*Gigi Simcox, RMR, CRR*