```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3
     LA UNION DEL PUEBLO ENTERO,      .
 4   ET AL,                           .
                                      .
 5            PLAINTIFFS,             .
         vs.                          . DOCKET NO. 5:21-CV-844-XR
 6                                    .
     GREGORY W. ABBOTT, ET AL,        .
 7                                    .
              DEFENDANTS.             .
 8

 9

10                TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE XAVIER RODRIGUEZ
11            UNITED STATES DISTRICT JUDGE
                   OCTOBER 5, 2023
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                            FATIMA MENENDEZ, ESQUIRE
                              JULIA LONGORIA, ESQUIRE
18                            MALDEF
                              110 BROADWAY
19                            SUITE 300
                              SAN ANTONIO TX 78205
20
                              VICTOR GENECIN, ESQUIRE
21                            JENNIFER A. HOLMES, ESQUIRE
                              NAACP LEGAL DEFENSE & EDUCATIONAL
22                            FUND INC
                              40 RECTOR STREET, FIFTH FLOOR
23                            NEW YORK NY 10006
24

25
```

```
 1

 2

 3

 4

 5    FOR THE DEFENDANTS:      RYAN G. KERCHER, ESQUIRE
                              KATHLEEN HUNKER, ESQUIRE
 6                            WILLIAM WASSDORF, ESQUIRE
                              TEXAS ATTORNEY GENERAL
 7                            P.O. BOX 12548
                              MC 009
 8                            AUSTIN TX 78711

 9

10

11

12

13    REPORTED BY:            GIGI SIMCOX, RMR, CRR
                              OFFICIAL COURT REPORTER
14                            UNITED STATES DISTRICT COURT
                              SAN ANTONIO, TEXAS
15

16

17

18

19

20

21

22

23

24

25
```

1      *(San Antonio, Texas; October 5, 2023, at 9:15 a.m., in*
2  *open court.)*
3              THE COURT:  With that, let's turn back to this case.
4              One second while we do some technology here.
5              MISS HOLMES:  Your Honor, while we get the technology
6  ready, I think there are some brief housekeeping matters.
7              THE COURT:  Go head.
8              MR. GENECIN:  Morning, Your Honor.
9              THE COURT:  Morning.
10             MR. GENECIN:  This is just left over from yesterday
11 afternoon.  The plaintiffs move the receipt into evidence of
12 HAUL MFV 394.  That's the addendum.
13             MR. WASSDORF:  I won't maintain my objection on that.
14             THE COURT:  I'm sorry.
15             MR. WASSDORF:  I won't maintain my objection on that.
16             THE COURT:  You won't maintain?
17             MR. WASSDORF:  No.
18             THE COURT:  Okay.
19             Then there's no opposition.  I just want to make
20 sure.  It's early in the morning, I just to make sure I
21 understand what's going on.
22             MR. KERCHER:  We're withdrawing the objection Your
23 Honor.
24             THE COURT:  Okay.  So 394 is admitted.
25             MR. GENECIN:  Thank you, Your Honor.

1          Yesterday Dr. Smith used a demonstrative PowerPoint,

2    and if the Court would find it useful to have that, we will

3    mark it as an exhibit and put it in.  If you don't feel the

4    need for it, we will not do that.

5          THE COURT:  So I'll be frank on that.

6          So once I say that, I don't think the defendants are

7    going to object, and it's in part of another reason why I was

8    so frustrated with yesterday's questioning.  Dr. Smith all but

9    concedes that there was a weak regressive analysis correlation

10   between race and applications for ballots by mail.  It frankly

11   hurts your case.  So with that said, it would be beneficial

12   for me to have it so I can make the determinations.

13         Any objection from the other side.

14         MR. KERCHER:  No objection, Your Honor.

15         THE COURT:  Admitted.

16         What are we going to call that?

17         MR. GENECIN:  I'm not sure what the next number is

18   but we will get the next number and submit it to

19   Miss Fernandez.

20         THE COURT:  Thank you.

21         MR. GENECIN:  Thank you very much.

22         THE COURT:  Any other housekeeping?

23         MISS PERALES:  Very short matter, Your Honor.

24         LUPE plaintiffs neglected to move into evidence LUPE

25   Plaintiffs Exhibit Number 1, the expert report of Dr. Andres

1    Tijerina.

2         MR. KERCHER:  Subject to the objection we made at the

3    time, Your Honor, regarding its relevance due to recency, no

4    further objection.

5         THE COURT:  Yeah.  I won't take into account the

6    timeline as I — you know, I think my job here is to lay out

7    the facts.  Some of the facts may or may not be — I think my

8    job here is to layout the facts and the story.  Then when I

9    apply it to the analysis some of the background facts may or

10   may not be applicable to the analysis.

11        LUPE 1 is admitted.

12        MISS PERALES:  Thank you, Your Honor.

13        THE COURT:  Any other housekeeping?

14        Your next witness.

15        Are we ready?

16        MISS HOLMES:  Your Honor, Jennifer Holmes for the

17   HAUL plaintiffs and we call Dr. J. Morgan Kousser to the

18   stand, but I think we need to check --

19        THE COURT:  Wait one second.

20        MISS HOLMES:  I think we need to check the tech.  My

21   apologies.

22        THE DEPUTY CLERK:  Is this witness on Zoom?

23        MISS HOLMES:  Yes, he says he's on.

24        THE DEPUTY CLERK:  Thank you.  I have to do something

25   else, Judge.  Give me just a minute.

J. MORGAN KOUSSER – DIRECT

1   *(Off the record discussion)*

2        THE WITNESS:  I'm on.

3        MISS HOLMES:  We're having the Voice of God effect

4   because we can't see you.  We can only hear you.  I think

5   that's on our end.  Hold on.  There you go.

6        Dr. Kousser's testimony is relative to HAUL

7   plaintiffs' challenges to SB 1, Sections 3.04, 3.09, 310, 312,

8   313, 315, 4.01, 4.06, 4.07, 4.09, 412, 502, 601, 603, 604,

9   605, and 607 under the Fourteenth and Fifteenth Amendments and

10  Section 2 of the Voting Rights Act.

11       THE COURT:  Thank you.

12       If you'll swear in Mr. Kousser.

13    (J. MORGAN KOUSSER, having been duly sworn, testified as

14  follows:)

15                    DIRECT EXAMINATION

16  BY MISS HOLMES:

17  Q.  Good morning, Dr. Kousser.  Can you state and spell your

18  name for the record?

19  A.   Initial J, middle name Morgan, M-O-R-G-A-N, last name

20  Kousser, K-O-U, S as in Sam, another S, E-R.

21  Q.  Where are you located right now?

22  A.  I am in Altadena, California, A-L-T-A-D-E-N-A.

23  Q.  Due to health reasons a doctor has instructed you not to

24  travel and is that why you are joining us from California?

25  A.  Yes.

2788
J. MORGAN KOUSSER – DIRECT

1  Q.  And I know I was texting you before we started, but can I

2  ask that you just make sure your phone is off so it doesn't

3  disturb your testimony?

4  A.  Yes.

5  Q.  Did you provide an expert report in this case?

6  A.  I did.

7  Q.  Do you have that report in front of you?

8  A.  I do.

9  Q.  Derek, can you bring up HAUL MFV 332.  Dr. Kousser, do you

10  see the exhibit in front of you on the screen?

11  A.  I do.

12  Q.  Is this exhibit a true and correct copy of the expert

13  report you submitted in this case?

14  A.  It is.

15       MISS HOLMES:  Your Honor, I'd like to move HAUL MFV

16  332 into evidence.

17       THE COURT:  Any objection?

18       MR. KERCHER:  Subject to the same objections we made

19  regarding Dr. Tijerina's report and Dean Tolson's report, Your

20  Honor, no further objection.

21       THE COURT:  About the history?

22       MR. KERCHER:  Yes.

23       THE COURT:  That's noted.  Overruled.

24       And what's the number again?

25       MISS HOLMES:  332.

J. MORGAN KOUSSER – DIRECT

1          THE COURT:  332 is admitted.

2          MISS HOLMES:  Yes.

3   BY MISS HOLMES:

4   Q.  Thank you, Derek.  You can — you anticipated my request.

5       Dr. Kousser, let's talk about your background and

6   experience.  Can you turn to Appendix A of your report.  What

7   is it?

8   A.  It's my curriculum vitae.

9   Q.  And the CV that was attached to your report is from 2022,

10  is that correct?

11  A.  Yes.

12  Q.  Are there any changes or updates to your CV since then?

13  A.  Well, I testified last week in the case from Florida.  I

14  think it is mentioned, but the name is wrong because the

15  Secretary of State changed, and so it's *Common Cause versus*

16  *Byrd*.  There are no other cases that I have testified in.

17  There is some consulting that I did on a California Voting

18  Rights Act matter, but that's not even public yet.  So this is

19  substantially correct.

20  Q.  Okay.  Let's turn to your educational background.  Where

21  did you attend college and graduate school?

22  A.  Undergraduate at Princeton and graduate student at Yale.

23  Q.  Did you earn a Ph.D.?

24  A.  Yes —

25  Q.  And what was that in?

J. MORGAN KOUSSER - DIRECT

1  A.  — at Yale.

2      It was in history, although I ended up taking more

3  political science courses than history courses while I was in

4  graduate school and I've taught in both political science and

5  history at Caltech.

6  Q.  And that anticipates my next question.  Where are you

7  currently employed?

8  A.  I'm an emeritus professor at the California Institute of

9  Technology, Caltech.

10  Q.  And since you're emeritus, have you retired from teaching?

11  A.  I have retired from teaching.

12  Q.  Do you still continue to do scholarship?

13  A.  Yes.

14  Q.  How long have you worked at Caltech?

15  A.  I worked there for 50 years when I retired.

16  Q.  And during that time, were you ever a visiting professor

17  at other schools?

18  A.  I was.  At Harvard for a semester, Michigan for a summer,

19  Oxford for a year, and a semester at the Hong Kong University

20  of science and technology.

21  Q.  While you were still teaching, what courses did you teach?

22  A.  For almost the whole 50 years I taught a course in history

23  of the U.S. Supreme Court.  It became a two-core course fairly

24  early.  I taught a variety of American History courses.  I

25  taught a civil reconstruction course.  That's perhaps relevant

2791
J. MORGAN KOUSSER — DIRECT

1  to this matter.  And for the last 10 years or so I taught a
2  course in the history of the United States after 1945, but I
3  also taught courses in political science, political behavior,
4  American political — American politics, and courses in race
5  relations.  At the beginning of the time that I got there I
6  taught a course in black history for several years.
7  Q.  And what do you consider to be your areas of
8  specialization?
9  A.  I'm a political historian.  I specialize in election law
10  and the history of race relations, a lot of work on the
11  history of racial discrimination and schools, but more on the
12  history of election law, particularly in the South and
13  particularly as regards disfranchisement, re-enfranchisement,
14  voting rights, and published several articles on the Voting
15  Rights Act in law school, law journals.
16      For example, there's a history of Section 5 of the Voting
17  Rights Act that was published in the Texas Law Review in 2008.
18  It's 108 pages long, 662 footnotes, so it's the most
19  comprehensive history of Section 5 of the Voting Rights Acts
20  that has yet been done.
21  Q.  Let's turn to your publications for a bit.  As you just
22  mentioned, have you published books, articles, and other
23  publications on the topics that you just addressed in your
24  prior answer?
25  A.  Yes.

J. MORGAN KOUSSER - DIRECT

1  Q.  And let me ask you about one of those books, *The Shaping*
2  *of Southern Politics*.  Is there anything from the methods that
3  you used to produce that book that you employed in this case?
4  A.  That book looks at the disfranchisement of Blacks and poor
5  Whites in the late 19th and early 20th centuries.
6      I was very much concerned with the legislation and
7  constitutional amendments in the South during that period of
8  time, why were they passed, to what was their effect.  Did
9  they disfranchise Whites as well as Blacks?  Were they
10  intending to disfranchise Whites as well as Blacks?
11      So I spent a lot of time worrying about the intentions of
12  the framers of laws in all eleven ex-Confederate states,
13  including Texas, and that is certainly very relevant to my
14  report in this case, as well as the effects of law.
15      And I did a lot of statistical analysis there.  Not so
16  much in this in the current report, but a lot of statistical
17  analysis in shaping Southern politics.
18  Q.  Have you previously served -- well, I think you told us
19  about one case at least, but have you previously served as an
20  expert witness?
21  A.  Yes, I have, approximately 60 plus cases as either an
22  expert witness, or a consultant, either in federal voting
23  rights cases or California voting rights cases.
24  Q.  And what was the subject of your expertise in those cases?
25  A.  I have -- several of the cases I have worked on

J. MORGAN KOUSSER – DIRECT

1  discriminatory intent, for example, *Mobile versus Bolden*,

2  *Garza versus Los Angeles County Board of Supervisors*, and many

3  others, and in some cases I testified about the Senate

4  factors, the discriminatory effect.  Some cases, as in this

5  one, I testified about both.

6  Q.  And what jurisdictions were those cases, what states were

7  they in?

8  A.  Texas, perhaps most relevant to this case, but Florida,

9  North Carolina, South Carolina, Alabama, California.  Probably

10 some others I forget at this point.

11 Q.  That's fine.

12 A.  They are all listed in the CV.

13 Q.  Not a problem and the Court will have that with your

14 report.

15    Can you tell us briefly about your prior expert work in

16 cases in Texas?

17 A.  Well, I worked on the 1992, I guess, redistricting case

18 and did a report there which turned into a chapter of the book

19 called *Colorblind Injustice*.  It actually reviewed all of the

20 previous redistricting, statewide redistricting from the time

21 of *Baker versus Carr* basically on.

22    And then — excuse me — I testified in *LULAC versus*

23 *Perry*, which I think I was a time delay in redistricting case,

24 the inter—central redistricting case that was decided by the

25 Supreme Court in 2006.  I testified in both the Section 2 and

2794

J. MORGAN KOUSSER – DIRECT

1  Section 5 versions of the 2011 redistricting and I testified

2  in the SB 14 voter ID case in the D.C. District Court, so

3  several cases in Texas.

4  Q.  Have you ever testified before Congress?

5  A.  A couple of times.  I testified in 1981 and in 2019, both

6  on the renewal of the Voting Rights Act.  And in 1981 Section

7  5 was up for renewal.  It got renewed in 1982.  I testified

8  before the House Judiciary Committee –– Subcommittee that

9  time.

10      And in 2019 there was a consideration of what has become

11  the John Lewis Act and I testified before the House Judiciary

12  Subcommittee on that matter in 2019.

13  Q.  You mentioned that in your expert work you have conducted

14  an analysis related to the question of whether a state law was

15  motivated by a racially discriminatory purpose.  In those

16  cases did you always find that there was a discriminatory

17  purpose to the law?

18  A.  Not always.  In particular, there's a case from South

19  Carolina that was before the D.C. District Court in 1982 where

20  I determined that I just could not decide –– there was

21  evidence on both sides about whether it was passively racially

22  discriminatory intent or not and so I set out the evidence for

23  both sides but did not urge the judges to decide one way or

24  another.

25  Q.  When you served as an expert in court cases, have you

J. MORGAN KOUSSER – DIRECT

1  employed research methods similar to those that you used to

2  conduct your scholarly research?

3  A.  Yes, and some of that research got published.  There are

4  five chapters on *Colorblind Injustice* which were originally

5  expert witness reports, and there's essentially no difference

6  whatsoever in the way that I conduct the research, if it is

7  going to be published as a scholarly monograph or article in

8  the way that I do it, if there's going to — if it's going to

9  be presented in court.

10  Q.  And in any of the cases where you've worked as an expert

11  has a court ever found that you were not qualified to serve in

12  that capacity?

13  A.  No.

14  Q.  And has any court ever excluded any part of your

15  testimony?

16  A.  No.

17       MISS HOLMES:  Your Honor, I tender Dr. Kousser as an

18  expert witness in the history of racial discrimination and

19  voting, minority voting rights and voting patterns, political

20  and legal history, and political analysis.

21       MR. KERCHER:  No objection.

22       THE COURT:  Dr. Kousser is recognized as such.

23  BY MISS HOLMES:

24  Q.  Okay.  Dr. Kousser, let's turn to your role in this case.

25  What were you asked to investigate?

J. MORGAN KOUSSER - DIRECT

1  A.  I was asked to gather, organize, analyze, and present

2  information about whether SB 1 was adopted with racially

3  discriminatory intent and whether it could be expected to have

4  a racially discriminatory effect.

5     The purpose of it was to make available to the decider of

6  fact, the judge, as much information and organized in as

7  comprehensive and logical a fashion as I could so that the

8  judge and clerks could access it and make their own decisions

9  about their racially discriminatory intent or effect.

10     I didn't — I'm not trying to tell the judge what to do,

11  judge is perfectly capable of that I'm sure, but I wanted to

12  make the information available in the form that would be most

13  helpful to the judge and I've tried to do so.

14  Q.  On behalf of which parties did you submit a report?  And I

15  can direct you to the cover page of your report.

16  A.  I'm told that they are referred to in this court as the

17  HAUL plaintiffs.  They are the Houston Area Urban League,

18  Delta Sigma Theta Sorority, Incorporated, The Arc — A-R-C —

19  of Texas, and Jeffrey Lamar Clemmons, C-L-E-M-M-O-N-S.

20  Q.  Can you tell us briefly how your report is organized?

21  A.  It is organized in a way that I think will be most helpful

22  to the judge.  I start out with a little introduction and

23  there's an extensive table of contents which is broken down

24  into very small pieces for easy access.  I then present a

25  relatively short summary to which can be read easily to go

J. MORGAN KOUSSER – DIRECT

1  through the major findings in the major way that it is
2  organized without the detail of all the footnotes and
3  quotations.
4      It shows — the purpose of this is that somebody can go
5  through this and quickly figure out how the argument flows and
6  how the pieces of it fit together.
7      I then do — I look at a basically chronological view of
8  racial discrimination, particularly in election laws in Texas,
9  starting with the Reconstruction Era, but not spending very
10  much time on that.  I think only five pages or so of the
11  128-page report is on matters before 1965.
12      I then look at racial discrimination and election laws
13  from — in Texas from 1965 to the present and then turn to
14  questions of the background, the factors that — the
15  historical, immediate historical background of the legislative
16  session in 2021, and look in quite a considerable detail at
17  the — at what happened in 2021 to — that led to the passage
18  of the — of SB 1 and its predecessors that are part of that
19  legislative session, which I think it's a little easier if I
20  just refer to that collectively as SB 1.  It's got SB 7, HB 6,
21  HB 3, but if I just refer to it as SB 1, it will be easier to
22  understand.
23      And I consider — then finally I look back at the basic
24  narrative and try to organize the facts in the basic narrative
25  under the so-called Arlington Heights factors and the Senate

1  factors, and something of the —— under the Brnovich

2  guidelines.

3     And that last portion I just summarized very briefly

4  what —— for example, the history of Texas redistricting, how

5  that is relevant to the —— to SB 1 to determining the intent

6  and the effect of SB 1, and I give paragraph references back

7  to the larger narrative so that one can look at the end and

8  arrange everything under those particular factors and see

9  exactly where it is that I discuss some subset of all of the

10  factors —— where the discussion of those factors actually

11  takes place in the body of my report.

12  Q.  And so, Dr. Kousser, if I may ——

13     Derek, can you pull up page 5 of the report, Exhibit 332.

14     And so this is part of the table of contents.  So,

15  Dr. Kousser, when you talked about organizing the narrative

16  portion of the report under certain factors in the later

17  sections of your report, were you referring to ——

18     Let's do the next page, Derek.  Sorry.  There we go.

19     Dr. Kousser, when you referred to organizing the narrative

20  portions of your report under the Arlington Heights factors,

21  the Senate factors, and the Brnovich guidepost, were you

22  referring to sections IX, X, and XI that are shown in your

23  table of contents?

24  A.  Yes.

25  Q.  And here, did you take all of the evidence presented in

J. MORGAN KOUSSER – DIRECT

1  the prior portion of the report and try to organize that

2  evidence under each of the factors within these sections?

3  A.  Yes.

4  Q.  And let's talk about the Arlington Heights factors

5  briefly.  How did those factors shape your analysis of the

6  intent behind SB 1?

7  A.  They helped me organize the evidence.  The Arlington

8  Heights factors are very similar to the sorts of things that

9  historians normally do when they are analyzing intent of some

10  piece of legislation, and so when I started working, looking

11  at intent and I was pointed to Arlington Heights as a way of

12  organizing things, it seemed very natural to do so.

13      I've written a bit about the way that I interpret the

14  Arlington Heights factors in about ten pages in *Colorblind*

15  *Injustice*, but basically what I did was not just take the

16  factors but also follow up and look at discussions of these

17  matters in district court and appeals court decisions

18  thereafter, and so some of the Arlington Heights factors I

19  have sort of broke it down into parts that seemed, to me,

20  relevant to those factors, but if — it's very easy and I set

21  it out at one point in this report to aggregate the ten

22  factors that I set out into the six factors of Arlington

23  Heights, if that's more convenient for the people who are

24  writing this decision.

25  Q.  And so when you use the Arlington Heights factors, do you

J. MORGAN KOUSSER — DIRECT

1  also include factors from subsequent cases?

2  A.  I do.  In particular, there's a case in the Eleventh

3  Circuit, *Birmingham Ministries*, which has listed two or three

4  more factors.  They fit into Arlington Heights but they can be

5  separated easily as sort of subfactors and I've tried to make

6  sure that I covered them as well.

7  Q.  You mentioned that the Arlington Heights factors align

8  with the factors you would look at as a historian.  In your

9  academic research when you consider the question of

10  legislative intent, do you generally interview state

11  lawmakers?

12  A.  No —

13  Q.  And why not?

14  A.  — I don't.

15     Well, for two reasons basically.  One, most of the ones

16  that we looked at, at least in my dissertation, were dead, so

17  no possibility of interviewing them, but if you interview

18  somebody later about what they had done in the past,

19  particularly in the context of ongoing litigation, it is just

20  not useful.  They are not credible on any side.

21     If I interviewed Democrats in this case, for example, or

22  minority members in this case, they will be likely to tell me,

23  of course, this was adopted with a racially discriminatory

24  intent.  Should I believe them?  What should I take from that?

25     It's much better to take what they said at the time.

2801

J. MORGAN KOUSSER – DIRECT

1    That's the public knowledge that one has and that's not

2    something that is as likely to be skewed biased as something

3    that would come out of an interview that might be done later.

4        The same thing with Republicans on the other side or

5    sponsors of the legislation.  I don't expect them to say, oh,

6    yes, I did this for a racially discriminatory reason.  I don't

7    expect that what they said –– what they would say in the

8    context of a lawsuit would be credible.  And that's just

9    natural human behavior.

10        Plus, I don't have any power to force them to say anything

11   to me and to force them to say anything under oath.  The Court

12   does.  The Court could take that into account and decide

13   whether anything that they said in the context of a lawsuit

14   would be credible, or how credible it would be on either side,

15   but I never do that.

16        As a matter of principle, I never talk to –– seek to talk

17   to people who were in the process because it doesn't add any

18   information to the information that you can get from reading

19   the hearings, the floor debates, things that they said outside

20   of formal procedure at the time, so it just doesn't add any

21   information.

22   Q.  Let's turn to your methodology related to the question of

23   discriminatory effect of SB 1.  We have mentioned the Senate

24   factors and the Brnovich guidepost.  Did you analyze evidence

25   related to those factors and guidepost?

J. MORGAN KOUSSER – DIRECT

1    A.  I did.

2    Q.  And you did not perform a statistical analysis in this

3    case, is that right?

4    A.  That's correct.

5    Q.  And why not?

6    A.  There were other people doing that.  I had plenty to do as

7    it was and I know some of the people who have engaged in that

8    research and they are perfectly capable of doing it so it was

9    a division of labor and I was working on something else in

10   this particular case.

11   Q.  Are there nonstatistical factors that bear on the question

12   of whether a law has a discriminatory effect?

13   A.  Yes.  They are set out in the Senate factors, and some of

14   them are things like the history of discrimination that comes

15   from with *White versus Regester* through the Senate report 97

16   417 in 1982.

17       There are racial appeals.  That's one of the factors

18   that's not entirely quantifiable.  The backgrounds and other

19   actions, decision-makers and statements by important

20   participants.  There are questions of the institutional rules

21   that the legislature did or didn't follow.  There are

22   questions of historical context.

23       With regard to impact you can say qualitatively something

24   about the degree to which a particular impact was expected or

25   not.  There may be statements that may be relevant to that but

J. MORGAN KOUSSER – DIRECT

1  for a lot of the analysis impact, one would like to do

2  quantitative research, and it's that that I left to other

3  experts testifying in this case.

4  Q.  What materials and sources did you rely on in arriving at

5  your findings in this case?

6  A.  Well, there were a variety of them.  One set, there are

7  official documents like hearings, transcripts of hearings,

8  transcripts of floor debates.  There are state and national

9  reports.  There's material from the census, U.S. Census, for

10  example.

11      There is — I drew upon material from — I think this is

12  the Texas Department of Health for statistics about COVID and

13  statistics about health, the number of people I think who had

14  health insurance, those sorts of things.  So there's those

15  sorts of official sources.

16      There are newspapers and other sorts of public documents

17  which are conventionally used by historians and political

18  scientists in analyzing such information.

19      Scholarly literature, of course, which is relevant to many

20  factors, the history of discrimination, matters of political

21  science related to the analysis of legislation, legislative

22  inputs, outputs, and general legislative procedures.

23  Q.  Dr. Kousser, did you also — sorry to interrupt.  I was

24  going to ask if you looked at court cases and polling and

25  surveys.

J. MORGAN KOUSSER — DIRECT

1  A.  I did.  I looked at some court cases that were relevant to

2  the history of discrimination in Texas.  I looked at some

3  polling founded in newspapers, followed it up by looking at

4  the original documents that came out of it.

5  Q.  And the sources that you relied upon in your report, are

6  those typically the same sources you would use in your

7  academic research?

8  A.  Yes.

9  Q.  And are these standard sources used in your field by

10  historians?

11  A.  Yes.

12  Q.  Are these standard sources used in your field by political

13  scientists?

14  A.  Yes.

15  Q.  Now, we've been referring generally to SB 1, but

16  specifically what provisions of SB 1 did you focus your

17  analysis on?

18      And I'd like to bring up the report at page 3, paragraph

19  6.

20  A.  I have it before me.  I don't know whether you have it out

21  on your screen yet.

22  Q.  Why don't you go ahead and we'll get it on the screen on

23  our end.

24  A.  Okay.  There it is.  The provisions banning drive-thru

25  vote centers, Sections 3.04, 3.12, 13; restricting early

J. MORGAN KOUSSER - DIRECT

1  in-person voting hours and eliminating 24-hour voting,

2  Sections 3.09 to 10; completing the elimination of

3  straight-ticket voting, Section 315; reducing the regulations

4  on poll watchers and constraining election officials' power

5  over them, Sections 4.01, 4.06, 4.07, 4.09; prohibiting drop

6  boxes for vote by mail — which I will call VBM hereafter —

7  ballots, Section 4.12; imposing additional voter ID

8  requirements on applications for VBM ballots, Section 5.02;

9  requiring paperwork of people who provide transportation to

10  the polls of 7 or more voters, Section 6.01; and onerously

11  regulating those who assist voters, Sections 6.03 to 6.05.

12  Q.  Did you consider these provisions in isolation or

13  collectively?

14  A.  Collectively.

15  Q.  And why?

16  A.  I have learned and political scientists generally believe,

17  I have learned from looking at past, analyzing past voting

18  restrictions, that the passage simultaneously of more than one

19  voting restriction has a multiplicative effect, can have at

20  least a multiplicative effect.  It's more than just simply one

21  provision at a time.

22      And also, in analyzing provisions as to their intent, the

23  fact that many provisions were instituted, many regulations

24  were instituted at once bears on the question of overall

25  intent.

2806

J. MORGAN KOUSSER - DIRECT

1    If you simply have a number of bills over a period of

2 time, it may be less easy to determine their intent then if

3 you've got one bill with an omnibus bill with lots of

4 provisions passed all at once.

5    It is also been the case in my study of things that if you

6 pass a bill with many provisions at once, it will have a

7 larger effect then passing them one by one over a period of

8 time.

9 Q.  And I'd like to turn to the first topic you mentioned when

10 you were going through the summary of your report, the

11 history.  We're not going to go over everything that's in your

12 report but is your full analysis of the history of

13 discrimination in Texas at Section 5, pages 19 through 30?

14 A.  Yes.

15 Q.  And why should we look at the history to understand the

16 intent behind SB 1?

17 A.  There are essentially two reasons.  One is that the courts

18 tell us to.  I quote a paragraph from the Texas case of *Graves*

19 *versus Barnes*, which was — eventually became *White versus*

20 *Regester* in the Supreme Court, and it lays out a bit of the

21 rationale behind looking at history.

22    The courts have told us to.  They are in the Arlington

23 Heights factors.  They are in the Senate factors.  And there

24 are reasons for the Courts to do so.  It's just commonsensical

25 that you take into account things that happen before when you

J. MORGAN KOUSSER – DIRECT

1    are looking at the analysis of any particular event, whether

2    that's a formal academic analysis, or a legal analysis, or

3    it's just something we're trying to understand when we think

4    about the world.

5        The second thing is that there are particular events that

6    have happened in Texas which have implications for --

7    particular implications for the study of SB 1 and it's very

8    instructive to look at those.  They don't determine our

9    analysis of SB 1, but they alert us to possibilities that we

10   might otherwise overlook or downplay.

11   Q.  In studying those particular events, did you find

12   parallels between past discriminatory events and the sequence

13   of events that led to SB 1?

14   A.  I did.

15   Q.  You mentioned in your testimony earlier that some of your

16   historical analysis relates to events from the

17   post-Reconstruction period up through the mid-20th century, is

18   that correct?

19   A.  That's correct.

20   Q.  The main focus of your historical analysis is the period

21   from the passage of the Voting Rights Act to the present, is

22   that correct?

23   A.  That's correct.

24   Q.  So let's turn to that.  When was the Voting Rights Act

25   enacted?

J. MORGAN KOUSSER – DIRECT

1  A.  1965.

2  Q.  And when did Texas --

3  A.  Renewed in 1970, '75, '82, 2006.

4  Q.  When did Texas become a covered jurisdiction under Section

5  5 of the Voting Rights Act?

6  A.  1975.

7  Q.  Can you explain how Texas came to be covered?

8  A.  Well, in 1965 the coverage formula was a -- that the state

9  has to have a literacy test, and it had to have a turnout in

10 the 1964 Presidential Election of under 50 percent.  Texas did

11 have a turnout of under 50 percent in 1964, but it did not

12 have a formal literacy test.

13     I should go back to something that I should have said

14 earlier about literacy tests.  Texas, in 1891 passed a secret

15 ballot law which acted in the circumstance as a literacy test

16 and continued to be a literacy test.  Why did it act as a

17 literacy test?  Because a lot of people were illiterate and

18 they -- that was certainly disproportionately that Black adult

19 males at that point were illiterate.

20     In 1890, according to the Census --

21 Q.  Sorry, Dr. Kousser.  The Court has heard about the

22 Australian ballot in testimony yesterday.

23 A.  Okay.

24 Q.  So I would like to just ask you what factors were relevant

25 for bringing Texas under Section 5 in the Voting Rights Act in

J. MORGAN KOUSSER - DIRECT

1    1975?

2    A.  The discussion in the hearings and the report, reports of

3    the House and Senate Judiciary Committees in 1975 looked at

4    discriminatory actions that had been taken, some of which had

5    been shown in court cases, others like *Graves versus Barnes*,

6    for example, and its subsequent follow-ups, and some of which

7    were -- that had not -- had not gotten to court yet but were

8    widely understood to be discriminatory, so there were a series

9    of discriminatory acts and it appeared to members of the House

10   and Senate that the discriminatory acts were not different in

11   kind and the discriminatory history of Texas was really not

12   very different in kind from the states that were already

13   covered.

14       In particular, there was discrimination against people who

15   were, in 1975, called language minorities.  And the formula

16   that Texas -- that covered all 254 counties in Texas was that

17   there had to be a certain proportion of people who were

18   language minorities in a county or in a state as a whole and

19   there had to be a discriminatory lack of materials available

20   in that particular language.

21       So the '75 coverage scheme expanded the coverage scheme

22   under Section 5 to include Texas as well as Arizona and some

23   counties elsewhere.

24   Q.  And how did the State of Texas respond to being brought

25   under Section 5 of the Voting Rights Act?

1    A.   The first thing it did was it passed a reregistration act

2    which would have required everybody to register anew.   It

3    would have been a major purge of all the voting rules.   In

4    fact, 100 percent purge, and then everybody would reregister

5    anew.

6        The justice department refused to preclear that law.   It's

7    the first law that Texas passed that was refused to be

8    precleared by the justice department.

9    Q.   How did bringing Texas under Section 5 impact findings of

10   discrimination in voting rights?

11   A.   It had a major impact.   From 1965 through 1975 about ten

12   or 15 cases were decided that found racial discrimination in

13   Texas.   After the state came under Section 5, including both

14   cases and refusals by the justice department to preclear

15   particular laws, in the next four years something like 115

16   became — cases were decided which found cases or refusals to

17   preclear which found racial discrimination in Texas election

18   laws.

19       More generally, laws, changes in laws allow discrimination

20   to be made visible.   The discrimination existed against Blacks

21   and Latinos in election laws in Texas before 1975, but the

22   1975 renewal and bringing Texas under their coverage of

23   Section 5 enabled that discrimination to be revealed.

24       That's one of the purposes of laws and one of the things

25   that you learn if you look at the history of election laws is

J. MORGAN KOUSSER – DIRECT

1  that if they are made more fine grain they can shed light on

2  discrimination and vice versa.

3  Q.  I would like to display Figure 1 from your report.  It's

4  on page 28.

5      Derek, can you bring it up, please.

6      Can you explain what this figure shows and how you

7  compiled it?

8  A.  Yes.  After the Northwest Austin case in 2009 I began to

9  compile a database of every Section 2 case, Section 5 case,

10  Section 5 successful objection, so it's an objection that

11  indicated that there was discriminations, not all submissions

12  are to the justice department, what are called — what were

13  called more information requests which resulted in a change in

14  a submission or withdrawal of the submission, Section 203,

15  208, cases which are language cases, Fourteenth and

16  Fifteenth Amendment cases, cases under the '57 and '60 Civil

17  Rights Acts, so I started compiling and have continued to

18  compile the largest database that anybody has ever compiled on

19  such matters.

20      It's over 4,000 instances at this point going up to the

21  present.  This particular figure is only up to 2020 but I

22  continue to work on it and just haven't redone the figure to

23  take into account the more recent cases.

24  Q.  And in the figure where it says "discriminatory events,"

25  does that mean legal actions won by minorities?

J. MORGAN KOUSSER - DIRECT

1  A.  Yes.

2  Q.  And how does -- Texas is at the bottom of this figure, is

3  that correct?

4  A.  That's correct.

5  Q.  And how does Texas compare to the other states listed?

6  A.  Texas had, by far, the most discriminatory events, events

7  where it has been proven that there was discrimination, cases,

8  objections, and so on.

9      The ones at the bottom, as it happens, that the states at

10  the bottom are all states that were covered under the

11  pre-Shelby County coverage scheme.  So Texas, Alabama,

12  Georgia, et cetera, have a lot more events, proven

13  discrimination, than the states that were not covered under

14  Section 5 up to the time of Shelby County, but Texas more than

15  any other state.

16  Q.  And could this be a result of population?  Texas is a big

17  state, could this be simply because as since it has a higher

18  population, it might deal with these issues more frequently?

19  A.  It could have been, but, in fact, Texas is only about six

20  to seven percent of the population of the United States and it

21  had nearly a quarter of the discriminatory events proven.  So

22  it's massively disproportionate to the number of -- to the

23  number of events divided by population for other states.

24  Q.  And Texas is listed here with 1,021 discriminatory events,

25  is that correct?

J. MORGAN KOUSSER - DIRECT

1  A.  That's correct.

2  Q.  Can you give us an example of one of those 1,021

3  discriminatory events that occurred at the state level?

4  A.  Every Texas redistricting since, and including 1970, has

5  been contested in court, and in every dissimilatory

6  redistricting, there's been at least one finding of either

7  discriminatory intent or effect in redistricting.  The voter

8  ID law, SB 14 was found to have a discriminatory intent and a

9  discriminatory effect at one level of court.

10  Q.  So moving on to a different topic —

11      Derek, you can take down the chart, please.

12      — does your report discuss the history of poll watchers

13  in Texas?

14  A.  It does.  It's not a very extensive discussion but there

15  is a discussion of poll watchers in Texas.

16  Q.  And for reference I can point you to page 16, paragraph 42

17  of your report.

18  A.  Okay.  There was a wider discussion — I'm sorry.

19      There was a wider use of particular poll watchers in the

20  country as a whole, including Texas, under what was called the

21  Eagle Eye program from the 1960s until it was declared illegal

22  in 1981 and then continues.  It's now that — that court order

23  has been rescinded.

24      But, in particular, in Texas, more recently, and in

25  particular to Harris County, in 2012 there was an organization

J. MORGAN KOUSSER – DIRECT

1  called King Street Patriots which started and there was

2  evidence at the time that it aimed at trying to discourage

3  minority voters from voting.  There was a bit of a federal

4  investigation.  There was certainly a lot of public discussion

5  of this.

6      That organization turned into another organization call

7  True the Vote, which became national but was centered in Texas

8  more than any other place, and in several elections there were

9  efforts by True the Vote to discourage minorities from voting,

10  or object to the votes of people in precincts that were

11  largely minorities.

12      So there's a very considerable history of the use of

13  objections to voters through organizations like these.

14  Q.  And considering Figure 1 as well as your other analysis of

15  the history, what did you conclude about the history of voting

16  discrimination in Texas?

17  A.  The history of voting discrimination in Texas is something

18  that continues.  There has been electoral discrimination since

19  the very beginning in the 1860s and '70s, particularly in the

20  1890s, and then with the White Primary cases in the early part

21  of the 20th century, but it didn't stop there.  And since 1965

22  discrimination in the passage of election laws in Texas has

23  been by this measure at least worse than in any other single

24  state.

25  Q.  And why is this relevant to SB 1?

2815

J. MORGAN KOUSSER – DIRECT

1   A.  We approach SB 1 somewhat differently.  If there's been a

2   history of discrimination, particularly one that continues up

3   to the present, then if there had been no history of

4   discrimination at all.  Texas knows how to discriminate.  It

5   has always used election laws to discriminate against

6   minorities and it should come as no surprise that they –– that

7   means would be used in SB 1 to discriminate against

8   minorities.

9   Q.  Dr. Kousser, I'd like to turn to your analysis of issues

10  related to voter fraud, and this is Section 6D of your report

11  beginning on page 45.  Why did you look into issues of voter

12  fraud?

13  A.  I looked into issues of voter fraud because there are a

14  series of laws passed in various places of the country, around

15  the country, which some people have said were responses to

16  voter fraud or to public concerns about voter fraud and this

17  has been offered as a justification for such laws, so I wanted

18  to see whether, in fact, if it were offered as a

19  justification, what would be the validity of that

20  justification.  Was there widespread proof of very widespread,

21  perhaps even decisive, voter fraud in Texas, or was –– or were

22  such charges not validated by any evidence.

23  Q.  And just to clarify, you said, "if it had been used as a

24  justification," do you mean as a justification for SB 1?

25  A.  For SB 1 and similar laws across the country, but SB 1 in

J. MORGAN KOUSSER – DIRECT

1  this case.

2  Q.  What evidence did you look at to evaluate the record of

3  charges of voter fraud in Texas?

4  A.  It's primarily evidence that comes — that derives from

5  records of the State Attorney General, but there were other

6  studies as well.  There was a study by the Dallas Morning News

7  of charges of election fraud, and there was a large claim in

8  2020 by the Harris County Republican Party of massive election

9  fraud that was presented to the Texas State Supreme Court —

10 Q.  So Dr. Kousser —

11 A.  — and rejected there.

12 Q.  Dr. Kousser, let's walk through some of these.  Can we

13 bring up the slides and go to slide 2, please, Derek.

14     Dr. Kousser, do you see the slides before you here?

15 A.  Yes.

16 Q.  I'd like to walk through some of the investigations you

17 analyzed in your report.  You looked at a 2006 to 2009

18 investigation by then Attorney General Gregg Abbott, is that

19 correct?

20 A.  That's correct.

21 Q.  And tell me about your analysis there.

22 A.  Well, he started the investigation with a press release

23 that he pledged to expose what he called, quote, "an epidemic

24 of voter fraud," end quote, through a special investigations

25 unit that he set up.

2817
J. MORGAN KOUSSER – DIRECT

1      This was funded by HAVA funds, by $700,000 of HAVA funds,

2  that's Help America Vote Act, in four years, at the end of

3  which he, and then there were some discussions in the

4  testimony in the Texas State Legislature, about the results of

5  his four years of investigation, but basically the results

6  were 26 indictments of individuals, there were five

7  convictions, and the talk before the Texas State Legislature

8  indicated that approximately 8 million people had voted in

9  Texas in 2008, five convictions over four years is an

10  infinitesimal proportion of 8 million people who voted over

11  that period of time.

12  Q.  And, Dr. Kousser, you also —

13  A.  Attorney General — sorry.

14  Q.  Sorry.

15  A.  Attorney General Abbott was very thorough.  He had every

16  reason to try to find to turn up every potential voting

17  instance of voting fraud that he could and that's all he

18  turned up.

19  Q.  And you also looked at a review of Attorney General

20  records concerning election violations from 2002 to 2012, so

21  we are expanding the scope in terms of years.  Tell me about

22  that review.

23  A.  It was done by an organization called PolitiFact, which is

24  featured in newspapers all around the country, including the

25  Austin American-Statesman.  It did a FOIA request, Freedom of

2818

J. MORGAN KOUSSER – DIRECT

1  Information Act request to the Attorney's General Office and

2  went through to find out how many investigations there had

3  been and then categorized them by individuals co-activities,

4  exactly what was charged, and so on.

5      They found, bottom line, 18 convictions for individual

6  voter fraud over the 11 years, which is inclusive of the Gregg

7  Abbott's investigation as well.  During that period of time

8  approximately 35 million votes were cast in Texas in statewide

9  or state legislative elections.

10      That figure I took from what is considered the

11  authoritative figure on election turnout, which is kept —

12  those records are kept by Michael McDonald, M-C-D-O-N-A-L-D,

13  at the University of Florida, and that's his — those — I

14  just added up all of his totals for that period of time in

15  Texas.

16  Q.  And then expanding the scope further, you looked at a

17  review of Attorney General records between 2002 and 2021 and

18  looked at all convictions or settlements of election

19  violations.  What did you find?

20  A.  This takes the original, the figures in the top half of

21  the table and then just adds reports about what happened from

22  2012 to 2021 from other sources but drawing on the Attorney

23  General's records and it just gives the total number of

24  convictions or settlements, when people decided that they

25  would plead guilty or something like that, over the whole

1  20-year period, and it found about 108 convictions or

2  settlements, again from Michael McDonald's record, of the

3  number of people who voted in Texas over that period of time.

4  It was nearly 87 million.  So it's really several 10

5  thousandths of one percent is all.

6  Q.  Regarding the 2020 Election specifically, what was your

7  analysis of charges of voter fraud in that election?

8  A.  Well, perhaps most relevant is the fact that the Elections

9  Director of the Secretary of State's Office testified before

10  the Texas House in February of 2021 that the election of 2020

11  had been, quote, "smooth and secure," end quote.  This was

12  something that was quoted again and again during the

13  legislative session by people on both sides.

14      There were further investigations.  There was an

15  investigation in Harris County during the time that the

16  election was going on and immediately thereafter.  It found no

17  evidence of systematic fraud.

18      The Secretary of State's Office did an analysis of the

19  2020 Election in four of the most populous counties, including

20  Harris County and Collin County, for example, afterwards, and

21  found no evidence of systematic fraud at all.

22      So lots of questions raised about potential fraud, but

23  when official bodies actually looked at the evidence they

24  found virtually none.

25  Q.  And that Harris County investigation, are you referring to

J. MORGAN KOUSSER – DIRECT

1    the Election Security Task Force?

2    A.   Yes.

3    Q.   And that Secretary of State investigation, are you

4    referring to the Secretary of State Forensic Audit of 2020?

5    A.   Yes.

6    Q.   In your analysis of charges of voter fraud, did you find

7    any patterns of those charges being directed at racial

8    minorities?

9    A.   Yes.  In particular, during the debates over the voter ID

10   law, which was over four legislative sessions from 2005 to

11   2011, there was plentiful charges about the identity of people

12   who were supposed fraudulent voters.

13        The sponsor of one version of the voter ID law

14   specifically said that there were large numbers of, quote,

15   "illegal aliens," end quote, who voted, and that the voter ID

16   law would stop that.

17        Furthermore, in 2020, in I believe October, September or

18   October of 2020, there were there was a charge by the Harris

19   County Republican Party that black members of the State

20   Legislature and, in general, black politicians had planned to

21   submit something like 700,000 fake ballots into the polls in

22   the 2020 Election.

23        They brought a legal case before the Texas State Supreme

24   Court.  The Texas State Supreme Court found no evidence of it,

25   not even plausible enough evidence to proceed to a more formal

J. MORGAN KOUSSER - DIRECT

1    inquiry, and in the -- during the time that SB 1 was being

2    considered in the Texas State legislature in 2021, there's a

3    colloquy between I believe Bryan Hughes and one of the black

4    State Senators who had been charged by name with having

5    engaged in this massive conspiracy and Senator Hughes assured,

6    I believe it's Senator Miles, that he was happy that no

7    evidence had been found of this sort of fraud, and that

8    Senator Miles, it was unfortunate that Senator Miles had been

9    charged with this, that there was no evidence of it.

10   Q.  So during the 2021 legislative session did Senator Hughes

11   agree that there was no validity to these charges against

12   these black political officeholders?

13   A.  Yes.

14   Q.  In your research did you identify charges of fraud against

15   voters of color, other charges of fraud against voters of

16   color that were highly publicized?

17   A.  Yes.  I have a little section called the Significance of

18   Crystal Mason someplace in the report.

19   Q.  If I can --

20   A.  Perhaps you can direct me to that.

21   Q.  Page 78 of your report, I believe that's where you discuss

22   Crystal Mason.

23   A.  Yes.  Crystal Mason was a middle class black woman who had

24   been convicted of a federal crime, and in an earlier election

25   she -- earlier than 2020 she believed that she had the right

J. MORGAN KOUSSER – DIRECT

1   to vote because she had done her time, she had served her

2   sentence, and she thought that she could go and vote.

3       She tried to go and vote.  The election clerk said you're

4   not on the roles but you can file a provisional ballot.  She

5   did so.  They found out that she was not legally qualified to

6   vote.  The vote was not counted, and then she was prosecuted

7   in Fort Worth and given a five-year sentence.

8       There was a great deal of publicity about this.  The

9   district attorney in Fort Worth said he wanted to make, wanted

10  to make her a case that would warn other people not to engage

11  in such activities.

12      Her case — her conviction was appealed.  In 2022, at

13  least, the case was still active and she actually had to go to

14  jail for — or prison for 10 months while the case was being

15  appealed.

16      So what is the significance of this?  This is a woman who

17  was not part of any sort of larger conspiracy.  She did not

18  know that she was ineligible to vote.  The guards against

19  somebody who was ineligible to vote, voting actually worked,

20  no need for a change in the regulations, that in anything that

21  she tried to do, which would have been illegal, was actually

22  caught.

23      Her vote didn't count and she was, she became the poster

24  child to try to warn other people not to vote in these sorts

25  of circumstances.

2823
J. MORGAN KOUSSER – DIRECT

1    If this was the poster child, this was the best they could
2  do in finding fraud, somebody who was not part of any
3  conspiracy and only voted by mistake and her vote was never
4  counted, that's indicative of how little evidence of fraud
5  that there was.
6    That's why I talked about the significance of
7  Crystal Mason, and also the fact that she was singled out.
8  She was a minority.
9    There were a couple of other instances where minorities
10 tried to vote, did not succeed in voting, and they were given
11 long terms, prison sentences.
12   So there's no evidence of systematic fraud, and when they
13 try to look for evidence of fraud somehow or another they
14 always land on minorities.
15 Q.  And, so, Dr. Kousser, you're not denying that fraud ever
16 occurs in Texas elections, is that right?
17 A.  That's correct.
18 Q.  And in your research did you find any specific instances
19 of election fraud?
20 A.  I did.
21 Q.  Tell us about those.
22 A.  Okay.  They came from local elections.  In fact, local
23 elections for the city council of Dallas twice.  And what's
24 interesting is the response, the legislative response and the
25 comparison between that legislative response and SB 1.

2824
J. MORGAN KOUSSER — DIRECT

1    In 2003, the State Legislature considered a bill called
2 the Wollens bill, W-O-L-L-E-N-S, after the person who
3 sponsored it.  It was a response to a particular instance of
4 infringements of vote by mail, in which somebody had gathered
5 up from mail boxes, perhaps, other people's ballots and other
6 people's attempts to apply for absentee ballots and filled
7 them out and returned them himself.

8    He got caught.  The existing law caught this person and
9 there was a lot of discussion in newspapers about it, but the
10 Wollens law tightened up the vote-by-mail law such that if you
11 deposit a ballot for somebody else you have to sign that
12 ballot.  And if there were lots of people who did -- if you do
13 that for lots of people, it would be even more evident than it
14 was more the existing law.  So vote by mail tightened up.

15    Also you couldn't deposit a lot of votes all at the last
16 minute, which apparently has been a practice in the past.  The
17 consequence of that was that the number of complaints of such
18 shenanigans went from about a dozen a year, it was reported in
19 the newspapers to five years later, zero.
20 Q.  Let me ask you.  How would you compare the Wollens bill,
21 which was a response to an issue with mail ballot fraud, to SB
22 1, which also does things related to mail ballots?
23 A.  It was a response to that fraud which was quite
24 particular.  It was narrowly tailored.  It came as a result of
25 a proven instance of mail ballot fraud and it was a

J. MORGAN KOUSSER – DIRECT

1  particular, and indeed bi–partisan response to that particular

2  instance of mail ballot fraud.

3      SB 1 was clearly not a response to mail or other ballot

4  fraud because there were –– there's almost no evidence of that

5  in the subsequent elections and mail ballot fraud was already

6  extremely tightly regulated by it's time that SB 1 was first

7  being considered.

8      So, narrowly tailored, directed at a specific proven

9  instance of ballot fraud.  And the Wollens bill, not narrowly

10  tailored, scattershot, not a response to particular instances

11  of fraud in SB 1.  A very different sort of consideration.

12  Q.  And so before the passage of SB 1 did Texas election law

13  already have ways to detect fraud related to voting by mail?

14  A.  It did.  There was one more instance in 2017.  Again, the

15  Dallas City Council race.  Again, the person was caught using

16  the procedures that had been set up but there was further

17  tightening.

18      The penalties were increased even further.  So if you were

19  worried about proven fraud in vote by mail, you saw in this

20  second instance as well as the previous instance that

21  everything was tightened up again and again and again.

22      It's probably one of the reasons that there were no

23  charges, no successful charges of vote–by–mail fraud, at least

24  extensive vote–by–mail fraud in the 2020 Election.  The law

25  was already extremely very –– extremely tight.

J. MORGAN KOUSSER – DIRECT

1   And, again, the 2017 bill, SB 5, was related to a
2  particular instance and it was narrowly tailored to deal with
3  that particular instance and the contrast with SB 1 could not
4  be more clear.
5  Q.  And so I'd like to turn to discuss some of the laws
6  considered by the legislature in the years leading up to SB 1.
7  Your report mentions the controversy surrounding Texas'
8  in-person voter ID law.  Why was this relevant to your
9  analysis of SB 1?
10 A.  There were a lot of parallels between the struggle over SB
11 14 and previous bills in the legislature and SB 1.
12   One was that there were charges of widespread fraud
13 connected with the voter ID struggle, but virtually no
14 evidence.  I believe that the -- one of the judges who heard
15 one of the -- heard the SB 1 -- sorry -- SB 14 case, said that
16 there had been two charges of individual identity fraud over
17 the past 10 years or so, and this is very similar to the lack
18 of validated election fraud behind SB 1, or in the -- serving
19 perhaps as a basis of or the background of SB 1.
20   A second thing was that the struggle had for voter ID was
21 not only extremely bitter and a struggle between essentially
22 minorities and the party of the vast majority of white people
23 in Texas, the Republican Party, was not only extremely
24 stringent but there were changes in the rules that made
25 possible the passage of SB 14 in 2011.

J. MORGAN KOUSSER - DIRECT

1    In 1947 the Senate passed a rule in order to try to

2 continue to be a relatively collegial body with not — with

3 fewer knock-down drag-out fights which required 21 of the 31

4 senators to be in favor of taking up a bill for it to be taken

5 up at all.

6    In 2011 that rule was relaxed for the purposes of the

7 voter ID bill only, so it was reduced from 21 to I believe 19

8 which just happened to be the number of Republican State

9 Senators at the time.  That enabled the bill to pass.  If it

10 had continued to be 21, then SB 14 would not have passed at

11 that point.

12    Still, the law was — the rule of the Senate was kept in

13 place until 2015 when it was reduced from 21 to 19 for all

14 bills in the Senate.  One of the crucial events that made

15 possible, perhaps the crucial event, that made possible the

16 passage of SB 1 in 2021 was the reduction of the number of

17 State Senators necessary to take up any bill from 19 to 18,

18 and that's obviously because Republicans lost a seat in the

19 State Senate in 2020 reducing their majority from 19 to 18,

20 but they could take up the bill because the norm of 21 or 19

21 had been reduced to 18 enabling the bill to pass.

22    So the struggle, the depth of the struggle, the fact that

23 the struggle was one of minorities versus majority of the

24 charges that this was racially discriminatory in intent and

25 the fact that courts so found the charges of massive fraud for

2828

J. MORGAN KOUSSER – DIRECT

1  which there was no evidence, the parallels between the

2  struggle of voter ID from 2005 to 2011 in Texas and the

3  struggle over SB 1 in 2021 were very parallel.

4  Q.  And why does this matter that there were parallels between

5  the passage of the voter ID law SB 14 and the passage of SB 1?

6  A.  In the struggles over the voter ID law, we see what it

7  took to convince courts that there was racial discrimination

8  and intent and effect, and we see that the Texas legislature,

9  a very recent Texas legislature, not something that happened

10  during Reconstruction, something that happened during the late

11  19th Century, the very recent Texas Legislature engaged in a

12  process that had the same subject matter as SB 1 roughly, was

13  a law that constricted the suffrage would — or the exercise

14  of the suffrage would actually be passed, and it had the same

15  punitive effect.

16       So we can see the parallel — we see the legislature

17  acting in exactly the same circumstance.  So if we see it

18  again, it doesn't surprise us, the same sort of analysis, even

19  many of the same people are still sitting in the legislature,

20  or people who had been around.

21  Q.  Did a court find that SB 14 was discriminatory in intent

22  and effect?

23  A.  Yes.

24  Q.  You've also mentioned another bill in your report, SB 9

25  from 2019.  And what about this bill is relevant to your

2829
J. MORGAN KOUSSER – DIRECT

1  analysis of SB 1?

2  A.  There were portions of this bill that it finally did not

3  pass.  It got caught up in the end of legislative session.

4  Problems jam, which is usual at the end of the legislative

5  session of almost any state legislature in the country.

6      Its provisions formed something of the skeleton for SB 1

7  and the governor at the beginning of the session in 2021

8  advised the legislature that they should start with some of

9  the — with the provisions from SB 19.

10      It also had the same sponsor in the Senate, Senator

11  Hughes, as a sponsor.  There were topics that the legislature

12  had discussed during 2019.  The criticisms of provisions which

13  were similar to SB 1, those criticisms had been levied already

14  at Sections of 19, so the SB 1, the 2021 legislature, started

15  out knowing what sorts of criticisms there were about these

16  sorts of provisions of SB 9 in 2019 and they went ahead

17  anyway.

18  Q.  So let's unpack that a bit.  I believe in your last answer

19  at times you referred to SB 19, did you mean SB 9?

20  A.  I did.  In 2019.

21  Q.  That's right.  And when SB 9 was being considered by the

22  legislature in 2019, did it face charges of discrimination?

23  A.  It did.

24  Q.  And why is that fact relevant to the question of the

25  intent or effect of SB 1?

J. MORGAN KOUSSER — DIRECT

1  A.  Those charges and the specificity of those charges, they

2  weren't just general, I think that there's racial

3  discrimination here, it was very specific about what in the

4  provisions of the bill would be discriminatory and why they

5  would be likely to have a discriminatory impact.  The fact

6  that the legislature went ahead, having seen that already,

7  strengthens the case for a racially discriminatory intent in

8  SB 1.

9  Q.  And can you briefly describe — you testified that SB 9 in

10  some ways formed a skeleton for SB 1.  Can you briefly

11  describe some of the general areas in which SB 9 was similar

12  to the provisions ultimately passed in SB 1?

13  A.  It would be helpful to — if you would direct me to that

14  section.  I think the —

15  Q.  Let's look at page 55 of your report, Section C.

16  A.  Right.  Okay.  So on there, Section 1 of the bill

17  increased the penalty for providing false information on

18  applications to vote or attempting to vote illegally from six

19  months to two years and it removed the necessity of proving

20  that the person knew that she had no right to vote and that

21  the vote was actually counted.

22      This was referred to informally as the Crystal Mason

23  Provision.  So an increase in the fines and penalties for

24  voting illegally, whether it was intentional or not, that was

25  part of the — to the bill.

J. MORGAN KOUSSER - DIRECT

1      The other provision that was important in SB 1 later
2  was — or provisions cracked down on people who were disabled
3  or who sought to provide assistance to a voter for any reason,
4  for example, difficulty in reading the English language.
5      These provisions changed, went through transmogrification
6  between what was in SB 9 in 2019, and then SB 7, et cetera,
7  that became SB 1.  But the important thing I think to — for
8  me to know here about the general intent of the framers of SB
9  1 is that these provisions made it more difficult for disabled
10 people to vote, whatever the very specific provisions were,
11 and they made it more difficult and risky for people who might
12 help them vote to help them vote, whether it's by telling
13 them, translating something for them, or helping them read
14 something, or transporting them, or whatever.
15     The topic of helping people to vote who have difficulty
16 voting but are legally qualified to vote, that was first
17 brought up in SB 9 and it was carried over into SB 1.
18 Q.  Let's turn to another issue you raised in your report, and
19 that is the demographic —
20         THE COURT:  Are turning away from SB9 now?
21         MISS HOLMES:  Yes, I am.
22         THE COURT:  So, Dr. Kousser, we're going to take a
23 break for a moment.  We've been at it for about two hours, so
24 if you will stand by, put yourself on mute.  We'll be taking a
25 break for about ten minutes.

1          THE WITNESS:  Okay.

2      (Recess)

3    BY MISS HOLMES:

4    Q.  Dr. Kousser, welcome back.  In your report you discuss

5    some demographic changes in Texas leading up to the 2020

6    Election, and that's Section 6 of your report.  What

7    demographic changes did you analyze related to population

8    growth?

9          And, Derek, could we bring up figure 2 from page 32,

10   please.

11   A.  Well, the most important change in some sense was the —

12   simply the growth of Texas.  From 1980 to 2020 Texas

13   population as a whole almost doubled.

14   Q.  And did you analyze any demographic changes related to the

15   growth by racial group?

16   A.  I did.  They are in figure 2.  What they show is that

17   there have been dramatic changes in the ethnic composition of

18   Texas since 1980.  In 1980, about five-eighths of the

19   population of Texas was White or Angelo, non-Hispanic White.

20         Today, if you project the line out a little further and

21   look at the '23 figures, the plurality ethnic group is Latino,

22   but Blacks have grown a little over that period of time but

23   not much.  Asian-Americans have grown substantially but

24   starting out at a very low level.

25         The dominant thing is that whereas Whites were

1  overwhelmingly the dominant group in 1980, now Whites are no

2  longer the dominant group at all.  It is –– Texas is a

3  majority–minority state.

4  Q.  What did you analyze in terms of the demographic changes

5  related to urbanization and racial groups?

6      And can we put up figures 3 and 4, please.

7  A.  The large cities have gotten larger.  And the large cities

8  have become more minority cities.  If you compare the largest

9  cities, the ten largest cities in Texas, they are minority

10  Angelo now.  They are overwhelmingly majority–minority Latino,

11  Black, Asian.

12      If you compare them with suburbs, small towns, rural areas

13  in 2020, the ethnic percentages show much smaller people of

14  color population, still a majority, but about 55 percent

15  rather than on the order of 75 percent in the ten largest

16  cities.

17      So fewer Anglos as a proportion of the population in the

18  areas outside the ten largest cities, a lot higher population

19  of people of color in the ten largest cities.

20  Q.  And when you say "Anglo," do you mean non–Hispanic White

21  people?

22  A.  Yes.

23  Q.  And how did these demographic changes relate to your

24  analysis of the potential impact of state laws on rural areas

25  versus urban areas?

2834

J. MORGAN KOUSSER - DIRECT

1   A.  The fact that Texas population grew so much in such a

2   relatively short period of time indicated that there were

3   fewer opportunities to vote in the larger cities than there

4   had been in the state as a whole in 1980.

5       Simply having a larger population density means that in

6   order to keep the right to vote the opportunities for voting

7   the same as they had been when there was less population

8   density, the state would have been forced to make changes to

9   make voting more easily available.

10      It did not, and so compared to other states which had

11  similar growth in the population and similar growth in the

12  minority populations, big cities, Texas fell behind going into

13  the legislative session of 2021.

14  Q.  And so if I understand you correctly, as the population of

15  Texas grew, particularly in urban centers, did you find that

16  increases in access and opportunities to vote under state law

17  did not keep pace?

18  A.  That's correct.  And also any law that was directed at the

19  larger metropolitan areas would necessarily have been directed

20  disproportionately at people of color.  So a law that singled

21  out Harris County, for example, and was directed at making it

22  less easy to vote after 2021 than it had been in 2020 would

23  have necessarily a larger disproportionate impact on people of

24  color.

25  Q.  How did the demographic changes that we've just discussed

1  lead to political shifts in Texas?

2  A.  They did.  The 2018 election was extraordinary in Texas.

3  It was the highest turnout since 1970 and the Republican Party

4  lost some seats, particularly in the State Legislature.  I

5  think they lost a dozen in the House and two in the Senate.

6       And the discussion of the added turnout and the increasing

7  effect -- the increasing power of the Democratic Party,

8  particularly in the Dallas/Fort Worth area, in the suburbs of

9  Dallas/Fort Worth was distinctly connected to the growth of

10  minority populations there.  As the area became more heavily

11  Black, Hispanic, and Asian-American, it voted for candidates

12  who were of the parties to which those groups adhered.

13       There was a particular instance in Houston.  There was a

14  slate of people running for judges called Black Girl Magic

15  running for 17 judicial positions in Harris County and they

16  quite dramatically won in the 2018 Election.

17  Q.  Did you --

18  A.  So increasing number of minority -- sorry.

19  Q.  Did you attribute that win by the Black Girl Magic slate

20  of judges to the demographic changes in Harris County?

21  A.  Yes, to the demographic changes and the activism that was

22  consequent on those demographic changes.

23  Q.  Now, Dr. Kousser, we've gone over some election laws in

24  Texas from the 20 years between 2000 and 2020.  I just ask

25  you, how would you characterize how easy or hard it was to

1  vote right before the 2020 Election under the code at that

2  time?

3  A.  There was a useful political science study that was done

4  looking at comparing election laws and the difficulty of

5  voting in all 50 states.  It was first done in 2018 and there

6  was an iteration in 2020.

7      What they found, looking at the whole range of election

8  laws in all of the states and comparing, coming up with an

9  index of the difficulty of voting in all the states they found

10 that Texas was the state with the greatest difficulty of

11 voting in 2020.  So that's the baseline that the 2021

12 legislature starts from.

13 Q.  So let's turn to the 2020 Election.  You devote a section

14 of your report to discussing this election and the COVID-19

15 pandemic, and that's Section 7E, starting on page 61.

16     First, I'd like to focus on two impacts of the pandemic

17 you describe.  First, can you describe your analysis of the

18 effect of the pandemic on urban areas in Texas?

19 A.  Particularly the first year of the panic, the COVID

20 crisis, there was more of an effect on urban areas than on

21 rural areas in small towns.

22     There was a greater incidence of COVID in urban areas

23 through, certainly through the summer of 2020.  That's

24 obviously because pandemics spread by contact and there's more

25 contact in urban areas.  So the crisis first hit in urban

1  areas disproportionately in Texas as elsewhere.

2  Q.  And next can you describe your analysis of the racial

3  differences and the impact of COVID in Texas?

4  A.  I believe that you have a graph on that.

5  Q.  My apologies.  I do.  Can we display figure 8 from page 65

6  of your report.  What does this figure tell us?

7  A.  Well, this is taken from some statistics compiled by the

8  Atlantic Magazine because there were no statistics on the

9  incidents of COVID by race in Texas from official state

10 sources.

11      So I looked at the database.  I made it into a graph.

12 What this shows is from April, sort of the first cases that

13 were recorded, through approximately Election Day, it looks at

14 the incidents of COVID cases by race in Texas, divides them by

15 the blue line which is Asian-Americans; the gray line, which

16 is cumulative cases as a percentage of population among

17 non-Hispanic Whites; the yellow line which is the proportion

18 of population, the cases divided by the population that are

19 Latino; and the red line which is the same figure for Blacks

20 over time.

21      What they show is that Blacks and Latinos had wildly

22 disproportionate number of cases according to their population

23 compared to Anglos.

24 Q.  And the X axis of this figure is the time period from

25 roughly when COVID began up to the 2020 Election, is that

1  correct?

2  A.  Yes.

3  Q.  This figure 8 shows COVID cases, but did COVID deaths also

4  follow a similar pattern in terms of racial differences?

5  A.  Yes, it did.  And I'm not sure — oh, yes.  I can quote

6  exactly.  That's in paragraph 154.

7      Texas did keep overall figures on the proportion of the

8  Black population that died by Election Day in 2020 and the

9  proportion of Anglos and also Latinos.  So the Black

10 population, proportion of the Black population that actually

11 had died, not just got it, but died, was 11 percent higher

12 than that of Anglos.  Latinos were 83 percent more likely than

13 Anglos to have died by Election Day 2020 in Texas.

14 Q.  And how did the impact of COVID on urban areas and

15 different racial groups affect the opinions of voters in 2020?

16 A.  For quite rational reasons voters who lived in the urban

17 areas, and particularly those that were people of color, were

18 more concerned about COVID than people who lived within small

19 towns and rural areas.  They were more likely to favor a wide

20 distribution of votes by mail, the ability to vote by mail,

21 and this is shown — this was shown in polling that was done

22 at the time.

23 Q.  And in your report did you describe how local election

24 officials in urban areas responded to these views of the

25 voters?

J. MORGAN KOUSSER – DIRECT

 1  A.  I did.  There were extensive efforts, particularly in
 2  Harris County, but also in Dallas/Fort Worth and San Antonio
 3  and Austin, and some other large towns to try to make it
 4  easier, under the circumstances, for people to be able to vote
 5  without endangering their health or even their lives by
 6  voting.
 7  Q.  And let's go through some of these efforts by local
 8  officials.  Can you describe your analysis related to each of
 9  these voting methods that I'll touch on and ultimately what
10  happened to this voting method under SB 1?  So first let's
11  discuss extended-hour voting and 24-hour voting.  What did
12  counties implement in 2020?
13  A.  The large urban counties almost all extended the hours of
14  early voting, often by two hours, sometimes even by more, and
15  in Harris County there was an extension for a couple of days
16  of early voting to 24-hour voting.
17     Who used it?  There are studies that were a part of the
18  hearings during the 2021 legislative session which showed that
19  extended hours, expanded hours, and 24-hour voting in the
20  urban areas were used disproportionately by minorities.  SB 1
21  cracked down on this and stopped minority — stopped large
22  urban areas from expanding voting hours at all, and absolutely
23  prohibited them from expanding it to a full 24 hours.
24  Q.  And next, let's talk about drive-thru voting.  Tell me
25  what local officials did in implementing this in 2020?

J. MORGAN KOUSSER – DIRECT

1  A.  This was particularly used in Houston, in Harris County.

2  It was used because if you were staying in your own car, you

3  were with people whose COVID experiences are probably pretty

4  parallel to yours, you're not going to get any sicker from

5  coming into contact with other people, and so there was the

6  possibility of driving through, you would present your

7  identification, you would be given a tablet, you would be able

8  to check things on the tablet and vote.

9      That was used disproportionately by minorities, the same

10  sorts of studies showed.  They were presented to the

11  legislature in 2021.  SB 1 banned that sort of activity.

12  Q.  And do you know in how many elections Harris County

13  offered drive-thru voting?

14  A.  I think that there were several sort of small municipal

15  elections after 2020.  I think perhaps as many as four that —

16  in which at least some citizens in Harris County were able to

17  use drive-thru voting.  It stopped when SB 1 went into effect.

18  Q.  And you reviewed testimony that was presented to the

19  legislature during the 2021 legislative session, correct?

20  A.  Yes.

21  Q.  And does that include testimony from the civil rights —

22  the Texas Civil Rights Project that presented an analysis of

23  how different racial groups used voting methods in 2020?

24  A.  Yes.

25  Q.  I'd like to display slide 3 from the slide deck, please.

J. MORGAN KOUSSER – DIRECT

1    Is this the Texas Civil Rights Project testimony and

2  analysis that you reviewed?

3  A.  Yes.

4  Q.  Okay.  And let's look at chart 1 here, chart 1 of 3.

5    Can you tell me what this shows?

6  A.  It looks at all early voters in Harris County by

7  demographic group.  What it shows is that the early voters

8  were predominantly Anglo, non-Hispanic White, over, well over

9  a majority were non-Hispanic White.  The other groups are

10  smaller proportion of all early voters than non-Hispanic

11  Whites were.

12  Q.  And now let's go to the next slide.  On the next slide

13  this puts chart one that you just described up against chart

14  two.  Can you tell me what this comparison shows?

15  A.  It shows that the proportion of people who voted in

16  expanded hours, not just early, all early voters, but the ones

17  that voted in the expanding — expanded hours part of early

18  voting in Harris County were — had a much larger proportion

19  of people of color.  A majority of people who used extended

20  hours were people of color as opposed to a minority of people

21  using expanded hours of all early voters.

22  Q.  And so according to chart one, minority voters were about

23  38 percent of the share of early voters, is that correct?

24  A.  Yes.

25  Q.  And according to chart two, minority voters were about

J. MORGAN KOUSSER – DIRECT

1  56 percent the share of extended hours voters, is that

2  correct?

3  A.  Yes.

4  Q.  Let's look at the next slide.  Now, this slide puts up

5  chart one again and on the right side chart three.  Chart

6  three shows the demographics of Harris County drive-thru early

7  voters, is that correct?

8  A.  Yes.

9  Q.  And what does the comparison of these two charts show?

10  A.  It shows that the proportion of Harris County voters who

11  used drive-thru was very substantially larger than the

12  proportion of people, all people who used early voting.  So

13  drive-thru voting was predominantly a minority concern.

14  Q.  And so according to chart three, the shared minority

15  voters who used drive-thru voting was roughly 53 percent?

16  A.  Yes.

17  Q.  You found this testimony and analysis from the Texas Civil

18  Rights Project online, is that correct?

19  A.  Yes.

20  Q.  Derek, could we display HAUL MFV 228, please.

21     Dr. Kousser, this exhibit is a document that was produced

22  in this case by a member of the legislature.  Is the document

23  that is on your screen the same as the Texas Civil Rights

24  Project testimony and analysis that you reviewed online?

25  A.  Yes.

J. MORGAN KOUSSER - DIRECT

1  Q.  Derek, can you scroll.

2      And why was it important to your opinion in this case that

3  that testimony and analysis was presented to the legislature

4  as part of the session that led to SB 1?

5  A.  The legislature was aware that by banning these sorts of

6  activities, expanded hours, and particularly drive-thru, that

7  they would have a disproportionate impact on minority voters,

8  and they did so knowing what that impact would be.

9  Q.  Let's go back to our list of voting methods that were

10  implemented by counties during the 2020 Election and I'd like

11  to talk about efforts to expand voting by mail.  Can you tell

12  me what counties did there?

13  A.  Several counties, but particularly Harris County, tried to

14  expand voting by mail beyond the people over 65 and the people

15  who had previously been counted as disabled.  In particular,

16  after a lawsuit that attempted that sort of expansion, which

17  lost in the Texas State Supreme Court, ruled that not all

18  people could vote by mail, if they were simply concerned that

19  they might be imperiled by voting in person, but the Texas

20  State Supreme Court decision also went on to say that it was

21  up to the voter to decide whether their lives were at stake

22  and there was nothing that election officials could do to

23  challenge that.

24      So the law was a little unsettled, and the election

25  officials in Harris County moved to send out applications for

J. MORGAN KOUSSER — DIRECT

1  absentee ballots to everybody in Harris County, along with an

2  explanation which would enable them to understand what the

3  legal — their legal rights were, and so that they could make

4  a decision as to whether they were actually eligible to vote

5  by mail or not.

6      That was stopped by a — by the Attorney General and

7  another set of lawsuits, but the procedure sending out

8  applications for absentee ballots by an election official,

9  that was banned by SB 1.

10 Q.  And, finally, let's talk about large vote centers.  Did

11 any county official set up large vote centers during the 2020

12 Election?

13 A.  They did.  I think almost all of the major cities did.

14 They set up large vote centers, either in tents or in large

15 auditoriums, stadiums, enclosed stadiums, et cetera.

16     The purpose of that was that people could vote and keep

17 social distance between them without endangering their health.

18 These were used quite extensively in all of the largest

19 cities.  There will several of them in some of the cities.

20 This was also banned by SB 1.

21 Q.  So we've discussed efforts by county officials to

22 implement or expand voting methods in 2020.  Did your research

23 show any documented fraud associated with these expanded

24 voting methods or voting hours that certain counties offered?

25 A.  There was none.  There was certainly none presented to the

J. MORGAN KOUSSER – DIRECT

1  legislature.  The legislature did not say we saw fraud in this

2  practice and therefore we are shutting it down.  There was no

3  testimony to that effect at all.

4  Q.  And was there any —

5  A.  In fact —

6  Q.  Was there any assessment from the Secretary of State's

7  Office about its confidence in the security of the 2020

8  Election in Texas?

9  A.  Yes.  As I said before, Keith Ingram, who is the Deputy

10 Secretary of State, in any case, the Elections Director,

11 testified that the election of 2020 had been sound and secure.

12 Q.  And let's consider the public.  Did you review any polling

13 about public confidence in elections in Texas after the 2020

14 Election and at the start of the 2021 legislative session?

15     And, Derek —

16 A.  I did.

17 Q.  — could you bring up slide 6, please?

18     I'm sorry.  I stepped on your answer.  Did you review such

19 polling?

20 A.  I did.

21 Q.  In looking at the slide that's displayed on the screen,

22 what does this polling show about Texans' views about the

23 election results in Texas of 2020?

24 A.  It shows that people overwhelmingly concluded that the

25 Texan election results were accurate and that that was true

J. MORGAN KOUSSER – DIRECT

1  among Republicans as well as Democrats.  76 percent of

2  Republicans believe that the Texas election results were

3  accurate.

4  Q.  And can we go to the next slide, please.

5      So given the public confidence and the accuracy of the

6  results of elections in Texas in 2020, can you describe how

7  salient the issue of election integrity was to the public

8  heading into the 2021 legislative session?

9  A.  Yes.  This is a very specific question that was asked.

10      This is from a University of Texas, Texas Tribune poll at

11  the time.  So the most significant factor here is the degree

12  to the priority that voters placed on election integrity and

13  voting rights at the beginning of the legislative session and

14  the proportion of Republicans who placed a priority on

15  election integrity and voting rights was about 2 percent, the

16  same as the proportion of Democrats who placed a high priority

17  on that.  So for the voters at the time election integrity at

18  the beginning of the legislative session was not a high

19  priority.

20  Q.  And can we go to the next slide, please.

21      And in this poll there was also a question about whether

22  voters believed Texas laws or Texas rules for voting should be

23  made more strict, less strict, or left as they are.  Do you

24  see that?

25  A.  Yes.

J. MORGAN KOUSSER — DIRECT

1  Q.  And what did the poll find?

2  A.  It found that more —— a higher proportion of all people

3  believe that the election laws should be left as they are now

4  or made more strict.  Altogether, 65 percent thought that they

5  should be left as they are now or made less strict.

6      Among Republicans, and this is the most interesting part

7  of the answer to that question, 44 percent believed that the

8  election laws should be left as they are, and 5 percent

9  believed they should be less strict.

10     So if you add those together, there is a plurality of

11  Republican electorate at the beginning of the legislative

12  session who believed that election laws should be left as they

13  are or made less strict.

14  Q.  Dr. Kousser, let me jump in here.  This poll is from

15  February 2021, is that correct?

16  A.  Yes.

17  Q.  And why is the timing of this poll important?

18  A.  If SB 1 were driven by what voters were actually concerned

19  with and what they wanted, voters would not have, even

20  Republican voters, did not put a high priority on the passage

21  of any election legislation, and even if they favored the

22  passage of election legislation they favored leaving the laws

23  as they were or making them less strict than —— rather than

24  more strict, which is what SB 1 actually accomplished.  This

25  was not a bottom-up public-driven policy, SB 1.  It was a

1  top-down leader-driven policy.

2  Q.  And just to clarify, February 2021 is very close to the

3  start of the legislative session, is that correct?

4  A.  Yes.

5  Q.  Okay.  Was there a shift in public views later?

6  A.  There was.  Later on in the legislative session, I believe

7  in May, there was a similar poll that the University of Texas

8  put out and what it showed was that at that point a majority

9  of Republicans, I think in excess of 60 percent, wanted the

10  election laws to be more strict rather than less strict.

11     Democrats had moved the other way.  They were more in

12  favor of making election laws that were less strict.  So it's

13  a leader-driven policy, not a public-driven policy.

14  Q.  So let's unpack that a little bit.  When you say it's a

15  leader-driven policy, what about the timing of this polling,

16  compared to the later, the May or June polling, indicates to

17  you that it was a leader-driven policy?

18  A.  Well, if you compare what the leaders of the legislature

19  and the governor were saying at the beginning of the

20  legislative session, they put a high priority on so-called

21  election integrity bills, and they continued to push, there

22  was more and more discussion of such bills throughout the

23  legislative session and public opinion shifted as a result of

24  that.

25     You take which came first.  The beginning of the

1  legislative session, leaders put a high priority on —

2  Republican leaders put a high priority on election integrity

3  bills and wanted them to be more strict.  Voters did not.  And

4  Republican [verbatim] voters put a high priority on election

5  bills and wanted them to stay the same or be less strict.

6      Later on, voters changed.  Leaders remained the same and

7  continued to push it.  So the implication is that this was

8  something that leaders wanted to do and the people in the

9  electorate followed.

10 Q.  I'd like to turn to the legislative session itself.

11     Can we bring up your report at page 3, paragraph 6 again,

12 Derek.

13     And these we showed this earlier, but these were the

14 particular provisions of SB 1 that you analyzed, is that

15 correct?

16 A.  Yes.

17 Q.  And we've discussed many of these already, so I'd just

18 like to focus on some additional ones on the list.  During the

19 legislative session what criticisms were raised about imposing

20 additional ID requirements on applications for ballot by mail

21 and mail ballots?

22 A.  The basic criticism was that the mail ballots, the chief

23 way to find — figure out whether the mail ballot is coming

24 from the person who purports to be the voter is to look at her

25 signature, that if you added numbers to it, in particular

J. MORGAN KOUSSER — DIRECT

1  either your driver's license number, or last four digits of

2  your social security number, or some other state

3  identification number, and you ask the voter to say — to put

4  the number that she had used when she registered to vote, to

5  include that on her application for vote by mail and her

6  ballot in itself, they may not know, they may not correctly

7  remember which identification they had used and the State

8  might not have all of that information.

9      If you had used your driver's license to register in the

10  first place, the State might not have — or the Secretary of

11  State might not have your social security number.  If you put

12  the social security number along with your application for an

13  absentee ballot or your ballot, the State might not even be

14  able to identify you.

15      Further, it was unnecessary and confusing for this sort of

16  thing to occur and the major way of deciding whether somebody

17  really had the right to vote was the signature which is harder

18  to copy to have access to than a social security number or a

19  driver's license.

20      Those things are actually fairly easy to find on the dark

21  web, I'm told.  I've never looked them up myself but you can

22  find those.  It's harder to copy somebody's signature.  So the

23  signature was the basic way of identifying somebody.

24      The other things would only confuse people and possibly

25  cause the disfranchisement of people who were really quite

J. MORGAN KOUSSER — DIRECT

1  able to vote and be able to vote.

2  Q.  And was there a concern that that disenfranchisement would

3  especially impact voters with disabilities or voters who were

4  minority?

5  A.  Yes.  They might have more difficulty getting all of those

6  numbers.  If you're disabled, you might not drive, you might

7  not have a driver's license number, but you should be able to

8  register to vote.  For minorities, minorities are less likely

9  to own cars than non-Hispanic Whites are, and so on and so on.

10  Q.  And during the legislative session what criticisms were

11  raised about additional requirements for people who transport

12  or assist voters?

13  A.  Again, the procedures, the criticism was that the

14  procedures were needlessly complicated and that they would

15  make it more difficult for people who were disabled or people

16  who had an insufficient command of English to be able to cast

17  ballots knowledgeably to be able to vote.

18      There were forms that had to be filled out.  There were

19  promises, or pledges, or swearing of things that you needed to

20  do.  There were some — during the period of time that all of

21  these bills were being considered, there were very strange

22  complications, sometimes only — if there were, for example, a

23  van that brought disabled people to vote, several disabled

24  people to vote, then other people would have to exit the van

25  while one person voted.  There was discussion about that.

J. MORGAN KOUSSER – DIRECT

1      But whatever the final provisions that were adopted, the

2  fear was that this, these complications, what are known in the

3  social scientific literature as bureaucratic dis-entitlement

4  things, bureaucratic procedures that just make it harder for

5  people to exercise their rights, that these procedures would

6  disfranchise people who should be able to vote.

7  Q.  And two more areas here.  During the legislative session

8  what criticisms were raised about provisions concerning poll

9  watchers?

10 A.  There was a long history of poll watchers in Texas and it

11 was a discriminatory history and there was testimony about the

12 longer history of poll watchers, and, in particular, the

13 history of poll watchers operating in a discriminatory manner

14 starting in Harris County in 2010 and continuing through 2018

15 and 2020 elections where there was testimony about the

16 activities of poll watchers in those elections, particularly

17 ones that disproportionately impacted minorities.

18 Q.  And also one additional area of SB 1.  Was there a

19 provision that is related to what is sometimes called

20 straight-ticket voting in SB 1?

21 A.  There was.

22 Q.  And what did SB 1 do in this area?

23 A.  It made it impossible to vote by a manner that would allow

24 you to vote for members of one party by a swipe, one swipe.

25      The previous law had outlawed straight-ticket voting in

J. MORGAN KOUSSER – DIRECT

1  general but apparently there are ways to design an electronic

2  vote, such that you could vote for large numbers of people

3  from one party, if not perhaps the whole ticket with one

4  swipe.  That was banned by SB 1.

5  Q.  And this ban of being able to select multiple candidates

6  from a particular party in a single gesture, how did this bear

7  on your analysis of intent?

8  A.  It's well-known that people with less education are more

9  likely to drop off and not vote a full ticket than people who

10  have more education, et cetera.  So the down-ticket results,

11  particularly the very bottom down-ticket results in an

12  election where you can vote by one swipe or pulling one lever

13  or voting for all the Democrats by checking one box are likely

14  to be different than those where those procedures are outlawed

15  as in SB 1, and, in particular, minorities are more likely to

16  drop off because on average they are less educated, they pay

17  less attention to politics, and so on and so on.

18     And the consequences for something like the Black girls

19  getting elected, Black women getting elected to the Harris

20  County judgeships, the consequences for an election like that

21  are obvious.

22  Q.  And do you know if Harris County has an especially long

23  ballot compared to other places?

24  A.  It does.

25  Q.  All right.  In your analysis, Dr. Kousser, in your report

2854

J. MORGAN KOUSSER - DIRECT

1  you identify procedural irregularities during the legislative

2  session concerning the election bills that ultimately became

3  SB 1, is that correct?

4  A.  Yes.

5  Q.  And did some of those procedural irregularities relate to

6  rule changes?  I think you mentioned this before, but can you

7  briefly tell us what the rule change was.

8  A.  Republicans lost a seat in the State Senate, and so the

9  rule for taking up in the Senate any one bill, the majority

10 was reduced by one so that it coincided with the number of

11 Republicans in the State Senate, and the so-called Dean of the

12 State Senate, John Whitmire, now a candidate for mayor in

13 Houston, remarked upon that, that if that rule change had not

14 taken place the bill would never have been considered.

15 Q.  Did any procedural irregularities that you examined have

16 the effect of minimizing public participation in the session?

17 A.  It did.  In the midst of COVID there were no Zoom

18 sessions, so people had to travel all the way to Austin and

19 they had to appear in sometimes relatively small rooms, if

20 they wanted to testify.

21     There were also hearings that were called at the last

22 moment, canceled at the last moment, which made it difficult

23 for people who had come from all over Texas to try to testify.

24     There were hearings that lasted all night.  A couple

25 notable instances of those, one that lasted 23 hours I think,

J. MORGAN KOUSSER — DIRECT

1  another one that had to be restarted at like 1:40 in the

2  morning to make it legal, and then it went on after another

3  saying the Pledge of Allegiance, et cetera, et cetera.

4      There were hearings that were held and then the bill was

5  dramatically changed and there were no more hearings on the

6  dramatically changed bill, so public participation was

7  minimized by no video and by the irregularities in the way

8  that the hearings were held and the length of them.

9  Q.  Did you identify any procedural irregularities that had

10 the effect of excluding minority legislators from the process?

11 A.  Yes.

12 Q.  What were those?

13 A.  In particular —

14 Q.  I'm sorry.  I just said "what were those."

15 A.  Okay.  In particular, the conference committee in the

16 regular session between the Senate and House, considering what

17 was then HB 6, SB 7, when that conference committee was first

18 formed it had no minority members at all.  They put some

19 minority members on it, two I believe, but they were largely

20 excluded from any of the discussions and negotiations that

21 produced a final bill.

22      The final bill was nearly three times as long as the House

23 bill which had been negotiated between minority members and

24 members of the majority extensively, and was less stringent,

25 less suppressive than the Senate bill at that time.

J. MORGAN KOUSSER - DIRECT

1      It was collapsed into the Senate bill.  When the bill was
2  presented, particularly the minority members of the conference
3  committee who should have been consulted according to the
4  usual rules, were aghast.
5      The bill was presented to them and to Democratic members
6  of both houses of the legislature, something like 11:00 at
7  night, for a debate that started the next morning, they hadn't
8  seen it, there hadn't been any hearings on that specific bill,
9  the bill was drastically changed from what they had seen
10  before and they were very considerably angered by that as
11  well.
12  Q.  And when we say -- we've been talking about minority
13  members, and by that do you mean racial minority members as
14  opposed to in the political minority?
15  A.  It's both.  About 80 percent of the Democrats in the
16  legislature are members of racial minorities, so most of the
17  people who are leaders of the legislature on the Democratic
18  side are minorities by definition.
19  Q.  Okay.  And I'll just clarify.  In my questions when I've
20  said "minority legislators," I mean racial minorities.
21  A.  Yes.
22  Q.  So let's talk about the reaction among legislators
23  opposing SB 1 to these procedural irregularities.  Were there
24  any legislators who wrote a letter to U.S. Attorney General
25  Merrick Garland complaining of these procedural

J. MORGAN KOUSSER - DIRECT

1  irregularities?

2  A.  Yes, they did so immediately on the -- after the time that

3  the bill was produced, the conference committee version of the

4  bill was produced.

5  Q.  Was there a member of the Senate who mounted a filibuster

6  against SB 1?

7  A.  Yes.  Eventually Carol Alvarado of Houston mounted a

8  15-hour filibuster.  I don't know how somebody could do that

9  sort of thing, but she did.

10 Q.  Were there any legislators who broke quorum in response to

11 what was going on in the session?

12 A.  In the regular session at the end there was insufficient

13 time to take up the bill if there was no quorum because they

14 had -- the leadership had waited too late to bring the bill

15 forward.

16     So what happened was that Democrats, minority Democrats

17 and White Democrats slowly filtered out of the House until it

18 was just about the time for the House to adjourn, sine die, so

19 there was a time specific where they had to adjourn and the

20 Democrats broke a quorum so that the bill could actually not

21 be taken up in the House --

22 Q.  And when was the last time --

23 A.  -- they then adjourned --

24 Q.  When was the last time there was a quorum break in Texas?

25 A.  It was in 2003.  I think the 2021 instance was the fourth

J. MORGAN KOUSSER — DIRECT

1  time in the history the Texas Legislature that there had been

2  a quorum break.

3  Q.  Let's talk about the governor.

4  A.  But they — I'm sorry.  They adjourned to a black church,

5  which was symbolic of the fact that in their belief, the

6  belief of the Democrats, this bill was particularly aimed at

7  minorities.

8  Q.  Let's talk about the governor.  Did he take any unusual

9  procedural actions to get SB 1 passed?

10  A.  There were two that were unusual.  One, he pledged that

11  there would be special sessions called again and again and

12  again, if the bill was not passed.  And, second, he suspended

13  the salaries of legislators and their staff.  I don't think

14  that that was ever litigated but he certainly said that he was

15  doing that, which would have been certainly a hardship on his

16  staff.

17  Q.  And did the speaker also have any threats to legislators

18  who had broken the quorum?

19  A.  It did.  He threatened to arrest them.

20  Q.  How did the procedural departures that we've just

21  discussed, and I know there are additional ones in your

22  report, form your conclusions in this case?

23  A.  They show the extent to which the leadership and the

24  legislature was absolutely concerned about the importance of

25  this bill, and for the Democrats, particularly minorities who

J. MORGAN KOUSSER - DIRECT

1  are Democrats, this was an existential, this bill was an

2  existential bill.

3      It threatened to destroy the ability of minority voters to

4  be able to elect candidates of their choice with any ease and

5  made it more difficult for election officials to be flexible

6  in the face of unforeseen happenings that might have made it

7  more difficult to vote, hurricanes, another epidemic,

8  whatever.

9  Q.  I'd like to turn to some statements by legislators made

10 during the session.  We've discussed the legislature's

11 awareness of the racial impact of SB 1 somewhat, did you

12 review any statements that demonstrated an awareness of this

13 impact?

14 A.  There were many statements of this effect, most coming

15 from minority state legislators.  And, here, I mean, state

16 legislators of color who were also Democrats.  They advertised

17 again and again and again that they felt the bill was racially

18 discriminatory in intent and effect.

19     There was also on the part of Republicans an awareness

20 that these charges were being made.  The most important one

21 perhaps was during the last discussions in the special

22 session, the speaker, Mr. Phelan, barred the use of the phrase

23 "racist or racism," those phrases in the discussion.  So he

24 didn't want those -- the -- what the minority members thought

25 was the reality of the situation, he didn't want that

1  broadcast, to be quoted in the public press or on TV or

2  whatever.

3  Q.  Now, did you review legislative transcripts in this case?

4  A.  I did.

5  Q.  And do you recall reviewing a statement by Senator

6  Zaffirini opposing SB 1?

7  A.  Yes.

8  Q.  And I'd like to read just a portion of that statement.

9      Derek, can you bring up HAUL MFV 181.  It's going to be at

10  page 4, line 23, if you have it handy.

11      And the Senator said, "Senate Bill 1, for example, would

12  expand the minimum number of early voting hours in some

13  counties but it would also establish the first maximum number

14  of hours for early voting since we authorized it 30 years ago.

15  Proponents of the bill argue that this change is not

16  problematic, that it reduces the number of early voting hours

17  in only four counties, yet approximately one of three Black

18  Texans, one of three Latino Texans, and one of three Asian

19  Texans live in one of those four counties."

20      How did statements like this shape your opinion of SB 1?

21  A.  What they show is an understanding that comparatively they

22  were reducing the number of hours in large cities with high

23  proportions of minorities.  They were increasing the number of

24  hours in smaller cities.

25      There's another part of that statement by someone else

1  which points out, I think it was Zaffirini, that points out

2  that 40 of the 41 counties that would have their hours

3  expanded were Republican majority counties, which means that

4  they were overwhelmingly white, so you increase the proportion

5  of the number of hours where the polling places are open in

6  areas which are predominantly white, you reduce them in areas

7  which are predominantly people of color.

8      That differentiation lends weight to the view that these

9  were understood to have a discriminatory impact by race and

10  that they were meant to have discriminatory impact by race.

11  Q.  And did you review any legislative statements about

12  whether SB 1 or its predecessor bills were responses to

13  specific fraud?

14  A.  Yes.

15  Q.  What were those?  Was there a statement from

16  Representative Cain to this effect — or on this topic?

17  A.  Yes, there were.  I'm not sure of the page number.

18  Q.  Let me direct you to your report at page 81 going over to

19  82.

20  A.  Sorry.  It's taking me a while.

21      Representative Cain accepted Director Ingram's statement

22  that the 2020 Election had been secure and he said that there

23  was no specific incident, event, or a crime that motivated HB

24  6.  So no specific fraudulent incident, event, or a crime, but

25  then he wanted to — he went on to say that the bill was

J. MORGAN KOUSSER – DIRECT

1  purely prophylactic.  "We don't need to wait for bad things to

2  happen," he said.

3      So this is an indication that he wasn't relying on charges

4  of actual fraud, he was relying on speculative charges that

5  fraud might occur in the future, if the changes that SB 1 made

6  were not made.

7  Q.  And you are aware that one of the justifications that has

8  been put forward as to SB 1 was that it creates uniformity, is

9  that right?

10  A.  That's correct.

11  Q.  Did you review any legislative statements where

12  legislators question the value of strict uniformity in

13  election laws across all counties?

14  A.  Yes.  There's a statement which I quote fairly

15  extensively.  I think it is from a Senator Johnson.

16  Q.  Yeah.  I believe it's Representative Ann Johnson.

17  A.  I'm sorry.  Representative Johnson.  I apologize.

18      She was talking to Representative Murr, who in the special

19  session became the chair of the committee in the House that

20  considered SB 1, and she was — he was saying that the bill

21  creates uniformity in hours and in other circumstances, and

22  she said — she used the metaphor of highways, in the highway

23  which was two lanes wide in an area where Representative Murr

24  came from.

25      That would provide — that was adequate for a small town

J. MORGAN KOUSSER – DIRECT

1  or a rural area, but in Houston, if you had a two-lane highway

2  instead of what she described as a 16-lane highway, the

3  two-lane highway would be inadequate.  So similarly, if you've

4  got a very large population, uniformity, by simply saying

5  you've got a two-lane highway in Houston, you've got a

6  two-lane highway in a small city in West Texas, that's not

7  uniformity.

8      It's not uniformity of ease of voting and the important

9  thing is to look at uniformity and ease of voting.  That kind

10  of uniformity would require there to be more lanes of voting

11  in Harris County than in a small area of West Texas or other

12  places in Texas.

13  Q.  Now, I'd like to read a short quote from Senator Hughes

14  who was a sponsor of the bill that you quote in your report.

15  And in the colloquy with Senator Alvarado, Senator Hughes

16  says, "There's nothing in this bill that has to do with

17  targeting specific groups.  The rules apply across the board."

18      Did you quote this in your report?

19  A.  I did.

20  Q.  In your opinion, can a law that does not target anyone

21  specifically by race still have a disparate impact or be

22  passed with a racially discriminatory intent?

23          MR. KERCHER:  Objection, Your Honor.  Calls for an

24  improper legal conclusion.

25          THE COURT:  The first part does.  That's sustained.

2864
J. MORGAN KOUSSER - DIRECT

1           The second part does not.

2    BY MISS HOLMES:

3    Q.  Let me rephrase my question before you answer.

4    A.  Please.

5    Q.  Dr. Kousser, in your academic work or previously have you

6    ever found a law that does not — or identified a law that

7    does not target anyone specifically by race but that you found

8    still evidenced a disparate impact or a racial intent in its

9    passage?

10   A.  Yes.  I talked about the Australian ballot law in Texas.

11   It had disparate impact because 60 percent of Black adult

12   males in 1890 were illiterate and 5 percent of White adult

13   males in the same place were illiterate.

14          Similarly, a law which had a disparate impact on areas,

15   large cities in Texas, would necessarily have a

16   disproportionate impact on minorities because minorities

17   composed a much higher proportion of the population of large

18   cities than they did on small towns.

19          So since the passage of the Fifteenth Amendment in 1870,

20   you couldn't single out race, and it's often you couldn't

21   single out ethnicity extensively, but you could attack

22   characteristics that were correlated with people of race and

23   have the same effect, and they did so in the 1890s and there

24   were certainly charges during the debate over SB 1 that they

25   were trying to do the same thing in SB 1.

2865

J. MORGAN KOUSSER – DIRECT

1          MR. KERCHER:  Objection, Your Honor, to the answer
2  after he switched from his analysis of the Australian ballot
3  and started talking about large cities as being nonresponsive,
4  and also as violating your previous ruling against offering an
5  impermissible legal conclusion.  Move to strike.
6          MISS HOLMES:  I think we talked about the effect on
7  large cities.  That was responsive, a law that is not
8  targeting by race but is targeting by large cities can have a
9  racial impact.  And when he talked about SB 1 he said there
10 were charges that SB 1 would have such an impact.
11         THE COURT:  Yeah.  I'll take into account all the
12 background he gave.  He doesn't make ultimate conclusions as
13 to the Court, so that's —
14         MISS HOLMES:  And — I'm sorry.
15         I know we're coming up on lunch, Your Honor.
16         THE COURT:  Let me get in my ruling first.
17         MISS HOLMES:  Oh, I'm sorry.
18         THE COURT:  So that's sustained in part and denied in
19 part.
20         MISS HOLMES:  I have about ten minutes left, if we
21 want to push through.
22         THE COURT:  I'd like to push through and then do you
23 want to continue on or do you want a lunch break?
24         MR. KERCHER:  The cross will take some time, Your
25 Honor, it will probably makes sense to take a break.

J. MORGAN KOUSSER – DIRECT

```
 1              THE COURT:  Okay.  Let's finish your part.
 2              MISS HOLMES:  Okay.  Thank you, Your Honor.
 3   BY MISS HOLMES:
 4   Q.  Dr. Kousser, you reviewed other bills from the 2021
 5   legislative session that were not related to elections in your
 6   analysis, is that correct?
 7   A.  That's correct.
 8   Q.  And one of those bills was a bill sponsored by Senator
 9   Hughes that was an amendment to an earlier law, and this bill,
10   SB 3, changed the election code to remove required elements
11   that had to be taught in the school curriculum, is that
12   correct?
13   A.  I think it was the education code not the election code.
14   Q.  Yes, the education code.  Can you describe what this bill
15   SB 3 did?
16   A.  It meant that there were certain topics that were not
17   required to be covered in history courses or social science
18   courses, and they were things like the history of white
19   supremacy, the history of the Ku Klux Klan, and the mention of
20   certain important figures like Martin Luther King, Cesar
21   Chavez, Frederick Douglas, Susan B. Anthony, and so on.
22   Q.  We heard question yesterday about teaching Martin Luther
23   King, Jr.'s letter from a Birmingham jail in high schools in
24   Texas.  Under this law, SB 3, would teaching that letter, as
25   well as anything about Martin Luther King, no longer be part
```

J. MORGAN KOUSSER – DIRECT

1  of the required curriculum in Texas under law?

2  A.  That is my understanding of it.

3  Q.  And I'm aware that you reviewed other bills not related to

4  elections as part of your analysis, but I would refer the

5  Court to that portion of your report.

6      And can you just tell us, why did you look at bills that

7  were not about elections, and what did that tell you about the

8  climate of the legislature that passed SB 1?

9  A.  The legislature was — it took some actions that reflected

10  in general about their opinions on racial issues, which is

11  potentially useful in trying to understand their views on SB

12  1.  The most interesting one, I think, was an attempt to

13  re-establish state office to collect statistics on disparate

14  health outcomes by race.  There had been such an office up to

15  2017.  There was an attempt to restart it, a little different

16  name, but essentially that.

17      The legislature refused to act on such a bill and the —

18  one of the criticisms of the bill, I believe in the House,

19  said that the bill assumes that there is racial discrimination

20  in the medical system and denied that there was any racial

21  discrimination in the medical system, "Anybody can get into a

22  hospital," he said, but the effect of that was to make it

23  impossible to find out what the disparities actually were.

24      That was what the bill was seeking.  It did not start, so

25  its sponsored said, with the presupposition that there were

J. MORGAN KOUSSER — DIRECT

1  disparate impacts, just wanted to find out what they were and

2  what the nature of them was —

3  Q.  So during —

4  A.  — and that actually, the most interesting —

5  Q.  Let me interrupt you for a moment.

6      During the legislative session were there bills that were

7  passed or considered that would have restricted learning about

8  race or learning about discrimination?

9          THE COURT:  In the healthcare context?

10          THE WITNESS:  There's two.

11 BY MISS HOLMES:

12 Q.  Was one in the health care context?

13 A.  Yes.

14 Q.  And was one in the educational context?

15 A.  Yes.

16 Q.  And so, finally, briefly looking at the final part of your

17 report, you have in Section 9, the section is entitled Did

18 Texas Adopt SB 1 with Discriminatory Intent, a Distillation of

19 the Evidence.

20      And we've walked through much of this evidence before so I

21 would just like you to tell us — you posit three hypotheses

22 in this section.  Can you tell us what the hypotheses were and

23 then what your conclusions were about those.

24      Let's start with the three.

25 A.  Okay.  These hypotheses I think are given on page 121.

1      The first hypothesis is if the legislature acted in
2  response to evidence of systematic ballot fraud.  The second
3  is that the legislature acted to guard against the possibility
4  of future fraud, even if such fraud had never taken place in
5  Texas.  And the third is that the Republican controlled
6  legislature put forth proposals that members knew would
7  disproportionately diminish minority voting because race and
8  party were so closely correlated in Texas that anything that
9  decreased minority, particularly Black voting, would increase
10 the probability that Republicans would continue to win
11 elections.
12 Q.  Can you tell me, yes or no, did you reject the first two
13 hypotheses?
14 A.  I did.
15 Q.  Is that because of all the evidence that we've been
16 discussing today, as well as what's in your report?
17 A.  Yes.
18 Q.  And what was your conclusion as to the third hypothesis?
19 A.  I think that there is more support for it and I think that
20 the — my report shows that there is more support for that
21 hypothesis than the other two.
22 Q.  And to conclude, Dr. Kousser, I'd like to turn to a
23 statement by a Senator Bryan Hughes about SB 1, and Senator
24 Hughes said "SB 1 would make it easier to vote or harder to
25 cheat."  Did SB 1 make it easier to vote?

J. MORGAN KOUSSER — DIRECT

1          MR. KERCHER:  Objection, Your Honor.  Improper legal
2    conclusion.
3          THE COURT:  She's —— I'm going to take that not as a
4    legal conclusion but as a factual observation from
5    Dr. Kousser.  That's overruled.
6          THE WITNESS:  The answer is that it made it harder to
7    vote.  That's simply a —— that's a social scientific fact.
8    You pile on more ways that —— you restrain several more ways
9    to vote and that makes it more difficult to vote as a social
10   scientific conclusion.
11         MISS HOLMES:  Thank you, Dr. Kousser.
12         I pass the witness.
13         THE COURT:  Will there be any other questions from
14   this side?  None.
15         Dr. Kousser, we are going to take a lunch break.  I
16   don't even know where —— you're in California, is that right?
17         THE WITNESS:  That's correct.
18         THE COURT:  Yeah, so a two—hour time difference.
19         It's now 12:11 central time.  We are going to resume
20   at 1:15, quarter past 1:00 central time, so if you will be
21   prepared to be back on screen at that time.
22         THE WITNESS:  I will.
23         THE COURT:  And then for planning purposes for
24   you—all, I do not teach tonight.  St. Mary's recognizes Red
25   Mass Day.  I will not be attending Red Mass, so if we want to

J. MORGAN KOUSSER – DIRECT

1  push on a little later, you need to let me know so I can

2  notify security and court marshals and everybody else, if

3  you're going to push past 5:30.  So talk amongst yourselves

4  about that and let Miss Fernandez know what your intent is

5  there.

6          We'll see you back.

7      *(Recess)*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Morgan Kousser – Cross

1    (Change in reporter)

2    *(1:14 p.m.)*

3         THE COURT:  Thank you.  Please be seated.

4         MR. KERCHER:  Your Honor, as we get settled back in

5    and the witness gets pulled back up, the parties have had

6    discussions about scheduling for trial.

7         There are two more witnesses that we are hopeful to

8    finish today, Drs. McDaniel and Grose.  We are hopeful that if

9    we go until 7:00 this evening, perhaps earlier, we will be

10   able to finish the cross and directs of those witnesses.

11        THE COURT:  Let's try to push for those two.

12        Sylvia, notify –– okay.

13        Dr. Kousser, are you back on?

14        THE WITNESS:  Yes.  I'm trying to get my –– trying to

15   get my face back on, and start video.

16        THE COURT:  There we go.

17        THE WITNESS:  Okay.  Can you –– okay.

18        THE COURT:  Your cross.

19                    CROSS-EXAMINATION

20   BY MR. KERCHER:

21   Q.  Good afternoon, our time, Dr. Kousser.  My name is Ryan

22   Kercher, I work for the Office of the Attorney General for the

23   State of Texas.  Thanks for being with us today.  I know that

24   you had to get up bright and early to join us for your direct

25   examination.

Morgan Kousser – Cross

1   A.  Yes.

2   Q.  My son recently did a campus visit to Cal Tech.  I hope

3   that you will still consider his application after this

4   cross-examination.

5   A.  Hopefully the examination will be considerate enough so

6   that he can get in.

7   Q.  Well, he'll be thankful there's no one here from the

8   University of Chicago.

9       Dr. Kousser, in 2001, mail ballot forgeries led to a state

10  district judge voiding the result of a Dallas city council

11  race, right?

12  A.  Yes.  I discussed that.

13  Q.  That scheme involved absentee ballots.  Is that true?

14  A.  Yes.

15  Q.  Voters claimed that they never sought absentee ballots,

16  but it appeared someone had applied for those ballots using

17  identical handwriting.  Is that your memory?

18  A.  Yes.

19  Q.  Political actors and officials apparently took part in the

20  scheme, right?

21  A.  I do not remember that.

22  Q.  Do you remember that the scheme was limited to local

23  low-turnout elections?

24  A.  Yes.

25  Q.  And in those elections those local small-turnout elections

Morgan Kousser – Cross

1  results can change through the manipulation of relatively few
2  mail ballots.
3      Do we agree on that?
4  A.  They can.  In this case they did not.
5  Q.  At least in part, as a response to this incident,
6  Representative Wolens sponsored HB54, which I think you
7  discussed a little bit on direct, right?
8  A.  Yes.
9  Q.  And that bill increased penalties for marking another
10 person's ballot without their consent?
11 A.  Yes.
12 Q.  It required those assisting voters to put their names,
13 addresses and signatures on carrier envelopes?
14 A.  Yes.
15 Q.  It banned the practice of storing mail ballots and sending
16 them to election departments at the last minute?
17 A.  Yes.  I said all of this, I think.
18 Q.  It also established, though, that caregivers could
19 continue to help those in their care, right?
20 A.  I think that that was the case, but I don't remember that
21 part of the law offhand.
22 Q.  Let's switch gears to 2017, where there was another
23 absentee ballot scandal, right?
24 A.  Yes.  I discussed that in my direct examination as well.
25 Q.  You're right, you did.  But I've got to highlight some of

1  the things in your report so that I can make my points.  Okay?

2  I'm going to try to be as quick and efficient as I can, but

3  there may be some repetition.  Fair?

4  A.  Fair.

5  Q.  That 2017 scandal involved a pair of west Dallas city

6  council races?

7  A.  Yes.

8  Q.  A man applied for numerous ballots by mail on behalf of

9  senior citizens, right?

10  A.  I believe that's correct.

11  Q.  And some 40 ballots had to be thrown out.  Is that true?

12  A.  I do not remember the detail in that regard.

13  Q.  All right.  Let's talk now about the lead-up to the 2021

14  legislative session.  Okay?

15  A.  Yes.

16  Q.  In 2021, Lieutenant Governor Dan Patrick said, "People in

17  America have lost faith in their elections."

18      You remember that?

19  A.  I think I quoted that.

20  Q.  And SB1 bill sponsor Bryan Hughes acknowledged, "We don't

21  know how pervasive it is, how much fraud."

22      You quoted that, too, right?

23  A.  Correct.

24  Q.  But Houston -- but excuse me -- but House Election

25  Committee Chair Briscoe Cain noted, "We don't need to wait for

1  bad things to happen."

2      I think you mentioned that on direct, right?

3  A.  I did.

4  Q.  A 2020 poll by the University of Houston's public affairs

5  school showed that 83 percent of Texas Republicans believed

6  there was widespread fraud in the 2020 election.  True?

7  A.  There is a differentiation made between -- in the polling

8  here in that poll and in the University of Texas poll between

9  assertions that there was widespread fraud in the -- someplace

10  in the country generally or particular places in the country.

11  Q.  Well, Dr. Kousser, I'm going to get to the -- I'm going to

12  get to the -- to the other poll in a moment.  Right now I'm

13  talking about the University of Houston poll, and I'm asking

14  you for a specific piece of information.  Okay?

15      That specific piece of information is that the University

16  of Houston public affairs school poll that you quoted in your

17  report showed that 83 percent of Texas Republicans believed

18  there was widespread fraud in the 2020 election.

19      Do we agree on that?

20  A.  That is different from what I quoted because it is in the

21  2020 election in general.

22      What I quoted, and the reason that it is important to

23  quote, is that the Texas -- University of Texas poll looked --

24  asked that question about Texas elections, whether they

25  thought that was -- there was widespread fraud in Texas

Morgan Kousser – Cross

1    elections.

2    Q.  Dr. Kousser --

3    A.  It also asked whether they thought --

4    Q.  I want to be clear.  I am not asking where you think this

5    piece of information fits into the arguments today.  I just

6    want to establish a baseline.

7        Brian, can we please pull up Dr. Kousser's report at

8    Page 82, paragraph 187.

9        Do you see that on your screen, Dr. Kousser?

10   A.  Yes.

11   Q.  The highlighted portion reads, "A poll by the University

12   of Houston's Hobby School of Public Affairs found that 83

13   percent of Texas Republicans believed that there was

14   widespread fraud in the 2020 election."

15       Do we agree I read that quote from your report correctly?

16   A.  You did, and I point out that --

17   Q.  Let's talk now about the --

18   A.  -- that did not say in Texas.

19   Q.  Let's talk now, Dr. Kousser, about the other report that

20   you discussed.  You point out the University of Texas poll

21   that was first published in 20 -- strike that.

22       You point out the University of Texas poll showing that

23   Republicans and Democrats may not have been prioritizing voter

24   integrity following the 2020 election, right?

25   A.  I said that, among other things, yes.

1  Q.  And, in fact, on direct, we looked at a slide that showed

2  the results of one of those surveys that showed that 46

3  percent of Republicans favored more strict voting laws in

4  Texas, right?

5  A.  That is correct.

6  Q.  That study does not show how politically active or likely

7  to vote or loud the different segments of the Republican Party

8  shown in the poll were, does it?

9  A.  That's just the public.

10 Q.  The poll is a snapshot in time, right?

11 A.  At the beginning of the legislative session, yes.

12 Q.  All right.  It does not show whether there was already a

13 growing trend in desiring stricter voting laws among

14 Republicans prior to the 2021 legislative session, right?

15 A.  Yes.  It is a snapshot.

16 Q.  You attribute the increase in interest in stricter voting

17 laws among Republicans over the course of the 2021 legislative

18 session to leadership, right?

19 A.  They were taking cues, I think, from the leadership.  I

20 made -- I made the implications clear in my direct testimony.

21 Q.  We agree, don't we, that correlation does not imply

22 causation?

23 A.  But it has a bearing on causation.  It does not -- the

24 statement is usually used in a statistical sense, not in a --

25 in a logical sense.

1     Here, I was just using it in a logical sense, and
2 correlation does often affect our idea of causation.
3 Q.  And I guess that's my point.  Although correlation may
4 affect our idea of causation, it does not imply it, true, just
5 as a matter of good social science?
6 A.  No.  That is not true.  As a matter of good social
7 science, it often implies it.  One thing happens to change
8 something else, and the major event that happens as
9 intervening can be considered to be causal.  That's not --
10 that's not unusual in social science or in general
11 understanding of how things work.
12 Q.  We agree, don't we, that the poll that you looked at on
13 direct examination showing 46 percent of Republicans just
14 before the 2021 legislative session favored stricter voting
15 laws was not a poll that you conducted, right?
16 A.  Correct.
17 Q.  You located that on the *Texas Tribune* website?
18 A.  It came from there, yes.
19 Q.  You did not compile the data yourself, true?
20 A.  No.  I looked at the data from the crosstabs.  I followed
21 the clicks and got the crosstabs from the University of Texas
22 original poll.
23 Q.  So let's move forward now into the 2021 legislative
24 session.
25     SB1 was, I think you discussed, one of several Election

1  Code bills that were considered by the Texas legislative --

2  legislature in that 2021 session, right?

3  A.  That's correct.  Many of them were put together in SB1.

4  Q.  And as you discussed on direct, those various bills and

5  provisions were vigorously debated throughout the 2021

6  legislative session?

7  A.  Yes.

8  Q.  The proposed changes to the Election Code in that session

9  evolved over the course of the regular and subsequent

10  special-called sessions, right?

11  A.  They evolved.  Some evolved more than others.

12  Q.  For example, one of SB1's predecessors, SB7, would have

13  allowed poll watchers to videotape voters receiving

14  assistance, right?

15  A.  That's correct.

16  Q.  And there was harsh criticism of that proposed provision,

17  true?

18  A.  Yes.

19  Q.  The legislature heard that criticism and responded by

20  dropping it from the bill.

21      We agree on that?

22  A.  Yes.  There were charges that it was unconstitutional.

23  Q.  And that provision did not wind up in SB1, right?

24  A.  Correct.

25  Q.  Another example from SB7, that bill originally required

Morgan Kousser – Cross

1  written documentation of disability from the Social Security
2  Administration to vote by mail.
3      Do you recall that?
4  A.  Yes.
5  Q.  That provision also did not make it into SB1?
6  A.  That's correct.
7  Q.  In fact, it did not even make it out of the Senate.
8      Do you remember that?
9  A.  I'm sorry.  I don't remember the exact details of when it
10 was dropped.
11 Q.  Your report, though, acknowledges that what you called the
12 most egregious provisions of these efforts to amend the
13 Election Code did not pass, true?
14 A.  Those provisions were very egregious, and they did not
15 pass.  That's correct.
16 Q.  On direct, you discussed Crystal Mason's prosecution,
17 right?
18 A.  Yes.
19 Q.  And this was a well-publicized case where people believed
20 there had been a real injustice.
21      Agree with that?
22 A.  Correct.
23 Q.  In fact, so many people were concerned about it, that
24 Texas Democrats introduced the Crystal Mason provisions during
25 the SB7 debate, right?

Morgan Kousser – Cross

1   A.   There were such provisions introduced.

2   Q.   And among them, those provisions, at least one would have

3   prevented charging a person from -- for casting a provisional

4   ballot without knowing she was ineligible to vote, right?

5   A.   That's correct.  This was moved in and out of the bills as

6   they went along.

7   Q.   Right.

8      So this single instance of this Crystal Mason charge

9   prompted legislative action and debate, right?

10  A.   It did.  That was not why I particularly made reference to

11  Ms. Mason.

12  Q.   Brian, can we go to Dr. Kousser's report at Page 65 and

13  look at Figure 8, which we looked at on direct.

14     Dr. Kousser, can you see Figure 8 on your screen?

15  A.   Yes.

16  Q.   And as you discussed on direct, this graph shows a higher

17  incidence of COVID infection as of November 2020 among black

18  and Hispanic populations than among nonwhite -- excuse me --

19  non-Hispanic white population, right?

20  A.   Correct.

21  Q.   And part of the point, as I understood it, as you

22  discussed this on direct, is that these infections --

23  infection rates incentivized minorities, at least black and

24  Hispanics, to vote by drive-through; is that -- is that

25  correct?

Morgan Kousser – Cross

1   A.  Or by mail if they possibly could, if that was legal, like

2   any other means than standing in line in a relatively small

3   polling place, particularly on one day.  So it incentivized

4   them to adopt procedures for voting which did not, in their

5   view, risk their health as much as other procedures.

6   Q.  Let's follow that drive-through voting example in terms of

7   how this may have incentivized certain populations.

8       Your point from the high COVID infection rate is that as

9   minority populations may have been disproportionately affected

10  by COVID, were incentivized to vote via drive-through voting,

11  that then banning drive-through voting would

12  disproportionately affect those minorities.

13      Is that a fair summary?

14  A.  It was an example of people having used it in the past and

15  being disproportionately minority.  So that was one of the

16  ways that they could have voted.  That certainly -- the

17  implication is that banning drive-through voting on the basis

18  of experience that had been had in the 2020 election, would

19  have a disproportionate impact on minorities.

20  Q.  Figure 8, though, Dr. Kousser, does not show infection

21  rates after November 2020.

22      We agree on that?

23  A.  Yes.

24  Q.  It does not predict falling infection rates, does it?

25  A.  It doesn't predict anything about infection rates.

2884
Morgan Kousser – Cross

1  Q.  In fact, it also does not predict voter behavior following

2  the cessation of COVID infections, true?

3  A.  The implications for voter behavior in subsequent times

4  depending -- would depend on whether this continued.  The

5  purpose here was just to look at the 2020 election.

6  Q.  Let's turn to some of the procedural irregularities that

7  you addressed in your report and on direct examination.

8      Your report discusses the conference committee

9  negotiations surrounding SB1's predecessor, SB7, right?

10 A.  Yes.

11 Q.  And you say that minority members -- and by that, I guess

12 I mean, both racial minorities who are a member of the

13 political minority, were excluded from the -- those

14 negotiations, right?

15 A.  Yes.

16 Q.  And those were Representative Terry Canales and Nicole

17 Collier, you remember that?

18 A.  Yes.  They did not sign the committee report -- I'm

19 sorry -- the conference committee report.  And they were very

20 critical of having been left out.

21 Q.  And to provide that information in your report, you cite

22 to the *Dallas Morning News*.

23     Do you recall that?

24 A.  I'm sure that you have that right, but you can see the

25 footnote.  If you'll tell me what page on my report, I can

1  look at that.

2  Q.  It is footnote 321.  It's on Page 87 or 88.

3      Here we are, Dr. Kousser.  It's on the screen for you.

4  A.  Okay.  Yeah.  I cite to that, and I cite to another

5  article as well.

6  Q.  You did not speak to Representatives Canales or Collier,

7  right?

8  A.  No.  I did not speak to any representatives at all in

9  compiling this report, for the reasons that I discussed in my

10 direct examination.

11 Q.  Right.

12     And in general, on your direct examination, you said that

13 you don't believe that conducting interviews of legislators is

14 credible evidence, right?

15 A.  In the –– in the face of a –– of a particular case.  It

16 may be credible evidence if it were taken at the time.  It

17 depends upon where the evidence comes from.

18 Q.  Well, I mean, the *Dallas Morning News* must have spoken to

19 Representatives Collier and Canales in order to get this

20 story, right?

21 A.  I suspect that they did, and the evidence comes from the

22 time and it's not in the presence of a particular case.

23 Q.  You're concerned that interviewing these legislators in

24 order to compile information for your report would come in the

25 context of litigation, such that these legislators would maybe

Morgan Kousser – Cross

1  skew what they told you in order to make their case.

2      Do I have that right?

3  A.  That's certainly one thing.  But they have no reason to

4  talk to me.  And they have no sanctions if they told me

5  something wrong.

6      They talk to a reporter and they tell them a lie, then the

7  reporter can deal with them differently the next time that

8  they -- that they talk to them.  There's the sanction of at

9  least talking to people again and again and again, as

10  reporters for a legislature do.

11      But I have no sanctions at all, no control over them.  And

12  there's no reason to believe that they would particularly tell

13  me the truth or not tell me the truth.  I just can't make any

14  judgments about that.

15  Q.  We agree, don't we, Dr. Kousser, that legislators in the

16  middle of a legislative fight have an incentive to make their

17  case to reporters, just as they may have an incentive to make

18  their case during litigation?

19  A.  They may have that incentive, but it's not so specific as

20  it is when there's litigation.

21  Q.  And you know -- or I should perhaps ask, are you aware

22  that legislators were deposed as a part of this litigation?

23  A.  I have been told that that is the case.  I have not read

24  any depositions.

25  Q.  Brian, can we go to report, Page 88, paragraph 199.

Morgan Kousser – Cross

1    In this paragraph, Dr. Kousser, you quote a tweet from

2  Jessica Gonzalez; is that right?

3  A.  Yes.

4  Q.  Is it right to say that a legislator's tweet is credible

5  enough to quote in your report without reaching out to the

6  legislator to examine the basis of that public statement?

7  A.  I just quote it for the fact of the matter.  She said that

8  they're trying to pass it with new language that was not

9  discussed and the public was not allowed to testify on.

10    The public, in fact, was not allowed to testify, and the

11  language that came out of SB7 after the conference committee

12  was different from the language that had been in the bill

13  before.  So there's -- there's a factual basis for what she

14  said and a factual basis that can be used to figure out

15  whether what she said was correct.

16  Q.  I understand that you -- that you may believe the tweet,

17  Dr. Kousser.  I'm talking to you about methodology.

18    And my question is, you are willing to quote a tweet in

19  your report without following up with the person who wrote the

20  tweet to ensure -- to talk to that person about whether it's

21  true.  Is that fair?

22  A.  I have other ways to decide whether that tweet was

23  correct, which I've just discussed.  And anyway, it's just for

24  the fact of the matter, she tweeted this.

25  Q.  The next paragraph of your report, paragraph 200, quotes

1 from a letter sent by 36 Houston Democrats to Speaker Phelan,

2 right?

3 A.  Yes.

4 Q.  These legislators are making their case, right?

5 A.  They are criticizing the procedures that have been carried

6 out before.

7 Q.  Right.  And that letter was good enough for you to quote

8 in your report.  We agree on that?

9 A.  Yes.  But all it says is that they –– that's their

10 characterization of the legislative session.

11 Q.  You spoke to none of it ––

12 A.  The part of it at the very end –– absolutely not.  The

13 part of it at the very end that says that they could not allow

14 their constituents with full-time jobs and family obligations

15 to participate in the process, that was clear because it was

16 laid out less than 24 hours before the final vote was taken.

17     So there is an outside way of determining whether that

18 part of the quotation was correct.  The early part of the

19 quotation ––

20         MR. KERCHER:  Objection, nonresponsive, Your Honor,

21 to everything after "absolutely not."

22         THE COURT:  That's sustained.

23         Doctor, please just listen to the question and answer

24 only the question posed.  Your lawyers will have an

25 opportunity to ask you any followup questions if they want to

Morgan Kousser – Cross

1  do that.

2        THE WITNESS:  Yes, sir.

3  BY MR. KERCHER:

4  Q.  Brian, can we go to Page 93, paragraph 212.  Thank you.

5      Can you see that on your screen, Dr. Kousser?

6  A.  Yes.

7  Q.  This is a portion of your report that you also discussed

8  on direct examination that describes the colloquy between

9  Senators Alvarado and Hughes, right?

10 A.  Yes.

11 Q.  And Senator Alvarado accuses Hughes of targeting

12 minorities, doesn't she?

13 A.  Yes.

14 Q.  Senator Hughes denies the accusation, right?

15 A.  Yes.

16 Q.  Your conclusion from that colloquy is that it reaffirmed

17 racial and partisan motives; is that right?

18 A.  The part of it that had partisan motives was the part that

19 said -- where Senator Hughes said this makes it easier for

20 political parties to find poll workers.

21     That is the partisan motive.

22     And the other -- I discussed how views -- how expressions

23 of views that a bill applies across the board ought to be

24 interpreted, and I argued that the fact that the rules apply

25 across the board doesn't --

Morgan Kousser – Cross

1  Q.  Dr. Kousser, I'm going to interrupt you.  You're talking

2  about parts of your report that we're not discussing right

3  now.  Right now, we're looking at paragraph 212 of your

4  report, and I want to ask you about the conclusion you draw --

5  you drew in that paragraph.

6      The final sentence reads, "The exchange between the two

7  senators reaffirmed the connection between racial and partisan

8  motives."

9      Did I read that correctly?

10  A.  Yes.

11  Q.  We agree, don't we, that the House Democrats broke quorum

12  in 2021?

13  A.  Correct.

14  Q.  Twice?

15  A.  Yes.

16  Q.  Several members of the House Democratic Delegation flew to

17  D.C. for the express purpose of stopping the Texas legislative

18  process, right?

19  A.  And also testifying before Congress and lobbying for the

20  John Lewis bill and the other bill that the Democrats were

21  carrying.

22  Q.  At least in part because of that delay, SB1 did not pass

23  until the end of August, right?

24  A.  Yes.

25  Q.  As a result of that irregularity, you know from Texas

Morgan Kousser – Cross

1  legislative procedure that the bill could not take effect

2  until 90 days after the governor signed it, right?

3  A.  Yes.

4  Q.  And that was just before the May 2022 primary.

5      We agree on that?

6  A.  Yes.

7  Q.  Now, you looked at procedural irregularities in 2021, but

8  you did not make a broader study of Texas legislative

9  procedure, true?

10  A.  Other -- excuse me.  Other than what is in this report and

11  what I had said in the -- excuse me -- in my testimony in the

12  voter ID case, I did not look at -- or I did not have further

13  study.

14  Q.  Okay.  You don't know, for example, how many times

15  late-night hearings have paused for a minute to change the

16  legislative day in the Texas Legislature, right?

17  A.  That's correct.

18  Q.  You agree that this session occurred during the pandemic,

19  true?

20  A.  Yes.

21  Q.  You also agree that a quorum break had not occurred since

22  2003, right?

23  A.  Yes.

24  Q.  It was very rare?

25  A.  Four times, I think.

Morgan Kousser – Cross

1  Q.  You mentioned procedural irregularities from the

2  governor's office, right?

3  A.  I discussed that the governor threatened to bring out --

4  to bring about legislative sessions, to call legislative

5  sessions until it passed and then cut off salaries for the

6  legislators and the staff that weren't in the legislature.

7  Q.  Well, specifically, Governor Abbott used his veto power to

8  line-item veto salaries of certain staffers.

9      Isn't that a more accurate statement?

10 A.  Yes.

11 Q.  And you're aware that Governor Abbott has, this session,

12 made a similar pledge regarding special sessions until an

13 agreement on education reform is reached?

14 A.  Yes, I keep reading the Texas newspapers and saw that.

15 Q.  You reference Speaker Phelan's banning of the use of the

16 terms "racist" and "racism" during the debate of SB1 and its

17 predecessors, right?

18 A.  Yes.

19 Q.  You're aware that Speaker Phelan has taken political heat

20 for working too closely with Democrats?

21 A.  Certainly, recently, that's the case.

22 Q.  In fact, he's even appointed Democratic committee chairs,

23 right?

24 A.  This is a tradition in the Texas Legislature.

25 Q.  My question is, he's appointed Democratic legislative

Morgan Kousser – Cross

1  chairs?

2  A.  Yes.

3  Q.  Brian, let's go to Dr. Kousser's report on Page 3.

4      Dr. Kousser, I want to talk a little bit about your

5  analysis now in your report.

6      I want to bring up Page 3 because on direct you discussed

7  these bullet points and helped focus the Court on the

8  provisions that you're sort of targeting or focusing on for

9  purposes of your analysis, fair?

10 A.  Yes.

11 Q.  And you talked on direct about a multiplicative effect of

12 having multiple potentially discriminatory provisions pass at

13 the same time, right?

14 A.  Yes.

15 Q.  And you're looking at the bill as a whole as a part of

16 that analysis?

17 A.  Yes.

18 Q.  We agree, if we take some of SB1's provisions

19 individually, that those provisions may not be discriminatory?

20        MS. HOLMES:  Your Honor, I'm going to object.  He's

21 asking him for a legal conclusion.

22        THE WITNESS:  No.

23        THE COURT:  That's overruled.

24        THE WITNESS:  No.  I think that individually one

25 might consider all of them as discriminatory.  But put

Morgan Kousser – Cross

1  together, the case seems to me more weighty.

2  BY MR. KERCHER:

3  Q.  I think I understand what you mean, and it may be the case

4  that my question was not clear.

5      When I say "if we look at individual provisions of SB1,"

6  I'm not just talking about the ones that you have listed out

7  here on Page 3 of your report.  I'm talking about all of the

8  provisions in the 61 pages of SB1.

9      So with that in mind, do we agree that there may be some

10  provisions in SB1 that are not discriminatory?

11  A.  There may be, if considered individually.  It's possible.

12  I focused on these and didn't really have an opinion on the

13  others.

14  Q.  Right.

15      So, for example, expanding curbside voting to pregnant

16  women is not something that would strike you as particularly

17  discriminatory, fair, by itself?

18  A.  By itself, no, it would not be.

19  Q.  Okay.  Now, the provisions that you have listed for us

20  here on Page 3 of your report are provisions that concern you

21  as being potentially discriminatory, right?

22  A.  Severally and together, yes.

23  Q.  And I'm glad you answered that way because I think I

24  understood your direct testimony to be that by aggregating

25  these provisions that are, in your view, more likely to be

Morgan Kousser – Cross

1   discriminatory, makes it more likely that SB1 is –– was passed

2   with discriminatory intent.

3       Is that –– is that a fair summary of your view here?

4   A.  Yes, and would have a discriminatory effect.

5   Q.  I want to help the Court understand how that analysis

6   works.

7       Let's assume for a moment that the Court disagrees with

8   some of the provisions that you have listed as being possibly

9   discriminatory.  Let's say the Court disagrees that the

10  elimination of 24-hour voting is discriminatory, that the

11  elimination of drive-through voting is discriminatory and the

12  elimination of straight-ticket voting is discriminatory.

13      Now, at that point, we are still looking at the whole bill

14  in order to analyze whether any of the remaining provisions

15  might be discriminatory, right?

16  A.  Yes.

17  Q.  But the multiplicative effect reduces as the number of

18  putatively discriminatory provisions shrinks.  Is that true?

19  A.  It would, yes.

20  Q.  And by corollary, the importance of those

21  nondiscriminatory provisions would grow as the number of

22  putatively discriminatory provisions shrank?

23  A.  That could happen.  That's different than the reality.

24  But, yes, if you eliminate those provisions, the case for the

25  whole bill being discriminatory might still be strong enough

Morgan Kousser – Cross

1  to have it ruled discriminatory.  That's up to the judge.  But

2  the case would be less strong.

3  Q.  Brian, let's go to the report, Pages 108 and 109,

4  paragraph 241, please.

5      Dr. Kousser, in this paragraph, you describe what you call

6  "models of human behavior," right?

7  A.  Yes.

8  Q.  Now, in the following paragraph –– Brian, can you take us

9  there –– at the bottom you list three patterns to expect from

10  the 2021 legislative session, right?

11  A.  Yes.

12  Q.  The third pattern to what you –– in your view, we should

13  expect from the 2021 legislative session is –– it says that,

14  "Since that" –– "since that party was overwhelmingly white and

15  its opposition drew disproportionately support from" ethic ––

16  excuse me –– "from ethnic or linguistic minorities, the

17  resulting legislation would likely disadvantage minority

18  voters."

19      Did I read that correctly?

20  A.  Yes.  I think that's drawn from the scholarship and recent

21  history of election changes in Texas (inaudible) have those

22  expectations.

23  Q.  Is your expectation that legislators act only in personal

24  racial interest?

25  A.  No.

Morgan Kousser – Cross

1   Q.  Is it your expectation --

2   A.  Not at all.

3   Q.  -- that legislators act only in the racial interests of

4   their constituents?

5   A.  They may; they may not.  It depends upon the evidence, the

6   concrete evidence of how they acted in that particular

7   instance with regard to that particular bill, at that

8   particular time, with that particular factual basis.

9   Q.  And in those particulars, a legislator may act in

10  religious or economic interests, true?

11  A.  If it's a bill related to religion or economics,

12  certainly.

13  Q.  Brian, can we go to Page 111 of Dr. Kousser's report,

14  paragraph 247.  Thank you.

15      Dr. Kousser, in this paragraph, you argue that blacks and

16  Latinos are more likely to be affected by SB1 provisions

17  because they are less likely to own automobiles; is that

18  right?

19  A.  Yes.  Because they're less likely to have driver's license

20  numbers for absentee ballot applications.

21  Q.  And for this argument you cite to U.S. Census data; is

22  that right?

23  A.  Yes.

24  Q.  Is that statistic that you are citing for a lack of -- or

25  a lower likelihood of automobile ownership, is that nationwide

Morgan Kousser – Cross

1  or is it specific to Texas?  Or do you know?

2  A.   In Texas.  I say it, "in Texas," specific to Texas.

3  Q.   If minorities in Texas are less likely to own vehicles,

4  then expanding drive-through voting statewide will

5  disproportionately affect minority voters, won't it?

6  A.   It could.  They could get a ride from somebody else.  They

7  often do.  People who don't have cars often do that.

8  Q.   You also argue that straight-ticket voting provisions in

9  SB1 closed a loophole in a preexisting straight-ticket ban.

10     Is that a fair summary?

11  A.   I'm not sure -- that was not discussed in a way that

12  allowed me to understand exactly what the setup of a vote --

13  voting machine would be.  It's one way to think it made it

14  more difficult to continue to vote straight ticket and that

15  was an intention of the previous law.  This made it even more

16  difficult, given the way that it was possible to set up voting

17  machines, apparently.

18  Q.   Well, I want to follow up on something that you did say on

19  direct about it.  But you said that there may be technology

20  that would have escaped the existing ban on straight-ticket

21  voting, right?

22  A.   Yes.  That's my understanding.

23  Q.   But you're not saying that technology had ever been

24  employed in Texas, true?

25  A.   I do not know.

1  Q.  Let's go to Page 112 of your report, Dr. Kousser.  This is

2  the top -- this is the bullet at the top of that page.

3      You argue here that minorities have less work flexibility

4  to vote than white -- than their white counterparts, right?

5  A.  Yes.

6  Q.  But you know that SB1 expanded the rights of workers to

7  take two hours off from work to vote during early voting,

8  right?

9  A.  Under very specific circumstances.  It wasn't that simple.

10 There had to be two hours that the early voting was open, that

11 they could not get to.  So it was more complicated.

12     I don't think I explained that in detail, but I looked

13 back at the section of the bill, and it -- or the law, and it

14 seems to be more complicated than simply giving them two hours

15 off.

16 Q.  Well, I understand you feel that the employee voting

17 provision in SB1 maybe didn't go far enough or didn't

18 effectuate the ends very well, but we agree that prior to SB1,

19 that opportunity to leave work in order to vote did not apply

20 to early voting, right?

21 A.  That's correct.

22 Q.  Two bullets down, you argue that poll watcher provisions

23 in SB1 will disproportionately affect minorities, right?

24 A.  Yes.

25 Q.  That assumes that poll watchers are disproportionately

1  white, doesn't it?

2  A.  Not necessarily.

3  Q.  We agree that Texas ––

4  A.  They might be Latino as well.

5  Q.  We agree that Texas is now a majority-minority state,

6  don't we?

7  A.  That's correct.

8  Q.  And there is no law preventing minorities from working as

9  poll watchers, true?

10 A.  Yes.  And they certainly can.

11 Q.  Brian, let's go to Page 116 and look at Table 3 on

12 Dr. Kousser's report.

13     Dr. Kousser, you compiled this data from exit polls,

14 right?

15 A.  Yes.

16 Q.  And, again, you did not conduct these surveys, true?

17 A.  Correct.

18 Q.  These are exit polls you cribbed data from, from CNN, the

19 *New York Times* and the *Washington Post*; is that right?

20 A.  I wouldn't use the verb "cribbed."  I took it from them.

21 Q.  Little bit further down on Page 116 at paragraph 255, you

22 attempt to tie critical race theory and banning books to SB1,

23 right?

24 A.  I was talking about the sort of culture of the legislative

25 session in using those examples to talk about the culture of

2901
Morgan Kousser – Cross

1  the legislative session which also passed SB1.

2  Q.  And your evidence for that hypothesis is a series of

3  newspaper articles which you said "May allow us to glean a

4  sense of the controversy," right?

5  A.  Yes.

6  Q.  All but one of those newspaper articles is the *Texas*

7  *Tribune*, true?

8  A.  Yes.  The *Texas Tribune* has a wonderful search engine, and

9  it's easiest to get -- find what you need there.

10 Q.  Dr. Kousser, you ever try the *National Review*?

11 A.  I have looked at *National Review* often.

12 Q.  What about the *Fort Worth Telegram-Star*?

13 A.  I did not look at that.  I think -- I think I am paying,

14 you know, $17 a month or whatever for four newspapers, and I

15 didn't include the *Fort Worth Star* on that.

16 Q.  Brian, can we go to Page 117, Section F of Dr. Kousser's

17 report.

18     Here, we're talking about background and other actions of

19 decision makers, right?

20 A.  Yes.

21 Q.  And you criticize Senator Hughes and Lieutenant Governor

22 Patrick for their positions on immigration and abortion and

23 tenure, calling them evidence of racial animus, right?

24 A.  I'm sorry.  What paragraph was that?

25 Q.  We're in Section F, maybe 256.  I can't see it on my

Morgan Kousser – Cross

1  outline.  I apologize.

2      Well, let me ask you, Dr. Kousser, whether you can

3  remember because, unfortunately, I'm not going to be able to

4  give you a pincite on this one.

5      Do you recall criticizing Senator Hughes and Lieutenant

6  Governor Patrick on their stances on immigration, abortion and

7  tenure?

8  A.  I don't think -- I don't think I criticized them.  If I

9  did that, I just tried to give some sense that they were among

10  the most conservative.  Those are examples.

11      There was a political scientist at Rice who looks at every

12  session and tries to rank all of the representatives and

13  senators by ideology.  I think these were just examples of

14  ideology, not particularly related to race.

15      Probably the immigration would have some relation to race,

16  but abortion wouldn't.  All I was just trying to do was to

17  give examples, I think, of the -- how they were considered

18  relatively conservative.

19  Q.  Brian, let's scroll down a little bit further on paragraph

20  261, please.  261.  And it bleeds on to the next page.  Yeah.

21      Yes, the last sentence here on 261, Dr. Kousser, says that

22  "It has been widely noted that Lieutenant Governor Patrick has

23  threatened to push through as a top priority a bill abolishing

24  tenure at Texas state universities for anyone who teaches

25  critical race theory and that he was an avid supporter of

Chris Poage, RMR, CRR
Official Court Reporter

2903
Morgan Kousser – Cross

1  banning the teaching of such doctrines in K through 12 state
2  schools."
3      Did I read that correctly?
4  A.  Yes.
5  Q.  This is a highly partisan issue, isn't it?
6  A.  It's partisan and racial.
7  Q.  Democrats and Republicans disagree on the policy choice to
8  remove tenure based on teaching critical race theory, don't
9  they?
10  A.  Also, blacks, Latinos and whites disagree.
11  Q.  And perhaps people of different religions and economic
12  backgrounds, right?
13  A.  I have no knowledge of that whatsoever.
14  Q.  Let's go to Page 120, paragraph 262.
15      You found no forthright admissions of racial motives by
16  proponents of SB1, right?
17  A.  That's correct.
18  Q.  And finding no such admissions of racial motives, you
19  argue that denials of racial animus are evidence of racial
20  motives; isn't that right?
21  A.  They can be, and I use the example from *Hamlet*.  Denial
22  seems exaggerated, and she decided –– Gertrude decided that
23  the lady in the play, the play within the play in Act III of
24  *Hamlet*, protested too much.  It's the same sort of argument.
25  Q.  So both admissions of racial animus and denials of racial

Morgan Kousser – Cross

1  animus may be taken as evidence of racial animus.

2      Do I have that right?

3  A.  These days, you don't see admissions of racial animus.

4  Since 1982 --

5          MR. KERCHER:  Objection, nonresponsive.

6          THE WITNESS:  -- in Georgia --

7          THE COURT:  He's trying to answer your question.

8          Go ahead.

9          THE WITNESS:  Since 1982 in Georgia, it is very

10  dubious that legislators would admit examples -- would admit

11  racial animus.

12          THE COURT:  What happened in Georgia?  Why are you

13  pinning to that time period?

14          THE WITNESS:  Okay.  Maybe I should sensor myself.

15          But there was a question about whether the Fifth

16  Congressional District, which is Atlanta, would be drawn with

17  sufficient black population to elect a representative of color

18  there.

19          The chair of the redistricting committee -- Joe Mack

20  Herricks, I think was his name, was quoted under oath -- I'm

21  sorry -- somebody else reported under oath that he had made

22  the following statement.  Please forgive me.  I will quote it

23  exactly.  "I am not going to draw any 'nigger' districts."

24          That decided the case, and that has been very

25  important in the voting rights literature and what voting

Morgan Kousser − Cross

1  rights lawyers tell people to not do.

2          THE COURT:  I got it.  Thank you, Doctor.

3          THE WITNESS:  If anybody did −−

4          THE COURT:  Thank you.

5          Your next question.

6  BY MR. KERCHER:

7  Q.  If I may, Your Honor.

8      Dr. Kousser, I'm not sure I got an answer to my question,

9  which was much more simple than that.

10      Under your methodology, both an admission of racial animus

11  and a denial of racial animus are evidence of racial animus,

12  true?

13  A.  An over−the−top denial of racial animus may be part of the

14  general evidence that one might consider about whether there

15  is racial animus.  And certainly, an admission, if it

16  occurred, would be evidence of racial animus.

17  Q.  You say "over−the−top denial."  If someone is accused

18  openly and publicly of being a racist, don't we expect a

19  vehement denial?  It's a profound insult, isn't it?

20  A.  It may be considered an insult, and the question here is

21  whether the Phelan comment in particular, denying the

22  information that might be gleaned by the public, by using such

23  terms, his denial seems to me to be over the top.

24      Why do you not allow the statement to be made if you think

25  it's so clear that it's untrue that it won't be taken −− that

1  nobody –– no one will take it seriously?  He must have thought

2  that people would take it seriously.  In order –– by banning

3  it, he stopped them from doing that.

4  Q.  Have you ever heard the phrase that "silence implies

5  assent"?

6  A.  It may.

7  Q.  All right.  Dr. Kousser, let's go ––

8  A.  I've heard the phrase, yes.

9  Q.  Let's go to Page 22, paragraph 268, which overlaps onto

10  the next page.

11      You argue here that it is easier to steal driver's

12  licenses or Social Security cards than it is to manufacture a

13  signature, right?

14  A.  Yes.

15  Q.  And part of your argument here is that SB1's voter ID

16  requirements are, in your view, unlikely to be effective,

17  true?

18  A.  Yes.

19  Q.  And people have disagreements all the time about whether a

20  piece of legislation will have the effect that it is intended

21  to have, right?

22  A.  It is often the case, yes.

23  Q.  A recent example, President Biden's Inflation Reduction

24  Act caused a huge fight among voters and policy wonks and

25  economists about whether or not it would, in fact, reduce

Morgan Kousser – Cross

1  inflation.

2      You remember that?

3  A.  There were -- there were battles over every aspect of that

4  legislation --

5  Q.  That's politics, Doctor?

6  A.  -- including that --

7          THE COURT:  Is there a question?

8          THE WITNESS:  Yes.  But it doesn't mean that --

9          THE COURT:  What was the question?

10         MR. KERCHER:  The question is, "That's politics?"

11         THE COURT:  Yeah.  I thought that was rhetorical.

12  But, okay, that's a question.

13         Is that politics; yes or no?

14         THE WITNESS:  That is politics, but there may be

15  right and wrong answers to questions about public policy.

16         THE COURT:  And your next question.

17  BY MR. KERCHER:

18  Q.  We've heard from numerous county elections officials in

19  this trial, some of whom have had differing opinions about

20  those ID requirements, some of whom did not.

21     Did you speak with any county election officials as a part

22  of your report?

23  A.  No.

24  Q.  So, for example, you do not have information about the

25  cost of hiring poll workers and watchers for 24-hour voting?

Morgan Kousser – Cross

1  A.  I do not have any specific evidence on that.  I did quote

2  Mr. Hollins responding to the question when it was raised

3  during the discussion of SB1.  He said he had no difficulty in

4  Harris County getting poll workers.

5      I do not know whether this is characteristic of the whole

6  state or not.

7  Q.  You also, at paragraph 270, say, without citation, that it

8  would not be difficult to recruit poll workers or poll

9  watchers in a 24/7 world, right?

10  A.  It refers back to paragraphs 217 and 218 where the

11  evidence is presented.

12  Q.  But that evidence, as I think you just described, does

13  not -- does not include having talked to election workers and

14  election officials about the actual costs.

15      Do I have that right?

16  A.  I did not talk to them, but there was a statement in the

17  record that I quoted.

18  Q.  Let's go to paragraph 274.

19      You argue that poll watchers already had adequate

20  opportunities to observe voting and counting, right?

21  A.  Let me see where we are.  Could you give me the page

22  number?

23  Q.  I've got it on screen, if that helps.  It's Page 123.

24  A.  Sorry.  I'm taking a long time to get there.  I apologize.

25  Q.  Well, you've been on the stand a long time, and we

Morgan Kousser – Cross

1  appreciate it.

2  A.  Yes.

3  Q.  So your point here, just to --

4  A.  The evidence --

5  Q.  -- to close the loop, is that poll watchers had already

6  had adequate opportunities to observe voting and counting,

7  right?

8  A.  Yes, and the evidence is in the earlier paragraphs.

9  Q.  Right.  I see --

10  A.  This is just a recounting --

11  Q.  I understand that.

12  A.  It just recounts.

13  Q.  You understand, Dr. Kousser, that there are people who

14  disagree with that view, in good faith, right?

15  A.  I don't know.  There may be.

16  Q.  Excuse me.  Brian, let's go to paragraph 283.

17     Here, you say that while many other southern states have

18  found a way to remove Confederate monuments, they still stand

19  tall in Texas.

20     Did I read that correctly?

21  A.  Yes.

22  Q.  There is no citation for that observation, is there?

23  A.  No, not there.

24  Q.  You're not aware of any state that has removed all of its

25  Confederate monuments, true?

Morgan Kousser – Cross

1  A.  I'm not aware of any that has removed all of them.

2  Certainly some of them have been removed in other places.

3  Q.  And although Thomas Jefferson was not a Confederate, there

4  is a statute of him as a slave owner in D.C. that is as tall

5  as the Lincoln Memorial, true?

6  A.  I used to ride my bike past it every day.  Yes.

7  Q.  Are you not aware, Dr. Kousser, that the University of

8  Texas, in 2017, chose to remove several Confederate statues

9  from campus?

10  A.  I remember reading about it at the time.  But my memory is

11  vague.  And that's not the Texas Legislature, I think.

12  Q.  You're aware the University of Texas is a state agency?

13  A.  Yes.

14  Q.  You don't know how many schools in Texas have been renamed

15  from their Confederate namesakes, do you?

16  A.  I do not.

17  Q.  Let's go to paragraph 285, please.

18      Dr. Kousser, this is where you argue that Texas' refusal

19  to expand Medicaid under the Affordable Care Act evidences a

20  refusal to respond to particular needs of minorities, right?

21  A.  Yes.

22  Q.  We agree, don't we, that the expansion of Medicaid and the

23  use of the Affordable Care Act is an extraordinarily complex

24  area of law?

25  A.  I do not know —— I'm sorry.  I'm sorry.  My voice is

Morgan Kousser – Cross

1  fading.

2      No.  I'm sorry.  I do not know that that is a complex area

3  of law.  It's been litigated, and there is a Supreme Court

4  opinion about it.  Certainly more than one.  But there's

5  clearly less uptake -- I'm sorry.  I apologize.

6      There -- at one point I talk about uninsurance -- the

7  proportion of people in Texas who are uninsured by ethnicity.

8  And it's much higher among blacks and considerably higher

9  among Latinos.

10 Q.  But those statistics, Dr. Kousser, don't mean that race is

11 the only basis not to expand Medicaid, true?

12 A.  It doesn't have to be the only basis to be discriminatory.

13 Q.  Well, if it's not the only basis, then it's possible that

14 the decision was not made for that reason at all, true?

15 A.  It's possible that it was not made for that, but it has a

16 discriminatory effect.  Whatever the ideological or partisan

17 or whatever the reason, as an actual fact, it is

18 discriminatory because so many fewer people have medical

19 insurance if they're black or Latino.  It's just a fact.

20 Q.  You know that Texas is one of ten states who have not

21 expanded Medicaid, right?

22 A.  Yes.  It is the largest one.  Virginia fell, I think, a

23 couple weeks ago.

24 Q.  And the others include Wisconsin and Wyoming, among

25 others, true?

Morgan Kousser – Cross

1  A.  I don't know.  I know that they include Florida.

2  Q.  In the next paragraph, 286, you posit that Texas schools

3  are segregated, right?

4  A.  I said more than a million black and Latino students in

5  the state learn in classrooms with few white peers.  If that's

6  the definition of "segregation," then that's what I said.

7  Q.  I guess that's what I'm saying.  Doctor, you skipped the

8  first part of the sentence, right?  You used that definition

9  as "segregation."  You say that Texas schools are segregated,

10  true?

11  A.  In that sense, yes.  It's without white peers.  They may

12  have Latino peers, blacks may have Latino peers, Latinos may

13  have black peers.  I'm excluding that as not integrated in the

14  same way that people have traditionally used the phrase.

15  Q.  Brian, let's go to report Page 126, paragraph 288.

16      Doctor, here you argue that making it even more difficult

17  to vote straight-party ticket will increase wait times at

18  in-person polls and, therefore, increase lines, right?

19  A.  Yes.  That's just logical.

20  Q.  Well, but we also established that SB1 is not the first

21  bill to make straight-ticket voting illegal in Texas, right?

22  A.  It's not the first bill.

23  Q.  And yet, you have no evidence to support --

24  A.  You said put --

25  Q.  And you have no evidence to support that any manner of

Morgan Kousser – Cross

1  straight-ticket voting had been used in the election prior to

2  SB1, right?

3  A.  It had been used in 2018, not 2020, I think.

4  Q.  In paragraph 289, you refer to a study that I believe you

5  found in the *Texas Tribune*, as well, arguing that Texas was

6  the most difficult state in which to vote, right?

7  A.  I read those studies when they came out, but it's also

8  cited in the *Texas Tribune*.

9  Q.  The study originally came out in 2018, right?

10 A.  Yes.

11 Q.  And that was just before what I believe you called on

12 direct the largest election Texas has seen since the 1970s,

13 true?

14 A.  The largest turnout, I believe.

15 Q.  True?

16 A.  The largest turnout, yes.  That is correct.

17 Q.  And then it was updated in 2020, right?

18 A.  Yes.

19 Q.  Which also had historically extraordinary turnout in

20 Texas, true?

21 A.  Yes.

22 Q.  Dr. Kousser, we've talked a little bit about some of the

23 folks you did not interview and why.  I want to make sure that

24 I close the loop on a few more categories.

25     In preparing your report, you spoke with no local election

2914
Morgan Kousser – Redirect

1  officials.  Is that true?

2  A.  Correct.

3  Q.  No state election officials, right?

4  A.  (Audio transmission gap).

5  Q.  I'm sorry.  You cut out there, Doctor.

6      No state election officials?

7  A.  Correct.

8  Q.  No one at the Secretary of State's office?

9  A.  Correct.

10  Q.  And no one at the Office of the Attorney General?

11  A.  Correct.

12  Q.  Dr. Kousser, you are a marathon runner for hanging in

13  there through this direct and cross-examination and getting up

14  so early.  Thank you very much for your time.

15      I pass the witness.

16          THE COURT:  Anything else on this side?  No one.

17          Any redirect?

18          MS. HOLMES:  Very briefly, Your Honor.

19                    REDIRECT EXAMINATION

20  BY MS. HOLMES:

21  Q.  Hello, again, Dr. Kousser.

22      On cross, counsel asked you about a University of Houston

23  poll that asked about voters' belief about widespread fraud in

24  the 2020 election.

25      Do you recall that?

Morgan Kousser – Redirect

1    A.  Yes.

2    Q.  And does this poll say anything about Texas voters' view

3    of fraud in elections that occurred in Texas in 2022 –– in

4    2020?

5    A.  No.

6    Q.  I know you're familiar with the *Arlington Heights* factors,

7    Dr. Kousser.

8        Is one of those factors to consider legislative history,

9    including any contemporaneous statements by lawmakers?

10   A.  Yes.

11   Q.  And would that be statements by lawmakers made

12   contemporaneous to the events that you are considering in

13   relation to the intent of those state actions?

14   A.  Yes.

15   Q.  And in forming your opinions in this case, did you rely on

16   statements that were made contemporaneous to the legislative

17   session in which SB1 was passed?

18   A.  Yes.

19   Q.  Can a –– can a legislator have more than one reason for

20   supporting a bill?

21   A.  Yes.

22   Q.  And one of those reasons could be a partisan reason; is

23   that correct?

24   A.  Could be.

25   Q.  One of those reasons could be a religious reason?

Morgan Kousser – Redirect

```
1   A.  Yes.

2   Q.  And in addition, another reason could be discrimination?

3   A.  Yes.

4   Q.  Is that correct?

5       There can be multiple reasons that a legislator might

6   support a bill; is that correct?

7   A.  That's correct.

8   Q.  And because a legislator has multiple reasons, does that

9   mean that discrimination could not be one of them?

10  A.  No.

11          MS. HOLMES:  That's it.  I pass the witness.

12          THE WITNESS:  It does not mean that.

13          THE COURT:  Anything based on those?

14          MR. KERCHER:  No, Your Honor.

15          THE COURT:  Thank you, Doctor.  You're excused, sir.

16          THE WITNESS:  Thank you very much, Your Honor.

17          THE COURT:  And your next witness.

18          MS. HOLMES:  Your Honor, before we proceed to the

19  next witness, would it be okay to take a break?

20          THE COURT:  That's fine.

21      (Recess at 2:24 p.m. until 2:40 p.m.)

22          THE COURT:  Thank you.  Please be seated.

23          Yes, sir.

24          MR. BIETER:  Good afternoon, Your Honor.  Mark

25  Bieter.  I'm with Stoel Rives, and we represent Mi Familia
```

2917
Eric McDaniel – Direct

1  Vota plaintiffs.  We're going to call Eric McDaniel.

2         Dr. McDaniel will be testifying in support of the

3  following sections of SB1 that Mi Familia Vota challenges:

4  3.04, 3.09, 3.10, 3.12, 3.13, 4.07, 4.12, 5.02, 5.03, 5.04,

5  5.07, 5.08, 6.03, 6.04, 6.05, 6.07 and 7.04.

6         THE COURT:  Thank you.

7      (The oath was administered)

8         ERIC MCDANIEL, PLAINTIFFS' WITNESS, SWORN

9                   DIRECT EXAMINATION

10 BY MR. BIETER:

11 Q.  Good afternoon, Dr. McDaniel.

12 A.  Good afternoon.

13 Q.  Could you state your name for the record, please.

14 A.  Eric McDaniel.

15 Q.  And where are you employed?

16 A.  University of Texas at Austin.

17 Q.  And what's your position there?

18 A.  I'm professor in the Department of Government and the

19 co-director of the Politics of Race and Ethnicity Lab.

20 Q.  What are some of your duties there?

21 A.  I teach, research, also administrative duties.  My

22 research is primarily dealing with racial and ethnic politics,

23 religion in politics, health politics and political behavior.

24 Q.  And you've been retained as an expert in this case,

25 correct?

Eric McDaniel – Direct

1   A.  Correct.

2   Q.  And what were you asked to do?

3   A.  To assess the impact of SB1.

4   Q.  And you performed that task?

5   A.  Yes.

6   Q.  Did you reach opinions about the impact of SB1?

7   A.  Yes.

8   Q.  Okay.  Before we dive into your specific opinions, I want

9   to get into your background and qualifications to serve as

10  a -- as an expert in this case.

11      Derek, could you pull up HAUL/MFV 333.

12      Do you recognize HAUL/MFV 333?

13  A.  Yes.

14  Q.  And what do you recognize it to be?

15  A.  My initial expert witness report.

16          MR. BIETER:  Your Honor, I'd offer Dr. McDaniel's

17  report into evidence.

18          THE COURT:  Any objection?

19          MS. HUNKER:  No objection, Your Honor.

20          THE COURT:  333's admitted.

21          MR. BIETER:  Thank you.

22  BY MR. BIETER:

23  Q.  Could you please turn, Derek, to Appendix A.  It's Page 19

24  of the PDF.

25      And is this -- is this a copy of your résumé as of the

Eric McDaniel – Direct

1    date of your February 22 –– 2022 report?

2    A.   Yes.

3    Q.   Have there been any changes or updates to the résumé since

4    then?

5    A.   I've been promoted from associate professor to full

6    professor, and there are a couple more publications.

7    Q.   Could you please walk through your formal education?

8    A.   I received my bachelor's of arts from Wilberforce

9    University in political science.  I received my Ph.D. and

10   my –– my master's of arts and Ph.D. from the University of

11   Illinois Urbana–Champaign.

12   Q.   Did you write a dissertation for your Ph.D.?

13   A.   Yes.

14   Q.   And what was that about?

15   A.   It examined the –– why some black churches choose to be

16   politically engaged and others choose not to.

17   Q.   Did you work in the field of political science after you

18   finished your degrees?

19   A.   Yes.

20   Q.   And where is that?

21   A.   At University of Texas.

22   Q.   And when did you start working at University of Texas?

23   A.   Started in 2003 –– or before I defended and joined ––

24   joined the government department in 2004.

25   Q.   Can you give us an example of some courses that you've

2920
Eric McDaniel – Direct

1  taught at University Texas over time?

2  A.  I've taught courses on black political participation,

3  Introduction to American and Texas Government, Racial and

4  Ethnic Politics, Comparative Racial and Ethnic Politics,

5  American Political Institutions, Social Policy, health -- the

6  Politics of Health and the Black Church and the Black

7  Political Participation.

8  Q.  And you say you conducted research.  What's the -- what's

9  the general focus of your research?

10 A.  General focus of my research is in relation to political

11 behavior, so understanding opinions and also how people

12 participate in politics, specifically focusing on racial and

13 ethnic minorities, as well as the role of religion.

14 Q.  Have you written any books on that subject?

15 A.  Yes.

16 Q.  And could you give an example of a book that you've

17 written on it?

18 A.  So my first book, *Politics in the Pews*; then my second

19 book, *Everyday Crusade*.

20 Q.  How about scholarly articles?

21 A.  Yes.  I have numerous scholarly articles associated with

22 looking at religion and politics and political behavior.

23 Q.  Do you sit on any boards or academic associations?

24 A.  Yes.

25 Q.  And which ones are those?

Eric McDaniel – Direct

1  A.  The Society for the Scientific Study of Religion, the

2  Politics and Religion Section of the American Political

3  Scientist Association are the two primary roles that I have.

4  Q.  And have you received any awards for your work?

5  A.  I received an award for my dissertation from the racial

6  and ethnic politics section of the American Political Science

7  Association.  And I received an honorable mention for Article

8  of the Year from Political Research Quarterly.

9          MR. BIETER:  Your Honor, I proffer Dr. McDaniel as an

10  expert in race and political behavior.

11          THE COURT:  Any response?

12          MS. HUNKER:  No objection to that specific expertise.

13          THE COURT:  He's recognized as such.

14          MR. BIETER:  Thank you, Your Honor.

15  BY MR. BIETER:

16  Q.  So you testified earlier that you reached opinions

17  regarding the impact of voting changes on various racial

18  groups, correct?

19  A.  Correct.

20  Q.  What are those opinions?

21  A.  My opinion is that the change in SB1 will

22  disproportionately affect black and Hispanic voters.

23  Q.  Did you reach any opinions about blacks and voting wait

24  times?

25  A.  Yes.  Blacks have longer wait times, consistently have --

Eric McDaniel – Direct

1 report longer wait times than their white counterparts.

2 Q.  Did you reach conclusions about Hispanics' use of

3 drop-boxes during elections?

4 A.  Yes.  Hispanic voters who choose to use absentee voting

5 are more likely to drop it off in person as opposed to put it

6 in the mail.

7 Q.  And did you reach an opinion on the impact of SB1's

8 extending early voting hours to counties with 55,000 or more

9 residents?

10 A.  Yes.  Those counties, there is a greater proportion of the

11 white population in the state in those counties compared to

12 other counties.

13 Q.  And last, did you reach any opinions about voter

14 intimidation?

15 A.  Voter intimidation was most likely to occur in counties

16 with a history of racial intimidation, which -- racial

17 terrorism, which I consider to be -- which I count as

18 lynching.  Furthermore, in counties where President Trump

19 either won by a small margin or lost, they're more likely to

20 see reports of voter intimidation.

21 Q.  Did you put those opinions into a report?

22 A.  Yes.

23 Q.  And that's one that we've looked at before.  Were there

24 other reports?

25 A.  I also had a report in response to the 2022 election, as

Eric McDaniel – Direct

1  well as a report in response to the State's rebuttal.

2  Q.  Why don't we go ahead and call that up.  Derek, could you

3  bring up HAUL/MFV 343.

4      Do you recognize this, Dr. McDaniel?

5  A.  No, I do not.

6  Q.  Must have been wrong.

7      Actually, maybe we can move on to -- could you bring up

8  HAUL/MFV 345.

9      Do you recognize this?

10 A.  Yes.

11 Q.  And what is this?

12 A.  It was my supplemental report in relation to the 2022

13 Election.

14          MR. BIETER:  Your Honor, I'd move this into evidence.

15          THE COURT:  Any objection?

16          MS. HUNKER:  No objection.

17          THE COURT:  345's admitted.

18          MR. BIETER:  Thank you.

19 BY MR. BIETER:

20 Q.  You testified earlier, Dr. McDaniel, that it is your

21 opinion that blacks are more likely to vote by mail than

22 whites or Hispanics; is that right?

23 A.  Correct.

24 Q.  And what's the -- what's the basis for that opinion?

25 A.  I used the 2016 and 2020 Cooperative Congressional

Eric McDaniel – Direct

1  Election Study, which is now referred to as the Cooperative

2  Election Study, to examine respondents in the state of Texas

3  and their choice of voting method.

4  Q.  Can we agree that Cooperative Elections Study is also

5  known as "CES" and refer to it -- that during testimony?

6  A.  Yes.

7  Q.  So you used a sample of the CES from both 2016 and 2020;

8  is that right?

9  A.  Yes.  I examined them -- I examined the 2020 sample and

10  used the 2016 sample as a comparison.

11  Q.  Can you tell us a little bit more about the CES?

12  A.  The CES is a stratified sample of -- in 2016, I believe

13  there were over -- I believe there were 62- to 63,000

14  respondents.  Of those, close to 4500 were from Texas.  In

15  2020, it was, I think, closer to 60,000, with about 4200 of

16  those respondents being from Texas.

17  Q.  Derek, could you bring up HAUL/MFV 333.  And take us to

18  Page 7, that table on Page 7.  Thank you.

19      Do you recognize this table?

20  A.  Yes.

21  Q.  And could you explain what it is?

22  A.  This is examining the reported voting method, so either

23  voting in person on election day, voting in person early or

24  voting by mail.

25  Q.  So for the purposes of our discussion now, we're going to

Eric McDaniel – Direct

1  be focused on voting by mail, which is light gray on the right

2  side; is that right?

3  A.  Yes.

4  Q.  And what do you glean from these charts?

5  A.  The black respondents were significantly more likely to

6  report voting by mail than their white counterparts.

7  Q.  Let's go to the middle chart there.

8      What does that tell you?  Could you interpret that for us?

9  A.  Again, for those over 65, you still see the difference for

10  blacks, about 50 percent of blacks over 65 reported voting by

11  mail compared to less than a third of whites.

12  Q.  And how about the bottom chart there?  What does that

13  signify?

14  A.  That signifies that blacks under the age of 65 more than

15  two times likely to report voting by mail than their white

16  counterparts.

17  Q.  Can we go on to the chart on Page 9, Derek.  And could you

18  blow up the bottom.  Yeah.  There we go.

19      So could you tell us what this graph indicates?

20  A.  This is the predicted probability of choosing a particular

21  voting method where I examined this for those who vote, for

22  election day, early voting and absentee voting.

23  Q.  And what do you glean from this?

24  A.  That after controlling for other variables that may

25  influence this, we still see that the black respondents are

Eric McDaniel – Direct

1  more likely to report absentee voting.

2  Q.  So -- and this is from the 2016 election?

3  A.  Yes.  And the pattern is the same in 2020.

4  Q.  Are you familiar with SB1's provisions related to mail-in

5  ballots?

6  A.  Yes.

7  Q.  And can you give us an example of some of those

8  provisions?

9  A.  There was changes in terms of, one, how somebody receives

10  the application.  In some counties, individuals who were over

11  65 -- if you're over the age of 65 in Texas, you automatically

12  qualify for absentee.  Some counties would mail them out.  SB1

13  says they can no longer mail them out.

14      On top of that, there were new ID requirements.  And so

15  looking back -- stepping back through the application, you

16  would first have to ask for the application, then apply, then

17  receive your ballot.  And once you receive your ballot, there

18  were new identification issues, new ways of indicating your

19  identification, but having to be put on the ballot in order

20  for it to be counted.

21  Q.  And what effect will SB1 have on black voters in Texas

22  with regard to vote by mail?

23  A.  I believe that it will decrease the chance for blacks to

24  vote by mail.

25  Q.  Will they be affected disproportionately than other

1  groups?

2  A.  Yes.

3  Q.  Did you analyze whether the changes to SB1 had an impact

4  on the mail-in vote during the November 2022 election?

5  A.  Yes.

6  Q.  And what did you find?

7  A.  I found that there was a decreased use of the mail-in

8  vote.

9  Q.  Did the overall voting rate decline in Texas from 2020 to

10 2022?

11 A.  Yes, it did.

12 Q.  And where was the decline most significant?

13 A.  In counties with large black populations.

14 Q.  I want to go on to your opinion about wait times.  You

15 testified earlier it was your opinion that Texas -- that in

16 Texas, blacks experienced longer wait times than whites and

17 Hispanics; is that right?

18 A.  Correct.

19 Q.  Could you please summarize what the basis of that opinion

20 is?

21 A.  The C -- the CES asked respondents how long it took them

22 to vote.  There were several categories:  No wait, zero to ten

23 minutes, and then all the way up to an hour or more.

24 Q.  Derek, could you go to Page 10, please, on Exhibit 333.

25 And could you blow up those.  Yeah.  There we go.  Thank you.

Eric McDaniel – Direct

1    Would you describe what these charts are?

2  A.  This represents the reported wait time for those who voted

3  in person, so for all voters in person and those who voted on

4  election day and those who took part in early voting.

5  Q.  So if we focus again on the right side, the light shaded

6  bars there, what do you glean from that information?

7  A.  So if we look at all voters, black respondents are almost

8  twice as likely to report having to wait an hour or more than

9  their white counterparts.

10   If we look at the election day voting, they -- nobody

11  reported waiting an hour or more.  But if you look on the left

12  side, you'll see they were significantly less likely to report

13  no wait time.

14   If we look at those who report early voting, it's about --

15  they're almost twice as likely to report having to wait an

16  hour or more.

17  Q.  And this was the 2020 election, correct?

18  A.  Yes.  2020.

19  Q.  Could you walk through, perhaps, what the bottom graph

20  means, just for an example?

21  A.  So this is looking at those who chose early voting.  And

22  if you look at the figure, the colors go from kind of black to

23  a light gray, where black indicates no wait, then the next

24  category is less than ten minutes, then the next category is

25  10 to 30 minutes, and 31 to 60, or an hour or more.

Eric McDaniel – Direct

1    If you look at the bottom chart, one thing we can see is,
2   if I'm doing my math correctly, about 60 percent of whites
3   report a ten-minute wait or less, whereas, about 53 percent of
4   blacks report that.
5   Q.  Now, Dr. McDaniel, in your opinion, will SB1 alleviate
6   wait times for black people?
7   A.  No.
8   Q.  And why is that?
9   A.  SB1 has changed some of the parameters around when early
10  voting can take place.  And where it has expanded early
11  voting, it's expanded in areas with a much smaller black
12  population.
13  Q.  So what impact do you expect SB1 will have on black
14  voters?
15  A.  I expect it to either have no effect on wait times or
16  increase wait times.
17  Q.  Moving on to your opinion about dropoff boxes, you
18  testified it's your opinion that Hispanic Texans are more
19  likely than other racial groups to drop off absentee ballots
20  at specified locations as opposed to using the mail; is that
21  right?
22  A.  Correct.
23  Q.  Derek, could you bring up the chart on Page 12, please.
24      Okay.  Could you explain what this chart signifies?
25  A.  This is the predicted probability of dropping off the

1  ballot at a polling place or election center by race.

2  Q.  And what's the source of the information on this chart?

3  A.  The 2020 CES.

4  Q.  So what do you glean from this chart?

5  A.  The Hispanic voters report being significantly more likely

6  to drop off their ballot in person as opposed to putting it in

7  the mail.

8  Q.  Are you familiar with provisions in SB1 dealing with

9  drop-boxes?

10  A.  Yes.

11  Q.  And what impact do you expect that to have on --

12  A.  It's limited the number of drop-boxes to one per county.

13  Q.  And in your opinion how will that provision affect

14  Hispanic voters in Texas?

15  A.  It will most likely lead to them not voting if they choose

16  to vote absentee.

17  Q.  Let me move on to another of SB1's changes.

18      Are you familiar with SB1's changes to early voting for

19  counties with populations of 55,000 or more?

20  A.  Yes.

21  Q.  And what was -- what was that change?

22  A.  It allowed for early voting in those counties, whereas,

23  before it only allowed for early voting counties of 100,000 or

24  more.

25  Q.  Can you bring up, Derek, Page 14, Figure 1.

1    Okay.  There's a lot of information on this.  Could you --
2    could you walk us through what this means?
3    A.  This is looking at the first -- the state column is the
4    percentage of individuals in the state that live in these
5    areas.  And the following column is the percentage of each
6    racial group or racial/ethnic group that lives in these areas.
7        And what is evident is that the overwhelming -- for Texas,
8    overwhelmingly people live in counties of 100,000 or more.
9    But this is more so for whites than it is for blacks and
10   Hispanics.
11   Q.  So just, for example, in this table, 6.6 percent of all
12   the whites in Texas live in counties from 55,000 to 99,999; is
13   that right?
14   A.  Correct.
15   Q.  All right.  So what effect will the expansion of early
16   voting have on those smaller counties?
17   A.  We should expect higher turnout because of more
18   opportunities to vote.  But overall, for the state, this
19   looks -- it looks more beneficial for white residents than
20   black or Hispanic residents.
21   Q.  Why do you say that?
22   A.  Because there are more white residents in these areas and
23   a higher concentration of whites in these areas than there are
24   blacks or Hispanics.
25   Q.  Let's move on to voter intimidation.

Eric McDaniel – Direct

1     You testified earlier that there was a relationship
2  between instances of voter intimidation and lynching and
3  President Trump's margin of victory.
4     Can you explain that relationship?
5  A.  So what I found is that of -- looking at the 12 counties
6  with the highest rate -- with the highest reported number of
7  voter intimidation incidents, that nine of the 12 had a
8  history of lynching in that county.
9     Amongst the -- in relation to the vote turnout, we found
10 that counties where President Trump won by a small margin,
11 meaning five points or less, or lost the county, you were more
12 likely to see incidence of voter intimidation.
13 Q.  And could you give examples of voter intimidations that
14 had been reported?
15 A.  So there are people taking photographs of the license
16 plates of voters, individuals walking around with their --
17 with their weapons easily visible to voters.
18    There are examples of individuals driving by, yelling
19 derogatory terms to voters who stood in line.
20 Q.  And that's in 2020, correct?
21 A.  Correct.
22 Q.  Derek, could you go to Page 15, Figure 9.
23    So what does this figure represent?
24 A.  The figure on the -- on the left-hand side is examining
25 lynchings.  And so the darker the square, the more lynchings

1  that took place.  The circles represent the number of reported

2  incidences of voter intimidation.  The larger the circle, the

3  more incidents.

4      The -- on the right-hand side, you have President Trump's

5  margin of victory, where the light gray is that he lost by 15

6  points or more, with the black saying he won by 15 or more.

7      So the darker the -- the darker the county, the more

8  President Trump won by.  And then the circles represent the

9  same thing about the number of incidences of voter

10  intimidation.

11  Q.  So the -- I guess the closer the margin of victory, the

12  more likely there was to get voter intimidation; is that

13  right?

14  A.  Yes.  So if he won by a small margin or if he lost, you

15  were more likely to see acts of voter intimidation.

16  Q.  Okay.  Did -- does SB1 do anything to address voter

17  intimidation?

18  A.  No.

19  Q.  So to wrap up, could you -- could you summarize your

20  opinions?

21  A.  I believe that SB1 does -- that the ramifications of SB1

22  will have a negative effect on black and Hispanic voter

23  turnout.  And furthermore, it does not address issues related

24  to intimidation and extrajudicial activities that might reduce

25  the -- might reduce turnout.

Eric McDaniel – Cross

1          MR. BIETER:  Thank you very much.

2          Pass the witness.

3          THE COURT:  Anything else on this side?

4          Any cross?

5          MS. HUNKER:  Yes, Your Honor.

6                    CROSS-EXAMINATION

7  BY MS. HUNKER:

8  Q.  Good afternoon, Dr. McDaniel.

9  A.  Good afternoon.

10 Q.  It's good seeing you again.  I hope the drive wasn't too

11 bad.

12 A.  It was fine.  Good to see you as well.

13 Q.  Before we begin, I want to make sure that you and I are

14 using the same terminology.

15     You've only submitted three reports in this case, correct?

16 A.  Correct.

17 Q.  So you had your initial report, dated February 28th, 2022?

18 A.  Correct.

19 Q.  You had a supplemental report dated April 29th, 2022 in

20 response to Dr. Hoekstra?

21 A.  Correct.

22 Q.  And you had a second supplemental report, dated February

23 10th, 2023?

24 A.  Correct.

25 Q.  If I use the term "original report," you understand that

Eric McDaniel – Cross

1  I'm referring to the initial report that you submitted on
2  February 28th, 2022?
3  A.  Correct.
4  Q.  And if I use the term "first supplemental report," you'd
5  understand that I'm referring to the supplemental report you
6  filed on April 29th, 2022 in response to Dr. Hoekstra?
7  A.  Yes.
8  Q.  And if I say "second supplemental report," you understand
9  that I'm referring to the report you submitted on February
10 10th, 2023?
11 A.  Yes.
12 Q.  In addition, in your three reports, you employ the term
13 "drop-box voting," correct?
14 A.  Yes.
15 Q.  When you use the term "drop-box," you're using it as a
16 catchall phrase that means any alternative to the post office?
17 A.  Yes.
18 Q.  This can include in-person delivery of a mail ballot at an
19 election office, correct?
20 A.  Yes.
21 Q.  It does not necessarily mean unattended box in which
22 voters drop their completed ballots?
23 A.  It could be one of those boxes.
24 Q.  And it could not be?
25 A.  It could -- yeah.

Eric McDaniel – Cross

1   Q.  Now, I want to clarify, what is --

2           THE COURT:  I'm sorry.  Let me -- so I'm confused now

3   what you mean by this.

4           Are you including drive-through voting also in that

5   term?

6           THE WITNESS:  No.  Drive-through voting would

7   probably -- would most likely fall under early voting.

8           This is more of the absentee ballot being dropped off

9   at a particular location.

10          MS. HUNKER:  There are some states, Your Honor, who

11  have boxes that --

12          THE COURT:  I'm familiar with that.  But I wasn't

13  sure how expansive that term meant now.  I'm clear now.

14  BY MS. HUNKER:

15  Q.  Now, I want to clarify what is and is not contained in the

16  four corners of your report.

17      In preparation for writing your reports, you did not read

18  any of the predecessor bills that were being considered in the

19  lead-up to Senate Bill 1?

20  A.  No.

21  Q.  And you did not read any of the legislative record

22  pertaining to Senate Bill 1?

23  A.  No.

24  Q.  You did not look at any of the written testimony that was

25  submitted for or against Senate Bill 1?

Eric McDaniel – Cross

```
 1  A.  No.
 2  Q.  And accordingly, you're not testifying with respect to a
 3  legislative intent?
 4  A.  No.
 5  Q.  You offer no conclusions in your report that the
 6  legislature adopted Senate Bill 1 for a specific purpose?
 7  A.  Excuse me?
 8  Q.  You offer no conclusions in your reports that the
 9  legislature adopted Senate Bill 1 for a specific purpose?
10  A.  No.
11  Q.  And that's true of all three of your reports?
12  A.  Correct.
13  Q.  In your original report and your second supplemental
14  report, you insert a background section, correct?
15  A.  Correct.
16  Q.  These background sections provide a summary of the events
17  leading to the litigation?
18  A.  Correct.
19  Q.  Specifically, the background section references events
20  during the 2020 General Election?
21  A.  Correct.
22  Q.  You added these background sections to provide context?
23  A.  Yes.
24  Q.  They are not part of your -- the conclusions as an expert?
25  A.  They were put there to establish the context.  So they
```

Eric McDaniel – Cross

1  are -- my conclusions are based upon what I believe the impact

2  would be, but my conclusion is not based upon what led up to

3  it.

4  Q.  Okay.  So your conclusions are about the stuff that

5  occurred really after Senate Bill 1.  It is not -- your

6  conclusions do not extend to the factual background of the

7  events in 2020?

8  A.  The factual background is about the events that did

9  lead -- that were part of the 2020 election and the turnout

10  and types of turnout in the 2020 election in the original

11  report, but the February 10th, 2023 report was in relation to

12  turnout in the 2022 election.

13  Q.  You were not retained to offer expert testimony on the

14  factual background leading up to this litigation, correct?

15  A.  Could you repeat that?

16  Q.  You were not retained to offer expert testimony on the

17  factual background leading up to this litigation?

18  A.  No.

19  Q.  You mentioned drive-through voting in your background

20  sections, correct?

21  A.  Correct.

22  Q.  But you did not analyze drive-through voting?

23  A.  No.

24  Q.  You did not assess who utilized drive-through voting when

25  it was offered?

Eric McDaniel – Cross

1   A.  No.

2   Q.  You, therefore, did not analyze which racial demographics

3   were more likely to utilize drive-through voting?

4   A.  Correct.

5   Q.  Likewise, you do not assess the impact of drive-through

6   voting on wait times?

7   A.  No, I do not.

8   Q.  Instead, your original report addresses five topics that

9   counsel went over with you.

10      One, racial differences in voting method; two, racial

11  differences in wait time for in-person voting; three, racial

12  differences in submitting absentee ballots; four, racial

13  impact of the expansion of early voting hours in counties with

14  population between 55,000 and 99,000; and five, patterns of

15  voter intimidation in the 2020 General Election?

16  A.  Correct.

17  Q.  Your first supplemental report responds to Dr. Hoekstra's

18  critiques of your initial findings?

19  A.  Correct.

20  Q.  Your second supplemental report addresses changes in early

21  voting and rejections of mail ballots?

22  A.  Correct.

23  Q.  And that's a fair high elevation summary of the topics

24  addressed by your three reports?

25  A.  Yes, it is.

Eric McDaniel – Cross

1   Q.  Let's talk a little bit about where you derived your
2   understanding of Senate Bill 1.  Then once we finish that,
3   we'll go over some of the topics you discussed in your three
4   reports.  Okay?
5   A.  Okay.
6   Q.  In preparation for your report, you read portions of
7   Senate Bill 1?
8   A.  Yes.
9   Q.  Specifically, you read the sections that pertain to early
10  voting and mail voting?
11  A.  Yes.
12  Q.  You did not look at any of the provisions of the Election
13  Code outside of Senate Bill 1?
14  A.  No.
15  Q.  You did not read any of the election advisories issued by
16  the Secretary of State's office about Senate Bill 1?
17  A.  No.
18  Q.  You did not read any of the election advisories issued by
19  the Secretary of State?
20  A.  No.
21  Q.  At some point before writing your original report, you
22  read -- you read a memorandum about Senate Bill 1 sent by
23  Isabel Longoria?
24  A.  Yes.
25  Q.  But, otherwise, you did not review any of the guidance

1  materials prepared by the counties in response to Senate

2  Bill 1?

3  A.  No.

4  Q.  You did not review any guidance materials issued by Texas

5  counties about the implementation of Senate Bill 1 in

6  preparation for your second supplemental report?

7  A.  No.

8  Q.  You did not consult anybody when coming to your

9  interpretation of Senate Bill 1?

10  A.  Correct.

11  Q.  Likewise, you did not base your interpretation of Senate

12  Bill 1 on your own reading of the statute's text?

13  A.  Correct.

14  Q.  Instead, for your original report and your first

15  supplemental report, you relied on articles of the *Texas

16  Tribune* when arriving at the interpretation of relevant SB1

17  provisions?

18  A.  It was a combination of those articles and my review of

19  SB1.

20  Q.  And for your second supplemental report, you referenced

21  the *Texas Tribune* when coming to your interpretation of Senate

22  Bill 1, correct?

23  A.  Yes.

24  Q.  But you also referenced other news articles related to the

25  effects of Senate Bill 1?

2942
Eric McDaniel – Cross

1  A.  Yes.

2  Q.  When looking at the provisions of Senate Bill 1, you did

3  not look to see how the provisions existed prior to the

4  legislation?

5  A.  Correct.

6  Q.  You did not seek to determine how the provisions changed

7  compared with preexisting law?

8  A.  Correct.

9  Q.  You did not look to see how the statutes were interpreted

10  prior to the enactment of Senate Bill 1?

11  A.  Correct.

12  Q.  And this is true for all three of your reports?

13  A.  Correct.

14  Q.  Turning to racial differences and voting method, in your

15  original report, you determined that blacks are more likely to

16  vote absentee than their white and Hispanic counterparts?

17  A.  Correct.

18  Q.  You also concluded that white and Hispanics are

19  significantly more likely to vote in person using early voting

20  compared to blacks?

21  A.  Correct.

22  Q.  And that white and Hispanics are marginally more likely to

23  vote in person on election day compared to blacks?

24  A.  Correct.

25  Q.  In making this determination, you looked at the

2943

Eric McDaniel – Cross

1  Cooperative Election Study?

2  A.  Correct.

3  Q.  Specifically, you looked at the Cooperative Election Study

4  conducted in 2016 and 2020?

5  A.  Correct.

6  Q.  You did not look at data from the 2014 and 2018 reports?

7  A.  Correct.

8  Q.  You did not look at Cooperative Election Study data from

9  any other election besides 2020 and 2016 when arriving at your

10  findings on racial differences in voting methods?

11  A.  Correct.

12  Q.  You chose 2020 and 2016 because they were Presidential

13  Elections?

14  A.  Correct.

15  Q.  The November 2022 election, however, the first General

16  Election after SB1, was not a Presidential Election?

17  A.  Correct.

18  Q.  It was a Midterm Election?

19  A.  Correct.

20  Q.  And you'd agree that, generally, more people vote in a

21  Presidential than a Midterm Election?

22  A.  Yes.  Correct.

23  Q.  You'd also agree that the 2020 General Election was

24  atypical?

25  A.  Yes.

Eric McDaniel – Cross

1  Q.  It occurred in the midst of the COVID-19 pandemic?

2  A.  Yes.

3  Q.  The COVID-19 pandemic presented obstacles to counties when

4  administering elections?

5  A.  Yes.

6  Q.  You'd agree that, to overcome these obstacles, counties

7  developed new policies and procedures that deviated from their

8  usual practice?

9  A.  Yes.

10  Q.  You'd agree that, to overcome these obstacles, counties

11  adjusted their election infrastructure?

12  A.  Yes.

13  Q.  The COVID-19 pandemic also presented obstacles to voters

14  when attempting to cast their ballot; is that right?

15  A.  There were perceived obstacles amongst voters,

16  specifically those who feared that voting in person might lead

17  to contracting the illness.

18  Q.  So 2020, there appeared to be a greater need for the use

19  of absentee ballots because of fears of the virus?

20  A.  Yes.

21  Q.  And in Texas, we, in fact, did see significant increase in

22  the percentage of those who voted by mail?

23  A.  Yes.

24  Q.  And as a consequence, the 2020 General Election is not

25  really analogous to the 2016 General Election?

Eric McDaniel – Cross

1  A.  It is, in the sense that they're both Presidential

2  Elections.  Furthermore, since SB1 was created in response to

3  2020, that 2016 serves as a good comparison.

4  Q.  But 2020 was an atypical election year, correct?

5  A.  Correct.

6  Q.  And you had higher turnout in 2020 than past Presidential

7  Elections in Texas?

8  A.  Correct.

9  Q.  And you had higher early voting than past elections,

10  correct?

11  A.  Correct.

12  Q.  And you had higher absentee ballots compared to past

13  Presidential Elections?

14  A.  Correct.

15  Q.  And so in those respects, 2020 is not analogous to 2016,

16  correct?

17  A.  In certain regards, yes.

18  Q.  And 2020 is not analogous to 2022 General Election?

19  A.  No, they are not.  And that's why I did not focus on -- my

20  report focuses on the change in turnout as opposed to

21  comparing them directly, as I did in the first report.

22  Q.  Thank you.

23      Nevertheless, you did base your analysis on 2020 and 2016

24  as the single point of comparison?

25  A.  The drop in turnout, yes.

Eric McDaniel – Cross

1  Q.  I want to bring up State Exhibit 9, which is
2  Dr. Hoekstra's response to your initial report.
3      The State's expert, Dr. Hoekstra, wrote a rebuttal to your
4  original report.  Let's take a quick look at Page 3, paragraph
5  7A.
6      In his rebuttal, Dr. Hoekstra criticizes your decision to
7  ignore data from 2018 and 2014, correct?
8  A.  Correct.
9  Q.  And he states that you ignored data that directly
10 contradicted your findings; is that right?
11 A.  That is not correct.
12 Q.  Well, that's what he said; is that right?
13 A.  That is what he says.
14 Q.  And I'm not here to argue otherwise.  I simply want to
15 talk with you about the exchange you had with Dr. Hoekstra.
16 My question is going to be about his analysis of those two
17 election years.
18     If we turn to Page 7, paragraph 16, Dr. Hoekstra
19 determines that black voters were less likely to vote absentee
20 than white voters in 2018 and 2014; is that right?
21 A.  Yes.
22 Q.  And the results of this analysis are illustrated in Table
23 1 on the following page, correct?
24 A.  Correct.
25 Q.  You did not conduct an analysis of the data from 2018 and

Eric McDaniel – Cross

```
 1  2014 after Dr. Hoekstra wrote his rebuttal?
 2  A.  Correct.
 3  Q.  So you don't know whether his numbers are accurate?
 4  A.  Correct.
 5  Q.  When you made the assertion that black voters were more
 6  likely to vote absentee, you did not assess the reason why
 7  black voters may be more likely to vote absentee; is that
 8  right?
 9  A.  I did not assess that.
10  Q.  And so you do not know whether those reasons remain?
11  A.  I have no reason to believe the reasons have changed.
12  Q.  And so you don't know one way or the other?
13  A.  Correct.
14  Q.  I'm going to put on display State Exhibit 291.  Do you
15  have it on your screen?
16  A.  Yes.
17  Q.  This is a report from the Center of Disease Controls about
18  risk for COVID–19 infection, hospitalizations and death, by
19  race and ethnicity, correct?
20  A.  Correct.
21  Q.  And if we look at the ratio rates compared to white
22  non–Hispanic persons and then black non–Hispanic persons, it
23  says that black or African–American non–Hispanic persons had a
24  case rate of 1.1 compared to white non–Hispanic persons?
25  A.  Correct.
```

2948
Eric McDaniel – Cross

1  Q.  It also says that black or African-American non-Hispanic
2  persons had a hospitalization rate 2.1 times the ratio
3  compared to whites, correct?
4  A.  Correct.
5  Q.  And it says that black or African-American non-Hispanic
6  persons had a death ratio for COVID-19 at 1.6 times a ratio
7  compared to white non-Hispanic persons, correct?
8  A.  Correct.
9  Q.  And you're aware that black or African-Americans had a
10  higher case ratio with COVID-19?
11  A.  Correct.
12  Q.  And you're aware that black or African-American
13  non-Hispanic persons had a hospitalization ratio higher than
14  white non-Hispanics?
15  A.  Yes.
16  Q.  And you're also aware that black or African-American
17  non-Hispanic persons had a higher death ratio compared to
18  white non-Hispanic persons?
19  A.  Yes.
20  Q.  And you'd agree with me that that information was
21  publicized that black African-Americans had worse health
22  outcomes with respect to COVID-19 during the 2020 General
23  Election?
24  A.  Yes.
25  Q.  However, you do not have any data on how the knowledge

Eric McDaniel – Cross

1  that black or African-Americans had worse health outcomes for

2  COVID-19 affected voting behavior?

3  A.  No, I do not.

4       MS. HUNKER:  Your Honor, with your permission, I move

5  for judicial notice on State Exhibit 291 and the information

6  contained within.  The data was taken from the CDC, who was

7  tasked by the federal government to track data related to

8  COVID-19 and health outcomes.

9       Moreover, the fact that black Americans had worse

10 health outcomes for COVID-19 is not subject to reasonable

11 dispute.  In fact, we had just heard Dr. Kousser raise a

12 similar point in his direct examination.

13      THE COURT:  Any response?

14      MR. BIETER:  No, Your Honor.

15      THE COURT:  State 291 is admitted.

16 BY MS. HUNKER:

17 Q.  Dr. McDaniel, I only have a few more questions before we

18 can close out this topic.

19 A.  Okay.

20 Q.  In your second report, you did not conduct an analysis of

21 whether blacks are more likely to vote absentee than white or

22 Hispanic counterparts?

23 A.  Those data were not available.

24 Q.  Your second report, instead, incorporated the analysis you

25 conducted in your original report; is that right?

2950
Eric McDaniel – Cross

1  A.  Could you repeat that one more time?

2  Q.  Sure.

3      Your second report, instead, incorporated the analysis you

4  conducted in your original report?

5  A.  No.  It refers back to those findings.  But the data used

6  for the second -- for the second report is data taken from the

7  Secretary of State's web page.

8  Q.  So the word "incorporated" was maybe incorrect.  It refers

9  back?

10  A.  Yes.

11  Q.  You do not specifically assess the rate in which black

12  voters voted absentee for the November 2022 General Election?

13  A.  Those data were not available.

14  Q.  You did not specifically assess the rate in which black

15  voters voted absentee compared to their white Hispanic or

16  Asian counterparts in the November 2022 General Election?

17  A.  Those data were not available at the time.

18  Q.  You did not specifically assess the rates in which

19  Hispanic voters voted absentee in the November 2022 General

20  Election?

21  A.  Those data were not available.

22  Q.  And you did not specifically assess the rate at which

23  Hispanic voters voted absentee compared to their white or

24  Asian counterparts in the November 2022 General Election?

25  A.  Those data were not available.

2951
Eric McDaniel – Cross

1  Q.  Let's turn to wait times.

2      In your initial report, you provided your opinion on

3  racial differences in wait times, correct?

4  A.  Correct.

5  Q.  And you concluded that black Texans reported longer wait

6  times than their white or Hispanic counterparts?

7  A.  Correct.

8  Q.  You did not arrive at any conclusion regarding wait times

9  of Asian-Americans; is that right?

10  A.  The sample size was not large enough.

11  Q.  And you arrived at this conclusion also using the

12  Cooperative Election Study data?

13  A.  Correct.

14  Q.  And like before, you analyzed data from 2020 and 2016?

15  A.  Correct.

16  Q.  I want to go again back to Dr. Hoekstra's response to your

17  original report.

18      On Page 9, paragraph 19, Dr. Hoekstra raises two

19  criticisms of your analysis, correct?

20  A.  Correct.

21  Q.  His first criticism is that voters are asked to pick an

22  appropriate category for their wait times but that it's hard

23  to determine where in that range the voters fall; is that

24  right?

25  A.  Correct.

Eric McDaniel – Cross

1  Q.  And his second criticism is that it's difficult to

2  interpret the results of an ordered logit model?

3  A.  Yes, ordered logit, yes.

4  Q.  In the Cooperative Election Study, voters reported --

5  self-reported wait times in five categories; is that right?

6  A.  Correct.

7  Q.  And these wait times were:  No wait, less than ten

8  minutes, ten minutes to 30 minutes, 30 minutes to 60 minutes,

9  an hour or more?

10  A.  Correct.

11  Q.  This means if a voter waited one minute, the voter could

12  put less than ten minutes?

13  A.  Correct.

14  Q.  Likewise, if a voter waited nine minutes, the voter could

15  put less than ten minutes?

16  A.  Correct.

17  Q.  And so if a voter waited 11 minutes, the voter could put

18  10 minutes to 30 minutes?

19  A.  Correct.

20  Q.  And if a voter waited 29 minutes, the voter could put

21  between 10 minutes and 30 minutes?

22  A.  Correct.

23  Q.  Even though he waited 19 minutes more?

24  A.  Correct.

25  Q.  You didn't try to guess where the person actually -- let

Eric McDaniel – Cross

1    me rephrase that.

2        You didn't want to try to guess where the person actually

3    fell within these ranges, so you went with what's the

4    probability; is that right?

5    A.  I went with the probability they would choose one of

6    these, yes.

7    Q.  In contrast to your ordered -- can you say the word one

8    more time?

9    A.  Logit.

10   Q.  -- logit model, Dr. Hoekstra performed an interval

11   regression model, correct?

12   A.  Correct.

13   Q.  And his analysis included data from 2018?

14   A.  Correct.

15   Q.  And he determined that white voters waited longer than

16   black voters in 2018?

17   A.  Correct.

18   Q.  You did not assess the interval regression model that

19   Dr. Hoekstra used?

20   A.  No, I did not.

21   Q.  So you do not know the accuracy of his analysis?

22   A.  No, I do not.

23   Q.  You did not look at the reasons why demographic groups

24   experienced wait times?

25   A.  No.  When I did the analysis, I did try to account for

Eric McDaniel – Cross

1  things such as population density.  So that might increase
2  wait times.  So I did have some control variables within there
3  to account for outside things that might be causing this.
4  Q.  So you controlled for some factors, but couldn't look at
5  all factors why certain demographic groups experienced wait
6  times?
7  A.  Yes.
8  Q.  And so you wouldn't know if these factors continue to
9  exist today?
10  A.  Repeat that question.
11  Q.  So you wouldn't know if those factors, the ones you didn't
12  analyze, continue to exist today?
13  A.  I'd have no reason to believe they've changed.
14  Q.  But no reason to believe that they've stayed the same?
15  A.  Yes.
16  Q.  You're familiar with countywide voting, correct?
17  A.  Yes.
18  Q.  And that is where a voter can vote at any polling place
19  within the county?
20  A.  Correct.
21  Q.  You do not know which counties had countywide voting in
22  2016?
23  A.  No.
24  Q.  You do not know which counties had countywide voting in
25  2020?

Eric McDaniel – Cross

1   A.   No.

2   Q.   You do not know which counties had countywide voting in

3   2022?

4   A.   No.

5   Q.   And so you don't know whether the number of counties with

6   countywide votings increased between 2016 and 2020?

7   A.   No.

8   Q.   And you don't know whether the number of counties with

9   countywide voting increased between 2020 and 2022?

10  A.   No.

11  Q.   And you haven't looked to determine whether countywide

12  voting helps address wait times experienced by Texas voters?

13  A.   No.

14  Q.   And, again, you would agree that 2020 and 2016 were

15  Presidential Elections, correct?

16  A.   Correct.

17  Q.   And that Presidential Elections tend to have higher

18  turnouts than non-Presidential Elections?

19  A.   Correct.

20  Q.   The 2020 election was even a high turnout compared to

21  Presidential Elections?

22  A.   Yes.

23  Q.   And higher turnout can have an effect on wait times?

24  A.   Correct.

25  Q.   You'd agree that there are more non-Presidential Elections

Eric McDaniel – Cross

1  than Presidential Elections that are held?

2  A.  Yes.

3  Q.  Dr. McDaniel, I'm going to ask a few more questions about

4  your second supplemental report, and then we can close out the

5  topics of wait times.

6      In your second supplemental report, you did not conduct an

7  analysis of whether black Texans reported longer wait times

8  than their white or Hispanic counterparts?

9  A.  Those data were not available.

10 Q.  You did not conduct additional analysis of whether

11 Hispanic Texans reported longer wait times than their white

12 counterparts?

13 A.  Those data were not available.

14 Q.  You, in fact, do not address racial differences in wait

15 times for in-person voting in your second supplemental report

16 at all?

17 A.  Those data were not available.

18 Q.  And so you did not address in your second supplemental

19 report the wait times that were for black voters in the

20 November 2022 General Election?

21 A.  I lacked the data to conduct that analysis.

22 Q.  And you did not address or analyze the wait times that

23 were for Hispanic voters in the 2022 General Election?

24 A.  I did not have the data to conduct that analysis.

25 Q.  And you did not conduct an analysis of wait times for

2957
Eric McDaniel – Cross

1  white voters during the 2022 General Election?

2  A.  I did not have the data.

3  Q.  And you didn't conduct any assessment on whether SB1

4  contributed to wait times in the November 2022 General

5  Election?

6  A.  No, I did not.

7  Q.  You did not assess whether SB1 contributed to longer wait

8  times for black or Hispanic Texans during the November 2022

9  General Election?

10 A.  No, I did not.

11 Q.  And you make no conclusions one way or the other of

12 whether SB1 contributed to wait times for black or Hispanic

13 voters in the November 2022 General Election?

14 A.  There's no discussion of wait times in that report.

15 Q.  Let's turn to racial differences in submitting absentee

16 ballots.

17     In your initial report, you provided your opinion on

18 racial differences in submitting absentee ballots specifically

19 with respect to dropoff locations?

20 A.  Correct.

21 Q.  The conclusion you arrive in your initial report was that

22 Hispanic Texans had a significantly higher probability of

23 submitting their ballot at specified locations compared to

24 whites?

25 A.  Correct.

Eric McDaniel – Cross

1  Q.  And, again, in making this determination, you relied on

2  the Cooperative Election Study?

3  A.  Correct.

4  Q.  In particular, you analyzed data from 2020?

5  A.  That's the only year -- that is first year that question

6  was asked.

7  Q.  Yeah.

8     So for the other topics we discussed, wait times, voting

9  methods, you cited data from 2016 to act as sort of a

10  counterbalance to 2020, correct?

11  A.  Correct.

12  Q.  And that's because 2020 was an atypical election year?

13  A.  Well, because SB1 was created in response to 2020.  That's

14  the primary reason why I used 2020.  And 2016 was the

15  comparison.

16     Furthermore, 2016 was used to demonstrate that this was

17  not a one-time thing.  These -- were not a one-time thing.

18  Q.  Brian, can you pull up the 2022 deposition, Page 89, lines

19  12 through 13.

20     All right.  I obviously wrote down the wrong quote.  So

21  we'll move on.

22  A.  Okay.

23  Q.  Because of the way the Cooperative Election Study was

24  conducted, the Cooperative Election Study only added --

25     Ah, thank you.  It was 88.

Eric McDaniel – Cross

1        Do you have the lines on the screen?

2    A.  Yes, I do.

3    Q.  And do you recall, in 2022, you and I having a nice

4    morning chat?

5    A.  Yes.  Yes.

6    Q.  And during that deposition, I asked you:  "And was this

7    because 2020 was an atypical year?"

8        And you responded, "Yes."

9    A.  Correct.

10   Q.  Do you stand by that statement?

11   A.  Yes.

12   Q.  So I'm going to reask the question I was just about to ask

13   before Brian fixed my mistake.

14       Because of the way the Cooperative Election Study was

15   conducted, the study only added the question regarding ballot

16   delivery in 2020?

17   A.  Correct.

18   Q.  So you do not have a comparison year that you could cite

19   in your report?

20   A.  Correct.

21   Q.  The only year we have to analyze ballot delivery is 2020

22   election?

23   A.  Correct.

24   Q.  And I recognize that in-person delivery of mail ballots is

25   a new practice.  So there isn't necessarily going to be many

1  studies looking at that question, correct?

2  A.  Regarding —— could you repeat that question?  I'm sorry.

3  Q.  Sure.

4      Because in-person delivery of mail ballots is a new

5  practice, there's not going to be that many studies looking at

6  that question?

7  A.  There is one study in particular from —— that stands out.

8  And that was cited in my report.

9  Q.  And 2020 was the same year that the COVID-19 was at its

10  height, right?

11  A.  Yes.

12  Q.  And it was also the same election that Governor Abbott

13  expanded the number of days that a voter could hand-deliver

14  their mail ballots?

15  A.  Yes.

16  Q.  And, again, you did not look at to see how the provisions

17  amended by Senate Bill 1 existed prior to the bill's passage?

18  A.  Correct.

19  Q.  And so you don't know what effect eliminating the relevant

20  provisions in Senate Bill 1 would have on the procedures and

21  practices related to ballot delivery in the various Texas

22  counties?

23  A.  Correct.

24  Q.  Dr. McDaniel, you did not analyze the burden that

25  returning a ballot by mail —— let me rephrase that.

2961

Eric McDaniel – Cross

1      You didn't analyze the burden that returning a ballot via

2  mail or an election center imposes on black or Hispanic

3  voters?

4  A.  No.  But there is work that is established that having

5  multiple drop-boxes leads to people -- people are more likely

6  to use a drop-box that's close to them.  When there's a

7  drop-box close to them, they're more likely to vote.

8  Q.  But you did not specifically look at what the burden would

9  be on black and Hispanic voters?

10  A.  No, I did not.

11  Q.  Turning to your second supplemental report, you didn't

12  conduct an additional analysis of whether Hispanic voters were

13  more likely to submit their ballot at a specified location as

14  compared to whites?

15  A.  That data was not available.

16  Q.  And you did not conduct an analysis of whether blacks were

17  more likely to submit their ballots at a specified location as

18  compared to whites?

19  A.  That data was not available.

20  Q.  And you did not specifically assess whether or not

21  Hispanics continued to exhibit the higher probability of

22  submitting their ballot at a specified location as compared to

23  whites in the November 2022 General Election?

24  A.  Those data were not available.

25  Q.  And you did not specifically assess whether black voters

Eric McDaniel – Cross

1  had a higher probability of submitting their ballot at a

2  specified location as compared to whites in the November '22

3  General Election?

4  A.  Again, those data were not available.

5  Q.  I want to shift topics.  Let's discuss early voting hours

6  in counties with populations between 55,000 and 99,000.

7      In your original report, you determined that counties with

8  population under 55,000 had significantly less wait time than

9  counties with populations between 55,000 and 99,000, as well

10 as counties with a population over 100,000; is that right?

11 A.  The descriptive statistics demonstrate that.  But once you

12 account for differences in size, a lot of those differences go

13 away.

14 Q.  And you assert that while counties with a population of

15 55,000 represent less than five percent of the state's

16 population, they contain larger percentages of the state's

17 white population compared to black and Hispanics?

18 A.  Correct.

19 Q.  And so you, therefore, conclude the new policies will

20 improve wait times for whites, while doing little for black or

21 Hispanic wait times?

22 A.  Correct.

23 Q.  Let's go back to Dr. Hoekstra's response to your original

24 report, specifically page 14, paragraph 30.

25      Dr. Hoekstra contends that you make an assertion about the

2963
Eric McDaniel – Cross

1  casual impact of a policy change based entirely on the

2  demographics of the counties being impacted, correct?

3  A.  Correct.

4  Q.  And he contends that implicit in your conclusions is a set

5  of assumptions about how black and white voters will respond

6  to the option of early voting?

7  A.  Correct.

8  Q.  My question for you is that you did not assess how

9  specific demographics within those small counties would react

10  to the expanded hours, correct?

11  A.  Correct.

12  Q.  And you did not assess whether black or Hispanic voters in

13  rural communities had different voting practices than black or

14  Hispanic voters in urban areas?

15  A.  Correct.

16  Q.  You did not analyze whether other provisions in Senate

17  Bill 1 would have expanded access to voting?

18  A.  No.

19  Q.  You, therefore, did not analyze whether other provisions

20  in Senate Bill 1 would have expanded access to black and

21  Hispanic voters specifically?

22  A.  No.

23  Q.  So, for example, you didn't consider the provision in SB1

24  that expanded protections for workers being able to take off

25  time from work to vote during the early voting period?

Eric McDaniel – Cross

1   A.  No, I did not.

2   Q.  You did not consider the provision that ensured if a voter

3   is standing in line when polls close during early voting

4   period, the voter must be allowed to vote?

5   A.  No, I did not.

6   Q.  And you did not consider the addition of the cure process

7   for mail-in ballots with defects while making your analysis?

8   A.  No, I did not.

9   Q.  And you didn't assess whether these additional protections

10  would benefit certain demographic groups compared to others?

11  A.  No, I did not.

12  Q.  Dr. McDaniel, we're going to change topics one last time.

13  A.  Okay.

14  Q.  I want to now address some of your conclusions regarding

15  voter intimidation, specifically how it applies to poll

16  watchers.

17  A.  Uh-huh.

18  Q.  In your report, you state that the 2020 election saw

19  increased concerns about voter intimidation, correct?

20  A.  Correct.

21  Q.  You also state that there was an increased number of

22  incidents of voter intimidation during the 2020 election?

23  A.  Correct.

24  Q.  To make this assertion, you relied on secondary sources;

25  is that right?

Eric McDaniel – Cross

1   A.  Correct.

2   Q.  You did not assess the alleged incidents of voter

3   intimidation yourself?

4   A.  No, I did not.

5   Q.  You, instead, based your conclusions on the information

6   found in secondary sources?

7   A.  Correct.

8   Q.  The secondary sources you relied on to conclude in your

9   initial report that there was an increased number of incidents

10  are listed in footnote 16, 17 and 18, correct?

11  A.  Correct.

12  Q.  And for the purposes of your initial report, you did not

13  rely on any additional sources to conclude that there was an

14  increased number of incidents of voter intimidation in 2020?

15  A.  Just those reports.

16  Q.  Let's go look at some of these sources.  And we're going

17  to start with footnote 18.  And do you see the footnote on

18  your screen?

19  A.  Yes.

20  Q.  Footnote 18 refers to a report published by the Texas

21  Civil Rights Project, correct?

22  A.  Correct.

23  Q.  The report is titled "Voter Intimidation in Texas During

24  the 2020 General Election"?

25  A.  Correct.

Eric McDaniel – Cross

1  Q.  As the title suggests, the report discusses voter

2  intimidation incidents that occurred in 2020?

3  A.  Correct.

4  Q.  The incidents that are described in this report do not

5  refer to poll watchers?

6  A.  No.

7  Q.  When you were referring to increase of incidents, you were

8  referring to voter intimidation generally, correct?

9  A.  Correct.

10  Q.  So you were not referring to in-person voter intimidation

11  by poll watchers?

12  A.  Correct.

13  Q.  In the report, the Texas Civil Rights Project cites data

14  from a different organization, the Election Protection

15  Coalition?

16  A.  Correct.

17  Q.  Specifically, it references the number of reports of voter

18  intimidation the Election Protection Coalition received during

19  the 2020 General Election?

20  A.  Correct.

21  Q.  You quoted this number in your initial report?

22  A.  Correct.

23  Q.  You did not look at the details of the incidents reported

24  to the Election Protection Coalition?

25  A.  No, I did not.

Eric McDaniel – Cross

1  Q.  And you're not aware of any incident reported to the

2  Election Protection Coalition that involved poll watchers?

3  A.  No, I'm not aware of those.

4  Q.  There is nothing in the Texas Civil Rights Project report

5  that identifies poll watchers engaging in voter intimidation?

6  A.  Correct.

7  Q.  Let's turn to footnote 17.

8     In footnote 17, you cite a *USA Today* article called "Voter

9  Intimidation is Surging in 2020.  Fight for the Right That

10 Begets All Rights."

11    Did I read that correctly?

12 A.  Yes.

13 Q.  According to the footnote, this article was published

14 October 27th, 2020, correct?

15 A.  Yes.

16 Q.  And so this would have been before election day but while

17 early voting was taking place, correct?

18 A.  Yes.

19 Q.  And this piece was written by Kristen Clarke, correct?

20 A.  Correct.

21 Q.  And she is an opinion contributor, correct?

22 A.  Correct.

23 Q.  And so this is an opinion piece as opposed to an article

24 that would have appeared in the news section of the *USA Today*?

25 A.  Kristen Clarke is an expert in this area, and so she is

1  well aware of that.  So while this is not a –– she's not a

2  journalist for *USA Today*, she is someone who works in this

3  area.

4  Q.  But it is an opinion piece, correct?

5  A.  Correct.

6  Q.  And this piece does not cite any specific incident of

7  voter intimidation that occurred in the 2020 election?

8  A.  I believe it does.  It does refer to claims of action but

9  not on election day.  This was published before election day.

10 Q.  And did not provide any specific examples of voter

11 intimidation during the 2020 election in Texas?

12 A.  No.

13 Q.  It does not give examples of voter intimidation in the

14 2020 election in Texas by a poll watcher?

15 A.  No.

16 Q.  Let's move to footnote 16.

17     And this footnote references a news article published in

18 *The Independent*, correct?

19 A.  Correct.

20 Q.  According to the footnote, the article was published on

21 October 12th, 2020?

22 A.  Correct.

23 Q.  That was before early voting began in Texas, correct?

24 A.  Correct.

25 Q.  And the article does not provide any specific examples of

1  voter intimidation during the 2020 election in Texas?

2  A.  No.

3  Q.  And the article does not give any examples of voter

4  intimidation in the 2020 election in Texas by a poll watcher?

5  A.  No.

6  Q.  In your first supplemental report, you cite a few more

7  sources, correct?

8  A.  Correct.

9  Q.  You cite, in footnote 10, the Lapp article published by

10 the *SLU Law Journal* online?

11 A.  Yes.

12 Q.  And you cite in footnote 11 a *Washington Post* article?

13 A.  Yes.

14 Q.  The Lapp article does not specifically look at Texas?

15 A.  I don't have it right in front of me, but I do not believe

16 it's focused specifically on Texas.

17 Q.  It, therefore, does not provide any specific examples of

18 voter intimidation during the 2020 election in Texas?

19 A.  No.

20 Q.  It does not give any examples of voter intimidation in the

21 2020 election in Texas by a poll watcher?

22 A.  No.

23 Q.  The *Washington Post* article, in contrast, does address

24 events in Texas, correct?

25 A.  I need to -- it is not in front of me at this moment.  So

2970

Eric McDaniel – Cross

1  I need to reference that article.

2  Q.  Okay.  You don't know if it was referring to poll

3  watchers, correct?

4  A.  It did not specifically refer to poll watchers.

5  Q.  And so I'm going to ask my next question with respect to

6  the initial report and then your first supplemental report.

7      In your original report, you do not have any specific

8  evidence establishing that poll watchers participated in voter

9  intimidation of voters in Texas?

10  A.  Correct.

11  Q.  In your first supplemental report, you do not have any

12  specific evidence establishing that poll watchers participated

13  in voter intimidation of voters in Texas?

14  A.  Correct.

15  Q.  As part of your analysis on voter intimidation, you tried

16  to examine correlations related to reported incidences of

17  voter intimidation and historical lynching, correct?

18  A.  Correct.

19  Q.  And some of the factors you looked at were county size and

20  the support of Donald Trump?

21  A.  Correct.

22  Q.  Your analysis looks at patterns, correct?

23  A.  Correct.

24  Q.  You cannot identify necessarily the cause?

25  A.  The underlying cause is that if the county has a history

2971
Eric McDaniel - Cross

1  of racial terrorism, it will more likely -- it was more likely

2  to engage -- individuals in this county are more likely to

3  engage in that.

4  Q.  And that's a correlation, correct?

5  A.  Correct.

6  Q.  It is not a causation?

7  A.  No.

8  Q.  When you were referring to reported lynchings, you were

9  referring to a specific source?

10 A.  Yes.

11 Q.  That source was Lynching in America:  Confronting the

12 Legacy of Racial Terror?

13 A.  Yes.

14 Q.  You did not conduct additional analysis of patterns of

15 voter intimidation in the 2020 General Election -- and I'm

16 going to strike that question for a moment.  I'll go back to

17 it in a minute.

18     This report looks at lynchings that occurred up to a

19 certain period of time?

20 A.  Correct.

21 Q.  Specifically, it looks at occurrences of lynching in the

22 United States, including in Texas, up till 1950?

23 A.  Correct.

24 Q.  And so this does not look at any alleged or confirmed

25 lynchings that occurred post-1950; is that right?

Eric McDaniel – Cross

1  A.  Yes.

2  Q.  And it does not look at any types of racial crimes that

3  have occurred or would have occurred post-1950?

4  A.  Correct.

5  Q.  And so in your report when you're referring to historical

6  instances of violence against African-Americans, you are

7  speaking about instances that would have occurred 1950 or

8  prior?

9  A.  Correct.

10  Q.  Let's go back to your initial report one more time where

11  it says "Opinions Expressed."

12      I have a few questions about subsection 2, and then I can

13  pass the witness to anyone else on my side who has questions.

14      In your initial report, you stated that Texas has given

15  greater power to partisan poll watchers, correct?

16  A.  Correct.

17  Q.  You also state that because of this increased power,

18  there's an increased concern about attempts at voter

19  intimidation?

20  A.  Correct.

21  Q.  Let's break down each of these assertions.

22      As we discussed earlier, for your initial report, you

23  based your interpretation of Senate Bill 1 on articles in the

24  *Texas Tribune*, correct?

25  A.  And my reading of Senate Bill 1.

Eric McDaniel – Cross

1  Q.  You didn't –– but you had said earlier you did not rely on

2  the reading of the statute, correct?

3  A.  Yes.

4  Q.  Nor did you contact any county official regarding the

5  statute's interpretation?

6  A.  Correct.

7  Q.  You did not look to see how the relevant provisions

8  existed prior to Senate Bill 1's enactment?

9  A.  Correct.

10  Q.  You did not know how the relevant provisions were

11  interpreted prior to SB1?

12  A.  Correct.

13  Q.  And so you do not know what powers partisan poll watchers

14  had prior to SB1?

15  A.  Correct.

16  Q.  You do not know what rights poll watchers had prior to

17  Senate Bill 1 to observe election activities?

18  A.  Correct.

19  Q.  And you do not know what limitations were imposed prior to

20  SB1 on poll watchers' observations of election-related

21  activities?

22  A.  Correct.

23  Q.  Nor do you know what limitations are imposed on poll

24  watchers now following the passage of Senate Bill 1?

25  A.  I am somewhat familiar with the limitations.

Eric McDaniel – Cross

1    Q.  When drafting your report, you did not assess the exact
2    ways in which Senate Bill 1 changed the rights and
3    responsibilities of poll watchers?
4    A.  Correct.
5    Q.  You do not assess poll watchers' power under the law?
6    A.  Repeat that question.
7    Q.  You do not assess poll watchers' power under the law?
8    A.  No, I do not.
9    Q.  Furthermore, we have established that you do not have any
10   specific evidence in your original report and first
11   supplemental report establishing that poll watchers
12   participated in voter intimidation of voters in Texas?
13   A.  Correct.
14   Q.  Nevertheless, you assert that Texas has given greater
15   power to partisan poll watchers and that, because of this
16   power, there's an increased concern about attempts at voter
17   intimidation, correct?
18   A.  Correct.
19   Q.  You do not conduct any assessment or analysis of poll
20   watchers in the November 2022 General Election?
21   A.  Those data were unavailable.
22   Q.  You do not assess or analyze the impact of poll watcher
23   provisions -- let me rephrase.
24       You do not analyze or assess the impact that poll watcher
25   provisions in Senate Bill 1 had on voter intimidation during

Eric McDaniel – Cross

1  the November 2022 General Election?

2  A.  Those data were unavailable.

3  Q.  Your second supplemental report does not address poll

4  watchers?

5  A.  Correct.

6  Q.  Your second supplemental report does not address voter

7  intimidation?

8  A.  Correct.

9  Q.  All your conclusions on poll watcher and voter

10 intimidation are contained in your original report and first

11 supplemental report?

12 A.  Correct.

13        MS. HUNKER:  No further questions.  Thank you for

14 your time, Dr. McDaniel.

15        THE WITNESS:  Thank you.

16        THE COURT:  Anybody else on this side?

17        MR. CAPOZZI:  Yes, Your Honor.

18                    CROSS-EXAMINATION

19 BY MR. CAPOZZI:

20 Q.  Good afternoon, Dr. McDaniel.  How are you today?

21 A.  I'm well.  Good afternoon.

22 Q.  Congratulations on your promotion to full professor.

23 A.  Thank you.

24 Q.  I only have one question about the 2022 initial report,

25 and then I'm mostly going to ask about the 2023 report.

Eric McDaniel – Cross

1    Before you wrote your reports in this case, you never read

2    the parts of SB1 addressing poll watchers, right?

3    A.  Correct.

4    Q.  And regarding your 2023 report, you based your

5    understanding of SB1's provisions on what the *Texas Tribune*

6    news articles and *Think Tank* articles said, right?

7    A.  And my own –– my own reading of sections of SB1.

8    Q.  Okay.  Let's talk about the methodology in your General

9    Election reports.  You took data from the Secretary of State's

10   website on voting patterns for each county in the 2020 and

11   2022 General Elections, right?

12   A.  Yes.

13   Q.  The Secretary of State received that data from each

14   county, right?

15   A.  Correct.

16   Q.  And the Secretary of State's office didn't alter or modify

17   that data.  It just presented the data as received from the

18   counties, right?

19   A.  From my understanding, that is correct.

20   Q.  And you didn't contact any of the counties to determine

21   whether the data that was provided to the Secretary of State's

22   office was correct, right?

23   A.  Correct.

24   Q.  You don't know the methodologies the counties use to track

25   the information regarding in–person and mail early voting,

Eric McDaniel – Cross

1  right?

2  A.  Correct.

3  Q.  When consulting the data from the Secretary of State's

4  office on early voting in 2020, you only accessed data on mail

5  ballots received by October 30th, 2020, right?

6  A.  Yes.  Because it only kept track of mail ballots received

7  by the last day of early voting.

8  Q.  But mail ballots can be received until election day,

9  right?

10  A.  Correct.

11  Q.  So there's a gap, a delta between the last day mail

12  ballots can be submitted and when they can be received, right?

13  A.  Correct.

14  Q.  And when analyzing the data, you didn't include the mail

15  ballots that would have been received after October 30th but

16  in time for the November 2020 General Election, right?

17  A.  No.  I primarily focused on in-person early voting.

18  Q.  Okay.  But you didn't analyze ballots received in the

19  delta between the last day of early voting and election day,

20  right?

21  A.  No, I did not.

22  Q.  And that's true of your analysis for the 2022 General

23  Election, too?

24  A.  The 2022 General Election is the only time -- only time I

25  used those data.  2020 is where I used the CES data.

Eric McDaniel – Cross

1  Q.  Understood.  Thank you for the clarification.
2      Let's talk about the 2023 report's discussion of in-person
3  early voting in the 2022 General Election.
4      For in-person early voting, the only data you looked at
5  was from the Secretary of State's web page, right?
6  A.  Correct.
7  Q.  And you compared the number of voters who used early
8  in-person voting in 2020 and 2022, right?
9  A.  Yes.
10 Q.  You couldn't conduct that same comparison between the 2022
11 and 2018 General Elections due to a lack of data, right?
12 A.  Yes.  The website only contains all 254 counties for 2020
13 and 2022.
14 Q.  And you couldn't conduct that same comparison between the
15 2022 and 2016 General Elections for the same reason, due to a
16 lack of data, right?
17 A.  Correct.
18 Q.  For the 2020 versus 2022 General Election comparison, you
19 calculated percentages of people who used early in-person
20 voting by dividing the number of people who use -- who voted
21 early in-person in each county by the total number of people
22 who voted in each election in that county, right?
23 A.  Correct.
24 Q.  As established, 2020 was a Presidential Election and 2022
25 was a Midterm Election, right?

Eric McDaniel – Cross

1   A.   Yes.  That's why I focused on the difference in turnout.

2   Q.   Okay.  And you agree that more voters cast ballots in

3   Presidential Elections, right?

4   A.   Yes.

5   Q.   And you agree that different sets of voters are interested

6   in voting in Presidential Elections than Midterm Elections,

7   right?

8   A.   In the state of Texas, because it was a gubernatorial

9   election, I would think that they would be very similar.

10  Q.   Brian, can you pull up the 2023 deposition, Page 54, lines

11  1 through 4.

12       "Question:  Would you agree with me that different sets of

13  voters are interested in voting in a Presidential Election as

14  compared to a midterm?

15       "Answer:  Yes."

16       Did I read that correctly?

17  A.   Yes.

18  Q.   And you would agree there was no Texas United States

19  Senate seat that was up for election in 2022, right?

20  A.   Yes.

21  Q.   There was a Texas United States Senate election in 2020,

22  right?

23  A.   Yes.

24  Q.   And there was a Texas United States Senate election in

25  2018, right?

Eric McDaniel – Cross

1  A.  Yes.

2  Q.  You're aware that the early voting period during the

3  November 2020 election was six days longer than in the 2022

4  General Election because Governor Abbott extended the early

5  voting period due to COVID in the 2020 General Election,

6  right?

7  A.  Yes.

8  Q.  Having an additional six days in 2020 gave the opportunity

9  for more voters to cast ballots through early in-person

10  voting, right?

11  A.  It gave the opportunity, yes.

12  Q.  And you didn't look at how Texas early voting turnout for

13  the November 2020 election compared to early voting turnout

14  nationwide, correct?

15  A.  No, I did not.

16  Q.  And you didn't look at how Texas early voting turnout in

17  the November 2022 General Election was comparable to early

18  voting turnout nationwide in 2022, right?

19  A.  No, I did not.

20  Q.  And you didn't assess whether Texas' early voting turnout

21  in the November 2022 General Election was comparable to the

22  nationwide race, right?

23  A.  No.

24  Q.  And you didn't assess whether the decline in early voting

25  turnout in Texas between 2020 and 2022 was of similar

Eric McDaniel – Cross

1  magnitude to what was experienced nationwide, right?

2  A.  The decline in early voting turnout?  Or the decline in

3  turnout?

4  Q.  The decline in early voting turnout.

5  A.  No, I did not.

6  Q.  And you didn't assess whether Texas' decline in early

7  voting turnout between 2020 and 2022 was part of a nationwide

8  trend, right?

9  A.  No, I did not.

10  Q.  Compared to other elections, you agree that the November

11  2020 General Election was an outlier for early voting, right?

12  A.  In the state of Texas maybe.

13  Q.  Okay.  And the 2020 General Election was an outlier

14  because substantially more voters cast ballots during early

15  in-person voting than in any previous General Election, right?

16  A.  Yes.

17  Q.  Even though the 2020 General Election was an outlier, you

18  compared the 2022 General Election to the 2020 General

19  Election because you lacked sufficient data for the 2018 and

20  2016 General Elections, right?

21  A.  That, and SB1 was created in response to 2020.

22  Q.  You would agree that overall voting turnout dropped in

23  Texas between the 2020 and 2022 General Elections, right?

24  A.  Yes.

25  Q.  And you agree that the significant drop in overall turnout

Eric McDaniel – Cross

1  between 2020 and 2022 could be a cause of the decreased early

2  voting turnout in 2022, right?

3  A.  My analysis demonstrated that it didn't seem to be linked

4  to turnout, the rate of turnout.

5  Q.  Brian, can you pull up Page 59, line 16 through 24 in the

6  2023 deposition.

7      "Question:  And you would agree that the significant drop

8  in turnout from 2020 to 2022 could be a cause for changes in

9  the drop in early voting seen between those two elections?

10     "Answer:  That the drop in turnout may have been

11  associated with the drop in -- of the use of in-person early

12  voting?

13     "Question:  That's correct.

14     "Answer:  Yes."

15     Did I read that correctly?

16  A.  Yes, you did.

17  Q.  I want to show you paragraphs 22 and 23, along with

18  Figure 5 in Dr. Hoekstra's response to your 2023 report.

19     That's paragraph 22 and 23.  Do you recognize these?

20  A.  Yes, I do.

21  Q.  And can we see Figure 5, Brian.

22     And do you recognize Figure 5?

23  A.  Yes.

24  Q.  You would agree that, in Figure 5, Dr. Hoekstra purports

25  to show that the percentage of early voting combining early

1  in-person and early mail voting increased from 2018 to 2022,

2  right?

3  A.  Yes.

4  Q.  Do you dispute the accuracy of Figure 5?

5  A.  I do not have his data, so I would -- I would need to look

6  at his data first.

7  Q.  So you don't know one way or the other?

8  A.  Yes.

9  Q.  Your 2023 report says that between the 2020 and 2022

10  General Elections overall turnout decreased more in counties

11  with larger portion of black residents, right?

12  A.  Correct.

13  Q.  Your report cannot discern the extent to which SB1 drove

14  any of the reduction you saw in voter turnout in the counties

15  with large black populations, right?

16  A.  Correct.

17  Q.  Your report cannot discern whether SB1 played any role in

18  the decline of voter turnout in counties with high populations

19  of black voters, right?

20  A.  The data given to me at the time did not allow me to make

21  that discernment.

22  Q.  Within counties with large numbers of black voters, your

23  report cannot distinguish between voting that declined among

24  white voters and black voters in those counties, right?

25  A.  That data -- the analysis cannot do that, but if you look

Eric McDaniel – Cross

1  at the research within political science, one of the things
2  you find is that as the percentage of blacks in a county
3  increases, the probability of whites turning out to vote
4  increases.  So to assume that this was being driven by whites
5  would be –– would go against well over 70 years of research.
6  Q.  But your report by itself cannot distinguish between
7  voting that declined among white voters and black voters in
8  counties with large black populations, right?
9  A.  Correct.
10  Q.  That's because you didn't have individual-level data,
11  right?
12  A.  Correct.
13  Q.  You only had county-level data, right?
14  A.  Correct.
15  Q.  When you conducted your analysis on turnout with respect
16  to early voting, you didn't break down your analysis between
17  counties that had their early voting hours affected by SB1
18  versus those that did not, right?
19  A.  Professor Hoekstra's response, he mentioned that.  But he
20  highlighted that these are the ones that were mentioned in
21  Professor Grose's report.  Because I didn't work with
22  Professor Grose, I was unaware of what counties he was
23  highlighting.
24  Q.  Do you agree that if you look at the early voting hours of
25  the counties in 2020, SB1 affected some of those counties'

1  early voting hours but not others?

2  A.  Yes.

3  Q.  And your report didn't distinguish between counties whose

4  early voting hours were affected and those that weren't

5  affected by SB1, right?

6  A.  No, I did not.

7  Q.  I want to show you Dr. Hoekstra's response to your report

8  again, paragraph 30 and Table 2.

9      You recognize Table 2, right?

10  A.  Yes.

11  Q.  Can we just see paragraph 30 real quick, Brian.

12      You recognize paragraph 30, right?

13  A.  Yes.

14  Q.  Dr. Hoekstra claims that when you examine early voting

15  turnout between 2020 and 2022, only in counties that Dr. Grose

16  identified as having hours affected by SB1, the correlation

17  between counties with high black populations and decline in

18  turnout is not statistically significant, right?

19  A.  Yes.  That's what it reports.

20  Q.  And if we can go back to Table 2, Brian.  Dr. Hoekstra

21  refers to Column 3 in Table 2.

22      Do you dispute the accuracy of Column 3 in Table 2?

23  A.  There are some problems with Column 3, especially

24  comparing Column 3 and Column 4.  One of the key things is

25  Column 3 only has 24 observations, whereas, Column 4 has 229.

Eric McDaniel – Cross

1    One of the things we do know is that as sample size

2  increases, that you are more likely to find statistically

3  significant relationships.  And so it is much easier to find

4  statistically significant relationship with 229 than it is

5  with 24.

6  Q.  But do you disagree with Dr. Hoekstra's assertion in

7  Column 3 that, among the 24 counties, there is no

8  statistically significant correlation between the decline in

9  early voting turnout and counties with high black populations?

10 A.  I do disagree.

11 Q.  Do you have any basis to dispute the numbers or the

12 calculations in Column 3 of Table 2?

13 A.  I would say running an analysis with only 24 observations

14 can lead to faulty results.

15 Q.  Do you disagree with his arithmetic in Table 3 -- I'm

16 sorry -- in Table 2, Column 3?

17 A.  I don't disagree with the arithmetic.  I disagree with

18 the -- with this comparison.

19 Q.  Okay.  I want to show you something else from

20 Dr. Hoekstra's response to your report.  Page 13, paragraph

21 27, subsection 1.

22    You're familiar with this part of Dr. Hoekstra's report,

23 right?

24 A.  Yes.

25 Q.  Dr. Hoekstra asserts that when you calculated the decline

Eric McDaniel – Cross

1  in turnout in counties with large black populations between

2  2020 and 2022, you performed the calculation incorrectly,

3  right?

4  A.  Correct.

5  Q.  That was a mistake on your part, right?

6  A.  Correct.

7  Q.  During your deposition with Ms. Hunker, you said you

8  would —— you would submit a supplemental report responding to

9  Dr. Hoekstra, right?

10  A.  Correct.

11  Q.  And you didn't submit that supplemental report, right?

12  A.  From my understanding, I did create the report, but there

13  was not enough time to file it.

14  Q.  So you didn't file a supplemental report?

15  A.  Yeah, it was not filed.

16  Q.  And so the mistake that we just talked about is still in

17  your final report, right?

18  A.  Yes.

19  Q.  On Page 7, line 131 of your 2023 report, you find a

20  positive relationship between the percentage of black voters

21  in a county and the percentage of voters who chose to use

22  in-person early voting in 2020, right?

23  A.  Correct.

24  Q.  You didn't do that assessment with 2018 or 2016, right?

25  A.  No.

Eric McDaniel – Cross

1  Q.  So you do not know the relationship between the percentage
2  of black voters in the county and the percentage of voters who
3  chose to vote early in-person when comparing the 2022 General
4  Election to the 2018 General Election, right?
5  A.  Well, the data was not available in 2018.
6  Q.  And you can't do that comparison between the 2016 and 2022
7  General Elections for the same reason, right?
8  A.  Yeah.  Data was not available.
9  Q.  And for the same reason, you can't do that comparison
10  between the 2014 and 2022 General Elections, right?
11  A.  Yes.  Data was not available.
12  Q.  And when you were looking at the relationship between the
13  percentage of black voters in the counties and the percentage
14  of voters who chose to vote early in-person, you couldn't
15  distinguish between potential early voting decline among white
16  voters within the counties versus black voters within those
17  counties, right?
18  A.  Correct.
19  Q.  You agree that only -- I'm sorry.  I already asked that
20  question.
21      You can't -- I'm sorry.  Strike that.
22      You can't determine the extent to which SB1 contributed to
23  the steeper drop in turnout in counties with large black
24  populations, right?
25  A.  Repeat the question.

Eric McDaniel – Cross

1  Q.  You can't determine the extent to which SB1 contributed to

2  the steeper drop in counties with large black populations

3  between 2020 and 2022, right?

4  A.  Correct.

5  Q.  Because here, too, you didn't have access to

6  individual-level data, just county-level data, right?

7  A.  Correct.

8  Q.  Let's talk briefly about the 2023 report's discussion of

9  mail voting.

10     When assessing mail voting for the November 2022 General

11  Election, you only utilized secondary sources like newspapers,

12  *Think Tank* reports and Congressional reports, right?

13  A.  Correct.

14  Q.  Your report does not analyze racial differences in mail

15  ballot rejection rates for the 2022 General Election, right?

16  A.  Correct.

17  Q.  Your report does not indicate whether nonwhites were more

18  likely to have their ballot rejected in the November 2022

19  General Election, right?

20  A.  Those data were not available to me.

21  Q.  For the Texas mail ballot rejection rate in the 2020

22  General Election, you relied on a report from the U.S.

23  Election Assistance Commission, right?

24  A.  Correct.

25  Q.  And you're aware that the data in the U.S. Election

1   Assistance Commission report was obtained from the individual

2   counties in Texas, right?

3   A.  Correct.

4   Q.  And you don't know what data counties were required to

5   track or collect in the November 2020 General Election, right?

6   A.  Correct.

7   Q.  And you don't know whether or not the data the counties

8   tracked and collected was the same in 2022 as in 2020, right?

9   A.  My assumption is they were following the same model for

10  each one.

11  Q.  But you don't know one way or the other?

12  A.  I don't know.

13  Q.  And you don't know whether the counties used the same

14  methodologies to track and collect that data in 2022 and 2020,

15  right?

16  A.  No, I do not.

17  Q.  The mail ballot rejection rate dropped substantially

18  between the 2022 Primary and General Elections, right?

19  A.  Correct.

20  Q.  Part of that was due to citizens better understanding the

21  new rules in the 2022 General Election, right?

22  A.  Correct.

23  Q.  And part of that was due to election administrators

24  learning how to effectively implement SB1's new rules, right?

25  A.  Actually, let me take a step back.

Eric McDaniel – Redirect

1       The rejection rate may have been that people may not --

2  because they didn't trust the mail ballot system, they may

3  have voted in person, which may have led to that reduction.

4  But it could also be updates in terms of the people reading

5  over the ballots and making judgments.

6  Q.  So there may be different explanations, but part of the

7  explanation is likely due to citizens better understanding the

8  new rules in the 2022 General Election, right?

9  A.  I would say that would be a portion of it.

10  Q.  And then another portion is that election administrators

11  learned how to effectively implement SB1's new rules, right?

12  A.  Yes.

13       MR. CAPOZZI:  Thank you for your time, Dr. McDaniel.

14  That's all I have.

15       THE COURT:  Anything else on this side?

16       Any redirect?

17       MR. BIETER:  Yes, Your Honor.  Thank you.

18                    REDIRECT EXAMINATION

19  BY MR. BIETER:

20  Q.  Dr. McDaniel, you recall that Ms. Hunker asked you several

21  questions about whether you read various reports or guidance

22  materials related to SB1?

23  A.  Yes.

24  Q.  Were those -- were those documents relevant to your

25  opinion?

2992
Eric McDaniel – Redirect

1  A.  They were relevant in terms of providing background

2  information about what was in SB1.  But my opinion was based

3  solely on the data that was in front of me.

4  Q.  You recall Ms. Hunker asking you several questions about

5  the CES and why you didn't analyze the CES for 2014 or 2018?

6  A.  Yes.

7  Q.  And why didn't you analyze those years?

8  A.  Because those were off-year elections.  And since 2020

9  wasn't a presidential year, I wanted to compare 2016, which

10  was also a presidential year, that bringing in 2014 and 2018

11  might obscure some of the findings.

12  Q.  And you remember your discussion with Ms. Hunker about

13  wait times?

14  A.  Yes.

15  Q.  And you recall that she referred, I believe, quote,

16  "marginally longer wait times for blacks"?

17  A.  Yes.

18  Q.  Were wait times for blacks marginally longer in --

19  A.  Blacks were statistically more likely to report longer

20  wait times than their white counterparts.  So this was

21  systematic, not random.  But it was a clear pattern.

22  Q.  You recall Ms. Hunker said, in certain regards, 2016 is

23  not analogous to 2020, right?

24  A.  Yes.

25  Q.  Why is 2016 and 2020 -- why are they analogous and why did

Eric McDaniel – Redirect

1  you –– why are you right to compare those years?

2  A.  Well, two Presidential Election years, there was a highly

3  contested race, are the two things that stood out for those

4  two.

5      Also, if I brought in 2012, that was before the Court's

6  decision regarding Section 5 of the Voting Rights Act.  And so

7  2016 served as the best basis to compare 2020.

8  Q.  Speaking of 2020, did the changes in 2020 election –– how

9  elections were conducted ease voting for voters?

10  A.  The county-level –– counties made decisions to try to ease

11  voting specifically because people were concerned about COVID.

12  Q.  Were there some changes that were not related specifically

13  to COVID that year that eased voting?

14  A.  I do believe that 24-hour voting may have been one aspect

15  of trying to make it easier for people to turn out.

16  Q.  Now, you had a discussion with Ms. Hunker about the logit,

17  using the logit model versus interval regression model?

18  A.  Yes.

19  Q.  Could you explain, in the best English that you can,

20  what –– why you used the logit model instead of the regression

21  model?

22  A.  I used the multinomial logit because it's the way in which

23  the data is set up and the way you think of the data.  And is

24  it the same interval, or is it something that's not in a

25  particular order?

Eric McDaniel - Redirect

1    And so, therefore, I used the multinomial logit because it
2  was not -- you were not necessarily comparing the same
3  interval change.  So this allowed me to predict the
4  probability that someone would report that they waited -- had
5  no wait time, waited ten minutes or less or waited more than
6  an hour.
7    So using the multinomial logit allowed me to examine the
8  probability that someone would report that this is what
9  happened to them.
10 Q.  And is that a typical method used in political science?
11 A.  Yes.
12 Q.  Now, you analyzed voting rates for mail-in ballots in
13 2016, correct?
14 A.  Correct.
15 Q.  There was no COVID in 2016, right?
16 A.  Correct.
17 Q.  And yet, the mail-in ballot rate for blacks was more or
18 less the same between 2020 and 2016?
19 A.  Yes.
20 Q.  Now, you recall you had a discussion with Ms. Hunker about
21 the history of lynching in Texas?
22 A.  Yes.
23 Q.  And she mentioned that you hadn't analyzed lynching since
24 the 1950s; is that right?
25 A.  The data stops at 1950.  But research has shown that

Eric McDaniel – Redirect

1  counties with a history of racial terrorism, that it's

2  something that lasts a long time.  It's not something that

3  just kind of goes away, disappears into the ether.  But that

4  does impact politics going centuries ahead.

5  Q.  And are there black voters who were alive in the 1950s

6  that are voting today?

7  A.  Yes.

8  Q.  You said you relied on Secretary of State and county data

9  for certain of your analysis?

10  A.  Yes.

11  Q.  Do you believe that someone should be able to rely on

12  Texas' counties' data to be reliable?

13  A.  Yes.

14  Q.  Now, counsel referred to a math error that you did in your

15  second supplemental report.  You recall that?

16  A.  Yes.

17  Q.  Does that math error invalidate your ultimate conclusion?

18  A.  No.  It showed that the size of the coefficient was a

19  little bit smaller, but the relationship was still

20  statistically significant.

21  Q.  Counsel also, towards the end, asked you whether mail

22  ballot rejection rates dropped between the 2020 primary and

23  the 2022 General Elections.  You recall that?

24  A.  Yes.

25  Q.  Will there always be new voters in every election?

Eric McDaniel – Redirect

1    A.   Yes.

2    Q.   And they'll have to learn SB1's provisions as they vote,

3    just like any new voter, correct?

4            MR. CAPOZZI:  Objection, leading.

5            MS. HUNKER:  Objection, leading, Your Honor.

6            THE COURT:  Sustained.

7    BY MR. BIETER:

8    Q.   Will there be -- will there be new voters in every

9    election?

10   A.   Yes.

11   Q.   And will there be voters that turn 65 in every election?

12   A.   Yes.

13   Q.   So how would you sort of summarize SB1 and its impact on

14   voters in Texas?

15   A.   My summary is that SB1 will probably curtail voting in

16   Texas.  Texas is one of the lowest-voting states and has

17   objectively been measured as the most difficult state to vote

18   in.  And I expect this to further depress the vote

19   specifically amongst black and Latino voters.

20           MR. BIETER:  Thank you, Doctor.

21           THE COURT:  Anything else based on those questions?

22           MS. HUNKER:  Not from the State, Your Honor.

23           MR. CAPOZZI:  No, Your Honor.

24           THE COURT:  Then you may step down, Doctor.  Thank

25   you.

Eric McDaniel – Redirect

1           THE WITNESS:  Thank you.

2           THE COURT:  And your next witness.

3           MS. PERALES:  Your Honor, may we have a short break?

4           THE COURT:  Yes.

5           MS. PERALES:  Thank you.

6       *(Recess at 4:17 p.m.)*

7       *(Change in reporter)*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Change in reporter)

2         MISS TULIN:  Good morning, Your Honor.  Before we

3    call our next witness, a couple housekeeping matters.

4         Leah Tulin for the LUPE plaintiffs.

5         Two matters.  First regarding scheduling, we are

6    looking ahead to hopefully wrapping this up and we have been

7    in touch, both sides and with Miss Fernandez, and what our

8    hope is, is to add October 20th, beginning at 11:00 a.m. and

9    then October 23rd and 24th and hopefully that will get us

10   through all of the evidence and also reserve time for closing

11   arguments, if that is how the Court wants to proceed.

12        THE COURT:  So let me just check on these three days.

13        Now, on closing arguments, what I was thinking what

14   would make it more fruitful for us to all have a discussion

15   about this is that you-all would be tendering the findings of

16   fact — your proposed findings of fact and conclusions of law,

17   I get them, I'm able to digest them, and then based on upon

18   that I would have questions for you for dialogue on closing.

19        Your thoughts.

20        MR. KERCHER:  So as I understand, the idea is that

21   the parties would tender their proposed findings of fact and

22   conclusions of law, after reviewing we would have a hearing at

23   that point and you could then —

24        THE COURT:  A hearing would be closing arguments,

25   yeah.

1          MR. KERCHER:  Yeah.

2          THE COURT:  That's what I was thinking, but, you

3   know, I'm open your thoughts.

4          MISS PERALES:  That's agreeable to plaintiffs as long

5   as we have an opportunity to discuss the deadline for findings

6   of fact and conclusions of law, given the size of the record.

7          THE COURT:  And so are we giving you final or are we

8   giving you rough?

9          MISS PERALES:  We're getting dailies and mostly we're

10  getting final.

11         THE COURT:  So I was assuming you guys were all

12  getting almost finals and so it wouldn't be like we're waiting

13  a month for a record to come out.

14         MR. KERCHER:  I think that's right, Your Honor, and

15  my team, and I'm sure plaintiffs are as well, are doing our

16  best to keep up as we go, but, I agree, that the parties

17  should probably –– maybe –– the parties should maybe discuss a

18  deadline so that we can get together on schedules.

19         For clarity, our, the State defendants, provided that

20  we give our case in chief beginning a week from Monday.  Our

21  hope is to complete our case in chief that week, particularly

22  if we can get most of that Friday.  We'll obviously have to

23  see how that goes but who knows how long these people are

24  going to cross-examine my witnesses, but that's our hope.

25  That's what we are shooting for.

```
1              THE COURT:  Okay.  So let's book the 20th, the 23rd,
2   and the 24th.  The 20th would have to start right after —— so
3   let's just bring in, the ceremony I have to do is down in the
4   atrium.  It will conclude probably about 10:30.  You can just
5   plan on being here and as soon as it finishes up, I will come
6   right up here.  So plan on being here at 10:30.
7              So, Sylvia, be sure to put this on the calendar
8   before I make a mistake and book something else.
9              So naturalization ceremonies, is this a big one?
10             THE DEPUTY CLERK:  200 plus family.
11             THE COURT:  So I don't know where you-all are parking
12  or what you-all are doing to get here, but on the 20th, you
13  may want to even arrive early, well, because all the others
14  will be arriving early.  Parking will be an issue on the 20th,
15  but let's crank out days.
16             So 20, 23, 24, Sylvia, book those on the calendar.
17             What else do we have?
18             MISS TULIN:  Just briefly, Your Honor, the LUPE
19  plaintiffs have identified two filings that we need to correct
20  exhibits for the filings themselves to account for PII that
21  was inadvertently put on the record.  Those are ECF 692 and
22  some of the attachments to ECF 779.
23             THE COURT:  And so, pardon me, what are you going to
24  do to these?
25             MISS TULIN:  What we would like to do is just file
```

1  substitutions and file redacted copies of what was

2  inadvertently disclosed.

3          THE COURT:  Any objection to that?

4          MR. KERCHER:  No objection, Your Honor.

5          THE COURT:  So that's fine.

6          MISS TULIN:  Thank you.

7          THE COURT:  Your next witness.

8          MR. BIETER:  Thank you, Your Honor.

9          Plaintiffs calls Dr. Christian Grose.  Dr. Grose will

10 be testifying in support of all sections of SB 1 that the Mi

11 Familia Vota plaintiffs challenge in this matter, and that's

12 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07,

13 4.12, 5.02, 5.03, 5.04, 5.07, 5.08, 5.13, 6.03, 6.04, 6.05,

14 6.07, 7.02, and 7.04.

15         THE COURT:  Thank you.

16         MR. KERCHER:  Your Honor, before we proceed, I just,

17 and this may be something to take up a little bit later, I

18 have from our earlier statement at the beginning of trial on

19 the Mi Familia Vota provisions they are challenging that they

20 had dismissed 2.04, 2.05, and 2.06.  And if that's a

21 scrivener's error on my part, I just — at some point we need

22 to sort that out.

23         MISS HOSTETLER:  We dismissed those relating to undue

24 burden but not for the intentional discrimination claims.

25

CHRISTIAN GROSE - DIRECT

1     (CHRISTIAN GROSE, having been duly sworn, testified as

2  follows:)

3                    DIRECT EXAMINATION

4  BY MR. BIETER:

5  Q.  Good afternoon, Dr. Grose.

6  A.  Hey, how's it going?

7  Q.  Going well.  Could you state your name for the record.

8  A.  My name is Christian Grose.  It's spelled

9  C-H-R-I-S-T-I-A-N, G-R-O-S-E.

10  Q.  Where are you employed, Dr. Grose?

11  A.  I work at the University of Southern California.

12  Q.  What's your position there?

13  A.  Professor of political science and public policy.

14  Q.  How long have you been in that position?

15  A.  I've been at U.S.C. for 13 years.

16  Q.  What are some of the duties in that position?

17  A.  I do research on voting rights, voting, redistricting;

18  teach classes on field experiments, audit studies of

19  discrimination, survey research methods, legislative politics.

20  Fixing American democracy is a class that I'm teaching next

21  spring that I'm looking forward to.

22  Q.  Have you been retained as an expert in this case?

23  A.  Yes.

24  Q.  What were you asked to do?

25  A.  I was asked to look at SB 1 and evaluate if it has

CHRISTIAN GROSE - DIRECT

1  discriminatory intent and effects.

2  Q.  Did you perform that task?

3  A.  Yes.

4  Q.  Did you reach opinions about discriminatory intent and

5  impacts of SB 1?

6  A.  Yes.

7  Q.  Before we get into your opinions, I want to talk about

8  your background a little bit.

9      Derek, could you bring up HAUL MFV 353.

10     Dr. Grose, do you recognize this document?

11 A.  Yes.

12 Q.  And what is it?

13 A.  This is my supplemental expert report from February 10,

14 2023.

15     MR. BIETER:  Your Honor, I move the admission of HAUL

16 MFV 353 into evidence.

17     THE COURT:  Any objection?

18     MR. BRYANT:  No, Your Honor.

19     THE COURT:  353 is admitted.

20 BY MR. BIETER:

21 Q.  Derek, could you go to page 10 please.

22     Is this a copy of your CV as of February 2023?

23 A.  Yes, it is.

24 Q.  And have there been updates to it since then?

25 A.  There have been a few updates since then.

CHRISTIAN GROSE – DIRECT

1  Q.  Why don't you walk us through your formal education.

2  A.  Yes.  I received my BA from Duke University in 1996 and

3  Ph.D. from the University of Rochester in 2003 in political

4  science.

5  Q.  Did you do a dissertation for your Ph.D.?

6  A.  I wrote a dissertation for my Ph.D.

7  Q.  And what was that?

8  A.  That was about voting rights in the South, including

9  Texas, but also including other parts of the South and I

10  looked at the impact of race on legislative decision-making.

11  Q.  What are some of the courses that you've taught?

12  A.  I've taught — I've taught a lot of classes, mostly

13  related to U.S. politics, voting rights, race, race and

14  ethnicity, I teach at the Ph.D. level and at the undergraduate

15  level.  At the Ph.D. level I teach a lot of statistical

16  analysis of political science and voting, and I also mostly

17  have taught a lot of classes on experiments and field

18  experiments.

19  Q.  On your CV here you list a number of leadership and

20  administrative appointments, could you give us an example of

21  one or two?

22  A.  Yeah, sure.  So I'm editing a journal called *Research in*

23  *Politics*, which is a, you know, major journal in the field.  A

24  few years ago I was the director of the political science and

25  international relations program at U.S.C., and then right now,

CHRISTIAN GROSE – DIRECT

1  for the last five years, I've been the academic director at

2  the U.S.C. Schwarzenegger Institute for state and global

3  policy.

4  Q.  What do you do at the Schwarzenegger Institute?

5  A.  So the Schwarzenegger Institute is a really unique, it's a

6  really unique institute where I am academic director and I

7  focus on the research side of topics related to election

8  administration and political reform, voting rights, and my

9  wheelhouse is generally to interact with academics, and do

10  research on those topics, and then also practitioners who are

11  interested in learning about best practices on those topics.

12      So we do a lot of work with election administrators to try

13  to think about best practices.  We often will host events and

14  convenings that will, you know, bring together policymakers,

15  academics, and people who are interested in these issues,

16  usually through a nonpartisan lens.

17  Q.  Derek, could you scroll down to the bottom there.  Thank

18  you.

19      You have a number of recent articles you've published.  Do

20  any of these relate to what you are opining on today?

21  A.  Yeah.  So I've listed the last ten articles I've

22  published.  I've published about 50 articles, chapters, and

23  other publications in political science and related fields,

24  but the last several years I've done work that are directly

25  related to the research that I did in the expert reports.

CHRISTIAN GROSE – DIRECT

1      So the first three, for instance, you know, are published

2  in the *American Political Science Review*, the *American Journal*

3  *of Political Science*, and the *Journal of Politics*.  Those are

4  generally considered the top three journals in the field of

5  political science.

6      All three of those look at experimental or causing ––

7           COURT REPORTER:  Excuse me, you need to slow down.

8           THE WITNESS:  Oh, slow down.  Okay, sorry.  When you

9  talk about your own research, you really start going, yeah.

10 Sorry about that.

11          So there's three articles in the *American Political*

12 *Science Review*, the *American Journal of Political Science*, and

13 the *Journal of Politics*, and those three are generally

14 considered the top journals in the field of political science.

15 I published them last year in 2022.

16          Those relate to the questions of experiments and

17 experimental methods and causal methods to understand

18 legislative decision-making, and in some instances related to

19 discrimination.

20          The fourth article there is about election

21 administration.  That focuses on bias in election –– that

22 election officials and election administrators may have,

23 including in Texas.

24          Some other articles later on, like, for instance, the

25 one called *Economic Interests cause Elected Officials to*

CHRISTIAN GROSE – DIRECT

1   *Liberalize their Racial Attitudes* and *Doubling Down in*
2   *Equality and Responsiveness in the Policy and Preferences of*
3   *Elected Officials*.  Both utilize audit studies or other
4   experimental methods that are similar to or very directly
5   related to the expert reports that I did.
6   BY MR. BIETER:
7   Q.  Have you published any books?
8   A.  I've published one book.
9   Q.  What was it called?
10  A.  It's called *Congress in Black and White*.
11  Q.  What was that book about?
12  A.  About race and voting rights and the impact of black
13  legislators on decision-making and Congress.
14  Q.  Could you give some examples of awards and honors you've
15  received?  You list quite a few, could you summarize a few of
16  them?
17  A.  Yes.  I've won a few awards.  I've won a couple awards for
18  these articles that we just talked about.
19      So the article I mentioned called the *Economic Interests*
20  article.  That won the best article published in that journal
21  for the year.  I think that award was two years ago.
22      I won an award.  I can't remember the name.  I can't see
23  it on the screen.  Yeah, there we go, the Herman Brown
24  Distinguished Scholar Award that was given annually to one
25  person who is a political scientist and that gave me the

CHRISTIAN GROSE − DIRECT

1  opportunity to give a research presentation about audit

2  studies and field experiments in Fort Worth, Texas, at Texas

3  Christian University.

4  Q.  Have you ever served as an expert before?

5  A.  Yes.

6  Q.  And what case was that?

7  A.  I don't remember the names of the cases exactly but I can

8  give you the summary and the focus.

9      So one was in Florida in a previous decade.  It was on

10  redistricting and race and I was an expert to analyze the

11  ability to elect in the legislative districts and it was — I

12  believe it was *League of Women Voters v Detzner*, now that I'm

13  thinking of it but I'm not certain if that's the case.

14     And then I also served as an expert recently for the

15  County of Riverside in California as a voting rights

16  consultant for both the drawing of the maps that they did and

17  then recently in a lawsuit that the county had that was

18  settled.

19     And then I've also served as the voting rights expert for

20  the County of San Diego, the eighth largest county in the

21  country when they were drawing their lines.

22         MR. BIETER:  Your Honor, based on his qualification I

23  proffer Dr. Grose as an expert on race and voting.

24         THE COURT:  Any response?

25         MR. BRYANT:  No objection, Your Honor.

CHRISTIAN GROSE - DIRECT

1          THE COURT:  He's recognized as such.

2  BY MR. BIETER:

3  Q.  Dr. Grose, you testified earlier you reached opinions

4  about discriminatory intent and impacts of SB 1.  What are

5  those opinions?

6  A.  Yeah, that's right.  So I have four main opinions that are

7  in the report.  One is that the Texas State Legislature, and

8  in particular, the legislators who voted for SB 1 have

9  evidence of discriminatory intent towards Latino voters and

10  discrimination towards Latino voters.

11      Number two is that the legislation SB 1 specifically

12  targets Harris County, the county that has the largest number

13  of Latino and Black voters, and so because of that, there is

14  an intent to the targeting of Harris County, specifically on

15  24-hour voting, the removal of 24-hour voting by SB 1.

16      I also looked at the changes to Sunday voting and the

17  hours for Sunday voting to make a similar conclusion that

18  targeted Harris County in particular and that there's an

19  intent there.

20      And then the final part is about both intent and effect.

21  There, I look at and find that the share of the Latino

22  vote-by-mail percentage before SB 1 and after SB 1 changed and

23  it declined.  The share of Latino voters using the vote by

24  mail went down after SB 1.

25  Q.  And did you put those opinions into a report?

CHRISTIAN GROSE - DIRECT

1    A.   Yes.

2    Q.   And one of those is one we just saw.  Have you done any

3    other reports?

4    A.   Yes.  There's one more report.

5    Q.   And when were those produced?

6    A.   That report, there's the first report I believe was in

7    February.  It was February 2022.  I think the date was either

8    the 27th or the 28th.  It was immediately after the

9    vote-by-mail data had come out.  That's why I remember the

10   date really precisely.

11        And then I did the supplemental report that you showed

12   earlier from last year.

13   Q.   Okay.  Derek, could you pull up HAUL MFV 347.

14        And do you recognize this document?

15   A.   Oh, yeah.  That's the one I was talking about.  That's the

16   initial report from February 2022.

17        MR. BIETER:  Your Honor, I move to admit for the

18   admission of Dr. Grose' report.

19        THE COURT:  Any objection to 347?

20        MR. BRYANT:  No, Your Honor.

21        THE COURT:  347 is admitted.

22   BY MR. BIETER:

23   Q.   Derek, could you call up HAUL MFV 350.

24        And, Dr. Grose, do you recognize this report?

25   A.   Yes, I do.

CHRISTIAN GROSE - DIRECT

1   Q.  And what is it?

2   A.  This is an additional rebuttal report that I wrote.

3        MR. BIETER:  Your Honor, I move for the admission of

4   Dr. Grose's April 25th, 2022 report, HAUL MFV 350 into

5   evidence.

6        THE COURT:  Any objection?

7        MR. BRYANT:  No objection, Your Honor.

8        THE COURT:  Thank you.  350 is admitted.

9        MR. BIETER:  Thank you.

10  BY MR. BIETER:

11  Q.  All right.  Dr. Grose, let's get into the heart of your

12  report.  You testified that legislators who supported SB 1

13  showed direct evidence of discrimination against Latino

14  voters, correct?

15  A.  Yeah, that's right.

16  Q.  And can you summarize what that opinion is based on?

17  A.  Yeah.  So that opinion is based on something that's called

18  an audit study.  It's an audit study or an experimental study

19  of Texas state legislators to analyze those who voted for SB 1

20  and those who did not vote for SB 1 and to measure

21  discriminatory intent that may or may not exist.

22  Q.  Can you describe generally what a randomized audit study

23  is?

24  A.  Yeah.  A randomized audit study is looking at, you know,

25  wants to basically measure if there's discrimination.  I mean,

CHRISTIAN GROSE - DIRECT

1  one of the problems with trying to measure discrimination from
2  a scholarly or empirical standpoint is that no one ever comes
3  up to you and says, I'm a racist, or I want to discriminate
4  against someone, right?
5      Like if you ask someone in a survey or you ask someone
6  while they are speaking like in the chamber and the
7  legislature, they are not going to say that explicitly.  So
8  what's been designed in social science and started in
9  economics and sociology and then has migrated to political
10  science, and it's a lot of the work that I do, is you do this
11  thing called a randomized audit study.
12      And so the idea is just thinking about — I'll talk about
13  one study that started in Econ, you know, maybe best known is
14  resumes, where you randomly assign resumes to firms and the
15  resumes are identical except that there are signals in the CV
16  or the resume about the race or ethnicity of the person, and
17  so there might be a, you know, a club membership that signals
18  a racial or ethnic cue, and then you randomly assign that to
19  different companies and then you see if the companies want to
20  hire people at the same rates.  And if they don't, that's
21  evidence of discrimination.
22      So that's been used a lot in political science, but
23  instead of firms, it's for legislators.  There's been a number
24  of studies, I've done a few of them that we talked about
25  earlier, that look at legislators who are the subjects and you

CHRISTIAN GROSE – DIRECT

1  randomly assign a Latino voter or a White voter, or a Black

2  voter and a White voter to be asking their elected official

3  about something and then you want to find out is there equal

4  response from the elected official from the legislator to the

5  voters.

6  Q.  And how did audit studies come to be used in the field of

7  political science?

8  A.  Yeah.  I mean, so I think the first one that was done was

9  a study that I did in 2007, those published in the *American*

10 *Journal of Political Science*.  It was published several years

11 later.

12     There's another audit study that's pretty well-known that

13 was also published a couple years after that.  It was

14 published a couple years after I did my study.

15     And then now there probably are 30 to 50 to 100 audit

16 studies in the field.  I'm not certain of the exact number but

17 they have really taken off in the last decade.

18 Q.  So they are commonly used in political science studies?

19 A.  Oh, they're very commonly used.  They're so commonly used

20 that some political scientists who don't do them are starting

21 to do them, yeah.

22 Q.  So let's talk about the randomized audit study you did in

23 this matter.  When did you do it?

24 A.  So I did this study in 2020.

25 Q.  And how did you do it?

CHRISTIAN GROSE – DIRECT

1  A.  So this was part of a classroom exercise in my Ph.D.

2  seminar and turned into a paper that I'm going to coauthor

3  with my graduate students.  We had read an article that I

4  wrote and published in 2018 that I used for this particular —

5  this is the method that I used in the expert report and that I

6  used for the part you are asking about and we wanted to

7  replicate that and find out if the results would hold in a

8  different setting and on a different bill.

9      And so this started with us doing the work in the spring

10  of 2020, spring-summer 2020, if I recall, and the point of it

11  was to basically check and see if we've had similar findings

12  to what we found previously.

13      So we randomly assigned legislators to get messages from

14  people writing in Spanish and then we randomly assigned

15  legislators to get messages from people writing in English and

16  we want to see was there discrimination against the Spanish

17  speakers, the Latino constituents, and that would be measured

18  by randomly assigning legislators in Texas and 13 other

19  states.

20  Q.  How are the messages communicated?

21  A.  Oh, yeah.  So the messages are sent by email and they are

22  sent by — they're sent by — to the legislator's email

23  addresses with the idea being you ask for something really

24  straightforward, in this case how to vote, like the subject

25  line was can I vote, or *puedo votar*, in Spanish, for the

CHRISTIAN GROSE — DIRECT

1   Spanish version, and then you just ask a question and you

2   assess, did the legislator respond?  Did they respond more to

3   the White constituent than the Latino constituent?  Did they

4   respond more — excuse me — did they respond better and did

5   they answer the question?  Did they actually help the person

6   vote or not?  And did that differ if the person wrote in

7   Spanish or if the person wrote in English?

8   Q.  What was the question that you asked in the email?

9   A.  So we asked, can I vote, and then the email text was — I

10  don't remember exactly, but it was something like, I've heard

11  a lot in the news lately that I may need identification to

12  vote.  Do I need to have a driver's license to vote?

13      And then there is a salutation and a little bit more to

14  the email, but generally in these studies you want to keep

15  them very short and simple, so just asked can I vote and asked

16  about the need for a driver's license.

17  Q.  So you sent one version that was in the English language

18  and another that was in Spanish.  Was it identical to the

19  English version except just in Spanish?

20  A.  Yeah.  The text of it was identical other than Spanish and

21  English, and then the some of my colleagues who are the

22  graduate students who work with me are fluent Spanish—speakers

23  who did that.

24  Q.  Derek, could you bring up HAUL MFV 347, and specifically

25  the table on page 11.

3016
CHRISTIAN GROSE — DIRECT

1    So does this table show the results of the randomized
2  audit study you conducted in 2020?
3  A.  Yes, these are the results.
4  Q.  And could you walk us through it and explain what it
5  means?  Why don't we start with the columns titled 1A and 1B?
6  A.  Yeah, sure.  I mean, just one thing before I do that
7  because we talked about the randomized audit before, but the
8  other thing we did in this study and what I in the expert
9  report that's directly relevant to this case is we looked at
10 legislators who voted for SB 1 and legislators who didn't vote
11 for SB 1 and to see if there was discrimination that's
12 measured through this audit study.
13    So the second column that you asked about, such as model
14 1A, this is just legislators who voted for SB 1 in the Texas
15 Legislature, and it's a simple measure, did they respond to
16 the person who said, can I vote, do I need a driver's license,
17 or did they not.
18    And the number under there is just was this randomized to
19 be from somebody who spoke Spanish, who we say is Latino, or
20 somebody who spoke English.  And then the difference was
21 negative .294.  To interpret that in regular language that's
22 29.4 percentage points where legislators who voted for SB 1
23 were less likely to respond to the Spanish language
24 constituent.
25    So this is evidence of discrimination.  This is the kind

CHRISTIAN GROSE — DIRECT

1  of thing that the randomized audit gets at because there's —
2  the randomization puts every single legislator into either
3  getting the Spanish language or the English language message.
4  Everything else is the same.  The randomization controls for
5  all other explanations.  And then the evidence of
6  discrimination is if there's a gap like this, and there is.
7  The gap is about 30 percentage points.
8  Q.  So, yeah, so supporters of SB 1, legislators who voted for
9  SB 1, they are about 29.4 percent less likely to respond to
10  the Spanish language email, is that correct?
11  A.  Yes.  So the legislators who voted for SB 1 were very —
12  were much less likely to respond to the Spanish language
13  constituent asking for help with voting and asking if you need
14  a driver's license to vote.
15  Q.  What do you analyze in column 1B?
16  A.  So column 1B looks at legislators who did not —— excuse me
17  —— yeah, legislators who did not vote for SB 1, in contrast to
18  the previous column.
19      So these are people who voted no on the bill.  And it's
20  the same thing.  Did they respond to the request from somebody
21  who wrote in Spanish than somebody writing in English.  The
22  request was otherwise identical.  Same randomization that we
23  would use in the audit study method.
24      And, here, there's no statistically significant
25  difference.  And so what that means is basically there's no

CHRISTIAN GROSE – DIRECT

1  discrimination.  It's a statistical zero.

2      And then you contrast that to statistical model 1A,

3  legislators who voted for SB 1, 29.4 percent percentage points

4  less likely to respond to somebody asking for help for voting

5  in Spanish.

6      The other column, legislators who voted no on SB 1,

7  there's no difference.  There's no discrimination found.

8  Q.  Okay.  How about the third and fourth column there.  What

9  do those signify?

10 A.  This is another way of measuring discrimination in audit

11 studies, especially legislative.  This is a method that I used

12 from an article published by Alex Coppock at Yale University,

13 and this is just asking, did the legislators respond, and

14 answer the question, or were they unresponsive.

15     So it's not just about did they respond or not to somebody

16 who speaks Spanish or somebody who speaks English, but did

17 they actually answer.  Did they say a driver's license is not

18 needed, or here's alternatives for how you could vote, or did

19 they ignore it, or did they say, you know, something else.

20     So, again, here's what, you know what was found is in this

21 particular case legislators who voted for SB 1 were 30.4

22 percentage points less likely to be responsive to the

23 Spanish-speaking —— excuse me —— the Spanish-speaking Latino

24 constituents.  And so it's very similar to the results of did

25 you respond or not but this measures the content of the

CHRISTIAN GROSE - DIRECT

1  response from the legislators.  And so, again, this is

2  evidence of discrimination against Spanish-speaking Latino

3  voters because of the randomized audit study.

4       And then the last column that you asked about is

5  legislators who voted no on SB 1 and did not support it and

6  did they write in response and answer the question that the

7  constituent asked, and there's no difference between the

8  Spanish language and the English language constituent.  They

9  responded similarly so there's no evidence of discrimination.

10 Q.  Could you give an example of a response that a supporter

11 of SB 1 might have sent that was unresponsive or unhelpful?

12 A.  Yeah.  I mean, so the email says, you know, can I vote,

13 and so we were trying to figure out did they answer that

14 question, can I vote and do I need a driver's license and the

15 answer is do you need a driver's license.

16      And, you know, so some of the legislators just didn't

17 really answer.  They just sort of responded and said, you

18 know, call me, or there's some other thing you can think

19 about.  And in our study that we were doing there were some

20 other legislators who said, are you a citizen, or are, you

21 know, asking questions about the respondent, and so that would

22 be considered not responding to the question.  And also would

23 be, yeah, potential evidence of discrimination — or would be

24 evidence of discrimination.

25 Q.  So how do the results in this audit study compare to other

CHRISTIAN GROSE - DIRECT

1  audit studies that you've seen that have similar studies,

2  similar topics?

3  A.  Yeah.  So this — you know, I've done a few of these

4  myself and there's a lot of them.  This is really high.  Like

5  the levels here are really high.  30.4 percentage point

6  difference in discrimination against Spanish-speaking Latinos

7  is much higher than you usually see in other studies.

8     Like there's a paper by Mia Costa, who is a professor at

9  Dartmouth who has summarized about 35, 30 audit studies and

10  she finds that, you know, the — usually the discrimination

11  metric is something around 4 to 8 percent.  I mean she also

12  finds it doesn't always exist, so some set of legislatures and

13  some legislators voting for certain bills there aren't these

14  findings.

15     So, you know, relative to the accent work, these are

16  really large magnitudes, you know, that are not typically

17  found in the audit studies that have been published.

18  Q.  Couldn't there be reasons other than discrimination why a

19  legislator would not respond at all or respond probably

20  inadequately to an email?

21  A.  So the way the study is designed is that all of those

22  things, any other explanation that might exist is controlled

23  for through the study.  So the reason that there's a

24  randomization is it's basically like you are flipping a coin,

25  right?

CHRISTIAN GROSE – DIRECT

1    So you are taking 150 and the 31 legislators in Texas and

2  you're in the House and the Senate and you're flipping a coin

3  and putting one of them into each bin, like you get a Spanish

4  response, you get an English response.  And so there could be

5  other things about all those legislators that make a

6  difference, but they are all controlled for through that

7  randomization.

8    It's a little bit like, if you think about it, how do we

9  know vaccines work or how do we know drugs work, it's the same

10 method.  You recruit people to be in the study and you flip a

11 coin and you randomly put some in a placebo group and the

12 regular group to get the medicine or get the vaccine and then

13 you give it to them and then you compare the differences

14 across.

15    And so it doesn't matter if you're, you know, any other

16 kind of demographic characteristic thought process of the

17 legislator, it's all controlled for through that

18 randomization.  So even if there are other things, the

19 discrimination here is still going to stand as a clear

20 explanation even without any other factor.

21 Q.  I want to move on to your opinion regarding Harris County.

22 You testified it was your opinion that SB 1's provisions

23 restricting early voting hours have the intent to surgically

24 affect Harris County and thus directly intended to affect

25 large numbers of voters of color, is that right?

CHRISTIAN GROSE - DIRECT

1  A.  That's right.

2  Q.  Can you summarize the basis of that opinion?

3  A.  Yeah.  So that one is looking at the specific, you know,

4  specific provision in SB 1 that changes the voting hours for

5  certain counties.  And so if you look at the voting hours in

6  2020, which is what I did, I was looking at 2020, there's one

7  county in the state that had 24-hour voting, that's Harris

8  County, Texas.  Harris County, Texas has the most Black voters

9  and the most Latino voters in the state.

10 Q.  Derek, could you call up HAUL MFV 347, and page 16, table

11 4.

12     Does this provide some of the data that you were --

13 A.  Oh, yeah.  This is what I was talking about.

14 Q.  Okay.  Would you explain this.

15 A.  Sure.  So this is where Harris County, the only county

16 that had 24-hour voting, removed by SB 1, the demographics of

17 the county, Circuit 2020, are displayed here.  This is the

18 census data, the citizen age voting population data is

19 similar.

20     You can see that the Latino-Hispanic population is 43

21 percent in Harris County.  Black population is 19 percent and

22 the non-Hispanic White population is 28 percent.  I compared

23 this in this table to other counties that are also about

24 55,000 people.

25     The reason I look at more than 55,000 is that's what the

CHRISTIAN GROSE — DIRECT

1  bill does.  The bill actually divides big counties and medium

2  counties of 55,000 and more differently from small counties

3  and creates regulations around those larger counties, and so

4  all the other counties besides Harris on average are much less

5  diverse racially and ethnically.

6      Harris County has the most Latino voters and the most

7  Black voters in the entire state of Texas in terms of

8  counties.  So one of my arguments is that, you know, these

9  data, anybody can get, the legislature has access to this, you

10 know, my argument is that they also know this and the — what

11 I say in the report is there's a targeting of that county

12 specifically and that county is the one that happens to have

13 the most Latino and most Black voters in the state and so

14 that's also relevant to the intent combined in the audit study

15 demonstrating discrimination through the experiment with the

16 text of the legislation that actually, you know, targets this

17 very diverse county.

18 Q.  So what's the basis for your opinion that it's

19 discriminatory, it's targeted at Harris County

20 discriminatorily?

21 A.  Yeah.  So the other part of it is that, you know, I look

22 at some of the voting patterns that happened in those larger

23 counties of 55,000 and up and the voting pattern show that in

24 2020, due to 24-hour voting and other innovations that Harris

25 County did, which are restricted by SB 1, the voter turnout

CHRISTIAN GROSE – DIRECT

1  controlling for other factors was higher in Harris County than
2  it was in some of the other large counties.
3      And so, again, that's data that people have access to.
4  They could do the same statistical analysis that I did, and,
5  you know, the legislature can look at that and see, you know,
6  that the creation of 24-hour voting in 2020 is directly
7  related to higher turnout, all its equal, in Harris County.
8      And then you also look at Harris County's high number of
9  Hispanic and Latino voters and Black voters and then we
10  also –– then we see that the intent is that there's an intent
11  to target that county with the largest number of Black and
12  Latino voters.
13  Q.  Derek, could you go to page 15, table 3.
14      Could you explain what this table captures?
15  A.  So this table is from the last part of my report.  It's
16  not on the Harris County part.  Is this the right table?  I
17  might be able to talk about this one.  Do you want to move
18  ahead?
19  Q.  Jumped a little early.  Let's see page 50.
20  A.  Oh, this is not the –– this is the supplemental report.
21  Q.  Oh, excuse me.  Yeah.  Could you call up 347.  There we
22  go.
23  A.  Okay.  Sorry.  What was the question?
24  Q.  Yeah.  Could you just explain what this table is?
25  A.  Okay.  Yeah.  So this is part of the –– the part of my

CHRISTIAN GROSE - DIRECT

1  report where I look at both Sunday voting, the restrictions on

2  Sunday voting in SB 1 and then the removal of 24-hour voting

3  in Harris County.

4      And before we get into the numbers, just the main takeaway

5  is the counties, counties that have early voting hours that

6  have been banned or restricted in SB 1 controlling for a bunch

7  of other factors, I ran the model, have higher turnout than

8  counties that didn't have those hours banned.

9      And so, you know, to be specific, what that means is SB 1,

10  for counties of 55,000 or more said, you can't have Sunday

11  voting before 9:00 a.m., said you can't have voting, you know,

12  between -- 24 hours a day anymore, and so those counties are

13  in that first row, right?  The first row are the ones where

14  the counties actually had restrictions.

15      And then the second row are the counties that that's the

16  way they were already running the elections in 2020.  So SB 1,

17  where they adopt the same practices in 2022, wouldn't really

18  affect them the same way it would affect these very small --

19  excuse me -- that would affect the large counties in the first

20  row.

21      And so the numbers, what this means is that I ran a

22  regression model and then I estimated predicted values where I

23  control for things like poverty, and income, and a lot of

24  other variables that explain why people turn out to vote or

25  not that are really common in political science, and then

CHRISTIAN GROSE – DIRECT

1  the — after you do that and you control for everything,

2  counties like Harris in the first row where SB 1 did actually,

3  you know, change their voting hours had in-person early voter

4  turnout of 61.2 percent.  And then counties that SB 1 would

5  not have caused them to change how they ran elections in 2020

6  had a much lower, about 7 percentage points lower.

7      So it's a lot of numbers, but the takeaway on that, again,

8  is these counties in the first row had higher turnout, all its

9  equal, and those are the counties that — and the legislature

10 could see this.

11     Again, this is data from an intent standpoint.  The

12 legislator can look and say, oh, these are the counties that

13 have higher turnout and have more extensive voting, and then

14 the restrictions that impacted those counties specifically are

15 the ones with the higher turnout controlling for a bunch of

16 other factors.

17 Q.  Why don't we move on to your opinion about Latino vote by

18 mail.  You testified that SB 1 reduces the percentage of

19 vote-by-mail electorate that is Latino, is that right?

20 A.  Yeah, that's right.

21 Q.  What is the basis for that opinion?

22 A.  So that, I looked at individual-level voter data by vote

23 by mail in 2020 in the Primary and the General, and 2022 in

24 the Primary and the General.  And so in 2020 it's before SB 1,

25 2022 it's immediately after SB 1.

CHRISTIAN GROSE - DIRECT

1    And then I just compared the share of the Latino

2  vote-by-mail electorate over time and find that the Latino

3  vote-by-mail electorate -- Latino vote-by-mail share of the

4  electorate went down after SB 1.

5  Q.  Derek, could you bring up HAUL MFV 353.  This is a table

6  that we already saw on page 5.  There we go.

7    Okay.  Could you just walk us through this table?

8  A.  Yeah.  So this is a table from my supplemental report and,

9  you know, this is basically just what's the percentage of

10  people who are using vote by mail in 2020 and 2022.

11    2020 is before SB 1 existed.  2022 is after SB 1 existed.

12  And both in the Primary and in the General Election you see a

13  decline in the share of Latino voters that's in percentage

14  terms after SB 1.

15    So just a couple numbers.  You know, in the Primary

16  Election, if you look at the Primary before SB 1 and the

17  Primary after SB 1, it's a decline of 2.3 percentage points in

18  the Latino vote-by-mail share of the electorate.

19    And if you compare General elections, we see something

20  really similar.  There's a 1.7 percentage point decline going

21  from 16.4 to 14.7.

22    So, I mean, the takeaway from these data are really

23  straightforward.  The share of the Latino vote-by-mail

24  electorate has gone down after the -- after SB 1, and so this

25  is a measurement of intent and effect and this is especially

CHRISTIAN GROSE - DIRECT

1  looking at those effects that came out of the finding of
2  intent from the earlier part of the report.
3  Q.  Is it possible that the rate went down because the
4  population of Latino or percentage of Latino voters in Texas
5  declined during that time?
6  A.  No, that's not the case.
7  Q.  Derek, why don't we bring up, if you could, HAUL MFV 350,
8  so actually the table on the very next page, page 6.
9      So what does this tell you?
10 A.  Yeah.  So this is just getting at what's the increase in
11 the Latino eligible electorate in the state.  I think one
12 thing that's really important in thinking about the data that
13 I looked at, and, you know, just in general thinking about
14 voting in Texas and impact on Latino voters is that the state
15 is growing and the Latino population is behind that growth,
16 right?
17     So just comparing 2020 to 2022 — 2022-2021 is in the
18 table because the data come out like a year later, the citizen
19 voting aging population, which is a good measure of the
20 eligible electorate, who is 18, who is citizen in the state,
21 that's gone up.  That's gone up from 30.5 to 31.1.
22     And then at the same time the average share of the
23 vote-by-mail electorate has gone down, right?  So in the
24 General Election it's gone down by 1.7, but, to me, what's
25 really important about this is, you know, what we would expect

CHRISTIAN GROSE - CROSS

1  to happen is as the Latino population grows and the Latino

2  voting eligible population grows there will probably be an

3  increase in the share of those using vote by mail, and so but

4  instead it's the Latino population is growing, Latino

5  vote-by-mail share is declining across a really short period

6  of only two years.

7  Q.  Did you give an example of a county where a Hispanic vote

8  by mail declined?

9  A.  Yeah.  So there's a few.  There's quite a few.  There is

10 254 counties and I look at all of them.  One of them is a

11 county at the border called Val Verde County, and that county

12 is about 80 percent Latino — 80 percent Latino-Hispanic, and

13 that county went from a fairly large number of voters who

14 voted by mail to zero, to zero voters that voted by mail, and

15 so the total number of Latino voters, which is most of the

16 county, went from a lot to, you know, infinitesimally and

17 infinitely small.

18          MR. BIETER:  That's all I have.  Pass the witness.

19          THE COURT:  Anything else from this side?

20          Any cross?

21          MR. BRYANT:  Yes, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. BRYANT:

24 Q.  Dr. Grose, it's good to see you again.  We had a chance to

25 meet, I believe on May 1st out in Los Angeles when I took your

CHRISTIAN GROSE - CROSS

1  deposition.  Glad to have you here in San Antonio.

2      You described in your testimony a randomized audit study

3  that was conducted, the data collection was conducted in April

4  of 2020, is that correct?

5  A.  We started the project —— I don't remember exactly.  It

6  was spring 2020, yeah.

7  Q.  Okay.  And I think we can look at your report but I

8  believe that the emails were sent out April 21st and 22nd of

9  2020, and, of course, lots of work had to be done after that

10 when responses came in, et cetera.  I'm going to call that,

11 for purposes of our discussion today, the April 2020 study so

12 we'll know what ——

13 A.  Can I just add one thing?  So the data also come from 2021

14 because we're looking at voting on SB 1 and the responses

15 don't come in, in April, so it is a little bit more than that

16 and I think it's, to be fair, it's got a —— it's really 2020

17 and 2021.

18 Q.  Well, I might differ with you on that.  It's certainly

19 true that there couldn't be any voting on SB 1 until 2021

20 because it didn't exist ——

21 A.  The emails came in after that date too so we had to spend

22 the time waiting for the emails to respond to do the

23 measurement of the discrimination.

24 Q.  Are you saying that the emails came in after SB 1?

25 A.  No.  I just said that they came in after April 2020.

CHRISTIAN GROSE - CROSS

1  Q.  Okay.  As long as you know that when I refer to the

2  April 2020 study, it's your randomized audit study that I am

3  referring to.

4       Is it fair to say that the reliability of your opinions in

5  this case regarding SB 1 is dependent on the quality and

6  reliability of the data that was gathered in the April 2020

7  study?

8  A.  It's — I would say no because there's a lot more than

9  that study in my opinions and the data are high quality also,

10 but the data — what I rely upon is that and a bunch of other

11 stuff that we were just talking about.

12 Q.  The data that you used to determine responsiveness of

13 legislators to the emails was generated in the April 2020

14 study, is that right?

15 A.  Yes, except for the — we also looked at if they voted for

16 SB 1 or did not, which is in 2021, which I think is really

17 important, like and so just saying that was it is —

18 Q.  That's not data you had to gather.  It was a public vote.

19 You know exactly who voted for and against SB 1 on August 31,

20 2021, don't you?

21 A.  No, we had to collect that data.  We had to actually go

22 and code it and put it into the spreadsheet that I turned

23 over.

24 Q.  Okay.  As you mentioned, the April 2020 study was actually

25 a classroom exercise in one of your graduate classes at

CHRISTIAN GROSE – CROSS

1   U.S.C., right?

2   A.   It started that way.   That was the beginning of the study,

3   yes.

4   Q.   And would you agree that the April 2020 study was done for

5   an entirely different purpose than the one for which you

6   ultimately used it in your reports and your opinions in this

7   case?

8   A.   I'm not sure if I would really agree with that.   We were

9   doing a study that is testing something we had published

10  previously in a peer-reviewed journal and as part of my work

11  in this case I wanted to rely on peer-reviewed research,

12  including my own, to bring data to bear on what was going on

13  with SB 1, so I don't know if that's quite right.

14  Q.   Wasn't the purpose for which you did the classroom

15  exercise in April 2020 to try to replicate a study of 14

16  different states, one of which was Texas, that you had

17  previously done years before and that was published in 2018,

18  that was the only purpose at that time, right?

19  A.   I mean, another purpose was to write peer-review research

20  and so the point of it was to actually publish this and to

21  compare it and look at the most current.   And that study that

22  you're referencing in 2018, we compared discrimination to

23  legislation in all of the states, so it's actually exactly

24  what I did in the expert report.   So I don't think it's –– the

25  way you are framing it isn't the way I would frame it.

CHRISTIAN GROSE - CROSS

1    Q.  The purpose for doing the April 2020 study was not related

2    to determining intention to discriminate in any future

3    legislation that Texas might pass in 2021 or thereafter, was

4    it?

5    A.  I don't agree with that, the way you framed it.

6    Q.  And it was not a study done to determine whether there was

7    any evidence of intentional discrimination, the enactment of

8    SB 1, was it?

9    A.  So I also don't agree with that and I'll explain a little

10   bit.

11   Q.  I'm sorry, Dr. Grose, your attorney can ask you questions

12   that will give you a chance to explain.  I just want you to

13   answer my questions.

14   A.  I was going to finish, if you don't want me to finish I

15   guess I won't.

16          THE COURT:  You've answered his last question.

17          Next question.

18   BY MR. BRYANT:

19   Q.  At the time that you and your students did the April 2020

20   study, you didn't know anything about SB 1, did you?

21   A.  I mean, in 2021, in April of 2020, I did not know what was

22   happening in 2021.

23   Q.  And SB 1 was passed by the 87th Texas Legislature that did

24   not exist at the time that you and your students did the

25   April 2020 study, did it?

CHRISTIAN GROSE – CROSS

1  A.  I don't know the number of the legislature and what year

2  they are associated with unfortunately.

3  Q.  Do you know that the legislature that was in office in

4  2020 was not the legislature that passed SB 1?

5  A.  The –– I do know that there were different legislatures,

6  but most of the legislators who served in 2021 also served in

7  2020 and they are the ones that are the subject of the study

8  in my expert report.

9  Q.  Certainly you had not been retained by the plaintiffs in

10 this case to give any expert opinions or do any expert work at

11 the time that you did the April 2020 study, did you?

12 A.  I'm not sure if I would say that because, again, as I'm

13 doing the study I may have been retained while we were working

14 on the study.  I don't recall.  You are talking about the

15 start date of doing the study, I don't remember when I was

16 retained relative to when we were working on the study.

17 Q.  Is it correct that you were only retained by plaintiffs in

18 this case in 2022?

19 A.  I'm not sure.  I can't remember if it was 2021 or 2022.

20 Q.  Now, you chose to do that April 2020 study at a somewhat

21 unusual time, didn't you?

22 A.  I'm not sure what you mean by that.

23 Q.  Okay.  In April 2020 you now know that the Texas

24 Legislature wasn't even in session, was it?

25 A.  I don't think so, but I'm not sure, yeah.

CHRISTIAN GROSE - CROSS

1  Q.  And you know now that the Texas Legislature only is in

2  session 140 days, every odd-numbered year, plus any called

3  special sessions that may be called by the governor?

4  A.  I'm not sure of the exact dates that you are referring to,

5  no.

6  Q.  And do you know that the Texas Legislature is a part-time

7  legislative body, right?

8  A.  Yes.

9  Q.  Do you know that the members of the Texas Legislature

10  generally are not paid a living salary for their service as

11  legislators?

12  A.  I mean, I actually don't know if I would say that.  I know

13  that they are paid similarly to many other state legislators,

14  which is low.

15  Q.  And do you know that under the Texas Constitution Texas

16  legislators are only paid $600 a month when the legislature is

17  not in session?

18  A.  I don't have the exact data on that in front of me, but we

19  did look at that as well as some of those other data about

20  Texas and other states in our 2018 study but I don't remember

21  off the top of my head that.

22  Q.  Do you understand now that in general when the Texas

23  Legislature is not in session, like when these emails were

24  sent out, the Texas legislators go back to their home

25  districts and try to earn a living in jobs or professions

CHRISTIAN GROSE - CROSS

1  other than being full-time legislators?

2  A.  Most of them are still doing their job though, so I don't

3  actually — I wouldn't entirely buy that premise, you know,

4  and again, the amount Texas legislators are paid is really

5  similar to what, you know, other states get.

6        MR. BRYANT:  Objection.  Nonresponsive.

7        THE COURT:  Sustained.

8        So you don't know, right?

9        THE WITNESS:  Could you repeat the question then

10  because —

11        MR. BRYANT:  I think you've answered the question —

12        THE COURT:  Then move on.

13        MR. BRYANT:  — I'm ready to move on.

14  BY MR. BRYANT:

15  Q.  But you and your students had no knowledge that the Texas

16  Legislature was not in session and that the legislators were

17  likely to be back home trying to earn a living on those dates

18  that you chose to send out the emails in your April 2020

19  study, did they?

20  A.  No.  I actually think we did talk about that.  And you

21  know, again, this is my Ph.D. students who are — they are

22  scholars, one of them is now a professor, who were working on

23  this project and so, you know, we purposely pick an election

24  year in which to do these audit studies, regardless of the

25  things that you are talking about, like if a legislature is in

CHRISTIAN GROSE - CROSS

1  session, and so we knew these things and it's important to

2  do -- it's important to ask people about voting when

3  there's --

4          MR. BRYANT:  Objection.  Nonresponsive.

5          THE COURT:  He answered.  Next question.

6  BY MR. BRYANT:

7  Q.  And have you done anything, even up to today, to determine

8  the extent, if any, to which those special circumstances of

9  April 2020 legislature not being in session, the legislators

10 being home working, may have affected the results of your

11 study?

12 A.  Yes.

13 Q.  What did you do?

14 A.  We did a randomized audit study.  So what's really nice

15 about that is all of the things you are talking about are

16 controlled for through the random audit.

17      So if somebody is busy in their district because they have

18 another job and they don't respond, they are as equally likely

19 to be assigned.  If half the legislature is busy and can't

20 respond to an email, there is equally likely to respond.

21      So what you are saying is right, and we thought about

22 this, you get no responses at all.  But instead we get a big

23 gap.  So that's why the randomization is so important, is all

24 of these things could be happening and we have thought about

25 it.  And it was really important for us to do the

1  randomization and overcome those problems.

2  Q.  Was one of your goals or the goal of the April 2020 study

3  to gauge the responsiveness of members of the Texas

4  Legislature's emails from their constituents inquiring about

5  voting in the November 2020 Election in Texas?

6  A.  Yes.  I mean, we didn't say November 2020 but that was the

7  year we sent it.  So just to be clear that the text didn't

8  mention a year, but it was done in 2020.

9  Q.  Could we bring up page 7 from Dr. Grose' first report.

10      So the highlighted portion says that in these randomized

11  audits legislators received requests from constituents.  So it

12  was a specifically important feature that the legislators

13  identify the people purportedly sending the emails as their

14  constituents, is that right?

15  A.  I'm not sure.  I'm not sure if that's right.

16  Q.  Would whether or not the sender of the email is a

17  constituent have an effect on whether the legislator is likely

18  to be responsive to a random email they get from somebody they

19  don't know?

20  A.  No.  It's because of the randomization that would control

21  for that explanation if they are constituent or not.

22  Q.  Let's pull up page 9 from Dr. Grose' report.

23      You also said on page 9 that all Texas legislators in 2020

24  received inquiries from constituents asking for assistance in

25  voting in the 2020 Election, was that correct?

CHRISTIAN GROSE - CROSS

1  A.  Yes.  I wrote that.

2  Q.  Now, when you described your study on direct, you didn't

3  mention one feature of it, I believe, and that is that you

4  chose some different names for the purported sender of the

5  emails in some instances than in others, and is it correct

6  that half of the emails in English purported to be from a

7  constituent named Santiago Rodriguez and half purported to be

8  from a constituent named Jacob Smith?

9  A.  Yes, and that was consistent with the previous study we

10 published in 2018.

11 Q.  And half of the emails in Spanish were also purportedly

12 from Santiago Rodriguez and half were purported to be from

13 Jacob Smith, is that right?

14 A.  So you said half of the Spanish were from —

15 Q.  From someone purportedly named Santiago Rodriguez and

16 someone purportedly named — half were purportedly from Jacob

17 Smith?

18 A.  Yes.  We randomly varied that.

19 Q.  And your design in this study was that each legislator had

20 an equal probability of being contacted by a constituent who

21 was perceived by the legislator to be Latino versus a

22 constituent who was perceived to be White, is that right?

23 A.  Yes.  And we were really interested in the Spanish

24 language and English language part because that was the part

25 of the 2018 study that we didn't spend as much time on and the

CHRISTIAN GROSE — CROSS

1  reason we were doing the second study to begin with.

2  Q.  And you stated in your report that, quote, "these messages

3  from Latino constituents and White constituents were sent

4  directly to Texas state legislators and coincided with the

5  2020 Election," did you say that in your report?

6  A.  I don't remember off the top of my head.  It's possible.

7  Sounds right, but I —

8  Q.  Does the language on the screen look familiar to you —

9  A.  That looks like it is —

10  Q.  — from your February 28th, 2022 report?

11  A.  Yes.  That looks like it's in my report.

12  Q.  Now, that wasn't quite accurate, was it, because emails

13  sent on April 21 and April 22 of 2020 did not, quote,

14  "coincide with the 2020 Election," unquote, did it?

15  A.  No, I don't agree.

16  Q.  For some reason, is it true that your April 2020 study

17  also assumed that anybody named Jacob Smith was White or

18  Anglo, is that right?

19  A.  No.  The study was focused again on Spanish and English

20  language constituents, and that was done to follow the

21  practice of past studies to make sure we were controlling for

22  name as well.  So I would say no because of that.

23  Q.  You just saw the excerpt that said it was an attempt to

24  identify — have the legislators believe that their emails

25  were coming either from a Latino constituent or a White

CHRISTIAN GROSE - CROSS

1  constituent, do you recall that language?  We can bring it up

2  again.

3  A.  Sure, that would help.

4  Q.  Okay.  You stated in your report, quote, "thus each

5  legislator had equal probability of being contacted by a

6  constituent who was perceived by the legislator to be Latino

7  verses a constituent who was perceived to be White," was that

8  the design of your study?

9  A.  That's a sentence in my report.  That is not the design of

10  my study.

11  Q.  And I ask you again, was the use of the term or the name

12  Jacob Smith intended to signal to the legislator that Jacob

13  Smith was a White constituent sending the email?

14  A.  Again, if you read the second sentence in the part you

15  have pulled up here, it says, "the constituent message in

16  Spanish signaled to Texas legislators that the constituent was

17  Latino and was a language minority."  So the names that you

18  are asking about were used to control for name consistent with

19  prior studies.

20      The key part of the report is in the second sentence after

21  the one you have just referred to where we're using Spanish to

22  signal Latino ethnicity in the presence of being a language

23  minority and so the names were to control for past studies and

24  how it was done in past studies.

25  Q.  And so were you trying to signal to the legislators that

CHRISTIAN GROSE - CROSS

1  if somebody sent them an email in English it had to be from a

2  White person?

3  A.  I don't know if I would characterize it that way.

4  Q.  I can understand why.  Are you aware that Smith is one of

5  the most common names, last names of African-Americans in

6  Texas?

7  A.  I thought it was Williams or Washington, but I -- and I

8  believe it's the most common White name in Texas.

9  Q.  Did you or whoever designed your study have a stereotype

10  that all people named Smith are White?

11  A.  No.

12  Q.  Wasn't this a flaw in your methodology in this study?

13  A.  No.

14  Q.  Now, the email message you sent to the legislators in

15  English stated --

16      Could we pull that up, please, it's on page 9.

17      In this instance it says, "My name is Santiago Rodriguez

18  and I've heard a lot in the news lately about identification

19  being required at the polls.  I don't have a driver's license.

20  Can I still vote in November?  Thank you for your help.

21  Sincerely, Santiago Rodriguez."

22      And would you agree that a recipient of this email would

23  assume that he's being asked about voting in November 2020?

24  A.  Yes, that's right.

25  Q.  And would you agree that a legislator who received this

CHRISTIAN GROSE — CROSS

1  would interpret it as being asked about the identification
2  required for in-person voting because it refers to as "at the
3  polls?"
4  A.  No, I don't necessarily — I don't necessarily agree, no.
5  Could be — you know, when constituents write messages they
6  are not nearly as precise as lawyers.
7  Q.  Now, as we discussed earlier, a premise of your study is
8  that the legislators are receiving these emails from
9  constituents.  Could you point out what, if anything, in this
10  email tells a legislator that the writer, Santiago Rodriguez
11  in this case, is a constituent of Senator Bettencourt?
12  A.  So the fact the person is writing Senator Bettencourt is
13  implying that they're a constituent.  You frequently do not
14  see people emailing specific details to people that don't
15  represent them, but it does not say the word "constituent," in
16  the text, if that's what you mean.
17  Q.  Is there anything —
18        THE COURT:  In the email there's no address of
19  Santiago Rodriguez put there?
20        THE WITNESS:  No, there's an email, and so this is
21  consistent with what — so the reason we did this, if you want
22  me to elaborate is some of the —
23        MR. BRYANT:  I was just about to ask, Your Honor.
24        THE COURT:  One at a time.  And me first, so...
25        MR. BRYANT:  You'll ask a better question anyway,

CHRISTIAN GROSE — CROSS

1  Your Honor.

2          THE COURT:  I used to be a legislative aide.  I mean,

3  if our office received —— not in the Texas House, at the U.S.

4  House, but if we got a correspondence from somebody, the first

5  thing we looked at is are they a constituent.  And if they

6  weren't, they got a form, thank you for your letter but you're

7  not his constituent, we've taken the liberty of forwarding

8  your correspondence to, and then directed them to the right

9  person.

10          THE WITNESS:  Yeah.

11          THE COURT:  At the Texas Senate and the Texas House,

12  with as little staff as they have, I could see if it's not a

13  constituent they would just disregard.  How do you take that

14  into account here for your study?

15          THE WITNESS:  No, it's a really good question.

16          So two things.  The reason we kept it short and

17  probably shorter than a typical letter would be is that you're

18  more like to get a response the shorter it is, that's what the

19  studies show, but the accounting for that is the

20  randomization.

21          So if every legislator in Texas got all those emails

22  and every single one was like, we're not a constituent, it

23  would be zero percent response, both of those who voted for SB

24  1 and both those that didn't, right?

25          And so the idea is if some legislators are more

CHRISTIAN GROSE - CROSS

1  likely to throw out a letter that doesn't have an address or

2  that doesn't have the word "constituent," they are in both

3  groups.  They are in both the Spanish language and the English

4  language group.

5        And so I hear what you are saying, I believe you

6  worked in the legislative office many years ago, but the

7  practices that vary are controlled for through the experiment

8  and so the — we shouldn't have gotten any responsiveness at

9  all, if that's what's going on, and instead we got a lot of

10  responsiveness to the English language one.

11        THE COURT:  Right, but how do you translate that into

12  intent?  That's the problem I have.  It could be just some —

13  one office is friendlier, more constituent-friendly than

14  another office.  How do you make that next leap to intent?

15        THE WITNESS:  It's from the averaging effect all the

16  way up.  So any one office by itself isn't going to give it to

17  you, it's the entire thing.  It's called like the average

18  treatment effect.  So it's the legislature, right?

19        So if you think about it, this is what's happening

20  with all of the legislators who voted for SB 1.  It's the

21  institutional difference in discrimination.  That's the

22  response.  We're focusing a lot on an individual email and,

23  really, it's about all of the responses.

24        And then when you add — so if you think about the

25  resume study, right, you might just not have responded on a

CHRISTIAN GROSE - CROSS

1  resume because you're busy that day, right?  But if you get a

2  hundred resumes and you don't respond to 50 of them who are

3  coming from people who seem to be like they are Latino, that's

4  the broader aggregate of evidence of discrimination.

5       So the individual-level stuff is not the

6  discrimination, it's the institutional aggregate average.  And

7  that's really important.

8       THE COURT:  Go ahead.

9  BY MR. BRYANT:

10 Q.  Is it fair to say there's nothing that went with the

11 emails that would signal to a legislator that the sender even

12 lived in their district?

13 A.  Like we just talked about, it's the -- there's nothing

14 that would suggest they do or they don't.

15 Q.  Now, I understand your students were able to and did

16 determine whether the emails they sent were opened, is that

17 right?

18 A.  There was a -- it wasn't the students, it's the email

19 program that allows you to see if an email is opened.

20 Q.  Okay.  And but you couldn't determine who opened the

21 emails, could you?

22 A.  I'm not sure -- I don't -- I'm not sure if I follow.

23 Q.  The program that you described indicated to you that

24 someone opened the email that you sent, for example, to

25 Senator Bettencourt, but you couldn't know whether that was

CHRISTIAN GROSE - CROSS

1 Senator Bettencourt, or a legislative employee, or a college
2 intern, or who in the world actually opened it other than it
3 had to be somebody who had access to Senator Bettencourt's
4 email, is that fair?
5 A.  I'm not sure if I would say that's fair because the
6 legislative office is an enterprise.  There's research on this
7 by Robert Salisbury published in the *Legislative Studies*
8 *Quarterly*.  You know, when you're acting on behalf —
9 you're — either the legislator is delegating to their staff
10 to act on their behalf, and from a constituent or voter's
11 perspective, they're writing their legislator and the response
12 they get is on behalf of or from the legislator.  And that's
13 what matters.
14 Q.  Did you have any way to know whether the legislators to
15 whom the emails were sent ever actually saw or read them?
16 A.  I mean, some of them — well, actually, in this particular
17 study, not necessarily, but our previous study we did
18 follow-ups and spoke to legislators after the fact and some of
19 them did read it.  And I hope to do that with this study too.
20 Q.  Would you agree that a basic premise of your study is that
21 the Texas legislators actually received and read the emails
22 that you sent to them?
23 A.  I'm not sure if I agree with that.  I think there's a lot
24 more nuance that I just talked about.
25 Q.  And you also recorded when there were responses to the

CHRISTIAN GROSE - CROSS

1  emails to the legislators, right?

2  A.  Yes.

3  Q.  And your assumption was that the response was either from

4  the legislator or directed by the legislator?

5  A.  Well, it's the legislator inasmuch again as it's the

6  office.  So like legislators, when they sponsor bills, often

7  write them with their staff, right?  So this is the legislator

8  as the enterprise is the response.

9  Q.  But the link that you tried to make was not between votes

10  on SB 1 by somebody in the office of a legislator, the SB 1

11  votes were actually the act of the legislators themselves,

12  right?

13  A.  So it is the legislators because, just like you are here

14  on behalf of the State of Texas, you are working on the behalf

15  of the State of Texas and so like what you are asking me is

16  not you personally it's actually the State.  And so this is

17  their office and the legislator who is responding.

18      And in, you know, states like Texas that have less staff,

19  the legislators do often respond to the emails.  They don't

20  always have the staff levels to be able to have staff respond.

21  So from the voter's perspective and the staff -- or excuse me

22  -- the legislator's perspective, it's the office and the

23  legislator that matter here.

24  Q.  Is it true that that many of the responses that you

25  received from the emails to the legislators were not from the

CHRISTIAN GROSE - CROSS

1  legislators themselves but from someone in their office?

2  A.  I don't remember exactly but I know I think most of them

3  were signed by a legislator not by a staff member but I would

4  have to go back and look.

5  Q.  Now, you touched a little bit in direct on the fact that

6  some responses from legislators or their staff you considered

7  helpful because they answered the question, "can I vote in

8  November," and those were counted as responsive, is that

9  right?

10  A.  Those were counted as responsive if they answered the

11  question, to be clear, yeah.

12  Q.  And if they responded but didn't answer the question, you

13  counted them as nonresponsive?

14  A.  Or not answering the question, correct.

15  Q.  And that was true even if it was responding with a

16  question like, "call me, I want to help you," is that right?

17  A.  No, I don't think that's right.  It was if they answered

18  the question.  So anything that didn't answer the question

19  would have been coded as did not answer the question.  So that

20  was the measure, did they answer the question.

21  Q.  And an example of such a response would be a response that

22  said, "call me, I want to help you?"

23  A.  No, that's not answering the question.  I don't think

24  anyone said that.

25       THE COURT:  But that's another one where I have

CHRISTIAN GROSE - CROSS

1  questions about.  So if they responded going, "are you a
2  citizen," I mean, even somebody who, a Democrat or someone who
3  would not be, you know, in your characterization, intent to
4  discriminate, I mean, that seems to me like a valid question,
5  trying to help somebody out, and you would characterize that
6  as a bad answer?
7        THE WITNESS:  No, not a bad answer.  That's why I'm
8  clarifying.  We coded — the coding is just did they answer
9  the question, not a bad or a good answer.  It's did they
10 answer the question.
11       THE COURT:  Well, so if they answered that way, did
12 they answer the question, or not?
13       THE WITNESS:  That would be coded not; however, most
14 of them — most of them weren't like that.  Most of them were
15 things like, you know, not really directly doing anything.
16 There were a couple that said call me and gave a number, but
17 that's not answering the question.
18       THE COURT:  Well, why is that not answering the
19 question?
20       THE WITNESS:  Well, because we asked — they say, "do
21 I need a driver's license to vote," so we coded — this is
22 stricter than responding or not, so we have the "respond or
23 not" as well.  This is just to see did they say if you need a
24 drivers license or not to vote.  So it's just a narrower
25 measure, not necessarily better or worse than the other

 1  measure.

 2          THE COURT:  Go ahead.

 3  BY MR. BRYANT:

 4  Q.  So if you sent an email to a Senator and his aide

 5  responded with, "call me, here's the number," and you would —

 6  that would — response would be coded as nonresponsive, and if

 7  that Senator voted against SB 1 sixteen months later, you

 8  would say that's intent to discriminate against Latinos,

 9  right?

10  A.  Not really how I would characterize it on both counts

11  actually.  So, again, we measured did they answer the

12  question.  That's the measure, not bad—good.  And so the

13  question I think you are asking me was more about bad—good and

14  so we measured did they answer the question.  And answering

15  the question is helpful.

16      And then the other part is, no, one email from one person

17  is not what would be related to the conclusion of

18  discriminatory intent.  The conclusion of —

19          MR. BRYANT:  Objection.  Nonresponse, Your Honor.

20          THE COURT:  You've answered the question, sir.

21  BY MR. BRYANT:

22  Q.  Was there another big obvious reason why Texas legislators

23  might not have responded to an email sent to them or to their

24  offices in April 2020, namely COVID?

25  A.  I mean, again, I'm not — it's the difference in response

CHRISTIAN GROSE - CROSS

1  that matters, not if any one individual opened an email.  And
2  so I did a lot of email during COVID.  I'm not sure how I
3  could answer that.
4          MR. BRYANT:  Object as nonresponsive.
5          THE COURT:  That's sustained.
6  BY MR. BRYANT:
7  Q.  Dr. Grose, is it true that April 20th, 2020 was close to
8  the very deepest part of the nationwide shutdown because of
9  the COVID pandemic?
10  A.  I'm not sure.  As I recall, it went on for quite a while.
11  Q.  Was April 2020 a time when the U.S. Government had
12  declared a national pandemic emergency?
13  A.  Yes.
14  Q.  And urged all Americans to stay home, unless they were
15  doing essential work, like being a first responder or working
16  in a hospital or keeping the electorate running?
17  A.  That was, yes, during the pandemic.
18  Q.  And were you aware that the Governor of Texas had also
19  declared a similar statewide COVID emergency at that time?
20  A.  I mean, I'm not sure about the Governor of Texas, but many
21  governors had, yes.
22  Q.  And were you aware that Travis County, Texas, where the
23  Texas Capitol is located and the main legislative offices of
24  the Texas legislators are located, had also urged all offices
25  to close unless they were engaged in essential government

CHRISTIAN GROSE - CROSS

1  functions?

2  A.  I am not aware of the details of Travis County.

3  Q.  Would you consider answering an email like the ones that

4  your students sent to the Texas legislators in April 2020 an

5  essential government function?

6  A.  Mmm, I mean, that's a good question.  In some ways I would

7  say yes because it's the job to talk to constituents but I

8  don't know how it's defined in the state, no.

9  Q.  Were you aware that the Texas Capitol where the Texas

10  legislators' offices are located was closed to the public at

11  the time your students sent the emails in April 2020, the

12  public couldn't even go in the building?

13  A.  That may be the case.  I think many legislators often

14  respond to emails off-site in their districts too.

15  Q.  How, if at all, did you take into account the

16  extraordinary circumstances of that COVID pandemic in your

17  April 2020 study and your interpretation of its results?

18  A.  I mean, there's a couple ways.  So one is we did this

19  study previously and published it in 2018.  That was parallel

20  and in a different period and we wanted to see did it hold in

21  a different era where things were different.

22      And, you know, so part of the whole point of the study was

23  it doesn't matter what else is going on we want to see if this

24  is happening.  And then, again, because of the randomization,

25  you know, all the 150 House members and 31 Senators are

CHRISTIAN GROSE - CROSS

 1  getting a coin flipped to be put into one of these.

 2      So if COVID is shutting everything down, no one is

 3  responding to anything, and there should be no gap.  There

 4  should be no discrimination gap.  So some people are

 5  responding.  30 percent more were responding to the English

 6  language during that time and so it's the difference that

 7  matters.  And so I don't know if I was clear about this enough

 8  through this line of questioning, it's not about one response.

 9  It's not about some emails.

10          MR. BRYANT:  Objection.  Nonresponsive.

11          THE COURT:  He's sort of responding to my questions.

12          Go ahead.

13          THE WITNESS:  Yeah.  So it's the -- like COVID

14  happened and COVID may make it harder to respond, but COVID,

15  like the randomization controls for that because everyone

16  would not respond, right, because if everything is shut down

17  and no one is checking their email, and no one is responding,

18  you would have zero percent responding to a Spanish-language

19  constituent and zero percent responding to an English-language

20  constituent, but you have a lot of legislators who chose to

21  respond.

22          Probably less than what would happen if there wasn't

23  COVID, but it's the gap.  It's the Latino versus the White

24  gap.  It's the Spanish versus English language gap, and so

25  even if there's lower responsiveness overall, it's that

1    aggregate difference that is the discrimination.

2        It's not about, are you busy, or is there COVID, or

3    is something happening.  It's actually that — that's why the

4    audit study is so important.

5        And then I guess, can I just say one other thing on

6    it?

7        THE COURT:  No.  Wait for a question.

8        THE WITNESS:  Okay.

9    BY MR. BRYANT:

10   Q.  The email inquires about the identification requirements

11   for in-person voting at the polls in Texas in November 2020,

12   doesn't it?

13   A.  I already answered that I think.

14   Q.  And SB 1 had no provisions about identification

15   requirements for in-person voting in Texas, did it?

16   A.  As I recall, the main part that would be parallel to the

17   study is that there's a driver's license number required to

18   apply for things.

19       And, you know, I mean, I have a broken foot right now, you

20   can't see it, it hurts a little bit.  I may have intended to

21   go vote in person and then I broke my foot and wanted to do a

22   request and so, to me — you know, again, a person writing

23   this and making these distinctions in voting, and so I think

24   it's in SB 1, the driver's license part is in SB 1 because the

25   rules changed on what you need to do with driver's license for

CHRISTIAN GROSE — CROSS

1  some of the voting.

2  Q.  My question was whether or not SB 1 made any changes in

3  the identification required for in-person voting in Texas?

4  A.  I think I answered that at the beginning.

5  Q.  What's the answer?

6  A.  I said I think that it's — the restrictions on driver's

7  license, to my knowledge, were about the vote by mail.

8  Q.  And not about in-person voting?

9  A.  There were driver's license restrictions already there

10 too.

11 Q.  Now let's talk about the long time interval between the

12 study in April 2020 and the passage of SB 1 in August 2021.

13 Is it your opinion that the time interval, which is about 16

14 months, is irrelevant to the validity of your study?

15 A.  I think 16 months is too long, and so I wouldn't say — I

16 wouldn't agree with the number, and then I don't think it's

17 irrelevant.

18 Q.  I'm not sure I understand your answer.  Are you saying

19 that you don't agree that there was a 16-month gap between

20 April 2020 and August 2021?

21 A.  No.  When people responded was shorter than, and since

22 this study is about measuring if people responded I think

23 characterizing a 16 month isn't quite right.  And then I also

24 said I don't totally agree with the characterization.

25 Q.  Would you agree that the reliability of your study and

CHRISTIAN GROSE - CROSS

1  opinions would have been greater if you had done that email

2  study at least in 2021?

3  A.  No, not necessarily.

4  Q.  Did you know when you prepared your report and opinions in

5  this case that SB 1 was passed in August 2021 by an almost

6  unanimous party vote, meaning that all but one of the

7  Republicans in the Texas Legislature voted for SB 1 and all of

8  the Democrats voted against it?

9  A.  I didn't look at that in the study.

10  Q.  Would you agree that the correlation between political

11  party and the vote on SB 1 is much higher than any correlation

12  between email responsiveness that you gauged and votes on SB

13  1?

14  A.  Like I said, I didn't look at those correlations and I'm

15  not sure if that's right because 30 percentage points is a

16  pretty large gap.  And I have looked at this in a previous

17  study.  I don't want to go on, if it's not related, but I'm

18  happy to talk about that.

19  Q.  Did you consider, up to today, the possibility that

20  partisanship rather than intention to discriminate is the best

21  explanation for the vote on SB 1?

22  A.  Yeah.  In the previous study I referenced, we looked at

23  that and we found partisanship did not explain a lot of the

24  discriminatory gap.  It was race and ethnicity that explained

25  the discriminatory gap, so I had considered that previously.

CHRISTIAN GROSE - CROSS

1  Q.  Yeah.  My question is whether you considered it in doing

2  the study on which you base your report and opinions today.

3  A.  So, I mean, we did in the sense of we had already looked

4  at that question in our previous study and we wanted to now

5  test race and ethnicity.

6  Q.  So in your previous study did you conclude that

7  partisanship can never explain the results of a responsiveness

8  study?

9  A.  No.  We found the partisanship didn't explain that much in

10  the earlier study and it was actually race and ethnicity and

11  we looked at both.

12  Q.  In connection with your study, report, and opinions did

13  you give any consideration to whether the individual

14  legislators to whom the emails were sent likely had different

15  language capabilities?

16  A.  I mean, we considered everything like we have talked about

17  before, in the sense that that would be controlled for through

18  the randomization and in Texas we didn't think it was

19  significant because so much in Texas is done in Spanish.

20  People speak in Spanish.  The -- you know, government websites

21  are in Spanish.

22      So we talked about that and we did consider it, but I

23  think the way we considered it was that it's not something we

24  would be super concerned about.

25  Q.  Are you aware of the fact that there are very great

CHRISTIAN GROSE – CROSS

1  demographic differences in the constituents of various

2  legislators in Texas?

3  A.  In what sense?  Constituents ——

4  Q.  For example, in Rio Grande Valley you might have

5  constituencies that are 85, 90 percent plus Hispanic and who

6  speak Spanish, and in Northeast Texas, or somewhere out in

7  Northwest Texas, there may be well less than 10 percent of the

8  constituents who speak Spanish?  Did you take into account any

9  of those individual circumstances of legislators or their

10  districts?

11  A.  I am aware of Spanish-language differences across the

12  state, for the first question.  And then the second one, yes,

13  we did take that into account.

14  Q.  And how did you take it into account?

15  A.  We did it in two ways.  One —— I feel like a broken

16  record —— but the randomization controls for that.  So

17  somebody who represents a Rio Grande Valley district is going

18  to be put into the Spanish-language one, and then the

19  neighboring person is going to be into an English-language

20  one.  And somebody up north in the state is going to be put

21  into the two groups as well.

22       And remember we did an additional follow-up where we

23  looked also to see if this was only in districts that were,

24  you know, had high levels of Latino population too.  And the

25  results are really similar.

CHRISTIAN GROSE - CROSS

1  Q.  Are you saying that you did not send Spanish-language

2  emails to legislators whose districts did not contain a high

3  level of Hispanics?

4  A.  No.  That's not what I said.

5  Q.  Okay.  Please explain what you said so I'll understand.

6  A.  So everyone is equally likely to be randomly assigned,

7  again, Spanish or English.

8      So if you're a legislator, just think about the Rio Grande

9  Valley, you know, in the Senate there is maybe five, four

10  districts there.  I'm not sure the exact number.  You know,

11  basically two out of the five or three out of the five would

12  randomly get a Spanish-language one and the other two would

13  get English.

14      And then the rest of the state, Dallas, Dallas County,

15  Fort Worth, same thing.  Everyone is randomly assigned.

16      So those other things about the constituencies that you

17  are talking about are controlled for through the

18  randomization.  Again, that's why the experiment measures

19  discrimination.

20      A lot of the other studies that don't use this method,

21  it's harder to get at the discriminatory intent because you

22  don't have all the other things controlled for.  And, here,

23  all those other things are controlled for because everybody

24  has an equal probability of being put into English or Spanish.

25      So, to be clear, we did not send only Spanish to the Rio

CHRISTIAN GROSE - CROSS

1  Grande Valley legislators.  That would be a bad design.

2  Q.  And so you sent Spanish-language emails to many

3  legislators who likely had relatively few Latinos in their

4  districts?

5  A.  I'm not sure.  I think most legislators in Texas have

6  quite a few Spanish speaking and Latino constituents in their

7  districts.

8  Q.  And would you say that all of the — or nearly all of the

9  legislators in Texas themselves speak Spanish?

10  A.  I don't know how many legislators speak Spanish in Texas.

11  Q.  You mentioned your book *Congress in Black and White*

12  earlier.  In that book you discuss findings that

13  African-American Congressmen are more responsive to their

14  African-American constituents than to their constituents of

15  other races, is that right?

16  A.  Yes.

17  Q.  And you're also familiar with many research studies on

18  that topic as well, right?

19  A.  Yes.

20  Q.  And you believe today that those findings are valid, or I

21  assume you wouldn't have put them in your book, right?

22  A.  I think my book's findings are valid, yes.

23  Q.  Including that finding?

24  A.  I think that's the thesis of the book, so, yes.

25  Q.  Okay.  And do those findings constitute evidence that this

CHRISTIAN GROSE - CROSS

1  conduct of African-American Congressmen shows their intent to
2  discriminate against their constituents who are not
3  African-American?
4  A.  I'm not sure if that's what I would say.  I think it's
5  just not what the book was about.  The book was about
6  allocating federal funds to congressional districts, not state
7  legislative districts, and there was a different question.
8  Q.  Did you consider in your report and opinions in this case
9  the possibility, and just that as you found with
10 African-American Congressmen, that they are more responsive to
11 African-American constituents than those of other races,
12 Hispanic Texas legislators might be more likely to be
13 responsive to those they believe are their Hispanic
14 constituents than their constituents they believe are White or
15 African-American?
16 A.  So I did not do an audit study in this book, just if
17 that's what you're asking.
18 Q.  That's not what I'm asking.
19 A.  Could you repeat it then, please?
20 Q.  Okay.  Did you consider in your report and expert opinions
21 the possibility that, just as you found that African-American
22 Congressmen are more responsive to African-American
23 constituents than those of other races, the same thing might
24 be true of Hispanic Texas legislators?
25 A.  We considered that and that was part of the 2018

CHRISTIAN GROSE - CROSS

1  peer-reviewed article upon which the expert report was based.

2  Q.  Did you consider in your report and expert opinions in

3  this case the possibility, just as you found African-American

4  Congressmen are more responsive to African-American

5  constituents than those of other races, non-Hispanic White

6  legislators might be likely to be more responsive to

7  non-Hispanic White constituents than constituents who write

8  them letters in Spanish or are perceived to be Latino?

9  A.  I mean, when you say, "consider," we thought about that,

10  but, again, the randomization controls for all — every one of

11  these things you are bringing up, not only did we consider,

12  but it's controlled for through the experiment on that.

13  Q.  Now, you testified to your opinion that Harris County was,

14  quote, "surgically and intentionally targeted in SB 1," and

15  you said that was based on direct evidence.  What direct

16  evidence do you have of the intention of any of the

17  legislators who passed SB 1 or voted to pass SB 1 other than

18  your randomized audit study?

19  A.  Did I say that?  I don't remember.  Was that in deposition

20  or in the report?

21  Q.  It's in your report, but you don't remember what you said.

22  I'll move on to something else.

23     Do you believe that the Texas Legislature has a legitimate

24  interest in promoting uniformity among — on the voting rules

25  in all parts of the state, at least counties with similar

CHRISTIAN GROSE — CROSS

1  sizes?

2  A.  I didn't -- it's hard to answer.  I'm not sure.

3  Q.  So you didn't consider that in coming up with your expert

4  reports or opinions, did you?

5  A.  I wouldn't say that.  That would be controlled for through

6  the randomization, and so, I mean, just coming back to that,

7  there's -- these alternative explanations are hard to say I

8  didn't consider because through their randomization we're able

9  to control for all other potential factors on the first day.

10  Q.  And you made your assertion that the legislature targeted

11  Harris County based on the fact that Harris County has the

12  largest number of Latino and African-American voters of any

13  Texas county?

14  A.  Yes.  And some other information and data as well.

15  Q.  And is it also true that Harris County has the largest

16  number of White voters of any county in Texas?

17  A.  In the state, I'm not sure.

18  Q.  And is it also true that because Harris County's

19  substantially more populous than any other county in Texas, it

20  has the largest number of voters of every race, ethnicity, age

21  group, or any other demographic characteristic?

22  A.  It does have the largest number of voters of minority and

23  ethnic characteristics, yes.

24  Q.  Is it correct that your expert reports and opinions are

25  based on nothing that any Texas legislator said or was

CHRISTIAN GROSE - CROSS

1    reported as saying prior to the passage of SB 1 other than a

2    few email responses?

3    A.  No, I wouldn't say that.

4    Q.  Okay.  What statements of Texas legislators are you —

5    A.  I'm sorry.  I didn't hear —

6    Q.  *(Inaudible)* report and opinions?

7        *(Crosstalk)*

8    A.  I'm sorry.  I didn't hear you say statements.  I thought

9    you said the legislature.  I read the text of the bill and

10   went through some of the proposed changes of the bill so what

11   I meant was legislature.

12   Q.  Okay.  And to be sure that I've given you a fair chance to

13   answer that question, it was:  Did you rely on anything that

14   any Texas legislator said or was reported as saying before the

15   bill passed?

16   A.  I'd have to go back and look.  I'm not sure because I read

17   quite a bit and relied on a lot.

18   Q.  Did you rely on anything that any Texas legislator said or

19   was reported as saying any time after SB 1 was passed?

20   A.  I'm not sure.  I don't remember.

21   Q.  And did you rely in your report or opinion on any

22   legislative history of SB 1 or predecessor bills?

23   A.  Yes.

24   Q.  What legislative history did you rely?

25   A.  I read SB 1 and I read some of the amendments and changes

CHRISTIAN GROSE - CROSS

1  that came up through the process.  And then on the Texas

2  Legislature online and a number of the committee reports.

3  Q.  And do you have any evidence of — that any provisions of

4  SB 1 have been differentially applied to any race or ethic

5  groups since it's been passed or in effect?

6  A.  Yes.  It's in the last part of my report.

7  Q.  And what is that?

8  A.  That's that the Latino share of the vote-by-mail

9  electorate has declined after SB 1.

10 Q.  My question is whether or not in that instance you believe

11 that the vote-by-mail ID requirements have been applied

12 differently to Latino voters as opposed to African-American

13 voters or White voters or members of any other racial or

14 ethnic group?

15 A.  I guess I don't follow.  I don't really follow the

16 question, no.

17 Q.  For example, are you saying that you have evidence that

18 the county election authorities apply a different standard to

19 meet the vote-by-mail ID requirements if you're Latino as

20 opposed to if you're an African-American?

21 A.  I mean, I looked at SB 1's text and how that impacted the

22 counties.  That's what I relied upon.  I'm not sure about —

23 I'm not exactly what sure what you are asking.

24 Q.  Now, you did also have testimony about vote by mail and

25 you base your opinion on the vote-by-mail percentages of the

CHRISTIAN GROSE − CROSS

1 electorate that represented Latinos in the 2020 elections and

2 the 2022 elections, right?

3 A.  Yes, that's right.

4 Q.  And your assumption is that because the vote-by-mail

5 percentage went down from 2020 to 2022 that that proves that

6 the vote-by-mail provision discriminated against Latino

7 voters?

8 A.  That's not my assumption.  That's my data.  That's the

9 analysis that we make a conclusion from.

10 Q.  Were there any other circumstances from the 2020 Election

11 that might reasonably account for a decline in Latino voting

12 by mail from 2020 to 2022?

13 A.  Not substantially, especially given the increase in the

14 Latino population and the state at the same time.  So if there

15 was some sort of decline you would anticipate that the turnout

16 would be flat, not go down.  The Latino share of the

17 electorate would be flat and not go down if there are other

18 things that are happening.

19 Q.  Did you consider that the 2022 voting numbers may not have

20 been comparable to the 2020 General Election voting numbers

21 because 2020 was a Presidential Election year and 2022 wasn't?

22 A.  I addressed that by using percentage share, yes.

23 Q.  And did you take into account that a somewhat polarizing

24 figure like Donald Trump was on the ballot in 2020 and was not

25 on the ballot in 2022?

CHRISTIAN GROSE - CROSS

1  A.  Donald Trump was a presidential candidate from 2015 onward

2  through all of that time, so, yes, I did take that into

3  account and he was present on the ballot formally in 2020 and

4  present in 2022 in different ways.

5  Q.  So are you saying that Donald Trump was as big a factor in

6  voting by Latinos in 2022 as he was in 2020?

7  A.  I don't see how Donald Trump in 2022 or 2020 is the main

8  explanation for a decline in vote-by-mail share.

9  Q.  Could you answer my question, sir?

10  A.  I think I did.  Could you repeat it?

11  Q.  Okay.  Are you saying that Donald Trump was as big a

12  factor in the 2022 Election in Latino voting in Texas as he

13  was in the 2020 Presidential Election in Texas?

14  A.  I'm not saying anything about that.

15  Q.  Okay.  And did you consider the possibility that COVID may

16  have artificially increased the percentage of Latinos that

17  voted by mail in 2020 as compared to years when COVID was not

18  as big a factor?

19  A.  I did, by looking at the Primary data from February prior

20  to the COVID period and comparing it to 2022 after COVID was

21  over.  So two of the four data points I looked at COVID was

22  not a factor, so, yes, I did consider that.

23  Q.  Would you agree that the 2018 Election, General Election,

24  was a more comparable election to the 2022 General Election?

25  A.  No --

CHRISTIAN GROSE - CROSS

1  Q.  That —

2  A.  — because I wanted to see if SB 1 had an impact and SB 1

3  was not passed in between 2018 and 2020.

4       THE COURT:  But how do you not take into account the

5  COVID?  I'm stuck on that same question as well.  So 2018

6  there's no COVID, 2020 there's COVID.  Wouldn't people just

7  feel more comfortable going to the polls rather than mail in

8  2022, how do you take that into account?

9       THE WITNESS:  Yeah.  So that's by looking at the

10 Primary data.  Again, there's two things.  So, I mean, so this

11 is the share of the electorate, so by looking at percentage

12 instead of overall numbers, the share of the electorate

13 that — if COVID is driving things like that, it should affect

14 everybody, regardless of race or ethnicity, right, and so

15 turnout should be a higher numerical, but as a share of the

16 vote-by-mail electorate that should not differ.

17       And then the other thing is the February Primary

18 data, the Primary was in March.  COVID pandemic was declared I

19 think around March 9 or 10, but in February in 2020 it wasn't

20 that present.  Like I even did a survey back then asking

21 people what was the most important issue.  One person out of a

22 thousand people said COVID was important in February 2022 on

23 that survey.

24       So that's the kind of, compared with COVID, it was

25 happening but we didn't know it was happening in February of

CHRISTIAN GROSE - CROSS

1    2020 and people's behavior didn't really change in 2020 at the

2    Primary.  It did in the General, but in the Primary — and

3    then when you compare the Primary in 2020 to the 2022 Primary,

4    again, it's percentage to try to make it comparable, those

5    periods both are kind of before COVID and after COVID, and so

6    you see a decline, you know, of 2.3 percentage points in the

7    Latino vote share in those two elections that I think aren't

8    part of COVID and COVID is not explaining it.

9    BY MR. BRYANT:

10   Q.  Dr. Grose, were you aware that COVID hit Latinos harder

11   than it hit other racial and ethnic groups?

12   A.  I don't have the data on that in Texas.  I did control for

13   COVID deaths by county in my analysis in the report, so I am

14   aware of that enough to have done that.

15   Q.  And did you consider the possibility that the fact that

16   Latinos were hit harder with COVID might explain why their

17   percentage of voting by mail was artificially inflated in 2020

18   and in 2020 [verbatim] it felt more comfortable to go to the

19   polls and vote in person?

20   A.  Like I said, one of the alternative models I mention in

21   the footnote includes controlling for deaths per county and so

22   people where there are more deaths would be more concerned and

23   that could correlate with that, so I considered that in my

24   alternative model.  It's not in the main part of the test.

25   Q.  And are you aware that the Latino vote-by-mail percentage

CHRISTIAN GROSE – CROSS

```
 1  went up from the 2018 General Election to the 2022 General
 2  Election?
 3  A.  I haven't looked at that.
 4          MR. BRYANT:  Pass the witness.
 5          THE COURT:  Anything else on this side?
 6          MR. LIU:  Just a couple questions.
 7          THE WITNESS:  Could we just do like a three-minute
 8  break, or a two-minute?  I need to move my foot a little bit.
 9  I'm sorry.
10          THE COURT:  Absolutely.  Feel free to stand up.
11          THE WITNESS:  Thanks.
12      (Pause in proceedings)
13          THE WITNESS:  Okay.  Thanks.  That was all.
14          MR. LIU:  May I proceed?
15          THE COURT:  Yes.
16  BY MR. LIU:
17  Q.  I wanted to make sure I understood your methodology.  So I
18  saw on your table –– about how many people were coded into
19  voting –– or supporting the legislation?
20  A.  Sorry.  Do you mind introducing yourself?
21  Q.  My name is Cory Liu.
22  A.  I'm sorry, what?
23  Q.  Cory.
24  A.  Okay.
25  Q.  I represent one of the county defendants.
```

CHRISTIAN GROSE - CROSS

1    So how many of the legislators were coded into supporting

2   SB 1?

3   A.   The number?  I don't remember off the top of my head.

4   Q.   Approximately.

5   A.   It's in the code in the -- I don't remember off the top of

6   my head the number.

7   Q.   Do you know like ballpark just like how many supported,

8   how many opposed?

9   A.   How many supported was something like -- across both

10  chambers was a hundred something, I think, but again, I don't

11  want to misstate if I don't remember off the top of my head.

12  Q.   Okay.

13  A.   I have it in the report but I just don't remember.

14  Q.   Within each of those two groups, the ones who coded as

15  support and the ones who were coded as not supporting, was

16  it -- I think you've described it as a coin flip.  Was it a

17  coin flip between each of those two groups?

18  A.   Yeah.  So I mean, we looked at that, and I looked at that,

19  and you can look at the differences within that after the

20  fact.  It's called a balance check or a balance test.  And

21  there was a fair amount of balance between those two groups.

22  Q.   Is that the same that it's about 50/50 Spanish and English

23  within each of those two, but the support -- people who voted

24  for the bill and the people who opposed the bill?

25  A.   Approximately, right.  So in statistical expectation, yes.

CHRISTIAN GROSE — CROSS

1  Q.  I think you also said it was another 50/50 split within

2  each of those as to the two different names that you testified

3  to earlier?

4  A.  Yeah.  I mean, just — yes, but let me just clarify.

5      So when you do this and then you subdivide into groups the

6  coin flip analogy works in those cases too.  So if you have a

7  large number of legislators, which in this case we have a

8  large number who are yes and who are no, the coin flip works

9  within each group.

10 Q.  So let's just say approximately, I know I don't have the

11 number in front of me either, so let's just say it's

12 approximately 60 or so who voted against it, does that mean

13 about 30 of them got one in English, about 30 got one in

14 Spanish, and then within each of those about 15 got one with

15 English with one of the names, 15 was English with the other

16 name, 15 Spanish with one of the names and then 15 with the

17 second name?

18 A.  Approximately.  I mean, with a coin flip, or sometimes you

19 might flip a coin heads three times in a row so it might be

20 34-26, but approximately, but it would not necessarily be

21 exactly equal, but statistically it would be the same and

22 equal.

23 Q.  So your conclusion, let's just say for the people who

24 opposed it, if it was about 60, is basically, compared to a

25 response rate to about 30 emails that you sent to 30 different

CHRISTIAN GROSE - CROSS

1  people in one language, and then about 30 emails in a

2  different language to the other 30?

3  A.  Yeah, that's approximately correct.

4  Q.  And then within each of those it's about 15 with a

5  particular email that is the name and the contents, right?

6  A.  So that, I would have to go back and look.

7  Q.  Well, say about half of the 30, right.  So half of the 30.

8  So within Spanish, it would be with the first one of the

9  names, and then 15 with the other name, right?

10 A.  Since the point of the study in the report here was the

11 language, I remember the language much better, and so that's

12 about half and half, yes, for the language.

13     But that would be what -- in that instance expectation you

14 would have a split across the entire sample like that.

15 Q.  So I know you said you were focusing on the language, but,

16 I mean, do you think the name might have played a factor that

17 would have been disentangled from the language?

18 A.  It would be totally disentangled from the language because

19 we also used randomization, and so that's consistent with the

20 prior study.  The language is the only thing that's explaining

21 the differential gap.  The name is just to control for a

22 potential confounder.  The name is not playing a role; it's

23 the language.  The language is the key, the key finding here.

24         MR. LIU:  No further questions.

25         THE COURT:  Anything else on this side?

CHRISTIAN GROSE – REDIRECT

1          Any redirect?

2                    REDIRECT EXAMINATION

3   BY MR. BIETER:

4   Q.  Dr. Grose, does it matter to your audit study if the Texas

5   Legislature was not in session while it was conducted?

6   A.  No, it doesn't.

7   Q.  Why is that?

8   A.  Because most legislators, including ones that I know and

9   am familiar with, respond to emails on their phones and in

10  their homes on their computers, and, you know, while walking

11  around.  And part of the job of being an elected official is

12  to respond to inquiries from people who come in.  And it helps

13  you get re-elected if you respond to emails, even if you're

14  not sitting in the capitol.

15  Q.  And did those who voted no on SB 1 still answer the

16  emails, even though the legislature was not in session?

17  A.  Yes, they did, even though the legislature wasn't in

18  session.  Or some of them did, yeah.  Some of them did not.

19  Q.  Does it matter to your audit study whether or not the

20  email indicates the writer is a constituent?

21  A.  No, it doesn't.  And, in fact, some of the earlier studies

22  that had been done on this topic would say things like --

23          MR. BRYANT:  Objection.  Nonresponsive.

24          THE COURT:  I think he's trying to get there.

25          Go ahead.

CHRISTIAN GROSE – REDIRECT

1           THE WITNESS:  Okay.  Thanks.

2           So some of the earlier studies actually grappled with

3    this.  In some of the studies we would write, I'm a

4    constituent, and would write some things that are very precise

5    and then in follow-up interviews with legislators asking about

6    the study, legislators would say that, you know, most

7    constituents aren't this precise about who they are, they just

8    write and say I need something can you answer my question.

9           So the studies have actually been updated over the

10   last decade to put in less of that information because it's

11   more realistic and authentic to what legislators would be

12   getting.  And, you know, it's a tradeoff of what you're going

13   to do, but that's the approach that we adopted.

14   BY MR. BIETER:

15   Q.  Mr. Bryant asked whether you thought the use of the last

16   name Smith was a flaw in your audit study, do you recall that?

17   A.  Not exactly.

18   Q.  Is it a flaw --

19   A.  I don't recall it exactly.  That's what I mean.

20   Q.  Is it a flaw in your audit study that the last name Smith

21   is used?

22   A.  No, it's not.

23   Q.  Why is that?

24   A.  Because, again, we were just trying to do what other

25   studies had done and we wanted to look at language but one of

CHRISTIAN GROSE — REDIRECT

1  the criticisms we might have gotten is if we didn't vary name
2  also, so we wanted to randomly do both, and so it's actually
3  not a flaw it's a design bonus.
4  Q.  Do legislators generally staff their offices with staffers
5  that track with their policy goals and world views?
6  A.  Yes.  The staffers often work on policy and other topics.
7  Q.  Is that part of the reason why it's not necessarily
8  relevant to your audit study whether the response came from a
9  legislator or a staff member?
10 A.  Yeah, because it's the legislator as an office or as an
11 enterprise.  To quote the article about it by Robert
12 Salisbury, "the legislators are the principal and everyone who
13 works for a legislator is an agent," like just in really any
14 government or business.
15     And so from a voter's perspective, the legislator is
16 responding, and it's the legislator that's also making policy.
17 And if the staff member writes the bill.  You know, if the
18 staff member wrote SB 1, the legislator is writing SB 1.  If
19 the legislator is responding to an email, the legislator is
20 responding to an email.  It's an enterprise of a legislator
21 that really matters here.
22     And then the other thing is just thinking about the
23 legislature broadly, you know, separating out the aggregate
24 from the individual --
25          MR. BRYANT:  Objection.  Nonresponsive.

3078
CHRISTIAN GROSE — REDIRECT

1         THE COURT:  Yeah.  You've already answered the
2   question.
3         THE WITNESS:  Okay.
4   BY MR. BIETER:
5   Q.  Did opponents of SB 1 face the same challenges during
6   COVID that SB 1 supporters did?
7   A.  Yes.  They would have been serving at the same time with
8   COVID.
9   Q.  Would COVID have made it harder to respond to a
10  Spanish-language email than to an English-language email?
11  A.  No.  That's what I was trying to get at earlier.  It would
12  not have made a difference.  COVID would not have affected a
13  differential on responsiveness.
14  Q.  So does there have to be another explanation for the
15  30 percent or so difference in responses among those who voted
16  for SB 1?
17  A.  Sorry; didn't hear.
18  Q.  Yeah.  Sorry.  So does there have to be another
19  explanation for why there's about a 30-percent difference in
20  responses among those who voted for SB 1?
21  A.  I mean, no, there's no other explanation other than
22  discriminatory intent and response to Latino-Spanish language
23  constituents.
24        MR. BIETER:  That's all I have.  Thanks.
25        THE COURT:  Anything based on those?

CHRISTIAN GROSE − RECROSS

1          MR. BRYANT:  Just one or two, Your Honor.

2                    RECROSS−EXAMINATION

3  BY MR. BRYANT:

4  Q.  Dr. Grose, your testimony today has all been about alleged

5  intent to discriminate against Latino voters in the SB 1, is

6  that correct?

7  A.  I stated earlier that it was about intent and effects, so

8  my testimony was about intent and also effects so...

9  Q.  But related to Latinos?

10  A.  Oh, I see what you are saying.  So the −− my report and my

11  testimony has quite a bit about Latinos, but also it discusses

12  Black voters and other voters of color too.

13  Q.  And, in fact, part of your opinion was that SB 1 was

14  intended to discriminate against all voters of color in Texas

15  but you didn't even bother to mention other voters of color

16  until right now, did you?

17  A.  I don't think that's right.  I don't have the report in

18  front of me but I don't think so.

19          MR. BRYANT:  Pass the witness.

20          THE COURT:  Anything based on that?

21          You are excused, sir.  Thank you.

22          We'll resume tomorrow at 1:00 in the afternoon.

23          MISS RODRIGUEZ:  Your Honor, I'm sorry, a small

24  housekeeping matter if you don't mind.

25          THE COURT:  Yeah.

```
 1            MISS RODRIGUEZ:  Elena Rodriguez, LULAC plaintiffs.

 2            Your Honor, so just to be clear, you proposed having

 3   the parties submit proposed findings of fact and conclusion of

 4   law and then subsequently have closing arguments at a later

 5   date, is that right?

 6            THE COURT:  Well, that was just my thought.

 7            MISS RODRIGUEZ:  Great.  Thank you, Your Honor.

 8            THE COURT:  I'm welcome to other suggestions.

 9            If you-all think that it's beneficial to have closing

10   arguments and then findings of fact and then come back and

11   have some more closing arguments, I'm open to that too.

12            MISS RODRIGUEZ:  Thank you.

13            THE COURT:  I'm inviting a dialogue on this.

14            MISS RODRIGUEZ:  Okay.  Great.  I appreciate that,

15   but I was going to ask just on behalf of LULAC plaintiffs —

16   I'm not speaking on behalf of any other plaintiffs — is that

17   we have a chance to confer and then respond, if you would like

18   for us to speak as plaintiffs with one voice.

19            THE COURT:  Yeah.

20            MISS RODRIGUEZ:  Sounds like that's fine with you.

21            THE COURT:  Yeah.  So when we do have closing, yeah,

22   you-all need to figure out how you're going to divvy up.

23            But talk to the other side too about the proposal.

24   Like I said, I could see benefits both ways.  I don't see

25   benefits to you having closings and then findings of fact and
```

1    then don't give me a chance to ask you questions.  I don't see

2    an upside to that one.

3            MISS RODRIGUEZ:  Great.  Understood, Your Honor.

4            THE COURT:  We'll see you tomorrow.

5            MISS RODRIGUEZ:  Thank you.

6            MR. WATKINS:  Your Honor, with apologies.

7            THE COURT:  Yeah.

8            MR. WATKINS:  Elijah Watkins for Mi Familia Vota.

9            Just as a matter of housekeeping, we'd like to move

10   to admit HAUL MFV Exhibits 333, 343, and 345.  They are the

11   three expert reports by Dr. Daniels.

12           THE COURT:  So I already admitted 333 and we already

13   admitted 345.  What was the other one?

14           MR. WATKINS:  343.

15           THE COURT:  343 is new.

16           Any objection to 343?

17           MS. HUNKER:  No objection, Your Honor.

18           THE COURT:  343 is admitted.

19           MR. WATKINS:  Thank you, Your Honor.

20           THE COURT:  Anybody else?

21           We'll see you tomorrow at 1.

22

23

24

25

*Gigi Simcox, RMR, CRR*

1                              —o0o—

2      I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.  I

4   further certify that the transcript fees and format comply

5   with those prescribed by the Court and the Judicial Conference

6   of the United States.

7

8   Date:  10/05/23              /s/ *Gigi Simcox*
                                 United States Court Reporter
9                                262 West Nueve Street
                                 San Antonio TX 78207
10

11

12                               /s/ *Chris Poage*
                                 United States Court Reporter
13                               262 West Nueve Street
                                 San Antonio TX 78207
14

15

16

17

18

19

20

21

22

23

24

25