1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION

3

LA UNION DEL PUEBLO ENTERO,    .
4  ET AL,                  .
                        .
5            PLAINTIFFS,    .
        vs.             . DOCKET NO. 5:21-CV-844-XR
6
GREGORY W. ABBOTT, ET AL,    .
7                          .
          DEFENDANTS.    .
8

9

10              TRANSCRIPT OF BENCH TRIAL
       BEFORE THE HONORABLE XAVIER RODRIGUEZ
11           UNITED STATES DISTRICT JUDGE
             OCTOBER 6, 2023
12

13

14

15

16  APPEARANCES:
FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                    FATIMA MENENDEZ, ESQUIRE
                  JULIA LONGORIA, ESQUIRE
18                    MALDEF
                  110 BROADWAY
19                    SUITE 300
                  SAN ANTONIO TX 78205
20

21                    DANIELA LORENZO, ESQUIRE
                  ELIAS LAW GROUP LLP
22                    250 MASSACHUSETTS AVENUE NW
                  SUITE 400
23                    WASHINGTON DC 20001

24

25

```
 1

 2

 3   FOR THE DEFENDANTS:      RYAN G. KERCHER, ESQUIRE
                             KATHLEEN HUNKER, ESQUIRE
 4                           WILLIAM WASSDORF, ESQUIRE
                             TEXAS ATTORNEY GENERAL
 5                           P.O. BOX 12548
                             MC 009
 6                           AUSTIN TX 78711

 7

 8

 9

10

11   REPORTED BY:            GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
12                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3085

ALLAN LICHTMAN – DIRECT

 1    *(San Antonio, Texas; October 6, 2023, at 1:00 p.m., in*
 2    *open court.)*
 3         MISS LORENZO:  Good afternoon, Your Honor, LULAC
 4    plaintiffs call Allan Lichtman to the stand, and
 5    Dr. Lichtman's testimony will support all of the sections
 6    LULAC plaintiffs challenge, this includes Sections 3.04, 3.09,
 7    3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04.
 8         (ALLAN LICHTMAN, having been duly sworn, testified as
 9    follows:)
10                   DIRECT EXAMINATION
11    BY MISS LORENZO:
12    Q.  Good afternoon, Dr. Lichtman.  Thank you for being with us
13    today.  Could you start by please stating your name for the
14    record?
15    A.  Allan J. Lichtman.
16    Q.  Have you been retained by the LULAC plaintiffs in this
17    case?
18    A.  Yes.
19    Q.  Why were you retained?
20    A.  I was retained to examine whether or not SB 1 in 2021 in
21    Texas was enacted with an intent to discriminate against
22    minorities, particularly Blacks and Hispanics in Texas.
23    Q.  Did you conduct that analysis?
24    A.  I did.
25    Q.  Did you prepare an expert report for this case based on

ALLAN LICHTMAN – DIRECT

1  that analysis?

2  A.  I did.

3       MISS LORENZO:  Permission to approach the stand, Your

4  Honor?

5       THE COURT:  Yes.

6  BY MISS LORENZO:

7  Q.  Dr. Lichtman, I just gave you a copy of what has been

8  premarked as LULAC Plaintiff's Exhibit 5.  Could you please

9  identify the exhibit?

10  A.  This is the report that I submitted on February 28th,

11  2022.

12  Q.  Did you include your findings and opinions and your

13  reasons for your findings and opinions in your report?

14  A.  Yes.

15  Q.  Are you prepared to discuss those findings, opinions, and

16  reasons today?

17  A.  Yes.

18  Q.  Do you adopt the statements you made in your February

19  report?

20  A.  Yes.

21       MISS LORENZO:  Your Honor, LULAC plaintiffs move to

22  admit LULAC Plantiff's Exhibit 5, the February 28, 2022 report

23  of Dr. Allan Lichtman.

24       THE COURT:  Any objection?

25       MR. KERCHER:  Subject to the same relevance

ALLAN LICHTMAN – DIRECT

1  objections we have lodged against Dr. Tijerina and the other

2  experts, none other.

3           THE COURT:  On the history?

4           MR. KERCHER:  Correct, Your Honor.

5           THE COURT:  Yeah.  Noted.  Overruled.

6           LULAC 5 is admitted.

7           MISS LORENZO:  Thank you, Your Honor.

8  BY MISS LORENZO:

9  Q.  Now, Dr. Lichtman, before we get to the specifics of your

10  opinions in this case I want to talk a bit about your

11  background.  Your CV is included in appendix one beginning on

12  page 142 of your report, correct?

13  A.  Let me doublecheck to make sure it's here.  I think it is.

14     Yes, it is.

15  Q.  Is this a complete and accurate summary of your background

16  and professional experience as of February 28, 2022?

17  A.  Yes.  Nothing of consequence has changed my background.

18  Q.  And could you please explain to the Court what your

19  educational background is.

20  A.  I graduated, I hate to say it, in 1967 from Brandeis

21  University with a BA in history, but I do need to explain that

22  for three years I was a science major and only switched to

23  history my senior year and that helps explain my interest in

24  quantitative methodology and social science that I later

25  pursued.

ALLAN LICHTMAN - DIRECT

1    In 1973, I received my Ph.D. from Harvard University.  My

2  dissertation and was a quantitative and historical study of

3  the Presidential Election of 1928, first election in which a

4  Catholic was running on a major party.

5    I also examined generally early 20th century presidential

6  elections, and it was subsequently published as a book, the

7  University of North Carolina Press and my specialty in

8  graduating with my Ph.D. was American Political History and

9  Quantitative Methodology.

10 Q.  What is your current role?

11 A.  I am currently distinguished professor of history at

12 American University in Washington, D.C.  That's nothing I made

13 up.  It's a University title.  It's the highest academic rank,

14 above full professor.  There are only a handful of

15 distinguished professors out of many, many hundreds of faculty

16 at the University.

17 Q.  Many congratulations, Dr. Lichtman.

18    How long have you been a professor at American University?

19 A.  Just recently we had a dinner celebrating my 50

20 consecutive years of teaching at American University.  It goes

21 fast.

22 Q.  I'm sure.  What are your principal areas of expertise?

23 A.  American political history, political analysis, historical

24 and quantitative methodology, and voting rights.

25 Q.  Have you published any books on these subjects?

ALLAN LICHTMAN — DIRECT

1  A.  Yes, and I'm not going to go through them all.  I'll just

2  hit some highlights.  As I said, my dissertation, using

3  quantitative and historical methods, was published as a book,

4  in I think around 1979.

5      At the same time I published in the Sage Series on

6  Quantitative Applications in Social Science, a monograph with

7  my coauthor Laura Langbein, called *Ecological Inference*.

8  Despite the title, it's not about the environment.  It's about

9  mathematical techniques for inferring the behavior of groups,

10  like Blacks and Whites from aggregate data like precinct data.

11      I also published at that time, with my coauthor Valerie

12  French*, Historians and the Living Past*, an analysis of

13  historical methodology.  It also includes a chapter on

14  quantitative methodology.

15      Later, I published my study in 2008 of the *White

16  Protestant Nation, the Rise of the American Conservative

17  Movement*, which was a finalist for the National Book Critics

18  Award in all published nonfiction books.

19      In 2013 I published with my coauthor Richard Breitman*, FDR

20  and the Jews*, which won the National Jewish Book Award in

21  American Jewish History and was a finalist for the Los Angeles

22  Times Book Prize for all history books published.

23      In 2018 I wrote a book on voting, *The Embattled Vote in

24  America:  From the Founding to the Present*, so it looked at

25  voting across the entire spectrum of U.S. history.

ALLAN LICHTMAN – DIRECT

1    And finally I need to mention the series of books on my

2    system for predicting American Presidential election results,

3    *The Keys to The White House*.  From the 1990s through 2020 that

4    series, I think, has been through about seven different

5    editions and I expect the next one next year.

6    Q.  Have you published any peer-reviewed articles on the area

7    of expertise that you identified?

8    A.  Yes.  I'm not going to, again, go through them all, I'm

9    just going to highlight a couple.  I published two articles

10   with my coauthor, Your Honor, Vladimir Keilis-Borok, who

11   helped me design the system, two articles in the proceedings

12   of the *United States National Academy of Sciences*, one of the

13   very few most prestigious scientific journals in the world.

14   It's very rare for someone who is not a hard scientist,

15   particularly someone who is a historian, to publish there.

16       I'll just briefly mention my 2003 article in the *Journal

17   of Legal Studies*, which built upon my reports for the United

18   States Commission on Civil Rights on racial disparities and

19   ballot rejection in the critical 2000 Presidential Election in

20   Florida.  That's one of many articles that I've written

21   applying my expertise and knowledge to voting issues.

22   Q.  Thank you, Dr. Lichtman.  Had you ever served as an expert

23   in any case before this one?

24   A.  I've been serving as an expert over five decades.  I

25   haven't counted but probably 110 cases, including cases before

ALLAN LICHTMAN — DIRECT

1  this Honorable Court.

2  Q.  And did any of those cases require you to opine on the

3  discriminatory intent of legislation?

4  A.  Yes.  I have, as an expert, opined on that issue, both as

5  retained by plaintiffs and as retained by governmental

6  entities.

7  Q.  Has a court ever in your five decades of serving as an

8  expert declined to recognize you as an expert?

9  A.  No.  I've been *Daubert-ed* I think three times, never

10  excluded.  The only thing that was ever said was in the

11  Florida sanctuary cities case the judge said I shouldn't opine

12  on the ultimate legal issue, which I hadn't attempted to do

13  anyway, and she found intentional discrimination based upon my

14  testimony.

15  Q.  Have you ever testified on voting rights issues in Texas

16  specifically?

17  A.  I have, a number of times in the 21st century.

18      I testified in the post-2000 landmark congressional

19  redistricting case here in Texas.  That went to the United

20  States Supreme Court and the majority of opinions cited my

21  work in striking down under the Voting Rights Act a district

22  in Southwest Texas for diluting the votes of Hispanics.  I'm

23  not aware of — it's very rare for the Supreme Court to go

24  ahead and strike down a congressional district.

25      I testified on the 2011 voter ID law in Texas and before

3092

ALLAN LICHTMAN – DIRECT

1   the three-judge San Antonio court.

2       I testified on the 2011 and 2013 congressional

3   redistricting plan.

4       Although it wasn't in Texas, I also testified while

5   Section 5 was still operative on the — I believe it was the

6   voter ID law and redistricting laws before three-judge courts

7   for the District Court for the District of Columbia.

8       I'm also involved in the challenge to the Texas current

9   redistricting plan but I haven't testified yet and I don't

10  know what the schedule is in that case.

11  Q.  And in any of those cases did you offer opinions on

12  discriminatory intent?

13  A.  Yes.  In several of those cases, including at least one of

14  the D.C. cases, the 2011 and the 2013 congressional

15  redistricting cases before the San Antonio court and the case

16  involving the voter ID law before the Federal District Court.

17  Q.  Did your analysis in this case use the same methods you

18  have used in your other discriminatory intent cases?

19  A.  Yes.  And, of course, with a slight modification of that.

20      When you're testifying on behalf of governmental entities,

21  like I've done several times, you're also refuting and

22  responding to whatever the expert for plaintiffs might be

23  contending in their reports, so it's a little bit different

24  than when you are testifying on the plaintiff's side.

25  Q.  Understood.  Did your analysis in this case use the same

ALLAN LICHTMAN — DIRECT

1  methods you have used in your scholarly work?

2  A.  Yes.

3        MISS LORENZO:  Your Honor, LULAC plaintiffs move to

4  tender Dr. Lichtman as an expert in American political history

5  and analysis, quantitative and historical methodology, and

6  voting rights under Federal Rule of Evidence 702.

7        MR. KERCHER:  No objection.

8        THE COURT:  The professor is noted as an expert in

9  those areas.

10        MISS LORENZO:  Thank you, Your Honor.

11  BY MISS LORENZO:

12  Q.  Dr. Lichtman, let's talk more about your analysis in this

13  case.  You testified earlier that you were retained to offer

14  opinions on whether Texas SB 1 was adopted with the intent of

15  discriminating against racial and ethnic minorities, is that

16  correct?

17  A.  That's correct.

18  Q.  Did you form any opinion on this?

19  A.  I did.

20  Q.  What methodology did you use to arrive at that opinion?

21  A.  Yeah.  As I said, this is consistent with methodologies I

22  have been using for many years testifying on behalf of

23  plaintiffs for intentional discrimination.

24        I've also used it as well with the modification I

25  mentioned in testifying on behalf of defendants, and, you

ALLAN LICHTMAN — DIRECT

1  know, what we do as experts in court cases is, there's a

2  framework and the frameworks are set by the courts.

3      For example, in a garden variety Section 2 case the Court

4  sets the framework of the three genus factors and the nine

5  Senate factors, and as experts we apply our knowledge and our

6  analyses, quantitative and historical, to examine those

7  factors and those issues.

8      So too here, I start with a template, a framework, laid

9  down by the Supreme Court in the Arlington Heights case in the

10  late 1970s, and it offers several I think, about five,

11  nonexhaustive guidelines for experts to examine to give

12  guidance to judges in reaching the ultimate legal conclusion

13  in these cases, and this involves looking at the historical

14  background, the discriminatory impact of the laws under

15  challenge, the sequence of events leading to the law,

16  substantive and procedural deviations in the law and its

17  adoption, and contemporary statements by decision-makers.

18      And, as I mentioned — and this is important — this is

19  consistent with my work as an historian.  These are the kinds

20  of things we also look at as an historian.  We don't frame it

21  in terms of the Arlington Heights factors.  That's not what

22  historians do, but we follow very much the same pattern of

23  analysis.

24      For example, in my analysis of late 19th, early 20th

25  century Jim Crow restrictive laws, the omnibus restrictive law

3095

ALLAN LICHTMAN — DIRECT

1  in North Carolina from 2013, or the 1924 immigration

2  restriction, all of which I've written about.

3  Q.  Now, of those five factors that you just identified, are

4  any of them dispositive as to discriminatory intent?

5  A.  Well, I suppose if contemporary decision-makers came out

6  and said, we intend to discriminate against minorities, that

7  would be dispositive, but even back in the '70s the Court

8  said, you don't expect that, that's not going to happen, and

9  certainly not in our own time, and certainly not in Texas,

10 with so much litigation, so outside of that — although, we do

11 have an example, we'll see, I think, here in Texas, but

12 outside of that you've got to look at the combination of

13 factors.

14      That's the whole point of historical methodology and the

15 Arlington Heights factors.  You don't draw a conclusion out of

16 just one factor, you draw a conclusion out of the totality of

17 factors.  Doesn't mean every single factor has to be present,

18 but you do need to look at the big picture.

19 Q.  Now that you've laid out your methodology for the Court,

20 Dr. Lichtman, could you please tell the Court what opinion you

21 formed in this case?

22 A.  I have drawn the opinion that essentially all of the

23 Arlington Heights factors pertaining to intentional

24 discrimination in SB 1 are present here in Texas.  They don't

25 all have to be present, but, in fact, the totality here in

ALLAN LICHTMAN - DIRECT

1  Texas is extremely strong.

2  Q.  So I want to talk in greater detail about the factors and

3  evidence you considered in forming that opinion.  You

4  identified historical background as one of the factors you

5  considered in evaluating whether SB 1 was passed with

6  discriminatory intent.  Why does historical background matter

7  to your discriminatory intent analysis?

8  A.  Yeah.  It's not only a guideline, but I've been studying

9  politics, I have to say, for nearly 60 years and I know

10  legislation doesn't come out of nowhere.  It doesn't

11  spontaneously generate in the ether.

12      It comes out of a context, and an examination of the

13  historical background is critical to examining that context.

14  Is this law that's being challenged an anomaly where a state

15  has been scrupulous in not discriminating and even advancing

16  minority rights, or does it fit within a pattern by the state

17  of discriminating against minorities, either one of those

18  situations in opposite directions, of course, would help

19  inform you about intentional discrimination in the law that

20  you're looking at.  Again, it's one factor, but I think, you

21  know, it's powerful.

22  Q.  And what did you observe from your review of the

23  historical background surrounding and predating SB 1?

