1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
2             SAN ANTONIO DIVISION

3

LA UNION DEL PUEBLO ENTERO,        .
4   ET AL,                         .
                                   .
5            PLAINTIFFS,            .
        vs.                        . DOCKET NO. 5:21-CV-844-XR
6                                  .
GREGORY W. ABBOTT, ET AL,          .
7                                  .
             DEFENDANTS.           .
8

9

10           TRANSCRIPT OF BENCH TRIAL
      BEFORE THE HONORABLE XAVIER RODRIGUEZ
11          UNITED STATES DISTRICT JUDGE
                OCTOBER 10, 2023
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                            FATIMA MENENDEZ, ESQUIRE
                              JULIA LONGORIA, ESQUIRE
18                            MALDEF
                              110 BROADWAY
19                            SUITE 300
                              SAN ANTONIO TX 78205
20

21                            JENNIFER A. HOLMES, ESQUIRE
                              NAACP LEGAL DEFENSE & EDUCATIONAL
22                            FUND INC
                              40 RECTOR STREET, FIFTH FLOOR
23                            NEW YORK NY 10006

24

25

```
 1

 2                              JAMES D. CROMLEY, ESQUIRE
                                JAMES MICHAEL SHOWALTER, ESQUIRE
 3                              ARENTFOX SCHIFF LLP
                                233 S. WACKER DRIVE, SUITE 7100
 4                              CHICAGO IL 60606

 5

 6                              EITAN BERKOWITZ, ESQUIRE
                                ARENTFOX SCHIFF LLP
 7                              44 MONTGOMERY STREET, 38TH FLOOR
                                SAN FRANCISCO CA 94104
 8

 9                              COURTNEY M. HOSTETLER, ESQUIRE
                                FREE SPEECH FOR PEOPLE
10                              1320 CENTRE STREET #405
                                NEWTON MA 02459
11

12                              BREANNA DELLA WILLIAMS, ESQUIRE
                                NAACP LEGAL DEFENSE & EDUCATIONAL
13                               FUND, INC.,
                                40 RECTOR STREET, 50TH FLOOR
14                              NEW YORK NY 10006

15

16
     FOR THE DEFENDANTS:        RYAN G. KERCHER, ESQUIRE
17                              KATHLEEN HUNKER, ESQUIRE
                                WILLIAM WASSDORF, ESQUIRE
18                              ETHAN QUINN SZUMANSKI, ESQUIRE
                                TEXAS ATTORNEY GENERAL
19                              P.O. BOX 12548
                                MC 009
20                              AUSTIN TX 78711

21

22                              ERIC J.R. NICHOLS, ESQUIRE
                                BUTLER SNOW LLP
23                              1400 LAVACA STREET, SUITE 1000
                                AUSTIN TX 78701
24

25
```

1

2

3    REPORTED BY:              GIGI SIMCOX, RMR, CRR
                               OFFICIAL COURT REPORTER
4                              UNITED STATES DISTRICT COURT
                               SAN ANTONIO, TEXAS
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *(San Antonio, Texas; October 10, 2023, at 9:00 a.m., in*
2    *open court.)*
3                THE COURT:  Any housekeeping?
4                MS. HOLMES:  Jennifer Holmes for the HAUL plaintiffs.
5                One quick housekeeping matter.  I would like to admit
6    Exhibit HAUL MFV 228.  This was the exhibit used during the
7    testimony of Dr. Kousser.  It is written testimony from the
8    Texas Civil Rights Project that was presented to the
9    legislature.
10               THE COURT:  Any objection to 228?
11               MR. KERCHER:  No, Your Honor.
12               THE COURT:  HAUL 228 is admitted.
13               MS. HOLMES:  Thank you.
14               THE COURT:  Anything else?
15               MS. HOLMES:  I don't think so.
16               THE COURT:  Your next witness.
17               MS. HOLMES:  The plaintiffs call Jennifer Miller to
18   the stand.
19       (JENNIFER MILLER, having been duly sworn, testified as
20   follows:)
21               MISS WILLIAMS:  Good morning, Your Honor.  I'm
22   Breanna Williams, counsel for the HAUL plaintiffs.
23               Jennifer Miller's testimony is relevant to the HAUL
24   and OCA plaintiffs' claims under SB 1, Sections 5.02, 5.03,
25   5.06, 5.07, 5.10, 5.12, 6.03, 6.04, 6.05, and 6.07.

1  BY MISS WILLIAMS:

2  Q.  Good morning.  Please state your name for the record.

3  A.  Jennifer Miller.

4  Q.  Where do you live?

5  A.  Austin, Texas.

6  Q.  What county that is in?

7  A.  Travis.

8  Q.  How long have you lived in Texas?

9  A.  I've lived in Texas since 1990.

10  Q.  And who do you live?

11  A.  I live with my husband and my adult daughter.

12  Q.  What is your daughter's name?

13  A.  Danielle Miller.

14  Q.  How old is Danielle?

15  A.  Twenty-five.

16  Q.  Tell us a little about Danielle.

17  A.  Danielle graduated from high school.  She just graduated

18  from a neurodiverse program at UT Austin.  Currently she

19  works.  She plays the violin.  She's a great young adult.

20  She's doing very, very well and she does vote.

21  Q.  You mentioned that Danielle graduated from a neurodiverse

22  program?

23  A.  Yes.

24  Q.  Can you speak a little about her neurodiversity?

25  A.  Absolutely.  Danielle is on the autism spectrum and right

1  now I guess her diagnosis would be level one autism.

2      Autism can be a very confusing disorder for a lot of

3  people because there is no visual cue that the person might

4  have a disability.  When we think disability, sometimes we

5  think mobility issues, maybe they have a cane, or there's a

6  cue, something, they have a cane, they have a hearing aid.

7      People with autism typically don't give a visual cue that

8  they have a disability.  And it's not a medical test right

9  now, so it's basically like taking a test.

10     I tell people like if you're taking a test and there's 300

11  questions, maybe you get 60 right.  You have an autism

12  diagnosis but maybe this person gets 60 right too but they are

13  not necessarily the same questions.  So those two people with

14  an autism level one diagnosis could be completely different

15  and have different needs but they are not visual.

16  Q.  So what are some ways that Danielle's diagnoses affect

17  her?

18  A.  Well, in addition to autism I do want to say she's got

19  some other things that she needs help with.  She also has a

20  diagnosis of dyslexia which makes it challenging to read.

21  Sometimes letters look backwards and sometimes reading long

22  articles are very, very exhausting.

23     She also has something called dysgraphia.  Most people

24  have never heard of this.  Think of dyslexia but for

25  handwriting.  I believe it's a brain disorder but no matter

1    how long you practice, and there are people with this disorder

2    that have Ph.D.s, your handwriting looks very rudimentary.  It

3    looks like a preschooler wrote it.  Sometimes you write things

4    incorrectly upside down or backwards but your brain sees it

5    appropriately.  If you're coloring, you don't notice, maybe

6    you are coloring outside the lines which makes it really

7    challenging.  Like if you're taking a standardized test in

8    school with the little bubbles, it's very, very hard to fill

9    in the bubbles without getting it outside the lines.

10   Q.  And what do you do for work, Miss Miller?

11   A.  Mainly right now I really work on helping my daughter

12   adult as a person with disabilities.  I do work part time in

13   the advertising and marketing industry.

14   Q.  Are you affiliated with The Arc of Texas?

15   A.  Yes, I am a member.  I get newsletters from them.  They

16   have a wonderful arts program in the Austin area.  My daughter

17   has taken some classes there as well and they help me with

18   case management.

19   Q.  Is your daughter also a member of The Arc of Texas?

20   A.  I would say yes.

21   Q.  Are you a legal decision-maker for Danielle?

22   A.  Yes, I am.

23   Q.  What does it mean that Danielle has a supported legal

24   decision-maker?

25   A.  Absolutely.  I'm definitely not a legal scholar.  In the

1  past when you were helping someone with a disability you

2  pretty much had to go through a legal process called

3  guardianship and guardianship basically takes away a lot of

4  rights from the individual.  For example, sometimes it impairs

5  the ability to get married.  Sometimes you can't really vote.

6  You are basically declaring the person incompetent.

7      Well, my daughter isn't incompetent but she does need a

8  little help, and she's over the age of 21.  So she selected me

9  to help her do things and help her make educated decisions in

10 financial areas, medical, things she needs help with, but it's

11 when she — what she needs help with and asks for.

12 Q.  So this model allows Danielle to retain the ability to

13 make her own decisions?

14 A.  Yes.

15 Q.  Does Danielle need assistance with any of her daily

16 activities?

17 A.  Absolutely.  With her type of disability she is not able

18 to drive, and since we live in Austin that doesn't have full

19 mass transit and we kind of almost live in a suburban

20 environment, out in the country, there's not a lot of mass

21 transit and Texas is a really big state.  You've got to get a

22 ride.  There's not a lot of Ubers or Lyft services in my area

23 so I help her with transportation.  I help her a little bit

24 with financial banking jobs, things like that.

25      The thing with autism is it's a very interesting label

1  because I like to say you're absolutely fine until you're not.

2  Every day is different with my daughter.  Sometimes she

3  requires a lot of help.  She can get very anxious.  She's

4  very, very sensitive to abrupt changes or changes in routine.

5      For example, if I'm driving her somewhere, like maybe I

6  take a different way to a store we're going to and it's not

7  her preferred way, she could get very, very upset, like why

8  are you going this way, this is the wrong way.  No, it's just

9  a different way.

10  Q.  And do you assist Danielle with voting?

11  A.  Yes.

12  Q.  Is Danielle registered to vote?

13  A.  Yes.

14  Q.  In which county?

15  A.  Travis.

16  Q.  And when did Danielle register to vote?

17  A.  I believe she signed up when she was 18.  She enjoyed

18  learning about history in high school.

19  Q.  Does Danielle have a Texas driver's license?

20  A.  No, she cannot drive but she has a legal Texas ID, which

21  is basically a driver's license for people who don't drive.

22  Q.  When Danielle registered to vote do you know if she

23  included her Texas identification number on her registration?

24  A.  To be honest, my daughter is 25.  That was a long time

25  ago.  I have no idea what we did to fill it out.  It's not

3200

1  something I thought I needed to memorize at the time.  Like I
2  know my phone number.  I know my address.  I don't remember
3  what we did.  That was a long time ago.
4  Q.  Would it be difficult for Danielle to remember what ID
5  number she used to register to vote?
6  A.  I believe so.  I can't remember.
7  Q.  Is her challenge with remembering related to her
8  disability?
9  A.  It can be.  With my daughter's disability, the way it
10  presents to her, she's very good at memorization, as long as
11  something is very important to her.
12      Like ask her anything about dinosaurs, she probably has a
13  Ph.D. in dinosaurs.  Ask her something she doesn't enjoy, like
14  maybe physics, she's probably not going to know the answer.
15      If it's something she needs to know all the time like her
16  phone number, she probably remembers it but she doesn't use
17  her social security number or Texas ID every day generally, so
18  it's not something she's going to remember.
19  Q.  Does Danielle vote regularly?
20  A.  Yes.
21  Q.  Does Danielle vote in all types of elections?
22  A.  Yes.
23  Q.  Is voting important in your household?
24  A.  I think yes.
25  Q.  To your knowledge, is voting important to Danielle?

*Gigi Simcox, RMR, CRR*

```
 1  A.  Yes.

 2  Q.  What method does Danielle typically use to vote?

 3  A.  Well, in the past, just because we didn't know any better

 4  we voted in person but we started voting by mail, and once we

 5  discovered that she could vote by mail that's her favorite

 6  method and she prefers to vote by mail.

 7  Q.  Do you recall approximately when Danielle transitioned to

 8  voting by mail?

 9  A.  I think we didn't really know that she could even qualify

10  for that.  We just didn't know any better.  We started looking

11  into that when the world locked down in 2020 during the

12  pandemic and that's when we discovered that she could qualify

13  to vote by mail.

14  Q.  Do you have experience assisting Danielle with voting in

15  person and voting by mail?

16  A.  Yes.

17  Q.  Okay.  So I'd like to ask you a few questions about how

18  each of those methods worked for you-all, but before we get

19  there let's discuss a few preliminary things.  Are you

20  familiar with SB 1, the election bill that the Texas

21  Legislature passed in 2021?

22  A.  Yes.

23  Q.  And are you aware that SB 1 has been in effect for

24  elections in Texas that have occurred since 2022?

25  A.  Yes.
```

1   Q.  So now I'd like to ask you a few questions about how you

2   assist Danielle with voting by mail.

3   A.  Sure.

4   Q.  Does Danielle need to reregister for an application for

5   ballot by mail?

6   A.  Yes.  Even though she has a lifelong disability that will

7   never change, she has to reregister every year.

8   Q.  Do you assist her with that?

9   A.  Yes, I do.

10  Q.  How?

11  A.  Well, first of all, she has to locate the information so

12  she can fill out the form to vote by mail, and with her

13  dysgraphia it's very, very, very hard to read her writing.  So

14  sometimes I help her fill it out and especially the numbers

15  because that needs to be very concise.  For example, if you

16  can't read your street address, you're not going to get the

17  ballot.

18  Q.  Do you assist Danielle with any research on candidates or

19  ballot initiatives before she votes?

20  A.  Well, I never tell Danielle ever how to vote but I can be

21  of an assistance.  Like most people do when they go to vote,

22  to be a good citizen you need to read about the issues so I

23  might bring her some newspapers or the League of Women's

24  Voters guides and she can read, well, this candidate said

25  this, and this candidate said this, and this proposition means

1  this, here's what people think that like it, and here's what

2  people think that don't, so she can read it or if she needs a

3  little assistance reading I can verbally read it to her so she

4  can make an informed choice.

5  Q.  And once Danielle receives her application for a ballot by

6  mail after she's reregistered does she typically need

7  assistance filling out that application?

8  A.  Yes.  I — we always worry about the handwriting

9  situation.

10  Q.  If you were not able to assist her, would Danielle have

11  had difficulty remembering her identification numbers for her

12  application for —

13  A.  Absolutely.

14  Q.  If you were not able to assist her, would Danielle have

15  had difficulty trying to follow the correct rules for entering

16  her identification numbers on the form?

17  A.  Yes.  It's confusing.

18  Q.  When Danielle receives a mail ballot does she typically

19  need assistance marking that ballot?

20  A.  She does need some help because she has dysgraphia, yes.

21  Q.  And when you assist Danielle with marking her mail ballot,

22  do you sign the carrier envelope in the space for assisters?

23  A.  Yes.

24  Q.  And is there usually an assister oath printed on the

25  carrier envelope about where you sign?

3204

1   A.   Yes.

2   Q.   I'd like to take a look at the mail ballot carrier

3   envelope and the assister oath with you.

4        Derek, will you please pull up Exhibit HAUL MFV 297 and go

5   to page 2.

6        Do you see the exhibit, Miss Miller?

7   A.   Yes, I do.   Thank you.

8   Q.   Is this an accurate representation of the mail ballot

9   carrier envelopes that Danielle receives when she votes by

10  mail?

11  A.   Yes, this looks familiar.

12  Q.   I'd like to draw your attention to a couple parts of this

13  carrier envelope.   First, let's look at the section labeled

14  Instructions to Assistant.   The first line of text in the

15  first bullet point under that heading says, "A voter may only

16  be assisted with reading or marking the ballot if the voter

17  has a physical disability that renders the voter unable to

18  write, or see, or has an inability to read the language in

19  which the ballot is written."

20  A.   Yes.

21  Q.   Is it your understanding after reading these instructions

22  that a voter is only eligible for assistance, if that voter is

23  unable to write or see?

24  A.   That seems to be what the sentence says.

25  Q.   Is it immediately clear to you whether Danielle is

1  eligible for assistance with a mail ballot, based on this

2  instruction?

3  A.  It's very vague and a gray area.

4  Q.  Do you know if autism qualifies as a physical disability?

5  A.  I don't believe autism does, but dysgraphia, I would argue

6  is a very gray area, because of her neurodiversity it makes

7  her physically challenged when writing and doing certain

8  things but she doesn't really have a physical disability but I

9  would argue, yes, she does, dysgraphia.  That is a physical

10  impairment.

11  Q.  Do you know if the challenges that Danielle experiences

12  due to her autism, dyslexia, and dysgraphia render her unable

13  to write or see?

14  A.  She can see just fine.  Her writing is very, very hard to

15  read.  You just can't read her writing.

16  Q.  Now I'd like to draw your attention to the section of the

17  carrier envelope labeled Oath of Person Assisting Voter?

18  A.  Um-hum.

19  Q.  Taking that oath from the beginning, it says, "I swear or

20  affirm under penalty of perjury that the voter I am assisting

21  represented to me they are eligible to receive assistance."

22      Does anything stand out to you in that line?

23  A.  Well, penalty of perjury.  And it also says "eligible to

24  receive assistance," that's pretty vague in what that means.

25  Q.  In terms of the part of the oath regarding the voter

1 representing that they are eligible to receive assistance, is

2 it clear to you what Danielle would have to say to a potential

3 assister so that they could assist her with voting without

4 violating this oath?

5 A.  No, it does not.  Typically in my household it's a lot,

6 mom, I need help.

7 Q.  Is there anything in the oath or instructions that would

8 let Danielle know whether she is eligible to receive

9 assistance?

10 A.  No.

11 Q.  Now I'd like to draw your attention to the third line of

12 the assister oath which reads, "I did not pressure or coerce

13 the voter into choosing me to provide assistance."

14      Do you see that?

15 A.  Yes, I do.

16 Q.  Are there any examples of things in your daily home life

17 that you worry may run afoul of this provision in the oath?

18 A.  Well, when I'm reading this line, I mean, pressure or

19 coerce sounds like, hey, I'm going to give you a dollar to go

20 vote.  I would never do that.  That's illegal.  That's very

21 cut and dry, but, you know, when Danielle is like we plan to

22 vote on Tuesday and maybe we plan to go at 3:00, and as I

23 stated, she doesn't like abrupt changes, maybe my schedule has

24 changed and I can no longer go at 3 and I said, hey, it's

25 Tuesday, it's 1:00, let's go vote now instead.  Is that

1  coercion?  I don't know.  What does that mean?

2  Q.  So do you feel comfortable swearing under penalty of

3  perjury with this language in the oath?

4  A.  No, I really don't.

5  Q.  Now, please take a look at the sentence in the assister

6  oath that begins on the fourth line, which reads, "I will not

7  communicate information about how the voter has voted to

8  another person."  Do you see that?

9  A.  Yes, I do.

10  Q.  Are there any examples of things in your daily home life

11  that you worry may run afoul of this provision in the oath?

12  A.  Just daily communication, my daughter would probably tell

13  someone in my household anyway how she voted.

14      And I think we all get this around election time, you just

15  get so many texts on your cell phone all the time, vote for

16  me, vote for me, vote for me, and I think you're just tired of

17  getting texts and sometimes you can do a one-off, yay, you

18  have my vote, so they quit texting you.  I could see someone

19  doing that.

20  Q.  Do you feel comfortable swearing under penalty of perjury

21  with this language in the oath?

22  A.  Well, I never coerce her to go vote, but it's so vague I

23  don't know what that means, and, you know, if I change the

24  sign and let's go vote now, is that considered coercion?  I

25  don't know.

1  Q.  Oh, sorry.  Just to be clear, I was asking about the

2  provision about not communicating information about how the

3  voter has voted.  The sentence we were just speaking about

4  that begins on the fourth line of the assister oath.

5  A.  Right.

6  Q.  So do you feel comfortable swearing under penalty of

7  perjury with that language in the oath?

8  A.  In a really casual situation, no.

9  Q.  In general, thinking of the oath as a whole, does the

10 revised oath after SB 1 make you more nervous to assist

11 Danielle with voting than the prior version did?

12 A.  Absolutely.

13 Q.  How did you sleep on the first night that you took this

14 revised oath?

15 A.  Well, it made me really nervous.  The word "perjury," is

16 in there.  I know I'm doing everything right but it sounds

17 very threatening and intimidating.

18 Q.  Derek, you can take the exhibit down now.  Thank you.

19     Miss Miller, now that we finished discussing the oath, I'd

20 like to return to our discussion about how the process works

21 when you assist Danielle with voting by mail.

22     When Danielle completed her mail ballots in 2022 do you

23 know if she included any identification number on her

24 completed ballot?

25 A.  Yes.  She was required to write — they said either write

3209

1  the last four digits of your social or your Texas driver's
2  license or your Texas ID, and I think originally back then
3  they asked put the number down you signed up when you
4  registered and we didn't know what that was so just to be safe
5  we wrote both down because we didn't know.
6  Q.  After Danielle has completed her mail ballot, do you
7  assist her with returning the marked mail ballot?
8  A.  Yes, I.  Do we live in somewhat of a suburban rural area
9  with kind of a rural mailbox, all our mail we pretty much take
10 to the post office, so, yes, she would drive to the post
11 office with me.
12 Q.  In your estimation would Danielle be able to vote by mail
13 without assistance?
14 A.  No, not at this time.
15 Q.  You testified earlier that you recall Danielle beginning
16 to vote by mail in about 2020?
17 A.  Um-hum.
18 Q.  Does that mean that you have assisted your daughter with
19 voting by mail both before and after SB 1 went into effect?
20 A.  Yes.
21 Q.  How does your experience assisting Danielle with voting by
22 mail since SB 1 has gone into effect compare with your
23 experience assisting Danielle with voting by mail before SB 1?
24 A.  Well, there's certainly a lot more things to do and
25 minutia and sometimes the mail is slow, and, you know, when

1  you have someone you're helping with autism you just have so

2  much extra stuff to do in your daily life.  Maybe you are

3  managing therapies, insurance, there's just so much going on

4  and now you have to remember to reregister to get a

5  vote-by-mail ballot every year.  It's just real easy to

6  forget.

7  Q.  Did you encounter any issues while assisting Danielle with

8  voting by mail before SB 1 was implemented?

9  A.  Not that I can recall.

10  Q.  After SB 1 was implemented, how did your experience

11  assisting Danielle with voting by mail change?

12  A.  I felt really intimidated helping her.  And it is her

13  constitutional right to vote, she just needs a little bit of

14  assistance.  Her voice is valid and needs to be heard, but

15  that and when we reregistered to vote, it took a very, very

16  long time to get processed.  And one time it didn't get

17  processed in time and we had to vote in person.

18  Q.  Do you believe that the ID requirements under SB 1 could

19  impact Danielle's ability to successfully vote by mail?

20  A.  Absolutely.

21  Q.  Have you experienced any issues while assisting Danielle

22  with voting by mail since SB 1 went into effect?

23  A.  Yes.  We did.  Again, you have so much going on in your

24  daily lives it's real easy to forget to request a ballot and

25  this year I believe she was looking for her ballot.  It wasn't

1  coming in the mail, and I'm like, well, that's odd it should

2  be here by now.  And I recall going on the voter website for

3  Travis County to just -- I was checking in to see like when is

4  the ballot coming, when is the ballot coming, and it never

5  came.  And we didn't know what to do because you either vote

6  by mail or you don't.

7      So I ended up calling and they are, just give it a couple

8  more days.  And then one day I went in and it said your

9  vote-by-mail ballot has been rejected.  And I was really

10  surprised because it said we had like ten to twelve days to

11  send in the application to get the ballot by mail and we had

12  sent it plenty of time and I live in Travis County and that

13  mail should have gotten there in two days, but after twelve

14  days it was rejected.

15      And I recall the rejection saying that we didn't get the

16  ballot in time.  And I was like, well, that's very odd, but,

17  okay.  And then I told my daughter, well, I'm so sorry, we

18  messed up.  I guess we really need to apply early because

19  twelve days didn't cut it, you're going to have to vote in

20  person.

21      Now, this was an abrupt change for my daughter who is very

22  comfortable with voting by mail in her home with no stressors,

23  no noise, everything is calm.  She was very upset by this.  It

24  really caused her a lot of stress for a couple of days.

25  Q.  To clarify for the record was that an application for a

```
 1  ballot by mail that was not received or a mail ballot, because
 2  I believe you said --
 3  A.  I'm so sorry.  Application for vote by mail.
 4  Q.  Thank you for that clarification.
 5  A.  I misspoke.
 6  Q.  And what did you do when Danielle did not receive her mail
 7  ballot?
 8  A.  Well, I just explained the situation to her and told her
 9  she was going to have to go vote in person.
10  Q.  When you took Danielle to vote in person after her
11  application for a mail ballot was not received, did you worry
12  about taking her to vote in person after SB 1 went into
13  effect?
14  A.  Honestly, I don't know if this is SB 1 or not.  I always
15  worry going to vote because I've had a couple of bad
16  experiences in the past two years personally and I was really
17  glad that Danielle wasn't with me when I voted.
18  Q.  Can you briefly describe the types of incidents that
19  you're thinking of?
20  A.  Well, sure.  We -- there have been very long lines for
21  voting.  It's very hard for my daughter to wait in line or do
22  something that's unexpected, and I recall in the past two
23  years, I can't give you the exact date, I cannot vote by mail,
24  I vote in person, and when I was voting there's just a big
25  commotion and it sounded like there was yelling, and in this
```

1  day and age, you are just like, what is going on.

2      And there was a man — we don't have booths you go into,

3  it's like a little box, and I turned around.  I was like,

4  what's going on, is there a fire?  And somebody was yelling at

5  him, you can't do that.

6      And this gentleman, whether he knew any better, he was

7  trying to intimidate anybody, I have no idea, but he had his

8  cell phone out and he was videoing and taking pictures of the

9  polling place, which I understand is completely illegal.

10      And it was kind of scary for everybody in there.  It

11  sounds like the people running the voting elections handled it

12  and he left, but it was very nerve-wracking.

13  Q.  Now, let's talk briefly about how the process went when

14  you took Danielle to vote in person after SB 1 had gone into

15  effect.  Did you drive Danielle to her polling place?

16  A.  Yes.

17  Q.  Did you assist her with checking in?

18  A.  She checked in and signed and I go behind her and sign the

19  oath that I'm there to help.

20  Q.  Derek, will you please show Exhibit HAUL MFV 089.

21      Miss Miller, you mentioned that you took an oath?

22  A.  Yes.

23  Q.  Do you see this exhibit, Miss Miller?

24  A.  Yes.

25  Q.  Is this an accurate representation of the form with the

1  assister oath on it that you filled out and signed when you

2  assisted Danielle with voting in person?

3  A.  Yes.

4  Q.  Derek, will you please show Exhibit HAUL MFV 089 and HAUL

5  MFV 297 side by side.

6      Miss Miller, we previously discussed the oath that you've

7  taken to assist Danielle with voting by mail since SB 1 went

8  into effect so I won't cover the same ground again, but will

9  you please take a look at the oath of assistance on form

10  758 — or 7-58 and the oath on the mail ballot carrier

11  envelope and verify that they are the same?

12  A.  Yes, they look the same.

13  Q.  Derek, please take HAUL MFV 297 down and leave HAUL MFV

14  089 up.  Thank you.

15      Miss Miller, we've discussed the oath in relation to when

16  you assist Danielle with voting by mail but I have a few

17  additional questions about how the oath affects you when you

18  assist her with voting in person.

19      First, I'd like for you to take a look at the second line

20  of the oath of assistance which reads, "I did not pressure or

21  coerce the voter into choosing me to provide assistance," do

22  you see that?

23  A.  Yes.

24  Q.  Would it be pressuring, in terms of voting in person, if

25  Danielle told you on a day where she was planning to vote in

1  person that she would like her father to assist her and you

2  told her that he was busy and you would take her instead?

3  A.  I have no idea.  Probably.  I don't know.

4  Q.  Would it be pressuring if you drove Danielle to her

5  polling place and as she was getting out of the car she said,

6  mom, I'll vote by myself this time, and you said, are you sure

7  you don't need me, what if there's a long line or there have

8  been changes in the process, and then she changed her mind?

9  A.  I have no idea by this sentence.

10  Q.  And, now, I'd like to discuss the portion of the last

11  sentence in the oath of assistance which reads, "I understand

12  that if assistance is provided to a voter who is not eligible

13  for assistance, the voter's ballot may not be counted."

14      Do you see that?

15  A.  Yes.

16  Q.  Based on this part of the oath, is it clear to you who

17  would decide if Danielle's ballot was not going to be counted

18  because she was not eligible for assistance?

19  A.  No.

20  Q.  Is Danielle's disability always visible?

21  A.  No, not at all.  You would never know.

22  Q.  Since your daughter's need for assistance isn't always

23  visible does this provision make you worry about assisting her

24  to vote, even if she needs it because your assistance might

25  jeopardize her vote being counted?

1    A.   Yes.

2    Q.   In your view, who should decide if a voter needs

3    assistance to vote?

4    A.   I think the person who needs assistance.

5    Q.   In general, does the revised oath after SB 1 make you more

6    nervous to assist Danielle with voting in person than the

7    prior version did?

8    A.   Yes.

9    Q.   Derek, you can take the exhibit down now.  Thank you.

10       Miss Miller, now that we've finished discussing the oath

11   of assistance I'd like to return to our discussion about how

12   the process worked when you assist Danielle with voting in

13   person.  Did you go to the voting machine with Danielle?

14   A.   I went to the voting machine but I kind of stood behind

15   it.

16   Q.   When Danielle went up to the voting machine did she need

17   assistance making her selections?

18   A.   Well, over the past couple of years it seems like Texas

19   has changed their voting machines and this is, again, an

20   abrupt change for someone with autism.  A few years ago I

21   recall when I voted in person instead of having a touch pad

22   and a paper ID they had like a little circle.  She was used to

23   that.

24       And over the past couple of years they've changed the

25   system so it's touch screen and you put a piece of paper in I

1  believe.  And since she had voted in mail, it's been a minute

2  since she's seen that sort of machine, so I was there to

3  assist her if she needed some assistance figuring out because

4  it was a change.

5  Q.  After Danielle had completed her ballot did you assist her

6  with returning her printout?

7  A.  Yes.  I directed her like, here is a machine, and put it

8  in.

9  Q.  In your experience would Danielle be able to vote in

10 person without assistance?

11 A.  I don't believe so.

12 Q.  How does your experience assisting Danielle with voting in

13 person after SB 1 went into effect compare with your

14 experience assisting Danielle with voting in person before SB

15 1?

16 A.  Just everything is really, really frustrating.  It's

17 intimidating and sometimes I can just like, do you just not

18 want my daughter to vote.

19 Q.  Since SB 1 went into effect has the process of assisting

20 Danielle with voting in person gotten more confusing for you?

21 A.  Everything is more confusing and complicated, yes.

22 Q.  Since SB 1 went into effect has the process of assisting

23 Danielle with voting in person gotten more stressful for you?

24 A.  Yes, because I don't really — the word "perjury," is in

25 there.  That's very intimidating for anyone and it's very

1  vague language of what I can do and not do.

2  Q.  Does anyone other than you or your husband help Danielle

3  vote?

4  A.  No, no one has.

5  Q.  If Danielle were to move out of your house and live

6  independently would she use another assister?

7  A.  She would have to find someone to assist her, absolutely.

8  She will outlive me.  It will happen.

9  Q.  Do you worry that the revised oath in SB 1 will deter

10  people from assisting your daughter with voting?

11  A.  Absolutely.  I mean, I'm her mother and it intimidates me.

12  If she had, you know, a paid aide, or someone who helps her in

13  the future who, you know, paid aides usually don't make that

14  money, why would they want the extra stress and liability of

15  helping someone to vote.

16  Q.  Miss Miller, why are you testifying here today?

17  A.  Well, I love my daughter.  Autism is a superpower.  My

18  daughter just needs a little more help but she can vote.  It's

19  her constitutional right.  She's a very good person.  She

20  wants to practice her civic duty and she should be able to

21  vote.

22  Q.  Is there anything else that you would like to share about

23  your opposition to the challenged provisions of SB 1?

24  A.  People with disabilities are a part of our community and

25  the fabric of our lives for real.  They need to be heard and

JENNIFER MILLER – CROSS

1  why are you making it so hard for people with disabilities to

2  vote?  I really don't understand.

3          MISS WILLIAMS:  Thank you, Miss Miller.

4          Your Honor, I pass the witness.

5          THE COURT:  Anything else from this side?

6          Any cross?

7                  CROSS-EXAMINATION

8  BY MR. KERCHER:

9  Q.  Good morning, Miss Miller.  Thank you for driving down

10  from Travis County.

11  A.  Thank you.

12  Q.  My name is Ryan Kercher.  I work for the Attorney

13  General's Office.  I appreciate you sharing a little bit of

14  Danielle's story with the court today.  I'm glad to hear she

15  is a violinist.  I played a little bit when I was a kid; I

16  wasn't any good though.

17      I wanted to talk to you a little bit about your daughter's

18  dysgraphia.

19  A.  Sure.

20  Q.  My neighbor's child has dysgraphia and the way that I

21  understand it is that it's sort of like dyslexia but for

22  writing, is that right?

23  A.  I'm not a medical professional, but maybe so.  That's a

24  good description.

25  Q.  And it is literally, I mean, there is something going on

JENNIFER MILLER - CROSS

1  in the brain but there is a physical inability to write

2  clearly with dysgraphia, is that right?

3  A.  Yes.  I believe the famous professor Dr. Temple Grandin

4  has it as well.

5  Q.  What does your daughter's signature look like?

6  A.  I like to say it looks like a celebrity scribble.

7  Q.  Is it always the same or does it change?

8  A.  I believe it's somewhat similar.

9  Q.  And did I understand your testimony correctly that she is

10  physically unable to write neatly or fill in bubbles like you

11  might have to on a Scantron or for a test?

12  A.  Yes.

13  Q.  I want to talk to you for a moment about your daughter's

14  Texas ID number that you talked about.

15  A.  Sure.

16  Q.  You testified on direct that you just did not recall

17  whether when she initially registered to vote she had used a

18  Texas ID number or a social security number, did I understand

19  that correctly?

20  A.  Yes.  That was a long time ago.  It's not something I — I

21  would have more attention had I known that I needed to know

22  that.  I just, I didn't know.

23  Q.  I can tell you I wouldn't know what's on mine either, so

24  that's perfectly fair.  Have you contacted the Travis County

25  Clerk's Office to see if you can learn what number your

JENNIFER MILLER – CROSS

1  daughter used when she first registered to vote when she
2  turned 18?
3  A.  It didn't occur to me I could do that.  That sounded to me
4  like confidential information they wouldn't give out.
5  Q.  Have you contacted the Secretary of State's Office to see
6  if you could get that information from them?
7  A.  I didn't know to do that.
8  Q.  Are you aware that your daughter could resubmit her voter
9  registration card with both her social security number and her
10  Texas ID number?
11  A.  That's what we've been doing.
12  Q.  Let's talk a little bit about the penalty of perjury
13  language that you discussed on direct, okay?
14  A.  Okay.
15  Q.  Are you aware of what Texas law says about what happens if
16  somebody swears or affirms, regardless of whether they say
17  penalty of perjury, and then intentionally deceive after
18  swearing and affirming?
19  A.  No.
20        MISS WILLIAMS:  Objection, Your Honor.  Calls for
21  legal conclusion.
22        THE COURT:  That's overruled.
23  BY MR. KERCHER:
24  Q.  I'm sorry.  Miss Miller, I thought I heard your answer.
25  Did you say you don't know?

3222
JENNIFER MILLER - CROSS

1  A.  No, I'm not a lawyer.

2  Q.  In the context of that swear or affirm language you talked

3  about being worried about what it means to pressure or coerce

4  your daughter as you're helping her to vote, right?

5  A.  I never tell my daughter who to vote for.  That's her

6  personal business.

7  Q.  And that was —— you were anticipating my next question.

8  You don't tell her daughter how to vote, right?

9  A.  No.

10 Q.  You want for her to make her own decision, right?

11 A.  Yes.

12 Q.  And I think that you closed your remarks on direct

13 examination by saying that your daughter's voice deserves to

14 be heard as a voter, do we agree on that?

15 A.  Yes.

16 Q.  You also don't walk around telling people how your

17 daughter voted, is that fair to say?

18 A.  That's fair to say.

19 Q.  It's not something you would do without her permission, to

20 be sure, right?

21 A.  Yes.

22 Q.  There are other parts of that oath that make you

23 uncomfortable and I would like to know, and when I ask you

24 this question, I'm not asking you to give me any information

25 an attorney might have given you, but have you sought legal

JENNIFER MILLER - CROSS

1  advice about how to interpret the terms of the oath that you

2  looked at on direct examination?

3  A.  No.

4  Q.  Have you talked to anybody at Arc of Texas about how to

5  interpret that language in that oath?

6  A.  No.  I'll be honest with you, I have a daughter with

7  autism.  I'm really, really, really busy.  Sometimes it just

8  doesn't occur to me to do that because I'm really busy.

9  Q.  I absolutely understand.  Please don't hear me to be

10  picking on you or beating up on you.  I just want to

11  understand your testimony.

12  A.  Sure.

13  Q.  And I understand that being the parent and a caretaker

14  must be very busy.  It's also the case that voting is very

15  important in your household, is that fair to say?

16  A.  Yes.

17  Q.  And so it's also true that if you have questions about

18  helping your daughter vote, for example, when you were waiting

19  on her ballot by mail to arrive you got on the Travis County

20  website to check the status of that, is that right?

21  A.  Yes.

22  Q.  Have you gotten on the Travis County Clerk's website to

23  see if there's any guidance or information about how to

24  understand the oath of assistance that you are concerned

25  about?

3224

JENNIFER MILLER - CROSS

1  A.  I don't recall it being there, but as far as looking for

2  help on changes, a lot of this occurred during the lockdown in

3  2020 and there weren't a lot of people around to get

4  assistance from I'm afraid.

5  Q.  You talked a little bit about voting in person with

6  Danielle —

7  A.  Yes.

8  Q.  — and I want to see if I understand a couple things that

9  you said.  My understanding is from what you said on direct is

10  that prior to the pandemic you and your daughter usually voted

11  in person, is that right?

12  A.  Yes.  We didn't really know — we didn't even know voting

13  by mail was an option for her.  We just didn't know any

14  better.

15  Q.  Voting can be a learning process, right?

16  A.  Well, I don't know about that.  I've never — I'm not

17  qualified to vote by mail, I didn't realize she could too.

18  Q.  And you talked about an incident where she did not get her

19  ballot by mail and so you had to break what she was used to

20  and go and vote in person, right?

21  A.  Yes.

22  Q.  And you may have said it on direct and I may have missed

23  it, did you say when that happened?  Do you remember which

24  election that was for?

25  A.  I kind of feel like it was this year.  Maybe the spring.

3225
JENNIFER MILLER - CROSS

1  I don't have a calendar in front of me, I don't recall, but I

2  believe it was this year.

3  Q.  And it sounded, to me, like you were not clear on why it

4  is that you did not receive her ballot by mail, other than

5  that the application had been received late, is that right?

6  A.  Well, two things.  We forgot to do the annual register

7  application for her.

8  Q.  Okay.

9  A.  And when I found that out we looked online, it was like,

10  oh, but you still have time to do it, you have twelve days.

11  We filled it out with the assumption we would get it back on

12  time because it says, don't worry, you can still do this,

13  twelve days.

14      And I have no idea what happened.  I don't know if it was

15  slow mail.  We didn't get it back on time.  So it wasn't our

16  intention to go vote in person.  It's just — that's what

17  happened.

18  Q.  Okay.  And I appreciate that additional detail.  That's

19  helpful.  One of the concerns that you had about taking your

20  daughter to vote in person after she had been voting by mail

21  for a long time was that that was a break in routine and you

22  didn't know how she would handle that, right?

23  A.  Well, yes.  There's a variety of things, but that's it.

24  If there's a long line, or something changes, or, you know,

25  people are really grumpy these days.  If there's a grumpy

1  person, that wouldn't be a good situation for her.

2  Q.  And you mentioned the long lines.  Travis County has a

3  website where you can check the wait times at each of the

4  polling locations during early voting and on Election Day,

5  right?

6  A.  I did not know that.  That's good to know.  I don't always

7  have time to do that.  We're on the go go go go go.

8  Q.  I recommend taking a look at that Clerks website —

9  A.  Well, thanks for the tip.  I will check it out.

10  Q.  — it may save you some time.

11       You talked about reading the oath of assistance when you

12  got to the polling place with your daughter, right?

13  A.  Yes.

14  Q.  And you talked about some of the concerns that you had

15  with it but you signed it anyway, did I understand that

16  correctly?

17  A.  Yes.

18  Q.  And then you helped your daughter vote, is that right?

19  A.  Yes, but I will say that I think I am — number one, I'm

20  not a legal scholar at all.  Number two, there's a lot of

21  things about voting apparently I don't know, you've educated

22  me on that, but I sign a lot of things.  I mean, I sign my

23  agreement with my cell phone.  I don't know what that means

24  either.  I think we all do.  I'm not a legal scholar.

25  Q.  That's an excellent point.  As far as you know, the

3227
JENNIFER MILLER - CROSS

1  election in which your daughter most recently voted in person,
2  her vote counted in that election, is that right?
3  A.  I believe yes.
4  Q.  And you have not been charged with a crime, fair to say?
5  A.  No.
6  Q.  And you will continue to assist your daughter voting
7  whether in person or by mail, is that right?
8  A.  As long as she tells me, mom, I need help.
9  Q.  And as far as you are aware since the passage of SB 1
10  there has been no time when your daughter's vote has not
11  counted, is that right?
12  A.  As far as I know.  I think her votes have always been
13  counted.
14          MR. KERCHER:  Thank you so much, Miss Miller, for
15  being here and with sharing your story with us.
16          Your Honor, I pass the witness.
17          THE COURT:  Any other questions?
18          MR. NICHOLS:  No, sir.  Thank you.
19          THE COURT:  Any redirect?
20          MISS WILLIAMS:  Nothing on redirect, Your Honor.
21          THE COURT:  May she be excused?
22          MISS WILLIAMS:  Yes, Your Honor.
23          THE COURT:  Thank you, Miss Miller.
24          THE WITNESS:  Thank you.
25          THE COURT:  And your next witness.

3228
JODI LYDIA NUNEZ LANDRY - DIRECT

1          MR. CROMLEY:  Morning, Your Honor, plaintiffs call

2   Miss Jodi Lydia Nunez Landry.

3          I'm James Cromley on behalf of the HAUL and OCA

4   plaintiffs.  We call Miss Jodi Lydia Nunez Landry.  Miss Nunez

5   Landry will testify primarily regarding HAUL and OCA

6   plaintiffs' challenges to the following sections of SB 1,

7   Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.03, 6.04, 60.5,

8   and 6.07.

9          MS. HOLMES:  Your Honor, we'll have to move the

10  podium to make way for her power chair.

11         MR. CROMLEY:  Your Honor, the witness is currently in

12  the restroom, may we take a five-minute break.

13         THE COURT:  Yeah, if anybody wants to stand and

14  stretch.  I'll just wait here.

15         *(Pause in proceedings)*

16         MR. CROMLEY:  Thank you, Your Honor Landry.

17     (JODI LYDIA NUNEZ LANDRY, having been duly sworn,

18  testified as follows:)

19                    DIRECT EXAMINATION

20  BY MR. CROMLEY:

21  Q.  Good morning.

22  A.  Good morning.

23  Q.  Could you please state your full name for the record.

24  A.  Jodi Lydia Nunez Landry.

25  Q.  Can we adjust the microphone forward just a little bit for

JODI LYDIA NUNEZ LANDRY - DIRECT

1  the witness.
2      Miss Nunez Landry, where do you live?
3  A.  I live in Seabrook, Texas.
4  Q.  Which county that is?
5  A.  That's Harris County.
6  Q.  And how old are you?
7  A.  I'm 53.
8  Q.  Could you please describe your educational background.
9  A.  I have a bachelor's in social work from the University of
10 Houston-Clear Lake.
11 Q.  And when did you receive that?
12 A.  In 2014.
13 Q.  In your spare time are you a member of any disability
14 affiliated organizations?
15 A.  Yes, I am.  I'm with REV UP Texas.  I'm a regional
16 representative.  I'm a former certified long-term care
17 ombudsman.  I've worked with Arc of Texas, Disability Rights
18 Texas.  I am a commissioner in the Houston Commission on
19 disabilities and I sometimes work with ADAPT and ADAPT of
20 Texas.  And I think that's —
21         THE COURT:  Do you want to relocate?
22         MR. KERCHER:  If I could.
23         THE COURT:  Yeah.
24 BY MR. CROMLEY:
25 Q.  So Miss Nunez Landry, you mentioned REV UP Texas, correct?

3230
JODI LYDIA NUNEZ LANDRY - DIRECT

1  A.  That's correct.

2  Q.  And do you currently hold a position with REV UP?

3  A.  Yes.  I'm the regional representative.  I essentially host

4  our monthly meetings.

5  Q.  And what do you do as a regional representative beyond

6  that?

7  A.  Beyond hosting the meetings?

8  Q.  Yes.

9  A.  Well, I've been registering people to vote and I attend

10 different events where I talk to people about the policy

11 issues that impact disabled people and we try to encourage

12 disabled people to register to vote and to be informed voters

13 and I share resources with them, like from, for instance,

14 Disability Rights Texas about voting accessibility and --

15 Q.  Has achieving REV UP's mission become anymore difficult

16 since the enactment of SB 1?

17 A.  Yes.  It's --

18 Q.  Can you explain how?

19 A.  Well, I mean, so many people are really confused about the

20 provisions in SB 1, what remains, what has been like, I guess

21 the right word "discarded," I don't know.

22    I'm sorry.  I'm a little nervous and I had an allergy

23 attack.

24    So there's just a lot of confusion and misinformation and

25 misunderstanding.  I was recently registering people to vote

JODI LYDIA NUNEZ LANDRY - DIRECT

1  at the Houston Abilities Expo, which is a very large event.

2  It's a three-day event for disabled people and during that

3  time, you know, hundreds of people would come to the table and

4  there are some people that confused drive-thru with curbside

5  voting.

6       They didn't think that we had that anymore.  I mean,

7  curbside, because those two terms were conflated and people

8  didn't understand whether or not they were eligible to vote by

9  mail.  They weren't sure what that meant.

10 Q.  You also mentioned The Arc of Texas.  Do you currently

11 hold a position with The Arc?

12 A.  I was their 2022 Partners in Disability leadership

13 participant and I attended -- they had classes for like it was

14 almost a year.

15 Q.  I'm sorry to cut you off.  I have bad hearing.

16      What do you do as a member of The Arc?

17 A.  Well, recently I was registering voters at the Houston

18 Multiservice Metropolitan Center and The Arc was there.  I do

19 referrals.  You know, I receive emails.  I'm in the loop.

20      I attended an event, I don't know, it was a couple of

21 years ago at D.C., that they in part hosted with other groups

22 to help disabled people get an expansion of home- and

23 community-based services.

24 Q.  Has achieving The Arc's mission, has it become more

25 difficult in any way since the enactment of SB 1?

JODI LYDIA NUNEZ LANDRY - DIRECT

1    A.  I think it's everything.  I mean, voting has been made far

2    more onerous than it needs to be because of disabled people.

3       We already encounter so many obstacles, and for a brief

4    window of time things were getting somewhat better, but it

5    seems like now the rug has been pulled out from underneath us

6    and I'm afraid that there are going to be people who won't go

7    and vote because of the difficulties.

8    Q.  So we'll talk more specifically about voting shortly, but

9    for now I would just like to know, is it important to you that

10   people vote?

11   A.  It's very, very important to me.  I mean, I just think

12   it's fundamental to democracy, voting.  I mean, we choose who

13   will have power and who will hopefully either enact policies

14   that can benefit us and — my father was a Marine in World War

15   II in the South Pacific.  He has since passed, but I feel like

16   it's the very least I can do is to vote.  And I consider it a

17   responsibility to be civically engaged and I would hope that

18   other people take this responsibility very seriously.

19   Q.  Do you encourage others to vote?

20   A.  I do.

21   Q.  Do you encourage them to vote in any specific way?

22   A.  No.  REV UP is nonpartisan and so it's more of a matter of

23   getting people registered and letting them — you know,

24   talking to them about policies and asking people what policies

25   matter to them and why, but generally speaking I try to avoid

JODI LYDIA NUNEZ LANDRY - DIRECT

1  any discussions of politics, you know, in that role.

2  Q.  So I'd like to shift our conversation a little bit and

3  just learn more about your disability, if that's all right.

4  Could you please describe for the court your disability.

5  A.  My disability or disability in general?

6  Q.  Yours, please.

7  A.  Oh, okay.  I have a rare and untreatable progressive form

8  of muscular dystrophy.

9  Q.  Can you explain how that affects your everyday life?

10  A.  I need assistance with activities of daily living with

11  almost everything I do, from getting into bed, to getting up

12  in the morning.  I need help showering, putting clothes on.

13  Someone makes food for me.  They pour coffee into a cup for

14  me.  It's every — it's pretty comprehensive.

15  Q.  Who typically provides you with that day-to-day

16  assistance?

17  A.  That would be my partner.

18  Q.  And aside from your partner does anybody else provide you

19  assistance?

20  A.  I mean, rarely.  Occasionally, if we go to the grocery

21  store, or like a store and I want to go look at the dresses or

22  something, and he doesn't want to, I'll roll over and but if

23  something is — you know, I can't reach or up high or heavy

24  I'll try to find a sales clerk or someone, but, I mean,

25  generally speaking he helps me with everything.

3234

JODI LYDIA NUNEZ LANDRY - DIRECT

1  Q.  So who is your preferred assister?

2  A.  That would be my partner.  Because he's been with me for a

3  while he understands what I need help with and what I can and

4  cannot do, and so generally speaking I don't have to go into

5  some lengthy explanation about the type of assistance I

6  require.

7  Q.  Is it difficult to find assistance?

8  A.  To say it's difficult to find assistance in Texas right

9  now is an understatement.  We're having a home care crisis.

10 Community attendants are earning exceedingly low wages without

11 benefits.

12      You can sometimes get paid — I know you can get paid more

13 working at like a nursery or even Starbucks, or, you know,

14 so — and it requires a certain amount of skill and it's hard

15 work, so it's — we're on a precipice right now where people

16 can't really maintain care attendants.

17 Q.  If you were not able to maintain a care attendant, what do

18 you fear would happen to you?

19 A.  My worst fear would be ending up in a nursing home and I

20 was a certified long-term care ombudsman, right up until the

21 pandemic, and I know firsthand what occurs in nursing homes

22 and I don't think most of you would want your pet in a nursing

23 home right now in Texas.

24 Q.  You mentioned you were a long-term care ombudsman.  Can

25 you describe what you did as a long-term care ombudsman?

JODI LYDIA NUNEZ LANDRY - DIRECT

1  A.  So a long-term care ombudsman for a congregate -- there

2  are different types but I was one for congregate institutions

3  and we advocate with and on behalf of the residents for their

4  rights and we inform them of their rights under law.

5      Sometimes, you know, sometimes it just involves sitting

6  with people and they are lonely and visiting with them.

7  Sometimes it involves trying to advocate for different issues

8  that they may have within that context and there were times

9  where we did educate them about their right to vote.

10 Q.  Thank you.  I'd like to go back to speaking just about you

11 for a moment.  Does your disability require you to do any

12 planning with regard to every day activities?

13 A.  Everything requires a lot of planning because most people

14 really don't understand what accessibility means and

15 inevitably, even despite planning, you will run into problems

16 like I did here today, coming here today.

17     So, yeah, I mean, you have to know about where the

18 restrooms are, are they actually accessible.  Generally they

19 say they are when they are not, and it's --

20 Q.  Do unexpected barriers make it difficult to plan?

21 A.  Yes, it does make it very difficult, but despite that you

22 still have to do a certain amount of planning.  Like just

23 coming here today, there are new sidewalks coming into the

24 courthouse but there was a pothole and my chair got stuck and

25 there was traffic coming and my partner had to try to lift my

3236
JODI LYDIA NUNEZ LANDRY - DIRECT

1  chair up to get onto the sidewalk and it was a little
2  harrowing right before coming into the courthouse.
3  Q.  Are there any activities in your everyday life that you
4  used to enjoy doing, even after becoming disabled, that have
5  become just too difficult to be worth it?
6  A.  For me, I miss actually working in the paid labor sector.
7  I would — but I don't have accessible public transportation
8  out in the suburbs where I live and sometimes accommodations
9  are difficult.  I miss that, but I manage to volunteer and do
10 things regardless of that.
11 Q.  So let's talk now about voting more generally.  Are you
12 registered to vote in Texas?
13 A.  I am registered to vote, yes.
14 Q.  And in which county?
15 A.  I'm sorry?
16 Q.  In which county?
17 A.  Oh, Harris County.
18 Q.  And roughly how long have you been registered to vote
19 there?
20 A.  I think it's been since about 1996, I think.
21 Q.  And were you registered to vote anywhere before that?
22 A.  Yes.  I lived in Ohio for a while and I was registered to
23 vote there.
24 Q.  And do you prefer to vote in person or by mail generally?
25 A.  Well, I like to vote in person but I feel like it's really

3237
JODI LYDIA NUNEZ LANDRY - DIRECT

1   necessary to have options because during the pandemic I
2   couldn't leave the house at all for a year and so I voted by
3   mail then, but, I mean, when you're relying on accessibility
4   equipment like an accessible van or a power chair things go
5   wrong and there may not be a way of getting to vote, but I do
6   like voting in person because, well, one thing is I like to
7   make sure that their polling locations are accessible, they
8   haven't been sometimes in the past, although, you know, it's
9   getting better, but I don't know, I — so often a lot of —
10  many of us are segregated and so I think whenever we can get
11  out and be a part of our communities and be visible to people
12  I think it's good for us and it's good for society, you know,
13  to be around disabled people because they, you know, learn
14  about our needs and issues.
15  Q.  So generally, without getting into any specific election,
16  could you please describe the preparation, if any, that goes
17  into your voting?
18  A.  Well, in the past I would sometimes drive by a location or
19  try to go in.  I've looked — tried to find what kind of
20  voting machines they were using online.
21      What else?  You know — yeah, I mean, there's like looking
22  up the different types of voting machines to see which type we
23  were using, but now I usually try to go to the same places now
24  that, you know, I'm familiar with and I've voted there before
25  so I don't have to do as much of the leg work but I have

3238
JODI LYDIA NUNEZ LANDRY - DIRECT

 1  helped other people look up polling locations to see what
 2  types of machines they have and whether they have remotes and
 3  whatnot.
 4  Q.  Do you ever do any research into candidates or issues on
 5  the ballot?
 6  A.  Yeah, I do.  Especially we've had last few — like this
 7  one coming up, we have 14 proposed constitutional amendments
 8  and sometimes the wording is confusing and so I've watched
 9  videos.  For instance, the League of Women Voters provides
10  videos on the different amendments and I usually take notes
11  and — on a little piece of paper and bring them into the
12  polling location with me.
13  Q.  So let's talk a little bit about your specific experience
14  voting since the enactment of SB 1.  First, have you heard of
15  SB 1?
16  A.  Yes.  I think — I can't imagine you live in this state
17  and not have heard about SB 1.
18  Q.  Could you please describe just what you understand about
19  SB 1?
20  A.  Well, I know it's a voter omnibus bill.  It was designed
21  to prevent fraud and I guess the rationalization was to
22  protect election integrity, and I know in the title of the
23  bill, I really can't remember it offhand, but it was something
24  like to increase criminal penalties and create penalties, or
25  something like that.

3239

JODI LYDIA NUNEZ LANDRY – DIRECT

1  Q.  How did you first hear about SB 1?

2  A.  I mean, it was all over the news, and I think like there

3  were even people who in the Texas Legislature who opposed it

4  who left the state for a really long time, but, I mean, it was

5  all over the news.

6      Of course, everybody in the quote-unquote disability

7  community, I know we're not a homogeneous community, but

8  everybody was very concerned about how it was going to affect

9  us because things are already very difficult now and we had

10  fought for some, you know, we made some gains with regard to

11  accessibility and it's just you spend all that time working on

12  something and having it taken away, and so it was just

13  everybody was very worried about it and confused.

14  Q.  So you said you had some concerns about SB 1.  Did you do

15  anything about that?

16  A.  Yes, I did.  I was on many calls with people — disabled

17  people and I heard about other groups organizing around this

18  issue and so I ended up getting in those calls and meetings.

19      We had at least two or three protests, peaceful, in

20  Houston, and then I went to march to Austin twice, once was

21  like in the August heat, pretty far to the Capitol with just

22  an incredibly diverse group of wonderful people I didn't know,

23  and — yeah.

24  Q.  Were you ever arrested as part of those protests?

25  A.  No.

3240
JODI LYDIA NUNEZ LANDRY – DIRECT

1  Q.  Okay.

2  A.  No, I wasn't.

3  Q.  Now let's talk about your specific experience as voting

4  since SB 1.  Did you vote in the March 2022 Primary elections?

5  A.  Yes, I did.

6  Q.  And where did you vote in those elections?

7  A.  It was at a community center, Clear Lake Community Center.

8  Q.  And did your partner go with you to the polling place?

9  A.  Yes.  He has to drive me.  I can't drive.

10  Q.  Did you encounter any difficulties when you voted in those

11  elections?

12  A.  Yes.  Well, yeah, I did with that one.

13  Q.  Could you tell us about that, please.

14  A.  Well, they have these giant paper feeds in front of the

15  monitors and so you have to reach pretty far back to access

16  the touch screen and initially when I went to put my paper in

17  apparently this happened to my partner too, it was going in

18  wrong and I was trying to stop it because it was going to

19  crumple the paper so I called the election worker over to do

20  that to stop it so it wouldn't — and she just inserted it in

21  for me, and — yeah.

22  Q.  Once you got the paper in, did you encounter any other

23  difficulties while voting?

24  A.  Well, I could not find an accessible remote.  Usually it's

25  on the right side of the voting machine but I couldn't find

1  it, but I don't know whether it was there or not.  It was just

2  there were a lot of wires and —

3  Q.  Without the remote, how does your voting process change,

4  if at all?

5  A.  So on these machines it's like in a little cubicle and the

6  paper feeds in the front so you have to reach pretty far to

7  the back to touch the screen, which required my — I had to

8  lean out of my chair to press the screen and I had to hold up

9  my one arm with the other arm and it was a very long ballot.

10      And my hand gets really — my arms get very heavy and

11  shake and so I had to take breaks, but then I was worried that

12  if I took a break too long that maybe — I don't know whether

13  the machines time out or not but I was concerned about it.

14      But it was a very arduous process and I had a lot of

15  cramping.  It was just unnecessarily difficult and I have to

16  say I was really not happy after that.

17  Q.  Did you experience any physical pain while voting?

18  A.  Yes.  It's very hard for me to hold up my hands to do

19  anything.

20  Q.  Now, earlier you testified that your partner helped you

21  with almost everything in everyday life.  Did you ask your

22  partner to provide you assistance while voting in the

23  March 2022 Election?

24  A.  No, because of the provisions and SB 1 with the oath and

25  at the time especially we were all so confused about it and

3242

JODI LYDIA NUNEZ LANDRY — DIRECT

1  also because I'm worried about partisan poll watchers.  I feel

2  like people already view us as a suspect class, and that

3  we're — perhaps people don't necessarily think we are capable

4  of doing things, but maybe we don't have the cognitive

5  wherewithal or maybe we're being influenced.

6  Q.  I'm sorry, Miss Nunez, when you say "us," to whom are you

7  referring?

8  A.  I'm sorry.  I think oftentimes people with disabilities

9  are sort of viewed as a suspect class.  There's a social

10  narrative that we are malingerers or we're trying to get

11  something for some nefarious reason that other people don't

12  get and so I don't — I mean, I'm already pretty conspicuous

13  in a power chair but I don't like to draw attention to myself,

14  especially now when it's a very volatile political atmosphere.

15     And I don't want to put my partner through any type of

16  risk, you know, legally speaking, and I don't want to put

17  myself through that, but I'm really afraid of losing

18  assistants.

19     I mean, it's hard work, you know, and you just don't want

20  to ask people too much, they are already doing a lot, and you

21  don't know what that tipping point is going to be and I mean

22  my worst fear is being forced into a nursing home and losing

23  all of my rights.

24  Q.  At any point before you went to vote in the March 2022

25  Election did you review the oath of assistance?

JODI LYDIA NUNEZ LANDRY – DIRECT

1  A.  I mean, no, not right before voting.

2  Q.  Just at any point before voting.

3  A.  Yeah.  I think initially it was in all of the newspapers

4  and you know we were talking about it.

5  Q.  And so we'll discuss the oath more specifically in a few

6  minutes, but during the March 2022 elections did you

7  understand fully what the oath required of your partner?

8  A.  I mean, no, not quite.  You know, I know that he had to

9  sign an oath.  He has to know whether I'm eligible, you know,

10  or if there's a possibility that if it's not right my ballot

11  could be discarded.  I mean, it just seems very risky.

12  Q.  If not for those provisions of the oath that you just

13  mentioned, would you have asked your partner to assist you in

14  the March 2022 elections?

15  A.  I would have preferred his being able to assist me.  He

16  could have just touched the screen, you know, when I asked him

17  and what I told him to do.  And I feel like I can trust him

18  and there's a certain amount of privacy there so that would

19  have -- that would make everything a lot easier.

20      I mean, I think technology is great and we should have it,

21  but inevitably sometimes technology fails, or, you know, there

22  are so many types of disabilities out there.  I have a friend

23  who he can't move at all, not even to, you know, use the

24  remote, and in that case his mother is his assistant and she

25  helps him with everything.  And I mean — yeah.

3244

JODI LYDIA NUNEZ LANDRY - DIRECT

1  Q.  So you did receive some assistance in the March 2022

2  Election you said, at the beginning with the paper?

3  A.  Not with actually voting, just with putting the paper in,

4  or stopping it from eating the paper incorrectly.

5  Q.  Were you ultimately able to cast your vote?

6  A.  Yeah, I did.  It was -- I mean, I took so long my partner

7  was waiting outside for me.  He was actually concerned and

8  worried, you know.

9  Q.  Was it more difficult to vote in that election than it

10  would have been had you been able to have the assister of your

11  choice?

12  A.  Well, yeah.  It was made more difficult.

13  Q.  If your partner had been able to assist you, would you

14  have been able to vote without physical pain?

15  A.  Yeah, he could have just touched the screen, yeah.

16  Q.  So let's go forward in time.  Did you vote in the

17  November 2022 elections?

18  A.  Yes, I did.

19  Q.  And where did you vote in those elections?

20  A.  I voted at the University of Houston-Clear Lake.

21  Q.  Did your partner go with you to the polling place?

22  A.  Yes, he did.

23  Q.  And did you receive any assistance when you voted in that

24  election?

25  A.  So during that election when -- they had a remote but it

1  was placed snuggly in this plastic box and I wasn't able to

2  get it out on my own and so I raised my hand and a person came

3  and they lifted it out for me.  I had to wait a while for

4  that.

5      And then when I started voting, the highlight indicator,

6  because you were using a remote, that would hover over your

7  selection choice, was the thin blue line that matched the blue

8  of the selection options.

9      And so when you had thought you chose the option and you

10 clicked on it, because it was difficult to discern, and you

11 thought you had it and you didn't, and so then it would jump

12 back to the language option screen, but initially I didn't

13 really understand what was going on and I thought the machine

14 was malfunctioning and so that went on a few times, and —

15 Q.  Did you ask for assistance because of that?

16 A.  Yes.  Finally, I did ask for assistance and —

17 Q.  Did you receive assistance?

18 A.  Well, I don't know what you mean by "assistance," but a

19 poll worker came up and he was very nice.  I don't want to say

20 anything about the — but they just didn't have any experience

21 with the remotes, even though they knew about them, and he

22 really didn't understand what I was trying to explain to him

23 about what was happening.  He could see it happening but he

24 didn't, you know, understand.

25     And so, again, you know, I tried and it was going back to

3246
JODI LYDIA NUNEZ LANDRY – DIRECT

1  the language option part and he didn't understand, and then
2  two other people came up and —
3  Q.  Do you know who they were?
4  A.  No.  I hope they were poll workers but I don't know who
5  they were.  I knew he was because when I had first gotten in I
6  had seen him and he had a tag, but I'm not sure who the other
7  people were and that made me really nervous and so they all
8  voted with me, much to my chagrin and frustration, but I mean
9  eventually I just figured it out because even though they
10  stood there they couldn't really understand what was going on.
11  Q.  Would you have preferred to vote without those three
12  people there with you?
13  A.  Yes, I would very much have preferred to have some
14  relative amount of privacy.  I think if my partner could have
15  been there, and he's really good with technology, but
16  regardless of that, he could have touched the screen and it
17  would have all been rather effortless.
18      And I was there so long that, you know, other people were
19  waiting to use the polling machines.  And, again, my partner,
20  who was waiting in the atrium, and he's like, what happened,
21  are you okay.  But I was really mad when I got out that time.
22  I was very, very angry.
23  Q.  Did you ask your partner to provide you assistance when
24  the machine was malfunctioning or at any point in time before
25  that?

3247
JODI LYDIA NUNEZ LANDRY - DIRECT

1   A.  No, I didn't because of the provisions in SB 1.  I just

2   don't want to put him in jeopardy.  I don't want to lose

3   having someone help me.  I don't want to raise — I don't want

4   to draw any attention to myself.  I don't want people to think

5   that, you know, I'm being coerced or whatever, you know, the

6   common assumptions tend to be about disabled people.

7   Q.  And just so I understand, because there was a technology

8   issue with the remote or the selection outline, how would your

9   partner have been able to help with that?

10  A.  Well, I mean, that was only a problem if you used the

11  remote, otherwise, you would just touch your selection on the

12  screen which is pretty straightforward.

13  Q.  Were you ultimately able to cast your vote in that

14  election?

15  A.  Yes, I was, but it took a really long time.

16  Q.  Was it more difficult than if your partner had been able

17  to help you?

18  A.  Yeah.  I wouldn't have had, you know — it felt like we

19  were having a tea party at the —

20  Q.  I would like to go through a few specific portions now of

21  SB 1, if that's okay.

22      Derek, could you please pull up the exhibit marked as HAUL

23  MFV 089.

24      Miss Nunez Landry, do you see the exhibit?

25  A.  Yes, I do.

JODI LYDIA NUNEZ LANDRY - DIRECT

1  Q.  Do you recognize what this is?

2  A.  Yes, I do.

3  Q.  So I'm going to read a line and then ask you a few

4  questions about that.  So the first line states, "I swear or

5  affirm under penalty of perjury that the voter I am assisting

6  represented to me that they are eligible to receive

7  assistance."  What does that line mean to you?

8  A.  This is very confusing to people, and when I've been

9  registered people to vote or just providing, you know,

10 information, no one really quite understands what eligible

11 means, what requirements make them eligible.

12      You know, so, for instance, when I was at the Disabilities

13 Expo I had people come up in walkers, or, you know, disabled

14 people, but some people think that, you know, you have to have

15 a doctor's note, or they think that that means they have to be

16 disabled like under SSDI.

17      You know, there's just not everybody is a disability

18 theorist, and what constitutes disability is a very complex

19 issue and, you know, the average person doesn't really know

20 what that means.  And, to me, like, for instance, as an

21 ombudsman -- when I was an ombudsman, I'm sorry -- you might

22 have people very nervous about helping someone if they don't

23 know what eligible for assistance means .

24      For instance, when I was an ombudsman there were a lot of

25 people that don't think they have a disability.  They will say

3249
JODI LYDIA NUNEZ LANDRY - DIRECT

1  something like, well, I'm just old, you know, or -- so to me

2  it almost makes it like people may be afraid to assist

3  someone --

4  Q.  Is it possible that someone could be eligible for

5  assistance and not know that?

6  A.  Well, yeah.  I've come across that.  You know, like people

7  thinking that to be disabled means that, you know, you are

8  eligible to receive SSDI or something like that.

9  Q.  Has the State or Harris County provided any guidance to

10  you or guidance that you know of on what that provision means?

11  A.  I haven't seen anything.  Not that I'm aware of, and, you

12  know, I've been on the phone with the Harris County Elections

13  Office.  I mean, but as far as, you know, the Secretary of

14  State's side or the Texas side, I have not seen anything.

15  Q.  Okay.  Let's move on to the second line starting in the

16  middle.  It states, "I did not pressure or coerce the voter

17  into choosing me to provide assistance."  Do you see that?

18  A.  Yes.

19  Q.  Can you explain to me what that means to you.

20  A.  I think, you know, it's sort of similar to what I said

21  about, you know, the one before that is -- well, I mean, what

22  does pressure or coerce mean in this context?  And I think

23  especially if people, you know, are under penalty of perjury

24  they may be afraid, and for so many of us who don't have

25  options on who is going to help us, is that coercion?  Is that

*Gigi Simcox, RMR, CRR*

3250
JODI LYDIA NUNEZ LANDRY - DIRECT

1  pressure?  I just think there is going to be so much confusion
2  that my fear is that people will be too afraid to help us.
3  Q.  You said there were a lot of us who don't have a choice as
4  to who help us, have you experienced a situation like that?
5  A.  You mean with disabled people having a difficult time
6  receiving community assistance?
7  Q.  Sure.
8  A.  Yeah.  That's like our reality.  That's every day.  People
9  can't maintain care attendants.  Sometimes some of my friends
10  say, I just hire one and they leave, and that in itself is a
11  full-time job.  I have friends who have master's degrees that
12  really want to work but that just keeps them from having, you
13  know, steady gainful employment because we depend on them for
14  everything.
15  Q.  In your experience as a long-term care ombudsman did you
16  ever encounter a situation where people were offered the
17  assistance of one person or they could refuse and receive no
18  assistance?
19  A.  Your average Texas nursing facility that is dangerously
20  understaffed, you'll be lucky if you get someone who can get
21  you out of bed and so, you know, it's slim pickings with that.
22      And, you know, depending on someone's disability type, you
23  know, if maybe they are not getting along with an attendant in
24  a nursing facility, I think maybe some CNAs or even ombudsman
25  might be a little bit worried about providing that under this

1  law, you know, if someone were to feel pressure or coerced

2  about it.

3  Q.  Can you explain what a CNA is?  I'm sorry.

4  A.  A CAN in a nursing home is a certified nursing assistant.

5  Q.  Thank you.

6  A.  And sometimes there's a revolving door between certified

7  nursing attendants — assistants and personal community

8  attendants, they sometimes work in both realms.

9  Q.  Now, with regard to this second line that we discussed,

10 has the State or Harris County provided any guidance to you or

11 guidance that you've seen on what this means?

12 A.  No, I haven't seen anything like that and I would be

13 interested in having a clarification written so we don't have

14 people not helping us or afraid to put other people in

15 jeopardy.

16 Q.  Let's move on to the third line starting at the far

17 right-hand side.  It states, "I understand that if assistance

18 is provided to a voter who is not eligible for assistance, the

19 voter's ballot may not be counted."

20      Can you explain what that means to you?

21 A.  Like I said before, most people really don't understand

22 what constitutes disability and eligibility and without any,

23 you know, very explicit guidelines about what that means, you

24 are going to have a lot of people who are afraid to do that

25 because they wouldn't want to disenfranchise someone.

1    I think there are a lot of ombudsman that would be worried

2  about that.  I mean, I have had instances where I spoke -- I

3  don't want to disparage the ombudsman program, they are

4  wonderful people and we really need them -- but there were

5  times where I would try to explain to like an ombudsman

6  supervisor, this falls under the ADA or something.  And they

7  are like the ADA, this doesn't have anything to do with

8  disability.  And I am like, yes, they are disabled people

9  living in a facility because oftentimes people just think,

10  well, this is just old age, and so they don't think of it in

11  terms of disability rights or in that context.

12  Q.  Has the State or Harris County provided any guidance to

13  you or guidance that you have seen on what this provision

14  means?

15  A.  No, they haven't.  And, again, I would be very interested

16  in that.

17  Q.  Have you ever represented to your partner that you are,

18  quote, "eligible for assistance?"

19  A.  No, I've never explicitly told him that I was eligible for

20  assistance.

21  Q.  What do you think could happen to your vote, if he took

22  this oath and you didn't say that to him?

23  A.  Well, just my ballot may not be counted.

24  Q.  How would that make you feel?

25  A.  To not have my ballot counted?  It seems very undemocratic

1  and I would feel disenfranchised and probably like I was a

2  second-class citizen.

3  Q.  Based on your experience, so personally, professionally,

4  what do you think are the resulting consequences of these

5  three provisions taken together?

6  A.  I think that there are going to be a lot of disabled

7  people who are going to have difficulties finding people to

8  assist them with voting.  I think a lot of people may not be

9  able to vote.  I think things are already difficult as it is

10  and this just layers on the difficulty and I fear that people

11  will not go and vote and they will be afraid to vote.

12  Q.  Are there any other activities in your life for which you

13  are too afraid to ask your partner to assist you?

14  A.  I mean, the only time something like that happens is like

15  here in the courthouse.  He had -- occasionally he will have

16  to go into the women's restroom with me and that's

17  uncomfortable.  I mean, you know, people may take it the wrong

18  way or something, but not anything else I could really think

19  of.

20  Q.  As it stands now will SB 1 affect how you vote in the next

21  election?

22  A.  Well, probably, yeah, because I'm anticipating the same

23  issue with the remote as I had before and that just makes

24  everything more difficult and -- yeah.

25  Q.  Is your disability going to get any better?

3254

JODI LYDIA NUNEZ LANDRY – DIRECT

1  A.  No, it's progressive and it's at a threshold now where

2  it's in overdrive and so prior to the pandemic I was, you

3  know, able to drive and even, you know, get myself up out of a

4  chair to transfer and I can't lift my hands to do my hair

5  anymore.

6  Q.  What do you want to see happen as a result of this

7  lawsuit?

8  A.  I believe strongly in democracy and everyone who is

9  eligible having, you know, equal opportunity to choose who is

10  going to represent us.  I think, you know, it's why people say

11  they are patriotic, why they say the pledge, why my father

12  went, you know, to World War II and trudged through the

13  jungles.

14      I don't understand if people believe in our stated

15  democratic principles why you would want to make it more

16  arduous for older and disabled people to vote.  It's

17  inscrutable to me.  I just can't — I don't understand that at

18  all, and without any evidence of widespread fraud in our

19  elections, to me, it seems like if you really want to have

20  integrity of a — in our elections that you need to make it

21  accessible for all eligible people.  I feel like there's

22  something fundamentally wrong with trying to prevent people to

23  vote.

24  Q.  Just a few more questions.  Have you ever called anywhere

25  to get guidance on SB 1's provisions?

1  A.  Yes.  Yeah, I have.

2  Q.  Where have you called?

3  A.  I keep these numbers with me at all times and I give them

4  to people.  I've called the Harris County Elections Office and

5  spoke to the ADA person there right after I left the polling

6  location and I was not at all happy.

7      I have called Disability Rights Texas and sent emails to

8  them.

9      I have called the Department of Justice.  I filed

10  complaint with the Department of Justice.

11      I've called friends who seem a little bit more politically

12  astute than I am.  Yeah.

13  Q.  Why did you make these calls generally?

14  A.  Because of all the problems that I encountered and when a

15  polling location prior to some of the problems I had witnessed

16  then there were older people who couldn't stand up anymore in

17  that election and they were leaving and I insisted that I be

18  let in to speak to someone so they could go in and vote.

19  Q.  Do you know the terms reasonable accommodation and

20  reasonable modification?

21  A.  I think I have a pretty good understanding of it.  I

22  couldn't give you like a legal definition.

23  Q.  I'm not asking for that.  Could you just tell us what they

24  mean to you?

25  A.  Well, I mean, it usually means a physical modification to

JODI LYDIA NUNEZ LANDRY - DIRECT

1  the environment or a policy enhancement of some type.  It

2  could mean assistive or communication types of technology, you

3  know, having a personal attendant assist you.

4  Q.  Did you, in either the March 2022 or November 2022

5  elections, request a reasonable accommodation or reasonable

6  modification with regard to the voting process?

7  A.  While I was actually at the polling location.

8  Q.  Yes, or before.

9  A.  I mean, I asked for — I don't really include that as a —

10  so much as a — I mean, any type of modification because

11  something was up with the paper feed because my partner had a

12  problem with that and he does not have a disability.  You

13  know, maybe just I've — afterwards I have complained about

14  things.

15  Q.  Did you ever ask that you be allowed to vote in a way that

16  was different from SB 1 or the election code?

17  A.  I would have liked to have had my partner assist me but I

18  knew under SB 1 that we were going to have to go through all

19  sorts of difficulties to do that, and, like I said to you

20  earlier, I don't — I didn't want to put him through that.

21      I'm really afraid of losing assistance and not having

22  anyone, and also I don't want to draw more attention to

23  myself.  Where I live, it's very politically volatile right

24  now and that makes me very nervous drawing attention to

25  myself.

3257
JODI LYDIA NUNEZ LANDRY - CROSS

1  Q.  Did you ever request that your partner be able to give you
2  assistance without taking the oath?
3  A.  I didn't really think that was an option.  I didn't know,
4  so, no.
5          MR. CROMLEY:  Pass the witness, Your Honor.
6          THE COURT:  Anything else on this side?
7          Your cross.
8                    CROSS-EXAMINATION
9  BY MR. KERCHER:
10 Q.  Morning, Miss Nunez Landry.  Thank you for being here this
11 morning.  I think you said at the outset of your testimony
12 that you're nervous, you're doing great.
13    My name is Ryan Kercher.  I work for the Attorney
14 General's Office.  I want to ask you a few questions about
15 what you talked about on direct and we'll get you on your way,
16 okay.
17    I wanted to talk to you about some of the things that you
18 testified you had experience with folks being confused about,
19 and I think thought that on direct you said that something you
20 learned that some people in the disabled community were
21 confused about was the difference between drive-thru voting
22 and curbside voting, is that right?
23 A.  Yes.  Many people thought that they were ineligible.
24 Q.  And I think I heard you, but you said many people thought
25 they were the same thing, is that right?

*Gigi Simcox, RMR, CRR*

3258
JODI LYDIA NUNEZ LANDRY — CROSS

1  A.  Yes.

2  Q.  You also talked about and this was in a little bit

3  different context but I think you talked about how there were

4  numerous constitutional — proposed constitutional amendments

5  coming up, is that right?

6  A.  Um-hum.

7  Q.  I'm sorry, is that a "yes?"

8  A.  That there are 14 proposed constitutional amendments

9  coming up?

10  Q.  Yes, ma'am.

11  A.  Yes.

12  Q.  And the reason — I'm not trying to pick on you, but if

13  you say um-hum, it's harder for us to figure out what you

14  meant when we're reading the transcript later, so I may ask

15  you for a yes or no, okay?

16  A.  Okay.

17  Q.  Thank you for answering out loud.

18      You talked about on direct with those numerous

19  constitutional amendments coming up, I think you said

20  sometimes the language can be confusing, right?

21  A.  Yes.  That's why I like to look up the amendments.

22  Q.  And so if that language doesn't immediately make sense to

23  you, you will go and try and educate yourself to get a better

24  understanding of what the proposed law or constitutional

25  amendment is, is that right?

1  A.  Generally speaking, yes.

2  Q.  Let's talk now a little bit about your experience in the

3  March 2022 Primary Election, okay?

4  A.  Okay.

5  Q.  I understand that once you got to the polling location you

6  had trouble reaching the touch screen, did I hear that right?

7  A.  Yes.

8  Q.  And then you had trouble inserting the paper ballot,

9  right?

10  A.  First there was problems inserting the paper into the

11  machine.

12  Q.  I have had that same problem.  But you were able to get

13  help from a poll worker, is that right?

14  A.  With the paper.

15  Q.  Is that right?  Somebody did help you get the paper

16  inserted, is that right?

17  A.  Yes.  Well, she stopped the machine and then helped me

18  with the paper.

19  Q.  Okay.  And I understand that because of your concerns

20  about SB 1 you chose not to ask for your partner's assistance

21  in that election, did I hear that right?

22  A.  I'm not really sure what you mean by "chose," in that

23  context.

24  Q.  Well, let me see if I can ask it a little bit differently.

25     You did not ask your partner for his assistance in voting

1  in the March 2022 Primary, is that right?

2  A.  I was too afraid to ask his assistance.

3  Q.  It's not the case, right, that someone stopped him from

4  assisting you, is that true?  Nobody said, hey, you can't help

5  her?

6  A.  You mean someone at the polling location?

7  Q.  That's right.

8  A.  Well, I mean, I think that there are implications with SB

9  1 that make it very burdensome and frightening for many of us

10  to risk losing attendants or putting them in some type of

11  legal jeopardy.

12  Q.  And I understand that you have concerns about what might

13  happen, but I want to bring you back to my question, which was

14  about what you actually experienced.  And no one has prevented

15  your partner at a polling location from providing you

16  assistance, is that fair?

17  A.  I wouldn't word it like that because I think that SB 1 has

18  implications and a chilling effect on us.  I mean, do you have

19  the exact wording of the bill name in SB 1, and if you do

20  could you read that to me?

21  Q.  You are asking to see the bill language, is that right?

22  A.  The title of the bill.

23  Q.  Do you need to see the bill language to tell me whether

24  someone at the polling location prevented your partner from

25  giving you assistance?

JODI LYDIA NUNEZ LANDRY - CROSS

1    A.  I think it has a chilling effect.

2    Q.  My question is whether anyone at a polling location has

3    ever prevented your partner from assisting you, and the answer

4    to that question is no, true?

5    A.  No one has physically prevented me.

6    Q.  If you were to ask your partner to provide you with

7    assistance at a polling location, is it your understanding

8    that he would do so?

9    A.  Yes.  I think so, yes.

10   Q.  Have you spoken with others in the disability community

11   who also require assistance at a polling location about

12   whether any of them have experienced their assister of choice

13   being prosecuted for providing them with assistance?

14   A.  I'm sorry.  So you're asking whether any of my friends or

15   people in the disability community who had their attendant of

16   their choice assist them, have any of them been prosecuted for

17   doing so?

18   Q.  That's right, yes, ma'am.

19   A.  I don't know that answer.

20   Q.  Are you aware of anyone who has been prosecuted for

21   providing the type of polling place assistance that you

22   require?

23   A.  I'm — okay, so has anyone been prosecuted for that?

24   Q.  Yes, ma'am.

25   A.  I have no idea.

JODI LYDIA NUNEZ LANDRY - CROSS

1  Q.  Are you aware of anyone's vote having not been counted as

2  a result of receiving the type of assistance you require?

3  A.  In what context exactly?

4  Q.  So when we looked at the assister oath earlier and you

5  expressed concerns that your vote might not be counted if you

6  received inappropriate assistance following SB 1, my question

7  is:  Are you aware of anyone's vote actually not counting as a

8  result of receiving the type of assistance you require?

9  A.  Well, I know I read recently that over 23,000 ballots were

10 discarded in Harris County, so there's that.

11 Q.  And I want to make sure I understand that answer.  When

12 you say you are aware of so many ballots being discarded, is

13 it your understanding that they were discarded because of the

14 assister oath, or just that they were discarded for some other

15 reason?

16 A.  I think the reasons were myriad.  I'm not exactly sure.

17 Q.  You talked about the oath of assistance and you were

18 concerned about the pressure and coerce language in that oath,

19 do you remember that?  Is that a yes?

20 A.  You are asking whether I'm concerned about what

21 constitutes pressure and coercion under SB 1?

22 Q.  Yes, ma'am.

23 A.  Yes, I am concerned about what precisely constitutes that.

24 It's not been made explicit.

25 Q.  And you said that you were worried and we talked about

JODI LYDIA NUNEZ LANDRY - CROSS

1  this on cross-examination as well, you were worried that that
2  language would have a chilling effect such that people would
3  cease providing assistance, right?
4  A.  Yes.  I think it does have that possibility.
5  Q.  That was not your experience, though, in the November 2022
6  Election when you had the opposite problem, right, too many
7  people assisting?
8  A.  Well, first of all, the other two people, whom I have no
9  idea who they were, I did not ask their assistance and they
10 were just there.
11 Q.  Well, I understand that their help may have been
12 unwelcome.  I guess my point is —
13 A.  Well, there was no help.  They just watched me vote and I
14 had no privacy voting.
15 Q.  The oath of assistance did not prevent those people from
16 coming and trying to help, is that true?
17 A.  Well, first of all, I didn't really choose them to — I
18 don't know who those two people were.  One person was a poll
19 worker but I don't know about the other two people, but I
20 don't that that poll workers have to do the oath.
21 Q.  Did you ask the other two people to leave?
22 A.  I think I made a slightly sardonic comment about not
23 having privacy and people watching me vote.  I was a little
24 agitated because I just don't understand why disabled people
25 couldn't be extended, you know, comparable rights of

JODI LYDIA NUNEZ LANDRY — CROSS

1  citizenship to do something so basic as vote in the United
2  States.
3  Q.  I think you said that you would be interested in getting
4  information from either Harris County or the State on what
5  some of those oath of assistance provisions mean, did I hear
6  that correctly?
7  A.  Yes, I would like a comprehensive explicit definition of
8  those things and I would be very interested in that and —
9  yeah.
10  Q.  Have you spoken with Harris County elections officials to
11  learn from them what their understanding of those provisions
12  is?
13  A.  After the November election I did call the ADA coordinator
14  and I did speak to them.  You know, that person was a lawyer
15  and I don't recall any substantive clarifying language about
16  that except to say that, you're good, you know, but this isn't
17  just about me.
18  Q.  Help me understand that part.  So you spoke with Harris
19  County's ADA administrator who told you, to use your words
20  just now, that "you're good," can you explain for the Court
21  what you mean by that?
22  A.  Okay.  So this happened in November so I can't precisely
23  verbatim recall exactly what she said —
24  Q.  Sure.
25  A.  — and I wouldn't want to misrepresent her, but the gist

JODI LYDIA NUNEZ LANDRY – CROSS

 1  of it was, you know, when I explained to her my disability,

 2  but that doesn't really do every other disabled person in

 3  Harris County much good.  Again, this isn't just about my

 4  voting.  It's about older and disabled people having the same

 5  rights to citizenship.

 6  Q.  And I understand that you have concerns about other folks

 7  with disabilities and their experiences but I want to hone in

 8  on yours.  And I'm not trying to pick on your memory.  I don't

 9  remember what happened to me in November of 2022, but I do

10  want to understand your testimony.

11      And as I understand it, you spoke to the Harris County ADA

12  administrator regarding your concerns about assistance in the

13  polling place, and after describing your disability and your

14  concerns, that Harris County ADA administrator told you that

15  you should not be concerned about receiving assistance, is

16  that a fair summary of your testimony?

17  A.  I can't recall what she said exactly.  I mean, mostly she

18  seemed to be focused on, you know, handling the problem with

19  the — trying to understand what I was trying to describe what

20  happened with the remote.

21  Q.  I understand that you don't recall what she said

22  specifically and I'm not asking that.  My question is whether

23  at the end of that phone call with the Harris County ADA

24  administrator it was your understanding from Harris County

25  that you could receive assistance as a disabled voter?

3266
JODI LYDIA NUNEZ LANDRY - CROSS

1  A.  Yes, I think so.

2  Q.  Have you had similar conversations with the Secretary of

3  State's Office?

4  A.  No.  I've been on their website.  I think one time I might

5  have filed — I don't remember when, something about voting

6  issues, but, I mean, have I called someone and spoken to them?

7  Q.  Yes, ma'am.

8  A.  So I guess all disabled people have to call the Secretary

9  of State to find out precisely whether we're eligible to vote

10 and whether we're pressured or coerced?  They are going to be

11 a very busy office I would think.

12 Q.  Well, I guess my thought is that any voter who has

13 concerns about how to interpret voting provisions that apply

14 to them may have resources available to them to learn about

15 those concerns and how they might be interpreted, which is why

16 my question to you is whether you had a phone call with

17 somebody at the Secretary of State's Office about your

18 concerns regarding voting provisions that apply to you, and do

19 I understand from your answer that you have not had that call

20 to the Secretary of State's Office?

21 A.  You know, after I have had difficulties voting I have

22 called and spoken to so many people that I really can't

23 remember everyone I called and spoken to, and it's quite

24 possible that I have but I can't really remember.

25 Q.  On direct examination you were asked a little bit about

3267

JODI LYDIA NUNEZ LANDRY - CROSS

1  asking for an accommodation before and during voting, and I
2  think I understood your answer to be that you did not request
3  an accommodation to vote, either before or during the
4  March 2022 or November 2022 elections, did I understand that
5  correctly?
6  A.  Well, when I went to vote, usually they see that I'm in a
7  power chair so they direct me to the accessible voting
8  machine, and so, um, I guess, you know, except for, you know,
9  asking for a remote or something, no.
10 Q.  And so when you go to a polling place and people can see
11 your chair, then it may be obvious to them that you may need
12 some assistance and they direct you to a particular voting
13 place, is that right?
14 A.  Yes.
15 Q.  Have you made any requests for accommodation to the
16 Secretary of State's Office that you can recall?
17 A.  Again, I've called so many people about issues that I
18 don't -- I think I've probably filled out something -- I don't
19 know.
20 Q.  And if you don't remember, that's a perfectly okay answer.
21 Nobody is going to get you in trouble for not remembering.
22     I'm going to ask you a similar question and if the answer
23 is the same, you don't remember, that's okay too.  I asked you
24 just a moment ago about whether you had requested an
25 accommodation from the Secretary of State's Office.  Now I'm

JODI LYDIA NUNEZ LANDRY — CROSS

1  going to ask you, have you ever, that you can recall,

2  requested an accommodation from the Office of the Attorney

3  General?

4  A.  I guess I like initially when I first started having

5  difficulties voting I was like calling everybody and sometimes

6  you would just fill out things on their website, so I really

7  can't remember everyone I tried to contact.  I mean, there

8  were times where I didn't receive a response back, so I just

9  can't.

10  Q.  So I think I understand your answer but I want to make

11  sure the record is clear.  You don't recall whether or not you

12  have requested an accommodation from the Attorney General's

13  Office, is that fair?

14  A.  I'm not sure.

15  Q.  Okay.

16          MR. KERCHER:  Thank you very much for your time

17  today.

18          Your Honor, I pass the witness.

19          THE COURT:  Anything else?

20          MR. NICHOLS:  Nothing.

21          Thank you, ma'am.

22          THE COURT:  Anything further?

23          MR. CROMLEY:  Yes, Your Honor.

24

25

JODI LYDIA NUNEZ LANDRY - REDIRECT

REDIRECT EXAMINATION

BY MR. CROMLEY:

Q.  Just a few questions, Miss Nunez Landry.  Mr. Kercher

asked you about your understanding of the 14 upcoming

amendments, right?

A.  I think so, yes.

Q.  Did you ever try to get a better understanding of SB 1?

A.  Yes, I have.  I — everyone has been so confused about it

and there's so much, even if you — there is a lot of

misinformation, and even if you read like media accounts of

it, and I'm talking about respectable sources.  I'm not like,

you know, getting information from Facebook or whatever.

    But so it seems like even journalists are kind of confused

about it because certain provisions have since been discarded

and some remain and so we — I spoke as a REV UP

representative, so many people were confused so I had spoken

to someone to see whether we could have, you know, a lawyer

come and talk to us about the provisions of SB 1.

Q.  When you say "us," who do you mean?

A.  Oh, I'm sorry.  Our monthly meetings for REV UP Texas, and

so we did have someone come and I was still kind of confused

afterwards and I think other people were.  Like I tend to

think that I have pretty good, you know, reading

comprehension.  So it's just very confusing.

Q.  You also spoke with Mr. Kercher about your concerns over

JODI LYDIA NUNEZ LANDRY - REDIRECT

1  the potential chilling effects of SB 1 and I want to clear

2  something up.  Are you concerned that SB 1 will prevent poll

3  workers from providing assistance?

4  A.  I'm not really concerned, I think with the poll workers so

5  much as like, you know, if we have family members or if

6  personal attendants, you know, or friends or whomever may help

7  us, or like, for instance, when I was an ombudsman, or, you

8  know, staff in a congregate facility.

9  Q.  So are you concerned that SB 1 could prevent someone's

10  chosen assister from assisting them?

11  A.  So because personal attendants, the wages are so low, a

12  lot of people, you know, may come from backgrounds where maybe

13  they have had a background with, you know, the criminal

14  justice system or maybe, you know, because of their

15  immigration status.

16        MR. NICHOLS:  Your Honor, I would object to

17  speculation at this point, speaking about other people's

18  situations.

19        THE COURT:  That's sustained.

20  BY MR. CROMLEY:

21  Q.  Miss Nunez Landry, my question is simply:  Are you

22  concerned that SB 1 would prevent — I'll move on.

23    You spoke with Mr. Kercher about your call to the ADA

24  administrator, correct?

25  A.  Yes.

JODI LYDIA NUNEZ LANDRY - REDIRECT

1  Q.  And that was a complaint after the election, not a request

2  for an accommodation, correct?

3  A.  Actually, as soon as I left the polling location I wasn't

4  even out of UHCL and I was calling them because of the

5  difficulties I had.

6  Q.  So is that a yes?

7  A.  That — I'm sorry.

8  Q.  Was that a yes that it was a complaint after the election,

9  not a request for an accommodation?

10  A.  It was a complaint after, yes.

11  Q.  And did the ADA coordinator tell you that you could waive

12  the oath requirements?

13  A.  I don't think so.  I don't want to misrepresent anything

14  she said but I don't really remember that, no.

15  Q.  Did the ADA coordinator — I'll move on.

16      You testified on direct that you didn't ask for a

17  modification to the — or a waiver to the oath because you

18  believed that wasn't an option.  In other words, do you think

19  that it would be futile to ask to have the oath waived?

20  A.  Do I think it would be futile to ask have the oath —

21  well, I certainly think there would probably be some type of

22  process involved with that.  I imagine the poll workers would

23  probably have to call a supervisor, and I just didn't believe

24  that that was an option or it was just going to be a very

25  complicated process.

3272
AMY LITZINGER - DIRECT

1  Q.  But you don't believe that anybody would actually waive

2  the oath requirement for you, correct?

3  A.  I don't know that they would know.  I don't think so, but

4  I have no idea.

5          MR. CROMLEY:  No further questions, Your Honor.

6          THE COURT:  Anything based on those?

7          MR. KERCHER:  No, Your Honor.

8          MR. NICHOLS:  No, sir.

9          THE COURT:  You may step down, ma'am.  I thank you.

10          Let's go ahead and take a morning break.

11      (Recess)

12          THE COURT:  Your next witness.

13          MR. BERKOWITZ:  Good morning, Your Honor.

14          Plaintiffs call Miss Amy Litzinger.

15          I am Eitan Berkowitz on behalf of HAUL and OCA

16  plaintiffs, and Miss Litzinger's testimony will speak to

17  Sections 502, 503, 506, 507, 510, 512, 603, 604, 605, and 607.

18          THE COURT:  Thank you.

19      (AMY LITZINGER, having been duly sworn, testified as

20  follows:)

21                      DIRECT EXAMINATION

22  BY MR. BERKOWITZ:

23  Q.  Good morning, Miss Litzinger.  Can you please state your

24  full name for the record.

25  A.  Amy Elizabeth Litzinger.

AMY LITZINGER – DIRECT

1  Q.  How old are you?

2  A.  I'm 35 years old.

3  Q.  And where do you live?

4  A.  I live in Austin, Texas.

5  Q.  Which county is that in?

6  A.  Travis County.

7  Q.  Who do you live with?

8  A.  I live with my parents currently.

9  Q.  Can you please describe your academic background?

10 A.  I have an undergrad degree in political science, English,

11 and comparative religion, and a master's degree in theology.

12 Q.  And what is your job?

13 A.  My job is a public policy specialist with a statewide

14 disability organization.

15 Q.  What does that role entail?

16 A.  I teach parents and self-advocates how to advocate at the

17 State Legislature.  I work with legislative staff to do mock

18 hearings.  Sometimes I also teach professionals, such as the

19 UT School of Nursing, how to do this.  I help parents and

20 families identify needs that might need legislation or agency

21 input, and then guide them through the process of getting new

22 legislation written.  I also am on many state agency

23 committees where I help with implementation of new

24 legislation.

25 Q.  Are you a member of The Arc of Texas?

AMY LITZINGER - DIRECT

1   A.   Yes.

2   Q.   How long have you been a member of The Arc of Texas?

3   A.   Since around 2004.

4   Q.   Can you describe, please, what membership in The Arc of

5   Texas entails for you and how you engage with the

6   organization?

7   A.   I often participate in their advocacy days and when they

8   are short on staff, and may also lead a group through the

9   Capitol in making office visits, and I also participate with

10  other members of The Arc and staff members on various

11  disability coalitions and state agency committees.

12  Q.   Why is it important to you to maintain membership in The

13  Arc of Texas?

14  A.   Because we're stronger in numbers and our voices are

15  stronger when we advocate together.

16  Q.   Are you a member of REV UP Texas?

17  A.   Yes.

18  Q.   How long have you been a member of REV UP Texas?

19  A.   At least five years.

20  Q.   And same question.  Can you just please describe what

21  membership for you entails in REV UP Texas.

22  A.   I educate other people with disabilities about their right

23  to vote and how they can vote accessibly.  I also help educate

24  candidates on disability issues and I've helped plan and

25  execute their disability issues forums and I've also done some

AMY LITZINGER - DIRECT

1  press conferences and they collaborated with the mixed-ability

2  dance team that I'm on called Body Shift to do a flash mob

3  about disability voting.

4  Q.  And why is it important to you to maintain membership in

5  REV UP Texas?

6  A.  Because if you don't vote and educate yourself, it's

7  harder to tell elected officials what you need because it's

8  much easier to do that through official channels, which is

9  voting.

10  Q.  Has your work with either organization ever involved

11  helping others register to vote?

12  A.  Yes.  I was a volunteer deputy registrar and I was trained

13  during a REV UP training for that but I am not currently a

14  voter deputy registrar.

15  Q.  Miss Litzinger, do you identify as a person with a

16  disability?

17  A.  Yes.

18  Q.  Could you please describe your disabilities.

19  A.  Well, my first disability is a visible one.  It's very

20  physical.  I have spastic quadriplegic Cerebral Palsy, which,

21  for me, means I have no sitting or standing balance.  I don't

22  walk.  I don't transfer myself, and I don't write with my

23  hands and I also don't drive a car because of startle reflex

24  and my orientation mobility difficulties.

25  Q.  Are there any other disabilities that you identify as

AMY LITZINGER - DIRECT

1  having?

2  A.  Yes.  I also have dysautonomia, which is new as a result

3  of some medical complications and that affects every system

4  that my brain would normally handle by itself without me

5  thinking about it, is not regulated well.  So temperature,

6  digestion, breathing, heart rate, for example.

7  Q.  Do these conditions impact your ability to move around?

8  A.  Yes.  As I said earlier, I don't transfer myself and I

9  don't drive and I use a power wheelchair, a tub lift, a Hoyer

10  lift, even to get around my house.  I can't push a manual

11  chair, but I own one.

12  Q.  And how much is your bodily movement restricted in your

13  wheelchair?

14  A.  Because I have no sitting or standing balance my

15  wheelchair has supports for me to remain upright, and I also

16  have contractures in my elbows, which means they don't

17  straighten all the way.

18  Q.  Can you always move the controller of your power chair?

19  A.  Depending on whether I've had medical injections to manage

20  spasticity or other changes in my muscle strength, I can't

21  always drive the chair but I can always swing the controller

22  out and back in by myself.

23  Q.  Do your disabilities impact your ability to travel by car

24  or use public transit?

25  A.  Because I am a quarter of a mile further than the

3277
AMY LITZINGER - DIRECT

1  three-quarter of a mile rule from a bus line, I'm not eligible
2  for paratransit from my address so I have to use my own
3  modified van that has a ramp that comes out of the floor.
4      It's very long so we need wider parking spaces.  I also
5  need the chair to be tied down because I can't transfer to a
6  regular seat and I use a chest clip in addition to my chair
7  seatbelt to provide the same function that a car seatbelt
8  would to keep me from coming forward if we stop in traffic or
9  if we're in an accident.
10 Q.  And because of this would you say that getting around is
11 time-consuming?
12 A.  Yes.  It's very time-consuming.  I have to find either a
13 member of the public or an attendant that is willing to drive
14 my van and everything has to be scheduled.  There are no
15 spontaneous trips.
16 Q.  Do your disabilities impact your ability to open doors or
17 move objects in your path out of the way?
18 A.  I cannot open doors myself unless I'm pushing out of them,
19 which only works one way.  And I can't lift anything heavier
20 than two pounds.  As you can see, I can't even lift most
21 glassware.  I have to use to-go cups or straws or plastic cups
22 with handles to drink out of.
23 Q.  And what about grasping objects or holding onto things?
24 A.  I only have grasp in my right hand, not my left, and even
25 that is not consistent, depending on when I have had Botox

AMY LITZINGER — DIRECT

1  lately, so my grip changes depending on the day.

2  Q.  Are you able to write for long periods of time?

3  A.  No, and even when I write my signature, it's uneven and

4  illegible so the only reason I'm able to use my signature

5  myself is that the form usually already has my name on it so

6  they can interpret it.

7  Q.  You mentioned temperature regulation related to your

8  dysautonomia.  Are you able to be in periods of extended hot

9  or cold for a long time?

10 A.  No.  It will raise my heart rate and affect other issues

11 in my body.  If it's not controlled, it can have really dire

12 consequences to the rest of my body.

13 Q.  And can you use the restroom without assistance?

14 A.  No.  As I said earlier, I don't transfer anywhere by

15 myself so if I have to use a toilet then I need to be

16 transferred by someone who knows how to do that.

17     And I recently had a surgery that allows me to catheterize

18 in my chair, but, again, I don't have the dexterity to be able

19 to use both hands to do it myself so someone needs to assist

20 me with that, although it's slightly easier than the full

21 bathroom transfer.

22 Q.  Do you —

23 A.  The other part of that is that because I'm catheterizing

24 we have to keep it as sterile as we can to avoid further

25 infection, besides my colonized infection, so it's not

3279

AMY LITZINGER - DIRECT

1  something that I would ask anyone off the street to help me
2  with.
3  Q.  And do these — do your disabilities impact your daily
4  activities in the same predictable way every day or is there
5  variation?
6  A.  With my CP there is less variation but there is still
7  variation in my spasticity, but the dysautonomia is definitely
8  much more variable than I'm used to with my CP.  So it's fair
9  to say that I can't always predict what my body is going to
10 allow me to do.
11 Q.  And because of everything you've just described, do you
12 need assistance with your daily activities?
13 A.  Yes.
14 Q.  And that's a need you have every day?
15 A.  Yes.
16 Q.  Which physical daily activities — which daily activities
17 are physically difficult for you, due to your disability that
18 require assistance?
19 A.  Transferring in and out of bed, or to shower, or restroom,
20 dressing, bathing, brushing my hair.  I don't cook.  I do feed
21 myself but I need someone to set up the food for me and cut it
22 into bite-size pieces.
23     I also can't do any housekeeping.  I don't drive, as we've
24 already said.  I have issues with directionality, even in a
25 place that I've been before.

3280

AMY LITZINGER – DIRECT

1      I don't write.  I use dictation software which I need

2   someone to set up.  So there aren't a lot of physical tasks

3   that I can do myself.  The most that I can do consistently is

4   to verbally direct my care.

5   Q.  Who typically provides you this assistance?

6   A.  I have a state Medicaid waiver which is a waiver off of

7   institutional living and I qualify under the CLASS program,

8   which is Community Living and Support Services.  It's for

9   people mostly with physical disabilities and I'm on the CVS

10  option, which stands for Consumer Directed Services where I

11  can interview, hire, and train my own people and direct them

12  myself.

13  Q.  And who do you intend to hire as your personal care

14  attendants?

15  A.  Because of the low wages and also because they tend to be

16  more understanding about disability, the people that I hire

17  tend to be from other marginalized groups or have disabilities

18  themselves.

19  Q.  And how important to you is the relationship that you have

20  with your personal care attendants?

21  A.  It's very important.  I value mutual respect and I

22  understand that this is a difficult job and it would be very

23  hard to trust someone with basically my health and safety and

24  access to my body and my entire life, if that relationship

25  were somehow put on shaky ground.

AMY LITZINGER - DIRECT

1  Q.  Would you say that the job of assisting you is something

2  that you can easily swap in, anyone can sort of swap in and

3  take care of, or that you rely on someone you know to do the

4  job?

5  A.  Definitely someone I know.  It takes more than two months

6  to safely train somebody to transfer me out of my chair

7  because of my balance issues, so this isn't something that I

8  could ask someone off the street or even someone who had, you

9  know, basic, all disabilities training to do.

10     There are several things that my attendants do for me that

11  not only would I not be comfortable but I don't think they

12  would be comfortable either.

13  Q.  I would like to talk now about your general voting process

14  and history.  Are you registered to vote Miss Litzinger?

15  A.  Yes.

16  Q.  In which county?

17  A.  Travis.

18  Q.  How long have you been registered to vote there?

19  A.  Since I turned 18, at the same address.  I haven't moved.

20  Q.  Are you a regular voter?

21  A.  Yes.

22  Q.  And do you vote in every election?

23  A.  I attempt to vote in every election, yes.  Even Primaries.

24  Q.  How many elections have you voted in since 2020?

25  A.  I would say probably four combined between in-person

AMY LITZINGER - DIRECT

1  voting and mail-in voting.

2  Q.  Is voting important to you?

3  A.  It's very important to me.

4  Q.  Why is that?

5  A.  Because I think people should know what I think and that's

6  the most concrete way to show your elected officials and your

7  candidates what's important to you.

8  Q.  Are you eligible to vote by mail?

9  A.  Yes.

10 Q.  On what basis?

11 A.  On the basis of my physical disability.

12 Q.  Since when have you been eligible to vote by mail?

13 A.  From the beginning of my voting history.

14 Q.  And how do you prefer to vote, by mail or in person?

15 A.  I prefer to vote in person.

16 Q.  Why is that?

17 A.  I prefer to vote in person because, as I said earlier, my

18 dexterity varies so every time I sign my name it's going to

19 look different, so the idea of having to come in to dispute a

20 signature sort of defeats the purpose of voting by mail for

21 me.

22     Plus, I think it's important that members of the public

23 see us voting so that they know that we are participating and

24 that we know that our vote is important.

25 Q.  And although you have a preference, is it important to you

3283

AMY LITZINGER - DIRECT

1  that you have an option to utilize another method of voting,
2  if you decide to?
3  A.  Yes.  Whether I like it or not, there are days where my
4  disability is going to limit my ability to vote in person and
5  I would definitely still want the vote by mail option so that
6  I don't disenfranchise myself by not giving myself that
7  opportunity when it's needed.
8  Q.  And could something related to your disability arise that
9  could force you to change a voting plan at the last minute on
10 Election Day?
11 A.  Yes.  I could have an attendant not be available to drive
12 me or assist me in getting to the polling place.  I could be
13 in a dysautonomia flare which could affect any number of
14 things.
15      There could be a weather issue, or in the case of when I
16 started voting by mail there could be a spike in COVID-19
17 cases in my area and several of my disability issues can
18 complicate my ability to fight off infection so I would like
19 to avoid COVID at all costs.
20      And in order to understand how SB 1 has impacted your
21 ability to vote, I just want to briefly discuss your typical
22 process for voting.
23 Q.  When you prepare to vote as far as educating yourself
24 about what's on the ballot, how do you typically go about
25 that?

1  A.  Well, I am a part of the League of Women Voters and I
2  really like their website because they provide unbiased
3  nonpartisan write-ups of all of the issues after they have
4  each candidate answer what their own platform is.
5      And what I really like about their website is that after
6  you do that they have -- I guess, it's a platform where you
7  can basically do a mock-up of your ballot based on what you
8  read.  You can choose your candidates for each position and
9  then print it out.  So I could do all of that without having
10 to involve my attendants or assisters in any way so I can make
11 my own choices.
12 Q.  And let's discuss the process of when you vote in person
13 of what that looks like.  So do you need assistance in order
14 to vote?
15 A.  Yes.
16 Q.  And starting with transportation to the polls what
17 assistance do you need in order to get there?
18 A.  Well, as I've said, I need someone to drive my accessible
19 van.  So they grab the keys.  I grab my notes for voting and
20 my ID.
21     We put the chest strap on.  We pull the ramp out.  I drive
22 in.  They tie down all four points of the chair.  We put my
23 head rest on.  I give them the address of the polling place.
24 They type it in and we go there.
25     And then when we get to the polling place we have to find

AMY LITZINGER - DIRECT

1  a van accessible parking space with enough area to let the
2  ramp out.  And if we don't, then I have to do curbside voting.
3  Q.  And then once you're at the polling place, what assistance
4  do you need in order to vote?
5  A.  We untie the chair and get the ramp down, or they might
6  have to go inside for me and request the curbside voting if
7  there's not a phone number to call.  And then I have them get
8  out my ID so that I can hand it at the desk and they have to
9  open doors and make sure there's not any chairs in the way.
10 Q.  And what happens once you check in at the front desk or
11 with the poll worker who is managing the --
12 A.  Right.  Well, we make sure they see my IDs and I sign in
13 and then I would go to the accessible voting booth because
14 it's generally lower than the other voting booths are.
15 Q.  Does your assister need to provide any assistance in order
16 for you to actually cast your ballot?
17 A.  Some days, depending on my spasticity, they may have to
18 put the Scantron in the slot in the machine for me.  Sometimes
19 I can do it myself.
20     They don't need to provide any assistance actually
21 choosing on the touchscreen, but then when I'm finished they
22 may have to put the finished ballot in the ballot box
23 depending on how high of an area they have put it in.
24 Q.  And once the whole process is done, does your assister
25 need to provide all the steps you mentioned earlier regarding

3286

AMY LITZINGER - DIRECT

1  transportation in reverse?

2  A.  Yes.

3  Q.  Are there any examples of where your nonvisible disability

4  could present issues, when going to vote in person?

5  A.  Yes.  Depending on how long we have to wait outside, if

6  there is an extreme temperature it could affect my heart rate.

7  I'll need access to water, if it has gone really high or

8  really low.  There may be instances where I need extra

9  restroom trips, in which case I would need someone to transfer

10 me safely in an accessible restroom.

11 Q.  And when it comes to providing all of this assistance that

12 you just described, would you be comfortable having a poll

13 worker provide you this help rather than a personal care

14 attendant?

15 A.  No, especially issues where these people would have to

16 interact with intimate parts of my body because I don't have

17 the dexterity to take off my chest strap, or lots of dexterity

18 issues come up in the restroom as well.  So there are many

19 reasons why probably neither party in this situation of a poll

20 worker helping would be comfortable in those kinds of

21 situations.

22 Q.  And even aside from what you just mentioned, would you

23 want to take the time while you are going to vote to explain

24 to a poll worker about your disabilities and what assistance

25 you might need?

AMY LITZINGER - DIRECT

1  A.  No.  It would definitely make everything take longer, and

2  with the — especially the issue with transferring, it may

3  present a safety issue to both of us, if I would have someone

4  untrained.

5  Q.  Now, before SB 1 did you ever have trouble receiving any

6  assistance you may need from poll workers?

7  A.  I have had several instances where poll workers seemed

8  like they were trained in other disabilities, or that all

9  disabilities need the same kind of help, but no one refused to

10 help me.  They were just confused as to what I might need.

11 Q.  So did that confusion before SB 1 ever threaten your

12 ability to ultimately cast your ballot?

13 A.  No.

14 Q.  I now just want to very briefly discuss the same topic,

15 the assistance you need to vote regarding the vote—by—mail

16 process.  At any time prior to SB 1 have you voted by mail?

17 A.  Yes.

18 Q.  And when was that?

19 A.  That was during the 2020 elections.

20 Q.  And what assistance do you require in general when you

21 vote by mail?

22 A.  Well, this is the same for when I open any mail.  I need

23 someone to open the envelope and get whatever is in the

24 envelope out for me and unfolded.  I also, assuming I'm going

25 to need to write on whatever is in the envelope, I need papers

AMY LITZINGER - DIRECT

1   to be held down or taped down for me, even if I'm the one

2   filling it out.  Again, I can write my signature legibly but

3   anything that requires me to write more than my signature or

4   anything that has the need to be legible, like numbers, for

5   example, I would have my attendant help me with.

6   Q.  Do you anticipate that you may want to or need to vote by

7   mail again in the future?

8   A.  Yes.

9   Q.  And as regards either voting method, by mail or in person,

10  how are you able to ensure that the ballot you submit

11  ultimately reflects your preference?

12  A.  I make sure that no one is in possession of my vote

13  without me there.

14  Q.  And so, in your opinion, are these processes of receiving

15  assistance that you just described sufficient to ensure that

16  you vote the way you intend to every time?

17  A.  Yes.

18  Q.  I'd like to turn now to the impact of SB 1 on your voting

19  history.  Since 2021 how many elections have you voted in?

20  A.  At least four.

21  Q.  How many of those were in person and how many by mail?

22  A.  One was by mail and the rest were in person.

23  Q.  Derek, can you please pull up HAUL Exhibit 89, which

24  should be the oath of assistance required.

25      Miss Litzinger, are you familiar with the assister oath

AMY LITZINGER - DIRECT

1  provision in SB 1?

2  A.  Yes.

3  Q.  And at the top of where this oath —— in the top line where

4  it says, "I swear or affirm under penalty of perjury that the

5  voter I am assisting represented to me that they are eligible

6  to receive assistance," do you think you should have to give a

7  statement of your eligibility as a condition of receiving

8  assistance?

9  A.  No, I don't think that is a fair assessment.

10  Q.  And before 2021 did you ever have difficulty getting an

11  attendant to help you vote?

12  A.  No.

13  Q.  Did you ever, before SB 1 was enacted, due to voting laws

14  in the state of Texas fail to get your assister of choice to

15  be the one to help you vote?

16  A.  No.

17  Q.  And since SB 1 have you faced barriers in getting the

18  assistance you need to vote?

19  A.  Yes.

20  Q.  In the May 2022 Primary you voted in person, is that

21  correct?

22  A.  Yes.

23  Q.  Can you please describe your experience voting in that

24  Primary?

25  A.  Yes.  It was fine, except for I forgot one of the steps to

AMY LITZINGER - DIRECT

1  get out of the car.  I forgot to undo the chest clip before I
2  got into the polling place, and it wasn't clear to me whether
3  or not that would be considered assistance with voting to ask
4  because it's not clear when the act of voting starts and
5  stops.
6      So I decided not to ask for assistance in unclipping it
7  because I had forgotten, so it was very, very difficult for me
8  to vote.  I'm lucky that I have a seat elevator on my chair
9  because I was able to elevate myself to mitigate the
10 restricted arm reach that I had with the chest clip on.
11 Q.  Do you recall approximately how long that ballot was in
12 that Primary Election?
13 A.  There were three questions.  I think there were five pages
14 that I had to swipe.
15 Q.  And was it difficult to complete those five pages, given
16 the struggles with the chest strap that you just described?
17 A.  Yeah.  In fact, it was actually quite painful.
18 Q.  Can you surmise what the impact would have been on your
19 ability to vote had that ballot been longer than five pages?
20 A.  I probably would have had the most extreme form of ballot
21 fatigue you have ever seen.  I probably wouldn't have finished
22 it.
23 Q.  Thank you, Derek.  You can take the exhibit down.
24     And turning to the November 2022 General Election, you
25 also voted in person at that time, is that correct?

3291
AMY LITZINGER - DIRECT

1  A.  Yes.

2  Q.  And in that election did you bring an attendant with you?

3  A.  Yes.

4  Q.  And did you have conversations with your attendant prior

5  to that election about them possibly taking the oath?

6  A.  Yes.  We had conversation at length about it.  We were

7  both nervous because we were unclear if the help I receive

8  would be included under the oath, and again when the process

9  of voting starts and stops.  So we decided together not to

10 have this person take the oath.

11 Q.  What, in particular, worried your attendant about taking

12 an oath, even though there might have been some confusion?

13 A.  We both stated that we were uncomfortable with the fact

14 that if I was found ineligible it would be a felony because a

15 felony might mean that they were no longer eligible to do

16 their job for me because it might affect their standing as an

17 attendant.

18 Q.  And in addition to having conversations about whether or

19 not the attendant would take the oath, did you and your

20 attendant also have conversations prior to voting about

21 whether or not she would provide assistance to you in the

22 polling place?

23 A.  We decided that although she would provide assistance in

24 getting to the polling place, that she would not provide

25 assistance to me once I was inside the building.

3292

AMY LITZINGER — DIRECT

1  Q.  And was that for similar reasons, the concern about a
2  possible felony?
3  A.  Yes.
4  Q.  Did you also ultimately get the help you needed to vote?
5  A.  No.
6  Q.  How did all of that impact your experience?
7  A.  Well, it was definitely slower than usual because I was
8  holding my own notes that I didn't even get to use because I
9  kept dropping them everywhere, and the other thing that was
10  different that I had never experienced before is the minute I
11  walked in with someone who did not look like we were related
12  to each other because she was of a different race, they
13  assumed that she was my assister and that she would be
14  assisting me and that she had to sign the oath simply by being
15  in the room and looking like she was with me, which had never
16  happened to me before.  Nobody had ever assumed that I had an
17  assister before.
18  Q.  And what was the emotional impact of having the poll
19  workers make that assumption and try to get your attendant to
20  take the oath?
21  A.  It was nerve-wracking for both of us.  The other reason
22  why we decided not to take the oath is this person doesn't
23  know me.  This person didn't know me very well at the time.
24  We hadn't talked about the full extent of my disability, so
25  that was difficult.

AMY LITZINGER - DIRECT

1       It was also difficult to have three people debating

2   whether I needed assistance the entire time I was voting.

3   Everything stopped except for people watching me, which was,

4   for something that was designed to keep my ballot private, I

5   didn't think like it was very private because everyone is

6   watching me vote and debating whether I'm self-sufficient or

7   not.

8   Q.  And I just want to be clear, the live debates you just

9   mentioned happening while you were voting, that was in

10  response — you had mentioned earlier your attendant did not

11  actually provide you assistance, so that was in response just

12  to your attendant's mere presence in the polling place?

13  A.  Right.

14  Q.  So would you say you ultimately were able to vote with the

15  same level of ease after SB 1 as before SB 1?

16  A.  No.

17  Q.  How many of your assisters have voiced to you that they

18  are uncomfortable taking the oath?

19  A.  All of them.

20  Q.  Have any of your attendants ultimately taken the oath?

21  A.  Not at this point, no.

22  Q.  Is that because you chose not to receive assistance from

23  them at the polling place due to these concerns you mentioned?

24  A.  Yes.

25  Q.  Do you think it's clear under the law, or is it clear to

3294

AMY LITZINGER - DIRECT

1  you whether you are eligible to receive assistance?

2  A.  It's not clear under the Texas law, no.

3  Q.  Do you feel comfortable representing to your attendant

4  that you qualify for assistance?

5  A.  I feel comfortable knowing that inherently I qualify but

6  because the law isn't clear and is open to interpretation

7  because of the severe penalties, even though it makes common

8  sense to me that I would qualify, I wouldn't feel comfortable

9  if that were disputed.

10 Q.  And what assistance do you need that your attendants have

11 refused to provide or been worried to provide because of the

12 oath?

13 A.  They are mostly comfortable providing transportation

14 because people who don't have disabilities might have a

15 transportation need in which they don't have to disclose

16 eligibility to receive what they have been uncomfortable

17 providing assistance once inside the polling place.

18 Q.  And how did it make you feel upon hearing that your

19 attendants were too frightened by the oath provision and

20 possible criminal liability to assist you with voting?

21 A.  Well, it made me feel like it's going to be harder to get

22 my vote to count and have my voice be heard, but it also made

23 me concerned that an attendant may refuse an entire shift

24 which means I wouldn't even get out of bed that day just

25 because I had informed them of my intention to vote.

3295

AMY LITZINGER – DIRECT

1  Q.  Just to be clear, you mean it left you concerned an
2  attendant might not come to work at all, if they know you plan
3  to vote that day?
4  A.  Right.
5  Q.  How would you describe the general atmosphere around
6  voting since SB 1 was enacted?
7  A.  Confused.  Even though I'm not a deputy registrar right
8  now, people have been asking me a lot of questions.
9  Q.  And can you describe the emotional condition of your
10  attendants when they — when you observed that they may have
11  to take this oath?
12  A.  People were very concerned.  Nobody has outright said no,
13  I can't help you, or I won't help you make sure that you can
14  go vote, but people were concerned about their own ability to
15  vote.  They were concerned about the potential penalties and
16  they were concerned about what types of help would fall under
17  the oath.
18  Q.  Would you generally describe your experiences getting help
19  from poll workers as smooth and easy?
20  A.  No.
21  Q.  Why not?
22  A.  In a lot of ways I feel like poll workers are trained in
23  pieces and they are more trained on technological ways to help
24  so they can vote independently, which is great, but if none of
25  those pieces of tech are what you need they don't really know

AMY LITZINGER - DIRECT

1  what to do if you say I don't need those or I need something
2  else, especially post-SB 1 because the response I get from the
3  majority of them is that makes sense that you need that and
4  maybe in another context I would but I don't know if I'm
5  allowed to do that under SB 1.
6  Q.  Do these experiences you've described since SB 1 impact
7  how or whether you will vote in the future?
8  A.  I'm definitely going to vote.  I don't think it's possible
9  to be as involved in politics and have all the knowledge that
10  I have and not vote.  That seems counterintuitive, but I'm
11  definitely going to have more conversations and more training
12  with my people and have to address a lot more confusion and
13  worry than I would before SB 1.
14  Q.  Despite the obstacles you've described, would you still
15  describe it as easier to vote in person rather than by mail?
16  A.  Yes.  It's definitely easier to vote in person because
17  then I don't — I know that my vote is more likely to be
18  counted and not thrown out for signatures or other related
19  issues.
20  Q.  Are you concerned that an attendant might manipulate how
21  you vote?
22  A.  No.
23  Q.  Why not?
24  A.  Because the type of assistance I need does not allow them
25  to have access to actually writing on my ballot without me

AMY LITZINGER – DIRECT

1  there.  I very rarely, if ever, have written any write-in

2  candidates, and even if I did I would make sure that my ballot

3  was always in sight of — in my sightline so that I can verify

4  that it wasn't being changed.

5  Q.  And so I assume, therefore, same answer with regards to

6  voter fraud, you're not concerned about voter fraud from an

7  attendant of yours?

8  A.  No.

9  Q.  Miss Litzinger, in your understanding, when you're voting

10  in person at what point in the process do the assister

11  provisions kick in?

12  A.  I don't know.

13  Q.  What specific activities does the oath apply to?

14  A.  I have no idea.

15  Q.  Derek, if we could please have HAUL MFV 297, which is the

16  carrier envelope for the application for a ballot by mail and

17  at the top of page 2.

18      Miss Litzinger, do you see in the box where it says

19  Instructions to the Voter — or I'm sorry — Instructions to

20  Assistant if Applicable, second one down?

21  A.  Yes.

22  Q.  Can you please read the highlighted portion?

23  A.  "A voter may only be assisted with reading or marking the

24  ballot if the voter has a physical disability that renders the

25  voter unable to write, or see, or has the inability to read

AMY LITZINGER - DIRECT

1  the language in which the ballot is written."

2  Q.  Is it your understanding from these instructions that when

3  you're voting by mail an assister would only be permitted to

4  assist you with reading or marking your ballot, if you were a

5  person with a disability who could not write or see?

6  A.  That is how I read this, yes.

7  Q.  Thank you, Derek.  We can take that down.

8      And, Miss Litzinger, is it clear to you at what point in

9  the vote-by-mail process the provisions impacting voter

10 assistance kick in?

11 A.  No.

12 Q.  Does your job as a public policy specialist entail

13 reading, would you say, significant amounts of legislation or

14 perhaps more than the average person?

15 A.  Yes.

16 Q.  And is it your testimony that despite this you're still

17 confused about the specific times the SB 1 assister provisions

18 kick in?

19 A.  Yes.

20 Q.  How have the voter assistance provisions in general, would

21 you say, just to say kind of summarize, impacted your ability

22 to vote?

23 A.  They have impacted my ability to be confident that my vote

24 will be counted and confident that I'm going to be able to

25 find someone to assist me and they have impacted my ability to

AMY LITZINGER – DIRECT

1  trust that poll workers are going to listen to me when I tell
2  them when I do and do not need assistance and what qualifies
3  as assistance.
4  Q.  Just a couple more questions, Miss Litzinger.  As regards
5  the voter ID requirements, you testified that since SB 1 was
6  enacted you have either primarily or exclusively voted in
7  person, is that correct?
8  A.  Yes.
9  Q.  And can you just remind us why that is?
10  A.  Because when I sign my signature on anything, not just an
11  envelope, on anything, because of my variations in spasticity
12  from not just day-to-day but hour-to-hour, my signature never
13  looks the same.  Ever.  And it's not going to look the same,
14  even if I try.
15      So the idea that my signature has to match the one on my
16  ID, which, by the way, isn't created in an accessible way
17  because it's very hard to roll up to the screen to sign on
18  your ID, and it's not something that would ever match the
19  environment in which I would be signing my name to vote or
20  anywhere else, that if my signature were disputed I would
21  still have to vote — I would still have to come in, in
22  person, to adjudicate my signature.
23  Q.  Do you have any concerns about the new voter ID
24  requirements?
25  A.  One of my big concerns is for those of us with a

3300
AMY LITZINGER - DIRECT

1  disability who don't drive it may be harder for us to obtain
2  the state ID.
3  Q.  And, lastly, just a couple questions about any notices you
4  have received as far as reasonable modifications you may be
5  entitled to.  Have you at any point received information from
6  the State or Travis County about your rights as a voter with
7  disabilities in any of the times that you have voted since
8  2021?
9  A.  No.
10 Q.  And, just to be clear, does that — that includes
11 information, nothing on a website, in the mail, or posted
12 signage at a polling place?
13 A.  Right.
14 Q.  And that includes receiving no information about how to
15 request a reasonable modification when voting, is that
16 correct?
17 A.  Right.
18 Q.  And also, similarly, that includes no information about
19 how you might file a grievance or a complaint if you have had
20 difficulty voting, is that correct?
21 A.  That I do know.
22 Q.  Have you received information about it since 2021?
23 A.  I haven't received any notification specifically in
24 regards to SB 1 but I have received information about how to
25 file a complaint and talk about your experience.

AMY LITZINGER – CROSS

1  Q.  Have you asked for a reasonable modification from the

2  county or the state?

3  A.  No.

4  Q.  Why not?

5  A.  Because it wasn't —— I wasn't clear on how to.

6  Q.  Did you ask for assistance from anyone else, such as a

7  disability advocacy group?

8  A.  All the advocacy groups that I ask that I'm a part of were

9  unclear about how to specifically address accommodations due

10  to SB 1.

11  Q.  So those organizations were similarly unable to provide

12  concrete answers to you about how SB 1 applies to voters with

13  disabilities?

14  A.  Right.

15        MR. BERKOWITZ:  Thank you very much, Miss Litzinger.

16        Your Honor, I pass the witness.

17        THE COURT:  Anything else on this side?

18        Any cross?

19                  CROSS-EXAMINATION

20  BY MR. WASSDORF:

21  Q.  Hello, Miss Litzinger.  Thank you for joining us this

22  afternoon.

23      I believe you testified on direct that you typically vote

24  in person, is that right?

25  A.  Right.

AMY LITZINGER – CROSS

1  Q.  And you have voted in person both before and since the

2  implementation of SB 1?

3  A.  Yes.

4  Q.  I think you stated on direct that you briefly voted by

5  mail during the COVID-19 pandemic, is that right?

6  A.  Yes.

7  Q.  And I think you testified that you had voted once by mail,

8  but I believe —

9  A.  Twice.

10  Q.  It was twice?

11  A.  Yes.

12  Q.  Thank you, ma'am.

13     And you have not voted by mail since the implementation of

14  Senate Bill 1, is that right?

15  A.  I have avoided voting by mail since the implementation of

16  SB 1.

17  Q.  So you have not voted by mail since the implementation of

18  SB 1?

19  A.  Right.

20  Q.  But you have successfully voted in person since the

21  implementation of SB 1?

22  A.  Yes.

23  Q.  Specifically in the March 2022 Primary?

24  A.  Yes.

25  Q.  And a May 2022 Constitutional Amendment Election?

AMY LITZINGER — CROSS

```
1   A.  Yes.
2   Q.  And the November 2022 General Election?
3   A.  Yes.
4   Q.  And I think you testified you had voted four times.  Was
5   there another election in there?
6   A.  I don't think so.
7   Q.  You previously testified that you have a personal care
8   attendant with you when you go vote, is that right?
9   A.  Either a personal care attendant or my parents.
10  Q.  And they drive you to the voting location?
11  A.  Yes.
12  Q.  And they assist you getting in and out of the vehicle?
13  A.  Yes.
14  Q.  And they would help you get your ID out?
15  A.  Right.
16  Q.  Now, we talked some earlier about the — your chest strap
17  during the May 2022 Election, do you remember that?
18  A.  Yes.
19  Q.  And you said that either you or your assister forgot to
20  unbuckle your chest strap?
21  A.  Yeah.  I can't do it myself.
22  Q.  And that chest strap being fastened significantly limited
23  your ability to operate the voting machine?
24  A.  Right.
25  Q.  So you needed to take your chest strap off but you weren't
```

AMY LITZINGER — CROSS

1  sure if that counted as assistance, is that right?

2  A.  Right, assistance in voting.

3  Q.  But you never asked a poll worker whether or not that

4  would count as assistance in voting, did you?

5  A.  No.

6  Q.  And as a result of having your chest strap fastened during

7  your voting process, it took you longer to vote than usual?

8  A.  Right.

9  Q.  But you were able to ultimately cast your vote?

10 A.  Yes.

11 Q.  When you cast your vote, you asked a poll worker to place

12 your ballot in the ballot box for you, is that right?

13 A.  Yes.

14 Q.  Likewise, because you didn't know if that would be

15 classified as assistance --

16 A.  Right.

17 Q.  -- therefore requiring your assister --

18 A.  Right.

19 Q.  -- to take the oath?

20 A.  Right.

21 Q.  But, likewise, you didn't ask a poll worker whether the

22 assister placing the ballot in the ballot box --

23 A.  When I asked for help, I did ask them and they said we

24 don't know.

25 Q.  You also voted in the 2022 General Election, is that

AMY LITZINGER — CROSS

1  right?

2  A.  Yes.

3  Q.  And I think there your assister, I think you said it was

4  her first day?

5  A.  Yeah.

6  Q.  And she wasn't very familiar with the voting process in

7  general?

8  A.  Right.

9  Q.  Because she, herself, wasn't registered to vote?

10  A.  Right.

11  Q.  And the election staff initially asked that your attendant

12  sign the assister oath?

13  A.  Yes.

14  Q.  But ultimately she was not required to sign the oath?

15  A.  Right.

16  Q.  And you were able to cast a ballot?

17  A.  It was very difficult to do that, but, yes.

18  Q.  And at no point since the implementation of Senate Bill 1

19  have you ever been prevented from casting a ballot?

20  A.  That would be true.

21        MR. WASSDORF:  Pass the witness, Your Honor.

22        THE COURT:  Anything else on this side?

23        MR. NICHOLS:  No, sir.  Thank you, ma'am.

24        THE COURT:  Any redirect?

25        MR. BERKOWITZ:  Just a couple questions.

3306
AMY LITZINGER – REDIRECT

1                    REDIRECT EXAMINATION
2   BY MR. BERKOWITZ:
3   Q.  Miss Litzinger, just two questions about the May 2022
4   Primary.  In addition to it taking longer to vote, you said
5   that the experience of sort of fighting against the chest
6   strap was incredibly painful, is that correct?
7   A.  Yes.
8   Q.  And is it correct that in that election you chose not to
9   use your personal care attendant due to SB 1 as well?
10  A.  They would not have been required to sign the oath because
11  they are family members, but, yes, I did choose not to.
12  Q.  Really quickly about given your handwriting matching
13  concerns, do you have concerns about inputting ID numbers on a
14  mail ballot in any legible way?
15  A.  I do have a lot of concerns about it being illegible or
16  not in the right space because a lot of times because of my
17  disability I will start lines not where a blank starts and
18  that's true for my signature as well, or it will not fit into
19  the area or it will be slanted downwards.
20  Q.  And finally, Miss Litzinger, has SB 1 made it harder for
21  you to vote?
22  A.  Yes.
23          MR. BERKOWITZ:  Thank you very much, Your Honor.
24          That's all.
25          THE COURT:  Anything based on those?

AMY LITZINGER – REDIRECT

1          MR. WASSDORF:  No, Your Honor.

2          THE COURT:  Thank you, ma'am.

3          Ready for lunch?  Can we come back at 1:15 or is that

4   not enough time?

5          MR. KERCHER:  It's enough time for the State

6   defendants.

7          THE COURT:  I'm sorry, that's enough time?

8          MR. KERCHER:  Yes.

9          THE COURT:  1:15, we'll see you back.

10      *(Recess)*

11      *(Change in reporter)*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3308
AMY LITZINGER – REDIRECT

1    *(Change in reporter)*

2    *(1:16 p.m.)*

3          THE COURT:  Thank you.  Please be seated.

4          While we're waiting on the witness, I can work late

5    today.  So can we push till 6:00, 6:30?

6          MR. KERCHER:  The conversations we've had with staff,

7    and I think among counsel, are that right now plaintiffs

8    anticipate calling seven witnesses today.  I think it makes

9    sense to get through those seven at a minimum.  But the pace

10   we're going, I'm hopeful that it won't take 7:00.

11         Likewise, if the Court can work late again tomorrow,

12   I think there are six witnesses on the docket.  I understand

13   that the Court needs to be done by 3:00 on Thursday.

14         THE COURT:  And, boy, that's pushing it.  I mean,

15   I've got to drive to the airport, park my car.  I am going to

16   be flying down 281.  I'd prefer almost 2:30, if we can.

17         MR. KERCHER:  Okay.  We will -- the parties will

18   confer on that, Your Honor.  For Thursday there are three

19   witnesses that the plaintiffs intend to call -- well, three

20   witnesses that the parties intend to call.  The plaintiffs

21   will call an expert in the morning, followed by Frank

22   Phillips, who is an elections administrator from the

23   defendant's case-in-chief, who will be here from Denton.  And

24   then it's my understanding that the plaintiffs had intended to

25   re-call Ms. Tania Chavez to shore up some standing questions

AMY LITZINGER — REDIRECT

1  based on new case law from the Fifth Circuit.

2          If we need to get done at 2:30 and we're not finished

3  at that point —

4          THE COURT:  What I was going to suggest, is unless

5  someone has a health consideration that you have to break for

6  lunch, we can work through lunch and just take an extended

7  period where someone can just grab a snack and work then

8  through lunch, too.  That's another possibility.

9          MR. KERCHER:  Okay.  We will confer.  Thank you, Your

10 Honor.

11         THE COURT:  Thank you.

12         MS. HOLMES:  Thank you, Your Honor.  We'll also look

13 into the possibility of having Ms. Chavez, who's the last

14 witness on Thursday, potentially testify Wednesday to give us

15 a little bit more room.

16         THE COURT:  Thank you.

17         Do we have a witness yet?

18         THE CLERK:  Yes.  But I need — I need the IT guys to

19 get on.

20     (Discussion off the record)

21         THE CLERK:  Ms. Halvorson, if you could please raise

22 your right hand, I'm going to swear you in.

23         THE WITNESS:  I don't have a lot of hand movement.

24         THE COURT:  She can dispense with that formality.

25         THE CLERK:  Okay.  That's fine.

3310

Laura Halvorson – Direct

```
 1      (The oath was administered)
 2            THE CLERK:  Thank you.
 3            MR. HA:  Good afternoon, Your Honor.
 4            Good afternoon, Ms. Halvorson.  My name is Derek Ha
 5  on behalf of the HAUL and OCA plaintiffs.
 6            Ms. Halvorson's testimony today will concern the
 7  following sections of SB1:  Sections 5.02, 5.03, 5.06, 5.07,
 8  5.10, 5.12, 6.03, 6.04, 6.05, and 6.07.
 9            THE COURT:  Thank you.
10      LAURA HALVORSON, PLAINTIFFS' WITNESS, SWORN BY VIDEO
11                     DIRECT EXAMINATION
12  BY MR. HA:
13  Q.  Good afternoon, Ms. Halvorson.  Can you –– can you please
14  state and spell your full name for the Court.
15  A.  Yes.  My name is Laura Halvorson.  The first name is
16  spelled L-A-U-R-A.  Last name Halvorson, H-A-L-V-O-R-S-O-N.
17  Q.  Where do you currently live?
18  A.  In San Antonio, Texas, and I live in a house.
19  Q.  Are you originally from Texas?
20  A.  Yes.  I was born and raised in Texas.
21  Q.  How much of your life have you lived in Texas?
22  A.  Pretty much my whole life, except for short periods when I
23  was a child in Florida, and four years In northern Virginia,
24  from 2015 to 2019.
25  Q.  Can you tell us a little bit about your educational
```

Laura Halvorson – Direct

1  background?

2  A.  Yes.  I have a master's in education from Texas Woman's

3  University that specializes in special education and

4  educational diagnostician certification.

5  Q.  And do you currently work?

6  A.  I don't.  I'm now retired on disability.

7  Q.  Before I ask further questions, Ms. Halvorson, if at any

8  point you require a break from testifying, please just say so.

9  A.  Thank you.

10  Q.  Ms. Halvorson, do you identify as a person with

11  disabilities?

12  A.  Yes.

13  Q.  And what is the name of your disability?

14  A.  I have Limb-Girdle muscular dystrophy.  You can just call

15  it muscular dystrophy.  And I have chronic muscular

16  respiratory failure.  That's why you see this breathing mask

17  on my face.  And I also have anxiety disorder and (audio

18  transmission gap) allergies.

19  Q.  How did you learn that you had muscular dystrophy?

20  A.  I just noticed when I was younger, probably around middle

21  school, that I wasn't keeping up with the other kids in gym

22  class.  And then just over time it got progressively worse.

23  Q.  Is muscular dystrophy in your case progressive?

24  A.  Yes.  I went from, you know, couldn't really tell.  I was

25  able to walk, breathe on my own.  And then just progressively

Laura Halvorson – Direct

1  over the years it's gotten to where I function pretty much

2  like a quadraplegic.  And I rely on my breathing machine 24

3  hours a day and use a complex rehab power wheelchair.

4  Q.  What would happen if your breathing machine became

5  unplugged or stopped working?

6  A.  Within a matter of minutes I could die.

7  Q.  Besides having to use that machine, do you require

8  assistance with activities of daily living?

9  A.  Yes.  I'm what they would consider total care.  I need

10  help with everything from transferring, bathing, dressing,

11  eating, meal prep, pretty much everything for activities of

12  daily living.

13  Q.  And who usually provides you with the assistance with your

14  daily activities that you just mentioned?

15  A.  I have personal care attendants that help me, that I hire.

16  Q.  How many personal care attendants do you currently have?

17  A.  I have three main ones and then one backup.

18  Q.  And how did you find these personal care attendants?

19  A.  I'm on a program through the state called Consumer

20  Directed Services.  That's where I find my own (audio

21  transmission gap).  And I place ads on websites like

22  indeed.com and do my own interviews and things to hire my

23  caretakers.

24  Q.  So are these people paid by the State?

25  A.  Yes.  That's correct.  I'm on a grant-based program called

3313
Laura Halvorson – Direct

1  Consumer Managed Personal Attendant Services, which is a
2  grant-based program in the state of Texas for people that are
3  Medicaid eligible.
4  Q.  How has the COVID-19 pandemic affected your life as a
5  person who lives with muscular dystrophy?
6  A.  It's greatly affected it.  Still, to this day I have to
7  live like it's 2020 because getting something, even a mild
8  case, as they say, of COVID, is fatal to me due to I'm unable
9  to cough on my own.  And even just a slight cold can put me in
10  the hospital.
11  Q.  In addition to that --
12  A.  And because of that, I just haven't -- oh, sorry.
13  Q.  Sorry.  Please finish.
14  A.  Go ahead.
15  Q.  In addition --
16  A.  Because of that, I -- sorry.  There's a delay.  Go ahead.
17  Q.  I was just going to ask, in addition to what you've just
18  described, has COVID-19 impacted your ability to find or
19  retain your caregivers?
20  A.  Yes.  Because of my compromised immune status, I have to
21  have caregivers that can wear a mask in indoor settings and
22  are vaccinated and still kind of follow the 2020 protocols
23  when I'm indoors inside my house.  And that's made it
24  difficult to find and retain caregivers, on top of the low
25  wages that they receive through the State.

Laura Halvorson – Direct

1  Q.  Since the COVID-19 pandemic began, how many times have you

2  been in public?

3  A.  Very, very little.  I've only gone to doctors appointments

4  and to the pharmacy, I can probably count, maybe ten times.

5  I've gone out to appointments and I think only like one indoor

6  (audio transmission gap) doctor place.  But that -- there was

7  no one indoors there, and I wore a mask.

8  Q.  Switching gears just a little bit, Ms. Halvorson, are you

9  a member of any organizations in Texas related to voting

10  rights or disability rights?

11  A.  Yes.  I'm a member of Rev Up Texas, and a member of The

12  Arc of Texas.

13  Q.  So I'm going to ask you a couple questions about each of

14  these organizations in turn.  First, when did you join Rev Up

15  Texas?

16  A.  In 2014 I was Ms. Wheelchair Texas, and was invited to go

17  to their Texas disabilities issues forum.  And that's when I

18  learned about their organization and how Texas has one of the

19  lowest voting turnouts in the United States.  And so that

20  became a big part of my platform, is getting people aware of

21  disability issues and voting.  And I've been a member ever

22  since.  I briefly moved to northern Virginia after that, then

23  helped found the Rev Up Virginia chapter as well.

24      Yeah.  And then when I moved back to Texas, I rejoined Rev

25  Up Texas.

3315
Laura Halvorson – Direct

1  Q.  With regard to the Texas chapter of Rev Up, what

2  activities do you -- have you engaged in as a member of that

3  organization?

4  A.  Just sharing resources, making sure other people with

5  disabilities around me and others are just registered to vote,

6  find nonpartisan materials to be educated on the issues, and

7  to have a plan to vote, mainly just resource sharing on social

8  media and through word of mouth.

9  Q.  And when did you join The Arc of Texas?

10 A.  I believe it was about a year or two ago.  Prior to that,

11 I just was already using the resources on their website to

12 follow different advocacy issues in the legislature and to

13 learn about how to sign up for personal care attendant

14 services in Texas and just how long the wait list and things

15 are here to get those services.

16 Q.  And what is -- what are some examples of activities that

17 you do as a member of The Arc of Texas?

18 A.  Mainly I get action alerts from them to where I learn

19 about different issues regarding Texans with functional and

20 developmental disabilities, and also just basic information

21 off their website and resource sharing.

22 Q.  Ms. Halvorson, are you currently a registered voter?

23 A.  Yes.

24 Q.  Where are you registered?

25 A.  I'm registered in Bexar County.

Laura Halvorson – Direct

1  Q.  And how long have you been a registered voter in Bexar

2  County?

3  A.  When I got my State ID at the end of 2019, when I moved

4  back.  So it was either end of 2019 or early 2020 when I got

5  registered to vote again.

6  Q.  How often do you vote?

7  A.  I vote in every election possible.  I know I voted in

8  every Presidential Election since 2004 and pretty much every

9  state local election since then as well.

10 Q.  Why do you try to vote as often as you do?

11 A.  I feel it's our duty as Americans to vote and make sure

12 our voice is heard.

13 Q.  Before moving on, Ms. Halvorson, do you know what Senate

14 Bill 1 passed in 2021 is?

15 A.  Yes.  It was intended to, I guess, protect election

16 integrity, but it's caused a lot of restrictions for people

17 with disabilities and others to cast their ballots.

18 Q.  And do you have an idea of when SB1 took effect?

19 A.  It was at the beginning of 2022.

20 Q.  So I want to ask you a few questions about your experience

21 voting before that point in time, so elections up through the

22 end of 2021 but not including 2022.  So prior to 2022, what

23 was your most frequently used method of voting?

24 A.  I would usually use curbside voting.  But it varied.  It

25 just depended on -- with my disability, some days are worse

Laura Halvorson – Direct

1  than others.  So sometimes it'd be curbside voting, sometimes

2  in person, and then I think one time a mail-in ballot.

3  Q.  With all things being equal, what is your preference

4  between in-person voting and the polling place versus curbside

5  voting?

6  A.  I'd prefer in-person just so I can see, but I think

7  curbside voting was the best option.

8  Q.  Can you clarify what you mean by "just so I can see" as an

9  advantage of in-person voting?

10  A.  What's that?  Oh, because I just -- especially with -- I

11  just need to see that my vote is being counted.  With curbside

12  voting, I would often -- especially in Texas, I would -- I

13  wouldn't get confirmation that my vote had been counted.  I

14  would get the tablet.  They'd bring it back inside, and I

15  wouldn't get someone to come back and say my vote has been

16  counted, when I see myself that my vote had been counted.

17  Q.  And prior to 2022, when you voted in person, did you

18  receive any form of assistance when you did that?

19  A.  I would have my personal care attendants help me.

20  Q.  And what type of assistance would you receive?

21  A.  Since I have very -- I can move kind of like my wrist

22  muscles a little bit.  I can't reach with the -- in Bexar

23  County they use the big touchscreen voting, which I can't

24  reach the buttons.  So my caregivers would often hand my ID to

25  the voting assistant, and then they -- my caregivers will

Laura Halvorson – Direct

1  touch the screen options based off what I tell them to choose

2  on the screen.

3  Q.  And during these in-person voting experiences, where you

4  did receive assistance, did you ever feel that one of your

5  personal care attendants was trying to influence your choices

6  on the ballot?

7  A.  No.

8  Q.  Did you ever feel that one of your personal care

9  attendants would manipulate the way in which your ballot was

10 marked?

11 A.  No.

12 Q.  So now let's move forward to elections beginning in 2022,

13 so after SB1 took effect.

14     Ms. Halvorson, did you participate in the March 2022

15 election?

16 A.  Yes.

17 Q.  And can you describe your method of voting for that

18 election?

19 A.  Yes.  At the end of 2021, I had a hip fracture from

20 falling out of my wheelchair, and it caused a lot of severe

21 pain.  So due to that and the fact around that time, I believe

22 it was the Omicron variant, which is very contagious, was kind

23 of high level, so I decided to apply for vote by mail to vote

24 in this election cycle for the March 2022.

25 Q.  So just to clarify, you voted by mail in the March 2022

Laura Halvorson – Direct

1  elections?

2  A.  Yes.  That's correct.

3  Q.  When you received your mail ballot, do you recall that --

4  do you recall whether there was an oath of assistance in the

5  envelope?

6  A.  Yes, there was.

7  Q.  And did you discuss that oath of assistance with your

8  personal care attendant?

9  A.  Yes.  And she was not comfortable with it, due to the way

10  it was written.  She's a green card holder.  And so, you know,

11  she (audio transmission gap) face any sort of penalty or

12  perjury that could risk her green card status.  And so she did

13  not feel comfortable assisting me with voting.

14  Q.  Was this the first time that a personal care attendant or

15  another caregiver has declined to assist you in voting?

16  A.  Yes.  That was the first time.

17  Q.  So did you have difficulty completing the mail ballot

18  without the benefit of that assistance?

19  A.  Yes.  It was much more difficult due to my very limited

20  mobility.

21  Q.  Did you have any difficulties completing the -- when

22  you -- when you -- sorry.

23      When you filled out the carrier envelope, do you remember

24  if you included any ID number or numbers?

25  A.  Yes.  Through Rev Up Texas and The Arc, they suggested, if

3320
Laura Halvorson – Direct

1  you're able to, to put both numbers on, due to the confusion,

2  you know, around SB1.  So I made sure to include both my last

3  four of my social and my driver's license number.

4  Q.  Can you describe the physical process of filling in the

5  mail ballot as well as writing in your ID numbers without the

6  benefit of assistance?

7  A.  Yes.  It was very difficult.  My very limited mobility and

8  pain levels, just trying to -- I have a lot of contractures in

9  my hands, just very little muscle movement and strength.  And

10  so trying to hold a pen and mark my ballot and have enough

11  pressure to where I could mark my ballot was very painful and

12  time-consuming.

13  Q.  Were you worried that your handwriting would not be

14  legible when you were filling out your ID numbers?

15  A.  Yes.  I had to -- my handwriting, due to the limited

16  mobility and weakness, makes my handwriting not very legible.

17  So I have to kind of move the pen very slowly and carefully to

18  make sure it's legible enough to read.

19  Q.  And from start to finish, how long did you it take you to

20  fill out the ballot and the envelope without assistance?

21  A.  I would kind of do it in like about, I'd say, 10- or

22  15-minute increments throughout the course of two days.  I

23  would fill out a little bit and then have to take a break.

24  Especially with my hip fracture, it was very hard to sit up in

25  my wheelchair and fill out that ballot.

3321

Laura Halvorson – Direct

1  Q.  So after those two days --

2  A.  Then also just trying to -- I'm sorry.  And just trying to

3  get my hands to cooperate to get the ballot in the envelope

4  all by myself was very difficult as well.

5  Q.  After the two day-process, do you recall how far in

6  advance of Election Day you submitted your ballot in March

7  2022?

8  A.  It was well -- it was a couple weeks before.  I do

9  remember they have a website through the Department of

10  State -- the Department of State -- Secretary of State, where

11  you can track your ballot.  And on that website it said my

12  ballot was received on February 26th, but it did not say

13  "accepted" until well after the election ended.  It was maybe

14  towards the end of March or after.

15  Q.  By the time you received confirmation that your ballot was

16  counted, would you have had an opportunity to cure any defects

17  on your mail-in ballot if it was rejected?

18  A.  No, because it was well after the election.  So I wouldn't

19  have been able to have changed it.  And so not knowing if my

20  ballot was accepted, that worried me -- if my vote wasn't

21  counted.

22  Q.  Is it physically safer for you to vote by mail than in

23  person?

24  A.  It's much safer because I don't have the risk of catching

25  COVID.

3322
Laura Halvorson – Direct

1  Q.  And would you want to have the option of voting by mail in
2  the future?
3  A.  Absolutely.  If there was a way to know that my vote was
4  accepted and counted, you know, in time for the election.
5  Q.  So let's move on to the following election.  Did you
6  participate in the November 2022 General Election?
7  A.  Yes.
8  Q.  And what was your voting method in that election?
9  A.  Due to the difficulties, like not knowing whether my vote
10 would be counted, voting by mail, I voted in person this time.
11 Q.  And when you voted in person in November 2022, did you
12 rely on an assister for that election?
13 A.  I didn't want to put my caregiver at risk.  So I had my
14 caregiver just drive me to the polling place, and then she was
15 there just to assist with my breathing machine since I
16 wasn't -- since I knew I wasn't going to be able to mark the
17 voting machine myself.  And I didn't want her to give me
18 assistance.
19     I did some research.  I've seen in other counties, they
20 had remote controls for people with limited mobility to mark
21 the ballot.  I didn't see that information readily available
22 on the Bexar County elections website.
23     But I did see that they had gotten new voting machines,
24 and then kind of had to do a lot of research and go into a
25 deep dive to figure out the name of the voting machine and

Laura Halvorson – Direct

1  then go to the manufacturer and see that they did have one of

2  those handheld remotes.  I emailed Bexar County a few weeks

3  before I was planning to go vote, asking them if they had

4  these remote controls at the election sites, and particularly

5  at my polling place.  But I didn't hear back.

6      And so I had my father go to the same polling place a few

7  days before and ask them if they had the remote controls for

8  the voting machines.  And they said they did.  And so I

9  decided to go vote a few days later.

10  Q.  So I want to back up a little bit to the beginning of what

11  you just said.  You said that you didn't want to put your

12  caregiver at risk.  Can you clarify what you mean by that?

13  A.  Yes.  With the new SB1 law, like it can cause -- if

14  someone, like a poll worker or someone, you know, thinks that

15  a caregiver's influencing my vote in any way, they could face

16  criminal charges.  And so I didn't want to put my caregiver at

17  risk in case, you know, a partisan poll watcher or something

18  assumed they were influencing my vote in any way.

19  Q.  Was this concern related to the oath of assistance that

20  you also saw during the March election?

21  A.  (Audio transmission gap).

22  Q.  Sorry.  I didn't catch your answer, Ms. Halvorson.  Was

23  this concern related to the oath of assistance?

24  A.  Yes.  That's correct.

25  Q.  And, Derek, could you pull up Exhibit HAUL/MFV 089.

3324
Laura Halvorson – Direct

1    Ms. Halvorson, do you recognize the exhibit on your
2  screen?
3  A.  Yes.  That's the oath of assistance that people have to
4  take when assisting a person with a disability.
5  Q.  Can you take a moment to read the oath to yourself just to
6  refresh your memory of the language and tell me when you're
7  comfortable proceeding.
8  A.  Yes.
9  Q.  Was this the language -- strike that.
10    What was your reaction when you read this oath?
11  A.  It still seems intimidating, especially the part about the
12  penalty of perjury and just a gray area.  There is, you know,
13  since -- with my caregivers, technically I'm the employer.
14  And so it still kind of leaves a gray area on there.
15  Q.  You testified a moment ago that you weren't worried about
16  a caregiver who would influence or manipulate your vote.  So
17  if that's the case, why were you concerned about the
18  provisions in this oath?
19  A.  I know I'm not concerned about my voters -- caregivers
20  influencing my vote, but other people around me, like
21  particularly partisan poll watchers, you know, especially if
22  they don't have an understanding of disability, you know, they
23  may think -- a lot of people kind of have -- I wouldn't say "a
24  lot," but there are people out there that kind of have a bias
25  against people with disabilities, thinking that, you know,

Laura Halvorson – Direct

 1  we're not able to make decisions for ourselves or we don't
 2  have the intellectual capacity to do so.  And so I was just
 3  worried that other people would perceive that my caregivers
 4  were influencing my vote, if they just see from across the
 5  room someone pressing buttons for me.
 6  Q.  Your concern with these stereotypes you just mentioned,
 7  does that concern come from previous experiences in other
 8  areas of your life where you've encountered the same
 9  stereotypes?
10  A.  Yes.
11  Q.  So now I want to talk about the actual experience of
12  voting in person in November 2022.  You already mentioned that
13  you used a voting machine.  Can you just briefly remind us how
14  you were able to make sure that you could use the voting
15  machine?
16  A.  I emailed the Department of Elections to ask if they had
17  the handheld remote attachment for the voting machines.  They
18  didn't respond back after a week or two.  And so I just had my
19  father go to the polling place that was I planning on voting.
20  And he went -- he voted there himself and asked the poll
21  workers if they had a handheld remote, and they confirmed that
22  they did.
23  Q.  And did you have to do --
24  A.  But -- oh, go ahead.
25  Q.  Did you have to do your own research to learn about the

3326
Laura Halvorson – Direct

1  availability of these remotes since you didn't get a response
2  from the -- from the County?
3  A.  Yes.  Yeah.  Like I -- like it doesn't show on the website
4  or anything that these remotes exist.  I just happened to see
5  other people voting, and through other organizations they
6  would talk about how some voting machines have this feature on
7  it.  So I had to -- I saw on the Bexar County website they got
8  new voting machines, and then kind of did some digging through
9  press releases on their website what the name of the voting
10  machine was.  And then I went to the manufacturer's website to
11  find the exact, you know, accommodation features, which was
12  that handheld remote, and then after my father confirmed that
13  they had this remote at the polling place.
14      When I went to go vote in person with it, however, there
15  were some glitches with that remote, where up was down, left
16  was right, and things like that.  So it didn't operate, you
17  know, like it should have.
18  Q.  Thank you, Ms. Halvorson.
19      And I apologize for making you repeat so much of what you
20  just said earlier.
21  A.  No worries.
22  Q.  When you arrived at the polling place in November 2022,
23  was the location crowded?
24  A.  It was not as crowded as like, you know, you see on the
25  news and like some of the other big cities.  Like, I

Laura Halvorson – Direct

1  probably -- there was probably like maybe five or six people

2  in line, but it was a very small room, which, you know,

3  definitely (audio transmission gap) social distancing going on

4  there.  When I went to, you know, sign in and everything to

5  get the voting process started, there were people kind of like

6  hanging over me, like, as I mentioned, my bubble.  And me and

7  my caregiver were the only ones wearing masks.  So it caused a

8  lot of concern and anxiety, you know, just due to how at risk

9  I am of catching COVID.

10  Q.  So overall, did you feel safe in this environment?

11  A.  I did not.

12  Q.  And you touched -- you started to touch on this a little

13  bit earlier.  What happened when you tried to use the remote

14  to vote on the voting machine?

15  A.  It didn't work properly.  It -- like, up was down, left

16  was right.  The -- like how it's supposed to highlight the

17  choice on there, it was like very hard to see, like it was

18  very vague to see what choice was highlighted.

19      And then also the font was -- I didn't realize that was

20  the issue until after -- kind of analyzing it afterwards, but

21  half of the candidates' names and their party affiliation was

22  cut off on each voting choice.  So it made things very

23  difficult.

24      Luckily, I use a nonpartisan website called Vote411, to

25  where you can kind of see your whole ballot before going in,

3328
Laura Halvorson – Direct

1  and research every candidate.  And even though it was a very

2  lengthy ballot, I was able to figure out which candidates I

3  was voting for.

4  Q.  When you realize --

5  A.  (Inaudible.)

6  Q.  When you realized that the controls on the remote were

7  pointing in the wrong directions, was there anyone in the

8  polling place who tried to help you?

9  A.  Yes.  One of the election workers gestured for them to

10  come over and help.  They just said, "Have you tried pushing

11  the buttons?"

12     Of course I tried pressing the buttons.  They were just

13  doing the wrong thing.  So I just -- kind of still just had to

14  figure it out on my own since they weren't much help.

15  Q.  And after you figured it out by yourself, did you face

16  difficulties in terms of actually making the choices on the

17  ballot?

18  A.  Yes.  Like after, like, I would select the choices,

19  getting to that last little summary screen, it kept on kind of

20  like cycling back to the previous screen, but eventually I was

21  able to get it to work and print the ballot out.

22  Q.  And --

23  A.  It just took a very long time.

24  Q.  And after your ballot was printed, did you face anymore

25  difficulties in the polling place?

Laura Halvorson – Direct

1  A.  Yes.  Yeah.  I just –– with my limited mobility just

2  grasping that ballot and then bringing it over, there's like a

3  Scantron feeder you have to feed it into.  I'm fortunate with

4  my power wheelchair, it has a seat elevation feature.  So I

5  was able to raise the height of my wheelchair to –– with my

6  very limited mobility, just kind of moving my wrist a little,

7  I was able to eventually wiggle the Scantron sheet into the

8  Scantron feeder, but it took a few minutes to do so.

9  Q.  Had your personal care assistant been there to help you

10  with the voting process, could you have avoided the issues

11  with the remote control not working?

12  A.  Yes.  I could have just not used the remote control and

13  had her select my options for me, and I probably could have

14  been in and out of there in like a third of the time.

15  Q.  Had your caregiver been available, would you have faced

16  the same problem with the candidates' names and party

17  affiliations being not visible to you?

18  A.  I could have just asked to use a different voting machine

19  that didn't have that same issue.  So that wouldn't have been

20  a problem had she been able to assist me.

21  Q.  And had your caregiver –– your personal care attendant

22  been available, would you have faced the same difficulties in

23  terms of depositing your ballot after it was printed?

24  A.  She could have printed them there in probably five seconds

25  or less.

3330
Laura Halvorson – Direct

1  Q.  How long did it take you to vote in person in November

2  2022 in total?

3  A.  It was well over 30 minutes, if not 45.

4  Q.  And after you cast your vote and completed the whole

5  process, did any of the poll workers say anything to you?

6  A.  Yes.  There was a poll worker at, like, right at the door,

7  handing out stickers.  And he said, "I'm going to give you two

8  stickers because you had to work twice as hard as everyone

9  else to vote."

10  Q.  As a whole, how did this experience leave you feeling?

11  A.  Lots of anxiety just for the fact I was in such a small

12  enclosed space with people not wearing masks or anything for

13  45 minutes, that put my health at risk.  And I was very

14  worried.  And it was also exhausting trying to do all the --

15  pressing of the buttons and putting the Scantron in by myself.

16  Q.  You said earlier that originally you emailed Bexar County

17  to try to get some information about the remotes, and never

18  got a response.  How did that make you feel?

19  A.  That upset me.  Like, I'm very stubborn and very

20  determined.  So I was still determined to find another way to

21  get that information, where I don't think other people -- they

22  probably would have just given up and not voted.

23  Q.  Did you ever consider requesting an accommodation for your

24  disability that would involve modifying or waiving one of the

25  requirements of SB1?

Laura Halvorson – Direct

1  A.  I didn't know that was a thing you could do.

2  Q.  Ms. Halvorson, what would happen if one of your caregivers

3  received a criminal penalty for violating the oath of

4  assistance while helping you vote?

5  A.  That would make me feel horrible and very angry, you know,

6  because I know they're not -- they're not doing anything

7  wrong.  It's just the fact others can perceive them as doing

8  something wrong.  And, you know, if they -- especially if it's

9  my main caregiver, who's a green card holder, you know, she

10  could lose her citizenship being here and able to work and

11  finding other caregivers.  I mean, just finding a replacement

12  for a caregiver is hard enough.

13  Q.  Do you feel like it would jeopardize your relationship

14  with that caregiver?

15  A.  Definitely.

16  Q.  Do you feel like it would jeopardize your ability to get

17  the assistance you need with your daily living?

18  A.  Yes.

19  Q.  Just a few more questions, Ms. Halvorson.

20     Do you know other voters who have disabilities?

21  A.  Yes.  I know many.

22  Q.  Do you have conversations with these people about voting?

23  A.  Yeah.  I'm their annoying friend that asks them every

24  election cycle if they're registered to vote and know where to

25  find nonpartisan information and if they have planned to go

Laura Halvorson – Direct

 1  vote.

 2  Q.  Do you talk with these people about SB1?

 3  A.  Yes.

 4  Q.  Based upon these interactions, have you gotten an

 5  understanding of SB1's impact on the disability community?

 6          MR. WASSDORF:  Objection, Your Honor.  I object to

 7  hearsay on that.

 8          THE WITNESS:  Yes.

 9          THE COURT:  That's overruled.

10  BY MR. HA:

11  Q.  Ms. Halvorson, based on these interactions, can you

12  describe your own understanding of what effect SB1 has had on

13  the people within the disability community you've talked to?

14  A.  Yes.  People I've talked to have, you know -- especially

15  since many of my friends have disabilities that affect their

16  mobility, they're worried about their caregivers facing these

17  same issues with penalty and perjury.  Some of them may not be

18  going out and voting like they used to, due to it.

19  Q.  Why is it important to you that other people with

20  disabilities go vote?

21  A.  Because they -- you know, I think politicians need to know

22  that, you know, we're like one -- I believe the statistic,

23  sir, one in four or one in five people have disabilities.  So

24  I think we need to be showing the power of the disability vote

25  and making sure our voices are heard and that our issues are

Laura Halvorson – Cross

1  heard as well.

2  Q.  Last question, Ms. Halvorson.  You told us that you have a

3  form of muscular dystrophy that is progressive.  Do you

4  believe that SB1's effects on your right to vote will change

5  as your condition continues to progress?

6  A.  Yes.  Because I'm going to need more and more help as the

7  years go on, especially from my caregivers, in order to cast

8  my ballot.

9          MR. HA:  Thank you, Ms. Halvorson.

10          Your Honor, I pass the witness.

11          THE COURT:  Anything else from this side?

12          Any cross?

13                    CROSS-EXAMINATION

14  BY MR. WASSDORF:

15  Q.  Good afternoon, Ms. Halvorson.  My name is Will Wassdorf

16  with the Office of the Attorney General, representing the

17  State in this case.  Can you hear me okay?

18  A.  Yes, I can hear you.

19  Q.  Now, I'm just going to start after you returned to Texas

20  from Virginia.  Is that all right?

21  A.  Yes.

22  Q.  After you returned to Texas, you voted in person during

23  the March 2022 Primary Election; is that right?

24  A.  In the March 2022 election I voted by mail.

25  Q.  Excuse me.  The March 2020.

Laura Halvorson - Cross

1   A.  March -- yes, I voted in person.

2   Q.  And during that in-person voting experience, you required

3   total assistance from your attendant; is that right?

4   A.  Yes.  That's correct.

5   Q.  And at that time the poll worker administered the

6   assister's oath to your assister?

7   A.  Correct.

8   Q.  And you were able to successfully cast your vote?

9   A.  Yes.

10  Q.  Now, by the next election, in November of 2020, COVID was

11  a little worse, right?

12  A.  Correct.

13  Q.  And so you used curbside voting during that election?

14  A.  Yes.  That's correct.

15  Q.  And your boyfriend at the time took you to the polls?

16  A.  Correct.

17  Q.  And he was administered the assister's oath?

18  A.  Yes.

19  Q.  And he assisted you?

20  A.  Yes.

21  Q.  And you were able to cast your vote during that election?

22  A.  Yes.

23  Q.  And you also used curbside voting during a 2020 local

24  election, if I recall; is that right?

25  A.  Yes.

Laura Halvorson – Cross

1   Q.  And you were ––

2   A.  Correct.

3   Q.  –– also able to successfully cast a vote during that

4   election?

5   A.  Yes.

6   Q.  Now, during the March 2022 primary, you voted by mail; is

7   that right?

8   A.  Correct.

9   Q.  And that was the first time you had voted by mail?

10  A.  I voted –– I voted by mail I believe like in November 2010

11  when I fractured my shoulder/arm area, where I was unable to

12  drive to the polling place myself.  So I used mail-in ballot

13  in 2010.  And then due to my hip fracture at the end of 2021

14  and just how bad things were getting with COVID at that point,

15  I decided to vote by mail in March 2022.

16  Q.  So it was the first time in a long time that you had voted

17  by mail?

18  A.  Correct.

19  Q.  Now, I believe you testified earlier that for this

20  election that your attendant would not sign the oath; is that

21  right?

22  A.  Correct.  She did not feel comfortable doing so, and I was

23  not going to force her to help me vote if she wasn't

24  comfortable.

25  Q.  And this was because at the time the oath was still

3336
Laura Halvorson - Cross

1  limited to reading the ballot, marking the ballot or directing

2  you to read or mark the ballot; is that right?

3  A.  Due to that and the part about the facing criminal charges

4  if it was seen, you know -- she was seen as violating

5  that oath in any way.

6  Q.  And you understand that the oath no longer contains the

7  provision about reading the ballot or marking the ballot or

8  directing you to do the same, right?

9  A.  Correct.

10  Q.  Are you aware that the Texas Penal Code makes it a crime

11  for you to violate an oath regardless of whether that oath

12  says in its own language that it's under the penalty of

13  perjury?

14  A.  Can you repeat the question?

15  Q.  Are you aware that the Texas Penal Code makes it a crime

16  to take an oath and then act contrary to that oath regardless

17  of whether the oath itself states that it is under the penalty

18  of perjury?

19  A.  I was -- I'm not -- that's kind of -- the language is kind

20  of -- I don't know.  I kind of need it broken down a little

21  more simpler than that.

22  Q.  All right.  During the March 2022 primary, you didn't ask

23  the County for any further accommodation or modification, did

24  you?

25  A.  I did not.  I wasn't aware that was a thing you could do.

Laura Halvorson - Cross

1  Q.  And despite not having the assistance of your attendant,

2  you were able to successfully cast a ballot?

3  A.  I was.  It just was very painful, you know, physically to

4  do and very time-consuming and exhausting to do.

5  Q.  After you cast your ballot in the March 2022 primary, you

6  used the tracker online to keep track of where your ballot was

7  in the process?

8  A.  Yes.  But I would check it pretty much every day just to

9  see if my ballot was counted.  Eventually, I believe it was

10  February 26th, it said "received," but it did not say

11  "accepted."  And I kept on checking the website repeatedly.

12  And it wasn't until well after the election ended that it

13  finally said "accepted" on there.  So that, you know,

14  didn't -- if there was any issues, it would have been too late

15  to correct my ballot.

16  Q.  But your ballot was accepted; is that right?

17  A.  Yes.

18  Q.  And because your ballot was not rejected, you can't say

19  what time period you would have had to cure it?

20  A.  Well, I mean, it didn't say "accepted" or "rejected" until

21  after the election ended.  So it would have been after the

22  election where it wouldn't have been counted.

23  Q.  And that's assuming that if it had been rejected, that you

24  would have only been notified after the election; is that

25  right?

3338
Laura Halvorson – Cross

1   A.  Correct.

2   Q.  But you don't know if that's what would have happened,

3   correct?

4   A.  I don't know.  It would have just said "received" after,

5   you know, they received it.

6   Q.  That late acceptance of your ballot scared you away from

7   mail-in voting; is that right?

8   A.  Correct.  And the fact it was very hard to do.  But just

9   the fact knowing my vote wasn't counted was the main issue.

10  Q.  And so you went back to in-person voting for the November

11  2022 election?

12  A.  Yes.

13  Q.  Now, I believe we talked earlier about the fact that you

14  had emailed the Bexar County elections department to ask if

15  they had remotes for the voting machines; is that right?

16  A.  That's correct.

17  Q.  And the county elections department never responded to

18  you?

19  A.  Correct.

20  Q.  But your dad was able to go in person and confirm that

21  they had the remotes?

22  A.  Yes.  I'm fortunate he had the time to do that.

23  Q.  And so you then went down to the polling place; is that

24  right?

25  A.  Yes.  That's correct.  Yeah, a few days later.

3339
Laura Halvorson – Cross

1  Q.  And you surrendered the mail-in ballot that you had

2  received?

3  A.  Yes.  I had to research how to do that because I wanted to

4  make sure I didn't have to come back again and do it all over.

5  So yes.

6  Q.  And at this point you didn't ask your personal attendant

7  to assist you, other than monitoring your ventilator; is that

8  right?

9  A.  Correct.  And she also drove me to the polling place, and

10  then had to put, like, a regular COVID face mask over my

11  breathing machine mask.

12  Q.  And you had some problems with the voting machine; is that

13  right?

14  A.  Yes.  Yeah.  The (audio transmission gap) remote, up was

15  down; left was right.  It wasn't like highlighting the

16  selections bright enough.  And some of the candidates' last

17  names and their party affiliation, just depending on how long

18  their name was, would be cut off on each of the selections.

19  Q.  But -- and that was because the font was too large?

20  A.  Yes.  And I didn't like -- didn't figure out why that was

21  until after it ended.  I asked, you know, why (audio

22  transmission gap) the voting -- like, why is it cut off?  They

23  didn't know.  But in hindsight, I realized they have a way to

24  enlarge -- make the font larger or smaller.  I believe that

25  was the issue.

3340
Laura Halvorson – Redirect

1  Q.  And when you were voting, you likewise didn't request any

2  additional accommodation or modification; is that right?

3  A.  Correct.

4  Q.  And you were able to successfully cast your vote during

5  the November 2022 election?

6  A.  Yes.

7  Q.  And you were able to take your ballot and put it in the

8  ballot box?

9  A.  Yeah.  It was very difficult.  I'm lucky I have that

10 feature on my wheelchair where I can elevate my wheelchair

11 high enough to reach the ballot box or the Scantron feeder,

12 whatever you want to call it.

13 Q.  And since the implementation of SB1, you have never been

14 prevented from casting a ballot in an election in the state of

15 Texas?

16 A.  No.  It's just been significantly harder to do so.

17           MR. WASSDORF:  Thank you, Ms. Halvorson.

18           Pass the witness.

19           THE COURT:  Anything else on this side?

20           MR. NICHOLS:  No, sir?

21           THE COURT:  Any redirect?

22           MR. HA:  Yes, please.

23                     REDIRECT EXAMINATION

24 BY MR. HA:

25 Q.  Derek, can we pull up HAUL/MFV Exhibit 297.  And we move

Laura Halvorson – Redirect

1  to the page of the exhibit with the -- with the instructions

2  for an assister.

3      Ms. Halvorson, does this exhibit look familiar to you?

4  A.  Yes.

5  Q.  And do you recall -- when you voted by mail in March 2022,

6  do you recall seeing the highlighted portion of the envelope?

7  A.  Yes.

8  Q.  And would you mind reading out loud the highlighted

9  sentence for the Court?

10  A.  Yes.  Is there a way to enlarge the font a little bit

11  more?  If not, I can squint.

12      It says, "A voter may only be assisted with reading or

13  marking the ballot if the voter has a physical disability that

14  renders the voter unable to -- unable to write or see, or has

15  the inability to read the language in which the ballot is

16  written.  If you are assisting the voter, you must read the

17  oath and complete the section below before assisting the

18  voter."

19  Q.  Is it your understanding that regardless of the changes to

20  the actual oath of assistance, that this instruction still

21  limits assistants to reading or marking the ballot for those

22  who cannot read or see?

23  A.  That's where it was like kind of the gray area for me,

24  because I know they changed it a little bit for future

25  elections, because I am able to write.  I just have a very --

3342
Laura Halvorson – Redirect

1  a lot of difficulty doing so.  And I can't, on a touchscreen,

2  reach the buttons independently.

3  Q.  Do you agree that even though the oath has changed, the

4  portion –– the portions that were taken out are still similar

5  to the instructions to the assistant that you see before you

6  now?

7  A.  Correct.

8  Q.  Ms. Halvorson, do you agree with the requirement that you

9  be required to represent eligibility for assistants before

10  receiving assistance in voting?

11  A.  I'm sorry.  Can you repeat that?

12  Q.  Ms. Halvorson, do you agree with the requirement that you

13  need to represent to your assister that you're eligible to be

14  assisted in voting?  Do you agree with having to make that

15  representation?

16      MR. NICHOLS:  Your Honor, pardon my interruption.  I

17  think this exceeds the scope of the cross.  He's going in a

18  new area, Your Honor; just to speed it up.

19      THE COURT:  So that was your examination.  Did you go

20  there or not?

21      MR. WASSDORF:  No, Your Honor.

22      THE COURT:  Sustained.

23  BY MR. HA:

24  Q.  Ms. Halvorson, if you had an assistant help you with your

25  voting–by–mail process in March 2022, would your concerns

3343

Laura Halvorson – Redirect

1  about the legibility of your handwriting have still bothered

2  you?

3  A.  No.

4  Q.  Would the -- would you still have experienced the same

5  level of physical pain that you did during those two days

6  filling out the ballot and the envelope?

7  A.  No.  I could have just told my personal care assistant

8  which bubble to mark for each office that I'm choosing

9  candidates for.

10  Q.  Is it important that you have different methods of voting

11  available to you in a given election?

12  A.  Yes.  Just based on my -- like each day is different with

13  my energy levels and my abilities.  And so I need different

14  methods of voting, whether it's voting by mail, in person or

15  curbside, just depending on my abilities and health at that

16  time.

17  Q.  And does the fact that you successfully had your vote

18  counted in an election mean that you didn't face any

19  difficulties casting your ballot in the election?

20  A.  Absolutely not.  I'm just a very stubborn and determined

21  person.  So no matter how hard something is, I'm going to --

22  whether -- when it comes to voting, I'm going to make sure

23  that I'm able to vote.

24          MR. HA:  Thank you.

25          Nothing further, Your Honor.

Laura Halvorson - Redirect

1          THE COURT:  Anything based on those?

2          MR. WASSDORF:  Nothing further.

3          THE COURT:  Thank you, Ms. Halvorson.  You're

4    excused.

5          THE WITNESS:  Yes.  Thank you, Your Honor.

6          THE CLERK:  The next witness is by Zoom, and we need

7    to get her on.  They need to let her know.

8          THE COURT:  Does the next witness also need

9    captioning or not?

10         THE CLERK:  No.

11         MR. SHOWALTER:  No.  But she's also on Zoom.  If we

12   could take a five-minute break to get her set up.

13         THE COURT:  That's fine.  If anybody needs to stop --

14   stretch, rather.

15      (Discussion off the record)

16         MR. KERCHER:  Your Honor, our tech expert has weighed

17   in, and he handles a lot of our Zoom depositions for us.  It

18   may be the case that Zoom has simply failed to recognize that

19   she has a camera, in which case she would need to restart her

20   computer and log back into the Zoom.

21         MR. SHOWALTER:  Should we take a --

22         THE COURT:  Either that or proceed just with audio.

23   It doesn't matter to me.

24         MR. KERCHER:  Your Honor, we don't have an objection,

25   for efficiency sake, to proceeding just with audio, no video.

Laura Halvorson - Redirect

1          THE COURT:  You want to proceed that way, or you want
2   to log her off and log back in?
3          MR. SHOWALTER:  I think we should just proceed.
4          THE COURT:  Go ahead.
5          MR. SHOWALTER:  Your Honor, my name is Mike
6   Showalter.  I'm an attorney for the HAUL plaintiffs.  We call
7   Teri Saltzman as our next witness.  Ms. Saltzman is here to
8   testify as a fact witness on behalf of plaintiffs' challenges
9   to SB1 Sections 5.02, 5.03, 5.07, 5.10, 5.12, 6.03, 6.04,
10  6.05, and 6.07, which have been challenged under Title 2 of
11  the Americans with Disabilities Act and Section 504 of the
12  Rehabilitation Act of 1973.
13         Good afternoon, Ms. Saltzman.  Can you please state
14  your name and spell it for the record?
15         THE COURT:  Oh, one second, ma'am.  If you will --
16         THE CLERK:  Need to swear her in.
17         THE COURT:  Raise your right hand and be sworn in.
18         THE CLERK:  Ms. Saltzman, I'm going to swear you in.
19      (The oath was administered)
20         THE CLERK:  Thank you.
21         THE WITNESS:  My name is Teri Saltzman.  That's Teri,
22  T-E-R-I.  Saltzman, S-A-L-T-Z-M-A-N.
23
24
25

Teri Saltzman – Direct

```
 1          TERI SALTZMAN, PLAINTIFFS' WITNESS, SWORN BY AUDIO
 2                        DIRECT EXAMINATION
 3   BY MR. SHOWALTER:
 4   Q.  And what do you do for a living?
 5   A.  I'm a disability advocate.  I assist people with
 6   disabilities.
 7   Q.  How long have you done that?
 8   A.  20 years.
 9   Q.  And what --
10   A.  Almost 25 years.
11   Q.  And what is your educational background?
12   A.  Special education, vocational rehabilitation.
13   Q.  Do you have a bachelor's or master's degree?
14   A.  Master's.
15   Q.  From where?
16   A.  Texas Tech is my master's degree.
17   Q.  And where do you currently live?
18   A.  I currently live in Pflugerville, Texas.
19   Q.  And is that --
20   A.  Travis County.
21   Q.  And how long have you lived in Travis County?
22   A.  I moved back to Travis County, Pflugerville, in 2014.
23   Q.  Are you registered to vote in Travis County?
24   A.  Yes.
25   Q.  And when did you get registered to vote there?
```

3347
Teri Saltzman – Direct

1   A.   In where?

2   Q.   And when?

3   A.   Oh, 2014, when I moved back.

4   Q.   Do you have a disability?

5   A.   Yes, sir.  I'm legally blind.

6   Q.   And does that -- does being legally blind affect things

7   that you do every day?

8   A.   Yes, sir.  I've been legally blind since I was eight.

9   And, yes, being legally blind affects every aspect of

10  independent living.

11  Q.   Do you drive?

12  A.   No, sir.

13  Q.   What tools do you use to assist with your blindness?

14  A.   Well, in order to read everything, I have assistive

15  devices from -- for reading.  I didn't get optic devices or

16  glasses, if you will, until I was about in tenth grade.  They

17  didn't come up with something to help me read until I was in

18  about tenth grade.  And with the other magnifiers, really,

19  (audio transmission gap) like binoculars, but they've been put

20  in a set of frames so that I can have hands free so I can

21  read.

22       And then as technology got better, I got assistive device

23  computer software where it would read to me, which is

24  beautiful, and magnifies, at the same time, so I can have

25  magnification and speech reading.  And it's -- technology is

Teri Saltzman – Direct

1  amazing.

2  Q.  And that just functions on your computer, right?

3  A.  Yes, sir.

4  Q.  Have you --

5  A.  And there's --

6  Q.  Go ahead.

7  A.  And I was just saying, there was -- there was things,

8  CCTVs and handheld devices, and just the, you know, wonderful

9  technology.

10  Q.  "CCTVs," by that you mean closed captioning on a

11  television, correct?

12  A.  Correct.

13  Q.  Are you a member of any disability rights organizations?

14  A.  Yes, sir.  AAPD is the -- an organization I've been a part

15  of and aware of and an advocate of for 23 years, since I've

16  been in the field.

17      And then they launched an organization called Rev Up.

18  It's a part of -- and it just promotes the advocacy of people

19  with disabilities to vote.  It's just a promotion.  And that

20  is one.

21      And The Arc of Texas is an advocacy organization that

22  supports people with disabilities in advocacy, self-advocacy.

23  So national council, all sorts of different advocacy agencies

24  and organizations.

25  Q.  You mentioned AAPP [sic] before.  Is that an acronym?

Teri Saltzman – Direct

1  A.  AAPD, yes.  American Association of People with

2  Disabilities.

3  Q.  And you mentioned that you're associated with an affiliate

4  of it called Rev Up.  Can you walk us through how you first

5  became aware of Rev Up?

6  A.  Through American Association of People with Disabilities,

7  they -- it came from AAPD, and it is just kind of an

8  organization from it, that their promotion is voting for

9  people with disabilities.

10 Q.  And you were a member --

11 A.  Just --

12 Q.  I'm sorry.  Go ahead.

13 A.  Yes.  Yes, I am.  And they just promote the idea and

14 concept of people with disabilities to vote.

15 Q.  And when did you join Rev Up?

16 A.  When I first moved back to Texas in 2014.

17 Q.  And what activities do you participate in with -- that are

18 associated with Rev Up?

19 A.  I promote the notion, the idea of.  And I talk to

20 consumers about it and promote the voting aspect of it.

21 Q.  Is voting important to you?

22 A.  Yes.

23 Q.  And when did you first become registered to vote?

24 A.  Oh, when I turned 18.

25 Q.  Why did you --

3350

Teri Saltzman – Direct

```
 1   A.  I've always voted.
 2   Q.  Why did you become registered to vote at age 18?
 3   A.  I grew up with a very strong political family and very
 4   active in voting.  My grandmother and my dad raised me and my
 5   family that way.  It is just part of my life.
 6   Q.  A few minutes ago you mentioned a second organization
 7   called The Arc of Texas.  Are you a member of The Arc of
 8   Texas?
 9   A.  Yes.
10   Q.  And how long have you been a member of The Arc of Texas?
11   A.  Since I moved back to Texas in 2014.
12   Q.  And what activities do you participate in that are
13   associated with The Arc of Texas?
14   A.  I also help promote the idea of self-advocacy for people
15   with disabilities, and -- which The Arc of Texas does.
16   Q.  And you mentioned before that you vote in Travis County?
17   A.  Yes.
18   Q.  And are you aware of a statute that is known as SB1?
19   A.  Yes.
20   Q.  When did you first hear about that?
21   A.  Is it 2021?  And -- it is 2021, or 2020.  And it affected
22   the 2021 election.
23   Q.  And before --
24   A.  2021 (audio transmission gap) 2022 election, something
25   like that.
```

3351
Teri Saltzman – Direct

1  Q.  So before passage of this thing called SB1, what was your

2  preferred way to vote?

3  A.  Mail-in ballot, preferred.

4  Q.  And why did you prefer to vote with a mail-in ballot?

5  A.  It is so much easier.  I have voted every way that there

6  is, and mail-in ballot is easier on me.

7  Q.  So did you vote in the March 2022 primary?

8  A.  Yes.

9  Q.  And you voted in Travis County for the March 2022 primary?

10  A.  Yes, sir.

11  Q.  How was your experience voting in that election?

12  A.  It was the worst experience I ever had in my whole life

13  voting.

14  Q.  Well, let's take it step by step.  What's the first thing

15  you did to vote -- to do to vote in the March 2022 primary?

16  A.  The first thing I did was -- is I took a training class

17  with the League of Women Voters.  Because of SB1, it was

18  suggested that I take this training so that I could learn the

19  new law so that I'd be sure to do it correctly.  So I took the

20  training.

21      And then I ordered -- then I called the County and ordered

22  the application to send in to be approved for the ballot --

23  then in January.  So I did that.  I ordered the ballot.

24      So somewhere like in February I got the application.  So I

25  filled out the application.  I figured that was okay.  So I

Teri Saltzman – Direct

1    filled out the application.  Then I sent in the application.
2    And this was the application to be approved to receive a
3    ballot.
4        And then I got that back and was denied to be approved to
5    receive a ballot.  And I'm like, well, okay.  I wasn't sure
6    why I was denied that.  So I read over it, and says something
7    about all the numbers.  And I looked at all the numbers, and
8    they were all correct, every number, my Social Security
9    number, the UID number, you know, that's on the card, the
10   voter ID number that's on the card and then another number.
11   Okay?  So all the three numbers are correct.  I went over them
12   and went over and over.
13       And so what I did was, is I called Disability Rights Texas
14   because I know that it's -- an important issue of Disability
15   Rights Texas is voting.  So I called Disability Rights Texas
16   and I spoke to Molly.  And I asked Molly if she could help me
17   with this because I didn't know what to do.  So Molly looked
18   at the numbers, and she also agreed that they were correct.
19       So then what she found out is she called Travis County and
20   what they suggested that I do is go to Ballot Tracker and go
21   through Ballot Tracker and cure it, right?  And so I tried to
22   do that.  But Ballot Tracker to me was not accessible.  So
23   when I went through Ballot Tracker, what it said was, is I
24   wasn't registered.  It didn't say anything about the numbers
25   being incorrect.  It said that it wasn't registered.  But I

Teri Saltzman – Direct

1   had my voter's registration card.  So that meant I was

2   registered.  So I was very confused.

3   Q.  So can we take a big step back?

4   A.  So to only -- oh, okay.

5   Q.  So who did -- was this an online process that you began

6   with?

7   A.  Yes, sir.

8   Q.  And what --

9   A.  The Ballot Tracker was an online process.

10  Q.  What office -- when you first applied for your ballot by

11  mail, what office did you apply to?

12  A.  Travis County.

13  Q.  And do you know specifically like what division of Travis

14  County it was?

15  A.  I think it's the elections office.

16  Q.  Okay.  So -- thank you.

17      So you walked us through the process.  You're now up to

18  where you're looking at Ballot Tracker.  Was the Ballot

19  Tracker website itself accessible?

20  A.  Actually, it was not.  My screen reader did not -- wasn't

21  able to read it.  Okay?  It should be able to read every word

22  on the screen.  Okay?  And then come to the point where -- the

23  very end, where you're supposed to click the button, and it

24  should read and go "button" so that the mouse would be on the

25  button and go "button" and you click it.  It did not read

Teri Saltzman – Direct

1  anything.

2      So the only way I had was the magnification.  So I would

3  have to be able to know the orientation of that document to

4  know where everything was.

5      So as I was reading it, okay, it -- I could see with the

6  magnifier some of the information and find -- to try to find

7  the button.  And I was able to find the button, but I would

8  have -- so I was on the phone about four times to get to get

9  to this spot in order to do it.

10     And finally I got a gentleman.  And he told me that the

11  reason why my application was denied had nothing to do with

12  the numbers.  He said it was because it was an outdated

13  application; had nothing to do with the numbers.

14     And I said, "Well, you're the one who sent me the

15  application."

16  Q.  So what happened next?

17  A.  So then they sent me another application.  And did the

18  same thing.  I didn't see anything different.  I put the

19  numbers on it again, the same numbers, the same place.

20  Q.  Did you verify the numbers with anybody?

21  A.  I took it to work, and I put it underneath my CCTV to make

22  sure that I did it right.

23  Q.  And is your CC --

24  A.  I was very frustrated -- I'm sorry, sir.

25  Q.  I'm sorry.  Is your CCTV at work?  I may have --

Teri Saltzman - Direct

1   A.   Yes.

2   Q.   It's more like a super magnifying, if I understand it?

3   A.   Yes.  A super magnifier, yes.

4   Q.   So what does it physically --

5   A.   I found -- yeah.  It looks like a giant monitor that

6   (audio transmission gap) you put a document underneath it, and

7   it blows it up on this giant monitor so that, you know -- and

8   then you can turn knobs, and you can even make it larger.

9   Q.   So you verified that the numbers were correct and --

10  A.   Yes, sir.

11  Q.   -- then what did you do next?

12  A.   Then I just sent it in.  But I was very frustrated that I

13  had to go this far just to get approved to vote by mail.  This

14  is not even voting by mail yet.  I haven't even gotten the

15  ballot yet.

16  Q.   So you've submitted your application.  You verified the

17  numbers?

18  A.   Yes, sir.

19  Q.   And did you -- did this result in you being issued a

20  ballot by mail?

21  A.   Finally, yes, sir.  And it was just before the March 1st

22  election, like a week.

23  Q.   So did you --

24  A.   I got the -- I got the ballot.

25  Q.   So then what happened?

Teri Saltzman – Direct

1   A.   Okay.  So -- okay.  Now I got the ballot, and so I'm

2   happy.  It's almost impossible to read because of the writing.

3   Just every spot on the -- on the envelope and on the ballot is

4   filled.  So I took my time filling everything out, the

5   Scantron, filling in the bubbles, doublecheck everything.  I

6   even had my husband make sure that everything was correct, and

7   I had him just review, make sure everything is correct with

8   the -- with the ballot.  And then I put it in the carrier

9   envelope correctly.  And then I made sure that it was signed

10  on both the line of the envelope correctly.

11      On a sidenote, I even helped people with disabilities make

12  sure to sign it correctly in different states and things like

13  that.  So I knew to do this.  I knew that it had to be

14  perfect.  Okay?

15      But inside -- underneath the flap of the envelope, there

16  was a whole -- there were like three or four things you had to

17  do.  And I think I missed a spot.  And with that, they would

18  not accept my ballot -- my ballot.  There was something

19  underneath the flap.

20  Q.   So did you --

21  A.   So it was --

22  Q.   Did your disability prevent you from seeing instructions

23  as to what would go underneath the flap of this envelope?

24  A.   Oh, absolutely.

25  Q.   Why?

Teri Saltzman – Direct

```
 1  A.  Absolutely.
 2      Even with my glasses and all my technology and all the
 3  people in the world to help me, I still couldn't see one area.
 4  Just there was one thing that I couldn't see to do.
 5  Q.  And --
 6  A.  And it just --
 7  Q.  And that area required you to put what in?
 8  A.  I think I have to check a box.
 9  Q.  So what happened next?
10  A.  So I called the elections office again.  And they said,
11  "Oh, well, you can -- you can cure it."
12      I said, "Okay.  How do I do that?"
13      They said, "Well, you can drive by and come into our
14  office and fix it."
15      And I said, "I'm blind, so I can't drive."
16      And they said, "Or you can go to Ballot Tracker."
17      And that means, oh, I have to go through Ballot Tracker
18  again.  Okay?
19      So I said, "Okay.  I'll go through Ballot Tracker again.
20  I'll try."
21      And so I tried to go through Ballot Tracker again.  But,
22  again, it's still not accessible.  But I knew it wasn't
23  accessible because of the first time.  So I went through
24  Ballot Tracker again.  And this time I was more oriented to
25  it, because it wasn't accessible the first time.  So it's not
```

Teri Saltzman – Direct

 1  going to be accessible the second time.  So I knew how to set

 2  my magnification up because it wasn't.

 3      So when I called them, you know, I had them walk me

 4  through it, okay, because of it not being accessible.  And I

 5  asked them, walk me through it so (audio transmission gap)

 6  cure it.  It took me several times to get it cured.  Finally,

 7  they were able to get me to the spot to cure it, and I was

 8  able to get it cured.  I asked him if he could do it.  He

 9  said, no, he can't do it.  That was illegal.

10      So I was able to get it done.  And on -- and then about an

11  hour after I hung up, I called back to check, and they said,

12  yes, it happened.

13  Q.  And what happened next as to this?  Did your ballot count

14  for this election?

15  A.  I don't know, because about a week later I got another

16  letter from them saying that it didn't -- it was denied.  But

17  I made the assumption, which I, you know -- but I made the

18  assumption that it was a duplicate of a previous letter.  But

19  I really don't even know if my March election was accepted.

20  Q.  So in general, just to sum up, what is your opinion of

21  voting in the March 2022 primary for you as a person with a

22  visual disability?

23  A.  It was horrible.

24  Q.  So when did you vote next?

25  A.  So then there was a May election, a runoff, I think.

3359
Teri Saltzman – Direct

1   Q.  And how --
2   A.  And -- yeah.  I'm sorry.
3   Q.  And how did you vote in the May election?
4   A.  So I decided that I had enough of that.  So I decided to
5   go through a curbside voting.  That was my very first time to
6   do that.  So I had my husband drive to a curbside, which was
7   on Kelly Lane.  And we went and we did that for my first time
8   of trying that.  And that was horrible.  I'll never do that
9   again.
10      So we went to do that, and the guy comes running out with
11  a laptop.  And that was completely inaccessible.  I couldn't
12  see anything.  I couldn't -- it was -- I couldn't see the
13  screen.  I couldn't see the keyboard.  It's like, nothing.  It
14  was very -- it was hilarious, really.
15  Q.  So I assume that the laptop that he presented to you did
16  not have any of the assistive technologies that you typically
17  use?
18  A.  Oh, no.  Oh, no.  It was -- it was like -- it was very
19  funny.
20  Q.  So did you manage to vote in this May 2022 election?
21  A.  My husband had to read it to me, and then I'd have to say,
22  "push that."  It was -- it just -- it was not -- I'll never do
23  it again.
24  Q.  So just summing up, how -- this experience was also not a
25  good experience?

3360
Teri Saltzman – Direct

 1  A.  No, sir.

 2  Q.  So moving on to the next election, in 2022 did you try to

 3  vote in a November election?

 4  A.  Yes, I did, of course.

 5  Q.  So can you walk us through that experience?

 6  A.  So I was very hesitant about voting.  This was -- and I

 7  love voting.  Okay?  But this, I think, is the very first time

 8  in my life that I was very hesitant.  So I carried my ballot

 9  around in my bag for days, for weeks, just carried it around,

10  because I was going to go do it at work, or I was going to --

11  I walked to go vote.  I -- you know, I mean, I've done -- I've

12  been very excited about voting.  But this time, that year, I

13  was very hesitant, very nervous about it.

14      But it got very close.  I needed to get it done.  So I

15  pulled out my ballot -- my ballot, and started to look at it,

16  look over it.  And I promise you, it was even smaller.  I

17  don't know how they could make it smaller.  I do not know how.

18  But they made it smaller.  And they got more information on

19  there.  I don't -- I can't tell you how they did it, but they

20  did it.

21  Q.  Could you --

22  A.  It took --

23  Q.  Could you compare --

24  A.  I'm sorry.  Go ahead.

25  Q.  I'm sorry.  It's hard because we don't -- without the

3361

Teri Saltzman - Direct

1  camera, it's hard to sometimes understand when we're done

2  talking.

3      What size was the type, like if you had to compare it to a

4  font?

5  A.  Oh, I don't -- I can't tell you.  Well, let's just say --

6  we'll start -- it is smaller than that.  Okay?  It's going to

7  be smaller than that.  But let's just say a 9 to a 6, or a 6

8  to a 3.  Let's just say it went like that.  Okay?

9  Q.  Okay.

10  A.  Okay.  But it's got to be a bit different from that.  It's

11  just, you know, comparison.

12      But so -- and I think I even sent Lisa or Marisol a copy

13  to show them the difference.  Okay?  But --

14  Q.  Who are Lisa and Marisol?

15  A.  But --

16  Q.  One question:  Who are Lisa and Marisol?

17  A.  Disability Rights Texas.

18      So I did -- I did what I did.  I slowed down.  I went

19  very, very slow filling it out, like I always do.  I even had

20  a coworker, some coworkers kind of look things over for me.

21  Not answer things or anything like that, just make sure, like

22  I said, the Scantrons, okay, things are bubbled in, just make

23  sure that I did things the way I wanted them done.  Okay?

24  Just doublecheck, okay, make sure, okay.

25      I brought it -- I brought the ballot home to have my

1  husband doublecheck the inside flap, okay, because that was my

2  problem with the March election, was the inside flap.  So he

3  checked the inside flap for me, make sure I got all of that

4  correct.  And then I signed it and made sure he checked --

5  made sure the flap was signed correctly, and then I sent it

6  in.

7  Q.  What happened to your ballot?

8  A.  I called about three days later.  I gave it three days.  I

9  called three days later.  They said they got it and it was

10  good.  I did not receive a letter.  I did not receive a denial

11  or anything.  So I assume it's okay.

12  Q.  So you believed --

13  A.  I trusted --

14  Q.  But you believe your ballot was accepted for this November

15  2022 General Election?

16  A.  They said it was.

17  Q.  So you mentioned you've contacted Travis County's election

18  office several times in the course of these three elections

19  concerning your attempts to vote?

20  A.  Yes, sir.

21  Q.  At any time did any member of the office mention to you

22  that you could request a modification of voting procedures

23  based on your disability?

24  A.  No, sir.

25  Q.  Did you tell people at the Travis County election office

Teri Saltzman – Direct

1  that you needed help with your ballot?

2  A.  Yes, sir.

3  Q.  And did they know you had a disability?

4  A.  Yes, sir.

5  Q.  Did they ever offer to waive or change the voting ID

6  requirements to help you vote easier due to your disability?

7  A.  No, sir.

8  Q.  And you indicated you visited the Travis County elections

9  website?

10  A.  Yes, sir.

11  Q.  Did the website mention that you could request

12  modification to any of the ID requirements because of your

13  disability?

14  A.  If it mentioned it, I did not see it.

15  Q.  Did the website mention anything about the Americans with

16  Disabilities Act or the ADA?

17  A.  I would certainly hope so.

18  Q.  But do you recall seeing anything?

19  A.  No, sir.

20  Q.  Did the Texas Secretary of State's ballot by mail tracker

21  website mention that you could request a modification of any

22  of the ID requirements because of your disability?

23  A.  Oh, I hope so.  But I didn't see it.  I don't recall.

24  Q.  Do you intend to keep voting in the future?

25  A.  Absolutely.

3364

Teri Saltzman – Direct

1  Q.  Why?

2  A.  Oh, I have to.  It's embedded in me.

3  Q.  And your personal --

4  A.  And I feel that voting is extremely important, especially

5  for people with disabilities.

6  Q.  Do you think that voting is more difficult for you now

7  after SB1 and in part due to your disability?

8  A.  Oh, yes.

9  Q.  Do you think the process has gotten any easier in these

10 elections that have passed since SB1?

11 A.  I don't have any faith to make it easy.  I don't see why

12 it will be easier.

13 Q.  Going into the next election, do you have any faith that

14 your ballot will be counted, or do you believe that you'll

15 have difficulties again?

16 A.  I have no reason to believe that it will be easier.

17 Q.  Do you personally --

18 A.  I have no reason.

19 Q.  Do you personally want voting by mail to go back to the

20 way it was before the passage of SB1?

21 A.  Yes, sir.  I don't know why it is so hard.  That was the

22 worst experience I've ever had in my whole entire voting life.

23        MR. SHOWALTER:  No further questions, Your Honor.

24 I'll pass the witness.

25        THE COURT:  Anything further on this side?

3365
Teri Saltzman – Cross

1          Any cross?

2          MR. BERG:  Yes, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. BERG:

5    Q.  Good afternoon, Ms. Saltzman.  This is Zachary Berg from

6    the Office of the Attorney General.  How are you?

7    A.  Hi.  I'm good.  Thank you.

8    Q.  On direct, you testified that you always vote by mail

9    ballot; is that correct?

10   A.  No.  I voted various ways.

11   Q.  And the first time you voted by mail ballot after

12   returning to Texas in 2014 was in the 2020 election, correct?

13   A.  Oh, no.  I voted in 2014.

14   Q.  Sorry.  Let me break that up into two questions.

15       You've been voting in Texas since 2014, correct?

16   A.  I voted since I returned back in 2014.  I've been voting

17   in Texas since the '80s, when I moved to Texas originally.

18   Q.  And after you returned to Texas in 2014, 2020 was the

19   first time that you voted by mail ballot, correct?

20   A.  No.  I don't think so.

21   Q.  For the application for ballot by mail in 2022, you

22   testified that Travis County sent you the wrong application,

23   correct?

24   A.  That's what they told me.

25   Q.  The gentleman at Travis County, I believe you said that

Chris Poage, RMR, CRR
Official Court Reporter

Teri Saltzman – Cross

1  he –– that Travis County sent you an old application for
2  ballot by mail; is that right?
3  A.  That's what he told me, yes.
4  Q.  And by that you understood that to mean a application from
5  before SB1, right?
6  A.  I guess that's what it meant, but I asked for the
7  application in January of that year.
8  Q.  And then in the March 2022 primary, Travis County told you
9  that your ballot had been cured, correct?
10  A.  After the election?
11  Q.  The March 2022 primary, did Travis County tell you that
12  your mail ballot had been cured?
13  A.  After the –– after the process?  Yes, finally.  But then I
14  got that denial letter after the election.
15  Q.  And you voted in the May 24th, 2022, primary runoff,
16  correct?
17  A.  Yes, sir.
18  Q.  And that ballot was accepted, correct?
19  A.  I suppose so.
20  Q.  And you voted by mail ballot in the November 2022 General
21  Election, correct?
22  A.  Yes, sir.
23  Q.  And that ballot was accepted?
24  A.  Yes, sir.
25  Q.  Let's talk about, on direct, counsel asked you about

Teri Saltzman – Cross

1  accommodations.  You've never requested a reasonable

2  accommodation in Texas, correct?

3          MR. SHOWALTER:  Objection; calls for a legal

4  conclusion.

5          THE COURT:  That's overruled.

6  BY MR. BERG:

7  Q.  You can answer it as to your understanding.

8  A.  Okay.  So can you ask me that again, please, sir?

9  Q.  Yes.

10      You've never requested a reasonable accommodation for

11  voting in Texas, correct?

12  A.  No, sir.

13      When you -- when you apply to vote by mail, it asks what

14  reason.  And what reason that the State allows, one of them is

15  disability.  So when I check off "disability," I think that

16  what I'm saying is that is my accommodation.

17  Q.  Let me ask you a differently phrased question.

18      Have you ever --

19  A.  Sure.

20  Q.  -- requested that an election official make a change to

21  the voting process to accommodate your disability?

22  A.  Okay.  So no, sir.  However, in the voting sites they have

23  to have audio.  They have to have large print machines.  And

24  they -- they have to have those accessible at walk in by law.

25  So they have to have that.  They have to have that

Teri Saltzman – Cross

```
 1  accessibility.
 2  Q.  Understood.
 3      You mentioned your –– that you are a member of Rev Up
 4  Texas and The Arc of Texas, correct?
 5  A.  Yes, sir.
 6  Q.  And part of what you testified that you do with these
 7  organizations is advocacy regarding voting for people with
 8  disabilities, correct?
 9  A.  Yes, sir.
10  Q.  Would you say that you follow proposed legislation that
11  will affect Texans with disabilities?
12  A.  Say that again.
13  Q.  Would you say you follow ––
14  A.  I'm sorry.
15  Q.  Would you say you follow proposed legislation that will
16  affect Texans with disabilities?
17  A.  Yes, sir.
18  Q.  Are you aware of how ––
19  A.  And –– and –– and throughout the country.
20  Q.  Are you aware of House Bill 3159 from the most recent
21  legislative session which would have allowed mail voters who
22  need assistance marking or reading ballots to do so privately
23  and securely by using an electronic system to make their
24  choices?
25  A.  No.  I didn't –– I was not aware of that.
```

Teri Saltzman – Redirect

1   Q.  And are you aware that Senator Bryan Hughes was the

2   sponsor of that bill?

3   A.  No, sir.  That's good.

4           MR. BERG:  Thank you, Ms. Saltzman.  That's all I

5   have for you.  I hope you're well.

6           I pass the witness.

7           THE WITNESS:  Thank you.

8           THE COURT:  Anything else?

9           MR. NICHOLS:  No, sir.

10          THE COURT:  Any redirect?

11                      REDIRECT EXAMINATION

12  BY MR. SHOWALTER:

13  Q.  Ms. Saltzman, thank you for your time.  One other

14  question.

15      If they introduced a bill today which could help you have

16  vote by mail securely and privately, would that give you any

17  chance to go back in the election in which your ballot didn't

18  count?

19          MR. BERG:  Objection; misstates testimony.

20          THE COURT:  That's overruled.

21          THE WITNESS:  Okay.  So you're asking me what again,

22  sir?

23  BY MR. SHOWALTER:

24  Q.  If they introduced a bill today in 2023 that would take

25  effect either later in 2023 or 2024, does that do anything to

Teri Saltzman – Redirect

1  affect your inability to vote or problems in voting in the

2  elections that happened in 2022?

3  A.  What the bill did that changed the vote by mail affected

4  the way a person would fill out the ballot, negatively

5  affected the way a person voted on a ballot.  And if it

6  continues that way and stays that way, it's not going to

7  change.  It's just going to make it hard and continue that

8  way.  That's what changed.  And it's not going to be better.

9            MR. SHOWALTER:  Thank you.

10           Nothing further.

11           THE COURT:  Anything based on that?

12           MR. BERG:  No, Your Honor.

13           THE COURT:  Thank you, ma'am.  You're excused.

14           THE WITNESS:  Thank you.

15           THE COURT:  And your next witness.

16           MS. HOLMES:  Your Honor, the plaintiffs call Marla

17  Lopez as our next witness.

18      (Witness enters courtroom)

19           MS. HOSTETLER:  Good afternoon, Your Honor.  Our next

20  witness is Marla Lopez.  And her testimony is relevant to Mi

21  Familia Vota claims challenging SB1 Sections 2.05 through

22  2.07, 3.04, 3.09 and 3.10, 3.12, 3.13, 4.01, 4.07, 4.12, 5.03

23  through 5.04, 5.07, 5.08, 5.13, 6.03, 6.04 through 6.07, 7.02,

24  and 7.04.

25      (The oath was administered)

```
 1              MARLA LOPEZ, PLAINTIFFS' WITNESS, SWORN
 2                       DIRECT EXAMINATION
 3   BY MS. HOSTETLER:
 4   Q.  Good afternoon.  Can you please state your name for the
 5   record.
 6   A.  Yes.  Marla Gloria Lopez.
 7   Q.  And how old are you?
 8   A.  I'm 26.
 9   Q.  Can you tell us your educational background?
10   A.  Yes.  I went to high school in Brownsville at Rivera High
11   School, and then I went to college at the University of Texas
12   at Austin.
13   Q.  And where do you work now?
14   A.  I work with Molly Cook for Texas Senate.
15   Q.  And did you work for Mi Familia Vota for a time?
16   A.  Yes.
17   Q.  What was -- what time period was that?
18   A.  November 2019 to April 2022.
19   Q.  Okay.  Where were you born?
20   A.  I was born in Atlanta.
21   Q.  And do you live in Texas now?
22   A.  Yes.
23   Q.  When did you move to Texas?
24   A.  I moved when I was about three or four years old.
25   Q.  And where did you move?
```

Marla Lopez – Direct

1   A.   I moved to Brownsville.

2   Q.   And where in Texas is Brownsville?

3   A.   Brownsville is on the U.S.-Mexican border by the Gulf of

4   Mexico.

5   Q.   What was Brownsville like growing up?

6   A.   Brownsville is very beautiful.  It is mostly Mexican

7   heritage culture.  There is a long history of, you know,

8   immigration and community building.  It is very family

9   oriented.  The school system, the school ISD, is the biggest

10  employer.

11       And I lived in Brownsville.  But in many parts of

12  Brownsville there are communities that are unincorporated.  We

13  call these "colonias."  And so those are some areas where we

14  don't have, you know, basic things like street lighting,

15  ditches, some places no running water.  So there's a great

16  variation for need, and there's also a lot of poverty.  But

17  it's all around a great place to live.  Very calm, very safe.

18  Q.   And what was it like living near the border?

19  A.   It was very militarized.  It wasn't uncommon for me to see

20  like ICE agents at the Stripes or at the gas stations on the

21  side of the road.  Police also very present.  And that didn't

22  always make me feel very safe.  But they're always -- they're

23  around, and, yeah, a lot of militarization.

24  Q.   How did that militarization aspect, how did it affect how

25  you or folks in your community view government officials?

Marla Lopez – Direct

1   A.  Well, I mean, generally it was a lot of distrust.

2   Oftentimes, like I said, there's a big history and a very

3   clear memory generationally of, you know, community fleeing

4   oppressive government.  And so that kind of history and

5   interaction have always kind of made interacting with police

6   very tense.  Folks don't often want to, you know, even seek

7   out resources because they fear it might be used against them

8   or, you know, just a lot of fear around surveillance in giving

9   information.

10      So oftentimes, you know, especially with, like, schools

11  and the presence of police in schools, those are things that

12  are also very concerning for family members.

13  Q.  When you said that it would make people not want to seek

14  out resources, could you explain what you mean there?

15          MR. BRYANT:  Objection, Your Honor.  It's not

16  relevant to the case.

17          THE COURT:  Yeah.  Where are we headed with this?

18          MS. HOSTETLER:  We are speaking about reasons why

19  individuals might have concerns about, for example, having to

20  sign oaths, having to give information.  So I do believe it is

21  relevant to how, for example, the assisters might look at some

22  of the provisions of SB1.

23          THE COURT:  Go ahead.

24          THE WITNESS:  Could you repeat the question?

25

Marla Lopez – Direct

1  BY MS. HOSTETLER:

2  Q.  Sure.  When you spoke about people not wanting to seek out

3  resources, could you explain what you mean by that?

4  A.  Yeah.  So in the Valley we're often hit by like natural

5  disasters, the power grid failing, for example.  And so

6  sometimes where there are relief centers or programs that

7  could provide some kind of relief, there is typically local

8  government present, often police as well.

9      And I think because of a lot of those generational trauma

10  that the Latino community in the Valley has, they're often a

11  little skeptical or hesitant.  They fear that they might be

12  asked, you know, different questions about where they live,

13  who they are, who lives with them, those types of things.

14  Q.  Where did you go to high school?  I know you said that.

15  Could you repeat it?

16  A.  Rivera High School.

17  Q.  What was your experience like in high school?

18  A.  Well, it -- going to high school in the Valley is really

19  interesting.  Most of us are, like I said, of Mexican Latino

20  heritage.  There are a lot of mixed status students there.

21  There's a big population of ESL students, which is English --

22  or English second language, English learning, something like

23  that.  So that's -- it's very easy to see this kind of

24  separation between if you speak English, if you don't speak

25  English.

3375

Marla Lopez - Direct

1    I mentioned I'm from Atlanta.  So something that helped me

2  a lot, especially when working with, you know, teachers or

3  like interacting with administration, was pretty much staying

4  away from speaking a lot of Spanish, or Spanglish.  Oftentimes

5  speaking Spanish is seen as -- you know, I guess like you're

6  probably a troublemaker, or if you don't speak English really

7  well, like, you probably don't understand a lot of like rules,

8  that type of stuff.  So I used to make a point of not only not

9  speaking Spanish, but mentioning like, "Oh, I'm not from the

10 Valley.  I'm from Atlanta," so kind of to, I guess, more put

11 me in the space of, like, I'm a good student.  I am deserving

12 of, like, your attention and support from teachers.

13        THE COURT:  We're getting really far afield now.

14 BY MS. HOSTETLER:

15 Q.  In high school, did you get involved in civic education or

16 civic activism?

17 A.  Yes, I did.

18 Q.  Can you briefly explain how you got involved?

19 A.  Yeah.  So I wanted to be a teacher in high school.  And in

20 2011 was when the STAAR test was rolled out.  And so as a high

21 school student, we were taking, you know, over a dozen tests.

22 And across the street from my high school was the elementary.

23 So a concern of my classmates and I was, are kids being able

24 to go to recess.  And so we lobbied the school board --

25        THE COURT:  Same issue.

Marla Lopez – Direct

1  BY MS. HOSTETLER:

2  Q.  How did your parents feel when you started becoming

3  involved in that advocacy?

4  A.  They were concerned, but they were proud of me for being

5  involved.

6  Q.  When you were growing up, do you remember seeing your

7  parents vote?

8  A.  No.

9  Q.  Is your father a plaintiff in this case?

10  A.  He is.

11  Q.  What is your father's name?

12  A.  Marlon Ramon Lopez.

13  Q.  And where does he live?

14  A.  He lives in Harris County.

15  Q.  What does he do?

16  A.  He's a welder.

17  Q.  Who does he work for?

18  A.  He works for a contracted group of welders.

19  Q.  How many hours a day does he tend to work?

20  A.  Typically about 12 hours.

21  Q.  Is it a hard job, physically?

22  A.  Yes.  He often comes home with burn marks on his arms and

23  things like that.

24  Q.  Where does he work?

25  A.  Right now, he works in Baton Rouge.

Marla Lopez – Direct

1   Q.  Does he always work in Baton Rouge?

2   A.  No.  Sometimes he could be outside of the country.  He

3   could be across the country.  Just depends.

4   Q.  So do the projects take him all over?

5   A.  Yeah.  One time he was in the U.S. Virgin Islands, for

6   example.

7   Q.  Where does he stay when he travels?

8   A.  Currently, he lives in a camper that he takes with him.

9   Q.  And so he's in the camper when he's at these work sites?

10  A.  Uh-huh.

11  Q.  When he has a project in Harris County, how far is his

12  commute?

13  A.  At least an hour.

14  Q.  Can he be here to testify during this trial?

15  A.  No.

16  Q.  Why not?

17  A.  He's in Baton Rouge, working.

18  Q.  Is that unusual that he's called out of county?

19  A.  No, it's not unusual.

20  Q.  Does he tend to get weekends off?

21  A.  Not typically.  Sometimes he'll work 12, two weeks

22  straight, and then get two days off.  And sometimes those days

23  off won't coincide on the weekend.

24  Q.  Does he have a lot of free time when he gets a day off?

25  A.  No.

3378
Marla Lopez - Direct

1   Q.  Have you talked with your father about voting?

2   A.  Yes, I have.

3   Q.  What do you talk about?

4   A.  Typically I talk to him about when he's available to vote,

5   when are the days to vote.  So we talk about making a plan to

6   vote.

7   Q.  Okay.  Did he vote in 2020?

8   A.  Yes.

9   Q.  Did you vote with him?

10  A.  I did.

11  Q.  How did you both vote?

12  A.  We voted drive-through.

13  Q.  How did you make that plan, or how did the two of you make

14  that plan?

15  A.  He was working in Harris County.  And I knew that there

16  was a voting location near his area.  And so we made a plan to

17  vote.  And that plan changed a few times because of his work

18  schedule.  And we just looked to the different options in the

19  time that we had.

20  Q.  Do you remember what day of the week you voted?

21  A.  It was a Saturday.

22  Q.  Okay.  Can you tell me about the drive-through voting

23  process that you experienced?

24  A.  Yes.  We showed up.  My dad was driving.  My little sister

25  was in the back seat.  We were going to run an errand after

Marla Lopez - Direct

1  voting.  So we pulled up to the drive-through, and we had to

2  get under, like, a -- like a roof, outdoor roof structure,

3  like a tarp, I guess.  And the poll worker spoke to my dad

4  first on the driver's side, asked us who was voting.  We said

5  him and I.  And he asked us for IDs.  Gave him our IDs.  He

6  went and checked it with the system.

7      And he gave us back our IDs and said -- he said to me that

8  I was going to need to fill out a form afterward.  And I think

9  what he had told me was that because my ID -- the address on

10 my ID didn't match what was on the voter roll.  And I

11 expressed -- I was like, "I'm pretty sure that doesn't mean I

12 need to vote provisional.  But sure, we'll talk about it after

13 I'm done voting."

14     He gave my dad a machine.  And then there was a wire that

15 ran under the truck already set up.  So he passed me another

16 machine.  And then he waited by my dad's side while we both

17 voted.

18     And then he gave my dad his sticker.  And then he had me

19 go over the provisional ballot form.  And I was like, "I'm

20 pretty sure that my ID's address does not need to match what's

21 on the voter roll, because that's where I live according to

22 what's on my voter roll, I'm registered under."  And so we got

23 the election judge involved.  And they said that's correct.

24 You don't need to vote provisional.  So he tore up the form in

25 front of me.  And then I got my sticker.  And we went and got

3380

Marla Lopez – Direct

1  a Happy Meal for my little sister after that.

2  Q.  Just to clarify, the registered voter address, was that

3  your updated address?

4  A.  Yes.  That was –– that was the address I was living at on

5  the registration.

6  Q.  And why didn't your driver's license address match that?

7  A.  I had just moved from the one apartment to another part of

8  the city.

9  Q.  Was there an election worker present by your car as you

10  voted?

11  A.  Yes.

12  Q.  Did you have to show your identification?

13  A.  Yes.

14  Q.  Would the election worker had either seen or heard either

15  you or your father if you were doing or saying something you

16  weren't allowed to do?

17  A.  Yes, he would have.

18  Q.  Would your dad have been able to vote in 2020 without

19  drive–through or extended–hour voting?

20  A.  I don't think he would have been able to.

21  Q.  Why not?  What were some of his limitations?

22  A.  Well, his work schedule was really complicated.  And

23  because we had different options and more time to make a

24  different plan if needed, we were able to show up through

25  drive–through.  And that was the best option for him.

3381
Marla Lopez – Direct

1  Q.  Okay.  Do you know if he's voted since SB1 passed?

2  A.  I don't think so.

3  Q.  Is he eligible to vote by mail in all elections?

4  A.  Not in all elections, no.

5  Q.  Okay.  Turning to you, what was the first election that

6  you voted in?

7  A.  It must have been the 2016 primary.

8  Q.  And briefly tell me about that voting experience.

9  A.  I was a student at the University of Texas at Austin.  And

10  in between classes I went to the Flawn Center where they have

11  the voting location.  And I showed up, showed them my ID.

12  They gave me my access code.  I voted.  And then I got my "I

13  voted" sticker.  And I asked for it in Spanish.  And then I

14  think I went to work or to class after that.

15  Q.  Did you hold a job while you were a student?

16  A.  Yes.

17  Q.  If you hadn't been able to vote on campus, would you have

18  been able to vote?

19  A.  It would have probably been very difficult.

20  Q.  Do you vote regularly now?

21  A.  I try to.

22  Q.  Did you vote in the 2022 primaries?

23  A.  I did.

24  Q.  During those primaries, did you have occasion to help

25  anyone else vote?

Marla Lopez – Direct

1   A.   I did.

2   Q.   Can you please tell me about your experience?

3   A.   Yes.  So I was still working with Mi Familia Vota, and

4   they had a hotline.  We got a call from an elderly

5   Spanish-speaking couple that they didn't know where their

6   polling location was and they would like somebody to help them

7   go vote.

8        So I showed up.  And I didn't realize this until I showed

9   up, that the voting location was at their senior living

10  center.  It was like an apartment senior living, independent

11  living-type thing.  And they were both monolingual Spanish

12  speakers.

13       So I walked with them from their apartment to the voting

14  location.  And they wanted me to assist them.  But I was like,

15  there's probably an election worker who's better equipped to

16  assist you.  And so they -- I told the election worker that

17  they wanted somebody to help them in Spanish.  And so the

18  election worker did.  And I had waited to vote until then so I

19  could accompany them.  And then so they voted with the

20  election worker kind of helping them navigate the system.  And

21  then I voted as well at another booth.

22  Q.   Why did you tell them you would rather a poll worker

23  assist them than yourself?

24  A.   I just didn't feel comfortable.  And I didn't feel like I

25  really understood the law just yet.  And I knew there was a

Marla Lopez – Direct

```
 1  form that I may or may not have to sign.  So I just didn't
 2  want to put my name down on a form and risk myself being
 3  prosecuted or sued, for whatever reason.
 4  Q.  Have you ever served as an election worker?
 5  A.  Yes.
 6  Q.  When?
 7  A.  As an election worker?  I think in the spring of 2021.
 8  Q.  And which county did you serve in?
 9  A.  Harris County.
10  Q.  And did you serve on Election Day or early voting?  Do you
11  remember?
12  A.  As an election worker, I don't remember what day.
13  Q.  Why did you become an election worker?
14  A.  This was around -- it was still during the pandemic, and I
15  knew that a lot of the election workers that typically help
16  out are older, often monolingual English speakers.  And so a
17  lot of folks -- they were short staffed because older folks
18  did not want to risk themself getting sick.  And since I'm a
19  Spanish speaker, I was like, you know, I'm in pretty good
20  health.  I can do it.
21  Q.  And have you ever served as an election judge?
22  A.  Yes, I have.
23  Q.  Do you remember which election?
24  A.  It was the 2021 election, in the fall.
25  Q.  Did you serve on Election Day?
```

Marla Lopez – Direct

1  A.  I believe so.

2  Q.  And which county?

3  A.  Harris County as well.

4  Q.  And how did you come to serve as an election judge?

5  A.  So through MFV, because of our election voter engagement

6  work, I have met a lot of the employees from the election

7  administrator, and they had told me that they needed judges

8  because they didn't have enough judges or people that were

9  very familiar with, like, voting locations and how, like,

10  those operations work and they needed somebody at a specific

11  location.  Otherwise, they weren't going to be able to operate

12  that voting location.

13  Q.  Just to clarify, when you say "MFV," are you referring to

14  Mi Familia Vota?

15  A.  Yes.  Thank you.

16  Q.  Okay.  So briefly, what was your day like as an election

17  judge?

18  A.  I started my day like at 5:00, 4:00 a.m.  I had to show up

19  to the voting location and set up the machines.  I had to set

20  up the scanner.  I had to make sure all of the wiring was out

21  of the way for voters.  I had to make sure the curbside

22  drive-up was operational.  And I had to make sure I had all my

23  forms.  I had to make sure everything was set up.

24      And then we opened the polling location at 7:00.  We ran

25  the voting location.  And then around -- well, actually at

3385

Marla Lopez – Direct

1  7:00 was when I had to start picking up, putting machines away

2  and making sure I had all of the ballots and the forms filled

3  out appropriately.  I had to zip-tie some ballots in a

4  specific box.  And then I believe it was around like 8:30 or

5  9:00 that I went to the dropoff location, which is at NRG Park

6  in Harris County.  And I had to wait in line until about 11:00

7  to make sure all of the equipment was turned in, the ballots

8  were signed off, and turned in appropriately, and then I went

9  home.

10  Q.  Did you get training before being an election judge?

11  A.  I did.

12  Q.  During your training did you talk about or were you

13  trained in poll watchers?

14  A.  We briefly mentioned -- they briefly mentioned like there

15  may or may not be poll watchers, but we did not get into it

16  very specifically.

17  Q.  How did you feel about that?

18  A.  It made me really nervous.  I think the laws were

19  changing, and I didn't feel like I really understood what was

20  changing.

21  Q.  Were you concerned about the possibility of disruptions

22  from poll watchers?

23  A.  Yes.

24  Q.  What were some of your concerns?

25  A.  Well, as an election judge, you have to make sure that the

3386

Marla Lopez - Direct

1  machines and the location is ready to go so a voter can come

2  in, vote efficiently, and then, you know, leave.  And so I was

3  just concerned that, you know, a poll watcher could come and

4  be disruptive and maybe, like, invade the space of a voter so

5  a voter might not feel comfortable.  And as an election judge,

6  I'm responsible to handle those situations.

7      And like I said, I didn't feel like I really understood

8  what would happen.  I just knew that the laws would change and

9  I could be sued by a poll watcher essentially.

10 Q.  Did you think you were going to do anything wrong?

11 A.  I mean, I knew that I was going to do the best that I

12 could based on the training and the knowledge that I had.  But

13 because things were changing, I just didn't feel

14 superconfident that even though I had good intentions, like

15 somebody could perceive that as, that's wrong, even though I'm

16 just trying my best to help out.

17 Q.  Do you have a good sense of, you know, where poll watchers

18 are allowed to go, allowed to do, what they aren't?

19 A.  I think now I kind of do, kind of.

20 Q.  Would you serve as an election judge again, now that SB1

21 is in effect?

22 A.  I don't think so.

23 Q.  Why not?

24 A.  Well, first, I don't really feel like I understand, you

25 know, what exactly poll watchers can do.  But I don't really

3387
Marla Lopez – Direct

1  think that the law has –– I guess if there were to be a

2  lawsuit or something, I don't think that there's any

3  protection for me as an election judge, that I could really

4  just be left out to dry and, like, not have anything to

5  protect me as an election judge, just trying to make sure that

6  the voting location is safe for voters.

7  Q.  Switching topics to your time at Mi Familia Vota, can you

8  remind me when you started working for them?

9  A.  November 2019.

10  Q.  And what was your job title then?

11  A.  I was a census organizer.

12  Q.  And was there a point at which you took on a new position

13  at Mi Familia Vota?

14  A.  Yes.  In 2020 I was promoted to interim Houston

15  coordinator.  And then in 2021 I became full-time Houston

16  coordinator.

17  Q.  Could you tell me about your responsibilities as Houston

18  coordinator?

19  A.  I managed the organizers and the organizing department.

20  And we had, I believe, like three main programs.  And so I

21  oversaw those programs.

22  Q.  Okay.  Can you tell us what those three programs are?

23  A.  Yes.  We had our main program, which is the youth

24  leadership program.  And then we had the environmental justice

25  program.  And then we were also working on an access to

Marla Lopez - Direct

1  healthcare program at the time.

2  Q.  Did you do any work with Mi Familia Vota around voter

3  engagement?

4  A.  Yes.

5  Q.  Could you tell me what some of that work looks like?

6  A.  So the voter engagement was year-round.  So we would go

7  register students at their high schools.  We would table at

8  community events and talk to people about voting and any

9  deadlines to register to vote, helping them register to vote,

10  check their registration.  And then during election times we

11  would also help them make a plan to vote.

12  Q.  You talked about making a plan to vote.  What does that

13  look like?

14  A.  So we would come into contact with voters.  Either they'd

15  call us or, you know, we would meet them in the community.

16  And we would tell them when they could go vote, where they

17  could go vote, what times were the polling locations open,

18  forms of acceptable ID, and different voting options that they

19  had.  So there's early voting and then Election Day.  If they

20  had any, you know, like, accessibility issues or curbside.  So

21  we went over all of the different -- well, the options that we

22  had or they had.

23  Q.  And where does the "making the plan" part come in?

24  A.  So, for example, we would get a call on the hotline and

25  somebody would explain, you know, "I want to go vote.  I don't

Marla Lopez - Direct

1  know when.  I don't know where."

2      And so we'd ask them, "Okay.  Well, where do you live?  Do

3  you work?  What days are you free?"

4      And so we would look at that against the calendar with

5  them.  And we would decide if there was, like, a specific time

6  or place that worked best for them.

7  Q.  During the 2020 election, was it helpful to be able to

8  tell Harris County voters about 24-hour voting?

9  A.  Yes.  That was a really -- that was a popular option for a

10  lot of folks that worked like dayshifts or like worked nights.

11  So they -- that was also part of the conversation, making a

12  plan to vote.  There were also I think -- of course, like

13  drive-through was an option as well.  And so we mentioned that

14  to folks.

15      And in Harris County you can also vote at any location.

16  You're not like zoned to a specific voting location.  So a lot

17  of that voter education was also part of the making that plan.

18  Q.  What has it been like to work on making plans with voters

19  now that SB1 has passed?

20  A.  It's a lot harder.  We don't have as many options, and it

21  takes more time to make a plan to vote because there's limited

22  options and limited time.  Folks like to vote on the weekends

23  when, you know, they're off work.  And that's not -- there's

24  not that much time on the weekend anymore.  Sundays is a good

25  example.

3390
Marla Lopez – Direct

1      And then drive-through voting is also not on the table

2 anymore, or 24-hour voting.  So it's a lot harder, and we have

3 to do a lot of the, I guess, like deeper voter education to go

4 over what time, what plan would work best for them.

5 Q.  Are there voters with whom you speak where they just at

6 the end say, "These options don't work for me.  I can't vote"?

7 A.  Yeah.  It's very common for folks to get frustrated or

8 discouraged because, depending on the kind of voter, if it's a

9 new voter, like a younger person, they'll typically be like,

10 "Well, it was so hard for me to register, and now I have to do

11 all of this to get out my vote.  Is it worth it?"

12      And then for older voters who might have families or

13 multiple jobs, it's just really complicated.  And so they feel

14 often discouraged.  So it's been hard.  It's -- you know,

15 oftentimes they're not really excited about it.  Or by the

16 time we're done, we have a plan, they're like, "Okay.  I have

17 to regret 10,000 things."

18 Q.  As Houston coordinator, you were a Houston coordinator

19 sort of in that before-SB1 and after-SB1 time?

20 A.  Yes.

21 Q.  Did you have to change any of your resource allocations at

22 Mi Familia Vota in order to, you know, address SB1?

23 A.  We did have to change our training for our staff.  We had

24 to retrain everybody on the -- I guess, we had to reduce the

25 training to include or remove all of the options that were

3391

Marla Lopez – Direct

1  taken away by –– or through SB1.  And so that took more time,

2  more training.

3      And we had to train all of our staff, not just the ones

4  that were doing voter education or voter engagement, because

5  at any point they could be asked by a voter if they needed

6  help, and you want to make sure that they knew how things had

7  changed.

8  Q.  Before SB1, did you encourage people to vote by mail?

9  A.  Yes.  We would talk to people about voting by mail.  And

10  most of the time people that vote by mail, they know that

11  they're going to vote by mail.  And so that was an option that

12  we would talk about.

13  Q.  And who are some of the potential voters that you talked

14  about this vote–by–mail option with?

15  A.  Most of them were older.  Some of them were Texas

16  residents, but they were outside the county or the state,

17  yeah, mostly people that fall under the eligibility to vote by

18  mail.  Well, I mean, always people that fall under that

19  eligibility.

20  Q.  Do you still –– or I guess when you were at Mi Familia

21  Vota, after SB1 passed, did you continue to encourage people

22  to vote by mail?

23  A.  We shifted our focus solely to voting early and in person.

24  After SB1 went into effect, there was –– there was a high rate

25  of applicant rejections to vote by mail.  And because –– what

Marla Lopez – Direct

1    I recall was that you had to, on your application, list down

2    the number -- or the identification number that you used to

3    register to vote.

4         And so oftentimes, for example, older voters who had been

5    voting by mail for a very long time, or people with

6    accessibility issues that rely on vote by mail, they don't --

7    they didn't recall what they registered to vote, like what

8    identification they used to register to vote.  So we saw a

9    high rate of rejection.  And we didn't want folks to feel even

10   more discouraged if they tried to use that option.

11   Q.  What are your concerns with a voter becoming discouraged?

12   A.  Well, the mission of Mi Familia Vota is to empower and

13   build a culture of voting and civic engagement.  So, you know,

14   it's hard enough to get people to register to vote.  And so in

15   order to have an electorate that is more likely to vote often,

16   it -- whenever there's all of these different steps and, like,

17   risk and complicated applications, people are just not likely

18   to follow through with that, or they have less time to look at

19   their options and make a plan.  And so they're less likely to

20   keep voting.  And we don't want that.  We want people to have

21   a voice.

22   Q.  Were you aware of SB1 and its predecessor bills when they

23   were being considered in the legislature?

24   A.  Yes.

25   Q.  How did you respond as the Houston coordinator?

Marla Lopez – Direct

1  A.  Well, we did a lot of community engagement.  We tried our

2  best to keep the community engaged about, what is SB1, what's

3  happening at the state level, and then we also did some

4  advocacy in Austin.

5  Q.  Who joined you on the advocacy?

6  A.  We had some high school students join us, some community

7  leaders, and other nonpartisan civic groups.

8  Q.  Do you remember which session of the legislature you --

9  was in session when you went to Austin?

10  A.  It was the 87th session.  I think it was the first special

11  session.  And that started in July of 2021.

12  Q.  Did you testify?

13  A.  I don't -- no, I did not testify.

14  Q.  Why not?

15  A.  There were hundreds of people that signed up to testify at

16  that -- for the House Elections Committee, and they cut off

17  testimony at a certain point in the night.  But I think I did

18  submit, like, a public comment.

19  Q.  In your experience, when you were speaking with voters

20  about their voting plans, did you find that there were fewer

21  options to tell voters about because of SB1?

22  A.  Yes.

23  Q.  Did it take longer to help people make voting plans?

24  A.  Yes.

25  Q.  Did this affect how many voters you and other Mi Familia

3394

Marla Lopez – Cross

1  Vota employees –– how many voters you were able to speak to?

2  A.  Yes.  I remember that our hotline call, like conversation

3  list, was shorter because we were talking to less people for a

4  longer period of time because we had to really go over the

5  limited voting time that they had and figure out Plan A and

6  Plan B just in case they weren't able to make their first

7  plan.

8      And so rather than spend, you know, five, ten minutes on

9  the phone with them, it turned into 15, 20 minutes on the

10  phone with them, or in person as well.

11  Q.  Is the hotline the only way in which you –– or other Mi

12  Familia Vota employees connect with voters?

13  A.  When I was there, it was a big part of the engagement

14  because we were still in, like, pandemic –– peak pandemic

15  stuff.  But we would also engage with them in the community at

16  tabling events and other community events.

17         MS. HOSTETLER:  Thank you very much.  Pass the

18  witness.

19         THE COURT:  Anything else from this side?

20         Any cross?

21         MR. BRYANT:  Yes, Your Honor.

22                    CROSS-EXAMINATION

23  BY MR. BRYANT:

24  Q.  Ms. Lopez, my name is David Bryant.  I represent the State

25  defendants.  I work for the Attorney General's office.

Marla Lopez – Cross

1    Do you describe yourself on your LinkedIn profile as "a

2  community organizer and policy advocate"?

3  A.  Yes.

4  Q.  And what community or communities do you organize?

5  A.  I focus mostly on working class Latino communities, but I

6  also work with other working class communities that are

7  historically marginalized.

8  Q.  And since August 2023 you've been employed as the finance

9  manager for the Molly Cook for Texas Senate District 15

10  campaign?

11  A.  That is correct.

12  Q.  And prior to your position with that campaign, did you

13  work from January 2023 to May 2023 as a policy analyst in the

14  office of Representative Erin Elizabeth Gamez?

15  A.  That's correct.

16  Q.  And she's a Texas State Representative who represents

17  Brownsville and Cameron County generally?

18  A.  Brownsville specifically.

19  Q.  Okay.  When you worked for Representative Gamez earlier

20  this year, did you live in Austin?  Were you a resident of

21  Austin, or were you a resident elsewhere?

22  A.  I lived in Austin.

23  Q.  And did you change your voter registration to your Austin

24  address?

25  A.  I did not.

Marla Lopez − Cross

1  Q.  Did you change your driver's license to your new Austin

2  address?

3  A.  I did not.

4  Q.  Prior to working for Representative Gamez, did you work

5  from May 2022 to November 2022 as an organizing director with

6  the Michelle Vallejo for Congress campaign?

7  A.  Yes.  I worked with Michelle Vallejo.

8  Q.  Good.  I was about to ask you how to −− how to pronounce

9  that properly, because I used to live in California, and they

10  called the city out there "Vallejo."  But it's "Vallejo,"

11  right?

12  A.  Uh-huh.

13  Q.  Okay.  And in what county did you live while you were −−

14  did you reside while you were working for that Michelle

15  Vallejo for Congress campaign?

16  A.  Hidalgo County.

17  Q.  And did you remain registered in Houston during that

18  period when your residence was in Hidalgo County?

19  A.  No.  I registered in Hidalgo County.

20  Q.  On your LinkedIn page you listed that position as with the

21  Michelle Vallejo for Congress campaign at Democratic

22  Congressional Campaign Committee.  What was the connection of

23  your employment at that time with the Democratic Congressional

24  Campaign Committee?

25       MS. HOSTETLER:  Objection; relevance.

Marla Lopez – Cross

1          THE COURT:  What's the relevance to this?

2          MR. BRYANT:  I'm trying to just get background

3   information on her activities, because it appears that she has

4   worked primarily in politics in recent years rather than in

5   anything relating to voting rights.

6          MS. HOSTETLER:  Your Honor, she left Mi Familia Vota

7   a little over a year ago.  It has not been an extensive period

8   of time.  Try to not object too frequently, but I'm really

9   questioning relevance.

10         THE COURT:  I'm wondering, how does this affect the

11  standing?  I'm assuming that's what you're challenging is

12  standing on Mi Familia?

13         MR. BRYANT:  Well, certainly -- we will challenge

14  standing, but I also challenge her bias.

15         THE COURT:  I'll let you go into that.

16         THE WITNESS:  Could you repeat the question?

17         MR. BRYANT:  Certainly.

18  BY MR. BRYANT:

19  Q.  I saw that on your LinkedIn page you listed your position

20  with the Michelle Vallejo for Congress campaign at Democratic

21  Congressional Campaign Committee, and I just wanted to see

22  what the connection was of your employment at that time with

23  the Democratic Congressional Campaign Committee.

24         MS. HOSTETLER:  Your Honor, I'm sorry to interrupt

25  again.  We also had a stipulation to not discuss political

Marla Lopez – Cross

1    activity or the political parties.

2          MR. BRYANT:  Your Honor, the stipulation relates to

3    the witness' personal political affiliation and how she voted.

4    And my question doesn't touch on that.

5          THE COURT:  Go ahead.

6          THE WITNESS:  What was the question again?  Sorry.

7    BY MR. BRYANT:

8    Q.  Okay.  Could you explain the connection of your employment

9    with the Democratic Congressional Campaign Committee?  And I'm

10   talking about the period when you were working on the Michelle

11   Vallejo for Congress campaign.

12   A.  They were my employer.

13   Q.  I'm sorry?

14   A.  They were my employer.

15   Q.  Okay.  So they were actually paying you?

16   A.  They were my employer.

17   Q.  Now, you worked for Mi Familia Vota in Harris County for

18   about two and a half years?

19   A.  Yes.

20   Q.  And was that a full-time position all the time you were

21   with Mi Familia Vota?

22   A.  Yes.

23   Q.  And about how many hours a week did you work for Mi

24   Familia Vota on average over that period?

25   A.  40.

Marla Lopez - Cross

1  Q.  Were you aware that during all that time Mi Familia Vota

2  had legal obligations under Texas law, like all other Texas

3  employers, to give their employees paid time off to vote if

4  they needed it?

5  A.  Yes.

6  Q.  Did you ever ask Mi Familia Vota for time off to vote?

7  A.  Yes.

8  Q.  How often did you do that?

9  A.  I mean, I can count the elections that I was working

10  there.  But definitely more than once.

11  Q.  And did Mi Familia Vota comply with its obligations to

12  give you time off to vote when you requested it?

13  A.  Yes.

14  Q.  Did you have an understanding that you had different

15  rights to time off from work to vote in 2022 as compared to

16  2020?

17  A.  Could you rephrase the question?

18  Q.  Sure.

19      Did you understand that you had more rights to ask your

20  employer for time off to vote in 2022 than you did in 2020?

21  A.  No.

22  Q.  Were you aware that Section 6.02 of SB1 in 2021 expanded

23  your right to paid time off from work to vote in Texas?

24  A.  No.

25  Q.  And did you understand that Section 6.02 in SB1 created

Marla Lopez - Cross

1 | criminal liability for Texas employers who refused to permit
2 | employees to have paid time off to -- from work to vote, not
3 | only on Election Day but during -- also during the early
4 | voting period?
5 | A.  I'm not familiar with that section.
6 | Q.  Are you aware that Texas law also prohibits employers from
7 | penalizing employees to retaliate against them for exercising
8 | their right to paid time off to vote if they need it?
9 | A.  I understand that generally, but not in the context of
10 | SB1.
11 | Q.  And just to be clear, that existed before.  This is after.
12 | I wasn't trying to suggest it was put in by SB1.
13 |     Okay.  So talking about the 2020 Primary Elections in
14 | Texas, you voted in Harris County for that election?
15 | A.  I believe so.
16 | Q.  And did you vote in person or by mail?
17 | A.  In person.
18 | Q.  Did you vote on Election Day, or did you vote early in the
19 | 2020 Primary Election?
20 | A.  I think I voted on Election Day in the primary.
21 | Q.  And I think you mentioned this earlier in your direct.
22 | You had the option to vote at any polling place in
23 | Harris County you might choose in the 2020 Primary Election?
24 | A.  Yes.
25 | Q.  I think there were some other elections in the first half

Marla Lopez – Cross

 1  of 2020, constitutional amendments and a runoff.  Did you vote

 2  in those as well?

 3  A.  I don't think I did.

 4  Q.  Okay.  And did you also vote in the 2022 primaries in

 5  Harris County?

 6  A.  Yes, I did.

 7  Q.  Did you vote in person or by mail?

 8  A.  I voted in person.

 9  Q.  And did you vote on Election Day, or did you vote early in

10  the 2022 Primary Elections?

11  A.  I don't recall.

12  Q.  And in that election also you had the option to vote at

13  any polling place you might choose in Harris County in that

14  2022 Primary Election?

15  A.  I believe so.

16  Q.  And I think you've already covered the fact that you --

17  oh, did you also vote in the 2022 General Election in

18  Harris County?

19  A.  I did.

20  Q.  Did you vote in person or by mail?

21  A.  In person.

22  Q.  And did you vote on Election Day, or did you vote early in

23  the 2022 General Election?

24  A.  I voted early.

25  Q.  And as previously, you had the option to vote at any

Marla Lopez – Cross

1  polling place you might choose in Harris County in that 2022

2  General Election?

3  A.  I didn't vote in Harris County on the 2022 General.

4  Q.  And where did you vote in that election?

5  A.  I voted in Hidalgo County.

6  Q.  Okay.  Now, you covered this a little bit in your direct.

7  You voted with your father in the 2020 General Election; is

8  that right?

9  A.  Yes.

10 Q.  And do you recall that early voting was available in that

11 2020 General Election from October 13th through October 30th

12 of 2020?

13 A.  Yes.

14 Q.  Do you recall the date on which you and your father voted

15 early in the 2020 General Election?

16 A.  I don't remember the date, but I know it was later in the

17 month.

18 Q.  Okay.  And I think you already said it was a Saturday,

19 right?

20 A.  Yes.

21 Q.  What time of day did you and your father choose to vote on

22 that Saturday in 2020?

23 A.  It was in the afternoon because we had an errand in the

24 evening.

25 Q.  Now, prior to the General Election in 2020, you and your

3403
Marla Lopez – Cross

1  father didn't have the option to vote by drive-through voting,

2  did you?

3  A.  No.

4  Q.  And I understand that you found the option for

5  drive-through voting more convenient?

6  A.  Yes.

7  Q.  Had that option to vote by drive-through voting not been

8  available to you, could you have voted in the 2020 General

9  Election either earlier or on Election Day?

10  A.  I -- could you rephrase the question again?

11  Q.  Sure.

12     Had that drive-through option not been available to you

13  for the General Election in 2020, could you have voted?

14  A.  Myself or both my dad and I?

15  Q.  I was just asking about you right now.

16  A.  I believe so.  I might have.

17  Q.  So it wasn't a problem of you not having time to go

18  anywhere other than to a drive-through voting polling place

19  during the 2020 General Election?

20  A.  What was your question?

21  Q.  Okay.  Is it correct that it was not a matter of necessity

22  that you voted drive-through in the 2020 General Election?

23  A.  Not for me.

24  Q.  And I think I know the answer to this, but it's correct

25  you didn't have any mobility limitations or disabilities or

Marla Lopez - Cross

1  personal limitations that prevented you from getting out of
2  your car and voting inside a polling place?
3  A.  No.
4  Q.  Was that true also for your father?
5  A.  For my father, no.
6  Q.  Is it true that he also did not have any mobility
7  limitations or disabilities or other reasons he couldn't get
8  out of a car and go in a polling place and vote?
9  A.  Not mobility issues.
10  Q.  Any other issues that would have kept him from voting in a
11  polling place?
12  A.  We had my little sister in the back seat, and we had
13  errands to run.  During that time of day was the only
14  opportunity we had.  So that did present a problem for my dad
15  and I.  And we preferred -- we found it more convenient to do
16  drive-through and keep my sister in the back seat.
17  Q.  Okay.  Again, a matter of convenience, right?
18  A.  Well, my sister was still small.  So we wanted to make
19  sure -- and it was during the pandemic.  There wasn't any
20  vaccines yet.  So we wanted to make sure that we were safe and
21  our health was safe.
22  Q.  And, in fact, you did feel it okay to get out of your car
23  and go into a polling place and vote in 2021, and, in fact, to
24  be an election judge?
25  A.  In 2021 I was vaccinated during -- when I was an election

Marla Lopez – Cross

1  worker and a judge.  So I felt safe in terms of my health.

2  But I answered that call to action because I knew that older

3  election workers and judges could be more at risk for their

4  health.

5  Q.  Okay.  And in your -- do you recall approximately what

6  time you and your father voted on -- in the General Election

7  in 2020 when you did the drive-through voting?

8  A.  It was in the -- it was in the late afternoon.

9  Q.  Okay.

10         MR. BRYANT:  Brian, could you please pull up the

11  excerpt that we had?

12  BY MR. BRYANT:

13  Q.  Ms. Lopez, this is an excerpt from the amended complaint

14  filed on your behalf.  It says "Voting early, in the evening,

15  and at a drive-through location was the only time and manner

16  that allowed both her and her father to vote due to their work

17  obligations."  Is that accurate?

18  A.  Yes.

19  Q.  Now, you said earlier that you voted in the afternoon, not

20  in the evening.  Was that correct?

21  A.  Well, it was like 4:00, 4:00 or 5:00.  It was between that

22  time.  And I knew that we had stuff to do later in the

23  evening.  I don't remember -- I don't recall the exact time,

24  but I know it was in the late afternoon before the -- like

25  before the later evening appointment that we had.

3406

Marla Lopez – Cross

1  Q.  Now, when I first read this, I read it to mean that voting

2  at a drive-through location early in the evening was the only

3  time and manner that you had to vote and that your father had

4  to vote.  Should I have read that to mean only that it was the

5  time when you both could vote together?

6  A.  Yes.

7  Q.  Okay.  And as I understand it, the reason that you chose

8  the drive-through location was not because you had work

9  obligations that you couldn't otherwise fulfill; is that

10 right?

11      In other words, you didn't have to vote by drive-through

12 on that -- on that date because of your work obligations with

13 Mi Familia Vota?

14 A.  Not that day.  My dad did.

15 Q.  Okay.  Now, during the early voting period in 2020, your

16 father was working somewhere in Harris County, right?

17 A.  Yes.

18 Q.  And I know that he worked very long hours.  Did he work

19 seven days a week?

20 A.  I don't recall his work schedule then.  But typically

21 he'll work more than seven days a week and then get a few days

22 off, and then restart the cycle for work.

23 Q.  So you don't recall whether or not he was working seven

24 days a week throughout this early voting period from October

25 13th to October 30th?

Marla Lopez - Cross

1   A.  We had made a plan to vote earlier during the early voting

2   period.  But because of his work schedule, we had to change to

3   a later date so his work schedule didn't interfere.  But I

4   don't remember if he was working 17 -- I mean, seven days or

5   15 days at a time.

6   Q.  You mentioned that you were -- you chose the time to vote

7   that you did because there were other things that one or both

8   of you needed to do later in the evening.  What in general was

9   that?  I don't need to get real specific.

10  A.  I can't recall.  But it was more of like things that he

11  needed to do and he wanted my help with.

12  Q.  What was the drive-through voting location where you and

13  your father voted in the 2020 General Election?

14  A.  Where was it?

15  Q.  Yes.  Or you could describe it.

16  A.  It was outside of a courthouse.  I think it was a county

17  courthouse or some local government courthouse.

18  Q.  Was that -- I think you may have mentioned in your direct

19  that the drive-through location was chosen because it was near

20  your father's -- a place where your father was working at the

21  time; is that right?  Or was it some other reason?

22  A.  It was -- it was -- it was the closest place between my

23  dad's work and wherever we were going.  So it was, like, on

24  the way.  It wasn't super out of the way for us.

25  Q.  Okay.  Were there at that time polling places in

Marla Lopez - Cross

1  Harris County where your father could have voted that were
2  closer to where he -- his residence was?
3  A.  No.  That was the closest one.
4  Q.  To his residence?
5  A.  To his residence and to work, and then to the destination
6  that we had our errand at.
7  Q.  Okay.  As I understood from your direct testimony, his
8  commute at that time was an hour; is that right?
9  A.  Uh-huh.
10 Q.  So was it closer to his work or to his residence?
11 A.  I don't remember exactly where the courthouse is.  But it
12 was -- it was close to the area generally that he would have
13 been working in.
14 Q.  Is it fair to say that the reason you -- reason that you
15 and your father chose to vote at that drive-through location
16 in the 2020 General Election was not really about necessity,
17 but about convenience for the two of you and your little
18 sister?
19 A.  I don't agree.
20 Q.  Ms. Lopez, I understand that you don't like all the
21 provisions of SB1.  Have any of them actually prevented you
22 from voting?
23 A.  Not me personally.
24 Q.  Have any of those provisions prevented your father from
25 voting?

Marla Lopez – Cross

1   A.   Yes.

2   Q.   Has he attempted to vote since SB1 has been in effect?

3   A.   We have tried to make a plan to vote.

4   Q.   Has he attempted to vote?

5   A.   I don't think so.

6   Q.   Now, it was mentioned in the complaint that you had some

7   incident prior to SB1 that involved intimidation of you by

8   poll watchers.  Do you -- are you familiar with that subject?

9   A.   Yes.

10  Q.   Could you describe what that -- what that incident was

11  prior to SB1.

12  A.   Well, it was when we went to go vote, and the poll worker

13  had told me that my ID wasn't, like, good for that -- that I

14  was going to need to vote provisional because my ID's address

15  didn't match what was on the voter roll.

16  Q.   Okay.  So that was the drive-through voting in November

17  2020?

18  A.   Uh-huh.

19  Q.   And so was it a poll watcher or an election worker who

20  told you that your ID had a problem on that occasion?

21  A.   An election worker.

22  Q.   Have you ever had any incident involving any kind of

23  intimidation by poll watchers?

24  A.   In the 2020 -- was it the 2020 election?

25       In the 2020 election on Election Day there was somebody

Marla Lopez - Cross

1  outside of the polling location with some, like, certain

2  political regalia.  And they did have, like -- it looked to me

3  like they had other things with them.  I wasn't sure.  And I

4  just didn't approach them because I didn't feel like it was

5  safe.  But I didn't directly interact with them.

6  Q.  Okay.  And on Election Day in 2020 you had already voted a

7  week or two earlier, right?

8  A.  Yes, with my dad.

9  Q.  Were you present at the polls on Election Day as part of

10 your work with Mi Familia Vota?

11 A.  Yes.  We were --

12 Q.  Okay.

13 A.  We were outside the polling location.

14 Q.  Now, you had that incident prior to SB1.  Was there

15 anything in SB1 that caused you to have greater fear of

16 intimidation by poll watchers?

17 A.  Yes.  I remember that the law would change it to where the

18 poll watcher could bring civil lawsuits against workers, and,

19 that they generally had free movement in the polling location,

20 which made me concerned.

21 Q.  And has anything occurred since SB1 was in effect that was

22 an incidence of intimidation by poll watchers where you were

23 present?

24 A.  Thankfully not.

25 Q.  And that's -- that includes the period in -- strike that.

3411

Marla Lopez - Cross

1    Have you ever seen any misbehavior by poll watchers other
2  than the incident that you described that, as I understand,
3  was just regalia by poll watchers at the November 2020 General
4  Election?
5  A.  Aside that time?
6  Q.  Have you seen any -- have you seen any evidence of
7  misbehavior or improper behavior by poll watchers in Texas
8  other than that instance you described?
9  A.  Not in person.  But I've heard and seen footage.  But I
10  wasn't there.
11  Q.  Okay.  Do you understand that a poll watcher in Texas
12  cannot legally get close enough to a voter to see how the
13  voter marked their ballot?
14  A.  I did not know that.
15  Q.  Or do you understand that a poll watcher in Texas cannot
16  legally verbally harass a voter while the voter's in the
17  process of voting?
18  A.  I did not know that.
19  Q.  And are you aware that a poll watcher can't legally
20  interfere physically with a voter in any way while the voter
21  is voting?
22  A.  No.
23  Q.  Okay.  Is it fair to say that any fear of intimidation by
24  poll watchers that you might have is based on the fear that
25  the poll watchers will violate Texas law?

Marla Lopez – Cross

1  A.  I don't think I understand the question.

2  Q.  Okay.  Is there anything in Texas law that you're aware of

3  that gives a poll watcher any right that, if exercised, would

4  cause you to have fear or feel intimidated as a voter?

5  A.  Yes.

6  Q.  What is that?

7  A.  Well, that they can be in the voting location.  Generally

8  I don't -- because the law, when I read it, has changed.

9  There were many things in my training that weren't addressed

10 or are really vague still.  But specifically, that they can

11 bring lawsuits against election workers and judges is what

12 concerns me the most.

13 Q.  Can you describe any -- strike that.

14     You've been able to vote in Texas before and after SB1,

15 right?

16 A.  Yes.

17 Q.  And do you have any reason to believe that you will not be

18 able to vote in the future as much as you want to because of

19 SB1?

20 A.  Possibly.

21 Q.  You possibly have a fear?

22 A.  I have a concern that I may not be able to in the future.

23 Q.  And why is that?

24 A.  Well, if I get another job or if I start a family or if I

25 work outside the county for a job, you know, I may need to do

Marla Lopez - Cross

1  a vote-by-mail application.  There's a chance that could be

2  rejected.  And there's not a lot of time to make a plan to

3  vote often.  So if I travel for work or if I have family that

4  needs me, then that would make it very hard to find a day and

5  time to vote, with very little options.

6  Q.  Anything else?

7  A.  Could you repeat the question again?  What are the

8  concerns that I'd have?

9  Q.  Yes.  What are -- what are the concerns that you have that

10  something in SB1 will prevent you from voting in the future?

11  A.  In SB1.  Well, I think, aside from the ones that I've

12  mentioned, possibly if there's, like, another type of form

13  that I would need to fill out, if, say, for example, like my

14  ID has changed or something like that.  But I think that's it.

15  Q.  Anything else?

16  A.  As a voter?

17  Q.  Yes.

18  A.  I can't think of anything right now.

19  Q.  You mentioned an incident when you were a student at the

20  University of Texas or some circumstance that caused you to

21  not want to go out and vote in a polling place in Travis

22  County.  Do you recall that?

23  A.  I don't recall right now.

24  Q.  Okay.  Is there any reason that you know of why you would

25  not have been comfortable voting in a polling place at the

Marla Lopez - Cross

1  University of Texas area but not in the actual student
2  facility that you referred to in your direct testimony?  And I
3  may have misunderstood it.  But if there's something there, I
4  want to get it out.
5  A.  Well, when I voted on campus, I voted between classes.  So
6  it was -- the polling location was really close.
7      Are you asking, like, in the context of SB1 voting on
8  campus?
9  Q.  No, because this would have been before SB1, wouldn't it?
10 A.  Uh-huh.  I don't think I understand your question.
11 Q.  Okay.  Then I'll move on to another one.
12     Now, talking about your experience with Mi Familia Vota,
13 you mentioned the three major projects of youth leadership,
14 environmental justice, and access to healthcare.  And then you
15 added that Mi Familia Vota does voter engagement year round;
16 is that right?
17 A.  Yes.
18 Q.  They do that every year, before SB1, after SB1.  That's a
19 perennial activity of Mi Familia Vota to the extent of your
20 knowledge?
21 A.  Yes.  It's a year-round voter engagement.
22 Q.  Okay.  And when Harris County in 2020 added the option of
23 drive-through voting and added the option of 24-hour voting,
24 did that require Mi Familia Vota to make changes to the way it
25 trained or educated people about voting?

Marla Lopez – Cross

1  A.  Yes.

2  Q.  And so, similarly, after SB1, the changes in SB1 that

3  prohibited drive-through voting and 24-hour voting also

4  required a similar change?

5  A.  We did have to update our trainings and spend time with

6  our staff retraining to make sure that they knew the changes

7  in the law and the voting options.

8  Q.  And that's going to be a perennial activity of Mi Familia

9  Vota, I assume, whenever there is a change in law; is that

10 right?  Voting law.

11 A.  Yes.

12 Q.  And if SB1 or some part of it were declared unlawful, that

13 would require another change by Mi Familia Vota, wouldn't it?

14 A.  Yes.

15 Q.  You mentioned that SB1 reduced the options available to

16 voters, at least in Harris County, from '20 to -- 2020 to

17 2022; is that right?

18 A.  Yes.  It reduced options and time.

19 Q.  Okay.  And were the number of hours that were available to

20 voters changed by SB1?

21 A.  Yes.

22 Q.  And were the hours available to voters to vote early

23 expanded by SB1?

24 A.  Not that I recall.

25 Q.  I think you mentioned on direct that -- strike that.

Marla Lopez - Cross

1          MR. BRYANT:  I pass the witness.

2          THE COURT:  Anything else from this side?

3          MR. NICHOLS:  Just very briefly, Judge.

4                    CROSS-EXAMINATION

5   BY MR. NICHOLS:

6   Q.  Good afternoon, Ms. Lopez.

7       I just want to make sure the record is clear.  You said

8   you served as an election judge in Harris County during one

9   election cycle.  I think you said that, didn't you?

10  A.  Yes, as an election judge.

11  Q.  Yes.  So which cycle was that?

12  A.  It was the 2021 fall election.

13  Q.  So it would have been the General Election in November?

14  A.  Yes.

15  Q.  Of 2021?

16  A.  Yes.

17  Q.  And I think you've told the Court that you don't plan to

18  serve as an election judge again in the future; is that

19  correct?

20  A.  Correct.

21  Q.  And have you served as an election judge or a poll worker

22  during any elections after November of 2021?

23  A.  No.

24  Q.  And you said that the reason why you don't plan to do that

25  is because you're worried about being sued civilly by someone

Marla Lopez – Cross

1  about your work as an election judge; is that right?

2  A.  Yes.

3  Q.  Now, Ms. Lopez, do you know who the district attorney for

4  Harris County is?

5  A.  I think so.

6  Q.  So who is that?

7  A.  Kim Ogg.

8  Q.  And you understand that as a DA, that Ms. Ogg and her

9  office has criminal jurisdiction, not civil jurisdiction.  Do

10  you understand that?

11  A.  No.

12  Q.  Okay.  And -- but the reason why, Ms. Lopez, you said you

13  didn't want to be an election judge is because -- I think I

14  wrote this down correctly, because you didn't want to get sued

15  as an official, even though you felt like you were doing your

16  job and had done nothing wrong.

17      Did I get that right?

18  A.  What I meant to say, or what I was trying to convey, is

19  that to the extent that I understand the law, I'm operating

20  under that with the best intention.  And a poll watcher who

21  may or may not be -- I consider myself very well versed in the

22  law, in Texas election law.  So a poll watcher who may or may

23  not have the same level of experience can bring a lawsuit,

24  probably also in good faith.  And there could be, you know --

25  I might not be able to do the same work that I've been doing.

Marla Lopez – Redirect

1  And I don't want to go to jail.

2  Q.  So you could get sued civilly, even though you felt like

3  you didn't do anything wrong.  Is that what you're saying?

4  That's your concern?

5  A.  Yes.  My concern is that I could be persecuted or

6  prosecuted.

7  Q.  And by "persecuted or prosecuted," you're talking about a

8  civil lawsuit that would be filed against you?

9  A.  Yes.  I think that's what SB1 says can happen.

10  Q.  Okay.  And, Ms. Lopez, do you know whether the Mi Familia

11  Vota plaintiffs have included claims by you and your father

12  against the Harris County DA Kim Ogg?

13  A.  I'm not aware of the very specific stuff.

14          MR. NICHOLS:  Okay.  Thank you.

15          That's all I have, Judge.

16          THE COURT:  Anything else on this side?

17          Any redirect?

18          MS. HOSTETLER:  I do, Your Honor.  Thank you.

19                    REDIRECT EXAMINATION

20  BY MS. HOSTETLER:

21  Q.  Has any job that you've had since leaving Mi Familia Vota

22  affected your memory of the events that we've discussed?

23  A.  No.

24  Q.  Did you have -- were you still working at Mi Familia Vota

25  when this lawsuit was filed?

Marla Lopez – Redirect

1  A.  I think so.

2  Q.  Were you working at Mi Familia Vota when SB1 went into

3  effect?

4  A.  Yes.

5  Q.  And did you attempt to provide testimony in a special

6  session of the legislature about SB1?

7  A.  I provided written comment.

8  Q.  Can you actually pull up -- I'm sorry to do this to you

9  since I didn't give you warning.  But could we pull up Joint

10  Exhibit 1, I believe Page 57.

11      And I want to ask you about Section 7.02.  And I believe

12  this is the section that my friend here was talking about when

13  they were talking about the time off from employment.  So if

14  you could look down at lines 12 through 16.

15      Do you understand that to be an exception to the rule that

16  employers have to give somebody two hours off of work to vote?

17  A.  Could you repeat the question?

18  Q.  Sure.

19      Do you understand the highlighted language to be an

20  exception to the general rule that an employer has to give an

21  employee two hours off of work to vote?

22  A.  I really don't think I understand what I'm reading.

23  Q.  Okay.  All right.  Are lines to vote sometimes long?

24  A.  Yes.

25  Q.  In Harris County have they been longer than two hours at

3420
Marla Lopez – Redirect

1  times?

2  A.  Yes.

3  Q.  When you were working for Mi Familia Vota during the

4  election period, did you work on Election Day?

5  A.  Yes.

6  Q.  Did you work pretty long hours on Election Day?

7  A.  Yes.

8  Q.  If you took time off to vote, which Mi Familia Vota, as

9  you said, would have given you, would that have taken away

10  from your time working with voters?

11  A.  To go vote on my own?

12  Q.  Yeah.

13  A.  I think so.

14  Q.  Has SB1 made it harder for you to vote?

15  A.  It's made my options a lot more limited, and I have less

16  time.

17  Q.  And why do you vote despite these difficulties?

18  A.  Because it's important to me, and I know that if I don't

19  go vote, there's no way that I'm going to have a say on who's

20  in office.

21  Q.  Is it easy to access voting?

22  A.  No.

23  Q.  When you were serving as a poll worker or a poll judge,

24  was your -- if the poll watcher started to interfere with a

25  voter, would you have known what your rights and

3421
Marla Lopez – Redirect

1  responsibilities were to both the poll watcher and the voter?
2  A.  At the –– at the time that I was an election judge, no.
3  Q.  Do you understand that a poll watcher is allowed to see
4  and hear what is going on in the polling place now under SB1?
5  A.  Yes.
6  Q.  Are you aware that there could be criminal sanctions if
7  you are accused of interfering with a poll watcher?
8  A.  Yes.
9        MR. NICHOLS:  Your Honor, I'll object to beyond the
10  scope.
11        MS. HOSTETLER:  We were –– we were speaking about her
12  concerns about poll watchers, her time as a judge.  My friend
13  here did bring up her concerns on his cross-examination.  I am
14  clarifying her previous testimony.  He indicated that she
15  spoke about being worried about civil repercussions.
16        THE COURT:  Yeah.  I remember this.  Go ahead.
17  BY MS. HOSTETLER:
18  Q.  Yeah.  So are you –– are you concerned about that criminal
19  piece of it as well?
20  A.  Yes.
21  Q.  Okay.  And I just want to clarify a little bit.  Did you
22  have a car on campus when you voted in 2006?
23  A.  I did not.  2016.
24  Q.  2016.  I am so sorry.  Yes.  Thank you for that.
25  A.  I did not.

Chris Poage, RMR, CRR
Official Court Reporter

3422
Marla Lopez – Redirect

1  Q.  And did you have a job at the same time that you were

2  going to school?

3  A.  Yes, I did.

4  Q.  So when you talked about not being able to vote had it not

5  been on campus, were you referencing those limitations?

6  A.  Yes.

7  Q.  Okay.  I just wanted to clarify.

8      Has it been more difficult to help voters come up with a

9  plan because of SB1?

10  A.  Yes.

11          MR. BRYANT:  Objection, Your Honor.  It's been asked

12  and answered.  We went over that.

13          THE COURT:  That's sustained.

14          MS. HOSTETLER:  I apologize.

15  BY MS. HOSTETLER:

16  Q.  If SB1 was declared unlawful, would the changes to your

17  training be as intensive as they have to be now that SB1 is —

18  A.  No.  They wouldn't be as —

19  Q.  Okay.  Would the time it takes to work with voters to come

20  up with a plan to vote, would it be as time intensive without

21  SB1 as it is now with SB1?

22  A.  It wouldn't be as time intensive.

23          MS. HOSTETLER:  Okay.  Thank you very much.

24          THE COURT:  Anything else?

25          MR. BRYANT:  No, Your Honor.

Marla Lopez – Redirect

1           MR. NICHOLS:  No, sir.  Thank you.

2           THE COURT:  You may step down.  Thank you, ma'am.

3           THE WITNESS:  Thank you.

4           THE COURT:  We have one last witness; is that right?

5           MS. HOSTETLER:  Yes.

6           MR. KERCHER:  Could we do a brief recess, Your Honor?

7           THE COURT:  Yeah.  Let's do 10 or 15.

8      (Recess at 4:45 p.m.)

9      (Change in reporter)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ANGELICA RAZO – DIRECT

1   *(Change in reporter)*

2          THE COURT:  And your next witness.

3          MISS HOSTETLER:  Thank you, Your Honor.

4          Our next witness is Angelica Razo.  Her testimony is

5   relevant to Mi Familia Vota's claims challenging SB 1's

6   Sections 2.05 to 2.07, 3.04, 3.9, 310, 312, 313, 401, 407,

7   412, 502 to 504, 507, 508, 513, 603 to 605, 607, 702, and 704.

8      (ANGELICA RAZO, having been duly sworn, testified as

9   follows:)

10                    DIRECT EXAMINATION

11  BY MISS HOSTETLER:

12  Q.  Please state your name for the record.

13  A.  Angelica Razo.

14  Q.  And where do you live?

15  A.  Houston, Texas.

16  Q.  What's your educational background?

17  A.  I received my bachelor's degree from Rice University in

18  2016.

19  Q.  Who do you work for?

20  A.  Mi Familia Vota.

21  Q.  How long have you worked for Mi Familia Vota?

22  A.  Since June 2017.

23  Q.  If I sometimes refer to Mi Familia Vota as MFV, will you

24  know what I mean?

25  A.  Yes.

ANGELICA RAZO – DIRECT

1  Q.  What is your current position with Mi Familia Vota?

2  A.  National deputy director of campaigns and programs.

3  Q.  When did you move into that position?

4  A.  In May 2023.

5  Q.  What positions did you hold at MFV before becoming

6  national deputy director?

7  A.  In June 2017 when I joined the organization I was youth

8  organizer.  In 2019 I became Houston coordinator.  And at the

9  end of 2019 I became Texas state director until this year,

10  May 2023.

11  Q.  Just to clarify, do you remember when you became Texas

12  state director?

13  A.  Yes, November 2019.

14  Q.  And you served in that position until you became national

15  deputy director?

16  A.  Yes.

17  Q.  Has Mi Familia Vota hired someone to be Texas state

18  director?

19  A.  Yes.

20  Q.  When did that person start?

21  A.  Mid-September 2023.

22  Q.  Did you — were you still running operations in Texas

23  until the new Texas state director started?

24  A.  Yes.

25  Q.  So you've been wearing two hats for about six months.  I'm

3426
ANGELICA RAZO - DIRECT

 1  glad you're down to one.  Can you please tell the Court about
 2  Mi Familia Vota?
 3  A.  Yes.  Mi Familia Vota is a national civic engagement
 4  organization.  We're nonpartisan and our mission is to
 5  increase political representation and power of the Latino
 6  community.
 7  Q.  And what does Mi Familia Vota do to reach these goals?
 8  A.  Yes.  We have a variety of programming.  One, we have
 9  year-round programming such as youth leadership development,
10  issue-based programs such as environmental justice.  We
11  advocate on issues that disproportionately impact our
12  community.
13      And then we have our voter mobilization campaigns, our
14  integrated voter engagement, our election related work that is
15  to educate voters and also encourage them to participate in
16  elections.
17  Q.  Is Mi Familia Vota Texas part of the national
18  organization?
19  A.  Yes.
20  Q.  How are decisions made about the programs that are run by
21  Mi Familia Vota in Texas?
22  A.  The Texas state director largely makes those decisions.
23  They are in charge of the State strategy, the annual plan and
24  budget, the program priorities and goals, where they will be
25  having operations in the state, how many staff members they

ANGELICA RAZO - DIRECT

1  need.

2      They are also largely focused on fundraising for the state

3  budget.  They are the media spokesperson and representative

4  for the organization for the state across either media and

5  other statewide coalitions and they manage the leadership team

6  in Texas.

7  Q.  How many employees does Mi Familia Vota have nationwide?

8  A.  Across the nation it's about 40 to 50 full-time permanent

9  employees.

10  Q.  Does that change during election cycles?

11  A.  Yes.  During election cycles it's very typical that we

12  onboard anywhere between 30 to 50 part-time folks that are

13  working specifically on election-related activity until

14  Election Day.

15  Q.  And how many permanent employees work in Texas?

16  A.  Six.

17  Q.  Okay.  And does that number also change during the

18  electoral cycle?

19  A.  Permanent employees, not necessarily, no.

20  Q.  What about part-time employees?

21  A.  Part-time employees, yes, drastically.

22  Q.  How many part-time employees come on during the election

23  period?

24  A.  Approximately 30.

25  Q.  Okay.  And what were your main job responsibilities as

ANGELICA RAZO - DIRECT

1  Texas state director?

2  A.  I would come up with the state strategy, our annual plan,

3  our annual budget.  I would fundraise to make sure that we

4  were meeting our budget.  I would — I was one of the main

5  decision-makers for understanding what our staff was going to

6  be doing, the priorities they were having, and I was also the

7  spokesperson for the organization.

8  Q.  Does Mi Familia Vota Texas have its own budget?

9  A.  Yes.

10 Q.  What is its annual budget?

11 A.  Anywhere between 900,000 — between 900,000 to

12 1.1 million.

13 Q.  Where does that money come from?

14 A.  That money largely comes from philanthropic intuitions,

15 such as foundations.  Also a small portion of it comes from

16 individual donors, donor advice funds, small portion maybe

17 from unions, but largely philanthropic institutions.

18 Q.  Have you changed fundraising practices in Mi Familia Vota

19 Texas since SB 1?

20 A.  Yes.

21 Q.  Could you please tell us about that?

22 A.  Yes.  The majority of our grants — the majority of our

23 funds are grant-specific, they're program-specific.  They have

24 deliverables attached to them through a memorandum of

25 understanding in which those funds can only be used for

ANGELICA RAZO - DIRECT

1  particular programmatic activities, such as youth leadership
2  development, environmental justice.
3     And it really doesn't allow us to be as nimble or flexible
4  as when we're dealing with new policies and we need to divert
5  human or financial resources.  We are trying to raise more
6  general operation support funds that allow us to be able to do
7  our work and carry out our mission with more flexibility.
8  Q.  Couldn't you just seek an issue-specific grant to work on
9  election work or SB 1-related responses?
10  A.  It's not necessarily that easy.  We would -- we know we're
11  going to have a greater impact in the work that we're able to
12  do if we're able to seek funds that are general operation
13  support.
14  Q.  So if you're spending your time building your operational
15  budget, does that leave you with less -- how does this affect
16  your ability to look for issue-specific grants?
17  A.  It's -- it definitely creates a strain on myself and other
18  folks that are helping me fundraise.  It also means we have to
19  think really carefully about how we reallocate staff time,
20  knowing that everyone on our team has to be aware about SB 1,
21  its impacts, and how they might end up having conversations
22  with voters on the ground pertaining to the SB 1 impacts.
23  Q.  What counties does Mi Familia Vota operate in, in Texas?
24  A.  Harris County, Dallas County, and we've done remote work
25  in Hidalgo County, Cameron County, and then through some of

ANGELICA RAZO - DIRECT

1  our activity remote and digital work.  We're also in

2  conversation with voters in Bexar County or other counties

3  across the state.

4  Q.  If I refer to just MFV or Mi Familia Vota for the rest of

5  our conversation, can we agree that we'll be talking about Mi

6  Familia Vota Texas, and not any of its national work or work

7  in other states?

8  A.  Yes.

9  Q.  Can you tell us a little bit about its environmental

10  justice campaign very briefly?

11  A.  Our environment justice campaign is largely focused in

12  Harris County.  One is to bring awareness about climate change

13  and the disproportionate impact it's having on the Latino

14  communities.  And then we have a specific campaign to bring

15  awareness to the pollution that is caused by WA Parish Coal

16  Plant in Fort Bend County.

17  Q.  And did you mention earlier that you had some other issue

18  areas that you work in?

19  A.  Yes.

20  Q.  Could you repeat what those are?  There's environmental

21  justice, and what were some of the others?

22  A.  Environmental justice, immigration, access to affordable

23  health care, educational equity, voting rights, worker's

24  rights, and reproductive justice.

25  Q.  How has your ability to work on these nonelection —

ANGELICA RAZO - DIRECT

1 related projects changed since SB 1 passed?

2 A.  It definitely becomes a lot more strained.  Again, we're

3 looking at the tight staff capacity that we have, the tight

4 financial resources that we have.  We can't be as flexible.

5     We know that we are answering questions about the impacts

6 of SB 1 and how that's showing up in voter's ability to make a

7 plan.  It doesn't allow us to, you know, be able to run

8 high-skill issue-based programming as much as we would want

9 because we're dealing with other impacts.

10 Q.  What does Mi Familia Vota's voter education program look

11 like?

12 A.  Yes.  Our voter education program is focused on helping

13 people make sure if they are eligible to register to vote or

14 register to vote, making sure we're checking their voter

15 registration status.  That's definitely something that's very

16 important to us, particularly in the aftermath of SB 1.

17     Helping them make a plan to vote, whether that's informing

18 them about the early voting dates, election dates, how to get

19 access to their sample ballot, how to find polling locations.

20 Really working alongside with them so they can come up with a

21 concrete plan where they envision themselves voting and

22 casting a ballot that fits their lifestyle.

23 Q.  You mentioned that voter registration — checking voter

24 registration has become important after SB 1, could you

25 explain that comment?

ANGELICA RAZO - DIRECT

1  A.  Yes, absolutely.  In 2019 when the Secretary of State
2  issued a voter purge, that was very alarming to us as an
3  organization.  We've also checked voter registration statuses.
4  We saw several of our community members get impacted by that
5  and we also saw some community members that were impacted by
6  that and weren't necessarily aware of that immediately.
7      It's very common that we've seen people that say, I know
8  I'm registered to vote.  I think I'm registered to vote.  And
9  then we check the voter registration status and we can't find
10 them in the voter registration polls.
11     With SB 1 now allowing monthly voter purges, it's really
12 more important for us that we take that time as we are talking
13 to voters to ensure that they are still on the voter
14 registration rolls.
15     We are working with voters that don't vote frequently, so
16 they are not necessarily checking their voter registration
17 status every single year and so they might miss that they have
18 gotten purged from the list.  So, again, that's why we are
19 taking that additional time to make sure that they are indeed
20 registered.
21 Q.  How do you help voters make a plan to vote?
22 A.  When we're helping them make a plan to vote, one, we're
23 really trying to understand what does their schedule look like
24 around the election time.  What are their voting options.  We
25 know that when people have more voting options, it's much

ANGELICA RAZO - DIRECT

1  easier for them to think about, okay, I can go vote during
2  this time, during this day.
3       And so post-SB 1 it's been more focused on if they are
4  eligible to vote by mail and voting in person, and looking,
5  again, what are the voting locations that are closest to their
6  home, to their work, what are the routes that they might be
7  taking after dropping their kids off school, what time of the
8  day makes more sense for them to go.
9       And then also, you know, we do provide information about
10  the specific elections that are coming up and where they can
11  find a sample ballot.
12  Q.  When are you making plans, these plans with voters, when
13  are you engaging with them to make these plans?
14  A.  The majority of helping voters make a plan to vote is
15  about eight to ten weeks out before election with a really
16  intense, really intense voter education helping people make a
17  plan to vote four weeks out of election date.
18  Q.  So when are you having these -- where are you having these
19  conversations with voters?
20  A.  We're typically having these conversations with voters,
21  one, through our direct voter contact programs.
22       And that's when we have a target list of individual voters
23  that we're reaching through door-to-door canvassing, phone
24  banking, text banking, and then also making sure that we're
25  meeting our community members in the spaces and places where

3434

ANGELICA RAZO - DIRECT

1  they're existing, and that's going to community events,

2  providing workshops and sessions with our community partners

3  at schools, at community colleges.  Sometimes we run a hotline

4  where people call in and they have questions about getting

5  a — helping get a plan to vote as well.

6  Q.  What type of voter does Mi Familia Vota focus on?

7  A.  So we're looking — we are focusing on the Latino

8  community at large, but then we're also targeting voters,

9  Latino voters that don't vote frequently.  They might have not

10  grown up in a voting household so they don't have a culture

11  voting.  They have recently aged into the electorate.

12       We know that every single day there's young Latinos that

13  are turning 18 and becoming eligible voters.  These are also

14  people that we're also talking to people who might be recently

15  naturalized citizens and they're still getting accustomed to

16  the voting process, in the country, and in the state, and in

17  the county where they reside.

18       We're talking to voters, again, that what we consider low-

19  to mid-propensity voters.  They have a propensity score that

20  classifies them as unlikely to vote, and that means that

21  there's probably not other campaigns, candidate political

22  parties, or even organizations that are trying to contact

23  these voters because they are likelihood of voting is so low.

24       That's the community that we're targeting.  We know that

25  if we're not engaging these voters, if we're not taking that

ANGELICA RAZO - DIRECT

1  initiative and specifically trying to have these conversations

2  with them, there's probably no other organization or entity

3  that is having those conversations with them.

4  Q.  When you talk about the propensity score, what is that?

5  A.  Yes.  A propensity score is that — it's a range that runs

6  from zero to 100.  It determines your likelihood of vote based

7  on your voting history.  We're talking with voters that are

8  zero to 30.  Sometimes we go as high as 50.  Again, that means

9  their likelihood to vote is very low.

10      You know, from a financial standpoint a lot of entities

11 consider them — consider these voters having a very low

12 return on investment, but, for us, that's the biggest

13 investment we can make is making sure we're reaching these

14 voters, we're playing the long game, we're trying to engage

15 them through multiple methods over multiple cycles because we

16 know that that's going to have an impact in the long run for

17 them participating and feeling comfortable in participating.

18 Q.  How is that score established?

19 A.  That score is established by the voter activation network.

20 Q.  And what is the voter activation network?

21 A.  It's a national database that has registered voters that

22 they're pulling information from Secretary of State's voter

23 registration rolls.

24 Q.  So I think you mentioned that you reach out to them

25 multiple times, is that right?

ANGELICA RAZO - DIRECT

1  A.  Yes.

2  Q.  Why is that important to reach out to these particular

3  voters multiple times?

4  A.  There's a lot of evidence that suggests that in order for

5  someone to take action they need to be contacted on average

6  seven times.  And we do try to do that.

7      We are -- our field program is very complex.  You know,

8  we're trying to reach voters, not just once at the doors, but

9  maybe twice during the electoral cycle.  We are also

10  contacting by the phones.  We are texting them.  We're sending

11  them messages the days leading up to the election, if they

12  haven't voted, if they need assistance on finding the polling

13  location.

14      And so we know, again, just one contact is not enough.  It

15  has to happen multiple times and multiple methods, and it also

16  has to happen year after year.

17  Q.  What happens if you encourage somebody like this to vote,

18  they try to vote, and it doesn't work for whatever reason?

19  A.  We know that it's really easy for our community members to

20  get discouraged from voting.  If they are taking the time and

21  registering to vote and then showing up to the polls or trying

22  to cast a vote-by-mail ballot and they are not successful, or,

23  one, they don't even realize that they made a mistake and they

24  don't know how to problem solve through that, it definitely

25  dissuades them.

ANGELICA RAZO - DIRECT

1    We have seen that, you know, individuals really blame

2  themselves.  They think I did something wrong, I don't know

3  how to fix it, and I don't know that I would be able to fix it

4  next time.  And those are the types of stories and experiences

5  that voters in our communities have and it creates a long-term

6  impact to where they sit out multiple elections.

7    And that's why our work as an organization is, one, to

8  make sure that we're able to reach as many voters as we can

9  and give them that information, and also give them the tools

10  to problem solve so if they need to have any issues addressed

11  they can do that.

12  Q.  If a person you worked with isn't able to vote

13  successfully, what would it take for them to become a voter

14  again?  What kind of effort would Mi Familia Vota have to put

15  into that?

16  A.  It typically requires individualized assistance, sitting

17  down with them, having a conversation with them.  Sometimes a

18  conversation that will last upwards of 20 to 30 minutes to,

19  again, feel like they have agency and they are confident that

20  they can go through this process again, not just with us in

21  that electoral cycle but for many electoral styles again.

22    So the voters we are targeting through our work, they are

23  very time-intensive voters, but we know that when people

24  receive that one-on-one support and that, we, as an

25  organization, a trusted messenger helping them through that

3438
ANGELICA RAZO — DIRECT

1  that, that they are more than likely going to cast a ballot.

2  And we see that and we hear that and they follow back up with

3  us to say, I voted, thank you.

4  Q.  What are some of the barriers that you're helping new or

5  intermittent voters overcome?

6  A.  Some of the barriers are informational barriers.  There's

7  a huge information gap in our community about the election

8  information that's, you know, what are the election dates,

9  when does early voting start, when can I go vote, where can I

10  find my polling location.

11      There's also a language justice issue.  Not all this

12  information is readily available in Spanish and in the areas

13  where we're working with.

14      But there's also cultural barriers that we're working

15  with, right?  Again, many of our community members didn't grow

16  up in voting households.  We know that voting is a social

17  behavior.  It's a behavior that people like to do in a

18  community and feel supported.  And if people don't have that

19  experience, then it can be very isolating and they feel like

20  they might not have a network of support to help them through

21  that process.

22      And so those are some of the things that we're looking at.

23      We also work with voters that, you know, have a distrust

24  in government for very valid reasons and so they might think,

25  you know, I can show up to vote but if I haven't seen

ANGELICA RAZO – DIRECT

1  investment in my community over the years that I've been

2  living here how do I know that that's going to have an impact.

3      So those are some of the things that we work through

4  voters letting them know if they cast their ballot it's

5  counting and it's really important that they are participating

6  in that activity.

7  Q.  Were you Texas state director before SB 1 became law?

8  A.  Yes.

9  Q.  And afterwards?

10 A.  Yes.

11 Q.  Did you change your allocation of resources because of SB

12 1?

13 A.  Yes.  We had — we definitely diverted human resources.

14 It was really time intensive to have all of our staff, you

15 know, caught up-to-date on the impacts of SB 1, how it was

16 impacting our work, how we might see that roll-out at the

17 community level, how we might see that roll-out in our work.

18     You know, we have staff that have very program-specific

19 deliverables that they are working on, very program-specific

20 activity.  We were using a lot of their time to be able to

21 understand SB 1 to make sure that they were prepared to give

22 the most accurate information they could as they are engaging

23 with voters during the election cycle.

24     THE COURT:  If you can slow down just a bit.

25     THE WITNESS:  Oh, sorry.

3440
ANGELICA RAZO – DIRECT

1  BY MISS HOSTETLER:

2  Q.  We're now a little about two years out from when SB 1 came

3  into effect.  Do you think you're going to be able to shift

4  those resources back to where they came from?

5  A.  Can you repeat the question?

6  Q.  Sure.  SB 1 has been in effect for about two years.  You

7  talked about shifting resources after it passed.  Now that

8  we're two years out, are you able to just shift those

9  resources back away from SB 1?

10  A.  No.  We are continuing to see a constant shift of

11  resources because of SB 1 and we anticipate that for next year

12  and for the long-term future.

13  Q.  Why?  Why will it continue to affect your resources for

14  the long-term future?

15  A.  Just looking at the upcoming election year that we have in

16  2024, we know that our work is about to scale up very

17  drastically in 2024.

18      There are voters that haven't voted since 2020 that are

19  going to come to us in 2024 and say, hey, I want to drive-thru

20  vote again, what's the sites for that again, because that's

21  what they did in 2020.  That's their expectation.  Again, we

22  are working with voters that are not voting in the off-cycles

23  between election years.

24      Again, maybe they didn't vote in 2020.  We're going to

25  contact voters who haven't voted in several years and they are

ANGELICA RAZO – DIRECT

1  being introduced to all these impacts of SB 1 and we're going
2  to have to take staff time and financial resources to be able
3  to effectively reach as many people as we can, knowing that
4  we're going to be strained under SB 1.
5  Q.  When there are fewer voting options, does this affect how
6  some voters are able to — or whether some voters are able to
7  vote?
8  A.  Yes.  When there's fewer voting options we see that voters
9  feel confined to make a plan to vote that might not
10  necessarily fit with their schedule.
11      For example, in 2020 when drive-thru voting was rolled out
12  in Harris County we were helping people make a plan to vote
13  and drive-thru voting was very convenient for them.  And these
14  were voters that lived in multigenerational households.
15      And one of our staff members voted for the first time
16  drive-thru voting.  She had her mother and her grandmother
17  with her.  And that was just the option that made it most
18  convenient for them.  It fit their lifestyle.
19      We are working with voters that have long commutes from
20  work that might not even work in the same county where they
21  are registered to vote.  Voters that need assistance.  Voters
22  that, you know, might work outside of the county as, you know,
23  in terms of they might be truckers.  They might work in the
24  oil and gas field.  It's a very — we see a lot of our
25  community members working in that field.  It's not very

ANGELICA RAZO – DIRECT

1  conducive to expect that they are going to be voting in the

2  7:00 a.m. to 7:00 p.m.

3      My sister is a nurse.  She works twelve-hour shifts.  Her

4  commute is about an hour, hour and a half.  That means she's

5  outside of her home from 6:00 a.m. to 8:30 and she does not

6  work in the county where she is registered to vote.  She's a

7  caretaker on her days off.

8      Those are the stories and experiences that we see in our

9  community.  So when there is less voting options, again, it

10  confines people to see, can I actually go and vote, does this

11  make sense with my schedule.

12 Q.  Is it just a matter of convenience or is it something that

13 you would say is potentially a stumbling block to being able

14 to vote at all?

15 A.  It's definitely a stumbling block.  Every single election

16 I talk to voters that say, I've been wanting to go vote, it

17 just really — I haven't been able to have the opportunity.

18 And I hear all the time people say, it's easy to vote, you

19 know, you just go to the nearest polling location, but that's

20 not the experience of the voters that we're working with.

21      One, again, that information gap.  We're working with

22 people that have multiple jobs that get off work from one job

23 just to go to the next job.  They are the sole caretaker of

24 their family, of elderly people in their household, and so,

25 no, it's not just that it's inconvenient, it's really a matter

ANGELICA RAZO – DIRECT

1  of am I going to be able to vote or not in this election.  And

2  the motivation is there.  People do want to go vote.

3  Q.  Does Mi Familia Vota do block walking?

4  A.  Yes.

5  Q.  Did you do –– did Mi Familia Vota do block walking during

6  the 2018 election cycle?

7  A.  Yes.

8  Q.  Did you do as much in 2020?

9  A.  Not necessarily.

10 Q.  Why was that?

11 A.  Because of the pandemic.  We were able to run a small

12 scale block walking campaign though.

13 Q.  Have you intended to bring it back up after the pandemic?

14 A.  Yes.

15 Q.  Were you able to do that to the extent that you wanted to

16 in 2021?

17 A.  No.

18 Q.  Why?

19 A.  One, financial resources; two, the scale of elections that

20 there were.  But definitely part of the financial resources.

21 Q.  Is that financial constraint related to SB 1?

22 A.  Um-hum.

23 Q.  Is that same –– was that same constraint in place in 2022?

24 A.  Yes.

25 Q.  Did you get positive feedback from the communities you

1  worked with about drive-thru voting?

2  A.  Yes.

3  Q.  What were some of that feedback?

4  A.  It was, one, again —

5        MR. SZUMANSKI:  Objection, Your Honor.  I believe

6  this calls for hearsay.

7  BY MISS HOSTETLER:

8  Q.  Based on what you saw in your position as state director,

9  what did you observe about the role that drive-thru voting

10  played in your community in 2020?

11  A.  Yes.  There was a lot of positive feedback as we were

12  talking to voters and we were letting them know about the

13  option to drive-thru vote.  People felt a lot more comfortable

14  with that.  Again, and some of the reasons why that was, is,

15  you know, people said I can go vote —

16        MR. SZUMANSKI:  Objection, Your Honor, getting into

17  hearsay.

18        THE COURT:  Don't repeat what other people told you.

19        Sustained.

20  BY MISS HOSTETLER:

21  Q.  Did curbside voting make up for everything that was lost

22  when SB 1 prohibited drive-thru voting?

23  A.  No.

24  Q.  Why not?

25  A.  One, curbside voting is not widely known, particularly in

3445

ANGELICA RAZO - DIRECT

1  our community.  I've been to many polling locations.  It can
2  be hard to find the place where you need to go to curbside
3  vote.  Typically, there's a button on the outside that you
4  press that alerts a poll worker to come out with a voting
5  machine so you can curbside vote.
6      There's also, you know, some polling locations say, hey,
7  we're going to have a poll worker outside that you can alert
8  them that you need to curbside vote.  I've been to many
9  polling locations where there was no poll worker outside and
10 because people are not as familiar with it, they might not
11 know about it and they might assume that although they are
12 eligible to curbside vote they are going to wait in line,
13 stand in line.
14     I observed a voter in November 2022 that had mobility
15 issues.  I actually was going to a really long line at one of
16 the polling locations in Harris County.  At that time the
17 waiting period for that polling location was about 30 to 60
18 minutes during the lunch hour.  I did let her know about
19 curbside voting.  She had never heard about it.
20     Fortunately, people did let this elderly woman, you know,
21 go through the line ahead of them, but that's an example of
22 someone that's eligible to curbside vote but the resources are
23 not necessarily reaching them or that's not the first option
24 they think of.
25 Q.  Did 24-hour voting and drive-thru voting, in your opinion,

ANGELICA RAZO – DIRECT

1  fit the needs of the Harris County electorate?

2  A.  Yes.

3  Q.  Why?

4  A.  The electorate in Harris County is very dynamic, you know,

5  including the Latino community.  We saw 24-hour voting very

6  greatly received.

7      People, again, that are shift workers, they're working

8  twelve-hour shifts, they're working more than one job, they

9  are getting off of work at irregular hours where they get off

10  work and they have family responsibilities that they have to

11  attend to and they have a long commute home.

12      Traversing Harris County is not easy.  We don't have the

13  best public transit system.  Our roads, you know, you can get

14  stuck in traffic for up to two hours, and so being able to

15  have one drive-thru voting and have more people with you and

16  not necessarily, you know, feel like you couldn't go vote

17  because you had young children with you, that was a really

18  great option for folks.

19      And then the 24-hour voting, again, for people that are

20  getting off at irregular work hours or after school, I spoke

21  to many voters that text me, hey, I just got off work, I want

22  to go vote.  Turns out that 24-hour voting was happening that

23  day.  I directed them towards a polling location.  Within an

24  hour, they had gone to cast their ballot.

25      That's an example of voters who, again, want to go vote

ANGELICA RAZO - DIRECT

1  and they are looking for options that make it easier to cast

2  their ballot because, again, the motivation is there from

3  voters.

4  Q.  In your experience are there people who maybe don't

5  qualify for curbside voting but would still face challenges

6  having to wait in long lines to vote?

7  A.  Yes.

8  Q.  Are there other counties that might also benefit, in your

9  opinion, from some of these options that became available in

10 2020, the 24-hour voting, extended-hour voting, drive-thru

11 voting, drop boxes?

12 A.  Yes.  We're seeing the electorate in Texas change from

13 what it was 30 to 40 years ago.  The electorate now needs more

14 voting options.

15      You know, we were really excited that Harris County was

16 rolling out these initiatives.  We had told them, as we were

17 providing feedback, we see this as a pilot, not just as a

18 one-time crisis management solution.  We want to see these

19 initiatives here for the long-term and we were really going to

20 welcome other counties exploring that.

21      And what SB 1 did is that it — you know, counties were

22 mandated beforehand.  Counties had that ability to choose and

23 think creatively about how they were meeting the needs of the

24 electorate in their county.  With SB 1, that completely takes

25 that off the table.

ANGELICA RAZO – DIRECT

1  Q.  Had you been planning to lobby or work with county

2  election officials in the aftermath of 2022 encourage an

3  expansion to other counties of some of these voting options?

4  A.  Yes.

5  Q.  Did you — did that plan change when SB 1 passed?

6  A.  Yes.

7  Q.  Was SB 1 the reason you did not begin to work with these

8  counties?

9  A.  Yes.

10 Q.  Can you talk — so you mentioned that you've been to a lot

11 of polling places.

12 A.  Um-hum.

13 Q.  Were you at some polling places during the mid-terms

14 2020 — 2022?

15 A.  2022, yes.

16 Q.  Can you give us — briefly talk about some of the things

17 that you saw while you were visiting polling places?

18 A.  On Election Day in November 2022 I was at two different

19 polling locations in the morning that we were at a polling

20 location that was fairly new to the community.  It was only

21 open for Election Day.

22     You know, we didn't see a lot of poll workers outside.

23 Voters were confused where the polling location was because it

24 was inside a much larger building, and our Primary Election

25 Day activity at the polls is to create community — to make

3449

ANGELICA RAZO – DIRECT

1  sure that we're a resource there before voters go to the polls
2  if they have any questions.  We hand out snacks.  We hand out
3  food.  We want voters to feel welcome and that we're grateful
4  that they are voting and taking that time out of the day.
5      And — but again, it wasn't — in that polling location,
6  it wasn't very obvious that it was a polling location.  And so
7  we were on the front lines and letting people know, hey, this
8  is a polling location.  It was a community center.  If you
9  work here, you have kids coming into day programs, this is a
10  place where you can go vote.
11     The other polling location that I visited later that day
12  was a very much different experience.  It was a polling
13  location that has been a polling location for a very long
14  time.  It's located in the community park.  I arrived there
15  around 1:30, 1:45 in the morning.  There was a line there
16  wrapped around the building.
17     It was really clear that there was at minimum 70 people
18  waiting in line that were probably using their lunch hour to
19  vote during that time, and so it was really concerning.  It
20  was November and I remember it was still hot.  I was sweating.
21  It was not a very comfortable situation for people to be in at
22  that time.
23  Q.  Has SB 1 changed how you interact with elderly voters or
24  voters who are eligible to vote by mail?
25  A.  Yes.

3450
ANGELICA RAZO – DIRECT

1  Q.  How?

2  A.  So with voters that are eligible to vote by mail, one, in

3  2020 we saw a lot of interest from our community about vote by

4  mail and so we've provided them information about the process

5  on how to vote by mail.

6      We also notice that our target community requires a lot of

7  assistance.  Typically, folks, Latino voters in the household

8  that are eligible to vote by mail, they might not have anybody

9  else in their household that's also eligible to vote by mail.

10     So there's not a lot of sharing of information of

11  resources within that household.  That causes for our elderly

12  folks to have more questions and require more assistance.

13  There's also a language piece to it as well.

14     So post-SB 1 we let people know about vote by mail.  We

15  let them know about all the steps and all the details they

16  need to know; however, we do let them know that if they miss a

17  step or maybe they don't receive their ballot they are going

18  to have to call the county.  They are going to have to make

19  sure they are reaching out and making sure they are on top of

20  the application and the ballot.

21     And it's a real concern to us because we worry that if

22  someone is attempting to vote by mail but then misses a step

23  and ultimately can't get their ballot cast, it's going to

24  dissuade them again.  So we let them know about vote by mail

25  with an education around it but we also make sure they know

ANGELICA RAZO - DIRECT

1  their options for voting in person as well.

2  Q.  Before SB 1 was it your understanding in Harris County

3  that applications would go out to eligible voters?

4  A.  Yes.

5  Q.  Did that happen after SB 1?

6  A.  No.

7  Q.  How did Mi Familia Vota respond to that?

8  A.  Yes.  We actually used our financial resources that we

9  wouldn't have used had SB 1 not been implemented to send out

10 mailers to folks that were over the age of 65 letting them

11 know how they could get an application for their ballots sent

12 to them.

13 Q.  Has Mi Familia Vota ever encouraged people in the

14 communities where it operates to become poll workers?

15 A.  Yes.

16 Q.  Why?

17 A.  For many reasons.  One, you know, we wanted to see more

18 polling places in our communities.  We've been told by the

19 county that in order to have more polling places they needed

20 support in getting them staffed, and so we've really

21 encouraged the poll worker program for that.

22     Two, we know that our voters sometimes have bad

23 experiences at the polling places.  Sometimes they don't

24 get — they don't feel welcomed at polling places.  They don't

25 feel like they are able to get assistance from someone from

3452

ANGELICA RAZO – DIRECT

1  their community.  We have had language issues at the polls
2  also in the past.
3      And then, third, you know, the poll worker program is
4  specifically also encouraged young people in Harris County.
5  You just have to be over the age of 16, a U.S. citizen.  It's
6  a great way for our young Latinos to get civically involved.
7      We have some very positive response from them, and, you
8  know, prior to SB 1 they have done it multiple cycles.  They
9  also get paid.  It's a way for them to get additional wages,
10 and it's also a way for them to become familiar with the
11 election process even before they start voting, and they,
12 themselves, become a really great resource to their family and
13 to their community in the aftermath.
14 Q.  After SB 1 did you continue to run this program?
15 A.  No.
16 Q.  Why not?
17 A.  We didn't have staff capacity or the financial resources
18 and there's real concerns that, you know, our poll workers,
19 because of the poll watchers, might get accused of wrongdoing,
20 and we would never want to put one of our community members in
21 a situation like that.
22 Q.  What are some of your concerns about risks to the poll
23 workers?
24 A.  Yeah.  I think part of it is poll watchers have the
25 freedom to move, that, you know, they can accuse someone of

3453

ANGELICA RAZO - DIRECT

1  wrongdoing, and they can make really serious allegations

2  against a poll worker that they really can't get removed

3  unless an election judge sees them.

4      And I've been at polling places and I know how much work

5  election judges have to do.  They can't be everywhere.  They

6  can't have eyes and ears everywhere.  It's also vague, you

7  know, to what power and freedom to move that they have and it

8  puts poll workers in a really risky scenario.

9  Q.  Would an investigation have to result in jail time for it

10  to negatively affect the life of an accused poll worker?

11  A.  No.

12      MR. NICHOLS:  Your Honor, I'm going to object.  This

13  is way beyond the scope of anything this witness has ever been

14  designated to testify on.  I'm looking now at —

15      THE COURT:  She's not an expert, is she?

16      MISS HOSTETLER:  No, she's not an expert.  She's been

17  a state director at Mi Familia Vota throughout the relevant

18  time period and was the 30(b)(6) representative for Mi Familia

19  Vota when she was deposed.

20      MR. NICHOLS:  Your Honor, I'm looking at the initial

21  disclosures.  The disclosure testimony, this is Document 84

22  filed 11/5/21 with the court, and there is nothing in there

23  that relates to any lay observations, much less expertise

24  about criminal matters.

25      MISS HOSTETLER:  I don't think we are asking for her

ANGELICA RAZO - DIRECT

1   expertise on criminal matters.  I think we are talking about

2   the reasons why Mi Familia Vota chose to pull back on its

3   voter — sorry — pull back on its poll worker program.

4           THE COURT:  Yeah, that's overruled.

5           Go ahead.

6           MISS HOSTETLER:  Now I forgot my own question.

7   BY MISS HOSTETLER:

8   Q.  Can you — did you think that a poll worker would have

9   to — would an investigation negatively affect a poll worker's

10  life, even if it didn't result in a prosecution or a

11  conviction?

12          MR. NICHOLS:  Your Honor, I'll object.  No

13  foundation.  Speculation about what a hypothetical

14  investigation could impact on some hypothetical individual.

15          THE COURT:  Say your question again.

16  BY MISS HOSTETLER:

17  Q.  Were you concerned about the negative effects on poll

18  workers of these accusations even if the investigation didn't

19  result in a conviction or a prosecution?

20  A.  Yes.

21  Q.  Why would it be — why were you concerned about the effect

22  it would have on poll workers, even if it didn't get to that

23  stage?

24          MR. NICHOLS:  Your Honor, this is complete

25  speculation about a hypothetical investigation and its impact

ANGELICA RAZO – DIRECT

1    on a hypothetical person.

2              THE COURT:  That's overruled.

3              Go ahead.

4              THE WITNESS:  I think our concern is, one, our

5    mission as an organization is also to create a safe voting

6    culture to give people the opportunity to be involved in a

7    civic life and civic responsibilities, and, we, as an

8    organization, are strongly encouraging, particularly our young

9    Latinos, to participate in the poll worker program knowing

10   that they are putting themselves at risk, knowing they may be

11   accused of wrongdoing.

12             You know, that's a concern for our reputation as an

13   organization, the trust that we have built with our community

14   members, and the long-term impacts that we want to see on an

15   individual.

16             You know, that's a very traumatizing experience for

17   people in our community to get accused of wrongdoing and I can

18   see it having a bad impact on their school life as they are

19   thinking about college, as they are thinking about work

20   experience that they are trying to build out.  Again, we are

21   working with young folks here.

22             MISS HOSTETLER:  Thank you.

23   BY MISS HOSTETLER:

24   Q.  Can you tell me about any work that Mi Familia has done

25   with voters who needed assistance to vote before SB 1?

ANGELICA RAZO - DIRECT

1    A.   Yes.  Prior to SB 1 we know several of our voters need

2    assistance, that's either assistance reading, understanding

3    the ballot, assistance in maybe they are only Spanish speakers

4    and so they need assistance, you know, reading a ballot, but

5    also communicating at the polls, mobility issues.

6        Prior to SB 1 we would always encourage people to take

7    someone close to them, someone that they trust to be able to

8    go assist them at the polls.  We had to let them know they

9    couldn't do that, that they could also ask for assistance from

10   a poll worker; however, I have spoken to many voters over the

11   years that have confided in me and told me, I had a really bad

12   experience —

13           MR. NICHOLS:  Your Honor, calling for hearsay.

14           THE COURT:  Sustained.

15   BY MISS HOSTETLER:

16   Q.  Have you changed how you communicate with voters who need

17   assistance, now that SB 1 is in effect?

18   A.  Yes.  One, we let them know that if they are going to take

19   an assister to the polls with them, that assister needs to

20   swear under oath that they are not going to influence their

21   vote.

22       We know that's a concern to the voter that needs

23   assistance.  It's a concern to the assister.  We also let them

24   know that they can receive assistance at the polls.

25       Because of the bad experiences that we've found out about

ANGELICA RAZO – DIRECT

1  that our voters have at the polls we spend more time with them

2  educating them about what to expect at the polls, what they

3  might be able to expect from the voting machine, the process,

4  the steps they need to be aware of.  It means we are spending

5  more time with them to decrease the likelihood they would have

6  to ask for assistance at the polls.

7  Q.  Does this kind of conversation —— in your experience are

8  there elderly or disabled or Spanish-language speakers in your

9  community who can't afford to pay for caretakers or attendants

10 in their regular lives?

11 A.  Yes.

12 Q.  In your experience do you know folks who might be willing

13 to provide assistance but have their own limitations?

14 A.  Yes.

15 Q.  Does Mi Familia Vota run door-to-door campaigns?

16 A.  Yes.

17 Q.  Can you walk me through what your door-knocking campaign

18 looks like?

19 A.  Our door-knocking campaign, again, it has a list of

20 identified voters that we're pulling from the voter activation

21 network.  That list is largely determined by the state

22 director, our data team, and other staff, our field —— and our

23 field director.

24      Our field director is the individual on staff that's in

25 charge of the field operations.  They typically have several

3458

ANGELICA RAZO - DIRECT

1  canvass leads and canvassers.  Our teams are made up of four

2  canvassers and one canvass lead.  Everybody has their set list

3  of households that they need to knock per shift.

4      Prior to a campaign launch, one, the script is made and

5  reviewed.  Everybody has the same script.  We provide a very

6  thorough training for our leadership and then for our

7  canvassing staff.

8      Training typically takes between four to six hours.  That

9  training includes, you know, our role as an organization, how

10  to stay compliant with all the policies, how to have this

11  conversation with voters, how to stay safe in the community,

12  what to do in case of an emergency.

13      With SB 1, we are now spending additional time with our

14  canvassers.  As I mentioned earlier, we onboard about 30

15  canvassers.  Every hour we spend training them because of SB 1

16  is — I mean, is an hour less that they have to be able to

17  contact between eight to ten voters each.

18      And we also make sure that they have gear.  That's

19  typically a T-shirt, a canvass bag, and a hat that identifies

20  them with Mi Familia Vota.  As they approach doors, we let

21  them know they should knock the door or ring the doorbell and

22  take a step back and make sure they look nonthreatening and

23  follow the script that they have.

24  Q.  So it sounds like this is related — are these related to

25  your voter education door-to-door campaigns?

3459

ANGELICA RAZO – DIRECT

1  A.  Yes.

2  Q.  Do you have other kinds of campaigns that Mi Familia Vota

3  runs door to door?

4  A.  We have phone banking, text banking.  Again, it's

5  typically the voters that we're trying to reach at the doors.

6  We also try to reach them through calling them, texting them,

7  sending them mailers.

8       The other activity that we do is we have a community

9  canvassing where we have staff at events and they are talking

10  to voters.  These events might be leading up to Election Day.

11  We have a lot of Hispanic Heritage Month events, back to

12  school events, at community events, National Day Out.

13      We're also partnering with community organizations that

14  have their own network of community members to provide voter

15  education and then we also do education through digital

16  methods and social media.

17  Q.  Do you run any issue-based campaigns or door-to-door

18  campaigns separate from this kind of work?

19  A.  Yes, when we have the financial resources.

20  Q.  Why is it important that Mi Familia Vota pay for gear worn

21  by your block walkers?

22  A.  We want to make sure that the staff and the personnel that

23  we have on the field that are having conversations with

24  voters, that they are identified as Mi Familia Vota.

25      For quality control reasons, if we have a canvasser that

ANGELICA RAZO - DIRECT

1  makes a mistake, or, you know, is talking to a community
2  member that had a negative experience, or a positive
3  experience, we want to know that we can trace that back to the
4  organization and fix the issue and come up with a solution.
5      We also know that some of the communities that we're
6  canvassing typically don't get canvassed and so for some
7  community members it's the first time someone is knocking on
8  their door and we want them to know that, you know, it's a
9  trusted organization, they are not talking to a stranger, and
10  we have really high-quality control methods that we're doing
11  afterwards.
12  Q.  Do you pay your canvassers?
13  A.  Yes.
14  Q.  Why?
15  A.  To run a quality field program like the ones that we run,
16  you want to make sure there's consistency that the training --
17  training is a big investment we're doing for all of our
18  personnel.  We want to keep our personnel on for as long as
19  the campaign can run.
20      You know, our canvassers, canvass leads are working
21  between 20 to 30 hours.  Canvass lead is working about 40
22  hours a week.  You know, these people can't afford to be
23  volunteers.  To have volunteers only means that we're
24  expending even more resources and less time actually reaching
25  as many voters as we would like to reach.

ANGELICA RAZO - DIRECT

1  Q.  Do you use any volunteers?

2  A.  We do have -- very small portion of our program is

3  volunteer.

4  Q.  Do you provide your volunteers with Mi Familia Vota

5  clothes?

6  A.  Yes.

7  Q.  Do you provide them with food?

8  A.  Yes.

9  Q.  Can you describe in a little bit more detail, not too

10  much, but how you train your canvassers?

11  A.  Again, it's about a four- to six-hour training.  We

12  review, you know, our mission as an organization, how to have

13  conversations with voters, what to be on the lookout for this

14  upcoming election, positions on the -- that you can expect to

15  see on the ballot, how to follow the script, and how to stay

16  safe.

17  Q.  Do you know about SB 1 provision 7.04?

18  A.  Yes.

19  Q.  Do you have any concerns about this provision?

20  A.  Yes.

21  Q.  What are some of your concerns?

22  A.  We're really concerned that we would get, you know, that

23  one of our canvassers would get accused of vote harvesting.

24  The conversations we're having at the door that are clearly

25  about elections and clearly encouraging people to go vote.

3462
ANGELICA RAZO − DIRECT

1  You know, we — if there's a voter on the other side of that

2  door that might have a ballot that we have no idea about, we

3  could get accused of vote harvesting.

4      Again, at a community event we have staff that, you know,

5  is having conversations with voters.  A lot of this activity

6  is happening during the early voting period once people have

7  received their ballot.

8      Completely unknown to us they could have a ballot on them

9  as we're having these conversations and they might be someone

10  might accuse us of trying to influence their vote and

11  therefore vote harvesting.

12  Q.  So when you are training your canvassers are they trained

13  to not influence votes?

14  A.  Yes.

15  Q.  Is that a serious part of your training?

16  A.  Yes.

17  Q.  Do you trust your canvassers that they are taking that

18  training seriously?

19  A.  Yes.

20  Q.  So then why would you have this concern, if you feel

21  confident that your canvassers are not saying anything that

22  would influence any one vote why would you have this concern?

23  A.  There is still a perception that might be from another

24  community member.  They might see or hear a portion of the

25  conversation and get confused.

3463
ANGELICA RAZO – DIRECT

1    So my concern is very much rooted in the perception, the

2 scrutiny that we might see versus the trust and the quality

3 control that we're doing as an organization to really

4 eliminate those types of scenarios.

5 Q.  Has Mi Familia Vota come under scrutiny in other

6 situations?

7 A.  Yes.

8 Q.  Could you talk to us about some of these?

9 A.  Um-hum.  We're a Latino organization.  Our community is

10 the Latino community.  I spent many years as a youth organizer

11 wanting to have the, you know, conversations around voter

12 registration with Latino students and I would be in classrooms

13 where teachers would say --

14    MR. NICHOLS:  Objection, Your Honor.  Calling for

15 hearsay.

16    THE COURT:  Don't repeat anything that someone has

17 told you.

18    THE WITNESS:  No.  I had experiences where I knew

19 that we were getting scrutinized.  I saw us wanting to do

20 voter registration in Latino-prominent schools, communities,

21 and people would say, you know, we think your organization is

22 too political.

23    Voter registration was something that we sometimes

24 would not get access to, but I did see other organizations,

25 primarily White organizations, doing that same type of

1  activity while we were considered as, you know, perceived too

2  political.

3  BY MISS HOSTETLER:

4  Q.  Sorry.  I don't mean to interrupt, but to be clear, the

5  work that you wanted to do that was seen as too political, was

6  that voter registration?

7  A.  Yes.

8  Q.  Did Mi Familia Vota take a position on SB 1 when it was in

9  the legislature or its predecessor bills?

10  A.  Yes.

11  Q.  Did you as a representative of Mi Familia Vota express its

12  position to legislators?

13  A.  Yes.

14  Q.  How?

15  A.  During the general session we ran a campaign to contact

16  voters who were constituents of legislatures that were on the

17  election committee and we shared with them our position on SB

18  1 and we encouraged them that if they felt the same, that they

19  should contact their legislatures and let them know.  That was

20  one way we were advocating.

21       We also had quite a bit of material on social media

22  alerting our community about it.  Also during special session

23  I provided written testimony.  And then we also participated

24  in advocacy specifically to oppose SB 1.

25  Q.  We talked a little bit ago about why you have pulled back

ANGELICA RAZO - DIRECT

1  on your encouraging folks to become poll workers, concerns

2  about the investigations.  Are those same concerns -- do you

3  have those same concerns about the Section 7.04, the so-called

4  vote harvesting provisions?

5  A.  Yes.

6  Q.  So you're concerned that it might have a negative impact

7  on your workers, if there were face-to-face accusations, even

8  if they were never prosecuted, even if they were never

9  convicted?

10         MR. NICHOLS:  Your Honor, this is pure speculation

11  about a hypothetical accusation and hypothetical

12  investigation.

13         THE COURT:  That's overruled.

14         Go ahead.

15         THE WITNESS:  Sorry.  Can you repeat the question?

16  BY MISS HOSTETLER:

17  Q.  Are you concerned about negative impact on your

18  canvassers, your workers, and volunteers, if they face an

19  accusation of vote harvesting, even if it —

20  A.  Yes.

21  Q.  Okay.

22         MISS HOSTETLER:  Pass the witness, please.

23         THE COURT:  Anything else on this side?

24         Any cross?

25         MR. SZUMANSKI:  Yes, Your Honor.

3466

ANGELICA RAZO — CROSS

1                        CROSS—EXAMINATION

2    BY MR. SZUMANSKI:

3    Q.  Good evening, Miss Razo.

4    A.  Evening.

5    Q.  Thank you for being here.  My name is Ethan Szumanski.

6    I'm an attorney with the Office of Attorney General of Texas

7    and I represent the State defendants in this case.  Again,

8    thank you for being here.  I know I'm standing between you and

9    getting out of here, so I'll be as brief as possible.

10        Now, first, I do want to talk a little bit about Mi

11   Familia Vota just generally, and just to make sure I'm clear,

12   right before SB 1 was passed you were the Texas state director

13   for Mi Familia Vota?

14   A.  Yes.

15   Q.  And after SB 1 was passed, for a year or so after that, up

16   until 2023, you were still the Texas state director for Mi

17   Familia Vota?

18   A.  Yes.

19   Q.  Now, as the Texas state director you oversaw essentially

20   the operations of Mi Familia Vota in Texas?

21   A.  Yes.

22   Q.  And you managed team members and decided state strategies

23   and policy priorities?

24   A.  Yes.

25   Q.  And you also determined whether Mi Familia Vota was in

ANGELICA RAZO - CROSS

1  compliance with relevant Texas laws?

2  A.  Yes.

3  Q.  All right.  Well, let's talk about Mi Familia Vota's

4  programs in particular, but just to be clear, Mi Familia Vota

5  is not a membership organization, right?

6  A.  No, we are not a membership organization.

7  Q.  But as an organization you would agree with me that Mi

8  Familia Vota cannot, as an organization, vote in elections?

9  A.  As an organization we do not vote in elections.

10  Q.  So as an organization it does not have any issues trying

11  to register to vote?

12  A.  No.

13  Q.  Does not have any issues with hours of polling locations?

14  A.  It does impact the work that we do as an organization.

15  Q.  But as an organization Mi Familia Vota doesn't have any

16  issues with hours of polling locations?

17  A.  As an individual, no.

18  Q.  And so as an organization Mi Familia Vota is not directly

19  regulated by Senate Bill 1, right?

20  A.  We are impacted by Senate Bill 1.

21  Q.  But you are not directly regulated by Senate Bill 1?

22  A.  Can you rephrase that question, please?

23  Q.  Sure.  I think we can move on.  Let's just talk about some

24  voter engagement.  Now, my understanding is that Mi Familia

25  Vota's voter engagement is kind of in three buckets.  You have

ANGELICA RAZO – CROSS

1  voter education, voter mobilization, and then, of course,

2  voter engagement, right?

3  A.  Yes.

4  Q.  Let's talk about voter education, the first bucket.  Now,

5  obviously Mi Familia Vota wants to ensure that those who are

6  eligible to vote have the necessary information and resources

7  to successfully cast a ballot?

8  A.  Yes.

9  Q.  And to achieve that, they engage in bilingual programs to

10  help people to vote?

11  A.  Yes.

12  Q.  They do education materials on the vote by-mail process?

13  A.  Yes.

14  Q.  They encourage voters to register to vote and they utilize

15  hotlines to answer any questions from voters?

16  A.  Yes.

17  Q.  Now, Mi Familia Vota has engaged in these activities

18  before the passage of SB 1?

19  A.  Yes, but now post-SB 1 with a different lens.

20  Q.  But you still engage in these activities after the passage

21  of SB 1, right?

22  A.  Um-hum, but not of education.

23  Q.  Now let's talk about the second bucket real quick, voter

24  mobilization.  Now MFV's voter mobilization efforts basically

25  involve encouraging Latino voters to go and vote, right?

ANGELICA RAZO – CROSS

1  A.  Yes.

2  Q.  And that involves calling voters, sending out text

3  messages, engaging in door knocking, basically doing

4  boots-on-the-ground type engagement in education, right?

5  A.  Yes.

6  Q.  Now, my understanding is that Mi Familia Vota has several

7  social media accounts?

8  A.  Yes.

9  Q.  Such as Facebook, Twitter, Instagram, and YouTube?

10  A.  Yes.

11  Q.  And Mi Familia Vota uses these social media outlets to

12  post various types of educational materials?

13  A.  Yes.

14  Q.  But it's correct to think that -- strike that.

15      So Mi Familia Vota Texas in particular does not have

16  social media accounts, right?

17  A.  We do not.  That's a recent development as of this year.

18  Q.  So that was just recently?

19  A.  Yes.

20  Q.  And those social media accounts would include Twitter,

21  Instagram, YouTube?

22  A.  As of right now, Instagram for the Texas team.

23  Q.  Just Instagram?

24  A.  Yes.

25  Q.  Now, Mi Familia Vota used -- Mi Familia Vota National,

ANGELICA RAZO - CROSS

1    particularly immediately following the passage of SB 1 still
2    uses all these accounts to educate voters?
3    A.  Yes.
4    Q.  And now Mi Familia Vota Texas, now that they have their
5    own social media account, they still use those mediums to
6    educate voters?
7    A.  Yes.
8    Q.  Okay.  Now let's talk about the third bucket, voter
9    engagement.  Now, Mi Familia Vota's voter engagement
10   activities essentially include discussions about upcoming
11   elections?
12   A.  Yes.
13   Q.  Such as why upcoming elections are important or what the
14   particular priority issues are on the ballot for that
15   particular election, right?
16   A.  Yes.
17   Q.  Okay.  Now, I believe you mentioned that as part of this
18   voter engagement bucket Mi Familia Vota engages in youth
19   leadership programs, school and college visits, and monthly
20   workshops, and things like that?
21   A.  Yes.
22   Q.  Now, Mi Familia Vota engaged in these types of activities
23   before the passage of SB 1?
24   A.  Yes.
25   Q.  And some of those activities included block walking and

ANGELICA RAZO – CROSS

1 phone bank activities, right?

2 A.  Yes.

3 Q.  Now, Mi Familia Vota still engages in block walking and

4 phone bank activities?

5 A.  Yes.

6 Q.  Now, for these three buckets of activities of voter

7 engagement Mi Familia Vota has allegedly suffered a

8 programmatic impact, right?

9 A.  Can you rephrase the question, please?

10 Q.  Sure.  So my understanding is that Mi Familia Vota has

11 allegedly suffered a programmatic impact in these three

12 buckets of voter engagement?

13 A.  Yes, that's been part of it.

14 Q.  But you would agree with me that Mi Familia Vota has not

15 suffered a financial impact?

16 A.  No.

17 Q.  So you would agree with me or you don't agree?

18 A.  I do not agree.

19 Q.  Has that always been your testimony?

20 A.  Yes, I believe so.

21 Q.  Okay.  Brian, would you mind pulling up the deposition

22 transcript for me, please.

23      Now, you remember giving a deposition in this case, right,

24 Miss Razo?  And in that deposition you were in a room with an

25 attorney and you had the opportunity to provide your full,

3472

ANGELICA RAZO - CROSS

1  frank testimony, right?

2  A.  Yes.

3  Q.  You had the opportunity, and you did, and you swore that

4  you told the truth, the whole truth, and nothing but the

5  truth?

6  A.  Yes.

7  Q.  The same oath you are under here today?

8  A.  Yes.

9  Q.  Okay.  And, Brian, it's going to be page -- yes.  There

10  you go.

11      Now, you see this portion of your deposition transcript on

12  the screen, right?

13  A.  Yes.

14  Q.  I want to read it and I want you to follow along with me.

15      It was asked, "Do any of these changes" -- referring to SB

16  1.  I'm going to reread it, but referring to SB 1, it says,

17  "Do any of those changes have a financial impact?"

18      You responded, "They have a programmatic impact."

19      Now, I do want to follow-up real quick and go to lines 8

20  through -- excuse me -- 19 through 22.  Thank you for pulling

21  it up, Brian.

22      Following up the attorney asked a question and you

23  responded, I'm going to read this verbatim.  It says, "But

24  there's no specific financial impact that you are aware of,

25  right?"

ANGELICA RAZO - CROSS

1      Your response was, "No."

2  A.  Can I see the --

3  Q.  I read that correctly, right?

4  A.  Yes.

5      Do you mind showing the portion of the deposition leading

6  up to that conversation?

7  Q.  Brian, is it all right if we pull up the entire page of 64

8  of that deposition transcript.

9  A.  Sorry.  Can you go up.

10  Q.  All right.  Miss Razo, I know you're reading this right

11  now but I believe your attorney will have the opportunity to

12  come up here and ask questions about this if they want to.  So

13  if they would like to make a note of this, they can come back

14  up here and ask you about those particular questions, okay,

15  and just for the sake of convenience and since we all probably

16  want a little bit of dinner right now we're going to go ahead

17  and move on.

18      All right.  So, Miss Razo, let's move on to voter

19  education and training in general, okay, just from a broad

20  perspective.  Now, broadly speaking, Mi Familia Vota, as we've

21  already established, trains and educates voters?

22  A.  Yes.

23  Q.  And as an organization that trains and educates voters it

24  has to update its training and education materials when any

25  change is made to election laws in Texas, right?

1   A.   Yes.

2   Q.   Now, Mi Familia Vota uses resources to educate voters on

3   changes to the election laws regardless of whether it agrees

4   with those changes or not?

5   A.   Yes, and some changes are more time intensive and costly

6   than others.

7   Q.   And so you would agree with me that a bill the size of SB

8   1 that changed so many parts of Texas election laws would have

9   required a lot of resources for Mi Familia Vota regardless of

10  whether Mi Familia Vota agreed with SB 1 or not?

11  A.   SB 1 had specific impacts in our community that we were

12  seeing as we were rolling out our work and so I know that

13  we're spending more time because SB 1 rolled out specific

14  provisions that means we're having lengthier conversations

15  with our community members that puts us at a greater risk

16  because of some of the provisions but our mission is to be

17  able to get every single Latino voter that wants to

18  participate, give them the resources and tools to be able to

19  do that.

20  Q.   And just to make clear, those resources are not dependent

21  on whether you agree with SB 1 or not?

22  A.   Can you rephrase that question, please.

23  Q.   Absolutely.  So, as you mentioned, Mi Familia Vota changes

24  some of its materials because changes to the election law

25  occur, right?

ANGELICA RAZO — CROSS

1   A.   Yes.

2   Q.   And that is whether you agree with those changes to

3   election laws or not?

4   A.   Yes.

5   Q.   Okay.  Now let's move on to some general challenges Mi

6   Familia Vota has regarding SB 1, okay?

7   A.   Okay.

8   Q.   Now, for all the provisions of SB 1 that Mi Familia Vota

9   challenges today and in this lawsuit you are not aware of the

10  impact of those challenges on the Latino community versus any

11  other racial group?

12  A.   I can't speculate for other groups.  I do know the impact

13  it's had on our community and I do know how we, as an

14  organization, will continue to have to address that impact for

15  years forward.

16  Q.   Right.  And like you said, you can't speculate as to what

17  other — what the impact may be on other racial groups, right?

18  A.   That's true.

19  Q.   So you don't know the impact on the Latino and Latino

20  community versus any other racial group based on SB 1's

21  provisions, right?

22  A.   We have seen our community get impacted disproportionate

23  by policies and we continue to see that through SB 1.

24  Q.   But you don't know whether SB 1 impacts Latinos more or

25  less than any other racial group because you haven't assessed

ANGELICA RAZO — CROSS

1  that, right?

2  A.   In the work that we do any voter can come to us with

3  issues, right, and while we're targeting the Latino community

4  it is the issues that we continue to see frequently in the

5  Latino community, and again, we can point back to how SB 1 has

6  caused an impact and is going to continue to cause an impact.

7  Q.   But that analysis is only cabined to the community you are

8  targeting and are familiar with, correct?

9  A.   Can you repeat that one more time?

10 Q.   I believe you were talking about how you particularly

11 target the Latino community, right?

12 A.   Yes.

13 Q.   And how you are familiar with the alleged impacts of SB 1

14 on the Latino community?

15 A.   Yes.

16 Q.   And so you do not — you are not familiar with other

17 communities besides the community you are familiar with,

18 right, such as other racial groups?

19 A.   Sure.

20 Q.   Okay.  Now, on direct you mentioned several things that

21 were in 2020, such as 24-hour voting, drive-thru voting,

22 correct?

23 A.   Yes.

24 Q.   Now, you are aware that some provisions of SB 1 require

25 early voting to be offered at least nine hours between the

ANGELICA RAZO – CROSS

1  hours of 6:00 a.m. and 10:00 p.m., right.

2  A.  Yes.

3  Q.  You are also aware that some provisions of SB 1 require

4  that polls in certain counties be open for at least twelve

5  hours on the last Sunday of the early voting period between

6  the hours of 6:00 a.m. and 10:00 p.m.?

7  A.  Can you repeat that last provision that you are talking

8  about.

9  Q.  Sure.  I know it was a mouthful.  So you're also aware

10  that other provisions of SB 1 require that polls in certain

11  counties be open for at least twelve hours on the last

12  Saturday of early voting?

13  A.  Yes.

14  Q.  And you're also aware that that applies to the last Sunday

15  of early voting as well?

16  A.  Yes.

17  Q.  Okay.  Now, you don't have — now, you are not aware of

18  any evidence that Latinos work hours outside of that time

19  frame more than any other race?

20  A.  Can you rephrase that question?

21  Q.  Sure.  So you don't have any evidence that Latinos work

22  more hours outside of that time frame than any other race,

23  right?

24  A.  I know that the Latino community members that we're

25  targeting and trying to encourage to vote are definitely

ANGELICA RAZO – CROSS

1   concerned about their lifestyle, their work hours, that might
2   not necessarily meet what that provision lays out.
3   Q.  Understood.  Understood.  I'm talking about you don't have
4   any evidence that Latinos work more hours than other racial
5   groups, right?
6   A.  I can't speculate to that.
7   Q.  Understood.  And you also talked about drive-thru voting,
8   do you remember that?
9   A.  Yes.
10  Q.  And you also mentioned curbside voting, right?
11  A.  Yes.
12  Q.  You are aware that curbside voting is still available in
13  Texas?
14  A.  Yes.
15  Q.  So even though drive-thru voting is no longer allowed, you
16  would still agree with me that curbside voting is eligible to
17  voters who qualify for curbside voting?
18  A.  Yes.
19  Q.  And you don't have any evidence that ending drive-thru
20  voting has more of an impact on Latino voters than other
21  racial groups?
22  A.  I know the electorate we're working with is very dynamic,
23  and again, more voting options allows people to be able to go
24  vote at a time that's at a time and place and method that's
25  reasonable for them and convenient for them.

ANGELICA RAZO — CROSS

1  Q.  Understood.  But just as you mentioned you are familiar

2  with the community you work with, not other communities,

3  right?

4  A.  Right.  I cannot speculate to other communities.

5  Q.  Understood.  Now, you also mentioned calling back some

6  poll workers on direct, do you remember that?

7  A.  Yes.

8  Q.  You are not aware of any poll worker who has been

9  investigated or prosecuted, in any way, as a result of SB 1?

10  A.  No.

11  Q.  And you also mentioned some concerns relating to poll

12  watchers under SB 1?

13  A.  Yes.

14  Q.  And I believe your concern was that if a presiding judge

15  has to consistently remove a poll worker then it could

16  allegedly cause a burden on the community you work with as a

17  result of SB 1, is that correct?

18  A.  Any voter that's being served at that polling location.

19  Q.  But you don't have any evidence that poll watchers

20  routinely breach the peace and aren't removed, right?

21  A.  Voters have raised concerns to us about disturbance at a

22  poll.

23  Q.  But you don't have evidence that poll watchers routinely

24  breach the peace and are not removed?

25  A.  I don't have any evidence and that's typically because

ANGELICA RAZO – CROSS

1  people don't always report that.

2  Q.  But you still don't have any evidence, right?

3  A.  Correct.

4  Q.  Now, you also mentioned Section 7.04 of SB 1., do you

5  remember that, the vote harvesting provisions?  Okay.  You are

6  aware that 7.04 of SB 1 bans vote harvesting?

7  A.  Yes.

8  Q.  And you understand that vote harvesting is something that

9  we don't want to happen in our elections, right?

10  A.  Sure.

11  Q.  Now, Mi Familia Vota makes sure that they do not engage in

12  vote harvesting?

13  A.  Correct.

14  Q.  They scrupulously ensure that every team member is in

15  compliance with the law?

16  A.  Yes.

17  Q.  Mi Familia Vota makes sure that they –– that every

18  constituent is not going out and making mistakes simply

19  because they are being compensated?

20  A.  Correct.

21  Q.  But you don't know if every organization is as scrupulous

22  or diligent as Mi Familia Vota, right?

23  A.  I can't speak for other organizations.

24  Q.  And you are also not aware of any poll worker or

25  constituent being prosecuted or investigated in any way as a

ANGELICA RAZO – REDIRECT

1  result of Section 7.04 of SB 1?

2  A.  As of right now, no.

3        MR. SZUMANSKI:  At this time I have no further

4  questions.  Thank you for your time, Miss Razo.

5        At this time I pass the witness.

6        MR. NICHOLS:  One, very briefly.

7  BY MR. NICHOLS:

8  Q.  Miss Razo, appreciate your time.  So just to follow up a

9  little bit on the canvassing efforts that Mi Familia Vota

10  engages in, in communities, knocking on doors.

11  A.  Yes.

12  Q.  So as I understand your testimony, none of those efforts

13  that are being done by the folks that are either paid or

14  volunteered to work with your group are intended to deliver

15  votes for a specific candidate or measure, correct?

16  A.  Correct.

17        MR. NICHOLS:  Thank you.

18        That's all I have, Judge.

19        THE COURT:  Anything else?

20        MISS HOSTETLER:  Very briefly, Your Honor.

21                    REDIRECT EXAMINATION

22  BY MISS HOSTETLER:

23  Q.  You spoke earlier about having to change the way you

24  fundraise grants because of SB 1.  Can you — when do you

25  typically start dealing with — when do you grant?

3482

ANGELICA RAZO – REDIRECT

1  A.  Throughout the entire year the most intensive time periods
2  are in the first quarter of the year and sometimes in the
3  middle of the year.  It depends on the grant cycles of the
4  philanthropic institutions that we're trying to seek funds
5  from.
6  Q.  And is the reason that –– can you explain just very
7  briefly, I know we've touched on this, but it gets to this
8  financial question, why you pulled back from issue–based grant
9  writing?
10  A.  Yes.  We wanted to have more general operation support.
11  Those types of funds are not easy to come by.  You know, it
12  typically takes building a lot of trust with the philanthropic
13  institution, you know, showcasing your work, being able to
14  deliver outcomes on what we are say we are going to deliver,
15  and it's more time sensitive than just seeking
16  programmatic–issued grants.
17      If the staff that we have can only do program or
18  issue–specific work and really does not allow them to engage
19  in some of that election and civic engagement work that we're
20  now seeing everyone on the staff needs to engage with, really
21  locks us in and we never want to use funds that were for one
22  specific purpose for another purpose.
23      Our fundraising strategy has gone towards let's raise more
24  general operational support although that is a harder and more
25  time–intensive way of fundraising.

3483

ANGELICA RAZO – REDIRECT

1  Q.  So does — when SB 1 have — does having a programmatic

2  impact, does that also sometimes mean having a financial

3  impact too?

4  A.  Yes.

5  Q.  So when you said SB 1 doesn't have a financial impact,

6  would you say that was a misstatement and why did you say

7  that?

8  A.  I misspoke.  And then the deposition was done in

9  April 2022.  We went through a pretty major mid-term election.

10      Since then in this past year because we've undergone a

11  major election and we've got to see how we divert resources in

12  the election work the impact SB 1 is having and then looking

13  ahead of 2024 it's starting to become more and more clear how

14  we finesse our fundraising strategy, how we finesse the way we

15  are using our resources, and really feeling like we have a

16  robust budget and that flexibility to be able to engage with

17  voters, knowing the conditions that SB 1 is — that the

18  conditions that SB 1 has for us as we're going into a major

19  election year and coming out of a major mid-term year.

20          MISS HOSTETLER:  Thank you so much.

21          THE COURT:  Anything based on that?

22          MR. SZUMANSKI:  No, Your Honor.

23          MR. NICHOLS:  No, Judge.

24          THE COURT:  You are excused, ma'am.  Thank you.

25          THE WITNESS:  Thank you.

3484
ANGELICA RAZO — REDIRECT

 1              THE COURT:  Anything else we need to take up before
 2  we leave for today?
 3              MR. KERCHER:  Only one thing, Your Honor.
 4              We have worked together with the plaintiffs to try
 5  and figure out what the rest of this week looks like,
 6  particularly with a short Thursday.  We had talked amongst
 7  ourselves a little bit about whether the Court would be open
 8  to starting at 8:30 on Thursday morning.
 9              THE COURT:  So we are starting at 8:30 tomorrow,
10  Thursday morning, but we have other matters.
11              MR. KERCHER:  I see.  Okay.
12              THE COURT:  I'll start 8:30 tomorrow if you need to.
13  I saw we have six witnesses for tomorrow.
14              MR. KERCHER:  I will defer to plaintiffs on that.
15  For Thursday that probably won't solve our problem because I
16  think we have whittled it down to two witnesses.  It's a
17  question of whether we're going to be able to fit all of that
18  into one day.
19              THE COURT:  And like I said we can forego lunch, if
20  you all want to do that.
21              MISS PERALES:  Yes, Your Honor, we'd be happy to
22  start at 8:30 in the morning.
23              THE COURT:  Tomorrow?
24              MISS PERALES:  Yes.
25              THE COURT:  We'll see you at 8:30.

*Gigi Simcox, RMR, CRR*

—o0o—

1       I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.  I

further certify that the transcript fees and format comply

with those prescribed by the Court and the Judicial Conference

of the United States.


Date:  10/10/23         /s/  *Gigi Simcox*
                    United States Court Reporter
                    262 West Nueve Street
                    San Antonio TX 78207


                    /s/  *Chris Poage*
                    United States Court Reporter
                    262 West Nueve Street
                    San Antonio TX 78207