24  A.  Yeah.  I kind of divided my analysis of the historical

25  background into two parts.  The first part looks at the more

ALLAN LICHTMAN — DIRECT

1  distant history of discrimination from the year of slavery,

2  through the year of Jim Crow, which extends well into the 20th

3  century, and, of course, as courts have recognized and every

4  scholar has recognized, Texas has, throughout this period,

5  which is a very long period, egregious discrimination against

6  minorities, not just in voting, but in virtually every realm

7  of life, education, law enforcement, transportation, housing.

8      Second, part of the analysis that I looked at was recent

9  acts which are discriminatory, and I didn't just look at

10  voting.  I looked at other realms which are also part of the

11  Jim Crow Era that are relevant to voting, such as education,

12  law enforcement, immigration, housing, and in all of those

13  areas I focused on the 21st century.

14  Q.  Is there a connection between earlier voting related

15  discrimination and 21st century voting related discrimination

16  in Texas?

17  A.  Yes, there is an important connection.  It's easy to

18  dismiss the earlier history saying, you know, it's a different

19  time, different actors, and that's all true, nonetheless,

20  there is a very important element of continuity that knits

21  together the more distant history with the current ongoing

22  history.

23      When I say "history," I mean right up to the present,

24  including current history.  In both cases, a threatened or

25  challenged power structure, which was predominantly White,

ALLAN LICHTMAN — DIRECT

1   responded to challenges to its control.  In the earlier
2   period, the Jim Crow period, it was the influx of Black voters
3   as a result of the Reconstruction Amendments and the
4   Fifteenth Amendment, and these Black voters were threatening
5   the White power structure in Texas and throughout the South.
6   It's not unique here.
7       And they responded by laws that restricted the
8   opportunities for Black voters to register and vote.  And most
9   of these laws, like SB 1, are, on their face, race-neutral.
10  Like, the poll tax didn't mention race.  The literacy test
11  didn't mention race, but, clearly, they were designed to
12  target in a discriminatory way African-Americans.
13      Now, look at the 21st century.  Again, those who hold the
14  levers of power in Texas were challenged by fundamental
15  demographic change, and that is the rise of the Black and
16  Hispanic population in Texas and the decline of the Anglo
17  population in Texas, and, of course, the Black and Hispanic
18  population, including citizen voting age population is the
19  base of the political opposition and the Anglos are the base
20  of those who hold power in Texas, so while things are
21  different and the measures are very different because now we
22  have the Voting Rights Act and all kinds of decisions, they
23  also responded with measures to restrict opportunities to vote
24  for this rising Hispanic and Black citizen voting age
25  population in Texas, so there is this linkage.

ALLAN LICHTMAN – DIRECT

1  Q.  So in addition to that shifting power dynamics that you

2  just mentioned a second ago, did you also evaluate Texas'

3  redistricting strategy as part of your historical background

4  analysis?

5  A.  Yes, I did.  And the reason I did that was redistricting

6  fundamentally affects not whether you can vote or not but

7  whether you can elect candidates of your choice and

8  redistricting can be used in a way to limit the ability of

9  minorities to elect candidates of their choice to whatever

10  legislative body is being redistricted, whether Congress or

11  State Senate, or House.

12  Q.  So you mentioned Section 5 earlier and I want to break

13  this discussion down into the Section 5 Era and the

14  post-Section 5 Era.  So starting with the Section 5 Era, what

15  did you learn from your analysis of Texas' redistricting

16  strategy?

17  A.  Yes.  Texas was covered under Section 5 in 1975.  That

18  means –– and it was just about one of nine states to be

19  totally covered, so it wasn't all that common.  That means

20  that any changes in electoral laws and procedures had to be

21  precleared by the United States Department of Justice or a

22  state could seek a declaratory judgment that their plan was

23  not retrogressive of minority voting opportunities by

24  appearing before the District of Columbia of District Court.

25      Now, in every redistricting cycle since Texas was covered

3100

ALLAN LICHTMAN – DIRECT

1  and since Section 5 was operative, we know it ceased to be
2  operative in 2013, but so looking at the 1980 through the 2010
3  redistricting cycle, Texas was denied preclearance, either by
4  the justice department or by the D.C. Court for at least one
5  of its plans in every one of these cycles.  It's the only
6  state in the nation with this consistent denial of
7  preclearance for redistricting plans.
8      In the redistricting that followed the 2010 Census, Texas
9  was the only state to have any of its plans for Congress, the
10 State House and the State Senate fail to achieve preclearance,
11 and both the State Senate and Congress plan failed to achieve
12 preclearance and discriminatory intent was found, and I
13 testified before the D.C. Court, was found by the D.C. Court.
14     So Texas has a rather unique history here of adopting
15 plans that either justice found were discriminatory or the
16 D.C. Court found were discriminatory.
17 Q.  So now I want to talk about the post–Section 5 Era.  What
18 did your analysis show?
19 A.  Well, I first looked at congressional redistricting
20 following the 2010 census after Section 5 was inoperable and
21 that was, of course, before the three–judge court in San
22 Antonio and the Court found that the 2011 congressional plan
23 where I testified had the intent and effect of discriminating
24 against minority voters in Texas, particularly in the heavily
25 populated Dallas/Fort Worth area.

ALLAN LICHTMAN - DIRECT

1    There was then interim remedial plans adopted by this

2  court, which was modified in light of Supreme Court.  I then

3  testified again in the 2013 — this thing never ends — plan,

4  and San Antonio Court did find discrimination, but, as I point

5  out in my report, that was overturned by the United States

6  Supreme Court, but the 2011 decision on the 2011 plan, as far

7  as I know, was not reviewed by the Supreme Court.

8  Q.  And what is the significance of the courts' rejecting

9  Texas redistricting map?

10  A.  The significance, of course, is that these redistricting

11  maps were discriminatory, including intent findings that at

12  least some of the plans not only had the effect of

13  discriminating against minorities but had the intent.

14    And I can't overemphasize how important redistricting is,

15  because this is the chance for, you know, those in power to

16  draw lines that keep them in power, and as we all know, the

17  power dynamics in Texas is very much split along racial lines,

18  with Anglos being the base for the Republicans, and

19  particularly — and minorities being the base for their

20  political opposition.

21  Q.  Now —

22  A.  And we also had, although it hasn't been adjudicated by a

23  court, we have a post-2020 redistricting plan that even though

24  95 percent of the growth in Texas was minority, Texas did not

25  create a single —

3102

ALLAN LICHTMAN - DIRECT

1          MR. KERCHER:  Objection, Your Honor.  Improper

2   character testimony.  It's a non-adjudicated offense.

3          THE COURT:  I think he's giving background and I

4   realize the El Paso Court hasn't done anything yet.

5          MR. KERCHER:  For the record, Your Honor, my

6   objection is overruled?

7          THE COURT:  Yes.

8          THE WITNESS:  I think I was explaining that although,

9   as far as I know, it has not been the subject of court

10  adjudication, I'm involved in the case.  I've examined the

11  2020 plan.  I've examined, you know, over all these many years

12  every, virtually every Texas redistricting plan.

13         THE COURT:  Well, let's go back to Q and A.

14         MISS LORENZO:  We can move on to the next section.

15  BY MISS LORENZO:

16  Q.  Okay.  So we talked about your analysis of the shifting

17  demographics and the redistricting strategy over the last

18  several decades.  Did you analyze as well Texas' recent voting

19  rights legislation?

20  A.  Yes.  I analyzed the 2011 voter ID plan which at the time

21  was the most restrictive voter ID law in the nation.  I point

22  out in my report, and as I said, I testified in this case in

23  the Federal District Court, that every court that's reviewed

24  this has found it was illegal one way or the another, either

25  violating the Voting Rights Act or being intentionally

ALLAN LICHTMAN - DIRECT

1  discriminatory.  That includes the District Court of D.C., the

2  Federal District Court here in Texas, a three-judge panel of

3  the Fifth Circuit, and an en banc decision by the Fifth

4  Circuit, and, finally, the case became moot with an

5  intentional discrimination finding still pending because at

6  the compulsion of the court, Texas adopted a reasonable

7  impediment declaration for voters lacking an authorized photo

8  identification.

9  Q.  Did you evaluate any executive mandates or advisories?

10 A.  Did you say executive mandates?

11 Q.  Yes.

12 A.  Yes.  I looked at the January 2019 Secretary of State's

13 Election Advisory that promised to send to county officials

14 actionable information on, I think it was 95,000 potential

15 voters who were flagged as noncitizens.

16      The county registrars was supposed to send them letters

17 warning that their registration could be purged, but the

18 termination of citizenship is very fraught and the list was

19 fundamentally fraught.  For example, among others, it did not

20 account for those who were naturalized prior to registering to

21 vote.

22      So a lawsuit was filed, a settlement was agreed upon, and

23 the advisory was rescinded and the Secretary of State told

24 election officials to take no further action on it.

25 Q.  Now, SB 1 was passed in 2021, besides your analysis of SB

ALLAN LICHTMAN - DIRECT

1  1 did you conduct any review of the 2021 legislative session

2  in Texas?

3  A.  I did.

4  Q.  Could you please tell the Court what you learned.

5  A.  Yeah.  Very briefly, I learned that, while I didn't

6  analyze these measures for intent because that would require a

7  full-blown analysis of each one of them, I simply noted that

8  there were a series of about five other bills passed by the

9  same legislature that made voting harder.

10 Q.  Are those additional bills outlined on page 27 of your

11 report?

12 A.  That's correct.

13 Q.  So we will note that for the record and move on to the

14 next question.  Why were these unrelated statutes relevant to

15 your discriminatory intent analysis?

16 A.  They are not the most relevant but they do show a

17 willingness on the part of the State of Texas which has

18 terrible voter turnout.  It's near the bottom of all the

19 states.  Instead of making voting easier to pass things it

20 made voting more difficult.

21     And, as I point out, given the fact that minorities have

22 much lower levels of wealth, income, education, health issues,

23 higher levels of poverty, when you make voting harder it's

24 going to hurt marginalized people the most.

25 Q.  And so far we've been talking about Texas' history

ALLAN LICHTMAN - DIRECT

1  regarding elections and voting rights, but you mentioned

2  earlier that you evaluated other facets of Texas' history?

3  A.  I did.

4  Q.  Now, in the interest of time, Dr. Lichtman, I'm not going

5  to ask you to go into detail on your findings for each of

6  these topics, but I would like to discuss your overarching

7  findings.  So at a very high level, what opinions did you form

8  about Texas' education related policies?

9  A.  Yes.  I formed opinions that in several very important

10 ways Texas' educational policies had a disparate impact upon

11 minorities.  Remarkably, about three-quarters of the public

12 school enrollment in Texas is minority.

13     And, as I point out, Texas lags far behind most states in

14 supporting public education.  I think a 2021 study showed it

15 was about third from last.  I also found that there was very

16 significant racial and ethnic disparities in punishments and

17 suspensions and other kinds of punishments, very important in

18 disrupting students' education.

19 Q.  At a high level, what opinions did you form about Texas'

20 law enforcement related?

21 A.  I'm not quite finished.

22 Q.  Oh, go ahead.

23 A.  I'm almost done.

24 Q.  Okay.

25 A.  I'm just about done.

3106

ALLAN LICHTMAN - DIRECT

1      And the final thing I want to point out is imposing the

2  orthodoxy, the views, the ideology of those who held power,

3  that's quite different from the ideology of everybody else on

4  education, which molds the future voters of Texas.

5  Q.  Understood.  Now, at a high level, what opinions did you

6  form about Texas' law enforcement related policies?

7  A.  Yeah, that there is significant discrimination in law

8  enforcement, with law enforcement being more directed against

9  minorities than against Anglos in Texas, that Texas has the --

10  I think it's sixth or so highest incarceration rate

11  disproportionately minority, which is very important because

12  Texas disenfranchises felons, including those on parole and

13  probation, and that, as my statistics point out, falls most

14  heavily on minorities.

15      And, of course, when you are in the law enforcement

16  system, your whole life is disrupted.  And as I point out,

17  even a bipartisan commission of the Texas Legislature itself

18  indicated that the Texas system to deal with these issues is

19  not effective.

20  Q.  At a high level what opinions did you form about Texas'

21  immigration related policies?

22  A.  Yeah, that, you know, Texas has had this, and I point in

23  out here and elsewhere, this kind of idea of the immigration

24  threat and it's passed one of the most restrictive immigration

25  laws, and it has by far the highest level of interior arrests,

3107
ALLAN LICHTMAN - DIRECT

1  that is not on the border, but in the state, way above the
2  second state, which is California, and almost all of them are
3  Hispanic, and the very few who aren't are primarily from Asia
4  and Africa.
5      And you can ask for proof of immigration status, even from
6  minor traffic violations, you can get caught up in this having
7  a broken taillight, plus, as I point out from the studies,
8  lots of U.S. citizens get caught up in these interior arrests.
9  In fact, Houston leads the country and El Paso is third, way
10  ahead of much bigger cities like Los Angeles and Miami.
11 Q.  At a high level what opinions did you form about housing
12 related policies?
13 A.  Yeah.  I just point out one thing here, and that is what's
14 almost unique in the country is Texas enacted a state law
15 allowing landlords to refuse to rent to persons receiving
16 federal housing assistance, overwhelmingly, minority.
17     It was in the Dallas case, so I was able to find this out,
18 Dallas was about to pass a law just to the contrary and now
19 Texas precludes localities from opening up renters to
20 predominantly minority persons receiving assistance.
21 Q.  Dr. Lichtman, why did you review these nonvoting related
22 facets of Texas' history?
23 A.  More than one reason.  First of all, legislators don't
24 take off one hat and put on another hat when they move from
25 one area of policy to another.  The same political interests,

ALLAN LICHTMAN - DIRECT

1  the same ideology, the same attitudes guide how they approach

2  different interests, and, therefore, looking at discrimination

3  and these other realms helps us understand decision-making by

4  Texas officials.

5      In addition, all of these areas bear directly upon voting.

6  We know education is tightly tied to voting and

7  discrimination.  And education, disruption of education, is

8  one factor that contributes to the wide gap in Texas in

9  educational attainment and proficiency between minorities and

10 Whites, and obviously the ideology that you are inculcating in

11 students affects how they are going to vote.

12     Clearly, law enforcement has a direct impact because of

13 felon disenfranchisement which I point out goes back to the

14 old Jim Crow Era as a means of keeping Black people from

15 voting.

16     And, obviously, if you are detaining U.S. citizens,

17 arresting them, disrupting their lives, that obviously also

18 can have an impact on voting, and discrimination in housing

19 leads to segregated communities which are associated with

20 poverty, high crime, poor schools, which also impact voting.

21 You know, voting is also kind of like a funnel where all of

22 these things funnel into the voting decision.

23 Q.  Now, Dr. Lichtman, we did not go through everything in

24 your report, so, for the record, your full historical

25 background analysis is in Section 2 on pages 20 through 40 of

ALLAN LICHTMAN — DIRECT

1  your expert report, correct?

2  A.  Yes.  And if you could speak a little louder and a little

3  more slowly, I would appreciate it.

4  Q.  I will.  I will speak louder.

5      So now we've discussed the historical background in which

6  SB 1 emerged, which is one of the five factors you considered

7  in forming your opinions.  The second factor you identified

8  was the sequence of events leading up to SB 1 being passed.

9  Did you form any opinions on this?

10  A.  Yes.

11  Q.  At a high —

12  A.  I got the page.  52 you are starting?

13  Q.  Yeah.

14  A.  Yeah, I'm good.

15  Q.  At a high level, what were your opinions?

16  A.  The sequence of events helps explain all of these other

17  factors, the adoption of SB 1, particularly the change in

18  demographics of Texas which very rapidly, very quickly before

19  SB 1 the political implications of that, changing modes of

20  voter, and, of course, the institution of the Big Lie, about a

21  stolen 2020 Presidential Election.

22  Q.  So let's start first about the shifting demographics you

23  just mentioned.

24      Derek, would you please pull up table 13 which is on page

25  175.  Thank you.

ALLAN LICHTMAN - DIRECT

1  A.  Wow, I can really see it.

2  Q.  Do you recognize this, Dr. Lichtman?

3  A.  I do.

4  Q.  This table uses the acronym C-V-A-P.  What does CVAP stand

5  for?

6  A.  Citizen Voting Age Population, that is those who are of

7  age and are U.S. citizens, and, therefore, eligible to

8  register to vote.

9  Q.  Could you tell the Court what this table shows.

10  A.  Yeah.  This table shows two things.  Over a relatively

11  short period of time, approximate through the adoption of SB

12  1, we see a substantial increase in the Hispanic and Black

13  percentage of CVAP.  Can I use the acronym?

14  Q.  Yes.  Go ahead.

15  A.  Of CVAP.  All the way up, and just a decade from

16  39.4 percent to 44.2 percent, that's almost 5 percentage

17  points out of more than 10 percent increase.

18      Correspondingly, we see a sharp decline in Anglo

19  percentage of CVAP going down from 56.4, more than 6

20  percentage points, and again more than 10 percent, all the way

21  down to 50.1.

22      In other words, put all the minorities together and

23  compare them to Anglos as of 2019, and it's probably changed

24  even since then, Texas is an evenly divided state between

25  Anglos and minorities, and that was not the case just a decade

ALLAN LICHTMAN - DIRECT

1  earlier.

2  Q.  Derek, could we please pull up tables 14 and 15 on pages

3  176 of his expert report.

4     Do you recognize these tables, Dr. Lichtman?

5  A.  Yes.  A little hard to read, but I can read them.  We're

6  good.

7  Q.  Looking at table 14 first, could you please tell the Court

8  what, if anything, this table shows us about Texas'

9  partisanship trends over the last several years?

10  A.  Yes.  It kind of updates what is already well-known in

11  Texas.  I've been in so many cases and no expert disagrees

12  that the base of the Republican Party is Anglo, the base of

13  the Democratic Party is Hispanic and Black, with Blacks

14  overwhelmingly Democratic, Hispanics substantially Democratic,

15  and Anglos very substantially Republican.

16     And the point of this is, you ask, is to show that the

17  demographic shifts have a political bite, that is this very

18  rapid escalation of the minority versus the Anglo CVAP means

19  that the base vote that could go for Democrats is expanding

20  and the base vote for Republicans is shrinking.

21     It doesn't mean that politics is going to turn topsy-turvy

22  in Texas, but it does mean that there is a challenge arising

23  from this.  I also noted, apropos of this, a couple of polls

24  just before the adoption of SB 2021 which show potential

25  Democratic senatorial and gubernatorial candidates competitive

3112

ALLAN LICHTMAN - DIRECT

1   in the next election, may not necessarily come to pass, but

2   they couldn't know that at the time.

3   Q.   Now, looking at table 15, could you please tell the Court

4   what, if anything, this table shows us about Texas'

5   partisanship trends over the last several years?

6   A.   Yeah.  One of the provisions of —

7       Oh, okay.  This is table 15.

8   Q.   Yes, table 15.

9   A.   Yeah.

10  Q.   Thank you, Derek.

11  A.   This shows that, in fact, although it's still a Republican

12  state, that as the demographics have shifted, Texas has become

13  at least relatively a more competitive state.  Not talking

14  anymore about double-digit differences between the National

15  Democratic presidential vote and the Texas Democratic

16  presidential vote, in just a short period of time, the

17  difference goes from ten points down to five points, one

18  point.

19      As I said, politics doesn't turn topsy-turvy, but it does

20  change, and it changes rapidly.  And, as I said, I've been

21  studying this for 60 years, one thing that politicians are

22  very much aware of, their electoral prospects.

23  Q.   Could we please pull table 16 from page 178 of his report.

24      Dr. Lichtman, what does this table show?

25  A.   Yeah, this is a bit of a shift here to a different element

1  of the sequence of events, not demography anymore, but mode of

2  voting, and it's important because as we'll see when we get to

3  the guts of SB 1, one of the things that SB 1 does for the

4  first time is put various identification restrictions on

5  mail-in voting, and this is the sequence that precedes that.

6      If we look at two standard surveys in my field, the

7  Cooperative Congressional Election Survey and the Survey of

8  Performance of the American Electorate, two separate surveys

9  which show the same thing, that is back in 2008 right before

10 the last Presidential Election before Texas adopted its

11 federal voter ID law that Anglos turned out to vote by mail at

12 2.6 percentage points and 52 percent higher than minorities in

13 one poll and 4.3 and 65.2 in the other, but the two polls

14 basically say the same thing, that as compared to minorities

15 Anglos were a substantial majority of those who voted by mail.

16     That fundamentally shifts in 2020.  Not only does voting

17 by mail as a general proposition substantially escalate but

18 you get a big turnaround.

19     Now, minorities are a substantial majority, according to

20 either of these polls, of those who are voting by mail, so a

21 complete flip in just a period of twelve years.

22     And the law, the CCES sample, is the changes are

23 statistically significant at standing levels in social

24 science, and if I were to combine the two samples, of course,

25 it would be even more statistically significant.  So we're not

ALLAN LICHTMAN – DIRECT

1  talking about random effects here.

2  Q.  Now, why are all these partisanship shifts that you just

3  described relative to your sequence of events analysis?

4  A.  Because, as I said, you know, one thing that politicians

5  everywhere are fundamentally concerned about is their own

6  power and their own electoral process, and all of this bears

7  on that.

8      You know, a challenge from the rising base of the

9  political opposition, and you have a challenge from the

10  changing composition of mail-in votes, both of which pose a

11  challenge to those who hold the levers of power, control the

12  executive and the legislature in Texas.

13  Q.  Now, shifting gears a little bit, you mentioned earlier

14  what you call the Big Lie.  How is the Big Lie relevant to the

15  sequence of events that led to SB 1's passage?

16  A.  Yeah.  I think I better define the Big Lie in order to get

17  into that.  The Big Lie is the lie that the 2020 Presidential

18  Election won by Joe Biden was stolen by the Democrats and

19  Texans were at the forefront, Texas Republican leaders

20  obviously, not rank and file Texans, at the forefront of

21  perpetrating the Big Lie.

22      The Attorney General Ken Paxton filed — this is after

23  every lawsuit that claim a consequential fraud in the election

24  was rejected Attorney General Ken Paxton files a lawsuit

25  directly to the Supreme Court asking the Supreme Court to

ALLAN LICHTMAN – DIRECT

1  overturn the certified election results.

2      This is, I think, December 8th, a couple –– a month after

3  the election, to overturn the results of the elections.

4  Doesn't touch on Texas, but on four states won by Biden,

5  Georgia, Michigan, Pennsylvania, and Wisconsin.  This was

6  summarily rejected by the Supreme Court.

7      And then towards the end of December, just after

8  Christmas, Texas Representative Louie Gohmert files another

9  lawsuit that sought to allow Vice President Mike Pence to be

10  the unilateral decider of the election to overturn certified

11  results and simply appoint Trump elected.

12      That also went nowhere and Attorney General Paxton

13  traveled to Washington on January 6th to whip up the crowd

14  that eventually broke into the Capitol.

15      And then these allegations of alleged voter fraud became

16  one of the fundamental justifications along with a tightly

17  intertwined notion of confidence in elections that justified

18  the adoption of SB 1, and I believe was even contained in the

19  preamble to SB 1.

20  Q.  You mentioned a moment ago attempts by Attorney General

21  Paxton to overturn elections results in Georgia, Michigan,

22  Pennsylvania, and Wisconsin.  Why is that relevant to your

23  analysis here?

24  A.  It's relevant in two ways.  One, if you look at those

25  states, those are all states with big urban areas with heavy

3116
ALLAN LICHTMAN - DIRECT

1  concentrations of African-Americans, like Philadelphia and

2  Detroit, cities that Trump particularly attacked in his Big

3  Lie about a stolen election, so the first relevant point is

4  that race is implicated in what the leadership in Texas was

5  doing.

6      Second relevant point is this is directed outside of the

7  State of Texas.  Nothing about Texas in here, which poses

8  certain difficulties when it comes to justifying SB 1 in

9  Texas.

10 Q.  Now, you've talked about the shift in demographics and the

11 role that Texas Republicans played in perpetrating the Big

12 Lie, how is that evidence relevant to the introduction of SB

13 1?

14 A.  As I said, extending the Big Lie to Texas, was a

15 justification for the adoption of SB 1.  It's even

16 incorporated into the bill itself, but there's a paradox here.

17 All of these efforts were directed elsewhere, not at Texas.

18     And, in Texas, the most knowledgeable election official,

19 Keith Ingram, the head of Division of Elections told

20 legislators that there wasn't issues in Texas.  It was smooth,

21 safe, and secure.  It was a success.

22     And even in the debates over SB 1, Representative Bell

23 transposed data from the nation to Texas.  There was a poll

24 taken about whether you had confidence in the vote and the

25 result was Texans had somewhat little confidence or very

3117

ALLAN LICHTMAN — DIRECT

1  little confidence at a level of 43 percent for the nation and

2  the representative said that was for Texas, but it wasn't

3  because there was a separate question for Texas and it was a

4  small fraction of the 43 percent.  Only 16 percent even said

5  they had somewhat of a lack of confidence.  That's about as

6  low and I've seen anywhere.

7  Q.  Now, did the Texas Legislature consider any evidence of

8  election fraud while it was debating SB 1?

9  A.  Yeah.  I heard you.  I'm thinking about it.

10      No, to the contrary, as I said, they were told by Keith

11  Ingram that the election was smooth and secure.  They were

12  told by the district attorney in Dallas County, a huge very

13  diverse county, cast almost a million votes, that there wasn't

14  any significant voter fraud in Dallas County, and that if

15  there was, he had sufficient tools available to him to deal

16  with that.  He didn't need anything else.

17      I also have in my report, I'm not going to go through

18  them, but colloquies between Democratic legislators and

19  advocates of SB 1 asking for examples of voter fraud that SB 1

20  would deal with and they came up empty.  They basically didn't

21  and weren't able to answer that question in a persuasive way,

22  nor were they able to show to whatever extent there might be

23  voter fraud that SB 1 could deal with it.

24  Q.  So we talked about the lack of evidence of fraud before

25  the legislature, but did you examine whether the legislature

ALLAN LICHTMAN – DIRECT

1  considered any evidence of the impact of SB 1 on racial

2  minorities?

3  A.  Absolutely.  That's one of the factors that I looked at,

4  along with, of course, procedural and substantive deviations,

5  and contemporary statements, so I think those are the ones

6  that we haven't looked at yet.

7  Q.  Do you know if the legislature conducted any racial impact

8  surveys as part of their discussions around SB 1?

9  A.  Yeah.  I mean, that may seem out of the blue, but, you

10  know, Texas has been the subject of continuing litigation,

11  some of it successful about discrimination.  And you think

12  they might be sensitive to whether or not this new massive

13  law, which also bears upon the fundamental right to vote,

14  might be discriminatory.

15      In fact, they said with no evidence that although the law,

16  you know, doesn't target any particular group, not only didn't

17  they do any kind of study or have any expert analysis, they

18  rejected an amendment that asked for such a study.  And they

19  could have done it.  There was no emergency to get this thing

20  done.

21  Q.  Now, your full sequence of events analysis is in section 4

22  on pages 52 to 61 of your expert report, correct?

23  A.  Which are we talking about now?  I didn't hear you.

24  Q.  I just wanted to confirm since we didn't talk about all of

25  it that the sequence of events analysis is your section 4 on

ALLAN LICHTMAN - DIRECT

1  pages 52 through 61 of your expert report.

2  A.  Yes.

3  Q.  So now we've talked about the historical background and

4  the sequence of events, and you alluded to this just a minute

5  ago, but the third factor that you identified was the

6  procedural and substantive deviations in the legislative

7  process that led to SB 1.  Did you form any opinions about

8  these?

9  A.  I did.

10  Q.  At a high level, what were they?

11  A.  The very highest level, SB 1 was adopted through a rush

12  process marred by significant procedural deviation.  Let me be

13  clear, by "procedural deviations," I don't mean violations of

14  law, but what I mean is deviations from rules or best or

15  standard practices.

16  Q.  So with that context in mind, I first want to talk about

17  procedural deviations.  What did you observe about the lead-up

18  to how SB 1's predecessors were introduced?

19  A.  Yeah.  I observed something quite interesting that you

20  don't usually see, and that is approximate -- right before the

21  adoption or the introduction of SB 1 the House Election

22  Committee, relevant committee that would be scrutinizing

23  legislation, headed by Chairman Brisco Cain, met with Keith

24  Ingram, the Director of the Division of Elections, and as he

25  would later tell the whole legislature, elections were a

1  success, in good shape, smooth, and secure.  Nonetheless,

2  shortly thereafter, they went ahead and introduced SB 1 with,

3  you know, justifications about fraud and confidence.

4  Q.  So focusing first on the predecessor bills, did Mr. Cane

5  introduce HB 6?

6  A.  Yes.  There were two predecessor bills, HB 6 in the House

7  and SB 7 in the Senate, and Brisco Cain introduced HB 6 in his

8  House Elections Committee.

9  Q.  Okay.  So when you were looking at Representative Cain's

10  introduction of HB 6, did you identify anything that gave you

11  pause?

12  A.  I certainly did, and, you know, I thought this was, you

13  know –– again, it wasn't illegal, but it was certainly a

14  deviation from best practice or standard practice.  He

15  admitted that he hadn't read the bill in its entirety.  It's a

16  long, complex omnibus bill with lots of provisions, many of

17  which are highly significant, and yet he hadn't read the bill

18  in its entirety before he –– because he had received a

19  substitute draft that morning.

20      This would not be the last time we would be getting

21  substitute drafts.  And I'm not going to get into all the

22  details, but also Senator –– excuse me –– Representative Cain

23  acted in a way that precluded the witnesses who had come to

24  testify from testifying.

25  Q.  So let's take that step by step.  Did you have an

ALLAN LICHTMAN - DIRECT

1  opportunity to examine or observe how HB 6 and SB 7 were
2  debated?
3  A.  Yes.  And it was a lot of testimony challenging of these
4  bills, particularly witnesses saying it would discriminatorily
5  impact minorities in the state of Texas and then Chairman Cain
6  executed a move.  Again, it wasn't illegal, but it was a great
7  significance as a deviation.  He substituted the text of SB 7
8  in his committee for the text of SB 6.
9       In other words, SB 7's language was substituted for the
10 language of HB 6.  And I know it's a little convoluted, but
11 that's the way it works.  And he claimed they are identical.
12 And it was pointed out right at the time they were not
13 identical.  They had many differences.  So what this meant was
14 SB 7 doesn't get considered.  There's no scrutiny, no
15 testimony on it in the House.
16 Q.  Did you get the chance to evaluate the procedures that
17 took place within the conference committee that evaluated
18 this --
19 A.  So the other thing that this maneuver did was result in
20 two different versions of SB 7 which then requires a
21 conference committee, of course, dominated by Republicans
22 because they have the majority, and actually chaired by Cain
23 and there were a number of procedural deviations.
24      As far as I know, it never met.  The report was dictated
25 behind closed doors by the Republican majority on the

ALLAN LICHTMAN - DIRECT

1  committee.  It was signed only by Republicans, very unusual.

2      I think there were 40 conference committee reports at that

3  same time and only one other had only been signed by

4  Republicans and that was another one of these election

5  integrity bills.  So then it goes to the House and the Senate

6  and their issues there.

7  Q.  Did you identify any irregularities besides those that you

8  just mentioned, specifically with the drafting process in the

9  conference committee?

10 A.  Yes.  This is very important.

11     Typically, a conference committee reconciles two bills but

12 this conference committee, only the Republicans, did more.

13 They added provisions.  They added one provision that

14 precluded Sunday voting before 1:00 p.m., kind of impacting

15 the so-called African-American Souls to the Polls initiative

16 and they added in the new ID restrictions on mail-in voting.

17 Q.  How common is it, Dr. Lichtman, for a conference committee

18 to add new provisions like that?

19 A.  Well, it's not common at all.  You've got to have what's

20 called an out-of-bounds resolution to do that.  And again, I'm

21 not going to go through it but I had some colloquies showing

22 that the advocates, Republican advocates for the bill couldn't

23 come up with other examples.

24     The only time it's common is in the budget and then it's

25 pretty standard, but for nonbudgetary bills, it's not a

ALLAN LICHTMAN – DIRECT

1  standard thing.  And then there comes an issue with the

2  out-of-bounds resolution.

3  Q.  What was that issue?

4  A.  Yeah.  An out-of-bounds resolution is a resolution that

5  enables you to add things to in a conference committee report.

6  And it's very clear and I quote the exact rules.  I'm not

7  going to go over them now, but they're in my report.

8     I quote the exact rules which indicate you have to justify

9  in detail the reasons why you're adding whatever provisions

10  you're adding.

11     And two quite significant provisions were added and the

12  out-of-bounds resolution were rushed right at the beginning of

13  the process, which was a very truncated process.  They didn't

14  even give the usual 24-hour gap.  They began debating this

15  right away, despite they had to suspend the rules for that.

16     And the out-of-bounds resolution just had a very generic

17  statement.  It did not specify in detail why you needed a

18  1:00 p.m. limitation and why you needed these new restrictions

19  on mail-in voting.

20  Q.  Now, was that conference committee report ultimately

21  passed?

22  A.  It was passed in the Senate with, as I said, minimal, wee

23  hours of the morning debate and vote.  It was not passed in

24  the House because Democrats walked out to break the quorum.

25  You know, they believed this bill was so discriminatory they

ALLAN LICHTMAN - DIRECT

 1  couldn't deal with it.

 2  Q.  So what happened after the Democrats walked out and

 3  prevented SB 7 from passing?

 4  A.  Yeah.  Something very significant happened.

 5      You know, one thing about Texas is, there's this

 6  reciprocal relationship between the governor and the

 7  legislature.  You know, both Republican, sharing the same

 8  political interests, and the same ideologies.

 9      So after the regular session ended Governor Abbott did

10  something which I hadn't seen before.  You know, I can't prove

11  a negative but it was certainly unusual.  He vetoed the

12  funding for the State Legislature.

13      But that didn't affect the legislators themselves.  It

14  only affected the staff members.  You know, the lower-paid

15  staff members working at legislative agencies and staffs.

16      He then called for a special session which he said --

17  passed SB 1 among other things and saying SB 1 was emergency

18  legislation.  And that had issues.

19  Q.  What was the significance of Governor Abbott's calling for

20  an emergency special session?

21  A.  There are two deviations here that I think are important

22  to emphasize.  Number one, there was no emergency.  The

23  elections in Texas were a success.  They were smooth and

24  secure.  No one had challenged them.  So there was no

25  emergency to pass an omnibus bill supposedly repairing

ALLAN LICHTMAN - DIRECT

1 problems that no one could actually identify.

2     Second issue was that there was no public demand for

3 considering so-called election integrity legislation as

4 emergency legislation in a special session.

5 Q.  Derek, could you please pull up chart 3 from page 180.

6 Thank you.

7     Dr. Lichtman, could you explain what we are looking at

8 here?

9 A.  Yeah.  This is a survey of likely voters.  It's a pretty

10 big sample, and it was asking what your priorities are for the

11 special session.

12     And there were some real emergencies, like dealing with a

13 failing electrical grid, but there was no public demand for

14 considering election integrity bills or election security

15 bills as emergency legislation in the special session.

16     It came in fifth among priorities with only 8 percent of

17 respondents to the polls considering that as their first

18 choice, or to turn it around, 92 percent had something else as

19 their first choice for what the special session was

20 considering.  No emergency.  No public demand for election

21 security legislation in a special session.

22 Q.  You can take that down, Derek.

23     So the Democrats prevented SB 7 from passing.

24 Governor Abbott called for a special session.  What happened

25 during that special session?

3126
ALLAN LICHTMAN — DIRECT

1   A.   Yeah.  Just to cut it short, Democrats not only walked out

2   they left the state to prevent what was now SB 1 which

3   incorporated provisions from all conference committee reports

4   as SB 7.  So I think SB 1 actually gets through the Senate but

5   can't be passed in the House because of a lack of a quorum

6   because of what the Democrats did.

7   Q.   Did Governor Abbott ask for a second special session?

8   A.   Yes.

9   Q.   What happened during that second special session?

10  A.   Well, again, to cut to the quick, an arrest warrant was

11  put out for the Democrats who had left the state so they were

12  compelled to come back, which created a quorum in the House

13  and the second special session enacts along party lines in the

14  House and the Senate SB 1.

15       I believe there was only one — I don't think any Democrat

16  voted for it and I think that in both the House and the Senate

17  there may have been one Republican.  So, you know, it's

18  99 percent along party lines.

19  Q.   Derek, could we please pull all the bullets on pages 75

20  and 76 of Dr. Lichtman's report, please.

21       Dr. Lichtman, what are we looking at here?  It should be

22  on your screen as well.

23  A.   Yeah.  So we are looking, again, at the second special

24  session and we're looking at legislation that was proposed,

25  either stand-alone, or I think one of them was actually an

ALLAN LICHTMAN — DIRECT

1  amendment, doesn't matter.  It was proposed to make voting

2  easier.  You know, the mantra of Republicans in Texas, and, in

3  fact, everywhere is, you know, "easy to vote hard to cheat,"

4  even though there was no evidence of any consequential

5  cheating in Texas.

6      Be that as it may, these were all something along the

7  lines of ten measures introduced, I think all of them are

8  Democrats, in the second special session designed to improve

9  access to registration and voting in Texas.

10     And I have a poll in my report, we don't need to go into

11  it in detail, which shows very strong public support for

12  measures to make voting easier in the state of Texas, but all

13  of these were rejected by the Republican majority in the State

14  Legislature.  None of them saw the light of day.

15  Q.  So let's turn now to substantive deviations.  Did you —

16  actually, first, what are substantive deviations?

17  A.  Yeah.  You know, Arlington Heights does not specifically

18  define it.  My understanding from, you know, my expertise, and

19  I keep hating to say this, studying all this over 50 years, is

20  the way I've looked at it is departures from established

21  policy without anything intervening to indicate a significant

22  need for the change of those policies.

23  Q.  Why do substantial deviations matter?

24  A.  Substantive deviations matter because they show the

25  motivations of the legislature.  They bear upon the intent of

ALLAN LICHTMAN — DIRECT

1  the legislature, if, in fact, they are departing from past

2  practice that was established and without, you know, some

3  significant evidence of a need for change adopting a more

4  restrictive law.

5  Q.  Could you please give an example of a substantive

6  deviation that you identified in this case?

7  A.  Yeah.  The first one I identified has to do with

8  identification.  As I said, I testified in the photo voter ID

9  case, so I'm quite familiar with it.

10      Texas adopted a strict photo voter ID law in 2011 and as

11  it was passed by Texas, didn't have even a reasonable

12  impediment option, but the law required only voting at the

13  polls to present ID.

14      No ID was required for absentee ballots, even though at

15  the time Republicans admitted that there's probably, back

16  then, more potential for absentee ballot fraud than for

17  in-person fraud, but as we pointed out in the previous chart

18  we looked at, at this time mail-in voting was primarily White

19  and so the legislature established as a policy that the ID

20  requirements would not be imposed upon mail-in voting.

21      And then when things shifted, so minorities predominated

22  in mail-in voting, even though there was no evidence of a new

23  emergence of fraud in mail-in voting the legislature shifted

24  that established policy to put the new restrictions in.  And

25  they did it in secret, as we know, in the conference

ALLAN LICHTMAN - DIRECT

1  committee.

2  Q.  Did you identify any other example of a substantive

3  deviation?

4  A.  I did, and that is the criminalization, at least in part,

5  of the electoral process, criminalization for those folks who

6  make our democracy work by volunteering to work the polls,

7  and, you know, in very vague ways subjecting them to possible

8  criminal penalties if they don't give adequate access to

9  partisan poll watchers.

10      And, sadly, we know, there have been many stories about

11  this, you know, these selfless folks have been subject to all

12  kinds of threats anyway and now Texas is subjecting them to

13  criminal penalties and there are also criminal penalties for

14  possible perjury because now you've got to swear an oath if

15  you're helping voters with the voting process.

16      And I point out, it's not as if there is some emergence of

17  any illegalities that require criminalization, you know, all

18  of a sudden and I cite poll data showing the people of Texas

19  are overwhelmingly opposed to subjecting election workers to

20  criminalization and to subject those who are assisting voters

21  to possible felonies.

22  Q.  So far we've discussed the historical background, sequence

23  of events, and the procedural and substantive deviations that

24  led to SB 1.  The fourth factor you identified was

25  contemporaneous statements made by decision-makers.

3130
ALLAN LICHTMAN — DIRECT

1  Dr. Lichtman, why did you evaluate contemporaneous statements

2  as part of your analysis in this case?

3  A.  Yeah.  I think as I indicated in, you know, my overarching

4  analysis of my methodology, you don't normally expect

5  decision-makers to come out with, you know, reasonably overt

6  statements that can be considered intent to discriminate.

7      Although I think we do have one here, but leaving that

8  aside for the moment, you always look at contemporaneous

9  statements to see whether there are indicators of

10  discriminatory intent, particularly to see if claims they make

11  like the misleading and pretextual to hide an underlying

12  discriminatory intent.

13  Q.  Now, you mentioned there was one example.  Are you

14  referring to the comment Senator Hall made during the

15  August 9, 2021 Senate Committee on State Affairs hearing which

16  you quote in your report?

17  A.  Yes.  I quote the full statement in my report.

18  Q.  Derek, could we please pull up the August 9, 2021 Senate

19  Committee on State Affairs hearing recording.

20      We're going to play a clip from the hearing from the time

21  stamp 10627 through 10832, and I would ask that the court

22  reporter write down what's said in the video.

23      Derek, you can play it.  Thank you.

24      *(Clip)*

25          ISABEL LONGORIA:  It's not something we knew going

ALLAN LICHTMAN — DIRECT

1  into November.  We wanted to provide a safe method of voting,

2  and now that we know anything to do to diminish that has a

3  discriminatory impact, because that's the point is, we don't

4  do things necessarily, right, because we know they are going

5  to have a racial impact, but once we know that information it

6  is racist to roll back a method that is disproportionally used

7  by marginalized voters and that's the point.  We have the

8  information now to know that it has a racial impact.

9          SENATOR HALL:  Well, I think there's a difference of

10  whether it's rolled back or allowing something as new, but I

11  don't see any difference between what you are proposing,

12  that's just as racist.  I mean, there is something really

13  racist because you're talking about a method that favors, so

14  it's just kind of the reverse of what we've talked about here

15  in there, so...

16          ISABEL LONGORIA:  That probably goes to a deeper

17  issue on how we feel about races and supporting those minority

18  voters.

19          SENATOR HALL:  I mean, if someone proposed a method

20  of voting that favored nonminority voters, you would be —— you

21  and others would be all over that as being racist, and what we

22  are trying to do is here is recognize that we're all

23  Americans, a black vote, a brown vote, a white vote, is one

24  vote, and we're all Americans, and that we have voting rules

25  that favor voting.  It doesn't favor voting to make it

1  convenient because of what culture or whatever beliefs you

2  have or whatever it is that everybody has equal access, equal

3  opportunity, no matter who they are in recognizing

4  considerations to those with special conditions of handicap,

5  but not setting up voting rules based on whether you are a

6  particular minority or whether you are white in there.  We had

7  that at one time.  We got rid of that.  It was wrong, when it

8  was there.  We got rid of that.  And today what we are trying

9  to do, and I think Senator Hughes with this bill, is make

10  equal opportunity for all people equally.  Not set it up to

11  favor one over the other, but I thank you for your testimony.

12     (Open court)

13  Q.  Thank you, Derek.  Dr. Lichtman, what method of voting are

14  they discussing in that clip?

15  A.  Particularly drive-thru voting and perhaps 24-hour, but

16  certainly drive-thru, which is — you know, has evolved many

17  more voters in Harris County in particular but it's not

18  limited to Harris County.

19  Q.  What is the significance of this exchange?

20  A.  Yeah.  This is I think pretty remarkable in that Senator

21  Hall is setting out a justification for whatever you might

22  call it, rolling back, or eliminating, quite intentionally,

23  any voting practice that is disproportionately used by

24  minorities, and this is based upon, you know, a fundamental

25  confusion that allows this intentional result of equating

ALLAN LICHTMAN − DIRECT

1  something like drive−thru voting, which is open to everyone,

2  it's not as if it's a mechanism that favors minorities, it's

3  not like the White Primary which keeps minorities out and only

4  allows Whites.  No.  Anyone can use drive−thru voting or

5  24−hour voting.

6      It just so happens that as Supervisor Longoria pointed

7  out, it is used by more marginal persons.  And of course there

8  are mechanisms that are more used by Whites.  We saw back in

9  the early 21st century mail−in voting was more used by Whites.

10 Does that mean you abolish mail−in voting?  Of course not.

11     So, you know, this is about as close as you can get to an

12 overt statement of intent to discriminate to roll back

13 whatever mechanism provides opportunities for minorities to

14 register and to vote.

15     MISS LORENZO:  Your Honor, LULAC plaintiffs move to

16 introduce HAUL MFV Exhibit 264, which is a transcript of this

17 August 9th, 2021 Senate Committee on State Affairs hearing.

18     THE COURT:  Any objection?

19     MR. KERCHER:  No, Your Honor, and if this is a

20 convenient time to take a break, we have lost internet for

21 some reason so it may be a reason to take a break for other

22 reasons as well, if that's okay.

23     MISS LORENZO:  That's perfect.

24     THE COURT:  One second.

25     So HAUL 264 is admitted.

ALLAN LICHTMAN - DIRECT

1          Did you lose attorney Wi-Fi, is that what you lost?

2          MR. KERCHER:  We did, Your Honor.

3          THE COURT:  Will you let IT know that there's a

4 problem.

5          Let's take a 10 or 15.

6     *(Recess)*

7 BY MISS LORENZO:

8 Q.  Dr. Lichtman, welcome back.  We were just discussing the

9 comments by Senator Hall.  Were there any other

10 contemporaneous statements relevant to drive-thru voting or

11 24-hour voting that you examined?

12 A.  Yeah.  There's a couple that I highlight in my report.  On

13 page 78 I quote Senate Sponsor Hughes, quote, "The provisions

14 apply equally across the state.  They are not limited to a

15 particular group or a particular area."

16     And then Lieutenant Governor Dan Patrick, who presides

17 over the Senate, said, quote, "Well, I have news for Harris

18 County, you're not the capital of Texas.  The State capitol

19 resides in Travis County, in the City of Austin, in this

20 building, not in the county judge or the mayor's office.

21 Harris County does not make policy and create law for the

22 other 253 Texas counties.  Out of thin air they decided on

23 drive-thru voting."

24 Q.  Dr. Lichtman, what is the significance of those

25 statements?

ALLAN LICHTMAN — DIRECT

1  A.  Well, there's a double significance here.  Maybe a triple.

2      First of all, they are zeroing in on Harris County,

3  ignoring the use of drive-thru voting and other counties that

4  are predominantly White and predominantly Republican.

5      Second — there are quite a few here.  Second, drive-thru

6  voting did not come out of thin air.  As I point out in my

7  report, it was actually adopted on a nonpartisan basis first

8  for the Primaries of 2020 and no issue was raised about its

9  use in the Primary.

10      It only became an issue when it was being used in the

11  General Election when it had direct partisan implications

12  since it was being used most heavily by minorities who were

13  the base of the political opposition to those who held power

14  in Texas.

15      Next, Harris County is not making law for the State of

16  Texas.  It has adopted, as other counties have, a means of

17  facilitating voting within Harris County.

18      Next, Republicans tried to stop Harris County uniquely

19  from doing drive-thru voting and not dealing with these other

20  counties.

21      They went to the State Supreme Court to try to stop it.

22  That was turned down summarily.  They went to the State

23  Supreme Court again.  That was to try to invalidate votes.

24  That was turned down summarily.

25      They went to the Federal District Court and the Federal

ALLAN LICHTMAN - DIRECT

1  District Court found that Harris County's, I think there were
2  ten drive-thru locations, were all perfectly legal during the
3  early voting period but only one of them could be used on
4  Election Day because unlike early voting when it could be any
5  structure including a tent on Election Day it had to be a
6  building.
7      That was distorted in debates like these statements by
8  proponents of SB 1 to claim that, I think it's Judge Haden had
9  declared drive-thru voting as an illegal practice, so thwarted
10 to have it stopped or declared illegal, they then turn to SB 1
11 with, A, Harris County, a big Democratic base and drive-thru
12 and I guess also 24-hour voting as mechanisms used
13 predominantly by minorities.
14     They didn't exactly in these and other statements come out
15 quite as overtly discriminatory as Senator Hall but they are
16 close.
17 Q.  Now, in your report you reference Brisco Cain's comments
18 regarding the preservation of the purity of the ballot box.
19 This is on page 87 of your report.  Why did you evaluate that
20 statement?
21 A.  Yeah.  A couple of reasons.  One, there's no impure ballot
22 box in the state of Texas, and even before he filed one of the
23 predecessors to SB 1, HB 6, Representative Cain was told that
24 by the most knowledgeable election official in the state.
25 They were told it again.  There was really no disputing it as

1  the colloquies that I put down indicate.  So now we're hearing
2  about the purity of the ballot box when the ballot box is not
3  impure.
4      It's exactly the way in which sponsors of the Jim Crow law
5  that earlier disenfranchised non-Whites in the South had also
6  justified, you know.  We've got to preserve the ballot, the
7  purity of the ballot from these Black folks, you know, who
8  claim, you know, either are being bought off or too ignorant
9  or too incompetent to vote, you know, pretextual kinds of
10 justifications, different, but also you see these pretextual
11 justifications in SB 1.
12     And I quote a 1906 statement by Senator Culberson of Texas
13 justifying the White Primary, which was a mechanism that by
14 its very nature excluded Blacks unlike drive-thru and 24-hour
15 voting which didn't exclude anyone, and he said he saw the
16 White Primary as uninfluenced by the chicanery and intrigue,
17 which heretofore defeated the will of the people, the Primary
18 he said, quote, "protects and guards the purity of the
19 ballot."
20     And not only all this pretextual then and now, but as I
21 think I mentioned the kinds of voter fraud that's even alleged
22 in Texas and I cite the audit, things like double voting or
23 felon voting or alleged voting by dead people.  SB 1 doesn't
24 deal with any of that.  Sort of like loading a cannon to shoot
25 a gnat, it's like loading a cannon to shoot a gnat and

ALLAN LICHTMAN - DIRECT

1  pointing in the wrong direction.

2  Q.  I want to turn briefly to the lawmakers purported reasons

3  for passing SB 1.  In your analysis, did you encounter

4  instances where lawmakers justified SB 1 as essential to

5  increase voter confidence?

6  A.  Absolutely.  I think I have a little section on that.

7  Maybe you can help me find the page.

8  Q.  Page 100.

9  A.  Yeah.  I got it.  It starts on page 100, and I quote quite

10  a few proponents of the bill talking about the need to

11  establish voter confidence and it's not the same as fraud.

12      This is kind of a way not having to prove anything because

13  it's such a vague concept.  Unlike fraud, if you're going to

14  claim that you've got to prove something, but voter confidence

15  is kind of a generalized concept related to but not the same

16  as voter fraud.

17  Q.  Based on your analysis does SB 1 increase voter confidence

18  in the integrity of voting in Texas?

19  A.  Not at all.  There's kind of a contradiction in the entire

20  approach to SB 1 by its sponsors.  On the one hand they are

21  whipping up all of these claims about tainted election,

22  irregularities, stolen elections, which are bound to affect

23  people's confidence in elections, and particularly

24  Republicans, right?

25      And in the data that I show from my polls the voter

ALLAN LICHTMAN - DIRECT

1  confidence issue is driven entirely almost, almost entirely by
2  Republicans.  And as I point out in my report you're not going
3  to increase voter confidence generally, like whipping up this
4  stolen election idea as a partisan and pushing an entirely
5  partisan bill voted 99 percent along partisan lines.
6      And the proof is, and I have poll data on this, that after
7  the adoption of SB 1, confidence in Texas elections, and
8  that's what we're talking about here, not about the nation,
9  actually declines.  Those who are very confident in Texas
10 elections prior to the adoption of SB 1 was 43 percent.  This
11 is very confident, doesn't include those who were somewhat
12 confident, 43 percent.
13     After the adoption of SB 1 it drops by 5 percentage
14 points, and over 10 percent down to 38 percent, a
15 statistically significant decline, one that can't just be
16 attributed to chance or random factors.
17     And that's not surprising, given that, as I said, SB 1 is
18 not an instrument that really deals with voter fraud or voter
19 confidence.
20 Q.  So other than allegedly preventing voter fraud and
21 promoting confidence in elections did Texas lawmakers make
22 statements justifying passing SB 1 to promote uniformity in
23 elections?
24 A.  They did.  And can you —
25 Q.  Page 107.

3140
ALLAN LICHTMAN - DIRECT

1  A.  107?

2  Q.  Um-hum.  Did lawmakers explain why uniformity was so

3  important?

4  A.  I'm sorry.  What?

5  Q.  Did lawmakers explain why uniformity was so important?

6  A.  No.  They never -- they said we want to promote

7  uniformity, but never said why.  And that's very significant

8  because Texas is an incredibly diverse place.  You know,

9  you've got these huge urban counties that cast nearly a

10  million or over 1.5 million votes, and then you have these

11  very small minimally populated counties that cast under 100 or

12  under 200 votes.

13      And the proponents in the legislature of SB 1 never

14  explained why what is best for Harris County is also best for

15  one of these very small likely populated counties in the state

16  of Texas.

17      And critically, assuming uniformity is a goal, which we

18  see it is an issue, there's a much better way of promoting

19  uniformity and that's to uniformly adopt legislation that

20  makes it easier to register and vote, not to uniformly adopt

21  registration like banning drive-thru and 24-hour voting.  That

22  only makes it harder to vote, particularly for minorities in

23  the state of Texas.  And Texas code does permit, particularly

24  in Primaries, counties to, you know, adopt their own

25  procedures.

ALLAN LICHTMAN — DIRECT

1  Q.  So we've discussed historical background, sequence of

2  events, procedural and substantive deviations, and

3  contemporaneous statements.  The final Arlington Heights

4  factor you identified was the discriminatory impact of SB 1.

5  Did you form any opinions about whether SB 1 has a

6  discriminatory impact?

7  A.  Yes.

8  Q.  At a high level what are those opinions, Dr. Lichtman?

9  A.  At a high level there are multiple discriminatory impacts

10  from SB 1.  We already talked about drive-thru and 24-hour

11  voting, which they've targeted against Harris County and I

12  think overall over 130,000 people voted disproportionately

13  minority through drive-thru or extended-hour voting, and that

14  kind of surgically attacks a mechanism utilized by minorities

15  to foster their registration and their voting, mail requiring

16  various kinds of identification and matching on mail-in voting

17  generally makes voting by mail more difficult, and, you know,

18  given socioeconomic, education, or language disparities makes

19  it particularly difficult for minorities, and then you have

20  the criminalization provisions as well which we've talked

21  about.

22  Q.  Now —

23  A.  Now, all of this has to be looked at, at the high level in

24  the context of the voting system that precedes the adoption of

25  SB 1.

3142
ALLAN LICHTMAN - DIRECT

1   Q.  So let's focus on that.  Why did you consider preexisting
2   barriers to voting as part of your analysis?
3   A.  Preexisting barriers to voting are extremely important
4   because in a sense they define the system to which SB 1 is
5   responding, and to hear the legislatures -- legislators'
6   justification, you know, there is all this fraud that we have
7   to deal with, that they can't name or establish that even the
8   audit of Dallas, Harris, Collin, and Tarrant County couldn't
9   establish, but the reality of what existed in Texas, the
10  context that they were dealing with is the most restrictive
11  system in the country for voting by a margin which is
12  reflected in overall low turnout in Texas, and as we'll see,
13  explicable by White Anglo and minority differences.
14  Q.  Derek, could we please pull up graph one and chart one
15  from pages 44 and 45 of his report.  Okay.
16      So, Dr. Lichtman, I would like to direct your attention to
17  graph one.  First, what does C-O-V-I stand for?
18  A.  Cost of Voting Index.
19  Q.  And what does the Cost of Voting Index represent?
20  A.  It represents how hard or easy it is to register and vote.
21  For example, it's harder to vote if you have excuse-only
22  absentee or mail-in ballots.  It's easier to vote if you have
23  online -- to register to vote if you have online voter
24  registration or same-day voter registration.
25      So this measures both laws and regulations that make it

ALLAN LICHTMAN - DIRECT

1  harder to vote, and then the absence of laws and regulations
2  that make it easier to vote.
3  Q.  So —
4  A.  And these political scientists analyze this and published
5  it in a peer-review journal for every single state, and this
6  is right before the adoption of SB 1.
7  Q.  So could you please describe for the Court what this graph
8  tells us about the voting process in Texas —
9  A.  Yes.
10  Q.  — before SB 1 was passed?
11  A.  Yes.  If you look at the black, which is at the bottom,
12  the black lines, these states are the ones that fall below the
13  median in terms of cost of voting, what is the more positive
14  in number, the higher the cost of voting the more difficult it
15  is to register and vote in the states.
16      The ones with the negative numbers, the more negative the
17  easier it is to vote.  So like Oregon and Washington that have
18  all mail voting are the easiest votes in which to vote.
19      The hardest state in which to register and vote is the
20  state of Texas with a Cost of Voting Index of 1.29.  Remember,
21  the higher the number, the more difficult it is to register
22  and vote.
23      That's not only, you know, multiple times the median,
24  which is about .05, but it is 30 percent higher than the next
25  most difficult state, and that is the state of Georgia.

 1      And, as I said, this manifests itself in the fact that
 2   Texas consistently falls in the bottom, bottom ten states in
 3   terms of turnout.  Turnout, you know, can be influenced by
 4   many things but certainly the cost of voting is one of the
 5   things that has an impact on turnout.
 6   Q.  So I'd like to refer now to chart one.  What does this
 7   tell us about access to voting in Texas before SB 1?
 8   A.  Yeah.  This tells us generically while the relationship is
 9   not perfect, the higher the cost of voting index, the lower
10   the turnout.  Again, no relation is perfect.  It's not the
11   only thing that influences turnout, but it's pretty strong, as
12   you can see by the equation there, and Texas falls in the
13   bottom right-hand corner, one of the lower turnout numbers.
14   And, of course, the lowest number on the Cost of Voting Index.
15   Q.  Dr. Lichtman, do you have a sense of what accounted for
16   this low voter turnout in Texas?
17   A.  Yes.  As I point out in my report based on the U.S. Census
18   current population survey this below-average turnout, low
19   turnout in Texas is entirely due to low minority turnout.
20      That is, and the numbers are in my report, White turnout,
21   Anglo turnout, non-Hispanic Whites, is higher in Texas than
22   the national average.  So if only Whites were voting, Texas
23   would be above this line, not well below this line.
24      And so the low turnout in Texas is entirely accounted for
25   by the low turnout of minorities which is much lower than the

ALLAN LICHTMAN - DIRECT

1  turnout of Anglos in Texas.  So all of this that were talked

2  about, the high cost of voting index, the low turnout, is

3  directly tied to race.

4  Q.  Okay.  So, Dr. Lichtman, we're going to try to get

5  everyone out of here for the holiday weekend so we're not

6  going to go over the rest of your discriminatory impact

7  analysis in your report, but, for the record, it is on pages

8  40 to 52, is that correct?

9  A.  Yes.

10  Q.  And in that section, did you cover the discriminatory

11  impact of SB 1 as it relates to drive-thru voting, 24-hour

12  voting, mail-in voting, and SB 1's criminal provisions?

13  A.  Yes, and we've already pretty extensively discussed the

14  impact on drive-thru and 24-hour voting, which, as I said, is

15  so significant because it's so surgically targeted at

16  minorities.  It's not one of these laws that, you know,

17  generically, and there are many of those, impact minorities

18  more than Whites.  This one zeros right in on minorities.

19  Q.  I'm almost done, Dr. Lichtman, just one more question.

20  A.  I'm not going anywhere.

21  Q.  In your professional opinion, what do the factors we have

22  just discussed reveal about the legislature's intent in

23  enacting SB 1?

24        MR. KERCHER:  Objection, Your Honor.  Calls for an

25  improper legal conclusion.

ALLAN LICHTMAN – DIRECT

1          MISS LORENZO:  Your Honor, this does not call for an

2    improper legal conclusion.  We just want to — we've already

3    evaluated the factors and he's just going to come up with a

4    conclusion of that analysis.

5          THE COURT:  That's overruled.

6          MISS LORENZO:  You can proceed.

7          THE WITNESS:  I'm certainly not going to offer an

8    ultimate legal opinion.  I'm going to offer an opinion based

9    upon my more than 50 years as an historian and social

10   scientist and the study I performed here, that, again,

11   stressing that you're not going to pull out just one factor,

12   and that all the factors don't have to be present, looking at

13   the totality we find that, in fact, all of the factors that

14   the template in Arlington Heights gives us and that I would

15   look at as an historian in assessing intentional

16   discrimination are present here.

17         We have the long past history of discrimination

18   officially against minorities.  We have the current situation

19   of discrimination officially against minorities, not just in

20   voting but in other critical ways of life that relate to

21   voting just as Jim Crow affected every critical way of life,

22   and as I explained, obviously it's different players,

23   different parties, you know, different mechanisms, but there

24   is nonetheless a clear connection between the two in terms of

25   challenges to the White power structure by demographic change

3147
ALLAN LICHTMAN – DIRECT

1  involved with minorities and responses with restrictive

2  legislation in all of these realms.

3       We have the immediate sequence of events that helps

4  explain the adoption of SB 1, the rise in minority citizen

5  voting age population relative to Anglo, which ties into the

6  well-established polarization politically in Texas, the

7  flipping by race of the use of mail-in voting which then

8  becomes attacked in SB 1.

9       We have multiple procedural deviations that affect

10  the way in which predecessor bills particularly, you know,

11  have the provisions of SB 1 in the Conference Committee report

12  adopted and lack of scrutiny.  We have pretty, at least from

13  one —

14       MR. KERCHER:  Object to the narrative answer, Your

15  Honor.

16       THE COURT:  That's sustained.

17  BY MISS LORENZO:

18  Q.  Dr. Lichtman, could you just give us a very brief

19  overview, just a very brief conclusion, like the top line

20  conclusion.

21  A.  The top line is all of the factors are present —

22  Q.  Exactly.

23  A.  — as an expert in the field I would look at.

24       MISS LORENZO:  Okay.  Thank you very much for your

25  time, Dr. Lichtman.

3148
ALLAN LICHTMAN – CROSS

1          I pass the witness.

2          THE COURT:  Anybody else on this side?

3          Any cross?

4          And, I'm sorry, but Spectrum has notified us that

5    there is no Wi-Fi in the downtown area and they expect service

6    to be resumed by 5:00.

7          THE WITNESS:  I would just ask one favor.  I'm hard

8    of hearing, so if you could speak loudly and slowly I'd

9    appreciate it and if I don't hear you I'll let you know.

10          MR. KERCHER:  Please do.  I don't think that anyone

11    has had a hard time hearing me so far this trial, but if I get

12    going too fast —

13          THE WITNESS:  Please don't go fast.

14          MR. KERCHER:  The court reporter is going to throw

15    something me at this point she's tired of it, I'm sure.

16                         CROSS-EXAMINATION

17    BY MR. KERCHER:

18    Q.  Dr. Lichtman, my name is Ryan Kercher.  I work for the

19    Attorney General's Office here in Texas.

20    A.  Nice to meet you.

21    Q.  Likewise, Doctor.  You are a historian by trade, right?

22    A.  Right, but I also consider myself a social scientist, you

23    know, the two are closely related.

24    Q.  And your report in this case, as we have discussed, walks

25    through the Arlington Heights factors, right?

ALLAN LICHTMAN — CROSS

1  A.  Yes.  I've looked at the Arlington Heights factors.

2  Q.  You and I agree, don't we, that the Arlington Heights

3  factors are not designed to present partisan arguments as if

4  they were facts evidencing discrimination, right?

5  A.  I'm not sure that's true.  It's very hard to separate out

6  partisan motivations from racial motivation.

7      If that was true —

8  Q.  My question is a little bit different than that.

9  A.  I'm sorry.

10 Q.  That's not your fault.  It's probably mine.

11 A.  Okay.

12 Q.  What I'm asking is:  When we were talking through the

13 Arlington Heights analysis, I'm not asking whether that may

14 look at both partisan and discriminatory intent, I'm asking

15 whether the Arlington Heights analysis requires the person

16 doing the analysis or allows the person doing, performing the

17 analysis to use partisan arguments as facts as if they were

18 facts evidencing discrimination?

19 A.  I still don't really understand your question, to tell you

20 the truth.  There seems to be a lot of premises built in there

21 that I don't necessarily buy because as I thought I was

22 answering your question it's very difficult back then and

23 today to disentangle partisanship and race, they are so tight.

24 Q.  Well, let's look at your report.  I think we are still

25 talking past each other.

ALLAN LICHTMAN - CROSS

1   A.   We may well be.

2   Q.   I'll take the blame for that.  I'm supposed to ask better

3   questions.  Let's look at your report together and we'll see

4   if we can't come to an understanding.

5   A.   Certainly.  If you're going to my report, let's just make

6   sure we're on the same page.

7   Q.   Literally and figuratively, right?

8   A.   Very good.

9   Q.   Doctor, your report covers a lot of the same ground as

10  Dr. Kousser's report.  Did you review his report in this case?

11  A.   No, I have no idea what is in his report or what he

12  testified to.

13  Q.   You are familiar with Dr. Kousser's work, true?

14  A.   Yes, I'm familiar with Dr. Kousser's work, but, as I said,

15  not in this instance.

16  Q.   Let's go to your report.

17       And, Brian, if you will pull it up, please, at page 29 —

18  A.   29.

19  Q.   — the second full paragraph.

20  A.   A pattern of denying the existence — is that the

21  paragraph you are looking at?  Second full paragraph?

22  Q.   I'm sorry, Doctor.  We are having a technical difficulty.

23  We are just trying to pull it up on screen so that we can all

24  have a reference point.

25            THE DEPUTY CLERK:  Are you still connected like you

ALLAN LICHTMAN — CROSS

1  were yesterday?

2          MR. KERCHER:  All right.

3          THE WITNESS:  Yes, it is that paragraph.

4  BY MR. KERCHER:

5  Q.  You found it all on your own.  I appreciate your diligence

6  there.  You write, "A pattern of denying the existence of

7  discrimination has also emerged in schools," right?

8  A.  Yes.

9  Q.  And you argue that the debate over critical race theory in

10  schools may be connected to discrimination in the voting

11  rights context, do I have that right?

12  A.  Yes, not directly, but certainly through an indirect

13  process.

14  Q.  And anyone who has internet access no knows that critical

15  race theory has been hotly debated in the public sphere,

16  right?

17  A.  In the political realm.  Among scholars, it's not

18  controversial.

19  Q.  Conservatives, for example, like Lieutenant Governor Dan

20  Patrick worry that the theory teaches that one race is better

21  than another or that one race is innately racist, right?

22  A.  What page are we on now?

23  Q.  Page 32, last paragraph.

24  A.  Yes.  That's what the politicians incorrectly claim.

25  Q.  Well, and you call that concern a political strawman,

3152
ALLAN LICHTMAN — CROSS

1  right?

2  A.  Correct, which it is.

3  Q.  You, yourself, are more sympathetic to the liberal view,

4  which is that critical race theory is, quote, just the

5  opposite, right?

6  A.  No.  You are merging apples and oranges.  Critical race

7  theory is neither liberal nor conservative.  It's empirical.

8  That's the way scholarship works.

9  Q.  Well, if I understand —

10  A.  I've got to answer your question.

11  Q.  Well, I think you have and I want to move on to the next

12  one.

13  A.  Well, I haven't.

14        THE COURT:  You have.

15        Go ahead.  Next question.

16  BY MR. KERCHER:

17  Q.  Dr. Lichtman, when you talk about the way scholarship

18  works, part of the way scholarship works is people debating

19  the value of ideas or methodology, right?

20  A.  I don't know what you mean by the "value."  Scholarship

21  works by people investigating the truth of scholarship and

22  overwhelmingly the truth of scholarship is that discrimination

23  is embedded currently in American life, overwhelming consensus

24  of scholars.

25  Q.  Well, you state that a liberal case for critical race

ALLAN LICHTMAN – CROSS

1  theory is that critical race theory has become a proxy for any

2  version of American history or Civics that does not reinforce

3  existing power structures and racial hierarchies, right?

4  A.  That's the way politicians have distorted it for their own

5  purposes.

6  Q.  You bring up SB 3 which was a bill passed in the Texas

7  Legislature in 2021, right?

8  A.  I think so.  You'll have to, again, get me on the page.

9  Q.  You were on page 29 now.

10 A.  39?

11 Q.  29.

12 A.  Sure.

13 Q.  Second full paragraph.  And it's on the screen for you,

14 "When you say that SB 3 was designed to limit teacher's

15 ability to accurately teach the history of racial injustice

16 and discrimination in the United States and the societal

17 inequities that stem from racial discrimination," did I read

18 that correctly?

19 A.  You ready that correctly.

20 Q.  On page 30 there is a block quote from a statement from

21 Penn-America, which is an advocacy group, right?

22 A.  Well, it's not a political advocacy group.  It's an

23 advocacy group for freedom of speech and inquiry of

24 scholarship.

25 Q.  Nowhere in your report do you quote SB 3 itself?

ALLAN LICHTMAN - CROSS

1  A.  I'm not sure that's true or not.  I thought I did quote

2  part of it.

3  Q.  Let's take a look at SB 3 together.

4      Brian, will you please bring up SB 3, section 9, which is

5  at page 10.

6      Dr. Lichtman, if you'll refer to your screen.

7  A.  What am I looking at?

8  Q.  We are going to bring up SB 3 in just a moment.

9  A.  Okay.

10  Q.  Brian, can you enlarge section 9 which bleeds over onto

11  the next page.  Thank you, sir.

12      Dr. Lichtman, have you read SB 3?

13  A.  I believe I did at the very beginning but it's a long bill

14  and you would have to refresh me on its particular

15  characteristics but I believe I do quote some of it in my

16  report.

17  Q.  Well, section 9 of SB 3 begins with a long and not

18  particularly scintillating paragraph, but if you'll bear with

19  me —

20  A.  Okay, I will.

21  Q.  — it says, "During the revision of the essential

22  knowledge and skills for the social studies curriculum

23  beginning in 2021 and scheduled to conclude in or around 2023,

24  the State Board of Education may not use the removal by this

25  act of documents, speeches, historical figures and other

1 knowledge and skills from specific statutory reference" -- and
2 then it references a statute -- "as a reason for the removal
3 or noninclusion of those documents, speeches, historical
4 figures, or other knowledge and skills from the essential
5 knowledge and skills for the social studies curriculum,
6 including any essential knowledge and skills that require an
7 understanding of" -- now, let's stop there that was a
8 mouthful.
9 A.   That's pretty convoluted and refers to various sections
10 that I don't know what they are.
11 Q.   It does, but in general this begins this prelude section
12 says that SB 3 is not a reason to remove or not to include
13 essential knowledge and skills that require an understanding
14 of, and then the following list, right?
15 A.   Incorrect.  It's specifically referenced in this other
16 section 28.002H-2, and I don't know it's referenced in there.
17 Q.   Well, are you saying that my summary is incorrect or that
18 you don't know whether it's correct?
19 A.   There's no way to know one way or another just from
20 looking at this.  That's what I'm saying.
21        MR. KERCHER:  Your Honor, I would ask that the Court
22 take judicial notice of SB 3 passed into law in the 2021 Texas
23 Legislative Session.
24        MISS LORENZO:  Objection, Your Honor.  Defense
25 counsel is asking beyond the scope of SB 3 and we would ask

ALLAN LICHTMAN - CROSS

1  that —

2        THE COURT:  No, all he's asking for is for me to

3  take —

4        MISS LORENZO:  He's asking about section 28.002 and

5  others laws that are embedded within SB 3 that are not being

6  introduced as well.

7        THE COURT:  He's just asking me to take judicial

8  notice that the statute was enacted in a certain legislature.

9        Do you still have objection to that?

10        MISS LORENZO:  No, Your Honor.

11        THE COURT:  I'll take judicial notice of that.

12  BY MR. KERCHER:

13  Q.  And then, Dr. Lichtman, if we scroll down a little bit

14  further in section 9 there is a list of materials that are not

15  to be excluded or removed from Texas curriculum, including

16  subsection 9 sub 1, which is the "fundamental, moral,

17  political and intellectual foundation of the American

18  experiment in self-government."

19        9 sub 2 —

20  A.  Are you asking me a question?

21  Q.  Are you familiar with that provision?

22  A.  Yes, and I can comment on it if you want.

23  Q.  Are you familiar with sub 2 that precludes the removal of

24  "historical content in Texas curricular of the history" —

25        THE COURT:  So I'm losing sight of where we're at.

ALLAN LICHTMAN - CROSS

1  I'm not I understood why the doctor included CR in all of this

2  and I don't understand the relevance of the cross on all this.

3  I don't see the relevance both ways to this issue.

4       MR. KERCHER:  The relevance is, Your Honor, that

5  Dr. Lichtman argues that because SB 3 was passed in the same

6  session as SB 1 that it may evidence discriminatory intent by

7  the legislature.  The basis of that criticism in the

8  legislature's intent is that SB 3, in Dr. Lichtman's view,

9  encourages a racist historical teaching in public schools.  A

10  review of SB 3 reveals that SB 3 requires inclusion of

11  materials that cover issues like the history of racism in the

12  United States and that it was morally wrong.  The fact that

13  Dr. Lichtman glosses over those specifics of SB 3 in his

14  report is relevant to its weight.

15       THE COURT:  So if it helps move things along, I

16  understand what the doctor is trying to do by claiming in the

17  same legislature that this bill was enacted but I'm not going

18  to give it any weight.

19       CRT, to me, is completely different to elections and

20  so I'm not going to include CRT in my discussions.  That's a

21  completely different political animal, but I do agree with the

22  statements.  CRT is a scholarly debate that got highjacked,

23  but I'm not going to take into account any of this.

24       So if you want to continue asking questions, feel

25  free, but I'm not going to give any credence to the insertion

ALLAN LICHTMAN - CROSS

1  of that in his report.

2        MR. KERCHER:  I appreciate the Court's helpful

3  thoughts on where it is in its thinking.  I will move, the

4  Court having taking judicial notice of SB 3.

5  BY MR. KERCHER:

6  Q.  Dr. Lichtman, let's go to page 37 of your report now

7  please.  Are you with me?

8  A.  Yes, I am.

9  Q.  And here you argue that immigration policy is

10  discriminatory, is that right?

11  A.  Correct.

12  Q.  Immigration policy is set by the federal government, do we

13  agree on that?

14  A.  Not entirely.  I'm talking about what the law authorizes

15  law enforcement in Texas to do.

16  Q.  You argue that opposition to so-called sanctuary cities

17  evidences discrimination in Texas, is that right?

18  A.  I don't see where I said that.

19  Q.  You do discuss the arguments concerning sanctuary cities

20  in Texas in your report, true?

21  A.  You'll have to show me.  I don't think so.  What I'm

22  talking about is arrests under SB 4.  I don't think I'm

23  talking at all about sanctuary cities.

24      If you want to show me —

25  Q.  Well —

3159
ALLAN LICHTMAN - CROSS

1  A.  Let me finish.  If you want to show me where I talk about

2  sanctuary cities the only thing I say is a half a sentence

3  just characterizes as anti-sanctuary city law but I don't

4  discuss sanctuary cities at all in my report.

5  Q.  You discuss SB 4, right?

6  A.  Yes, that's correct.

7  Q.  And SB was a part of the sanctuary city debate, true?

8  A.  Yes, but I don't discuss it in terms of sanctuary cities,

9  only in terms of arrests and detentions, which is not the same

10  as sanctuary cities.

11  Q.  To make sure that we are talking about the same thing,

12  when we talk about sanctuary cities we are talking about

13  cities, municipalities, that adopt local rules or ordinances

14  that are designed not to comply with federal officials in

15  immigration policy, true?

16  A.  I think there are lots of different definitions of

17  sanctuary cities.  That's one of them, but it's not something

18  I address here.

19  Q.  SB 4 directed cities to comply and cooperate with federal

20  officials in immigration enforcement, do we agree on that?

21  A.  Oh, yes, and I talk about that.  Right.  Absolutely.

22  Q.  On page 38 in the first full paragraph you reference ICE

23  arrests?

24  A.  That's correct.

25  Q.  Texas does not make ICE arrests?

ALLAN LICHTMAN - CROSS

1    A.   I'm sorry, what?

2    Q.   Texas does not make ICE arrests?

3    A.   No, but it doesn't and it doesn't because when you are

4    questioning the immigration status, which SB 4 authorizes,

5    even for someone stopped for a broken taillight and the

6    officer, for whatever reason, determines that it may be an

7    undocumented immigrant, that's what leads to ICE arrests.

8    Q.   I think that you answered my question but then it was

9    followed by an argument and I want to make sure that I got an

10   answer to my question.  Texas does not make ICE arrests, true?

11   A.   It influences and affects ICE arrests.

12   Q.   My question is not whether it influences or affects.

13   A.   No, of course, Texas itself does not make ICE arrests.

14   That's federal.

15   Q.   You argue that ICE arrests disproportionately affect

16   minorities, right?

17   A.   Correct.

18   Q.   The majority of immigrants to the United States has not

19   been majority non-Hispanic White for a long time, true?

20   A.   Absolutely true.

21   Q.   So to enforce illegal entry laws at all in this country

22   would support your position that federal immigration policy is

23   discriminatory?

24   A.   All I'm saying here is —

25   Q.   My question is yes or no.

1  A.   Yeah.  In a sense, not completely.  In the sense that I

2  further elaborate.  Not completely.

3  Q.   You point to statistics in your report and you reference

4  them on direct examination showing that El Paso has the third

5  most instances of wrongful immigration detention, right?

6  A.   That's in my report.

7  Q.   You are aware that as recently as September 24th of this

8  year El Paso's Democratic Mayor Oscar Leeser said the city is

9  quote, "at a breaking point," end quote with more than 2,000

10  people per day seeking asylum and vastly exceeding shelter

11  capacity?

12  A.   We're not talking about border arrests.  We are talking

13  about internal ICE arrests.  And Houston is actually first in

14  the nation and it's not on the border.

15  Q.   You are aware that New York's Democratically elected mayor

16  has complained about the influx of illegal immigrants into his

17  city?

18  A.   That's possible.  I haven't looked at that in my report.

19  Q.   You are aware that —

20  A.   As a matter of fact, that's later than I did my report

21  anyway.

22  Q.   You are aware that after 989 days of refusing to visit the

23  Texas border to view the immigration crisis, no less than

24  Democratic Joe Biden has bypassed some 26 federal regulations

25  to complete the U.S.—Mexico border wall that was previously

ALLAN LICHTMAN - CROSS

1  vilified by Democrats?

2  A.  I have no idea.  I don't know what you are quoting.

3  Q.  You refer to Texas — on direct examination you referred

4  to Texas' felon disenfranchisement statute, right?

5  A.  I refer to what?

6  Q.  Texas felon disenfranchisement —

7  A.  Yes, of course.

8  Q.  You point out that incarcerated populations skew towards

9  minority demographics, right?

10 A.  Substantially in Texas.

11 Q.  They skew towards minority populations all over the

12 country, to be fair?

13 A.  But it has —

14 Q.  My question is —

15 A.  Yes, of course, but —

16 Q.  And Texas is one of 24 states with some form of felon

17 disenfranchisement, according to the ACLU, right?

18 A.  Correct.

19 Q.  Let's go to page 39 of your report where you argue that

20 housing policy in Texas is also racially discriminatory,

21 right?

22 A.  Correct.

23 Q.  Now, you testified on direct examination that part of your

24 review of evidence in your evaluation of SB 1 was that you

25 reviewed executive statements, is that true?

ALLAN LICHTMAN – CROSS

1  A.  I reviewed what?

2  Q.  Executive statements, or statements by the executive

3  branch, is that right?

4  A.  I don't think I reviewed that for —— on page 39 for my

5  housing discrimination, no.

6  Q.  On page 39 your point is that low income renters

7  needing —— let me back up.  I skipped a question.  I

8  apologize.

9  A.  No problem.

10  Q.  The reason that you argue that Texas housing policy is

11  discriminatory is because the bill you cite from 2015 gives

12  landlords the right to refuse rentals to those receiving

13  federal housing assistance, right?

14  A.  Right.  And Texas is one of the very few states.  In fact,

15  I think the only one at the time.

16  Q.  And your point here is that low-income renters needing

17  such assistance are disproportionately minority?

18  A.  Overwhelmingly.

19  Q.  You are aware, though, that during the pandemic

20  Governor Abbott issued an executive order preventing landlords

21  from evicting nonpaying tenants?

22  A.  I'm not, but this is —— predates that and is actually a

23  law, not an executive order that can come and go.

24  Q.  And you are aware that during the pandemic, the Texas

25  Supreme Court created the Texas Eviction Diversion Program,

ALLAN LICHTMAN – CROSS

1  right?

2  A.  I'm not, but I don't dispute it.  Most states did that,

3  yeah, sure.

4  Q.  Are you familiar with that program at all?

5  A.  Not in Texas, no.

6  Q.  Let's go to page 47 of your report.  Here, you raise

7  concerns about what you call partisan poll watchers, right?

8  A.  Yes.

9  Q.  You know generally that Texas counties and election

10 officials work with both Republican and Democrat leaders to

11 recruit poll watchers, right?

12 A.  Where do I say that?

13 Q.  I didn't ask whether you said that —

14 A.  Oh, I'm sorry.

15 Q.  — whether you know that.  Are you familiar?

16 A.  If you recruit partisan poll workers, sure.

17 Q.  You worry that efforts by Republicans to organize — you

18 worry about efforts by Republicans to organize poll watchers

19 in Harris County, right?

20 A.  Yes.

21 Q.  Harris County is the most diverse county in the state of

22 Texas, right?

23 A.  Certainly by numbers, yes.

24 Q.  This is the third or fourth most diverse county anywhere

25 in the United States, isn't that true?

ALLAN LICHTMAN - CROSS

1  A.  I haven't compared it to every county in the United

2  States.

3  Q.  It is also heavily Democrat, isn't that true?

4  A.  Correct.

5  Q.  In particular, in its interior, as opposed to its suburbs?

6  A.  I'm sorry, what?

7  Q.  I said it is heavily Democratic in particular in its

8  interior, as opposed to its suburbs?

9  A.  It's most heavily Democrat in concentrations of

10  minorities, yes.

11  Q.  There is no law preventing Democrats from recruiting large

12  numbers of diverse poll watchers in Harris County, is there?

13  A.  Anyone can try to recruit poll workers, of course.

14  Q.  Let's go to page 49 of your report, first full paragraph.

15  You cite out-of-state studies about the dangers of poll

16  watchers to minorities, right?

17  A.  Yes.

18  Q.  Texas is a majority-minority state, isn't it?

19  A.  What is -- I'm sorry -- minority?

20  Q.  Texas is a majority-minority state, true?

21  A.  Are we doing population, voting aging, or CVAP?

22  Q.  Population.

23  A.  Yes.  Barely, but yes.

24  Q.  There is no law, to your knowledge, in Texas preventing

25  minorities from serving as poll watchers, true?

1   A.   True.

2   Q.   You cite no study or statistic suggesting that minorities

3   serving as poll watchers have any proclivity to discriminate

4   against members of their own demographic, do we agree on that?

5   A.   I don't know what you are quoting so I can't agree.

6   Q.   I'm not quoting anything.  I'm asking about whether

7   something was included in your report.  So let me ask — with

8   that understanding let me ask —

9   A.   Unless you tell me a source and what you are quoting, I

10  certainly did not have that language in my report.

11  Q.   I guess that's my point, Doctor.  In your studies and in

12  your review of evidence, you found no studies or at least

13  cited to none suggesting that minority poll watchers have a

14  proclivity to discriminate against members of their own

15  demographic?

16  A.   You are just pulling that out of the air without a source.

17  I can't comment but I certainly have not seen a source for

18  that, nor have any expert for the state presented that.

19  Q.   Well, let me provide you some context.  I understand, as I

20  ask the question it probably doesn't — you haven't been

21  sitting in the courtroom, forgive me.

22       We heard earlier in trial from Dean Tolson, who was an

23  expert also called by the plaintiffs that there is a

24  possibility that a minority poll watcher may act in a

25  discriminating manner towards a member of that poll watcher's

3167
ALLAN LICHTMAN – CROSS

1  own demographic, and so my question is whether your report
2  found any evidence to support that?
3  A.  I did not see any evidence to support that.  And, as I
4  said, no expert for the State has presented such evidence.  If
5  they have, I could have responded to it.
6  Q.  I'm not suggesting there is any.
7  A.  I understand.
8  Q.  Let's go to page 49, further down page 49, sorry, where
9  you discuss the restrictions on mail-in voting.  Do you see
10 that?
11 A.  Yes.
12 Q.  Here you talk about some concerns that we've already heard
13 in this trial about the effect of SB 1's vote-by-mail
14 provisions, right?
15 A.  Correct.
16 Q.  Your report quotes many studies and newspaper articles in
17 this section, true?
18 A.  What page are we on now?
19 Q.  We are still on page 49 where you begin your discussion of
20 the restrictions on mail-in voting, right?
21 A.  My first quote is National Conference of State
22 Legislatures voting outside the polling place, pointing out
23 that Texas is one of only 16 states to require an excuse.
24 Q.  Part of the –– as part of your discussion about
25 restrictions on mail-in voting ––

ALLAN LICHTMAN - CROSS

1  A.  Yes.

2  Q.  — you did not include the partisan shift on the issue in

3  Texas since at least 2007, right?

4  A.  I did include the partisan shift on mail-in voting.

5  Q.  Are you familiar with Texas Representative Anchia's

6  remarks in 2007 on the nature of mail-in voting?

7  A.  I certainly am, and that's one of the points I made here

8  but I've answered your question.

9  Q.  And he called the lack of voter ID in mail-in voting a

10  glaring weakness, didn't he?

11  A.  Absolutely, back then.

12  Q.  Let's go to page 51 of your report, Dr. Lichtman.  This is

13  the beginning of the section in your report where you raise

14  concerns about what you would call voter registration purges

15  in SB 1, right?

16  A.  Verifying citizenship, yes.

17  Q.  And you reference a 2019 effort to remove noncitizens from

18  the voter roles that went poorly for Texas, right?

19  A.  Yes, for inherent reasons.

20  Q.  It resulted in litigation, true?

21  A.  Yes, resulted in a lot of misidentifications in a process

22  that by its very nature is very fraught.

23  Q.  And that litigation that spun out of that purge in 2019,

24  that litigation wound up in a settlement, are you familiar

25  with that?

1  A.  I have a whole section on that in my report.

2  Q.  And you are aware that SB 1's registration purges are an

3  effort to codify that settlement agreement, right?

4  A.  It is an effort, but it's a flawed effort.

5  Q.  And you can point to no mass purges like they tried in

6  2019 since the passage of SB 1, right?

7  A.  I think I do cite — let me see where I cite here, yeah.

8  I do cite Texas is still flagging citizens after the SB 1 went

9  into effect.  My source is from December 2021.

10  Q.  Well, my question is a little bit different.  My question

11  is not whether the Secretary of State continues to pass DPS

12  information onto the counties as required by state and federal

13  law, my question is whether you cite any mass purges like was

14  attempted in 2019 since the passage of SB 1?

15  A.  I don't know what you mean by "mass purges," but I do cite

16  substantial numbers of those particularly in minority counties

17  that are incorrectly flagged, 17 percent at naturalization

18  ceremonies in Bexar, 15 percent in Travis.  Whether that's

19  mass or not, that's another issue.

20  Q.  You talked on direct examination and I don't have a cite

21  in your report here, I'm just going from memory of —

22  A.  Fair enough.

23  Q.  — your report.  You talked about the sequence of events

24  portion of your report, do you recall that?

25  A.  I do.

ALLAN LICHTMAN - CROSS

1  Q.  And you talked about racial demographic changes in Texas
2  posing a challenge to, in your words, White Republicans,
3  right?
4  A.  Yes.  Republicans in general who are predominantly White,
5  elected from White districts predominantly.
6  Q.  And I think that you acknowledged on direct that we don't
7  know how those demographic shifts are going to play out
8  politically, right?
9  A.  That's not true.  I have evidence showing how the
10  demographic shift has played out politically demonstrating
11  that Texas has become substantially more competitive.  It's
12  still a Republican state, but it's more competitive.  I cite
13  the differences between Democratic voting in Texas and
14  nationally and a couple of polls right before SB 1 which
15  challenge the Republican denomination in Texas.
16  Q.  An interesting outgrowth, perhaps, of some of that
17  demographic change was in Starr County between 2016 and 2020,
18  are you familiar with that?
19  A.  Which county?
20  Q.  Starr County, S-T-A-R —
21  A.  I'm not familiar with demographic change within that
22  county.  I'm looking at the state as a whole, the legislature
23  represents the state as a whole.
24  Q.  So you are not familiar that Starr County went to Hillary
25  Clinton by 58 percent in 2016, and Joe Biden by just

ALLAN LICHTMAN — CROSS

1  52 percent in 2020?

2  A.  Unless you show me a source, I know nothing about Starr

3  County.

4  Q.  And so then you don't know that Starr County is 96 percent

5  Hispanic?

6  A.  I just told you I didn't look at Starr County.  You keep

7  asking the question.  Same answer.

8  Q.  If we look only at racial changes in Texas, it paints a

9  simplicity picture of politics, doesn't it?

10  A.  It paints a picture of what?

11  Q.  A simplistic picture of politics?

12  A.  Not really, because politics in Texas pivots so

13  fundamentally along racial and ethnic lines, it's by no means

14  a simplistic picture.

15  Q.  That's — I guess the point that I'm making is if I

16  understand your answer correctly, you are falling into the

17  same problem of racial profiling.  If you only look for a

18  problem in one place, that's the only place you're going to

19  find it, isn't that right?

20  A.  Absolutely wrong.  I'm not looking at racial profiling.

21  I'm looking at the bedrock of what drives politics in Texas,

22  and I've been looking at this for more years than I want to

23  remember, and it hasn't changed.  And it's not just voting

24  patterns.  I looked in-depth at redistricting, and where, you

25  know, Republicans get elected, Anglo districts.  Where do

ALLAN LICHTMAN – CROSS

1  Democrats get elected?  Minority districts.  No matter how you

2  cut the pie, it comes out the same.

3  Q.  That redistricting litigation is also focused almost

4  exclusively on the influence of race in politics, right?

5  A.  Redistricting has everything to do with race and politics,

6  and, as I said, Texas has a unique record, by far unique.

7  Q.  You are getting a little beyond my question, Dr. Lichtman.

8      *(Crosstalk)*

9  A.  (Inaudible) redistricting.

10  Q.  We've been here a long time.  You've been on the stand a

11  long time.  I'm going to try to cabin your answers a little

12  bit more closely.

13      Your report looks at race but does not look nearly so

14  closely at economic, or religious, or cultural interests and

15  their involvement in politics, true?

16  A.  I'm looking at race which divides and polarizes the

17  parties.

18  Q.  You have not evaluated, for example, the decline in the

19  power of evangelical voters in Texas over the last decade?

20  A.  Whatever else may be involved, the racial and ethnic

21  divide is stark.

22          MR. KERCHER:  Objection.  Nonresponsive.

23          THE COURT:  One second, sir.

24          That's sustained.

25

ALLAN LICHTMAN - CROSS

1  BY MR. KERCHER:
2  Q.  Dr. Lichtman, I'm not asking you whether you think it is
3  important to look at it.  It's much simpler than that.
4  A.  Okay.
5  Q.  Your report does not look at the impact of the decline of
6  the power of the evangelical vote in Texas over the course of
7  the last decade, true?
8  A.  I did not look at evangelical voters.
9  Q.  You did not look at the shift of working-class voters to
10  the Republican Party in the last six years as a part of your
11  report, true?
12  A.  You've got a premise in there.
13  Q.  True?
14  A.  I can't answer that question because you've stuck in a
15  factual premise that you have improved.
16  Q.  Did you evaluate whether there has been a shift in
17  working-class voters to the Republican Party in Texas in the
18  last five or six years?
19  A.  No.  That's fair now.
20  Q.  Dr. Lichtman, let's go to page 58 in your report.  You
21  discuss in your report the involvement of the Heritage
22  Foundation as you understand them to have been involved in the
23  crafting of SB 1, right?
24  A.  No.  I didn't discuss this in direct but the Heritage
25  Foundation claimed to be, and as I said, it may have been in

ALLAN LICHTMAN – CROSS

1  depo because I didn't discuss it here, I'm not claiming the

2  truth of this.  I'm just claiming that this is what Heritage

3  and other conservative groups have claimed, and obviously they

4  are very happy with what Texas is doing.

5  Q.  You know that it's not uncommon for advocacy groups to be

6  involved in the crafting of legislation, right?

7  A.  Absolutely.

8  Q.  Whether Republican or Democrat, liberal or conservative,

9  right?

10      You talked on direct —

11          COURT REPORTER:  I didn't know if there was an answer

12  to the last question.

13  Q.  Dr. Lichtman, did you answer the last question?

14  A.  I said correct, that advocacy groups of all kinds are

15  involved obviously.

16  Q.  On direct examination, Dr. Lichtman, you talked about

17  procedural irregularities, right?

18  A.  Yes, and that is in my report as well.

19  Q.  And I think you said on direct that SB 1 passed in a

20  rushed process, is that right?

21  A.  Yes.  Passed very quickly without much scrutiny.

22  Q.  SB 1 was a late iteration of similar bills that had been

23  considered earlier in the 2021 legislative session, is that

24  true?

25  A.  Minimally considered, yes.

3175
ALLAN LICHTMAN – CROSS

1  Q.  SB 1's predecessors did not pass in the regular session in
2  2021, right?
3  A.  Only one house, yes.
4  Q.  So, for example, SB 7 was one of SB 1 predecessors, right?
5  A.  Yes.
6  Q.  And that did not pass because when the Democrats first
7  broke quorum at the end of that regular session, time ran out
8  to pass SB 7, right?
9  A.  They didn't have a quorum so they couldn't pass it, yes.
10  Q.  The important part of that question for my purposes is:
11  Time ran out?
12  A.  Yes.
13  Q.  You said that there was a lot of testimony on the
14  provisions being considered in SB 1 and its predecessor bills,
15  true?
16  A.  Only early on, and then the testimony was truncated and
17  never on the Conference Committee Report, which had
18  significant additions to any earlier legislation.
19  Q.  And SB 1 itself did not pass until the second special
20  session in August of 2021, is that right?
21  A.  That's right.
22  Q.  I see you are holding your ear.
23  A.  I'm all right.  You're doing a great job of speaking up.
24  I appreciate it.
25  Q.  It's the best excuse I've had to yell at an expert this

ALLAN LICHTMAN – CROSS

1  entire trial.

2      On direct you also shared concerns about the Texas

3  Legislature suspending their rules, right?

4  A.  Yes.

5  Q.  Now, you acknowledge that the Texas legislative rules

6  allow for suspension of the rules, right?

7  A.  Yes.

8  Q.  And so suspending the rules is not, itself, a breaking of

9  those rules, fair?

10  A.  It's not illegal, no, but it was done in this case to

11  diminish and undermine scrutiny of the bill.

12  Q.  Also in your discussion of procedural irregularities on

13  direct you mentioned that Governor Abbott vetoed legislation,

14  or a portion of legislation relating to legislative salaries?

15  A.  I did.

16  Q.  And that was to put political pressure on the Democrats

17  who had broken quorum, right?

18  A.  Yes.

19  Q.  And you know that breaking quorum subjects legislators to

20  arrest and a fine pursuant to the order of the chamber?

21  A.  Yes.  I think that's what happened in the second special

22  session.

23  Q.  Are you aware that Governor Abbott, this session, in 2023,

24  used his veto power numerous times to put political pressure

25  on legislators regarding property tax reform?

ALLAN LICHTMAN - CROSS

1   A.   I'm aware but I don't believe he ever suspended the

2   appropriations for the legislature.

3   Q.   Let's go to page 63 in the last paragraph.

4   A.   53?

5   Q.   63, I'm sorry.  Six three.  This paragraph.

6   A.   I haven't found it yet, hold on.

7   Q.   Apologies.

8   A.   Got it.  I'm there.

9   Q.   All right.  In this paragraph you quote Isabel Longoria

10  whom we've heard from in this trial.  You said that SB 1's

11  predecessor, SB 7, applied "Jim Crow sundown laws" to voting,

12  right?

13  A.   That's what she said.

14  Q.   We heard testimony from a plaintiff's expert witness

15  earlier in trial that modern Texas voting laws are not the

16  same as they were during the Jim Crow Era, do you agree with

17  that?

18  A.   I completely agree with that and explained that in my

19  report and my testimony.

20  Q.   And we agree that Miss Longoria is, at best, using

21  hyperbole in this statement?

22  A.   Imagine that.  Hyperbole being used in political debate.

23  Q.   I'm going to remember you said that, Doctor.

24  A.   And, of course, she's not a decision-maker.

25  Q.   You follow Miss Longoria's quote in your report with this

3178

ALLAN LICHTMAN – CROSS

1  sentence, "despite these critiques, SB 7 eventually passed out
2  of the Senate and was sent to the House for consideration?"
3  A.   Yes.
4  Q.   We agree that the Texas Legislature should not make policy
5  decisions based on hyperbole?
6  A.   Of course, but I'm talking about witness after witness.  I
7  just highlighted Longoria because it was so colorful.
8  Q.   Let's go to page 78 of your report.  Here, you discuss
9  your argument that SB 1 targeted voting methods
10  disproportionately used by minority voters, right?
11  A.   Correct.
12  Q.   For example, drive-thru voting?
13  A.   Correct.
14  Q.   You analyze the drive-thru voting locations according to
15  partisanship precents, right?
16  A.   I did not.
17  Q.   You did not perform a racial impact study on the
18  drive-thru voting locations, is that —
19  A.   I do.  I can refer it to you.  I didn't perform it but it
20  was — a racial impact study was conducted and I testified
21  about it showing that Hispanics and Blacks, as compared to
22  Anglos, were much more likely — or used drive-thru and
23  24-hour voting in much greater proportion than did Whites,
24  Anglos.
25  Q.   Did you know that the drive-thru voting locations were

ALLAN LICHTMAN - CROSS

1  chosen intentionally in heavily minority areas?

2  A.  You put another premise into your question which you would

3  have to prove to me that they were intentionally put in

4  heavily minority areas.

5  Q.  I'll represent to you, Dr. Lichtman, that earlier in this

6  trial we heard testimony from Isabel Longoria, and that in

7  response to a question about the placement of those drive-thru

8  voting locations about whether that choice was race-based, her

9  answer was that it was "an historically and racially informed

10  decision?"

11  A.  I don't know what that means.  I would have to listen to

12  her whole testimony and evaluate.  I do evaluate that in my

13  report, though, the claim that was made during the debates

14  that these drive-thru options were in disproportionately

15  Democratic areas, Democratic precincts, and I point that

16  that's inevitable in a county that votes over 70 percent

17  Democratic.  It doesn't indicate any effort to racially or

18  politically tilt the results.

19  Q.  You also acknowledge, though, that SB 1's drive-thru

20  voting ban also precludes the use of that procedure in not

21  just the highly diverse Harris County, but also Bee County and

22  Calhoun County, right?

23  A.  That's correct with a minimal number of votes compared to

24  Harris County and all of the discussion and claims about this

25  were surgically targeted to the use of these options solely in

3180
ALLAN LICHTMAN — CROSS

1  Harris County and all the lawsuits brought by Republicans were

2  surgically targeted to Harris County.

3  Q.  The drive-thru voting ban does not just apply to Harris

4  County, we agree on that?

5  A.  Absolutely.

6  Q.  And it applied — when you talked about it applying also

7  to Bee County and Calhoun County I think on direct examination

8  you characterized those counties as predominantly White, did I

9  hear that correctly?

10  A.  That is correct, but we don't know the racial composition

11  in those small counties of who used drive-thru voting or even

12  the numbers.

13  Q.  So it would be difficult to draw a conclusion from those

14  counties then, fair?

15  A.  The conclusions I drew from those counties was that

16  Republican decision-makers ignored them and made the claim

17  that this was something just invented "out of thin air," I

18  think I'm quoting that pretty directly, by Harris County, when

19  it wasn't.

20  Q.  Let's talk about the quote from Senator Hall that we

21  watched on the video during your direct examination.

22  A.  Yes.

23  Q.  And I think that text is on page 86 of your report.

24  A.  I will go there.

25  Q.  Brian, can you pull that up, please.

ALLAN LICHTMAN – CROSS

1    A.   Sure.  All right.  I can see it on the screen.

2    Q.   You presage that quote in your report by saying, "Finally

3    Republican Senator Bob Hall, a member of the pivotal committee

4    on state affairs made an extraordinary argument against

5    drive-thru and 24-hour voting.  He argued, in essence, that

6    any arrangement for voting used disproportionately by

7    minorities was inherently racist and should be banned, even

8    though the options are open to all voters."

9         Did I read that correctly?

10   A.   You did.

11   Q.   If we scroll down, Brian, to the block quote at the bottom

12   of the page, Dr. Lichtman, this is the quote that we saw on

13   the video during your direct examination from Senator Hall.

14   A.   There are two paragraphs here, which are you referring to?

15   Q.   I'm referring to the one that was just highlighted at the

16   bottom of page --

17   A.   The one that says "I mean," but you've got to look at in

18   the context of the first paragraph as well.  It's slightly

19   interrupted but it's all of a piece from Senator Hall.

20   Q.   Senator Hall's remarks acknowledge that there is a time in

21   Texas history when voting laws applied only to a single race,

22   doesn't he?

23   A.   That's exactly my point.

24   Q.   Well, let me make mine, if I may.

25   A.   All right.  Yes, he does refer back to that.

ALLAN LICHTMAN - CROSS

1  Q.  He said, "We had that at one time.  We got rid of it.  It

2  was wrong when, when it was there.  We got rid of it.  And

3  today, what we are trying to do, and I think Senator Hughes,

4  with this bill, is make equal opportunity for all people

5  equally.  Not set it up to favor one over the other, but I

6  thank you for your testimony."  Did I read that correctly?

7  A.  You read it correctly.

8  Q.  The next page of your report, Dr. Lichtman, page 87.

9  A.  Your Honor —

10         THE COURT:  Yes.

11         THE WITNESS:  I think I need a break.

12         THE COURT:  You need a break?

13         THE WITNESS:  Yeah.

14         THE COURT:  Let's take a break.

15     *(Recess)*

16  BY MR. KERCHER:

17  Q.  Welcome back, Dr. Lichtman.

18  A.  Thank you.

19  Q.  We were looking at page 87 —

20  A.  Okay.

21  Q.  — of your report, in which you argue that SB 1 will not

22  effectuate its stated goals, right?

23  A.  Argue what?

24  Q.  That SB 1 will not effectuate its stated goals, right?

25  A.  If the stated goal is promoting confidence and stopping

ALLAN LICHTMAN - CROSS

1  fraud, absolutely not.

2  Q.  You agree that there was a lot of partisan debate about

3  whether SB 1 could, in fact, effectuate its goals while it was

4  being considered in the legislature, right?

5  A.  No.  In fact, I have two colloquies here involving Senator

6  Hughes and Chairman Cain and neither one of them can come up

7  with any indication that their issues with regard to fraud

8  that SB 1 needs to address on page 88, page 89, page 90.

9  Q.  Well, we agree that the consideration of SB 1 was a part

10  of a larger consideration of election code reforms in the 2021

11  Legislature, true?

12  A.  There was certainly, I think, I pointed that out, lots of

13  other things that either weren't passed or were passed

14  relating to elections, certainly.

15  Q.  And I think you also pointed out that as a part of those

16  considerations of election code reform in the 2021 Legislature

17  there was a lot of testimony, some for, some against the

18  provisions like those that ended up in SB 1?

19  A.  You used the word "reform."  I would not use the word

20  reform here.  And as I mentioned for the most part, to the

21  extent there was testimony, it was very negative on

22  predecessors to SB 1.

23  Q.  Well, whether you call it reform, or change, or amendment,

24  you and I agree there was a lot of discussion about the pros

25  and cons of changing the election code in 2021 in Texas?

ALLAN LICHTMAN – CROSS

1    A.  Certainly discussion, yes.

2    Q.  I talked with Dr. Kousser about this example yesterday and

3    I want to see whether you agree with it.  There is often

4    discussion about whether a piece of legislation or policy will

5    actually effectuate its goal, right, that's part of politics?

6    A.  Yes, but even more broadly whether there is even a basis

7    for setting forth the goal.

8    Q.  The example that I used with Dr. Kousser was President

9    Biden's Inflation Reduction Act, do you recall that?

10   A.  Do I recall the act?

11   Q.  Yes, sir.

12   A.  I think so.

13   Q.  And you know generally that there are —

14   A.  I haven't studied it.

15   Q.  And this is not going to be a quiz on it, but you recall

16   that there was public debate about whether or not that act

17   could, in fact, reduce inflation, right?

18   A.  Yes.

19   Q.  And even now that it has passed, there are economists of

20   all stripes who are trying to figure out whether subsequent

21   changes to the economy are the result of that act or some

22   other force, right?

23   A.  I guess so.  I haven't followed that but I won't argue.

24   It's no point arguing.

25   Q.  You also argue at length in your report that there is not

ALLAN LICHTMAN - CROSS

1  very much voter fraud at all, we agree on that?

2  A.  That's what all the authorities told the legislators.

3  Q.  But there are other aspects of election integrity, right?

4  A.  There are other what?

5  Q.  Aspects of election integrity, right?

6  A.  I'm not sure what you are driving at.  You would have to

7  give me examples.

8  Q.  Well, the example, how about voter intimidation, that

9  would go to election integrity, wouldn't it?

10  A.  And this makes it worse, SB 1.

11  Q.  You and other experts in this case have talked about a

12  history of voter intimidation in Texas, right?

13  A.  Yes, by Republicans.

14  Q.  So, for example -- well, you say "by Republicans," we've

15  heard examples of Democratic Party machines using voter

16  intimidation to exploit Latino minorities in Texas history

17  that lasted through the 1970s and '80s?

18  A.  I can't respond to what you may or may not have heard.

19  Q.  You did not cover that history in your report, fair?

20  A.  When you say "that history," I can't answer because you're

21  just relating something you heard and I haven't heard.

22  Q.  Well, I think I understand your answer and I apologize if

23  I'm being repetitive, but I want to make sure I understand.

24  You are saying you are not familiar with whether or not Texas

25  has a history of Democratic voting machines exploiting Latino

3186

ALLAN LICHTMAN — CROSS

1  minorities?

2  A.  Certainly has an old history of that, absolutely.  I've

3  seen nothing that suggests it has over the past many decades a

4  current history of that.  The current history that I cite is,

5  in fact, enshrined in the settlement agreements that affects

6  Republicans.

7  Q.  And when you talk about current history, I understand you

8  to mean the history that most directly bears upon the intent

9  of the Legislature in your analysis, is that true?

10  A.  No.  I simply said current history.  I think I explained.

11  Yes, the current history is probably the most relevant, but

12  when it ties to past history that becomes relevant as well,

13  but if there isn't a tie between current and past history then

14  there's an issue.

15  Q.  On direct examination you referenced a study and we saw a

16  chart that was in your report.  I'm sorry I don't have the

17  page number for you —

18  A.  That's okay.

19  Q.  — but I think we've discussed this study earlier in the

20  trial.  It uses a putatively quantitative measure to determine

21  in which states it is most difficult to vote and register to

22  vote?

23  A.  The Cost of Voting Index, yes.

24  Q.  That is not a study, to be clear, that you performed, is

25  that right?

ALLAN LICHTMAN – CROSS

1  A.  That's correct.  It's a well-established study by

2  political scientists that's relied on by people in my field.

3  Q.  And that study was conducted in 2020, is that right?

4  A.  Yes.

5  Q.  In 2018 Texas had its turnout in decades, true?

6  A.  For a mid-term, I think that's true across the nation.

7  Q.  And in 2020 Texas had its largest turnout for a

8  Presidential Election, isn't that true?

9  A.  That's correct, but as I pointed out it's still towards

10  the bottom of the states.

11  Q.  On direct examination you referenced a quote by Chairman

12  Brisco Cain where he uses the phrase "purity of the ballot

13  box?"

14  A.  Yeah.  I think we just — you just referenced that

15  earlier, page 87.

16  Q.  You know that purity of the ballot box is a direct quote

17  from Article 6, Section 4 of the Texas Constitution?

18  A.  From when?

19  Q.  February 15th, 1876.

20  A.  That — I didn't know that but I'm not going to argue with

21  you.  That sounds like something that would have been put in

22  back then.

23  Q.  And we agree that February 15, 1876 is before the end of

24  Reconstruction, true?

25  A.  It's right at the end of Reconstruction when states were

ALLAN LICHTMAN – CROSS

1  making already the transition from reconstruction governments

2  to white supremacy governments.

3  Q.  And we agree, don't we, when we talk about the end of

4  white supremacy — or the end of Reconstruction, that it ended

5  sometime around 1877 with the compromise reached after the end

6  of — after the Rutherford B. Hayes compromise, true?

7  A.  No, I disagree with that, and if you read my book you can

8  see I dated to 1875 with the failure of the Civil Rights Act

9  of 1875.

10  Q.  You agree that Texas adoption of its 1876 Constitution was

11  part of the requirement for redemption under the

12  Reconstruction structure, right?

13  A.  I don't understand the question.  I'm sorry.  That's

14  sounded garbled.

15  Q.  Well, and it may be; you're the historian.

16  A.  It's getting late and I didn't catch that.

17  Q.  You agree, don't we, that under Reconstruction Texas was

18  required to formulate a new Constitution?

19  A.  Yes.

20  Q.  All right.

21          MR. KERCHER:  Thank you, Dr. Lichtman.

22          I'll pass the witness, Your Honor.

23          THE COURT:  Anything else from this side?  Nothing.

24          Any redirect?

25          MISS LORENZO:  No questions, Your Honor.

ALLAN LICHTMAN - CROSS

1          THE COURT:  Doctor, thank you, and you are excused.

2          THE WITNESS:  Good to see you again.

3          THE COURT:  Any other witnesses for today?

4          MISS PERALES:  No, Your Honor, just a short

5   housekeeping matter.

6          THE COURT:  Yeah.

7          MISS PERALES:  LUPE plaintiffs have consulted with

8   the other parties and do not have an objection so we would

9   like to alert the Court of our plan for the very last witness

10  next week to recall Miss Tania Chavez, who was the very first

11  witness of the trial.

12          She spoke regarding the organization of which she is

13  the head, LUPE, who is also the lead plaintiff in the action.

14  Subsequent to Miss Chavez' testimony the Fifth Circuit issued

15  another standing decision providing further guidance to

16  organizational plaintiffs regarding the standards for proving

17  standing and based on that further guidance we would like to

18  recall Miss Chavez for a short supplemental testimony.

19          THE COURT:  So you are doing that Tuesday?

20          MISS PERALES:  No, at the very end, Your Honor, so

21  Thursday.

22          THE COURT:  Thursday?

23          MISS PERALES:  Yes.

24          THE COURT:  So does this side have any witnesses for

25  Tuesday, or are we starting with the State?

3190

ALLAN LICHTMAN - CROSS

1        MISS PERALES:  We have witnesses for Tuesday,

2   Wednesday, and Thursday, the goal is to conclude on the 12th

3   if we can run on time.

4        THE COURT:  Thank you.  Okay.

5        Anything else we need to take up?

6        MR. KERCHER:  Not from the State defendants at this

7   time, Your Honor.

8        THE COURT:  So we will see you-all Tuesday at 9.  I

9   think we have a couple matters at 8:30 — no; we're good.

10  Tuesday is good, okay.

11       Well, Tuesday at 9 then, and I was going to say enjoy

12  the weekend but I don't think you are.

13                         -o0o-

14    I certify that the foregoing is a correct transcript from

15  the record of proceedings in the above-entitled matter.  I

16  further certify that the transcript fees and format comply

17  with those prescribed by the Court and the Judicial Conference

18  of the United States.

19

20  Date:  10/06/23              /s/  *Gigi Simcox*
                                 United States Court Reporter
21                               262 West Nueve Street
                                 San Antonio TX 78207
22                               Telephone:  (210)244-5037

23

24

25

*Gigi Simcox, RMR, CRR*